# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | |
|---|---|
| IN RE: VALSARTAN, LOSARTAN, AND IRBESARTAN PRODUCTS LIABILITY LITIGATION<br><br>This document relates to:<br><br>*All Actions* | No. 1:19-md-2875-RBK<br>Hon. Robert Kugler<br>Hon. Joel Schneider |

## COMPENDIUM OF UNPUBLISHED CASES CITED IN PLAINTIFFS' APPENDIX OF STATE LAW CHARTS

## TABLE OF CONTENTS

**Case**                                                                                    **Tab**

*Animal Hosp. of Nashua, Inc. v. Antech Diagnostics*,
    No. 11cv448, 2012 WL 1801742 (D.N.H. May 17, 2012)…………………………….1

*Avila v. CNH Am. LLC*,
    2007 WL 2688613, *1 (D. Neb. Sept. 10, 2007)………………………………………...2

*Brown v. Saint–Gobain Performance Plastics Corp*.,
    2017 WL 6043956 (D.N.H. Dec. 6, 2017)……………………………………………3

*Estes v. Lanx, Inc.*,
    2015 U.S. Dist. LEXIS 171184 (N.D. Miss. Dec. 23, 2015)…………………………4

*Jarrett v. Wright Med. Tech., Inc*.,
    2019 U.S. Dist. LEXIS 104086 (S.D. Ind. June 21, 2019)………………………….5

*Johnson v. Eli Lilly & Co*.,
    2015 U.S. Dist. LEXIS 30537 (S.D. Ohio Mar. 12, 2015)………………………….6

*Lamping v. Am. Home Prods., Inc.*,
    2000 WL 35751402 (Mont. Dist. Ct. Feb. 2, 2000)………………………………….7

*Liberty Mut. Fire Ins. Co. v. Cagle's, Inc.*,
    2010 WL 528867  (N.D.Ga. Dec. 16, 2010)……………………………………………8

*Miranda v. Dacruz*,
    2009 WL 3515196 (R.I. Super. Ct. Oct. 26, 2009)…………………………………...9

*Sullivan v. Saint-Gobain Performance Plastics Corp*.,
    2019 U.S. Dist. LEXIS 221612 (D. Vt. Dec. 27, 2019)……………………………..10

*Waithe v. Arrowhead Clinic, Inc.*, No. CV 409–021,
    2012 WL 776916 (S.D.Ga. Mar. 7, 2012)…………………………………………...11

Tab 1

2012 WL 1801742
United States District Court, D. New Hampshire.

ANIMAL HOSPITAL OF NASHUA, INC., Plaintiff
v.
ANTECH DIAGNOSTICS and
Sound–Eklin, Defendants.

No. 11–cv–448–SM.
|
May 17, 2012.

**Attorneys and Law Firms**

Adam J. Chandler, Robert M. Fojo, Nelson Kinder
Mosseau PC, Manchester, NH, for Plaintiff.

Julie B. Brennan, Brian H. Lamkin, Manchel & Brennan, P.C.,
Newton, MA, for Defendants.

***ORDER***

STEVEN J. McAULIFFE, District Judge.

**\*1** Plaintiff, Animal Hospital of Nashua, Inc. ("AHN"),
is suing its suppliers of veterinary diagnostic services and
equipment support services, VCA Cenvet, d/b/a Antech
Diagnostics ("Antech"), and Sound Technologies, Inc., d/
b/a Sound–Eklin ("Sound–Eklin"). AHN seeks to recover
economic losses incurred as a result of defendants' failure to
provide adequate services and equipment.

Before the court is defendants' motion for judgment on
the pleadings with respect to several of plaintiff's claims
(document no. 27). For the reasons given, defendants' motion
is granted in part and denied in part.

**Legal Standard**

"A motion for judgment on the pleadings under Federal Rule
of Civil Procedure 12(c) is treated much like a Rule 12(b)(6)
motion to dismiss." Estate of Bennett v. Wainwright, 548
F.3d 155, 163 (1st Cir.2008) (citing Pérez–Acevedo v. Rivero–
Cubano, 520 F.3d 26, 29 (1st Cir.2008)). When ruling on a
motion for judgment on the pleadings under Rule 12(c), the
court takes the facts pled in the light most favorable to the
plaintiff and "draw[s] all reasonably supported inferences in

[its] favor." Abraham v. Woods Hole Oceanographic Inst.,
553 F.3d 114, 115 (1st Cir.2009) (citation omitted). "[T]o
survive a Rule 12(b)(6) motion (and, by extension, a Rule
12(c) motion) a complaint must contain factual allegations
that 'raise a right to relief above the speculative level.' "
Gray v. Evercore Restructuring L.L.C., 544 F.3d 320, 324
(1st Cir.2008) (citation omitted). In other words, a Rule 12(c)
motion should be granted "if the complaint fails to state facts
sufficient to establish a 'claim to relief that is plausible on
its face.' " Id. (quoting Trans–Spec Truck Serv., Inc. v.
Caterpillar Inc., 524 F.3d 315, 320 (1st Cir.2008)).

**Background**

The following facts are drawn from AHN's complaint, and are
construed favorably to AHN.

AHN is a veterinary hospital located in Nashua, New
Hampshire, and owned by Dr. Leo G. Bishop. Donna Cole
is AHN's chief executive officer. In 2008, Antech, a provider
of veterinary diagnostic and clinical laboratory services,
approached Bishop and Cole. It represented itself as a
"leading animal care company" offering "better pricing than
[its] competitors with equivalent or superior service and
quality." Antech offered to provide AHN with lab services, an
x-ray system, and a loan of $100,000, in exchange for AHN's
commitment to use Antech's laboratory services for six years
and make an annual payment to Antech of $200,000 during
that period.

On August 1, 2008, AHN and Antech entered into a Loan
Service Agreement and an Equipment Service Agreement.
Under the agreements, Antech was to provide "all veterinary
diagnostic and clinical laboratory Services" to AHN for six
years, but AHN was free to "use a laboratory other than a[n]
Antech Lab to perform services that a[n] Antech lab cannot
perform." Amended Complaint, pars. 14, 15, document
no. 17. Under the Equipment Services Agreement, Antech
provided AHN with an x-ray system and other equipment
manufactured by Sound Technologies, Inc. (collectively
"STI Equipment"), and it purchased service and warranty
coverage to support AHN's use of the equipment (the "Service
and Warranty Agreement"). Defendant Sound–Eklin was a
party to the Service and Warranty Agreement. [1] Under that
agreement, Sound–Eklin warranted that the STI Equipment
would be free from defects for one year, and it further

2012 WL 1801742, 2012 DNH 087

promised to provide, among other things, remote diagnostics, call support, and software downloads and fixes.

**\*2** Starting sometime in 2009, "numerous" laboratory test results AHN received using the STI Equipment and Antech's laboratory services were "incorrect." AHN told Antech of the errors, but Antech failed to address or respond to AHN's concerns.

In February of 2011, two and one-half years into the contract term, AHN began experiencing significant problems with the STI Equipment. It soon discovered that Antech and SoundEklin had discontinued the x-ray system's "imaging receptor"—a piece of hardware that captures images during exposure. It also learned that defendants had discontinued software support for the x-ray system.

In August 2011, AHN brought its business to an alternative laboratory services provider. When Antech threatened litigation, AHN, under protest and subject to a reservation of its rights, repaid Antech the remaining balances on the loan and all open invoices, and it made the STI Equipment available for pick-up by Antech.

AHN then filed suit in this court alleging that it incurred costs in excess of $450,000 as a result of defendants' conduct. It asserts claims for breach of contract, breach of the covenant of good faith and fair dealing, negligence, negligent misrepresentation, fraud, unjust enrichment, and violation of New Hampshire's Consumer Protection Act.

Defendants move for judgment on the pleadings with regard to the consumer protection and unjust enrichment claims, and as to all tort claims.

### Discussion

#### I. *Tort Claims*
Defendants seek dismissal of the tort claims primarily on grounds that this dispute arises from the parties' contractual relationship and tort law offers no remedy. They point out, correctly, that AHN alleges damages solely for economic losses. Tort claims brought to secure relief only for economic losses are generally barred under the "economic loss doctrine". [2] *See 2yorgo,* *Plourde Sand & Gravel Co. v. JGI Eastern, Inc.,* 154 N.H. 791, 794 (2007); *Robinson Helicopter Co. v. Dana Corp.,* 102 P.3d at 272 (Cal.2004)).

The doctrine is a "judicially-created remedies principle that operates generally to preclude contracting parties from pursuing tort recovery for purely economic or commercial losses associated with the contract relationship." *Plourde,* 154 N.H. at 794 (quotation omitted). [3]

But there are exceptions. *See generally id.* at 794–801. A party may recover solely economic losses in tort, for example, if he shows that the losses resulted from defendant's breach of an independent duty arising "outside the terms of the contract." *Id.* at 794. *See also Robinson Helicopter,* 102 P.3d at 273–74.

Here, in its general negligence counts (Counts III and X), AHN alleges that defendants owed it a duty to use their professional "skill and diligence ... in connection with [their] responsibilities to provide ... services." The "services" identified are the same as those specified in the Agreements: "veterinary diagnostic and clinical laboratory services" and "equipment support and service, remote diagnostics, software downloads, fixes, and enhancements, and other remote solutions." Amended Complaint, Count III, par. 112; Count X, par. 151, document no. 17. In short, AHN posits duties owed by defendants that arise from the terms of the contracts —and not from "outside" the contractual relationship. The general negligence claims, Counts III and X, are, therefore, barred under the economic loss doctrine. *See Deutsche Bank Nat'l Trust Co. v. Fadili,* 2011 WL 4703707, at \*9 (D.N.H. Oct. 4, 2011) (McCafferty, M.J.) (holding negligence claim was barred by the economic loss doctrine where "the factual allegations supporting [the] negligence claim are virtually identical to those supporting [the] breach of contract claim."). [4]

**\*3** As for AHN's negligent misrepresentation claims, those, too, are barred. Negligent misrepresentation claims can avoid dismissal under the economic loss doctrine, *see Plourde,* 154 N.H. at 799, but only when they allege "independent, affirmative misrepresentations unrelated to the performance of the contract." *Wyle v. Lees,* 162 N.H. 406, 411–12 (2011). In other words, the alleged misrepresentation must not " 'concern the quality or characteristics of the subject matter of the contract or otherwise relate to the offending party's expected performance.' " *Id.* at 411 (quotation omitted).

Case 1:19-md-02875-RMB-SAK   Document 577-4   Filed 09/18/20   Page 6 of 112
PageID: 12123
Animal Hosp. of Nashua, Inc. v. Antech Diagnostics, Not Reported in F.Supp.2d (2012)
2012 WL 1801742, 2012 DNH 087

Here, AHN identifies as representations of "fact" Antech's statements (1) that it would "provid[e] a functioning X-ray system" and "a laboratory that produced correct results and/or provided proper and reliable service"; (2) "that it would respond in dealing with both the X-ray System and any problems with erroneous laboratory results"; and (3) that it would "provid[e] a level of service" that was "superior or equivalent to its competitors." Amended Complaint, Count IV, par. 116, document no. 17. AHN further alleges that Sound–Eklin represented that it would "provid[e] a functioning X-ray System, and that it would respond in dealing with problems or deficiencies associated with the X-ray System." *Id.* at Count XI, par. 155.

As an initial matter, Antech's statement about the quality of its service, as pled, constitutes "mere puffery," and cannot support a misrepresentation claim.[5] The remaining statements, although not plainly puffery, fare no better since they relate to "the quality or characteristics of the subject matter of the contract" or to defendants' "expected performance." *Wyle,* 162 N.H. at 411. That is, AHN's negligent misrepresentation claims, Counts IV and XI, are "based only on breach of ... contractual dut[ies]," *id.,* and so, are barred by the economic loss doctrine.[6]

AHN's fraud claim (Count VI) also does not survive, but for a different reason. AHN fails to plausibly allege that Antech had the fraudulent intent required to turn a mere promise into an actionable statement of fact.

In its fraud claim, AHN alleges that Antech intentionally made false statements of fact on which AHN reasonably relied to its detriment. The alleged false "facts" on which AHN is said to have reasonably relied are identified as statements by Antech (1) that it was a "leading animal care company"; (2) that it would offer "better pricing than [its] competitors with equivalent or superior service and quality"; (3) that it would "provide AHN with ... X-ray equipment worth $95,000 ... $100,000 in cash, and ... 'capitation billing' "; and (4) that "it would fulfill and perform all of the terms of the Service Agreements." Amended Complaint, Count VI, pars. 128–131, document no. 17.

Of course, Antech's alleged "puffery" about its superior pricing and leading position in the industry are not actionable. What is left are mere promises. Under both New Hampshire and California law, " 'a promise is not a statement of fact.' " *See Yorgo Foods, Inc. v. Orics Indus., Inc.,*

2011 WL 4549392, *12 (D.N.H. Sept. 29, 2011) (quoting *Hydraform Prods. Corp. v. Am. Steel & Aluminum Corp.,* 127 N.H. 187, 200 (1985)); *Tarmann,* 2 Cal.App. 4th at 158. Nevertheless, AHN's fraud claim could avoid dismissal by plausibly alleging that Antech " 'at the time it [made its promises], ... had no intention to fulfill' " them. *Yorgo Foods,* 2011 WL 4549392, at *12, *quoting Thompson v. H.W.G. Group,* 139 N.H. 698, 701 (1995 ) ("[A] promise can imply a statement of material fact about the promisor's intention and capacity to honor the promise.") (quotation omitted); *Tarmann,* 2 Cal.App. 4th at 158–159 & n. 2 (promises made with "actual contemporaneous intent not to perform" are misrepresentations of fact actionable as "actual fraud").

**\*4** Here, the amended complaint alleges, at least generally, that Antech had such fraudulent intent at the time it promised to provide money, equipment, services, and support to AHN. Specifically, it alleges "on information and belief" that Antech made those promises "with knowledge of their falsity." Amended Complaint, document no. 17, Count VI, par. 132. Accepting that allegation as an assertion—albeit a general one—that Antech did not intend to fulfill its promises when they were directly made, still it falls short.

Although, in a claim for fraud, a defendant's knowledge or state of mind may be "alleged generally," Fed.R.Civ.P. 9(b), the general allegation of fraudulent intent here is directly contradicted by specific factual allegations in the complaint. *See Carrol v. Xerox Corp.,* 294 F.3d 231, 243 (1st Cir.2002) (complaint failed to state claim for fraud and misrepresentation where general allegation that plaintiff reasonably relied on misrepresentations was contradicted by specific factual allegations); *see also Libby v. Merril,* 2003 WL 21756830, at *4 (D.Me. July 29, 2003) ("bald assertion" that defendant acted pursuant to "policy or regulation" not accepted as true where it was "undermined" by other allegations).

With regard to Antech's promise to provide equipment, the amended complaint states that "[o]n or after" the parties executed the Equipment Service Agreement, "Antech provided AHN with the STI Equipment." Amended Complaint, par. 31, document no. 17. The complaint further alleges that "AHN received" money from Antech in the form of a $125,000 loan. *Id.* at par. 60. With regard to Antech's promise to provide laboratory services, the amended

Case 1:19-md-02875-RMB-SAK    Document 577-4    Filed 09/18/20    Page 7 of 112
PageID: 12124
Animal Hosp. of Nashua, Inc. v. Antech Diagnostics, Not Reported in F.Supp.2d (2012)
2012 WL 1801742, 2012 DNH 087

complaint asserts that Antech provided such services, but alleges that, starting sometime in 2009, "numerous laboratory test results" were "incorrect." *Id.* at par. 50. With regard to Antech's promise to provide continuing support for the equipment and software, the amended complaint alleges that Antech's defaults did not begin until February 2011, two and one-half years into the six-year contractual period. *Id.* at par. 34.

The picture painted by the specific allegations is one of Antech undertaking to perform its contractual obligations, but failing, as the performance period progressed, to fulfill its obligations, to AHN's economic detriment. Absent more specific and pertinent factual allegations, the amended complaint does not adequately allege that Antech had no intention of keeping its contractual promises at the time they were first made.

AHN's conclusory allegation of fraudulent intent is also not saved by its specific allegation that Antech's conduct was part of a "corporate pattern and practice" of wrongful conduct—as evidenced by similar lawsuits filed in 2011 involving Antech and other animal hospitals. *See* Amended Complaint, Count VI, par. 132, document no. 17. An adequate inference of fraudulent intent does not arise from the fact that defendants failed to fulfill virtually identical contractual obligations owed to other similarly-situated customers.

## II. *CPA Claim*

**\*5** AHN alleges in Counts V and XII that defendants committed unfair and deceptive trade practices in violation of N.H.Rev.Stat. Ann. ("RSA") 358–A. It says defendants' deceptive practices included "providing an X-ray System that became obsolete"; "providing a laboratory that frequently produced erroneous results and/or provided poor service"; "non-responsiveness" to problems relating to the "obsolete X-ray System" and to "the erroneous lab results." Amended Complaint, Count V, par. 122; Count XII, par. 161.

New Hampshire's Consumer Protection Act makes it "unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state." *RSA 358–A:2.* Unfair or deceptive acts include "[r]epresenting that goods or services have ... uses, benefits, or quantities that they do not have," and "[r]epresenting that goods or services are of a particular standard, quality, or grade, ... if they are of another." *RSA 358–A:2,* V, VII. The Act also reaches

any other unfair or deceptive practice that "attain[s] a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." *Barrows v. Boles,* 141 N.H. 382, 390, 687 A.2d 979 (1996) (quotation omitted). *See also Tagliente v. Himmer,* 949 F.2d 1, 7 (1st Cir.1991) (applying "rascality" test).

Defendants argue that AHN has not alleged that they engaged in any conduct specified in the Act or rising to the requisite level of "rascality." AHN responds that it has plausibly alleged that defendants falsely represented that their goods and services had "uses, benefits, or quantities" which they did not have, or that the goods and services met "a particular standard, quality, or grade" which they did not meet. AHN further contends that defendants engaged in "unfair, unethical, and oppressive conduct."

To state a claim under the Act for misrepresentations relating to the quality of a good or service, a plaintiff must allege that defendant misrepresented a "*particular* standard or [level of] quality." *Private Jet Serv. Group, Inc. v. Sky King, Inc.,* 2006 WL 2864057, at \*5 (D.N.H. Oct. 4, 2206) (DiClerico, J.) (defendant's promises to "keep its aircraft operative and airworthy" and to provide "high quality" services and equipment were "too vague" to support a claim for misrepresentation under *RSA 358–A:2,* VII) (emphasis added). Here, AHN has not alleged that defendants made anything more than vague or general puffery-type representations with respect to the quality of their goods and services.

AHN has also not alleged any conduct that meets the "rascality" standard. Both parties are business entities who negotiated an arms-length contractual relationship. Although the Act does apply to business-to-business transactions, *see Mountain Platform Tennis, Inc. v. Sherwinn–Williams Co.,* 40 F.3d 492, 497 (1st Cir.1994), it is "especially difficult" to show rascality in such circumstances. *Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp.,* 72 F.3d 190, 200 (1st Cir.1995) (applying rascality standard under the Massachusetts consumer protection law). *See also Wentworth–Douglass Hosp. v. Young & Novis,* 2012 WL 1081172, at \*4 (D.N.H. March 30, 2012) ("[W]hat is 'rascality' in a transaction between a seller and an ultimate consumer may be nothing more than 'rough and tumble' where two businesses are involved."). In the "rough and tumble" business world, disputes over broken promises ordinarily will not rise to a level sufficient to support a claim

2012 WL 1801742, 2012 DNH 087

under the Act. *See* 🔖 *Yorgo Foods,* 2011 WL 4549392, at *13.

**\*6** That is so here, at least as the facts have been pled. As discussed, the alleged wrongful conduct relates entirely to defendants' failures to fulfill their contractual obligations. No additional facts are alleged that might suggest a degree of rascality. The fact that defendants are involved in other, similar litigation, may suggest a general inability or unwillingness to perform their contractual obligations, but does not suggest why, and, of course, plaintiff has presumably pled all facts it deemed relevant to this case in its amended complaint.

Accordingly, defendants' motion for judgment on the pleadings as to AHN's claims under New Hampshire's Consumer Protection Act, Counts V and XII, is granted.

III. *Unjust Enrichment*
Defendants' correctly urge dismissal of AHN's claims for unjust enrichment, Counts VII and XIII, on grounds that recovery under that equitable theory is not available when the parties' relationship is governed by a valid contract. *See* 🔖 *Yorgo Foods,* 2011 WL 4549392 at *12 ("A cause of action for unjust enrichment does not lie when a valid unrescinded

contract governs the rights of the parties."). But AHN is equally correct in arguing that it may pursue a claim for unjust enrichment, as an alternative theory of liability, in case the court ultimately finds that no enforceable contract existed between the parties—an issue potentially raised by defendants' denial of AHN's contractual allegations. *See* Answer to Amended Complaint, document no. 25, pars. 14–22 (denying language quoted verbatim from the Agreements).

Defendants' motion for judgment on the pleadings as to Counts VII and XIII is, therefore, denied.

### Conclusion

For these reasons, defendants' motion for judgment on the pleadings (document no. 27) is granted with regard to Counts III, IV, V, VI, X, XI, and XII, and denied with regard to Counts VII and XIII.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 1801742, 2012 DNH 087

### Footnotes

1    In 2004, Antech acquired Sound, a provider of medical technology equipment. In 2009, after the parties entered into their agreements, Antech acquired Eklin, a leading seller of digital radiology, ultrasound, and practice management software systems in the veterinary market. Antech merged Eklin and Sound to create Sound–Eklin, the second named defendant in this case.

2    The Agreements contain a California choice-of-law provision. The applicable law in California and New Hampshire is substantially in accord with respect to the issues raised in defendants' motion. Neither party argues otherwise.

3    The doctrine, under New Hampshire law, also bars tort claims for economic losses where the parties are not in privity, *see* 🔖 *Plourde,* 154 N.H. at 795. Plaintiff's contention that, notwithstanding the doctrine, it is entitled to assert tort claims "in the alternative" to its breach of contract claims, is a non-starter.

4    The court also rejects AHN's theory that its general negligence claims escape the reach of the economic loss doctrine because, as a laboratory, Antech owed AHN a special duty of care independent of its contractual obligations. AHN has not shown that such a duty exists. The cases it cites are inapposite because all involve the duty of care a laboratory owes to *patients* who are injured by erroneous lab results, *see e.g.* 🔖 *Garlick v. Quest Diagnostics, Inc.,* 2009 WL 5033949, at *10 (D.N.J. Dec. 14, 2009), or the duty of care a veterinarian

2012 WL 1801742, 2012 DNH 087

owes to a pet owner in its medical treatment of the animal. *See e.g.,* 📑 *de Mercado v. Superior Court,* 148 Cal.App. 4th 711, 716 (2007).

5       *See* 📑 *Evans v. Taco Bell Corp.,* 2005 WL 2333841, at *12 and n .19 (D.N.H. Sept. 23, 2005) (Diclerico, J.)

("[G]eneral claims to superiority" are " 'puffery' " and "do not amount to actionable representations."); *Cook, Perkiss & Liehe, Inc. v. Northern California Collection Serv., Inc.,* 911 F.2d 242, 246 (9th Cir.1990) (finding no false representation of fact in violation of the Lanham Act where defendant's statement that it could provide the same quality of service as competitors at a lower price was a non-actionable "general assertion[ ... ] of superiority rather than [a] factual misrepresentation").

6       The court necessarily rejects AHN's argument to the effect that its general allegation that each defendant "should have known that its representations were false" suffices as an allegation that defendants had no intention of fulfilling their contractual obligations. *See* 📑 *Tarmann v. State Farm Mut. Auto Ins. Co.,* 2 Cal.App. 4th 153, 158–159 (Cal.App. 6 Dist.1991) (The "specific intent" required to show that the "promisor did not intend to perform at the time he or she made the promise," "precludes pleading a false promise claim as a negligent misrepresentation.").

---

**End of Document**                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 2

2007 WL 2688613
Only the Westlaw citation is currently available.
United States District Court, D. Nebraska.

Cindy AVILA, individually and as
Personal Representative of the Estate of
Steven Avila, Deceased, et al., Plaintiffs,
v.
CNH AMERICA LLC, et al., Defendants.

No. 4:04CV3384.
|
Sept. 10, 2007.

**Attorneys and Law Firms**

Angela T. Pacheco, Brian W. Butcher, Jim R. Ross, Weitz, Luxenberg Law Firm, Fort Worth, TX, John D. Mixon, McCurdy, McCurdy Law Firm, Arlington, TX, L. William Kelly, III, Kelly, Schroeder Law Firm, Grand Island, NE, Lemuel M. Srolovic, Weitz, Luxenberg Law Firm, New York, NY, Nancy S. Eichler, Masry, Vititoe Law Firm, Westlake Village, CA, for Plaintiffs.

Brenton W. Vincent, Francis X. Lyons, S. Patrick McKey, Francis J. Higgins, Bell, Boyd Law Firm, Christopher F. Regan, Mark R. Ter Molen, Richard F. Bulger, Mayer, Brown Law Firm, Chicago, IL, Donald G. Blankenau, Blackwell, Sanders Law Firm, Lincoln, NE, Edward G. Warin, McGrath, North Law Firm, Thomas H. Dahlk, Blackwell, Sanders Law Firm, Brian C. Buescher, Patrick B. Griffin, Kutak, Rock Law Firm, Omaha, NE, for Defendants.

## MEMORANDUM AND ORDER

RICHARD G. KOPF, United States District Judge.

 *1 This matter is before the court on a motion for partial judgment on the pleadings filed by five defendants: (1) Unisys Corporation; (2) CNH America LLC; (3) Case New Holland, Inc.; (4) CNH Global N.V.; and (5) Fiatallis North America LLC f/k/a Fiatallis North America, Inc.[1] The motion concerns the first three counts of the plaintiffs' fourth amended complaint, alleging (1) simple negligence, (2) negligent failure to warn, and (3) negligent infliction of emotional distress. As to these three negligence claims, the defendants request that judgment be entered against eighteen plaintiffs who do not allege that they (or the minors they

represent) have sustained personal injuries, but who seek to recover damages for future medical monitoring. These plaintiffs are: (1) Cindy Avila; (2) David R. Bergholz; (3) Jeffrey L. Bergholz, individually and as next friend of S.L.B. and S.R.B., minors; (4) Rose Bergholz; (5) Warren Edghill; (6) Julia Foote; (7) Joanie Guerrero, as next friend of B.C.G. and B.C.G., minors, but not in her individual capacity; (8) Robert Guerrero; (9) Donald Jenkins; (10) Anthony Martinez; (11) Kris Mleczko; (12) Jason P. Ressler; (13) Barbara Schorle; (14) Bruce Schorle; (15) Cheri Schwieger; (16) Gordon Svoboda; (17) Sherri Tolle; and (18) Roxana Webb.

I agree with the defendants that damages are an essential element of any negligence cause of action brought under Nebraska law, which applies in this case. *See Brown ex rel. Watts v. Social Settlement Ass'n,* 259 Neb. 390, 610 N.W.2d 9, 11 (Neb.2000) ("For actionable negligence to exist, there must be a legal duty on the part of the defendant to protect the plaintiff from injury, a failure to discharge that duty, and damage proximately resulting from such undischarged duty."); 🚩 *Popple by Popple v. Rose,* 254 Neb. 1, 573 N.W.2d 765, 769 (Neb.1998) ("An action predicated on a duty to warn is essentially a negligence action, requiring a duty, breach, proximate cause, and damages."); *Catron v. Lewis,* 271 Neb. 416, 712 N.W.2d 245, 248–49 (Neb.2006) ("In Nebraska, where there is no impact or physical injury to the plaintiff, the plaintiff ... must show that [his or her] emotional distress is medically diagnosable and significant and is so severe that no reasonable person could have expected to endure it."). I also agree with the defendants that Nebraska law does not recognize a claim for medical monitoring when no present physical injury is alleged. *See* 🚩 *Trimble v. Asarco, Inc.,* 232 F.3d 946, 963 (8th Cir.2000) (predicting Nebraska Supreme Court would hold that residents of area near former lead smelter and refinery could not establish claim for future medical monitoring costs against owner and former operator of site, absent showing of any present physical injury), overruled on other grounds by 📄 *Exxon Mobil Corp. v. Allapattah Services, Inc.,* 545 U.S. 546, 125 S.Ct. 2611, 162 L.Ed.2d 502 (2005).

Because the eighteen plaintiffs listed above only claim a "[n]eed for future medical monitoring" in the appendix to the fourth amended complaint detailing the medical effects of each plaintiff's (or represented party's) alleged exposure to toxins,[2] their personal injury negligence claims will be dismissed with prejudice[3] as against the five defendants that

2007 WL 2688613

have moved for partial judgment on the pleadings. At this
time, however, I will *not* enter a final judgment pursuant to
Federal Rule of Civil Procedure 54(b) because these plaintiffs
have also alleged private nuisance and trespass claims that
are not subject to the pending motion,[4] and because not all
defendants have joined in the motion.

 **\*2**  The plaintiffs have filed a cross-motion to certify the
following question to the Nebraska Supreme Court in the
event the defendant's motion is not denied:

> Whether, under Nebraska law,
> plaintiffs exposed to toxins in their
> private domestic water supply alleging
> negligence, private nuisance, and
> trespass against the sources of the
> toxins may seek to recover the
> reasonable costs of future medical
> monitoring prescribed by a competent
> medical expert because of their
> exposures, where the subject plaintiffs
> do not allege a present physical injury
> as do others similarly exposed?

(Filing 242.) The plaintiffs' motion will be denied.

Whether to use a state's certification procedure is within
the " 'sound discretion of the federal court.' " *Perkins
v. Clark Equip. Co., Melrose Div.,* 823 F.2d 207, 209 (8th
Cir.1987) (quoting *Lehman Brothers v. Schein,* 416 U.S.
386, 391, 94 S.Ct. 1741, 40 L.Ed.2d 215 (1974)). Further, "
'[a]bsent a 'close' question and lack of state sources enabling
a nonconjectural determination, a federal court should not
avoid its responsibility to determine all issues before it.' " *Id.*
(quoting *Shakopee Mdewakanton Sioux Community v. City
of Prior Lake,* 771 F.2d 1153, 1157 n. 2 (8th Cir.1985) (1986)).
*See also Hatfield v. Bishop Clarkson Memorial Hosp.,* 701
F.2d 1266 (8th Cir .1983) (discussing various factors which
may affect certification decision, including closeness of the
question; lack of state precedent; conflicting public policy
aims; whether case involves federal question or is strict
diversity; and likelihood of legal issue recurring). Especially
considering that the Eighth Circuit made a determination
in 2000 that Nebraska law does not recognize medical
monitoring claims, and finding no significant changes in

Nebraska law since that time, I conclude that there is no
good reason to certify the plaintiffs' question to the Nebraska
Supreme Court.

Accordingly,

IT IS ORDERED that:

1. Plaintiffs' motion to certify a question to the Nebraska
Supreme Court (filing 242) is denied.

2. Defendants' motion for partial judgment on the pleadings
(filing 237) granted, as follows:

 a. All personal injury claims alleging negligence, negligent
    failure to warn, and negligent infliction of emotional
    distress (counts one, two, and three of the fourth
    amended complaint) brought by the following eighteen
    plaintiffs, who claim only a need for future medical
    monitoring, are dismissed with prejudice as against the
    defendants Unisys Corporation, CNH America LLC,
    Case New Holland, Inc., CNH Global N.V., and Fiatallis
    North America LLC f/k/a Fiatallis North America, Inc.:

 (1) Cindy Avila;

 (2) David R. Bergholz;

 (3) Jeffrey L. Bergholz, individually and as next friend of
 S.L .B. and S.R.B., minors;

 (4) Rose Bergholz;

 (5) Warren Edghill;

 (6) Julia Foote;

 (7) Joanie Guerrero, as next friend of B.C.G. and B.C.G.,
 minors, but not in her individual capacity;

 (8) Robert Guerrero;

 **\*3**  (9) Donald Jenkins;

 (10) Anthony Martinez;

 (11) Kris Mleczko;

 (12) Jason P. Ressler;

 (13) Barbara Schorle;

 (14) Bruce Schorle;

(15) Cheri Schwieger;

(16) Gordon Svoboda;

(17) Sherri Tolle; and

(18) Roxana Webb.

b. Property damage claims alleged by any of these plaintiffs in counts one, two, and three are not dismissed.

c. No claims are dismissed as against the defendants Fiatallis North America, Inc., Fiat S.p.A., and Cargill, Inc.

3. This order does not constitute a final judgment under Federal Rule of Civil Procedure 54(b).

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 2688613

## Footnotes

1    Fiatallis North America, Inc., is separately named as a defendant in this action, but it has not answered the fourth amended complaint or joined in the pending motion. The two other defendants to the action are Fiat S.p.A. and Cargill, Inc.

2    The appendix attached to the fourth amended complaint (filing 222) is a redacted document. The original document is filed separately under seal (filing 230).

3    Property damage negligence claims also alleged by thirteen of these plaintiffs are not subject to the defendant's motion and will not be dismissed.

4    The defendants restricted the scope of the motion in their reply brief by arguing only that "the three negligence counts should be dismissed with prejudice." (Filing 246, at 13, 14.) Thus, I have not considered whether these plaintiffs might be entitled to recover future medical monitoring costs by alleging claims for private nuisance (count four) and trespass (count five).

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 3

KeyCite Yellow Flag - Negative Treatment
Distinguished by Lath v. PennyMac Loan Services LLC, D.N.H., June 4, 2019

2017 WL 6043956

NOT FOR PUBLICATION
United States District Court, D. New Hampshire.

Kevin BROWN, et al.

v.

SAINT–GOBAIN PERFORMANCE
PLASTICS CORP., et al.

Civil No. 16–cv–242–JL
|
Signed 12/06/2017

**Attorneys and Law Firms**

Kevin Scott Hannon, Pro Hac Vice, Hannon Law Firm LLC, Denver, CO, Paul M. DeCarolis, Anthony Sculimbrene, Gottesman & Hollis PA, Nashua, NH, Hunter J. Shkolnik, Pro Hac Vice, Paul J. Napoli, Pro Hac Vice, Napoli Shkolnik PLLC, Melville, NY, Kirk C. Simoneau, Lawrence A. Vogelman, Nixon Vogelman Barry Slawsky & Simoneau PA, Manchester, NH, Louise R. Caro, Pro Hac Vice, Napoli Shkolnik PLLC, Coconut Grove, FL, Finis E. Williams, III, Williams Law Office, Concord, NH, for Kevin Brown, et al.

Bruce W. Felmly, Nicholas F. Casolaro, McLane Middleton, Manchester, NH, Douglas E. Fleming, III, Pro Hac Vice, Lincoln D. Wilson, Mark Cheffo, Pro Hac Vice, Patrick Curran, Pro Hac Vice, Paul A. LaFata, Pro Hac Vice, Sheila L. Birnbaum, Pro Hac Vice, Quinn Emanuel Urquhart & Sullivan LLP, New York, NY, for Saint–Gobain Performance Plastics Corp., et al.

**MEMORANDUM ORDER**

Joseph N. Laplante, United States District Judge

*1 Resolution of the defendants' motions to dismiss this environmental trespass action turns on whether the plaintiffs have pleaded injuries recognized by New Hampshire law. Plaintiffs in this consolidated, putative class action allege that defendant Saint–Gobain Performance Plastics Corporation's Merrimack, New Hampshire plant released chemicals that contaminated the local groundwater.[1] They seek to recover against Saint–Gobain and the facility's general manager, Gwenael Busnel, for damages to plaintiffs' property, including diminished property value, and accrual of costs associated with monitoring for potential injuries caused by ingesting the chemicals at issue.

The court has subject-matter jurisdiction over this action under the Class Action Fairness Act. 28 U.S.C. § 1332(d)(2)(A). The defendants move to dismiss the complaint in its entirety. They contend that the plaintiffs have not pleaded any present, physical injury to their property or their persons, and that the economic loss doctrine precludes their recovery in tort for purely economic damages. They further argue that plaintiffs have failed to plead intentional trespass and that New Hampshire law does not recognize their claims for negligent failure to warn and unjust enrichment.

The court denies the majority of the defendants' motion. At this stage of the litigation, the property-owning plaintiffs have pleaded facts, including present, physical damage to their property and contamination of groundwater, sufficient to maintain their claims for trespass, nuisance, and negligence. The defendants' motion to dismiss the medical-monitoring plaintiffs' claims is likewise denied at this juncture. Because New Hampshire has not recognized negative unjust enrichment—that is, unjust enrichment through a defendant's failure to incur costs rather than through receipt of a benefit —as a cause of action, however, the court dismisses the plaintiffs' unjust enrichment claim.

**I. Applicable legal standard**

A plaintiff's complaint must include "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Martinez v. Petrenko, 792 F.3d 173, 179 (1st Cir. 2015) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). This standard "demands that a party do more than suggest in conclusory terms the existence of questions of fact about the elements of a claim." A.G. ex rel. Maddox v. Elsevier, Inc., 732 F.3d 77, 81 (1st Cir. 2013). In ruling on such a motion, the court accepts as true all well-pleaded facts set forth in the complaint and draws all reasonable inferences in the plaintiff's favor. See, e.g., Martino v. Forward Air, Inc., 609 F.3d 1, 2 (1st Cir. 2010). With the facts construed in this manner, "questions of law

Brown v. Saint–Gobain Performance Plastics Corp., Not Reported in Fed. Supp. (2017)

2017 WL 6043956, 2017 DNH 246

[are] ripe for resolution at the pleadings stage." Simmons v. Galvin, 575 F.3d 24, 30 (1st Cir. 2009).

## II. Background

**\*2** This proposed class action arises out of the release of toxic chemicals from Saint–Gobain's manufacturing plant in Merrimack, New Hampshire. Saint–Gobain has owned and operated a plant in Merrimack since 2000.[2] Defendant Busnel has served as general manager of the plant since 2012.[3] At that location, Saint–Gobain used ammonium perfluorooctonoate (AFPO), a derivative of perfluorooctanoic acid (PFOA)[4] in, for example, a process that coated woven fiberglass and other fabric with material.[5]

In early 2016, Saint–Gobain reported the presence of elevated levels of PFOA in the municipal water supplied by the Merrimack Village District Water Works.[6] Following this report, the New Hampshire Department of Environmental Services discovered the presence of PFOA in residential wells in the vicinity of Saint–Gobain's plant and recommended that certain residents of surrounding cities and towns not drink or cook with water from those wells, or consume vegetables from gardens where PFOA–contaminated water was used.[7]

The plaintiffs allege that Saint–Gobain released PFOA into the air, soil, and water in the vicinity of its Merrimack facility.[8] Because PFOA is water-soluble, it "can migrate readily from soil to groundwater" and, because it is biologically and chemically stable, it can "remain present in the environment long after [it is] released."[9] The United States Environmental Protection Agency associates exposure to PFOA with increased risk for certain types of cancer, as well as other illnesses and conditions.[10]

Plaintiffs further allege that Saint–Gobain was aware of the potential for PFOA contamination arising from its manufacturing processes in light of contamination of the public drinking water supply near its Hoosick, New York plant, which it reported to the United States Environmental Protection Agency in 2014.[11] Plaintiffs also allege that Saint–Gobain removed its operations from a plant in North Bennington, Vermont, to the Merrimack facility after Vermont imposed tighter environmental protection regulations to reduce emissions of PFOA.[12] Despite this knowledge, plaintiffs allege, Saint–Gobain failed to install systems to limit PFOA emissions from its Merrimack facility.[13]

The plaintiffs allege that PFOA has contaminated the soil and water obtained through private wells within a certain geographic area,[14] as well as water in Merrimack and Bedford, New Hampshire, provided through the Merrimack Village District Water Works.[15] For all of those who own residential property within these geographic areas, the plaintiffs seek damages for injury to their property, including (1) diminished market value, (2) costs incurred to remediate and mitigate the contamination, and (3) loss of use and enjoyment of their property.[16]

**\*3** For all of those who resided in these geographical areas and consumed water containing defined levels of PFOA for at least one year, or were born to mothers who consumed such water, the plaintiffs seek to recover the costs of monitoring for injuries related to exposure to PFOA in light of their "significant increased risk of illness, disease or disease process ...."[17] The DeBlois plaintiffs, who have opted out of these classes, seek the same remedies, as well as recovery for "additional losses including, but not limited to, business losses, attorney fees for protecting their property rights in placing the water line, future water expenses and out-of-pocket expenses."[18]

## III. Analysis

Plaintiffs bring claims under four common-law torts: trespass, nuisance, negligence, and negligent failure to warn. They also seek to recover under the equitable doctrine of unjust enrichment. The defendants move to dismiss plaintiffs' negligence, nuisance, and trespass claims, arguing that the plaintiffs claiming property damage have not alleged any tangible damage to their property, but seek only economic damages foreclosed in tort by the economic loss doctrine or to recover for groundwater contamination, for which they have no private cause of action. Defendants further argue that the plaintiffs seeking medical monitoring have not alleged any present physical injury. Finally, they argue that the plaintiffs have failed to plead all the elements of trespass, and that plaintiffs, even on the facts construed in their favor, cannot recover under their negligent failure to warn and unjust enrichment theories.

### A. Injury to property

2017 WL 6043956, 2017 DNH 246

Two sub-classes of plaintiffs claim injuries resulting from chemical contamination of their real property: those in the appropriate geographical areas who own property served by private wells and those in the relevant towns who own property served by the Merrimack Village District Water Works. [19] The defendants move to dismiss the negligence, trespass, and nuisance claims of these property-owning plaintiffs for failure to allege present and actual damages to their property.

The allegations in the complaint are, as the defendants observe, fairly general. These property-owning plaintiffs allege that Saint–Gobain, through releasing toxic PFOA into nearby environs, contaminated the soil, dust, household water and household water systems, groundwater wells, air, and trees on the plaintiffs' property. [20] They also allege that the PFOA contamination "further migrated through the soil and into the groundwater that Plaintiffs and Class Members have the right to use and have used for their domestic water supply." [21]

As a result of this contamination, they allege, the property-owning plaintiffs have "suffered the cost of mitigating the contamination through filters and alternative water supplies, and the cost of restoring and maintaining the water" and have had to pay to remediate their properties. [22] They further claim that the value and marketability of their property has diminished as a result of the contamination. [23] Finally, they claim loss of use and enjoyment of their properties, and that they "have also suffered annoyance, discomfort, and inconvenience" due to the "contamination of their properties and water supplies ...." [24]

Through these allegations, the property-owning plaintiffs have pleaded, at the very least, a compensable injury sufficient to state claims for trespass and nuisance by pleading the presence of PFOAs in the groundwater serving both private and municipal water sources. "[C]ontamination of water with chemicals having a potential to cause harm is itself an injury regardless of whether the chemicals are certain to cause the ultimate harm of which they are capable." Energynorth Nat. Gas, Inc. v. Cont'l Ins. Co., 146 N.H. 156, 164, 781 A.2d 969 (2001).

**\*4** Having established that contamination of water as alleged here may amount to an injury, the question then becomes whether it amounts to an injury to the plaintiffs. In New

Hampshire, as Saint–Gobain observes, "instead of absolute ownership of the groundwater beneath one's land, 'the right of each is only to a reasonable use or management.' " In re Town of Nottingham, 153 N.H. 539, 548, 904 A.2d 582 (2006) (quoting Bassett v. Salisbury Mfg. Company, 43 N.H. 569, 577 (1862)). Absent such absolute ownership rights in groundwater, diminution of groundwater under a landholder's property by the State does not amount to a taking. Nottingham, 153 N.H. at 548, 904 A.2d 582. Similarly, "in this state lakes, large natural ponds, and navigable rivers are owned by the people, and held in trust by the state in its sovereign capacity for their use and benefit," giving rise to a public, not a private, right to use and benefit from them. St. Regis Paper Co. v. N.H. Water Res. Bd., 92 N.H. 164, 170, 26 A.2d 832 (1942) (comparing such rights to traditional riparian rights, "which are property rights and which may not be invaded or taken from the owner without compensation."). The public nature of this right prevented the plaintiff in St. Regis from successfully challenging the State's delegation of authority over such waters to the State Water Resources Board. Id. at 170–71, 26 A.2d 832.

Relying on Nottingham and St. Regis, Saint–Gobain argues that the property-holding plaintiffs cannot recover for alleged contamination of the groundwater under their properties. [25] Those plaintiffs are not, however, seeking compensation for a governmental taking, nor do they challenge the State's regulation of navigable waterways. Instead, they have pleaded an interference with their use of the groundwater under their property in light of alleged chemical contamination. The New Hampshire Supreme Court has suggested that at least "claims for diminution in value of private property, lost business expenditures and other business and economic losses resulting from [chemical] contamination properly belong to private parties," rather than the State as trustee of those waters. State v. Hess Corp., 161 N.H. 426, 437, 20 A.3d 212 (2011), as modified on denial of reconsideration (Mar. 22, 2011). Thus, under Hess, the property-owning plaintiffs have an interest sufficient to state claims at least for economic losses arising from the presence of contaminated groundwater by alleging diminished property values. [26] Insofar as damages in trespass and nuisance actions "are measured primarily by the difference between the value of the real estate before and after the defendant's wrong was committed," Delay Mfg. Co. v. Carey, 91 N.H. 44, 44, 13 A.2d 152 (1940), the plaintiffs have alleged damage sufficient to state a claim under those theories. [27] See also Soucy v. Royal, 116 N.H.

2017 WL 6043956, 2017 DNH 246

170, 172, 359 A.2d 198 (1976) (damages in trespass and nuisance "determined by the difference between the value of the property with and without the trespass and nuisance").

 *5  It is less clear that the property-owning plaintiffs have alleged physical damage to their real property sufficient to recover on a claim for negligence. "To recover for negligence, a plaintiff must show that the defendant owes a duty to the plaintiff and that the defendant's breach of that duty caused the plaintiff's injuries." Christen v. Fiesta Shows, Inc., No. 2016-0528, 173 A.3d 162, 2017 WL 4400281, at *2 (N.H. Oct. 4, 2017). Saint–Gobain contends that the plaintiffs' general allegations of damage do not suffice as allegations of present, physical injury to their property sufficient to state a claim for negligence,[28] and that the economic loss doctrine precludes them from recovering in negligence for the economic losses discussed supra.[29]

"In New Hampshire, the general rule is that 'persons must refrain from causing personal injury and property damage to third parties, but no corresponding tort duty exists with respect to economic loss.' " Plourde Sand & Gravel Co. v. JGIE, Inc., 154 N.H. 791, 795, 917 A.2d 1250 (2007) (quoting Ellis v. Robert C. Morris, Inc., 128 N.H. 358, 364, 513 A.2d 951 (1986)). Thus, "a plaintiff may not ordinarily recover in a negligence claim for purely 'economic loss'." Border Brook Terrace Condo. Ass'n v. Gladstone, 137 N.H. 11, 18, 622 A.2d 1248 (1993).

As the plaintiffs observe, the economic loss doctrine most commonly precludes contracting parties from recovering in tort for purely economic losses associated with that contractual relationship. See Plourde, 154 N.H. at 794, 917 A.2d 1250 ("[W]here a plaintiff may recover economic loss under a contract, generally a cause of action in tort for purely economic loss will not lie."). The parties dispute whether New Hampshire extends the economic loss doctrine to prohibit recovery in tort for any economic loss, even one suffered outside of a contractual relationship. The New Hampshire Supreme Court has suggested as much, see id. at 794–95, 917 A.2d 1250, and the First Circuit Court of Appeals has concluded that New Hampshire adopted the economic loss doctrine in "its broadest form," under which "the doctrine reaches beyond the contractual context ...." Schaefer v. Indymac Mortg. Servs., 731 F.3d 98, 103–04 (1st Cir. 2013). But, as the plaintiffs observe, the existence of a contractual relationship governed the outcome of both of

those cases. See Plourde, 154 N.H. at 798, 917 A.2d 1250 (economic loss doctrine barred tort recovery where plaintiff's economic loss arose "solely from disappointed commercial expectations in that the plaintiff lost the anticipated profits of its contract with" a third party (quotations omitted)); Schaefer, 731 F.3d at 106 (plaintiff's negligence claims arising out of foreclosure proceedings barred by economic loss doctrine where alleged duties to provide information to plaintiff arise from mortgage agreement). It is unclear, therefore, whether the economic loss doctrine in New Hampshire would bar recovery of economic losses in a situation such as this, where the alleged losses arise from negligence outside of the context of a contractual or otherwise purely economic relationship.

The court need not definitively resolve this question at this stage in the proceedings. The property-owning plaintiffs have pleaded not only economic damages, but also that they have suffered damage to their property through the presence of PFOA in the soil and water, requiring them to mitigate the contamination and remediate their properties. They further allege that the contamination has led to lost use and enjoyment of those properties. Though the complaint is not a model of precision and clarity, and these allegations are less than robust,[30] the court is disinclined, at this stage in the litigation, to dismiss the plaintiffs' negligence claim where they have sufficiently pleaded damages to their property to maintain claims for the common-law torts of trespass and nuisance on effectively the same factual bases.

### B. Medical monitoring damages
 *6  Two additional sub-classes of plaintiffs seek damages in the form of costs to cover monitoring for potential medical conditions arising from their exposure to PFOA through its presence in the air and soil and through consumption of contaminated water.[31] Exposure to PFOA in this manner, the plaintiffs allege, creates a "significant increased risk of illness, disease or disease process ... requiring an award of the cost of a program for medical monitoring for detection of such illness, disease process or disease."[32] Saint–Gobain moves to dismiss the medical-monitoring plaintiffs' claims,[33] arguing that the lack of any present physical injury to the plaintiffs—as compared to speculative, future injury—precludes their recovery in tort.

Some states allow recovery for the costs of such medical monitoring. The plaintiffs rely heavily, for example, on the Supreme Court of Appeals of West Virginia's decision that,

Case 1:19-md-02875-RMB-SAK    Document 577-4    Filed 09/18/20    Page 19 of 112
PageID: 12136

Brown v. Saint-Gobain Performance Plastics Corp., Not Reported in Fed. Supp. (2017)

2017 WL 6043956, 2017 DNH 246

even absent present, physical injury, "a cause of action exists under West Virginia law for the recovery of medical monitoring costs, where it can be proven that such expenses are necessary and reasonably certain to be incurred as a proximate result of a defendant's tortious conduct." [🔖] Bower v. Westinghouse Elec. Corp., 206 W.Va. 133, 522 S.E.2d 424, 431 (W.Va. 1999). To sustain such a claim,

> the plaintiff must prove that (1) he or she has, relative to the general population, been significantly exposed; (2) to a proven hazardous substance; (3) through the tortious conduct of the defendant; (4) as a proximate result of the exposure, plaintiff has suffered an increased risk of contracting a serious latent disease; (5) the increased risk of disease makes it reasonably necessary for the plaintiff to undergo periodic diagnostic medical examinations different from what would be prescribed in the absence of the exposure; and (6) monitoring procedures exist that make the early detection of a disease possible.

[🔖] Id. at 432–33. Other states have likewise recognized a right to similar recovery against exposure to toxic chemicals.

See, e.g., [🔖] Exxon Mobil Corp. v. Albright, 433 Md. 303, 71 A.3d 30, 80, (Md. 2013) ("evidence of physical injury is not required to support costs for medical surveillance");

[🔖] Meyer ex rel. Coplin v. Fluor Corp., 220 S.W.3d 712, 718 (Mo. 2007) ("recovering medical monitoring damages does not require a threshold showing of present physical injury"); [🔖] Potter v. Firestone Tire & Rubber Co., 6 Cal.4th 965, 25 Cal.Rptr.2d 550, 863 P.2d 795, 823 (Cal. 1993) ("a reasonably certain need for medical monitoring is an item of damage for which compensation should be allowed");

[🔖] Ayers v. Jackson Twp., 106 N.J. 557, 525 A.2d 287, 312 (N.J. 1987) (recognizing "the cost of medical surveillance [as] a compensable item of damages" in toxic tort litigation).

See also [🔖] Baker v. Saint–Gobain Performance Plastics Corp., 232 F.Supp.3d 233, 252–53 (N.D.N.Y. 2017) (denying motion to dismiss tort claims against Saint–Gobain seeking

medical-monitoring costs as damages); [🔖] Benoit v. Saint–Gobain Performance Plastic Corp., No. 116-CV-1057, 2017 WL 3316132, at *9–10 (N.D.N.Y. Aug. 2, 2017) (same). In doing so, several courts have relied, at least in part, on the conclusion of the Court of Appeals for the District of Columbia that a plaintiff "ought to be able to recover the cost for the various diagnostic examinations proximately caused by [the defendant's] negligent action." [🔖] Friends for All Children, Inc. v. Lockheed Aircraft Corp., 746 F.2d 816, 825 (D.C. Cir. 1984) (addressing claims for compensation for medical evaluations of passengers following an airplane crash).

**\*7** Still other states have rejected an expansion of negligence doctrine to encompass potential, not present, physical injury. See, e.g., [🔖] Henry v. Dow Chem. Co., 473 Mich. 63, 701 N.W.2d 684, 691 (Mich. 2005) (economic losses incurred by paying for medical monitoring "are wholly derivative of a possible, future injury rather than an actual, present injury. A financial 'injury' is simply not a present physical injury, and thus not cognizable under our tort system." (emphasis original)); [🔖] Lowe v. Philip Morris USA, Inc., 344 Or. 403, 183 P.3d 181, 186 (Or. 2008) ("the present economic harm that defendants' actions allegedly have caused—the cost of medical monitoring—is not sufficient to give rise to a negligence claim"); see also [🔖] Metro–N. Commuter R. Co. v. Buckley, 521 U.S. 424, 444, 117 S.Ct. 2113, 138 L.Ed.2d 560 (1997) (declining to recognize a "separate tort claim for medical monitoring costs" for "asymptomatic plaintiffs" under the Federal Employers' Liability Act).

Neither New Hampshire's legislature nor its Supreme Court has spoken on the question. Generally, in New Hampshire,

> [t]he possibility that injury may result from an act or omission is sufficient to give the quality of negligence to the act or omission; but possibility is insufficient to impose any liability or give rise to a cause of action. ... If, in a sense, there has been negligence, there is no cause of action unless and until there has been an injury.

Brown v. Saint-Gobain Performance Plastics Corp., Not Reported in Fed. Supp. (2017)

2017 WL 6043956, 2017 DNH 246

White v. Schnoebelen, 91 N.H. 273, 274, 18 A.2d 185 (1941). In the absence of such a present, physical injury, the medical-monitoring plaintiffs in this action seek to recover for an "economic injury"—that is, the cost of monitoring to determine whether they have an injury. [34] Such an allegation appears to conflate "[a]n allegation of 'injury,' " which is "an instance of actionable harm," with "a claim for 'damages,' " that is, "a sum of money awarded to one who has suffered an injury." Smith v. Cote, 128 N.H. 231, 241–42, 513 A.2d 341 (1986). The two are distinct. Id. In so doing, the plaintiffs effectively conceded that they do not, at present have an injury. [35] And, as discussed supra, it is unclear to the court whether New Hampshire law precludes a negligence claim seeking to recover purely economic damages in an action sounding purely in tort. See supra Part III.A (discussing economic loss doctrine).

The court is therefore considering whether to certify this question to the New Hampshire Supreme Court, and at what procedural posture such a certification would be most advantageous. See Old Republic Ins. Co. v. Stratford Ins. Co., 777 F.3d 74, 86 (1st Cir. 2015) (the court is "permitted to certify questions of law to the New Hampshire Supreme Court when questions of New Hampshire law are determinative of the case, and there is no controlling precedent from the New Hampshire Supreme Court."); N.H. Sup. Ct. R. 34. The defendants' motion to dismiss this claim is, accordingly, denied without prejudice.

### C. Trespass (Count 1)

*8 The defendants further argue that the plaintiffs' claim for trespass must be dismissed because the plaintiffs have not alleged that Saint–Gobain intentionally invaded their property. [36] "[A] trespass [is] an intentional invasion of the property of another." Case v. St. Mary's Bank, 164 N.H. 649, 658, 63 A.3d 1209 (2013) (quoting Moulton v. Groveton Papers Co., 112 N.H. 50, 54, 289 A.2d 68 (1972)) (alterations in original). "[I]t is well settled in this jurisdiction that an involuntary or accidental entry upon the land of another is not a trespass." Paine v. Hampton Beach Imp. Co., 98 N.H. 359, 363–64, 100 A.2d 906 (1953) (internal quotations and citations omitted). That said, "[t]he intent with which tort liability is concerned is not necessarily a hostile intent, or a desire to do any harm. Rather it is an intent to bring about a result which will invade the interests of another

in a way that the law forbids." Thompson v. Forest, 136 N.H. 215, 219, 614 A.2d 1064 (1992) (quoting W.P. Keeton et al., Prosser and Keeton on the Law of Torts § 8 (5th ed. 1984)).

> If an actor knows that an injury is substantially certain to result from his act and he nevertheless completes the act, he is treated by the law as if he in fact desired to produce the injury. To constitute an intentional tort, the tortfeasor must have known that his conduct was substantially certain to result in injury.

Id. at 219–20 (citing Vittum v. N.H. Ins. Co., 117 N.H. 1, 4, 369 A.2d 184 (1977)).

The plaintiffs here have alleged that Saint–Gobain used PFOA in its manufacturing processes at its Merrimack facility, knowing that those processes, as well as the structure of its plant, "were sources of odors, visible emissions, particular emissions and releases of toxic pollutants, including PFAS, that would travel when released and contaminate the properties and water supplies of Plaintiffs and of Class Members," resulting in their exposure. [37] The plaintiffs further allege that Saint–Gobain knew that its processes could result in such contamination because (1) it used similar manufacturing processes in, among other places, Hoosick Falls, New York, which resulted in PFOA contamination of drinking water in that community, and (2) its predecessor, ChemFab, relocated its processing plant to Merrimack from North Bennington, Vermont, because Vermont implemented controls to reduce PFOA emissions. [38] Despite this knowledge, plaintiffs allege, Saint–Gobain failed to sufficiently control or abate PFOA emissions from the Merrimack facility. [39]

The plaintiffs have thus alleged that Saint–Gobain knew that its manufacturing processes emitted PFOA and that PFOA could, as a result, infiltrate groundwater pulled by private wells and municipal water systems. The court therefore declines to dismiss the plaintiffs' claim, as the defendants would have it do, on the grounds that the plaintiffs have also alleged that the defendants did so negligently. [40]

Case 1:19-md-02875-RMB-SAK    Document 577-4    Filed 09/18/20    Page 21 of 112
PageID: 12138
Brown v. Saint-Gobain Performance Plastics Corp., Not Reported in Fed. Supp. (2017)
2017 WL 6043956, 2017 DNH 246

### D. Negligent failure to warn (Count 4)

In addition to their claims for general negligence, the plaintiffs claim that the defendants negligently failed to warn them "of the release of toxic PFAS and the likelihood that groundwater and household water supplies were contaminated with PFAS emitted from the Saint–Gobain Site, and that they were being exposed to toxic PFAS."[41] Saint–Gobain moves to dismiss this claim, arguing that New Hampshire law did not impose on it a duty to warn the plaintiffs under these circumstances.

"In general, anyone who does an affirmative act is under a duty to others to exercise the care of a reasonable [person] to protect them against an unreasonable risk of harm to them arising out of the act." Coan v. New Hampshire Dep't of Envtl. Servs., 161 N.H. 1, 8, 8 (A.3d 109 2010) (quoting Restatement (Second) of Torts § 302 comment a at 82 (1965)). On the other hand, "[t]he duties of one who merely omits to act are more restricted, and in general are confined to situations where there is a special relation between the actor and the other which gives rise to the duty." Id. The defendants, arguing that the plaintiffs allege an omission of an action (that is, failure to warn them of the potential for contamination), contend that no claim for negligent failure to warn can lie against them where the plaintiffs have pleaded the existence of no special relationship giving rise to the duty to warn.[42] The plaintiffs, arguing that the defendants have acted affirmatively (that is, by emitting PFOA), contend that defendants are subject to the duty of a reasonable person to protect the plaintiffs against the unreasonable risk of harm arising from that act by warning them about the presence of PFOA in their household water.[43]

*9 The defendants are correct, therefore, that an allegation of omission, standing alone, likely would require a special relationship between the parties for a failure to warn claim to lie. The plaintiffs have not alleged such a relationship. But nor have they alleged an omission in a vacuum—they plead it in the context of an affirmative action by Saint–Gobain. The plaintiffs have alleged that the Saint–Gobain committed an affirmative act by releasing the PFOA, and only then that it omitted to act by failing to warn the plaintiffs about potential contamination resulting from those emissions. The court is thus inclined to view plaintiffs' allegations as invoking the general "duty to others to exercise the care of a reasonable [person] to protect them against an unreasonable risk of harm to them arising out of the act." Coan, 161 N.H. 8, 8 A.3d 109.

At the same time, that duty is the general duty that gives rise to a claim of negligence. Id. As such, it is unclear to the court that the plaintiffs may maintain a negligent failure to warn claim based on that duty separate from their general negligence claim. At this stage of the litigation, however, where the latter may proceed for the reasons discussed supra Part III.A–B, the court declines to dismiss the former.

### E. Unjust enrichment (Count 5)

"Unjust enrichment is an equitable remedy that is available when an individual receives 'a benefit which would be unconscionable for him to retain.' " Axenics, Inc. v. Turner Const. Co., 164 N.H. 659, 669, 62 A.3d 754 (2013) (quoting Clapp v. Goffstown Sch. Dist., 159 N.H. 206, 210, 977 A.2d 1021 (2009)). "The party seeking restitution must establish not only unjust enrichment, but also that the person sought to be charged had wrongfully secured a benefit or passively received one which it would be unconscionable to retain, and unjust enrichment generally does not form an independent basis for a cause of action." Gen. Insulation Co. v. Eckman Const., 159 N.H. 601, 611, 992 A.2d 613 (2010) (quoting 42 C.J.S. Implied Contracts § 10, at 17 (2007)). "Unjust enrichment is not a boundless doctrine, but is, instead, narrower, more predictable, and more objectively determined than the implications of the words 'unjust enrichment'." Clapp, 159 N.H. at 210, 977 A.2d 1021 (quotation omitted).

> While it is said that a defendant is liable if 'equity and good conscience' requires, this does not mean that a moral duty meets the demands of equity. There must be some specific legal principle or situation which equity has established or recognized, to bring a case within the scope of the doctrine.

Cohen v. Frank Developers, Inc., 118 N.H. 512, 518, 389 A.2d 933 (1978) (quoting Am. Univ. v. Forbes, 88 N.H. 17, 19–20, 183 A. 860 (1936)).

The plaintiffs' unjust enrichment claim is premised on the savings that Saint–Gobain incurred—that is, money not spent —rather than on a benefit bestowed—that is, money or

some good received. [44] Such a savings "is also referred to as negative unjust enrichment or recoverable profit." Allan Kanner, Unjust Enrichment in Environmental Litigation, 20 J. Envtl. L. & Litig. 111, 146 (2005). Some jurisdictions have recognized negative unjust enrichment claims. See

📙 Branch v. Mobil Oil Corp., 778 F.Supp. 35, 36 (W.D. Okla. 1991) ("Oklahoma recognizes a claim for negative unjust enrichment."). Others have recognized a version of that claim, available only where "the plaintiff is unable to establish actual damages because such a determination may be too difficult" but "it would be unjust to allow Defendant to benefit from disposal of waste on a plaintiff's property without payment of any kind." Little Hocking Water Ass'n, Inc. v. E.I. du Pont Nemours & Co., 91 F.Supp.3d 940, 986 (S.D. Ohio 2015).

Relying on these extra-jurisdictional cases, the plaintiffs claim that Saint–Gobain has unjustly enriched itself through its failures to "incur expenditures to limit or prevent the release of toxic PFAS into the environment and the contamination to Plaintiffs' and Class Members' properties and ... neighborhoods and household water supplies" and to incur the costs to (1) "timely investigate the impacts" of that contamination; (2) "timely mitigate" those impacts, and (3) "remediate the contaminated soil, dust and groundwater." [45] By failing to incur these costs, the plaintiffs allege, Saint–Gobain "has received a benefit and it would be unconscionable and contrary to equity for [it] to retain that benefit." [46]

**\*10** The plaintiffs have not cited, however, and the court has not found, any case suggesting that New Hampshire recognizes claims for negative unjust enrichment. To the contrary, the plaintiffs offer only one case recognizing an unjust enrichment claim, and that in the context of a benefit conveyed by the plaintiff to the defendant when the plaintiff repaired and improved the defendant's property. Petrie–Clemons v. Butterfield, 122 N.H. 120, 124, 441 A.2d 1167 (1982). No other case cited by the plaintiffs addresses the possibility of such a claim. See Axenics, 164 N.H. at 670, 62 A.3d 754 (no unjust enrichment where express contract governed scope of plaintiff's work on defendant's property);

📙 Clapp, 159 N.H. at 211, 977 A.2d 1021 (no unjust enrichment where defendant retained funds it had otherwise voted to spend because express contract governed employee's recovery); Univ. Sys. of N.H. v. Nat'l Gypsum, No. 84–716, 1985 U.S. Dist. LEXIS 18277, at \*22 (D.N.H. July 2, 1985) (no unjust enrichment where plaintiff voluntarily removed asbestos from its buildings); Cohen, 118 N.H. at

518, 389 A.2d 933 (no unjust enrichment to defendant when plaintiff forbore from exercising an option to purchase land to develop competing shopping center); cf. Camden Nat'l Bank v. Grestone Select Holdings, LLC, 2017 DNH 235, 10–12 (no unjust enrichment in contract context).

Another court in this district has rejected a similar argument, concluding, under Cohen, that restitution for unjust enrichment is available only in the context of a contract (express or implied) or a quasi-contract, and "that profits gained by defendants as a result of" the defendants' alleged statutory violations do not "constitute the unjust receipt and retention of a 'benefit' for which restitution is required."

📙 Pacamor Bearings, Inc. v. Minebea Co., 892 F.Supp. 347, 356–57 (D.N.H. 1995).

Because the plaintiffs' claim for unjust enrichment is not based on a "specific legal principle or situation which equity has established or recognized" in New Hampshire so as "to bring [this] case within the scope of the doctrine," Cohen, 118 N.H. at 518, 389 A.2d 933, the court grants the defendants' motion to dismiss Count 5 of the consolidated complaint.

## F. Respondeat superior (Count 6)

Finally, the defendants move to dismiss the plaintiffs' residual claim against Saint–Gobain based in respondeat superior. [47] Because the court dismisses the plaintiffs' claim for unjust enrichment against both defendants, no claim for respondeat superior liability may lie as against Saint–Gobain on that basis. The court otherwise denies the defendants' motion to dismiss the plaintiffs' claims based in respondeat superior.

## G. Plaintiffs' motions

As a final note, the plaintiffs' request on the last page of their opposition for leave to amend their pleadings [48] runs afoul of this court's Local Rule 7.1(a)(1) ("Objections to pending motions and affirmative motions for relief shall not be combined in one filing."). Even if it did not, as the defendants rightly observe, the court afforded the plaintiffs in this consolidated action three separate opportunities to file a consolidated complaint. [49] The court assumes that the allegations and claims asserted in their operative consolidated complaint are the result of considered factual and legal assessments by interim class counsel, and is thus disinclined to grant the plaintiffs a fourth opportunity to adduce facts in support of their consolidated claims.

2017 WL 6043956, 2017 DNH 246

**\*11** The court is equally disinclined to elevate form over substance, however, and therefore grants the plaintiffs' motion for leave to substitute certain paragraph references in their consolidated complaint to correct what appear to the court to be mere typographical errors. Plaintiffs shall file an amended complaint reflecting these revisions on or before **December 13, 2017**.

## IV. <u>Conclusion</u>

For the reasons discussed above, the court GRANTS–IN–PART and DENIES–IN–PART the defendants' motion to dismiss the complaint.[50] Specifically, it grants the defendants' motion to dismiss the plaintiffs' unjust enrichment claim (Count 5), and denies it as to the plaintiffs' remaining claims.

Finally, the court GRANTS the plaintiffs' motion for leave to substitute.[51]

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2017 WL 6043956, 2017 DNH 246

## Footnotes

1    The plaintiffs filed a series of actions against Saint–Gobain and the plant's general manager arising from the chemical contamination. Specifically, one set of plaintiffs filed two proposed class actions in Hillsborough Superior Court against Saint–Gobain and Gwenael Busnel, which defendants removed to this court. A second set of plaintiffs filed a proposed class action in this court against Saint–Gobain alone. A third set of plaintiffs filed an individual action against Saint–Gobain in this court. The court consolidated these cases for all purposes, <u>see</u> Order of Consolidation (doc. no. <u>48</u>), and appointed interim lead class counsel, <u>see</u> Order of May 11, 2017 (doc. no. <u>76</u>).

2    Plaintiffs allege that the plant was previously operated by ChemFab Corporation, which Saint–Gobain acquired in 2000. Compl. (doc. no. <u>80</u>) ¶ 12.

3    <u>Id.</u> ¶ 9.

4    PFOA and AFPO are members of a family of per- and polyfluoroalkyl substances (PFAS). In their complaint, the plaintiffs use the terms PFAS and PFOA interchangeably to refer to both chemicals collectively. <u>See id.</u> ¶ 13. The court refers to them collectively as PFOA, except where quoting the plaintiffs' complaint.

5    <u>Id.</u> ¶¶ 13–14.

6    <u>Id.</u> ¶ 37.

7    <u>Id.</u> ¶¶ 42–44.

8    <u>Id.</u> ¶¶ 13–15.

9    <u>Id.</u> ¶ 13.

10   <u>Id.</u> ¶ 46–47.

11   <u>Id.</u> ¶¶ 17–20.

12   <u>Id.</u> ¶¶ 21–26.

13   <u>Id.</u> ¶¶ 27–29.

14   For purposes of defining the property-owner classes, the plaintiffs define this area as comprising:

In Bedford and Merrimack, the geographic area west of the Merrimack River within three (3.0) miles of the property boundary of the Saint–Gobain Site; in Litchfield, the geographic area bounded by the Merrimack River on the west, Cummings Drive on the South, extended east to the Merrimack River and west to the Londonderry Town line, and the Londonderry Town Line on the East and the City of Manchester on the North and East, and the geographic area in Manchester bounded by Raymond Wieczorek Drive on the North.

<u>Id.</u> ¶ 60.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.                    9

Brown v. Saint-Gobain Performance Plastics Corp., Not Reported in Fed. Supp. (2017)

2017 WL 6043956, 2017 DNH 246

15  Id. ¶¶ 37, 43.

16  Id. ¶ 54.

17  Id. ¶ 55.

18  Id. ¶ 56.

19  Id. ¶¶ 58, 60–61.

20  Id. ¶¶ 15, 39, 48.

21  Id. ¶ 39, 48.

22  Id. ¶ 54.

23  Id.

24  Id.

25  See Defendants' Mem. (doc. no. 82–1) at 9–10.

26  The Court further concluded that the State, acting as parens patriae, is "not necessarily preclude[d] ... from pursuing damages for the costs of investigating, monitoring, treating, remediating, replacing, or otherwise restoring [privately-owned] wells" when "the injury alleged affects the general population of a State in a substantial way." Id. It did not, however, affirmatively hold that the individual property owners may not recover such damages. Cf. id. at 440 (leaving open the possibility that "any monetary damages claimed by citizens individually may be excluded from the State's recovery" should private-well owners "actually object to state testing and treatment of their wells.").

27  The defendants also argue that the groundwater contamination alleged here would amount to a public, rather than a private, nuisance or trespass, precluding property-owning plaintiffs from a claim under those theories. See Defendants' Mem. (doc. no. 82–1) at 12–14. A private nuisance "may be defined as an activity which results in an unreasonable interference with the use and enjoyment of another's property. A public nuisance, on the other hand, is an unreasonable interference with a right common to the general public." Robie v. Lillis, 112 N.H. 492, 495, 299 A.2d 155 (1972) (internal citations and quotations omitted). Where "[c]onduct which unreasonably interferes with the rights of others may be both a public and a private nuisance," id., and the determining factor is the substantiality of the interference, the court is not inclined to dismiss these claims on this record.

To the extent that the cases from other jurisdictions on which the defendants rely for the proposition that interference with groundwater cannot give rise to a private nuisance or trespass claim, they conflict with Hess, 161 N.H. at 437, 20 A.3d 212, and do not mandate dismissal.

28  Defendants' Mem. (doc. no. 82–1) at 10–12.

29  Id. at 7–8, 10.

30  As an example, as the defendants observed during oral argument, the property-owning plaintiffs have not clearly alleged direct damage to any property. Instead, they have alleged that their property is contaminated by PFOA as a result of the defendants' actions and that they have "suffered the need for and the cost of remediation of their properties." Compl. (doc. no. 80) ¶ 54. At oral argument, plaintiff's counsel confirmed that their allegations of a need for mitigation and remediation, rendered necessary by the contamination, constitute the plaintiffs' allegations of injury to their property beyond mere invasion by PFOA. The court, drawing all reasonable inferences in the plaintiffs' favor, see 🔖 Martino, 609 F.3d at 2, construes these as allegations that the plaintiffs' property has been damaged in some manner that gives rise to some necessarily remedial actions.

31  Compl. (doc. no. 80) ¶¶ 55, 59, 62.

32  Id. ¶ 55.

33  The plaintiffs pleading all claims on behalf of "Plaintiffs and Class Members" generally, without distinguishing among or between property-owning plaintiffs and plaintiffs seeking to recover for medical monitoring costs. At oral argument, plaintiffs' counsel clarified that the plaintiffs assert all claims on behalf of all plaintiffs. It is unclear to the court whether plaintiffs who are not property-owners may recover for injuries to their persons under theories of trespass and nuisance. As the defendants have not moved on those grounds, and as the parties have not briefed the issue, the court need not resolve it here.

Case 1:19-md-02875-RMB-SAK   Document 577-4   Filed 09/18/20   Page 25 of 112
PageID: 12142
Brown v. Saint-Gobain Performance Plastics Corp., Not Reported in Fed. Supp. (2017)
2017 WL 6043956, 2017 DNH 246

34  Opp. (doc. no. 84–1) at 17. Plaintiffs further characterize their "injury" as "the present need for and cost of diagnostic testing." Id. at 18, 622 A.2d 1248. At oral argument, plaintiffs' counsel further clarified that the injury giving rise to the medical-monitoring plaintiffs' claims constitutes their exposure to PFOA plus the cost of the monitoring.

35  The court is not persuaded that the rule allowing a plaintiff to "maintain an action against an insurer for negligent failure to settle a case without prior payment of or proof of ability to pay the excess judgment," Dumas v. State Farm Mut. Auto. Ins. Co., 111 N.H. 43, 46, 274 A.2d 781 (1971), translates into a viable claim for damages where the defendant's alleged breach of a duty may, but has not yet, resulted in actual injury to the plaintiff. See Opp. (doc. no. 84–1) at 19.

36  Defendant's Mem. (doc. no. 82–1) at 17–18.

37  Compl. (doc. no. 80) ¶ 14.

38  Id. ¶¶ 18–20, 21–26.

39  Id. ¶¶ 27–30, 33.

40  Defendants' Mem. (doc. no. 82–1) at 17–18; Compl. (doc. no. 80) ¶ 40.

41  Compl. (doc. no. 80) ¶¶ 94–96.

42  Defendants' Mem. (doc. no. 82–1) at 18–19.

43  Opp. (doc. no. 84–1) at 21–23.

44  Opp. (doc. no. 84–1) at 23–24.

45  Compl. (doc. no. 80) ¶ 98.

46  Id. ¶ 99.

47  Defendants' Mem. (doc. no. 82–1) at 20.

48  Opp. (doc. no. 84–1) at 24,

49  See Consolidation Order (doc. no. 48) (ordering plaintiffs to file consolidated complaint); Brown Plaintiffs' Master Consolidated Complaint (doc. no. 60) (filed without consultation with Dowling plaintiffs' counsel); Order of March 6, 2017 (granting extension of time to file consolidated complaint); Dowling Plaintiffs' Master Consolidated Complaint (doc. no. 70) (filed without consultation with Brown plaintiffs' counsel); Order of March 30, 2017 (granting motion to stay filing of consolidated complaint until appointment of interim class counsel); Order of May 11, 2017 (appointing interim counsel and ordering consolidated complaint to be filed).

50  Document no. 82.

51  Document no. 88.

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 4



**User Name:** Ava Cavaco

**Date and Time:** Wednesday, September 16, 2020 5:16:00 PM CDT

**Job Number:** 125571121

## Document (1)

1. *Estes v. Lanx, Inc., 2015 U.S. Dist. LEXIS 171184*

   **Client/Matter:** -None-

   **Search Terms:** Estes v. Lanx, Inc., No. 1:14CV052-SA-DAS, 2015 U.S. Dist. LEXIS 171184, at *20-24 (N.D. Miss. Dec. 23, 2015)

   **Search Type:** Natural Language

   **Narrowed by:**

   | Content Type | Narrowed by |
   |---|---|
   | Cases | -None- |



 Positive
As of: September 16, 2020 10:16 PM Z

## *Estes v. Lanx, Inc.*

United States District Court for the Northern District of Mississippi, Aberdeen Division

December 23, 2015, Decided; December 23, 2015, Filed

CAUSE NO.: 1:14CV052-SA-DAS

**Reporter**
2015 U.S. Dist. LEXIS 171184 *; CCH Prod. Liab. Rep. P19,754

ROCKY ESTES, PLAINTIFF v. LANX, INC., et al., DEFENDANTS

**Subsequent History:** Affirmed by *Estes v. Lanx, Inc., 2016 U.S. App. LEXIS 15328 (5th Cir. Miss., Aug. 16, 2016)*

**Prior History:** *Estes v. Lanx, Inc., 2015 U.S. Dist. LEXIS 166320 (N.D. Miss., Dec. 11, 2015)*

## Core Terms

manufacturing, screws, warranty, pedicle, Spinal, genuine, Fixation, seller, clearance, misrepresentation, merchantability, consumer, user, failure-to-warn, surgery, preempted, spoliated, subsumed, broken, proximately, implanted, quotation, labeled, fusion, cure

**Counsel:** **[*1]** For Rocky Estes, Plaintiff: Duncan L. Lott, LEAD ATTORNEY, DUNCAN LOTT, ATTORNEY, Booneville, MS.

For Lanx, Inc., Defendant: Adria H. Jetton, LEAD ATTORNEY, BAKER DONELSON BEARMAN CALDWELL & BERKOWITZ, PC, Jackson, MS; Bradley Witherspoon Smith, LEAD ATTORNEY, BAKER, DONELSON, BEARMAN & CALDWELL, Jackson, MS.

**Judges:** Sharion Aycock, UNITED STATES DISTRICT

JUDGE.

**Opinion by:** Sharion Aycock

## Opinion

MEMORANDUM OPINION

Plaintiff filed this suit against Lanx, Inc., for negligence, products liability for design defect, products liability for manufacturing defect, breach of express and implied warranties, fraudulent concealment, and negligent misrepresentation. Defendant filed a Motion for Summary Judgment [94] that no genuine disputes of material fact exist as to those claims. After reviewing the record, motion, response, rules, and authorities, the Court finds as follows:

*Factual and Procedural Background*

In 2011, Rocky Estes underwent spinal fusion surgery wherein the Lanx Telluride Spinal Fixation System was implanted to fuse his L5-S1 vertebrae. Within five months, two pedicle screws fractured. A revision surgery was performed on June 28, 2012, to remove the broken screws and replace the Telluride Spinal Fixation System **[*2]** with new orthopedic hardware.

Estes seeks compensation for injuries, pain and suffering, and his extensive past and future medical treatment on the basis that the pedicle screw was negligently designed or manufactured, that Lanx breached warranties as to the pedicle screws, and that Lanx failed to obtain FDA clearance for the Telluride System.

Lanx filed a Motion for Summary Judgment on those

claims.

*Summary Judgment Standard*

Summary judgment is warranted under *Rule 56(a) of the Federal Rules of Civil Procedure* when the evidence reveals no genuine dispute regarding any material fact and the moving party is entitled to judgment as a matter of law. The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*.

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Id. at 323, 106 S. Ct. 2548*. The nonmoving party must then "go beyond the **[*3]** pleadings" and "set forth 'specific facts showing that there is a genuine issue for trial.'" *Id. at 324, 106 S. Ct. 2548* (citation omitted). In reviewing the evidence, factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994)* (en banc). Importantly, conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments have never constituted an adequate substitute for specific facts showing a genuine issue for trial. *TIG Ins. Co. v. Sedgwick James of Wash., 276 F.3d 754, 759 (5th Cir. 2002)*; *SEC v. Recile, 10 F.3d 1093, 1097 (5th Cir. 1997)*; *Little, 37 F.3d at 1075*.

*Discussion and Analysis*

Plaintiff's causes of action can be summarized into three broader sub-categories: (1) claims concerning the specific pedicle screw and/or spinal fixation system used in Estes' 2011 surgery; (2) claims regarding warranties allegedly made by Lanx; and (3) claims that the Telluride Spinal Fixation System was improperly placed on the market for sale without proper FDA clearance.

**(1) Mississippi Products Liability Act and Negligence**

As for the first category, claims centered around the specific medical device used on Estes, the Plaintiff pled these causes of action: negligence, defective design, and manufacturing defect. Lanx contends that Plaintiff cannot sustain **[*4]** a negligence action on the basis that the Mississippi Products Liability Act precludes common law negligence.

**a.** *Design Defect under the MPLA*

Defendant contends Plaintiff's MPLA design defect claim should be dismissed as no feasible alternative design has been offered into evidence. Plaintiff failed to respond. The Mississippi Supreme Court has summarized the design defect elements under the MPLA as follows:

> The danger presented by the product's design was known or should have been known to the manufacturer [or seller] (i.e., the danger was foreseeable); (2) the product failed to function as expected (as a result of a design characteristic); (3) an alternative design existed that would not impair the product's usefulness or desirability; and (4) the alternative design would have to a reasonable probability prevented the harm.

*Phillips 66 Co., 94 So. 3d at 1060* (quoting *Williams v. Bennett, 921 So. 2d 1269, 1274 (Miss. 2006)* (internal quotation marks omitted)). Plaintiff put forth no evidence as to an alternative design. Accordingly, the Court finds that no genuine issue of material fact has been produced as to Plaintiff's design defect claim and that claim is dismissed. *See Gilley v. Protective Life Ins. Co., 17 F.3d 775, 781 n.13 (5th Cir. 1994)* ("We have held that an argument is waived if the party fails to make the argument in **[*5]** response to summary judgment.").

**b.** *Failure to Warn under the MPLA*

For a plaintiff to prevail on a failure-to-warn claim in Mississippi, he must prove by a preponderance of the evidence that at the time the product left the control of the manufacturer, designer, or seller:

> (i) . . . The product was defective because it failed to contain adequate warnings or instructions . . . ; and
>
> (ii) The defective condition rendered the product unreasonably dangerous to the user or consumer; and
>
> (iii) The defective and unreasonably dangerous condition of the product proximately caused the damages for which recovery is sought.

2015 U.S. Dist. LEXIS 171184, *5

*Miss. Code Ann. § 11-1-63(a)(i)(2)*, *(ii)*, *(iii)*. On such a claim, a plaintiff must also prove the following:

(c)(i) . . . [A]t the time the product left the control of the manufacturer, designer[,] or seller, the manufacturer, designer[,] or seller knew or in light of reasonably available knowledge should have known about the danger that caused the damage for which recovery is sought and that the ordinary user or consumer would not realize its dangerous condition[; and]

(ii) An adequate product warning or instruction is one that a reasonably prudent person in the same or similar circumstances would have provided with respect to the **[\*6]** danger and that communicates sufficient information on the dangers and safe use of the product, taking into account the characteristics of, and the ordinary knowledge common to an ordinary consumer who purchases the product; or in the case of a prescription drug, medical device[,] or other product that is intended to be used only under the supervision of a physician or other licensed professional person, taking into account the characteristics of, and the ordinary knowledge common to, a physician or other licensed professional who prescribes the drug, device[,] or other product.

*Miss. Code Ann. § 11-1-63(c)*.

Thus, "[a] manufacturer is liable under a failure-to-warn theory if the product 'failed to contain adequate warnings,' the inadequate warnings 'rendered the product unreasonably dangerous to the user or consumer,' and the inadequate warnings 'proximately caused the damages for which recovery is sought.'" *Union Carbide Corp. v. Nix, Jr., 142 So. 3d 374, 385 (Miss. 2014)*. The Fifth Circuit in interpreting Mississippi law has stated:

Under the learned intermediary doctrine, which is codified in the Mississippi Products Liability Act, a manufacturer of a prescription drug has no duty to warn the end user of the drug's possible adverse effects. *Wyeth Labs., Inc. v. Fortenberry, 530 So. 2d 688 (Miss. 1988)*. The manufacturer's duty to warn **[\*7]** runs only to the prescribing physician, who acts as an intermediary between the manufacturer and the patient. *Id.* The learned intermediary doctrine applies to medical devices as well as prescription drugs. *Moore v. Mem. Hosp. of Gulfport, 825 So. 2d 658, 662 n.6 (Miss. 2002)*.

*Smith v. Johnson & Johnson, Inc., 483 F. App'x 909, 913-14 (5th Cir. 2012)* (per curiam). "In order to make out a case for failure to warn under the learned intermediary doctrine, the plaintiff must establish that the treating physician, or a reasonable physician in the treating physician's position, would not have used the product had he received an adequate warning." *Id. at 914* (citing *Thomas v. Hoffman—LaRoche, Inc., 949 F.2d 806, 812 (5th Cir. 1992))*.

Plaintiff alleges Lanx had a duty to inform the hospital and the attending physician that the Lanx Telluride Spinal Fixation System had not been cleared, or that a standalone *510(k)* had not been submitted to the FDA, and that this failure caused his injuries.[1] In support of this claim, Plaintiff states that "Dr. Crosby has confirmed that had he known that Lanx Telluride Spinal Fixation System had not been cleared or that a standalone *510(k)* had not been submitted to the FDA and the Telluride System had not been cleared by the FDA he would not have used the Telluride System in the surgical procedure he performed on Estes." No record citation is provided by Plaintiff, **[\*8]** and no support is found therein, to substantiate this claim. Thus, Plaintiff has failed to put forth evidence that the treating physician would not have used this product had he known of the alleged lack of FDA clearance for the device or components of the product. Additionally, the treating physician did indicate in his deposition that he was aware of the risks of spinal fusion surgery and implantation of fusion devices, including the possibility of device failure. Even knowing those risks, Dr. Crosby testified he still used the Lanx Telluride Spinal Fixation System. Plaintiff's failure to warn claim is dismissed.

c. *Manufacturing Defect under the MPLA*

For a plaintiff to prevail on a manufacturing defect claim in Mississippi, he must prove by a preponderance of the evidence that at the time the product left the control of the manufacturer or designer:

(i) The **[\*9]** product was defective because it

_____

[1] Although the Amended Complaint [90] does not assert a failure to warn theory of liability under the MPLA, and the Court generally will not consider claims raised only in response to summary judgment, the Court analyzes them herein because dismissal of these claims is necessary after their consideration. *See Roberts v. Lubrizol Corp., 582 F. App'x 455, 461 (5th Cir. 2014)* (quoting *Cutrera v. Bd. of Supervisors of La. State Univ., 429 F.3d 108, 113 (5th Cir. 2005)*; *see also Green v. JP Morgan Chase Bank, N.A., 562 F. App'x. 238, 240 (5th Cir. 2014)*.

2015 U.S. Dist. LEXIS 171184, *9

deviated in a material way from the manufacturer's or designer's specifications or from otherwise identical units manufactured to the same manufacturing specifications, . . .; and

(ii) The defective condition rendered the product unreasonably dangerous to the user or consumer; and

(iii) The defective and unreasonably dangerous condition of the product proximately caused the damages for which recovery is sought.

Miss. Code Ann. § 11-1-63(a)(1)(i)-(iii).

"[M]anufacturing defect claims involve allegations not that the entire product line in question was defectively designed, but rather that the specific product purchased by the consumer was manufactured in a way which deviated from the design specifications." Hickory Springs Mfg. Co. v. Star Pipe Prods., Ltd., 991 F. Supp. 2d 778, 782 (N.D. Miss. 2014).

"[A] product is not 'defective' under § 11-1-63(a)(i)(1) unless it is shown to be out of compliance with the manufacturer's specifications." Cooper Tire & Rubber Co. v. Tuckier, 826 So. 2d 679, 693 (Miss. 2002) (citing Leverette v. Louisville Ladder Co., 183 F.3d 339, 341 (5th Cir. 1999) (holding that expert's testimony that ladder had manufacturing defect was properly excluded in products liability action under Mississippi law where expert failed to assess whether ladder met manufacturer's specifications)).

Plaintiff's Amended Complaint suggests that the "Lanx Pedicle Screws were not made in accordance with the Defendants' [sic] specifications or performance [*10] standards." However, Plaintiff never states how the pedicle screws at issue deviated from the manufacturing specification. In fact, Plaintiff puts forth no manufacturing specifications at all. Plaintiff further contends that proof of malfunction creates a genuine issue of material fact as to a manufacturing defect under the MPLA. Moreover, Plaintiff alleges that Defendant spoliated the evidence by failing to collect or maintain the broken pedicle screws after their removal from the Plaintiff.

The Court finds that Plaintiff's assertion that proof of malfunction is enough to sustain a question of fact in manufacturing defect cases under the MPLA is erroneous. Plaintiff's citations on this issue indicate the converse of Plaintiff's contentions. See Shelter Ins. Co. v. Mercedes-Benz USA, LLC, 236 F. App'x 45, 47-48 (5th Cir. 2007) (holding that evidence that only the

battery malfunctioned, without proof of an actual deviation from manufacturer specifications, was not enough to prove an essential element of the plaintiff's claim); Tuckier, 826 So. 2d at 693 ("[A] product is not 'defective' under § 11-1-63(a)(i)(1) unless it is shown to be out of compliance with the manufacturer's specifications."). Accordingly, without evidence of any manufacturer specifications, Plaintiff has failed to put forth evidence as to [*11] an element of the manufacturing defect claim that he would have to prove at trial. Therefore, Lanx's motion for summary judgment as to this claim is granted.

d. Negligence

Plaintiff's Amended Complaint additionally alleges that Lanx breached its duty of reasonable care in that it negligently "designed, developed, manufactured, tested, inspected, packaged, promoted, marketed, distributed, labeled, and/or sold" the Lanx Telluride System and its component, the Lanx Pedicle Screw. Despite the allegations not being in his complaint, the Plaintiff, in response to Defendant's Motion for Summary Judgment asserts that Lanx was additionally negligent in releasing the Telluride Spinal Fixation System into commerce without proper FDA clearance.

The Mississippi Legislature amended the Mississippi Products Liability Act (MPLA) in 2014 to apply to "any action for damages caused by a product, including, but not limited to, any action based on a theory of strict liability in tort, negligence or breach of implied warranty" and details the requirements to find "[t]he manufacturer, designer or seller" liable in such actions. MS LEGIS 383 (2014), 2014 Miss. Laws Ch. 383 (H.B. 680) (amended text emphasized). This [*12] amendment seems to signal the Mississippi Legislature's intent for all claims brought for damage caused by a product to be analyzed under the MPLA. See Little v. Smith & Nephew, Inc., No. 1:15-CV-028-GHD, 2015 U.S. Dist. LEXIS 75666, *12-13 (N.D. Miss. June 11, 2015). However, that version of the MPLA went into "force from and after July 1, 2014." See 2014 Miss. Laws WL No. 48 (H.B. 680). "[I]f a statute is to apply 'effective from and after passage' it is not to apply to causes of action that have accrued prior to the passage of the statute." Tie—Reace Hollingsworth ex rel McDonald v. City of Laurel, 808 So. 2d 950, 954 (Miss. 2002). "A cause of action accrues only when it comes into existence as an enforceable claim; that is, when the right to sue becomes vested, and the theory that an injury has to happen before a tort is considered complete." Oaks v. Sellers, 953 So. 2d 1077, 1081 (Miss. 2007) (internal quotation marks and

citation omitted). Indisputably, this cause of action accrued prior to the 2014 amendments to the MPLA.

Under the previous version of the MPLA, a determination of whether a plaintiff's negligence claim can exist alongside his other MPLA claims requires this Court to navigate unsettled Mississippi law. The previous version of the MPLA states that it applies "in any action for damages caused by a product except for commercial damage to the product itself." *See* Laws 2004, 1st Ex. Sess., Ch. 1, § 3, **[*13]** eff. September 1, 2004, amended by Laws 2014, Ch. 383 (H.B. No. 680), § 1, eff. July 1, 2014. To date, the Mississippi Supreme Court has never clearly indicated whether negligence claims are abrogated by the MPLA, and as recently as 2012 declined to decide that issue. *See Phillips 66 Co. v. Lofton, 94 So. 3d 1051, 1063 (Miss. 2012)* ("[G]iven that we have found that [the plaintiff] met his evidentiary burden under MPLA, it is unnecessary for this Court to reach the issue of whether [his] negligence claim was subsumed under MPLA . . . ."). In interpreting Mississippi law that same year, the Fifth Circuit stated that negligence claims can be brought alongside strict liability claims, but "a party may not disguise a products liability claim as a negligence claim to avoid dismissal." *Murray v. GM, L.L.C., 478 F. App'x 175, 181 (5th Cir. 2012)* (per curiam) (citing *McSwain v. Sunrise Med., Inc., 689 F. Supp. 2d 835, 844 (S.D. Miss. 2010)). See McSwain, 689 F. Supp. 2d at 846* (the plaintiff's "common law negligence claims fail because they are mere restatements of the claims brought under the MPLA, and . . . are not supported by sufficient evidence"); *Murray v. GM, LLC, No. 3:10-CV-188-HTW-LRA, 2011 U.S. Dist. LEXIS 93845, 2011 WL 3684517, at *3 (S.D. Miss. Aug. 22, 2011)* ("[W]hen a plaintiff's negligence claim cannot survive apart from his MPLA claim, regardless of how the plaintiff labels the claim . . . the claim is governed by the MPLA."); *McKee v. Bowers Window & Door Co., 64 So. 3d 926, 940 (Miss. 2011)* (the plaintiffs' "negligence claim fail[s] to present **[*14]** any new discussion or claim that does not relate back to the . . . products liability claim")).

With regard to specific claims, courts in Mississippi generally held that a negligence claim arising from defective design or failure to warn could not exist as a stand-alone claim because MPLA design defect claims and failure-to-warn claims necessarily required a negligence analysis. *See Hill v. Forest Labs., Inc., No. 2:06-CV-244-KS-MTP, 2014 U.S. Dist. LEXIS 78057, 2014 WL 2558756, at *2 (S.D. Miss. June 6, 2014)* (the plaintiff's claim that defendant "negligently failed to warn of the alleged association between Lexapro and suicide"

"was plainly a product liability claim within the scope of the MPLA"); *Hankins v. Ford Motor Co., No. 3:08-CV-639-CWR, 2011 U.S. Dist. LEXIS 143269, 2011 WL 6180410, at *4-5 (S.D. Miss. Dec. 13, 2011)* (quoting *Palmer v. Volkswagen of America, Inc., 905 So. 2d 564, 599-600 (Miss. Ct. App. 2003)* (internal quotation marks omitted) ("[W]hen a plaintiff claims defective design under the MPLA, a jury instruction on negligence is not necessary . . . because the risk-utility test [in the MPLA] requires the jury to reach a conclusion about the manufacturer's conduct[;] the test is a version of Judge Learned Hand's negligence calculus. Therefore, . . . a jury performing risk-utility analysis necessarily makes a negligence determination."); *McSwain, 689 F. Supp. 2d at 846* ("The claim that [defendant] negligently failed to warn users of the danger of the **[*15]** chair without anti-tip bars is a restatement of the failure to warn cause of action under the MPLA."); *Jowers v. BOC Group, Inc., No. 1:08-CV-036-KMO, 2009 U.S. Dist. LEXIS 53126, 2009 WL 995613, at *4 (S.D. Miss. Apr. 14, 2009)* aff'd in part, vacated in part on other grounds, and remanded sub nom., *Jowers v. Lincoln Elec. Co., 617 F.3d 346 (5th Cir. 2010)* ("[T]he greater weight of the somewhat-mixed authority holds that negligence-based claims of product defect [against a manufacturer] are abrogated by the MPLA."); *Lundy v. Conoco, Inc., No. 3:05-CV-477-WHB, 2006 U.S. Dist. LEXIS 82423, 2006 WL 3300397, at *2 (S.D. Miss. Nov. 10, 2006)* ("The Court finds that the failure to warn/inadequate warnings claims, regardless of the fact that Plaintiffs labeled one claim 'products liability' and the other 'negligence', are both governed by the [MPLA]."); *Bennett v. Madakasira, 821 So. 2d 794, 804 (Miss. 2002)* ("Although a plaintiff in a prescription drug liability case may alternatively rely on strict liability and negligence principles, these principles merge into one inquiry; the adequacy of the defendant's warnings."); *Palmer, 905 So. 2d at 600,* aff'd in part, rev'd in part on other grounds, *904 So. 2d 1077 (Miss. 2005)* ("[L]ike a claim of design defect, a claim of inadequate warnings under the MPLA requires the jury to perform negligence analysis in assessing liability. . . . [Thus], the court need not present the jury with a separate negligence instruction on inadequate warnings."). Therefore, it is clear that under the **[*16]** prior version of the MPLA, purported negligence claims that merely restate the elements of defective design or failure-to-warn claims brought under the MPLA are subsumed by the MPLA.

However, Mississippi case law interpreting the previous version of the MPLA is unclear as to whether a negligence claim arising from a manufacturing defect can exist as a stand-alone negligence claim. *See Little,*

2015 U.S. Dist. LEXIS 171184, *16

No. 1:15-CV-028-GHD, 2015 U.S. Dist. LEXIS 75666, at *12-13. The Fifth Circuit has determined under Mississippi law that "[t]he risk-utility analysis [employed in defect design and failure-to-warn claims] applies to design defect cases, not manufacturing defect cases," thus hinting that a negligence claim premised on manufacturing defect might exist alongside an MPLA manufacturing defect claim. See Leverette v. Louisville Ladder Co., 183 F.3d 339, 342 (5th Cir. 1999); see also Joiner v. Genlyte Thomas Grp., L.L.C., No. 1:09-CV-00093-GHD, 2012 U.S. Dist. LEXIS 20966, 2012 WL 567201, at *4 (N.D. Miss. Feb. 21, 2012) (a negligence claim arising from manufacturing defect might exist alongside a separate MPLA manufacturing defect claim). But see Deese v. Immunex Corp., No. 3:11-CV-373-DPJ-FKB, 2012 U.S. Dist. LEXIS 17342, 2012 WL 463722, at *5 (S.D. Miss. Feb. 13, 2012) ("It is unclear whether Mississippi law recognizes such a negligence claim separate and apart from the MPLA claims for negligent design or failure to warn.").

In addition to Plaintiff's manufacturing defect claim [*17] under the MPLA, Plaintiff's Amended Complaint could be liberally read to include a negligence action on the basis of manufacturing. Regardless of whether the MPLA subsumes that negligence action or not, the Court finds there are no genuine disputes of material fact concerning any manufacturing negligence, so summary judgment is appropriate as to that claim.

Plaintiff claims that the purpose of the Telluride Spinal Fixation System being implanted was to stabilize the spinal section to allow boney fusion. According to Dr. Crosby, Plaintiff's treating physician, achieving boney fusion takes between six and twenty-four months. The pedicle screws at issue here severed at five months. Plaintiff contends that evidence of the screws' malfunction is enough to show a breach of Lanx's duty. However, Plaintiff fails to elaborate or put forth expert testimony as to any particular manufacturing negligence on the part of Lanx. Plaintiff's expert testified that he had no opinions as to the manufacturing process as it applied to the particular screws. In follow up at the deposition, however, Lanx's counsel acknowledges that because the screws were not available, any opinion as to their defective construction [*18] would be inappropriate. Plaintiff contends that Lanx spoliated the evidence because it failed to save the broken pedicle screws after their removal.

Spoliation is "[t]he intentional destruction, mutilation, alteration, or concealment of evidence." Black's Law Dictionary 1531 (9th ed. 2009). But "[a] party can only be sanctioned for destroying evidence that it had a duty to preserve, and such duty arises when 'the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation.'" Consol. Aluminum Corp. v. Alcoa, Inc., 244 F.R.D. 335, 339 (M.D. La. 2006) (quoting Zubulake v. UBS Warburg, LLC, 220 F.R.D. 212, 216 (S.D.N.Y. 2003)). When spoliation is the result of a litigant's bad-faith actions, it gives rise to an adverse inference that the evidence was detrimental to the spoliating party's case. Vick v. Tex. Emp't Comm'n, 514 F.2d 734, 737 (5th Cir. 1975). "The party requesting an adverse inference must first show that the documents in question exist or existed and were within the control of the opposing party." Jobe v. ATR Mktg., Inc., 189 F.3d 466, at *6 n.3 [published in full-text format at 1999 U.S. App. LEXIS 40209] (5th Cir. 1999) (unpublished table decision) (citation omitted). "Moreover, a party seeking to obtain an adverse inference based on non-production or destruction of documents must show bad faith." Id. (citing Vick, 514 F.2d at 737 ("[T]he circumstances of the act must manifest bad faith. Mere negligence is not enough, for it does not [*19] sustain an inference of consciousness of a weak case.")).

Dr. Fernandez performed the surgical removal of the Lanx Telluride System. Dr. Crosby and Allen Rasoul, a medical product distributor, were also present during the surgery. Rasoul distributed Lanx, as well as other medical devices, and was present at Estes' surgery to deliver the new system being implanted. Plaintiff contends because complaints regarding broken screws were most often reported by distributors, and not individual patients, Rasoul should have collected the broken screws and either returned them to Lanx, had the hospital maintain possession of them, or retrieve them for himself. It is undisputed, however, the screws were not recovered after surgery, and the screws were not destroyed by Lanx or Rasoul. Because Plaintiff has failed to put forth a genuine issue of material fact as to bad faith on the part of Lanx, no spoliation instruction is warranted. Without evidence or testimony regarding Lanx's alleged manufacturing negligence, Plaintiff has not put forth any genuine issues of material fact as to that claim.

Aside from the negligence claims subsumed by the MPLA and the negligence in manufacturing claim, Plaintiff [*20] also makes negligence claims based on the alleged failure of Lanx to secure the appropriate clearance from the FDA. However, Plaintiff has not adequately shown a genuine issue of material fact as to

causation against Lanx for its alleged releasing the Telluride System into commerce without FDA approval. It is well established that causation is an essential element of a negligence claim. *See Weathersby Chevrolet Co., Inc. v. Redd Pest Control Co., Inc., 778 So. 2d 130, 133 (Miss. 2001)*. Plaintiff's own expert testified that connecting the Plaintiff's injury with the alleged failure to properly file with the FDA would be improper as it was too speculative. Accordingly, despite whether there was any duty to Plaintiff to achieve proper FDA clearance or breach of that duty by Lanx, the negligence claim for allegedly failing to obtain proper FDA authorization cannot succeed as there is no causative link between that alleged failure and Plaintiff's injuries. Accordingly, Defendant's Motion for Summary Judgment as to Plaintiff's negligence claims identified is granted.

(2) Warranties

The second category of claims covers Plaintiff's breach of express warranty and breach of implied warranties. Defendant counters that because Lanx never made representations to Estes, that these causes of **[*21]** action are due to be dismissed.

a. *Breach of Express Warranty*

For a plaintiff to prevail on a breach of express warranty claim in an action for damages caused by a product in Mississippi, he must prove by a preponderance of the evidence that at the time the product left the control of the manufacturer, designer, or seller:

> (i) . . . The product breached an express warranty or failed to conform to other express factual representations upon which the claimant justifiably relied in electing to use the product; and
> (ii) The defective condition rendered the product unreasonably dangerous to the user or consumer; and
> (iii) The defective and unreasonably dangerous condition of the product proximately caused the damages for which recovery is sought.

*Miss. Code Ann. § 11-1-63(a)(i)(4), (ii), (iii)*.

"[A]n express warranty is any affirmation of fact or promise which concerns the product and becomes part of the basis for the purchase of such a product. Fault does not need to be shown to establish a breach. The plaintiff need only show that the product did not live up to its warranty." *Scirocco, 2015 U.S. Dist. LEXIS 66561, 2015 WL 2451225, at *4* (quoting *Forbes v. GMC, 935 So. 2d 869, 876 (Miss. 2006)* (quoting *Austin v. Will—*

*Burt Co., 232 F. Supp. 2d 682, 687 (N.D. Miss. 2002)*, *aff'd, 361 F.3d 862 (5th Cir. 2004)* (internal quotation marks omitted)); *see also Miss. Code Ann. § 75-2-313(1)(a)*. The plaintiff must ultimately show that he relied on the alleged representation. **[*22]** *See Miss. Code Ann. § 11-1-63(a)(i)(4)*.

Plaintiff alleges the existence of an express warranty as follows:

> Defendant expressly warranted that the Lanx Telluride System and its component part of the Lanx Pedicle Screw were safe and fit for use by consumers and users including Plaintiff Rocky Estes for its intended purpose, that it was of merchantable quality, that it did not produce any dangerous side effects, and that it was adequately tested and fit for its intended use.

In response to summary judgment, Plaintiff again spins his claim to reflect Lanx's alleged failure to get FDA clearance for the Telluride System or its components. However, Plaintiff has failed to allege any express warranty that Lanx made to him regarding its 510(k) submission to the FDA, or even any specific claim made by Lanx to Plaintiff regarding the safety of the Telluride System or the pedicle screw associated therewith. Moreover, Plaintiff has produced no evidence or testimony creating a genuine issue of material fact that he relied on any representation by Lanx as to the safety or federal regulatory clearance. Accordingly, Defendant's Motion for Summary Judgment as to the breach of express warranty claim is granted.

b. *Breach of Implied Warranty **[*23]** of Merchantability*

To recover on a claim for breach of an implied warranty of merchantability, a plaintiff must demonstrate the following:

> (1) That a "merchant" sold "goods," and he was a merchant with respect to "goods of the kind" involved in the transaction, (2) which were not merchantable at the time of sale, and (3) injuries and damages to the plaintiff or his property, (4) caused proximately and in fact by the defective nature of the goods, and (5) notice to the seller of the injury.

*Watson Quality Ford, Inc. v. Casanova, 999 So. 2d 830, 834 (Miss. 2008)* (citing *Miss. Code Ann. § 75-2-314*). With respect to the last element, the Mississippi Supreme Court has noted that "though there may have been a breach of the warranty of merchantability, the seller has a right to attempt cure. An opportunity for the seller to cure is a reasonable requisite of a buyer's right

Case 1:19-md-02875-RMB-SAK   Document 577-4   Filed 09/18/20   Page 35 of 112
PageID: 12152

Page 8 of 10
2015 U.S. Dist. LEXIS 171184, *23

of recovery." *Id. at 834-35*.

Defendant asserts that because Plaintiff never allowed Lanx the chance to cure the alleged defect that Plaintiff's implied warranty of merchantability claim fails. Plaintiff failed to respond to this specific allegation of Lanx. Because opportunity to cure is a "requisite" to the buyer's right of recovery, and there is no testimony or proof that Plaintiff attempted to contact or contacted Lanx when it was **[*24]** discovered that the pedicle screw was broken, Lanx was not given an opportunity to cure and that claim is dismissed.

c. *Breach of Implied Warranty of Fitness for a Particular Purpose*

To recover on a claim for breach of an implied warranty of fitness for a particular purpose under Mississippi law, a plaintiff is required to demonstrate the following;

(1) the seller at the time of the contracting had reason to know the particular purpose for which the goods were required; (2) the reliance by the plaintiff as buyer upon the skill or judgment of the seller to select suitable goods, and (3) the goods were unfit for the particular purpose.

*Watson Quality Ford, Inc., 999 So. 2d at 835* (quoting *Garner v. S & S Livestock Dealers, Inc., 248 So. 2d 783, 785 (Miss. 1971)* (internal quotation marks omitted) (citing *Miss. Code Ann. § 75-2-315*)). "[N]o claim for breach of the implied warranty of fitness for a particular purpose will lie when a product is to be used for its ordinary purpose." *Id.* (citing *Ford Motor Co. v. Fairley, 398 So. 2d 216, 219 (Miss. 1981))*.

Aside from the fact that there is no allegation that the pedicle screw or Lanx Telluride Spinal Fixation System was not used for its ordinary purpose, there is no proof or testimony that Plaintiff relied on Lanx, the seller, in selecting to use that product. In fact, Estes testified that he relied solely on his treating physician Dr. Crosby to make **[*25]** that decision. Accordingly, Defendant's request for summary judgment as to the implied warranty for fitness for a particular purpose is granted.

d. *Negligent Misrepresentation*

Numerous Mississippi district courts have held that the MPLA subsumes common law negligent misrepresentation claims based on a defective product. *See Austin, 2013 U.S. Dist. LEXIS 137480, 2013 WL 5406589, at *8*; *Gardley—Starks, 917 F. Supp. 2d at 602*; *McSwain, 689 F. Supp. 2d at 844-45*; *Lashley v. Pfizer, Inc., 877 F. Supp. 2d 466, 471 (S.D. Miss. 2012)*;

*Murray, No. 3:10-CV-188 HTW-LRA, 2011 U.S. Dist. LEXIS 93845, 2011 WL 3684517, at *3 (S.D. Miss. Aug. 22, 2011)*, aff'd, *478 F. App'x 175 (5th Cir. 2012)*; *Walker v. George Koch Sons, Inc., 610 F. Supp. 2d 551, 562-63 (S.D. Miss. 2009)*. *See also Jowers, 2009 U.S. Dist. LEXIS 53126, 2009 WL 995613, at *9* (discussing *R.J. Reynolds Tobacco Co. v. King, 921 So. 2d 268 (Miss. 2005)* (negligent misrepresentation claim may not be product liability claim if affirmative representations were made in addition to and separate from those in connection with a failure-to-warn claim)). Because Plaintiff in the case *sub judice* alleges that Defendant made representations with respect to the screw that mirror his allegations concerning the alleged representations in his failure-to-warn claim, the Court finds that his negligent misrepresentation claim is subsumed by the MPLA and must be dismissed.

(3) Claims as to the FDA

Plaintiff's factual basis for the final category of claims centers on Lanx's FDA clearance for either the pedicle screws used in the Telluride Spinal Fixation System, or the Telluride Spinal Fixation System itself. Plaintiff's fraudulent concealment **[*26]** cause of action alleges liability for the fraudulent concealment or misrepresentation that the Lanx Telluride System had been properly approved by the FDA.

In a factually and legally similar case to this one, the United States Supreme Court in *Buckman Co. v. Plaintiffs' Legal Comm., 531 U.S. 341, 347-49, 121 S. Ct. 1012, 148 L. Ed. 2d 854 (2001)*, held that federal law preempts state-law causes of action claiming that a medical device manufacturer made fraudulent representations to the FDA. *531 U.S. at 353, 121 S. Ct. 1012*. *Buckman* involved orthopedic bone screws that the FDA approved in an expedited process as "substantially equivalent" to devices already on the market. *531 U.S. at 346, 121 S. Ct. 1012*. Plaintiffs who suffered injuries after implantation of the screws brought suit alleging that the manufacturer misled the FDA. Like here, they further alleged that the misrepresentations were a "but for" cause of their injuries because, absent the misrepresentations, the product would never have reached the market. *531 U.S. at 343, 121 S. Ct. 1012*.

The Supreme Court rejected the novel cause of action because the state law claim would conflict with the FDA's authority to punish fraud on the agency. As noted by the Court:

[T]he § 510(k) process sets forth a comprehensive scheme for determining whether an applicant has

demonstrated that a product is substantially equivalent to a predicate device. Among **[*27]** other information, the applicant must submit to the FDA "proposed labels, labeling, and advertisements sufficient to describe the device, its intended use, and the directions for its use," _21 CFR § 807.87(e) (2000)_, and a statement attesting to and explaining the similarities to and/or differences from similar devices (along with supporting data), see _§ 807.87(f)_. The FDA is also empowered to require additional necessary information. See _§ 807.87(l)_. Admittedly, the § 510(k) process lacks the PMA review's rigor: The former requires only a showing of substantial equivalence to a predicate device, while the latter involves a time-consuming inquiry into the risks and efficacy of each device. Nevertheless, to achieve its limited purpose, the § 510(k) process imposes upon applicants a variety of requirements that are designed to enable the FDA to make its statutorily required judgment as to whether the device qualifies under this exception.

Accompanying these disclosure requirements are various provisions aimed at detecting, deterring, and punishing false statements made during this and related approval processes. The FDA is empowered to investigate suspected fraud, see _21 U.S.C. § 372_; 21 CFR § 5.35 (2000), and citizens may report wrongdoing and petition the **[*28]** agency to take action, _§ 10.30_. In addition to the general criminal proscription on making false statements to the Federal Government, _18 U.S.C. § 1001, (1994 ed., Supp. IV)_, the FDA may respond to fraud by seeking injunctive relief, _21 U.S.C. § 332_, and civil penalties, _21 U.S.C. § 333(f)(1)(A)_; seizing the device, _§ 334(a)(2)(D)_; and pursuing criminal prosecutions, _§ 333(a)_. The FDA thus has at its disposal a variety of enforcement options that allow it to make a measured response to suspected fraud upon the Agency.

_Buckman, 531 U.S. at 348-49, 121 S. Ct. 1012_. Indeed, the Court stated "that the federal statutory scheme amply empowers the FDA to punish and deter fraud against the Administration." _531 U.S. at 348, 121 S. Ct. 1012_. Not only does federal law provide administrative tools to punish and deter fraud, but the agency's decision to employ those tools implicates its discretion and special competence.[2] Among the factors that make

FDA enforcement "a somewhat delicate balance of statutory objectives," _id., 121 S. Ct. 1012_, are the need for administrative efficiency and the possibility that tort liability based on inadequate disclosures would create "an incentive to submit a deluge of information," _531 U.S. at 351, 121 S. Ct. 1012_. The Court concluded that authorizing tort liability for failure to comply with FDA disclosure requirements "would exert an extraneous pull on the scheme established **[*29]** by Congress, and it is therefore pre-empted by that scheme." _531 U.S. at 353, 121 S. Ct. 1012_; _Lofton v. McNeil Consumer & Specialty Pharms., 672 F.3d 372, 375-76 (5th Cir. 2012)_.

The parties have failed to brief whether federal regulatory law impliedly preempts Plaintiff's causes of action based on Lanx's submissions to the FDA. Accordingly, the parties are ORDERED to SHOW CAUSE as to whether these claims and others are or are not preempted. Show Cause Responses are due JANUARY 8, 2016.

_Conclusion_

Accordingly, the Defendant's Motion for Summary Judgment [94] is GRANTED IN PART. Plaintiff has failed to bring forth genuine issues of material fact as to the following claims: (1) all negligence claims; (2) all claims under the MPLA; and (3) all warranty claims.

The parties shall have until January 8, 2016, to show cause as to why FDA regulations do or do not impliedly preempt Plaintiff's claims regarding Lanx's failure to procure the appropriate 510(k) clearance from the FDA before introducing the Telluride System and/or pedicle screw into commerce.

SO ORDERED, this the 23rd day of December, 2015.

/s/ Sharion Aycock

**U.S. DISTRICT JUDGE**

ORDER ON SUMMARY JUDGMENT **[*30]**

Pursuant to a Memorandum Opinion issued this day, the Defendant's Motion for Summary Judgment [94] is hereby GRANTED IN PART. As explained in the Opinion, the parties are ORDERED TO SHOW CAUSE as to why Plaintiff's remaining claims are not preempted by _Buckman Co. v. Plaintiffs' Legal Comm., 531 U.S. 341, 347-49, 121 S. Ct. 1012, 148 L. Ed. 2d 854 (2001)_.

---

[2] The FDA has authority to investigate fraud, _21 U.S.C. § 372_, consider citizen petitions, _21 C.F.R. § 10.30_, and seek criminal

and civil penalties particular to fraud-on-the-FDA, _21 U.S.C. § 332-33_. _Buckman, 531 U.S. at 349, 121 S. Ct. 1012_.

2015 U.S. Dist. LEXIS 171184, *30

Show Cause Responses are due January 8, 2016.

SO ORDERED, this the 23rd day of December, 2015.

**/s/ Sharion Aycock**

**U.S. DISTRICT JUDGE**

---

**End of Document**

Tab 5



**User Name:** Ava Cavaco

**Date and Time:** Wednesday, September 16, 2020 5:20:00 PM CDT

**Job Number:** 125571414

## Document (1)

1. *Jarrett v. Wright Med. Tech., Inc., 2019 U.S. Dist. LEXIS 104086*

   **Client/Matter:** -None-

   **Jarrett v. Wright Med. Tech., Inc., No. 1:12-cv-00064-SEB-DML, 2019 U.S. Dist. LEXIS 104086, at *7 (S.D. Ind. June 21, 2019)**

   **Search Type:** Natural Language

   **Narrowed by:**

   | Content Type | Narrowed by |
   |---|---|
   | Cases | custom: Custom |


Cited
As of: September 16, 2020 10:20 PM Z

## *Jarrett v. Wright Med. Tech., Inc.*

United States District Court for the Southern District of Indiana, Indianapolis Division

June 21, 2019, Decided; June 21, 2019, Filed

No. 1:12-cv-00064-SEB-DML

**Reporter**
2019 U.S. Dist. LEXIS 104086 *; 99 U.C.C. Rep. Serv. 2d (Callaghan) 297; 2019 WL 2567708

COLEMAN JARRETT, PAULA JARRETT, Plaintiffs, v. WRIGHT MEDICAL TECHNOLOGY, INC. a Delaware corporation, Defendant.

## Core Terms

warranty, hip, implant, punitive, subsumed, prejudgment, metal, replacement, misrepresentation, merchantability, consortium, contract-based, manufacturer, pled, patients

**Counsel:** **[*1]** For COLEMAN JARRETT, Plaintiff: Eric Charles Lewis, LEWIS LEGAL SERVICES, P.C., Indianapolis, IN; Shayne Hodge, PRO HAC VICE, THE MILLER LAW FIRM, LLC, Orange, VA; Tayjes Shah, PRO HAC VICE, THE MILLER FIRM, LLC, Orange, VA.

PAULA JARRETT, Plaintiff, Pro se.

For WRIGHT MEDICAL TECHNOLOGY, INC., a Delaware corporation, Defendant: Anne A. Gruner, J. Scott Kramer, DUANE MORRIS LLP, Philadelphia, PA; Blake N. Shelby, FROST BROWN TODD LLC (Indianapolis), Indianapolis, IN; Robert B. Thornburg, FROST BROWN TODD LLC, Indianapolis, IN.

**Judges:** SARAH EVANS BARKER, United States District Judge.

**Opinion by:** SARAH EVANS BARKER

## Opinion

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S PARTIAL MOTION TO DISMISS**

This cause is before the Court on Defendant's Partial Motion to Dismiss and Motion to Strike Plaintiffs' Second Amended Complaint [Dkt. 34]. The motions were filed on October 15, 2018, pursuant to *Federal Rules of Civil Procedure 12(b)(6)* and *12(f)* and are fully briefed. Plaintiff Coleman Jarrett filed this lawsuit against Defendant Wright Medical Technology, Inc. ("Wright Medical") alleging six causes of action arising under Indiana law: the Indiana Products Liability Act (Count I), breach of express warranty (Count II), breach of implied warranty of merchantability **[*2]** (Count III), fraud (Count IV), and common law punitive damages (Count VI). Plaintiff Paula Jarrett, Mr. Jarrett's wife, alleges a claim for loss of consortium (Count V). We have jurisdiction under diversity of citizenship. For the reasons detailed below, we <u>GRANT IN PART</u> and DENY IN PART Defendant's Partial Motion to Dismiss and Motion to Strike.

**Factual Background**

Wright Medical is a company incorporated in Delaware with its principal place of business in Arlington, Tennessee. Plaintiffs Coleman and Paula Jarrett are both citizens and residents of the State of Indiana. Wright Medical "design[s], manufacture[s], market[s], distribute[s] and s[ells]" hip replacements. Sec. Am. Compl. ¶ 13. Mr. Jarrett's doctor (who is not a party to this dispute) implanted Wright Medical's Conserve Hip Implant System ("Conserve") into Mr. Jarrett's hip on

2019 U.S. Dist. LEXIS 104086, *2

July 17, 2006, in Indianapolis, Indiana. *Id.* Conserve is a "metal-on-metal hip-replacement product." *Id.* ¶ 10. Wright Medical produced and sold the Conserve hip implant that Mr. Jarrett received. *Id.* ¶ 13.

Mr. Jarrett alleges that nearly four years after his hip replacement (June 29, 2010) he began to experience pain in his hip. *Id.* ¶ 24. In July of 2010, **[*3]** in seeking an explanation for the pain he was experiencing, "learned that his left hip [had] failed due to a gross loosening of the Conserve Cup component and a metal reaction." *Id.* ¶ 25. During Mr. Jarrett's surgery to remove and replace the Conserve Cup his doctor reportedly had noticed that "metal ions [had been] released from the Conserve." *Id.* Since the failure of the implant, Mr. Jarrett has "endured a painful recovery . . . and continues to suffer from injuries of a permanent and lasting nature and discomfort . . . ." *Id.* ¶ 26.

Mr. Jarrett's legal claims include the assertion that Wright Medical "marketed to patients with hip problems that, after being implanted with the Conserve Hip Systems, they could engage in and/or return to a normal, active lifestyle . . . ." *Id.* ¶ 19. However, according to Mr. Jarrett, Wright Medical, "[p]rior to, on, and after July 17, 2006, . . . knew that the Conserve . . . was defective and harmful to patients and that its components had an unacceptable failure and complication rate." *Id.* ¶ 23. Mr. Jarrett contends that his doctor recommended the Conserve to him based on Wright Medical's affirmations to the doctor "that there were no known issues/ **[*4]** minimal issues" with the Conserve. *Id.* ¶ 20. Moreover, Wright Medical "fail[ed] to warn doctors and patients that the Conserve was defective in that the metal on metal design increased the risk of early failure and revision surgery over conventional hip replacement designs." *Id.* ¶ 34(d).

On January 17, 2012, Mr. Jarrett filed his complaint in this action, which he amended on October 1, 2018. In the motions currently before us, Wright Medical seeks dismissal of Counts II-VI and an order striking the request for attorney fees and prejudgment interest.

## Legal Analysis

### I. Standard of Review

Defendant's motion to dismiss is based on *Federal Rule of Civil Procedure 12(b)(6)*. Under that rule, the Court

accepts as true all well-pled factual allegations in the complaint and draws all ensuing inferences in favor of the non-movant. *Lake v. Neal, 585 F.3d 1059, 1060 (7th Cir. 2009)*. Nevertheless, the complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," and its "[f]actual allegations must . . . raise a right to relief above the speculative level." *Pisciotta v. Old Nat'l Bancorp, 499 F.3d 629, 633 (7th Cir. 2007)* (citations omitted). The complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*; see *Fed. R. Civ. P. 8(a)(2)*. Stated otherwise, a facially plausible complaint is one **[*5]** which permits "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*.

Defendant's Motion to Strike is based on *Federal Rule of Civil Procedure 12(f)*, which provides that a court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." *Fed. R. Civ. P. 12(f)*. Allegations subject to being stricken are those that "bear . . . no possible relation to the controversy or may cause the objecting party prejudice." *Evansville Greenway & Remediation Tr. v. S. Ind. Gas & Elec. Co.*, No. 3:07-cv-66-SEB-WGH, 2010 WL 11569546, at *3 (S.D. Ind. Aug. 27, 2010) (quoting *Talbot v. Robert Matthews Distrib. Co., 961 F.2d 654, 664 (7th Cir. 1992)*). Whether to strike material pursuant to *Rule 12(f)*, is an issue vested in the Court's discretion. *Id.* at *3.

## II. Discussion

### A. Breach of Warranty Claims-(Counts II and III)

Wright Medical seeks dismissal of Mr. Jarrett's breach of express warranty (Count II) and implied warranty of merchantability (Count III) claims, arguing that they cannot be pursued as separate claims because they are subsumed within the Indiana Products Liability Act (Count I). Br. Supp. at 4.

An express warranty is "any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain . . . ." *IND. CODE ANN. § 26-1-2-313(1)(a)* (West, Westlaw through 2019 Legis. **[*6]** Sess.). "[A] warranty

2019 U.S. Dist. LEXIS 104086, *6

that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." *Id.* at *§ 26-1-2-314(1).*

The Indiana Products Liability Act (IPLA) includes all causes of action "(1) brought by a user or consumer, (2) against a manufacturer or seller, and (3) for physical harm caused by a product . . . ." *IND. CODE ANN. § 34-20-1-1* (West, Westlaw through 2019 Legis. Sess.). The IPLA provides "a single cause of action when a consumer seeks to recover from a manufacturer or seller for physical harm." *Cincinnati Ins. Cos. v. Hamilton Beach/Proctor-Silex, Inc.,* No. 4:05 CV 49, 2006 U.S. Dist. LEXIS 98072006 WL 299064, at *2 (N.D. Ind. Feb. 7, 2006).

Wright Medical argues that both of Mr. Jarrett's breach of warranty claims emanate from the personal injuries he suffered due to "the hip implant components at issue." Br. Supp. at 4. Indiana courts recognize that plaintiffs suing for breach of warranty may seek to assert both tort-based causes of action under the IPLA and contract-based claims under the Uniform Commercial Code. *Cincinnati Ins. Cos., 2006 U.S. Dist. LEXIS 9807, 2006 WL 299064, at *3; B&B Paint Corp. v. Shrock Mfg., Inc., 568 N.E.2d 1017, 1019-20 (Ind. Ct. App. 1991).* Tort-based breaches of implied warranty claims are "redundant with strict liability claims," and thus are subsumed under the IPLA. *Cincinnati Ins. Cos., 2006 U.S. Dist. LEXIS 9807, 2006 WL 299064, at *3.* Contract-based claims are not subsumed. *B&B Paint Corp., 568 N.E.2d at 1019-20.*

The Indiana Supreme **[*7]** Court distinguishes between causes of action under the IPLA and contract law. Claims under the IPLA are for "damage from a defective product or service . . . [that] causes personal injury . . . ." *Gunkel v. Renovations, Inc., 822 N.E.2d 150, 153 (Ind. 2005).* Contract law applies to claims for "damage to the product or service itself and purely economic loss arising from the failure of the product or service to perform as expected." *Id.* For example, in *Hathaway v. Cintas Corporate Services, Inc.,* the plaintiff suffered injuries when sparks from the plasma cutter he was using caught his employer-provided shirt on fire. *903 F. Supp. 2d 669, 671 (N.D. Ind. 2012).* The court ruled that plaintiff's breach of warranty claims were tort-based because he was not seeking "recovery for damage to the shirt or any economic loss . . . ." *Id. at 673.* Compare this holding to *Atkinson v. P & G-Clairol, Inc.* where plaintiff sought damages for injuries she incurred in using the defendant's hair care product. *813 F. Supp. 2d 1021, 1022 (N.D. Ind. 2011).* The court held in *Atkinson*

that plaintiff's express and implied breach of warranty claims were contract-based, even though the plaintiff did not limit her recovery to contract damages which included "the cost of the product . . . [and] economic loss." *Id. at 1026.* The court noted that plaintiff was not required "to **[*8]** delineate in the Complaint [her] damages to make it clear that she sought after damages included the return of the purchase price of the [product]." *Id.*

Our review causes us to conclude that Mr. Jarrett's breach of express warranty and implied warranty of merchantability claims are both contract-based and thus not subsumed under the IPLA. In Count II, Mr. Jarrett alleges that Wright Medical's 2005 press release stated that its "A-CLASS(TM) Advanced Metal minimizes wear through optimized durability, reducing the surface run-in wear to one-tenth the rate experienced by conventional total hip systems . . . ." Sec. Am. Compl. ¶ 50. However, "Defendant's metal-on-metal design actually increases severe complications from wear debris . . . significantly decreas[ing] the survivorship of the device." *Id.* ¶ 52. In Count III Mr. Jarrett alleges that Wright Medical was "a merchant with respect to . . . the Conserve," *id.* ¶ 60 and breached the implied warranty "because the Conserve was dangerous and could not safely be used for its ordinary purpose, *id.* ¶ 63." Mr. Jarrett seeks damages based on both Counts II and III that "includ[e] the cost of the hip replacement and all economic damages stemming **[*9]** from the hip replacement." (*Id.* ¶¶ 58, 68).

The facts of the case before us are distinguishable from *Hathaway.* In *Hathaway,* the plaintiff did not seek damages for harm to the shirt that had caught fire. Here, Mr. Jarrett seeks to recover money damages to replace the defective hip implant and to offset the economic losses that will result from the replacement. These are contract-based claims, and as such are not subsumed under the IPLA.

Alternatively, Wright Medical argues that, even if Counts II and III are contract-based, the claims are time-barred under the applicable statute of limitations and should be dismissed. Br. Supp. at 5. Actions for breach of contract of sale "must be commenced within four years after the cause of action accrued." *IND. CODE ANN. § 26-1-2-725(1)* (West, Westlaw through 2019 Legis. Sess.). The "breach of warranty occurs when tender of delivery is made . . . ." *Id.* at *§ 26-1-2-725(2).* However, "where a warranty explicitly extends to future performance of the goods and discovery of the breach . . . [takes time], the cause of action accrues when the breach is or should

have been discovered." *Id.*

Indiana courts recognize that "a cause of action accrues upon the occurrence of a legal injury" combined with the **[*10]** harm caused. *Tolen v. A.H. Robins Co., 570 F. Supp. 1146, 1151 (N.D. Ind. 1983)* (concluding that plaintiff's legal injury occurred when her doctor implanted the defendant's contraceptive device). However, in certain cases the statute of limitations may be tolled, including where the future performance exception applies.

Courts have clarified when the future performance exception for a breach of warranty claim tolls the statute of limitations. This exception applies only to express warranties, not implied warranties. *Id. at 1154* (citing *Stumler v. Ferry-Morse Seed Co., 644 F.2d 667, 669 (7th Cir. 1981)* (per curiam)). The future performance exception applies only when the express warranties are connected to a "specific time period or future date . . . ." *Stumler, 644 F.2d at 672* (holding that the warranties were just "promise[s] that the [tomato] seeds w[ould] perform well or perform in a certain manner" and thus were not sufficient for the exception to apply). In *Tolen*, for example, the warranties that the contraceptive would protect plaintiff "[f]or a period of several years" and that "[s]ome women [were] . . . protected . . . for five years or longer" were viewed by the court as not sufficiently explicit. *Tolen, 570 F. Supp. at 1153-54*. This provision in the warranty under review here contrasts with situations where the exception was found to apply, which "reference[d] . . . **[*11]** future time, such as [a] 'lifetime warranty' . . . ." *Id. at 1154* (quoting *Rempe v. Gen. Elec. Co., 28 Conn. Supp. 160, 254 A.2d 577, 579 (Conn. Super. Ct. 1969))*.

Here, the statute of limitations began to accrue when Mr. Jarrett's doctor surgically inserted the Conserve hip implant on July 17, 2006. Sec. Am. Compl. ¶ 13. Mr. Jarrett's original Complaint [Dkt. 1] for the breach of warranty claims was filed on January 17, 2012, more than four years after the product was delivered. Accordingly, Mr. Jarrett's warranty claims were asserted after the limitations period had run, and Mr. Jarrett's contention that the statute of limitations for these claims is tolled by the future performance exception is unavailing. Wright Medical's representation to Mr. Jarrett's doctor was that the Conserve hip implant "would last longer than the 15-20 years that a conventional hip replacement would last," (*id.* ¶ 51) is similar to the warranty language in *Tolen* that the device would last many years. Wright Medical's express warranty to Mr. Jarrett did not reference a future time

and was not sufficiently specific for the exception to apply. Therefore, even though these warranty claims are not subsumed by the IPLA which would allow them to survive the motion to dismiss on that basis, they are time-barred. **[*12]** Wright Medical's Motion to Dismiss Mr. Jarrett's breach of express warranty (Count II) and implied warranty of merchantability (Count III) claims is <u>GRANTED</u>.

## B. Fraud-Count IV

Wright Medical next seeks dismissal of Mr. Jarrett's fraud claim (Count IV) under alternative theories: that the claim is either subsumed under the IPLA or not properly pled under *Federal Rule of Civil Procedure 9(b)*. Br. Supp. at 7. The IPLA includes all products liability actions "regardless of the substantive legal theory or theories upon which the action is brought." *§ 34-20-1-1*. Plaintiff concedes that the fraud claim (Count IV) merges into the IPLA claim. Br. Opp'n at 6; Br. Supp. at 7. Though not in dispute between the parties, we explain below why this is true.

Courts have expressed a clear preference for "merging claims into a single IPLA action (whether it is based on theories of manufacturing defect, design defect, failure to warn, or a combination thereof) . . . ." *Cavender v. Medtronic, Inc., No. 3:16-CV-232, 2017 U.S. Dist. LEXIS 57376, 2017 WL 1365354, at *4 (N.D. Ind. Apr. 14, 2017)*. For example, in *Ryan ex rel. Estate of Ryan v. Philip Morris USA, Inc.*, plaintiff sued defendant for negligence, fraud, and products liability after her husband, who had smoked cigarettes throughout his life, died. *No. 1:05 CV 162, 2006 U.S. Dist. LEXIS 9077, 2006 WL 449207, at *1 (N.D. Ind. Feb. 22, 2006)*. The **[*13]** court held that all of the plaintiff's claims "f[ell] within the purview of the IPLA," requiring the dismissal of the individual claims of fraud and negligence. *2006 U.S. Dist. LEXIS 9077, [WL] at *3*.

Taking the allegations in Mr. Jarrett's Second Amended Complaint as true, as we must, we hold that Mr. Jarrett's fraud claim is subsumed by the IPLA. Mr. Jarrett has alleged that the metal on metal hip implant was defective because, when utilized by active patients, increased wear occurred as well as an increase in metal particles causing various injuries. *Id.* ¶ 77. Mr. Jarrett claims that his injury resulted from Wright Medical's fraud in withholding information about the reported harms generated by metal on metal hip implants, *id.* ¶ 82 despite Wright Medical's having been aware of

studies to that effect, *id.* ¶ 77.[1] Mr. Jarrett's fraud allegations are a part of the product liability theory of failure to warn of a product defect which causes physical harm; the fraud claim is thus subsumed by the IPLA. Wright Medical's Motion to Dismiss Count IV in Mr. Jarrett's Second Amended Complaint is therefore <u>GRANTED</u>.[2]

## C. <u>Loss of Consortium-Count V</u>

Mrs. Jarrett alleges in Count V her loss of **[*14]** consortium claim stemming from Wright Medical's actions and the resultant incapacitation to Mr. Jarrett, her husband. Sec. Am. Compl. ¶ 86. Wright Medical seeks to dismiss Count V arguing that this claim as well is subsumed under the IPLA (Count I). Br. Supp. at 4.

Indiana courts have held that loss of consortium claims are derivative of causes of action under the IPLA. *Bailey v. Medtronic, Inc., No. 1:17-cv-02314-JMS-DML, 2017 U.S. Dist. LEXIS 200300, 2017 WL 6035329, at *6 (S.D. Ind. Dec. 6, 2017)*. Loss of consortium claims do not merge into the IPLA for the reason that they do not "consist[] of an effort on the part of . . . consumers, to recover from . . . a manufacturer, for physical harm caused by a product . . . ." *2017 U.S. Dist. LEXIS 200300, [WL] at *3*. A derivative claim is "[a] lawsuit arising from an injury to another person . . . ." *In re Guardianship of French, 927 N.E.2d 950, 959 (Ind. Ct. App. 2010)* (citation omitted). "'[A] cause of action for loss of consortium derives its viability from the validity of the claim of the injured spouse against the wrongdoer.'" *Bd. of Comm'rs v. Nevitt, 448 N.E.2d 333, 341 (Ind. Ct. App. 1983)* (quoting *Arthur v. Arthur, 156 Ind. App. 405, 296 N.E.2d 912, 913 (Ind. Ct. App. 1973))*. A claim that

forms the basis for a loss of consortium claim is valid if the foundational claim was not previously dismissed on its merits. *Id.*

Here, Mrs. Jarrett's claim for loss of consortium as a derivative claim is not subsumed under the IPLA. Wright Medical has not yet challenged Mr. Jarrett's **[*15]** IPLA claim on the merits; thus, the derivative claim is still valid and not subject to dismissal. That claim may proceed and Wright Medical's Motion to Dismiss Count V is <u>DENIED</u>.

## D. <u>Common Law Punitive Damages-Count V</u>

Wright Medical also seeks dismissal of Mr. Jarrett's claim for common law punitive damages (Count VI) arguing that Mr. Jarrett did not "allege sufficient factual support for the type of conduct required for such damages under Indiana law." Br. Supp. at 10. "In Indiana, punitive damages may be awarded if the defendant acted with fraud, malice, gross negligence or oppression, and if it appears that the public interest would be served by the deterrent effect of punitive damages." *Stuhlmacher v. Home Depot U.S.A., Inc., No. 2:10 CV 467, 2011 U.S. Dist. LEXIS 50887, 2011 WL 1792853, at *6 (N.D. Ind. May 11, 2011)* (citation omitted). Punitive damages can be recovered on grounds other than fraud, and thus, a generally stated claim for punitive damages does not have to be pled with particularity. *Gorman v. Saf-T-Mate, Inc., 513 F. Supp. 1028, 1037 (N.D. Ind. 1981)* (citation omitted). However, if the claim for punitive damages is based on the defendant's fraud, such allegations must be pled with particularity, as required by *Rule 9(b)*. *Stuhlmacher, 2011 U.S. Dist. LEXIS 50887, 2011 WL 1792853, at *6*.

Wright Medical argues that, to the extent that Mr. Jarrett's claim for punitive damages is based **[*16]** on fraud, it was not pled with particularity and also includes "the same essential unidentified 'misrepresentations' and allegedly false information . . . as asserted in ... Count IV for fraud." Br. Supp. at 10. Wright Medical argues that Mr. Jarrett's fraud claim (Count IV) does not include "any specific statements about the hip implant components at issue that were made directly to Plaintiff or his physicians . . . who made the alleged representations, and the place and method of the allegedly fraudulent communications as required under *Rule 9(b)*." *Id.* at 8-9. Wright Medical further contends that, to the extent that Count VI is premised on malice or oppressiveness, Mr. Jarrett has pled no more than "a bare conclusory statement without supporting facts." *Id.*

---

[1] This case is distinguishable from *Elward v. Electrolux Home Products, Inc.* in which the court concluded that the fraudulent concealment claim was not merged into the IPLA. *264 F. Supp. 3d 877, 895 (N.D. Ill. 2017)*. In *Elward* the court noted that the fraudulent concealment claim "d[id] not merely allege a failure to warn that caused physical harm; rather, they also assert that they would have not purchased [defendant's] dishwasher if not for [defendant's] intentional concealment . . . ." *Id. at 895 n.13*.

[2] The Court does not address Wright Medical's alternative contention that Mr. Jarrett's fraud claim is not pled with particularity as required under *Federal Rule of Procedure 9(b)* because "no independent cause of action for fraud can be maintained . . . ." *Ryan, 2006 U.S. Dist. LEXIS 9077, 2006 WL 449207 at *3*.

2019 U.S. Dist. LEXIS 104086, *16

at 11.

We begin by addressing Mr. Jarrett's allegations sounding in fraud. To adequately allege a claim for fraud, the plaintiff must "identify the person who made the misrepresentation; the time, place and content of the misrepresentation; and the way in which the misrepresentation was communicated to the pleader." *Stuhlmacher, 2011 U.S. Dist. LEXIS 50887, 2011 WL 1792853 at \*5* (citing *Gen. Elec. Capital Corp. v. Lease Resolution Corp., 128 F.3d 1074, 1078 (7th Cir. 1997)).* In other words, a plaintiff must adequately allege "the who, what, where, and when of the alleged fraud." *2011 U.S. Dist. LEXIS 50887, [WL] at \*6* (quoting *Ackerman v. Nw. Mut. Life Ins. Co., 172 F.3d 467, 469 (7th Cir. 1999)).*

Here, Mr. Jarrett **[\*17]** has failed to allege the "who" and "where" elements of the alleged fraud. Mr. Jarrett claims only that Wright Medical's "sales representatives and distributors, represented to Plaintiff's implanting physician, Dr. Parr, that the Conserve was vetted and cleared by the FDA, was safe and effective, was designed for more active, younger patients . . . ." *Id.* ¶ 71. But he has failed to identify the specific sales representatives or distributors who allegedly made these misrepresentations to his doctor. *See North v. Bridgestone/Firestone, Inc., No. IP 01-5252-C-B/S, 2002 U.S. Dist. LEXIS 23149, 2002 WL 31689264, at \*8 (S.D. Ind. Nov. 20, 2002)* (pleading fraud with particularity requires pleading "the identity of the person making the misrepresentation").

While Mr. Jarrett generally alleges that Wright Medical "directed its marketing (via websites, journal ads, brochures . . .) to surgeons and younger, more active consumers who wanted to return to physical activities," *id.* ¶ 75, he has failed to assert the place where any of the allegedly false statements appeared and in what medium—in the marketing materials, in-person conversations, in other communications or publications, or through other means. These allegations are insufficient to adequately plead the "where" of the alleged **[\*18]** fraud. *See Lautzenhiser v. Coloplast A/S, No. 4:11-cv-86-RLY-WGH, 2012 U.S. Dist. LEXIS 142657, 2012 WL 4530804, at \*7 (S.D. Ind. Sept. 29, 2012)* (dismissing fraud claim in part because the plaintiff "failed to allege any specific reports, press releases, or advertisements ... that would put [the defendants] on any notice of the medium in which these fraudulent statements were made").

Having determined that Mr. Jarrett has pled insufficient

facts to properly allege fraud under *Rule 9(b)*, his claim for punitive damages on a theory other than fraud is adequate. Mr. Jarrett claims that Wright Medical "downplayed, understated, and/or disregarded their knowledge of the serious and permanent side effects and risks associated with the use of the Conserve despite available information . . . ." *Id.* ¶ 89. "Defendant failed to provide warnings that would have dissuaded health care professionals from using the Conserve . . . ." *Id.* ¶ 92. He states that "Defendant failed to provide adequate training and instructions to physicians that could have prevented failure of the Conserve causing serious harm . . . ." *Id.* ¶ 93. Such allegations (that Wright Medical knowingly disregarded serious and permanent side effects of the product without adequately warning and training health care professionals) **[\*19]** are sufficient, if proven, to support an award of punitive damages. *Cf. Ryan, 2006 U.S. Dist. LEXIS 9077, 2006 WL 449207, at \*5* (noting that plaintiff's complaint "assert[ed] a claim for punitive damages" based on allegations of the defendants' "reckless, wanton, and knowing conduct in manufacturing and supplying a product that was unreasonably dangerous"). Wright Medical's Motion to Dismiss Count VI is therefore <u>DENIED</u>.

## E. Attorney Fees

Wright Medical seeks to have stricken Mr. Jarrett's request for attorney fees, pursuant to *Federal Rule of Civil Procedure 12(f)*. Indiana courts recognize the rule that "requires statutory authority or an agreement for requiring a losing party to pay the prevailing party's attorney fees." *Collins v. Pfizer, Inc., No. 1:08-cv-0888-DFH-JMS, 2009 U.S. Dist. LEXIS 3719, 2009 WL 126913, at \*5 (S.D. Ind. Jan. 20, 2009)* (holding that the plaintiff did "not identif[y] any legal basis for an award of attorney fees").

Here, there is no allegation that the parties had an agreement requiring the losing party to pay attorney fees. Thus, to be valid, Mr. Jarrett's request for fees must be based on statutory authority. He invokes for that purpose *Indiana Code § 26-1-2-721*, which provides that, "[i]n all suits based on fraud or material misrepresentation, if the plaintiff recovers judgment in any amount, the plaintiff shall also be entitled to recover reasonable attorney **[\*20]** fees . . . ." *IND. CODE ANN. § 26-1-2-721* (West, Westlaw through 2019 Legis. Sess.). However, as we have ruled, Mr. Jarrett has no cause of action for fraud separate from his IPLA claim, and the IPLA does not include a provision for attorney

2019 U.S. Dist. LEXIS 104086, *20

fees. *Spangler v. Sears, Roebuck & Co., 752 F. Supp 1437, 1450 (S.D. Ind. 1990)*. Thus, there is no legal basis for Mr. Jarrett's request for attorney fees and it cannot survive. Accordingly, Wright Medical's Motion to Strike Mr. Jarrett's request for attorney fees is <u>GRANTED</u>.

## F. <u>Prejudgment Interest</u>

Lastly, Wright Medical seeks to strike Mr. Jarrett's request for prejudgment damages on the grounds that Mr. Jarrett did not comply with the Indiana Tort Prejudgment Interest Statute (TPIS), *Indiana Code § 34-51-4-1*, by providing Wright Medical a written offer of settlement within a year of filing the claim. Br. Supp. at 12.

*Indiana Code § 34-51-4-1* provides that prejudgment interest "applies to any civil action arising out of tortious conduct." *IND. CODE ANN. § 34-51-4-1* (West, Westlaw through 2019 Legis. Sess.). *Indiana Code § 34-51-4-6(1)* provides that prejudgment interest is not available if, "within one year after a claim is filed in the court, or any longer period determined by the court to be necessary upon showing of good cause, the party who filed the claim fails to make a written offer of settlement to the party or parties against whom the **[*21]** claim is filed." *Id.* at *§ 34-51-4-6(1)*. Indiana courts have interpreted the TPIS to be the "exclusive source governing the award of prejudgment interest in cases falling within its ambit." *Kosarko v. Padula, 979 N.E.2d 144, 149 (Ind. 2012)*.

Mr. Jarrett seeks an award of prejudgment interest as a form of compensable damages. Sec. Am. Compl. at 26. The TPIS covers Mr. Jarrett's cause of action because the IPLA is a tort-based claim. *See Gunkel v. Renovations, Inc. 822 N.E.2d 150, 153 (Ind. 2005)*. However, there is no evidence to show that Mr. Jarrett provided Wright Medical a written settlement offer within one year of filing the action. Therefore, he has failed to meet the requisite elements for recovery under the TPIS. Wright Medical's Motion to Strike Mr. Jarrett's request for prejudgment interest is therefore <u>GRANTED</u>.

## III. Conclusion

For the foregoing reasons, Wright Medical's Partial Motion to Dismiss and Motion to Strike is <u>GRANTED IN PART</u> and <u>DENIED IN PART</u>: Count II (Granted), Count III (Granted), Count IV (Granted), Count V (Denied),

Count VI (Denied), Attorney Fees (Granted), Prejudgment Interest (Granted). Count I survives as it was not the subject of the motions considered here.

IT IS SO ORDERED.

Date: 6/21/2019

/s/ Sarah Evans Barker

SARAH EVANS BARKER, JUDGE

United States District Court

Southern District **[*22]** of Indiana

---

**End of Document**

Tab 6



**User Name:** Ava Cavaco
**Date and Time:** Wednesday, September 16, 2020 5:21:00 PM CDT
**Job Number:** 125571466

## Document (1)

1. *Johnson v. Eli Lilly & Co., 2015 U.S. Dist. LEXIS 30537*

   **Client/Matter:** -None-
   **Search Terms:** Johnson v. Eli Lilly & Co., No. 1:14cv453, 2015 U.S. Dist. LEXIS 30537, at *4 (S.D. Ohio Mar. 12, 2015)
   **Search Type:** Natural Language
   **Narrowed by:**

   | Content Type | Narrowed by |
   | --- | --- |
   | Cases | -None- |

 Positive
As of: September 16, 2020 10:21 PM Z

## *Johnson v. Eli Lilly & Co.*

United States District Court for the Southern District of Ohio, Western Division

March 12, 2015, Filed

Case No. 1:14cv453

**Reporter**
2015 U.S. Dist. LEXIS 30537 *; 2015 WL 1120009

Brandy Johnson, Plaintiff, v. Eli Lilly and Company, Defendant.

## Core Terms

warranty, manufacturing, fraudulent, misrepresentation, abrogate

**Counsel:** **[*1]** Brandy Johnson, Individually and as Natural Parent, on behalf of C.J.J, Plaintiff: J Pierre Tismo, Seth W Schanher, LEAD ATTORNEYS, Dyer, Garofalo, Mann & Schultz, Dayton, OH; Mark Premo-Hopkins, PRO HAC VICE, Joseph J Zonies, LEAD ATTORNEY, PRO HAC VICE, Reilly Pozner LLP, Denver, CO; Christopher L. Schnieders, Thomas P. Cartmell, Wagstaff & Cartmell, LLP, Kansas City, MO.

For Eli Lilly and Company, Defendant: John Charles Hansberry, LEAD ATTORNEY, Pepper Hamilton LLP, Pittsburgh, PA; Martin Harry Lewis, LEAD ATTORNEY, Tucker Ellis & West LLP, Cleveland, OH; Anthony Vale, PRO HAC VICE, Pepper Hamilton LLP, Philadelphia, PA.

**Judges:** Michael R. Barrett, United States District Judge.

**Opinion by:** Michael R. Barrett

## Opinion

### OPINION & ORDER

This matter is before the Court upon Defendant's Motion to Dismiss Four Counts of the Complaint and for an Order Pursuant to *Rule 9(b)*. (Doc. 8). Plaintiff filed a Response in Opposition (Doc. 9) and Defendant filed a Reply (Doc. 13).

### I. BACKGROUND

Plaintiff alleges that while she was pregnant, she took Prozac, which is a prescription medication sold by Defendant Eli Lilly and Company. Plaintiff claims Prozac caused her son to be born with certain birth defects which led to his death when he was **[*2]** less than one year old.

Defendant argues that Plaintiff's claims for breach of warranty — implied warranty of fitness for particular purpose (Count Five), breach of warranty — implied warranty of merchantability (Count Six) and fraudulent misrepresentation (Count Seven) are abrogated by Ohio's Product Liability Act ("OPLA"). Defendant also moves for an order pursuant to *Federal Rule of Civil Procedure 9(b)* requiring Plaintiff to plead with specificity the facts relating to her allegations of fraudulent concealment, and if Count Seven is not dismissed, the circumstances of the fraud alleged. Finally, Defendant argues that Plaintiff's claim for defective manufacturing/construction (Count One) fails to state a claim

Plaintiff agrees that her claims for breach of warranty — implied warranty of fitness for particular purpose (Count Five) and breach of warranty — implied warranty of merchantability (Count Six) should be dismissed. (See

2015 U.S. Dist. LEXIS 30537, *2

Doc. 9, PAGEDID# 62, n.2). However, Plaintiff disputes that her claim for fraudulent misrepresentation (Count Seven) falls within the scope of OPLA, and argues that it meets the requirements of *Rule 9(b)*. Plaintiff also argues that she has adequately plead a claim for defective manufacturing/construction **[*3]** (Count One).


## II. ANALYSIS


### A. Standard of Review

"[T]o survive a motion to dismiss, a complaint must contain (1) 'enough facts to state a claim to relief that is plausible,' (2) more than 'a formulaic recitation of a cause of action's elements,' and (3) allegations that suggest a 'right to relief above a speculative level.'" *Tackett v. M&G Polymers, USA, LLC, 561 F.3d 478, 488 (6th Cir. 2009)* (quoting *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007))*. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*. However, the factual allegations "must contain more than conclusions and an unsubstantial recitation of the necessary elements of a claim." *McCormick v. Miami Univ., 693 F.3d 654, 658 (6th Cir. 2012)*.

*Federal Rule of Civil Procedure 9(b)* requires that "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." As one district court has recently explained:

It is well-settled in the Sixth Circuit that circumstances constituting fraud include "the time, place, and content of the alleged misrepresentation" as well as the identity of the individual making the representation. *United States v. Ford Motor Co., 532 F.3d 496, 504 (6th Cir.2008)* (internal quotations omitted); *Sogevalor, SA v. Penn Central Corp., 771 F.Supp. 890, 893 (S.D.Ohio 1991)* (citing *Michaels Bldg. Co. v. Ameritrust Co., N.A., 848 F.2d 674, 680 (6th Cir. 1988))*. The plaintiff must also allege "the fraudulent scheme; the fraudulent intent; **[*4]** and the injury resulting from the fraud." *Ford Motor, 532 F.3d at 504*.

*MISC Berhard v. Advanced Polymer Coatings, Inc., No. 1:14 CV 1188, 2014 U.S. Dist. LEXIS 143523, 2014 WL 5038001, at *2 (N.D. Ohio Oct. 8, 2014)*.


### B. Ohio Product Liability Act abrogation

The OPLA applies to "recovery of compensatory damages based on a product liability claim," in addition to "[a]ny recovery of punitive or exemplary damages in connection with a product liability claim." *Ohio Rev.Code § 2307.72(A)* & *(B)*. "The OPLA has been held to abrogate claims for strict products liability, negligent failure to warn, breach of express warranty, and breach of implied warranty." *Mitchell v. Proctor & Gamble, No. 2:09-CV-426, 2010 U.S. Dist. LEXIS 17956, 2010 WL 728222, at *3 (S.D. Ohio Mar. 1, 2010)* (and cases cited therein); *see also Ohio Rev.Code § 2307.71(B)* ("*Sections 2307.71 to 2307.80* are intended to abrogate all common law product liability causes of action.).

However, "[c]laims of active misrepresentation (as opposed to failure to warn) in connection with a product are not abrogated by the OPLA." *Boroff v. Alza Corp., 685 F. Supp. 2d 704, 711 (N.D. Ohio 2010)* (citing *Hollar v. Philip Morris, Inc., 43 F.Supp.2d 794, 809 (N.D. Ohio 1998)* (holding that claims of active misrepresentation implicate a broader "duty not to deceive" and are thus not product liability claims barred by the OPLA)); *see also Hogue v. Pfizer, Inc., 893 F. Supp. 2d 914, 918 (S.D. Ohio 2012)* (explaining that "the OPLA does not abrogate fraud claims which are based on a general duty not to actively deceive; however, the OPLA does abrogate fraud claims arising from a duty to warn.") (citing *Glassner v. R.J. Reynolds Tobacco Co., 223 F.3d 343, 348-49 (6th Cir. 2000))*.

Here, Plaintiff's claim **[*5]** for fraudulent misrepresentation is based upon a duty to warn. In her Complaint, Plaintiff alleges Defendant knew or should have known about the adverse side effects and risks of Prozac as early as 1987. (Doc. 1, ¶¶ 29-31). Plaintiff alleges that instead of disclosing these risks, Defendant "made consistent and repeated misrepresentations . . . in its promotional materials and marketing documents," fraudulently proclaiming Prozac "has no association with teratogenicity . . . and is safe and effective for use during pregnancy and in woman of childbearing age." (Id., ¶¶ 44, 104, and 106). Plaintiff also alleges that Defendant "fraudulently omitted" information regarding "the risks of birth defects revealed in Lilly's animal studies on Prozac" breached its "duty to disclose material information" regarding Prozac. (Id., ¶¶ 22, 29-

Ava Cavaco

31, 44, 103, 107-108).

These allegations show that Plaintiff's fraud claim is based on a theory of omission and concealment. *Accord Hogue, 893 F. Supp. 2d at 919* (explaining that "claims of fraud based upon fraudulent misrepresentation and concealment are preempted to the extent they are predicated on a duty to issue additional or clearer warnings through advertising and promotion.") (quoting **[*6]** *Glassner v. R.J. Reynolds Tobacco Co., 223 F.3d 343, 349 (6th Cir. 2000))*. Therefore, the Court finds that Plaintiff's claim of fraudulent misrepresentation (Count Seven) falls within the scope of OPLA and is DISMISSED.

## C. Defective manufacturing/construction

Defendant argues that Plaintiff has failed to state a claim for defective manufacturing/construction (Count One). Plaintiff's claim is brought pursuant to *Ohio Revised Code § 2307.74*, which provides:

> A product is defective in manufacture or construction if, when it left the control of its manufacturer, it deviated in a material way from the design specifications, formula, or performance standards of the manufacturer, or from otherwise identical units manufactured to the same design specifications, formula, or performance standards. A product may be defective in manufacture or construction as described in this section even though its manufacturer exercised all possible care in its manufacture or construction.

*Ohio Rev. Code § 2307.74*. One court found the plaintiff adequately plead a claim under this section where the plaintiff alleged "specific problems with the product; namely, that test results showed the product was out of specification with regard to its primary compound, and that this was a deviation from the product's intended characteristics." *Friedman v. Intervet Inc., No. 3:09CV2945, 2010 U.S. Dist. LEXIS 71718, 2010 WL 2817257, at *3 (N.D. Ohio July 16, 2010).* **[*7]**

Here, Plaintiff has merely alleged that the Prozac "was not made in accordance with" Defendant's "specifications or performance standards," and Defendant "sold and/or distributed Prozac in a condition that posed unreasonable risks from reasonably anticipated use." (Doc. 1, ¶¶ 57, 59(c)). Plaintiff argues that without discovery she cannot specify the manufacturing defect. However, this Court has

previously rejected this argument. *See Frey v. Novartis Pharms. Corp., 642 F. Supp. 2d 787, 792 (S.D. Ohio 2009)* (finding that the plaintiffs failed to adequately plead claim under *Ohio Rev. Code § 2307.74* even though the plaintiffs argued that "they cannot particularly allege that the scientific makeup of the drug is defective for a specific reason without conducting discovery, which requirement would exceed *Twombly's* plausibility standard."). Accordingly, the Court finds that Plaintiff has failed to state a claim under *Ohio Revised Code § 2307.74* and therefore, that claim is DISMISSED.

## III. CONCLUSION

Based on the foregoing, Defendants' Motion to Dismiss (Doc. 8) is **GRANTED** as to Plaintiff's claim for claims for breach of warranty — implied warranty of fitness for particular purpose (Count Five), breach of warranty — implied warranty of merchantability (Count Six) and fraudulent **[*8]** misrepresentation (Count Seven) and claim for defective manufacturing/construction (Count One).

**IT IS SO ORDERED**.

*/s/ Michael R. Barrett*

Michael R. Barrett, Judge

United States District Court

---

**End of Document**

Tab 7

2000 WL 35751402 (Mont.Dist.) (Trial Order)
District Court of Montana,
Fourth Judicial District Court.
Missoula County

Teri LAMPING, Joyce Anderson, Katherine Bordner, and Judy A. Williams,
on behalf of themselves and all others similarly situated, Plaintiffs,
v.
AMERICAN HOME PRODUCTS, INC.; Wyeth Laboratories, Inc.; A.H. Robins Company, Inc., Defendants.

No. DV-97-85786.
February 2, 2000.

**Opinion and Order**

Ed McLean, District Judge, Department No. 1, Fourth Judicial District, Missoula County Courthouse, Missoula, Montana
59802, Telephone: (406) 523-4771.

Ed McLean, District Judge.

Dept. 1

Pending before the Court is "Plaintiffs' Motion for Class Certification", (Ct. Doc. #40) and Defendants' "Motion f or Judgment
on the Pleadings by American Corporation and Wyeth Laboratories, Inc." (Ct.Doc. # 54) [1]

The original Plaintiff, Jacqueline Lair, alleged separate causes of action for strict products liability, failure to warn, negligence
and breach of express and implied warranties. Ms. Lair alleged actual present physical injury and defined the proposed
class as all Montana residents who had consumed certain prescription appetite-suppression drugs manufactured and marketed
by Defendants. Defendants manufactured and sold prescription drugs known as "fenfluramine", (brand name "Pondimin")
and "dexfenfluramine", (brand name "Redux") which was used for the reduction and control of obesity. Fenfluramine was
approved by the federal Food and Drug Administration ("FDA") in 1973, and dexfenfluramine was first sold in the United
States in 1996, following FDA approval. A third prescription drug, "phentermine", was also used for the reduction and
control of obesity, and was sometimes prescribed by physicians in combination with either fenfluramine or dexfenfluramine
as part of what became known as the "fen-phen" combination. Phentermine was not manufactured or sold by the Defendants.
Fenfluramine and dexfenfluramine were voluntarily withdrawn from the market on September 15, 1997, pending further
analysis, after consultations with the FDA and the emergence of reports purporting to link these two diet drugs to serious heart
valve abnormalities. Phentermine has not been removed from the market and has not been shown to cause any heart value
abnormalities when taken alone, and not in combination with fenfluramine and/or dexfenfluramine, and thus, the manufacturers
and sellers of phentermine are not party defendants to this action.

Plaintiffs' First Amended Complaint substitutes the four currently named Plaintiffs, none of whom have experienced any
symptoms of actual present physical injuries to date, for Ms. Lair who does have provable physical injuries. The Amended
Complaint abandons all of the independent tort claims and asserts only one cause of action, for "medical monitoring". The
Plaintiffs also seek leave to amend their complaint a second time to assert a claim for product strict liability should the Court
conclude that Montana does not recognize "medical monitoring" as a separate cause of action, but does recognize "medical
monitoring" as an element of damages in a tort action.

Defendants seek judgment in their favor on the pleadings based on the fact that none of the named Plaintiffs have suffered any proven present physical injury from the use of the two diet pills at issue which has historically been required under Montana law before a tort action could be maintained. Furthermore, Defendants oppose certification of this case as a class action, arguing that the majority of jurisdictions have held that class actions are not proper for pharmaceutical cases because the facts of each individual's case are necessary to the determination of proximate cause, including among many, such individual issues as when and how long was the subject drug(s) used by the patient, was the physician who prescribed the drug(s) properly notified of the possible side effects at issue, and what other medical factors are present in the particular patient's medical condition which might affect actual and proximate cause. Furthermore, Defendants argue that because Montana does not recognize medical monitoring damages absent present manifestation of physical injury, Plaintiffs' motion seeking class certification is rendered moot. Accordingly, the Court must first determine whether the Plaintiffs' medical monitoring claims can withstand Defendants' Rule 12(c), M.R.Civ.P., Motion for Judgment on the Pleadings seeking dismissal of this action for failure to state a claim upon which the Plaintiffs can recover under Montana law.

## MOTION FOR JUDGMENT ON THE PLEADINGS

Plaintiffs filed this action against "Defendants [who] have, together, manufactured, distributed, and sold the diet drugs called Pondimin and Redux", seeking class certification status for the purpose of creating a monetary fund which would be administered under Court authority over time to provide medical monitoring for any person in Montana who has ever used these prescription drugs to monitor for possible serious heart and lung diseases.

Plaintiffs acknowledge that to date the Montana Supreme Court has not recognized "medical monitoring" damages absent proof of actual present injury, either has an independent cause of action or as an element of damages in a tort action. See, *Schelski v. Creative Nail Design,* 280 Mont. 476, 993 P.2d 799 (1997); *Brandenburger v. Toyota Motor Sales U.S.A., Inc.,* 162 Mont. 506, 513 P.2d 268 (1973);* also see, *MCA § 27-1-719(2)* ("A person who sells a product in a defective condition unreasonably dangerous to a user or consumer or to the property of a user or consumer is liable for physical harm caused by the product to the ultimate user or consumer or to his property ..." (emphasis supplied)). Nevertheless, Plaintiffs maintain that the time has come for Montana to recognize a medical monitoring action, as the public's exposures to toxic substances and wastes demand equitable relief to aid in early discovery and treatment of serious latent injuries caused by toxic exposures. Plaintiffs also argue that as of the end of 1997 at least eight of the fifty-one state jurisdictions had recognized medical monitoring as an independent cause of action, sixteen state jurisdictions had recognized it as a form of damages, twenty-six jurisdictions (including Montana) had not addressed the issue of medical monitoring either as an independent cause of action or as a form of damages, and only one jurisdiction had explicitly considered and rejected a claim of medical monitoring. *See, In Re Telectronics Pacing Systems, Inc. Addufix Atrial "J" Leads Products Liability Litigation,* CV95-87 (MDL 1057) (S.D. Ohio 1997) (attached as Exhibit A to "Plaintiffs' Brief in Opposition to Defendants' Motion for Judgment on the Pleadings"). The lone court rejecting medical monitoring as a cause of action was a case seeking a lump sum money judgment. See, *Ball v. Joy,* 755 F.Supp. 1344 (S.D.W.Va.), *aff'd,* 958 F.2d 36 (4th Cir. 1992).

Defendants respond that a recent, "well-reasoned" United States Supreme Court opinion rejected a claim for medical monitoring relief by uninjured, asymptomatic asbestos-exposed railroad workers, and adopted a "physical injury" requirement. *Metro-North Commuter Railroad Co. v. Buckley,* 512 U.S. 424, 117 S.Ct. 2113 (1997). This is not entirely accurate. The *Metro-North* Court held that medical monitoring was not provided for by the Federal Employers' Liability Act (FELA), and as Congress failed to provide such remedy under the Act, it was not the role of the Court to judicially create such 25- remedy. In dicta, the Court laid out several policy reasons against creating a full blown cause of action for medical monitoring. Specifically, the Court was concerned about the potential for a flood of litigation resulting in awards for lump sum damages that would deplete funds needed to compensate those who actually suffered physical injuries. The *Metro-North* Court also acknowledged, however, that the state and federal courts which have authorized the recovery of costs for medical monitoring have imposed limitations on the remedy that address these policy concerns. *Id.* [2]

Defendants further respond that, even if medical monitoring would be appropriate in general toxic substance exposure cases, recognizing such action for injuries caused by side effects to drugs absent present injuries would be against public policy as such actions would deter drug companies from producing and manufacturing many life saving drugs, as all drugs have the potential for serious side effects. [3]

Defendants argue that, as reflected in comment k to the Restatement regarding strict liability, the public's interests involving prescription drugs are adequately protected by the necessity of approval by the FDA before new drugs can be placed on the market, and under the "learned-intermediary" doctrine whereby the treating physician weighs the benefits to the patient against the potential side effects and makes the professional decision whether to administer a certain prescription drug to that particular patient. See, *Hill v. Squibb & Sons. E.R.,* 181 Mont. 199, 592 P.2d 1383 1388 (1979) (recognizing that as a general rule, the duty of a drug manufacturer to warn of the dangers inherent in a prescription drug is satisfied if adequate warning is given to the physicians who prescribe the drug); accord, *Terhune v. A.H. Robins Co.,* 577 P.2d 975 (Wash. 1978) (manufacturer's duty to warn runs to physician, not patient)

In arguing against recognition of an independent "medical monitoring" cause of action in Montana, Defendants fail to make adequate distinction between a claim seeking "medical monitoring" in the form of equitable injunctive relief through a court-managed fund, as opposed to a claim seeking lump sum monetary damages for "enhanced risk" of harm, in that Defendants cite cases involving the latter to support their opposition to a medical-monitoring fund claim. Pre-injury medical monitoring claims have been recently recognized in some jurisdictions dealing with cases involving asbestos exposure, automobile accidents, groundwater contamination, insecticides, landfill toxins, PCBs and related organic chemicals, petroleum-product emissions, radioactive emissions, and cigarettes. See, Annotation "Recovery of Damages for Expense of Medical Monitoring to Detect or Prevent Future Disease or Condition", 17 A.L.R.5th 327 (1994). Although none of the cases reflected in the annotation deal with pharmaceutical products, the annotation reflects that many of those courts which have recognized medical monitoring claims in toxic tort or mass accident actions have 8. recognized the difference between costs of "medical monitoring" for diagnostic and early treatment purposes and "lump sum" damages for emotional distress and the risk of potential future injuries caused by "enhanced risk of harm".

Most recently, in recognizing a medical monitoring cause of action in a fen-phen case, the Appellate Court of Florida explained the difference:

> An action for medical monitoring seeks to recover only the quantifiable costs of periodic medical examinations necessary to detect the onset of physical harm, where as an enhanced risk claim seeks compensation for the anticipated harm itself, proportionately reduced to reflect the chance that it will not occur.

*Petito v A.H.Robins Co., Inc.,* 1999 Fla. App. LEXIS 17035 (decided Dec. 22, 1999), *quoting* *Redland Soccer Club, Inc. v. Dep't. of the Army,* 696 A.2d 137 (Pa. 1997).

> ... The injury in an enhanced risk claim is the anticipated harm itself. The injury in a medical monitoring claim is the cost of the medical care that will, one hopes, detect that injury. The former is inherently speculative because courts are forced to anticipate the probability of future injury. The latter is much less

speculative because the issue for the jury is the less conjectural question of whether the plaintiff needs medical surveillance.

*Petito,* supra, *quoting* 🔖 *In re Paoli R.R. Yard PCB Litigation,* 916 F.2d 829, 850-51 (3d Cir. 1990).

The Florida court in *Petito* agreed with the Supreme Court of New Jersey that the implementation of and supervision over a medical monitoring fund is well within a court's equitable powers. *Petito, citing* 🔖 *Ayers v. Township of Jackson,* 525 A.2d 287 (N.J. 1987). The Florida court further determined that public policy actually favors this result in fen-phen cases where the demonstrable 25% to 30% risk of developing serious heart valve disease is exceptionally high. The potential liability of a defendant is likely to be limited by the commencement of such a fund, as there is sufficient evidence to suggest that early detection may lessen the heart damages that a plaintiff would otherwise ultimately suffer from exposure to the drugs.

Defendants also argue that allowing a "medical monitoring" claim for pre-injury surveillance, and then upon discovery of actual physical injury allowing the patient to file a separate individual tort action seeking actual damages, violates the rule against claim-17 splitting. This Court is not persuaded by that argument as the purposes and the elements of the two actions are distinctly different. Moreover, a medical monitoring claim is equitable in nature, whereas the personal injury claim is legal in nature. And finally, pursuant to the discovery doctrine, a patient's personal injury action does not accrue until physical symptoms manifest themselves, whereas the patient's independent claim for medical monitoring accrues when the patient can meet all of the elements of the claim, which notably does not include an actual physical injury element. The *Petito* court concluded that in order to establish an independent claim for medical monitoring in a toxic exposure case, a plaintiff must prove the following elements:

(1) exposure greater than normal background levels;

(2) to a proven hazardous substance;

(3) caused by the defendant's negligence;

(4) as a proximate result of the exposure, plaintiff has a significantly increased risk of contracting a serious latent disease;

(5) a monitoring procedure exists that makes the early detection of the disease possible;

(6) the prescribed monitoring regime is different from that normally recommended in the absence of exposure; and,

(7) the prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

*Petito,* supra, *citing* 🔖 *Barnes v. The American Tobacco Co.,* 161 F.3d 127, 138-39 (3d Cir. 1998) (*quoting* 🔖 *Redland,* 696 A.2d at 145-46).

After careful consideration of the parties' arguments and persuasive case law from other jurisdictions that have had the opportunity to consider the matter, this Court concludes that public policy dictates Montana's recognition of an independent cause of action for medical monitoring under the specific facts of this case because of the statistically high risk of serious heart valve disease from the use of fen/phen drugs, and the public as well as individual benefits of mitigating against those serious injuries through early detection and treatment. Accordingly, the Court concludes that the Amended Complaint adequately pleads a medical monitoring claim under the *Petito* elements to withstand Judgment on the Pleadings.

In addition, the *Petito* court suggested that if the plaintiffs prove all of the above elements to the satisfaction of the jury, it may be appropriate for a court in equity to take or cause to be taken the following minimal steps:

1. Appoint a plan administrator.

2. With the administrator's advise, approve an advisory panel of persons qualified and knowledgeable in the field to do the following:

a. establish a plan where only persons who consumed the subject drugs (i.e "fenfluramine" (brand name "Pondimin") and "dexfenfluramine" (brand name "Redux")), may participate;

b. establish the minimal areas of diagnostic tests or procedures to be performed (including the number as well as the duration of the procedures);

c. select a list of highly knowledgeable, skilled, competent, and neutral and detached examining physicians to perform the tests, both for the metropolitan areas as well as the regional areas throughout the state.

3. Establish a notification process generally sufficient to bring the opportunity for monitoring to the attention of persons who have used the subject drugs.

4. Establish a time frame for those eligible to obtain the monitoring.

5. Implement procedures whereby the monitoring physicians submit their reports and findings, together with the statement of their charges, directly to the plan administrator who shall promptly pay the reasonable amount of their claims. The parties shall have full access to such reports and the reports will be made public except for the names of the examinees, which shall remain confidential.

This court finds the *Petito* courts recommendations for setting up and administering a medical monitoring fund appropriate, and should the Plaintiffs prevail, will consider and apply these recommendations to the extent necessary in carrying out the purposes of medical monitoring in this case.

### *MOTION FOR CLASS CERTIFICATION*

Defendants oppose Plaintiffs' motion seeking certification of this case as a class action by arguing that Plaintiffs have the burden of proving why this Court should certify this case as a class action suit under Rule 23, M.R.Civ.P. (which is essentially identical to federal Rule 23) and that Plaintiffs cannot meet that burden because of the overwhelming individual legal and factual matters specific to each proposed member of the class necessary to determination of causation and damages.

Rule 23(a) and (b), M.R.Civ.P., as interpreted by the Montana Supreme Court in *McDonald v. Washington,* 261 Mont. 392, 400, 862 P.2d 1150, 1155 (1993), outlines the procedure for determining whether the present action should be certified as a class action by this Court. Moreover, the *McDonald* case clearly establishes that certification is a preliminary matter which must be determined without considering the merits of the named Plaintiffs' claims. As historically stated by the United States Supreme Court:

We find nothing in either the language or history of Rule that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action. Indeed, such a procedure contravenes the Rule by allowing a representative plaintiff to secure the benefits of a class action without first satisfying the requirement for it. He is therefore allowed to obtain

determination on the merits of the claims advanced on behalf of the class without any assurance that a class action may be maintained.

*Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178-79, 94 S.Ct. 2140, 2152 (1974).

Moreover, the Court stated:

> ... a preliminary determination of the merits may result in substantial prejudice to a defendant, since of necessity it is not accompanied by the traditional rules and procedures applicable to civil trials. The court's tentative findings, made in the absence of established safeguards, may color the subsequent proceedings and place an unfair burden on the defendant.

*Eisen,* 417 U.S. at 179, 94 S.Ct. at 2153.

Thus, the particular merits of the Plaintiffs' claims are not issues to be considered by this Court in ruling on the issue of class certification. *Polich v. Burlington Northern, Inc.,* 116 F.R.D. 258, 261 (D.Mont. 1987), *citing Eisen,* 417 U.S. at 177-78. However, the nature of the Plaintiffs' claims is directly relevant to a determination of whether the matters in controversy are primarily individual in character or are susceptible to proof in a class action. *Polich,* 116 F.R.D. at 261. Montana's class action rule provides as follows.

Rule 23(a) provides: One or more members of a class may sue or be sued as representative parties on behalf of all only if

(1) the class is so numerous that joinder of all members is impracticable,

(2) there are questions of law or fact common to the class,

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and

(4) the representative parties will fairly and adequately protect the interests of the class.

Rule 23(b) provides: An action may be maintained as a class action if the [four] prerequisites of subdivision (a) are satisfied, and in addition:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum;

(D) the difficulties likely to be encountered in the management of a class action.

Prior to considering the specific criteria set forth in Rule 23 however, the court must find that a precisely defined class exists, and that the putative class representatives are members of the class. *Polich,* 116 F.R.D. at 261. Plaintiffs define their proposed medical-monitoring class as "[a]11 Montana residents who have consumed Pondimin or Redux" (excluding defendants and their officers, directors and controlling persons) and have not yet exhibited symptoms of serious physical injury to the heart. While certain limitations such as establishing minimum time periods of exposure may ultimately narrow the pool, the Court finds the proposed defined class manageable and specific enough to proceed to consideration of the Rule 23 criteria.

Once the plaintiffs have successfully maneuvered the threshold hurdle of identifying a precisely defined class, plaintiffs have the burden of proving satisfaction of the six elements necessary under Rule 23 to certification of a class action. *McDonald,* 261 Mont. at 400, 862 P.2d at 1155. [4] Failure to meet any one of the six necessary elements of Rules 23(a) and (b)(3) results in the denial of class certification. Thus, the Plaintiffs herein must prove the following six elements in order to maintain this action as a class action:

1. The class must be so numerous that joinder of all members is impractical.

2. There must be questions of fact or law common to the class.

3. The claims or defenses of the representative parties must be typical of the claims or defenses of the proposed class.

4. The representative parties will fairly and adequately protect the interest of the proposed class.

5. The questions of law or fact common to the members of the class predominate over questions of the individual members.

6. The class action is superior to other methods of adjudicating the controversy.

*McDonald,* 261 Mont. at 400, 862 P.2d at 1155.

The purpose of Rule 23 is to provide flexibility in the management of class actions, with the trial court taking an active role in the conduct of the litigation. *Eisen,* 417 U.S. at 184, 94 S.Ct. at 2156. The need for class actions and the type of case best litigated as a class action was best summed up as follows:

Equity has long recognized that there is need for a course which could redress wrongs otherwise unremediable because the individual claims involved were to small, or the claimants too widely dispersed. Moreover, early in the development of our civil procedures it became apparent that judicial efficiency

demanded the elimination of multiple suits arising from the same facts and questions of law. Hence, the wise and necessary procedure was created by which a few representatives of a class could sue on behalf of others similarly situated, and be granted a judgment that would bind all.

*McDonald,* 261 Mont. at 405, 862 P.2d at 1158 *citing* *Green v. Wolf Corporation,* 406 F.2d 291, 297 (1968).

Under the first criteria set forth at Rule 23(a) (1), plaintiffs must show that "the class is so numerous that joinder of all members is impracticable." Mere speculation as to satisfaction of the numerosity requirement is not sufficient. *Polich,* 116 F.R.D. at 261. Rather, plaintiffs must present some evidence of, or reasonably estimate, the number of class members applicable. *Id.* According to studies dating from the mid-1970's through the early OPINION AND ORDER Page 17 1990's, users of the subject diet drugs suffered (1) substantial increased risk of developing primary pulmonary hypertension (requiring heart-lung transplants) , (2) substantially increased risk of valvular heart disease, and (3) substantially increased risk of serotonin neurotoxicity (impairing cognition, memory, mood regulations, sleep and neuroendocrine function). Accordingly, the FDA and numerous medical associations released public awareness notifications and many recommended costly diagnostic testing because of the severity of the injuries and the high percentage of risk to the users in developing serious damage to the heart and lungs. It has been estimated that at least six million people have used these drugs, including thousands of Montanans, and thus the element of numerosity has been met in this matter.

The second criteria at Rule 23(a) (2) requires that "there are questions of law or fact common to the class". The commonality requirement is satisfied "where the question of law linking the class members is substantially related to the resolution of the litigation even though the individuals are not identically situated." *McDonald,* 261 Mont. at 401, 862 P.2d at 1155, *citing* *Jordan v. County of Los Angeles,* 669 F.2d 1311, 1320 (1982) Courts that have analyzed Rule 23(a) (2) have generally given it a permissible application in a variety of substantive law areas so that the commonality requirement is usually found to be satisfied. *Id.* In the present case, because the Court has recognized this case as an independent claim for "medical-monitoring", the Defendants' arguments that there are insurmountable individual issues as to each plaintiff regarding knowledge, causation, and damages, do not apply. The elements of a medical-monitoring class action as recognized hereinabove concentrate on the statistical risks, the availability of mitigating treatments upon discovery, and the minimal threshold requirement that each class member has used Pondimin and/or Redux for an appreciable period of time necessary to trigger the risks of serious heart and lung disease. Accordingly, the Court finds the commonality requirement satisfied in this matter.

The third criteria at Rule 23(a) (3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." The third criteria does not require that the claims of the representatives be identical to those of the class members, but that they be typical. *Polich,* 116 F.R.D. at 262.

The named plaintiff's claim will be typical of the class where there is a nexus between the injury suffered by the plaintiff and the injury suffered by the class. Thus, a named plaintiff's claim is typical if it stems from the same event, practice, or course of conduct that forms the basis of the class claims and is based upon the same legal or remedial theory.

*McDonald,* 261 Mont. at 402, 862 P.2d at 1156, *citing* *Jordan,* 669 F.2d at 1321.

The typicality requirement is designed to .assure that the named representative's interests are aligned with those of the class. When there is such an alignment of interests, a plaintiff who vigorously pursues his or her own interests will necessarily advance the interests of the class. *McDonald,* 261 Mont. at 402, 862 P.2d at 1156. While the class may contain individuals who are indifferent or even opposed to the class relief sought by the named plaintiffs, if all of the members of the class would benefit by the act ion brought by the plaintiffs, the requirement of typicality has been satisfied. *Polich,* 116 F.R.D. at 262, *citing Eisen, supra;* *McDonald,* 261 Mont. at 402-03, 862 P.2d at 1156.

The court finds the typicality element satisfied in this case as the proposed representative class members all claim to have used Pondimin and/or Redux, thus increasing their risks of serious heart and lung disease, they all remain asymptomatic at this point in time, and they all maintain they would benefit from early detection and treatment should they fall within the 25 % to 30 % of all users who ultimately develop such disease.

The fourth criteria at Rule 23(a) (4) requires that "the representative parties will fairly and adequately protect the interests of the class." This requires that the named representative's attorney be qualified, experienced, and generally capable to conduct the litigation, and that the named representative's interests are not antagonistic to the interests of the class. *McDonald,* 261 Mont. at 403, 862 P.2d at 1156, *citing* *Jordan,* 669 F.2d at 1323. Defendants do not question the qualifications of Plaintiffs' attorneys to litigate this action and the Court has no reservations as to their qualifications.

The fifth requirement to establish certification as a class action is whether questions of law and fact common to the members of the class predominate over questions of the individual members. It has been commonly recognized that the necessity for calculation of damages on an individual basis should not preclude class determination when the common issues which determine liability predominate. *McDonald,* 261 Mont. at 403-04, 862 P.2d at 1157, *citing* *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 456 (1977). As this action seeks injunctive equitable relief through a court-4 administered fund for purposes of diagnosis only, the individual members' personal injury claims are not at issue. Accordingly, individual questions of law and fact do not predominate in this matter.

The sixth, and final, element necessary to certify a class action is whether a class action is superior to other methods of adjudication. Rule 23(b) (3), M.R.Civ.P. To determine whether a class action is superior to other methods of adjudication the Rule requires consideration of four factors, namely:
A. the interest of members of the class in individually controlling the prosecution or defense of separate actions;

B. the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

C. the desirability or undesirability of concentrating the litigation of the claims in the particular forum;

D. the difficulties likely to be encountered in the management of a class action.

*McDonald,* 261 Mont. at 404, 862 P.2d at 1157.

Again, because this action has been limited to equitable relief in the form of a court-administered fund for diagnosis purposes only, a class action is superior to other methods of adjudication in that it is less costly to the defendant than individually defending against each of the proposed class members, while at the same time providing relief for uninsured and/or limited income class members in a judicious manner and mitigating against increased physical injuries through early detection and treatment. Thus, it is in the best interests of the defendants, the proposed class members, the judicial system, and the public at large to certify this action as a class suit. Having concluded as such, the Court enters the following order.

**ORDER**

IT IS HEREBY ORDERED that Defendants' Motion for Judgment on the Pleadings is DENIED, and this Court hereby recognizes the Plaintiffs' independent claim for "medical monitoring" as a judiciable claim in Montana under the facts and circumstances of this case.

IT IS FURTHER ORDERED that Plaintiffs' Motion for Class Certification is GRANTED

DATED this 2 nd day of February, 2000.

<<signature>>

ED McLEAN

District Judge

cc: Meloy & Morrison

Hagens & Berman

Garlington, Lohn & Robinson

Arnold & Porter

**Footnotes**

1    Defendant A.H. Robins Company, Inc. was merged into American Home Products on August 3, 1998 and ceased to exist as a separate entity.

2    To date, the following courts have recognized medical monitoring claims, in one form or another, in toxic substance exposure cases or mass-injury tort cases arising from single incidents: *Barnes v. The American Tobacco Co.,* 161 F.3d 127 (3d Cir. 1998); *In Re Paoli Railroad Yard PCB Litigation,* 916 F.2d 829 (3d Cir. 1990) (Pennsylvania case); *Friends for All Children, Inc. v. Lockheed Aircraft Corp.,* 241 U.S. App. D.C. 83, 746 F.2d 816 (D.C. Cir. 1984) (District of Columbia case); *Hagerty v. L & L Marine Services, Inc.,* 788 F.2d 315 (5th Cir.) *modified on other grounds,* 797 F.2d 256 (5th Cir. 1986); *Potter v. Firestone Tire and Rubber Co.,* 863 P.2d 795 (Ca. 1993); *Ayers v. Township of Jackson,* 525 A.2d 287 (N.J. 1987); *Redland Soccer Club, Inc. v. Dep't. of the Army,* 696 A.2d 137 (Pa. 1997); *Hansen v. Mountain Fuel Supply Co.,* 858 P.2d 970 (Utah 1993); *Bower v. Westinghouse Electric Corp.,* 1999 W.Va. LEXIS 118, No. 25338, 1999 WL 518926 (W.Va. July 19, 1999); *Burns v. Taguays Mining Corp.,* 752 P.2d 28 (Ariz. Ct. App. (1987); *Meyerhoff v. Turner Construction Co.,* 509 N.W.2d 847 (Mich. App. 1993), *holding reaffirmed in Meyerhoff v. Turner Construction Co.,* 534 N.W.2d 204 (1995); *Gibbs v. E.I. DuPont de Nemours & Co.,* 876 F.Supp. 475 (W.D.N.Y. 1995) (New York case); *Day v. NLO,* 851 F.Supp. 869 (S.D. Ohio 1994); *Bocook*

*v. Ashland Oil, Inc.,* 819 F.Supp. 530 (S.D. W. Va. 1993) (applying Kentucky law); *Cook v. Rockwell Int'l Corp.,* 778 F.Supp. 512, 515 (D. Colo. 1991); *Bourgeois v. A.P. Green Industries, Inc.,* 716 So.2d 355 (La. 1998), *reh'g denied* (Sept. 4, 1998) (however, the Louisiana legislature has since passed legislation nullifying the *Bourgeois* opinion).

3     *Young v. Key Pharmaceuticals, Inc.,* 922 P.2d 59 (Wash. 1996) cites to Restatement (Second) of Torts § 402A, comment k recognizing that prescription drugs are considered "unavoidably unsafe" products, and thus, liability is limited because society might otherwise be deprived of the benefits it receives from new or experimental drugs. Also see, *Brown v. Superior Court,* 751 P.2d 470 (Cal. 1988); *Rogers v. Miles Laboratories, Inc.,* 802 P.2d 1346 (Wash. 1991).

Comment k reads:

*Unavoidably unsafe products.* There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified notwithstanding the unavoidable high degree of risk with they involve. Such a product, properly prepared, and accompanied by proper direction and warning, is not defective, nor is it unreasonably dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true and particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held strictly liable for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.

4     Although federal Rule 23 for certifying class actions is identical to Montana's rule, federal courts treat the analysis as a two step process, wherein the plaintiffs must first prove the existence of the four necessary requirements set forth in Rule 23(a) (i.e. numerosity, commonality, typicality, and adequacy of representation). *Polich,* 116 F.R.D. at 260. If the four requirements of 23(a) are met, federal plaintiffs must then show that the class action independently qualifies under one of the three subparagraphs of Rule 23(b). *Polich* at 260, *also see* *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 163, 94 S.Ct. 2140, 2145 (1974). Under the six element analysis used by the *McDonald* Court, the third subparagraph of Rule 23(b) creates two necessary elements, and the first and second subparagraphs of the Rule are ignored. Whether the Montana Supreme Court in fact intended to ignore the first and second subparagraphs in favor of mandating the necessity of the requirements set forth in the third subparagraph of Rule 23(b) remains yet to be seen.

---

**End of Document**                                                          © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 8

Case 1:19-md-02875-RMB-SAK    Document 577-4    Filed 09/18/20    Page 65 of 112
PageID: 12182
Liberty Mut. Fire Ins. Co. v. Cagle's, Inc., Not Reported in F.Supp.2d (2010)

KeyCite Yellow Flag - Negative Treatment

Disagreement Recognized by Liberty Ins. Corp. v. PGT Trucking, Inc., W.D.Pa., June 27, 2011

2010 WL 5288673
Only the Westlaw citation is currently available.
United States District Court,
N.D. Georgia,
Atlanta Division.

LIBERTY MUTUAL FIRE INSURANCE
COMPANY a Wisconsin Corporation, Plaintiff,
v.
CAGLE'S, INC. a Georgia Corporation, Defendant.

Civil Action File No. 1:10–CV–2158–TWT.
|
Dec. 16, 2010.

**Attorneys and Law Firms**

John V. Burch, William Randal Bryant, Bovis Kyle & Burch, LLC, Atlanta, GA, Michael R. Morris, Morris & Morris, P.A., West Palm Beach, FL, for Plaintiff.

Robert Stanley Huestis, Robert S. Huestis, P.C., Athens, GA, for Defendant.

*ORDER*

THOMAS W. THRASH, JR., District Judge.

**\*1** This is breach of contract action arising out of an insurance dispute. It is before the Court on the Plaintiff's Motion to Dismiss the Defendant's Counterclaim [Doc. 7]. For the reasons set forth below, the Court DENIES the Plaintiff's motion.

## I. *Background*

For the period January 1990 through January 1991, Liberty Mutual Fire Insurance Company provided workers' compensation insurance to Cagle's, Inc. under a retrospectively rated policy (the "Policy"). Under the Policy, Liberty Mutual was required to administer and defend workers' compensation claims against Cagle's. The Policy also included a retrospective premium endorsement. (*See* Compl., Ex. 1.) According to this endorsement, Liberty

Mutual was authorized to make annual premium adjustments based on claims activity for the preceding year. The nature and extent of that claims activity could yield either a credit or debit to Cagle's' account. Where claims activity yielded a credit in favor of Cagle's, Liberty Mutual had to refund premiums that Cagle's had already paid. Conversely, where claims activity yielded a debit, Cagle's had to pay additional premiums as calculated by Liberty Mutual.

In December 1990, Tony Centers, a Cagle's' employee, suffered an injury to his lower back. Subsequently, Centers made a workers' compensation claim under the Policy. In 1991, Liberty Mutual settled the indemnity portion of Centers' claim. The medical portion of the claim remained open so that Centers could continue to receive medical treatment. The Defendant alleges, however, that Centers received no treatment after October 1991 until 1999.

In December 2002, Centers made another claim for medical benefits related to the 1990 injury. Cagle's contends that this claim arose from a different and unrelated injury caused by a slip and fall. Liberty Mutual, however, accepted Centers' claim as an expense related to the 1990 injury. In August 2009, Liberty Mutual settled the entirety of Centers' claim for $112,316.65. Accordingly, Liberty Mutual made adjustments that resulted in increased premiums for the eighteenth and nineteenth retrospective adjustment periods. In March 2010, Liberty Mutual sent Cagle's a statement listing $129,969 in additional premiums owed under the Policy. (*See* Compl., Ex. 2.) Cagle's refused to pay.

Liberty Mutual then filed this Complaint, based on diversity of citizenship, seeking to recover the additional premiums. Cagle's filed an Answer and Counterclaim for breach of fiduciary duty, declaratory judgment, and attorneys' fees. Cagle's argues that the Plaintiff failed to properly investigate Centers' claim and thus improperly made payments to Centers resulting in increased premiums under the Policy. Liberty Mutual has filed a Motion to Dismiss the Defendant's Counterclaim [Doc. 7]. The Plaintiff argues that it owed no duty to Cagle's under the Policy and that the Defendant is not entitled to a declaratory judgment.

## II. *Motion to Dismiss Standard*

**\*2** A complaint should be dismissed under Rule 12(b)(6) only where it appears that the facts alleged fail to state a "plausible" claim for relief. *Ashcroft v. Iqbal,* —— U.S.

——, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009); FED. R. CIV. P. 12(b)(6). A complaint may survive a motion to dismiss for failure to state a claim, however, even if it is "improbable" that a plaintiff would be able to prove those facts; even if the possibility of recovery is extremely "remote and unlikely." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (citations and quotations omitted). In ruling on a motion to dismiss, the court must accept factual allegations as true and construe them in the light most favorable to the plaintiff. *See Quality Foods de Centro America, S.A. v. Latin American Agribusiness Dev. Corp., S.A.,* 711 F.2d 989, 994–95 (11th Cir.1983). Generally, notice pleading is all that is required for a valid complaint. *See Lombard's, Inc. v. Prince Mfg., Inc.,* 753 F.2d 974, 975 (11th Cir.1985), *cert. denied,* 474 U.S. 1082, 106 S.Ct. 851, 88 L.Ed.2d 892 (1986). Under notice pleading, the plaintiff need only give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests. *See Erickson v. Pardus,* 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (citing *Twombly,* 550 U.S. at 555).

### III. *Discussion*

A. *Breach of Fiduciary Duty*

Liberty Mutual argues that it owed no duty to Cagle's. Both parties agree that Georgia law governs the Defendant's breach of duty claim. (Def.'s Br. in Opp'n to Pl.'s Mot. to Dismiss, at 3 n. 2.) The Plaintiff contends that under Georgia law, "the insurer-insured relationship does not itself impose fiduciary responsibilities upon the insurer." *Cone Fin. Grp., Inc. v. Employers Ins. Co. of Wausau,* No. 7:09–CV–118, 2010 WL 3221831, at *2 (M.D.Ga. Aug.13, 2010). "The relationship is instead governed by the insurance contract." *Id.* Georgia courts have noted, however, "that because of the potential for conflict of interest, in dealing with *retrospective premium policies,* a duty is imposed upon the insurer to act reasonably and in good faith." *Benton Exp., Inc. v. Royal Ins. Co. of Am.,* 217 Ga.App. 331, 333, 457 S.E.2d 566 (1995) (emphasis added); *see also Home Ins. Co. v. Sunrise Carpet Indus., Inc.,* 229 Ga.App. 268, 271, 493 S.E.2d 641 (1997) (*quoting Benton* and noting same duty with respect to retrospective premium policies). In *Benton,* the plaintiff brought a breach of fiduciary duty claim seeking a declaration of its liability for additional premiums owed under a retrospective premium insurance policy. The plaintiff argued "[the defendant] did not properly investigate or handle claims, [and] that it settled

claims unreasonably, overpaying claimants." *Id.* at 332, 457 S.E.2d 566. Citing potential conflicts of interest between insurer and insured, the Georgia Court of Appeals held that insurers owe a duty of good faith and reasonableness with respect to retrospective premium policies. Because "potential exists for the insurer to overcharge the insured," insurers must act reasonably when defending and settling claims on behalf of their insureds. *Id.* Having found, however, that the defendants acted reasonably and in good faith, the court affirmed the grant of summary judgment in favor of the defendants.

**\*3** Here, as in *Benton,* Cagle's asserts that Liberty Mutual failed to properly investigate Tony Centers' claim. Because the Policy provides for retrospective premium adjustments, the Plaintiff owed Cagle's a duty to act reasonably and in good faith in defending and settling claims against Cagle's. *See Benton,* 217 Ga.App. at 333, 457 S.E.2d 566. The cases cited by Liberty Mutual do not hold otherwise. Indeed, these cases do not address the duty owed under a retrospective premium policy. *See Cone,* 2010 WL 3221831, at *2 (no duty under "large deductible policy" under which insured was liable for claims up to $250,000); *Prime Mgmt. Consulting & Inv. Servs. LLC v. Certain Underwriters at Lloyd's London,* No. 1:07–CV–1578, 2007 WL 4592099, at *2 (N.D.Ga. Dec. 28, 2007) (no duty where insured allows insurance proceeds to be depleted); *Arrow Exterminators, Inc. v. Zurich Am. Ins. Co.,* 136 F.Supp.2d 1340, 1354 (N.D.Ga.2001) (finding that insurer may settle claims against insured "even though such settlements deplete or exhaust the policy limits."). These cases simply state the general rule that an insurance contract does not automatically create an independent duty on the part of the insurer. As discussed above, however, Georgia courts have found that retrospective premium policies present special risks that necessitate the imposition of a duty of reasonableness and good faith in settling claims.

Liberty Mutual also argues that the economic loss rule precludes Cagle's' breach of duty claim. Specifically, the Plaintiff contends that the existence of a contract between the parties requires Cagle's to seek a remedy in contract and not in tort. *See Rosen v. Protective Life Ins. Co.,* No. 1:09–CV–03620, 2010 WL 2014657, at *9 (N.D.Ga. May 20, 2010). However, where "an independent duty exists under the law, the economic loss rule does not bar a tort claim because the claim is based on a recognized independent duty of care and thus does not fall within the scope of the rule." *Id.* (quoting *Davencourt at Pilgrims Landing Homeowners*

Case 1:19-md-02875-RMB-SAK    Document 577-4    Filed 09/18/20    Page 67 of 112
PageID: 12184

*Ass'n v. Davencourt at Pilgrim's Landing,* 221 P.3d 234, 244 (Utah 2009)). Here, as discussed above, Liberty Mutual owed Cagle's an independent duty. Thus, the economic loss rule does not bar recovery in tort. For these reasons, the Defendant's breach of fiduciary duty claim should not be dismissed.

### B. *Declaratory Judgment*

The Plaintiff has also moved to dismiss Cagle's' declaratory judgment claim. In its Motion to Dismiss, Liberty Mutual argued that Cagle's may not seek a declaratory judgment regarding premium adjustments that may occur in the future. The Plaintiff noted that these prospective adjustments will be determined by the nature and extent of claims activity that has yet to occur. In its reply, however, Liberty Mutual argues that Cagle's may not seek a declaratory judgment "as to something that has already happened." (Pl.'s Reply Br. in Supp. of Pl.'s Mot. to Dismiss at 11.) Apparently, Liberty Mutual now contends that the Defendant may not seek a declaratory judgment with respect to premiums *already paid* under the Policy. [1]

**\*4** The Plaintiff, however, misunderstands the Defendant's claim. Cagle's is not seeking a declaration of liability for future premium adjustments. Nor is it seeking a declaration relating to adjustments that have already been paid to the Plaintiff. Rather, Cagle's requests a declaration regarding the eighteenth and nineteenth retrospective adjustments that Liberty Mutual has calculated but Cagle's has yet to pay. The Plaintiff has billed Cagle's for these premiums. The Defendant, however, disputes the debt and is uncertain regarding its legal obligation to satisfy it. Thus, Cagle's' claim presents an "actual controversy." *See* 28 U.S.C. § 2201(a). For this reason, the Defendant's declaratory judgment claim should not be dismissed.

### IV. *Conclusion*

For the reasons set forth above, the Court DENIES the Plaintiff's Motion to Dismiss the Defendant's Counterclaim [Doc. 7].

SO ORDERED, this 15 day of December, 2010.

### All Citations

Not Reported in F.Supp.2d, 2010 WL 5288673

## Footnotes

1    It is unclear whether Liberty Mutual has abandoned its contention that the declaratory relief is related to future premium adjustments. Regardless, as discussed below, both of the Plaintiff's arguments are flawed.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 9

2009 WL 3515196 (R.I.Super.) (Trial Order)
Superior Court of Rhode Island.

Maria MIRANDA Individually and as Parent, Natural Guardian,
and Next-of-Friend to her minor child, Alexandro Murillo,
v.
Francisco and Philomena DACRUZ.

No. PC 04-2210.
October 26, 2009.

**Decision**

  **\*1**  GIBNEY, J. Before this Court are two motions *in limine* filed by Maria Miranda ("Plaintiff"), one motion *in limine* filed by Francisco and Philomena DaCruz ("Defendants"), and one motion for summary judgment / *in limine* filed by Defendants. Defendants have not filed an objection to either of Plaintiff's motions. Plaintiff objects to both of Defendants' motions. For the reasons discussed herein, this Court grants Plaintiff's motion to limit the testimony of Defendants' expert, Dr. Nancy Hebben ("Dr. Hebben"), and grants, in full, Plaintiffs motion to strike certain inadmissible statements from Dr. Hebben's written report. This Court denies Defendants' motion to exclude Dr. John Rosen ("Dr. Rosen"). Finally, this Court grants Defendants' motion, construed as a motion *in limine,* regarding the costs of future medical monitoring and prohibits any testimony on the necessity of such monitoring.

**I Facts and Travel**

This matter arises out of the alleged lead paint poisoning of Alexandro Murillo [1] ("Murillo") while he was a tenant at Francisco and Philomena DaCruz's ("Defendants") owner-occupied dwelling located at 8 Star Street in Pawtucket, Rhode Island. (Compl. ¶ 2.) Murillo was born on XX/XX/1997 in Providence, Rhode Island and lived at the Star Street address with his mother Maria Miranda (Plaintiff) and father Roberto Murillo during all time periods relevant to this action. (Compl. ¶ 4.) On or about August 2, 1999, Murillo was diagnosed with lead poisoning (Compl. ¶ 7.) Thereafter, on or about August 27, 1999, the Rhode Island Department of Health inspected 8 Star Street and confirmed the existence of lead paint exposure hazards throughout the dwelling. (Compl. ¶ 8.) As a result, the Rhode Island Department of Health issued a Notice of Violation to Defendants on or about September 27, 1999. (Compl. ¶ 9.) The Notice cited Defendants' property at 8 Star Street for violations of the Lead Poisoning Prevention Act (G.L. 1956 § 23 G.L. 1956 § 23-24.6 *et seq.),* Rules and Regulations for Lead Poisoning Prevention (R23-24.6-PB) and Housing Maintenance and Occupancy Code (G.L. 1956 § 45-24.3 *et seq.).* (Compl. ¶ 9.) Accordingly, Plaintiff, on behalf of Murillo, filed this Complaint in Superior Court on April 26, 2004. Plaintiffs Complaint charges Defendants with "Negligence" (Count I), "Negligent Misrepresentation and Omissions" (Count II), and seeks, *inter alia,* "Punitive Damages" (Count III). However, on September 21, 2009, the parties agreed to dismiss Count III with prejudice. This Court entered an order to this effect.

This Court heard oral argument for Defendants' motion for summary judgment / motion *in limine* regarding the costs of future medical monitoring on August 31, 2009; Defendants' motion to exclude Dr. Rosen on September 8, 2009; and Plaintiff's motion to limit Dr. Hebben on September 11, 2009. This Court did not hear oral argument regarding Plaintiff's motion to strike certain parts of Dr. Hebben's report. Although the parties also submitted motions regarding Dr. Theodore Lidsky and Dr. Nancy Frieder's testimony and Dr. Frieder's written report, this Court need not decide those motions at this time. Defendants withdrew their motion to exclude Dr. Lidsky on the record and Defendants are proposing an order on Dr. Frieder, which is still pending.

## II Analysis

## A Applicable Law

## 1 Motions *in Limine*

**\*2** "A motion *in limine* is 'widely recognized as a salutary device to avoid the impact of unfairly prejudicial evidence upon the jury and to save a significant amount of time at the trial.' " *BHG, Inc. v. F.A.F., Inc.,* 784 A.2d 884, 886 (R.I. 2001) (quoting *Ferguson v. Marshall* Contractors, Inc., 745 A.2d 147, 150 (R.I. 2000)). It is not "intended to be a dispositive motion," rather " 'it has been used in this state primarily to prevent the proponent of potentially prejudicial matter from displaying it to the jury in any manner until the trial court has ruled upon its admissibility in the context of the trial itself.' " *Id.* (quoting *Ferguson,* 745 A.2d at 150-01).

## 2 Expert Witness Testimony

All four of the instant motions request this Court to act as a gatekeeper to bar all or parts of various expert witnesses' testimony. In Rhode Island, the trial court decides whether an expert is permitted to testify, a decision that is afforded much deference.

*See* R.I. R. Evid. 104; *Raimbeault v. Takeuchi Manufacturing Ltd.,* 772 A.2d 1056, 1061 (R.I. 2001) (quoting *Gallucci v. Humbyrd,* 709 A.2d 1059 (R.I. 1998)) (stating that "[t]his Court will not disturb a trial justice's ruling on the admissibility of expert testimony absent an abuse of discretion"). Before an expert is permitted to testify, the trial court applies Rhode Island Rule of Evidence 702, commonly referred to as the *Daubert* test, to determine whether the witness is able to clear two evidentiary hurdles: (1) he or she has applicable expert qualifications and (2) he or she will impart reliable and relevant expert testimony that will assist the trier of fact. *See Raimbeault,* 772 A.2d at 1061 (holding that *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 589 (1993), applies to scientific testimony in Rhode Island state courts). A party must prove by a preponderance of the evidence that its expert can meet these two requirements. *DePetrillo v. Dow Chem. Co.,* 729 A.2d 677, 689 (R.I. 1999).

First, the proponent party must show that its witness qualifies as an expert in the applicable subject matter "by [his or her] knowledge, skill, experience, training, or education." *R.I. v. Botelho,* 753 A.2d 343, 347 (R.I. 2000) (citing R.I. R. Evid. 702). Second, even if qualified as an expert, a witness may only testify to "scientific, technical or other specialized knowledge that will assist the jury in understanding the evidence or in determining a fact issue." *Id.* (citing R.I. R. Evid. 702). In deciding whether an expert has met this second requirement, the trial court examines "whether the testimony sought is relevant, within the witness's expertise, and [reliable] based on an adequate factual foundation." *R.I. v.* *Bettencourt,* 723 A.2d 1101, 1112 (R.I. 1999); *see Raimbeault,* 772 A.2d at 1056 (stating that R.I. R. Evid. 702 and *Daubert* aim to "ensure that any and all scientific testimony or evidence admitted [is] not only relevant, but [also] reliable"); *see also* R.I. R. Evid. 401 (explaining that relevant evidence is evidence that makes a material fact "more probable or less probable than it would be without the evidence"). In order for the trial court to evaluate whether the proposed testimony is reliable, the expert must explain how he or she reached his or her opinion and the factual, scientific basis supporting his or her conclusions. *See* *Gorham v. Public Building Auth. of Providence,* 612 A.2d 708 (R.I. 1992); *see also* R.I. R. Evid. 705 (generally requiring the disclosure of facts or data underlying an expert opinion). Overall, "[t]he critical inquiry ... is whether the expert testimony reflects scientific knowledge that can be tested by scientific experimentation and whether the expert testimony logically advances a material aspect of the plaintiffs case." *Raimbeault,* 772 A.2d at 1061; *see also* *DePetrillo,* 729 A.2d at 689 (stating that admissible expert testimony is "scientifically valid and ... 'fits' an issue in the case"). Finally, as with all evidence, the trial court must ensure that the probative value of the expert testimony does not pale against the "danger of unfair prejudice" if the testimony is admitted. R.I. R. Evid. 403(b).

**B Plaintiff's Motions**

**1 Plaintiff's Motion *in Limine* To Limit the Testimony of Dr. Nancy Hebben, Ph.D.**

 **\*3**  Plaintiff has filed a motion *in limine* to limit the testimony of Defendants' neuropsychologist expert, Dr. Hebben, to "her education, background and the result of [Murillo's] neuropsychological testing performed by her." (Pl.'s 1st Hebben memo at 2.) Plaintiff argues that Dr. Hebben "lacks the necessary education, training and experience to qualify her to offer any expert opinion with respect to the effect of lead generally or specifically on the minor plaintiff in this matter." *Id.* [2] This Court agrees with Plaintiff and grants her motion.

In a toxic tort case, it is necessary for the plaintiff to prove by a preponderance of the evidence both general and specific cause for the medical condition suffered by the plaintiff. 3 Faigman, Kaye, Saks & Sanders, *Modern Scientific Evidence* § 23:2, at 5 (2005-2006 ed.). "General causation asks whether exposure to a substance causes harm to anyone. Specific causation asks whether exposure to a substance caused a particular plaintiffs injury." *Id.* In the instant case, it appears that Defendants want Dr. Hebben to refute both types of causation related to Murillo's condition. With respect to general cause, she intends to assert that it is extremely unlikely that "a blood lead burden in the absence of symptology--typically seen at blood lead level of 70-80 ug/dl--can cause any cognitive injury." (Pl.'s 1st Hebben memo at 6.) Dr. Hebben will also testify relative to specific cause, namely that "Murillo's elevated blood [lead] levels had no effect on his cognitive development." *Id.* Plaintiff asserts that Dr. Hebben is unqualified to present these opinions and theories. *Id.* at 2.

As Plaintiff emphasizes, Dr. Hebben has no clinical experience or significant training in the fields of lead epidemiology, toxicology or pediatric medicine, nor has she published a single, peer-reviewed article on her lead poisoning theories. *Id.* at 4-6. Perhaps most telling, is the abundance of scholarly, scientific, and legislative publications that *directly contradict* her opinion that cognitive effects are absent unless there are physical manifestations of lead poisoning (for example, encephalopathy). In fact, Plaintiffs memo includes a bibliography of 67 sources that support the scientific opinion that lead levels as low as 10 ug/dl are associated with maladies in cognitive function. [3] (Pl.'s Hebben memo Appendix); *see, e.g.,* American Academy of Pediatrics Policy Statement, *Lead Exposure in Children: Prevention, Detection and* Management, 116 *Pediatrics* 1036-46 (Oct. 2005) (stating that lead levels of 10 ug/dl and below are correlated with a decrease in IQ). Dr. Hebben, conversely, cannot point to a single, up-to-date source that supports her position. [4] (Pl.'s 1st Hebben memo at 6 n.5.)

 **\*4**  Because Dr. Hebben is a neuropsychologist who lacks any training or experience in lead toxicology, lead poisoning epidemiology, or pediatric medicine, this Court finds no justification for allowing her to testify to the specific cause of Murillo's injuries. *See In re Alexis L.,* 972 A.2d 159, 169 (R.I. 2009) (holding that an expert witness must have "sufficient training and experience upon which to base an opinion"). In addition, this Court finds her theories on lead poisoning general causation to be so significantly outside the mainstream of medical acceptance and completely lacking factual basis, that allowing her to present her opinion would serve only to confuse the jury. *See In re Mackenzie C.,* 877 A.2d 674, 883-84 (R.I. 2005) (quoting *Owens v. Silvia,* 838 A.2d 881, 891-92 (R.I. 2003) (explaining that a "novel theory" that "has [not] been or can[not] be tested ... has [not] been the subject of peer review and publication ... does [not] have a known or potential rate of error ... and that has [not] gained general acceptance in the scientific community" is inadmissible); *DiPetrillo,* 729 A.2d at 688 (asserting that the trial court must scrutinize the reliability of an expert witness's underlying principles and methodology due to the danger that the expert will confuse or mislead the jury); *see also R.I. v. Motyka,* 893 A.2d 267, 280 (R.I. 2006) (stating that "expert testimony based upon novel scientific evidence" is admissible if it will "assist the trier of fact"). Accordingly, this Court grants Plaintiff's motion to prohibit Dr. Hebben from discussing her lead poisoning theory and the effect of lead on Murillo's cognitive development before the jury. She may explain to the jury her educational background and describe the neuropsychological evaluation she conducted on Murillo on December 17, 2008; however, this Court will limit this testimony as well. *See infra.*

### 2 Plaintiff's Motion *in Limine* To Strike Irrelevant References and Unqualified
### Opinions in Neuropsychological Evaluation of Nancy Hebben, Ph.D.

Plaintiff's second motion with respect to Dr. Hebben requests this Court to strike certain parts of Dr. Hebben's seventeen-page neuropsychological evaluation of Murillo, which was conducted on December 17, 2008. In her memo, Plaintiff specifically enumerates the passages that she argues are irrelevant and prejudicial. (Pl.'s 2nd Hebben Memo at 1-2.) She also argues that several passages are unacceptable for Dr. Hebben to testify about because they contain references to medical conditions and causes of liability, which Dr. Hebben is unqualified to discuss. *Id.* at 3. This Court agrees with Plaintiff's arguments regarding irrelevance, prejudice, medical conditions and liability. Accordingly, this Court grants Plaintiffs motion in full.

The two basic characteristics of admissible evidence are relevance and the lack of an undue prejudicial effect. *See* R.I. R. Evid. 401 (relevant evidence is evidence that makes a material fact "more probable or less probable than it would be without the evidence"); R.I. R. Evid. 403 (relevant evidence may be excluded if its probative value is outweighed by its prejudicial effect). "The trial justice must exercise his or her discretion to exclude evidence sparingly, because only evidence that is 'marginally relevant and enormously prejudicial' must be excluded." *R.I. v. Dominick,* 968 A.2d 279 (R.I. 2009) (quoting *R.I. v. Patel,* 949 A.2d 401, 412-13 (R.I. 2008)).

Clearly, this Court finds that all of the statements listed in Plaintiff's memo under the first heading "Irrelevant and Prejudicial References" should be stricken. They are not relevant to this case and are "enormously prejudicial." *Id.* To name a few examples, it is beyond this Court's imagination why Murillo's father's traffic citation, Murillo's parents' family planning decisions, Murillo's mother's (Plaintiff) HIV* status, Murillo's breakfast and lunch habits, Murillo's Cape Verdean mosquito bites or Murillo's mother (Plaintiff) forgetting to attend a parent-teacher conference have the slightest relevance to Murillo's cognitive abilities or a neuropsychological evaluation, which tests "different kinds of abilities such as problem solving, attention, memory, language and motor skills." Univ. of Virginia Health Sys., Dept. of Neurology, "What is a Neuropsychological Evaluation Like?," http://www.healthsystem.virginia.edu/internet/neurology/what_we_treat/neuropsychology/ (last visited Oct. 15, 2009) [hereinafter UVA Dept. of Neurology]. Similarly, details about Murillo's parents' own education, their primary languages, previous marriages and their relationships with their other children are not sufficiently relevant to the instant case to outweigh the strongly prejudicial effect on the jury. Accordingly, all listed passages in this section of Plaintiff's memo are inadmissible by Defendants' witness, Dr. Hebben.

**\*5** Moving on to "Medical References," this Court also finds it inappropriate for Dr. Hebben to mention or discuss Murillo's May 14, 2007 visit to Memorial Hospital to rule out a seizure. (Pl.'s 2nd Hebben memo at 3.) While Murillo was at the hospital, doctors performed a CT scan on his brain. As stated above, Dr. Hebben is a neuropsychologist, not a medical doctor. Neuropsychologists, "who specialize in assessing and treating the cognitive and emotional needs of patients suffering from neurological disorders or conditions, such as Alzheimer's disease, brain injury, or brain tumors," do not necessarily review CT scans when conducting neuropsychological evaluations or making their diagnoses. *See* UVA Dept. of Neurology. [5] *But see Arbaugh v. AG Processing, Inc.* 184 S.W.3d 53, 58-59 (Ark. App. 2004) (allowing a neuropsychologist to mention that a

"CT scan and an MRI were performed on Arbaugh, and both were normal"); *Tenn. v. Barnett,* 909 S.W.2d 423, 425 (Tenn. 1995) (stating that "[t]he physician interpreting the results agreed with the neuropsychologist that the CT scan would not detect subtle abnormalities"). Although neuropsychologists may be familiar with CT scans of the human brain, *see generally* David G. Andrewes *Neuropsychology: From Theory To Practice* xii (2001) (stating that neuroimaging methods are used in modem neuropsychology research), it is rare for neuropsychologists to read and interpret patients' scans, which are ordinarily done by a radiologist. Univ. of Washington, Dept. of Radiology, Head CT Scan, http://www.rad. washington.edu/clinical/patinfo/ct/head-ct-scan (last visited Oct. 16, 2009) ("A radiologist skilled in CT scanning will review and interpret the CT findings, and will send a detailed report to your primary care or referring doctor.") Accordingly, this Court finds that Dr. Hebben's Ph.D. in neuropsychology, without more, does not qualify her to discuss the details of the CT scan and Murillo's final diagnosis of febrile seizure and viral syndrome. (Pl.'s 2nd Hebben memo at 3.) There is nothing in the record that indicates Dr. Hebben has training or experience reading CT scans, nor was she collaborating with Murillo's treating physician or neurologist at the time this scan

was taken at Memorial Hospital. *See Torrado v. Santilli,* 776 A.2d 1059, 1060 (R.I. 2001) (finding that a registered nurse who "worked full-time as a psychotherapist and maintained a part-time therapy practice out of her home" could not testify about post traumatic stress disorder because she "had never published articles in the area of post-traumatic stress disorder, was not a licensed psychologist or social worker, and *had not worked with a medical doctor or psychiatrist when she treated plaintiff*") (emphasis added). As the court in *Torrado* found with respect to its expert, this Court also finds that Dr. Hebben's Ph.D. in neuropsychology, without more, is insufficient to qualify her to discuss Murillo's CT scan and seizure diagnosis.

Finally, this Court finds that Dr. Hebben is not allowed to testify about any of the "Liability References" listed in Plaintiff's memo. (Pl.'s 2nd Hebben memo at 3.) Dr. Hebben's expertise does not qualify her to speculate about lead paint liability, nor did she personally view the lack of peeling paint or the newness of the 8 Star Street apartment. *See Franco v. Latina,* 916 A.2d 1251, 1258 (R.I. 2007) (stating that admissible expert "opinion elicited [must have] probative force [and cannot be] merely speculative"); *Skene v. Beland,* 824 A.2d 489, 492 (R.I. 2003) (disallowing expert testimony that was too speculative and lacked evidentiary support). Likewise Dr. Hebben cannot testify to the hearsay statement that Murillo's parents "did not see [him] as having any problems related to lead." (Pl.'s 2nd Hebben memo at 3.) Again this is speculative and lacks any evidentiary support. Clearly, Murillo's parents lack the ability to make the assessment of whether Murillo's cognitive functions were affected by lead paint. Accordingly, all references to liability listed in Plaintiff's memo are inadmissible also.

### C Defendants' Motions

### 1 Defendants' Motion *in Limine* To Exclude the Testimony and Report of Plaintiff's Designated Expert, Dr. John Rosen, M.D.

Defendants request this Court to exclude Dr. Rosen's testimony on general and specific causation. (Defs.' Rosen memo.) They argue that Dr. Rosen does not have the proper qualifications to give reliable testimony on lead poisoning or differential diagnoses. *Id.* at 12-13. They also argue that Dr. Rosen has not cited any relevant epidemiology or toxicology texts to support Plaintiff's contention that the dosage and duration of lead exposure experienced by Murillo can and did produce the singular cognitive effect (diminished Verbal IQ) Murillo exhibits. *Id.* at 13-14. Further, Defendants challenge Dr. Rosen's differential diagnosis methodology. *Id.* at 14. They argue that he did not provide a detailed explanation of how he "ruled in" and "ruled out" the potential causes for Murillo's cognitive deficit and instead made the unjustified conclusion that lead was the specific cause. *Id.* 14-15.

 **\*6**  Plaintiff intends to have Dr. Rosen provide the jury with a general explanation of "the harmful effects of lead on the human body and especially on children, the matter in which children are poisoned by lead, the sources of lead poisoning and the pertinent scientific and historical literature regarding lead poisoning." (Pl.'s Supp. Res. To Def.'s Interrog.) Dr. Rosen will also explain specific causation. He will testify "within a reasonable degree of medical certainty that [Murillo] was lead poisoned and that lead poisoning has caused his serious, permanent and irreversible injuries." *Id.* Dr. Rosen also will state that the lead exposure occurred at Defendants' 8 Star Street property, which exceeded Rhode Island's regulatory limits for lead during the time Murillo was a tenant there. *Id.* Plaintiff explains that Dr. Rosen will rely on Murillo's medical, school and other pertinent records to make this assessment. *Id.* He will also base his testimony on the Rhode Island Department of Health lead inspection records and records of other inspections conducted at the property. *Id.*

After reviewing the record, this Court finds that Dr. Rosen is both qualified as an expert and presents reliable support for his opinions. As Plaintiff reports, Dr. Rosen is a pediatrician with thirty years experience treating lead poisoned children. (Pl.'s Expert Opp'n Combined memo at 25.) He is the Director of the Division of Environmental Sciences at the Children's Hospital at Montefiore at the Albert Einstein College of Medicine, which boasts the largest treatment program for lead poisoned children in the United States, and is a Professor of Pediatrics at the hospital as well. *Id.* Since he began his career, Dr. Rosen has treated over 30,000 lead poisoned children and is involved in the current treatment of 1,500 children. *Id.* He has designed medical monitoring programs for adults and children affected by United States' Superfund sites where lead was the primary contaminant

and has also advised the United States Department of Justice and the United States Environmental Protection Agency on the immediate and latent effects of lead exposure. *Id.* at 26. He is a frequently published author on the subject of childhood lead poisoning in the nation's top medical journals and was appointed to serve as the Chairperson of the Center for Disease Control's Advisory Committee on Lead Poisoning Prevention in both 1984 and 1991. *Id.* at 27. Additionally, impressive is the National Institute of Health's funding of Dr. Rosen's research on lead poisoning for the last 32 years. *Id.* Accordingly, this Court is satisfied that Dr. Rosen is qualified as a lead poisoning expert based on his education, experience, training, and knowledge of the applicable subject matter.

Further, this Court finds that Dr. Rosen's testimony provides a fact supported, scientific explanation of the general causes and effects of lead poisoning based on his many years of research and experience. *Id.* at 28. Additionally, Defendants' characterization of Murillo's impairments as a singular cognitive effect and the suggestion that there is no literature to support such a targeted deficiency caused by lead poisoning are plainly incorrect. *Id.* First, Murillo exhibits not a singular deficiency, but rather a *variety* of cognitive deficits including weaknesses in "language fluency, verbal reasoning, word reasoning, sustained attention, sentence comprehension and intra- and inter-scatter." *Id.* Second, Dr. Rosen explains that "childhood lead poisoning *can* produce *one or several* cognitive impairments that reflect brain damage in a child," an observation that is supported by other lead poisoning experts. *Id.* at 29 (emphasis added). Accordingly, Dr. Rosen is qualified to give his expert opinion that lead poisoning is a general cause of cognitive deficiencies.

This Court is also satisfied that Dr. Rosen provides a well-reasoned, factually-supported, scientific rationale and methodology for his opinion that Murillo's cognitive deficits were specifically caused by lead poisoning. Dr. Rosen's deposition reveals that he conducted a differential diagnosis of all possible causes of Murillo's cognitive impairment based on his "medical records, blood lead levels, environmental history and neuropsychological assessments." *Id.* A differential diagnosis is an accepted way of proving specific causation. *See* [image] *McGovern v. Brigham & Women's Hosp.,* 584 F. Supp. 2d 418, 426 n.8 (D. Mass. 2008) (quoting [image] *Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 262 (4th Cir.1999)) ("differential diagnosis is a 'standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated' "). Dr. Rosen explains that no other causes of brain injury, lead poisoning, or cognitive deficits appear in the record besides the lead paint that was present in Murillo's childhood home and violated a number of Rhode Island statutes. *Id.* Despite Defendants' argument that Dr. Rosen's explanation of his methodology lacks enough detail to evaluate its soundness; this Court finds that his statements on differential diagnosis are sufficient to pass the gatekeeper's muster. Defendants remain free to cross-examine Dr. Rosen to cast doubt on his methods and conclusions. As such, Defendants' motion to exclude Dr. Rosen's testimony on specific and general causation is denied. Dr. Rosen may testify as intended; however, this Court will exclude Dr. Rosen from testifying that Murillo requires indefinite medical monitoring. *See infra.*

## 2 Defendant's Motion for Summary Judgment/Motion *in Limine* To Exclude Evidence Concerning the Costs of Medical Monitoring

**\*7** Defendants also object to Plaintiff's use of Dr. Rosen's testimony to persuade the jury to award medical monitoring damages. (Defs.' Medical Monitoring memo.) Basically, Dr. Rosen will opine that childhood lead poisoning not only leads to cognitive deficits, but also can result in other adverse medical conditions later in life. *Id.* at 2 (quoting Dr. Rosen's March 11, 2009 Report). For example, Dr. Rosen asserts that because of Murillo's lead exposure, he is now in a much higher risk category for "kidney disease, peripheral neuropathy, hypertension, and cardiovascular disease." *Id.* To combat and forestall these potential effects, Dr. Rosen recommends a medical monitoring program costing "$3000 annually through age 18 and about $5000 annually from age 19 for the rest of his life." *Id.* Defendants argue that Rhode Island case law does not support awarding damages for medical monitoring if the plaintiff only has the potential to contract the medical conditions. *Id.* They request this Court to grant summary judgment because there are no material facts in dispute-there is no argument that Murillo does not have these physical conditions currently-and therefore they are entitled to judgment as a matter of law because Rhode Island law does not support awarding medical monitoring damages for the mere potential of future harm. *Id. See* Super. R. Civ. P. 56. Alternately, in their motion *in limine,* Defendants request this Court to exclude evidence on medical monitoring as it will mislead and prejudice the jury to

award damages that Rhode Island does not recognize. *Id.* This Court agrees with Defendants' argument and will exclude any evidence from Dr. Rosen or Plaintiff's other witnesses on the necessity of medically monitoring Murillo.

Because summary judgment is used to grant a party total relief on a particular cause of action-for example, negligence-it is inappropriate to use this legal tool to suppress evidence on a *part* of an element of that cause of action-in this instant case, the *extent* of damages. *See Franklin-Mason v. Penn,* ---F.R.D.---, No. 03-945, 2009 WL 1931151 at *2 (D.D.C. July 7, 2009) (holding that Federal Rule of Civil Procedure 56 [which is identical to Rhode Island Rule 56] does not permit a party to "file a motion for partial summary judgment on a fact or an element of a claim"); *Evergreen Int'l v. Marinex Const. Co.,* 477 F. Supp. 2d 697, 698-99 (D.S.C. 2007) (stating that a plaintiff was not entitled to summary judgment when plaintiff was "seeking a determination that these amount of damages are not in genuine dispute, [because Plaintiff] does not attempt to dispose of any particular claim in its entirety"); *Saylor v. Fayette R. Plumb, Inc.,* 30 F.R.D. 176, 180 (E.D. Pa.1962) (stating that Rule 56 "does not contemplate partial summary judgment as to a portion of a single claim"). Defendants do not challenge the existence of *all* damages, which could arguably cancel a required element of the negligence action and thereby dispose of the claim in its entirety. Rather, they only challenge a *portion* of the damages, making summary judgment procedurally improper. Nonetheless, this Court will construe Defendants' submittal in their alternate motion *in limine* form and grant it as such.

Defendants properly state that the law in Rhode Island allows plaintiffs to recover "present damages for future apprehended consequences upon a showing that such consequences are reasonably certain to ensue." *Pescatore v. MacIntosh,* 113 R.I. 139, 148 n.5, 319 A.2d 21, 26 n.5 (R.I. 1974). Plaintiffs must establish the "nature and extent" of present damages based on "legally competent evidence" and not based on "speculation or conjecture." *White v. Leclerc,* 444 A.2d 847, 850 (R.I. 1982). "Although mathematical exactitude is not required, the damages must b based on reasonable and probable estimates." *Id.* Here, Dr. Rosen and Plaintiff state the *cost* of future medical monitoring with a reasonable amount of certainty; however, Dr. Rosen can only speculate regarding likelihood and timeframe that Murillo will contract a future medical condition. (Defs.' Medical Monitoring memo at 4) (quoting Dr. Rosen's March 11, 2009 Report). Defendants suggest that *Kelley v. Cowesett Hills Association* strongly weighs against awarding Plaintiff damages for medical monitoring in this case. 768 A.2d 425, 430 (R.I. 2001). The *Kelley* Court held that a plaintiff's exposure to asbestos did not create a viable negligence cause of action because there was no physical manifestation of injury and the only requested damages were compensation for medical monitoring. *Id.* at 430. The court acknowledged that "exposure to a carcinogen, although potentially increasing one's risk of developing cancer, is too tenuous to be a viable cause of action." *Id.* Like the *Kelley* plaintiff, Defendants argue that Murillo also does not have any manifestation of the physical conditions that Dr. Rosen states are higher risk, which makes an award of medical monitoring damages unacceptable. The Defendants also point to *Pescatore,* wherein the Rhode Island Supreme Court allowed a plaintiff to recover for current injuries from a car accident and also for future dental work that was certainly necessary. 113 R.I. at 149, 319 A.2d at 26-27. Defendants contend that *Pescatore* militates against Plaintiff's request for medical monitoring damages because unlike the necessary dental work in *Pescatore,* it is far from certain that Murillo will require future medical care due to his lead exposure. Finally, Defendants suggest that this Court should adopt the rationale in *Metro-North Commuter Railroad v. Buckley,* 521 U.S. 424, 439 (1997). In that case, the United States Supreme Court did not permit the plaintiffs to recover under a cause of action for medical monitoring because they did not have any symptoms of the disease. The Court was concerned that "tens of millions of individuals may have suffered exposure to substances that might justify some form of substance-exposure-related medical monitoring" and permitting plaintiffs to recover solely on this basis would "threaten a 'flood' of less important cases" and "unlimited and unpredictable liability." *Id.* at 442. Defendants argue that affording Murillo the opportunity to recover medical monitoring damages would set a dangerous precedent in this Court.

 **\*8**  Plaintiff, however, reminds this Court that the instant negligence cause of action is not based on medical monitoring damages alone. Unlike the plaintiff in *Kelley,* Plaintiff is requesting damages for Murillo's exhibited cognitive deficiencies and only seeks to augment these stated damages with the additional costs of future monitoring. (Pl.'s Opp'n Medical Monitoring memo at 4, 6.) Plaintiff argues that she can prove that Murillo was lead poisoned and this indicates, with a reasonable degree of medical certainty, that he has an increased risk of future physical harms. *Id.* at 6. In opposing Defendants' motion *in limine,* Plaintiff focuses on Dr. Rosen and his expert opinion that health issues aside from cognitive deficiencies often occur as a result

of lead poisoning. *Id.* 5-14. He cites several public health treatises that "indicate the direct consequences of lead poisoning can become apparent as an adult [physical malady]." *Id.* at 7. Plaintiff, however, does not cite any case law where a Rhode Island court (or any court) allowed medical monitoring for a possible, yet unmanifested, future harm. Nevertheless, Plaintiff argues that Murillo should be compensated for his heightened risk, which is derivative of leading poisoning and therefore caused by Defendants' alleged negligence.

This Court is not persuaded to open the damages flood gates to indefinite future monitoring. Although Murillo arguably has a heightened risk of future harm due to his lead exposure, he currently does not exhibit any indication that the risk is manifesting into actuality. Over the course of his lifetime, Murillo will be exposed to a number of causative factors for "kidney disease, peripheral neuropathy [a nerve disorder, often caused by diabetes], hypertension, and cardiovascular disease." (Defs.' Medical Monitoring memo at 2) (quoting Dr. Rosen's March 11, 2009 Report). It is patently unfair to saddle Defendants with the cost of indefinite monitoring considering Murillo does not exhibit any present harm and there are numerous other superseding causes for these conditions.

In closing, this Court duly notes Plaintiffs and Defendants' supplemental responses to this evidentiary issue. In their memos, both parties herald the Massachusetts Supreme Judicial Court's recent decision, *Donovan v. Philip Morris USA, Inc.,* as favoring their position. ---N.E.2d ---, No. SJC-10409, 2009 WL 3321445 (Mass. Oct. 19, 2009). This Court agrees that *Donovan* is an instructive case and finds that it supports this Court's decision today. In *Donovan,* the Court held that smoker-plaintiffs could maintain a cause of action in negligence against cigarette manufacturers where the only requested damages was for a "court-supervised program of medical surveillance for early detection of lung cancer." *Id.* at *1. The court held there was a cognizable claim because the plaintiffs exhibited "[s]ubcellular or other physiological changes ... which, in themselves, are not symptoms of any illness or disease, but are warning signs." *Id.* at *7. [6] Unlike the *Donovan* plaintiffs, whose lung tissues exhibited changes that warned of potential cancers, Murillo's kidneys, heart, and nerves do not present any physiological changes indicative of future harm. As such, Murillo's request falls outside the strictures of *Donovan.* Medical monitoring damages are inappropriate in this case. This Court grants Defendants' motion in full.

### III Conclusion

**\*9** Plaintiff's motion to limit Dr. Hebben's testimony is granted. She only may testify regarding her credentials and her neuropsychological evaluation of Murillo. Plaintiff's motion to strike the listed inadmissible statements within Dr. Hebben's written report is granted in full. Defendants' motion to exclude Dr. Rosen is denied. He may testify about specific and general causation as intended. Finally, Defendants' motion *in limine* regarding the costs of future medical monitoring is granted. Neither Dr. Rosen nor Plaintiff's other witness may present evidence that Murillo requires future medical monitoring. Counsel shall prepare appropriate judgments for entry.

### Footnotes

1    Records indicate that an August 2, 1999 blood test registered Murillo's venous blood lead level at 46 ug/dl. Thereafter, Murillo was treated at the St. Joseph's Lead Clinic from age two until age five. He was discharged from treatments at age five when his venous blood lead level fell to 7 ug/dl.

2    To support her argument that Dr. Hebben is unqualified, Plaintiff's memo includes an appendix of multiple depositions from analogous cases where Dr. Hebben was a witness. (The most recent deposition is from September 2008). Plaintiff, however, has not directly deposed Dr. Hebben in the instant case. Nonetheless, this Court finds no indication that Dr. Hebben has altered her rationale or found additional support for her opinions since the time of the depositions referenced

by the Plaintiff. Accordingly, Plaintiff may rely on these legal documents from prior matters to support her motion. This Court invites the Defendants to present any evidence showing Dr. Hebben is otherwise qualified.

3   This Court notes that Murillo's highest recorded blood lead level was 46 ug/dl.

4   Plaintiff's 1st Hebben memo appendix does include a motion *in limine* filed in the Worcester Housing Court case *Aldrea v. Miller,* 96-CV-160, that references a Dr. Hebben deposition wherein she stated that Dr. Henrietta Sachs agrees with her lead theories. The plaintiff in the *Aldea* case, however, pointed out that Dr. Sachs had not practiced medicine in over 20 years and that Dr. Sachs was also excluded from testifying on these outdated theories in the *Aldea* case.

5   The University of Virginia Department of Neurology explains that a neuropsychological evaluation consists of:
a comprehensive assessment of cognitive and behavioral functions using a set of standardized tests and procedures. Various mental functions are systematically tested, including, but not limited to: intelligence, problem solving and conceptualization, planning and organization, attention, memory, and learning, language, academic skills, perceptual and motor abilities, emotions, behavior, and personality.

UVA Dept. of Neurology.

6   Two particular passages in *Donovan* are exceptionally on point:
When competent medical testimony establishes that medical monitoring is necessary to detect the potential onset of a serious illness or disease *due to physiological changes indicating a substantial increase in risk* of harm from exposure to a known hazardous substance, the element of injury and damage will have been satisfied and the cost of that monitoring is recoverable in tort. *No particular level or quantification of increase in risk of harm is necessary, so long as it is substantial and so long as there has been at least a corresponding subcellular change.* 📑 *Donovan,* 2009 WL 3321445 at * 7 (emphasis added).

In this respect, medical expenses are recoverable not only for direct treatment and diagnosis of a present injury or an injury likely to occur, but for diagnostic tests needed to monitor medically a person who has been substantially *exposed to a toxic substance that has created physiological changes indicating a substantial increase in risk* that the person will contract a serious illness or disease. *Id.*

---

**End of Document**                                                            © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 10



**User Name:** Ava Cavaco

**Date and Time:** Wednesday, September 16, 2020 5:22:00 PM CDT

**Job Number:** 125571506

## Document (1)

1. *Sullivan v. St.-Gobain Performance Plastics Corp., 431 F. Supp. 3d 448*

   **Client/Matter:** -None-

   **Search Terms:** Sullivan v. Saint-Gobain Performance Plastics Corp., No. 5:16-cv-125, 2019 U.S. Dist. LEXIS 221612 (D. Vt. Dec. 27, 2019)

   **Search Type:** Natural Language

   **Narrowed by:**

   | Content Type | Narrowed by |
   |---|---|
   | Cases | -None- |

Ⓐ Neutral

As of: September 16, 2020 10:22 PM Z

# *Sullivan v. St.-Gobain Performance Plastics Corp.*

United States District Court for the District of Vermont

December 27, 2019, Decided; December 27, 2019, Filed

Case No. 5:16-cv-125

**Reporter**

431 F. Supp. 3d 448 *; 2019 U.S. Dist. LEXIS 221612 **; CCH Prod. Liab. Rep. P20,792; 2019 WL 7282104

JAMES D. SULLIVAN, LESLIE ADDISON, WILLIAM S. SUMNER, JR., RONALD S. HAUSTHOR, GORDON GARRISON, LINDA CRAWFORD, TED CRAWFORD, and BILLY J. KNIGHT, individually, and on behalf of a Class of persons similarly situated, Plaintiffs, v. SAINT-GOBAIN PERFORMANCE PLASTICS CORPORATION, Defendant.

**Prior History:** *Sullivan v. St.-Gobain Performance Plastics Corp., 226 F. Supp. 3d 288, 2016 U.S. Dist. LEXIS 180405 (D. Vt., Dec. 28, 2016)*

## Core Terms

monitoring, exposure, Vermont, disease, causation, latent, chemical, equitable, cancer, contamination, impairment, injunction, discovery, elevated, asymptomatic, blood, emotional, enhanced, symptoms, exposed, toxins, surveillance

## Case Summary

**Overview**

HOLDINGS: [1]-In an action for medical monitoring arising from groundwater contamination injuries, the court found that the economic loss rule did not bar the claim because the parties were strangers that never negotiated a contract, and it could not be said that defendant owed no tort duty to prevent harm to its neighbors; [2]-Even though medical monitoring arising from a toxic tort was not a proper cause of action, medical monitoring was a permissible remedy under

Vermont law because bodily harm included alterations to blood serum due to chemical exposure, and this action most likely fell in line with other states' cases that permitted medical monitoring where there was an objective test for exposure and the relatively small, defined class of people who tested positive after consuming water within the affected area.

**Outcome**

Motions for summary judgment denied.

## LexisNexis® Headnotes

Civil Procedure > Preliminary Considerations > Federal & State Interrelationships > Federal Common Law

Governments > Courts > Judicial Precedent

*HN1*[⤓] **Federal & State Interrelationships, Federal Common Law**

The federal courts do not serve as engines for change of state common law. The role as a federal court sitting in diversity is not to adopt innovative theories that may distort established state law.

Torts > ... > Compensatory Damages > Types of Losses > Economic Losses

431 F. Supp. 3d 448, *448; 2019 U.S. Dist. LEXIS 221612, **221612

Torts > Negligence > Elements

## HN2[⬇] Types of Losses, Economic Losses

Vermont follows the majority rule in the United States by requiring physical injury for many torts. Exceptions include reputational torts such as libel and slander, business torts such as interference with contractual relations, and claims of professional negligence. For most claims of negligence, physical injury has long been a required element. The physical injury rule is not a shibboleth to be honored without understanding its purpose and origin. In applying the physical injury rule, it is important to consider why the rule exists and whether these purposes are at work in the case.

Torts > ... > Compensatory Damages > Types of Losses > Economic Losses

## HN3[⬇] Types of Losses, Economic Losses

The physical injury rule operates as one of the means to express and enforce the rule that in most circumstances, parties to a contract have no tort duty to protect one another from economic loss. In this setting, the physical injury rule is known as the economic loss rule. Because parties to a contract have the opportunity to apportion the risk of economic loss through bargaining, they cannot recover in tort in the absence of physical damage. The economic loss rule prohibits recovery in tort for purely economic losses. The distinguishing factor between economic and non-economic loss is the opportunity to allocate risk through a contract. More commonly, physical damage is viewed as unexpected and therefore its costs are less readily distributed and assigned by contract.

Contracts Law > ... > Damages > Types of Damages > Compensatory Damages

Torts > ... > Compensatory Damages > Types of Losses > Economic Losses

## HN4[⬇] Types of Damages, Compensatory Damages

Vermont cases applying the economic loss rule are generally confined to claims between parties to a contract.

Torts > ... > Compensatory Damages > Types of Losses > Economic Losses

## HN5[⬇] Types of Losses, Economic Losses

A second purpose of the physical injury rule is to limit cases of emotional distress which could otherwise become speculative and excessive in number. Like most states, Vermont imposes a zone of danger requirement on such claims. In the absence of a physical injury requirement, anyone witnessing an accident, even perhaps later on television, might bring a lawsuit against the at-fault party for emotional distress. The rule serves to limit potential liability to people who suffered injury or were close enough to be at risk. Like the economic loss rule, it can be expressed as a rule of duty excluding any obligation to protect observers and bystanders not in the zone of danger.

Torts > Strict Liability

Torts > Remedies > Damages > Types of Damages

## HN6[⬇] Torts, Strict Liability

There have been identified five interests in physical safety and freedom for which the common law provides some measure of protection. The first and most highly protected is the interest in freedom from harmful bodily contacts. This interest is protected not only against intentional invasion but against invasions caused by negligence and activities giving rise to strict liability.

Torts > ... > Compensatory Damages > Types of Losses > Permanent Injuries

## HN7[⬇] Types of Losses, Permanent Injuries

In the context of a tort claim, bodily harm is any physical impairment of the condition of another's body, or physical pain or illness. There is an impairment of the physical condition of another's body if the structure or function of any part of the other's body is altered to any extent even though the alteration causes no harm. In permitting a claim for bodily harm based upon any demonstrable alteration of an individual's body, the Restatement (Third) of Torts establishes a low threshold for the physical injury rule.

Case 1:19-md-02875-RMB-SAK    Document 577-4    Filed 09/18/20    Page 82 of 112
PageID: 12199

Page 3 of 21

431 F. Supp. 3d 448, *448; 2019 U.S. Dist. LEXIS 221612, **221612

Business & Corporate Compliance > ... > Water Quality > Environmental Law > Water Quality

Real Property Law > Water Rights > Groundwater

*HN8*[ ] **Environmental & Natural Resources, Water Quality**

By statute through the Groundwater Protection Act, *Vt. Stat. Ann. tit. 10, § 1390 et seq.*, and at common law, liability for damage to ground water has long been recognized in Vermont law.

Torts > ... > Compensatory Damages > Types of Losses > Permanent Injuries

*HN9*[ ] **Types of Losses, Permanent Injuries**

In the context of a tort claim, by defining bodily harm to include any alteration to a person's body, the Restatement (Third) of Torts includes changes such as abnormal blood serum results showing the presence of an unusual and potentially harmful chemical.

Civil Procedure > Preliminary Considerations > Equity > Relief

Torts > ... > Compensatory Damages > Types of Losses > Permanent Injuries

*HN10*[ ] **Equity, Relief**

The Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 4 defines physical harm as physical impairment of the human body (bodily harm). Bodily harm includes physical injury, illness, disease, impairment of bodily function, and death. This definition does not address whether "impairment" includes the asymptomatic structural alteration also recognized as a bodily injury in the Restatement (Second). However, the comments note that a number of courts have addressed claims seeking payment for medical monitoring of persons who had been exposed to risk-creating agents or behavior but who had not suffered any current physical harm at the time of suit. Since those cases do not involve claims for physical harm, they are beyond the scope of the physical-harm Chapters in the Restatement. Comment C states that § 4 of this Restatement does not include *Comment a of the Restatement Second of Torts § 15*, which states that

there is bodily impairment whenever the structure of any part of the body is altered to any extent even though the alteration causes no other harm.

Business & Corporate Compliance > ... > Environmental Law > Hazardous Wastes & Toxic Substances > Asbestos

Civil Procedure > Preliminary Considerations > Equity > Irreparable Injury

Environmental Law > Hazardous Wastes & Toxic Substances > Toxic Torts

*HN11*[ ] **Hazardous Wastes & Toxic Substances, Asbestos**

As it concerns medical monitoring, the definition in § 4 of the Restatement(Third) no longer provides guidance because of the reporters' concerns about the proliferation of asbestos claims and other mass torts. Their retreat on this issue seems unlikely to strand Vermont plaintiffs exposed to environmental contamination without a remedy in Vermont law.

Civil Procedure > Preliminary Considerations > Equity > Relief

Torts > ... > Compensatory Damages > Types of Losses > Permanent Injuries

Environmental Law > Hazardous Wastes & Toxic Substances > Toxic Torts

*HN12*[ ] **Equity, Relief**

Almost three decades ago, the federal case law decided in the Vermont district supports the availability of a medical monitoring remedy. The decision recognized the necessary limits of what can be known and what can be proved in the case of an asymptomatic plaintiff. In permitting the case to proceed in the absence of testimony about the specific increase in the health risk, the court showed the way towards the adoption of a standard of general causation in toxic exposure cases. This is consistent with subsequent decisions in other states which permit the medical monitoring remedy upon proof of an increased risk to an exposed population.

431 F. Supp. 3d 448, *448; 2019 U.S. Dist. LEXIS 221612, **221612

Civil Procedure > Preliminary
Considerations > Equity > Relief

*HN13*[↧]  **Equity, Relief**

The Vermont Supreme Court has described equitable remedies as flexible in light of changing conditions. Courts may exert equitable powers based upon common-law, statutory, or constitutional rights, or upon judicial acknowledgement of public-policy considerations establishing an as-yet-unrecognized legal right. Equitable remedies are available to fill gaps and shortcomings in the law in particular cases. The courts exercise discretion in fashioning remedies which meet current needs and conditions.

Civil Procedure > Preliminary
Considerations > Equity > Relief

*HN14*[↧]  **Equity, Relief**

The equitable powers of courts are available to address important public policy concerns, especially those which have not been resolved through statutory or common-law damages remedies. The equitable authority is interstitial. It fills gaps and repairs unfairness in particular cases. The substantive basis for an equitable ruling may be drawn from existing legal rights or from public policy which supports the recognition of a new right. These principles support the extension of the court's authority to issue an injunction to protect public health, even in the absence of existing common-law authority for such an order.

Civil Procedure > Preliminary
Considerations > Equity > Relief

Environmental Law > Hazardous Wastes & Toxic
Substances > Toxic Torts

*HN15*[↧]  **Equity, Relief**

In sum, the cases denying medical monitoring share several characteristics. All concern a very large potential exposure class—thousands or millions of claimants with potentially ruinous economic consequences. Few concern chemicals which can be measured in the blood readily.

Civil Procedure > Preliminary
Considerations > Equity > Relief

Environmental Law > Hazardous Wastes & Toxic
Substances > Toxic Torts

*HN16*[↧]  **Equity, Relief**

A common theme in all of the cases denying medical monitoring is the unknown size of the total cost.

Civil Procedure > Preliminary
Considerations > Equity > Relief

Environmental Law > Hazardous Wastes & Toxic
Substances > Toxic Torts

*HN17*[↧]  **Equity, Relief**

The choice between permitting and excluding a medical monitoring remedy for potential future illness is a choice between competing values. The jurisdictions which do not permit the remedy do so on the basis of concerns about unforeseen economic consequences to the defendant. The jurisdictions which allow the remedy value the potential saving of lives which may be achieved through early detection and treatment.

Civil Procedure > Preliminary
Considerations > Equity > Relief

Environmental Law > Hazardous Wastes & Toxic
Substances > Toxic Torts

*HN18*[↧]  **Equity, Relief**

The the facts necessary to support a medical monitoring claim include six elements: Exposure at a rate significantly greater than the general population; To a proven hazardous substance; As the result of tortious conduct of the defendant; As a proximate result of the exposure, plaintiffs have suffered an increased risk of contracting a serious disease; The increased risk makes it medically necessary for the plaintiffs to undergo periodic medical examination different from that prescribed for the general population in the absence of the exposure; and Monitoring procedures exist which are reasonable in cost and safe for use.

431 F. Supp. 3d 448, *448; 2019 U.S. Dist. LEXIS 221612, **221612

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

Civil Procedure > Trials > Jury Trials > Province of Court & Jury

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Materiality of Facts

*HN19*[🔽]  **Entitlement as Matter of Law, Genuine Disputes**

Cases in which there are substantial material factual disputes require a trial. Disputed questions of material fact should be resolved by a jury at trial, not by a court at summary judgment.

Environmental Law > Hazardous Wastes & Toxic Substances > Toxic Torts

Torts > ... > Elements > Causation > Causation in Fact

Torts > ... > Elements > Causation > Proximate Cause

*HN20*[🔽]  **Hazardous Wastes & Toxic Substances, Toxic Torts**

There is no question that under Vermont law, a plaintiff seeking money damages for personal injury due to exposure to a toxic substance must prove specific causation. In order to defeat a summary judgment motion, a plaintiff seeking damages for toxic exposure must produce evidence suggesting a probability, rather than a mere possibility, that (1) he was exposed to the specified chemical at a level that could have caused his physical condition (general causation); and (2) the exposure to that chemical did in fact result in the condition (specific causation).

Civil Procedure > Preliminary Considerations > Equity > Relief

Torts > Negligence > Elements > Causation

Environmental Law > Hazardous Wastes & Toxic Substances > Toxic Torts

*HN21*[🔽]  **Equity, Relief**

In the context of a plaintiff seeking money damages for personal injury due to exposure to a toxic substance, the causation question changes when the claim is for medical monitoring. In some cases, there is no present illness or condition, only an elevated risk. No plaintiff in a medical monitoring case can prove specific causation, because he or she has no specific condition. The claim relates to an increased risk for a population, not to the experience of individual members. Courts have differed on the wisdom and propriety of crafting a monitoring remedy for a population. But if the remedy is not barred as a matter of law, proof of causation must also be at the population level. It is for this reason that courts which have permitted medical monitoring claims to go forward have not required proof of specific causation.

Civil Procedure > Preliminary Considerations > Equity > Relief

Environmental Law > Hazardous Wastes & Toxic Substances > Toxic Torts

Torts > ... > Proof > Evidence > Burdens of Proof

Torts > ... > Elements > Causation > Proximate Cause

*HN22*[🔽]  **Equity, Relief**

The Manual for Complex Litigation addresses the difference in the burden of proof between medical monitoring and personal injury claims. Plaintiffs in a medical monitoring case must show that the defendant caused the exposure to the substance and the consequent increase in risk. Courts generally require plaintiffs to show that diagnostic tests exist, that the increased risk has made testing reasonably necessary, and that early detection can significantly improve medical treatment of the disease. However, courts have not, to date, required plaintiffs to show that the increase in risk constitutes the proximate cause of any injury that might follow, leaving that issue for any personal injury damage actions that might ensue. The initial element described by the Manual—exposure and consequent increase in risk—is equivalent to the general causation element in Blanchard—exposure to a specified chemical that could have caused his physical condition. As the Manual points out, courts which permit the medical monitoring remedy have not required proof of specific causation for a latent injury. Proving the specific cause

431 F. Supp. 3d 448, *448; 2019 U.S. Dist. LEXIS 221612, **221612

of something which has not occurred presents insuperable difficulties even if sound epidemiological evidence of the increased risk and reasonable ameliorative measures are present.

Civil Procedure > Preliminary Considerations > Equity > Relief

*HN23*[⤓] **Equity, Relief**

It is an accepted element of the medical monitoring remedy that it covers costs not already borne as a matter of routine by a class member. There is no need to consider each case on an individual basis to determine what level of care the named plaintiff is receiving now. It is the remedy which must be fashioned to exclude currently available care and testing.

**Counsel:** [**1] For John Schraven, Special Master: John A. Schraven, Shoup Evers & Green, PLLC, Burlington, VT.

For James D. Sullivan, Leslie Addison, William S. Sumner, Jr., Ronald S. Hausthor, Linda Crawford, Gordon Garrison, Ted Crawford, Plaintiffs: David F. Silver, Esq., Rachel B. Strecker, Esq., Barr, Sternberg, Moss, Lawrence & Silver, P.C., Bennington, VT; Gary A. Davis, Esq., James S. Whitlock, Esq., PRO HAC VICE, Douglas A. Ruley, Davis & Whitlock, P.C., Asheville, NC; Emily J. Joselson, Esq., James W. Swift, Esq., Justin G. Sherman, Esq., Langrock Sperry & Wool, LLP, Middlebury, VT.

For Billy J. Knight, Plaintiff: Emily J. Joselson, Esq., James W. Swift, Esq., Justin G. Sherman, Esq., Langrock Sperry & Wool, LLP, Middlebury, VT; James S. Whitlock, Esq., Douglas A. Ruley, Davis & Whitlock, P.C., Asheville, NC; Rachel B. Strecker, Esq., Barr, Sternberg, Moss, Lawrence & Silver, P.C., Bennington, VT.

For Saint-Gobain Performance Plastics Corporation, Defendant: Bert Wolff, Esq., David Weinraub, Esq., Douglas E. Fleming, III, Esq., Lincoln D. Wilson, Esq., Marina Schwarz, Esq., Mark S. Cheffo, Esq., Paul A. LaFata, Esq., Rachel Passaretti-Wu, Esq., Sheila L. Birnbaum, Esq., Stephen N. Williams, [**2] Esq., PRO

HAC VICE, Dechert LLP, New York, NY; Timothy C. Doherty, Jr., Esq., Downs Rachlin Martin PLLC, Burlington, VT.

**Judges:** Geoffrey W. Crawford, Chief United States District Judge.

**Opinion by:** Geoffrey W. Crawford

# Opinion

 [*450]  DECISION ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT REGARDING THE REMEDY OF MEDICAL MONITORING AND DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**(Docs. 310, 321)**

In this groundwater contamination class action, Plaintiffs seek to recover the expense of medical monitoring in future years to determine whether class members who currently test positive for exposure to PFOA have contracted an illness or medical condition associated with exposure to the substance. Defendant opposes the claim on several grounds. These include arguments that the medical monitoring remedy is unavailable under Vermont law and that it is not supported by the particular facts of this case.

**FACTS**

The court will not repeat the statements of the facts which appear in its prior rulings on the *Daubert* motion to exclude expert witnesses (Doc. 300) and the ruling on the motion for class certification (Doc. 303). The facts of particular importance to the medical monitoring issue are described below.

**PROCEDURAL HISTORY**

Following the filing [**3] of the complaint in May 2016, the defendant filed a motion to dismiss on abstention grounds (Doc. 8). The court denied that motion in

431 F. Supp. 3d 448, *450; 2019 U.S. Dist. LEXIS 221612, **3

December 2016. (Doc. 29.) In January 2017, the defendant filed its answer and a motion for judgment on the pleadings. (Doc. 34, 35.) The motion sought judgment for Defendant on multiple grounds, including the assertion that "the Court should not permit medical monitoring damages unless the plaintiff can demonstrate a present physical injury." (Doc. 35-1 at 14.) In May 2017, the court declined to rule on the availability of medical monitoring damages at such an early juncture:

> The court defers any consideration of the potential remedy of medical monitoring to a time when the factual record is developed. Medical monitoring is not itself a cause of action. It is a form of relief. The court has insufficient information about the need and appropriateness of medical monitoring. The motion to dismiss all claims related to medical monitoring is denied without prejudice to the right of the defendant to renew the motion or to bring the issue back before the court as a motion for partial summary judgment following discovery.

(Doc. 74 at 14.)

Discovery commenced in **[**4]** February 2017. (Doc. 43.) The issue of medical monitoring **[*451]** arose again in the context of Defendant's motion to compel the production of medical records of the individual plaintiffs. (Doc. 83.) In September, the court granted the motion to compel, only limiting the length of time for which records must be produced. (Doc. 83.) The court described the dispute over the availability of medical monitoring and again declined to issue a ruling on the scope of the potential remedy:

> The discovery motion before the court provides an inadequate basis on which to make a decision which will affect the rest of the case. It is too early to make a fundamental mistake, and there is no need to do so. There are good reasons to wait before committing to one theory of the case.

(Doc. 105 at 6.) Over Plaintiffs' objection, the court permitted discovery into Plaintiffs' primary care records for 20 years with a provision for additional requests if these records provided any basis for a belief that other records might contain information about "potential exposure to toxins or treatment for conditions related to PFOA exposure." (*Id.* at 8.) Discovery is now virtually complete. (*See* Doc. 323.) The time has arrived for a **[**5]** ruling on the availability of a medical monitoring remedy at trial.

In the course of a pre-trial conference in September 2019, the court ordered the parties to complete briefing

on the medical monitoring issue by November 1, 2019, with Defendant's summary judgment motion due on the same date. The parties have been helpful in complying with this request. Plaintiffs have filed a timely motion for summary judgment on the medical monitoring issue. (Doc. 310.) Defendant has filed a response as well as its own motion for summary judgment. (Docs. 320, 321.) Plaintiff filed a response to Defendant's motion for summary judgment (Doc. 329.) Defendant filed a reply. (Doc. 333.)

## ISSUES PRESENTED

The issues raised by the parties and addressed by the court are:

- Does Vermont law permit the remedy of medical monitoring? This issue is primarily addressed by the parties in the context of Plaintiffs' motion for summary judgment.
- As to medical monitoring, does the factual record permit entry of summary judgment in favor of either party?

This issue is raised in both parties' motions for summary judgment. The court will issue a separate ruling on Defendant's motion for summary judgment regarding proof of **[**6]** diminution of property value.

## I. Remedy or a New Cause of Action?

The court analyzes the availability of medical monitoring as a form of injunctive relief available (or not) under existing Vermont law, not as a new cause of action. This is consistent with the original complaint which seeks "an injunction requiring Defendant to . . . [establish and implement] a long-term medical testing protocol for Plaintiffs and Class Members to monitor their health and diagnoses at an early stage any ailments associated with exposure, inhalation or ingestion of PFOA." (Doc. 1 at 26.) It is also consistent with the defendant's position that physical injury is a necessary element of medical monitoring claims and that "[n]either the Vermont Supreme Court nor any other reported decision in Vermont has previously authorized medical monitoring damages as a form of relief for asymptomatic plaintiffs." (Doc. 35-1 at 20.)

In the most recent round of briefing, the plaintiffs describe medical monitoring as a **[*452]** proposed remedy. They assert that "[c]onsistent with *Stead* and Vermont Supreme Court decisions, Vermont would recognize the remedy of medical monitoring." (Doc. 310

431 F. Supp. 3d 448, *452; 2019 U.S. Dist. LEXIS 221612, **6

at 9.) The defendant argues against permitting [**7] medical monitoring either as a remedy for existing torts or as an independent cause of action. (Doc. 320 at 9-25.) Its principal objection is that Vermont common law requires physical injury as an element for damages in tort causes of action. This argument applies equally to existing and to as-yet-unrecognized causes of action.

Focusing on whether medical monitoring is a permissible remedy under causes of action already recognized by the Vermont state courts is consistent with principles of federalism which guide a district court applying state law in a diversity case. *HN1*[↑] The federal courts do not serve as engines for change of state common law. *See City of Johnstown v. Bankers Std. Ins. Co., 877 F.2d 1146, 1152 (2d Cir. 1989)* ("Our role as a federal court sitting in diversity is ... not to adopt innovative theories that may distort established state law."). There is no need to predict whether the Vermont Supreme Court would recognize a new tort theory when the same question can be answered by considering existing tort law in Vermont. The court is satisfied that analyzing medical monitoring in the light of a remedy for existing causes of action does not foreclose arguments made by either side and fairly addresses the physical injury rule upon which Defendant relies. [**8]

## II. Scope and Purpose of the Physical Injury Rule in Vermont

Defendant's primary objection to recognition of a medical monitoring remedy arises from the application of the physical injury rule in Vermont law. Defendant argues that because the individual plaintiffs and the members of the exposure class have suffered no damages from an illness caused by exposure to PFOA, they cannot recover the cost of medical monitoring to detect its future onset.

*HN2*[↑] Vermont follows the majority rule in the United States by requiring physical injury for many torts. Exceptions include reputational torts such as libel and slander, business torts such as interference with contractual relations, and claims of professional negligence. Defendant is correct in observing that for most claims of negligence, physical injury has long been a required element.

The physical injury rule is not a shibboleth to be honored without understanding its purpose and origin. It serves two primary functions—neither of which is relevant here. In applying the physical injury rule, it is important to consider why the rule exists and whether these purposes are at work in this case.

*HN3*[↑] First, the rule operates as one of the means to express [**9] and enforce the rule that in most circumstances, parties to a contract have no tort duty to protect one another from economic loss. *See O'Connell v. Killington, Ltd., 164 Vt. 73, 665 A.2d 39 (1995)* (ski area has no duty to protect the litigation interest of a skier injured in a collision on the slopes). In this setting, we know the physical injury rule as the "economic loss rule." Because parties to a contract have the opportunity to apportion the risk of economic loss through bargaining, they cannot recover in tort in the absence of physical damage. *See Long Trail House Condo. Ass'n v. Engelberth Constr., Inc., 2012 VT 80, ¶ 10, 192 Vt. 322, 59 A.3d 752* ("The economic loss rule 'prohibits recovery in tort for purely economic losses.'" (quoting *EBWS, LLC v. Britly Corp., 2007 VT 37, ¶ 30, 181 Vt. 513, 928 A.2d 497*)).

[*453] The distinguishing factor between economic and non-economic loss is the opportunity to allocate risk through a contract. In *Walsh v. Cluba, 2015 VT 2, 198 Vt. 453, 117 A.3d 798*, the Vermont Supreme Court affirmed the dismissal of claims for physical damage to leased premises because "any duty [the tenant] had concerning the subject property was established by virtue of the lease agreement." *Id. ¶ 29*. More commonly, physical damage is viewed as unexpected and therefore its costs are less readily distributed and assigned by contract.

The basis for the economic loss rule is not present here. The parties are strangers to one another. They never negotiated [**10] an agreement or signed a contract. They owe no contractual duty to one another. But it would violate basic principles of negligence and nuisance law to state that Defendant owes no tort duty to prevent harm to its neighbors. Particular elements of damage may be disputed, but this is not a case like *Walsh v. Cluba* in which the parties' contract preempted any separate duty in tort. There is no strong policy reason to extend to these defendants the *ex ante* immunity from tort liability for economic harm which the law provides for parties to a contract.

*HN4*[↑] Vermont cases applying the economic loss rule are generally confined to claims between parties to a contract. The economic loss cases cited by defendant in its briefing include *Wentworth v. Crawford & Co., 174 Vt. 118, 126, 807 A.2d 351, 357 (2002)* (rehabilitation services contract) ("[O]ur caselaw prohibits a claimant

431 F. Supp. 3d 448, *453; 2019 U.S. Dist. LEXIS 221612, **10

from seeking damages for contractual losses through tort law."); *O'Connell, 164 Vt. at 77, 665 A.2d at 42* (ski ticket) ("Negligence law does not generally recognize a duty to exercise reasonable care to avoid intangible economic loss to another unless one's conduct has inflicted some accompanying physical harm."); *Breslauer v. Fayston Sch. Dist., 163 Vt. 416, 422, 659 A.2d 1129, 1132 (1995)* (employment contract) ("If we find a duty here, we create a new tort theory available in any breach of contract case where **[\*\*11]** an economic entity acts through employees."). See also *Springfield Hydroelectric Co. v. Copp, 172 Vt. 311, 779 A.2d 67 (2001)* (power purchase contract); *Gus' Catering, Inc. v. Menusoft Sys., 171 Vt. 556, 762 A.2d 804 (2000)* (purchase of software package). These cases have little application to this case in which there was no contract.

*HN5*[↑] A second purpose of the physical injury rule is to limit cases of emotional distress which could otherwise become speculative and excessive in number. Like most states, Vermont imposes a "zone of danger" requirement on such claims. *Vaillancourt v. Med. Ctr. Hosp. of Vt., Inc., 139 Vt. 138, 425 A.2d 92 (1980)*. In the absence of a physical injury requirement, anyone witnessing an accident, even perhaps later on television, might bring a lawsuit against the at-fault party for emotional distress. The rule serves to limit potential liability to people who suffered injury or were close enough to be at risk. Like the economic loss rule, it can be expressed as a rule of duty excluding any obligation to protect observers and bystanders not in the zone of danger. This is not a line of cases on which Defendant relies. But this second purpose of the physical injury rule illustrates again that the rule exists to serve policy purposes not present in this case.

## III. Definition of Physical Injury

One reason the court is cautious about applying the physical injury rule to bar the medical **[\*\*12]** monitoring remedy is that its application is not consistent with the two purposes for which Vermont courts have commonly invoked the rule. *Supra*, Part **[\*454]** II. A second reason is that in the absence of case law defining "physical injury," it is very likely that the Vermont Supreme Court will adopt the definition developed in *section 15 of the Restatement (Second) of Torts*. The injury claimed by members of the exposure class satisfies this definition.

*HN6*[↑] In Chapter 2 of the Restatement ("Intentional Invasions of Interests in Personality"), the drafters identified five "interests" in physical safety and freedom for which the common law provides some measure of protection. The first and most highly protected is "the interest in freedom from harmful bodily contacts."[1] The introductory note to Chapter 2 states that this interest "is protected not only against intentional invasion but against invasions caused by negligence [and activities giving rise to strict liability.]"

*HN7*[↑] *Section 15 of the Restatement* defines "bodily harm" in uncompromising terms: "Bodily harm is any physical impairment of the condition of another's body, or physical pain or illness." Comment a develops the point further: "There is an impairment of the physical condition of another's body if the structure **[\*\*13]** or function of any part of the other's body is altered to any extent even though the alteration causes no harm."

The illustration offered by the reporters is the painless and beneficial removal of a wart by a doctor without permission. In permitting a claim for bodily harm based upon any demonstrable alteration of an individual's body, the Restatement establishes a low threshold for the physical injury rule. Were Vermont to adopt the Restatement position, there can be little doubt that a plaintiff could recover damages upon proof that defendant was responsible for the introduction of a persistent chemical into his body even if the chemical had not caused present illness or disability.

The Vermont Supreme Court has frequently followed the Restatement (Second) of Torts.[2] It seems likely that

---

[1] Other interests, not necessarily in order of importance, include interest in freedom from offensive bodily contacts, freedom from apprehension of harmful or offense contact, interest in freedom from confinement, and interest in freedom from disagreeable emotions. Restatement (Second) of Torts, Ch. 2, Intro. Note.

[2] *See Sheldon v. Ruggiero, 2018 VT 125, ¶ 24, 202 A.3d 241, 209 Vt. 33* (noting adoption of *§ 286* (elements of a safety statute)); *Couture v. Trainer, 2017 VT 73, ¶ 13, 205 Vt. 319, 174 A.3d 1245* (*§ 587* and other provisions related to defamation); *Ring v. Carriage House Condo. Owners' Ass 'n, 2014 VT 127, 198 Vt. 109, 112 A.3d 754* (*§ 909* (punitive damages against a principal)); *McGee v. Vt. Fed. Bank, 169 Vt. 529, 726 A.2d 42 (1999)* (*§ 552(1)* (negligent misrepresentation)); *Estate of Fleming v. Nicholson, 168 Vt. 495, 724 A.2d 1026 (1998)* (*§ 913* (interest)); *Derosia v. Liberty Mut. Ins. Co., 155 Vt. 178, 583 A.2d 881 (1990)* (*§ 324A* (undertaking to render services to one party may result in liability to another)); *Zaleskie v. Joyce, 133 Vt. 150, 333 A.2d 110 (1975)* (*§ 402A* (strict liability)). If there is an

it will do so in the case of *§ 15*. The Court is unlikely to extend the limitation of tort recovery which gives rise to the physical injury to defendants who are alleged to have contaminated ground water. **HN8**[↑] By statute through the *Groundwater Protection Act, 10 V.S.A. § 1390 et seq.*, and at common law, liability for damage to ground water has long been recognized in Vermont law. It is more likely that the Vermont Supreme Court will **[**14]** follow the definition of bodily harm developed in the Restatement and apply it to latent injuries caused by chemical exposure. **HN9**[↑] By defining bodily harm to include any alteration to a person's **[*455]** body, the Restatement includes changes such as abnormal blood serum results showing the presence of an unusual and potentially harmful chemical.

The court must also consider whether the Vermont Supreme Court will follow the American Law Institute in subsequently seeking to remove the medical monitoring issue from its analysis of physical harm. The Restatement (Second) is not the last word on this particular issue. **HN10**[↑] The *Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 4* defines "physical harm" as "physical impairment of the human body ("bodily harm")...Bodily harm includes physical injury, illness, disease, impairment of bodily function, and death." This definition does not address whether "impairment" includes the asymptomatic structural alteration also recognized as a bodily injury in the Restatement (Second). The other shoe drops in the final paragraph of Comment C to *§ 4*:

> A number of courts have addressed claims seeking payment for medical monitoring of persons who had been **[**15]** exposed to risk-creating agents or behavior but who had not suffered any current physical harm at the time of suit. Since those cases do not involve claims for physical harm, they are beyond the scope of the physical-harm Chapters in this Restatement.

The purpose of the change is made explicit in the Reporter's Note. Comment C states that "*§ 4* of this Restatement does not include *Comment a of the Restatement Second of Torts § 15*, which states that there is bodily impairment whenever 'the structure... of any part of the ... body is altered to any extent even though the alteration causes no other harm.'" The Reporters connect this change to "[a]n unfortunate and aberrational exception to the self-correction of small or

trivial harms explained in this Comment [represented by] asbestos claims by plaintiffs who suffer no clinical symptoms but who have abnormal lung X-rays, a condition known as pleural plaque." The Comment concludes the discussion by identifying a range of cases and academic writing on the issue.

The court views the Restatement (Third) as equivocal in its application to this case. A primary purpose of the change in the definition of "bodily injury" was to exclude claims of emotional distress based upon minor and asymptomatic **[**16]** alterations of the body. The example provided for a physical alteration is trivial: brief tanning or toning of the body (Reporters' Note to *§ 4*, Comment C). This case includes no claim for emotional distress. These would be damages for personal injury which are excluded from the class action.

In the case of medical monitoring as a result of toxic exposure, the reporters to Restatement (Third) cited cases on both sides of the argument. While it is fair to say that the definition in *§ 4 of the Restatement (Third)* of Torts: Physical and Emotional Harm represents a more nuanced position than the simpler proposition in the Restatement (Second) that any alteration of the body may constitute an injury, it would exaggerate the ALI position to say that it excluded recovery for medical monitoring. Rather, the revised definition chooses not to provide a definitive answer to the question of whether medical monitoring is appropriate for asymptomatic exposure. The issue on which *§ 4* (Restatement(Third) differs from the stronger position in *§ 15* (Restatement)(Second) is whether *all* cases of bodily alteration are bodily injuries. Trivial changes such as minor sunburn are not. **HN11**[↑] As it concerns medical monitoring, the definition in *§ 4 of the Restatement(Third)* no longer **[**17]** provides guidance because of the reporters' concerns about the proliferation **[*456]** of asbestos claims and other mass torts. Their retreat on this issue seems unlikely to strand Vermont plaintiffs exposed to environmental contamination without a remedy in Vermont law.

A single federal district court case in Vermont has considered these questions. In *Stead v. F.E. Myers Co., 785 F. Supp. 56 (D. Vt. 1990)*, the district court denied a motion in limine to exclude expert testimony concerning an increased risk in cancer for homeowners who drank water contaminated by oil which leaked from their submersible pump. As the court wrote in that case:

> [Plaintiffs] seek to offer proof of an increased risk of cancer that, while admittedly unquantifiable, is substantial enough to require medical monitoring

---

occasion when the Court chose not to follow the Restatement (Second) of Torts, it did so in silence.

Ava Cavaco

431 F. Supp. 3d 448, *456; 2019 U.S. Dist. LEXIS 221612, **17

for many years, the cost for which they seek recovery. When offered for this purpose, quantification of the increased risk to a reasonable degree of medical certainty is not required.

_HN12_[↑] _Id. at 57_.[3] Almost three decades ago, the _Stead_ decision supports the availability of a medical monitoring remedy. The decision recognized the necessary limits of what can be known and what can be proved in the case of an asymptomatic plaintiff. In permitting the case to proceed in the absence **[**18]** of testimony about the specific increase in the cancer risk to the homeowners, the court showed the way towards the adoption of a standard of general causation in toxic exposure cases. _Stead_ is consistent with subsequent decisions in other states which permit the medical monitoring remedy upon proof of an increased risk to an exposed population.

## IV. Other Areas of Guidance—Equitable Remedies Under Vermont Law

With little direct guidance available from toxic contamination cases within Vermont, there are three places to turn for assistance in predicting the direction of Vermont law concerning medical monitoring. One is the law of equitable remedies in Vermont. _HN13_[↑] The Vermont Supreme Court has described these remedies as flexible in light of changing conditions. "Courts may exert equitable powers based upon common-law, statutory, or constitutional rights, or upon judicial acknowledgement of public-policy considerations establishing an as-yet-unrecognized legal right." _Titchenal v. Dexter, 166 Vt. 373, 377, 693 A.2d 682, 684 (1997)_. Equitable remedies are available to fill gaps and shortcomings in the law in particular cases. _In re Beach Props., Inc., 2015 VT 130, ¶ 23, 200 Vt. 630, 133 A.3d 854_ ("The essence of equity is that it applies _only_ in those exceptional cases 'wherein the law (by reason **[**19]** of its universality) is deficient.' (quoting _Bucklin v. Beals, 38 Vt. 653, 662 (1866)))_; _MacGowan v._

_Gaines, 127 Vt. 477, 481, 253 A.2d 121 (1969)_ ("Courts of equity are created . . . to reach and correct mistakes in which courts of law have no jurisdiction."). The courts exercise discretion in fashioning remedies which meet current needs and conditions. _Huard v. Henry, 2010 VT 43, 188 Vt. 540, 999 A.2d 1264_ (mem.) (affirming an injunction requiring property owners to comply with amendments to wastewater permit). Injunctive relief may be available in cases in which money damages cannot address the loss. _Appeal of Gadhue, 149 Vt. 322, 326, 544 A.2d 1151, 1153_ _[*457] (1987)_ ("Thus, plaintiffs ability to request a mandatory injunction was in no way impaired by the absence of special damages.").

_HN14_[↑] The equitable powers of our courts are available to address important public policy concerns, especially those which have not been resolved through statutory or common-law damages remedies. The equitable authority is interstitial. It fills gaps and repairs unfairness in particular cases. As the _Tichenal_ case demonstrates, the substantive basis for an equitable ruling may be drawn from existing legal rights or from public policy which supports the recognition of a new right. These principles support the extension of the court's authority to issue an injunction to protect public health, even in the absence of existing **[**20]** common-law authority for such an order.

## V. Other Areas of Guidance—Vermont Statutory Law

A second place to look is Vermont statutory law. To date no statute concerning medical monitoring has been passed. Both houses of the Vermont legislature passed a bill in the 2019 session. 2019 Vt. Senate Bill No. 37. This bill would have provided a statutory remedy, apparently tailored for the facts of this case. The governor vetoed it in June 2019. The governor's veto message raised concerns about the availability of insurance for Vermont employers and "unknown legal and financial risks, and increased liability, [which are] problematic for continued investment in Vermont." Governor's Veto Message for 5.197 (June 17, 2019), https://governor.vermont.gov/sites/scott/files/S.37%20ve to%20%206-17-19.pdf. The governor expressed his willingness to sign the bill if the legislature accepted an amendment previously offered by certain House members. _Id. at 2_. Since both legislative bodies voted in favor of a statutory medical monitoring remedy and the executive expressed support for a different version of the bill, it overstates the case to say that the legislative and executive branches have rejected medical monitoring. **[**21]** These inconclusive events of the

---

[3] In _Soutiere v. BetzDearborn, Inc., No. 2:99-cv-299, 2002 U.S. Dist. LEXIS 28511, 2002 WL 34381147 (D. Vt. July 24, 2002)_, the court denied a medical monitoring claim for increased risk of cancer on the ground that the evidence of causation was insufficient. "Regardless of whether Vermont would recognize medical monitoring as a cause of action or an element of compensable damages, the Plaintiffs have not provided a basis for concluding that there is reliable evidence that plaintiffs are at increased risk of developing cancer." _2002 U.S. Dist. LEXIS 28511, [WL] at *4_.

Case 1:19-md-02875-RMB-SAK    Document 577-4    Filed 09/18/20    Page 91 of 112
PageID: 12208

Page 12 of 21

431 F. Supp. 3d 448, *457; 2019 U.S. Dist. LEXIS 221612, **21

2019 legislative session tell the court very little about the likely direction of a statutory remedy and even less about the availability of a common law remedy.

The Vermont legislature has long been aware of the danger of latent injury to our population. *Section 518 of Title 12*, enacted in 1967, established a discovery rule and a 20-year period of repose for "actions to recover for injury for ionizing radiation injury or injury from other noxious agents medically recognized as having a prolonged latent development." *See Campbell v. Stafford, 189 Vt. 567, 570, 15 A.3d 126 (2011)* (a noxious agent is "something that acts upon the body, causing a disease or illness such as cancer"). In 1999, the legislature enacted a similar discovery rule for occupational injuries such as asbestosis which may have a latent period before symptomatic onset. *21 V.S.A. § 660(b)*. These statutes of limitations do not directly address the issue of remedy that is before this court, but they do illuminate the continuing concern of the legislature with providing legal recourse for individuals injured through exposure to toxic substances.

## VI. Other Areas of Guidance—The Law of Other States

The third place to look is the body of case law from other states which accept **[**22]** or reject the proposed remedy of medical monitoring. State and federal courts have frequently addressed this issue. There is consensus on some issues such as the unavailability of a money damage award. *See Metro-North Commuter R. R. Co. v. Buckley, 521 U.S. 424, 117 S. Ct. 2113, 138 [*458] L. Ed. 2d 560 (1997)*. Courts are divided about whether there should be an equitable remedy to detect health problems which are not yet symptomatic but could be detected at an early stage through testing. Screening for illness is hardly a radical concept. Many forms of cancer are detected at early stages despite the absence of symptoms. Blood tests, pap smears, mammograms, and colonoscopies are all common examples of tests provided to asymptomatic people.

In considering case law from other states, the court has considered decisions which permit as well as those which reject the medical monitoring remedy. Cases across the country have been decided along a few identifiable fault-lines. The court will seek to identify the specific legal issues which have motivated courts to permit or deny a medical monitoring remedy.

## A. Cases Rejecting Medical Monitoring

The court begins by discussing leading cases *rejecting* medical monitoring in cases of toxic exposure.

### 1. *Rhodes v. E.I. du Pont de Nemours & Co., 636 F.3d 88 (4th Cir. 2011)*, *cert. denied, 565 U.S. 977, 132 S. Ct. 499, 181 L. Ed. 2d 347 (2011)*

In *Rhodes*, residents whose water supply **[**23]** was contaminated with PFOA released by a DuPont manufacturing facility sought "injunctive relief to obtain long-term diagnostic testing (medical monitoring) for latent diseases on behalf of a class of Water Department customers exposed to PFOA." *636 F.3d at 93*. As in this case, the named plaintiffs and the proposed class "do not suffer from any illness or disease caused by their exposure to PFOA. Instead, the plaintiffs assert that they are injured because PFOA has accumulated in their blood." *Id at 95*. They sought monitoring for substantially the same conditions identified by plaintiffs here: "liver disease, cholesterol abnormalities, and certain cancers." *Id.*

The district court granted summary judgment to DuPont. On appeal, the plaintiffs argued that the West Virginia law of battery was likely to follow *Section 15 of the Restatement (Second) of Torts* in identifying a harmful bodily contact when there is a "physical impairment of the condition of [the] body, or physical pain or illness." Plaintiffs invited the appeals court to follow Comment a, which extended the definition of "physical impairment" to any alteration in the structure or function of any part of the body, even when such structural change does not cause other harm.

The appeals court declined **[**24]** the invitation and followed West Virginia precedent that required actual physical impairment as an element of the tort. *See Funeral Servs. by Gregory, Inc. v. Bluefield Cmty. Hosp., 186 W. Va. 424, 413 S.E.2d 79 (W. Va. 1991)* (mere exposure accompanied by fear of contracting disease is not battery), overruled on other grounds by *Courtney v. Courtney, 190 W. Va. 126, 437 S.E.2d 436 (1993)*. The court described its role in defining state decisional law in the absence of authority from the state supreme court as limited and conservative. It declined to adopt *Section 15 of the Restatement (Second) of Torts*. It dismissed trespass claims in the absence of evidence of damage or interference with use or possession of plaintiff's homes. It rejected private nuisance claims on

Case 1:19-md-02875-RMB-SAK    Document 577-4    Filed 09/18/20    Page 92 of 112 PageID: 12209

Page 13 of 21
431 F. Supp. 3d 448, *458; 2019 U.S. Dist. LEXIS 221612, **24

the ground that the injury was to the public water supply. It ruled that plaintiffs were unable to pursue a public nuisance remedy because there was no evidence of that they had suffered a unique and enhanced "special injury."

The *Rhodes* decision is remarkable in its cursory dismissal of the decision of the West Virginia Supreme Court of Appeals **[*459]** in *Bower v. Westinghouse Elec. Corp., 206 W. Va. 133, 522 S.E.2d 424 (W. Va. 1999)*. In *Bower*, the court sought to answer the following question in a medical monitoring case certified by the Northern District of West Virginia: "Whether, under West Virginia law, a plaintiff who does not allege a present physical injury can assert a claim for the recovery of future **[**25]** medical monitoring costs where such damages are the proximate result of defendant's tortious conduct?" *Id. at 429*.

The state supreme court expressly rejected "the contention that a claim for future medical expenses must rest upon the existence of present physical harm." *Id. at 430*. It also rejected the contention that a plaintiff is "required to demonstrate the probable likelihood that a serious disease will result from the exposure." *Id. at 431*. Instead, the *Bower* court followed *In re Paoli Railroad Yard PCB Litigation, 916 F.2d 829 (3d Cir. 1990)* ("*Paoli I*"), in defining the appropriate inquiry as "whether medical monitoring is, to a reasonable degree of medical certainty, necessary in order to diagnose properly the warning signs of disease." *Paoli I, 916 F.2d at 851*.

The court in *Bower* identified six necessary elements of a claim for medical monitoring:

> (1) plaintiff has, relative to the general population, been significantly exposed; (2) to a proven hazardous substance; (3) through the tortious conduct of the defendant; (4) as a proximate result of the exposure, plaintiff has suffered an increased risk of contracting a serious latent disease; (5) the increased risk of disease makes it reasonably necessary for the plaintiff to undergo periodic diagnostic medical examinations different from what would be **[**26]** prescribed in the absence of the exposure; and (6) monitoring procedures exist that make the early detection of a disease possible.

*Bower, 522 S.E.2d at 432-33*. None of these elements includes a requirement of present diagnosis or symptoms of disease. Instead, exposure is the signal event triggering potential liability for monitoring costs.

[T]he plaintiff is not required to show that particular disease is certain or even likely to occur as a result of exposure. All that must be demonstrated is that the plaintiff has a significantly increased risk of contracting a particular disease relative to what would be the case in the absence of exposure.

*Id. at 433* (internal citation omitted). In a footnote, the *Bower* decision criticizes federal court decisions which construe the law of West Virginia to require a physical injury element in cases of latent injury and medical surveillance. "Federal courts continue to apply [*Ball v. Joy Tech., Inc., 958 F.2d 36 (4th Cir. 1991)*] to reject medical monitoring claims arising under West Virginia law. As will be explained anon, the *Ball* decisions do not accurately reflect West Virginia law." *Id. at 427 n.2* (internal citations omitted).

*Bower* authorizes a medical monitoring remedy in West Virginia which is consistent with plaintiff's claims in this case. The **[**27]** effort in the *Rhodes* decision to avoid the holding by characterizing *Bowers* as applying only to cases in which plaintiffs assert a new cause of action for medical monitoring is unpersuasive. In seeking to limit medical monitoring claims to people who no longer need medical monitoring because they are now known to suffer from illness or injury, the *Rhodes* opinion does not accurately describe the state of decisional law in West Virginia.

### 2. *Caronia v. Philip Morris USA, Inc., 22 N.Y.3d 439, 982 N.Y.S.2d 40, 5 N.E.3d 11 (2013)*

Closer to home, the New York Court of Appeals held that New York law continues **[*460]** to require physical injury as an element of tort recovery even when the remedy sought is medical monitoring. As in *Bowers*, the question was certified by a federal court: "Under New York Law, may a current or former longtime heavy smoker who has not been diagnosed with a smoking-related disease, and who is not under investigation by a physician for such a suspected disease, pursue an independent equitable cause of action for medical monitoring for such a disease?" *Caronia, 22 N.Y.3d at 446*.

Subsequent questions concerned the elements of proof and the statute of limitations. The New York Court of Appeals answered the first question in the negative. "We conclude that the policy reasons set forth above **[**28]** militate against a judicially-created independent cause of action for medical monitoring." *Id.*

431 F. Supp. 3d 448, *460; 2019 U.S. Dist. LEXIS 221612, **28

*at 452*. These concerns included opening the floodgates to "tens of millions" of potential plaintiffs, flooding the court with claims, and exhausting the tortfeasor's resources before people who actually sustained injury could be paid. *Id. at 451*. The court also expressed concerns about whether courts had the technical expertise required to administer such a program.

*Caronia* is different from this case. Plaintiffs in that case were people over 50 who had smoked the equivalent of one pack of Marlboro's per day for 20 years or more. They had a history of exposure to cigarette smoking but no evidence of the presence of a toxic substance in their bodies. In defining what evidence could be sufficient to demonstrate physical harm, the Court of Appeals followed a line of prior cases which identified "an injury too slight to be noticed at the time it is inflicted" as supporting the accrual of a cause of action for toxic exposure. *See Schmidt v. Merchants Despatch Transp. Co., 270 N.Y. 287, 300, 200 N.E. 824 (1936)* (superseded by statute) (claim for inhalation of dust causing lung disease accrued at employee's first exposure even though "the injured party may be ignorant of the existence of the wrong [**29] or injury"). *Schmidt* barred recovery for later-discovered injuries outside the three-year statute of limitations until the passage of *N.Y. C.P.L.R. 214-c*, providing a three-year discovery rule in cases of latent injury caused by exposure to harmful substances. In *Askey v. Occidental Chemical Corp., 102 A.D.2d 130, 477 N.Y.S.2d 242 (N.Y. App. Div. 1984)*, the court opened the door to a potential medical monitoring claim on the ground that an invisible genetic damage was a sufficient physical injury to support a traditional tort-based recovery of consequential damages. "The future expense of medical monitoring, could be a recoverable consequential damage provided that plaintiffs can establish with a reasonable degree of medical certainty that such expenditures are "reasonably anticipated" to be incurred by reason of their exposure." *Id. at 137*.

In discussing *Schmidt* and *Askey*, the *Caronia* decision recognizes the continued viability of the holding in both courts that a physical injury sufficient to support a claim for damages may be present even though it is invisible and undetectable. In toxic tort cases, this requirement has developed into a requirement of evidence of testing or other evidence that the toxin is present in the body. Cases cited by *Caronia* include *Abusio v. Consolidated Edison Co. of NY., 238 A.D.2d 454, 656 N.Y.S.2d 371 (N.Y. App. Div. 1997)* (fear of future illness insufficient in [**30] the absence of evidence of a clinically demonstrable presence of toxins in the body), *Allen v.*

*General Electric Co., 32 A.D. 3d 1163, 821 N.Y.S.2d 692 (N.Y. App. Div. 2006)* (in order to obtain medical monitoring damages, plaintiff [*461] must establish clinically demonstrable presence of toxins in the body), and *Dangler v. Town of Whitestown, 241 A.D. 2d 290, 672 N.Y.S.2d 188 (N.Y. App. Div. 1998)* (medical monitoring considered as damages). In a footnote, the Court of Appeals cautioned that these cases do not support the recognition of a new cause of action for medical monitoring. *Caronia, 22 N.Y.3d at 449 n.2*.

The question for the present case is whether the principles expressed in *Caronia* would entirely bar a medical monitoring claim. *Caronia* does not apply directly because it construes New York law. But if it applied, it would likely permit these plaintiffs to seek to prove their case under traditional tort theories premised upon the presence of PFOA in their bodies. *Schmidt* established that an injury could occur even though the plaintiff had no knowledge of it. *Askey* recognized the steep burden of proof (which was not met on the particular facts of that case) but recognized that a plaintiff who could demonstrate the occurrence of genetic damage could make a claim for medical monitoring. The subsequent decisions, considered in the context of existing tort causes of action and avoiding [**31] any mention of an independent cause of action, established the requirement of objective evidence of the presence of toxins. That evidence was not present in *Caronia*. The smokers sought millions of low-level CT scans to find out if there was evidence of injury. This case is different—the plaintiff exposure class is made up of people who test positive for PFOA at elevated levels. It remains for Plaintiffs to prove at trial that the test levels are of clinical significance and other elements of their damage claim. But for purposes of summary judgment, if these plaintiffs had been subject to New York law, the *Caronia* decision would permit them to proceed to trial.

In *Baker v. Saint-Gobain Performance Plastics Corp., 232 F. Supp. 3d 233 (N.D.N.Y. 2017)*, the district court, presiding over a water contamination case substantially identical to the present case, considered the application of *Caronia* to a claim for medical monitoring. That court reached very similar conclusions. "[U]nder case law cited favorably by *Caronia*, a plaintiff may show an injury sufficient to seek medical monitoring damages through the accumulation of a toxic substance within her body." *Id. at 250*. In Judge Kahn's view, New York law would permit the recovery of medical monitoring damages on proof of a rational [**32] basis for the fear of future injury supported by some manifestation of toxin

contamination. *See id. at 252* (citing *In re World Trade Ctr. Lower Manhattan Disaster Site Litig., 758 F.3d 202, 213 (2d Cir. 2014)).* The decision in *Baker v. Saint-Gobain* is currently on appeal to the Second Circuit.

### 3. *Metro-North Commuter Railroad Co. v. Buckley, 521 U.S. 424, 117 S. Ct. 2113, 138 L. Ed. 2d 560 (1997)*

*Metro-North* concerns the availability of a medical monitoring program for a railroad worker under the *Federal Employers' Liability Act (FELA), 45 U.S.C. § 51 et seq.* In a portion of the decision not relevant here, the Court declined to permit recovery of emotional damages in a FELA case arising from on-the-job exposure to asbestos dust. The plaintiff also sought to recover future medical monitoring costs attributed to his exposure to asbestos-laden insulation dust. The majority opinion rejected the plaintiffs claim for lump-sum money damages for future monitoring costs in the absence of disease or symptoms. After reviewing the state law decisions on medical monitoring, the majority concluded "that the cases authorizing recovery for medical monitoring in the absence **[*462]** of physical injury do not endorse a full-blown, traditional tort law cause of action for lump-sum damages . ." *Id. at 441.* The Court identified policy reasons for exercising caution. These included difficulties in identifying extra monitoring costs above the treatment **[**33]** that would be provided to a plaintiff in any event, the sheer number of potential plaintiffs ("tens of millions of individuals"), *id. at 442*, and the existence of other sources of payment.

It is now largely accepted that a cash damage award paid directly to plaintiffs for future medical monitoring expenses is an inappropriate remedy. *See Ayers v. Twp. of Jackson, 106 N.J. 557, 525 A.2d 287, 314 (N.J. 1987)* ("In our view, the use of a court-supervised fund to administer medical-surveillance payments in mass exposure cases . . . is a highly appropriate exercise of the Court's equitable powers."); *see also Potter v. Firestone Tire & Rubber Co., 6 Cal. 4th 965, 1009, 25 Cal. Rptr. 2d 550, 863 P.2d 795 (1993)* ("Moreover, toxic exposure plaintiffs may recover 'only if the evidence establishes the necessity, as a direct consequence of the exposure in issue, for specific monitoring beyond that which an individual should pursue as a matter of general good sense and foresight.' (quoting *Miranda v. Shell Oil Co., 17 Cal. App. 4th 1651, 1660, 12 Cal. App. 4th 28, 15 Cal. Rptr. 2d 569, 26 Cal. Rptr. 2d 655 (Cal. Ct. App. 1993))).* The *Metro-North* decision joins in this view. "[W]e do not find

sufficient support in the common law for the unqualified rule of lump-sum damages recovery that is, at least arguably, before us here." *Metro-North, 521 U.S. at 444.* The decision does not foreclose a future medical monitoring remedy in FELA cases which is better focused on addressing unmet medical needs directly. Instead, it invites consideration of the **[**34]** issue in future cases. "We need not, and do not, express any view here about the extent to which the FELA might, or might not, accommodate medical cost recovery rules more finely tailored than the rule we have considered." *Id.*

### 4. *Henry v. Dow Chemical Co., 473 Mich. 63, 701 N.W.2d 684 (Mich. 2005)*

The *Henry* majority decision and the dissent illustrate the choice the Vermont Supreme Court must make when a medical monitoring case reaches it. The case concerns the broad release of dioxin over many years across the Tittabawassee River floodplain in Saginaw County, Michigan. The plaintiffs sought certification of a class of thousands of individuals. The Michigan Supreme Court held that in the absence of proof of actual injury, a claim for medical monitoring is not permitted by Michigan law. The majority decision advances four primary bases for that holding.

> 1. The pool of plaintiffs who can assert claims based on exposure alone is potentially limitless and may cause great economic harm.
> 2. The legislative and executive branches are better suited to make decisions about who needs monitoring. Michigan law already provides an administrative remedy.
>
> 3. Courts are in a poor position to judge whether medical monitoring of thousands of people will result in improved **[**35]** health.
> 4. Calling the relief an "equitable remedy" changes little.

These are all legitimate concerns which any court must consider. But these concerns are largely absent or of limited concern in this case.

> 1. Here, the exposure class is limited to people who actually demonstrate increased levels of PFOA in their bloodstream. The Vermont Department of Health has already tested a significant percentage of the population. **[*463]** The numbers of people with elevated PFOA number in the hundreds, not thousands. This number will likely increase, but it is

unlikely to reach the many thousands feared in *Henry* or the tens of millions described in *Metro-North*.

2. In Bennington, the executive branch has been very active in requiring the provision of clean municipal water to residents in the affected area. Neither the legislature nor the Department of Environmental Conservation have addressed the medical monitoring issue. If the judiciary defers to the other branches, it would be deferring to a vacuum. Michigan presented a very different picture in which state environmental regulations authorized regulators to develop appropriate monitoring.

3. This case presents less complex medical issues than those described [**36] in the *Henry* decision. Plaintiffs seek to prove an association between PFOA and a small set of specific illnesses, including certain cancers. They do not seek to screen an entire population for cancer.

4. The court agrees that calling the relief an "equitable remedy" does not change the outcome. For reasons explained already, it is prudent for a federal court to remain within the lines of existing tort doctrine. But the elements of proof are likely to be identical whether the remedy is called a new tort or an injunction based on a familiar cause of action.

*HN15*[⬆] In sum, the cases denying medical monitoring share several characteristics. All concern a very large potential exposure class—thousands or millions of claimants with potentially ruinous economic consequences. Few concern chemicals which can be measured in the blood as readily as the PFOA in this case. The *Caronia* case is typical in denying medical monitoring to a potential class consisting of everyone who smoked regularly even if they appeared to be in good health at present.

The facts in this case are different. The exposure class is limited to people who provide objective tests showing significantly elevated blood levels of PFOA. [**37] Plaintiffs' expert proposes two micrograms per liter. The court sees the appropriate level as a trial issue. It can be set at a higher level if the medical testimony supports it. But whatever level is chosen, the exposure class members all have objective evidence of an alteration of their bodies. In this sense, their claim for medical monitoring is more persuasive than the claim of smokers, for example, who can prove only an increased risk of cancer without any present changes in their bodies.

A second difference is the absence in this case of potentially ruinous economic consequences. *HN16*[⬆] A common theme in all of the cases denying medical monitoring is the unknown size of the total cost. Here the plaintiffs seek approximately $20 million for their proposed plan. (Doc. 278 at 15, Ducatman testimony, Apr. 23, 2019.) The court has expressed doubts about whether all its features are actually necessary. The questions of cost and the exact form of the remedy are trial issues. But it is clear that the expense is finite and significantly less than the amount already paid by the defendant to install town water mains and alternative sources of supply to all affected households.

## B. Cases Permitting [**38] the Medical Monitoring Remedy

The court turns to the cases *permitting* the remedy of medical monitoring.

**[*464] 1.** *Ayers v. Twp. of Jackson, 106 N.J. 557, 525 A.2d 287 (N.J. 1987).*

*Ayers* is the seminal case permitting a medical monitoring claim. Following a jury trial, the municipal defendant was held liable under a nuisance theory for damages to residents' groundwater caused by a landfill. Over half of the $16 million verdict was awarded for the cost of future "medical surveillance expenses." *Id. at 565*. In affirming the award, the Supreme Court of New Jersey framed the issue as a question of the timing of a judicial remedy:

> At what stage in the evolution of a toxic injury should tort law intercede by requiring the responsible party to pay damages?

*Id. at 579*. The court recognized the absence of a statutory or regulatory response to claims arising from exposure to chemical contamination. The court identified causation as the most difficult problem of proof in claims of latent injury and delayed onset. The majority opinion denied damages for unquantified enhanced risk of disease. *Id. at 598*. In the court's view, "[t]he claim for medical surveillance stands on a different footing from the claim based on enhanced risk." *Id. at 599*. It described the claim as consistent with well-accepted legal principles [**39] and "consistent with the important public health interest in fostering access to medical testing for individuals whose exposure to toxic chemicals creates an enhanced risk of disease." *Id. at 603*. The court also recognized separate public policy

concerns such as deterrence of polluters and consistency with other causes of action in which recovery of medical expenses alone were permitted. *Id. at 605*. The court — like virtually every court to follow which has permitted a medical monitoring claim — favored a court-supervised fund in place of a lump-sum cash award. *Id. at 609*.

*Ayers* makes a full-throated argument in favor of medical monitoring on public policy grounds. As in this case, the facts were favorable to the remedy. A limited number of residents attributed their exposure to an identifiable source. The court had no reason to explore the outer reaches of the remedy such as the claims for monitoring millions for exposure of consumers to hazards like tobacco. The majority acted with caution in denying recovery for enhanced risk as a stand-alone and unquantified measure of damages. Despite the cries from academic critics of medical monitoring that the sky is falling, *Ayers* remains the law in New Jersey which must **[**40]** rank high among states most gravely affected by industrial and chemical pollution. *See Sinclair v. Merck & Co., 195 N.J. 51, 948 A.2d 587 (N.J. 2008)* (recognizing the continuing application of *Ayers* in cases of environmental contamination while denying medical monitoring in pharmaceutical case involving New Jersey statute).

**2. The three *Paoli* decisions by the Third Circuit: *In Re Paoli R.R. Yard PCB Litigation, 916 F.2d 829 (3d Cir. 1990)* (Paoli I); *In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717 (3d Cir. 1994)* (Paoli II); and *In re Paoli R.R. Yard PCB Litigation, 113 F.3d 444 (3d Cir. 1997)* (Paoli III)**

Medical monitoring under Pennsylvania law was an important feature of each appellate decision in this decade-long saga which finally ended in a defendants' verdict after a jury trial. In *Paoli I*, the appeals court reversed the trial court's decision to grant summary judgment to the defendant after excluding the expert testimony on *Daubert* grounds. In the course of the decision, the appeals court recognized the existence of a medical monitoring **[*465]** remedy under Pennsylvania law for latent injury and identified four elements of what the court described as the medical monitoring cause of action. These were:

a. Significant exposure to a proven hazardous substance through negligence of the defendant;
b. Causation through exposure of a significantly increased risk of contracting a serious latent disease;

c. Medical necessity of periodic diagnostic medical examinations; **[**41]** and
d. Monitoring procedures which make early detection and treatment of the disease possible and beneficial.

In *Paoli II*, the case returned primarily for further consideration of the exclusion of expert testimony under *Daubert*. The panel also returned to the issue of medical monitoring and refined the previous elements by adding a requirement that the monitoring regime be different from that which a plaintiff would receive in the normal course of care absent any exposure to the alleged toxic chemical. The court also added a requirement that the benefits of the proposed medical monitoring include its costs, including frequency, price and risk of harm. The panel remanded the case for trial.

The trial resulted in a defendants' verdict. On appeal, the Third Circuit reexamined the medical monitoring remedy, including the jury instructions, and upheld the verdict. *Paoli III*.

All three *Paoli* decisions rest on the court's conclusion that Pennsylvania law would recognize a claim for medical monitoring for latent injury while likely rejecting a claim for money damages based on fear of contracting a disease. "[The enhanced risk claim] is inherently speculative because courts are forced to anticipate **[**42]** the probability of future injury. [The medical monitoring claim] is much less speculative because the issue for the jury is the less conjectural question of whether the plaintiff needs medical surveillance." *Paoli I, 916 F.2d at 850-51*. Having set up this choice, the Third Circuit predicted that the Pennsylvania Supreme Court would embrace the latter. To date its judgment has proved correct. *See Redland Soccer Club, Inc. v. Dep't of the Army & Dep't of Defense of the United States, 548 Pa. 178, 696 A.2d 137 (Pa. 1997)*; *Simmons v. Pacor, Inc., 543 Pa. 664, 674 A.2d 232 (Pa. 1996)*. This court anticipates that the common law analysis of the Third Circuit in the *Paoli* cases will remain highly persuasive when the Vermont Supreme Court considers these issues under Vermont common law.

**3. *Sadler v. PacifiCare of Nevada, Inc., 130 Nev. 990, 340 P.3d 1264 (Nev. 2014)***

The *Sadler* decision is relatively recent. It follows an outbreak of hepatitis C caused by unsafe injection practices at health-care facilities in Nevada. Patients with no symptoms of the illness sued for the cost of

431 F. Supp. 3d 448, *465; 2019 U.S. Dist. LEXIS 221612, **42

medical monitoring. In permitting the remedy, the Nevada Supreme Court recognized the social policies favoring early detection of possible disease.

> [T]here are significant policy reasons for allowing a recovery for medical monitoring costs, not the least of which is that early detection can permit a plaintiff to mitigate the effects of a disease, such that the ultimate costs for treating the disease may [**43] be reduced. If medical monitoring claims are denied plaintiffs who cannot afford testing may, through no fault of their own be left to wait until their symptoms become manifest, losing valuable treatment time. Rather than allowing this result, it is more just to require the responsible party to pay for the costs of monitoring necessitated by that party's action.

[*466] *Id. at 1271* (internal citations omitted). The *Sadler* decision rests upon similar statements in *Friends for All Children, Inc. v. Lockheed Aircraft Corp., 746 F.2d 816, 241 U.S. App. D.C. 83 (D.C. Cir. 1984)*; *Potter v. Firestone Tire & Rubber Co., 6 Cal. 4th 965, 25 Cal. Rptr. 2d 550, 863 P.2d 795 (Cal. 1993)*; *Ayers v. Twp. of Jackson, 106 N.J. 557, 525 A.2d 287, 314 (1987)*; and *Hansen v. Mountain Fuel Supply Co., 858 P.2d 970 (Utah 1993)*. The *Sadler* decision also recognizes the force of the Restatement (Second) of Torts, which "specifically contemplates the 'invasion of any legally protected interest of another' as an injury." *Sadler, 340 P.3d at 1270* (quoting *Restatement (Second) of Torts § 7(1)* (1965) (emphasis omitted)).

## C. Summary

*HN17*[⬆] The choice between permitting and excluding a medical monitoring remedy for potential future illness is a choice between competing values. The jurisdictions which do not permit the remedy do so on the basis of concerns about unforeseen economic consequences to the defendant. The jurisdictions which allow the remedy value the potential saving of lives which may be achieved through early detection and treatment. The cases lie along a continuum from the smokers' cases in which medical monitoring is [**44] consistently denied—see, for example, *Lowe v. Philip Morris USA, Inc., 344 Ore. 403,, 183 P.3d 181 (Or. 2008)*—to cases like *Save the Children* and *Sadler*, in which victims of a catastrophic accident or negligent health care seek follow-up monitoring for potential illness. This case falls much closer to the cases in which medical monitoring has been permitted by the highest courts in other states because of the presence of an objective test for

exposure and the relatively small, defined class of people who tested positive for PFOA after consuming water within the affected area. For these reasons, the court anticipates that this is the type of case in which Vermont decisional law will follow cases permitting proof of the elements of a medical monitoring remedy.

## VI. Plaintiffs' Motion for Summary Judgment

The court turns now to the parties' motions for summary judgment which seek judgment on the basis of the record evidence before the court. Applying the familiar summary judgment standard, the court begins with Plaintiffs' motion.

Plaintiffs seek a ruling that they are entitled to the medical monitoring remedy as a matter of law. The short answer is that they are required to prove their case at trial. It is hardly an exaggeration to observe that almost every [**45] fact in the case is in dispute. *HN18*[⬆] These include the facts necessary to support a medical monitoring claim.

The court follows the *Bower* and *Paoli* line of decisions in identifying these six elements as:

> Exposure at a rate significantly greater than the general population;
> To a proven hazardous substance;
> As the result of tortious conduct of the defendant;
> As a proximate result of the exposure, plaintiffs have suffered an increased risk of contracting a serious disease;
> The increased risk makes it medically necessary for the plaintiffs to undergo periodic medical examination different from that prescribed for the general population in the absence of the exposure; and

Monitoring procedures exist which are reasonable in cost and safe for use. *See Hansen v. Mountain Fuel Supply Co., 858 P.2d 970, 979 (Utah 1993)* (identifying similar factors under Utah law). It is premature to define the exact requirements. Trial evidence will be significant. The court [*467] and the parties have not yet resolved the issue of which questions are for the court and which will be decided by jury verdict. But the list of factors above provides a clear guide to the plaintiffs' burden of proof.

The *Daubert* hearings provided an account, not yet complete, of Defendant's challenge on the facts [**46] and the science to each of these elements. These include claims by the defense that Plaintiffs' exposure is

in many cases no greater than background, that PFOA is generally harmless, at least at the concentrations found in Bennington, that the PFOA found in well water in Bennington originated from sources other than Chem-Fab, that Plaintiffs have no increased risk of disease, that they already receive monitoring for the relevant conditions as part of their primary care, and that monitoring will cause more harm than good. Defendant has identified experts who are prepared to testify in support of these claims and others.

*HN19*[↑] Cases in which there are substantial material factual disputes require a trial. *See, e.g., Dufort v. City of New York, 874 F.3d 338, 349 (2d Cir. 2017)* ("[D]isputed questions of material fact . . . should be resolved by a jury at trial, not by a court at summary judgment.").

### VII. Defendant's Motion for Summary Judgment

In addition to its argument that medical monitoring is not available as a matter of law, Defendant offers a separate reason why the facts developed in this case, particularly as they relate to the medical histories of the named plaintiffs, preclude a medical monitoring remedy. In its motion for summary judgment, Defendant **[\*\*47]** argues that "Plaintiffs have not adduced any admissible expert evidence as to the essential element of specific causation as to any of the named Plaintiffs—that is, that exposure to PFOA from the Chemfab facility caused **them** an increased risk of adverse health conditions, as opposed to whether it can do so in general." (Doc. 321 at 1.) Plaintiffs respond that it is their burden to prove general causation—but not that Defendant has caused an identifiable health problem in any individual. They seek medical monitoring to avoid or reduce exactly that outcome.

The court considers the facts in the light most favorable to the plaintiffs. The record evidence submitted by Plaintiffs, if believed by the fact-finder, would demonstrate the following:

1. The two Chem-Fab plants in Bennington and North Bennington are the primary source of the high level of PFOA found in the ground water within the affected zone.
2. PFOA is associated with an increased risk of liver and thyroid disorders, kidney cancer, ulcerative colitis, gout, testicular cancer and pregnancy-related conditions.

3. Six of the eight class members have blood tests showing PFOA levels in their bodies that exceed the background levels found **[\*\*48]** in the general population. Hundreds of residents of Bennington and North Bennington, residents of the affected area, have similar test results.
4. PFOA above the background level of 2.1 micrograms per liter of blood gives rise to an increased health risk.
5. Testing is available for early detection of the conditions associated with exposure to PFOA.
6. An appropriate testing program for a person with elevated PFOA results exceeds in scope and cost the routine care provided by primary care physicians.

 **[\*468]** 7. Early detection improves the subject's chances of a better outcome.

Absent from this summary is any assertion that the class representatives or other class members currently suffer from illness caused by PFOA. Plaintiffs have excluded such claims from this litigation. The only relief sought by Plaintiffs for the effects of PFOA on the bodies of class members is medical monitoring to detect illness in the future.

The court has rejected Defendant's legal argument that medical monitoring is unavailable to asymptomatic individuals. The remaining issues concern the nature of the proof required to prove causation of increased risk of illness. In addition, Defendant seeks to rule out any relief **[\*\*49]** to the named plaintiffs because they receive equivalent and sufficient monitoring through their existing physicians.

### A. General v. Specific Causation

*HN20*[↑] There is no question that under Vermont law, a plaintiff seeking money damages for personal injury due to exposure to a toxic substance must prove specific causation. In *Blanchard v. Goodyear Tire and Rubber, 2011 VT 85, ¶ 5, 190 Vt. 577, 30 A.3d 1271* (mem.), the Court held that in order to defeat a summary judgment motion, a plaintiff seeking damages for toxic exposure must produce "evidence suggesting a probability, rather than a mere possibility, that (1) he was exposed to the specified chemical at a level that could have caused his physical condition (general causation); and (2) the exposure to that chemical did in fact result in the condition (specific causation)."

*HN21*[↑] The causation question changes when the claim is for medical monitoring. In cases like this one,

431 F. Supp. 3d 448, *468; 2019 U.S. Dist. LEXIS 221612, **49

there is no present illness or condition, only an elevated risk. No plaintiff in a medical monitoring case can prove specific causation, because he or she has no specific condition. The claim relates to an increased risk for a population, not to the experience of individual members. Courts have differed on the wisdom and propriety of crafting a monitoring **[\*\*50]** remedy for a population. But if the remedy is not barred as a matter of law, proof of causation must also be at the population level. It is for this reason that courts which have permitted medical monitoring claims to go forward have not required proof of specific causation.

**HN22**[⬆] The Manual for Complex Litigation addresses the difference in the burden of proof between medical monitoring and personal injury claims.

> Plaintiffs [in a medical monitoring case] must show that the defendant caused the exposure to the substance and the consequent increase in risk. Courts generally require plaintiffs to show that diagnostic tests exist, that the increased risk has made testing reasonably necessary, and that early detection can significantly improve medical treatment of the disease. However, courts have not, to date, required plaintiffs to show that the increase in risk constitutes the proximate cause of any injury that might follow, leaving that issue for any personal injury damage actions that might ensue.

Manual for Complex Litigation (Fourth) § 22.74 (2004). The initial element described by the Manual—exposure and consequent increase in risk—is equivalent to the general causation element in *Blanchard*—exposure to a specified chemical that could **[\*\*51]** have caused his physical condition. As the Manual points out, courts which permit the medical monitoring remedy have not required proof of specific causation for a latent injury. Proving the specific cause of something which has not occurred presents insuperable difficulties even if sound epidemiological evidence of **[\*469]** the increased risk and reasonable ameliorative measures are present.

If believed by the factfinder, the factual claims made by Plaintiffs through their experts are sufficient to establish general causation and meet the elements of the medical monitoring remedy developed above. In the context of the *Daubert* ruling, the court has already discussed the testimony of the three "transfer" experts. If believed, their testimony provides a potential basis for a factual determination that Defendant is responsible for the elevated PFOA levels in the affected zone.

Plaintiffs offer Alan Ducatman, M.D. and Philippe

Grandjean, M.D. on the issues of general causation and remedy for the exposure class. Both have passed their *Daubert* examination. In reaching an opinion that PFOA is associated with a population-wide increase in specific diseases, both used an accepted "weight of the evidence" **[\*\*52]** process to consider the state of research to date. Defendant and its experts disagree with the manner in which Dr. Ducatman and Dr. Grandjean selected and weighed the available studies. Defendant accuses the experts of "cherry-picking" the outcomes which support Plaintiffs. That is a significant trial issue. The existence of a dispute over methodology and conclusion does not result in summary judgment. It highlights the factual dispute between the parties.

The defendant also criticizes the two medical experts for their failure to review and consider the individual plaintiffs' medical records. Dr. Ducatman explains that this was a considered decision:

> [Review of individual records is] not only unnecessary, it's actually inappropriate and a barrier . . . I want medical records when I'm dealing — and I want them all, and I insist on them all when I'm dealing with the topic of individual causation. I do not need 200,000 Navy employees' medical records to put in place their asbestos medical surveillance program.

(Doc. 279 at 205, Ducatman Testimony, Apr. 29, 2019.) At trial, the court will determine as a matter of law the level of causation which forms part of the plaintiffs' burden of proof. **[\*\*53]** Since general causation appears at this time to be the correct legal standard, the absence of an expert report on specific causation of a health risk documented in each plaintiff's medical history does not result in summary judgment for the defendant.

## A. Differences Among Class Members; Existing Monitoring

The defendant seeks summary judgment in the individual cases of the class representatives on the ground that two representatives do not have elevated PFOA levels, some of them already have the more common ailments associated with PFOA such as high cholesterol, and all of them have some form of primary medical care in place. Plaintiffs respond that after certification, the issues before the court are limited to common issues with common answers. In Plaintiffs' view, it is no longer appropriate to seek out differences among the representative plaintiffs who have been accepted as the standard bearers for the class as a

431 F. Supp. 3d 448, *469; 2019 U.S. Dist. LEXIS 221612, **53

whole.

The court agrees with the plaintiffs. Assuming that Plaintiffs meet their burden of proof on general causation, differences among individual class members are resolved through the remedy and not by entering partial summary judgment against one named plaintiff or another. **[**54]** The simplest example is testing for conditions limited to one gender such as pregnancy complications. Any medical monitoring injunction would limit the test to women of childbearing age. It is unnecessary to enter partial summary judgment against the male plaintiffs on this issue.

**[*470]** Similarly, access to primary care and annual checkups varies. _HN23_[↑] It is an accepted element of the medical monitoring remedy that it covers costs not already borne as a matter of routine by a class member. There is no need to consider each case on an individual basis to determine what level of care the named plaintiff is receiving now. It is the remedy which must be fashioned to exclude currently available care and testing.

The defendant has other remedies if it believes the class is significantly compromised by the inclusion of two members who do not have above-background PFOA levels or by members who are receiving primary care which overlaps with a potential medical monitoring remedy. These would include motions to remove or substitute class representatives or decertification. The two class representatives who do not have elevated PFOA tests would be candidates for a motion seeking their removal as representatives **[**55]** of the exposure class. But the motion for summary judgment seeking piecemeal determination of individual plaintiffs' claims revisits the decisions the court has already made about common questions and answers and the ability of the named plaintiffs to represent the class.

**Conclusion**

The court DENIES both motions for summary judgment (Docs. 310, 321). The court will permit Plaintiffs to seek a medical monitoring remedy at trial.

Dated at Rutland, in the District of Vermont, this 27 day of December, 2019.

/s/ Geoffrey W. Crawford

Geoffrey W. Crawford, Chief Judge

United States District Court

_____

**End of Document**

Tab 11

2012 WL 776916
Only the Westlaw citation is currently available.
United States District Court,
S.D. Georgia,
Brunswick Division.

Kenneth WAITHE and Linda Waithe,
Individually and on behalf of All
Others Similarly Situated, Plaintiffs,
v.
ARROWHEAD CLINIC, INC., Arrowhead
Management, Inc., Harry W. Brown, Inc., H.
Brown Management Company, LLC, Harry W.
Brown, Jr., Legal Counsel, Inc., Robert D. Stein
d/b/a/ Robert D. Stein & Associates, Defendants.

No. CV 409–021.
|
March 7, 2012.

**Attorneys and Law Firms**

Brent J. Savage, Savage & Turner, PC, Savannah, GA, Lloyd
Dan Murray, Murray & Harvey, LLC, Richmond Hill, GA,
for Plaintiffs.

Mason White, Brennan, Harris & Rominger, LLP, Savannah,
GA, Allison S. Thompson, James C. Grant, Alston & Bird,
LLP, Johannes S. Kingma, John Colquitt Rogers, Lindsey P.
Hettinger, Carlock, Copeland & Stair, LLC, Atlanta, GA, for
Defendants.

**ORDER**

LISA GODBEY WOOD, Chief Judge.

**\*1** Presently before the Court is a Motion for Summary
Judgment filed by Defendants Arrowhead Clinic, Inc.
("ACI"), Arrowhead Management Inc. ("AMI"), Harry
W. Brown, Inc. ("HWBI"), and H. Brown Management
Company, LLC ("Brown Management") (collectively
referred to as "Brown–Arrowhead"). Brown–Arrowhead's
Mot. Summ. J ., Dkt. No. 101. Also before the Court
is a Motion for Summary Judgment filed by Defendants
Robert D. Stein d/b/a/ The Law Offices of Robert D.
Stein and Legal Counsel, Inc. (collectively referred to as
"Stein"). Stein's Mot. Summ. J., Dkt. No. 103. Linda and
Kenneth Waithe ("Plaintiffs") have also moved for summary

judgment. Pls.' Mot. Summ. J., Dkt. No. 104. For the
reasons stated below, the Court orders Plaintiffs' Motion
**DENIED,** Brown–Arrowhead's Motion **GRANTED,** and
Stein's Motion **GRANTED.**

**BACKGROUND**

Plaintiffs were involved in a car accident on January 1,
2005. Pls.' Am. Compl., Dkt. No. 6. Soon after the accident,
Plaintiffs sought chiropractic treatment at the Arrowhead
Clinic in Hinesville, Georgia. L. Waithe Dep. 33:20, Dkt.
No. 101, Ex. C. During the initial visit, Plaintiffs met with a
representative from Stein, who initiated a legal representation
contract. *Id.* at 78:16. The circumstances of how the Plaintiffs
and the Stein representative met are in dispute. Plaintiffs
assert that upon arrival at the clinic they filled out several
basic medical information forms. *Id.* at 35:4. Plaintiffs then
participated in an initial consultation in an examination room
with someone they were told was a doctor. *Id.* at 35:19.
The doctor discussed spinal injuries and showed Plaintiffs a
few exemplar spinal x-rays. *Id.* According to the Plaintiffs,
the doctor told them that in order to receive treatment from
the clinic Plaintiffs would need a lawyer. *Id.* at 35:23,
Plaintiffs claim they questioned this requirement, but the
doctor confirmed that it was necessary that the Plaintiffs have
legal counsel in order to receive treatment. *Id.* The doctor then
said, "It just so happens I have someone here from the Stein
firm." *Id.* at 36:3. Plaintiffs claim that the Stein representative
was referred to as an "investigator." *Id.* at 79:3. According to
Plaintiffs, the investigator had the Plaintiffs fill out a number
of forms connected with the Stein firm including a contract
for legal representation. *Id.* at 50:4. Among the documents
signed by the Plaintiffs was an "Attorney Recommendation"
form, indicating that they asked their doctor to recommend
a lawyer. Attorney Recommendation Form 2, Dkt. 101, Ex.
G. Plaintiffs state that they did not actually ask Brown–
Arrowhead to recommend counsel, as the form indicates, but
signed the form because they thought that they would not
receive treatment unless they agreed to meet with Stein. L.
Waithe Dep. 126:22, Dkt. No. 101, Ex. C.

Plaintiffs' sole payment to Brown–Arrowhead was a $100
payment for each Plaintiff made during that first visit to the
clinic. *Id* . at 69:23. Although Plaintiffs visited the clinic
several more times for treatment, they were never asked
to make any additional payments. Plaintiffs' bills indicate
that their insurance companies made various payments to
the clinic. Brown–Arrowhead's Mot. Summ. J., Dkt. No.
101, Ex. J. Plaintiffs had little contact with Stein during this
time, other than phone calls during settlement negotiations.

2012 WL 776916

Ultimately, the Plaintiffs received approximately $7,750 each in settlement of their claims against the other driver, of which approximately forty percent went to Stein for fees. L. Waithe Dep. 96:1, Dkt. No. 101, Ex. C.

**\*2** Several months after the culmination of Brown–Arrowhead's chiropractic treatment and Stein's legal representation of the Plaintiffs', Plaintiffs' current counsel contacted Brown–Arrowhead about the likelihood of the present lawsuit. Soon after that contact, Brown–Arrowhead sent Plaintiffs a $200 check, apparently as a refund for any payments (or overpayments) made by the Plaintiffs. Plaintiffs cashed the check without question. *Id.* at 70:13. This lawsuit followed.

Plaintiffs testified that they felt that Stein misled them into believing that Stein would try to get the best possible settlement for the Plaintiffs. *Id.* at 134:11. Linda Waithe felt that the Stein firm harmed them by "not providing [Plaintiffs] with the best possible representation." *Id.* at 136:23. Kenneth Waithe believed he was harmed by the fact that Stein misrepresented its interactions with Brown–Arrowhead (including the exchange of information between the parties), by not being generally truthful in their dealings, and because Stein did not "really [go] all out for [Plaintiff]." K. Waithe Dep. 61:24, 64:6, Dkt. No. 103, Ex. 6.

Plaintiffs filed suit against Brown–Arrowhead and Stein based on a number of different theories of liability.[1] Plaintiff's initial Complaint consisted of eight separate counts. Compl., Dkt. No. 1. Count One asserted a claim of professional negligence against Stein, and Count Two asserted a claim of professional negligence against Brown–Arrowhead. The remaining six counts were asserted against both sets of Defendants. Count Three alleged fraud and constructive fraud arising from Defendants' failure to disclose to Plaintiffs the relationship between the Defendants. Count Four alleged fraud and constructive fraud for the failure to properly credit Plaintiffs' patient accounts. Count Five alleged ordinary negligence by Stein based on its duty to insure adequate representation and not to "solicit, harass and invade the privacy of potential clients," and negligence by Brown–Arrowhead based on its duty to "protect and respect [patient's] privacy, and to adequately maintain their patient accounts." Count Six claimed that Defendants breached their fiduciary duties to Plaintiffs. Counts Seven and Eight claimed a right to attorney's fees and punitive damages, respectively.[2]

Brown–Arrowhead moved to dismiss Plaintiffs' Complaint on various grounds. Brown–Arrowhead's Mot. Dismiss, Dkt. No. 7. The Court granted Brown–Arrowhead's motion with regards to Counts Two (Professional Negligence), Four (Fraud/Constructive Fraud), and Six (Breach of Fiduciary Duty). Dkt. No. 55. Although the Court stated that Count Three (Fraud/Constructive Fraud) failed to state a claim as pled, the Court granted Plaintiffs additional time to amend their Complaint in order to cure the defects. *Id.* The Court denied Brown–Arrowhead's motion regarding Count Five (Negligence), Seven (Attorneys' Fees), and Eight (Punitive Damages). *Id.*

**\*3** Plaintiffs took advantage of the extra time afforded to amend Count Three, and filed "Plaintiffs' Second Amended Complaint as to Count Three—the Fraud Count." Pls.' Second Am. Compl., Dkt. No. 59. Brown–Arrowhead, moved to dismiss the amended Count Three and argued that all other counts had been abandoned by the Plaintiffs because they failed to include them in the amended complaint. Brown–Arrowhead's Second Mot. Dismiss, Dkt. No. 63. Stein moved to dismiss the amended Count Three and Count Four as it pertained to Stein. Stein's Mot. Dismiss, Dkt. No. 65. The Court held that the amended Count Three remained impermissibly vague, and dismissed the claim with regards to both sets of Defendants. Dkt. No. 122. The Court rejected Brown–Arrowhead's argument that Plaintiffs abandoned the other claims. *Id.* Finally, the Court explicitly dismissed Count Four as it related to Stein, relying on the same reasoning for dismissing Count Four with regards to Brown–Arrowhead in its earlier order. *Id.*

As the case stands now, one claim against Brown–Arrowhead and three claims against Stein remain unresolved. The sole remaining claim against Brown–Arrowhead is Count Five which claims that Brown–Arrowhead was negligent in failing to protect the Plaintiffs' privacy and in failing to adequately maintain the Plaintiffs' patient accounts. The three remaining claims against Stein are as follows: Count One asserts that Stein committed professional negligence by requiring Plaintiffs to sign a contract for representation that authorized Stein to pay all of the client's medical expenses, and by wrongfully soliciting clients in the physical confines of a medical provider; Count Five asserts that Stein was negligent in soliciting, harassing, and failing to adequately represent the Plaintiffs, as well as invading Plaintiffs' privacy; and Count Six alleges that Stein breached its fiduciary duty to adequately protect the interests of its clients by "receiving private information concerning a potential client, without

2012 WL 776916

authorization, and using it to their economic advantage." [3] Both sets of Defendants have filed motions for summary judgment. [4] Brown–Arrowhead's Mot. Summ. J., Dkt. No. 101, Stein's Mot. Summ. J., Dkt. No. 103. Plaintiffs also seek summary judgment on their claims. Pls.' Mot. Summ. J., Dkt. No. 104. The Court now considers the parties' summary judgment motions.

## LEGAL STANDARD

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Collins v. Homestead Correctional Inst.,* 2011 WL 4584817, at \*2 (11th Cir. Oct.5, 2011) (quoting *Eberhardt v. Waters,* 901 F.2d 1578, 1580 (11th Cir.1990)). The court must view the evidence and draw all inferences in the light most favorable to the nonmovant. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To discharge this burden, the movant must show the court that there is an absence of evidence to support the nonmoving party's case. *Id.* at 325. The burden then shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

\*4 Plaintiffs seek summary judgment on their claims against Brown–Arrowhead. Pls.' Mot. Summ. J., Dkt. No. 104. Indeed, Plaintiffs are so confident that liability has been established, they find it "incredible" that they need to move for summary judgment on their claims. *Id.* at 1. Brown–Arrowhead disagrees. Dkt. No. 111. Plaintiffs' motion focuses on two claims: a common law claim for conversion and a claim of insurance fraud pursuant to O.C.G.A. § 33–1–9. Neither of these claims was pled in any version of Plaintiffs' Complaint, and the Court is unaware of either party ever mentioning these theories prior to Plaintiffs' motion.

Brown–Arrowhead's response is twofold: (1) Plaintiffs should not be permitted to assert these claims because they have not followed the proper procedures for asserting new claims, and (2) if permitted to proceed on these theories, Plaintiffs' claims fail as a matter of law. The Court finds Brown–Arrowhead's first argument sufficiently persuasive that it is unnecessary to consider the merits of Plaintiffs' summary judgment arguments.

"At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed.R.Civ.P. 15(a). A plaintiff may not amend her complaint through argument in a brief opposing summary judgment." *Gilmour v. Gates, McDonald and Co.,* 382 F.3d 1312, 1315 (11th Cir.2004) (per curiam)); *see also Joseph M. Still Burn Ctrs., Inc. v. Liberty Mut. Ins. Co.,* 2010 WL 55471 (S.D.Ga.2010) (refusing to consider a claim improperly raised in a response to a motion for summary judgment). Here, Plaintiffs go one step further: instead of raising new claims in a response to a motion for summary judgment, Plaintiffs assert entirely new claims in their own motion. The Court will not consider claims that are entirely novel, and raised for the first time on summary judgment. Accordingly, Plaintiffs' motion for summary judgment is denied.

## DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

As noted earlier, one claim against Brown–Arrowhead and three claims against Stein remain unresolved. Plaintiffs' Count Five (Negligence) against Brown–Arrowhead remains pending; Plaintiffs' Counts One (Professional Negligence), Five (Negligence), and Six (Breach of Fiduciary Duty) remain pending against Stein. The Defendants move for summary judgment on all remaining claims.

### I. Brown–Arrowhead's Motion for Summary Judgment

Only one claim against Brown–Arrowhead remains pending: Plaintiffs' Count Five (Negligence). In Georgia, "[i]n order to have a viable negligence action, a plaintiff must satisfy the elements of the tort, namely, the existence of a duty on the part of the defendant, a breach of that duty, causation of the alleged injury, and damages resulting from the alleged breach of the duty." *Rasnick v. Krishna Hospitality, Inc.,* 289 Ga. 565, 713 S.E.2d 835, 837 (Ga.2011) (citing *John Crane, Inc. v. Jones,* 278 Ga. 747, 604 S.E.2d 822 (Ga.2004)).

**\*5** Plaintiffs' Count Five asserts that Brown–Arrowhead had a duty to patients' privacy and "to adequately maintain their patient accounts ...." Pls.' Am. Compl. ¶ 57, Dkt. No. 6. Plaintiffs' claim that Brown–Arrowhead breached its duty by entering into a business relationship with Stein that was intended to put Brown–Arrowhead's interests ahead of its patients. *Id.* ¶ 58.

### A. Disclosure of Patient Information

In part, Plaintiffs' negligence claim is based on the notion that Brown–Arrowhead disclosed confidential patient information to Stein. Pls.' Am. Compl. ¶ 57, Dkt. No. 6. In their motion for summary judgment, Brown–Arrowhead argues that there "is simply no evidence in the record that Plaintiffs' confidential medical information was released without their consent." Brown–Arrowhead's Mot. Summ. J. 15–16, Dkt. No. 101 Brown–Arrowhead argues that the Plaintiffs signed a form upon their initial visit to Brown–Arrowhead's Hinesville, Georgia clinic that clearly authorized the clinic to release medical information to Stein. *Id.* (referring to Agreement of Patient and Attorney Regarding Payment of Benefits and Doctor's Lien, Dkt. No. 101, Ex. H). Indeed the first sentence of the agreement states:

> I (Linda D. Waithe) authorize Harry W. Brown, Inc. through its employees, agents, and representatives (my "Doctor"), to furnish my attorney, (Rob Mayhue/Stein), Esquire, and/or (Go American) Insurance Company, and any other insurance company providing coverage to me and/or my family or the designee of any of them either, any medical information requested concerning the condition or treatment of injuries sustained by me, my spouse, and/or my children, on (1–1–05). [5]

Plaintiffs, motivated perhaps by the decisiveness of the above-quoted agreement, focus on alleged disclosures of private information that occurred *before* the signing of the release authorization. Pls.' Resp. 21, Dkt. No. 113. Specifically, Plaintiffs argue that before they signed the release authorization, the clinic provided Stein with Plaintiffs' patient intake forms, presumably in order to alert Stein about a potential client. *Id.* Plaintiffs base their claim on Shelah Gibbs's statements:

> Once the attorney was selected, the call center staff would fax a new patient intake form to the attorney's office. The sheet would have, in addition to other information, the patient's name, the date of the accident, address, insurance information, the clinic the patient would be going to, the date and time of the scheduled appointment, and the manner in which the patient heard about the Arrowhead Clinics.

Gibbs Aff. ¶ 5, Dkt. No. 113, Ex. 9. Brown–Arrowhead does not dispute whether it ever sent patient intake forms to Stein, but instead claims that Plaintiffs have presented no evidence that these specific Plaintiffs' intake forms were sent to Stein. Brown–Arrowhead's Reply 13–14, Dkt. No. 119.

Brown–Arrowhead argues that Gibbs' affidavit is generalized knowledge, and that she does not have any personal knowledge about the Plaintiffs' intake forms. *Id.* Brown–Arrowhead emphasizes that Gibbs, during her deposition, repeatedly testified that she had no personal knowledge of the Waithes. For example, in response to a question about how the Waithes became clients of Stein, Gibbs stated "I don't know [the Plaintiffs] personally and I can't say that I know how they became patients of Stein." Gibbs Dep. 102:17, Dkt. No. 95, Ex. A. And, in response to the question "[Y]ou don't know one way or the other whether the Stein firm was contacted prior to the Waithes' arrival at the clinic?" Gibbs replied "I don't know that, specifically, no." *Id.* at 126:10; *see also id.* at 118:16, 234:5, 281:23.

**\*6** "At the summary judgment stage, general factual allegations of injury will not suffice; rather, the plaintiff 'must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true.' " *Barbour v. Haley,* 471 F.3d 1222, 1225 (11th Cir.2006) (quoting *Lewis v. Casey,* 518 U.S. 343, 358, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996)). Importantly, "a court is not required to accept as true testimony that is not based

2012 WL 776916

on personal knowledge" and a court may disregard testimony not based on personal knowledge. *Corwin v. Walt Disney Co.,* 475 F.3d 1239, 1250 (11th Cir.2007). Furthermore, "inadmissible hearsay cannot be considered on a motion for summary judgment." *Macuba v. Deboer,* 193 F.3d 1316, 1321 (11th Cir.1999) (internal citations omitted).

Here, the only support for Plaintiffs' claim that their private medical information was released is Gibbs' generalized factual assertion that the Brown–Arrowhead "call center staff would fax a new patient intake form to the attorney's office." Gibbs Aff. ¶ 5, Dkt. No. 113, Ex. 9. During her deposition Gibbs indicated repeatedly that her knowledge of this process was second-hand, based primarily on conversations she had with the call center staff members. *See, e.g.,* Gibbs Dep. 99:17, Dkt. No. 95, Ex. A. Moreover, Gibbs explicitly testified that she did not know of how Stein came to be aware of Plaintiffs' need for an attorney. *See id.* at 102:17, 118:16, 126:10, 234:5, 253:14, 281:23. Gibbs clearly has no personal knowledge as to how Plaintiffs came to be Stein's clients. Without some factual evidence that Plaintiffs' private information was released, Plaintiffs' claims for negligent release of private medical information must fail. [6] Accordingly, Brown–Arrowhead is entitled to summary judgment on this claim.

### B. Failure to Adequately Maintain Patient Accounts
Plaintiffs' second theory of negligence is based on the notion that Brown–Arrowhead breached its duty to accurately maintain patient accounts. Pls.' Am. Compl. ¶ 57, Dkt. No. 6. Plaintiffs' theory is not perfectly clear, but appears to be that Brown–Arrowhead negligently failed to identify money that was to be refunded to the Plaintiffs, which caused the funds to remain in the hands of Brown–Arrowhead for approximately twenty-nine months. Plaintiffs claim that they suffered damage in the amount of interest that would have accrued on the funds if the money had been refunded at an earlier date.

Plaintiffs' theory focuses on $100 per patient, paid by the Waithes to the Brown–Arrowhead clinic on the day of the initial consultation. [7] This $100 was the only money paid by the Waithes to Brown–Arrowhead. It was not clear to either party that the amount constituted an overpayment until the treatment was completed and all insurance proceeds were credited to the Waithes' accounts. Indeed, Plaintiffs were not even aware that they were entitled to a refund, nor did they ask

Brown–Arrowhead to refund any overpayments. L. Waithe Dep. 69:24, Dkt. No. 101, Ex. C. Rather, Plaintiffs' attorney contacted Brown–Arrowhead prior to filing suit, and Brown–Arrowhead voluntarily refunded the amounts to the Waithes. Harry W. Brown, Sr. Dep. 36–37, 56–57, Dkt. No. 113, Ex. 6. The Waithes were unsure why they received the check from Brown–Arrowhead, but nevertheless deposited the amount without question. L. Waithe Dep. 72:12, Dkt. No. 101, Ex. C.

**\*7** Brown–Arrowhead seeks summary judgment, contending that there is a complete lack of evidence to support the Plaintiffs' claims. Brown–Arrowhead's Mot. Summ. J. 16, Dkt. No. 101. Brown–Arrowhead asserts that the evidence shows that the Plaintiffs' patient accounts were properly maintained, and that the $100 overpayments were properly refunded to the Plaintiffs. *Id.* Alternatively, Brown–Arrowhead argues that any claim for interest on the refunded amounts is an action for economic loss arising from a contract between the Plaintiffs and Brown–Arrowhead, and consequently, recovery in tort is barred. [8] Plaintiffs' response consists primarily of arguing that Brown–Arrowhead had a duty to "abide by the Georgia Chiropractic Association's Code of Ethics," and that Brown–Arrowhead breached that duty when it "illegally used [Plaintiffs'] money for over two years without paying back any interest." Dkt. No. 113, at 20.

Brown–Arrowhead's first argument—that there is a lack of evidence to support Plaintiffs' claims—is well-taken. The course of events, viewed in the light most favorable to the Plaintiffs, indicates that Brown–Arrowhead voluntarily sent a refund to Plaintiffs with very little prompting. The initial payments by the Plaintiffs to Brown–Arrowhead were lawful, voluntary payments for services rendered. After these initial payments, Plaintiffs' insurers made various payments on the accounts. Once the treatment was complete, and the clinic received all payments from the insurers, each Plaintiff was left with a credit balance. After Plaintiffs' counsel contacted Brown–Arrowhead, approximately two and half years later, Brown–Arrowhead sent Plaintiffs a check for $200, consistent with the total amount of overpayments made by the Waithes. L. Waithe Dep. 71:22, Dkt. No. 101, Ex. C. Based on these facts, there is no evidence to support a claim that Brown–Arrowhead failed to identify and refund overpayments to the Plaintiffs.

However, reading the Plaintiffs' pleadings with generous liberality, Plaintiffs seem to argue that Brown–Arrowhead had a duty to identify and refund the overpayments sooner, and breached that duty by failing to include interest in the

Waithe v. Arrowhead Clinic, Inc., Not Reported in F.Supp.2d (2012)
2012 WL 776916

refund amount. As such, the Court will consider Brown–Arrowhead's alternative argument that Plaintiffs' claims, if any, arise solely from the contract between Plaintiffs and Brown–Arrowhead, and thus, Plaintiffs are unable to recover in tort.

Brown–Arrowhead couches its argument in terms of "Georgia's economic loss rule." Brown–Arrowhead's Mot. Summ. J. 17, Dkt. No. 101. Georgia's economic loss rule "generally provides that a contracting party who suffers purely economic losses must seek his remedy in contract and not in tort. Under the economic loss rule, a plaintiff can recover in tort only those economic losses resulting from injury to his person or damage to his property ...." *Gen. Elec. Co. v. Lowe's Home Ctrs., Inc.,* 279 Ga. 77, 608 S.E.2d 636, 637 (Ga.2005). "However, where 'an independent duty exists under the law, the economic loss rule does not bar a tort claim because the claim is based on a recognized independent duty of care and thus does not fall within the scope of the rule.' " *Liberty Mut. Fire. Ins. Co. v. Cagle's, Inc.,* 2010 WL 5288673, at *3 (N.D.Ga. Dec.16, 2010). Although the economic loss rule is most frequently applied in the context of products liability claims, the Georgia courts have applied the doctrine in a number of other contexts. *See, e.g., City of Atlanta v. Benator,* 310 Ga.App. 597, 714 S.E.2d 109, 116 (Ga.Ct.App.2011) (applying the economic loss rule in context of a negligent construction suit).

**\*8** Here, it is beyond question that Plaintiffs' claims for interest on overpayments are claims for "purely economic" losses. There is also no dispute that that the Plaintiffs and Brown–Arrowhead were in a contractual relationship. The more difficult issue is whether Plaintiffs have asserted a cause of action based on a duty of care that exists independent from the contract between the parties. Specifically, in order for Plaintiffs' claim to be viable, Georgia law would need to impose a duty to pay interest on overpayments to a medical care provider, independent of any contractual duty to do so.

Although the Court is not aware of any case that perfectly addresses this issue, Georgia cases indicate that there is no such duty. Georgia courts have stated:

> [i]t is very generally stated that interest, being of purely statutory origin and not the creature of the common law, should not be awarded

except in such cases as fall within the terms of the statute, unless it has been contracted for either expressly or impliedly. In other words, there is no absolute right, independent of contract, express or implied, or of statute, to interest.

*City of Atlanta v. Lunsford,* 105 Ga.App. 247, 124 S.E.2d 493, 494 (Ga.Ct.App.1962) (quoting *Gormley v. Eison,* 189 Ga. 259, 5 S.E.2d 643 (1939)). Plaintiffs have not established an independent duty under Georgia law to pay interest on overpayments. Consequently, Georgia's economic loss rule bars recovery in tort.[9] Brown–Arrowhead is entitled to summary judgment on Plaintiffs' negligence claim.

**II. Stein's Motion for Summary Judgment**

Stein moves for summary judgment on the three remaining claims pending against it—Count One (Professional Negligence), Count Five (Negligence), and Count Six (Breach of Fiduciary Duty)—by arguing generally that the Plaintiffs failed to show that Stein was the proximate cause of any damages and therefore all claims must fail. Stein's Mot. Summ. J., Dkt. No. 103. Stein accurately cites Georgia cases showing that damages proximately caused by the defendant are a required element for Plaintiffs' professional negligence and breach of fiduciary duty theories of liability. *See Oehlerich v. Llewellyn,* 285 Ga.App. 738, 647 S.E.2d 399, 401 (Ga.Ct.App.2007) (professional negligence); *Griffin v. Fowler,* 260 Ga.App. 443, 579 S.E.2d 848, 850 (Ga.Ct.App.2003) (breach of fiduciary duty). Likewise, it is beyond question that damages are a required element of an ordinary negligence claim. *Rasnick v. Krishna Hospitality, Inc.,* 289 Ga. 565, 713 S.E.2d 835, 837 (Ga.2011). Consequently, Stein is correct in their assertion that all three claims require a showing of damages proximately caused by the defendant, and that without proof of damages, the claims are subject to summary judgment.

Stein relies heavily on the Georgia Court of Appeals' decision in *John E. King and Assocs. v. Toler,* 296 Ga.App. 577, 675 S.E.2d 492 (Ga.Ct.App.2009).[10] *Toler* and the present case are remarkably similar. Like the present dispute, *Toler* was a putative class action against Arrowhead Clinics and an allegedly connected law firm, John E. King and Associates. The *Toler* plaintiffs asserted causes of action against the clinic

and the law firm based on professional negligence, ordinary negligence, breach of fiduciary duty, and fraud/constructive fraud. *Id.* In *Toler,* the plaintiffs pointed to several aspects of the law firm's conduct: wrongfully soliciting clients, to the point of harassment; wrongfully requiring plaintiffs to sign a contract that authorized the law firm to pay the plaintiff's medical bills; failing to adequately represent the plaintiffs; and, failing to disclose a fee-sharing arrangement between the law firm and the clinic. *Id.*

**\*9** In *Toler,* the trial court granted the plaintiffs' motion for class certification, and the appellate court reversed. *Id.* The court of appeals rejected certification because "none of the named plaintiffs was able to articulate any injury received from either the clinic or law firm." [11] *Id.* at 579, 675 S.E.2d 492. The court of appeals examined the statements by each named plaintiff and concluded that not one had set forth a compensable injury. One plaintiff claimed that she "did not feel comfortable" signing a representation contract with a law firm without speaking to a lawyer contemporaneously and regretted having limited interaction with her lawyer during the representation. *Id.* at 580, 675 S.E.2d 492. Another stated that she was harmed by having to drive a long distance to the clinic. *Id.* The third plaintiff stated that she was harmed because she would have preferred that the law firm pay her medical bills before providing her with a settlement check, rather than afterwards. *Id.* The court concluded that none of these claims gave rise to a compensable injury.

The *Toler* plaintiffs argued that they would still be entitled to nominal damages if they prevailed on their claims, especially with regards to the breach of fiduciary duty claim. The court rejected this argument, emphasizing that in order to recover nominal damages the plaintiffs needed to show "some injury" to prevail. *Id.* at 581, 675 S.E.2d 492 (citing *Willet v. Russell M. Stookey, P.C.,* 256 Ga.App. 403, 568 S.E.2d 520 (Ga.Ct.App.2002)). The court concluded that at the time of class certification, the plaintiffs had "as [of] yet identified no injuries, however small." *Id.*

As stated previously, three claims remain outstanding against Stein: Count One (Professional Negligence); Count Five (Negligence); Count Six (Breach of Fiduciary Duty). Stein argues, regardless of Plaintiffs' theory, Plaintiffs cannot show that any damages were proximately caused by Stein's conduct. The Court considers each of Plaintiffs remaining counts separately.

### A. Interest on Overpayments

Before addressing whether Plaintiffs have adequately established an injury or harm to support their substantive claims, one point warrants clarification. Plaintiffs, in their response to Stein's motion, argue that Plaintiffs suffered actual damages because "the Waithes have a right to the interest accrued and that the Waithes would have never been paid back their money without incurring legal fees." Dkt. No. 112, at 18. The Plaintiffs refer to the $100 initial payments made by the Waithes to Brown–Arrowhead, and their claims to interest addressed *supra.* There is simply no evidence that Stein had access to or control over the funds paid by Plaintiffs to Brown–Arrowhead. Accordingly, any claimed harm related to the interest on Plaintiffs' overpayments to Brown–Arrowhead cannot support a cause of action against Stein.

### B. Count: One: Professional Negligence

Plaintiffs claim Stein committed professional negligence by (1) requiring Plaintiffs to sign a contract for representation which authorized Stein to pay all of the client's medical expenses knowing that they were brought into the case by Brown–Arrowhead, and (2) by wrongfully soliciting clients in at the Brown–Arrowhead clinic. Pls .' Am. Compl. ¶¶ 38, 39, Dkt. No. 6. Stein argues that Plaintiffs cannot show an injury because Plaintiffs cannot show that they would have (1) hired a different lawyer or (2) received a higher settlement if the professional negligence had occurred. Stein's Mot. Summ. J. 12–13, Dkt. No. 103. In response to Stein's motion, Plaintiffs go to great lengths to establish that Stein's conduct violated various provisions of the Rules of the State Bar of Georgia. Dkt. No. 112, 20–26. Plaintiffs, however, do little to show how these violations caused an injury.

**\*10** "[I]n a suit for legal malpractice, proof that the attorney's negligence proximately caused the client's harm is necessary for recovery." *Oehlerich,* 647 S.E.2d at 401 (citing O.C.G.A. § 51–1–8; *Dow Chem. Co. v. Ogletree, Deakins, Nash, Smoak & Stewart,* 237 Ga.App. 27, 514 S.E.2d 836 (Ga.Ct.App.1999); and *Whitehead v. Cuffie,* 185 Ga.App. 351, 364 S.E.2d 87 (Ga.Ct.App.1987)). "Proximate cause in a malpractice action requires a plaintiff to demonstrate that 'but for the [attorney's] error, the outcome would have been different; any lesser requirement would invite speculation and conjecture.' " *Szorvy v. Olderman,* 243 Ga.App. 449, 530 S.E.2d 783, 786 (Ga.Ct.App.2000) (quoting *Houston v. Surrett,* 222 Ga.App. 207, 474 S.E.2d 39 (Ga.Ct.App.1996)). Indeed, plaintiffs generally must show

that a more favorable outcome would have occurred, if not for the attorney's negligence, in order to sufficiently show that an injury occurred. *See, e.g.,* 📄 *Szurovy,* 530 S.E.2d at 786; *McMann v. Mockler,* 233 Ga.App. 279, 503 S.E.2d 894 (Ga.Ct.App.1998); *Dedon v. Orr,* 235 Ga.App. 64, 508 S.E.2d 445 (Ga.Ct.App.1998).

Plaintiffs' are clearly unable to show injury related to their first theory of professional negligence—that Stein was professionally negligent in requiring Plaintiffs to sign a contract that allowed Stein to pay all of Plaintiffs' medical expenses. There is no indication in the record that Stein ever paid any of Plaintiffs' medical expenses. Rather, it appears that Plaintiffs' insurers paid all of the medical expenses. [12] The proceeds of the settlement negotiated by Stein went directly to the Plaintiffs after Stein collected its fees. Consequently, there is no evidence of damages related to the contract for payment of medical fees.

Plaintiffs' second theory of liability, based on unethical solicitation of clients, is equally unavailing. Plaintiffs did not state that they would have selected another attorney in their case if Stein had not approached them at the Brown–Arrowhead clinic. Moreover, Plaintiffs have made no effort to show that they could have achieved a more favorable settlement, but for the unethical solicitation. Without some showing of injury, however small, Plaintiffs' claim for professional negligence fails.

Notably, both theories of professional negligence were alleged and rejected in the *Toler* case. *Toler,* 675 S.E.2d at 494 ("The claims brought by the complaint were for professional negligence against King for wrongfully soliciting clients within the confines of a medical office, and for wrongfully requiring the client to sign a contract authorizing the King firm to pay all the medical expenses of the Brown clinics."). Plaintiffs in the present suit have failed to show how they suffered any sort of harm or injury that is different from the plaintiffs in *Toler*. The plaintiffs in *Toler* were exposed to nearly the exact same conduct by a law firm that the Waithes experienced. Without distinguishing the harm suffered by the Waithes from the harms (or lack thereof) suffered by the *Toler* plaintiffs, Plaintiffs' claim for professional negligence fails. Stein is entitled to summary judgment on Plaintiffs' professional negligence claim.

### C. Count Five: Negligence

**\*11** Count Five alleges Stein was negligent in failing to "insure that [Plaintiffs] were adequately represented and [that Stein] had a duty not to solicit, harass and invade the privacy of [Plaintiffs]." Pls.' Am. Compl. ¶ 56, Dkt. No. 6. Here, the Court need go no further than *Toler*: The same exact allegations were made against the King firm in *Toler. Toler,* 675 S.E.2d at 494 ("The claims brought by the complaint were for ... negligence ... in that ... the King firm had a duty to ensure that their clients were adequately represented and also had a duty not to solicit or harass potential clients...."). In *Toler,* the court was faced with essentially identical circumstances related to the adequacy of representation and client solicitation, and the court found no compensable injury. *Id.* Here, Plaintiffs have failed to show that they suffered any harm or injury that is distinct from the plaintiffs in *Toler*. Without identifying an injury suffered by the Waithes above and beyond those suffered by the *Toler* plaintiffs, Plaintiffs' claim for negligence fails. Because Plaintiffs are unable to establish a compensable injury, Stein is entitled to summary judgment on Count Five. [13]

### D. Count Six: Breach of Fiduciary Duty

Plaintiffs' Count Six claims that Stein breached its fiduciary duty to Plaintiffs by "receiving private information concerning a potential client, without authorization and using it to their economic advantage." Pls.' Am. Compl. ¶ 64, Dkt. No. 6. Again, Stein argues that Plaintiffs are unable to show any damages proximately caused by Stein's conduct. Stein's Mot. Summ. J. 11, Dkt. No. 103.

"It is well settled that a claim for breach of fiduciary duty requires proof of three elements: (1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage proximately caused by the breach." *Nash v. Studdard,* 294 Ga.App. 845, 670 S.E.2d 508, 514 (Ga.Ct.App.2008) (internal citations omitted). Without a showing of damages proximately caused by the breach, a claim may not be maintained. *See, e.g., Willett v. Stookey,* 256 Ga.App. 403, 568 S.E.2d 520 (Ga.Ct.App.2002), *Conner v. Hart,* 252 Ga.App. 92, 555 S.E.2d 783 (Ga.Ct.App.2001).

Plaintiffs have simply failed to identify any actual injury related to the receipt of private information. [14] At best, Plaintiffs can assert that they became clients of Stein because of the alleged release of patient intake forms. However, becoming a Stein client is not an injury in and of itself, no matter how strenuously Plaintiffs claim it to be.

Plaintiffs also argue that, if nothing else, they are entitled to "nominal damages" for breach of fiduciary duty, and cite multiple cases in support. Dkt. No. 112, at 19. In support of their position, Plaintiffs first refer to *Tante v. Herring,* 264 Ga. 694, 453 S.E.2d 686 (Ga.1994). However, *Tante* did not address nominal damages. *Tante* held that an attorney's conduct [15] that had no adverse impact on representation could not support a claim for legal malpractice, but it could support a claim of breach of fiduciary duty. *Id.* at 687. Plaintiffs also cite *Holmes v. Drucker,* 201 Ga.App. 687, 411 S.E.2d 728 (Ga.Ct.App.1991), which states as a general principle that where there is a breach of a legal duty accompanied by damage, even nominal damage, the law gives a right to recover. This case does not, however, state that nominal damages can be awarded where plaintiffs are unable to state any injury or harm. To the contrary, *Drucker* states that "[d]amages, even only nominal damages are given as compensation for *injury* done." *Id.* at 730 (emphasis added). Plaintiffs' cited cases do not help identify a compensable injury in this case. [16] If anything, Plaintiffs' authority supports Stein's argument that Plaintiff must show an injury, even to claim nominal damages, in order to survive summary judgment. Plaintiffs have failed to do so, and therefore Stein is entitled to summary judgment on Plaintiffs' breach of fiduciary duty claim.

### E. Other Damages

**\*12** Plaintiffs interject various other theories of injury throughout their briefs. For example, Plaintiffs claim that they suffered an injury because they "lost any true control over their personal injury claims," Dkt. No. 112, at 18, and because Stein failed to "disclose its relationship with Brown–Arrowhead," [17] Dkt. No. 112, at 12. Plaintiffs fail to explain how these circumstances caused them harm. Even in a light most favorable to the Plaintiffs, the Plaintiffs have failed to do more than hint at the shadow of injury. Wraithlike damages, however, are not sufficient to carry the Plaintiffs' claims beyond summary judgment.

### IV. Punitive Damages and Attorneys' Fees

Plaintiffs asserted claims for attorneys' fees and punitive damages in separate counts of their Complaint. Pls.' Am. Compl. ¶¶ 66, 68, Dkt. No. 6. Punitive damages may only be awarded in tort actions in which there is a valid claim for actual damages. *Nash v. Studdard,* 294 Ga.App. 845, 670 S.E.2d 508, 515 (Ga.Ct.App.2008) (citing *Nelson & Hill,* 245 Ga.App. 60, 537 S.E.2d 670 (Ga.Ct.App.2000)); *Rhone v. Bolden,* 270 Ga.App. 712, 608 S.E.2d 22 (2004). Likewise, once all underlying claims are eliminated, a claim for attorneys' fees may not be maintained. *Duffy v. The Landings Ass'n, Inc.,* 254 Ga.App. 506, 563 S.E.2d 174 (Ga.Ct.App.2002). Because all of Plaintiffs' substantive claims have been adjudicated in favor of the Defendants, Defendants are also entitled to summary judgment on Plaintiffs' claims for attorneys' fees and punitive damages.

### CONCLUSION

For the reasons stated above, Plaintiffs' Motion for Summary Judgment is **DENIED,** Brown–Arrowhead's Motion for Summary Judgment is **GRANTED,** and Stein's Motion for Summary Judgment is **GRANTED.** The Clerk is directed to close the case and **ENTER FINAL JUDGMENT** in favor of Defendants on all claims.

### SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2012 WL 776916

---

### Footnotes

1    Plaintiffs ultimately seek to proceed as a class action with two distinct classes of Plaintiffs. Pls.' Am. Compl., Dkt. No. 6. Currently, discovery has only been allowed regarding the individual named Plaintiffs; discovery related to class certification is contingent on finding that the named individual Plaintiffs have viable claims. Dkt. No. 80.

2012 WL 776916

2    The original Complaint filed in the State Court of Liberty County, Georgia is nearly identical to the Plaintiff's "First Amended and Recast Complaint" filed in this Court, with one small difference. *See* Dkt. Nos. 1, 6. The first amended complaint purposefully drops Harry W. Brown Sr. as a defendant in the suit.

3    Plaintiffs' requests for attorney's fees in Count Seven and punitive damages in Count Eight have not been dismissed, but do not set forth separate causes of action. Rather, these are claims for damages, which are contingent on the success of the remaining substantive claims. *See Nash v. Studdard,* 294 Ga.App. 845, 670 S.E.2d 508, 515 (Ga.Ct.App.2008) (punitive damages); *Duffy v. The Landings Ass'n, Inc.,* 254 Ga.App. 506, 563 S.E.2d 174 (Ga.Ct.App.2002) (attorney's fees).

4    The Defendants filed their motions prior to the Court's order dismissing a number of Plaintiffs' claims. As such, much of Defendants' briefing addresses claims that are no longer before the Court, and consequently the Court disregards those portions as moot.

5    A nearly identical form pertaining to Kenneth Waithe is contained in the same exhibit. The portions of the form in parentheses were filled in by hand; the remaining portions were printed. Both forms indicate that they were signed by Plaintiffs on January 6, 2005.

6    The Court notes that even if the Waithes had demonstrated that their medical intake forms had been released, it is unlikely that the Waithes suffered any harm, given that they authorized the Stein firm to access their medical records immediately after the alleged disclosure. In effect, Plaintiffs are complaining about a disclosure of private medical information that occurred on Monday and was authorized on Tuesday.

7    Plaintiffs also point to $481 per patient that may have been owed to Plaintiffs' insurers, and argue that Brown–Arrowhead wrongfully retained these insurance funds for a similar length of time. Plaintiffs in this case are Kenneth and Linda Waithe; no insurance companies are participating in the suit. Plaintiff seeks to certify this action as a class action, hoping eventually to include some insurers and third-party payors in the class. *See* Pls.' Am. Compl. ¶ 33, Dkt. No. 6. Presently, however, the Court is only faced with claims by the Waithes and therefore limits its consideration to the payments made by those individuals.

8    Brown–Arrowhead has additional arguments. First, Brown–Arrowhead contends that Plaintiffs have failed to adequately plead an action for negligence. Brown–Arrowhead argues that Plaintiffs have, at best, alleged that Brown–Arrowhead had a duty, but have not pled that Brown–Arrowhead breached this duty, or that any breach caused the Plaintiffs harm. Brown–Arrowhead's Mot. Summ. J. n. 11, Dkt. No. 101. Second, Brown–Arrowhead argues that even if Plaintiffs had adequately pled an action for negligence, the claim could only be asserted against HWBI (the entity that collected the funds), not against AMI, ACI, Brown Management, or Brown (other related entities), given that the other entities had no access or control over the refunded amounts. *Id.* at 17. The Court finds Brown–Arrowhead's other arguments sufficiently persuasive that it need not address Brown–Arrowhead's argument regarding pleading and proper parties.

9    The Court is aware that Georgia recognizes an exception to the economic loss rule for claims of misrepresentation. *See ASC Const. Equip. USA, Inc. v. City Comm. Real Estate, Inc.,* 303 Ga.App. 309, 693 S.E.2d 559 (Ga.Ct.App.2010). However, the instant claim is not based on misrepresentation, but rather on negligent maintenance of patient accounts. Therefore, the misrepresentation exception is not applicable here.

10    Stein also relies on the subsequent grant of summary judgment in *Toler* by the State Court of Chatham County, Georgia. *See Toler v. Arrowhead Clinic, Inc.,* STCV0603261. The Court need not address the State Court's grant of summary judgment, given that the State Court merely applied the reasoning of the court of appeals' decision to the individual named plaintiffs following rejection of class certification. Moreover, the conclusions set forth in the court of appeals' decision are decisive in this matter.

11    More specifically, the court of appeals rejected certification because without an articulable injury by the named plaintiffs, "each claim would have [needed] to be determined on an individual basis," and therefore, "there [were] no common questions of law or fact which predominate[d] over any common issues shared by the putative class." *Toler,* 675 S.E.2d at 495.

12    As noted, Plaintiffs paid $100 worth of expenses, but that portion was later refunded.

13    The Court also notes that alternative claims which are mere duplications of a plaintiff's professional negligence claim are typically subject to summary judgment in the defendant's favor. *See Griffin,* 579 S.E.2d at 850

**Waithe v. Arrowhead Clinic, Inc., Not Reported in F.Supp.2d (2012)**

2012 WL 776916

(holding that plaintiff's breach of fiduciary duty claim was a "mere duplication" of plaintiff's legal malpractice claim and could not be maintained). Here, Plaintiffs' claims of negligence against Stein attacks the adequacy of representation and the manner in which Stein solicited clients; Plaintiffs' professional negligence claims in Count One is essentially the same. However, because the Court grants summary judgment to Stein for other reasons, the Court need not address whether Plaintiffs' claims are duplicative.

14    The Court also notes that it has already recognized that Plaintiffs have made an insufficient factual showing that there was any release of Plaintiffs' private medical information. Gibbs' testimony is generalized, and lacking in personal knowledge about how the Plaintiffs came to be clients of Stein.

15    In *Tante,* the defendant attorney was accused of taking advantage of knowledge that plaintiff was emotionally and mentally impaired in order to convince the plaintiff have an affair with him. The conduct in the instant case does not begin to approach the reprehensibility of the *Tante* defendant's conduct.

16    Plaintiffs' cite another case, *Peters v. Hyatt Legal Servs.,* 211 Ga.App. 587, 440 S.E.2d 222 (Ga.Ct.App.1993), which is also inapposite. There, the court held that change to a plaintiff's marital status, without the plaintiff's knowledge and without full consent, is "sufficient to state a cause of action for at least nominal damages." *Id.* at 225. Here, however, there is no claim that the Plaintiffs suffered any such "legal-status" injury.

17    Plaintiff Linda Waithe acknowledged that she actually knew that there was a relationship between Stein and Brown–Arrowhead on the date of her first consultation, based on the fact that the Brown–Arrowhead doctor recommended Stein. L. Waithe Dep. 65:21, Dkt. No. 101, Ex. C. Consequently, to the extent that Plaintiffs base their claims against Stein on Stein's failure to disclose the connection with Brown–Arrowhead, Plaintiffs have failed to demonstrate that disclosure would have made any difference.

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

    © 2020 Thomson Reuters. No claim to original U.S. Government Works.