# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
|  | : |  |
|  | : | MDL No. 2875 |
| **IN RE: VALSARTAN,** | : |  |
| **LOSARTAN, AND** | : | Honorable Robert B. Kugler, |
| **IRBESARTAN PRODUCTS** | : | District Court Judge |
| **LIABILITY LITIGATION** | : |  |
|  | : |  |
| **This Document Relates to All** | : | Honorable Joel Schneider, |
| **Actions** | : | Magistrate Judge |
|  | : |  |
|  | : |  |

## COMPENDIUM OF UNREPORTED OR UNPUBLISHED AUTHORITIES CITED IN MANUFACTURER DEFENDANTS' REPLY BRIEF

# **TABLE OF CONTENTS**

**Cases**                                                                                      **Tab**

*Amarin Pharma, Inc. v. ITC*, 2018-1247, 2018-114 (Fed. Cir. Mar. 27, 2018), Corrected Brief for the United States as Amicus Curiae Supporting Appellee ................................................................1

*Am. Fed'n of State Cty. & Mun. Emps. v. Ortho-McNeil-Janssen Pharm., Inc.*, No. 08-5904, 2010 WL 891150 (E.D. Pa. Mar. 11, 2010) ...................................................................2

*Baird v. Bayer Healthcare Pharm., Inc.*, No. 13-77, 2013 WL 5890253 (E.D. Ky. Oct. 31, 2013) ...................................3

*Bell v. Boehringer Ingelheim Pharm., Inc.*, No. 17-1153, 2018 WL 928237 (W.D. Pa. Feb. 15, 2018) ...................................4

*Bowman v. RAM Med, Inc.*, No. 10-4403, 2012 WL 1964452 (D.N.J. May 31, 2012).......................................................5

*Boyd v. Johnson & Johnson Consumer Co., Inc.,* No. 09-3135, 2010 WL 2255317, (D.N.J. May 31, 2010)....................................6

*Canadian Pac. Ry. Co. v. Nat'l Steel Car Ltd.*, No. 02 C 8800, 2005 WL 782698 (N.D. Ill. Apr. 6, 2005)..............................7

*Crouch v. Johnson & Johnson Consumer Co., Inc.*, No. 09-2905, 2010 WL 1530152, (D.N.J. Apr. 15, 2010)................................8

*D'Addario v Johnson & Johnson Consumer Co., Inc.,* No. 19-15627, 2020 WL 3546750, (D.N.J. June 30, 2020)....................................9

*In re: Elk Cross Timbers Decking Mktg.*, No. 15-18, 2015 WL 6467730 (D.N.J. Oct. 26, 2015) ...................................10

*Excela Pharma Sciences, LLC v. Sandoz Inc.*, ---F. Supp. 3d.---, No. 19-318, 2020 WL 5535026 (W.D.N.C. Sept. 15, 2020) .............................11

*In re Gerber Probiotic Sales Pracs. Litigation,*, No. 12-835, 2013 WL 4517994 (D.N.J. Aug. 23, 2013) ...................................12

*Gov't Employees Ins. Co. v. Pennsauken Spine & Rehab P.C.*, No. 17-11727, 2018 WL 3727369 (D.N.J. Aug. 6, 2018) ........................................13

*Hammer v. Vital Pharms., Inc.*, No. 11-4124, 2012 WL 1018842 (D.N.J. Mar. 26, 2012)...........................................................................14

*Hoffman v. Nutraceutical Corp.*, No. 12-5803, 2013 WL 2650611 (D.N.J. June 10, 2013) ..................................................................15

*Hubert v. Gen. Nutrition Corp.*, No. 15-01391, 2017 WL 3971912 (W.D. Pa. Sept. 8, 2017) ....................................................................16

*Ironshore Specialty Ins. Co. v. Callister, Nebeker & McCullough*, 15-677, 2016 WL 633353 (D. Utah Feb. 17, 2016)) ..........................................17

*Jones v. Francis*, No. 13-4562, 2013 WL 5603848 (D.N.J. Oct. 11, 2013) .......................................................................................18

*Levinson v. Johnson & Johnson Consumer Cos., Inc.*, 09–3317, 2010 WL 421091, (D.N.J. Feb. 1, 2010)................................................19

*In re Magnesium Oxide Antitrust Litig.*, Civ. No. 10–5943, 2011 WL 5008090 (D.N.J. October 20, 2011) ..............................................20

*Mann v. Brenner* No. 09–246, 2010 WL 1220963, 375 F. App'x 232 (3d Cir. Mar. 30, 2010)....................21

*In re Mercedes-Benz Emissions Litig.*, No. 16-881, 2019 WL 413541 (D.N.J. Feb. 1, 2019) .......................................................................22

*Metcalfe v. Biomet, Inc.*, No. 18-456, 2019 WL 192902 (D.N.J. Jan. 15, 2019) ...................................................................................23

*Parker v. Wellman*, 230 Fed. App'x. 878 (11th Cir. Apr. 18, 2007)........................24

*Player v. Motiva Enters., LLC*, No. 02-3216, 2006 WL 166452 (D.N.J. Jan. 20, 2006)...........................................................................25

*Redwind v. W. Union, LLC*, No. 18-02094, 2019 WL 3069864, (D. Or. June 21, 2019).....................................................................................26

*Reiff v. GAF Materials Corp.*, No. 10-1142, 2010 WL 3081789 (E.D. Pa. Aug. 6, 2010) .......................................................................27

*Rodman v. Otsuka Am. Pharm., Inc.*, ---F. Supp. 3d---, 2020 WL
    2525032 (N.D. Cal. May 18, 2020) ................................................................ 28

*Rolland v. Spark Energy, LLC*, No. 17-2680, 2019 WL 1903990
    (D.N.J. April 29, 2019) ................................................................................... 29

*Sich v. Pfizer Pharm.*, No. 17-02828, 2017 WL 4407930 (D.N.J. Oct.
    4, 2017) .......................................................................................................... 30

*Stinson v. Twin Pines Coal, Co.*, No. 14-334, 2014 WL 4472605
    (M.D. Ala. Sept. 11, 2014) ............................................................................. 31

*Theodore v. Newark Dep't of Health & Cmty. Wellness*, No. 19-
    17726, 2020 WL 1444919 (D.N.J. Mar. 25, 2020) ........................................ 32

*In re Volkswagen Timing Chain Prod. Liab. Litig.*, No. 16-2765, 2017
    WL 1902160 (D.N.J. May 8, 2017) ................................................................ 33

*Winkworth v. Spectrum Brands, Inc.*, No. 19-1011, 2020 WL 3574687
    (W.D. Pa. June 30, 2020) ............................................................................... 34

# TAB 1

Nos. 2018-1247, 2018-114

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT**

————————

AMARIN PHARMA, INC., AMARIN PHARMACEUTICALS IRELAND LTD.,

*Appellants,*

v.

INTERNATIONAL TRADE COMMISSION,

*Appellee,*

ROYAL DSM NV, DSM MARINE LIPIDS PERU S.A.C, DSM NUTRITIONAL
PRODUCTS LLC, DSM NUTRITIONAL PRODUCTS CANADA, INC.,
PHARMAVITE LLC, NORDIC NATURALS, INC., NORDIC PHARMA, INC.,

*Intervenors.*

————————

On Appeal from the United States International
Trade Commission, No. 3247.
(*caption continued on inside cover*)

————————

**CORRECTED BRIEF FOR THE UNITED STATES AS
AMICUS CURIAE SUPPORTING APPELLEE**

————————

*Of Counsel:*

ROBERT P. CHARROW
  *General Counsel*

REBECCA K. WOOD
  *Associate General Counsel*
  *Chief Counsel, Food & Drug Admin.*

ANNAMARIE KEMPIC
  *Deputy Chief Counsel, Litigation*

JAMES C. FRASER
  *Associate Chief Counsel, Litigation*
  *Department of Health & Human Services*

CHAD A. READLER
  *Acting Assistant Attorney General*

SCOTT R. MCINTOSH
JOSEPH F. BUSA
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7537*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-0261*

*(caption continued from front cover)*
In re: AMARIN PHARMA, INC.,
AMARIN PHARMACEUTICALS IRELAND LTD.,

Petitioners,

_____

On Petition for Writ of Mandamus to the
United States International Trade Commission

# TABLE OF CONTENTS

**Page**

INTEREST OF THE UNITED STATES ....................................................................... 1

STATEMENT OF THE CASE ................................................................................... 2

    A. FDA Regulation of Drugs and Dietary Supplements ............................................ 2

    B. The International Trade Commission .................................................................. 4

    C. Factual Background and Proceedings Below ....................................................... 5

SUMMARY OF ARGUMENT ................................................................................ 7

ARGUMENT:  The Federal Food, Drug, and Cosmetic Act Precludes Private
Enforcement Proceedings Like Amarin's ................................................................ 8

    A. Amarin's Claims Are Private Attempts to Enforce the FDCA, and Are
       Therefore Prohibited ..................................................................................... 8

    B. Amarin's Arguments Are Without Merit ........................................................... 21

CONCLUSION ................................................................................................... 29

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:** <span style="float:right">**Page(s)**</span>

*Allergan, Inc. v. Athena Cosmetics, Inc.*,
738 F.3d 1350 (Fed. Cir. 2013)........................................................ 8, 9, 24, 25, 26, 27

*Alpharma, Inc. v. Pennfield Oil Co.*,
411 F.3d 934 (8th Cir. 2005) ................................................................................ 20

*Baden Sports, Inc. v. Molten USA, Inc.*,
556 F.3d 1300 (Fed. Cir. 2009)............................................................................. 12

*Buckman Co. v. Plaintiffs' Legal Comm.*,
531 U.S. 341 (2001)............................................................... 1, 3, 8, 10, 25

*Clock Spring, LP v. Wrapmaster, Inc.*,
560 F.3d 1317 (Fed. Cir. 2009).............................................................................. 17

*Cottrell, Ltd. v. Biotrol Int'l, Inc.*,
191 F.3d 1248 (10th Cir. 1999) ............................................................................. 21

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
539 U.S. 23 (2003)................................................................................................. 12

*Dial A Car, Inc. v. Transp., Inc.*,
82 F.3d 484 (D.C. Cir. 1996)............................................................................ 20-21

*Heckler v. Chaney*,
470 U.S. 821 (1985)............................................................................................... 10

*Hi-Tech Pharm., Inc. v. Hodges Consulting, Inc.*,
230 F. Supp. 3d 1323 (N.D. Ga. 2016).................................................................. 24

*IQ Prods. Co. v. Pennzoil Prods. Co.*,
305 F.3d 368 (5th Cir. 2002) ................................................................................ 20

*Mylan Labs., Inc. v. Matkari*,
7 F.3d 1130 (4th Cir. 1993) .................................................................................. 19

*Mylan Pharm., Inc. v. Thompson,*
  268 F.3d 1323 (Fed. Cir. 2001), *superseded by statute on other grounds
  as recognized in Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S,*
  566 U.S. 399, 408 (2012) ............................................................13, 19

*PDK Labs, Inc. v. Friedlander,*
  103 F.3d 1105 (2d Cir. 1997) ........................................................ 20

*PhotoMedex, Inc. v. Irwin,*
  601 F.3d 919 (9th Cir. 2010) ....................................................17, 18

*POM Wonderful LLC v. Coca-Cola Co.,*
  134 S. Ct. 2228 (2014) .........................................................8, 21, 22, 23

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank,*
  566 U.S. 639 (2012) .................................................................... 11

*Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.,*
  902 F.2d 222 (3d Cir. 1990) ........................................................18-19

*ThermoLife Int'l, LLC v. Gaspari Nutrition Inc.,*
  648 F. App'x 609 (9th Cir. 2016) ................................................ 23

*TianRui Grp. Co. v. Int'l Trade Comm'n,*
  661 F.3d 1322 (Fed. Cir. 2011) .................................................... 13

*Ventas, Inc. v. United States,*
  381 F.3d 1156 (Fed. Cir. 2004) .................................................... 9

*Wyeth v. Levine,*
  555 U.S. 555 (2009) .................................................................... 3

## Statutes:

Federal Food, Drug, and Cosmetic Act:
  21 U.S.C. § 301 *et seq.* .............................................................. 2
  21 U.S.C. § 321(g)(1) ............................................................. 2, 16
  21 U.S.C. § 321(g)(1)(B) ............................................................. 2
  21 U.S.C. § 321(g)(1)(C) ............................................................. 2
  21 U.S.C. § 321(p)(1) .................................................................. 3

21 U.S.C. § 321(ff)................................................................................15
21 U.S.C. § 321(ff)(1)..............................................................................2
21 U.S.C. § 321(ff)(3)(B)(ii)....................................................................2
21 U.S.C. § 331(a)...................................................................................14
21 U.S.C. § 331(d).............................................................................3, 14
21 U.S.C. § 332.................................................................................3, 11
21 U.S.C. § 333........................................................................................3
21 U.S.C. § 334(a)(1)...............................................................................3
21 U.S.C. § 337(a)..............................1, 4, 7, 9, 10, 11, 15, 17, 26, 27, 28
21 U.S.C. § 337(b)...................................................................................9
21 U.S.C. § 342(f)(1)(a)...........................................................................3
21 U.S.C. § 351......................................................................................14
21 U.S.C. § 352......................................................................................14
21 U.S.C. § 355...............................................................................3, 4, 9
21 U.S.C. § 381(a)............................................................................11, 14
21 U.S.C. § 381(a)(3)...............................................................................3
21 U.S.C. § 393....................................................................................4, 9
52 Stat. 1040, 1046................................................................................12
H.R. Rep. No. 2139 (April 14, 1938).......................................................9

Lanham Act:
    15 U.S.C. § 1125(a)..............................................................................4
    15 U.S.C. § 1125(a)(1)(B)................................................................4, 16

Tariff Act of 1930:
    19 U.S.C. § 1334................................................................................27
    19 U.S.C. § 1337(a)(1)...................................................................27, 28
    19 U.S.C. § 1337(a)(1)(A)(i)...........................................................4, 17
    19 U.S.C. § 1337(d)..............................................................................4
    46 Stat. 590, 703...............................................................................12

28 U.S.C. § 517..........................................................................................1

Sherman Food, Drug, and Cosmetic Law,
    Cal. Health & Safety Code § 109875 *et seq.*........................................24

Unfair Competition Law,
    Cal. Bus. & Prof. Code § 17203...........................................................24

**Rule:**

Fed. R. App. P. 29(a)(2) ....................................................................... 1

**Other Authorities:**

*Black's Law Dictionary* (10th ed. 2014) ............................................. 10

Initial Determination, *In re Certain Insulated Sec. Chests*,
    USITC Inv. No. 337-TA-244, 1987 WL 451338 (June 17, 1986) ............................. 4

## INTEREST OF THE UNITED STATES

This case presents the question whether private parties may seek to enforce the Federal Food, Drug, and Cosmetic Act (FDCA) through a private proceeding like the complaint that Amarin brought before the International Trade Commission. The United States submits this amicus brief to protect its interest in the proper resolution of that question. *See* 28 U.S.C. § 517; Fed. R. App. P. 29(a)(2).

"The FDCA leaves no doubt that it is the Federal Government rather than private litigants who are authorized to file suit for noncompliance with" the FDCA. *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 349 n.4 (2001). Private parties are expressly prohibited from bringing "proceedings for the enforcement, or to restrain violations, of" the FDCA. 21 U.S.C. § 337(a). Yet that is precisely what Amarin seeks to do here. Amarin's claims, though nominally brought under the Tariff Act, attempt to enforce or restrain violations of the FDCA because they seek—as a necessary component of the stated cause of action—to prove FDCA violations and compel obedience to the FDCA through the remedies provided by that statute. For that reason, the International Trade Commission correctly concluded that Amarin's claims are precluded by the FDCA. The United States takes no position on the other issues in this case.

1

## STATEMENT OF THE CASE

### A. FDA Regulation of Drugs and Dietary Supplements

**1.** The Federal Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. § 301 *et seq.*, authorizes the Food and Drug Administration (FDA) to regulate, among other things, drugs and dietary supplements. Determining whether an article is a "drug" or a "dietary supplement" under the FDCA can involve difficult and complex analysis. In general, the term "drug" includes "articles (other than food)" that are "intended to affect the structure or any function of the body of man or other animals," as well as "articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals." *Id.* § 321(g)(1)(B), (C). A "dietary supplement" is a product that, among other factors, contains a "dietary ingredient[]," which includes, among other things, a vitamin, mineral, herb, or "a dietary substance for use by man to supplement the diet by increasing the total dietary intake." *Id.* § 321(ff)(1).

These general definitions are further refined by other provisions of the FDCA. For example, a "dietary supplement" that otherwise might meet the definition of a "drug" is "not a drug * * * solely because" the label contains certain types of health-related claims. 21 U.S.C. § 321(g)(1). And the term "dietary supplement" excludes "an article authorized for investigation as a new drug," where the investigation has been instituted and made public, unless before such authorization the article was "marketed as a dietary supplement or as a food." *Id.* § 321(ff)(3)(B)(ii).

2

The FDCA treats "drugs" and "dietary supplements" differently. Unless a drug is "generally recognized" as "safe and effective for use under the conditions prescribed, recommended, or suggested" in its labeling, it is classified as a "new drug." 21 U.S.C. § 321(p)(1). And the FDCA prohibits introducing a new drug into interstate commerce before it has been approved by FDA. *Id.* §§ 331(d), 355. To obtain pre-market approval, the drug sponsor has the burden of proving that a new drug is safe and effective for its intended use. *See Wyeth v. Levine*, 555 U.S. 555, 567 (2009). A sponsor that introduces a new drug into interstate commerce without complying with this requirement is subject to a variety of FDA enforcement measures, including criminal penalties (21 U.S.C. § 333), injunctive relief (*id.* § 332), forfeiture (*id.* § 334(a)(1)), and—most relevant here—exclusion of the drug from importation into the United States (*id.* § 381(a)(3)).

By contrast, "dietary supplements" do not require or receive pre-market approval for safety and efficacy. If FDA determines that a dietary supplement is "adulterated" food—because, for example, it "presents a significant or unreasonable risk of illness or injury," 21 U.S.C. § 342(f)(1)(A)—the manufacturer may be subject to the same range of FDCA enforcement measures applicable to new drugs.

**2.** "The FDCA leaves no doubt that it is the Federal Government rather than private litigants who are authorized to file suit for noncompliance with" the FDCA. *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 349 n.4 (2001). Congress gave the Secretary of Health and Human Services and FDA the authority to execute the

3

requirements of the FDCA. *See* 21 U.S.C. §§ 355, 393. And Congress prohibited private parties from bringing actions to enforce the FDCA: "[A]ll * * * proceedings for the enforcement, or to restrain violations, of this chapter shall be *by and in the name of the United States.*" *Id.* § 337(a) (emphasis added).

## B. The International Trade Commission

The Tariff Act of 1930 prohibits "[u]nfair methods of competition and unfair acts in the importation of articles" into the United States, where such acts have the "threat or effect" of "destroy[ing] or substantially injur[ing] an industry in the United States." 19 U.S.C. § 1337(a)(1)(A)(i). Private parties may submit claims under this provision to the International Trade Commission for adjudication. If the Commission finds a violation, it "shall direct that the articles concerned" be "excluded from entry into the United States." *Id.* § 1337(d).

The Tariff Act does not fully define what constitutes an "unfair act" or "unfair method of competition." Through adjudication, the Commission has interpreted those terms to include conduct violating the false-advertising provisions of the Lanham Act, 15 U.S.C. § 1125(a). *See, e.g.*, Initial Determination, *In re Certain Insulated Sec. Chests*, USITC Inv. No. 337-TA-244, 1987 WL 451338, at *2 (June 17, 1986). The Lanham Act prohibits using in commercial advertising any "term" that "misrepresents the nature, characteristics, [or] qualities" of goods. 15 U.S.C. § 1125(a)(1)(B).

4

### C.  Factual Background and Proceedings Below

**1.**  Amarin obtained approval from FDA to market a new drug to treat severe

hypertriglyceridemia.  Appx9, Appx14-15.  The drug consists of capsules of an ethyl

ester form of eicosapentaenoic acid that is synthetically produced from fish oils.

Appx9, Appx11, Appx14-15.  Amarin alleges that other manufacturers also

synthetically derive eicosapentaenoic acid (and close relatives) and import articles

"predominantly comprised" of those ingredients into the United States.  Appx9.

Those manufacturers allegedly label and market those articles as "dietary

supplements," and also allegedly market them as suitable for treating various diseases.

Appx9, Appx11, Appx14-15, Appx17-18.

Amarin filed a complaint with the International Trade Commission, seeking to

exclude these articles from the United States under the Tariff Act.  Appx4-114.  The

complaint alleged that the accused articles do not qualify as "dietary supplements"

under the FDCA and instead constitute "new drugs," for which the manufacturers

should have, but did not, obtain FDA approval of their safety and efficacy prior to

marketing them in the United States, as required by the FDCA.  Appx16.

Based on these allegations, Amarin presented two legal claims to the

Commission.  In one claim, Amarin contended that the importation of the articles

violates the Tariff Act "based on the standards set forth in the FDCA."  Appx56; *see*

Appx56-59.  In other words, Amarin alleged that the articles were marketed in

violation of the FDCA, and that importation of articles marketed in violation of the

5

FDCA is an "unfair act" for that reason.  In the other claim, Amarin argued that labeling the articles as "dietary supplements" is an "unfair act" in violation of the Tariff Act because it constitutes false advertising under the Lanham Act.  Appx16; *see* Appx31-56.  Amarin reasoned that labeling the articles as "dietary supplements" is "literally false" because the articles do not qualify as "dietary supplements" under the FDCA, and it also "hides the material fact that the products are actually unapproved 'new drugs.'"  Appx55.

2.  FDA submitted a letter to the Commission asking it to dismiss the complaint.  FDA noted that it had not determined whether the articles were drugs or dietary supplements.  Appx627.  FDA explained that Congress gave FDA enforcement authority over the FDCA and prohibited private parties from bringing proceedings to enforce the FDCA.  Appx630.  And, FDA explained, the complaint that Amarin filed with the Commission "attempt[s] an unlawful private FDCA enforcement action."  Appx627.  Amarin's claims "all depend on the allegation that the products at issue are falsely labeled as 'dietary supplements' because they do not meet the FDCA definition of 'dietary supplements' and instead meet the FDCA definition of 'new drugs.'"  Appx631.  Accordingly, FDA concluded, "in order to resolve any of [Amarin's] claims, the Commission will necessarily have to step into the shoes of the FDA," but "the FDCA precludes such action."  Appx632.

6

**3.** The Commission dismissed the complaint. The Commission held that "Amarin's complaint does not allege an unfair method of competition or an unfair act cognizable under" the Tariff Act. Appx1. The Commission explained that "the Lanham Act allegations in this case are precluded by the Food, Drug and Cosmetic Act," and that "the Food and Drug Administration is charged with the administration of the FDCA." *Id.*

## SUMMARY OF ARGUMENT

**A.** The International Trade Commission correctly held that the Federal Food, Drug, and Cosmetic Act precludes Amarin's complaint. The FDCA prohibits private proceedings "for the enforcement, or to restrain violations, of" that statute. 21 U.S.C. § 337(a). The FDCA instead commits enforcement exclusively to the federal government to ensure that complex enforcement decisions are made with the benefit of FDA's scientific and regulatory expertise. As a consequence, private parties, like Amarin, may not initiate proceedings in a court or administrative agency to remedy alleged violations of the FDCA. Nor can private parties circumvent that prohibition by wrapping their FDCA enforcement claims inside some *other* cause of action. The FDCA prohibits "all" private proceedings to enforce or restrain violations of the FDCA, *id.*, including private claims that are nominally brought under another statute but seek to prove violations of the FDCA and compel obedience to that statute—as the courts of appeals have consistently concluded.

**B.**  Amarin's arguments to the contrary are without merit.  To be sure, private parties may bring suit to remedy violations of statutes that create private causes of action, so long as those suits are *not* attempts to enforce the FDCA.  That is why, for example, false advertising about the content of fruit juice can be remedied in a private action under the Lanham Act, where the claim does not seek to prove or remedy a violation of the FDCA's juice-labeling provisions but instead rests on allegations entirely independent of the FDCA.  *See POM Wonderful LLC v. Coca-Cola Co.*, 134 S. Ct. 2228 (2014).  Nor does the FDCA preempt claims brought under state law that seek to prove and remedy violations of state statutes parallel to but independent of the FDCA.  *See Allergan, Inc. v. Athena Cosmetics, Inc.*, 738 F.3d 1350 (Fed. Cir. 2013).  But where a private party, like Amarin, seeks to prove and remedy violations of the FDCA itself, as a necessary element of its stated cause of action, its claims are precluded by the FDCA's prohibition on private enforcement proceedings.

## ARGUMENT

### THE FEDERAL FOOD, DRUG, AND COSMETIC ACT PRECLUDES PRIVATE ENFORCEMENT PROCEEDINGS LIKE AMARIN'S.

**A.    Amarin's Claims Are Private Attempts to Enforce the FDCA, and Are Therefore Prohibited.**

**1.**  "The FDCA leaves no doubt that it is the Federal Government rather than private litigants who are authorized to file suit for noncompliance with" the FDCA. *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 349 n.4 (2001).  Congress gave the Secretary of Health and Human Services and FDA the authority to execute the

requirements of the FDCA.  *See* 21 U.S.C. §§ 355, 393.  And Congress expressly

provided that "all such proceedings for the enforcement, or to restrain violations, of

[the FDCA] shall be *by and in the name of the United States*"—not private parties.  *Id.*

§ 337(a) (emphasis added); *see* H.R. Rep. No. 2139, at 5 (April 14, 1938).

The only exception to this rule is that "[a] State may bring in its own name and

within its jurisdiction proceedings for the civil enforcement" of specific provisions of

the FDCA related to food.  21 U.S.C. § 337(b).  In narrowly drawing that lone

exception, Congress underscored that, otherwise, only the United States may bring

"proceedings for the enforcement, or to restrain violations, of" the FDCA.  *Id.*

§ 337(a); *see Ventas, Inc. v. United States*, 381 F.3d 1156, 1161 (Fed. Cir. 2004) ("[T]he

maxim *expressio unius est exclusio alterius* presumes that [enumerated exceptions] are the

only exceptions Congress intended.").  For that reason, this Court has correctly noted

that, outside this single exception, "[t]he FDA—and the FDA alone—has the power

and the discretion to enforce the FDCA." *Allergan, Inc. v. Athena Cosmetics, Inc.*, 738

F.3d 1350, 1359 (Fed. Cir. 2013).

Centralizing FDCA enforcement authority within FDA ensures that FDA's

expertise will inform often-difficult factual and legal determinations, such as which

requirements apply to particular articles and whether an article is being distributed in

violation of the FDCA.  *See* Appellee Br. 27-37 (illustrating the technical issues that

would arise in adjudicating Amarin's claims).  It also ensures that discretionary

determinations—like whether enforcement measures should be pursued for a

9

violation, and if so, which remedies are appropriate—will be made by policymakers, not private parties. And it promotes uniformity. Private parties, of course, must reach their own determinations about what the FDCA requires in the first instance, and courts may need to determine if the FDCA has been violated when the federal government brings FDCA enforcement proceedings. But Congress deliberately chose to centralize within FDA the crucial decision whether to seek to prove and redress alleged violations of the FDCA. Doing so maximizes the benefits of centralized enforcement. *Cf. Heckler v. Chaney*, 470 U.S. 821, 832 (1985) (discussing those benefits).

    **2.** The FDCA's prohibition on private "proceedings for the enforcement, or to restrain violations, of" the Act, 21 U.S.C. § 337(a), means that private parties may not bring suit under the FDCA itself to remedy what they allege to be violations of the Act. It also means that private parties may not circumvent this straightforward prohibition by invoking some *other* cause of action, under another federal statute, in order to bring what is, at bottom, still an action "for the enforcement" or "to restrain violations" of the FDCA. *See Buckman*, 531 U.S. at 353 (preempting state fraud claims that "exist solely by virtue of the FDCA").

    A proceeding "for the enforcement" of the FDCA is one that seeks "[t]o give force or effect" and "compel obedience to" the FDCA. *Black's Law Dictionary* (10th ed. 2014) (defining "to enforce"). Similarly, a proceeding to "restrain violations" of the FDCA seeks to prove and redress such violations. In order to give meaningful

effect to Congress's mandate that "*all*" such proceedings to enforce or restrain violations of the FDCA "shall be by and in the name of the United States," 21 U.S.C. § 337(a) (emphasis added), the FDCA precludes those private proceedings that rely on alleged violations of the FDCA as a necessary component of their cause of action and that seek to redress or restrain those FDCA violations. That is particularly clear where the private proceeding seeks remedies like those available under the FDCA, such as injunctive relief, *id.* § 332, or refusal of admission of articles into the United States, *id.* § 381(a).

That conclusion is reinforced by traditional principles of statutory construction. Where "Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions," and where one such specific solution contradicts a more-general statute, the "specific provision is construed as an exception to the general one" in order to "eliminate the contradiction." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). Here, the FDCA is a highly reticulated regime of requirements for very specific articles—including drugs and dietary supplements—and, as part of that comprehensive scheme to solve particular problems, the FDCA prohibits private proceedings to enforce or restrain violations of the FDCA. By contrast, the Tariff Act states general requirements—no "unfair acts" in the "importation of articles"—that are applicable to a far larger universe of articles, and it creates a private cause of action to enforce those general requirements. The FDCA's careful prohibition on private enforcement proceedings cannot be fully

11

implemented if a private party may use the Tariff Act to enforce or restrain violations of the FDCA. Accordingly, the more-specific provisions of the FDCA control.

That conclusion is reinforced by the timeline. When Congress enacted the Tariff Act in 1930, it allowed private parties to file complaints with the Commission alleging "unfair acts" in the importation of articles and seeking to exclude those articles from the United States. *See* 46 Stat. 590, 703. The question whether private parties could use that mechanism to exclude articles alleged to violate the FDCA first arose in 1938, when the FDCA was enacted. And, at that first available opportunity, Congress made clear that its new and specific regulatory regime could not be enforced through private enforcement proceedings of any stripe. *See* 52 Stat. 1040, 1046 (prohibiting "all" private enforcement). Congress thus did not extend the Tariff Act to cover violations of the FDCA; it preferred instead to leave FDCA enforcement to the comprehensive framework it created in that more-specific statute.

The Supreme Court and this Court applied similar reasoning when limiting the scope of the Lanham Act in order to give full force to the Copyright and Patent Acts. These courts held that claims alleging false statements about the authorship of a written work, or origin of an innovation, are not cognizable under the false-advertising provision of the Lanham Act because, among other reasons, entertaining such claims under the Lanham Act would avoid the more-specific regulation of those subjects under the Copyright and Patent Acts. *See Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 33-35 (2003); *Baden Sports, Inc. v. Molten USA, Inc.*, 556 F.3d

12

1300, 1307 (Fed. Cir. 2009); *see also TianRui Grp. Co. v. Int'l Trade Comm'n*, 661 F.3d 1322, 1333 (Fed. Cir. 2011) (The Tariff Act "cannot be used to circumvent express congressional limitations on the scope of substantive U.S. patent law.").

Similarly, this Court held in *Mylan Pharmaceuticals, Inc. v. Thompson*, 268 F.3d 1323, 1332-33 (Fed. Cir. 2001), *superseded by statute on other grounds as recognized in Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 408 (2012), that a claim nominally seeking declaratory judgment regarding non-liability for patent infringement was actually an improper attempt to privately enforce the FDCA. The plaintiff argued that it should be declared to not be liable for infringement because the defendant had violated a provision of the FDCA. *Id.* Because no cause of action existed to challenge that type of FDCA violation, this Court held that the prohibition on private FDCA enforcement proceedings precluded entertaining the plaintiff's suit under the Declaratory Judgment and Patent Acts. *Id.*

For these reasons, permitting private parties to enforce and restrain violations of the FDCA using the Tariff Act would permit what Congress prohibited. The specific provisions of the FDCA govern, and they preclude extending the provisions of the earlier and more-general Tariff Act to enforce the FDCA.

**3.** Both of the claims that Amarin submitted to the International Trade Commission constitute private efforts to enforce or restrain violations of the FDCA, and both are therefore precluded.

13

**a.** One of Amarin's claims contends that the Commission should exclude articles from entry into the United States because those articles allegedly violate several provisions of the FDCA. Amarin claims that the importation of the accused articles is an "unfair act," within the meaning of the Tariff Act, "*based upon the standards set forth in the FDCA.*" Appx56 (emphasis added). Amarin elaborates that the accused articles are allegedly "misbranded drugs in violation of the standards set forth in Section 502 of the FDCA, [21 U.S.C.] § 352, and adulterated drugs, in violation of Section 501 of the FDCA, *id.* § 351." Appx57; *see also* Appx57-59 (alleging other violations). Amarin further contends that the introduction of these allegedly adulterated and misbranded drugs "is prohibited by Section 301(d) and (a) of the FDCA[,] [21 U.S.C.] § 331(a), (d)." Appx59. Amarin also explains that "the FDCA prohibits unapproved 'new drugs,' and adulterated and misbranded 'drugs,' from entering the United States under Section 801(a) of the FDCA, 21 U.S.C. § 381(a)," and argues that, under that provision of the FDCA, FDA "must refuse * * * admission to the United States" of unapproved, adulterated, and misbranded drugs. *Id.*

In sum, Amarin seeks to prove a series of alleged FDCA violations and to remedy those violations by excluding unapproved, adulterated, and misbranded drugs from importation into the United States. In advancing this claim, Amarin provides no reason, other than the alleged violations of the FDCA, to conclude that the importation of the accused articles constitutes an "unfair act" within the meaning of

14

the Tariff Act. Instead, Amarin candidly admits that this claim seeks relief "based upon the standards set forth in the FDCA." Appx56. For these reasons, Amarin's claim is a private proceeding "for the enforcement, or to restrain violations, of" the FDCA, 21 U.S.C. § 337(a), and Amarin is therefore prohibited from pursuing that claim.

**b.** Amarin's false-advertising claim is no different. In that claim, Amarin contends that the accused articles should be excluded from entry into the United States because labeling on, or advertisements about, those articles is allegedly false or misleading, in violation of the false-advertising provision of the Lanham Act, such that importation of those articles would constitute an "unfair act" under the Tariff Act. Appx31-56. But this claim, too, is expressly predicated on proving, and seeks remedies for, alleged violations of the FDCA.

Amarin contends that labeling on the accused articles "falsely asserts that the products are 'dietary supplements,'" where the articles "cannot meet the definition of 'dietary supplement' in Section 201(ff) of the FDCA, 21 U.S.C. § 321(ff)." Appx33. Amarin's complaint devotes over twelve pages to identifying provisions of the FDCA that govern what is and is not a "dietary supplement," alleging facts about the articles, and explaining why, in Amarin's view, the articles do not meet the FDCA's definition of "dietary supplement." Appx34-47. Amarin further alleges that the articles "are actually unapproved 'new drugs' under the FDCA," within the meaning of "Section

15

201(g)(1) of the FDCA," 21 U.S.C. § 321(g)(1). Appx47. The complaint devotes another eight pages to identifying the provisions of the FDCA that govern what constitutes a "drug" and a "new drug," alleging facts about the articles, and explaining why, in Amarin's view, the articles qualify as unapproved "new drugs" under the FDCA. Appx47-55. Amarin also identifies warning letters and other statements by FDA regarding what Amarin alleges are similar articles presenting similar violations of the FDCA. Appx37-38, Appx50-51.

Amarin relies on these alleged FDCA violations to establish the central element of Amarin's false-advertising claim. Appx55-56. The Lanham Act makes it unlawful to use in commercial advertising any "term" that "misrepresents the nature, characteristics, [or] qualities" of goods. 15 U.S.C. § 1125(a)(1)(B). Amarin's only argument for why the accused articles' labeling is false or misleading is that it is "literally false" to call the articles "dietary supplements" when they allegedly do not meet the FDCA's definition of that term and instead are unapproved "new drugs." Appx55. Amarin provides no reason, other than these alleged FDCA violations, to conclude that the labeling or advertising makes a false or misleading statement. Amarin also relies on these alleged FDCA violations for another element of its false-advertising claim—materiality—alleging that "[i]f consumers knew that the products were illegally marketed unapproved 'new drugs' and that, as such, it was unclear whether the products were safe and effective, it would influence the consumers' purchasing decisions." *Id.* Amarin's false-advertising claim, like Amarin's other claim,

16

is thus expressly predicated on alleging, proving, and restraining a series of FDCA violations.

It makes no difference that Amarin's claims require proof of additional matters beyond the alleged violations of the FDCA. To prevail on either of its two claims, for example, Amarin will need to prove that importation of the articles that violate the FDCA will harm Amarin's business. *See Clock Spring, LP v. Wrapmaster, Inc.*, 560 F.3d 1317, 1329 n.10 (Fed. Cir. 2009) (a false-advertising plaintiff must show that it "has been or is likely to be injured as a result of the [false] statement"); 19 U.S.C. § 1337(a)(1)(A)(i) (a Tariff Act complainant must show a "threat or effect" of "destroy[ing] or substantially injur[ing] an industry in the United States"). But the existence of these additional elements in Amarin's claims does not change the fact that Amarin's claim to relief ultimately requires that it prove what are alleged to be violations of the FDCA; nor does it change the fact that Amarin seeks to redress and restrain those FDCA violations. Indeed, Amarin seeks remedies like those that are available to the government—and only to the government—in an FDCA enforcement proceeding. Accordingly, Amarin's claims are private actions "for the enforcement, or to restrain violations, of" the FDCA, and they are prohibited for that reason. 21 U.S.C. § 337(a).

**4.** That conclusion is consistent with the consensus of the courts of appeals that have addressed this issue. For example, in *PhotoMedex, Inc. v. Irwin*, 601 F.3d 919 (9th Cir. 2010), a medical-device manufacturer brought a false-advertising claim under

the Lanham Act against a competitor who allegedly advertised its device as "FDA approved" when, the plaintiff contended, the competitor's device was different enough from a previously-approved device that the competitor was required by the FDCA to make a further filing with FDA, but had not done so. *Id.* at 923-28. The Ninth Circuit held that "[b]ecause the FDCA forbids private rights of action under that statute, a private action brought under the Lanham Act may not be pursued when, as here, the claim would require litigation of the alleged underlying FDCA violation in a circumstance where the FDA has not itself concluded that there was such a violation." *Id.* at 924. The court explained that to permit adjudication of the false-advertising claim "would, in effect, permit [the plaintiff] to assume enforcement power which the [FDCA] does not allow and require the finder of fact to make a decision that the FDA itself did not make." *Id.* at 930.

The Third Circuit reached the same conclusion in *Sandoz Pharmaceuticals Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222 (3d Cir. 1990), where a drug manufacturer brought a false-advertising claim under the Lanham Act against a competitor, alleging that the labeling on the competitor's drug lists an ingredient as "inactive" when the FDCA allegedly required that the ingredient be labeled as "active." *Id.* at 230. The court noted that the plaintiff had provided no reason to think that the labeling was false or misleading other than the contention that the labeling violated the FDCA, and the court noted that FDA had not concluded whether the ingredient at issue was active or inactive or taken enforcement action accordingly. *Id.* at 230-31. The court held that

18

adjudication of the claim would improperly "usurp" FDA's exclusive authority, emphasizing that the FDCA does not "create[] an express or implied private right of action," and concluding that what the FDCA "do[es] not create directly, the Lanham Act does not create indirectly, at least not in cases requiring original interpretation" of the FDCA. *Id.* at 231.

Similarly, in *Mylan Laboratories, Inc. v. Matkari*, 7 F.3d 1130, 1139 (4th Cir. 1993), a drug manufacturer brought a false-advertising claim under the Lanham Act against competitors who implicitly represented that their generic drugs were "properly approved by the FDA" by placing those drugs on the market in alleged violation of the FDCA. The Fourth Circuit recognized that a false-advertising claim might proceed if the plaintiff could identify representations in the drug's packaging or labeling that misled consumers in a way independent of the FDCA. *Id.* But the Fourth Circuit held that "permitting [the plaintiff] to proceed on the theory that the defendants violated [the Lanham Act] merely by placing their drugs on the market would, in effect, permit [the plaintiff] to use the Lanham Act as a vehicle by which to enforce" the FDCA, which, the court noted, the plaintiff "is not empowered" to do. *Id.* This Court quoted this passage with approval in another case, also called *Mylan*, 268 F.3d at 1332, to support this Court's holding that a claim brought as a declaratory judgment action was actually an improper attempt to enforce the FDCA through a private enforcement proceeding.

19

Finally, the Second Circuit held in *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1113 (2d Cir. 1997), that an inventor developing a weight-loss product had no standing to bring a false-advertising claim against a competitor under the Lanham Act. In support of that holding, the court concluded that the plaintiff's "dogged insistence that [the defendant's] products are sold without proper FDA approval suggests" that the plaintiff's "true goal is to privately enforce alleged violations of the FDCA," but "no such private right of action exists." *Id.*[1]

The courts of appeals have applied the same principle consistently in contexts involving other statutory schemes that also prohibit private enforcement actions. For example, in *IQ Products Co. v. Pennzoil Products Co.*, 305 F.3d 368, 374 (5th Cir. 2002), the Fifth Circuit held that the Federal Hazardous Substances Act's prohibition on private enforcement actions precluded adjudication of a false-advertising claim that was predicated on the allegation that a product's labeling violated the Act and was false or misleading for that reason. Similarly, in *Dial A Car, Inc. v. Transportation, Inc.*,

---

[1] *Alpharma, Inc. v. Pennfield Oil Co.*, 411 F.3d 934 (8th Cir. 2005), is not to the contrary. There, an antibiotic manufacturer brought a false-advertising claim against a competitor whose product was approved by FDA for certain uses but who allegedly falsely advertised additional, unapproved uses. *Id.* at 935-37. The Eighth Circuit held that this claim was cognizable, distinguishing the cases above. It was undisputed in *Alpharma* that the product was a "drug" and that FDA approval was required for each intended use. The court explained that there was thus no need to make a "preemptive determination" about how FDA would categorize the article at issue. *Id.* at 940. The claim rested on whether FDA had approved the competitor's drug for additional uses —a factual issue that FDA had partially addressed. *Id.* at 939. By contrast, Amarin's claims rest on disputed allegations about the proper FDCA classification of certain articles, a determination at the heart of FDCA enforcement that FDA has not made.

82 F.3d 484, 489-90 (D.C. Cir. 1996), the D.C. Circuit held that a false-advertising claim was not a proper vehicle by which a taxi company could sue a competitor for advertising itself to be lawfully permitted to operate in the District of Columbia. The Lanham Act could not be used "to interpret and *enforce* municipal regulations" (emphasis in original), at least where the Taxicab Commission had not clearly addressed the issue already. *Id.* at 490; *see also Cottrell, Ltd. v. Biotrol Int'l, Inc.*, 191 F.3d 1248, 1255 (10th Cir. 1999) (holding that plaintiff could not bring a claim seeking enforcement of the Federal Insecticide, Fungicide, and Rodenticide Act "dressed up as a Lanham Act claim").

## B.    Amarin's Arguments Are Without Merit.

**1.**    Amarin chiefly contends that the Supreme Court's decision in *POM Wonderful LLC v. Coca-Cola Co.*, 134 S. Ct. 2228 (2014), has already settled the question presented in this case. Br. 2, 4, 18, 44-54. But Amarin's reliance on *POM Wonderful* is fundamentally misplaced.

In *POM Wonderful*, a juice manufacturer brought a false-advertising claim under the Lanham Act against the manufacturer of a competing juice product. 134 S. Ct. at 2233. The plaintiff alleged that the competitor's labeling misled consumers by prominently featuring the words "pomegranate" and "blueberry" in large type on the product's label, even though the juice contained only small amounts of each, *id.* at 2233, 2235—allegations entirely independent of the FDCA. Indeed, the plaintiff in *POM Wonderful* did not cite the FDCA, allege that the competitor's labeling violated

the FDCA, or allege that any such violation was the reason that the labeling was false or misleading. *See* First Am. Compl., *POM Wonderful LLC v. The Coca Cola Co.*, No. 08-cv-6237 (C.D. Cal., filed July 27, 2009) (Dkt. No. 53).

The district court and court of appeals in *POM Wonderful* held that the FDCA nonetheless precluded the plaintiff's false-advertising claim because regulations under the FDCA, which contain detailed provisions governing juice labeling, occupied the field, permitting some features of the defendant's label and prohibiting none of the features alleged to be misleading. 134 S. Ct. at 2236. But the Supreme Court reversed, holding that there was no conflict in fully enforcing both the FDCA and the Lanham Act in that case, where the plaintiff's claims were predicated on statements made on labeling regulated by the FDCA, but were not predicated on proving and remedying violations of the FDCA.

*POM Wonderful* thus stands for the proposition that the FDCA does not occupy the field of food labeling. False-advertising claims are not precluded by the FDCA simply because the FDCA independently regulates food labeling. As the Court characterized its holding in *POM Wonderful*, "Congress did not intend the FDCA to preclude Lanham Act suits *like POM's*." 134 S. Ct. at 2241 (emphasis added). And POM, as the Court emphasized, sought "to enforce the Lanham Act, not the FDCA or its regulations." *Id.* at 2239.

*POM Wonderful* therefore did not decide the question presented here: whether the FDCA's prohibition on private proceedings to enforce or restrain violations of the FDCA precludes a private party's claims that seek to prove and stop violations of the FDCA by invoking a private cause of action under another statute. Amarin alleges that the labeling on the accused articles constitutes an "unfair act" under the Tariff Act, and "false" advertising under the Lanham Act, solely *because* the articles allegedly violate the FDCA's requirements. Amarin's claims thus come into direct conflict with the government's exclusive enforcement authority under the FDCA. And *POM Wonderful* expressly left open the question whether the FDCA precludes private causes of action brought under other statutes where those statutes and the FDCA "cannot be implemented in full at the same time." 134 S. Ct. at 2240.

In the wake of *POM Wonderful*, courts have recognized this distinction between false-advertising claims that rest on FDCA violations and those that do not. Courts have permitted adjudication of false-advertising claims involving allegations not predicated on proving FDCA violations, like claims that a dietary supplement was falsely advertised as "safe" and "natural" when it was neither, under the common meaning of those words. *See ThermoLife Int'l, LLC v. Gaspari Nutrition Inc.*, 648 F. App'x 609, 612 (9th Cir. 2016) (unpublished). But they have properly continued to hold that Lanham Act claims predicated on proving and restraining FDCA violations are precluded, consistent with the consensus among the courts of appeals on that

23

issue before *POM Wonderful*. *See, e.g.*, *Hi-Tech Pharm., Inc. v. Hodges Consulting, Inc.*, 230 F. Supp. 3d 1323, 1331 (N.D. Ga. 2016); Appellee Br. 24-25 (collecting cases).

**2.** Taking a different tack, Amarin argues (Br. 54-56) that the Commission's conclusion that the FDCA precludes Amarin's claims "cannot be reconciled" with this Court's opinion in *Allergan, Inc. v. Athena Cosmetics, Inc.*, 738 F.3d 1350 (Fed. Cir. 2013). But *Allergan* is fully consistent with the Commission's conclusion.

The plaintiff in *Allergan* sold an eyelash-growth product and sued a competitor for alleged violations of California's Sherman Food, Drug, and Cosmetic Law, *see* Cal. Health & Safety Code § 109875 *et seq.*, which parallels the FDCA. The plaintiff alleged that the competitor was wrongly marketing an eyelash-growth product as a "cosmetic" when it was actually an unapproved "new drug," under California law. *Allergan*, 738 F.3d at 1353. The plaintiff brought the action under California's Unfair Competition Law, which creates a cause of action to remedy violations of state business laws like the Sherman Law. Cal. Bus. & Prof. Code § 17203.

This Court held in *Allergan* that the FDCA did not impliedly preempt the plaintiff's state-law claim. 738 F.3d at 1355. The Court reasoned that California's Sherman Law regulated in areas—health and safety—that "implicate an historic state power that may be vindicated under state law tort principles" absent a "clear and manifest purpose of Congress" to preempt such state law. *Id.* Applying this presumption against preemption, the Court "d[id] not find a clear purpose by Congress to preempt the state law claim at issue." *Id.* And the Court concluded that

24

the Sherman Law "is not an obstacle to realizing federal goals" because "it contains provisions that parallel the FDCA, such that the statutes have consistent goals." *Id.* at 1355-56. The Court distinguished *Buckman*, 531 U.S. 341, which held that the FDCA preempted a state tort claim predicated on alleged fraud against FDA. The *Allergan* Court reasoned that the tort action in *Buckman* "existed—unlike [the *Allergan* plaintiff's] claim—'solely by virtue of the FDCA disclosure requirements.'" 738 F.3d at 1356 (quoting *Buckman*, 531 U.S. at 352-53). The claim in *Allergan* existed solely by virtue of independent state law.

*Allergan* does not support Amarin's argument that private parties may use the Tariff Act to enforce or restrain violations of the FDCA. The *Allergan* claim did not run afoul of the FDCA's prohibition on private enforcement proceedings because the claim did not attempt to enforce the FDCA. Rather, the claim sought to enforce compliance with an independent state statute—the Sherman Law—using a state cause of action that permits private enforcement of the Sherman Law. To be sure, the contents of the Sherman Law paralleled the FDCA. But the Sherman Law was not dependent on the FDCA for its existence. And it was this independent state law, not the FDCA, that the *Allergan* plaintiff sought to enforce in a private action for unfair competition under state law.

Amarin, by contrast, seeks to prove and remedy violations of the FDCA itself through the claims brought under the Tariff Act, and the FDCA prohibits such private enforcement proceedings. *Accord* U.S. Amicus Br., *Athena Cosmetics, Inc. v.*

25

*Allergan, Inc.*, No. 13-1379, 2015 WL 2457643, at *18 (U.S. May 26, 2015)

(distinguishing *Allergan* from cases, like *PDK Labs*, that are "essentially efforts to

enforce the FDCA itself, rather than parallel state law"); U.S. Amicus Br., *Albertson's,*

*Inc. v. Kanter*, No. 07-1327, 2008 WL 5151069, at *8 (U.S. Dec. 5, 2008) ("Although 21

U.S.C. 337 precludes private actions to enforce the FDCA itself, Section 337 does not

prohibit private actions to enforce parallel state requirements.").

     That distinction—between suits to enforce the independent Sherman Law and

impermissible suits to enforce the FDCA—is bolstered by the federalism interests at

issue in *Allergan*, which are absent here.  This Court noted in *Allergan* that California's

Sherman Law was enacted pursuant to the state's "historic police powers," and the

Court therefore applied a presumption against preemption, which, it held, the FDCA

did not overcome.  738 F.3d at 1355; *accord* U.S. Amicus Br., *Athena*, 2015 WL

2457643, at *11-17 (relying on the presumption against preemption).  In so holding,

this Court left for state law the interpretation and enforcement of state law within

California.  And it did so secure in the knowledge that private actions under state law

to enforce state law would have no necessary consequence for the proper

interpretation and enforcement of the FDCA itself.

     Not so, here.  Amarin's claims seek to enforce and restrain violations of the

FDCA—a federal statute.  Adjudication of those claims would directly enforce the

FDCA, with nationwide effect.  Worse, nothing in Amarin's theory would seem to

prevent other private commercial competitors from bringing claims under the

26

Lanham Act in federal courts across the country seeking to prove and remedy alleged FDCA violations, with potentially precedential effect. That would effectively circumvent FDA's exclusive control over how products are regulated under the FDCA and which products warrant enforcement proceedings. And it would significantly diminish the benefits that Congress secured in centralizing "all" decisions to bring FDCA enforcement proceedings. 21 U.S.C. § 337(a). As discussed above, Amarin's claims are precluded by the FDCA under the normal tools of statutory construction. And, unlike in *Allergan*, there is no extra thumb on the scale in analyzing that question—no presumption against preemption to protect independent state law—because there are no federalism interests are at stake. *See* 738 F.3d at 1356 (applying the presumption against preemption and distinguishing preclusion cases like *PhotoMedex*).

**3.** Finally, Amarin appears to argue (Br. 5, 18, 51, 63) that two provisions of the Tariff Act override the FDCA's express prohibition on private enforcement proceedings. Amarin notes that the Commission's remedies are "in addition to any other provision of law," 19 U.S.C. § 1337(a)(1), and that the Tariff Act generally requires that other parts of the Executive Branch "shall cooperate fully" with the Commission "for the purposes of aiding and assisting its work," *id.* § 1334.

Neither provision qualifies the FDCA's flat prohibition on "all" private proceedings "for the enforcement, or to restrain violations, of" the FDCA. 21 U.S.C. § 337(a). The "in addition" provision does not address when a complainant's claim is

27

cognizable (the question here); it conditionally indicates that "when" the Commission

finds an "unfair act" in a claim properly before it, the Tariff Act's remedies shall be

"in addition" to any others.  19 U.S.C. § 1337(a)(1).  Moreover, the "in addition"

provision preserves other remedies—an issue unrelated to whether the later-enacted

*FDCA* displaces an application of the *Tariff Act* that is incompatible with the FDCA's

specific prohibition on private enforcement proceedings.  The "shall cooperate"

provision speaks to how agencies assist the Commission where the Commission has

jurisdiction.  It does not blithely require all other federal agencies to make regulatory

enforcement determinations that are exclusively reserved to those agencies in their

organic acts, much less override the clear language of 21 U.S.C. § 337(a).

## CONCLUSION

For the foregoing reasons, this Court should hold that the FDCA precludes

Amarin's claims.

Respectfully submitted,

CHAD A. READLER
  *Acting Assistant Attorney General*

*Of Counsel:*

ROBERT P. CHARROW
  *General Counsel*

REBECCA K. WOOD
  *Associate General Counsel*
  *Chief Counsel, Food & Drug Admin.*

ANNAMARIE KEMPIC
  *Deputy Chief Counsel, Litigation*

JAMES C. FRASER
  *Associate Chief Counsel, Litigation*

  *Department of Health & Human Services*

SCOTT R. MCINTOSH
  */s/ Joseph F. Busa*
JOSEPH F. BUSA
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7537*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-0261*
  *Joseph.F.Busa@usdoj.gov*

March 2018

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the requirements of Federal Rules of Appellate Procedure 29 and 32(a).  This brief was prepared using Microsoft Word 2013 in Garamond 14-point font, a proportionally spaced typeface.  This brief contains 6,995 words.

*/s/ Joseph F. Busa*
JOSEPH F. BUSA
Counsel for the United States

## CERTIFICATE OF SERVICE

I hereby certify that on March 27, 2018, I electronically filed the foregoing

corrected brief with the Clerk of the Court for the United States Court of Appeals for

the Federal Circuit by using the appellate CM/ECF system.  Participants in the case

are registered CM/ECF users, and service will be accomplished by the appellate

CM/ECF system.


/s/ Joseph F. Busa
JOSEPH F. BUSA
Counsel for the United States

# TAB 2

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 45 of 410
PageID: 12652
American Federation of State County and Municipal..., Not Reported in...
2010 WL 891150

🚩 KeyCite Yellow Flag - Negative Treatment
Distinguished by In re McNeil Consumer Healthcare, Marketing and Sales
Practices Litigation, E.D.Pa., July 15, 2011

2010 WL 891150
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

AMERICAN FEDERATION OF STATE COUNTY
AND MUNICIPAL EMPLOYEES, District Council
47 Health Andwelfare Fund, et al., Plaintiffs,

v.

ORTHO–McNEIL–JANSSEN
PHARMACEUTICALS, INC., et al., Defendants.

Civil Action No. 08–cv–5904.
|
March 11, 2010.

West KeySummary

1    Sales 👈 Parties entitled to notice

Buyer of pain medication patch failed to
notify seller of the alleged breach of warranty,
as required to support buyer's claim for
breach of implied and express warranty under
the Pennsylvania Uniform Commercial Code
(UCC). Although seller may have had notice that
its product was defective since it issued a recall
notice, the buyer did not notify the seller that the
transaction was claimed to involve a breach of
warranty. 13 Pa.C.S.A. § 2607(c)(1).

17 Cases that cite this headnote

**Attorneys and Law Firms**

William D. Marvin, Cohen Placitella & Roth, Philadelphia,
PA, for Plaintiffs.

Kathryn E. Deal, David J. Antczak, Edward M. Posner,
Drinker Biddle & Reath LLP, Philadelphia, PA, for
Defendants.

*MEMORANDUM OPINION AND ORDER*

RUFE, District Judge.

**\*1** Plaintiff American Federation of State, County and
Municipal Employees, District Council 47 Health and
Welfare Funds, and Philadelphia Firefighters Union Local
No. 22 Health and Welfare Fund bring this action against
Defendants Ortho–McNeil–Janssen Pharmaceuticals, Inc.
("OMJ"), Sandoz, Inc., and ALZA Corporation ("ALZA"),
alleging violation of the Pennsylvania Unfair Trade Practices
and Consumer Protection Law ("UTPCPL"), breach of
express and implied warranties, and unjust enrichment.
Before the Court is Defendants' Motion to Dismiss Plaintiffs'
Complaint. [1] For the reasons set forth below, the Motion will
be granted in part and denied in part.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

Defendants OMJ and Sandoz, Inc. market and distribute the
fentanyl transdermal system patch ("fentanyl patch"), which
is a Schedule II narcotic, available only through a doctor's
prescription, designed to deliver a steady, controlled dosage
of a powerful medication that provides relief for severe and
chronic pain . [2] ALZA, an affiliate of OMJ, contracted with
OMJ and Sandoz to manufacture and supply fentanyl patches
throughout the United States . [3] OMJ distributes the patches
under the brand name Duragesic and Sandoz distributes the
patches under a generic equivalent. [4] The fentanyl patches are
available in a variety of dosage delivery rates (e.g., 12.5, 25,
50, 75 and 100 micrograms per hour ("mcg/hour")). [5]

On February 12, 2008, OMJ announced a recall of all 25 mcg/
hour Duragesic patches (and its generic equivalent) stamped
with expiration dates on or before December 2009. [6] The
official press release stated, in pertinent part, that:

[The 25mcg/hr fentanyl transdermal system patches] being
recalled may have a cut along one side of the drug
reservoir within the patch. The result is possible release of
fentanyl gel from the gel reservoir into the pouch in which
the patch is packaged, exposing patients or caregivers
directly to fentanyl gel. Fentanyl patches that are cut or
damaged in any way should not be used. Exposure to
fentanyl gel may lead to serious adverse events, including
respiratory depression and possible overdose, which may

2010 WL 891150

be fatal....Anyone who has 25 mcg/hr ... fentanyl patches
should check the box or foil pouch for the expiration date ...
The recalled patches all have expiration dates on or before
December 2009. The cut edge in affected patches can be
seen upon opening the sealed foil pouch that holds the
patch. Affected patches should not be handled directly. [7]
Plaintiffs are health and welfare trust funds that provide
medical coverage, including prescription drug coverage, to
their members and their members' dependents. [8] Plaintiffs
and other similarly situated third-party payors have paid
for supplies of 25 mcg/hour fentanyl patches, which were
later recalled by Defendants, on behalf of their qualified
members. [9] As a result of the recall, Plaintiffs allege that
they, and similarly situated third-party payors, paid or will
pay expenses related to the purchase and reimbursement of 25
mcg/hour fentanyl patches that had to be discarded. [10]

**\*2** On December 19, 2008, Plaintiffs filed the underlying
class-action Complaint, alleging the following: COUNT I:
Violations of Pennsylvania's Unfair Trade Practices and
Consumer Protection Law ("UTPCPL"); COUNT II: Breach
of an Express Warranty under the Pennsylvania Uniform
Commercial Code ("UCC"); COUNT III: Breach of an
Implied Warranty; and COUNT IV: Rescission / Unjust
Enrichment. On March 25, 2009, Defendants filed the instant
Motion to Dismiss, asserting several grounds for dismissal of
Plaintiffs' Complaint under Federal Rules of Civil Procedure
12(b)(1) and 12(b)(6). The Court has carefully reviewed
Defendants' Motion, Plaintiffs' Response, [11] Defendants'
Reply, [12] and all accompanying materials, and this matter is
now ready for disposition.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(1) allows a party to
move for dismissal of any claim wherein the district court
lacks subject matter jurisdiction. [13] When considering a 12(b)
(1) motion, the court "review [s] only whether the allegations
on the face of the complaint, taken as true, allege sufficient
facts to invoke the jurisdiction of the district court." [14] When
subject matter jurisdiction is challenged under 12(b)(1), the
plaintiff must bear the burden of persuasion. [15]

In order for a plaintiff to have standing in federal court,
the case or controversy presented by the plaintiff must be
justiciable and establish an injury-in-fact. [16] To establish
an injury-in-fact, a plaintiff must allege: (1) defendant

violated a legally protected interest that is concrete and
particularized, and actual or imminent—not merely an injury
that is "conjectural" or "hypothetical," (2) the injury is fairly
traceable to the challenged conduct, and (3) the injury is
redressable by a remedy that federal courts are permitted to
give. [17] If the complaint fails to satisfy these requirements,
"a federal court does not have subject matter jurisdiction ...
[and] the claim[s] must be dismissed." [18]

Federal Rule of Civil Procedure 12(b)(6) allows a party
to move for dismissal for failure to state a claim upon
which relief can be granted. [19] Under 12(b)(6), the moving
party "bears the burden of showing no claim has been
stated." [20] The court must "accept as true all allegations
in the complaint and all reasonable inferences that can be
drawn therefrom, and view it in a light most favorable
to the non-moving party." [21] The United States Supreme
Court clarified this standard in *Bell Atlantic Corporation v.
Twombly,* explaining that "a plaintiff's obligation to provide
the grounds of his entitlement to relief requires more than
labels and conclusions, and a formulaic recitation of the
elements of a cause of action will not do." [22] Instead, a
plaintiff must allege facts that "raise a right to relief above the
speculative level ... on the assumption that all the allegations
in the complaint are true (even if doubtful in fact)." [23]

## III. DISCUSSION

### A. FRCP 12(b)(1)

**\*3** Relying upon FRCP12(b)(1), Defendants assert that
the Court lacks subject matter jurisdiction because Plaintiffs
allegedly (1) failed to plead an injury-in-fact sufficient to
satisfy Article III standing; (2) lack standing as a "person"
under the UTPCPL; and (3) do not fall within the class of
buyers or end-users that may recover for a breach of warranty
under the Pennsylvania UCC. The Court will address each
argument separately below.

### (i) Injury–In–Fact

Defendants argue that Plaintiffs' Complaint failed to allege
that any of their members actually purchased defective
fentanyl patches. Defendants assert that unless Plaintiffs
pled that their members received patches that were actually
defective, Plaintiffs' alleged injury is merely conjectural and
hypothetical. Defendants further assert that "[p]ayment for a
product that is recalled as a precautionary measure because it

2010 WL 891150

might have a defect is not the legal equivalent of payment for a product that actually is defective ." [24] In effect, Defendants' arguments attempt to distinguish between patches that were actually defective (*e.g.,* patches that contained a cut on the gel reservoir) and patches that were subject to Defendants' product recall. The Court finds, however, that Defendants' recall notice made no such distinction. The recall notice warned that "[f]entanyl patches that are cut or damaged in any way should not be used," and that "[e]xposure to fentanyl gel may lead to serious adverse events, including respiratory depression and possible overdose, which may be fatal." [25] Plaintiffs pled that as a result of this warning and product recall, they "have paid or will pay expenses related to the purchase of and reimbursement for supplies of 25 mcg/hour fentanyl patches [previously purchased for their members, bearing the relevant expiration dates] that were unusable, worthless, and had to be discarded." [26] These facts, if accepted as true, plead an economic loss that is concrete, particular, and traceable to a defect resulting from Defendants' manufacturing and distribution process, and would permit a remedy if Plaintiffs are successful on the merits.

Additionally, Plaintiffs' claim, as pled, seeks monetary damages for the purchase price of the recalled fentanyl patches, an injury that directly impacts Plaintiffs, not just the consequential damages that their members may incur from exposure to the defective patches. [27] Claims for monetary damages generally satisfy the injury-in-fact threshold. [28] Based on the allegations pled in the Complaint, the Court finds that Plaintiffs have satisfied the injury-in-fact requirements necessary to establish Article III standing.

**(ii) Standing Under the UTPCPL**

Defendants argue, in the alternative, that Plaintiffs are not "persons" under the UTPCPL, and therefore do not have standing to sue, because "[t]hey do not themselves obtain or consume the fentanyl patches in question" nor were their purchases made for primarily "personal, family, or household purposes." [29] Pennsylvania courts, however, have long recognized the ability of third-party trusts and associations to assert UTPCPL claims on behalf of their constituent members based on the statute's broad definition of "person." [30] Section 201–9.2(a) of the UTPCPL permits a private action for the recovery of damages for "[a]ny person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money ... as a result of ... [any] act

or practice declared unlawful by this act ...."[31] The UTPCPL defines "person" as "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entities." [32] In addition, the "purpose" requirement of § 201–9.2(a) focuses on whether the final consumer uses the product for personal, family or household use, not whether the third-party entity personally uses the product or merely purchases it. [33]

**\*4** Defendants, nonetheless, rely on *Balderston v. Medtronic Sofamor Danek, Inc.* to support their position. [34] In *Balderston,* the plaintiff-physician filed suit against a manufacturer of surgical screws, which were used on his patients during spinal fusion operations, claiming that the defendant misrepresented the FDA's approval status of the screws. The plaintiff claimed that he had been misled as to the FDA's approval status, and was subsequently exposed to lawsuits. The district court, however, determined that the plaintiff's patients, not the plaintiff, had actually purchased the screws and therefore concluded that the plaintiff lacked standing. The district court further concluded that plaintiff could not qualify as a purchaser because any purchase he would have made was for business purposes, not for "personal, family, or household" use. [35] On appeal, the Third Circuit affirmed the district court's findings and noted that plaintiff unequivocally acknowledged that "purchase [of the surgical screw was] by the consumer, the patient ... [and that] neither plaintiff nor his practice [were] ever billed for the screw and [did] not pay for it." [36]

The distinctions between the facts in *Balderston* and the facts as pled before this Court are clear. Whereas in *Balderston,* the plaintiff could in no way be considered a purchaser or even consumer of the goods at issue, Plaintiffs here actually paid for the fentanyl patches *on behalf* of their members for their members' personal, family or household use. [37] This places Plaintiffs in a far different relationship with Defendants that the distant or tangential relationship between the plaintiff and the defendant in *Balderston.* The facts here compel the conclusion that Plaintiffs allegations, as pled in the Complaint, strongly support the position that they have standing as purchasers under the UTPCPL. The Court finds that since Plaintiffs purchased the fentanyl patches on behalf of their members in their representative capacity, and those patches were purchased for the personal, family and household use of their members, Plaintiffs have properly asserted a claim under the UTPCPL. [38]

American Federation of State County and Municipal..., Not Reported in...
2010 WL 891150

#### (iii) Buyers Under Pennsylvania's UCC

As a third alternative argument for dismissal under FRCP 12(b)(1), Defendants assert that because "plaintiffs merely pay or reimburse some or all of the purchase price of the covered prescription medicines that their members buy and use," Plaintiffs, as third-party payors, do not qualify as "buyers" under Pennsylvania's UCC. [39] Defendants' argument, however, essentially takes a section of the UCC that *extends* warranty protections to relatives and persons in the same household as the buyer, and incorrectly suggests to this section somehow *limits* buyers to only "natural persons."

Section 2103(a) of the UCC defines "buyer" as a "person who buys or contracts to buy goods." [40] Section 1201(b) (27) of the UCC defines "person" as "[a]ny individual; corporation; business trust; estate; trust; partnership; limited liability company; association; joint venture; government; governmental subdivision, agency or instrumentality, public corporation or other legal or commercial entity." [41] Contrary to Defendants' arguments, the definition of "person" under the UCC is not limited to a "natural person;" rather, the UCC uses a very broad definition, which includes corporations, trusts and business trusts. Therefore, the Court finds that Plaintiffs are in fact considered both "persons" and "buyers" under the UCC. Accordingly, each of Defendants' arguments offered to support its motion to dismiss the Complaint for a lack of subject matter jurisdiction are denied.

#### B. FRCP 12(b)(6)

**\*5** Relying upon FRCP 12(b)(6), Defendants assert that the Court should dismiss Plaintiffs' Complaint because Plaintiffs failed to state a claim for which relief can be granted by not pleading that: (1) Defendants committed unfair or deceptive acts or practices under the UTPCPL; (2) Plaintiffs provided Defendants reasonable notification of the alleged breach of warranty as required by Title 13 of the Pennsylvania Consolidated Statutes, Section 2607(c)(1); (3) a warranty was actually breached; (4) an express warranty extended to them as third-party medical benefit payors; and (5) Defendants actually received a benefit as required for a claim of unjust enrichment. The Court will address each argument separately below.

#### (i) The UTPCPL

Defendants argue that Plaintiffs' UTPCPL claims should be dismissed for failure to state a claim upon which relief can be granted because Plaintiffs failed to: (1) identify, with particularity, a false or deceptive representation made by Defendants that was material to Plaintiffs' coverage decisions and (2) plead justifiable reliance on Defendants' alleged representations. In support of their first point, Defendants assert that in order for Plaintiffs to plead an unfair or deceptive act or practice under the UTPCPL, Plaintiffs must allege that the "defendants made a representation that their patches would invariably be free from defects." [42] The UTPCPL, however, defines unfair or deceptive acts or practices to include representations that "goods ... have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," or representations "that goods ... are of a particular standard, quality, or grade ..., if they are of another." [43] Under both definitions, Plaintiffs allegations in the complaint, if taken as true, sufficiently plead an unfair or deceptive act committed by Defendants. The "unfair and deceptive" act alleged in Plaintiffs' Complaint is Defendants' representation that the recalled fentanyl patches would release the drug at a safe dosage rate. However, due to the defect and subsequent recall, the fentanyl patches could actually release the drug at a significantly higher and more dangerous dosage rate, which rendered the patches useless to Plaintiffs.

As to their second point, Defendants assert that any alleged reliance by Plaintiffs that the fentanyl patches would be completely free from cuts or damage is not "justifiable," especially given that the fentanyl patches packaging included an insert disclaimer, which warned that broken or cut patches could lead to overdose or death. [44] Plaintiffs argue in opposition that the Complaint sufficiently pleads "the type of representations that fall into the traditional scope of consumer protection statutes—where a product seller promises one thing but delivers another." [45] Plaintiffs assert in the Complaint that Defendants represented to end-users, physicians and third-party payors that the fentanyl patches were designed to safely release the prescription drug at a rate of 25 mcg/hour. However, because of the manufacturing defect, the patches potentially released the drug at an excessive, possibly fatal, rate. Accordingly, the Court finds that Plaintiffs sufficiently alleged that Defendants committed unfair or deceptive acts or practices under the UTPCPL and Plaintiffs sufficiently pled justifiable reliance on the alleged unfair or deceptive acts in their Complaint.

### (ii) Breach of Implied and Express Warranty Under Pennsylvania UCC

**\*6** Defendants argue that Plaintiffs' breach of express and implied warranty claims should be dismissed for failure to state a claim upon which relief can be granted because Plaintiffs failed to allege in their Complaint that they notified Defendants of the breach of warranty. Under § 2607(c)(1) of the UCC, a buyer must "within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." [46] Defendants argue that "[t]he purpose of the notice requirement is to afford the seller a reasonable time within which to cure the breach or settle the claim." [47] Plaintiffs argue in opposition that Defendants cannot complain of a lack of notice for the breach of warranty, as it was Defendants themselves who first gave notice to the purchasers that the fentanyl patches were defective through the recall notice. According to Plaintiffs, "Defendants were already well aware of the breach and had an opportunity to make good." [48]

Plaintiffs' argument, however, that notification under § 2607(c) is unnecessary because Defendants had actual or constructive knowledge of the breach, is not supported by the language of the UCC, its statutory purpose, or existing case law interpreting § 2607. Plaintiffs appear to confuse the term "notice" with "notify"—which the UCC explicitly distinguishes. Under UCC § 1202(a), a person has *notice* of a fact when the person has actual knowledge of it, has received notification of it, or, from all of the facts and circumstances known to that person at the time in question, has reason to know it exists. [49] On the other hand, § 1202(d) defines *notify* to mean "give a notice or notification to another person by taking such steps as may be reasonably required to inform the other person in ordinary course, whether or not the other person actually comes to know of it." [50]

The purpose of notification under § 2607(c)(1) is not intended to merely make the seller aware of the breach; rather, the notification must "inform [ ] the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation." [51] Thus, the purpose of notification under § 2607(c) is to allow the seller an opportunity to resolve the dispute regarding an alleged breach before the buyer initiates a lawsuit. Therefore, even assuming that Defendants were aware that the fentanyl patches were defective, Defendants may not have been aware of Plaintiffs' intent to file a class action lawsuit, and were

denied the opportunity to negotiate or settle this claim without judicial involvement. To "notify" under the UCC requires the affirmative act of notification, and Section 2607(c) (1) explicitly requires the buyer to "notify the seller of breach or be barred from any remedy." [52] Plaintiffs' "constructive notice" argument does not address whether Plaintiffs ever actually and affirmatively notified Defendants of the breach, as required by § 2607(c)(1), prior to initiating this litigation.

**\*7** Additionally, the Third Circuit recently analyzed § 2607(c) of the UCC in *Vanalt Electrical Construction, Inc. v. Selco Manufacturing Corporation,* and concluded that a "review of Pennsylvania precedent and other authorities interpreting the UCC indicates that the Pennsylvania Supreme Court would agree that a buyer must prove compliance with Section 2607 before recovering for a breach of contract or warranty involving nonconforming goods...." [53] Here, the Court must also treat the § 2607(c) reasonable notification requirement as a condition precedent to recovery, with Plaintiffs bearing the burden to prove that reasonable notification was given. As reasonable notification is a material element necessary to sustain recovery of a UCC breach of warranty claim, Plaintiffs were required to affirmatively allege that they reasonably notified Defendants. [54] Inasmuch as § 2607(c) bars a buyer's recovery absent the buyer providing reasonable notification of the breach, it follows that a buyer must also plead, at a minimum, in its Complaint, that it provided reasonable notification in order to state a viable claim for recovery. [55] Plaintiffs were not required to allege in the Complaint that the notification occurred in any substantial form (such as a letter or a formal demand), as the "reasonableness" of the notice is a factual matter left for the jury to resolve. However, Plaintiffs needed to allege, at a minimum, that they notified Defendants in some manner "or be barred from any remedy." [56] The Court finds that Plaintiffs failed to allege that they provided Defendants with notification as required by § 2607(c)(1) of the UCC. As such, the Court further finds that Plaintiffs' breach of express and implied warranty claims should be dismissed under FRCP 12(b)(6).

### (iii) Unjust Enrichment

Defendants also argue that Plaintiffs' unjust enrichment claim should be dismissed for failure to state a claim upon which relief can be granted. To satisfy the pleading requirements of unjust enrichment, the plaintiff must allege the following elements in its complaint: (1) a benefit conferred upon one

party by another, (2) appreciation of the benefit by the recipient, and (3) acceptance and retention of the benefit under circumstances that would make it inequitable or unjust for the recipient to retain the benefit without payment of value. [57]

Defendants offer two distinct arguments to defeat Plaintiffs' unjust enrichment claim. First Defendants assert that when an unjust enrichment claim is based upon tortious conduct, and the court dismisses the tort claims based upon the same conduct, the court must also dismiss the unjust enrichment claim as it "is essentially another way of stating a traditional tort claim." [58] The Court finds, however, that this argument is inconsequential and cannot constitute a basis for dismissal in this instance because the Court does not dismiss Plaintiffs' UTPCPL claim.

Second, Defendants assert that Plaintiffs, as third-party payors obligated to reimburse their members' prescription drug expenses, did not confer a "benefit" to Defendants in any way recognized under the law and that "any 'benefit' inured to [D]efendants was merely 'incidental' to [P]laintiffs' performance of their independent contractual obligations." [59] To support this argument, Defendants rely on *Allegheny General Hospital v. Phillip Morris, Inc.* [60] The facts of *Allegheny General,* however, are distinguishable: *Allegheny General* involved a hospital's expenses to treat tobacco-related illnesses caused by the patient's prolonged tobacco use. The hospital and tobacco companies had no preexisting relationship, and the hospital did not directly pay the tobacco companies for any products or services. Under such circumstances, the Third Circuit found that the benefit conferred to the tobacco companies was too incidental or remote to establish a claim of unjust enrichment. [61] Here, however, as pled in the Complaint, Plaintiffs directly paid for or reimbursed the purchase costs of fentanyl patches on behalf their members. The benefit in this case is not remote or incidental; rather, the benefit (the amount paid by Plaintiffs to Defendants for defective fentanyl patches) is direct and measurable.

**\*8** Plaintiffs' Complaint alleges that Defendants "reaped substantial profits from the sale of defective fentanyl patches," and that "Defendants' profits would have been reduced, but for their wrongful and unlawful conduct." [62] Otherwise stated, Plaintiffs pled that they conferred a monetary benefit to Defendants, that Defendants appreciated the benefit, and that the Defendants retained the benefit under inequitable circumstances. The Court finds that these factual allegations, if taken as true, sufficiently plead a claim of unjust enrichment. Accordingly, Defendants' arguments offered to support its motion to dismiss the Complaint for failure to state a claim upon which relief can be granted are denied as to Plaintiffs' unjust enrichment and UTPCPL claims and granted as to Plaintiffs' breach of express and implied warranty claims.

### IV. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss Counts II and III for Plaintiffs' failure to plead reasonable notification as required by 13 Pa. Cons.Stat. § 2607(c) is hereby granted. Defendants' remaining general and specific grounds for dismissal under FRCP 12(b)(1) and 12(b)(6), particularly as to Counts I and IV, are hereby denied.

An appropriate order follows.

### ORDER

**AND NOW,** this 11th day of March 2010, upon consideration of Defendants' Motion to Dismiss [docket entry No. 14]; Plaintiffs' Answer to Defendants' Motion to Dismiss [docket entry Nos. 15 and 16]; and Defendants' Reply [docket entry No. 19], and for the reasons set forth in the attached Memorandum Opinion, it is hereby **ORDERED** that Defendants' Motion is **GRANTED IN PART** and **DENIED IN PART.** Defendants' Motion to Dismiss Plaintiffs' **COUNTS I** and **IV** is **DENIED.** Defendants' Motion to Dismiss Plaintiffs' **COUNTS II** and **III** is **GRANTED. Counts II** and **III** are hereby **DISMISSED.**

It is so **ORDERED.**

### All Citations

Not Reported in F.Supp.2d, 2010 WL 891150

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 51 of 410
PageID: 12658
American Federation of State County and Municipal..., Not Reported in...
2010 WL 891150

# Footnotes

1    Document No. 14.

2    Compl. [Document No. 1] ¶¶ 6–7, 16.

3    *Id.* ¶ 8.

4    *Id.*

5    *Id.*

6    *Id.* ¶ 19.

7    Defs.' Mot. to Dismiss, Ex. A; *see also* Compl. ¶ 20.

8    Compl.¶¶ 1–2.

9    *Id.* ¶ 21.

10   *Id.* ¶ 23.

11   Document No. 15.

12   Document No. 19.

13   FED. R. CIV. P. 12(b)(1) (West 2009 Revised).

14   *Licata v. U.S. Postal Serv.,* 33 F.3d 259, 260 (3d Cir.1994).

15   *Kehr Packages v. Fidelcor, Inc.,* 926 F.2d 1406, 1409 (3d Cir.1991).

16   *See* *Flast v. Cohen,* 392 U.S. 83, 95, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).

17   *See* *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

18   *Taliaferro v. Darby Twp. Zoning Bd.,* 458 F.3d 181, 188 (3d Cir.2006).

19   FED. R. CIV. P. 12(b)(6) (West 2009 Revised).

20   *Kehr Packages,* 926 F.2d at 1409.

21   *Rocks v. City of Philadelphia,* 868 F.2d 644, 645 (3d Cir.1989).

22   550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (citations omitted).

23   *Id.* (citations omitted).

24   Defs.' Mot. at 8.

25   Defs.' Mot., Ex. A; *see also* Compl. ¶ 20.

26   Compl. ¶¶ 21, 23.

27   Compl. at 13–14; *see also* Pls.' Answer to Defs.' Mot. to Dismiss at 5.

28   *See* *Danvers Motor Co. v. Ford Motor Co.,* 432 F.3d 286, 293 (3d Cir.2005).

29   Defs.' Mot. at 10–11.

30   *See* *Commonwealth v. TAP Pharmaceutical Products, Inc.,* 885 A.2d 1127,1142–1143 (Pa.Commw.2005)

     (definition of "person" under § 9.2(a) includes third-party medical benefit payors); *See also* *Valley Forge
     Towers South Condominium v. Ron–Ike Foam Insulators, Inc.,* 393 Pa.Super. 339, 574 A.2d 641, 644–645
     (Pa.Super.1990) ("associations" were explicitly included within the definition of "person" under § 202–2(2)
     and that even though the breach of warranty claim for defective roofing membranes affected the individual
     unit owners the association represented, the condominium association could assert a claim as a "person"
     under § 9.2(a)).

31   73 PA. STAT. § 201–9.2(a) (2010 Electronic Update).

32   *Id.* § 201–2(2).

33   *See* *TAP Pharm. Prods.,* 885 A.2d at 1142–1143; *See also* *Valley Forge Towers,* 574 A.2d at 649.

34   285 F.3d 238 (3d Cir.2002) (a surgeon filed a UTPCPL claim against the manufacturer of pedicle screws,
     which were used on his patients during various surgical procedures. The Third Circuit held the surgeon did

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 52 of 410
PageID: 12659
American Federation of State County and Municipal... Not Reported in...
2010 WL 891150

not qualify as a "person" under the UTPCPL because his patients actually purchased the screws, and even if he had directly purchased the screws, the court reasoned that he purchased them primarily for business purposes).

35    *Id.* at 240.

36    *Id.* at 241.

37    *See* Compl. ¶¶ 26, 35.

38    *See* TAP Pharm. Products, 885 A.2d at 1142–1143 (distinguishing *Balderston* from the Commonwealth's third-party payor programs); *See also* Valley Forge Towers, 574 A.2d at 649.

39    Defs. Mot. at 14–15.

40    13 PA. CONS.STAT. § 2103(a) (2010 Electronic Update).

41    *Id.* § 1201(b)(27).

42    Defs.' Mot. at 12.

43    73 PA. STAT. § 201–2(4)(v), (vii).

44    Defs.' Mot. at 13.

45    Pls.' Answer at 11.

46    13 PA. CONS.STAT. § 2607(c)(1).

47    Defs.' Mot. at 16.

48    Pls.' Answer at 14.

49    13 PA. CONS.STAT. § 1202(a).

50    *Id.* § 1202(d).

51    *Id.* § 2607 cmt. 4; *see also* Beneficial Comm. Corp. v. Brueck, 23 Pa. D. & C.3d 34, 37 (Pa.Ct.Comm.Pl.1982) ("Section 2607(c)'s requirement that the buyer notify the seller of the breach within a reasonable time after he discovers or should have discovered the breach gives the manufacturer the opportunity to cure the defect, settle the claim through negotiation, and gather information that may assist in defending the claim.").

52    *Id.* § 2607(c)(1).

53    233 Fed. Appx. 105, 111 (3d Cir.2007) (held in a dispute over the sale of goods, the buyer must prove compliance with the notice requirement of Section 2607" and that "reasonable notification is a precondition to the buyer's recovery for breach", with the buyer bearing the burden to prove its requirements).

54    *See* Vanalt, 233 Fed. Appx. at 111; *See also* Twombly, 550 U.S. at 562 (quoting Car Carriers v. Ford Motor Co., 745 F.2d 1101, 1106 (7th Cir.1984) (a complaint " 'must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory' ").

55    Section 2607(c)(1) requires the buyer to "within a reasonable time after he discovers or should have discovered any breach notify the seller of the breach or be barred from any recovery." 13 PA. CONS.STAT. § 2607(c)(1).

56    *See Id.; see also* Vanalt, 233 Fed. Appx. at 112.

57    Allegheny Gen. Hosp. v. Phillip Morris, Inc., 228 F.3d 429, 447 (3d Cir.2000).

58    Defs.' Mot. at 19.

59    *Id.* at 20.

60    228 F.3d at 434, 446–448. (held a hospital's claim of unjust enrichment filed against certain tobacco companies was based on remote and indirect injuries, consequently the tobacco companies had no legal obligation to pay the non-paying patients' medical expenses, and whatever "incidental benefit" the tobacco companies received was insufficient to establish a claim of unjust enrichment).

61    *Id.*

62    Compl. ¶ 49.

2010 WL 891150

---

**End of Document**                                  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 3

2013 WL 5890253, Prod.Liab.Rep. (CCH) P 19,263

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by Martin v. Bayer Healthcare Pharmaceuticals, Inc.,
W.D.Ky., August 25, 2015

2013 WL 5890253
United States District Court, E.D. Kentucky,
Southern Division, at London.

Tasha BAIRD, Plaintiff,

v.

BAYER HEALTHCARE
PHARMACEUTICALS, INC., Defendant.

Civil Action No. 6:13–077–DCR.
|
Oct. 31, 2013.

**Attorneys and Law Firms**

Amy Collignon Gunn, Todd S. Hageman, The Simon Law
Firm, PC, St. Louis, MO, Jennifer L. Lawrence, Thomas C.
Korbee, The Lawrence Firm, Covington, KY, for Plaintiff.

Brian P. O'Donoghue, Goldberg, Kohn, Bell, Black
Rosenbloom & Moritz, Chicago, IL, Darryl Scott Lavery,
Boehl, Stopher & Graves, Louisville, KY, for Defendant.

**MEMORANDUM OPINION AND ORDER**

DANNY C. REEVES, District Judge.

**\*1** This matter is pending for consideration of Defendant
Bayer Healthcare Pharmaceuticals, Inc.'s ("Bayer") motion
to dismiss certain claims. [Record No. 13] Bayer argues that
some of Plaintiff Tasha Baird's claims should be dismissed
because they are deficient under Kentucky law. The Plaintiff
has not responded to the motion within the time provided by
the local rules. See LR 7.1(c). For the reasons set forth below,
Bayer's motion will be granted.

**I.**

Plaintiff Tasha Baird, a twenty-two year old female, had a
Mirena Intrauterine Device ("Mirena IUD") placed by
her doctor on April 2, 2009. [Record No. 1, p. 6 ¶¶ 41, 42]
Defendant Bayer, the holder of the approved New Drug
Application ("NDA") of the Mirena IUD, describes the
product, which requires a prescription and must be implanted

by a doctor, as a "small (1.26 inches long), T-shaped, and
made of soft, flexible plastic" device that is approved by
the FDA as a contraceptive device. [Record No. 13–1, p.
2] Baird alleges that after placement of the Mirena IUD,
she suffered complications, such as an ectopic pregnancy
"and surgical and other medical treatments." [*Id.,* ¶ 45] Baird
alleges that she has suffered "severe and permanent physical
injuries, and has endured substantial pain and suffering," as
well as incurring "significant expenses for medical care and
treatment," and economic loss. [*Id.,* ¶ 46]

On April 9, 2013, the plaintiff filed the current action against
Bayer, asserting the following claims: (1) negligence; (2)
strict products liability—defective design; (3) strict products
liability—manufacturing defect; (4) strict products liability
—failure to warn; (5) strict products liability—defect due
to non-comformance with representations; (6) strict products
liability—defect due to failure to adequately test; (7) breach
of express warranty; (8) breach of implied warranties; (9)
fraudulent misrepresentation; (10) fraudulent concealment;
(11) negligent misrepresentation; (12) fraud and deceit; and
(13) punitive damages. [*Id.,* pp. 10–33] Bayer contends that
the plaintiff's sixth, seventh, eighth, eleventh, and thirteenth [1]
claims should be dismissed. The motion will be granted
because Bayer has shown that some of the plaintiff's claims
lack merit and should be dismissed under Rule 12(b)(6) and
federal pleading standards.

**II.**

When evaluating a motion to dismiss under Rule 12(b)(6),
the Court must determine whether the complaint alleges
"sufficient factual matter, accepted as true, to 'state a claim
to relief that is plausible on its face.' " Ashcroft v.
Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp.
v. Twombly, 550 U.S. 544, 555 (2007)). The plausibility
standard is met "when the plaintiff pleads factual content that
allows the court to draw the reasonable inference that the
defendant is liable for the misconduct alleged." *Id.* (citing
Twombly, 550 U.S. at 556). Although the complaint need
not contain "detailed factual allegations" to survive a motion
to dismiss, "a plaintiff's obligation to provide the grounds
of his entitlement to relief requires more than labels and
conclusions, and a formulaic recitation of the elements of a
cause of action will not do." Twombly, 550 U.S. at 555
(internal quotation marks and alteration omitted).

**\*2** In considering a 12(b)(6) motion, the Court is required to "accept all of plaintiff's factual allegations as true and determine whether any set of facts consistent with the allegations would entitle the plaintiff to relief." *G.M. Eng'rs & Assoc., Inc. v. West Bloomfield Twp.,* 922 F.2d 328, 330 (6th Cir.1990) (citation omitted). However, the Court need not accept as true legal conclusions cast in the form of factual allegations if those conclusions cannot be plausibly drawn from the facts, as alleged. *See Iqbal,* 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."); *see also Papasan v. Allain,* 478 U.S. 265, 286 (1986) (noting that in reviewing a motion to dismiss, the district court "must take all the factual allegations in the complaint as true," but that the court is "not bound to accept as true a legal conclusion couched as a factual allegation").

### III.

Bayer seeks to dismiss the plaintiff's failure to adequately test claim, arguing that Kentucky law does not recognize a claim under this cause of action, and because it is simply a failure-to-warn claim in disguise. [Record No. 13–1, p. 6] It further argues that the plaintiff's breach of warranty claims fail because of privity of contract between Baird and Bayer is lacking. Next, Bayer argues that Baird's negligent misrepresentation claim is deficient because such a claim cannot be premised on a product's advertising or packaging. Finally, Bayer argues that the plaintiff's punitive damages claim should be dismissed because punitive damages are a remedy, not a cause of action.

### A. Sixth Claim—Failure to Adequately Test

Bayer argues that this claim is should be dismissed because Kentucky does not recognize an independent duty to test pharmaceutical products. *See Prather v. Abbott Labs.,* No. 3:09–CV–573–H, 2013 U.S. Dist. LEXIS 47511, at \*32–37 (W.D.Ky. Apr. 2, 2013) ("It is unclear whether Kentucky law recognizes an independent duty to test. No Kentucky cases explicitly impose such a duty, but a careful reading of the [Kentucky Products Liability Act] suggests testing may be indicative of whether the manufacturer satisfied its more general duty to exercise reasonable care.").

Where Kentucky courts have not spoken on the issue, this Court will not read into Kentucky products liability law a failure-to-test claim. The plaintiff's failure-to-warn allegations will include the question of whether Bayer satisfied "its more general duty to exercise reasonable care."[2] *Prather,* 2013 U.S. Dist. LEXIS, at \*33. In that regard, Baird's failure to adequately test claim is subsumed under her failure to warn claim. *See Clark v. Danek Medical, Inc.,* No. Civ.A. 3:94CV–634–H, 1999 WL 613316, at \*3 n. 4 (March 29, 1999) (finding a duty to adequately test as subsumed by claims such as failure-to-warn or design defect claims); *see also Rodriguez v. Stryker Corp.,* 680 F.3d 568, 574 (6th Cir.2012) (finding that a failure-to-test claim brought under Tennessee law collapsed into a failure to warn claim where the factual averments and evidence showed that the manufacturer exercised ordinary and reasonable care in testing a product for potential danger). As a result, the Court will dismiss Baird's sixth claim.

### B. Seventh and Eighth Claims—Breach of Warranty

**\*3** Bayer next argues that the plaintiff's breach of warranty claims fail as a matter of law because there is no privity of contract between the plaintiff and defendant. As this Court has previously noted, privity of contract is an essential element to breach of warranty claims. *Pruitt v. Genie Indus., Inc.,* No. 3:10–81–DCR, 2013 WL 1397701, at \*3 (E.D.Ky. Jan. 10, 2013). As in *Pruitt,* the plaintiff seeks to hold the defendant liable under theories of express and implied liability. [*Id.; see also* Record No. 1, pp. 21–23.] "Under Kentucky law, privity of contract is an essential element of a claim for breach of warranty." *Id.* (citing *Allen v. Abbott Labs,* No. 11–146–DLB, 2012 WL 10508 (E.D.Ky. Jan. 3, 2012)). The same is true for an alleged breach of an implied warranty. *Brown Sprinkler Corp. v. Plumbers Supply Co.,* 265 S.W.3d 237, 240 (Ky.App.2007) (holding that a plaintiff asserted a claim based upon implied warranty must establish that it enjoyed privity of contract with the seller). Privity of contract does not extend beyond the "buyer/seller setting." *Munn v. Pfizer Hos. Prods. Grp., Inc.,* 750 F.Supp. 244, 248 (W.D.Ky.1990).

In her Complaint, the plaintiff does not assert that she is in privity with Bayer. [Record No. 1, pp. 21–23] Both of her warranty claims lack any assertions regarding her purchase of the Mirena IUD, or Bayer's alleged status as the "seller" and Baird as the "buyer ." Thus, Bayer is correct that the plaintiff has failed to assert an essential element of a breach

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 57 of 410
PageID: 12664
Baird v. Bayer Healthcare Pharmaceuticals, Inc., Not Reported in F.Supp.2d (2013)
2013 WL 5890253, Prod.Liab.Rep. (CCH) P 19,263

of warranty claim under Kentucky law. *See* *Snawder v. Cohen*, 749 F.Supp. 1473, 1481 (W.D.Ky.1990) (applying Kentucky law and granting summary judgment against patient who received vaccine, where patient lacked privity with manufacturer of the vaccine). Accordingly, the Court will dismiss Baird's seventh and eighth claims.

### C. Eleventh Claim—Negligent Misrepresentation

Bayer also asserts that the plaintiff's negligent misrepresentation claim is not viable because it is inappropriate in the context of product liability claims. Kentucky law limits negligent misrepresentation claims to instances where a party is in the business of "supplying false information for the guidance of others in their business transactions." *Our Lady of Bellefonte Hosp., Inc. v. Tri-State Physicians Network, Inc.,* No. 06–141–HRW, 2007 WL 2903231, at *7 (E.D.Ky. Sept. 27, 2007). As noted by the Supreme Court of Kentucky, the language of a negligent representation claim "is poorly suited to a product sale." *Presnell Construction Manager, Inc., v. EH Construction, LLC,* 134 S.W.3d 575 (Ky.2004). In fact, there are no Kentucky cases recognizing a negligent misrepresentation claim based on a defective product and statements in its advertising and packaging. *Bland,* 2012 WL 524473, at *2. And the Sixth Circuit has anticipated that Kentucky law would not recognize a negligent misrepresentation claim in a commercial product sale. *See* *Miller's Bottled Gas, Inc. v. Borg–Warner Corp.,* 955 F.2d 1043, 1054 (6th Cir.1992).

**\*4** The plaintiff's negligent misrepresentation claim is based on Bayer's representations to the medical and healthcare community. [Record No. 1, p. 27] Allowing her negligent representation claim to proceed in this context would improperly expand this cause of action. As in *Bland,* the Court "declines any invitation to extend the negligent

misrepresentation cause of action beyond its present limits set by the Kentucky Supreme Court." 2012 WL 524473, at *2. Thus, Baird's eleventh claim will be dismissed

### D. Thirteenth Claim—Punitive Damages

Finally, Bayer seeks to dismiss the plaintiff's claim for punitive damages because such damages "are a remedy, not a cause of action." [Record No. 13–1, p. 5] Bayer is correct that this "claim" is actually a prayer for relief, not a separate cause of action. *See* *Toon v. City of Hopkinsville,* No. 5:09–CV–37, 2011 WL 1560590, at *3 (W.D.Ky. Apr. 14, 2011). To the extent that Baird is seeking to assert punitive damages as a separate cause of action, the claim will be dismissed. [3]

### III.

For the reasons stated above, it is hereby

**ORDERED** as follows:

1. Defendant Bayer Healthcare Pharmaceuticals, Inc.'s Motion to Dismiss Certain of Plaintiff's Claims [Record No. 13] is **GRANTED.**

2. Plaintiff Tasha Baird's sixth, seventh, eighth, eleventh, and thirteenth claims in her Complaint, respectively, her failure-to-test, breach of express warranty, breach of implied warranty, negligent misrepresentation, and punitive damages claims, [Record No. 1 ] are **DISMISSED,** with prejudice, for failure to state a claim upon which relief could be granted.

### All Citations

Not Reported in F.Supp.2d, 2013 WL 5890253, Prod.Liab.Rep. (CCH) P 19,263

---

### Footnotes

1    In its brief, Bayer mistakenly refers to this as the plaintiff's fourteenth claim, when it is, in fact, her thirteenth listed claim. [*See* Record No. 13–1, p. 2; *see also* Record No. 1, p. 31.]
2    The Complaint alleges that Bayer "failed to adequately test the safety of [Mirena] versus other hormonal contraceptives, intrauterine devices and other form of birth control therapy." [Record No. 1, p. 20 ¶ 113]

**WESTLAW**   © 2020 Thomson Reuters. No claim to original U.S. Government Works.                    3

**Baird v. Bayer Healthcare Pharmaceuticals, Inc., Not Reported in F.Supp.2d (2013)**

2013 WL 5890253, Prod.Liab.Rep. (CCH) P 19,263

Additionally, it alleges that if Bayer had adequately tested the safety and disclosed the results to the public, Baird would not have used the Mirena IUD. [ *Id.,* ¶ 14]

3    Baird has, however, properly included punitive damages in her prayer for relief. Accordingly, dismissing this as a claim has no effect on her ability or inability to collect punitive damages in this matter.

---

End of Document    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 4

Case 1:19-md-02875-RMB-SAK     Document 598-3     Filed 10/16/20     Page 60 of 410
PageID: 12667
Bell v. Boehringer Ingelheim Pharmaceuticals, Inc., Not Reported in Fed. Supp. (2018)
2018 WL 928237

2018 WL 928237
Only the Westlaw citation is currently available.
United States District Court, W.D. Pennsylvania.

William L. BELL, Jr., Plaintiff,
v.
BOEHRINGER INGELHEIM
PHARMACEUTICALS, INC., Boehringer
Ingelheim Pharma GmbH & Co. KG,
Boehringer Ingelheim International GmbH,
and; and Eli Lilly & Company, Defendants.

CIVIL ACTION NO. 17-1153
|
Signed 02/15/2018

**Attorneys and Law Firms**

Justin J. Hawal, The DiCello Law Firm, Mentor, OH, for Plaintiff.

Elizabeth C. Curtin, Sidley Austin LLP, Chicago, IL, Heidi Levine, Sidley Austin LLP, New York, NY, Wendy West Feinstein, Morgan, Lewis & Bockius LLP, John C. Hansberry, Pepper Hamilton, Pittsburgh, PA, Barry H. Boise, Pepper Hamilton, Philadelpha, PA, for Defendants.

**MEMORANDUM OPINION**

Joy Flowers Conti, Chief United States District Judge

I. Introduction

 **\*1** Plaintiff William L. Bell, Jr. ("Bell") alleges that he developed an acute kidney injury as a direct result of taking the prescription drug Jardiance. Bell alleges numerous claims under Pennsylvania law. This court has subject-matter jurisdiction based on diversity of citizenship.

Defendants Boehringer Ingelheim Pharmaceuticals, Inc. ("BIPI")[1] and Eli Lilly & Company ("Lilly") filed a motion to dismiss all but counts 4 and 9 (ECF No. 10), arguing that Pennsylvania law broadly bars all non-negligence claims asserted against prescription drug manufacturers. Defendants also argue that the entire complaint should be dismissed for failing to comply with federal pleading standards. Lilly filed a separate motion to dismiss all claims against it (ECF No. 7), arguing that because BIPI is the sole holder of the Jardiane New Drug Application ("NDA") filed with the Food and Drug

Administration ("FDA") Lilly never had authority to change Jardiance's labeling or design. The motions are fully briefed and ripe for disposition. The parties agreed to stay the case pending the court's resolution of these motions. (ECF No. 15).

II. Factual Background

As set forth in the complaint, in July 2014, defendants submitted an NDA to the FDA for Jardiance. Complaint ¶ 20 (ECF No. 1). In August 2014, the FDA approved Jardiance for the treatment of Type II diabetes. *Id.* ¶ 21. Jardiance is the tradename for the drug empagliflozin, which is a member of the gliflozin class of sodium-glucose cotransporter 2 ("SGLT2") inhibitors. *Id.* ¶ 22. SGLT2 inhibitors are designed to inhibit renal glucose reabsorption with the goal of lowering blood glucose. *Id.* ¶ 24. Excess glucose is not metabolized. Instead, it is excreted through the kidneys. *Id.* ¶ 24. Jardiance is indicated for only improved glycemic control in type 2 adult diabetics, but defendants market it for off label purposes, including weight loss, reduced blood pressure and improved glycemic control in type 1 diabetes. *Id.* ¶ 25. Since the release of Jardiance, the FDA has received a significant number of reports of diabetic ketoacidosis. *Id.* ¶ 26. Bell alleges that defendants knew about the significant risk of diabetic ketoacidosis but did not adequately warn consumers or the medical community about the severity of such risks. *Id.* ¶ 30.

On June 13, 2015, Bell began taking Jardiance per his doctor's instructions, primarily to treat diabetes. *Id.* ¶ 32. Bell relied on defendants' claims that Jardiance was safe and effective for the treatment of diabetes. *Id.* ¶ 35. On August 31, 2015, Bell suffered acute renal failure. *Id.* ¶ 37. Bell does not plead any other facts about his medical condition.[2]

The complaint asserts the following causes of action: (1) products liability—design defect (strict liability); (2) products liability—failure to warn (strict liability); (3) willful and wanton misconduct or gross negligence; (4) negligence; (5) breach of express warranty; (6) breach of implied warranty; (7) fraudulent misrepresentation; (8) negligent misrepresentation; (9) negligent design; (10) fraudulent concealment; and (11) fraud.

III. Standard of Review

 **\*2** A motion to dismiss tests the legal sufficiency of the complaint. *Kost v. Kozakiewicz,* 1 F.3d 176, 183 (3d Cir. 1993). In deciding a motion to dismiss, the court is not opining on whether the plaintiff will be likely to prevail on

2018 WL 928237

the merits; rather, when considering a motion to dismiss, the court accepts as true all well-pled factual allegations in the complaint and views them in a light most favorable to the plaintiff. *U.S. Express Lines Ltd. v. Higgins,* 281 F.3d 383, 388 (3d Cir. 2002). While a complaint does not need detailed factual allegations to survive a Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)") motion to dismiss, a complaint must provide more than labels and conclusions. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A "formulaic recitation of the elements of a cause of action will not do." *Id.* (citing *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)). "Factual allegations must be enough to raise a right to relief above the speculative level" and "sufficient to state a claim for relief that is plausible on its face." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955).

> The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.... Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.' "

*Id.* (quoting *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955) (internal citations omitted).

Two working principles underlie *Twombly. Id.* First, with respect to mere conclusory statements, a court need not accept as true all of the allegations contained in a complaint. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955.) Second, to survive a motion to dismiss, a claim must state a plausible claim for relief. *Id.* at 679, 129 S.Ct. 1937. "Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* (citing 490 F.3d at 157-58). "But where the well-pleaded facts do not permit the court to infer

more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]—that the pleader is entitled to relief." ' *Id.* (quoting Fed. R. Civ. P. 8(a)(2)). A court considering a motion to dismiss may begin by identifying pleadings that are not entitled to the assumption of truth because they are mere conclusions.

> While legal conclusions can provide the framework of the complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Id.*

## IV. Legal Analysis

### A. Pennsylvania Law Regarding Claims Against Manufacturers of Prescription Drugs

This case is governed by Pennsylvania law. Defendants argue that under Pennsylvania law, product liability claims against pharmaceutical manufacturers can only be brought under a negligence theory.

#### 1. Strict liability claims

In *Hahn v. Richter,* 543 Pa. 558, 673 A.2d 888, 889-90 (Pa. 1996), the Pennsylvania Supreme Court held that "where the adequacy of warnings associated with prescription drugs is at issue, the failure of the manufacturer to exercise reasonable care to warn of dangers, i.e., the manufacturer's negligence, is the **only** recognized basis of liability." *Id. at 890* (emphasis added). The Pennsylvania Supreme Court explained in *Hahn* that the Restatement (Second) of Torts § 402A, comment k "denies application of strict liability to products such as prescription drugs, which, although dangerous in that they are not without medical risks, are not deemed defective and unreasonably dangerous when marketed with proper warnings." *Id.* For example, the

rabies vaccine commonly leads to serious consequences when injected, but because the disease itself leads to death, the marketing and use of the vaccine is fully justified.

Id. at 890 n.2. That kind of product, properly prepared and accompanied by proper directions and warning, is not defective and is not unreasonably dangerous. Id.

**\*3** Bell argues that Hahn is "antiquated" and this court should instead follow the principles set forth in Tincher v. Omega Flex, Inc., 628 Pa. 296, 104 A.3d 328 (Pa. 2014), a case involving stainless steel tubing. Tincher did not address pharmaceutical drugs and did not overrule Hahn. See id. at 382 (recognizing that under Hahn, a manufacturer is immune from strict liability defective design claims premised upon sale of prescription drugs without adequate warnings). In addition, Bell argues that this court should follow Lance v. Wyeth, 624 Pa. 231, 85 A.3d 434 (Pa. 2014), which recognized a negligent design defect claim against a prescription drug manufacturer. Lance described Hahn as having a "truncated analysis" that offered a "poor foundation for extrapolation." Id. at 452 n.21. The court emphasized in Lance, though, "that we are not revisiting Hahn." Id. The court reiterated that "for policy reasons this Court has declined to extend strict liability into the prescription drug arena...." Id. at 264.

With respect to state law claims, this court is bound by the law as set forth by the Pennsylvania Supreme Court. Hahn is still good law and is controlling on cases involving prescription drugs. In Hahn, the supreme court rejected strict liability theories in the prescription drug context. Bell's strict liability claims in counts 1 and 2 of the complaint must be dismissed.

## 2. Breach of warranty claims

In Hahn, the Pennsylvania Supreme Court did not specifically address breach of warranty claims. Its holding that negligence is the "only" recognized basis of liability, id. at 890, similarly precludes a claim against a prescription drug manufacturer based on an alleged breach

of warranty. In Salvio v. Amgen, Inc., 810 F.Supp.2d 745 (W.D. Pa. 2011), the court explained:

> Pennsylvania state and federal courts have interpreted Hahn broadly to bar all non-negligence based claims asserted against a manufacturer of prescription drugs. Leonard v. Taro Pharmaceuticals USA, Inc., No. 10-1241, 2010 WL 4961647, at *5, 2010 U.S. Dist. LEXIS 127892 (W.D. Pa. Dec. 2, 2010) (citing Aaron v. Wyeth, No. 07-927, 2010 WL 653984, at *11, 2010 U.S. Dist. LEXIS 14581, *30–1 (W.D. Pa. Feb. 19, 2010) (dismissing breach of express and implied warranty claims under Hahn); Kline v. Pfizer, Inc., No. 08-3238, 2008 WL 4787577, at *3, 2008 U.S. Dist. LEXIS 101655, *7 (E.D. Pa. Oct. 31, 2008) (dismissing breach of express and implied warranty claims under Hahn); Colacicco v. Apotex, Inc., 432 F.Supp.2d 514, 548 (E.D. Pa. 2006) (dismissing breach of implied warranty claim under Hahn)).

Salvio, 810 F. Supp.2d at, 755–56; accord Rowland v. Novartis Pharmaceuticals Corp., 34 F.Supp.3d 556, 568-69 (W.D. Pa. 2014). Bell's claims for breach of express and implied warranties in counts 5 and 6 of the complaint will be dismissed.

## 3. Fraud claims

Counts 7, 10 and 11 of Bell's complaint allege that defendants knowingly represented that Jardiance was safer than alternative medications and failed to make truthful representations regarding the risks of taking Jardiance. The case law is split regarding claims for fraudulent misrepresentation, fraudulent concealment and fraud.

Bell v. Boehringer Ingelheim Pharmaceuticals, Inc., Not Reported in Fed. Supp. (2018)
2018 WL 928237

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 63 of 410
PageID: 12670

Some courts hold that *Hahn* broadly bars all non-negligence based claims asserted against a manufacturer of prescription drugs. In *Leonard v. Taro Pharm. USA, Inc.,* No. 10CV1341, 2010 WL 4961647 (W.D. Pa. Dec. 2, 2010), the court reasoned that a claim of intentional misrepresentation or fraud is "a non-negligence based claim akin to strict liability for failure to warn, and is barred by *Hahn* and its progeny." *Id.* at *5. Other courts have recognized fraud-based claims. In *Tatum v. Takeda Pharm. N. Am., Inc.,* No. CIV.A. 12-1114, 2012 WL 5182895 (E.D. Pa. Oct. 19, 2012), the court pointed out that *Hahn* required a seller of prescription drugs to warn not only of risks of which he reasonably should have knowledge, but also warn of risks of which he did, in fact, have knowledge. *Id.* at *4; *see Hahn,* 673 A.2d at 890 (a seller must warn of risks of which he "**has** or reasonably should have knowledge") (emphasis added). *Accord Cutruzzula v. Bayer Healthcare Pharm. Inc.,* No. CV 14-1474, 2015 WL 8488670, at *5 (W.D. Pa. Nov. 17, 2015), report and recommendation adopted, No. CV 14-1474, 2015 WL 8492767 (W.D. Pa. Dec. 10, 2015) (refusing to dismiss fraud claims if they contain allegations of affirmative misrepresentations that go beyond a mere failure to warn).

 **\*4** The court is persuaded that Pennsylvania law recognizes a cause of action for fraudulent marketing of prescription drugs. *Hahn* does not preclude claims where the plaintiff alleges that the seller had actual knowledge of the risks of prescription drugs and intentionally concealed them. The fraud claims in counts 7, 10 and 11 of Bell's complaint are not barred by *Hahn* as a matter of law. [3]

### 4. Negligent misrepresentation claim

Count 8 of Bell's complaint alleges negligent misrepresentation. Although the court in *Leonard* dismissed a <u>fraudulent</u> misrepresention claim, it held that a claim for <u>negligent</u> misrepresentation is not barred by *Hahn.* 2010 WL 4961647, at *5 (quoting *Colacicco,* 432 F.Supp.2d at 548). This court agrees with that analysis. Because count 8 of Bell's complaint sounds in negligence, it is not barred by *Hahn.*

### 5. Gross negligence claim

In count 3 of the complaint, Bell alleges that defendants acted with willful and wanton conduct or gross negligence and seeks punitive damages. "[T]here is no separate cause of action under Pennsylvania law for gross negligence." *Spence v. ESAB Group, Inc.,* 623 F.3d 212, 215 n. 2 (3d Cir. 2010) (citing *Hunter v. Squirrel Hill Assocs., LP,* 413 F.Supp.2d 517, 520 n. 2 (E.D. Pa. 2005) ("While Pennsylvania courts acknowledge differing standards of care, they do not recognize degrees of negligence as separate causes of action.")). *See also Floyd v. Brown & Williamson Tobacco Corp.,* 159 F.Supp.2d 823, 828 (E.D. Pa. 2001) (dismissing plaintiff's separately pleaded claim for gross negligence); *Salvio,* 810 F.Supp.2d at 756 (same); *Kline v. Pfizer, Inc.,* No. CIV.A.08-3238, 2008 WL 4787577, at *3 (E.D. Pa. Oct. 31, 2008) (same).

The dismissal of a stand-alone gross negligence claim does not preclude Bell from pursuing damages (including punitive damages) if he is able to demonstrate that defendants were grossly negligent. As explained in *Daly v. New Century Trans, Inc.,* No. 1:11-CV-2037, 2012 WL 4060687 (M.D. Pa. Sept. 14, 2012):

> Although not recognized as a separate cause of action, gross negligence has been recognized by Pennsylvania and federal courts interpreting Pennsylvania law as "a form of negligence where the facts support substantially more than ordinary carelessness, inadvertence, laxity, or indifference." Thus, Pennsylvania law acknowledges differing standards of care, but does not recognize degrees of negligence as separate causes of action.

*Id.* at *4 (citations omitted) (recognizing that allegations of gross negligence could support a claim for punitive damages). In count 4, Bell asserts a claim of negligence which is sufficient to encompass gross negligence. In accordance with these standards, Count 3 of Bell's complaint will be dismissed as a separate cause of action because it is subsumed within the negligence claims.

In summary, counts 1, 2, 3, 5 and 6 of Bell's complaint are not recognized by controlling Pennsylvania law. Counts 1, 2, 5 and 6 will be dismissed with prejudice, without leave to amend. *Salvio,* 810 F.Supp.2d at 757 (denying leave

Bell v. Boehringer Ingelheim Pharmaceuticals, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 928237

to amend non-negligence claims as futile). Count 3 is being dismissed but it is not dismissed on the merits; it is dismissed because it is not a separate claim.

### B. Federal Pleading Standards

Defendants contend that even if some of the claims asserted by Bell are theoretically cognizable, the complaint in this case fails to allege sufficient facts to make any claim plausible. Defendants, therefore, seek dismissal of the entire complaint.

**\*5** Bell argues that the claims are sufficiently pled. For example, Bell points to allegations that Jardiance was more dangerous than other risks associated with treatment of diabetes (although factual details are not provided), the benefits of Jardiance were outweighed by the risks, there are other (unspecified) design alternatives that have a better safety profile (although what those designs are, and how the safety profile is better are not pled), and Jardiance was more dangerous that the expectations of ordinary consumers and physicians (again, with no factual details provided).

Factual details are almost entirely lacking. The complaint appears to be copied from another source, because it refers to "her" and "she." *See supra* note 2. There are no factual details about when Bell contracted diabetes, whether he has type I or type II diabetes, whether he has other medical conditions, who his treating physicians were, why he decided to take Jardiance, what alternatives to Jardiance were discussed, whether he read the warnings, how long he took Jardiance or at what dose or why he believes his acute renal failure was caused by Jardiance.

A close examination of the complaint reveals that the vast majority of its averments are bald legal conclusions or a formulaic repackaging of the elements of the claim. Bell did not plead the roles of each defendant. Bell did not plead how each defendant's conduct in the design of Jardiance, how warnings about Jardiance fell below the required standard of care or how each defendant's alleged breaches of duty caused Bell's injury. Bell did not explain how and why the design or warnings were defective. In paragraphs 22-24 of the complaint, Bell describes how SGLT2 inhibitors like Jardiance work. The complaint does not plead any facts, however, about why this design is defective. Bell conclusorily alleged that "several alternative safer products" exist (Complaint ¶ 29) but did not identify those products or explain why they are safer.

In *House v. Bristol-Myers Squibb Co.*, No. 3:15-894, 2017 WL 55876 (W.D. Ky. Jan. 4, 2017), and *Fleming v. Janssen Pharmaceuticals, Inc.*, 186 F.Supp.3d 826, 835 (W.D. Tenn. 2016), the courts dismissed very similar complaints asserting products liability claims against manufacturers of similar drugs for failing to plead sufficient facts. In *Fleming*, the court explained:

> The only assertion as to how the product design was defective is a description of how the class of products works. (See Compl. ¶ 24 ("SGLT2 inhibitors ... are designed to inhibit renal glucose reabsorption with the goal of lowering blood glucose. As a result, excess glucose is not metabolized, but instead is excreted through the kidneys of a population of consumers already at risk for kidney disease.").) The Court cannot reasonably infer from the generic description of SGLT2 inhibitors' mechanism of action that Invokana was defective or unreasonably dangerous. The facts are also insufficient as to the alleged defect as the cause of Plaintiff's injuries. Plaintiff asserts, for example, that "[a]s a direct and proximate result of Defendants' negligence, wrongful conduct, and the unreasonably dangerous and defective characteristics of INVOKANA, Plaintiff suffered severe and permanent physical and emotional injuries." (Compl. ¶ 48.) Under Rule 12(b)(6), such "unadorned, the-defendant-unlawfully-harmed-me accusation[s]" are insufficient to state a claim.

186 F.Supp.3d at 835-36. The court dismissed the failure to warn claim because the plaintiff failed to allege facts showing that the drug was unreasonably dangerous. *Id.* at 836.

**\*6** In *House*, the court similarly concluded that it could not infer defectiveness from a generic description of how SGLT2 inhibitors work. *House*, 2017 WL 55876 at \*4. The court characterized the following allegations as formulaic legal conclusions that were insufficient to meet the *Twombly-Iqbal* standard: (a) the drugs "contained unreasonably dangerous design defects and were not reasonably safe as intended to be used"; (b) the drugs "were defective in design and formulation, making use of the drugs more dangerous than an ordinary consumer would expect and more dangerous than other risks associated with the treatment of diabetes"; (c) defendants "could have designed their respective [drugs] to make them less dangerous"; and (d) there "was a practical, technically feasible safer alternative design that would have

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 65 of 410
PageID: 12672

Bell v. Boehringer Ingelheim Pharmaceuticals, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 928237

prevented the harm Plaintiff suffered without substantially impairing" the function of the drugs. *Id.* at *3-4. The court dismissed the failure to warn claim as similarly based on only conclusory statements. *Id.* at *4.

The allegations in Bell's complaint are substantially identical to those held to be insufficient in *Fleming* and *House.* *See Salvio,* 810 F. Supp.2d at 754 (describing complaint as "little more than a list of legal conclusions regarding Defendants' failure to test, market, warn, design, and manufacture"). There are simply no actual facts pled about how each defendant was negligent in Jardiance's design or warnings or how each defendant's alleged breaches of the standard of care caused Bell's injuries. Bell's complaint will likewise be dismissed.

Fraud claims are subject to the more rigorous standards of Federal Rule of Civil Procedure 9(b) and must be pled with particularity. *See House,* 2017 WL 55876 at *8 (dismissing fraud-based claims described at a high level of generality). The fraud-based claims in counts 7, 10 and 11 of Bell's complaint fall far short of the Rule 9 standard and must be dismissed.

In sum, the complaint fails to plead sufficient facts to make any claim "plausible," as required by the Federal Rules of Civil Procedure. The complaint, therefore, will be dismissed in its entirety.

### C. Federal Preemption

Lilly filed a separate motion to dismiss, arguing that because BIPI is the sole holder of the NDA, Lilly had no ability to change Jardiance's label or design. Lilly reasons that because federal law required it to follow the NDA, Bell's contrary state law claims are preempted.

Lilly cites *Warren v. Boehringer Ingelheim Pharmaceuticals, Inc.,* No. 16-1326, 2017 WL 3970666 (S.D. Ind. Sept. 8, 2017) (involving Jardiance), and *Germain v. Teva Pharmaceuticals, USA, Inc.,* 756 F.3d 917 (6th Cir. 2014), which concluded that a manufacturer who does not hold the NDA has no ability to change the warning label or the design of the drug. In *Warren,* the court held that Lilly could not comply with any duty imposed by state law to change the design or labeling of Jardiance, and therefore, state law claims against Lilly were preempted. *Warren,* 2017 WL 3970666 at

*16. *Accord Yates v. Ortho-McNeil-Janssen Pharm., Inc.,* 808 F.3d 281, 298 (6th Cir. 2015) (a "post-approval design defect claim is clearly preempted by federal law").

Bell, in response, explains that his "claims focus on the initial design of Jardiance **prior to** FDA approval." ECF No. 17 at 5 (emphasis added); *see* ECF No. 17 at 6 ("Plaintiff's claims are premised on Eli Lilly's duty to initially design a reasonably safe product."). Bell apparently recognizes that he cannot pursue post-FDA approval claims against Lilly.

The case law regarding preemption of pre-approval design claims is not fully developed. Impossibility preemption is a demanding defense on which defendants bear the burden of proof. *Wyeth v. Levine,* 555 U.S. 555, 573, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009). The United States Court of Appeals for the Third Circuit has not addressed preemption in the prescription drug context. *But see Sikkelee v. Precision Airmotive Corp.,* 822 F.3d 680, 702-03 (3d Cir. 2016) (holding at the summary judgment stage that federal law did not preempt a products liability claim in the aviation industry and discussing preemption principles in the "analogous preapproval scheme for pharmaceutical labeling"). In *Warren,* the court refused to dismiss a claim against BIPI based on the original design of Jardiance before FDA approval. *Warren,* 2017 WL 3970666 at *10, 15. *Accord Estate of Cassel v. Alza Corp.,* No. 12-771, 2014 WL 856023 (W.D. Wis. Mar. 5, 2014) (holding that a pre-FDA approval design defect claim survived summary judgment because defendants failed to meet their burden to establish the preemption defense as a matter of law). In *Yates,* the court held that a pre-FDA approval design claim was preempted, but did so at the summary judgment stage, not on a motion to dismiss. *808 F.3d at 289,* 299-300 (holding that the plaintiff's argument regarding a pre-approval duty to design a safer drug was "too attenuated"). The court recognized in *Yates,* however, that "[a]s a general matter, plaintiffs injured by brand-name prescription drugs retain state-law tort remedies against the manufacturer of those drugs, provided it is not impossible for the drug manufacturer to comply with both state and federal law." *Id.* at 294.

*7 As explained above, the complaint contains no factual details about Lilly's actions or how the design of Jardiance was allegedly defective prior to FDA approval. Without knowing what Lilly's actions were, the court cannot evaluate

Bell v. Boehringer Ingelheim Pharmaceuticals, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 928237

whether those actions create a conflict between Pennsylvania law and federal law. Given the lack of factual allegations in Bell's complaint and the unsettled state of preemption law, the court reserves ruling on the preemption issue at this time. Lilly's motion will be denied without prejudice.

### V. Leave to Amend

Bell affirmatively requested leave to amend the complaint in the event that the motions to dismiss were granted. Pursuant to Rule 15, leave to amend should be freely granted. When a complaint is subject to dismissal under Rule 12(b)(6), district courts should generally permit an opportunity to amend unless an amendment would be inequitable, or otherwise unjust by way of futility, bad faith, or undue delay. *Arthur v. Maersk, Inc.,* 434 F.3d 196, 204 (3d Cir. 2006). There has been no undue delay.

As explained above, it is clear that Bell will be unable to correct the shortcomings identified in this opinion as to counts 1, 2, 5 and 6 because those claims are not recognized by controlling Pennsylvania law and as to count 3 because it is subsumed into the negligence claims. Leave to amend those claims is denied because amendment would be futile. Amendment of the negligence and fraud-based claims asserted by Bell in counts 4, 7, 8, 9, 10 and 11 is not necessarily futile. Those claims are being dismissed for failure to comply with the required pleading standards.

Bell may file an amended complaint on or before March 8, 2018. The court cautions that if Bell chooses to file an amended complaint, it will be important for him to assure that the complaint contains all factual allegations needed to render the claims "plausible," against each defendant, because the court is unlikely to permit a further "bite at the apple." Bell must ensure that any fraud-based claims comply with the particularity standard in Rule 9. It will also be important for Bell to plead how the design or warnings were faulty. *See Salvio,* 810 F.Supp.2d at 750-51 (taking judicial notice of the package warning label); ECF No. 11 at 9 n.5 (purporting to quote from Jardiance's warning label regarding impaired renal function).

### VI. Conclusion

In accordance with the foregoing, Defendants' joint motion to dismiss (ECF No. 10) will be GRANTED, and Lilly's separate motion to dismiss (ECF No. 7) will be DENIED WITHOUT PREJUDICE. Counts 1, 2, 3, 5 and 6 are dismissed without leave to amend. Counts 4, 7, 8, 9, 10 and 11 are dismissed with leave to amend. An appropriate order will be entered.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 928237

---

**Footnotes**

1    Two other Boehringer entities named as defendants have not yet been served.
2    The complaint appears to be copied from another case with a female plaintiff, as there are multiple references to "her" and "she." *See, e.g.,* Complaint Introduction and ¶ 46.
3    As will be discussed below, fraud claims are subject to rigorous pleading standards.

---

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 5

2012 WL 1964452
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Edna Diane BOWMAN and
Amy McHenry, Plaintiffs,
v.
RAM MEDICAL, INC., Amerimed Corp.,
Henry Schein, Inc., Marathon Medical
Corp., Medline Industries, MMS–A Medical
Supply Co., and Q–Med Corp., Defendants.

Civil Action No. 10–cv–4403 (DMC)(MF).
|
May 31, 2012.

**Attorneys and Law Firms**

Philip A. Tortoreti, Victoria Hwang-Murphy, Daniel R. Lapinski, Wilentz, Goldman & Spitzer, Woodbridge, NJ, for Plaintiffs.

Kenneth N. Laptook, Wolff & Samson, PA, West Orange, NJ, Karen E. Clarke, Proskauer Rose, LLP, Newark, NJ, Scott L. Haworth, Nora Coleman, Haworth Coleman & Gerstman, LLC, New York, NY, Stuart Mark Feinblatt, Sills Cummis Epstein & Gross, P.C., Newark, NJ, John C. Whipple, Arseneault, Whipple, Fassett & Azzarello, LLP, Chatham, NJ, Thomas McKay, III, John Philip Johnson, Cozen & O'Conner, Esqs., Cherry Hill, NJ, for Defendants.

**OPINION**

DENNIS M. CAVANAUGH, District Judge.

**\*1** This matter comes before the Court upon the motion by Defendants RAM Medical, Inc., Henry Schein, Inc., Marathon Medical Corp., Medline Industries, MMS–A Medical Supply Co. and Q–Med Corp. (collectively, "Defendants") (ECF No. 34) to dismiss Plaintiff's complaint (ECF No. 1), filed on January 31, 2011. An amended motion to dismiss was filed by Defendants on September 30, 2011 (ECF No. 51). Defendant C.R. Bard, Inc. filed a motion to dismiss on April 23, 2012 (ECF No. 55). Pursuant to FED.R.CIV.P. 78, which states that the court has the authority to provide for submitting and determining the motions on briefs without oral hearings, no oral argument was heard.

*I. BACKGROUND*

**A. Factual Background**

Defendants are in the business of marketing, distributing, selling, manufacturing or causing to be manufactured the surgical mesh at issue in this litigation. (Pl.'s Compl. ¶ 35, Aug. 26, 2010, ECF No. 1). Defendants, at all relevant times, allegedly sold surgical mesh as sterile, Food and Drug Administration ("FDA") approved, indicated for surgical use and Bard-manufactured. *Id.* at ¶ 36. Plaintiffs bring this action on behalf of themselves and putatively on behalf all other similarly situated persons "in the United States who had Defendants' counterfeit surgical mesh surgically implanted from September 1, 2007 until the present." (Pl.'s Compl. ¶ 26). The Complaint includes specific information about two Plaintiffs, Edna Diane Bowman and Amy McHenry. On December 1, 2009, Plaintiff Edna Diane Bowman underwent a surgical procedure at Lexington Medical Center in West Columbia, South Carolina ("LMC"), during which Defendants' counterfeit mesh was implanted in her body. *Id.* at ¶ 40. On February 23, 2010, Plaintiff Amy McHenry underwent a laparoscopic hernia repair procedure at LMC, during which Defendants' counterfeit mesh was implanted in her abdomen. *Id.* at ¶ 37. On July 19, 2010, Plaintiff Bowman received a letter from LMC informing her that the surgical mesh implanted during her surgery was "counterfeit surgical mesh." *Id.* at ¶ 51. On July 15, 2010, Plaintiff McHenry received a letter from LMC informing her of the same. *Id.* at ¶ 49.

Essentially, Plaintiffs claim that a counterfeit product was used during surgery without their consent or knowledge. However, Plaintiffs cite no physical injury or harm resulting. Plaintiffs state their claims in five counts including: (1) violation of the New Jersey Consumer Fraud Act ("NJCFA"), (2) unjust enrichment and common law restitution, (3) breach of express warranty, (4) breach of implied warranty of merchantability and (5) breach of implied warranty of fitness for a particular purpose. Plaintiffs contend the nature of the action involves false, misleading, inaccurate, deceptive and unconscionable commercial practices. (Pl.'s Compl. ¶ 1).

Plaintiffs explain that their belief was that the surgical mesh implanted was: (1) Bard-manufactured, (2) sterile, (3) approved for use by the FDA, and (4) indicated for surgical use. (Pl.'s Compl. ¶ 47). Plaintiffs claim that in the condition in which Defendants sold their counterfeit mesh, the mesh had zero value. *Id.* at ¶ 48. Further, Plaintiffs state that had they

**Bowman v. RAM Medical, Inc., Not Reported in F.Supp.2d (2012)**

2012 WL 1964452

known that Defendants' surgical mesh was not as represented, they would not have purchased, or agreed to purchase of the surgical mesh for use during the surgical procedures. *Id.* at ¶ 54. The only ascertainable loss Plaintiffs allege is the purchase price of a product they believed to be something else. *Id.* at ¶ 55. Plaintiffs vaguely state they "will incur [future] costs to repair the damages caused by Defendants' unlawful activity," but omit to further explain such "repairs." *Id.*

**\*2** Plaintiffs seek relief that includes: class certification; declarations that Defendants' unlawful actions violate the NJCFA, breach express and implied warranties of merchantability and implied warranties of fitness, and unjustly enrich Defendants; orders directing disgorgement of profits derived from unlawful practices, compelling Defendants to reimburse Plaintiffs in an amount equal to their ascertainable loss, and treble damages pursuant to N.J.S.A. 56:8–1 *et seq.;* restitution; and, attorney's fees. (Pl.'s Compl. ¶ 93).

### B. Procedural Background

This matter comes before the Court upon the motion by Defendants RAM Medical, Inc., Henry Schein, Inc., Marathon Medical Corp., Medline Indus., MMS–A Medical Supply Co. and Q–Med Corp. (collectively, "Defendants") (ECF No. 34) to dismiss Plaintiff's complaint (ECF No. 1), filed on January 31, 2011. An amended motion to dismiss was filed by Defendants on September 30, 2011 (ECF No. 51). This Court *sua sponte* consolidated the *Calo Action* (Docket No. 11–cv–7381) with this matter on April 17, 2012.

Defendant C.R. Bard, Inc. filed a motion to dismiss on April 23, 2012 (ECF No. 55). [1] Plaintiff Irene Kirk Calo then filed a motion to voluntarily dismiss her action, without prejudice, on May 21, 2012 (ECF No. 58), which this Court **granted** (ECF No. 58) pursuant to FED. R. CIV. P. 41(a)(2).

[1]   Thereafter, Plaintiff Calo and C.R. Bard, Inc. stipulated to dismissal of Plaintiff's claims against C.R.Bard, Inc. with prejudice on May 29, 2012. Since Calo's motion for voluntary dismissal was granted on this day, this point is moot.

### II. STANDARD OF REVIEW

In deciding a motion to dismiss, the District Court is "required to accept as true all factual allegations in the complaint and draw all inferences in the facts alleged in the light most favorable to [the Plaintiff]." *Phillips v. Cnty. of Allegheny,* 515 F.3d 224. 228 (3d Cir.2008V The Plaintiff's "obligation to provide the 'grounds' of his 'entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "[A court is] not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). Instead, when their truth is assumed, those factual allegations "must be enough to raise a right to relief above a speculative level." *Twombly,* 550 U.S. at 555. Plaintiff's obligation "requires more than labels and conclusions." *Id.* at 545. To survive a motion to dismiss, the complaint must state a plausible claim, not merely conclusory statements deriving from assumptions or inferences. *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1950, 173 L.Ed.2d 868 (2009).

In reviewing a motion to dismiss, it is well-established that a court should "consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim." *M & M Stone Co. v. Pa.,* 388 Fed.Appx. 156, 162 (3d Cir.2010).

### III. DISCUSSION

### A. STANDING

As an initial matter, this Court must discuss whether jurisdiction is founded in this case, given the requirements of Article III. Defendants say Plaintiffs lack standing because they state no injury in fact. (Def.'s Am. Mot. Dismiss 1, Sept. 30, 2011, ECF No. 51). Under Article III, federal judicial power is restricted to cases and controversies. *Sprint Commc'ns Co. v. APCC Servs., Inc.,* 554 U.S. 269, 273, 128 S.Ct. 2531, 171 L.Ed.2d 424 (2008). The case-or-controversy requirement means that Plaintiff must establish standing. *Id.* Without standing, the federal court lacks subject matter jurisdiction and must dismiss the action. *Common Cause of Pa. v. Pa.,* 558 F.3d 249, 257 (3d Cir.2009). Article III standing requires adequate establishment of: 1) an injury in fact, 2) causation, and 3) redressability. *Sprint Commc'ns,* 554 U.S. at 273. An injury in fact involves a concrete and particularized and actual or imminent, as opposed to conjectural or hypothetical, invasion of a legally protected interest. *Id.* (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–1, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The causation element of standing requires a connection between the alleged injury in fact and the alleged conduct of the Defendant. Id The redressable element means that it is likely,

and not merely speculative, that the injury in fact would be remedied by the relief sought. *Id.*

**\*3** Defendants, in their motion to dismiss, explain how Plaintiffs fail to adequately establish the injury in fact element of standing:

> In the instant matter, [P]laintiffs summarily allege that they "will incur costs to repair the damages caused by [D]efendants' unlawful activity" [ (Pl.'s Compl. ¶¶ 55 and 64) (emphasis omitted) ] without any indication of when or why such costs might be incurred, and while explicitly excluding any allegations of personal injury, either present or future. [ (Pl.'s Compl. ¶ 10) ] ... Plaintiffs have not alleged present, manifest or even imminent damages, or any adverse consequences whatsoever. The allegations are purely subjective and hypothetical. (Def.'s Am. Mot. Dismiss 7).

Plaintiffs counter that the injury in fact is the cost of buying a product that they would not have bought, had facts that arose later been apparent at the time when they could have made a choice. (Pl.'s Opp'n 10, Mar. 28, 2011, ECF No. 37). In the same vein, Plaintiffs argue that they received something other than what was bargained for. *Id.*

Defendants supply strong argument showing that Plaintiffs fail to adequately establish that the instant scenario demonstrates injury in fact. On the spectrum of proof relevant to injury in fact, Plaintiffs' case presents more of an "abstract" notion of injury, rather than a harm that is "distinct and palpable." *See Whitmore v. Arkansas,* 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) (citing *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343; *and O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)). Indeed, it can be assumed from the complaint that Plaintiffs might not have even discovered that "counterfeit mesh" was implanted without the letter from LMC describing the situation as such. Though Plaintiffs cleverly oscillate between contract and tort theories in an attempt to show that a harm amounts to "injury in fact" as envisioned under the standards for Article III standing, their arguments fall short of concrete proof.

Thus, this Court lacks subject matter jurisdiction over Plaintiffs' claim and must dismiss. Though no further analysis is required due to the lack of subject matter jurisdiction, this Court will engage in a brief analysis of each Count of the Complaint.

## B. Count I: Violation of the New Jersey Consumer Fraud Act ("NJCFA")

Plaintiffs argue that their NJCFA claims are distinct and sustainable based on an economic injury theory, given they paid a premium for a product based on Defendants' misrepresentations. *See Id.* at 9; *see also Medley v. Johnson & Johnson Consumer Cos., Inc.,* No. 10–cv–2291, 2011 WL 159674, at \*2 n. 2 (D.N.J. Jan.18, 2011) (DMC). Plaintiffs will not establish the elements required by the NJCFA based on the fact that their allegations are "founded in the principals of economic inequities, not tort ..." (Pl.'s Opp'n 5). A claim under the NJCFA requires proof of: 1) an unlawful practice as defined under the Act; 2) ascertainable loss of moneys or property; and 3) a causal relationship between Defendant's unlawful conduct and Plaintiff's ascertainable loss. N.J.S.A. 56:8–19 (1998).

**\*4** Plaintiffs state that Defendants' business practice of marketing, advertising and promoting counterfeit surgical mesh is "false, misleading, inaccurate and deceptive." (Pl.'s Compl. ¶ 58). However, Plaintiffs oppose Defendants' motion to dismiss with argument that focuses almost exclusively upon the heightened pleading requirement Defendants' suggest, and not at all upon the supplemental evidence that would buttress Plaintiff's otherwise conclusory claims. The NJCFA requires an unlawful practice such as an affirmative act, a knowing omission or a regulatory violation. *Parker v. Howmedica Osteonics Corp.,* 2008 WL 141628, \*2 (D.N.J. Jan.14, 2008) (citation omitted). Plaintiffs did not specifically allege any conduct that tends to amount to an "unlawful practice" under the NJCFA.

Otherwise fatal to Plaintiffs' claim is the failure of proof problem with the contention that they never received the benefit of the bargain or "paid for a product that was of no value." (Pl.'s Compl. ¶ 63). Such allegations do not satisfy the NJCFA's "ascertainable loss" requirement, without more. Though the "counterfeit surgical mesh" has a price tag, the "no value" concept of it, considering Plaintiffs do not assert any physical injury or otherwise, is abstract. Plaintiffs do not provide specific proofs of harm to support, or upon which this Court could infer a quantifiable loss. *Thiedemann v. Mercedes–Benz USA, LLC,* 183 N.J. 234, 252, 872 A.2d 783 (2005); *see also, Parker v. Howmedica Osteonics Corp.,* 2008 WL 141628, at \*3 (D.N.J. Jan.14, 2008). Stating the expectation of a future loss, similarly fails to meet the requirement of the CFA, because it is too speculative. *Id.* This insurmountable problem is the same as that which precluded

Plaintiff from establishing injury in fact or standing purposes. Plaintiffs fail to state a claim under the NJCFA.

### C. Count II: Unjust Enrichment and Common Law Restitution

Plaintiffs may not sidestep Article III standing requirements by basing their claim in contract theory. Plaintiffs allege that they would not have purchased the product if it was not sterile, Bard-manufactured, FDA approved or indicated for surgical use. As such, Plaintiffs contend Defendants were unjustly enriched by their purchase and that they are therefore entitled to restitution. The parties point to a matter previously before this Court, *Koronthaly v. L'Oreal USA, Inc.,* No. 07–cv–5588, 2008 WL 2938045 (D.N.J. July 29, 2008), *aff'd,* 374 Fed.Appx. 257 (3d Cir.2010) (Plaintiff asserted lipstick products contained lead in far greater amounts than permitted in candy by the FDA). The Third Circuit reviewed a similar issue of whether a consumer could recover on the basis that she did not know what she was getting or would not have purchased the product had she known certain details about it. *Koronthaly,* 374 Fed.Appx. at 258. In a short opinion, the Court held that the purchases were not made pursuant to a contract and therefore Plaintiff had failed to prove that that which would have precluded her from buying the product had formed part of the basis of any bargain. *Id.* at 259. Plaintiff's claim failed because she did not demonstrate a concrete injury in fact, and it could not otherwise be sustained by artful pleading dependent upon contract theory. *Id.* Despite Plaintiffs' contentions that this case is distinguishable from *Koronthaly,* the fact that Plaintiffs did not actually receive the product they intended to purchase and paid for, does not affect Plaintiffs' failing contract claims. Rather, the Third Circuit guides that the focus is upon the harm, or in this case, the lack thereof, rather than the buyer's expectation.

### D. Count III: Breach of Express Warranty

**\*5** Plaintiffs fail to demonstrate specifically that they relied upon labeling or other expressions of promise that could have formed the "basis of the bargain." Plaintiffs frame their breach of express warranty claim almost identically to their breach of implied warranty claims. In other words, Plaintiffs submit no specific proof of promises that were expressed, whether they amounted to, as Plaintiffs suggest, assertions that the product was (1) Bard-manufactured, (2) sterile, (3) FDA

approved, (4) indicated for surgical use or otherwise. Rather, Plaintiffs frame their claims upon assumptions of promise and information that the surgical mesh used was counterfeit. Establishing an express warranty requires more substantial proof. Indeed, the Third Circuit held that breach of an express warranty sounds in breach of contract and, as such, Plaintiffs' claim foils for reasons similar to those described in the prior section. *Pritchard v. Liggett & Myers Tobacco Co.,* 350 F.2d 479, 484 (3d Cir.1965). This Court will not assume, even considering LMC's concession that the mesh was counterfeit, that these four expressions were specifically made and relied upon. Such a lack of specificity does not comport with the nature of the theories supporting consumer reliance upon an express warranty.

### E. Counts IV and V: Breach of Implied Warranty of Merchantability and Fitness for a Particular Purpose

Defendants convince this Court that, standing alone, the counterfeit nature of the surgical mesh "does not demonstrate that [Plaintiffs] or others could not use the product safely." (Pl.'s Opp'n 27). Plaintiffs do not supply any supporting facts, other than the counterfeit designation of the mesh, rendering the product valueless or unfit. Finally, Plaintiffs fail to assert any injury, and in fact disclaim any physical harm, resulting from the product. Plaintiffs again rely on the abstract concept of the mesh's "zero value" without proving specifically how the product failed. Plaintiffs further tail to show that the product is generally or otherwise unfit for the ordinary purpose which it was used. Rather, Plaintiffs declare that the surgical mesh continues to work for the purpose for which it was designed, to this day, despite any misrepresentations or omissions regarding the brand or otherwise. Plaintiffs can sustain neither a claim of breach of implied warranty of merchantability nor fitness for a particular purpose.

### IV. CONCLUSION

For the foregoing reasons, this Court hereby **grants** Defendants' motion to dismiss Plaintiff's complaint. An appropriate order, filed on this day, follows this opinion.

### All Citations

Not Reported in F.Supp.2d, 2012 WL 1964452

---

                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 6

KeyCite Red Flag - Severe Negative Treatment

On Reconsideration Boyd v. Johnson & Johnson Consumer Companies, Inc., D.N.J., August 2, 2010

2010 WL 2265317
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Jaimee BOYD and Jessica Pollock, individually and
on behalf of all others similarly situated, Plaintiffs,
v.
JOHNSON & JOHNSON CONSUMER
COMPANIES, INC., Defendant.

Civil Action No. 09–CV–3135 (DMC–MF).
|
May 31, 2010.

West KeySummary

1    Sales 🔑 Nature of Good or Product

Consumer of baby wash and shampoo lacked
standing and therefore failed to state a breach of
implied warranty claim against the manufacturer.
Consumer argued that she suffered economic
injury in purchasing the allegedly contaminated
product, sufficient to confer standing. However,
the products consumer purchased did not contain
chemicals explicitly banned by the Food and
Drug Administration (FDA) for use in cosmetics.

Fed.Rules Civ.Proc.Rule 12(b)(1), 28 U.S.C.A.

1 Cases that cite this headnote

**Attorneys and Law Firms**

Scott M. Lempert, Sandals & Associates, P.C., Philadelphia, PA, for Plaintiffs.

Daniel B. Carroll, Drinker, Biddle & Reath, LLP, Florham Park, NJ, for Defendant.

**OPINION**

DENNIS M. CAVANAUGH, District Judge.

**\*1** This matter comes before the Court upon motion
by Johnson & Johnson Consumer Companies, Inc.
("Defendant") to dismiss the Amended Class Action
Complaint ("Complaint") of Jaimee Boyd and Jessica
Pollock, individually and on behalf of all others similarly
situated, ("Plaintiffs") for failure to state a claim pursuant
to Fed.R.Civ.P. 12(b)(6) and for lack of subject matter
jurisdiction pursuant to Fed. R. Civ. 12(b)(1). Pursuant
to Fed.R.Civ.P. 78, no oral argument was heard. After
considering the submissions of all parties, it is the decision of
this Court for the reasons herein expressed that Defendant's
motion to dismiss is **granted in part** and **denied in part.**

**I BACKGROUND**

The Amended Complaint is brought individually and on
behalf of all class purchasers ("Class Members") of J & J's
Baby Shampoo and/or Aveeno Baby Wash and Shampoo
("products"). (Plaintiffs' Complaint ("Pl.Compl."), ¶ 1).
Plaintiffs allege that "although Defendant represented that
the products it made, marketed, distributed, promoted and
sold were safe for children, its Children's Personal Care
Products were actually contaminated with toxic chemicals
linked to increased cancer risk, adverse skin reactions, and
other serious health problems." (Pl.Compl., ¶ 2). Plaintiffs
further allege that despite representations made by Defendant
that their products are safe and gentle, these products contain
contaminants that are not disclosed on the label and that could
otherwise have been removed, or at least reduced, pursuant to
a process called vacuum stripping. (Pl.Compl., ¶¶ 2, 5).

Plaintiffs assert that independent lab tests, conducted
in accordance with regulations promulgated by the
Environmental Protection Agency ("EPA"), reveal that J &
J's Baby Shampoo contains methylene chloride in levels as
high as 1.1 ppm, 1,4 dioxane levels as high as 38 ppm, and
formaldehyde levels as high as 210 ppm. (Pl.Compl., ¶¶ 3,
44). "After testing, [J & J's] Aveeno Baby Wash and Shampoo
was found to be contaminated with 1,4–dioxane. Independent
Lab Tests found 1,4–dioxane levels of 13 ppm." (Pl.Compl.,
¶ 54). Plaintiffs also assert that each of the foregoing qualifies
as a cosmetic pursuant to the Food Drug and Cosmetic Act
because each is "intended to be rubbed, poured, sprinkled,
or sprayed on, introduced into, or otherwise applied to the
human body or any part thereof for cleansing, beautifying,
promoting attractiveness, or altering the appearance" and is

not "soap." 21 U.S.C. § 321(i) (2008). (Pl.Compl., ¶¶ 48, 58).

Count I of the Complaint asserts a claim for breach of implied warranty pursuant to the Uniform Commercial Code ("UCC") § 2–314. (Pl.Compl.¶ 83). Count II of the Complaint asserts a claim for breach of implied warranties of merchantability and fitness for a particular use. (Pl.Compl., ¶ 90). Count III of the Complaint asserts a claim for unfair and deceptive trade practices. (Pl. Compl ., ¶ 95). Count IV of the Complaint asserts a claim for unjust enrichment. (Pl.Compl., ¶ 103).

## II. STANDARD OF REVIEW

**\*2** "There is a fundamental difference of review under Rule 12(b) (1), where the existence of disputed facts will not preclude the court from evaluating the merits of the jurisdictional claim, and Rule 12(b)(6) where the court is required to accept as true all the allegations of the complaint and all inferences arising from them." Anjelino v. New York, 200 F.3d 73, 87 (3d Cir.1999). "[T]he threshold to withstand a motion to dismiss under [Rule] 12(b)(1) is thus lower than that required to withstand a Rule 12(b)(6) motion." Kehr Packages Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir.1991)).

A. Fed.R.Civ.P. 12(b)(6)

"The [d]istrict [c]ourt, in deciding a motion under Fed.R.Civ.P. 12(b)(6), [is] required to accept as true all factual allegations in the complaint and draw all inferences in the facts alleged in the light most favorable to the [Plaintiff]." Phillips v. County of Allegheny, 515 F.3d 224, 228 (3d Cir.2008). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, [ ] a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "[A court is] not bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). "Factual allegations must be enough to raise a right to relief above a speculative level, [ ] on the assumption that all factual allegations in the complaint are true (even if doubtful in fact)." Bell, 550 U.S. at 555–56.

B. Fed.R.Civ.P. 12(b)(1)

"On a Rule 12(b)(1) motion, no presumption of truthfulness attaches to the allegations of the plaintiff." CNA v. United States, 535 F.3d 132, 139 (3d Cir.2008). A facial attack "concerns 'an alleged pleading deficiency' whereas a factual attack concerns the actual failure of [a plaintiff's] claims to comport [factually] with the jurisdictional prerequisites." Id. (citing U.S. ex rel. Atkinson v. Pa. Shipbuilding Co.., 473 F.3d 506, 514 (3d Cir.2007)).

## III. DISCUSSION

A. Standing

To bring a suit in a federal court, Plaintiffs must have standing pursuant to Article III of the United States Constitution. To establish standing under Article III, Plaintiffs must show: (1) injury in fact; (2) causation; and (3) redressability. Horvath v. Keystone Health Plan E., Inc., 333 F.3d 450, 455 (3d Cir.2003); Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

**\*3** Id. (citing AT & T Communications of N.J., Inc.v. Verizon N.J., Inc., 270 F.3d 162, 170 (3d Cir.2001)). "The injury must affect the plaintiff in a personal and individual way." Pitt News v. Fisher, 215 F.3d 354 (3d Cir.2000); Alston v. Countrywide Fin. Corp., 585 F.3d 753, 763 (3d Cir.2009).

"[O]rdinarily, one may not claim standing .... to vindicate the constitutional rights of some third party." *Pitt,* 215 at 362. "We apply this prudential rule against third party standing even when the requirements of Article III have been met, to 'avoid deciding questions of broad social import ... [and] to limit access to the federal courts to those litigants best suited to assert a particular claim.' " *Id.* (citing *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99–100, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979)). "[W]hen the asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction." *Berg v. Obama,* 586 F.3d 234, 239 (2009) (citing *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). Furthermore, "[t]he standing inquiry does not change in the context of a putative class action.... [S]tanding cannot be predicated on an injury which the plaintiff has not suffered, nor can it be acquired through the back door of a class action." *Koronthaly v. L'Oreal,* 2008 U.S. Dist. LEXIS 59024, * 12 (D.N.J. July 25, 2008).

Defendant contends that "Plaintiff[s'] failure to plead any manifest, present, non-speculative injury, and failure to allege that [the products] did not provide cleansing benefits" requires the Court to conclude that Plaintiffs lack standing in the instant matter. In reliance upon this Court's decision in *Koronthaly,* Defendant asserts that Plaintiffs' demand for a refund of the purchase price as a consequence of exposure to Defendant's products fails to establish an injury-in-fact and therefore, is not sufficient to confer standing where the alleged harm is no more than conjectural or hypothetical. As a result, Defendant claims that the absence of a cognizable injury and thereby standing in this matter requires dismissal pursuant to Fed.R.Civ.P. 12(b)(1).

In response, Plaintiffs contend that economic injury is sufficient to confer standing in this matter, relying upon *Clinton v. City of New York,* 524 U.S. 417, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998) and *Danvers Motor Co. v. Ford Motor Co.,* 432 F.3d 286 (3d Cir.2005). Plaintiffs contend that where the product contains undisclosed toxins and an ingredient banned by the FDA, the injury arises at the time of purchase. In distinguishing the *Koronthaly v. L'Oreal* case, citing to this Court's disposition on a motion for reconsideration, Plaintiffs assert that unlike *Koronthaly* where this Court determined that plaintiff "provided no authoritative evidence that the lead levels in defendants' lipstick products

constitute[d] a dangerous amount or [were] in some way prohibited[,]" the present action involves methylene chloride, a substance banned by the FDA for use in cosmetics. 2008 U.S. Dist. LEXIS 86419, *11 (D.N.J. Oct. 24, 2008). Further, Plaintiffs contend that the EPA classifies the other chemicals at issue as probable carcinogens. Lastly, Plaintiffs assert that their claims should stand because Plaintiffs have at least raised an issue of fact with respect to whether the chemicals contained in Defendant's products are dangerous in amount.

**\*4** The *Koronthaly* case involved the purchase of a lipstick containing lead, the content of which was not subject to FDA regulation. *Id.* at \*2–3. However, the lead content of the lipstick appeared dangerous when compared to the lead content regulation imposed by the FDA on candy. *Id.* In the absence of an FDA regulation concerning lead content in lipstick, or other legal prohibition, the plaintiff could not "seek a remedy for a harm that she ha[d] not actually or allegedly suffered." Moreover, this Court accorded great weight to the decision in *Williams v. Purdue Pharma Co.,* 297 F.Supp.2d 171 (D.D.C.2003), concluding that the "plaintiffs' allegation of an economic injury in a products liability action was insufficient to establish injury-in-fact" because "without alleging that a product failed to perform as advertised, a plaintiff has received the benefit of his bargain and has no basis to recover purchase costs." *Id.* at \*13–14. Therefore, the *Williams* Court "remarked that benefit of the bargain injury could not sustain a claim of injury in fact." *Id.*

While the Court agrees that the assertion of an economic injury is not an automatic bar to standing, *Koronthaly* demonstrates that an exception has been recognized in the context of claims concerning defective products, absent a specific legal prohibition precluding particular ingredients or usages. Insofar as Plaintiffs claims pertain to allegedly toxic chemicals that have not been banned by the FDA for use in cosmetics, including 1,4–dioxane and formaldehyde, in accordance with *Koronthaly,* this Court concludes that any potential injury is too remote, hypothetical and/or conjectural to establish standing in this matter. However, insofar as Plaintiffs' claims pertain to methylene chloride, a chemical explicitly banned for use by the FDA in any cosmetic, this Court declines to dismiss Plaintiffs' claims pursuant to Fed.R.Civ.P. 12(b)(1) for lack of standing. As alleged, Plaintiff Boyd only purchased J & J's Baby Shampoo, which contains methylene chloride, (Pl.Compl., ¶¶ 8, 44) and Plaintiff Pollack only purchased Aveeno Baby Wash and Shampoo, which does not contain methylene chloride. (Pl.Compl., ¶¶ 9, 54) At this stage, only Plaintiff Boyd is

2010 WL 2265317

permitted to proceed with respect to her claims concerning J & J's Baby Shampoo. Any claims pertaining to Plaintiff Pollack's use of Aveeno Baby Wash and Shampoo are dismissed in their entirety.

### B. Choice of Law

As a federal district court sitting in diversity, this Court must apply the choice of law rules of New Jersey, the forum state. *See* *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). New Jersey's choice of law rules mandate that the determinative law is that of the state with the greatest interest in governing the particular issue. The first step is to determine whether a conflict exists between the law of interested states, and then any conflict shall be determined on an issue-byissue basis. "Under general conflict of laws principles, where the laws of the two jurisdictions would produce the same result on the particular issue presented, there is a 'false conflict,' and the court should avoid the choice-of-law question." *Williams v. Stone,* 109 F.3d 890, 894 (3d Cir.1997). If there is a conflict, then the court must identify the governmental policies underlying the law of each state and how those policies are affected by each state's contacts to the litigation. If the state's law is not related to its contacts with the litigation, then the state does not have an interest in having its law applied to the underlying issue. *See* *Vezey v. Doremus,* 103 N.J. 244, 510 A.2d 1187, 1189 (N.J.1986). That is, if there is an actual conflict between the two states' laws, the court then determines "which state has the most meaningful connections with and interests in the transaction and the parties." *Spence–Parker v. Del. Riv. & Bay Authority,* 2009 U.S. Dist. LEXIS 75187, *20 (D.N.J. Aug. 21, 2009). Where no actual conflict of law exists, no choice of law need be made. *See* *Zavala v. Wal–Mart Stores, Inc.,* 393 F.Supp.2d 295, 333 (D.N.J.2005). "If there is no actual conflict, the court must apply the law of New Jersey." *LNT Merck Co. v. Dyson, Inc.,* 2009 U.S. Dist. LEXIS 62308, *6 (D.N.J. July 21, 2009) (citing *Lebegern v. Forman,* 471 F.3d 424, 428 (3d Cir.2006)). In that instance, a motion to dismiss under Fed.R.Civ.P. 12(b) (6) should be decided under New Jersey law. *See Gallerstein v. Berkshire Life Ins. Co. of America,* 2006 U.S. Dist. LEXIS 64487, *3 (D.N.J. Sept. 11, 2006).

**\*5** The parties' moving papers recognize that the outcome is the same regardless of whether New Jersey State Law, Colorado State Law, or Pennsylvania State Law is applied to this diversity action. Therefore, the parties assert that no conflict of laws issue is present in the instant matter.

### 1. New Jersey State Law Breach of Warranty, Consumer Fraud and Unjust Enrichment Claims

Defendant asserts that dismissal is required with respect to all Plaintiffs' claims because the claims are based on alleged harm caused by a product and, as a consequence, are subsumed by the New Jersey Product Liability Act ("PLA"). Plaintiffs argue that the PLA does not subsume Plaintiffs' UCC or consumer protection claims because Plaintiffs neither assert themselves as "claimants" nor allege present or future physical injuries as a consequence of Defendant's products. Plaintiffs further allege that the heart of the present matter is the economic harm caused by Defendant's misrepresentations, omissions and breaches of warranty. Additionally, Plaintiffs contend that the instant matter does not present a risk of double recovery, and that the claims asserted do not constitute a failure to warn cause of action pursuant to the PLA.

The New Jersey Supreme Court decision in *Sinclair v. Merck & Co .* is instructive. In *Sinclair v. Merck & Co.,* the Plaintiffs "alleged that as a result of their direct and prolonged consumption of Vioxx, they are at enhanced risk of serious undiagnosed and unrecognized myocardial infarction, commonly referred to as 'silent heart attack,' and other latent and unrecognized injuries." 195 N.J. 51, 55, 948 A.2d 587 (2008). In that case, the plaintiffs asserted claims for negligence, violation of the Product Liability Act, violation of the Consumer Fraud Act, breach of express and implied warranties and unjust enrichment. *Id.* In dismissing the complaint in its entirety, New Jersey Supreme Court determined the following,

[p]laintiffs seek to avoid the requirements of the PLA by asserting their claims as CFA claims. However, the Legislature expressly provided in the PLA that claims for "harm caused by a product" are governed by the PLA "irrespective of the theory underlying the claim." N.J.S.A. 2A:58C–1b(3). We explained in *Lead Paint,* supra, that "[t]he language chosen by the Legislature in enacting the PLA is both expansive and inclusive, encompassing virtually all possible causes of action in relating to harms caused by consumer and other products." 191 N.J. at 436–37, 924 A.2d 484. As a result, we declared that "[i]n light of the clear intention of our Legislature to include all [product liability] claims within the scope of the PLA,

we find no ground on which to conclude that the claims being raised by plaintiffs, regarding an ordinary household product used by consumers, were excluded from the scope of" the PLA. We reach the same conclusion here.

The language of the PLA represents a clear legislative intent that, despite the broad reach we give to the CFA, the PLA is paramount when the underlying claim is one for harm caused by a product. The heart of plaintiffs' case is the potential for harm caused by Merck's drug. It is obviously a product liability claim. Plaintiffs' CFA claim does not fall within an exception to the PLA, but rather clearly falls within its scope. Consequently, plaintiffs may not maintain a CFA claim.

**\*6** *Id.* [1] [2]

Similarly, at the heart of this matter is the potential for harm caused by the defective products, J & J Baby Shampoo and/or Aveeno Baby Shampoo and Wash, containing allegedly "toxic chemicals linked to increased cancer risk, adverse skin reactions, and other serious health problems." (Compl., ¶ 2). Further, Plaintiffs allege that the products were rendered useless "because they were contaminated with dangerous and potentially cancer-causing chemicals and continued use of the products would require Plaintiffs and Class Members to knowingly continue and even increase the exposure of their vulnerable infants and children to the harmful contaminants." (Compl., ¶ 2).

Consistent with the *Sinclair* decision, this Court concludes that the PLA subsumes all of Plaintiffs' claims, effectively precluding Plaintiffs' claims with respect to the CFA, and otherwise, in the absence of "harm" as defined by the PLA. The Court does not agree that articulating a claim in terms of pure economic harm where the core issue is the potential injury arising as a consequence of the products' allegedly harmful chemicals converts the underlying defective product claim into an independent and unrelated consumer fraud issue. Indeed, Plaintiffs' original Complaint contains a cause of action for products liability strategically omitted from the amended Complaint. Limiting a claim to economic injury and the remedy sought to economic loss cannot be used to obviate the PLA.

The assertion of a claim pursuant to the PLA is premised upon a requisite level of harm, including:

(a) physical damage to property, other than to the product itself; (b) personal physical illness, injury or death; (c) pain and suffering, mental anguish or emotional harm; and (d) any loss of consortium or services or other loss deriving from any type of harm described in subparagraphs (a) through (c) of this paragraph.

N.J.S.A. 2A:58C–1b(2). Harm, for purposes of the PLA, does not include pure economic loss. Insofar as Plaintiffs concede that their injury is purely economic, Plaintiffs' claims cannot survive. Therefore, with respect to New Jersey law, in accordance with *Sinclair*, Plaintiffs' Complaint is dismissed in its entirety.

### 2. Colorado State Law Breach of Warranty, Consumer Fraud and Unjust Enrichment

Despite the parties' respective beliefs that there is no conflict of law issue present in the instant matter, it is not clear to the Court that product liability laws of Colorado subsume related claims in the same manner as the New Jersey PLA [3]. Therefore, upon dismissal of all New Jersey State Law claims and for purposes of inclusion, the Court will proceed by addressing the viability of Plaintiffs' claims under Colorado State Law. If Plaintiff Boyd has asserted viable claims pursuant to Colorado State Law, then a conflict of law exists and the Court will undertake to ascertain which state has the superior interest in the litigation.

### i. Consumer Fraud

**\*7** Defendant contends that Plaintiffs have no viable claims pursuant to Colorado State Laws because Plaintiffs fail to allege any non-speculative, ascertainable loss and fail to plead their claims with particularity in accordance with Fed.R.Civ.P. 9(b). Plaintiff Boyd claims that "ascertainable loss is not a distinct element under [the Colorado Consumer Protection Act ("CCPA") ], and [pursuant to Colorado State Law], the Court may look to its analysis of other states' laws." (Pl. Br. at 33). Plaintiff also alleges that she suffered "ascertainable loss to the extent [she] paid for a product and got something less than what was promised." (Pl. Br. at 28).

"[A] CCPA claim arises when a party knowingly makes a misrepresentation or makes a false representation that has the capacity to deceive." *Rhino Listings USA, Inc. v. Rocky Mountain Rhino Listings, Inc.,* 62 P.2d 142, 148 (Colo.2003). The CCPA "deters and punishes businesses which commit deceptive practices in their dealings with the public by providing prompt, economical, and readily available remedies against consumer fraud." *Id.* at 146. To prove a private cause of action under COLO. STAT. ANN.. § 6–1–113, a plaintiff must show: (1) that the defendant engaged in an unfair or deceptive trade practice; (2) that the challenged practice occurred in the course of defendant's business, vocation, or occupation; (3) that it significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property; (4) that the plaintiff suffered injury in fact to a legally protected interest; and (5) that the challenged practice caused the plaintiff's injury." *Hall v. Walter,* 969 P.2d 224, 234 (Colo.1998). "The CCPA is silent as to specific injuries for which it intends to provide a remedy." *Id.* at 236 See also *Crowne v. Tull,* 126 P.3d 196, 209 (Colo.2006). "[The CCPA's] focus lies with defining prohibited actions that are likely to injure the public and specifying civil penalties and private remedies available for these violations." *Hall,* 969 P.2d at 224. "[I]n determining whether conduct falls within the purview of the CCPA, it should ordinarily be assumed that the CCPA applies to the conduct ... because of the strong and sweeping remedial purposes of the CCPA." *Showpiece Homes Corp. v. Assurance Co. of Am.,* 38 P.3d 47, 51 (Colo.2001). Given the CCPA's policy of providing a private action where a defendant's conduct has a significant impact on the public, Plaintiff Boyd's claims pertaining to J & J Baby Shampoo may proceed under Colorado State Law.

Although foreclosed by application of the PLA in the instant case, the CFA was enacted to "protect the consumer against imposition and loss as a result of fraud and fraudulent practices by persons engaged in the sale of goods and services." *Smith v. Alza,* 400 N.J.Super. 529, 552, 948 A.2d 686 (2008). "The CCPA was enacted to regulate commercial activities and practices which, because of their nature, may prove injurious, offensive, or dangerous to the public." *Rhino Listings,* 62 P.2d at 146 (citing *People ex rel. Dunbar v. Gym of America, Inc.,* 177 Colo. 97, 493 P.2d 660, 667 (Colo.1972)). Beyond the underlying governmental purpose of the CCPA, Plaintiff Boyd in this action resides

in Colorado and presumably, the purchase of the allegedly defective product occurred in Colorado. J & J is a New Jersey corporation engaged in business throughout the United States, including Colorado. Therefore, Colorado State contacts in the instant matter seem to outweigh New Jersey State contacts. Colorado State Law prevails with respect to this issue.

### ii. Breach of Implied Warranty

**\*8** Defendant asserts that Plaintiffs' breach of implied warranty claims should be dismissed because Plaintiffs' Complaint fails to allege that the products were not merchantable or failed to perform the function for which they were sold, and because the complaint fails to allege any purpose that is separate and apart from the ordinary purpose. (Def. Br. at 33–34). Plaintiffs' Complaint asserts a claim for breach of implied warranties because the goods were allegedly not fit for their ordinary purpose or particular use on children and further, because the products fail to conform to the promises and representations made on the labels. Specifically, Plaintiffs allege that the products are not merchantable because they are contaminated with methylene chloride. (Pl. Br. at 35–36).

"Colorado case law recognizes that [warranties of merchantability and fitness for a particular purpose] may coexist when there is sufficient evidence to support the creation of each warranty." *Palmer v. A.H. Robins Co., Inc.,* 684 P.2d 187, 209 (Colo.1984). "Under Colorado [State] [L]aw, a warranty of fitness for a particular purpose does not arise when a product is purchased for the ordinary purpose for which the device or product is to be used." *Hauck v. Michelin North Am., Inc.,* 343 F.Supp.2d 976 (D.Colo.2004) (citing *Weir v. Federal Insurance Co.,* 811 F.2d 1387, 1393 (10th Cir.1987)). "To establish a prima facie case for breach of implied warranty for fitness for a particular purpose, the plaintiff must show that: (1) the defendant sold and impliedly warranted the product to be fit for a particular purpose; (2) the plaintiff was reasonably expected to use the product; (3) the product was not suitable for the purpose warranted; and (4) the breach was a cause of the plaintiff's injuries." *Simon v. Coppola,* 876 P.2d 10 (Colo.Ct.App.1993). "[W]arranties of merchantability, if all other statutory prerequisites have been met, arise in every contract for sale, unless properly excluded." *Graham Hydraulic Power, Inc. v. Stewart & Stevenson Power, Inc.,* 797 P.2d 835, 838 (Colo.Ct.App.1990).

In order for goods to be merchantable, they must be at least as such as:

(a) pass without objection in trade under the contract description; and

(b) in the case of fungible goods, are of fair average quality within the description; and

(c) are fit for the ordinary purposes for which such goods are used; and

(d) run, within the variations permitted by the agreement, of even kind, quality, and quantity within each unit and among all units involved; and

(e) are adequately contained, packaged, and labeled as the agreement may require; and

(f) conform to the promises or affirmations of fact made on the container or label if any.

COLO. STAT. ANN.. § 4–2–314. Assuming, without concluding, that the descriptive messages on the alleged defective products constitute promises or affirmations, then, in accordance with the foregoing limitations, Plaintiff's claims for breach of implied warranties pursuant to Colorado State Law are permitted to proceed.

**\*9** Although foreclosed by application of the PLA in the instant matter, the underlying purpose of the UCC as recognized by the New Jersey Supreme Court, is "to simplify, clarify and modernize the law governing commercial transactions; to permit the continued expansion of commercial practices through custom, usage and agreement of the parties; and to make uniform the law among various jurisdictions." *N.J. S.A. 12A:1–102(1); Alloway v. General Marine Indus., L.P.,* 149 N.J. 620, 630, 695 A.2d 264 (1997). Codified under title 4 of Colorado State Law, Colorado State Law adheres to the same underlying purposes as New Jersey. *See Proactive Tech., Inc. v. Denver Place Assoc. Ltd. P'ship,* 141 P.3d 959, 961 (Colo.Ct.App.2006). Similar to the foregoing analysis, Colorado's contacts with the representative Plaintiff and the transactions that are the source of Plaintiff Boyd's claims favor the application of Colorado law over New Jersey with respect to this issue.

### iii. Unjust Enrichment

Defendant asserts that unjust enrichment is not a proper remedy available in this case because Plaintiffs fail to assert that the products failed to perform. By contrast, Plaintiffs assert that they purchased the products conferring a monetary benefit upon the Defendant for useless products that they would not otherwise have purchase, but for the representations that the products were safe, gentle and/or mild. To sustain a claim for unjust enrichment under Colorado law, a plaintiff "must prove that: (1) the defendant received a benefit (2) at the plaintiff's expense (3) under circumstances that would make it unjust for the defendant to retain the benefit without commensurate compensation." *Lewis v. Lewis,* 189 P.3d 1134, 1141 (Colo.2008). "Actions seeking monetary damages are considered legal while actions seeking to invoke the coercive power of the court, such as those seeking injunctions or specific performance, are deemed equitable." *American Family Mut. Ins. Co. v. DeWitt,* 218 P.3d 318, 324 (Colo.2009) (citing *Paterson v. McMahon,* 99 P.3d 594, 597–98 (Colo.2004)); *see also Salzman v. Bachrach,* 996 P.2d 1263, 1265 (explaining restitution is an equitable remedy). Generally, equitable remedies are not available, however, when there is a "plain, speedy, [and] adequate remedy at law." *Szaloczi v. John R. Behrmann Revocable Trust,* 90 P.3d 835, 842 (Colo.2004). "When plaintiffs have an adequate remedy at law for damages, [equitable remedies] will not lie." *Mahoney Marketing Corp. v. Sentry Builders of Colorado, Inc.,* 697 P.2d 1139, 1140 (Colo.Ct.App.1985). Plaintiff explicitly and exclusively alleges economic injury. Therefore, there is no indication that a remedy at law would be inadequate. To the extent that Plaintiff Boyd asserts a claim for unjust enrichment pursuant to Colorado State Law, Plaintiff's Complaint is dismissed.

### IV. *CONCLUSION*

For the foregoing reasons, Defendant's motion is **granted in part** and **denied in part.** Plaintiff's Complaint is **partially dismissed without prejudice** pursuant to Fed.R.Civ.P. 12(b)(1) and Fed.R.Civ.P. 12(b)(6). An appropriate Order accompanies this Opinion.

### All Citations

Not Reported in F.Supp.2d, 2010 WL 2265317

## Footnotes

1    Although this Court permitted the CFA claims to proceed in *Nafar v. Hollywood Tanning Sys., Inc.,* in that case, the Plaintiff's claims and basis for distinction of the CFA from the PLA was the purchase of services, rather than the purchase of a defective product. 2007 U.S. Dist. LEXIS 26312, *12–14 (D.N.J. Apr. 5, 2007). CFA claims rooted in services are clearly distinguishable from claims grounded in products. The present action does not involve a claim for defective services.

2    Further, *In re Ford Motor Co. E–350 Van Products,* 2008 U.S. Dist. LEXIS 73690, *48 n. 9 (D.N.J. Sept. 3, 2008), where the Court found the Sinclair case "inapposite" "because, by design, the PLA 'except[s] actions for harm caused by breach of an express warranty[,]' which plaintiffs expressly allege [d.]" On the basis of an express warranty, the Court concluded that *Sinclair* decision "does not mandate dismissal of unjust enrichment and state consumer fraud claims where a party does not plead a PLA claim." *Id.*(internal citations omitted). Plaintiffs do not assert a claim for breach of an express warranty in the present action.

3    The Court will not address the viability of Plaintiffs' claims pursuant to Pennsylvania law since Plaintiff Pollack's portion of the Complaint was dismissed for lack of standing.

---

**End of Document**                                     © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 7

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by Duncan Place Owners Association v. Danze, Inc., N.D.Ill., June 30, 2016

2005 WL 782698
United States District Court,
N.D. Illinois, Eastern Division.

CANADIAN PACIFIC RAILWAY COMPANY, a
Canadian Corporation, Plaintiff, Counter-Defendant,
NATIONAL STEEL CAR, LIMITED,
a Canadian Corporation, Involuntary
Plaintiff, Counter-Defendant,

v.

WILLIAMS-HAYWARD PROTECTIVE
COATINGS, INC., an Illinois Corporation,
Defendant, Counter-Plaintiff.

No. 02 C 8800.
|
April 6, 2005.

**Attorneys and Law Firms**

Susan M. Humiston, Alison Crawford Archer, Leonard, Street and Deinard, Minneapolis, MN, David K. Schmitt, Margaret Anne Gisch, Elizabeth A. Eberspacher, Field & Golan LLP, Chicago, IL, for Plaintiff.

Eric H. Jostock, Henry J. Jostock, P.C., David Alan Belofsky, Douglas Merrill Belofsky, Lance Russell Minor, Belofsky & Belofsky, P.C., Chicago, IL, for Defendant.

*MEMORANDUM OPINION AND ORDER*

ST. EVE, J.

**\*1** In its Second Amended Complaint, Plaintiff, Counter-Defendant Canadian Pacific Railway Company ("CPR") alleges breach of express and implied warranties, unjust enrichment, and promissory estoppel arising out of the use of Defendant, Counter-Plaintiff Williams-Hayward Protective Coatings, Inc.'s ("Williams-Hayward") High-Rubber Thermalbond paint on its boxcars. In its Second Amended Counterclaim, Involuntary Plaintiff, Counter-Defendant National Steel Car, Ltd. ("NSC") alleges breach of express and implied warranties, unjust enrichment, promissory estoppel, tortious interference with contract, and fraudulent misrepresentation and concealment against

Williams-Hayward. Williams-Hayward filed Counterclaims against both NSC and CPR, including a breach of contract claim in Count I against NSC. Before the Court is Williams-Hayward's Motions for Summary Judgment as to all of CPR's claims in its Second Amended Complaint and all of NSC's claims in its Second Amended Counterclaim. Williams-Hayward also moves for summary judgment against NSC on Count I of Williams-Hayward's Counterclaim. For the following reasons, the Court grants in part and denies in part Williams-Hayward's motions.

BACKGROUND

I. Northern District of Illinois Local Rules

Northern District of Illinois Local Rule 56.1 governs the admission of facts in this background section. Local Rule 56.1(a)(3) requires the moving party to provide "a statement of material facts as to which the moving party contends there is no genuine issue." Local Rule 56.1(b)(3) requires the non-moving party to admit or deny every factual statement proffered by the moving party and to concisely designate any material facts that establish a genuine dispute for trial. If a responding party does not admit or deny each fact presented by the movant, the movant's statement may be deemed as admitted. *See Brasic v. Heinemann's Inc.,* 121 F.3d 281, 284 (7 th Cir.1997). If the responding party denies the movant's facts, he must also provide citations to evidentiary material supporting the denial. *Smith v. Lamz,* 321 F.3d 680, 683 (7 th Cir.2003). With these standards in mind, the Court turns to the relevant facts in this case.

II. Relevant Facts

    A. Parties and Individuals Involved
CPR is a Canadian corporation that operates a Class I railroad through the United States and Canada, and is headquartered in Calgary, Alberta. (R. 282-1, Plaintiffs' Joint Statement of Facts, ¶ 1; R. 250-1, Defendant's Statement of Facts, ¶ 3.) NSC is a rail car manufacturer located in Hamilton, Ontario. (Pls' Stmt. ¶ 2; Def.'s Stmt. ¶ 2.) Williams-Hayward is an Illinois corporation that manufactures paint. (Pls' Stmt. ¶ 4; Def.'s Stmt. ¶ 1.)

Wayne Kurcz is Williams-Hayward's Executive Vice President and is responsible for Williams-Hayward's internal operations. (*Id.* ¶ 5.) Kurcz has a Masters Degree in chemistry and has worked at Williams-Hayward since 1973. (*Id.*)

Canadian Pacific Railway Co. v. Williams-Hayward..., Not Reported in...
2005 WL 782698, 57 UCC Rep.Serv.2d 136

William-Hayward's technical service staff includes Norman Black, who also serves as Williams-Hayward's Director of Canadian Operations. (*Id.* ¶ 6.) Prior to working at Williams-Hayward, Black worked for a company in the business of constructing, repairing, and leasing rail cars and for another company that is a coating supplier and competitor of Williams-Hayward. (*Id.* ¶ 7.)

**\*2** Martin Quintal has served as CPR's sourcing manager since 2002. (Def.'s Stmt. ¶ 17.) Between 1999 and 2002, Quintal was CPR's senior sourcing specialist and from 1997 until 1999, Quintal was the purchasing manager for freight cars. (*Id.*) As purchasing manager, Quintal handled new freight car purchases, replenished freight car parts, and supervised six subordinates. (*Id.* ¶ 19.) As senior sourcing specialist, Quintal continued to handle the purchasing of freight cars and car parts. (*Id.* ¶ 20.) Quintal's duties as sourcing manager are similar to his responsibilities as a senior sourcing specialist, except that he also supervises a sourcing specialist and two buyers. (*Id.* ¶ 21.)

CPR has employed Charles Cheun since 1997 as a car equipment engineer. (*Id.* ¶ 26.) From 1981 until 1997, Cheun held the positions of quality system engineer, senior quality assurance, manager of quality assurance, supervisor of quality assurance, and assistant supervisor of quality assurance. (*Id.*) Cheun has a Bachelors Degree in mechanical engineering and a certificate of general management from the University of Calgary. (*Id.*)

B. Bi-Level Boxcar Build

In 1999, Williams-Hayward and CPR had an initial meeting concerning a bi-level boxcar build at which Cheun, Quintal, and Kurcz discussed Kurcz's desire for CPR to specify Williams-Hayward's High-Rubber Thermalbond paint on a car build for bi-level auto racks that CPR was planning to manufacture. (Pls' Stmt. ¶ 14; Def.'s Stmt. ¶ 44.) At the end of the meeting, there was an understanding that Kurcz would contact Quintal about their discussions. (Pls' Stmt. ¶ 14.) On August 30, 1999, Kurcz sent a letter to Quintal stating:

> Based upon my discussions with you and Mr. Charles N.P. Cheun, we are pleased to make the following proposals. Williams-Hayward Protective Coatings, Inc.'s ultimate goal is to develop a long-term

> contract to freeze pricing for three to four years, however, we understand the problem you may face projecting future new car and repair business. We, therefore, will offer a one year contract renewable at the Canadian Pacific Railway's option. If we are able to stabilize pricing through the time period then rebate values will remain the same. If not, then your office will be notified 90 days prior to your renewal date.

(Def.'s Stmt. ¶ 46; Def.'s Ex 4; Pls' Stmt. ¶ 15.)

Kurcz attached a proposed purchase agreement, including a rebate agreement signed by Kurcz on behalf of Williams-Hayward, to his August 30, 1999, letter. (Def.'s Stmt. ¶ 46; Def.'s Ex. 4.) The proposed rebate agreement contained a warranty provision that provided in pertinent part:

*PRO-RATED WARRANTY*

> All goods sold by WHPC are warranted to be free from defects in material and workmanship pro-rated over the five (5) years on exterior, eight (8) years on the interior from the date of application of paint on the railroad unit provided from the date the paint was shipped from WHPC. The foregoing warranty is in lieu and excludes all other warranties not expressly set forth herein, whether express or implied by operation of law or otherwise, including but not limited to any implied warranties of merchantability or fitness....

> **\*3** THIS WARRANTY IS IN LIEU OF ALL WARRANTIES, OR MERCHANTABILITY, FITNESS FOR PURPOSE, OR OTHER WARRANTIES, EXPRESS OR IMPLIED, EXCEPT OF TITLE AND AGAINST PATENT INFRINGEMENT.

(Def.'s Stmt. ¶ 48; Def.'s Ex. 4.) In a letter dated September 3, 1999, from Kurcz to Quintal, Kurcz provided prices for various Williams-Hayward paints for the rail cars that CPR was contemplating building. (Def.'s Stmt. ¶ 53.) The letter contained no references to any warranties. (*Id.*)

The parties do not dispute that Quintal never signed the proposed purchase agreement. (Pls' Stmt. ¶ 17; Def.'s Ex. 4.) At his deposition, Quintal testified that he could not accept

2005 WL 782698, 57 UCC Rep.Serv.2d 136

Kurcz's proposal on its terms because CPR could not give Williams-Hayward all of its paint business. (Pls' Stmt. ¶ 17; Pls' Ex. 6.) Instead, Quintal sent a letter to Kurcz on October 1, 1999, which stated:

Please refer to your proposals dated August 30th and September 3rd, 1999, which includes [sic] rebates and prices for paint products related to our new freight car program. This letter will confirm CPR's desire to do business with Williams-Hayward Protective Coatings, Inc. (WHPC).

As discussed, we will not be able to guarantee 90% of our business to WHPC. I will however offer you our business in year 2000 relative to new bi-level racks, using rebates offered by WHPC for these cars.

The first confirmed project consists in 243 bi-level racks to be built by Thrall Manufacturing starting in January, 2000 (Job no. 99-0534). We have specified WHPC's Thermalbond paint in our car specifications to Thrall.

My understanding of your offer is that:

(1) a U.S. $1.00/U.S. Gal. rebate will be remitted to CPR at the end of the program.

(2) WHPC will track volume of paint ordered by Thrall for this order and gallonage shipped will be faxed to me for my records. A monthly report of the rebate status will also be faxed to this office.

(3) WHPC will perform unannounced audits at Thrall, at the minimum once, with copies of the audits sent to this office.

(4) pro-rated warranty on this product is 5 years.

Please confirm that my understanding is correct.

As I might have hinted to you, CPR has other projects for 2000 such as coal cars, boxcars and more bi-levels. If this initial project proves to be successful, I am prepared to maximize the business given to WHPC for those projects. I will keep you posted.

(Def.'s Stmt. ¶ 54; Pls' Ex. 25.)

In a letter dated October 4, 1999, Kurcz responded to Quintal's October 1, 1999, letter:

Thank you for you response of October 1st, and you are correct as to our agreement. As we had discussed, Williams-Hayward Protective Coatings, Inc. is very interested in demonstrating the value of our waterborne products on your hopper fleet, also, and would appreciate any assistance the Canadian Pacific Railway can give us to do so at your Canadian manufacturers. Naturally, the rebates will apply as stated in my earlier communique.

**\*4** (Def.'s Stmt. ¶ 57; Def.'s Ex. 7.)

At his deposition, Quintal testified that he had telephone conversations and meetings with Kurcz concerning their projects after the bi-level boxcar build. (Pls' Ex. 6, Quintal Dep. at 100-01.) Kurcz and Quintal also discussed the rebates for the different car builds. (*Id.* at 101.) Although Williams-Hayward gave CPR rebates on several different projects, the parties dispute whether an agreement on a rebate applied to the boxcar project at issue in this litigation. (Pls' Stmt. ¶ 24; Def.'s Stmt. ¶¶ 74-78.) At his deposition, Kurcz testified that he believed that Quintal's October 1, 1999, letter "activated" the warranty provisions in the initial 1999 rebate agreement and that the warranty provisions and disclaimers applied to all of the parties' subsequent projects. (Pls' Stmt. ¶ 24; Pl.'s Ex. 1; Kurcz Dep. at 263-66.)

## C. Paper Boxcar Build

In 2000, CPR formed a project team to acquire a large number of boxcars. (Pls' Stmt. ¶ 35; Def.'s Stmt. ¶ 86.) CPR management requested Cheun to draft the specifications for the contemplated construction of three types of boxcars-paper boxcars, pulp boxcars, and oriented strand board (OSB) boxcars. (Pls' Stmt. ¶ 36; Def.'s Stmt. ¶ 106.) The boxcar team concluded that CPR needed a new boxcar designed for the purpose of carrying paper rolls to expand capacity, reduce damage to the paper rolls, and make it easier to load and unload the lading. (Def.'s Stmt. ¶ 99.) The paper boxcars were to carry rolled paper used to print newspapers. (Pls' Stmt. ¶ 37.)

Canadian Pacific Railway Co. v. Williams-Hayward..., Not Reported in...
2005 WL 782698, 57 UCC Rep.Serv.2d 136

On July 18, 2000, CPR issued a Request for Quotation ("RFQ") for the construction of 1,000 boxcars to several car builders in North America, including NSC. (Pls' Stmt. ¶ 41.) The RFQ stated that CPR's objective was "to provide CPR shippers with a high quality, state-of-the-art boxcar that not only ensures damage free transportation, but also accommodates 286,000 lbs loading." (Def.'s Stmt. ¶ 127.) CPR received bids from several manufacturers and in December 2000, CPR verbally awarded NSC the contract to manufacture the boxcar order. (Pls' Stmt. ¶ 42; Def.'s Stmt. ¶ 146.) On June 21, 2001, NSC and CPR entered into a written purchase agreement for NSC's construction of the OSB and paper boxcars. (Pls' Stmt. ¶ 45, Def.'s Stmt. ¶ 147.)

Prior to awarding NSC the contract, Hugh Nicholson of NSC emailed Quintal and Cheun about CPR's approved listing of suppliers for waterborne paints. (Def.'s Stmt. ¶¶ 148-150; Def.'s Ex. 263.) Cheun responded to Nicholson indicating that they had three approved suppliers-Sigma, Williams-Hayward, and Davis Frost. (Def's Stmt. ¶ 150; Pls' Stmt. ¶ 52.) On July 20, 2000, Nicholson emailed Cheun stating that it was NSC's intention to quote Williams-Hayward Thermalbond Acrylic TER Polymer paint. (Def.'s Stmt. ¶ 151; Def.'s Ex. 398.) On July 21, 2000, Cheun emailed Norman Black, Williams-Hayward's Director of Canadian Operations, asking: "Can you advise if the Thermalbond Acrylic Terpolmer [sic] coating is the appropriate one for our new paper boxcars or if there is a better coating that you would recommend?" (Pls' Stmt. ¶ 54; Def.'s Stmt. ¶ 152.) On July 25, 2000, Black responded by suggesting certain interior and exterior Thermalbond products. (Pls' Stmt. ¶ 55; Def.'s Stmt. ¶ 153.) At his deposition, Black testified that he knew that CPR planned to build boxcars and that some of the boxcars would be used for paper service. (Pls' Stmt. ¶ 57, Pls' Ex. 4, Black Dep. at 661.)

**\*5** In July 2000, Black met with Dennis Ryan, NSC's Managing Director. (Pls' Stmt. ¶ 56.) Ryan testified that Black provided him with information concerning Williams-Hayward's recommendations for the exterior and interior paint for the boxcars and indicated that Williams-Hayward was CPR's supplier of choice. (Pls' Stmt. ¶ 58; Pls' Ex.10, Ryan Dep. at 63-64.) The information Black provided included the recommended part numbers, also known as "specs," and pricing. (*Id.* at 64.) Ryan also testified that in later meetings with Black, they discussed the specifics of the paper boxcar projects, such as the type of loading, the importance of the interior lining, and that the boxcars would be hauling newspaper service. (*Id.* at 69.)

At his deposition, Quintal testified that he discussed the OSB and paper car builds with Kurcz prior to CPR awarding the boxcar project to NSC. (Pls' Stmt. ¶ 46; Pls' Ex. 6, Quintal Dep. at 158-59.) Cheun testified that both Kurcz and Black had told him that other railways had used Williams-Hayward paint in boxcar and paper service. (Pls' Stmt. ¶ 48; Pls' Ex. 5, Cheun Dep. at 283-84.) Before NSC commenced construction of the boxcar order, Kurcz gave NSC a Power Point presentation on Williams-Hayward's waterborne coating systems. (Pls' Stmt. ¶ 64.)

On at least five occasions, NSC performed trial applications of Williams-Hayward's paint at which Black attended. (*Id.* ¶ 77.) Some, but not all of these trial applications involved the use of High-Rubber Thermalbond. (*Id.*) None of these trial applications were performed on boxcars. (*Id.*) At his deposition, Black testified that the main purpose of the trial applications was to go over the "do's and don't's" for using waterborne as opposed to solvent-based paints, educate the painters, and remind them to use the correct techniques. (*Id.* ¶ 78.) Black also attended the trial applications to answer questions and oversee the application of the paint. (*Id.*)

### D. NSC's Purchase Order

In May 2001, NSC issued a purchase order for the paint to be applied to the paper boxcars. (Def.'s Stmt. ¶ 6; Pls' Stmt. ¶ 85.) Conditions in the purchase order contained the following language: "Unless otherwise specified, the Seller expressly warrants that all the material and work covered by this order will conform to the specifications, drawings, samples or other description, if any, furnished or specified by Buyer, and will be merchantable, of good material and workmanship and free from defect." (Pls' Stmt. ¶ 96, Pls' Ex. 56.) The purchase order also stated: "Suppliers are responsible for understanding the nature of the work and the tolerances the parts must meet." (*Id.* ¶ 98, Pls' Ex. 56, at 9.) Also, the purchase order specifically prohibited "any attempt by the Seller to impose any additional terms through invoices." (*Id.* ¶ 94, Pls' Ex. 56, ¶ 1(B)).

NSC mailed Williams-Hayward a signed copy of the purchase order and an "Acknowledgment Copy" for Williams-Hayward to sign. (Pls' Stmt. ¶ 101.) Williams-Hayward signed the "Acknowledgment Copy" of the purchase order under language stating: WE HEREBY ACKNOWLEDGE RECEIPT AND ACCEPTANCE OF YOUR ORDER, SUBJECT TO ALL TERMS AND

CONDITIONS APPEARING ON THE FACE AND BACK, THEREOF. (Pls' Ex. 56, at 1.)

E. Pull-Ahead Car and Subsequent Correspondence

**\*6** On August 1, 2001, NSC delivered to CPR the first paper boxcar, also know as the pull-ahead car. (Pls' Stmt. ¶ 108; Def.'s Stmt. ¶ 173.) The newsprint paper supplier loaded the pull-ahead car and shipped it to the Minneapolis Star Tribune. (Pls' Stmt. ¶ 110, Def.'s Stmt. ¶ 173.) Upon unloading, it was discovered that the protective wrappers that covered the paper rolls were sticking to the wall of the paper boxcar, tearing off the rolls, and thus exposing the paper rolls. (Pls' Stmt. ¶ 111, Def.'s Stmt. ¶¶ 173-74.) After the pull-ahead car run, the supplier of the paper rolls required a second test run before it would accept the fleet of rail cars into its business service. (Pls' Stmt. ¶ 115.)

Following his inspection of the pull-ahead car, Williams-Hayward's Black informed Alistair Wilson, Executive Vice President of NSC, that if NSC controlled its millage parameter-the minimum and maximum thickness requirements-the sticking problem would be eliminated. (Id. ¶¶ 116-17.) During this time period, NSC requested Black's approval to switch from the High-Rubber Thermalbond to another paint for application to the paper boxcar's interiors. (Id. ¶ 119.) Black informed NSC that Williams-Hayward would not warrant the alternate coating. (Id. ¶ 120.) Consequently, NSC asked Black for a letter of assurance that, if the High-Rubber Thermalbond paint was properly applied and dried, the paint would not present the type of sticking problems NSC experienced with the pull-ahead car. (Id.)

On September 5, 2001, Black emailed Kurcz about the situation:

As you are aware CP reported to NSC that they had a problem with one of the cars from the first 375 car order. The car was loaded with finished paper and after unloading the first load from the subject car the customer reported that some of the paper wrapping had stuck to the floor and walls. I think that the floor is an issue with chalking. NSC's records indicate that the walls of the subject car had received considerable repairs after the initial coating application. I get the impression that NSC are [sic] thinking that the problem may be an isolated case and they may have contributed to the problem. As you may also be aware, NSC approached me yesterday to see if we would supply General Service interior white for the next group of CP boxcars (625 cars). They originally specified our high

rubber white (72-6427-CP). I spoke to Mark about this and have since informed NSC that this is not a good idea and WHPC would not warranty this coating in dedicated paper service. I advised them about the recent Valspar/Gunderson cars (that they were aware of). The next group of CP cars are in position to paint/coat tonight or tomorrow. I have adequate stock of 72-6427 at NSC.

TO GET TO THE POINT-NSC requested a letter from WHPC that would assure them that if this product is applied correctly and force cured it will not present the type of problem they experienced with this one car. They would like some type of assurance that we have used this product in paper service for X number of years etc. I offered to provide them this letter but they requested that it come from higher up and longer tenure than I. The reason I have to send this request to you.

**\*7** Can you please provide such a letter/email to Mr. Todd Pafford at NSC, Todd's email address is, _____, as soon as possible.

Give me a call if you have any questions or wish to discuss.

(Id. ¶ 122, Pls' Ex. 57.) On September 5, 2001, Kurcz wrote Todd Pafford via email in response to Black's request. (Id. ¶ 123; Def.'s Stmt. ¶ 178.) Kurcz stated:

I am writing you this communique in response to you [sic] request of our Director of Canadian Operations as to our recommendations for the interior of Boxcars that are exposed to the chemical environment of Paper service. Thermalbond High Rubber coatings were developed in 1984 as replacements for vinyl's and epoxies in severely corrosive services. Since that time these products have been successfully used in both acid and alkali services for tank car hopper cars and interiors of boxcars and potash service. High rubber Thermalbond has become the standard in the Cloro-Alkali business and the Sulfuric Acid business. The chemical resistance has stood the test of time and this is the main reason we recommend this system for such severe services. We believe the situation that has been noted on one unit done by NSC for the CP is isolated and most likely associated with the high mills in the repair areas that might not have been fully dry; this should not at all reflect on the viability of the product for the end use intended. We know of no company offering coatings systems in the corrosive services that can produce the actual fleet data of over 90,000 units in service for over 15 years with such a success rate. Therefore we are confident with our recommendation for the use of High Rubber Thermalbond products at NSC

Canadian Pacific Railway Co. v. Williams-Hayward..., Not Reported in...
2005 WL 782698, 57 UCC Rep.Serv.2d 136

and to our mutual customer Canadian Pacific Railroad. We will not Warranty a general service version of Thermalbond in corrosive service for our Warranties are based on real fleet data and not theoretical data. The histories of current industry failures, not related to our products only add credence to our claims. If applied and dried properly these systems have and will for National Steel Car pose no problems in the service they are being used for. We are confident that NSC has for the over whelming [sic] majority of the units fulfilled their requirements on the application side. Once we see the unit in question we may better determine what the causes are, in my 30 years of developing water based products for the rail and chemical industry there have been times where neither the applicator nor the coating are the cause. When push comes to shove we rely on our rich in service fleet data and NSC can be confident that using these products will in the long run reduce concerns rather than create them.

Thank your [sic] for using our unique High Rubber Thermalbond and General Service Thermalbond products and if I may be of any further service plead do not hesitate to contact me.

(Def.'s Stmt. ¶ 178, Pls' Stmt. ¶ 124, Pls' Ex. 58.)

On September 19-20, 2001, Wilson and Kurcz exchanges a series of emails regarding the sticking problem in the pull-ahead car. (Pls' Stmt. ¶¶ 128-29.) Initially, Wilson emailed Kurcz about the "jack test" NSC used to simulate roll pressure against the wall of a paper boxcar and that the "jack test" had failed because paper fibers were stuck to the wall of the boxcar. (Id. ¶ 128.) Wilson stated to Kurcz: "Because of our limited experience with this material we need concurrence that this is the way the material is supposed to react." (Id. ¶ 129, Pls' Ex. 33.) Wilson further stated: "Based upon our observation of this test we have elected to discontinue applying the interior coating until advised otherwise which will have an impact on our production effectiveness. It is most important that we receive your confirmation or further instructions as quickly as absolutely possible." (Id.) Wilson also explained to Kurcz: "Again because of our limited experience with this material we need full "buy-off" from Williams Hayward that our application is being applied in accordance with your technical requirements and is fit for the service intended." (Id. ¶ 130, Pls' Ex. 33.)

**\*8** During Kurcz and Wilson's email exchange, Kurcz responded to Wilson's concerns stating the following:

There is absolutely nothing wrong with our product and your test cars will prove it.

Williams Hayward Protective Coatings will take no exceptions and warranty our product as to your process.

Williams Hayward Protective Coatings feels no need for you to perform any tests. We are satisfied NSC may proceed with your currant [sic] applications as long as you are following the recommended cure parameters we have given you. Norm [Black] will work very close with your people to ensure these procedures are followed and any concerns you may have are addressed.

If you listen to us then you will be successful and if we mislead you it is our responsibility and liability.

(Id. ¶ 133, Pls' Ex. 33.)

### F. The Second Trial Car

On October 12, 2001, NSC released another trial boxcar-paper car 220164. (Pls' Stmt. ¶ 145.) In November 2001, the newsprint paper supplier loaded paper car 220164 and then shipped the paper rolls to the Minneapolis Star Tribune, where the paper rolls were unloaded. (Id. ¶ 146.) Again, there was a problem with paint sticking to the paper rolls and the interior walls of the boxcar, and thus the Star Tribune would not sign-off on the paper cars' usage at that time. (Id. ¶¶ 146-47, Pls' Ex. 62.) Cheun of CPR then emailed Kurcz requesting that Kurcz send someone to investigate paper car 220164 in Minneapolis. (Id. ¶ 148, Pls' Ex. 66.) On November 4, 2001, Kurcz forwarded Cheun's email to Black and Ed Kurcz of Williams-Hayward and stating: "Check this out get photos and mill thickness readings. Immediately. Ed I need you to go personally also this could be big trouble if it is not a mill thickness issue up stay in contact with Norm. I have my mobile with me." (Id.)

### G. Changes to the Paint Application Process

Meanwhile, in late September 2001, Black recommended that NSC change its paint application process and NSC subsequently implemented the recommended process. (Id. ¶¶ 139-142.) On November 14, 2001, Williams Hayward gave NSC a 10-page document entitled "Facility Coatings Application & Cure Recommendations for Canadian Pacific Railroad Box Cars for Hot Paper Service at National Steel Car, Hamilton, Ontario" that Kurcz had signed. (Id. ¶ 152.) This document contained detailed recommendations

concerning the procedures for applying the paint and NSC complied with these new procedures. (*Id.* ¶ 157.) The November 14, 2001, recommendation stated: "It is of critical importance that Williams Hayward Protective Coatings representatives are permitted to audit the Process established to certify and write off on the cars for shipment. Our method of write off on each car will be to certify in writing the process at the beginning of each shift taking all necessary measurements and verifying against the standards established." (*Id.* ¶ 154.)

**\*9** From November 14, 2001, to December 19, 2001, Black of Williams-Hayward monitored the dry film thickness readings. (*Id.* ¶ 158.) Williams-Hayward also reformulated the High-Rubber Thermalbond by replacing a solvent to make it dry faster, and sent the reformulated paint to NSC in mid-November 2001. (*Id.* ¶¶ 162-63.)

H. Events of November 2001

Around November 16, 2001, paper boxcars were loaded with newsprint paper rolls and then shipped to Lancaster, Pennsylvania. (*Id.* ¶ 164.) After unloading the paper cars, it was discovered that the paper rolls stuck to the interior paint. (*Id.*)

On or about November 21, 2001, CPR informed NSC that it would not accept any paper boxcars with Williams-Hayward interiors unless they were lined with cardboard. (*Id.* ¶ 165.) On November 21, 2001, NSC wrote Williams-Hayward and informed it that because NSC was in full compliance with Williams-Hayward's requirements, the cost of lining the paper boxcars with cardboard would be held strictly to Williams-Hayward's account. (*Id.* ¶ 166.) Williams-Hayward replied that it would not accept any charges and therefore had no choice but to request NSC to terminate use of the High-Rubber Thermalbond until they clarified the issue. (*Id.* ¶ 167.)

I. Events of December 2001

On December 18, 2001, Kurcz sent an email to Pafford at NSC that stated in relevant part:

I received your voice mail and have put together some information that may help you understand why one would choose or we would recommend Thermalbond as the coating system for the insides of the boxcars. I guess after all these years, I have taken for granted, that everyone in the rail industry knows of Williams Hayward Protective Coatings [sic] position with water-based paints. While for

many years in the U.S. we have been the major source of supply of these products at all major railroads and car builders; that has most certainly not been the case with National Steel Car. Not to take up too much of your time I put together a little history of our High rubber Thermalbond as it relates to box car interiors. As to our relationship with the Canadian Pacific Railroad it goes back many years, for we have been the major supplier for Thrall Car Manufacturing since the mid 1970s. For any freight cars, (auto-racks, coal cars, gondolas, hoppers etc.), built for the Canadian Pacific Railroad or for that matter any other Rail Road by Thrall since 1994, Thermalbond would be the coating system applied.

So the total number of boxcars we can prove had our Thermalbond Interior product in, over the years is 12,000. Whether you wish to believe it or not there has not been "ONE" paper sticking complaint over the years and we are still supplying to this day, the Union Pacific Rail Road, the Canadian National/IC Rail Road and the Canadian Pacific shops.

Any and all things I have stated can be substantiated, for Williams Hayward Protective Coatings is the oldest supplier of water based products in the rail industry and we are confident we are also the best. The system given to The [sic] CP and applied by you is a time tested excellent product with a long pedigree. The product will do the job it was intended to do and give the customer the extra chemical resistance they need in pulp services.

**\*10** (Def's Stmt. ¶ 200, Pls' Stmt. ¶ 172, Pls' Ex. 64.)

According to NSC's Wilson, in December 2001, CPR informed NSC that it would no longer accept or pay for any paper cars whose interiors were coated with High-Rubber Thermalbond. (Pls' Stmt. ¶ 173.) On December 20, 2001, NSC stopped processing the paper cars. (*Id.* ¶ 174.) On December 21, 2001, NSC, CPR, and Williams-Hayward participated in a conference call. (*Id.* ¶ 175.) The parties dispute that during the conference call, Kurcz stated that some of the boxcars from the other railroad companies that had used High-Rubber Thermalbond for transporting paper had experienced paper sticking problems, but that it was an accepted industry problem. (*Id.*; Wright's Dep. at 249-255, Kurcz's Dep. at 729-735.) Further, the parties dispute that Kurcz stated that had he known that paper sticking was not acceptable to CPR, he never would have recommended

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 89 of 410
PageID: 12696
Canadian Pacific Railway Co. v. Williams-Hayward ..., Not Reported in...

2005 WL 782698, 57 UCC Rep.Serv.2d 136

the High Rubber Thermalbond paint for the interior of the boxcars. (*Id.*)

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The Court considers the evidence in a light most favorable to the non-moving party and draws all reasonable inferences in its favor. *See Anderson,* 477 U.S. at 255.

## ANALYSIS

I. Summary Judgment Motion Against CPR

In support of its motion for summary judgment against CPR, Williams-Hayward makes the following arguments: (1) the rebate agreement between Williams-Hayward and CPR disclaims all warranties; (2) CPR cannot assert claims for breach of implied warranty because it is not in contractual privity with Williams-Hayward; (3) CPR cannot assert its claim for breach of express warranty because it is not in contractual privity with Williams-Hayward; (4) CPR cannot establish a claim for unjust enrichment; (5) CPR cannot establish a claim for promissory estoppel; (6) the statute of frauds bars CPR's claims; and (7) CPR cannot establish that Williams-Hayward proximately caused its damages. The Court addresses each argument in turn.

A. Rebate Agreement

Central to Williams-Hayward's arguments on summary judgment is whether CPR and Williams-Hayward had a written "rebate agreement" containing disclaimers of warranties that would bar CPR's warranty claims and quasi-contract claims of unjust enrichment and promissory estoppel.

Williams-Hayward contends that the "rebate agreement" is memorialized in Kurcz's August 30, 1999, letter and attached purchase agreement. Williams-Hayward asserts that this rebate agreement governs all of the parties' projects.

**\*11** In Kurcz's August 1999 letter, he proposed an arrangement where CPR would agree to purchase large volumes of paint from Williams-Hayward in exchange for long-term fixed pricing. Kurcz suggested a fixed one-year pricing structure renewable at CPR's option with a rebate component. Kurcz attached a proposed purchase agreement to the letter that included a rebate agreement signed by Kurcz on behalf of Williams-Hayward. The proposed rebate agreement included language that the warranty described within was "in lieu of all warranties, or merchantability, fitness for purpose, or other warranties, express or implied."

The parties do not dispute that Quintal never signed the purchase agreement attached to the August 30, 1999 letter. CPR contends that Quintal rejected the offer and then made a counter-offer in his October 1, 1999, letter to Kurcz. The October 1, 1999, letter concerned 243 bi-level auto racks that Thrall Manufacturing would build and for which CPR would specify Williams-Hayward's Thermalbond paint. It further provided that CPR may award Williams-Hayward with additional projects if the initial project proved successful. The October 1, 1999, letter did not contain any disclaimers of warranties or limitations of remedies. Kurcz responded to Quintal in a letter dated October 4, 1999, stating that Quintal was correct as to the agreement.

Based on this correspondence, CPR argues that it did not agree to the disclaimers of warranty in the rebate agreements in the first instance. CPR also contends that the October 1, 1999, letter only pertains to the 243 bi-level racks to be built by Thrall Manufacturing, and not to any of the parties' subsequent projects.

In contrast, Kurcz testified that the 1999 purchase agreement covered all sales relative to CPR and applied to the paper boxcars at issue in this litigation. Williams-Hayward also contends that because CPR's filings in this matter are pleaded under Illinois law and the purchase agreement expressly provided that the contract was governed by Illinois law, CPR has adopted the purchase agreement, including the rebate agreement containing the disclaimers of warranties.

Viewing the evidence and reasonable inferences in a light most favorable to CPR, CPR has established that a genuine

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 90 of 410
PageID: 12697
Canadian Pacific Railway Co. v. Williams-Hayward..., Not Reported in...
2005 WL 782698, 57 UCC Rep.Serv.2d 136

issue of material fact exists as to whether CPR and Williams-Hayward had a written agreement containing disclaimers of warranties that would bar CPR's warranty claims concerning the paper boxcars. In other words, CPR has presented evidence upon which a reasonable jury could find that the parties did not have a written agreement containing disclaimers of warranties. The parties' correspondence after Kurcz's August 1999 letter, plus Quintal's deposition testimony concerning future projects, calls into question whether Quintal accepted Kurcz's offer in the first instance and also whether the disclaimers of warranties applied to the parties' subsequent projects, including the paper boxcars at issue in this litigation. Under Illinois law, when there is a factual dispute, whether a contract exists is one for the factfinder. *Reese v. Forsythe Mergers Group, Inc.,* 288 Ill.App.3d 972, 979, 224 Ill.Dec. 647, 682 N.E.2d 208 (Ill.App.Ct.1997); *see also Glass v. Kemper Corp.,* 133 F.3d 999, 1001 (7th Cir.1998) ("when the existence of a contract depends on inference from a series of documents, the inference is to be drawn by the trier of fact"). Accordingly, whether the rebate agreement exists is a question for the jury. [1]

### B. Implied Warranty Claims

**\*12** In Counts II and III of its Second Amended Complaint, CPR alleges that Williams-Hayward breached the implied warranties of merchantability and fitness. Williams-Hayward contends that because CPR does not have contractual privity concerning the Thermalbond paint purchased by NSC, CPR cannot bring these claims. CPR, on the other hand, contends that it falls within the narrow class of plaintiffs that may assert implied warranty claims absent contractual privity.

### 1. Privity Requirement & Exceptions

As opposed to an express warranty in which the warrantor has made the requisite affirmation as part of a contract, an "implied warranty is derived from the interplay of a transaction's factual circumstances with the foreseeable expectations of a buyer or other person who is protected by law in those expectations." *Collins Co. v. Carboline Co.,* 125 Ill.2d 498, 508-09, 127 Ill.Dec. 5, 532 N.E.2d 834 (Ill.1988) (implied warranty arises despite seller's actual wishes). In general, Illinois law requires a plaintiff suing for breach of implied or express warranties to establish contractual privity. *See Reed v. City of Chicago,* 263 F.Supp.2d 1123, 1125 (N.D.Ill.2003). Section 2-318 of

the Illinois Uniform Commercial Code, however, contains exceptions to the general privity requirement. *Id.* Section 2-318 reads in pertinent part: "A seller's warranty whether express or implied extends to any natural person who is in the family or household of his buyer or who is a guest in his home if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of the warranty." Although this section lists mandatory exceptions to the privity requirement, this list is not exhaustive. *Reed,* 263 F.Supp.2d at 1125; *see also Whitaker v. Lian Feng Mach. Co.,* 156 Ill.App.3d 316, 321, 108 Ill.Dec. 895, 509 N.E.2d 591 (1987) (UCC warranty extends to buyer's employee). The Illinois Supreme Court, however, has not completely abolished the privity requirement in economic loss actions for breach of implied warranties. *Szajna v. General Motors Corp.,* 115 Ill.2d 294, 311, 104 Ill.Dec. 898, 503 N.E.2d 760 (Ill.1986); *see also Collins,* 125 Ill.2d at 516, 127 Ill.Dec. 5, 532 N.E.2d 834 (Section 2-318 and its comments leave "a door at least slightly ajar for future extension of some warranties in appropriate circumstances to nonprivity plaintiffs.").

CPR contends that because Williams-Hayward knew its identity, the purpose and requirements of the Thermalbond paint to be applied to the paper boxcars, and then delivered the paint to meet CPR's needs, CPR can bring its breach of implied warranty claims despite its lack of contractual privity. Indeed, Illinois courts recognize an exception to the privity requirement "when the remote manufacturer knows the identity, purpose and requirements of the dealer's customer and manufactured or delivered the goods specifically to meet those requirements." *Crest Container Corp. v. R.H. Bishop Co.,* 111 Ill.App.3d 1068, 1076, 67 Ill.Dec. 727, 445 N.E.2d 19 (Ill.App.Ct.1982) (quoting *Frank's Maint. & Eng'g v. C.A. Roberts Co.,* 86 Ill.App.3d 980, 992-93, 42 Ill.Dec. 25, 408 N.E.2d 403 (Ill.App.Ct.1980)).

**\*13** Without a clear explanation or citations to legal authority, Williams-Hayward contends that it is doubtful that this exception survived the Illinois Supreme Court's decision in *Szajna.* Courts in this district, however, have concluded that this exception did survive the *Szajna* decision and have applied this exception after the *Szajna* decision was entered. *See, e.g., Outboard Marine Corp. v. Babock Indus.,* Case No. 91 C 7247, 1995 WL 296963, at \*5 (N.D.Ill. May 12, 1995); *Hirn v. Teledyne Cont'l Motors,* Case No. 93 C 7787, 1994

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 91 of 410
PageID: 12698
Canadian Pacific Railway Co. v. Williams-Hayward..., Not Reported in...
2005 WL 782698, 57 UCC Rep.Serv.2d 136

WL 685071, at *3 (N.D.Ill.Dec.7, 1994); Omni-Circuits, Inc. v. DRP, Inc., Case No. 85 C 9081, 1987 WL 7290, at *2 (N.D.Ill. Feb.23, 1987).

In Omni-Circuits, Judge Hart noted that the Szajna court did not address this exception and the Illinois court's reasoning behind requiring privity in economic loss cases allows for this exception to the privity requirement. Id. at *2-3, 104 Ill.Dec. 898, 503 N.E.2d 760. Also, as the Illinois Supreme Court recognized after its Szajna decision, Section 2-318 of the UCC may allow for future extensions of some warranties to nonprivity plaintiffs. See Collins, 125 Ill.2d at 516, 127 Ill.Dec. 5, 532 N.E.2d 834. Finally, after a thorough search of Illinois case law, the Court has not found any Illinois cases that abrogate the Crest Container exception subsequent to the Szajna holding. Accordingly, the Court concludes that the Szajna decision did not abolish the exception articulated in Crest Container. The Court thus turns to whether CPR has established a genuine issue of material fact relating to this exception.

Deposition testimony reveals that Quintal discussed the paper boxcar builds with Kurcz prior to CPR awarding the boxcar project to NSC. Further testimony indicates that Kurcz and Black were aware of CPR's specific paint needs because they told Cheun that other railways had used Williams-Hayward paint in boxcars and paper service. In addition, Cheun emailed Black asking: "Can you advise if the Thermalbond Acrylic Terpolmer [sic] coating is the appropriate one for our *new paper boxcars* or if there is a better coating that you would recommend?" (emphasis added). Black responded by suggesting certain interior and exterior High-Rubber Thermalbond products. Black also testified that he knew of CPR's plans to build boxcars and that it would use some of the boxcars for paper services. Viewing the facts and inferences in a light most favorable to CPR, CPR has established that there are genuine issues of material fact whether Williams-Hayward (1) knew CPR was the ultimate consumer of the paint, (2) was aware of the paint's purpose, and (3) delivered the paint to meet CPR's needs.

2. CPR's Opportunity to Examine the Thermalbond Paint
Williams-Hayward contends that even if CPR and Williams-Hayward were in privity of contract, CPR would not have claims for breach of implied warranties because CPR had the opportunity to examine Williams-Hayward's paint. See Trans-Aire Int'l, Inc. v. Northern Adhesive Co., 882 F.2d 1254, 1259 (7th Cir.1989) (citing Section 2-316 of the Illinois Uniform Commercial Code). Section 2-316(3)(b) provides in pertinent part, "when the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him." Comment 8 of Section 2-316 explains: " 'Examination' as used in this paragraph is not synonymous with inspection before acceptance or at any other time after the contract has been made. It goes rather to the nature of the responsibility assumed by the seller at the time of the making of the contract."

 *14 CPR admits that it examined the Williams-Hayward paint on various boxcars, but contends that it could not have discovered the latent defects of the paint by mere observation, but instead needed chemical testing.[2] Comment 8 to 2-316 explains: "However, an examination under circumstances which does not permit chemical or other testing of the goods would not exclude defects which could be ascertained only by such testing." In other words, latent defects cannot be excluded from implied warranties by a parties' mere examination of the product. Id.; Dacor Corp. v. Sierra Precision, Case No. 93-2708, 1994 WL 83303, at *4 (7th Cir. Mar.14, 1994).

CPR has raised a genuine issue of material fact that the paint's defects were not obvious upon mere examination. Whether CPR's examination precludes it from bringing the implied warranty claims is a question for the jury.

Williams-Hayward also argues that because CPR is a "professional buyer" that examined a product in their field, CPR "assumed the risk as to all defects which a professional in the field ought to observe." See UCC § 2-316, Comment 8. Williams-Hayward, however, does not fully explain how a corporation that operates a railroad is a professional buyer of paint. Instead, Williams-Hayward contends that CPR purchased "billions of dollars of goods and services each year" and that Cheun had experience selecting paint for boxcars. Without more, Williams-Hayward has not established that CPR is a professional buyer of paint. See R & L Grain Co. v. Chicago Eastern Corp., 531 F.Supp. 201, 208 (N.D.Ill.1981) (under Illinois law "it is the burden of the party seeking to invoke a warranty exclusion to plead and prove its effect").

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 92 of 410
PageID: 12699
Canadian Pacific Railway Co. v. Williams-Hayward ..., Not Reported in...
2005 WL 782698, 57 UCC Rep.Serv.2d 136

Finally, the Court rejects Williams-Hayward's argument that CPR did not rely on Williams-Hayward's conduct and assertions in selecting a suitable paint for the paper boxcars. As discussed throughout this opinion, CPR has established a genuine issue of material fact for trial concerning whether it relied on Williams-Hayward's assertions as to what was required for the coating in the paper boxcar service.

### 3. Merchantability of Paint

Next, Williams-Hayward contends that CPR's paint requirements for the paper boxcars were not "ordinary," and thus CPR's claim does not fall within the warranty of merchantability. To establish a claim for breach of the implied warranty of merchantability, a plaintiff must show (1) a sale of goods, (2) that the seller of the goods is a merchant with respect to those goods, and (3) the goods were not of merchantable quality, that is, the goods were unfit for the ordinary purposes for which they are used. *See Brandt v. Boston Scientific Corp.,* 204 Ill.2d 640, 645, 275 Ill.Dec. 65, 792 N.E.2d 296 (Ill.2003); *Crest Container,* 111 Ill.App.3d at 107, 66 Ill.Dec. 524, 443 N.E.2d 207.

Williams-Hayward has provided evidence that CPR's paper boxcars were intended to be state-of-the-art boxcars that would ensure damage free transportation. Based on this evidence, Williams-Hayward contends that use of its paint was not for the ordinary purposes for which they are used. *See Brandt,* 204 Ill.2d at 645, 275 Ill.Dec. 65, 792 N.E.2d 296. This evidence alone, however, does not unequivocally establish that Williams-Hayward's paint was merchantable. Instead, the question of whether the paint's use in the paper boxcars was "ordinary," is a question of fact for the jury. *See Check v. Clifford Chrysler-Plymouth of Buffalo Grove, Inc.,* 342 Ill.App.3d 150, 159, 276 Ill.Dec. 579, 794 N.E.2d 829 (Ill.App.Ct.2003). The Court, therefore, denies Williams-Hayward's motion for summary judgment as to Count II of CPR's Second Amended Complaint.

### C. Express Warranty Claim

**\*15** CPR also alleges a claim for breach of express warranties under Section 2-313 of the Illinois Uniform Commercial Code. Section 2-313(1)(a) states: "Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." The Illinois Supreme Court has explained that an express "warranty arises only

because the warrantor has willed it into being by making the requisite affirmation as part of a contract to which it is an adjunct." *Collins,* 125 Ill.2d at 509, 127 Ill.Dec. 5, 532 N.E.2d 834. In general, because an express warranty is a "creature of contract," a party must have privity to the contract before bringing a breach of express warranty claim. *See id.* at 510-11, 127 Ill.Dec. 5, 532 N.E.2d 834; *see also Collins Co., Ltd. v. Carboline Co.,* 837 F.2d 299, 301 (7 th Cir.1988) (applying Illinois law).

Williams-Hayward contends that because CPR has no privity of contract to the sales contract between Williams-Hayward and NSC, CPR cannot bring any express warranty claims. CPR argues that despite its lack of privity to the paint contract, express warranties are enforceable by those to whom the warranties are made. In support of this argument, CPR relies on case law involving the purchase of automobiles with express written manufacturer warranties or implied warranties under the federal Magnuson-Moss Act. These cases are both factually and legally distinguishable from this matter. *See Rothe v. Maloney Cadillac,* 119 Ill.2d 288, 116 Ill.Dec. 207, 518 N.E.2d 1028 (Ill.1988); *Connick v. Suzuki Motor Co., Ltd.,* 275 Ill.App.3d 705, 212 Ill.Dec. 17, 656 N.E.2d 170 (Ill.App.Ct.1995), *rev'd on other grounds,* 174 Ill.2d 482, 221 Ill.Dec. 389, 675 N.E.2d 584 (Ill.1996); *see also Ampat/Midwest, Inc. v. Illinois Tool Works, Inc.,* No. 85 C 100029, 1988 WL 53222 (N.D.Ill. May 12, 1988).

In the context of a buyer purchasing a product from a dealer and not the manufacturer, Illinois courts have concluded that brochures, documents, and advertisements may be the basis of express warranty. *See Connick,* 275 Ill.App.3d at 713, 212 Ill.Dec. 17, 656 N.E.2d 170. In other words, manufacturer documents given directly to the buyer prior to a purchase may give rise to an express warranty because the assertions become part of the basis of the bargain unless clear affirmative proof shows otherwise. *See Ampat/Midwest, Inc.,* 1988 WL 53222, at \*4; *Crest Container,* 111 Ill.App.3d at 1074, 67 Ill.Dec. 727, 445 N.E.2d 19 (coil manufacturer's catalog created express warranty).

Here, CPR does not explain how this exception to the privity requirement applies to the circumstances at hand. For instance, CPR does not come forward with evidence

of manufacturer brochures, catalogs, or advertisements that were part of the basis of the bargain supporting their claim for express warranties. Specifically, CPR has not established that Williams-Hayward made specific, written promises or warranties via manufacturer's catalogs or other marketing materials. Without more, the Court would be hard-pressed to extend this exception to CPR's claims that Black and Kurcz made statements that constitute express warranties.

**\*16** As discussed, there are very few exceptions to the privity requirement for a plaintiff suing for breach of express or implied warranty, *see* 🔖 *Reed,* 263 F.Supp.2d at 1125, and CPR has failed to establish that it fits within any exception to this requirement regarding express warranties. Accordingly, the Court grants Williams-Hayward's summary judgment motion as to Count I of CPR's Second Amended Complaint.

D. Unjust Enrichment and Promissory Estoppel

Williams-Hayward contends that because it has established that the rebate agreement governs the parties' disputes, CPR cannot bring its claims of promissory estoppel and unjust enrichment. Indeed, when a specific contract governs the parties' relationship, quasi-contractual theories, such as unjust enrichment or promissory estoppel, cannot form a basis for damages. *See* 🔖 *Hartigan v. E & E Hauling, Inc.,* 153 Ill.2d 473, 497, 180 Ill.Dec. 271, 607 N.E.2d 165, 177 (Ill.1992); 🔖 *Wagner Excello Foods, Inc. v. Fearn Int'l, Inc.,* 235 Ill.App.3d 224, 235, 76 Ill.Dec. 258, 601 N.E.2d 956, 964 (Ill.App.Ct.1992) (plaintiff cannot bring promissory estoppel claim when parties have entered a binding contract on same subject matter).

1. Alternative Claims

CPR, however, has brought these quasi-contractual claims in the alternative to its breach of warranty claims, a practice not only allowed under Federal Rule of Civil Procedure 8(e)(2), but one that is common. *See, e.g.,* 🔖 *Cromeens, Holloman, Sibert, Inc. v. AB Volvo,* 349 F.3d 376, 397 (7 th Cir.2003); *see also* 🔖 *Prentice v. UDC Advisory Servs., Inc.,* 271 Ill.App.3d 505, 512, 207 Ill.Dec. 690, 695, 648 N.E.2d 146, 151 (Ill.App.Ct.1995) (alternative claims for breach of contract and promissory estoppel permissible). In *Cromeens,* the Seventh Circuit explained that under the doctrine of pleading in the alternative, "a party is allowed to plead breach of contract, or if the court finds no contract was formed, to

plead for quasi-contractual relief in the alternative. Once a valid contract is found to exist, quasi-contractual relief is no longer available." *Id.; see also* 🔖 *Prentice,* 271 Ill.App.3d at 512, 207 Ill.Dec. 690, 648 N.E.2d 146 (once enforceable contract exists, party may no longer recover under theory of promissory estoppel).

CPR has established that a genuine issue of material fact exists as to whether there is a contract between the parties, as discussed above. Because there is a factual dispute, the question of whether a contract exists is for the jury to decide. *See Reese,* 288 Ill.App.3d at 979, 224 Ill.Dec. 647, 682 N.E.2d 208. As such, CPR may maintain its alternative quasi-contractual theories at this procedural juncture.

2. Unjust Enrichment

Without a fully-developed explanation, Williams-Hayward contends that CPR cannot establish that it was unjustly enriched because NSC still owes it money for the paint. Williams-Hayward does not provide the Court with any legal authority supporting its argument that because it has not been paid the full amount for NSC's purchase, it has not unjustly retained any benefits to CPR's detriment.

**\*17** To establish unjust enrichment, CPR must show that Williams-Hayward has unjustly retained a benefit to CPR's detriment and that Williams-Hayward's retention of that benefit violates fundamental principles of justice, equity, and good conscience. 🔖 *HPI Health Care Servs., Inc. v. Mount Vernon Hosp., Inc.,* 131 Ill.2d 145, 160, 137 Ill.Dec. 19, 545 N.E.2d 672 (Ill.1989).

Here, CPR sets forth evidence that Williams-Hayward allegedly recommended paint for the paper cars that was more expensive than Williams-Hayward's general service paint. (Pls' Stmt. ¶ 119.) Further, CPR has provided evidence that NSC paid Williams-Hayward a "significant sum" for the paint. 🔖 (*Id.* ¶ 185, 137 Ill.Dec. 19, 545 N.E.2d 672.) Thus, CPR contends that it would be fundamentally unjust for Williams-Hayward to retain the benefit of selling a more expensive product when CPR did not receive the benefit of a superior coating for the paper boxcars.

Viewing the facts and inferences in a light most favorable to CPR, the Court concludes that CPR has established a genuine issue of material fact as to whether Williams-Hayward was

unjustly enriched. Accordingly, the Court denies Williams-Hayward's motion for summary judgment as to Count IV.

### E. Statute of Frauds

Williams-Hayward argues that because the sale of paint was in excess of $500, any alleged contract must be in writing to satisfy the statute of frauds, and thus CPR cannot succeed on any of its claims. CPR contends that Williams-Hayward has waived this affirmative defense because Williams-Hayward makes this argument for the first time in its motion for summary judgment.

"Federal Rule of Civil Procedure 8(c) requires that defendants raise all affirmative defenses that will defeat the allegations in the complaint in a responsive pleading. We have stated numerous times that if a defendant does not raise defenses at the time of filing an answer, those defenses are deemed waived." *Castro v. Chicago Hous. Auth.,* 360 F.3d 721, 735 (7th Cir.2004); *see also Perry v. Sullivan,* 207 F.3d 379, 382 (7th Cir.2000) (collecting cases). The Seventh Circuit has further articulated that if "Rule 8(c) is not to become a nullity, we must not countenance attempts to invoke such defenses at the *eleventh hour,* without excuse and without adequate notice to the plaintiff." *Venters v. City of Delphi,* 123 F.3d 956, 969 (7th Cir.1997) (emphasis added).

Williams-Hayward brings its statute of frauds defense for the first time in its motion for summary judgment-approximately two months before trial is set to commence and well over two years after CPR filed its original complaint. Williams-Hayward does not explain why it brought this affirmative defense so late in the proceedings. Although Williams-Hayward contends that it has given CPR adequate notice concerning its statute of frauds defense, Williams-Hayward fails to take into account that the trial is scheduled to begin on May 2, 2005. In other words, it is the eleventh hour. Under these circumstances, there is no excuse for Williams-Hayward's failure to raise its affirmative defense earlier in the proceedings. *See Castro* 360 F.3d at 735.

### F. Damages

**\*18** Last, Williams-Hayward argues that CPR cannot establish that its damages were proximately caused by Williams-Hayward. First, Williams-Hayward argues that because CPR failed to make a claim for the difference between the value of the goods accepted and the value they

would have if Williams-Hayward had warranted them, CPR cannot recover any damages in this matter.

Under the Illinois Uniform Commercial Code, Section 2-714(2): "The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount." *Id.* Courts read the "special circumstances" exception in conjunction with Section 1-106 of the UCC, which provides that UCC remedies "shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed." *Razor v. Hyundai Motor Am.,* 349 Ill.App.3d 651, 659, 286 Ill.Dec. 190, 813 N.E.2d 247 (Ill.App.Ct.2004). Also, an aggrieved party may recover incidental and consequential damages under Section 2-714(3). *Id.*

Based on these standards, "the difference between the value of the goods accepted and the value they would have had they been warranted" is not the sole measure of damages as Williams-Hayward asserts. Therefore, CPR's claims of incidental and consequential damages flowing from the breach are appropriate under the circumstances.

Second, Williams-Hayward contends that CPR cannot establish that its incidental and consequential damages are reasonable or were foreseeable by Williams-Hayward at the time of contracting.[3] Williams-Hayward specifically argues that because it had no reason to know CPR's particular requirements for the paper boxcars, it cannot be liable for any losses resulting from them. This argument is based on a fact in dispute, namely, whether Williams-Hayward knew of CPR's requirements for the paper boxcars. Because damages are determined by the factfinder "in the exercise of sound discretion and in any manner reasonable under the circumstances," *see id.* at 660, 286 Ill.Dec. 190, 813 N.E.2d 247, Williams-Hayward's argument fails.

### II. Summary Judgment Motion Against NSC

In support of its motion for summary judgment against NSC, Williams-Hayward contends that NSC cannot establish: (1) that Williams-Hayward made any express warranties; (2) its claims for breach of implied warranties; (3) its promissory estoppel claims; (4) its tortious interference with contract claim; (5) its fraud and fraudulent concealment claim; and

(6) that Williams-Hayward proximately caused its alleged damages. The Court discusses each argument below.

A. Breach of Express Warranties

Count I of NSC's Second Amended Counterclaim alleges a claim for breach of express warranties under Section 2-313 of the Illinois Uniform Commercial Code. Under Section 2-313(1)(a): "Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." In other words, "in a breach of express warranty action under the UCC, plaintiff must show a breach of an affirmation of fact or promise that was made a part of the basis of the bargain."

Hasek v. DaimlerChrysler Corp., 319 Ill.App.3d 780, 788, 253 Ill.Dec. 504, 745 N.E.2d 627 (Ill.App.Ct.2001).

1. Verbal Assurances

**\*19** Williams-Hayward contends that it made no verbal warranties to NSC that its High-Rubber Thermalbond paint would be an acceptable treatment for the paper boxcars. Specifically, Williams-Hayward argues that the information Norman Black, Williams-Hayward's Director of Canadian Operations, gave Dennis Ryan, NSC's Managing Director, when NSC was preparing its bid for CPR does not amount to "affirmations of fact or promises." Williams-Hayward relies on Black and Ryan's first meeting when Black provided Ryan with information concerning Williams-Hayward's alleged recommendations for the exterior and interior paint for the boxcars. (See Pls' Stmt ¶ 58; Pls' Ex. 10, Ryan Dep. at 63-64.)

NSC, however, contends that Williams-Hayward ignores other testimony in the record that Ryan informed Black that some of the boxcars would be used in paper service and that the elimination of damage to the paper rolls was a critical feature of the paper boxcars. For example, Ryan testified that in his later meetings with Black, they discussed the specifics of the paper boxcar projects, such as the type of loading, the importance of the interior lining, and that the boxcars would be hauling newspaper service.

Nevertheless, Williams-Hayward contends that the parole evidence rule bars any evidence of its alleged verbal recommendations made to NSC. Under Illinois common law, parol or extrinsic evidence regarding a prior or contemporaneous agreement is not admissible to vary or contradict a fully integrated contract. Eichengreen v.

Rollins, Inc., 325 Ill.App.3d 517, 521, 259 Ill.Dec. 89, 757 N.E.2d 952 (Ill.App.Ct.2001).

NSC, however, brings its express warranty claim under the Illinois Uniform Commercial Code. Relying on the Restatement (Second) of Contracts, Section 214, the Illinois Supreme Court expressly stated that in UCC cases, as opposed to claims based on Illinois common law, parol evidence is admissible to determine whether an agreement is completely or partially integrated and also to explain the meaning of a fully integrated contract. McMahon Food Corp. v. Burger Dairy Co., 103 F.3d 1307, 1314 (7th Cir.1996) (citing J & B Steel Contractors, Inc. v. C. Iber & Sons, Inc., 162 Ill.2d 265, 271-72, 205 Ill.Dec. 98, 642 N.E.2d 1215 (Ill.1994)). In addition, courts need not decide that the a contract is ambiguous as a condition for the admission of parol evidence in UCC cases. See Hessler v. Crystal Lake Chrysler-Plymouth, Inc., 338 Ill.App.3d 1010, 1020-21, 273 Ill.Dec. 96, 788 N.E.2d 405 (Ill.App.Ct.2003). As such, the parol evidence rule does not bar evidence of Williams-Hayward's alleged verbal assurances or recommendations.

2. Written Warranties

NSC has also establish that the purchase order contains express written warranties. [4] For instance, conditions to the purchase order include that "the Seller expressly warrants that all the material and work covered by this order will conform to the specifications, drawings, samples or other description, if any, furnished or specified by Buyer." Further, NSC points to language in the purchase order stating: "Suppliers are responsible for understanding the nature of the work and the tolerances the parts must meet."

**\*20** Williams-Hayward's argument that NSC waived any express warranty claims because Williams-Hayward informed NSC that it would supply free epoxy paint to replace the High-Rubber Thermalbond on the paper boxcars is a disputed fact. Accordingly, it cannot be the basis for a finding of waiver. NSC has established a genuine issue of material fact as to whether Williams-Hayward made express warranties to NSC and whether Williams-Hayward breached those express warranties. [5]

B. Breach of Implied Warranties

In Counts II and III of its Second Amended Counterclaim, NSC alleges that Williams-Hayward breached the implied warranties of fitness and merchantability. Williams-Hayward

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 96 of 410
PageID: 12703

Canadian Pacific Railway Co. v. Williams-Hayward..., Not Reported in...

2005 WL 782698, 57 UCC Rep.Serv.2d 136

contends that NSC's experience with Williams-Hayward's paint and its opportunities to test the paint preclude its claims for breach of implied warranties. *See Trans-Aire Int'l, Inc. v. Northern Adhesive Co., 882 F.2d 1254, 1259* (7th Cir.1989).

First, Williams-Hayward argues that NSC is a professional buyer that examined a product in its field, and thus NSC "assumed the risk as to all defects which a professional in the field ought to observe." *See* Illinois UCC Section 2-316, Comment 8. Williams-Hayward does not completely explain how a rail car manufacturer is a professional buyer of paint. Indeed, in his email of December 18, 2001, Kurcz admits that NSC did not have experience with Williams-Hayward's High-Rubber Thermalbond paint. Nevertheless, Williams-Hayward argues that because NSC maintained a department devoted to the purchase of speciality items, including paint, for the rail cars it manufactured, it is a "professional in the field." This limited argument simply does not satisfy Williams-Hayward's burden of establishing the exclusion of claims based on the implied warranty of fitness or merchantability. *See R & L Grain Co. v. Chicago Eastern Corp., 531 F.Supp. 201, 208 (N.D.Ill.1981).*

Second, Williams-Hayward contends that because NSC had the opportunity to examine the High-Rubber Thermalbond paint in trial applications, it cannot bring its claims for breach of implied warranties. *See* Illinois UCC Section 2-316, Comment 8. NSC, however, correctly notes that the purpose behind the trial applications was for Williams-Hayward's Black to explain how to apply the paint safely and properly. In addition, there is no evidence in the record that NSC examined the High-Rubber Thermalbond's propensity to fuse with paper or its ability to perform in paper service, because NSC contends that the paint's propensity to stick was a latent defect. Also, NSC asserts that it did not have the ability to load paper rolls into the paper boxcars after they were painted. (*See* Pls' Stmt. ¶ 82.) Finally, after the pull-ahead car exhibited sticking problems and NSC's own "jack test" failed, Kurcz of Williams-Hayward emailed NSC's Wilson explaining that he did not see a need for any paint testing if NSC proceeded with its process and used the recommended cure parameters.

**\*21** Based on this evidence, NSC has created a genuine issue of material fact of whether it is barred from bringing its implied warranty claims based on the "examination" exception under Comment 8 of Section 2-316 if the Illinois Uniform Commercial Code. [6]

### C. Promissory Estoppel Claims

NSC brings two counts based on promissory estoppel-promissory estoppel related to the suitability of the paint and promissory estoppel related to the application of the paint. Williams-Hayward contends that because there is a binding sales contract between the parties, NSC cannot bring any claims of promissory estoppel. *See Wagner Excello Foods, Inc. v. Fearn Int'l, Inc., 235 Ill.App.3d 224, 235, 76 Ill.Dec. 258, 601 N.E.2d 956 (Ill.App.Ct.1992)* (plaintiff cannot bring promissory estoppel claim when parties have entered into binding contract on same subject matter). NSC, on the other hand, contends that the promises underlying its promissory estoppel claims concern different subject matter than the sales contract. *See Prentice v. UDC Advisory Servs., Inc., 271 Ill.App.3d 505, 512, 207 Ill.Dec. 690, 648 N.E.2d 146 (Ill.App.Ct.1995); see also Industrial Lift Truck Serv. Corp. v. Mitsubishi Int'l Corp., 104 Ill.App.3d 357, 361-61, 60 Ill.Dec. 100, 432 N.E.2d 999 (Ill.App.Ct.1982)* ("general rule is that no quasi-contractual claim can arise when a contract exists between the parties concerning the same subject matter on which the quasi-contractual claim rests").

Here, NSC has presented statements and recommendations made by Kurcz that pertain to the circumstances after the pull-ahead car and paper car 220164 experienced paint sticking problems. These allegations are different in subject matter than the sales contract. Williams-Hayward's "promises" include Kurcz's assurances made to Pafford and Wilson in the fall of 2001 and Williams-Hayward's recommended changes to the process in which NSC would coat and cure the paint. Based on this evidence, NSC has established a genuine issue of material fact that its promissory estoppel claims concern a different subject matter than the sales contract.

Finally, Williams-Hayward contends that the statute of frauds prohibits NSC from bringing its promissory estoppel claims. The Court notes that Williams-Hayward's alleged promises to NSC that form the basis of its promissory estoppel claims are in writing. The Court rejects Williams-Hayward's statute of frauds defense for the reasons stated in detail above.

### D. Tortious Interference with Contract

NSC brings a claim of tortious interference with contract, which requires a plaintiff to show (1) the existence of a valid and enforceable contract between the plaintiff and a third party, (2) defendant's awareness of the contract, (3) defendant's intentional and unjustified inducement of a breach

Case 1:19-md-02875-RMB-SAK   Document 598-3   Filed 10/16/20   Page 97 of 410
PageID: 12704
Canadian Pacific Railway Co. v. Williams-Hayward..., Not Reported in...
2005 WL 782698, 57 UCC Rep.Serv.2d 136

of the contract, (4) defendant's wrongful conduct caused a subsequent breach of the contract by the third party, and (5) damages resulting from the breach. *Purmal v. Robert N. Wadington & Assocs.,* 354 Ill.App.3d 715, 289 Ill.Dec. 578, 820 N.E.2d 86 (Ill.App.Ct.2004).

**\*22** Williams-Hayward contends that NSC cannot establish that it intentionally and unjustifiably induced CPR to breach its contract with NSC. NSC does not address Williams-Hayward's argument, instead, NSC argues that sufficient evidence exists to establish fraudulent intent. A claim of tortious interference with contract, however, does not require that the actor have "fraudulent intent."

"The tort of interference with existing or prospective contractual relations requires that the interference be both intentional and improper." *LaRocco v. Bakwin,* 108 Ill.App.3d 723, 730, 64 Ill.Dec. 286, 291-92, 439 N.E.2d 537 (Ill.App.Ct.1982) (citing Section 767 of the Restatement (Second) of Torts)). Comment d. to Section 767 of the Restatement (Second) of Torts explains that because interference with contractual relations is an intentional tort, "the injured party must show that the interference with his contractual relations was either desired by the actor or known by him to be a substantially certain result of his conduct."

NSC does not argue either how Williams-Hayward desired to interfere with NSC and CPR's contract or how Williams-Hayward knew that CPR's alleged breach would be a "substantially certain result" of its conduct. In addition, NSC presents no arguments with supporting evidence that CPR actually breached their contract. Without more, NSC's tortious interference with contract must fail. [7] Therefore, the Court grants Williams-Hayward's motion for summary judgment as to Count VI of NSC's Second Amended Counterclaim.

### E. Fraudulent Misrepresentation and Concealment

In Count VII of its Second Amended Counterclaim, NSC alleges fraudulent misrepresentation and concealment against Williams-Hayward. Under Illinois law, a party must prove the elements of fraud by clear and convincing evidence. *In re Application of Rosewell,* 106 Ill.2d 311, 318-19, 88 Ill.Dec. 28, 478 N.E.2d 343 (Ill.1985); *see also Bixby's Food Sys., Inc. v. McKay,* 193 F.Supp.2d 1053 (N.D.Ill.2002). At summary judgment NSC must establish the elements of fraudulent misrepresentation and concealment by clear and convincing

evidence because it must carry this burden of proof at trial. *See Celotex Corp.,* 477 U.S. at 322; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 252-53.

The elements of a claim for fraudulent misrepresentation are: (1) defendant made a false statement of material fact; (2) defendant knew that the statement was false; (3) defendant intended that the statement would induce the plaintiff to act; (4) plaintiff relied on the truth of the statement; and (5) plaintiff's damages resulted from reliance on the statement. *Davis v. G.N. Mortgage Corp.,* 396 F.3d 869, 882 (7th Cir.2005); *Board of Educ. of City of Chicago v. A, C, and S, Inc.,* 131 Ill.2d 428, 452, 137 Ill.Dec. 635, 546 N.E.2d 580 (Ill.1989). "In its general sense, 'fraud' means anything calculated to deceive, including all acts, omissions, and concealments involving a breach of legal or equitable duty, trust, or confidence resulting in damage to another." *Tri-G Inc. v. Burke, Bosselman & Weaver,* 353 Ill.App.3d 197, 216, 288 Ill.Dec. 580, 817 N.E.2d 1230 (Ill.App.Ct.2004).

#### 1. False Statements of Fact

**\*23** Williams-Hayward contends that NSC cannot establish that it made false statements of fact because the asserted facts amount to nothing more than Williams-Hayward's opinions. In general, an expression of opinion will not support an action for fraud. *See Duhl v. Nash Realty, Inc.,* 102 Ill.App.3d 483, 489, 57 Ill.Dec. 904, 429 N.E.2d 1267, 1272 (Ill.App.Ct.1981); *see also West v. Western Cas. & Surety Co.,* 846 F.2d 387, 393 (7th Cir.1988) ("statement that merely expresses an opinion or that relates to future or contingent events, rather than past or present facts, does not constitute an actionable misrepresentation"). Whether a statement is one of fact or opinion depends on the circumstances of a case. *Prime Leasing, Inc. v. Kendig,* 332 Ill.App.3d 300, 309, 265 Ill.Dec. 722, 773 N.E.2d 84 (Ill.App.Ct.2002). "A statement that, standing alone, appears to be a statement of opinion, nevertheless may be a statement of fact when considered in context. Courts focus on the circumstances surrounding the representation to determine whether the plaintiff may have justifiably relied on the opinion as though it were a statement of fact." *West,* 846 F.2d at 393. When a speaker "holds himself out or is understood as having special knowledge of the matter which is not available to the plaintiff," the speaker's "opinion becomes in effect an

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 98 of 410
PageID: 12705

Canadian Pacific Railway Co. v. Williams-Hayward..., Not Reported in...

2005 WL 782698, 57 UCC Rep.Serv.2d 136

assertion summarizing his knowledge." *Id.* (citing *Duhl, 102 Ill.App.3d at 489, 57 Ill.Dec. 904, 429 N.E.2d 1267).* "Thus, the general rule is that it is not 'the form of the statement which is important and controlling, but the sense in which it is reasonably understood." ' *West,* 846 F.2d at 394 (quoting Prosser & Keeton on Torts § 109, at 755 (W. Keeton 5 th ed.1984)).

NSC, however, has presented sufficient evidence, under the clear and convincing standard of proof, to establish that a genuine issue of material fact exists to whether Kurcz's statements in his email of September 5, 2001, Kurcz's subsequent assurances made in September 2001, and Kurcz's email of December 18, 2001, contained false statements of material facts. For instance, NSC has set forth evidence that Kurcz held himself out as experienced in developing water based products for the rail and chemical industry for over 30 years and that Williams-Hayward "know[s] of no company offering coatings systems in the corrosive services that can produce the actual fleet data of over 90,000 units in service for over 15 years with such a success rate." (*See* Def.'s Stmt. ¶ 178.) Kurcz also stated that Williams-Hayward was the "oldest supplier of water based products in the rail industry and we are confident we are also the best." (*See* Def.'s Stmt. ¶ 200.)

Furthermore, NSC has come forward with evidence of Kurcz's assertion that Williams-Hayward's High-Rubber Thermalbond paint, if properly applied, would pose no problems for the transport of the paper rolls. Kurcz also explained to NSC's Todd Pafford that the High-Rubber Thermalbond paint would do the job it was intended to do. Also, there is sufficient evidence in the record that Kurcz knew the problem of the paint sticking in the paper cars when he made these statements.

**\*24**  Based on this evidence, a reasonable jury could find that Kurcz made false statements of fact. Specifically, examining the emails in the context of the paper boxcar sticking problems that occurred during the fall of 2001, a reasonable jury could find that Kurcz had summarized his knowledge of the paint systems based on his background and expertise, and that Kurcz's emails contained false statements of material facts.

2. Scienter

Williams-Hayward also contends that NSC cannot prove that it intentionally made a false statement of material fact. The Court notes that "evaluations of motive and intent are generally inappropriate on a motion for summary judgment," *see* *Kyle v. Patterson,* 196 F.3d 695, 698 (7 th Cir.1999), and that "resolution by summary judgment of the issues raised by an allegation of fraud is often difficult or impossible." *FDIC v. Lauterbach,* 626 F.2d 1327, 1334 (7 th Cir.1980) (summary judgment often inappropriate in fraud claims because district court would be required to resolve subjective issue of fraudulent intent). There is no absolute rule, however, that precludes summary judgment concerning fraud claims.

*Id.; see also* *Munson v. Friske,* 754 F.2d 683, 690 (7 th Cir.1985) ("although summary judgment is usually not proper in a case involving a weighing of conflicting questions of motive and intent, summary judgment is proper where the plaintiff presents no indications of motive and intent supportive of his position").

NSC has presented evidence upon which a reasonable jury could find by clear and convincing evidence that Williams-Hayward made representations in reckless disregard or culpable ignorance of their truth or falsity. *See* *Hartmann Co. v. Capital Bank & Trust Co.,* 296 Ill.App.3d 593, 602, 230 Ill.Dec. 830, 694 N.E.2d 1108 (Ill.App.Ct.1998). Specifically, NSC has set forth evidence that while Williams-Hayward was making assurances that the High Rubber Thermalbond paint, if applied properly, would pose no problems for the transport of the paper rolls, Kurcz admitted to Black and Ed Kurcz that the paint sticking problem "could be big trouble if it is not a mill thickness issue." (Pls' Stmt. ¶ 148.) Despite Kurcz's assurance to NSC's Pafford that they never had one paper sticking complaint in all Williams-Hayward's years of service, there is evidence in the record that during the December 21, 2001, telephone conference, Kurcz stated that some of the boxcars from the other railroad companies that had used High-Rubber Thermalbond for transporting paper had experienced paper sticking problems, but that this was an accepted industry problem.

3. Reliance

Next, Williams-Hayward contends that NSC cannot establish that it relied on Kurcz's statements made in his fall of 2001 emails. To establish justifiable reliance, NSC must show that it reasonably relied on Williams-Hayward's representations in light of the facts within NSC's actual knowledge and any facts NSC might have discovered by the exercise of

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 99 of 410
PageID: 12706
Canadian Pacific Railway Co. v. Williams-Hayward... Not Reported in...
2005 WL 782698, 57 UCC Rep.Serv.2d 136

ordinary prudence. *See D.S.A. Fin. Corp. v. County of Cook, 345 Ill.App.3d 554, 559, 280 Ill.Dec. 130, 801 N.E.2d 1075 (Ill.App.Ct.2003).* Justifiable reliance is typically a question of fact for the jury. *Id.*

**\*25** Here, NSC has established that there is a genuine issue of material fact as to its reliance on Kurcz's assurances and statements. There is evidence in the record that because of NSC's limited experience with High-Rubber Thermalbond paint, NSC needed full "buy-off" from Williams-Hayward that NSC's application was in accordance with Williams-Hayward's technical requirements and was fit for the service intended. NSC also presents evidence that it relied on Williams-Hayward's assurances and followed Black's and Williams-Hayward's revised paint application process.

### 4. Fraudulent Concealment-Duty to Disclose

To establish a claim for fraudulent concealment, a plaintiff must show, in addition to the elements of fraudulent misrepresentation, that the defendant concealed a material fact when it was under the duty to disclose that fact to the plaintiff. *W.W. Vincent & Co. v. First Colony Life Ins. Co., 351 Ill.App.3d 752, 762, 286 Ill.Dec. 734, 814 N.E.2d 960 (Ill.App.Ct.2004).* The duty to disclose certain material facts may arise out of several situations, including if (1) plaintiff and defendant are in a fiduciary or confidential relationship, or (2) plaintiff places trust and confidence in defendant, thereby placing defendant in a position of influence and superiority. *Connick v. Suzuki Motor Co., Ltd., 174 Ill.2d 482, 250, 221 Ill.Dec. 389, 675 N.E.2d 584 (Ill.1996)* (citations omitted).

A genuine issue of material fact exists as to whether NSC placed trust and confidence in Williams-Hayward. The record reveals that Williams-Hayward knew that NSC had no experience with High Rubber Thermalbond prior to its contract with CPR to manufacture the paper boxcars. Not only did Williams-Hayward develop the High-Rubber Thermalbond in the first instance, but Kurcz expressly stated that Williams-Hayward had extensive experience in the industry. Specifically, Kurcz emailed Pafford: "We know of no company offering coatings systems in the corrosive services that can produce the actual fleet data of over 90,000 units in service for over 15 years with such a success rate. Therefore we are confident with our recommendation for the use of High Rubber Thermalbond products at NSC and to our mutual customer Canadian Pacific Railroad." (Def.'s Stmt. ¶ 178, Pls' Stmt. ¶ 124, Pls' Ex. 58.)

Because NSC has established that a genuine issue of material fact exists as to whether it placed trust and confidence in Williams-Hayward, the question of whether Williams-Hayward had a duty to disclose material facts is a question for the jury.

### F. Damages

Last, Williams-Hayward contends that NSC cannot establish that Williams-Hayward caused its alleged damages.

### 1. Breach of Warranty Claims

Williams-Hayward argues that because NSC failed to make a claim for the difference between the value of the goods accepted and the value they would have had they been warranted, NSC cannot recover any damages in this matter. As discussed above, under the Illinois Uniform Commercial Code, Section 2-714(2), "the difference between the value of the goods accepted and the value they would have had they been warranted" is not the sole measure of damages as Williams-Hayward asserts. Instead, an aggrieved party may recover incidental and consequential damages under Section 2-714(3) and also damages if "special circumstances show proximate damages of a different amount." *See Razor v. Hyundai Motor America, 349 Ill.App.3d 651, 659, 286 Ill.Dec. 190, 813 N.E.2d 247 (Ill.App.Ct.2004).*

**\*26** Nonetheless, Williams-Hayward contends that it had no reason to know of NSC's particular requirements for the paper cars at the time of contracting, and thus it cannot be held liable for any losses resulting from them. The Court, however, has already concluded that there is a genuine issue of material fact concerning Williams-Hayward's knowledge of the paint's requirements for the paper boxcars. Accordingly, Williams-Hayward's argument fails.

### 2. Promissory Estoppel Claims

Next, Williams-Hayward contends that the promissory estoppel claims are merely a reiteration of the warranty claims; therefore, the proper damages are the "difference between the value of the goods accepted and the value they would have had they been warranted." *See* Illinois Uniform Commercial Code, Section 2-714(2). The Court, however, has rejected Williams-Hayward's argument that the promissory estoppel claims are based on the same subject matter as the sales contract. Williams-Hayward's argument concerning promissory estoppel damages also fails.

### 3. Fraud Claim

Williams-Hayward asserts that NSC cannot recover damages for loss of reputation, interest charges, and cost overruns from the repainting of the paper boxcars because these damages were not a foreseeable result of Williams-Hayward's alleged fraud. Williams-Hayward discusses the law of proximate cause, but does not support its argument with facts in the record. Without a more developed argument, Williams-Hayward has failed to establish that, as a matter of law, NSC cannot establish damages based on its fraudulent misrepresentation and concealment claim. Because proximate cause for tort damages is generally a question of fact, this issue is for the jury to decide. *Kavales v. City of Berwyn,* 305 Ill.App.3d 536, 547, 238 Ill.Dec. 738, 712 N.E.2d 842 (Ill.App.Ct.1999).

Finally, Williams-Hayward contends that NSC cannot establish any entitlement to exemplary damages because there is no evidence of Williams-Hayward's fraudulent conduct. As discussed, NSC has established a genuine issue of material fact as to its fraud claim against Williams-Hayward, and thus Williams-Hayward's argument regarding exemplary damages fails.

### III. Summary Judgment Motion on Williams-Hayward's Count I of Counterclaim

In Count I of its counterclaims, Williams-Hayward, relying on Illinois Uniform Commercial Code Section 2-709, contends that, as a matter of law, it is entitled to the payment of the purchase price and additional accrued charges for the paint accepted by NSC. For the following reasons, Williams-Hayward's argument fails.

NSC asserts that it properly revoked acceptance of the "non-conforming goods" under Section 2-608 of the Illinois Uniform Commercial Code, and thus is not required to pay the remainder of the purchase price as Williams-Hayward contends. Section 2-608 reads:

(1) The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it

**\*27** (a) on the reasonable assumption that its non-conformity would be cured and it has not been seasonably cured; or

(b) without discovery of such non-conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

In essence, when a buyer has already accepted goods, he may revoke acceptance when a nonconformity substantially impairs the value of the goods. *See Sorce v. Naperville Jeep Eagle, Inc.,* 309 Ill.App.3d 313, 320-21, 242 Ill.Dec. 738, 722 N.E.2d 227 (Ill.App.Ct.1999). Whether an attempted revocation of acceptance is valid hinges on material questions of fact. *Id.* at 321, 242 Ill.Dec. 738, 722 N.E.2d 227 ("trier of fact must determine whether the alleged nonconformities in the goods caused substantial impairment to the buyer")

Based on Williams-Hayward's assurances that the paint's stickiness problems would be cured, NSC contends that it may revoke its acceptance under Section 2-608. Williams-Hayward, however, contends that despite the alleged assurances made in the fall of 2001, NSC's continued use of the High-Rubber Thermalbond demonstrates that NSC never revoked its acceptance of the paint. Illinois courts, however, reject the notion that use by the buyer constitutes irrevocable acceptance. *See North Am. Lighting, Inc. v. Hopkins Mfg. Corp.,* 37 F.3d 1253, 1259 (7 [th] Cir.1994); *Frank's Maint. & Eng'g v. C.A. Roberts Co.,* 86 Ill.App.3d 980, 986, 42 Ill.Dec. 25, 408 N.E.2d 403 (Ill.App.Ct.1980).

Nonetheless, Williams-Hayward argues that NSC has failed to demonstrate that it "experienced a substantial impairment of value after it accepted and consumed Williams-Hayward's paint." To establish the substantial impairment of the value of goods, a buyer must bring forward objective evidence that, with respect to his needs, the value of the goods was substantially impaired. *GNP Commodities, Inc. v. Walsh Heffernan Co.,* 95 Ill.App.3d 966, 978, 51 Ill.Dec. 245, 420 N.E.2d 659 (Ill.App.Ct.1981); *see also North Am. Lighting, Inc.,* 37 F.3d at 1259.

NSC has provided ample evidence that due to the propensity of the High-Rubber Thermalbond to fuse with the paper rolls, the paint had no value to NSC. For example, after hauling newsprint paper rolls, the pull-ahead car and subsequent trial cars all exhibited sticking problems, namely, the paint stuck to the paper rolls' wrappings and exposed the paper rolls to damage. Because of this damage, the newsprint paper supplier refused to accept the paper boxcars for its service. A

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 101 of 410
PageID: 12708
Canadian Pacific Railway Co. v. Williams-Hayward... Not Reported in...

2005 WL 782698, 57 UCC Rep.Serv.2d 136

reasonable jury could find that the paint's stickiness problems rendered the boxcars unsuitable for paper service.

Next, Williams-Hayward contends that NSC exercised improper ownership over the paint remaining on NSC's premises after NSC determined that the paint was non-conforming. Section 2-603(1) of the Illinois Uniform Commercial Code explains that absent instructions from the seller with respect to the goods, a "buyer does not have a duty to return goods; rather the burden is on the seller to repossess them if he wants them." *See* *Frank's Maint.,* 86 Ill.App.3d at 986, 42 Ill.Dec. 25, 408 N.E.2d 403. NSC has set forth evidence that Williams-Hayward never provided instructions regarding the disposition of the paint, nor did Williams-Hayward attempt to retrieve the paint. (Pls' Stmt. ¶¶ 180-82.)

Because NSC has raised a genuine issue of material fact concerning the disposition of the paint, Williams-Hayward's argument fails.

CONCLUSION

**\*28** For these reasons, the Court grants in part and denies in part Defendant's Motions for Summary Judgment.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 782698, 57 UCC Rep.Serv.2d 136

## Footnotes

1    For the first time in its Reply Brief, Williams-Hayward contends that CPR's claims are nothing more than "thinly-disguised tort claims" barred by *Moorman Mfg. Co. v. National Tank Co.,* 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443, 452 (Ill.1982). Williams-Hayward waives this argument because it was brought for the first time in its Reply Brief. *See* *Carter v. Tennant Co.,* 383 F.3d 673, 679 (7th Cir.2004).

2    Any examinations made by CPR after the contract was formed do not affect the existence of the implied warranties. *See* White & Summers, Uniform Commercial Code § 12-6 (4th ed.)

3    For the first time in its Reply Brief, Williams-Hayward contends that CPR cannot recover consequential damages. *See* *Szajna v. General Motors Corp.,* 115 Ill.2d 294, 311, 104 Ill.Dec. 898, 503 N.E.2d 760 (Ill.1986). Williams-Hayward waives this argument because it was made for the first time in the Reply Brief. *See* *Carter v. Tennant Co.,* 383 F.3d 673, 679 (7th Cir.2004). Also, Williams-Hayward's reliance on the dicta in *Szajna* is misplaced.

4    Williams-Hayward argues that its invoices following the shipments of paint, and not the purchase order, are the controlling contractual documents. Williams-Hayward, however, signed the acknowledgment copy of the purchase order under language stating: WE HEREBY ACKNOWLEDGE RECEIPT AND ACCEPTANCE OF YOUR ORDER, SUBJECT TO ALL TERMS AND CONDITIONS APPEARING ON THE FACE AND BACK, THEREOF. By signing this acknowledgment, Williams-Hayward accepted NSC's offer set forth in the purchase order. *See* *Outboard Marine Corp. v. Babock Indus.,* Case No. 91 C 7247, 1995 WL 296963, at *5 (N.D.Ill. May 12, 1995) (citing UCC Section 2-207.) Furthermore, because the purchase order prohibits any attempts to impose additional terms to the contract through invoices, Williams-Hayward's subsequent invoices are not part of the contract for the purchase of the paint. *See id.*

5    Based on facts in dispute, Williams-Hayward makes the cursory argument that NSC did not rely on the alleged verbal representations, and thus they were not the "basis of the bargain" as required for a breach of express warranty claim. Because Williams-Hayward's argument is undeveloped, the Court considers it waived. *See* *Estate of Moreland v. Dieter,* 395 F.3d 747, 759 (7th Cir.2005) ("Perfunctory or undeveloped arguments are waived"); *see also* *Weng v. Allison,* 287 Ill.App.3d 535, 538, 223 Ill.Dec. 123, 678 N.E.2d

1254 (Ill.App.Ct.1997) (burden on seller to establish by affirmative proof that affirmations did not become part of basis of bargain).

6        Again, Williams-Hayward makes the argument that the paint was merchantable because it was not used for an "ordinary purpose." As discussed in detail above, whether the use of High-Rubber Thermalbond in the paper boxcars was "ordinary" is a question of fact for the jury. *See Check v. Clifford Chrysler-Plymouth of Buffalo Grove, Inc.,* 342 Ill.App.3d 150, 159, 276 Ill.Dec. 579, 794 N.E.2d 829 (Ill.App.Ct.2003).

7        It is not the Court's role to construct the litigants' legal arguments, especially when the parties are represented by counsel. *See* *Doherty v. City of Chicago,* 75 F.3d 318, 324 (7 [th] Cir.1996).

---

End of Document                                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# **TAB 8**

Crouch v. Johnson & Johnson Consumer Co., Inc., Not Reported in F.Supp.2d (2010)

2010 WL 1530152

KeyCite Yellow Flag - Negative Treatment

On Reconsideration in Part Crouch v. Johnson & Johnson Consumer Companies, Inc., D.N.J., August 2, 2010

2010 WL 1530152

Only the Westlaw citation is currently available.

NOT FOR PUBLICATION

United States District Court, D. New Jersey.

Jennifer CROUCH, individually and on behalf of all others similarly situated, Plaintiffs,

v.

JOHNSON & JOHNSON CONSUMER COMPANIES, INC.; Kimberly Clark Corporation; Wal–Mart Stores, Inc.; and John Doe, Defendants.

Civil Action No. 09–CV–2905 (DMC).
|
April 15, 2010.

West KeySummary

1    **Antitrust and Trade Regulation** 🗝 Exclusive and Concurrent Remedies or Laws

**Products Liability** 🗝 Economic losses; damage to product itself

**Products Liability** 🗝 Cosmetics, soaps, and hair-care products

**Products Liability** 🗝 Nature and form of remedy

A mother failed to state a New Jersey law consumer fraud claim against a baby shampoo manufacturer. The mother's claims were preempted by the New Jersey Product Liability Act, which barred claims based on pure economic loss. The mother alleged that she suffered an economic loss at the time of her shampoo purchase because the shampoo contained undisclosed toxins and an ingredient banned by the FDA. N.J.S.A. 2A:58C–1b(2).

8 Cases that cite this headnote

**Attorneys and Law Firms**

Scott M. Lempert, Sandals & Associates, P.C., Philadelphia, PA, for Plaintiff.

Daniel B. Carroll, Drinker, Biddle & Reath, LLP, Florham Park, NJ, Walter H. Swayze, III, Segal, McCambridge, Singer & Mahoney, Ltd., Jersey City, NJ, John C. McGuire, Joseph F. Falgiani, Sedgwick, Detert, Moran, & Arnold, LLP, Newark, NJ, for Defendants.

**OPINION**

DENNIS M. CAVANAUGH, District Judge.

**\*1** This matter comes before the Court upon motion by Johnson & Johnson Consumer Companies, Inc. ("J & J"), Kimberly–Clark Corporation ("KC") and Wal–Mart Stores, Inc. ("Wal–Mart") (collectively, "Defendants") to dismiss the Amended Class Action Complaint ("Complaint") of Jennifer Crouch, individually and on behalf of all others similarly situated, ("Plaintiffs") for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6) and for lack of subject matter jurisdiction pursuant to Fed. R. Civ. 12(b)(1). Pursuant to Fed.R.Civ.P. 78, no oral argument was heard. After considering the submissions of all parties, it is the decision of this Court for the reasons herein expressed that Defendants' motion to dismiss is **granted in part** and **denied in part.**

**I** *BACKGROUND*

The Complaint is brought individually and on behalf of all class purchasers ("Class Members") of J & J's Baby Shampoo, J & J's Moisture Care Baby Wash, Aveeno Baby Soothing Relief Creamy Wash, Equate Tearless Baby Wash and Huggies Soft Skin Shea Butter Baby Wipes ("products"). Plaintiffs allege that "although Defendants represented that the products they marketed, distributed, promoted, sold, and/or made were safe for children, the Children's Personal Care Products were actually contaminated with toxic chemicals linked to increased cancer risk, adverse skin reactions, and other serious health problems." (Plaintiffs' Complaint ("Pl.Compl."), ¶ 1). Plaintiffs further allege that despite representations made by these companies that their products are safe and gentle, these products contain contaminants that are not disclosed on the label and that could otherwise have been removed pursuant to a process called vacuum stripping. (Pl.Compl., ¶¶ 2, 5).

2010 WL 1530152

Plaintiffs assert that independent lab tests, conducted in accordance with regulations promulgated by the Environmental Protection Agency ("EPA"), reveal that J & J's Baby Shampoo contains methylene chloride in levels as high as 1.1 ppm, 1,4 dioxane levels as high as 38 ppm, and formaldehyde levels as high as 210 ppm. (Pl.Compl., ¶¶ 3, 46). "After testing, [J & J's] Moisture Care Baby Wash was found to be contaminated with 1,4–dioxane. Independent Lab Tests found 1,4–dioxane levels of 22 ppm." (Pl.Compl., ¶ 56). "After testing, [J & J's] Aveeno Baby Soothing Relief Creamy Wash was found to be contaminated with 1,4–dioxane. Independent Lab Tests found 1,4–dioxane levels of 4.0 ppm." (Pl.Compl., ¶ 66). Plaintiffs also assert that each of the foregoing qualifies as a cosmetic pursuant to the Food Drug and Cosmetic Act because each is "intended to be rubbed, poured, sprinkled, or sprayed on, introduced into, or otherwise applied to the human body or any part thereof for cleansing, beautifying, promoting attractiveness, or altering the appearance" and is not "soap." 21 U.S.C. § 321(i) (2008). (Pl.Compl., ¶¶ 50, 60, 69).

Plaintiffs also contend that "[a]fter testing, [ ] Kimberly Clark's Huggies Soft Skin Shea Butter Baby Wipes were found to be contaminated with 1,4–dioxane. Independent Lab Tests found 1,4–dioxane levels of .53 ppm." (Pl.Compl., ¶ 74). Moreover, Plaintiffs assert that this product qualifies as a cosmetic pursuant to the Food Drug and Cosmetic Act because it is "intended to be rubbed, poured, sprinkled, or sprayed on, introduced into, or otherwise applied to the human body or any part thereof for cleansing, beautifying, promoting attractiveness, or altering the appearance" and is not "soap." 21 U.S.C. § 321(I) (2008). (Pl.Compl., ¶ 77).

**\*2** Additionally, Plaintiffs allege that "[a]fter testing, [Wal-Mart's] Equate Tearless Baby Wash was found to be contaminated with methylene chloride, 1,4–dioxane, and formaldehyde. Independent Lab Tests found methylene chloride levels of 0.57 ppm, 1,4–dioxane levels of 39 ppm, and formaldehyde levels of 350 ppm." (Pl.Compl., ¶ 83). Plaintiffs assert that this product qualifies as a cosmetic pursuant to the Food Drug and Cosmetic Act because it is "intended to be rubbed, poured, sprinkled, or sprayed on, introduced into, or otherwise applied to the human body or any part thereof for cleansing, beautifying, promoting attractiveness, or altering the appearance" and is not "soap." 21 U.S.C. § 321(I) (2008). (Pl.Compl., ¶ 86).

Count I of the Complaint asserts a claim for breach of implied warranty pursuant to the Uniform Commercial Code ("UCC") § 2–314. (Pl. Compl. at 102). Count II of the Complaint asserts a claim for breach of implied warranties of merchantability and fitness for a particular use. (Pl.Compl., ¶ 114). Count III of the Complaint asserts a claim for unfair and deceptive trade practices. (Pl.Compl., ¶ 121). Count IV of the Complaint asserts a claim for unjust enrichment. (Pl.Compl., ¶ 129).

## II. *STANDARD OF REVIEW*

"There is a fundamental difference of review under Rule 12(b)(1), where the existence of disputed facts will not preclude the court from evaluating the merits of the jurisdictional claim, and Rule 12(b)(6) where the court is required to accept as true all the allegations of the complaint and all inferences arising from them." *Anjelino v. New York,* 200 F.3d 73, 87 (3d Cir.1999). "[T]he threshold to withstand a motion to dismiss under [Rule] 12(b)(1) is thus lower than that required to withstand a Rule 12(b)(6) motion." *Kehr Packages Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1409 (3d Cir.1991)).

### A. Fed.R.Civ.P. 12(b)(6)

"The [d]istrict [c]ourt, in deciding a motion under Fed.R.Civ.P. 12(b)(6), [is] required to accept as true all factual allegations in the complaint and draw all inferences in the facts alleged in the light most favorable to the [plaintiff]." *Phillips v. County of Allegheny,* 515 F.3d 224, 228 (3d Cir.2008). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, [ ] a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "[A court is] not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). "Factual allegations must be enough to raise a right to relief above a speculative level, [ ] on the assumption that all factual allegations in the complaint are true (even if doubtful in fact)." *Bell,* 550 U.S. at 555–56.

### B. Fed.R.Civ.P. 12(b)(1)

2010 WL 1530152

**\*3** "On a Rule 12(b)(1) motion, no presumption of truthfulness attaches to the allegations of the plaintiff."

*CNA v. United States,* 535 F.3d 132, 139 (3d Cir.2008). A facial attack "concerns 'an alleged pleading deficiency' whereas a factual attack concerns the actual failure of [a plaintiff's] claims to comport [factually] with the jurisdictional prerequisites." *Id.* (citing *U.S. ex rel. Atkinson v. Pa. Shipbuilding Co.,* 473 F.3d 506, 514 (3d Cir.2007)).

### III. *DISCUSSION*

A. Standing

To bring a suit in a federal court, Plaintiffs must have standing pursuant to Article III of the United States Constitution. To establish standing under Article III, Plaintiffs must show: (1) injury in fact; (2) causation; and (3) redressability. *Horvath v. Keystone Health Plan E., Inc.,* 333 F.3d 450, 455 (3d Cir.2003); *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id.* (citing *AT & T Communications of N.J., Inc. v. Verizon N.J., Inc.,* 270 F.3d 162, 170 (3d Cir.2001)). "The injury must affect the plaintiff in a personal and individual way." *Pitt News v. Fisher,* 215 F.3d 354 (3d Cir.2000); *Alston v. Countrywide Fin. Corp.,* 585 F.3d 753, 763 (3d Cir.2009).

"[O]rdinarily, one may not claim standing .... to vindicate the constitutional rights of some third party." *Pitt,* 215 at 362. "We apply this prudential rule against third party standing even when the requirements of Article III have been met, to 'avoid deciding questions of broad social import ... [and] to limit access to the federal courts to those litigants best suited to assert a particular claim.' " *Id.* (citing *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99–100, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979)). "[W]hen the asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction." *Berg v. Obama,* 586 F.3d 234, 239 (2009) (citing *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). Furthermore, "[t]he standing inquiry does not change in the context of a putative class action.... [S]tanding cannot be predicated on an injury which the plaintiff has not suffered, nor can it be acquired through the back door of a class action." *Koronthaly v. L'Oreal,* 2008 U.S. Dist. LEXIS 59024, \*12 (D.N.J. July 25, 2008).

**\*4** Defendants contend that "Plaintiff[s'] failure to plead any manifest, present, non-speculative injury, and failure to allege that [the products] did not provide cleansing benefits" requires the Court to conclude that Plaintiffs lack standing in the instant matter. In reliance upon this Court's decision in *Koronthaly,* Defendants assert that Plaintiffs' demand for a refund of the purchase price as a consequence of exposure to Defendants' products fails to establish an injury-in-fact and therefore, is not sufficient to confer standing where the alleged harm is no more than conjectural or hypothetical. As a result, Defendants claim that the absence of a cognizable injury and thereby standing in this matter requires dismissal pursuant to Fed.R.Civ.P. 12(b)(1).

In response, Plaintiffs contend that economic injury is sufficient to confer standing in this matter, relying upon *Clinton v. City of New York,* 524 U.S. 417, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998) and *Danvers Motor Co. v. Ford Motor Co.,* 432 F.3d 286 (3d Cir.2005). Plaintiffs contend that where the product contains undisclosed toxins and an ingredient banned by the FDA, the injury arises at the time of purchase. In distinguishing the *Koronthaly v. L'Oreal* case, citing to this Court's disposition on a motion for reconsideration, Plaintiffs assert that unlike *Koronthaly* where this Court determined that plaintiff "provided no authoritative evidence that the lead levels in defendants' lipstick products constitute[d] a dangerous amount or [were] in some way

Crouch v. Johnson & Johnson Consumer Co., Inc., Not Reported in F.Supp.2d (2010)

2010 WL 1530152

prohibited[,]" the present action involves methylene chloride, a substance banned by the FDA for use in cosmetics. 2008 U.S. Dist. LEXIS 86419, *11, 2008 WL 4723862 (D.N.J. Oct. 24, 2008). Further, Plaintiffs contend that the EPA classifies the other chemicals at issue as probable carcinogens. Lastly, Plaintiffs assert that their claims should stand because Plaintiffs have at least raised an issue of fact with respect to whether the chemicals contained in Defendants' products are dangerous in amount.

The *Koronthaly* case involved the purchase of a lipstick containing lead, the content of which was not subject to FDA regulation. *Id.* at *2–3. However, the lead content of the lipstick appeared dangerous when compared to the lead content regulation imposed by the FDA on candy. *Id.* In the absence of an FDA regulation concerning lead content in lipstick, or other legal prohibition, the plaintiff could not "seek a remedy for a harm that she ha[d] not actually or allegedly suffered." Moreover, this Court accorded great weight to the decision in *Williams v. Purdue Pharma Co.,* 297 F.Supp.2d 171 (D.D.C.2003), concluding that the "plaintiffs' allegation of an economic injury in a products liability action was insufficient to establish injury-in-fact" because "without alleging that a product failed to perform as advertised, a plaintiff has received the benefit of his bargain and has no basis to recover purchase costs." *Id.* at *13–14. Therefore, the *Williams* Court "remarked that benefit of the bargain injury could not sustain a claim of injury in fact." *Id.*

**\*5** While the Court agrees that the assertion of an economic injury is not an automatic bar to standing, *Koronthaly* demonstrates that an exception has been recognized in the context of claims concerning defective products, absent a specific legal prohibition precluding particular ingredients or usages. Insofar as Plaintiffs claims pertain to allegedly toxic chemicals that have not been banned by the FDA for use in cosmetics, including 1,4–dioxane and formaldehyde, in accordance with *Koronthaly,* this Court concludes that any potential injury is too remote, hypothetical and/or conjectural to establish standing in this matter. However, insofar as Plaintiffs' claims pertain to methylene chloride, a chemical explicitly banned for use by the FDA in any cosmetic, this Court declines to dismiss Plaintiffs' claims pursuant to Fed.R.Civ.P. 12(b)(1) for lack of standing. At this stage, Plaintiffs are permitted to proceed only with respect to claims concerning J & J's Baby Shampoo and Wal–Mart's Equate Tearless Baby Wash. With respect to the other allegedly defective products and their manufacturers, Plaintiffs' claims are dismissed.

B. Choice of Law

As a federal district court sitting in diversity, this Court must apply the choice of law rules of New Jersey, the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). New Jersey's choice of law rules mandate that the determinative law is that of the state with the greatest interest in governing the particular issue. The first step is to determine whether a conflict exists between the law of interested states, and then any conflict shall be determined on an issue-by-issue basis. "Under general conflict of laws principles, where the laws of the two jurisdictions would produce the same result on the particular issue presented, there is a 'false conflict,' and the court should avoid the choice-of-law question." *Williams v. Stone,* 109 F.3d 890, 894 (3d Cir.1997). If there is a conflict, then the court must identify the governmental policies underlying the law of each state and how those policies are affected by each state's contacts to the litigation. If the state's law is not related to its contacts with the litigation, then the state does not have an interest in having its law applied to the underlying issue. *See Vezey v. Doremus,* 103 N.J. 244, 510 A.2d 1187, 1189 (N.J.1986). That is, if there is an actual conflict between the two states' laws, the court then determines "which state has the most meaningful connections with and interests in the transaction and the parties." *Spence–Parker v. Del. Riv. & Bay Authority,* 2009 U.S. Dist. LEXIS 75187, *20, 2009 WL 2602094 (D.N.J. Aug. 21, 2009). Where no actual conflict of law exists, no choice of law need be made. *See Zavala v. Wal–Mart Stores, Inc.,* 393 F.Supp.2d 295, 333 (D.N.J.2005). "If there is no actual conflict, the court must apply the law of New Jersey." *LNT Merck Co. v. Dyson, Inc.,* 2009 U.S. Dist. LEXIS 62308, *6 (D.N.J. July 21, 2009) (citing *Lebegern v. Forman,* 471 F.3d 424, 428 (3d Cir.2006)). In that instance, a motion to dismiss under Fed.R.Civ.P. 12(b) (6) should be decided under New Jersey law. *See Gallerstein v. Berkshire Life Ins. Co. of America,* 2006 U.S. Dist. LEXIS 64487, *3, 2006 WL 2594862 (D.N.J. Sept. 11, 2006).

**\*6** The parties' moving papers recognize that the outcome is the same regardless of whether New Jersey State Law or Kentucky State Law is applied to this diversity action. Therefore, the parties assert that no conflict of laws issue is present in the instant matter.

1. New Jersey State Law Breach of Warranty, Consumer Fraud and Unjust Enrichment Claims

Defendants assert that dismissal is required with respect to all Plaintiffs' claims because the claims are based on alleged harm caused by a product and as a consequence, are subsumed by the New Jersey Product Liability Act ("PLA"). Plaintiffs argue that the PLA does not subsume Plaintiffs' UCC or consumer protection claims because Plaintiffs neither assert themselves as "claimants" nor allege present or future physical injuries as a consequence of Defendants' products. Plaintiffs further allege that the heart of the present matter is the economic harm caused by Defendants' misrepresentations, omissions and breaches of warranty. Additionally, Plaintiffs contend that the instant matter does not present a risk of double recovery, and that the claims asserted do not constitute a failure to warn cause of action pursuant to the PLA.

The New Jersey Supreme Court decision in *Sinclair v. Merck & Co* . is instructive. In *Sinclair v. Merck & Co.,* the Plaintiffs "alleged that as a result of their direct and prolonged consumption of Vioxx, they are at enhanced risk of serious undiagnosed and unrecognized myocardial infarction, commonly referred to as 'silent heart attack,' and other latent and unrecognized injuries." 195 N.J. 51, 55, 948 A.2d 587 (2008). In that case, the plaintiffs asserted claims for negligence, violation of the Product Liability Act, violation of the Consumer Fraud Act, breach of express and implied warranties and unjust enrichment. *Id.* In dismissing the complaint in its entirety, New Jersey Supreme Court determined the following,

> [p]laintiffs seek to avoid the requirements of the PLA by asserting their claims as CFA claims. However, the Legislature expressly provided in the PLA that claims for "harm caused by a product" are governed by the PLA "irrespective of the theory underlying the claim." N.J.S.A. 2A:58C–1b(3). We explained in *Lead Paint*, supra, that "[t]he language chosen by the Legislature in enacting the PLA is both expansive and inclusive, encompassing virtually all possible causes of action in relating to harms caused by consumer and other products." 191 N.J. at 436–37, 924 A.2d 484. As a result, we declared that "[i]n light of the clear intention of our Legislature to include all [product liability] claims within the scope of the PLA, we find no ground on which to conclude that the claims being raised by plaintiffs, regarding an ordinary household

product used by consumers, were excluded from the scope of" the PLA. We reach the same conclusion here.

The language of the PLA represents a clear legislative intent that, despite the broad reach we give to the CFA, the PLA is paramount when the underlying claim is one for harm caused by a product. The heart of plaintiffs' case is the potential for harm caused by Merck's drug. It is obviously a product liability claim. Plaintiffs' CFA claim does not fall within an exception to the PLA, but rather clearly falls within its scope. Consequently, plaintiffs may not maintain a CFA claim.

**\*7** *Id.* [1] [2]

Similarly, at the heart of this matter is the potential for harm caused by the defective products, J & J Baby Shampoo, J & J Moisture Care Baby Wash, Aveeno Baby Soothing Relief Creamy Wash, Kimberly–Clark's Soft Skin Shea Butter Baby Wipes and John Doe and Wal–Mart Equate Tearless Baby Wash, containing allegedly "toxic chemicals linked to increased cancer risk, adverse skin reactions, and other serious health problems." (Compl., ¶ 2). Further, Plaintiffs allege that the products were rendered useless "because they were contaminated with dangerous and potentially cancer-causing chemicals and continued use of the products would require Plaintiffs and Class Members to knowingly continue and even increase the exposure of their vulnerable infants and children to the harmful contaminants." (Compl., ¶ 2).

Consistent with the *Sinclair* decision, this Court concludes that the PLA subsumes all of Plaintiffs' claims, effectively precluding Plaintiffs' claims with respect to the CFA, and otherwise, in the absence of "harm" as defined by the PLA. The Court does not agree that articulating a claim in terms of pure economic harm where the core issue is the potential injury arising as a consequence of the products' allegedly harmful chemicals converts the underlying defective product claim into an independent and unrelated consumer fraud issue. Indeed, Plaintiffs' original Complaint contains a cause of action for products liability strategically omitted from the amended Complaint. Limiting a claim to economic injury and the remedy sought to economic loss cannot be used to obviate the PLA.

The assertion of a claim pursuant to the PLA is premised upon a requisite level of harm, including:

2010 WL 1530152

(a) physical damage to property, other than to the product itself; (b) personal physical illness, injury or death; (c) pain and suffering, mental anguish or emotional harm; and (d) any loss of consortium or services or other loss deriving from any type of harm described in subparagraphs (a) through (c) of this paragraph.

N.J.S.A. 2A:58C–1b(2). Harm, for purposes of the PLA, does not include pure economic loss. Insofar as Plaintiffs concede that their injury is purely economic, Plaintiffs' claims cannot survive. Therefore, with respect to New Jersey law, in accordance with *Sinclair*, Plaintiffs' Complaint is dismissed without prejudice in its entirety.

2. Kentucky State Law Breach of Warranty, Consumer Fraud and Unjust Enrichment

Despite the parties' respective beliefs that there is no conflict of law issue present in the instant matter, it is not clear to the Court that product liability laws of Kentucky subsume related claims in the same manner as the New Jersey PLA. Therefore, upon dismissal of all New Jersey State Law claims and for purposes of inclusion, the Court will proceed by addressing the viability of Plaintiffs' claims under Kentucky State Law. If Plaintiffs have asserted viable claims pursuant to Kentucky State Law, then a conflict of law exists and the Court will undertake to ascertain which state has the superior interest in the litigation.

i. Consumer Fraud

**\*8** Defendants contend that Plaintiffs have no viable claims pursuant to Kentucky Consumer Protection Act ("CPA") because the Kentucky Products Liability Act ("KPLA") subsumes the CPA, because Plaintiffs fail to allege any non-speculative, ascertainable loss and finally, because Plaintiffs fail to plead their claims with particularity in accordance with Fed.R.Civ.P. 9(b). Plaintiffs assert that claims pursuant to the CPA are not subsumed by the KPLA because Plaintiffs do not allege physical injury and because Plaintiffs are not seeking to impose liability on Defendants for representations made regarding a product different from the product purchased.

"As used in KRS [§§ ] 411.310 to 411.340, a 'product liability action' shall include any action brought for or on account of personal injury, death or property damage caused by or resulting from the manufacture, construction, design, formulation, development of standards, preparation, processing, assembly, testing, listing, certifying, warning, instructing, marketing, advertising, packaging or labeling of any product." *Monsanto Co. v. Reed,* 950 S.W.2d 811, 814 (Ky.1997) (citing KRS § 411.300(1)). "The PLA applies to all damage claims arising from the use of products, regardless of the legal theory advanced. There is no language in the PLA which suggests that products liability actions mean only those actions based on strict liability in tort under Section 402A of the Restatement of Torts. As we read the Act, if a claim is brought against a seller or a manufacturer of a product which is alleged to have caused injury, then the PLA applies, regardless of whether the action is founded on strict liability in tort, negligence or breach of warranty. While each of these theories of recovery in products liability cases requires proof of different elements and has different implications, [ ] their central purpose is the same: recovery of damages for injury or property damage caused by a product." *Id.*

"Under the Kentucky Consumer Protection Act, all 'unfair' acts or practices in the conduct of any trade or commerce are declared to be unlawful." *Ford Motor Co. v. Mayes,* 575 S.W.2d 480, 385 (Ky.Ct.App.1978) (citing KRS 367.170(1)). "The term 'unfair' is defined to mean 'unconscionable.' " *Id.* (citing KRS 367.170(2)). "Any person who purchases goods primarily for 'personal, family or household purposes' and who thereafter suffers any ascertainable loss as a result of any act declared unlawful by KRS 367.170 is authorized to bring a civil action to recover actual damages." *Id.* (citing KRS 367.220(1)).

Notably, the Kentucky Court of Appeals has rejected the argument that the "Consumer Protection Act, K.R.S. 367170, was not intended to create a cause of action for bodily injury: that its purpose was to protect consumers against economic loss resulting from unethical trade practices by sellers of goods and services." *AMC v. Addington,* 1984 Ky.App. LEXIS 480, \*13, 1984 WL 588048 (Ky.Ct.App. Apr. 6, 1984). "It is generally true that if injury results from an activity declared to be statutorily unlawful, then a tort has been committed. This is so notwithstanding the fact that the primary purpose of the Kentucky Consumer Protection Act is

2010 WL 1530152

to suppress unethical trade practices for the buying public. We consider the statute to create a degree of consumer expectation as to the safety and usability of products, encompassing some mishandling and haphazards within the definition of ordinary use of a [product]." *Id.* at *13–14. That Court elaborated,

> **\*9** [i]t is our reasoning that if one is injured from a breach of a statutory duty, in this case the duty imposed by K.R.S. 367.220 [3], then that cause of action is preserved by K.R.S. 446.070 [4], which [pr]ovides that a person injured by a violation of *any* statute may recover damages. While it appears that we are letting in the back door a cause of action via K.R.S. 446.070, it is only sensible that one who breaches or violates a duty imposed by law should be responsible for the consequences readily foreseeable by that failure to follow the law. The cases annotated under overwhelmingly permit recovery for personal injuries resulting from various and sundry statutory violations.

*Id.* The principle espoused by the Kentucky Court of Appeals appears to be the inverse of the approach adopted in New Jersey. That is, rather than the KPLA subsuming the Kentucky CPA, the expansive reach of the Kentucky CPA appears to encompass and allow for the assertion of products liability/personal injury tort claims. Therefore, with respect to Kentucky State Law, this Court will not dismiss Plaintiffs' claims on this ground.

Although foreclosed by application of the PLA in the instant case, the CFA was enacted to "protect the consumer against imposition and loss as a result of fraud and fraudulent practices by persons engaged in the sale of goods and services." *Smith v. Alza,* 400 N.J.Super. 529, 552, 948 A.2d 686 (2008). As articulated above, the "primary purpose of the Kentucky Consumer Protection Act is to suppress unethical trade practices for the buying public." *AMC,* 1984 Ky.App. LEXIS 480, at *13, 1984 WL 588048. The representative

Plaintiff resides in Louisville, Kentucky and from 2006 to 2008 purchased Defendants' products. J & J is a New Jersey corporation engaged in business throughout the United States. Wal-Mart is an Arkansas corporation engaged in business throughout the United States. Therefore, the Kentucky State contacts in the instant matter seem to outweigh New Jersey State contacts. Kentucky State Law prevails with respect to this issue.

#### ii. Breach of Warranty

Defendants move to dismiss Plaintiffs' breach of implied warranty claims because the Complaint fails to allege that the products were not merchantable or failed to perform the function for which they were sold, because the Complaint only asserts a claim for a potential breach and finally, because the Complaint fails to allege a "particular purpose" separate and apart from the ordinary purpose. In contrast, Plaintiffs contend that the Complaint adequately asserts a claim of breach of implied warranty of merchantability because the products are adulterated with methylene chloride and for breach of implied warranty of fitness because the goods are not fit for their ordinary and/or particular use on children.

"Contract liability for breach of warranty arises not from the common law, but from the terms of the contract and the statutory provisions of the U.C.C. The concept of implied warranty in particular is governed by two express sections of the U.C.C., KRS 355.2–314 and KRS 355.2–315." *Compex Int'l Co. v. Taylor,* 209 S.W.3d 462, 465 (Ky.2006). Pursuant to KRS 355.2–315, "[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under KRS 355.2–316[, Exclusion or Modification of Warranties,] an implied warranty that the goods shall be fit for such purpose." "Fit for ordinary purposes for which used" does not require perfection. *Bickett v. W.R. Grace & Co.,* 1972 U.S. Dist. LEXIS 14781, *22, 1972 WL 20845 (W.D.Ky.1972). "The standard is reasonable fitness for the purpose intended." *Id.* (internal citations omitted).

**\*10** Pursuant to KRS 355.2–314, "Goods to be merchantable must be at least as such as"

> (a) pass without objection in the trade under the contract description; and

(b) in the case of fungible goods, are of fair average quality within the description; and

(c) are fit for the ordinary purposes for which such goods are used; and

(d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

(e) are adequately contained, packaged, and labeled as the agreement may require; and

(f) conform to the promises or affirmations of fact made on the container or label if any.

Assuming, without concluding, that the descriptive messages on the alleged defective products constitute promises or affirmations, then, in accordance with the foregoing limitations, Plaintiffs' claims for breach of implied warranties pursuant to Kentucky State Law are permitted to proceed.

Although foreclosed by application of the PLA in the instant matter, the underlying purpose of the UCC as recognized by the New Jersey Supreme Court, is "to simplify, clarify and modernize the law governing commercial transactions; to permit the continued expansion of commercial practices through custom, usage and agreement of the parties; and to make uniform the law among various jurisdictions." *N.J.S.A. 12A:1–102(1); Alloway v. General Marine Indus., L.P.,* 149 N.J. 620, 630, 695 A.2d 264 (1997). Kentucky recognizes that "one of the purposes of the UCC is 'to make uniform the law among the various jurisdictions.' " "*Star Bank v. Parnell,* 992 S.W.2d 189, 192 (Ky.Ct.App.1998). Kentucky also recognizes that "[a] principal purpose of the UCC is to lower transaction costs by permitting covered parties to rely on certain objective standards of fair and reasonable dealing." *A & A Mech. v. Thermal Equip. Sales,* 998 S.W.2d 505, 510 (Ky.Ct.App.1999). Similar to the foregoing analysis, Kentucky's contacts with the representative Plaintiff and the transactions that are the source of the Plaintiffs' claims favors the application of Kentucky State law over New Jersey with respect to this issue.

iii. Unjust Enrichment

Defendants assert that where an adequate remedy at law exists, a claim seeking equitable relief is not viable. Additionally, Defendants contend that the unjust enrichment claim cannot survive because instead of being pled in the alternative, it merely incorporates other deficient claims set forth in the Complaint. Finally, Defendants argue that because Plaintiffs fail to assert that the allegedly defective products failed to perform the function for which they were sold, a claim for unjust enrichment cannot survive. By contrast, Plaintiffs assert that non-gratuitous benefits were conferred upon Defendant, the retention of which would unjustly enrich the Defendants.

"A party may state as many separate claims or defenses as it has, regardless of consistency." *Holley Performance Products v. Keystone Auto Operations, Inc.,* 2009 U.S. Dist. LEXIS 102709, *16, 2009 WL 3613735 (W.D.Ky. Oct. 29, 2009). In *Holley,* the Court concluded that "as this is a motion to dismiss, and not for summary judgment, the burden on the plaintiff is only to allege sufficient facts to show unjust enrichment is a plausible claim for relief." *Id.* ("The Court need not at this time determine whether or not there is in fact a viable contract claim which destroys any claims for equitable relief; the Court need only determine if all claims are sufficiently plead."). "Under Kentucky law, to succeed on a claim of unjust enrichment, the plaintiff must show the following elements: (1) a benefit conferred upon the defendant at the plaintiff's expense; (2) a resulting appreciation of the benefit by the defendant, and (3) an inequitable retention of the benefit without payment for its value." *Stonestreet Farm, LLC v. Buckram Oaks Holdings, N.V.,* 2007 U.S. Dist. LEXIS 31313, *15, 2007 WL 6995056 (E.D.Ky. Apr. 16, 2007) (citing *Guarantee Electric v. Bog Rivers Electric Corp.,* 669 F.Supp. 1371, 1381 (W.D.Ky.1987)). Equitable remedies are only available where legal remedies are insufficient. *Holley,* 2009 U.S. Dist. LEXIS 102709, at *7, 2009 WL 3613735 (citing *Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 478, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962)).

**\*11** Plaintiffs claim to have conferred a non-gratuitous benefit upon Defendants. Consistent with the elements of a claim for unjust enrichment, it is unclear to the Court how a non-gratuitous benefit is incurred at the expense of Plaintiffs. Nonetheless, Plaintiffs allege exclusively economic injury. On this ground, there is no indication that an adequate remedy at law is unavailable to Plaintiffs. Therefore, to the extent that Plaintiffs assert a claim for unjust enrichment pursuant to Kentucky State Law, Plaintiffs' Complaint is dismissed.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion is **granted in part** and **denied in part**. Plaintiffs' Complaint is **partially dismissed without prejudice** pursuant to Fed.R.Civ.P. 12(b)(1) and Fed.R.Civ.P. 12(b)(6). An appropriate Order accompanies this Opinion.

### All Citations

Not Reported in F.Supp.2d, 2010 WL 1530152

## Footnotes

1    Although this Court permitted the CFA claims to proceed in *Nafar v. Hollywood Tanning Sys., Inc.,* in that case, the Plaintiff's claims and basis for distinction of the CFA from the PLA was the purchase of services, rather than the purchase of a defective product. 2007 U.S. Dist. LEXIS 26312, *12–14 (D.N.J. Apr. 5, 2007). CFA claims rooted in services are clearly distinguishable from claims grounded in products. The present action does not involve a claim for defective services.

2    Further, *In re Ford Motor Co. E–350 Van Products,* 2008 U.S. Dist. LEXIS 73690, *48 n. 9 (D.N.J. Sept. 3, 2008), where the Court found the Sinclair case "inapposite" "because, by design, the PLA 'except[s] actions for harm caused by breach of an express warranty[,]' which plaintiffs expressly allege[d.]" On the basis of an express warranty, the Court concluded that *Sinclair* decision "does not mandate dismissal of unjust enrichment and state consumer fraud claims where a party does not plead a PLA claim." *Id.* (internal citations omitted). Plaintiffs do not assert a claim for breach of an express warranty in the present action.

3    K.R.S. 367.220. **Action for recovery of money or property—When action may be brought.**

(1) Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by K.R.S. 367.170, may bring an action under the Rules of Civil Procedure in the Circuit Court in which the seller or lessor resides or has his principal place of business or is doing business, or in the Circuit Court in which the purchaser or lessee of goods or services resides, or where the transaction in question occurred, to recover actual damages. The court may, in its discretion, award actual damages and may provide such equitable relief as it deems necessary or proper. Nothing in this subsection shall be construed to limit a person's right to seek punitive damages where appropriate.

4    K.R.S. 446.070. **Penalty no bar to civil recovery.** "A person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation, although a penalty or forfeiture is imposed for such violation."

---

**End of Document**                                         © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 9

2020 WL 3546750
Only the Westlaw citation is currently available.
**NOT FOR PUBLICATION**
United States District Court, D. New Jersey.

Lory D'ADDARIO and Peter D'Addario, Plaintiffs,

v.

JOHNSON & JOHNSON; Ethicon, Inc.;
and Mentor Worldwide, LLC, Defendants.

Civil Action No. 19-15627 (MAS) (TJB)
|
Filed 06/30/2020

**Attorneys and Law Firms**

Dena Rachel Young, Brian J. McCormick, Jr., Ross Feller
Casey LLP, Philadelphia, PA, for Plaintiffs.

Michael Charles Zogby, Drinker Biddle & Reath, LLP,
Florham Park, NJ, Jessica Leigh Brennan, Faegre Drinker
Biddle & Reath LLP, Gillette, NJ, for Defendants.

**MEMORANDUM OPINION**

SHIPP, District Judge

**\*1** This matter comes before the Court upon Defendants
Mentor Worldwide, LLC ("Mentor"), Ethicon, Inc.
("Ethicon"), and Johnson & Johnson's (collectively,
"Defendants") Motion to Dismiss. (ECF No. 6.) Plaintiffs
Lory D'Addario ("D'Addario") and Peter D'Addario
(collectively, "Plaintiffs") opposed (ECF No. 25), and
Defendants replied (ECF No. 26.) [1] The Court has carefully
considered the parties' submissions and decides the matter
without oral argument pursuant to Local Civil Rule 78.1. For
the reasons set forth below, Defendants' Motion is granted.

**I. BACKGROUND** [2]
On June 14, 2013, the United States Food and Drug
Administration ("FDA") approved Mentor's premarket
approval application for its MemoryShape breast implants
(hereinafter, "Mentor Breast Implants"). (Compl. ¶¶ 74, 218,
ECF No. 1.) Defendants design, manufacture, market, label,
and distribute Mentor Breast Implants. (*Id.* ¶ 1.)

In July 2015, D'Addario underwent breast reconstruction
surgery and received Mentor Implants. (*Id.* ¶ 152.) Plaintiffs
allege that, at that time, Defendants were aware that
Mentor Implants caused breast implant-associated anaplastic
large cell lymphoma ("BIA-ALCL") but failed to advise
D'Addario of the risk. (*Id.* ¶¶ 73, 153–55.) Had D'Addario
known of the slightest risk of BIA-ALCL, she would not have
proceeded with the implantation. (*Id.* ¶ 156.)

In July 2017, D'Addario tested positive for BIA-ALCL. (*Id.*
¶ 158.) Following diagnosis and treatment of BIA-ALCL,
D'Addario suffered pain, swelling, and embarrassment. (*Id.* ¶
161.) In August 2017, D'Addario underwent implant removal
and total capsulectomy. (*Id.* ¶ 159.) The explantation caused
D'Addario tremendous pain. (*Id.* ¶ 160.)

Plaintiffs bring the following Counts against Defendants:
(1) Strict Liability—Manufacturing Defect in violation of
the Connecticut Product Liability Act ("CPLA"), Con. Gen.
Stat. §§ 52-572, *et seq.*; (2) Negligent Misrepresentation;
(3) Breach of Express and Implied Warranty; (4) Violation
of the Connecticut Unfair Trade Practices Act ("CUTPA"),
Conn. Gen. Stat. §§ 42-110b, *et seq.*; and (5) Loss of
Consortium. (*Id.* ¶¶ 176–233.)

**II. LEGAL STANDARD**
"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short
and plain statement of the claim showing that the pleader
is entitled to relief,' in order to 'give the defendant fair
notice of what the ... claim is and the grounds upon which
it rests.' " *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555
(2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957))
(alteration in original).

**\*2** District courts undertake a three-part analysis when
considering a motion to dismiss pursuant to Federal Rule
of Civil Procedure 12(b)(6). *Malleus v. George*, 641 F.3d
560, 563 (3d Cir. 2011). "First, the court must 'tak[e] note
of the elements a plaintiff must plead to state a claim.' "
*Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009))
(alteration in original). Second, the court must accept as
true all of the plaintiff's well-pled factual allegations and
"construe the complaint in the light most favorable to the
plaintiff." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210
(3d Cir. 2009) (internal quotations and citation omitted). In
doing so, the court is free to ignore legal conclusions or

factually unsupported accusations that merely state, "the-defendant-unlawfully-harmed-me." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Finally, the court must determine whether "the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.' " *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679). "The defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).

## III. DISCUSSION

Defendants make the following arguments for the dismissal of Plaintiffs' Complaint: (1) Counts Two through Four are subsumed by the CPLA (Defs.' Moving Br. 10–12); (2) Plaintiffs' product liability claims are preempted by federal law (*id.* at 13–36); (3) Plaintiffs' claims do not satisfy applicable pleading requirements (*id.* at 36–40); and (4) Plaintiffs' loss of consortium claim fails because it is a derivative claim. The Court addresses each argument in turn.

### A. CPLA Subsumption [3]

Defendants argue that Counts Two through Four of the Complaint are subsumed by the CPLA. (*Id.* at 10.) The CPLA provides the exclusive vehicle in Connecticut for actions premised on "harm caused by a product." Conn. Gen. Stat. § 52–572n(a) ("A product liability claim ... shall be in lieu of all other claims against product sellers, including actions of negligence, strict liability and warranty, for harm caused by a product."). The provision essentially consolidates all product liability claims into a "single form of action." *LaMontagne v. E.I. Du Pont De Nemours & Co.*, 41 F.3d 846, 855 (2d Cir. 1994) (citing *Winslow v. Lewis-Shepard, Inc.*, 562 A.2d 517, 521 (Conn. 1989)).

Here, the Court finds—and Plaintiffs agree (Pls.' Opp'n Br. 34)— that Counts Two and Three alleging negligent misrepresentation and breach of express and implied warranty are subsumed by the CPLA. Although the two claims are dismissed, Plaintiffs may, nonetheless, assert these common law theories of products liability under Count One, their CPLA claim. *Fraser v. Wyeth, Inc.*, 857 F. Supp. 2d 244, 252 (D. Conn. 2012) ("A plaintiff bringing a cause of action under the CPLA therefore retains the right to allege traditional theories of recovery under one unified CPLA claim." (citation omitted)).

Next, the Court turns to Plaintiffs' CUTPA claim. The CPLA will not bar a CUTPA claim if an injury was not caused by a defective product or if the plaintiffs are not pursuing a claim for "personal injury, death or property damage." *Gerrity v. R.J. Reynolds Tobacco Co.*, 818 A.2d 769, 774 (Conn. 2003) (quoting Conn. Gen. Stat. § 52-572m(b)). In other words, where the plaintiffs' CUTPA claim seeks "to redress merely *a financial injury* suffered ... of a kind that has never been regarded as part of the traditional tort remedy for harm caused by a defective product," the CUTPA claim is not barred. *Id.* at 775.

**\*3** Plaintiffs' characterization of D'Addario's injuries as "financial" in nature belies their true nature as harms caused by a defective product. (*See* Pls.' Opp'n Br. 23–24.) Plaintiffs allege that, because of Defendants' deceptive trade practices, she suffers from permanent and continuing injuries, which "require medical treatment and hospital expenses" and "lost ... financial gains." (Compl. ¶ 228.) The Court, however, fails to distinguish between the injuries Plaintiffs allege and those typically asserted in garden-variety products liability suits. The Court, therefore, dismisses Plaintiffs' CUTPA claim as barred by the CPLA's exclusivity provision. For these reasons, the Court dismisses Counts Two, Three, and Four as subsumed by the CPLA.

### B. Federal Preemption

Defendants argue that Plaintiffs' state-law claims are either expressly or impliedly preempted by federal law. (Defs.' Moving Br. 13–36.) Defendants also argue that certain claims fail because Plaintiffs have not alleged parallel state-law duties (*id.* at 28–36) or causal nexuses between her injuries and Defendants' alleged violations (*id.* at 36).

The Medical Device Amendments of 1976 ("MDA") to the Federal Food Drug & Cosmetic Act, 21 U.S.C. §§ 360c, *et seq.*, "imposed a regime of detailed federal oversight" for medical devices. *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 316, 319 (2008). Of the devices regulated under the MDA, Class III devices that undergo the "premarket approval" process receive the greatest oversight. *Id.* at 317. The premarket approval process is "rigorous" and "includes review of the device's proposed labeling. The FDA evaluates safety and effectiveness under the conditions of use set forth on the label, § 360c(a)(2)(B), and must determine that the

proposed labeling is neither false nor misleading, § 360e(d)(1)(A)." *Id.* at 317–18.

Premarket approval further imposes "requirements" that are "specific to a medical device." *Id.* at 323–24. Devices are "to be made with almost no deviations from the specifications in its approval application." *Id.* at 323. "Once a device has received premarket approval, the MDA forbids the manufacturer to make, without FDA permission, changes in design specifications, manufacturing processes, labeling, or any other attribute, that would affect safety or effectiveness." *Id.* at 319 (citing § 360e(d)(6)(A)(i)).

To determine whether the MDA expressly preempts a state claim under § 360k(a), courts consider (1) whether the FDA has established "requirements" applicable to the specific device at issue; and if so, (2) whether the plaintiffs' claims are based on state requirements that are "different from, or in addition to," the federal ones and that "relate to safety and effectiveness." *Shuker v. Smith & Nephew, PLC,* 885 F.3d 760, 771 (3d Cir. 2018) (citing *Riegel,* 552 U.S. at 321–22). If the answer is yes to both questions, the state claim is preempted. *Id.* "If, instead, the answer to the second question is no, then the state duties in such a case parallel, rather than add to, federal requirements, and the claims are not preempted." *Id.* (citation omitted) (internal quotation marks omitted).

Even if a state-law claim is not expressly preempted, it may be impliedly preempted under § 337(a). Under the MDA, all actions to enforce FDA requirements "shall be by and in the name of the United States." 21 U.S.C. § 337(a). "[T]he Federal Government rather than private litigants ... are authorized to file suit for noncompliance with the medical device provisions." *Buckman Co. v. Plaintiffs' Legal Committee,* 531 U.S. 341, 349 n.4 (2001). To that end, the *Buckman* Court held that "state-law fraud-on-the-FDA claims inevitably conflict with the FDA's responsibility to police fraud consistently with the Administrations judgment and objectives" and are impliedly preempted by the MDA. *Id.* at 350.

**\*4** Ultimately, where a state-law claim for violating a state-law duty "parallels" a federal-law duty under the MDA, the MDA will not preempt the state-law claim. *Riegel,* 552 U.S. at 330. It is not enough to state that a state law parallels federal law generally. Plaintiffs must also allege a link between a product's deviation from an FDA requirement and the alleged injury. *Clements v. Sanofi-Aventis, U.S., Inc.,* 111 F. Supp. 3d 586, 598 (D.N.J. 2015); *see Simoneau v. Stryker Corp.,* No. 13-1200, 2014 WL 1289426, at \*10 (D. Conn. Mar. 31, 2014) (dismissing a plaintiff's misbranding, failure to warn, and failure to report claims for failure to link her injury to a violation of an FDA requirement).

Here, it is undisputed that Mentor Breast Implants received premarket approval. (Compl. ¶ 74.) It is also undisputed that the first part of the *Riegel* preemption analysis is satisfied. (Pls.' Opp'n Br. 18.) The Court, therefore, only considers the second part of the *Riegel* test—whether Plaintiffs' state-law claims would impose requirements that are "different from or in addition to" federal safety and effectiveness requirements.

### 1. Strict Product Liability—Manufacturing Defect

Plaintiffs allege that "Mentor Breast Implants were manufactured in a flawed manner that violated the FDA approved design standards and specifications." (Compl. ¶ 178.) Plaintiffs allege that the breast implants she received were manufactured in a non-conforming manner because they "contained a graham-negative biofilm/endotoxin released from the surface of the textured surface which stimulates lymphocytes" (Compl. ¶ 180), and that these "bacteria stimulating lymphocytes" caused D'Addario's BIA-ALCL (*id.* ¶ 182).

Plaintiffs do not, however, allege that the FDA required the exclusion of this endotoxin. If a federal requirement is not properly identified, the Court is unable to determine whether Plaintiffs' state-law claim based upon Connecticut requirements is "different from, or in addition to," the federal ones, that relate to safety and effectiveness. *Mendez v. Shah,* 94 F. Supp. 3d 633, 639 (D.N.J. 2015). Moreover, although Plaintiffs broadly allege that Defendants "failed to adhere to [numerous] federal specifications" (*e.g.,* Compl. ¶ 184a-e), Plaintiffs fail to allege how these violations resulted in the presence of lymphocytes in her implants or any other injury. Plaintiffs' manufacturing defect claim is, accordingly, dismissed.

To the extent Plaintiffs now base their manufacturing defect claim on violations of FDA's Current Good Manufacturing

Practices (see Pls.' Opp'n Br. 9, 17–18). these allegations are improperly pleaded in the opposition brief. "[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." *Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) (citation omitted). Because the Court grants Plaintiffs leave to amend the Complaint, Plaintiffs may further flush out this theory in an amended complaint.

### 2. Failure to Warn

The contours of Plaintiffs' failure-to-warn claim are unclear, as allegations that could potentially support such a claim are scattered throughout the Complaint. (*See generally* Compl.) Nonetheless, liberally construing the Complaint, the Court identifies the following two theories: (I) Defendants failed to warn "consumers, healthcare providers, the general public, and the FDA that ALCL or BIA-ALCL ... was a potential risk of Mentor Breast Implants, and that hundreds, if not thousands, of patients had suffered negative experiences and events as a result of such known risk" (Compl. ¶ 117); and (2) Defendants failed to warn D'Addario "of the defective and unreasonably dangerous conditions of its Mentor Breast Implants that could cause serious injury or death and to timely and accurately report such adverse events to the FDA" (*id.* ¶ 179).

**\*5** To the extent Plaintiffs take issue with the original warning Mentor provided to "consumers, [including D'Addario], healthcare providers. [and] the general public" (Compl. ¶ 117), this claim is preempted. A device's "proposed labeling" is reviewed during the PMA process and a manufacturer may not revise the labeling without FDA permission. *Riegel*, 552 U.S. at 318–19. "[S]tate claims based on labeling defects such as false or missing information about health risks ... are[, therefore,] preempted in the case of Class III medical devices, because these claims necessarily impose requirements different from or additional to the FDA's requirements." *Simoneau*, 2014 WL 1289426, at \*11; *see also* *Horn v. Thoratec Corp.*, 376 F.3d 163, 176 (3d Cir. 2004) (finding a plaintiff's state-law claims would add to the requirements imposed by the FDA on device labeling). Because Plaintiffs' claim would require Mentor to provide different warnings or instructions from those initially approved by the FDA, the claim is preempted.

To the extent Plaintiffs challenge the information Mentor provided to the FDA in its premarket approval application (Compl. ¶ 117), Plaintiffs "identif[y] no separate state law duty to warn the FDA." *Simoneau*, 2014 WL 1289426, at \*11. Moreover, such a claim fundamentally alleges fraud-on-the-FDA and would be impliedly preempted under *Buckman*, For these reasons, the Court dismisses Plaintiffs' failure-to-warn claim.

### 3. Negligent Misrepresentation

Plaintiffs allege that Defendants "negligently misrepresented material information regarding their product including, but not limited to, its safety." (Compl. ¶ 202.) According to Plaintiffs, "Defendants knew or should have known that their breast implants were not actually safe as they were manufactured in a defective condition." (*Id.* ¶ 203.) Plaintiffs allege that "[D'Addario] was[, therefore,] unaware and ignorant of the falsity of the statements and reasonably ... relied upon them and believed them to be true." (*Id.* ¶ 204.)

Here, Plaintiffs' negligent misrepresentation claim fails because they wholly fail to set forth a relevant federal requirement. To the extent Plaintiffs' claim is based on defective manufacturing, the Court reiterates that Plaintiffs fail to allege a violation of a federal requirement on this basis. *See supra* Section III.B.2. Plaintiffs' negligent misrepresentation claim is dismissed.

### 4. Breach of Implied and Express Warranty

The Complaint alleges that "Mentor Breast Implants do not conform to ... implied or express warranties and representations because [they] are not safe or effective for their ordinary purpose, nor are they safer or more effective than other breast implants available, [and] they were not manufactured in the specifications required by the FDA." (Compl. ¶ 220; *see also id.* ¶¶ 213–16, 221.)

Here, again, Plaintiffs' breach of warranty claim based on device safety and effectiveness fails because Plaintiffs fail to allege a violation of a federal regulation. *Supra* Section III.B.2. Furthermore, Plaintiffs' breach of warranty claim essentially challenges the safety and effectiveness of Mentor Breast Implants, and, to find for Plaintiffs, the Court would necessarily contradict the FDA's determination of safety and

effectiveness during premarket approval. Plaintiffs' breach of express and implied warranty claim is, accordingly, dismissed.

### C. Group Pleading

Defendants argue that Plaintiffs make "the same conclusory and generic allegation against each defendant—i.e., that each defendant is responsible for 'designing, formulating, testing, packaging, labeling, producing, assembling, advertising, marketing, promoting, distributing, manufacturing, and selling' " Mentor Breast Implants. (Defs.' Moving Br. 37 (quoting Compl. ¶ 22).) According to Defendants, by "lumping" together their alleged misconduct, Plaintiffs fail to provide fair notice of the basis of their claims as against each individual defendant. (*Id.*) Defendants further argue that, although Plaintiffs allege that Johnson & Johnson and Ethicon are "agents" or "alter-egos" of Mentor or that Johnson & Johnson "controlled" Mentor, Plaintiffs fail to allege facts that support these theories. (*Id.* at 38–39.) Plaintiffs argue that they have fulfilled their duty at this pleading stage—pointing to allegations that Johnson & Johnson has owned Mentor since 2009 and that Johnson & Johnson and Ethicon admitted they are "combining forces" with Mentor. (Pls.' Opp'n Br. 37–38.)

**\*6** Plaintiffs' Complaint broadly alleges Defendants' misconduct but fails to allege the conduct for which each defendant is culpable. "Courts in this district generally agree that this type of 'group pleading' does not satisfy Rule 8, because it does not place Defendants on notice of the claims against each of them." *Sheeran v. Blyth Shipholding S.A.*, No. 14-5482, 2015 WL 9048979, at \*3 (D.N.J. Dec. 16, 2015). Moreover, the lack of well-pleaded facts does not allow the Court "to draw the reasonable inference that [each] defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Plaintiffs, accordingly, have not alleged sufficient facts to identify each defendant's role with the Mentor Breast Implants. It is not enough to say that "each of the defendants is responsible for everything." *Sheeran*, 2015 WL 9048979, at \*5. Nor does the *In re Riddell Concussion Reduction Litigation*, 77 F. Supp. 3d 422 (D.N.J. 2015) decision mandate a contrary conclusion. There, the plaintiffs alleged that the defendant entities took concerted action and "operat[ed] under a single brand." *Id.* at 431–32. Plaintiffs make no such allegations as to Defendants here. (*See generally* Compl.) Because Counts One through Five are directed to each of the Defendants, they are dismissed without prejudice.

### D. Plaintiffs' Loss-of-Consortium Claim Fails

Because a loss of consortium claim is a derivative claim and because D'Addario fails to assert a product liability claim, Peter D'Addario's loss of consortium claim fails as a matter of law and must be dismissed. *Jacoby v. Brinckerhoff*, 735 A.2d 347, 352 (Conn. 1999) (Finding a "plaintiff cannot pursue an action for loss of consortium in the absence of any basis in the record for a finding that his ... spouse was injured as a result of her treatment by the defendant"); *see also O'Dell v. Greenwich Healthcare Servs., Inc.*, No. CV116008364S, 2013 WL 2278752, at \*5 (Conn. Super. Ct. Apr. 25, 2013).

### IV. CONCLUSION

For these reasons, the Court grants Defendants' Motion to Dismiss. The Complaint is dismissed without prejudice subject to the filing of an amended complaint. The Court will enter an Order consistent with this Memorandum Opinion.

**All Citations**

Slip Copy, 2020 WL 3546750

---

**Footnotes**

1    Defendants filed a notice of supplemental authority, alerting the Court to three "district court decisions granting Mentor's motions to dismiss in nearly identical cases." (ECF No. 27.) Plaintiffs replied to Defendants' notice. (ECF No. 28.) Thereafter, Defendants filed an additional notice of supplemental authority on another "district court decision granting Mentor's motion to dismiss in a nearly identical case." (ECF No. 29.)

2020 WL 3546750

2    The Court accepts all well-pleaded factual allegations as true. *See* *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).

3    Under New Jersey's "most significant relationship" test, where plaintiffs assert product liability claims, the plaintiffs' home state has the "most significant relationship" to the issues. *Arlandson v. Hartz Mountain Corp.*, 792 F. Supp. 2d 691, 699 (D.N.J. 2011) (citing *P.V. v. Camp Jaycee*, 962 A.2d 453 (N.J. 2008)). Here, the Court applies the law of Plaintiffs' home state of Connecticut to Plaintiffs' product liability claims, which the parties do not dispute. (Defs.' Moving Br. 7, ECF No. 6; Pls.' Opp'n Br. 5, ECF No. 25.)

---

**End of Document**              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 10

Case 1:19-md-02875-RMB-SAK   Document 598-3   Filed 10/16/20   Page 121 of 410
PageID: 12728
In re: Elk Cross Timbers Decking Marketing, Not Reported in Fed.Supp. (2015)
2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

KeyCite Yellow Flag - Negative Treatment
Distinguished by In re Insulin Pricing Litigation, D.N.J., February 20, 2020

2015 WL 6467730
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

IN RE: ELK CROSS TIMBERS
DECKING MARKETING, Sales Practices
and Products Liability Litigation.

Civil Action No.: 15-18 (JLL)
|
MDL No.: 2577
|
Signed 10/26/2015

OPINION

LINARES, District Judge

*1  This matter comes before the Court by way of a motion to dismiss (ECF No. 60 ("GAF Mot.") the Omnibus Amended Complaint ("OAC") (ECF No. 15) pursuant to Federal Rule of Civil Procedure 12(b)(6) by Building Materials Corporation of America d/b/a GAF Materials Corporation ("GAF").

Jurisdiction is premised upon 28 U.S.C. § 1332(d). (See OAC ¶ 36.) No oral argument was heard pursuant to Rule 78 of the Federal Rules of Civil Procedure. After considering the submissions of the parties in support of and in opposition to the instant motion, GAF's motion to dismiss is granted in part and denied in part.

I. BACKGROUND

A. General Allegations

Plaintiffs bring the instant putative class action individually and on behalf of all owners of GAF Elk Cross Timbers and/or DuraLife Decking (collectively "Decking"), "a non-natural wood product made from manufactured composite wood." (Id. ¶¶ 1, 2.) At all times relevant to this litigation, GAF, a Delaware corporation with its principal place of business located in Wayne, New Jersey, has been in the business of manufacturing, marketing, and selling exterior building products in North America, including Decking. (Id. ¶¶ 8–10.) Plaintiffs allege, generally, that the Decking is "defective in design and manufacture," which results in

cracking, warping, swelling, mold, discoloration, twisting, and shrinking. (See, e.g., id. ¶¶ 44–50, 74.) Plaintiffs also allege that GAF knew or should have known about these defects but failed to disclose the defects to its consumers. (Id. ¶¶ 73–75).

Plaintiffs further allege, that despite GAF's knowledge of the defects, it misrepresented and warranted that the Decking was a superior product knowing that customers would rely on these misrepresentations. (Id. ¶¶ 76, 79–81, 86.) Specifically, Plaintiffs allege that "GAF made the following representations in conjunction with the sale of its Decking, each of which were intended to (and did) convey information regarding the durability and performance of the Decking, rather than mere puffery:"

a. The Decking's "superior engineering and design creates a deck that lasts longer than ordinary woods decks with less maintenance–no staining or sealing required."

b. The Decking "won't warp, crack, splinter or rot like wood."

c. The Decking "[r]esists scratching and high traffic wear and tear."

d. The Decking "resists sagging, splintering, warping, insects and rotting."

e. The Decking contains "[n]o toxic chemicals like treated wood."

f. "For the beauty of a wooden deck with less care and effort, chose Elk Cross Timbers brand composite decking [viz., the Decking]."

g. The Decking "is designed with the EZ–Build System, which not only makes construction a snap, but also adds beauty with its concealed fasteners hidden below the surface."

h. "No matter what your design goals are, you can rely on [the Decking] to give you the lasting, quality deck of your dreams, with little time and effort."

(Id. ¶ 85 (alteration in original).)

B. Individual Plaintiff Allegations

*2  The OAC sets forth factual allegations for twenty-five (25) sets of Plaintiffs (either as an individual or as a couple). (See id. ¶¶ 11–35.) The allegations in the *amended* omnibus

2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

complaint for the individual Plaintiffs are mostly cut and paste allegations providing only the most basic information. With minor tweaks in some instances, the individual allegations follow the below format:

> Plaintiff [insert name] is an [insert state] citizen who resides in [insert town, state]. [Insert name] purchased and installed Decking on [his/her/ their] home in [insert time frame]. On [insert date], [insert name] initially filed a Complaint in the United States District Court of the [insert court]. Within a year prior to filing the Complaint, [name/he/she/ they] discovered that the Decking is defective and must be replaced, and that any other property damage caused by the Decking must be repaired. [1]

For example, the allegations for Ken Burger are:

> Plaintiff Ken Burger ("Burger") is an Ohio citizen who resides in Cincinnati, Ohio. Mr. Burger purchased and installed Decking on his home in the summer of 2010. On June 19, 2014, Burger initially filed a Complaint in the United States District Court of the Southern District of Ohio. Within a year prior to filing his initial Complaint, Burger discovered that the Decking is defective and must be replaced, and that any other property damage caused by the Decking must be repaired.

(*Id.* ¶ 11.) And the essentially identical allegations for Frederick and Veronica Robertie are:

> Plaintiffs Frederick and Veronica Robertie ("Robertie") are North

> Carolina citizens who reside in Bolivia, North Carolina. The Roberties purchased and installed Decking on their home in January/February, 2009. On August 13, 2014, the Roberties initially filed a Complaint in the United States District Court of the Eastern District of North Carolina. Within a year of filing the Complaint, they discovered that the Decking is defective and must be replaced, and that any other property damage caused by the Decking must be repaired.

(*Id.* ¶ 12.) For these two Plaintiffs, and others like them, these are the only specific allegations made, as opposed to general allegations made by "Plaintiffs."

Sixteen (16) of the twenty-three (23) remaining Plaintiff fact sets [2] further allege, in only a cursory one sentence or clause manner, that based upon "GAF's marketing" or its "representations" or the "quality" of the Decking that the Plaintiff "believed that the Decking was superior to other decking boards" or that they bought the decking because of the representations/marketing/quality. The allegations related to such representations are as follows:

• **Ross:** "Based upon GAF's marketing, at the time of purchase, Ross believed that the Decking was superior to other decking boards." (*Id.* ¶ 13.)

• **Sheridan:** "Based upon GAF's marketing, at the time of purchase, Sheridan believed that the Decking was superior to other decking boards in the industry and would require limited maintenance." (*Id.* ¶ 14.)

**\*3** • **Denton:** "Mr. Denton purchased and installed Decking on his home in July, 2008 based upon the representations regarding the quality of the Decking." (*Id.* ¶ 15.)

• **Hoover & Cohen:** "They purchased and installed Decking on their home in July, 2007 based upon the representations regarding the quality of the Decking." (*Id.* ¶ 16.)

• **Warren:** "Mr. Warren purchased and installed Decking on his home in the spring/summer of 2008 because

2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

of the representations regarding the quality of the Decking." (*Id.* ¶ 18.)

- **Narducci:** "Mr. Narducci purchased and installed Decking on his home in the spring/summer of 2008 based upon the quality and ease of use of the Decking." (*Id.* ¶ 19.)

- **Ernst:** "Mr. Ernst purchased and installed Decking on his home in the summer of 2007 based upon the representations regarding the quality of the Decking." (*Id.* ¶ 21.)

- **Turcheck:** "Mr. Turcheck purchased and installed Decking on his home in the spring of 2006 based upon the representations regarding the quality of the Decking." (*Id.* ¶ 23.)

- **Stidham:** "Mr. Stidham purchased and installed Decking on his home in the summer of 2008 based upon the representations regarding the quality of the Decking." (*Id.* ¶ 25.)

- **Williams:** "Mr. and Mrs. Williams purchased and installed Decking on their home in August, 2008 based upon the representations regarding the quality of the Decking." (*Id.* ¶ 26.)

- **Wolcott:** "Mr. Wolcott purchased and installed Decking on his home in July, 2006 based upon the quality of the representations regarding the Decking." (*Id.* ¶ 27.)

- **Khanna:** "Mr. Khanna purchased and installed Decking on his home in the winter and spring of 2009 based upon representations regarding the quality of the Decking." (*Id.* ¶ 29.)

- **Giovannetti:** "Mr. Giovannetti purchased and installed Decking on two separate areas of his home in July, 2009 and again in November 2009 based upon the representations regarding the quality of the Decking." (*Id.* ¶ 30.)

- **Shepherd:** "Mr. Shepherd purchased and installed Decking on his home in 2007 based upon the representations regarding the quality of the Decking." (*Id.* ¶ 32.)

- **Barker:** "Mr. Barker purchased and installed Decking on his home in 2006 based upon the representations regarding the quality of the Decking." (*Id.* ¶ 34.)

**Megerle:** "Megerle purchased and installed Decking on her home in 2008 based upon the representations regarding the quality of the Decking." (*Id.* ¶ 35.)

None of these individuals allege any other facts regarding the representations or GAF's marketing materials with respect to their Decking purchases. Only Plaintiff McGovern adds any more detail to his allegations. He alleges that:

> Plaintiff Thomas McGovern ("McGovern") is an Indiana citizen and a resident of Fort Wayne, Indiana. Through a contractor, Mr. McGovern purchased and installed Decking on his vacation home in Mackinac Island, Michigan during June and July of 2008. By the summer of 2010, Plaintiff noticed that the Decking had separated due to expansion of the boards. Plaintiff also noticed that the Decking had become stained with mold and mildew. This required the Decking to be reconfigured and rebuilt using the existing boards. Plaintiff also had to scrub each board with bleach to get the mildew and resultant stains off before rebuilding. Despite Plaintiff's efforts, the Decking remains unsightly, warped, and stained. He has since discovered that the Decking is inherently defective and must be replaced, and that any other property damage caused by the Decking must be repaired. McGovern initially filed an action against GAF in this Court on August 21, 2014. Before filing that case, Plaintiff submitted a pre-suit demand to Defendant. Defendant has not paid all costs, labor, and damages associated with replacing the Cross Timbers Decking.

**\*4** (*Id.* ¶ 17.)

Twenty-one (21) of the twenty-three (23) remaining Plaintiffs' complete individual allegations are seven (7) or fewer lines

of the OAC. (*See id.* ¶¶ 11–27, 29–32, 34–35.) There are no other allegations specific to each Plaintiff in the OAC; rather, the remaining factual allegations are framed as "Plaintiffs" without differentiation.

### C. Photographs as Factual Allegations
In the OAC, Plaintiffs included photographs for thirteen (13) of the twenty-three (23) remaining Plaintiffs. (*See id.* ¶¶ 51–65.) GAF argues that such "[p]hotographs are not factual allegations" that should be considered when determining the sufficiency of the pleading. (*See* GAF Mot. at 19–20.) Plaintiffs counter that unlike the cases cited by GAF where the "purpose of including many of the photographs ... is unclear," here that is not the case because "Plaintiffs included an allegation that the photographs were a true and accurate representation of the respective Plaintiff's Decking." (Pls.' Opp'n at 9 n.7.) Plaintiffs miss the point. GAF is arguing that–without more–they cannot ascertain "what any of those pictures supposedly shows," and without such information, the photographs do not provide additional factual information. (GAF Reply at 2.) The Court agrees.

First, there is no information as to when the photos were taken. Second, although the Court could guess from some of the pictures what Plaintiffs are attempting to show, it is *Plaintiffs* who must actually make the allegations. Third, for some of the pictures, the Court cannot even guess (were that the standard–which it is not) what the Plaintiffs are attempting to show. Thus, while the Court does not take issue with the inclusion of the photographs in the OAC, without a description of what Plaintiffs are attempting to show through the photographs (beyond that some of the Plaintiffs have some kind of decking), the photographs do not add anything useful for the Court's analysis.

## II. THE MOTION TO DISMISS
The OAC asserts twenty-eight (28) claims on behalf of twenty-five (25) Plaintiff fact sets. The named Plaintiffs in the OAC are from sixteen (16) different states. After GAF served its moving brief on May 20, 2015, Plaintiff Montante's claims were voluntarily dismissed. (ECF No. 51.) Plaintiff Montante was the only Plaintiff from Pennsylvania. The Benders' claims were also voluntarily dismissed. (ECF No. 59.) The Benders were from Iowa (*see* OAC ¶ 33); other Plaintiffs from Iowa remain in the case. After these dismissals and given the different state substantive laws that must be applied to the state law claims (*see infra* Section III), the OAC asserts approximately 139 different causes of action.[3] GAF purports

to move to dismiss the OAC in its entirety. (*See* GAF Mot. at 4.)

**\*5** The parties were afforded special briefing for the present motion. The parties each received eleven (11) weeks to prepare the moving and opposition briefs, and GAF was given forty-five (45) days to prepare and serve its reply. (*See* ECF No. 47.) Additionally, the parties were permitted to file moving and opposition briefs of fifty-five (55) pages each, and a reply of twenty (20) pages. (*See* ECF No. 41.) The parties both–very helpfully– submitted an exhibit with each brief containing a summary chart of the bullet point arguments related to each cause of action. The Court accepted these additional exhibits and has used them along with the briefs in considering the submissions.

By way of Plaintiffs' opposition, Plaintiffs conceded GAF's choice of law arguments, which GAF had presented in nine and a half pages of briefing. (*See* Pls.' Opp'n at 8 n.6; ECF No. 61–1 (Pls.' Args. in Opp'n to GAF's Mot. to Dismiss ("Pls.' Checklist")); GAF Mot. at 8–17.) Plaintiffs also did not oppose GAF's motion to dismiss numerous individual causes of action.[4] (*See* ECF No. 61–1 (Pls.' Checklist).)[5] As a result, Plaintiffs did not need to use their opposition to address these conceded arguments. Additionally, because the Pennsylvania causes of action were dismissed after GAF's briefing, but before Plaintiffs' opposition was due, Plaintiffs did not need to respond to GAF's arguments related to the Pennsylvania law causes of action. Thus, Plaintiffs had the full fifty-five (55) pages of briefing to respond to a much smaller subset of arguments than were briefed by GAF.

Although the Court commends the parties' efforts to address all the issues, the Court does require that a party actually address an issue that it either is purportedly moving on or opposing. The Court cannot and will not consider arguments in the abstract separated from the specific claim at issue unless the party can demonstrate that the elements of the particular claim are somehow irrelevant to the argument being made. Such abstract arguments improperly attempt to make the Court an attorney for the parties. The Court thus will only consider arguments and related law presented by the parties, both of whom are well-represented.

Likewise, the Court finds citations to cases analyzing state law, that are not the state law at issue, unhelpful without some explanation for how such law is relevant. For example, there are no Plaintiffs from New Jersey and the parties agree that New Jersey substantive law does not apply to any claim. (*See*

In re: Elk Cross Timbers Decking Marketing, Not Reported in Fed. Supp. (2015)

2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

*infra* Section III.) Yet, both parties revert for some arguments to citations to Third Circuit and District of New Jersey cases analyzing New Jersey substantive law. (*See, e.g., GAF Mot.* at 42; Pls.' Opp'n at 42–43.) There are even citations to New Jersey statutes in support of some arguments. (*See, e.g.,* Pls.' Opp'n at 38 (citing N.J.S.A. 12A:2–719(2)).)

**\*6** The Court finds it acceptable to not list all elements of every single cause of action if GAF is moving related to arguments regarding only one or some of the elements. But GAF must, at a minimum, identify the element at issue and cite to cases analyzing relevant state law in support of its argument. And Plaintiffs, in opposition, must respond with relevant state law for each state moved on. Both GAF and Plaintiffs cited to a plethora of state law using single space string cite footnotes in support of limited body text. (*See, e.g., GAF Mot.* at 25 n.15; Pls.' Opp'n at 34 n.41.) The Court has accepted such citations for purposes of this motion even though they effectively extended the page limits as ordered by this Court. Especially given this, failure to provide specific state law on an issue– which both parties demonstrated could be done in little space–is not acceptable.

For these reasons, the Court has treated GAF's motion as a partial motion to dismiss as GAF has not specifically moved on each cause of action.[6] Likewise, where Plaintiffs chose not to brief an issue for a specific state in opposition, that issue has been treated as unopposed, unless a general appropriate argument in opposition was made.

Finally, for many, if not most, of the individual causes of action, GAF makes multiple, alternative arguments for dismissal, generally for failure to plead what it argues is a required element of the cause of action. While the Court need not reach alternative arguments once it has determined that a cause of action should be dismissed on another basis, the Court is mindful that the OAC will be amended, that there likely will be another motion to dismiss, and that there is parallel briefing presently underway in a related matter. Therefore, in the interests of judicial efficiency and case management, the Court has considered the failure to plead arguments where specifically addressed by the parties. If, however, a cause of action is dismissed *with prejudice* on one basis, the Court has not considered alternative arguments.

With this background, the Court turns to the parties' arguments.

### III. CHOICE OF LAW

GAF argues that the law to be applied to Plaintiffs' state claims is the substantive law of the state where each Plaintiffs' decking was installed. (*See* GAF Mot. at 8–17.) However, with respect to whether those claims are properly pled, GAF argues that federal procedural law of the Third Circuit applies. (*Id.* at 17.) "Plaintiffs agree with GAF that the substantive laws of the Plaintiffs' state where the Decking was installed applies." (Pls.' Opp'n at 8 n.6.) They also agree that "[r]egarding matters of procedure, the transferee court must apply federal law as interpreted by the court of the district where the transferee court sits." (*Id.*)

Therefore, the parties agree on the choice of law to be applied, and this Court will apply the substantive law where the decking was installed. Table 1 below identifies the substantive law to be applied to the state law claims of the current named plaintiffs.

*TABLE 1*

| Plaintiffs | Applicable State Law |
|---|---|
| Ken Burger (OAC ¶ 11) | Ohio |
| Frederick & Veronica Robertie ("Robertie") (Id. ¶ 12) | North Carolina |
| John Ross (Id. ¶ 13) | Missouri |
| Chad Sheridan (OAC ¶ 14) | Iowa |
| Charles Denton (Id. ¶ 15) | Iowa |
| Robert Hoover & Judy Cohen ("Hoover & Cohen") (Id. ¶ 16) | Montana |

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 126 of 410
PageID: 12733
In re: Elk Cross Timbers Decking Marketing, Not Reported in Fed.Supp. (2015)
2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

| | |
|---|---|
| Thomas McGovern (Id. ¶ 17) | Michigan |
| Harrison Warren (Id. ¶ 18) | Nebraska |
| Michael Narducci (Id. ¶ 19) | Michigan |
| Leanne Claxton (Id. ¶ 20) | Michigan |
| Jeff Ernst (Id. ¶ 21) | Illinois |
| Dorothy Kaiser (Id. ¶ 22) | Colorado |
| Dennis Turcheck (Id. ¶ 23) | Colorado |
| Christine Tuthill (Id. ¶ 24) | Colorado |
| John Stidham (Id. ¶ 25) | Indiana |
| Arnold and Cathy Williams ("Williams") (Id. ¶ 26) | California |
| James Wolcott (Id. ¶ 27) | Virginia |
| Samir Khanna (Id.¶ 29) | New Hampshire |
| Mark Giovannetti (Id. ¶ 30) | New York |
| Donna and Johnathan Mapp ("Mapp") (Id. ¶ 31) | Mississippi |
| John Shepherd (Id. ¶ 32) | North Carolina |
| Paul Barker (Id. ¶ 34) | Colorado |
| Michele Megerle (Id. ¶ 35) | Colorado |

After concessions and the voluntary dismissals, approximately 119 causes of action remain for the Court's consideration.

**IV. LEGAL STANDARDS.**

**A. Standards**

**\*7** Under Rule 8(a), for a complaint to survive dismissal, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* In determining the sufficiency of a complaint, the Court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party. *See Burtch v. Milberg Factors, Inc.,* 662 F.3d 212, 221 (3d Cir.2011). But, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal,* 556 U.S. at 678. Thus, "a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Burtch,* 662 F.3d at 220 (quoting *Twombly,* 550 U.S. at 555) (alteration in *Twombly* ).

Pursuant to Federal Rule of Civil Procedure 9(b):

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 127 of 410
PageID: 12734

In re: Elk Cross Timbers Decking Marketing, Not Reported in Fed.Supp. (2015)

2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

[A] plaintiff alleging fraud must state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which [it is] charged. To satisfy this standard, the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation.

*Frederico v. Home Depot, 507 F.3d 188, 200 (3d Cir.2007)* (internal quotations and citations omitted, alteration in original). Thus, where fraud is alleged, this heightened pleading standard must be met. Furthermore, in class action cases, each "individually named plaintiff must satisfy Rule 9(b) independently" so "[t]he complaint should therefore contain sufficient detail as to [a named plaintiff's] claims to apprise [a defendant] of that plaintiff's exact grounds for relief and the specific conduct that plaintiff charges." *Pacholec v. Home Depot USA, Inc., 2006 WL 2792788, *2 (D.N.J. Sept. 26, 2006)* (alteration in original); *see also Crozier v. Johnson & Johnson Consumer Cos., Inc., 901 F.Supp.2d 494, 506 (D.N.J.2012)* (same).

**B. Applicable Standard for Plaintiffs' Claims**

GAF argues that the heightened pleading standards of Rule 9(b) apply to most of Plaintiffs' remaining state consumer protection claims (Counts 2, 4–10, 13–14, 16–19). (*See* GAF Mot. at 25 & n.15.) GAF also argues that Rule 9(b) applies to Plaintiffs' claims of negligent misrepresentation (Count 22), fraudulent misrepresentation (Count 23), and fraudulent concealment/omission (Count 24). (*Id.* at 20–21.)

Plaintiffs do not contest that Rule 9(b) applies to their California and Colorado consumer protection claims (Counts 9, 16–17), but they do dispute that it applies to its other consumer protection claims. (Pls.' Opp'n at 10–12.) Plaintiffs' also contest that Rule 9(b) applies to their negligent misrepresentation causes of action. (*Id.* at 10.)

*1. State Consumer Protection Claims*

GAF asserts that "[t]he Third Circuit and this Court have held that Rule 9(b) applies not only to common law misrepresentation claims but also to state statutory consumer protection claims pled in federal court." (GAF Mot. at 25 (citing *Frederico, 507 F.3d at 200; Glauberzon v. Pella Corp., 2011 WL 1337509, at *8 (D.N.J. Apr. 7, 2011); Dewey v. Volkswagen AG, 558 F.Supp.2d 505, 526 (D.N.J.2008).*) The Court first notes that GAF concedes that Rule 8(a) applies to Plaintiffs' New York consumer protection claim (Count 15). (*See id.* at n.15.) Thus, if GAF believed that the Third Circuit had ruled that Rule 9(b) applied to *all* state consumer protection claims–without regard to the actual requirements of the state cause of action–it would not have conceded that Rule 8 applies to the New York claim. In fact, application of federal procedural law does not mean that the underlying state law is irrelevant. Very recently, the Third Circuit clearly made this point. *See In re Asbestos Prods. Liab. Litig., 611 F. App'x 86 (3d Cir.2015)* (unpublished). The Third Circuit stated:

**\*8** Federal Rule of Civil Procedure 8(a) requires a plaintiff to allege sufficient facts to put the defendant on "fair notice of what the ... claim is and the grounds upon which it rests." [*Twombly, 550 U.S. at 555.] **We must look to state law, however, to define "what the ... claim is."***

As the District Court recognized, Illinois is a "two disease" state, meaning that each asbestos-related disease gives rise to a cause of action with a separate statute-of-limitations period. ***Taken together, federal procedural law and Illinois substantive law*** thus required Plaintiffs to plead sufficient facts to support their lung-cancer claims separately from their nonmalignancy claims [regardless of how state courts require them to be pled].

*Id.* at 89–90 (other internal citations omitted, emphasis added).

Similarly, where this Court has previously held that Rule 8(a) applies to New York consumer protection claims under § 349–*see Wiseberg v. Toyota Motor Corp., 2012 WL 1108542 at *4 (D.N.J. Mar. 30, 2012)* (a case cited by GAF, *see* GAF Mot. at 26 n.15)–it cited to a Second Circuit case, which engaged in an analysis similar to that of the Third Circuit above. *See id.* (citing *Pelman ex rel. Pelman v. McDonald's Corp., 396 F.3d 508, 511 (2d Cir.2005)*). In *Pelman,* the Second Circuit reasoned that "*because § 349 extends well beyond common-law fraud* to cover a

Case 1:19-md-02875-RMB-SAK Document 598-3 Filed 10/16/20 Page 128 of 410
PageID: 12735

In re: Elk Cross Timbers Decking Marketing, Not Reported in Fed. Supp. (2015)

2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

broad range of deceptive practices, *and because a private action under § 349 does not require proof of the same essential elements (such as reliance) as common-law fraud*, an action under § 349 is not subject to the pleading-with-particularity requirements of Rule 9(b)." *Pelman, 396 F.3d at 511* (internal citations omitted, emphasis added). For these reasons, the Court disagrees with GAF that it is appropriate to apply a blanket approach to whether the heightened pleading standards of Rule 9(b) apply without reference to the specific state law at issue.

Plaintiffs argue that "[i]n addition to New York, formulaic compliance with Rule 9(b) is not required for the purpose of pleading consumer protection claims in Indiana, Michigan, Missouri, Illinois, Virginia, North Carolina, Ohio, Nebraska, Iowa, Montana or New Hampshire." (Pls.' Opp'n at 11–12 (citing to law analyzing the statutes at issue).) Plaintiffs concede that Rule 9(b) applies to the consumer protection claims for California and Colorado. (*Id.* at 12.) Thus, the parties agree that Rule 8(a) applies to Plaintiffs' New York consumer protection claim (Count 15), and that Rule 9(b) applies to Plaintiffs' California and Colorado consumer protection claims (Counts 9, 16–17). However, they disagree on the appropriate pleading standard for the other state consumer protection claims.

Although GAF relied primarily on its general Third Circuit argument, it did provide a footnote with case citations for the specific contested states. (*See* GAF Mot. at 25–26 n.15.) Therefore, the Court has considered this issue for all of the contested states. Because the cases cited by both parties raise state specific issues, the Court has addressed which standard is appropriate in the consumer protection discussion section (*see infra* Section V.B.) related to the specific state consumer protection claims.

### 2. *Negligent Misrepresentation Causes of Action*

**\*9** Both parties argue in the abstract with respect to whether Plaintiffs' negligent misrepresentation claims for fourteen (14) states must meet the heightened pleading standards of Rule 9(b). GAF argues that "[t]his heightened pleading standard applies not only to fraudulent misrepresentation claims but also to negligent misrepresentation claims." (GAF Mot. at 21 (citing *Dist. 1199P Health & Welfare Plan v. Janssen, L.P., 784 F.Supp.2d 508, 532 (D.N.J.2011)* (analyzing New Jersey law).) Plaintiffs, on the other hand,

argue that "all states do not require pleading negligent misrepresentation in satisfaction of Rule 9(b)" using a "*see, e.g.*" cite for cases regarding only two (Colorado and New York) of the state laws at issue. (Pls.' Opp'n at 10 & n.10.)

The Court does not view GAF to have properly raised this issue for any state, or Plaintiffs to have properly raised that Rule 8 should be applied, except by example. GAF has not properly moved to dismiss any of Plaintiffs' negligent misrepresentation causes of action for failure to meet either pleading standard as it has not pointed to any of the relevant state's requirements as compared to Plaintiffs' allegations. Therefore, the Court will not reach this issue at this time. The Court does note that simple citation to *District 1199P* will be insufficient to establish that the Third Circuit (and hence this Court) would apply Rule 9(b) to all the negligent misrepresentation causes of action. The Court also notes that the two cases cited by Plaintiffs argue against application of Rule 9(b) for those states. *See Conrad v. Educ. Res. Inst., 652 F.Supp.2d 1172, 1183 (D.Colo. Aug. 13, 2009)* ("The theory of liability for negligent misrepresentation is one of negligence, rather than of intent to mislead. Thus, a claim for negligent misrepresentation should not be governed by the pleading standards set forth in Rule 9(b).") (internal citations omitted); *In re LILCO Sec. Litig., 625 F.Supp.1500, 1504 (E.D.N.Y.1986)* ("Negligent misrepresentation is not a claim that necessitates the particularized pleading of Rule 9(b).").

## V. DISCUSSION

### A. GAF's Arguments That Certain Causes of Action Are Time Barred

#### 1. *Untimely as a matter of law*

GAF argues that "many of Plaintiffs' claims are untimely." (GAF Mot. at 26.) Specifically, GAF argues that the following causes of action are time barred *as a matter of law*: breach of implied warranties cause of action (Count 21) under Illinois law and the negligence (Count 1), UDTPA (Count 10), negligent misrepresentation (Count 22), fraudulent misrepresentation (Count 23), fraudulent concealment (Count 24), and unjust enrichment (Count 27) causes of action [7] for North Carolina (Plaintiff Shepherd only). (*See id.* at 35, 54.)

**Illinois (Count 21).** "The statute of limitations for breach of implied warranties [under Illinois law] (Count 21) is four

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 129 of 410
PageID: 12736

In re: Elk Cross Timbers Decking Marketing, Not Reported in Fed. Supp. (2015)
2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

years from 'when tender of delivery is made.' " (*Id.* at 35 (quoting 810 Ill. Comp. Stat. 5/2−725).) Additionally, "[t]he statute runs from the time of **delivery** of the good, regardless of when the defect is discovered–that is, the 'discovery rule' does not apply in claims for breach of implied warranty."

*Karpowicz v. General Motors Corp.,* 1997 WL 285943 at *5 (N.D.Ill. May 23, 1997) (citing 810 ILCS 5/2−725(1)) (emphasis added). Plaintiffs do not respond to this argument in opposition. (*See* Pls.' Opp'n at 25–34. [8]) The OAC alleges that Plaintiff Ernst "purchased and installed Decking on his home in the summer of 2007," and that he "initially filed a Complaint in the United States District Court of the Northern District of Illinois" on August 19, 2014, approximately seven (7) years later. (OAC ¶ 21.) Therefore, the Court finds that Plaintiff Ernst's breach of implied warranty claim is time barred on the face of the OAC, and, therefore, this cause of action is dismissed with prejudice.

**\*10  North Carolina (Plaintiff Shepherd only) (Counts 1, 10, 22–24, 27).** [9]  For these causes of action, the parties dispute the applicable statute of limitations. GAF argues that "[f]or claims alleging injury from a product and accruing before October 1, 2009, North Carolina's statute of repose is 'six years after the date of initial purchase for use or consumption.' " (GAF Mot. at 35 (quoting N.C. GEN. STAT. § 1−50(a)(6) (2009), *repealed* by § 1−46.1).) Plaintiffs, on the other hand, argue that "[t]he applicable statute is N.C. GEN. STAT. § 1−46.1, which became effective October 1, 2009, and applies a twelve year statute of repose to claims accruing on or after that date." (Pls.' Opp'n at 33.) Plaintiffs further argue that "§ 1−46.1 applies because Plaintiff Shepherd's claims did not **accrue** until after October 1, 2009." (*Id.* (emphasis added) (citing *Schenkel & Shultz, Inc. v. Hermon F. Fox & Assoc., P.C.,* 636 S.E.2d 835, 840 (N.C.Ct.App.2006) and *New Bern Assoc., v. Celotex Corp.,* 87 N.C.App. 65, 70, *disc. rev. denied,* 321 N.C. 297 (1987), for the proposition that the "accrual" date is the date of discovery).)

Plaintiffs' cases do not analyze the causes of action at issue. *See Schenkel,* 636 S.E.2d at 839 ("[A] statutory 'discovery rule' offers a claimant additional time in **certain** contract or negligence actions to have the opportunity to discover the harm before **the three-year statute of limitation** s begins to accrue.") (citing, *e.g.,* N.C. GEN. STAT. § 152(16) (2005) ("for personal injury or physical damage to claimant's property") (emphasis added) and N.C. GEN. STAT. § 1−15(c) (2005) ("a cause of action for malpractice")); *New Bern,*

87 N.C.App. at 70 ("A cause of action for physical damage to property accrues when the physical damage becomes 'apparent or ought reasonably to have become apparent to the claimant, whichever event first occurs.' ") (quoting N.C. GEN. STAT. § 1−52(16)). Instead, Plaintiffs use these cases to argue that the action "accrued" only when Plaintiff Shepherd discovered the defect, which he alleges to have been after October 1, 2009. (*See* Pls.' Opp'n at 33–34; OAC ¶ 32.) However, Plaintiffs' conclusion with respect to the appropriate date of "accrual" is drawn from the plain language of the statutes at issue in the cases Plaintiffs cite, not from the statute that they argue applies here.

Section 1−52(16), cited in Plaintiffs' cases, provides:

> Within three years an action−... (16) Unless otherwise provided by law, for personal injury or physical damage to claimant's property, the cause of action, except in causes of actions referred to in G.S. 1−15(c), ***shall not accrue until bodily harm to the claimant or physical damage to his property becomes apparent or ought reasonably to have become apparent to the claimant***, whichever event first occurs....

(emphasis added). Section 1−15(c) provides:

> (c) Except where otherwise provided by statute, a cause of action for malpractice arising out of the performance of or failure to perform professional services ***shall be deemed to accrue at the time of the occurrence of the last act of the defendant giving rise to the cause of action***: Provided that whenever there is bodily injury to the person, economic or monetary loss, or a defect in or damage to property which originates under circumstances making the injury, loss, defect ***or damage not readily apparent to the claimant at the time of its origin,***

2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

***and the injury, loss, defect or damage is discovered or should reasonably be discovered by the claimant*** two or more years after the occurrence of the last act of the defendant giving rise to the cause of action, suit must be commenced within one year from the date discovery is made: Provided nothing herein shall be construed to reduce the statute of limitation in any such case below three years. Provided further, that in no event shall an action be commenced more than four years from the last act of the defendant giving rise to the cause of action....

**\*11**  (emphasis added.) In comparison, § 1–46.1, which Plaintiffs argue is applicable here (and which came into effect October 1, 2009), provides:

> Within 12 years an action–(1) No action for the recovery of damages for personal injury, death, or damage to property based upon or arising out of any alleged defect or any failure in relation to a product shall be brought more than 12 years ***after the date of initial purchase*** for use or consumption.

(emphasis added). The plain language of § 1–46.1 does not comport with Plaintiffs' view of when the cause of action "accrued" in this case. Section 1–46.1's predecessor, § 150(a)(6), provided a six, not twelve, year limitations period from the purchase date. *See Patterson v. McKinley Med., L.L.C.,* 2011 WL 1260145, at *1 (E.D.N.C. Mar. 30, 2011).

In a North Carolina case analyzing the statutes at issue here–§ 1–50(a)(6) versus § 1–46.1, the court agreed "that the applicable statute of repose is N.C. Gen.Stat. § 150(a)(6), which was in effect at the time Plaintiff ***purchased*** the allegedly defective product." *See Lackey v. DePuy Ortho., Inc.,* 2011 WL 2791264, at *2 (W.D.N.C. July 14, 2011) (emphasis added); *see also Patterson.,* 2011 WL 1260145 at n.1 ("The amending legislation [for § 1–46.1] states: This act becomes effective October 1, 2009, and applies to causes

of action that accrue on or after that date ....") (internal quotations omitted). The *Lackey* court further held that § 1–50(a)(6) "functions as an 'unyielding and absolute barrier' to claims brought more than six years after the product at issue was purchased." *Lackey,* 2011 WL 2791264, at *3 (quoting *Nat'l Property Investors, VIII v. Shell Oil,* 950 F.Supp. 710, 713 (E.D.N.C.1996). Thus, the *Lackey* court held that "[i]n sum, N.C. Gen.Stat. § 1–50(a)(6) set the fixed time limit at six years from the time of the product's sale or delivery beyond which DePuy cannot be liable for a product sold in 1998." *Id.* at *4 (holding that the purchase date for a defective prosthetic hip controlled which limitations period applied).

Plaintiff Shepherd alleges that he "purchased and installed Decking on his home in 2007." (OAC ¶ 32.) Therefore, § 1–50(a)(6), the statute in effect at the time of his purchase, applies. Because he purchased the decking more than six (6) years prior to bringing suit, Plaintiff Shepherd's negligence, UDTPA, negligent misrepresentation, fraudulent misrepresentation, fraudulent concealment, and unjust enrichment causes of action are time barred, and will be dismissed with prejudice.

### 2. *Untimely as pled*

GAF argues that the following additional causes of action are time-barred ***as pled*** because of insufficient allegations of fraudulent concealment to toll the limitations period. [10]

- **Count 2** (Indiana Deceptive Consumer Sales Act–Stidham)

- **Count 8** (Montana Consumer Protection Act–Hoover & Cohen)

- **Count 15** New York General Business Law § 349–Giovannetti

**\*12**  • **Count 18** (Nebraska Consumer Protection Act–Warren)

- **Count 21** (Breach of Implied Warranties–Williams, Denton, Sheridan, Ross, Warren, Khanna, Giovannetti, Robertie, Shepherd, Wolcott)

- **Count 22** (Negligent Misrepresentation–Mapp)

- **Count 23** (Fraudulent Misrepresentation–Mapp)

In re: Elk Cross Timbers Decking Marketing, Not Reported in Fed. Supp. (2015)

2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

• **Count 27** (Unjust Enrichment–McGovern, Narducci, Claxton, Mapp, Warren, Wolcott)

(*See* GAF Mot. at 29–34.) [11]
Plaintiffs do not contest the limitation periods put forward by GAF (except with regard to North Carolina for Plaintiff Shepherd as discussed above in Section V.A.1). Instead, Plaintiffs argue that the relevant periods under state law will be tolled because of "the discovery rule and the doctrine of equitable estoppel/fraudulent concealment." (Pls.' Opp'n at 26 & nn.36–38.) Plaintiffs further argue–and this Court agrees– that "[a] motion to dismiss on statute of limitations grounds should be denied unless it is apparent [from the OAC's allegations] that the challenged claims are time-barred." (*Id.* at 25 (citing  *Barefoot Architect, Inc. v. Bunge,* 632 F.3d 822, 835 (3d Cir.2011)).) As the Third Circuit has recently stated with respect to the discovery rule:

> [W]hile a court may entertain a motion to dismiss on statute of limitations grounds, it may not allocate the burden of invoking the discovery rule in a way that is inconsistent with the rule that a plaintiff is not required to plead, in a complaint, facts sufficient to overcome an affirmative defense. This distinction comes to the fore here, where the applicability of the discovery rule is not evident on the face of the complaint but the plaintiff also does not plead facts that unequivocally show that the discovery rule does not apply.

 *Schmidt v. Skolas,* 770 F.3d 241, 251 (3d. Cir.2014) (internal citations omitted). Here, although GAF argues that Plaintiffs have not affirmatively pled facts sufficient to justify tolling for the causes of action in the bullet list above, the Court finds that Plaintiffs have not "pleaded [themselves] out of court" because their allegations do not affirmatively demonstrate on the face of the OAC that tolling would not apply. *See*  *id.* at 252. Thus, the Court denies GAF's motion to dismiss the above causes of action on the ground that they are time-barred *as pled*. GAF is not precluded from re-raising this issue at an appropriate stage of the proceedings.

### 3. *Magnuson–Moss Warranty Act ("MMWA")*

**\*13** GAF also argues that for Plaintiffs' implied warranty causes of action that are time-barred "their Magnuson–Moss claims based on that implied warranty are also time-barred because Magnuson–Moss borrows its limitations period from the applicable state statute." (GAF Mot. at 34.) Plaintiffs concede that, if their state warranty claims are time-barred, so too are their MMWA claims based on those warranties. (*See* ECF No. 61–1 at 6 (Pls.' Checklist).) Thus, as Plaintiffs did not oppose dismissal of the California (Williams), Iowa (Denton, Sheridan), Missouri (Ross), New Hampshire (Khanna), New York (Giovannetti), and Virginia (Wolcott) Plaintiffs' breach of implied warranty claims, and this Court has dismissed the Illinois breach of implied warranty cause of action as time-barred, the Court finds that the MMWA claims based on these implied warranty claims also are dismissed.

### B. Plaintiffs' Consumer Protection Claims

As noted above, GAF generally argues that all the consumer protection claims, except for that of New York, should be dismissed for failure to meet the Rule 9(b) pleading standards. (*See* GAF Mot. at 25 & n.15.) However, GAF has not made any argument for how the OAC is insufficiently pled with respect to any of the specific consumer protection claims under the applicable state law. Therefore, despite GAF's statement that "[a]t the outset, ***and before applying each state's substantive laws***, all Plaintiffs' claims must meet the appropriate federal pleading standards .... [and] Plaintiffs have failed to satisfy the pleading standards" (*see id.* at 17), this Court does not treat GAF's motion as moving on that basis for these claims.

The parties' arguments over which pleading standard applies, however, raises separate pleading issues for certain states because some courts find that different pleading standards apply depending on the basis for the claims. In other words, some statutes provide for relief without proving fraud. Because the pleading standard arguments are specifically addressed by both parties and will inform any re-pleading, those arguments are addressed below, along with other specific arguments for dismissal made by GAF for these claims. [12]

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 132 of 410
PageID: 12739
In re: Elk Cross Timbers Decking Marketing, Not Reported in Fed.Supp. (2015)
2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

### 1. *Count 2 (Indiana Deceptive Consumer Sales Act ("IDCSA"))*

GAF argues that Plaintiffs' IDCSA claim must meet the heightened pleading standard of Rule 9(b). (*See id.* at 25 n.15) GAF also argues that the IDCSA claim should be dismissed for failure to plead "either that the deceptive act is incurable or that the plaintiff notified the defendant in writing and provided an opportunity to cure the deceptive act," and that "Indiana Plaintiffs allege neither fact here." (*Id.* at 49 (citing Ind.Code § 24–5–0.5–5(a)).) Both arguments are related.

*Young v. Harbor Motor Works, Inc.*, provides that "[u]nder the IDCSA, where a movant ... [does] not distinguish between its allegations of deceptive acts and incurable deceptive acts ... the entire complaint must be judged by Rule [9(b) ] standards." 2009 WL 187793 at *6 (N.D. Ind. Jan 27, 2009) (internal quotations omitted, alteration in original). Additionally, Indiana Code § 24–5–0.5–5(a) provides: "No action may be brought under this chapter ... unless (1) the deceptive act is incurable or (2) the consumer bringing the action shall have given notice in writing to the supplier...." Plaintiff acknowledges this requirement by quoting the same provision in opposition. (*See* Pls.' Opp'n at 15.) However, Plaintiffs are unable to clearly identify what they are alleging– an incurable deceptive act or a deceptive act where notice is required.

In arguing that the Rule 9(b) standards are not applicable to their IDCSA claim, Plaintiffs cite *Hayes v. Chapman*, 894 N.E.2d 1047, 1053 (Ind.Ct.App.2008), and add the following parenthetical explanation: "holding no showing of fraudulent intent is required *for Indiana Deceptive Consumers Sales Act. Ind.Code § 24–5–0.5–2(7)* )." (*Id.* at 11 n.12 (emphasis added).) Section 24–5–0.5–2(7) deals with "uncured deceptive act[s]" for which notice is required; *see also Hayes,* 894 N.E.2d at 1053 (distinguishing between "[a]n uncured deceptive act" under "I.C. § 24–5–0.5–2(a)(7)" and "[a]n incurable deceptive act" under "I.C. § 24–5–0.5–2(a)(8).")[13] However, a few pages farther in Plaintiffs' opposition, and Plaintiffs–in addressing GAF's notice requirement point– argue that "[i]n fact, the IDCSA defines '*incurable deceptive act*' as meaning 'a deceptive act done by a supplier as part of a scheme, artifice, or device with intent to defraud or mislead.' *Ind.Code. § 24–5–0.5–2(8).* As discussed herein, *the OAC contains ample*

*allegations that GAF acted with an intent to deceive or mislead* Plaintiffs." (Pls.' Opp'n at 15–16 (citing a different provision than they relied on for their Rule 8(a) argument) (emphasis added).)

**\*14** Plaintiffs cannot have it both ways: either they are pleading an uncured defect– which has a notice requirement but potentially lower pleading standard, or they are pleading an incurable deceptive act which does not have a notice requirement but must meet 9(b). And, because even Plaintiffs are not clear on the basis for their IDCSA claim, the pleadings are obviously insufficient to put GAF on notice of the basis of the claim. Therefore, Plaintiffs' IDCSA claim is dismissed without prejudice.

### 2. *Count 4 (Michigan Consumer Protection Act ("MCPA")*

For Plaintiffs' MCPA claim, GAF's only argument is generally that Rule 9(b) must be met. (*See* GAF Mot. at 25 & n.15; ECF 60–2 (GAF's Checklist of Arguments ("GAF's Checklist").) Plaintiff argues that meeting Rule 9(b) is not required for an MCPA claim. (*See* Pls.' Opp'n at 11 & n.13 (citing *Michels v. Monaco Coach Corp.,* 298 F.Supp.2d 642, 651 (E.D.Mich.2003).) As an initial point, "[t]he Michigan Consumer Protection Act [ ('MCPA') ] proscribes thirty-seven discrete acts." *Dzielak v. Whirlpool Corp.,* 26 F.Supp.3d 304, 339 (D.N.J.2014) (citing Mich. Comp. Laws § 445.903). Furthermore, "[t]o state a claim under the [MCPA], a complaint must identify which proscribed act or acts the defendant has allegedly committed." *Id.* Here, Plaintiffs allege that GAF's conduct violates §§ 445.903(n), (s), (bb), and (cc), but add that their claims are "not necessarily limited to [those] sections." (OAC ¶ 147.) Plaintiffs' "not necessarily limited" language does not sufficiently state a claim for unidentified sections of the MCPA. However, Plaintiffs' case supports the proposition that not all proscribed acts must meet the heightened pleading standard. *See Michels,* 298 F.Supp.2d at 651 (MCPA claim "not premised on fraud," but on "breach of its express and implied warranties" under 445.903(y)). GAF's case is in agreement: "When the claim is based on breach of express or implied warranties, these pleading strictures do not apply but otherwise, the allegations must include the specificity required by Fed.R.Civ.P. 9(b)." *In re Packaged Ice Antitrust Litig.,* 779 F.Supp.2d 642, 666 (E.D.Mich.2011). Section 445.903(y), however, is not

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 133 of 410
PageID: 12740
In re: Elk Cross Timbers Decking Marketing, Not Reported in Fed.Supp. (2015)

2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

one of the sections on which Plaintiffs' claims are based. Therefore, Plaintiffs' citation is not helpful here. Because the parties do not address which standard should apply to the alleged violations actually pled, the Court will not reach this issue at this time.

Also, because GAF did not specifically argue how Plaintiffs' MCPA claim failed to meet either pleading standard, and Plaintiffs have identified specific proscribed acts, the Court will not dismiss this claim at this time. Because the Court is treating this claim as unmoved on for failure to meet the appropriate pleading standard, GAF is not precluded from arguing that any amended pleading fails to meet the standard.

### 3. *Count 5 (Missouri Merchandising Practices Act ("MMPA"))*

Plaintiffs argue that "[a] claim alleging violations of the Missouri Merchandising Practices Act does not necessarily need to be stated with the same particularity as a claim of common law fraud or mistake." (Pls.' Opp'n at 11 n.14

(quoting *Ullrich v. CADCO, Inc.,* 244 S.W.3d 772, 777 (Mo.Ct.App.2008)).) However, the full sentence in that cases provides: "Although *Rule 55.15* requires that in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity, a claim alleging violations of the MMPA does not necessarily need to be stated with the same particularity as a claim of common law fraud or

mistake." *Ullrich,* 244 S.W.3d at 777 (internal quotations omitted, emphasis added). [14] Rule 55.15 is a Missouri rule of procedure. Citation to a case analyzing state procedural rules is not persuasive.

**\*15** GAF, on the other hand, argues that courts applying federal rules of procedure apply the Rule 9(b) heightened pleading standards to MMPA claims. (*See* GAF Mot. at 25 n.15 citing *Johnsen v. Honeywell Int'l Inc.,* 2015 WL 631361, at \*9 (E.D.Mo. Feb. 12, 2015).) The *Johnsen* court stated: "In MMPA actions, courts apply the particularity requirements of Fed.R.Civ.P. 9(b) pertaining to fraud." 2015 WL 631361, at \*9. The court in *Blake v. Career Education Cororation* (cited by the *Johnsen* court) likewise noted that "[t]he United States District Courts in Missouri have consistently applied Rule 9(b) to cases arising under the MMPA." 2009 WL 140742, at \*2 (E.D.Mo. Jan. 20, 2009) (collecting cases).

Additionally, here, Plaintiffs' MMPA claims plainly sound in fraud. Plaintiffs allege: "GAF's conduct constitutes deception, fraud, false pretense, false promise, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact." (OAC ¶ 153.) The Third Circuit has made clear that where fraud is alleged, "[t]he stringent pleading restrictions of Rule 9(b), Fed.R.Civ.P., apply to such a claim," and that "[t]o satisfy this standard, the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation

into a fraud allegation." *Frederico,* 507 F.3d at 200. Therefore, the Court will apply the heightened pleading standards of Rule 9(b) to Plaintiffs' MMPA claim.

However, because GAF did not specifically argue how Plaintiffs' MMPA claim failed to meet Rule 9(b), the Court will not dismiss this claim at this time on this basis. Because the Court is treating this claim as unmoved on for failure to meet 9(b), GAF is not precluded from arguing that any amended pleading fails to meet the requirement.

### 4. *Count 6 (Illinois Consumer Fraud Act ("ICFA"))*

Plaintiffs argue that "[b]ecause neither fraud nor mistake is *an element of unfair conduct* under [the] Illinois' Consumer Fraud Act, a cause of action for unfair practices under the Consumer Fraud Act need only meet the notice pleading standard of Rule 8(a), not the particularity requirement in

Rule 9(b)." (Pls.' Opp'n at 11 n.15 (quoting *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.,* 536 F.3d 663, 670 (7th Cir.2008)) (emphasis added).) However, *Windy City* also states: "The Supreme Court of Illinois has held that recovery under the Consumer Fraud Act

'may be had for unfair as well as deceptive conduct.' " 536 F.3d at 669 (quoting *Robinson v. Toyota Motor Credit Corp.,* 775 N.E.2d 951, 960 (Ill.2002)); *see also In re Riddell Concussion Reduction Litig.,* 77 F.Supp.3d 422, 433 n.11 (D.N.J.2015) (citing *Windy City* for the proposition that claims based on unfair practices "need only meet the notice pleading standard of Rule 8(a)" but holding that "Rule 9(b) applies to Plaintiffs' claims to the extent they are premised on

fraud"); *Stavropoulos v. Hewlett–Packard Co.,* 2014 WL 2609431, at \*4 (N.D. Ill. June 9, 2014) ("Claims under ICFA sound in fraud and therefore must be pled with particularity under Rule 9(b).")

2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

Here, Plaintiffs allege that GAF's conduct "was unfair, unlawful, *and* a fraudulent business practice." (OAC ¶ 163 (emphasis added); *see also id.* ¶ 164 (same).) However, they also allege that "GAF committed unfair *or* deceptive acts and practices." (*Id.* ¶¶ 165, 166 (emphasis added).)

As with Plaintiffs' Indiana consumer protection claim, Plaintiffs cannot have it both ways: either they are pleading an unfair business practice–which may only need to meet Rule 8(a)'s pleading requirements, or they are pleading fraud which must meet Rule 9(b). And, because the pleadings are not clear on the basis of their claim, Plaintiffs' ICFA claim is dismissed without prejudice. The Court does note that, overall, Plaintiffs' allegations with respect to this claim appear to sound in fraud.

### 5. *Count 7 (Virginia Consumer Protection Act ("VCPA"))*

**\*16** Plaintiffs argue that the "***misrepresentations*** providing the basis of a [VCPA] claim need not be pleaded with the same kind of particularity as common law fraud claims." (Pls.' Opp'n at 11 n.16 (quoting *Debrew v. Lexus,* 1997 WL 1070613, at \*2 (Va.Cir.Ct.1997)) (emphasis added).) "The claims of fraud and misrepresentation are distinct under the VCPA." *Nigh v. Koons Buick Pontiac GMC, Inc.,* 143 F.Supp.2d 535, 553 (E.D.Va.2001). And, the "misrepresentations" which provide "the basis of a VCPA claim need not be pled with the same kind of particularity as common law fraud claims." *Id.* However, courts have required the pleading standards of Rule 9(b) to be met for a VCPA claim where fraudulent behavior is alleged. *See Murphy v. Capella Educ. Co.,* 589 F. App'x 646, 652, 656–57 (4th Cir.2014).

Here, Plaintiffs allege that "GAF violated VA. CODE § 59.1–200.4, which provides, inter alia, that: '[t]he following ***fraudulent*** acts or practices committed by a supplier in connection with a consumer transaction are hereby declared unlawful ... [listing acts].'" (OAC ¶ 174 (emphasis added).) Plaintiffs further allege: "In particular, GAF's ***fraudulent concealment*** of the defects with the Decking, as described more fully ... throughout [the] Complaint and incorporated herein by reference, violated the Virginia Consumer Protection Act." (*Id.* ¶ 175 (emphasis added).) Plaintiffs cases do not support the proposition that Plaintiffs' allegations based on *fraud* need not meet the particularity requirement of Rule 9(b). Because Plaintiffs' VCPA claim

plainly sounds in fraud, the Court will apply the heightened pleading standards of Rule 9(b) to this claim.

However, because GAF did not specifically argue how Plaintiffs' VCPA claim failed to meet Rule 9(b), the Court will not dismiss this claim at this time on this basis. Because the Court is treating this claim as unmoved on for failure to meet 9(b), GAF is not precluded from arguing that any amended pleading fails to meet this standard.

### 6. *Count 8 (Montana Consumer Protection Act ("MTCPA")*

Although GAF argues that Rule 9(b) should apply to Plaintiffs' MTCPA claim, it provides no case law or other analysis to support its argument, simply stating that "[w]hile it seems that no federal court has yet affirmatively concluded that Rule 9(b) applies to this statute, this claim also sounds in fraud and should be pled with particularity, as all of these other courts [applying other state laws] have held." (GAF Mot. at 25 n.15.) That GAF can find no on-point case law does not relieve it of the obligation to support its argument with legal analysis. GAF may not punt legal argument to this Court for research and analysis through such bare assertions. Likewise, Plaintiffs who argue for application of Rule 8(a) similarly improperly punt to this Court. (*See* Pls.' Opp'n at 12 n.21 ("GAF provides no case law to assert that the Montana Consumer Protection Act is required to be pleaded with particularity. Thus, GAF asserts no basis to assert a heightened pleading standard for this claim.") (internal citations omitted).) Therefore, the Court is declining at this time to decide the issue of the appropriate pleading standard for this claim.

Additionally, because GAF did not specifically argue how Plaintiffs' MTCPA claim failed to meet either 8(a) or 9(b), the Court will not dismiss this claim at this time. Because the Court is treating this claim as unmoved on for failure to meet the pleading standard, GAF is not precluded from arguing specifically that any amended pleading fails to meet the applicable standard.

### 7. *Count 9 (Colorado Consumer Protection Act ("CCPA"))*

**\*17 Legal Standard.** The parties do not dispute that the Rule 9(b) pleading standards apply to this claim. However, because GAF did not specifically argue how Plaintiffs' CCPA claim failed to meet Rule 9(b), the Court will not dismiss this

Case 1:19-md-02875-RMB-SAK Document 598-3 Filed 10/16/20 Page 135 of 410 PageID: 12742

In re: Elk Cross Timbers Decking Marketing, Not Reported in Fed. Supp. (2015)

2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

claim on this basis at this time. Because the Court is treating this claim as unmoved for failure to meet 9(b), GAF is not precluded from arguing that any amended pleading fails to meet the requirement.

**Certain Relief Is Not Permitted.** GAF argues that Plaintiffs' CCPA claim also "should be dismissed to the extent it seeks monetary relief on behalf of a class because the CCPA does not authorize any damages, attorneys' fees, or costs for claims brought as class actions." (GAF Mot. at 49 (citing *Martinez v. Nash Finch Co.*, 886 F.Supp.2d 1212, 1218– 19 (D.Colo.2013))).) Plaintiffs argue that CCPA claims for money damages have been allowed to proceed in some cases. (*See* Pls.' Opp'n at 16 & n.23.) For example, Plaintiffs assert that "[w]hile Colorado courts have not addressed this precise issue, in *In re Onstar Contract Litig.*, [600 F.Supp.2d 861 (E.D.Mich.2009),] interpreting Colorado law, the Michigan district court held class members could be awarded actual damages." (*Id.* at 16.)

Various courts analyzing Colorado law have criticized the holding in *In re Onstar* for relying on a case analyzing a prior–not current–version of the statute at issue. *See In re Syngenta AG MIR 162 Corn Litig.*, 2015 WL 5607600 at *50–51 (D.Kan. Sept. 11, 2015) (analyzing Colorado law and dismissing the CCPA class claims) ("Plaintiffs also cite to *In re OnStar Contract Litig.*, 600 F.Supp.2d 861 (E.D.Mich.2009), in which the court relied on *Robinson [v. Lynmar Racquet Club, Inc.,* 851 P.2d 274 (Colo.App.1993) ]. The *OnStar* court did not consider the different version of the statute at issue in *Robinson*, however, and this Court cannot agree with that court's conclusion that by the plain language of the [current] statute, the class action prohibition applies only to statutory and treble damages."); *Friedman v. Dollar Thrifty Automotive Group, Inc.,* 2015 WL 4036319, at *5 (D.Colo. July 1, 2015) ("What Plaintiffs fail to acknowledge, however, is that the *Robinson* case relied on by *Onstar* was decided under a previous version of § 6–1–113(2) which precluded only treble damages, costs and attorney fees. Actual damages were not excluded."); *see also Martinez,* 886 F.Supp. at 1218 ("The plain and unambiguous language of the statute [§ 6–1–113(2) ] compels the conclusion that *all* of the remedies in subparts (a)(I)-(III) and (b), including actual damages, are not available to classes.") (emphasis in original). In short, Colorado courts have addressed this specific issue and have found Plaintiffs' exact arguments unpersuasive.

Plaintiffs' other cases–which they acknowledge are not on point–are equally unpersuasive. (*See* Pls.' Opp'n at 16 & n.23 ("While Colorado courts have not addressed this precise issue...."); *Jackson v. Unocal Corp.,* 262 P.3d 874 (Colo.2011) (Plaintiffs provide no pincite for this case which discusses a "land damages class action," and the Court finds no discussion of § 6–1–113(2)); *Mountain States Tel. and Tel. Co. v. District Court,* 778 P.2d 667, 669 (Colo.1989) (a case not analyzing § 6–1–113(2) and decided prior to the current version of the statute; *Mangone v. U–Haul Int'l, Inc.,* 7 P.3d 189 (Colo.App.1999) (Plaintiffs provide no pincite for this case, and the Court finds no discussion of § 6– 1–113(2)). For these reasons, the Court dismisses Plaintiffs' CCPA claims to the extent they seek monetary damages on behalf of a class.

### 8. *Count 10: North Carolina Unfair and Deceptive Trade Practices* ("UDTPA")

**\*18 Legal Standard.** Plaintiffs argue that "[a] ... UDTPA claim *does not* require proof of fraud, bad faith, or actual deception." (Pls.' Opp'n at 11–12 n.17 (emphasis in original) (quoting *Geo Plastics v. Beacon Dev. Co.,* 434 F. App'x. 256, 261 (4th Cir.2011)).) The case cited by GAF states the same thing. *See La Tortilleria, Inc. v. Nuestro Queso, LLC,* 2014 WL 1322627, at *7 (M.D.N.C. Mar. 31, 2014) (both cases citing to *RD & J Props. V. Lauralea–Dilton Enters., LLC,* 600 S.E.2d 492, 501 (N.C.2004)), adopted, 2014 WL 3484995 (M.D.N.C. July 11, 2014). As identified in *Geo Plastics,* the first element of a UDTPA claim is that "the defendant committed an unfair *or* deceptive act or practice...." 434 F. App'x at 261 (emphasis added). The *Geo Plastics* court, however, was deciding a motion for summary judgment, not analyzing the appropriate pleading standard to apply to this claim. *See id.* at 261–62. On the other hand, in *La Tortilleria* where the basis of the UDTPA was fraudulent inducement, the court held that *Rule 9(b)* applied. *See 2014 WL 1322627, at *6* ("When fraud is alleged, the circumstances constituting fraud must be pled with particularity.").

Here, Plaintiffs allege that GAF engaged in "misrepresentations, concealment, omissions, *and other deceptive conduct*." (OAC ¶ 206 (emphasis added).) Because Plaintiffs' North Carolina UDTPA [15] are based on deceptive (not simply unfair) conduct, the Court finds that Rule 9(b) is applicable. However, because GAF did not specifically argue how Plaintiffs' UDTPA claim failed to meet Rule 9(b), the Court will not dismiss this claim on this basis at this time.

2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

Because the Court is treating this claim as unmoved on for failure to meet 9(b), GAF is not precluded from arguing that any amended pleading fails to meet the requirement.

**Aggravating Circumstances.** GAF argues that Plaintiffs' UDTPA claims should be dismissed for the additional reason that Plaintiffs have failed to allege "substantial aggravating circumstances." (*See* GAF Mot. at 49 ("North Carolina courts and the Fourth Circuit have held that a mere breach of contract or breach of warranty does not, standing alone, constitute an unfair or deceptive trade practice.").) Plaintiffs do not seem to disagree on the general statement of the law as cited by GAF. *See* *South Atlantic Ltd. P'ship of Tennessee, LP v. Riese,* 284 F.3d 518, 535 (4th Cir.2002) ("[W]hile there is no doubt that the North Carolina courts have construed the UTPA liberally, there are some limits on its application. For example, only practices that involve [s]ome type of egregious or aggravating circumstances are sufficient to violate the UTPA.) (internal citations and quotations omitted) (cited by Plaintiffs, *see* Pls.' Opp'n at 17).

Plaintiffs, instead, argue that they have adequately pled an action that goes beyond contract law. Plaintiffs assert that "[t]his, however, is not a mere breach of warranty case.... Plaintiffs' UDTPA claim is rooted in the conduct of GAF and its knowledge that the Decking was not manufactured in accordance with its representations and GAF failed to disclose this information." (Pls.' Opp'n at 17.) However, Plaintiffs do not address the language in GAF's case that provides that a "[p]laintiff cannot convert its breach of warranty claim into an unfair trade practices claim simply by artfully pleading the appropriate legal language for such a claim.... Plaintiff must also allege facts to support its legal claims." *Terry's Floor Fashions, Inc. v. Ga.-Pac. Corp.,* 1998 WL 1107771, at *10 (E.D.N.C. July 23, 1998) (internal quotations omitted). This statement in *Terry* is consistent with this Court's position on the insufficiency of mere recitation of legal catchwords or phrases. As the Court discusses throughout this Opinion (*see, e.g., infra* Section V.G), Plaintiffs' allegations with respect to GAF's conduct are short on substance. Therefore, the Court finds that dismissal without prejudice of Plaintiffs' UDTPA claim is appropriate on this basis.

### 9. *Count 11 (Ohio Product Liability Act ("OPLA"))*

**\*19** Neither GAF nor Plaintiffs address the appropriate legal standard for Plaintiffs' Ohio OPLA claim. Both parties cite to cases dealing with the Ohio Consumer Sales Practices Act (Count 12), [16] not OPLA claims. (*See* GAF Mot. at 25 n.15 ("Count 12: Ohio Consumer Sales Practice Act"); Pls.' Opp'n at 12 n.18 ("Indeed, Ohio district courts in many cases have not applied Rule 9(b)'s heightened pleading standard to Ohio CSPA claims.").) Therefore, the Court does not address the appropriate standard for the OPLA claim at this time. Also, because GAF did not specifically argue how Plaintiffs' OPLA claim failed to meet either 8(a) or 9(b), the Court will not dismiss this claim on this basis at this time. Because the Court is treating this claim as unmoved on for failure to meet the pleading standard, GAF is not precluded from arguing specifically that any amended pleading fails to meet the requirement.

### 10. *Count 13 (New Hampshire Rev. Stat. § 358–A et seq. ("NHCPA"))*

GAF argues that Rule 9(b) applies to Plaintiffs' NHCPA claim. (*See* GAF Mot. at 25 n.15 (citing *Gwyn v. Loon Mountain Corp.,* 2002 WL 1012929 (D.N.H. May 15, 2002), *aff'd,* 350 F.3d 212 (1st Cir.2003).) The *Gwyn* court held that "[b]y basing its CPA claim upon alleged misrepresentations and further asserting that the misrepresentations constituted a ***knowing and willful*** violation of the CPA, plaintiffs have in essence accused defendant of fraud. Where an allegation of fraud lies at the core of a cause of action, the heightened pleading standards of Fed.R.Civ.P. 9(b) apply." 2002 WL 1012929, at *7. Plaintiffs, in response, cite to *Leonard v. Abbott Labs., Inc.,* 2012 WL 764199 (E.D.N.Y. Mar. 5, 2012) (analyzing the New Hampshire statute). (*See* Pls.' Opp'n at 12 n.22.) The *Leonard* court first noted that it was "bound by the law of [the] Second Circuit," and then held that given what it believed were similarities between the NHCPA and the New York consumer protection statute, Rule 8(a) should apply. *See* 2012 WL 764199, at *19–20. The *Leonard* court also acknowledged that "[t]he act provides a non-exhaustive list of prohibited practices." *Id.* at *16. Plaintiffs' briefing does not compare the cases cited to the actual language in the OAC or clearly explain the basis for their claim under this statute.

Plaintiffs specific NHCPA allegations do not contain the words "fraud," "deception," or "willful and knowing." Instead, they are more vague and assert that GAF "was

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 137 of 410
PageID: 12744

In re: Elk Cross Timbers Decking Marketing, Not Reported in Fed. Supp. (2015)

2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

aware, or by the exercise of reasonable [care] should have been aware" of its allegedly improper conduct. (OAC ¶ 237.) Neither party analyzes the appropriate standard in the context of Plaintiffs' allegations, and the Court will not do so *sua sponte*.

Because GAF has not properly moved on this claim for failure to meet the pleading standard in any case, the Court will not reach this issue at this time. Because the Court is treating this claim as unmoved for failure to meet the pleading standard, GAF is not precluded from arguing that any amended pleading fails to meet the requirement.

### 11. *Count 15 (New York General Business Law § 349)*

Because GAF did not specifically argue how Plaintiffs' New York claim failed to meet Rule 8(a), the Court will not dismiss this claim at this time. Because the Court is treating this claim as unmoved on for failure to meet Rule 8(a), GAF is not precluded from arguing that any amended pleading fails to state a claim for this Count.

### 12. *Counts 16 and 17 (California False Advertising Law and California Consumer Legal Remedies Act)*

Because GAF did not specifically argue how Plaintiffs' California consumer claims failed to meet Rule 9(b), the Court will not dismiss these claims at this time. Because the Court is treating these claims as unmoved on for failure to meet 9(b), GAF is not precluded from arguing that any amended pleading fails to state a claim for these Counts.

### 13. *Count 18 (Nebraska Consumer Protection Act ("NCPA"))*

**\*20** GAF argues that Rule 9(b) applies to Plaintiffs' NCPA claim. (*See* GAF Mot. at 26 n.15 (citing *In re ConAgra Foods Inc.,* 908 F.Supp.2d 1090, 1099 (C.D.Cal.2012)) (applying Rule 9(b) to Nebraska's statute).) Plaintiffs, on the other hand, argue that " '[t]he heightened pleading requirements of Rule 9(b) do not apply to allegations of unfair and deceptive trade practices' under Nebraska's laws." (Pls.' Opp'n at 12 n.19 (quoting *Alpharma, Inc. v. Pennfield Oil Co.,* 2008 WL 2331019, at \*2 (D. Neb. June 4, 2008).) Neither of these cases provides any pleading standard analysis. In *In re*

*ConAgra,* "Plaintiffs [did] not dispute that Rule 9(b), rather than the more lenient requirements of Rule 8, govern[ed] their claims." 908 F.Supp.2d at 1097. And the point from Plaintiffs' case is supported by citation to a case "regarding unfair and deceptive trade practice action brought by the FTC under the Federal Trade Commission Act" and *Pelman* (discussing New York law). *See* 2008 WL 2331019, at \*2. Because GAF has not properly moved on this claim for failure to meet the pleading standard, and both parties provide no real analysis or persuasive support for their pleading positions, this Court will not reach this issue at this time. Because the Court is treating this claim as unmoved on for failure to meet the pleading standard, GAF is not precluded from arguing that any amended pleading fails to meet the requirement.

### 14. *Count 19 (Iowa Consumer Fraud Act ("IACFA"))*

GAF argues that Rule 9(b) applies to Plaintiffs' IACFA claims. (*See* GAF Mot. at 25 n.15 (citing *Wegner v. Pella Corp.,* 2015 WL 2089658, at \*6 (D.S.C. May 5, 2015) (applying Rule 9(b) to Iowa's statute)).) Plaintiffs do not provide case law for Iowa supporting that Rule 8(a) should apply to this claim. (*See* Pls.' Opp'n at 12 n.20.) Instead Plaintiffs cite to GAF's case and argue instead that "[w]hile the court held Rule 9(b) applied to a claim for a violation of the IACFA, it also held a 'relaxed Rule 9(b) standard' was appropriate." (*Id.* (quoting *Wegner* ).)

First, it appears that Plaintiffs are actually arguing for a "relaxed" 9(b) approach for this claim, not Rule 8(a). Second, in *Wegner* the court held that "[a]lthough the **Fourth Circuit** has not adopted this relaxed Rule 9(b) standard, a relaxed standard **comports with the Fourth Circuit's [general] instruction[s]**" regarding pleading under Rule 9(b). 2015 WL 2089658, at \*6 (emphasis added). Plaintiffs do not cite to Third Circuit cases applying such a relaxed standard for claims sounding in fraud, nor do they explain why they believe such an approach would be utilized in this district. The Court, thus, finds Plaintiffs' argument unpersuasive.

Plaintiffs also argue that they allege a *per se* violation of the IACFA, and then state that "[t]here is no requirement that the IACFA claim have a heightened pleading requirement." (Pls.' Opp'n at 12 n.20.) Plaintiffs provide no explanation for their conclusion. Here, Plaintiffs allege that GAF's "concealment, **intentional** and negligent **misrepresentation**, and breach of express and implied warranties **constitute** unfair, unlawful, **and fraudulent business acts and practices** in violation of

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 138 of 410
PageID#: 12745
In re: Elk Cross Timbers Decking Marketing, Not Reported in Fed. Supp. (2015)
2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

IOWA CODE ANN. § 714H.3." (OAC ¶ 323 (emphasis added).) As Plaintiffs' IACFA claim sounds in fraud, and they have provided no analysis or support for application of Rule 8(a) standards, the Court finds that the heightened pleading standards of Rule 9(b) (as applied in the Third Circuit) are applicable. However, because GAF did not specifically argue how Plaintiffs' IACFA claim failed to meet Rule 9(b), the Court will not dismiss this claim at this time. Because the Court is treating this claim as unmoved on for failure to meet 9(b), GAF is not precluded from arguing specifically that any amended pleading fails to meet the requirement.

### 15. *Economic Loss Doctrine*

In addition to the arguments discussed above, GAF also argues that the Missouri MMPA, Virginia VCPA, North Carolina UDTPA, Ohio OPLA, and Nebraska NCPA claims must be dismissed for failure to plead more than economic losses. (*See* GAF Mot. at 38 & n.22.) Where Plaintiffs provided cases on this point in opposition (*see* Pls.' Opp'n at 34–35 n.41), they support GAF's general statement of the law (*see* GAF Mot. at 38–39 n.22). *MO:Compare In re Genetically Modified Rice Litig.,* 666 F.Supp.2d 1004, 1015 (E.D.Mo.2009) ("The economic loss doctrine bars recovery of purely pecuniary losses in certain tort cases if there is no personal injury or physical damage to property other than the property at issue in the case–usually an allegedly defective product in a products liability case.") (Plaintiffs' case) *with Graham Constr. Servs. v. Hammer & Steel Inc.,* 755 F.3d 611, 616 (8th Cir.2014) ("Under Missouri law, [r]ecovery in tort for pure economic damages are only limited to cases where there is personal injury, damage to property other than that sold, or destruction of the property sold due to some violent occurrence.") (internal quotations omitted) (GAF's case); *NC:Compare Indem. Ins. Co. of N. Am. v. Am. Eurocopter LLC,* 2005 U.S. Dist. LEXIS 34011, at *35 (M.D.N.C.2005) ("North Carolina has adopted the economic loss rule, which prohibits recovery for economic loss in tort. Instead, such claims are governed by contract law.") (quoting *Moore v. Coachmen Indus.,* 499 S.E.2d 772, 780 (N.C.App.1998)) (Plaintiff's case) *with In re Bldg. Mat'ls Corp. of Am. Asphalt Roofing Shingle Prods. Liab. Litig.,* 2013 WL 169289, at *9 (D.S.C. Jan. 16, 2013) ("[T]he United States Court of Appeals for the Fourth Circuit has found error in allowing an unfair and deceptive trade practices claim to proceed under North Carolina law where the claim essentially alleged a contractual breach.") (citing *Broussard v. Meineke Disc.*

*Muffler Shops, Inc.,* 155 F.3d 331, 346 (4th Cir.1998)) (GAF's case); *OH:Compare Maranatha Volunteers Int'l, Inc. v. Golden Giant, Inc.,* 1999 WL 357786 at *4 (6th Cir.1999) ("It is not the nature of the claim but the character of the loss that determines whether the cause of action lies in tort or contract.") (Plaintiffs' case) *with Cincinnati v. Beretta U.S.A. Corp.,* 768 N.E.2d 1136, 1146 (Ohio 2002) ("In this case, since appellant alleged only economic damages, it has not set forth a statutory product liability claim and is consequently barred from bringing any such claims under the Act.") (GAF's case); *NE: Lesiak v. Central Valley Ag Co-op, Inc.,* 808 N.W.2d 67, 82 (Neb.2012) (The court "reaffirm[ed] the doctrine's continued application in the products liability context," and made clear that "the doctrine requires that where a defective product causes harm only to itself, unaccompanied by either personal injury or damage to other property, contract law provides the exclusive remedy to the plaintiff.") (cited by both Plaintiffs and GAF). [17]

**\*21** Plaintiffs do not argue that these claims cannot be barred by the economic loss doctrine. Instead they argue that their allegations of damage to other property are adequately pled. (Pls.' Opp'n at 34–35; *see also* ECF No. 61–1 (Pls.' Checklist) (stating only that Plaintiffs have "[s]ufficiently alleged damage to 'other property' ").)

The individual plaintiffs plead nothing more than "that any other property damage caused by the Decking must be repaired." (OAC ¶¶ 11–27, 29–32, 34–35.) This bare assertion does not state that there is actually any other property damage alleged, much less what that damage is alleged to be for each plaintiff. Plaintiffs generally allege that "Plaintiffs' " "residences/structures" or "exterior finishes, columns, walls, and other property" have been damaged (*see id.* ¶¶ 118–121), but such general allegations provide inadequate notice of whether Plaintiffs are alleging any actual damage to other property and what that damage is alleged to be.

Plaintiffs argue that "[i]f there is not damage to other property, then GAF can move to dismiss these claims at summary judgment." (Pls.' Opp'n at 35.) The Court agrees with GAF that Plaintiffs may not "skip the federal pleading requirements, and embark on discovery to fish for claims that are legally barred." (GAF Reply at 10.) The Supreme Court, in *Iqbal,* made clear that "the Federal Rules do not require courts to credit a complaint's conclusory statements without reference to its factual context.... And [even] Rule 8 does not empower respondent to plead the bare elements of his

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 139 of 410
PageID: 12746

In re: Elk Cross Timbers Decking Marketing, Not Reported in Fed. Supp. (2015)

2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

cause of action, affix the label 'general allegation,' and expect his complaint to survive a motion to dismiss." *Iqbal,* 556 U.S. at 686–87. Therefore, the Court dismisses Plaintiffs' Missouri MMPA, Virginia VCPA, North Carolina UDTPA, Ohio OPLA, and Nebraska NCPA claims without prejudice for failure to plead anything other than economic loss.

### C. GAF's Arguments That Other Causes of Action Are Abrogated by Statute

#### 1. *Indiana*

In its moving brief, GAF argued that "[t]he Indiana Products Liability Act ('IPLA') abrogates the Indiana Plaintiffs' [ (Stidham) ] claims for negligence (Count 1), strict liability (Count 26), negligent misrepresentation (Count 22), and fraudulent misrepresentation or concealment (Counts 23–24)." (GAF Mot. at 50.) Plaintiffs did not oppose GAF's dismissal of the negligence, strict liability, and fraudulent misrepresentation Indiana causes of action. (*See* ECF No. 61–1 at 1, 5, 7 (Pls.' Checklist).) Plaintiffs did not concede in their Checklist dismissal of the Indiana negligent misrepresentation and fraudulent concealment/omission claims. (*See id.* at 4, 6.) Plaintiffs, however, also did not argue that the negligent misrepresentation and fraudulent concealment causes of action are not abrogated by the IPLA; GAF's argument regarding abrogation for these causes of action simply does not appear on Plaintiffs' checklist or in Plaintiffs' opposition. (*See id.*; *see also* GAF Reply at 19.)

The Court agrees with GAF that all of Plaintiffs' Indiana tort claims are barred by the IPLA. *See Ryan ex rel. Estate of Ryan v. Philip Morris USA, Inc.,* 2006 WL 449207, at *2 (N.D.Ind. Feb. 22, 2006)* ("The express wording of the [IPLA] statute, as well as the clear holdings of the Indiana Supreme Court ... make it clear that all of Ryan's claims fall within the purview of the IPLA. This is true not only of Plaintiff's negligence claims, but her fraud claims as well.") (dismissing the common law claims). Therefore, the Indiana Plaintiff's negligent misrepresentation and fraudulent concealment claims will be dismissed with prejudice.

#### 2. *Ohio*

**\*22** GAF argues that "[d]epending on whether this Court finds Plaintiffs have pled damage to other property,

either their OPLA *or* common law claims should be dismissed." (GAF Reply at 19–20 (emphasis added).) Plaintiffs' position appears to be that it can pursue both sets of claims for different measures of damages. (*See* Pls.' Opp'n at 51 ("The *Huffman* court held that the plaintiff could simultaneously assert claims against a manufacturer under the common law for negligence as well as under OPLA because the measure of damages is different.").) Because the Court has dismissed Plaintiffs' OPLA claim, it need not decide at this time whether, if the OPLA claim is re-pled and survives dismissal, Plaintiffs could also bring common law claims with the OPLA claim.

### D. GAF's Argument That Certain Other Causes of Action Fail Because of the Economic Loss Doctrine

GAF argues that "[t]he Economic Loss Doctrine adopted by various states also bars many of Plaintiffs' claims." (GAF Mot. at 36.) Specifically, GAF argues that the non-consumer protection claims shown below should be dismissed for failure to plead harm to other property. (*See id.* at 38–39 n.22.)

- **Missouri** (Ross): Counts 1 (Negligence), 22 (Negligent Misrepresentation), 23 (Fraudulent Misrepresentation), 24 (Fraudulent Concealment), 26 (Strict Liability);

- **Nebraska** (Warren): Counts 1 (Negligence), 22 (Negligent Misrepresentation), 23 (Fraudulent Misrepresentation), 24 (Fraudulent Concealment), 26 (Strict Liability);

- **North Carolina** (Robertie): [18] Counts 1 (Negligence), 22 (Negligent Misrepresentation), 23 (Fraudulent Misrepresentation), 24 (Fraudulent Concealment);

- **Virginia** (Wolcott): Counts 1 (Negligence), 22 (Negligent Misrepresentation), 23 (Fraudulent Misrepresentation), 24 (Fraudulent Concealment);

- **California** (Williams): Counts 1 (Negligence), 22 (Negligent Misrepresentation), 26 (Strict Liability);

- **Colorado** (Kaiser, Turcheck, Tuthill, Barker, Megerle): Counts 1 (Negligence), 26 (Strict Liability);

- **Illinois** (Ernst): Counts 1 (Negligence), 22 (Negligent Misrepresentation), 26 (Strict Liability);

- **Iowa** (Denton, Sheridan): Counts 1 (Negligence), 22 (Negligent Misrepresentation);

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 140 of 410
PageID: 12747

In re: Elk Cross Timbers Decking Marketing, Not Reported in Fed. Supp. (2015)

2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

- **Michigan** (McGovern, Narducci, Claxton): Counts 1 (Negligence), 22 (Negligent Misrepresentation);

- **New Hampshire** (Khanna): Counts 1 (Negligence), 22 (Negligent Misrepresentation), 23 (Fraudulent Misrepresentation), 24 (Fraudulent Concealment), 26 (Strict Liability); and

- **New York** (Giovannetti): Counts 1 (Negligence), 22 (Negligent Misrepresentation), 23 (Fraudulent Misrepresentation), 24 (Fraudulent Concealment).

For the reasons stated previously with respect to Plaintiffs' Missouri, Nebraska, North Carolina, and Virginia consumer protection claims (*see supra* Section V.B.15), the Court agrees with GAF that the above causes of action for these states are also insufficiently pled, and, therefore, are dismissed without prejudice.

For the same reasons, the Court will dismiss the causes of action above for the California, Colorado, Illinois, Iowa, Michigan, New Hampshire, and New York Plaintiffs without prejudice. Plaintiffs have not argued that the economic doctrine is inapplicable in these states. In fact, the case law Plaintiffs cite (*see* Pls.' Opp'n at 34–35 n.41) supports GAF's legal position. [19] *See Jimenez v. Superior Court,* 58 P.3d 450, 483 (Cal.2002) ("To apply the economic loss rule, we must first determine what the product at issue is. Only then do we find out whether the injury is to the product itself (for which recovery is barred by the economic loss rule) or to property other than the defective product (for which plaintiffs may recover in tort)."); *Metropolitan Pro. & Cas. Ins. Co. v. James McHugh Constr. Co.,* 1999 WL 971283, *2 (N.D.Ill. Oct. 21, 1999) (The "doctrine prevents a plaintiff from recovering in tort for purely economic losses.... The economic loss rule therefore does not bar recovery for incidents resulting in damage to other property.")

(internal quotations omitted); *Richards v. Midland Brick Sales Co., Inc.,* 551 N.W.2d 649, 650 (Iowa 1996) ("It is a generally recognized principle of law that plaintiffs cannot recover in tort when they have suffered only economic harm."); *Quest Diagnostics, Inc. v. MCI WorldCom, Inc.,* 656 N.W.2d 858, 862 n.4 (Mich.Ct.App.2002) ("Michigan's economic loss doctrine is broader than other jurisdictions in that it not only includes damage to the product itself, but may also include damage to other property when this damage was within the contemplation of the parties to the

agreement.") (internal quotations omitted); *Border Brook Terrace Condo. Ass'n v. Gladstone,* 622 A.2d 1248, 1253 (N.H.1993) ("We agree with the defendants that a plaintiff may not ordinarily recover in a negligence claim for purely 'economic loss.' "); *Trump Int'l Hotel & Tower v. Carrier Corp.,* 524 F.Supp.2d 302, 312 (S.D.N.Y.2007) ("Thus, I find that the pressure differential flow switch did not damage 'other property' when it malfunctioned and caused the absorption chiller to freeze. As a result, Trump's negligence claim is dismissed.").

**\*23** As noted above in discussing Plaintiffs' consumer protection claims, Plaintiffs simply argue they have sufficiently pled damage to other property–an exception to the rule. (*See* Pls.' Opp'n at 34–35.) As this Court has held above (*see supra* V.B.15), the Court disagrees that Plaintiffs' bare allegations are sufficient to survive dismissal of these causes of action.

### E. Count 1 (Negligence): Other Argument for Dismissal

GAF argues that the negligence causes of action for the North Carolina (Robertie) [20] and Michigan (McGovern, Narducci, Claxton) Plaintiffs should also be dismissed for failure to plead a reasonable alternative design. (*See* GAF Mot. at 48–49.) Plaintiffs counter that "these states do not require allegations of an alternative feasible design to sustain negligence claims against a building product manufacturer." (Pls.' Opp'n at 4950.) The Court agrees with GAF with respect to Michigan and Plaintiffs with respect to North Carolina.

With respect to Michigan, Plaintiffs' case identifies "a reasonable alternative design" as a required element for a negligence claim based on design defect, [21] as Plaintiffs have alleged here (*see* OAC ¶¶ 116–121). Plaintiffs have not alleged that a reasonable alternative design was available. Therefore, the Michigan Plaintiffs' negligence cause of action is also appropriately dismissed without prejudice on this basis.

With respect to North Carolina, Plaintiffs' case says nothing on point. However, GAF's own case makes clear that Plaintiffs must prove "***either one of the following***: ... the manufacturer unreasonably failed to adopt a safer, practical, feasible, and otherwise reasonable alternative design or formulation ..." *or* that "the design or formulation of the

Case 1:19-md-02875-RMB-SAK   Document 598-3   Filed 10/16/20   Page 141 of 410
PageID: 12748

In re: Elk Cross Timbers Decking Marketing, Not Reported in Fed. Supp. (2015)

2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

product was so unreasonable that a reasonable person, aware of the relevant facts, would not use or consume a product of this design." *Earp v. Novartis Pharm. Corp.,* 2013 WL 4854488, at *6 (E.D.N.C. Sept. 11, 2013) (citing N.C. GEN. STAT. § 99B–6(a)) (emphasis added). GAF's case thus does not support that a reasonable alternative design must be pled in every case. That this Court finds that a reasonable alternative design is not always required to state a negligent design claim under North Carolina law does not mean that Plaintiffs have adequately stated a claim under North Carolina law. GAF did not appropriately move on that broader basis, so the Court has not reached that question.

### F. Count 22 (Negligent Misrepresentation): Other Arguments for Dismissal

#### 1. Failure to plead a special relationship

GAF argues that the negligent misrepresentation claims for the Ohio (Burger), North Carolina (Robertie), [22] Iowa (Denton, Sheridan), Virginia (Wolcott), and New York (Giovannetti) Plaintiffs should be dismissed for failure to plead a special relationship. [23] (GAF Mot. at 45 & n.29; ECF No. 63–1 at 8–9 (GAF's Reply Checklist).)

**\*24** Plaintiffs do not respond to GAF's arguments with respect to Ohio, Virginia, and New York. (*See* Pls.' Opp'n at 45–46.) GAF's case law for these states supports that a special relationship is required to bring a negligent misrepresentation claim under these states' law. *See Premier Bus. Grp., LLC v. Red Bull of N. Am., Inc.,* 2009 WL 3242050, at *11 (N.D.Ohio Sept. 30, 2009) ("[N]egligent misrepresentation requires a special relationship under which the defendant supplied information to the plaintiff for the latter's guidance in its business transactions.") (internal quotations omitted); *Velez v. Lizardi,* 2015 WL 868929, at *4–5 (Va.Ct.App. Mar. 3, 2015) (requiring a special relationship for constructive fraud); [24] *Prime Mover Capital Partners, L.P. v. Elixir Gaming Techs., Inc.,* 793 F.Supp.2d 651, 673–74 (S.D.N.Y.2011) ("[U]nder New York law, a plaintiff may recover for negligent misrepresentation only where the defendant owes her a fiduciary duty. Such a special relationship requires a closer degree of trust between the parties than that of the ordinary buyer and seller in order to find reliance on such statements justified.") (internal quotations omitted). Plaintiffs in these states have not alleged that a special relationship existed with GAF.

Therefore, the Court dismisses the Ohio, Virginia, and New York Plaintiffs' negligent misrepresentation causes of action without prejudice.

Plaintiffs do dispute that a special relationship is required for a negligent misrepresentation claim under North Carolina law. (*See* Pls.' Opp'n at 45.) For North Carolina, Plaintiffs cite (without a pincite) to *Rowan County Board of Education v. United States Gypsum Co.,* 332 N.C. 1 (1992). However, the *Rowan* court was analyzing a fraud, not a negligent misrepresentation, claim, and it did not discuss a special relationship. *See id.* GAF's case analyzing North Carolina law, on the other hand, supports that a special relationship is required. *See Synovus Bank v. Karp,* 887 F.Supp.2d 677, 690 (W.D.N.C.2012) ("[T]he Magistrate Judge correctly concluded that the Defendants' allegations do not support a finding of any type of special relationship between Synovus Bank and the Defendants beyond that of the typical lender-borrower relationship. Accordingly, ... the Defendants' negligent misrepresentation claims are dismissed.") (internal citations omitted), *aff'd in part sub nom. Synovus Bank v. Tracy,* 2015 WL 860361 (4th Cir. Mar. 2, 2015); *see also Energy Inv. Fund v. Metric Constr.,* 525 S.E.2d 441, 445 (N.C.2000) ("EIF's claim for negligent misrepresentation also fails in that EIF has not alleged or established a special relationship with defendants which supports standing to bring a direct claim.... Absent some indication whereby defendants directly solicited EIF with the intent to induce its participation in BCH, EIF has failed to allege the existence of a legally cognizable duty of care which runs from defendants to EIF."). As the North Carolina Plaintiffs (Robertie) have not alleged that a special relationship existed with GAF, their negligent misrepresentation cause of action is dismissed without prejudice.

For Iowa, Plaintiffs cite to *Sain v. Cedar Rapids Community School District,* 626 N.W.2d 115 (Iowa 2001). (Pls.' Opp'n at 46.) *Sain* supports GAF's basic proposition that a special relationship is required for a negligent misrepresentation claim under Iowa law. *See Sain,* 626 N.W.2d at 124 ("As with all negligence actions, ***an essential element*** of negligent misrepresentation is that the defendant must owe a duty of care to the plaintiff.") (emphasis added). Instead, Plaintiffs cite to *Sain* to argue that such a duty exists where "a defendant supplied 'information' and that this information was false." (Pls.' Opp'n at 46.) The *Sain* court, however, made clear "that this duty arises only when

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 142 of 410
PageID: 12749

In re: Elk Cross Timbers Decking Marketing, Not Reported in Fed Supp. (2015)
2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

the information is provided by persons in the business or profession of supplying information to others." 626 N.W.2d at 124, 128–29 (finding that the duty existed for a student and his guidance counselor). "Thus, when deciding whether the tort of negligent misrepresentation imposes a duty of care in a particular case, [Iowa courts] distinguish between those transactions where a defendant is in the business or profession of supplying information to others from those transactions that are arm's length and adversarial." *Id.* at 124. In reaching this decision, the *Sain* court cited to *Molo Oil Company v. River City Ford Truck Sales, Inc. Id.* In that case, the court held that "if the transaction at issue took place at arm's length, the plaintiff's cause of action must fail." *Molo Oil*, 578 N.W.2d 222, 227 (Iowa 1998) (refusing "to apply this rule [creating a duty] to a retailer in the business of selling and servicing its goods").

**\*25** Plaintiffs have alleged no facts demonstrating that GAF was in the business of supplying information period, much less in the way contemplated by Iowa courts. Therefore, the Iowa Plaintiffs' negligent misrepresentation causes of action also will be dismissed without prejudice.

### 2. *Failure to plead privity*

GAF argues that the Michigan Plaintiffs' (McGovern, Claxton, Narducci) negligent misrepresentation claims should be dismissed for lack of privity. (*See* GAF Mot. at 46 (citing *Yaldu v. Bank of Am. Corp.,* 700 F.Supp.2d 832, 845–46 (E.D.Mich.2010).) *Yaldu* provides that, under Michigan law, "[t]he elements of negligent misrepresentation are: ... (4) the defendant and plaintiff were in privity of contract...." *Id.* at 845. Plaintiffs do not address GAF's argument. However, with respect to similar arguments related to the implied warranty claims, Plaintiffs do not assert that any Plaintiff has alleged sufficient facts establishing privity, only that no such requirement exists. (*See* Pls.' Opp'n at 44–45.) Therefore, because Plaintiffs have not pled that privity exists as required under Michigan law, this Court finds that the Michigan Plaintiffs' negligent misrepresentation claims also should be dismissed on this basis.

### G. Count 24 (Fraudulent Concealment): Other Argument for Dismissal

The parties agree that Rule 9(b) applies to this claim. The Court initially notes that briefing by both parties on this

Count was challenging. This is particularly true because GAF intertwines its arguments against equitable tolling (which the Court has rejected as premature, *see supra* Section V.A.2) with its arguments that Plaintiffs' fraudulent concealment claims fail to state a claim under Rule 9(b). The Court is only addressing these issues at this time because several issues are core to Plaintiffs' allegations. As this Court has previously noted, the Court will not accept abstract arguments, arguments based on analysis of New Jersey law (unless explained why relevant), and, will not hunt to try to figure out if and how Plaintiffs are opposing GAF's arguments.

At the base of Plaintiffs' disjointed opposition is that they have adequately pled "fraud by omission with particularity" and that "[w]ithout the benefit of discovery in this matter, Plaintiffs cannot specify exactly when GAF knew the Decking was defective." (Pls.' Opp'n at 19.) The primary OAC allegations that Plaintiffs identify in support of their particularity position are the following:

> 72. The Decking's defects are latent and undetectable until they manifest. Therefore, Plaintiffs and Class members could not reasonably have discovered, even with the exercise of due diligence, that there was a defect until after the Decking had been purchased and installed. Indeed, the defect typically does not manifest itself until a year or two after installation.

> 73. But GAF knew or should have known of the Decking's defects, and that the Decking is not fit for its ordinary and intended use, is not merchantable, and fails to perform in accordance with GAF's own statements and warranties, as well as with the reasonable expectations of ordinary consumers.

> 74. And GAF knew or should have known that the Decking had the potential and tendency for swelling, expanding, warping, staining, discoloration, twisting, and shrinking.

> **\*26** 75. Despite GAF's actual or constructive knowledge of the Decking's defects and problems, GAF continued to market and sell the Decking–and failed to disclose, and otherwise concealed, the Decking's inherent defects.

> 85. As discussed herein, GAF made the following representations in conjunction with the sale of its Decking, each of which were intended to (and did) convey information regarding the durability and performance of the Decking, rather than mere puffery: ... [list of alleged representations].

2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

88. GAF's made its representations about the Decking despite GAF's knowledge that the Decking was defective.

372. GAF took affirmative steps to prevent Plaintiffs and Class members from learning of the Decking's defects, including keeping non-public information and internal knowledge and communications secret.

Most of these allegations–and all dealing with omission– are essentially fill-in-the-blank pleading allegations. In other words, if someone replaced "GAF" with "insert party" and "Decking" with "insert product," they could have bare-bones pleadings for any defective product. In other contexts, this Court–with more specific allegations than those above–has held that such bare-bones pleadings do not meet Rule 8, much less Rule 9.

Plaintiffs also generally allege that "*[d]espite a litany of complaints from consumers like Plaintiffs* and Class Members, GAF refuses to inform purchasers, homeowners, and Class Members about the Decking's defects." (OAC ¶ 77 (emphasis added).) The OAC originally included twenty-five (25) Plaintiff fact sets; twenty-three (23) remain. However, with the exception of Plaintiff McGovern, *none* of the Plaintiffs allege informing GAF of any decking issue, when they so communicated with GAF, the content of any "complaint" or other communications, or any other facts to support knowledge by GAF of any alleged defect. Even Plaintiff McGovern alleges only that he "initially filed an action against GAF in this Court on August 21, 2014," and "[b]efore filing that case, Plaintiff submitted a pre-suit demand to Defendant." (*Id.* ¶ 17.) Plaintiff McGovern does not identify when he submitted the pre-suit demand or the content of that demand. In fact, a couple of Plaintiffs' allegations above assert only that GAF "knew *or should have known*" of the alleged defect.

Paragraph 372 which simply states that "GAF took affirmative steps to prevent Plaintiffs and Class members from learning of the Decking's defects" appears to be the heart of its omission claim. While there may be a limitation to Plaintiffs' knowledge prior to discovery, Plaintiffs must have some basis for their allegations beyond conclusory assertions that simply mimic legal elements. With this background, the Court will address the specific argument made by GAF that Plaintiffs failed to plead a special or fiduciary relationship as required by certain states.

GAF states that "[f]raudulent concealment as a cause of action in these states requires *either* an affirmative act of concealment *or* confidential, fiduciary, or other special relationship," and that Plaintiffs have alleged neither. (GAF Mot. at 45–46 n.30 (emphasis added).) As such, GAF argues that the California (Williams), Illinois (Ernst), Ohio (Burger), North Carolina (Robertie),[25] Iowa (Denton, Sheridan), Montana (Hoover & Cohen), Nebraska (Warren), Michigan (McGovern, Narducci, Claxton), Virginia (Wolcott), New York (Giovannetti), and Mississippi (Mapp)[26] Plaintiffs' fraudulent concealment claims should be dismissed. (*See id.*) Plaintiffs counter that a showing of a special relationship is not required because–as GAF acknowledges–Plaintiffs must plead *either* an affirmative act(s) of concealment *or* a special relationship; Plaintiffs do not argue that they have plead a special or fiduciary relationship for any of the Plaintiffs. (*See* Pls.' Opp'n at 20–21.) However, Plaintiffs have not sufficiently pled an affirmative act of concealment as discussed above, so they cannot defeat GAF's argument on this issue on that cursory argument alone.

**\*27** Plaintiffs further argue that in "numerous states at issue" (citing to cases analyzing Illinois, South Carolina (not at issue here), and Virginia law only), that neither an affirmative misrepresentation nor a special relationship are required "so long as the defendant: (1) knows about the defect at the time of sale, (2) makes partial representations while concealing other information, or (3) enjoys a position of superior knowledge over the plaintiff." (Pls.' Opp'n at 21 & n.28.) Plaintiffs also argue that in California, North Carolina, Iowa, Illinois, Nebraska, Ohio, New York, Montana, and Mississippi "when a manufacturer knows that it is selling a defective product, a duty to disclose that defect arises." (*Id.* at 22–24 & nn.29–35.)

Plaintiffs' cases do not support their argument that the fraudulent concealment claims in these states have been sufficiently pled for a product defect case. The cases cited by Plaintiffs involve more specific pleadings than are present here, different postures of the cases, and/or analysis of state, not federal, pleading sufficiency; no case supports that Plaintiffs can meet their pleading burden with bald assertions simply reciting magic legal phrases. In other words, even by their own definition, the allegations in the OAC are insufficient to state claims for fraudulent concealment in these states because Plaintiffs make nothing but conclusory allegations that GAF knew or should have known that its advertisements and/or representations were false or misleading at the time of sale. Thus, regardless

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 144 of 410
PageID: 12751

In re: Elk Cross Timbers Decking Marketing, Not Reported in Fed.Supp. (2015)

2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

of whether an affirmative duty to disclose exists relieving them of other proofs, Plaintiffs have not pled sufficient facts to establish such a duty existed here. Therefore, Plaintiffs' fraudulent concealment causes of action in these states will be dismissed without prejudice.

Plaintiffs did not provide opposition with respect to GAF's Michigan arguments. (*See id.*) To state a claim for fraudulent concealment under Michigan law, Plaintiffs must plead either affirmative concealment or a fiduciary relationship. *See First of Mich. Corp. v. Swick,* 894 F.Supp. 298, 301 (E.D.Mich.1995)("Defendants acknowledge that fraudulent concealment requires some affirmative fraudulent act and an additional act to perpetuate the concealment; mere inaction or silence is not sufficient. Instead, defendants rely on the exception to this rule creating an affirmative duty when there is a fiduciary relationship.... [B]ecause there was not a fiduciary relationship between plaintiffs and defendants, mere inaction by plaintiffs is insufficient to establish fraudulent concealment.") (internal quotations and citations omitted). Plaintiffs have not sufficiently alleged either, and, therefore, the Michigan Plaintiffs' (McGovern, Narducci, Claxton) fraudulent concealment causes of action also will be dismissed without prejudice.

Because the Court finds that Plaintiffs' pleadings are insufficient regardless of whether GAF's or Plaintiffs' view of the law is correct, the Court will not decide at this time whether a showing of a special relationship or an affirmative act of concealment is required in all the states at issue.

### H. Count 20 (Breach of Express Warranty)

#### 1. *Failure to plead breach of the Smart Choice Limited Warranty*

GAF argues that all of Plaintiffs' express warranty claims fail "[t]o the extent that Plaintiffs attempt to plead a breach of the Smart Choice Limited Warranty, ... because they have not actually pled any breach of those terms." (GAF Mot. at 39.)

Although Plaintiffs assert that "Plaintiffs' claim for breach of [express] warranty includes ... a claim for breach of the Limited Warranty **offered by GAF**" (Pls.' Opp'n at 35 (emphasis added)), Plaintiffs do not plead the actual express terms of the applicable warranties, and how GAF failed to comply with those terms. They also do not allege that they gave GAF an opportunity to repair or replace any faulty

product and GAF did not do so according to the express terms of the warranty. The only Plaintiff who alleges that he notified GAF at all–Plaintiff McGovern–does not allege any details of the communication other than that it was a "pre-suit demand." (*See* OAC ¶ 17.) This Court agrees with GAF that "at its core, Plaintiffs' claim regarding the Smart Choice Limited Warranty is not that GAF breached it, but that they are dissatisfied with the remedy that it provides." (GAF Mot. at 39–40; *see also* Pls.' Opp'n at 36 (explaining how they believe the warranty coverage is inadequate).) Plaintiffs have not identified in the OAC the warranty terms that were breached, and how they were breached.

**\*28** In lieu of arguments related to the actual warranty terms, Plaintiffs make arguments that the Smart Choice Warranty is unconscionable and "fails of its essential purpose." (*See* Pls.' Opp'n at 36–39.) As an initial matter, in support of both of these arguments, Plaintiffs cite primarily New Jersey case law and statutes, not cases applying the relevant law. Second, Plaintiffs seem to conflate various concepts. Even the New Jersey case cited by Plaintiffs for its unconscionability argument does not support their express warranty position because Plaintiffs have not explained how the concept of unconscionability demonstrates that their affirmative *express* warranty claims are sufficiently pled. *See In re AZEK Bldg. Prods., Inc. Marketing & Sales Practices Litig.,* 82 F.Supp.3d 608, 614, 616 (D.N.J.2015) (holding that "Defendant correctly argues that Plaintiffs have failed adequately to plead breach of the Lifetime Limited Warranty" while finding unconscionability, on the other hand, relevant to whether Defendants could *disclaim* certain causes of action based on the terms of the warranty). At this time, GAF has not moved to dismiss claims based on an argument that such claims are precluded by the terms of the warranty. Therefore, aside from being improperly supported given the relevant law, Plaintiffs' unconscionability argument is unresponsive to GAF's arguments related to Plaintiffs' claims for breach of the *express* warranty.

With respect to Plaintiffs' failure of essential purpose argument, Plaintiffs again cite to New Jersey law in response to GAF's citation to cases applying relevant state law. (*See* Pls.' Opp'n at 38 ("Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this Act.") (citing N.J.S.A. 12A:2–719(2)).) GAF's citations support their argument that a "warrantor in a repair or replace warranty must be provided with an opportunity to repair any defect, and no Plaintiff [here] adequately alleges providing any such opportunity,

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 145 of 410
PageID: 12752
In re: Elk Cross Timbers Decking Marketing, Not Reported in Fed.Supp. (2015)
2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

rendering the express warranty claims insufficient." (GAF Mot. at 40 n.23.) GAF's cases also support that in some instances, a plaintiff may be able to meet this requirement by pleading allegations to support that such an effort would be futile. Plaintiffs have not made such an argument here, and they have not alleged any facts supporting such an argument.

The Court agrees with GAF that "[b]ecause no Plaintiff alleges GAF failed to provide the remedy promised in the Smart Choice Limited Warranty, Plaintiffs have not alleged any [express] breach of it." (*Id.* at 41.) Therefore, all claims based on the theory that the express warranty was breached pursuant to its terms are dismissed without prejudice.

### 2. *Failure to plead representations that became a basis of the bargain*

GAF also argues that all of the Plaintiffs' express warranty claims fail because "they do not allege that any statements outside of the Smart Choice Limited Warranty became part of the basis of the parties' bargain and thus formed express warranties." (*Id.* at 39.) GAF does not allege that representations can never form the basis for an express warranty claim. Instead GAF argues that "Plaintiffs' failure to allege that they heard or saw any alleged representations and relied on them necessitates dismissal of their breach of express warranty claims." (*Id.* at 41.)

GAF's case law (*see id.* at 41–42 n.25) supports that– at a minimum–Plaintiffs must have seen or heard the representations that they allege became a basis of the bargain. It also supports that in most, if not all, relevant states, Plaintiffs must allege that they relied on such representations or that the representations induced the purchase. *See Nat'l Mulch & Seed, Inc. v. Rexius Forest By–Prods. Inc.,* 2007 WL 894833, at *16 (S.D.Ohio Mar. 22, 2007)* ("An affirmation of fact is part of the basis of the parties bargain if it induces the buyer to purchase the product."); *Hope v. Nissan N. Am., Inc.,* 353 S.W.3d 68, 85 (Mo.Ct.App.2011)* ("To prove a claim for breach of express warranty in Missouri, a plaintiff must show: ... (3) the statement of fact was a material factor inducing the buyer to purchase the goods...."); *Sharp v. Tamko Roofing Prods., Inc.,* 2004 WL 2579638, at *2 (Iowa Ct.App.2004)* ("For a plaintiff to prove a breach of an express warranty based on sales representations, there must be a finding the sale would not have been made but for the representations."); *Schlenz v. John Deere Co.,* 511 F.Supp.

224, 228 (D.Mont.1981)* ("Manufacturers such as defendants create express warranties ... if they make representations in advertising brochures that the purchaser relies on as part of the basis for the bargain."); *Dow Corning Corp. v. Weather Shield Mfg., Inc.,* 790 F.Supp.2d 604, 611 (E.D.Mich.2011)* ("Under Michigan's version of the Uniform Commercial Code, advertisements and promotional literature can be a part of the basis of the bargain and thus constitute express warranty where they are prepared and furnished by a seller to induce purchase of its products and the buyer relies on the representations."); *Neb. Plastics, Inc. v. Holland Colors Am., Inc.,* 2003 WL 22519410, at *18 (D.Neb. Nov. 7, 2003)* ("This court has held that [s]ince an express warranty must have been made part of the basis of the bargain, it is essential that the plaintiffs prove reliance upon the warranty.") (quoting *Hillcrest Country Club v. N.D. Judds Co.,* 461 N.W.2d 55, 61 (Neb.1990))* (internal quotations omitted); *Melton v. Ortho–McNeil Pharm., Inc.,* 2014 WL 4930673, at *3 (N.D.Ohio Oct. 1, 2014) (applying Illinois law)* ("Essential to the formation of a warranty is the buyer's reliance on the representations of the seller.... [E]ven if the advertisement had contained an affirmation of fact or promise, it is of no consequence to the instant claims as Ms. Melton admits she did not read the advertisement, and therefore could not have relied on any statement therein."); *Assocs. of San Lazaro v. San Lazaro Park Props.,* 864 P.2d 111, 115 (Colo.1993)* ("Sellers are encouraged to warrant only that which they know they can fulfill, while buyers who in fact rely on express warranties may anticipate judicial enforcement thereof."); *Wabash Power Equip., Co. v. BTU State Line, LLC,* 2014 WL 1329411, at *7 (N.D.Ind. Mar. 31, 2014)* ("As the Seventh Circuit Court of Appeals explained, describing Indiana law, [t]he buyer has the burden of establishing that both parties understood and agreed to the same thing, before an express warranty can be proven. That means that if both parties did not rely on a certain assertion or opinion to be a part of the deal, no express warranty was created.") (internal quotations omitted, alteration in original); *Tae Hee Lee v. Toyota Motor Sales, U.S.A., Inc.,* 992 F.Supp.2d 962, 979 (C.D.Cal.2014)* ("Moreover, Plaintiffs do not allege that they read or relied on the 'marketing brochure' before making their purchases."); *Kelleher v. Marvin Lumber & Cedar Co.,* 891 A.2d 477, 502 (N.H.2006)* ("To satisfy this requirement, a plaintiff claiming breach of express warranty based upon a representation in a catalog or brochure would have to prove, at a minimum, that he or she read, heard, saw or was otherwise aware of the representation in the catalog or brochure."); *Cavanagh v. Ford Motor Co.,* 2014 WL 2048571, at *4

In re: Elk Cross Timbers Decking Marketing, Not Reported in Fed. Supp. (2015)

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 146 of 410
PageID: 12753

2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

(E.D.N.Y. May 19, 2014) ("A successful claim of a breach of express warranty requires proof that an express warranty existed, was breached, and that plaintiff had relied on that warranty. Where a [p]laintiff does not identify the terms of the purported warranty he claims to have relied on, any conclusory allegation ... for breach of express warranty [must] be dismissed.") (internal citations and quotations omitted, alteration in original); Maxwell v. Remington Arms Co., LLC, 2014 WL 5808795, at *3 (M.D.N.C. Nov. 7, 2014) ("In determining whether a seller's affirmation or description becomes the basis of the bargain, North Carolina courts look to certain factors, including whether the buyer knew of the seller's statements.") (internal quotations omitted); Craig v. DaimlerChrysler Corp., 2008 WL 2816842, at *7 (S.D.Miss. Mar. 19, 2008) ("In order to set forth a product liability claim for breach of express warranty, Plaintiffs must demonstrate that: The product breached an express warranty or failed to conform to other express factual representations upon which the claimant justifiably relied in electing to use the product.") (internal quotations omitted).[27]

**\*29** Plaintiffs do not cite relevant law demonstrating that a plaintiff can state a breach of express warranty claim based on representations that they were not even aware of. (See Pls.' Opp'n at 39–41.) Instead, Plaintiffs make broad statements primarily supported by citations to cases analyzing New Jersey law. (See, e.g., id. at 39 ("All affirmations of fact by the seller, description of the goods, or exhibitions of samples become part of the basis of the bargain unless good reason is shown to the contrary." Cipollone v. Liggett Grp., Inc., 893 F.2d 541, 568 (3rd Cir.1990).").) In fact, Plaintiffs seem to concede that–at a minimum–awareness of the representation is a requirement. (See id. at 40 ("A representation is presumed to be part of the basis of the bargain '*once the buyer has become aware of the affirmation of fact or promise.*'") (emphasis added) (quoting another case analyzing New Jersey law, Liberty Lincoln–Mercury, Inc., 171 F.3d 818, 825 (3d. Cir.1999).) And yet, as GAF notes (see GAF Reply at 13), Plaintiffs have failed to plead which, if any, representations that the Plaintiffs were aware of. With respect to reliance, Plaintiffs assert–without more– that "[t]o the extent that a particular state requires reliance, Plaintiffs have adequately alleged it." (Pls.' Opp'n at 40 n.42.) Such arguments improperly punt Plaintiffs' opposition responsibility to this Court.

The Court finds that Plaintiffs have not pled anything sufficient to support a benefit of the bargain argument. As an initial matter, the following Plaintiffs make no allegations *of any kind* with respect to representations:[28] Burger (Ohio), McGovern (Michigan), Claxton (Michigan), Kaiser (Colorado), Tuthill (Colorado), and Mapp (Mississippi). (OAC ¶¶ 11, 17, 20, 22, 24, 31.) Thus, these Plaintiffs' express warranty claims will be dismissed without prejudice to the extent they are based on a benefit of the bargain theory.

The following Plaintiffs make only the single cut and paste allegation that they purchased the decking based on "the representations regarding the quality of the Decking": Denton (Iowa), Hoover & Cohen (Montana), Warren (Nebraska), Ernst (Illinois), Turcheck (Colorado), Stidham (Indiana), Williams (California), Wolcott (Virginia), Khanna (New Hampshire), Giovannetti (New York), Shepherd (North Carolina), Barker (Colorado), and Megerle (Colorado). (Id. ¶¶ 15–16, 18, 21, 23, 25–27, 29–30, 32, 34–35.) Plaintiffs Ross (Missouri) and Sheridan (Iowa) allege that "[b]ased upon GAF's marketing, at the time of purchase, [they] believed that the Decking was superior to other decking boards." (Id. ¶¶ 13–14.) Plaintiff Sheridan also alleges that based on the marketing, he believed it "would require limited maintenance." (Id. ¶ 14.) Plaintiff Narducci (Michigan) alleges that he purchased the decking "based upon the quality and ease of use of the Decking." (Id. ¶ 19.) Plaintiff Narducci does not identify the basis for that belief. None of the Plaintiffs identify which representations they saw or heard, where they saw or heard them, when they saw or heard them, from whom, and whether the representations induced them to purchase the product (in those states where required). In short, there is no indication in any of Plaintiffs' allegations what representations identified in the general allegations section became a basis of the bargain between these parties and GAF.

These allegations are inadequate to meet the basic requirements of Rule 8, and cannot be salvaged by a couple of general allegations by Plaintiffs. (See id. ¶ 87 ("Plaintiffs, class members, and the builders, contractors, subcontractors, and other agents, relied on GAF's representations regarding the quality of the Decking."); see id. ¶ 339 ("Plaintiffs, Class Members, and the builders, contractors, subcontractors, and other agents who worked for them, relied on GAF's representations regarding the quality of the Decking.").) As this Court has made clear, even "Rule 8 does not empower respondent to plead the bare elements of his cause of action, affix the label 'general allegation,' and expect his complaint to survive a motion to dismiss." Iqbal, 556 U.S. at 686–87. Thus, these Plaintiffs' express warranty claims also will

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 147 of 410
PageID: 12754

In re: Elk Cross Timbers Decking Marketing, Not Reported in Fed.Supp. (2015)

2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

be dismissed without prejudice to the extent they are based on a benefit of the bargain theory.

### 3. *Failure to plead notice*

**\*30** GAF further argues that the Ohio (Burger), Michigan (Claxton, Narducci, McGovern), Illinois (Ernst), Indiana (Stidham), and New York (Giovannetti) Plaintiffs' express warranty claims also fail because they do not "allege facts showing that they provided GAF with notice of the alleged defects." (GAF Mot. at 44 & n.27; *see also* ECF No. 63–1 at 5–6(GAF Reply Checklist).) Plaintiffs counter that "these states all permit the filing of a complaint to constitute notice in this context." (*See* Pls.' Opp'n at 42 & n.45.)

With respect to Illinois, the case relied on by Plaintiffs does not support their position. In *Connick v. Suzuki Motor Company, Ltd.,* the Illinois Supreme Court held that "[o]nly a consumer plaintiff who suffers *a personal injury* may satisfy the section 2–607 notice requirement by filing a complaint stating a breach of warranty action against the seller." 675 N.E.2d 584, 590 (Ill.1996) (emphasis added). The Illinois court further held that "[t]he reason for this distinction is that where the breach has not resulted in personal injury, the UCC indicates a preference that the breach be cured without a lawsuit." *Id.* at 590–91. Here, the Illinois Plaintiff has not alleged any pre-suit notice. Therefore, his breach of express warranty claim is dismissed without prejudice on this basis.

With respect to Ohio, Michigan, Indiana, and New York, the most liberal reading of Plaintiffs' cases is that notice by complaint is the unusual exception, not the rule. And it is an exception premised on the filing of the complaint providing "reasonable" notice. Here, Plaintiffs have alleged no facts related to this issue. Instead all many of these Plaintiffs baldly assert is that they discovered the defect within a year prior to filing suit. (*See* OAC ¶¶ 11–12, 14–16, 18–23, 25–27, 29–32, 34.) Others do not even identify when they allegedly discovered the defect. (*See id.* ¶¶ 13, 17, 24, 35.) [29] Thus, Plaintiffs do not allege when each Plaintiff actually discovered the issue, or any other facts to support that notice was reasonable. Plaintiffs appear to believe that their notice argument means that the mere filing of the complaint without any allegations related to notice is enough to survive a motion to dismiss. If this were the case, then no express warranty claim could be dismissed in these states based on failure to provide notice, as every case begins with the filing of a complaint. Plaintiffs' cases do not support such a broad assertion. Because the Court finds that Plaintiffs' failure to make *any* allegations related to notice justifies dismissal without prejudice, it need not decide at this time when or if the filing of a complaint can satisfy the notice requirement in these states.

### 4. *Failure to plead privity*

GAF also argues that the Indiana Plaintiff's (Stidham) express warranty claim should be dismissed for failure to allege privity. (*See* GAF Mot. at 45.) To support this argument, GAF cites to *Atkinson v. P & G–Clairol, Inc.,* which held that "vertical privity is required for claims of breach of express warranty and breach of implied warranty of fitness for a particular purpose." 813 F.Supp.2d 1021, 1026 (N.D.Ind.2011). Plaintiffs, on the other hand, cite to *Prairie Production, Inc. v. Agchem Div.-Pennwalt Corporation,* which held, on an issue of first impression, that "a plaintiff may recover against a manufacturer for economic loss for breach of express warranties, even though the plaintiff is not in privity with the manufacturer." 514 N.E.2d 1299, 1302–03 (Ind.Ct.App.1987). A recent case in the Southern District of Indiana, *Ryden v. Tomberlin Automotive Group,* 2012 WL 4470266, at \*1–2 (S.D.Ind.2012), dealt with the same arguments and cases as the parties present here. In that case, the court did not resolve the split between the holdings in these cases (*Atkinson* and *Prairie Production* ). Instead, it clarified the basis for the *Prairie Production* holding. The court stated:

**\*31** In *Prairie Production,* the Indiana Court of Appeals relied on the New York case of *Randy Knitwear, Inc. v. Am. Cyanamide Co.,* 11 N.Y.2d 5, 226 N.Y.S.2d 363, 181 N.E.2d 399 (N.Y.1962), and held that where a manufacturer had made representations to a buyer in the chain the distribution through advertisements and product labels, and the buyer in fact relied upon those representations, the buyer could maintain a claim for breach of an express warranty. 514 N.E.2d at 1303–04; *see also id.* at 1304 ("[T]he seller's representation rises to the level of an express warranty only if it becomes part of the basis of the bargain."). The cases that have followed *Randy Knitwear* only allow express warranty claims where the conditions of representation and reliance are met. They do not treat the case as a general repudiation of privity, but as an exception to it.

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 148 of 410
PageID: 12755

In re: Elk Cross Timbers Decking Marketing, Not Reported in Fed. Supp. (2015)
2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

*Id.* at \*2. The *Ryden* court then found–without resolving the dispute–that the plaintiff's allegations failed even to meet the *Prairie Production* requirements of awareness and reliance. *Id.* ("Significantly, Plaintiff does not allege that he relied on these advertisements in making his decision to buy a Vehicle, nor does he allege that he ever saw this advertisement or was aware of it. Without such allegations, Plaintiff's breach of express warranty claim does not fall within the exception to the privity requirement articulated in *Randy Knitwear* and *Prairie Production.*"). The Court reaches the same conclusion in this case. Even if Plaintiffs are correct that *Prairie Production* states the appropriate rule (that privity is not always required for express warranty claim under Indiana law), they have failed to plead any allegations supporting that an exception to this requirement exists here. Therefore, the Indiana Plaintiffs' express warranty cause of action will be dismissed without prejudice on this basis. The Court does not decide at this time whether such allegations without would be sufficient to state an express warranty claim under Indiana law.

### I. Count 21 (Breach of Implied Warranties)

#### 1. *Failure to plead not merchantable*

GAF argues that in Ohio (Burger), North Carolina (Robertie, Shepherd), Montana (Hoover & Cohen), Michigan (Narducci, Claxton, McGovern), Nebraska (Warren), Colorado (Kaiser, Tuthill, Turcheck, Barker, Mergele), Indiana (Stidham), and Mississippi (Mapp) "an implied warranty claim (Count 21) should be dismissed where, as here, Plaintiffs do not sufficiently allege that the items cannot be used for their ordinary purpose." (GAF Mot. at 42.) [30] GAF argues–and the Court agrees–that "[h]ere, Plaintiffs describe the 'ordinary purpose' of CrossTimbers and/or DuraLife as 'serving as exterior home decking in high-traffic areas exposed to the elements,' " and "and at no point do Plaintiffs allege that they are unable to use their CrossTimbers and/or DuraLife in this manner." (*Id.* at 43 (quoting OAC ¶ 81).)

Plaintiffs do not challenge GAF's law, and, in fact, cite to cases analyzing New Jersey and Pennsylvania law in opposition. (*See* Pls.' Opp'n at 41–42 (citing *In re AZEK*, 82 F.Supp.3d at 616, and *Fleisher v. Fiber Composites, LLC,* 2012 WL 5381381, at \*6–7 (E.D.Pa. Nov. 2, 2012)).) Without acknowledging the different allegations in those cases, Plaintiffs state "[t]he court found that the essential

function of a deck includes aesthetic improvement of the property [which] is a quintessential fact question that should not be resolved in the context of a motion to dismiss." (*Id.* at 41 (internal quotations omitted).) Plaintiffs further argue that "GAF's argument that Plaintiffs failed to allege that the Decking is 'not merchantable' ignores the plain text of the OAC and the reasonable inferences which may be drawn from those allegations." (*Id.* at 42 n.44 (citing OAC ¶¶ 73, 81, 346).) These OAC paragraphs provide:

**\*32** 73. But GAF knew or should have known of the Decking's defects, and that the Decking is not fit for its ordinary and intended use, is not merchantable, and fails to perform in accordance with GAF's own statements and warranties, as well as with the reasonable expectations of ordinary consumers.

81. Through these media, as well as by oral affirmations to the Plaintiffs and the general public, GAF advertised and warranted that the Decking was merchantable as exterior home decking, fit for the ordinary purpose of serving as exterior home decking in high-traffic areas exposed to the elements, and free from defects in both its materials and its workmanship.

346. Contrary to such implied warranties, the Decking is not of merchantable quality or fit for its intended use–it is defective and unsuitable for use as an exterior decking product.

Plaintiffs do not allege what their expectations were other than their express statement that the ordinary purpose was to "serv[e] as exterior home decking in high-traffic areas exposed to the elements." Nor do they allege that the decking failed in this respect.

A complaint may not be amended through briefing. *See Bell v. City of Phila.,* 275 F. App'x 157, 160 (3d Cir.2008). Because Plaintiffs have not alleged the facts that serve as the basis of their argument and have not cited relevant law on that point, the Court need not decide if such allegations would be sufficient under relevant law. Based on the OAC, Plaintiffs have not alleged that the decking is not merchantable, and, therefore, the implied warranty causes of action in these states will be dismissed without prejudice on that basis.

#### 2. *Failure to plead notice*

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 149 of 410
PageID: 12756

In re: Elk Cross Timbers Decking Marketing, Not Reported in Fed.Supp. (2015)
2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

For the same reasons that the Ohio (Burger), Michigan (Narducci, Claxton, McGovern), and Indiana (Stidham) Plaintiffs'[31] express warranty claims are dismissed for lack of notice (*see supra* Section V.H.3), their implied warranty claims must also be dismissed without prejudice.

### 3. *Failure to plead privity*

GAF argues that the North Carolina (Robertie, Shepherd) and Ohio (Burger) Plaintiffs'[32] implied warranty causes of action must be dismissed for failure to plead privity. (*See* GAF Mot. at 44 & n.28.) Plaintiffs argue that these states do not require privity for implied warranty claims; they do not argue that they have plead facts sufficient to support that privity exists. (*See* Pls.' Opp'n at 44.)

**\*33** The Court agrees with GAF that privity is required for Plaintiffs' contract-based implied warranty causes of action in North Carolina and Ohio. *See Energy Inv. Fund v. Metric Constr., Inc.*, 525 S.E.2d 441, 446 (N.C.2000) ("[W]hen a claim is only for economic loss, ... the general rule is that privity is required to assert a claim for breach of an implied warranty involving only economic loss."); *Curl v. Volkswagen of Am., Inc.*, 871 N.E.2d 1141, 1147 (Ohio 2007) ("Ohio continues to require privity as to contract claims.").[33] Therefore, as Plaintiffs in these states have not alleged privity or losses beyond economic losses, theses causes of action will be dismissed without prejudice.

### 4. *Failure to plead an alternative design*

As with the Michigan Plaintiffs' negligence causes of action, GAF argues that their breach of implied warranty causes of action should be dismissed for failure to plead an alternative feasible design. (*See* GAF Mot. at 49–50.) While Plaintiffs argued that the Michigan negligence causes of action do not require pleading an alternative reasonable design (this Court disagreed, *see supra* Section V.E), Plaintiffs do not make the same argument with respect to the breach of implied warranty cause of action. In any case, under Michigan law, "[b]reach of implied warranty and negligent design are two distinct theories of recovery but involve the same elements of proof." *Severstal N. Am., Inc. v. N. Am. Refractories, Co.*, 2009 WL 1620115, at \*13 (E.D. Mich. June 9, 2009). Thus, for the same reasons the negligence causes of action are

dismissed on this basis (*see supra* Section V.E), the Michigan Plaintiffs' (McGovern, Narducci, Claxton) implied warranty causes of action also will be dismissed without prejudice.

### 5. *Duplicative of the strict liability claim*

GAF argues that the Nebraska Plaintiff's (Warren) "breach of implied warranty claim ... fails because, as a matter of Nebraska law, it is subsumed by his strict product liability claim." (GAF Mot. at 50.) The Court has dismissed the Nebraska Plaintiff's strict liability cause of action, and has dismissed the Nebraska Plaintiff's implied warranty cause of action on other grounds. Therefore, it is unnecessary to decide at this time if the implied warranty claim could exist in the absence of a viable strict liability claim.

### J. Count 25 (Magnuson–Moss Warranty Act ("MMWA"))

Both GAF and Plaintiffs agree that "Magnuson–Moss claims based on breaches of express and implied warranties under state law depend upon [the underlying] state law claims." (Pls.' Opp'n at 52; *see also* GAF Mot. at 52.) In fact, on their argument checklist, Plaintiffs assert that they "do not oppose GAF's motion to dismiss their claims under this [Magnuson–Moss Warranty] act to the extent their claims arise from their breach of implied warranty claims in CA, IA, MO, MO [sic] NH, NY, and VA," which Plaintiffs also had not opposed dismissal of. (*See* ECF No. 61–1 at 6 (Pls.' Checklist).) Because this Court has dismissed additional state warranty claims, Plaintiffs MMWA claims based on those claims also are dismissed without prejudice.

**\*34** GAF also argues that Plaintiffs' MMWA claims must be dismissed because "Plaintiffs do not allege facts showing that Plaintiffs provided any notice to GAF or any opportunity to cure the alleged defects." (GAF Mot. at 52.) "[T]he MMWA provides that no legal action can be brought under its private right of action until the warrantor is given the opportunity to cure the violation." *McGarvey v. Penske Auto. Grp., Inc.*, 2011 WL 1325210, at \*8 (D.N.J. Mar. 31, 2011) (citing 15 U.S.C. § 2310(e)); *see also Greene v. BMW of N. Am.*, 2013 WL 5287314, at \*5 (D.N.J. Sept. 17, 2013) (same, dismissing a MMWA claim in an amended complaint with prejudice). Plaintiffs have not opposed this argument. In any case, Plaintiffs have pled no facts that they provided GAF an opportunity to cure the alleged defect. As noted above, the only Plaintiff who alleges that he notified GAF at all–Plaintiff

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 150 of 410
PageID: 12757
In re: Elk Cross Timbers Decking Marketing, Not Reported in Fed.Supp. (2015)
2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

McGovern–provides no details regarding the contents of the notice or whether GAF was provided an opportunity to cure the alleged defect. (*See* OAC ¶ 17.) Therefore, Plaintiffs' MMWA claims are also properly dismissed without prejudice on this basis.

### K. Count 27 (Unjust Enrichment)

#### 1. *Failure to plead a direct benefit*

GAF argues that Ohio Plaintiff's (Burger) unjust enrichment claims fails because Ohio "do[es] not recognize unjust enrichment claims for indirect purchases." (GAF Mot. at 48) (citing *Savett v. Whirlpool Corp.,* 2012 WL 3780451 (N.D.Ohio Aug. 31, 2012).) "Under Ohio law, indirect purchasers may not assert unjust enrichment claims against a defendant without establishing that the purchaser conferred a benefit on the defendant through an economic transaction." *Savett,* 2012 WL 3780451, at \*7. In *Savett,* the court found that the plaintiff failed to state a claim against defendant Whirlpool for unjust enrichment because plaintiff purchased the refrigerator from Home Depot, and had not alleged any direct benefit conferred on Whirlpool. *Id.* In response, Plaintiffs cite to *Nessle v. Whirlpool Corp.,* 2008 WL 2967703 (N.D.Ohio July 25, 2008). (*See* Pls.' Opp'n at 49.) However, in *Nessle,* the parties did not dispute whether a direct benefit was conferred. *See* 2008 WL 2967703, at \*6. The element at issue in that case was whether the "retention of the benefit under the circumstances ... would be unjust ... without payment." *Id.* As such, Plaintiffs' case does not support its argument or contradict the law supplied by GAF. Therefore, the Ohio Plaintiff's (Burger) unjust enrichment cause of action is dismissed without prejudice.

#### 2. *Cannot plead in the alternative*

GAF argues that the North Carolina (Plaintiff Robertie),[34] Missouri (Ross), Montana (Hoover & Cohen), Nebraska (Warren), Indiana (Stidham), Mississippi (Mapp), and New York (Giovannetti) Plaintiffs' unjust enrichment causes of action fail "because those states prohibit such claims when the existence of a contract is alleged, such as the Smart Choice Limited Warranty." (GAF Mot. at 47 & n.33 (citing to law analyzing unjust enrichment claims in these states).) Plaintiffs, on the other hand, argue that they are permitted to plead an unjust enrichment claim in the alternative pursuant to Federal Rule of Civil Procedure 8(d)(3). (*See* Pls.' Opp'n at 47–48.)

GAF's citations to federal court decisions in these states support its position. *See Wireless Commc'ns, Inc. v. Epicor Software Corp.,* 2011 WL 90238, at \*7 (W.D.N.C. Jan. 11, 2011) ("Here, Wireless admits that there is a contract between itself and Epicor in the Complaint. Given the existence of an actual contract, this Court will not recognize the existence of a quasi-contract. Therefore, Wireless' unjust enrichment claim is dismissed.") (internal citations omitted); *Affordable Cmty. of Mo. v. Fed. Nat'l Mortg. Ass'n,* 714 F.3d 1069, 1077 (8th Cir.2013) ("We also agree with the district court that Affordable's unjust enrichment claim should be dismissed. Unjust enrichment is an equitable remedy based on the concept of a quasi-contract, and a plaintiff may not recover under both an express contract and unjust enrichment.") (internal quotations and citations omitted); *Signal Peak Energy, LLC v. E. Mont. Minerals, Inc.,* 922 F.Supp.2d 1142, 1149 (D.Mont.2013) ("EMM may not maintain an unjust enrichment claim against SPE because unjust enrichment has its foundation in equity and is an obligation created by law in the absence of a contract.") (emphasis in original); *In re Saturn L–Series Timing Chain Prods. Liab. Litig.,* 2008 WL 4866604, at \*15 (D.Neb. Nov. 7, 2008) ("It would certainly be contrary to every correct notion of the law to permit a party to resort to an implied contract, when the parties have entered into an express agreement which remains in force."); *Schafer v. Jeld Wen Doors/IWP Custom Door Div.,* 2007 WL 3407659, at \*6 (N.D.Ind. Nov. 9, 2007) ("The only reasonable inference from the Complaint is that an express or implied contract governed the Plaintiffs' purchase of the custom door unit from the Defendant. Accordingly, it would be improper to invoke the equitable theory of unjust enrichment in this case and Count V is dismissed."); *Weisblum v. Prophase Labs, Inc.,* 88 F.Supp.3d 283, 297 (S.D.N.Y.2015) ("[B]ecause Weisblum has not shown that his unjust enrichment claim differs from his contract and tort claims, it must be dismissed."); *Morgan Stanley Mortg. Capital Holdings, LLC v. Realty Mortg. Corp.,* 2008 WL 4279585, at \*7 (S.D.Miss. Sept. 11, 2008) ("The Court finds that as Mississippi does not allow damages to be recovered for unjust enrichment in cases in which a legally binding, written contract exists between the parties, the unjust enrichment claim pleaded by Realty is not plausible on its face.").

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 151 of 410
PageID: 12758
In re: Elk Cross Timbers Decking Marketing, Not Reported in F.Supp. (2015)
2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

**\*35** Plaintiffs' cases, on the other hand, are not persuasive. First, they only cite to two Pennsylvania cases. (*See* Pls.' Opp'n at 47–48 (citing 🔖 *Fleisher v. Fiber Composites,* 2012 WL 5381381 (E.D.Pa. Nov. 2, 2012) (analyzing Pennsylvania law), and 🔖 *Kantor,* 2015 U.S. Dist. LEXIS 486583, 2015 WL 1650049"[35]".) *Fleisher* is consistent with GAF's cases. In *Fleisher,* the court stated: "plaintiffs may plead alternative theories of breach of contract and unjust enrichment *where there is any question as to the validity of [the] contract in question*." *See* 🔖 2012 WL 5381381, at \*14 (emphasis added) (internal citations omitted). In *Kantor,* on the other hand, the court allowed the unjust enrichment to be pled in the alternative to the contractual-based claims under Federal Rule of Civil Procedure 8(d)(3) even though the plaintiff conceded that "at the end of the day, both counts cannot co-exist." 🔖 2015 WL 1650049, at \*7. *Kantor* is not persuasive compared to other cases that hold that dismissal is appropriate with allegations (or the lack thereof) similar to those in this case. Plaintiffs must point to allegations providing some basis for the unjust enrichment claim separate from their contract claims, or they must explain how the claim is truly "alternative." They have not done so. Here, there is no dispute that a contract exists; Plaintiffs are bringing claims based on alleged breaches of the express warranty (as well as alleged implied warranties). Plaintiffs also have not explained how their unjust enrichment causes of action differ from their warranty causes of action. Therefore, the North Carolina (Robertie), Missouri (Ross), Montana (Hoover & Cohen), Nebraska (Warren), Indiana (Stidham), Mississippi (Mapp), and New York (Giovannetti) Plaintiffs' unjust enrichment claims will be dismissed without prejudice.

### 3. *Fails because fraud claims fail*

GAF argues that "where [as here] the [Illinois] plaintiff's claim of unjust enrichment is predicated on the same allegations of fraudulent conduct that support an independent *claim* of fraud, resolution of the fraud claim against the plaintiff is dispositive of the unjust enrichment claim as well." (GAF Mot. at 47–48 (quoting 🔖 *Ass'n Benefit Servs., Inc. v. Caremark RX, Inc.,* 493 F.3d 841, 855 (7th Cir.2007) (alteration and emphasis in original)).) In other words, GAF argues that the Illinois Plaintiff's (Ernst) unjust enrichment cause of action fails because his fraud causes of action fail.

The case cited by Plaintiffs in opposition supports GAF's general statement of the law. *See* 🔖 *Aliano v. WhistlePig, LLC,* 2015 WL 2399354, at \*9 (N.D.Ill. May 18, 2015) (quoting the same *Caremark* standard quoted by GAF, but not dismissing the unjust enrichment claim because the court held that the fraud claim was adequately pled). Here, the Court has dismissed the Illinois Plaintiff's consumer protection claim and fraudulent concealment claim. *See supra* Sections V.B.4, V.G. Therefore, the Court will also dismiss the Illinois Plaintiff's unjust enrichment claim without prejudice on this basis.

### 4. *Failure to plead extraordinary circumstances*

GAF argues that the Indiana Plaintiff's claim for unjust enrichment should be dismissed "because Indiana law requires a consumer to plead 'extraordinary circumstances' beyond being 'dissatisfied' with their purchase," and no such circumstances are pled here. (GAF Mot. at 48 (quoting 🔖 *Hughes v. Chattem, Inc.,* 818 F.Supp.2d 1112, 1125 (S.D.Ind.2011).) The *Chattem* court held that "where [plaintiffs] fail to allege extraordinary circumstances, much less that they did not receive the benefit of their bargain, we find that an order of unjust enrichment is inappropriate." 🔖 818 F.Supp.2d at 1125. Plaintiffs, on the other hand, argue that Indiana law does not require "extraordinary circumstances" to state an unjust enrichment claim, and that the "pivotal concept of unjust enrichment is the occurrence of a wrong or something unjust." (Pls.' Opp'n at 48–49 (quoting *Roberts v. Alcoa, Inc.,* 811 N.E.2d 466, 475 (Ind.Ct.App.2004) (internal quotations omitted)). The Court finds the two statements of the law consistent; a plaintiff must plead some wrong beyond simple dissatisfaction with the product. Plaintiffs, however, identify no allegations in the OAC (beyond conclusory legal assertions) with respect to the Indiana Plaintiff that they believe meet this pleading requirement. Therefore, the Court finds dismissal of the Indiana Plaintiff's (Stidham) unjust enrichment claim without prejudice is also appropriate on this basis.

### L. Count 28 (Declaratory Judgment)

**\*36** In a one sentence section, GAF argues that "Plaintiffs' declaratory relief claim (Count 28) fails ... because a declaratory relief claim is 'not ... a cause of action courts may be compelled to enforce.' " (GAF Mot. at 53 (quoting 🔖 *In re AZEK,* 82 F.Supp.3d 608, 624–25 (D.N.J.2015)).) As an

Case 1:19-md-02875-RBK-SAK    Document 598-3    Filed 10/16/20    Page 152 of 410
PageID: 12759
In re: Elk Cross Timbers Decking Marketing, Not Reported in Fed. Supp. (2015)
2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

initial matter, *In re AZEK*, was addressing a claim under the Declaratory Judgment Act ("DJA") (🔖 28 U.S.C.A. § 2201). *See* 82 F.Supp.3d at 62425; *see also* Docket No. 12–6627, ECF No. 90 (Am. Compl., Count XV ("Declaratory Relief Pursuant to 🔖 28 U.S.C. § 2201")). Plaintiffs respond by citing cases also analyzing the DJA. (*See* Pls.' Opp'n at 52–53.) The Court notes, however, that Plaintiffs' OAC does not specify that Count 28 is being brought under this provision. That aside, the Court is not persuaded by *In re AZEK* as compared to the cases cited by Plaintiffs that this claim– pled in the alternative–need be dismissed at this time. GAF may re-raise this issue after the OAC has been amended, based on the clarified allegations, if any, related to this Count.

## VI. RE–PLEADING

To the extent that this Court finds any of the OAC's allegations insufficient, Plaintiffs "request that they be permitted leave to amend to cure any deficiencies." (Pls.' Opp'n at 53.) As noted throughout this Opinion, where the Court has determined that a cause of action is dismissed due to pleading failures, the Court has indicated those dismissals are without prejudice to re-pleading. However, the Court is mindful that the parties are presently briefing a motion to dismiss in a related action involving nine (9) additional Plaintiff fact sets and seven (7) additional states. (*See* ECF Nos. 64, 69.) The Court is also mindful that GAF will no doubt move to dismiss the Amended OAC. Therefore, given the number of causes of actions involved under numerous state laws and in the interest of judicial efficiency and party fairness, the Court provides the following guidelines for future motion to dismiss briefing:

- Page limits will be set as they were for briefing of the present motion: 55 pages for moving and opposition briefs and 20 for GAF's reply.

- Sur-replies will be disregarded unless prior permission of the Court has been granted.

- All citations that do not contain argument may be included in endnotes that will not count towards the page limit. Parenthetical descriptions of the cases are acceptable for purposes of this guideline; textual arguments are not and must be included in the body of the brief. Because citations included as end notes will be exempt from the page limit, the parties are limited to no more than two (2) case citations as end notes per point. For example, all of the citations in GAF's footnote 26 in its motion would be acceptable as an exempt end note. But GAF could

not, for example, include three citations under each state heading in the exempt portion of the brief.

- For any cause of action under state law for which GAF moves for dismissal, GAF may include, in a combined separate exhibit, the elements of the cause of action, with appropriate case citation. Again, no argument may be included in this exhibit. This exhibit will not count towards the page limit, but may be referenced in the body of the brief. If Plaintiffs disagree with the elements as put forward by GAF, Plaintiffs, likewise, may include an exhibit of elements that will not go to the page limit so long as no argument is included.

- The parties may also include argument checklist exhibits in the same format as submitted with the present motion.

- All case citations must contain a parenthetical identifying the law applied by the court cited, and must include pin cites. Additionally, the Court prefers (but will not require) citation to one legal research service (if available) given the number of cases cited.

- The parties may not re-argue items that were addressed and decided herein, but may argue points that were not previously raised, that the Court treated as unmoved on, or that the Court declined to address in this Opinion.

- **\*37** • GAF does not need to address in its motion whether claims should be dismissed with or without prejudice. After decision on a new motion to dismiss, if any claims are dismissed for insufficiency of the pleadings, Plaintiffs will be required to move to amend the second OAC to explain why a third OAC should be permitted. That separate motion will be subject to the standard briefing rules of this Court unless otherwise ordered by the Court.

- GAF should conform its present briefing in the related matter to this Opinion, and will be given an opportunity to re-serve its brief as ordered by Magistrate Judge Dickson.

The Court also notes that failure to dismiss certain causes of action at this time is not an indication that a particular cause of action was properly pled. In most, if not all, cases, the causes of action that have survived were ones that GAF did not move on or that this Court treated as unmoved on. Plaintiffs are on notice that they will not automatically get another opportunity at redo for these causes of action if they are dismissed upon a new motion to dismiss based on the amended OAC. The

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 153 of 410
PageID: 12760
In re: Elk Cross Timbers Decking Marketing, Not Reported in Fed. Supp. (2015)
2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

Court has gone to great lengths to address the parties' pleading disputes; simple failure to respond to this Court's holdings (including applying this Court's holdings to analysis of other causes of action) will not be sufficient to avoid dismissal with prejudice.

**VII. CONCLUSION**

For the reasons set forth above, GAF's motion to dismiss is granted in part and denied in part. Exhibit 2, attached to this Opinion, sets forth the rulings with regard to the specific causes of action. Plaintiffs are granted leave to file a second OAC, which cures the pleading deficiencies discussed herein, in accordance with the schedule to be set by Magistrate Judge Dickson. An appropriate Order accompanies this Opinion.

**All Citations**

Not Reported in Fed. Supp., 2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

## Footnotes

1   That there are some cut and paste allegations in the OAC where there are twenty-five (25) Plaintiff fact sets is not itself noteworthy. However, when the cut and paste allegations, which provide only the most basic information, comprise most, if not all, of the individual allegations, it is noteworthy. The Court recognizes that there may exist causes of action where individual detail is not necessary. That is not the case for many of the causes of action asserted by Plaintiffs, as discussed throughout this Opinion.

2   Plaintiffs Montante and the Benders have since been voluntarily dismissed from the case. (*See* ECF Nos. 51, 58 (respectively).)

3   The Court uses the term "claim" to refer to Plaintiffs' "Counts," such as "Negligence," as identified in the OAC. It uses the term "cause of action" to refer to the specific legal cause of action being brought–for example, a negligence claim under Michigan law on behalf of one or more plaintiffs.

4   The claims for which Plaintiffs are unopposed to dismissal are: Count 1 (Negligence–Stidham and Mapp); Count 2 (Indiana Consumer Protection Statute–McGovern); Count 3 (New Jersey Consumer Fraud Act–All Plaintiffs); Count 12 (Ohio Consumer Sales Practices Act–Burger); Count 21 (Breach of Implied Warranties– Williams, Denton, Sheridan, Ross, Khanna, Giovannetti, Wolcott); Count 23 (Fraudulent Misrepresentation– Stidham); Count 25 (Magnuson–Moss Warranty Act–Williams, Denton, Sheridan, Ross, Khanna, Giovannetti, Wolcott, only to the extent that these causes of action arise from their breach of implied warranty causes of action); Count 26 (Strict Products Liability–Stidham, Denton, Sheridan, Claxton, McGovern, Narducci, Mapp, Giovannetti, Shepherd, Burger, Wolcott); Count 27 (Unjust Enrichment–Claxton, McGovern, Narducci). (*See* ECF No. 61–1 at 1, 3–7 (Pls.' Checklist).) These claims, therefore, are dismissed with prejudice.

5   Exhibit 1, attached to this Opinion identifies the causes of action in the OAC that were either conceded by Plaintiffs or have been voluntarily dismissed. Exhibit 1 follows the OAC; the parties' checklists do not in all respects.

6   The Court finds that GAF has failed to move on specific causes of action in three ways: (1) the cause of action is not included on the checklist or argued anywhere in the brief (*see, e.g.,* ECF No. 60–2 (GAF's Checklist of Args. ("GAF's Checklist")) (Negligence for Montana)), (2) GAF "moves" simply by claiming "all plaintiffs" fail "to plead with particularity" without citing to the relevant state law elements and explaining how any element has not been met (*see, e.g., id.* ("All Causes of Action," Negligent Misrepresentation, Fraudulent Misrepresentation)), or (3) GAF does not provide any law or analysis related to a specific state cause of action (*see, e.g., infra* Section V.B.6).

7   Plaintiffs do not oppose dismissal of Plaintiff Shepherd's strict liability cause of action. (*See* ECF 61–1 at 7 (Pls.' Checklist).)

8   The only Illinois case cited by Plaintiffs, *Beaudette by Beaudette v. Illinois Indus. Comm'n,* 719 N.E.2d 191, 192–93 (Ill.Ct.App.1999), did not address the statute at issue or address the discovery rule.

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 154 of 410
PageID: 12761
In re: Elk Cross Timbers Decking Marketing, Not Reported in Fed. Supp. (2015)
2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

9    GAF only moved that the North Carolina breach of implied warranty cause of action was time barred **as pled**. (*See* GAF Mot. at 33.)

10   In reply, GAF withdraws its argument at this time that Plaintiffs' Virginia Consumer Protection Act claim (Count 7), California False Advertising Law claim (Count 16), and California Consumer Legal Remedies Act (Count 17) are time-barred. (*See* GAF Reply at 6 n.4.)

11   In reply, GAF argues for the first time that many of these claims should be dismissed as time-barred **as a matter of law**. (*See* GAF Reply at 7–9.) GAF very clearly identified in its motion–in two separate places– the causes of action for which it was moving on as time-barred as a matter of law versus on the basis of a pleading failure due to insufficient allegations of fraudulent concealment. (*See* GAF Mot. at 35–36, 54 ("In addition, many of Plaintiffs' claims suffer from additional incurable deficiencies that warrant dismissal with prejudice .... the following claims are time-barred as a matter of law because the applicable states' laws do not recognize any tolling even if fraudulent concealment had been adequately pled: the Illinois claims for breach of implied warranties; Mr. Shepherd's tort (Counts 1, 22–24, 26), UDTPA (Count 10) and unjust enrichment (Count 27) claims in North Carolina; and the OCSPA (Count 12) claim in Ohio.").) The Court will not address GAF's arguments, first made in reply, that additional causes of action should be dismissed as a matter of law.

12   Arguments that a claim is time-barred are addressed in Section V.A, and not re-addressed in this section.

13   The Indiana Supreme Court has held that "the language and structure of the Act do not require intent as an element of every deceptive act." *McKinney v. State,* 693 N.E.2d 65, 68 (Ind.1998).

14   Plaintiffs' citation does not indicate that the beginning of the sentence has been omitted.

15   The Court does not reach North Carolina arguments for North Carolina Plaintiff Shepherd as his UDTPA cause of action has been dismissed as time barred. *See supra* Section V.A.1.

16   Plaintiffs have not opposed dismissal of Count 12. (*See* ECF No. 61–1 at 3 (Pls.' Checklist).)

17   Plaintiffs do not provide case law for Virginia. GAF's Virginia case law also supports that more than an economic loss must be pled. *See McConnell v. Servinsky Eng'g, PLLC,* 22 F.Supp.3d 610, 614 (W.D.Va.2014) ("This is an economic loss, which occurs when a product injures itself because one of its component parts is defective, and is a loss for which no action in tort will lie.") (internal quotations omitted).

18   The Court does not reach the argument for these causes of action for North Carolina Plaintiff Shepherd as they have been dismissed as time barred. *See supra* Section V.A.1. Plaintiffs did not oppose dismissal for other causes of action. *See supra* n.4.

19   Plaintiffs do not provide any case cite analyzing Colorado law. (*See* Pls.' Opp'n at 34–35 n.41.')

20   The Court does not reach this argument for North Carolina Plaintiff Shepherd as the cause of action has been dismissed as time barred. *See supra* Section V.A.1.

21   *See Sundberg v. Keller Ladder,* 2001 WL 1397290, at *5–6 (E.D.Mich. Nov. 8, 2001).

22   North Carolina Plaintiff Shepherd's negligent misrepresentation claim has been dismissed as time barred. *See supra* Section V.A.1. Therefore, the Court does not reach this argument for Plaintiff Shepherd.

23   GAF makes the same argument for Indiana. However, as this Court has found this cause of action to be barred by the Indiana PLA (*see* Section V.C.1), it does not reach this argument for Indiana.

24   "Virginia courts ... do not recognize negligent misrepresentation as a separate cause of action from that of constructive fraud." *Baker v. Elam,* 883 F.Supp.2d 576, 581 (E.D.Va.2012).

25   The Court does not reach this argument for North Carolina Plaintiff Shepherd as his cause of action has been dismissed as time barred. *See supra* Section V.A.1.

26   GAF also makes this argument with respect to the Indiana Plaintiff. (*See* GAF Mot. at 45 n.30.) However, as this Court has dismissed the Indiana fraudulent concealment cause of action as barred by the Indiana PLA (*see supra* Section V.C.1), it does not reach this argument.

27   With respect to Virginia, GAF states: "Virginia requires that the alleged breach of an express warranty proximately caused the alleged damage." (GAF Mot. at 42 n.25 (citing VA. CODE § 8.2–714.) GAF's motion provides no analysis of this provision–"Buyer's damages for breach in regard to accepted goods"–nor does

28    it cite to any case law addressing a basis of the bargain argument under Virginia law. The Court, therefore, does not treat GAF as moving to dismiss the Virginia breach of express warranty cause of action on this basis.

28    Robertie does not make any allegations related to representations, but also does not bring a claim for breach of express warranty. (*See* OAC ¶ 12, Count 20; ECF No. 60–2, (GAF's Checklist).)

29    Although Plaintiff McGovern does not identify when he is alleging that he discovered the defect, he does allege that "[b]y the summer of 2010"–four years prior to filing suit– he "noticed that the Decking had separated due to expansion of boards" and that the Decking "became stained with mold and mildew." (OAC ¶ 17.)

30    Although GAF cites cases analyzing New Jersey law for this statement (*see, e.g.,* 📑 *Green v. Green Mountain Coffee Roasters, Inc.,* 279 F.R.D. 275, 283 (D.N.J.2011)), it provides a footnote citation to cases analyzing the law of the relevant states. (*See* GAF Mot. at 4243 n.26.) Therefore, the Court will consider this argument. The Court does not reach this argument for Illinois Plaintiff Ernst as his breach of implied warranty cause of action has been dismissed as time barred. *See supra* Section V.A.1.

31    The Court does not reach this argument for Illinois Plaintiff Ernst as his breach of implied warranty cause of action has been dismissed as time barred. *See supra* Section V.A.1.

32    The Court does not reach this argument for Illinois Plaintiff Ernst as his breach of implied warranty cause of action has been dismissed as time barred. *See supra* Section V.A.1.

33    Plaintiffs assert that Ohio has "relaxed" this rule. (*See* Pls.' Opp'n at 44 n.47 (citing 📑 *DiCenzo v. A–Best Prods., Inc.,* 897 N.E.2d 132, 141 (Ohio 2008).) However, the *DiCenzo* court actually stated that "in [various cases] the court gradually relaxed the long-held requirement of privity [by holding] that a breach-of-warranty claim could ***arise out of tort*** .... " 📑 897 N.E.2d at 141 (emphasis added). This is not inconsistent with the standard stated by the Ohio Supreme Court in *Curl.*

34    The Court does not reach this argument for North Carolina Plaintiff Shepherd as his unjust enrichment cause of action has been dismissed as time barred. *See supra* Section V.A.1.

35    Plaintiffs do not provide the full case name in the opposition, and the LEXIS citation provided is incorrect.

The Court assumes that Plaintiffs are attempting to cite to 📑 *Kantor v. Hiko Energy, LLC,* 2015 WL 1650049 (2015 U.S. Dist. LEXIS 48653) (E.D.Pa. Apr. 14, 2015).

---

**End of Document**                                          © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 11

Exela Pharma Sciences, LLC v. Sandoz, Inc., --- F.Supp.3d ---- (2020)
2020 WL 5535026

2020 WL 5535026
Only the Westlaw citation is currently available.
United States District Court, W.D. North Carolina,
Asheville Division.

EXELA PHARMA SCIENCES, LLC, Plaintiff,

v.

SANDOZ, INC., Defendant.

CIVIL CASE NO. 1:19-cv-00318-MR
|
Signed 09/15/2020

**Attorneys and Law Firms**

Christina D. Brown-Marshall, Pro Hac Vice, Corrin Nicole Drakulich, Pro Hac Vice, Fish & Richardson P.C., Atlanta, GA, David M. Wilkerson, Larry S. McDevitt, The Van Winkle Law Firm, Asheville, NC, for Plaintiff.

Bridget A. Blinn-Spears, Nexsen Pruet, PLLC, Raleigh, NC, David J. Horowitz, Pro Hac Vice, Susan Cook, Pro Hac Vice, Hogan Lovells, Washington, DC, Marguerite S. Willis, Nikole Setzler Mergo, Nexsen, Pruet, Jacobs & Pollard, LLC, Columbia, SC, Mark W. Bakker, Nexsen Pruet, LLC, Greenville, SC, William W. Wilkins, Pro Hac Vice, Nexsen Pruet, LLC, Greeneville, SC, for Defendant.

**MEMORANDUM OF DECISION AND ORDER**

Martin Reidinger, Chief United States District Judge

**\*1 THIS MATTER** comes before the Court upon the Plaintiff's Motion for *Ex Parte* Temporary Restraining Order and Preliminary Injunction [Doc. 3], and the Defendant's Motion to Dismiss the Complaint or, in the Alternative, Stay the Case Pending Referral to FDA [Doc. 29].

**I. PROCEDURAL BACKGROUND**
On November 6, 2019, Exela Pharma Sciences, LLC, (the "Plaintiff"), initiated this action against Sandoz, Inc., (the "Defendant"), asserting claims for unfair and deceptive trade practices in violation of N.C. Gen. Stat. 75-1.1, et seq. ("Chapter 75"); tortious interference with prospective business advantage in violation of North Carolina common law; and false advertising and unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a). [Doc. 1]. Along

with the Complaint, the Plaintiff filed a motion seeking the immediate issuance of a temporary restraining order and a preliminary injunction requiring the Defendant to recall and take all necessary steps to recover, remove from interstate commerce, and cease the sale of all the Defendant's L-Cysteine product. [Doc. 3]. In support of its motion, the Plaintiff relies upon the allegations of its Complaint, as verified by the Plaintiff's manager, Phanesh Koneru, [1] as well as several exhibits.

The Court held a hearing on the Plaintiff's request for a temporary restraining order on November 7, 2019. On November 12, 2019, the Court issued an Order denying the Plaintiff's request for a temporary restraining order, finding that the Plaintiff failed to show "its entitlement to such relief." [Doc. 16 at 9]. Nevertheless, the Court held the Plaintiff's request for a preliminary injunction in abeyance pending further presentation of evidence and briefing by the parties. [Id. at 13].

On December 6, 2019, the Defendant filed a Response in Opposition to Plaintiff's Motion for Preliminary Injunction [Doc. 31] and a Motion to Dismiss the Complaint or, in the Alternative, Stay the Case Pending Referral to FDA [Doc. 29]. On December 13, 2019, the Plaintiff filed a Reply in Support of Plaintiff's Motion for Preliminary Injunction [Doc. 33]. On December 23, 2019, the Plaintiff filed a Response in Opposition to Defendant's Motion to Dismiss. [Doc. 38].

Having been fully briefed, this matter is ripe for disposition.

**II. FACTUAL BACKGROUND**
The Plaintiff's Verified Complaint presents the following facts. [2]

**\*2** The Plaintiff is a North Carolina limited liability company with its principal place of business in Lenoir, North Carolina. [3] [Doc. 1 at ¶ 14]. The Plaintiff develops, manufactures, and markets injectable pharmaceutical products, including an L-Cysteine injection product that is now approved by the FDA. [Id. at ¶¶ 14, 42-43].

L-Cysteine is an amino acid that is administered by parenteral administration (i.e., injection or intravenous infusion) to high-risk patients, such as preterm or low-weight newborns and patients with severe liver disease, as part of a nutritional supplement regimen (also known as "total parenteral nutrition" or "TPN"). [Id. at ¶ 26]. Aluminum

is a known contaminant of TPN solutions, and aluminum toxicity can cause serious health problems including dementia and impaired neurologic development among others. [Id. at ¶ 27]. High-risk infants who receive TPN are particularly susceptible to harm from excessive, toxic amounts of aluminum, as they have immature kidneys, which impairs the removal of aluminum from the body. [Id. at ¶ 28]. The Defendant manufactures an L-Cysteine product in Canada with a label stating that it contains as much as 5,000 mcg/L of aluminum. [Id. at ¶ 5]. The Defendant's L-Cysteine product is not approved by the FDA. [Id. at ¶ 1].

Beginning in 2014, there was a shortage of L-Cysteine in the United States. [4] [Docs. 1-15, 31-2 at 2]. This led the FDA to approach the Defendant about importing and selling its unapproved L-Cysteine product in the United States under the FDA's "shortage program" without requiring the drug to obtain FDA approval. [Id.; Doc. 1 at ¶¶ 6, 38]. Pursuant to the shortage program and the Defendant's request, the FDA ultimately gave the Defendant a "Memorandum of Discretion" on April 12, 2016 [Doc. 31-2 at 38-39], which stated that the FDA would not bring an enforcement action against the Defendant for importing and selling its L-Cysteine product for 6 months if the Defendant followed certain conditions. [Id. at ¶ 40, 44; see also Doc. 31-2 at 6, 13-16, 38-39, 41-59]. [5] One such condition was that the Defendant had to distribute a "Dear Healthcare Provider" letter alongside its L-Cysteine product that explained the product, the drug shortage, and the lack of other similar FDA-approved products. [Doc. 1 at ¶ 41; Doc. 1-17; Doc. 1-18; see also Doc. 31-2 at 41-59]. The contents of the letters were pre-approved by the FDA and those letters had to be reviewed by the FDA before distribution. [Doc. 31-2 at 41-50].

**\*3** The Defendant sought several extensions of the Memorandum of Discretion and the FDA granted each of the Defendant's requests, with each renewal providing the Defendant with six additional months to import and distribute its unapproved product. [Doc. 1 at ¶ 40]. The FDA approved the last Dear Healthcare Provider letter on June 21, 2019, instructing the Defendant to ensure that the "previously reviewed Dear Healthcare Provider letter continues to accompany [the Defendant's] L-Cysteine in distribution" in shipments thereafter. [Doc. 31-2 at 50]. Every version of the letter stated that "there are currently no FDA-approved L-Cysteine Hydrochloride Injection products in the United States." [Doc. 1 at ¶ 41; Doc. 1-18; see also Doc. 31-2 at 41-59].

Beginning in 2017, the Plaintiff undertook extensive efforts to tackle the aluminum problem in TPN solutions and develop an L-Cysteine product with low aluminum levels. [Doc. 1 at ¶ 31]. In May 2017, the Plaintiff filed a New Drug Application (NDA) with the FDA for an L-Cysteine product that contained a maximum of 1,400 mcg/L of aluminum. [Id.]. In July 2017, however, the FDA informed the Plaintiff that this proposed level of aluminum was unacceptably high, and that the product should have less than or equal to 145 mcg/L of aluminum in order to gain permanent approval. [Id. at ¶ 32]. The Plaintiff ultimately succeeded in reducing the aluminum levels in its L-Cysteine product to less than 120 mcg/L and submitted its new data to the FDA for its redeveloped product in July 2018. [Id. at ¶ 33]. On April 16, 2019, the FDA approved the Plaintiff's NDA under Fast Track designation and Priority Review. [Id.]. The Plaintiff branded its L-Cysteine product ELCYS. [Id.].

After ELCYS received FDA approval, the Plaintiff's marketing and sales teams began communicating with health systems regarding its availability. [Id. at ¶ 34]. By late May 2019, the Plaintiff had manufactured sufficient inventory to meet the entire market demand for L-Cysteine. [6] [Id.].

In late May 2019, the Defendant's executives reached out to the Plaintiff's executives to inquire whether the Plaintiff would be willing to license its "recently approved products," including ELCYS, to the Defendant. [Id. at ¶ 43]. The Plaintiff declined the Defendant's offer. [Id.].

After the FDA approved the Plaintiff's product, the Plaintiff made numerous efforts to get the Defendant to stop selling its unapproved product. Starting in May 2019, the Plaintiff repeatedly asked the FDA to remove L-Cysteine hydrochloride injection from its drug shortage list and prohibit any further importation and distribution of the Defendant's unapproved product. [Doc. 1 at ¶ 49; Doc. 1-23]. Receiving no relief from the FDA, the Plaintiff sent letters to the CEO and Chairman of the Board of Defendant Sandoz's parent company, Novartis, A.G., on August 20, 2019. [Doc. 1-24]. Copying the FDA on the letter, the Plaintiff told Novartis about the allegedly improper and unethical conduct and asked that Novartis immediately stop importation and distribution of the L-Cysteine product. [Doc. 1 at ¶ 50; Doc. 1-24].

On September 3, 2019, the FDA declared an end to the L-Cysteine drug shortage. [Id. at ¶ 50; Doc. 1-25]. Around the same time, the FDA asked the Defendant to stop importing

Exela Pharma Sciences, LLC v. Sandoz, Inc., --- F.Supp.3d ---- (2020)

2020 WL 5535026

its L-Cysteine product. [Doc. 1-21]. The Defendant's stopped importing its L-Cysteine product in response to the FDA's request. [Doc. 1 at ¶ 45]. On September 25, 2019, the Plaintiff sent a letter to its customers stating that although "there is now an FDA approved L-Cysteine available in the US market[,]" the "FDA is allowing Sandoz to continue distributing its existing inventory ...." [Doc. 1-21 at 2].

**\*4** On September 24, 2019, the Defendant responded to the Plaintiff's August 20 letter, acknowledging that the Plaintiff's ELCYS product had been approved by the FDA and that "the drug shortage has abated." [Doc. 1 at ¶ 51; Doc. 1-15]. The Defendant nevertheless confirmed that it had the FDA's permission to sell the product that it had already imported and expressed its intention to do so. [Id.]. The Plaintiff's marketing team claims to have observed customers buying or committing to buy up to a year's supply of the Defendant's product even after ELCYS received FDA approval. [Doc. 1 at ¶ 53].

On October 8, 2019, the FDA directed the Defendant to stop distribution distributing its L-Cysteine product. [Doc. 1-20]. The Defendant immediately complied with the FDA's request. [Doc. 1 at ¶ 45; Doc. 1-20]. Despite being the only FDA-approved L-Cysteine product on the market and having low aluminum levels, the Plaintiff's ELCYS has attained less than 20% of the L-Cysteine market while the Defendant "maintain[s] over" 80%. [7] [Id. at ¶¶ 35, 58].

### III. STANDARD OF REVIEW

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). To be "plausible on its face," a plaintiff must demonstrate more than "a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678, 129 S.Ct. 1937.

In reviewing the complaint, the Court must accept the truthfulness of all factual allegations but is not required to assume the truth of "bare legal conclusions." Aziz v. Alcolac, Inc., 658 F.3d 388, 391 (4th Cir. 2011). "The mere recital of elements of a cause of action, supported only by conclusory statements, is not sufficient to survive a motion

made pursuant to Rule 12(b)(6)." Walters v. McMahen, 684 F.3d 435, 439 (4th Cir. 2012).

Determining whether a complaint states a plausible claim for relief is "a context-specific task," Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009), which requires the Court to assess whether the factual allegations of the complaint are sufficient "to raise the right to relief above the speculative level," Twombly, 550 U.S. at 555, 127 S.Ct. 1955. As the Fourth Circuit has explained:

> To satisfy this standard, a plaintiff need not forecast evidence sufficient to prove the elements of the claim. However, the complaint must allege sufficient facts to establish those elements. Thus, while a plaintiff does not need to demonstrate in a complaint that the right to relief is probable, the complaint must advance the plaintiff's claim across the line from conceivable to plausible.

Walters, 684 F.3d at 439 (citations and internal quotation marks omitted).

### IV. DISCUSSION

In its Motion to Dismiss the Complaint or, in the Alternative, Stay the Case Pending Referral to FDA, the Defendant argues that the Plaintiff's Chapter 75 and tortious interference with prospective business advantage claims are preempted by the Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 et seq., and that the Plaintiff's Lanham Act claim fails because it is inconsistent with the FDCA. [Doc. 29-1]. Specifically, the Defendant argues that the FDCA does not contain a private right of action to enforce its provisions and that the Plaintiff's state-law claims interfere with the federal regulatory regime because they are allegedly predicated on unenforced FDCA violations. [Id.]. The Defendant, therefore, argues that the Plaintiff's Complaint, as a matter of law, fails to state a claim upon which relief can be granted. The Plaintiff responds that the Complaint contains sufficient facts to support the Chapter 75, tortious interference with prospective business

advantage, and Lanham Act claims and that those claims are not preempted by or inconsistent with the FDCA. [Doc. 38].

**A. State Law Claims**

**\*5** The Supremacy Clause of the Constitution makes evident that "state laws that conflict with federal law are 'without effect.' " Altria Grp., Inc. v. Good, 555 U.S. 70, 76, 129 S.Ct. 538, 172 L.Ed.2d 398 (2008) (citation omitted). There are three types of preemption under the Supremacy Clause: (1) express preemption, (2) field preemption, and (3) conflict preemption. Id. at 76–77, 129 S.Ct. 538. Conflict preemption, the only type of preemption relevant here, exists where "there is an actual conflict between state and federal law," id., and the " 'state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc., 471 U.S. 707, 713, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985) (citations and quotations omitted). For example, the Supreme Court has held that a state-law claim contrary to the FDCA is barred by conflict preemption because "the federal statutory scheme ... used by the [FDA] to achieve a somewhat delicate balance of statutory objectives" would be "skewed by allowing" a plaintiff to bring state-law claims. Buckman Co. v. Plaintiffs' Legal Comm., 531 U.S. 341, 348, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001). In evaluating whether federal law has preempted state law, the Court must look to "the purpose of Congress [as] the ultimate touchstone," while also "start[ing] with the assumption that the historic police powers of the States were not to be superseded ... unless that was the clear and manifest purpose of Congress." Wyeth v. Levine, 555 U.S. 555, 565, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009).

The FDCA charges the FDA with "promot[ing] the public health by promptly and efficiently reviewing clinical research and taking appropriate action on the marketing of regulated products in a timely manner." 21 U.S.C. § 393(b)(1). In the FDCA, Congress required the FDA to "protect the public health" by making sure that "drugs are safe and effective." Id. § 393(b)(2)(B). The FDCA also empowers the FDA to combat drug shortages, See, e.g., id. at §§ 356c-1(a)(5), 356d, 356(e)(4).

If a drug is marketed without prior FDA approval, the FDA may bring an enforcement action under the FDCA. See 21 U.S.C. §§ 332–34 (1982). The FDCA gives the FDA "complete discretion" to "decide how and when [it] should be exercised." Heckler v. Chaney, 470 U.S. at 835, 105 S.Ct. 1649. The FDCA provides that "all such proceedings for the enforcement, or to restrain violations, of [the FDCA] shall be by and in the name of the United States." As such, "[t]he FDCA leaves no doubt that it is the Federal Government rather than private litigants who are authorized to file suit for noncompliance ...." Buckman, 531 U.S. at 349 n. 4, 121 S.Ct. 1012.

The FDCA's prohibition on private actions, however, would be "thwarted if savvy plaintiffs can label as arising under a state law for which there exists a private enforcement mechanism a claim that in substance seeks to enforce the FDCA." Loreto v. Procter & Gamble Co., 515 F. App'x 576, 579 (6th Cir. 2013). As such, "private litigants may not bring a state-law claim against a defendant when the state-law claim is in substance (even if not in form) a claim for violating the FDCA." Id. (citations and internal quotation marks omitted); see also American Home Products Corp. v. Johnson & Johnson, 436 F. Supp. 785, 797 (S.D.N.Y. 1977) (noting that "state unfair competition laws [are] not the proper legal vehicle in which to vindicate the public's interest in health and safety."). Likewise, "[t]here can be no state law cause of action if a plaintiff's true goal is to privately enforce alleged violations of the FDCA." Borchenko v. L'Oreal USA, Inc., 389 F.Supp.3d 769, 773 (C.D. Cal. 2019) (citation and quotations omitted).

"The test for determining whether a state law claim is impliedly preempted is whether or not the claim would exist in the absence of the FDCA." Evans v. Rich, No. 5:13-CV-868-BO, 2014 WL 2535221, at *2 (E.D.N.C. June 5, 2014) (citing Loreto, 515 Fed. App'x at 579). " 'As the Sixth Circuit has explained, any claim that relies on the FDCA or its implementing regulations '[a]s a critical element' is barred by § 337(a).' " Agee v. Alphatec Spine, Inc., No. 1:15-CV-750, 2017 WL 5706002, at *3 (S.D. Ohio Mar. 27, 2017) (quoting Marsh v. Genentech, Inc., 693 F.3d 546, 553 (6th Cir. 2012)); see also In re Darvocet, Darvon, & Propoxyphene Prods. Liab. Litig., 756 F.3d 917, 936 (6th Cir. 2014) ("claims" premised on "a violation of the FDCA" are impliedly preempted "because the FDA has the exclusive power to enforce FDCA" and there is "no private right to

enforce the statute"). For example, "a state-law claim that the defendant made misrepresentations to the FDA is preempted because such a claim would not exist absent the federal regulatory scheme established by the FDCA." Riley v. Cordis Corp., 625 F. Supp. 2d 769, 777 (D. Minn. 2009) (citing Buckman, 531 U.S. at 352-53, 121 S.Ct. 1012). Similarly, courts have found implied preemption applies to claims like "breach of warranty, negligence per se, design defect, and failure to warn." Evans, 2014 WL 2535221, at *2 (citing in re Medtronic, Inc. Sprint Fidelis Leads Products Liab. Litig., 592 F.Supp.2d 1147, 1159–64 (D. Minn. 2009)).

**\*6** With this preemption framework in mind, the Court now turns to each of the Plaintiff's state law claims.

### 1. Chapter 75 Claim

A Chapter 75 claim requires (1) an unfair or deceptive act or practice; (2) in or affecting commerce; which (3) proximately caused actual injury to the claimant or its business. N.C. Gen. Stat. § 75-1.1. An act is deceptive "if it has a tendency or capacity to deceive." Rahamankhan Tobacco Enterprises Pvt. Ltd. v. Evans MacTavish Agricraft, Inc., 989 F.Supp.2d 471, 477 (E.D.N.C. 2013). An act is unfair "if it offends established public policy," "is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers," or "amounts to an inequitable assertion of ... power or position." Id. A deceptive practice is one that has "the capacity or tendency to deceive the average consumer, but proof of actual deception is not required." Spartan Leasing, Inc. v. Pollard, 101 N.C. App. 450, 461, 400 S.E.2d 476, 482 (1991). "What is an unfair or deceptive trade practice usually depends upon the facts of each case and the impact the practice has in the marketplace." Durling v. King, 146 N.C. App. 483, 489, 554 S.E.2d 1, 4 (2001) (citing Pan American World Airways, Inc. v. United States, 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963)).

The Plaintiff generally claims that the Defendant violated Chapter 75 through its "unfair and deceptive actions to import, sell, and stuff the distribution channels with its unapproved product." [Doc. 1 at ¶ 1]. Specifically, the Plaintiff alleges that the Defendant acted unlawfully by (1) importing and selling an illegal product, [id. at ¶¶ 6, 8, 36, 37, 66, 67, 69, 77, 79]; (2) seeking a "Memorandum of Discretion," and numerous extensions of that Memorandum,

to import an illegal product, [id. at ¶¶ 40, 69]; (3) failing to update its 2018 Dear Healthcare Provider letter after the FDA approved ELCYS, [id. at ¶ 69]; (4) failing to warn its customers about its product's aluminum content, [id.]; and (5) misusing "its incumbent status in the market and its huge market power and reach to block hospitals and distributors from switching" to the Plaintiff's L-Cysteine product. [Id.]

#### a. Importing and Selling an Illegal Product

The Plaintiff claims that the Defendant violated Chapter 75 by importing and selling its L-Cysteine product because such conduct is the type of " 'immoral, unethical, [and] unscrupulous behavior' " that Chapter 75 "deems as 'unfair.' " [Doc. 1 at ¶ 68 (quoting State ex rel. Cooper v. NCCS Loans, Inc., 174 N.C. App. 630, 640 (2005)]. The crux of the Plaintiff's Chapter 75 claim is that the Defendant's L-Cysteine product was unlawful, dangerous, and unfit for importation or sale, and that the FDA acted unlawfully by letting the Defendant import and sell that product. [8] Stated differently, the Plaintiff's state-law claim challenges the FDA's decision not to bring enforcement proceedings against the Defendant under the FDCA for importing and selling an unapproved and unsafe drug.

**\*7** The Plaintiff's Chapter 75 claim related to the Defendant's sale and importation of the L-Cysteine product is preempted. The FDCA contains no private right of action and gives the FDA "complete discretion" to decide whether to bring enforcement proceedings. Heckler, 470 U.S. at 835, 105 S.Ct. 1649. As such, the "FDA has power to determine whether particular drugs require an approved NDA [New Drug Application] in order to be sold to the public." Weinberger v. Hynson, Westcott & Dunning, Inc., 412 U.S. 609, 624, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973). The Plaintiff does "not have the authority to stand in the shoes of the FDA to determine whether [the defendant's] sale of the products at issue amounts to the sale of an unapproved drug under the FDCA. This enforcement authority [lies] exclusively with the FDA." Allergan, Inc. v. Athena Cosmetics, Inc., 738 F.3d 1350, 1359 (Fed. Cir. 2013); see also Agee, 2017 WL 5706002, at *5 (stating that if "the distribution of [the product] was in violation of the FDCA and relevant FDA regulations ... it is the sole responsibility and privilege of the federal government, and not private plaintiffs, to bring a suit to enforce those violations."). The crux of the Plaintiff's Chapter 75 claim is a challenge to

Exela Pharma Sciences, LLC v. Sandoz, Inc., --- F.Supp.3d ---- (2020)
2020 WL 5535026

whether the importation and sale of the Defendant's L-Cysteine product are lawful under the FDCA. As such, the Plaintiff is preempted from making that claim.

The Plaintiff's claim related to the Defendant's importation and sale of its L-Cysteine product is also preempted because it would stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Hillsborough Cnty., 471 U.S. at 713, 105 S.Ct. 2371 (citations omitted). The FDCA empowers the FDA to combat drug shortages, see, e.g., 21 U.S.C. §§ 356c-1(a)(5), 356d, 356(e)(4), while also ensuring "that any product regulated by the FDA is 'safe' and 'effective' for its intended use." FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (citing 21 U.S.C. § 393(b)(2)). As such, the FDA "must evaluate the risks associated" with a drug shortage when deciding to bring an enforcement action under the FDCA. 21 U.S.C. § 356(c). Allowing a state-law claim challenging the FDA's discretionary refusal to bring an enforcement action under the FDCA against the Defendant would therefore thwart the FDA's purpose. Hillsborough Cnty., 471 U.S. at 713, 105 S.Ct. 2371 (citations omitted). Other courts have rejected similar claims. See Loreto, 515 F. App'x at 579 (stating that "[a] plaintiff cannot use a state-claim to argue that a defendant's product was " 'illegal,' and had [consumers] known it, they wouldn't have purchased the products" because that "theory of liability depends entirely upon an FDCA violation.").

Allowing a Chapter 75 claim based on the safety of the Defendant's L-Cysteine product would also skew "the federal statutory scheme ... used by the [FDA] to achieve a somewhat delicate balance of statutory objectives." Buckman, 531 U.S. at 348, 121 S.Ct. 1012. Here, the record shows that the FDA engaged in a prolonged effort to balance those objectives, as well as the various interests, before deciding to let the Defendant to distribute its L-Cysteine product. That decision necessarily involved balancing the risks inherent in a drug shortage with the safety risks of allowing the importation and sale of an unapproved product. After ELCYS received FDA approval, the FDA still had to account for the risk that ELCYS might not be able to meet the entire market demand for L-Cysteine, the risk of supply chain issues during the transition from the Defendant's L-Cysteine product to ELCYS, and other associated risks. [9] Allowing state-law

claims would disrupt the delicate and considered balance that the FDA struck. In short, the FDA was charged with addressing a shortage of a critical medical product. The FDA made its determination of the best solution of the problem. For the Plaintiff to now second guess the FDA's decision in a civil action based on state law would render the FDA's authority to be a nullity.

**\*8** The Plaintiff's claim related to the Defendant's importation and sale of its L-Cysteine product presents a similar issue to the one addressed in Drager v. PLIVA USA, Inc., 741 F.3d 470, 479 (4th Cir. 2014). In Drager, a consumer injured by a drug brought state-law claims alleging that the manufacturer's label that was approved by the FDA was inadequate. The Fourth Circuit held that the state-law claims were preempted by federal law because they would force the manufacturer to either "leave the market or accept tort liability" despite the manufacturer's compliance with FDA's edicts. Id. The Fourth Circuit explained that the Hobson's choice presented in such a situation illustrates how allowing a state-law claim can subvert the federal regulatory scheme, thus requiring the preemption of such state claims. Id.

The logic of Drager is applicable to this case. Here, the FDA issued a Memorandum of Discretion, and several renewals of that Memorandum, allowing the Defendant temporary permission to import and sell its L-Cysteine product. [Doc. 1 at ¶¶ 40, 44]. Notwithstanding the Defendant's permission from the FDA, a viable Chapter 75 claim related to the import and sale of the L-Cysteine product would have nonetheless forced the Defendant "to leave the market or accept tort liability." Id. This is precisely the type of claim that the Fourth Circuit held in Drager must be preempted.

This case, just like Drager, is unlike the failure-to-warn cases that the Plaintiff cites. [See Doc. 38 at 11]. For example, in Wyeth v. Levine, the Supreme Court explained that a state-law claim was not preempted by the FDCA's labeling requirements because those "requirements create a floor, not a ceiling, for state regulation." 555 U.S. 555, 563, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009). As such, the Court in Wyeth found that the state-law claim did not "stand as an obstacle to the accomplishment of Congress' purposes in

the FDCA" because the defendant could have remained in the market by adding additional warnings that would comply with both the state-law and federal-law requirements. 🔖 Id. at 581, 129 S.Ct. 1187. That is not the case here, where the Plaintiff asserts that the only way to comply with state law would have been for the Defendant to leave the market, notwithstanding the Defendant's compliance with the FDA's directives. 🔖 Drager, 741 F.3d at 479. Likewise, 🔖 Wyeth was a claim by an injured patient against a drug company related to a purportedly deficient label, not a claim by a competitor seeking to prevent the distribution of a purportedly unsafe drug. That distinction is important because removing a product that the FDA expressly allowed in the market to address a drug shortage interferes with federal objectives in a way that changing a product's label does not. See Zogenix, Inc. v. Patrick, No. CIV.A. 14-11689-RWZ, 2014 WL 1454696, at *2 (D. Mass. Apr. 15, 2014) (stating that "🔖 Wyeth is a drug labeling case, and defendant present no evidence of persuasive argument that its reasoning should control" when determining whether a state law can contravene the FDA's decision to allow the sale of a drug.).

The Plaintiff also relies on 🔖 Allergan, [Doc. 38 at 12], where the Federal Circuit found that a state-law claim based on the marketing, sale, and distribution or an unapproved drug was not preempted by the FDCA. 🔖 Id. In that decision, however, the Federal Circuit focused on the fact that the state-law requirements paralleled the FDCA requirements, in a situation where the FDA had *not* given the defendant explicit permission to market, sell, or distribute the drug at issue. 🔖 Allergan, 738 F.3d at 1355. That case has no application here, because the FDA gave explicit permission to the Defendant to distribute its product. The Plaintiff's state-law claim would entirely undercut the FDA's decision and authority.

**\*9** Instead, Zogenix, Inc. v. Patrick, No. CIV.A. 14-11689-RWZ, 2014 WL 1454696, at *2 (D. Mass. Apr. 15, 2014) is more instructive. In that case, Massachusetts's ban on the sale of an FDA-approved drug was preempted because allowing the state to "countermand the FDA's determinations and substitute its own requirements [would] undermine the FDA's ability to make drugs available to prevent and protect the public health." 🔖 Id. As such, the state-tort claim would interfere with " 'the accomplishment and execution of' an important federal objective." 🔖 Id. (quoting 🔖 Hines v. Davidowitz,

312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)). Like the plaintiff in 🔖 Zogenix, the Plaintiff herein seeks to overturn the FDA's decision to allow the importation and sale of a product. While the Plaintiff argues that 🔖 Zogenix is distinguishable because that case involved an FDA-approved drug, rather than drug allowed to be imported and sold under a Memorandum of Discretion, [Doc. 38 at 12], that distinction matters little for preemption purposes. The outcome of the FDA's decision in both instances, whether made through its approval process or through an exercise of discretion to address a shortage, was to allow the drug to be imported and sold. The Plaintiff cannot use a state-law claim to contravene the FDA's decision and remove that drug from the market because that would interfere with the federal objective of allowing that drug to remain available. See id. at *2-3. This is particularly true in a case such as this one where the FDA was trying to address a crucial shortage.

The Plaintiff next argues that the FDA's Memorandum of Discretion allowing the Defendant to import and sell its L-Cysteine product was illegitimate because the FDA's entire shortage program was declared illegal by the D.C. Circuit in 🔖 Cook v. FDA, 733 F.3d 1 (D.C. Cir. 2013). [Doc. 1 at ¶ 39]. The claim in 🔖 Cook was brought under the Administrative Procedures Act against the FDA regarding the importation of sodium thiopental from unregistered foreign laboratories for use in lethal injections. 🔖 733 F.3d at 10. 🔖 Cook held that the FDA is required to examine samples of imported drugs manufactured in unregistered facilities to determine if those drugs violate FDCA requirements. 🔖 Id. at 9 ("We do not say the FDA must sample and examine every article under its jurisdiction that is offered for import but only that it must sample and examine drugs manufactured ... in an *unregistered* establishment."). [10] 🔖 Cook specifically allowed the FDA to "exercise enforcement discretion to allow the domestic distribution of a misbranded or unapproved new drug" and "invoke its express statutory authority to permit the importation of an unapproved new drug." 🔖 Id. at 10. Contrary to the Plaintiff's argument, 🔖 Cook did not go as far as to hold that the FDA's shortage program is illegal. 🔖 Id. at 10.

🔖 Cook is simply inapposite here. Unlike 🔖 Cook, the Plaintiff did not bring this action against the FDA seeking judicial review of agency action (or inaction) under the

Exela Pharma Sciences, LLC v. Sandoz, Inc., --- F.Supp.3d ---- (2020)
2020 WL 5535026

Administrative Procedures Act. The FDA is not even a party to this case. Instead, this case presents a dispute between two drug manufacturers. Moreover, the Plaintiff cites no authority for the proposition that the FDA's refusal to bring enforcement proceedings would even be reviewable under the circumstances found here as it was in 🔖 Cook. See 🔖 Heckler v. Chaney, 470 U.S. 821, 832-33, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) (stating that "an agency's decision not to take enforcement action should be presumed immune from judicial review" unless the "substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers."). While the presumption against judicial review did not apply in 🔖 Cook because the FDCA "provided guidelines for the agency to follow in exercising its enforcement powers" concerning unregistered foreign facilities, 🔖 Cook, 733 F.3d at 6, the Plaintiff identifies no such guidelines that apply to the registered facility at issue here. As such, the FDA's enforcement decisions concerning registered laboratories appear to be immune from judicial review because the FDCA's enforcement provisions commit "complete discretion to the FDA to decide how and when they should be exercised." 🔖 Heckler, 470 U.S. at 835, 105 S.Ct. 1649.

**\*10** For all these reasons, the Plaintiff's Chapter 75 claim based on the Defendant's sale or importation of its L-Cysteine product must be dismissed as preempted.

### b. Seeking a Memorandum of Discretion

The Plaintiff next claims that the Defendant violated Chapter 75 by seeking a renewal of the Memorandum of Discretion in June 2019 after ELCYS received FDA approval to continue selling its L-Cysteine product. [Doc. 1 at ¶¶ 40, 69]. In this sense, however, the Plaintiff's true quarrel is with the FDA *granting* the Defendant's June 2019 request for a renewal of the Memorandum of Discretion, not with the Defendant's *seeking* the renewal. The FDA did not declare the end of the drug shortage until September 3, 2019. [Id. at ¶ 50; Doc. 1-25]. It was not unfair or deceptive for the Defendant to ask if it could continue importing and selling its L-Cysteine product while the drug shortage continued. That is particularly true considering that it was this drug shortage that originally led the FDA to ask the Defendant to import and sell its L-Cysteine product. [Doc. 1-15].

Moreover, the Plaintiff has failed to plausibly allege that the Defendant's requests for the Memorandum of Discretion or the subsequent renewals of that Memorandum involved any unfairness or deception. The FDA was fully aware of the development of ELCYS, its approval status and production status, the differences in the aluminum content between the ELCYS and the Defendant's L-Cysteine product, as well as the state of the L-Cysteine market when it renewed the Memorandum of Discretion in June 2019. Despite that knowledge, the FDA rebuffed the Plaintiff's requests to end the drug shortage until September 3, 2019, waited until that time to halt importation of the Defendant's L-Cysteine product, and waited until October 8, 2019 to halt sales of that product. [Docs. 1-23, 1-20, 1-21].

Though the FDA is not a party to this case, it has issued guidance explaining that it generally weans unapproved products off the market once a competing product has been approved. See FDA, Marketed Unapproved Drugs – Compliance Policy Guide: Sec. 440.100, Marketed New Drugs without Approved NDAs or ANDAs (Sep. 2011) at 7-8 ("When a company obtains approval to market a product that other companies are marketing without approval, FDA normally intends to allow a grace period of roughly 1 year from the date of approval of the product before it will initiate enforcement action (*e.g.*, seizure or injunction) against marketed unapproved products of the same type." "To assist in an orderly transition to the approved product(s), in implementing a grace period, FDA may identify interim dates by which firms should first cease manufacturing unapproved forms of the drug product, and later cease distributing the unapproved product."). That guidance explains the FDA's actions here. In fact, rather than allowing the Defendant a one-year grace period per its regulations, it gave the Defendant only six months (April to October 2019) to continue importing and selling its L-Cysteine product before halting importation of the product and then halting sales of the product. [11]

**\*11** The Plaintiff does not allege that the FDA's guidance-based decisions were a result of any false or misleading actions on the part of the Defendant. The Plaintiff only alleges that the Defendant committed an unfair or deceptive act by merely seeking renewal. That is insufficient to support a Chapter 75 claim. For these reasons, the Plaintiff's Chapter 75 claim based on the Defendant seeking a renewed Memorandum of Discretion in June 2019 is without merit, and that claim must be dismissed.

#### c. Failing to Update Dear Healthcare Provider Letter

The Plaintiff next claims that the Defendant violated Chapter 75 by failing to update the Dear Healthcare Provider letter that accompanied its L-Cysteine product to inform customers that ELCYS had received FDA approval. [Doc. 1 at ¶¶ 9, 41, 69]. Specifically, the Plaintiff alleges that the Defendant sent out Dear Healthcare Provider letters in March 2016, [Doc. 1-17], and September 2018 [Doc. 1-18], stating that "there are currently no FDA-approved L-Cysteine Injection products in the United States" and failed to send a new letter to update that statement until six months after ELCYS received FDA approval. [Doc. 1 at ¶ 9, 41, 46, 69; Doc. 1-21]. [12]

The Defendant argues that the Plaintiff's claim is preempted because the Dear Healthcare Provider letters were mandated, overseen, and preapproved by the FDA as part of its decision to grant a Memorandum of Discretion to the Defendant under the FDCA. [Doc. 29-1 at 17]. The Defendant also argues that it did not violate Chapter 75 because it sent a new letter to tell customers that "there is now an FDA approved L-Cysteine available in the U.S. market" roughly five months after ELCYS received FDA approval. [Doc. 29-1 at 18 (citing Doc. 1 at ¶¶ 46) ].

"Manufacturers and distributors of drugs and the Food and Drug Administration occasionally are required to mail important information about drugs to physicians and others responsible for patient care" in so-called Dear Healthcare Provider letters. See 21 C.F.R. § 200.5. The FDA can mandate and oversee the distribution of Dear Healthcare Provider letters in conjunction with its oversight of drug shortages. [Doc. 29-1 at 17; Center for Drug Evaluation and Research, Drug Shortage Management, Manual of Policies and Procedures 4190.1 at 10 ("When a potential or actual shortage might be resolved by obtaining a drug from an alternate source," the FDA will "[c]oordinate issuance and clearance of a Dear Healthcare Provider Letter ....."). While no explicit statutory or regulatory provisions set forth the circumstances under which a drug manufacturer must issue a Dear Healthcare Provider letter, the FDA has brought enforcement actions under the FDCA where Dear Healthcare Provider letters contained "false or misleading" statements. State ex rel. McGraw v. Johnson & Johnson, 226 W. Va. 677, 682, 704 S.E.2d 677, 682 (2010).

*12  Here, the Memorandum of Discretion and the subsequent renewals of that Memorandum show that the Defendant distributed the Dear Healthcare Provider letters at the FDA's direction and with the FDA's approval. [Doc. 31-2 at 41-59]. The distribution of those letters was one of the FDA's conditions for not exercising its enforcement authority against the Defendant's L-Cysteine product. [Id.]. Under those conditions, the FDA explicitly approved the language contained in the Defendant's Dear Healthcare Provider letters and any revisions of those letters required FDA approval. [Doc. 31-2 at 41, 43, 46-50].

Notably, the last Memorandum of Discretion renewal occurred on June 21, 2019, after the FDA approved ELCYS, after the Plaintiff had produced sufficient ELCYS for the entire market, and after the Plaintiff had started shipping ELCYS. [Id. at 50; Doc. 1 at ¶ 33, 34]. The FDA, however, did not require the Defendant to update its Dear Healthcare Provider letter after ELCYS was approved. Instead, the June 21, 2019 renewal mandated (under threat of enforcement action) that "*[t]he previously reviewed Dear Healthcare Provider letter continues to accompany*" the Defendant's product. [Doc. 31-2 at 50 (emphasis added) ]. That previously reviewed letter stated that "there are currently no FDA-approved L-Cysteine Injection products in the United States." [Doc. 1-18]. Accordingly, the FDA not only approved the statement in the Dear Healthcare Provider letter about which the Plaintiff complains, but *required* the Defendant to make that statement.

Nevertheless, the Plaintiff argues that the Defendant should face state tort liability for failing to ask the FDA for permission to update the Dear Healthcare Provider letter after the FDA approved ELCYS. [Id. at ¶ 69]. The Memorandum of Discretion and its subsequent renewals prohibited the Defendant from unilaterally changing the statements contained in the letter, including the statement about which the Plaintiff complains. [Doc. 31-2 at 50; see also Doc. 31-2 at 43 (stating that "if Sandoz makes further edits to this letter, [the FDA] requests the opportunity to review before the letter is printed and distributed") ]. The Supreme Court has held that "when a party cannot satisfy its state duties without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency, that party cannot independently satisfy those state duties for pre-emption purposes." PLIVA, Inc. v. Mensing, 564 U.S. 604, 623-24, 131 S.Ct. 2567, 180 L.Ed.2d 580 (2011). That is because "[t]he only action the [Defendant] could independently take—asking for the FDA's help—is not a matter of state-law concern." Id. at 624, 131 S.Ct. 2567.

Exela Pharma Sciences, LLC v. Sandoz, Inc., --- F.Supp.3d ---- (2020)
2020 WL 5535026

To the extent that the Plaintiff's Chapter 75 claim is based on the Defendant's failure to update its Dear Healthcare Provider letter, that claim is preempted because the FDA controlled the contents of the Dear Healthcare Provider letters and the Defendant could not unilaterally update those letters without the FDA's involvement and approval, which is not a matter of state-law concern. Therefore, the failure to change the contents of the letter cannot be a basis for a state law claim.

While the Plaintiff asserts that the Defendant "failed to inform its customers of the FDA-approved status of Exela's product at least until September 25, 2019[,]" [Doc. 1 at ¶ 69], that allegation also cannot support a Chapter 75 claim. As discussed above, the FDA's scheme for controlling the risks associated with the Defendant's product required the Defendant to communicate with customers through Dear Healthcare Provider letters. That arrangement and process would have been undermined if the Defendant sent other communications to customers contradicting the contents of the FDA-approved Dear Healthcare Provider letters. The Defendant's failure to subvert the FDA's scheme and risk enforcement action by sending a communication other than a Dear Healthcare Provider letter cannot give rise to a Chapter 75 claim.

#### d. Failing to Warn Customers About Aluminum Content

**\*13** The Plaintiff next claims that the Defendant violated Chapter 75 by failing to warn its customers that its L-Cysteine product had a higher aluminum content than the standard that the FDA required ELCYS to meet and by failing to tell its customers about the difference in aluminum content between the two products. [Doc. 1 at ¶ 69]. The Plaintiff also alleges that the Defendant did not update its Dear Healthcare Provider letters or "distribute any other formal communication to the field to inform its customers that the aluminum levels of its unapproved product far exceed" the standard that the FDA required ELCYS to meet to receive approval. [Id. at ¶ 9].[13]

To begin, what the Plaintiff refers to as "FDA standards" are not standards at all. The relevant regulations do not set any upper limit on aluminum content for small volume parenteral drug products like the Defendant's L-Cysteine product. See 21 C.F.R. § 201.323. Moreover, the letter where the Plaintiff contends that the FDA provided its aluminum content standard "does not constitute an official agency determination." Schering-Plough Healthcare Prod., Inc. v.

Schwarz Pharma, Inc., 547 F. Supp. 2d 939, 947 (E.D. Wis. 2008), amended, No. 07-CV-642, 2009 WL 151573 (E.D. Wis. Jan. 22, 2009) (collecting cases); see also Dietary Supplemental Coal., Inc. v. Sullivan, 978 F.2d 560, 563 (9th Cir. 1992) (stating that "regulatory letters do not constitute final agency action."). Indeed, the FDA later explained to the Plaintiff that the Defendant's L-Cysteine product had aluminum levels that were "well within the standards agreed upon with FDA" and that "[i]t is thus inappropriate to suggest that the Sandoz product is somehow unsafe." [Doc. 1-15]. As such, the fact that the FDA required the Plaintiff's ELCYS product to meet a certain aluminum level to *receive FDA approval* did not create a binding limitation on other drugs, especially ones that do not seek FDA approval like the Defendant's. In this argument, the Plaintiff conflates the level that needed to be met to receive temporary permission with the level for permanent approval.

The Plaintiff further argues that the Defendant violated Chapter 75 by failing to tell its customers about the difference in aluminum content between the Defendant and the Plaintiff's products. [Doc. 1 at ¶ 69]. The Plaintiff has cited no authority for the proposition that a merchant's failure to inform its customers as to how its product compares unfavorably to a competitor's product constitutes a deceptive trade practice. There is no basis to conclude that the law imposes such obligation.

The Plaintiff's dispute appears to be with the FDA for temporarily permitting importation and sale of a drug that did not meet the same aluminum levels that the FDA required ELCYS to meet for permanent approval. The Plaintiff cannot, however, use a state-law claim against a competitor to "countermand the FDA's determinations and substitute its own requirements" regarding the permissible aluminum content of the Defendant's L-Cysteine product. Zogenix, 2014 WL 1454696, at \*2. If the Plaintiff were allowed to bring such a claim, it would stand "in the way of 'the accomplishment and execution of'" an important federal objective" by undermining "the FDA's ability to make drugs available to promote and protect the public health." Id. (quoting Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)). "The Constitution does not allow it to do so." Id.

As such, to the extent that the Plaintiff's Chapter 75 claim is based on the Defendant failing to meet the same aluminum content level that ELCYS was required to meet or on the

Defendant failing to affirmatively advertise the differences between the two products, that claim must be dismissed as preempted and as failing to state a claim upon which relief can be granted.

### e. Oversupplying Customers

**\*14** The Plaintiff next argues that the Defendant violated Chapter 75 by "oversupplying customers and flooding distribution channels with its unapproved product to prevent them from purchasing [ELCYS]." [Doc. 1 at ¶ 69]. In short, the Plaintiff bases this claim on the fact that the Defendant imported, marketed, and sold a product that it was permitted by the FDA to import, market, and sell, and in quantities that did not exceed that permission.

As discussed previously, the Plaintiff is preempted from bringing a state-law claim to challenge the FDA's decision to allow the Plaintiff to import and sell its L-Cysteine product because there is no private right of action in the FDCA and the FDA is the sole entity that can bring enforcement actions to halt the sale and importation of drugs. In re Darvocet, Darvon, & Propoxyphene Prods. Liab. Litig., 756 F.3d 917, 936 (6th Cir. 2014) As such, the Plaintiff is preempted from bringing a Chapter 75 claim against the Defendant based on the volume of its L-Cysteine product sales.

### f. Misusing Incumbent Status

Finally, the Plaintiff argues that the Defendant violated Chapter 75 by misusing "its incumbent status in the market and its huge market power and reach to block hospitals and distributors from switching" to ELCYS. [Id. at ¶ 70]. It bears repeating that the Plaintiff's claims cannot be based merely on the Defendant's importation or sale of its L-Cysteine product because those claims are preempted.

The Defendant's sales were permitted by the FDA and the Plaintiff does not identify any act, other than the sales themselves, that constituted an unfair or deceptive act or an inequitable assertion of power. The volume of the sales, and the timing of those sales, as permitted by the FDA, are not suitable bases for a Chapter 75 claim. Moreover, an incumbent market competitor's sale of its inventory does not become an unfair or deceptive act simply because those sales come at the expense of a smaller market competitor.

The Plaintiff has cited no authority for this proposition. As such, the Plaintiff cannot base its Chapter 75 claim on the Defendant's incumbent status in the market or its volume of sales before exiting the market.

For all these reasons, the Plaintiff's Chapter 75 claim is dismissed.

### 2. Interference with Prospective Economic Advantage Claim

The Plaintiff next claims that the Defendant illegally interfered with its prospective economic advantage by continuing to sell its unapproved L-Cysteine product after ELCYS received approval from the FDA. [Doc. 1 at ¶¶ 75-81].

Tortious interference with prospective economic advantage "arises when a party interferes with a business relationship 'by maliciously inducing a person not to enter into a contract with a third person, which he would have entered into but for the interference, ... if damage proximately ensues, when this interference is done not in the legitimate exercise of the interfering person's rights.' " Beverage Sys. of the Carolinas, LLC v. Associated Beverage Repair, LLC, 368 N.C. 693, 701, 784 S.E.2d 457, 463 (2016) (quoting Spartan Equip. Co. v. Air Placement Equip. Co., 263 N.C. 549, 559, 140 S.E.2d 3, 11 (1965)). Because the interference must be done outside of the legitimate exercise of the interfering person's rights, "[i]nterference with a contract is justified if it is motivated by a legitimate business purpose, as when the plaintiff and the defendant ... are competitors." Id., 368 N.C. at 700, 784 S.E.2d at 463 (citations and quotations omitted). To survive dismissal, a complaint alleging tortious interference "must admit of no motive for interference other than malice." Pinewood Homes, Inc. v. Harris, 184 N.C. App. 597, 605, 646 S.E.2d 826, 832–33 (2007).

**\*15** The Plaintiff tries to meet this element of the tort of interference by alleging that the Defendant's "actions were not an exercise of any legitimate right of its own" because "it is illegal to introduce" an unapproved drug into interstate commerce. [Doc. 1 at ¶ 79 (citing 21 U.S.C. §§ 331(d), 355(a); Cook, 733 F.3d at 9-10) ]. Again, the cornerstone of the Plaintiff's claim is this assertion that it is somehow "illegal" for the Defendant to do precisely what the FDA gave the Defendant permission to do. As such,

this claim again attempts to enforce the FDCA against the Defendant for importing and selling an illegal drug. The FDA, however, is the only entity that can bring a claim against the Defendant for its alleged introduction of an illegal drug into interstate commerce. *See* Allergan, Inc. v. Athena Cosmetics, Inc., 738 F.3d 1350, 1359 (Fed. Cir. 2013). The Plaintiff is preempted from bringing a claim based on the Defendant having no legal right to make the sales.

The Plaintiff's allegations also show that the Defendant was merely a competitor motivated by a legitimate business purpose when it imported and sold its L-Cysteine product. Beverage Sys. of the Carolinas, 368 N.C. at 701, 784 S.E.2d at 463. The Plaintiff's own allegations show that the crux of the Defendant's alleged wrongdoing is that it "schemed to stay, *compete*, and dominate the L-Cysteine market for months" and thereby prevent "the vast majority of customers from buying [the Plaintiff's] FDA-approved product." [Doc. 41 at ¶ 78] (emphasis added). Those allegations, however, simply show a market competitor motivated by a legitimate business purpose—selling its existing inventory. The Plaintiff has failed to plausibly allege that the Defendant, as its competitor, had no legitimate business purpose for selling its inventory after ELCYS had been approved. As such, the Plaintiff's allegations concerning interference with prospective economic advantage fail to state a claim upon which relief can be granted and must be dismissed.

**B. Lanham Act Claim**

The Plaintiff next claims that the Defendant violated the Lanham Act by making "false and misleading representations in the course of selling its unapproved L-Cysteine product." [Doc. 1 at ¶ 84]. According to the Plaintiff, those false and misleading representations

> include, but are not limited to failing to update its Dear Healthcare Provider letter to inform customers of the FDA approved status and availability of [the Plaintiff's] product; providing a link on its product website to a database that says nothing about the aluminum content of [the Defendant's] product while clearly indicating the low aluminum content of FDA-approved ELCYS; failing to inform

> customers that the aluminum levels of [the Defendant's] unapproved product exceed FDA standards; and failing to inform customers of the much lower aluminum content of [the Plaintiff's] approved product.

[Id.].

To state a claim for false advertising under the Lanham Act, a plaintiff must allege that: (1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the defendant placed the false or misleading statement in interstate commerce; and, (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with their product. Scotts Co. v. United Indus. Corp., 315 F.3d 264, 272 (4th Cir. 2002). Unless the omission of a statement would render an affirmative statement false or misleading, the Lanham Act "imposes no affirmative duty of disclosure." MDM Grp. Assocs., Inc. v. Emerald Isle Realty, Inc., No. 2:07-CV-48 D, 2008 WL 2641271, at *5 (E.D.N.C. July 1, 2008) (citation and quotations omitted); see also Casper Sleep, Inc. v. Mitcham, 204 F. Supp. 3d 632, 638 (S.D.N.Y. 2016).

**1. Failing to Update Dear Healthcare Provider Letter**

**\*16** The Plaintiff asserts that the Defendant violated the Lanham Act by continuing to send Dear Healthcare Provider letters stating that "there are currently no FDA-approved L-Cysteine Hydrochloride Injection products in the United States" even after ELCYS received FDA approval on April 16, 2019. [Doc. 1 at ¶ 41; Doc. 1-18; *see also* Doc. 31-2 at 41-59]. The Plaintiff does, however, allege that the Defendant updated its customers on September 25, 2019, when it told them that "there is now an FDA approved L-Cysteine available in the US market." [Doc. 1-21 at 2].[14] The Defendant moves to dismiss, arguing that the Plaintiff's Lanham Act claims fail as a matter of law. [Doc. 29-1 at 16-32].

Exela Pharma Sciences, LLC v. Sandoz, Inc., --- F.Supp.3d ---- (2020)
2020 WL 5535026

In POM Wonderful LLC v. Coca–Cola Co., the Supreme Court held that "the FDCA and the Lanham Act complement each other" and the FDCA does not categorically bar Lanham Act suits. 573 U.S. 102, 134 S. Ct. 2228, 2241, 189 L.Ed.2d 141 (2014). POM Wonderful, nevertheless, preserved "the possibility that *some* Lanham Act suits might be precluded by the FDCA." JHP Pharm., LLC v. Hospira, Inc., 52 F. Supp. 3d 992, 998 (C.D. Cal. 2014) (citing id.). Specifically, the Court in POM Wonderful said that a Lanham Act claim may be precluded by the FDCA if "it turns on the content" of something that has been "previously preapproved by the FDA." Id. at 998; see also Church & Dwight Co. Inc. v. SPD Swiss Precision Diagnostics, GmbH, 104 F. Supp. 3d 348, 352 (S.D.N.Y. 2015) (stating POM Wonderful held that "in essence, that Lanham Act claims might be precluded if the FDA had authorized the challenged name and label."). Moreover, POM Wonderful suggested that a Lanham Act claim might be precluded by the FDCA if it conflicts "with an affirmative policy judgment by the FDA." JHP Pharm., 52 F. Supp. 3d at 998 (citing POM Wonderful, 134 S. Ct. at 2241). Likewise, other courts have found that Lanham Act claims which "involve an issue on which the FDA has taken 'positive regulatory action' are all likely precluded by the FDCA." Allergan USA Inc. v. Imprimis Pharm., Inc., No. SACV171551DOCJDEX, 2017 WL 10526121, at *7 (C.D. Cal. Nov. 14, 2017) (quoting JHP Pharm., 52 F. Supp. 3d at 1000 n.5, 1004).

Here, the Plaintiff's Lanham Act claim regarding the Dear Healthcare Provider letters "turns on the content" of something that was "previously preapproved by the FDA." JHP Pharm., 52 F. Supp. 3d at 998. Because the Plaintiff's Lanham Act claim challenges the letters that were a condition of the Memorandum of Discretion, it thereby also challenges the FDA's policy judgment and implicates an issue upon which the FDA has taken positive regulatory action. Imprimis Pharm., 2017 WL 10526121, at *7. Based on the Supreme Court's discussion in POM Wonderful, such a claim is precluded.

Examining the practical effects of allowing such a claim to proceed further demonstrates that preclusion is appropriate here. If the Plaintiff were correct that the FDA approved and mandated Dear Healthcare Provider letters could serve as the grounds for a Lanham Act violation, the Defendant would have had three options once ELCYS received FDA approval in April 2019: (1) face Lanham Act liability for continuing to distribute its L-Cysteine product with the FDA-approved Dear Healthcare Provider letter; (2) face FDA enforcement action for violating the Memorandum of Discretion by sending a new Dear Healthcare Provider letter that had not been approved by the FDA; or (3) withdraw its product from the market completely while it negotiated a new Dear Healthcare Provider letter with the FDA. It is unreasonable to interpret the Lanham Act to impose such a Hobson's choice, particularly when the FDA has taken and continues to take positive regulatory action to address something as critical and sensitive as a drug shortage. As such, this is not an instance where "the FDCA and the Lanham Act complement each other ...." POM Wonderful, 573 U.S. 102, 134 S. Ct. 2228, 2241, 189 L.Ed.2d 141 (2014). Accordingly, the Plaintiff's Lanham Act claim based on the Defendant's failure to send a new Dear Healthcare Provider letter after ELCYS received FDA approval fails to state a claim upon which relief can be granted.

### 2. Failing to Disclose Aluminum Content Difference

**\*17** The Plaintiff's Lanham Act claim also fails to the extent it is based on the Defendant's failure to affirmatively advertise the aluminum content of its L-Cysteine product. The Plaintiff, however, concedes that the Defendant never affirmatively "told its customers the respective aluminum levels of the [Plaintiff and the Defendant's] products." [Doc. 1 at ¶ 9]. The Plaintiff makes no allegation that the Defendant made any statement that would be rendered false or misleading by failing to affirmatively provide information regarding its product's aluminum content or ELCYS's aluminum content. The Defendant had no duty to provide such a statement under the Lanham Act. Therefore, the Plaintiff cannot state a Lanham Act claim based on the Defendant's failure to affirmatively advertise the difference between the aluminum content in its L-Cysteine product and ELCYS. Emerald Isle Realty, 2008 WL 2641271, at *5; see also Casper Sleep, 204 F. Supp. 3d at 638.

### 3. Failing to Disclose FDA "Standards"

The Plaintiff also asserts that the Defendant failed to inform customers that the aluminum levels of its "unapproved

product exceed FDA standards." [Doc. 1 at ¶ 84]. What the Plaintiff refers to as FDA "standards," however, are not actual FDA standards at all. (See, Part IV.A.1.c., *supra*.). As such, Plaintiff's allegations are based on a false premise. Moreover, the Plaintiff's own allegations show that the Defendant never made any statement regarding the aluminum content of its L-Cysteine product or whether its product met any FDA "standards." The Lanham Act "imposes no affirmative duty of disclosure." Emerald Isle Realty, 2008 WL 2641271, at *5; Casper Sleep, 204 F. Supp. 3d at 638.

This claim is a thinly veiled attempt by the Plaintiff to step into the shoes of the FDA to enforce the FDCA based on an underlying assumption that the Defendant's product is unsafe due to its aluminum levels. Such a claim is precluded. PhotoMedex, Inc. v. Irwin, 601 F.3d 919, 924 (9th Cir. 2010) ("Because the FDCA forbids private rights of action under that statute, a private action brought under the Lanham Act may not be pursued when, as here, the claim would require litigation of the alleged underlying FDCA violation in a circumstance where the FDA has not itself concluded that there was such a violation."); American Home Products Corp. v. Johnson & Johnson, 436 F. Supp. 785, 797 (S.D.N.Y. 1977) (stating that "an action under the Lanham Act and state unfair competition laws is not the proper legal vehicle in which to vindicate the public's interest in health and safety."). Accordingly, the Plaintiff's Lanham Act claim cannot be based on the Defendant's failure to disclose that its product does not meet FDA "standards."

For all these reasons, the Plaintiff's Lanham Act claim will be dismissed.

## V. CONCLUSION

In 2014 the FDA determined that there was a shortage of L-Cysteine product needed for medical treatments in the United States. The FDA approached the Defendant and worked out a program to *temporarily* allow the Defendant to import and sell its L-Cysteine product in the United States to meet this shortage. The Plaintiff meanwhile developed a competing L-Cysteine product for which the Plaintiff sought full FDA approval to sell in the U.S. market. Regarding the brief (less than six-month) period of the overlap of the availability of both the Plaintiff's and the Defendant's product, the Plaintiff complains that the FDA should not have allowed the Defendant to continue to sell its product. The Plaintiff brings this action, however, against the Defendant, not the FDA. Because of the exclusivity of the FDCA and the authority of the FDA regarding such sales, the Plaintiff's claims against the Defendant fail both under the Lanham Act and pursuant to state law. For this reason, the Defendant's Motion to Dismiss will be granted.

## ORDER

**IT IS, THEREFORE, ORDERED** that the Defendant's Motion to Dismiss the Complaint or, in the Alternative, Stay the Case Pending Referral to FDA [Doc. 29] is **GRANTED**, and this action is **DISMISSED WITH PREJUDICE**.

**\*18 IT IS FURTHER ORDERED** that the Plaintiff's Motion for Preliminary Injunction [Doc. 3] is **DENIED**.

The Clerk of Court is directed to close this civil action.

**IT IS SO ORDERED.**

**All Citations**

--- F.Supp.3d ----, 2020 WL 5535026

## Footnotes

1    Mr. Koneru's Verification provides as follows: "That he/she has read the foregoing COMPLAINT; that he/she is the Manager of Exela Pharma Sciences LLC, named Plaintiff in this matter, and that he/she know the contents thereof; that the same is true of his/her own knowledge, *except as to those matters and things stated therein upon information and belief*, and as to those matters and things he/she believes them to be true." [Doc. 1 at 29 (emphasis added) ].

2    Several allegations in the Complaint are made "on information and belief." Mr. Koneru did not verify such statements (see footnote 1 *supra*), and the Plaintiff provided no affidavits or sworn testimony to support such allegations at the hearing. Conclusory allegations based "upon information and belief" are no substitute for plausible factual allegations that wrongdoing has occurred. See Harman v. Unisys Corp., 356 F. App'x 638, 640 (4th Cir. 2009) (stating that allegations that included the phrase "upon information and belief" were insufficient to defeat a motion to dismiss because the allegations at issue were "conclusory"). As such, the conclusory allegations in the Complaint that are made "on information and belief" will not be considered.

3    The Plaintiff asserts subject matter jurisdiction in this Court pursuant to the existence of diversity jurisdiction per 28 U.S.C. § 1332 and federal question jurisdiction based on the Lanham Act claim. See 28 U.S.C. § 1331, 15 U.S.C. § 1125(a). The Plaintiff has not presented sufficient allegations to invoke diversity jurisdiction. Nevertheless, the Court will address the Motion to Dismiss based on the existence of federal question jurisdiction.

4    Discussions between the FDA and the Defendant regarding the shortage began in 2014. [Doc. 31-2 at 2].

5    The Plaintiff's Complaint does not attach the Memorandum of Discretion or the communications between the FDA and the Defendant related to the issuance of the Memorandum of Discretion and its subsequent renewals. The Defendant, however, attaches the Memorandum of Discretion and those communications to its Response in Opposition to Plaintiff's Motion for Preliminary Injunction. [Doc. 31-2 at 13-16, 38-39, 41-59]. The Court may consider a document submitted by a defendant without converting a Rule 12(b)(6) motion to a summary judgment motion if the document "was integral to and explicitly relied on in the complaint and if the plaintiffs do not challenge its authenticity." Am. Chiropractic Ass'n v. Trigon Healthcare, Inc., 367 F.3d 212, 234 (4th Cir. 2004) (citation and quotations omitted); see also Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir. 2001). The Memorandum of Discretion and the communications surrounding its issuance and renewals are integral documents that were explicitly referenced and relied upon in the Plaintiff's complaint. [Doc. 1]. The Plaintiff does not challenge the authenticity of those documents. As such, the Court will consider the contents of the Memorandum of Discretion and the communications between the FDA and the Defendant when analyzing this Motion. [Doc. 31-2 at 13-16, 38-39, 41-59].

6    Notwithstanding its approval of the Plaintiff's ELCYS product, the following month the FDA approved the Defendant's continued distribution of its product along with the previously approved Dear Healthcare Provider letter. [Doc. 31-2 at 50].

7    The Plaintiff's allegation in Paragraph 58 of the Complaint appears to facially contradict its allegation in Paragraph 45. If the Defendant discontinued sales of this product by October 8, 2019, then as of the date of the Plaintiff's filing (November 6, 2019), the Defendant no longer had *any* share of the market. [Doc. 1 at ¶¶ 45, 58]. Giving the Plaintiff the benefit of a very generous inference, this may mean that 80% of the *use* (rather than sales) of an L-Cysteine product in the United States as of November 6, 2019 was of the Defendant's product that had been sold prior to October 8, 2019.

8    The Plaintiff concedes that the Defendant's "misconduct originated in a violation of the FDCA–the import and sale of the unapproved product." [Doc. 1-38 at 7].

9    The FDA also had to balance the competing interests of these parties, each of whom sought and advocated for different outcomes. While the Plaintiff wanted the FDA to remove the Defendant's L-Cysteine product from the market almost immediately after ELCYS received FDA approval, the Defendant wanted a chance to sell the inventory *it* created in response to the FDA's requests to help with the drug shortage.

10    While Cook involved importation from an unregistered facility, this case involves importation from a registered facility. [Doc. 1-22 at 5]; Cook, 733 F.3d at 9.

11    Notably, the Plaintiff did not have sufficient production to satisfy the market for a significant portion of that six-month period. The Plaintiff makes no allegations regarding the adequacy of its distribution network to distribute what it was able to manufacture during that time.

12    The Plaintiff's Complaint fails to identify the particular communication that provides a basis for the alleged
      Chapter 75 violation. The Plaintiff alleges, *on information and belief*, that the Defendant sent Dear Healthcare
      Provider letters with incorrect information regarding ELCYS' FDA approval status after it had received FDA
      approval on April 16, 2019. [Doc. 1 at ¶¶ 9, 46]. The Plaintiff's Complaint, however, only attaches Dear
      Healthcare Provider letters sent on March 1, 2016, and September 1, 2018. [Doc. 1-17; 1-18]. The Plaintiff
      provides no communication from after April 16, 2019, where the Defendant falsely states that its L-Cysteine
      product is the only L-Cysteine product available in the United States. The only communication that the Plaintiff
      provides from that period is from September 25, 2019, when the Defendant informed customers that "there
      is now an FDA approved L-Cysteine available in the US market." [Doc. 1-21].

13    Regarding the Plaintiff's allegations concerning the Dear Healthcare Provider letter, <u>see</u> Part IV.A.1.c, <u>supra</u>.

14    While the Defendant argues that the Dear Healthcare Provider letters do not constitute commercial
      advertising, another court has held that Dear Healthcare Provider letters are "disseminated in a manner

      sufficient to constitute commercial advertising placed in interstate commerce[.]" De Simone v. VSL Pharm.,
      Inc., 395 F. Supp. 3d 617, 624 (D. Md. 2019).

---

**End of Document**                                      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 12

In re Gerber Probiotic Sales Practices Litigation, Not Reported in F.Supp.2d (2013)

2013 WL 4517994

KeyCite Yellow Flag - Negative Treatment

Disagreed With by Counts v. General Motors, LLC, E.D.Mich., February 14, 2017

2013 WL 4517994

Only the Westlaw citation is currently available.

NOT FOR PUBLICATION

United States District Court, D. New Jersey.

In re GERBER PROBIOTIC
SALES PRACTICES LITIGATION.

Civil Action No. 12–835 (JLL).

|

Aug. 23, 2013.

**Attorneys and Law Firms**

James E. Cecchi, Lindsey H. Taylor, Donald A. Ecklund, Carella Byrne Cecchi Olstein Brody & Agnello, P.C., Roseland, NJ, Richard Daniel Devita, Devita & Associates, Hoboken, NJ, Antonio Vozzolo, Courtney E. Maccarone, Faruqi & Faruqi, LLP, Yitzchak Kopel, Bursor & Fisher PA, New York, NY, Ro nald A. Marron, San Diego, CA, for Plaintiffs.

Scott A. Ohnegian, Riker, Danzig, Scherer, Hyland & Peretti, LLP, Morristown, NJ, for Defendants.

**OPINION**

LINARES, District Judge.

*1 This matter comes before the Court by way of a motion to dismiss the Second Consolidated Amended Complaint ("SAC") (CM/ECF No. 48) pursuant to Federal Rule of Civil Procedure 12(b)(6) (CM/ECF No. 53) by Gerber Products Company (hereafter "Defendant" or "Gerber"). No oral argument was heard pursuant to Rule 78 of the Federal Rules of Civil Procedure. After considering the submissions of the parties in support of and in opposition to the instant motions, Defendant's motion to dismiss is granted.

*I. BACKGROUND*

The instant putative consumer-protection class action arises out of the alleged deceptive, false, and misleading marketing of three Gerber products (collectively the "Products"): Good Start Protect Infant Formula and Good Start Protect Formula for 9 through 24 months ("Good Start"), and DHA &

Probiotic Cereal—Single Grain Oatmeal and Rice varieties. (SAC ¶ 2). Plaintiffs [1] allege that the marketing and labeling of those products are deceptive in two primary ways: despite representations to the contrary, the Products (1) do not provide immune system benefits; and (2) are not are not near equal to breast milk.

Plaintiffs first assert that the Products' marketing and labeling contain false and misleading representations based on the immune system effect of probiotic bacteria, "Bifidus BL." (SAC ¶ 1). The allegation is essentially that despite Defendant's representations regarding the Products' immune system benefits, "numerous studies show that the Products do not and cannot provide the immune-related health benefits Defendant claims." (SAC ¶ 3). Specifically, Plaintiffs allege:

Gerber's representations are designed to induce the consumer, who is unaware that healthy babies' bodies already maintain the proper balance of intestinal bacteria, to buy the Products. Gerber advertises the Products as the only formulas and cereals that include probiotics that will strengthen and support the immune systems of young children. However, Defendant's marketing message is false and deceptive, as the "probiotic" bacteria in the Products do not perform as advertised, and scientific studies ... demonstrate that probiotic supplementation in infant formula does not support infant immunity or provide the advertised health benefits including because such supplementation does not (a) decrease the levels of harmful pathogens in babies' intestinal microflora, (b) increase the levels of good bacteria in babies' intestinal micro-flora, or (c) reduce infections

(SAC ¶ 7, see also ¶¶ 16, 17).

With regard to the Good Start products, Plaintiffs maintain that the Gerber marketing strategy deliberately includes "IMMUNIPROTECT," which contains the trademarked

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 175 of 410
PageID: 12782
In re Gerber Probiotic Sales Practices Litigation, Not Reported in F.Supp.2d (2013)
2013 WL 4517994

Bifidus BL probiotic bacteria, as a "deceptive marketing hook." (SAC ¶ 5). Plaintiffs also maintain that to further reinforce the allegedly deceptive message, Gerber represents that the Products' "advanced" immune system benefits result from the use of Bifidus BL, which is found in breast milk. (SAC ¶ 6).

**\*2** Second, Plaintiffs allege that despite the fact that "experts unanimously agree that breast milk is best for infants," Gerber also adds ingredients to the Products in order to "claim through its marketing and advertising campaign and package labeling that the Products possess nutritional qualities that are nearly equivalent to those of breast milk." (SAC ¶ 11, *see also* ¶¶ 12, 14). However, scientific evidence allegedly demonstrates that "breast milk provides unique nutritional benefits that Defendant's Products do not provide." (SAC ¶ 14).

Plaintiffs assert that even though the Products' marketing implies that there is a proven scientific basis for the immune system benefits, by representing that the health-related claims are based on "studies" and "research," "the body of scientific evidence on probiotic supplementation in infant formula shows that the probiotic ingredient in the Products *does not* support the infant immune system and *does not* otherwise provide the advertised health benefits." (SAC ¶ 18, *see e.g.* ¶ 37, 39) (emphasis in original). Similarly, "scientific evidence proves that, contrary to Defendant's advertising, formula supplemented with probiotics does not provide breast milk-quality nutrition." (SAC ¶ 19).

In support of their position that the findings of numerous studies contradict Defendant's representations regarding the Products, Plaintiffs point to a number of scientific studies and reports. (SAC ¶¶ 70–86). In addition, Plaintiffs allege that Defendants cite no studies that effectively support certain of its claims and, in fact, the studies cited by Defendants actually demonstrate the falsity of Defendant's advertising and otherwise do not support its immunity strengthening claims. (SAC ¶¶ 87–91, 93–102). Therefore, Plaintiffs allege that "[n]one of these studies, even if they could be characterized as clinical—which they cannot—supports the conclusion that Gerber Products in fact strengthen and support a baby and toddler's immune system as labeled and advertised." (SAC ¶ 92).

Accordingly, Plaintiffs allege that the "labeling and advertising claims are false and deceptive because they imply that the Products provide more health benefits than other, less

costly predecessor and regular formulas that do not contain probiotics, Bifidus BL, or "IMMUNIPROTECT." (SAC ¶ 65). Therefore, Plaintiffs allege that Defendant's representations regarding the Products are likely to mislead consumers, acting reasonably under the circumstances, into believing that the Products are superior to other products because they are the near-equivalent of breast milk and that they provide immune system benefits. (SAC ¶ 66). They also maintain that a reasonable consumer would not have purchased the Products but for the alleged misrepresentations and that Plaintiffs have paid a premium for doing so. (SAC ¶ 104).

Plaintiffs assert that despite rebranding the Products in February 2010 and re-naming them in early 2011, Defendant has manufactured, marketed, and sold the Products since at least September 27, 2009 with false and misleading representations on the packaging, labeling, and online advertising. (SAC ¶¶ 3, 33). Defendants allegedly advertise and promote the Products primarily through "the front-of-pack and back-of-pack" labeling claims. (SAC ¶ 47). In addition, Defendants allegedly use online advertising, its website, and other media, including television commercials. (SAC ¶¶ 48, 63). Gerber allegedly sells the Products at a premium over predecessor and regular formula products without probiotics. (SAC ¶ 21).

**\*3** Plaintiffs assert the following causes of action in the SAC [2] : (1) violation of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8–2 *et seq.* ("NJCFA") on behalf of Plaintiffs Dourdoulakis and Jose and the putative Class or New Jersey Subclass; (2) violation of the Consumers Legal Remedies Act, California Civil Code § 1750, *et seq.,* on behalf of Plaintiffs Alvarez, Ginger, Hawkins, and Thomas and the putative California Subclass; (3) unlawful business acts and practices in violation of California Business & Professions Code Section 17200, *et seq.,* on behalf of Plaintiffs Alvarez, Ginger, Hawkins and Thomas and the putative California Subclass; (4) violations of the Illinois Consumer Fraud Act, 815 ILCS 505/1, *et seq.,* on behalf of Plaintiff Rudich and the putative Illinois Subclass; (5) violation of the New York Consumer Protection Act, N.Y. Gen. Bus. Law § 349, *et seq.,* on behalf of Plaintiff Siddiqi and the putative New York Subclass; (6) violation of the Washington Deceptive Trade Practices Law, Wash. Rev.Code. §§ 19.86.020, *et seq.* on behalf of Plaintiff Burns

and the putative Washington Subclass. In addition, without specifying under which state's law they are brought, the SAC also contains a number of state law claims on behalf of all Plaintiffs and the putative class: (1) breach of express warranty (Count VII); (2) breach of implied warranty of merchantability (Count VIII); and (3) unjust enrichment (Count IX).

## II. JURISDICTION and LEGAL STANDARD

Jurisdiction is premised upon 28 U.S.C. § 1332(d)(2), as Plaintiffs allege that the matter in controversy, exclusive of interest and cost, exceeds the value of $5 million and is a class action in which at least one class member is a citizen of a different state from Defendant.

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." For a complaint to survive dismissal, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The plaintiff's short and plain statement of the claim must "give the defendants fair notice of what the ... claim is and the grounds upon which it rests." Twombly, 550 U.S. at 545 (quoting Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

In evaluating the sufficiency of a complaint, a court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the non-moving party. See Phillips v. County of Alleg hen y, 515 F.3d 224, 234 (3d Cir.2008). "Factual allegations must be enough to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. at 555 (2007). Further, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555, 557 (2007)). However, this " 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal

evidence of the necessary element." West Perm Alleg hen y Health Sys. Inc. v. UPMC, 627 F.3d 85, 98 (3d Cir.2010) (quoting Phillips v. County of Alleg hen y, 515 F.3d 224, 234 (3d Cir.2008)).

## IV. DISCUSSION

*4 Defendant argues that dismissal is warranted on several grounds: (1) the SAC does not allege a plausible false advertising claim; (2) Plaintiffs have not adequately plead their fraud claims with the requisite level of particularity under Federal Rule of Civil Procedure 9(b); (3) Plaintiffs lack constitutional standing to bring their claims; (4) Plaintiffs lack standing to seek injunctive relief; (5) Plaintiffs fail to satisfy the essential elements of the applicable state consumer fraud and false advertising statutes; (6) Plaintiffs fail to allege a breach of warranty; and (7) Plaintiff's unjust enrichment claim is improper.

Plaintiffs' standing to assert claims under Article III of the Constitution is a threshold jurisdictional question. See e.g. O' Shea v. Littleton, 414 U.S. 488, 493, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). Accordingly, the Court begins its analysis there. The Court concludes for the reasons set forth below that Plaintiffs only have standing to assert claims premised on the alleged misrepresentations on the Products' labeling. In addition, Plaintiffs do not have standing to seek injunctive relief. The Court has considered the parties' arguments based on the Product labeling and determines, again for the reasons set forth below, that as Plaintiffs' claims are based on Defendant's overall marketing in connection with the Products, the SAC does not sufficiently allege false advertising claim based on the labeling alone. Accordingly, the Court dismisses the SAC without prejudice.

## A. Standing

Defendant argues that Plaintiffs' allegations are insufficient to demonstrate that they have constitutional standing in two regards: (1) they do not sufficiently plead an injury for purposes of Article III; and (2) they do not adequately plead causation. In addition, Gerber submits that Plaintiffs do not have standing to seek injunctive relief because they do not plead a threat of future injury, as required to maintain a claim for injunctive relief.

Gerber asserts that "Plaintiffs have not adequately pled injury in fact and causation, which are necessary elements to establish Article III standing." (Def.'s Mot. 4). The

In re Gerber Probiotic Sales Practices Litigation, Not Reported in F.Supp.2d (2013)

2013 WL 4517994

requirements of Article III constitutional standing are as follows:

> First, the plaintiff must have suffered an "injury in fact"-an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of-the injury has to be fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Darners Motor Co., Inc. v. Ford Motor Co.,* 432 F.3d 286, 290–91 (3d Cir.2005); *Society Hill Towers Owners' n v. Rendell,* 210 F.3d 168, 175–76 (3d Cir.2000).

**\*5** "In the class action context, however, traditional notions of standing are not completely informative of what claims may be asserted." *In re Franklin Mut Funds Litig.,* F.Supp.2d at 461. However, "if none of the named plaintiffs purporting to represent a class establishes the requisite case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class." *Hayes v. Wal–Mart Stores, Inc.,* —— F.3d ——, 2013 WL 3957757, at \*9 (3d Cir.2013) (quoting *O' Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)). At the pleading stage, "[a]lthough general factual allegations of injury resulting from the defendant's conduct may suffice, the complaint must still 'clearly and specifically set forth facts sufficient to satisfy' Article III." *Reilly v. Ceridian Corp.,* 664 F.3d 38, 41 (3d Cir.2011) (quoting *Lujan,* 504 U.S. at 561; *Whitmore v. Arkansas,* 485 U.S. 149, 155 (1990)).

*1. Injury In Fact*

With regard to the injury in fact requirement, Defendant asserts that "not one plaintiff alleges (even in conclusory terms) that he did not receive the health benefits from the products as advertised. This is a fatal flaw." (Def.'s Mot. 4; *see also* Def.'s Mot. 24–25).[3] In arguing that Plaintiffs did not suffer an injury-in-fact, Defendant relies on a number of consumer protection cases where the products at issue contained potentially dangerous substances, but the plaintiffs suffered no ill effects. (Def.'s Mot. 25) (citing *In re Fruit Juice Products Mktg. & Sales Practices Litig.,* 831 F.Supp.2d 507 (D.Mass.2011) (plaintiffs suffered no injury-in-fact where they alleged that fruit juice contained trace amounts of lead); (Def.'s Reply 14–15) (citing *Koronthaly v. L' Oreal USA, Inc.,* 2008 WL 2938045, at \*4–5 (D.N.J. Jul.29, 2008) (plaintiff did not have standing where she alleged she was denied the benefit of the bargain when she purchased lipstick containing lead). However, as discussed above, that is not the substance of Plaintiffs' claim. Throughout the SAC and their Opposition, Plaintiffs claim that they paid a premium for the Products at issue based on false, deceptive, and misleading representations. Plaintiffs correctly argue that "[m]onetary harm is a classic form of injury in fact. Indeed it is often assumed without discussion." (Pl.'s Opp'n. 22) (quoting *Danvers Motor Co., Inc. v. Ford Motor Co.,* 432 F.3d at 293) (internal citation omitted). Accordingly, at this stage of the litigation, Plaintiffs sufficiently allege an actual injury which is concrete and particularized. *See Wang v. OCZ Tech. Grp., Inc.,* 276 F.R.D. 618, 625 (N.D.Cal.2011).[4]

*2. Causation*

As to causation, Defendant submits that "plaintiffs fail to specify which allegedly false or misleading advertisement was reviewed prior to purchasing the product(s) and how that statement influenced the purchasing decision." (Def.'s Mot. 4). However, Defendant does not point to a requirement that such specificity is required to demonstrate constitutional standing generally. Rather, Gerber points to a number of cases which analyze the standing requirements for certain specific state consumer protection statutes, which the parties do not dispute are analyzed under the lens of Rule 9(b)'s heightened pleading requirement.[5] (Def.'s Mot. 25) (citing *In Re Toshiba Am. HD DVD Mktg. & Sales Practices Litig.,* 2009 WL 2940081, at \*13 (D.N.J. Sept.11, 2009) (considering claims asserted under New Jersey's Consumer

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 4517994

Fraud Act) [6] ; *Delacruz v. Cytosport, Inc.,* 2012 WL 1215243, at *8 (N.D.Cal. Apr.11, 2012) (discussing the reliance requirement under California's Unfair Competition Law, False Advertising Law and Consumer Legal Remedies Act); *Wang v. OCX Tech. Grp., Inc.,* 276 F.R.D. 618, 628 (N.D.Cal.2011) (considering whether allegations satisfy the heightened pleading requirements of Rule 9(b)); *Johns v. Bayer Corp.,* 2010 WL 476688, at *5 (S.D.Cal. Feb.9, 2010) (discussing statutory standing requirements of California's Unfair Competition Law and Consumer Legal Remedies Act)). In their Opposition, Plaintiffs argue that "[t]here is a causal connection between the Plaintiffs' injury and Defendant's conduct. Plaintiffs thought they were purchasing, and paying for, products with the immune benefits Gerber stated they had, but Plaintiffs did not receive what they paid for because [ ] Gerber misrepresented the qualities of its products." (Pls.' Opp'n. 23).

**\*6** A number of Plaintiffs allege that they relied on alleged misrepresentations contained only on the Products' labeling. Plaintiffs Rudich, Siddiqi, and Lhomas all identify the Products they purchased and allege that they "viewed and specifically relied upon Defendant's claims by reading the representations made on the product label concerning the probiotic benefit of the Products, purchased Gerber Products in reliance on these claims, and sustained injury in fact and lost money as a result of the wrongful conduct described herein." (SAC ¶¶ 29–31). On the other hand, a number of Plaintiffs state in a conclusory fashion that they relied on Defendant's "advertisements and labeling." Plaintiffs Burns, Dourdoulakis, Ginger, Hawkins, and Jose all allege that they purchased certain of the Products based on "Gerber's misleading claims in its advertisements and labeling that the Products contained probiotic bacteria strains that provide immunity-related health benefits and are near-equivalents to breastmilk." (SAC ¶¶ 24–28). In addition, one Plaintiff merely alleges only that she would not have purchased the Products but for Gerber's "misrepresentations." (SAC ¶ 23). Plaintiff Alvarez alleges that she "would not have purchased and paid a premium for the Gerber products but for Gerber's misrepresentations, and she suffered injury in fact and lost money as a result of Gerber's deceptive, unfair, and fraudulent practices described herein." (SAC ¶ 23).

Separate and apart from the product labeling, the SAC references a number of different types of representative "advertisements," including television commercials, press releases, and excerpts from Gerber's website. Indeed, as discussed in greater detail below, Plaintiffs premise their claims on Gerber's overall marketing campaign in connection with the Products. However, no Plaintiff provides facts sufficient to allege causation in connection with those aspects of Defendant's marketing campaign. For example, other than the Products' label, no Plaintiff alleges even the general type or medium of "advertising" to which they were allegedly exposed. Nor do Plaintiffs otherwise allege facts as to how misrepresentations in the "advertising" caused their injuries. Therefore, the SAC does not contain sufficient facts to allege that the injuries which resulted to Plaintiffs were fairly traceable to any of Gerber's representations other than those on the Products' labeling. *See* *Hein v. Freedom From Religion Foundation, Inc.,* 551 U.S. 587, 599, 127 S.Ct. 2553, 168 L.Ed.2d 424 (2007) (quoting *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) ("A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."))

### 3. *Injunctive Relief*

Next, Defendant argues that Plaintiffs lack standing to seek injunctive relief because they have not alleged a threat of a future injury, which is required to obtain prospective relief. (Def.'s Mot. 4, 26–27). On the other hand, Plaintiffs argue that it is premature to decide whether they have standing to seek injunctive relief. (Pls.' Opp'n. 23). Plaintiffs further argue that "[i]n the instant case, Plaintiffs' ability to seek injunctive relief on behalf of other class members to prevent Gerber from continuing to falsely tout the qualities of its Products arises only because of the class-action context of this case. As a result, Plaintiffs' standing to seek injunctive relief should be determined after class certification, in relation to whether the class as a whole would have standing to seek injunctive relief, not just the named Plaintiffs." (Pls.' Opp'n. 25). Plaintiffs also point to a number of cases from the district courts of California to argue that standing should not be so narrowly construed. (Pls.' Opp'n. 23–24).

**\*7** "An injury-in-fact 'must be concrete in both a qualitative and temporal sense.' " *Reilly v. Ceridian Corp.,* 664 F.3d at 42. As explained by the Third Circuit, where a plaintiff seeks prospective relief, "the plaintiff must show that he is 'likely to suffer future injury' from the defendant's conduct." *McNair v. Synapse Grp., Inc.,* 672 F.3d 213, 223 (3d Cir.2012) (quoting *City of Los Angeles v. Lyons,* 461

U.S. 95, 105, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983)). "The threat of injury must be sufficiently real and immediate, and, as a result of the immediacy requirement, past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief. if unaccompanied by any continuing, present, adverse effects." *Id.* (internal citations and quotations marks omitted). The Court agrees with Defendant that in this instance, no Plaintiff alleges that he or she is likely to "suffer future injury from the defendant's conduct [and in] the class action context, that requirement must be satisfied by at least one named plaintiff." *Id.; see also Dicuio v. Brother Intern. Corp.,* Civ. No. 2012 WL 3278917, at * 15 (D.N.J. Aug. 9, 2012) ("[I]t is not enough that other, non-named members of the class may intend to purchase [the product] in the future."). Therefore, the Court dismisses without prejudice Plaintiffs' claim for injunctive relief. *Dicuio,* 2012 WL 3278917, at * 14–16; *Robinson v. Hornell Brewing Co.,* Civ. No. 11–2183, 2012 WL 1232188, at *3–7 (D .N.J. Apr. 11, 2012).

**B. False or Misleading Advertising**

In essence, Gerber maintains that the Products' marketing is not deceptive or misleading as a matter of law. Defendant submits that the law of New Jersey, California, New York, and Washington requires that allegedly false advertisements must have the capacity to mislead the average consumer. (Def.'s Mot. 6–7). Similarly, Defendant contends that the law of Illinois requires a plaintiff to allege that he was deceived and that deception caused him damages." (Def.'s Mot. 7). Accordingly, Gerber argues that Plaintiffs' false advertising claim is deficient due to the following: (1) Gerber's Good Start Formula Products are not marketed as an equivalent of breast milk; (2) Plaintiffs' lack of substantiation allegations are not viable; and (3) the cited studies are either irrelevant or confirm the advertised healthy immune system benefits.

Defendants argue that private individuals may not bring an action demanding substantiation for advertising claims. (Def.'s Mot. 9). In Opposition to this instant motion, Plaintiff asserts that: "Gerber casts Plaintiffs' case as something it is not-a 'lack of substantiation case'-and then contends the re-defined case must be dismissed." (Pls.' Opp'n. 1). Rather, Plaintiffs clarify that their claim is based on Defendant's alleged false and deceptive marketing regarding "probiotic" bacteria which is alleged to not perform as advertised. (Pl's Opp'n. 1) (citing SAC ¶¶ 64–65, 67–69, 78, 93). Plaintiffs distinguish a lack of substantiation argument-where a plaintiff argues that there is no competent evidence to support a

claim made in defendant's advertising or labeling-from their claim which they maintain is premised upon allegations that competent scientific evidence demonstrates that claims made by a defendant are objectively false. (PL's Opp'n. 9). Accordingly, they argue that the scientific evidence to which they point supports their allegations of false advertising. (PL's Opp'n. 8–9). They concede, however, that their claims are not viable to the extent that it is premised upon a lack of substantiation theory. Therefore, to the extent Plaintiffs' claims are based on a lack of substantiation theory, they are dismissed with prejudice. *Franulovic v. Coca–Cola Co.,* 390 F. App'x. 125, 128 (3d Cir.2010); *Scheuerman v. Nestle Healthcare Nutrition, Inc.,* Nos. 10–3684, 10–5628, 2012 WL 2916827, at *6–7 (D.N.J. Jul.17, 2012).

**\*8** Gerber additionally argues that Plaintiffs may not rely on a lack of substantiation theory to "so easily sidestep their obligation to allege *facts* demonstrating falsity in order to survive a motion to dismiss." (Def.'s Mot. 2). However, as discussed above, Plaintiffs do cite a number of studies and reports and allege in detail that those relied upon by Defendant in its marketing are false or misleading. (Pl's Opp'n. 6–8). Thus, Plaintiffs do not merely assert that no credible science supports Defendant's claims; rather, they allege that the representations regarding the Products are affirmatively false. *Hughes v. Ester C Co.,* —— F.Supp.2d ——, 2013 WL 1080533, at *13 (E.D.N.Y. Mar.15, 2013).

Notwithstanding, Gerber argues that "Plaintiffs' reliance on these studies is misplaced: the studies either confirm the immunity benefits of Gerber's probiotic formula and cereal products ... or are entirely irrelevant. Merely citing a gaggle of studies might create the appearance of factual issues, but in this case the tactic does not withstand even minimal scrutiny-it was rejected in a very recent decision and should likewise be rejected again here." (Def.'s Mot. 3) (citing *Route,* 2013 WL 658251, at *5). The Court concludes that *Route* is distinguishable from this case. In *Route,* the court characterized plaintiff's allegations of falsity as based on allegations that: "(1) one paper discusses both the evidence supporting the advertisement's claim and the evidence that doesn't support it, (2) unidentified experts and studies have shown that the advertisement's claims are false, and (3) [p]laintiff subjectively believes that the advertisement's claims are false." *Route,* 2013 WL 658251 at *5. In this case, however, Plaintiffs point to a number of studies, which they contend have "demonstrated that the bacteria in the Products do not provide any clinically relevant

immunity benefits. This means that it does not provide these benefits, rendering the advertising false or misleading." (PL's Opp'n. 12) (internal citations omitted). The parties dispute the reliability and findings of certain studies, as well as the applicability of same to infants and children who consume the Products at issue. In this regard, however, the Court agrees with Plaintiffs that it is not appropriate to consider the content of the studies and resolve the factual issues at this stage of the litigation. Indeed, in arguing that other courts have rejected similar claims, Defendant relies on two cases that involved motions for summary judgment. (Def.'s Mot. 17–18) (citing *Scheuerman v. Nestle Healthcare Nutrition, Inc.,* Nos. 10–3684 and 10–5628, 2012 WL 2916827, at *7 (D.N.J. Jul.17, 2012)[7] ; *Stanley v. Bayer Healthcare, LLC,* No. 11–862, 2012 WL 1132920, at *5 (S.D.Cal. April 3, 2012).* Therefore, the Court declines to hold that Gerber's representations regarding purported immune system benefits are neither false, deceptive, nor misleading.

a. *Equivalence of Breast Milk*
**\*9** The Court now turns to whether a reasonable consumer could find Gerber's representations regarding the products misleading. Gerber maintains that it "endorses breast milk in the clearest of terms on its products and its website as the ideal source of nutrition for babies." (Def.'s Mot. 7, *see also* 8). Further, Defendant asserts: "Remarkably, Gerber's statements-which eviscerate plaintiffs' breast milk equivalence claim-are carefully edited out of the SAC." (Def.'s Mot. 8).[8] Specifically, Defendant points to the use of ellipses in place of the word "ideal" throughout the SAC and writes: "Is this really how lawyers should state a claim? Alleging a fraud only by deleting the truth? The Court should not approve such tactics." (Def.'s Mot. 9) (citing *Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.,* 653 F.3d 241, 253 (3d Cir.2011); *Freeman v. Time, Inc.,* 68 F.3d 285, 290 (9th Cir.1995)); *see also* *Route v. Mead Johnson Nutrition Co.,* 2013 WL 658251. Defendant argues that it clearly and unmistakably endorses breast milk as the ideal nutrition for babies.[9] However, the parties do not dispute that the appropriate inquiry is whether a reasonable person would be misled by the overall advertising. (Pls.' Opp'n. 3, n. 2.; Def.'s Reply 3).

In their Opposition, Plaintiffs write: "With overblown and false indignation, Gerber accuses Plaintiffs of 'the consummate blue smoke and mirrors' by 'repeatedly replac[ing] Gerber's statements promoting breast milk as the 'ideal' source of nutrition for babies with 'dot-dot-dot. Gerber should focus on being more accurate and less accusatory." (Pls.' Opp'n. 4) (internal citations omitted, alteration in original). Plaintiffs quote allegations in the SAC at length and clarify that the substance of their claim is that: despite touting the benefits of probiotic cultures in Good Start which are "like those naturally promoted by breast milk to support an infant's healthy immune system," those claims are allegedly contrary to scientific evidence which demonstrates that "formula supplemented with probiotics does not provide breast milk-quality nutrition." (PL's Opp'n. 2, 4–5). Therefore, Plaintiffs explain that they "never allege that Gerber advertises that Good Start is *better* than breast milk. Instead, Plaintiffs allege that Gerber falsely or deceptively *equates* Good Start to breast milk." (PL's Opp'n. 3). Stated another way, Plaintiffs allege that "Gerber clearly holds out breastfeeding as the gold standard, and then (falsely) equates Good Start to that gold standard." (PL's Opp'n. 4). Accordingly, Plaintiffs argue "that this is not the 'rare' case where an advertisement can be declared not deceptive as a matter of law." (PL's Opp'n. 5) (citing *Williams v. Gerber Prods. Co.,* 552 F.3d 934, 938 (9th Cir.2008)).

The Court notes that whether a practice is deceptive or misleading is generally a question of fact. *See e.g. Williams,* 552 F.3d at 938–39 ("whether a practice is deceptive, fraudulent, or unfair is generally a question of fact which requires 'consideration and weighing of evidence from both sides' " and usually cannot be resolved through a motion to dismiss); *Union Ink Co. v. AT & T Corp.,* 352 N.J.Super. 617, 645, 801 A.2d 361 (App.Div.2002) ("Whether the advertisements contained material misstatements of fact, or were merely puffing, as alleged by defendants, presents a question to be determined by the trier of fact."). Here, Plaintiffs allege that in light of the fact that "experts unanimously agree that breast milk is best for infants," Gerber adds ingredients to the Products in order to "claim through its marketing and advertising campaign and package labeling that the Products possess nutritional qualities that are nearly equivalent to those of breast milk," despite the fact that scientific evidence demonstrates that "breast milk provides unique nutritional benefits that Defendant's Products do not provide." (SAC ¶ 11,14).

**\*10** Notwithstanding, as discussed above, Plaintiffs only establish standing to assert claims based on the alleged misrepresentations on the Products' labeling. However, the

2013 WL 4517994

allegedly deceptive or misleading practice on which Plaintiffs base their claims is the overall marketing of the Products, which includes both the labeling as well as many other aspects of Gerber's marketing/advertising. Stated another way, Plaintiffs do not assert independent claims based on the Product's labeling alone.

In addition, both parties rely on representations of Defendant's overall marketing message in both the advertising as well as the labeling of the Products in support of their arguments. For example, throughout Plaintiffs' brief, they point to concrete examples of misleading statements from press releases and the website in the SAC. Plaintiffs also refer to Defendant's "misrepresentations" without specifying the source. (*See e.g.* SAC ¶ 66). Also, they allege that a reasonable consumer would not have purchased the Products but for the alleged misrepresentations and that Plaintiffs have paid a premium for doing so. (SAC ¶ 104). Further, in responding to Defendant's argument that Plaintiffs have not alleged that a reasonable consumer is "likely to be deceived" under California law, Plaintiffs point to the following which exemplifies the issue:

> Gerber expressly advertises that Good Start contains probiotics, which makes Good Start a near-equivalent to breast milk. For example, in one press release, Defendant stated "Nestle believes that GOOD START formula provides mothers, who cannot or who choose not to breastfeed, a healthy breast milk alternative." SAC ¶ 44; *see also* ¶ 12 (Good Start contains probiotics "like those promoted by breast milk"), ¶ 40 (same), ¶ 41 ("This breakthrough product is the first and only older-baby formula in the U.S. with the probiotic, BIFIDUS BL-beneficial cultures like those found in breast milk that help support babies' immune system."), ¶ 57 and ¶ 59 (product packaging and labeling), ¶¶ 60–62 (Gerber website, including a FAQ "How does GOOD START Protect compare with breast milk?"), ¶ 63 (tv ad).

(Pls.' Opp'n. 29). To be sure, the Court does not suggest that Plaintiffs may never refer to Defendant's collective misrepresentations in the SAC. However, as determined above, Plaintiffs only have standing to assert claims based on the labeling of the Products. In light of the fact that Plaintiffs' claims are premised on Gerber's overall marketing campaign, the Court cannot determine whether Plaintiffs state a plausible right to relief based on the representations contained on the Products' labels alone. Accordingly, the Court dismisses the SAC without prejudice.

## IV. CONCLUSION

For the reasons set forth above, Defendant's motion is GRANTED. The SAC only establishes standing to sue for injuries caused by the alleged misrepresentations on the Products' labels. However, as Plaintiffs premise their claims on Defendant's overall marketing message and assert no independent claims based on the labeling of the Products alone, they do not clearly allege a plausible right to relief. In addition, Plaintiffs do not allege a plausible future injury which could suffice as a basis for injunctive relief in the Third Circuit. Accordingly, the Court dismisses the SAC without prejudice. However, the Court dismisses with prejudice Plaintiffs' claims to the extent that they are premised upon a lack of substantiation theory.

**\*11** If Plaintiffs choose to amend, the Court advises the parties of the following in light of the Court's inherent authority to manage its cases and docket. Plaintiffs assert claims for breach of express warranty, breach of implied warranty, and unjust enrichment without specifying which state or states' laws they seek to invoke. As a general matter, absent a conflict, a court sitting in diversity applies the law of the forum state. *Erie Railroad v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Klaxon Co. v. Stentor Elec. Mfg.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *see* *Huber v. Taylor,* 469 F.3d 67, 74 (3d Cir.2006). Choice of law analysis must also be applied in the class action context. *Phillips Petroleum v. Shutts, All* U .S. 797 (1985). Accordingly, the parties should make clear which law they contend applies, to the extent possible given the posture of the litigation, for purposes of determining plausibility and otherwise.

In addition, Plaintiffs assert causes of action under the consumer fraud and false advertising statutes of a number of States. To the extent that any of the parties make general arguments regarding those claims, they should exercise caution to ensure that those arguments are indeed applicable to all claims and make clear where they are not. For example, Defendant argues that dismissal is warranted because "not one of the nine named plaintiffs identifies the advertisements on which he relied or how that advertisement influenced the purchasing decision." (Def.'s Mot. 3–4; *see also* 19–20). However, the Court notes that while almost all of the relevant statutes require a plaintiff to satisfy the heightened pleading standards of 9(b), Defendants do not address which of the state consumer protection statutes at issue require individual

reliance. [10] Defendant also argues that Plaintiffs fail to satisfy Rule 9(b) because they do not allege the "premium" they allegedly paid. However, Defendants do not explain why this is fatal to state claims in light of the essential elements of each. For example, Defendants address the "ascertainable loss" requirement in the New Jersey Consumer Fraud Act [11] at length but make no similar arguments regarding the laws of other states. Therefore, as the essential elements of the relevant consumer fraud and false advertising statutes vary, the parties should organize their briefs in a manner which makes clear to which elements Rule 9(b) applies and which of their arguments are generally applicable.

An appropriate Order accompanies this Opinion.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 4517994

## Footnotes

1   The following plaintiffs assert claims in the SAC: Maria Alvarez, Ryan Burns, Irene Dourdoulakis, Chad Ginger, Shavonda Hawkins, Joven Jose, Andrew Rudich, Saba Siddiqi and Janna Thomas. (SAC ¶¶ 23–31) (collectively "Plaintiffs").

2   Defendant explains:
    This case began when ten separate nationwide class actions were filed in six different District Courts between February and April 2012. On June 7, 2012, the five then-pending New Jersey cases were consolidated and a single consolidated complaint was filed. Dkt. No. 28. On October 16, 2012, the Judicial Panel on Multidistrict Litigation denied consolidation of all pending cases in the District of Washington. *In re Gerber Probiotic Prods. Mktg and Sales Practices Litig.,* —— F.Supp.2d ——, 2012 WL 495523 (J.P.M.L. Oct. 16, 2012). Following that ruling, the California plaintiffs consolidated their actions, and Gerber moved to transfer the two remaining non-New Jersey actions to this Court pursuant to 28 U.S.C. § 1404(a). Both courts determined that the paramount 1404 factors (avoiding duplication, fostering judicial economy and conserving limited judicial resources) weighed in favor of transfer. *Burns v. Gerber Prods. Co.,* 922 F.Supp.2d 1168, 2013 WL 518664 (E.D.Wash. Feb.12, 2013); *Hawkins v. Gerber Prods. Co.,* 924 F.Supp.2d 1208, 2013 WL 627066 (S.D.Cal. Feb.20, 2013). The Second Amended Consolidated Complaint (Dkt.48) was filed on April 10, 2013.
    (Def.'s Mot. 1 n. 1).

3   The Court agrees with Plaintiffs that this argument goes to the merits of the claim. "Although standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal, it often turns on the nature and source of the claim asserted. The actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing." *Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (internal citations and quotations omitted). To the extent that a state consumer statute or other cause of action requires a showing of same, it would be more appropriate to address Defendant's arguments within the context of that discussion. The Court notes, however, that it does not reach Defendant's argument that Plaintiff fails to plead certain essential elements of their consumer fraud claims.

4   Even under the more exacting standard of Rule 9(b), courts in this District have held that an exact dollar amount is not required to plead an ascertainable loss under the New Jersey Consumer Fraud Act. *Nelson v. XACTA 3000 Inc.,* No. 08–5426, 2010 WL 1931251, at *7 n. 3 (D.N.J. May 12, 2010); *Torres–Hernandez v. CVT Prepaid Solutions, Inc.,* No. 08–1057, 2008 WL 5381227, at *7 n. 3 (D.N.J. Dec.17, 2008)

In re Gerber Probiotic Sales Practices Litigation, Not Reported in F.Supp.2d (2013)

2013 WL 4517994

5    The parties do not dispute that most of Plaintiffs' false advertising claims asserted under state statutes, including New Jersey, Illinois, California, and Washington, must meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). (Def.'s Mot. 3; Def.'s Reply 9).

6    For the sake of completeness, it is worth noting that in *In re Toshiba* the court concluded that the plaintiff's allegations regarding ascertainable loss and causation under the NJFCA satisfied neither Rule 8(a) or 9(b). 2009 WL 2940081, at *13.

7    The Court notes for the sake of completeness that *Scheuerman* disposed of both a motion to dismiss and a motion for summary judgment. 2012 WL 2916827, at *7. However, in concluding that the plaintiffs' claims premised upon false or misleading statements were insufficient, the court considered evidence adduced throughout discovery as well as opinions of experts. *Id.* at 7–9.

8    The parties do not dispute that the Court may properly consider the contents of the advertisings upon which Plaintiffs base their claims in deciding the instant motion to dismiss. (Def.'s Mot. 8) (citing *Am. Cyanamid Co. v. S.C Johnson & Son, Inc.,* 729 F.Supp. 1018, 1021–22 (D.N.J.1989)).

9    In its Reply, Defendant further argues that Plaintiffs fail to distinguish *Route v. Mead Johnson Nutrition Co.,* 2013 WL 658251. (Def.'s Reply 5). That case also involved allegedly misleading representations made in connection with the marketing of baby formula. Defendants point to the following language from a footnote in that case: "[I]t appears that Plaintiff would have this Court find that anytime baby formula is advertised as providing health benefits *analogous* to those found in breast milk, the advertisement is misleading. This surely cannot be." (Def.'s Reply 5) (quoting *Route,* 2013 WL 658251, at *5 n. 6) (emphasis added by Defendant). Notably, the decisions of other district courts are not binding on this court. In any event, here Plaintiffs allege that in light of the fact that "experts unanimously agree that breast milk is best for infants," Gerber adds ingredients to the Products in order to "claim through its marketing and advertising campaign and package labeling that the Products possess nutritional qualities that are nearly equivalent to those of breast milk," despite the fact that scientific evidence demonstrates that "breast milk provides unique nutritional benefits that Defendant's Products do not provide" (SAC ¶ 11, 14).

10    Defendant cites this Court's Opinion in another case for the proposition that " 'general exposure to, and reliance upon, some advertisements, is insufficient to survive [the] heightened scrutiny' of Rule 9(b)." (Def.'s Br. 20) (quoting *Gray v. Bayer Corp.,* No. 08–4716, 2009 WL 1617930, at *3 (D.N.J. June 9, 2009) (Linares, J.) (no alteration supplied). The Court notes, however, that the excerpt to which Defendant points related to the Court's discussion of Rule 9(b) with regard to negligent and intentional misrepresentation, which require a plaintiff to allege and prove reliance upon a defendant's misrepresentations. 2009 WL 1617930, at *3.

11    *See e.g. Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co.,* 192 N.J. 372, 929 A.3d 1076, 1086 (N.J.2007). (In order to state a claim under the NJCFA, a plaintiff must allege the following: (1) unlawful conduct; (2) an ascertainable loss; and (3) a causal relationship between the defendant's unlawful conduct and the plaintiff's ascertainable loss.)

---

**End of Document**                                          © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 13

2018 WL 3727369
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey,
Camden Vicinage.

GOVERNMENT EMPLOYEES
INSURANCE CO., et al., Plaintiffs,
v.
PENNSAUKEN SPINE AND
REHAB P.C., et al., Defendants.

Civil No. 17-11727 (RBK/KMW)
|
Signed 08/06/2018

**Attorneys and Law Firms**

Gene Y. Kang, John J. Robertelli, Rivkin Radler, LLP, Hackensack, NJ, Michael Vanunu, Rivkin Radler LLP, Uniondale, NY, Plaintiffs.

Andrew S. Brown, William M. Tambussi, Brown & Connery, LLP, Westmont, NJ, Thomas F. Flynn, III, Flynn & Associates, P.C., Cherry Hill, NJ, for Defendants.

## OPINION

ROBERT B. KUGLER, United States District Judge

**\*1** This matter comes before the Court upon the motion for default judgment (ECF No. 25) of Plaintiffs GEICO Casualty Company, GEICO General Insurance Company, and GEICO Indemnity Company against Defendants Delaware Valley Physical Medicine Associates, P.C. and Eric Lipnack. Defendants have also moved to vacate the clerk's entry of default. (ECF No. 33.) For the reasons set forth below, Plaintiffs' motion for default judgment is **DENIED** and Defendants' motion to vacate the clerk's entry of default is **GRANTED**.

## I. BACKGROUND AND PROCEDURAL HISTORY

Plaintiffs are Maryland corporations whose principal places of business are in Chevy Chase, Maryland and are authorized to issue automobile insurance policies in New Jersey. (Compl. at 5.) Defendant Delaware Valley Physical Medicine Associates, P.C. ("Delaware Valley") is a professional medical corporation with its principal place of business in New Jersey. Defendant Delaware Valley was owned and controlled by Defendant Lipnack, who currently resides in and is a citizen of Florida. (*Id.*) Defendant Lipnack was licensed to practice medicine in New Jersey through 2015, at which point his license expired. (*Id.*)

Plaintiffs' complaint is expansive: at 279 pages in length and with numerous defendants, many of whom have been dismissed from the case, it defies easy summarization (and, as we'll see, faces some procedural defects which only add to this difficulty). But the following points appear to be at issue.

Defendants provided medical care to persons injured in automobile accidents. After treating their patients, they would then charge Plaintiffs for reimbursement of any expenditures related to their care. (*Id.* at 111.) Plaintiffs assert that Defendants engaged in illegal *quid pro quo* relationships with other doctors and health clinics around the state and paid these third parties for each referral. (*Id.* at 256.) Defendant Lipnack, it is alleged, would often refer patients to facilities in which he had an ownership interest. (*Id.* at 204–10.) After making these referrals—both self-referrals and tit-for-tat referrals—Defendants would perform unnecessary and illusory procedures and practices for injuries that, in Plaintiffs' view, were not serious enough to warrant the treatment they received. (*Id.* at 144.) Plaintiffs allege Defendants never administered the procedures and practices for which they charged Plaintiffs, choosing instead to charge for the procedures and then pocket the money. (Pl. Br. at 12.) Plaintiffs also allege that Defendants knowingly performed these medically unnecessary procedures, when they were performed at all. They also charge that Defendants sought reimbursements above and beyond the cost of providing care through devices such as "unbundling"—separating and charging the same procedure multiple times under different billing codes—and fraudulent billing. (*Id.*; *see also* Compl. at 195, 252.)

Plaintiffs bring several claims. First, they contend that Defendants were not in compliance with the New Jersey Insurance Fraud Prevention Act ("NJIFPA") because Defendants would routinely engage in "illegal referral and self-referral"; purport to provide and bill for "medically unnecessary" and illusory care; and "inflate, exaggerate, and misrepresent" their charges. (*Id.* at 256.) Plaintiffs argue that Defendants repeatedly and systematically engaged in a pattern of illegal behavior that injured them. Second, Plaintiffs advance a common law fraud claim, arguing

Case 1:19-md-02875-RMB-SAK   Document 598-3   Filed 10/16/20   Page 186 of 410
PageID: 12793
Government Employees Insurance Co. v. Pennsauken..., Not Reported in Fed....
2018 WL 3727369

that Defendants submitted thousands of fraudulent billings and charges on which Plaintiffs relied when making reimbursement payments to Defendants. (*Id.* at 273.) Finally, Plaintiffs advance a claim of unjust enrichment against Defendants, asserting that they were unfairly enriched as a result of allegedly false, improper, and unlawful acts. (*Id.* at 275.) For these claims, Plaintiffs seek $3,900,000.00 in damages.

**\*2** Plaintiffs filed their original complaint (ECF No. 1) on November 16, 2017, naming eleven individuals and entities, including Defendants. Summons were properly issued to each named party on November 17, 2017. (ECF No. 3.) Plaintiffs dismissed their claims against the nine parties aside from the instant Defendants on January 22, 2018 and on June 12, 2018. (ECF Nos. 26 and 51.) Defendants failed to file an answer by January 2, 2018, the deadline set forth in the summons, at which point Plaintiffs filed a request for default. (ECF No. 23.) On January 4, 2018, the clerk of court entered default against Defendants. (*Id.*) Plaintiffs moved for default judgment on January 17, 2018. (ECF No. 25.) Defendants' counsel entered an appearance on February 5, 2018 and sought an extension to reply, which this Court granted on February 30, 2018. (ECF No. 30.) Defendants then timely filed a brief opposing Plaintiffs' motion for default judgment on February 20, 2018. (ECF No. 32.)

## II. STANDARD FOR DEFAULT JUDGMENT

Federal Rule of Civil Procedure 55(b)(2) allows the Court, upon a plaintiff's motion, to enter default judgment against a defendant that has failed to plead or otherwise defend a claim for affirmative relief. The Court should accept as true all well-pleaded factual allegations in the complaint by virtue of the defendant's default except for those allegations pertaining to damages. *Chanel, Inc. v. Gordashevsky*, 558 F. Supp. 2d 532, 536 (D.N.J. Apr. 7, 2008) (citing *Comdyne I, Inc. v. Corbin*, 908 F.2d 1142, 1149 (3d Cir. 1990) ). The Court also does not adopt a plaintiff's *legal* conclusions because whether the facts set forth an actionable claim is for the Court to decide. *Doe v. Simone*, Civ. No. 12-5825, 2013 WL 3772532, at \*2 (D.N.J. July 17, 2013).

While the decision to enter default judgment is left principally to the discretion of the district court, there is a well-established preference in the Third Circuit that cases be decided on the merits rather than by default judgment whenever practicable. *Hritz v. Woma Corp.*, 732 F.2d

1178, 1180–81 (3d Cir. 1984). Default judgment, and the dismissal that accompanies it, "must be a sanction of last, not first, resort." *Carter v. Albert Einstein Med. Ctr.*, 804 F. 805, 807 (3d Cir. 1986) (quoting *Poulis v. State Farm Fire and Casualty Co.*, 747 F.2d 863, 867 (3d Cir. 1984) ). Consequently, the Court must address a number of issues before deciding whether a default judgment is warranted.

## III. DISCUSSION

### A. The Court's Jurisdiction

First, this Court must determine whether it has both subject-matter and personal jurisdiction over Defendants. *See U.S. Life Ins. Co. in N.Y.C. v. Romash*, Civ. No. 09-3510, 2010 WL 2400163, at \*1 (D.N.J. June 9, 2010).

Here, the Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1332(a)(1) and § 1367. The amount in controversy exceeds $75,000 and Plaintiffs and Defendants are residents of different states, fulfilling the requirements of § 1332. Additional claims that fail to meet the amount in controversy requirement are properly supplemental under § 1367. Therefore, this Court has subject-matter jurisdiction. Venue is also proper pursuant to 28 U.S.C. § 1391(b), as the Defendants are residents within the District of New Jersey, where a "substantial part of the events or omissions giving rise to the claim occurred."

### B. Entry of Default

Second, the Court must ensure that entry of default under Rule 55(a) was appropriate. Rule 55(a) directs the clerk of court to enter default when the party "against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise...." In this case, Defendants were properly served with Plaintiffs' summonses on November 17, 2017 and failed to answer or defend the action by the date set by the Court, at which point the clerk appropriately issued the entry of default on January 4, 2018.

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 187 of 410
PageID: 12794
Government Employees Insurance Co. v. Pennsauken..., Not Reported in Fed....
2018 WL 3727369

### C. Fitness of Defendants to be
### Subject to Default Judgment

**\*3** Third, this Court must confirm that the defaulting parties are not infants or incompetent persons, or persons in military service exempted from default judgment. *See* Fed. R. Civ. P. 55(b)(2); 50 U.S.C.A. § 501 *et seq.* (2006) (codification of the Servicemembers Civil Relief Act of 2003). In this case, it appears to the Court that Defendants are not infants, incompetent, or active duty members of the United States military. Plaintiffs obtained a certificate from the United States Department of Defense Manpower Data Center indicating that Defendant Lipnack does not serve in the military. (Decl. of Gene Y. Kang, Ex. A.) Rule 55(b) (2) is satisfied.

### D. Plaintiffs' Causes of Action

Fourth, the Court must determine whether Plaintiffs' complaint states a proper cause of action against Defendant. In performing the inquiry into a cause of action, the Court accepts as true a plaintiff's well-pleaded factual allegations while disregarding its mere legal conclusions. *See DirecTv, Inc. v. Asher*, Civ. No. 03-1969, 2006 WL 680533, at \*1 (D.N.J. Mar. 14, 2006) (citing Wright & Miller, Federal Practice and Procedure § 2688, at 58–59 (3d ed. 1998) ).

Whatever else they may be, Plaintiffs' causes of action are cognizable. Plaintiffs assert three separate claims against Defendants: (1) violation of the NJIFPA; (2) common law fraud; and (3) unjust enrichment. Plaintiffs maintain that Defendants engaged in a system of fraudulent referrals for "medically unnecessary, illusory, and otherwise unreimbursable healthcare services." (Repl. Br. at 10.) These illegitimate referrals, as alleged, violated not only the NJIFPA, but also constituted common law fraud. (*Id.* at 13.) As a result of a system of fraudulent referrals, Plaintiffs hold that Defendants were unjustly enriched at Plaintiffs' expense. (*Id.* at 18–19.)

As this Court finds, for other reasons below, that default judgment is inappropriate, it defers finding whether the allegations set forth in the complaint are sufficient to state a claim against Defendants. While it is true that the complaint offers much more than "labels and conclusions or a formulaic recitation of the elements of a cause of action," *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations and citations omitted), the full scope of the claims within it are somewhat uncertain.

To put it simply: Plaintiffs play fast and loose with the requirements of the Federal Rules of Civil Procedure. Rule 8(c) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Yet this complaint may be fairly labeled sprawling and inscrutable; among its vices, it frequently incorporates previous references, leading to computationally impossible statements. A model example may be found on page 275 in Count Fifteen, paragraph 674, which incorporates "each and every allegation in paragraphs 1 through 673 above." This is apparently inclusive of hundreds of sub-paragraphs and, indeed, all previous fourteen counts, which, of course, incorporate the previous counts, resulting in a logarithmic expansion of paragraphs as each count incorporates previous incorporations that themselves incorporated incorporations. Each successive count thus snowballs into a blizzard of theories, facts, allegations, and claims which must be shoveled away before the blob beneath the snowbank reveals itself as a car, house, or plausible insurance dispute.

This practice flouts Rule 8, which does not countenance enigma: "shotgun pleadings"—or snowball pleadings, as is the case here—are verboten. *See, e.g.,* *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1323 (11th Cir. 2015) (surveying and decrying the practice of "shotgun pleading" and its sundry forms, including where a complaint's counts incorporate by reference the allegations of previous counts, "leading to a situation where most of the counts ... contain irrelevant factual allegations and legal conclusions"); *Litwak v. Tomko*, Civ. No. 3:16-0446, 2017 WL 4151178, at \*5 (M.D. Pa. Sept. 19, 2017) ("a pleading ... that intermingles a wide number of claims based on a variety of legal theories ... runs afoul of the Federal Rules."); *Lapella v. City of Atl. City*, Civ. No. 10-2454 (JBS/JS), 2012 WL 2952411, at \*5 (D.N.J. July 18, 2012) ("By incorporating all preceding allegations into each count, Plaintiffs engage in shotgun pleadings that obfuscate her claims and defy the mandate of Rule 8, denying Defendants of the fullest extent of notice to which they are entitled."). At 279 pages, with additional attached exhibits of more than 1,140 pages, the complaint is a far cry from Rule 8(c)'s requirement of "short and plain statement." This is especially problematic here, as Third Circuit precedent requires this Court to consider Defendants' meritorious defenses against Plaintiffs' complaint. Those

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 188 of 410
PageID: 12795
Government Employees Insurance Co. v. Pennsauken..., Not Reported in Fed....

2018 WL 3727369

defenses are seriously complicated by the state of the pleadings.

### E. *Chamberlain* Factors

**\*4**  Under *Chamberlain v. Giampapa*, 210 F.3d 154, 164 (3d Cir. 2000), this Court must now consider three factors —(1) whether the defendant appears to have a meritorious defense, (2) whether denial of default would prejudice the plaintiff, and (3) whether a defendant's delay is due to culpable conduct—when deciding whether to enter default judgment against Defendants. [1]

The first factor weighs against the entry of default judgment. "The showing of a meritorious defense is accomplished when allegations of defendant's answer, if established at trial, would constitute a complete defense to the action." *United States v. $55,518.05 in U.S. Currency*, 728 F.2d 192, 195 (3d Cir. 1984) (internal quotations and citation omitted). Defendants' opposition brief sets forth four defenses to the allegations asserted by Plaintiff. In addition, Defendants' answer—attached to their opposition brief instead of being filed separately, as should be done—categorically denies 679 paragraphs of allegations in the complaint and sets forth 15 more defenses. The Court finds that they are of sufficient merit for the purposes of deciding whether to enter default judgment. Defendants raise several disputes of material fact (whose genuineness is impossible to determine at this time); contend they did not perform medically unnecessary procedures and "upcoding"; argue that they are entitled to Personal Injury Protection Arbitration proceedings pursuant to N.J. Stat. Ann. § 39:6A-5; argue that they did not violate the "Cody Law" pursuant to N.J. Stat. Ann. § 45:9-22.5; and deny violating the New Jersey Insurance Fraud Prevention Act, N.J. Stat. Ann. § 17:33A-1 *et seq.* To be sure, the instant Defendants are not blameless: they responded to this complaint tardily; their briefing is opaque and undeveloped; their refutations of the allegations brought against them are murky and conclusory. But given the diversity of disputes in this case, the millions of dollars at stake, and the complexity of the pleadings, it is simply inappropriate to enter default judgment when Defendants have not had an opportunity to refute the allegations against them. For this reason, many courts in this Circuit "have, while recognizing that [a] lack of a meritorious defense is, by itself, dispositive in the motion to vacate default judgment

context, been reluctant to similarly hold in the entry of default context." *Nat'l Specialty Ins. Co. v. Papa*, Civ. No. 11-2798 (RMB/KMW), 2012 WL 868944, at \*2 (D.N.J. Mar. 14, 2012) (citing cases). We find this factor weighs against default judgment. Plaintiffs may challenge the merits of Defendants' defenses at a later stage in proceedings.

**\*5**  The second factor also favors Defendants. "Delay in realizing satisfaction on a claim rarely serves to establish the degree of prejudice sufficient to prevent the opening [of] a default judgment entered at an early stage of the proceeding." *Nationwide Mut. Ins. Co. v. Starlight Ballroom Dance Club, Inc.*, 175 F. App'x 519, 523–24 (3d Cir. 2006) (citing *Feliciano v. Reliant Tooling Co.*, 691 F.2d 653, 656–57 (3d Cir. 1982) ). Although *Starlight Ballroom* addresses a different issue than the one the Court addresses today —i.e., the opening of a default judgment rather than the entry of one —*Chamberlain* and *Hill* hold that it is as applicable to the entry of a default judgment as it is to the vacation of a default judgment. Defendants have entered an appearance and have opposed this motion. Plaintiffs' delay in satisfaction, should they prevail, is not so prejudicial that it supports entering default judgment.

Finally, the Court must consider the culpability of the defaulting party. Culpable conduct "is conduct that is 'taken willfully or in bad faith.' " *Chamberlain*, 210 F.3d at 164 (citation omitted). "Negligence alone cannot sustain a default judgment"; willful, intentional, reckless or bad faith conduct is required. *Hritz*, 732 F.2d at 1183. There is no evidence of anything but, at most, negligence on the part of the Defendants' attorneys. Defense counsel admits that it was his and his office's failure to not "immediately enter an [sic] appearance and otherwise plead on [Defendants'] behalf." (Opp'n at 4.) Although defense counsel erred in not responding by the deadline, such a mistake is not imputed to the client, and it certainly doesn't rise above the level of simple negligence. *See Augusta Fiberglass Coatings v. Fodor Contracting*, 842 F.2d 808, 811 (4th Cir. 1988) (holding that an attorney's negligent failure to file an answer is not imputed to defendant); *Momah v. Albert Einstein Med. Ctr.*, 161 F.R.D. 304, 308 (E.D. Pa. May 8, 1995) (finding that counsel's neglectful failure to file a response to an amended complaint did not rise to a culpable level). This factor does not weigh in favor of entering default judgment either.

Thus, under Third Circuit precedent, the *Emcasco* factors weigh against entering default judgment. The Court therefore denies Plaintiffs' motion for the entry of default judgment.

## IV. VACATING DEFAULT

Defendants' motion to vacate the clerk's entry of default is defective: Local Civil Rule 7.2 requires that a motion be accompanied by a Notice of Motion as well as a brief. *See, e.g., Bounasissi v. New York Life Ins. & Annuity Corp.*, Civ. No. 15-7585 (JBS/JS), 2016 WL 852483, at *2 (D.N.J. Mar. 4, 2016). But because it is in the interests of judicial economy and because Plaintiffs will not be prejudiced as the analysis is identical to that of whether to enter default judgment, the Court will entertain the request.

A district court may set aside an entry of default for good cause shown. *See* Fed. R. Civ. P. 55(c); *see also* Fed. R. Civ. P. 77(c) ("[T]he clerk's action may be suspended or altered or rescinded by the court upon cause shown."). In exercising its discretion to set aside a default, a district court must consider (1) whether the plaintiff will be prejudiced; (2) whether the defendant has a meritorious defense, that is, whether the defendant's allegations, if established at trial, would constitute a complete defense to the action; and (3) whether the default was the result of the defendant's culpable conduct. *Dambach v. United States*, 211 F. App'x 105, 109 (3d Cir. 2006). Motions to set aside a clerk's default "are held to a more lenient standard." *Papa*, WL 868944, at *2.

*See also Feliciano v. Reliant Tooling Co. Ltd.*, 691 F.2d 653, 656 (3d Cir. 1982) ("Less substantial grounds may be adequate for setting aside a default than would be required for opening a judgment"); *Meehan v. Snow*, 652 F.2d 274, 276 (2d Cir. 1981) ("[T]he standard for setting aside the entry of a default pursuant to Rule 55(c) is less rigorous than the 'excusable neglect' standard for setting aside a default judgment by motion pursuant to Rule 60(b)."); Wright & Miller, *supra*, § 2692 ("[T]he federal courts are willing to grant relief from a default entry more readily and with a lesser showing than they are in the case of a default judgment.").

**\*6** The Court has already considered these factors in the context of whether to enter default judgment, pursuant to *Chamberlain*'s instructions, and have concluded the factors do not weigh in favor of entering default judgment. We likewise find that for the more lenient standard of whether to vacate the clerk's entry of default, the Court must do so, as Plaintiffs have shown the "good cause" required by Rule 55(c). We will therefore vacate the clerk's entry of default.

## V. CONCLUSION

For the reasons set forth above, Plaintiffs' motion for default judgment is **DENIED** and Defendants' request to vacate the clerk's entry of default is **GRANTED**. An order follows.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 3727369

## Footnotes

1    The applicability of these factors to a motion to *enter* default judgment is not immediately apparent. *Chamberlain* relied on *United States v. $55,518.05 in U.S. Currency*, 728 F.2d 192, 194, (3d Cir. 1984) for the proposition that these three factors may be applied in the context of *entering* a default judgment, but *U.S. Currency* only used these factors for *setting aside* a default judgment. *Chamberlain* appears to have been the first Third Circuit opinion to have extended the *U.S. Currency* factors to this context, though several lower courts had previously taken the same approach. *See, e.g., Metro Commercial Real Estate, Inc. v. Reale*, Civ. A. No. 95-2382 (ABB), 1995 WL 508207, at *1 (E.D. Pa. Aug. 24, 1995) (extending the test for the setting aside of default judgment to the entry of default judgment); *Stevens v. Wiggins*, Civ. A. No. 90-7038, 1991 WL 152960, at *1 (E.D. Pa. Aug. 6, 1991) (same). It is worth noting that *Chamberlain*'s approach has been called into question, though not overruled. Judge Rendell, concurring in *Hill v. Williamsport Police Dep't*, 69 F. App'x 49, 50 (3d Cir. 2003), noted that *Chamberlain* appeared to have merged the analysis of *setting aside* a default judgment with the *entering* of one, and that "it makes little sense for a plaintiff to be required

**Government Employees Insurance Co. v. Pennsauken..., Not Reported in Fed....**

2018 WL 3727369

to demonstrate that the defendant does not have meritorious defenses" when moving for default judgment.

🔖 *Hill,* 69 F. App'x at 53. Judge Ambro, writing for the majority in *Hill*, noted that several circuits employed significantly different tests. *Id.* And indeed, most other circuits employ different tests for the entering and setting aside of default judgments, in recognition of the different interests at play for each judicial action. *See generally* Wright & Miller, *supra,* § 2685 (listing factors used by different circuit courts for the entry of default judgment). Whatever the merits of these approaches, *Chamberlain*'s "meritorious defense" test places an unusual burden on a defendant when, as here, he opposes the entry of default judgment but must put up a substantive defense of his case before *any* motion practice or discovery begins.

---

End of Document                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 14

KeyCite Yellow Flag - Negative Treatment

Called into Doubt by Fidelity and Guar. Ins. Underwriters, Inc. v. Omega Flex, Inc., D.N.J., March 26, 2013

2012 WL 1018842
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Charles HAMMER, on behalf of herself
and all others similarly situated, Plaintiffs

v.

VITAL PHARMACEUTICALS, INC. d/b/a VPX;
ABC Cos. nos. 1–100; John Does Nos. 1–100;
XYZ Cos Nos. 1–100; Robert Roes Nos. 1–
100, DEF Cos. Nos. 1–100 and John Smiths
Nos 1–100 and (fictitious names), Defendants.

Civil Action No. 11–4124.
|
March 26, 2012.

**Attorneys and Law Firms**

Frank V. Floriani, Sullivan, Papain, Block, McGrath & Cannavo, PC, Hackensack, NJ, for Plaintiffs.

George H. Parsells, McElroy, Deutsch, Mulvaney & Carpenter, LLP, Morristown, NJ, for Defendants.

**OPINION**

WOLFSON, District Judge.

**\*1** This putative class action brought by Plaintiff Charles Hammer ("Hammer" or "Plaintiff") challenges the marketing and sales practices of Liquid Clenbutrx Hardcore ("Clenbutrx"), a "dietary supplement" manufactured by Defendant Vital Pharmaceuticals, Inc. d/b/a VPX/REDLINE (improperly pled as Vital Pharmaceuticals, Inc. d/b/a VPX) ("VPX" or "Defendant"). In the Complaint, Plaintiff alleges that Defendant's advertisements and packaging of Clenbutrx contained various affirmative misrepresentations concerning the supplement that were deceptive and misleading, that Plaintiff purchased the products pursuant to these misrepresentations, and he suffered damages as a result thereof. Based on these averments, Plaintiff asserts violations of the New Jersey Consumer Fraud Act, N .J.S.A. § 56:8–1 et seq. ("NJCFA") (Count I), as well as claims for common law fraud (Count II), unjust enrichment (Count

III), breaches of express (Count IV) and implied warranties (Count V) and injunctive relief (Count VI). In the instant matter, Defendant moves to dismiss the Complaint in its entirety. For the reasons set forth below, Defendant's motion is granted as follows: with respect to Counts I (NJCFA) and II (Common Law Fraud), Plaintiff's claims regarding the misrepresentation that Clenbutrx is "certified by science" and that Clenbutrx is a "dietary supplement" are DISMISSED WITHOUT PREJUDICE. The remaining fraud allegations —i.e., statements regarding Clenbutrx is the world's fastest, hardest hitting fat incinerator and authentic synergistic blend of ingredients—are DISMISSED WITH PREJUDICE. In addition, Counts III (Unjust Enrichment) and VI (Injunctive Relief) are DISMISSED WITHOUT PREJUDICE. Lastly, Count IV (Breach of Express Warranty) and Count V (Breach of Implied Warranty) are DISMISSED WITHOUT PREJUDICE.

**I. BACKGROUND**

In addressing Defendant's Motion to Dismiss, this Court must accept as true the allegations contained in the Complaint. *See Toys "R" Us, Inc. v. Step Two, S.A.,* 318 F.3d 446, 457 (3d Cir.2003); *Dayhoff, Inc. v. H.J. Heinz Co.,* 86 F.3d 1287, 1301 (3d Cir.1996). Thus, the facts recited herein are taken from the Complaint and do not represent this Court's factual findings.

VPX manufactures, markets and sells a line of "dietary supplements" including Clenbutrx. Compl. ¶ 14. Since 2006 [1], *inter alia,* internet advertisements and the product packaging represented and warranted that Clenbutrx contains "Apple Geranium (Pelargoium odorantissomum) (leaves) standardized to 1, 3 Dimethylpentylamine." *Id.* ¶ 16. In addition, VPX advertises that Clenbutrx is "certified by science, backed by the real world, and proven to give you mind blowing energy" and that its "authentic synergistic blend of ingredients ... leave[s] scientists wondering how amazing this stuff is." *Id.* ¶ 17. Because of these misrepresentations, Plaintiff purchased Clenbutrx for $29.99. *Id.* ¶ 36.

[1]     The Court notes that in Plaintiff's opposition brief, he points out that after being served with the Complaint, Defendant removed "Apple Geranium (Pelargoium odorantissomum) (leaves) standardized to 1, 3 dimethylpentylamine" from the ingredients of Clenbutrx, as well as its marketing materials. Pl's Opp. Br. at 3. This fact was not disputed by Defendant.

2012 WL 1018842, 77 UCC Rep.Serv.2d 283

**\*2** On July 18, 2011, Plaintiff filed the instant Complaint against VPX, asserting a violation of the NJCFA, common law fraud, unjust enrichment, and breaches of express and implied warranties. The genesis of Plaintiff's complaint is that Defendant's advertisements and packaging of the dietary supplement, Clenbutrx, contained false and misleading statements which led Plaintiff to purchase such product. [2] Specifically, Plaintiff alleges that the various representations concerning Clenbutrx induced consumers to believe that they were purchasing a product containing "apple geranium ... [standardized] to 1, 3 Dimethylpentylamine." *Id.* ¶ 18. Contrary to this representation, Plaintiff alleges that, apple geranium, a natural substance, does not normally contain 1, 3 Dimethylpentylamine, which is a synthetic laboratory-produced chemical compound. *Id.* ¶¶ 20–21. In that regard, Plaintiff complains that he was induced into purchasing Clenbutrx, a self proclaimed dietary supplement, when the supplement actually contains a synthetic compound. *Id.* ¶ 26. As a result, Plaintiff avers that Defendant's "misrepresentation[ ]" that Clenbutrx "is a 'DIETARY SUPPLEMENT' " that contains Apple Geranium has "misled consumers in general and Plaintiff in particular into believing that ... Clenbutrx ... is a dietary supplement, and as a dietary supplement contains *only* dietary ingredients ...." *Id.* ¶ 28 (emphasis added). In addition, Plaintiff claims that VPX's representations that Clenbutrx is "certified by science, backed by the real world," and that "scientists [are] wondering how amazing this stuff is" are false because "[n]o scientist has ever 'certified ' or 'backed' this product's ingredient at issue." *Id.* ¶ 57.

[2] The language of the allegations in the Complaint, specifically, ¶¶ 18–22, are subject to varying interpretations. However, in light of the nature of Plaintiff's claims, the Court will construe these allegations in the manner set forth in this Opinion.

On or about August 9, 2011, Defendant filed the instant Motion to Dismiss, contending that: (1) Plaintiff did not plead the fraud claims with sufficient particularity; (2) the labeling of Clenbutrx as a "dietary supplement" was mandated by federal law; (3) the alleged misleading statements on Clenbutrx's website are puffery; and (4) Plaintiff did not suffer an ascertainable loss. Def's Mot. at 6–11. In addition, Defendant contends that Plaintiff's unjust enrichment and warranty claims fail as a matter of law.

On or about September 28, 2011, Plaintiff filed opposition to Defendant's Motion to Dismiss. Defendant filed a Reply Brief on or about October 17, 2010.

## II. STANDARD OF REVIEW

The Federal Rules of Civil Procedure provide that a complaint "shall contain (1) a short and plain statement of the grounds upon which the court's jurisdiction depends ... (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks." *Fed.R.Civ.P. 8(a).* The purpose of a complaint is "to inform the opposing party and the court of the nature of the claims and defenses being asserted by the pleader and, in the case of an affirmative pleading, the relief being demanded." *Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1182 (3d ed.2004).*

**\*3** When reviewing a motion to dismiss, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny,* 515 F.3d 224, 233 (3d Cir.2008) (citation and quotations omitted). In *Bell Atlantic Corporation v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the Supreme Court clarified the 12(b)(6) standard. Specifically, the Court "retired" the language contained in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* at 561 (quoting *Conley,* 355 U.S. at 45–46). Instead, the factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level." *Id.* at 555. As the Third Circuit has stated, "[t]he Supreme Court's *Twombly* formulation of the pleading standard can be summed up thus: 'stating ... a claim requires a complaint with enough factual matter (taken as true) to suggest 'the required element. This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of 'the necessary element'." *Phillips,* 515 F.3d at 234 (quoting *Twombly,* 550 U.S. at 556).

In affirming that *Twombly* standards apply to all motions to dismiss, the Supreme Court recently explained the following principles. "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal,* 556 U.S. 662, ——, 129

S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009); *Fowler v. UPMC Shadyside,* 578 F.3d 203, 210–11 (3d Cir.2009). "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 1950. The plausibility standard requires that "the plaintiff plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" and demands "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 129 S.Ct. at 1949 (quoting *Twombly,* 550 U.S. at 556). Ultimately, "a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." *Fowler,* 578 F.3d at 211. In evaluating a motion to dismiss, a court may consider only the complaint, exhibits attached to the complaint, matters of public record, and undisputedly authentic documents if the complainant's claims are based upon these documents. *Pension Benefit Guar. Corp. v. White Consol. Indus.,* 998 F.2d 1192, 1196 (3d Cir.1993).

### III. DISCUSSION

#### A. NJCFA and Common Law Fraud

**\*4** The NJCFA provides in relevant part:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

N.J.S.A. § 56:8–2.

The term "person" as used in the NJCFA includes, *inter alia,* natural persons, partnerships, corporations, companies, trusts, business entities and associations. N.J.S.A § 56:8–1(d).

To state a prima facie case under the NJCFA, a plaintiff must sufficiently plead three elements: (1) unlawful conduct by the defendant; (2) an ascertainable loss by the plaintiff; and (3) a causal connection between the defendant's unlawful conduct and the plaintiff's ascertainable loss. *Payan v. GreenPoint Mortg. Funding, Inc.,* 681 F.Supp.2d 564, 572 (D.N.J.2010) (citing *Bosland v. Warnock Dodge, Inc.,* 197 N.J. 543, 964 A.2d 741, 749 (2009)). Unlawful practices under the NJCFA fall into three general categories: affirmative acts, knowing omissions, and regulation violations. *Frederico v. Home Depot,* 507 F.3d at 188 (3d Cir.2007)). Intent to defraud is not necessary to show unlawful conduct by an affirmative act of the defendant, but is an element of unlawful practice by knowing omission of the defendant. *See Gennari v. Weichert Co. Realtors,* 148 N.J. 582, 691 A.2d 350 (1997); *Torres–Hernandez v. CVT Prepaid Solutions, Inc.,* No. 08–1057, 2008 WL 5381227, at *6 (D.N.J. Dec.17, 2008).

Moreover, it is well-established that claims under the NJCFA must also meet the heightened pleading requirements of Fed.R.Civ.P. 9(b). *See, e.g., Frederico v. Home Depot,* 507 F.3d 188, 200 (3d Cir.2007); *Arcand v. Brother Intern. Corp.,* 673 F.Supp.2d 282 (D.N.J.2009). Pursuant to that rule, a plaintiff alleging fraud must state the circumstances of the alleged fraud with particularity. Fed.R.Civ.P. 9(b). In order to satisfy this heightened pleading standard, a plaintiff "must state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the 'precise misconduct with which [it is] charged.' Specifically, the plaintiff must plead or allege the 'date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Frederico,* 507 F.3 at 200. Indeed, the Third Circuit has advised that, at a minimum, a plaintiff must support allegations of fraud with all the essential factual background that would accompany " 'the first paragraph of any newspaper story'—that is, the 'who, what, when, where and how' of the events at issue." *In re Suprema Specialties, Inc. Sec. Litig.,* 438 F.3d 256, 276–77 (3d Cir.2006) (citations omitted) *abrogated on other grounds by Tellabs, Inc. v. Makor Issues & Rights, L.T.D.,* 551 U.S. 308, 322–23, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). Moreover, a complaint sounding in fraud must do more than assert generalized facts, it must allege facts specific to the plaintiff. *Rolo v. City Investing Co. Liquidating Trust,* 155 F.3d 644, 658–59 (3d Cir.1998) *abrogated on other grounds by Rotella v. Wood,* 528 U.S. 549, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000) (where the complaint failed to allege "what actually happened to either" of the plaintiffs, the complaint

2012 WL 1018842, 77 UCC Rep.Serv.2d 283

did not plead "fraud with the specificity required by Rule 9(b).").

 **\*5** In addition, Plaintiff's common law fraud must also be pled with specificity. To plead a fraud claim, a plaintiff must allege "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resultant damages." *Banco Popular North America v. Gandi,* 184 N.J. 161, 172–73, 876 A.2d 253 (2005).

### 1. Unlawful Conduct

Plaintiff's NJCFA claim must contain specific allegations of Defendants' unlawful conduct, subject to the heightened pleading requirements of Rule 9(b). To constitute an affirmative misrepresentation under the NJCFA, the statement must be: (1) material to the transaction; (2) a statement of fact; (3) found to be false; (4) and calculated to induce the buyer to make the purchase. *Gennari v. Weichert Co. Realtors,* 148 N.J. 582, 607, 691 A.2d 350, 366 (1997). "A statement of fact is material if: (a) a reasonable person would attach importance to its existence in determining a choice of action ...; or (b) the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it." *Ji v. Palmer,* 333 N.J.Super. 451, 755 A.2d 1221, 1228 (N.J.App.Div.2000) (quoting Restatement (Second) of Torts § 538(2)).

In the Complaint, Plaintiff alleges that VPX marketed Clenbutrx as a dietary supplement, and that this advertising was misleading because the product did not contain only dietary ingredients. In addition, Plaintiff contends that the nutrition label on the product touted that the product contains "apple geranium ... [standardized] to 1, 3 Dimethylpentylamine"; however, Plaintiff contends that contrary to the representation on the label, apple geranium, a natural dietary ingredient, contained 1, 3 Dimethylpentylamine, which is a synthetic compound. Finally, Plaintiff argues that Defendant made false and misleading representations concerning Clenbutrx including that the product was "the world's fastest hardest hitting fat incinerator," that the product was "certified by science, backed by the real world, and proven to give you mind blowing energy," and that its "authentic synergistic blend of ingredients ... leave[s] scientists wondering how amazing this stuff is." In response, Defendant argues that Plaintiff cannot establish a violation of the NJCFA for three separate

reasons: (1) there was no unlawful conduct by Defendant because the labeling of Clenbutrx as a "dietary supplement" was mandated by federal law; (2) the alleged misleading statements on Clenbutrx's website are puffery; and (3) Plaintiff did not suffer an ascertainable loss.

The Court will separately consider each of the alleged misrepresentations.

### i. The Labeling of Clenbutrx as a "Dietary Supplement"

As discussed above, in the Complaint, Plaintiff alleges that Defendant's labeling of Clenbutrx as a "dietary supplement" is actionable under the NJCFA. Specifically, Plaintiff contends that Defendant affirmatively misrepresented Clenbutrx as a "dietary supplement" because the product does not contain "only dietary ingredients." Compl. ¶ 26. In other words, Plaintiff appears to allege that because apple geranium contains 1, 3, Dimethylpentylamine, it was improper to label Clenbutrx as a dietary supplement. Plaintiff's allegations fall short of stating a viable claim.

 **\*6** Pursuant to 21 U.S.C. § 321(ff)(1), a dietary supplement is "a product (other than tobacco) intended to supplement the diet that bears or contains *one or more* of the following dietary ingredients: (A) a vitamin; (B) a mineral; (C) an herb or other botanical; (D) an amino acid; (E) a dietary substance for use by man to supplement the diet by increasing the total dietary intake; or (F) a concentrate, metabolite, constituent, extract, or combination of any ingredient described in (A), (B), (C), (D), or (E)." 21 U.S .C. § 321(ff)(1) (emphasis added); *see GNC Franchising LLC v. Sala,* No. 06–191, 2006 U.S. Dist. LEXIS 11320, at \*11–13 (W.D.Pa. Mar. 20, 2006). Significantly, a substance's intended use is relevant to deciding whether the product is a dietary supplement. *See* 21 U.S.C. § 321(ff)(1); *see United States v. Lane Labs–USA, Inc.,* 324 F.Supp.2d 547, 564 (D.N.J.2004).

Here, responding to Plaintiff's allegations, Defendants argue that "Clenbutrx contains dietary ingredients, including other botanicals, [thus] the labeling of this product as a 'dietary supplement' " was entirely proper. Def's Rep. Br. at 5. At the motion to dismiss stage, the Court cannot credit Defendant's assertion regarding what types of ingredient are contained in Clenbutrx. However, even taking the Complaint as true, Plaintiff's allegations fail to state a claim. Plaintiff has failed to allege that there is *no* dietary ingredient listed on the Clenbutrx label; instead, Plaintiff alleges only that because apple geranium, a natural ingredient, contains 1, 3,

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 196 of 410
PageID: 12803
Hammer v. Vital Pharmaceuticals, Inc., Not Reported in F.Supp.2d (2012)
2012 WL 1018842, 77 UCC Rep.Serv.2d 283

Dimethylpentylamine, it was improper to label Clenbutrx as a dietary supplement. This lone allegation does not come close to state a claim under the statutory scheme of § 321(ff). Rather, the statute specifically provides for the labeling of a product as a "dietary supplement" if the supplement contains *one or more* specified dietary ingredients. *See* 21 U.S.C. § 321(ff)(1). In fact, the statute does not require that *every* ingredient must be a dietary ingredient. In that regard, Plaintiff does not allege that Clenbutrx does not contain other botanicals, or that there are no other dietary ingredients in Clenbutrx. Simply stated, the mere fact that apple geranium in Clenbutrx may not be an herb or a botanical does not necessarily mean that Clenbutrx does not have other dietary ingredients that would qualify it as a dietary supplement. Moreover, Plaintiff has failed to allege that Clenbutrx is not intended to be used as a dietary supplement. Accordingly, the Court finds that Plaintiff's claim, as it is currently pled, concerning the labeling of Clenbutrx as a dietary supplement is not actionable under the NJCFA. This claim is dismissed without prejudice.

### ii. Statements Made on Clenbutrx's Website

Next, Plaintiff contends that the following separate statements on Defendant's website constitute affirmative misrepresentations: (1) Clenbutrx is "the world's fastest, hardest hitting fat incinerator"; (2) Clenbutrx is "certified by science, backed by the real world, and proven to give you mind-blowing energy"; and (3) Clenbutrx's "authentic synergistic blend of ingredients ... leave[s] scientists wondering how amazing this stuff is." (Compl.¶ 16.) In response, Defendant argues that these statements are not actionable under the NJCFA because they are puffery.

**\*7** "The NJCFA distinguishes between actionable misrepresentations of fact and 'puffery.' " *In re Toshiba America HD DVD Marketing and Sales Practices Litigation,* Civ. No. 08–939, 2009 WL 2940081, at \*9 (D.N.J. Sept. 11, 2009) (citing *Rodio v. Smith,* 123 N.J. 345, 352, 587 A.2d 621 (1991)) (finding that the slogan "[y]ou're in good hands with Allstate" was "nothing more than puffery" and as such was not "a deception, false promise, misrepresentation, or any other unlawful practice within the ambit of the Consumer Fraud Act.") "Advertising that amounts to 'mere' puffery is not actionable because no reasonable consumer relies on puffery. The distinguishing characteristics of puffery are vague, highly subjective claims as opposed to specific, detailed factual assertions." *Id.* at \*10, 587 A.2d 621 (quoting *Haskell v. Time, Inc.,* 857 F.Supp. 1392, 1399 (E.D.Cal.1994)); *see, e.g., Hughes v. Panasonic,* Civ. A.

No. 10–846, 2011 WL 2976839, at \*35, 36 (D.N.J. July 21, 2011) (holding that Panasonic's statements about the televisions' "industry leading black levels and contrast ratios" as well its representations about the television technology's ability to render images "the way the director intended" and producing "breathtaking" and "vivid" colors are non-actionable puffery). Morever, "[i]t has been noted in the context of Lanham Act cases that, unlike puffery, 'false claims that explicitly or implicitly address product attributes of importance to customers and make statements that are measurable by comparative research are not puffery." *Bracco Diagnostics, Inc., v. Amersham Health, Inc.,* 627 F.Supp.2d 384, 464 (D.N.J.2009) (citing *Castrol Inc., v. Pennzoil Co.,* 987 F.2d 939, 945–46 (3d Cir.1993) (holding that Pennzoil's claim of superior engine protection was more than mere puffery because "it is both specific and measurable by comparative research")). The Court will consider each statement in turn.

Here, Plaintiff argues that the statements that Clenbutrx is "the world's fastest, hardest hitting fat incinerator" and that Clenbutrx contains an "authentic synergistic blend of ingredients ... [that] leave[s] scientists wondering how amazing this stuff is" are actionable misrepresentations under the NJCFA. The Court does not agree. These statements are the epitome of vague and highly subjective claims of superiority. *See, e.g, In re Toshiba,* 2009 WL 2940081, at \*10. While Defendants use the buzz words "authentic" or "scientists," that is not sufficient to bring the statements out of the realm of puffery because these statements are not making a specific claim as to the product. *See Tatum v. Chrysler Group LLC,* No. 10–4269, 2011 U.S. Dist. LEXIS 32362, at \*14, 2011 WL 1253847 (D.N.J. Mar. 28, 2011) ("Absent specific claims as to the braking system, Defendant's general advertising was puffery ...."). Indeed, neither of these statements contains a specific or detailed factual assertion upon which a reasonable consumer would rely. *See Angrisani v. Capital Access Network, Inc.,* 175 Fed. Appx. 554, 556 (3d Cir.2006) ( "statements that can be categorized as "puffery" or vague and "ill-defined opinions" are not assurances of fact and do not constitute misrepresentations.") (citation omitted). Rather, such statements are routinely made by companies seeking to gain a competitive advantage in their respective industries, and therefore they are considered puffery. *In re Toshiba,* 2009 U.S. Dist. LEXIS 82833 at \*28. As such, the Court holds that these statements do not constitute actionable misrepresentations for purposes of the NJCFA, and Plaintiff is precluded from bringing NJCFA claims based upon those statements of puffery.

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 197 of 410
PageID: 12804
Hammer v. Vital Pharmaceuticals, Inc., Not Reported in F.Supp.2d (2012)
2012 WL 1018842, 77 UCC Rep.Serv.2d 283

**\*8** On the other hand, the statement that Clenbutrx is "certified by science" is not puffery and thus could be actionable under the NJCFA. Indeed, unlike the above statements, Defendant's use of the term "certified by science," transforms a subjective statement that might otherwise be considered puffery, i.e., that the product will "give you mind blowing energy," into something that appears "both specific and measurable." *Castrol,* 987 F.2d at 946; *see, e.g., Lieberson v. Johnson & Johnson Consumer Cos.,* No. 10–6196, 2011 U.S. Dist. LEXIS 107596, at \*24, 2011 WL 4414214 (D.N.J. Sept. 21, 2011) (product labels touting that the products were "clinically proven to help babies sleep better" was not puffery). Moreover, Plaintiff alleges that no scientist has ever "certified" or "backed" Clenbutrx. Compl. ¶ 57. Thus, the Court finds that the statement that Clenbutrx is "certified by science, backed by the real world, and proven to give you mind blowing energy" is an actionable misrepresentation under the NJCFA.

Thus, the Court will consider the additional prongs required to set forth a claim under the NJCFA regarding the statement that Clenbutrx is "certified by science." [3]

[3]     In the event Plaintiff amends the Complaint on his affirmative misrepresentation claim regarding Clenbutrx's characterization as a "dietary supplement"—which the Court has dismissed—Plaintiff must be mindful that in order to properly allege a NJCFA claim based on that representation, the allegations must conform to the Court's rulings on the remainder of the NJCFA elements.

## 2. Ascertainable Loss

Next, Defendant argues that Plaintiff has not pled an ascertainable loss sufficient to establish a cause of action under the NJCFA because he "purchased a dietary supplement manufactured in compliance with the dietary supplement guidelines. Thus, Plaintiff did not suffer a loss in receiving what he paid for." Def's Rep. Br. at 6. In response, Plaintiff argues that he suffered an ascertainable loss of $29.99, i.e., the price he paid for Clenbutrx. The Court agrees that at this juncture, Plaintiff has pled an ascertainable loss.

Under the NJCFA, "[a]n ascertainable loss is a loss that is 'quantifiable or measurable'; it is not 'hypothetical or illusory.' " *Lee v. Carter–Reed Co., L.L.C.,* 203 N.J. 496, 522 (2010) (quoting *Thiedemann v. Mercedes–Benz USA, LLC,* 183 N.J. 234, 248, 872 A.2d 783 (2005)). There

are at least three recognized theories of ascertainable loss that may apply to a NJCFA claim. In cases involving product misrepresentation, "either out-of-pocket loss or a demonstration of loss in value will suffice to meet the ascertainable loss hurdle...." *Thiedemann,* 872 A.2d at 792. The "out-of-pocket" theory may include the purchase price of a misrepresented product if the purchasers did not receive a refund and the seller's misrepresentations rendered the product essentially worthless. *See Lee,* 2010 N.J. LEXIS 951, at \*51–52, 2010 WL 3781595. A "loss-in-value" theory is based on the quantifiable difference in value between the merchandise as advertized and the merchandise as delivered. *Thiedemann,* 872 A.2d at 792 (stating that an expert may employ a "market conditions" approach to product value to determine ascertainable loss). Under the third theory, an "ascertainable loss" can include a nominal overcharge for which the plaintiffs have not made a "pre-suit demand for a refund." *Bosland,* 964 A.2d at 751.

**\*9** Here, it is clear that Plaintiff is asserting an "out-of-pocket" theory of loss; specifically, Plaintiff alleges that he "suffered an ascertainable loss of monies, including, but not necessarily limited to the purchase price of the Liquid Clenbutrx Hardcore [he] purchased[.]" In addition, Plaintiff contends that he "would not have purchased" the product but for Defendant's misrepresentations. Compl. ¶ 38. The Court notes, however, that the ascertainable loss would only relate to the misrepresentations regarding Clenbutrx as a dietary supplement and the statement that Clenbutrx is "certified by science."

Accordingly, the Court finds that Plaintiff has sufficiently pled ascertainable loss.

## 3. Causation

Finally, Defendant argues that Plaintiff has not established the third prong of a NJCFA claim—i.e. a causal relationship between the alleged unlawful conduct and Plaintiff's ascertainable loss. Indeed, it is well-established that "[c]ausation under the CFA is not the equivalent of reliance." *Lee,* 203 N.J. at 522; *see also Int'l Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co., Inc.,* 192 N.J. 372, 929 A.2d 1076 (2007) (holding that the CFA "essentially replaces reliance, an element of proof traditional to any fraud claim, with the requirement that plaintiff prove an ascertainable loss.") "To establish causation, a consumer merely needs to demonstrate that he or she suffered an ascertainable loss 'as a result of' the unlawful practice." *Id.*

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 198 of 410
PageID: 12805
Hammer v. Vital Pharmaceuticals, Inc., Not Reported in F.Supp.2d (2012)
2012 WL 1018842, 77 UCC Rep.Serv.2d 283

However, in the context of advertisements, causation is particularly crucial under the Rule 9(b) heightened pleading requirements. In that regard, Plaintiff, here, must allege how his ascertainable loss was attributable to the unlawful conduct. In other words, Plaintiff must allege where and when he saw the advertisement which contained the alleged misrepresentation. *See, e.g., Gross v. Johnson & Johnson–Merck Consumer Pharms. Co.,* 303 N.J.Super. 336, 346, 696 A.2d 793 (App.Div.1997) (CFA class could only include persons who "saw the challenged advertisements" and "would not have purchased the Pepcid but for the challenged advertisements."); *Solo v. Bed Bath & Beyond, Co.,* No. 06–1908, 2007 U.S. Dist. LEXIS, at *12 (D.N.J. Apr. 26, 2007); *Franulovic v. The Coca–Cola Company,* No. 07–539, 2007 U.S. Dist. LEXIS, at *24, 2007 WL 3166953 (D.N.J. Oct.25, 2007) (plaintiff failed to "allege that she purchased Enviga because of a certain misleading ad, or that she purchased the prescribed amount of Enviga and did not enjoy the advertised effects. Melfi also does not allege that other consumers actually purchased the beverage because of Defendants' advertising, or that they did not get the advertised results. Instead, Melfi's claims generally state that Enviga's marketing was false and misleading, without alleging that this false advertising caused her a quantifiable loss.").

Plaintiff has fail to so plead here. Instead, Plaintiff, in a broad-brush fashion, alleges that he purchased Clenbutrx "upon being induced, by Defendant VPX's packaging and promotional materials and Internet advertising ...." Compl. ¶ 26. While Plaintiff lists various websites wherein VPX advertised Clenbutrx, Plaintiff fails to identify any specific advertisement he viewed, where he viewed it, how he was misled by these advertisements and how these advertisements caused his injuries. In other words, the Complaint fails to identify which, if any, of the promotional or marketing materials were viewed by Plaintiff, and if they were, when these materials were viewed and how they induced Plaintiff to purchase Clenbutrx. More simply stated, Plaintiffs have failed to allege any specific facts establishing a connection between the alleged conduct of Defendants and the alleged injury claimed. Morever, as a corollary issue, Plaintiff also fails to allege where he purchased Clenbutrx, i.e., a store, by mail, or on the internet. This is important because according to Plaintiff's allegations, he was induced by Defendants' online advertisement into purchasing the supplement. At the same time, Plaintiff also alleges that he was induced by the packaging of Clenbutrx, but he does not specify where he observed the packaging. Absent any explanation of the connection between Plaintiff's alleged damages and the

wrongful conduct of VPX, Plaintiff's NJCFA claim also fails on this basis.

**\*10** In light of the above analysis, the Court dismisses without prejudice Plaintiff's NJCFA claim regarding the alleged misrepresentation that Clenbutrx is a "dietary supplement" and the statement that Clenbutrx is "certified by science." The remaining allegations related to Plaintiff's NJCFA claim are dismissed with prejudice.

Finally, Plaintiff's common law fraud claim is dismissed without prejudice for the same reasons stated above.

### C. Plaintiff's Unjust Enrichment Claim

Under the set of facts Plaintiff has alleged, Plaintiff has not stated a claim for unjust enrichment. "To establish unjust enrichment, the plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust." *VRG Corp. v. GKN Realty Corp.,* 135 N.J. 539, 554, 641 A.2d 519 (1994). Specifically, "the unjust enrichment doctrine requires that plaintiff show that it expected remuneration from the defendant at the time if performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights." *Id.* Importantly, in New Jersey, a claim for unjust enrichment requires a direct relationship between the parties. *See, e.g., Cooper v. Samsung Elecs. Am. Inc.,* No. 07–3853, 2008 U.S. Dist. LEXIS 75810, 2008 WL 4513924 (D.N.J.2008); *see also Premier Pork L.L.C. v. Westin Inc.,* No. 07–1661, 2008 U .S. Dist. LEXIS 20532, 2008 WL 724352, at *14 (D.N.J.2008) ("quasi contract claims involve either some direct relationship between the parties or a mistake on the part of the person conferring the benefit ..."); *Callano v. Oakwood Park Homes Corp.,* 91 N.J.Super. 105, 109, 219 A.2d 332 (App.Div.1966) (citing importance of either a direct relationship or a mistake in quasi-contract). For example, in *Cooper,* the court held that although plaintiff alleged that the manufacturer was unjustly enriched through the purchase of a television, plaintiff had not conferred a direct benefit on the manufacturer since the purchase was made through a retailer. As a result, the court dismissed plaintiff's unjust enrichment claim.

Applied here, the Court finds that Plaintiff has not sufficiently alleged a claim for unjust enrichment. Indeed, as in *Cooper,* Plaintiff has not alleged where he purchased Clenbutrx, i.e., whether he purchased it directly from Defendant or if he purchased the product through a retail establishment, online or otherwise. As a result, the Court is unable to determine

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 199 of 410
PageID: 12806
Hammer v. Vital Pharmaceuticals, Inc., Not Reported in F.Supp.2d (2012)
2012 WL 1018842, 77 UCC Rep.Serv.2d 283

whether there is a direct relationship between the parties such that Plaintiff can establish that he conferred a benefit upon Defendant for purposes of an unjust enrichment claim. Thus, the Court will dismiss Plaintiff's unjust enrichment claim without prejudice.

### D. Warranty Claims

#### 1. Pre-litigation Notice

Plaintiff asserts claims of breach of express warranty and breach of implied warranty of merchantability. However, fatal to both claims is the lack of allegations involving pre-litigation notice. New Jersey has adopted the Uniform Commercial Code's ("UCC") notice requirement for an express warranty claim. *Luppino v. Mercedes–Benz USA, LLC,* No. 09–5582, 2011 U.S. Dist. LEXIS 65495, at *7, 2011 WL 2470625 (D.N.J. Jun. 20, 2011); *Joc, Inc. v. Exxonmobil Oil Corp.,* No. 08–5344, 2010 WL 1380750, at *4 (D.N.J. Apr.1, 2010); *Slack v. Suburban Propane Partners, L.P.,* No. 10–2548, 2010 WL 5392845, at *4–5 (D.N.J. Dec.22, 2010). It provides: "Where a tender has been accepted ... the buyer must within a reasonable time after [s]he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." N.J.S.A. 12A:2–607(3)(a). Based upon the language, this statutory notice is a "condition precedent to filing any suit for breach of warranty." *Joc,* 2010 WL 1380750 at *4. A similar requirement is needed for a breach of implied warranty. *See C.F. Seabrook Co. v. Beck,* 174 N.J.Super. 577, 593, 417 A.2d 89 (App.Div.1980) ("New Jersey law on sales requires notice as a prerequisite to the buyer's assertion that the seller breached an implied warranty of merchantability." (citing *Johnson v. Hoffman,* 7 N.J. 123, 131, 132, 80 A.2d 624 (1951)).

 *11  Here, Plaintiff has failed to plead that he provided the pre-litigation notice of breach. More importantly, Plaintiff offers no excuse or explanation for his failure to do so. Accordingly, because Plaintiff has failed to allege that the condition precedent has been met—sending a pre-litigation notice—Plaintiff's express and implied warranty claims necessarily fail. *See Luppino,* 2011 U.S. Dist. LEXIS 65495 at *7 ("At no time has any court in this district or in the state of New Jersey found that a buyer is not required to provide a direct seller with pre-suit notice in an action for express breach of warranty. Thus, Stern and Casiero's admission that they have failed to provide notice to Defendant proves fatal to their breach of express warranty claims.").

However, regardless of notice, both warranty claims are also inadequately pled and thus subject to dismissal. The Court turns to those analyses.

#### 2. Breach of Express Warranty

In the Complaint, Plaintiff alleges that by labeling Clenbutrx as a "dietary supplement," Defendant expressly warranted that the product contained only dietary ingredients including "Apple Geranium ... standardized to 1, 3 Dimethylpentylamine." Compl. ¶¶ 69, 71. In its Motion to Dismiss, Defendant argues that Plaintiff did not adequately plead his claim for breach of express warranty. Specifically, Defendant argues that Clenbutrx "conforms to all affirmations, promises or descriptions made by VPX," and that Clenbutrx "contains all of the ingredients on the product's label, which include components, in addition to apple geranium, that qualify it as a dietary supplement." Def's Br. at 14–15.

Under New Jersey law, a breach of express warranty claim has four elements: "(1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations." *Frederico,* 507 F.3d at 203. Moreover, courts in this Circuit have held that an advertisement may create an express warranty. *See, e.g., Cipollone v. Liggett Group, Inc.,* 893 F.2d 541, 575–76 (3d Cir.1990) rev'd in part on other grounds 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (concluding that cigarette advertisements representing that the cigarettes were safe could constitute an express warranty); *Elias v. Ungar's Food Products, Inc.,* 252 F.R.D. 233, 252 (D.N.J.2008) (packaging statements regarding fat and caloric content created express warranty). For example, in Elias, plaintiff alleged that descriptions on the packages of five products about fat and caloric content did not conform with the product because the product contained substantially more calories and fat than described. As a result, plaintiffs argued that the express warranty concerning the lower caloric and fat content had been breached. *Id.* at 251. The court agreed and held that the express warranty appeared to be breached. *Id.*

 *12  In the instant matter, Plaintiff argues that by labeling Clenbutrx as a "dietary supplement," Defendant warranted that the product contained only dietary ingredients. As discussed above, 21 U.S.C. § 321(ff)(1) provides that a product may be labeled as a dietary supplement if it contains one or more dietary ingredients. Thus, even if Defendant's labeling of Clenbutrx as a "dietary supplement" created an

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 200 of 410
PageID: 12807
Hammer v. Vital Pharmaceuticals, Inc., Not Reported in F.Supp.2d (2012)
2012 WL 1018842, 77 UCC Rep.Serv.2d 283

express warranty between the parties, because Plaintiff does not allege that the product does not contain any "dietary ingredients" as defined by 21 U.S.C. § 321(ff)(1), Plaintiff has not stated a claim for breach of that warranty. Simply put, taking Plaintiff's Complaint as true, even if apple geranium is not a dietary ingredient, Plaintiff has failed to allege that there are no other dietary ingredients, or equivalent, contained in Clenbutrx. Without those allegations, Plaintiff has not sufficiently alleged a breach of an express warranty. Accordingly, this claim is dismissed without prejudice.

### 3. Breach of Implied Warranty of Merchantability

In addition, Plaintiff alleges that VPX breached the implied warranty of merchantability because Clenbutrx was "not adequately packaged, labeled, sold, promoted, or fit for the ordinary purposes" as a dietary supplement. Compl. ¶¶ 75, 78. Specifically, Plaintiff appears to argue that Defendant "impliedly warranted that the product is composed entirely of dietary ingredients, that 1, 3 dimethylpentylamine is found in apple geranium, and that therefore the product is safe." Compl. ¶ 75. [4]

[4]
Plaintiff also asserts that Defendant breached an implied warranty by failing to publish its "money back" guarantee on the Clenbutrx packaging materials; the guarantee was only published on its website. As stated above, a breach of implied warranty concerns the merchantability of the product; however, nothing in Plaintiff's allegations regarding the money back guarantee concerns the product's fitness for its ordinary purpose. Thus, Plaintiff's allegations in this context cannot form a legal basis for a breach of implied warranty claim. Moreover, even if this were a sufficient basis, Plaintiff has not cited any authority that requires a manufacturer or seller to offer a money back guarantee as a matter of law, let alone requiring companies to advertise that guarantee in a particular way. Accordingly, the Court will dismiss these allegations with prejudice.

Pursuant to N.J.S.A. 12A:2–314, "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind ..." N.J.S.A. 12A:2–314. " 'Merchantability' requires that a product conform to its ordinary and intended use." Hughes, 2011 WL 2976839 at *22 (quoting Berenblat v. Apple, Inc., 2009 WL 2591366, at *2 (N.D.Cal. Aug.21, 2009)). "In order for the implied warranty of merchantability

to be breached, the product at issue must have been defective or not fit for the ordinary purpose for which it was intended." In re In re Toshiba Am. HD DVD Marketing and Sales Practices Litigation at *16. "The implied warranty of merchantability does not 'impose a general requirement that goods precisely fulfill the expectation of the buyer. Instead, it provides for a minimum level of quality.' " Hughes, 2011 WL 2976839, at *22 (quoting Berenblat at *3). Indeed, the warranty of merchantability " 'simply means that the thing sold is reasonably fit for the general purpose for which it is manufactured and sold.' " Ferrari v. American Honda Motor Co., Inc., 2009 WL 211702, at *3 (N.J.App.Div. Jan. 30, 2009) (quoting Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 370, 161 A.2d 69 (1960) (emphasis added)).

In this instant matter, Plaintiff does not dispute that Clenbutrx is sold for the ordinary purpose as a dietary supplement. See, e.g., Compl. ¶ 76 ("Defendant made such implied warranties knowing that the ordinary purpose for which Liquid Clenbutrx Hardcore was to be used was as a dietary supplement."). Instead, with regard to the implied warranty claim, Plaintiff alleges, at most, that the product contains ingredients other than dietary ingredients, and therefore, the product is unsafe. However, Plaintiff has proffered nothing by way of pleadings to support its assertion that a dietary supplement is not "merchantable" if it contains components other than dietary ingredients or that Clenbutrx is somehow unsafe. Similarly, Plaintiff has entirely failed to allege or explain why the inclusion of "apple geranium standardized to 1, 3 Dimethylpentylamine" renders Clenbutrx unfit for the purpose of being a dietary supplement. Thus, the Court will dismiss Plaintiff's claim for breach of the implied warranty of merchantability without prejudice.

### E. Plaintiff's Claim for Injunctive Relief

*13 Finally, Plaintiff asserts a cause of action for injunctive relief, arguing that Defendant should be enjoined from continuing its marketing and sale of Clenbutrx. Compl. ¶ 87. In response, Defendant contends that injunctive relief is not a recognized cause of action and should be dismissed. In addition, Defendant contends that even if the Court recognized this cause of action, since VPX has changed its labeling and advertisements, this cause of action is moot. Def's Rep. Br. at 15.

Initially, the Court notes that at least one court in this district has held that injunctive relief is not separate cause of action. See Smajlaj, 2011 WL 1086764, at *2 ("Plaintiffs also seek injunctive relief, which they mistakenly characterize

2012 WL 1018842, 77 UCC Rep.Serv.2d 283

as a cause of action."). Moreover, the Court finds that in this matter, Plaintiff's claim for injunctive relief appears to be expressly tied to his fraud claims; specifically, Plaintiff alleges that Defendant's actions "of marketing, advertising, promoting, distributing, and selling" Clenbturx "continue to deceive" the public. Compl. ¶ 85. Thus, Plaintiff asks this Court to enjoin Defendant from "continuing their marketing, advertisement, promotion, distribution, and sale" of Clenbutrx. Compl. ¶ 87. Because the Court has already dismissed Plaintiff's fraud claims, and in the apparent absence of any other cause of action connected to Plaintiff's claim for injunctive relief, the Court will dismiss Plaintiff's cause of action for injunctive relief without prejudice. Importantly, however, in the event Plaintiff re-pleads his fraud claims, he must request an injunction as a part of the relief, not as a separate cause of action.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is GRANTED. Specifically, with respect to Counts I (NJCFA) and II (Common Law Fraud), Plaintiff's claims regarding the misrepresentation that Clenbutrx is "certified by science" and that Clenbutrx is a "dietary supplement" are DISMISSED WITHOUT PREJUDICE. The remaining fraud allegations—i.e., statements regarding Clenbutrx as the world's fastest, hardest hitting fat incinerator and authentic synergistic blend of ingredients—are DISMISSED WITH PREJUDICE. In addition, Counts III (Unjust Enrichment) and VI (Injunctive Relief) are DISMISSED WITHOUT PREJUDICE. Moreover, with respect to Count IV (Breach of Express Warranty) and Count V (Breach of Implied Warranty) are DISMISSED WITHOUT PREJUDICE. An order will be entered consistent with this Opinion.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 1018842, 77 UCC Rep.Serv.2d 283

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 15

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 203 of 410
PageID: 12810
Hoffman v. Nutraceutical Corp., Not Reported in F.Supp.2d (2013)
2013 WL 2650611

2013 WL 2650611
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Harold M. HOFFMAN, individually and on
behalf of those similarly situated, Plaintiff,
v.
NUTRACEUTICAL CORP., Defendant.

Civil Action No. 12–5803 (ES).
|
June 10, 2013.

**Attorneys and Law Firms**

Harold M. Hoffman, Englewood, NJ, pro se.

Michael R. O'Donnell, Riker, Danzig, Scherer, Hyland, &
Perretti, PA, Morristown, NJ, for Defendant.

**OPINION**

SALAS, District Judge.

**I. INTRODUCTION**

 **\*1** Pending before this Court is Nutraceutical Corp.'s
("Defendant") Motion to Dismiss Harold M. Hoffman's
("Plaintiff") Complaint. (D.E. No. 10, Brief in Support of
Motion to Dismiss Plaintiff's Complaint ("Br.")). The motion
is unopposed. The Court has reviewed the submissions
and decides the motion without oral argument pursuant to
Fed.R.Civ.P. 78(b). For the following reasons, the Court
GRANTS the motion without prejudice.

**II. BACKGROUND**

On August 9, 2012, Plaintiff, individually and on behalf of
those similarly situated, filed a complaint against Defendant
in the Superior Court of New Jersey, Bergen County. (D.E.
No. 1, Complaint ("Compl.")). On September 14, 2012,
Defendant removed the state court case to this District (D.E.
No. 1, Notice of Removal ("Removal")). [1]

[1]    On September 21, 2012, Plaintiff filed a motion to
      remand to state court. (D.E. No. 4). The motion
      was denied by Judge Mannion via Report &
      Recommendation ("R & R") on January 24, 2013.

(D.E. No. 20). Plaintiff subsequently objected to
Judge Mannion's decision exercising jurisdiction
on January 27, 2013. (D.E. No. 21). Judge Salas
adopted Judge Mannion's R & R and overruled
Plaintiff's objection on March 8, 2013. (D.E. No.
25).

In the Complaint, Plaintiff alleges that Defendant advertised
KAL Glucosamine Chondroitin MSM (the "product") as
"pure, unadulterated and of the highest quality." (Compl.12).
Plaintiff claims that despite the express promise that "[n]o
ingredient other than those listed on the label have been added
to this product," Defendant's product was "contaminated
by 1.7 micrograms of lead per daily use." (Id. at 4).
Next, Plaintiff claims that he and other members of the
putative class relied on the express representations with
respect to purity of the product and made the purchase of
the product in reliance thereof. (Id. at 5–6). Accordingly,
Plaintiff argues that Defendant's conduct violates the
New Jersey Consumer Fraud Act, N.J.S.A. 56:8–2, and
constitutes: an unconscionable commercial practice (Count I);
deception (Count II); fraud (Count III); false pretense, false
promise and/or misrepresentation (Count IV); and knowing
concealment, suppression and/or omission of material facts
(Count V). In addition, Plaintiff raises the following claims-
common-law fraud (Count VI); unjust enrichment (Count
VII); breach of express warranty (Count VIII); and breach of
implied warranty of merchantability (Count IX). (Compl.14–
18).

In response, Defendant moves to dismiss the above counts
pursuant to Fed.R.Civ.P. 12(b)(6) because Plaintiff does not
state any claim upon which relief may be granted. (Br.2).
Specifically, Plaintiff fails to "allege that he was injured by
the Product or the alleged lead therein, nor could he as he never
claims to have even used the Product." Nor does Plaintiff
"make any allegations regarding the Product's performance or
efficacy, again having never used the Product." (Id. at 5). [2]

[2]    Defendant also seeks to disqualify Plaintiff as class
      counsel. The Court need not address the issue in
      this Fed.R.Civ.P. 12(b) (6) motion.

**III. ANALYSIS**

   **A. Legal Standard**

For a complaint to survive dismissal, it "must contain
sufficient factual matter, accepted as true, to 'state a claim
to relief that is plausible on its face.' " *Ashcroft v. Iqbal,*

Hoffman v. Nutraceutical Corp., Not Reported in F.Supp.2d (2013)

2013 WL 2650611

556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). In determining the sufficiency of a complaint, the Court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party. *See Phillips v. Cnty. of Allegheny,* 515 F.3d 224, 231 (3d Cir.2008). But, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions[;][t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678.

### B. Plaintiff's Consumer Fraud Act ("CFA") Claims (Counts I–V)

**\*2** Plaintiff claims that "[t]he product delivered by Defendant to [P]laintiff and members of the putative class misrepresented the safety, quality, constituent ingredients and purity of defendant's product. Indeed, the spoiled and contaminated product delivered by Defendant to consumers, lacked the purity and beneficial qualities promised by Defendant." (Compl.6). Defendant contends that Plaintiff's CFA claims must be dismissed because Plaintiff fails to show damages in connection thereto. (Br.15). The Court agrees.

To state a cause of action under the CFA, plaintiff must allege: "(1) an unlawful practice by the defendants; (2) an ascertainable loss by plaintiff; and (3) a causal nexus between the first two elements—defendants' allegedly unlawful behavior and the plaintiff's ascertainable loss." *Parker v. Howmedica Osteonics Corp.,* No. 07–02400, 2008 WL 141628, at \*2 (D.N.J. Jan.14, 2008) (citing *N.J. Citizen Action v. Schering–Plough Corp.,* 367 N.J.Super. 8, 842 A.2d 174, 176 (N.J.Super.Ct.App.Div.2003)).

First, plaintiff must allege an unlawful practice. An unlawful practice "typically involves an affirmative act of fraud and can arise from an affirmative act, an omission, or a violation of an administrative regulation." *Adamson v. Ortho–McNeil Pharm., Inc.,* 463 F.Supp.2d 496, 501 (D.N.J.2006). "[N]ot just 'any erroneous statement' will constitute a misrepresentation prohibited" under the CFA. *Gennari v. Weichert Co. Realtors,* 148 N.J. 582, 607, 691 A.2d 350 (1997). "The misrepresentation has to be one which is material to the transaction and which is a statement of fact, found to be false, made to induce the buyer to make the purchase." *Id.*

Next, plaintiff must allege an ascertainable loss. Although the CFA does not define "ascertainable loss," courts have interpreted it as a "cognizable and calculable claim of loss due to the alleged CFA violation." *Solo v. Bed, Bath & Beyond, Inc.,* No. 06–1908, 2007 WL 1237825, at \*3 (D.N.J. Apr., 26, 2007) (citing *Thiedmann v. Mercedes–Benz USA, LLC,* 183 N.J. 234, 249, 872 A.2d 783 (2005)); *Hoffman v. Hampshire Labs, Inc.,* 405 405 N.J.Super. 105, 963 A.2d 849, 854 (N.J.Super.Ct.App.Div.2009). To properly plead an ascertainable loss, plaintiff must allege facts showing "either an out-of-pocket loss or a demonstration of loss in value." *Dist. 1199P Health and Welfare Plan v. Janssen, L.P.,* 784 F.Supp.2d 508, 530 (D.N.J.2011) (citing *Thiedmann,* 183 N.J. at 248, 872 A.2d 783). This requirement to show a demonstration of a loss in value includes a benefit-of-the-bargain theory that "requires nothing more than that the consumer was misled into buying a product that was ultimately worth less to the consumer than the product he was promised. *Smajlaj v. Campbell Soup Co.,* 782 F.Supp.2d 84, 99 (D.N.J.2011); *Henderson v. Hertz Corp.,* No. 6937–03, 2005 WL 4127090, at \*7–8 (N.J.Super.Ct.App.Div.2005).

Finally, plaintiff must show a causal nexus between the misrepresentation or concealment of the material fact by defendant and the loss suffered by any person. *Dewey v. Volkswagen AG,* 558 F.Supp.2d 505, 526 (D.N.J.2008). Here, Plaintiff failed to make the necessary three-part showing under the CFA. Specifically, Plaintiff failed to show that Defendant's alleged CFA violation caused Plaintiff's "ascertainable loss." Plaintiff merely alleged that some of Defendant's product contained 1.7 micrograms of lead in it. Even under a benefit-of-the-bargain theory of damages, Plaintiff failed to show that the alleged lead in Defendant's product caused the product to be worth less than was promised. Plaintiff failed to show that the product he used actually contained lead. Moreover, Plaintiff failed to establish that the presence of 1.7 micrograms of lead in the product constituted a misrepresentation that is contrary to the product being "pure, unadulterated and of the highest quality." [3] Because Plaintiff failed to make the requisite showing under the CFA, Plaintiff's CFA claims are dismissed.

[3]    On the contrary, Defendant notes that the recommended daily intake of lead is 75 micrograms, or 44 times the amount found in the product at issue. (Br.5).

### C. Plaintiff's Common Law Fraud Claim (Count VI)

2013 WL 2650611

**\*3** Plaintiff avers that "Defendant, in the advertisement, marketing and sale of the [product], deliberately and knowingly engaged in concealment, suppression and/or omission of material facts with the intent that others, including members of the plaintiff-class, rely upon same, and, upon information and belief, members of the class did justifiably rely upon same to their detriment." (Compl.14). Such conduct, according to Plaintiff, constitutes common-law fraud. (*Id.* at 15). Defendant disagrees and argues that Plaintiff's common-law fraud claim must be dismissed because Plaintiff "failed to sufficiently plead damages resulting from the alleged trace amount of lead in the [p]roduct." (Br.19).

To properly plead common-law fraud in New Jersey, plaintiff must show: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Gennari v. Weichert Co. Realtors,* 148 N.J. 582, 610, 691 A.2d 350 (1997) (citing *Jewish Ctr. of Sussex Cnty. v. Whale,* 86 N.J. 619, 624–25, 432 A.2d 521 (1981)).

Here, Plaintiff failed to identify the resulting damages, a requisite showing to properly plead common law fraud. Significantly, Plaintiff does not even allege that the product that he personally purchased, and used, contained lead. Consequently, the Court dismisses Plaintiff's claim of common-law fraud.

### D. Plaintiff's Breach of Unjust Enrichment Claim (Count VII)

Plaintiff states that "as a result of [Defendant's] false and deceptive conduct ... [Defendant] became indebted to class members for the sums paid by class members ... for purchase of a misrepresented product." (Compl.16). And retention of said sums "without reimbursement, would result in the unlawful, unjust and inequitable enrichment." (*Id.*). Defendant disagrees and argues that because Plaintiff "failed to plead that the [p]roduct failed to function as advertised or that he was injured by the [p]roduct ... there was nothing unjust about [Defendant's] accepting and retaining money in exchange for delivering the [p]roduct to [Plaintiff]." (Br.20).

The doctrine of unjust enrichment "rests on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another." *Assocs. Comm. Corp. v. Wallia,* 211 N.J.Super. 231,

511 A.2d 709, 716 (N.J.Super.Ct.App.Div.1986) (citing *Callano v. Oakwood Park Homes Corp.,* 219 A.2d 232, 234 (N.J.Super.Ct.App.Div.1966)). To establish "unjust enrichment, a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust." *VRG Corp. v. GKN Realty Corp.,* 135 N.J. 539, 554, 641 A.2d 519 (1994).

Here, Plaintiff's allegations fail to support the claim of unjust enrichment. Even accepting all allegations as true, there is nothing in the record to suggest that Defendant's retention of Plaintiff's money is unjust. Plaintiff received the benefit of the product that he paid for and Defendant received the benefit of payment for said product. As such, the doctrine of unjust enrichment is inapposite here. Accordingly, the Court dismisses Plaintiff's claim of unjust enrichment.

### E. Plaintiff's Breach of Express Warranty and Implied Warranty of Merchantability Claims (Counts VIII & IX)

**\*4** Plaintiff raises claims of breach of express and implied warranties. Specifically, Plaintiff alleges that he entered into a contract with Defendant for the purchase of the product, and in the contract, Defendant made express promises as to the purity of the product. (Compl.17). Additionally, Plaintiff claims that the implied warranty of merchantability was breached because the product "was not fit for the ordinary purpose for which it was intended to be used." (*Id.* at 19, 641 A.2d 519). Defendant disagrees and argues that the warranty claims must be dismissed because "Plaintiff alleges no specific lead level in his product, and no actual injury from using the [p]roduct." (Br.21).

Under New Jersey law, an express warranty is "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain." N.J. STAT. ANN. § 12A:2–313(1)(a). "The plaintiff in a warranty action need not establish the existence of a defect; the failure of the goods to perform as warranted is sufficient." *Spring Motors Distribs., Inc. v. Ford Motor Co.,* 98 N.J. 555, 586, 489 A.2d 660 (1985). Proof of causation is also required, but "mere failure of promised performance is enough without proof of any defect." *Realmuto v. Straub Motors, Inc.,* 65 N.J. 336, 343, 322 A.2d 440 (1974). To recover damages for breach of express warranty, plaintiffs must establish that such damages were reasonably foreseeable at the time that the contract was entered into. *Spring Motors Distribs., Inc.,* 98 N.J. at 579–80, 489 A.2d 660

2013 WL 2650611

(describing that damages for misrepresenting products comes from "society's interest in the performance of promises").

An implied warranty "simply means that the thing sold is reasonably fit for the general purpose for which it is manufactured and sold." *Henningsen v. Bloomfield Motors, Inc.,* 32 N.J. 358, 370, 161 A.2d 69 (1960). To establish a breach of implied warranty, plaintiff must show "that the product was not reasonably fit for the ordinary purposes for which it was sold and such defect proximately caused injury to the ultimate consumer." *Hollinger v. Shoppers Paradise of New Jersey, Inc.,* 134 N.J.Super. 328, 340 A.2d 687, 692 (N.J.Super. Ct. Law Div.1975).

Here, Plaintiff fails to make the necessary showing of damages required for both a breach of express warranty claim and an implied warranty of merchantability claim. Plaintiff merely asserts that some of Defendant's product contained 1.7 micrograms of lead. As such, Plaintiff fails to establish what damages resulted from the product containing said lead. Consequently, Plaintiff's claims of breach of express and implied warranty are dismissed.

### IV. CONCLUSION

For these reasons, the Court GRANTS Defendant's Motion to Dismiss without prejudice. An appropriate Order follows this Opinion.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 2650611

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 16

KeyCite Yellow Flag - Negative Treatment

Disagreed With by Debernardis v. IQ Formulations, LLC, 11th Cir.(Fla.), November 14, 2019

2017 WL 3971912
Only the Westlaw citation is currently available.
United States District Court, W.D. Pennsylvania.

Daniel HUBERT, individually and on behalf
of all others similarly situated, Plaintiff,

v.

GENERAL NUTRITION
CORPORATION, Defendant.

2:15-cv-01391
|
Signed 09/08/2017

**Attorneys and Law Firms**

D. Aaron Rihn, Robert Peirce & Associates, P.C., Pittsburgh, PA, Gregory F. Coleman, Lisa A. White, Mark E. Silvey, Greg Coleman Law PC, Knoxville, TN, Arthur Stock, Shanon J. Carson, Berger & Montague, P.C., Philadelphia, PA, Jennifer S. Goldstein, Whitfield Bryson & Mason, Washington, DC, for Plaintiff.

Amy B. Alderfer, Brett Nicole Taylor, Cozen O'Connor, Los Angeles, CA, Paul K. Leary, Jr., Mark E. Utke, Cozen O'Connor, Philadelphia, PA, for Defendant.

## OPINION

Mark R. Hornak, United States District Judge

**\*1** Presently before the Court is a motion by Defendant General Nutrition Corporation ("GNC" or "Defendant") to dismiss the First Amended Consolidated Class Action Complaint (the "Amended Complaint") filed by Plaintiff Daniel Hubert, individually and on behalf of similarly situated individuals (ECF No. 39) pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) (the "Motion to Dismiss") (ECF No. 48). In this prospective class action litigation, Plaintiff Hubert alleges that he and other consumers ("Plaintiffs") purchased supplements sold by GNC with false and misleading labeling in violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, et seq., and the consumer fraud protection laws of numerous states. [1] Plaintiffs further assert that GNC breached implied warranties, engaged in negligent misrepresentation and unjustly enriched itself to the detriment of consumers. Defendant has moved to dismiss the Amended Complaint for lack of subject matter jurisdiction and for failure to state a claim. For the reasons set forth below, Defendant's Motion to Dismiss for lack of subject matter jurisdiction will be granted, and the Amended Complaint will be dismissed, without prejudice. [2] Because the Court finds that Plaintiffs lack standing to bring this case, it need not address Defendant's other theories.

## I. BACKGROUND

GNC, which is headquartered in Pittsburgh, Pennsylvania, is the largest global specialty retailer of nutritional supplements. Am. Compl. ¶¶ 25, 36. Plaintiffs allege that GNC marketed and sold supplements manufactured by third party vendors, which allegedly contained picamilon, BMPEA or acacia rigidula, despite having known that these substances are not dietary ingredients. [3] Id. ¶¶ 3, 4, 38. The supplements at issue here are primarily weight-loss and sports nutrition supplements available as powders and liquids. Id. ¶ 27.

**\*2** Plaintiffs aver that federal and state law place primary responsibility for the safety of dietary supplements, [4] as well as truthful labeling and advertising, on supplement manufacturers and distributors such as GNC. Am. Compl. ¶ 28. According to Plaintiffs, GNC sold products with false and misleading labeling, and it failed to disclose material facts about the dangers of ingesting picamilon, BMPEA and acacia rigidula. Id. ¶ 5. Plaintiffs claim that they were "hoodwinked" into purchasing supplements containing these substances and would not have done so if GNC had disclosed that they contained mislabeled ingredients which purportedly pose serious health risks and are not marketable as dietary supplements. Id. ¶¶ 6, 24.

Regarding picamilon, Plaintiffs allege that Jennifer Jakel ("Jakel"), who was GNC's Senior Project Manager for Technical Research, reviewed documents translated from Russian indicating that it is a "derivative of gamma-amino-butyric acid and nicotinic acid." Am. Compl. ¶ 43. In 2007, Jakel made a notation stating "[n]o NDI that I could find," suggesting that a NDI submission was not tendered to the Food and Drug Administration ("FDA") for picamilon. Id. ¶¶ 31, 44. Again in April 2014, Jakel wrote "still no NDI found." Id. ¶ 44.

Subsequently, on September 28, 2015, Dr. Cara Welch of the FDA issued a declaration stating that "picamilon

does not qualify as a dietary ingredient" under the Food, Drug and Cosmetic Act (the "FDC Act"). Am. Compl. ¶ 40. Plaintiffs allege that GNC continued to sell dietary supplements containing picamilon until September 21, 2015, despite having known since 2007 that it was not a dietary ingredient. Id. ¶¶ 44, 46.

Plaintiffs additionally claim that GNC has been aware since the fall of 2013 that some dietary supplements labeled as containing acacia rigidula actually contained BMPEA. Am. Compl. ¶¶ 52. Ms. Jakel supposedly was notified in November 2013 of a study by FDA researchers which revealed that many dietary supplements purportedly containing acacia rigidula actually contained BMPEA, despite no testing to show that BMPEA was safe for humans (hereinafter, "the FDA Study"). Id. ¶¶ 49, 52. Subsequently, Jakel allegedly emailed a *USA Today* article about the FDA Study to approximately 100 recipients at GNC. Id. ¶ 52.

Plaintiffs allege that despite knowing of the FDA Study, GNC continued to sell supplements containing acacia rigidula, without testing them to determine whether they were adulterated with BMPEA. Am. Compl. ¶¶ 55. However, in April 2015, when the FDA formally announced that BMPEA did not meet the definition of a dietary ingredient, GNC stopped selling products containing BMPEA. Id. ¶ 60.

Concerning acacia rigidula, Plaintiffs allege that the FDA warned six manufacturers in March 2016, that it is a new dietary ingredient which lacks evidence of safe use and therefore could not be lawfully sold in the United States. Am. Compl. ¶ 67. Plaintiffs allege that GNC did not provide the FDA with the required pre-market notification showing a history of acacia rigidula's safe use, yet it was openly found on labels of supplements offered for sale at GNC. Id. ¶¶ 70, 72.

*3 Plaintiffs aver that despite GNC's alleged knowledge regarding picamilon, BMPEA and acacia rigidula, GNC sold products containing those substances which were supplied by third-party vendors. Am. Compl. ¶ 78. Plaintiffs claim that GNC exercised significant control over the third-party products it sold by reviewing and pre-approving labels, warnings, packaging and advertising. Id. ¶¶ 73, 74. In addition, third-party vendors could not alter approved formulas, labels or advertising without GNC's permission. Id. ¶ 74. By controlling the product labels of third party vendors, Plaintiffs allege that GNC misrepresented that supplements containing picamilon, BMPEA and acacia rigidula were safe for consumers and legal to sell. Id. ¶ 79. According to

Plaintiffs, it is irrelevant that GNC received guarantees from third-party vendors that products containing those substances complied with legal requirements because GNC knew or should have known that they were not safe and could not be lawfully sold. Id. ¶¶ 75, 76.

In sum, Plaintiffs allege that picamilon, BMPEA and acacia rigidula were listed on the labels of a variety of supplements available for sale at GNC, including products that they purchased. Am. Compl. ¶¶ 47, 65, 72. Plaintiffs claim that through this labeling, GNC misrepresented that those substances were safe and could be legally sold in the United States. Id. As a result, Plaintiffs assert that they purchased supplements they otherwise would not have purchased, paid more for supplements than they otherwise would have paid and have been subjected to unreasonable safety risks. Id. ¶¶ 6, 24, 81.

## II. STANDARD OF REVIEW

Under Fed.R.Civ.P. 12(b)(1), "a court must grant a motion to dismiss if it lacks subject-matter jurisdiction to hear a claim."

In re Schering Plough Corp. Intron/Temodar Consumer Class Action, 678 F.3d 235, 243 (3d Cir. 2012). "A motion to dismiss for want of standing is ... properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter." Ballentine v. United States, 486 F.3d 806, 810 (3d Cir. 2007).

In evaluating a challenge to subject matter jurisdiction under Rule 12(b)(1), a court first must determine whether the movant presents a facial or a factual attack. See Davis v. Wells Fargo, 824 F.3d 333, 346 (3d Cir. 2016). The distinction is important because it determines how the complaint must be reviewed. See Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977). A facial attack "challenges subject matter jurisdiction without disputing the facts alleged in the complaint, and it requires the court to 'consider the allegations of the complaint as true.' " Davis, 824 F.3d at 346 (citation omitted). A factual challenge "attacks the factual allegations underlying the complaint's assertion of jurisdiction, either through the filing of an answer or 'otherwise present[ing] competing facts.' " Id. (citation omitted). Here, GNC makes a facial challenge because it has not disputed the validity of Plaintiffs' factual claims in its Motion to Dismiss. In essence, GNC contends that the allegations of the Amended Complaint, even accepted as true, are insufficient to establish Plaintiffs' Article III standing.

Hubert v. General Nutrition Corporation, Not Reported in Fed. Supp. (2017)

2017 WL 3971912

In considering a facial challenge to standing, courts are to apply the same standard as on review of a Rule 12(b)(6) motion for failure to state a claim. See Petruska v. Gannon Univ., 462 F.3d 294, 299 n.1 (3d Cir. 2006) (explaining "that the standard is the same when considering a facial attack under Rule 12(b)(1) or a motion to dismiss for failure to state a claim under Rule 12(b)(6)") (citation omitted). Consequently, the court is to "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff [has standing]." Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (citation omitted). Nonetheless, "[t]hreadbare recitals of the elements of [standing], supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Thus, "[t]o survive a motion to dismiss [for lack of standing], a complaint must contain sufficient factual matter" that would establish standing if accepted as true. Id. (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

## III. DISCUSSION

**\*4** GNC argues that the Amended Complaint must be dismissed for lack of standing because Plaintiffs have not sufficiently pled the essential element of injury-in-fact. According to GNC, Plaintiffs simply allege that they purchased the supplements, but do not allege that they actually consumed them or suffered any adverse health consequences from them. GNC points out that any apprehension Plaintiffs may have about possible future injury is insufficient to establish injury-in-fact.

Plaintiffs respond that they have suffered an economic injury, which suffices to establish injury-in-fact for standing purposes. Plaintiffs contend that they incurred economic injury because they purchased products with false, misleading and inaccurate labeling, which omitted information material to their purchases.

GNC counters that the gravamen of the Amended Complaint involves picamilon, BMPEA and acacia rigidula purportedly endangering the health of consumers. GNC contends that despite the emphasis on the alleged health dangers posed by those substances, Plaintiffs attempt to shift the focus to economic injury in order to establish an injury-in-fact for standing purposes. Even so, GNC urges that Plaintiffs have not sufficiently pled the element of injury-in-fact because they do not allege they purchased the supplements after the FDA issued warning letters.

For reasons explained below, the Court agrees that an economic injury can qualify as an injury-in-fact for standing purposes, but concludes that Plaintiffs have not adequately alleged that they suffered an injury-in-fact in this case. Therefore, the Amended Complaint must be dismissed for lack of standing.

### A. Article III Standing

Article III of the Constitution limits the scope of federal judicial power to the adjudication of "cases" or "controversies." U.S. Const., art. III, § 2. "The courts have developed several justiciability doctrines to enforce the case-or-controversy requirement, and perhaps the most important of these doctrines is the requirement that a litigant have standing to invoke the power of a federal court." In re Schering Plough, 678 F.3d at 244 (internal quotations and citation omitted). "[T]he standing question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." Warth v. Seldin, 422 U.S. 490, 498-99 (1975) (quoting Baker v. Carr, 369 U.S. 186, 204 (1962)).

It is well established that the "irreducible constitutional minimum" of standing consists of three elements. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 136 S.Ct. 1540, 1547 (2016) (citing Lujan, 504 U.S. at 560-61). The plaintiff, as the party invoking federal jurisdiction, bears the burden to establish standing. Lujan, 504 U.S. at 561. At the pleading stage, the plaintiff must "clearly ... allege facts demonstrating" each element. Spokeo, 136 S.Ct. at 1547 (quoting Warth, 422 U.S. at 518).

Although there are three required elements of constitutional standing, the Third Circuit has emphasized that "the injury-in-fact element is often determinative." Toll Bros., Inc. v. Twp. of Readington, 555 F.3d 131, 138 (3d Cir. 2009); see

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 211 of 410
PageID: 12818
Hubert v. General Nutrition Corporation, Not Reported in Fed. Supp. (2017)

2017 WL 3971912

also Spokeo, 136 S.Ct. at 1547 (observing that injury-in-fact is the "[f]irst and foremost" of standing's three elements) (citation omitted). To establish injury-in-fact, a plaintiff must show that he suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560. Although "[i]njury-in-fact is not Mount Everest," Danvers Motor Co., Inc. v. Ford Motor Co., 432 F.3d 286, 294 (3d Cir. 2005), the complaint still must "clearly and specifically set forth facts sufficient to satisfy" Article III standing requirements. Whitmore v. Arkansas, 495 U.S. 149, 155 (1990).

*5 The Third Circuit has explained that "[w]hile it is difficult to reduce injury-in-fact to a simple formula, economic injury is one of its paradigmatic forms." Danvers Motor, 432 F.3d at 291. Indeed, "[m]onetary harm is a classic form of injury-in-fact." Id. at 293 (citation omitted). However, allegations of "possible future injury" are insufficient to satisfy the requirements of Article III. Whitmore, 495 U.S. at 158; Reilly v. Ceridian Corp., 664 F.3d 38, 42 (3d Cir. 2011).

**B. Plaintiffs Have Not Established That They Suffered an Injury-in-Fact, Thus They Lack Standing.**

Plaintiffs are correct that economic injury can suffice to establish injury-in-fact for standing purposes. However, the question here is whether Plaintiffs have suffered an economic injury. The Court concludes that the Amended Complaint does not adequately plead facts that establish they have; consequently, Plaintiffs have not established that they suffered an injury-in-fact.

**1. Analysis of Injury-In-Fact**

The Court's standing analysis is informed by precedent from courts within this Circuit that have evaluated whether the plaintiff suffered an injury-in-fact in cases where, as here, it was alleged the product at issue contained a dangerous substance that was unknown to the consumer or the product label contained alleged misrepresentations.[5]

First, in Koronthaly v. L'Oreal USA, Inc., 374 Fed.Appx. 257 (3d Cir. 2010), our Court of Appeals affirmed a district

court's dismissal for lack of standing in a case where the plaintiff purchased lipstick that contained lead, which was not disclosed on the packaging or the product, and the plaintiff claimed she would not have purchased the lipstick had she known about the lead. In finding no standing, the Third Circuit deemed it significant that the plaintiff conceded she suffered no adverse health consequences from using the lipstick, and her subjective allegation that trace amounts of lead in the lipstick were unacceptable to her was not an injury-in-fact. Id. at 259. Further, to the extent the plaintiff claimed that the injury-in-fact was the loss of the "benefit of the bargain," the Third Circuit explained that she mistakenly relied on contract law. Id. Because the plaintiff's lipstick purchases were not made pursuant to a contract, she could not have been denied the benefit of any bargain. Id. The Third Circuit concluded that "[a]bsent any allegation that [the plaintiff] received a product that failed to work for its intended purpose or was worth objectively less than what one could reasonably expect, [she] has not demonstrated a concrete injury-in-fact." Id.

In Young v. Johnson & Johnson, Civil Action No. 11-4580, 2012 WL 1372286 (D.N.J. Apr. 19, 2012), the district court determined that the plaintiff lacked standing in a case involving the alleged misrepresentation of the nutritional content and health benefits of Benecol, a butter/margarine substitute. The court found that the plaintiff did not sufficiently plead an injury-in-fact because he merely alleged that he purchased Benecol fairly regularly during a five-year period, but he did not allege that he actually consumed it or that he suffered any adverse health effects from it. Id. at *3. In addition, the court found unavailing the plaintiff's contention that he satisfied the injury-in-fact requirement based on allegations that he was deprived of the "benefit of the bargain," received an inferior product and paid a premium price because he believed Benecol was healthy, when in fact it was not. Id. at *4. In finding no economic injury, the court explained that the plaintiff's purchases of Benecol were not made pursuant to a contract and he did not allege how he paid a premium for it or received a product that did not deliver the advertised benefits. Id. (citing Koronthaly, 374 Fed.Appx. 259).

*6 In both James v. Johnson & Johnson Consumer Cos., Inc., Civil No. 10-cv-03049, 2011 WL 198026 (D.N.J. Jan. 20, 2011) and Medley v. Johnson & Johnson Consumer Cos., Inc., Civil No. 10-cv-02291, 2011 WL 159674 (D.N.J. Jan. 18, 2011), the district court accepted the plaintiffs'

contention that economic injury suffices to confer standing, but found that they could not clear the threshold requirement for showing an economic injury. The cases involved ten plaintiffs who alleged Johnson & Johnson violated the FDA's ban on methyl chloride in cosmetic products because its baby shampoo contained that substance. The economic injury for which the plaintiffs sought redress was the price they paid for the shampoo, which the court noted they apparently used in bathing their children without adverse health reactions. Id. at *2. The court accepted as true the plaintiffs' allegation that had they known the true nature of the baby shampoo, they would not have purchased it or allowed their children to be exposed to it, but determined that economic damages did not follow as a consequence. Id. The court concluded that once the shampoo had been used, there was no economic injury for the plaintiffs to complain of and the fear of future injury is insufficient to confer standing. Id. The court observed that the plaintiffs received the benefit of their bargain so long as there were no adverse health effects and the shampoo worked as intended, meaning that is cleansed the children's hair without producing irritation, and nothing in the complaint suggested otherwise. Id. As such, the court found that the plaintiffs did not demonstrate that they suffered an injury-in-fact.

Likewise, in Estrada v. Johnson & Johnson, Civil Action No. 16-7492, 2017 WL 2999026 (D.N.J. July 14, 2017), the court found that the plaintiff did not suffer an injury-in-fact and therefore lacked standing. In that case, the plaintiff asserted California state law consumer-fraud claims against Johnson & Johnson, claiming that it had been aware since at least 1982 of studies associating talcum powder with an elevated risk of ovarian cancer for women, yet failed to disclose that risk to consumers and continued to market baby powder as safe despite knowledge of the risk. As a result of Johnson & Johnson's misrepresentations and omissions, the plaintiff claimed to have suffered an economic injury based on three theories: (1) benefit of the bargain; (2) alternative product; and (3) premium price. Id. at * 6.

First, the plaintiff claimed that she did not receive the benefit of her bargain because she purchased baby powder under the belief that it was safe, but she would not have done so had she known that using baby powder in the genital area could lead to an increased risk of developing ovarian cancer. Estrada, 2017 WL 2999026, at *6. The court ultimately found that the plaintiff did not suffer an economic injury-in-fact based on a benefit of the bargain theory. Id. at *13. The court noted that the plaintiff's claim was similar to those

alleged by the consumers in Koronthaly, James and Medley: she alleged that she used baby powder; it was effective for its intended uses of eliminating friction and absorbing excess moisture; she was not physically injured; Johnson & Johnson failed to list enough warnings about an alleged increased risk of ovarian cancer associated with baby powder use; and she would like her money back. Id. at *9. However, the court found that absent a plausible allegation of adverse health consequences from using baby powder or that it failed to perform satisfactorily for its intended use, the plaintiff could not claim that she was denied the benefit of her bargain. [6] Id. (citing Koronthaly, 374 Fed.Appx. at 259; James, 2011 WL 198026, at *2). The court held that the plaintiff's benefit of the bargain theory, based on Johnson & Johnson's alleged omissions, was an insufficient basis to find that she suffered an injury-in-fact. Id. at *9, 13. If the plaintiff wanted to file an amended complaint to reassert a benefit of the bargain theory, the court required that she point to an affirmative legal duty on Johnson & Johnson's part to disclose the facts that allegedly were omitted. Id. at *9.

*7 Next, the Estrada court found that the plaintiff did not establish that she suffered an injury-in-fact under an alternative product theory of economic harm. Estrada, 2017 WL 2999026, at * 14. The court recognized that injury-in-fact exists where a consumer alleges that, absent the defendant's omissions or misrepresentations, she would have purchased a cheaper alternative product. Id. at *13 (citations omitted). Although the plaintiff alleged she would have purchased an alternative cornstarch-based powder had she known of the increased cancer risk purportedly associated with baby powder, she did not allege that an alternative product would have been cheaper than baby powder. Id. at *14.

Finally, the Estrada court found that the plaintiff's premium price theory of economic harm did not sufficiently establish that she suffered an injury-in-fact. Estrada, 2017 WL 2999026, at *15. In premium price cases, a plaintiff alleges that the defendant's omissions or misrepresentations caused her to overpay for a product. Id. (citations omitted). Under that theory, the plaintiff claimed that as a result of Johnson & Johnson's omissions and misrepresentations, it was able to sell baby powder for more than it otherwise would have if consumers had been properly informed about the safety risks. The court determined that the plaintiff's "threadbare"

2017 WL 3971912

allegation that she purchased baby powder at a premium, without any supporting factual allegations, was insufficient to establish an injury-in-fact. Id. It was significant in the court's analysis that the plaintiff did not allege that Johnson & Johnson advertised baby powder as superior to other products, nor did she identify any comparable, cheaper products to show that baby powder was sold at a premium price. Id.

**2. The Amended Complaint Fails to Adequately Plead That Plaintiffs Suffered an Economic Injury-In-Fact.**

In view of the foregoing authority, Plaintiffs here do not sufficiently allege that they suffered an economic injury to satisfy the injury-in-fact element of standing. At the outset, Plaintiffs allege that GNC sold supplements with false and misleading labeling and otherwise failed to disclose material facts about the dangers of ingesting picamilon, BMPEA and acacia rigidula. Am. Compl. ¶ 5. Plaintiffs then allege that they were hoodwinked into purchasing the supplements and would not have done so if GNC had disclosed that they contained mislabeled ingredients which supposedly pose serious health risks or were unlawful. Id. ¶¶ 6, 24. As a result of GNC's practices, Plaintiffs claim that they purchased supplements they otherwise would not have purchased, paid more for supplements than they otherwise would have paid[7] and have been subjected to unreasonable safety risks. Id. ¶ 81. Based on these allegations, Plaintiffs apparently attempt to assert two theories of economic injury: (1) they did not receive the benefit of their bargain; and (2) they paid a premium price for the supplements.[8]

**\*8** First, Plaintiffs' premium price allegations do not sufficiently establish that they suffered an economic injury. Although Plaintiffs broadly aver that GNC's alleged omissions and misrepresentations caused them to pay more for supplements than they otherwise would have paid, that "threadbare" allegation, without any supporting factual allegations, is insufficient to establish an injury-in-fact. See Estrada, 2017 WL 2999026, at \*15 ("threadbare" allegation that the plaintiff purchased a product at a premium, without factual support, was insufficient to establish injury-in-fact); Young, 2012 WL 1372286, at \*4 (finding no injury-in-fact where, inter alia, the plaintiff did not set forth allegations as to how he paid a premium price for the product). As in Estrada, the Court finds it significant that Plaintiffs do not allege GNC advertised the supplements they purchased as superior to other products, nor do Plaintiffs identify any

comparable, cheaper products to show that the supplements they purchased from GNC were sold at a premium price. See Estrada, 2017 WL 2999026, at \*15.

Next, Plaintiffs' allegation that they did not receive the benefit of their bargain when they purchased the supplements does not suffice to establish that they suffered an economic injury-in-fact. As stated, Plaintiffs allege that they paid money for the supplements that, absent GNC's alleged omissions and misrepresentations, they otherwise would not have paid. See Am. Compl. ¶¶ 6, 24, 81; see supra n. 7. Although Plaintiffs do not allege that they consumed the supplements,[9] they certainly do not claim they suffered any adverse health consequences from them. Furthermore, Plaintiffs do not allege that the supplements at issue, which are "primarily weight-loss and sports-nutrition supplements," see Am. Compl. ¶ 27, failed to work for their intended purpose or did not deliver the advertised benefits.

The Amended Complaint presents some of the same concerns as in Koronthaly, Young, James, Medley and Estrada, which ultimately led the courts to find that the plaintiffs in those cases did not suffer an injury-in-fact. As observed in Koronthaly and Young, Plaintiffs' purchases of the supplements were not made pursuant to a contract, thus they could not have been denied the benefit of any bargain. Beyond that, as in Koronthaly, Young, James, Medley and Estrada, Plaintiffs have not alleged that the supplements failed to work for their intended purpose of weight loss and/or sports nutrition, and there is no allegation that Plaintiffs' health was adversely affected.

While we accept as true Plaintiffs' allegation that they would not have purchased the supplements had they known the supplements purportedly contained dangerous ingredients, economic damages do not necessarily follow as a consequence. To the extent Plaintiffs consumed the supplements, see supra, n. 9, once they were used, there would be no economic injury for Plaintiffs to complain of and apprehension concerning future health consequences is insufficient to establish an injury-in-fact. See James, 2011 WL 198026, at \*2; Medley, 2011 WL 159674, at \*2. As in James and Medley, Plaintiffs would have received the benefit of their bargain so long as the supplements worked as intended, meaning they provided weight-loss and sports nutrition benefits, and they produced no adverse health effects. See id. Nothing in the Amended Complaint suggests this was not the case.

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 214 of 410
PageID: 12821

Hubert v. General Nutrition Corporation, Not Reported in Fed. Supp. (2017)

2017 WL 3971912

Plaintiffs appear to base their benefit of the bargain theory upon GNC's alleged omissions and misrepresentations, claiming that GNC sold products with false and misleading labeling, and it otherwise failed to disclose material facts about the dangers of ingesting picamilon, BMPEA and acacia rigidula. See Am. Compl. ¶ 5. However, Plaintiffs do not allege what material facts GNC failed to disclose about the dangers of ingesting those substances or whether GNC had a duty to do so. Thus, the Court cannot conclude that Plaintiffs did not receive the benefit of their bargain based on alleged omissions by GNC. See Estrada, 2017 WL 2999026, at *6 (the plaintiff could not assert a benefit of the bargain theory of economic harm based on an omission where she failed to allege that the defendant was under a duty to disclose the omitted fact).

 *9  In addition, the Court finds that Plaintiffs were not deprived of the benefit of their bargain based on alleged misrepresentations by GNC. As observed in Estrada, courts have found that a plaintiff did not receive the benefit of the bargain in cases where sufficient facts were pled for the court to conclude that the plaintiff was induced into purchasing the product at issue by a *specific* misrepresentation made by the defendant. See Estrada, 2017 WL 2999026, at *9–*11 (citations omitted). Unlike those cases, the plaintiff in Estrada did not sufficiently allege that she was induced into purchasing baby powder based on specific misrepresentations made by Johnson & Johnson on its website or on the product's label or advertisements. Id. at *11. Rather, the plaintiff simply alleged that she read the label prior to purchasing baby powder and in reliance on the label, she believed that baby powder was safe. Id. at *12.

Likewise, here, Plaintiffs fail to allege that they were underlined induced into purchasing the supplements based on *specific* misrepresentations made by GNC. Plaintiffs allege that picamilon, BMPEA and acacia rigidula were "openly found" on the labels of various supplements available for sale at GNC; thus, through labeling, GNC misrepresented that the products were safe. See Am. Compl. ¶¶ 47, 65, 72, 79. Although Plaintiffs do not specifically allege it, they suggest that they read the labels on the supplements and believed they were safe. As in Estrada, that is insufficient, particularly in view of the fact that Plaintiffs do not otherwise allege they were induced into purchasing the supplements by any specific statements on the labels.

In sum, the Court is well-aware that "[i]njury in fact is not Mount Everest," Danvers Motor, 432 F.3d at 294, but, for the reasons explained herein, we conclude that Plaintiffs have not sufficiently alleged that they suffered an economic injury to satisfy the injury-in-fact element. Therefore, Plaintiffs have failed to establish that they have standing to bring the present action. Because Plaintiffs do not have standing, the Amended Complaint will be dismissed for lack of subject matter jurisdiction. Absent subject matter jurisdiction, the Court is without authority to rule on the remaining merit-based arguments. [10] ACLU-NJ v. Township of Wall, 246 F.3d 258, 261 (3d Cir. 2001) ("If plaintiffs do not possess Article III standing, ... the District Court ... lack[s] subject matter jurisdiction to address the merits of plaintiffs' case.").

## IV. CONCLUSION

Rule 15(a)(2) provides that leave to amend should be freely given "when justice so requires." Fed.R.Civ.P. 15(a)(2). Therefore, to the extent that Plaintiffs wish to file a second amended complaint to cure the deficiencies discussed herein, they will be granted leave do so within 30 days from the date of this decision.

 *10  Accordingly, the Motion to Dismiss filed by GNC as to Plaintiffs' lack of standing will be granted, and the Amended Complaint will be dismissed without prejudice at this time.

An appropriate order will be entered.

## All Citations

Not Reported in Fed. Supp., 2017 WL 3971912

**Footnotes**

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 215 of 410
PageID: 12822

Hubert v. General Nutrition Corporation, Not Reported in Fed. Supp. (2017)

2017 WL 3971912

1    Plaintiffs allege that GNC violated the following state laws: Arkansas's Deceptive Trade Practice Act, Ark. Code Ann. § 4-88-101, *et seq.*; California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*; California's Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*; California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.*; Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.*; Iowa's Private Right of Action for Consumer Frauds Act, Iowa Code Ch. 714H; Michigan's Consumer Protection Act, Mich. Comp. Laws Ann. § 445.901, *et seq.*; Minnesota's Unlawful Trade Practices Act, Minn. Stat. Ann. § 325D.09, *et seq.*; Minnesota's Uniform Deceptive Trade Practices Act, Minn. Stat. Ann. § 325D.43, *et seq.*; Minnesota's Consumer Fraud Act, Minn. Stat. Ann. § 325F.68, *et seq.*; Minnesota's False Statement in Advertising Act, Minn. Stat. Ann. § 325F.67; Minnesota's Private Attorney General Statute, Minn. Stat. Ann. § 8.31, *et seq.*; New York's General Business Law, N.Y. Gen. Bus. Law § 349; New Hampshire's Consumer Protection Act, N.H. Rev. Stat. Ann. § 358-A, *et seq.*; Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, *et seq.*; and Texas' Deceptive Trade Practices-Consumer Protection Act, Tex. Bus. & Com. Code Ann. § 17.41, *et seq.*

2    In view of the Court's ruling granting the Motion to Dismiss for lack of subject matter jurisdiction, Defendant's Request for Judicial Notice (ECF No. 49-5) and Plaintiffs' Motion to Strike Declaration of Stephen Cherry (ECF No. 59) will be denied as moot.

3    Picamilon is a synthetic chemical which is used as a prescription drug in Russia, but it is not approved as a drug in the United States, BMPEA is an amphetamine-like chemical that is not found in nature, acacia rigidula is an herb or other botanical, and both BMPEA and acacia rigidula allegedly have no history of safe use. Am. Compl. ¶¶ 4, 39, 48, 66.

4    A dietary supplement is a product intended to supplement the diet that contains one or more of the following dietary ingredients: a vitamin; a mineral; an herb or other botanical; an amino acid; or a combination thereof. Am. Compl. ¶ 29. A dietary ingredient that was not previously marketed in the United States prior to October 14, 1994, is considered a "new dietary ingredient" ("NDI"). Id. ¶ 30. A manufacturer is required to notify the FDA if it intends to market a supplement that contains a NDI. Id. ¶ 31. If the FDA does not comment within 75 days after the NDI submission, the ingredient may be used in dietary supplements. Id.

5    The Court is cognizant that Plaintiffs cite cases from other jurisdictions to support their position that they have suffered an economic injury. See Plaintiffs' Resp. in Opp'n (ECF No. 61 at 6, n.3). As stated, however, the Court relies on the precedent from the Third Circuit discussed herein to assess whether the Plaintiffs have sufficiently established an injury-in-fact for standing purposes.

6    The Estrada court distinguished cases cited by the plaintiff which recognized standing on a benefit of the bargain theory of economic harm, explaining that the plaintiffs in those cases did not receive the benefit of their bargain because either: (1) they received a defective product; or (2) they pled facts sufficient for the court to conclude that they were induced into purchasing the product at issue based on a specific misrepresentation made by the defendants. See Estrada, 2017 WL 2999026, at *9-*11 (citations omitted). Unlike the consumers in those cases, the plaintiff in Estrada did not sufficiently allege that she was induced into purchasing baby powder based on specific misrepresentations made by Johnson & Johnson on its website, or on the product's label or advertisements. Id. at *11.

7    In connection with Plaintiffs' various state law claims, Plaintiffs allege generally throughout the Amended Complaint that they purchased supplements from GNC that they otherwise would not have, or would not have paid as much for them as they did. See Am. Compl. ¶¶ 144, 154, 162, 172, 180, 213, 223, 232, 241, 259, 273, 279 and 282.

8    We note that the Amended Complaint contains no allegations that Plaintiffs would have purchased a cheaper, alternative product absent GNC's alleged omissions or misrepresentations, thus injury-in-fact cannot be established under an alternative product theory of economic injury. Further, to the extent that Plaintiffs urge that they have standing based upon concerns of health problems that have yet to occur, see Am. Compl. ¶ 81

**Hubert v. General Nutrition Corporation, Not Reported in Fed. Supp. (2017)**

2017 WL 3971912

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 216 of 410
PageID: 12823

(alleging that "[a]s a result of GNC's practices, Plaintiffs ... have been subjected to unreasonable safety risks"), apprehension concerning possible future injury is insufficient to establish injury-in-fact. Whitmore, 495 U.S. at 158; Reilly, 664 F.3d at 42.

9    Plaintiffs simply allege that they purchased the supplements on various occasions between 2011 and 2015. See Am. Compl. ¶¶ 11-22. However, in view of the fact that a number of Plaintiffs purchased supplements on multiple occasions over a period of months or years, see id. ¶¶ 11-13, 15, 17-21, it is logical to infer that they must have consumed the supplements. Indeed, it is highly unlikely that a consumer would make multiple purchases of items that he never used in the first place.

10   Although the Court is not empowered to address GNC's arguments for dismissal under Rule 12(b)(6), and expresses no opinion on the merits of that motion, we note the possibility that GNC's preemption claim could be premature. "[F]ederal preemption is an affirmative defense on which the defendant bears the burden of proof." In re Asbestos Prods. Liab. Litig., 822 F.3d 125, 133 n.6 (3d Cir. 2016). The Third Circuit has explained that "[t]his allocation of the burden of proof suggests that a motion under Rule 12(c) for judgment on the pleadings is a more appropriate procedural vehicle for dismissing cases on preemption grounds, instead of a motion under Rule 12(b)(6), except for cases in which preemption is manifest in the complaint itself." Id. (citations omitted). As stated, the Court expresses no opinion at this juncture as to whether this is a case in which preemption is manifest in the complaint itself, but simply raises the issue for the parties' consideration at the appropriate time.

---

End of Document                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# **TAB 17**

2016 WL 633353
Only the Westlaw citation is currently available.
United States District Court,
D. Utah, Central Division.

Ironshore Specialty Insurance Company, Plaintiff,
v.
Callister, Nebeker & McCullough, PC; W. Waldan
Lloyd; and J. Hoyt Stephenson, Defendants,
J. Hoyt Stephenson, Third-Party Plaintiff,
v.
Old Republic Insurance
Company, Third-Party Defendant.

Case No. 2:15-cv-00677-RJS
|
Signed 02/17/2016

**Attorneys and Law Firms**

Michael F. Skolnick, Kirk G. Gibbs, Smith D. Monson, Kipp
& Christian, Salt Lake City, UT, for Plaintiff.

George W. Burbidge, II, Karra J. Porter, Christensen & Jensen
PC, David K. Isom, Isom Law Firm, Salt Lake City, UT, for
Defendants.

**MEMORANDUM DECISION AND ORDER**

ROBERT J. SHELBY, United States District Judge

 **\*1**  This insurance dispute arises out of a malpractice suit
in Utah state court. Defendant and Third-Party Plaintiff J.
Hoyt Stephenson sued the law firm of Callister, Nebeker &
McCullough, P.C. and one of its attorneys, J. Waldan Lloyd,
in Utah state court for legal malpractice. Plaintiff Ironshore
Specialty Insurance Company then brought this suit, seeking
a declaratory judgment that Mr. Stephenson's malpractice
claims against Callister are not covered under any insurance
policy Ironshore issued to Callister and that Ironshore owes
no duty to defend or indemnify Callister against those claims.

Mr. Stephenson counterclaimed against Ironshore and
brought third-party claims against Old Republic Insurance
Company, which also issued an insurance policy to Callister.
Mr. Stephenson brings claims against both insurance
companies for breach of contract, breach of the implied
covenant of good faith and fair dealing, insurance bad

faith and breach of fiduciary duties, intentional infliction
of emotional distress, and civil conspiracy. He also seeks a
declaratory judgment concerning the rights and duties of all
parties.

Ironshore and Old Republic now separately move to dismiss
Mr. Stephenson's claims against them under Federal Rule
of Civil Procedure 12(b)(6) for failure to state a claim
upon which relief can be granted. For the reasons stated
below, the court GRANTS the motions and DISMISSES Mr.
Stephenson's claims.

**BACKGROUND**

Because this matter is before the court on motions to dismiss,
the court accepts as true the well-pleaded factual allegations
in Mr. Stephenson's First Amended Answer, Counterclaim,
and Third-Party Complaint, and views those facts in the light
most favorable to Mr. Stephenson as the nonmoving party. [1]

In February 2014, Mr. Stephenson sued Callister, Nebeker
& McCullough, P.C. and W. Waldan Lloyd (collectively
"Callister") in Utah state court for malpractice. Mr.
Stephenson's claims arise out of legal services Callister
performed for him in connection with various business
entities and transactions. Mr. Stephenson alleges in the state
court action that Callister breached its professional, ethical,
fiduciary, and other duties owed to him.

For example, Mr. Stephenson alleges that Mr. Lloyd sent
a letter to a third party in 2010, in which Mr. Lloyd
falsely accused Mr. Stephenson of committing serious state
and federal felonies and breaches of fiduciary duties. Mr.
Stephenson claims that Callister's malpractice caused him to
lose business; to be investigated for alleged crimes and civil
breaches; to be charged by the State of Utah with serious
felonies, which have now been dismissed with prejudice; to be
arrested during a traumatic traffic stop and wrongfully jailed;
to face an ongoing and imminent threat that his remaining
business and livelihood will be destroyed; and to suffer
serious emotional harm.

Mr. Stephenson maintains that both Ironshore Specialty
Insurance Company and Old Republic Insurance Company
have duties to indemnify and defend Callister from potential
liability in the state court action. Mr. Stephenson bases that
claim on Callister's alleged representations to that effect
during discovery in the state court action. These claimed

duties to indemnify and defend stem from the insurance policies that Ironshore and Old Republic each issued to Callister.

**\*2** The insurance policy that Ironshore issued to Callister states in relevant part:

Section I.A. The Insurer shall pay on behalf of each Insured all sums the Insured shall become legally obligated to pay as Damages as a result of a Claim first made against the Insured during the Policy Period and reported to the Insurer during the Policy Period and arising out of the rendering of or failure to render Professional Legal Services.

Section I.B. The Insurer shall have the right and duty to defend any Claim first made against the Insured during the Policy Period and reported to the Insurer during the Policy Period and arising out of the rendering of or failure to render Professional Legal Services, including an appeal thereof, seeking Damages to which this insurance applies even if any of the allegations are groundless, false, or fraudulent. The Insurer shall have the right to appoint defense counsel and to make any investigation it deems necessary and, with the written consent of the Insured, settle any Claim covered by the terms of this Policy. If the Insured shall refuse to consent to any settlement or compromise recommended by the Insurer and acceptable to the claimant and shall elect to contest the Claim, then the liability of the Insurer under this Policy shall not exceed the amount for which the Insurer would have been liable for Damages and Claim Expenses if the Claim had been settled or compromised, when and as so recommended. The Insurer shall have no liability for Claim Expenses incurred thereafter and shall have the right to withdraw from further investigation or defense of the Claim by tendering control of such investigation or defense to the Insured, and the Insured agrees, as a condition of the issuance of this Policy, to accept such tender.

Section X.P. Bankruptcy or insolvency of the Insured shall not relieve the Insurer of any of its obligations under this policy. [2]

Similarly, the insurance policy that Old Republic issued Callister states in relevant part:

Section 1. Coverage. The COMPANY shall pay on behalf of the INSURED all sums in excess of the deductible which the INSURED shall become legally obligated to pay as DAMAGE as a result of any CLAIM first made against the

INSURED during the POLICY PERIOD and reported in writing to the COMPANY during the POLICY PERIOD or within thirty (30) days after the end of the POLICY PERIOD. The CLAIM must be caused by an act, error or omission of the INSURED committed in the performance of PROFESSIONAL SERVICES for others and committed on or after the RETROACTIVE DATE.

Section 2. Defense and Settlement of Claims. The COMPANY shall have the right and the duty to defend any CLAIM seeking DAMAGES to which this POLICY applies even if any allegations of the CLAIM are groundless, false or fraudulent. The INSURED and the COMPANY shall mutually agree upon the selection of defense counsel to conduct the defense of any CLAIM.

The COMPANY may investigate any CLAIM as it deems necessary, but the COMPANY shall not settle any CLAIM without the INSURED's consent. If, however, the INSURED refuses to consent to a settlement recommended by the COMPANY, and acceptable to the claimant, then the COMPANY'S total liability for such CLAIM shall not exceed the amount for which the CLAIM could have been settled plus the DEFENSE COSTS incurred up to the time of such refusal, or the applicable limit of insurance, whichever is less.

**\*3** Section 16. Bankruptcy. Bankruptcy or insolvency of the INSURED or of the INSURED'S estate shall not relieve the COMPANY of any of its obligations under this POLICY.

Mr. Stephenson maintains that, despite these insurance policies, neither Ironshore nor Old Republic has agreed to indemnify or defend Callister from potential liability in the state court action. And even though Mr. Stephenson allegedly made an objectively reasonable settlement offer to Callister, neither Callister, nor Ironshore, nor Old Republic has responded to the offer.

In an attempt to confirm his belief that Ironshore and Old Republic must indemnify and defend Callister, Mr. Stephenson subpoenaed Ironshore and Old Republic to produce documents relating to the malpractice action. The subpoenas also ordered the insurance companies to testify on whether they are obligated to indemnify and defend Callister in the state court action. Both Ironshore and Old Republic objected to the subpoena served upon it on work product grounds.

In September 2015, Ironshore sued Callister and Mr. Stephenson in this court. Ironshore seeks a declaratory judgment that Mr. Stephenson's legal malpractice claims against Callister are not covered under any insurance policy Ironshore issued to Callister and that Ironshore owes no duty to indemnify or defend Callister against those claims. [3]

Mr. Stephenson then counterclaimed against Ironshore and brought third-party claims against Old Republic. Mr. Stephenson asserts the following claims against both insurers under Utah law: (1) breach of contractual duty to indemnify Callister and Mr. Stephenson, (2) breach of the implied covenant of good faith and fair dealing, (3) insurance bad faith and breach of fiduciary duties, (4) intentional infliction of emotional distress, and (5) civil conspiracy. Mr. Stephenson also seeks a declaratory judgment regarding the rights and duties of all parties. [4]

### ANALYSIS

**\*4** Ironshore moves under Federal Rule of Civil Procedure 12(b)(6) to dismiss Mr. Stephenson's counterclaims. Old Republic likewise moves to dismiss Mr. Stephenson's third-party claims under Federal Rule 12(b)(6).

The court's analysis proceeds in three parts. First, the court provides the applicable legal standard. Second, the court examines each of Mr. Stephenson's substantive claims. And third, the court discusses Mr. Stephenson's request for a declaratory judgment.

In the end, the court concludes that Mr. Stephenson has failed to state a single valid claim for relief, and that dismissal is appropriate.

### I. Legal Standard

To survive a Federal Rule 12(b)(6) motion to dismiss, Mr. Stephenson must "state a claim upon which relief can be granted," meaning Mr. Stephenson must allege "enough factual matter, taken as true, to make his 'claim to relief ... plausible on its face.' " [5] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." [6] In undertaking this analysis, the court is instructed to "accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff." [7]

But the court will not accept as true "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." [8]

### II. Mr. Stephenson's Substantive Claims

The court now turns to Mr. Stephenson's affirmative claims against Ironshore and Old Republic. The court examines each of his following claims in turn: (A) breach of contract, (B) breach of the implied covenant of good faith and fair dealing as well as insurance bad faith, (C) intentional infliction of emotional distress, and (D) civil conspiracy.

#### A. Breach of Contract

Mr. Stephenson's first cause of action against Ironshore and Old Republic is for breach of contract. Under Utah contract law, only a party to an insurance contract may seek to enforce the contract, unless the claimant is an assignee or an intended third-party beneficiary of the contract. [9] The parties agree that Mr. Stephenson is neither a party to nor an assignee of the insurance contracts involved in this case. The issue presented is whether Mr. Stephenson may bring his breach of contract claims as an intended third-party beneficiary of the contracts. [10]

**\*5** Intended "[t]third-party beneficiaries are those recognized as having enforceable rights created in them by a contract to which they are not parties and for which they give no consideration." [11] "For a third party to have an enforceable right, the contracting parties must have clearly intended to confer a separate and distinct benefit upon the third party." [12] "A third party who benefits only incidentally from the performance of a contract has no right to recover under that contract." [13]

Mr. Stephenson contends that he is an intended third-party beneficiary of the Ironshore and Old Republic insurance contracts because Callister and the insurers intended to confer upon him separate and distinct rights. Mr. Stephenson points to the bankruptcy provisions in each contract in support of his argument. The provisions—which are nearly identical—state that Callister's bankruptcy or insolvency will not relieve the insurers of their obligations under the policies. Mr. Stephenson argues that the provisions establish that the central aim of the policies is to benefit third parties like him by ensuring that injured third parties possess the right to collect

directly from the insurer even if the insured becomes bankrupt or insolvent.

The court disagrees with Mr. Stephenson's interpretation of the bankruptcy provisions, and concludes that he is not an intended third-party beneficiary of the insurance contracts. The court relies on two cases for this conclusion: the Utah Supreme Court's decision in *Broadwater v. Old Republic Surety* and the Tenth Circuit's decision in *Adams v. General Accident Assurance Co. of Canada*.

First, the Utah Supreme Court held in *Broadwater* that plaintiff, an injured third party, was not an intended third-party beneficiary of a lost instruments bond, because nothing in the bond indicated that the parties to the bond intended to confer on plaintiff the right to enforce payment. [14] The bond listed only the insured as obligees, the bond's purpose was to indemnify the insured against third-party claims, and "[p]erformance on the bond only incidentally benefit[ted] plaintiff by providing a fund from which her damages may ultimately be paid." [15]

Second, the Tenth Circuit held in *Adams* that the injured third-party judgment creditors were not intended third-party beneficiaries of the insurance contract between the tortfeasor and the torfeasor's insurer. [16] The court stated that, although an injured party may benefit under the contract if the insurer pays, "the intent of the parties to the policy is to protect the financial well-being of the insured, not to benefit the injured party." [17] This intent was reflected by the insurer's agreement to "pay and to defend its insured, not an injured party." [18] Accordingly, the court found that "the benefit[s of the policy] flow[ ] to the injured party only incidentally." [19]

This case is analogous. Nowhere in the bankruptcy provisions or elsewhere in the insurance contracts do the contracting parties refer to Mr. Stephenson or purport to provide him (or other third-party claimants) with any enforceable rights. Instead, the provisions merely state that if Callister goes bankrupt or becomes insolvent, the insurers' obligations to Callister will continue. Those obligations include the insurers' duties to indemnify and defend Callister under certain conditions. They do not include any duties owed to Mr. Stephenson or other third-party claimants.

*6 Moreover, the contracting parties included the indemnity, defense, and bankruptcy provisions to protect the financial well-being of Callister, not to benefit third parties injured by the law firm's alleged malpractice. While Mr. Stephenson may ultimately receive a benefit under one of the contracts if one of the insurers is obligated to indemnify Callister, that benefit will flow to Mr. Stephenson only incidentally because performance of the contracts merely provides a fund from which his damages may be paid.

Mr. Stephenson is not privy to the insurance contracts at issue in this case, because he is not an intended third-party beneficiary under either contract. Mr. Stephenson may not assert his breach of contract claims directly against Ironshore and Old Republic. The court dismisses Mr. Stephenson's breach of contract claims with prejudice.

**B. Breach of the Implied Covenant of Good Faith and Fair Dealing, and Tortious Insurance Bad Faith**

Mr. Stephenson's next causes of action against Ironshore and Old Republic are for (1) breach of the implied covenant of good faith and fair dealing and (2) tortious insurance bad faith. The court considers these overlapping claims together.

The duty of an insurer to deal fairly under both of Mr. Stephenson's causes of action derives from the insurance contract. [20] In the absence of a contractual relationship or statutory duty, an injured third party may not sue a tortfeasor's insurer for failure to bargain in good faith. [21] Accordingly, Utah courts have consistently held that only first parties to an insurance contract or their privies may bring an action for breach of the implied covenant of good faith and fair dealing, or for tortious insurance bad faith. [22]

Here, although it is undisputed that Mr. Stephenson is a first party to neither insurance contract at issue, he nevertheless alleges that both Ironshore and Old Republic owe him a duty of good faith and fair dealing as well as fiduciary duties. But as explained above, Mr. Stephenson is not privy to either contract: he is neither an assignee, nor an intended third-party beneficiary. And even if he were an intended third-party beneficiary under either contract, the duty of good faith is not owed to third-party beneficiaries—it is owed only to first parties. [23]

*7 Mr. Stephenson lacks standing to bring claims against Ironshore or Old Republic for breach of the implied covenant of good faith and fair dealing or for tortious insurance bad faith. Those claims are dismissed with prejudice.

### C. Intentional Infliction of Emotional Distress

Mr. Stephenson's next claim against Ironshore and Old Republic is for intentional infliction of emotional distress. To state a claim for intentional infliction of emotional distress under Utah law, a plaintiff must plead facts showing that the defendant:

> intentionally engaged in some conduct toward the plaintiff, (a) with the purpose of inflicting emotional distress, or, (b) where any reasonable person would have known that such would result; *and* his actions are of such a nature as to be considered outrageous and intolerable in that they offend against the generally accepted standards of decency and morality. [24]

"If the trial court determines that a defendant's conduct was not outrageous as a matter of law, then the plaintiff's claim fails." [25] "To be considered outrageous, the conduct must evoke outrage or revulsion; it must be more than unreasonable, unkind, or unfair." [26] "[C]onduct is not outrageous simply because it is tortious, injurious, or malicious, or because it would give rise to punitive damages, or because it is illegal." [27]

Here, Mr. Stephenson has not alleged sufficient facts to state a plausible claim against Ironshore and Old Republic for intentional infliction of emotional distress. He alleges that the insurers' conduct toward him was "intentional and reckless" and was "of such a nature as to be considered outrageous and intolerable in that it offends generally accepted standards of decency and morality." [28] He also alleges that "the Insurers' delay and protection of Callister[ ] have severely weakened and harmed [him] financially, socially[,] and emotionally." [29] But these allegations are legal conclusions that are not entitled to any assumption of truth under *Iqbal*.

Mr. Stephenson also alleges no facts plausibly showing that Ironshore or Old Republic intentionally engaged in conduct toward him with the purpose of inflicting emotional distress. While Mr. Stephenson claims that the insurers acted with "callous disregard for [him] during the period in which the

Insurers [ ] had notice and knowledge of the harm that they ... caus[ed] [him]," [30] he pleads no facts supporting this legal conclusion.

And Mr. Stephenson has failed to allege facts showing that the insurers proximately caused him to suffer severe emotional distress. He instead states in a conclusory fashion that "[t]he Insurers' conduct has foreseeably and proximately caused Stephenson sever[e] emotional distress." [31]

**\*8** These bare allegations are insufficient to state a claim for intentional infliction of emotional distress upon which relief can be granted. The claim is dismissed.

### D. Civil Conspiracy

Mr. Stephenson's final claim against Ironshore and Old Republic is for civil conspiracy. To state a claim for civil conspiracy, a plaintiff must adequately plead the existence of an underlying tort. [32] Where a plaintiff has "not adequately pleaded any of the basic torts [he] allege[s] dismissal of [his] civil conspiracy claim is appropriate." [33]

Here, Mr. Stephenson's conspiracy claim is based on the underlying torts of insurance bad faith and intentional infliction of emotional distress. But as discussed above, he has failed to adequately plead either of those tort causes of action. The court dismisses Mr. Stephenson's claim for civil conspiracy.

### III. Declaratory Judgment

Finally, Mr. Stephenson seeks a declaratory judgment regarding the rights and duties of all parties as they relate to the insurance contracts. His request is based on his contention that he is an intended third-party beneficiary of the insurance contracts. But as explained above, Mr. Stephenson is not an intended third-party beneficiary of either contract. The court dismisses Mr. Stephenson's claim for declaratory relief with prejudice.

### CONCLUSION

For the reasons stated above, the court GRANTS Ironshore's motion to dismiss (Dkt. 20) and Old Republic's motion to dismiss (Dkt. 18). The court dismisses Mr. Stephenson's First Amended Counterclaim and Third-Party Claims (Dkt. 14).

SO ORDERED this 17th day of February, 2016.

**All Citations**

Not Reported in F.Supp.3d, 2016 WL 633353

## Footnotes

1    *See* 🚩 *Carroll v. Lawton Indep. Sch. Dist. No. 8*, 805 F.3d 1222, 1226 (10th Cir. 2015).

2    When evaluating the sufficiency of a complaint under Federal Rule of Civil Procedure 12(b)(6), a court may consider documents referred to in the pleading—such as the insurance contracts—"if the documents are central to the ... claim and the parties do not dispute the documents' authenticity." 🚩 *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002). Here, the insurance contracts are central to Mr. Stephenson's claims against Ironshore and Old Republic, and none of the parties dispute their authenticity. The court may consider the insurance contracts.

3    Ironshore asserts that it joined Mr. Stephenson as a party in this case so he would be bound by any declaratory judgment the court may issue. *See* 🚩 *Harris v. Quinones*, 507 F.2d 533, 537 (10th Cir. 1974).

4    Mr. Stephenson also asserts that Ironshore and Old Republic owe Callister and himself the following duties: (i) a duty to indemnify Callister and himself for the claims he has asserted in the state court action; (ii) a duty to diligently investigate the facts to determine whether his malpractice claims against Callister are valid; (iii) a duty to evaluate his claims fairly; (iv) a duty to engage counsel in the state court action who do not act unreasonably and do not assert objectively unreasonable or frivolous claims, defenses, or positions; (v) a duty to act promptly, zealously, and reasonably in accepting, rejecting, or settling his claims in the state court action; (vi) a duty to act objectively reasonable in dealing with Callister and himself; and (vii) a duty not to unreasonably diminish the amount of funds available for indemnification by asserting frivolous or bad faith claims or defenses in the state court action. Though Mr. Stephenson does not bring specific causes of action under these duties, he contends that Ironshore and Old Republic have breached each of these duties.

5    🚩🔶 *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008) (quoting 🚩 *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

6    🚩 *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

7    *Jordan-Arapahoe, LLP v. Bd. of Cnty. Comm'rs*, 633 F.3d 1022, 1025 (10th Cir. 2011) (quoting 🚩 *Beedle v. Wilson*, 422 F.3d 1059, 1063 (10th Cir. 2005)).

8    🚩 *Iqbal*, 556 U.S. at 678.

9    *See City of Grantsville v. Redev.* 🚩 *Agency*, 233 P.3d 461, 466 (Utah 2010); *see also Adams v. Gen. Accident Assurance Co. of Canada*, 133 F.3d 932, at *3 (10th Cir. 1997) (unpublished) (" 'In Utah, a plaintiff must direct his action against the actual tortfeasor, not the insurer' because an injured party 'has no direct cause

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 224 of 410
PageID: 12831
Ironshore Specialty Insurance Company v. Callister,..., Not Reported in...

2016 WL 633353

of action against the insurer.' " (quoting 🏷 *Campbell v. Stagg*, 596 P.2d 1037, 1039 (Utah 1967))); *County v. Jensen*, 83 P.3d 405, 408 (Utah Ct. App. 2003) (noting that "Utah adheres to the 'general rule,' that in the absence of a contractual provision or statute or ordinance to the contrary, the absence of privity of contract between the injured party and the tortfeasor's insurer bars a direct action by the injured party against the insurer" (citation omitted) (internal quotation marks omitted)).

10    See *Orlando Millenia, LC v. United Title Serv. of Utah, Inc.*, 355 P.3d 965, 972 (Utah 2015) ("In contract law, a third party has standing to sue if it is an *intended*, and not merely an *incidental*, beneficiary.").

11    *Broadwater v. Old Republic Sur.*, 854 P.2d 527, 536 (Utah 1993) (citation omitted) (internal quotation marks omitted).

12    *Id.*

13    *Id.* at 537.

14    *Id.*

15    *Id.*

16    133 F.3d at *4–5.

17    🏷 *Id.* at *4.

18    *Id.*

19    *Id.*

20    *Broadwater*, 854 P.2d at 535.

21    *Id.* at 535–36.

22    See 🏷 *Sperry v. Sperry*, 990 P.2d 381, 383 (Utah 1999) (recognizing that "Utah law clearly limits the duty of good faith to first parties to insurance contracts" and that "only a first party can sue for breach of that duty"); *Savage v. Educators Ins. Co.*, 908 P.2d 862, 865 (Utah 1995) (holding that "an action for breach of the covenant of good faith and fair dealing may be brought only by a party to the insurance contract"); *id.* at 866 (stating that the "duty of good faith and fair dealing is a contractual covenant, one that arises solely as an incident to contractual obligations owed by an insurer to its insured"); 🏷 *Ammerman v. Farmers Ins. Exch.*, 430 P.2d 576, 577–78 (Utah 1967) (holding that the tort cause of action for insurance bad faith is available only to first parties to an insurance contract, not third-party beneficiaries); *Cannon v. Travelers Indem. Co.*, 994 P.2d 824, 828 & n.3 (Utah Ct. App. 2000) (noting that "[i]t is well settled that the duty of good faith and fair dealing runs to parties to an insurance contract or their privies," and rejecting the third-party claimant's argument that she is owed a duty of good faith and fair dealing as a third-party beneficiary, because the duty is owed only to first parties to insurance contracts); 🏷 *Pixton v. State Farm Mut. Auto. Ins. Co.*, 809 P.2d 746, 749 (Utah Ct. App. 1991) (holding that "there is no duty of good faith and fair dealing imposed upon an insurer running to a third-party claimant ... seeking to recover against the company's insured").

23    See 🏷 *Sperry*, 990 P.2d at 383.

24    *Bennett v. Jones, Waldo, Holbrook & McDonough*, 70 P.3d 17, 30 (Utah 2003) (citation omitted).

25    🏷 *Prince v. Bear River Mut. Ins. Co.*, 56 P.3d 524, 536 (Utah 2002).

26    🏷 *Franco v. The Church of Jesus Christ of Latter-day Saints*, 21 P.3d 198, 207 (Utah 2001) (citation omitted) (internal quotation marks omitted); *see also* 🏷 *Retherford v. AT&T Commc'ns of Mountain States, Inc.*, 844 P.2d 949, 977 n.19 (Utah 1992) (describing outrageous conduct as "extraordinarily vile conduct, conduct that is atrocious, and utterly intolerable in a civilized community" (citation omitted) (internal quotation marks omitted)).

27    🏷 *Prince*, 56 P.3d at 536.

28    Dkt. 14, ¶¶ 107–08.

29    *Id.* ¶ 110.

30    *Id.* ¶ 111.

31      *Id.* ¶ 115.

32      *Puttuck v. Gendron*, 199 P.3d 971, 978 (Utah Ct. App. 2008).

33      *Id.* (citation omitted) (internal quotation marks omitted).

---

**End of Document**                                © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 18

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 227 of 410
PageID: 12834
Jones v. Francis, Not Reported in F.Supp.2d (2013)
2013 WL 5603848

2013 WL 5603848
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Keith JONES, Dieunane Jean, Jayden Jones by
and Through His guardian ad litem Dieunane
Jean, Janiah Jones by and Through Her guardian
ad litem Dieunane Jean, Jordan Jones by and
Through His guardian ad litem, and Justin Jones
by and Through His guardian ad litem, Plaintiffs,
v.
Marvin FRANCIS, Carlisle Carrier Corp., John
Does 1–5 and ABC Corps. 1–10, Defendants.

Civil Action No. 13–04562(SRC).
|
Oct. 11, 2013.

**Attorneys and Law Firms**

Edward P. Capozzi, Fishman, McIntyre, PC, Fort Lee,
NJ, James P. Kimball, Seigel C,LLC, Ridgewood, NJ, for
Plaintiffs.

Matthew T. Pisano, Mount Laurel, NJ, for Defendants.

**OPINION**

CHESLER, District Judge.

**\*1** This matter comes before the Court upon the Rule
12(b)(6) motion filed by Defendants Marvin Francis and
Carlisle Carrier Corp. (collectively, "Defendants") to dismiss
the punitive damages demand in Count One of the Complaint.
[Docket Entry 6.] Plaintiffs Keith Jones, Dieunane Jean,
Jayden Jones, Janiah Jones, Jordan Jones, and Justin Jones
(collectively, "Plaintiffs") have opposed the motion. [Docket
Entry 11.] The Court has considered the papers filed by the
parties, and, pursuant to Federal Rule of Civil Procedure 78,
rules on the motion without oral argument. For the reasons
stated herein, Defendants' motion will be denied.

**I. Background**
For purposes of the present motion, the Court accepts as
true all well-pleaded facts in the Complaint. *Pryor v.
Nat'l Collegiate Athletic Assoc.,* 288 F.3d 548, 559 (3d

Cir.2002). This lawsuit arises from an April 18, 2013
automobile accident. Plaintiffs allege that they were travelling
along Freeway Drive in East Orange, New Jersey when a
commercial vehicle owned by Defendant Carlisle Carrier
Corp. and driven by Defendant Marvin Francis struck their
automobile. (Compl.¶¶ 13, 17.) As a result of the collision,
Plaintiffs' vehicle was thrown over a retaining wall and onto
Interstate 280 twenty feet below. (Compl.¶ 19.) Plaintiffs
allege the collision was the result of the careless, negligent,
and reckless operation, maintenance, or repair of Defendants'
vehicle. (Compl.¶ 17.) Each Plaintiff was hospitalized with
substantial injuries.

Plaintiffs brought their personal injury and loss of consortium
lawsuit in New Jersey Superior Court, demanding judgment
for "compensatory damages, punitive damages, interest, costs
of suit, attorney's [sic] fees, and other such relief as the Court
may deem proper." (Compl. at 9–10 (First Count).) Because
the parties are completely diverse and the Complaint requests
damages well in excess of $75,000, Defendants removed to
this Court. [Docket Entry 1.] Defendants have now moved
under Rule 12(b)(6) to dismiss Plaintiffs' punitive damages
request, arguing that under federal pleading standards and
the New Jersey Punitive Damages Act Plaintiffs fail "to
state a claim that would support the imposition of punitive
damages...." (Mov. Br. at 2.) In other words, Defendants do
not argue that the Complaint fails to state a claim upon which
relief can be granted, but instead take issue with the nature of
the damages Plaintiffs request as one form of that relief.

**II. Discussion**

**A. Standard of Review**
A complaint will survive a motion under Rule 12(b)(6) only
if it states "sufficient factual allegations, accepted as true,
to 'state a claim for relief that is plausible on its face.' "
*Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173
L.Ed.2d 868 (2009) (quoting *Bell Atlantic v. Twombly,* 550
U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).
"A claim has facial plausibility when the plaintiff pleads
factual content that allows the court to draw the reasonable
inference that the defendant is liable for the misconduct
alleged." *Id.* (citing *Twombly,* 550 U.S. at 556). Following
*Iqbal* and *Twombly,* the Third Circuit has held that, to prevent
dismissal of a claim, the complaint must show, through the
facts alleged, that the plaintiff is entitled to relief. *Fowler
v. UPMC Shadyside,* 578 F.3d 203, 211 (3d Cir.2009).

Jones v. Francis, Not Reported in F.Supp.2d (2013)
2013 WL 5603848

While the Court must construe the complaint in the light most favorable to the plaintiff, it need not accept a "legal conclusion couched as a factual allegation." *Baraka v. McGreevey,* 481 F.3d 187, 195 (3d Cir.2007); *Fowler,* 578 F.3d at 210–11; *see also Iqbal,* 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, will not suffice." *Iqbal,* 556 U.S. at 678.

**B. Viability of Plaintiffs' Request for Punitive Damages**

**\*2** Initially, the Court notes that Defendants' argument ascribes a breadth to the Supreme Court's *Twombly* and *Iqbal* decisions that is not warranted by the language of those cases or, in fact, Federal Rule of Civil Procedure 8(a) itself. As demonstrated in the standard of review section that accompanies this and every other opinion on a Rule 12(b)(6) motion, the "plausibility" pleading regime addresses the types of facts a plaintiff must allege to make out a cause of action, not the types of damages the alleged cause of action may eventually warrant. Indeed, nothing in *Twombly, Iqbal,* or their progeny refers to pleading requirements for damages requests at all; instead, the cases themselves analyze the well-pleaded facts exclusively in the context of the elements of the alleged cause of action. *See Iqbal,* 556 U.S. at 680, 687 ("Rule 8 does not empower respondent to plead the bare elements of his cause of action [for invidious discrimination] ... and expect his complaint to survive a motion to dismiss."); *see also Malleus v. George,* 641 F.3d 560, 563 (3d Cir.2011) ("a court must ... look[ ] at the well-pleaded components of the complaint and evaluat[e] whether all of the elements [a plaintiff must plead to state a claim] are sufficiently alleged"). In sum, once a civil complaint shows a claim to be "facially plausible," *Fowler,* 578 F.3d at 210, nothing in Rule 8 or its judicial gloss suggests, let alone requires, that this Court scrutinize the damages requested by plaintiff as redress for that claim.

This conclusion is not altered by Defendants' reliance on New Jersey's Punitive Damages Act, N.J. Stat. Ann. § 2A:15–5.9 to –5.17.[1] Under the Act, punitive damages may be awarded only if the plaintiff "proves by clear and convincing evidence" that the harm suffered was the result of acts or omissions

"actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed...." *Id.* at § 2A:15–5.12(a). This burden of proof, Defendants argue, requires Plaintiffs to have plead "facts as to defendants' intentional, willful, or wanton conduct ... within the four corners of the Complaint." (Mov. Br. at 3.)

Defendants' argument fails. The excerpt from the Punitive Damages Act upon which Defendants rely is, quite simply, an "evidentiary inquiry," since "it defines the quantum of proof [Plaintiffs] must present" on the issue of punitive damages. *See Fowler,* 578 F.3d at 213. "Under the Federal Rules of Civil Procedure," however, "an evidentiary standard is not a proper measure of whether a complaint fails to state a claim." *Id.* (citing *Powell v. Ridge,* 189 F.3d 387, 394 (3d Cir.1999)). Should the opportunity arise in this case, Defendants can move under Rule 56(a) for summary judgment on the issue of punitive damages if Defendants believe Plaintiffs have failed to adduce proofs sufficient to carry their burden under New Jersey law. The Court, however, will not force Plaintiffs to use their pleadings to do so.[2]

**\*3** The Court also notes that punitive damages in the case of an automobile accident, while rare, are not out of the realm of possibility. Punitive damages awards been upheld where, for instance, an oil truck struck and killed a motorist and the nominal plaintiff submitted "substantial proof" that the truck was driven by an highly inexperienced driver who knew the brakes were not working but had not been trained how to fix them. *Smith v. Whitaker,* 313 N.J.Super. 165, 713 A.2d 20, 34–35 (N.J.Super.Ct.App.Div.1998). Elsewhere, the Appellate Division has held presenting proof that a driver who caused an accident was intoxicated plus evidence of "separate aggravating circumstances" creates a jury question on the issue of punitive damages. *See Dong v. Alape,* 361 N.J.Super. 106, 824 A.2d 251, 259 (N.J.Super.Ct.App.Div.2003). In short, a lawsuit arising from what may seem like "a simple motor vehicle accident" (*see* Mov. Br. at 3), may in fact turn out to be something more. Then again, it might not. It follows that the Court should not decide the availability or unavailability of punitive damages as a matter of law on a motion to dismiss, and Defendants' motion is thus denied .[3]

**III. Conclusion**

For the reasons stated herein, the Court will deny Defendants' motion to dismiss the request for punitive damages contained in Plaintiffs' Complaint. An appropriate form of Order will be filed.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 5603848

## Footnotes

1    The parties do not dispute that New Jersey law applies here.

2    The Punitive Damages Act requires that a plaintiff specifically request a punitive damages award in the complaint. N.J. Stat. Ann. 2A:15–5.11. It stands to reason that if the New Jersey legislature intended for a heightened pleading standard—say, one which approximates an evidentiary burden of proof—to apply to such a request, the legislature would have said so. Instead, the Punitive Damages Act, as written, deals with pleading and proving punitive damages in two separate and entirely unrelated sections.

3    Were the Court to accept Defendants' argument, every request for damages, including standard fare like attorneys' fees or "such other relief as the Court may deem proper," (*see, e.g.,* Compl. at 10), could be attacked at the motion to dismiss stage, on the theory that the facts alleged did not support a claim for such a remedy. Requests for this type of relief, while boilerplate, embody a central tenet of notice pleading under the federal rules, even post *Twombly* and *Iqbal*—once a plaintiff plausibly states his cause of action, subsequent discovery may reveal facts that bring to light previously unknown but nevertheless appropriate redress.

End of Document    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 19

Levinson v. Johnson & Johnson Consumer Companies, Inc., Not Reported in F.Supp.2d...
2010 WL 421091

KeyCite Red Flag - Severe Negative Treatment

On Reconsideration Levinson v. Johnson & Johnson Consumer Companies, Inc., D.N.J., August 2, 2010

2010 WL 421091
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Erika LEVINSON and Maria Watkins,
individually and on behalf of all
others similarly situated, Plaintiffs,

v.

JOHNSON & JOHNSON CONSUMER
COMPANIES, INC. and Wal-
mart Stores, Inc., Defendants.

Civil Action No. 09–CV–3317 (DMC).
|
Feb. 1, 2010.

West KeySummary

**1**    **Antitrust and Trade Regulation** 🔑 Nature
and form

**Products Liability** 🔑 Economic losses;
damage to product itself

**Products Liability** 🔑 Cosmetics, soaps, and
hair-care products

**Products Liability** 🔑 Nature and form of
remedy

Store customers failed to state a consumer
fraud claim against a store under New Jersey
law. Although the customers alleged that they
suffered only economic harm, their underlying
claims arose out of the store's allegedly defective
baby shampoo which contained toxins that
created a potential for harm to their children.
Therefore the customer's claims were subsumed
by the New Jersey Product Liability Act (PLA)
which precluded recovery for solely economic
harm. Fed.Rules Civ.Proc.Rule 12(b)(1), 28
U.S.C.A.; N.J.S.A. 2A:58C–1b(2).

2 Cases that cite this headnote

**Attorneys and Law Firms**

Rosalee B. Connell, Finkelstein Thompson LLP, Washington, DC, for Plaintiffs.

Daniel B. Carroll, Theodore James McEvoy, Drinker, Biddle & Reath, LLP, David E. Sellinger, Greenberg Traurig LLP, Florham Park, NJ, John C. McGuire, Joseph F. Falgiani, Sedgwick, Detert, Moran, & Arnold, LLP, Newark, NJ, for Defendants.

**OPINION**

DENNIS M. CAVANAUGH, District Judge.

**\*1**    This matter comes before the Court upon motion by Johnson & Johnson Consumer Companies, Inc. and Wal-Mart Stores, Inc. ("Defendants") to dismiss the complaint of Erika Levinson and Maria Watkins, individually and on behalf of all others similarly situated, ("Plaintiffs") for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6) and for lack of subject matter jurisdiction pursuant to Fed. R. Civ. 12(b)(1). Pursuant to Fed.R.Civ.P. 78, no oral argument was heard. After considering the submissions of all parties, it is the decision of this Court for the reasons herein expressed that Defendants' motion to dismiss is **granted in part** and **denied in part.**

**I   BACKGROUND**

The Amended Class Action Complaint is brought individually and on behalf of all class purchasers ("Class Members") against Johnson & Johnson Consumer Companies, Inc. ("J & J") and Wal–Mart Stores, Inc. ("Wal–Mart") (collectively "Defendants"). Plaintiffs allege that J & J's Baby Shampoo and Wal–Mart's Equate Tearless Baby Wash include and consequently, exposed Plaintiffs' children to "toxic and potentially cancer-causing chemicals[,]" including methylene chloride, an ingredient banned [for use in cosmetics] by the Food and Drug Administration ("FDA"), 1,4–dioxane and formaldehyde." (See Plaintiffs' Complaint ("Pl.Compl."), ¶ 3). "Along with increased risk of cancer, skin irritation and other serious health problems, chronic exposure to low levels of chemicals can lead to asthma and hypersensitivity in children." (Pl.Compl., ¶ 38).

"Independent Lab Tests found methylene chloride levels [between .35 ppm and] 1.1 ppm, 1,4–dioxane levels [between 20 ppm and] 38 ppm, and formaldehyde levels of [between

150 and 230] ppm" in J & J Baby Shampoo. (Pl.Compl., ¶ 43). The chemicals are allegedly not disclosed on the J & J label. (Pl.Compl., ¶ 44). "Independent Lab Tests of Equate Tearless Baby Wash revealed methylene chloride levels of 0.57 ppm, 1,4–dioxane levels of 39 ppm and formaldehyde levels of 360 ppm." (Pl.Compl., ¶ 11).

"Plaintiffs and the Class Members were damaged by Defendants' omissions and failure to warn that their Children's Personal Care Products were contaminated with toxic and potentially cancer-causing chemicals." (Pl.Compl., ¶ 4). The J & J Baby Shampoo contains descriptive messages, such as "as gentle to the eyes as pure water[,]" "Ultra Mild" and "Hypoallergenic" and "rinses clean ... gentle enough even for newborns." (Pl.Compl., ¶ 13). Wal–Mart's Equate Tearless Baby Wash contains descriptive messages, such as "an extra mild ... cleanser that won't sting baby's eyes," "rinses completely," and is a "hypoallergenic formula." (Pl.Compl., ¶ 51). Plaintiffs assert that the offensive chemicals could have been removed by a process called "vacuum stripping." (Pl.Compl., ¶ 14). Lastly, Plaintiffs remark that children are especially vulnerable and susceptible to the chemicals in question. (Pl.Compl., ¶ ¶ 35–38).

**\*2** Count I of the complaint asserts a claim for breach of implied warranty pursuant to the Uniform Commercial Code ("UCC") § 2–314. (Pl. Compl. at 71). Count II of the complaint asserts a claim for breach of implied warranties of merchantability and fitness for a particular use. (Pl.Compl., ¶ 83). Count III of the complaint asserts a claim for unfair and deceptive trade practices. (Pl.Compl., ¶ 90). Count IV of the complaint asserts a claim for unjust enrichment. (Pl.Compl., ¶ 98).

## II. *STANDARD OF REVIEW*

"There is a fundamental difference of review under Rule 12(b)(1), where the existence of disputed facts will not preclude the court from evaluating the merits of the jurisdictional claim, and Rule 12(b)(6) where the court is required to accept as true all the allegations of the complaint and all inferences arising from them." *Anjelino v. New York,* 200 F.3d 73, 87 (3d Cir.1999). "[T]he threshold to withstand a motion to dismiss under [Rule] 12(b)(1) is thus lower than that required to withstand a Rule 12(b)(6) motion." *Kehr Packages Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1409 (3d Cir.1991)).

### A. Fed.R.Civ.P. 12(b)(6)

"The [d]istrict [c]ourt, in deciding a motion under Fed.R.Civ.P. 12(b)(6), [is] required to accept as true all factual allegations in the complaint and draw all inferences in the facts alleged in the light most favorable to the [Plaintiff]." *Phillips v. County of Allegheny,* 515 F.3d 224, 228 (3d Cir.2008). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, [ ] a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief'requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "[A court is] not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). "Factual allegations must be enough to raise a right to relief above a speculative level, [ ] on the assumption that all factual allegations in the complaint are true (even if doubtful in fact)." *Bell,* 550 U.S. at 555–56.

### B. Fed.R.Civ.P. 12(b)(1)

"On a Rule 12(b)(1) motion, no presumption of truthfulness attaches to the allegations of the plaintiff." *CNA v. United States,* 535 F.3d 132, 139 (3d Cir.2008). A facial attack "concerns 'an alleged pleading deficiency' whereas a factual attack concerns the actual failure of [a plaintiff's] claims to comport [factually] with the jurisdictional prerequisites." *Id.* (citing *U.S. ex rel. Atkinson v. Pa. Shipbuilding Co.,,* 473 F.3d 506, 514 (3d Cir.2007)).

## III. *DISCUSSION*

### A. Standing
To bring a suit in a federal court, the plaintiff must have standing pursuant to Article III of the United States Constitution. To establish standing under Article III, the plaintiff must show: (1) injury in fact; (2) causation; and (3) redressability. *Horvath v. Keystone Health Plan E., Inc.,* 333 F.3d 450, 455 (3d Cir.2003); *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

**\*3** First, the plaintiff must have suffered an injury in fact—an invasion

Case 1:19-md-02875-RMB-SAK Document 598-3 Filed 10/16/20 Page 233 of 410 PageID: 12840

Levinson v. Johnson & Johnson Consumer Companies, Inc., Not Reported in F.Supp.2d...

2010 WL 421091

of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id.* (citing *AT & T Communications of N.J., Inc.v. Verizon N.J., Inc.,* 270 F.3d 162, 170 (3d Cir.2001)). "The injury must affect the plaintiff in a personal and individual way." *Pitt News v. Fisher,* 215 F.3d 354 (3d Cir.2000); *Alston v. Countrywide Fin. Corp.,* 585 F.3d 753, 763 (3d Cir.2009).

"[O]rdinarily, one may not claim standing .... to vindicate the constitutional rights of some third party." *Pitt,* 215 at 362. "We apply this prudential rule against third party standing even when the requirements of Article III have been met, to 'avoid deciding questions of broad social import ... [and] to limit access to the federal courts to those litigants best suited to assert a particular claim.' " *Id.* (citing *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99–100, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979)). "[W]hen the asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction." *Berg v. Obama,* 586 F.3d 234, 239 (2009) (citing *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). Furthermore, "[t]he standing inquiry does not change in the context of a putative class action....[S]tanding cannot be predicated on an injury which the plaintiff has not suffered, nor can it be acquired through the back door of a class action." *Koronthaly v. L'Oreal,* 2008 U.S. Dist. LEXIS 59024, *12 (D.N.J. July 25, 2008).

As a threshold matter, Defendants contend that Plaintiffs lack standing to sue in the instant action given that Plaintiffs failed to allege an injury-in-fact or that the product failed to perform the hair-cleansing benefits for which it was sold. Moreover, in

reliance upon this Court's decision in *Koronthaly,* Defendants assert that Plaintiffs' demand for a refund of the purchase price as a consequence of exposure to Defendants' products fails to establish an injury-in-fact and therefore, is not sufficient to confer standing where the alleged harm is no more than speculative. As a result, Defendants claim that the absence of a cognizable injury and thereby standing in this matter requires dismissal pursuant to Fed.R.Civ.P. 12(b)(1).

In response, Plaintiffs contend that economic injury is sufficient to confer standing in this matter, relying upon *Clinton v. City of New York,* 524 U.S. 417, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998) and *Danvers Motor Co. v. Ford Motor Co.,* 432 F.3d 286 (3d Cir.2005). Plaintiffs contend that where the product contains undisclosed toxins and an ingredient banned by the FDA, the injury arises at the time of purchase. In distinguishing the *Koronthaly v. L'Oreal* case, citing to this Court's disposition on a motion for reconsideration, Plaintiffs assert that unlike *Koronthaly* where this Court determined that plaintiff "provided no authoritative evidence that the lead levels in defendants' lipstick products constitute[d] a dangerous amount or [were] in some way prohibited[,]" the present action involves methylene chloride, a substance banned by the FDA for use in cosmetics. 2008 U.S. Dist. LEXIS 86419, *11 (D.N.J. Oct. 24, 2008). Further, Plaintiffs contend that the Environment Protection Agency ("EPA") classifies the other chemicals at issue as probable carcinogens. Lastly, Plaintiffs assert that their claims should stand because Plaintiffs have at least raised an issue of fact with respect to whether the chemicals contained in Defendants' products are dangerous in amount.

**\*4** The *Koronthaly* case involved the purchase of a lipstick containing lead, the content of which was not subject to FDA regulation. *Id.* at *2–3. However, the lead content of the lipstick appeared dangerous when compared to the lead content regulation imposed by the FDA on candy. *Id.* In the absence of an FDA regulation concerning lead content in lipstick, or other legal prohibition, the plaintiff could not "seek a remedy for a harm that she ha[d] not actually or allegedly suffered." Moreover, this Court accorded great weight to the decision in *Williams v. Purdue Pharma Co.,* 297 F.Supp.2d 171 (D.D.C.2003), concluding that the "plaintiffs' allegation of an economic injury in a products liability action was insufficient to establish injury-in-fact" because "without alleging that a product failed to perform as advertised, a plaintiff has received the benefit of his bargain and has no basis to recover purchase costs." *Id.* at *13–14.

Levinson v. Johnson & Johnson Consumer Companies, Inc., Not Reported in F.Supp.2d...
2010 WL 421091

Therefore, the *Williams* Court "remarked that benefit of the bargain injury could not sustain a claim of injury in fact." *Id.*

"The term 'cosmetic' means (1) articles intended to be rubbed, poured, sprinkled, or sprayed on, introduced into, or otherwise applied to the human body or any part thereof for cleansing, beautifying, promoting attractiveness, or altering the appearance, and (2) articles intended for use as a component of any such articles; except that such term shall not include soap." 21 U.S.C. § 321(i). "In its definition of the term 'cosmetic,' the Federal Food, Drug, and Cosmetic Act specifically excludes soap. The term 'soap' is nowhere defined in the act. In administering the act, the Food and Drug Administration interprets the term 'soap' to apply only to articles that meet the following conditions:"

> (1) The bulk of the nonvolatile matter in the product consists of an alkali salt of fatty acids and the detergent properties of the article are due to the alkali-fatty acid compounds; and

> (2) The product is labeled, sold, and represented only as soap.

21 § C.F.R. 701.20. Plaintiff asserts and Defendants do not appear to dispute that the Baby Shampoo is classified as a cosmetic rather than soap. Therefore, the allegedly defective products will be treated as a cosmetics subject to the FDA regulation banning methylene chloride.

While the Court agrees that the assertion of an economic injury is not an automatic bar to standing, *Koronthaly* demonstrates that an exception has been recognized in the context of claims concerning defective products, absent a specific legal prohibition precluding particular ingredients or usages. Insofar as Plaintiffs claims pertain to allegedly toxic chemicals that have not been banned by the FDA for use in cosmetics, including 1,4–dioxane and formaldehyde, in accordance with *Koronthaly,* this Court concludes that any potential injury is too remote, hypothetical and/or conjectural to establish standing in this matter. However, insofar as Plaintiffs claims pertain to methylene chloride, a chemical explicitly banned for use by the FDA in any cosmetic, this Court declines to dismiss Plaintiffs' claims pursuant to Fed.R.Civ.P. 12(b)(1) for lack of standing.

B. Choice of Law

**\*5** As a federal district court sitting in diversity, this Court must apply the choice of law rules of New Jersey, the forum state. See *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). New Jersey's choice of law rules mandate that the determinative law is that of the state with the greatest interest in governing the particular issue. The first step is to determine whether a conflict exists between the law of interested states, and then any conflict shall be determined on an issue-by-issue basis. "Under general conflict of laws principles, where the laws of the two jurisdictions would produce the same result on the particular issue presented, there is a "false conflict," and the Court should avoid the choice-of-law question." *Williams v. Stone,* 109 F.3d 890, 894 (3d Cir.1997). If there is a conflict, then the Court must identify the governmental policies underlying the law of each state and how those policies are affected by each state's contacts to the litigation. If the state's law is not related to its contacts with the litigation, then the state does not have an interest in having its law applied to the underlying issue. See *Vezey v. Doremus,* 103 N.J. 244, 510 A.2d 1187, 1189 (N.J.1986). That is, if there is an actual conflict between the two states' laws, the court then determines "which state has the most meaningful connections with and interests in the transaction and the parties." *Spence–Parker v. Del. Riv. & Bay Authority,* 2009 U.S. Dist. LEXIS 75187, *20, 2009 WL 2602094 (D.N.J. Aug. 21, 2009). Where no actual conflict of law exists, no choice of law need be made. See *Zavala v. Wal–Mart Stores, Inc.,* 393 F.Supp.2d 295, 333 (D.N.J.2005). "If there is no actual conflict, the Court must apply the law of New Jersey." *LNT Merck Co. v. Dyson, Inc.,* 2009 U.S. Dist. LEXIS 62308, *6 (D.N.J. July 21, 2009) (citing *Lebegern v. Forman,* 471 F.3d 424, 428 (3d Cir.2006)). In that instance, a motion to dismiss under Fed.R.Civ.P. 2(b)(6) should be decided under New Jersey law. See *Gallerstein v. Berkshire Life Ins. Co. of America,* 2006 U.S. Dist. LEXIS 64487, *3, 2006 WL 2594862 (D.N.J. Sept. 11, 2006).

The parties' respective moving papers recognize that the outcome is the same regardless of whether New Jersey State Law or Missouri State Law is applied to this diversity action. Therefore, the parties assert that no conflict of laws issue is present in the instant matter.

C. New Jersey State Law Breach of Warranty, Consumer Fraud and Unjust Enrichment Claims

Defendants assert that dismissal is required with respect to all Plaintiffs' claims because the claims are based on alleged

Levinson v. Johnson & Johnson Consumer Companies, Inc., Not Reported in F.Supp.2d...
2010 WL 421091

harm caused by a product and as a consequence, are subsumed by the New Jersey Product Liability Act ("PLA"). Plaintiffs contend that the PLA does not apply because their claims are essentially classic breach of warranty and consumer fraud causes of action. Plaintiffs argue that "[w]hile the PLA covers and subsumes causes of action involving physical harms caused by a product, the [Consumer Fraud Act ("CFA") ] and other remedies remain available when the plaintiffs only claim economic injuries involving a product." (Pl. Br. at 18). Further, Plaintiffs argue that the PLA does not apply because Plaintiffs do not assert themselves as "claimants" or allege "harm" as defined by the PLA.

**\*6** The New Jersey Supreme Court decision in *Sinclair v. Merck & Co* . is instructive. In *Sinclair v. Merck & Co.,* the Plaintiffs "alleged that as a result of their direct and prolonged consumption of Vioxx, they are at enhanced risk of serious undiagnosed and unrecognized myocardial infarction, commonly referred to as "silent heart attack," and other latent and unrecognized injuries." 195 N.J. 51, 55, 948 A.2d 587 (2008). In that case, the plaintiffs asserted claims for negligence, violation of the Product Liability Act, violation of the Consumer Fraud Act, breach of express and implied warranties and unjust enrichment. *Id.* In dismissing the complaint in its entirety, New Jersey Supreme Court determined the following,

> [p]laintiffs seek to avoid the requirements of the PLA by asserting their claims as CFA claims. However, the Legislature expressly provided in the PLA that claims for "harm caused by a product" are governed by the PLA "irrespective of the theory underlying the claim." N.J.S.A. 2A:58C–1b(3). We explained in *Lead Paint,* supra, that "[t]he language chosen by the Legislature in enacting the PLA is both expansive and inclusive, encompassing virtually all possible causes of action in relating to harms caused by consumer and other products." 191 N.J. at 436–37, 924 A.2d 484. As a result, we declared that "[i]n light of the clear intention of our Legislature to include all [product liability] claims within the scope of the PLA, we find no ground on which to conclude that the claims being raised by plaintiffs, regarding an ordinary household product used by consumers, were excluded from the scope of" the PLA. We reach the same conclusion here.

The language of the PLA represents a clear legislative intent that, despite the broad reach we give to the CFA, the PLA is paramount when the underlying claim is one for harm caused by a product. The heart of plaintiffs' case is the

potential for harm caused by Merck's drug. It is obviously a product liability claim. Plaintiffs' CFA claim does not fall within an exception to the PLA, but rather clearly falls within its scope. Consequently, plaintiffs may not maintain a CFA claim.

*Id.* [1] [2]

Similarly, at the heart of this matter is the potential for harm caused by the defective products, J & J Baby Shampoo and Wal-Mart Equate Tearless Baby Wash, containing allegedly "toxic chemicals linked to increased cancer risk, adverse skin reactions, and other serious health problems." (*See* Pl. Compl., ¶ 2). Plaintiffs directly assert that they "were damaged by Defendants' omissions and failure to warn that their Children's Personal Care Products were contaminated with toxic and potentially cancer-causing chemicals." (Pl.Compl., ¶ 4). Therefore, consistent with the *Sinclair* decision, this Court concludes that the PLA subsumes all of Plaintiffs' claims, effectively precluding Plaintiffs' claims with respect to the CFA, and otherwise, in the absence of "harm" as defined by the PLA. The Court does not agree that articulating a claim in terms of pure economic harm where the core issue is the potential injury arising as a consequence of the products' allegedly harmful chemicals converts the underlying defective product claim into an independent and unrelated consumer fraud issue. Limiting a claim to economic injury and the remedy sought to economic loss cannot be used to obviate the PLA.

**\*7** The assertion of a claim pursuant to the PLA is premised upon a requisite level of harm, including:

> (a) physical damage to property, other than to the product itself; (b) personal physical illness, injury or death; (c) pain and suffering, mental anguish or emotional harm; and (d) any loss of consortium or services or other loss deriving from any type of harm described in subparagraphs (a) through (c) of this paragraph.

N.J.S.A. 2A:58C–1b(2). Harm, for purposes of the PLA, does not include pure economic loss. Insofar as Plaintiffs concede that their injury is purely economic, Plaintiffs' claims cannot survive. Therefore, with respect to New Jersey law,

Levinson v. Johnson & Johnson Consumer Companies, Inc., Not Reported in F.Supp.2d...

2010 WL 421091

in accordance with *Sinclair*, Plaintiffs' complaint is dismissed without prejudice in its entirety.

### D. Missouri State Law Breach of Warranty, Consumer Fraud and Unjust Enrichment Claims

Despite the parties' respective beliefs that there is no conflict of law issue present in the instant matter, it is not clear to the Court that product liability laws of Missouri subsume related claims in the same manner as the New Jersey PLA. Therefore, upon dismissal of all New Jersey State Law claims and for purposes of inclusion, the Court will proceed by addressing the viability of Plaintiffs' claims under Missouri State Law. If Plaintiffs have asserted viable claims pursuant to Missouri State Law, then a conflict of law exists and the Court will undertake to ascertain which state has the superior interest in the litigation.

### i. Consumer Fraud

Defendants contend that Plaintiffs have no viable claims pursuant to Missouri State Law because Plaintiffs fail to allege any non-speculative, ascertainable loss and fail to plead their claims with particularity in accordance with Fed.R.Civ.P. 9(b). Plaintiffs assert that they "suffered ascertainable losses to the extent that they paid for and got something less than what was promised" and to the extent that Defendants engaged in material omissions of fact with respect to the presence of toxic chemicals in the products at issue. (Pl. Br. at 29, 33). Plaintiffs also present the Court with the results of independent lab tests detecting the presence of methylene chloride in the allegedly defective products.

"A party must plead the circumstances of each element of fraud with particularity." *Owen v. GMC,* 533 F.3d 913, 921 (8th Cir.2008); Fed.R.Civ.P. 9(b). "Although the [Missouri Merchandising Practices Act ("MMPA") ] does not sound in tort and does not require a showing of a product defect as a matter of course, the plain language of the MMPA demands a causal connection between the ascertainable loss and the unfair or deceptive merchandising practice." *Id.* at 922. However, if "the alleged unfair practice is the failure to disclose a product defect, there must be a showing that the [product] in fact suffered that defect, or evidence from which the defect reasonably could be inferred, in order to demonstrate an ascertainable loss *as a result of* [defendant]'s failure to disclose the defect." *Id.* at 923. "The MMPA prohibits "deception, fraud, false pretense, false promise, misrepresentation, unfair

practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce" by defining such activity as an unlawful practice." *Plubell v. Merck & Co.,* 289 S.W.3d 707, 711 (Mo.App.S.D.2009) (citing Mo. Ann. Stat. § 407.020). "Civil actions may be brought under the MMPA to recover actual damages by ' [a]ny person who purchases or leases merchandise primarily for personal, family or household purposes and thereby suffers an ascertainable loss of money or property, real or personal, as a result of [an unlawful practice].' " *Id.* (citing Mo. Ann. Stat. § 407.025.1). "The MMPA also specifically authorizes class actions where an unlawful practice 'has caused similar injury to numerous other persons.' " *Id.* (citing Mo. Ann. Stat. § 407.025.2). To the extent that Plaintiffs' claims pursuant to Missouri State Law concern methylene chloride, a chemical banned by the FDA for use in cosmetics and detected in Defendants' products, Plaintiffs claims may proceed under Missouri State Law.

**\*8** Although foreclosed by application of the PLA in the instant case, the CFA was enacted to "protect the consumer against imposition and loss as a result of fraud and fraudulent practices by persons engaged in the sale of goods and services." *Smith v. Alza,* 400 N.J.Super. 529, 552, 948 A.2d 686 (2008). "The MMPA was enacted to preserve fundamental honesty, fair play, and right dealings in public transactions." *Owen v. GMC,* 533 F.3d 913, 922 (8th Cir.2008) (citing *Scott v. Blue Springs Ford Sales, Inc.,* 215 S.W.3d 145, 160 (Mo.Ct.App.2006)). Beyond the underlying governmental purpose of the MMPA, the representative Plaintiffs in this action reside in Missouri and presumably, the purchases of the allegedly defective products occurred in Missouri. J & J is a New Jersey corporation engaged in business throughout the United States, including Missouri. Wal–Mart is an Arkansas corporation engaged in business throughout the United States, including Missouri. Therefore, the Missouri State contacts in the instant matter seem to outweigh New Jersey State contacts. Missouri State Law prevails with respect to this issue.

### ii. Breach of Implied Warranty

Defendants assert that Plaintiffs' breach of implied warranty claims should be dismissed because Plaintiffs' complaint fails to allege that the products were not merchantable or failed to perform the function for which they were sold, and because

2010 WL 421091

the complaint fails to allege any purpose that is separate and apart from the ordinary purpose. (Def. Br. at 28–29). Plaintiffs' complaint asserts a claim for breach of implied warranties because the goods were allegedly not fit for their ordinary purpose or particular use on children and further, because the products fail to conform to the promises and representations made on the labels. Specifically, Plaintiffs allege that the products are not merchantable because they are contaminated with methylene chloride. (Pl. Br. at 36).

"In an action based on breach of warranty, it is of course necessary to show not only the existence of the warranty but the fact that the warranty was broken and that the breach of the warranty was the proximate cause of the loss sustained." *Worthy v. Specialty Foam Products,* 591 S.W.2d 145, 149 (Mo.App. S.D.1979). "After establishing the existence of this warranty," there must be a showing; "(1) that the implied warranty of merchantability had been broken, and (2) that the breach of this warranty was the proximate cause of its loss." *Id.* "Crucial to the issue of whether or not a seller has breached an implied warranty of merchantability, is the determination of whether or not the goods in question are merchantable." *Id.* "Merchantable goods must be at least as such as[:]"

(a) pass without objection in the trade under the contract description; and

(b) in the case of fungible goods, are of fair average quality within the description; and

(c) are fit for the ordinary purposes for which such goods are used; and

**\*9** (d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

(e) are adequately contained, packaged, and labeled as the agreement may require; and

(f) conform to the promises or affirmations of fact made on the container or label if any.

Mo. Ann. Stat. § 407.2–314. The Uniform Commercial Code ("UCC") limits the recovery of damages to those proximately caused by the breach of warranty and imposes an obligation on the buyer to minimize damages in good faith. *Groppel Co. v. United States Gypsum Co.,* 616 S.W.2d 49, 59 n. 11 (1981). Assuming, without concluding, that the descriptive messages on the alleged defective products constitute promises or affirmations, then, in accordance with the foregoing limitations, Plaintiffs' claims for breach of implied warranties pursuant to Missouri State Law are permitted to proceed.

Although foreclosed by application of the PLA in the instant matter, the underlying purpose of the UCC as recognized by the New Jersey Supreme Court, is "to simplify, clarify and modernize the law governing commercial transactions; to permit the continued expansion of commercial practices through custom, usage and agreement of the parties; and to make uniform the law among various jurisdictions." N.J. S.A. 12A:1–102(1); *Alloway v. General Marine Indus., L.P.,* 149 N.J. 620, 630, 695 A.2d 264 (1997). Codified under chapter 400 of Missouri State Law, Missouri State Law adheres to the same underlying purposes as New Jersey. *See Excel Bank v. Nat'l Bank of Kansas City,* 290 S.W.3d 801, 803–04 (Mo.App. W.D.2009). Similar to the foregoing analysis, Missouri's contacts with the representative Plaintiffs and the transactions that are the source of the representative Plaintiffs' claims favors the application of Missouri law over New Jersey with respect to this issue.

iii. Unjust Enrichment

Defendants assert that unjust enrichment is not a proper remedy available in this case because Plaintiffs fail to assert that the products failed to perform. By contrast, Plaintiffs assert that they purchased the products conferring a monetary benefit upon the Defendants for useless products that they would not otherwise have purchase, but for the representations that the products were safe, gentle and/or mild. "The elements of a claim of unjust enrichment are: (1) a benefit conferred upon the defendant by the plaintiff, (2) appreciation by the defendant of the fact of such benefit, and (3) acceptance and retention by the defendant of that benefit under circumstances in which retention without payment would be inequitable." *Mays–Maune & Co. v. Werner Bros., Inc.,* 139 S.W.3d 201, 205 (Mo.App. E.D.2005). Equitable remedies are coercive remedies like declaratory judgments and injunctions, the latter of which includes specific performance and some types of restitution. *State ex rel Leonardi v. Sherry,* 137 S.W.3d 462, 470 (2004). "Damages and, in some instances, restitution constitute the legal remedies." *Id.* (internal citations omitted). Generally, equitable remedies are only available when there is a showing of irreparable injury and/or the absence of an adequate remedy at law. *See State ex rel General Dynamics Corp. v. Luten,* 566 S.W.2d 452, 461 (1978). "There is nothing

Levinson v. Johnson & Johnson Consumer Companies, Inc., Not Reported in F.Supp.2d...
2010 WL 421091

more basic in law than the proposition that there is neither irreparable injury nor lack of an adequate remedy at law when the only harm would be the payment of money, which clearly can be recovered if, in fact, the plaintiff succeeds on the merits of its claims .... [I]f plaintiff were to prevail, it would have a legal remedy that would allow it to recover any funds that, *arguendo,* were paid wrongfully." *Shipley v. Cates,* 200 S.W.3d 529, 541 (2006). Plaintiffs explicitly and exclusively allege economic injury. Therefore, there is no indication that a remedy at law would be inadequate. To the extent that Plaintiffs assert a claim for unjust enrichment pursuant to Missouri State Law, Plaintiffs' complaint is dismissed.

## IV. *CONCLUSION*

**\*10** For the foregoing reasons, Defendants' motion is **granted in part** and **denied in part.** Plaintiff's complaint is **partially dismissed without prejudice** pursuant to Fed.R.Civ.P. 12(b)(1) and Fed.R.Civ.P. 12(b)(6). An appropriate order accompanies this opinion.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 421091

## Footnotes

1    Although this Court permitted the CFA claims to proceed in *Nafar v. Hollywood Tanning Sys., Inc.,* in that case, the Plaintiff's claims and basis for distinction of the CFA from the PLA was the purchase of services, rather than the purchase of a defective product. 2007 U.S. Dist. LEXIS 26312, \*12–14 (D.N.J. Apr. 5, 2007). CFA claims rooted in services are clearly distinguishable from claims grounded in products. The present action does not involve a claim for defective services.

2    Further, Plaintiffs misconstrue *In re Ford Motor Co. E–350 Van Products,* 2008 U.S. Dist. LEXIS 73690, \*48 n. 9 (D.N.J. Sept. 3, 2008), where the Court did indeed find the Sinclair case "inapposite" "because, by design, the PLA 'except[s] actions for harm caused by breach of an express warranty[,]' which plaintiffs expressly allege[d.]" On the basis of an express warranty, the Court concluded that *Sinclair* decision "does not mandate dismissal of unjust enrichment and state consumer fraud claims where a party does not plead a PLA claim." *Id.* (internal citations omitted). Plaintiffs do not assert a claim for breach of an express warranty in the present action.

---

End of Document                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 20

In re Magnesium Oxide Antitrust Litigation, Not Reported in F.Supp.2d (2011)
2011 WL 5008090, 2012-1 Trade Cases P 77,878

KeyCite Yellow Flag - Negative Treatment

Declined to Follow by Le v. Kohls Department Stores, Inc., E.D.Wis.,
February 8, 2016

2011 WL 5008090
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

In re MAGNESIUM OXIDE
ANTITRUST LITIGATION.

Civ. No. 10–5943 (DRD).
|
Oct. 20, 2011.

**Attorneys and Law Firms**

Trujillo, Rodriguez & Richards, LLC, by: Lisa J. Rodriguez,
Esq., Haddonfield, NJ, Gold Bennett Cera & Sidener LLP,
by: Solomon B. Cera, Esq., C. Andrew Dirksen, Esq.,
San Francisco, CA, Goldman Scarlato & Karon, P.C., by:
Daniel R. Karon, Esq., Cleveland, OH, for Direct Purchaser
Plaintiffs.

Lite Depalma Greenberg, LLC, by: Allyn Z. Lite, Esq., Joseph
J. DePalma, Esq., Newark, NJ, Hagens Berman Sobol Shapiro
LLP, by: Steve W. Berman, Esq., Anthony D. Shapiro, Esq.,
Elizabeth A. Fegan, Esq., Jason A. Zweig, Esq., New York,
NY, Hudson Mallaney & Shindler, by: J. Barton Goplerud,
Esq., West Des Moines, IA, Girardi Keese, by: Stephen
G. Larson, Esq., Los Angeles, CA, for Indirect Purchaser
Plaintiffs.

Loweinstein Sanler PC, by: Douglas S. Eakley, Esq., Michael
J. Hahn, Esq., Roseland, NJ, Paul, Weiss, Rifkind, Wharton
& Garrison LLP, by: Aidan Synnott, Esq., Daniel A. Crane,
Esq., New York, NY, Cozen O'Connor, P.C., by: John P.
Johnson, Esq., Francis P. Newell, Esq., Peter M. Ryan, Esq.,
Philadelphia, PA, Finklestein Thompson LLP, by: Rosalee
B. Connell, Esq., Douglas G. Thompson, Esq., Michael G.
McLellan, Esq., Washington, DC, for Defendants.

**OPINION**

DEBEVOISE, Senior District Judge.

*1 This matter arises out of the consolidation of five separate
actions in this Court [1] alleging a conspiracy to fix prices
in and allocate shares of the domestic Magnesium Oxide

market from January 2002 to the present ("the Class Period").
On November 15, 2010, Direct Purchaser Plaintiffs ("DP
Plaintiffs") Orangeburg Milling Company, Inc., Bar Ale, Inc.,
and Air Krete, Inc. filed a Class Action Complaint ("CAC")
against Defendants Premier Chemicals, LLC ("Premier"),
Sumitomo Corporation of America ("Sumitomo"), and YAS,
Inc. ("YAS") pursuant to Sections 4 and 16 of the Clayton
Act, 15 U.S.C. §§ 15, 26, alleging violations of Section
1 of the Sherman Act, 15 U.S.C. § 1, and seeking class
certification under Federal Rule of Civil Procedure 23(b)
(2) and (3), declaratory judgment, treble damages, costs and
attorneys' fees, and an injunction. On December 30, 2010, DP
Plaintiffs filed an Amended CAC to add additional factual
allegations in support of their claims.

On October 7, 2010, Indirect Purchaser Plaintiffs ("IP
Plaintiffs") Ronald Hayek, Daniel, Walker, Sue Walker, and
John Bidart filed a CAC against Defendants under Section
16 of the Clayton Act, alleging violations of Section 1
of the Sherman Act, and under various state antitrust and
consumer protection laws. IP Plaintiffs seek similar relief as
DP Plaintiffs. [2] On December 31, 2010, IP Plaintiffs filed
an Amended CAC to add similar factual allegations as those
added by DP Plaintiffs in their Amended CAC.

On March 1, 2011, Defendants filed a Motion to Dismiss [3]
all of Plaintiffs' claims pursuant to Federal Rule of
Civil Procedure 12(b)(6). For the reasons set forth below,
Defendants' motion is granted. No Defendant is entitled to
dismissal of Plaintiffs' federal and state antitrust claims on
the merits because Plaintiffs sufficiently allege a meeting
of the minds among all Defendants to fix prices in and
allocate shares of the domestic Magnesium Oxide market.
However, Defendants are entitled to dismissal of IP Plaintiffs'
federal and state antitrust claims and the majority of their
consumer protection claims for lack of standing. In addition,
those consumer protection claims under which IP Plaintiffs
have standing are dismissed to the extent they are based on
allegations of fraud because those allegations do not comply
with the requirements of Federal Rule of Civil Procedure
9(b). Finally, Plaintiffs' federal and state antitrust claims are
dismissed because they are time-barred by their respective
statutes of limitations.

**I. BACKGROUND**

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 241 of 410
PageID: 12848

In re Magnesium Oxide Antitrust Litigation, Not Reported in F.Supp.2d (2011)
2011 WL 5008090, 2012-1 Trade Cases P 77,878

Magnesium Oxide ("MgO") is a solid, white, naturally occurring mineral that is used in producing a wide variety of products, including refractory products, animal feeds, fertilizers, electrical insulation, and pharmaceuticals. It is formed by an ionic bond between one magnesium atom and one oxygen atom. MgO can be mined from magnesite or processed from seawater or subterranean brines containing magnesium chloride. This case concerns the two most common forms of MgO: Caustic-calcined magnesia ("CCM") and dead-burned magnesia ("DBM"). DBM and CCM are produced differently and have different commercial applications. [4]

*2  In 2000, according to the CACs, domestic consumption of DBM and CCM came from two sources: the United States and China. Roughly 50% of CCM "and a lesser amount of" DBM consumed in the United States were produced domestically, while the rest was imported from China. (Direct Purchasers' Consolidated Amended Class Action Complaint ("Direct CAC") ¶ 27; (Indirect Purchasers' Consolidated Amended Class Action Complaint ("Indirect CAC") ¶ 33.) At that time, Premier allegedly maintained control over the majority of DBM and CCM consumed in the United States by (1) purchasing imported CCM and DBM for resale to its customers in the United States, and (2) sourcing magnesite from China for production into DBM to be sold domestically.

"Sumitomo similarly purchased Chinese MgO but only [DBM] for resale to its U.S. customers" and "sourced magnesite from China for manufacture into [DBM] for sale in the U.S." (Direct CAC ¶ 27; Indirect CAC ¶ 34.) To do so, it enlisted the help of YAS to (1) "facilitate[ ][its] purchases of Chinese magnesite" (Direct CAC ¶ 27; Indirect CAC ¶ 35), and (2) purchase Chinese DBM for resale in the United States.

This arrangement proved successful because Hideo Sumikawa, the current president of YAS, previously worked for Sumitomo and has since maintained relationships with certain Chinese magnesite mines. "In particular, Sumitomo, through Coy Akiyama—head of Sumitomo's inorganic chemicals unit—purchases [DBM] from Chinese mines that Sumikawa (YAS) has facilitated, thereby allowing Sumitomo and YAS to participate together in the U.S. MgO market." (Direct CAC ¶ 33; Indirect CAC ¶ 41.)

According to Plaintiffs, sometime before the Class Period, Premier "saw its share of MgO markets shrink due to increased Chinese competition." (Direct CAC ¶ 28; Indirect CAC ¶ 36.) Specifically, "cheaper imports, mainly from

China ha[d] replaced some of the U.S. domestic production, notably affecting Premier." (Direct CAC ¶ 29; Indirect CAC ¶ 37.) Thus, during the Class Period, Premier and Sumitomo allegedly bought nearly all of the Chinese DBM available for purchase and resold it to their customers in the United States.

In addition, Plaintiffs allege that, "[d]uring the Class Period, with some limited exceptions, the MgO markets were considered to be fairly saturated, with limited potential for growth." (Direct CAC ¶ 30; Indirect CAC ¶ 38.) However, "[i]nstead of competing, representatives from Premier, Sumitomo, and YAS began meeting regularly to discuss fixing U.S. MgO prices and allocating MgO markets." (Direct CAC ¶ 31; Indirect CAC ¶ 39.) Specifically, Plaintiffs allege a conspiracy among Premier, Sumitomo, and YAS to (1) fix prices in and allocate shares of the domestic DBM market and (2) allocate the domestic CCM market to Premier so that it could fix prices in that market, which resulted in Plaintiffs' purchasing DBM and CCM at artificially high prices.

### i. The DBM and CCM Agreements

*3  Plaintiffs allege that, during the Class Period, Cary W. Ahl, Sr. Premier's then-president, "regularly called" Mr. Sumikawa of YAS "to discuss fixing Premier's and Sumitomo's [DBM] prices and allocating their respective MgO accounts in the U.S." (Direct CAC ¶ 34; Indirect CAC ¶ 42.) These market allocation and price-fixing schemes were allegedly implemented by Mr. Ahl and his successors at Premier and Terry Wakisama at Sumitomo.

In the summer of 2004, Coy Akiyama of Sumitomo, Mr. Sumikawa of YAS, Gary Vannorsdel, an animal nutrition broker, and Mr. Vannorsdel's son, met at a Holiday Inn, in Tulsa, Oklahoma, to discuss plans for Sumitomo to enter the CCM market without upsetting Premier. Sumitomo had been shipping DBM to the United States on "partially empty barges and wanted to maximize efficiencies by filling these barges with [CCM] for sale to the western U.S." (Direct CAC ¶ 39; Indirect CAC ¶ 48.) Indeed, DBM shipments filled only half of Sumitomo's New Orleans barge capacity. Apparently, "Tulsa was the only port that could accommodate this barge, and Sumitomo had access to a very large storage facility in Tulsa." (Direct CAC ¶ 36; Indirect CAC ¶ 44.)

At the Tulsa meeting, "[i]n the course of discussing a strategy for Sumitomo to enter the U.S. [CCM] market, Akiyama (Sumitomo) recounted to Sumikawa (YAS) multiple discussions between him and Ahl where Ahl had

2011 WL 5008090, 2012-1 Trade Cases P 77,878

called Akiyama to set [DBM] prices; to allocate [DBM] markets; and to ensure that Sumitomo was maintaining its agreement with Premier to fix [DBM] prices and allocate [DBM] markets." (Direct CAC ¶ 40; Indirect CAC ¶ 49.) At one point, Mr. Vannorsdel "expressed concern about compromising his relationship with Premier by helping facilitate Sumitomo and YAS's involvement" in the CCM market, to which Mr. Akiyama responded, " 'Don't be concerned because we [Sumitomo] talk with Premier on a daily basis to set prices and to discuss what accounts they can have.' " (Direct CAC ¶ 41; Indirect CAC ¶ 50.)

Shortly after the Tulsa meeting, Mr. Ahl discovered Sumitomo's plan to enter the CCM market and retaliated by dropping DBM prices. [5] As a result, Sumitomo did not follow through with its plans to enter the CCM market. "Following the [CCM]-related message that Premier sent to Sumitomo and YAS via Premier's pre-market-entry retaliation, Sumitomo and YAS illegally agreed with Premier to remain out of the [CCM] market—a market Sumitomo, as a rational profit-seeking entity, was motivated to enter—thus allowing Premier to maintain its control over [CCM] pricing." (Direct CAC ¶ 43; Indirect CAC ¶ 52.)

#### ii. Fraudulent Concealment

Plaintiffs allege that the MgO conspiracy was "inherently self-concealing" and that Defendants took affirmative measures to conceal it. (Direct CAC ¶ 48–49; Indirect CAC ¶ 55–56.) Specifically, Plaintiffs allege that "[D]efendants met secretly and among themselves for the express purpose of fixing prices and allocating markets of domestically sold MgO." (Direct CAC ¶ 50; Indirect CAC ¶ 57.) In addition, Defendants allegedly explained increases in the price of MgO "by references to tight supply, thinning margins, and increased energy and freight costs." (Direct CAC ¶ 51; Indirect CAC ¶ 58.) As a result, Plaintiffs allege that "neither [P]laintiffs nor the class members had knowledge of any of the foregoing violations, and neither [P]laintiffs nor the class members, until recently, could have discovered through reasonable diligence that [D]efendants and their co-conspirators had engaged in the foregoing violations." (Direct CAC ¶ 49; Indirect CAC ¶ 56.)

#### iii. The Complaints

**\*4** On November 15, 2010, DP Plaintiffs—i.e. those who purchased either DBM or CCM directly from one or more Defendants, their predecessors, subsidiaries, or co-conspirators during the Class Period—filed a CAC against

Defendants under Sections 4 and 16 of the Clayton Act alleging violations of Section 1 of the Sherman Act, and seeking class certification under Federal Rule of Civil Procedure 23(b)(2) and (3), declaratory judgment, treble damages, costs and attorneys' fees, and an injunction. On December 30, 2010, DP Plaintiffs filed an Amended CAC to add additional factual allegations in support of their claims.

On October 7, 2010, IP Plaintiffs—i.e. those who purchased products containing DBM or CCM that was manufactured, distributed or sold by one or more Defendants, their predecessors, subsidiaries, or co-conspirators during the Class Period—filed a CAC against Defendants under Section 16 of the Clayton Act, alleging violations of Section 1 of the Sherman Act, and under various state antitrust and consumer protection laws, and seeking similar relief as the DP Plaintiffs. On December 31, 2010, IP Plaintiffs filed an Amended CAC to add similar factual allegations as those added by DP Plaintiffs in their Amended CAC.

## II. DISCUSSION

Defendants now move to dismiss both Amended CACs pursuant to Federal Rule of Civil Procedure 12(b)(6). In doing so, Defendants argue that Plaintiffs (1) lack standing to assert their federal and state antitrust claims; (2) fail to allege a plausible antitrust conspiracy to fix DBM prices, allocate portions of the domestic DBM market, and allocate the domestic CCM market to Premier; and (3) fail to plead fraudulent concealment with particularity to equitably toll the applicable federal and state antitrust statutes of limitations. Defendants further argue that IP Plaintiffs' lack standing to assert their consumer protection and unfair competition claims, and that those claims are improperly pled.

### A. Standard of Review

In assessing the parties' arguments, the Court must apply the standard of review applicable to requests for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6). That rule permits a court to dismiss a complaint for failure to state a claim upon which relief can be granted. When considering a Rule 12(b)(6) motion, the Court must accept the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir.1997). The Court's inquiry, however, "is not whether plaintiffs will ultimately

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 243 of 410
PageID: 12850
In re Magnesium Oxide Antitrust Litigation, Not Reported in F.Supp.2d (2011)
2011 WL 5008090, 2012-1 Trade Cases P 77,878

prevail in a trial on the merits, but whether they should be afforded an opportunity to offer evidence in support of their claims." *In re Rockefeller Ctr. Prop., Inc.,* 311 F.3d 198, 215 (3d Cir.2002).

The Supreme Court recently clarified the Rule 12(b)(6) standard in two cases: *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), and *Bell Atlantic Corporation v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The decisions in those cases abrogated the rule established in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim, which would entitle him to relief." In contrast, *Bell Atlantic,* 550 U.S. at 545, held that "[f]actual allegations must be enough to raise a right to relief above the speculative level." Thus, the assertions in the complaint must be enough to "state a claim to relief that is plausible on its face," *id. at 570,* meaning that the facts alleged "allow [ ] the court to draw the reasonable inference that the defendant is liable for the conduct alleged." *Iqbal,* 129 S.Ct. at 1949; *see also,* *Phillips v. County of Allegheny,* 515 F.3d 224, 234–35 (3d Cir.2008) (In order to survive a motion to dismiss, the factual allegations in a complaint must "raise a reasonable expectation that discovery will reveal evidence of the necessary element," thereby justifying the advancement of "the case beyond the pleadings to the next stage of litigation.").

**\*5** When assessing the sufficiency of a complaint, the Court must distinguish factual contentions—which allege behavior on the part of the defendant that, if true, would satisfy one or more elements of the claim asserted—from "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal,* 129 S.Ct. at 1949. Although for the purposes of a motion to dismiss the Court must assume the veracity of the facts asserted in the complaint, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id. at 1950.* Thus, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.*

When a claim is dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6), leave to amend and reassert that claim is ordinarily granted. *In re Burlington Coat Factory Litig.,* 114 F.3d 1410, 1434 (3d Cir.1997). A claim may be dismissed with prejudice, however, if amending the complaint would be futile. *Id .* "Futile," as used in this context, means that the complaint could not be amended to state a legally-cognizable claim. *Id.* (citing *Glassman v. Computervision Corp.,* 90 F.3d 617, 623 (1st Cir.1996)).

## B. Plaintiffs' Standing to Bring Antitrust Claims

Standing is a jurisdictional prerequisite under Article III of the United States Constitution. "Under Article III, the Federal Judiciary is vested with the 'Power' to resolve not questions and issues but 'Cases' or 'Controversies.' " *Arizona Christian Sch. Tuition Org. v. Winn,* ——U.S. ——, ——, 131 S.Ct. 1436, 1441, 179 L.Ed.2d 523 (2011). "To state a case or controversy under Article III, a plaintiff must establish standing." *Id. at 1442* (citing *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)). The Supreme Court explained the elements of standing in *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992):

> "First, the plaintiff must have suffered an 'injury in fact'— an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not "conjectural" or "hypothetical." ' Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court .' Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.' "

Defendants argue that Plaintiffs lack antitrust standing because they do not identify whether they purchased DBM or CCM. Specifically, Defendants contend that the alleged agreements regarding DBM and CCM, respectively, amount to "two conspiracies [that] are allegedly directed at different purchasers and encompass different time frames[,] and [n]othing indicates that anticompetitive activity in one market would have an effect on prices in the other market." (YAS Br., 9.) "Under these circumstances," according to Defendants, "a purchaser of [DBM] would suffer no redressable injury from anticompetitive conduct in the [CCM] market, and would

accordingly lack standing to maintain claims based on such conduct (and vice versa)." (*Id.*).

**\*6** This argument is unavailing because, as discussed fully below, Plaintiffs allege a single conspiracy in the domestic MgO market comprised of two agreements: one to fix prices in and allocate shares of the domestic DBM market, and one to allocate the domestic CCM market to Premier. These agreements are interdependent in that Defendants entered into the CCM agreement in order to maintain the DBM agreement. As a result, price-fixing in the DBM market has an effect on prices in the CCM market, and vice versa, because the absence of one agreement would eliminate the consideration for the other.

As a general matter, DP Plaintiffs' allegation that they were "injured by having paid more for MgO[6] than they otherwise would have paid absent [D]efendants' unlawful conduct" (Direct CAC ¶ 56) is sufficient to establish antitrust standing. Standing to sue under Section 4 of the Clayton Act is determined by a five-factor test:[7] "(1) the causal connection between the antitrust violation and the harm to the plaintiff; (2) whether the plaintiff's alleged injury is of the type that the antitrust laws were intended to redress; i.e., did the plaintiff suffer antitrust injuries; (3) the directness of the injury; (4) the existence of more direct victims of the violation; and (5) the potential for duplicative recovery or complex apportionment of damages." *In re Warfarin Sodium Antitrust Litig.,* 214 F.3d 395, 399 (3d Cir.2000) (citing *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 495 U.S. 519, 538 (1983). Here, there is little doubt that those who purchased DBM and/or CCM directly from Defendants at supracompetitive prices have standing to sue for damages under Section 4 and for injunctive relief under Section 16. *See* *id. at 401* ("It is difficult to imagine a more formidable demonstration of antitrust injury" than supra-competitive pricing.); *In re Mercedez Benz Anti–Trust Litig.,* 157 F.Supp.2d 355, 364 (D.N.J.2001) ("Where, as here, it is alleged that consumers paid a price higher than the price that would have been offered had the dealers been competing, the purpose of the antitrust laws is obviously thwarted."). Thus, DP Plaintiffs have standing to pursue their antitrust claims.

IP Plaintiffs, however, do not. While they seek solely injunctive relief under Section 16 of the Clayton Act—and therefore are not subject to the aforementioned five-factor test, *see* Note 7—they must still allege "(1) [a] threatened loss or injury cognizable in equity; (2) proximately resulting from the alleged antitrust injury." *In re Warfin,* 214 F.3d at 400. In analyzing whether an antitrust injury proximately caused an alleged loss to an indirect purchaser, this Circuit has been guided by the Supreme Court's decision in *Shield of Virginia v. McCready,* 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982).[8] *McCready* explained that "an antitrust violation may be expected to cause ripples of harm to flow through the Nation's economy; but ... [i]t is reasonable to assume that Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action." *457 U.S. at 476.* Thus, in determining whether an injury was proximately caused by an antitrust violation for Article III standing purposes, courts should "look (1) to the physical and economic nexus between the alleged violation and the harm to the plaintiff, and (2) more particularly, to the relationship of the injury alleged with those forms of injury about which Congress was likely to have been concerned in making defendant's conduct unlawful and in providing a private remedy." *Id. at 478.* In doing so, they should consider whether the plaintiff's injury is "inextricably intertwined with the injury that the conspirators sought to inflict," *In re Warfarin,* 214 F.3d at 400–01 (purchasers of prescription drug whose active ingredient was the subject of a price-fixing conspiracy maintained standing to sue as indirect purchasers because "the excess amount paid" for the drug was "inextricably intertwined with the injury [Defendant] aimed to inflict"), or, put another way, "whether the injury alleged is so integral an aspect of the conspiracy alleged, there can be no question but that the loss was precisely the type of loss that the claimed violations ... would be likely to cause." *McCready,* 457 U.S. at 479 (quotations and citations omitted) (alleged conspiracy among psychiatrists and Blue Shield to take patients away from psychologists by refusing to reimburse Blue Shield subscribers for psychotherapeutic services resulted in "clearly foreseeable" harm to Blue Shield subscribers and "was a necessary step in effecting the ends of the alleged illegal conspiracy.").

**\*7** Here, IP Plaintiffs allege that "as a direct and proximate result of Defendants' and their co-conspirators' unlawful contract, combination and conspiracy, Plaintiffs and the Class members were injured and financially damaged in their business and property by having paid more for MgO Products than they would have absent Defendants' and their coconspirators' unlawful conduct." (Indirect CAC ¶ 54.)

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 245 of 410
PageID: 12852
In re Magnesium Oxide Antitrust Litigation, Not Reported in F.Supp.2d (2011)
2011 WL 5008090, 2012-1 Trade Cases P 77,878

However, they fail to specify which MgO products—i.e. products containing DBM or CCM—they purchased. The mere fact that a product contains DBM or CCM does not necessarily mean that an increase in the price of that product is "inextricably intertwined" with, or an "a necessary step in achieving the ends" of, the alleged conspiracy to fix prices in and allocate shares of the domestic DBM and CCM markets. Indeed, the price of DBM and CCM would have a minimal foreseeable effect on the price of products containing trace amounts of them, but a significant foreseeable effect on the price of products in which they are major ingredients. Thus, without knowing which specific products IP Plaintiffs purchased, it is impossible to determine whether an increase in their price is the type of injury that furthers the object of the alleged conspiracy to fix prices in and allocate shares of the domestic DBM and CCM markets. Accordingly, IP Plaintiffs' federal antitrust claims are dismissed for lack of standing.[9] However, IP Plaintiffs are granted leave to amend in order to allege (1) the specific purchased products containing DBM or CCM and (2) the nexus between an increase in the price of those products and the alleged conspiracy to fix prices in and allocate shares of the domestic DBM and CCM markets.

Defendants further argue that IP Plaintiffs lack standing to assert their state law antitrust claims, with the exception of Iowa and California, because they only allege purchasing MgO products in Iowa and California. Specifically, Defendants contend that IP Plaintiffs "have no standing to bring claims based on violations of states in which they neither reside nor purchased any MgO products." (Sumitomo Br. (IP Pl.), 4.) IP Plaintiffs counter that "Defendants improperly confuse 'standing' with class certification issues," which, at this point, are premature. (IP Pl's Br., 30.) Specifically, IP Plaintiffs maintain that they "are not bringing claims in their own name in other states; rather they are seeking to *represent* similarly situated persons in other states," and that "[t]his issue, improperly raised by Defendants on a motion to dismiss will be addressed at class certification under Rule 23." (*Id.* at 31) (emphasis in original).

It is well-settled that a named plaintiff in a class action lawsuit is required to establish Article III standing. *See Lewis v. Casey,* 518 U.S. 343, 357, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) ("That a suit may be a class action ... adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other,

unidentified members of the class to which they belong and which they purport to represent." (quotations and citations omitted)); *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) ("[T]he plaintiff still must allege a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants."); *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974) ("[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class." (citations omitted)); *Winer Family Trust v. Queen,* 503 F.3d, 319, 326 (3d Cir.2007) ("The initial inquiry in either case is whether the lead plaintiff individually has standing.").

**\*8** Less well-settled is whether, pre-class certification, named plaintiffs are required to establish standing for each and every claim set forth in a class action complaint, or whether it is sufficient to establish standing for a single claim because a court will determine if the named plaintiffs have standing to represent the unnamed class members seeking redress under the balance of asserted claims during the class certification process pursuant to Federal Rule of Civil Procedure 23. This issue typically arises in cases, such as this one, where named plaintiffs assert analogous causes of action under the laws of many states but cannot specifically tie their injuries to each state. Indeed, here, IP Plaintiffs, who allege that they purchased MgO products in Iowa and California, assert violations of twenty-five states' antitrust laws.[10]

Courts, including this one, have held that "the fact that the named Plaintiffs may not have individual standing to allege violations of ... laws in states other than those in which they purchased Defendants' [product] is immaterial [because] [t]he issue ... is one of predominance—whether questions of law or fact common to all class members predominate over any questions affecting only individual members." *Ramirez v. STI Prepaid LLC,* 644 F.Supp.2d 496, 505 (D.N.J.2009) (quotations and citations omitted); *see also In re Grand Theft Auto Video Game Consumer Litig. (No. II),* No. 06–MD–1739, 2006 WL 3039993, at *3 (S.D.N.Y. Oct. 25, 2006) ("The relevant question ... is not whether the Named Plaintiffs have standing to sue Defendants—they most certainly do—but whether their injuries are sufficiently similar to those of the purported Class to justify the prosecution of a nationwide class action. This question is, at least in the

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 246 of 410
PageID: 12853
In re Magnesium Oxide Antitrust Litigation, Not Reported in F.Supp.2d (2011)
2011 WL 5008090, 2012-1 Trade Cases P 77,878

first instance, appropriately answered through the class certification process."); *In re Buspirone Patent Litig.,* 185 F.Supp.2d 363, 377 (S.D.N.Y.2002) ("[T]hese alleged problems with standing will not arise unless class certification is granted. If certification is granted, the proposed class would contain plaintiffs who have personal standing to raise claims under the laws governing purchases in all of the [ ] states, and the only relevant question about the named plaintiffs' standing to represent them will be whether the named plaintiffs meet the ordinary criteria for class standing ...").

Other courts find that they must initially "review[ ] the standing of actual, not proposed plaintiffs" to assert the claims in a class action complaint because "[t]he alternative ... would allow named plaintiffs in a proposed class action, with no injuries in relation to the laws of certain states referenced in their complaint, to embark on lengthy class discovery with respect to injuries in potentially every state in the Union." *In re Wellbutrin XL Antitrust Litig.,* 260 F.R.D. 143, 154–56 (E.D.Pa.2009); *see also In re Potash Antitrust Litig.,* 667 F.Supp.2d 907, 924 (N.D.Ill.2009) (named plaintiffs are required to establish standing for each claim under which they purport to represent class members because "[t]o have standing as a class representative, the plaintiff must be part of the class, that is, he must possess the same interest and suffer the same injury shared by all members of the class he represents." (quotations and citations omitted)), *rev'd on other grounds by, Minn–Chem Inco. v. Agrium Inco.,* ––– F.3d ––––, No. 10–1712, 2011 WL 4424789 (7th Cir. Sept.23, 2011); *In re Packaged Ice Antitrust Litig.,* 08–md–01952, 2011 WL 891160, at *11 (E.D.Mich. Mar. 11, 2011) ("[N]amed plaintiffs lack standing to assert claims under the laws of the states in which they do not reside or in which they suffered no injury.").

**\*9** Two Supreme Court decisions, *Amchem Prods. Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) and *Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999), are at the heart of this issue. In *Amchem,* the Supreme Court reviewed a challenge to certification of a global settlement class involving persons who were exposed to asbestos. *See* 521 U.S. at 591–92. In doing so, it analyzed the role of settlement in determining class certification under Rule 23, as well as arguments set forth by objectors that certain members of the settlement class lacked standing to sue because they had not sustained a cognizable injury or because their injury was not redressable. *Id.* at 612. The Court declined to reach the standing arguments because it found the class certification issues under Rule 23 to be dispositive. *Id.* Consequently, the Court held that because resolution of the class certification issues "here is logically antecedent to the existence of Article III issues, it is appropriate to reach them first." *Id.* (citation omitted).

The Court further explained that it was "follow[ing] the path taken by the [Third Circuit] Court of Appeals" in "declin[ing] to reach these issues because they 'would not exist but for the [class-action] certification.' " *Id.* (quoting *Georgine v. Amchem Prods., Inc.,* 83 F.3d 610, 623 (3d Cir.1996)). To be sure, in *Georgine,* the Court of Appeals, when faced with class certification and Article III issues simultaneously, decided the class certification issues first because they were dispositive. 83 F.3d at 623. In doing so, the Court found "it prudent not to decide issues unnecessary to the disposition of the case, especially when many of these issues implicate constitutional issues." *Id.* (citing *Spector Motor Serv., Inc. v. McLaughlin,* 323 U.S. 101, 105, 65 S.Ct. 152, 89 L.Ed. 101 (1944) (expressing the rule that courts will avoid constitutional questions when possible)). Thus, these rulings echo the "fundamental and longstanding principle of judicial restraint [ ] requir[ing] that courts avoid reaching constitutional questions in advance of the necessity of deciding them." *Lyng v. Northwest Indian Cemetery Protective Ass'n,* 485 U.S. 439, 445, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988).

The *Ortiz* court also dealt with certification issues regarding a global settlement class for asbestos related injuries and arguments regarding the Article III standing of certain class members who petitioners alleged did not suffer an injury-in-fact. 527 U.S. at 821, 831. As in *Amchem,* the Court decided to address the class certification issues before the Article III questions. *Id.* at 831. In doing so, it explained:

Ordinarily, of course, this or any other Article III court must be sure of its own jurisdiction before getting to the merits. *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 88–89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). But the class certification issues are, as they were in *Amchem,* "logically antecedent" to Article III concerns, 521 U.S., at 612, 117 S.Ct. 2231, 138 L.Ed.2d 689,

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 247 of 410
PageID: 12854
In re Magnesium Oxide Antitrust Litigation, Not Reported in F.Supp.2d (2011)
2011 WL 5008090, 2012-1 Trade Cases P 77,878

and themselves pertain to statutory standing, which may properly be treated before Article III standing, *see Steel Co., supra,* at 92, 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210. Thus the issue about Rule 23 certification should be treated first, "mindful that [the Rule's] requirements must be interpreted in keeping with Article III constraints...." *Amchem, supra,* at 612–613, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689.

**\*10** *Id.*

Thus, *Amchem* and *Ortiz* stand for the proposition that, in cases where a court is presented with class certification and Article III standing issues simultaneously, and the class certification issues are dispositive in that they pertain to statutory standing—i.e. whether a statute authorizes a given party to sue in the first place, the certification issues are "logically antecedent" to the standing issues and the court may therefore elect to address the certification issues first in the interest of judicial restraint. Under these circumstances, if a court finds that "certification of [a] proposed class [is] improper, the issue of certain class members' standing would [be] moot." *In re Welbutrin XL,* 260 F.R.D. at 153.

Here, however, the Court is presented solely with the issue of whether the named IP Plaintiffs have standing to assert the causes of action in the Indirect CAC, a threshold issue that the Court must address. *See Lewis* 518 U.S. at 357. Contrary to *Ramirez* and *In re Grand Theft Auto,* the "[Supreme] Court's standing cases confirm that a plaintiff must demonstrate standing for each claim he seeks to press." *DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 335, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006); *see also Allen v. Wright,* 468 U.S. 737, 752, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) ("[T]he standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted."); *Blum v. Yaretsky,* 457 U.S. 991, 999, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) ("It is not enough that the conduct of which the plaintiff complains will injure *someone.* The complaining party must also show that he is within the class of persons who will be concretely affected. Nor does a plaintiff who has been subject to injurious conduct of one kind possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject."). Otherwise, a plaintiff would be able to bring a class action complaint under the laws of nearly every state in the Union without having to allege concrete, particularized injuries relating to those states, thereby dragging defendants into expensive nationwide class discovery, potentially without a good-faith basis. In other words, the plaintiff would have to do "no more than name the preserve on which he intends to hunt." *Johnson v. Ga. Highway Express, Inc.,* 417 F.2d 1122, (5th Cir.1969), overruled on other grounds by *Griffin v. Dugger,* 823 F.2d 1476 (11th Cir.1987). Accordingly, because the named IP Plaintiff lack standing to assert antitrust violations under the laws of Arizona, the District of Columbia, Hawaii, Illinois, Maine, Minnesota, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Oregon, South Dakota, Tennessee, Utah, and West Virginia, *see* Note 10, IP Plaintiffs' claims under those laws are dismissed.

## C. The Alleged MgO Conspiracy

### i. One Conspiracy or Two

**\*11** As an initial matter, Defendants maintain that Plaintiffs allegations are confusing to the point where it is impossible to determine whether the alleged conspiracy relates to DBM, CCM, or MgO in general. As a result, Defendants contend that Plaintiffs fail to allege a plausible antitrust conspiracy. This contention is unfounded. While Plaintiffs at times refer to anticompetitive conduct regarding MgO generally, it is clear from the surrounding allegations whether such conduct concerns DBM or CCM.[11] Indeed, as evidenced by their next contention, Defendants have no problem categorizing Plaintiffs' individual allegations as relevant to DBM or CCM.

On that note, Defendants contend that, to the extent that the Court finds that Plaintiffs allege distinct conspiracies regarding DBM and CCM, respectively, the Court should analyze the allegations relating to each conspiracy separately and require that those allegations independently meet the pleading requirements of *Twombly* and *Iqbal.* Plaintiffs counter that they allege a single MgO conspiracy comprised of intertwined and interdependent anticompetitive agreements.

As Plaintiffs point out, it is well-settled that "[t]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 699, 82

2011 WL 5008090, 2012-1 Trade Cases P 77,878

S.Ct. 1404, 8 L.Ed.2d 777 (1962); *see also In re Fine Paper Antitrust Litig.,* 685 F.2d 810, 822 (3d Cir.1982) ("a seriatim examination of [ ] claims against each [ ] conspiracy defendant[ ] as if they were separate lawsuits ... overlook[s] the conspiracy itself."). Defendants contend that the Supreme Court's ruling in *Continental Ore* is inapposite because that case concerned a monopolistic exclusion conspiracy, as opposed to a price-fixing conspiracy. This contention is remarkably unpersuasive. The very case that *Continental Ore* cites for the proposition that a court must look to an alleged conspiracy as a whole, *United States v. Patten,* 226 U.S. 525, 33 S.Ct. 141, 57 L.Ed. 333 (1913), concerned a conspiracy to artificially inflate the price of cotton. Furthermore, there is no indication that *Continental Ore* limited its ruling to conspiracies based on monopolistic exclusion. *See* 370 U.S. at 699 ("we do not believe that ... liability under the antitrust laws can be measured by any rigid or mechanical formula ..."). Finally, Defendants fail to present, nor does the Court see, a single reason why it would be any less logical or equitable to assess an alleged price-fixing or market allocation conspiracy as a whole than a monopolistic exclusion conspiracy.

Defendants' contention that the Court should analyze Plaintiffs' allegations separately with respect to DBM and CCM because Plaintiffs allege "two different courses of conduct as to the two different products at two different times" (Sumitomo Reply Br., 3) is also unavailing. While it is true that Defendants initially "agreed to fix prices and allocate markets for DBM," ("the DBM Agreement") and subsequently agreed to allocate the domestic CCM market to Premier ("the CCM Agreement"), (*id.*), those agreements are not mutually exclusive. To the contrary, the CCM Agreement is dependent on the DBM Agreement, and vice versa. *See In re Vitamins Antitrust Litig.,* 320 F.Supp.2d 1, 16 (D.D.C.2004) (recognizing the potential "interdependency between various branches of a common conspiracy."). Specifically, Defendants entered into the CCM Agreement in order to restore and maintain the DBM Agreement after Premier broke that agreement due to Sumitomo and YAS's attempt to enter the domestic CCM market. Consequently, the absence of one eliminates the consideration for the other. Moreover, "[h]orizontal antitrust conspiracies commonly include sellers in more than one relevant market." *In re Vitamins Antitrust Litig.,* No. MISC 99–197, 2000 WL 1475705, at *10 (D.D.C. May 9, 2000). Accordingly, the Court will treat Plaintiffs CACs as alleging

a single conspiracy not to compete in the sale of two forms of MgO.

### ii. The Necessity of Allegations Regarding the MgO Market

**\*12** Defendants argue that Plaintiffs fail to allege an unlawful price-fixing and market allocation conspiracy because they do not set forth relevant market conditions and Sumitomo's, YAS's, and Premier's relative market power indicating that they plausibly could have fixed the price of DBM and allocated the domestic DBM and CCM markets. Plaintiffs argue that they are alleging per se violations of Section 1 of the Sherman Act and therefore "Defendants' arguments concerning market power and relevant markets are legally irrelevant." (DP Pl's. Br., 12.)

"Section 1 of the Sherman Act provides: Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." *In re Ins. Brokerage Antitrust Litig.,* 618 F.3d 300, 314 (3d Cir.2010) (quoting 15 U.S.C. § 1). "[T]his statutory language imposes two essential requirements on an antitrust plaintiff." *Id.* "First, the plaintiff must show that the defendant was a party to a contract, combination ... or conspiracy." *Id. at 315* (quotation and citation omitted). This requires the plaintiff to demonstrate "some form of concerted action" indicating a "unity of purpose or a common design and understanding or a meeting of the minds or a conscious commitment to a common scheme." *Id.* (quotations and citations omitted).

Second, "the plaintiff must show that the conspiracy to which the defendant was a party imposed an unreasonable restraint on trade ." *Id.* (quotation and citation omitted). "[T]he usual standard applied to determine whether a challenged practice unreasonably restrains trade is the so-called rule of reason." *Id.* (quotation and citation omitted). "[U]nder a rule-of-reason analysis, the plaintiff bears the initial burden of showing that the alleged [agreement] produced an adverse, anticompetitive effect within the relevant geographic market." *Id.* (quotation and citation omitted). "[S]uccessful attempts to meet this burden typically include a demonstration of defendants' market power, as a judgment about market power is [a] means by which the effects of the [challenged] conduct on the market

place can be assessed." *Id.* at 315–16 (quotation and citations omitted).

"If the plaintiff carries this burden, the court will need to decide whether the anticompetitive effects of the practice are justified by any countervailing pro-competitive benefits." *Id.* However, "Judicial experience has shown that some classes of restraints" almost never have "redeeming competitive benefits," and therefore a court need not apply the rule of reason analysis. *Id.* Instead, they are "subject to a 'per se' standard." *Id.* "Paradigmatic examples are horizontal agreements among competitors to fix prices or to divide markets." *Id.* (quotation and citation omitted). If a plaintiff's allegations "fall into one of the recognized classes," an unreasonable restraint on trade is "conclusively presumed" and therefore "plaintiffs are relieved of the obligation to define a market and prove market power." *Id.* (citations omitted).

**\*13** As discussed below, Plaintiffs sufficiently allege that Defendants entered into (1) a horizontal agreement to fix prices in and allocate shares of the domestic DBM market and (2) a horizontal agreement to allocate the domestic CCM market to Premier. Accordingly, Plaintiffs assert per se antitrust violations that do not require allegations regarding the nature of the domestic DBM and CCM markets or Defendants' power within those markets.[12]

### iii. The DBM Agreement

Defendants argue that Plaintiffs' allegations of an agreement to fix prices in and allocate shares of the domestic DBM market are facially insufficient because (1) they fail to provide the substance of the agreement, (2) they fail to rule out potentially alternative, lawful explanations for such an agreement, and (3) their "factual narrative is inherently implausible." (Sumitomo (DP Pl's.) Br., 15 .) Plaintiffs argue that their allegations of a price-fixing and market allocation agreement are sufficient because (1) they "explicitly state who was conferring with whom about MgO pricing, markets and customers" (DP Pl's. Br., 15.), and (2) Defendants' arguments regarding the inherent plausibility of the alleged conspiracy implicate factual questions that are not properly resolved on a motion to dismiss.

Defendants' contention that Plaintiffs' allegations are inadequate because they "fail to disclose the actual substance of the alleged conversations or agreements" (Sumitomo (DP Pl's.) Br., 14) is unavailing. *Twombly* does not require detailed allegations regarding the specific nature of a price-fixing or market allocation agreement; rather, "stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." 550 U.S. at 556. Put another way, a complaint "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of an illegal agreement." *Id.* Requiring Plaintiffs to set forth the full details of an antitrust conspiracy at this stage of the litigation would present an onerous burden because "in antitrust cases, [ ] the proof is largely in the hands of the alleged conspirators." *In re Neurontin Antitrust Litig.,* No. 02–1390, 2009 WL 2751029, at \*7 (D.N.J. Aug.28, 2009) (quoting *Hosp. Building Co. Trustees of Rex Hosp.,* 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976)).

Here, Plaintiffs allege that (1) a significant portion of DBM consumed in the United States comes from China; (2) during the Class Period, Premier and Sumitomo bought nearly all Chinese DBM available for purchase and resold it to their customers in the United States; (3) Mr. Ahl of Premier "regularly called" Mr. Sumikawa of YAS "to discuss fixing Premier's and Sumitomo's [DBM] prices and allocating their respective MgO accounts in the U.S" (Direct CAC ¶ 34; Indirect CAC ¶ 42); (4) these market allocation and price-fixing schemes were implemented by Mr. Ahl and his successors at Premier and Mr. Wakisama of Sumitomo; (5) at the 2004 Tulsa meeting, Mr. Akiyama recounted to Mr. Sumikawa "multiple discussions" between him and Mr. Ahl to set DBM prices and allocate DBM markets "and ensure that Sumitomo was maintaining its agreement with Premier to fix [DBM] prices and allocate [DBM] markets," (Direct CAC ¶ 40; Indirect CAC ¶ 49); and (5) when Mr. Vannorsdel allegedly "expressed concern about compromising his relationship with Premier by helping facilitate Sumitomo and YAS's involvement" in the CCM market, Mr. Akiyama responded, " 'Don't be concerned because we [Sumitomo] talk with Premier on a daily basis to set prices and to discuss what accounts they can have.' " (Direct CAC ¶ 41; Indirect CAC ¶ 50.)

**\*14** These allegations plausibly suggest that Defendants entered into an agreement to fix prices in and allocate shares of the domestic DBM market, the specifics of which can be reasonably expected to be revealed in discovery. Plaintiffs state (1) the subject of the alleged agreement, (2) the parties to the agreement and the specific individuals that discussed and implemented the agreement, and (3) the context in which

the agreement arose. This is sufficient to withstand a motion to dismiss.

Defendants' contention that Plaintiffs fail to assert a plausible antitrust conspiracy because their allegations could, in fact, refer to a lawful vertical agreement between Sumitomo and Premier to fix prices for DBM whereby Sumitomo purchases DBM from Premier as a reseller, is irrelevant. At the pleading stage, Plaintiffs need only set forth allegations that create an inference of an unlawful agreement, *Twombly, 550 U.S. at 556*, which, as previously discussed, they have done; they need not set forth allegations tending to rule out potential alternative explanations. [13]

Finally, Defendants' contention that the alleged DBM Agreement is "inherently implausible" in that, on the one hand, Sumitomo was allegedly worried about retaliatory action by Premier for attempting to enter the CCM market and, on the other hand, "could give credible assurances to the Vannorsdels that it could shield them from Premier['s] retaliation because of [Sumitomo's] 'daily' contact with Premier," (Sumitomo (DP Pl.'s) Br., 15) is similarly irrelevant because it asks the Court to improperly assess the merits of Plaintiffs' allegations. [14] *See Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc., 525 F.3d 8, 17 (D.C.Cir.2008)* ("*Twombly* was concerned with the plausibility of an inference of conspiracy, not with the plausibility of a claim. A court deciding a motion to dismiss must not make any judgment about the probability of the plaintiff's success ... the court must assume that all the allegations in the complaint as true (even if doubtful in fact)" (quotations and citations omitted)). Thus, Plaintiffs have sufficiently alleged an unlawful agreement among Defendants to fix prices in and allocate shares of the domestic DBM market.

### iv. The CCM Agreement

Defendants contend that Plaintiffs fail to allege the existence of an unlawful agreement to allocate the domestic CCM market to Premier because (1) they merely allege parallel conduct that does not indicate concerted action, (2) there are obvious alternative explanations for Sumitomo's and YAS's decision not to enter the CCM market, and (3) they fail to establish that Defendants were competitors in the CCM market. Plaintiffs counter that they are not relying on parallel conduct but rather direct admissions of an agreement among Defendants to allocate the domestic CCM market to Premier,

and therefore Defendants' proffered alternative explanations are irrelevant.

As previously discussed, *Section 1* of the Sherman Act "does not prohibit [all] unreasonable restraints of trade ... but only restraints effected by a contract, combination, or conspiracy." *Twombly, 550 U.S. at 553* (quotation and citation omitted). This is because seemingly anticompetitive conduct may be just as "consistent with conspiracy ... [as] with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Id. at 554* (citation omitted). Accordingly, "[t]he crucial question is whether the challenged anticompetitive conduct stem[s] from independent decision or from an agreement, tacit or express." *Id. at 553* (quotation and citation omitted). "Hence, when allegations of parallel conduct are set out in order to make a *§ 1* claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id. at 557.*

**\*15** This is usually accomplished by pleading one or more "plus factors" that "indicate the existence of an actionable agreement." *In re Ins. Brokerage, 618 F.3d at 321.* While "[t]here is no finite set of such criteria," the Court of Appeals has identified "at least three such plus factors: (1) evidence that the defendant had a motive to enter into a[ ] conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) evidence implying a traditional conspiracy." *Id. at 321–22* (quotations and citation omitted).

Here, Plaintiffs' allegations suggest an agreement among Defendants to allocate the CCM market to Premier. Plaintiffs allege that (1) representatives from Sumitomo and YAS met with others at a Tulsa hotel, in the summer of 2004, to discuss entering the domestic CCM market in order to fill Sumitomo's barge capacity; (2) Premier discovered their plan to enter the domestic CCM market and retaliated by lowering DBM prices; and (3) as a result, Sumitomo and YAS agreed with Premier to remain out of the CCM market.

To be sure, contrary to Plaintiffs' contentions, these allegations do not amount to a direct admission of an unlawful agreement to allocate the CCM market to Premier; taken in isolation, they merely amount to parallel conduct

plus a conclusory allegation of an agreement. Placing these allegations in the context of the CACs as a whole, however, Plaintiffs successfully demonstrate the first plus factor—that Sumitomo and YAS had a motive to enter into an unlawful agreement with Premier to stay out of the domestic CCM market—and provide a plausible context for that agreement. As previously discussed, Sumitomo and YAS maintained an agreement with Premier to fix prices in and allocate shares of the domestic DBM market. As a result, as the CACs indicate, Sumitomo and YAS wanted to enter the CCM market undetected so that they could continue to maintain their agreement with Premier in the DBM market. When Premier discovered their plans and, in response, cut prices in the DBM market, Sumitomo and YAS agreed with Premier to stay out of the CCM market with the motive of restoring and maintaining their agreement in the DBM market.

In this context, Defendants' alternative explanations that a profit-maximizing entity could independently decide not to enter a market in which (1) it remained unfamiliar with the product and its customers and (2) the dominant player recently cut prices are by no means "obvious" or "more plausible" (Sumitomo (DP Pl's.) Br., 18) than an illegal agreement to stay out of the CCM market and therefore do not provide a basis for dismissal. At the pleading stage, "a claim of conspiracy predicated on parallel conduct should be dismissed if common economic experience, or the facts alleged in the complaint itself, show that independent self-interest is an obvious alternative explanation for defendants' common behavior." *In re Ins. Brokerage,* 618 F.3d at 326. Plaintiffs' allegations need not rule out all potential alternative explanations. *See Starr v. Sony BMG Music Entertainment,* 592 F.3d 314, 352 (2d Cir.2010) ("Although the *Twombly* court acknowledged that for purposes of summary judgment a plaintiff must present evidence that tends to exclude the possibility of independent action, it specifically held that, to survive a motion to dismiss, plaintiffs need only enough factual matter (taken as true) to suggest that an agreement was made" (quotations and citations omitted)).

**\*16** Finally, Sumitomo's argument that Plaintiffs fail to allege a plausible agreement to allocate the CCM market to Premier because there is no indication that Defendants were actual or potential competitors in the CCM market is unavailing. Sumitomo specifically contends that Plaintiffs must establish that it had the intent and capability of entering the CCM market as a competitor in order to allege a plausible agreement among Defendants to allocate the CCM

market to Premier. However, the authority cited by Sumitomo provides little support for this contention. *See Palmer v. BRG of Georgia, Inc.,* 498 U.S. 46, 49–50, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990) (parties need not have competed in the same territorial market to unlawfully allocate that market); *Andrx Pharm, Inc. v. Bioval Corp., Int'l,* 256 F.3d 799, 806–07 (D.C.Cir.2001) (potential competitor must show background and experience in new market, financial capability to enter market, and affirmative steps toward entry in order to establish injury-in-fact for standing to sue under Section 4 of the Clayton Act); *Engine Specialities, Inc. v. Bombardier Ltd.,* 605 F.2d 1, 9 (1st Cir.1979) (to sustain jury finding of unlawful horizontal market allocation agreement among potential competitors, there must have been sufficient support in the record to establish that potential competitors had the "necessary desire, intent, and capability to enter the market").

To be sure, the Court of Appeals has generally recognized that the existence of an unlawful horizontal agreement to allocate a given market must occur among competitors or potential competitors in that market:

> An agreement among persons who are not actual or potential competitors in a relevant market is for Sherman Act purposes *brutum fulmen* ... To some extent, of course, a horizontal agreement tends to define the relevant market, for it tends to show that the parties to it are at least potential competitors. If they were not, there would be no point to such an agreement. Thus its very existence supports an inference that it would have an effect in a relevant market. Where, ... however, the disputed issue is the existence or scope of the alleged horizontal agreement that is to be inferred from circumstantial evidence, the first inquiry must be whether or not each firm alleged to have been a party to it was an actual or potential competitor in that market.

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 252 of 410
PageID: 12859
In re Magnesium Oxide Antitrust Litigation, Not Reported in F.Supp.2d (2011)
2011 WL 5008090, 2012-1 Trade Cases P 77,878

*United States v. Sargent Elec. Co.,* 785 F.2d 1123, 1127 (3d Cir.1986) (reversing dismissal of indictment on double jeopardy grounds). However, Sumitomo fails to present, nor is the Court aware of, any authority requiring a purchaser plaintiff to specifically establish, at the pleading stage, that the parties to a horizontal agreement to allocate a given market were competitors or potential competitors in that market. To require Plaintiffs, pre-discovery, to establish Sumitomo's background and experience in the CCM market, its financial capability to enter that market, and the specific steps taken by Sumitomo to enter it, would be overly onerous, as much of this information is likely to be exclusively in the hands of Sumitomo.[15] Thus, Plaintiffs have sufficiently alleged an unlawful agreement among Defendants to allocate the domestic CCM market to Premier.

### v. YAS' Involvement in the Alleged Conspiracy

**\*17** YAS separately argues that Plaintiffs fail to establish its participation in the alleged conspiracy because they fail to show that it came to a meeting of the minds with Sumitomo and Premier to (1) fix prices and allocate shares of the domestic DBM market and (2) allocate the domestic CCM market to Premier.[16] Plaintiffs counter that (1) they have set forth direct allegations indicating YAS's knowledge and participation in the alleged conspiracy, and (2) YAS need not have played the same role in the conspiracy, maintain the same motives as Sumitomo or Premier for participating in it, or sell MgO to be held liable.

As previously discussed, to hold YAS or any other Defendant liable, Plaintiffs must set forth allegations suggesting that YAS maintained "unity of purpose or a common design and understanding or a meeting of minds or a conscious commitment to a common scheme" with Sumitomo and Premier to (1) fix prices and allocate shares of the domestic DBM market, and (2) allocate the CCM market to Premier. *In re Ins. Brokerage,* 618 F.3d at 315 (quotations and citation omitted). This does not require a showing that YAS knew of or participated in every transaction in furtherance of or related to the alleged conspiracy. *See TV Signal Co. of Aberdeen v. American Tel. & Tel. Co.,* 462 F.2d 1256, 1259 (8th Cir.1972) ("Although knowledge is implicit in the requirement of unity of purpose, no case of which we are aware requires that each party to a conspiracy knows of each transaction encompassed by the conspiracy in order to be held accountable therefore."); *In re Vitamins Antitrust Litig.,*

320 F.Supp.2d 1, 15 (D.D.C.2004) ("Although Plaintiffs must show that each Defendant had knowledge of an agreement as to the overall conspiracy, they need not show (1) evidence of a formal agreement, or (2) knowledge, on behalf of the Defendant, of every detail of the alleged conspiracy."); *In re Mercedez–Benz,* 157 F.Supp.2d at 375 ("That a particular defendant may or may not have joined in a specific overt act in furtherance of the conspiracy ... does not affect its status as a conspirator."). On the other hand, "knowledge alone [of the conspiracy] is not sufficient" to hold it liable. *In re Vitamins,* 320 F.Supp.2d at 16. Plaintiffs must therefore set forth allegations suggesting that YAS (1) had knowledge of the conspiracy to fix prices and allocate shares of the domestic DBM market, and allocate the CCM market to Premier, and (2) intended to join that conspiracy. *Id.* "[A] party progresses form mere knowledge of an endeavor to intent to join it when there is 'informed and interested cooperation, stimulation, instigation. And there is also a stake in the venture which, even if it may not be essential, is not irrelevant to the question of conspiracy.' " *Id.* (quoting *Direct Sales Co. v. United States,* 319 U.S. 703, 713, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943)).

### 1. The DBM Agreement

Plaintiffs allege that Mr. Sumikawa of YAS (1) facilitates Sumitomo's purchases of Chinese DBM for resale in the domestic DBM market, (2) received regular phone calls from Mr. Ahl of Premier "to discuss fixing Premier's and Sumitomo's [DBM] prices and allocating their respective [DBM] accounts in the U.S," (Direct CAC ¶ 34; Indirect CAC ¶ 42), and (3) attended the 2004 Tulsa meeting where (i) Mr. Akiyama of Sumitomo recounted to him "multiple discussions" between him and Mr. Ahl to set DBM prices and allocate DBM markets "and ensure that Sumitomo was maintaining its agreement with Premier to fix [DBM] prices and allocate [DBM] markets," (Direct CAC ¶ 40; Indirect CAC ¶ ) and (ii) it was revealed that Sumitomo communicates with Premier on a daily basis fix prices and allocate accounts. These allegations create a plausible inference that YAS had knowledge of an agreement to fix prices in and allocate shares of the domestic DBM market and the intent to join it. Accepting Plaintiff's allegations as true and making all reasonable inferences in their favor, YAS' facilitation of Sumitomo's DBM purchasing indicates a plausible stake in the DBM Agreement, while its receipt of phone calls to discuss the Agreement and attendance at a meeting at which it was revealed indicates that YAS had knowledge of the DBM

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 253 of 410
PageID: 12860
In re Magnesium Oxide Antitrust Litigation, Not Reported in F.Supp.2d (2011)
2011 WL 5008090, 2012-1 Trade Cases P 77,878

Agreement and that it engaged in informed and interested cooperation.

**\*18**  Citing to  *In re Elevator Antitrust Litig.,* *502 F.3d 47, 50 (2d Cir.2007)* and  *Hinds County, Mississippi v. Wachovia Bank N.A.,* *620 F.Supp.2d 499, 518 (S.D.N.Y.2009),* YAS argues that these allegations should be "discounted" because they amount to mere "averments of agreements made at some unidentified place and time." (YAS Br., 4.) *In re Elevator Antitrust Litig.* concerned a list of "basically every type of conspiratorial activity that one could imagine ... in entirely general terms without any specification of any particular activities by any particular defendant." *502 F.3d at 50.* Similarly, *Hinds County* dealt with conclusory allegations of *" 'per se* illegal horizontal communications' in support of [an] alleged conspiracy." *620 F.Supp.2d at 518.* Here, in contrast, Plaintiffs allege (1) the way in which YAS participates with Sumitomo—a member of the conspiracy—in the domestic DBM market, (2) phone calls from Premier—another party to the conspiracy—to YAS to discuss fixing prices in and allocating shares of the domestic DBM market, and (3) YAS's attendance at a meeting where Sumitomo—its partner in the domestic DBM market—recounted to YAS discussions in which it set prices in and allocated shares of the domestic DBM market with Premier. These allegations, do not amount to a mere "list of theoretical possibilities," *In re Elevator Antitrust Litig., 502 F.3d at 50,* or "require the Court to assume the existence of the conspiracy." *Hinds County, 620 F.Supp.2d at 518.* Rather, they make the alleged conspiracy more plausible.

YAS further argues that "it is wholly implausible that [it] (a minor player that was not itself a manufacturer, importer or seller [17]) would have discussed fixing Premier's and Sumitomo's [DBM] prices," particularly since Plaintiffs fail to "allege that YAS had any ability to influence (let alone) dictate Sumitomo's [DBM] prices, nor which customers Sumitomo dealt with." (YAS Br., 5.) As previously discussed, this line of argument is not only improper at the pleading stage—where the Court must accept Plaintiffs' allegations as true—it is also unpersuasive. There is nothing "wholly implausible" about YAS participating in discussions to fix prices in and allocate shares of the domestic DBM market. Sumitomo was only able to participate in the domestic DBM market in the first place due to YAS's relationship with Chinese mines from which Sumitomo could purchase DBM

and magnesite. Consequently, it is certainly plausible that YAS could participate in discussions with co-conspirators to fix prices and allocate shares of the DBM market.

### 2. The CCM Agreement

Plaintiffs' allegations suggesting an agreement among Sumitomo and Premier to allocate the CCM market to Premier apply with equal force to YAS. As previously discussed, Plaintiffs allege that (1) Sumitomo and YAS met with others at a Tulsa hotel, in the summer of 2004, to discuss entering the domestic CCM market in order to fill Sumitomo's barge capacity; (2) Premier discovered their plan to enter the domestic CCM market and retaliated by lowering DBM prices to keep Sumitomo and YAS out of the CCM market; and (3) as a result, Sumitomo and YAS agreed with Premier to remain out of the CCM market.

**\*19**  YAS argues that these allegations are conclusory because they "provide [ ] no details whatsoever about YAS's participation in this alleged agreement, including what role it is alleged to have played." (YAS Br., 7.) At the pleading stage, however, Plaintiffs need not allege the specific nature of YAS's or any other Defendant's participation in the agreement to allocate the CCM market to Premier. *See* *In re Static Random Access Memory (SRAM) Antitrust Litig., 580 F.Supp.2d 896, 904 (N.D.Cal.2008)* ("Although Plaintiffs will need to provide evidence of each Defendants' participation [at summary judgment] ... they now only need to make allegations that plausibly suggest that each Defendant participated in the alleged conspiracy."). As previously discussed, Plaintiffs must set forth allegations suggesting that YAS had knowledge of the agreement and the intent to join it. Plaintiffs' allegations that YAS, as Sumitomo's partner in the domestic MgO market, (1) attended a meeting to arrange for Sumitomo to enter the domestic CCM market and (2) subsequently agreed with Sumitomo and Premier to allocate that market to Premier in order to maintain their agreement to fix prices and allocate shares of the domestic DBM market, do just that.

Finally, like Sumitomo, YAS argues that it cannot be held liable for the alleged agreement to allocate the domestic CCM market to Premier because Plaintiffs fail to establish that YAS was an actual or potential competitor in that market. For the reasons discussed in Point IIC*iv,* at the pleading stage, Plaintiffs, as purchasers, need not establish that YAS was an actual or potential competitor in the CCM market in order to allege its participation in a horizontal conspiracy.

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 254 of 410
PageID: 12861
In re Magnesium Oxide Antitrust Litigation, Not Reported in F.Supp.2d (2011)

2011 WL 5008090, 2012-1 Trade Cases P 77,878

Furthermore, YAS's (1) role in facilitating Sumitomo's purchase of Chinese DBM and (2) attendance at the 2004 Tulsa meeting where it, Sumitomo, and the Vannorsdels discussed entering into the CCM market, suggests that YAS intended to participate with Sumitomo in the CCM market in the same way as they had been participating in the DBM market. Thus, Plaintiffs have set forth allegations plausibly suggesting that YAS participated in an agreement to allocate the CCM market to Premier.

**D. Statute of Limitations and Fraudulent Concealment**

Actions brought under the Clayton Act are subject to a four-year statute of limitations. 15 U.S.C. § 15b. In an antitrust conspiracy that continues over a period of years, each overt act in furtherance thereof that injures the plaintiff —for example, the selling of a price-fixed product—starts the statute of limitations period running for that particular act. *Klehr v. A.O. Smith Corp.,* 521 U.S. 179, 189, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997); *see also Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 338, 91 S.Ct. 795, 28 L.Ed.2d 77 ("Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business" (citations omitted)). However, "the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period." *Klehr,* 521 U.S. at 190 (citations omitted).

 **\*20** Defendants argue that Plaintiffs' federal antitrust claims are barred by the applicable four-year statute of limitations. Specifically, Defendants contend that Plaintiffs (1) fail to allege overt acts in furtherance of the alleged conspiracy that occurred after 2004 and (2) fail to plead fraudulent concealment with particularity to otherwise toll the statute of limitations. Plaintiffs do not dispute that they fail to allege overt acts after 2004, but maintain that they plead fraudulent concealment with the requisite particularity to toll the statute of limitations.

The equitable doctrine of fraudulent concealment applies to every federal statute of limitations. *Holmberg v. Armbrecht,* 327 U.S. 392, 397, 66 S.Ct. 582, 90 L.Ed. 743 (1946). To toll a statute of limitations through fraudulent concealment, a plaintiff must show "(1) an affirmative act of concealment; (2) which misleads or relaxes the plaintiff's inquiry, who (3) exercised due diligence in investigating his

cause of action ." *In re Lower Lake Erie Iron Ore Antitrust Litig.,* 998 F.2d 1144, 1178–79 (3d Cir.1993) (citation omitted). In addition, allegations of fraudulent concealment must be pled with particularity in accordance with Federal Rule of Civil Procedure 9(b). *In re Mercedes–Benz,* 157 F.Supp.2d at 368.

However, "Rule 9[ (b) ] does not require plaintiffs to plead facts that, by the nature of the alleged fraud, are within the defendants' control." *Id.* (citing *In re Craftmatic Secs. Litig.,* 890 F.2d 628, 645 (3d Cir.1989)). Indeed, "[c]ourts must be sensitive to the fact that [a rigid] application of Rule 9(b) prior to discovery may permit sophisticated defrauders to successfully conceal the details of their fraud." *In re Craftmatic,* 890 F.2d at 645 (quotation and citation omitted). "Thus, courts have relaxed the rule when factual information is peculiarly within the defendant's knowledge or control." *Id.* Accordingly, under the more flexible application of Rule 9(b), Plaintiffs need not allege the specific information that is exclusively within Defendants' knowledge or control. *See id.* at 646. However, Plaintiffs must allege facts suggesting fraudulent concealment and "why additional information lies exclusively within the defendants' control." *Id* .

As discussed fully below, Plaintiffs fail to satisfy each element of fraudulent concealment, thus requiring dismissal of their federal antitrust claims as time-barred. However, the Court will grant Plaintiffs leave to amend their allegations of fraudulent concealment to equitably toll the statute of limitations. [18]

*i. Affirmative Acts of Concealment*

Defendants argue that (1) Plaintiffs fail to sufficiently allege affirmative acts of concealment and (2) their allegations that the MgO conspiracy is self-concealing cannot satisfy the first element of fraudulent concealment. [19] Plaintiffs contend that they have alleged (1) a self-concealing conspiracy that satisfies the first element of fraudulent concealment, or, (2) in the alternative, affirmative acts of concealment committed by Defendants.

 **\*21** The Court of Appeals has yet to define what constitutes an affirmative act of concealment in antitrust cases. However, courts have generally taken two distinct views. *In re Mercedez–Benz,* 157 F.Supp.2d at 368. The first requires a plaintiff to show one or more affirmative acts to conceal an

2011 WL 5008090, 2012-1 Trade Cases P 77,878

antitrust conspiracy that are wholly extrinsic to the conspiracy itself. *See, e.g., Colorado v. Western Paving Constr. Co.,* 630 F.Supp. 206, 2010 (D.Colo.1986), *aff'd en banc by an equally divided court,* 841 F.2d 1025 (10th Cir.1988), *cert. denied,* 488 U.S. 870, 109 S.Ct. 179, 102 L.Ed.2d 148 (1988). The second also requires a plaintiff to show one or more affirmative acts of concealment, but those acts may be part and parcel to, or in furtherance of, the conspiracy. *Supermarket of Marlington, Inc. v. Meadow Gold Dairies, Inc.,* 71 F.3d 119, 122 (4th Cir.1995) (citing *Texas v. Allen Constr. Co.,* 851 F.2d 1526, 1532 (5th Cir.1988)). The Court finds the first view to be overly restrictive in this case. In a conspiracy involving price-fixing, "it is virtually impossible to distinguish between acts in furtherance of the conspiracy and acts designed to maintain the conspiracy's secrecy because the conspiracy's success is often contingent upon its ability to avoid detection by regulators and purchasers." *In re Aspartame Antitrust Litig.,* No. 06–1732, 2007 WL 5215231, at *5 (E.D.Pa. Jan.18, 2007); *See also In re Mercedez–Benz,* 157 F.Supp.2d at 372 ("secrecy is [the] natural lair" of a price-fixing conspiracy).

Several courts, including those in this Circuit, have found that a plaintiff may avoid the affirmative act requirement altogether in cases where an antitrust conspiracy is "inherently self-concealing." *See, e.g., In re Aspartame,* 2007 WL 5215231, at *5; *In re Nine West Shoes Antitrust Litig.,* 80 F.Supp.2d 181, 192 (S.D.N.Y.2000); *In re Mercedez–Benz,* 157 F.Supp.2d at 371; *Pennsylvania Milk Indus. Mgmt. Corp.,* 812 F.Supp. 500 (E.D.Pa.1992); *Bethlehem Steel Corp. v. Fischbach & Moore, Inc.,* 641 F.Supp. 271, 273–74 (E.D.Pa.1986). However, the definition of a self-concealing antitrust conspiracy, particularly one that involves price-fixing, remains nebulous. The *In re Mercedez–Benz* court held that a self-concealing antitrust conspiracy is one where "concealment is so intertwined with the conspiracy as a whole that the equitable foundations of the fraudulent concealment doctrine require the limitations period to be tolled." 157 F.Supp.2d at 371. Other courts maintain that all properly alleged price-fixing conspiracies are inherently self-concealing. *See, e.g., In re Issuer Plaintiff Initial Public Offering Antitrust Litig.,* No. 00–7804, 2004 WL 487222, at *4 (S.D.N.Y. Mar.12, 2004); *Nine West,* 80 F.Supp.2d at 192.

The Court agrees that, under certain circumstances, an antitrust conspiracy may depend on its own concealment to the point that any act in furtherance thereof can also be said to conceal it. As the Supreme Court explained long ago, the purpose of the fraudulent-concealment doctrine is to prevent a defendant from "concealing a fraud, or ... committing a fraud in a manner that it concealed itself until such time as the party committing the fraud could plead the statute of limitations to protect it." *Bailey v. Glover,* 88 U.S. (21 Wall.) 342, 349, 22 L.Ed. 636 (1874). However, the Court cannot find that conspiracies involving price-fixing are *per se* self-concealing, as such a finding would render them wholly exempt from the applicable statute of limitations.

**\*22** Although not binding, *In re Publication Paper Antitrust Litig.,* No. 04–1631, 2005 WL 2175139 (D.Conn. Sept.7, 2005) provides a helpful framework under which to determine whether a conspiracy involving price-fixing is self-concealing for the purposes of establishing fraudulent concealment. That case found that a price-fixing conspiracy may be self-concealing, depending on the nature of the industry in which the item is price-fixed:

> In a competitive, well-regulated industry it will often be the case that a price-fixing conspiracy, if not concealed, would immediately fail because of governmental or private legal action. In such circumstances, any announcement of a price increase will carry with it an implicit statement that the price increase is legitimate, i.e., the result of competitive forces, not collusion. Nevertheless, not every price-fixing conspiracy is self-concealing. For example, there may be industries in which the participants are aware of collusion but it is not stopped because of indifference, fear, or because the perpetrators are exempt from, or beyond the reach of, antitrust laws. In such circumstances, the defendants' announcement of a price increase will not carry with it any implied certification of legitimacy, and

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 256 of 410
PageID: 12863

In re Magnesium Oxide Antitrust Litigation, Not Reported in F.Supp.2d (2011)
2011 WL 5008090, 2012-1 Trade Cases P 77,878

so, absent additional circumstances, will not be self-concealing.

*In re Publication Paper,* 2005 WL 2175139, at *4. Accordingly, "whether a particular price-fixing conspiracy or, more precisely, whether a particular announcement of a price increase necessarily conceals its true nature depends on the nature of the industry and the circumstances surrounding the announcement." *Id.* In other words, a plaintiff must show circumstances indicating that a price increase "carries with it a pretense of legitimacy" or "that it would necessarily be assumed that [it was] the result of legitimate market forces." *Id.* To do so, a plaintiff may, for example, set forth allegations showing "that price increases are not abnormal, that such increases are typically ascribed to market forces, that an openly collusive price increase would not be tolerated, and that there was nothing suspicious about the circumstances under which each of the pre-limitations period price announcements were made." *Id.*

Here, Plaintiffs fail to allege particular circumstances surrounding the MgO market indicating that the alleged conspiracy was self-concealing. Plaintiffs come close to pleading an affirmative act of concealment in alleging that "price increases for MgO were justified by references to tight supply, thinning margins, and increased energy and freight costs" (Direct CAC ¶ 51; Indirect CAC ¶ 58), however they fail to explain the particular circumstances surrounding Defendants' price increases and pretextual justifications for those increases—information which is in Plaintiffs' control—in accordance with Rule 9(b). [20] Thus, Plaintiffs have failed to meet the first element of fraudulent concealment to toll the statute of limitations. However, the Court will grant Plaintiffs leave to amend to adequately plead either (1) circumstances surrounding the MgO market during the Class Period indicating that the alleged conspiracy is self-concealing, or (2) particular circumstances surrounding Defendants' price increases and the allegedly pretextual justifications for those price increases. *See* *In re Burlington Coat Factory Litig.,* 114 F.3d at 1434.

### ii. Reliance

**\*23** Defendants argue that Plaintiffs fail to meet the second element of fraudulent concealment because they have not alleged that that they relied on Defendants' alleged affirmative acts of concealment. Plaintiffs argue that there is no reliance requirement to establish fraudulent concealment.

While the aforementioned elements of fraudulent concealment do not specifically note a reliance requirement, the language of the second element strongly suggests one. As previously noted, the second element of fraudulent concealment requires a showing that the defendant's concealment misled or relaxed the plaintiff's potential inquiry into what otherwise would have been evidence of its cause of action. *In re Lower Lake Erie,* 998 F.2d at 1179; *see also* *Forbes v. Eagleson,* 228 F.3d 471, 487 (3d Cir.2000) ("[T]he plaintiff must show that he actually was mis[led] ... into thinking that he d [id] not have a cause of action" (quotation and citation omitted)). Implicit in the notion that a plaintiff's inquiry was misled or relaxed by an act of concealment is that the plaintiff relied on that act of concealment. That is, the plaintiff's inquiry would not have been misled or relaxed if it did not rely on the defendant's act of concealment. Here, Plaintiffs make no allegations that they were misled by Defendants' concealment of the alleged conspiracy and therefore have failed to meet the second element of fraudulent concealment. However, the Court will grant Plaintiffs leave to amend to adequately plead that they relied on the self-concealing nature of Defendants' conspiracy and/or pretextual justifications for Defendants' price increases. *See* *In re Burlington Coat Factory Litig.,* 114 F.3d at 1434.

### iii. Due Diligence

Defendants argue that Plaintiffs fail to satisfy the due diligence element of fraudulent concealment because they do not allege any due diligence performed during the Class Period, particularly that which led to the discovery of the alleged conspiracy. Plaintiffs counter that, under the fraudulent concealment doctrine, they need only plead that they would not have discovered their claim, even in the exercise of reasonable due diligence. Plaintiffs further argue that determinations of due diligence are fact-intensive and therefore not properly addressed on a motion to dismiss.

The parties cite somewhat differently worded standards to support their respective positions on what the due diligence prong requires. Defendants cite *In re Lower Lake Erie,* in which the Court of Appeals held that a plaintiff must show that he "exercised due diligence in investigating his cause of action." 998 F.2d at 1178–79. Plaintiffs, on the other hand cite *Matthews v. Kidder, Peabody & Co., Inc.,* where the Court

In re Magnesium Oxide Antitrust Litigation, Not Reported in F.Supp.2d (2011)

2011 WL 5008090, 2012-1 Trade Cases P 77,878

of Appeals held that a plaintiff must show that his ignorance is not attributable to a lack of "reasonable due diligence in attempting to uncover the relevant facts." 260 F.3d 239, 256 (3d Cir.2001).

While the wording of the due diligence prong has differed slightly among Third Circuit case law, its substance has remained consistent. The due diligence prong is rooted in the notion of inquiry notice: that an injury accrues when a reasonable plaintiff under the circumstances would have discovered it. *See* Matthews, 260 F.3d at 251. As previously discussed, a federal antitrust injury accrues when an overt act is committed that injures the plaintiff, thereby triggering the four-year statute of limitations; however, one or more affirmative acts of concealment "may toll the statute of limitations [ ] if [they] mislead[ ] a plaintiff into thinking that he does not have a cause of action." *Davis v. Grusemeyer*, 996 F.2d 617, 624 (3d Cir.1993), *overruled on other grounds by* Rolo v. City Investing Co. Liquidating Trust, 155 F.3d 644 (3d Cir.1998). Thus, to establish the due diligence prong of fraudulent concealment, a plaintiff must affirmatively show that he was not on inquiry notice of the alleged antitrust conspiracy. *See id.* ("A key aspect of a plaintiff's case alleging fraudulent concealment is [ ] proof that the plaintiff was not previously on notice of the claim he now brings." (citations omitted)).

**\*24** In this Circuit, "inquiry notice [is] analyzed in two steps."[21] Matthews, 260 F.3d at 252. "First, the burden is on the defendant [s] to show the existence of 'storm warnings.' " *Id.* In this case, a storm warning would be information or data that would alert a reasonable MgO purchaser of ordinary intelligence to potentially culpable conduct. "Second, if the defendants establish the existence of storm warnings, the burden shifts to the plaintiffs to show that they exercised reasonable due diligence and yet were unable to discovery their injuries." *Id.* This requires Plaintiffs to show that (1) they investigated the storm warnings and (2) in their investigation, they exercised the due diligence expected of a reasonable DBM or CCM purchaser of ordinary intelligence. *See id.*

As Plaintiffs point out, this inquiry is necessarily bound up with the facts of the case because it "implicates factual questions as to when [a] plaintiff discovered or should have discovered the elements of the cause of action," *id.* at 250 (quotations and citation omitted); *see also* Mercedez–Benz,

157 F.Supp.2d at 373 ("At a minimum, this issue will involve assessing the factual circumstances surrounding the accused purchasing transactions and whether those circumstances would have put a reasonably diligent plaintiff on notice of a price-fixing conspiracy"), and, as a result, at the pleading stage, this court has been hesitant to dismiss an otherwise fraudulently concealed antitrust claim for failure to sufficiently allege due diligence. *See* In re Electrical Carbon Prods., 333 F.Supp.2d at 317–18; Mercedez–Benz, 157 F.Supp.2d at 374.

Citing to *In re Publication Paper* and *Hinds County,* Defendants maintain that, at the pleading stage, the due diligence prong nonetheless requires that "Plaintiffs [ ] allege with particularity when the Named Plaintiffs or Class members became aware of the antitrust violations and what inquiries [they] made into the activities alleged in the complaint." (Sumitomo Reply Br., 18) (internal quotations omitted). In *In re Publication Paper,* the plaintiffs alleged that they were aware of certain suspicious activities two years before the end of the limitations period. *See* 2005 WL 2175139, at *5. Accordingly, the court found that the plaintiffs were therefore required allege they steps they took to investigate those activities. *See id.* Here, however, Plaintiffs do not allege any suspicious activities or storm warnings within the limitations period.

Defendants' citation to *Hinds County* is more persuasive. In that case, the plaintiffs attempted to satisfy the due diligence prong by alleging that they "did not discover, nor could have discovered through reasonable diligence, that [d]efendants and their co-conspirators were violating the antitrust laws until shortly before this litigation was commenced, because [d]efendants and their co-conspirators were using deceptive and secret methods to avoid detection and affirmatively conceal their violations." Hinds County, 620 F.Supp.2d at 521–22. The court found that allegation too vague to satisfy Rule 9(b) and further explained that to deem such an allegation sufficient would "allow[ ] the allegations required to satisfy the first prong of fraudulent concealment to also satisfy the third prong." *Id.* at 521–22.

**\*25** The Court finds this logic persuasive. Here, Plaintiffs allege that, due to the secretive nature of the alleged MgO conspiracy, "neither plaintiffs nor the class members had knowledge of any of the foregoing violations, and neither plaintiffs nor the class members, until recently, could have discovered through reasonable diligence that [D]efendants

2011 WL 5008090, 2012-1 Trade Cases P 77,878

and their co-conspirators had engaged in the foregoing violations." (Direct CAC ¶ 49; Indirect CAC ¶ 56 .) This allegation cannot satisfy the requirements of Rule 9(b), particularly when it fails to encompass when and how Plaintiffs ultimately discovered the alleged MgO conspiracy—information that is certainly with Plaintiffs' control. *See*

In re Craftmatic, 890 F.2d at 645. Without some level of specificity regarding Plaintiffs' discovery of the alleged conspiracy, it is impossible to discern whether Plaintiffs could or should have discovered it within the limitations period. Thus, Plaintiffs have failed to meet the due diligence prong of fraudulent concealment. However, Plaintiffs will be granted leave to amend to adequately plead, in accordance with Rule 9(b), (1) when and how they discovered the alleged MgO conspiracy, and (2) that the self-concealing nature of the conspiracy and/or pretextual justifications for Defendants' price increases made it so that they were not alerted to any storm warnings that would otherwise trigger an obligation to perform due diligence. *See* In re Burlington Coat Factory Litig., 114 F.3d at 1434.

### E. IP Plaintiffs' Claims for Violations of Various States' Consumer Protection Laws

IP Plaintiffs assert claims under California, Florida, Hawaii, Massachusetts, Montana, Nebraska, New Hampshire, New York, South Carolina, and Vermont consumer protection and unfair competition laws. As with IP Plaintiffs' antitrust claims under state law, Defendants argue that IP Plaintiffs lack standing to assert their consumer protection claims, except that under California law, because they "do not allege purchases in any of the 10 states other than California." (Sumitomo (IP Pl.'s) Br., 5). Defendants further argue that these claims should be dismissed because IP Plaintiffs do not plead them with particularity in accordance with Federal Rule of Civil Procedure 9(b).

#### i. Standing

IP Plaintiffs' standing to sue under a state's consumer protection law is analogous to their standing under a state's antitrust law. As discussed in Point B, IP Plaintiffs' failure to tie their injuries or Defendants' unlawful conduct to a number of states was fatal to their standing to sue because the antitrust laws of those states require a showing that part of Defendants' conduct occurred or had an effect in-state. On the other hand, IP Plaintiffs have standing to sue under the antitrust laws that have no such requirement.

Similarly, many of the consumer protection and unfair competition laws asserted by IP Plaintiffs require that Defendants' unlawful conduct affect trade and commerce in the state under whose law they are suing, *see* MCA 30–14–103, 102 (Montana) ("Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful.... [T]rade or commerce [must] directly or indirectly affect[ ] the people of this state."); MGLA §§ 93A 1, 2 (Massachusetts) (same); S.C.Code 1976 §§ 39–5–10, 20 (South Carolina) (same); Neb. Rev. St. §§ 59–1602, 1601 (Nebraska) ("Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce shall be unlawful.... Trade and commerce shall mean the sale of assets or services and any commerce directly or indirectly affecting the people of the State of Nebraska."); N.H.Rev.Stat. § 358–A:2 (New Hampshire) ("It shall be unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state.");

N.Y. Gen. Bus. Law § 349 (New York) ("Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."); *Sherman v. Ben & Jerry's Franchising, Inc.,* 08–CV–207, 2009 WL 2462539, at *10 (D.Vt. Aug.10, 2009)* (Out of state plaintiffs alleging out of state conduct do not have standing to sue under Vermont Consumer Fraud Protection Act), while others do not, *see* F.S.A. 501.204, 501.211 (Florida)F.S.A. 501.204, 501.211 (Florida); HRS 480–2, 480–13 (Hawaii).[22]

**\*26** IP Plaintiffs' allegations that "Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes the above states, by affecting, fixing, controlling, and/or maintaining, at artificial and noncompetitive levels, the prices at which MgO and MgO Products were sold, distributed, or obtained in those states;" "MgO price competition was restrained, suppressed, and eliminated throughout the states;" and "MgO prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the states" (Indirect CAC ¶¶ 79, 81) are conclusory and do not tie their injuries to the alleged conspiracy's effect on trade and commerce in those specific states. Therefore, IP Plaintiffs' consumer protection claims under Montana, Massachusetts, Nebraska, New Hampshire, and New York law are dismissed for lack of standing.

#### ii. Pleading Requirements

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 259 of 410
PageID: 12866

In re Magnesium Oxide Antitrust Litigation, Not Reported in F.Supp.2d (2011)
2011 WL 5008090, 2012-1 Trade Cases P 77,878

The consumer protection laws of Florida and Hawaii—under which IP Plaintiffs currently maintain standing to sue—require that they plead the circumstances of any alleged fraudulent conduct with particularity in accordance with Rule 9(b). *See* *Jovine v. Abbott Laboratories, Inc.,* 11–CV–80111, 2011 WL 1376029 (S.D.Fla. Apr.12, 2011) (applying Rule 9(b) to allegations of unfair or deceptive acts or practices under the Florida Deceptive and Unfair Trade Practices Act); *Cannon v. U.S. Bank, NA,* Civ. No. 11–00079, 2011 WL 1637415, (D.Hawai'i Apr.29, 2011) (applying Rule 9(b) to allegations of fraudulent business practices under the Hawaii State Unfair and Deceptive Business Practices Act); *Athena Feminine Techs., Inc. v. Wilkes,* No. C 10–4868, 2011 WL 4079927 (N.D.Cal. Sept.13, 2011) ("[A] claim brought under the fraudulent prong of the [Unfair Competition Law] must be pled with particularity under Rule 9(b)").

IP Plaintiffs' allegations that "Defendants deliberately failed to disclose material facts to Plaintiff and the classes concerning Defendants' unlawful activities and artificially inflated prices for MgO and MgO Products," and "misrepresented to all consumers during the Class Period that Defendants' MgO prices were competitive and fair" (Indirect CAC ¶ 80); *see also* (Indirect CAC ¶ 83) (alleging "affirmative misrepresentations and omissions concerning the price of MgO") are not set forth with any measure of particularity. *See* *In re Supreme Specialties, Inc. Sec. Litig.,* 438 F.3d 256, 270 (3d Cir.2006) (Under Rule 9(b), a plaintiff must allege fraud with particularity by pleading the following: "(1) a specific false representation [or omission] of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his [or her] damage." (quotations and citation omitted)). Accordingly, IP Plaintiffs' consumer protection and unfair competition claims under Florida and Hawaii law are dismissed to the extent they are premised on Defendants' fraudulent conduct. However, IP Plaintiffs are granted leave to amend their allegations to comply with the requirements of Rule 9(b). Additionally, at this time, those claims may move forward to the extent they are premised on allegations of Defendants' engaging in unfair competition, as there is no indication that Rule 9(b) applies to such allegations.

## III. CONCLUSION

**\*27** For the foregoing reasons, Defendants' Motion to Dismiss is GRANTED to the following extent only. The Court rules as follows:

(1) IP Plaintiffs' federal and state antitrust claims are dismissed without prejudice for lack of standing. IP Plaintiffs have thirty (30) days to amend their allegations to set forth (1) the specific products purchased containing DBM or CCM and (2) the nexus between an increase in the price of those products and the alleged conspiracy to fix prices and allocate shares of the domestic DBM and CCM markets.

(2) IP Plaintiffs' antitrust claims under Arizona, the District of Columbia, Hawaii, Illinois, Maine, Minnesota, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Oregon, South Dakota, Tennessee, Utah, and West Virginia law are dismissed with prejudice for lack of standing.

(3) Plaintiffs' federal and state antitrust claims are dismissed without prejudice as time-barred under the applicable statutes of limitations. Plaintiffs have thirty (30) days to amend their allegations of fraudulent concealment to equitably toll those statutes of limitations.

(4) IP Plaintiffs' consumer protection and unfair competition claims under Montana, Massachusetts, Nebraska, New Hampshire, and New York are dismissed with prejudice for lack of standing.

(5) IP Plaintiffs' consumer protection and unfair competition claims under Florida and Hawaii law are dismissed without prejudice to the extent they are premised on allegations of Defendants' fraudulent conduct. IP Plaintiffs have thirty (30) days to amend those allegations to comply with Federal Rule of Civil Procedure 9(b).

The Court will enter an order implementing this opinion.

## All Citations

Not Reported in F.Supp.2d, 2011 WL 5008090, 2012-1 Trade Cases P 77,878

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.    20

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 260 of 410
PageID: 12867
In re Magnesium Oxide Antitrust Litigation, Not Reported in F.Supp.2d (2011)
2011 WL 5008090, 2012-1 Trade Cases P 77,878

# Footnotes

1   *See* Docket Nos. 10–cv–5174, 10–cv–5352, 10–cv–6095, and 10–cv–6093, and 10–cv–5943, all of which were consolidated under Docket No. 10–cv–5943.

2   To be sure, IP Plaintiffs seek only injunctive relief for Defendants' alleged violations of federal antitrust laws, as only direct purchasers may bring federal antitrust actions for damages. *Illinois Brick v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977).

3   In fact, Sumitomo, Premier, and YAS each filed separate motions to dismiss. However, each joined in the others' arguments. Therefore, for the sake of simplicity and brevity, the Court will treat them as a single motion.

4   CCM "is manufactured at lower temperatures than [DBM] and is used in products like animal feeds and fertilizers." (Direct CAC ¶ 25; Indirect CAC ¶ 31.) DBM, on the other hand, "is most often used in refractory applications." (*Id.*)

5   These prices were later restored.

6   MgO collectively refers to DBM and/or CCM. (Direct CAC ¶ 1.)

7   As discussed further below, standing to assert claims for injunctive relief under Section 16 of the Clayton Act are analyzed under a more relaxed standard. *See* *In re Warfarin,* 214 F.3d at 399.

8   Although that decision analyzed proximate causation in the context of a Section 4 claim for damages, the Court of Appeals has applied its analysis to Section 16 claims because proximate cause is an element of standing under both. *See* *In re Warfin Sodium Antitrust Litig.,* 214 F.3d 395, 400–01 (3d Cir.2000).

9   IP Plaintiffs also lack standing to assert their state antitrust claims because those claims are construed in accordance with federal antitrust principles. *See* *In re Digital Music Antitrust Litig.,* 592 F.Supp.2d 435, 448 n. 21 (S.D.N.Y.2008) (Arizona, California, District of Columbia, Iowa, Kansas, Maine, Michigan, Minnesota, North Carolina, South Dakota, Vermont, West Virginia, Wisconsin), *rev'd on other grounds by,* *Starr v. Sony BMG Music Entm't.,* 592 F.3d 314 (2d Cir.2010); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 635–36 (9th Cir.1987) (Hawaii); *Gutnayer v. Cendant Corp.,* 116 Fed. App'x 758, 761 (7th Cir.2004) (Illinois); *Monsanto Co. v. Swann,* No. 4:00–CV–1481, 2001 WL 34079480, at *3 (E.D.Mo. Sept.19, 2001) (Mississippi); Neb.Rev.Stat. § 59–829 (2010) (Nebraska); Nev.Rev.Stat. § 598A.050 (2011) (Nevada); *Minuteman, LLC v. Microsoft Corp. .,* 147 N.H. 634, 637, 795 A.2d 833 (N.H.2002) (New Hampshire); *Clough v. Rush,* 959 F.2d 182, 187 (10th Cir.1982) (New Mexico); *Fido's Fences v. Canine Fence Co.,* 672 F.Supp.2d 303, 313 (E.D.N.Y.2009) (New York); *Westgo Indus., Inc. v. W.J. King Co.,* Civil No. A3–75–82, 1981 WL 2064, at *6 (D.N.D. Mar.1, 1981) (North Dakota); *Oregon Laborers–Employees Health & Welfare Trust Fund v. Phili Morris, Inc.,* 185 F.3d 957, 963 n. 4 (9th Cir.1999) (Oregon); *In re Refalen Antitrust Litig.,* 221 F.R.D. 260, 278–79 (D.Mass.2004) (Tennessee); *Am. Airlines v. Christensen,* 967 F.2d 410, 414 (10th Cir.1992) (Utah).

10  At this time, IP Plaintiffs lack Article III standing to assert violations of the following state antitrust laws because they fail to allege a causal connection between their injuries and the conduct prohibited by the laws of those states, which require a showing that such conduct occurred, or whose effect was felt, in-state. *See* A.R.S. § 44–1402 (Arizona) ("A contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce, any part of which is within this state, is unlawful"); DC ST § 28–4502 (District of Columbia) (same); HRS § 480–4 (Hawaii) (same); 10 M.R.S.A. § 1101 (Maine) (same); SDCL § 37–1–3.1 (South Dakota) (same); K.S.A. § 50–101 (Kansas) ("A trust is a combination of capital, skill, or acts, by two or more persons," among other things, "[t]o fix any standard or figure, whereby such person's price to the public shall be, in any manner, controlled or established, any article or commodity of merchandise, produce or commerce intended for sale, use or consumption in this state"); M.C.L.A. §§

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 261 of 410
PageID: 12868
In re Magnesium Oxide Antitrust Litigation, Not Reported in F.Supp.2d (2011)
2011 WL 5008090, 2012-1 Trade Cases P 77,878

445.771, 445.772 (Michigan) ("A contract, combination, or conspiracy between 2 or more persons in restraint of, or to monopolize, trade or commerce in a relevant market is unlawful.... Relevant market means the geographical area of actual or potential competition in a line of trade or commerce, all or any part of which is within this state"); M.S.A. § 325D.54 (Minnesota) (act applies to "(a) any contract, combination, or conspiracy when any part thereof was created, formed, or entered into in this state; and (b) any contract, combination, or conspiracy, wherever created, formed, or entered into; any establishment, maintenance, or use of monopoly power; and any attempt to establish, maintain, or use monopoly power; whenever any of the foregoing affects the trade or commerce of this state."); Neb. Rev. St. § 59–801 (Nebraska) ("Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce, within this state, is hereby declared to be illegal."); N.R.S. § 598A.060 (Nevada) (same); N.M.S .A. § 1978, 57–1–1 (New Mexico) (same); W.Va.Code § 47–18–3 (West Virginia) (same); NY GBL § 340 (New York) (Every contract, agreement, arrangement or combination whereby ... [c]ompetition or the free exercise of any activity in the conduct of any business, trade or commerce or in the furnishing of any service in this state is or may be restrained ... is hereby declared to be against public policy, illegal and void."); N.C.G.S.A. § 75–1 (North Carolina) ("Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the State of North Carolina is hereby declared to be illegal."; NDCC, 51–08.1–01, 02 (North Dakota) ("A contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in a relevant market is unlawful.... Relevant market means the geographical area of actual or potential competition in a line of commerce, all or any part of which is within this state."); O.R.S. 646.705 (Oregon) ( "As used in ORS 136.617 and 646.705 to 646.805, 'trade or commerce' means trade or commerce within the state; or between the state and any state, territory, or foreign nation."); (Tennessee) T .C.A. § 47–25–101 ("All arrangements, contracts, agreements, trusts, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in the importation or sale of articles imported into this state, or in the manufacture or sale of articles of domestic growth or of domestic raw material, and all arrangements, contracts, agreements, trusts, or combinations between persons or corporations designed, or which tend, to advance, reduce, or control the price or the cost to the producer or the consumer of any such product or article, are declared to be against public policy, unlawful, and void."). IP Plaintiffs' allegations that "[P]rices for MgO and MgO Products were raised, fixed, maintained, and stabilized at artificially high levels throughout the states," and "Defendants' illegal conduct had a substantial effect on commerce in the above states" (Indirect CAC ¶¶ 72, 73) are conclusory and fail to specifically tie their injuries to the alleged MgO conspiracy occurring or its effects in those states.

IP Plaintiffs lack statutory standing to sue under Utah's antitrust laws because they have a citizenship/ residency requirement. See U.C.A. §§ 1953 76–10–919 ("A person who is a citizen of this state or a resident of this state and who is injured or is threatened with injury in his business or property by a violation of the Utah Antitrust Act may bring an action for injunctive relief and damages, regardless of whether the person dealt directly or indirectly with the defendant."), and under Illinois's antitrust laws because they do not allow a private right of action. See 740 ILCS 10/7 ("This State, counties, municipalities, townships and any political subdivision organized under the authority of this State, and the United States, are considered a person having standing to bring an action under this subsection.").

However, IP Plaintiffs apparently have standing to sue under Mississippi, New Hampshire, Vermont, and Wisconsin antitrust laws, as they provide a private right of action and have no discernible requirement of in-state conduct or effect, or residency. See Miss.Code Ann. §§ 75–21–1, 9 (Mississippi); N.H. Rev. Stat § 356:1 (New Hampshire); 9 V.S.A. §§ 2453, 2465 (Vermont); W.S.A. §§ 133.03, 133.18 (Wisconsin).

11    Moreover, the CACs specifically note at the outset that the term MgO can refer to DBM or CCM. See (Direct CAC ¶ 1; Indirect CAC ¶ 1 n. 1).

12    This also disposes of Sumitomo's contention that the Court should consider "certain relevant facts" noted in Animal Science Prods., Inc. v. China Nat'l Metals & Minerals, 596 F.Supp.2d 842 (D.N.J.2008) regarding the domestic DBM and CCM markets. (Sumitomo (DP Pl.'s) Br., 4.)

13    This is to be distinguished from the requirement to plead plus factors to rule out independent action "when a plaintiffs' claims of conspiracy rest on parallel conduct," *In re Ins. Brokerage,* 618 F.3d at 323, which is discussed below regarding the alleged CCM Agreement. Plaintiffs need not assert plus factors to establish the plausibility of the DBM Agreement because they set forth direct allegations of that agreement. *See In re Ins. Brokerage,* 618 F.3d at 323 ("Allegations of direct evidence of an agreement, if sufficiently detailed, are independently adequate.").

14    Moreover, there is nothing "inherently implausible" about Sumitomo's attempt to assuage the Vannorsdels' concern about Premier's potential retaliation by stating that it speaks with Premier on a daily basis to set DBM prices and allocate shares of the DBM market. It is certainly plausible that Sumitomo was aware of the risk of retaliation by Premier but believed it could "enter the [CCM] market discreetly" (Direct CAC ¶ 39; Indirect CAC ¶ 48) because Premier's attention was focused on maintaining their agreement in the DBM market.

15    In any event, Plaintiffs allege Sumitomo's motive for entering the CCM market (filling excess barge capacity), and certain steps taken to enter that market (meeting with the Vannorsdels in Tulsa).

16    Citing to *Toledo Mack Sales & Serv. v. Mack Trucks, Inc.,* 530, F.3d 204 (3d Cir.2008), YAS further argues that Plaintiffs' failure to establish that YAS occupies the same level as Sumitomo and Premier on the MgO supply chain "precludes *per se* treatment of YAS' alleged antitrust violations." (YAS Br., 4 n. 5.) This argument misses the mark. While *Toledo Mack* noted that, "[i]n contrast to horizontal price-fixing agreements between entities at the same level of a product's distribution chain, the legality of a vertical agreement that imposes a restriction on the dealer's ability to sell the manufacturer's product is governed by the rule of reason," and that "[t]he rule of reason analysis applies even when ... the plaintiff alleges that the purpose of the vertical agreement between a manufacturer and its dealers is to support illegal horizontal agreements between multiple dealers," 530 F.3d at 225 (citation omitted), Plaintiffs do not allege YAS' arrangement with Sumitomo to source Chinese magnesite and MgO constitutes an unlawful vertical agreement to support a horizontal conspiracy between Sumitomo and Premier. Rather, Plaintiffs allege that YAS participated directly with Sumitomo and Premier in the alleged horizontal conspiracy to fix prices and allocate shares of the DBM market and allocate the CCM market to Premier. Moreover, "[t]he law is settled that where an upstream supplier participates in a conspiracy involving horizontal competitors, it is proper to analyze the entire restraint as one of horizontal price-fixing." *In re Mercedez–Benz,* 157 F.Supp.2d at 362.

17    Citing to *Howard Hess Dental Laboratories Inc. v. Dentsply Intern., Inc.,* 424 F.3d 363 (3d Cir.2005), YAS also argues that Plaintiffs' failure to allege that it sold DBM or CCM requires its dismissal from this case as a matter of law. While that case notes the well-settled proposition that only direct purchasers may recover damages in federal antitrust suits, it by no means indicates that only a seller of the product in question may be found liable in a Section 1 conspiracy. As previously discussed, YAS need not have participated in a particular act in furtherance of the conspiracy to be held liable.

18    IP Plaintiffs' state antitrust law claims similarly require dismissal for failure to establish fraudulent concealment, as their applicable statutes of limitations range from three to six years. *See* Ariz.Rev.Stat. Ann. § 44–1410(A) (Arizona) (2011) (four years); Cal. Bus. & Prof.Code § 16750.1 (2011) (California) (four years); D.C.Code § 28–4511(b) (2011) (four years); Haw.Rev.Stat. § 480–24(a) (2010) (Hawaii) (four years); Ill. Comp. Stat. ch. 740, § 10/7(2) (2010) (four years); Iowa Code § 553.16 (2011) (Iowa) (four years); *Four B Corp. v. Daicel Chem. Indus., Ltd.,* 253 F.Supp.2d 1147, 1156 (D.Kan.2003) (Kansas) (three years) (citing Kan. Stat. Ann. § 60–512(2) (2010)); *McKinnon v. Honeywell Int'l, Inc.,* 977 A.2d 420, 424 (Me.2009) (Maine) (six years) (citing Me.Rev.Stat. Ann. tit. 14 § 752 (2008)); Mich. Comp. Laws § 445.781 (2010) (Michigain) (four years); *Am. Computer Trust Leasing v. Jack Farrell Implement Co.,* 763 F.Supp. 1473, 1491 n. 21 (D.Minn.1991) (Minnesota) (four years) (citing Minn.Stat. § 325D.64 (subdiv .1) (2010)); Miss.Code Ann. § 15–1–49(1) (2010) (three years); Neb.Rev.Stat. § 25–206 (2010) (Nebraska) (four years); Nev.Rev.Stat. § 598A.220(2)(a) (2010) (four years); N.H.Rev.Stat. § 356:12(II) (1973) (New Hampshire) (four years); N.M.

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 263 of 410
PageID: 12870
In re Magnesium Oxide Antitrust Litigation, Not Reported in F.Supp.2d (2011)
2011 WL 5008090, 2012-1 Trade Cases P 77,878

Stat. § 57–1–12(B) (1978) (New Mexico) (four years); N.Y. Gen. Bus. Law § 340(5) (2004) (New York) (four years); N.C. Gen.Stat. § 75–16.2 (2010) (North Carolina) (four years); N.D. Century Code § 51–08.1–10(2) (1987) (four years); Or.Rev.Stat. § 646.800(2) (1975) (Oregone) (four years); S.D. Codified Laws § 37–1–14.4 (1975) (South Dakota) (four years); *State ex rel. Leech v. Levi Strauss & Co.,* No. 79–722–III, 1980 WL 4696, at *3 (Tenn.Ch. Sept.25, 1980) (Tennessee) (three years) (citing Tenn. Stat. § 28–3–105(3) (2011)); Utah Code § 76–10–925(2) (1979) (Utah) (four years); Vt. Stat. Ann. tit. 12, § 511 (2010) (Vermont) (six years); W. Va.Code § 47–18–11 (1978) (West Virginia) (four years); Wis. Stat. § 133.18(2) (2011) (Wisconsin) (six years). However, to the extent that IP Plaintiffs sufficiently amend their allegations to establish fraudulent concealment of their federal antitrust claims, they will also have established fraudulent concealment of their state law antitrust claims. *See* Note 9.

19    Defendants further argue that Sumitomo's alleged admission to the Vannorsdels of the DBM Agreement cuts against their fraudulent concealment allegations. This is unpersuasive because the admission in no way put Plaintiffs on notice of their claims during the limitations period. *See Emerson Elec. Co. v. Le Carbon Lorraine, SA,* 500 F.Supp.2d 437, 448 (D.N.J.2007) ("Where fraudulent concealment of a federal antitrust claim has been shown, the four-year federal statute of limitations begins anew from the time the plaintiff knew or should have known of the existence of the federal claim." (quotations and citations omitted)).

20    Nor can Plaintiffs' conclusory allegation that "defendants met secretly and among themselves for the express purpose of fixing prices and allocating markets of domestically sold MgO" (Direct CAC ¶ 50; Indirect CAC ¶ 57) satisfy the affirmative act requirement.

21    While the following inquiry notice analysis is laid out in the context of a RICO case, it has also been applied in antitrust cases involving price-fixing. *See In re Aspartame Antitrust Litig.,* 416 Fed. App'x. 208, 211–12 (3d Cir.2011); *In re Electrical Carbon Prods. Antitrust Litig.,* 333 F.Supp.2d 303, 317 (D.N.J.2004).

22    Thus, contrary to Defendants' contention, the fact that IP Plaintiffs fail to allege that they reside or purchased an MgO product in a given state does not automatically deprive them of standing to sue under the state's consumer protection or unfair competition law. To be sure, the case Defendants cite in support of this contention held that the named plaintiffs in that case lacked standing to assert consumer protection and unfair competition claims under the laws of states in which they neither resided nor suffered an injury. *See In re Potash* 667 F.Supp.2d at 924. However, the Court cannot accept this holding as a bright line rule. Standing issues are intimately bound up with the elements of the particular claim asserted, as a plaintiff must establish that his injury is "fairly traceable to the challenged action of the defendant." *Lujan,* 504 U.S. at 560; *see also Blum,* 457 U.S. at 999 ("The complaining party must also show that he is within the class of persons who will be concretely affected."); *Allen,* 468 U.S. at 752 ("[T]he standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted.").

---

End of Document                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# **TAB 21**

375 Fed.Appx. 232
This case was not selected for
publication in the Federal Reporter. See
Not for Publication in West's Federal Reporter See
Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued
on or after Jan. 1, 2007. See also Third Circuit
LAR, App. I, IOP 5.7. (Find CTA3 App. I, IOP 5.7)
United States Court of Appeals,
Third Circuit.

Emmett J. MANN, Appellant

v.

John S. BRENNER; Dave Redshaw; Don Hoyt;
Robert A. Kinsley; Matt Jackson; City of York;
York College; Redevelopment Authority of the
City of York; Steven R. Buffington; Officer Wentz.

No. 09–2461.
|
Submitted Under Third Circuit
LAR 34.1(a) March 23, 2010.
|
Filed: March 30, 2010.

**Synopsis**
**Background:** Property owner brought § 1983 action against
city, its agents, and college, alleging retaliation, malicious
prosecution, and violation of his due process and equal
protection rights. Defendants moved to dismiss for failure to
state a claim. The United States District Court for the Middle
District of Pennsylvania, Yvette Kane, J., 2008 WL 4491950,
granted motions. Owner appealed.

**Holdings:** The Court of Appeals, Jordan, Circuit Judge, held
that:

[1] owner failed to state a First Amendment retaliation claim;

[2] owner failed to state a claim of malicious prosecution;

[3] owner was collaterally estopped from litigating claim that
he was unfairly harassed into a condemnation proceeding in
violation of his Due Process rights;

[4] owner failed to state a "class of one" equal protection
claim; and

[5] district court properly stayed discovery while evaluating
defendants' motion to dismiss.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss.

West Headnotes (5)

**[1]    Civil Rights    🔑    Property and housing**

Property owner's vague and conclusory
allegations that, after he defended himself
in court against fines for code violations,
defendant cited owner with additional fines in
retaliation for owner's initial successful defense
were insufficient to state a § 1983 claim for
First Amendment retaliation, absent allegation
of facts that could reasonably support the
necessary causal link between owner's protected
speech and the unlawful retaliation. U.S.C.A.
Const.Amend. 1; 🚩 42 U.S.C.A. § 1983.

9 Cases that cite this headnote

**[2]    Civil Rights    🔑    Criminal prosecutions**

To state a claim of malicious prosecution in
violation of the Fourth Amendment, property
owner was required to allege that defendants
acted without probable cause in citing him for
code violations and that he suffered a deprivation
of liberty consistent with the concept of a seizure
as a result of the criminal citation proceedings.

U.S.C.A. Const.Amend. 4; 🚩 42 U.S.C.A. §
1983.

4 Cases that cite this headnote

**[3]    Eminent Domain    🔑    Matters concluded**

Prior condemnation proceedings, in which
court rejected property owner's argument that
defendants harassed and intimidated him into
selling his property for an unreasonably low
price, collaterally estopped owner from litigating
claim that he was unfairly harassed into a

condemnation proceeding in violation of his Due Process rights. U.S.C.A. Const.Amend. 14.

1 Cases that cite this headnote

[4]    **Civil Rights**  ⚷  Property and housing

Property owner's allegations that he was subjected to unequal and unauthorized mistreatment on a selective basis because of the defendants' unlawful desire for his property were insufficient to state a 🔖 § 1983 claim under a "class of one" equal protection theory, where owner failed to plead that he was treated differently than other similarly situated individuals; owner's bald assertions amounted to nothing more than a formulaic recitation of the elements of a constitutional discrimination claim. U.S.C.A. Const.Amend. 14.

28 Cases that cite this headnote

[5]    **Federal Civil Procedure**  ⚷  Proceedings to obtain

District court properly stayed discovery while evaluating defendants' motion to dismiss where, had the motion been granted, discovery would have been futile.

36 Cases that cite this headnote

*233  On Appeal from the United States District Court for the Middle District of Pennsylvania (D.C. No. 06–cv–1715), District Judge: Honorable Yvette Kane.

**Attorneys and Law Firms**

Don A. Bailey, Esq., Bailey, Stretton & Ostrowski, Harrisburg, PA, for Appellant.

*234  Robert G. Hanna, Jr., Esq., James D. Young, Esq., Lavery, Faherty, Young & Patterson, Harrisburg, Pa, Paul W. Minnich, Esq., Sean E. Summers, Esq., Barley Snyder, Donald B. Hoyt, Esq., Blakey, Yost, Bupp & Rausch, York, PA, for Appellee.

Before: RENDELL, FUENTES and JORDAN, Circuit Judges.

OPINION OF THE COURT

JORDAN, Circuit Judge.

**1   Emmett Mann appeals the District Court's order granting the motions to dismiss of defendants City of York (the "City"), its agents, and York College. [1] He also appeals the District Court's decision to stay discovery pending disposition of the motions to dismiss. We have jurisdiction under 28 U.S.C. § 1291 and will affirm. [2]

**I. Background**

Mann owned a house in York, Pennsylvania, which he rented to college students. In 2004 and 2005, York College sought to acquire property for additional student housing and thus approached Mann about selling his house. However, the parties could not agree on a sales price. At some later time, Mann's home was cited for code violations and declared "blighted" by the City.

The City initiated condemnation proceedings against Mann in the Court of Common Pleas of York County. Although Mann stipulated to the blight determination, he argued that the City and York College had conspired to harass and intimidate him into selling his property for a reduced value. Mann accused the defendants of manipulating building codes and ordinance violations to bring improper charges against him, intentionally damaging his property, and lodging other unspecified false criminal charges against him. The Court of Common Pleas issued an opinion on October 6, 2006, in which it found the taking to be proper. It also concluded that the City had not acted in bad faith or committed fraud in pursuing condemnation proceedings against Mann. The condemnation concluded in May 2007, when Mann was paid $166,000 for his property.

Meanwhile, on August 31, 2006, Mann filed a complaint in the United States District Court for the Middle District of Pennsylvania, pursuant to 🔖 42 U.S.C. § 1983, in which he alleged that the defendants conspired to intimidate and harass him into accepting a significantly reduced price for his property. As Mann asserts, "[t]heir plan, plainly put, was to drive [me] crazy." (App.34.) The defendants filed motions to dismiss Mann's complaint, which the District Court granted, giving Mann leave to replead. The District Court instructed Mann on how to cure the deficiencies in his

original complaint, and he subsequently filed two amended complaints. Mann's third version of the complaint, which was dismissed on the defendants' motions, is the subject of this appeal.

Mann's appeal ultimately boils down to two overarching issues. First, he contends that the District Court applied the wrong legal standard in assessing the motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), and then erred in **235 dismissing his claims under that standard. Second, he argues that the District Court improperly stayed discovery while it considered the defendants' motions to dismiss.

## II. Discussion

We have plenary review over the question of whether the District Court applied the correct legal standard in evaluating the motions to dismiss. Phillips v. County of Allegheny, 515 F.3d 224, 230 (3d Cir.2008). We review "questions concerning the scope or opportunity for discovery" for abuse of discretion. In re Orthopedic Bone Screw Prod. Liab. Litig., 264 F.3d 344, 365 (3d Cir.2001).

### A. Motions to Dismiss

#### 1. Standard

**2 In evaluating a motion to dismiss for failure to state a claim under Rule 12(b)(6), the District Court must accept the plaintiff's well-pleaded allegations as true and draw all reasonable inferences in his favor. Phillips, 515 F.3d at 231. The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." Id. at 234 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Thus, to survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege facts sufficient to "nudge [his] claims across the line from conceivable to plausible." Id. (quoting Twombly, 550 U.S. at 570, 127 S.Ct. 1955).

The District Court used the correct standard in evaluating Mann's claims. It dedicated an entire section of its opinion to discussing the proper standard under Rule 12(b)(6) and noted that a motion to dismiss should be granted when "taking all factual allegations and inferences as true, the moving party

is entitled to judgment as a matter of law." (App.16.) The District Court recognized that the motions were governed by Rule 12(b)(6) as interpreted by the Supreme Court in Twombly and this Court in Phillips (id. at 15–16), and it continually referred to those principles in its discussion of each of Mann's claims.[3] Accordingly, there is no merit to Mann's contention that the District Court applied the wrong legal standard in evaluating the motions to dismiss.[4]

#### 2. Merits

Mann also argues that even if the District Court used the correct legal standard, it erred in applying the standard to dismiss his claims. Specifically, Mann contends that he adequately stated a claim for relief on three grounds: (1) the defendants retaliated against him, in violation of the First Amendment, by imposing heftier fines after Mann "used legal process" to successfully defend himself against other fines; (2) the defendants maliciously prosecuted him in violation of the Fourth Amendment; and (3) the defendants violated his Fourteenth Amendment rights to due process and equal protection by using harassment and intimidation to "railroad [him] into a condemnation." (Id. at 41–42.)

#### *236 a. First Amendment Retaliation

[1] Mann's First Amendment retaliation claim is based on the assertion that, after he defended himself in court against $2,000 in fines for code violations, defendant Buffington cited Mann with another $2,000 in fines in retaliation for Mann's initial successful defense. To establish a First Amendment retaliation claim predicated on 42 U.S.C. § 1983, a plaintiff must prove the following elements: (1) he engaged in constitutionally protected conduct; (2) the defendant took adverse action sufficient to deter a person of ordinary firmness from exercising his rights; and (3) the adverse action was prompted by plaintiff's protected conduct. Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir.2003).

Our review of the record leads us to agree with the District Court that Mann failed to properly allege a retaliation claim. Nowhere in Mann's third amended complaint does he allege facts that could reasonably support the necessary "causal link" between his protected speech (successfully defending the initial fines) and the unlawful retaliation

(an additional $2,000 fine). *Id.* Instead, Mann makes vague and conclusory allegations that he was assessed some unreasonable fine for some unspecified violation, in retaliation for "cho [osing] to use legal process as a way to protect and extend his rights." (App.50.) *See Ashcroft v. Iqbal,* ––– U.S. ––––, 129 S.Ct. 1937, 1950, 173 L.Ed.2d 868 (2009) (a complaint must do more than allege a "mere possibility of misconduct;" it must show the pleader's entitlement to relief). These allegations fall far short of what is required to put the defendants on notice of the claims and the bases for them. *See Phillips,* 515 F.3d at 233 (under Rule 8(a), plaintiff must plead enough facts to provide the defendant "fair notice" of the claim and the " 'grounds' on which the claim rests") (citation omitted)); *Baraka v. McGreevey,* 481 F.3d 187, 195 (3d Cir.2007) (on a motion to dismiss, "we are not compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation" (internal citations and quotation marks omitted)). Accordingly, Mann has not established that he was unlawfully retaliated against in violation of the First Amendment.

### b. *Malicious Prosecution*

**\*\*3** Mann next contends that defendants Buffington, Wentz, and Redshaw violated his Fourth Amendment right to be free from malicious prosecution by citing him with thousands of dollars in fines and bringing other "frivolous criminal charges" [5] against him. To state a claim for malicious prosecution predicated on the Fourth Amendment, a plaintiff must demonstrate that (1) the defendant acted maliciously for a purpose other than bringing the plaintiff to justice when (2) he initiated a criminal proceeding (3) without probable cause (4) which ended in the plaintiff's favor, but (5) caused the plaintiff to suffer a deprivation of liberty consistent with a seizure. *Johnson v. Knorr,* 477 F.3d 75, 81–82 (3d Cir.2007).

**[2]** Even though on its third iteration, Mann's complaint wholly fails to allege that the defendants acted without probable cause in citing him for code violations. *See Estate of Smith v. Marasco,* 318 F.3d 497, 522 (3d Cir.2003) (an "essential element of a malicious prosecution claim" is that plaintiff prove lack of probable cause). Furthermore, Mann did not allege that he **\*237** suffered a "deprivation of liberty

consistent with the concept of a seizure" as a result of the criminal citation proceedings. *Johnson,* 477 F.3d at 82. The only deprivation Mann claims to have suffered is "legal fees, court costs, and interminable inconvenience." (App.38.) Such deprivations are insufficient to establish that Mann was the victim of a malicious prosecution under the Fourth Amendment. *See DiBella v. Borough of Beachwood,* 407 F.3d 599, 603 (3d Cir.2005) (plaintiffs failed to state a § 1983 malicious prosecution claim because the inconvenience of attending trial was not a Fourth Amendment seizure; their travel was not restricted, they did not post bail, and they did not have to report to pretrial services). Accordingly, the District Court properly dismissed Mann's malicious prosecution claim.

### c. *Due Process*

Mann alleges a violation of his substantive due process rights based on the defendants' unlawful agreement "to deprive [him] of his rights through the unlawful use of state authority as a way to coerce him into compliance with their wishes." (Appellant's Br. at 18.) Mann's due process claim that he was unfairly harassed into a condemnation proceeding is barred by the doctrine of collateral estoppel. Collateral estoppel applies when: "(1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the prior action." *Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.,* 458 F.3d 244, 249 (3d Cir.2006) (citations omitted). We have plenary review over a district court's decision regarding collateral estoppel. *Id.* at 248. Mann disputed only the identity of the issues prong in the District Court and now raises the additional argument that the issue was never actually litigated.

**\*\*4** **[3]** The Honorable Sheryl Ann Dorney presided over the condemnation proceeding in the Court of Common Pleas of York County. Judge Dorney rejected Mann's precise argument that the defendants harassed and intimidated him into selling his property for an unreasonably low price. (App. 69 (describing Mann's argument that the City had "bad faith or tainted motive" in obtaining his property "for as nominal price as possible" and noting that "we fail to see how this argument is valid.").) Addressing Mann's contention that the City "acted in bad faith by acting in consort with York

College to obtain the propert[y] as inexpensively as possible," Judge Dorney concluded that Mann had "not overcome the heavy burden to show that the [City] has committed fraud or an abuse of discretion." (*Id.* at 68–69.) This record makes clear that the identical issue [6] Mann **238** seeks to raise on appeal was actually litigated in the state condemnation proceeding. Accordingly, to the extent that Mann seeks to relitigate whether the defendants unlawfully coerced him into selling his property for a nominal value, the issue is barred by collateral estoppel. [7]

Mann's complaint also raises, though not explicitly, a "class of one" equal protection claim. The Equal Protection Clause of the Fourteenth Amendment requires that similarly situated individuals be treated alike. *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). An equal protection claim may be brought by a "class of one," an individual claiming "that [ ]he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (per curiam). To state a claim under the "class of one" theory, a plaintiff must show that "(1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment." *Phillips,* 515 F.3d at 243 (quoting *Hill v. Borough of Kutztown,* 455 F.3d 225, 239 (3d Cir.2006)). In *Olech,* the Supreme Court upheld the plaintiff's claim that the village violated the Equal Protection Clause by arbitrarily demanding a 33–foot easement to connect her property to the municipal water supply while only demanding a 15–foot easement from other property owners. *Olech,* 528 U.S. at 565, 120 S.Ct. 1073. The Supreme Court later clarified that "[w]hat seems to have been significant in *Olech* [was] the complaint alleged that the board consistently required only a 15–foot easement, but subjected Olech to a 33–foot easement." *Engquist v. Or. Dep't of Agric.,* 553 U.S. 591, 128 S.Ct. 2146, 2153, 170 L.Ed.2d 975 (2008).

[4]    In his complaint, Mann sets forth general allegations that "he was subjected to unequal and unauthorized mistreatment on a selective basis because of the defendants['] unlawful desire for his property," in violation of his right to equal

protection. (App.49.) Although he alleges that "[o]ther citizens are not treated in this fashion, particularly the political leaders of the City of York" (*id.* at 41), Mann fails to plead that he was treated differently than other similarly situated individuals, that is, other property owners of blighted structures in the City of York. While *Olech* may not require plaintiffs to "identify in the complaint specific instances where others have been treated differently," *Phillips,* 515 F.3d at 245, the complaint is still deficient. Without any allegation regarding other blighted property owners, Mann simply cannot "nudge [his] claims across the line from conceivable to plausible." *Id.* at 234 **239** (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955); *see also Hill,* 455 F.3d at 239 ("class of one" claim failed because plaintiff, a Borough Manager, did "not allege the existence of similarly situated individuals—i.e., Borough Managers—who [the Mayor] treated differently than he treated [plaintiff]"). Mann's bald assertions that the defendants violated his right to equal protection because "he was selectively and vindictively cited and prosecuted by the City in an effort to force him into cooperation with York College" (App.44), "amount to nothing more than a 'formulaic recitation of the elements' of a constitutional discrimination claim." *Iqbal,* 129 S.Ct. at 1951 (citation omitted). Accordingly, the District Court properly dismissed Mann's equal protection claim.

B. *Discovery*

**5    [5]    Mann contends that it was an abuse of discretion for the District Court to stay discovery while it considered the defendants' motions to dismiss. [8] In certain circumstances it may be appropriate to stay discovery while evaluating a motion to dismiss where, if the motion is granted, discovery would be futile. *See Iqbal,* 129 S.Ct. at 1954 ("Because respondent's complaint is deficient under Rule 8, he is not entitled to discovery."). That is precisely the case here. As laid out above, none of Mann's claims entitle him to relief. That, as Mann contends, he could have produced "a litany of facts" substantiating his claims (Appellant's Br. at 30), if he had more time to conduct discovery, misses the mark. *See Mitchell v. McNeil,* 487 F.3d 374, 379 (6th Cir.2007) (because plaintiffs' complaint failed to state a claim for relief, "it follows that the district court did not err in granting defendants' Rule 12(b)(6) motion before permitting discovery by plaintiffs"). A motion to dismiss pursuant to

Rule 12(b)(6) tests the legal sufficiency of a claim, and therefore may be decided on its face without extensive factual development. *See Neitzke v. Williams,* 490 U.S. 319, 326–27, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989) (the purpose of Rule 12(b)(6) is to "streamline[ ] litigation by dispensing with needless discovery and factfinding"); *Chudasama v. Mazda Motor Corp.,* 123 F.3d 1353, 1367 (11th Cir.1997) ("A motion to dismiss based on failure to state a claim for relief should ... be resolved before discovery begins."); *Rutman Wine Co. v. E. & J. Gallo Winery,* 829 F.2d 729, 738 (9th Cir.1987) (the idea that discovery should be permitted before deciding a motion to dismiss "is unsupported and defies common sense [because t]he purpose of F.R. Civ. P. 12(b)(6) is to enable defendants to challenge the legal sufficiency of complaints without subjecting themselves to discovery"). Accordingly, the District Court did not abuse its discretion in staying discovery pending resolution of the **\*240** motions to dismiss. [9]

### III. Conclusion

For the foregoing reasons, we will affirm the order of the District Court granting the defendants' motions to dismiss.

### All Citations

375 Fed.Appx. 232, 2010 WL 1220963

## Footnotes

1   The City defendants include John S. Brenner (Mayor), Don Hoyt, Matt Jackson, Dave Redshaw, Steven R. Buffington, Officer Wentz, and the Redevelopment Authority of the City of York. The York College defendants include York College and Robert A. Kinsley, a private contractor.

2   The District Court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

3   Mann fails to cite either *Twombly* or the "plausibility" standard it ushered in, instead choosing to rely on the now defunct "no-set-of-facts" standard of *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (Appellant's Br. at 22), which the Supreme Court squarely rejected in *Twombly. See Twombly,* 550 U.S. at 563, 127 S.Ct. 1955 (*Conley's* no-set-of-facts language "has earned its retirement. The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard").

4   Even if the District Court had applied the wrong legal standard, that would not in itself entitle Mann to relief because our review of a motion to dismiss for failure to state a claim is *de novo. McTernan v. City of York, Pa.,* 577 F.3d 521, 526 (3d Cir.2009).

5   As the District Court observed, "[a]lthough [Mann] was strongly encouraged to do so in the Court's previous order, [Mann] still does not identify the date, the forum, or specifically what charges were involved in these 'criminal charges.' " (App.18.)

6   We have held that "[t]o defeat a finding of identity of the issues for preclusion purposes, the difference in the applicable legal standards must be 'substantial.' " *Raytech Corp. v. White,* 54 F.3d 187, 191 (3d Cir.1995). Judge Dorney evaluated Mann's claim under state condemnation law, which places a "heavy" burden on the plaintiff to prove that "the condemnor is guilty of fraud, bad faith or has committed an abuse of discretion." (App. 68 (quoting *Downingtown Area Sch. Dist. v. DiFrancesco,* 125 Pa.Cmwlth. 264, 557 A.2d 819, 820 (1989)).) Mann apparently asks us to evaluate his claim under a general due process rubric, which focuses on whether "the alleged harassment 'remove[d] or significantly alter[ed]' plaintiffs' liberty and property interests." *Thomas v. Independence Twp.,* 463 F.3d 285, 297 (3d Cir.2006) (citation omitted). Although we recognize that the plaintiff's burden is greater in the context of state condemnation law than in pleading a due process violation, we find that the issue addressed and resolved in the condemnation proceeding is "in substance the same" as Mann's due process claim. *Raytech Corp.,* 54 F.3d at 193. Both schemes

**Mann v. Brenner, 375 Fed.Appx. 232 (2010)**

require a court to decide whether the defendants engaged in unlawful conduct to deprive the plaintiff of his property, and Mann has failed to persuade us that the legal standards are substantially different in this case. We therefore conclude that the identity prong is satisfied.

7    Mann apparently concedes that he is collaterally estopped from relitigating whether the condemnation action was brought in bad faith. He states that Judge Dorney "decided (and quite correctly so) that the aforementioned misconduct was not relevant to the issue of the Condemnor having the power to take the subject property, nor did the obvious misconduct interfere with the procedure which eventually decided 'just compensation.' " (Appellant's Br. at 27.) However, Mann maintains that although "Judge Dorney decided properly on the condemnation issue," she failed to address "any civil rights issues which may have shared a possible commonality of facts." (*Id.*) For that reason, we address Mann's due process claim, as well as his retaliation and malicious prosecution claims.

8    Mann urges us to apply dicta contained in our decision in *Alston v. Parker,* 363 F.3d 229 (3d Cir.2004), to determine that he was entitled to discovery before dismissal. The facts of *Alston* are easily distinguishable from those in the case at hand. For one, the plaintiff in *Alston* was *pro se* and a prisoner involuntarily committed to a psychiatric hospital. Furthermore, despite our recognition that "confined prisoner[s]" face difficulty in bringing civil rights actions "owing to their incarceration or institutionalization," we concluded that the district court did not err in failing to order discovery because "it is not essential at the pleading stage." *Id.* at 233 n. 6, 236. Moreover, the central holding of the case was that the district court improperly applied a stringent pleading standard that conflicted with Rule 8(a)'s notice pleading. *Id.* at 232 ("[T]he lack of discovery was not the real barrier blocking Alston's path to relief. Rather, it was the stringent pleading standard presupposed by the parties and the District Court."). Accordingly, we decline to extrapolate the reasoning of *Alston* to this case, brought by a represented party and properly evaluated under Rule 8(a)'s notice pleading standard.

9    Mann suggests that the District Court should have granted him leave to amend his complaint. Because Mann was permitted to do so twice before the present motions to dismiss were filed, we think the District Court was well within its discretion in finding that allowing Mann a fourth bite at the apple would be futile. *See Phillips,* 515 F.3d at 245 (dismissal without leave to amend is justified where the amendment would be futile); *Lorenz v. CSX Corp.,* 1 F.3d 1406, 1413 (3d Cir.1993) (district court may deny amendment based on "repeated failure to cure deficiencies by amendments previously allowed") (quoting *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)).

---

**End of Document**                                     © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 22

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 273 of 410
PageID: 12880
In re Mercedes-Benz Emissions Litigation, Not Reported in Fed. Supp. (2019)
2019 WL 413541, RICO Bus.Disp.Guide 13,132

🚩 KeyCite Red Flag - Severe Negative Treatment

Vacated and Remanded by In re Mercedes-Benz Emissions Litigation, 3rd
Cir.(N.J.), January 10, 2020

2019 WL 413541
**NOT FOR PUBLICATION**
United States District Court, D. New Jersey.

IN RE MERCEDES-BENZ
EMISSIONS LITIGATION

Civil Action No.: 16-881 (JLL)(JAD)
|
Signed 02/01/2019

**OPINION**

JOSE L. LINARES, Chief Judge

*1  This matter comes before the Court by way of Defendants
Mercedes-Benz USA, LLC's and Daimler AG's motion to
dismiss the Fourth Consolidated and Amended Class Action
Complaint ("FAC"), (ECF No. 117), as well as Defendant
Robert Bosch LLC's motion to dismiss the FAC, (ECF No.
118). Plaintiffs have opposed these motions (ECF Nos. 126–
27), and Defendants have replied thereto, (ECF Nos. 131–32).
The Court decides this matter without oral argument, pursuant
to Federal Rule of Civil Procedure 78. For the reasons stated
below, Defendants' motions are granted in part and denied in
part.

**I. BACKGROUND [1]**

**A. Facts**

This is a putative class action involving allegations that
Defendants Mercedes-Benz USA, LLC and Daimler AG
(collectively, "Mercedes"), together with Bosch GmbH
and Bosch LLC (collectively, "Bosch") have unlawfully
mislead consumers into purchasing certain "BlueTEC diesel"
vehicles (the "Polluting Vehicles") by misrepresenting the
environmental impact of these vehicles during on-road
driving. (FAC ¶ 10–20). [2]

According to Plaintiffs, "Mercedes' advertisements,
promotional campaigns, and public statements represented
that the Polluting Vehicles had high fuel economy, low
emissions, reduced NOx by 90%, had lower emissions

than comparable diesel vehicles, and had lower emissions
than other comparable vehicles." (FAC ¶ 323). However,
Mercedes, with help of Bosch, installed an electronic control
unit in the Polluting Vehicles known as the EDC17. (FAC
¶ 358). The EDC17 allegedly functions as a defeat device,
meaning it turned off or limited emissions reductions during
real-world driving conditions. (FAC ¶¶ 16–17, 21). This
defeat device was "only discoverable when conducting
over-the-road testing that is not part of the certification
protocol." (FAC ¶ 252). The Polluting Vehicles also allegedly
failed to perform up to their touted environmental standards
in other situations, such as when ambient temperatures drop
below 50°F/10°C—a defect Mercedes has acknowledged.
(FAC ¶ 135).

Plaintiffs contend that Mercedes never disclosed the existence
of the defeat device, nor the fact that the BlueTEC engines
emit emissions substantially higher than those of gasoline
vehicles, and thus, "defrauded its customers by omission, and
engaged in fraud and unfair and deceptive conduct under
federal and state law." (FAC ¶¶ 19, 313). Had Plaintiffs known
of the emissions issues associated with the Polluting Vehicles,
they would not have purchased those vehicles, or they would
have paid substantially less for them. (FAC ¶ 317). As to
Bosch, the FAC sets forth that Mercedes and Bosch entered
into a scheme to evade U.S. emissions requirements and
to deceive "the public into believing the Polluting Vehicles
were 'clean diesels,' " in order to "bolster revenue, augment
profits and increase Mercedes' share of the diesel vehicle
market." (FAC ¶¶ 17, 356).

*2  Plaintiffs, on behalf of a national class and state
subclasses, now assert claims for violation of the RICO Act,
as well as violations of state consumer protection statutes, and
fraudulent concealment. (FAC ¶¶ 342–1752).

**B. Procedural History**

Plaintiffs initiated this action on February 18, 2016. (ECF
No. 1). On May 6, 2016, Plaintiffs filed the Consolidated
and Amended Class Action Complaint ("CAC"). (ECF No.
17). Mercedes moved to dismiss the CAC on July 8, 2016.
(ECF No. 38). This Court granted that motion on December
6, 2016. (ECF Nos. 58–59). The Court found that Plaintiffs
failed to establish Article III standing because the CAC did
not allege that their injury was fairly traceable to Mercedes'
conduct. (ECF No. 58 at 11–14). In particular, the Court found
that "Plaintiffs have not alleged that they actually viewed
any category of advertisements ... that contained the alleged
misrepresentations." (ECF No. 58 at 14). Accordingly, the

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 274 of 410
PageID: 12881
In re Mercedes-Benz Emissions Litigation, Not Reported in Fed. Supp. (2019)

2019 WL 413541, RICO Bus.Disp.Guide 13,132

Court dismissed the CAC without prejudice. (ECF Nos. 58–59). Plaintiffs then filed a third consolidated and amended class action complaint on March 3, 2017, (ECF No. 81), and finally, they filed the operative FAC on September 25, 2017 adding Bosch as a defendant and the accompanying RICO allegations. Mercedes and Bosch now move separately to dismiss the FAC arguing that Plaintiffs lack Article III standing, that Plaintiffs' state-law claims are preempted by the Clean Air Act or, alternatively, fail to state a claim, and finally that Plaintiffs fail to state a RICO claim.

## II. LEGAL STANDARD

### A. Federal Rule of Civil Procedure 12(b)(1): Standing

Defendants seek to dismiss Plaintiffs' Complaint for lack of standing. "Rule 12(b)(1) governs motions to dismiss for lack of standing, as standing is a jurisdictional matter." *N. Jersey Brain & Spine Ctr. v. Aetna, Inc.*, 801 F.3d 369, 371 n.3 (3d Cir. 2015).

"In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Storino v. Borough of Point Pleasant Beach*, 322 F.3d 293, 296 (3d Cir. 2003) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975) ). "It is axiomatic that, in addition to those requirements imposed by statute, plaintiffs must also satisfy Article III of the Constitution ...." *Horvath v. Keystone Health Plan E., Inc.*, 333 F.3d 450, 455 (3d Cir. 2003). The requirements of Article III standing are as follows:

> (1) the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the conduct complained of; and (3) it must be likely, as opposed to merely speculative, that the injury be redressed by a favorable decision.

*Taliaferro v. Darby Twp. Zoning Bd.*, 458 F.3d 181, 188 (3d Cir. 2006) (quoting *United States v. Hays*, 515 U.S. 737, 742–43 (1995) ); *see also* *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (reiterating the same factors and articulating the second factor as "fairly traceable to the challenged conduct of the defendant").

On a motion to dismiss for lack of standing, the plaintiff " 'bears the burden of establishing' the elements of standing, and 'each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation.' " *FOCUS v. Allegheny Cty. Ct. Com. Pl.*, 75 F.3d 834, 838 (3d Cir. 1996) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ). "For the purpose of determining standing, [the court] must accept as true all material allegations set forth in the complaint, and must construe those facts in favor of the complaining party." *Storino*, 322 F.3d at 296 (citing *Warth*, 422 U.S. at 501).

### B. Federal Rule of Civil Procedure 12(b)(6)

**\*3** To withstand a motion to dismiss for failure to state a claim, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

To determine the sufficiency of a complaint under Twombly and Iqbal in the Third Circuit, the Court must take three steps. "First, it must 'tak[e] note of the elements [the] plaintiff must plead to state a claim.' Second, it should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.' Finally, '[w]hen there are well-pleaded factual allegations, a court should assume

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 275 of 410
PageID: 12882
In re Mercedes-Benz Emissions Litigation, Not Reported in Fed. Supp. (2019)
2019 WL 413541, RICO Bus.Disp.Guide 13,132

their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 675, 679) (citations omitted). "In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

### III. ANALYSIS

**A. Article III Standing**

As mentioned briefly above, this Court had previously dismissed Plaintiffs' CAC for lack of standing. In its prior Opinion, this Court found that while the Plaintiffs had set forth allegations "sufficient to support [their] claims that the [Polluting Vehicles] do not live up to Defendants' representations," Plaintiffs nevertheless failed to establish Article III standing because it was not clear that the injury was "fairly traceable" to Defendants' conduct. (ECF No. 58 at 8, 14). This was because "no Plaintiff ha[d] alleged that he or she relied upon any of the cited advertisements in deciding to lease or purchase one of Defendants' vehicles." (ECF No. 58 at 13–14). Both Mercedes and Bosch now argue that Plaintiffs lack Article III standing. (ECF Nos. 117-1 at 19–25; 118-1 at 19–27). Mercedes and Bosch both claim that Plaintiffs failed to address the traceability deficiencies raised in the Court's prior Opinion. (ECF Nos. 117-1 at 19–23; 118-1 at 25–27). Mercedes also argues that Plaintiffs allegations contain three theories of injury that are foreclosed as a matter of law: allegations regarding public environmental and health harms, violations of environmental regulations, and allegations of future harm, and that Plaintiffs have nevertheless abandoned these theories as a basis for standing. (ECF No. 117-1 at 24). Mercedes argues that Plaintiffs' benefit of the bargain theory is unsupported by allegations in the FAC. (ECF No. 117-1 at 24). Bosch similarly claims that Plaintiffs have abandoned all theories of injury except for a benefit-of-the-bargain injury, but that the "benefit of the bargain, upon which Plaintiffs base their claim for overpayment, cannot serve as the basis for an Article III injury in the absence of a contract or any 'bargain' between [Bosch] and Plaintiffs." (ECF No. 118-1 at 20–21). The Court will address these arguments in turn.

1. Injury-in-Fact

**\*4** Plaintiffs have established an injury in fact that can serve as the basis for Article III standing. In its prior Opinion, this Court found that "Plaintiffs have plausibly pled that the products received did not live up to the claims made by Defendants," and that "benefit of the bargain damages are recoverable for overpayment and recoverable to confer standing." (ECF No. 58 at 6, 8). In challenging Plaintiffs' benefit of the bargain theory of injury in fact, both Mercedes and Bosch argue that Plaintiffs have not shown that the Polluting Vehicles "failed to work for [their] intended purpose or [are] worth objectively less than what one could reasonably expect." (ECF No. 117-1 at 24 (quoting *Koronthaly v. L'Oreal USA, Inc.*, 374 F. App'x 257, 259 (3d Cir. 2010)); ECF No. 118-1 at 21). However, accepting Plaintiffs' allegations as true, they paid a higher price for the BlueTEC clean diesel engines, which, in reality, polluted at levels far higher than would be expected. (FAC ¶¶ 317, 323). "In other words, they paid for a product which did not operate in the way they believed it did." *In re Duramax Diesel Litig.*, 298 F. Supp. 3d 1037, 1052 (E.D. Mich. 2018). Claims of overpayment for a misrepresented product are "classic form[s] of injury in fact," that "[are] concrete and particularized." *In re Gerber Probiotic Sales Practice Litig.*, No. 12-835, 2013 WL 4517994, at \*5 (D.N.J. Aug. 23, 2013).

Defendants' reliance on cases like *Koronthaly* and *Estrada v. Johnson & Johnson*, No. 16-7492, 2017 WL 2999026 (D.N.J. July 14, 2017), is misplaced, as those cases are distinguishable. In fact, *Estrada* explains why the facts before Judge Wolfson in that case and before the Third Circuit in *Koronthaly* are different from those present here. Judge Wolfson wrote that:

> [w]hile Plaintiff places reliance on several cases recognizing standing on a benefit-of-the-bargain theory of economic harm, those cases are distinguishable from the present matter[, because] ... in each of those cases, the courts found that the plaintiffs did not receive the benefit of their bargain because either: (i) the plaintiffs received a defective product; or (ii) the plaintiffs pled facts sufficient for the court to conclude

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 276 of 410
PageID: 12885

In re Mercedes-Benz Emissions Litigation, Not Reported in Fed. Supp. (2019)

2019 WL 413541, RICO Bus.Disp.Guide 13,132

that they would not have purchased the product at issue but for a specific misrepresentation by the defendants; *i.e.*, that the plaintiff was induced into purchasing the product by a specific misrepresentation.

*Estrada*, 2017 WL 2999026, at *9. In both *Koronthaly* and *Estrada*, the plaintiffs pled injury-in-fact based on economic harm from an alleged physical injury that came from an undisclosed risk from using a cosmetic product. 374 F. App'x at 259; 2017 WL 2999026, at *9. However, these are cases where "the plaintiffs suffered no ill effects." *In re Gerber*, 2013 WL 4517994, at *5. That is not the case here, as Plaintiffs have pled facts asserting that they fall into either of the two categories recognizing standing on a benefit of the bargain theory as outlined in *Estrada*.

In addition, Bosch argues that Plaintiffs have not established an injury-in-fact in their claims against it, because "[Bosch] was not a party to any of Plaintiffs' vehicle-purchase contracts, and no named Plaintiff makes any allegation that they had any relationship with [Bosch]." (ECF No. 118-1 at 21). Bosch's reliance on the absence of privity of contract is not relevant in this context. In the cases Bosch cites in support of this proposition—*Koronthaly, Bowman v. RAM Med., Inc.*, No. 10-cv-4403, 2012 WL 1964452 (D.N.J. May 31, 2012), and *Young v. Johnson & Johnson*, No. 11-4580, 2012 WL 1372286 (D.N.J. Apr. 19, 2012)—the lack of the contract alone was not the only reason the plaintiffs failed to establish injury-in-fact. In each case, it was the lack of privity of contract in addition to a failure to allege facts demonstrating that the product failed to work as intended or was worth less than what a reasonable consumer would expect. *Koronthaly*, 374 F. App'x at 259; *Bowman*, 2012 WL 1964452, at *3; *Young*, 2012 WL 1372286, at *4. Judge Chen explained in *In re Chrysler-Dodge-Jeep Ecodiesel Marketing, Sales Practices and Products Liability Litigation ("FCA ")*:

> *5  [T]he courts in *L'Oreal* and *Johnson & Johnson* never held that a plaintiff must have a contractual relationship with a defendant in order to assert a cognizable overpayment injury. Instead, those courts simply noted that the plaintiffs there had invoked a benefit-of-the-bargain theory of injury, but could not maintain such a theory because they had not entered into contracts with the defendants. Here, Plaintiffs do not allege that they entered into contracts with the Bosch Defendants, which were then breached. Rather, Plaintiffs assert that the Bosch Defendants played a role in designing, implementing, and concealing software that was used in the Class Vehicles to cheat emissions tests.... The benefit-of-the-bargain contract analysis in *L'Oreal* and *Johnson & Johnson* is therefore inapplicable.

295 F. Supp. 3d 927, 953 (N.D. Cal. 2018). [3]

#### 2. Fairly Traceable

Defendants' traceability arguments also fail. While this Court is very cognizant of its previous Opinion dismissing the CAC on traceability grounds, it now finds that the FAC addresses these concerns, in light of Plaintiffs amendments and a spate of recent decisions in other districts addressing Article III standing in very similar cases which support a finding that Plaintiffs have established Article III standing. Mercedes and Bosch attack the traceability query from different angles, so the Court will address their arguments separately.

##### i. *Mercedes*

Mercedes argues that "fifty-four out of the sixty named plaintiffs in the FAC [ ] still fail to allege facts sufficient to support Article III standing," despite the Court's prior Opinion holding that those same Plaintiffs did not establish reliance on the cited advertisements in their decision to purchase or lease a Polluting Vehicle. (ECF No. 117-1 at 19–20). Mercedes claims that twenty-four of those plaintiffs reallege the same boilerplate, generalized assertions of deception and reliance that the Court previously rejected. (ECF No. 117-1 at 20–21). Another seventeen Plaintiffs point to advertising

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 277 of 410
PageID: 12884
In re Mercedes-Benz Emissions Litigation, Not Reported in Fed.Supp. (2019)
2019 WL 413541, RICO Bus.Disp.Guide 13,132

from non-party dealerships, while seven Plaintiffs do not allege that the advertisements they saw "contained the alleged misrepresentations." (ECF No. 117-1 at 21–22). Finally, six more Plaintiffs do not allege that they viewed or relied on Mercedes' ads before buying or leasing their vehicle. (ECF No. 117-1 at 23).

Plaintiffs argue that they have cured these defects by retooling their complaint and "focusing on Mercedes' omissions and referencing the 'clean diesel' marketing campaign to demonstrate that those omissions were plausibly material to the targeted consumers." (ECF No. 126 at 28). The Court agrees. Plaintiffs have, for example, alleged that "Mercedes marketed the BlueTEC-equipped vehicles as environmentally friendly and fuel efficient," that this advertising "[was] widely disseminated throughout the United States," and that Mercedes "h[eld] itself out as a protector of the environment." (FAC ¶¶ 321–22, 324). At the same time, Plaintiffs allege that "Mercedes intentionally shut[ ] down or severely limit[ed] the emissions control system when the BlueTEC vehicles are on the road," and that Mercedes "intentionally concealed" and hid this fact "from the consuming public at the same time that" it "touted the vehicles as 'clean,' earth friendly, and complaint with all the relevant emissions standards." (FAC ¶ 16).

**\*6** Similar allegations have been found by other courts addressing defect device-based diesel emissions scandals across the country. In *Counts v. General Motors*, the plaintiffs also asserted an overpayment theory. 237 F. Supp. 3d 572, 582 (E.D. Mich. 2017). The Court explained as follows:

> GM promised a clean diesel engine—including 'at least 90% less nitrogen oxide and particulate emissions'—but actually delivered a vehicle that turns off its emissions reduction system when in use. GM charged more for the diesel Chevrolet Cruze model than a comparable gasoline model and Plaintiffs chose the diesel model based at least in part on its 'clean diesel' features. Accordingly, Plaintiffs allege that GM's misrepresentations resulted in their overpaying for a vehicle because the vehicle did not work in the way GM promised it would.

*Id.* The *Counts* Court found that:

> [t]his alleged disparity between what the Cruze was represented to be and what it actually is ... is sufficient

to constitute an injury in fact. Even if the Plaintiffs did not specifically rely on the 'clean diesel' advertising in choosing to buy the Cruze, they paid a price, determined the market, which relied upon GM's representation that the vehicle included a fully functional 'clean diesel' system.... Plaintiff's overpayment can thus be traced directly to GM's alleged actions.

*Id.* at 586.

In *In re Duramax Diesel Litigation*, the plaintiffs alleged that GM "represented the Duramax [diesel] engine as providing both low emissions and high performance." 298 F. Supp. 3d 1037, 1046 (E.D. Mich. 2018). However, the *Duramax* plaintiffs alleged that the high power and efficiency of the Duramax engine was obtained only by reducing emissions controls with the aid of a defeat device. *Id.* at 1047. The *Duramax* plaintiffs alleged that had they known "of the higher emissions at the time they purchased or leased their Polluting Vehicles, they would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did." *Id.* at 1050. The *Duramax* Court found that the injury was "traceable to GM's actions: GM developed the Duramax engine (including the alleged defeat devices), marketed its diesel vehicles as environmentally friendly, and set the MSRP for its diesel vehicles." *Id.* at 1052.

Lastly, in *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*, the Court analyzed whether inflated financing and leasing fees paid by former lessees of the class vehicles were fairly traceable to the conduct of Volkswagen. —— F. Supp. 3d. ——, 2018 WL 4777134, at \*9 (N.D. Cal. Oct. 3, 2018). The plaintiffs in that case alleged that they paid a premium for Volkswagen's TDI "clean diesel" vehicles, which Volkswagen marketed as "being low-emission, environmentally friendly, fuel efficient, and high performing," while concealing "the fact that VW had installed software in these cars that caused their emission controls to perform one way during emissions testing, and another (less effective) way during normal driving conditions. *Id.* at \* 1. The Court found that the increased fees were fairly traceable to Volkswagen's conduct, because the ' "clean diesel' premium plausibly increased the price of the financed

vehicles, which in turn would have led directly to higher financing fees." *Id.* at *9.

**\*7** The allegations in the three cases finding Article III standing above are sufficiently similar to those before this Court to support a finding that the alleged injury in fact was fairly traceable to Mercedes' conduct. As to Mercedes' argument that fifty-four of the sixty named plaintiffs fail to establish Article III standing, this argument fails for the same reasons elaborated above. The "boilerplate" allegations that Mercedes' claims are insufficient are quite the opposite. That language is as follows:

> Unknown to Plaintiff, at the time the vehicle was purchased, it was equipped with an emissions system that turned off or limited its emissions reduction system during normal driving conditions and emitted pollutants such as NOx at many multiples of emissions emitted from gasoline-powered vehicles, at many times the level a reasonable consumer would expect from a "Clean Diesel", and at many multiples of that allowed by federal law. Mercedes' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the ML 350 without proper emission controls has caused Plaintiff out-of-pocket loss, future attempted repairs, and diminished value of his vehicle. Mercedes knew about, manipulated, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle was a "clean diesel" as compared to gasoline vehicles, complied with United States emissions standards, and would retain all of its operating characteristics throughout its useful life, including high fuel economy. Plaintiff selected and ultimately purchased his vehicle, in part, because of the BlueTEC Clean Diesel system, as represented through advertisements and representations made by Mercedes. Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Polluting Vehicle had high emissions compared to gasoline vehicles and the fact that Mercedes had designed part of the emissions reduction system to turn off during normal driving conditions. Had Mercedes disclosed this design, and the fact that the ML 350 actually emitted pollutants at a much higher level than gasoline vehicles do, and at a much higher level than a reasonable consumer would expect, and emitted unlawfully high levels of pollutants, Plaintiff would not have purchased the vehicle, or would have paid less for it.

(FAC ¶27). The FAC sets out these same allegations for each named plaintiff. (FAC ¶¶ 27–87). These allegations mirror those in *Counts, Duramax,* and *Volkswagen,* in addition to the other portions of the FAC already outlined above. As such, the Court rejects Mercedes' arguments regarding the deficiencies of the named plaintiffs' claims as to Article III standing.

### ii. *Bosch*

Bosch argues that Plaintiffs' allegations are based on its alleged misconduct with Volkswagen and Fiat-Chrysler, and Bosch's conduct with respect to other auto-makers "cannot serve to establish a causal relationship to Plaintiffs' alleged injuries concerning Mercedes vehicles." (ECF No. 118-1 at 25). Even if those allegations could establish a causal relationship, Bosch argues, Plaintiffs have failed to identify any advertisements, representations, or omissions by Bosch itself, and thus Plaintiffs' injuries are not fairly traceable to Bosch. (ECF No. 118-1 at 26).

Case 1:19-md-02875-RMB-SAK   Document 598-3   Filed 10/16/20   Page 279 of 410
PageID: 12886
In re Mercedes-Benz Emissions Litigation, Not Reported in Fed. Supp. (2019)
2019 WL 413541, RICO Bus.Disp.Guide 13,132

**\*8** Plaintiffs argue that they have adequately alleged that their injuries are fairly traceable to Bosch's conduct for the same reasons that the injuries are fairly traceable to Mercedes' conduct. (ECF No. 127 at 16.) This Court agrees. The FAC is littered with allegations detailing Bosch's active participation in the alleged scheme to market the BlueTEC line of vehicles as "clean diesels" when Bosch knew they were not. For example, Plaintiffs allege that without Bosch's "knowing and active cooperation, Mercedes would not have been able to carry out the 'Clean Diesel' scheme outlined in this complaint," and that Bosch "participated not just in the development of the defeat device, but in the scheme to prevent U.S. regulators from uncovering the device's true functionality." (FAC ¶¶ 20, 106). Bosch also allegedly "marketed 'Clean Diesel' in the United States and lobbied U.S. regulators to approve 'Clean Diesel.' " (FAC ¶ 106).

In *FCA*, the Northern District of California dealt with facts nearly identical to the case before this court. There, the plaintiffs alleged that they paid more for the EcoDiesel feature, which the defendant falsely advertised as delivering more power, performance, fuel economy, and environmental friendliness than comparable gasoline vehicles. 295 F. Supp. 3d at 946. Bosch argued similarly that the plaintiffs had "not identified any statement that [Bosch] made to [the plaintiffs] that could support a purportedly inflated price for the Class Vehicles," and that because Bosch was not a party to the contract with Plaintiffs, it could not have deprived them of their benefit of the bargain. Id. at 951. There, as here, the plaintiffs alleged that Bosch "participated in a scheme and conspiracy with [the auto manufacturers] to develop, implement, and conceal software used in the Class Vehicles to cheat emissions tests." Id. The FCA Court found that the hidden software in the EDC17 rendered the affected vehicles defective, and thus less valuable, and that because Bosch "had a hand in developing and implementing this software, their conduct plausibly caused Plaintiffs' economic loss." Id. The FCA Court continued: "to the extent [Bosch] knowingly concealed the software installed in the Class Vehicles from regulators and consumers, Plaintiffs' economic injuries are also fairly traceable to that conduct," because the FCA plaintiffs, like the Plaintiffs here, alleged that the would not have bought or leased the Polluting Vehicles, or would have paid less to do so had the defeat device been disclosed. Id. at 952. Thus, the FCA court determined that the plaintiffs did not "need to identify a statement on which

they relied that was made by [Bosch] to plausibly trace their economic injuries to these entities." Id.

The *Duramax* Court reached the same conclusion when facing Bosch's arguments regarding traceability. There, the Plaintiffs alleged that Bosch participated in the scheme to develop the defeat device and prevent U.S. regulators from discovering it, in addition to lobbying U.S. regulators to approve "clean diesel." 298 F. Supp. 3d at 1053. Faced with these allegations, Bosch argued that, because it did not manufacture the *Duramax* engine or market the affected vehicles, "any overpayment by Plaintiffs [was] attributable solely to GM's actions." Id. The *Duramax* Court reasoned that though "the exact nature of [Bosch's] marketing is unclear, it is plausible that Bosch's efforts contributed to the market demand for 'clean diesel' vehicles, generally, in the United States," and that the premiums Plaintiffs paid for those vehicles "were a natural consequence of that market demand." Id. "In other words, Plaintiffs overpaid for their vehicles *because* Bosch worked closely with GM to install working defeat devices in the *Duramax* vehicles." Id. Thus, the *Duramax* Plaintiffs adequately alleged that their injury was fairly traceable to Bosch's conduct. Id. at 1054. Both FCA and *Duramax* lay out factually analogous precedent for finding that Plaintiffs have established Article III standing as to their claims against Bosch, and this Court will apply that precedent here in finding the same.

## B. Rico Claims

**\*9** Plaintiffs have also alleged a RICO claim against defendants. They state:

> For many years now, the RICO Defendants have aggressively sought to increase the sales of Polluting Vehicles in an effort to bolster revenue, augment profits and increase Mercedes' share of the diesel vehicle market. Finding it impossible to achieve their goals lawfully, however, the RICO Defendants resorted instead to orchestrating a fraudulent scheme and conspiracy. In particular, the RICO Defendants, along with other entities and individuals, created and or participated in the affairs of an

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 280 of 410
PageID: 12887
In re Mercedes-Benz Emissions Litigation, Not Reported in Fed. Supp. (2019)
2019 WL 413541, RICO Bus.Disp.Guide 13,132

illegal enterprise ("Emissions Fraud Enterprise") whose direct purpose was to deceive the regulators and the public into believing the Polluting Vehicles were "clean diesels." As explained in greater detail below, the RICO Defendants' acts in furtherance of the Emissions Fraud Enterprise violate § 1962(c) and (d).

(FAC ¶ 336).

The Racketeer Influenced and Corrupt Organizations Act "makes it unlawful 'for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.' " *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 362 (3d Cir. 2010) (quoting 18 U.S.C. § 1962(c) ). Section 1962(d) expands liability under the statute by making it "unlawful for any person to conspire to violate [ 18 U.S.C. § 1962(c)]". 18 U.S.C. § 1962(d). "The RICO statute provides for civil damages for 'any person injured in his business or property by reason of a violation of [ § 1962].' " *Amos v. Franklin Fin. Servs. Corp.*, 509 F. App'x 165, 167 (3d Cir. 2013) (quoting *Tabas v. Tabas*, 47 F.3d 1280, 1289 (3d Cir. 1995) ). A violation of the statute requires:

> (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. The plaintiff must, of course, allege each of these elements to state a claim. Conducting an enterprise that affects interstate commerce is obviously not in itself a violation of § 1962, nor is the mere commission of the predicate offenses. In addition, the plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or

property by the conduct constituting the violation.

*Id.* (quoting *Sedima S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985) ).

Defendants argue that Plaintiffs have failed to allege a RICO injury, RICO causation, and a RICO enterprise, and that they have otherwise failed to allege a pattern of racketeering with particularity. (ECF Nos. 117-1 at 25–39; 118-1 at 27–55).

### 1. RICO Injury

The injury to business or property element of a RICO claim requires "proof of a concrete financial loss and not mere injury to a valuable intangible property interest." *Maio v. Aetna, Inc.*, 221 F.3d 472, 483 (3d Cir. 2000) (quoting *Steele v. Hosp. Corp. of Am.*, 36 F.3d 69, 70 (9th Cir. 1994) ). A complaint therefore must contain allegations "of actual monetary loss, i.e., an out-of-pocket loss" to adequately plead the injury element. *Id.* Physical or emotional harm to a person is insufficient to show that a person was injured in his business or property under the act. *Magnum v. Archdiocese of Phila.*, 253 F. App'x 224, 227 (3d Cir. 2007). "Similarly, losses which flow from personal injuries are not [damage to] property under RICO." *Id.* (quotations omitted).

**\*10** Defendants argue that Plaintiffs alleged injuries—diminished value and overpayment—are not cognizable under RICO. Diminished value is not a proper RICO injury, according to Defendants, because Plaintiffs have not alleged facts showing that the vehicles have a lower resale value, and RICO injury cannot be based on possible future events or factual speculation. (ECF Nos. 117-1 at 26; 118-1 at 31–32). Defendants are correct that RICO does not recognize injuries conditioned on future events or injuries that are impermissibly speculative. *Maio*, 221 F.3d at 495.

In fact, Plaintiffs fail to address Defendants' contentions that their diminished value claims are not sufficient for RICO purposes. "Where an issue of fact or law is raised in an opening brief, but it is uncontested in the opposition brief, the issue is considered waived or abandoned by the non-movant in regard to the uncontested issue." *Markert v. PNC Fin. Servs. Grp.*, 828 F. Supp. 2d 765, 773 (E.D. Pa. 2011). Thus, to the extent Plaintiffs' RICO claims are based on

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 281 of 410
PageID: 12888

In re Mercedes-Benz Emissions Litigation, Not Reported in Fed. Supp. (2019)

2019 WL 413541, RICO Bus.Disp.Guide 13,132

their diminished value theory of injury,[4] Plaintiffs do not have RICO standing. *See* *Duramax, 298 F. Supp. 3d at 1071* (finding that the plaintiffs' diminished value damages—based on a nearly identical paragraph to paragraph 332 of the FAC—"are contingent on future, uncertain developments," and that those "injuries may never occur," "are ... currently unmeasurable," and "cannot give rise to RICO standing").

Plaintiffs' overpayment theory does not suffer from the same fatal flaws. As described above, Plaintiffs allege that had Defendants disclosed the existence of the defeat device and the true emissions performance of the Polluting Vehicles, they would not have purchased those vehicles or would have paid substantially less for them. Defendants argue that Plaintiffs' overpayment allegations fail to establish RICO standing because "loss of value" or "benefit of the bargain" damages are typically not available in RICO suits, and because "absent the sale of [a Polluting] Vehicle at a loss, Plaintiffs' overpayment theory is a claim for a speculative, intangible property interest rather than a concrete financial loss." (ECF Nos. 117-1 at 27; 118-1 at 29). The existing diesel emissions litigation decisions squarely reject these arguments and distinguish the cases relied upon by Mercedes and Bosch.

*Volkswagen, 2018 WL 4777134, at *13–15,* *FCA, 295 F. Supp. 3d at 959–61;* *Duramax, 298 F. Supp. 3d at 1068–73.* The Court agrees with those decisions.

Defendants rely heavily on *In re Bridgestone/Firestone, Inc. Tires Products Liability Litigation, 155 F. Supp. 2d 1069 (S.D. Ind. 2001),* *In re General Motors LLC Ignition Switch Litigation, Nos. 14-md-2543, 14-mc-2543, 2016 WL 3920353 (S.D.N.Y. July 15, 2016),* and *McLaughlin v. American Tobacco Co., 522 F.3d 215 (2d Cir. 2008),* in support of their claim that overpayment allegations are insufficient to create RICO standing.

**\*11** The *Bridgestone* plaintiffs asserted a RICO claim against Bridgestone/Firestone on the grounds that there was an alleged defect in certain tires that created a dangerous likelihood of tread separation. *155 F. Supp. 2d at 1077.* The plaintiffs based their RICO injury on their need to "bear the financial loss associated with the cost of replacing the Tires and/or the diminished value of their vehicles equipped with the Tires now that the truth regarding their safety and lack of roadworthiness is known." *Id. at 1089.* Plaintiffs also based RICO injury on the fact that, had they known

of the defect, they would not have bought, or would have paid substantially less for the defective tires or the vehicles equipped with them. *Id.* The Court determined that these injuries were too speculative to sustain a RICO injury as "[t]he actual failure of the Tires ... is a contingency upon which Plaintiffs' economic damages are dependent." *Id. at 1092.*

In *Ignition Switch,* the plaintiffs' RICO claim was premised on GM's manufacture of vehicles with a defective ignition switch. *2016 WL 3920353, at *1.* The plaintiffs' theory of injury was that they would not have purchased those cars, or paid less for them, had they known of the defective ignition switch. *Id. at *7.* The Court held that this theory did not create RICO standing, because " 'loss of value' or 'benefit of the bargain' damages 'are generally unavailable in RICO suits' and 'plainly' unavailable where (similar to the case here) a RICO claim 'sound[s] in fraud in the inducement.' " *Id. at *16* (quoting *McLaughlin, 522 F.3d at 228–29*).

Finally, *McLaughlin* concerned a class action based on allegations that the defendants—tobacco companies fraudulently marketed light cigarettes as healthier alternatives to "full-flavored" cigarettes. *522 F.3d at 220.* The plaintiffs' theory of injury in this case was again based on a benefit of the bargain argument: the plaintiffs created a "loss of value" model which measured "the difference between the price plaintiffs paid for light cigarettes as represented by defendants and the (presumably lower) price they would have paid (but for defendants' misrepresentation) had they known the truth." *Id. at 228.* The Second Circuit held that these expectation-based damages did not suffice to create a RICO injury, because "Defendants' misrepresentation could in no way have reduced the value of the cigarettes that plaintiffs actually purchased, they simply could have induced plaintiffs to buy Lights instead of full-flavored cigarettes." *Id. at 229.* Additionally, the plaintiffs' theory required the Second Circuit to "conceptualize the impossible—a healthy cigarette—and then to imagine what a consumer might have paid for such a thing." *Id. at 229.*

There are critical differences between the theory of injury set forth here by Plaintiffs and the RICO injuries alleged in the three aforementioned cases. First, Plaintiffs allege that they overpaid for the Polluting vehicles *at the time of purchase.* FAC ¶ 400. All three courts to have dealt with the question

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 282 of 410
PageID: 12889
In re Mercedes-Benz Emissions Litigation, Not Reported in Fed. Supp. (2019)
2019 WL 413541, RICO Bus.Disp.Guide 13,132

of RICO injury in the context of a defeat device-based diesel emissions litigation have concluded that the fact that the injury occurred at the time of purchase constitutes a RICO injury. In *Duramax*, the Court wrote that such an injury, "clearly suffices to create RICO standing," as the plaintiffs had identified "a specific payment attributable directly to the vehicle component at issue which they opted to purchase on the basis of fraudulent conduct." 298 F. Supp. 3d at 1071–72. In *FCA*, the Court similarly found that "Plaintiffs' allegations of overpayment easily clear[ed] the threshold" for establishing a concrete RICO injury where "Plaintiffs ... identified a particular, reasonably narrow range by which they allegedly overpaid for the Class Vehicles." 295 F. Supp. 3d at 962.

While Defendants argue that *Duramax* and *FCA* are distinguishable because they allege an overpayment of a specific amount, (ECF Nos. 134–35, 143–44), that is not the hill upon which RICO injury dies. In *Volkswagen*, Plaintiffs adequately alleged a RICO injury where they contended that "they each paid a premium for something that they did not receive—a vehicle with low emissions." 2018 WL 4777134, at *14. This injury was sufficiently concrete and tangible, despite the fact that these plaintiffs did not identify the specific amount of damage. *Id.* In fact, the *FCA* Court acknowledged the same. 295 F. Supp. 3d at 962 (noting that the threshold for RICO injury does not require a particular dollar amount); *see also In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*, 804 F.3d 633, 639–640 (3d Cir. 2015) (finding plaintiffs adequately alleged RICO injury based on allegations that they overpaid—absent a specific dollar amount—for a drug due to the inflationary effect that a drug manufacturer's illegal or deceptive marketing practices had on the drug); *In re Aetna UCR Litig.*, MDL No. 2020, Civ. No. 07-3541, 2015 WL 3970168, at *10 (D.N.J. June 30, 2015) (finding plaintiffs adequately alleged RICO injury where plaintiffs claimed they suffered "out-of-pocket losses in the form of higher co-payments" and "overpaid for their health insurance plans"). What is important, and what is alleged here, is that the overpayment occurred at the time of purchase, rather than being "contingent on a future occurrence or on the vagaries of the free market." *Duramax*, 298 F. Supp. 3d at 1072.

**\*12** Additionally, "courts have recognized expectation damages under RICO ... where an agreement between the parties provided for a certain performance guarantee that

the defendant had no intention of keeping." *Ignition Switch*, 2016 WL 3920353, at *17 (collecting cases). Here, as in *Volkswagen*, *FCA*, and *Duramax*, Plaintiffs allege that Defendants participated in a scheme to place a defeat device in the Polluting Vehicles, rendering them defective from the moment they were manufactured. Because Defendants allegedly knew of—and orchestrated the creation of—that defect, they had no intention of delivering vehicles with heightened fuel efficiency and environmental friendliness.

*See Duramax*, 298 F. Supp. 3d at 1072 ("But, here, GM allegedly sold *Duramax* vehicles, for a premium, which did not perform as a reasonable consumer would expect. In other words, Defendants had no intention of delivering the emissions performance which consumers expected.").

Finally, to the extent there remains a question whether Plaintiffs' overpayment theory constitutes an injury to business or property for the purposes of RICO, Supreme Court precedent indicates that it does. *Reiter v. Sonotone Corporation* is an antitrust case in which the Supreme Court interpreted Section 4 of the Clayton Act, which allows any person injured "in his business or property" by the violation of an antitrust law to sue under that statute. 442 U.S. 330, 337 (1979) (quoting 15 U.S.C. § 15). The Supreme Court concluded that when "a consumer ... acquires] goods or services for personal use, [she] is injured in 'property' when the price of those goods or services is artificially inflated by reason of the anticompetitive conduct complained of." *Id.* at 339. The Third Circuit has referenced the Supreme Court's rationale in *Reiter* when analyzing a RICO claim as support for the conclusion that monetary loss suffices to constitute a RICO injury. *Maio, 221 F.3d at 483–84* (3d Cir. 2000). Thus, *Reiter* would indicate that Plaintiffs' allegations that they overpaid for the Polluting Vehicles as a result of Defendants' deceptive conduct constitute injuries to property. *See Volkswagen*, 2018 WL 4777134, at *14 (interpreting *Reiter* the same way); *FCA*, 295 F. Supp. 3d at 959 (same); *Duramax*, 298 F. Supp. 3d at 1067–68, 1072–73 (same).

## 2. RICO Causation

A civil RICO plaintiff is required "to show that a RICO predicate offense 'not only was a "but for" cause of his injury,

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 283 of 410
PageID: 12890
In re Mercedes-Benz Emissions Litigation, Not Reported in Fed.Supp. (2019)
2019 WL 413541, RICO Bus.Disp.Guide 13,132

but the proximate cause as well.' " *Hemi Grp., LLC v. City of N.Y.*, 559 U.S. 1, 9 (2010) (quoting *Holmes v. Sec. Inv'r Prot. Corp.*, 563 U.S. 258, 268 (2010) ). The "central question" is "whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006). Mercedes argues that Plaintiffs' "entire theory of RICO conduct relies on the claim that" the defendants perpetrated a fraud against United States government regulators, and thus Plaintiffs have failed to allege that they were injured by the enterprise's conduct. (ECF No. 117-1 at 28). Even if Plaintiffs do allege that they were directly deceived by the enterprise, Mercedes argues that Plaintiffs' RICO allegations should be dismissed because they "are based on the same generalized advertising scheme that the Court previously found insufficient to satisfy the 'fairly traceable' requirement of Article III standing." (ECF No. 117-1 at 29). Bosch separately argues that Plaintiffs have not established either proximate or "but for" cause, because they have failed "to allege (1) reliance upon any actionable misstatement or omission, or (2) a direct relationship between Bosch LLC's purported conduct and their alleged injuries." (ECF No. 118-1 at 33).

### i. *Mercedes*

Mercedes makes the argument that Plaintiffs fail to establish RICO causation for the same reasons that they failed to establish traceability for the purposes of Article III standing. (ECF No. 117-1 at 29). As this Court has already determined that Plaintiffs have adequately alleged that Plaintiffs' injuries were fairly traceable to Mercedes' conduct, it need to not rehash that analysis here, as Mercedes has not set forth any new arguments to the contrary.

**\*13** Alternatively, Mercedes argues that, because Plaintiffs' RICO claim centers around a fraud-on-the-regulators theory, Plaintiffs have failed to meet RICO's proximate cause requirement. (ECF No. 117-1 at 30). The reasoning goes: because the purpose of the alleged enterprise was to deceive regulators (rather than promulgate advertisements), Plaintiffs' overpayment as a result of the advertisements touting the emissions bona fides of the Polluting Vehicles is in no way connected to the fraud on the regulators. (ECF No. 117-1 at 30–31).

Mercedes relies on *Anza* as support for its claim that Plaintiffs' RICO allegations do not satisfy the proximate cause

requirement. In *Anza*, the plaintiff sued its primary competitor under the RICO statute, alleging that the competitor reduced its prices without harming its bottom line by "failing to charge the requisite New York sales tax to cash-paying customers." 547 U.S. at 453 54. The Supreme Court found that this theory of injury did not satisfy RICO's proximate cause requirement, because "[i]t was the State that was being defrauded and the State that lost tax revenue as a result." *Id.* at 458. The Court also observed that the cause of Plaintiff's injury—lower prices—was "entirely distinct" from the alleged RICO violation—the defrauding of the state— and that the plaintiff's lost sales could have resulted from any number of alternative factors. *Id.* at 458–59.

The facts in *Anza* are distinct from what Plaintiff's allege here. Plaintiff's specifically allege that Mercedes defrauded its customers when it failed to disclose the existence of the defeat device, and that this deception caused Plaintiffs' injuries. (FAC ¶¶ 313–15). Furthermore, while Plaintiffs allege that Defendants deceived regulators, those regulators are not alleged to have been harmed by that deception like the State of New York was in *Anza. FCA*, 295 F. Supp. 3d at 966. Plaintiffs argue that the deception of the regulators inevitably led to their injuries, because "but for [that] deception about compliance, it would not have been able to sell the Polluting Vehicles." (ECF No. 126 at 36–37). These allegations are sufficient to establish RICO causation. *FCA*, 295 F. Supp. 3d at 967 ("By deceiving regulators, Defendants were able to sell Class Vehicles that emitted NOx at levels up to 20 times legal limits and that contained one or more defeat devices ..., [which] plausibly caused Plaintiffs to overpay for the defective Class Vehicles by an amount directly attributable to the alleged wrongful conduct of the Defendants."); *see also Volkswagen*, 2018 WL 4777134, at \*15 ("[T]he regulators were more like gatekeepers than victims of the fraud: they did not lose money from the fraud like consumers did. Also, Plaintiffs base their RICO claims at least in part on allegations that VW (on behalf of the enterprise) directly deceived consumers into believing that the class vehicles were 'clean' and 'environmentally friendly,' when they were not. To prevail on this theory, Plaintiffs would not even need to prove that VW first defrauded EPA and CARB; they would only need to demonstrate that VW defrauded *them* about certain vehicle attributes.") (citations omitted).

2019 WL 413541, RICO Bus.Disp.Guide 13,132

### ii. *Bosch*

Bosch first argues that the misstatements Plaintiffs allegedly relied on are either non-actionable puffery, assert compliance with U.S. emissions standards, or made by Mercedes, breaking "any causative link to Bosch." [5] (ECF No. 118-1 at 33–34). Secondly, Bosch argues that Plaintiffs fail to establish "any direct relationship between [Bosch's] alleged conduct and their alleged injuries." (ECF No. 118-1 at 35). These arguments have all been rejected in *Duramax*, *FCA*, and *Volkswagen*, and this Court agrees with those prior decisions.

**\*14**  In *Duramax*, Bosch argued that "to the extent Plaintiffs claim that their injury resulted from their reliance on purportedly false ads by GM, that itself breaks any causal link to the Bosch Defendants." 298 F. Supp. 3d at 1075. The *Duramax* Court deemed that argument "clearly inconsistent" with Supreme Court precedent, pointing to the Supreme Court's decision in *Bridge v. Phoenix Bond & Indemnification Co.*, 553 U.S. 639 (2008). *Id.* *Duramax* explained that *Bridge* held that reliance is not a requirement of a RICO cause of action and explicitly rejected the notion that "a plaintiff who brings [a RICO claim predicated on mail fraud] must show that it relied on the defendant's misrepresentations in order to establish the requisite element of causation." *Id.* at 1076 (quoting *Bridge*, 553 U.S. at 653). In fact, *Bridge* stands for the proposition that a plaintiff has identified a "a sufficiently direct relationship between the defendant's wrongful conduct and the plaintiff's injury" where "[i]t was a foreseeable and natural consequence of [the defendant's] scheme." *Bridge*, 553 U.S. at 657–58. The *Duramax* Court, applying this standard, then found that the plaintiffs' allegations established but-for and proximate cause. 298 F. Supp. 3d at 1076–77 ("According to Plaintiffs, Bosch 'exerts near-total control' over the customization of EDC17, eliminating the possibility which GM programmed the functionality which enables use of defeat devices without Bosch's knowledge.").

Here, Plaintiffs make nearly identical allegations: "All Bosch ECUs, including the EDC17, run on complex, highly proprietary engine management software over which Bosch GmbH exerts near-total control. In fact, the software is typically locked to prevent customers, like Mercedes, from making significant changes on their own. Accordingly, both the design and implementation are interactive processes,

requiring Bosch's close collaboration with the automaker from beginning to end." (FAC ¶ 270). Thus, Plaintiffs have established a sufficiently direct relationship between Bosch and the alleged RICO injury for purposes of RICO causation. *See Volkswagen*, 2018 WL 4777134, at \*15–17 (rejecting Bosch's argument that the actions of the car manufacture break the causal link in the chain, and thus, that there is not a sufficiently direct relationship between Bosch and the plaintiff's RICO injury); *FCA*, 295 F. Supp. 3d at 967–68 (same).

### 3. The Merits of the RICO Claim

#### i. *Impermissible Group Pleading*

Bosch contends that Plaintiffs "make impermissible group pleadings against 'RICO Defendants' and varying definitions of 'Bosch.'" (ECF No. 118-1 at 38). Bosch argues that this "blurs the conduct of the various defendants and does not put each defendant on notice of its precise conduct," and thus fails to satisfy the pleading requirements of Rule 9(b). (ECF No. 118-1 at 38–39). Rule 9(b) requires that Plaintiffs "state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the 'precise misconduct with which [it is] charged." *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (quoting *Lum v. Bank of Am.*, 361 F.3d 217, 223 (3d Cir. 2004) ). However, Rule 9(b) does not require that that a plaintiff plead with specificity "which fraudulent acts were caused or performed by which individual defendants." *In re Midlantic Corp. S'holder Litig.*, 758 F. Supp. 226, 233 (D.N.J. 1990).

Bosch made similar, unsuccessful arguments in both *FCA* and *Duramax. See FCA*, 295 F. Supp. 3d at 976–77 (rejecting Bosch's arguments that the plaintiffs "improperly 'lumped' the Bosch entities together" for the purposes of Rule 9(b), because the structure of the Bosch entities was such that there were employees "at both entities [who] work together on certain projects, including the EDC17 project."); *Duramax*, 298 F. Supp. 3d at 1056 ("Given Plaintiffs' allegation that Bosch employees and constituent entities often blur the legal boundaries between Bosch subsidiaries, the allegations against the Bosch Defendants are sufficiently specific."). Here, Plaintiffs plead allegations similar to those that were found sufficient in *FCA* and *Duramax*: Bosch GmbH and Bosch LLC "operate under the umbrella of the

2019 WL 413541, RICO Bus.Disp.Guide 13,132

Bosch Group," individuals from both Bosch GmbH and Bosch LLC worked in divisions relevant to the creation and design of the EDC17, and Bosch itself does not distinguish between its own legal entities when describing its business. (FAC ¶¶ 109, 111–12). The FAC sufficiently puts Bosch on notice of the claims made against it.

### ii. *RICO Enterprise*

**\*15** To allege an association-in-fact enterprise, which Plaintiffs purport to do here, they must plead a "purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *In re Ins. Brokerage*, 618 F.3d at 366 (quoting *Boyle v. United States*, 556 U.S. 938, 946 (2009) ). Defendants argue that Plaintiffs have not alleged a sufficient purpose or relationship between Defendants to constitute an association-in-fact enterprise. (ECF Nos. 117-1 at 31–35; 118-1 at 40–43).

An association-in-fact enterprise "need have no formal hierarchy or means for decision-making, and no purpose or economic significance beyond or independent from the group's pattern of racketeering activity." *In re Aetna UCR Litig.*, 2015 WL 3970168, at \*27 (quoting *In re Ins. Brokerage*, 618 F.3d at 368). Plaintiffs allege that the purpose of Defendants' enterprise was to "deceive the regulators and the public into believing the Polluting Vehicles were 'clean diesels.' " (FAC ¶ 356). Defendants worked together to design, manufacture, distribute, test, and sell the Polluting Vehicles, while implanting the EDC17, falsifying emissions tests, and distributing deceptive marketing materials. (FAC ¶¶ 360–67). Plaintiffs allege that Defendants profited from this enterprise due to the increased number of vehicles sold as a result of the fraudulently obtained Certificates of Compliance ("COCs") and Executive Orders ("EOs"), as well as through misleading advertising. (FAC ¶ 367). These allegations sufficiently allege a purpose of the enterprise. *See In re Ins. Brokerage Antitrust Litig. ("In re Ins. Brokerage II")*, MDL No. 1663, No. 04-5184, 2017 WL 3642003, at \*10 (D.N.J. Aug. 23, 2017) (finding that plaintiffs properly pleaded a purpose for the enterprise where they alleged that certain agreements existed "to facilitate the sale of insurance, in particular, the sale of insurance at supra-competitive rates to compensate both brokers and syndicates above what a competitive market would dictate"); *In re Aetna UCR Litig.*, 2015 WL 3970168, at \*27 (finding that plaintiffs properly

alleged a purpose for the enterprise where the plaintiffs alleged a dual purpose: "(1) 'to create a mechanism through which Aetna, UHG and the Insurer Conspirators could under-reimburse subscribers ... for Nonpar services through use of flawed and invalid data' and (2) to increase insurer profits by deceptively underpaying ONET benefits to their policy holders") (citation omitted); *see also Duramax*, 298 F. Supp. 3d at 1066, 1078–79 (finding a properly plead common purpose based on nearly identical allegations to those in this case, including that the purpose of the enterprise was "to deceive the regulators and the public into believing the Polluting Vehicles were 'clean' and 'environmentally friendly,' " and that GM and Bosch "associated for the common purpose of designing, manufacturing, distributing, testing, and selling the Polluting Vehicles through fraudulent COCs ... and EOs ..., false emissions tests, deceptive and misleading marketing and materials, and deriving profits and revenues from those activities").

With respect to the relationships of those associated with the enterprise, Mercedes argues that Plaintiff's FAC is deficient in that nearly all of the allegations "address Bosch's relationships with *other* vehicle manufacturers, namely Volkswagen and FCA." (ECF No. 117-1 at 32). Bosch, meanwhile, contends that Plaintiffs have done no more than "list the purported RICO participants," and have provided no allegations ' "plausibly implying the existence of an enterprise' separate from the legal entities." (ECF No. 118-1 at 42 (citations omitted) ). Both Defendants allege that Plaintiffs plead nothing more than an ordinary business relationship. (ECF No. 117-1 at 34–35; ECF No. 118-1 at 42–43).

**\*16** It is true that ordinary business relationships are not sufficient to impose RICO liability. *Duramax*, 298 F. Supp. 3d at 1080 (describing a "widespread consensus" to this effect). However, both *Duramax* and *FCA* addressed similar arguments and concluded that similar pleadings sufficiently alleged the existence of the kind of relationships necessary to establish an association-in-fact. The *Duramax* Court rejected GM and Bosch's argument that "any alleged relationship between them [was] simply a routine business relationship." 298 F. Supp. 3d at 1079. There, the plaintiffs alleged that defendants "associated for the common purpose of designing, manufacturing, distributing, testing, and selling the Polluting Vehicles through fraudulent COCs and EOs, false emissions tests, and deceptive and misleading marketing and materials, and deriving profits and revenues from

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 286 of 410
PageID: 12893
In re Mercedes-Benz Emissions Litigation, Not Reported in Fed. Supp. (2019)
2019 WL 413541, RICO Bus.Disp.Guide 13,132

those activities." *Id.* at 1080. The Court held that such allegations established a business relationship that was "far from 'routine,' " and was instead a course of conduct that was "inherently deceptive[, because] Bosch and GM collaborated to create an engine which performed one way when being tested for emissions and another way when in normal use." *Id.*

The Court in *FCA* came to the same conclusion. *FCA* reasoned that the EDC17 "had only a deceitful purpose—to cheat emissions tests," and that the plaintiffs' "allegations plausibly support[ed] that each Defendant participated in developing or implementing the [defeat devices]." 295 F. Supp. 3d at 981. The FCA court came to this conclusion based on allegations that set forth "that the Bosch Defendants' software documentation describes parameters and functions that correlate with many of the hidden [defeat devices]," and that the "FCA Defendants initiated and oversaw development of the EcoDiesel engine and activated the [defeat devices] in the Class Vehicles." 295 F. Supp. 3d at 981–82. Such allegations went "beyond connecting Defendants to each other by way of normal commercial dealings." *Id.* at 982. Plaintiffs here have laid out many of the same allegations in the FAC, alleging, for example, that Bosch "continuously cooperated with Mercedes to ensure that the EDC Unit 17 was fully integrated into the Polluting Vehicles," and that it concealed "the defeat devices on U.S. documentation and in communications with U.S. regulators." (FAC ¶ 374). The EDC 17 was "customized ... for installation in the Polluting Vehicles with unique software code to detect when it was undergoing emissions testing." (FAC ¶ 360). Such allegations are sufficient to show a relationship between Defendants beyond a normal business relationship.

### iii. *Directing the Conduct of the RICO Enterprise*

As part of their RICO claim, Plaintiffs must also allege that Defendants "conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993). "The word 'participate' makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase 'directly or indirectly' makes clear that RICO liability is not limited to those with a formal position in the enterprise, but *some* part in directing the enterprise's affairs is required." *Id.* at 179. Defendants again argue

that Plaintiffs have failed to assert anything more than legal conclusions as to their participation in the enterprise, and that any facts alleged show merely an ordinary business relationship. (ECF No. 117-1 at 35 –37; ECF No. 118-1 at 43–47).

On top of Plaintiffs' allegations mentioned *supra* in Section III.B.3.ii, Plaintiffs have sufficiently alleged the participation of Mercedes and Bosch in the enterprise. They set forth that the EDC17 contains a "unique set of specifications and software code" made for the Polluting vehicles, that the implementation of those EDC17s into the Polluting Vehicles required Mercedes and Bosch to collaborate closely, and that Defendants knowingly and actively intended the EDC17 to function as a defeat device to evade United States emissions requirements. (FAC ¶¶ 13, 104, 108, 268, 270, 360, 374). Plaintiffs then allege that Defendants concealed the existence of the defeat device and lied to U.S. regulators. (FAC ¶¶ 125, 273–74, 374). Very similar allegations based on very similar facts have been found to satisfy this pleading element of a RICO claim in other diesel emissions litigations. *See* *FCA*, 295 F. Supp. 3d at 983 (finding that the plaintiffs adequately alleged participation in the enterprise where the FCA Defendants "conspired to install and conceal emission control software in the EcoDiesel® engines to illegally circumvent stringent U.S. emission standards" and oversaw the development of those engines, while Bosch's argument "that they were simply performing services for the enterprise," was "not sustainable at the pleading stage" "given the level of control they are alleged to have maintained over the emissions software in the Class Vehicles"); *Duramax*, 298 F. Supp. 3d at 1086–87 (holding that Bosch's argument that it simply "worked together with GM to design and implement software and ... participated in promoting clean diesel technology generally" was a similarly faulty "repackaging of [its] previous argument that ... the relationship between the Defendants was merely a routine business relationship," where the plaintiffs alleged "that Bosch was an integral part of the operation of the enterprise because Bosch 'locked out' EDC17 ... [and] worked closely with its customers to customize EDC17," which performed "an inherently deceptive function," and thus Bosch's responsibility for programming the operation of the EDC17 was at the "heart of the fraudulent enterprise").

### iv. *Pattern of Racketeering Activity*

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 287 of 410
PageID: 12894
In re Mercedes-Benz Emissions Litigation, Not Reported in Fed. Supp. (2019)
2019 WL 413541, RICO Bus.Disp.Guide 13,132

**\*17** A pattern of racketeering activity "requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years ... after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). "These predicate acts of racketeering may include, *inter alia*, federal mail fraud under 18 U.S.C. § 1341 or federal wire fraud under 18 U.S.C. § 1343." *In re Ins. Brokerage*, 618 F.3d at 363 (quoting *Lum*, 361 F.3d at 223. Here, Plaintiffs allege precisely these two predicate acts. In order to plead mail or wire fraud, Plaintiffs must describe "(1) the existence of a scheme to defraud; (2) the use of the mails [or wires] ... in furtherance of the fraudulent scheme; and (3) culpable participation by the defendant, that is, participation by the defendant with specific intent to defraud." *United States v. Dobson*, 419 F.3d 231, 237 (3d Cir. 2005). These allegations must satisfy the pleading standards of Federal Rule of Civil Procedure 9(b). *In re Ins. Brokerage II*, 2017 WL 3642003, at \*6.

Mercedes argues that Plaintiffs have failed to plead a pattern of racketeering activity for two reasons: First, they have failed to satisfy Rule 9(b), because they "allege only nondescript acts by unidentified parties at unspecified times, and second, Plaintiffs "have not pled any facts demonstrating how the applications [for certification to the EPA] further the purposes of the alleged" enterprise. (ECF No. 117-1 at 38–39). Bosch additionally argues that Plaintiffs have failed to plead a claim of mail or wire fraud against it with the particularity required by Rule 9(b), as they have failed to allege a scheme to defraud, any participation by Bosch in that scheme, facts showing that Bosch should be held vicariously liable for Mercedes' alleged acts of mail and wire fraud, or a specific intent to defraud. (ECF No. 118-1 at 49–55).

Plaintiffs have sufficiently plead a pattern of racketeering activity with respect to Defendants. First, the allegations discussed at length in Parts III.B.3.ii and iii clearly allege the existence of scheme to defraud. Importantly, as noted in this Opinion's standing analysis, Plaintiffs pin Defendants' alleged liability on omissions rather than affirmative misrepresentations. Reliance on omissions on their own is sufficient to plead the predicate acts of mail and wire fraud.

*Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1415 (3d Cir. 1991) ("Under the mail fraud statute, a scheme or artifice to defraud 'need not be fraudulent on its face, but must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension ... [and] [t]he scheme need not involve affirmative misrepresentation.") (quoting *United States v. Pearlstein*, 576 F.2d 531, 535 (3d Cir. 1978); *Livingston v. Shore Slurry Seal, Inc.*, 98 F. Supp. 2d 594, 597 (D.N.J. 2000) (quoting the same language from *Kehr Packages*. As laid out in *Duramax*:

> allegations of omissions—as opposed to affirmative misrepresentations—will inevitably be less specific. Misrepresentations occur at a definite point in time, but omissions occur over periods of time. And, because misrepresentations involve action while omissions involve inaction, plaintiffs are less likely to uncover discrete evidence of omissions. It must be remembered that the essential purpose of Rule 9(b) is to provide the defendants with adequate notice of the allegations so that they can defend against the claims.

298 F. Supp. 3d at 1083 (citations omitted); *see also Christidis v. First Pa. Mortg. Tr.*, 717 F.2d 96, 99–100 (3d Cir. 1983) ("In applying the first sentence of Rule 9(b) courts must be sensitive to the fact that its application, prior to discovery, may permit sophisticated defrauders to successfully conceal the details of their fraud. Moreover, in applying the rule, focusing exclusively on its 'particularity' language 'is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules.' ") (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure § 1298, at 407 (1969) ). As such, "plaintiffs pleading a fraud by omission claim are not required to plead fraud as precisely as they would for a false representation claim." *Feldman v. Mercedes Benz USA*, No. 11-984, 2012 WL 6596830, at \*10 (D.N.J. Dec. 18, 2012).

**\*18** To adequately plead the use of the mails and wires in furtherance of the scheme, Plaintiffs need not allege that each Defendant personally mailed or wired the allegedly fraudulent communications, only that the mailing or wiring of that communication was foreseeable to Defendants.

2019 WL 413541, RICO Bus.Disp.Guide 13,132

*United States v. Tiller*, 302 F.3d 98, 101 (3d Cir. 2002). Furthermore, "the gravamen of the offense is the scheme to defraud, and any 'mailing that is incident to an essential part of the scheme satisfies the mailing element,' even if the mailing itself 'contain[s] no false information.'" ' *Bridge*, 553 U.S. at 647 (quoting *Schmuck v. United States*, 489 U.S. 705, 712, 715 (1989) ). Plaintiffs allege several uses of the mails and wires in furtherance of the scheme, such as numerous, specific applications for certification of various Polluting Vehicles to the EPA, (FAC ¶ 384), as well as advertisements touting the low emissions and environmental friendliness of the BlueTEC engine, (*see, e.g.*, FAC ¶¶ 32, 33, 36, 321, 323, 325).

These allegations are sufficient to establish the use of the mails and wires in furtherance of the scheme. The applications submitted to the EPA

> affirmed that the vehicles complied with emission standards. Without those mailings and electronic communications, [Mercedes] would have been unable to sell the vehicles. The applications and resulting certificates also increased the likelihood that consumers would perceive the [BlueTEC] vehicles as emitting pollution at a low level. And although Bosch may not have directly used the mail or wire to further the fraudulent scheme, [Mercedes'] uses of the mail and wire were inevitable and thus reasonably foreseeable.

*Duramax*, 298 F. Supp. 3d at 1084; [6] *see also FCA*, 295 F. Supp. 3d at 979 (applying the same standard to similar facts and coming to the same conclusion). As to the advertisements identified by Plaintiffs, if they

> were relying on these advertisements as the basis for [their] claim of fraud, then Defendants' arguments regarding puffery and duty to disclose would become relevant.

However, these representations do not constitute the fraudulent scheme; they merely further it. The level of emissions produced by a diesel engine was a material consideration for consumers purchasing a vehicle. [Mercedes'] extensive advertising which emphasized the low emissions and environmentally-friendly nature of its "clean diesel" engine underscores its understanding of that fact. Thus, regardless of whether these advertisements would be actionable on their own, they were material to the scheme.

*Duramax*, 298 F. Supp. 3d at 1084.

Finally, with respect to Defendants' culpable participation in the scheme, Plaintiffs need only allege intent generally. Fed. R. Civ. P. 9(b); *In re Ins. Brokerage II*, 2017 WL 3642003, at *9. Defendants' intent to defraud can be inferred from the scheme alone. *United States v. Chartock*, 283 F. App'x 948, 954–55 (3d Cir. 2008); *United States v. Pearlstein*, 576 F.2d 531, 541 (3d Cir. 1978); *see also FCA*, 295 F. Supp. 3d at 977 ("Because the AECDs themselves plausibly have a deceitful purpose, allegations supporting that each Defendant knew about yet concealed the AECDs also support a plausible claim that each Defendant intended to defraud."); *Duramax*, 298 F. Supp. 3d at 1083 ("[I]ntent can be inferred from the nature of the alleged conduct. The way in which EDC17 interacted with the *Duramax* engine is inherently deceptive. The alleged purpose of the device is to provide the perception of reduced emissions while avoiding the reality of reduced emissions. Defendants cannot reasonably argue that the deceptive nature of EDC17 was unanticipated or unintended, and even if they do, that argument could be resolved only by a jury."); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prods. Liab. Litig.*, MDL No. 2672, 2017 WL 4890594, at *15 (N.D. Cal. Oct. 30, 2017) ("Bosch's intent to defraud reasonably [could] be inferred from the scheme itself," as no party had "sought to justify, or explain a lawful purpose for, software that effectively turns a vehicle's emission systems on or off depending on whether the vehicle is undergoing emissions testing or being operated under

2019 WL 413541, RICO Bus.Disp.Guide 13,132

normal driving conditions."). Thus, Plaintiffs have adequately alleged Defendants' intent to defraud and have adequately established a pattern of racketeering activity based on the predicate acts of mail and wire fraud.

v. <em>RICO Conspiracy</em>

**\*19** Bosch argues that Plaintiffs failed to adequately plead a RICO conspiracy because they failed to plead a substantive RICO violation. As Plaintiffs have adequately plead their substantive RICO claim and that Bosch had knowledge of the racketeering activity, they have adequately plead a RICO conspiracy.

### C. Preemption

Defendants contend that Plaintiffs' state-law claims are preempted by the Clean Air Act ("CAA"). (ECF No. 117-1 at 39; ECF No. 118-1 at 55). This argument has been discussed thoroughly and rejected several times over by courts dealing with diesel emissions litigations. *Volkswagen,* 2018 WL 4777134, at \*18–23; *FCA,* 295 F. Supp. 3d at 990–1003; *Duramax,* 298 F. Supp. 3d at 1057–65; *Counts,* 237 F. Supp. 3d at 588–92. For the same reasons, this Court also rejects Defendants' preemption arguments.

"Federal law can preempt state law in three ways: (1) express preemption, (2) field preemption, and (3) conflict preemption." *Farina v. Nokia,* 625 F.3d 97, 115 (3d Cir. 2010).

> Express preemption applies where Congress, through a statute's express language, declares its intent to displace state law. Field preemption applies where "the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." Conflict preemption nullifies state law inasmuch as it conflicts with federal law, either where compliance with both laws is impossible or where state law erects an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

*Id.* (quoting *Hillsborough Cty. v. Automated Med. Labs., Inc.,* 471 U.S. 707, 713 (1985). Both Defendants argue that Plaintiffs state-law claims are expressly preempted by the CAA, while Mercedes advances an additional implied preemption argument.

1. Express Preemption

Section 209 of the Clean Air Act reads:

> No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part. No State shall require certification, inspection, or any other approval relating to the control of emissions from any new motor vehicle or new motor vehicle engine as condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle, motor vehicle engine, or equipment.

42 U.S.C. § 7543(a). Defendants are correct that the CAA contains an express preemption clause. *See In re Caterpillar, Inc. C13 and C15 Engine Prods. Liab. Litig.,* 14-3722, 2015 WL 4591236, at \*10 (D.N.J. July 29, 2015) ("The CAA's express preemption provision is specific and unambiguous.").

Defendants argue that Plaintiffs' state-law claims fall squarely within that preemption provision because they relate to the Polluting Vehicles' compliance with emissions standards and are an attempt to enforce federal regulatory standards under state law. (ECF No. 117-1 at 41–42; ECF No. 118-1 at 56–57). Plaintiffs' state-law claims do not fall under the express preemptive scope of the CAA for several reasons. First, while Plaintiffs do reference violations of federal emissions standards those violations are not an essential element of their state-law claims. To prove their state-law claims, Plaintiffs must show that Defendants lied to or deceived them, not that Defendants violated federal emissions standards. The proof in which Plaintiffs must ground their claims pulls those claims outside the scope of the express preemption of the CAA. *Volkswagen,* 2018 WL 4777134, at \*19; *FCA,* 295 F. Supp. 3d at 993–94; *Duramax,* 298 F. Supp. 3d at 1061; *Counts,* 237 F. Supp. 3d at 591–92. Second, Plaintiffs could prove that Mercedes lied about claims concerning its

Case 1:19-md-02875-RMB-SAK Document 598-3 Filed 10/16/20 Page 290 of 410 PageID: 12897
In re Mercedes-Benz Emissions Litigation, Not Reported in Fed. Supp. (2019)
2019 WL 413541, RICO Bus.Disp.Guide 13,132

BlueTec engines, such as that it was "the world's cleanest and most advanced diesel" with "ultra-low emissions, high fuel economy and responsive performance," (FAC ¶ 11), without having to prove that emissions exceeded EPA-established limitations or that Defendants installed a defeat-device prohibited by the EPA. *Volkswagen*, 2018 WL 477134, at *20; *FCA*, 295 F. Supp. 3d at 993–94; *Duramax*, 298 F. Supp. 3d at 1061–62; *Counts*, 237 F. Supp. 3d at 591–92. Thus, Plaintiffs' state-law claims are not expressly preempted by the CAA.[7]

### 2. Implied Preemption

**\*20** Mercedes argues that even if Plaintiffs' claims are not expressly preempted, they are impliedly preempted under *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001). When dealing with a question of implied preemption, the Court begins its "analysis 'with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' That assumption applies with particular force when Congress has legislated in a field traditionally occupied by the States." *Altria Grp. v. Good*, 555 U.S. 70, 77 (2008) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947) ). *Buckman* involved a defendant that allegedly made fraudulent representations to the FDA in order to gain approval for its orthopedic bone screws that plaintiffs alleged caused their injuries. *531 U.S. at 343*. The Supreme Court held that allowing the plaintiffs to proceed on their state tort claims based on the alleged fraud on the FDA would "inevitably conflict with the [agency's] responsibility to police fraud consistently with [its] judgment and objectives." *Id. at 350*. Mercedes argues that *Buckman* thus preempts all state tort claims "stemming from a defendant's alleged fraud on a federal agency." (ECF No. 117-1 at 43–44).

Importantly, *Buckman's* holding rested in part on the fact that the Supreme Court had "clear evidence that Congress intended that the [Medical Device Amendments] be enforced exclusively by the Federal Government," and that the plaintiffs' "fraud claims exist[ed] solely by virtue of the [Food, Drug, and Cosmetic Act] disclosure requirements." *531 U.S. at 352–53*. While Mercedes frames Plaintiffs' claims as "all stem[ing] from the threshold allegation that 'the COCs were fraudulently obtained' and the vehicles were

therefore 'never legal for sale; nor were they EPA and or CARB complaint," ' (ECF No. 117-1 at 44 (quoting FAC ¶ 275) ), this does not place Plaintiffs' state-law claims within the realm of *Buckman*. As explained above, Plaintiffs' claims do not "exist solely by virtue" of the alleged violations of the EPA's emissions standards. The core allegation of Plaintiffs' state-law tort claims is that *Defendants lied to and deceived consumers, and so Buckman does not preempt these claims. See FCA*, 295 F. Supp. 3d at 994–95 (applying the same reasoning to distinguish *Buckman* from state-law claims nearly identical to those before this Court); *In re Caterpillar*, 2015 WL 4591236, at * 14 (holding that consumer fraud claims were not impliedly preempted by the CAA, as those claims were not "about the ability of Caterpillar's Engines to comply with EPA emissions standards").

### D. Plaintiffs' State-Law Misrepresentation Claims

Mercedes argues that "[a] vast majority of plaintiffs' misrepresentation claims—including those arising under state common law and state consumer protection statutes—should also be dismissed because they are based on nonactionable puffery." (ECF No. 117-1 at 44). As mentioned *supra* Section III.A.2.i, Plaintiffs have shifted the focus of the FAC away from claims relying on Defendants' affirmative misrepresentations and are instead basing those claims on Defendants' omissions. This is reinforced by the fact that Plaintiffs do not respond to Mercedes' argument that their state-law misrepresentation claims should be dismissed. (*See* ECF No. 126 at 60 (addressing Mercedes' puffery arguments only in the context of fraudulent concealment) ). Thus, to the extent that Plaintiffs' state-law consumer protection claims are based solely on affirmative misrepresentations, those affirmative misrepresentation claims are dismissed. *Griglak v. CTX Mortg. Co.*, No. 09-5247, 2010 WL 1424023, at *3 (D.N.J. Apr. 8, 2010) ("The failure to respond to a substantive argument to dismiss a count, when a party otherwise files opposition, results in a waiver of that count.").

### E. Plaintiffs' State-Law Fraudulent Concealment Claims

Defendants also argue that this Court should dismiss Plaintiffs' fraudulent concealment claims. Both Defendants claim that Plaintiffs have failed to set forth facts showing a duty to disclose, (ECF Nos. 117-1 at 51–53; 118-1 at 58–60), while Mercedes also attacks the fraudulent concealment allegations in the FAC under Rule 9(b), (ECF No. 117-1 at 48–51). Defendants principally challenge Plaintiffs' fraudulent

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 291 of 410
PageID: 12898
In re Mercedes-Benz Emissions Litigation, Not Reported in Fed. Supp. (2019)
2019 WL 413541, RICO Bus.Disp.Guide 13,132

concealment claims under New Jersey law, which Plaintiffs seek to apply to the nationwide class. [8] To state a claim for fraudulent concealment under New Jersey law, a plaintiff must establish: (1) a material misrepresentation or omission of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity or knowing the omission to be material; (3) intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and

(5) resulting damages. *Delaney v. Am. Express Co.*, No. 06-5134, 2007 WL 1420766, at \*5 (D.N.J. May 11, 2007); *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 610 (1997). Rule 9(b) applies to fraudulent concealment claims, *GKE Enters., LLC v. Ford Motor Credit Co. LLC USA*, No. 09-4656, 2010 WL 2179094, at \*4 (D.N.J. May 26, 2010); however, as mentioned above, Plaintiffs are not required to plead fraud by omissions claims as precisely as affirmative misrepresentation claims, *Feldman*, 2012 WL 6596830, at \*10, so long as the complaint places "the defendant on notice of the precise misconduct with which it is charged," *Montich v. Miele USA, Inc.*, 849 F. Supp. 2d 439, 443 (D.N.J. 2012) (quoting *Frederico*, 507 F.3d at 200).

**\*21** Mercedes contends that Plaintiffs have failed to satisfy the what, who, where, or when of the alleged fraudulent concealment, as required by Rule 9(b). In doing so, Mercedes mistakenly focuses on Mercedes' affirmative misrepresentations set forth in the FAC. For example, Mercedes argues that "every plaintiff fails to plead sufficiently the 'what' to satisfy Rule 9(b) because they fail to specify what false statements were allegedly made regarding *their* vehicle." (ECF No. 117-1 at 48–49 (referring to Plaintiff Andary, who "allege[d] that she read on the 'Mercedes website' 'something about a "green generation of Mercedes' " ") (quoting FAC ¶ 33) ). With regard to the "who" element of Rule 9(b), Mercedes again argues that "[f]orty-nine plaintiffs ... attribut[e] claimed statements to dealership representatives or unidentified third-party websites." (ECF No. 117-1 at 49). In attacking Plaintiffs' fraudulent concealment claims, Mercedes applies a heightened Rule 9(b) standard to affirmative statements that Plaintiffs no longer rely on except to show the materiality of the omissions.

When looking at Plaintiffs' allegations concerning Defendants' omissions, they have sufficiently notified Mercedes and Bosch of the precise misconduct with which they are charged. Plaintiffs allege that Defendants

"programmed [the] BlueTEC vehicles to turn off or otherwise limit the effectives of the emission reduction systems during normal real world driving," throughout the entire period of BlueTEC vehicle production and sale in the U.S. (FAC ¶¶ 10, 13). Plaintiffs also allege that Mercedes failed to disclose these facts about the emissions controls nationwide. (FAC ¶ 316). Similar allegations have been found to satisfy Rule 9(b) both within and outside of this district in other automotive defect cases. *See Volkswagen*, 2018 WL 4777134, at \*24 (dismissing plaintiffs' fraudulent misrepresentation claims but finding that the fraudulent omissions claims survived, because plaintiffs identified "the specifics of what VW failed to disclose: (1) that 'the Clean Diesel engine systems were not EPA-compliant,' and (2) that the class vehicles 'used software that caused the vehicles to operate in low-emission test mode during emissions testing' "); *Counts*, 237 F. Supp. 3d at 599 (finding that plaintiffs sufficiently alleged that GM "actively concealed and had exclusive knowledge of the alleged 'defeat device' "); *Feldman*, 2012 WL 6596830, at \*10 (holding that plaintiffs adequately stated a claim of fraud by omission where they "allege[d] specific facts showing Defendants' knowledge and concealment of the alleged defect"). This Court will not dismiss Plaintiffs' state-law fraudulent concealment claims for failure to meet the standards of Rule 9(b).

Mercedes concludes that "[b]ecause no plaintiff has sufficiently alleged under Rule 9(b)'s heightened pleading standard the *what, who, where*, and *when* of any fraud, no plaintiff has adequately pled reliance, and all of their claims must be dismissed." (ECF No. 117-1 at 50–51). However, as the Court just found, Plaintiffs met the standards of Rule 9(b). Even still, the burden of establishing reliance on an omission is not difficult. Plaintiffs need not "offer direct proof that the entire class relied on defendant's representation that omitted materials facts, where the plaintiffs have established that the defendant withheld these material facts for the purpose of inducing the very action the plaintiffs pursued." *Varacallo v. Mass. Mut. Life Ins. Co.*, 332 N.J. Super. 31, 50 (App. Div. 2000); *see also Counts*, 237 F. Supp. 3d at 596 97 (citing *Varacallo* and concluding that the plaintiffs need not plead individualized reliance for fraud by omission under New Jersey law). [9]

**\*22** Bosch also contends that Plaintiffs "fail[ed] to plead any facts to suggest reliance on any specific or actionable representation by [it]." (ECF No. 118-1 at 59). However,

2019 WL 413541, RICO Bus.Disp.Guide 13,132

for the same reasons that Plaintiffs need not establish direct reliance on Mercedes representations, they need not establish direct reliance on Bosch's: they allege that Bosch intentionally withheld the existence of the defeat device while simultaneously promoting clean diesel technology around the country.

Under New Jersey law, "courts will not imply a duty to disclose, unless such disclosure is necessary to make a previous statement true or the parties share a 'special relationship.' " *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1185 (3d Cir. 1993). The categories of relationships that give rise to a duty to disclose are: "(1) fiduciary relationships, such as principal and agent, client and attorney, or beneficiary and trustee; (2) relationships where one party expressly reposits trust in another party, or else from the circumstances, such trust necessarily is implied; and (3) relationships involving transactions so intrinsically fiduciary that a degree of trust and confidence is required to protect the parties." *Id.* Here, Plaintiffs do not assert that they fall into one of the special relationship categories with Defendants. As such, the Court will only focus on the parties' arguments challenging whether or not a duty to disclose existed to make a previous statement true. [10]

Mercedes claims that Plaintiffs "cannot establish that disclosure was necessary to make true a previous statement made by [Mercedes]," because "the alleged representations vary from plaintiff to plaintiff." (ECF No. 117-1 at 53). Mercedes argues that this distinguishes the facts at hand from *In re Volkswagen Timing Chain Products Liability Litigation*, No. 16-2765, 2017 WL 1902160 (D.N.J. May 8, 2017), because in *Timing Chain*, the partial disclosures were uniform. (ECF No. 117-1 at 53). The Court disagrees and finds that the facts at hand establish a duty to disclose for Mercedes and Bosch. Here, Plaintiffs set forth numerous examples of Mercedes' nationwide marketing efforts to promote its BlueTEC clean diesel vehicles. (FAC ¶¶ 323–27). In none of those examples does Mercedes disclose that the purported benefits of the BlueTEC engine could only be achieved through or were completely obscured by the use of a defeat device. These allegations are sufficient to establish partial disclosures that Mercedes had an obligation to make true. *See Timing Chain*, 2017 WL 1902160, at *20 (finding that the plaintiffs plead a partial disclosure after which the defendant had a duty to disclose "any and all information regarding the Timing Chain System" to plaintiffs, where the plaintiffs alleged that the defendant "represent[ed]

in the maintenance schedules that the timing belt, which performs the same function as the Timing Chain System, will need service after a certain time but makes no representation that the Timing Chain System will need maintenance"); *Strawn v. Canuso*, 271 N.J. Super. 88, 104 (App. Div. 1994) (establishing a duty on buyers and brokers of real estate to disclose the existence of off-site conditions that were unknown to the buyer but that were known or should have been known to the seller and that would reasonably and foreseeably affect the value or desirability of the property), *aff'd* 140 N.J. 43 (1995).

**\*23** In fact, in *Strawn*, the New Jersey Supreme Court adopted the interpretation of the Restatement (Second) of Torts which imposes a "duty upon a party to disclose to another 'facts basic to the transaction, if he knows that the other is about to enter into it under a mistake ... and the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts,' " where the nondisclosure of those facts amounts to taking advantage of the plaintiffs ignorance, such that it would be "shocking to the ethical sense of the community, and [would be] so extreme and unfair, as to amount to a form of swindling.' " *United Jersey Bank v. Kensey*, 306 N.J. Super. 540, 554 (App. Div. 1997) (citations omitted). It is this Court's opinion that Mercedes and Bosch's active concealment of the existence of the defeat device amounts to such a situation. *Cf.* *FCA*, 295 F. Supp. 3d at 1009 (finding that allegations of defendants' active concealment of the defeat devices was sufficient to establish a duty to disclose under New Jersey law); *Counts*, 237 F. Supp. 3d at 600 (noting that the defendant's alleged active concealment of the defeat device was sufficient to establish a duty to disclose in some states). [11]

### F. Plaintiffs' State Statutory Claims

#### 1. Rule 9(b), Causal Nexus, and False, Deceptive, or Misleading Statements

Mercedes argues that Plaintiffs fail to state claims for violations of various states' consumer protection statutes under Rule 9(b) because Plaintiffs have not pled a "causal nexus" between Mercedes' unlawful conduct and Plaintiffs' injury with enough specificity and because Plaintiffs have "failed to allege facts establishing that the Mercedes Defendants made" false, deceptive, or misleading statements. (ECF No. 117-1 at 54–55). Mercedes attempts to address

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 293 of 410
PageID: 12900

In re Mercedes-Benz Emissions Litigation, Not Reported in Fed. Supp. (2019)
2019 WL 413541, RICO Bus.Disp.Guide 13,132

these state-specific arguments by citing to an "Appendix B," attached to their brief. (ECF No. 117 at 54–55). Appendix B is a six-page document containing four columns: the state law that applies, the causes of action under that state's law, the elements of the cause of action that Plaintiffs allegedly fail to establish, and "relevant authorities." (ECF No. 117-3 at 1–6). There is no context or analysis accompanying this document. Two courts have rejected similar attempts to argue that Plaintiffs have failed to meet the pleading requirements of various states' consumer protection statutes through an appendix. *See* 🔖 *FCA*, 295 F. Supp. 3d at 1015 (deeming arguments made in a joint appendix regarding the plaintiffs' failure to allege reliance, a deceptive act, omission, or practice, and a concrete, nonspeculative loss in relation to consumer protection claims as waived); 🔖 *Counts*, 237 F. Supp. 3d at 593–94 ("Neither party makes a colorable effort to individually address the validity of Plaintiffs' ... consumer protection ... claims on a state specific basis. Rather, each attempts to 'raise' certain state-specific arguments by referencing appendices attached to their briefing.... The parties' scattershot effort to raise arguments and defenses by simply citing to dozens, if not hundreds, of state court cases will not be addressed."). This Court will also do the same. As in *Counts*, this Court agrees that "[c]ourts are not responsible for combing through appendices in an attempt to *sua sponte* raise and resolve legal arguments which the parties have not briefed." 🔖 237 F. Supp. 3d at 594.

In any event, Mercedes' arguments regarding causal nexus and false, deceptive, or misleading statements have been adequately addressed elsewhere in this Opinion. As to the existence of a causal nexus, this Court conducted an in-depth analysis of the causal link between Mercedes' alleged unlawful conduct and Plaintiffs' alleged injuries in the portions of the brief discussing Article III standing and RICO causation. *See supra* Sections III.A.2, B.2. With respect to whether Plaintiffs have adequately pled false, deceptive, or misleading statements, that has been discussed throughout, but particularly in reference to Plaintiffs' common law fraud claims *supra* Section III.E. This Court also notes that *Duramax* analyzed the state consumer protection claims in conjunction with the state common law fraud claims without meaningful distinction. 🔖 298 F. Supp. 3d at 1057–65.

### 1. Bosch and the Michigan Consumer Protection Act

**\*24** Bosch argues that Plaintiffs fail to state a claim under the Michigan Consumer Protection Act ("MCPA"), because

they have failed "to identify any purportedly false affirmative misrepresentation by" Bosch, they have not identified Bosch's duty to disclose, and they have not alleged any injury as a result of Bosch's conduct. (ECF No. 118-1 at 60). By Bosch's own admission, an omission suffices as a "material misrepresentation" under the MCPA. (ECF No. 118-1 at 60). The Court has already established that Bosch made material omissions that it had a duty to disclose. *Supra* Section III.E. Additionally, the Court has rejected Bosch's argument that Plaintiffs have not adequately pled that they suffered an injury as a result of Bosch's conduct. *Supra* Section III.A.2.ii.

### 2. Ascertainable Loss under New Jersey and Florida Law

Mercedes argues that Plaintiffs Caputo, Caniero, Watkins, Carroll, and Cunningham "fail to plead injury with the specificity required under the consumer protection statutes of New Jersey and Florida because they have not alleged sufficient facts to show they suffered an ascertainable loss." (ECF No. 117-1 at 56). Ascertainable loss is an essential element of a claim under the New Jersey Consumer Fraud Act (NJCFA). 🔖 *Smajlaj v. Campbell Soup Co.*, 782 F. Supp. 2d 84, 97 (D.N.J. 2011). Mercedes claims that because Plaintiffs have failed to plead how much they paid for their vehicles and how much a comparable vehicle would cost, they have not satisfied the standard for ascertainable loss. (ECF No. 117-1 at 56 (citing 🔖 *In re Riddell Concussion Reduction Litig.*, 77 F. Supp. 3d 422, 439 (D.N.J. 2015) ) ). Plaintiffs contend that *Riddell* is in conflict with New Jersey Supreme Court precedent, suggesting that New Jersey's highest court does not require a plaintiff to plead a price comparison, because "if the damages calculation were so simple, expert testimony would never be necessary." (ECF No. 126 at 66–67).

Here, Mercedes has the better argument. "In cases involving ... misrepresentation, either out-of-pocket loss or a demonstration of loss in value will suffice to meet the ascertainable loss hurdle ...." 🔖 *Thiedemann v. Mercedes-Benz USA, LLC*, 183 N.J. 234, 248 (2005). In demonstrating that out-of-pocket loss or loss in value, the New Jersey Supreme Court has explicitly endorsed the necessity of a price comparison in pleadings seeking to state a claim under the NJCFA. *See* 🔖 *D'Agostino v. Maldonado*, 216 N.J. 168, 191 (2013) (detailing that an ascertainable loss must be capable of calculation); 🔖 *Thiedemann*, 183 N.J. at 248 (describing ascertainable loss as "not hypothetical or illusory" and a loss that "must be presented with some certainty

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 294 of 410
PageID: 12901
In re Mercedes-Benz Emissions Litigation, Not Reported in Fed.Supp. (2019)
2019 WL 413541, RICO Bus.Disp.Guide 13,132

demonstrating that it is capable of calculation, although it need not be demonstrated in all its particularity"). This district has interpreted the New Jersey Supreme Court precedent to require this price comparison as well. *E.g.,* Riddell, 77 F. Supp. 3d at 439; Smajlaj, 782 F. Supp. 2d at 100–01. In fact, in *Bosland v. Warnock Dodge, Inc.*, the New Jersey Supreme Court addressed the question of ascertainable loss in an automobile overcharge case. There, the Supreme Court held that the "overcharge in question is one that can be readily quantified and thus [ ] ascertainable within the meaning of the CFA." 197 N.J. 543, 559 (2009). The plaintiff in *Bosland* though had specifically outlined the fee payments demonstrating that she could have been overcharged by either $40 or $20. *Id.* at 548.

Plaintiffs have not done that here. In their brief they do not set forth any instances of a price comparison in the FAC, nor can the Court find any. What Plaintiffs have done is set the table for a price comparison, alleging that Plaintiffs would not have purchased or leased the BlueTEC vehicles at the prices they paid, or would have purchased or leased a less expensive alternative. (*E.g.,* FAC ¶ 535). They have not gone one step further to compare the price of a Polluting Vehicle with what they believe to be a comparable replacement. *E.g.,* Smajlaj, 782 F. Supp. 2d at 103 (finding a sufficient allegation of ascertainable loss where plaintiffs alleged that when they bought a can of soup mislabeled as low-sodium they overpaid for what was essentially full-sodium soup that they alleged to be 20 to 80 cents cheaper).

**\*25** Additionally, Plaintiffs' argument that expert testimony would never be required if the NJCFA only allowed claims with easily calculable ascertainable losses misses the mark. This is because, as mentioned above, the pleading need not demonstrate the ascertainable loss "in all its particularity." Thiedemann, 183 N.J. at 248. Ascertainable loss sets "the stage for establishing the measure of damages." *Id.* "There is no calculation of 'damages sustained' unless the ascertainable loss requirement is first satisfied. The two concepts indeed have separate functions in the analysis." D'Agostino, 216 N.J. at 192. Thus, the idea that requiring Plaintiffs to plead ascertainable loss as described above will necessarily write out a nuanced calculation of damages is incorrect. As such, Plaintiffs have failed to state a claim under the NJCFA. The Court will allow Plaintiffs to amend this claim.

As to Florida's Deceptive and Unfair Trade Practices Act (FDUTPA), this Court agrees with Judge Simandle in *Riddell* that actual damages under the FDUTPA are measured as "the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties." 77 F. Supp. 3d at 439 (quoting Rollins, Inc. v. Butland, 951 So. 2d 860, 869 (Fla. Dist. Ct. App. 2006) ). However, this Court does not agree that this definition from *Rollins* establishes a pleading standard, as nothing in that case indicates that the Florida District Court of Appeal intended that definition to apply as a hurdle that must be cleared at the motion to dismiss phase. In fact, the 11th Circuit, the Southern District of Florida, and other courts analyzing FDUTPA have held that the *pleading standard* for a an FDUTPA claim is less stringent than the definition of actual damages. *See, e.g.,* Fitzpatrick v. General Mills, Inc., 635 F.3d 1279, 1283 (11th Cir. 2011) ("[E]ach putative class member would only need to show that he or she paid a premium for YoPlus to be entitled to damages under the FDUTPA."); Hasemann v. Gerber Prods. Co., No. 15-2995, 2016 WL 5477595, at * 21 (E.D.N.Y. Sept. 28, 2016) ("A plaintiff may recover damages under the FDUTPA by alleging that the plaintiff 'paid a price premium' for the allegedly deceptive product.") (quoting Carriuolo v. Gen. Motors Co., 823 F.3d 977, 986 (11th Cir. 2016) ); Moss v. Walgreen Co., 765 F. Supp. 2d 1363, 1367 n.1 (S.D. Fla. 2011) (stating that a consumer suffers damages when she pays "more for the product than she otherwise would have," based on a manufacturer's deceptive practice, regardless of whether or not the consumer relied on the deceptive practice). Thus, Plaintiffs have adequately stated their FDUTPA claim.

3. <u>Statutory Time Bars</u>
Mercedes next argues that Plaintiff Mose's Alabama claim, Findlay and Rubey's Indiana claims, and Watkins' Florida claim are time barred, as those statutes of limitation and repose "begin to run from the date that the alleged tort *occurred—i.e.,* the original purchase date of the vehicles." (ECF No. 117-1 at 57).

The parties do not dispute that Alabama's consumer protection statute is subject to a four-year statute of repose. Mercedes presumes that Mose's purchase took place "in or near 2007," because it was a 2007 model vehicle. (ECF No. 117-1 at 57). However, the FAC explicitly states that Mose

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 295 of 410
PageID: 12902
In re Mercedes-Benz Emissions Litigation, Not Reported in Fed.Supp. (2019)

2019 WL 413541, RICO Bus.Disp.Guide 13,132

purchased his vehicle in February of 2013, (FAC ¶ 29), and thus falls within the statute of repose. Mercedes also argues in a footnote that because Mose asserted an Alabama Deceptive Trade Practices Act, he waived his right to bring other claims. (ECF No. 117-1 at 57 n.25). Given that Mercedes asserted an argument on which there is a split of authority, *In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 405 (S.D.N.Y. 2017), in a footnote, this Court declines to address that argument. *John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) ("[A]rguments raised in passing (such as, in a footnote), but not squarely argued, are considered waived").

**\*26** As to Plaintiff Watkins' Florida claim, Mercedes again argues that because Watkins purchased a used vehicle in 2013, the vehicle must have originally been sold prior to 2013 and thus is subject to a four-year statute of limitations. (ECF No. 117-1 at 57–58). Mercedes cites no law supporting its proposition that the original sale date of the new car is what starts the clock running on the statue of limitations rather than the purchase date of the used car by Plaintiff Watkins. Moreover, Mercedes incorrectly argues that FDUTPA's statute is not tolled by the actions at bar. *In re Takata Airbag Prods. Liab. Litig.*, 193 F. Supp. 3d 1324,1344, 1346 (S.D. Fla. 2016) (stating that "the doctrine of fraudulent concealment will operate to toll the statute of limitations when it can be shown that fraud has been perpetrated on the injured party sufficient to place him in ignorance of his right to a cause of action or to prevent him from discovering his injury," and tolling the plaintiffs FDUTPA claim based on this reasoning). Plaintiff Watkins' FDUTPA claim is not barred by the statute of limitations.

With respect to Findlay and Rubey's Indiana consumer protection claims, Mercedes again uses the vehicle model years as the purchase dates, (ECF No. 117-1 at 58), when Findlay purchased his vehicle in August 2015 and Rubey purchased his vehicle in January 2014. This would put Findlay's purchase inside the two year statute of limitations. Ind. Code § 24-5-0.5-5(b). As to Rubey's purchase, Mercedes' alleged active and intentional fraudulent concealment operates to toll the statute of limitations. *Cwiakala v. Economy Autos, Ltd.*, 587 F. Supp. 1462, 1466 (N.D. Ind. 1984).

### 4. State Consumer Protection Class Action Bars

Mercedes also argues that Plaintiffs' claims under the consumer protection laws of Alabama, Georgia, Mississippi, Montana, Ohio, South Carolina, and Tennessee are barred because the consumer protection laws of those states do not permit class actions. (ECF No. 117-1 at 59). Mercedes argues that pursuant to *Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Company*, 559 U.S. 393 (2010), Rule 23 does not override state substantive law to permit class actions in this situation. (ECF No. 117-1 at 59). This Court has twice addressed and rejected this argument. *In re Liquid Aluminum Sulfate Antitrust Litig.*, 16-md-2687, 2017 WL 3131977, at \*25 (D.N.J. July 20, 2017) (holding that *Shady Grove* instructs that state consumer protection class action bars do not apply to those claims if brought as a class action under Federal Rule of Civil Procedure 23); *Timing Chain*, 2017 WL 1902160, at \*24 (holding the same); *see also Fitzgerald v. Gann Law Books, Inc.*, 956 F. Supp. 2d 581, 586 (D.N.J. 2013) ("*Shady Grove* holds that, even where a federal-court plaintiff asserts a state-law cause of action, Rule 23 may permit class-wide relief where state law would deny it.").

## G. Arbitration

Mercedes' final argument is that two plaintiffs, Andary and Feller, are bound to arbitrate all of their claims pursuant to their purchase agreements. (ECF No. 117-1 at 61). Generally, an agreement to arbitrate a dispute "is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *E.M. Diagnostic Sys., Inc. v. Local 169, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of America*, 812 F.2d 91, 94 (3d Cir. 1987) (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960) ). The Federal Arbitration Act ("FAA"), applies to arbitration clauses contained in contracts involving matters of interstate commerce. *See* 9 U.S.C. § 2; *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). When a party, whose claims are subject to the FAA, refuses to arbitrate the district court must decipher whether the claims are arbitrable. *Medtronic Ave, Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44, 54 (3d Cir. 2001) (citing *AT&T Techs., Inc. v. Comms. Workers of Am.*, 475 U.S. 643, 649 (1986) ). In doing so, the district court applies "the relevant state contract law to questions of arbitrability, which may be decided as a matter of law only if there is no genuine issue of material fact when viewing the facts in the

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 296 of 410
PageID: 12903

In re Mercedes-Benz Emissions Litigation, Not Reported in Fed. Supp. (2019)

2019 WL 413541, RICO Bus.Disp.Guide 13,132

light most favorable to the nonmoving party." *Aliments Krispy Kernels, Inc. v. Nichols Farms*, 851 F.3d 283, 288–89 (3d Cir. 2017).

**\*27**  "[F]ederal policy favors arbitration and thus a court resolves doubts about the scope of an arbitration agreement in favor of arbitration." *Medtronic*, 247 F.3d at 55 (citing *Moses H. Cone*, 460 U.S. at 24–25). However, "[i]f there is doubt as to whether such an agreement [to arbitrate] exists, the matter, upon a proper and timely demand, should be submitted to a jury." *Par-Knit, Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 (3d Cir. 1980), *abrogated on other grounds by Aliments*, 851 F.3d at 287–88. In considering a motion to compel arbitration, a court must engage in a two-step analysis: it must determine first whether there is a valid agreement to arbitrate and, if so, whether the specific dispute falls within the scope of said agreement. *See Century Indem. Co. v. Certain Underwriters at Lloyd's*, 584 F.3d 513, 523 (3d Cir. 2009).

Andary and Feller's arbitration provision reads as follows:

ARBITRATION PROVISION

PLEASE REVIEW • IMPORTANT • AFFECTS YOUR LEGAL RIGHTS

1. EITHER YOU OR WE MAY CHOOSE TO HAVE ANY DISPUTE BETWEEN US DECIDED BY ARBITRATION AND NOT IN COURT OR BY JURY TRIAL.

2. IF A DISPUTE IS ARBITRATED, YOU WILL GIVE UP YOUR RIGHT TO PARTICIPATE AS A CLASS REPRESENTATIVE OR CLASS MEMBER ON ANY CLASS CLAIM YOU MAY HAVE AGAINST US INCLUDING ANY RIGHT TO CLASS ARBITRATION OR ANY CONSOLIDATION OF INDIDIVDUAL ARBITRATIONS.

3. DISCOVERY AND RIGHTS TO APPEAL IN ARBITRATION ARE GENERALLY MORE LIMITED THAN IN A LAWSUIT, AND OTHER RIGHTS THAT YOU AND WE WOULD HAVE IN COURT MAY NOT BE AVAIABLE IN ARBITRATION.

(ECF No. 117-4 at 9, 13).

Mercedes admits that it was not a signatory to these purchase or lease agreements. (ECF No. 117-1 at 62). As this Court explained in *Timing Chain*:

> Basic contract law requires parties to be in privity with each other in order for them to enforce the terms of a contract. *See Black's Law Dictionary* (10th ed. 2014) (defining privity of contract as "[t]he relationship between the parties to a contract, allowing them to sue each other but preventing a third party from doing so"). Since the parties never personally entered into an agreement with each other, no privity of contract between Plaintiffs and Defendant can be established Hence, without privity of contract between the parties, Defendant ... cannot enforce the arbitration clause contained within the purchase and/or lease agreements signed by Plaintiffs and the various dealerships. Thus, in accordance with [*Century Indemnification Company*,] there is no valid agreement between the parties that this Court can enforce, and the Motion to Compel Arbitration must be denied.

2017 WL 1902160, at \*8.

Even still, Mercedes argues, this is the type of relationship in which a non-signatory can enforce the arbitration agreement. (ECF No. 117-1 at 62). Courts have permitted "non-signatory third party beneficiaries to compel arbitration against signatories of arbitration agreements." *E.I. DuPont de Nemours and Co. v. Rhone Poulenc Fiber and Resin Intermediates, S.A.S.*, 269 F.3d 187, 195 (3d Cir. 2001). For example, courts have "bound a signatory to arbitrate with a non-signatory at the nonsignatory's insistence because of the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the nonsignatory's obligations and duties in the contract ... and [the fact that] the claims were intimately founded in and intertwined with the underlying contract obligations." *E.I. DuPont*, 269 F.3d at 199 200 (citations and quotations omitted). "The distinction between signatories and non-signatories is important to ensure that short of piercing the corporate veil, a court does not ignore the corporate form of a non-signatory based solely on the interrelatedness of the claims alleged." *Id.* at 202.

**\*28**  This Court rejected the same argument in *Timing Chain*. 2017 WL 1902160, at \*9. As in *Timing Chain*, the FAC indicates that Plaintiffs each purchased and/or leased their vehicle from an authorized car dealership, that they entered into the purchase or lease agreement with that dealership,

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 297 of 410
PageID: 12904
In re Mercedes-Benz Emissions Litigation, Not Reported in Fed. Supp. (2019)
2019 WL 413541, RICO Bus.Disp.Guide 13,132

and that the agreement contained only the dealership's name and Andary and Feller's names. "Accordingly, there [is] no relationship, let alone a close one, that" indicates that the Court should permit Mercedes to enforce the arbitration agreements. As such Mercedes' motion to compel arbitration is denied.

### IV. CONCLUSION

For the reasons stated herein, Mercedes' motion to dismiss the First Amended Complaint is granted in part and denied in part, and Bosch's motion to dismiss the First Amended Complaint is denied. An appropriate Order accompanies this Opinion.

### All Citations

Not Reported in Fed. Supp., 2019 WL 413541, RICO Bus.Disp.Guide 13,132

### Footnotes

1    The facts as stated herein are taken as alleged in the FAC, (ECF No. 107).

2    The Polluting Vehicles consist of the following Mercedes models powered by BlueTEC diesel engines: ML 320, ML 350, GL 320, E320, S350, R320, E Class, GL Class, ML Class, R Class, S Class, GLK Class, GLE Class, and Sprinter. (FAC ¶ 18).

3    Bosch also argues that the R320 and GLE types of the Polluting Vehicles should excluded from the claims because, "Plaintiffs have no standing to pursue claims based on Affected Vehicles that they did not purchase or lease." (ECF No. 118-1 at 13–14). This argument is premature at the motion to dismiss stage. *Luppino v. Mercedes-Benz USA, LLC*, No. 09-5582, 2013 WL 6047556, at *6 (D.N.J. Nov. 12, 2013) (finding that "dismissal of Plaintiffs' claims related to vehicle wheel tire combinations Plaintiffs did not purchase would be premature" at the motion to dismiss stage).

4    Plaintiffs diminished value theory is articulated as follows: "Moreover, when and if Mercedes recalls the Polluting Vehicles and degrades the BlueTEC Clean Diesel engine performance and fuel efficiency in order to make the Polluting Vehicles compliant with EPA standards, Plaintiffs and Class members will be required to spend additional sums on fuel and will not obtain the performance characteristics of their vehicles when purchased. Moreover, Polluting Vehicles will necessarily be worth less in the marketplace because of their decrease in performance and efficiency and increased wear on their cars' engines." (FAC ¶ 332).

5    The actionability of the misstatements as puffery are addressed *infra* Section III.B.3.iv. To the extent Bosch claims that Plaintiffs are trying to enforce compliance with emissions standards, that argument is addressed by Parts III.B.2.i and III.C.

6    *Duramax* also explicitly rejects "Bosch's repeated argument that Plaintiffs must specifically allege that *Bosch* used the mail or wire to defraud," as "simply, wrong," and notes that even though the plaintiffs had not "specifically alleged the date of the applications or the specific identity of the employee who prepared them," the plaintiffs had "alleged enough detail to put Defendants on notice of the alleged predicate acts." *Id.*

7    The key cases that Defendants rely on in support of their express preemption argument, such as *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992), *Jackson v. Gen. Motors Corp.*, 770 F. Supp. 2d 570 (S.D.N.Y. 2011), and *In re Office of Att'y Gen. of N.Y.*, 709 N.Y.S.2d 1 (App. Div. 2000), have already been discussed at length and distinguished appropriately by the four cases cited in this paragraph. As such, in the interest of judicial economy, the Court refers the parties to the appropriate discussion of these cases in *Volkswagen, FCA, Duramax*, and *Counts.*

8    Mercedes' challenges to fraudulent concealment claims under laws other than New Jersey's are few. Defendant alleges that there is no private cause of action for fraudulent concealment under Connecticut law, (ECF No. 117-1 at 48 n.17 (citing *Traylor v. Awwa*, 899 F. Supp. 2d 216, 224 25 (D. Conn. 2012) ) ), and

In re Mercedes-Benz Emissions Litigation, Not Reported in Fed. Supp. (2019)
2019 WL 413541, RICO Bus.Disp.Guide 13,132

argues that a commercial transaction does not give rise to a duty to disclose under Illinois law, and thus mirrors New Jersey law, (ECF No. 117-1 at 52 n.22). The Court agrees with Plaintiffs regarding Connecticut law, in that Connecticut recognizes claims for fraudulent concealment but calls them fraud by "suppression" or "nondisclosure." *Reville v. Reville*, 312 Conn. 428, 441 (2014) ("Fraud by nondisclosure ... involves the failure to make a full and fair disclosure of known facts connected with a matter about which a party has assumed to speak, under circumstances in which there is a duty to speak.... A lack of full and fair disclosure of such facts must be accompanied by an intent or expectation that the other party will make or will continue in a mistake, in order to induce that other party to act to her detriment."). As to the question of whether Defendants had a duty to disclose under Illinois law, that question is answered below.

9    Mercedes does not brief the Court on the differences in the laws of the various state subclasses with respect to reliance and fraudulent concealment. To the extent that Mercedes purports to rely on Appendix A to its brief, that attachment does not provide state-specific legal citation or information beyond a boilerplate statement that there was a "[f]ailure to satisfy Rule 9(b) with respect to **reliance,** by failing to allege the *what* and *when* of the purported fraud." (*e.g.*, ECF No. 117-2 at 4 (referencing Plaintiff Roberts) ). Thus, the Court declines to do a state-by-state analysis on the differing requirements for pleading reliance in fraudulent concealment claims at this stage. *See* *Counts*, 237 F. Supp. 3d at 597 (deciding that "the Court will not *sua sponte* analyze the elements of fraudulent concealment from each state's law that Plaintiffs purport to sue under" where the defendant did not specifically raise the argument).

10   Bosch ignores the aspect of the duty to disclose that flows from a previous false statement and instead only focuses on the existence of a special relationship. (ECF No. 118-1 at 59).

11   As to Mercedes' contention that Illinois law would also not impose a duty to disclose in this scenario, that argument fails. *See* *Heider v. Leewards Creative Crafts*, 613 N.E.2d 805, 814 (1993) ("Mere silence in a business transaction does not amount to fraud. Yet, silence accompanied by deceptive conduct or suppression of material facts gives rise to active concealment; it is then the duty of the party which has concealed information to speak.").

---

End of Document                                      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 23

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 300 of 410
PageID: 12907
Metcalfe v. Biomet, Inc., Not Reported in Fed. Supp. (2019)
2019 WL 192902

2019 WL 192902
Only the Westlaw citation is currently available.
**NOT FOR PUBLICATION**
United States District Court, D. New Jersey.

David METCALFE Plaintiff,

v.

BIOMET, INC., Biomet Orthopedics, LLC,
Biomet U.S. Reconstruction, LLC, and
Biomet Manufacturing, LLC Defendants.

Civ. No. 18-CV-456-WHW-CLW
|
Signed 01/15/2019

**Attorneys and Law Firms**

Nicholas Rocco Farnolo, Napoli Shkolnik, Melville, NY, for
Plaintiff.

Edward J. Fanning, Jr., Jean Paige Patterson, McCarter &
English LLP, Newark, NJ, for Defendants.

**OPINION**

William H. Walls, Senior United States District Judge

 **\*1**  In this products liability action, Defendants Biomet,
Inc., Biomet Orthopedics, LLC, Biomet U.S. Reconstruction,
LLC, and Biomet Manufacturing, LLC (collectively,
"Biomet") move to dismiss three counts of the Amended
Complaint under Federal Rule of Civil Procedure 12(b)(6).
ECF No. 9. Plaintiff David Metcalfe opposes. ECF No. 26.
Decided without oral argument under Federal Rule of Civil
Procedure 78, the motion to dismiss is granted in part and
denied in part.

**FACTUAL BACKGROUND** [1]

Biomet designed, manufactured, marketed, and sold a
medical prosthesis called the M2a Magnum Hip Metal-on-
Metal Hip System (the "Device"). ECF No. 6 ("Am. Compl.")
¶¶ 1, 7, 9, 10, 12, 14. Metcalfe underwent hip replacement
surgery in 2014 during which the Device was implanted. *Id.*
¶ 52.

The Device differs from typical hip implants in that it is
lined with cobalt-chromium metal rather than polyethylene or
plastic. *Id.* ¶ 20. According to Metcalfe, the cobalt-chromium
lining leads to "prosthesis-derived metal wear debris" and/or
"surface corrosion," and fluid accumulation and soft tissue
and/or bone death inside the hip. *Id.* ¶ 30. These dangers
were allegedly well-known as early as 1996, *see id.* ¶¶ 31-34, and
Biomet was aware of them at all time relevant to this action,
*id.* ¶ 37.

Biomet nonetheless marketed the Device as safe, effective,
and superior to other hip replacement products. *Id.* ¶ 38.
As example, a Biomet marketing brochure—that Metcalfe's
orthopedic surgeon received—asserted that the Device
"offers optimal joint mechanic restoration" and that studies
"have shown no definitive correlation of negative health
issues ... from metal-on-metal implants" like the Device.
*Id.* ¶¶ 39-40. Biomet also stated in 2011 in the Journal of
Arthroplasty that the Device has a "revision rate" of "less than
2.5%." *Id.* ¶ 41. In sum, Biomet represented that the Device
was safe.

Metcalfe alleges that the Biomet Device implanted in him
was defective and that he required a second hip replacement
surgery. *Id.* ¶ 54. As a result of the defective Device, Metcalfe
claims he was harmed in several ways: permanent harm from
severe metal poisoning and metallosis, medical complications
typically associated with a second hip replacement, lost
wages, and extra medical expenses. *Id.* ¶ 53.

Metcalfe sued Biomet for providing the allegedly defective
Device to Metcalfe's original surgeon, and for causing
Metcalfe physical and monetary harm. *Id.* ¶ 1. Metcalfe
asserts claims for:

(i) design defect strict liability (Count 1);

 **\*2**  (ii) inadequate warning strict liability (Count 2);

(iii) manufacturing defect strict liability (Count 3);

(iv) breach of express warranty (Count 4);

(v) negligence (Count 5); and

(vi) negligent misrepresentation (Count 6)

*Id.* ¶¶ 69-127. Biomet moves to dismiss Counts 4 through 6.
ECF No. 9.

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 301 of 410
PageID: 12908
Metcalfe v. Biomet, Inc., Not Reported in Fed. Supp. (2019...

2019 WL 192902

## STANDARD OF REVIEW

Rule 12(b)(6) allows for dismissal where the non-moving party fails to state a claim upon which relief can be granted. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007) ). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (internal quotation marks omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—that the pleader is entitled to relief." *Id.* at 679.

## DISCUSSION

### 1. Negligence (Count 5) and Negligent Misrepresentation (Count 6)

Biomet moves to dismiss Counts 5 and 6 because "strict liability has superseded negligence" and negligent misrepresentation causes of action under New Jersey's Product Liability Act, N.J.S.A. 2A:58C-1 *et seq.* (the "PLA"). ECF No. 9-1 at 3-8. According to Biomet, "negligence is no longer a basis for liability under the PLA." *Id.* at 7. Metcalfe responds that he "will not contest [Biomet]'s arguments relating to" Counts 5 and 6. ECF No. 26 at 1 n.1.

Counts 5 and 6 are dismissed. The PLA is "the sole basis of relief under New Jersey law available to consumers injured by a defective product." *Repola v. Morbark Indus., Inc.,* 934 F.2d 483, 492 (3d Cir. 1991). Consequently, Metcalfe cannot bring claims for negligence and negligent misrepresentation. *See Port Auth. of New York & New Jersey v. Arcadian Corp.,* 189 F.3d 305, 313 (3d Cir. 1999) (dismissing negligence claim "based solely on harm caused by defendants' allegedly defective products"); *Indian Brand Farms v. Novartis Crop Prot., Inc.,* 890 F. Supp. 2d 534, 547 (D.N.J. 2012) (dismissing negligent misrepresentation claim

where "essential nature of Plaintiffs' case is in fact that of a traditional product liability action").

### 2. Breach of Express Warranty (Count 4)

Biomet also moves to dismiss Metcalfe's claim for breach of express warranty. An express warranty is created by "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain," "[a]ny description of the goods which is made part of the basis of the bargain," or "[a]ny sample or model which is made part of the basis of the bargain[.]" N.J.S.A. § 12A:2-313(1)(a)-(c). To state a claim for breach of express warranty under New Jersey law, Metcalfe "must properly allege (1) that [Biomet] made an affirmation, promise or description about the product; (2) that this affirmation, promise or description became part of the basis of the bargain for the product; and (3) that the product ultimately did not conform to the affirmation, promise or description." *Kearney v. Bayerische Motoren Werke Aktiengesellschaft,* No. CV1713544WHWCLW, 2018 WL 4144683, at *15 (D.N.J. Aug. 29, 2018). Biomet argues that Metcalfe has not alleged "any facts to suggest an express warranty existed," ECF no. 9-1 at 9, and that if any did exist, they did not become the basis of the parties' bargain, ECF No. 27 at 2-4.

**\*3** Metcalfe contends that Biomet made express warranties regarding the Device in two places: (1) the Biomet marketing brochure and (2) the 2011 Journal of Arthroplasty article. ECF No. 26 at 5 (quoting Am. Compl. ¶¶ 39, 41). Biomet disagrees for several reasons: that Metcalfe does not allege he or his doctor ever read the 2011 Journal of Arthroplasty article, that the marketing brochure is insufficiently attributed, and that the marketing brochure's statements are mere puffery. ECF No. 27 at 2-4.

Regarding the 2011 Journal of Arthroplasty article, Metcalfe fails to allege that he or his doctor saw the article before the Device was implanted. Am. Compl. ¶ 41. This is fatal to his breach of express warranty claim regarding this statement.

In New Jersey, "a plaintiff effectuates the 'basis of the bargain' requirement of section 2-313 by proving that she read, heard, saw or knew of the advertisement containing the affirmation of fact or promise." *Cipollone v. Liggett Grp., Inc.,* 893 F.2d 541, 567 (3d Cir. 1990), *overruled on other grounds,* 505 U.S. 504 (1992). Because the 2011 Journal of Arthroplasty article is "neither a written warranty delivered to the purchaser in connection with a sale nor an

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 302 of 410
PageID: 12909

Metcalfe v. Biomet, Inc., Not Reported in Fed. Supp. (2019)
2019 WL 192902

oral affirmation of fact or promise made to the purchaser in person by the seller," Metcalfe must plead [2] that he (or his doctor) saw Biomet's statement. *Id.* n.29. *Compare*

🔖 *In re Caterpillar, Inc., C13 & C15 Engine Prod. Liab. Litig.,* No. 1:14-CV-3722 JBS-JS, 2015 WL 4591236, at *27 (D.N.J. July 29, 2015) (dismissing breach of express warranty claim where "Plaintiffs have not alleged that any of the Plaintiffs saw or relied upon the alleged marketing statements"), *with Peruto v. TimberTech Ltd.,* 126 F. Supp. 3d 447, 455 (D.N.J. 2015) (plaintiffs who "alleged that they were exposed to specific affirmations of fact in product brochures, videos and internet marketing" stated claim for breach of express warranty). He has not done so. The 2011 Journal of Arthroplasty article cannot support his breach of express warranty claim.

Some courts in this district have reached the opposite conclusion—namely, that whether the plaintiff saw an alleged warranty and by extension whether that warranty became a basis of the bargain is inappropriate for resolution at the motion to dismiss stage. *See McDonough v. Bayer Healthcare, LLC,* No. CIV. 10-442, 2011 WL 2119107, at *4 (D.N.J. May 26, 2011) ("At this stage, it is sufficient that Plaintiff has pleaded alleged warranties that plausibly could have been the basis of the bargain."); *Smith v. Merial Ltd.,* No. CIV. 10-439, 2011 WL 2119100, at *7 (D.N.J. May 26, 2011) (same). This Court disagrees. Both decisions cite 🔖 *In re Ford Motor Co. E-350 Van Prod. Liab. Litig. (No. II),* No. CIV03-4558(HAA), 2008 WL 4126264, at *5 (D.N.J. Sept. 2, 2008) for the proposition that "whether an alleged warranty was the basis of the bargain cannot be resolved on a motion to dismiss[.]" *See McDonough,* 2011 WL 2119107, at *4; *Smith,* 2011 WL 2119100, at *7. *In re Ford* did not involve a question as to whether the plaintiff had seen the alleged representation that Ford's vehicle was a "15-passenger" van, but whether the plaintiff relied on Ford's warranty that the van could safely seat 15 people in making its purchasing decision. 🔖 2008 WL 4126264, at *3-5. *In re Ford* does not adequately support *McDonough*'s and *Smith*'s conclusions that *any* benefit of the bargain determination is premature on a motion to dismiss.

**\*4** Instead, logic compels the conclusion the Court reaches today. A plaintiff must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." 🔖 *Iqbal,* 556 U.S. at 678. But if a plaintiff does not plead that he saw the alleged warranty, then a court cannot *reasonably* infer that

the warranty formed a basis of the bargain. One court in this District recently granted a motion to dismiss on these grounds. *See In re: Elk Cross Timbers Decking Mktg.,* 15-CV-18 (JLL), 🔖 2015 WL 6467730, at *29 (D.N.J. Oct. 26, 2015) (dismissing breach of warranty claim because plaintiffs "failed to plead which, if any, representations [ ] Plaintiffs were aware of). As the *Cipollone* court explained, "It strains the language to say that a statement is part of the 'basis' of the buyer's 'bargain,' when that buyer had no knowledge of the statement's existence." 🔖 893 F.2d at 567.

Because Metcalfe did not plead that he or his surgeon was aware of the 2011 Journal of Arthroplasty article, statements made in that article are not actionable.

Regarding the Biomet marketing brochure, the Court discerns three statements contained within the passage quoted by Metcalfe: (1) the Device "offers optimal joint mechanical restoration," (2) the Device "offers ... ultra low -wear rates [*sic*] in vivo," and (3) "[m]any studies conducted over the last several decades have shown no definitive correlation of negative health issues to ion levels exhibited from metal-on-metal implants." Am. Compl. ¶ 39. [3] Biomet contends that the marketing brochure is insufficiently attributed, and that the first two statements are mere puffery. ECF No. 27 at 3-4. Biomet does not specifically address the third statement regarding study results.

Contrary to Biomet's argument, the marketing brochure is sufficiently attributed to survive a motion to dismiss. Courts in like circumstances have found similarly broad descriptions of the source of an alleged misrepresentation to be adequate.

*See, e.g.,* 🔖 *Knipe v. SmithKline Beecham,* 583 F. Supp. 2d 602, 626 (E.D. Pa. 2008) (applying New Jersey law) (actionable statements "made in various articles, conferences, and journals presented to the medical community"). By quoting the marketing brochure at length, Metcalfe enables Biomet to identify which brochure he is suing over—giving Biomet "fair notice of what the ... claim is and the grounds upon which it rests." 🔖 *Twombly,* 550 U.S. at 555 (quoting 🔖 *Conley v. Gibson,* 355 U.S. 41, 47 (1957) ).

Biomet references several inapposite decisions for its contrary argument. In *Johnson v. Brown & Williamson Tobacco Corp.,* the plaintiff failed to identify the statement giving rise to the alleged warranty—not merely the source of the statement.

Case 1:19-md-02875-RMB-SAK   Document 598-3   Filed 10/16/20   Page 303 of 410
PageID: 12910
Metcalfe v. Biomet, Inc., Not Reported in Fed. Supp. (2019)
2019 WL 192902

*122 F. Supp. 2d 194, 206 (D. Mass. 2000).* So too in *Heisner ex rel. Heisner v. Genzyme Corp.,* No. 08-C-593, 2008 WL 2940811, at *8 (N.D. Ill. July 25, 2008). And in *Simmons v. Stryker Corp.,* the plaintiff "identifie[d] no source whatsoever of any alleged warranty." No. CIV. A. 08-3451 JAP, 2008 WL 4936982, at *2 (D.N.J. Nov. 17, 2008). Unlike in those cases, Metcalfe has identified the statements forming the alleged warranty and their source—Biomet's marketing brochures. *See* Am. Compl. ¶ 39.

Biomet next argues that the first and second statements in the marketing brochure—(1) that the Device "offers optimal joint mechanical restoration," and (2) that the Device "offers ... ultra low -wear rates [*sic*] in vivo," Am. Compl. ¶ 39— are "classic puffery" and not actionable. ECF No. 27 at 3. According to Biomet, these are "[g]eneralized statements about safety, effectiveness, or quality[.]" *Id.* at 4.

**\*5** "Puffery is an exaggeration or overstatement expressed in broad, vague, and commendatory language." *Castrol Inc. v. Pennzoil Co.,* 987 F.2d 939, 945 (3d Cir. 1993). "[S]tatements that are nothing more than mere puffery are not considered specific enough to create an express warranty." *Smith,* 2011 WL 2119100, at *5; *see also* *In re Toshiba Am. HD DVD Mktg. & Sales Practices Litig.,* Civ. No. 08-939, 2009 WL 2940081, at *16 (D.N.J. Sept. 10, 2009) (dismissing breach of warranty claim based on defendant's statement that HD DVD Players were for "Today, Tomorrow, and Beyond," since statement is just "puffery"). A statement can amount to a warranty, even if unintended to be such by the seller, 'if it could fairly be understood ... to constitute an affirmation or representation that the [product] possesse[s] a certain quality or capacity relating to future performance.' " *L.S. Heath & Son, Inc. v. AT & T Info. Sys., Inc.,* 9 F.3d 561, 570 (7th Cir. 1993) (quoting *Gladden v. Cadillac Motor Car Div., General Motors Corp.,* 83 N.J. 320, 326 (1980) ).

Some courts note that puffery determinations may be reserved for the jury "except in clear cases[.]" *Snyder v. Farnam Companies, Inc.,* 792 F. Supp. 2d 712, 723 (D.N.J. 2011) (denying motion to dismiss because plaintiff has provided more than bald assertions, and puffery determination is for the jury); *see also* *Union Ink Co. v. AT&T Corp.,* 352 N.J. Super. 617, 645 (App. Div. 2002) ("Whether the advertisements contained material misstatements of fact, or were merely puffing, as alleged by defendants, presents a

question to be determined by the trier of fact."). This is a clear case.

The marketing brochure's statement that the Device "offers ... ultra low -wear rates [*sic*] in vivo" is not puffery. This statement is analogous to the one in *Castrol* that defendant's product offers "longer engine life and better engine protection." 987 F.2d 939. Here, as in *Castrol,* the statement is "both specific and measurable by comparative research." *Id.* at 946. It is specific in that the statement deals with a particular aspect of the product—its wear rate— rather than the Device's overall quality. *Cf. Guardavacarro v. Home Depot,* No. CV168796FLWDEA, 2017 WL 3393812, at *8 (D.N.J. Aug. 8, 2017) (statement that ladder has "durable shoes that rest flat on [a] slip resistant pad or [are] held in spur position with [the] SHU-Lock feature" specific enough to state breach of express warranty claim); *Stewart v. Smart Balance, Inc.,* No. CIV.A. 11-6174 JLL, 2012 WL 4168584, at *11 (D.N.J. June 26, 2012) ("fat free" on milk container is actionable because it is "specific and guarantees the product falls into a precise category").

And it is measurable in that it "create[s] a necessary comparison to ... competitors that is testable." *Brucker v. State Farm Mut. Auto. Ins. Co.,* No. 17CV00084, 2017 WL 7732876, at *3 (W.D. Pa. May 26, 2017); *see also* *Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co.,* 228 F.3d 24, 39 (1st Cir. 2000) (statement that "invites consumers to compare" product to competitors not puffery). Unlike in *Brucker,* which dealt with the motto "like a good neighbor, State Farm is there," Biomet's statement regarding the Device's wear rates does not "rel[y] on a subjective opinion about the goods provided." *Id.* Instead, a comparison of the Device's wear rate to the wear rates of competing products would reveal whether the Device's rate is "ultra low." This statement is actionable.

The other contested statement, that the Device "offers optimal joint mechanical restoration," is puffery. In New Jersey "advertising the advantages of a product, including claims of general superiority, constitutes puffing and is not actionable[.]" *Stiffel Co. v. Westwood Lighting Grp.,* 658 F. Supp. 1103, 1115 (D.N.J. 1987). That is all Biomet did here by labeling the Device's performance "optimal." Similar language has been consistently held unactionable. *See, e.g., Rapid Models & Prototypes, Inc. v. Innovated Sols.,* No. CIV. 14-277 NLH/KMW, 2015 WL 4914477, at *5 (D.N.J. Aug.

Metcalfe v. Biomet, Inc., Not Reported in Fed. Supp. (2019)

2019 WL 192902

18, 2015) ("ideal" performance and "exceptional" quality);

*Hughes v. Panasonic Consumer Elecs. Co.*, No. CIV.A. 10-846 SDW, 2011 WL 2976839, at *21 (D.N.J. July 21, 2011) ("industry leading" technology); *Wojcik v. Borough of Manville*, No. A-1627-08T3, 2010 WL 322893, at *3 (N.J. Super. App. Div. Jan. 29, 2010) ("one of the best" and "great" helmets). Biomet's statement that the Device "offers optimal joint mechanical restoration," is puffery.

**\*6** Finally, Biomet does not argue that the third statement in its marketing brochure—"[m]any studies conducted over the last several decades have shown no definitive correlation of negative health issues to ion levels exhibited from metal-on-metal implants," Am. Compl. ¶ 39—is puffery. It is not. *See*

*Lieberson v. Johnson & Johnson Consumer Companies, Inc.*, 865 F. Supp. 2d 529, 540-41 (D.N.J. 2011) (statement that products are " 'clinically proven' to help babies sleep better" is not puffery because statement is "both specific and measurable").

As discussed, the first statement in Biomet's marketing brochure is puffery, but the second and third statements are not.

### CONCLUSION

Biomet's motion to dismiss (ECF No. 9) is granted as to Counts 5 and 6. The motion is also granted as to the first statement in Biomet's marketing brochure, and as to the statements in the 2011 Journal of Arthroplasty article. The motion is denied as to the second and third statements in Biomet's marketing brochure. An appropriate order follows.

### All Citations

Not Reported in Fed. Supp., 2019 WL 192902

---

### Footnotes

1    Unless stated otherwise, all facts are drawn from Metcalfe's Amended Complaint ("Am. Compl."), ECF No. 6. These facts are taken as true for the purpose of the Biomet's motion. *See Cuevas v. Wells Fargo Bank, N.A.*, 643 F. App'x 124, 125-26 (3d Cir. 2016) (quoting *McTernan v. City of York*, 577 F.3d 521, 526 (3d Cir. 2009) ) ("[I]n deciding a motion to dismiss, all well-pleaded allegations ... must be taken as true and interpreted in the light most favorable to the plaintiffs, and all inferences must be drawn in favor of them.").

2    *Cipollone* involved defective jury instructions, so the plaintiff needed to prove, rather than simply plead, that his late wife (the injured party) had seen the advertisement. 893 F.2d at 567. As discussed below, this requirement is equally applicable at the motion to dismiss stage.

3    Metcalfe adequately alleges that his doctor saw the Biomet marketing brochure. *See* Am. Compl. ¶ 40 ("These brochures were given to doctors around the world, including Plaintiff's orthopedic surgeon[.]").

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 24

**Parker v. Wellman, 230 Fed.Appx. 878 (2007)**

Prod.Liab.Rep. (CCH) P 17,729

---

KeyCite Yellow Flag - Negative Treatment

Distinguished by Paz v. Brush Engineered Materials, Inc., 5th Cir.(Miss.), January 13, 2009

230 Fed.Appx. 878
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007.
See also U.S. Ct. of App. 11th Cir. Rule 36-2.
United States Court of Appeals,
Eleventh Circuit.

Neal PARKER, Wilbert Carlton, Stephen King,
Ray Burns, Deborah Watkins, Leonard Ponder,
Barbara King, Patricia Burns, All individually
and as Representative Plaintiffs on behalf of all
other similarly situated, Plaintiffs–Appellants,
v.
Brush WELLMAN, Schmiede Machine and
Tool Corporation, Thyssenkrupp Materials
NA, Inc., D.b.a. Copper and Brass Sales,
Alcoa, Inc., McCann Aerospace Machining
Corporation, Defendants–Appellees,
Axsys Technologies, et al., Defendants.

No. 06–12243.
|
April 18, 2007.

**Synopsis**

**Background:** Products liability action was brought against manufacturers, sellers, and distributors of aircraft or aircraft components, seeking recovery due to exposure to respirable form of beryllium. On defendants' motion for a more definite statement, the District Court, Story, J., 377 F.Supp.2d 1290, granted defendants' motion. After plaintiffs amended their complaint, defendants moved to enforce Court's order, which was treated as a motion for summary judgment. The United States District Court for the Northern District of Georgia, 420 F.Supp.2d 1355, dismissed action, and plaintiffs appealed.

**Holdings:** The Court of Appeals held that:

[1] employees' alleged subcellular, subclinical, and cellular damage from exposure to beryllium did not satisfy requirement of a current physical injury;

[2] employees were not entitled to recover medical monitoring costs; but

[3] genuine issue of material issue of fact as to whether beryllium sensitization was a current disease, pain, or impairment precluded summary judgment.

Affirmed in part, vacated in part, and remanded.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

West Headnotes (3)

[1]     **Damages**  Particular cases in general
        **Products Liability**  Nature of Injury or Damage
        **Products Liability**  Aircraft
        Plaintiffs' alleged subcellular, subclinical, and cellular damage from exposure to beryllium did not satisfy requirement of a current physical injury, necessary to recover for personal injuries and emotional distress in products liability action against manufacturers, sellers, and distributors of aircraft or aircraft components.

        5 Cases that cite this headnote

[2]     **Damages**  Medical treatment and care of person injured
        Plaintiffs' allegations of subcellular, subclinical, and cellular damage from exposure to beryllium were insufficient to state a current physical injury, as was required to recover medical monitoring costs, in products liability action against manufacturers, sellers, and distributors of aircraft or aircraft components.

        8 Cases that cite this headnote

[3]     **Federal Civil Procedure**  Tort cases in general

Parker v. Wellman, 230 Fed.Appx. 878 (2007)
Prod.Liab.Rep. (CCH) P 17,729

Genuine issue of material issue of fact as to whether beryllium sensitization was a current disease, pain, or impairment precluded summary judgment in favor of manufacturers, users and dischargers of beryllium in products liability action against manufacturers, sellers, and distributors of aircraft or aircraft components brought by employees for beryllium sensitization.

4 Cases that cite this headnote

**Attorneys and Law Firms**

*879 David S. Hagy, Robert E. Shields, Doffermyre Shields Canfield Knowles & Devine, Atlanta, GA, Stephan Matanovic, Ruben Honik, Golomb & Honik, P.C., Philadelphia, PA, for Plaintiffs–Appellants.

James R. Johnson, Robin A. Schmahl, Jones Day, H. Lane Young, II, Mary Elizabeth O'Neill, Hawkins & Parnell, Stephen E. O'Day, Andrew McFee Thompson, Smith, Gambrell & Russell, Sewell K. Loggins, Anne M. Landrum, Mozley, Finlayson & Loggins, LLP, Atlanta, GA, Jeffrey D. Ubersax, Cleveland, OH, David G. Greene, Lord, Bissell & Brook, New York, NY, for Defendants–Appellees.

Appeal from the United States District Court for the Northern District of Georgia. D.C. Docket No. 04–00606 CV–RWS–1.

Before EDMONDSON, Chief Judge, BIRCH and WILSON, Circuit Judges.

**Opinion**

PER CURIAM:

**1** Plaintiffs–Appellants ("Plaintiffs"), a group of 120 current and former employees of Defendant–Appellee Lockheed Martin ("Lockheed") and their families, appeal from the district court's dismissal of their suit against Defendants–Appellees Brush Wellman, Inc., Schmiede Machine and Tool Corporation, Thyssenkrupp Materials NA, Inc. (d/b/a Copper and Brass Sales), Alcoa, Inc., and McCann Aerospace Machining Corporation (collectively, "Defendants"), in which Plaintiffs sought to recover damages *880 for personal injuries allegedly sustained due to Defendants' manufacture, use, and discharge of beryllium, a hazardous substance. We affirm the district court's dismissal

of Plaintiffs' claim for a medical monitoring fund and of those claims based on allegations of "subclinical" injury. But, because we conclude that the district court prematurely granted Defendants judgment on Plaintiffs' claims of beryllium sensitization, we vacate that judgment and remand for further proceedings.

I. BACKGROUND

Plaintiffs filed this putative class action in a state court. The Complaint alleges that Defendants are involved in the manufacture, use, or discharge, or all of these, of beryllium. Plaintiffs contend that they were exposed to respirable forms of beryllium from certain products used at Lockheed's Marietta, Georgia, facility. The Complaint alleges that Defendants either knew or should have known that beryllium can cause various adverse health consequences and that Plaintiffs' activities at Lockheed would result in harmful exposure to the substance.

Plaintiffs assert that, as a result of their exposure, they "have suffered and will suffer in the future personal injuries in the form of sub-clinical, cellular, and sub-cellular damage and some have suffered from acute and chronic lung disease, dermatologic disease, and chronic beryllium disease ("CBD")." Plaintiffs also contend that they "have been placed at substantially increased risk of catastrophic latent disease, such as chronic beryllium disease and cancer," and "have suffered and will suffer in the future from fear, anxiety, and emotional upset" because of their personal injuries and increased risk of disease. The Complaint includes claims for medical monitoring, strict liability, negligence, fraudulent concealment, civil conspiracy, punitive damages, and attorneys' fees.

Lockheed removed the case to federal court pursuant to 28 U.S.C. § 1442(a)(1). Defendants filed various motions to dismiss, motions for judgment on the pleadings, and motions for a more definite statement. The district court ruled that those claims relying on "sub-clinical, cellular, or sub-cellular" injuries were not cognizable under Georgia law, concluding that Georgia only allows tort recovery for injuries with "manifest physiological symptoms." The district court noted that it would enter an order dismissing those "subclinical" claims after Plaintiffs filed an amended pleading identifying those plaintiffs who had sustained "actionable tort injuries." The court similarly granted Defendants' motions to dismiss "these 'subclinical' Plaintiffs' claims for increased risk and negligent infliction of emotional distress" and for medical monitoring.

**\*\*2** Plaintiffs then filed a Substituted Amended Complaint ("Amended Complaint"), in which they identified five persons "whose injuries have manifested themselves such that they have been detected by physical examination and/or laboratory test." Plaintiffs also repeated their allegation that all Plaintiffs had "sustained subclinical, cellular, and subcellular effects that constitute physical injuries." In response, Defendants moved to enforce the district court's earlier order, arguing that the five specified plaintiffs alleged only beryllium sensitization, which is not an actionable injury even when detected by clinical tests. Because both parties submitted expert affidavits, the district court, with the consent of the parties, treated Defendants' motion as a motion for summary judgment. The court granted Defendants' motion, concluding that, even accepting the Plaintiffs' expert's opinion, beryllium sensitization constituted no actionable **\*881** injury under Georgia law. Because Plaintiffs had put forth no other claims, the court dismissed the case.

## II. STANDARD OF REVIEW

Defendants argue that the district court dismissed only the medical monitoring claim in Count I before the summary judgment stage, but the district court's opinion specifically stated that the court was granting Defendants' motion to dismiss on the "subclinical" claims. The later order therefore only dealt with the claims of the five plaintiffs who further alleged beryllium sensitization. We review the rulings in the first order under Fed.R.Civ.P. 12(b)(6), which governs motions to dismiss for failure to state a claim, and review the ruling in the second order under Fed.R.Civ.P. 56, which applies to motions for summary judgment.

We review a district court's dismissal of a claim under Rule 12 *de novo,* accepting the well-pleaded factual allegations in the complaint as true and construing them in the light most favorable to the plaintiff. *Aldana v. Del Monte Fresh Produce, N.A., Inc.,* 416 F.3d 1242, 1246 (11th Cir.2005). A dispositive Rule 12 motion may be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.*

We also review the district court's grant of summary judgment *de novo,* viewing the record and drawing all reasonable inferences in the light most favorable to the nonmoving party. *Hall v. United Ins. Co. of America,* 367 F.3d 1255, 1262

(11th Cir.2004). Summary judgment is proper only if no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. *Id.*

The parties acknowledge that the legal questions presented in this case are governed by Georgia law. "In rendering a decision based on state substantive law, [we] must decide the case the way it appears the state's highest court would. Where the state's highest court has not spoken to an issue, [we] must adhere to the decisions of the state's intermediate appellate courts absent some persuasive indication that the state's highest court would decide the issue otherwise." *Chepstow Ltd. v. Hunt,* 381 F.3d 1077, 1080 (11th Cir.2004) (alterations in original) (internal quotation marks and citation omitted).

## III. DISCUSSION

### A. Plaintiff's "Subclinical" Injury Claims

**\*\*3** **[1]** Plaintiffs contend that the district court erred in concluding, as a matter of law, that allegations of subclinical damage could not support an award of damages for personal injury and emotional distress. Plaintiffs argue that, under Georgia law, the question of whether the alleged subclinical damage constitute a physical injury is one of fact that cannot be resolved on the pleadings. We disagree.

To recover for personal injuries under Georgia law, a plaintiff must show that he has suffered "injury to life or limb or damage to other property." *Pickren v. Pickren,* 265 Ga.App. 195, 593 S.E.2d 387, 388 (2004). Georgia similarly allows recovery of damages for emotional distress upon a showing of "(1) a physical impact to the plaintiff; (2) the physical impact cause[d] physical injury to the plaintiff; and (3) the physical injury to the plaintiff cause[d] the plaintiff's mental suffering or emotional distress." *Lee v. State Farm Mut. Ins. Co.,* 272 Ga. 583, 533 S.E.2d 82, 85 (2000). Thus, to the extent that Plaintiffs' allegations of subclinical damage are insufficient to support a claim for physical injury, they **\*882** are also insufficient to support a claim for emotional distress. [1]

In the leading Georgia case dealing with exposure to a toxic substance, the Court of Appeals indicated that a personal injury plaintiff must present evidence of "actual disease, pain or impairment of some kind." *Boyd v. Orkin Exterminating Co., Inc.,* 191 Ga.App. 38, 381 S.E.2d

295, 298 (1989), *overruled on other grounds,* 🚩 *Hanna v. McWilliams,* 213 Ga.App. 648, 446 S.E.2d 741 (1994). In *Boyd,* homeowners sued a pest control company for negligently applying insecticide inside their home, which resulted in the exposure of themselves and their children to harmful levels of toxic substance. 🚩 *Boyd,* 381 S.E.2d at 296. At trial, the plaintiffs presented evidence demonstrating the presence of elevated levels of toxin metabolites in their children's blood. They also adduced medical expert testimony stating that the elevated levels, in themselves, constituted an "injury" and that the children would require periodic monitoring to determine whether they were developing health problems associated with the toxic exposure. *Id.* But, the appellate court upheld the directed verdict for the defendant, concluding that "there was no evidence that the appellants had sustained any specific injury." 🚩 *Id.* at 297–98.

Here, the district court read *Boyd* to "apparent[ly] reject[ ] subclinical effects as actionable 'injuries.' " We agree. According to the *Boyd* appellate opinion, the trial evidence in *Boyd* consisted of medical testimony that the presence of the elevated levels of toxin metabolites, by itself, was an injury; the medical testimony did not show that those metabolites "had caused or would eventually cause actual disease, pain or impairment." 🚩 *Id.* at 298. Likewise, Plaintiffs here have alleged that the subclinical and cellular damage from their exposure, by itself, is an injury. But Plaintiffs have not alleged that this subclinical damage has resulted in an identifiable physical disease, illness, or impairing symptoms. And to the extent that Plaintiffs allege that their subclinical condition will eventually cause—or will at least increase their risk of developing—future disease, pain, or impairment, Plaintiffs concede that they do not seek current compensation for this anticipated harm. [2] Instead, Plaintiffs rest their personal injury claims on the contention that their allegations of subclinical and cellular damage are sufficient to allege a current physical injury under Georgia law; because we reject this argument, Plaintiffs' claims for personal injury and emotional distress **\*883** must fail. [3]

**\*\*4** [2] And because Plaintiffs' allegations of subclinical damage are insufficient to state a current physical injury, Plaintiffs are not entitled to recover the "quantifiable costs of periodic medical examinations" as future medical expenses.

*See* 🚩 *Hendrix v. Raybestos–Manhattan, Inc.,* 776 F.2d 1492, 1504 (11th Cir.1985) (allowing recovery of future medical expenses that are reasonably certain to be incurred as a result

of plaintiff's current physical injury). Plaintiffs have failed to point us to any Georgia authority that allows recovery of medical monitoring costs in the absence of a current physical injury, and *Boyd* suggests that Georgia would not recognize such a claim. [4] *See* 🚩 *Boyd,* 381 S.E.2d at 298 (affirming partial summary judgment to defendants where plaintiffs "merely produced medical testimony that the children would require monitoring in the future to determine whether they developed health problems due to their exposure to the chemicals"). The district court therefore correctly dismissed Plaintiffs' claim for a medical monitoring fund in Count I of the Complaint.

### *B. Plaintiffs' Beryllium Sensitization Claims*

[3] Plaintiffs also contend that the district court improperly granted summary judgment to Defendants based on the court's conclusion that beryllium sensitization—a clinically-manifest condition—constituted no actionable injury under Georgia law. Plaintiffs argue that the medical expert affidavits established that a material issue of fact exists on whether beryllium **\*884** sensitization is a current "disease, pain or impairment." We agree.

Plaintiffs' expert, Dr. Maier, opined that beryllium sensitization is "an abnormal immune response" that is "comparable to an allergy" and "an important precursor to [CBD]." Dr. Maier indicated that approximately six to eight percent per year of sensitized persons develop CBD and stated that "[i]t is likely that the majority of individuals with sensitization will eventually develop CBD." She also compared sensitization with HIV and pleural plaques, other immunological conditions that have a "high risk" of developing into more serious diseases. Dr. Maier concluded that "it is clear that beryllium sensitization is a marker of injury to beryllium."

In contrast, while Defendants' expert, Dr. Repsher, agreed that beryllium sensitization is similar to an allergy, he stated that the condition is a "part of a normally functioning and healthy immune system" that does not result in any "structural or functional changes" in the body. Instead, a sensitized person is merely "*capable* of having a harmful, allergic-type reaction to beryllium *in the future.*" He also opined that the condition "cause[s] no impairment or harm of any kind" and that a sensitized person may never develop CBD. He disagreed with Dr. Maier's analogy to pleural plaques and also stated that

sensitization appears to be reversible, as some people who test positively for the condition later test negative.

**\*\*5** In sum, the parties' experts disagree on whether the beryllium sensitization is a current disease or impairment and on the probability that the condition will later develop into CBD. These issues are questions of fact that should be answered by a jury, and summary judgment was therefore improper.

### IV. CONCLUSION

We conclude that Plaintiffs' allegations of injury in the form of subcellular, subclinical, and cellular harm are insufficient to survive Defendants' motions to dismiss on their claims for damages for personal injury and emotional distress. We also decide that the district court correctly determined that Georgia law does not currently allow for recovery of medical monitoring costs. But we conclude that Plaintiffs' expert testimony creates a genuine dispute of material fact on whether beryllium sensitization is a current physical impairment; summary judgment was therefore inappropriate on the claims of the five plaintiffs identified as being sensitized. For these reasons, the district court's rulings are affirmed in part and vacated in part; and the case is remanded for further proceedings consistent with this opinion.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

**All Citations**

230 Fed.Appx. 878, 2007 WL 1149982, Prod.Liab.Rep. (CCH) P 17,729

---

### Footnotes

1    Plaintiffs' reliance on the HIV-exposure case *Johnson v. American Nat'l Red Cross,* 276 Ga. 270, 578 S.E.2d 106 (2003), in support of their emotional distress claim is misplaced. Plaintiffs argue that they have stated a claim for fear of future disease because they have alleged "actual" exposure to a disease-causing agent and a "channel of communication" through which exposure took place. But *Johnson* did not address whether a the plaintiff had sufficient physical injury to recover emotional distress damages; the court merely concluded that a failure to show actual exposure was fatal to the plaintiff's claim. And the earlier case of *Russaw v. Martin,* 221 Ga.App. 683, 472 S.E.2d 508, 510 (1996)—on which *Johnson* relied, see *Johnson,* 578 S.E.2d at 109–10—indicates that even those suing for emotional distress due to HIV exposure must allege and prove a physical injury.

2    In this manner, Plaintiffs are similarly situated to the claimants in *Boyd,* who introduced evidence that the elevated toxin levels, while not impairing the children's present health, increased their risk of developing cancer. *Boyd,* 381 S.E.2d at 298. But even if *Boyd* can be read to allow recovery where the subclinical effects of exposure are shown to increase—to a "reasonable degree of medical certainty"—the risk of manifest disease or impairment, see *id.* at 298, Plaintiffs concede that they do not seek recovery for this "enhanced risk."

3    We are aware that some courts have allowed tort claims based on allegations of subclinical or cellular "injury" in exposure cases, in some cases treating such an allegation as one of latent disease. *See, e.g., Werlein v. United States,* 746 F.Supp. 887, 901 (D.Minn.1990), *vacated in part on other grounds,* 793 F.Supp. 898 (D.Minn.1992); *Barth v. Firestone Tire & Rubber Co.,* 661 F.Supp. 193, 196 (N.D.Cal.1987); *Brafford v. Susquehanna Corp.,* 586 F.Supp. 14, 17–19 (D.Colo.1984).
    But we think that, in Georgia, the more persuasive position is that an allegation of subclinical damage does not satisfy *Boyd's* requirement of an actual "disease" or "impairment," even if it is a predictor of future disease.

*See, e.g.,* 🔖 *Rainer v. Union Carbide Corp.,* 402 F.3d 608, 618–22 (6th Cir.2005) (concluding that, under Kentucky law, allegations of "subcellular damage" were insufficient to satisfy the requirement of "bodily injury" for recovery under the Price–Anderson Act where plaintiffs lacked "present physical illness" but introduced evidence that "chromosomal damage is directly linked with an increased likelihood of cancer"); 🔖 *Schweitzer v. Consol. Rail Corp.,* 758 F.2d 936, 942 (3rd. Cir.1985) ("We believe ... that subclinical injury resulting from exposure to asbestos is insufficient to constitute actual loss or damage to a plaintiff's interest required to sustain a cause of action under generally applicable principles of tort law."); 🔖 *Laswell v. Brown,* 683 F.2d 261, 269 (8th Cir.1982) (concluding that allegations of exposure to an "unusually high risk of disease in genetically passed cellular" damage was insufficient to state a claim where the complaint was "conspicuously void of ... allegations that the children have sustained ... damage *other than the exposure to a higher risk of disease and cellular damage* " (emphasis added)); *cf.* 🔖 *Eagle–Picher Indus., Inc. v. Liberty Mut. Ins. Co.,* 682 F.2d 12, 19–20 (1st Cir.1982) (examining various definitions of "injury" and "disease" and concluding that insurance policies could not be construed to cover subclinical changes that did not cause impairment "until, if ever, they accumulate to become clinically evidence or manifest").

4    Whether courts should recognize a medical monitoring cause of action in the absence of a present physical illness or impairment is not well-settled nationwide. *See, e.g.,* 🔖 *Paz v. Brush Engineered Materials, Inc.,* 949 So.2d 1, 6–7 (Miss.2007) (collecting cases from different jurisdictions and then declining to recognize medical monitoring actions absent allegations of present physical injury under Mississippi law, which "requires the traditional elements of proof in a tort action").

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 25

2006 WL 166452
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Jeff PLAYER, et al., Plaintiffs,
v.
MOTIVA ENTERPRISES LLC, a successor
in interest to Star Enterprises, Defendant.

No. Civ. 02–3216(RBK).
|
Jan. 20, 2006.

**Attorneys and Law Firms**

Keith A. McKenna, McKenna, Mulcahy & McKenna, Montclair, NJ, for Plaintiffs.

Jeffrey W. Moryan, Connell Foley LLP, Roseland, NJ, for Defendant.

OPINION

KUGLER, United States District Judge:

**\*1** This matter comes before the Court upon motions by Defendant Motiva Enterprises, LLC, ("Defendant" or "Motiva") for summary judgment of the claims of Plaintiffs Jeff Player, et al. ("Plaintiffs"), and to exclude Plaintiffs' experts Michael Gochfeld, M.D., Ph.D. ("Gochfeld"), R. Brian Ellwood, Ph.D. ("Ellwood"), Bruce M. Gallo ("Gallo"), and Daniel McDonald ("McDonald"). For the reasons set forth below, Defendant's motions will be granted in part and denied in part.

I. Background [1]
This environmental contamination suit is brought by the current and former owners of twenty-seven parcels of residential property located in the Spring Hollow Subdivision in Gloucester Township, New Jersey. [2] Plaintiffs allege that emissions from Defendant's nearby Texaco gasoline service station contaminated their property and the Kirkwood Cohansey Aquifer, the underground water source for their potable wells.

Contamination of the aquifer was first detected on April 5, 2000, when significant concentrations of the gasoline-related compound methyl tertiary butyl ether ("MTBE") was discovered in a drinking fountain at Camden County Community College. New Jersey Consumers Water Company ("Consumers"), the entity responsible for providing water to the college, conducted sampling of some of its wells and discovered significant amounts of gasoline-related compounds in municipal supply well number 8 ("CW–8"). Consumers took the well offline on April 10.

While investigating the contamination, the New Jersey Department of Environmental Protection ("NJDEP") detected a discharge of volatile organic compounds ("VOCs") from Defendant's service station, located at 585 Berlin Cross Keys Road ("Motiva site" or "contamination site"). [3] The NJDEP issued a Field Directive on April 12, 2000, requiring Motiva to investigate the source and extent of the discharge, to implement an interim treatment system, and to submit a remedial action work plan to the NJDEP. Defendant installed an interim recovery system and twenty-five monitoring and recovery wells between April and June 2000.

The NJDEP issued a second directive on May 5, 2000, ordering Defendant to cease gasoline retail operations and provide treatment or an alternate source of water to replace CW–8. Defendant replaced the interim system with a permanent ground water recovery and treatment system in June 2000, and installed forty-one additional monitoring wells from June 2000 to present. As further required by the NJDEP, Defendant regularly sampled potable wells located on approximately forty residential properties in the vicinity of the Motiva site. Defendant detected small amounts of MTBE in thirteen of the residential wells it sampled. [4]

Per the NJDEP directive, Motiva submitted a Remedial Investigation Work Plan/Remedial Investigation report on July 2000 and a Remedial Action Workplan ("RAW") on November 14, 2000. In its RAW, Defendant requested permission to cease sampling of the residential wells, contending that the MTBE detected in those wells could not have come from the Motiva site since the wells are located upgradient [5] or sidegradient from the site, and no emissions were detected in most of the monitoring wells between the Motiva site and the potable wells. [6] Motiva also claimed that recent literature indicated that traces of MTBE in groundwater could likely result from "non-point sources." (March 2001 Directive at 2.)

**\*2** Plaintiffs' expert, R. Brian Ellwood, Ph.D ("Ellwood"), submitted a response to the RAW on January 17, 2001. In his report, Ellwood notes that as of January 17, 2001, "[c]ontrol of contamination at depth beneath the site, control of offsite contamination, and possibly control of contamination at the northern site boundary, has not been established." (Preliminary Report Sicklerville Road Groundwater Contamination ("Ellwood Report"), McKenna Cert. in Opp. to Def.'s Mot. Summ. J., filed Oct. 12, 2005 ("McKenna Cert."), Ex. F, at 2.) Ellwood also offered possible theories to demonstrate the plausibility of Defendant's responsibility for the MTBE in spite of Motiva's arguments to the contrary.

The NJDEP ultimately rejected Defendant's request to cease sampling of the residential wells in its March 2001 Directive on the basis that "there is insufficient evidence for Equiva to conclude that the MTBE detected in the 13 potable wells in the area did not originate from the Cross Keys Texaco site" and "that regardless of the source of the MTBE in these wells, which is obviously debatable, ongoing sampling of these wells is required *primarily due to their proximity to the site."* (March 2001 Directive at 2) (emphasis in original).

Also in the March 2001 Directive, the NJDEP approved a Classification Exemption Area ("CEA") for the site that excluded all but 1/10 of an acre of 583 Berlin Cross Keys Road (the Wallace Property). The CEA establishes the boundaries of a ground water plume where VOCs exceed the GWQS. [7]

Through summer 2004, the NJDEP regularly reduced the testing requirements. By August 18, 2003, the NJDEP required only:

> annual sampling of the wells at 4, 7, 11, 13 and 14 Donna Marie Court; 2, 4, 6, and 8 Latham Way; 12 and 20 Spring Hollow Drive, and; 937 and 948 Sicklerville Road. For all the sampling events of the aforementioned potable wells conducted April 2002, the Department notes that all wells continue to exhibit no gasoline related contamination in

> excess of the Department's Drinking Water Quality Standards.

(NJDEP Directive, Aug. 18, 2003, McKenna Cert., Ex. D.)

The NJDEP approved shut down of the recovery and treatment system on April 30, 2004. (NJDEP Correspondence, Aug. 9, 2004, Mairo Cert., Ex. S., at 2.) Finally, on August 9, 2004, the NJDEP determined that "Defendant's Remedial Action Progress Reports "meet the conditions of the March 21, 2001 Remedial Action Workplan (RAW) approval. Shell Oil Products U.S. (Shell OPUS) is, therefore, in compliance with N.J.A.C. 7:14B–6." (Aug. 9, 2004, NJDEP Correspondence, Mairo Cert., Ex. S., at 1.)

**B. The Residential Properties**
Plaintiffs own twenty-seven respective residential properties near Defendant's gasoline station. [8] Twenty-six of the twenty-seven properties-all but 583 Berlin Cross Keys Road ("the Wallace property")-contain potable wells located in the Kirkwood Cohansey Aquifer. Because Plaintiffs' properties are north/northeast of the contamination site, (Undisputed Facts ¶ 38), they are considered upgradient or sidegradient of the contamination site, depending on whether CW–8 is pumping. [9]

**\*3** Consistent with the requirements of the NJDEP directives, Defendant tested the Plaintiffs' residential wells for six gasoline-related compounds: benzene, toluene, ethylbenzene, xylenes, MTBE, and TBA. No testing detected any gasoline-related compound on eighteen of the properties. [10] Detection of compounds on the remaining eight properties was as follows:

• A single detection of 0.79 ppb toluene and ten detections of MTBE (highest at 15.5 ppb) at 4 Latham Way,

  • Three detections of MTBE (highest at 0.76 ppb) at 14 Donna Marie Court,

  • Three detections of MTBE (highest at 1.4 ppb) at 6 Latham Way,

  • A single detection of 1.4 ppb toluene at 850 Sicklerville Road,

- A single detection of 0.4 ppb MTBE at 4 Donna Marie Court,

- A single detection of 0.3 ppb MTBE at 12 Donna Marie Court,

- A single detection of 1.2 ppb MTBE at 8 Latham Way, and

- A single detection of 0.3 ppb MTBE at 20 Spring Hollow Road.

The GWQS for toluene is 1,000 ppb and the GWQS for MTBE is 70 ppb. No gasoline-related compound was detected on any Plaintiff's property after April 2001. According to the Certification of Julian Davies, a Project Manager for EnviroTrac, Ltd., an environmental consulting firm retained by Defendant to remediate the Motiva site, the NJDEP never restricted the consumption of water from Plaintiffs' potable wells, and never required Defendant to treat the water, provide Plaintiffs with an alternate source of water, or collect soil samples from the residential properties.[11] (Julian Davies Cert., Mairo Cert., Ex. R, at 2.)

Since the fact of the contamination became known, several Plaintiffs have sold their property. Maria and John Wallace sold 583 Berlin Cross Keys Road for $350,000.00 in September 2001, Plaintiffs Thomas and Tina Stankiewicz sold 9 Spring Hollow Drive in July 2002 for $143,000.00, Barbara Tanner sold 17 Spring Hollow Drive for $134,000.00 in February 2002, Daniel and Maria Rodriguez sold 18 Spring Hollow Drive for $138,000.00 in July 2003, David Lodi sold 5 Donna Marie Court for $104,000.00 in September 2001, 13 Donna Marie Court was sold for $109,900.00 in July 2000, and 19 Spring Hollow Drive was sold for $133,900.00 in May 2001.

Defendant filed motions for summary judgment and to exclude experts on June 24, 2005, after requesting and receiving permission from this Court to extend by one week the date for the filing of dispositive and *in limine* motions. Briefs in opposition were due July 22, 2005, however, Plaintiffs instead filed an untimely request for an extension on August 2, 2005, and a second request on September 6, 2005, moving the deadline to September 30, 2005. On October 5, 2005, Plaintiffs filed another untimely request for an extension, and ultimately did not submit a complete Opposition until October 14, 2005. Nevertheless, because a district court should not grant a

motion for summary judgment without examining the merits, *Stackhouse v. Mazurkiewicz,* 951 F.2d 29, 30 (3d Cir.1991) (citing *Anchorage Assoc. v. Virgin Islands Bd. of Tax Rev.,* 922 F.2d 168 (3d Cir.1990)), this Court will exercise its discretion to consider Plaintiffs' Opposition, even though it is untimely. Local Civ. R. 7.1(d)(5).

## II. Standard

**\*4** Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 330, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could find for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment. *Celotex,* 477 U.S. at 330. The moving party may satisfy this burden by either (1) submitting affirmative evidence that negates an essential element of the nonmoving party's claim; or (2) demonstrating to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's case. *Id.* at 331.

Once the moving party satisfies this initial burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). To do so, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Serbin,* 96 F.3d at 69 n. 2 (quoting *Celotex,* 477 U.S. at 322); *Heffron v. Adamar of N.J., Inc.,* 270 F.Supp.2d 562, 568–69 (D.N.J.2003). "If the non-movant's evidence on any essential element of the claims asserted is merely 'colorable' or is 'not significantly probative,' the court must enter summary judgment in favor of the moving party."

*Player v. Motiva Enterprises LLC*, Not Reported in F.Supp.2d (2006)

2006 WL 166452

*Heffron,* 270 F.Supp.2d at 69 (citing *Anderson, 477 U.S. at 249–50).*

## III. Motion to Exclude Expert Daniel McDonald

Defendant moves to exclude the testimony of Plaintiffs' expert Daniel McDonald ("McDonald") on the grounds that he is unqualified and his report is unreliable.[12] Admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).[13] In the Third Circuit, the admissibility of expert testimony is contingent on the "qualifications" of the expert and the "reliability" of his methodology. *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717 (3d Cir.1994) (interpreting *Daubert* ); *see also Oddi v. Ford Motor Co.,* 234 F.3d 136, 145 (3d Cir.2000).

### A. *In Limine* Hearing

In certain instances, courts are obligated to provide *in limine* hearings before applying *Daubert* to exclude expert testimony. *Padillas v. Stork–Gamco, Inc.,* 186 F.3d 412 (3d Cir.1999). A hearing is required, for example, where the court excludes an expert's conclusions on the grounds that they are "insufficiently explained and the reasons and foundations for them inadequately and perhaps confusingly explicated." *Id.* In other words, where a report is "conclusory and did not adequately explain the basis for [the expert's] opinion or the methodology employed in reaching his conclusions," the "plaintiff needs an 'opportunity to be heard' on the critical issues of scientific reliability and validity." *Oddi,* 234 F.3d 136, 152 (3d Cir.2000) (holding that the district court did not err "in granting summary judgment here without an *in limine* hearing") (quoting *Padillas,* 186 F.3d at 417). Where the evidentiary record is substantial, however, or the court has before it the information necessary to determine that the expert lacks "good grounds" for his conclusions, an *in limine* hearing may be unnecessary. *Id.* at 153.

**\*5** The evidence before this Court clearly establishes the process by which McDonald "arrived at his conclusions," *Oddi,* 234 F.3d at 152, and McDonald's report and deposition details the methodology underlying his determinations. As discussed below, this Court will exclude

McDonald's testimony on the grounds that his analysis and methodology are baseless and inconclusive, not because his report is insufficiently explained. Additionally, Defendant's motion for summary judgment alerted Plaintiffs to the *Daubert* challenge, yet Plaintiffs neither requested a hearing nor offered any affidavit or evidence in support of McDonald. Accordingly, an *in limine* hearing is unnecessary.

### B. Qualifications

The Third Circuit instructs courts to "liberally" evaluate an expert's qualifications. *Oddi v. Ford Motor Co.,* 234 F.3d 136, 145 (3d Cir.2000). In particular, the Circuit has "eschewed overly rigorous requirements of expertise and [has] been satisfied with more generalized qualifications." *In re Paoli,* 35 F.3d at 741 (citing *Hammond v. International Harvester Co.,* 691 F.2d 646, 652–53 (3d Cir.1982) and *Knight v. Otis Elevator Co.,* 596 F.2d 84, 87–88 (3d Cir.1979)). This liberal treatment extends to the expert's substantive qualifications as well as his formal qualifications. *Id.*

Nevertheless, the Third Circuit has "also set a floor with respect to an expert witness's qualifications." *Elcock v. Kmart Corp.,* 233 F.3d 734, 742 (3d Cir.2000). To demonstrate when an expert would not be qualified under Rule 702, the *Elcock* Court offered the pre-*Daubert* case, *Aloe Coal Co. v. Clark Equip. Co.,* 816 F.2d 110 (3d Cir.1987), which held a tractor salesperson unqualified to testify as an expert about the cause of a tractor fire. *Elcock,* 233 F.3d at 742 (citing *Aloe Coal,* 816 F.2d 110).

In *Elcock* itself, the Court determined with "misgivings" that the district court had not abused its discretion by concluding that a psychologist with experience in obtaining employment for disabled individuals was qualified to testify to the possibility for vocational rehabilitation of the injured plaintiff. However, the Court acknowledged that it also would have upheld a decision to exclude the expert since "he seems most qualified to testify on a micro-level regarding the ability of a disabled individual to return to a specific job; he does not appear particularly qualified to testify on the macro-level regarding the number of jobs in the national or local economy that the disabled individual is able to perform."[14] *Elcock,* 233 F.3d at 744. Taken together, *Elcock* and *Aloe Coal* indicate that where a proposed expert's area of experience is

Case 1:19-md-02875-RMB-SAK Document 598-3 Filed 10/16/20 Page 317 of 410
PageID: 12924
Player v. Motiva Enterprises LLC, Not Reported in F.Supp.2d (2006)
2006 WL 166452

adjacent to, but not actually encompassing, the subject matter of his testimony, he may be deemed unqualified.

McDonald has worked as a licensed appraiser in New Jersey for approximately twenty-two years. Defendant argues that McDonald is nevertheless unqualified to testify to the diminution in value of Plaintiffs' properties because McDonald has no experience in appraising contaminated property. Defendant notes that McDonald has never appraised property allegedly contaminated by emissions from a gasoline station and has never acted as an expert in a situation involving contamination of the groundwater or allegations of a leaking underground storage tank. (Daniel McDonald Dep. ("McDonald Dep."), Mairo Cert. in Supp. Def.'s Mot. to Exclude Plaintiffs' Expert Daniel McDonald, Ex. C, at 23–24.) Defendant also points out that McDonald did not entirely understand the Ellwood and Gallo reports upon which he relied, including the charts indicating the presence and degree of contaminating agents on the property. (McDonald Dep. at 55–56.)

**\*6** This case lies squarely between *Aloe Coal* and *Elcock*. Although McDonald is an experienced appraiser, no evidence indicates that he has any experience appraising contaminated properties or is qualified to value the effects of stigma on property values. Just as a psychologist experienced in assisting individuals to find work may be unqualified to testify about the general availability of jobs in the economy, an individual able to appraise an uncontaminated property may have no grounds for appreciating the devaluation of the same property under unique conditions of contamination or stigma. Because nothing in McDonald's experience indicates knowledge or expertise in issues of contamination, he is unqualified to testify to the loss of value to Plaintiffs' properties arising from the alleged contamination.

### C. Reliability

Because expert testimony has the potential to bear considerable weight with a jury, the district court functions as a gatekeeper responsible for assuring "that the scientific methodology upon which the expert opinion is founded is reliable" and that "the expert's conclusion is based on good grounds." *In re Paoli,* 35 F.3d at 732–33. To ascertain "reliability," the court must examine a number of factors, both those established in *Daubert* and those previously enumerated by the Third Circuit in *United States v. Downing,* 753 F.2d 1224 (3d Cir.1985). *Oddi,* 234 F.3d 145 (citing *Paoli II,* 35 F.3d at 742). In particular, the court must consider:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subjected to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Paoli II,* 35 F.3d at 742 n. 8; *see also Elcock,* 233 F.3d at 746 (noting that "each factor need not be applied in every case"). The party wishing to introduce the testimony bears the burden of establishing "by a preponderance of the evidence that their opinions are reliable." *Paoli,* 35 F.3d at 744.

Of course, an expert's opinion need not be "perfect," and judges may not substitute their opinions for those of an expert. *Paoli,* 35 F.3d at 744; *see also Crowley v. Chait,* 322 F.Supp.2d 530, 536 (D.N.J.2004). However, courts also need not admit mere conclusions or "opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Magistrini v. One Hour Martinizing Dry Cleaning,* 180 F.Supp.2d 584, 608 (D.N.J.2002) (quoting *General Elec. Co. v. Joiner,* 522 U.S. 136, 145–46, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)).

**\*7** Mere assumptions, without causal evidence or methodological analysis may be inadmissible. *In re TMI Litig.,* 193 F.3d 613, 667–68 (3d Cir.1999). Conclusions based only on the expert's experience, *Oddi,* 234 F.3d at 140–41, and testimony founded on methods that are not

*Player v. Motiva Enterprises LLC, Not Reported in F.Supp.2d (2006)*

2006 WL 166452

generally accepted or lack testable hypotheses may also fail to surmount the *Daubert* standard, 🔖 *Elcock,* 233 F.3d at 746. Furthermore, conclusions based on analogies that are too dissimilar to the subject of the testimony may also merit exclusion. 🔖 *General Elec.,* 522 U.S. at 144 (rejecting expert testimony that plaintiff's cancer was due to exposure to PCBs when the testimony was based on animal studies of infant mice that had developed cancer after exposure to PCBs).

In response to Defendant's motion to exclude McDonald's testimony, Plaintiffs argue that "Mr. McDonald's opinions are based upon credible facts, NJDEP records, the reports of Plaintiffs' liability experts and individual appraisal reports prepared for each residential property." (Pl.'s' Opp. Def.'s Mot. Summ. J. ("Opp."), filed Oct. 12, 2005, at 30.) However, McDonald testified in his deposition that he relied only on the Gallo and Ellwood Reports, and he specifically testifies that he did *not* "review any correspondence from the NJDEP related to this site." (McDonald Dep. at 15.) [15]

In spite of Plaintiffs' arguments to the contrary, this Court cannot avoid the conclusion that McDonald's methodology is entirely unreliable. In his report, McDonald determines that the value of Plaintiffs' properties with no evidence of contamination should be discounted 35% percent and property with onsite contamination should be discounted by 66%. (McDonald Report ("McDonald Report"), Mairo Cert. in Support of Def.'s Mot. Exclude Pl.s' Expert Daniel McDonald, Ex. B., at 31, 33.) McDonald reached the 35% and 66% figures without discussing, or even recognizing, the extent to which the property was actually contaminated. As demonstrated by his ignorance of the "ND"/Not Detected signifier in the Gallo and Ellwood Reports, McDonald did not know how to read the charts denoting the levels of contamination. (McDonald Dep. at 56.) Nor had McDonald ever conducted any physical inspection of or visit to the properties prior to writing the report. [16] (McDonald Dep. at 15–16.)

Furthermore, to quantify the stigma attached to Plaintiffs' properties, McDonald relies upon a highly misleading analogy with a site of profoundly contaminated residential properties in Dover Township. (McDonald Report at 27.) Specifically, McDonald compares Plaintiffs' properties with "an area of Dover Township that had ground water contamination from Union Carbide and ... Ciba Geigy that resulted in what was commonly known as a cancer cluster among children," meaning "an inordinate number of children

with cancer." (McDonald Dep. at 158–59.) McDonald selected the Dover site not because of its comparability, but because McDonald "didn't know of any other cases that, where the data was as readily available." (McDonald Dep. at 159.)

**\*8** Employing the Dover analogy, McDonald determined that the property in the Dover site is in the final stages of recovery and continues to suffer a stigma loss of 13%. Because McDonald considered Plaintiffs' properties in the early stages of recovery, McDonald determined that they must bear a stigma discount of at least two or three times that of the Dover site, resulting in a discount of 35%. [17] However, the severity of the contamination and resulting illness among Dover residents undercuts any grounds for comparison with Plaintiffs' properties where there were few detections of contaminants and no reported physiological effects.

The methodology employed to reach the 66% figure is equally unreliable. To assess the value of properties with some evidence of contamination, McDonald sent an email to thirteen financial lenders to determine whether they would "lend on a property that has known contamination, or the stigma of contamination, to the ground water." (McDonald Report at 32.) Of the thirteen lenders, six replied. One of those refused to comment, and one said that it would loan given certain circumstances. The other four lenders stated that they would not lend on a property that is contaminated, but the content of their brief responses suggested that they understood the email hypothetical to denote property that was actually contaminated and out of compliance with state requirements. [18]

From the results of the email test, McDonald concludes that there would be no buyers other than those who could pay cash. [19] McDonald then assessed the discount in value given cash-only buyers, extrapolating from this a discount of 66%. (McDonald Report at 33.) However, the reliability of the 66% figure is entirely invalidated by the overemphasis placed on the four responses to the email hypothetical, the misleading implication in the email hypothetical, suggesting a much greater contamination of the property than actually present, and the unclear calculations and assumptions underlying McDonald's arrival at 66%.

Ultimately, McDonald's report does not fulfil any of the reliability factors. His method is untestable and arbitrary, without a generally accepted, established, or peer reviewed methodology, and his evaluation was conducted without any

2006 WL 166452

real standards. Because McDonald is unqualified and his
evaluation is unreliable, Defendant's motion *in limine* to
exclude his testimony will be granted.

IV. Plaintiffs' Claims

A. Negligence and Gross Negligence
To surmount a motion for summary judgment of a negligence
claim, Plaintiffs must provide evidence such that a reasonable
jury could find "breach of a duty of care and actual damages
sustained as a proximate cause of the breach." *Muise v. GPU,
Inc.,* 371 N.J.Super. 13, 35, 851 A.2d 799 (App.Div.2004)
(citing 🔖 *Weinberg v. Dinger,* 106 N.J. 469, 484, 524 A.2d
366 (1987)); 🔖 *Nappe v. Anschelewitz, Barr, Ansell &
Bonello,* 97 N.J. 37, 45, 477 A.2d 1224 (1984) ("[T]he
plaintiff must show a breach of duty and resulting damage to
prevail in a negligence action."). Motiva argues that Plaintiffs
have failed to establish damages and causation and requests
summary judgment of Plaintiffs' gross negligence claim on
the same basis.[20]

**\*9** The absence of an injury will preclude a negligence
claim, even where a clear breach of duty is present.
🔖 *Rocci v. MacDonald–Cartier,* 323 N.J.Super. 18, 24–
25, 731 A.2d 1205 (App.Div.1999) (affirming summary
judgment for insufficient evidence of damages in defamation
case and noting that "a plaintiff must present proof of a
material question of fact as to both liability and damages")
(citing *Norwood Easthill Assoc. v. Norwood Easthill Watch,*
222 N.J.Super. 378, 384, 536 A.2d 1317 (App.Div.1988)
(affirming summary judgment of malicious interference claim
on basis that "plaintiff has suffered no injury or damage")).
At the summary judgment stage, Plaintiffs must provide
actual evidence of injury and cannot simply rely upon
"unsubstantiated allegations." 🔖 *Trap Rock Indus., Inc. v.
Local 825,* 982 F.2d 884, 890 (3d Cir.1992) (reversing
district court's denial of summary judgment). Just as "a
residential customer not in residence during a power loss,
or a commercial customer whose store was closed, might
have no damages except the inconvenience of resetting
clocks," *Muise,* 371 N.J.Super. at 49, 851 A.2d 799, the
release of contaminants into the groundwater aquifer does not
itself generate damages, unless Plaintiffs can show that they
suffered harm.

Plaintiffs concede that they "have not presented and
will not present claims for the present manifested bodily

injury." (Undisputed Facts ¶ 67.) However, they argue
that they have adequately established damages for medical
monitoring and property damage. They do not address their
claim for emotional distress.[21]

1. Medical Monitoring
Damages for medical monitoring are appropriate where a
plaintiff exhibits no physical injury, but nevertheless requires
medical testing as a proximate result of a defendant's
negligent conduct. 🔖 *Ayers v. Jackson Twp.,* 106 N.J. 557,
600, 525 A.2d 287 (1987). The risk of injury need not be
quantified to merit medical surveillance damages; however,
the plaintiff must establish that the risk of serious disease
is "significant." 🔖 *Id.* at 599–600, 525 A.2d 287; *Campo v.
Tama,* 133 N.J. 123, 131, 627 A.2d 135 (1993) (awarding
medical monitoring damages to a plaintiff with a "fifty-
to seventy-five-percent chance of suffering a recurrence of
cancer" due to the delay resulting from defendant doctor's
malpractice). In the case of toxic exposure, "medical-
surveillance damages may be awarded only if a plaintiff
reasonably shows that medical surveillance is required
because the exposure caused a distinctive increased risk of
future injury." 🔖 *Theer v. Philip Carey Co.,* 133 N.J. 610,
627, 628 A.2d 724 (1993). Such damages are "not available
for plaintiffs who have not experienced direct and hence
discrete exposure to a toxic substance and who have not
suffered an injury or condition resulting from that exposure."
🔖 *Id.* at 628, 628 A.2d 724.

Low level contamination, "that is, contamination below
the minimum level set by DEP for water remediation,"
typically is insufficient to establish injurious toxic exposure.
🔖 *Muralo Co., Inc. v. Employers Ins. of Wausau,* 334
N.J.Super. 282, 290–291, 759 A.2d 348 (App.Div.2000)
("[S]ince it is clear that no untreated groundwater is ever
entirely pure, we are satisfied that DEP standards are the most
reliable guide for determining whether contamination causing
damage ... has occurred."). Here, contaminants have been
detected in only eight of Plaintiffs' wells, and no detection has
been even close to the GWQS. The NJDEP never restricted
Plaintiffs' use of water from their potable wells, nor required
Defendant to treat Plaintiffs' wells or to provide Plaintiffs with
an alternate water source.

**\*10** Plaintiffs rely on the testimony of Dr. Michael Gochfeld,
Ph.D. ("Gochfeld"), to establish the significant health risks

and necessity of medical surveillance following the alleged contamination of Plaintiffs' property. However, nothing in Gochfeld's report concludes that the individual Plaintiffs themselves require medical monitoring under the circumstances. Rather, Gochfeld's report creates a medical monitoring program for a hypothetical target population without taking into consideration the actual exposure of any plaintiff. [22] (Gochfeld Dep. at 26–29.) Gochfeld prepared his report under the assumption that "there were known or actual or potential exposure to a variety of constituents of gasoline." (Gochfeld Dep. at 12.) He states in deposition that he had "no specific factual knowledge of the actual exposures in this case," and he confirms that he has never examined the individual Plaintiffs. (Gochfeld Dep. at 10, 29.)

Gochfeld himself notes that "[w]hether a person exposed to MTBE requires medical monitoring depends in large measure on the level of exposure and the time over which it occurred" and notes that "clearly people that are exposed to MTBE casually would not require one." (Gochfeld Dep. at 24.) Furthermore, Gochfeld stated that he "probably would not" recommend medical monitoring for the minor and often single detections of MTBE on Plaintiffs' properties. [23] (Gochfeld Dep. at 46–50.) Consequently, Gochfeld's report does not establish that Plaintiffs require medical monitoring.

Plaintiffs also appear to argue that their wells may have been more contaminated prior to the initiation of Defendant's testing in July 2000. (Opp. at 20.) However, Plaintiffs provide no evidence suggesting that such exposure actually occurred or that any exposure prior to July 2000 was more than minimal. Plaintiffs also argue for the first time in their Opposition that they may have ingested water from contaminated sources besides the potable wells on their property. (Opp. at 20.) However, Plaintiffs offer no evidence that any Plaintiff actually consumed water from CW–8. Without any evidence supporting their theories, Plaintiffs cannot establish a claim for medical monitoring sufficient to survive summary judgment.

Because Plaintiffs have provided no evidence of a "distinctive increased risk of future injury" from the exposure, Plaintiffs are not entitled to damages for medical monitoring.

## 2. Property Damage

Defendant requests summary judgment of Plaintiffs' claims of property damage on the grounds that the contamination caused no actual damage to Plaintiffs' properties. [24] Instead of claiming that their property was physically harmed, Plaintiffs contend that the news of the contamination stigmatized their property, reducing its value in the minds of potential buyers.

In support of their claim for stigma damages, Plaintiffs offer the expert testimony of Daniel McDonald. However, as discussed previously, McDonald's testimony must be excluded as unreliable. Plaintiffs also argue that the testimony of individual Plaintiffs establishes a stigma discount to their property:

> **\*11** Plaintiff Marie Wallace has submitted sworn Interrogatory statements documenting a $150,000.00 loss on the sale of her property. See Exhibit 0 to McKenna Certification. Other Plaintiffs have similarly provided certified answers to Interrogatories and Deposition testimony as to the loss in value through sales transactions, which occurred from the discharge. See Exhibit N–R to the McKenna Certification.

(Opp. at 20–21.)

This evidence fails to establish an injury. Exhibits N–R consist of contracts for sale and unexecuted contracts for sale of three of Plaintiffs' properties, including the Wallace property, leaving it to the Court's imagination to ascertain how these contracts demonstrate a loss in value. Wallace's testimony also fails to establish a stigma injury to the property.

Specifically, Wallace claims that she received a verbal offer for her asking price of $500,000.00 from a man named "Amin," whose last name she cannot recall. (Marie Wallace Dep., McKenna Cert., Ex. 0, M.) Wallace claims that he reneged from the agreement after she told him about the release, however, the alleged offeror never gave Wallace the offer in writing and she has no evidence of the offer or "Amin's" motive for withdrawing, aside from her own testimony. Consequently, even construing this evidence in the light most favorable to Plaintiffs, no reasonable jury could find that Plaintiffs' properties were stigmatized on the basis of this evidence alone.

3. Emotional Distress

Defendant also moves for summary judgment of Plaintiffs' claim for emotional distress. Plaintiffs do not respond to this argument in their Opposition, and Defendant is entitled to summary judgment of Plaintiffs' emotional distress claim for Plaintiffs' failure to present evidence of significant distress or physical injury.

A claim for emotional distress cannot succeed absent evidence of physical injury or "severe and substantial" emotional distress, even where a person has a reasonable concern of an enhanced risk of future disease. *Ironbound Health Rights Advisory Com'n v. Diamond Shamrock Chem. Co.,* 243 N.J.Super. 170, 174–75, 578 A.2d 1248 (App.Div.1990) (noting that "[i]n the absence of physical injury, damages are allowed where the resultant emotional distress is severe and substantial" and listing cases). Without some physical injury, mere exposure to toxic chemicals does not give rise to a claim for emotional distress damages. *Id.* (holding plaintiffs unable to sustain emotional distress claim for exposure to chemicals manufactured at plant near their residences); *see also Mauro v. Raymark Indus., Inc.,* 116 N.J. 126, 137, 561 A.2d 257 (1989); *Troum v. Newark Beth Israel Med. Ctr.,* 338 N.J.Super. 1, 17, 768 A.2d 177 (App.Div.2001). Because Plaintiffs provided no evidence of significant emotional distress or physical injury, Defendant's motion for summary judgment will be granted.

B. Trespass

Defendant moves for summary judgment of Plaintiffs' claim for trespass. Plaintiffs argue that Defendant's "intentional refusal" to remove the contamination from their property and failure to install remediation equipment amounts to an intentional trespass. [25] (Opp. at 25.)

**\*12**  The Restatement (Second) of Torts defines intentional trespass as:

One who intentionally and without a consensual or other privilege

(a) enters land in possession of another or any part thereof or causes a thing or third person so to do, or

(b) remains thereon, or

(c) permits to remain thereon a thing which the actor or his predecessor in legal interest brought thereon in the manner

stated in §§ 160 and 161, is liable as a trespasser to the other irrespective of whether harm is thereby caused to any of his legally protected interests.

Rest. (2d) Torts § 158.

As Defendant argues, New Jersey has moved away from "such common law claims as trespass and nuisance" in environmental pollution cases. *Mayor and Council of Borough of Rockaway v. Klockner & Klockner,* 811 F.Supp. 1039, 1053 (D.N.J.1993); *Kenney v. Scientific, Inc.,* 204 N.J.Super. 228, 256, 497 A.2d 1310 (1985) ("There is no need for us ... to torture old remedies to fit factual patterns not contemplated when those remedies were fashioned."). Regardless of the continuing viability of trespass claims in the environmental context, however, Plaintiffs have failed to come forward with any evidence supporting their claim and cannot survive summary judgment.

Plaintiffs note that they are "not arguing that Defendants intentionally caused the contamination of their property," but rather are claiming that "defendants have repeatedly refused to perform the horizontal and vertical delineation of the soil and groundwater contamination in the area of the residential properties." (Opp. at 25.) However, no evidence suggests that such measures were necessary to remove contaminants from Plaintiffs' properties. Rather, the record indicates that Defendant consistently complied with NJDEP requirements, including the installation and maintenance of a groundwater recovery system to rehabilitate the aquifer, and the NJDEP never required Defendant to install any sort of remediation equipment on any of the residences. Given that there has been no detection of a gasoline-related contaminant in any Plaintiff's potable well since April 2001, the argument that Defendant permitted contamination to remain on Plaintiffs' properties lacks any viable evidentiary foundation. Defendant's motion for summary judgment of Plaintiffs' trespass claim will be granted.

C. Strict Liability

Plaintiffs originally claimed a cause of action for strict liability under the theory that the handling, storage, or use of gasoline constitutes an abnormally dangerous activity. However, Plaintiffs voluntarily dismissed this claim in their Opposition. (Pl.'s Opp. at 3.) Accordingly, the Court will not address the merits of Plaintiffs' strict liability claim.

D. Environmental Statutes

1. New Jersey Environmental Rights Act

Plaintiffs allege a right to recover under the New Jersey Environmental Rights Act ("ERA"), N.J.S.A. 2A:35A–1 et seq. Defendant requests summary judgment on the grounds that Plaintiffs have not satisfied the ERA's notice provision, N.J.S.A. 2A:35A–11, and that an ERA claim is not actionable where the NJDEP has acted to institute and oversee remediation of the contamination.

 *13 Section 4(a) of the ERA, permits "any person" to "maintain an action in a court of competent jurisdiction against any other person to enforce, or to restrain the violation of, any statute, regulation or ordinance which is designed to prevent or minimize pollution, impairment or destruction of the environment." N.J.S.A. 2A:35A–4(a). Although the ERA itself does not create substantive rights, it confers standing on private persons to enforce other environmental statutes, including the New Jersey Spill Compensation and Control Act ("Spill Act"). Rockaway, 811 F.Supp. at 1054; Allied Corp. v. Frola, 701 F.Supp. 1084, 1091 (D.N.J.1988).

The NJDEP is "entrusted initially with the right to determine the primary course of action to be taken." Howell Township v. Waste Disposal, Inc., 207 N.J.Super. 80, 95, 504 A.2d 19 (App.Div.1986) ("In order to be effective, [the NJDEP] must normally be free to determine what solution will best resolve a problem on a state or regional basis given its expertise and ability to view those problems and solutions broadly."). Consequently, the right of private parties to sue under the EPA is "an alternative to inaction by the government which retains primary prosecutorial responsibility." Superior Air Prod. Co. v. NL Indus., Inc., 216 N.J.Super. 46, 58, 522 A.2d 1025 (App.Div.1987); Rockaway, 811 F.Supp. at 1054 ("[T]he primary goal of the ERA is to limit lawsuits by private litigants to those instances where the government has not acted.").

A private ERA suit may be permitted even in the absence of complete government inaction if the NJDEP has "failed in its mission ... failed or neglected to act in the best interest of the citizenry or has arbitrarily, capriciously or unreasonably acted." Howell, 207 N.J.Super. at 96, 504 A.2d 19; Morris County Transfer Station, Inc. v. Frank's Sanitation Serv., Inc., 260 N.J.Super. 570, 578, 617 A.2d 291 (App.Div.1992) (permitting private ERA action where the NJDEP would not address violation for three years and had taken no enforcement actions against contaminating defendant who continued operating its illegal facility two months after receiving a violation notice). Where NJDEP "action subsequently proves sufficient to protect the environment," however, NJDEP "action under the Spill Act is preemptive of private rights under ERA." Superior Air Prod., 216 N.J.Super. at 61, 522 A.2d 1025. The permissibility of private action must be evaluated on a case-by-case basis. Id.

Here the record indicates consistent and pervasive NJDEP oversight of the remediation process, requiring Defendant to regularly test Plaintiffs' wells and institute interim and permanent groundwater recovery systems. Plaintiffs have not claimed that the NJDEP failed to act or acted unreasonably, and there are no grounds for finding NJDEP inaction sufficient to permit a private ERA suit. Furthermore, as discussed below, Plaintiffs failed to give the NJDEP the requisite notice of their private suit. Accordingly, Defendant's motion for summary judgment of Plaintiffs' ERA claim will be granted.

2. Notice

 *14 Before a private party may commence an action under the ERA, the party must "at least 30 days prior to the commencement thereof, direct a written notice of such intention by certified mail, to the Attorney General, the Department of Environmental Protection, the governing body of the municipality in which the alleged conduct has, or is likely to occur, and to the intended defendant." N.J.S.A. 2A:35A–11. The notice provision is intended to give the government an adequate opportunity to intervene in the litigation and to allow the NJDEP:

> to exercise value judgments in individual cases, e.g., whether it will join in that litigation or enforcement proceeding, whether other actions it may have taken already with respect to the particular problem or offender would render the litigation subject to collateral estoppel or res judicata principles, whether its expertise would assist the court, whether broad State interests would be sacrificed unduly to regional or personal interests by the instigators of that litigation, etc.

*Player v. Motiva Enterprises LLC, Not Reported in F.Supp.2d (2006)*
2006 WL 166452

*Howell,* 504 A.2d at 95; 📄 *Morris County,* 260 N.J.Super. at 578, 617 A.2d 291 (quoting *Howell* for same).

Because Plaintiffs did not provide the required thirty day notice to the NJDEP or the Attorney General, they are barred from further pursuing their claim under the ERA. Plaintiffs argue that Defendant is judicially estopped from claiming lack of notice for failure to raise this issue at an earlier stage in the case. Plaintiffs analogize the ERA requirement to that of an affidavit of merit, required in certain cases to avoid "unmeritorious and frivolous malpractice lawsuits at an early stage of litigation." 📄 *Knorr v. Smeal,* 178 N.J. 169, 197–98, 836 A.2d 794 (2003) (holding judicially estopped defendant's request for summary judgment for plaintiff's failure to file affidavit of merit) (citing 🚩 *Palanque v. Lambert–Woolley,* 168 N.J. 398, 404, 774 A.2d 501, 505 (2001)); 📄 *Ferreira v. Rancocas Orthopedic Assoc.,* 178 N.J. 144, 836 A.2d 779, (2003) (same).

Defendant argues that the ERA notice requirement is more analogous to the notice of intent in the Resource Conservation and Recovery Act (RCRA), which the Supreme Court held to be a jurisdictional prerequisite to suit in 📄 *Hallstrom v. Tillamook County,* 493 U.S. 20, 31, 110 S.Ct. 304, 107 L.Ed.2d 237 (1989) ("[C]ompliance with the 60–day notice provision is a mandatory, not optional, condition precedent for suit."); 📄 *Public Interest Research Group of N.J., Inc. v. Windall,* 51 F.3d 1179, 1189 (3d Cir.1995) (holding notice provision jurisdictional in context of Clean Water Act ("CWA")); 📄 *Hawksbill Sea Turtle v. Federal Emergency Mgmt. Agency,* 126 F.3d 461, 471 (3d Cir.1997) (holding notice provision jurisdictional in context of Endangered Species Act ("ESA")).

However, the language of the notice requirement in RCRA is not entirely analogous to that of the ERA. RCRA states, under the heading of "Actions prohibited" that "No action may be commenced ... prior to 60 days after the plaintiff has given notice of the violation to" the Administrator, the state and the alleged violator. 42 U.S.C.A. § 6972. The ERA lacks the "no action may be commenced" language of the RCRA, CWA, and ESA, and states only that notice must be sent "at least 30 days prior to the commencement" of suit. Consequently, the argument that the plain language of the statute creates a jurisdictional bar is not as strong in the context of the ERA.

**\*15** Nevertheless, because the purpose of the notice provision is to provide the Attorney General and NJDEP with notice of the suit and opportunity to intervene, *Howell,* 504 A.2d at 95, and not merely to protect defendants, as in the case of the affidavit of merit, Defendant is not judicially estopped from raising Plaintiffs' lack of compliance with the notice provision and is entitled to summary judgment of Plaintiffs' ERA claim.

E. Spill Act Claim

In their complaint, Plaintiffs assert a private right of action under the Spill Act, N.J.S.A. 58:10–23.11 *et seq.*[26] As amended in 1991, the Spill Act authorizes a private cause of action for individuals to recover costs for environmental damage to their property. 📄 *Housing Auth. of City of New Brunswick v. Suydam Inv., L.L.C.,* 177 N.J. 2, 18, 826 A.2d 673 (2003). Actions under the Spill Act are limited to clean up and removal costs, *Bahrle v. Exxon Corp.,* 145 N.J. 144, 155, 678 A.2d 225 (1996), defined as:

> all direct costs associated with a discharge, and those indirect costs that may be imposed by the department pursuant to section 1 of P.L.2002, c. 37 associated with a discharge, incurred by the State or its political subdivisions or their agents or any person with written approval from the department in the: (1) removal or attempted removal of hazardous substances, or (2) taking of reasonable measures to prevent or mitigate damage to the public health, safety, or welfare, including, but not limited to, public and private property.

N.J.S.A. 58:10–23.11b(d). The Act does not authorize "damages arising from emotional distress, enhanced risk of disease, loss of enjoyment of property, and other economic and financial harm." *Bahrle,* 145 N.J. at 155, 678 A.2d 225. Plaintiffs maintain that the investigation conducted by Ellwood was a reimbursable clean up and removal cost under the Spill Act. As Plaintiffs suggest, because "a discharge cannot be addressed until the contaminants are defined and the extent of the discharge determined," certain forms of investigative costs are implicitly included in the Act. 📄 *Metex Corp. v. Federal Ins. Co.,* 290 N.J.Super. 95, 115, 675 A.2d 220 (App.Div.1996).

However, for a private party to obtain reimbursement under the Act, the party must have obtained "written approval from the department," for example, in a memorandum of agreement, prior to incurring the cost. N.J.S.A. 58:10–

23.11b(d); *Id.* Such approval permits the NJDEP to "review and approve or disapprove its investigation to date, its proposed remedial action, and its report of the implementation of its action." *Id.; see also* Interfaith Cmty Org. v. Honeywell Intern., Inc., 263 F.Supp.2d 796, 867 (D.N.J.2003) (concluding "that such costs were approved by and/or incurred at the direction of NJDEP and thus are recoverable under the Spill Act."). Because Plaintiffs have not obtained NJDEP approval for any cost incurred, including the Ellwood

report, Defendant is entitled to summary judgment of Plaintiffs' Spill Act Claim.

**\*16** The accompanying Order shall enter today.

Elcock, 233 F.3d at 741.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 166452

---

## Footnotes

1    The following facts are taken from Defendant's statement of undisputed material facts, filed June 24, 2005, ("Undisputed Facts") and Plaintiffs' counterstatement of undisputed facts, filed Oct. 14, 2005, ("Counterstatement Facts"). Plaintiffs did not provide a separate statement of undisputed facts.

Although Plaintiffs dispute the majority of Defendant's statements of fact, Plaintiffs' counterstatements typically provide additional facts without setting forth any conflicting evidence. Where no actual disputes are presented, Defendant's statements will be treated as undisputed. *See e.g.,* Tofano v. Reidel, 61 F.Supp.2d 289, 292 n. 1 (D.N.J.1999) (citing Fed.R.Civ.P. 56(e)) ("This court will ... not consider assertions without evidential support as creating genuine issues of disputed fact."); Talbot v. United States, 2005 WL 2917463, *2 (D.N.J.2005) (noting that where the nonmoving party does not submit facts in opposition, "it is entirely appropriate for this court to treat all facts properly supported by the movant to be uncontroverted") (quoting *Allebach v. Sherrer,* No. 04–287, 2005 U.S. Dist. LEXIS 15626, at *5 (D.N.J.2005)).

More generally, Plaintiffs' brief suffers from numerous typographical errors and a dearth of citations to page numbers in the record. This "alone warrants exclusion of the evidence." *See* Orr v. Bank of America, NT & SA, 285 F.3d 764, 774–75 (9th Cir.2002) (holding that party's failure to cite page and line numbers when referencing the deposition merits exclusion of evidence); Huey v. UPS, Inc., 165 F.3d 1084, 1085 (7th Cir.1999) ( "[J]udges need not paw over the files without assistance from the parties."); Nissho–Iwai Am. Corp. v. Kline, 845 F.2d 1300, 1307 (5th Cir.1988) (parties must designate specific facts and their location in the record).

2    Among the original litigants to the suit were also former plaintiffs Michael and Susan Kammerhoff and Norma Simmons. The Kammerhoff plaintiffs were voluntarily dismissed, and plaintiff Norma Simmons died on August 26, 2000.

3    VOCs generally associated with gasoline discharge include MTBE, benzene, toluene, ethylbenzene, xylene (collectively "BTEX"), and tertiary butyl alcohol ("TBA"). The NJDEP has issued a Ground Water Quality Standard ("GWQS") for each of these VOCs, also known as "gasoline-related compounds." MTBE, for example, has a GWQS of 70 parts per billion ("ppb").

4    Although Motiva detected MTBE in thirteen residential wells, not all of these wells are owned by Plaintiffs to this litigation. Of the twenty-seven parcels of property at issue in this suit, only eight of the properties contain wells that ever tested positive for any gasoline-related compound.

5    The direction of water's flow in an aquifer is described as "downgradient," and the direction against the current is "upgradient."

6    In particular, testing revealed emissions in monitoring wells 6–Shallow ("MW–6S") and 7–Deep ("MW–7D"), which lie between the Motiva site and the residential properties. However, the majority of upgradient

monitoring wells did not test positive for gasoline-related contaminants. (NJDEP Directive, March 21, 2001 ("March 2001 Directive"), Mairo Cert. in Supp. Def.'s Mot. Summ. J., filed June 24, 2005 ("Mairo Cert."), Ex. O, at 4.)

7    Plaintiffs dispute Defendant's characterization of the CEA, (Counterstatement Facts ¶ 31), on the basis that Defendant proposed the CEA prior to conducting an actual delineation of the plume and that "the Plaintiffs' residential wells could only had [sic] been included in the CEA, if Defendant intended to supply a permanent public water supply to Plaintiffs' properties." While Plaintiffs' contention with the CEA is not entirely clear, Plaintiffs have not provided any evidence indicating that the NJDEP improperly approved the CEA or that the CEA was an inaccurate representation of the boundaries of contaminants in excess of the GWQS.

8    Plaintiffs' properties are: 850 Sicklerville Road; 565, 569, 581, and 583 Berlin–Cross Keys Road; 6, 9, 10, 12, 13, 14, 1, 16, 17, 18, 20 Spring Hollow; 2, 4, 6, and 8 Latham Way; 3, 4, 5, 7, 12, 14, and 15 Donna Marie Court.

9    CW–8 is located approximately 1,000 feet downgradient of the contamination site. (March 2001 Directive at 2.) While active, CW–8 pumps approximately 500 gallons per minute and causes the groundwater to flow southwest. (Ellwood Report at 2.) When CW–8 is not pumping, the groundwater flow is more westerly. (Ellwood Report at 2.)

10    Plaintiff disputes these facts on the basis that:

The Defendant has no data for any portable [sic] water supply of the Plaintiffs prior to July 2000. The Defendant never performed any delineation of the groundwater plume in the areas of the residential properties despite having actual knowledge of such contamination in MW–6, MW–7 and MW–12. See Gallo Certification and Exhibits C, D and E.

(Counterstatement Facts ¶¶ 46–48.) However, because Defendant makes no averment of the presence or absence of contamination prior to July 2000, Defendant's statements are not actually in dispute. Plaintiffs provide no fact indicating an inaccuracy in Defendant's statements regarding the testing of Plaintiffs' wells. Consequently, there is no actual dispute regarding the presence or amount of *detected* gasoline-related compounds.

11    Plaintiffs dispute these statements by citing to Exhibit F of the McKenna certification; however, Exhibit F is the Ellwood report and therefore is not indicative of the NJDEP requirements. Plaintiffs nowhere cite to a statement by the NJDEP requiring Defendant to treat their water or provide them with an alternate water source, and therefore this fact is undisputed.

12    Because this Court will grant Defendant's motion for summary judgment, it will not reach the merits of Defendant's motions to exclude experts Gochfeld, Ellwood, and Gallo.

13    After *Daubert,* Rule 702 was amended to encompass the *Daubert* analysis:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. While *Daubert* itself addressed only the admissibility of scientific evidence, the Court has since noted that courts' gatekeeping obligations extend to all expert testimony. 📄 *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 151, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

14    The Court noted that it had "misgivings" about the expert's qualifications in spite of:

(1) [the expert's] general training in "assessing" individuals, which he received while earning his Ph.D. in psychology; (2) his experience, twenty years previous, helping drug addicts reenter the workforce; (3) his experience primarily in the last two years dealing with the Virgin Islands Division of Workers' Compensation, which he had advised regarding the ability of approximately fifty to sixty-five disabled employees to return to their previous jobs; (4) his past experience as an expert witness making lost earning capacity assessments; (5) his attendance at two seminars regarding vocational rehabilitation, and his stated familiarity with the literature in the area; (6) his membership in two vocational rehabilitation organizations, both of which place

no restrictions on membership; and (7) the fact that when [the expert] was in school, a degree in vocational rehabilitation therapy was not available, but that he received similar training nonetheless.

15   Plaintiffs also argue that "Defendant does not attack the methodology, standard or factual basis for the opinions," (Opp. at 31), however, it is quite clear from Defendant's motion that the reliability of McDonald's methodology is hotly disputed.

16   McDonald also appeared unaware of the fact that Plaintiffs' properties are served by potable wells, even though the potable wells contain the evidence of contamination.

> Q: Do you know whether or not the plaintiffs' properties have potable wells?
> A: It's my understanding that they are hooked to a public water system.
> Q: If each of the properties did in fact have a potable well, would that be a factor that you were consider relevant in your analysis?
> Mr. McKenna: You may want to review the documents that you referenced in your report to assist you in this area. Just separate the Ellwood and Gallo reports. I'm going to go to the men's room.
> (Whereupon, a recess is taken.)
> Mr. Mairo: I am going to object that Mr. McKenna was basically coaching the witness.
> Back on the record.
> A: Your question about whether or not each of these houses were, was, had their own private well on site-
> Q: Uh-huh?
> A: -it's my understanding that each house is served by wells within and around the neighborhood and that Consumer, Consumers Water Company owns those wells and supplies that water to the homes.

(McDonald Dep. at 36.)

17   McDonald reaches the 35% devaluation figure with the following methodology:

> The subject properties are in the early stages of monitoring, and clean up of the ground water contamination. The properties from Dover Twp. are beyond the clean up stage and into the final stage of recovery, yet they still show a 13% loss in value as compared to similar properties outside of the contaminated area. The subject area is in stage D of recovery, which is the beginning of the remediation process. Based on the acceptance of the Detrimental Condition Model as a viable process for valuing Detrimental Conditions to Real Estate, by the appraisal community and the Subcommittee on Housing and Community Opportunity of the House Committee on Financial Services, it would be logical to assume that the discount to the properties which are the subject of this report, would be 2 to 3 times that of properties in the final stage of recovery. In this case a discount of 35% would be considered reasonable.

(McDonald Report at 31.)

18   Interbay Funding, for example, qualified their statement that they would not lend by noting, "The property would have to be completely cleaned up. They would have to file all necessary documents to the state of NJ and we would require something from the state telling us the property is cleaned up." (McDonald Report at 32.) From this, McDonald concluded that Interbay Funding would not lend on properties such as Plaintiffs', without considering that none of Plaintiffs' properties were contaminated in excess of state standards.

19   In evaluating this data, McDonald states:

> The lenders that did respond have overwhelmingly stated that they would not approve the loan at all, or they would require substantial conditions to the loan. In the case of the subject properties, it can be assumed that a purchaser with private financing or cash would be the only potential buyer of houses in this area.

(McDonald Report at 32.)

20   Because the Court now finds that there is no evidence of any actual injury arising from Defendant's negligence, this Court will not address Defendant's causation argument.

21   Plaintiff argues that Defendant's motion for summary judgment of its negligence claim should be denied on the basis of the doctrine of *res ipsa loquitur*. However, *res ipsa loquitur* acts only to "permit[ ] an inference of defendant's negligence" (i.e., that defendant acted in an unreasonable manner) under particular circumstances. *Jerista v. Murray,* 185 N.J. 175, 192, 883 A.2d 350 (2005). The doctrine does not establish

either causation or the presence of damages. *See e.g.,* 📁 *Bahrle v. Exxon Corp.,* 279 N.J.Super. 5, 35, 652 A.2d 178 (App.Div.1995) (holding *res ipsa* doctrine inapplicable where "there was a factual dispute as to whether the contamination was a result of plaintiffs' own voluntary acts or neglect"). Accordingly, because Defendant is contesting only causation and damages, the *res ipsa* doctrine does not apply.

22    Gochfeld testifies in his deposition that he created his report without any specific information about the Plaintiffs:

> Q: So, for example, in determining the percentage of the target population that was in high exposure category, that wasn't based on the ground water, your review of the ground water tables that were attached to Mr. Gallo's report?
>
> A: It was not.
>
> Q: That was based purely on just an assumption of yours?
>
> A: It was an assumption based on experience with previous programs or programs that are currently underway in our communities.
>
> Q: Having no specific factual knowledge of the actual exposures in this case?
>
> A: That's correct, these are hypotheticals.

(Gochfeld Dep. at 28–29.)

23    Gochfeld also states that he would not even recommend medical monitoring for the one property with by far the highest detection of MTBE (13.8 ppb at 4 Latham Way) "on this data alone" because "[i]t is possible that a person living there would only be drinking bottled water, would not be in the house very much." (Gochfeld Dep. at 50.)

24    Defendant argues further that New Jersey law does not permit Plaintiffs to recover for stigma damages in the absence of some physical harm to their property. Because Plaintiffs have provided no evidence of any stigma to their property, the Court will not reach Defendant's alternative argument.

25    It is unclear whether Plaintiffs allege negligent trespass since they discuss only the Restatement (Second) of Torts § 158, Intentional Trespass, in their Opposition. Unlike intentional trespass, negligent or reckless trespass requires evidence of "harm to the land, to the possessor, or to a thing or a third person." Rest. Torts 2d § 165; *see also* 📁 *Burke v. Briggs,* 239 N.J.Super. 269, 271, 571 A.2d 296 (App.Div.1990) (citing Rest.2d Torts § 158 with approval for another premise); *Karpiak v. Russo,* 450 Pa.Super. 471, 481, 676 A.2d 270 (Pa.Super.1996) (affirming dismissal of trespass claim for entry of dust onto property since the "evidence failed to establish that the dust caused appellants harm"). As discussed previously, Plaintiffs have not provided any evidence of injury to their persons or property. Consequently, to the extent that Plaintiffs are claiming negligent trespass, Defendant is entitled to summary judgment.

26    It is unclear whether Plaintiffs also raise a claim for cleanup and removal costs from the Spill Compensation Fund under 📁 N.J.S.A. 58:10–23.11g(a). (Opp. at 12–13.) However, the appropriate procedure to obtain compensation under the Fund is by filing a claim with the administrator of the Fund, "not later than one year after the date of discovery of damage. The administrator shall prescribe appropriate forms and procedures for such claims." N.J.S.A. 58:10–23.11k. In the event "a party, including a potentially responsible party ... contests the amount or validity of" a claim for reimbursement from the Spill Fund, "the dispute is referred to an arbitrator whose decision may be appealed to the Appellate Division," and the arbitrator's decision will be final unless it was "arbitrary, capricious, or unreasonable." 📁 *Lacey Municipal Util. Auth. v. New Jersey Dept. of Envir. Prot., Envir. Claims Admin.,* 369 N.J.Super. 261, 273, 848 A.2d 843 (App.Div.2004). Accordingly, this is an improper forum for a Spill Compensation Fund claim.

---

**End of Document**                                          © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 26

2019 WL 3069864
Only the Westlaw citation is currently available.
United States District Court, D. Oregon.

Sage REDWIND, Plaintiff,

v.

WESTERN UNION, LLC, Defendant.

Case No. 3:18-cv-02094-SB
|
Signed 06/21/2019

**Attorneys and Law Firms**

Sage Redwind, Hillsboro, OR, pro se.

Elizabeth A. Falcone, Paul E. Cirner, Amanda C. Van Wieren, Ogletree Deakins Nash Smoak & Stewart P.C., Portland, OR, for Defendant.

## FINDINGS AND RECOMMENDATION

STACIE F. BECKERMAN United States Magistrate Judge

**\*1** Plaintiff Sage Redwind ("Redwind"), appearing as a self-represented litigant, brings this action against her former employer, Western Union, LLC ("Western Union"), alleging claims for discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964. (ECF No. 1.)

Pending before the Court is Western Union's partial motion to dismiss (ECF No. 5), and Redwind's motion for sanctions. (ECF No. 15.) The Court has jurisdiction over this case under 28 U.S.C. § 1331. For the following reasons, the Court recommends that the district judge grant in part, and deny in part, Western Union's motion to dismiss. The Court denies Redwind's motion for sanctions.

## BACKGROUND [1]

Redwind, a woman of Indian ancestry, started working for Western Union in February 2008. (Compl. ¶¶ 1, 3.) Redwind began as a Territory Manager and later became an Account Executive for the state of Oregon. (Compl. ¶ 3.)

### Allegations of Disparate Treatment

Redwind excelled at her job, winning numerous performance awards and consistently receiving high marks in annual company performance reviews. (Compl. ¶ 4.) Despite Redwind's strong work performance, Western Union treated employees of other races more favorably. (Compl. ¶¶ 5-6.) Specifically, Redwind alleges that Western Union disproportionately hired, promoted, and gave raises to Latinx employees. (Compl. ¶¶ 5-6.)

On January 15, 2018, Redwind asked Stefani Carroll ("Carroll"), a human resources ("HR") professional, about the average salary for her position. (Compl. ¶ 24.) Carroll declined to answer, citing company confidentiality. (Compl. ¶ 24.) Undeterred, Redwind asked another HR employee the same question on February 1, 2018, and learned that $56,000 was "the minimum" for her position. (Compl. ¶ 25.) That same day, Redwind revealed to Carroll what she had learned. (Compl. ¶ 27.) Carroll "acknowledged that Redwind's salary was below the company approved minimum but took no corrective action[.]" (Compl. ¶ 27.)

### Allegations of Retaliation

During the course of her employment, Redwind filed a grievance against her former manager, Lorena Casillas Calvo ("Calvo"). (Compl. ¶ 8.) Calvo responded to Redwind's grievance by requiring Redwind to work sixteen to twenty hours a day with no breaks. (Compl. ¶ 8.) Redwind complained to Calvo about her work schedule. (Compl. ¶ 9.) Calvo forwarded Redwind's complaints to Calvo's manager, Brad Lewis Gray ("Gray"), who then dismissed Redwind's concerns as "unproductive and uncivil." (Compl. ¶ 9.)

Following these interactions, Western Union referred Redwind's grievance to outside counsel. (Compl. ¶ 11.) This was not Western Union's "common practice for handling employee grievances." (Compl. ¶ 11.) When Redwind asked for Western Union's HR department to handle her grievance instead of outside counsel, Western Union "refused and threatened that if [Redwind] did not comply by engaging their attorney, disciplinary action may be taken against her." (Compl. ¶ 12.) Redwind then filed a charge with the Equal Employment Opportunity Commission ("EEOC"). (Compl. ¶ 12.)

2019 WL 3069864

**\*2**  On October 31, 2017, Redwind applied for an open Account Executive position in Spokane, Washington. (Compl. ¶ 13.) On January 23, 2018, Redwind learned that her final interview was set for February 3, 2018. (Compl. ¶ 15.) Two days later, Western Union informed Redwind via email that the position she applied for had closed. (Compl. ¶ 15.) On February 13, 2018, Western Union terminated Redwind's employment. (Compl. ¶ 35.)

#### Prior and Current Litigation Between the Parties

On October, 27, 2014, Redwind filed an action in the District of Oregon against Western Union, "alleging claims for defamation, discrimination, harassment, retaliation, and discriminatory pay practices." *Redwind v. Western Union, LLC*, No. 3:14-cv-01699-AC, 2016 WL 3606595, at \*1 (D. Or. May 2, 2016); Compl. ¶ 2. [2] The district court granted, and the Ninth Circuit affirmed, summary judgment for Western Union on all of Redwind's claims. *See Redwind v. Western Union, LLC*, 698 F. App'x 346 (9th Cir. 2017).

On December 12, 2018, Redwind filed this case against Western Union, alleging Title VII claims for retaliation and discrimination. (ECF No. 1.) This motion followed. (ECF No. 5.)

#### ANALYSIS

#### I. STANDARD OF REVIEW

A well-pleaded complaint requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). A federal claimant is not required to detail all factual allegations, but the complaint must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Factual allegations must be enough to raise a right to relief above a speculative level." *Id.* While the court must assume all facts alleged in a complaint are true and view them in a light most favorable to the nonmoving party, it need not accept as true any legal conclusion set forth in the complaint.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In addition, a plaintiff must set forth a plausible claim for relief, a possible claim for relief will not do. *Id.* ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of

entitlement to relief." (quotations and citation omitted)). "In sum, for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678).

"A document filed *pro se* is to be 'liberally construed,' and a '*pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.' " *Woods v. Carey*, 525 F.3d 886, 889-90 (9th Cir. 2008) (quoting *Erickson v. Pardus*, 551 U.S. 89, 127 (2007)).

#### II. DISCUSSION

Western Union asks the Court to dismiss Redwind's pay discrimination claim on the grounds that (1) Redwind fails to state a valid claim for relief; and (2) principles of claim preclusion bar any pay discrimination claim that accrued before April 5, 2015. (Def.'s Mot. at 6.) Western Union also asks the Court to dismiss part of Redwind's retaliation and discrimination claims because Western Union's decision to refer her grievances to outside counsel does not constitute an adverse employment action. (Def.'s Mot. at 8.)

**\*3**  Redwind responds by asking the Court to deny Western Union's motion to dismiss for three reasons: (1) Western Union violated Local Rule ("LR") 7-1(a)(1)(A) by failing to confer in good faith before filing its motion; (2) Federal Rule of Civil Procedure 12(b)(6) does not allow a party to move for partial dismissal of a claim; and (3) Redwind has stated valid claims for relief. Redwind also moves for sanctions against Western Union, raising the same arguments. (ECF No. 15.) The Court will address Redwind's procedural arguments before turning to the merits.

#### A. LR 7-1(a)(1)(A)

LR 7-1(a)(1)(A) requires a moving party to certify that the "parties made a good faith effort through personal or telephone conferences to resolve the dispute, and have been unable to do so[.]" LR 7-1(a)(1)(A). This rule "encourage[s] parties to resolve amicably disputes when possible, preserving judicial resources for those matters that require the court's intervention." *Thompson ex rel. Thorp Family Charitable Remainder Unitrust v. Federico*, 324 F. Supp. 2d 1152, 1172 (D. Or. 2004).

Redwind argues that Western Union failed to comply with LR 7-1(a)(1)(A) because Redwind informed Western Union during the parties' conferral that her claims did not arise from her previous suit against Western Union, thereby resolving any dispute about that issue. (Pl.'s Opp'n at 2, 4-5.) As Western Union points out, however, LR 7-1(a)(1)(A) does not require a party to agree with the legal conclusions an opposing party makes during conferral. Rather, LR 7-1(a)(1)(A) only requires a party to discuss disputed issues with an opposing party before seeking court intervention. Western Union did so, and therefore the Court finds that Western Union complied with LR 7-1(a)(1)(A).

**B. Partial Motion to Dismiss**

Redwind argues that Western Union's partial motion to dismiss is procedurally improper because Federal Rule of Civil Procedure ("Rule") 12(b)(6) does not allow a party to seek partial dismissal of a claim. Instead, Redwind argues that Western Union should have filed a motion to strike under Rule 12(f). [3] (Pl.'s Opp'n at 2, 9.)

Rule 12(f) authorizes courts to strike from a pleading "any redundant, immaterial, impertinent, or scandalous matter." FED. R. CIV. P. 12(f). By contrast, Rule 12(b)(6) allows a party to move for dismissal when a complaint fails to state a valid claim for relief. FED. R. CIV. P. 12(b)(6). The Ninth Circuit has made clear that "an attempt to have certain portions of [the plaintiff's] complaint dismissed" is an action "better suited for a Rule 12(b)(6) motion [ ], not a Rule 12(f) motion." *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 974 (9th Cir. 2010); *see also Yamamoto v. Omiya*, 564 F.2d 1319, 1327 (9th Cir. 1977) ("Rule 12(f) is neither an authorized nor a proper way to procure the dismissal of all or a part of a complaint.") (citation and quotation marks omitted). Allowing litigants to use Rule 12(f) "to dismiss some or all of a pleading" "create[s] redundancies within the Federal Rules of Civil Procedure, because a Rule 12(b)(6) motion ... already serves such a purpose." *Whittlestone, Inc.*, 618 F.3d at 975.

**\*4**  Although Rule 12(b)(6) is the proper procedural mechanism to dismiss part of a complaint, many courts have recognized that a party may not use Rule 12(b)(6) to dismiss only part of a *claim. See BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015) ("A motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of *parts* of claims; the question at this stage is simply whether the

complaint includes factual allegations that state a plausible claim for relief.") (emphasis in original); *Doe v. Napa Valley Unified Sch. Dist.*, No. 17-cv-03753-SK, 2018 WL 4859978, at \*2 (N.D. Cal. Apr. 24, 2018) ("By its own terms, there does not appear to be any way to grant partial dismissal of a claim under Fed. R. Civ. P. 12(b)(6).") (quoting *In re Netopia, Inc., Sec. Litig.*, No. C-04-03364 RMW, 2005 WL 3445631, at \*3 (N.D. Cal. Dec. 15, 2005)). In other words, courts may not dismiss only some of the claim's allegations if the claim otherwise survives. *See Thompson v. Paul*, 657 F. Supp. 2d 1113, 1119 (D. Ariz. 2009) ("The Court is unaware, however, of any situation in which a Rule 12(b)(6) motion may be used to strike certain allegations in support of a claim, where the underlying claim itself is not challenged."); *In re Netopia, Inc*, 2005 WL 3445631, at \*3 (denying a motion to dismiss because Rule 12(b)(6) "should not be used on subparts of claims; a cause of action either fails totally or remains in the complaint"); *Limone v. United States*, 271 F. Supp. 2d 345, 364 (D. Mass. 2003) (holding that a defendant may not "seek dismissal of *facts* rather than *claims*" under Rule 12(b)(6)) (emphasis in original).

Here, Western Union moves to dismiss only one aspect of Redwind's retaliation and discrimination claim—Western Union's decision to refer Redwind's grievance to outside counsel. Granting Western Union's motion to dismiss this allegation would not dismiss Redwind's retaliation and discrimination claim because she also alleges, among other things, that Western Union terminated her after she filed a charge with the EEOC. (Compl. ¶¶ 12, 15.) Accordingly, the district judge should deny Western Union's motion to dismiss only part of Redwind's retaliation claim. *See Finnegan v. Washoe Cty.*, No. 3:17-cv-00002-MMD-WGC, 2017 WL 3299040, at \*3 (D. Nev. Aug. 2, 2017) ("While Defendant asks the Court to strike the paragraphs ..., the purpose of a Rule 12(b)(6) motion is not for the Court to strike selected portions of a plaintiff's complaint. Thus, although the allegations in these paragraphs of the [complaint] may not amount to acts of discrimination or adverse employment action under Title VII, [the plaintiff is still permitted to include them.").

**C. Merits**

Western Union moves to dismiss Redwind's pay discrimination claim on the ground that Redwind has failed to state a claim because she does not allege that Western Union paid similarly situated employees a higher salary. (Def.'s Mot. at 5-6.) The Court agrees.

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a). To establish a *prima facie* case of pay discrimination, Redwind must allege that: (1) she belongs to a protected class; (2) she was qualified for her position; (3) she was subjected to an adverse employment action; and (4) Western Union paid similarly situated individuals outside her protected class a higher salary.

See *Redwind*, 2016 WL 3606595, at *9 (citing *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008)).

Here, Redwind has not alleged the final required element. Although Redwind alleges that Western Union treats Latinx employees more favorably, Redwind does not allege that these employees are similarly situated or that Western pays them a higher salary. As a result, the district judge should dismiss without prejudice Redwind's pay discrimination claim. *See Ross v. Rengo Packaging, Inc.*, No. 17-cv-00200 RLP, 2017 WL 3821776, at *2 (D. Haw. Aug. 31, 2017) (dismissing the plaintiff's Title VII discrimination claim for failure to allege that the defendant "treated other similarly situated employees more favorably"); *see also Simons v. Costco Wholesale Corp.*, No. 3:18-cv-00755-SB, 2018 WL 7078666, at *3 (D. Or. Dec. 6, 2018) (finding a plaintiff's allegation that he was demoted "for a purported improper employee practice, for which similarly situated Caucasian colleagues were neither disciplined, nor demoted" to be "no more than a conclusory assertion that Plaintiff and his co-workers were similarly situated" because the plaintiff did "not describe the purported improper employment practice at issue, or allege facts related to the circumstances of Defendant's differential treatment"); *Demekpe v. Cty. of Los Angeles*, No. 15-cv-06007, 2015 WL 13237302, at *8 (C.D. Cal. Dec. 8, 2015) (holding that the plaintiff "failed to allege facts showing that he was 'similarly situated' to" employees outside his protected class where the plaintiff alleged "only vague facts about his own conduct and no facts about the conduct" of the other employees); *Barrett v. Kaiser Found. Health Plan of the Nw.*, No. 3:14-cv-020160-SI, 2015 WL 1491037, at *3 (D. Or. Apr. 1, 2015) (dismissing the plaintiff's Title VII discrimination claim because the plaintiff provided "no more than a conclusory assertion that [the] [p]laintiff and [his comparator] were similarly situated," and failed to allege any facts about his comparator's circumstances); *Brown v. Litchfield Elementary Sch. Dist. No. 79*, No.

10-2808, 2011 WL 2976874, at *3 (D. Ariz. July 22, 2011) (dismissing the plaintiff's race discrimination claim because the plaintiff alleged "no facts to demonstrate that she and the [comparator] ... displayed similar conduct"). [4]

### D. Sanctions

**\*5** On January 25, 2019, Redwind filed a motion for Rule 11 sanctions. (ECF No. 15.) Redwind argues that sanctions are warranted because: (1) Western Union falsely certified that the parties were unable to resolve their dispute without the Court's intervention; (2) Western Union's motion to dismiss is procedurally improper; (3) Redwind sufficiently alleged a claim for relief; and (4) Western Union failed to file an answer to Redwind's complaint. (ECF No. 15.) For the reasons stated above, the Court finds that Western Union had a reasonable basis for filing its motion to dismiss under Rule 12(b)(6), and for not filing an answer to Redwind's complaint. Therefore, the Court denies Redwind's motion for sanctions.

## CONCLUSION

For the reasons stated, the Court recommends that the district judge GRANT Western Union's motion to dismiss Redwind's pay discrimination claim, and DENY Western Union's motion for partial dismissal of Redwind's retaliation and discrimination claims. (ECF No. 5.) The district judge should allow Redwind to file an amended complaint within fourteen days if she is able to cure the deficiencies discussed herein. The Court DENIES Redwind's motion for sanctions. (ECF No. 15.)

## SCHEDULING ORDER

The Court will refer its Findings and Recommendation to a district judge. [5] Objections, if any, are due within fourteen (14) days. If no objections are filed, the Findings and Recommendation will go under advisement on that date. If objections are filed, a response is due within fourteen (14) days. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

### All Citations

Slip Copy, 2019 WL 3069864

## Footnotes

1    The following facts are either undisputed or viewed in the light most favorable to Redwind.

2    The Court takes judicial notice of the court records in Redwind's prior suit against Western Union. *See*
     *United States v. Raygoza-Garcia*, 902 F.3d 994, 1001 (9th Cir. 2018) (noting that courts may take judicial
     notice of undisputed matters of public record, including "court records") (citations omitted).

3    Redwind further argues that Western Union's partial motion to dismiss did not excuse its obligation to answer
     Redwind's complaint within twenty-one days. (Pl.'s Opp'n at 13.) On the contrary, "[m]any district courts have
     held that a motion to dismiss filed by a defendant that is directed against less than all of the claims alleged
     by a plaintiff suspends the time for that defendant to answer the unchallenged claims." *In re Premera Blue
     Cross Customer Data Sec. Breach Litig.*, 198 F. Supp. 3d 1183, 1191 (D. Or. 2016) (citing *ThermoLife Int'l,
     LLC v. Gaspari Nutrition, Inc.*, 2011 WL 6296833, at *5 (D. Ariz. Dec. 16, 2011)). Consistent with this line of
     authority, the Court finds that Western Union's partial motion to dismiss suspended its obligation to answer
     Redwind's complaint.

4    Western Union also moved to dismiss Redwind's pay discrimination claim to the extent that it accrued prior
     to April 5, 2015. Redwind represented in her response to Western Union's motion and to the Court at oral
     argument that her pay discrimination claim arises only from events that occurred in 2017-2018. Although in
     her original complaint Redwind references her ten-year employment relationship with Western Union (*see*
     Compl. ¶¶ 26, 51), the Court is satisfied that Redwind understands she is estopped from re-litigating her
     previously-litigated pay discrimination claims.

5    Absent consent of all parties to the jurisdiction of a U.S. Magistrate Judge, the undersigned must refer any
     dispositive motions to a U.S. District Judge by issuing Findings and Recommendation ("F&R"). Parties may
     avoid this review process, while preserving the right of appeal to the Ninth Circuit Court of Appeals, by
     consenting to the jurisdiction of a U.S. Magistrate Judge. Parties may consent at any time prior to trial, and
     Standing Order 2017-4 directs that parties may file consents electronically (in CM/ECF, "Consents" may be
     found under "Civil Events," "Other Filings"). Consents filed while an F&R is pending will not become effective
     until after the U.S. District Judge has ruled on the pending F&R.

**End of Document**                                     © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 27

2010 WL 3081789
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial
staff and not assigned editorial enhancements.**

United States District Court,
E.D. Pennsylvania.

Jeffrey M. REIFF and Dominique Reiff, Plaintiffs,

v.

GAF MATERIALS CORP., Defendant.

Civil Action No. 10–1142.
|
Aug. 6, 2010.

**Attorneys and Law Firms**

Raymond M. Bily, Reiff and Bily, Philadelphia, PA, for
Plaintiffs.

Charles V. Curley, Scott M. Rothman, Halberstadt Curley,
LLC, Conshohocken, PA, for Defendant.

*ORDER*

BERLE M. SCHILLER, District Judge.

**\*1** AND NOW, this **6th** day of **August, 2010,** upon
consideration of Defendant's Motion for Partial Dismissal of
Claims Under Fed.R.Civ.P. 12(b)(6) and Plaintiffs' response
thereto, and for the reasons stated in the Court's Memorandum
dated August 6, 2010, it is hereby **ORDERED** that:

1. Defendant's Motion for Partial Dismissal of Claims Under
Fed.R.Civ.P. 12(b)(6) (Doc. No. 7) is **GRANTED.**

2. Counts I and III of Plaintiffs' Complaint are hereby
**DISMISSED.**

3. Defendants shall file an Answer to Plaintiff's Complaint no
later than Monday, August 16, 2010.

*MEMORANDUM*

In this diversity action, Plaintiffs Jeffrey and Dominique Reiff
are suing Defendant GAF Materials Corp. ("GAF") stemming

from Defendant's sale of and maintenance of a roofing system
on Plaintiffs' home. Currently before the Court is Defendant's
Motion for Partial Dismissal of Claims under Federal Rule
of Civil Procedure 12(b)(6). For the reasons that follow, the
Court grants that motion.

**I. BACKGROUND**

According to Plaintiffs' Complaint, Defendant GAF, a New
Jersey corporation, was in the business of manufacturing,
designing, selling, and producing roofing materials, including
the "Tru Slate 2.0 Roof System," as well as materials and
accessories necessary for the installation of said roofing
system. (Compl.¶ 5.) Plaintiffs are citizens of Pennsylvania
and also own a home in Ventnor, New Jersey. (*Id.* ¶¶ 1, 8.) In
the summer of 2007, Plaintiffs decided to place a slate roof on
their New Jersey home. (*Id.* ¶¶ 8–9.) They retained a general
contractor, JP Leeds, Jr. Builder, Inc. ("Leeds"), which in turn
contracted with Defendant to purchase a Tru Slate 2.0 Roof
System. (*Id.* ¶¶ 9–10.) Defendant strongly recommended that
Leeds retain Select Roofing & Siding LLC ("Select Roofing")
to install the roof, claiming that Select Roofing had significant
experience and expertise installing the roofing system in
coastal areas where roofs were often subject to high winds
and stormy conditions. (*Id.* ¶¶ 11–12.) Leeds retained Select
Roofing, which installed the roofing system in or about the
middle of October 2007, at a cost to Plaintiffs of $36,295.12.
(*Id.* ¶ 14.)

On or about May 12, 2008, a severe storm struck the New
Jersey coast, and as a result, dozens of slate tiles became
dislodged from Plaintiffs' Tru Slate roof. (*Id.* ¶ 15.) One slate
tile damaged the exterior of a neighboring property, while
other slate tiles broke a window and landed on a second
floor deck of the same neighboring property. (*Id.*) Plaintiffs
contacted GAF to request its assistance in repairing the roof
and ensuring that this did not happen again. (*Id.* ¶ 17.)

On June 25, 2008, Defendant's TruSlate Business Manager
told Plaintiffs that GAF was committed to solving any
problems that existed with the Tru Slate Roofing System,
and intended to use Plaintiffs' property as a "model" to show
to prospective purchasers of the Tru Slate Roofing System.
(*Id.* ¶¶ 18–19.) Subsequently, GAF sent a team of technicians
and certified slate roof installers to travel to Plaintiffs' home
in order to remedy the problems with the Tru Slate Roofing
System. (*Id.* ¶ 21.) Afterwards, GAF assured Plaintiffs that the
roof was now in excellent condition. (*Id.* ¶ 22.) Subsequently,
in April, 2009, Plaintiffs traveled to their property in Ventnor
and discovered that a significant number of additional slate

tiles had blown off the roof and were missing; that a number of leading edge tiles and top ridge tiles were loose and not well-secured; that an additional 4 to 6 mid roof tiles were missing; and it appeared that other tiles were about to blow off of the roof. (*Id.* ¶ 23.) Plaintiffs emailed GAF about this issue on April 7, 2009. (*Id.* ¶ 24.) In or around June 2009, Herb Van Gent, Defendant's Area Manager–East for Field Operations conducted an inspection of Plaintiffs' roofing system. (*Id.* ¶ 27.) Mr. Van Gent appeared at the subject premises together with a Tru Slate Roofing installer and met with Mr. Reiff. (*Id.* ¶ 28.) The installer climbed on the roof and hammered a few nails. (*Id.*) Thereafter, Mr. Van Gent advised Mr. Reiff that the problem was not serious and that GAF would resolve it, but no further action was taken. (*Id.* ¶ 29.) However, since April 2009, Plaintiffs' Tru Slate Roofing System has continued to deteriorate, with slate tiles disappearing on a continuing basis. (*Id.* ¶ 34.) As a result of these problems, Plaintiffs believe their only option is to have their Tru Slate Roofing System removed and install a conventional roof on their property, which they estimate would cost more than $200,000. (*Id.* ¶ 36.)

**\*2** Plaintiffs filed this lawsuit on March 16, 2010, charging Defendant with negligence, breach of warranties, and misrepresentation. On April 16, 2010, Defendant filed a motion to dismiss Plaintiffs' negligence and misrepresentation claims under Federal Rule of Civil Procedure 12(b)(6), saying those claims are barred by New Jersey's economic loss rule.

## II. STANDARD OF REVIEW

In reviewing a motion to dismiss for failure to state a claim, a district court must accept as true all well-pleaded allegations and draw all reasonable inferences in favor of the non-moving party. *See Bd. of Trs. of Bricklayers and Allied Craftsman Local 6 of N.J. Welfare Fund v. Wettlin Assocs.,* 237 F.3d 270, 272 (3d Cir.2001). A court should accept the complaint's allegations as true, read those allegations in the light most favorable to the plaintiff, and determine whether a reasonable reading indicates that relief may be warranted.

*Umland v. PLANCO Fin. Servs., Inc.,* 542 F.3d 59, 64 (3d Cir.2008). A court need not credit "bald assertions" or "legal conclusions" when deciding a motion to dismiss. *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir.1997); *see also Ashcroft v. Iqbal,* —— U.S. ——, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009).

"Factual allegations [in a complaint] must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). To survive a motion to dismiss, a complaint must include "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. Although the federal rules impose no probability requirement at the pleading stage, a plaintiff must present "enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element[s]" of a cause of action. *Phillips v. County of Allegheny,* 515 F.3d 224, 234 (3d Cir.2008). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949. Simply reciting the elements will not suffice. *Id.* (concluding that pleading that offers labels and conclusions without further factual enhancement will not survive motion to dismiss); *see also Phillips,* 515 F.3d at 231.

The Third Circuit Court of Appeals has recently directed district courts to conduct a two-part analysis when faced with a 12(b)(6) motion. First, the legal elements and factual allegations of the claim should be separated, with the well-pleaded facts accepted as true but the legal conclusions disregarded. *Fowler v. UPMC Shadyside,* 578 F.3d 203, 210–11 (3d Cir.2009). Second, the court must then make a common sense determination of whether the facts alleged in the complaint are sufficient to show a plausible claim for relief. *Id.* at 211. If the court can only infer the mere possibility of misconduct, the complaint must be dismissed because it has alleged—but has failed to show—that the pleader is entitled to relief. *Id.*

## III. DISCUSSION

**\*3** New Jersey's economic loss rule precludes tort recovery for economic loss suffered by reason of a defective product if the only damage plaintiff suffered is to the product itself. *See Alloway v. General Marine Indus., L.P.,* 695 A.2d 264, 275 (N.J.1997). [1] Plaintiffs argue that the economic loss rule does not bar their negligence and misrepresentation claims because they allege that Defendant's roofing system has caused damage to more than just the product itself, but has also harmed an adjacent structure. The economic loss rule concerns itself with the nature of the plaintiff's loss, not with damages sustained by non-parties. Nowhere in Plaintiff's Complaint is there any indication that Plaintiffs have paid

Reiff v. GAF Materials Corp., Not Reported in F.Supp.2d (2010)
2010 WL 3081789

for their neighbors' injuries or have otherwise been assigned their neighbors' legal claims. The only damage Plaintiffs allege is to their roof. Plaintiffs argue that their Complaint alleges that their home "does not have a complete roof ... thus implying the fact of leakage and water damage to the structure itself." (Pls.' Resp. to Def.'s Mot. to Dismiss at 7 (citing Compl. ¶ 35).) While a court reviewing a motion to dismiss must read a complaint in the light most favorable to the plaintiff, it need not read in to the complaint allegations that were not made. Plaintiffs have not alleged any damage to their home and the Court will not infer any such damage without an allegation. Speculation about the possibility of future personal injury or damage to Plaintiffs' other property is also not enough to circumvent the economic loss rule. *See Morris v. Osmose Wood Preserving,* 340 Md. 519, 667 A.2d 624 (Md.1995). The economic loss doctrine applies with equal force to misrepresentation claims. *Boyes v. Greenwich Boat Works, Inc.,* 27 F.Supp.2d 543, 550–51 (D.N.J.1998) (collecting cases). Since the only damage Plaintiffs allege to have suffered is to the product they purchased, New Jersey's economic loss doctrine bars their negligence and misrepresentation actions. Plaintiffs' lawsuit can proceed as a breach of warranty claim, but not as a tort claim.

## IV. CONCLUSION

For the reasons stated above, Plaintiffs' negligence and misrepresentation claims will be dismissed. Only their breach of warranty claim remains. An appropriate Order will be docketed separately.

## All Citations

Not Reported in F.Supp.2d, 2010 WL 3081789

## Footnotes

1    Both parties appear to assume that New Jersey law applies and so will the Court.

End of Document                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# **TAB 28**

Rodman v. Otsuka America Pharmaceutical, Inc., F.Supp.3d --- (2020)

2020 WL 2525032, 112 Fed. R. Evid. Serv. 733

KeyCite Blue Flag – Appeal Notification

Appeal Filed by INA RODMAN v. OTSUKA AMERICA
PHARMACEUTICAL, 9th Cir., August 25, 2020

2020 WL 2525032
United States District Court, N.D. California.

Ina Ann RODMAN, Plaintiff,

v.

OTSUKA AMERICA
PHARMACEUTICAL, INC., Defendant.

Case No. 18-cv-03732-WHO
|
Signed 05/18/2020

**Synopsis**

**Background:** Patient brought product liability action against
manufacturer of a prescription antipsychotic medication,
alleging that the medication caused patient to develop tardive
dyskinesia. Both parties moved for summary judgment and
manufacturer moved to exclude expert testimony.

**Holdings:** The District Court, William H. Orrick, J., held that:

[1] doctor expert witness was qualified to opine on adequacy
of label for the antipsychotic medication;

[2] expert witness opinion on label adequacy of an
antipsychotic medication was not product of reliable
principles or methods;

[3] no evidence supported finding that manufacturer of
a prescription antipsychotic medication failed to disclose
actual risk of developing tardive dyskinesia from taking the
medication;

[4] any failure to disclose risk by manufacturer did not impact
treating physician's prescribing decision, and thus patient
could not prevail on failure to warn claims;

[5] even if label for antipsychotic prescription medication
failed to discuss specific methods for screening patients
for tardive dyskinesia, that failure did not impact treating
physician's prescribing decision; and

[6] no evidence supported finding that defect in prescription
antipsychotic medication was due to manufacturer's

negligence, and thus patient could not prevail on design defect
claim under California law.

Manufacturer's motion for summary judgment and to exclude
expert evidence granted.

**Procedural Posture(s):** Motion for Summary Judgment;
Motion to Exclude Expert Report or Testimony.

West Headnotes (37)

[1] **Federal Civil Procedure** 🔑 Burden of proof

In order to prevail, a party moving for summary
judgment must show the absence of a genuine
issue of material fact with respect to an essential
element of the non-moving party's claim, or to a
defense on which the non-moving party will bear
the burden of persuasion at trial. Fed. R. Civ. P.
56(a).

[2] **Federal Civil Procedure** 🔑 Burden of proof

Once a movant for summary judgment has made
showing of an absence of a genuine issue of
material fact, the burden then shifts to the party
opposing summary judgment to identify specific
facts showing there is a genuine issue for trial.
Fed. R. Civ. P. 56(a).

[3] **Federal Civil Procedure** 🔑 Burden of proof

To prevent summary judgment, a party opposing
summary judgment must present affirmative
evidence from which a jury could return a verdict
in that party's favor. Fed. R. Civ. P. 56(a).

[4] **Federal Civil Procedure** 🔑 Presumptions

On a motion for summary judgment, a court
draws all reasonable factual inferences in favor
of the non-movant. Fed. R. Civ. P. 56(a).

[5] **Federal Civil Procedure** 🔑 Ascertaining
existence of fact issue

In deciding a motion for summary judgment, credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. Fed. R. Civ. P. 56(a).

**[6]    Federal Civil Procedure** 🗝 **Weight and sufficiency**

Conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment. Fed. R. Civ. P. 56(a).

**[7]    Evidence** 🗝 **Matters involving scientific or other special knowledge in general**

**Evidence** 🗝 **Necessity and sufficiency**

To be admissible under rule governing expert testimony, the testimony must be relevant and reliable. Fed. R. Evid. 702.

**[8]    Evidence** 🗝 **Matters involving scientific or other special knowledge in general**

For purposes of determining admissibility of expert testimony, "relevance" means that the evidence will assist the trier of fact to understand or determine a fact in issue. Fed. R. Evid. 702.

**[9]    Evidence** 🗝 **Necessity and sufficiency**

Under reliability requirement, expert testimony must have a reliable basis in the knowledge and experience of the relevant discipline. Fed. R. Evid. 702.

**[10]    Evidence** 🗝 **Necessity and sufficiency**

To ensure reliability of expert evidence, a court must assess the expert's reasoning or methodology, using as appropriate such criteria as testability, publication in peer reviewed literature, and general acceptance. Fed. R. Evid. 702.

**[11]    Evidence** 🗝 **Necessity and sufficiency**

Factors for determining reliability of an expert witness are helpful, not definitive, and a court has discretion to decide how to test reliability based on the particular circumstances of the particular case. Fed. R. Evid. 702.

**[12]    Evidence** 🗝 **Necessity and sufficiency**

When evaluating specialized or technical expert opinion testimony, the relevant reliability concerns may focus upon personal knowledge or experience. Fed. R. Evid. 702.

**[13]    Evidence** 🗝 **Due care and proper conduct in general**

Doctor expert witness was qualified to opine on adequacy of label for an antipsychotic medication, in product liability action after a patient developed tardive dyskinesia allegedly because of the medication, even though the expert could not prescribe the medication or diagnose tardive dyskinesia, where the expert was experienced as a toxicologist and pharmacologist. Fed. R. Evid. 702.

**[14]    Evidence** 🗝 **Medical testimony**

Expert witness opinion on label adequacy of an antipsychotic medication was not product of reliable principles or methods, in product liability action after a patient developed tardive dyskinesia allegedly because of the medication, where the expert opined that label was inadequate as it did not list tardive dyskinesia as a possible adverse reaction, reporting of tardive dyskinesia caused by the medication had risen above level for which an adverse reaction should be listed, but that opinion was based on another researcher's data set, and that researcher had strongly cautioned that her studies did not represent a true incidence rate for development of tardive dyskinesia from taking the medication. Fed. R. Evid. 702.

**[15]    Evidence** 🗝 **Opinions of others**

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 341 of 410
PageID: 12948

Rodman v. Otsuka America Pharmaceutical, Inc., --- F.Supp.3d ---- (2020)
2020 WL 2525032, 112 Fed. R. Evid. Serv. 733

An expert witness may not analyze data that was not her own and reinterpret it in a manner inconsistent with the conclusions of those who originally generated it. Fed. R. Evid. 702.

**[16]    Evidence** 🔑 **Opinions of others**

Experts are properly disqualified if the studies on which they rely merely suggest, without definitely concluding, the truth of a particular assertion. Fed. R. Evid. 702.

**[17]    Products Liability** 🔑 **Learned intermediary**
**Products Liability** 🔑 **Drugs in general**

A manufacturer of a prescription drug is obligated warn physicians, not patients, of potential side effects associated with its pharmaceutical products.

**[18]    Products Liability** 🔑 **Learned intermediary**
**Products Liability** 🔑 **Drugs in general**
**Products Liability** 🔑 **Implants and prosthetic devices**

Known as the "learned intermediary doctrine," the duty to warn the physician—rather than the patient—applies in the case of prescription drugs and implants, where the physician stands in the shoes of the ordinary user because it is through the physician that a patient learns of the properties and proper use of the drug or implant.

**[19]    Products Liability** 🔑 **Learned intermediary**
**Products Liability** 🔑 **Drugs in general**

A manufacturer of prescription drugs discharges its duty to warn if it provides adequate warnings to the physician about any known or reasonably knowable dangerous side effects, regardless of whether the warning reaches the patient.

**[20]    Products Liability** 🔑 **Warnings or Instructions**

**Products Liability** 🔑 **Warnings or instructions**
**Products Liability** 🔑 **Drugs in general**

A plaintiff asserting causes of action based on a failure to warn regarding prescription medication must prove not only that no warning was provided or the warning was inadequate, but also that the inadequacy or absence of the warning caused the plaintiff's injury.

**[21]    Products Liability** 🔑 **Learned intermediary**
**Products Liability** 🔑 **Drugs in general**

Whether a warning for a prescription medication is adequate depends on how a prescribing doctor would understand the label.

**[22]    Products Liability** 🔑 **Warnings or Instructions**

**Products Liability** 🔑 **Drugs in general**

There can be no genuine dispute about the adequacy of a prescription medicine warning that directly warns in plain and explicit terms of the specific risk that has caused injury to the plaintiff.

**[23]    Products Liability** 🔑 **Warnings or Instructions**

**Products Liability** 🔑 **Drugs in general**

No evidence supported finding that manufacturer of a prescription antipsychotic medication failed to disclose actual risk of developing tardive dyskinesia from taking the medication, that was known or knowable in light of the generally recognized and prevailing scientific and medical knowledge available at the time of manufacture and distribution, where only evidence indicating a higher actual incidence rate of tardive dyskinesia associated with the medication was an expert opinion, which was not based on reliable scientific principles or methods.

**[24]    Products Liability** 🔑 **Learned intermediary**

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 342 of 410
PageID: 12949

Rodman v. Otsuka America Pharmaceutical, Inc., --- F.Supp.3d ---- (2020)

2020 WL 2525032, 112 Fed. R. Evid. Serv. 733

**Products Liability** &#128273; **Drugs in general**

Even if label for antipsychotic prescription medication failed to discuss fact that tardive dyskinesia had been reported in patients taking the medication, that failure did not impact treating physician's prescribing decision, and thus patient could not prevail on failure to warn claims against manufacturer of the medication, where the physician was aware that the medication could cause tardive dyskinesia even in patients taking lower doses, and the physician stated that an additional warning on the medication's label would not have impacted his decision.

[25]    **Products Liability** &#128273; **Warnings or Instructions**

**Products Liability** &#128273; **Warnings or instructions**

**Products Liability** &#128273; **Drugs in general**

Inadequacy of a warning for a prescription medication and causation are separate elements of affirmative burden in a product defect claim.

[26]    **Products Liability** &#128273; **Warnings or instructions**

**Products Liability** &#128273; **Drugs in general**

Even if a warning for a prescription medication was inadequate, a product defect claim based on insufficient warnings cannot survive summary judgment if stronger warnings would not have altered the conduct of the prescribing physician.

[27]    **Federal Civil Procedure** &#128273; **Tort cases in general**

A defendant need not produce its own evidence to prevail on summary judgment in a prescription medication defect action; pointing to an absence of evidence on the plaintiff's part in proving causation is sufficient.

[28]    **Products Liability** &#128273; **Warnings or Instructions**

**Products Liability** &#128273; **Drugs in general**

Even if label for antipsychotic prescription medication failed to discuss specific methods for screening patients for tardive dyskinesia, that failure did not impact treating physician's prescribing decision, and thus patient could not prevail on failure to warn claims against manufacturer of the medication, where the physician knew how to monitor for tardive dyskinesia symptoms, and in fact did monitor patient for those symptoms.

[29]    **Products Liability** &#128273; **Risk-utility test**

**Products Liability** &#128273; **Drugs in general**

No evidence supported finding that defect in prescription antipsychotic medication was due to manufacturer's negligence, and thus patient could not prevail on design defect claim under California law for allegedly developing tardive dyskinesia as a result of taking the medication, where there was no indication that there were any safer alternative medications, what the relative costs and benefits of the medication were as compared with similar drugs on the market, or that manufacturer failed to design the medication with the amount of care that a reasonably careful designer or manufacturer would have used in similar circumstances.

[30]    **Products Liability** &#128273; **Design**

**Products Liability** &#128273; **Drugs in general**

California does not recognize strict liability for design defects in prescription drugs.

[31]    **Products Liability** &#128273; **Design**

Under California law, a plaintiff alleging a design defect claim under a negligence theory must prove that the defect in the product was due to negligence of the defendant.

[32]    **Products Liability** &#128273; **Design**

Under California law, as with a general negligence claim, a plaintiff alleging design

defect in prescription drugs must show breach of duty, causation, and damages.

**[33]    Products Liability**  🔑  Manufacturing defect
**Products Liability**  🔑  Design

Concerning the standard of care for negligence under California law, a designer/manufacturer/etc. is negligent if it fails to use the amount of care in designing/manufacturing/etc. the product that a reasonably careful designer/manufacturer/etc. would use in similar circumstances to avoid exposing others to a foreseeable risk of harm.

**[34]    Products Liability**  🔑  Risk-utility test

Generally, the test of negligent design under California law involves a balancing of the likelihood of harm to be expected from a product with a given design and the gravity of harm if it happens against the burden of the precaution which would be effective to avoid the harm.

**[35]    Products Liability**  🔑  Risk-utility test
**Products Liability**  🔑  Warnings or Instructions

Under California law regarding negligent design claims, even if a manufacturer has done all it reasonably could have done to warn about a risk or hazard related to a product's design, a reasonable person could conclude that the magnitude of the reasonably foreseeable harm as designed outweighed the utility of the product as designed.

**[36]    Products Liability**  🔑  Risk-utility test

In evaluating the adequacy of a product's design under risk-benefit test under California law, a jury may consider, among other relevant factors, the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design.

**[37]    Federal Civil Procedure**  🔑  Burden of proof

As a non-moving party on a summary judgment motion with the burden of proof, a plaintiff must set forth by affidavit or other admissible evidence, specific facts demonstrating the existence of an actual issue for trial; she may not merely state that she will discredit the moving party's evidence at trial and proceed in the hope that something can be developed at trial in the way of evidence to support her claim. Fed. R. Civ. P. 56(a).

**Attorneys and Law Firms**

Robert E. Cartwright, Jr., The Cartwright Law Firm, Inc., San Francisco, CA, Perry Roger Staub, Jr., Pro Hac Vice, Taggart Morton, L.L.C., Roger Anthony Javier, Pro Hac Vice, The Javier Law Firm, LLC, New Orleans, LA, for Plaintiff.

Amanda Jereige, Winston Strawn LLP, Seth Andrew Weisburst, Gordon Rees Scully Mansukhani, LLP, San Francisco, CA, Francie Nicole Berger, Matthew A. Campbell, Pro Hac Vice, Matthew M. Saxon, Winston and Strawn LLP, Washington, DC, Luke A. Connelly, Pro Hac Vice, Winston and Strawn LLP, New York, NY, for Defendant.

**ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. No. 65, 66, 67, 68

William H. Orrick, United States District Judge

**\*1**  In this product liability suit, plaintiff Ina Rodman alleges that she suffers from a movement disorder known as Tardive Dyskinesia ("TD") as a result of ingesting the prescription antipsychotic medication Abilify. She brings failure to warn and design defect claims against defendant Otsuka America Pharmaceutical, Inc. ("Otsuka"). Before me are cross-motions for summary judgment on the failure to warn claim, along with Otsuka's motion for summary

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 344 of 410
PageID: 12951

Rodman v. Otsuka America Pharmaceutical, Inc., --- F.Supp.3d ---- (2020)
2020 WL 2525032, 112 Fed. R. Evid. Serv. 733

judgment on the design defect claim. Both parties also move to exclude portions of expert testimony.

Rodman's case founders on a lack of proof. For the reasons set forth below, I GRANT summary judgment in favor of Otsuka on all three theories of Rodman's failure to warn claim, as well as her design default claim. Along the way, I GRANT Otsuka's motion to exclude Dr. Laura M. Plunkett's expert testimony on label inadequacy and DENY the remainder of its motion as moot. And I DENY Rodman's motion for partial summary judgment on her failure to warn claim and DENY as moot her motion to exclude portions of Dr. Sara J. Polfliet's and Dr. Christoph U. Correll's expert testimony.

## BACKGROUND

Abilify is an "atypical" or "second-generation" antipsychotic prescription medication that was first approved by the United States Food and Drug Administration ("FDA") for the treatment of schizophrenia. *See* Corrected Declaration of Matthew M. Saxon in Support of Defendant's Motion for Summary Judgment ("Saxon Decl. ISO MSJ") [Dkt. No. 73-2] ¶ 3 & Ex. B (2002 Abilify Label). It has since been approved by the FDA to treat several other mental health conditions, including bipolar disorder & Major Depressive Disorder ("MDD"). *See id.* ¶ 4 & Ex. C (2009 Abilify Label at 1). Since the medication was first marketed, the Abilify label has included the following warning about the risks of TD:

### 5.4 Tardive Dyskinesia

A syndrome of potentially irreversible, involuntary, dyskinetic movements may develop in patients treated with antipsychotic drugs. Although the prevalence of the syndrome appears to be highest among the elderly, especially elderly women, it is impossible to rely upon prevalence estimates to predict, at the inception of antipsychotic treatment, which patients are likely to develop the syndrome. Whether antipsychotic drug products differ in their potential to cause tardive dyskinesia is unknown.

The risk of developing tardive dyskinesia and the likelihood that it will become irreversible are believed to increase as the duration of treatment and the total cumulative dose of antipsychotic drugs administered to the patient increase. However, the syndrome can develop, although much less commonly, after relatively brief treatment periods at low doses.

There is no known treatment for established cases of tardive dyskinesia, although the syndrome may remit, partially or completely, if antipsychotic treatment is withdrawn. Antipsychotic treatment, itself, however, may suppress (or partially suppress) the signs and symptoms of the syndrome and, thereby, may possibly mask the underlying process. The effect that symptomatic suppression has upon the long-term course of the syndrome is unknown.

**\*2** Given these considerations, ABILIFY should be prescribed in a manner that is most likely to minimize the occurrence of tardive dyskinesia. Chronic antipsychotic treatment should generally be reserved for patients who suffer from a chronic illness that (1) is known to respond to antipsychotic drugs and (2) for whom alternative, equally effective, but potentially less harmful treatments are not available or appropriate. In patients who do require chronic treatment, the smallest dose and the shortest duration of treatment producing a satisfactory clinical response should be sought. The need for continued treatment should be reassessed periodically.

If signs and symptoms of tardive dyskinesia appear in a patient on ABILIFY, drug discontinuation should be considered. However, some patients may require treatment with ABILIFY despite the presence of the syndrome.

*Id.*, Ex. B (2002 Abilify Label at 8-9); *see also* Ex. C (2009 Abilify Label at 17-18).

In 2010, Rodman's prescribing physician and psychiatrist, Dr. John Hawkins, diagnosed Rodman with MDD and prescribed her Abilify. *Id.*, Ex. A, (Hawkins Dep. at 157:3-24) and Ex. H, (Rodman Medical Records at 28, 32). In June 2015, after a change in medical insurance, Rodman emailed Dr. Hawkins explaining that Abilify has become "quite expensive" and asking for instructions about how best to discontinue the medication. *Id.*, Ex. H (Rodman Medical Records at 334). Dr. Hawkins replied with instructions for weaning her off Abilify and told her to monitor her mood as she did. *Id.* He also instructed her to "be sure to follow-up with a new psychiatrist under you[r] new medical coverage." *Id.*

On March 30, 2016, a doctor at the University of Florida diagnosed Rodman with "dyskinesia of the tongue." *Id.*, Ex. J (Rodman Dental Records at 9). On May 19, 2016, she began seeing a neurologist, Dr. Anette Nieves, who treated her TD symptoms. *Id.*, Ex. F (Nieves Dep. at 47:11-48:23).

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 345 of 410
PageID: 12952

Rodman v. Otsuka America Pharmaceutical, Inc., --- F.Supp.3d ---- (2020)
2020 WL 2525032, 112 Fed. R. Evid. Serv. 733

In the First Amended Complaint ("FAC") [Dkt. No. 28], Rodman alleges three theories with regard to failure to warn: (i) the Abilify label "did not accurately reflect the incidence and risk of developed [TD]" with the use of Abilify (FAC ¶¶ 26, 30); (ii) the Abilify label "failed to specifically discuss the fact that [TD] had been reported in patients taking Abilify, including those taking lower doses for depression" (FAC ¶ 25); and (iii) the label failed to "provide[ ] a discussion or instruction regarding specific methods for screening patient for [TD], such as AIMS (Abnormal Involuntary Movement Scale)" (FAC ¶ 29). The FAC also asserts a claim for defective design. FAC ¶¶ 34-35. [1]

On March 2, 2020, Rodman filed a motion for partial summary judgment on the failure to warn claim and motion to exclude or limit the expert reports of Dr. Polfliet and Dr. Correll. *See* Plaintiff's Motion for Partial Summary Judgment ("Rodman Partial SJ") [Dkt. No. 66]; Plaintiff's Motion to Exclude Duplicative Expert Testimony and Motion to Exclude Inadmissible Expert Testimony ("Rodman Mot. Exclude") [Dkt. No. 65]. On the same day, Otsuka filed its motion for summary judgment on both the failure to warn and design defect claims and a motion to exclude the expert report of Dr. Plunkett. *See* Defendant's Motion for Summary Judgment ("Otsuka MSJ") [Dkt. No. 67]; Defendant's Motion to Exclude Testimony of Laura M. Plunkett ("Otsuka Mot. Exclude") [Dkt. No. 68]. [2] On May 6, 2020, I heard argument from the parties.

### LEGAL STANDARD

### I. MOTION FOR SUMMARY JUDGMENT

*3 [1] [2] [3] Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *See* Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial." *Id.* The party opposing summary judgment must present affirmative

evidence from which a jury could return a verdict in that party's favor. Anderson v. Liberty Lobby, 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

[4] [5] [6] On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant. *Id.* at 255, 106 S.Ct. 2505. In deciding the motion, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See* Thornhill Publ'g Co., Inc. v. GTE Corp., 594 F.2d 730, 738 (9th Cir. 1979).

### II. MOTION TO EXCLUDE EXPERT TESTIMONY

Federal Rule of Evidence 702 allows a qualified expert to testify "in the form of an opinion or otherwise" where:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

[7] [8] To be admissible under Rule 702 expert testimony must be relevant and reliable. *See* Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). "[R]elevance means that the evidence will assist the trier of fact to understand or determine a fact in issue." Cooper v. Brown, 510 F.3d 870, 942 (9th Cir. 2007); *see also* Primiano v. Cook, 598 F.3d 558, 564 (9th Cir. 2010) ("The requirement that the opinion testimony assist the trier of fact goes primarily to relevance.") (internal quotation marks omitted).

[9] [10] [11] [12] Under the reliability requirement, the expert testimony must "have] a reliable basis in the knowledge and experience of the relevant discipline."

*Primiano*, 598 F.3d at 565. To ensure reliability, the court must "assess the [expert's] reasoning or methodology, using as appropriate such criteria as testability, publication in peer reviewed literature, and general acceptance." *Id.* These factors are "helpful, not definitive," and a court has discretion to decide how to test reliability "based on the particular circumstances of the particular case." *Id.* (internal quotations marks and footnotes omitted). "When evaluating specialized or technical expert opinion testimony, the relevant reliability concerns may focus upon personal knowledge or experience." *United States v. Sandoval-Mendoza*, 472 F.3d 645, 655 (9th Cir. 2006).

## DISCUSSION

## I. MOTIONS TO EXCLUDE EXPERT TESTIMONY

### A. Motion to Exclude Expert Testimony of Dr. Plunkett

Rodman retained Dr. Plunkett, a pharmacologist, toxicologist, and FDA regulatory specialist, to support her failure to warn claim. *See* Corrected Declaration of Matthew M. Saxon in Support of Defendant's Motion to Exclude Expert Testimony ("Saxon Decl. ISO Mot. Exclude") [Dkt. No. 74-2] Ex. B (Plunkett Rep.). Otsuka moves to exclude Dr. Plunkett's testimony on two grounds: (i) she is not qualified to offer label inadequacy opinions and her opinions are not reliable nor based on sufficient facts or data; (ii) she is not qualified to offer a specific causation opinion. Otsuka Mot. Exclude 1.

### 1. Dr. Plunkett's Opinion on Label Inadequacy

**\*4** Otsuka attacks Dr. Plunkett's opinions supporting Rodman's three failure to warn theories that the Abilify label:

- "failed to adequately describe the risk of [TD] associated with use of the drug" because "the scientific literature [ ] contained discussion of the fact that the occurrence rate for [TD] was much higher than 0.1 or 1%, the 'infrequent' standard that was mentioned in the initial Abilify labeling." Plunkett Rep. ¶ 33.

- "failed to specifically discuss the fact that [TD] had been reported in patients taking Abilify, including those taking lower doses for depression." Plunkett Rep. ¶ 33.

- "never provided a discussion or instruction regarding specific methods for screening patients for [TD], such as AIMS (Abnormal Involuntary Movement Scale)." Plunkett Rep. ¶ 36.

In this section, I focus on whether Dr. Plunkett is qualified to render the first opinion and if it is based both on reliable facts or data and is the product of reliable principles or methods. As I explain later in Sections II.A.2-3, I deny Otsuka's motion to exclude Dr. Plunkett's second and third opinions as moot because I am granting Otsuka's motion for summary judgment on the second and third failure to warn theories since Dr. Hawkins unequivocally testified that a label that added these points would not have changed his prescribing decision.

**[13]** Otsuka argues that Dr. Plunkett lacks the qualifications to opine on the adequacy of the Abilify label because she has no special knowledge of antipsychotics like Abilify, she cannot prescribe them, and she has not published articles about them. Otsuka Mot. Exclude 7. While she cannot prescribe Abilify or diagnose TD, those skills are not necessary prerequisites to testifying about the adequacy of Abilify's label. Dr. Plunkett's experience and expertise as a toxicologist and pharmacologist qualify her to opine on Otsuka's labeling practices and the adequacy of its Abilify label. *See In re Xarelto (Rivaroxaban) Prod. Liab. Litig.*, No. MDL 2592, 2017 WL 1352860, at \*2 (E.D. La. Apr. 13, 2017) (denying motion to exclude Dr. Plunkett in case bringing multiple product liability claims, including failure to warn, and finding that she is "qualified to testify about drug pharmacology, general causation, regulatory matters and the adequacy of labels for both prescription and non-prescription drugs").

**[14]** That said, the method she employed here is problematic. Dr. Plunkett primarily relies on a survey of scientific published literature to conclude that the Abilify label "failed to adequately describe the risk of [TD] associated with use of the drug." Plunkett Rep. ¶ 33. She describes this survey of scientific literature in paragraph 21 of her report.

It was initially reported that the risk of TD was greater with older antipsychotics compared to new agents, like Abilify, but Dr. Plunkett explains that published literature starting as early as 2006 found that may not be the case. *Id.* ¶ 21 (string cite of articles). She draws attention to two sources in particular. The first source is a 2011 study that calculated a 3.4% "estimate of the rate of occurrence of [TD] in a clinic population."

Plunkett Rep. ¶¶ 21, 34; *see* Saxon Decl. ISO Mot. Exclude, Ex. I (Peña, M.S., et al. 2011, Tardive dyskinesia and other movement disorders secondary to aripiprazole. *Mov. Disord.* 26:147-152) (hereinafter "Peña study"). The second source is a listing of events found in the FDA Adverse Event Reporting System known as "FAERS". TD was the second most frequent reported adverse event among Abilify users and Dr. Plunkett finds that this "reporting rate (5%) was similar to the rate reported by Peña in 2011 in clinic experience (3.4%)." Plunkett Rep. ¶ 34. She compares these figures to those provided on the Abilify label. TD was listed on the Abilify label as an "infrequent" adverse reaction that was observed outside of clinic studies with Abilify; infrequent was defined as an occurrence of greater than 0.1% but less than 1%. Plunkett Rep. ¶ 31. [3]

**\*5** From all of this she concludes that "consideration of the body of studies related to [TD] and Abilify use show that [TD] is not a rare event (*i.e.*, less than 0.1%) or even an infrequent event (less than 1%) but instead may be considered a common adverse event (greater than 1%)." *Id.* ¶ 21. Her concluding paragraph reads: "Therefore, it is my opinion that the Abilify labeling on the drug prescribed by Dr. Hawkins and used by Ms. Rodman failed to adequately describe the risk of [TD] associated with use of the drug. Moreover, removal of the mention of [TD] from the Adverse Reactions section of the label in 2014 was inconsistent with the fact that the reporting of [TD] in the published literature has risen significantly and that physicians were reporting higher rates of [TD] than 1% (see paragraph 21 above). Failure to provide physicians with accurate and up to date information on the occurrence of [TD] put patients at risk." *Id.* ¶ 33.

Otsuka's motion focuses on the inaccuracies of comparing data collected from Dr. Plunkett's cited sources to data reflected on the Abilify label. The "infrequent" figure of 0.1 to 1% that Dr. Plunkett identifies in the Abilify label was a calculated incidence rate of TD among Abilify users; the 5% (from FAERS) and 3.4% (from Peña study) figures she compares it with were not true incidence rates. A true incidence rate is one that looks at a pool of Abilify users to identify how many patients developed TD. The studies Dr. Plunkett cites looked at a pool of those with TD and identified how many of them used Abilify, which does not result in a true incidence rate.

Both the FAERS and Peña study cautioned that their sources cannot be used to calculate an incidence rate. In the cover letter accompanying the FAERS data, which Rodman's counsel obtained via Freedom of Information Act ("FOIA") request and on which Dr. Plunkett relied, the FDA expressly stated that the FAERS data cannot be used to calculate an incidence rate. *See* Saxon Decl. ISO Mot. Exclude, Ex. F (FOIA Request and Response at 5) ("The information in these reports has not been scientifically or otherwise verified as to a cause and effect relationship *and cannot be used to estimate the incidence of these events.*") (emphasis added). The Peña study had a similar disclaimer. *See id.*, Ex. I (Peña study at 150) ("[T]he true prevalence and incidence of TD and other drug-induced movement disorders associated with TGAs, such as aripiprazole [Abilify], are not known."). Dr. Plunkett also conceded in her deposition that the FAERS data and the Peña study did not give her an incidence rate. *See id.*, Ex. C (Plunkett Dep. at 126:12-15); *id.*, Ex. H (copy of Dr. Plunkett Dep. in *Crochet v. Bristol-Myers Squibb Co.*, Case No. 3:16-cv-00036 (M.D. La.), at 56:3-6; 324:11-19; 284:4-23).

**[15]** **[16]** Dr. Plunkett may not "analyze[ ] data that was not [her] own and reinterpret[ ] it in a manner inconsistent with the conclusions of those who originally generated it."

*Carnegie Mellon Univ. v. Hoffmann-LaRoche, Inc.*, 55 F. Supp. 2d 1024, 1040 (N.D. Cal. 1999); *In re Accutane Prod. Liab.*, No. 804-MD-2523-T-30TBM, 2009 WL 2496444, at \*2 (M.D. Fla. Aug. 11, 2009), *aff'd*, 378 F. App'x 929 (11th Cir. 2010) ("[W]hen an expert relies on the studies of others, he must not exceed the limitations the authors themselves place on the study."). Indeed, "experts are properly disqualified if the studies on which they rely merely suggest, without definitely concluding, the truth of a particular assertion." *Haynes ex rel. Haynes v. Nat'l R.R. Passenger Corp.*, 319 F. App'x 541, 543 (9th Cir. 2009) (citing

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 144–47, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)).

Notably, Dr. Plunkett's testimony has been previously excluded in another drug product liability case on analogous grounds. The court in *In re Mirena Ius Levonorgestrel-Related Prod. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 260 (S.D.N.Y. 2018) concluded "there [was] too great an analytic gap between the available data and the conclusion" that Dr. Plunkett drew. In that case, Dr. Plunkett opined on the causality between a prescription drug and idiopathic intracranial hypertension. In making her conclusion, she found that the temporality factor was satisfied based on her reliance on "three studies which, she stated, had 'addressed' temporality (by Valenzuela, Rai, and Alder) and on three

case reports drawn from the Bayer database." *Id.* at 255. "Beyond identifying these materials, however, Dr. Plunkett [did] not address their contents. The Valenzuela authors, for instance, specifically noted in their publication that they lacked temporal data." *Id.* The court found that "Dr. Plunkett's handling of the Valenzuela study is [ ] problematic" and ultimately excluded her proposed testimony because it was "beset by methodological deficiencies." *Id.* at 261, 263

**\*6** Similarly, in this case Dr. Plunkett exceeds the boundaries of the sources she relies on by going beyond what the sources concluded. Without explanation, she compares figures that authors explicitly cautioned are not true incidence rates with the true incidence rate provided in Abilify's label. Rodman argues that only Otsuka has the capability to calculate the true incidence rates, but this assertion is rebutted by Otsuka's expert, Dr. Correll, who was able to conduct a true incidence rate study of Abilify (which Rodman does not seek to exclude). [4]

Dr. Plunkett does not explain why it makes sense to compare different data sets and how that necessarily leads to her conclusion that the Abilify label was inadequate. For example, she does not address the contents of the Peña study that gave her the supposedly comparative figure of 3.4%. The Peña study was an analysis of TD patients over the span of eight years at a movement disorders clinic in Houston, Texas. The review found that for 8 out of the clinic's 236 patients being treated for TD, their symptoms were either "definite[ly]" or "probabl[y]" associated with Abilify. *See* Saxon Decl. ISO Mot. Exclude, Ex. I (Peña study at 150). [5] Importantly, the study analyzed a pool of TD patients and tracked whether they had taken Abilify in the past, not a pool of Abilify users to track whether they contracted TD, which would have led to a true incidence rate. In addition to cautioning that the study did not provide a true incidence rate, the authors recognized that although patients classified as "definite" were "only those patients taking [Abilify] alone before the developments of TD, we cannot exclude the possibility that they were also taking other neuroleptics as medication history was obtained only from the patient interview." *Id.* at 151.

In her opposition, Rodman attempts to characterize Dr. Plunkett's report in a different way. She claims that even though the data and studies Dr. Plunkett relies upon cannot establish incidence rates, they "should have alerted Otsuka to investigate and change the Abilify label." Plaintiffs' Memorandum of Points and Authorities in Opposition to

Defendant's Motion to Exclude Testimony of Dr. Laura M. Plunkett [Dkt. No. 75] 13. But the concluding paragraph in question here, on which Rodman primarily relies for her failure to warn claim, reflects a different conclusion:

> During this time, the scientific literature also contained discussion of the fact that the occurrence rate for tardive dyskinesia was much higher than 0.1 to 1%, the "infrequent" standard that was mentioned in the initial Abilify labeling and in the labeling in 2010 through December 2014 as well. Therefore, it is my opinion that the Abilify labeling on the drug product prescribed by Dr. Hawkins and used by Ms. Rodman failed to adequately describe the risk of tardive dyskinesia associated with use of the drug.

**\*7** Plunkett Rep. ¶ 33.

Rodman also argues that Dr. Plunkett's report would be helpful to the jury because her expertise in FDA regulation is necessary to explain how Otsuka should have used the information at its disposal to label its product correctly. But Dr. Plunkett's report does not opine on whether Otsuka met the FDA guidelines; she testifies about whether the Abilify label adequately warns doctors about use of this prescription drug. [6]

Because Dr. Plunkett extrapolated conclusions beyond the scope of her sources, I find that her opinion on label inadequacy is not the product of reliable principles or methods. Otsuka's motion to exclude Dr. Plunkett's opinion on label inadequacy is GRANTED and its motion to exclude other opinions by Dr. Plunkett, namely on specific causation, is DENIED as moot. As explained below, this is ultimately fatal to Rodman's failure to warn claim on the theory that the Abilify label underreported the risk of contracting TD.

## B. Motion to Exclude Expert Testimony of Dr. Polfliet and Dr. Correll

Rodman moves to exclude Dr. Polfliet's expert testimony on grounds that it is duplicative with testimony from Otsuka's

Case 1:19-md-02875-RMB-SAK Document 598-3 Filed 10/16/20 Page 349 of 410 PageID: 12956

Rodman v. Otsuka America Pharmaceutical, Inc., --- F.Supp.3d ---- (2020)

2020 WL 2525032, 112 Fed. R. Evid. Serv. 733

other expert, Dr. Correll, and to exclude certain portions of Dr. Polfliet's and Dr. Correll's opinions because they "improperly offer legal conclusions" regarding Dr. Hawkins' testimony and speculate as to his state of mind. Rodman Mot. Exclude 3-4, 9-11. Given my ruling on the other motions, Rodman's motion to exclude is DENIED as moot.

## II. MOTIONS FOR SUMMARY JUDGMENT

### A. Failure to Warn

[17] [18] [19] A manufacturer of a prescription drug is obligated warn physicians, not patients, of potential side effects associated with its pharmaceutical products. *Motus v. Pfizer Inc.*, 196 F. Supp. 2d 984, 990 (C.D. Cal. 2001) (" *Motus I*"), aff'd sub nom. *Motus v. Pfizer Inc. (Roerig Div.)*, 358 F.3d 659 (9th Cir. 2004) (" *Motus II*"). Known as the "learned intermediary" doctrine, the duty to warn the physician—rather than the patient—applies in the case of prescription drugs and implants, where "the physician stands in the shoes of the 'ordinary user' because it is through the physician that a patient learns of the properties and proper use of the drug or implant." *Valentine v. Baxter Healthcare Corp.*, 68 Cal. App. 4th 1467, 1483, 81 Cal.Rptr.2d 252 (1999). A manufacturer discharges its duty to warn if it provides adequate warnings to the physician about any known or reasonably knowable dangerous side effects, regardless of whether the warning reaches the patient. *Motus I*, 196 F. Supp. 2d at 991 (citation omitted).

**\*8** [20] [21] [22] "A plaintiff asserting causes of action based on a failure to warn must prove not only that no warning was provided or the warning was inadequate, but also that the inadequacy or absence of the warning caused the plaintiff's injury." *Motus I*, 196 F. Supp. 2d at 991. Whether a warning is adequate depends on "how a prescribing doctor would understand the label." *Hexum v. Eli Lilly & Co.*, 2015 WL 5008263 at \*7 (C.D. Cal. 2015). There can be no genuine dispute about the adequacy of a warning that "directly warns in plain and explicit terms of the specific risk that has caused injury to the plaintiff." *Utts v. Bristol-Myers Squibb Co.*, 251 F. Supp. 3d 644, 673-74 (S.D.N.Y. 2017) (applying California law), aff'd sub nom. *Gibbons v. Bristol-Myers Squibb Co.*, 919 F.3d 699 (2d Cir. 2019).

Otsuka moves for summary judgment on the failure to warn claim on grounds that Rodman has failed to adduce any evidence that the Abilify label was inadequate or that an additional warning would have changed how Dr. Hawkins treated her. Otsuka MSJ 10. Rodman cross-moves for partial summary judgment on grounds that there is no genuine dispute that the Abilify label was inadequate under all three of her failure to warn theories. Rodman Partial SJ 2. While she does not explicitly say so in her motion, she appears to argue that there is no genuine dispute on the proximate causation element of her failure to warn claim as well. *Id.* at 10.

### 1. Rodman's First Theory: the label understated the incidence and risk of developing TD with use of Abilify

[23] Rodman concedes that the Abilify label mentions TD as a risk; instead, she contends that Otsuka "failed to disclose the actual risk of contracting [TD] adequately, that was known or knowable in light of the generally recognized and prevailing scientific and medical knowledge available at the time of manufacture and distribution." Rodman Partial SJ 1. She relies on Dr. Plunkett's expert report to argue that she has met the first element (label inadequacy) of her failure to warn claim under this theory. *Id.* at 6-7; *see also id.* at 8 ("Dr. Plunkett concluded her report and testimony by confirming that defendant failed to properly identify the incidence rate of tardive dyskinesia.")

Because I exclude Dr. Plunkett's opinion on this point and that opinion is essential to the first element of Rodman's failure to warn theory, summary judgment is GRANTED to Otsuka. *See, e.g.*, *Carlucci v. CNH America LLC*, No. 10-12205-DPW, 2012 WL 4094347, at \*1, \*10 (D. Mass. Sept. 14, 2012) (noting that "[a]fter determining to grant [the defendant's] motion to exclude [the plaintiffs' defective design and warnings expert's] testimony, [the court] conclude[s][it] should grant [the defendant's] motion for summary judgment" since "[a]s to their negligence and breach of implied warranty claims for design defects ... the [plaintiffs'] lack of expert testimony is fatal"). [7]

### 2. Rodman's Second Theory: the label failed to specifically discuss the fact that TD has been reported in patients taking Abilify, including those taking lower doses

**[24]    [25]    [26]    [27]** "[I]nadequacy of the warning and causation are separate elements of Plaintiffs' affirmative burden." *Tucker v. Wright Med. Tech., Inc.*, No. 11-CV-03086-YGR, 2013 WL 1149717, at *16 (N.D. Cal. Mar. 19, 2013). Therefore, even if a warning was inadequate, "a product defect claim based on insufficient warnings cannot survive summary judgment if stronger warnings would not have altered the conduct of the prescribing physician."

📄 *Motus II*, 358 F.3d at 661. In other words, a defendant may prevail on summary judgment "by showing that Plaintiff lacks evidence establishing that an adequate warning would have affected [the doctor's] decision to prescribe [the medication]."

📄 *Motus I*, 196 F. Supp. 2d at 992. A defendant "need not produce its own evidence; pointing to an absence of evidence on the Plaintiff's part is sufficient." 📄 *Id.* (citation omitted).

**\*9** Rodman argues that the label warning failed to specifically discuss the fact that TD has been reported in patients taking Abilify, including those taking lower doses for depression. Otsuka responds that the label already included a warning to physicians that patients taking low doses of Abilify could develop TD. *See* Saxon Decl. ISO MSJ, Ex. B (2002 Abilify Label at 8-9) (stating that TD "can develop, although much less commonly, after relatively brief treatment periods at low doses"); *id.*, Ex. C (2009 Abilify Label at 17-18) (same); Declaration of Matthew M. Saxon in Support of Defendant's Reply in Support of its Motion to Exclude Expert Testimony [Dkt. No. 81-1] ¶ 6 & Ex. E (2014 Abilify Label at ECF page number 417).

Even assuming that the label did not include an adequate warning about TD risks at low doses, Rodman's argument fails. Dr. Hawkins confirmed that he was aware that Abilify could cause TD even in patients taking lower doses. *See* Saxon Decl. ISO MSJ, Ex. A (Hawkins Dep. at 263:18-264:2) (statement that "syndrome can develop ... after relatively brief periods at low doses" was "consistent with [his] understanding while [he was] treating Ms. Rodman"). He repeatedly testified that he "knew when [he was] prescribing Ms. Rodman Abilify that [TD] was one of the risks of the medication," and that "[TD] was a possibility" with the use of Abilify. *See id.* at 121:20-122:15, 118:18-25; *see also id.* at 102:10-14 (admitting that "when [he] began prescribing Ms. Rodman Abilify, at that time [he] understood that [TD] was one of the risks associated with the use of Abilify"). He also testified that he understood that one of the risks "related to discontinuing use of Abilify" was that "there can be symptoms of [TD] when an antipsychotic is discontinued."

*Id.* at 294:14-19. Even if the label had included the warning desired by Rodman, Dr. Hawkins unequivocally testified that it would not have impacted his prescribing decision.

Otsuka's motion for summary judgment on this failure to warn theory is GRANTED.

### 3. Rodman's Third Theory: the label failed to provide instruction regarding specific methods for screening patients for TD, such as the AIMS test

**[28]** Rodman argues that the Abilify label failed to provide a discussion or instruction regarding specific methods for screening patients for TD, such as the AIMS test. But Dr. Hawkins testified that he knew how to monitor for TD symptoms, including using the AIMS test, and monitored Rodman while she was in his care. *See* Saxon Decl. ISO MSJ, Ex. A (Hawkins Dep. at 124:21-24, 126:25-127:15, 270:10-271:13) (Dr. Hawkins testified that he was "familiar with the AIMS test" at the time he was prescribing Abilify to Rodman, that he has been familiar with the test "for a long time" having learned about it during medical school or residency training, and that he "didn't need a drug company at the time to tell [him] about the AIMS test"). A change in the label would not have impacted Dr. Hawkins's prescribing decision because he already understood ways to monitor Rodman for TD symptoms, including the AIMS test. Accordingly, Otsuka's motion for summary judgment on this failure to warn theory is GRANTED.

In sum, summary judgment is GRANTED to Otsuka on all three theories of Rodman's failure to warn claim.

### B. Design Defect

**[29]    [30]    [31]    [32]    [33]** California does not recognize strict liability for design defects in prescription drugs. *See*

📄 *Brown v. Super. Ct.*, 44 Cal.3d 1049, 1061, 245 Cal.Rptr. 412, 751 P.2d 470 (1988) ("[A] drug manufacturer's liability for a defectively designed drug shall not be measured by the standards of strict liability."). A plaintiff alleging a design defect claim under a negligence theory must prove "that the defect in the product was due to negligence of the defendant." *Tucker*, 2013 WL 1149717, at *7 (N.D. Cal. Mar. 19, 2013) (quoting 📄 *Chavez v. Glock, Inc.*, 207 Cal.App. 4th 1283, 1305, 144 Cal.Rptr.3d 326 (2012)). As with a general negligence claim, the plaintiff must show

breach of duty, causation, and damages. *Id.* (citation omitted). Concerning the standard of care for negligence, a "[designer/ manufacturer/etc.] is negligent if [it] fails to use the amount of care in [designing/manufacturing/etc.] the product that a reasonably careful [designer/manufacturer/etc.] would use in similar circumstances to avoid exposing others to a foreseeable risk of harm. *Id.* (citation omitted, alteration in original).

**\*10** **[34]** **[35]** **[36]** Generally, "the test of negligent design involves a balancing of the likelihood of harm to be expected from a [product] with a given design and the gravity of harm if it happens against the burden of the precaution which would be effective to avoid the harm." *Tucker,* 2013 WL 1149717, at \*7 (quoting *Merrill v. Navegar, Inc.,* 26 Cal. 4th 465, 479, 110 Cal.Rptr.2d 370, 28 P.3d 116 (2001)). Even if a manufacturer has done all it reasonably could have done to warn about a risk or hazard related to a product's design, a reasonable person could conclude that the magnitude of the reasonably foreseeable harm as designed outweighed the utility of the product as designed. *Id.* (citation omitted). "In evaluating the adequacy of a product's design under the risk-benefit test, 'a jury may consider, among other relevant factors, the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design.' " *Tucker,* 2013 WL 1149717, at \*8 (citation omitted).

**[37]** In opposing Otsuka's summary judgment motion on this claim, Rodman argues that she "has no obligation to offer evidence at this point because she is "not required to divulge the testimony of medical witnesses designated to testify at trial." Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Oppo. Otsuka MSJ") [Dkt. No. 77] 15-16. This is not the law. As the non-moving party with the burden of proof, Rodman "must set forth by affidavit or other admissible evidence, specific facts demonstrating the existence of an actual issue for trial"; she "may not merely state that [she] will discredit the moving party's evidence at trial and proceed in the hope that something can be developed at trial in the way of evidence to support [her] claim." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir. 1987); *see also Richardson v. CBS Studios Inc.,* No. CV 12-7925 ABC (SHX), 2013 WL 12120265, at \*7 (C.D. Cal. Sept. 25, 2013) ("[s]ummary judgment is

warranted because Plaintiffs, the non-moving parties, have failed to produce enough evidence to create a genuine issue" and cannot wait until trial to present that evidence);

*Codding v. Pearson Educ., Inc.,* No. 18-CV-00817-LB, 2019 WL 5864579, at \*10 (N.D. Cal. Nov. 8, 2019) (granting summary judgement after rejecting argument that plaintiff "has no obligation to offer affirmative evidence on [ ] issue until trial").

The limited evidence Rodman does identify comes short of creating a genuine dispute on the design defect claim. She cites the deposition of Dr. Anette Nieves, the neurologist who diagnosed her with TD, who testified that she does not prescribe Abilify to her patients and that she may prescribe clonazepam and quetiapine when "a patient would come off of an antipsychotic medication." *See* Declaration of Perry R. Staub, Jr. in Support of Opposition to Defendant's Motion for Summary Judgment ("Staub Decl."), Ex. 2 (Nieves Dep. at 38:3-10). Dr. Nieves never suggested that these two medications were safer alternatives to Abilify, just that she would recommend patients take these medications when "com[ing] off an antipsychotic medication," like Abilify. *Id.* at 38:5.

Rodman also cites testimony from Dr. Hawkins that if he had been aware that the rate of TD was higher than that reported in the label, he might have considered other alternative medications. Oppo. Otsuka MSJ 15. But this testimony does not address whether there were any safer alternative medications to Abilify.

Next, she relies on two portions of Dr. Plunkett's expert report that discuss the different pharmacological profile of Abilify versus other atypical antipsychotic drugs. Oppo. Otsuka MSJ 16. In the first portion, Dr. Plunkett merely describes "[o]ther drugs that have been or are used today in the treatment of psychotic disorders," not that any of these are necessarily safer alternatives to Abilify. Staub Decl., Ex. 3 (Plunkett Rep. ¶ 15). In the other portion, Dr. Plunkett finds that "like other anti-psychotic drugs, the risk of adverse events such as [TD] would be biologically plausible"; Rodman does not explain how this shows existence of a safe alternative design. *Id.* at ¶ 20. Rodman fails to show how any of Dr. Plunkett's concluding paragraphs relate to her design defect claim. *Id.* ¶¶ 33-38.

**\*11** Even if the testimony she points to could somehow create a genuine despite on the existence of a safe alternative design, Rodman fails to address any other elements of a

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 352 of 410
PageID: 12959

Rodman v. Otsuka America Pharmaceutical, Inc., --- F.Supp.3d ---- (2020)
2020 WL 2525032, 112 Fed. R. Evid. Serv. 733

design defect claim. For example, she does not point to evidence that goes to the relative costs and benefits of Abilify as compared with similar drugs on the market. Nor does she provide any evidence that Otsuka failed to design Abilify with the amount of care that a reasonably careful designer or manufacturer would have used in similar circumstances and "presents no admissible evidence regarding what a reasonably careful designer or manufacturer would have done with respect to the design." *Mariscal v. Graco, Inc.*, 52 F. Supp. 3d 973, 991 (N.D. Cal. 2014) (granting summary judgment to defendant where plaintiff "produced no other admissible evidence from which a jury could deduce the appropriate standard of care, which is fatal to [plaintiff's] negligent design defect claim"). Instead, she incorrectly argues that she "has no obligation to divulge the planned trial testimony of treating medical physicians disclosed as testifying experts at trial." Oppo. Otsuka MSJ 16.

For these reasons, Otsuka's motion for summary judgment on the design defect claim is GRANTED.

## CONCLUSION

Accordingly, Otsuka's motion for summary judgment on all three theories of Rodman's failure to warn claim and design defect claim is GRANTED. Its motion to exclude Dr. Plunkett's expert testimony on label inadequacy is GRANTED and the rest of its motion is DENIED as moot. Rodman's motion for partial summary judgment on her failure to warn claim is DENIED and her motion to exclude Dr. Polfliet's and Dr. Correll's expert testimony is DENIED as moot.

**IT IS SO ORDERED.**

**All Citations**

--- F.Supp.3d ----, 2020 WL 2525032, 112 Fed. R. Evid. Serv. 733

## Footnotes

1    On November 6, 2018, I denied Otsuka's motion to dismiss the FAC on grounds that it is barred by California's two-year statute of limitations. *See* Order Denying Motion to Dismiss [Dkt. No. 37].

2    On March 30, 2020, Otsuka filed errata for both of its motions due to clerical errors and errors in compiling exhibits. *See* Defendant's Corrected Motion for Summary Judgment [Dkt. No. 73-1]; Defendant's Corrected Motion to Exclude Testimony of Laura M. Plunkett [Dkt. No. 74-1].

3    Dr. Plunkett also points out that this specific "infrequent" warning was located on the Abilify label when it was first approved by the FDA in 2002. Abilify continued to carry it in 2007, when it was approved for use in MDD. Plunkett Rep. ¶ 31. But in December 2014, the specific mention of "infrequent" occurrence of TD was dropped from that particular "Adverse Reaction" section of the label. *Id.* She finds it "difficult to understand why the term was removed altogether from this section" given that "by 2014 there were numerous reports of [TD] in the published medical literature (see discussion in above paragraph 21)." *Id.* ¶ 33.
     As Otsuka points out, the December 2014 label still mentioned TD under the "Adverse Reaction" section by cross-referencing the reader to the "Warnings and Precautions" section of the label, which contained the warning reproduced in the Background section of this Order. What Dr. Plunkett referred to was the removal of information about the frequency of the TD from a particular portion of the "Adverse Reaction" section of the label. *See* Declaration of Matthew M. Saxon in Support of Defendant's Reply in Support of its Motion to Exclude Expert Testimony [Dkt. No. 81-1] ¶ 6 & Ex. E (2014 Abilify Label at ECF page numbers 417, 428, 444).

4    As discussed in Section I.B. of this Order, Rodman's motion to exclude other portions of Dr. Correll's expert testimony is DENIED as moot.

5    A patient was categorized as "definite" Abilify-associated TD if Abilify was the only neuroleptic used prior to the onset of the movement disorder; a patient was categorized as "probable" if the patient was exposed to multiple neuroleptics, but [Abilify] was the last one before the movement disorder emerged. *See* Saxon Decl.

ISO Mot. Exclude, Ex. I (Peña study at 150). Out of the eight patients identified in the study, five patients were categorized as "definite" and three were categorized as "probable". *Id.*

6    Even if I take Rodman's re-characterization of Dr. Plunkett's report at face value, Dr. Plunkett does not explain how a failure to investigate informs her failure to warn claim. *See, e.g.,* *Latiolais v. Merck & Co., Inc.*, 2007 WL 5861354, at *3 n.1 (C.D. Cal. 2007)* (finding a failure-to-act theory, based on pharmaceutical negligent testing of medication, "is subsumed by the manufacturer's duty to warn and it does not change the premise of Plaintiff's claims, which is that [the pharmaceutical company's] failure to warn of any product defects or dangers—tested or not—ultimately caused" the injury).

7    At the hearing, Rodman argued that she has met the second element of her failure to warn claim under this theory because Dr. Hawkins testified that if the incidence rate of TD was higher than depicted on the Abilify label, then it would have impacted his prescribing decision. Even if Rodman has met the second element, the point here is that she has failed to establish a genuine issue of material fact regarding the first element of her claim.

---

**End of Document**                                      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 29

2019 WL 1903990
Only the Westlaw citation is currently available.
**NOT FOR PUBLICATION**
United States District Court, D. New Jersey.

Janet ROLLAND, Plaintiff,
v.
SPARK ENERGY, LLC, Defendant.

Civil Action No. 17-2680 (MAS) (LHG)
|
Signed 04/29/2019

**Attorneys and Law Firms**

Matthew Ross Mendelsohn, Mazie Slater Katz & Freeman LLC, Roseland, NJ, for Plaintiff.

Ezra Dodd Church, Morgan Lewis & Bockius LLP, Philadelphia, PA, for Defendant.

**MEMORANDUM OPINION**

Michael A. Shipp, United States District Judge

 *1 This matter comes before the Court on Defendant Spark Energy, LLC's ("Defendant") Third Motion to Dismiss and Motion to Strike Class Allegations. (ECF No. 54.) Plaintiff Janet Rolland ("Plaintiff") filed a Second Amended Complaint ("SAC") on August 17, 2018. (ECF No. 48.) Plaintiff opposed Defendant's Motion (ECF No. 59), and Defendant replied (ECF No. 67).[1] The Court has carefully considered the parties' submissions and decides the matter without oral argument pursuant to Local Civil Rule 78.1. For the reasons set forth below, the Court grants in part and denies in part Defendant's Motion.

**I. Background**[2]
The parties are familiar with the matter's factual history, and therefore, the Court only repeats those facts necessary to resolve the instant motion. Plaintiff enrolled in Defendant's electricity services from February 25, 2012 to December 24, 2014. (SAC ¶¶ 7, 24.) Defendant offered a twelve-month low, fixed-rate for new customers. (*Id.* ¶¶ 2, 17.) After twelve billing cycles, Defendant placed Plaintiff on a month-to-month variable rate plan ("Variable Rate Plan"). (*Id.* ¶ 17.) Defendant notified Plaintiff before the last billing cycle that

her initial fixed-rate services were ending and she would be automatically enrolled in the Variable Rate Plan if she did not terminate her service. (*Id.* ¶ 20.) Plaintiff did not respond and was automatically enrolled into the Variable Rate Plan. (*Id.*) The price of the Variable Rate Plan was higher than the initial fixed rate. (*Id.* ¶¶ 17-31.) According to Plaintiff, the variable rare jumped 108% from the introductory fixed rate at the end of the first billing cycle, and Defendant's prices were 93% to 114% higher than competitors' rates. (*Id.* ¶ 24.)

Defendant moves to dismiss Count One of Plaintiff's SAC. (*Id.* ¶¶ 54-66.) Plaintiff filed two previous complaints (ECF Nos. 30, 48) after this Court granted Defendant's Motions to Dismiss without prejudice (ECF Nos. 28, 44). The Court denied Defendant's original Motion to Dismiss Plaintiff's breach of contract and breach of implied covenant of good faith and fair dealing claims. (First Mot. to Dismiss, ECF No. 28.) The Court, however, granted Defendant's Motion to Dismiss Plaintiff's New Jersey Consumer Fraud Act ("NJCFA") claim, finding Plaintiff did not satisfy Federal Rule of Civil Procedure[3] 9(b)'s pleading standards as to the NJCFA. (Dec. 7, 2017 Hr'g Tr. 6:7-12, ECF No. 34.)

Specifically, the Court cited to 📁 *Melville v. Spark Energy, Inc.*, No. 15-8706, 2016 WL 6775635 (D.N.J. Nov. 15, 2016), and *Vitale v. U.S. Gas & Electric, Inc.*, No. 14-4464, 2016 WL 1060807 (D.N.J. Mar. 16, 2016), as setting the appropriate pleading standard, and provided Plaintiff leave to file an amended complaint. (*Id.* at 5:23-6:12.)

 *2 Plaintiff subsequently filed an Amended Complaint. (ECF No. 30.) Defendant moved to dismiss, arguing Plaintiff failed to satisfactorily plead an NJCFA claim. (Second Mot. to Dismiss 8-13, ECF No. 37.) In its July 11, 2018 Memorandum Opinion, the Court granted Defendant's motion, finding Plaintiff again failed to provide sufficiently detailed allegations to plead an NJCFA claim. (July 11, 2018 Mem. Op. 6, ECF No. 43.) The Court further reiterated its prior determination that *Melville* and *Vitale* set forth the proper NJCFA pleading standard, and found Plaintiff's Amended Complaint failed to "allege that Plaintiff purchased electricity through Defendant based on any specific representation(s), or that price was considered by *Plaintiff when* purchasing from Defendant." (*Id.* at 5-6.) The Court granted Plaintiff one final opportunity to cure the deficiencies in her Amended Complaint. (*Id.* at 7.)

Plaintiff subsequently filed the SAC. (*See generally* SAC.) Currently before the Court is Defendant's third Motion to Dismiss Plaintiff's NJCFA claim. (*See* Def.'s Moving Br.,

Rolland v. Spark Energy, LLC, Not Reported in Fed. Supp. (2019)

2019 WL 1903990

ECF No. 54-1.) Defendant moves to dismiss with prejudice Plaintiff's NJCFA claim, and further moves to dismiss or strike Plaintiff's nationwide class allegations. (*Id.*)

## II. Legal Standard

When analyzing a Rule 12(b)(6) motion, the district court conducts a three-part analysis. First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009). Second, the court must accept as true all of a plaintiff's well-pleaded factual allegations and construe the complaint in the light most favorable to the plaintiff. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). The court, however, must disregard any conclusory allegations proffered in the complaint. *Id.* at 210-11. Finally, the court must determine whether the "facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.' " *Id.* at 211 (quoting *Iqbal*, 556 U.S. at 679). "[W]here the well-pleaded facts do not permit the court to infer more than mere possibility of misconduct," the claim is insufficient. *Iqbal*, 556 U.S. at 679.

Where a plaintiff pleads fraud, however, the plaintiff "must meet a heightened pleading standard under [Rule] 9(b)." *Zuniga v. Am. Home Mortg.*, No. 14-2973, 2016 WL 6647932, at *2 (D.N.J. Nov. 8, 2016). The NJCFA is subject to the heightened standard of Rule 9(b). *Smajlaj v. Campbell Soup Co.*, 782 F. Supp. 2d 84, 98 (D.N.J. 2011) (citing *F.D.I.C. v. Bathgate*, 27 F.3d 850, 876-77 (3d Cir, 1994) ). "In alleging fraud ..., a party must state with particularity the circumstances constituting fraud ...." Fed. R. Civ. P. 9(b). "A plaintiff alleging fraud must therefore support its allegations 'with all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where and how of the events at issue.' " *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016) (quoting *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002) ). "To satisfy this standard, the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007). The purpose of Rule 9(b) is "to

place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of ... fraudulent behavior." *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984).

A plaintiff seeking a claim under the NJCFA must present evidence of: (1) unlawful conduct; (2) an ascertainable loss by the plaintiff; and (3) a causal relationship between the unlawful conduct and the ascertainable loss. *Melville*, 2016 WL 6775635, at *2 (citing *Int'l Union of Operating Eng'gs Local No. 68 Welfare Fund v. Merck & Co., Inc.*, 929 A.2d 1076, 1086 (N.J. 2007) ); *see also* N.J.S.A. 56:8-19. Unlawful conduct includes, "any unconscionable commercial practice, deception, fraud, false pretense, false promise, [or] misrepresentation ... in connection with the sale or advertisement of any merchandise or real estate...." N.J.S.A. 56:8-2. A plaintiff must allege "substantial aggravating circumstances" to state a valid NJCFA claim. *Neuss v. Rubi Rose, LLC*, No. 16-2339, 2017 WL 2367056, at *7 (D.N.J. May 31, 2017) (citation omitted).

**\*3** Finally, under Rule 12(b)(1), a party may move to dismiss a complaint for lack of subject matter jurisdiction. Because federal courts are courts of limited jurisdiction, the party seeking to invoke the court's jurisdiction bears the burden of proving the existence of subject matter jurisdiction. *See* *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

## III. Analysis

### A. Plaintiffs NJCFA Claim

Defendant asserts that Plaintiff's SAC does not address the inadequacies from the prior dismissed complaints. (Def.'s Moving Br. 4.) Defendant contends Plaintiff failed to plead the third element of an NJCFA claim—a causal nexus between her injury and Defendant's allegedly unlawful conduct. (*Id.* at 8 (citing *Arcand v. Bro. Int'l Corp.*, 673 F. Supp. 2d 282, 303 (D.N.J. 2009) ).) Specifically, Defendant contends, "Plaintiff fails to state that she ... read, reviewed, looked at, or relied on the Terms of Service or the Renewal Notice. Instead, Plaintiff pleads she merely 'received' or was 'provided' those documents ...." (*Id.* at 9 (emphasis removed).)

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 357 of 410
PageID: 12964

Rolland v. Spark Energy, LLC, Not Reported in Fed. Supp. (2019)

2019 WL 1903990

Defendant also argues Plaintiff again failed to allege that she considered price when she purchased services from Defendant, and instead, continues to "resort only to the considerations of a 'reasonable consumer'—an attempt the Court specifically rejected." (*Id.* at 10 (citing July 11, 2018 Mem. Op. 6 ("Plaintiffs Amended Complaint does not allege that Plaintiff purchased electricity through Defendant based on any specific representation(s), or that price was considered by *Plaintiff* when purchasing from Defendant.") ).) Thus, Defendant contends that although "Plaintiff speculates about what the platitudinal 'reasonable consumer' would think and do. she does not state facts—let alone particularized facts— of a representation that caused *her* to roll over to a [V]ariable [R]ate [Plan] and to stay there." (*Id.* at 11.)

Moreover, Defendant contends Plaintiff failed to allege any misrepresentation or omission on behalf of Defendant. (*Id.* at 12.) Rather, Defendant argues "Plaintiff simply points to additional language in the Terms and Conditions that an administrative fee would not be included in the fixed rate —an allegation that has nothing to do with her variable-rate allegations." (*Id.* at 13.) Defendant disputes Plaintiff's statement that Defendant's use of the terms "competitively priced" amounts to a misrepresentation of the Variable Rate Plan. (*Id.* at 14.) Instead, Defendant alleges this phrase is merely "puffery," which this Court has previously found as not actionable under the NJCFA. (*Id.* (citing *Urbino v. Ambit Energy Holdings, LLC*, No. 14-5184, 2015 WL 4510201, at \*5 n.7 (D.N.J. July 24, 2015) ("[C]laims of 'substantial savings,' 'low, competitive rates,' 'exceptional value,' and 'great savings' are not factual assertions. As such, they are not actionable under the [NJ]CFA.") ).)

Finally, Defendant contends Plaintiff has not pled substantial aggravating circumstances sufficient to constitute consumer fraud under the NJCFA. (*Id.* at 15.) *See Hassler v. Sovereign. Bank*, 374 F. App'x 341, 344 (3d Cir. 2010) (quoting *Turf Lawnmower Repair, Inc. v. Bergen Record Corp.*, 655 A.2d 417, 429 (N.J. 1995) ("To constitute consumer fraud ... the business practice in question must be 'misleading' and stand outside the norm of reasonable business practice in that it will victimize the average consumer ....") ); *see also Suber v. Chrysler Corp.*, 104 F.3d 578, 587 (3d Cir. 1997) (differentiating between mere breach of contract or warranty and an NJCFA violation). Thus, Defendant contends, "No basis exists to morph the breach of contract claim ... into a treble-damages [NJ]CFA claim." (*Id.* at 16.)

**\*4** This Court previously identified *Melville* and *Vitale* as providing the appropriate NJCFA pleading standard. (July 11, 2018 Mem. Op. 5 (citing *Melville*, 2016 WL 6775635; *Vitale*, 2016 WL 1060807.) In *Melville*, the plaintiff took the agreement into consideration when he read and reviewed the terms. *Melville*, 2016 WL 6775635, at \*1. The *Melville* court also stated that "as with common law and equitable fraud, an NJCFA violation must be pled with particularity" and held that the plaintiff satisfied the Rule 9(b) standard because the plaintiff attached the agreement and referenced a specific encounter between the defendant and the plaintiff. *Id.* at \*4.

In *Vitale*, the plaintiffs claimed the defendant told them, and provided them with documentation, that stated the rates were "competitive" when they switched to the defendant's services. *Vitale*, 2016 WL 1060807, at \*1. Further, the plaintiffs directly quoted the standardized telephone sales pitch that induced them to switch electricity providers. *Id.* at \*3. There, the court held the plaintiffs satisfied the NJCFA pleading requirements because the plaintiffs demonstrated the specific misleading statements that they considered, which induced them to switch to the defendant's services. *Id.*

In the instant matter, Plaintiff again fails to allege that she considered any of Defendant's representations when she purchased Defendant's electricity services. "To properly plead a causal nexus, a plaintiff cannot rely on legal conclusions that fail to allege when statements were made or when the plaintiff[ ] [was] exposed to the statements." *Torres-Hernandez v. CVT Prepaid Sols., Inc.*, No. 08-1057, 2008 WL 5381227, at \*7 (D.N.J. Dec. 17, 2008) (citation omitted). Here, although Plaintiff attached the Terms of Service and Renewal Notice to her SAC, Plaintiff did not plead any facts demonstrating that she saw, read, heard, or in any way took those documents into consideration. (*See* SAC, Ex. 1; SAC, Ex. 2.) In fact, Plaintiff merely alleges that she "received" Defendant's Renewal Notice, and Defendant "provided her" its Terms of Service. (SAC ¶¶ 18, 20.) Therefore, Plaintiff failed to establish the Terms of Service and Renewal Notice were material to her decision making, but instead, pleads pursuant to a reasonable consumer, which the Court has already rejected. (*See* July 11, 2018 Op. 5-6 (collecting cases); *see also id.* at 6.) *See also Mladenov v. Wegmans Food Mkts., Inc.*, 124 F. Supp. 3d 360, 377 (D.N.J. 2015) (finding the plaintiffs failed to plead an NJCFA claim with sufficient particularity because, among other things, the "[p]laintiffs

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 358 of 410
PageID: 12965

Rolland v. Spark Energy, LLC, Not Reported in Fed. Supp. (2019)

2019 WL 1903990

[did] not specify any instance in which they even saw [the d]efendant's advertisements"); *Berman v. ADT LLC*, No. 12-7705, 2015 WL 4496517, at *5 (D.N.J. July 22, 2015) (finding the plaintiffs failed to successfully plead an NJCFA claim because the record lacked evidence that the defendants' representations were "material to [the plaintiffs'] decision-making").

The Court is also not persuaded by Plaintiff's assertion that Defendant's use of the phrase "competitively priced offers" in the Renewal Notice constitutes a misrepresentation. (SAC, Ex. 2.) This Court has previously determined, "claims of 'substantial savings,' 'low, competitive rates,' 'exceptional value,' and 'great savings' are not factual assertions, As such, [those phrases] are not actionable under the [NJ]CFA." *Urbino*, 2015 WL 4510201, at *5 n.7 (citation omitted); *see also* 🔖 *Glass v. BMW of N. Am.*, No. 10-5259, 2011 WL 6887721, at *6 (D.N.J. Dec. 29, 2011) (citation omitted) ("Advertising that amounts to mere puffery is not actionable because no reasonable consumer relies on puffery. The distinguishing characteristics of puffery are vague, highly subjective claims, as opposed to specific, detailed factual assertions."); *Berman*, 2015 WL 4496517, at *5 (alteration in original) (internal quotation marks and citation omitted) ("[I]dle comments or mere puffery are not material because reasonable consumers do not rely on puffery."). Here, Defendant's assertion that its rates were competitively priced falls squarely into the category of puffery. Nonetheless, as stated previously, Plaintiff failed to plead that she read or considered the Renewal Notice, and therefore, has not demonstrated that she even took the phrase "competitively priced" into consideration.[4]

**B. Plaintiff's Multistate Class Allegations**

**\*5** Defendant next argues the SAC fails to support a multistate class. Specifically, Defendant moves to dismiss Plaintiff's class allegations pursuant to Rules 12(b)(1), 12(b)(6), or 23(d)(1)(D). (Def.'s Moving Br. 17-21.)

Plaintiff's class definition does not include a geographic limitation, *i.e.* New Jersey, but rather, Plaintiff brings the suit "on behalf of a class of consumers who purchased electricity on a variable rate from Defendant from April 19, 2011, to

present." (SAC ¶ 6.) Plaintiff further provides that Defendant "has thousands of customers in New Jersey and elsewhere," and operates in "New Jersey and other states." (SAC ¶ 8.) Although the Court recognizes Plaintiff's nationwide class allegations are limited, Plaintiff's allegations are sufficiently broad to encompass a class outside of the State of New Jersey.

Moreover, the Court is not inclined to dismiss or strike Plaintiff's class allegations at the motion to dismiss stage, and finds this issue better suited for the class certification stage.[5] *See Rubi Rose, LLC*, 2017 WL 2367056, at *10 ("[S]trik[ing] ... class allegations at [the motion to dismiss] stage would be premature, and the Court's consideration of this issue is better suited for the class certification stage."); *see also* 🔖 *Durso v. Samsung Elecs. Am., Inc.*, No. 12-5352, 2013 WL 5947005, at *13 (D.N.J. Nov. 6, 2013) (citation omitted) ("Dismissal of class claims prior to discovery and a motion to certify the class by plaintiff is the exception rather than the rule."); *Fishman v. Gen. Elec. Co.*, No. 12-585, 2013 WL 1845615, at *6 (D.N.J. Apr. 30, 2013) (explaining that a motion to strike under Rule 12(f), rather than a motion to dismiss under Rule 12(b)(6), is the "proper procedural mechanism" for disputing nationwide class allegations, and finding the defendant's motion premature at the motion to dismiss stage); *cf.* 🔖 *Bell v. Cheswick Generating Station*, No. 12-929, 2015 WL 401443, at *5-7 (W.D. Pa. Jan. 28, 2015) (reviewing the defendant's motion brought pursuant to Rules 12(b) and 23(c)(1)(A) as a motion to strike class allegations). The Court, accordingly, denies Defendant's motion to dismiss or strike Plaintiff's nationwide class allegations.[6]

**IV. Conclusion**

For the reasons set forth above, the Court dismisses with prejudice Plaintiff's NJCFA claim. The Court denies Defendant's Motion to Strike Plaintiff's nationwide class. The Court will enter an Order consistent with this Memorandum Opinion.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 1903990

Rolland v. Spark Energy, LLC, Not Reported in Fed. Supp. (2019)

2019 WL 1903990

## Footnotes

1   The Court permitted Plaintiff and Defendant to submit a sur-reply and sur-sur-reply, respectively, but reserved on its decision as to whether it would consider the arguments advanced in that correspondence. (ECF Nos. 68, 69, 70, 71, 72, 73.) The Court hereby grants Plaintiffs and Defendant's Motions to submit a sur-reply and sur-sur-reply. (ECF Nos. 71, 72.) Further, the Court acknowledges receipt of the notices of supplemental authority (ECF Nos. 77, 79), and the responses thereto (ECF Nos. 78, 80).

2   For purposes of the instant motion, the Court accepts all well-pled factual allegations in the Complaint as true. *See* *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).

3   Unless otherwise noted, all references to "Rules" hereinafter refer to Federal Rules of Civil Procedure.

4   Plaintiff's arguments regarding the Administrative Fee lack merit as the Terms of Service provides that fixed rate plan customers will not pay an administrative fee, and Plaintiff does not allege that she paid an administrative fee during the time she was enrolled in the fixed rate plan. (SAC, Ex. 1; *see also* SAC ¶ 39 (stating Plaintiff began paying an administrative fee after switching to the Variable Rate Plan).)

5   The Court acknowledges that "[c]ourts are divided on the question of the appropriate standard of review for pre-discovery motions to strike class allegations ...." *Bell v. Cheswick Generating Station*, No. 12-929, 2015 WL 401443, at *3 (W.D. Pa. Jan. 28, 2015) (collecting cases). Here, the Court finds Defendant's motion premature, and therefore, does not reach the issue.

6   The Court further finds Defendant's standing argument unpersuasive. *See, e.g.*, *Langan v. Johnson & Johnson Consumer Cos.*, 897 F.3d 88, 96 (2d Cir. 2018) ("[W]hether a plaintiff can bring a class action under the state laws of multiple states is a question of predominance under Rule 23(b)(3), not a question of standing ....").

---

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 30

2017 WL 4407930
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey,
Camden Vicinage.

Michael SICH and Ellen
Bitterlich, his wife, Plaintiffs,
v.
PFIZER PHARMACEUTICAL, Pfizer
Incorporated, et al., Defendants.

Civil No. 1:17-cv-02828 (RBK/KMW)
|
Signed 10/04/2017

**Attorneys and Law Firms**

Mark J. Molz, Hainesport, NJ, for Plaintiffs.

Rahil Darbar, Stephen C. Matthews, Porzio, Bromberg &
Newman P.C., Morristown, NJ, for Defendants.

**OPINION**

ROBERT B. KUGLER, United States District Judge

 **\*1**  This matter arises upon defendant Pfizer Incorporated's
("Defendant") motion to dismiss plaintiffs Michael Sich and
Ellen Bitterlich's ("Plaintiffs") suit for failure to state a claim
upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).
For the reasons set forth in the opinion below, this motion
is **GRANTED WITHOUT PREJUDICE**, and Plaintiffs are
permitted to submit an amended complaint as to only the
claims arising under the New Jersey Products Liability Act
("PLA") within 14 days.

**I. BACKGROUND**
Plaintiffs allege that Defendant's drug, Dep-Medrol, caused
Mr. Sich severe physical injuries. *See* Compl. at 1. In February
2015, Mr. Sich visited Reconstructive Orthopedics where a
physician's assistant administered an injection of Dep-Medrol
in his left knee. *Id.* Later that month, Mr. Sich returned to
Reconstructive Orthopedics for an appointment with Dr. Scott
Schoifet and received a second injection. *Id.* at 2. Within
hours, Mr. Sich began experiencing symptoms including
elevated temperature, sensitivity, swelling, rashes, and hives.
*Id.* Within a week, Mr. Sich underwent open debridement

and two operations, and required seventeen days of inpatient
treatment. *Id.* Plaintiffs then sued in New Jersey State Court,
but Defendant removed the case on diversity grounds. *See*
Notice of Removal (Doc. No. 1). Mr. Sich alleges that the
"medication supplied by Defendant [ ] was defective" and
caused his injuries. *Id.*

Plaintiffs seek relief under a number of theories. *See* Compl.
First, Plaintiffs allege a design defect, a failure to warn,
and manufacturing defects under the PLA. *Id.*; N.J.S.A.
§ 2A:58C. Second, Plaintiffs allege breach of actual and
implied warranties, negligence, and "other causes of action
allowed by law." Compl. at 4. Finally, Plaintiffs allege loss of
consortium on behalf of Ms. Bitterlich. *Id.* at 5.

**II. STANDARD**
Federal Rule of Civil Procedure 12(b)(6) allows a court to
dismiss an action for failure to state a claim upon which
relief can be granted. When evaluating a motion to dismiss,
"courts accept all factual allegations as true, construe the
complaint in the light most favorable to the plaintiff, and
determine whether, under any reasonable reading of the
complaint, the plaintiff may be entitled to relief." Fowler v.
UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009) (quoting
Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d
Cir. 2008)). In other words, a complaint survives a motion
to dismiss if it contains sufficient factual matter, accepted
as true, to "state a claim to relief that is plausible on its
face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell
Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).

To make this determination, a court conducts a three-part
analysis. Santiago v. Warminster Twp., 629 F.3d 121, 130
(3d Cir. 2010). First, the court must "tak[e] note of the
elements a plaintiff must plead to state a claim." *Id.* (quoting
Iqbal, 556 U.S. at 675). Second, the court should identify
allegations that, "because they are no more than conclusions,
are not entitled to the assumption of truth." Id. at 131
(quoting Iqbal, 556 U.S. at 680). Finally, "where there are
well-pleaded factual allegations, a court should assume their
veracity and then determine whether they plausibly give rise
to an entitlement for relief." *Id.* (quoting Iqbal, 556 U.S.
at 680). This plausibility determination is a "context-specific
task that requires the reviewing court to draw on its judicial
experience and common sense." Iqbal, 556 U.S. at 679. A

2017 WL 4407930

complaint cannot survive where a court can only infer that a claim is merely possible rather than plausible. *Id.*

## III. ANALYSIS

**\*2** *Plaintiffs' Strict Products Liability, Negligence, Breach of Implied Warranty, and Loss of Consortium Claims Are Subsumed by the PLA.*

The PLA is "both expansive and inclusive, encompassing virtually all possible causes of action relating to harms caused by consumer and other products." *In re Lead Paint Litigation*, 924 A.2d 484, 436-37 (N.J. 2007) (citing N.J.S.A. § 2A:58C-1(b)(3) (defining "product liability action")). The statute's reach includes "any claim or action brought by a claimant for harm caused by a product, irrespective of the theory underlying the claim, except actions for harm caused by breach of an express warranty." N.J.S.A. § 2A:58C-1(b) (3).

Here, Plaintiffs allege injuries sustained as a result of Mr. Sich's use of Depo-Medrol. *See* Compl. The PLA, as a result, applies—this is a products liability case. But "negligence, strict liability and implied warranty have been consolidated into a single product liability cause of action" by the PLA. *Clements v. Sanofi-Aventis, U.S. Inc.*, 111 F. Supp. 3d 586, 596 (D.N.J. 2015) ("New Jersey law no longer recognizes breach of implied warranty, negligence, and strict liability as viable separate claims for harms deriving from a defective product."); *Fid. & Guar. Ins. Underwriters, Inc. v. Omega Flex, Inc.*, 936 F. Supp. 2d 441, 446-51 (D.N.J. 2013); *Green v. Gen. Motors Corp.*, 709 A.2d 205, 209 (N.J. Super. 1998). Furthermore, the PLA subsumes loss of consortium claims arising in products liability contexts. *Chester v. Boston Sci. Corp.*, No. CV 16-02421, 2017 WL 751424, at \*4 (D.N.J. Feb. 27, 2017). Therefore, Plaintiffs' strict products liability, negligence, breach of implied warranty, and loss of consortium claims are subsumed by the PLA and must be dismissed as a matter of law.

Because the PLA subsumes these claims, it would be futile to include them in the amended complaint.

*Plaintiffs PLA and Breach of Express Warranty Claims Fail to Meet The* Fed. R. Civ. P. 12(b)(6) *Pleading Standard and Must be Dismissed Without Prejudice With Leave to Amend.*

### A. Design Defect

Under New Jersey law, the plaintiff must show that the "product was defective, that the defect existed when the product left the defendant's control, and that the defect caused injury to a reasonably foreseeable user." *Feldman v. Lederle Labs.*, 97 N.J. 429, 449 (N.J. 1984); *see Donlon v. Gluck Grp., LLC*, No. 09-5379, 2011 WL 6020574, at \*3 (D.N.J. Dec. 2, 2011). The plaintiff must demonstrate that the "product [was] manufactured as intended but the design render[ed] the product unsafe." *Pollander v. Desimone BMW of Mt. Laurel, Ltd.*, No. A-3204-10T3, 2012 WL 127563, at \*3 (N.J. Super. Ct. App. Div. Jan. 18, 2012). Plaintiffs must also provide—pursuant to a risk-utility analysis—an alternative design that is both practical and feasible. *Lewis v. Am. Cyanamid Co.*, 155 N.J. 544, 560-61 (N.J. 1998); *Schraeder v. Demilec (USA) LLC*, No. 12-6074, 2013 WL 5770970, at \*2 (D.N.J. Oct. 22, 2013).

Plaintiffs have failed to reach this bar. Plaintiffs have alleged that as a result of a defect in the product, "including its sterility and/or formulation, Plaintiff Michael Sich was injected with toxic substances and injured." Compl. at 3. That is not enough —Plaintiffs have failed to plead facts that satisfy each of the necessary elements of a design defect claim, they have simply alleged injury.

### B. Failure to Warn

**\*3** A manufacturer is liable for harm caused by a failure to warn if the product does not contain an adequate warning or instruction. N.J.S.A. § 2A:58C-4. A warning is adequate if it is "one that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger and that communicates adequate information on the dangers and safe use of the product." *Id.*; *Banner v. Hoffman-La Roche Inc.*, 891 A.2d 1229, 1236 (N.J. Super. App. Div. 2006) (*cert. denied*, 921 A.2d 447 (N.J. 2007)).

Plaintiffs' allegations fail to meet this standard. Plaintiffs allege that "[a]s a direct and proximate result of" Defendant's failure to warn, "Plaintiff Michael Sich was injected with toxic substances and was injured." Compl. at 3. Plaintiffs offer nothing further, and thus do not reach the requisite plausibility requirement.[1] *Iqbal*, 556 U.S. at 680.

### C. Manufacturing Defect

Sich v. Pfizer Pharmaceutical, Not Reported in Fed. Supp. (2017)
2017 WL 4407930

A manufacturing defect exists if a product "deviated from the design specification, formulae, or performance standards of the manufacturer or from otherwise identical units manufactured to the same manufacturing specifications or formulae." N.J.S.A. § 2A:58C-2(a). A plaintiff must prove "that the product was defective, that the defect existed when the product left the manufacturer's control, and that the defect proximately caused injuries to the plaintiff, [who must be] a reasonably foreseeable or intended user." *McMahon v. Gen. Dynamics Corp.*, 933 F. Supp. 682, 695 (D.N.J. 2013) (citing *Myrlak v. Port Authority of N.Y. and N.J.*, 723 A.2d 45, 52 (N.J. 1999)).

Plaintiffs have alleged that as a "direct and proximate result of ... manufacturing defects including its sterility and/or formulation, Plaintiff Michael Sich was injected with toxic substance and was injured." Compl. at 3. Plaintiffs have not, however, explained how the drug differed from the requisite standard or how it was allegedly defective. This claim thus lacks the factual support that it needs to reach the *Twombly / Iqbal* plausibility standards—conclusory statements are not enough. 550 U.S. at 570; 556 U.S. at 680.

### D. Breach of Express Warranty

An express warranty is an "affirmation of fact or promise made by the seller ... which relates to the goods and becomes part of the basis of the bargain." N.J.S.A. § 12A:2-313(a). Plaintiffs must allege: (1) that Defendant made an affirmation, promise, or description about the product; (2) that this affirmation, promise, or description became part of the basis of the bargain for the product; and (3) that the product ultimately did not conform to the affirmation, promise or description. *Mendez v. Shah*, 28 F. Supp. 3d 282, 294 (D.N.J. 2014); *Fid. & Guar. Ins. Underwriters, Inc.*, 936 F. Supp. 2d at 451.

Plaintiffs have failed to present an affirmation, promise, or description about the product made by Defendant. They have additionally failed to allege how this missing affirmation, promise, or description became a part of the basis of the bargain for the product, nor how the product ultimately did not conform to that affirmation, promise, or description. As such, the breach of express warranty claim constitutes a categorical allegation and nothing more. *Iqbal*, 556 U.S. at 678.

### IV. CONCLUSION

**\*4** Because the complaint as pleaded does not present facts, accepted as true, that give rise to any plausible entitlement to relief, Defendant's motion to dismiss is **GRANTED WITHOUT PREJUDICE** and Plaintiffs are permitted 14 days to submit an amended complaint correcting the deficiencies noted above.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 4407930

---

### Footnotes

1    Because Plaintiffs have not alleged or pleaded *any* facts related to the warning label, this Court does not reach the questions of (1) whether the learned intermediary doctrine applies and if Mr. Sich's healthcare provider was adequately warned of any relevant dangers; and (2) whether the warning label is protected by the rebuttable presumption of adequacy afforded to FDA-approved prescription medication under the PLA. N.J.S.A. § 2A:58C-4.

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 31

2014 WL 4472605
Only the Westlaw citation is currently available.
United States District Court,
M.D. Alabama,
Southern Division.

Charles Byron STINSON, on behalf of himself
and a class of others similarly situated, Plaintiff,
v.

TWIN PINES COAL CO., INC., and The
American Coal Company, Defendants.

No. 1:14–CV–334–WKW[WO].
|
Signed Sept. 11, 2014.

**Attorneys and Law Firms**

Joseph Holland Aughtman, The Aughtman Law Firm,
Montgomery, AL, Joseph Daniel Talmadge, Jr., Morris Cary
Andrews Talmadge Jones & Driggers LLC, Dothan, AL, for
Plaintiff.

Edward Reed Jackson, Jackson Fikes Hood & Brakefield,
Jasper, AL, Hunter Spence Morano, Jeffrey Edwin Friedman,
Friedman Dazzio Zulanas & Bowling PC, Birmingham, AL,
Brian E. Pumphrey, McGuire Woods LLP, Richmond, VA,
Leonard J. Marsico, McGuirewoods, LLP, Pittsburgh, PA,
Marion Dale Marsh, Marsh & Cotter LLP, Enterprise, AL, for
Defendants.

### *MEMORANDUM OPINION AND ORDER*

W. KEITH WATKINS, Chief Judge.

**\*1** Before the court are Defendant The American Coal
Co.'s ("AMCOAL") motion to dismiss pursuant to Federal
Rule of Civil Procedure 12(b)(6) and Plaintiff Charles
Bryon Stinson's motion to exclude the exhibits attached to
AMCOAL's motion. (Docs.# 9, 18.) In this diversity, putative-
class action, Mr. Stinson has sued AMCOAL for breach of
contract. AMCOAL contends that Mr. Stinson cannot recover
on behalf of himself or a putative class because he is neither a
party to that contract nor an intended third-party beneficiary.
The motions have been fully briefed. (Docs.# 10, 13, 17, 18,
22, 25.) Based upon careful consideration of the arguments
of counsel and the relevant law, the court finds that Mr.
Stinson does not have standing to sue AMCOAL for breach

of contract because he lacks a legally protected interest in
that contract. Because the court does not have the power
to entertain this action, dismissal is required under Federal
Rule of Civil Procedure 12(b)(1). [1] In light of the Rule 12(b)
(1) dismissal AMCOAL's Rule 12(b)(6) motion is due to be
denied as moot. Additionally, Mr. Stinson's motion to exclude
(Doc. # 18) is due to be denied.

### I. JURISDICTION AND VENUE

Subject-matter jurisdiction is proper pursuant to 28 U.S.C.
§ 1441 and the Class Action Fairness Act, codified in part at
28 U.S.C. §§ 1332(d) and 1453. Personal jurisdiction
and venue are not contested.

### II. STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Civil Procedure
12(b)(1) challenges the court's subject matter jurisdiction.
*McElmurray v. Consol. Gov't of Augusta–Richmond Cnty.,*
*501 F.3d 1244, 1251 (11th Cir.2007).* On a Rule 12(b)(1)
facial attack, the court evaluates whether the plaintiff "has
sufficiently alleged a basis of subject matter jurisdiction"
in the complaint and employs standards similar to those
governing Rule 12(b)(6) review. *Houston v. Marod*
*Supermarkets, Inc., 733 F.3d 1323, 1335 (11th Cir.2013).*

When evaluating a motion to dismiss pursuant to Federal
Rule of Civil Procedure 12(b)(6), the court must take the
facts alleged in the complaint as true and construe them in
the light most favorable to the plaintiff. *Resnick v. AvMed,*
*Inc., 693 F.3d 1317, 1321–22 (11th Cir.2012).* To survive
Rule 12(b)(6) scrutiny, "a complaint must contain sufficient
factual matter, accepted as true, to 'state a claim to relief
that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S.
662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550
U.S. 544, 570 (2007)). "[F]acial plausibility" exists "when
the plaintiff pleads factual content that allows the court to
draw the reasonable inference that the defendant is liable for
the misconduct alleged." *Id.* (citing *Twombly,* 550 U.S. at
556).

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 366 of 410
PageID: 12973
Stinson v. Twin Pines Coal Co., Inc., Not Reported in F.Supp.3d (2014)
2014 WL 4472605

In contrast to a facial attack on subject matter jurisdiction, a Rule 12(b)(1) factual attack "challenge[s] the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered." *Lawrence v. Dunbar,* 919 F.2d 1525, 1529 (11th Cir.1990) (internal quotation marks omitted). When the attack is factual, "the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Id.* Therefore, "no presumptive truthfulness attaches to [the] plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Id.*

**\*2** For the reasons discussed in Part IV.A., the Rule 12(b)(1) analysis takes the form of a facial challenge. That challenge also properly includes consideration of the contract at issue, which is appended to AMCOAL's motion to dismiss.

### III. BACKGROUND

The facts essential to resolution of the motion to dismiss, construed in Mr. Stinson's favor, are as follows. Beginning in September 2008, Mr. Stinson received high electric bills for properties he owns in Southeast Alabama. Mr. Stinson blames the increased costs on rate hikes he says resulted from the failure of coal suppliers, including AMCOAL, to abide by their contracts for coal deliveries to PowerSouth Energy Cooperative ("PowerSouth") for electric power generation.

PowerSouth is a "non-profit power generation and transmission cooperative" that sells wholesale power to its member retail electric distribution cooperatives. (Am.Compl.¶ 3.) Hence, "PowerSouth generates power[,] and its member cooperatives distribute that power." (Am.Compl.¶ 5.) Covington Electric Cooperative, Inc. ("CEC"), and South Alabama Electric Cooperative ("SAEC"), as member cooperatives, purchase electricity from PowerSouth. (Am.Compl.¶ 9.) CEC and SAEC are "non-profit member-owned[,] retail electric distribution cooperatives" that serve rural communities in south Alabama, including the communities (Enterprise and Glenwood) where Mr. Stinson owns three parcels of property. (Am.Compl.¶¶ 2, 4.) Mr. Stinson purchases power from CEC and SAEC to service these properties and, thus, is a member of both CEC and SAEC.

Mr. Stinson alleges that, at some point between January 2008 and July 30, 2008, AMCOAL breached a coal supply agreement dated November 1, 2003 ("the Agreement"), between it and PowerSouth by failing to supply coal to PowerSouth in accordance with the Agreement's terms. (Am.Compl.¶¶ 7–8.)

AMCOAL's breach of the Agreement "resulted in PowerSouth paying a higher price to other suppliers of coal in order to keep its power plant in production." (Am.Compl.¶ 9.) PowerSouth passed those increased costs to its retail electric distribution cooperatives, including CEC and SAEC, which in turn passed the costs to their own members, including Mr. Stinson, in the form of a 30–percent rate increase, beginning in approximately September 2008.

Mr. Stinson originally filed this action in the Circuit Court of Coffee County, Alabama, on April 30, 2013, against four fictitious Defendants, described as "those persons or entities who or which failed or refused to provide coal in accordance with their contracts with PowerSouth...." (Compl.¶ 7.) On April 7, 2014, Mr. Stinson amended his Complaint to substitute AMCOAL and Twin Pines Coal Co., Inc. ("Twin Pines"), for "Fictitious Defendant A" and "Fictitious Defendant B." [2] In the Amended Complaint, Mr. Stinson asserts claims for breach of contract against AMCOAL and Twin Pines on behalf of himself and "[a]ll individual persons in the State of Alabama who were members of cooperatives that were members of PowerSouth and who paid those cooperatives for power from July 30, 2008 to present." (Am.Compl.¶ 14.) Mr. Stinson asserts that he and the putative class "were the intended and direct third party beneficiaries" of the Agreement and incurred damages as a result of AMCOAL's breach. (Am.Compl.¶¶ 6, 10.)

**\*3** AMCOAL timely removed this action to federal court as one arising under the court's original diversity jurisdiction under CAFA and 28 U.S.C. § 1441, and filed the pending Rule 12(b)(6) motion to dismiss. In support of its motion to dismiss, AMCOAL submitted as exhibits the Agreement and its subsequent amendments. Mr. Stinson opposes the motion to dismiss on the merits and moves to exclude the exhibits from consideration.

### IV. DISCUSSION

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 367 of 410
PageID: 12974
Stinson v. Twin Pines Coal Co., Inc., Not Reported in F.Supp.3d (2014)
2014 WL 4472605

### A. *Mr. Stinson's Motion to Exclude Consideration of Extrinsic Documents*

Mr. Stinson argues that discovery may reveal that the Agreement and the subsequent amendments to the Agreement, which are attached to AMCOAL's motion to dismiss, are not authenticate, and, thus, the documents are not proper for consideration on a motion to dismiss. AMCOAL responds that "the Agreement need not be verified or authenticated under these circumstances," as Mr. Stinson "has no basis upon which to dispute the authenticity or completeness of the Agreement." (Doc. # 22, at 6.) Moreover, AMCOAL has submitted an affidavit from one of the signatories to the Agreement who attests that the Agreement and its amendments are in fact "true and correct ." (B.J. Cornelius's Aff. at 1–2 (Doc. # 22–2).)

Although Mr. Stinson makes his arguments in Rule 12(b)(6) terminology, his arguments also are relevant to whether the Rule 12(b)(1) motion should be treated as a facial or factual attack. A Rule 12(b)(1) facial-attack mimics a Rule 12(b)(6) challenge, *see* Houston, 733 F.3d at 1335, and under the Rule 12(b)(6) rubric, a "district court may consider an extrinsic document if it is (1) central to the plaintiff's claim, and (2) its authenticity is not challenged."[3] *SFM Holdings, Ltd. v. Banc of Am. Sec., LLC,* 600 F.3d 1334, 1337 (11th Cir.2010). Another district court has succinctly explained that "[t]he clearest cases for admitting extrinsic documents on a motion to dismiss are those where the plaintiff's complaint alleges a breach of contract or some other contract-related claim, and the plaintiff does not attach the contract to the complaint." *ABN AMRO, Inc. v. Capital Int'l Ltd.,* No. 04cv3123, 2007 WL 845046, at *6 (N.D.Ill. Mar. 16, 2007). "In such cases, defendants are allowed to attach the contract to their motion to dismiss, and the court is allowed to consider it as part of the pleadings." *Id.* Moreover, "a plaintiff cannot defeat consideration of a[n] integral document on a motion to dismiss unless it can offer a factual basis questioning its authenticity." *Oshinsky v. N.Y. Football Giants, Inc.,* No. 09cv1186, 2009 WL 4120237, at * 3 (D.N.J. Nov. 17, 2009).

The two requirements for permitting consideration of extrinsic documents on Rule 12(b)(6) review are met and, thus, are appropriate for consideration on Rule 12(b)(1) review. First, although Mr. Stinson did not attach the Agreement to the Complaint or the Amended Complaint, he does not dispute that the Agreement is "central" to his breach-of-contract claim. *See* SFM Holdings, 600 F.3d at 1337. Indeed, the Agreement is at the heart of Mr. Stinson's claim against AMCOAL, for the claim is that AMCOAL breached the Agreement between it and PowerSouth by failing to supply coal to PowerSouth in accordance with the Agreement's terms and that Mr. Stinson is a third-party beneficiary to that Agreement. (Am.Compl.¶ 7.) Second, AMCOAL submits an affidavit authenticating the Agreement and its amendments. Mr. Stinson offers no factual basis for questioning the documents' authenticity, and his assertion that perhaps discovery will show that documents are not authentic is insufficient to prevent the court from considering the Agreement.

**\*4** Accordingly, for purposes of AMCOAL's motion to dismiss, the Agreement and its amendments are presumed authentic and properly are part of the Rule 12(b)(1) analysis. Mr. Stinson's motion to exclude is due to be denied.

### B. *AMCOAL's Motion to Dismiss*

AMCOAL briefs the issue of Mr. Stinson's status as a third party beneficiary as a challenge to the sufficiency of the Amended Complaint's allegations to state the elements of a breach-of-contract claim pursuant to Rule 12(b)(6); however, at the same time, it argues that Mr. Stinson "has no standing to sue AMCOAL for breach of contract" as he is not a third-party beneficiary to the contract. (Doc. # 10, at 2.) For its standing argument, AMCOAL relies upon Alabama case law providing that "[a] third person has no rights under a contract between others," and "no standing to enforce" the contract, "unless the contracting parties intend that the third person receive a direct benefit enforceable in court." *Russell v. Birmingham Oxygen Serv., Inc.,* 408 So.2d 90, 93 (A la.1981).

"Where, as here, jurisdiction is predicated on diversity of citizenship, a plaintiff must have standing under both Article III of the Constitution and applicable state law in order to maintain a cause of action." *Mid–Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.,* 418 F.3d 168, 173 (2d Cir.2005); *see also* *Avenue CLO Fund Ltd. v. Bank of Am., NA,* 709 F.3d 1072, 1077 (11th Cir.2013) (citing Mid–Hudson for the aforementioned principle). AMCOAL raises a potential problem with respect to state-law standing, although it focuses the bulk of its argument on Rule 12(b)(6) pleadings deficiencies rather than on justiciability concerns. And, although AMCOAL does not mention Article III standing, this court is obliged to address it. *See* Bochese v. Town

*of Ponce Inlet,* 405 F.3d 964, 968 (11th Cir.2005). For the reasons that follow, Mr. Stinson fails to demonstrate that he has standing to sue AMCOAL for breach of contract.

To establish standing for Article III purposes, Mr. Stinson must show, among other things, that he has a "legally protected interest" in the Agreement that AMCOAL injured. *See id.* at 980. In this diversity, breach-of-contract action, the standing analysis converges under Article III and state law because "[t] he question of whether, for [Article III] standing purposes, a non-party to a contract has a legally enforceable right therein is a matter of state law." *Id.* at 981. In other words, the court looks to Alabama law to determine if Mr. Stinson has a legally protected interest in the Agreement that allows him to sue AMCOAL.

Under Alabama law, "one who seeks recovery in contract as a third-party beneficiary must establish that the contract was intended for his direct, as opposed to incidental, benefit." *Zeigler v. Blount Bros. Constr. Co.,* 364 So.2d 1163, 1166 (Ala .1978). Conversely, "[i]f the benefit to the third person is not intended to be a direct benefit, but rather to be merely an incidental benefit, the third person will not be entitled to damages based on a breach of that contract." *Collins Co. v. City of Decatur,* 533 So.2d 1127, 1132 (Ala.1988). "[T]o ascertain the intent of the parties, [the court] must first look to the contract itself, because while the intention of the parties controls in construing a written contract, the intention of the parties is to be derived from the contract itself where the language is plain and unambiguous." *Locke v. Ozark City Bd. of Educ.,* 910 So.2d 1247, 1251 (Ala.2005) (citation, internal quotation marks, and alterations omitted). "The court's inquiry may stop when it determines from the face of the contract that the parties did not intend to confer upon the third person a direct benefit." *Custer v. Homeside Lending, Inc.,* 858 So.2d 233, 249 (Ala.2003). "It is only where a contract provision is found to be ambiguous that it may become necessary to consider the surrounding circumstances and the construction the parties gave the language in order to determine the intent of the contracting parties." *H.R.H. Metals, Inc. v. Miller,* 833 So.2d 18, 24 (Ala.2002); *see also Collins Co.,* 533 So.2d at 1132 ("[C]ourts must look to the surrounding circumstances of the transaction only when the contract is unclear as to whether the contracting parties intentionally conferred upon a third person a direct benefit.").

**\*5** AMCOAL contends that the Agreement is plain that it does not provide a direct benefit to Mr. Stinson, as an electricity consumer, but rather "*directly* benefit[s] PowerSouth alone." (Doc. # 10, at 7.) AMCOAL argues that this case "is exactly like" *Zeigler.* (Doc. # 10, at 7 (citing *Zeigler,* 364 So.2d at 1163).) In *Zeigler,* customers of Alabama Power Company ("APCO"), who incurred higher bills for electricity after APCO's dam collapsed, sued APCO and its contractors for breach of contract, alleging that proper construction of the dam would have resulted in lower electricity bills for APCO's customers. The customers sought recovery under the theory that they were third-party beneficiaries of APCO's contracts for the construction of the dam. *See Zeigler,* 364 So.2d at 1164–65. The Supreme Court of Alabama affirmed the judgment dismissing the third-party beneficiary, breach-of-contract claim. *See id.* at 1168.

As to the contracts themselves, the Supreme Court of Alabama observed that the contracts made "[n]o reference ... to any third parties," and nothing contained in the[ ] contracts ... suggest[ed] that in their making [APCO] was directly concerned with the amount of money subscribers for electrical power would be charged each month." *Id.* at 1166. Rather, "[p]erformance of the contracts would, and did, result in an enhancement of APCO's real and riparian property holdings, to the direct benefit of the corporation itself." *Id.* The Supreme Court of Alabama concluded that, "[a]t best, ... the plaintiffs are not direct, but only incidental beneficiaries who claim the loss of an economic benefit based upon the alleged failure of a promised performance by a party contractually bound to another." *Id.* The court explained that

> while it might be necessary for
> APCO to construct dams (or to
> purchase a multitude of other services)
> in order to establish or maintain
> a hydroelectric network so that its
> utility business might serve members
> of the plaintiffs class, nevertheless
> the existence of those contracts does
> not Ipso facto make all subsequent
> purchasers of the end product the
> direct beneficiaries of the promised
> performances simply because they

have an ultimate economic interest in those performances.

*Id.* at 1167.

On the other hand, Mr. Stinson contends that this case is more analogous to 📖 *Harris v. Board of Water and Sewer Commissioners of City of Mobile,* 320 So.2d 624 (Ala.1975), and 📖 *Davidson v. Marshall–DeKalb Electric Co-operative,* 495 So.2d 1058 (Ala.1986). In *Harris,* a fire ignited at the plaintiff's motel and restaurant. The fire department responded, but the closest hydrants were dry. With no water to extinguish the fire, the motel and restaurant burned completely. The plaintiff sued the Board of Water and Sewer Commissioners of Mobile which had contracted with the City of Mobile "to provide fire hydrants and to maintain an adequate supply of water for the proper functioning of those hydrants." 📖 320 So.2d at 626. The Supreme Court of Alabama held that the plaintiff could maintain his breach-of-contract claim against the board under a third-party-beneficiary theory:

> **\*6** In our present situation, how can it be said that [the plaintiff] is not the very party for whose benefit the contract was made? We agree that the City itself enjoys some degree of direct benefit from their contract with the Board since its own property is protected. But, in the end, the most direct benefit inures to the people of the City, like [the plaintiff], who rely on these city-provided services for the protection of their property. This is not to say that the Board is an insurer against all fire losses, but it should be answerable to all those who are injured by its breach of the contract to supply water or its negligent maintenance of nonfunctioning fire hydrants where damage results proximately therefrom. We find that the facts alleged are sufficient to show that benefits of the contract in question flow to [the plaintiff], and thus make him a third-

party beneficiary entitled to sue on the contract for its breach.

📖 *Id.* at 628.

In *Davidson,* the plaintiffs, owners of a mobile home park, received electric power from a non-profit electric cooperative. The plaintiffs sued the cooperative, alleging that its change in billing practices, which made the owners responsible for the electric bills of the park's tenants, breached the contract between the cooperative and the Tennessee Valley Authority ("TVA"). The Alabama Supreme Court held that the plaintiffs were intended third-party beneficiaries of the cooperative's contract with the TVA based upon an express clause in the contract stating that the cooperative's "operation of an electric system and TVA's wholesale service thereto are for the benefit of the consumers of electricity." 📖 495 So.2d at 1060 (emphasis omitted).

After careful consideration of the authorities relied upon by the parties, the court finds that this case is more comparable to *Zeigler* than it is to *Harris* and *Davidson.* The Agreement governs PowerSouth's purchase of coal from AMCOAL. It is, as the title designates, a "Coal Supply Agreement." The Agreement sets out the terms for the sale and shipment of coal and specifies the requirements in terms of the quantity, price, and quality of the coal. There is no provision in the Agreement that refers to a third party whom PowerSouth and AMCOAL intended to benefit directly from PowerSouth's acquisition of coal. In fact, the Agreement mentions neither PowerSouth's power-generation operations nor its relationship with its retail electric distribution cooperatives nor the ultimate consumers of the electricity.

There was the potential, of course, that a breach of the Agreement by AMCOAL would force PowerSouth to have to pay a higher price for its coal from another supplier and that down the line—after PowerSouth used the coal to carry out its power-generation operations and provided that power to its member retail electric distribution cooperatives—the breach could result in increased electricity bills for consumers. But this potential adverse economic effect on the end user is too far downstream to infer from this Agreement that AMCOAL and PowerSouth entered into a coal-supply agreement with the intention that Mr. Stinson and other electricity consumers benefit directly from that Agreement. The Agreement is plain—through its omission of any reference to third parties, much

less to electricity consumers—that it was not formed for the direct benefit of Mr. Stinson. Rather, at best, Mr. Stinson and his proposed class of Plaintiffs are "only incidental beneficiaries who claim the loss of an economic benefit based upon the alleged failure of a promised performance by a party contractually bound to another." *Zeigler,* 364 So.2d at 1166. Mr. Stinson is not, therefore, an intended third-party beneficiary to the Agreement.

**\*7**  Mr. Stinson argues that *Harris* should control the outcome, not *Zeigler,* but *Harris* is distinguishable. In *Harris,* the plaintiffs directly received the services the board provided pursuant to its contract with the City of Mobile. Namely, the board's agreement to keep the city's hydrants supplied with water provided the direct benefit of fire protection for the plaintiffs, who were city business owners. Here, the Agreement was for the sale of coal, and PowerSouth received the direct benefit by the purchase of this natural resource, as the coal allowed PowerSouth to carry out its power-generation operations. The benefit that accrued to Mr. Stinson was not direct. It did not accrue until after PowerSouth used the coal to generate electric power and sold that power to its member retail electric distribution cooperatives, which then re-sold the power to Mr. Stinson. In other words, before Mr. Stinson could benefit from the Agreement, the natural resource PowerSouth purchased from AMCOAL had to be converted into electricity and then sold twice, first to CEC and SAEC, and then finally to Mr. Stinson. At best, Mr. Stinson was a remote, indirect user of a twice-sold, converted natural resource.

Mr. Stinson also argues that *Zeigler's* analysis is inapposite because A PCO is a for-profit organization and PowerSouth is a non-profit organization. Mr. Stinson emphasizes that for-profit organizations "are allowed to act in self-interest and reap the financial benefit of their contracts, but non-profit cooperatives are not." (Doc. # 17, at 10.) Hence, according to Mr. Stinson, "[a]ny benefit flowing to PowerSouth from a contract was automatically a benefit to the ultimate consumer of its electricity." (Doc. # 17, at 10.) AMCOAL counters that to accept Mr. Stinson's premise would be to "transform him and every other member of a cooperative into an intended third-party beneficiary to each and every contract entered into by that cooperative." (Doc. #25, at 4.) AMCOAL also points out that, although AMCOAL does not seek "entrepreneurial profit," it still must generate sufficient revenue to compensate employees and construct infrastructure and, in this regard, Mr. Stinson "mischaracterizes an electrical cooperative

purpose." (Doc. # 25, at 4.) AMCOAL has the better argument.

It is recognized that Alabama law distinguishes between non-profit and profit corporations in their formation, purposes, and governance, but the authorities on third-party beneficiaries upon which the parties rely also consistently reinforce that the intent of the parties "derive[s] from the contract itself where the language is plain and unambiguous." *Locke,* 910 So.2d at 1251. For example, the *Davidson* case cited by Mr. Stinson involved, as here, a non-profit electric cooperative, but *Davidson* is distinguishable because the contract between the electric cooperative and the TVA included express, plain, and unambiguous language that the parties had entered into the contract "for the benefit of the consumers of electricity." *Davidson,* 495 So.2d at 1060; *see also* *H.R.H. Metals, Inc.,* 833 So.2d at 25 (holding that an injured subcontractor was a third-party beneficiary to the general contractor's building contract because it expressly provided that the general contractor was to "maintain its own safety and health program for its employees, subcontractors, and agents *sufficient to prevent injury or illness to such persons resulting from their presence on the Vulcan premises* "). There is no such express language in the Agreement at issue here. The Agreement does not reference third parties, does not include an express declaration that it intended to benefit third parties, and does not provide any third party a right to sue to enforce the coal-supply contract. The non-profit/profit distinction between A PCO and PowerSouth does not compel a different conclusion than the one reached in *Zeigler* because it is plain that the Agreement confers no right upon Mr. Stinson to sue on the Agreement between AMCOAL and PowerSouth.

**\*8**  Finally, Mr. Stinson argues that the intent of the contracting parties cannot be discerned from the Agreement alone because the Agreement "does not clearly and unambiguously preclude the possibility of a third party beneficiary." (Doc. # 17, at 6.) He cites no authority for his argument, however, and support for his argument does not emanate from *Zeigler,* where, as here, the contracts were silent as to third parties. In *Zeigler,* it was the fact that the contracts clearly did not mention third parties that was decisive. *See* 364 So.2d at 1166. *Zeigler* did not require that a contract include affirmative language rejecting a third party from claiming a beneficiary status.

In short, no provision in the Agreement creates an ambiguity as to whether AMCOAL or PowerSouth intended electrical

power consumers, like Mr. Stinson, to be direct beneficiaries of the Agreement. And, as stated, under Alabama law, "[i]t is only where a contract provision is found to be ambiguous that it may become necessary to consider the surrounding circumstances and the construction the parties gave the language in order to determine the intent of the contracting parties." *H.R.H. Metals,* 833 So.2d at 24. Accordingly, the court need not look to the surrounding circumstances to ascertain intent. Based upon the plain and unambiguous terms of the Agreement, Mr. Stinson is not a third party beneficiary to the Agreement.

Because Mr. Stinson is not an intended, third-party beneficiary to the Agreement, he does not have a legally protected interest in the Agreement. He lacks standing, therefore, to bring a breach-of-contract action against AMCOAL—in an individual or representative capacity—

under both Article III of the U.S. Constitution and state law. Accordingly, Rule 12(b)(1) dismissal is required. [4]

## V. CONCLUSION

For the foregoing reasons, it is ORDERED that Mr. Stinson's action against AMCOAL is DISMISSED with prejudice pursuant to Rule 12(b)(1) for lack of subject-matter jurisdiction, that Mr. Stinson's motion to exclude (Doc. # 18) is DENIED, and that AMCOAL's Rule 12(b)(6) motion to dismiss (Doc. # 9) is DENIED as moot. This lawsuit proceeds as to Mr. Stinson's action against Twin Pines Coal Co., Inc.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4472605

---

## Footnotes

1    Although AMCOAL urges dismissal under Rule 12(b)(6), the arguments for and against dismissal are closely akin to the standing inquiry, and, thus, the arguments are helpful to the Rule 12(b)(1) analysis.

2    The Amended Complaint also names Fictitious Defendants C and D. "As a general matter, fictitious-party pleading is not permitted in federal court." *Richardson v. Johnson,* 598 F.3d 734, 738 (11th Cir.2010) (citing *New v. Sports & Recreation, Inc.,* 114 F.3d 1092, 1094 n. 1 (11th Cir.1997)). No demonstration has been made that an exception to the general rule applies in this case. The fictitious-party claims are not properly before the court and are disregarded.

3    No reason can be discerned why resolution of a Rule 12(b)(1) facial attack should not include consideration of extrinsic documents in the same manner permitted under Rule 12(b)(6).

4    Even if it is assumed that Mr. Stinson has standing, the Amended Complaint would be subject to dismissal for failure to state a claim pursuant to Rule 12(b)(6).

---

End of Document                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 32

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 373 of 410
PageID: 12980
Theodore v. Newark Department of Health and Community Wellness, Slip Copy (2020)

2020 WL 1444919

KeyCite Yellow Flag - Negative Treatment
On Reconsideration Theodore v. Newark Department of Health and Community Wellness, D.N.J., April 16, 2020

2020 WL 1444919
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

Gessy M. THEODORE, Plaintiff,

v.

NEWARK DEPARTMENT OF HEALTH AND
COMMUNITY WELLNESS, et al., Defendants.

19-cv-17726
|
Signed 03/25/2020

**Attorneys and Law Firms**

Louis Joseph Johnson, Jr., the Law Office of Louis J. Johnson Jr., L.L.C., Hoboken, NJ, for Plaintiff.

Charles R.G. Simmons, Rainone Coughlin Minchello, LLC, Iselin, NJ, for Defendants Newark Department of Health and Community Wellness, Mark Wade, Michael Wilson.

Albert James Leonardo, Zazzali, Fagella, Nowak, Kleinbaum & Friedman, Newark, NJ, for Defendant American Federation of State, County, and Municipal Employees, Council 52, AFL-CIO Local 2299.

**OPINION**

WILLIAM J. MARTINI, U.S.D.J.:

*1 Plaintiff Gessy M. Theodore ("Plaintiff") brings this action against Defendants Newark Department of Health and Community Wellness ("NDH"), Mark Wade, Michael Wilson (collectively, "City Defendants"), and the American Federation of State, County, and Municipal Employees, Council 52, AFL-CIO Local 2299 ("Union" and collectively, "Defendants") for discriminatory treatment and retaliation. The matter comes before the Court on the Defendants Union and NDH's motions to dismiss pursuant to FRCP 12(b)(6). ECF Nos. 4 (Union Motion) 9 (City Defendants Motion). For the reasons set forth below, the motions are **GRANTED IN PART** and **DENIED IN PART**.

**I. BACKGROUND**

Plaintiff is a 62-year-old woman of Haitian decent. Compl. ¶¶ 15, ECF No. 1. She has worked at NDH since 1997. Id. Plaintiff alleges that her direct supervisor, Defendant Wilson, has overseen a campaign of discrimination against her due to her age and national origin, preferring African-American employees. Id. ¶¶ 18-19. Since November 9, 2016, Plaintiff alleges she took a series of steps to rectify certain instances of discrimination, including a request for a grievance to be filed, a letter to the then-director of NDH, and a meeting with Defendant Wade, the director of NDH. Id. ¶¶ 11, 20-24. As a result, Plaintiff alleges, Defendants took a series of steps to retaliate against her, including: a refusal to entertain Plaintiff's application for an Assistant Chief Inspector position in late 2016 and a pretextual demand to see Plaintiff's license in December 2016. Id. ¶¶ 25-27. Plaintiff further alleges Defendant Wilson: "improperly dominated Defendant Union in a manner that preventer [her] from challenging disciplinary actions [and] receiving money under a settlement agreement reached between the City of Newark and 8 inspectors." Id. ¶ 28. Further, Wilson's influence allegedly "interfered with [Plaintiff's] ability to vote in [U]nion elections [and] caused her to be expelled from" the Union. Id.

Citing various documents attached to the Complaint, Plaintiff next alleges "Defendants" denied her requests to take continuing education classes and caused customers to believe she no longer works for NDH. Id. ¶¶ 30, 34. Further, Wilson allegedly plotted to call Plaintiff to various meetings without adequate notice. Id. ¶¶ 31-32. In May 2018, Wilson terminated Plaintiff from NDH, purportedly for failing to attend a December 2017 meeting. Id. ¶ 33. The termination was later downgraded to a suspension. Id. Finally, "Defendants continue to impose daily and hostile conditions upon Plaintiff's employment because of her age, race, ethnicity, and national origin," including name calling, imposing responsibility for others' errors, and "inequal pay and opportunity." Id. ¶ 35.

On November 28, 2018, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII"). Compl. ¶ 4, Ex. A. The EEOC determined that NDH "failed to exercise its right to rebut Plaintiff's allegations," and thus issued a right to sue notice on June 17, 2019. Id. ¶¶ 6-7, Ex. B. Accordingly, Plaintiff filed an eight-count complaint: alleging:

| Count | Claim |
|-------|-------|
| Count 1 | Age Discrimination (Disparate Treatment) in Violation of the Age Discrimination in Employment Act ("ADEA") |
| Count 2 | National Origin Discrimination in Violation of 42 U.S.C. § 1981 ("§ 1981"). |
| Count 3 | Retaliation in Violation of § 1981 |
| Count 4 | Race, Ethnicity, and National Origin Discrimination in Violation of Title VII |
| Count 5 | Retaliation in Violation of Title VII |
| Count 6 | Race, Ethnicity, National Origin, and Age Discrimination (Disparate Treatment) in Violation of the New Jersey Law Against Discrimination ("LAD") |
| Count 7 | Retaliation in Violation of LAD |
| Count 8 | Retaliation in Violation of § 1981 |

## II. STANDARD OF REVIEW

A complaint survives a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss if the Plaintiff states a claim for relief that is "plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007). The movant bears the burden of showing that no claim has been stated. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). Courts accept all factual allegations as true and draw "all inferences from the facts alleged in the light most favorable" to plaintiffs. *Phillips v. County of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). But courts do not accept "legal conclusions" as true and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).[1]

## III. DISCUSSION

### A. Count One: Age Discrimination in Violation of the ADEA

In Count One, Plaintiff accuses Defendants of violating the ADEA by refusing to promote her to Assistant Chief Inspector in late 2016, despite her qualification, due to unfounded assumptions regarding older workers' commitment and ability. Compl. ¶¶ 26, 38. Under the ADEA, it is "unlawful for an employer to ... discriminate against any individual ... because of such individual's age." 29 U.S.C. § 623(a)(1). But a "complaint under the ADEA will be dismissed for failure to exhaust administrative remedies if a supporting EEOC charge was not filed within ... 300 days ... of notification to the employee of the adverse employment action." *Ruehl v. Viacom, Inc.*, 500 F.3d 375, 382 (3d Cir. 2007).

Here, Plaintiff filed her EEOC charge on November 28, 2018. *See* Compl. Ex. A ("EEOC Charge"). November 2018 is significantly more than 300 days after "late 2016." Compl. ¶ 26. Accordingly, Plaintiff's EEOC charge was untimely

and the Count One is **DISMISSED**. Dismissal is **WITH PREJUDICE**, as Plaintiff cannot cure her failure to file an administrative charge within 300 days of the incident at issue in Count One.

### B. Counts Two, Three, and Eight: National Origin Discrimination and Retaliation in Violation of Section 1981

In Count Two, Plaintiff alleges liability under 42 U.S.C. § 1981 for discriminating against her as an immigrant of Haitian origin. Section 1981 prohibits discrimination on the basis of race, not solely on the basis of national origin. *See Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987). Other than a blanket allegation that Defendant Wilson preferred African Americans to her, due to her Haitian origin, Compl. ¶ 19, Plaintiff does not specify *which* Defendant is accused of violating the statute in *what* manner. *See* Compl. ¶¶ 42-46 (referring to "Defendants" and "conduct described above" without further specification). Counts Three and Eight similarly regurgitate the elements of a retaliation claim against "Defendants" without specifying race-based (as opposed to national-origin based) conduct. *Id.* ¶¶ 48-51, 71-75.[2]

#### 1. City Defendants' Motion

**\*3** The City Defendants argue that as government actors, NDH and Dr. Wade cannot be liable under Section 1981, only Section 1983. City Motion at 14-15 (citing *McGovern v. City of Philadelphia*, 554 F.3d 114 (3d Cir. 2009)). Plaintiff consents to dismissal of Counts Two, Three, and Eight against Dr. Wade and NDH without prejudice, so that they can be realleged under Section 1983. City Opp. at 14, ECF No. 14. Accordingly, Counts Two, Three, and Eight are **DISMISSED WITHOUT PREJUDICE** as to Defendants NDH and Dr. Wade.[3]

#### 2. Union's Motion

As to Count Two, the Union argues Plaintiff's Section 1981 claims fail because she does not allege any desperate treatment was the result of purposeful or intentional *race* discrimination. Union Mot. at 14. As to Counts Three and

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 375 of 410
PageID: 12982
Theodore v. Newark Department of Health and Community Wellness, Slip Copy (2020)

2020 WL 1444919

Eight (retaliation), the Union argues Plaintiff fails to allege any protected activity. *Id.* at 18-21. Cross referencing their arguments in the Title VII context, Plaintiff asserts she alleged enough facts to state a claim under 📖 Section 1981. Union Opp. at 10. But Plaintiff's argument on Title VII circularly cross-references itself and the above-described portion of Plaintiff's brief on 📖 Section 1981. *See id.* at 8 (citing Parts I-II). With respect to retaliation, Plaintiff argues that she sought protection against Defendant Wilson but instead was expelled from the Union. *Id.* at 10. She also argues the Union "secured a settlement that treated her differently [from unknown individuals] and also negotiated a similar settlement for Defendant Wilson." *Id.* (citing Compl. ¶ 28 and Exs. D, F, G, I).

The lack of specificity in Plaintiff's claims make it impossible to test their sufficiency. The allegations are little more than recitations of 📖 Section 1981's elements against general "Defendants." *See* Compl. ¶¶ 42-51, 71-75. The only specific paragraph cited by Plaintiff's brief implies Defendant Wilson, as a *member* of the Union, used his influence to ensure it took certain actions against her. Compl. ¶ 28. However, there is nothing that shows this action, assuming it is attributable to the Union, was due to Plaintiff's *race*, as required by the 📖 Section 1981. *See* 📖 *Saint Francis Coll.*, 481 U.S. at 613; *see also Vodopivec v. Anthony's LLC*, 17-cv-13579, 2018 WL 3656162, at *5 (D.N.J. Aug. 2, 2018). Plaintiff's attachment and general citation to various complaints she filed over the years does not exempt her from the pleading requirements of FRCP 8. *See supra* n.3. For these reasons, Counts Two, Three, and Eight, as alleged against the Union, are **DISMISSED WITHOUT PREJUDICE**. Plaintiff may reallege these claims but should ensure she specifies *in each count* what race-based discriminatory conduct she alleges, what attempt to enforce her rights *under* 📖 Section 1981 the Union retaliated against her for (i.e., complaints about race-based discrimination, not ageist, national-origin, or personal-animus-based conduct), and *when* such conduct occurred.

## C. Counts Four and Five; Race, Ethnicity, and National Origin Discrimination and Retaliation in Violation of Title VII

### 1. City Defendants' Motion

**\*4** As with the ADEA, the City Defendants argue Plaintiff's Title VII claims in Counts Four and Five are barred by a failure to file a timely charge with the EEOC. City Mot. at 10-13. The City Defendants are correct as to many of the allegations, which occurred well before February 1, 2018—300 days before Plaintiff filed her charge with the EEOC.

Accordingly, claims associated with events occurring before February 1, 2018, are **DISMISSED WITH PREJUDICE**. As to any conduct occurring on or after February 1, 2018, the motion is **DENIED**. Further, because Plaintiff alleges a hostile work environment in Count Five (and includes sufficient facts to make that allegation plausible), discovery may include inquiry into events constituting that hostile environment since Plaintiff returned to Defendant Wilson's supervision in 2012, so long as the allegedly hostile environment continued into 2018. *See* City Opp. at 6 (discussing Plaintiff shifting to working with Wilson); *see also* 📖 *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002) ("Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.").

### 2. Union Motion

As to the Union, individual-event-based claims occurring before February 1, 2018, are similarly **DISMISSED WITH PREJUDICE**. As to events after that period, the Union argues the EEOC charge did not name them, and thus Plaintiff has failed to exhaust administrative remedies. Union Mot. at 9-11. Plaintiff responds that because (1) the Union's activity would have been discovered in the EEOC's investigation, had NDH responded, and (2) the charge includes the words "other entities," Plaintiff's EEOC charge and right to sue apply to the Union. Union Opp. at 6-7.

Plaintiff is mistaken. On its face, the facts alleged in the EEOC charge would not reasonably put the Union on notice of the charges against it. *See* Compl. Ex. A (failing to mention the Union or any leader thereof); *see also* 📖 *Barzanty v. Verizon PA, Inc.*, 361 F. App'x 411, 414 (3d Cir. 2010) (noting that because the EEOC is required to serve the employer "against whom the charges are made, th[e] standard allows a [defendant] to be put on notice of the claims likely to be filed."). Plaintiff's expectation of what an investigation would reveal, had NDH responded, is insufficient. *See* 📖 *Antol v.*

*Perry,* 82 F.3d 1291, 1296 (3d Cir. 1996) (finding charge did not fairly encompass claim for gender discrimination even though investigation would reveal individuals selected for positions were women and plaintiff was a man). Plaintiff is correct that "once a charge of some sort is filed with the EEOC ... the scope of a resulting private civil action in the district court is defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Hicks v. ABT Assocs., Inc.,* 572 F.2d 960, 966 (3d Cir. 1978) (cleaned up). But here, notwithstanding Plaintiff's mention of "other entities," nothing in the charge of discrimination would prompt a reasonable expectation that the Union would be tied up in the EEOC's investigation. *See* Compl. Ex. A (naming NDH, and *not the Union,* in box seeking name of Employer, Labor Organization, or Employment Agency, etc.). Neither the Union, nor any Union activity, is mentioned in the charge at all. *See id.*; *Tourtellotte v. Eli Lilly & Co.,* 636 F. App'x 831, 851 (3d Cir. 2016) (distinguishing *Hicks* and finding claim failed because factual statement of the charge lacked anything reasonably related to the additional claim). Based on the charge "as filed," the EEOC would have no reason to expect to investigate the Union, nor would the Union be notified of the forthcoming charges. *Cf.* *Hicks,* 572 F.2d 960, 967 (finding scope of court's jurisdiction depends on the reasonable scope of an investigation of the charge "as filed.").

**\*5** Accordingly, with the exception of continuing hostile work environment claims and those events occurring within 300 days of the administrative charge Plaintiff has filed against the Union with New Jersey's Public Employment Relations Commission ("PERC"), *see* Union Opp. at 9, Counts Four and Five are **DISMISSED WITH PREJUDICE**. Like for the City Defendants, the motion is **DENIED** with respect to ongoing hostile work environment claims and claims based on events occurring within 300 days of Plaintiff's filing with PERC.

### D. Counts Six and Seven: Race, Ethnicity, National Origin, and Age Discrimination (Disparate Treatment) and Retaliation in Violation of LAD

Counts Six and Seven essentially mirror their federal counterparts. *See* Compl. ¶¶ 67-75. Both the Union and City

Defendants argue the Court lacks subject matter jurisdiction, or should decline to exercise supplemental jurisdiction, to hear Plaintiff's state-law claims. Defendants are incorrect. The Court has supplemental jurisdiction to hear Plaintiff's LAD claims, which are based on the exact same facts as Plaintiff's remaining federal claims. *See* 28 U.S.C. § 1367(a).

Defendants also argue that LAD claims have a two-year statute of limitations. N.J.S. 2A:14-2(a); *Williams v. Verizon New Jersey, Inc.,* 19-cv-9350, 2020 WL 1227663, at *7 (D.N.J. Mar. 12, 2020). Defendants are correct on this front. Accordingly, claims based on conduct occurring before November 28, 2016, are **DISMISSED WITH PREJUDICE** except to the extent the conduct is part of a hostile work environment continuing beyond that date.

Finally, Defendants argue that like in the federal context, Plaintiff fails to sufficiently allege the elements of either direct or retaliation LAD claims. As with Plaintiff's Section 1981 claims, the lack of specificity in Counts Six and Seven make it impossible to judge their sufficiency. Accordingly, for those allegations that are part of a purported hostile environment or occurred after November 2016, Count Six and Seven are **DISMISSED WITHOUT PREJUDICE**. If Plaintiff intends to reallege LAD claims, she must be more specific to give each defendant adequate notice. *See, e.g.,* Compl. ¶ 67 (accusing *Plaintiffs* of attempting to "silence and discourage Ms. Theodore"); *see also supra* n.3 (discussing group and shotgun pleading). The parties should also ensure all administrative pre-requisites are satisfied.

### IV. CONCLUSION

For the reasons set forth above, both the Union's, ECF No. 4, and the City Defendants', ECF No. 9, motions are **GRANTED IN PART** and **DENIED IN PART**. An appropriate order follows.

### All Citations

Slip Copy, 2020 WL 1444919

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 377 of 410
PageID: 12984
Theodore v. Newark Department of Health and Community Wellness, Slip Copy (2020)
2020 WL 1444919

## Footnotes

1   Defendant Union also moved pursuant to 12(b)(1) due to the Court's purported lack of subject matter jurisdiction. The different provisions of FRCP 12(b) in this instance is inconsequential, as the facts relevant to the Court's jurisdiction under FRCP 12(b)(1) are readily available to it even under a 12(b)(6)-style test of the complaint (e.g., the administrative charge filed and, with respect to the Court's supplemental jurisdiction, its maintenance of certain related federal claims). The Union does not attempt to rely on extraneous documents that would require jurisdictional discovery or a different standard.

2   Paragraph 72 does specify a restriction in workload, a reduction in benefit, and rumors about her being terminated. But as relevant below, none of this conduct is alleged against the Union.

3   If those counts are reasserted via amended complaint, Plaintiff should ensure she provides adequate notice as to what each Defendant is allegedly liable for, and when such conduct occurred. *See* FRCP 8(a)(2) (requiring "a short and plain statement of the claim showing that the pleader is entitled to relief"); *Sheeran v. Blyth Shipholding S.A.*, 14-cv-5482, 2015 WL 9048979, at *3 (D.N.J. Dec. 16, 2015) (finding group pleading fails to satisfy FRCP 8). Plaintiff may not rely on a series of attachments to her Complaint and internal cross-references to every prior paragraph to avoid the pleading requirements of the Federal Rules, including the attorney's certification as to their belief in the adequacy of each claim. *See* FRCP 11(b); *Terrell v. Williams*, No. 6:17-CV-104, 2017 WL 4582800, at *3 (S.D. Ga. Oct. 13, 2017) (rejecting "shotgun pleading" and plaintiff's citation to various attachments to the complaint); *Lapella v. City of Atl. City*, 10-cv-2454, 2012 WL 2952411, at *5 n.3 (D.N.J. July 18, 2012) ("By incorporating all preceding allegations into each count, Plaintiff engages in shotgun pleadings that obfuscate her claims and defy the mandate of Rule 8, denying Defendants of the fullest extent of notice to which they are entitled.").

End of Document                                        © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 33

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 379 of 410
PageID: 12986
In re Volkswagen Timing Chain Product Liability Litigation, Not Reported in Fed. Supp....
2017 WL 1902160, 92 UCC Rep.Serv.2d 754

KeyCite Yellow Flag - Negative Treatment
Declined to Follow by In re Takata Airbag Products Liability Litigation,
S.D.Fla., June 1, 2020

2017 WL 1902160
**NOT FOR PUBLICATION**
United States District Court, D. New Jersey.

IN RE VOLKSWAGEN TIMING CHAIN
PRODUCT LIABILITY LITIGATION

Civil Action No.: 16-2765 (JLL)
|
Signed 05/08/2017

**OPINION**

JOSE L. LINARES, UNITED STATES DISTRICT JUDGE

**\*1** This matter comes before the Court by way of Defendant Volkswagen Group of America, Inc.'s Motion to Dismiss Plaintiffs First Amended Complaint (ECF No. 6 ("Compl.")) and Compel Arbitration pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (ECF No. 36). Plaintiffs have collectively submitted an opposition (ECF No. 40), which Defendant has replied to (ECF No. 42). The Court decides this matter without oral argument pursuant to Rule 78 of the Federal Rules of Civil Procedure. For the reasons set forth below, the Court grants in part and denies in part Defendant's Motion to Dismiss.

## I. BACKGROUND [1]

### A. The Parties

Plaintiff David Zimand is a citizen and resident of the State of New Jersey, who leased and later purchased a 2009 Volksagen ("VW") Jetta Wolfsburg Edition equipped with a 2.0L TSI [2] engine from a VW and Audi authorized dealer, Jack Daniels Motors Inc., in Fairlawn, New Jersey. (Compl. ¶ 18). Additionally, Plaintiff Chris Drake, who is also a citizen and resident of New Jersey, purchased a 2010 VW GTI equipped with a 2.0L TSI engine from an authorized VW dealer. (Compl. ¶ 26).

Also, Plaintiff Jay Melman, who is a citizen and resident of the State of New York, purchased a 2010 VW Tiguan equipped with a 2.0L TSI engine in New York. (Compl. ¶ 24). Additionally, Plaintiff Hamza Deib, another citizen and resident of New York, purchased a 2010 Audi A4 equipped with a 2.0L TFSI [3] engine. (Compl. ¶ 46). Plaintiff Rosario Panepinto, who is also a New York citizen and resident, purchased a 2009 VW Jetta equipped with a 2.0L TSI engine from an authorized VW dealer. (Compl. ¶ 48).

Next, Plaintiff Anoushirvan Nadiri is a citizen and resident of the State of California, who purchased a new 2011 VW GTI equipped with 2.0L TSI engine from an authorized VW dealer. (Compl. ¶ 27). Additionally, Plaintiffs Jennifer Piumarta and William R. Swihart, who are also California citizens and residents, purchased a certified pre-owned 2010 Audi A3 equipped with a 2.0L TFSI engine and a 2009 Audi A4 Avant equipped with a 2.0L TSI engine, respectively, from authorized Audi dealers. (Compl. ¶¶ 28, 29). Furthermore, California citizen and resident Plaintiff Umar Ellahie "entered into a contract for a 2010 Volkswagen CC from Sunnyvale Volkswagen in Sunnyvale, California." (Compl. ¶ 62).

Furthermore, Plaintiff Dawn Stanton Blanchard, who is a Florida citizen and resident, leased a 2011 VW CC equipped with a 2.0L TSI engine from an authorized VW dealer, South Motors Volkswagen, in Miami, Florida. (Compl. ¶ 32). In addition, Plaintiffs Luis F. Lopez and Shimelesse Mekbeb, who are also citizens and residents of Florida, purchased a 2009 A4 Quattro equipped with a 2.0L TFSI engine and a 2009 VW Jetta equipped with a 2.0L TSI engine, respectively. (Compl. ¶¶ 36, 37). Also, Florida citizens and residents Plaintiffs Allison Fleck and William Fleck leased and then purchased a 2012 Volkswagen EOS from Volkswagen of Freehold in Freehold, New Jersey. (Compl. ¶ 65).

**\*2** Further, Plaintiff Rafael Serbia, a citizen and resident of the State of Connecticut, purchased a new 2011 VW GTI equipped with a 2.0L TSI engine from an authorized VW dealer. (Compl. ¶ 31). Another citizen and resident of Connecticut, Plaintiff Karl Molwitz purchased a pre-owned 2009 Volkswagen Tiguan from Danbury Volkswagen in Danbury, Connecticut. (Compl. ¶ 56). Moreover, Plaintiff Allan Gaudet, who is also a citizen and resident of Connecticut, "entered into a contract for a 2011 Volkswagen GTI from Crowley Volkswagen in Plainville, Connecticut." (Compl. ¶ 59).

Illinois citizen and resident Plaintiff Erika Sennsovispurchased a certified pre-owned 2011 Tiguan equipped with a 2.0L TSI engine from an authorized VW dealer. (Compl. ¶ 39). Plaintiff Katrina Calihan, also a citizen

and resident of Illinois, purchased a certified pre-owned 2010 Tiguan equipped with a 2.0L TSI engine from an authorized VW dealer. (Compl. ¶ 40).

Next, Plaintiff John Schaffranek, a citizen and resident of the Commonwealth of Pennsylvania, purchased a 2010 VW CC. (Compl. ¶ 53). Also a citizen and resident of Pennsylvania, Plaintiff Jeffery Pipe purchased a new 2009 Audi A4 equipped with a 2.0L TFSI engine from an authorized Audi dealer. (Compl. ¶ 51).

Moreover, Plaintiff Dena Stockalper is a citizen and resident of the State of Arkansas, who purchased a 2012 VW EOS Lux equipped with a 2.0L TSI EA888 engine in Springdale, Arkansas. (Compl. ¶ 22). Next, Plaintiff Hannah LeMoine, who is a citizen and resident of the State of Colorado, purchased a 2010 Audi A3 equipped with a 2.0L TSI engine. (Compl. ¶ 30). Plaintiff Robby Smith, a citizen and resident of the State of Georgia, purchased a certified pre-owned 2010 Audi A4 equipped with a 2.0L TFSI engine from an authorized Audi dealer. (Compl. ¶ 38). Additionally, Plaintiff Garrett Johnson, who is a citizen and resident of Indiana, purchased a 2009 Audi A4 equipped with a 2.0L TFSI engine. (Compl. ¶ 41).

Furthermore, citizen and resident of the State of Kansas, Plaintiff Neel Mody purchased a new 2012 VW Tiguan equipped with a 2.0L TSI engine from an authorized VW dealer. (Compl. ¶ 42). Plaintiff Debra Ann Haggerty, who is a citizen and resident of the State of Michigan, purchased a new 2012 VW CC equipped with a 2.0L TSI engine from an authorized VW dealer. (Compl. ¶ 43). In addition, Plaintiff David Zhao, a citizen and resident of the State of Minnesota, purchased a new 2012 Audi Q5 equipped with a 2.0L TFSI engine from an authorized Audi dealer. (Compl. ¶ 44). Additionally, Plaintiff Suzanne Noyes, a citizen and resident of the State of New Hampshire, purchased a 2012 VW Tiguan equipped with a 2.0L TSI engine. (Compl. ¶ 45).

Next, Plaintiff Jason Hosier is a citizen and resident of the State of Maryland, who purchased a 2010 VW Tiguan equipped with a 2.0L TSI engine from an authorized VW dealer. (Compl. ¶ 47). Additionally, citizen and resident of the State of North Carolina, Plaintiff Debra J. Oles purchased a 2008 VW Passat equipped with a 2.0L TSI engine from an authorized VW dealer. (Compl. ¶ 49). Plaintiff James I. Scott, IV, a citizen and resident of the State of Ohio, purchased a 2011 VW GTI equipped with a 2.0L TSI engine from an authorized VW dealer. (Compl. ¶ 50). Additionally, Plaintiff

Michael A. Borchino, who is a citizen and resident of the State of South Carolina, purchased a new 2012 VW CC equipped with a 2.0L TSI engine from an authorized VW dealer. (Compl. ¶ 52).

Moreover, Plaintiff Pamela K. Kane, a citizen and resident of the State of Texas, purchased a new 2010 Audi A4 equipped with a 2.0L TFSI engine from an authorized Audi dealer. (Compl. ¶ 54). Additionally, citizen and resident of the State of Washington, Plaintiff Zachariah Gossman purchased a 2009 Audi A4 equipped with a 2.0L TFSI engine. (Compl. ¶ 55). Next, Plaintiff Bartosz Zielezinski, who is a citizen and resident of the State of Nevada, purchased a 2012 Audi A5 from AutoNation Volkswagen in Las Vegas, Nevada. (Compl. ¶ 67).

**\*3** Finally, Defendant Volkswagen Aktiengesellschaft ("VWAG") is a German corporation that designs, develops, manufactures, and sells automobiles. (Compl. ¶ 73). VWAG is the parent corporation of Defendants Volkswagen Group of America, Inc. ("VW America") and Audi Aktiengesellschaft ("Audi AG"). (Compl. ¶ 73). Defendant VW America is a New Jersey corporation that acts in the furtherance of the interests of VWAG, which includes the advertising, marketing, and sale of VWAG and VW America (collectively referred to as "VW") automobiles nationwide. (Compl. ¶ 74). Defendant Audi AG is a German corporation that designs, develops, manufactures, and sells luxury automobiles under the Audi brand name. (Compl. ¶ 75). Audi AG is the parent corporation of Audi of America, Inc. ("Audi America"), which is a Delaware corporation that, *inter alia*, advertises, markets, and sells Audi AG and Audi America (collectively referred to as "Audi") automobiles nationwide. (Compl. ¶ 76).

### B. Procedural History

Plaintiff initially brought this putative class action on May 16, 2016. (ECF No. 1). Thereafter, Plaintiffs filed their "First Consolidated Class Action Complaint" on August 22, 2016, (ECF No. 6), which, as noted above, is currently the operative complaint. Plaintiffs bring this class action against Defendants individually, and on behalf of all persons similarly situated in the United States who purchased, own, owned, lease, or leased a 2008 through 2013 model year 2.0L TSI or 2.0L TFSI VW or Audi vehicle containing the allegedly defective Timing Chain System[4] (the "Class Vehicles"). (*See generally* Compl.). On December 12, 2016, Defendant VW America filed the instant motion to dismiss and compel arbitration of the claims. (ECF No. 36).

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 381 of 410
PageID: 12988

In re Volkswagen Timing Chain Product Liability Litigation, Not Reported in Fed. Supp....

2017 WL 1902160, 92 UCC Rep.Serv.2d 754

### C. Timing Chain Systems

Each Plaintiff either leased or purchased a Class Vehicle manufactured and/or sold by Defendants. (Compl. ¶¶ 79, 80). The Class Vehicles are equipped with 2.0L TSI or 2.0L TFSI EA888 four-cylinder turbocharged gasoline engines, which contain the allegedly defective Timing Chain System. (Compl. ¶ 81, 89).

### a. Engine Mechanics and Components

A "combustion" is required in order for a conventional four-stroke internal combustion engine to function. (Compl. ¶ 87). First, the engine's intake valves open in order to allow fuel and air to enter into the piston combustion chamber. (Compl. ¶¶ 88, 91). The valves then close so that the "rising piston can compress the air and fuel right below the spark plug," which then results in a combustion that drives the piston down. (Compl. ¶ 91). This combustion produces byproducts that must be removed in order for further combustion to occur. (Compl. ¶ 87). Thus, the exhaust valves open so that the "rising piston can expel the combusted air and fuel mixture" resulting from the combustion. (Compl. ¶ 91).

Crucial to the proper operation of the engine is the synchronization of the piston movements with the opening and closing of the intake and exhaust valves. (Compl. ¶¶ 87, 92). Therefore, a timing chain is added to physically connect the crankshaft, which is connected to the pistons, to the camshaft, which opens and closes the valves. (Compl. ¶ 88). If the timing chain system fails, then "synchronization is lost and the four-stroke cycle will be disrupted," which may result in power loss or engine failure. (Compl. ¶ 92).

### b. The Class Vehicles

Here, the 2.0L TSI and 2.0L TFSI both use a double overhead camshaft ("DOHC") configuration with two camshafts connected to the crankshaft by a timing chain. (Compl. ¶ 89). This engine is specifically an interference engine, such that the intake or exhaust valves, when fully open, extend into the area in which the piston travels. (Compl. ¶ 89). Therefore, a stretched, broken, or dislocated timing chain could severely distort the camshaft timing, which could cause the pistons to collide into the valves, leading to damaged pistons and/or valves. (Compl. ¶ 89). This could cause substantial engine failure, which is expensive to repair or replace. (Compl. ¶ 89).

### D. The Defective Timing Chain System

### a. The Chain Tensioner

**\*4** Plaintiffs claim that the source of the defect in the Timing Chain System is the Hydraulic Tensioner, Camshaft Chain Drive (the "Chain Tensioner"), which keeps the timing chain in proper tension—which is crucial in preventing "jumps"—through oil pressure. (Compl. ¶¶ 96, 97). Since oil pressure is only available when the vehicle is turned on with the engine running, there is little to no oil pressure when the vehicle is turned off or is starting up. (Compl. ¶ 97). Thus, the Chain Tensioner uses a mechanical mechanism during the latter in order to keep the chain tight. (Compl. ¶ 97). This mechanism requires several key components: a steel retainer clip, a piston retainer pin, a ratchet pawl, and piston teeth. (Compl. ¶ 98). According to Plaintiffs, the failure of the ratchet pawl caused the loss of tension on the timing chain, which then allowed the timing chain to "jump a tooth" during start up, causing the bending of intake valves and subsequent engine failure. (Compl. ¶ 99).

Ordinarily, when the engine is running, there is an internal spring that augments oil pressure in order to push a piston against a timing chain tensioning rail, which presses against the timing chain and maintains its tension. (Compl. ¶ 97). When the engine is off and there is no oil pressure to push the piston out, a ratchet pawl is used to prevent the piston from collapsing inward. (Compl. ¶ 100). The piston incorporates ratchet teeth and a retaining clip in order to hold a detached pawl above the piston. (Compl. ¶ 100). If the pawl teeth are broken or worn, or if the retaining clip fails to hold the pawl in position, then the piston will not hold the proper tension on the chain when oil pressure is low. (Compl. ¶ 100). This low tension can cause the chain to "jump a tooth," which may subsequently cause the camshaft to be out of sync with the crankshaft and pistons. (Compl. ¶ 100).

### E. Defendants' Knowledge and Omissions

Plaintiffs claim Defendants knew or should have known of the defect in the Timing Chain Systems and "fraudulently, intentionally, negligently and/or recklessly concealed [the defect] from Plaintiffs and members of the Classes...." (Compl. ¶ 106).

### a. Knowledge

First, Defendants released several technical service bulletins ("TSB") from 2010 to 2012 regarding the timing chain issues with the Class Vehicles. (Compl. ¶¶ 111–122). They specifically described noise coming from the timing chains, difficulty starting engines, and possible damage to the camshaft. (Compl. ¶¶ 112–119). In 2012, a TSB stated that the "[t]iming chain tension may be incorrect due to [the] tensioner," causing skips in the timing chain. (Compl. ¶ 116). At this time, dealers were instructed to repair the Timing Chain System when customers complained of rattling noises after the engine started, issues with the engine not starting, or the "check engine" light being on. (Compl. ¶ 117). Such TSBs were not available publicly and were not disclosed to owners or lessees. (Compl. ¶ 121).

Second, consumer complaints were made to the National Highway Traffic Safety Administration ("NHTSA") regarding failures of the Chain Tensioner that were causing problems with the Timing Chain System. (Compl. ¶¶ 123–125). Several of the consumers experienced sudden and complete engine failure. (Compl. ¶ 125). Plaintiffs assert that Defendants have a duty to identify potential defects in their vehicles, and that the monitoring of NHTSA complaints falls within this duty. (Compl. ¶ 123).

Third, Defendants significantly redesigned the Chain Tensioner in 2012. (Compl. ¶¶ 126–127). Specifically, the ratchet pawl of the earlier Chain Tensioner was accessible from outside the part, and needed an external steel retainer clip to keep its position. (Compl. ¶ 127). The "Redesigned Tensioner" no longer needed the external retainer clip because the grooved tensioner piston and internal clip were placed inside the structure. (Compl. ¶ 127). This change is significant because the earlier Chain Tensioner utilized a sintered metal (type of metal forged by being heated beyond its melting point such that its particles formed a molecular bond), which is weaker than other forged metal. (Compl. ¶¶ 128–129). The sintered metal pawl could no longer function properly after approximately 50,000 miles because its teeth would significantly erode. (Compl. ¶ 129).

**\*5** Additionally, Defendants redesigned the timing chain incorporated by the Timing Chain System. (Compl. ¶ 130). Specifically, the earlier timing chain had "alternating rows of link plate thickness," which may have allowed the chain

to stretch, subsequently affecting the Timing Chain System. (Compl. ¶ 130).

Plaintiffs further assert that even if Defendants did not have actual knowledge, they should have at least been put on notice of the Timing Chain System defects following the number of replacement components and revisions. (Compl. ¶ 153). Additionally, Plaintiffs allege that predecessor models of the Class Vehicles used identical Timing Chain System components that were also experiencing premature failure. (Compl. ¶ 153).

### b. Omissions

Not only do Plaintiffs assert that Defendants had knowledge of the Timing Chain System defect, but they also assert that Defendants intentionally concealed this defect from Plaintiffs and other Class Vehicle purchasers and/or lessees. (Compl. ¶ 151).

First, Plaintiffs' omission claims are based on Defendants' representations in the USA Warranty and Maintenance schedules provided with the Class Vehicles that the Timing Chain System is "intended and reasonably expected to last for the useful life of the engine and at least 120,000 miles without the need for repair or replacement." (Compl. ¶ 94). Specifically, several of Defendants' maintenance schedules do not require maintenance of the Timing Chain System within 120,000 to 135,000 miles. (Compl. ¶ 94; *see* Compl. at Exhibits A, B, E, G). Thus, Plaintiffs allege that Defendants set forth incorrect maintenance recommendations in its Class Vehicle owner manuals and concealed these inaccuracies from Class Vehicle owners and/or lessees. (Compl. ¶¶ 143, 158–161, 181).

Next, Plaintiffs allege that Defendants deceived Plaintiffs and other Class Vehicle purchasers and/or lessees by failing to disclose material information regarding the Timing Chain System defects and the impact this would have on future repairs, costs, and reliability. (Compl. ¶ 189). Further, Plaintiffs allege that Defendants concealed their knowledge during the express warranty period in order to shift the costs of repair and replacement to Plaintiffs once the period expired. (Compl. ¶ 151): Even when several of Plaintiffs' Class Vehicles showed signs of premature failure—that only Defendants could identify or know of—within the express warranty period, Defendants did not disclose the existence of the defect. (Compl.¶¶ 139, 141). The express warranty

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 383 of 410
In re Volkswagen Timing Chain Product Liability Litigation, Not Reported in Fed. Supp....
PageID: 12990

2017 WL 1902160, 92 UCC Rep.Serv.2d 754

included "bumper to bumper coverage for 3 years or 36,000 miles, whichever occur[red] first," and "a Powertrain Limited Warranty for '5 years or 60,000 miles whichever occur[red] first.' " (Compl. ¶ 9). Moreover, Plaintiffs allege Defendants continued to sell the Class Vehicles containing the defect and refused to fully compensate Plaintiffs who experienced Timing Chain System failures after the expiration of the express warranty. (Compl. ¶ 138). Thus, Plaintiffs assert that they were deprived of the "right to have such defective part replaced for free under the warranty." (Compl. ¶ 189).

Plaintiffs further allege that these material omissions concerning the defective Timing Chain System protected Defendants' corporate profits since Plaintiffs and other members of the putative class would not have purchased the vehicles or would have purchased them at a lower price had they been aware of the defects. (Compl. ¶¶ 192, 193).

## II. LEGAL STANDARD

**\*6** To withstand a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

To determine the sufficiency of a complaint under *Twombly* and *Iqbal* in the Third Circuit, the court must take three steps: first, the court must take note of the elements a plaintiff must plead to state a claim; second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth; finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief. *See Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (citations omitted). "In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the

complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

## III. ANALYSIS

Based on the aforementioned allegations, Plaintiffs brought the within suit seeking to recover damages for the following causes of action, individually and on behalf of the putative class: Count I—Fraud; Count II—Breach of Contract;[5] Count III—Negligent Misrepresentation; Count IV—Breach of Express Warranty; Count V—Breach of Implied Warranty; Count VI—Violation of the Magnuson-Moss Warranty Act; Count VII—Unjust Enrichment. (*See* Compl. at 74–91).

Additionally, each group of Plaintiffs from the various different States have brought putative sub-class actions asserting the following violations of State consumer fraud and/or consumer protection laws: Count VIII—Violation of the New Jersey Consumer Fraud Act; Count IX—Violation of the Arkansas Deceptive Trade Practice Act; Count X— Violation of California's Unfair Competition Law; Count XI —Violation of the California Consumer Legal Remedies Act; Count XII—Violation of the Colorado Consumer Protection Act; Count XIII—Violation of the Connecticut Unfair Trade Practices Act; Count XIV—Violation of the Connecticut Product Liability Act; Count XV—Violation of the Florida Deceptive and Unfair Trade Practices Act; Count XVI— Violation of the Georgia Uniform Deceptive Trade Practices Act; Count XVII—Violation of the Georgia Fair Business Practices Act of 1975; Count XVIII—Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act; Count XIX—Violation of the Indiana Deceptive Consumer Sales Act; Count XX—Violation of the Kansas Consumer Protection Act; Count XXI—Violation of the Maryland Consumer Protection Act; Count XXII—Violations of the Michigan Consumer Protection Act; Count XXIII— Violation of the Minnesota Prevention of Consumer Fraud Act; Count XXIV—Violation of the Minnesota Uniform Deceptive Trade Practices Act; Count XXV—Violation of Minnesota's "Private Attorney General Statute"; Count XXVI —Violation of the Nevada Deceptive Trade Practices Act; Count XXVII—Violation of the New Hampshire Consumer Protection Act; Count XXVIII—Violations of the New York Consumer Protection Act; Count XXIX—Violation of the North Carolina Unfair and Deceptive Trade Practices

In re Volkswagen Timing Chain Product Liability Litigation, Not Reported in Fed. Supp....

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 384 of 410 PageID: 12991

2017 WL 1902160, 92 UCC Rep.Serv.2d 754

Act; Count XXX—Violation of the Ohio Consumer Sales Practices Act; Count XXXI—Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law; Count XXXII—Violation of the South Carolina Consumer Unfair Trade Practices Act; Count XXXIII—Violation of the Texas Deceptive Trade Practices-Consumer Protection Act; Count XXXIV—Violation of the Washington Consumer Protection Act. (*See* Compl. at 92–198). The Court discusses each claim separately.

### A. Breach of Contract

**\*7** As noted above (*see* n.5, *supra*), Plaintiffs have collectively abandoned their breach of contract claim. (Pl. Opp. Br. at 41). Accordingly, this claim is hereby dismissed.

### B. Motion to Dismiss and Compel Arbitration

Generally, an agreement to arbitrate a dispute "is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to to submit." *E.M. Diagnostic Sys., Inc. v. Local 169, Intl Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America*, 812 F.2d 91, 94 (3d Cir. 1987)(quoting *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)). The Federal Arbitration Act ("FAA"), applies to arbitration clauses contained in contracts involving matters of interstate commerce. *See* 9 U.S.C. § 2; *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). When a party, whose claims are subject to the FAA, refuses to arbitrate same the district court must decipher whether the claims are arbitrable. *Medtronic Ave, Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44, 54 (3d Cir. 2001)(citing *AT&T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 649 (1986)). "In the absence of any express provision excluding a particular grievance from arbitration, ... only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." *AT&T Technologies*, 475 U.S. at 654 (quotations omitted); *see* *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 (3d Cir. 1980)("Before a party to a lawsuit can be ordered to arbitrate and thus be deprived of a day in court, there should be an express, unequivocal agreement to that effect.").

"Federal policy favors arbitration and thus a court resolves doubts about the scope of an arbitration agreement in favor of arbitration." *Medtronic*, 247 F.3d at 55 (citing *Moses H. Cone*, 460 U.S. at 24-25); *Zimmerman*, 783 F. Supp. at 868. The presumption in favor of arbitration guides district courts to refrain from denying a motion to compel arbitration absent certainty that the claims do not fall within the scope of an arbitration clause. *See* *Medtronic*, 247 F.3d at 55; *Mutual Ben. Life Ins., Co., v. Zimmerman*, 783 F. Supp. 853, 869 (D.N.J. 1992)("There is a presumption of arbitrability in the sense that an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.")(internal citations and quotations omitted). However, "[i]f there is doubt as to whether such an agreement [to arbitrate] exists, the matter, upon a proper and timely demand, should be submitted to a jury." *Par-Knit*, 636 F.2d at 54. In considering a motion to compel arbitration, a court must engage in a two-step analysis: *it must determine first whether there is a valid agreement to arbitrate* and, if so, *whether the specific dispute falls within the scope of said agreement. See* *Century Indem. Co. v. Certain Underwriters at Lloyd's*, 584 F.3d 513, 523 (3d Cir. 2009)(emphasis added); *Salvadori v. Option One Mtg. Corp.*, 420 F. Supp. 2d 349, 356 (D.N.J. 2006).

**\*8** The Court here finds that, contrary to Defendant VW America's assertion, no agreement to arbitrate exists between the parties. Defendant argues that arbitration must be compelled because the various Plaintiffs entered into purchase and/or lease agreements contained an arbitration clause. (ECF No. 36-1 ("Def. Mov. Br.") at 7-11). Those purchase and/or lease agreements contained the following language:

"**ARBITRATION PROVISION**

"**PLEASE REVIEW-IMPORTANT-AFFECTS YOUR LEGAL RIGHTS**

"**1. EITHER YOU OR WE MAY CHOOSE TO HAVE ANY DISPUTE BETWEEN US DECIDED BY ARBITRATION AND NOT IN COURT OR BY JURY TRIAL.**

"**2. IF A DISPUTE IS ARBITRATED, YOU WILL GIVE UP YOUR RIGHT TO**

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 385 of 410 PageID: 12992

In re Volkswagen Timing Chain Product Liability Litigation, Not Reported in Fed. Supp....
2017 WL 1902160, 92 UCC Rep.Serv.2d 754

PARTICIPATE AS A CLASS REPRESENTATIVE
OR CLASS MEMBER ON ANY CLASS
CLAIM YOU MAY HAVE AGAINST US
INCLUDING ANY RIGHT TO CLASS
ARBITRATION OR ANY CONSOLIDATION
OF INDIVIDUAL ARBITRATIONS...."

((Def. Mov. Br. at 7)(quotations and bold in original); *see also* Exhibits A-I annexed to Def. Mov. Br.) This clause, according to Defendant, requires the Court to dismiss the action and compel arbitration consistent with the above law.

However, as Plaintiffs have explained, and as Defendant concedes, Defendant VW America was not a party to these purchase and/or lease agreements. (*See* ECF No. 40 ("Pl. Opp. Br.") at 8-11; ECF No. 42 ("Def. Rep. Br.") at 1-3). Rather, those agreements were entered into by Plaintiffs and the various dealerships from which they purchased and/or leased their vehicles from. (Def. Mov. Br. at 7). Accordingly, Defendant VW America never entered into any agreement with Plaintiffs to arbitrate.

Basic contract law requires parties to be in privity with each other in order for them to enforce the terms of a contract. *See Black's Law Dictionary* (10th ed. 2014), *available at* Westlaw BLACKS (defining privity of contract as "The relationship between the parties to a contract, allowing them to sue each other but preventing a third party from doing so."). Since the parties never personally entered into an agreement with each other, no privity of contract between Plaintiffs and Defendant can be established. The parties concede this point. (*See* Def. Mov. Br. at 10, 31, 37; Pl. Opp. Br. at 9). Hence, without privity of contract between the parties, Defendant VW America cannot enforce the arbitration clause contained within the purchase and/or lease agreements signed by Plaintiffs and the various dealerships. Thus, in accordance with *Century Indem. Co., supra,* there is no valid agreement between the parties that this Court can enforce, and the Motion to Compel Arbitration must be denied.

Defendant VW America also attempts to rely on the doctrine of equitable estoppel in support of its Motion to Compel Arbitration. (*See* Def. Mov. Br. at 12). "[I]n certain situations, a non-signatory to an arbitration agreement may compel a signatory to arbitrate." 🚩 *EPIX Holdings Corp. v. Marsh & McLennan Cos.,* 410 N.J. Super. 453, 982 A.2d 1194, 1200 (N.J. Super. Ct. App. Div. 2009); *see also* 🔖 *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.,* 269 F.3d 187, 195 (3d Cir. 2001)

(noting situations in which non-signatories may be bound by an arbitration clause). The *EPIX* Court noted that "the combination of the requisite nexus of the claim to the contract *together with the integral relationship* between the non-signatory and the other contracting party [is] ... a sufficient basis to invoke estoppel." 🚩 982 A.2d at 1202 (emphasis in original).

**\*9** Courts have permitted "non-signatory third party beneficiaries to compel arbitration against signatories of arbitration agreements." *E.I. DuPont, supra* at 195 (citation omitted). For example, the Third Circuit has "bound a signatory to arbitrate with a non-signatory at the non[-]signatory's insistence *because of the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the non[-]signatory's obligations and duties in the contract* ... and [the fact that] the claims were intimately founded in and intertwined with the underlying contract obligations." 🔖 *E.I. DuPont,* 269 F.3d at 199-200 (internal quotations omitted; alteration in original) (emphasis added). "The distinction between signatories and non-signatories is important to ensure that short of piercing the corporate veil, a court does not ignore the corporate form of a non-signatory based solely on the interrelatedness of the claims alleged." 🔖 *Id.* at 202.

Here, the doctrine of equitable estoppel does not assist Defendant VW America's assertions that arbitration must be compelled. This is because Defendant VW America can point to no allegations that there was a "close relationship" between the parties. Rather, the allegations in the Complaint indicate the complete opposite. Plaintiffs each purchased and/or leased their vehicle from an authorized car dealership. At the time Plaintiffs acquired their vehicles, they entered into a purchase and/or lease agreement between themselves *and the dealership.* A member of each dealership presented this document. The agreements only contained the dealership's name and the various Plaintiffs' names. Accordingly, there was no relationship, let alone a close one, that supports the application of equitable estoppel in this action. Thus, the Motion to Compel Arbitration must be denied.

### C. Plaintiffs' Complaint Does Not Need to be Dismissed for "Lumping"

Defendant also briefly argues that Plaintiffs' entire complaint should be dismissed for "combin[ing] separate named defendant entities under the name 'Defendants[.]' " (Def.

In re Volkswagen Timing Chain Product Liability Litigation, Not Reported in Fed. Supp....
2017 WL 1902160, 92 UCC Rep.Serv.2d 754

Mov. Br. at 17). Accordingly, Defendant VW America believes the Complaint should be dismissed for failing to meet the pleading standards set forth under Rules 8 and 9(b) of the Federal Rules of Civil Procedure. (Id.). However, this argument is not persuasive. While Plaintiffs do use the term "Defendants" throughout the Complaint, they also make particularized allegations against each Defendant, including Defendant VW America, separately.

Specifically, as to Defendant VW America, Plaintiffs allege that it is headquartered in the United States and "engages in ... the advertising, marketing and sale of VW automobiles nationwide." (Compl. ¶ 74). Plaintiffs clearly distinguish Defendant VW America form Defendant Audi America by stating that Defendant Audi America is also headquartered in the United States and engages is nearly identical activities that Defendant VW America engages in. (Compl. ¶ 76). The Complaint also explains that both Defendants VW America and Audi America are authorized agents, representatives, servants, employees and/or alter egos of the German parent companies. (Compl. ¶ 77).

The allegations against each entity are clear, and, as Plaintiffs explain, "to the extent Plaintiffs assert common allegations as to [Defendants collectively]," it is because the entities are intertwined through a complex corporate structure. (Pl. Opp. Br. at 18). Plaintiffs cannot be expected to know the exact corporate structure and degree of each Defendant's involvement, at this stage in the litigation and prior to discovery. *See Weske v. Samsung Elecs., Am., Inc.*, 934 F. Supp. 2d 698, 708 (D.N.J. 2013)(holding that Courts should employ a relaxed pleading standard when "specific information is in the exclusive control of the defendant")

(citing  *Craftmatic Sec. Litig v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989)).

**\*10** Moreover, this Court is satisfied that, with the limited information in Plaintiffs' possession, Plaintiffs have made specific allegations as to Defendant VW America. For example, Plaintiff Molowitz asserts his vehicle was impacted by the timing chain issue, that he contacted Defendant VW America regarding same, and that Defendant VW America denied his request for repairs. (Compl. ¶ 58). Plaintiffs also allege that Defendant VW America "acted as [an] authorized agent[ ], representative[ ], servant[ ], [and/or] employee[ ]" of its German parent company, and that Defendant VW America performed activities of "advertising, warranties, warranty repairs, dissemination of technical information and monitoring the performance of [its] vehicles." (Compl. ¶ 77).

Additionally, Plaintiffs make specific allegations regarding Defendant VW America's knowledge of the supposedly faulty timing chain because Defendant "VW America was monitoring warranty claims and Class Vehicle performance in the United States." (Compl. ¶ 136). Moreover, "[c]ertain Plaintiffs were informed by representatives of [Defendant] VW America that" it would not repair the faulty timing chain system because the "failure occurred outside of the express warranty period." (Compl. ¶ 137). Plaintiffs further allege that "Defendants' [collective] knowledge of Class Vehicle defects was derived from warranty claims, claims supervisors, customer complaints *and monitoring ofperformance of Class Vehicles by* [*Defendant*] *VW America quality assurance employees.*" (Compl. ¶ 153)(emphasis added). Finally, Plaintiffs have alleged that "Defendant (*and particularly the sales and marketing executives at* [*Defendant*] *VW America*) advertised and otherwise created the reasonable expectation (including but not limited to scheduled class engine maintenance recommendations) that Class Vehicles would last over 120,000 miles or ten years before experiencing Timing Chain System failure." (Compl. ¶ 157)(emphasis added).

The Court finds that these allegations are specific to, and targeted at, Defendant VW America. Thus, while Plaintiffs use the generic term of "Defendants" in their Complaint, they also make particularized allegations regarding Defendant VW America's conduct sufficient to satisfy Rules 8 and 9(b) of the Federal Rules of Civil Procedure. Hence, Defendant VW America's Motion to Dismiss based on "lumping" is hereby denied.

### D. Dismissal for Failure to "Plead Which State's Law Applies" as to Plaintiff's Common Law Counts is Unwarranted

Defendant avers that Plaintiffs' common law claims for fraud, breach of contract, [6] negligent misrepresentation, and unjust enrichment must be dismissed since Plaintiffs have not identified the applicable law for each claim, thereby rendering them "vague." (Def. Mov. Br at 15). Defendant also argues that each Plaintiffs home state has the "most significant relationship," and, according to New Jersey law, each state's laws governing common law claims must be applied to each group of Plaintiffs, based on the state where they reside. (Def. Mov. Br. at 16-17). Indeed, New Jersey's choice of law principles are applicable to this matter since federal courts with diversity jurisdiction must apply the choice of law principles of the forum state. *See*  *Klaxon Co. v. Stentor*

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 387 of 410
PageID: 12994
In re Volkswagen Timing Chain Product Liability Litigation, Not Reported in Fed. Supp....
2017 WL 1902160, 92 UCC Rep.Serv.2d 754

*Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941). However, the Court need not address the choice of law arguments at this juncture.

As Plaintiff correctly notes, the choice of law analysis has routinely been found to be premature at the motion to dismiss phase of a class action law suit, especially when certain discovery is needed to further develop the facts that will be used in the choice of law analysis. *See, e.g.,* 📙 *Prudential Ins. Co. of Am. v. Goldman, Sachs & Co.*, No. 12-cv-6590, 2013 WL 1431680, at *5 (D.N.J. Apr. 9, 2013)* (choice of law analysis at motion to dismiss premature); 📙 *In re Samsung DLP Television Class Action Litig.*, No. 07-cv-2141, 2009 WL 3584352, at *3 (D.N.J. Oct. 27, 2009) (same); 🚩 *In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46, 55 (D.N.J. 2009) (same); *see also* 📙 *Arcand v. Brother Int'l Corp.*, 673 F. Supp. 2d 282, 295 (D.N.J. 2009) (finding that New Jersey's most significant relationship test" requires a fact-sensitive analysis that cannot be performed on a record that consists solely of a complaint and motion to dismiss); 📙 *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 541 (D.N.J. 2004) (finding that a choice of law analysis is premature at the motion to dismiss phase).

Further, Defendant has failed to explain how Plaintiffs' common law claims conflict among their home states. Rather, Defendant simply concludes that a conflict exists and therefore the Complaint must be dismissed. Yet, as discussed, the most significant relationship test is a fact-sensitive inquiry. Accordingly, the Court declines to engage in a choice of law analysis at this juncture and Defendant VW America's Motion to Dismiss based on same is hereby denied.

### E. Plaintiffs Have Sufficiently Pled *prima facie* Claims for Breach of Express Warranty

**\*11**  Defendant VW America advances five separate arguments as to why Plaintiffs' breach of express warranty claims must be dismissed. First, Defendant VW America argues that no claim can lie for repairs to, or failures of, the Timing Chain System beyond the express warranty period contained in Defendant's New Vehicle Limited Warranty ("NVLW"). (Def. Mov. Br. at 18). Second, Defendant asserts that both the time and mileage terms of the NVLWs were not unconscionable. (Def. Mov. Br. at 19). Third, Defendant avers that the NLVWs do not cover design defects, which, it claims, is the gravamen of Plaintiffs' claims. (Def. Mov.

Br. at 22). Fourth, Defendant claims that Plaintiffs have not pled sufficient facts showing they complied with the NLVWs' notice requirements. (Def. Mov. Br. at 23). Finally, Defendant asserts that four Plaintiffs' express warranty claims are barred by the statute of limitations; specifically those Plaintiffs from Connecticut, New York, Ohio, and Texas. (Def. Mov. Br. at 27). For the following reasons, the Court is unpersuaded by any of these arguments and concludes that Plaintiffs have included sufficient allegations to withstand a motion to dismiss.

First, the Court is satisfied that Plaintiffs have pled sufficient facts to allege that the NVLWs were unconscionable, and therefore the time and mileage limitations argument advanced by Defendant is premature. Indeed, as Plaintiffs note, "[o]ne way Plaintiffs may avoid [the] durational limits of Defendant's warranty is by alleging facts sufficient to show that the warranty is unconscionable." (Pl. Opp. Br. at 21) (citing 📙 *Skeen v. BMW of N. Am., LLC*, 2014 WL 283628 *12 (D.N.J. Jan. 24, 2014))(compiling cases). The *Skeen* matter is quite similar to this action. There, the Plaintiffs brought a putative class action against BMW asserting that certain MINI Cooper vehicles suffered from "a latent defect in a part of the engine known as the 'timing chain tensioner' which causes the part to fail prematurely." *Skeen, supra* at 1. Those vehicles were subject to "an express warranty of 48 months or 50,000 miles, whichever came first." *Id.* at 1. Plaintiffs there alleged that the warranty period was "not fatal to their warranty claims because Defendants [therein] knew the defects would manifest and manipulated the warranty term to make sure it did not happen until after the warranty term expired." *Id.* at 1.

BMW moved to dismiss the various claims, including the breach of warranty claim asserting that the malfunction occurred after the warranty period expired, and therefore no claim could stand. *Id.* at 1, 4. The Court denied the motion regarding the warranty claim. *Id.* at 4, 15-16. According to the Court, Plaintiffs had sufficiently pled both substantive and procedural unconscionability. *Id.* Specifically, the Court noted that Plaintiffs were in a significantly weaker bargaining position than the manufacturer because the "preprinted" warranty left the purchasers with no meaningful choice in setting the terms of said warranty," and therefore satisfied the procedural unconscionability requirement. *Id.* at 43 (citing 📙 *Delta Funding Corp. v. Harris*, 189 N.J. 28, 55 (N.J. Sup. Ct. 2006)(Zazzali, J., concurring in part and dissenting in part)). Moreover, the Court concluded that substantive

unconscionability was also sufficiently pled because plaintiffs alleged that defendant knew the timing chain tensioner would fail and the warranty was manipulated in such a manner so that defendant could avoid paying for it. *Id.* at 41-42. Thus, the Court was satisfied that plaintiffs met the unconscionability pleading standard.

This Court is also satisfied that Plaintiffs have pled both substantive and procedural unconscionability. Substantive unconscionability occurs when "the term is 'excessively disproportionate,' involving an exchange of obligations so one-sided as to shock the court's conscience." *Skeen, supra* at 12. "[P]rocedural unconscionability focuses on the circumstances of the negotiation that produced the contested term," and typically is present when a party has "no meaningful choice" in negotiating the term due to "a gross disparity in bargaining power." *Id.* (quoting *Henderson v. Volvo Cars of North America, LLC*, 2010 WL 2925913, *9 n.6 (D.N.J. Jul. 21, 2010)).

**\*12** Here, both forms of unconscionability have been pled. Just as in *Skeen*, Plaintiffs have pled that Defendant was well aware of the defect in their vehicles' Timing Chain Systems. (Compl. ¶¶ 2, 5, 11, 110, 256). Plaintiffs further pled that said defect manifests during and/or shortly after the warranty period, but prior to the end of the Class vehicles' useful lives. (Compl. ¶¶ 5, 33, 94, 110, 139-41, 144, 150, 248). Moreover, Plaintiffs allege that Defendant had superior knowledge regarding said defect. (Compl. ¶¶ 11, 107, 110, 122). Additionally, Plaintiffs have pled that they had no meaningful choice in determining the temporal and/or mileage limits of the NLVWs. (Compl. ¶ 162). Finally, Plaintiffs allege that the NLVWs were drafted by Defendant, without any input, let alone meaningful input, from Plaintiffs, that there was a gross disparity in bargaining power in favor of Defendant, the terms of the NLVWs unreasonably favored Defendant, and Defendant was aware of the defect at the time of sale. (Compl. ¶¶ 162-, 165-72, 256).

Based on the above, Plaintiffs have sufficiently pled that the express warranties were unconscionable. It is important to note that this Court is not declaring the NLVWs unconscionable at this time. Rather, at the Motion to Dismiss stage, the Court is merely satisfied that Plaintiffs have alleged sufficient facts to support the assertion that the NLVWs are unconscionable. Should Plaintiffs be able to, through discovery, elicit sufficient evidence to support the allegations the NLVWs' limitations may not be applicable,

and Defendant's defense of this claim based on said limitations would not be viable. Accordingly, and since this is a fact sensitive inquiry, dismissal at this time is inappropriate.

Defendant's next argument in support of dismissal of the express warranty claims is that the NLVWs "cover only repairs to correct 'a manufacturer's defect in material and workmanship.' " (Def. Mov. Br. at 22). In essence, Defendant asserts that the Timing Chain System defect is a "design defect" and therefore is not covered by the NLVWs. (Id.). For this reason, Defendant argues that the express warranty claims must be dismissed.

The Court is not persuaded by this argument either. Courts within this district have refused to apply a distinction between a defect in design and a defect in materials or workmanship at the pleadings stage of litigation. *See Alin v. Am. Honda Motor Co.*, 2010 WL 1372308, at *6 (D.N.J. Mar. 31, 2010)*(Hayden, J.)(holding that "where the distinction between defect in design and defect in materials or workmanship is a matter of semantics, and sufficient facts are alleged to assert both, the defendant's characterization of the nature of the claim pre-discovery should not control whether the complaint survives."); *see also Cox v. Chrysler Grp., LLC*, 2015 WL 5771400, at *6 (D.N.J. Sept. 30, 2015)*(same). This Court agrees with the *Alin* and *Cox* opinions. Indeed, Plaintiffs' Complaint contains sufficient factual allegations to assert a breach of the warranty, regardless of whether the defect is in design or in manufacturing and workmanship. (Compl. ¶¶ 94-100, 108, 126-29, 201, 251-53).

Moreover, even if the NLVWs only cover design defects, Plaintiffs' allegations specifically point to defects in the materials and/or the workmanship. The Complaint describes how various materials within the Timing Chain System break and/or fail, and how that failure leads to the motor failing in general. (Compl. ¶¶ 94-100). Plaintiffs also make allegations regarding how the material used in the ratchet pawl sintered metal is defective and fails over time. (Compl. ¶¶ 126-29). These allegations were designed to point to specific materials and/or workmanship that contained defects known to Defendant, which by its own admissions and arguments, would be covered by the NLVWs. Accordingly, the Court is satisfied that Plaintiffs have sufficiently pled claims for breach of the NLVWs.

Additionally, Defendant argues that Plaintiffs failed to comply with the notice requirements of the NLVWs,

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 389 of 410
In re Volkswagen Timing Chain Product Liability Litigation, Not Reported in Fed. Supp....
PageID: 12996
2017 WL 1902160, 92 UCC Rep.Serv.2d 754

warranting dismissal of their express warranty claims. (Def. Mov. Br. at 23). Defendant asserts that the States of Arkansas, California, Colorado, Connecticut, Florida, Georgia, Illinois, Indiana, Maryland, Michigan, Minnesota, Nevada, New Hampshire, New Jersey, New York, North Carolina, Ohio, South Carolina, Texas, and Washington, and the Commonwealth of Pennsylvania, all have pre-suit notice requirements for breach of warranty claims. (Id.). Defendant avers that not a single Plaintiff has complied with said pre-suit notice requirements, and therefore the claims must be dismissed. (Id. at 23-24).

**\*13** However, this argument also fails. Defendant's reliance on the Uniform Commercial Code ("UCC") § 2-607 is misplaced. That provision requires a buyer of a product that allegedly breaches an express warranty to provide the *seller* of a product with notice within a reasonable time after the breach is discovered or when the buyer should have discovered said breach. *See* UCC § 2-607(3)(a). However, Defendant here is not the direct seller of the vehicles, but rather the remote manufacturer and/or seller.

Pre-suit notice is not required when the action is brought against a remote manufacturer and/or seller. *See* Strzakowlski v. Gen. Motors Corp., 2005 WL 2001912, *3 (D.N.J. Aug. 16, 2005). There, the Court explained that it "has previously predicted that the New Jersey Supreme Court would not require notice under section 2-607(3)(a) in a case against a *remote manufacturer who was not the immediate seller of a defective product.*" *Strzakowlski, supra* at *3 (emphasis added). The Court further held that even if notice was required, notice could be satisfied merely by filing the Complaint. *Id.* at *3. Additionally, Plaintiffs need not give a remote manufacturer and/or seller pre-suit notice in California, Florida, Georgia, Michigan, New Jersey, New York, Ohio, Pennsylvania, and Washington. *See* In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices & Prods. Liab. Litig., 754 F. Supp. 2d 1145, 1180 (C.D. Cal. 2010)(under California law, pre-suit notice excused with respect to remote manufacturer with whom consumer did not deal); Strzakowlski v. Gen. Motors Corp., 2005 WL 2001912, *3 (D.N.J. Aug. 16, 2005)(New Jersey does not require notice to remote manufacturer and, if it did, filing complaint would satisfy notice); In re MyFord Touch Consumer Litig., 46 F. Supp. 3d 936, 975-979 (N.D. Cal 2014)(surveying states: in Florida, notice not required to manufacturer; in Ohio and Pennsylvania, the filing of a complaint satisfies notice); In re Bridgestone/ Firestone, Inc. Tires Prods. Liab. Litig., 155 F. Supp. 2d 1069, 1109-1110 (S.D. Ind. 2001)(surveying cases: in Pennsylvania, Michigan, New York, and Georgia, the filing of a complaint satisfies notice requirement); Cats v. Monaco RV, LLC, 2016 WL 5253204, at *4 (W.D. Wash. Sept. 22, 2016)(the State of Washington does not require notice to remote sellers, and, if required, taking vehicle to dealer for repair satisfied notice). As for Illinois, Indiana, and Minnesota, the notice requirement is satisfied when, as alleged here, the manufacturer is aware of the defect with the goods. *See* In re Rust-Oleum Restore Mktg., Sales Practices & Prods. Liab. Litig., 155 F. Supp. 3d 772, 799-800 (N.D. Ill. 2016) (Ill. law); Anderson v. Gulf Stream Coach, Inc., 662 F.3d 775, 781-82 (7th Cir. 2011) (Ind. law); Church of the Nativity of Our Lord v. Watpro, Inc., 491 N.W.2d 1, 5 (Minn. 1992). Accordingly, the Court concludes that Plaintiffs, in certain circumstances, were not required to provide Defendant with any pre-suit notice, and, in cases where pre-suit notice was required, Plaintiffs satisfied said requirement by simply filing their Complaint. Hence, dismissal on this ground is also unwarranted.

Finally, Defendant argues that a four-year statute of limitations bars any express warranty claims by Plaintiffs from Connecticut, New York, Ohio, and Texas. (Def. Mov. Br. at 27; Def. Rep. Br. at 28-29). Defendant cites to Conn. Gen. Stat. § 42a-2-725(1)-(2); N.Y. U.C.C. Law § 2-725; Ohio Rev. Code § 1302.98; Tex. Bus & Com. Code Ann. § 2.725 in support of this contention. (Def. Mov. Br. at 27). Those statutes impose a four-year statute of limitations for repair and replace warranties, such as the NLVWs. None of these statutes of limitations have a discovery rule. *See* Conn. Gen. Stat. § 42a-2-725(1)-(2); N.Y. U.C.C. Law § 2-725; Ohio Rev. Code § 1302.98; Tex. Bus & Com. Code Ann. § 2.725.

**\*14** Resolving this argument would require the Court to engage in a choice of law analysis. However, as noted above, this Court will not engage in a choice of law analysis at this juncture. Yet, this does not preclude the Court from rendering a determination, since Plaintiffs have properly alleged grounds for equitable tolling of the statute of limitations. *See* In re Ford Motor Co. E-350 Van Prods. Liab. Litig. (No. II), 2008 WL 4126264, at *17 (D.N.J. Sept. 2, 2008); Simpson v. Widger, 311 N.J. Super. 379, 391 (N.J. Super. Ct. App. Div. 1998)("[T]he presence of fraud may toll the running of the statute" for breach of warranty claims).

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 390 of 410
PageID: 12997
In re Volkswagen Timing Chain Product Liability Litigation, Not Reported in Fed. Supp....
2017 WL 1902160, 92 UCC Rep.Serv.2d 754

For fraudulent concealment to toll the statute of limitations a plaintiff must plead "(1) wrongful concealment by the party raising the statute of limitations defense, resulting in (2) plaintiffs failure to discover the operative facts forming the basis of his cause of action during the limitations period (3) despite the exercise of due diligence." *Dewey v. Volkswagen AG*, 558 F. Supp. 2d 505, 523 (D.N.J. 2008).

The Court is satisfied that Plaintiffs have met all three elements of the above standard. Specifically, Plaintiffs allege that "Defendant[ ] wrongfully and intentionally concealed a defect in the [Timing Chain System] of the Class Vehicles, which can fail at any time." (Compl. ¶ 2). Plaintiffs further allege that Defendant had knowledge of this defect, and, despite this knowledge, Defendant has "never disclosed to Plaintiffs and members of the Classes that the defect exists or that drivers and/or occupants of the Class Vehicles [were] at risk." (Compl. ¶ 5). Additionally, Plaintiffs assert that the Timing Chain System failed far before its useful life expired. (Id.). Accordingly, Plaintiffs allege that Defendant has "wrongfully and intentionally transferred the cost of repair or replacement of the Timing Chain System to Plaintiffs and members of the Classes by fraudulently concealing the existence of the defect, which Defendant [knew would] typically occur after the expiration of the [NLVWs]." (Id.). Moreover, Plaintiffs assert and allege that despite their due diligence, they were incapable of ascertaining the defect, partly due to Defendant's alleged fraudulent concealment. (Compl. ¶¶ 10-12, 14, 106-10, 144-60, 195-202).

While this Court is not concluding that Defendant did in fact fraudulently conceal the defect in the Timing Chain System, it is satisfied that Plaintiffs have sufficiently pled same. Since Plaintiffs have successfully pled fraudulent concealment, the statute of limitations may be equitably tolled. Accordingly, the Court finds that it is inappropriate to dismiss the express warranty claims at this juncture. Defendant may renew this argument at a later point, should discovery tend to indicate that no fraudulent concealment occurred.

### F. Plaintiffs Have Successfully Pled a *prima facie* Cause of Action for a Breach of the Implied Warranty of Merchantability

Similarly, Defendant argues that Plaintiffs' claims for breach of the implied warranty of merchantability must be dismissed for the following reasons: 1) the implied warranties expired prior to the manifestation of the defect

and the Class Vehicles are merchantable; 2) "[m]any of Plaintiffs [i]mplied [w]arranty [c]laims [m]ust [b]e [d]ismissed [b]ecause [p]laintiffs [a]re [n]ot in [p]rivity with Defendant[ ];" 3) Plaintiffs did not comply with the pre-suit notice requirements; and 4) certain Plaintiffs are barred by the statute of limitations. (Def. Mov. Br. at 29-36). For the reasons below, the Court disagrees with said arguments and denies Defendant's Motion to Dismiss Plaintiffs' breach of the implied warranty of merchantability claims.

 **\*15** Summarily, the Court disposes of arguments three and four, regarding the pre-suit notice and statute of limitations, relatively. This is because the arguments advanced in support of both the pre-suit notice requirements and the statute of limitations are identical to those advanced by Defendant in support of dismissal of the express warranty claims. (Def. Mov. Br. at 34-35, *cf.* Def. Mov. Br. 23-25, 27-29). Accordingly, the above analysis, *supra* at 26-30, is applicable to these arguments. Hence, these arguments are not persuasive and no further analysis is necessary herein.

The implied warranty of merchantability is designed "to protect buyers from loss where the goods purchased are below commercial standards." *Altronics of Bethlehem, Inc. v. Repco, Inc.*, 957 F.2d 1102, 1105 (3d Cir. 1992)(citing *Vlases v. Montgomery Ward & Co.*, 377 F.2d 846, 849 (3d Cir. 1967)). "In order to be merchantable, goods must be 'fit for the ordinary purposes for which such goods are used.' " *Id.* (citation omitted). "[T]o establish a breach of this warranty, a plaintiff must show, among other things, that the product at issue was defective." *Am. Atelier, Inc. v. Materials, Inc.*, 2017 U.S. App. LEXIS 851, *3, 2017 WL 203371 (3d Cir. Jan. 18, 2017)(citing *Altronics, supra* at 1105). "In the context of a car, this warranty is satisfied when the vehicle provides safe and reliable transportation." *Greene v. BMW of North Am.*, 2013 WL 5287314, *2 (D.N.J. Sept. 17, 2013).

Here, despite Defendant's assertion that the Class Vehicles were merchantable, Plaintiffs have successfully pled a *prima facie* claim for breach of the implied warranty of merchantability. The Complaint contains more than sufficient factual allegations regarding the failure of the Timing Chain System, which led to failure of the vehicle in general. For example, Plaintiffs allege that when the Timing Chain System's tensioner failed the timing of the motor's valves was no longer in sync causing various internal components to bend and/or break. (Compl.¶¶ 3, 4, 34, 92). The bending and/or breaking of said components causes the motor to cease operation. (Id.). When the motor ceased working, the

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 391 of 410
PageID: 12998

In re Volkswagen Timing Chain Product Liability Litigation, Not Reported in Fed. Supp....

2017 WL 1902160, 92 UCC Rep.Serv.2d 754

vehicle no longer performed its ordinary commercial purpose of driving. (Id.) Hence, Plaintiffs have sufficiently pled that the vehicles were not merchantable.

Moreover, the latency in manifestation is insufficient to support dismissal at this juncture of this litigation. It is true that implied warranties do not extend beyond the time, or other limitations, of a good's express warranty. *See, e.g.,* *Glass v. BMW of N. Am.,* 2011 U.S. Dist. LEXIS 149199, *49, 2011 WL 6887721 (D.N.J. Dec. 29, 2011); *Suddreth v. Mercedes-Benz, LLC,* 2011 U.S. Dist. LEXIS 126237, *12-13, 2011 WL 5240965 (D.N.J. Oct. 31, 2011). According to Defendant, the breach of the implied warranty of merchantability claim must be dismissed because the defect manifested itself after the NLVWs expired. However, as this Court explained above, Plaintiffs have sufficiently pled unconscionability of the NLVWs, which may result in the inapplicability of the NLVWs' time and mileage limitations. If said limitations are inapplicable, the express warranty claims may still be viable. If the express warranty claims are viable due to the unconscionability of the limitation terms, then the implied warranty claims would remain viable as well, since the prior limitations relied on by Defendant no longer bind Plaintiffs. Accordingly, dismissal of the implied warranty claims pursuant to this argument is also inappropriate.

Finally, Defendant argues that Plaintiffs from California, Connecticut, Florida, Georgia, Illinois, New York, North Carolina, Ohio, and Washington cannot maintain an implied warranty claim because they are not in "vertical privity" with Defendant. (Def. Mov. Br. at 31-34). Indeed, those states require the parties to be in vertical privity with each other in order for a breach of implied warranty claim to lie. *See* *Clemens v. DaimlerChrysler Corp.,* 534 F.3d 1017, 1023 (9th Cir. 2008); *TD Props., LLC, v. VP Bldgs., Inc.,* 602 F. Supp. 2d 351, 362 (D. Conn. 2009); *Speier-Roche v. Volkswagen Grp. of Am., Inc.,* 2014 U.S. Dist. LEXIS 59991, *21-22, 2014 WL 1745050 (S.D. Fla. Apr. 30, 2014); *Monticello v. Winnebago Indus.,* 369 F. Supp. 2d 1350, 1361 (N.D. Ga. 2005); *Ibarolla v. Nutrex Research, Inc.,* 2012 U.S. Dist. LEXIS 155721, *22, 2012 WL 5381236 (N.D. Ill. Oct. 31, 2012); *In re Scotts EZ Seed Litig.,* 2013 U.S. Dist. LEXIS 73808, *24-25, 2013 WL 2303727 (S.D.N.Y. May 22, 2013); *Kelly v. Ga.-Pac. LLC,* 671 F. Supp. 2d 785, 769 (E.D.N.C. 2009); *Curl v. Volkswagen of Am.,*

*Inc.,* 114 Ohio St. 3d 266, 269 (Ohio 2007); *Baughn v. Honda Motor Co.,* 107 Wash.2d 127, 151 (Wash. 1986). [7]

**\*16** However, each of these states provides various exceptions to the vertical privity requirement; the so-called third-party beneficiary exception. [8] California, North Carolina, Florida and Washington all have exceptions to the vertical privity requirement when, as is the case here, the consumer, rather than the dealer, is the ultimate user. *See* *In re MyFord Touch Consumer Litig.,* 46 F. Supp. 3d 936, 983-85 (N.D. Cal. 2014)(acknowledging the third-party beneficiary exception under California and North Carolina law); *Keegan v. Am. Honda Motor Co.,* 838 F. Supp. 2d 929, 947-48 (C.D. Cal. 2012)(stating that in California the purchaser of a vehicle may maintain implied warranty claim against manufacturer when vehicle is purchased from authorized dealership); *Sanchez-Knutson v. Ford Motor Co.,* 52 F. Supp. 3d 1223, 1233-34 (S.D. Fla. 2014)(acknowledging the third-party beneficiary exception under Florida law); *In re MyFord Touch Consumer Litig.,* 2015 WL 5118308, *7 (N.D. Cal. Aug. 31, 2015)(acknowledging the third-party beneficiary exception under Washington law). In Georgia, the vertical privity requirement is satisfied when the manufacturer provides an express warranty, as is the case with Defendant's NLVWs. *See* *Lee v. Mylan, Inc.,* 806 F. Supp. 2d 1320, 1326 (M.D. Ga. 2011). Finally, and similar to Georgia, Illinois' vertical privity requirement is satisfied if the manufacturer provides a written warranty that satisfies the Magnuson-Moss Warranty Act, as, once again, is the case with Defendant's NLVWs.

*See* *Rothe v. Maloney Cadillac, Inc.,* 518 N.E.2d 1028, 1030-31 (Ill. 1988); *Szajna v. Gen. Motors Corp.,* 503 N.E.2d 760, 770 (Ill. 1986).

Accordingly, while a party may generally be required to be in vertical privity with its adversary to assert a breach of implied warranty claim in California, Connecticut, Florida, Georgia, Illinois, New York, North Carolina, Ohio, and Washington, Plaintiffs herein are not required to meet said requirement. This is because Plaintiffs from California, North Carolina, Florida and Washington are exempt from said requirement as they were the true consumers of the product, not the dealer. Moreover, those Plaintiffs from Georgia and Illinois are also exempt from the vertical privity requirement since Defendant provided express warranties to Plaintiffs hailing from these states, which absolves Plaintiffs from the vertical privity

requirement in those states. Therefore, dismissal of the breach of the implied warranty of merchantability is inappropriate.

### G. Plaintiffs Have Pled a Claim Under the Magnuson-Moss Warranty Act

Defendant does not attack the sufficiency of Plaintiffs' Magnuson-Moss Warranty Act ("MMWA") claim. Rather, Defendant's sole argument in support of dismiss of Plaintiffs' MMWA is premised on its anticipated dismissal of Plaintiffs' express and implied warranty claims. (Def. Mov. Br. at 36). Indeed, a prerequisite to a MMWA claim is adequately pleading a breach of warranty claim. *See Cooper v. Samsung Elecs. Am., Inc.*, 2008 U.S. Dist. LEXIS 75810, *18-19, 2008 WL 4513924 (D.N.J. Sep. 30, 2008). Here, since the Court has determined that Plaintiffs have asserted viable breach of warranty claims, both express and implied, Plaintiffs satisfy the pleading requirement to assert an MMWA claim. Accordingly, the Court will not dismiss Plaintiffs' MMWA claims.

### H. Plaintiffs Have Article III Standing to Bring Common Law Fraud, Statutory Fraud, and Negligent Misrepresentation Claims

According to Defendant, Plaintiffs lack Article III standing to assert claims for common law fraud, statutory fraud, and negligent misrepresentation. (Def. Mov. Br. at 39). Article III standing requires Plaintiffs to allege: 1) an injury in fact; 2) causation; and 3) redressability. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Defendant does not challenge that Plaintiffs have pled both an injury in fact and redressability with regards to these claims, nor does it assert that Plaintiffs have insufficiently pled any of the three claims. (*See* Def. Mov. Br. at 39-41). Rather, Defendant focuses its argument strictly on causation and asserts that these causes of action must be dismissed because Plaintiffs' alleged injuries cannot be "traced" to Defendant. (Id.)(citing *Toll Bros., Inc. v. Twsp. of Readington*, 555 F.3d 131, 142 (3d Cir. 2009)).

**\*17** The Court is satisfied that Plaintiffs have more than sufficiently pled causation. Plaintiffs point to Defendant's knowledge of the defects in the Timing Chain System and allege that it concealed same. (*See, e.g.*, Compl. ¶¶ 2, 5, 11). As a matter of fact, Plaintiffs allege Defendant acknowledged the issue in their TSBs. (*See, e.g.*, Compl. ¶¶ 2, 111-25). The concealment of this information, Plaintiffs assert, was fraudulent, negligent and the sole reason they suffered damages in the form of a malfunctioning vehicle and

the costs associated with repairing same, as well as higher operation costs due to the inefficiency of the motor. (*See, e.g.*, Compl. ¶¶ 105, 108, 145, 149, 150-58). Hence, the Complaint contains ample allegations of the injury Plaintiffs suffered, and, more importantly, Defendant's role in causing said injury. Therefore, the Court holds that Plaintiffs have Article III standing to bring this action.

### I. Plaintiffs Have Pled Their Common Law Fraud Claims with Particularity

Next, Defendant asserts that, while the 22 different states laws implicated in this action all have different common law fraud pleading standards, they all require that fraud be pled with particularity, and argues that Plaintiffs have failed to meet this heightened pleading standard. (Def. Mov. Br. at 41-42). In making this argument, Defendants advance the following sub-arguments: 1) Plaintiffs failed to plead an actionable misrepresentation; 2) Plaintiffs failed to plead any omission Defendant was under a duty to disclose (based on varying state laws); 3) Plaintiffs cannot maintain a fraud claim because their vehicles outlasted the time and mileage durations in the NLVWs; and 4) certain claims by Plaintiffs are barred by the economic loss doctrine. (Def. Mov. Br at 42-59). For the reasons below, the Court is not persuaded by any of these arguments.

First, the Court disposes of arguments three and four above. Argument three relies on the expiration of the NLVWs. (Def. Mov. Br. at 57). For that argument to succeed, this Court would need to conclude that the time and mileage limitations set forth in the NLVWs are applicable to these Plaintiffs. This is because of the fact that, generally speaking, permitting common law fraud claims beyond the scope of the express warranty would effectively extend the express warranty. *See, e.g., Duffy v. Samsung Elecs. Am., Inc.*, 2007 U.S. Dist. LEXIS 14792, *22-23, 2007 WL 703197 (D.N.J. Mar. 2, 2007); *Noble v. Porsche Cars N. Am., Inc.*, 694 F. Supp. 2d 333, 337-38 (D.N.J. 2010); *Nobile v. Ford Motor Co.*, 2011 U.S. Dist. LEXIS 26766, *15-16, 2011 WL 900119 (D.N.J. Mar. 14, 2011). However, while the Court has not reached the complete opposite conclusion (*i.e.* that the limitations are not applicable to Plaintiffs), this Court has concluded that Plaintiffs have sufficiently pled that said limitations are potentially unconscionable. Since the Court has reached such a conclusion, the applicability of the NLVWs' limitations remains unknown.

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 393 of 410
PageID: 13000
In re Volkswagen Timing Chain Product Liability Litigation, Not Reported in Fed. Supp....
2017 WL 1902160, 92 UCC Rep.Serv.2d 754

As noted above, should Plaintiffs succeed at proving the alleged unconscionability of the NLVWs' limitations, the warranty period may not be applicable to Plaintiffs. If the limitations are not applicable to Plaintiffs, then their common law fraud claims would no longer be bound to the time and mileage limitations contained therein. Accordingly, the Court will not dismiss said claims based on the time and mileage limitations contained in the NLVWs.

Additionally, the Court will not dismiss the claims pursuant to the economic loss doctrine. Under that doctrine, a plaintiff who is dissatisfied with a product must bring a breach of contract or warranty claim. *See E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 871-72 (1986). Florida, Michigan, New Hampshire, New Jersey, North Carolina, Ohio, Pennsylvania, and South Carolina all extend the economic loss doctrine to fraud based claims, such as those advanced by Plaintiffs here. *See Burns v. Winnebago Indus., Inc.*, 2013 U.S. Dist. LEXIS 116377, *9, 2013 WL 4437246 (M.D. Fla. Aug. 16, 2013); *Murphy v. P&G*, 695 F. Supp. 2d 600, 602 (E.D. Mich. 2010); *In re Elk Cross Timbers Decking Mktg., Sales Practices & Prods. Liab. Litig.*, 2015 U.S. Dist. LEXIS 144790, *73-74, 2015 WL 6467730 (D.N.J. Oct. 26, 2015) (Linares, J.)(applying New Hampshire law); *Park v. Inovio Pharms., Inc.*, 2016 U.S. Dist. LEXIS 24993, *4-6, 2016 WL 796890 (D.N.J. Mar. 1, 2016); *Orlando v. Novurania of Am., Inc.*, 162 F. Supp. 2d 220, 225-26 (S.D.N.Y. 2001); *Malone v. Tamko Roofing Prods.*, 2013 U.S. Dist. LEXIS 145530, *6, 2013 WL 5561628 (W.D.N.C. Oct. 8, 2013); *Galoski v. Stanley Black & Decker, Inc.*, 2015 U.S. Dist. LEXIS 114663, *19-21, 2015 WL 5093443 (N.D. Ohio Aug. 28, 2015); *Sabol v. Ford Motor Co.*, 2015 U.S. Dist. LEXIS 92341, *17, 2015 WL 4378504 (E.D. Pa. July 16, 2015); *Sapp v. Ford Motor Co.*, 687 S.E.2d 47, 49 (S.C. 2009).

 *18  However, each of these states also have exceptions to the general rule that permit all of Plaintiffs' claims to proceed. New York law does not apply the economic loss doctrine to "claims of misrepresentation and fraud." *In re Caterpillar, Inc., C13 & C15 Engine Prods. Liab. Litig.*, 2015 WL 4591236, *35 (D.N.J. Jul. 29, 2015)(citing *Weisblum v. Prophase Labs, Inc.*, 2015 WL 738112, *12 (S.D.N.Y. Feb. 20, 2015)). New Jersey, Florida, North Carolina, Pennsylvania, New Hampshire, and South Carolina law also do not apply the economic loss doctrine to fraud based claims when a plaintiff alleges fraudulent inducement or that the defendant violated an extrinsic duty. *See Smith v. Citimortgage, Inc.*, 2015 WL 12734793, *7 (D.N.J. Dec. 22, 2015)(Linares, J.)(under New Jersey law, "fraud [based] claims that are extrinsic to the underlying contract, such as for fraudulent inducement, are not" barred by economic loss doctrine); *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 965-67 (N.D. Cal. 2014)(holding that the economic loss doctrine does not bar fraudulent inducement claims under Florida or North Carolina law); *Stein v. Fenestra Am., L.L.C.*, 2010 WL 816346, *4 (E.D. Pa. Mar. 9, 2010)(finding that the economic loss doctrine does not apply under Pennsylvania law where the fraud is "extraneous to the contract"); *Wyle v. Lees*, 162 N.H. 406, 411 (N.H. 2011)(holding that the economic loss doctrine does not apply to fraudulent inducement); *Simons v. Wal-Mart Stores E., L.P.*, 2013 WL 393998, *5 (D.S.C. Jan. 31, 2013)("The economic loss rule does not bar tort claims where a defendant voluntarily assumes a duty to use due care over and above the duty required by the contract."). Similarly, Michigan and Ohio's economic loss doctrine does not bar fraud claims by consumers who are not in contractual privity with the defendant. *See Republic Ins. Co. v. Broan Mfg. Co., Inc.*, 960 F. Supp. 1247, 1249 (E.D. Mich. 1997) (Michigan's economic loss doctrine "has no application outside the commercial realm."); *Blackward v. Simplex Prods. Div.*, 2001 WL 1255924, *3 (Mich. Ct. App. Oct. 19, 2001) ("The economic loss doctrine as adopted in Michigan clearly distinguishes between transactions involving the sale of goods for commercial purposes, where there are economic expectations attached to the purchases, and those involving the sale of defective products which result in losses traditionally remedied by resort to tort law."); *Weske v. Samsung Elecs., Am., Inc.*, 934 F. Supp. 2d 698, 706 (D.N.J. 2013)(find that the economic loss doctrine does not bar negligence claims under Ohio law for claims brought by consumer not in privity with manufacturer); *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 968 (N.D. Cal. 2014) (same).

Here, Plaintiffs' common law fraud claims fall into each their home state's exception to the economic loss doctrine. Plaintiffs' fraud claims are simply exempt from New York's economic loss doctrine. As for the Ohio and Michigan Plaintiffs, their claims also survive since, as established above, the parties were never in privity with each other. Finally, the New Jersey, Florida, North Carolina,

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 394 of 410
PageID: 13001

In re Volkswagen Timing Chain Product Liability Litigation, Not Reported in Fed. Supp....
2017 WL 1902160, 92 UCC Rep.Serv.2d 754

Pennsylvania, New Hampshire, and South Carolina Plaintiffs' fraud claims also survive because they have adequately pled fraud claims based on fraudulent inducement.

Additionally, Plaintiffs have pled actionable misrepresentation. Defendant asserts that "Plaintiffs never allege that Defendants actually made any affirmative misrepresentations that Plaintiffs relied upon regarding the timing chain system or the useful life of the vehicles in the Warranty Manuals or elsewhere." (Def. Mov. Br. at 43). This is simply not true, as Plaintiffs have done exactly that. Specifically, Plaintiffs allege that Defendant's sale and marketing departments advertised and otherwise misrepresented to Plaintiffs that the Class Vehicles would last over 120,000 miles or ten years without needing to service the Timing Chain System. (Compl. ¶¶ 8, 142-43, 156-57). These misrepresentations were made in the NLVWs and Maintenance schedules. (Compl. ¶¶ 83, 94). Plaintiffs further allege that Defendant misrepresented that the NLVWs would cover all defects occurring within the mileage limitations despite the fact that they knew it intended to deny coverage for anything that it deemed a "design defect," without actually ever defining that term. (Compl. ¶¶ 9-10). Additionally, Plaintiffs assert that Defendants misrepresented that the NLVWs would cover all engine parts while knowing that the Timing Chain System would likely fail outside the warranty period and refused to cover same during the warranty period. (Comp. ¶¶ 135-37). Finally, Plaintiffs allege "Defendants misrepresented the that the Timing Chain System failures were the result of other conditions not covered under [the NLVWs]." (Pl. Opp. Br. at 52)(citing Compl. ¶ 149).

These alleged misrepresentations, which, at this point in the litigation the Court must accept as true, were not simply puffery, but actual misstatements of fact. *See Castol Inc. v. Pennzoil Co.*, 987 F.2d 939, 946 (3d Cir. 1993). Accordingly, Plaintiffs have successfully pled actionable misrepresentations to support their common law fraud claims.

**\*19** Lastly, Defendant asserts Plaintiffs have failed to plead any omission of information that it had a duty to disclose. (Def. Mov. Br. at 46). According to Defendant, New Jersey, Georgia, Illinois, and South Carolina laws create a duty to disclose only if there is a fiduciary or other special relationship between the parties. (Id.)(citing *N. J. Econ. Dev. Auth. v. Pavonia Rest., Inc.*, 319 N.J. Super. 435, 446 (N.J. Super. Ct. App. Div. 1998); *Lilliston v. Regions Bank*, 653 S.E.2d 306, 309 (Ga. Ct. App. 2007); *Greenberger v.*

*GEICO General Ins. Co.*, 631 F.3d 392, 401 (7th Cir. 2011) (applying Illinois law); *Pitts v. Jackson Nat'l Life Ins. Co.*, 574 S.E.2d 502, 510 (S.C. Ct. App. 2002)). Defendant further argues that in Arkansas, "plaintiffs and defendants must be in either a fiduciary relationship or in contractual privity for a duty to disclose to attach." (Id.)(citing *Perez v. Volkswagen Grp. of Am.*, 2013 U.S. Dist. LEXIS 54845, *29-30, 2013 WL 1661434 (W.D. Ark. Apr. 17, 2013)). Ohio and Texas laws are similar and also only impose a duty to disclose when there is a fiduciary or special relationship, or when a defendant makes a misleading partial disclosure. *See Gator Dev. Corp. v. VHH, Ltd.*, 2009-Ohio-1802, ¶ 28 (Ohio Ct. App. Apr. 17, 2009); *Yoon v. Yoo*, 2016 U.S. Dist. LEXIS 129268, *8, 2016 WL 4801314 (N.D. Tex. Feb. 24, 2016). Defendant further asserts that arm's-length transactions between a manufacturer and consumer does not give rise to such a relationship and therefore no duty to disclose existed here. (Def. Mov. Br. at 47)(citing *Stevenson v. Mazda Motor of Am., Inc.*, 2015 U.S. Dist. LEXIS 70945, *27, 2015 WL 3487756 (D.N.J. June 2, 2015); *Coba v. Ford Motor Co.*, 2013 U.S. Dist. LEXIS 8366, *37, 2013 WL 244687 (D.N.J. Jan. 22, 2013)). Hence, Defendant concludes that since there is no fiduciary or other special relationship, and, with regards to the Ohio and Texas Plaintiffs, no partial disclosures were made, it had no duty to disclose and the common law fraud claims must be dismissed. (Def. Mov. Br. at 47-49).

However, as Defendant acknowledges (*see* Def. Mov. Br. at 49-55), "the laws of the majority of [Plaintiffs'] home states recognize a duty to disclose where the defendant possesses exclusive or superior knowledge or actively conceals the omitted information."[9] (Pl. Mov. Br. at 46-47 (citing Def. Mov. Br. at 49)); *see also Song Fi, Inc. v. Google, Inc.*, 2016 U.S. Dist. LEXIS 45547, *22, 2016 WL 1298999 (N.D. Cal. Apr. 4, 2016); *Mallon Oil Co. v. Bowen/Edwards Assocs., Inc.*, 965 P.2d 105, 111 (Colo. 1998); *Bac Home Loans Serv. v. Farina*, 2010 Conn. Super. LEXIS 4929, *1-2 (Conn. Super. Ct. June 2, 2010); *Mukamal v. GE Capital Corp. (In re Palm Beach Fin. Partners, L.P.)*, 517 B.R. 310, 335 (Bankr. S.D. Fla. 2013); *Fifth Third Bank v. Double Tree Lake Estates, LLC*, 2013 U.S. Dist. LEXIS 20234, *21-22 (N.D. Ind. Feb. 12, 2013); *Kestrel Holdings I, L.L.C. v. Learjet Inc.*, 316 F. Supp. 2d 1071, 1078 (D. Kan. 2004); *Dean v. Beckley*, 2010 U.S. Dist. LEXIS 105007, *16, 2010 WL 3928650 (D. Md. Oct. 1, 2010); *Glidden Co. v. Jandernoa*, 5 F. Supp. 2d 541, 551, 553 (W.D. Mich.

Case 1:19-md-02875-RMB-SAK     Document 598-3     Filed 10/16/20     Page 395 of 410
PageID: 13002

In re Volkswagen Timing Chain Product Liability Litigation, Not Reported in Fed. Supp....
2017 WL 1902160, 92 UCC Rep.Serv.2d 754

1998); *Graphic Commc'ns.* 🔖 *Local 1B Health & Welfare Fund "A" v. CVS Caremark Corp.,* 850 N.W.2d 682, 695 (Minn. 2014); *Heldenbrand v. Multipoint Wireless, LLC,* 2012 U.S. Dist. LEXIS 150634, *13–14, 2012 WL 5198479 (D. Nev. Oct. 18, 2012); *King v. Philip Morris, Inc.,* 2000 N.H. Super. LEXIS 5, *26, 2000 WL 34016322 (N.H. Super. Ct. 2000); 🔖 *Remington Rand Corp. v. Amsterdam-Rotterdam Bank,* N.V., 68 F.3d 1478, 1483-84 (2d Cir. 1995) (applying New York law); *McKee v. James, 2013 NCBC 38,* ¶ 51 (N.C. Super. Ct. 2013); 🔖 *Gaines v. Krawczyk,* 354 F. Supp. 2d 573, 586 (W.D. Pa. 2004); 🔖 *White v. Zhou Pei,* 452 S.W.3d 527, 537-38 (Tex. App. 2014); 🔖 *Lovell v. P.F. Chang's China Bistro, Inc.,* 2015 U.S. Dist. LEXIS 112101, *17-18, 2015 WL 4940371 (W.D. Wash. Mar. 27, 2015) (citation omitted).

Here, Plaintiffs from New York, California, Colorado, Connecticut, Florida, Indiana, Kansas, Michigan, Minnesota, New Hampshire, Maryland, North Carolina, Pennsylvania, Washington and Nevada have all sufficiently pled Defendant's superior knowledge with regards to the defect in the Timing Chain System. Specifically, Plaintiffs point to various pre-production testing, design failure mode analysis, early consumer complaints, warranty data gathered from the various dealerships, consumer complaints to the NHTSA, and Defendant's testing performed in response to consumer complaints in support of the fact that Defendant had superior, and potentially exclusive, knowledge regarding the defect. (Compl. ¶ 107). Plaintiffs have also alleged the presence of various TSBs and Defendant's decision to redesign the Timing Chain System as further proof of its superior knowledge. (Compl. ¶¶ 112-30). Plaintiffs further contend that Defendant took steps in order to conceal the defect in order to shift the cost of repair to Plaintiffs. (Compl. ¶¶ 2, 5, 10, 11-12, 14, 106-07, 110, 121, 144, 146, 149, 151-52, 156-57, 160-61, 189, 191, 193). Indeed, these allegations are sufficient to impose a duty to disclose on Defendant. *See, e.g.,* 🔖 *Majdipour v. Jaguar Land Rover N. Am., LLC,* 2013 WL 5574626, *17 (D.N.J. Oct. 9, 2013); 🔖⚠ *In re MyFord Touch Consumer Litig.,* 46 F. Supp. 3d 936, 960 (N.D. Cal. 2014); 🔖 *Feldman v. Mercedes-Benz USA, LLC,* 2012 WL 6596830, *11 (D.N.J. Dec. 18, 2012).* Accordingly, the Court concludes that the New York, California, Colorado, Connecticut, Florida, Indiana, Kansas, Michigan, Minnesota, New Hampshire, Maryland, North Carolina, Pennsylvania, Washington and Nevada Plaintiffs have sufficiently pled a duty to disclose and the Court will not dismiss their common law fraud claims.

**\*20** The Court comes to the same conclusion as to the Georgia, Illinois, Ohio, South Carolina, and Texas Plaintiffs. In those jurisdictions, Defendant owed a duty to disclose safety defects. *See, e.g.,* 🔖 *McCabe v. Daimler AG,* 948 F. Supp. 2d 1347, 1368-70 (N.D. Ga. 2013)(imposing a duty to disclose where "safety defects with gasoline tanks ... could not have been discovered through the exercise of ordinary prudence and caution [by plaintiffs]" and allowing the fraud by omission claims under Georgia and Texas law to proceed); *In re Takata Airbags Prods. Liability Litig.,* No. 15-md-2599, slip op. at 13-14 (S.D. Fla. Sept. 21, 2016)("South Carolina law does not always require a fiduciary relationship for a duty to disclose to exist")(citing 🔖 *Fisher v. Pelstring,* 817 F. Supp. 2d 791, 823 (D.S.C. 2011)); *In re Takata Airbags Prods. Liability Litig.,* No. 15-md-2599, slip op. at 11, 15, 21-22 & 31 (S.D. Fla. Oct. 14, 2016)(permitting fraudulent concealment claims to proceed under Ohio, Georgia and Illinois law based on duty to disclose safety defects). Plaintiffs here have specifically pled that the defect in the Timing Chain System created safety concerns, and, despite Defendant's knowledge of the defect and the safety concerns associated with same, Defendant chose not to disclose the defect to Plaintiffs. (Compl. ¶¶ 4, 10). Hence, Defendant had a duty to disclose the safety defect under Georgia, Illinois, Ohio, South Carolina, and Texas law and Plaintiffs claims pursuant to this theory of liability will not be dismissed.

Finally, New Jersey law imposes a duty to disclose when a defendant has made a partial disclosure. *See* 🔖 *Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1185 (3d Cir. 1993) ("where a claim for fraud is based on silence or concealment, New Jersey courts will not imply a duty to disclose, unless such disclosure is necessary to make a previous statement true"). Here, Plaintiffs have made allegations with respect to Defendant's partial disclosures regarding the Class Vehicles. Plaintiffs rely on the maintenance schedules which, *inter alia,* identify engine parts and components that require routine maintenance and/or replacement at certain points throughout the lifespan of the vehicle. (Compl. at Exs. A, B). According to Plaintiffs' Complaint, "Defendant represents in the maintenance schedules that the timing belt, which performs the same function as the Timing Chain System, will need service after a certain time but makes no representation that the Timing Chain System will need maintenance." (Pl. Opp. Br. at 51 (citing Compl. ¶ 83)). Accordingly, Plaintiffs have pled that Defendant made partial disclosure regarding the Class Vehicles. Since Defendant allegedly made said

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 396 of 410
PageID: 13003
In re Volkswagen Timing Chain Product Liability Litigation, Not Reported in Fed. Supp....
2017 WL 1902160, 92 UCC Rep.Serv.2d 754

partial disclosures, it had a duty to fully disclose any and all information regarding the Timing Chain System to Plaintiffs under New Jersey law. Hence, Plaintiffs have pled a viable claim for common law fraud based on Defendant's duty to disclose under New Jersey law, and dismissal would be inappropriate.

### J. Plaintiffs Have Successfully Pled Claims for Negligent Misrepresentation

First, the parties agree the Arkansas does not recognize negligent misrepresentation claims. (Def. Mov. Br. at 59; Pl. Opp. Br. at n.41). Accordingly, Plaintiffs claim for negligent misrepresentation under Arkansas is hereby dismissed.

Defendant argues that the rest of the negligent misrepresentation claims must be dismissed for three reasons: 1) certain states do not permit a negligent misrepresentation claim to lie absent an express, false statement, and therefore cannot be based on an omission; 2) certain states permit omission claims, but only when there is a special relationship; [10] and 3) aside from Kansas and Texas, the economic loss doctrine bars suit for economic damages based on tort theories. These arguments are unconvincing.

First, negligent misrepresentation may be actionable in New York and Michigan even when the claim is based on an omission. *See Williams v. Polgar*, 215 N.W.2d 149 (Mich. 1974)(permitting a negligent misrepresentation claim against an abstracter when he or she omits a recorded deed in a title abstract after failing to conduct a reasonable investigation); *Gomez-Jimenez v. N.Y. Law Sch.*, 103 A.D.3d 13, 17-18 (N.Y. App. Div. 2012)("To state a cause of action for fraudulent misrepresentation, a plaintiff must allege a misrepresentation or a material omission of fact"). Hence, the New York and Michigan Plaintiffs may have an actionable claim under the relevant laws of their forum states and dismissing the claim, at this juncture, would not be proper.

**\*21** Defendant's argument that the negligent misrepresentation claims must be dismissed because there is no special relationship between the parties is equally unpersuasive. This is because, as discussed above, claims based on affirmative misrepresentations and omissions by a vehicle manufacturer may lie when the manufacturer has exclusive or superior knowledge regarding the defect or if the defect relates to a safety concern. The Court has already concluded that, for purposes of this motion, Defendant, at the very least, had superior knowledge regarding the defect

and that the defect here potentially implicates safety concerns. Accordingly, at this point in the litigation, Plaintiffs' claims for negligent misrepresentation by Defendant is sufficient as no special relationship is necessary.

Finally, the economic loss doctrine does not bar Plaintiffs' negligent misrepresentation claims. First, as Plaintiffs note, Defendant concedes that this argument is inapplicable to the Kansas and Texas Plaintiffs, and therefore dismissal of those claims pursuant to this argument is not warranted. [11] Moreover, the remainder of the jurisdictions all have exceptions to the economic loss doctrine. Specifically, those states allow claims to proceed when the tort claim is based on conduct that is either independent of a contract or where there is a risk of personal injury. *See, e.g., United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1227 (10th Cir. 2000)* (discussing Colorado law and the applicability of the economic loss doctrine); *HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.*, 685 So. 2d 1238, 1239 (Fla. 1996); *Ulbrich v. Groth*, 310 Conn. 375, 406 (Conn. 2013); *U.S. Bank, N.A. v. Integrity Land Title Corp.*, 929 N.E.2d 742, 746 (Ind. 2010); *Holloman v. D.R. Horton, Inc.*, 241 Ga. App. 141, 147-48 (Ga. Ct. App. 1999); *In re Chi. Flood Litig.*, 680 N.E.2d 265, 274-75 (Ill. 1997); *Lloyd v. Gen. Motors Corp.*, 916 A.2d 257, 265-66 (Md. Ct. App. 2007); *80 S. Eighth St. Ltd. P'ship v. Carey-Canada, Inc.*, 486 N.W.2d 393, 399 (Minn. 1992); *Phillips v. Dignified Transition Sols.*, 2014 WL 4294972, \*7 (D. Nev. Aug. 28, 2014); *Johnson v. Capital Offset Co.*, 2013 WL 5406613, \*3 (D.N.H. Sept. 25, 2013); *Silicon Knights, Inc. v. Epic Games, Inc.*, 2011 WL 1134453, \*6, n.7 (E.D.N.C. Jan. 25, 2011); *Nat'l Mulch & Seed, Inc. v. Rexius Forest By-Prods. Inc.*, 2007 WL 894833, \*6 (S.D. Ohio Mar. 22, 2007); *Brand Mktg. Grp. LLC v. Intertek Testing Servs.*, N.A., Inc., 801 F.3d 347, 354 (3d Cir. 2015) (applying Pennsylvania economic loss doctrine); *Jackson v. City of Seattle*, 244 P.3d 425, 431 (Wash. Ct. App. 2010); *Robinson Helicopter Co. v. Dana Corp.*, 102 P.3d 268, 273 (Cal. 2004). Plaintiffs' negligent misrepresentation claim is independent of any contractual claim. (Compl. ¶ 4; *see also* n.5 *supra*). Plaintiffs have also alleged that potential for personal injury in connection with the allegedly defective Timing Chain System. (Compl. ¶ 4). For these reasons, as well as those set forth in Subsection I *supra*, the Court will not dismiss Plaintiffs' negligent

misrepresentations claims as being barred by the economic loss doctrine.

### K. Plaintiffs' Have Sufficiently Pled Claims for Unjust Enrichment

Defendant argues that Plaintiffs' unjust enrichment claim should be dismissed because they have an adequate remedy at law. (Def. Mov. Br. at 61)(citing *In re Ford Tailgate Litig*, 2014 U.S. Dist. LEXIS 119769, *12–17, n.3, 2014 WL 3899545 (N.D. Cal. Aug. 8, 2014)). Essentially, Defendant asks this Court to dismiss the unjust enrichment claims because Plaintiffs have asserted other viable, legal remedies.

(Def. Mov. Br. at 62)(citing *Ebner v. Fresh, Inc.*, 2016 U.S. App. LEXIS 4875, *17-18, 2016 WL 1056088 (9th Cir. Mar. 17, 2016))(additional citations omitted). This argument is meritless.

**\*22** To assert a *prima facie* cause of action for unjust enrichment a plaintiff must allege that: "(1) at plaintiffs expense (2) defendant received a benefit (3) under circumstances that would make it unjust for defendant to retain the benefit without paying for it." *In re K-Dur*, 338 F. Supp. 2d 517, 544 (D.N.J. 2004)(citing *Restatement of Restitution § 1 (1937)*); *see also VRG Corp. v. GKN Realty Corp.*, 135 N.J. 539, 554 (N.J. Sup. Ct. 1994)(stating that a plaintiff seeking to assert a claim for unjust enrichment must establish that "defendant received a benefit[,] and that retention of that benefit without payment would be unjust[,] ... [and plaintiff] expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights."). [12]

Plaintiffs here have sufficiently pled claims for unjust enrichment. Indeed, they claim that Defendant received a benefit at Plaintiffs' expense. Specifically, they allege that Defendant benefited, at Plaintiffs' expense, when they sold Plaintiffs a vehicle that would not operate properly until the end its purported usual lifespan. (Compl. ¶¶ 1, 2, 5, 9-10). Said differently, Plaintiffs allege that they received a vehicle that was inferior to the vehicle they thought they were purchasing, yet the price they paid was the price for a supposedly better functioning vehicle they thought they were purchasing. Hence, Plaintiffs have pled that Defendant has been unjustly enriched at their expense.

This claim is pled in the alternate to the other claims in the Complaint. (Pl. Opp. Br. at 63). Pursuant to Rule 8(d)(2) of the Federal Rules of Civil Procedure, a party "may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient." Fed. R. Civ. P. 8(d)(2); *see also Verizon N.J., Inc. v. Ntegrity Telecontent Servs., inc.*, 219 F. Supp. 2d 616, 635 (D.N.J. 2002). Therefore, Defendant's argument that Plaintiffs' unjust enrichment claims are duplicative fails. For these reasons, the Court concludes that Plaintiffs have pled an alternate *prima facie* causes of action for unjust enrichment, and therefore does not dismiss said claims.

### L. Plaintiffs' Have Sufficient Pled Their Statutory Consumer Fraud Claims

As noted above, Plaintiffs have all brought consumer protection claims pursuant to each Plaintiff's local state laws. According to Defendant, the state law consumer protection claims must be dismissed for the following reasons: 1) all of the claims fail to satisfy Fed. R. Civ. P. 9(b) as they lack particularity; 2) eighteen of the state law claims must be dismissed because they fail to allege practices that are likely to deceive ordinary customers; 3) the Arkansas and New York claims must be dismissed because they fail to plead any injury other than diminution of the value of the vehicles; 4) the Georgia and Indiana claims must be dismissed because those states do not recognize omission based claims; 5) Colorado, Georgia, and South Carolina laws do not recognize classwide claims for damages under their consumer protection statutes; 6) Georgia, California and Minnesota's consumer protection statutes do not allow for monetary damages, only equitable relief; 7) the economic loss doctrine bars the Michigan, New Jersey, North Carolina, and Pennsylvania Plaintiffs' claims; 8) the Connecticut claims must be dismissed because Connecticut's Products Liability Act subsumes all other claims; 9) the New Jersey and California claims must be dismissed because those states will not permit a claim when a component has outlasted its warranty period; 10) the Ohio claim must be dismissed because Defendant was not placed on sufficient notice that its conduct was deceptive or unconscionable; and 11) the Connecticut and New York claims are time barred. (Def. Mov. Br. at 64-79). The Court disagrees with each of these arguments, except for the argument addressing the Ohio claims.

Case 1:19-md-02875-RMB-SAK Document 598-3 Filed 10/16/20 Page 398 of 410
PageID: 13005

In re Volkswagen Timing Chain Product Liability Litigation, Not Reported in Fed. Supp....
2017 WL 1902160, 92 UCC Rep.Serv.2d 754

**\*23** First, with regards to the Ohio Consumer Sales Protection Act, Defendant argues that the claim must be dismissed as it was not sufficiently on notice that its conducts was deceptive or otherwise unconscionable as defined by the Act. *See* Ohio Rev. Code § 1345.09(B). Plaintiffs bringing claims under this act "must demonstrate that either (1) the alleged violation is an act or practice that was declares to be deceptive or unconscionable by a rule adopted by the Attorney General before the consumer transaction on which the action is based, or (2) the alleged violation is an act or practice that was determined by a court to violate the [Act] and the court's decision was available for inspection before the transaction took place." *In Re Porsche Cars N. Am., Inc. Plastic Coolant Tubes Prods. Liab. Litig.*, 880 F. Supp. 2d 801, 868 (S.D. Ohio 2012). The Ohio Plaintiffs seemingly concede that they failed to sufficiently plead their claim under the Ohio Consumer Sales Protection Act, and offer to re-plead same. (Pl. Opp. Br. at 72, n.55). Accordingly, the Court dismisses the Ohio Plaintiffs' claims under the Ohio Consumer Sales Protection Act, without prejudice, and with leave to file an amended claim.

Additionally, the Court finds that Defendant is correct that each and every one of the various Plaintiffs' statutory fraud and/or violations of consumer protection laws all sound in fraud and therefore are subject to the heightened pleading standards of Fed. R. Civ. P. 9(b). The Court further finds that Plaintiffs have pled *prima facie* claims of statutory fraud and/or violations of consumer protection laws in accordance with each of their home state laws sufficient to satisfy Rule 9(b). Defendant's entire argument relies on its assertion that Plaintiffs' have supposedly failed to plead a misrepresentation by Defendant or that Plaintiffs did not plead facts to support a duty to disclose. The Court disagrees with both of these notions.

As to the duty to disclose, the Court has addressed this argument, *supra*, and has concluded that Plaintiffs' complaint contains sufficient factual allegations to support a duty to disclose claim. Accordingly, the Court adopts the above logic and conclusion. As to the particularity, the Court has discussed, in great detail, how Plaintiffs' Complaint is replete with allegations of both overt misrepresentations and active concealment with respect to the alleged defect in the Timing Chain System. Indeed, Plaintiffs make very specific allegations about how they were supposedly misled about the defective Timing Chain System, along with misrepresentations by Defendant regarding the warranties, the useful life of the vehicle and its engine components, as well as the necessary maintenance and repairs associated with the Class Vehicles. (Compl. ¶¶ 8, 9-10, 94, 135-37, 143, 149, 157, 189-94). These allegations sufficiently place Defendant on notice regarding the specific misconduct that Plaintiffs' assert was fraudulent and deceptive in connection with the statutory fraud and/or violation of consumer protection laws. *See Gotthelf v. Toyota Motor Sales, U.S.A., Inc.*, 2012 WL 1574301, \*15-18 (D.N.J. May 3, 2012)(Linares, J.), *aff'd*, 525 Fed.Appx. 94 (3d Cir. 2013)(recognizing that the purpose of the heightened Rule 9(b) pleading standards in connection with fraud based claims is to assure a defendant is provided with notice of the "precise misconduct with which [it is] charged."). Here, the Court is satisfied that the Complaint contains sufficient allegations regarding the statutory fraud and/or consumer protection claims and meets the heightened pleading standard under Rule 9(b).

Additionally, as noted above, the economic loss doctrine does not bar Plaintiffs' fraud based claims. Those exceptions to the doctrine's applicability extend to statutory fraud and/or consumer protection claims as well. *See, e.g., In re Ford Motor Co. E-350 Van Prods. Liab. Litig. (No. II)*, 2008 WL 4126264, \*29 (D.N.J. Sept. 2, 2008)(compiling cases that refused to dismiss New Jersey Consumer Fraud Act claims pursuant to the economic loss doctrine); *Kantor v. Hiko Energy, LLC*, 100 F. Supp. 3d 421, 429 (E.D. Pa. 2015)(holding that the economic loss rule does not bar a Pennsylvania consumer fraud claim); *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 967 (N.D. Cal. 2014)(applying North Carolina law and holding that "the consumer protection statute here gives rise to a duty independent of the contract and therefore should not be barred by the economic loss rule"); *Safeco Ins. Co. of Am. v. CPI Plastics Grp., Ltd.*, 625 F. Supp. 2d 508, 520 (E.D. Mich. 2008)(finding that Michigan's economic loss doctrine does not apply to consumer transactions). Accordingly, based on this Court's analysis above, as well as the relevant case law, the Court concludes that the economic loss doctrine does not bar the Michigan, New Jersey, North Carolina, and Pennsylvania Plaintiffs' statutory fraud and/or violation of consumer protection law claims.

**\*24** Defendant's argument that the Colorado, Georgia, and South Carolina Plaintiffs' claims must be dismissed because those states do not recognize classwide claims for damages is unpersuasive for two reasons. First, as the parties are aware, the application before the Court is to dismiss the Complaint

pursuant to Fed. R. Civ. P. 12(b)(6). Defendant does not attack the sufficiency of the class allegations in the Complaint, but rather directs its argument as to whether the action could proceed as a class action in general. Hence, Defendant does not address the sufficiency or insufficiency of the claims it seeks to dismiss.

Moreover, the Supreme Court has addressed this issue and has held that matters may proceed as putative class actions, regardless of whether state statutes prohibit such claims, so long as the application of Fed. R. Civ. P. 23 does not "abridge, enlarge or modify any substantive right." *Shady Grove Othopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 407 (2010)(quoting 28 U.S.C. § 2072(b)). Circuit Courts applying *Shady Grove* have also held that class actions may proceed despite state statutes prohibiting such actions. *See, e.g., In re Hydroxycut Marketing and Sales Practices Litig.*, 299 F.R.D. 648 (S.D. Cal. 2014)(permitting claims under Georgia, South Carolina and other state consumer protection statutes to proceed as class action under Rule 23 where state statutes do not allow class actions); *see also List v. Lumber One Wood Preserving, LLC*, 792 1331 (11th Cir. 2015)(same application for Alabama consumer protection statutes). Hence, the claim may proceed as a class action and any attacks as to whether class certification is appropriate can be raised at the class certification phase.

Defendant also argues that Plaintiffs from Arkansas, California, Colorado, Connecticut, Florida, Georgia, Illinois, Indiana, Maryland, Michigan, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Texas and Washington cannot maintain their claims under the relevant state statutes, because all of those statutes either require a plaintiff to plead subjective reasonable reliance on the alleged deceptive acts or "determine whether a particular practice is deceptive according to its objective tendency to deceive reasonable, ordinary, or average customers." (Def. Mov. Br. at 68)(quotations omitted). Plaintiffs do not disagree with this standard. In support of this argument, Defendant relies on its prior arguments that "Plaintiffs have failed adequately to [*sic*] the existence of, let alone reliance on, misrepresentations, omissions or other deceptive acts by" Defendant. (Def. Mov. Br. at 69).

However, as the Court explained above, Plaintiffs Complaint sufficiently pleads reliance on Defendant's alleged misrepresentations and/or omissions. This is apparent based on Defendant's alleged superior and/or exclusive knowledge

of the defective Timing Chain System as well as the allegations that Defendant actively concealed same from Plaintiffs, and those similarly situated. (Compl. ¶¶ 11, 106-07, 110, 122, 143, 151, 158-61, 181). Plaintiffs further contend that these alleged misrepresentations and/or omissions would mislead purchasers, including Plaintiffs, regarding the useful life of the vehicle, the anticipated cost of repair, and the overall value and quality of the Class Vehicles. (Compl. ¶¶ 156-57, 168-, 193). Thus, for these reasons, as well as those detailed above, the Court is satisfied that Plaintiffs have sufficiently pled that they reasonably relied on Defendant's alleged misrepresentations and/or omissions, and therefore their claims will not be dismissed for this reason.

**\*25** As to the Arkansas and New York Plaintiffs, Defendant avers that these claims must be dismissed because those Plaintiffs fail to plead any damages other than a diminution of the value of their vehicles. (Def. Mov. Br. at 70). The Court disagrees. Defendant cites to case law from both jurisdictions, yet said law does not support its contention. While the Court in *Wallis v. Ford Motor Company*, 208 S.W.3d 153, 161 (Ark. 2005) did dismiss the claim there, the dismissal was because Plaintiff did not plead any "actual damage or injury," and simply pled an abstract diminution in value. The Arkansas Court noted that "actual damage or injury is sustained when the product has *actually malfunctioned or the defect has manifested itself.*" *Id.* Here, Plaintiffs from Arkansas, as well as the rest of Plaintiffs, have sufficiently pled that the malfunction has already either manifested itself in their vehicles and/or that the vehicles have already malfunctioned. (Compl. ¶ 248). Thus, the Court concludes that the Arkansas Plaintiffs have sufficiently pled their claims under the Arkansas Deceptive Trade Practices Act and the Court declines to dismiss same at this juncture.

Similarly, New York's consumer protection laws are implicated when a "plaintiff [alleges] that a deceptive practice caused him to pay more than the good or service he actually received was worth." *Servedio v. State Farms Ins. Co.*, 889 F. Supp. 2d 450, 453 (E.D.N.Y. 2012), *aff'd*, 531 Fed.Appx. 110 (2d Cir. 2013). The *Servedio* Court held that such allegations "maybe able to satisfy the injury requirement" under New York law. *Id.* New York Courts have also explained that where a consumer pays an inflated price due to deceptive conduct on behalf of a defendant that "plaintiff might have a claim for the higher price the consumer paid for the product as a result of the misrepresentation." *Small v. Lorillard Tobacco Co., Inc.*, 94 N.Y.2d 43, 56 n.5 (1999). Here,

the New York Plaintiffs have sufficiently pled that, based on Defendant's alleged misrepresentations and/or omissions, they were caused to overpay for the supposedly defective Class Vehicles which are purportedly worth less than a defect-free vehicle. (Compl. ¶¶ 15, 183-84, 192-93). Thus, the Court will not dismiss the Arkansas and New York claims based on this argument.

Defendant argues that the Georgia and Indiana claims must be dismissed because those jurisdictions do not recognize omission based claims. (Def. Mov. Br. at 71). This assertion is correct, to the degree that both jurisdictions do not permit statutory consumer fraud claims to proceed merely on allegations of omissions. *See Energy Four, Inc. v. Dornier Med. Systems, Inc.*, 765 F. Supp. 724, 731 (N.D. Ga. 1991)(absent an affirmative representation that is "misleading, partially incorrect, or untrue," the "mere failure to disclose is not actionable.");

🚩 *Lawson v. Hale*, 902 N.E.2d 267, 274 (Ind. Ct. App. 2009)("Indiana Code section 24-5-0.5-3(a) ... does not apply to nondisclosures."). The Georgia and Indiana Plaintiffs concede the assertion that omission based claims cannot lie in these jurisdictions, but note that they have made allegations of affirmative misrepresentations, which satisfy the pleading requirements of both jurisdictions. (Pl. Opp. Br. at 71-72). Indeed, as detailed above, Plaintiffs' Complaint contains numerous allegations of affirmative misrepresentations. (Compl. ¶¶ 9, 10, 12, 135-37, 143, 149, 156, 157, 362). Those allegations, for example, include affirmative misrepresentations regarding the coverage afforded by the NLVWs, and the useful life of the vehicle. (Compl. ¶¶ 94, 135-37). Thus, the Court is satisfied that the Georgia and Indiana Plaintiffs have pled *prima facie* claims under each their forum state's consumer protection laws.

Defendant further asserts that the California, Georgia, and Minnesota Plaintiffs' consumer fraud claims must be dismissed because those statutes allow for injunctive relief, and those Plaintiffs cannot seek injunctive relief when they have an adequate remedy at law. (Def. Mov. Br. at 72). This argument fails for numerous reasons. First, the Court has explained that Plaintiffs may plead causes of actions in the alternate under Rule 8(d)(2) of the Federal Rules of Civil Procedure. Accordingly, at the very least, these Plaintiffs may sustain these claims in the alternate. Moreover, while these Plaintiffs may ultimately be foreclosed from recovering under these statutes due to the injunctive nature of the relief, that does not necessarily preclude an award of injunctive relief for currently unascertained members of the putative class who

may later be identified through discovery. For these reasons, the Court declines to dismiss the California, Georgia, and Minnesota Plaintiffs' statutory consumer fraud claims at this juncture.

**\*26** As to the Connecticut Plaintiffs, Defendant argues that Connecticut's Products Liability Act subsumes any and all other claims stemming from the allegedly defective product. (Def. Mov. Br. at 75)(citing Conn. Gen. Stat. § 52-572m-q). Yet, despite Defendant's assertion that this provision forecloses *all* claims stemming from a defective product, the Connecticut Supreme Court has created exceptions to said blanket rule. *See* 🚩 *Gerrity v. R.J. Reynolds Tobacco Co.*, 818 A.2d 769 (Conn. 2003). In *Gerrity*, the Connecticut Supreme Court found that a plaintiff may sustain both a Connecticut Products Liability Act claim along with a Connecticut Unfair Trade Practices Act claim if the Unfair Trade Practices Claim is based on financial injury caused by the allegedly defective product. 🚩 *Gerrity*, 818 A.2d at 775-76. Here, Plaintiffs have pled financial injury in the form of exacerbated costs of maintenance and repair, as well as increased ownership costs due to inefficiency. (Compl. ¶¶ 151, 189). The Court is satisfied that, at this juncture, Plaintiffs have pled a financial injury and therefore may maintain both a Products Liability claim, as well an Unfair Trade Practices Act, under Connecticut law.

Finally, the Court disagrees with Defendant's assertion that the New York, Connecticut, and Ohio statutory consumer fraud claims are time barred. (Def. Mov. Br. at 78-79). The statute of limitations under both New York and Connecticut law for consumer fraud claims is three years. *See* 🚩 *Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1184-85 (N.Y. 2013); 🚩 Conn. Gen. Stat. § 42-110g. In Ohio, the statute of limitations for such claims is two years. *See Ohio Re. Code. Ann.* § 1345.10(c). All three of these statutes of limitations begin running when the "violation" first occurs. *See Indep. Ins. Serv. Corp. v. Hartford Life Ins. Co.*, 472 F. Supp. 2d 183, 190 (D. Conn. 2007)(the "limitation period for [Connecticut Unfair Trade Practices Act] is triggered upon the occurrence of the alleged violation"); *Ohio Rev. Code Ann.* § 1345.10 (an action may not be brought "more than two years after the occurrence of the violation"); 🚩 *Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1184 (N.Y. 2012) (there must be "successful deception of plaintiffs within three years of the time the action was brought"). Defendant contends that the

Case 1:19-md-02875-RMB-SAK    Document 598-3    Filed 10/16/20    Page 401 of 410
PageID: 13008

In re Volkswagen Timing Chain Product Liability Litigation, Not Reported in Fed. Supp....

2017 WL 1902160, 92 UCC Rep.Serv.2d 754

statute of limitations began each of the Plaintiffs from these forum states purchased their vehicles.

However, as Plaintiffs correctly note, post-sale deceptive conduct is actionable in all three of the venues. *See* Marshall v. Hyundai Motor America, 51 F. Supp. 3d 451 (S.D.N.Y. 2014)(finding that the plaintiff's consumer fraud claims under New York's General Business Law was not time barred due to "post-sale" fraud, specifically, defendant's "fail[ure] to disclose information about the defects in the brake system through adequate warnings or adequate recall notices"); CSL Silicones Inc. v. Midsun Grp. Inc., 170 F. Supp. 3d 304, 312 (D. Conn. 2016) (findind that a "[Connecticut Unfair Trade Practices Act] claim can accrue separately for each discrete illegal act that forms the basis of a [Connecticut Unfair Trade Practices Act] claim"). Here, Plaintiffs Complaint contains sufficient factual allegations regarding Defendant's supposed ongoing deception and failure to disclose the defect despite having knowledge of same. (Compl. ¶¶ 136, 168-69, 181). Dismissal, without affording Plaintiffs the opportunity to conduct discovery regarding this issue, would be inappropriate. Thus, the Court concludes that Plaintiffs have sufficiently pled these claims at this juncture and declines to dismiss them.

## CONCLUSION

For the aforementioned reasons, Defendant's Motion to Dismiss Plaintiffs' Amended Complaint is hereby granted in part and denied in part. The Court hereby dismisses Count II (Breach of Contract),[13] Count III (Negligent Misrepresentation) *only as to the Arkansas Plaintiffs*,[14] and Count XXX (Violation of the Ohio Sales Practices Act) as to the Ohio Sub-Class.[15] The remainder of Defendant's Motion to Dismiss is hereby denied.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 1902160, 92 UCC Rep.Serv.2d 754

## Footnotes

1    This background is derived from Plaintiffs' First Consolidated Amended Class Action Complaint (ECF No. 6 ("Compl.")), which the Court must accept as true at this stage of the proceedings. *See* Alston v. Countrywide Fin. Corp., 585 F.3d 753, 758 (3d Cir. 2009).

2    A full description of the TSI engine is contained herein, *infra*.

3    A full description of the TFSI engine is contained herein, *infra*.

4    A full discussion regarding timing chains and the alleged defect that is the subject matter of this action is contained herein, *infra*.

5    Plaintiffs have since abandoned their Breach of Contract Claim. (Pl. Opp. Br. at 41).

6    As discussed in n. 5, *supra*, this claim has been abandoned by Plaintiffs.

7    The Court notes that Defendant is incorrect in its assertion that both Michigan and Nevada law require vertical privity for breach of implied warranty claims. *See* Montgomery v. Kraft Foods Glob., Inc., 822 F.3d 304, 309 (6th Cir. 2016)(Mich. law); Pack v. Damon Corp., 434 F.3d 810, 818-20 (6th Cir. 2006)(Mich. law); Hiles Co. v. Johnston Pump of Pasadena, Cal., 560 P.2d 154, 157 (Nev. 1977)("[W]e believe that lack of privity between the buyer and manufacturer does not preclude an action against the manufacturer for the recovery of economic losses caused by breach of warranties.").

8    The Court notes that Defendant did not address Plaintiffs' exception arguments in its reply brief. (*See generally* Def. Rep. Br.).

9    Specifically, this is applicable to Plaintiffs from New York, California, Colorado, Connecticut, Florida, Indiana, Kansas, Michigan, Minnesota, New Hampshire, Maryland, North Carolina, Pennsylvania, Washington and Nevada.

2017 WL 1902160, 92 UCC Rep.Serv.2d 754

10    Defendant relies on its pervious arguments regarding the lack of a special relationship.

11    The Court notes that Defendant did not advance any argument with regards to Colorado's application of the economic loss doctrine to these claims.

12    The Court notes that there are no material differences between jurisdictions regarding the law of unjust enrichment. Accordingly, the Court analysis same under New Jersey law. *See* 🚩 *Tele Aid*, 257 F.R.D. at 58 ("While there are minor variations in the elements of unjust enrichment under the laws of the various states, those differences are not material and do not create an actual conflict.").

13    This Count was voluntarily withdrawn by Plaintiffs.

14    Dismissal of the negligent misrepresentation claims by the Arkansas Plaintiffs was conceded to.

15    The Ohio Plaintiffs shall be permitted to submit an amended pleading addressing the deficiencies set forth herein.

---

**End of Document**
© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 34

2020 WL 3574687
Only the Westlaw citation is currently available.
United States District Court, W.D. Pennsylvania.

Bruce WINKWORTH and Marcia Botelho,
Individually, on behalf of themselves and on
behalf of all others similarly situated, Plaintiffs,

v.

SPECTRUM BRANDS, INC., Defendant.

Civil Action No. 19-1011
|
Signed 06/30/2020

**Attorneys and Law Firms**

Patrick Howard, Charles J. Kocher, Pro Hac Vice, Saltz
Mongeluzzi Barrett & Bendesky, P.C., Philadelphia, PA, Troy
M. Frederick, Frederick Law Group, PLLC, Indiana, PA, for
Plaintiffs.

Loly Tor, Patrick J. Perrone, Pro Hac Vice, K&L Gates LLP,
Newark, NJ, Michael S. Nelson, K&L Gates LLP, Pittsburgh,
PA, for Defendant.

**MEMORANDUM OPINION**

PATRICIA L. DODGE, United States Magistrate Judge

**\*1** Plaintiffs Bruce Winkworth and Marcia Botelho
("Plaintiffs") commenced this class action lawsuit to seek
redress with respect to an allegedly defective and dangerous
condition present in Remington® Hot Rollers ("Hot Rollers")
that were warranted, advertised, distributed, and sold by
Defendant Spectrum Brands, Inc., ("Spectrum"). Plaintiffs
allege that due to a latent defect, the Hot Rollers heat
to unreasonably unsafe temperatures when operated as
instructed and, therefore, expose consumers to dangerous
contact with their skin.

The Complaint alleges claims for breach of express warranty,
breach of the implied warranty of merchantability, violation
of the Magnuson-Moss Consumer Products Warranties Act
("MMWA"), negligence, and negligent failure to warn.
Plaintiffs assert these claims on their own behalf and on
behalf of two putative classes: (1) a nationwide declaratory
judgment/injunctive relief class, and (2) a Pennsylvania-only

damages class. Specifically excluded from both classes are
claims for personal injury and wrongful death.

Presently pending before the Court is Spectrum's motion to
dismiss the Complaint for failure to state a claim. For the
reasons stated herein, Spectrum's motion will be granted in
part and denied in part.

**I. Procedural History**

Plaintiffs commenced this lawsuit in the Court of Common
Pleas of Jefferson County, Pennsylvania, in July 2019. (ECF
No. 1-1 ("Compl.").) Spectrum subsequently removed the
case to this Court based on the Class Action Fairness Act and
now seeks dismissal of Plaintiffs' Complaint under Federal
Rule of Civil Procedure 12(b)(6) for failure to state a claim
upon which relief may be granted. (ECF No. 9.) Spectrum's
motion has been fully briefed. (ECF Nos. 10, 15, 21.)

**II. Factual Background**

According to the allegations of the Complaint, Plaintiff
Winkworth purchased a Hot Rollers product in February
2018. The Complaint does not include any other factual
allegations about Plaintiff Winkworth. Plaintiff Botelho
("Botelho") is alleged to be the owner and end user of the Hot
Rollers. (Compl. ¶¶ 19, 21, 41.)

On May 17, 2018, Botelho notified Spectrum that she had
burned herself while using her Hot Roller. [1] (*Id.* ¶¶ 22, 43,
84.) Specifically, in an email to Spectrum's customer service
department, she stated that "I sent [sic] before that this model
is no good, now the end of a curler fell off went down my
shirt and burned my chest, what are you going to do about
that." (*Id.* ¶¶ 22, 42.)

**\*2** According to the Complaint, other consumers have also
complained about defects in the Hot Rollers. (*Id.* ¶¶ 45–47.)

When Spectrum offered to send a replacement, Botelho
stated that she did not want a replacement and that she
"really [thought] [the Hot Rollers] should be taken off the
market." (Exh. B at 2–3.) Spectrum then offered to send
Botelho any product of her choice that was available on
Spectrum's website. (*Id.* at 2.) Botelho replied that she did
not "want any of those products. Burns hurt and scar." (*Id.*)
In a follow up inquiry, Spectrum asked Botelho "[w]]ill you
be seeking medical attention? Would you be interested in a
refund?" (*Id.*) Botelho responded that the burn was better
but it "did scar my chest. Now what? I hope you recalled

Winkworth v. Spectrum Brands, Inc., Slip Copy (2020)
2020 WL 3574687

it. Its dangerous. If I decide to get a lawyer I will." (*Id.* at 1.) Spectrum then advised Botelho that in order to assist with her injury claim, her information was being forwarded to their insurance company and that a representative from the insurance company would contact her. (*Id.*) There are no allegations in the Complaint that reflect that any refund or replacement was provided to either of the Plaintiffs.

Plaintiffs assert that according to Spectrum's website, the Hot Rollers utilize an exclusive "thermal wax core" to create long lasting curls. (Compl. ¶ 2.) According to the Complaint, Spectrum also represents on its website that the Hot Rollers are built with plastic "cool touch ends" for safe and comfortable use and that these plastic ends are designed to protect against the heating element in the Hot Rollers, i.e., the thermal wax core. (*Id.* ¶ 4.)

Due to what Plaintiffs characterize as a latent defect, however, the Hot Rollers heat to unreasonably unsafe temperatures. (*Id.* at ¶ 5.) Although Spectrum affirmatively represents that the Hot Rollers comply with the applicable standards regarding surface temperatures for consumer goods, Plaintiffs allege that the Hot Rollers actually violate those standards. (*Id.* ¶¶ 7–12, 31–39.) At such high temperatures, the plastic end caps allegedly become loose and detach from the Hot Rollers. (*Id.* ¶¶ 5, 12.) This exposes consumers to dangerous skin contact not only with the hot plastic end, but also the metal underneath it that it is designed to guard against. (*Id.* ¶¶ 5, 30.) Plaintiffs assert that this alleged defect "is unreasonably dangerous and renders the Hot Rollers unfit to use when curling hair with a bare hand—their intended and ordinary purpose." (*Id.* ¶ 16.)

According to the allegations of the Complaint, this latent defect exists in every Hot Roller that left Spectrum's control. (*Id.* ¶ 60.) Based on excerpts from various online consumer reviews included in the Complaint, Plaintiffs assert that Spectrum has possessed knowledge of this defect for several years. (*Id.* ¶¶ 45–47.) Plaintiffs believe that Spectrum "acknowledged internally that the [d]efect caused injuries and burns to consumers." (*Id.* ¶ 48.) Yet, according to Plaintiffs, Spectrum provides no warnings or instructions in the Hot Rollers' "Use and Care Guide" to alert consumers of this defect and its effects; continues to market, sell, and warrant the Hot Rollers; and has failed to implement a recall or repair program. (*Id.* ¶¶ 40, 49.)

**\*3** The Complaint alleges that the Hot Rollers have defects in workmanship and materials. (*Id.* ¶¶ 53, 103, 107.)

Spectrum provides a "Limited Two-Year Warranty" with respect to the Hot Rollers. (*Id.* ¶ 52.) This express warranty provides coverage "against any defects that are due to faulty material or workmanship ..." (*Id.*) If a Hot Roller manifests a defect within the warranty period, Spectrum promises to provide a replacement free of charge. (*Id.*) Plaintiffs claim that Spectrum breached this warranty by not repairing or replacing the Hot Rollers. (*Id.* at ¶ 58.)

According to Plaintiffs, although the Hot Rollers are not merchantable as consumer goods sold in the United States, Spectrum warrants, markets, and advertises that the Hot Rollers are of merchantable quality and fit for the ordinary purpose for which they are used, which is curling with a bare hand. (*Id.* ¶¶ 16, 59, 62.) Therefore, Spectrum fell short of its warranty obligations because it failed to remedy and eliminate the latent defect in the Hot Rollers that causes burns or creates substantial risk of burns. (*Id.* at ¶ 63.)

Plaintiffs state causes of action for breach of the implied warranty of merchantability (Count I), breach of express warranty (Count II), violation of the Magnuson-Moss Consumer Products Warranty Act ("MMWA") (Count III), negligence (Count IV), and negligent failure to warn (Count V).

### III. Standard of Review

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a Rule 12(b)(6) motion, the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)). While "accept[ing] all of the complaint's well-pleaded facts as true," the court "may disregard any legal conclusions." *Id.* at 210–11.

To survive the motion, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

Winkworth v. Spectrum Brands, Inc., Slip Copy (2020)

2020 WL 3574687

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Though 'detailed factual allegations' are not required, a complaint must do more than simply provide 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.' " *Davis v. Abington Mem'l Hosp.*, 765 F.3d 236, 241 (3d Cir. 2014) (quoting *Twombly*, 550 U.S. at 555). In sum, the plaintiff "must plead facts sufficient to show that her claim has substantive plausibility." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10 (2014).

To assess the sufficiency of a complaint under *Twombly* and *Iqbal*, a court must take three steps: (1) outline the elements the plaintiff must plead to state a claim for relief; (2) peel away those allegations that are no more than conclusions and thus not entitled to the assumption of truth; (3) look for well-pled factual allegations, assume their veracity, and then determine whether they plausibly give rise to an entitlement to relief. *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012). The court's plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

**IV. Discussion**

**\*4** In its motion to dismiss, Spectrum argues that Plaintiffs' breach of express warranty claim must be dismissed because the alleged latent defect in the Hot Rollers is a design defect, but its limited warranty only warrants against defects due to faulty material or workmanship. It also asserts that Plaintiffs' claims for breach of express and implied warranties fail because Spectrum satisfied its obligations under those warranties by offering Botelho both a replacement product and a refund. [2]

With respect to the MMWA claim, Spectrum maintains that because Plaintiffs' causes of action for breach of express and implied warranties fail to state a claim upon which relief may be granted, their MMWA claim, which is based on a breach of those warranties, necessarily fails as well.

In seeking dismissal of Plaintiffs' claims for negligence and negligent failure to warn, Spectrum contends that those claims are barred by the economic loss rule. Finally, Spectrum asserts that Plaintiffs' request for injunctive relief should be stricken from the Complaint because they lack standing to seek such relief.

Each of these issues will be addressed below.

A. Plaintiffs' express warranty claim

In Pennsylvania, "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." 13 Pa. C.S. § 2313(a). It is well established that "[a] manufacturers' liability for breach of an express warranty derives from, and is measured by, the terms of that warranty." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 525 (1992).

Spectrum argues that Plaintiffs' breach of express warranty claim fails because as pleaded in the Complaint, the alleged defect in the Hot Rollers is a design defect, and the limited warranty extends only to defects that are due to faulty material or workmanship. However, the Complaint alleges that the Hot Rollers have defects in workmanship and materials as well as design defects. (Compl. ¶¶ 53, 103, 107.) More specifically, Plaintiffs contend that the defect in the material selection of the plastic end caps referenced in the Complaint is a defect in workmanship or materials, and therefore, falls within the ambit of the express warranty. (ECF No. 15 at 8; *see* Compl. ¶ 104.)

Spectrum asserts that by claiming that the choice of material was defective, Plaintiffs are asserting a design defect, not a defect in material. Plaintiffs counter that at this stage of the proceedings, it would be premature to make any conclusive determination regarding the nature of the alleged defect or defects. *See, e.g., Alin v. Am. Honda Motor Co.*, No. 08-4825, 2010 WL 1372308, at *6 (D.N.J. Mar. 31, 2010) ("At the pleading stage, where the distinction between a defect in design and defect in materials or workmanship is a matter of semantics, and sufficient facts are alleged to assert both, the defendant's characterization of the nature of the claim pre-discovery should not control whether the complaint survives.").

**\*5** Accordingly, because the Court cannot resolve this issue at the pleading stage, it concludes that it cannot dismiss the express warranty claim on this basis.

At the same time, Spectrum also argues that it complied with the terms of its warranty by offering a replacement to Plaintiff Botelho which she rejected. [3] Because Botelho refused this remedy, Spectrum contends, Plaintiffs' breach of

express warranty claim fails. *See* 📄 *Davenport v. Medtronic, Inc.*, 302 F. Supp. 2d 419, 441 (E.D. Pa. 2004) (dismissing breach of express warranty claim because the plaintiff decided not to avail himself of the relief provided by the terms of the warranty).

Relying on the Supreme Court's decision in *Campbell-Ewald Co. v. Gomez*, Plaintiffs argue that Spectrum's pre-suit offer does not foreclose their warranty claims because it has lapsed and is, therefore, "a legal nullity." 📄 136 S. Ct. 663, 670 (2016). *Campbell-Ewald*, however, is inapposite. In that case, the Supreme Court rejected a mootness challenge in the context of an unaccepted offer of judgment under 📄 Federal Rule of Civil Procedure 68. 📄 *Id.* at 671. The Supreme Court explained that such an offer "is considered withdrawn" if not accepted within 14 days, providing plaintiff no relief and leaving his personal stake in the litigation unchanged. 📄 *Id.* at 671–72 (quoting 📄 Fed. R. Civ. P. 68(b)). *Campbell-Ewald* offers no guidance on warranty claims and a defendant's compliance with and satisfaction of its warranty obligations. Here, Spectrum's offer of a replacement product was not a settlement offer. Rather, it is the remedy Spectrum promised to provide under its limited warranty. [4]

Based upon the Complaint and its exhibits, it appears that Botelho was offered a replacement product by Spectrum and rejected it. That would satisfy Spectrum's warranty obligations and compel dismissal of this claim. At the same time, Botelho's May 2018 email suggests that this was not the first time that she notified Spectrum about the alleged defect. (Compl. ¶ 22.) The parties' prior communications, if any, and their potential relevance to this claim are not set forth in the Complaint.

Therefore, Spectrum's motion to dismiss the express warranty claim will be granted without prejudice. Plaintiffs will be granted leave to amend this claim in the event that they can allege facts that would support a claim that Spectrum failed to comply with the terms of the limited warranty as it relates to the Plaintiffs' individual claim(s).

### B. Plaintiffs' breach of implied warranty of merchantability claim

**\*6** Under Pennsylvania law governing implied warranty of merchantability, every seller warrants, among other things, that the goods are "fit for the ordinary purposes for which such goods are used." 📄 13 Pa. C.S. § 2314(b)(3). To establish a breach of an implied warranty of merchantability, Plaintiffs must allege that "(1) that the product malfunctioned; (2) that plaintiffs used the product as intended or reasonably expected by the manufacturer; and (3) the absence of other reasonable secondary causes." 📄 *Altronics of Bethlehem, Inc. v. Repco, Inc.*, 957 F.2d 1102, 1105 (3d Cir. 1992).

The measure of damages in a breach of implied warranty claim is the difference between the value of the goods accepted and their value if they had been as warranted. 12 Pa. C.S. § 2714. In seeking dismissal of Plaintiffs' breach of implied warranty of merchantability claim, Spectrum argues that Plaintiffs have no damages because they rejected Spectrum's offer to provide a refund. Assuming that Plaintiff Botelho's Hot Rollers had no value because of the alleged defect, Spectrum's offer to refund the purchase price would have made her whole had she accepted the offer. Therefore, Spectrum argues, Plaintiffs cannot now contend that they have suffered damages because they rejected an offer that would have made them whole.

However, Spectrum's fundamental assertion that it offered a refund which Botelho did not accept is not clear from the parties' email exchange. As an initial matter, it appears that Spectrum asked Botelho if she would be interested in a refund after inquiring whether she would be seeking medical attention. Even if this statement is construed as an offer for a refund, the email exchange that is part of the Complaint does not conclusively reflect that Botelho definitively understood it as such and rejected it, or that she was otherwise made whole. Rather, Botelho updated Spectrum on her alleged injury and Spectrum advised her that her claim was being forwarded to its insurance company. This suggests that the focus of that particular exchange may have been on Botelho's injury as opposed to addressing a warranty claim. Further, the Complaint does not allege that Spectrum actually sent or attempted to send Botelho a refund that was rejected. Therefore, Spectrum's argument fails, at least at this stage.

### C. Plaintiffs have alleged a plausible MMWA claim

The MMWA provides a private right of action in federal court for consumers who are "damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation ... under a written warranty, [or] implied warranty." 📄 15 U.S.C. § 2310(d)(1). Spectrum argues that because Plaintiffs have failed to state a viable state law claim for a breach of express or implied warranties, their derivative

MMWA claim necessarily fails and must also be dismissed.
*See* *Cooper v. Samsung Elecs. Am., Inc.*, 374 F. App'x 250, 254 (3d Cir. 2010) (affirming dismissal of MMWA claims that were based on state law breach of warranty claims that had been dismissed). Because the Court has determined that Plaintiffs have adequately alleged a claim for breach of an implied warranty, however, Spectrum's motion to dismiss must be denied.

### D. Plaintiffs' negligence and negligent failure to warn claims are barred by the economic loss rule

Under Pennsylvania law, the economic loss doctrine bars tort claims involving defective products where the plaintiff's loss is damage to the product itself. *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 671 (3d Cir. 2002). The Supreme Court has explained that "[d]amage to a product itself ... means simply that the product has not met the customer's expectations, or, in other words, that the customer has received 'insufficient product value.' " *E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 872 (1986) (citing J. White and R. Summers, Uniform Commercial Code 406 (2d ed. 1980)). Therefore, such claims are "most naturally understood as ... warranty claim[s] ... [because] maintenance of product value and quality is precisely the purpose of express and implied warranties." *Id.* (footnote and citation omitted).

**\*7** Here, the Complaint explicitly excludes all claims for personal injury and wrongful death. (Compl. ¶¶ 67, 68.) Plaintiffs' loss, therefore, is premised solely on damage to the product itself, that is, the diminished value and quality of the Hot Rollers due to their alleged defects. This brings Plaintiffs' tort claims squarely within the ambit of the economic loss doctrine.

Relying on *Dittman v. UPMC*, 196 A.3d 1036 (Pa. 2018), however, Plaintiffs contend that their negligence and negligent failure to warn claims are not barred by that doctrine. In *Dittman*, the Pennsylvania Supreme Court found a specific carve-out to the economic loss doctrine under a negligence theory where a legal duty exists "independently of any contractual duties between the parties." *Id.* at 1054 (quoting *Tommy L. Griffin Plumbing & Heating Co. v. Jordan, Jones & Goulding, Inc.*, 463 S.E.2d 85, 88 (S.C. 1995)). Plaintiffs assert that their negligence and negligent failure to warn claims fit that carve-out because Spectrum had a duty (1) to ensure that its Hot Rollers did not pose

a significantly increased or unreasonable risk of injury to consumers, and (2) to use reasonable care to warn consumers about the risks and dangers regarding the use of the Hot Rollers.

The relationship between Plaintiffs and Spectrum, and Spectrum's duties to Plaintiffs, are based upon Plaintiffs' purchase and use of Hot Rollers to which certain express and implied warranties apply. These warranties relate to the quality and characteristics of the Hot Rollers, including that they are free of defects due to faulty material or workmanship and can be used for their ordinary purpose. Thus, Spectrum's legal duties to Plaintiffs and other purchasers of Hot Rollers are contract-based. Plaintiffs do not allege any facts in their Complaint from which the Court could conclude that Spectrum had duties to them that are not encompassed in these express and implied warranties, or that Spectrum has other duties that are grounded in tort. Therefore, as alleged in their Complaint, any duty Spectrum owes to Plaintiffs regarding the condition of the Hot Rollers is governed solely by the express and implied warranties.

Because no independent legal duty apart from those warranties exists, the Court finds that Plaintiffs' negligence and negligent failure to warn claims are barred by the economic loss rule and must be dismissed.

### E. Plaintiffs lack standing to seek injunctive relief

A plaintiff seeking injunctive relief bears the burden of establishing that she is " 'likely to suffer future injury' from the defendant's conduct." *In re Johnson & Johnson Talcum Powder Prods, Mktg., Sales Practices & Liab. Litig.*, 903 F.3d 278, 292 (3d Cir. 2018) (quoting *McNair v. Synapse Grp., Inc.*, 672 F.3d 213, 223 (3d Cir. 2012)). In class actions, at least one named plaintiff must satisfy this future injury requirement. *McNair*, 672 F.3d at 223 (citations omitted).

In *McNair*, the Third Circuit considered whether the plaintiffs who were "former customers" of a magazine company had standing to seek injunctive relief. *672 F.3d at 215*. The company offered magazine subscriptions under a "continuous service plan" in which "a customer's subscription does not expire unless and until the customer opts to cancel it." *Id.* at 216. Initial subscriptions were offered at "free or greatly reduced rates" and then, once the promotional period ended, customers were charged regular rates until the subscription

was cancelled. *Id.* The plaintiffs brought a putative class action to enjoin the company's alleged "deceptive business practices." *Id.* at 219.

**\*8**  The *McNair* Court held that the plaintiffs lacked standing to seek injunctive relief. *Id.* at 227. This holding was premised on the plaintiffs failure to "establish[ ] any reasonable likelihood of future injury." *Id.* at 225. Because the plaintiffs were former customers who were already aware of the company's advertising practices, the Third Circuit concluded that any future injury they might suffer was "wholly conjectural." *Id.* at 219. The *McNair* Court explained that while the plaintiffs may in the future accept an offer, "speaking generally, the law accords people the dignity of assuming that they act rationally, in light of the information they possess." *Id.* at 225. This type of speculative future harm did not confer standing to seek injunctive relief. *Id.*

Similarly, in *In re Johnson & Johnson Talcum Powder Products Marketing, Sales Practices & Liability Litigation*, the plaintiff filed a class action against a drug manufacturer asserting she received " 'unsafe' Baby Powder despite being promised 'safe' Baby Powder[.]" 903 F.3d 278, 288 (3d Cir. 2018). The plaintiff sought "injunctive relief in the form of 'corrective advertising' and 'enjoining Defendants from continuing the unlawful practices' of selling Baby Powder without properly warning consumers of the alleged health risks." *Id.* at 292. Relying on *McNair*, the Third Circuit held that the plaintiff lacked standing to seek injunctive relief because she was not likely to suffer future injury from the defendants' conduct due to her awareness of the alleged health risks associated with the Baby Powder. *Id.* In so holding, the Third Circuit explicitly refused "to give cognizance to this sort of 'stop me before I buy again' claim." *Id.* at 293.

Here, Plaintiffs allege that the in-box disclaimers that limit the applicable express and implied warranties to two years are unconscionable and unenforceable. (Compl. ¶¶ 69, 85, 90.) Plaintiffs argue that such "warranty exclusions, limitations and disclaimers dissuade consumers from filing a claim." (ECF No. 15 at 16.) Therefore, Plaintiffs seek to enjoin Spectrum from engaging in "practices aimed at discouraging customers who purchased defective Hot Rollers from seeking the full panoply of remedies available to them." (Compl. ¶ 133.)

Plaintiffs have not alleged that they will sustain future injury. Moreover, given their allegations that the Hot Rollers are defective and their communications with Spectrum, it is unreasonable to assume that Plaintiffs would sustain future injury by repurchasing Hot Rollers. Indeed, "the law accords people the dignity of assuming that they act rationally, in light of the information they possess." *McNair*, 672 F.3d at 225. Because Plaintiffs have not established any reasonable likelihood of future injury, they lack standing to seek injunctive relief against Spectrum.

Accordingly, Plaintiffs' request for injunctive relief must be dismissed.

### F. Claims of Plaintiff Winkworth

Other than the allegation that Plaintiff Winkworth purchased Hot Rollers, the Complaint includes no factual allegations that appear to support any of the claims asserted therein. For example, he is not alleged to be the owner of the Hot Rollers, to have used the product, have had knowledge of any alleged defects, placed Spectrum on notice of alleged defects or communicated with Spectrum in any way. Therefore, Spectrum could not have fulfilled any express or implied warranty obligation that it might have had to him. Moreover, given the measure of damages for breach of warranty, it does not appear that both Plaintiffs cannot not recover such damages from Spectrum.

As such, the claims of Plaintiff Winkworth are dismissed without prejudice.

### V. Conclusion

For the reasons discussed herein, Spectrum's motion to dismiss (ECF No. 9) will be granted in part and denied in part. An appropriate order will follow.

**All Citations**

Slip Copy, 2020 WL 3574687

## Footnotes

1    "To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)*. Plaintiffs cite to Exhibit B of the Complaint in reference to Botelho's communications with Spectrum, but there are no exhibits attached to the Complaint because Plaintiffs inadvertently failed to attach the exhibits when filing this action. Plaintiffs' counsel subsequently provided Spectrum with copies of those exhibits. (ECF No. 10 at 3 n.1.) Accordingly, Exhibit B to Spectrum's brief can be considered. (*Id.* at 18–22.) *See Schmidt v. Skolas, 770 F.3d 241, 249 (3d Cir. 2014)*.

2    To assert warranty claims in Pennsylvania, "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy[.]" *13 Pa. C.S. § 2607(c)(1)*. Because Plaintiffs do not allege that Winkworth notified Spectrum of the defect, it is unclear if or how they contend that he is an appropriate plaintiff with respect to the warranty claims asserted in the Complaint. While Spectrum has not specifically addressed Winkworth's warranty claims for failure to comply with the notice requirement of *§ 2607*, it has moved to dismiss all warranty claims asserted in the Complaint.

3    Spectrum also asserts that it offered Botelho a refund. This issue is addressed *infra* in connection with the implied warranty claim.

4    Plaintiffs also argue that their warranty claims should survive because, despite Botelho's request to recall the Hot Rollers, Spectrum did not cure the alleged defect by providing a remedy on a class-wide basis. This argument is untenable because Plaintiffs cannot premise their breach of warranty claims on damages "suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Warth v. Seldin, 422 U.S. 490, 502 (1975)*. They first must have standing to assert claims on their own behalf. (*See id.*) ("[Plaintiffs] must allege and show that they personally have been injured ... [in order to] seek relief on behalf of [themselves] or any other member of the class.").

---

**End of Document**          © 2020 Thomson Reuters. No claim to original U.S. Government Works.