# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| | : | MDL No. 2875 |
| **IN RE: VALSARTAN,** | : | |
| **LOSARTAN, AND** | : | Honorable Robert B. Kugler, |
| **IRBESARTAN PRODUCTS** | : | District Court Judge |
| **LIABILITY LITIGATION** | : | |
| | : | |
| **This Document Relates to All** | : | Honorable Joel Schneider, |
| **Actions** | : | Magistrate Judge |
| | : | |
| | : | |

## COMPENDIUM OF UNREPORTED OR UNPUBLISHED AUTHORITIES CITED IN MANUFACTURER DEFENDANTS' COMPENDIUM OF CHARTS

# TABLE OF CONTENTS

**Cases**                                                                                               **Tab**

*Am. Coach Lines of Orlando, Inc. v. N. Am. Bus Indus.,*
  *Inc.*, No. 09-1999, 2011 WL 653524 (M.D. Fla. Feb. 14, 2011) ........................1

*Bodie v. Purdue Pharma Co.*, 236 F. App'x. 511 (11th Cir. 2007) ........................2

*Brooks v. Remington Arms Co., Inc.*, No. 09-01054, 2010 WL 6971894
  (W.D. Ark. Oct. 27, 2010) ..................................................................3

*Craig v. DaimlerChrysler Corp.*, No. 06-450, 2008 WL 2816842
  (S.D. Miss. Mar. 19, 2008) ..................................................................4

*In re: Elk Cross Timbers Decking Mktg.*, No. 15-18, 2015 WL 6467730 (D. N.J.
  Oct. 26, 2015) ..................................................................................5

*Haley v. Kolbe & Kolbe Millwork Co., Inc.*, No. 14-99, 2015 WL 3774496
  (W.D. Wisc. June 16, 2015) ..............................................................6

*Harrison v. Leviton Mfg. Co., Inc.*, No. 05-0491, 2006 WL 2990524
  (N.D. Okla. Oct. 19, 2006) ..................................................................7

*Kaaradsheh v. Express Liquor, Inc.*, No. 120885, 467 Mich. 864 (Mich. Aug. 30,
  2002) ................................................................................................8

*Maxwell v. Remington Arms Co., LLC*, No. 1:10-918, 2014 WL 5808795
  (M.D. N.C. Nov. 7, 2014) ..................................................................9

*Monte v. Toyota Motor Corp.*, Nos. 220671, 220983, 2001 WL 1152901
  (Mich. Ct. App. Sept. 28, 2001) ......................................................10

*Morris v. Biomet, Inc.*, No. 18-2440, 2020 WL 5849482 (D. Md. September 30,
  2020) ..............................................................................................11

*Nat'l Mulch and Seed, Inc. v. Rexius Forest By-Prods. Inc.*, No. 2:02-1288,
  2007 WL 894833 (S.D. Ohio Mar. 22, 2007).....................................12

*Sharp v. Tamko Roofing Prod., Inc.*, No. 02-0728, 2004 WL 2579638
  (Iowa Ct. App. Nov. 15, 2004) ........................................................13

*Starks v. Coloplast Corp.*, No. 13–3872, 2014 WL 617130
  (E.D. Pa. Feb. 18, 2014) ..................................................................14

*Stuto v. Corning Glass Works*, No. 88–1150, 1990 WL 105615
    (D. Mass. Jul. 23, 1990)..........................................................................15

*In re Trasylol Prod. Liab. Litig.*, No. 08–MD–01928, 2010 WL 5140439
    (S.D. Fla. Feb. 16, 2010)......................................................................16

# TAB 1

American Coach Lines of Orlando, Inc. v. North American..., Not Reported in...
2011 WL 653524, 73 UCC Rep.Serv.2d 626

KeyCite Yellow Flag - Negative Treatment
Declined to Extend by Johnson v. Nissan North America, Inc., N.D.Cal., February 15, 2018

KeyCite Overruling Risk - Negative Treatment
Overruling Risk Tiara Condominium Ass'n, Inc. v. Marsh & McLennan Companies, Inc., Fla., March 7, 2013

2011 WL 653524
Only the Westlaw citation is currently available.
United States District Court, M.D. Florida,
Orlando Division.

AMERICAN COACH LINES
OF ORLANDO, INC., Plaintiff,
v.

NORTH AMERICAN BUS INDUSTRIES,
INC., and Blue Bird Corporation, Defendants.

No. 6:09–cv–1999–Orl–19GJK.
|
Feb. 14, 2011.

**Attorneys and Law Firms**

Larry D. Smith, Peggy Smith Bush, Southern Trial Counsel, PLC, Orlando, FL, for Plaintiff.

Gordon Todd Whitcomb, Fidelity National Title Group, Inc, Jacksonville, FL, David Scott Brecher James Harvey Cummings Smith, Gambrell & Russell, LLP, Jacksonville, FL, for Defendants.

**ORDER**

PATRICIA C. FAWSETT, District Judge.

**\*1** This case comes before the Court on the following:

1. Motion for Summary Judgment by Defendants North American Bus Industries, Inc. and Blue Bird Corporation (Doc. No. 33, filed July 26, 2010);

2. Notice of Filing of Affidavit of Ernest W. Lee in Support of Motion for Summary Judgment by Defendants North American Bus Industries, Inc. and Blue Bird Corporation (Doc. No. 34, filed July 26, 2010);

3. Response in Opposition to Defendants' Motion for Summary Judgment and Request for Oral Argument by Plaintiff American Coach Lines of Orlando, Inc. (Doc. No. 41, filed Aug. 27, 2010);

4. Notice of Filing of Affidavit of Brian M. Dickson in Support of Response in Opposition to Defendants' Motion for Summary Judgment by Plaintiff American Coach Lines of Orlando, Inc. (Doc. No. 42, filed Aug. 27, 2010);

5. Notice of Filing of Affidavit of Michael W. Pierce in Support of Response in Opposition to Defendants' Motion for Summary Judgment by Plaintiff American Coach Lines of Orlando, Inc. (Doc. No. 43, filed Aug. 27, 2010);

6. Reply to Response in Opposition to Motion for Summary Judgment by North American Bus Industries, Inc. and Blue Bird Corporation (Doc. No. 46, filed Sept. 22, 2010);

7. Order Deferring Ruling on Motion for Summary Judgment and Granting Request for Oral Argument (Doc. No. 47, filed Oct. 8, 2010);

8. Supplemental Memorandum of Law in Support of Motion for Summary Judgment by Defendants North American Bus Industries, Inc. and Blue Bird Corporation (Doc. No. 50, filed Nov. 12, 2010);

9. Notice of Filing of Deposition Transcript of Brian Dickson in Support of Motion for Summary Judgment by Defendants North American Bus Industries, Inc. and Blue Bird Corporation (Doc. No. 54, filed Nov. 29, 2010);

10. Amended Supplemental Memorandum of Law in Support of Motion for Summary Judgment by Defendants North American Bus Industries, Inc. and Blue Bird Corporation (Doc. No. 56, filed Dec. 2, 2010);

11. Notice of Re-filing of Affidavit of Brian Dickson by Plaintiff American Coach Lines of Orlando, Inc. (Doc. No. 63, filed Jan. 5, 2011);

12. Notice of Filing of Affidavit of Drew Hawkins by Plaintiff American Coach Lines of Orlando, Inc. (Doc. No. 65, filed Jan. 5, 2011);

13. Notice of Filing of Affidavit of Michael Pierce by Plaintiff American Coach Lines of Orlando, Inc. (Doc. No. 66, filed Jan. 5, 2011);

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 6 of 207
PageID: 13023
American Coach Lines of Orlando, Inc. v. North American..., Not Reported in...
2011 WL 653524, 73 UCC Rep.Serv.2d 626

14. Notice of Filing of Affidavit of David Cahill by Plaintiff American Coach Lines of Orlando, Inc. (Doc. No. 67, filed Jan. 5, 2011);

15. Notice of Filing of Affidavit of Brian Dickson dated January 5, 2011, by Plaintiff American Coach Lines of Orlando, Inc. (Doc. No. 68, filed Jan. 5, 2011);

16. Supplemental Response in Opposition to Defendants' Motion for Summary Judgment by Plaintiff American Coach Lines of Orlando, Inc. (Doc. No. 69, filed Jan. 5, 2011);

17. Notice of Filing of Compact Disk by Plaintiff American Coach Lines of Orlando, Inc. (Doc. No. 74, filed Jan. 14, 2011);

**\*2** 18. Supplemental Reply in Support of Motion for Summary Judgment by Defendants North American Bus Industries, Inc. and Blue Bird Corporation (Doc. No. 75, filed Jan. 19, 2011);

19. Notice of Filing of Compact Disk Pursuant to Court's Order of January 26, 2011, by Plaintiff American Coach Lines of Orlando, Inc. (Doc. No. 78, filed Jan. 31, 2011); and

20. Affidavit of Jack Mears filed by Plaintiff American Coach Lines of Orlando, Inc. (Doc. No. 84, filed Feb. 9, 2011).

## Background

### I. Undisputed Facts
This case concerns eleven "Xcel 102–Model 4000" transit buses purchased in 2005 by Plaintiff American Coach Lines of Orlando, Inc. ("American Coach") from the manufacturer, Defendant Blue Bird Corporation ("Blue Bird"). (Doc. No. 34–1 ¶¶ 4–5; Doc. No. 54–1 at 39, 49; Doc. No. 65–1 at 5.) American Coach seeks to hold Blue Bird and Defendant North American Bus Industries, Inc. ("NABI") liable for damages incurred due to mechanical breakdowns of the subject buses and the inability to obtain replacement parts for the subject buses in a timely manner. (Doc. No. 1, filed Nov. 24, 2009.)

Negotiations for the purchase of the subject buses occurred in 2005 between Drew Hawkins, who was then a sales representative for Blue Bird, and Kathleen Feder, who was

then the President and General Manager of American Coach. (Doc. No. 58–1 ¶¶ 3, 5; Doc. No. 65–1 ¶¶ 3–4; Doc. No. 69–13 at 10.) On August 10, 2005, Feder signed a document listing several components of the subject buses and the sales price per bus, which was considered by Hawkins and Brian Dickson, the current Vice President and General Manager of American Coach, to be the sales agreement for the subject buses ("Sales Agreement"). (Doc. No. 65–1 ¶ 9; *id.* at 5–6; Doc. No. 68–1 ¶¶ 2–10.)

During his deposition as the corporate representative for American Coach, (Doc. No. 54–1 at 6–7), Dickson testified that Feder was the only person he knew who could say whether or not Blue Bird's limited warranty was provided to American Coach in connection with the sale or delivery of the subject buses. (Doc. No. 54–3 at 14–15.) Feder averred that "[a]s a person involved in the purchase of the [subject buses] by American Coach, [she] was aware that the purchase of the [subject buses] included Blue Bird's limited warranty as a part of the parties' agreement." (Doc. No. 59–1 ¶ 5.) Feder further explained that American Coach purchased extended warranties on certain components of the subject buses because "the Blue Bird limited warranty which covered the [subject buses] was not sufficient for [American Coach's] purposes." (*Id.* ¶ 4.)

Hawkins sent a fax to Glen Wilder on August 5, 2005, five days before Feder signed the Sales Agreement and three days before he met with Feder "to finalize the order," noting that he "wanted to get a head start on a couple of items," including "establish[ing] [the] warranty on 4 stock buses in writing to American Coach (Engine, Transmission, Blue Bird, and Carrier)." (Doc. No. 54–5 at 8.) However, Hawkins averred that "to the best of his recollection, [he] did not have any conversation with Ms. Feder about limited warranties at the time she purchased these buses on behalf of American Coach and [he] probably did not do so." (Doc. No. 65–1 ¶ 5.) At the same time, Hawkins considered that it was "Blue Bird's obligation to provide replacement parts as part of the agreement between Blue Bird and American Coach." (*Id.* ¶ 10.)

**\*3** Ernest W. Lee, the Manager of Warranty Administration for Blue Bird, asserted that "[i]n connection with the sale and delivery of the [subject buses], Blue Bird issued its standard Limited Warranty" to American Coach. (Doc. No. 34–1 ¶¶ 1, 8; *id.* at 16.) According to Lee, "a copy of the Blue Bird Limited Warranty applicable to the sale of the [subject] buses" was attached to his affidavit ("Lee Warranty"). (*Id.* at 16.)

**American Coach Lines of Orlando, Inc. v. North American..., Not Reported in...**

2011 WL 653524, 73 UCC Rep.Serv.2d 626

Lee further stated that "[a]s a matter of general practice, a copy of the [Lee] Warranty would have been delivered with each of the [b]uses." (*Id.* ¶ 8.) Feder asserted that "[w]hen American Coach purchased buses, it had a process in place that included reviewing certain checklists with the bus delivery drivers to confirm receipt of certain items." (Doc. No. 59–1 ¶ 6.) Feder also maintained that "[i]n connection with the delivery of the [subject buses], as a part of that process, American Coach did receive and review the Blue Bird limited warranty certificates." (*Id.*) Hawkins averred that "[w]arranty documents for these buses would not have been sent to Ms. Feder before delivery." (Doc. No. 65–1 ¶ 6.)

All of the subject buses were delivered to American Coach by March 31, 2006. (Doc. No. 34–1 ¶ 7; *id.* at 5–15; Doc. No. 68–4 at 2–11; Doc. No. 68–5 at 1–12.) Within one year of purchase, American Coach discovered mechanical problems with the subject buses, and American Coach reported those problems to Blue Bird "as soon as they were discovered." (Doc. No. 42 ¶ 5; Doc. No. 54–3 at 41.) Blue Bird responded by referring American Coach to Defendant North American Bus Industries, Inc. ("NABI"). (Doc. No. 42 ¶ 7.)

According to Jack Kemp, the designated corporate representative of Blue Bird and NABI, Blue Bird and NABI were purchased by Cerberus Capital Partners at some point after the subject buses were delivered. (Doc. No. 69–13 at 7, 13.) Thereafter, the commercial bus operations of both Blue Bird and NABI were consolidated at NABI, and the school bus operations of both entities were consolidated at Blue Bird. (*Id.*) However, Blue Bird and NABI remained separate companies.[1] (*Id.* at 35.)

[1] To the extent American Coach argues that NABI assumed any of Blue Bird's obligations for the subject buses pursuant to the reorganization of Blue Bird and NABI, American Coach has failed to produce evidence of such an assumption. American Coach has not produced any documents pertaining to the reorganization of Blue Bird and NABI showing that NABI assumed any warranty obligations of Blue Bird for the subject buses. The only evidence of record referencing the reorganization of Blue Bird and NABI is the aforementioned testimony of Jack Kemp and the letter from NABI to American Coach dated October 5, 2007, notifying American Coach that the model of the subject buses was being

discontinued and suggesting that the reorganization of Blue Bird and NABI occurred sometime prior to the date of the letter. (Doc. No. 68–6 at 2.) Even assuming for the sake of argument that NABI accepted responsibility for Blue Bird's warranty obligations for the subject buses, a fact which has not been shown, American Coach has failed to sustain its claims for the reasons stated in this opinion.

Ernest Lee averred that American Coach submitted 26 warranty claims to Blue Bird for the subject buses between March 2006 and December 2007. (Doc. No. 50–2 ¶¶ 1, 6; *id.* at 4.) Only three claims were rejected, and 22 claims were paid in full. (*Id.* at 4.) Lee further asserted that American Coach submitted no warranty claims after December 2007. (*Id.* ¶ 6.) Dickson conceded during his deposition that American Coach submitted warranty claims to Blue Bird in the first two years after the purchase of the buses and that he did not know whether American Coach had submitted warranty claims after December 2007. (Doc. No. 54–2 at 17; Doc. No. 54–3 at 51; Doc. No. 63 ¶ 2.)

On October 5, 2007, Buddy Cox, the Director of Private Sector Sales for NABI, sent American Coach a letter stating as follows:

**\*4** As a result of recent product rationalization efforts, [NABI] has decided to discontinue the production of the Blue Bird brand, Model C4Re—Xcel 102 transit bus product line.

The current contracts for your company will be produced and delivered as planned. Additionally, NABI will continue to provide warranty and technical support for the [model of the subject buses] in the field through its existing customer service organization. Replacement parts will continue to be provided through NABI's Aftermarket Parts organization ....

(Doc. No. 68–6 at 2.) According to Dickson, Cox was a point of contact for American Coach who assured American Coach that Blue Bird and NABI would resolve the buses' mechanical problems. (Doc. No. 42 ¶ 15.)

Dickson averred that "[o]n an ongoing basis," representatives of both Blue Bird and NABI told American Coach that they would resolve the mechanical problems with the buses. (*Id.* ¶ 8.) Dickson further asserted that Blue Bird and NABI failed to provide replacement parts and repairs in a timely fashion and that the replacement parts failed. (*Id.*

American Coach Lines of Orlando, Inc. v. North American..., Not Reported in...
2011 WL 653524, 73 UCC Rep.Serv.2d 626

¶ 9.) In early 2008, Dickson met with James Bernacchi, Senior Vice President of NABI, to discuss the mechanical problems arising with the subject buses. (*Id.* ¶ 10.) According to Dickson, Bernacchi acknowledged that there were an unusual number of mechanical issues with the subject buses requiring repair and replacement parts and that "he could—and would—resolve these issues." (*Id.*) In addition to meeting with Bernacchi, Dickson discussed the buses' mechanical problems with other representatives of NABI and Blue Bird, including Jack Kemp, who identified himself as American Coach's service contact with NABI. (*Id.* ¶ 11.) Kemp told Michael W. Pierce, the Vice President of Maintenance for American Coach, that he should talk to a representative of both Blue Bird and NABI to resolve the subject buses' mechanical issues and to obtain replacement parts. (Doc. No. 43 ¶ 4.)

Sometime in 2008, Pierce met with representatives of Blue Bird and NABI in Dallas, Texas, and discussed the mechanical problems with the subject buses. (Doc. No. 66–1 ¶ 3.) Chuck Brookshire, an employee of Blue Bird, stated that Blue Bird would pull parts off buses being assembled if necessary to improve lead times for parts and that he would ask Kemp to "get personally involved in Orlando to resolve the problems." (*Id.* ¶¶ 6–7.) Pierce averred that Brookshire's statements led him to believe that Blue Bird and NABI were committing to fix the problems with the subject buses and that this commitment "was not limited to any particular time frame but rather to ongoing problems being experienced." (*Id.* ¶ 9.) On December 17, 2008, Dickson notified Blue Bird and NABI that "parts for a bus that [was] in an accident had a lead time of fourteen (14) weeks ...." (Doc. No. 42 ¶ 12.) Kemp stated in response that "he would help." (*Id.*)

 **\*5** On March 11, 2009, David Cahill, the Manger of Fleet and Facilities Maintenance for American Coach, (Doc. No. 67–1 ¶ 1), emailed Kemp to ask what warranty was provided on "these EXL 102," (Doc. No. 54–5 at 23), apparently referring to the subject buses. (*See* Doc. No. 65–1 at 5 (providing on the Sales Agreement that the subject buses were "Xcel 102–Model 4000").) Kemp responded by listing the extended warranties for the subject buses and other buses and attaching a "[p]ublished warranty statement" ("Kemp Warranty"). (Doc. No. 54–5 at 23–25.) The Kemp Warranty is identical to the Blue Bird warranty certificate identified by Dickson to be a "Blue Bird warranty document [for] the same model" as the subject buses issued for a bus purchased by American Coach of Miami, Inc. at "around the same time" the subject buses were purchased. (Doc. No. 63 ¶ 3; *id.* at 24.)

Although not identical, both the Lee and Kemp Warranties warranted "each bus or coach to be free from defects in material and workmanship under normal use and service for two (2) years/100,000 miles/160,000 kilometers, whichever occurs first from date of delivery to the original user." (Doc. No. 34–1 at 16; Doc. No. 54–5 at 25.) Both warranties stated in bold faced type using capital letters that **"THIS LIMITED WARRANTY IS EXPRESSLY IN LIEU OF ALL OTHER WARRANTIES EXPRESSED OR IMPLIED AND ALL OTHER OBLIGATIONS OR LIABILITIES** [and that] **BLUE BIRD MAKES NO WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE."** (*Id.*) In addition, both warranties contained a Georgia choice of law provision and provided that "[a]ny suit alleging a breach of this limited warranty or of any other alleged warranty must be filed within one year of breach." (*Id.*)

On March 13, 2009, Dickson contacted NABI and Blue Bird about a bus that "had been out of service for several months" and for which parts had not been delivered by March 1, 2009 as promised. (*Id.* ¶ 13.) Dickson maintained that he was told by an unidentified source that NABI and Blue Bird "would resolve the problems." (*Id.*) Also on March 13, 2009, Cahill emailed Kemp, with copies to Pierce and Dickson, to reiterate that the long wait times for particular parts were unacceptable. (Doc. No. 67–1 ¶ 7; *id.* at 69.) Pierce replied to all recipients a few hours later requesting that Blue Bird buy back the subject buses. (*Id.* at 69.) According to Dickson, NABI responded by "ask [ing] for part numbers and offer[ing] to help." (Doc. No. 42 ¶ 14.)

On March 16, 2009, John Lewis, the Director of Aftermarket Sales for NABI, told Pierce that a parts operation employee was planning a trip to the area and would be calling to set up an appointment. (Doc. No. 43 ¶ 8.) During this conversation, Lewis asked Pierce for the most critical parts needed by American Coach to get the buses back in service. (*Id.*)

According to Dickson and Cahill, at no time did any representative of Blue Bird or NABI state that a limited warranty prohibited or restricted them from resolving the mechanical issues with the subject buses or providing replacement parts. (Doc. No. 63 ¶ 16; Doc. No. 67–1 ¶ 11.) Cahill attached to his affidavit over 70 pages of emails documenting several requests for replacement parts by American Coach to Blue Bird and NABI between September 29, 2008 and October 12, 2010. (Doc. No. 67–1 at 6–78.)

American Coach Lines of Orlando, Inc. v. North American..., Not Reported in...
2011 WL 653524, 73 UCC Rep.Serv.2d 626

**\*6** Kemp testified that Blue Bird and NABI provided customer service to American Coach after the Blue Bird limited warranty expired by assisting American Coach in purchasing replacement parts and working with American Coach to try to resolve the mechanical issues with the subject buses. (Doc. No. 69–13 at 24, 33, 36.) However, Kemp maintained that in taking these actions, Blue Bird and NABI did not provide warranty benefits beyond the original warranty term. (*Id.* at 36.)

Dickson maintained that down times for the subject buses ranged from days to months, lead times on delivery of parts were often weeks at a time, and the buses were out of service on average over 50% of the time. (Doc. No. 42 ¶¶ 6, 12.) In addition, Dickson and Pierce asserted that NABI and Blue Bird failed to provide replacement parts either completely or within a reasonable time frame. (*Id.* ¶ 20; Doc. No. 43 ¶ 15.) Dickson and Pierce also contended that American Coach "sustained economic losses directly attributable to the failure and/or refusal of Blue Bird and NABI to provide replacement parts in a timely fashion." (Doc. No. 42 ¶ 21; Doc. No. 43 ¶ 16.)

American Coach has submitted the affidavit of Jack Mears, the President of Jack Mears & Associates, to provide expert testimony on fleet transportation operations. (Doc. No. 84 ¶¶ 1–2, 4.) Mears holds a Bachelor of Science in Industrial Engineering and an M.B.A. from the University of Miami and possesses forty years experience in the trucking and transportation business. (*Id.* ¶¶ 3, 5.) Mears asserted that he is knowledgeable and experienced in equipment engineering, specifications, maintenance, equipment forecasting, purchase of lease equipment, scheduling, and control of maintenance operations. (*Id.* ¶ 6.) Mears averred that in his experience, an expected outof-service ratio of 10% is commercially reasonable and that the 33–50% out of service rate claimed by American Coach is not acceptable within the industry. (*Id.* ¶ 9.) Mears further stated that in his experience, he "would expect a purchaser of vehicles like the [subject buses] to expect that the manufacturer is obligated to provide replacement parts whether that is part of a written agreement or not." (*Id.* ¶ 11.) Mears also opined that "[i]t is common in the industry for manufacturers to extend written warranties through a course of dealings" without documenting the extension in writing. (*Id.* ¶ 14.)

**II. Parties' Contentions**

On November 24, 2009, American Coach filed a twelve-count complaint against Blue Bird and NABI, alleging: (1) breach of contract against NABI; (2) breach of implied warranty of merchantability against NABI; (3) breach of implied warranty of fitness for a particular purpose against NABI; (4) breach of express warranty against NABI; (5) negligence against NABI; (6) strict liability against NABI; (7) breach of contract against Blue Bird; (8) breach of implied warranty of merchantability against Blue Bird; (9) breach of implied warranty of fitness for a particular purpose against Blue Bird; (10) breach of express warranty against Blue Bird; (11) negligence against Blue Bird; and (12) strict liability against Blue Bird. (Doc. No. 1.)

**\*7** On July 26, 2010, Blue Bird & NABI moved for summary judgment on all twelve counts. (Doc. No. 33.) American Coach responded in opposition, requesting oral argument and deferral of the Motion until further discovery was taken. (Doc. No. 41.) On October 8, 2010, the Court entered an Order deferring ruling on the Motion, granting Plaintiff's request for oral argument, and directing the parties to file supplemental memoranda of law with evidentiary support on specific issues. (Doc. No. 47.)

Defendants filed a supplemental memorandum of law and an amended supplemental memorandum of law.[2] (Doc. Nos. 50, 56.) Plaintiff thereafter filed a supplemental memorandum of law, (Doc. No. 69), and Defendants filed a reply brief. (Doc. No. 75.) On February 9, 2011, the Court heard oral argument on the Motion.

[2]    The amended supplemental memorandum of law merely updated the page citations in the initial supplemental memorandum.

**Standard of Review**

Courts "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir.2004).* An issue of fact is "material" under the applicable substantive law if it might affect the outcome of the case. *Hickson Corp., 357 F.3d at 1259.* An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Id.* at 1260. The

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 10 of 207
PageID: 13027
American Coach Lines of Orlando, Inc. v. North American..., Not Reported in...
2011 WL 653524, 73 UCC Rep.Serv.2d 626

court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.; Anderson,* 477 U.S. at 251–52.

The party moving for summary judgment has the burden of proving that: (1) there is no genuine issue as to any material fact, and (2) it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in the light most favorable to the party opposing the motion and resolves all reasonable doubts against the moving party. *Anderson,* 477 U.S. at 255. The court may not weigh conflicting evidence or weigh the credibility of the parties. *Hairston v. Gainesville Sun Pub. Co.,* 9 F.3d 913, 919 (11th Cir.1993). If a reasonable fact finder could draw more than one inference from the facts and that inference creates an issue of material fact, the court must not grant summary judgment. *Id.* On the other hand, summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Celotex Corp.,* 477 U.S. at 322. In addition, when a claimant fails to produce "anything more than a repetition of his conclusory allegations," summary judgment for the movant is "not only proper but required." *Morris v. Ross,* 663 F.2d 1032, 1034 (11th Cir.1981).

**Analysis**

**I. Governing Law**

 **\*8**  The Court initially addresses the parties' dispute concerning whether Florida or Georgia law applies in this case. (Doc. No. 33 at 6–8; Doc. No. 41 at 7–8; Doc. No. 56 at 3.) Except for the choice of law issue subsumed in the dispute over whether Blue Bird's limited warranty containing a Georgia choice of law provision applies to the subject buses, discussed *infra* part V, the Court need not undertake a choice of law analysis here because the applicable Florida and Georgia laws are substantially similar. *See Fioretti v. Mass. Gen. Life Ins. Co.,* 53 F.3d 1228, 1234 (11th Cir.1995) ("[W]hen the laws of the competing states are substantially similar, the court should avoid the conflicts question and simply decide the issue under the law of each of the interested states."). Accordingly, the Court will proceed to the merits of the individual claims.

**II. Count I: Breach of Sales Contract by NABI**

In Count I of the Complaint, American Coach alleges that NABI breached the sales contract for the subject buses. (Doc. No. 1 ¶¶ 23–40; 91–107.) NABI contends that it is entitled to summary judgment on this claim because NABI did not manufacture or sell the subject buses and because NABI was not in privity of contract with American Coach under any sales contract. (Doc. No. 33 at 8.)

Only parties to a contract can be liable for breach of contract. *See, e.g., O'Connell v. Cora Bett Thomas Realty, Inc.,* 254 Ga.App. 311, 563 S.E.2d 167, 170 (Ga.Ct.App.2002) (finding that an entity not a party to a contract could not be liable for its breach); *Preve v. Albert,* 578 So.2d 33, 34 (Fla. 4th DCA 1991) (reversing a breach of contract finding because the appellant did not sign the contract and thus was not a party to the contract); *In re Donner's Estate,* 364 So.2d 742, 749 (Fla. 3d DCA 1978) ("[A] contract cannot bind one who is not a party thereto ...." (citing *Strong & Trowbridge Co. v. H. Baars & Co.,* 60 Fla. 253, 54 So. 92, 93 (Fla.1910)). The only executed agreement for the subject buses is the Sales Agreement consisting of a list of bus components and the sales price per bus signed by Feder. (Doc. No. 65–1 at 5–6.) NABI is not mentioned in, let alone obligated by, the Sales Agreement. (*Id.*)

Further, the testimony of record makes clear that Blue Bird, not NABI, manufactured, sold, and delivered the subject buses to American Coach. Ernest Lee averred that Blue Bird sold the subject buses to American Coach, that Blue Bird, not NABI, manufactured the buses, that "NABI was not involved in the sale of the buses," and that Blue Bird delivered the buses to American Coach. (Doc. No. 34–1 ¶¶ 4–7.) Dickson testified that the subject buses were purchased directly from Blue Bird and that NABI was "not a part of th[e] process when the buses were purchased." (Doc. No. 54–1 at 24, 49.) Blue Bird did not refer American Coach to NABI until after delivery of the subject buses when American Coach discovered and reported mechanical problems to Blue Bird. (Doc. No. 42 ¶¶ 5, 7; Doc. No. 43 ¶ 3.) Finding no evidence of record that NABI was involved in the sale of the subject buses or a party to a contract for the purchase of the subject buses, summary judgment should be granted for NABI on the breach of contract claim in Count I.

**III. Count VII: Breach of Sales Contract by Blue Bird**

American Coach Lines of Orlando, Inc. v. North American..., Not Reported in...
2011 WL 653524, 73 UCC Rep.Serv.2d 626

**\*9** In Count VII of the Complaint, American Coach claims that Blue Bird breached the sales contract for the subject buses by failing to provide replacement parts. (Doc. No. 1 ¶ 103.) The Sales Agreement contains no obligation to provide replacement parts, (Doc. No. 65–1 at 5–6), and there is no evidence of record of a modification to the Sales Agreement or any other sales contract obligating Blue Bird to provide replacement parts. Dickson testified that the only promise he was made is "that after the buses were discontinued, [Blue Bird and NABI] would continue to support replacement parts for the buses" for an indefinite period of time. (Doc. No. 54–3 at 2.) Absent any evidence of an obligation under a sales contract for Blue Bird to provide replacement parts, American Coach has not met its burden of production, *Celotex, 477 U.S. at 322,* and Blue Bird is entitled to summary judgment on the breach of contract claim in Count VII. *See TechBios, Inc. v. Champagne,* 301 Ga.App. 592, 688 S.E.2d 378, 381 (Ga.Ct.App.2009) (noting that a claim for breach of contract requires proof of breach); *Abbott Labs., Inc. v. Gen. Elec. Capital,* 765 So.2d 737, 740 (Fla. 5th DCA 2000) (same).

## IV. Counts II–III: Breach of Implied Warranties by NABI

In Counts II and II, American Coach asserts claims for breach of the implied warranties of merchantability and fitness for a particular purpose against NABI arising out of the sale of the subject buses. (Doc. No. 1 at 8–10.) NABI argues that it should be granted summary judgment on these claims because NABI did not sell the subject buses to American Coach. (Doc. No. 33 at 8.)

The implied warranties of merchantability and fitness for a particular purpose are warranties imposed by law on a seller of goods. Fla. Stat. §§ 672.314–.315; O.C.G.A. §§ 11–2–314 to –315. Only a seller of goods in privity of contract with a buyer may be liable for breach of implied warranties. *See, e.g., McQuiston v. K–Mart Corp.,* 796 F.2d 1346, 1347–48 (11th Cir.1986) (applying Florida law); *McQueen v. Minolta Bus. Solutions, Inc.,* 275 Ga.App. 297, 620 S.E.2d 391, 393 (Ga.Ct.App.2005). It is undisputed that Blue Bird, not NABI, manufactured, sold, and delivered the subject buses to American Coach. *See supra* part II. Accordingly, NABI is entitled to summary judgment on the breach of implied warranty claims in Counts II and III of the Complaint.

## V. Counts VIII–IX: Breach of Implied Warranties by Blue Bird

Blue Bird asserts that American Coach's claims for breach of the implied warranties of merchantability and fitness for a particular purpose are barred by the disclaimer of implied warranties contained in the limited warranty certificates issued for the subject buses. (Doc. No. 33 at 8–9; Doc. No. 56 at 7–12.) American Coach maintains in opposition that it is unclear what warranty disclaimer, if any, governs the subject buses. (Doc. No. 41 at 5–7; Doc. No. 69 at 11.)

Blue Bird has the burden of proving that it lawfully disclaimed the implied warranties of merchantability and fitness for a particular purpose. *E.g., Chrysler Corp. v. Wilson Plumbing Co., Inc.,* 132 Ga.App. 435, 208 S.E.2d 321, 324–25 (Ga.App.1974); *Rehurek v. Chrysler Credit Corp.,* 262 So.2d 452, 454 (Fla. 2d DCA 1972). As discussed below, Blue Bird has met that burden. Blue Bird's limited warranty governs the subject buses because the evidence of record viewed in the light most favorable to American Coach shows that the warranty was known to American Coach at the time of purchase. Alternatively, American Coach assented to Blue Bird's limited warranty through its post-sale conduct, and American Coach has not presented any evidence to raise a genuine issue of material fact on this issue. Further, Blue Bird's limited warranty contains a valid Georgia choice of law provision and satisfies the Georgia statutory requirements for disclaiming implied warranties.

### A. Warranty Governing Subject Buses
**\*10** Generally, a disclaimer of implied warranties must be part of the "sales bargain between the parties," and a disclaimer first provided to the purchaser subsequent to a sale is invalid. *See McNamara Pontiac, Inc. v. Sanchez,* 388 So.2d 620, 621 (Fla. 5th DCA 1980) ("To be effective, a disclaimer must be part of the sales bargain between the parties." (citations omitted)); *Knipp v. Weinbaum,* 351 So.2d 1081, 1085 (Fla. 3d DCA 1977) ("[A] disclaimer, to be effective, must be a part of the basis of the bargain between the parties." (citations omitted)); *Wilson Plumbing,* 208 S.E.2d at 324–25 (declining to enforce a manufacturer's limited warranty disclaiming implied warranties where the warranty was first provided to the buyer after he was contractually obligated to purchase).

The Sales Agreement does not mention any warranty disclaimer or limited warranty containing a warranty disclaimer, (Doc. No. 65–1 at 5–6), and thus that document fails to show that a warranty disclaimer was "part of the basis of the bargain" for the subject buses. *Cf. Family Boating & Marine Ctrs. of Fla., Inc. v. Bell,* 779 So.2d 402, 403

American Coach Lines of Orlando, Inc. v. North American..., Not Reported in...
2011 WL 653524, 73 UCC Rep.Serv.2d 626

(Fla. 2d DCA 2000) (holding that a purchaser could not recover for breach of implied warranties where the purchase contract expressly disclaimed implied warranties). Although the record contains no written document indicating that a warranty disclaimer was part of the bargain for the subject buses, a disclaimer of implied warranties is nevertheless valid if the buyer knew of the disclaimer "at the time the sale was made, with proof of knowledge being either direct or indirect through evidence of trade custom or course of dealing." *Pennington Grain & Seed, Inc. v. Tuten,* 422 So.2d 948, 951 (Fla. 1st DCA 1982); *see also* Fla. Stat. § 672.316(3)(c) ("An implied warranty can also be excluded or modified by a course of dealing or course of performance or usage of trade."); O.C.G.A. § 11–2–316(3)(c) (same); *Knipp,* 351 So.2d at 1084–85 ("The Uniform Commercial Code contemplates that a seller may disclaim warranties as long as the buyer reasonably understands this is being done."). In addition, a disclaimer of implied warranties that is not part of an initial bargain binds a purchaser where the purchaser "expressly assent[s]" to a warranty containing the disclaimer "by unequivocal behavior, clearly indicating a willingness to be bound by the terms." *Twin Disk, Inc. v. Big Bud Tractor, Inc.,* 772 F.2d 1329, 1334 (7th Cir.1985); *see also Tuten,* 422 So.2d at 951 (noting that a post-sale disclaimer is valid if the purchaser subsequently "assented to it" (citation omitted)).

As discussed below, the unrefuted evidence of record shows that Blue Bird's warranty disclaimer applies to the subject buses because American Coach knew at the time of purchase that the subject buses included Blue Bird's limited warranty containing the warranty disclaimer or, alternatively, because American Coach expressly assented to Blue Bird's limited warranty by its post-sale conduct.

### 1. Knowledge at Time of Purchase

**\*11**  In support of its assertion that American Coach was aware of the warranty disclaimer at the time of sale, Blue Bird relies on the affidavit of Kathleen Feder, the President and General Manager of American Coach who was involved in the purchase of the subject buses. (Doc. No. 75 at 5; Doc. No. 58–1 ¶¶ 1, 3.) Feder averred that "[a]s a person involved in the purchase of the [subject buses] by American Coach, [she] was aware that the purchase of the [buses] included Blue Bird's limited warranty as part of the parties' agreement." (Doc. No. 58–1 ¶ 5.) Feder explained that she purchased extended warranties for certain components of the subject buses because the "Blue Bird limited warranty which covered the [subject buses] was not sufficient for [American Coach's] purposes." (*Id.* ¶ 4.) Consistent with

Feder's testimony, the Sales Agreement reflects the purchase of several extended warranties by American Coach. (Doc. No. 65–1 at 6.)

Feder did not specify in her affidavit the terms of "Blue Bird's limited warranty" that she considered part of the purchase of the subject buses, and there is conflicting evidence of record about which Blue Bird limited warranty of record governed the subject buses. Ernest Lee identified the Lee Warranty as being issued "in connection with the sale and delivery of the [subject buses]." (Doc. No. 34–1 ¶ 8.) However, when requested to admit that the Lee Warranty applied to the subject buses, American Coach denied the admission on the ground that it was unable to locate the Lee Warranty in its records in May or June of 2010. (Doc. No. 41–1 ¶ 1.) Jack Kemp provided Cahill a copy of the Kemp Warranty in March 2009 when Cahill asked what warranty governed the subject buses. (Doc. No. 54–5 at 23–25.) Further, "[a]t some point before this lawsuit was filed," Brian Dickson obtained a Blue Bird limited warranty certificate identical to the Kemp Warranty that was issued to American Coach Lines of Miami, Inc. for a bus of the same model and purchased "at around the same time" as the subject buses. (Doc. No. 63 ¶ 3; *id.* at 24.) Although the foregoing evidence presents a genuine dispute over whether the Lee or Kemp Warranty governs the subject buses, that dispute is not material to this case because the provisions of both Warranties relevant to the issues raised by the parties are indistinguishable.

The Kemp Warranty has a revision date of "05/2005," whereas the Lee Warranty has a revision date of "06/2003," and the Lee Warranty is issued by "Blue Bird Body Company," whereas the Kemp Warranty is issued by "Blue Bird Coachworks," the same entity listed in the Sales Agreement.[3] (*Compare* Doc. No. 34–1 at 16, *with* Doc. No. 54–5 at 25, and Doc. No. 65–1 at 5.) Notwithstanding these differences, the Lee and Kemp Warranties reflect the same policy number, "2CCN," and the same effective date, "09/2001." (*Compare* Doc. No. 34–1 at 16, *with* Doc. No. 54–5 at 25.) Both Warranties expressly state that they are a limited warranty for "Xcel," which is the model of the subject buses. (*Id.*) Both Warranties contain the same Georgia choice of law provision and period of limitation, "two (2) years/100,000 miles/160,000 kilometers, whichever occurs first from date of delivery to the original user." (*Id.*) In addition, the warranty disclaimers and remaining provisions of the Lee and Kemp Warranties are virtually identical. (*Id.*) Finding no evidence of record plausibly suggesting that "Blue Bird's limited warranty" contemplated by Feder is materially

different than the Lee or Kemp Warranties, any dispute about whether the Lee or Kemp Warranty governs the subject buses is not material.

3    According to Paul Yousif, the Treasurer of Blue Bird Body Company, Blue Bird Corporation is the parent corporation of Blue Bird Body Company, the entity that builds and sells Blue Bird buses. (Doc. No. 80–1 ¶ ¶ 1–2.) Yousif further averred that Blue Bird Coachworks was a name previously used by Blue Bird Body Company to identify the division of Blue Bird Body Company that sold commercial buses and motor homes. (*Id.* ¶ 3, 218 S.E.2d 580.)

**\*12** In support of its argument that the Blue Bird limited warranty does not apply to the subject buses, American Coach submits the affidavit of Drew Hawkins, the Blue Bird sales representative who negotiated with Feder for the sale of the subject buses. (Doc. No. 65–1 ¶ ¶ 3–4.) Hawkins averred that "to the best of his recollection, [he] did not have any conversation with Ms. Feder about limited warranties at the time she purchased these buses on behalf of American Coach and [he] probably did not do so." (*Id.* ¶ 5.) This averment, without more, does not reasonably dispute Feder's knowledge that the Blue Bird limited warranty applied to the subject buses, as there is no evidence of record that Feder's knowledge of the Blue Bird limited warranty stemmed from conversations with Hawkins. Hawkins also stated that "[w]arranty documents for these buses *would not have been* sent to Ms. Feder before delivery." (*Id.* ¶ 6 (emphasis added).) This speculative statement is not evidence that Feder did not receive or view Blue Bird's limited warranty prior to purchasing the subject buses. Thus, Hawkins' averments do not create a genuine issue pertaining to Feder's knowledge of Blue Bird's limited warranty at the time the subject buses were purchased. Feder's testimony about her knowledge of the Blue Bird limited warranty at the time of purchase, in the absence of any evidence creating a material dispute about the terms of that warranty, demonstrates that American Coach knew at the time of purchase that the Blue Bird limited warranty and the warranty disclaimer contained therein applied to the subject buses. *See Tuten,* 422 So.2d at 951 (noting that a disclaimer is valid even though it did not form part of the basis of the bargain if the buyer knew of the disclaimer at the time the sale was made). Where, as here, "resolution of [an] issue requires a determination of state of mind, [m]uch depends on the credibility of the witnesses testifying as to their own states of mind." *Croley v. Matson Navigation Co.,* 434 F.2d 73, 77 (5th Cir.1970). However, American Coach has produced

no evidence reasonably challenging Feder's credibility or the veracity of her assertion that she knew at the time of purchase that the Blue Bird's limited warranty would cover the subject buses. Accordingly, based on the unchallenged testimony of Feder, it cannot reasonably be disputed that Blue Bird's limited warranty applies to the subject buses. *See* 10B Fed. Prac. & Proc. Civ. § 2730 (3d ed. 2010) ("[T]he fact that an affiant's statements would be best tested by a jury, in and of itself, will not preclude [awarding summary judgment] unless the evidence presented casts sufficient doubt on the affiant's credibility to create a genuine issue of material fact.") (citing *Dyer v. MacDougall,* 201 F.2d 265, 269 (2d Cir.1953)).

**2. Express Assent to Limited Warranty**

Blue Bird contends that even if American Coach lacked actual knowledge of Blue Bird's limited warranty disclaimer at the time of purchase, the limited warranty applies to the subject buses because American Coach assented to the warranty by its post-sale conduct. (Doc. No. 56 at 10–12.) The Court agrees.

**\*13** The evidence of record presents no genuine dispute concerning whether American Coach received and reviewed Blue Bird's limited warranty certificates upon delivery of the subject buses. According to Kathleen Feder, "when American Coach purchased buses, it had a process in place that included reviewing certain checklists with the bus delivery drivers to confirm receipt of certain items." (Doc. No. 58–1 ¶ 6.) Feder further averred that "[i]n connection with the delivery of the [subject buses], as a part of that process, American Coach did receive and review the Blue Bird limited warranty certificates." (*Id.*) Consistent with the testimony of Feder, Ernest Lee testified that "[i]n connection with the sale and delivery of the [subject buses], Blue Bird issued its 'standard Limited Warranty.'" (Doc. No. 34–1 ¶ 8.) Lee further testified that "[a]s a matter of general practice, a copy of the Limited Warranty would have been delivered with each of the [subject buses]." (*Id.*) Similarly, Drew Hawkins testified that "[w]arranty documents would generally have [been] sent to American Coach with the bus[es] at the time of delivery...." (Doc. No. 65–1 ¶ 6.)

Feder's testimony that American Coach received the Blue Bird limited warranty certificates when the buses were delivered is not refuted by American Coach's inability to locate the Lee Warranty in its records in May or June 2010. (Doc. No. 41–1 ¶ 1.) In addition, American Coach's receipt of the Blue Bird limited warranty certificates at the time of delivery is not inconsistent with Cahill's request to Kemp for

the warranties governing the subject buses in March 2009. (Doc. No. 54–5 at 23.)

Additionally, to the extent American Coach argues that Feder's testimony is genuinely disputed by the bills of lading for the subject buses, that argument is without merit. (Doc. No. 69 at 6–7.) As noted by American Coach, the "pickup inspection" section of some bills of lading was not fully completed. (Doc. Nos.68–4, 68–5.) However, the bills of lading do not address delivery of warranty documents, and no bill of lading noted in the comment section that a warranty was missing. (*Id.*) Further, there is no evidence of record indicating that the bills of lading for the subject buses were the "checklists" referenced by Feder in her affidavit that American Coach completed upon delivery of buses to confirm receipt of certain items. (Doc. No. 58–1 ¶ 6.) Accordingly, the bills of lading do not reasonably call into question Feder's assertion that the Blue Bird limited warranty certificates for the subject buses were received and reviewed by American Coach when the buses were delivered. (*Id.*)

American Coach's post-delivery conduct is consistent with its receipt of Blue Bird's limited warranty at the time of delivery. According to Lee, 26 warranty claims were submitted to Blue Bird for the subject buses between March 2006 and December 2007. (Doc. No. 50–2 ¶ 6; *id.* at 4.) Only three claims were rejected, and 22 claims were paid in full. (*Id.* at 4.) Further, Blue Bird paid in full all but one of the 13 warranty claims related to the subject buses submitted directly by American Coach to Blue Bird. (*Id.*) Lee further asserted that American Coach submitted no warranty claims after December 2007. (*Id.* ¶ 6.) Brian Dickson, the General Manager of American Coach, conceded during his deposition that American Coach submitted warranty claims to Blue Bird in the first two years after the purchase of the buses and that he had no information indicating that American Coach had submitted warranty claims after December 2007. (Doc. No. 54–2 at 17; Doc. No. 54–3 at 51.) Dickson also acknowledged that a Blue Bird "Warranty Adjustment Application" completed by American Coach was faxed to Blue Bird on March 26 of an unknown year. (Doc. No. 54–3 at 23–24; Doc. No. 54–5 at 28.) According to Kemp, the warranty adjustment form was remitted by customers to request credit for work covered by a Blue Bird warranty. (Doc. No. 69–13 at 19.) Blue Bird's warranty records indicate that the repairs documented on the Warranty Adjustment Application of record submitted by American Coach were paid in full. (*Compare* Doc. No. 54–5 at 28, *with* Doc. No. 50–2 at 4.)

**\*14** By receiving and reviewing the Blue Bird limited warranty certificates upon delivery of the buses, submitting at least one warranty adjustment form to Blue Bird, directly making at least 13 warranty claims to Blue Bird for the subject buses, and receiving credit from Blue Bird on 23 warranty claims between March 2006 and December 2007, American Coach expressly assented to the terms of Blue Bird's limited warranty. *See Twin Disk,* 772 F.2d at 1334–35 (finding that a purchaser "expressly assented" to a post-sale warranty containing a disclaimer by knowing the warranty terms, making inquiries regarding the warranty, assigning the warranty to its customers by telling them to contact the seller directly about repairs, and processing over 210 claims under the warranty); *Monsanto Agr. Prods. Co. v. Edenfield,* 426 So.2d 574, 577–78 (Fla. 1 st DCA 1982) (finding that purchaser assented to post-sale disclaimer printed on seed package by using seeds after reading directions for use which contained disclaimer and an express invitation to return the product if the terms of warranty were unacceptable). Having availed itself of benefits under Blue Bird's limited warranty, American Coach "by unequivocal behavior, clearly indicat[ed] a willingness to be bound" by its terms and thus is barred from denying the disclaimer of implied warranties contained therein. *E.g., Twin Disk,* 772 F.2d at 1335.

In summary, Blue Bird's limited warranty applies to the subject buses because the unrefuted evidence of record shows that American Coach knew at the time of purchase of the subject buses that Blue Bird's limited warranty applied. Alternatively, American Coach is barred from denying the applicability of Blue Bird's limited warranty due to its post-sale knowledge of the warranty and availment of its terms.[4] Having found that Blue Bird's limited warranty governs the subject buses, the Court turns to whether the warranty lawfully disclaims the implied warranties of merchantability and fitness for a particular purpose.

4    Blue Bird also argues that American Coach should be imputed knowledge that the Limited Warranty applied to the subject buses because it submitted a warranty claim to Blue Bird for another bus before purchasing the subject buses. (Doc. No. 56 at 9.) Submitting a claim on a product's warranty containing a disclaimer, without more, does not permit an inference that the purchaser knew a subsequent purchase of that product would be covered by the same disclaimer. *See Bowdoin v. Showell Growers, Inc.,* 817 F.2d 1543, 1547 (11th Cir.1987) (noting that a previous purchase

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 15 of 207
PageID: 13032
American Coach Lines of Orlando, Inc. v. North American..., Not Reported in...
2011 WL 653524, 73 UCC Rep.Serv.2d 626

accompanied by a disclaimer of warranty, by itself, does not permit an inference that the purchaser knew a subsequent purchase of the same product would be covered by the same disclaimer). Further, a course of dealings demonstrating the regular application of a particular warranty disclaimer is not established by a single prior transaction or occurrence. *Id.* at 1547 n. 18; *see also* Fla. Stat. § 671.205(2) ("A 'course of dealing' is a sequence of conduct concerning previous transactions...."); *Irvin Int'l Inc. v. Riverwood Int'l Corp.,* 299 Ga.App. 633, 683 S.E.2d 158, 161–62 (Ga.Ct.App.2009) (noting that a single transaction seven years prior did not establish a course of dealing). Accordingly, the fact that American Coach submitted a warranty claim to Blue Bird prior to purchasing the subject buses, by itself, does not permit an inference that American Coach knew at the time of purchase that the Blue Bird warranty disclaimer would apply to the subject buses.

**B. Validity of Disclaimer Contained in Limited Warranty**

Blue Bird's limited warranty governing the subject buses contains a choice of law provision specifying that "[a]ll rights under this limited warranty shall be governed by the law of Georgia, U.S.A." (Doc. No. 34–1 at 16.) This choice of law provision does not contravene public policy, as Blue Bird manufactured the subject buses and is a Georgia corporation with its principal place of business in Georgia. (Doc. No. 1 ¶¶ 3, 9; Doc. No. 14 ¶¶ 3, 9; Doc. No. 34–1 ¶ 5); *see* Fla. Stat. § 671.105(1) ("[W]hen a transaction bears a reasonable relation to this state and also to another state or nation the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties."); *Burroughs Corp. v. Suntogs of Miami, Inc.,* 472 So.2d 1166, 1167–68 (Fla.1985) (upholding a sales contract provision applying a Michigan statute of limitations because it bore a reasonable relationship to Michigan, as the seller was a Michigan corporation with its principal place of business in Michigan). Therefore, Georgia law governs Blue Bird's limited warranty.

**\*15** A disclaimer of the implied warranties of merchantability and fitness for a particular purpose is permitted by Georgia law under the following circumstances:

[T]o exclude or modify the implied warranty of merchantability or any part of it the language must

mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that "There are no warranties which extend beyond the description on the face hereof."

O.C.G.A. § 11–2–316(2). The term "conspicuous" is defined by statute as follows:

"Conspicuous," with reference to a term, means so written, displayed, or presented that a reasonable person against which it is to operate ought to have noticed it. Whether a term is conspicuous or not is a decision for the court. Conspicuous terms include the following:

(A) A heading in capitals equal to or greater in size than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same or lesser size; and

(B) Language in the body of a record or display in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbols or other marks that call attention to the language.

*Id.* § 11–1–201(10).

In contrast to the other four paragraphs of Blue Bird's limited warranty which appear in plain, unformatted type, the third paragraph of the limited warranty is printed as follows:

**THIS LIMITED WARRANTY IS EXPRESSLY IN LIEU OF ALL OTHER WARRANTIES EXPRESSED OR IMPLIED AND ALL OTHER OBLIGATIONS OR LIABILITIES.... BLUE BIRD MAKES NO WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE....**

(Doc. No. 34–1 at 16; Doc. No. 54–5 at 25.) This bold, capitalized language is "conspicuous" under O.C.G.A. § 11–1–201(10)(B) and constitutes a valid disclaimer of the implied warranties of merchantability and fitness for a particular purpose under O.C.G.A. § 11–2–316(2). *See Steele v. Gold Kist, Inc.,* 186 Ga.App. 569, 368 S.E.2d 196, 197 (Ga.Ct.App.1988) (finding that a written disclaimer stating in capital letters that retailer had made no warranties, express or implied, including merchantability or fitness for particular purpose, except as expressly stated, precluded consumer's action against retailer for breach of implied warranties).

American Coach Lines of Orlando, Inc. v. North American..., Not Reported in...
2011 WL 653524, 73 UCC Rep.Serv.2d 626

Having found that Blue Bird's limited warranty governs the subject buses and lawfully disclaims the implied warranties of merchantability and fitness for a particular purpose, Blue Bird is entitled to summary judgment on American Coach's claims for breach of the implied warranties of merchantability and fitness for a particular purpose in Counts VIII and IX.

## VI. Count IV: Breach of Express Warranty by NABI
In Count IV of the Complaint, American Coach contends that NABI breached oral and written express warranties that the subject buses would be free from defects in material and workmanship for two years or 100,000 miles, whichever occurs first, and that the subject buses would be suitable for the purpose for which they were purchased. (Doc. No. 1 at 11–12.) NABI argues that it should be granted summary judgment on this claim because NABI lacked contractual privity with American Coach. (Doc. No. 33 at 8.)

**\*16** As the party asserting a claim for breach of express warranty, American Coach bears the burden of proving, *inter alia,* the existence of an express warranty and breach of that warranty. *See State Farm Ins. Co. v. Nu Prime Roll–AWay of Miami,* 557 So.2d 107, 108 (Fla. 3d DCA 1990) ("The burden of proof is on the plaintiff to show facts giving rise to a warranty ...." (citing *Boehm v. Fox,* 473 F.2d 445, 449 (10th Cir.1973))); *Fender v. Colonial Stores, Inc.,* 138 Ga.App. 31, 225 S.E.2d 691, 693 (Ga.Ct.App.1976) ("An action based on breach of warranty necessitates a showing of the existence of the warranty, the fact that the warranty was broken and that the breach of the warranty was the proximate cause of the loss sustained." (citation omitted)). Consequently, American Coach must produce evidence creating a genuine issue of material fact regarding the existence of an express warranty and breach of that warranty to withstand Defendants' motion for summary judgment. *Celotex,* 477 U.S. at 322.

Blue Bird's limited warranty does not mention, let alone obligate, NABI. (Doc. No. 34–1 at 16; Doc. No. 54–5 at 25.) Therefore, NABI cannot be liable to American Coach for breach of that warranty. *See supra* part II (noting that only parties to a contract can be liable for its breach). Notwithstanding, American Coach maintains that NABI expressly warranted the subject buses to American Coach through its statements concerning repairs and delivery of replacement parts. (Doc. No. 41 at 8–12.) The Court disagrees. As discussed below, NABI is not liable to American Coach for breach of express warranty because NABI's statements to American Coach concerning the subject buses did not form part of the basis of the bargain for the subject buses or, alternatively, because NABI and American Coach were not in contractual privity and no exception to the contractual privity rule applies.

### A. Statements as Basis of the Bargain
Pursuant to Fla. Stat. § 672.313, and O.C.G.A. § 11–2–313, an express warranty is created by the following:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

In view of these provisions, an express warranty is created only by actions forming "part of the basis of the bargain." *Accord* U.C.C. § 2–313, cmt. 1 ("Express warranties rest on 'dickered' aspects of the individual bargain ...."). The parties do not cite, and the Court does not find, any Florida or Georgia law to the contrary.

The breach of express warranty claim against NABI fails because there is no evidence that NABI made any statements, representations, or promises to American Coach forming "part of the basis of the bargain" for the subject buses. Brian Dickson averred that in January 2011, he located in American Coach's business records a document entitled "NABI Standard Warranty" bearing an effective date of October 27, 2006. (Doc. No. 68–1 ¶ 16; Doc. No. 68–6 at 4–35.) American Coach argues that the NABI Standard Warranty "might be considered" to be an express warranty governing the subject buses. (Doc. No. 69 at 9–10.) The Court disagrees. The effective date of this warranty is October 27, 2006, (Doc. No. 68–6 at 5), over six months after the subject buses were delivered to American Coach and over one year after Feder executed the Sales Agreement. (Doc. No. 34–1 ¶ 7; *id.* at 5–15; Doc. No. 54–1 at 40; Doc. No. 65–1 at 5–6.) In view of the time gap between the effective date of the NABI Standard Warranty and the date of the Sales Agreement, and absent any evidence of record linking the NABI Standard Warranty to the sale of the subject buses, the

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 17 of 207
PageID: 13034
American Coach Lines of Orlando, Inc. v. North American..., Not Reported in...
2011 WL 653524, 73 UCC Rep.Serv.2d 626

NABI Standard Warranty did not plausibly form part of the basis of the bargain for the subject buses.

**\*17** Further, because all statements of record by NABI to American Coach regarding the subject buses were made after the buses were delivered to American Coach, (Doc. No. 42 ¶¶ 8–16; Doc. No. 43 ¶¶ 4–11), NABI's statements to American Coach were not part of the "basis of the bargain" and thus did not create an express warranty under Florida or Georgia law. Finding no evidence of record that NABI gave American Coach an express warranty forming part of the basis of the bargain for the subject buses, American Coach's claim for breach of express warranty against NABI must fail.

**B. Privity**
As discussed *supra* part II, Blue Bird, not NABI, manufactured, sold, and delivered the subject buses to American Coach, and NABI was not in contractual privity with American Coach regarding the purchase and sale of the subject buses. Contractual privity is generally required to establish breach of an express warranty under Florida and Georgia law. *See, e.g., Levine v. Wyeth Inc.,* 684 F.Supp.2d 1338, 1345 (M.D.Fla.2010) (collecting Florida cases); *Weiss v. Johansen,* 898 So.2d 1009, 1012 (Fla. 4th DCA 2005); *Ellis v. Rich's, Inc.,* 233 Ga. 573, 212 S.E.2d 373, 376 (Ga.1975). As discussed below, although both states' jurisprudence is clouded by exceptions to the contractual privity requirement, no exception under Georgia or Florida law applies here.

**1. Georgia Law**
In *Stewart v. Gainesville Glass Co., Inc.,* 131 Ga.App. 747, 206 S.E.2d 857 (Ga.Ct.App.1974), the Georgia Court of Appeals ruled that a consumer who purchased windows from a local dealer could not enforce the manufacturer's ten year warranty because the consumer had no privity with the manufacturer. *Id.* at 860. This decision was affirmed by the Georgia Supreme Court in a one-paragraph opinion holding that contractual privity was required to claim breach of an express warranty except as provided in O.C.G.A. § 11–2–318 and except where the warranty "clearly extends to some identifiable third person," meaning a third-party beneficiary. *Stewart v. Gainesville Glass Co., Inc.,* 233 Ga. 578, 212 S.E.2d 377, 377 (Ga.1975).

While no case has explicitly modified the general rule and two exceptions stated in *Stewart,* a line of Georgia cases appears to carve out a third exception to the privity requirement. In *Jones v. Cranman's Sporting Goods,* 142 Ga.App. 838,

237 S.E.2d 402 (Ga.Ct.App.1977), an express warranty included in the papers accompanying a defective rifle by the manufacturer/distributor [5] of the gun was enforced against the manufacturer/distributor, notwithstanding the fact that the plaintiff purchased the rifle from a sporting goods store, not the manufacturer/distributor. This result was based on the extension of the following principle beyond the context of an automobile purchase: "[w]here an automobile manufacturer, through its authorized dealer issues to a purchaser of one of its automobiles from such dealer admittedly as a part of the sale a warranty by the manufacturer running to the purchaser, privity exists...." *Jones,* 237 S.E.2d at 405 (quoting *Chrysler Corp. v. Wilson Plumbing, Co.,* 132 Ga.App. 435, 208 S.E.2d 321, 323 (Ga.Ct.App.1974)). Although the warranty card accompanying the rifle in *Jones* was included by the manufacturer/distributor, not an authorized dealer, in the papers that came with the gun, the court found the case to be analogous to *Wilson Plumbing,* reasoning that because "[t]he weapon here was 'fully guaranteed' by the distributor to the ultimate consumer, ... it became part of the bargain of sale and thus privity existed." *Id.* at 406. To the extent *Jones* creates a third exception to the privity requirement for an express warranty under *Stewart,* such exception is limited to cases where the express warranty is "part of the bargain of sale." *Id.; cf. EMJ Corp. v. Laticrete Int'l, Inc.,* 934 F.Supp. 430, 433–34 (M.D.Ga.1996) (noting that this result "seems to eliminate the privity requirement almost entirely, since a purchaser could easily characterize any warranty as a part of the 'bargain of sale' and thus establish privity with the manufacturer.").

5       The manufacturer, not the distributor, warranted the gun in *Jones. Jones,* 237 S.E.2d at 405. However, the court in *Jones* presumed on the motion for summary judgment that the manufacturer and distributor were alter egos and thus considered each of their actions attributable to the other. *Id.*

**\*18** The evidence of record does not satisfy any of the three exceptions to the requirement of contractual privity to establish breach of an express warranty under Georgia law. First, the third-party privity provisions under O.C.G.A. § 11–2–318 do not apply here. Pursuant to O.C.G.A. § 11–2–318, a seller's express or implied warranty extends to the buyer's family, household, and guests who foreseeably use, consume, or are affected by the purchased goods. Because NABI did not sell the subject buses to American Coach, (Doc. No. 34–1 ¶ 6), this exception does not apply.

American Coach Lines of Orlando, Inc. v. North American..., Not Reported in...
2011 WL 653524, 73 UCC Rep.Serv.2d 626

Second, American Coach is not a third-party beneficiary to any express warranty because there is no evidence that NABI promised Blue Bird or any other entity to act or perform for the benefit of American Coach. *See Stewart,* 206 S.E.2d at 753 ("A third-party beneficiary contract is one in which the promisor engages to render some performance to a third person." (citation omitted)). Third, the *Jones* exception does not apply here because there is no evidence in the record that NABI's statements to American Coach formed "part of the bargain of sale" for the subject buses. *See supra* part VI.A (noting that there is no evidence of record that NABI made any statements, representations, or promises to American Coach as "part of the basis of the bargain" for the subject buses). Accordingly, there is no factual basis in the record for finding an exception to the contractual privity requirement under Georgia law.

### 2. Florida Law

In addition to the statutory third-party privity exception which does not apply here,[6] Florida law provides an exception to the privity requirement where a buyer relies on "direct contacts" with a manufacturer in purchasing a product. In *Cedars of Lebanon Hosp. Corp. v. European X–Ray Distribs. of Am., Inc.,* 444 So.2d 1068 (Fla. 3d DCA 1984), the Florida Third District Court of Appeal found that privity existed between a manufacturer and a buyer, notwithstanding that the seller was a third-party distributor, where the manufacturer's representative made direct contact with the buyer and where the buyer relied on representations directly from the manufacturer's representative in purchasing the product from the distributor. *Id.* at 1072. The court emphasized that had there been no "direct contacts" between the manufacturer and buyer, there would have been no viable claim for breach of an express warranty. *Id.* at 1072 n. 4. Similarly, in *ISK Biotech Corp. v. Douberly,* 640 So.2d 85 (Fla. 1 st DCA 1994), the Florida First District Court of Appeal sustained a claim for breach of express warranty against a manufacturer where the manufacturer informed the seller that it could assure buyers that the fungicide would not destroy watermelon crops and where the plaintiff purchased the fungicide relying on such advice from the seller. *Id.* at 87–88. These cases and others stand for the proposition that a manufacturer, although not the ultimate seller of the product, may expressly warrant a product through "direct contacts" with the buyer upon which the buyer relies in purchasing the product. *See, e.g., Smith v. Wm. Wrigley Jr. Co.,* 663 F.Supp.2d 1336, 1341–42 (S.D.Fla.2009) (finding a well-pled claim for breach of express warranty against a chewing

gum company where the plaintiff alleged that the company advertised the gum as "scientifically proven to help kill the germs that cause bad breath," that there was no scientific proof to substantiate the advertisement, and that the plaintiff purchased gum in reliance on the advertisement); *cf. Spolsky Gen. Contractor, Inc. v. Jett–Aire Corp. Aviation Mgmt. of Cent. Fla., Inc.,* 637 So.2d 968, 970 (Fla. 5th DCA 1994) (holding that a manufacturer of floor paint was not liable to a general contractor for breach of express warranty where there was no sale from the manufacturer to the contractor, no privity between them, no contract between them, and no reliance by the contractor on any warranty from the manufacturer).

6    Section 672.318, Florida Statutes, provides that a buyer's family, household, guests, employees, agents, and servants who foreseeably use, consume, or are affected by the purchased goods may hold a seller liable for an express or implied warranty despite the absence of privity. Like the third-party privity exception under Georgia law, the third-party privity exception under Florida law is inapplicable because NABI did not sell the subject buses. *See supra* part VI.B.1.

**\*19** The instant case does not fit within the "direct contacts" exception to the privity requirement for two reasons. First, Blue Bird, not NABI, manufactured and sold the subject buses. (Doc. No. 34–1 ¶¶ 4–6.) Second, as discussed *supra* part VI.A, there is no evidence in the record that American Coach relied on any statements or representations by NABI in purchasing the subject buses. Rather, Blue Bird referred American Coach to NABI after the subject buses were delivered to American Coach and mechanical problems were discovered. (Doc. No. 42 ¶¶ 5, 7.) Accordingly, no exception to the contractual privity requirement for a breach of express warranty claim under Florida law applies here.

In summary, NABI should be granted summary judgment on the breach of express warranty claim in Count IV due to the absence of any statements by NABI to American Coach forming part of the basis of the bargain for the subject buses or, alternatively, due to the lack of privity between NABI and American Coach or an exception to the privity requirement.

### VII. Count X: Breach of Express Warranty by Blue Bird

The parties dispute whether the claim for breach of express warranty against Blue Bird is barred by the one-year limitations period set forth in the limited warranty governing the subject buses. (Doc. No. 33 at 9–12; Doc. No. 41 at

American Coach Lines of Orlando, Inc. v. North American..., Not Reported in...
2011 WL 653524, 73 UCC Rep.Serv.2d 626

13–14.) Blue Bird's limited warranty provides that "[a]ny suit alleging a breach of this limited warranty or of any other alleged warranty must be filed within one year of breach." (Doc. No. 34–1 at 16; Doc. No. 54–5 at 25.) This case was filed on November 24, 2009. (Doc. No. 1.) Therefore, the instant claim for breach of express warranty against Blue Bird is barred unless a breach occurred on or after November 24, 2008.

"A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered." O.C.G.A. § 11–2–725(2). Accordingly, "[w]hile a breach of warranty generally occurs upon delivery of the goods regardless of the time of discovery of the breach ..., where there is an agreement to repair or replace, the warranty is not breached until there is a refusal or failure to repair." *Space Leasing Assocs. v. Atl. Bldg. Sys., Inc.,* 144 Ga.App. 320, 241 S.E.2d 438, 441 (Ga.Ct.App.1977). In the case of a warranty to repair or replace goods, "[i]t is the refusal to remedy within a reasonable time, or a lack of success in the attempts to remedy which would constitute a breach of warranty" and cause the limitations period to accrue. *Id.* (quoting *Ford Motor Co. v. Gunn,* 123 Ga.App. 550, 181 S.E.2d 694, 696 (Ga.Ct.App.1971)).

Blue Bird's limited warranty governing the subject buses is a warranty to repair or replace goods, as it warrants:

each bus or coach to be free from defects in material and workmanship under normal use and service for two (2) years/100,000 miles/160,000 kilometers, whichever occurs first from date of delivery to the original user. Blue Bird warrants all components installed by Blue Bird except ....

**\*20** Blue Bird's obligation covered in this limited warranty is limited to the repair or replacement of such parts as shall, under normal use and service, appear to have been defective in workmanship or material.

(Doc. No. 34–1 at 16; Doc. No. 54–5 at 25.) Because Blue Bird's limited warranty governing the subject buses is a warranty to repair or replace, American Coach's claims for breach of express warranty against Blue Bird did not accrue until Blue Bird refused to remedy defects covered by the warranty within a reasonable time or failed in its attempts to remedy such defects. *Space Leasing,* 241 S.E.2d at 441.

Blue Bird's limited warranty was expressly limited to a term of two years, and no representations of any person, including salespersons, dealers, distributors, or factory representatives of Blue Bird, could extend the warranty term. (Doc. No. 34–1 at 16; Doc. No. 54–5 at 25.) Although Jack Mears testified that it is common industry practice to extend warranties beyond the original term pursuant to a course of dealings, (Doc. No. 84 ¶ 14), the express, two-year term of the Blue Bird limited warranty prevails over any contrary course of dealings. *See* O.C.G.A. § 11–1–205(4) ("The express terms of an agreement and an applicable course of dealing ... shall be construed wherever reasonable as consistent with each other; but such construction is unreasonable [the] express terms control...."). Thus, because all of the subject buses were delivered to Blue Bird by March 31, 2006, (Doc. No. 34–1 at 5–15), Blue Bird's limited warranty covered repairs and replacement parts for mechanical defects in the subject buses existing on or before March 31, 2008. (*Id.* at 16, 241 S.E.2d 438.)

The record contains several incidents after November 28, 2008, the accrual date for American Coach's claims under Blue Bird's limited warranty, in which representatives of Blue Bird [7] attempted to provide replacement parts for the subject buses. None of these incidents permit a reasonable fact finder to infer that the defects underlying those incidents existed on March 31, 2008, and thus were covered by Blue Bird's limited warranty. Because those defects were not covered by Blue Bird's limited warranty, any refusal or failure to repair those defects did not breach Blue Bird's limited warranty.

[7]     As noted earlier at some point after the subject buses were delivered, the commercial bus operations of both Blue Bird and NABI were consolidated at NABI, and it appears that some Blue Bird personnel became NABI personnel serving in the same role. (Doc. No. 69–13 at 7, 13.) The parties do not squarely address whether the personnel who transferred from Blue Bird to NABI remained representatives of Blue Bird for purposes of Blue Bird's limited warranty. However, viewing the evidence of record in the light most favorable to American Coach, the Court proceeds by attributing all statements by Blue Bird and NABI personnel to Blue Bird on this claim.

On December 17, 2008, Brian Dickson notified Blue Bird and NABI that "parts for a bus that [was] in an accident had a lead time of fourteen (14) weeks .... " (Doc. No. 42

¶ 12.) Dickson maintained that "Jack Kemp, on behalf of Defendants, responded that he would help." (*Id.*) It is unclear whether Dickson first learned on or about December 17, 2008 that the lead time for the parts would be fourteen weeks or whether Dickson received the parts on December 17, 2008, fourteen weeks after the request. Under either interpretation of Dickson's averments, a reasonable fact finder could not conclude absent any other evidence concerning the repairs discussed on December 17, 2008, that such repairs existed on March 31, 2008, and thus were covered by Blue Bird's limited warranty.

**\*21**  On March 13, 2009, Dickson contacted NABI and Blue Bird about one of the subject buses which "had been out of service for several months" and for which parts were promised by March 1, 2009 but had not been delivered. According to Dickson, he "was again told that NABI and Blue Bird would resolve the problems." (*Id.* ¶ 13, 241 S.E.2d 438.) Although "[l]ead times on parts were often weeks at a time," (*id.* ¶ 12, 241 S.E.2d 438), the fact that the parts discussed on March 13, 2009 had been outstanding for "several months," without more, does not permit a reasonable inference that those parts pertained to a defect existing on March 31, 2008.

Also on March 13, 2009, Cahill emailed Kemp, with copies to Pierce and Dickson, to reiterate that the long wait times for particular parts on buses that had been down for three and two weeks, respectively, were unacceptable. (Doc. No. 67–1 ¶ 7; *id.* at 69, 241 S.E.2d 438.) Pierce replied to all recipients a few hours later requesting that Blue Bird buy back the subject buses. (*Id.* at 69, 241 S.E.2d 438; Doc. No. 43 ¶ 7.) According to Dickson, NABI responded by "ask[ing] for part numbers and offer[ing] to help." (Doc. No. 42 ¶ 14.) Based on the bus downtimes provided by Cahill, without more, the parts Cahill referenced could not have reasonably pertained to a defect existing on March 31, 2008.

On March 16, 2009, NABI notified Pierce that a parts operation representative would be in the area and would be calling to set up an appointment. (Doc. No. 43 ¶ 8.) NABI asked Pierce for the most critical parts needed by American Coach "to help focus their efforts." (*Id.*) Because these statements did not concern any particular defect to the subject buses, a reasonable fact finder could not infer that Blue Bird or NABI was attempting to make repairs covered by Blue Bird's limited warranty on March 13, 2009.

Cahill attached to his affidavit over 70 pages of emails documenting several requests for replacement parts by American Coach to Blue Bird and NABI between September 29, 2008 and October 12, 2010. (Doc. No. 67–1 at 6–78.) However, American Coach does not cite, and the Court does not find, any discussion of repairs or replacement parts in those emails pertaining to a defect existing on March 31, 2008.

In summary, American Coach has not produced any evidence showing that work done by Blue Bird or its representatives after November 28, 2008, concerned a defect that was covered under the warranty. Therefore, American Coach's claim for breach of Blue Bird's limited warranty is untimely, and summary judgment should be granted for Blue Bird on American Coach's claim for breach of express warranty in Count X.

## VIII. Formation of "Oral Agreement for Warranty Work"

Notwithstanding the claims against NABI and Blue Bird for breach of implied and express warranties, American Coach argues that there is a genuine issue of material fact concerning whether NABI, Blue Bird, and American Coach entered into "freestanding, oral, enforceable contract agreements to provide service, support, and replacement parts." (Doc. No. 41 at 14.) Although American Coach did not assert this claim in the Complaint, (Doc. No. 1), neither Blue Bird nor NABI have objected to the consideration of this claim on summary judgment. Therefore, the Court will consider the merits of the claim.

**\*22**  The elements of a breach of contract action are: (1) a valid contract; (2) a material breach; and (3) damages. *Beck v. Lazard Freres & Co., LLC,* 175 F.3d 913, 914 (11th Cir.1999). A valid contract consists of "offer, acceptance, consideration, and sufficient specification of the essential terms." *St. Joe Corp. v. McIver,* 875 So.2d 375, 381 (Fla.2004) (citing *W.R. Townsend Contracting, Inc. v. Jensen Civil Constr., Inc.,* 728 So.2d 297, 302 (Fla. 1 st DCA 1999)); *see also* O.C.G.A. § 13–3–1 ("To constitute a valid contract, there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contact can operate.").

According to Dickson, after American Coach purchased the subject buses, he was assured by an unspecified person that Blue Bird's discontinuation of the subject buses' model would not affect American Coach's ability to obtain replacement

parts "in a timely fashion." (Doc. No. 42 ¶ 4.) Cox's letter of October 5, 2007, regarding the discontinuation of the model of the subject buses stated that "NABI will continue to provide warranty and technical support for the [model of the subject buses] in the field through its existing customer service organization" and that "[r]eplacement parts will continue to be provided through NABI's Aftermarket Parts organization ...." (Doc. No. 68–6 at 2.)

Michael Pierce asserted that he "was told by representatives of both Blue Bird and NABI that they would resolve" the mechanical issues with the subject buses and obtain replacement parts. (Doc. No. 43 ¶ 4.) Pierce also "was assured [by an unspecified individual] that NABI would resolve" the mechanical issues with the subject buses. (*Id.* ¶ 11.) John Lewis asked Pierce "for the most critical parts which American Coach needed to get [the] buses back in service to help focus their efforts." (*Id.* ¶ 8.)

Representatives of both NABI and Blue Bird made similar statements to Dickson. Dickson asserted that "[o]n an ongoing basis, American Coach was told by representatives of both Blue Bird and NABI that they would resolve the issues" with the subject buses. (Doc. No. 42 ¶ 7.) Dickson met with James Bernacchi of NABI, who "represented that he could —and would—resolve these issues." (*Id.* ¶ 10.) Jack Kemp told Dickson that "he would help" in response to Dickson's complaint that lead times for parts exceeded fourteen months. (*Id.* ¶ 12.) Dickson further maintained that he "was told ... that NABI and Blue Bird would resolve the problems" in response to contacting NABI and Blue Bird on March 13, 2009 about a bus that had been out of service for several months and for which parts had been promised by March 1, 2009 but had not been delivered. (*Id.* ¶ 13.) NABI responded to American Coach's request that NABI buy back the subject buses due to the degree of mechanical problems by "ask[ing] for part numbers and offer[ing] to help." (*Id.* ¶ 14.) In addition, Buddy Cox told American Coach that NABI would "resolve the problems" associated with the subject buses. (*Id.* ¶ 15.) Pierce and Dickson averred that based on the above-referenced statements, American Coach relied on Blue Bird and NABI to repair the subject buses and provide replacement parts as promised. (*Id.* ¶ 18; Doc. No. 43 ¶ 13.)

**\*23** Even if the foregoing assurances of Blue Bird and NABI constituted an offer that was accepted by American Coach, there is no enforceable contract due to a lack of consideration. "To satisfy the consideration requirement under Georgia law, an accepting party to a contract can either tender bargained-

for performance or make a mutual promise." *Lambert v. Austin Ind.,* 544 F.3d 1192, 1195 (11th Cir.2008) (citing O.C.G.A. § 13–3–42). Similarly, consideration under Florida law is established by performance or a promise to perform. *See Palm Lake Partners II, LLC v. C & C Powerline, Inc.,* 38 So.3d 844, 851 n. 10 (Fla. 1st DCA 2010) ("[A] promise, no matter how slight, qualifies as consideration," so long as "the promisor agrees to do something that he or she is not already obligated to do." (quoting *Cintas Corp. No. 2 v. Schwalier,* 901 So.2d 307, 309 (Fla. 1st DCA 2005))); *Ballou v. Campbell,* 179 So.2d 228, 230 (Fla. 2d DCA 1965) (noting that consideration includes a promise or a specific act or forbearance) (quotation omitted).

There is no evidence in the record that American Coach made a promise to NABI or to Blue Bird or took any action for the benefit of NABI or Blue Bird in exchange for a promise to repair and provide replacement parts for the subject buses. Dickson's deposition testimony reveals that the only post-sale consideration provided by American Coach to NABI was payments for parts delivered to American Coach and that American Coach provided no consideration for mere promises by NABI:

Q. Was there anything given by American Coach to NABI in return for any promises NABI made to American Coach?

A. No, nothing for promises, no. At some point we may have paid NABI for parts versus Blue Bird for parts.... [N]othing other than that.

Q. If you paid NABI for parts, you were provided parts, right? That would be the agreement?

A. No. I would say if we were provided parts by NABI or Blue Bird, we paid them for them.

...

Q. In this claim, it's claimed that NABI made some warranties regarding these buses. What I'm asking is: With regard to the claim that NABI somehow warranted these buses, was anything provided by American Coach to NABI for those promises?

A. No, no. We wouldn't have provided them anything. We would have brought them into the process with the— because they were responsible essentially for Blue Bird and we were attempting to get—compel them to resolve the issues, but we wouldn't have provided them anything for that.

(Doc. No. 54–2 at 43–44.) Absent any consideration provided by American Coach for promises to repair or provide replacement parts, no contract was formed between American Coach and NABI or Blue Bird for repair or replacement parts other than Blue Bird's limited warranty.

## IX. Enforceable Promise to Repair Buses and Provide Replacement Parts

American Coach contends that "[p]romises made by Blue Bird and NABI after the purchase of the subject buses [to] fix mechanical problems and [to] provide replacement parts are enforceable ...." (Doc. No. 41 at 14.) This assertion sounds in promissory estoppel. Although American Coach did not assert a claim for promissory estoppel in the Complaint, (Doc. No. 1), neither Blue Bird nor NABI have objected to the consideration of this claim on summary judgment. Therefore, the Court will consider the merits of the claim.

**\*24** The doctrine of promissory estoppel provides that "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." O.C.G.A. § 13–3–44(a); *W.R. Grace & Co. v. Geodata Servs., Inc.,* 547 So.2d 919, 924 (Fla.1989) (citing Restatement (Second) Contracts § 90 (1979)). The character of the reliance protected by promissory estoppel is explained as follows:

> The promisor is affected only by reliance which he does or should foresee, and enforcement must be necessary to avoid injustice. Satisfaction of the latter requirement may depend on the reasonableness of the promisee's reliance, on its definite and substantial character in relation to the remedy sought, on the formality with which the promise is made, on the extent to which the evidentiary, cautionary, deterrent and channeling functions of form are met by the commercial setting or otherwise, and on the extent to which such other policies as the enforcement

of bargains and the prevention of unjust enrichment are relevant.

*W.R. Grace,* 547 So.2d at 924 (quoting Restatement (Second) Contracts § 90 (1979)).

As reflected in the explication of promissory estoppel provided by Section 90 of the Restatement (Second) of Contracts, there can be no promissory estoppel unless the terms of the promise are definite in relation to the remedy sought. *Vencor Hosps. v. Blue Cross Blue Shield of R.I.,* 284 F.3d 1174, 1185 (11th Cir.2002) (applying Florida law); *see also Voyles v. Sasser,* 221 Ga.App. 305, 472 S.E.2d 80, 82 (Ga.Ct.App.1996) (rejecting a promissory estoppel claim due to the indefiniteness of the promise allegedly relied upon). In addition, the promisee's reliance on the promise must be reasonable, and this inquiry is generally a factual matter for a jury. *Gilmour v. Am. Nat. Red Cross,* 385 F.3d 1318, 1321 (11th Cir.2004) (citing Georgia law). However, "a determination of reasonableness can be made as a matter of law if a prior disclaimer or disclosure prevents justifiable reliance on the representation." *Id.* (citing Georgia law); *see also D. O.P. Invs., Inc. v. Oakland Hills Joint Venture,* 909 So.2d 355, 356 (Fla. 4th DCA 2005) (finding no justifiable reliance as a matter of law on a seller's misstatement as required for a claim of fraud where the buyer became aware of the truth prior to the purchase).

The promissory estoppel claim against Blue Bird fails because any reliance on promises by Blue Bird to repair the subject buses was unreasonable, as such promises contradict the terms of the Limited Warranty. *See Gilmour,* 385 F.3d at 1322 (finding an employee's reliance on her employer's statement regarding payment of medical expenses unreasonable because coverage was clearly limited by the employer's manuals previously received by the employee); *Gerdes v. Russell Rowe Commc'ns, Inc.,* 502 S.E.2d 352, 354–5 5 (Ga.Ct.App.1998) (holding that the plaintiff could not reasonably rely on an oral promise for higher compensation when an earlier binding agreement specifically stated that alterations must be in writing). The Limited Warranty provides that "no person ... is authorized to make any representation or warranty concerning Blue Bird products except to refer purchasers to this Limited Warranty." (Doc. No. 34–1 at 16; Doc. No. 54–5 at 25.) Therefore, any reliance by American Coach on statements by representatives of Blue Bird to repair the subject buses beyond the terms of the Limited Warranty was unreasonable.

Case 1:19-md-02875-RMB-SAK   Document 598-4   Filed 10/16/20   Page 23 of 207
PageID: 13040
American Coach Lines of Orlando, Inc. v. North American..., Not Reported in...
2011 WL 653524, 73 UCC Rep.Serv.2d 626

**\*25**  The parties do not address whether the transfer of Blue Bird's commercial bus operations to NABI at some unspecified date after the subject buses were delivered rendered NABI employees representatives of Blue Bird under the Limited Warranty. (Doc. No. 69–13 at 7, 13.) In any case, to the extent the Limited Warranty does not preclude reasonable reliance by American Coach on statements by NABI personnel, American Coach's promissory estoppel claim against NABI fails because the evidence of record does not show that NABI made a definite promise to American Coach to provide replacement parts or to repair the subject buses. Promises by NABI to American Coach "offer[ing] to resolve the issues" with the subject buses and assuring that it "could—and would—resolve ... issues" and that it "would help," (Doc. No. 42 ¶¶ 7–15), were indefinite because they failed to disclose what actions NABI would take and when NABI would take such actions. *See Hygema v. Markley,* 137 Fla. 1, 187 So. 373, 380 (Fla.1939) (rejecting the alleged promise as the basis for promissory estoppel because it "was entirely indefinite as to terms and time"); *Voyles,* 472 S.E.2d at 81–82 (finding promissory estoppel inapplicable because the seller's alleged promise to the buyer of an insurance agency that the agency would "continue to service [the seller's] insurance needs as it had prior to sale" was not sufficiently definite in time to justify buyer's reliance on it). The indefinite nature of promises by Blue Bird and NABI to provide replacement parts is evident from Dickson's deposition testimony:

> Q.... Were there any promises to provide replacement parts in connection with the purchase of the buses?
>
> A. I don't know. I wasn't there. The only promise that I was made is that after the buses were discontinued, [Blue Bird and NABI] would continue to support replacement parts for the buses.
>
> Q. Was there any time limit? Was that just for infinity?
>
> A. There wasn't a time limit on them.
>
> ...
>
> Q. Other than making sort of general promises of we'll take care of it or we'll help, were there any specific or concrete promises regarding exactly what they would do in terms of getting the replacement parts or assisting with repairs?
>
> A. No, no....

> Q. They were sort of nonspecific, general statement like we'll take care of it?
>
> A. Tell us what you need and we'll try to help you out and get them. That was essentially their response.
>
> ...
>
> Q.... When we're talking about the complaints about the delays in getting parts, am I correct that at that point American Coach is buying parts from Blue Bird or NABI, not necessarily getting warranty provided parts? You couldn't just even get parts that you wanted to buy at that point, right?
>
> A. Correct, right....
>
> ...
>
> Q. You were just trying to buy parts and they can't get them quick enough?
>
> A. Correct.

(Doc. No. 54–3 at 2–5.) Similarly, Chuck Brookshire's statement to Pierce that Blue Bird would pull parts off buses being assembled if necessary to improve lead times for parts and get Kemp involved, which caused Pierce to believe that Blue Bird and NABI were committing to fix the problems with the subject buses, "was not limited to any particular time frame but rather to ongoing problems being experienced." (Doc. No. 66–1 ¶¶ 6–7, 9.)

 **\*26**  Although downtimes for buses ranged from days to months and lead times for repair parts were up to fourteen weeks, (Doc. No. 42 ¶ 12), there is no evidence in the record that Blue Bird or NABI promised American Coach repair and lead times less than this duration or of any specific duration. "[T]o apply the doctrine of promissory estoppel to facts which are not sufficiently definite 'in time or term or reasonableness' would 'wreak havoc with basic contract law.' " *Bergman v. DeIulio,* 826 So.2d 500, 504 (Fla. 4th DCA 2002) (quoting *W.R. Grace,* 547 So.2d at 925). Thus, absent a definite and substantial promise to repair the subject buses and provide replacement parts, the doctrine of promissory estoppel is inapplicable.

In addition to being indefinite, assurances by Blue Bird and NABI that they "could—and would—resolve ... issues" and that it "would help" are insufficient to support a claim of promissory estoppel because those statements concern

present intentions with regard to future acts. (Doc. No. 42 ¶¶ 10, 12–16); *see W.R. Grace,* 547 So.2d at 924 ("[O]rdinarily, a truthful statement as to the present intention of a party with regard to his future act is not the foundation upon which an estoppel may be built." (quoting *S. Inv. Corp. v. Norton,* 57 So.2d 1, 3 (Fla.1952)).

In summary, to the extent American Coach asserts a claim of promissory estoppel against NABI and Blue Bird arising out of promises to provide replacement parts and repairs, summary judgment should be granted for NABI and Blue Bird.

## X. Counts V, VI, XI, XII: Negligence and Strict Liability Against NABI and Blue Bird

Defendants contend that the negligence and strict liability claims against them are barred by the economic loss rule. (Doc. No. 33 at 12–13.) The economic loss rule is a judicially created doctrine that sets forth the circumstances under which a tort action is prohibited if the only damages suffered are economic losses. *Indem. Ins. Co. of N.A. v. Am. Aviation, Inc.,* 891 So.2d 532, 536 (Fla.2004). "Economic losses are, simply put, disappointed economic expectations." *Id.* at 536 n. 1. They include "damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits." *Id* at 536 n. 1 (quoting *Casa Clara Condo. Ass'n, Inc. v. Charley Toppino & Sons, Inc.,* 620 So.2d 1244, 1246 (Fla.1993)). "In the specific context of products liability, economic loss includes 'the diminution in the value of the product because it is inferior in quality and does not work for the general purposes for which is was manufactured or sold.' " *Id.* (quoting *Casa Clara,* 620 So.2d at 1246). "Economic loss has also been defined more broadly as the loss of the 'benefit of [the] bargain.' " *Id.* (quoting *Casa Clara,* 620 So.2d at 1246).

The Florida economic loss rule applies in two situations: (1) where the parties are in contractual privity and one party seeks to recover damages in tort for matters arising out of the contract; or (2) where the defendant is a manufacturer or distributor of a defective product which damages itself but does not cause personal injury or damage to any other property. *Curd v. Mosaic Fertilizer, LLC,* 39 So.3d 1216, 1223 (Fla.2010) (citing *Am. Aviation,* 891 So.2d at 536). These two situations have been named the contractual economic loss rule and the products liability economic loss rule, respectively. *Id.*

*\*27* In Georgia, "the 'economic loss rule' generally provides that a contracting party who suffers purely economic losses

must seek his remedy in contract and not in tort." *Gen. Elec. Co. v. Lowe's Home Centers, Inc.,* 279 Ga. 77, 608 S.E.2d 636, 637 (Ga.2005). A contracting party "can recover in tort only those economic losses resulting from injury to his person or damage to his property" other than the defective product itself. *Id.* at 637 & n. 4 (citing *Vulcan Materials Co. v. Driltech,* 251 Ga. 383, 306 S.E.2d 253, 257 (Ga.1983)). Both economic loss rules have exceptions, but none apply here. [8]

[8] The economic loss rule does not apply to torts independent of a breach of contract, such as fraudulent inducement and negligent misrepresentation. *Am. Aviation,* 891 So.2d at 537; *Moransais v. Heathman,* 744 So.2d 973, 981 (Fla.1999); *see also ASC Const. Equip. USA, Inc. v. City Commercial Real Estate, Inc.,* 303 Ga.App. 309, 693 S.E.2d 559, 566 (Ga.Ct.App.2010) (holding that economic loss rule did not bar a claim for negligent misrepresentation where losses were purely economic). The rule also does not apply to allegations of "neglect in providing professional services." *Am. Aviation,* 891 So.2d at 537 (citing *Moransais,* 744 So.2d at 983); *see also Hamilton v. Powell, Goldstein, Frazer & Murphy,* 167 Ga.App. 411, 306 S.E.2d 340, 342 (Ga.Ct.App.1983) (recognizing tort claims for attorney malpractice arising from duty imposed by law, rather than by contract). Nor does the economic loss rule "prevent the bringing of an action and recovery for intentional torts, such as, fraud, conversion, intentional interference, civil theft, abuse of process, and other torts requiring proof of intent." *Curd,* 39 So.3d at 1233 (citing *Am. Aviation,* 891 So.2d at 543). In addition, Georgia courts recognize an "accident exception" to the economic loss rule, under which "loss stemming from defects that cause accidents of violence or collision with external objects is treated as physical injury" which may be recovered in tort, whereas "[d]efects of quality, evidenced by internal deterioration or breakdown," are considered economic loss that cannot be recovered pursuant to the economic loss rule. *Driltech,* 306 S.E.2d at 255; *see also id.* at 257 ("An 'accident' [is] defined as a sudden and calamitous event which, although it may only cause damage to the defective product itself, poses an unreasonable risk of injury to other persons or property.").

Notwithstanding American Coach's argument that the fraudulent inducement and negligent misrepresentation claims may be viable with additional discovery, (Doc. No. 41 at 16–17), American Coach has produced no evidence supporting any of the exceptions to the economic loss rule. Although one of the subject buses was in an "accident," (Doc. No. 42 ¶ 12), the evidence of record does not show that the accident stemmed from a defect in the bus itself and thereby satisfies the accident exception to the economic loss rule under Georgia law. *Driltech,* 306 S.E.2d at 255.

American Coach argues that the economic loss rule does not apply because its "allegations are based, in part, on acts that occurred after the purchase of the subject buses and are based on servicing and repair of the buses, not the purchase itself." (Doc. No. 41 at 16.) To the extent this distinction raises issues beyond the pleadings, (Doc. No. 1 ¶¶ 74, 13 8), neither NABI nor American Coach object to consideration of those issues. Accordingly, the Court will consider whether the economic loss rule bars the following tort claims by American Coach: (1) negligent manufacturing of the subject buses against NABI; (2) negligent repair of the subject buses against NABI; (3) strict liability against NABI; (4) negligent manufacturing of the subject buses against Blue Bird; (5) negligence repair of the subject buses against Blue Bird; and (6) strict liability against Blue Bird.

**A. Count V: Negligent Manufacturing Against NABI**

The Court need not decide whether the economic loss rule bars American Coach's negligent manufacturing claim against NABI because that negligence claim lacks the essential element of duty. *See, e .g., Curd,* 39 So.3d at 1227 (noting that the existence of a legal duty is an essential element of a negligence claim); *Underwood v. Select Tire, Inc.,* 296 Ga.App. 805, 676 S.E.2d 262, 267 (Ga.Ct.App.2009) (same). Because NABI did not manufacture the subject buses, (Doc. No. 34–1 ¶¶ 4–6), NABI owed American Coach no duty with respect to the manufacturing of the subject buses. *Cf. Borda v. East Coast Entm't, Inc.,* 950 So.2d 488, 491 (Fla. 4th DCA 2007) ("Florida ... recognizes that a legal duty will arise whenever a human endeavor creates a generalized and foreseeable risk of harming others." (quoting *McCain v. Fla. Power Corp.,* 593 So.2d 500, 503 (Fla.1992)); *Ponse v. Atlanta Cas. Co.,* 254 Ga.App. 641, 563 S.E.2d 499, 502 (Ga.Ct.App.2002) ("[W]here one undertakes an act which he

has no duty to perform and another reasonably relies upon that undertaking, the act must generally be performed with ordinary or reasonable care ." (citation omitted)). Absent any manufacturing by NABI triggering a legal duty, summary judgment should be granted for NABI to the extent American Coach claims that NABI negligently manufactured the subject buses.

**B. Count V: Negligent Repair Against NABI**

Discussion of the economic loss rule is also unnecessary to the extent American Coach asserts a negligent repair claim against NABI because there is no evidence of record that NABI's repairs or attempted repairs of the subject buses damaged American Coach. As noted by Blue Bird and NABI in their supplement briefing, (Doc. No. 56 at 12–14), Dickson had no knowledge of an instance where Blue Bird or NABI repaired or attempted to repair the subject buses:

**\*28** Q. Did Blue Bird or NABI actually lay hands on the buses and actually perform the repairs, or were they reimbursing American Coach for repairs that others performed on the buses?

A. I don't recall ... NABI or Blue Bird ever physically doing repairs themselves. They may have come down and switched something from this to that. I don't recall. It's not really—they're not—it's not like they own dealerships and they provide service as a part of the relationship.

Q. As I understand it, American Coach would get the buses repaired, they submit claims to Blue Bird, and they'd be reimbursed if they were covered under a warranty?

A. That is the way the process would work....

...

Q. So am I correct when I say neither Blue Bird nor NABI laid hand on or repaired the buses?

A. As far as I know that's correct.

(Doc. No. 54–2 at 45–47.)

Kemp testified that he traveled to American Coach's facilities on behalf of Blue Bird and NABI on five occasions to made repairs to the subject buses and to assist American Coach's personnel make repairs. (Doc. No. 69–13 at 15–16.) However, American Coach, which bears the burden of proof, has produced no evidence that Kemp's actions caused damage to American Coach. Finding no evidence of record

that NABI's repairs or attempted repairs to the subject buses caused damage to American Coach, NABI is entitled to summary judgment on the negligent repair claim against it. *See Curd,* 39 So.3d at 1227 (noting that a negligence claim requires proof of conduct by the defendant causing actual loss or damage (citation omitted)); *Bashlor v. Walker,* 303 Ga.App. 478, 693 S.E.2d 858, 863 (Ga.Ct.App.2010) (same).

**C. Count VI: Strict Liability Against NABI**

NABI argues that the strict liability claim against it for defective manufacture of the subject buses is barred by the economic loss rule. (Doc. No. 33 at 12–14.) Notwithstanding the applicability of the economic loss rule, the strict liability claim against NABI fails because NABI did not manufacture, distribute, or sell the subject buses.

Under Georgia law, a strict liability claim can be maintained only against the manufacturer of a product. *Farmex, Inc. v. Wainwright,* 269 Ga. 548, 501 S.E.2d 802, 804 (1998) ("[S]trict liability is an available remedy only against a 'manufacturer.' "); *Ellis v. Rich's, Inc.,* 233 Ga. 573, 212 S.E.2d 373, 376 (1975) (noting that O.C.G.A. § 51–1–11(b) "preclude[s] any extension of strict liability by this court" to parties other than the manufacturer). A "manufacturer" is an entity having "an active role in the production, design, or assembly of products and placing them in the stream of commerce." *Alltrade, Inc. v. McDonald,* 213 Ga.App. 758, 445 S.E.2d 856, 858 (Ga.Ct.App.1994) (quoting *Freeman v. United Cities Propane Gas of Ga.,* 807 F.Supp. 1533, 1540 (M.D.Ga.1992)).

The Florida doctrine of strict liability is broader than the Georgia doctrine. Strict liability in Florida embraces not only manufacturers, but also "others in the distributive chain including retailers, wholesalers, ... distributors," and commercial lessors "engaged in the business of leasing of the allegedly defective product." *Samuel Friedland Fam. Enters. v. Amoroso,* 630 So.2d 1067, 1068, 1071 (Fla.1994).

**\*29** NABI cannot be held strictly liable under either Georgia or Florida law. NABI did not manufacture, distribute, or sell the subject buses. (Doc. No. 34–1 ¶¶ 4–6.) In addition, NABI did not take any actions or make any representations to American Coach regarding the subject buses until after the buses were delivered to American Coach and after American Coach reported mechanical defects in the subject buses to Blue Bird. (Doc. No. 42 ¶¶ 5,7; Doc. No. 43 ¶ 3.) Because NABI did not take any actions governed by the doctrine

of strict liability, summary judgment should be granted for NABI on American Coach's strict liability claim in Count VI.

**D. Count XI: Negligent Manufacturing Against Blue Bird**

American Coach's claim that Blue Bird negligently manufactured the subject buses is barred by the economic loss rule, as there is no evidence in the record that American Coach suffered personal injury or damage to property other than purely economic damages to the subject buses caused by Blue Bird's failure to uphold its contractual obligations. *See Lowe's,* 608 S.E.2d at 637 & n. 4 (noting that under the economic loss rule, a plaintiff can recover in tort "only those economic losses resulting from injury to his person or damage to his property" other than the defective product itself (citing *Driltech,* 306 S.E.2d at 257)); *see also Curd,* 39 So.3d at 1223 (noting that the products liability economic loss rule bars recovery in tort where "the defendant is a manufacturer or distributor of a defective product which damages itself but does not cause personal injury or damage to any other property").

American Coach "experienced breakdowns and service interruptions and failures of the subject buses," "experienced the failure and/or refusal of Blue Bird and NABI to provide replacement ... parts ... either completely or within a reasonable time frame," and "sustained economic losses directly attributable to the failure and/or refusal of Blue Bird and NABI to provide replacement parts in a timely fashion." (Doc. No. 43 ¶¶ 14–16.) Further, Brian Dickson averred that American Coach's damages included "wear and tear" to buses which American Coach "press[ed] into service ... to cover for the 'down' Blue Bird buses." (Doc. No. 68–1 ¶ 19.) American Coach also produced an extensive log of mechanical repairs made to the subject buses since they were purchased from Blue Bird. (Doc. Nos.74, 78.) However, the repairs reflected in the log do not involve personal injury or damage to property other than the subject buses. Because American Coach's losses are purely economic and because Blue Bird's contractual obligations pertaining to the subject buses are limited by the Blue Bird limited warranty, (Doc. No. 34–1 at 16; Doc. No. 54–5 at 25), American Coach's negligent manufacturing claim against Blue Bird is barred by the economic loss rule. *See Driltech,* 306 S.E.2d at 257 ("The economic loss rule prevents recovery in tort when a defective product has resulted in the loss of the value or use of the thing sold, or the cost of repairing it."); *see also Am. Aviation,* 891 So.2d at 536 n. 1 (noting that economic losses are "disappointed economic expectations," including "damages

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 27 of 207
PageID: 13044

American Coach Lines of Orlando, Inc. v. North American..., Not Reported in...

2011 WL 653524, 73 UCC Rep.Serv.2d 626

for inadequate value, costs of repair and replacement of the defective product, [and] consequent loss of profits" (citations omitted)).

### E. Count XI: Negligent Repair Against Blue Bird

**\*30** The Court need not address whether the negligent repair claim against Blue Bird is barred by the economic loss rule. As noted *supra* part X.B, there is no evidence of record that Blue Bird performed or attempted to perform any repairs of the subject buses that damaged American Coach. Therefore, Blue Bird breached no duty to American Coach and is entitled to summary judgment on the negligent repair claim.

### F. Count XII: Strict Liability Against Blue Bird

The economic loss rule applies to both negligence and strict liability claims. See *Flintkote Co. v. Dravo Corp.,* 678 F.2d 942, 946 (11th Cir.1982) (noting that under Georgia law, the economic loss rule bars claims of both negligence and strict liability where the only damages are to the defective product itself (citing *Chrysler Corp. v. C.C. Taylor,* 141 Ga.App. 671, 234 S.E.2d 123, 124 (Ga.Ct.App.1977))); *Busbee v. Chrysler Corp.,* 240 Ga.App. 664, 524 S.E.2d 539, 541–42 (Ga.Ct.App.1999) (barring the plaintiff's negligence and strict liability claims due to no viable exception to the economic loss rule); *see also Fla. Power & Light Co. v. Westinghouse Elec. Corp.,* 510 So.2d 899, 902 (Fla.1987) ("[A] manufacturer in a commercial relationship has no duty under either a negligence or strict products liability theory to prevent a product from injuring itself." (quoting *E. River S.S. Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 871, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986))).

The strict liability claim against Blue Bird fails because the record contains no evidence of non-economic damages

allegedly resulting from the defective manufacturing of the subject buses. *See supra* parts X.D (noting that American Coach only provided evidence of economic loss); *Cedars of Lebanon,* 444 So.2d at 1070–71 (affirming the dismissal of a strict liability claim against a manufacturer where the alleged damage was limited to the defective product itself); *Henderson v. Gen. Motors Corp.,* 152 Ga.App. 63, 262 S.E.2d 238, 239–40 (Ga.Ct.App.1979) (applying the economic loss rule to grant summary judgment for the defendant car manufacturer on a strict liability claim where the plaintiff only sustained economic loss from an improperly manufactured car). American Coach bears the burden of proof on this claim. *E.g., Ctr. Chem. Co. v. Parzini,* 234 Ga. 868, 218 S.E.2d 580, 582 (Ga.1975). Accordingly, summary judgment should be granted for Blue Bird on the strict liability claim in Count XII.

### Conclusion

Based on the foregoing, it is hereby **ORDERED** and **ADJUDGED** that the Motion for Summary Judgment by Defendants North American Bus Industries, Inc. and Blue Bird Corporation (Doc. No. 33) is **GRANTED.** The Clerk of Court is directed to enter judgment for Defendants North American Bus Industries, Inc. and Blue Bird Corporation and against Plaintiff American Coach Lines of Orlando, Inc. on Counts I–XII of the Complaint and close the case.

**DONE** and **ORDERED.**

### All Citations

Not Reported in F.Supp.2d, 2011 WL 653524, 73 UCC Rep.Serv.2d 626

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 2

Bodie v. Purdue Pharma Co., 236 Fed.Appx. 511 (2007)

2007 WL 1577964, 62 UCC Rep.Serv.2d 818, 20 Fla. L. Weekly Fed. C 708

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by Wilson v. Kidde Products Ltd., N.D.Ala., August 14, 2012

236 Fed.Appx. 511
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007.
See also U.S. Ct. of App. 11th Cir. Rule 36-2.
United States Court of Appeals,
Eleventh Circuit.

Jerry BODIE, Plaintiff–Appellant,

v.

PURDUE PHARMA COMPANY, The,
Purdue Pharma, L.P., Purdue Pharma,
Inc., Purdue Frederick Company, P.F.
Laboratories, Inc. The, Defendants–Appellees.

No. 05–13834.
|
June 1, 2007.

**Synopsis**

**Background:** Patient who became dependent on OxyContin, a narcotic prescribed for his back pain, brought action against pharmaceutical company that manufactured and marketed the drug, alleging strict liability under Alabama Extended Manufacturer's Liability Doctrine (AEMLD), negligent failure to warn, breach of implied warranty, and fraud. The United States District Court for the Northern District of Alabama entered summary judgment for pharmaceutical company. Patient appealed.

**Holdings:** The Court of Appeals, Birch, Circuit Judge, held that:

[1] allegedly inadequate warning was not proximate cause of patient's injury, as required for AEMLD and negligent failure to warn claims, given that physician, a learned intermediary, prescribed the drug based on independent knowledge;

[2] allegation that drug was unsafe and unreasonably dangerous did not give rise to a claim for breach of implied warranty of merchantability under Alabama law; and

[3] patient failed to plead fraud claim with sufficient particularity.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

West Headnotes (5)

[1] **Products Liability** 🔑 Warnings or instructions

**Products Liability** 🔑 Drugs in general

Even if pharmaceutical company's warning about addictive nature of OxyContin, a narcotic prescribed for patient's back pain, was inadequate, this was not proximate cause of patient's injury of addiction, as required for claim under Alabama Extended Manufacturer's Liability Doctrine (AEMLD), since physician, a learned intermediary, prescribed the drug based on his independent knowledge of the drug and its high potential for addiction.

22 Cases that cite this headnote

[2] **Products Liability** 🔑 Warnings or instructions

**Products Liability** 🔑 Drugs in general

Even if pharmaceutical company's warning about addictive nature of OxyContin, a narcotic prescribed for patient's back pain, was inadequate, this was not proximate cause of patient's injury of addiction, as required for negligent failure to warn claim under Alabama law, since physician, a learned intermediary, prescribed the drug based on his independent knowledge of the drug and its high potential for addiction.

15 Cases that cite this headnote

[3] **Federal Civil Procedure** 🔑 Tort cases in general

Patient's testimony that physician told him that OxyContin, a narcotic prescribed for his

back pain, was not addictive, which conflicted with physician's testimony that he knew the drug was addictive, was insufficient to raise question of material fact precluding summary judgment on negligent failure to warn claim brought against pharmaceutical company; since physician's decision to prescribe the drug was not based on information that he obtained from pharmaceutical company, the learned intermediary doctrine precluded a finding of proximate cause regardless of whether physician told patient the drug was addictive or not addictive.

6 Cases that cite this headnote

[4]    **Sales**   Drugs and medical devices

Patient's allegation that OxyContin, a narcotic prescribed for his back pain, was unsafe and unreasonably dangerous because it was addictive did not give rise to a claim for breach of implied warranty of merchantability under Alabama law, where the drug was fit for its intended pharmacological purpose of treating pain. Ala.Code 1975, § 7–2–314(2).

16 Cases that cite this headnote

[5]    **Federal Civil Procedure**   Fraud, mistake and condition of mind

Patient failed to plead with sufficient particularity his fraud claim against pharmaceutical company based on allegedly deceptive statements regarding narcotic OxyContin in pamphlet and website, under Alabama law. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

3 Cases that cite this headnote

**Attorneys and Law Firms**

*513 James Michael Terrell, McCallum, Methvin & Terrell, P.C., Birmingham, AL, Andrea B. Bierstein, Kirby, McInerney & Squire, LLP, New York, NY, for Plaintiff–Appellant.

Chilton D. Varner, Bradley W. Pratt, Gordon A. Smith, W. Randall Bassett, King & Spalding, LLP, Atlanta, GA, Harlan I. Prater, IV, Melody H. Eagan, Lightfoot, Franklin & White, LLC, Birmingham, AL, for Defendants–Appellees.

Appeal from the United States District Court for the Northern District of Alabama. D.C. Docket No. 02–2838–CV–HS–W.

Before EDMONSON, Chief Judge, BIRCH and ALARCÓN,[*] Circuit Judges.

[*]    Honorable Arthur L. Alarcón, U.S. Circuit Judge for the Ninth Circuit, sitting by designation.

**Opinion**

BIRCH, Circuit Judge:

**\*1** Plaintiff–Appellant Jerry Bodie ("Bodie") brought this action against the defendants-appellees, The Purdue Pharma Company, Purdue Pharma, L.P., Purdue Pharma, Inc., Purdue Frederick Co., and The P.F. Laboratories, Inc. (hereinafter, collectively, "Purdue"), who manufacture and market the prescription drug OxyContin. Bodie argued that Purdue distributed OxyContin without providing sufficient warnings about the dangers of the drug, and that it made affirmative misrepresentations about the drug's characteristics. Specifically, Bodie alleged that Purdue understated the addictive nature of OxyContin, and that the company recommended a dosage frequency that would heighten the risk of addiction. After discovery, Purdue moved for summary judgment on all counts, which the district court granted. Bodie now appeals. Upon careful review of the record and the briefs and having heard oral argument, we AFFIRM the judgment of the district court.

**I. BACKGROUND**

The evidence, which we view in a light most favorable to the nonmoving party—in this case, Bodie—is as follows. Bodie first began suffering from chronic back and neck problems in 1978, when he was diagnosed with severe spinal and cervical stenosis. Although Bodie tried various methods of treating his condition, he continued to suffer from chronic pain. In March of 1998, he underwent spinal decompression surgery to relieve the pressure on his spinal cord and ameliorate the pain. Although the surgery stabilized the condition of Bodie's spine, he continued to suffer from pain symptoms.

Bodie v. Purdue Pharma Co., 236 Fed.Appx. 511 (2007)

2007 WL 1577964, 62 UCC Rep.Serv.2d 818, 20 Fla. L. Weekly Fed. C 708

After Bodie's neurosurgeon determined that there was little more that could be done to improve Bodie's condition, he referred Bodie to Dr. Eugene Mangieri, a pain specialist, and his associate, Dr. Gabriel Fernandez, a neurologist.

Bodie first visited the pain clinic in November 1998, at which time Dr. Mangieri gave him a prescription for 30 milligrams of OxyContin to help with his back pain. [1] **\*514** OxyContin is a prescription drug manufactured by Purdue. The drug's sole active ingredient is oxycodone, an opioid—that is, a synthetic opiate similar to other opium derivatives such as morphine. [2] The drug was approved by the Food and Drug Administration (FDA) in 1995 for the management of moderate to severe pain. Since that time, doctors have prescribed it to treat chronic back and neck pain similar to the kind suffered by Bodie. OxyContin is listed by the FDA as a Schedule II narcotic, which, by law, means that (1) the drug has a high potential for abuse; (2) the drug has a currently accepted medical use, but with severe restrictions; and (3) if abused, the drug may carry a risk of severe psychological and physical dependence. *See* 21 U.S.C. § 812(b). As such, OxyContin is tightly regulated; no physician can write a prescription for OxyContin without a license from the Drug Enforcement Agency. *See* 21 U.S.C. § 843(a)(1). In this case, Drs. Mangieri and Fernandez were licensed to prescribe OxyContin to their patients.

[1]    There is some confusion over whether Dr. Mangieri or Dr. Fernandez wrote the initial prescription in 1998. Dr. Mangieri testified—and the medical records admitted into evidence reflect—that it was actually Dr. Fernandez who first saw Bodie and wrote him a prescription for Oxycontin. (Indeed, Dr. Mangieri testified that he never saw Bodie as a patient until May of 1999.) Bodie, however, maintains that he met with Dr. Mangieri in November 1998, that Dr. Mangieri wrote his first prescription, and that the records suggesting that Dr. Fernandez saw him are incorrect. Because we construe the evidence in a light most favorable to Bodie, we will assume that Dr. Mangieri wrote the first OxyContin prescription in November 1998, and that the conversation we describe occurred at the time of that first visit.

[2]    For some helpful background on OxyContin, *see generally* Paul Tough, *The Alchemy of OxyContin,* N.Y. TIMES, July 29, 2001, § 6 (Magazine) at 32.

**\*\*2** When Bodie was first prescribed OxyContin by Dr. Mangieri in November 1998, he testified that the doctor informed him that it was "a miracle drug, that it was not addictive, had very few side effects, constipation being probably the primary thing, and that could be managed by medication or whatever." *See* R3–88, Exh. 4 at 85; *id.* at 135 (stating that the doctor told him "basically ... that ... it was a miracle drug, very few side effects, wasn't addictive, that type of thing"). Bodie also testified that Dr. Mangieri gave him a pamphlet about OxyContin, and that he later reviewed an internet website (maintained by Purdue) containing additional information about the drug. Bodie claims that both of these sources reiterated the statements of Dr. Mangieri—namely, that OxyContin "was safe and non-addictive." *Id.* at 89.

Bodie took OxyContin from November 1998 until March 2002. He took the drug exactly as prescribed; there is no evidence that he ever abused the medication. Initially, Bodie's condition improved as a result of the medication. Indeed, the record suggests that Bodie's chronic pain was under control after he began taking the medication; that he began playing golf regularly; and that the drug permitted Bodie to "get along with everyday life." *Id.* at 148.

As Bodie began to develop a tolerance for the medication, [3] Dr. Mangieri gradually increased Bodie's dosage of 30 milligrams a day. In April 1999, his dosage was raised to 200 milligrams a day. In November 1999, as Bodie's back pain returned in earnest, his dosage was increased again, this time to 400 milligrams a day. Later, in mid–2000, Bodie's dosage was decreased to 320 milligrams, and from mid–2000 to March 2002 Bodie alternated between a daily dosage of 320 and 400 milligrams of OxyContin.

[3]    Tolerance, or "the need for increasing doses ... to maintain a defined effect such as analgesia," is common with opioids such as OxyContin. R3–88, Exh. 1. Purdue recommended frequently assessing the need for an increased dosage to address a patient's tolerance to the drug.

According to Bodie, by early 2002, the OxyContin that he was taking regularly had turned him into a "zombie," and he was not satisfied with the quality of his life. *Id.* at 149. Bodie testified that he "pretty much went from the chair to the **\*515** chair to the bathroom, from the chair to the bedroom, and that was pretty much all [he] did for two or three months." *Id.* at 149. In one incident the pharmacist at Bodie's local pharmacy warned Bodie that he was "on

more OxyContin than any patient [he had] ever had in [the] pharmacy." *Id.* at 175. That experience—coupled with the constipation that the drug was causing him [4]—prompted Bodie to want to cease using the drug. Thus, in February 2002, Bodie visited Dr. Fernandez and told him that he wanted to halt his OxyContin use. Dr. Fernandez advised that he was not familiar with the protocol for ceasing OxyContin, and that Dr. Mangieri, the pain specialist, would have to oversee the process. Dr. Fernandez agreed, however, to start to taper down Bodie's dosages of OxyContin, from 320 milligrams to 240 milligrams a day, in an attempt to gradually wean Bodie off of the drugs. [5] Bodie testified that the reduced dosage left him "shaky," "panicky," and "nauseated." *Id.* at 194.

[4]  Constipation is a common side effect of the prolonged use of OxyContin.

[5]  Physical dependence is common when patients take high doses of opioids such as OxyContin on a regular basis. As a result, Purdue recommended in its product literature that patients taking OxyContin taper down their dosage of the drug rather than abruptly discontinuing it. The packaging that accompanied OxyContin, provided by Bodie, stated that "[p]hysical dependence is the occurrence of withdrawal symptoms after abrupt discontinuation of a drug.... If OxyContin is abruptly discontinued in a physically dependent patient, an abstinence syndrome may occur.... If signs and symptoms of withdrawal occur, patients should be treated by reinstitution of opioid therapy followed by a gradual, tapered dose reduction of OxyContin...." *See* R3–88, Exh. 1. The label also advised that "higher doses should be tapered over several days to prevent signs and symptoms of withdrawal in the physically dependent patient." *Id.*

**3**  Rather than pursuing the gradual tapering off of the drug, in March 2002 Bodie voluntarily admitted himself into the North Harbor Rehabilitation Center in Tuscaloosa, Alabama. Once admitted, Bodie was "lock[ed] ... up" and began a process of in-patient detoxification. *Id.* at 198. He was given methadone to aid with the withdrawal symptoms caused by ceasing OxyContin in such an abrupt manner. After approximately two weeks, Bodie was discharged from the Rehabilitation Center. He has not taken OxyContin since that time.

In November 2002 Bodie filed the present action in the Northern District of Alabama, naming as defendants Purdue, Abbott Laboratories, and Abbott Laboratories, Inc. [6] Bodie contended that Purdue had minimized the risks of addiction to OxyContin, and that it had also affirmatively misrepresented these risks in marketing and selling the drug. Specifically, Bodie alleged that Purdue promoted OxyContin as being non-addictive; that it described OxyContin addictions as being "rare" in patients who used it as directed; and that the company's literature made a false distinction between "addiction" to the drug (that is, abusing it for the purpose of getting high) and "dependence" on the drug (where withdrawal symptoms would result if it was discontinued abruptly). Bodie alleged that this false dichotomy between "addiction" and "dependence" was established so that Purdue could publicly understate the number of patients who were, in reality, addicted to the drug.

[6]  Abbott Laboratories and Abbott Laboratories, Inc. were dismissed from the action in September 2004, and are not parties to this appeal.

Bodie also alleged that the 12–hour dosage frequency recommended by Purdue was intentionally designed to lead to addiction **516** in patients. Specifically, he contended that Purdue knew that the 12–hour dosing cycle was not sufficient to mollify a patient's pain, because the drug's ameliorative effects wore off before the 12–hour period was complete. As a consequence, Bodie alleged that patients would need additional amounts of oxycodone (so called "rescue medication") and larger and larger doses of the drug. He contends that, over time this exacerbated the risk of addiction in patients taking OxyContin.

Bodie's complaint lodged five counts against Purdue, for strict product liability (Count 1); breach of implied warranty (Count 2); negligent failure to warn (Count 3); malicious conduct (Count 4); [7] and fraud (Count 5). Bodie sought damages for the cost of rehabilitation from his addiction to OxyContin; for his lost wages brought about by the effects of that addiction; compensatory damages for his pain and suffering; and punitive damages. Following discovery, Purdue moved for summary judgment. After a hearing, the district court granted Purdue's motion as to all counts.

[7]  There is no independently cognizable cause of action for "malicious conduct" under Alabama law. Presumably Bodie included this count, Count 4, in order to support his request for punitive

Bodie v. Purdue Pharma Co., 236 Fed.Appx. 511 (2007)

2007 WL 1577964, 62 UCC Rep.Serv.2d 818, 20 Fla. L. Weekly Fed. C 708

damages. *See* Ala.Code § 6–11–20 (1975) (stating that punitive damages may not be awarded in a tort action unless "it is proven by clear and convincing evidence that the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff"). Essentially, Count 4 is a reiteration of the negligent failure to warn claim alleged in Count 3 of the complaint. *See* R1–1 at 24 (stating, in connection with Count 4 for "malicious conduct," that "the Pharmaceutical Defendants *breached their duty* " towards the plaintiff, thereby causing him injury) (emphasis added). Thus, for purposes of this appeal, we construe Count 4 as identical to the negligent failure to warn claim asserted in Count 3.

The district court's order granting summary judgment in favor of Purdue was predicated on a number of separate conclusions. First, and most important, the district court concluded that Bodie's claims failed because he failed to show that Purdue's allegedly inadequate warnings had proximately caused his injuries. Applying Alabama's "learned intermediary doctrine," which imposes on a pharmaceutical company a duty to provide warnings solely to the prescribing physician, rather than to the patient directly, *see Stone v. Smith, Kline & French Labs.,* 447 So.2d 1301, 1304–05 (Ala.1984), the court concluded that there was no evidence that Purdue's allegedly inadequate warnings proximately caused Dr. Mangieri's decision to prescribe OxyContin to Bodie. In fact, because Dr. Mangieri—the learned intermediary—testified in his deposition that he was well aware of the potential for addiction to OxyContin in patients, and because he stated that he had chosen to prescribe the drug to Bodie independent of the adequacy or inadequacy of Purdue's warning, the court concluded that there was no showing that the allegedly inadequate warnings had proximately caused Bodie's addiction. In light of the court's conclusion that Bodie had failed to establish proximate cause, the court concluded that summary judgment was proper as to the counts for negligence (Count 3); breach of implied warranty (Count 2); and malicious conduct (Count 4). [8]

[8]     The district court did not address the merits of Count 1 of Bodie's complaint, the so-called "strict liability" count, based on the court's determination that a product liability action grounded in strict liability was not viable under Alabama law.

**\*\*4** As to the remaining count, Count 5, for fraud, the district court again applied the "learned intermediary" doctrine.

The court first concluded that under Alabama **\*517** law a pharmaceutical company could not be liable in a fraud action brought directly by a consumer for misrepresentations allegedly made in its product literature, because permitting such an action would eviscerate the purpose of the learned intermediary doctrine, which limits a pharmaceutical company's duty to the obligation to adequately warn the *doctor*—who makes an independent assessment of the drug—not the patient. Accordingly, the court concluded that permitting a fraud action brought directly by a consumer against a pharmaceutical company—for allegedly misleading information that the consumer read and relied upon in taking a prescription drug—would undermine the viability of the learned intermediary doctrine.

Moreover, in reviewing the fraud count the court concluded that Bodie had failed to present substantial evidence as to what specific misrepresentations were made by Purdue about OxyContin. Observing that Bodie had failed to produce *any* Purdue documentation about OxyContin from the time period in which Bodie alleged that the misrepresentations were made (that is, November 1998), the court concluded that Bodie's fraud claim was not specific enough to withstand summary judgment. Therefore it granted summary judgment on the fraud count (Count 5).

After granting Purdue summary judgment on all of Bodie's claims, the court entered final judgment in favor of Purdue. This appeal followed.

## II. DISCUSSION

Bodie argues that the district court erred in granting summary judgment in favor of Purdue. We review a district court's grant of summary judgment *de novo,* applying the same legal standard used by the district court. *See Johnson v. Bd. of Regents,* 263 F.3d 1234, 1242 (11th Cir.2001). Under that standard, summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). We view the evidence and all factual inferences in a light most favorable to the non-moving party—in this case, Bodie—and all reasonable doubts about the facts are resolved in favor of the non-movant. *Johnson,* 263 F.3d at 1243. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden

Bodie v. Purdue Pharma Co., 236 Fed.Appx. 511 (2007)
2007 WL 1577964, 62 UCC Rep.Serv.2d 818, 20 Fla. L. Weekly Fed. C 708

of proof at trial.' " *Johnson,* 263 F.3d at 1243 (quotations and citation omitted).

In reviewing Bodie's case on appeal, we discuss together Bodie's claims based upon the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD") (Count 1)[9] **\*518** and Purdue's negligent failure to warn (Counts 3 and 4). We then turn to Bodie's claim for breach of implied warranty (Count 4). Finally, we address Bodie's claim for fraud (Count 5).

[9]      Count 1 of Bodie's complaint was framed as a count for "strict product liability." As the district court noted, Alabama does not adhere to a system of strict product liability, but instead follows a modified version of strict liability known as the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD"). *See Sears, Roebuck & Co., Inc. v. Haven Hills Farm,* 395 So.2d 991, 994 (Ala.1981) (*per curiam* ). This cause of action, which has been described as a "fault based defective product theory," is comparable to a defective product action grounded in strict liability. *Atkins v. Am. Motors Corp.,* 335 So.2d 134, 140 (Ala.1976). Alabama's AEMLD action, however, retains the negligence-based notion of "fault" on the part of the manufacturer, supplier or retailer, rather than adhering to the "no-fault" system posited in a traditional strict liability jurisdiction. *Id.* at 139–140.
     Although AEMLD liability is described as a "fault-based" system, in actuality the defendant's "fault" in an AEMLD action—or the required scienter —"is supplied by [his] selling a product in a defective condition." *Sears,* 395 So.2d at 994. That is, "[t]he fault of the manufacturer, or retailer, is that he has conducted himself unreasonably in placing a product on the market which will cause harm"; the existence of a "dangerously unsafe chattel is negligence within itself." *Atkins,* 335 So.2d at 140. Thus, in practice, an AEMLD claim is similar to a traditional strict product liability claim.
     Because Alabama's analogous cause of action for strict product liability is an AEMLD claim, for purposes Bodie's appeal we will construe Count 1 as being based upon the AEMLD.

A. *Bodie's Claims Based on the AEMLD and Negligent Failure to Warn*

**\*5** Bodie's complaint alleged claims based on the AEMLD (Count 1) and negligent failure to warn (Counts 3 and 4). To establish liability under the AEMLD, a plaintiff must show:

(1) he suffered injury or damages to himself or his property by one who [sold] a product in a defective condition unreasonably dangerous to the plaintiff, as the ultimate user or consumer, if

(a) the seller [was] engaged in the business of selling such a product, and

(b) it [was] expected to and [did], reach the user or consumer without substantial change in the condition in which it [was] sold.

*Morguson v. 3M Co.,* 857 So.2d 796, 800 (Ala.2003) (citations and quotations omitted). In connection with this *prima facie* case, the burden is also on the plaintiff to show that "that which rendered the product in such an unfit condition in fact caused the injury." *Sears,* 395 So.2d at 995. In addition, the Alabama Supreme Court has stated that, for AEMLD cases involving prescription drugs, which are inherently unsafe, "the adequacy of [a drug's] accompanying warning determines whether the drug, as marketed, is defective, or unreasonably dangerous." *Stone,* 447 So.2d at 1304 (citation omitted). In other words, "the adequacy of the warning issued by a drug manufacturer bears on whether a plaintiff has proved a *prima facie* case under the [AEMLD]." *Id.* (citation omitted).

As to the negligent failure to warn claims, Counts 3 and 4, the plaintiff must establish the same elements as a standard negligence action under Alabama law. *See E.R. Squibb & Sons, Inc. v. Cox,* 477 So.2d 963, 969, n. 3 (Ala.1985) (*per curiam* ). Thus, a plaintiff bringing such an action must establish: (1) that the defendant had a duty; (2) that the defendant failed to provide adequate warnings of the hazards of a particular product, thereby breaching that duty; (3) that the breach was the proximate cause of the plaintiff's harm; (4) that the plaintiff suffered injury as a result. *See Toole v. Baxter Healthcare Corp.,* 235 F.3d 1307, 1314 (11th Cir.2000) (affirming comparable jury charge on negligent failure to warn under Alabama law).

As with an AEMLD claim, "[t]he element of proximate cause is essential to the plaintiff's *prima facie* case of negligent failure to adequately warn." *Gurley v. Am. Honda Motor Co., Inc.,* 505 So.2d 358, 361 (Ala.1987). Thus, "[u]nder both the AEMLD and the negligence theory, *[the plaintiff]] has the*

burden of proving proximate causation." *Clarke Indus., Inc. v. Home Indem. Co.,* 591 So.2d 458, 461 (Ala.1991) (emphasis added).

As the district court noted, Bodie's claims must also be viewed through the lens of Alabama's "learned intermediary" doctrine, which applies both to actions **\*519** brought pursuant to the AEMLD, *see Morguson,* 857 So.2d at 802–03, and to those based on a negligent failure to warn theory. *See Stone,* 447 So.2d at 1304–05. The "learned intermediary" doctrine creates an exception to the general rule that one who markets goods must warn foreseeable ultimate users about the inherent risks of his products. *Walls v. Alpharma USPD, Inc.,* 887 So.2d 881, 883 (Ala.2004). The doctrine, which applies in all cases involving prescription drugs, *Toole,* 235 F.3d at 1313, provides that a drug manufacturer's duty is limited to the obligation to advise the *prescribing physician* of any potential dangers that may result from the use of the drug. That is, because the pharmaceutical company's duty extends only to the prescribing physician, rather than to the patient, "a manufacturer of prescription drugs discharges its duty by providing the physician with information about risks associated with these products." *Christopher v. Cutter Labs.,* 53 F.3d 1184, 1192 (11th Cir.1995) (citation omitted).

**\*\*6** While the "learned intermediary" doctrine does not create an automatic bar to recovery for a plaintiff alleging claims under the AEMLD or the negligent failure to warn, application of the doctrine will often temper the viability of these actions. Specifically, application of the "learned intermediary doctrine" may have the effect of destroying the causal link between the allegedly defective product, and the plaintiff's claimed injury. As we stated in *Christopher*:

> [T]he failure of the manufacturer to provide the physician with an adequate warning of the risks associated with a prescription product is not the proximate cause of a patient's injury if the prescribing physician had independent knowledge of the risk that the adequate warning should have communicated. Thus, the causal link between a patient's injury and the alleged failure to warn is broken when the prescribing physician had "substantially the same" knowledge as an adequate warning

from the manufacturer should have communicated to him.

53 F.3d at 1192 (internal citations omitted).

Bodie maintains that Purdue's warnings about the drug were inadequate and deceptive, in that they both underscored the risk of addiction to the drug and sought to characterize OxyContin as being non-addictive, when Purdue knew that was not the case. Even were we to assume that Purdue's warnings and accompanying literature about OxyContin were, in fact, inadequate and deceptive, [10] we would nevertheless **\*520** conclude that Bodie's claims based on the AEMLD and negligent failure to warn must fail, because Bodie has failed to satisfy his burden of proving proximate causation between these allegedly flawed warnings and his injury of addiction. We conclude that the application of the "learned intermediary" doctrine to the facts of Bodie's case severs the causal chain between Purdue's allegedly flawed drug warnings and Bodie's resulting injury.

[10]    We will assume, without deciding, that Purdue's literature about OxyContin was inadequate and misleading for purposes of Counts 1, 3, and 4. This is an assumption we would not otherwise be willing to concede, based on the product literature that was introduced into evidence. First, in addition to the heading "Warning: May Be Habit Forming," which appeared at the top of each page of the product packaging, Purdue's packaging made clear that "OxyContin is a mu-agonist opioid with an abuse liability similar to morphine and is a Schedule II controlled substance." *See* R3–88, Exh. 1; *see also* 21 U.S.C. § 812 (defining a Schedule II narcotic as one that "has a high potential for abuse" and "may lead to severe psychological and physical dependence"). The OxyContin label further warned that "[o]xycodone products are common targets for both drug abusers and drug addicts." R3–88, Exh. 1.

While the label did draw a distinction between physical dependence and addiction—stating that "tolerance and physical dependence in pain patients are *not* signs of psychological dependence" and that "iatrogenic 'addiction' to opioids legitimately used in the management of pain is very rare"—the label also made quite clear that the drug carried a high

Bodie v. Purdue Pharma Co., 236 Fed.Appx. 511 (2007)
2007 WL 1577964, 62 UCC Rep.Serv.2d 818, 20 Fla. L. Weekly Fed. C 708

potential for abuse and could be habit-forming. *Id.* Thus we are not persuaded that Purdue's labeling of OxyContin was misleading or false. For purposes of this section of the opinion, however, we assume, without deciding, that Purdue's warnings were inadequate and that more thorough warnings should have been given in connection with the drug.

In Bodie's case, the prescribing physician, Dr. Mangieri, testified that he was well aware of the risks of Schedule II narcotics such as OxyContin, specifically the risk that such drugs "ha[ve] the potential to cause addiction in patients." R3–88, Exh. 9 at 26, 49; *see also id.* at 51 (agreeing that OxyContin has a "high potential for abuse and addiction"). Dr. Mangieri testified that he took the prospect of prescribing a Schedule II narcotic to a patient very seriously. Dr. Mangieri also agreed in his deposition that he was aware of the contents of OxyContin.

Moreover, Dr. Mangieri's testimony established that his decision to prescribe OxyContin to Bodie was made independent of Purdue's accompanying literature about the drug. That is, Dr. Mangieri testified that his decision to prescribe OxyContin was based upon his role as the prescribing physician and his familiarity with the particular needs of his patient, Bodie; Dr. Mangieri's choice to prescribe OxyContin was not driven by Purdue's product literature about the drug. After expressly stating that his decision to prescribe OxyContin to Bodie was not based any marketing materials about the drug provided to him by Purdue, Dr. Mangieri testified at length, as follows:

**7** I think promotional materials are valuable, and I think they serve as educational tools by pharmaceutical firms to physicians in at least making them aware that certain products are available and that they exist....But then it's incumbent upon the physician through the literature and through actually understanding the drug, what the drug is intended to do, how the drug was studied, and then go into the issue as to whether or not he or she feels comfortable in prescribing that medication for whatever the condition might be. So though it's nice to have the pharmaceutical rep come and give you the introduction to it, but then one doesn't go and prescribe a medication simply on the basis of what somebody comes into your front door and tells you, especially not a Class II drug. Not in this office.

[W]ith any drug that I'm going to write for a patient, I want to know exactly what's in there, what it's supposed to do,

how did we find out what it does do, what's the side effect profile like, how many patients really benefitted from it, what are the things I need to be looking for in terms of, you know, long-term toxicity, and how do I monitor the patient to find out that they're getting into trouble before it happens. Those are things that are incumbent upon a physician who's responsible for taking care of a person ....

R3–88, Exh. 9 at 68–70.

Put simply, Dr. Mangieri made clear that his decision to prescribe OxyContin to Bodie was based upon his understanding of the drug and his evaluation of this particular patient, and that his decision did not hinge upon the product literature (be it **\*521** adequate or inadequate) that was provided to him by Purdue. Under application of Alabama's "learned intermediary" doctrine, when a prescribing physician such as Dr. Mangieri "had independent knowledge of the risk[s] that the adequate warning should have communicated," and chose to prescribe the drug based on that independent knowledge, then, by law, the allegedly inadequate warning of the drug company is not the proximate cause of the plaintiff's injury. *See Christopher,* 53 F.3d at 1192 (citations omitted). Because Bodie has failed to satisfy his burden of proving causation, his claims under both the AEMLD and the negligent failure to warn must fail. *See Clarke Indus., Inc.,* 591 So.2d at 461.

[1]  Specifically, with respect to the AEMLD action (Count 1), the Alabama Supreme Court has indicated that a drug that carries inadequate warnings will be deemed defective or unreasonably dangerous for purposes of the AEMLD. *Stone,* 447 So.2d at 1304. The burden remains on a plaintiff bringing an AEMLD action, however, to prove that "that which rendered the product [dangerous] in fact *caused* the injury." *Sears,* 395 So.2d at 995 (emphasis added). Here, even if we assume that OxyContin failed to carry adequate warnings —such that it was an unreasonably dangerous product—we cannot conclude it was this defect that caused Bodie's injury. The "learned intermediary" doctrine applies to claims brought under the AEMLD. *See Morguson,* 857 So.2d at 802–03; *Toole,* 235 F.3d at 1314. Because the evidence suggests that the learned intermediary, Dr. Mangieri, prescribed OxyContin based on his independent knowledge of the drug and its high potential for addiction, we cannot conclude that the allegedly inadequate warning (that is, the claimed defect) proximately caused Bodie's injury of addiction.

**8** [2]  Similarly, with respect to Purdue's alleged failure to warn about the risks of the drug (Counts 3 and 4), we

cannot conclude that the allegedly flawed warnings that accompanied OxyContin were the proximate cause of Bodie's injury. Because Dr. Mangieri, as the learned intermediary, testified that his decision to prescribe OxyContin was reached independent of the allegedly insufficient information on OxyContin's label or its accompanying literature, Bodie has failed to establish that the inadequate warning proximately caused his injury. *See Christopher,* 53 F.3d at 1192; *Anderson v. Sandoz Pharma. Corp.,* 77 F.Supp.2d 804, 808 (S.D.Tex.1999) ("If [the doctor] was aware of the possible risks involved in the use of the drug, yet chose to use it regardless of the adequacy of the warning, then, as a matter of law, the adequacy of the warning was not a producing cause of the plaintiff's injury.") (internal quotations and citations omitted). *See also Timmons v. Purdue Pharma. Co.,* No. 8:04–CV–1479–T–26MAP, 2006 WL 263602 (M.D.Fla. Feb. 2., 2006) (unpublished) (where doctor's decision to prescribe OxyContin was made independent of any alleged misrepresentations by Purdue, stating that "the learned intermediary doctrine precludes a finding of causation" between the faulty warnings and the injury of addiction).[11]

[11]   Although it is an unpublished district court decision in our circuit, we note that the facts of *Timmons* are strikingly similar to the facts of Bodie's case. There, as here, the plaintiff sued Purdue, alleging that the company had downplayed the risks of addiction to OxyContin and had affirmatively misrepresented the drug as being non-addictive, when those representations were not true. The district court observed that the "learned intermediary" doctrine applied to the case. In light of record evidence that none of the plaintiff's physicians had relied on Purdue's statements that addiction was "rare," as well as testimony that the doctors had been independently aware of the addictive nature of the drug, the *Timmons* court concluded that the plaintiff had failed to establish proximate cause, and granted summary judgment to Purdue.

**\*522** **[3]**   In conclusion, because Dr. Mangieri's testimony—viewed in conjunction with Alabama's "learned intermediary" doctrine—precludes a finding of proximate causation,[12] Bodie's claims based upon the AEMLD (Count 1) and negligent failure to warn (Count 3 and 4) must fail as a matter of law. The district court acted properly in granting summary judgment in favor of Purdue on these counts.

[12]   Bodie attempts to circumvent Dr. Mangieri's testimony—and the damaging effect that it has on his ability to establish causation—by citing to Bodie's testimony in rebuttal that Dr. Mangieri expressly told him that OxyContin was "not addictive." *See* R3–88, Exh. 4 at 85. Bodie argues that the credibility of Dr. Mangieri's testimony is undermined by Bodie's own conflicting testimony on this issue. He contends that this creates an issue of fact as to what Dr. Mangieri told him about OxyContin, and that therefore summary judgment was inappropriate. On appeal, Bodie argues that the district court erred in essentially "crediting" Dr. Mangieri's testimony and in discounting his own testimony.

This line of argument misses the point, however. The question, for purposes of Bodie's negligent failure to warn action, is whether Dr. Mangieri's decision to prescribe OxyContin to Bodie ultimately hinged on the information (accurate or inaccurate) that he obtained from Purdue. Dr. Mangieri testified it quite clearly was not. *See* R3–88, Exh. 9 at 67–68 (stating that he had independent knowledge of the risks of the drug, including its addictiveness, and that he chose to prescribe OxyContin regardless of the adequacy of the warning). Bodie presented no evidence to refute this testimony.

Nor does Bodie's testimony that Dr. Mangieri may have told his patient that the drug was non-addictive establish that Dr. Mangieri chose to prescribe the drug based on Purdue's alleged misrepresentations. To the extent that Bodie encourages us to infer that Dr. Mangieri relied on Purdue's alleged misrepresentations—based on the fact that Dr. Mangieri's statements were similar to those allegedly made by Purdue—we find that this fact inference is too tenuous to withstand a motion for summary judgment, especially in light of Dr. Mangieri's express testimony that no representative of Purdue ever told him "that OxyContin was less addictive than other opioids." *Id.* at 72. *See, e.g., Bald Mountain Park v. Oliver,* 863 F.2d 1560, 1564 (11th Cir.1989) ("In passing upon a motion for summary judgment, a finding of fact which may be inferred but not demanded by circumstantial evidence has no probative value against positive and uncontradicted evidence that no such fact exists.") (quotation omitted).

2007 WL 1577964, 62 UCC Rep.Serv.2d 818, 20 Fla. L. Weekly Fed. C 708

B. *Bodie's Claim Based on Breach of Implied Warranty*

In Count 2 of his complaint, Bodie lodged a claim against Purdue for breach of the implied warranty of merchantability. Under Alabama law, "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Ala.Code § 7–2–314 (1975). "Merchantability" refers to a product's being, in part, "fit for the ordinary purpose for which such goods are used." *Id.* These provisions in the Alabama Code mirror the Uniform Commercial Code ("U.C.C.")'s provisions on the implied warranty of merchantability. *See* U.C.C. § 2–314. To establish a *prima facie* case for breach of the implied warranty of merchantability, the plaintiff must prove: (1) the existence of the warranty; (2) a breach of that warranty; and (3) and damages proximately resulting from that breach. *Barrington Corp. v. Patrick Lumber Co., Inc.,* 447 So.2d 785, 787 (Ala.Civ.App.1984) (citation omitted).

Where the goods appear to be otherwise fit for the purpose for which they are used, however, the Alabama Supreme Court has declined to permit claims based on the use of allegedly unreasonably dangerous products to be redressed under the mechanism of the U.C.C., instead limiting the parties *\*523* to remedies under products liability law. For example, in *Shell v. Union Oil Co.,* 489 So.2d 569, 570–71 (Ala.1986), the plaintiff alleged a claim for breach of the implied warranty of merchantability because a product, purchased by his employer from the defendants and provided to him, contained benzene, a cancer causing agent. The plaintiff alleged that the benzene was not "fit for the ordinary purposes for which such goods are used," Ala.Code 1975 § 7–2–314(2), because it was a cancer-causing substance that was unreasonably dangerous.

**9** The Alabama Supreme Court determined that the plaintiff's sole basis for claiming that the product was not "merchantable" was because it was cancer-causing and thus unreasonably dangerous. *Id.* at 571. The court stated: "[s]uch an argument ignores the clear distinction between causes of action arising under tort law and those arising under the U.C.C. as adopted in Alabama." *Id.* The court held that "[w]hether this product was unreasonably dangerous ... is not a question properly addressed in an action brought under the provisions of the U.C.C. That question could be properly raised in an action under [the AEMLD], but not in this U.C.C. action for breach of warranty." *Id.* Noting that the product at issue performed as it was supposed to, and that the warnings accompanying the product adequately described the inherent dangers of the product, the court questioned whether there

was an "implied warranty of merchantability in the sense that these two manufacturers promised the employee that he would not be injured by his use or contact with their product." *Id.* at 571–72. The court determined that a manufacturer or supplier's implied warranty was limited to "*commercial* fitness and suitability," not "the broader obligation to warrant against health hazards inherent in the use of the product" when it was otherwise commercially fit for its intended use. *Id.* at 572. Thus the court granted judgment as a matter of law to the defendants on the breach of warranty claim.

Similarly, in *Yarbrough v. Sears, Roebuck & Co.,* 628 So.2d 478 (Ala.1993), the plaintiffs sued the manufacturers of a kerosene heater that caught fire, causing damage to the plaintiffs' home and personal injuries. The evidence established that the warnings that accompanied the heater had been "specific, comprehensive, and detailed" in warning users of the dangers of using the item improperly, and that the plaintiff had not heeded these warnings. *Id.* at 482–83. The Alabama Supreme Court, in reviewing the claim for breach of implied warranty, found that the gravamen of the plaintiffs' claim was that "the kerosene heater was unreasonably dangerous and therefore could not be merchantable." *Id.* at 483. The court, however, held that "[w]hether the kerosene heater was unreasonably dangerous is not a question properly addressed in a claim alleging breach of warranty under the U.C.C. but it could be ... properly raised in a claim under the AEMLD." *Id.* Where the evidence suggested that the item was fit for its intended use, the court was unwilling to permit a breach of implied warranty of merchantability claim based solely on the allegation that the product was inherently dangerous.

In light of these cases, courts applying Alabama law have seen fit to subsume U.C.C.–based breach of implied warranty claims into tort and product liability claims, where the product is fit for its intended use and there is no evidence of "non-merchantability" other than a general allegation that the product contains inherent dangers. *See Emody v. Medtronic, Inc.,* 238 F.Supp.2d 1291, 1296 (N.D.Ala.2003); *Brock v. Baxter Healthcare Corp.,* 96 F.Supp.2d 1352, 1356 n. 2 (S.D.Ala.2000). Cf. *Spain v. Brown & Williamson* *\*524* *Tobacco Corp.,* 872 So.2d 101, 108 (Ala.2003) (*en banc* ) (*per curiam* ) (permitting a breach of warranty claim in a product liability case where there was insufficient evidence that the products were in fact fit for their intended use).

**10** [4] Here, Bodie alleged that Purdue breached the implied warranty of merchantability because OxyContin

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 39 of 207
PageID: 13056

Bodie v. Purdue Pharma Co., 236 Fed.Appx. 511 (2007)
2007 WL 1577964, 62 UCC Rep.Serv.2d 818, 20 Fla. L. Weekly Fed. C 708

was "not of merchantable quality," was "unsafe" and was "unreasonably dangerous [,] thereby causing injury to plaintiff." R1–1 at 22. The evidence suggests, however, that OxyContin was, in fact, fit for its intended use as an analgesic treatment for chronic pain; indeed, as Bodie himself conceded, use of the drug managed his pain and improved his quality of life. Bodie has offered scant evidence as to how OxyContin was not fit for its intended use; in effect, his U.C.C. breach of warranty claim—based on the general allegation that the drug was "unsafe" and "dangerous"—is akin to the type of claim that the Alabama Supreme Court refused to recognize in *Shell*. As in *Shell,* there was no "implied warranty of merchantability in the sense that [Purdue] promised [Bodie] that he would not be injured by his use or contact with their product." *See* 489 So.2d at 571–72. In fact, Purdue provided warnings with respect to OxyContin's addictive qualities, [13] and the product was fit for its intended pharmacological purpose of treating pain. We conclude that Bodie does not have a valid cause of action under Alabama law for breach of the implied warranty of merchantability. *See Yarbrough,* 628 So.2d at 483; *Shell,* 489 So.2d at 571–72. Accordingly, the district court acted properly in granting summary judgment on Count 2 of Bodie's complaint.

[13]   As noted previously, Purdue's OxyContin label stated that the drug could be "habit forming," and warned that it was an "opioid with an abuse liability similar to morphine and [was] a Schedule II controlled substance." *See* R3–88, Exh. 1.

C. *Bodie's Claim Based on Fraud and Misrepresentation*
In Count 5 of his complaint, Bodie alleged a claim for fraud. Under Alabama law, in order to establish a *prima facie* case for fraud, the plaintiff must show: (1) a false representation, that is, proof that the defendant made an untrue statement; (2) of an existing material fact; (3) that is reasonably relied upon; and (4) that plaintiff was damaged as a proximate result of the reliance. *See Prestwood v. City of Andalusia,* 709 So.2d 1173, 1175 (Ala.1997). For fraud claims brought in federal court—such as Bodie's—a higher threshold of specificity is required; under Federal Rule of Civil Procedure 9(b), "the circumstances constituting fraud or mistake shall be stated with particularity." We have construed this rule as requiring that a plaintiff alleging a fraud count alert the defendant to the precise misconduct with which he is charged. *See Clausen v. Lab. Corp. of America, Inc.,* 290 F.3d 1301, 1310 (11th Cir.2002). That is, the plaintiff alleging fraud or misrepresentation must set forth "(1) precisely what statements were made in what documents

or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same; and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *Id.*

**\*\*11** Here, the district court determined that the "learned intermediary" doctrine applied to Bodie's count for fraud, such that Purdue's "duty" extended only to the obligation to provide truthful and accurate information to Dr. Mangieri, not to Bodie **\*525** directly. In other words, the district court concluded that the "learned intermediary" doctrine barred a plaintiff from bring an action directly against a pharmaceutical company for allegedly deceptive statements made to consumers in its drug literature. Applying the learned intermediary doctrine, and determining that there was no evidence that *Dr. Mangieri* had "reasonably relied upon" the allegedly false statements Purdue made to him in prescribing OxyContin, the court concluded that Bodie's fraud count failed.

On appeal, Bodie argues that the district court erred in applying the "learned intermediary" doctrine to his fraud claim. He contends that the Alabama Supreme Court has not held that the "learned intermediary" doctrine applies to claims based on fraud and misrepresentation. Moreover, Bodie argues that consumers *should* be permitted to bring a claim for fraud directly against a pharmaceutical company, where the company makes false statements about a drug in its advertising and product literature, and the consumer relies upon those false statements in deciding to take the drug.

[5]   Alabama courts have not directly addressed whether the "learned intermediary" doctrine applies in cases alleging fraud by a pharmaceutical company. [14] We need not reach whether the "learned intermediary" doctrine precludes a plaintiff from bringing an action directly against a pharmaceutical company, however, because even if we were to assume that the doctrine did not apply, Bodie's action would fail, due to a lack of any specific evidence as to what misrepresentations were made by Purdue about OxyContin. That is, even assuming that Alabama were to permit a direct fraud action against a pharmaceutical company (independent of the "learned intermediary" doctrine) for false statements made in promoting and marketing a prescription drug, Bodie's claim would fail, because he has not presented specific evidence of what materially false statements—if any —Purdue made.

14    Other circuits, such as the Fourth Circuit and Fifth Circuit, have broadly construed the doctrine, holding that it applies to all claims involving prescription drugs. *See Talley v. Danek,* 179 F.3d 154, 163 (4th Cir.1999); *In re Norplant Contraceptive Prod. Liab. Litig.,* 165 F.3d 374, 379 (5th Cir.1999). Courts applying Georgia law in our circuit have reached a similar conclusion. *See, e.g., Catlett v. Wyeth,* 379 F.Supp.2d 1374, 1381 (N.D.Ga.2004) (stating that the doctrine encompasses any cause of action related to prescription drugs, including fraud claims directly against a pharmaceutical company).

A plaintiff alleging fraud must describe "precisely what statements were made in what documents," "the time and place of each such statement and the person responsible for making ... same," and "the content of such statements." *Clausen,* 290 F.3d at 1310. Bodie failed to present any documentation to support his allegation that Purdue's literature and website contained false information about OxyContin. The Purdue documentation that Bodie admitted into evidence to support his fraud claim had been written years after Bodie alleges that the purportedly false statements were in fact made to him (in November 1998). As the district court pointedly observed, "*[n]o pre–1999 Purdue documentation regarding OxyContin has been offered into evidence.*" R4–110 at 3 (emphasis added).

 **12  In addition, Bodie failed to present specific evidence of the content of the alleged misstatements. In his deposition, when asked about the content of the allegedly deceptive pamphlet and website about OxyContin, Bodie stated: "I'd just have to give you generalities, I can't give you specifics." R3–88, Exh. 4 at 85. Asked about the pamphlet, Bodie stated that he got  *526  "some sort of pamphlet," and that he could not remember whether he received it at the pharmacy or in the doctor's office, but that "generally speaking, it was kind of

saying it was safe and the best thing, you know, for pain ... that type of thing." *Id.* at 82–83, 86. As to the website, Bodie stated that the website reinforced the pamphlet's general message that OxyContin was "safe and non-addictive." *Id.* at 89.

Upon review, we agree with the district court that Bodie failed to present specific evidence of Purdue's representations about OxyContin and how, if at all, they were false. Bodie not only failed to offer into evidence documentary evidence to establish "precisely what statements were made in what documents," *see Clausen,* 290 F.3d at 1310, but his testimony on these questions in his deposition was highly vague and general in nature. Bodie also failed to demonstrate with adequate specificity "the time and place of each such statement and the person responsible for making ... same." *Id.* Finally, Bodie failed to establish with particularity "content of such statements," *id.,* other than his highly general testimony that Purdue stated (in an unavailable document and on an unavailable website) that OxyContin was safe and non-addictive. This evidence was not sufficient to support a direct claim for fraud against Purdue, even if such a cause of action were available. Accordingly, the district court acted properly in granting summary judgment to Purdue on the fraud count (Count 5).


### III. CONCLUSION

Bodie appealed the district court's decision to grant summary judgment in favor of Purdue, contending that this decision was in error. Having reviewed the record, we conclude that summary judgment was appropriate as to all of Bodie's counts. Accordingly, we **AFFIRM** the judgment of the district court.


### All Citations

236 Fed.Appx. 511, 2007 WL 1577964, 62 UCC Rep.Serv.2d 818, 20 Fla. L. Weekly Fed. C 708

---

**End of Document**                                          © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 3

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 42 of 207
PageID: 13059
Brooks v. Remington Arms Co., Inc., Not Reported in F.Supp.2d (2010)
2010 WL 6971894

2010 WL 6971894
Only the Westlaw citation is currently available.
United States District Court,
W.D. Arkansas,
El Dorado Division.

Benjamin D. BROOKS, David Russell
Rodgers, Individually and on behalf of
all others similarly situated, Plaintiffs
v.
REMINGTON ARMS COMPANY, INC., Defendant.

Civil No. 1:09–cv–01054.
|
Oct. 27, 2010.

**Attorneys and Law Firms**

Gary M. Draper, Griffin, Rainwater & Draper, Crossett, AR, Adam Quentin Voyles, Lubel Voyles LLP, Houston, TX, Jeffrey W. Hightower, Jr., Hightower Angelley, LLP, Stephen W. Drinnon, The Drinnon Law Firm PLLC, Dallas, TX, for Plaintiffs.

Anne E. Cohen, Debevoise Plimpton LLP, New York, NY, Dale G. Wills, Swanson Martin Bell LLP, Chicago, IL, Teresa M. Wineland, Williams and Anderson PLC, Little Rock, AR, for Defendant.

*REPORT AND RECOMMENDATION OF A*
*UNITED STATES MAGISTRATE JUDGE*

BARRY A. BRYANT, United States Magistrate Judge.

**\*1** Before this Court is Defendant's Motion to Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted. ECF No. 20. Defendant filed this Motion on March 12, 2010. *Id.* On March 26, 2010, Plaintiffs responded to Defendant's Motion. ECF No. 22. This Motion was referred to the undersigned on August 20, 2010. This Court held a hearing on this Motion on October 5, 2010 in Texarkana, Arkansas. ECF No. 28. Counsel for all parties attended and represented their clients at this hearing.

**1. *Background***
On December 10, 2009, Plaintiffs filed their original complaint. ECF No. 1. Thereafter, on February 23, 2010, after

requesting and being granted leave to file, Plaintiffs filed their amended complaint. ECF No. 16. In this amended complaint, Plaintiffs purport to represent both themselves and "all other similarly situated" as a part of a nation-wide class action lawsuit. [1] *Id.* Plaintiffs are bringing this lawsuit raising both breach of express warranty and breach of implied warranty claims. *Id.* at 19–21. This is a diversity of jurisdiction case pursuant to 28 U.S.C. § 1332. *Id.* ¶ 3.

[1]    This is a purported class action because Plaintiffs' class has not been certified.

In their amended complaint, Plaintiffs claim in 2006 and 2007, they purchased a "new Model 700 Remington bolt-action rifle for more than $400." *Id.* ¶ 9. Plaintiffs claim both of these rifles they purchased "contained a 'Walker' fire control system." *Id.* Plaintiffs claim this "Walker" system "can (and often does) fire without a trigger pull upon release of the safety, movement of the bolt, or when jarred or bumped." *Id.* ¶ 11. Plaintiffs allege that a "design defect" which allows a separation between the trigger and connector causes this problem:

> ... because the connector is not bound to the trigger, during the recoil action after each firing of the rifle, the connector separates from the trigger body several times and creates a gap between the two parts.... The result of this defect (the separation) is to allow dirt, debris or manufacturing scrap ... [to become] ... lodged in the space created between the connector and the trigger, preventing the connector from returning to its original position.

*Id.* ¶ 17.

Plaintiffs do not claim in their amended complaint that their rifles have actually misfired resulting in personal injury or causing property damage. Instead, in stating a claim for damages, Plaintiffs allege their rifles "manifest the defect" because this design defect is present in all the guns with the "Walker" system. ECF No. 16 ¶ 57. Plaintiffs allege that once the rifles are fired, the debris and dirt are "free to enter" the housing of the rifle. *Id.* Because their rifles have been fired, the debris and dirt have been "free to enter." *Id.* Thus,

their rifles have manifested the defect. *Id.* Plaintiffs do not allege that their rifles have been found to contain dirt and debris which resulted from this separation. Instead, Plaintiffs allege that rifles like their rifles have been inspected and have manifested the defect, namely the separation between the connector and the trigger.

**\*2** Plaintiffs then raise two causes of action: (1) breach of express warranty and (2) breach of implied warranty. ECF No. 16 ¶¶ 58–67. For the express warranty, Plaintiffs claim Remington warranted that its rifles "will be free from defects in material and workmanship." *Id.* ¶ 59. Plaintiffs claim Remington breached this warranty "by providing Plaintiffs and the Class Members with rifles containing defective fire controls and then refusing to recall the firearms containing these defective fire controls." *Id.* ¶ 60. Plaintiffs claim they "have suffered present, actual injury and loss as a result of Remington's defective product of approximately $450 each." *Id.* ¶ 62.

Plaintiffs also allege a breach of an implied warranty against Remington. ECF No. 16 ¶¶ 63–67. Plaintiffs claim that "Remington impliedly represented and warranted that its rifles were free of defects; of merchantable quality; and/or fit for their intended purpose." *Id.* ¶ 64. Plaintiffs claim that as a result of this breach, they "have suffered present, actual injury and loss ... of approximately $450 each." Based upon these allegations, Plaintiffs claim that they and the proposed class members "are entitled to damages in the aggregate amount in excess of $5,000,000.00." *Id.* ¶ 67.

After Plaintiffs filed their amended complaint, Defendant then filed a Motion to Dismiss. ECF No. 20. In this Motion, Defendant requests that Plaintiffs' case be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) because Plaintiffs failed to state a claim upon which relief can be granted. *Id.* Plaintiffs responded to this Motion on March 26, 2010 and request that it be denied. ECF No. 22. This motion is currently before this Court.

**2.** *Applicable Law*
Pursuant to FED.R.CIV.P. 12(b)(6), a case may be dismissed if the plaintiff fails to "state a claim upon which relief can be granted." In assessing whether a plaintiff has failed to state a claim, a court should first presume the facts as stated are true. *See Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949–50 (2009). Second, a court must determine whether the plaintiff pleads factual content that allows the court to draw the reasonable inference "that the defendant is liable for the

misconduct alleged." *Id.* Dismissal is not proper when the factual allegations in a complaint, which are assumed to be true, are sufficient to state a claim to relief that is plausible on its face. *See Hawks v. J.P. Morgan Chase Bank,* 591 F.3d 1043, 1049 (8th Cir.2010) (internal quotation marks and citations omitted).

**3.** *Discussion*
Plaintiffs raise two causes of action in their amended complaint: (A) breach of implied warranty and (B) breach of express warranty. ECF No. 16. Because these two warranty claims have different elements and the arguments associated with each are different, this Court will address each of these claims separately.

**A. Breach of Implied Warranty**
**\*3** In their amended complaint, Plaintiffs claim that "Remington impliedly represented and warranted that its rifles were free of defects; of merchantable quality; and/or fit for their intended purpose." ECF No. 16 ¶ 64. Plaintiffs claim that, because this "Walker" fire control system is defective, Remington breached its implied warranty to Plaintiffs. *Id.* ¶¶ 64–67. Plaintiffs allege benefit-of-the-bargain damages of approximately $450.00 each, claiming they bought rifles that should have been defect-free when, in fact, those rifles were defective. *Id.* ¶ 67. Plaintiffs now claim those rifles have no value and are worthless.

As a diversity case, the law in the State of Arkansas applies as the substantive law. *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78 (1938). In reviewing the law in Arkansas, the case of *Wallis v. Ford Motor Company,* 362 Ark. 317, 208 S.W.3d 153 (2005) is important to consider. In the *Wallis* case, the Arkansas Supreme Court addressed the issue of whether benefit-of-the-bargain damages were allowable under Arkansas common-law fraud or the Arkansas Deceptive Trade Practices Act (ADTPA) where no defect had been manifested. *Id.* The *Wallis* court held that those damages were not allowable. 208 S.W.3d at 329. The *Wallis* court held that benefit-of-the-bargain damages for common-law fraud and ADTPA violations were not recoverable unless "the actual product received by the purchaser manifests that it is different from that which was promised." *Id.* at 319. Otherwise, the plaintiffs suffer from no "cognizable injury." *Id.* at 329.

Following the same logic as used in the *Wallis* case, U.S. District Judge James M. Moody dismissed an implied

warranty claim where there was no allegation that the plaintiff's product had malfunctioned as a result of the purported defect. *Roberts v. Sunbeam Products,* No. 4:05–cv–000183, 2005 WL 3447609, at *1 (E.D.Ark. December 14, 2005). Judge Moody stated that the plaintiff had not established "at the time her blanket left the control of the manufacturer, it was in a defective condition, and that such defective condition was the proximate cause of an injury." *Id.* Thus, the plaintiff could not recover on a breach of implied warranty claim.

Plaintiffs attempt to avoid the requirements of the *Wallis* case by including a provision in their amended complaint regarding a "manifestation of the defect." ECF No. 16 ¶ 57. Plaintiffs claim that even though their rifles have never misfired, they "manifest the defect" which is present in all guns with a "Walker" fire control system. *Id.* Plaintiffs claim that the "product defect manifests itself each time the rifle is fired, and both of Plaintiffs' Subject Rifles has been fired." *Id.* Thus, Plaintiffs claim both their rifles have "manifested a defect." *Id.*

This Court finds Plaintiffs' argument is fundamentally flawed for two reasons. First, even assuming Plaintiffs can state a cognizable cause of action for breach of implied warranty based only upon their "injury" being this "manifestation of a defect," Plaintiffs still have not properly alleged that their rifles in fact manifested this alleged defect. Indeed, Plaintiffs only state in their amended complaint that "all rifles" which contain the "Walker" based fire control system have this problem. Plaintiff notably do not allege that "dirt, debris or manufacturing scrap" has become lodged in "the space created between the connector and the trigger" *in their rifles.* Then, they surmise that because their rifles have both (1) been fired and (2) contain this fire control system, their rifles have manifested this defect.[2] ECF No. 16 ¶ 57. This is simply not sufficient. Under the *Wallis* case, damages must be alleged by Plaintiffs themselves in order to state a cognizable claim. *See Wallis,* 362 Ark. at 326. To meet this requirement, Plaintiffs should have alleged that *their rifles* had been fired, that *their rifles* had dirt and debris accumulate in the fire control system after the rifle had been fired, and that this accumulation of dirt and debris created a danger of misfiring, thereby manifesting the alleged defect.

[2]    To ensure this Court properly understood Plaintiffs' pleading in this matter, Plaintiffs were even directly asked whether they pled that *their rifles* contained

dirt or debris or had a "separation" as a result of this "design defect." Plaintiffs stated they had not.

**\*4** Second, had Plaintiffs properly pled their damages, this Court finds those "damages" would still not be sufficient under the *Wallis* case to state a cognizable cause of action.[3] Notably, although the *Wallis* court only addressed fraud and a violation of the ADTPA, the same analysis applies to a breach of implied warranty claim. *See Roberts,* 2005 WL 3447609, at *1 (applying *Wallis's* logic to a breach of an implied warranty claim). The *Wallis* court held the following:

[3]    If this were just a pleading defect, this Court would be inclined to recommend that leave be given such that Plaintiffs could amend their pleadings. Since, however, more than just a pleading defect is involved, this Court declines to make such a recommendation.

The striking feature of a typical no-injury class is that the plaintiffs have either not yet experienced a malfunction because of the alleged defect or *have experienced a malfunction but not been harmed by it.*
*Id.* at 324 (emphasis added). Based upon that language, in this case, giving every benefit of the doubt to Plaintiffs, even if this "manifestation" had caused them to experience a "malfunction" by dirt and debris collecting, they still have not "been harmed by it." Plaintiffs only claim a reduction in value of their rifles such that those rifles are now worthless. Under *Wallis,* such benefit-of-the-bargain damages without any other damages are barred. Thus, this Court recommends that Defendant's Motion to Dismiss as to Plaintiffs' breach of implied warranty claim be **GRANTED.**

**B. Breach of Express Warranty**
Based upon the analysis outlined above, Defendant alleges Plaintiffs' breach of express warranty claim should be dismissed under Federal Rule of Civil Procedure 12(b)(6). Defendant also claims Plaintiffs' express warranty claim should be dismissed because Plaintiffs failed to properly plead reliance and because a design defect claim is not covered by this express warranty. This Court will address Defendant's arguments as well as the deficiencies in Plaintiffs' amended complaint.[4]

[4]    This Court will not address Defendant's claim regarding whether this design defect claim is covered by the express warranty given. It appears

this would be an issue of first impression for Arkansas and without further briefing and because this case should otherwise be dismissed, this Court does not address this issue.

### 1. Plaintiffs' Amended Complaint

As an initial matter, this Court has reviewed Plaintiffs' amended complaint and, as noted above, finds Plaintiffs have not alleged that *their rifles* have actually accumulated any dust or debris or otherwise "manifested a defect" so as to show that they have been damaged. Thus, based upon the pleadings, this Court cannot find Plaintiffs have properly pled damages, which are essential to establish a breach of express warranty. *See Briehl v. General Motors Corp.,* 172 F.3d 623, 630 (8th Cir.1999) (holding that the plaintiff's claims for breach of an implied and express warranties, fraudulent misrepresentation, fraudulent concealment, and fraud were deficient because the plaintiffs failed to plead damages "an essential element of each claim"). Thus, based upon this determination alone, this Court finds dismissal is appropriate.

### 2. Reliance in an Express Warranty Claim

Further, even assuming Plaintiffs had pled damages, this Court also finds Plaintiffs' express warranty claim fails because Plaintiffs failed to allege that they relied on Remington's representations regarding workmanship. [5] Instead of pleading reliance, Plaintiffs stated the following in their amended complaint: "Because the affirmations of fact [the express warranty] made by Remington about the goods during the bargain are regarded as part of the description of those goods, *no reliance is necessary to make such affirmations part of the agreement. See* UCC 2–313, comment 3." ECF No. 16 ¶ 59 (emphasis added).

[5]     Again, if this were just a pleading defect, this Court may be inclined to recommend that leave be given such that Plaintiffs could amend their pleadings. Since, however, more than just a pleading defect is involved, this Court declines to make such a recommendation.

**\*5**  The parties then argue extensively in their briefing about whether the element of reliance is required. Defendant relies heavily upon the Arkansas Supreme Court case *Ciba–Geigy Corp. v. Alter,* 309 Ark. 426, 834 S.W.2d 136 (1992) and the Arkansas federal court case *Clayton v. Batesville Casket Co., Inc.,* No. 07–00214, 2009 WL 2448164, at *5 (E.D.Ark. Aug. 10, 2009) (Moody, J.) to support its claim that reliance is

required. ECF No. 21 at 13–15. Plaintiffs dispute the holdings of those cases and claim that reliance is not an element of their breach of express warranty claim. ECF No. 22 at 12–13. In support of their claim, Plaintiffs rely heavily upon Comment 3 of Ark.Code Ann. § 4–2–313 (the UCC). *Id.*

In evaluating the issue of whether reliance is required for an express warranty claim, this Court must once again apply the substantive law of Arkansas. In *Ciba–Geigy Corporation v. Alter,* 309 Ark. 426, 834 S.W.2d 136 (1992), the Arkansas Supreme Court addressed the reliance requirement for an express warranty claim in considering a party's appeal on a separate issue. In *Ciba–Geigy Corporation,* the Arkansas Supreme Court directly addressed this issue and held that reliance is an essential element of an express warranty claim, and they held that the express warranty "must be part of the basis of the parties bargain." 834 S.W.2d at 447. They also held that "[w]hen a buyer is not influenced by the statement in making his or her purchase, the statement is not a basis of the bargain." *Id.*

Despite this very clear holding, Plaintiffs claim "the Arkansas Supreme Court was careful not to decide this issue [of whether reliance is required for an express warranty claim]." ECF No. 22 at 12. Plaintiffs' characterization of the holding in *Ciba–Geigy Corporation* is misleading. It is true that the Arkansas Supreme Court reversed the case for another reason, and the express warranty issue was not the main issue before them. However, in order to assist the trial court during retrial of the action, that Court also addressed other issues that were present in the case. They specifically held that although the case must be reversed due to one error, they also addressed "[o]ther issues which may arise on retrial," and the Arkansas Supreme Court clearly intended to provide a ruling on this issue.

In their attempt to circumvent the requirements of *Ciba–Geigy Corporation,* Plaintiffs also cite to Comment 3 of Ark.Code Ann. § 4–2–313 (the UCC). Comment 3 states as follows:

> In actual practice affirmations of fact made by the seller about the goods during a bargain are regarded as part of the description of those goods; hence no particular reliance on such statements need be shown in order to weave them into the fabric of the

agreement. Rather, any fact which is to take such affirmations, once made, out of the agreement requires clear affirmative proof. The issue normally is one of fact.

This comment to the UCC is persuasive but is not controlling and certainly cannot be used to contradict the holding of Arkansas's highest state court. *See Traylor v. Huntsman,* 253 Ark. 704, 708, 488 S.W.2d 30, 33 (1972) (rejecting the party's reliance on a UCC comment when an Arkansas Supreme Court case contradicted its reasoning). This Court declines to adopt a UCC comment over a holding by the Arkansas Supreme Court. Thus, the Court recommends Defendant's Motion to Dismiss Plaintiffs' express warranty claim be **GRANTED.** [6]

[6]   This Court notes that even if Plaintiffs' case were not dismissed, it is very unlikely this case would be certified because the reliance element of an express warranty claim is such an individualized inquiry that class certification would not be proper. *See Clayton v. Batesville Casket Co., Inc.,* No. 07–00214, 2009 WL 2448164, at *5

(E.D.Ark. Aug. 10, 2009) (Moody, J.) (denying class certification on an express warranty claim because "individualized proof" would be required as to whether an "affirmation of fact or promise was made to each purchaser" and "whether the purchaser was influenced by the representation in making his or her purchase").

**4.** *Conclusion*
 **\*6**  Based upon the foregoing, this Court recommends that Defendant's Motion to Dismiss (ECF No. 20) be **GRANTED** in its entirety.

**The parties have fourteen (14) days from receipt of this Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger** *de novo* **review by the district court.** ***See Thompson v. Nix,* 897 F.2d 356, 357 (8th Cir.1990).**

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 6971894

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 4

Craig v. DaimlerChrysler Corp., Not Reported in F.Supp.2d (2008)

2008 WL 2816842, 67 UCC Rep.Serv.2d 142

🏷 KeyCite Yellow Flag - Negative Treatment

Distinguished by Taylor v. Rice, N.D.Ind., February 21, 2020

2008 WL 2816842

United States District Court,

S.D. Mississippi,

Southern Division.

Brandy Rena CRAIG and James M. Craig, Plaintiffs.

v.

DAIMLERCHRYSLER CORPORATION, Defendant.

Civil Action No. 1:06CV450–LG–JMR.

|

March 19, 2008.

Named Expert: Gilbert L. Rhoades, Dr. Robert J. Weierman, M.D.

**Attorneys and Law Firms**

Wendy C. Tynes, Dustin N. Thomas, Earl L. Denham, Kristopher W. Carter, Denham Law Firm, Ltd., Ocean Springs, MS, for Plaintiffs.

William C. Hammack, Kacey G. Bailey, Bourdeaux & Jones, Meridian, MS, M. Sheila Jeffrey, Miller, Canfield, Paddock & Stone, PLC, Ann Arbor, MI, for Defendant.

***MEMORANDUM OPINION AND ORDER***

LOUIS GUIROLA, JR., District Judge.

**\*1 BEFORE THE COURT** is the Motion to Exclude the Testimony of Plaintiff's Proffered Expert Gilbert L. Rhoades [128], the Motion to Exclude the Testimony of Robert J. Weierman, M.D. [130], and the Motion for Summary Judgment [133] filed by Defendant DaimlerChrysler Corporation. Upon reviewing the submissions of the parties and the relevant law, the Court finds that the Motion to Exclude Rhoades should be granted, that the Motion to Exclude Weierman should be granted in part and denied in part, and that the Motion for Summary Judgment should be granted in part and denied in part.

**FACTS**

On December 27, 2002, James M. Craig and James L. Craig purchased a used Jeep Liberty from Mandal Pontiac, Buick, GMC, Inc., in D'Iberville, Mississippi. James M. Craig and his wife, Brandy Rena Craig, are the plaintiffs in this action, and James L. Craig is the father of James M. Craig. The Liberty left the control of Defendant Chrysler on July 26, 2001. (Ex. 1 to Def.'s Mot. for Summ. J.).

On June 27, 2003, Plaintiff Brandy Craig was involved in a car accident on Pass Road in Biloxi, Mississippi, when she struck the rear of a Dodge Durango driven by Constance Bennett. In a sworn statement, Brandy gave the following description of the accident:

> 5. I saw that the Bennett vehicle was stopped in front of me, and I gently applied my brakes, and the brakes did not engage. The Jeep continued forward and struck the Bennett vehicle. The tires did not skid, and the vehicle continued to move forward.

(Ex. 20 to Def.'s Mot. for Summ. J.). At her deposition, Brandy testified that she was traveling approximately twenty miles per hour on Pass Road when she saw that the Bennett vehicle was stopping in front of her. (Ex. A to Pl.'s Resp. at 49). She testified that she applied the brakes "normally" when she was about a car length or more behind Bennett. (Ex. A to Pl.'s Resp. at 49). She gave the following testimony:

A. I didn't slam the brakes down to the floor or anything, no.

Q. Okay. Did the Jeep respond at all to your brake application?

A. It slowed down. But with the pedal being all the way pressed, the wheels kept rolling.

Q. All right. Is it—is it your testimony that you applied the brake pedal all the way to the floor?

A. Not all the way to the floor, no. It doesn't go all the way to the floor.

Q. Well, is it your testimony that you applied the brake pedal as far down as it would go?

A. Yes, sir.

Q. And the Liberty did not stop?

A. It slowed down, but it did not come to a complete stop.

Q. All right. What do you estimate your speed to be at the time you struck the rear of the—

A. I don't know.

Q. Durango?

A. I really don't. Maybe 15 miles an hour.

(Ex. A to Pl.'s Resp. at 50). Bennett's Durango and Brandy's Liberty sustained minor damage in the accident. (Ex. A to Pl.'s Resp. at 51–52; Ex. 3 to Def.'s Mot. for Summ. J.). Bennett testified that Brandy did the following after the accident: "She just got out, and she said, [']I'm so sorry. You know, I didn't see you until the last minute.[']" (Ex. 15 to Def.'s Mot. for Summ. J. at 16). It had been raining on the day of the accident. (Ex. A to Pl.'s Resp. at 49).

 *2  Brandy continued to drive the Liberty after the accident and alleges that she was again unable to stop the vehicle a few days after the accident. At her deposition, she described this incident as follows:

> It was on June 30th. The accident was on the 27th, which was the Friday. The 30th, I was on Highway 90 in front of the President Casino at the hotel. I was pulling out on to 90. It was like an incline. And the vehicle slid in the middle of the street. And it was sitting like this on Highway 90. And 90 is east/west. And the only thing that saved my life was both those lights were red.

(Ex. A to Pl.'s Resp. at 29.) After the June 30th incident near the President Casino, Brandy asked a friend, David Hunt, who is an ASC certified mechanic, to look at the vehicle, and he test-drove it for her. (Ex. A to Pl.'s Resp. at 32–33). Hunt testified that Liberty skidded through an intersection on Pass Road in Gulfport, Mississippi, although he attempted to stop. (Ex. C to Pl.'s Resp. at 31). He then traveled to a residential area where he could continue to test the Liberty without endangering other vehicles. (Ex. C to Pl.'s Resp. at

32). He gave the following description of the next application of the brakes:

> So just like you normally would, I applied the brakes probably from about twenty-five miles an hour as if I had a stop sign and was going to stop. And the same thing happened. It just—the front wheels quit rolling. But they didn't skid or make any noise. But, literally, it—it just went right through the intersection. And the —and the brake pedal felt normal. So it wasn't like a low brake pedal, excessive travel. And so I—I knew specifically there was a problem.

(Ex. C to Pl.'s Resp. at 32). Hunt testified that the Liberty traveled through three intersections despite his attempts to stop. (Ex. C to Pl.'s Resp. at 32–33). He explained that the brake function seemed to depend on the speed at which the Liberty was traveling. (Ex. C to Pl.'s Resp. at 33). At low speeds, the Liberty braked normally, but at higher speeds the brakes did not slow or stop the vehicle. (Ex. C to Pl.'s Resp. at 33). Hunt did not inspect the brakes and testified that he could not identify any particular defect. (Ex. C to Pl.'s Resp. at 47, 60). The roads were wet when Hunt tested the vehicle. (Ex. C to Pl.'s Resp. at 30).

Brandy reported the problems with the Liberty to Chrysler, and Chrysler retained Christopher J. Beall to inspect the vehicle. In his report Beall wrote:

> When I drove vehicle [sic] in traffic, brakes functioned normally down to about 10 MPH but on slippery surfaces the front end locked up. This happened twice out of 10 counted stops. I was not able to drive on wet surfaces but drove in empty/vacant parking lot where gravel had accumulated to simulate a slicker than normal road surface.

(Ex. 13 to Def.'s Mot. for Summ. J.). However, at his deposition Beall explained:

A....[O]n a vehicle that does not have anti-lock brakes and I'm on a slippery surface and depending on how hard I'm pushing on the—on the brakes and the type of surface I'm on, it's not unusual to expect the wheels to lock up.

**\*3** Q. So it's normal?

A. It's within the parameters of normal. You're trying to box me in to is it normal or abnormal, and given the conditions that I tested the vehicle and given the—the—the vehicle does not have anti-lock brakes, or anything like that, and—and so on, to me, personally, for the wheels to lock up on a slippery surface, yeah, that's to be expected.

(Ex. 19 to Def.'s Mot. for Summ. J.).

Chrysler also retained an engineer, Robert M. Kuhn, Jr., who inspected the Liberty and opined that the braking system is not defective in design, operation, or manufacture. (Ex. 7 to Def.'s Mot. for Summ. J. at 7). He also opined that the vehicle met all applicable Federal Motor Vehicle Safety Standards, and that the collision was most likely caused by Brandy Craig's failure to maintain a reasonable assured safe distance behind the vehicle in front of her. (Ex. 7 to Def.'s Mot. for Summ. J. at 7). He also gave the opinion that Brandy Craig's description of the accident is a description of normal brake function. (Ex. 7 to Def.'s Mot. for Summ. J. at 7). Kuhn was not able to drive the vehicle at the time of his inspection. (Ex. 7 to Def.'s Mot. for Summ. J. at 7).

The vehicle was also inspected and driven by Ray Rowell at the request of Chrysler. Rowell noted that the front brakes locked up when stopping on loose dirt or gravel. (Ex. 8 to Def.'s Mot. for Summ. J.). He stated: "At no time during the informal testing or driving of the vehicle did I detect any issues with the brake system ." (Ex. 8 to Def.'s Mot. for Summ. J.). At his deposition, Rowell explained that when the front tires lock on gravel or other slick surfaces, it is a tire-to-road condition, not a braking condition. (Ex. 23 to Def.'s Mot. for Summ. J. at 67). This was confirmed by an engineer at Chrysler, Douglas Bain, who explained that lock up occurs when the braking force exceeds the traction level of the tire to the road. (Ex. 24 to Def.'s Mot. for Summ. J. at 41).

Plaintiff's expert, Gilbert L. Rhoades, gave the following opinion in his report: "Brake malfunctions were experienced by Ms. Craig per her testimony and by the inspection of Mr. Hunt, the service report of Champion and the testing

and report of Mr. Beall." (Ex. D to Def.'s Mot. to Exclude Rhoades). He also opined:

> Because the Liberty driven by Ms. Craig at the time of the accident was a slow vehicle, because Ms. Craig observed the signal light and the slowed or stopped Durango on her approach, and because she testified that she applied the brakes to come to a normal stop, the more reasonable inference from these facts is that she was maintaining a proper lookout and attempted to maintain proper control at the time of the accident.

(Ex. D to Def.'s Mot. to Exclude Rhoades). Rhoades also estimated that the speed of the Liberty was nine miles per hour at the time of the collision. He opined that the Liberty's speed was not the cause of the accident. In a letter, Rhoades also gave the opinion that "the most reasonable inference from the facts surrounding this accident is that the brakes on the ... Liberty ... were not fit for the intended use." (Ex. E to Def.'s Mot. to Exclude Rhoades). At his deposition Rhoades testified that he thought that the proportional valve on the Liberty could be defective, but he admitted that he could not give an opinion that the proportional valve or the braking system is defective without performing an additional inspection of the Liberty. (Ex. F to Def.'s Mot. to Exclude Rhoades at 139). Rhoades' deposition was taken on April 2, 2007, and no supplemental report or testimony has been produced by Plaintiffs in which Rhoades gives any opinion that the braking system was defective. Rhoades also admitted that he cannot give an opinion that there was any manufacturing or design defect without performing further inspections. (Ex. F to Def.'s Mot. to Exclude Rhoades at 143–44). However, Rhoades explains: "The system did not perform properly. I cannot tell you what specific component has a problem that caused the malfunction described by Ms. Craig." (Ex. F to Def.'s Mot. to Exclude Rhoades at 143).

**\*4** A dealership that inspected the vehicle on June 30, 2003, the day of the braking incident near the President Casino, told Brandy Craig that new front brake pads were needed and the rotors needed cutting, but she declined to have the repairs performed. (Ex. 18 to Def.'s Mot. for Summ. J.). No expert or individual who has inspected or driven the vehicle has been

Craig v. DaimlerChrysler Corp., Not Reported in F.Supp.2d (2008)

2008 WL 2816842, 67 UCC Rep.Serv.2d 142

able to identify any specific defect with the Liberty or its braking system that has been attributed to the accident.

Brandy alleges that she suffered a herniated disc as a result of the accident and that she underwent a discogram and endoscopic disc excision. However, she had a history of degenerative disc disease, bulging discs, and lower back pain prior to the accident.

Brandy and James M. Craig filed a lawsuit against Chrysler, asserting the following claims: strict liability/design defect; strict liability/failure to warn and/or instruct; negligence; strict liability/breach of express and implied warranties; "breach of warranty/U.C.C.;" and Misrepresentations, fraud, and concealment. They seek damages for medical expenses, pain and suffering, emotional distress, loss of enjoyment, lost wages, and property damage. They also seek punitive damages. Chrysler has filed a Motion for Summary Judgment, a Motion to Exclude the Testimony of Gilbert L. Rhoades, and a Motion to Exclude the Testimony of Brandy's treating physician, Dr. Robert Weierman.

## DISCUSSION

### MOTION TO EXCLUDE THE TESTIMONY OF GILBERT RHOADES

The admissibility of expert testimony is governed by FED. R. EVID. 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

When deciding whether expert testimony is admissible, "the court must ensure the expert uses reliable methods to reach

his opinions; and those opinions must be relevant to the facts of the case." Guy v. Crown Equip. Corp., 394 F.3d 320, 325 (5th Cir.2004) (citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 593–94 (1993)). The following non-exclusive factors are used by courts in determining whether expert testimony is admissible: whether the proposed evidence or theory "can be (and has been tested);" whether it "has been subjected to peer review and publication;" whether it has been evaluated in the light of potential rate[s] of error;" and whether the theory has been accepted in the "relevant scientific community." Guy, 394 F.3d at 325 (citing Daubert, 509 U.S. at 593–94). "Although the Daubert analysis is applied to ensure expert witnesses have employed reliable principles and methods in reaching their conclusions, the test does not judge the expert conclusions themselves." Guy, 394 F.3d at 325. The proponent of expert testimony must prove by a preponderance of the evidence that the testimony is reliable. Moore v. Ashland Chem., Inc., 151 F.3d 269, 276 (5th Cir.1998).

**\*5** Chrysler asserts that Rhoades' testimony should be excluded because his opinions are not based upon reliable principles and methods or sufficient facts and data. Plaintiffs assert that Rhoades reviewed testimony given in the case, reviewed the reports of other inspectors of the vehicle, inspected the vehicle, and measured the scene of the accident, and therefore his opinion that the accident was caused by a brake malfunction rather than Brandy Craig's speed or lack of attention is well-supported and admissible. However, Rhoades admits that he cannot identify any manufacturing or design defect with the Liberty and that he would have to perform additional inspections and tests to identify any defect. (Ex. F to Def.'s Mot. to Exclude Rhoades at 139, 143–44). Therefore, his opinion that a brake defect rather than speed or driver error was the cause of the accident is based on speculation. Since his opinion is not based on sufficient facts or data and is not the product of reliable principles or methods, his opinion is not admissible pursuant to FED.R.EVID. 702. As a result, Chrysler's Motion to Exclude the Testimony of Gilbert Rhoades is granted.

### MOTION TO EXCLUDE THE TESTIMONY OF DR. ROBERT WEIERMAN

After the June 27th accident, Brandy was initially treated by a chiropractor, but on August 11, 2003, she resumed treatment with an orthopedic surgeon who had treated her prior back problems, Dr. Robert Weierman. Dr. Weierman diagnosed Brandy with a herniated disc and performed a discogram and disc excision. Dr. Weierman testified that the accident

accelerated the herniation of the disc. (Ex. B to Pl.'s Resp. to Mot. to Exclude Weierman at 70). Dr. Weierman testified at his deposition that his opinion is supported by the changes in Brandy's symptoms after the accident and the changes seen in an MRI taken after the accident, which he had compared with an MRI that was taken before the accident. (Ex. B to Pl.'s Resp. to Mot. to Exclude Weierman at 60, 68).

However, a biomechanical engineer retained by Chrysler, Dr. Harry Smith, has opined: "To a degree of medical and engineering certainty there is no biomechanical mechanism of the collision event of June 27, 2003, that could be construed to be the causation of Ms. Brandy Craig's ongoing medical condition (i.e., spine degeneration)." (Ex. 10 to Def.'s Mot. for Summ. J.). He explained that the imaging studies taken of Brandy before and after the accident "demonstrated findings consistent with degenerative changes incurred from daily living activities and were inconsistent with injury related to frontal impact trauma." (Ex. 10 to Def.'s Mot. for Summ. J.).

Chrysler argues that Dr. Weierman's opinion concerning the causation of Brandy's back problem should be excluded because he admitted that he is not an expert in the field of biomechanics.[1] The Court has reviewed Dr. Weierman's deposition testimony, his office records, and the report of Dr. Harry Smith, and finds that Dr. Weierman's opinion that the accident at issue accelerated the herniation of the disc in Brandy's lower back is based on reliable principles and methods. He had examined Brandy and discussed her symptomology both before and after the accident at issue, and he has examined MRIs taken both before and after the accident. He has determined that her symptomology and the condition of the disc changed after the accident. An orthopedic surgeon who specializes in treating the spine is certainly qualified to make such a determination. However, Dr. Weierman will not be permitted to testify regarding biomechanics or the forces that may have been experienced by Brandy during the accident. Additionally, Chrysler will be permitted to cross-examine Dr. Weierman concerning his lack of expertise in biomechanics, so that the jury can determine the weight that should be given to his testimony. Therefore, Chrysler's Motion to Exclude Dr. Weierman's Testimony is granted in part and denied in part.

[1]    Chrysler also notes that Dr. Weierman is not an expert in the fields of occupant kinematics and accident reconstruction, and while Dr. Weierman has not attempted to give any opinion concerning these subjects, Chrysler requests an order preventing Dr. Weierman from giving any testimony on these subjects at trial. Should Dr. Weierman give opinions concerning these two subjects, Chrysler will have the opportunity to object at trial.

### MOTION FOR SUMMARY JUDGMENT

**\*6** Pursuant to FED.R.CIV.P. 56, any party to a civil action may move for a summary judgment upon a claim, counterclaim, or cross-claim as to which there is no genuine issue of material fact and upon which the moving party is entitled to prevail as a matter of law. A party seeking summary judgment bears the initial burden of identifying those portions of the pleadings and discovery on file, together with any affidavits, that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the movant carries its burden, the burden shifts to the non-movant to show that summary judgment should not be granted. Celotex Corp. v. Catrett, 477 U .S. at 324–25. The non-moving party may not rest upon mere allegations or denials in its pleadings, but must set forth specific facts showing the existence of a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256–57 (1986).

### PRODUCT LIABILITY

In a product liability suit, the plaintiff must prove by a preponderance of the evidence that when the product left the manufacturer the product was defective, the defect rendered the product unreasonably dangerous, and the dangerous condition proximately caused the injury. Miss.Code Ann. § 11–1–63(a). The product can be defective in one of four ways: (1) if it deviated in a material way from the manufacturer's specifications or from otherwise identical units manufactured to the same manufacturing specifications (a manufacturing defect); (2) if it failed to contain adequate warnings or instructions; (3) if it was designed in a defective manner (a design defect); or (4) if the product breached an express warranty or failed to conform to other express factual representations upon which the claimant justifiably relied in electing to use the product. Miss.Code Ann. § 11–1–63(a)(i).

### Manufacturing Defect

Chrysler argues that the Liberty did not deviate from Chrysler's specifications or from otherwise identical units manufactured to the same manufacturing specifications because no defect has been identified. In some cases, proof of a malfunction will in and of itself be proof of a defect in

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 53 of 207
PageID: 13070
Craig v. DaimlerChrysler Corp., Not Reported in F.Supp.2d (2008)
2008 WL 2816842, 67 UCC Rep.Serv.2d 142

manufacture. *BFGoodrich, Inc. v. Taylor,* 509 So.2d 895, 903 (Miss.1987). In the present case, David Hunt testified that the Liberty slid through three intersections when he drove it soon after the accident. Hunt's testimony, particularly when it is considered with Brandy's description of the accident and the incident near the President Casino, creates a genuine issue of material fact regarding whether the brakes on the vehicle malfunctioned, causing Brandy's accident. The Court recognizes that no expert has identified any defect with the Liberty and that the incidents described by Hunt and Brandy could have been caused by slippery road conditions rather than a brake malfunction. However, that is a question that the jury must decide after reviewing all of the evidence. Therefore, the Court finds that there is a genuine issue of material fact as to whether there was a manufacturing defect in the Liberty.

### Failure to Warn

**\*7** Chrysler asserts that it had no duty to warn of a braking defect since no defect had been identified. However, as previously explained, there is a genuine issue of material fact regarding whether the brakes malfunctioned, causing Brandy's accident. Therefore, there is a genuine issue of material fact regarding whether Chrysler failed to warn consumers of a braking defect.

### Design Defect

In order to demonstrate that a design defect rendered a product unreasonably dangerous, a plaintiff must demonstrate that: (1) the manufacturer knew or should have known, about the danger that caused the injury; (2) the product failed to function as expected; **and** (3) there was a feasible design alternative that would have to a reasonable probability prevented the harm. Miss.Code Ann. § 11–1–63(f); *see also, Guy v. Crown Equip. Corp.,* 394 F.3d 320, 324 (5th Cir.2004) (discussing Mississippi law). In the present case, Plaintiffs have made no attempt to demonstrate that there was a feasible design alternative.[2] Therefore, Chrysler is entitled to summary judgment as to Plaintiffs' design defect claim. *See Guy,* 394 F.3d at 330–31.

[2]    Plaintiffs' proposed expert, Gilbert Rhoades, did not render any opinion about a feasible design alternative.

### Express Warranty

In order to set forth a product liability claim for breach of express warranty, Plaintiffs must demonstrate that: "The product breached an express warranty or failed to conform to other express factual representations upon which the claimant justifiably relied in electing to use the product." Miss.Code Ann. § 11–1–63(a)(4). Plaintiffs have not responded to Chrysler's assertion that it is entitled to summary judgment as to their product liability claim for breach of express warranty and have not asserted that they relied on any express warranty when they purchased the product.[3] Upon reviewing the record, the Court has determined that the only relevant express warranty that pertained to the Liberty was a warranty in which Chrysler agreed to repair any defect in the vehicle. (Ex. 27 to def.'s Mot. for Summ. J. at 5). As explained *infra,* there is a genuine issue of material fact as to whether the Liberty had a braking defect. However, there is no evidence in the record that Plaintiffs relied upon this warranty when they purchased the Liberty. Brandy testified that she and her husband picked out the Jeep Liberty. (Ex. A to Pl.'s Resp. at 21). They decided to buy it because they had two children, and it had four doors. (Ex. A to Pl.'s Resp. at 21–22). Also, it was a new model at the time when they bought it, and they liked how it looked. (Ex. A to Pl.'s Resp. at 22). She testified that the price of the Liberty was an important factor in their decision to purchase the Liberty. (Ex. A to Pl.'s Resp. at 22). Brandy admitted that she did not rely on any advertisements from Chrysler when she chose the Liberty and that she had no communication with Chrysler before the Liberty was purchased. (Ex. A to Pl.'s Resp. at 22–23). Therefore, Chrysler is entitled to summary judgment as to Plaintiffs' breach of express warranty claim pursuant to the product liability act. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256–57 (1986) (explaining that in summary judgment proceedings, the non-moving party may not rest upon mere allegations or denials in its pleadings but must set forth specific facts showing the existence of a genuine issue for trial).

[3]    In their Memorandum in Response to Defendant's Motion for Summary Judgment, Plaintiffs assert that "Defendant expressly represented that the braking system as manufactured and installed in the subject 2002 Jeep Liberty was safe for operation, and expressly and impliedly warranted the product to be free of material defects, including, but not limited to, defects in design, assembly, manufacturing, testing and installation." (Pl.'s Mem. at 6). Plaintiffs also assert that they relied upon these alleged express warranties.

(Pl.'s Mem. at 6). However, Plaintiffs have not cited or produced any competent summary judgment evidence that supports these assertions. *See* FED.R.CIV.P. 56(e).

### U.C.C. WARRANTY CLAIMS

**\*8** Plaintiffs have also asserted warranty claims pursuant to the Uniform Commercial Code. Chrysler seeks summary judgment as to each of those claims.

### Express Warranty

Miss Code Ann. § 75–2–313 provides that express warranties are created by the following: (1) "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain;" (2) "[a]ny description of the goods which is made part of the basis of the bargain;" or (3) "[a]ny sample or model which is made part of the basis of the bargain." As explained previously, Plaintiffs have not asserted that any promises or warranties became the basis of the bargain when they purchased the Liberty. Rather, price, appearance, and size were the factors that Plaintiffs relied on when deciding to purchase the vehicle. (Ex. A to Pl.'s Resp. at 21–23). Therefore, Chrysler is entitled to summary judgment regarding Plaintiffs' U.C.C. express warranty claim.

### Implied Warranty of Merchantability

Miss Code Ann. § 75–2–314 provides that a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. In order to be merchantable, goods must be fit for the ordinary purpose for which such goods are used. Miss Code Ann. § 75–2–314(2)(c). Chrysler argues that the Liberty was fit for the ordinary purpose for which it was intended —transportation—because Brandy continued to drive the Liberty for more than three thousand miles after the June 27, 2003, accident. [4] However, since there is a genuine issue of material fact regarding whether the brakes were defective, Chrysler is not entitled to summary judgment as to the implied warranty of merchantability.

[4]   The mileage on the Liberty on June 30, 2003, was 30,669, and the mileage on the vehicle on July 8, 2004, was 33,897. (Ex. 8, 18 to Def.'s Mot. for Summ. J.).

### Implied Warranty of Fitness for a Particular Purpose

Miss.Code Ann. § 75–2–315 provides:

> [W]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is an implied warranty that the goods shall be fit for such purpose.

Plaintiffs have not produced any evidence or testimony that the Liberty was purchased for any particular purpose other than transportation. Additionally, Plaintiffs do no assert that they relied on the seller's skill or judgment to select the Liberty. Rather, Plaintiffs argue that the Liberty's brakes were not fit for their intended purpose because the brakes did not stop the car when Brandy had the accident. In *Royal Lincoln–Mercury Sales, Inc. v. Wallace,* the Mississippi Supreme Court held:

> There is no testimony that the plaintiff relied upon the seller's skill or judgment in selecting the car that he purchased from Royal. Obviously, the purpose of the purchase from the authorized dealer was that of transportation. Although it can be envisioned that an automobile could be purchased for a particular purpose such as racing, towing a large trailer, or other specialized use, where the ordinary purchaser would need the seller's skill or judgment in making a selection, this was not so in the present case. We, therefore, think that § 75–2–315 has no application.

**\*9** *Royal Lincoln–Mercury Sales, Inc. v. Wallace,* 415 So.2d 1024, 1027 (Miss.1982). Since there is no evidence that the Liberty was purchased for any purpose other than transportation and since there is no evidence that the Plaintiffs relied on the seller's skill or judgment when selecting the Liberty, Chrysler is entitled to summary judgment regarding Plaintiffs' claim of breach of the implied warranty of fitness for a particular purpose.

## *NEGLIGENCE*

Plaintiffs assert that Chrysler was negligent "in the designing, testing, manufacturing, researching, assembling, failing to warn, installing, marketing, advertising, failing to repair, and distributing and selling" of the Liberty. In order to overcome summary judgment, a plaintiff must show that there is a genuine issue of material fact regarding each of the four elements of negligence: (1) a duty or obligation, recognized by law, requiring the defendant to conform to a certain standard of conduct; (2) a breach of the duty; (3) a reasonably close causal connection between the conduct and the resulting injury; and (4) actual loss or damage. *Sellars v. Walgreen Co.,* 971 So.2d 1278, 1279 (¶ 5) (Miss.Ct .App.2008) (quoting *Weatherby Chevrolet Co. v. Redd Pest Control Co.,* 778 So.2d 130, 133 (¶ 8) (Miss.2001).

Chrysler is not entitled to summary judgment regarding the negligence counts concerning the design, manufacture, research, assembling, failure to warn, installation, failing to repair, and distributing and selling of the Liberty, since the Court has found that there is a genuine issue of material fact regarding whether the brakes were defective.

However, as previously explained, Brandy admitted that Plaintiffs did not rely on advertisements or the marketing of the Liberty when they decided to purchase the vehicle. Therefore, Plaintiffs cannot demonstrate the necessary element of causation as to those two negligence counts. Therefore, Chrysler is entitled to summary judgment regarding the negligence counts concerning advertisement and marketing.

## *MISREPRESENTATION, FRAUD, AND CONCEALMENT*

### Fraud and Fraudulent Misrepresentation

In order to establish a fraud claim, a plaintiff must demonstrate each of the following elements: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of the truth; (5) his intent that it should be acted on by the hearer and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance in its truth; (8) his right to rely thereon; and (9) his consequent and proximate injury. *Dominquez v. Palmer,* 970 So.2d 737, 742 (¶ 28) (Miss.Ct.App.2007). In *Dominquez,* the Court held that it was not error to grant summary judgment as to a fraud

claim where the plaintiff's claim contained no allegations of specific instances of fraud. *Dominquez,* 970 So.2d at 742. In order to establish a fraudulent misrepresentation claim, a plaintiff must demonstrate the same elements of fraud. *Levens v. Campbell,* 733 So.2d 753, 761 (¶ 35) (Miss.1999).

 **\*10** In their Amended Complaint, Plaintiffs assert that Chrysler "intentionally misrepresented through deceit and/ or concealment of material facts as herein above alleged, which were known to [Chrysler], and intentionally deprived persons, including Plaintiff[s] herein, of knowledge that could have and would have kept Plaintiff from being injured in the accident." (Am. Compl. at 9). However, the Court finds that Chrysler is entitled to summary judgment as to Plaintiffs' fraudulent misrepresentation and fraud claims because Plaintiffs have not cited or submitted any competent summary judgment evidence supporting their assertions that Chrysler made any false representations that were relied upon by Plaintiffs. *See* FED.R.CIV.P. 56(e).

### Negligent Misrepresentation

In order to establish a negligent misrepresentation claim, a plaintiff must prove by a preponderance of the evidence: (1) a misrepresentation **or omission of fact;** (2) that the representation or omission is material or significant; (3) failure to exercise reasonable care on the part of the defendant; (4) reasonable reliance on the misrepresentation or omission; and (5) damages as a direct result of such reasonable reliance. "The basis for damages from negligent misrepresentation is the lack of care; the basis for damages resulting from fraud is the want of honesty." *Bank of Shaw v. Posey,* 573 So.2d 1355, 1360 (Miss.1990). Plaintiffs allege that Chrysler failed to inform them of problems with the braking system on the Liberty, which is an allegation of an omission of fact. (Am. Compl. at 9). Thus, Plaintiffs have asserted a negligent misrepresentation claim in addition to fraudulent misrepresentation and fraud claims, but Defendant has only requested summary judgment regarding the fraudulent misrepresentation and fraud claims. Therefore, it is not entitled to summary judgment regarding the negligent misrepresentation claim. Additionally, the Court notes that the negligent misrepresentation claim would hinge on whether the brakes were defective, which is a genuine issue of material fact.

### Concealment

Plaintiffs have also asserted a concealment claim. Chrysler asserts that it is entitled to summary judgment regarding

Craig v. DaimlerChrysler Corp., Not Reported in F.Supp.2d (2008)
2008 WL 2816842, 67 UCC Rep.Serv.2d 142

the concealment claim, relying upon caselaw concerning the use of the doctrine to toll the statute of limitations. *See Sanderson Farms, Inc. v. Ballard,* 917 So.2d 783, 790 (Miss.2005) (holding that a plaintiff must demonstrate that an affirmative act or conduct prevented discovery of a claim and that the plaintiff performed due diligence to discover the claim). Nevertheless, the Mississippi Supreme Court has explained: "The duty to disclose is based upon a theory of fraud that recognizes that the failure of a party to a business transaction to speak may amount to the suppression of a material fact which should have been disclosed and is, in effect, fraud." *Holman v. Howard Wilson Chrysler Jeep, Inc.,* No.2005–CT–01154–SCT, 2008 WL 95774 at *2 (¶ 9) (Miss. Jan. 10, 2008) (citing *Welsh v. Mounger,* 883 So.2d 46, 49 (Miss.2004)). The Mississippi courts have adopted Section 551 of the *Restatement (Second) of Torts* as the standard for determining when there is a duty to disclose information in a business transaction. *Holman,* 2008 WL 95774 at *3 (¶ 9). Plaintiffs did not respond to Chrysler's argument concerning the fraudulent concealment claim, and the nature of Plaintiffs' concealment claim is unclear. However, the Court finds that Chrysler would be entitled to summary judgment under either standard. Pursuant to the doctrine of fraudulent concealment pertaining to the tolling of the statute of limitations, Plaintiffs have not alleged any affirmative act by Chrysler that would have prevented discovery of their claim. Additionally, Section 551 of the *Restatement (Second) of Torts* pertains to a business transaction between the parties. In the present case, the Liberty was purchased used from an unauthorized dealer, not from Chrysler, such that the duties set forth in the *Restatement* do not apply in this case. Therefore, Chrysler is entitled to summary judgment concerning Plaintiffs' concealment claim.

### *INJURY AND CAUSATION*

 **\*11** Chrysler also argues that it is entitled to summary judgment because Brandy's back problem was caused by degenerative disc disease and because the condition of her spine did not change as a result of the accident. However, the expert opinion of Brandy's treating physician, Dr. Robert Weierman, which is discussed *infra,* creates a genuine issue of material fact regarding whether Brandy's back was injured in the accident.

### *PUNITIVE DAMAGES*

Miss Code Ann. § 11–1–65 provides:

> Punitive damages may not be awarded if the plaintiff does not prove by clear and convincing evidence that the defendant against whom punitive damages are sought acted with actual malice, gross negligence, which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud.

The Mississippi Supreme Court has explained: "Regarding intent, we have held that the 'kinds of wrongs to which punitive damages are applicable are those which, besides the violation of a right or the actual damages sustained, import insult, fraud, or oppression and not merely injuries but injuries inflicted in the spirit of wanton disregard for the rights of others.' " *Neider v. Franklin,* 844 So.2d 433, 438 (¶ 17) (Miss.2003).

Plaintiffs assert that Chrysler knew or should have known that the Liberty was defectively designed and that there were safer, feasible design alternatives available. Additionally, Plaintiffs assert that Chrysler "steadfastly ignored the information available and known by [Chrysler], or which through reasonable conduct would have been known, and concealed it from the public in order to maximize profits." (Pls.' Mem. at 9). However, Plaintiffs cite no evidence in support of these assertions. Plaintiffs have not even attempted to demonstrate that a feasible design alternative existed, and in the over four and one-half years that have passed since the accident, no one has been able to locate any specific defect in the Liberty. Chrysler has produced evidence that the Liberty was thoroughly tested, and there is no evidence that additional testing would have resulted in the discovery of any defect. (Ex. 24 to Def.'s Mot. for Summ. J.). Therefore, Plaintiffs cannot prove by clear and convincing evidence that Chrysler acted with actual malice, acted with gross negligence, or committed actual fraud. As a result, Chrysler is entitled to summary judgment regarding Plaintiffs' claim for punitive damages.

**IT IS THEREFORE ORDERED AND ADJUDGED** that the Motion to Exclude the Testimony of Plaintiff's Proffered Expert Gilbert L. Rhoades [128] filed by DaimlerChrysler is **GRANTED.**

Craig v. DaimlerChrysler Corp., Not Reported in F.Supp.2d (2008)
2008 WL 2816842, 67 UCC Rep.Serv.2d 142

**IT IS FURTHER ORDERED AND ADJUDGED** that the Motion to Exclude the Testimony of Robert J. Weierman, M.D. [130] is **GRANTED** as to any testimony concerning biomechanics and is **DENIED** in all other respects.

**IT IS FURTHER ORDERED AND ADJUDGED** that the Motion for Summary Judgment [133] is **GRANTED** as to Plaintiffs' product liability claims for design defect and breach of express warranty, U .C.C. claims for breach of express warranty and breach of the implied warranty of fitness for a particular purpose, fraudulent misrepresentation claim, fraud claim, negligent advertising claim, negligent marketing claim, and concealment claim, and is **DENIED** in all other respects.

**\*12  SO ORDERED AND ADJUDGED.**

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 2816842, 67 UCC Rep.Serv.2d 142

---

**End of Document** <span style="float:right">© 2020 Thomson Reuters. No claim to original U.S. Government Works.</span>

# TAB 5

In re: Elk Cross Timbers Decking Marketing, Not Reported in Fed. Supp. (2015)

2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 59 of 207
PageID: 13076

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by In re Insulin Pricing Litigation, D.N.J., February 20, 2020

2015 WL 6467730
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

IN RE: ELK CROSS TIMBERS
DECKING MARKETING, Sales Practices
and Products Liability Litigation.

Civil Action No.: 15-18 (JLL)
|
MDL No.: 2577
|
Signed 10/26/2015

OPINION

LINARES, District Judge

**\*1** This matter comes before the Court by way of a motion to dismiss (ECF No. 60 ("GAF Mot.") the Omnibus Amended Complaint ("OAC") (ECF No. 15) pursuant to Federal Rule of Civil Procedure 12(b)(6) by Building Materials Corporation of America d/b/a GAF Materials Corporation ("GAF"). Jurisdiction is premised upon 28 U.S.C. § 1332(d). (*See* OAC ¶ 36.) No oral argument was heard pursuant to Rule 78 of the Federal Rules of Civil Procedure. After considering the submissions of the parties in support of and in opposition to the instant motion, GAF's motion to dismiss is granted in part and denied in part.

## I. BACKGROUND

### A. General Allegations

Plaintiffs bring the instant putative class action individually and on behalf of all owners of GAF Elk Cross Timbers and/or DuraLife Decking (collectively "Decking"), "a non-natural wood product made from manufactured composite wood." (*Id.* ¶¶ 1, 2.) At all times relevant to this litigation, GAF, a Delaware corporation with its principal place of business located in Wayne, New Jersey, has been in the business of manufacturing, marketing, and selling exterior building products in North America, including Decking. (*Id.* ¶¶ 8–10.) Plaintiffs allege, generally, that the Decking is "defective in design and manufacture," which results in cracking, warping, swelling, mold, discoloration, twisting,

and shrinking. (*See, e.g., id.* ¶¶ 44–50, 74.) Plaintiffs also allege that GAF knew or should have known about these defects but failed to disclose the defects to its consumers. (*Id.* ¶¶ 73–75).

Plaintiffs further allege, that despite GAF's knowledge of the defects, it misrepresented and warranted that the Decking was a superior product knowing that customers would rely on these misrepresentations. (*Id.* ¶¶ 76, 79–81, 86.) Specifically, Plaintiffs allege that "GAF made the following representations in conjunction with the sale of its Decking, each of which were intended to (and did) convey information regarding the durability and performance of the Decking, rather than mere puffery:"

a. The Decking's "superior engineering and design creates a deck that lasts longer than ordinary woods decks with less maintenance–no staining or sealing required."

b. The Decking "won't warp, crack, splinter or rot like wood."

c. The Decking "[r]esists scratching and high traffic wear and tear."

d. The Decking "resists sagging, splintering, warping, insects and rotting."

e. The Decking contains "[n]o toxic chemicals like treated wood."

f. "For the beauty of a wooden deck with less care and effort, chose Elk Cross Timbers brand composite decking [viz., the Decking]."

g. The Decking "is designed with the EZ–Build System, which not only makes construction a snap, but also adds beauty with its concealed fasteners hidden below the surface."

h. "No matter what your design goals are, you can rely on [the Decking] to give you the lasting, quality deck of your dreams, with little time and effort."

(*Id.* ¶ 85 (alteration in original).)

### B. Individual Plaintiff Allegations

**\*2** The OAC sets forth factual allegations for twenty-five (25) sets of Plaintiffs (either as an individual or as a couple). (*See id.* ¶¶ 11–35). The allegations in the ***amended*** omnibus complaint for the individual Plaintiffs are mostly cut and paste

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 60 of 207
PageID: 13077
In re: Elk Cross Timbers Decking Marketing, Not Reported in Fed. Supp. (2015)
2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

allegations providing only the most basic information. With minor tweaks in some instances, the individual allegations follow the below format:

> Plaintiff [insert name] is an [insert state] citizen who resides in [insert town, state]. [Insert name] purchased and installed Decking on [his/her/ their] home in [insert time frame]. On [insert date], [insert name] initially filed a Complaint in the United States District Court of the [insert court]. Within a year prior to filing the Complaint, [name/he/she/ they] discovered that the Decking is defective and must be replaced, and that any other property damage caused by the Decking must be repaired. [1]

For example, the allegations for Ken Burger are:

> Plaintiff Ken Burger ("Burger") is an Ohio citizen who resides in Cincinnati, Ohio. Mr. Burger purchased and installed Decking on his home in the summer of 2010. On June 19, 2014, Burger initially filed a Complaint in the United States District Court of the Southern District of Ohio. Within a year prior to filing his initial Complaint, Burger discovered that the Decking is defective and must be replaced, and that any other property damage caused by the Decking must be repaired.

(*Id.* ¶ 11.) And the essentially identical allegations for Frederick and Veronica Robertie are:

> Plaintiffs Frederick and Veronica Robertie ("Robertie") are North Carolina citizens who reside in

Bolivia, North Carolina. The Roberties purchased and installed Decking on their home in January/February, 2009. On August 13, 2014, the Roberties initially filed a Complaint in the United States District Court of the Eastern District of North Carolina. Within a year of filing the Complaint, they discovered that the Decking is defective and must be replaced, and that any other property damage caused by the Decking must be repaired.

(*Id.* ¶ 12.) For these two Plaintiffs, and others like them, these are the only specific allegations made, as opposed to general allegations made by "Plaintiffs."

[1]  That there are some cut and paste allegations in the OAC where there are twenty-five (25) Plaintiff fact sets is not itself noteworthy. However, when the cut and paste allegations, which provide only the most basic information, comprise most, if not all, of the individual allegations, it is noteworthy. The Court recognizes that there may exist causes of action where individual detail is not necessary. That is not the case for many of the causes of action asserted by Plaintiffs, as discussed throughout this Opinion.

Sixteen (16) of the twenty-three (23) remaining Plaintiff fact sets [2] further allege, in only a cursory one sentence or clause manner, that based upon "GAF's marketing" or its "representations" or the "quality" of the Decking that the Plaintiff "believed that the Decking was superior to other decking boards" or that they bought the decking because of the representations/marketing/quality. The allegations related to such representations are as follows:

- **Ross:** "Based upon GAF's marketing, at the time of purchase, Ross believed that the Decking was superior to other decking boards." (*Id.* ¶ 13.)

- **Sheridan:** "Based upon GAF's marketing, at the time of purchase, Sheridan believed that the Decking was superior to other decking boards in the industry and would require limited maintenance." (*Id.* ¶ 14.)

- **\*3  •  Denton:** "Mr. Denton purchased and installed Decking on his home in July, 2008 based upon

the representations regarding the quality of the Decking." (*Id.* ¶ 15.)

• **Hoover & Cohen:** "They purchased and installed Decking on their home in July, 2007 based upon the representations regarding the quality of the Decking." (*Id.* ¶ 16.)

• **Warren:** "Mr. Warren purchased and installed Decking on his home in the spring/summer of 2008 because of the representations regarding the quality of the Decking." (*Id.* ¶ 18.)

• **Narducci:** "Mr. Narducci purchased and installed Decking on his home in the spring/summer of 2008 based upon the quality and ease of use of the Decking." (*Id.* ¶ 19.)

• **Ernst:** "Mr. Ernst purchased and installed Decking on his home in the summer of 2007 based upon the representations regarding the quality of the Decking." (*Id.* ¶ 21.)

• **Turcheck:** "Mr. Turcheck purchased and installed Decking on his home in the spring of 2006 based upon the representations regarding the quality of the Decking." (*Id.* ¶ 23.)

• **Stidham:** "Mr. Stidham purchased and installed Decking on his home in the summer of 2008 based upon the representations regarding the quality of the Decking." (*Id.* ¶ 25.)

• **Williams:** "Mr. and Mrs. Williams purchased and installed Decking on their home in August, 2008 based upon the representations regarding the quality of the Decking." (*Id.* ¶ 26.)

• **Wolcott:** "Mr. Wolcott purchased and installed Decking on his home in July, 2006 based upon the quality of the representations regarding the Decking." (*Id.* ¶ 27.)

• **Khanna:** "Mr. Khanna purchased and installed Decking on his home in the winter and spring of 2009 based upon representations regarding the quality of the Decking." (*Id.* ¶ 29.)

• **Giovannetti:** "Mr. Giovannetti purchased and installed Decking on two separate areas of his home in July, 2009 and again in November 2009 based upon the representations regarding the quality of the Decking." (*Id.* ¶ 30.)

• **Shepherd:** "Mr. Shepherd purchased and installed Decking on his home in 2007 based upon the representations regarding the quality of the Decking." (*Id.* ¶ 32.)

• **Barker:** "Mr. Barker purchased and installed Decking on his home in 2006 based upon the representations regarding the quality of the Decking." (*Id.* ¶ 34.)

**Megerle:** "Megerle purchased and installed Decking on her home in 2008 based upon the representations regarding the quality of the Decking." (*Id.* ¶ 35.)

2    Plaintiffs Montante and the Benders have since been voluntarily dismissed from the case. (*See* ECF Nos. 51, 58 (respectively).)

None of these individuals allege any other facts regarding the representations or GAF's marketing materials with respect to their Decking purchases. Only Plaintiff McGovern adds any more detail to his allegations. He alleges that:

> Plaintiff Thomas McGovern ("McGovern") is an Indiana citizen and a resident of Fort Wayne, Indiana. Through a contractor, Mr. McGovern purchased and installed Decking on his vacation home in Mackinac Island, Michigan during June and July of 2008. By the summer of 2010, Plaintiff noticed that the Decking had separated due to expansion of the boards. Plaintiff also noticed that the Decking had become stained with mold and mildew. This required the Decking to be reconfigured and rebuilt using the existing boards. Plaintiff also had to scrub each board with bleach to get the mildew and resultant stains off before rebuilding. Despite Plaintiff's efforts, the Decking remains unsightly, warped, and stained. He has since discovered that the Decking is inherently defective and must be replaced, and that any other property damage caused by the Decking must be repaired. McGovern initially filed an action against GAF in this Court

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 62 of 207
PageID: 13079

In re: Elk Cross Timbers Decking Marketing, Not Reported in Fed. Supp. (2015)
2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

on August 21, 2014. Before filing that case, Plaintiff submitted a pre-suit demand to Defendant. Defendant has not paid all costs, labor, and damages associated with replacing the Cross Timbers Decking.

**\*4**  (*Id.* ¶ 17.)

Twenty-one (21) of the twenty-three (23) remaining Plaintiffs' complete individual allegations are seven (7) or fewer lines of the OAC. (*See id.* ¶¶ 11–27, 29–32, 34–35.) There are no other allegations specific to each Plaintiff in the OAC; rather, the remaining factual allegations are framed as "Plaintiffs" without differentiation.

### C. Photographs as Factual Allegations

In the OAC, Plaintiffs included photographs for thirteen (13) of the twenty-three (23) remaining Plaintiffs. (*See id.* ¶¶ 51–65.) GAF argues that such "[p]hotographs are not factual allegations" that should be considered when determining the sufficiency of the pleading. (*See* GAF Mot. at 19–20.) Plaintiffs counter that unlike the cases cited by GAF where the "purpose of including many of the photographs ... is unclear," here that is not the case because "Plaintiffs included an allegation that the photographs are a true and accurate representation of the respective Plaintiff's Decking." (Pls.' Opp'n at 9 n.7.) Plaintiffs miss the point. GAF is arguing that–without more–they cannot ascertain "what any of those pictures supposedly shows," and without such information, the photographs do not provide additional factual information. (GAF Reply at 2.) The Court agrees.

First, there is no information as to when the photos were taken. Second, although the Court could guess from some of the pictures what Plaintiffs are attempting to show, it is *Plaintiffs* who must actually make the allegations. Third, for some of the pictures, the Court cannot even guess (were that the standard–which it is not) what Plaintiffs are attempting to show. Thus, while the Court does not take issue with the inclusion of the photographs in the OAC, without a description of what Plaintiffs are attempting to show through the photographs (beyond that some of the Plaintiffs have some kind of decking), the photographs do not add anything useful for the Court's analysis.

## II. THE MOTION TO DISMISS

The OAC asserts twenty-eight (28) claims on behalf of twenty-five (25) Plaintiff fact sets. The named Plaintiffs in the OAC are from sixteen (16) different states. After GAF served its moving brief on May 20, 2015, Plaintiff Montante's claims were voluntarily dismissed. (ECF No. 51.) Plaintiff Montante was the only Plaintiff from Pennsylvania. The Benders' claims were also voluntarily dismissed. (ECF No. 59.) The Benders were from Iowa (*see* OAC ¶ 33); other Plaintiffs from Iowa remain in the case. After these dismissals and given the different state substantive laws that must be applied to the state law claims (*see infra* Section III), the OAC asserts approximately 139 different causes of action. [3] GAF purports to move to dismiss the OAC in its entirety. (*See* GAF Mot. at 4.)

[3]    The Court uses the term "claim" to refer to Plaintiffs' "Counts," such as "Negligence," as identified in the OAC. It uses the term "cause of action" to refer to the specific legal cause of action being brought–for example, a negligence claim under Michigan law on behalf of one or more plaintiffs.

**\*5**  The parties were afforded special briefing for the present motion. The parties each received eleven (11) weeks to prepare the moving and opposition briefs, and GAF was given forty-five (45) days to prepare and serve its reply. (*See* ECF No. 47.) Additionally, the parties were permitted to file moving and opposition briefs of fifty-five (55) pages each, and a reply of twenty (20) pages. (*See* ECF No. 41.) The parties both–very helpfully– submitted an exhibit with each brief containing a summary chart of the bullet point arguments related to each cause of action. The Court accepted these additional exhibits and has used them along with the briefs in considering the submissions.

By way of Plaintiffs' opposition, Plaintiffs conceded GAF's choice of law arguments, which GAF had presented in nine and a half pages of briefing. (*See* Pls.' Opp'n at 8 n.6; ECF No. 61–1 (Pls.' Args. in Opp'n to GAF's Mot. to Dismiss ("Pls.' Checklist")); GAF Mot. at 8–17.) Plaintiffs also did not oppose GAF's motion to dismiss numerous individual causes of action. [4] (*See* ECF No. 61–1 (Pls.' Checklist).) [5] As a result, Plaintiffs did not need to use their opposition to address these conceded arguments. Additionally, because the Pennsylvania causes of action were dismissed after GAF's briefing, but before Plaintiffs' opposition was due, Plaintiffs did not need to respond to GAF's arguments related to the Pennsylvania law causes of action. Thus, Plaintiffs had the

full fifty-five (55) pages of briefing to respond to a much smaller subset of arguments than were briefed by GAF.

4    The claims for which Plaintiffs are unopposed to dismissal are: Count 1 (Negligence–Stidham and Mapp); Count 2 (Indiana Consumer Protection Statute–McGovern); Count 3 (New Jersey Consumer Fraud Act–All Plaintiffs); Count 12 (Ohio Consumer Sales Practices Act–Burger); Count 21 (Breach of Implied Warranties–Williams, Denton, Sheridan, Ross, Khanna, Giovannetti, Wolcott); Count 23 (Fraudulent Misrepresentation–Stidham); Count 25 (Magnuson–Moss Warranty Act–Williams, Denton, Sheridan, Ross, Khanna, Giovannetti, Wolcott, only to the extent that these causes of action arise from their breach of implied warranty causes of action); Count 26 (Strict Products Liability–Stidham, Denton, Sheridan, Claxton, McGovern, Narducci, Mapp, Giovannetti, Shepherd, Burger, Wolcott); Count 27 (Unjust Enrichment–Claxton, McGovern, Narducci). (*See* ECF No. 61–1 at 1, 3–7 (Pls.' Checklist).) These claims, therefore, are dismissed with prejudice.

5    Exhibit 1, attached to this Opinion identifies the causes of action in the OAC that were either conceded by Plaintiffs or have been voluntarily dismissed. Exhibit 1 follows the OAC; the parties' checklists do not in all respects.

Although the Court commends the parties' efforts to address all the issues, the Court does require that a party actually address an issue that it either is purportedly moving on or opposing. The Court cannot and will not consider arguments in the abstract separated from the specific claim at issue unless the party can demonstrate that the elements of the particular claim are somehow irrelevant to the argument being made. Such abstract arguments improperly attempt to make the Court an attorney for the parties. The Court thus will only consider arguments and related law presented by the parties, both of whom are well-represented.

Likewise, the Court finds citations to cases analyzing state law, that are not the state law at issue, unhelpful without some explanation for how such law is relevant. For example, there are no Plaintiffs from New Jersey and the parties agree that New Jersey substantive law does not apply to any claim. (*See infra* Section III.) Yet, both parties revert for some arguments to citations to Third Circuit and District of New Jersey cases

analyzing New Jersey substantive law. (*See, e.g.,* GAF Mot. at 42; Pls.' Opp'n at 42–43.) There are even citations to New Jersey statutes in support of some arguments. (*See, e.g.,* Pls.' Opp'n at 38 (citing N.J.S.A. 12A:2–719(2)).)

 *6  The Court finds it acceptable to not list all elements of every single cause of action if GAF is moving related to arguments regarding only one or some of the elements. But GAF must, at a minimum, identify the element at issue and cite to cases analyzing relevant state law in support of its argument. And Plaintiffs, in opposition, must respond with relevant state law for each state moved on. Both GAF and Plaintiffs cited to a plethora of state law using single space string cite footnotes in support of limited body text. (*See, e.g.,* GAF Mot. at 25 n.15; Pls.' Opp'n at 34 n.41.) The Court has accepted such citations for purposes of this motion even though they effectively extended the page limits as ordered by this Court. Especially given this, failure to provide specific state law on an issue– which both parties demonstrated could be done in little space– is not acceptable.

For these reasons, the Court has treated GAF's motion as a partial motion to dismiss as GAF has not specifically moved on each cause of action. [6] Likewise, where Plaintiffs chose not to brief an issue for a specific state in opposition, that issue has been treated as unopposed, unless a general appropriate argument in opposition was made.

6    The Court finds that GAF has failed to move on specific causes of action in three ways: (1) the cause of action is not included on the checklist or argued anywhere in the brief (*see, e.g.,* ECF No. 60–2 (GAF's Checklist of Args. ("GAF's Checklist")) (Negligence for Montana), (2) GAF "moves" simply by claiming "all plaintiffs" fail "to plead with particularity" without citing to the relevant state law elements and explaining how any element has not been met (*see, e.g., id.* ("All Causes of Action," Negligent Misrepresentation, Fraudulent Misrepresentation)), or (3) GAF does not provide any law or analysis related to a specific state cause of action (*see, e.g., infra* Section V.B.6).

Finally, for many, if not most, of the individual causes of action, GAF makes multiple, alternative arguments for dismissal, generally for failure to plead what it argues is a required element of the cause of action. While the Court need not reach alternative arguments once it has determined that a cause of action should be dismissed on another basis,

In re: Elk Cross Timbers Decking Marketing, Not Reported in Fed. Supp. (2015)
2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

the Court is mindful that the OAC will be amended, that there likely will be another motion to dismiss, and that there is parallel briefing presently underway in a related matter. Therefore, in the interests of judicial efficiency and case management, the Court has considered the failure to plead arguments where specifically addressed by the parties. If, however, a cause of action is dismissed *with prejudice* on one basis, the Court has not considered alternative arguments.

With this background, the Court turns to the parties' arguments.

## III. CHOICE OF LAW

GAF argues that the law to be applied to Plaintiffs' state claims is the substantive law of the state where each Plaintiffs' decking was installed. (*See* GAF Mot. at 8–17.) However, with respect to whether those claims are properly pled,

GAF argues that federal procedural law of the Third Circuit applies. (*Id.* at 17.) "Plaintiffs agree with GAF that the substantive laws of the Plaintiffs' state where the Decking was installed applies." (Pls.' Opp'n at 8 n.6.) They also agree that "[r]egarding matters of procedure, the transferee court must apply federal law as interpreted by the court of the district where the transferee court sits." (*Id.*)

Therefore, the parties agree on the choice of law to be applied, and this Court will apply the substantive law where the decking was installed. Table 1 below identifies the substantive law to be applied to the state law claims of the current named plaintiffs.

*TABLE 1*

| Plaintiffs | Applicable State Law |
|---|---|
| Ken Burger (OAC ¶ 11) | Ohio |
| Frederick & Veronica Robertie ("Robertie") (Id. ¶ 12) | North Carolina |
| John Ross (Id. ¶ 13) | Missouri |
| Chad Sheridan (OAC ¶ 14) | Iowa |
| Charles Denton (Id. ¶ 15) | Iowa |
| Robert Hoover & Judy Cohen ("Hoover & Cohen") (Id. ¶ 16) | Montana |
| Thomas McGovern (Id. ¶ 17) | Michigan |
| Harrison Warren (Id. ¶ 18) | Nebraska |
| Michael Narducci (Id. ¶ 19) | Michigan |
| Leanne Claxton (Id. ¶ 20) | Michigan |
| Jeff Ernst (Id. ¶ 21) | Illinois |
| Dorothy Kaiser (Id. ¶ 22) | Colorado |
| Dennis Turcheck (Id. ¶ 23) | Colorado |
| Christine Tuthill (Id. ¶ 24) | Colorado |
| John Stidham (Id. ¶ 25) | Indiana |

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 65 of 207
PageID: 13082
In re: Elk Cross Timbers Decking Marketing, Not Reported in Fed. Supp. (2015)
2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

| | |
|---|---|
| Arnold and Cathy Williams ("Williams") (Id. ¶ 26) | California |
| James Wolcott (Id. ¶ 27) | Virginia |
| Samir Khanna (Id. ¶ 29) | New Hampshire |
| Mark Giovannetti (Id. ¶ 30) | New York |
| Donna and Johnathan Mapp ("Mapp") (Id. ¶ 31) | Mississippi |
| John Shepherd (Id. ¶ 32) | North Carolina |
| Paul Barker (Id. ¶ 34) | Colorado |
| Michele Megerle (Id. ¶ 35) | Colorado |

After concessions and the voluntary dismissals, approximately 119 causes of action remain for the Court's consideration.

## IV. LEGAL STANDARDS.

### A. Standards

**\*7** Under Rule 8(a), for a complaint to survive dismissal, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* In determining the sufficiency of a complaint, the Court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party. *See Burtch v. Milberg Factors, Inc.,* 662 F.3d 212, 221 (3d Cir.2011). But, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal,* 556 U.S. at 678. Thus, "a plaintiff's obligation to provide the grounds for his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Burtch,* 662 F.3d at 220 (quoting *Twombly,* 550 U.S. at 555) (alteration in *Twombly* ).

Pursuant to Federal Rule of Civil Procedure 9(b):

> [A] plaintiff alleging fraud must state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which [it is] charged. To satisfy this standard, the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation.

*Frederico v. Home Depot,* 507 F.3d 188, 200 (3d Cir.2007) (internal quotations and citations omitted, alteration in original). Thus, where fraud is alleged, this heightened pleading standard must be met. Furthermore, in class action cases, each "individually named plaintiff must satisfy Rule 9(b) independently" so "[t]he complaint should therefore contain sufficient detail as to [a named plaintiff's] claims to apprise [a defendant] of that plaintiff's exact grounds for relief and the specific conduct that plaintiff charges." *Pacholec v. Home Depot USA, Inc.,* 2006 WL 2792788, *2 (D.N.J. Sept. 26, 2006)* (alteration in original); *see also Crozier v. Johnson & Johnson Consumer Cos., Inc.,* 901 F.Supp.2d 494, 506 (D.N.J.2012) (same).

### B. Applicable Standard for Plaintiffs' Claims

GAF argues that the heightened pleading standards of Rule 9(b) apply to most of Plaintiffs' remaining state consumer protection claims (Counts 2, 4–10, 13–14, 16–19). (*See* GAF Mot. at 25 & n.15.) GAF also argues that Rule 9(b) applies to Plaintiffs' claims of negligent misrepresentation (Count 22), fraudulent misrepresentation (Count 23), and fraudulent concealment/omission (Count 24). (*Id.* at 20–21.)

In re: Elk Cross Timbers Decking Marketing, Not Reported in Fed. Supp. (2015)

Case 1:19-md-02875-RMB-SAK   Document 598-4   Filed 10/16/20   Page 66 of 207
PageID: 13083

2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

Plaintiffs do not contest that Rule 9(b) applies to their California and Colorado consumer protection claims (Counts 9, 16–17), but they do dispute that it applies to its other consumer protection claims. (Pls.' Opp'n at 10–12.) Plaintiffs' also contest that Rule 9(b) applies to their negligent misrepresentation causes of action. (*Id.* at 10.)

### 1. *State Consumer Protection Claims*

GAF asserts that "[t]he Third Circuit and this Court have held that Rule 9(b) applies not only to common law misrepresentation claims but also to state statutory consumer protection claims pled in federal court." (GAF Mot. at 25 (citing *Frederico,* 507 F.3d at 200; *Glauberzon v. Pella Corp.,* 2011 WL 1337509, at *8 (D.N.J. Apr. 7, 2011); *Dewey v. Volkswagen AG,* 558 F.Supp.2d 505, 526 (D.N.J.2008).) The Court first notes that GAF concedes that Rule 8(a) applies to Plaintiffs' New York consumer protection claim (Count 15). (*See id.* at n.15.) Thus, if GAF believed that the Third Circuit had ruled that Rule 9(b) applied to *all* state consumer protection claims–without regard to the actual requirements of the state cause of action–it would not have conceded that Rule 8 applies to the New York claim. In fact, application of federal procedural law does not mean that the underlying state law is irrelevant. Very recently, the Third Circuit clearly made this point. *See In re Asbestos Prods. Liab. Litig.,* 611 F. App'x 86 (3d Cir.2015) (unpublished). The Third Circuit stated:

> **\*8** Federal Rule of Civil Procedure 8(a) requires a plaintiff to allege sufficient facts to put the defendant on "fair notice of what the ... claim is and the grounds upon which it rests." [*Twombly,* 550 U.S. at 555.] **We must look to state law, however, to define "what the ... claim is."**

> As the District Court recognized, Illinois is a "two disease" state, meaning that each asbestos-related disease gives rise to a cause of action with a separate statute-of-limitations period. *Taken together, federal procedural law and Illinois substantive law* thus required Plaintiffs to plead sufficient facts to support their lung-cancer claims separately from their nonmalignancy claims [regardless of how state courts require them to be pled].

*Id.* at 89–90 (other internal citations omitted, emphasis added).

Similarly, where this Court has previously held that Rule 8(a) applies to New York consumer protection claims under § 349–see *Wiseberg v. Toyota Motor Corp.,* 2012 WL 1108542

at *4 (D.N.J. Mar. 30, 2012) (a case cited by GAF, *see* GAF Mot. at 26 n.15)–it cited to a Second Circuit case, which engaged in an analysis similar to that of the Third Circuit above. *See id.* (citing *Pelman ex rel. Pelman v. McDonald's Corp.,* 396 F.3d 508, 511 (2d Cir.2005)). In *Pelman,* the Second Circuit reasoned that "*because § 349 extends well beyond common-law fraud* to cover a broad range of deceptive practices, *and because a private action under § 349 does not require proof of the same essential elements (such as reliance) as common-law fraud*, an action under § 349 is not subject to the pleading-with-particularity requirements of Rule 9(b)." *Pelman,* 396 F.3d at 511 (internal citations omitted, emphasis added). For these reasons, the Court disagrees with GAF that it is appropriate to apply a blanket approach to whether the heightened pleading standards of Rule 9(b) apply without reference to the specific state law at issue.

Plaintiffs argue that "[i]n addition to New York, formulaic compliance with Rule 9(b) is not required for the purpose of pleading consumer protection claims in Indiana, Michigan, Missouri, Illinois, Virginia, North Carolina, Ohio, Nebraska, Iowa, Montana or New Hampshire." (Pls.' Opp'n at 11–12 (citing to law analyzing the statutes at issue).) Plaintiffs concede that Rule 9(b) applies to the consumer protection claims for California and Colorado. (*Id.* at 12.) Thus, the parties agree that Rule 8(a) applies to Plaintiffs' New York consumer protection claim (Count 15), and that Rule 9(b) applies to Plaintiffs' California and Colorado consumer protection claims (Counts 9, 16–17). However, they disagree on the appropriate pleading standard for the other state consumer protection claims.

Although GAF relied primarily on its general Third Circuit argument, it did provide a footnote with case citations for the specific contested states. (*See* GAF Mot. at 25–26 n.15.) Therefore, the Court has considered this issue for all of the contested states. Because the cases cited by both parties raise state specific issues, the Court has addressed which standard is appropriate in the consumer protection discussion section (*see infra* Section V.B.) related to the specific state consumer protection claims.

### 2. *Negligent Misrepresentation Causes of Action*

**\*9** Both parties argue in the abstract with respect to whether Plaintiffs' negligent misrepresentation claims for fourteen (14) states must meet the heightened pleading standards

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 67 of 207
PageID: 13084

In re: Elk Cross Timbers Decking Marketing, Not Reported in Fed. Supp. (2015)
2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

of Rule 9(b). GAF argues that "[t]his heightened pleading standard applies not only to fraudulent misrepresentation claims but also to negligent misrepresentation claims." (GAF Mot. at 21 (citing *Dist. 1199P Health & Welfare Plan v. Janssen, L.P.,* 784 F.Supp.2d 508, 532 (D.N.J.2011) (analyzing New Jersey law).) Plaintiffs, on the other hand, argue that "all states do not require pleading negligent misrepresentation in satisfaction of Rule 9(b)" using a "*see, e.g.*" cite for cases regarding only two (Colorado and New York) of the state laws at issue. (Pls.' Opp'n at 10 & n.10.)

The Court does not view GAF to have properly raised this issue for any state, or Plaintiffs to have properly raised that Rule 8 should be applied, except by example. GAF has not properly moved to dismiss any of Plaintiffs' negligent misrepresentation causes of action for failure to meet either pleading standard as it has not pointed to any of the relevant state's requirements as compared to Plaintiffs' allegations. Therefore, the Court will not reach this issue at this time. The Court does note that simple citation to *District 1199P* will be insufficient to establish that the Third Circuit (and hence this Court) would apply Rule 9(b) to all the negligent misrepresentation causes of action. The Court also notes that the two cases cited by Plaintiffs argue against application of Rule 9(b) for those states. *See Conrad v. Educ. Res. Inst.,* 652 F.Supp.2d 1172, 1183 (D.Colo. Aug. 13, 2009) ("The theory of liability for negligent misrepresentation is one of negligence, rather than of intent to mislead. Thus, a claim for negligent misrepresentation should not be governed by the pleading standards set forth in Rule 9(b).") (internal citations omitted); *In re LILCO Sec. Litig.,* 625 F.Supp. 1500, 1504 (E.D.N.Y.1986) ("Negligent misrepresentation is not a claim that necessitates the particularized pleading of Rule 9(b).").

## V. DISCUSSION

### A. GAF's Arguments That Certain Causes of Action Are Time Barred

#### 1. *Untimely as a matter of law*

GAF argues that "many of Plaintiffs' claims are untimely." (GAF Mot. at 26.) Specifically, GAF argues that the following causes of action are time barred *as a matter of law*: breach of implied warranties cause of action (Count 21) under Illinois law and the negligence (Count 1), UDTPA (Count 10), negligent misrepresentation (Count 22), fraudulent misrepresentation (Count 23), fraudulent concealment (Count 24), and unjust enrichment (Count 27)

causes of action[7] for North Carolina (Plaintiff Shepherd only). (*See id.* at 35, 54.)

[7]     Plaintiffs do not oppose dismissal of Plaintiff Shepherd's strict liability cause of action. (*See* ECF 61–1 at 7 (Pls.' Checklist).)

**Illinois (Count 21).** "The statute of limitations for breach of implied warranties [under Illinois law] (Count 21) is four years from 'when tender of delivery is made.' " (*Id.* at 35 (quoting 810 Ill. Comp. Stat. 5/2–725).) Additionally, "[t]he statute runs from the time of *delivery* of the good, regardless of when the defect is discovered–that is, the 'discovery rule' does not apply in claims for breach of implied warranty." *Karpowicz v. General Motors Corp.,* 1997 WL 285943 at *5 (N.D.Ill. May 23, 1997) (citing 810 ILCS 5/2–725(1)) (emphasis added). Plaintiffs do not respond to this argument in opposition. (*See* Pls.' Opp'n at 25–34.[8]) The OAC alleges that Plaintiff Ernst "purchased and installed Decking on his home in the summer of 2007," and that he "initially filed a Complaint in the United States District Court of the Northern District of Illinois" on August 19, 2014, approximately seven (7) years later. (OAC ¶ 21.) Therefore, the Court finds that Plaintiff Ernst's breach of implied warranty claim is time barred on the face of the OAC, and, therefore, this cause of action is dismissed with prejudice.

[8]     The only Illinois case cited by Plaintiffs, *Beaudette by Beaudette v. Illinois Indus. Comm'n,* 719 N.E.2d 191, 192–93 (Ill.Ct.App.1999), did not address the statute at issue or address the discovery rule.

**\*10 North Carolina (Plaintiff Shepherd only) (Counts 1, 10, 22–24, 27).**[9] For these causes of action, the parties dispute the applicable statute of limitations. GAF argues that "[f]or claims alleging injury from a product and accruing before October 1, 2009, North Carolina's statute of repose is 'six years after the date of initial purchase for use or consumption.' " (GAF Mot. at 35 (quoting N.C. GEN. STAT. § 1–50(a)(6) (2009), *repealed* by § 1–46.1).) Plaintiffs, on the other hand, argue that "[t]he applicable statute is N.C. GEN. STAT. § 1–46.1, which became effective October 1, 2009, and applies a twelve year statute of repose to claims accruing on or after that date." (Pls.' Opp'n at 33.) Plaintiffs further argue that "§ 1–46.1 applies because Plaintiff Shepherd's claims did not *accrue* until after October 1, 2009." (*Id.* (emphasis added) (citing *Schenkel & Shultz, Inc. v. Hermon F. Fox & Assoc., P.C.,* 636 S.E.2d 835, 840 (N.C.Ct.App.2006) and *New Bern Assoc. v. Celotex Corp.,* 87 N.C.App. 65, 70, *disc. rev. denied,*

321 N.C. 297 (1987), for the proposition that the "accrual" date is the date of discovery).)

9          GAF only moved that the North Carolina breach of implied warranty cause of action was time barred *as pled*. (*See* GAF Mot. at 33.)

Plaintiffs' cases do not analyze the causes of action at issue. *See Schenkel*, 636 S.E.2d at 839 ("[A] statutory 'discovery rule' offers a claimant additional time in *certain* contract or negligence actions to have the opportunity to discover the harm before *the three-year statute of limitation* s begins to accrue.") (citing, *e.g.,* N.C. GEN. STAT. § 152(16) (2005) ("for personal injury or physical damage to claimant's property") (emphasis added) and N.C. GEN. STAT. § 1–15(c) (2005) ("a cause of action for malpractice")); *New Bern,* 87 N.C.App. at 70 ("A cause of action for physical damage to property accrues when the physical damage becomes 'apparent or ought reasonably to have become apparent to the claimant, whichever event first occurs.' ") (quoting N.C. GEN. STAT. § 1–52(16)). Instead, Plaintiffs use these cases to argue that the action "accrued" only when Plaintiff Shepherd discovered the defect, which he alleges to have been after October 1, 2009. (*See* Pls.' Opp'n at 33–34; OAC ¶ 32.) However, Plaintiffs' conclusion with respect to the appropriate date of "accrual" is drawn from the plain language of the statutes at issue in the cases Plaintiffs cite, not from the statute that they argue applies here.

Section 1–52(16), cited in Plaintiffs' cases, provides:

> Within three years an action–... (16) Unless otherwise provided by law, for personal injury or physical damage to claimant's property, the cause of action, except in causes of actions referred to in G.S. 1–15(c), *shall not accrue until bodily harm to the claimant or physical damage to his property becomes apparent or ought reasonably to have become apparent to the claimant*, whichever event first occurs....

(emphasis added). Section 1–15(c) provides:

> (c) Except where otherwise provided by statute, a cause of action for malpractice arising out of the performance of or failure to perform professional services *shall be deemed to accrue at the time of the occurrence of the last act of the defendant giving rise to the cause of action*: Provided that whenever there is bodily injury to the person, economic or monetary loss, or a defect in or damage to property which originates under circumstances making the injury, loss, defect *or damage not readily apparent to the claimant at the time of its origin, and the injury, loss, defect or damage is discovered or should reasonably be discovered by the claimant* two or more years after the occurrence of the last act of the defendant giving rise to the cause of action, suit must be commenced within one year from the date discovery is made: Provided nothing herein shall be construed to reduce the statute of limitation in any such case below three years. Provided further, that in no event shall an action be commenced more than four years from the last act of the defendant giving rise to the cause of action....

**\*11**  (emphasis added.) In comparison, § 1–46.1, which Plaintiffs argue is applicable here (and which came into effect October 1, 2009), provides:

> Within 12 years an action–(1) No action for the recovery of damages for personal injury, death, or damage to property based upon or arising out of any alleged defect or any failure in relation to a product shall be brought more than 12 years *after*

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

In re: Elk Cross Timbers Decking Marketing, Not Reported in Fed. Supp. (2015)

2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 69 of 207
PageID: 13086

the date of initial purchase for use or
consumption.

(emphasis added). The plain language of § 1–46.1 does not
comport with Plaintiffs' view of when the cause of action
"accrued" in this case. Section 1–46.1's predecessor, § 150(a)
(6), provided a six, not twelve, year limitations period from
the purchase date. *See Patterson v. McKinley Med., L.L.C.,
2011 WL 1260145, at *1 (E.D.N.C. Mar. 30, 2011).*

In a North Carolina case analyzing the statutes at issue
here–§ 1–50(a)(6) versus § 1–46.1, the court agreed "that
the applicable statute of repose is N.C. Gen.Stat. § 150(a)
(6), which was in effect at the time Plaintiff *purchased* the
allegedly defective product." *See Lackey v. DePuy Ortho.,
Inc., 2011 WL 2791264, at *2 (W.D.N.C. July 14, 2011)*
(emphasis added); *see also Patterson., 2011 WL 1260145 at
n.1* ("The amending legislation [for § 1–46.1] states: This
act becomes effective October 1, 2009, and applies to causes
of action that accrue on or after that date ....") (internal
quotations omitted). The *Lackey* court further held that § 1–
50(a)(6) "functions as an 'unyielding and absolute barrier' to
claims brought more than six years after the product at issue
was purchased." *Lackey, 2011 WL 2791264, at *3* (quoting
*Nat'l Property Investors, VIII v. Shell Oil, 950 F.Supp. 710,
713 (E.D.N.C.1996).* Thus, the *Lackey* court held that "[i]n
sum, N.C. Gen.Stat. § 1–50(a)(6) set the fixed time limit at six
years from the time of the product's sale or delivery beyond
which DePuy cannot be liable for a product sold in 1998." *Id.
at *4* (holding that the purchase date for a defective prosthetic
hip controlled which limitations period applied).

Plaintiff Shepherd alleges that he "purchased and installed
Decking on his home in 2007." (OAC ¶ 32.) Therefore,
§ 1–50(a)(6), the statute in effect at the time of his
purchase, applies. Because he purchased the decking
more than six (6) years prior to bringing suit, Plaintiff
Shepherd's negligence, UDTPA, negligent misrepresentation,
fraudulent misrepresentation, fraudulent concealment, and
unjust enrichment causes of action are time barred, and will
be dismissed with prejudice.

### 2. *Untimely as pled*

GAF argues that the following additional causes of action
are time-barred *as pled* because of insufficient allegations of
fraudulent concealment to toll the limitations period. [10]

[10]    In reply, GAF withdraws its argument at this time
that Plaintiffs' Virginia Consumer Protection Act
claim (Count 7), California False Advertising Law
claim (Count 16), and California Consumer Legal
Remedies Act (Count 17) are time-barred. (*See*
GAF Reply at 6 n.4.)

- **Count 2** (Indiana Deceptive Consumer Sales Act–
Stidham)

- **Count 8** (Montana Consumer Protection Act–Hoover &
Cohen)

- **Count 15** (New York General Business Law § 349–
Giovannetti)

*12   • **Count 18** (Nebraska Consumer Protection Act–
Warren)

- **Count 21** (Breach of Implied Warranties–Williams,
Denton, Sheridan, Ross, Warren, Khanna, Giovannetti,
Robertie, Shepherd, Wolcott)

- **Count 22** (Negligent Misrepresentation–Mapp)

- **Count 23** (Fraudulent Misrepresentation–Mapp)

- **Count 27** (Unjust Enrichment–McGovern, Narducci,
Claxton, Mapp, Warren, Wolcott)

(*See* GAF Mot. at 29–34.) [11]

[11]    In reply, GAF argues for the first time that many
of these claims should be dismissed as time-barred
*as a matter of law*. (*See* GAF Reply at 7–9.) GAF
very clearly identified in its motion–in two separate
places–the causes of action for which it was moving
on as time-barred as a matter of law versus on
the basis of a pleading failure due to insufficient
allegations of fraudulent concealment. (*See* GAF
Mot. at 35–36, 54 ("In addition, many of Plaintiffs'
claims suffer from additional incurable deficiencies
that warrant dismissal with prejudice .... the
following claims are time-barred as a matter of law
because the applicable states' laws do not recognize
any tolling even if fraudulent concealment had been
adequately pled: the Illinois claims for breach of
implied warranties; Mr. Shepherd's tort (Counts
1, 22–24, 26), UDTPA (Count 10) and unjust
enrichment (Count 27) claims in North Carolina;

In re: Elk Cross Timbers Decking Marketing, Not Reported in Fed. Supp. (2015)
2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 70 of 207
PageID: 13087

and the OCSPA (Count 12) claim in Ohio.").) The Court will not address GAF's arguments, first made in reply, that additional causes of action should be dismissed as a matter of law.

Plaintiffs do not contest the limitation periods put forward by GAF (except with regard to North Carolina for Plaintiff Shepherd as discussed above in Section V.A.1). Instead, Plaintiffs argue that the relevant periods under state law will be tolled because of "the discovery rule and the doctrine of equitable estoppel/fraudulent concealment." (Pls.' Opp'n at 26 & nn.36–38.) Plaintiffs further argue–and this Court agrees– that "[a] motion to dismiss on statute of limitations grounds should be denied unless it is apparent [from the OAC's allegations] that the challenged claims are time-barred." (*Id.* at 25 (citing *Barefoot Architect, Inc. v. Bunge,* 632 F.3d 822, 835 (3d Cir.2011)).) As the Third Circuit has recently stated with respect to the discovery rule:

> [W]hile a court may entertain a motion to dismiss on statute of limitations grounds, it may not allocate the burden of invoking the discovery rule in a way that is inconsistent with the rule that a plaintiff is not required to plead, in a complaint, facts sufficient to overcome an affirmative defense. This distinction comes to the fore here, where the applicability of the discovery rule is not evident on the face of the complaint but the plaintiff also does not plead facts that unequivocally show that the discovery rule does not apply.

*Schmidt v. Skolas,* 770 F.3d 241, 251 (3d. Cir.2014) (internal citations omitted). Here, although GAF argues that Plaintiffs have not affirmatively pled facts sufficient to justify tolling for the causes of action in the bullet list above, the Court finds that Plaintiffs have not "pleaded [themselves] out of court" because their allegations do not affirmatively demonstrate on the face of the OAC that tolling would not apply. *See id.* at 252. Thus, the Court denies GAF's motion to dismiss the above causes of action on the ground that they are time-barred *as pled*. GAF is not precluded from re-raising this issue at an appropriate stage of the proceedings.

### 3. *Magnuson–Moss Warranty Act ("MMWA")*

**\*13** GAF also argues that for Plaintiffs' implied warranty causes of action that are time-barred "their Magnuson–Moss claims based on that implied warranty are also time-barred because Magnuson–Moss borrows its limitations period from the applicable state statute." (GAF Mot. at 34.) Plaintiffs concede that, if their state warranty claims are time-barred, so too are their MMWA claims based on those warranties. (*See* ECF No. 61–1 at 6 (Pls.' Checklist).) Thus, as Plaintiffs did not oppose dismissal of the California (Williams), Iowa (Denton, Sheridan), Missouri (Ross), New Hampshire (Khanna), New York (Giovannetti), and Virginia (Wolcott) Plaintiffs' breach of implied warranty claims, and this Court has dismissed the Illinois breach of implied warranty cause of action as time-barred, the Court finds that the MMWA claims based on these implied warranty claims also are dismissed.

### B. Plaintiffs' Consumer Protection Claims

As noted above, GAF generally argues that all the consumer protection claims, except for that of New York, should be dismissed for failure to meet the Rule 9(b) pleading standards. (*See* GAF Mot. at 25 & n.15.) However, GAF has not made any argument for how the OAC is insufficiently pled with respect to any of the specific consumer protection claims under the applicable state law. Therefore, despite GAF's statement that "[a]t the outset, ***and before applying each state's substantive laws,*** all Plaintiffs' claims must meet the appropriate federal pleading standards .... [and] Plaintiffs have failed to satisfy the pleading standards" (*see id.* at 17), this Court does not treat GAF's motion as moving on that basis for these claims.

The parties' arguments over which pleading standard applies, however, raises separate pleading issues for certain states because some courts find that different pleading standards apply depending on the basis for the claims. In other words, some statutes provide for relief without proving fraud. Because the pleading standard arguments are specifically addressed by both parties and will inform any re-pleading, those arguments are addressed below, along with other specific arguments for dismissal made by GAF for these claims. [12]

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 71 of 207
PageID: 13088

In re: Elk Cross Timbers Decking Marketing, Not Reported in Fed. Supp. (2015)

2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

12    Arguments that a claim is time-barred are addressed in Section V.A, and not re-addressed in this section.

### 1. Count 2 (Indiana Deceptive Consumer Sales Act ("IDCSA"))

GAF argues that Plaintiffs' IDCSA claim must meet the heightened pleading standard of Rule 9(b). (*See id.* at 25 n.15) GAF also argues that the IDCSA claim should be dismissed for failure to plead "either that the deceptive act is incurable or that the plaintiff notified the defendant in writing and provided an opportunity to cure the deceptive act," and that "Indiana Plaintiffs allege neither fact here." (*Id.* at 49 (citing Ind.Code § 24–5–0.5–5(a)).) Both arguments are related.

*Young v. Harbor Motor Works, Inc.*, provides that "[u]nder the IDCSA, where a movant ... [does] not distinguish between its allegations of deceptive acts and incurable deceptive acts ... the entire complaint must be judged by Rule [9(b) ] standards." 2009 WL 187793 at *6 (N.D. Ind. Jan 27, 2009) (internal quotations omitted, alteration in original). Additionally, Indiana Code § 24–5–0.5–5(a) provides: "No action may be brought under this chapter ... unless (1) the deceptive act is incurable or (2) the consumer bringing the action shall have given notice in writing to the supplier....." Plaintiff acknowledges this requirement by quoting the same provision in opposition. (*See* Pls.' Opp'n at 15.) However, Plaintiffs are unable to clearly identify what they are alleging– an incurable deceptive act or a deceptive act where notice is required.

In arguing that the Rule 9(b) standards are not applicable to their IDCSA claim, Plaintiffs cite *Hayes v. Chapman*, 894 N.E.2d 1047, 1053 (Ind.Ct.App.2008), and add the following parenthetical explanation: "holding no showing of fraudulent intent is required **for Indiana Deceptive Consumers Sales Act.** ***Ind.Code § 24–5–0.5–2(7)*** )." (*Id.* at 11 n.12 (emphasis added).) Section 24–5–0.5–2(7) deals with "uncured deceptive act[s]" for which notice is required; *see also Hayes,* 894 N.E.2d at 1053 (distinguishing between "[a]n uncured deceptive act" under "I.C. § 24–5–0.5–2(a)(7)" and "[a]n incurable deceptive act" under "I.C. § 24–5–0.5–2(a)(8).")[13] However, a few pages farther in Plaintiffs' opposition, and Plaintiffs–in addressing GAF's notice requirement point– argue that "[i]n fact, the IDCSA defines '***incurable deceptive act***' as meaning 'a deceptive act done by a supplier as part of a scheme, artifice, or

device with intent to defraud or mislead.' ***Ind.Code. § 24–5–0.5–2(8)***. As discussed herein, ***the OAC contains ample allegations that GAF acted with an intent to deceive or mislead*** Plaintiffs." (Pls.' Opp'n at 15–16 (citing a different provision than they relied on for their Rule 8(a) argument) (emphasis added).)

13    The Indiana Supreme Court has held that "the language and structure of the Act do not require intent as an element of every deceptive act." *McKinney v. State*, 693 N.E.2d 65, 68 (Ind.1998).

**\*14** Plaintiffs cannot have it both ways: either they are pleading an uncured defect– which has a notice requirement but potentially lower pleading standard, or they are pleading an incurable deceptive act which does not have a notice requirement but must meet 9(b). And, because even Plaintiffs are not clear on the basis for their IDCSA claim, the pleadings are obviously insufficient to put GAF on notice of the basis of the claim. Therefore, Plaintiffs' IDCSA claim is dismissed without prejudice.

### 2. Count 4 (Michigan Consumer Protection Act ("MCPA")

For Plaintiffs' MCPA claim, GAF's only argument is generally that Rule 9(b) must be met. (*See* GAF Mot. at 25 & n.15; ECF 60–2 (GAF's Checklist of Arguments ("GAF's Checklist")).) Plaintiff argues that meeting Rule 9(b) is not required for an MCPA claim. (*See* Pls.' Opp'n at 11 & n.13 (citing *Michels v. Monaco Coach Corp.*, 298 F.Supp.2d 642, 651 (E.D.Mich.2003).) As an initial point, "[t]he Michigan Consumer Protection Act [ ('MCPA') ] proscribes thirty-seven discrete acts." *Dzielak v. Whirlpool Corp.*, 26 F.Supp.3d 304, 339 (D.N.J.2014) (citing Mich. Comp. Laws § 445.903). Furthermore, "[t]o state a claim under the [MCPA], a complaint must identify which proscribed act or acts the defendant has allegedly committed." *Id.* Here, Plaintiffs allege that GAF's conduct violates §§ 445.903(n), (s), (bb), and (cc), but add that their claims are "not necessarily limited to [those] sections." (OAC ¶ 147.) Plaintiffs' "not necessarily limited" language does not sufficiently state a claim for unidentified sections of the MCPA. However, Plaintiffs' case supports the proposition that not all proscribed acts must meet the heightened pleading standard. *See Michels*, 298 F.Supp.2d at 651 (MCPA claim "not premised on fraud," but on "breach of its express and implied warranties" under 445.903(y)). GAF's case is in agreement: "When the claim is based on breach of express or implied warranties, these

2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

pleading strictures do not apply but otherwise, the allegations must include the specificity required by Fed.R.Civ.P. 9(b)." *In re Packaged Ice Antitrust Litig.,* 779 F.Supp.2d 642, 666 (E.D.Mich.2011). Section 445.903(y), however, is not one of the sections on which Plaintiffs' claims are based. Therefore, Plaintiffs' citation is not helpful here. Because the parties do not address which standard should apply to the alleged violations actually pled, the Court will not reach this issue at this time.

Also, because GAF did not specifically argue how Plaintiffs' MCPA claim failed to meet either pleading standard, and Plaintiffs have identified specific proscribed acts, the Court will not dismiss this claim at this time. Because the Court is treating this claim as unmoved for failure to meet the appropriate pleading standard, GAF is not precluded from arguing that any amended pleading fails to meet the standard.

### 3. *Count 5 (Missouri Merchandising Practices Act ("MMPA"))*

Plaintiffs argue that "[a] claim alleging violations of the Missouri Merchandising Practices Act does not necessarily need to be stated with the same particularity as a claim of common law fraud or mistake." (Pls.' Opp'n at 11 n.14 (quoting *Ullrich v. CADCO, Inc.,* 244 S.W.3d 772, 777 (Mo.Ct.App.2008)).) However, the full sentence in that cases provides: "Although **Rule 55.15** requires that in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity, a claim alleging violations of the MMPA does not necessarily need to be stated with the same particularity as a claim of common law fraud or mistake." *Ullrich,* 244 S.W.3d at 777 (internal quotations omitted, emphasis added).[14] Rule 55.15 is a Missouri rule of procedure. Citation to a case analyzing state procedural rules is not persuasive.

[14]     Plaintiffs' citation does not indicate that the beginning of the sentence has been omitted.

**\*15**  GAF, on the other hand, argues that courts applying federal rules of procedure apply the Rule 9(b) heightened pleading standards to MMPA claims. (*See* GAF Mot. at 25 n.15 (citing *Johnsen v. Honeywell Int'l Inc.,* 2015 WL 631361, at \*9 (E.D.Mo. Feb. 12, 2015).) The *Johnsen* court stated: "In MMPA actions, courts apply the particularity requirements of Fed.R.Civ.P. 9(b) pertaining to fraud." 2015 WL 631361, at \*9. The court in *Blake v. Career Education Cororation* (cited

by the *Johnsen* court) likewise noted that "[t]he United States District Courts in Missouri have consistently applied Rule 9(b) to cases arising under the MMPA." 2009 WL 140742, at \*2 (E.D.Mo. Jan. 20, 2009) (collecting cases).

Additionally, here, Plaintiffs' MMPA claims plainly sound in fraud. Plaintiffs allege: "GAF's conduct constitutes deception, fraud, false pretense, false promise, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact." (OAC ¶ 153.) The Third Circuit has made clear that where fraud is alleged, "[t]he stringent pleading restrictions of Rule 9(b), Fed.R.Civ.P., apply to such a claim," and that "[t]o satisfy this standard, the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Frederico,* 507 F.3d at 200. Therefore, the Court will apply the heightened pleading standards of Rule 9(b) to Plaintiffs' MMPA claim.

However, because GAF did not specifically argue how Plaintiffs' MMPA claim failed to meet Rule 9(b), the Court will not dismiss this claim at this time on this basis. Because the Court is treating this claim as unmoved for failure to meet 9(b), GAF is not precluded from arguing that any amended pleading fails to meet the requirement.

### 4. *Count 6 (Illinois Consumer Fraud Act ("ICFA"))*

Plaintiffs argue that "[b]ecause neither fraud nor mistake is *an element of unfair conduct* under [the] Illinois' Consumer Fraud Act, a cause of action for unfair practices under the Consumer Fraud Act need only meet the notice pleading standard of Rule 8(a), not the particularity requirement in Rule 9(b)." (Pls.' Opp'n at 11 n.15 (quoting *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.,* 536 F.3d 663, 670 (7th Cir.2008)) (emphasis added).) However, *Windy City* also states: "The Supreme Court of Illinois has held that recovery under the Consumer Fraud Act 'may be had for unfair as well as deceptive conduct.' " 536 F.3d at 669 (quoting *Robinson v. Toyota Motor Credit Corp.,* 775 N.E.2d 951, 960 (Ill.2002)); *see also In re Riddell Concussion Reduction Litig.,* 77 F.Supp.3d 422, 433 n.11 (D.N.J.2015) (citing *Windy City* for the proposition that claims based on unfair practices "need only meet the notice pleading standard of Rule 8(a)" but holding that "Rule 9(b) applies to Plaintiffs' claims to the extent they are premised on fraud"); *Stavropoulos v. Hewlett–Packard Co.,* 2014 WL 2609431, at \*4 (N.D. Ill. June 9, 2014) ("Claims under ICFA sound in

2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

fraud and therefore must be pled with particularity under Rule 9(b).")

Here, Plaintiffs allege that GAF's conduct "was unfair, unlawful, *and* a fraudulent business practice." (OAC ¶ 163 (emphasis added); *see also id.* ¶ 164 (same).) However, they also allege that "GAF committed unfair *or* deceptive acts and practices." (*Id.* ¶¶ 165, 166 (emphasis added).)

As with Plaintiffs' Indiana consumer protection claim, Plaintiffs cannot have it both ways: either they are pleading an unfair business practice–which may only need to meet Rule 8(a)'s pleading requirements, or they are pleading fraud which must meet Rule 9(b). And, because the pleadings are not clear on the basis of their claim, Plaintiffs' ICFA claim is dismissed without prejudice. The Court does note that, overall, Plaintiffs' allegations with respect to this claim appear to sound in fraud.

### 5. Count 7 (Virginia Consumer Protection Act ("VCPA"))

**\*16**  Plaintiffs argue that the "*misrepresentations* providing the basis of a [VCPA] claim need not be pleaded with the same kind of particularity as common law fraud claims." (Pls.' Opp'n at 11 n.16 (quoting *Debrew v. Lexus, 1997 WL 1070613, at \*2* (Va.Cir.Ct.1997)) (emphasis added).) "The claims of fraud and misrepresentation are distinct under the VCPA." *Nigh v. Koons Buick Pontiac GMC, Inc., 143 F.Supp.2d 535, 553 (E.D.Va.2001).* And, the "misrepresentations" which provide "the basis of a VCPA claim need not be pled with the same kind of particularity as common law fraud claims." *Id*. However, courts have required the pleading standards of Rule 9(b) to be met for a VCPA claim where fraudulent behavior is alleged. *See Murphy v. Capella Educ. Co., 589 F. App'x 646, 652, 656–57 (4th Cir.2014).*

Here, Plaintiffs allege that "GAF violated VA. CODE § 59.1–200.4, which provides, inter alia, that: '[t]he following *fraudulent* acts or practices committed by a supplier in connection with a consumer transaction are hereby declared unlawful ... [listing acts].'" (OAC ¶ 174 (emphasis added).) Plaintiffs further allege: "In particular, GAF's *fraudulent concealment* of the defects with the Decking, as described more fully ... throughout [the] Complaint and incorporated herein by reference, violated the Virginia Consumer Protection Act." (*Id.* ¶ 175 (emphasis added).) Plaintiffs cases do not support the proposition that Plaintiffs'

allegations based on *fraud* need not meet the particularity requirement of Rule 9(b). Because Plaintiffs' VCPA claim plainly sounds in fraud, the Court will apply the heightened pleading standards of Rule 9(b) to this claim.

However, because GAF did not specifically argue how Plaintiffs' VCPA claim failed to meet Rule 9(b), the Court will not dismiss this claim at this time on this basis. Because the Court is treating this claim as unmoved on for failure to meet 9(b), GAF is not precluded from arguing that any amended pleading fails to meet this standard.

### 6. Count 8 (Montana Consumer Protection Act ("MTCPA")

Although GAF argues that Rule 9(b) should apply to Plaintiffs' MTCPA claim, it provides no case law or other analysis to support its argument, simply stating that "[w]hile it seems that no federal court has yet affirmatively concluded that Rule 9(b) applies to this statute, this claim also sounds in fraud and should be pled with particularity, as all of these other courts [applying other state laws] have held." (GAF Mot. at 25 n.15.) That GAF can find no on-point case law does not relieve it of the obligation to support its argument with legal analysis. GAF may not punt legal argument to this Court for research and analysis through such bare assertions. Likewise, Plaintiffs who argue for application of Rule 8(a) similarly improperly punt to this Court. (*See* Pls.' Opp'n at 12 n.21 ("GAF provides no case law to assert that the Montana Consumer Protection Act is required to be pleaded with particularity. Thus, GAF asserts no basis to assert a heightened pleading standard for this claim.") (internal citations omitted).) Therefore, the Court is declining at this time to decide the issue of the appropriate pleading standard for this claim.

Additionally, because GAF did not specifically argue how Plaintiffs' MTCPA claim failed to meet either 8(a) or 9(b), the Court will not dismiss this claim at this time. Because the Court is treating this claim as unmoved on for failure to meet the pleading standard, GAF is not precluded from arguing specifically that any amended pleading fails to meet the applicable standard.

### 7. Count 9 (Colorado Consumer Protection Act ("CCPA"))

**\*17  Legal Standard.** The parties do not dispute that the Rule 9(b) pleading standards apply to this claim. However,

2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

because GAF did not specifically argue how Plaintiffs' CCPA claim failed to meet Rule 9(b), the Court will not dismiss this claim on this basis at this time. Because the Court is treating this claim as unmoved on for failure to meet 9(b), GAF is not precluded from arguing that any amended pleading fails to meet the requirement.

**Certain Relief Is Not Permitted.** GAF argues that Plaintiffs' CCPA claim also "should be dismissed to the extent it seeks monetary relief on behalf of a class because the CCPA does not authorize any damages, attorneys' fees, or costs for claims brought as class actions." (GAF Mot. at 49 (citing *Martinez v. Nash Finch Co.,* 886 F.Supp.2d 1212, 1218–19 (D.Colo.2013)).) Plaintiffs argue that CCPA claims for money damages have been allowed to proceed in some cases. (*See* Pls.' Opp'n at 16 & n.23.) For example, Plaintiffs assert that "[w]hile Colorado courts have not addressed this precise issue, in *In re Onstar Contract Litig.,* [600 F.Supp.2d 861 (E.D.Mich.2009),] interpreting Colorado law, the Michigan district court held class members could be awarded actual damages." (*Id.* at 16.)

Various courts analyzing Colorado law have criticized the holding in *In re Onstar* for relying on a case analyzing a prior–not current–version of the statute at issue. *See In re Syngenta AG MIR 162 Corn Litig.,* 2015 WL 5607600 at *50–51 (D.Kan. Sept. 11, 2015) (analyzing Colorado law and dismissing the CCPA class claims) ("Plaintiffs also cite to *In re OnStar Contract Litig.,* 600 F.Supp.2d 861 (E.D.Mich.2009), in which the court relied on *Robinson [v. Lynmar Racquet Club, Inc.,* 851 P.2d 274 (Colo.App.1993) ]. The *OnStar* court did not consider the different version of the statute at issue in *Robinson,* however, and this Court cannot agree with that court's conclusion that by the plain language of the [current] statute, the class action prohibition applies only to statutory and treble damages."); *Friedman v. Dollar Thrifty Automotive Group, Inc.,* 2015 WL 4036319, at *5 (D.Colo. July 1, 2015) ("What Plaintiffs fail to acknowledge, however, is that the *Robinson* case relied on by *Onstar* was decided under a previous version of § 6–1–113(2) which precluded only treble damages, costs and attorney fees. Actual damages were not excluded."); *see also Martinez,* 886 F.Supp. at 1218 ("The plain and unambiguous language of the statute [§ 6–1–113(2) ] compels the conclusion that *all* of the remedies in subparts (a)(I)-(III) and (b), including actual damages, are not available to classes.") (emphasis in original). In short, Colorado courts have addressed this specific issue and have found Plaintiffs' exact arguments unpersuasive.

Plaintiffs' other cases–which they acknowledge are not on point–are equally unpersuasive. (*See* Pls.' Opp'n at 16 & n.23 ("While Colorado courts have not addressed this precise issue...."); *Jackson v. Unocal Corp.,* 262 P.3d 874 (Colo.2011) (Plaintiffs provide no pincite for this case which discusses a "land damages class action," and the Court finds no discussion of § 6–1–113(2)); *Mountain States Tel. and Tel. Co. v. District Court,* 778 P.2d 667, 669 (Colo.1989) (a case not analyzing § 6–1–113(2) and decided prior to the current version of the statute); *Mangone v. U–Haul Int'l, Inc.,* 7 P.3d 189 (Colo.App.1999) (Plaintiffs provide no pincite for this case, and the Court finds no discussion of § 6–1–113(2)). For these reasons, the Court dismisses Plaintiffs' CCPA claims to the extent they seek monetary damages on behalf of a class.

### 8. *Count 10: North Carolina Unfair and Deceptive Trade Practices* ("UDTPA")

**\*18  Legal Standard.** Plaintiffs argue that "[a] ... UDTPA claim *does not* require proof of fraud, bad faith, or actual deception." (Pls.' Opp'n at 11–12 n.17 (emphasis in original) (quoting *Geo Plastics v. Beacon Dev. Co.,* 434 F. App'x. 256, 261 (4th Cir.2011)).) The case cited by GAF states the same thing. *See La Tortilleria, Inc. v. Nuestro Queso, LLC,* 2014 WL 1322627, at *7 (M.D.N.C. Mar. 31, 2014) (both cases citing to *RD & J Props. V. Lauralea–Dilton Enters., LLC,* 600 S.E.2d 492, 501 (N.C.2004)), adopted, 2014 WL 3484995 (M.D.N.C. July 11, 2014). As identified in *Geo Plastics,* the first element of a UDTPA claim is that "the defendant committed an unfair *or* deceptive act or practice...." 434 F. App'x at 261 (emphasis added). The *Geo Plastics* court, however, was deciding a motion for summary judgment, not analyzing the appropriate pleading standard to apply to this claim. *See id.* at 261–62. On the other hand, in *La Tortilleria* where the basis of the UDTPA was fraudulent inducement, the court held that Rule 9(b) applied. *See* 2014 WL 1322627, at *6 ("When fraud is alleged, the circumstances constituting fraud must be pled with particularity.").

Here, Plaintiffs allege that GAF engaged in "misrepresentations, concealment, omissions, **and other deceptive conduct.**" (OAC ¶ 206 (emphasis added).) Because Plaintiffs' North Carolina UDTPA [15] are based on deceptive (not simply unfair) conduct, the Court finds that Rule 9(b) is applicable. However, because GAF did not specifically argue how Plaintiffs' UDTPA claim failed to meet Rule 9(b), the Court will not dismiss this claim on this basis at this time. Because the Court is treating this claim as unmoved on for

In re: Elk Cross Timbers Decking Marketing, Not Reported in Fed. Supp. (2015)
2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

failure to meet 9(b), GAF is not precluded from arguing that any amended pleading fails to meet the requirement.

[15]    The Court does not reach UDTPA arguments for North Carolina Plaintiff Shepherd as his UDTPA cause of action has been dismissed as time barred. *See supra* Section V.A.1.

**Aggravating Circumstances.** GAF argues that Plaintiffs' UDTPA claims should be dismissed for the additional reason that Plaintiffs have failed to allege "substantial aggravating circumstances." (*See* GAF Mot. at 49 ("North Carolina courts and the Fourth Circuit have held that a mere breach of contract or breach of warranty does not, standing alone, constitute an unfair or deceptive trade practice.").) Plaintiffs do not seem to disagree on the general statement of the law as cited by GAF. *See South Atlantic Ltd. P'ship of Tennessee, LP v. Riese,* 284 F.3d 518, 535 (4th Cir.2002) ("[W]hile there is no doubt that the North Carolina courts have construed the UTPA liberally, there are some limits on its application. For example, only practices that involve [s]ome type of egregious or aggravating circumstances are sufficient to violate the UTPA.) (internal citations and quotations omitted) (cited by Plaintiffs, *see* Pls.' Opp'n at 17).

Plaintiffs, instead, argue that they have adequately pled an action that goes beyond contract law. Plaintiffs assert that "[t]his, however, is not a mere breach of warranty case.... Plaintiffs' UDTPA claim is rooted in the conduct of GAF and its knowledge that the Decking was not manufactured in accordance with its representations and GAF failed to disclose this information." (Pls.' Opp'n at 17.) However, Plaintiffs do not address the language in GAF's case that provides that a "[p]laintiff cannot convert its breach of warranty claim into an unfair trade practices claim simply by artfully pleading the appropriate legal language for such a claim.... Plaintiff must also allege facts to support its legal claims." *Terry's Floor Fashions, Inc. v. Ga.-Pac. Corp.,* 1998 WL 1107771, at *10 (E.D.N.C. July 23, 1998) (internal quotations omitted). This statement in *Terry* is consistent with this Court's position on the insufficiency of mere recitation of legal catchwords or phrases. As the Court discusses throughout this Opinion (*see, e.g., infra* Section V.G), Plaintiffs' allegations with respect to GAF's conduct are short on substance. Therefore, the Court finds that dismissal without prejudice of Plaintiffs' UDTPA claim is appropriate on this basis.

### 9. *Count 11 (Ohio Product Liability Act ("OPLA"))*

**\*19**  Neither GAF nor Plaintiffs address the appropriate legal standard for Plaintiffs' Ohio OPLA claim. Both parties cite to cases dealing with the Ohio Consumer Sales Practices Act (Count 12), [16] not OPLA claims. (*See* GAF Mot. at 25 n.15 ("Count 12: Ohio Consumer Sales Practice Act"); Pls.' Opp'n at 12 n.18 ("Indeed, Ohio district courts in many cases have not applied Rule 9(b)'s heightened pleading standard to Ohio CSPA claims.").) Therefore, the Court does not address the appropriate standard for the OPLA claim at this time. Also, because GAF did not specifically argue how Plaintiffs' OPLA claim failed to meet either 8(a) or 9(b), the Court will not dismiss this claim on this basis at this time. Because the Court is treating this claim as unmoved on for failure to meet the pleading standard, GAF is not precluded from arguing specifically that any amended pleading fails to meet the requirement.

[16]    Plaintiffs have not opposed dismissal of Count 12. (*See* ECF No. 61–1 at 3 (Pls.' Checklist).)

### 10. *Count 13 (New Hampshire Rev. Stat. § 358–A et seq. ("NHCPA"))*

GAF argues that Rule 9(b) applies to Plaintiffs' NHCPA claim. (*See* GAF Mot. at 25 n.15 (citing *Gwyn v. Loon Mountain Corp.,* 2002 WL 1012929 (D.N.H. May 15, 2002), *aff'd,* 350 F.3d 212 (1st Cir.2003).) The *Gwyn* court held that "[b]y basing its CPA claim upon alleged misrepresentations and further asserting that the misrepresentations constituted a ***knowing and willful*** violation of the CPA, plaintiffs have in essence accused defendant of fraud. Where an allegation of fraud lies at the core of a cause of action, the heightened pleading standards of Fed.R.Civ.P. 9(b) apply." 2002 WL 1012929, at *7. Plaintiffs, in response, cite to *Leonard v. Abbott Labs., Inc.,* 2012 WL 764199 (E.D.N.Y. Mar. 5, 2012) (analyzing the New Hampshire statute). (*See* Pls.' Opp'n at 12 n.22.) The *Leonard* court first noted that it was "bound by the law of [the] Second Circuit," and then held that given what it believed were similarities between the NHCPA and the New York consumer protection statute, Rule 8(a) should apply. *See* 2012 WL 764199, at *19–20. The *Leonard* court also acknowledged that "[t]he act provides a non-exhaustive list of prohibited practices." *Id.* at *16. Plaintiffs' briefing does not compare the cases cited to the actual language in the OAC or clearly explain the basis for their claim under this statute.

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 76 of 207
PageID: 13093
In re: Elk Cross Timbers Decking Marketing, Not Reported in Fed. Supp. (2015)
2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

Plaintiffs specific NHCPA allegations do not contain the words "fraud," "deception," or "willful and knowing." Instead, they are more vague and assert that GAF "was aware, or by the exercise of reasonable [care] should have been aware" of its allegedly improper conduct. (OAC ¶ 237.) Neither party analyzes the appropriate standard in the context of Plaintiffs' allegations, and the Court will not do so *sua sponte*.

Because GAF has not properly moved on this claim for failure to meet the pleading standard in any case, the Court will not reach this issue at this time. Because the Court is treating this claim as unmoved on for failure to meet the pleading standard, GAF is not precluded from arguing that any amended pleading fails to meet the requirement.

### 11. *Count 15 (New York General Business Law § 349)*

Because GAF did not specifically argue how Plaintiffs' New York claim failed to meet Rule 8(a), the Court will not dismiss this claim at this time. Because the Court is treating this claim as unmoved on for failure to meet Rule 8(a), GAF is not precluded from arguing that any amended pleading fails to state a claim for this Count.

### 12. *Counts 16 and 17 (California False Advertising Law and California Consumer Legal Remedies Act)*

Because GAF did not specifically argue how Plaintiffs' California consumer claims failed to meet Rule 9(b), the Court will not dismiss these claims at this time. Because the Court is treating these claims as unmoved on for failure to meet 9(b), GAF is not precluded from arguing that any amended pleading fails to state a claim for these Counts.

### 13. *Count 18 (Nebraska Consumer Protection Act ("NCPA"))*

**\*20**  GAF argues that Rule 9(b) applies to Plaintiffs' NCPA claim. (*See* GAF Mot. at 26 n.15 (citing *In re ConAgra Foods Inc.*, 908 F.Supp.2d 1090, 1099 (C.D.Cal.2012)) (applying Rule 9(b) to Nebraska's statute).) Plaintiffs, on the other hand, argue that " '[t]he heightened pleading requirements of Rule 9(b) do not apply to allegations of unfair and deceptive trade practices' under Nebraska's laws." (Pls.' Opp'n at 12

n.19 (quoting *Alpharma, Inc. v. Pennfield Oil Co.*, 2008 WL 2331019, at \*2 (D. Neb. June 4, 2008).) Neither of these cases provides any pleading standard analysis. In *In re ConAgra*, "Plaintiffs [did] not dispute that Rule 9(b), rather than the more lenient requirements of Rule 8, govern[ed] their claims." 908 F.Supp.2d at 1097. And the quote from Plaintiffs' case is supported by citation to a case "regarding unfair and deceptive trade practice action brought by the FTC under the Federal Trade Commission Act" and *Pelman* (discussing New York law). *See* 2008 WL 2331019, at \*2. Because GAF has not properly moved on this claim for failure to meet the pleading standard, and both parties provide no real analysis or persuasive support for their pleading positions, this Court will not reach this issue at this time. Because the Court is treating this claim as unmoved on for failure to meet the pleading standard, GAF is not precluded from arguing that any amended pleading fails to meet the requirement.

### 14. *Count 19 (Iowa Consumer Fraud Act ("IACFA"))*

GAF argues that Rule 9(b) applies to Plaintiffs' IACFA claims. (*See* GAF Mot. at 25 n.15 (citing *Wegner v. Pella Corp.*, 2015 WL 2089658, at \*6 (D.S.C. May 5, 2015) (applying Rule 9(b) to Iowa's statute)).) Plaintiffs do not provide case law for Iowa supporting that Rule 8(a) should apply to this claim. (*See* Pls.' Opp'n at 12 n.20.) Instead Plaintiffs cite to GAF's case and argue instead that "[w]hile the court held Rule 9(b) applied to a claim for a violation of the IACFA, it also held a 'relaxed Rule 9(b) standard' was appropriate." (*Id.* quoting *Wegner* ).)

First, it appears that Plaintiffs are actually arguing for a "relaxed" 9(b) approach for this claim, not Rule 8(a). Second, in *Wegner* the court held that "[a]lthough the **Fourth Circuit** has not adopted this relaxed Rule 9(b) standard, a relaxed standard **comports with the Fourth Circuit's [general] instruction[s]**" regarding pleading under Rule 9(b). 2015 WL 2089658, at \*6 (emphasis added). Plaintiffs do not cite to Third Circuit cases applying such a relaxed standard for claims sounding in fraud, nor do they explain why they believe such an approach would be utilized in this district. The Court, thus, finds Plaintiffs' argument unpersuasive.

Plaintiffs also argue that they allege a *per se* violation of the IACFA, and then state that "[t]here is no requirement that the IACFA claim have a heightened pleading requirement." (Pls.' Opp'n at 12 n.20.) Plaintiffs provide no explanation for their conclusion. Here, Plaintiffs allege that GAF's "concealment,

2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

*intentional* and negligent *misrepresentation*, and breach of express and implied warranties ***constitute*** unfair, unlawful, ***and fraudulent business acts and practices*** in violation of IOWA CODE ANN. § 714H.3." (OAC ¶ 323 (emphasis added).) As Plaintiffs' IACFA claim sounds in fraud, they have provided no analysis or support for application of Rule 8(a) standards, the Court finds that the heightened pleading standards of Rule 9(b) (as applied in the Third Circuit) are applicable. However, because GAF did not specifically argue how Plaintiffs' IACFA claim failed to meet Rule 9(b), the Court will not dismiss this claim at this time. Because the Court is treating this claim as unmoved for failure to meet 9(b), GAF is not precluded from arguing specifically that any amended pleading fails to meet the requirement.

### 15. *Economic Loss Doctrine*

In addition to the arguments discussed above, GAF also argues that the Missouri MMPA, Virginia VCPA, North Carolina UDTPA, Ohio OPLA, and Nebraska NCPA claims must be dismissed for failure to plead more than economic losses. (*See* GAF Mot. at 38 & n.22.) Where Plaintiffs provided cases on this point in opposition (*see* Pls.' Opp'n at 34–35 n.41), they support GAF's general statement of the law (*see* GAF Mot. at 38–39 n.22). *MO:Compare In re Genetically Modified Rice Litig.,* 666 F.Supp.2d 1004, 1015 (E.D.Mo.2009) ("The economic loss doctrine bars recovery of purely pecuniary losses in certain tort cases if there is no personal injury or physical damage to property other than the property at issue in the case–usually an allegedly defective product in a products liability case.") (Plaintiffs' case) *with Graham Constr. Servs. v. Hammer & Steel Inc.,* 755 F.3d 611, 616 (8th Cir.2014) ("Under Missouri law, [r]ecovery in tort for pure economic damages are only limited to cases where there is personal injury, damage to property other than that sold, or destruction of the property sold due to some violent occurrence.") (internal quotations omitted) (GAF's case); *NC:Compare Indem. Ins. Co. of N. Am. v. Am. Eurocopter LLC,* 2005 U.S. Dist. LEXIS 34011, at *35 (M.D.N.C.2005) ("North Carolina has adopted the economic loss rule, which prohibits recovery for economic loss in tort. Instead, such claims are governed by contract law.") (quoting *Moore v. Coachmen Indus.,* 499 S.E.2d 772, 780 (N.C.App.1998)) (Plaintiffs' case) *with In re Bldg. Mat'ls Corp. of Am. Asphalt Roofing Shingle Prods. Liab. Litig.,* 2013 WL 169289, at *9 (D.S.C. Jan. 16, 2013) ("[T]he United States Court of Appeals for the Fourth Circuit has found error in allowing an unfair and deceptive trade practices claim to

proceed under North Carolina law where the claim essentially alleged a contractual breach.") (citing *Broussard v. Meineke Disc. Muffler Shops, Inc.,* 155 F.3d 331, 346 (4th Cir.1998)) (GAF's case); *OH:Compare Maranatha Volunteers Int'l, Inc. v. Golden Giant, Inc.,* 1999 WL 357786 at *4 (6th Cir.1999) ("It is not the nature of the claim but the character of the loss that determines whether the cause of action lies in tort or contract.") (Plaintiffs' case) *with Cincinnati v. Beretta U.S.A. Corp.,* 768 N.E.2d 1136, 1146 (Ohio 2002) ("In this case, since appellant alleged only economic damages, it has not set forth a statutory product liability claim and is consequently barred from bringing any such claims under the Act.") (GAF's case); *NE: Lesiak v. Central Valley Ag Co-op, Inc.,* 808 N.W.2d 67, 82 (Neb.2012) (The court "reaffirm[ed] the doctrine's continued application in the products liability context," and made clear that "the doctrine requires that where a defective product causes harm only to itself, unaccompanied by either personal injury or damage to other property, contract law provides the exclusive remedy to the plaintiff.") (cited by both Plaintiffs and GAF).[17]

> [17]    Plaintiffs do not provide case law for Virginia. GAF's Virginia case law also supports that more than an economic loss must be pled. *See McConnell v. Servinsky Eng'g, PLLC,* 22 F.Supp.3d 610, 614 (W.D.Va.2014) ("This is an economic loss, which occurs when a product injures itself because one of its component parts is defective, and is a loss for which no action in tort will lie.") (internal quotations omitted).

**\*21**  Plaintiffs do not argue that these claims cannot be barred by the economic loss doctrine. Instead they argue that their allegations of damage to other property are adequately pled. (Pls.' Opp'n at 34–35; *see also* ECF No. 61–1 (Pls.' Checklist) (stating only that Plaintiffs have "[s]ufficiently alleged damage to 'other property' ").)

The individual plaintiffs plead nothing more than "that any other property damage caused by the Decking must be repaired." (OAC ¶¶ 11–27, 29–32, 34–35.) This bare assertion does not state that there is actually any other property damage alleged, much less what that damage is alleged to be for each plaintiff. Plaintiffs generally allege that "Plaintiffs' " "residences/structures" or "exterior finishes, columns, walls, and other property" have been damaged (*see id.* ¶¶ 118–121), but such general allegations provide inadequate notice of whether Plaintiffs are alleging any actual damage to other property and what that damage is alleged to be.

In re: Elk Cross Timbers Decking Marketing, Not Reported in Fed. Supp. (2015)

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 78 of 207
PageID: 13095

2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

Plaintiffs argue that "[i]f there is not damage to other property, then GAF can move to dismiss these claims at summary judgment." (Pls.' Opp'n at 35.) The Court agrees with GAF that Plaintiffs may not "skip the federal pleading requirements, and embark on discovery to fish for claims that are legally barred." (GAF Reply at 10.) The Supreme Court, in *Iqbal,* made clear that "the Federal Rules do not require courts to credit a complaint's conclusory statements without reference to its factual context.... And [even] Rule 8 does not empower respondent to plead the bare elements of his cause of action, affix the label 'general allegation,' and expect his complaint to survive a motion to dismiss." *Iqbal,* 556 U.S. at 686–87. Therefore, the Court dismisses Plaintiffs' Missouri MMPA, Virginia VCPA, North Carolina UDTPA, Ohio OPLA, and Nebraska NCPA claims without prejudice for failure to plead anything other than economic loss.

**C. GAF's Arguments That Other Causes of Action Are Abrogated by Statute**

*1. Indiana*

In its moving brief, GAF argued that "[t]he Indiana Products Liability Act ('IPLA') abrogates the Indiana Plaintiffs' [ (Stidham) ] claims for negligence (Count 1), strict liability (Count 26), negligent misrepresentation (Count 22), and fraudulent misrepresentation or concealment (Counts 23–24)." (GAF Mot. at 50.) Plaintiffs did not oppose GAF's dismissal of the negligence, strict liability, and fraudulent misrepresentation Indiana causes of action. (*See* ECF No. 61–1 at 1, 5, 7 (Pls.' Checklist).) Plaintiffs did not concede in their Checklist dismissal of the Indiana negligent misrepresentation and fraudulent concealment/omission claims. (*See id.* at 4, 6.) Plaintiffs, however, also did not argue that the negligent misrepresentation and fraudulent concealment causes of action are not abrogated by the IPLA; GAF's argument regarding abrogation for these causes of action simply does not appear on Plaintiffs' checklist or in Plaintiffs' opposition. (*See id.*; *see also* GAF Reply at 19.)

The Court agrees with GAF that all of Plaintiffs' Indiana tort claims are barred by the IPLA. *See Ryan ex rel. Estate of Ryan v. Philip Morris USA, Inc.,* 2006 WL 449207, at *2 (N.D.Ind. Feb. 22, 2006) ("The express wording of the [IPLA] statute, as well as the clear holdings of the Indiana Supreme Court ... make it clear that all of Ryan's claims fall within the purview of the IPLA. This is true not only

of Plaintiff's negligence claims, but her fraud claims as well.") (dismissing the common law claims). Therefore, the Indiana Plaintiff's negligent misrepresentation and fraudulent concealment claims will be dismissed with prejudice.

*2. Ohio*

**\*22** GAF argues that "[d]epending on whether this Court finds Plaintiffs have pled damage to other property, either their OPLA *or* common law claims should be dismissed." (GAF Reply at 19–20 (emphasis added).) Plaintiffs' position appears to be that it can pursue both sets of claims for different measures of damages. (*See* Pls.' Opp'n at 51 ("The *Huffman* court held that the plaintiff could simultaneously assert claims against a manufacturer under the common law for negligence as well as under OPLA because the measure of damages is different.").) Because the Court has dismissed Plaintiffs' OPLA claim, it need to decide at this time whether, if the OPLA claim is re-pled and survives dismissal, Plaintiffs could also bring common law claims with the OPLA claim.

**D. GAF's Argument That Certain Other Causes of Action Fail Because of the Economic Loss Doctrine**

GAF argues that "[t]he Economic Loss Doctrine adopted by various states also bars many of Plaintiffs' claims." (GAF Mot. at 36.) Specifically, GAF argues that the non-consumer protection claims shown below should be dismissed for failure to plead harm to other property. (*See id.* at 38–39 n.22.)

- **Missouri** (Ross): Counts 1 (Negligence), 22 (Negligent Misrepresentation), 23 (Fraudulent Misrepresentation), 24 (Fraudulent Concealment), 26 (Strict Liability);

- **Nebraska** (Warren): Counts 1 (Negligence), 22 (Negligent Misrepresentation), 23 (Fraudulent Misrepresentation), 24 (Fraudulent Concealment), 26 (Strict Liability);

- **North Carolina** (Robertie): [18] Counts 1 (Negligence), 22 (Negligent Misrepresentation), 23 (Fraudulent Misrepresentation), 24 (Fraudulent Concealment);

- **Virginia** (Wolcott): Counts 1 (Negligence), 22 (Negligent Misrepresentation), 23 (Fraudulent Misrepresentation), 24 (Fraudulent Concealment);

In re: Elk Cross Timbers Decking Marketing, Not Reported in Fed. Supp. (2015)

2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 79 of 207
PageID: 13096

- **California** (Williams): Counts 1 (Negligence), 22 (Negligent Misrepresentation), 26 (Strict Liability);

- **Colorado** (Kaiser, Turcheck, Tuthill, Barker, Megerle): Counts 1 (Negligence), 26 (Strict Liability);

- **Illinois** (Ernst): Counts 1 (Negligence), 22 (Negligent Misrepresentation), 26 (Strict Liability);

- **Iowa** (Denton, Sheridan): Counts 1 (Negligence), 22 (Negligent Misrepresentation);

- **Michigan** (McGovern, Narducci, Claxton): Counts 1 (Negligence), 22 (Negligent Misrepresentation);

- **New Hampshire** (Khanna): Counts 1 (Negligence), 22 (Negligent Misrepresentation), 23 (Fraudulent Misrepresentation), 24 (Fraudulent Concealment), 26 (Strict Liability); and

- **New York** (Giovannetti): Counts 1 (Negligence), 22 (Negligent Misrepresentation), 23 (Fraudulent Misrepresentation), 24 (Fraudulent Concealment).

18    The Court does not reach the argument for these causes of action for North Carolina Plaintiff Shepherd as they have been dismissed as time barred. *See supra* Section V.A.1. Plaintiffs did not oppose dismissal for other causes of action. *See supra* n.4.

For the reasons stated previously with respect to Plaintiffs' Missouri, Nebraska, North Carolina, and Virginia consumer protection claims (*see supra* Section V.B.15), the Court agrees with GAF that the above causes of action for these states are also insufficiently pled, and, therefore, are dismissed without prejudice.

For the same reasons, the Court will dismiss the causes of action above for the California, Colorado, Illinois, Iowa, Michigan, New Hampshire, and New York Plaintiffs without prejudice. Plaintiffs have not argued that the economic doctrine is inapplicable in these states. In fact, the case law Plaintiffs cite (*see* Pls.' Opp'n at 34–35 n.41) supports GAF's legal position. [19] *See Jimenez v. Superior Court,* 58 P.3d 450, 483 (Cal.2002) ("To apply the economic loss rule, we must first determine what the product at issue is. Only then do we find out whether the injury is to the product itself (for which recovery is barred by the economic loss rule) or to property other than the defective product (for

which plaintiffs may recover in tort)."); *Metropolitan Pro. & Cas. Ins. Co. v. James McHugh Constr. Co.,* 1999 WL 971283, *2 (N.D.Ill. Oct. 21, 1999)* (The "doctrine prevents a plaintiff from recovering in tort for purely economic losses.... The economic loss rule therefore does not bar recovery for incidents resulting in damage to other property.") (internal quotations omitted); *Richards v. Midland Brick Sales Co., Inc.,* 551 N.W.2d 649, 650 (Iowa 1996) ("It is a generally recognized principle of law that plaintiffs cannot recover in tort when they have suffered only economic harm."); *Quest Diagnostics, Inc. v. MCI WorldCom, Inc.,* 656 N.W.2d 858, 862 n.4 (Mich.Ct.App.2002) ("Michigan's economic loss doctrine is broader than other jurisdictions in that it not only includes damage to the product itself, but may also include damage to other property when this damage was within the contemplation of the parties to the agreement.") (internal quotations omitted); *Border Brook Terrace Condo. Ass'n v. Gladstone,* 622 A.2d 1248, 1253 (N.H.1993) ("We agree with the defendants that a plaintiff may not ordinarily recover in a negligence claim for purely 'economic loss.' "); *Trump Int'l Hotel & Tower v. Carrier Corp.,* 524 F.Supp.2d 302, 312 (S.D.N.Y.2007) ("Thus, I find that the pressure differential flow switch did not damage 'other property' when it malfunctioned and caused the absorption chiller to freeze. As a result, Trump's negligence claim is dismissed.").

19    Plaintiffs do not provide any case cite analyzing Colorado law. (*See* Pls.' Opp'n at 3435 n.41.)

**\*23** As noted above in discussing Plaintiffs' consumer protection claims, Plaintiffs simply argue they have sufficiently pled damage to other property–an exception to the rule. (*See* Pls.' Opp'n at 34–35.) As this Court has held above (*see supra* V.B.15), the Court disagrees that Plaintiffs' bare allegations are sufficient to survive dismissal of these causes of action.

### E. Count 1 (Negligence): Other Argument for Dismissal

GAF argues that the negligence causes of action for the North Carolina (Robertie) [20] and Michigan (McGovern, Narducci, Claxton) Plaintiffs should also be dismissed for failure to plead a reasonable alternative design. (*See* GAF Mot. at 48–49.) Plaintiffs counter that "these states do not require allegations of an alternative feasible design to sustain negligence claims against a building product manufacturer." (Pls.' Opp'n at 4950.) The Court agrees with GAF with respect to Michigan and Plaintiffs with respect to North Carolina.

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 80 of 207
PageID: 13097

In re: Elk Cross Timbers Decking Marketing, Not Reported in Fed. Supp. (2015)
2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

20     The Court does not reach this argument for North Carolina Plaintiff Shepherd as the cause of action has been dismissed as time barred. *See supra* Section V.A.1.

With respect to Michigan, Plaintiffs' case identifies "a reasonable alternative design" as a required element for a negligence claim based on design defect,[21] as Plaintiffs have alleged here (*see* OAC ¶¶ 116–121). Plaintiffs have not alleged that a reasonable alternative design was available. Therefore, the Michigan Plaintiffs' negligence cause of action is also appropriately dismissed without prejudice on this basis.

21     *See Sundberg v. Keller Ladder,* 2001 WL 1397290, at *5–6 (E.D.Mich. Nov. 8, 2001).

With respect to North Carolina, Plaintiffs' case says nothing on point. However, GAF's own case makes clear that Plaintiffs must prove "***either one of the following***: ... the manufacturer unreasonably failed to adopt a safer, practical, feasible, and otherwise reasonable alternative design or formulation ..." ***or*** that "the design or formulation of the product was so unreasonable that a reasonable person, aware of the relevant facts, would not use or consume a product of this design." *Earp v. Novartis Pharm. Corp.,* 2013 WL 4854488, at *6 (E.D.N.C. Sept. 11, 2013) (citing N.C. GEN. STAT. § 99B–6(a)) (emphasis added). GAF's case thus does not support that a reasonable alternative design must be pled in every case. That this Court finds that a reasonable alternative design is not always required to state a negligent design claim under North Carolina law does not mean that Plaintiffs have adequately stated a claim under North Carolina law. GAF did not appropriately move on that broader basis, so the Court has not reached that question.

## F. Count 22 (Negligent Misrepresentation): Other Arguments for Dismissal

### 1. *Failure to plead a special relationship*

GAF argues that the negligent misrepresentation claims for the Ohio (Burger), North Carolina (Robertie),[22] Iowa (Denton, Sheridan), Virginia (Wolcott), and New York (Giovannetti) Plaintiffs should be dismissed for failure to plead a special relationship.[23] (GAF Mot. at 45 & n.29; ECF No. 63–1 at 8–9 (GAF's Reply Checklist).)

22     North Carolina Plaintiff Shepherd's negligent misrepresentation claim has been dismissed as time barred. *See supra* Section V.A.1. Therefore, the Court does not reach this argument for Plaintiff Shepherd.

23     GAF makes the same argument for Indiana. However, as this Court has found this cause of action to be barred by the Indiana PLA (*see* Section V.C.1), it does not reach this argument for Indiana.

**\*24** Plaintiffs do not respond to GAF's arguments with respect to Ohio, Virginia, and New York. (*See* Pls.' Opp'n at 45–46.) GAF's case law for these states supports that a special relationship is required to bring a negligent misrepresentation claim under these states' law. *See Premier Bus. Grp., LLC v. Red Bull of N. Am., Inc.,* 2009 WL 3242050, at *11 (N.D.Ohio Sept. 30, 2009)* ("[N]egligent misrepresentation requires a special relationship under which the defendant supplied information to the plaintiff for the latter's guidance in its business transactions.") (internal quotations omitted); *Velez v. Lizardi,* 2015 WL 868929, at *4–5 (Va.Ct.App. Mar. 3, 2015) (requiring a special relationship for constructive fraud);[24] *Prime Mover Capital Partners, L.P. v. Elixir Gaming Techs., Inc.,* 793 F.Supp.2d 651, 673–74 (S.D.N.Y.2011) ("[U]nder New York law, a plaintiff may recover for negligent misrepresentation only where the defendant owes her a fiduciary duty. Such a special relationship requires a closer degree of trust between the parties than that of the ordinary buyer and seller in order to find reliance on such statements justified.") (internal quotations omitted). Plaintiffs in these states have not alleged that a special relationship existed with GAF. Therefore, the Court dismisses the Ohio, Virginia, and New York Plaintiffs' negligent misrepresentation causes of action without prejudice.

24     "Virginia courts ... do not recognize negligent misrepresentation as a separate cause of action from that of constructive fraud." *Baker v. Elam,* 883 F.Supp.2d 576, 581 (E.D.Va.2012).

Plaintiffs do dispute that a special relationship is required for a negligent misrepresentation claim under North Carolina law. (*See* Pls.' Opp'n at 45.) For North Carolina, Plaintiffs cite (without a pincite) to *Rowan County Board of Education v. United States Gypsum Co.,* 332 N.C. 1 (1992). However, the *Rowan* court was analyzing a fraud, not a negligent misrepresentation, claim, and it did not discuss a special relationship. *See id.* GAF's case analyzing North Carolina

Case 1:19-md-02875-RMB-SAK   Document 598-4   Filed 10/16/20   Page 81 of 207
PageID: 13098
In re: Elk Cross Timbers Decking Marketing, Not Reported in Fed. Supp. (2015)
2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

law, on the other hand, supports that a special relationship is required. *See Synovus Bank v. Karp,* 887 F.Supp.2d 677, 690 (W.D.N.C.2012) ("[T]he Magistrate Judge correctly concluded that the Defendants' allegations do not support a finding of any type of special relationship between Synovus Bank and the Defendants beyond that of the typical lender-borrower relationship. Accordingly, ... the Defendants' negligent misrepresentation claims are dismissed.") (internal citations omitted), *aff'd in part sub nom. Synovus Bank v. Tracy,* 2015 WL 860361 (4th Cir. Mar. 2, 2015); *see also Energy Inv. Fund v. Metric Constr.,* 525 S.E.2d 441, 445 (N.C.2000) ("EIF's claim for negligent misrepresentation also fails in that EIF has not alleged or established a special relationship with defendants which supports standing to bring a direct claim.... Absent some indication whereby defendants directly solicited EIF with the intent to induce its participation in BCH, EIF has failed to allege the existence of a legally cognizable duty of care which runs from defendants to EIF."). As the North Carolina Plaintiffs (Robertie) have not alleged that a special relationship existed with GAF, their negligent misrepresentation cause of action is dismissed without prejudice.

For Iowa, Plaintiffs cite to *Sain v. Cedar Rapids Community School District,* 626 N.W.2d 115 (Iowa 2001). (Pls.' Opp'n at 46.) *Sain* supports GAF's basic proposition that a special relationship is required for a negligent misrepresentation claim under Iowa law. *See Sain,* 626 N.W.2d at 124 ("As with all negligence actions, ***an essential element*** of negligent misrepresentation is that the defendant must owe a duty of care to the plaintiff.") (emphasis added). Instead, Plaintiffs cite to *Sain* to argue that such a duty exists where "a defendant supplied 'information' and that this information was false." (Pls.' Opp'n at 46.) The *Sain* court, however, made clear "that this duty arises only when the information is provided by persons in the business or profession of supplying information to others." 626 N.W.2d at 124, 128–29 (finding that the duty existed for a student and his guidance counselor). "Thus, when deciding whether the tort of negligent misrepresentation imposes a duty of care in a particular case, [Iowa courts] distinguish between those transactions where a defendant is in the business or profession of supplying information to others from those transactions that are arm's length and adversarial." *Id.* at 124. In reaching this decision, the *Sain* court cited to *Molo Oil Company v. River City Ford Truck Sales, Inc. Id.* In that case, the court held that "if the transaction at issue took place at arm's length, the plaintiff's cause of action must fail." *Molo Oil,* 578 N.W.2d 222, 227 (Iowa 1998) (refusing "to apply this rule

[creating a duty] to a retailer in the business of selling and servicing its goods").

**\*25**  Plaintiffs have alleged no facts demonstrating that GAF was in the business of supplying information period, much less in the way contemplated by Iowa courts. Therefore, the Iowa Plaintiffs' negligent misrepresentation causes of action also will be dismissed without prejudice.

### 2. *Failure to plead privity*

GAF argues that the Michigan Plaintiffs' (McGovern, Claxton, Narducci) negligent misrepresentation claims should be dismissed for lack of privity. (*See* GAF Mot. at 46 (citing *Yaldu v. Bank of Am. Corp.,* 700 F.Supp.2d 832, 845–46 (E.D.Mich.2010).) *Yaldu* provides that, under Michigan law, "[t]he elements of negligent misrepresentation are: ... (4) the defendant and plaintiff were in privity of contract...." *Id.* at 845. Plaintiffs do not address GAF's argument. However, with respect to similar arguments related to the implied warranty claims, Plaintiffs do not assert that any Plaintiff has alleged sufficient facts establishing privity, only that no such requirement exists. (*See* Pls.' Opp'n at 44–45.) Therefore, because Plaintiffs have not pled that privity exists as required under Michigan law, this Court finds that the Michigan Plaintiffs' negligent misrepresentation claims also should be dismissed on this basis.

### G. Count 24 (Fraudulent Concealment): Other Argument for Dismissal

The parties agree that Rule 9(b) applies to this claim. The Court initially notes that briefing by both parties on this Count was challenging. This is particularly true because GAF intertwines its arguments against equitable tolling (which the Court has rejected as premature, *see supra* Section V.A.2) with its arguments that Plaintiffs' fraudulent concealment claims fail to state a claim under Rule 9(b). The Court is only addressing these issues at this time because several issues are core to Plaintiffs' allegations. As this Court has previously noted, the Court will not accept abstract arguments, arguments based on analysis from New Jersey law (unless explained why relevant), and, will not hunt to try to figure out if and how Plaintiffs are opposing GAF's arguments.

At the base of Plaintiffs' disjointed opposition is that they have adequately pled "fraud by omission with particularity"

and that "[w]ithout the benefit of discovery in this matter, Plaintiffs cannot specify exactly when GAF knew the Decking was defective." (Pls.' Opp'n at 19.) The primary OAC allegations that Plaintiffs identify in support of their particularity position are the following:

> 72. The Decking's defects are latent and undetectable until they manifest. Therefore, Plaintiffs and Class members could not reasonably have discovered, even with the exercise of due diligence, that there was a defect until after the Decking had been purchased and installed. Indeed, the defect typically does not manifest itself until a year or two after installation.

> 73. But GAF knew or should have known of the Decking's defects, and that the Decking is not fit for its ordinary and intended use, is not merchantable, and fails to perform in accordance with GAF's own statements and warranties, as well as with the reasonable expectations of ordinary consumers.

> 74. And GAF knew or should have known that the Decking had the potential and tendency for swelling, expanding, warping, staining, discoloration, twisting, and shrinking.

> **\*26** 75. Despite GAF's actual or constructive knowledge of the Decking's defects and problems, GAF continued to market and sell the Decking–and failed to disclose, and otherwise concealed, the Decking's inherent defects.

> 85. As discussed herein, GAF made the following representations in conjunction with the sale of its Decking, each of which were intended to (and did) convey information regarding the durability and performance of the Decking, rather than mere puffery: ... [list of alleged representations].

> 88. GAF's made its representations about the Decking despite GAF's knowledge that the Decking was defective.

> 372. GAF took affirmative steps to prevent Plaintiffs and Class members from learning of the Decking's defects, including keeping non-public information and internal knowledge and communications secret.

Most of these allegations–and all dealing with omission–are essentially fill-in-the-blank pleading allegations. In other words, if someone replaced "GAF" with "insert party" and "Decking" with "insert product," they could have bare-bones pleadings for any defective product. In other contexts, this Court–with more specific allegations than those above–has

held that such bare-bones pleadings do not meet Rule 8, much less Rule 9.

Plaintiffs also generally allege that "*[d]espite a litany of complaints from consumers like Plaintiffs* and Class Members, GAF refuses to inform purchasers, homeowners, and Class Members about the Decking's defects." (OAC ¶ 77 (emphasis added).) The OAC originally included twenty-five (25) Plaintiff fact sets; twenty-three (23) remain. However, with the exception of Plaintiff McGovern, *none* of the Plaintiffs allege informing GAF of any decking issue, when they so communicated with GAF, the content of any "complaint" or other communications, or any other facts to support knowledge by GAF of any alleged defect. Even Plaintiff McGovern alleges only that he "initially filed an action against GAF in this Court on August 21, 2014," and "[b]efore filing that case, Plaintiff submitted a pre-suit demand to Defendant." (*Id.* ¶ 17.) Plaintiff McGovern does not identify when he submitted the pre-suit demand or the content of that demand. In fact, a couple of Plaintiffs' allegations above assert only that GAF "knew *or should have known*" of the alleged defect.

Paragraph 372 which simply states that "GAF took affirmative steps to prevent Plaintiffs and Class members from learning of the Decking's defects" appears to be the heart of its omission claim. While there may be a limitation to Plaintiffs' knowledge prior to discovery, Plaintiffs must have some basis for their allegations beyond conclusory assertions that simply mimic legal elements. With this background, the Court will address the specific argument made by GAF that Plaintiffs failed to plead a special or fiduciary relationship as required by certain states.

GAF states that "[f]raudulent concealment as a cause of action in these states requires *either* an affirmative act of concealment *or* confidential, fiduciary, or other special relationship," and that Plaintiffs have alleged neither. (GAF Mot. at 45–46 n.30 (emphasis added).) As such, GAF argues that the California (Williams), Illinois (Ernst), Ohio (Burger), North Carolina (Robertie),[25] Iowa (Denton, Sheridan), Montana (Hoover & Cohen), Nebraska (Warren), Michigan (McGovern, Narducci, Claxton), Virginia (Wolcott), New York (Giovannetti), and Mississippi (Mapp)[26] Plaintiffs' fraudulent concealment claims should be dismissed. (*See id.*) Plaintiffs counter that a showing of a special relationship is not required because–as GAF acknowledges–Plaintiffs must plead *either* an affirmative act(s) of concealment *or* a special relationship; Plaintiffs do not argue that they have

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 83 of 207
PageID: 13100

In re: Elk Cross Timbers Decking Marketing, Not Reported in Fed. Supp. (2015)

2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

plead a special or fiduciary relationship for any of the Plaintiffs. (*See* Pls.' Opp'n at 20–21.) However, Plaintiffs have not sufficiently pled an affirmative act of concealment as discussed above, so they cannot defeat GAF's argument on this issue on that cursory argument alone.

25    The Court does not reach this argument for North Carolina Plaintiff Shepherd as his cause of action has been dismissed as time barred. *See supra* Section V.A.1.

26    GAF also makes this argument with respect to the Indiana Plaintiff. (*See* GAF Mot. at 45 n.30.) However, as this Court has dismissed the Indiana fraudulent concealment cause of action as barred by the Indiana PLA (*see supra* Section V.C.1), it does not reach this argument.

**\*27** Plaintiffs further argue that in "numerous states at issue" (citing to cases analyzing Illinois, South Carolina (not at issue here), and Virginia law only), that neither an affirmative misrepresentation nor a special relationship are required "so long as the defendant: (1) knows about the defect at the time of sale, (2) makes partial representations while concealing other information, or (3) enjoys a position of superior knowledge over the plaintiff." (Pls.' Opp'n at 21 & n.28.) Plaintiffs also argue that in California, North Carolina, Iowa, Illinois, Nebraska, Ohio, New York, Montana, and Mississippi "when a manufacturer knows that it is selling a defective product, a duty to disclose that defect arises." (*Id.* at 22–24 & nn.29–35.)

Plaintiffs' cases do not support their argument that the fraudulent concealment claims in these states have been sufficiently pled for a product defect case. The cases cited by Plaintiffs involve more specific pleadings than are present here, different postures of the cases, and/or analysis of state, not federal, pleading sufficiency; no case supports that Plaintiffs can meet their pleading burden with bald assertions simply reciting magic legal phrases. In other words, even by their own definition, the allegations in the OAC are insufficient to state claims for fraudulent concealment in these states because Plaintiffs make nothing but conclusory allegations that GAF knew or should have known that its advertisements and/or representations were false or misleading at the time of sale. Thus, regardless of whether an affirmative duty to disclose exists relieving them of other proofs, Plaintiffs have not pled sufficient facts to establish such a duty existed here. Therefore, Plaintiffs'

fraudulent concealment causes of action in these states will be dismissed without prejudice.

Plaintiffs did not provide opposition with respect to GAF's Michigan arguments. (*See id.*) To state a claim for fraudulent concealment under Michigan law, Plaintiffs must plead either affirmative concealment or a fiduciary relationship. *See First of Mich. Corp. v. Swick*, 894 F.Supp. 298, 301 (E.D.Mich.1995)("Defendants acknowledge that fraudulent concealment requires some affirmative fraudulent act and an additional act to perpetuate the concealment; mere inaction or silence is not sufficient. Instead, defendants rely on the exception to this rule creating an affirmative duty when there is a fiduciary relationship.... [B]ecause there was not a fiduciary relationship between plaintiffs and defendants, mere inaction by plaintiffs is insufficient to establish fraudulent concealment.") (internal quotations and citations omitted). Plaintiffs have not sufficiently alleged either, and, therefore, the Michigan Plaintiffs' (McGovern, Narducci, Claxton) fraudulent concealment causes of action also will be dismissed without prejudice.

Because the Court finds that Plaintiffs' pleadings are insufficient regardless of whether GAF's or Plaintiffs' view of the law is correct, the Court will not decide at this time whether a showing of a special relationship or an affirmative act of concealment is required in all the states at issue.

### H. Count 20 (Breach of Express Warranty)

#### 1. *Failure to plead breach of the Smart Choice Limited Warranty*

GAF argues that all of Plaintiffs' express warranty claims fail "[t]o the extent that Plaintiffs attempt to plead a breach of the Smart Choice Limited Warranty, ... because they have not actually pled any breach of those terms." (GAF Mot. at 39.)

Although Plaintiffs assert that "Plaintiffs' claim for breach of [express] warranty includes ... a claim for breach of the Limited Warranty **offered by GAF**" (Pls.' Opp'n at 35 (emphasis added)), Plaintiffs do not plead the actual express terms of the applicable warranties, and how GAF failed to comply with those terms. They also do not allege that they gave GAF an opportunity to repair or replace any faulty product and GAF did not do so according to the express terms of the warranty. The only Plaintiff who alleges that he notified GAF at all–Plaintiff McGovern–does not allege

2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

any details of the communication other than that it was a "pre-suit demand." (*See* OAC ¶ 17.) This Court agrees with GAF that "at its core, Plaintiffs' claim regarding the Smart Choice Limited Warranty is not that GAF breached it, but that they are dissatisfied with the remedy that it provides." (GAF Mot. at 39–40; *see also* Pls.' Opp'n at 36 (explaining how they believe the warranty coverage is inadequate).) Plaintiffs have not identified in the OAC the warranty terms that were breached, and how they were breached.

**\*28** In lieu of arguments related to the actual warranty terms, Plaintiffs make arguments that the Smart Choice Warranty is unconscionable and "fails of its essential purpose." (*See* Pls.' Opp'n at 36–39.) As an initial matter, in support of both of these arguments, Plaintiffs cite primarily New Jersey case law and statutes, not cases applying the relevant law. Second, Plaintiffs seem to conflate various concepts. Even the New Jersey case cited by Plaintiffs for its unconscionability argument does not support their express warranty position because Plaintiffs have not explained how the concept of unconscionability demonstrates that their affirmative *express* warranty claims are sufficiently pled. *See In re AZEK Bldg. Prods., Inc. Marketing & Sales Practices Litig.,* 82 F.Supp.3d 608, 614, 616 (D.N.J.2015) (holding that "Defendant correctly argues that Plaintiffs have failed adequately to plead breach of the Lifetime Limited Warranty" while finding unconscionability, on the other hand, relevant to whether Defendants could *disclaim* certain causes of action based on the terms of the warranty. At this time, GAF has not moved to dismiss claims based on an argument that such claims are precluded by the terms of the warranty. Therefore, aside from being improperly supported given the relevant law, Plaintiffs' unconscionability argument is unresponsive to GAF's arguments related to Plaintiffs' claims for breach of the *express* warranty.

With respect to Plaintiffs' failure of essential purpose argument, Plaintiffs again cite to New Jersey law in response to GAF's citation to cases applying relevant state law. (*See* Pls.' Opp'n at 38 ("Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this Act.") (citing N.J.S.A. 12A:2–719(2)).) GAF's citations support their argument that a "warrantor in a repair or replace warranty must be provided with an opportunity to repair any defect, and no Plaintiff [here] adequately alleges providing any such opportunity, rendering the express warranty claims insufficient." (GAF Mot. at 40 n.23.) GAF's cases also support that in some instances, a plaintiff may be able to meet this requirement by

pleading allegations to support that such an effort would be futile. Plaintiffs have not made such an argument here, and they have not alleged any facts supporting such an argument.

The Court agrees with GAF that "[b]ecause no Plaintiff alleges GAF failed to provide the remedy promised in the Smart Choice Limited Warranty, Plaintiffs have not alleged any [express] breach of it." (*Id.* at 41.) Therefore, all claims based on the theory that the express warranty was breached pursuant to its terms are dismissed without prejudice.

### 2. *Failure to plead representations that became a basis of the bargain*

GAF also argues that all of the Plaintiffs' express warranty claims fail because "they do not allege that any statements outside of the Smart Choice Limited Warranty became part of the basis of the parties' bargain and thus formed express warranties." (*Id.* at 39.) GAF does not allege that representations can never form the basis for an express warranty claim. Instead GAF argues that "Plaintiffs' failure to allege that they heard or saw any alleged representations and relied on them necessitates dismissal of their breach of express warranty claims." (*Id.* at 41.)

GAF's case law (*see id.* at 41–42 n.25) supports that–at a minimum–Plaintiffs must have seen or heard the representations that they allege became a basis of the bargain. It also supports that in most, if not all, relevant states, Plaintiffs must allege that they relied on such representations or that the representations induced the purchase. *See Nat'l Mulch & Seed, Inc. v. Rexius Forest By–Prods. Inc.,* 2007 WL 894833, at \*16 (S.D.Ohio Mar. 22, 2007) ("An affirmation of fact is part of the basis of the parties bargain if it induces the buyer to purchase the product."); *Hope v. Nissan N. Am., Inc.,* 353 S.W.3d 68, 85 (Mo.Ct.App.2011) ("To prove a claim for breach of express warranty in Missouri, a plaintiff must show: ... (3) the statement of fact was a material factor inducing the buyer to purchase the goods...."); *Sharp v. Tamko Roofing Prods., Inc.,* 2004 WL 2579638, at \*2 (Iowa Ct.App.2004) ("For a plaintiff to prove a breach of an express warranty based on sales representations, there must be a finding the sale would not have been made but for the representations."); *Schlenz v. John Deere Co.,* 511 F.Supp. 224, 228 (D.Mont.1981) ("Manufacturers such as defendants create express warranties ... if they make representations in advertising brochures that the purchaser relies on as part of the basis for the bargain."); *Dow Corning Corp. v. Weather*

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 85 of 207
PageID#: 13102

In re: Elk Cross Timbers Decking Marketing, Not Reported in Fed. Supp. (2015)

2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

*Shield Mfg., Inc.,* 790 F.Supp.2d 604, 611 (E.D.Mich.2011) ("Under Michigan's version of the Uniform Commercial Code, advertisements and promotional literature can be a part of the basis of the bargain and thus constitute express warranty where they are prepared and furnished by a seller to induce purchase of its products and the buyer relies on the representations."); *Neb. Plastics, Inc. v. Holland Colors Am., Inc.,* 2003 WL 22519410, at *18 (D.Neb. Nov. 7, 2003) ("This court has held that [s]ince an express warranty must have been made part of the basis of the bargain, it is essential that the plaintiffs prove reliance upon the warranty.") (quoting *Hillcrest Country Club v. N.D. Judds Co.,* 461 N.W.2d 55, 61 (Neb.1990)) (internal quotations omitted); *Melton v. Ortho–McNeil Pharm., Inc.,* 2014 WL 4930673, at *3 (N.D.Ohio Oct. 1, 2014) (applying Illinois law) ("Essential to the formation of a warranty is the buyer's reliance on the representations of the seller.... [E]ven if the advertisement had contained an affirmation of fact or promise, it is of no consequence to the instant claims as Ms. Melton admits she did not read the advertisement, and therefore could not have relied on any statement therein."); *Assocs. of San Lazaro v. San Lazaro Park Props.,* 864 P.2d 111, 115 (Colo.1993) ("Sellers are encouraged to warrant only that which they know they can fulfill, while buyers who in fact rely on express warranties may anticipate judicial enforcement thereof."); *Wabash Power Equip., Co. v. BTU State Line, LLC,* 2014 WL 1329411, at *7 (N.D.Ind. Mar. 31, 2014) ("As the Seventh Circuit Court of Appeals explained, describing Indiana law, [t]he buyer has the burden of establishing that both parties understood and agreed to the same thing, before an express warranty can be proven. That means that if both parties did not rely on a certain assertion or opinion to be a part of the deal, no express warranty was created.") (internal quotations omitted, alteration in original); *Tae Hee Lee v. Toyota Motor Sales, U.S.A., Inc.,* 992 F.Supp.2d 962, 979 (C.D.Cal.2014) ("Moreover, Plaintiffs do not allege that they read or relied on the 'marketing brochure' before making their purchases."); *Kelleher v. Marvin Lumber & Cedar Co.,* 891 A.2d 477, 502 (N.H.2006) ("To satisfy this requirement, a plaintiff claiming breach of express warranty based upon a representation in a catalog or brochure would have to prove, at a minimum, that he or she read, heard, saw or was otherwise aware of the representation in the catalog or brochure."); *Cavanagh v. Ford Motor Co.,* 2014 WL 2048571, at *4 (E.D.N.Y. May 19, 2014) ("A successful claim of a breach of express warranty requires proof that an express warranty existed, was breached, and that plaintiff had relied on that warranty. Where a [p]laintiff does not identify the terms of the purported warranty he claims to have relied on, any

conclusory allegation ... for breach of express warranty [must] be dismissed.") (internal citations and quotations omitted, alteration in original); *Maxwell v. Remington Arms Co., LLC,* 2014 WL 5808795, at *3 (M.D.N.C. Nov. 7, 2014) ("In determining whether a seller's affirmation or description becomes the basis of the bargain, North Carolina courts look to certain factors, including whether the buyer knew of the seller's statements.") (internal quotations omitted); *Craig v. DaimlerChrysler Corp.,* 2008 WL 2816842, at *7 (S.D.Miss. Mar. 19, 2008) ("In order to set forth a product liability claim for breach of express warranty, Plaintiffs must demonstrate that: The product breached an express warranty or failed to conform to other express factual representations upon which the claimant justifiably relied in electing to use the product.") (internal quotations omitted). [27]

[27]    With respect to Virginia, GAF states: "Virginia requires that the alleged breach of an express warranty proximately caused the alleged damage." (GAF Mot. at 42 n.25 (citing VA. CODE § 8.2–714).) GAF's motion provides no analysis of this provision–"Buyer's damages for breach in regard to accepted goods"–nor does it cite to any case law addressing a basis of the bargain argument under Virginia law. The Court, therefore, does not treat GAF as moving to dismiss the Virginia breach of express warranty cause of action on this basis.

**\*29** Plaintiffs do not cite relevant law demonstrating that a plaintiff can state a breach of express warranty claim based on representations that they were not even aware of. (*See* Pls.' Opp'n at 39–41.) Instead, Plaintiffs make broad statements primarily supported by citations to cases analyzing New Jersey law. (*See, e.g., id.* at 39 ("All affirmations of fact by the seller, description of the goods, or exhibitions of samples become part of the basis of the bargain unless good reason is shown to the contrary. *Cipollone v. Liggett Grp., Inc.,* 893 F.2d 541, 568 (3rd Cir.1990).").) In fact, Plaintiffs seem to concede that–at a minimum–awareness of the representation is a requirement. (*See id.* at 40 ("A representation is presumed to be part of the basis of the bargain *once the buyer has become aware of the affirmation of fact or promise*.' ") (emphasis added) (quoting another case analyzing New Jersey law, *Liberty Lincoln–Mercury, Inc.,* 171 F.3d 818, 825 (3d. Cir.1999).) And yet, as GAF notes (*see* GAF Reply at 13), Plaintiffs have failed to plead which, if any, representations that the Plaintiffs were aware of. With respect to reliance, Plaintiffs assert–without more– that "[t]o the extent that a particular state requires reliance,

In re: Elk Cross Timbers Decking Marketing, Not Reported in Fed. Supp. (2015)

2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

Plaintiffs have adequately alleged it." (Pls.' Opp'n at 40 n.42.) Such arguments improperly punt Plaintiffs' opposition responsibility to this Court.

The Court finds that Plaintiffs have not pled anything sufficient to support a benefit of the bargain argument. As an initial matter, the following Plaintiffs make no allegations *of any kind* with respect to representations:[28] Burger (Ohio), McGovern (Michigan), Claxton (Michigan), Kaiser (Colorado), Tuthill (Colorado), and Mapp (Mississippi). (OAC ¶¶ 11, 17, 20, 22, 24, 31.) Thus, these Plaintiffs' express warranty claims will be dismissed without prejudice to the extent they are based on a benefit of the bargain theory.

[28] Robertie does not make any allegations related to representations, but also does not bring a claim for breach of express warranty. (*See* OAC ¶ 12, Count 20; ECF No. 60–2, (GAF's Checklist).)

The following Plaintiffs make only the single cut and paste allegation that they purchased the decking based on "the representations regarding the quality of the Decking": Denton (Iowa), Hoover & Cohen (Montana), Warren (Nebraska), Ernst (Illinois), Turcheck (Colorado), Stidham (Indiana), Williams (California), Wolcott (Virginia), Khanna (New Hampshire), Giovannetti (New York), Shepherd (North Carolina), Barker (Colorado), and Megerle (Colorado). (*Id.* ¶¶ 15–16, 18, 21, 23, 25–27, 29–30, 32, 34–35.) Plaintiffs Ross (Missouri) and Sheridan (Iowa) allege that "[b]ased upon GAF's marketing, at the time of purchase, [they] believed that the Decking was superior to other decking boards." (*Id.* ¶¶ 13–14.) Plaintiff Sheridan also alleges that based on the marketing, he believed it "would require limited maintenance." (*Id.* ¶ 14.) Plaintiff Narducci (Michigan) alleges that he purchased the decking "based upon the quality and ease of use of the Decking." (*Id.* ¶ 19.) Plaintiff Narducci does not identify the basis for that belief. None of the Plaintiffs identify which representations they saw or heard, where they saw or heard them, when they saw or heard them, from whom, and whether the representations induced them to purchase the product (in those states where required). In short, there is no indication in any of Plaintiffs' allegations what representations identified in the general allegations section became a basis of the bargain between these parties and GAF.

These allegations are inadequate to meet the basic requirements of Rule 8, and cannot be salvaged by a couple of general allegations by Plaintiffs. (*See id.* ¶ 87 ("Plaintiffs, class members, and the builders, contractors, subcontractors,

and other agents, relied on GAF's representations regarding the quality of the Decking."); *see id.* ¶ 339 ("Plaintiffs, Class Members, and the builders, contractors, subcontractors, and other agents who worked for them, relied on GAF's representations regarding the quality of the Decking.").) As this Court has made clear, even "Rule 8 does not empower respondent to plead the bare elements of his cause of action, affix the label 'general allegation,' and expect his complaint to survive a motion to dismiss." *Iqbal,* 556 U.S. at 686–87. Thus, these Plaintiffs' express warranty claims also will be dismissed without prejudice to the extent they are based on a benefit of the bargain theory.

### 3. *Failure to plead notice*

**\*30** GAF further argues that the Ohio (Burger), Michigan (Claxton, Narducci, McGovern), Illinois (Ernst), Indiana (Stidham), and New York (Giovannetti) Plaintiffs' express warranty claims also fail because they do not "allege facts showing that they provided GAF with notice of the alleged defects." (GAF Mot. at 44 & n.27; *see also* ECF No. 63–1 at 5–6(GAF Reply Checklist).) Plaintiffs counter that "these states all permit the filing of a complaint to constitute notice in this context." (*See* Pls.' Opp'n at 42 & n.45.)

With respect to Illinois, the case relied on by Plaintiffs does not support their position. In *Connick v. Suzuki Motor Company, Ltd.,* the Illinois Supreme Court held that "[o]nly a consumer plaintiff who suffers *a personal injury* may satisfy the section 2–607 notice requirement by filing a complaint stating a breach of warranty action against the seller." 675 N.E.2d 584, 590 (Ill.1996) (emphasis added). The Illinois court further held that "[t]he reason for this distinction is that where the breach has not resulted in personal injury, the UCC indicates a preference that the breach be cured without a lawsuit." *Id.* at 590–91. Here, the Illinois Plaintiff has not alleged any pre-suit notice. Therefore, his breach of express warranty claim is dismissed without prejudice on this basis.

With respect to Ohio, Michigan, Indiana, and New York, the most liberal reading of Plaintiffs' cases is that notice by complaint is the unusual exception, not the rule. And it is an exception premised on the filing of the complaint providing "reasonable" notice. Here, Plaintiffs have alleged no facts related to this issue. Instead all many of these Plaintiffs baldly assert is that they discovered the defect within a year prior to filing suit. (*See* OAC ¶¶ 11–12, 14–16, 18–23, 25–27, 29–32, 34.) Others do not even identify when they

Case 1:19-md-02875-RMB-SAK   Document 598-4   Filed 10/16/20   Page 87 of 207
PageID: 13104

In re: Elk Cross Timbers Decking Marketing, Not Reported in Fed. Supp. (2015)
2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

allegedly discovered the defect. (*See id.* ¶¶ 13, 17, 24, 35.) [29] Thus, Plaintiffs do not allege when each Plaintiff actually discovered the issue, or any other facts to support that notice was reasonable. Plaintiffs appear to believe that their notice argument means that the mere filing of the complaint without any allegations related to notice is enough to survive a motion to dismiss. If this were the case, then no express warranty claim could be dismissed in these states based on failure to provide notice, as every case begins with the filing of a complaint. Plaintiffs' cases do not support such a broad assertion. Because the Court finds that Plaintiffs' failure to make ***any*** allegations related to notice justifies dismissal without prejudice, it need not decide at this time when or if the filing of a complaint can satisfy the notice requirement in these states.

[29]   Although Plaintiff McGovern does not identify when he is alleging that he discovered the defect, he does allege that "[b]y the summer of 2010"– four years prior to filing suit– he "noticed that the Decking had separated due to expansion of boards" and that the Decking "became stained with mold and mildew." (OAC ¶ 17.)

#### 4. *Failure to plead privity*

GAF also argues that the Indiana Plaintiff's (Stidham) express warranty claim should be dismissed for failure to allege privity. (*See* GAF Mot. at 45.) To support this argument, GAF cites to *Atkinson v. P & G–Clairol, Inc.,* which held that "vertical privity is required for claims of breach of express warranty and breach of implied warranty of fitness for a particular purpose." 813 F.Supp.2d 1021, 1026 (N.D.Ind.2011). Plaintiffs, on the other hand, cite to *Prairie Production, Inc. v. Agchem Div.-Pennwalt Corporation,* which held, on an issue of first impression, that "a plaintiff may recover against a manufacturer for economic loss for breach of express warranties, even though the plaintiff is not in privity with the manufacturer." 514 N.E.2d 1299, 1302–03 (Ind.Ct.App.1987). A recent case in the Southern District of Indiana, *Ryden v. Tomberlin Automotive Group,* 2012 WL 4470266, at *1–2 (S.D.Ind.2012), dealt with the same arguments and cases as the parties present here. In that case, the court did not resolve the split between the holdings in these cases (*Atkinson* and *Prairie Production* ). Instead, it clarified the basis for the *Prairie Production* holding. The court stated:

**\*31** In *Prairie Production,* the Indiana Court of Appeals relied on the New York case of *Randy Knitwear, Inc. v. Am. Cyanamide Co.,* 11 N.Y.2d 5, 226 N.Y.S.2d 363, 181 N.E.2d 399 (N.Y.1962), and held that where a manufacturer had made representations to a buyer in the chain the distribution through advertisements and product labels, and the buyer in fact relied upon those representations, the buyer could maintain a claim for breach of an express warranty. 514 N.E.2d at 1303–04; see also id. at 1304 ("[T]he seller's representation rises to the level of an express warranty only if it becomes part of the basis of the bargain."). The cases that have followed *Randy Knitwear* only allow express warranty claims where the conditions of representation and reliance are met. They do not treat the case as a general repudiation of privity, but as an exception to it.

*Id.* at *2. The *Ryden* court then found–without resolving the dispute–that the plaintiff's allegations failed even to meet the *Prairie Production* requirements of awareness and reliance. *Id.* ("Significantly, Plaintiff does not allege that he relied on these advertisements in making his decision to buy a Vehicle, nor does he allege that he ever saw this advertisement or was aware of it. Without such allegations, Plaintiff's breach of express warranty claim does not fall within the exception to the privity requirement articulated in *Randy Knitwear* and *Prairie Production.*"). The Court reaches the same conclusion in this case. Even if Plaintiffs are correct that *Prairie Production* states the appropriate rule (that privity is not always required for express warranty claim under Indiana law), they have failed to plead any allegations supporting that an exception to this requirement exists here. Therefore, the Indiana Plaintiffs' express warranty cause of action will be dismissed without prejudice on this basis. The Court does not decide at this time whether such allegations without more would be sufficient to state an express warranty claim under Indiana law.

### I. Count 21 (Breach of Implied Warranties)

#### 1. *Failure to plead not merchantable*

GAF argues that in Ohio (Burger), North Carolina (Robertie, Shepherd), Montana (Hoover & Cohen), Michigan (Narducci, Claxton, McGovern), Nebraska (Warren), Colorado (Kaiser, Tuthill, Turcheck, Barker, Mergele), Indiana (Stidham), and Mississippi (Mapp) "an implied warranty claim (Count 21) should be dismissed where, as here, Plaintiffs do not

sufficiently allege that the items cannot be used for their ordinary purpose." (GAF Mot. at 42.)[30] GAF argues–and the Court agrees–that "[h]ere, Plaintiffs describe the 'ordinary purpose' of CrossTimbers and/or DuraLife as 'serving as exterior home decking in high-traffic areas exposed to the elements,' " and "and at no point do Plaintiffs allege that they are unable to use their CrossTimbers and/or DuraLife in this manner." (*Id.* at 43 (quoting OAC ¶ 81).)

[30]    Although GAF cites cases analyzing New Jersey law for this statement (*see, e.g., Green v. Green Mountain Coffee Roasters, Inc.,* 279 F.R.D. 275, 283 (D.N.J.2011)), it provides a footnote citation to cases analyzing the law of the relevant states. (*See* GAF Mot. at 4243 n.26.) Therefore, the Court will consider this argument. The Court does not reach this argument for Illinois Plaintiff Ernst as his breach of implied warranty cause of action has been dismissed as time barred. *See supra* Section V.A.1.

Plaintiffs do not challenge GAF's law, and, in fact, cite to cases analyzing New Jersey and Pennsylvania law in opposition. (*See* Pls.' Opp'n at 41–42 (citing *In re AZEK,* 82 F.Supp.3d at 616, and *Fleisher v. Fiber Composites, LLC,* 2012 WL 5381381, at *6–7 (E.D.Pa. Nov. 2, 2012).) Without acknowledging the different allegations in those cases, Plaintiffs state "[t]he court found that the essential function of a deck includes aesthetic improvement of the property [which] is a quintessential fact question that should not be resolved in the context of a motion to dismiss." (*Id.* at 41 (internal quotations omitted).) Plaintiffs further argue that "GAF's argument that Plaintiffs failed to allege that the Decking is 'not merchantable' ignores the plain text of the OAC and the reasonable inferences which may be drawn from those allegations." (*Id.* at 42 n.44 (citing OAC ¶¶ 73, 81, 346).) These OAC paragraphs provide:

  **\*32**  73. But GAF knew or should have known of the Decking's defects, and that the Decking is not fit for its ordinary and intended use, is not merchantable, and fails to perform in accordance with GAF's own statements and warranties, as well as with the reasonable expectations of ordinary consumers.

  81. Through these media, as well as by oral affirmations to the Plaintiffs and the general public, GAF advertised and warranted that the Decking was merchantable as exterior home decking, fit for the ordinary purpose of serving as exterior home decking in high-traffic areas exposed to the

elements, and free from defects in both its materials and its workmanship.

  346. Contrary to such implied warranties, the Decking is not of merchantable quality or fit for its intended use–it is defective and unsuitable for use as an exterior decking product.

Plaintiffs do not allege what their expectations were other than their express statement that the ordinary purpose was to "serv[e] as exterior home decking in high-traffic areas exposed to the elements." Nor do they allege that the decking failed in this respect.

A complaint may not be amended through briefing. *See Bell v. City of Phila.,* 275 F. App'x 157, 160 (3d Cir.2008). Because Plaintiffs have not alleged the facts that serve as the basis of their argument and have not cited relevant law on that point, the Court need not decide if such allegations would be sufficient under relevant law. Based on the OAC, Plaintiffs have not alleged that the decking is not merchantable, and, therefore, the implied warranty causes of action in these states will be dismissed without prejudice on that basis.

### 2. *Failure to plead notice*

For the same reasons that the Ohio (Burger), Michigan (Narducci, Claxton, McGovern), and Indiana (Stidham) Plaintiffs'[31] express warranty claims are dismissed for lack of notice (*see supra* Section V.H.3), their implied warranty claims must also be dismissed without prejudice.

[31]    The Court does not reach this argument for Illinois Plaintiff Ernst as his breach of implied warranty cause of action has been dismissed as time barred. *See supra* Section V.A.1.

### 3. *Failure to plead privity*

GAF argues that the North Carolina (Robertie, Shepherd) and Ohio (Burger) Plaintiffs'[32] implied warranty causes of action must be dismissed for failure to plead privity. (*See* GAF Mot. at 44 & n.28.) Plaintiffs argue that these states do not require privity for implied warranty claims; they do not argue that they have plead facts sufficient to support that privity exists. (*See* Pls.' Opp'n at 44.)

2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

32     The Court does not reach this argument for Illinois Plaintiff Ernst as his breach of implied warranty cause of action has been dismissed as time barred. *See supra* Section V.A.1.

**\*33** The Court agrees with GAF that privity is required for Plaintiffs' contract-based implied warranty causes of action in North Carolina and Ohio. *See Energy Inv. Fund v. Metric Constr., Inc.,* 525 S.E.2d 441, 446 (N.C.2000) ("[W]hen a claim is only for economic loss, ... the general rule is that privity is required to assert a claim for breach of an implied warranty involving only economic loss."); *Curl v. Volkswagen of Am., Inc.,* 871 N.E.2d 1141, 1147 (Ohio 2007) ("Ohio continues to require privity as to contract claims."). [33] Therefore, as Plaintiffs in these states have not alleged privity or losses beyond economic losses, theses causes of action will be dismissed without prejudice.

33     Plaintiffs assert that Ohio has "relaxed" this rule. (*See* Pls.' Opp'n at 44 n.47 (citing *DiCenzo v. A–Best Prods., Inc.,* 897 N.E.2d 132, 141 (Ohio 2008).) However, the *DiCenzo* court actually stated that "in [various cases] the court gradually relaxed the long-held requirement of privity [by holding] that a breach-of-warranty claim could ***arise out of tort*** ...." *897 N.E.2d at 141* (emphasis added). This is not inconsistent with the standard stated by the Ohio Supreme Court in *Curl.*

#### 4. *Failure to plead an alternative design*

As with the Michigan Plaintiffs' negligence causes of action, GAF argues that their breach of implied warranty causes of action should be dismissed for failure to plead an alternative feasible design. (*See* GAF Mot. at 49–50.) While Plaintiffs argued that the Michigan negligence causes of action do not require pleading an alternative reasonable design (this Court disagreed, *see supra* Section V.E), Plaintiffs do not make the same argument with respect to the breach of implied warranty cause of action. In any case, under Michigan law, "[b]reach of implied warranty and negligent design are two distinct theories of recovery but involve the same elements of proof." *Seversol N. Am., Inc. v. N. Am. Refractories, Co.,* 2009 WL 1620115, at \*13 (E.D. Mich. June 9, 2009). Thus, for the same reasons the negligence causes of action are dismissed on this basis (*see supra* Section V.E), the Michigan Plaintiffs' (McGovern, Narducci, Claxton) implied warranty causes of action also will be dismissed without prejudice.

#### 5. *Duplicative of the strict liability claim*

GAF argues that the Nebraska Plaintiff's (Warren) "breach of implied warranty claim ... fails because, as a matter of Nebraska law, it is subsumed by his strict product liability claim." (GAF Mot. at 50.) The Court has dismissed the Nebraska Plaintiff's strict liability cause of action, and has dismissed the Nebraska Plaintiff's implied warranty cause of action on other grounds. Therefore, it is unnecessary to decide at this time if the implied warranty claim could exist in the absence of a viable strict liability claim.

### J. Count 25 (Magnuson–Moss Warranty Act ("MMWA"))

Both GAF and Plaintiffs agree that "Magnuson–Moss claims based on breaches of express and implied warranties under state law depend upon [the underlying] state law claims." (Pls.' Opp'n at 52; *see also* GAF Mot. at 52.) In fact, on their argument checklist, Plaintiffs assert that they "do not oppose GAF's motion to dismiss their claims under this [Magnuson–Moss Warranty] act to the extent their claims arise from their breach of implied warranty claims in CA, IA, MO, MO [sic] NH, NY, and VA," which Plaintiffs also had not opposed dismissal of. (*See* ECF No. 61–1 at 6 (Pls.' Checklist).) Because this Court has dismissed additional state warranty claims, Plaintiffs MMWA claims based on those claims also are dismissed without prejudice.

**\*34** GAF also argues that Plaintiffs' MMWA claims must be dismissed because "Plaintiffs do not allege facts showing that Plaintiffs provided any notice to GAF or any opportunity to cure the alleged defects." (GAF Mot. at 52.) "[T]he MMWA provides that no legal action can be brought under its private right of action until the warrantor is given the opportunity to cure the violation." *McGarvey v. Penske Auto. Grp., Inc.,* 2011 WL 1325210, at \*8 (D.N.J. Mar. 31, 2011) (citing 15 U.S.C. § 2310(e)); *see also Greene v. BMW of N. Am.,* 2013 WL 5287314, at \*5 (D.N.J. Sept. 17, 2013) (same, dismissing a MMWA claim in an amended complaint with prejudice). Plaintiffs have not opposed this argument. In any case, Plaintiffs have pled no facts that they provided GAF an opportunity to cure the alleged defect. As noted above, the only Plaintiff who alleges that he notified GAF at all–Plaintiff McGovern–provides no details regarding the contents of the notice or whether GAF was an opportunity to cure the alleged defect. (*See* OAC ¶ 17.) Therefore, Plaintiffs'

Case 1:19-md-02875-RMB-SAK   Document 598-4   Filed 10/16/20   Page 90 of 207
PageID: 13107

In re: Elk Cross Timbers Decking Marketing, Not Reported in Fed. Supp. (2015)
2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

MMWA claims are also properly dismissed without prejudice on this basis.

## K. Count 27 (Unjust Enrichment)

### 1. Failure to plead a direct benefit

GAF argues that Ohio Plaintiff's (Burger) unjust enrichment claims fails because Ohio "do[es] not recognize unjust enrichment claims for indirect purchases." (GAF Mot. at 48) (citing *Savett v. Whirlpool Corp.,* 2012 WL 3780451 (N.D.Ohio Aug. 31, 2012).) "Under Ohio law, indirect purchasers may not assert unjust enrichment claims against a defendant without establishing that the purchaser conferred a benefit on the defendant through an economic transaction." *Savett,* 2012 WL 3780451, at *7. In *Savett,* the court found that the plaintiff failed to state a claim against defendant Whirlpool for unjust enrichment because plaintiff purchased the refrigerator from Home Depot, and had not alleged any direct benefit conferred on Whirlpool. *Id.* In response, Plaintiffs cite to *Nessle v. Whirlpool Corp.,* 2008 WL 2967703 (N.D.Ohio July 25, 2008). (*See* Pls.' Opp'n at 49.) However, in *Nessle,* the parties did not dispute whether a direct benefit was conferred. *See* 2008 WL 2967703, at *6. The element at issue in that case was whether the "retention of the benefit under the circumstances ... would be unjust ... without payment." *Id.* As such, Plaintiffs' case does not support its argument or contradict the law supplied by GAF. Therefore, the Ohio Plaintiff's (Burger) unjust enrichment cause of action is dismissed without prejudice.

### 2. Cannot plead in the alternative

GAF argues that the North Carolina (Plaintiff Robertie), [34] Missouri (Ross), Montana (Hoover & Cohen), Nebraska (Warren), Indiana (Stidham), Mississippi (Mapp), and New York (Giovannetti) Plaintiffs' unjust enrichment causes of action fail "because those states prohibit such claims when the existence of a contract is alleged, such as the Smart Choice Limited Warranty." (GAF Mot. at 47 & n.33 (citing to law analyzing unjust enrichment claims in these states).) Plaintiffs, on the other hand, argue that they are permitted to plead an unjust enrichment claim in the alternative pursuant to Federal Rule of Civil Procedure 8(d)(3). (*See* Pls.' Opp'n at 47–48.)

[34]  The Court does not reach this argument for North Carolina Plaintiff Shepherd as his unjust enrichment cause of action has been dismissed as time barred. *See supra* Section V.A.1.

GAF's citations to federal court decisions in these states support its position. *See Wireless Commc'ns, Inc. v. Epicor Software Corp.,* 2011 WL 90238, at *7 (W.D.N.C. Jan. 11, 2011) ("Here, Wireless admits that there is a contract between itself and Epicor in the Complaint. Given the existence of an actual contract, this Court will not recognize the existence of a quasi-contract. Therefore, Wireless' unjust enrichment claim is dismissed.") (internal citations omitted); *Affordable Cmty. of Mo. v. Fed. Nat'l Mortg. Ass'n,* 714 F.3d 1069, 1077 (8th Cir.2013) ("We also agree with the district court that Affordable's unjust enrichment claim should be dismissed. Unjust enrichment is an equitable remedy based on the concept of a quasi-contract, and a plaintiff may not recover under both an express contract and unjust enrichment.") (internal quotations and citations omitted); *Signal Peak Energy, LLC v. E. Mont. Minerals, Inc.,* 922 F.Supp.2d 1142, 1149 (D.Mont.2013) ("EMM may not maintain an unjust enrichment claim against SPE because unjust enrichment has its foundation in equity and is an obligation created by law in the absence of a contract.") (emphasis in original); *In re Saturn L–Series Timing Chain Prods. Liab. Litig.,* 2008 WL 4866604, at *15 (D.Neb. Nov. 7, 2008) ("It would certainly be contrary to every correct notion of the law to permit a party to resort to an implied contract, when the parties have entered into an express agreement which remains in force."); *Schafer v. Jeld Wen Doors/IWP Custom Door Div.,* 2007 WL 3407659, at *6 (N.D.Ind. Nov. 9, 2007) ("The only reasonable inference from the Complaint is that an express or implied contract governed the Plaintiffs' purchase of the custom door unit from the Defendant. Accordingly, it would be improper to invoke the equitable theory of unjust enrichment in this case and Count V is dismissed."); *Weisblum v. Prophase Labs, Inc.,* 88 F.Supp.3d 283, 297 (S.D.N.Y.2015) ("[B]ecause Weisblum has not shown that his unjust enrichment claim differs from his contract and tort claims, it must be dismissed."); *Morgan Stanley Mortg. Capital Holdings, LLC v. Realty Mortg. Corp.,* 2008 WL 4279585, at *7 (S.D.Miss. Sept. 11, 2008) ("The Court finds that as Mississippi does not allow damages to be recovered for unjust enrichment in cases in which a legally binding, written contract exists between the parties, the unjust enrichment claim pleaded by Realty is not plausible on its face.").

**\*35** Plaintiffs' cases, on the other hand, are not persuasive. First, they only cite to two Pennsylvania cases. (*See* Pls.'

In re: Elk Cross Timbers Decking Marketing, Not Reported in Fed.Supp. (2015)

2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 91 of 207
PageID: 13108

Opp'n at 47–48 (citing *Fleisher v. Fiber Composites,* 2012 WL 5381381 (E.D.Pa. Nov. 2, 2012) (analyzing Pennsylvania law), and "*Kantor,* 2015 U.S. Dist. LEXIS 486583, 2015 WL 1650049" [35] ).) *Fleisher* is consistent with GAF's cases. In *Fleisher,* the court stated: "plaintiffs may plead alternative theories of breach of contract and unjust enrichment *where there is any question as to the validity of [the] contract in question*." *See* 2012 WL 5381381, at *14 (emphasis added) (internal citations omitted). In *Kantor,* on the other hand, the court allowed the unjust enrichment to be pled in the alternative to the contractual-based claims under Federal Rule of Civil Procedure 8(d)(3) even though the plaintiff conceded that "at the end of the day, both counts cannot co-exist." 2015 WL 1650049, at *7. *Kantor* is not persuasive compared to other cases that hold that dismissal is appropriate with allegations (or the lack thereof) similar to those in this case. Plaintiffs must point to allegations providing some basis for the unjust enrichment claim separate from their contract claims, or they must explain how the claim is truly "alternative." They have not done so. Here, there is no dispute that a contract exists; Plaintiffs are bringing claims based on alleged breaches of the express warranty (as well as alleged implied warranties). Plaintiffs also have not explained how their unjust enrichment causes of action differ from their warranty causes of action. Therefore, the North Carolina (Robertie), Missouri (Ross), Montana (Hoover & Cohen), Nebraska (Warren), Indiana (Stidham), Mississippi (Mapp), and New York (Giovannetti) Plaintiffs' unjust enrichment claims will be dismissed without prejudice.

[35] Plaintiffs do not provide the full case name in the opposition, and the LEXIS citation provided is incorrect. The Court assumes that Plaintiffs are attempting to cite to *Kantor v. Hiko Energy, LLC,* 2015 WL 1650049 (2015 U.S. Dist. LEXIS 48653) (E.D.Pa. Apr. 14, 2015).

### 3. *Fails because fraud claims fail*

GAF argues that "where [as here] the [Illinois] plaintiff's claim of unjust enrichment is predicated on the same allegations of fraudulent conduct that support an independent *claim* of fraud, resolution of the fraud claim against the plaintiff is dispositive of the unjust enrichment claim as well." (GAF Mot. at 47–48 (quoting *Ass'n Benefit Servs., Inc. v. Caremark RX, Inc.,* 493 F.3d 841, 855 (7th Cir.2007) (alteration and emphasis in original).) In other words, GAF

argues that the Illinois Plaintiff's (Ernst) unjust enrichment cause of action fails because his fraud causes of action fail.

The case cited by Plaintiffs in opposition supports GAF's general statement of the law. *See Aliano v. WhistlePig, LLC,* 2015 WL 2399354, at *9 (N.D.Ill. May 18, 2015) (quoting the same *Caremark* standard quoted by GAF, but not dismissing the unjust enrichment claim because the court held that the fraud claim was adequately pled). Here, the Court has dismissed the Illinois Plaintiff's consumer protection claim and fraudulent concealment claim. *See supra* Sections V.B.4, V.G. Therefore, the Court will also dismiss the Illinois Plaintiff's unjust enrichment claim without prejudice on this basis.

### 4. *Failure to plead extraordinary circumstances*

GAF argues that the Indiana Plaintiff's claim for unjust enrichment should be dismissed "because Indiana law requires a consumer to plead 'extraordinary circumstances' beyond being 'dissatisfied' with their purchase," and no such circumstances are pled here. (GAF Mot. at 48 (quoting *Hughes v. Chattem, Inc.,* 818 F.Supp.2d 1112, 1125 (S.D.Ind.2011).) The *Chattem* court held that "where [plaintiffs] fail to allege extraordinary circumstances, much less that they did not receive the benefit of their bargain, we find that an order of unjust enrichment is inappropriate." 818 F.Supp.2d at 1125. Plaintiffs, on the other hand, argue that Indiana law does not require "extraordinary circumstances" to state an unjust enrichment claim, and that the "pivotal concept of unjust enrichment is the occurrence of a wrong or something unjust." (Pls.' Opp'n at 48–49 (quoting *Roberts v. Alcoa, Inc.,* 811 N.E.2d 466, 475 (Ind.Ct.App.2004) (internal quotations omitted).). The Court finds the two statements of the law consistent; a plaintiff must plead some wrong beyond simple dissatisfaction with the product. Plaintiffs, however, identify no allegations in the OAC (beyond conclusory legal assertions) with respect to the Indiana Plaintiff that they believe meet this pleading requirement. Therefore, the Court finds dismissal of the Indiana Plaintiff's (Stidham) unjust enrichment claim without prejudice is also appropriate on this basis.

### L. Count 28 (Declaratory Judgment)

**36** In a one sentence section, GAF argues that "Plaintiffs' declaratory relief claim (Count 28) fails ... because a declaratory relief claim is 'not ... a cause of action courts

may be compelled to enforce.' " (GAF Mot. at 53 (quoting
*In re AZEK,* 82 F.Supp.3d 608, 624–25 (D.N.J.2015).) As an
initial matter, *In re AZEK,* was addressing a claim under the
Declaratory Judgment Act ("DJA") (28 U.S.C.A. § 2201).
*See* 82 F.Supp.3d at 62425; *see also* Docket No. 12–6627,
ECF No. 90 (Am. Compl., Count XV ("Declaratory Relief
Pursuant to 28 U.S.C. § 2201")). Plaintiffs respond by citing
cases also analyzing the DJA. (*See* Pls.' Opp'n at 52–53.) The
Court notes, however, that Plaintiffs' OAC does not specify
that Count 28 is being brought under this provision. That
aside, the Court is not persuaded by *In re AZEK* as compared
to the cases cited by Plaintiffs that this claim– pled in the
alternative–need be dismissed at this time. GAF may re-raise
this issue after the OAC has been amended, based on the
clarified allegations, if any, related to this Count.

## VI. RE–PLEADING

To the extent that this Court finds any of the OAC's allegations
insufficient, Plaintiffs "request that they be permitted leave to
amend to cure any deficiencies." (Pls.' Opp'n at 53.) As noted
throughout this Opinion, where the Court has determined that
a cause of action is dismissed due to pleading failures, the
Court has indicated those dismissals are without prejudice to
re-pleading. However, the Court is mindful that the parties
are presently briefing a motion to dismiss in a related action
involving nine (9) additional Plaintiff fact sets and seven
(7) additional states. (*See* ECF Nos. 64, 69.) The Court is
also mindful that GAF will no doubt move to dismiss the
Amended OAC. Therefore, given the number of causes of
actions involved under numerous state laws and in the interest
of judicial efficiency and party fairness, the Court provides
the following guidelines for future motion to dismiss briefing:

- Page limits will be set as they were for briefing of the
  present motion: 55 pages for moving and opposition
  briefs and 20 for GAF's reply.

- Sur-replies will be disregarded unless prior permission of
  the Court has been granted.

- All citations that do not contain argument may be included
  in endnotes that will not count towards the page limit.
  Parenthetical descriptions of the cases are acceptable
  for purposes of this guideline; textual arguments are not
  and must be included in the body of the brief. Because
  citations included as end notes will be exempt from the
  page limit, the parties are limited to no more than two
  (2) case citations as end notes per point. For example, all
  of the citations in GAF's footnote 26 in its motion would

be acceptable as an exempt end note. But GAF could
not, for example, include three citations under each state
heading in the exempt portion of the brief.

- For any cause of action under state law for which GAF
  moves for dismissal, GAF may include, in a combined
  separate exhibit, the elements of the cause of action,
  with appropriate case citation. Again, no argument may
  be included in this exhibit. This exhibit will not count
  towards the page limit, but may be referenced in the body
  of the brief. If Plaintiffs disagree with the elements as
  put forward by GAF, Plaintiffs, likewise, may include an
  exhibit of elements that will not go to the page limit so
  long as no argument is included.

- The parties may also include argument checklist exhibits
  in the same format as submitted with the present motion.

- All case citations must contain a parenthetical identifying
  the law applied by the court cited, and must include
  pin cites. Additionally, the Court prefers (but will
  not require) citation to one legal research service (if
  available) given the number of cases cited.

- The parties may not re-argue items that were addressed
  and decided herein, but may argue points that were not
  previously raised, that the Court treated as unmoved on,
  or that the Court declined to address in this Opinion.

**\*37** • GAF does not need to address in its motion whether
  claims should be dismissed with or without prejudice.
  After decision on a new motion to dismiss, if any
  claims are dismissed for insufficiency of the pleadings,
  Plaintiffs will be required to move to amend the second
  OAC to explain why a third OAC should be permitted.
  That separate motion will be subject to the standard
  briefing rules of this Court unless otherwise ordered by
  the Court.

- GAF should conform its present briefing in the related
  matter to this Opinion, and will be given an opportunity
  to re-serve its brief as ordered by Magistrate Judge
  Dickson.

The Court also notes that failure to dismiss certain causes of
action at this time is not an indication that a particular cause of
action was properly pled. In most, if not all, cases, the causes
of action that have survived were ones that GAF did not move
on or that this Court treated as unmoved on. Plaintiffs are on
notice that they will not automatically get another opportunity
at redo for these causes of action if they are dismissed upon

2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

a new motion to dismiss based on the amended OAC. The Court has gone to great lengths to address the parties' pleading disputes; simple failure to respond to this Court's holdings (including applying this Court's holdings to analysis of other causes of action) will not be sufficient to avoid dismissal with prejudice.

**VII. CONCLUSION**
For the reasons set forth above, GAF's motion to dismiss is granted in part and denied in part. Exhibit 2, attached to

this Opinion, sets forth the rulings with regard to the specific causes of action. Plaintiffs are granted leave to file a second OAC, which cures the pleading deficiencies discussed herein, in accordance with the schedule to be set by Magistrate Judge Dickson. An appropriate Order accompanies this Opinion.

**All Citations**

Not Reported in Fed. Supp., 2015 WL 6467730, 87 UCC Rep.Serv.2d 1212

---

**End of Document**                          © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 6

2015 WL 3774496
Only the Westlaw citation is currently available.
United States District Court,
W.D. Wisconsin.

Mary HALEY and Michael Haley, Leslie Banks and James Hal Banks, Annie Buinewicz and Brian Buinewicz, Terrance McIver and Jean Ann McIver, Susan Senyic and Christian Senyk, Matthew Deller and Renee Deller, Patricia Groome, [1] Gary Samuels and Marie Lohr, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

KOLBE & KOLBE MILLWORK CO., INC., Defendant,
and
Fireman's Fund Insurance Company and United States Fire Insurance Company, Intervenor Defendants.

No. 14–cv–99–bbc.
|
Signed June 15, 2015.
|
Filed June 16, 2015.

**Attorneys and Law Firms**

Dixon R. Gahnz, James A. Olson, Lawton & Cates, S.C., Madison, WI, Joseph J. Depalma, Susana Cruz Hodge, Lite Depalma Greenberg, LLC, Newark, NJ, Katrina Carroll, Kyle A. Shamberg, Lite Depalma Greenberg, LLC, Chicago, IL, Benjamin D. Elga, Cuneo Gilbert & Laduca, LLP, Brooklyn, NY, Bonnie J. Prober, Charles J. Laduca, Cuneo Gilbert & Laduca, LLP, Bethesda, MD, Charles E. Schaffer, Levin Fishbein Sedran & Berman, Philadelphia, PA, Daniel M. Cohen, Katherine W. Van Dyck, Cuneo Gilbert & Laduca, Washington, DC, Jill T. Lin, Jonas Palmer Mann, Michael Andrew McShane, Audet & Partners, LLP, San Francisco, CA, Michael J. Flannery, Cuneo Gilbert & Laduca, St. Louis,

MO, Rebecca A. Peterson, Robert K. Shelquist, Lockridge Grindal Nauen P.L.L.P., Minneapolis, MN, for Plaintiffs.

Gordon Davenport, III, Michael D. Leffel, Krista J. Sterken, Matthew D. Lee, Megan Renee Stelljes, Foley & Lardner, Madison, WI, Susan G. Schellinger, Elizabeth K. Miles, Davis & Kuelthau S.C., Milwaukee, WI, for Defendant.

Beth Ann Berger, Jeffrey Alan Goldwater, Lewis Brisbois Bisgaard & Smith Llp, Chicago, IL, Danita Lea Davis, Michael Raymond Gregg, Merlo Kanofsky & Gregg, Ltd., Danita Lea Davis, Merlo Kanofsky & Gregg & Machalinski Ltd., Chicago, IL, for Intervenor Defendants.

OPINION AND ORDER

BARBARA B. CRABB, District Judge.

**\*1** This is a proposed class action in which plaintiffs Mary and Michael Haley, Leslie and James Hal Banks, Annie and Brian Buinewicz, Terrance and Jean Ann McIver, Susan and Christian Senyk, Matthew and Renee Deller, Patricia Groome, Gary Samuels and Marie Lohr, on behalf of themselves and all others similarly situated, allege that defendant Kolbe & Kolbe Millwork Co. sold them defective windows that leak and rot. Plaintiffs have alleged common law and statutory claims that defendant breached express and implied warranties, negligently misrepresented the condition of the windows they sold, were negligent in the manufacture and design of the windows, made fraudulent representations and have been unjustly enriched. Before the court is defendant's motion for partial summary judgment, dkt. # 164, in which defendant argues that many of plaintiffs' claims are barred by the statute of limitations and the economic loss doctrine and that plaintiffs have failed to establish the elements of some of their claims. Although plaintiffs challenge defendant's statute of limitations arguments with respect to the express warranty and fraudulent misrepresentation claims, they do not make any arguments in opposition to defendant's challenges to plaintiffs' claims of implied warranty, negligence and unjust enrichment and have not proposed any supplemental findings of fact in support of those claims. Also before the court is plaintiffs' motion for leave to file a surreply to respond to an argument defendant raised in its reply brief relating to the length of the Buinewiczes' warranty period. Dkt. # 214.

[1] On November 6, 2014, the parties agreed to add "Patricia Samuels," the spouse of plaintiff Gary Samuels, as a named plaintiff, dkt. # 86, but at her deposition, she testified that her name is "Patricia Groome." Dkt. # 160 at 2. Therefore, I am amending the caption to reflect her correct name.

For the reasons explained below, I am granting defendant's motion for summary judgment with respect to the following claims:

(1) The Buinewicz plaintiffs' express warranty claims based on a one-year warranty period.

(2) The McIver plaintiffs' express warranty claim related to the windows remaining free of defects for 10 years.

(3) The express warranty claims brought by all of the plaintiffs related to statements made by defendant in its advertising and product literature.

(4) The implied warranty claims brought by the Banks, Buinewicz, McIver, Senyk, Deller and Lohr plaintiffs.

(5) The fraudulent misrepresentation claim brought by the Groome and Samuels plaintiffs.

(6) The negligence, negligent misrepresentation and unjust enrichment claims brought by all plaintiffs.

Defendant's motion will be denied with respect to (1) the Banks, Lohr, Senyk and Deller plaintiffs' express warranty claims related to defendant's representation that the windows would remain free from defects for 10 years; and (2) the McIver and Senyk plaintiffs' express warranty claims based on defendant's failure to honor its promise to repair, replace or pay for the defective windows. Plaintiffs' motion for leave to file a surreply will be granted.

From the parties' proposed findings of fact, I find the following facts to be material and undisputed.

UNDISPUTED FACTS

**\*2** Defendant Kolbe & Kolbe Millwork Co. is a Wisconsin corporation that designed, manufactured, warranted, advertised and sold windows installed in plaintiffs' homes.

### A. *Mary Haley and Michael Haley*

These plaintiffs live in Alden, Michigan. In 2010, they purchased windows from defendant through their builder, Old Mission Windows, a distributor for defendant. Defendant provided a 10–year warranty that the windows "shall be free from defects in material and workmanship that would render them unserviceable or unfit for the ordinary use for which each window ... is manufactured." Under this warranty, defendant was obligated to repair, replace or refund the purchase price for any window that was defective. The warranty also included a Wisconsin choice of law provision.

In December 2010, plaintiffs noticed that their windows were warping and condensation was forming on them. The distributor inspected the windows and told plaintiffs that "condensation is normal" and that the problem was "a humidity issue." Even though the distributor adjusted the windows, plaintiffs continued to observe condensation.

Sometime between November 2012 and the end of the winter in 2013, plaintiffs asked defendant to replace their windows. In October 2013, plaintiffs repeated this request. When defendant refused it, plaintiffs concluded that defendant was not going to honor the warranty on the windows.

### B. *Leslie Banks and Hal Banks*

The Banks reside in Pensacola, Florida and purchased windows from defendant as part of the construction of their new home in 2002. The windows were installed in 2003 and came with a 10–year warranty and Wisconsin choice of law provision similar to the one the Haleys received. Plaintiffs observed rot in their window sashes within two years, and by 2007, they had observed ten rotting window sashes.

During a hurricane in 2004, the Banks observed water coming in underneath two bedroom windows and puddling on the carpet. By 2005, there were "a lot" of rotten window sashes. In 2006, Ms. Banks had water testing performed on the window and was advised that an exterior sealant would solve the problem. Defendant replaced every sash in the Banks home in 2007.

During 2007, plaintiffs' windows began leaking again and one replacement sash had rot. In late November or early December 2007, the Banks had another water test, which showed that a window in the office had failed because of leaking that had caused the failure of the milled joints. Defendant's representative visited their home in January 2008 and told them that the problem was caused by cladding that was too short. Defendant replaced 25 of the sashes-it had replaced earlier.

2015 WL 3774496

In 2010, plaintiffs' windows began leaking again. Defendant blamed the problem on "weep holes." In 2011, defendant performed further testing and sent plaintiffs a letter saying that it would not replace any more sashes because the majority of the water problems were caused by flaws in the waterproofing of plaintiffs' home and not by defects in the windows. The letter caused the Banks to conclude that defendant was not going to honor the warranty on their windows.

### C. *Annie and Brian Buinewicz*

**\*3** These plaintiffs reside in Doylestown, Pennsylvania and acquired their windows through a distributor as part of the construction of their new home in 1997. The Buinewiczes received a warranty that "the windows shall be free from defects in materials and workmanship" for a period of one year from the date of purchase. Under this warranty, defendant was obligated to repair or replace any window that was defective. The one-year warranty did not contain a choice of law provision. Plaintiffs' windows had a special paint, known as the "K–Kron system," that came with a 10–year warranty, guaranteeing "film integrity" and promising that the windows "will resist cracking, peeling, flaking, etc. of the applied paint film."

In the spring of 2003, plaintiffs discovered that the frame, sash and sill of their son's bedroom window had rotted. Plaintiffs called their builder, who discovered more deteriorating windows. Defendant and its distributor replaced the deteriorated pieces of the windows. By 2007, the Buinewiczes noticed additional rot on the windows in their son's bedroom window and the family room. Further inspection by the builder, the distributor and defendant revealed that additional replacements were needed in many windows throughout plaintiffs' home. Defendant replaced the deteriorating pieces of the windows in 2007. Plaintiffs noticed more rot in the summer of 2013 but defendant declined the claim on the ground that it fell outside the warranty period.

### D. *Terrance and Jean Ann McIver*

The McIvers reside in Kalamazoo, Michigan and purchased their windows between 2000 and 2002. The windows came with a 10–year warranty similar to that received by the Haleys but with no choice of law provision. Between 2005 and 2008, plaintiffs noticed that their windows were cracking. They saw chipped and cracked paint and wood grain appearing

through the paint. The changes were gradual and worsened over time. In the fall of 2008, defendant's representative visited their home and told the McIvers that the cracks were the result of normal joint movement and that they should paint the windows. (Although the undisputed facts state only "2008," plaintiffs alleged in their complaint that this discussion occurred in or around October 2008. Dkt. # 34 at ¶ 84.) Plaintiffs interpreted this as defendant's failure to honor its warranty.

### E. *Susan and Christian Senyk*

The Senyks reside in Collegeville, Pennsylvania and received the windows for their new home in 2003. The windows came with a 10–year warranty and Wisconsin choice of law provision similar to that received by the Haleys. In 2008, plaintiffs noticed that a window in their living room was leaking and that other windows had rot. They contacted the distributor in the spring of 2009. A representative from the distributor inspected the windows and later informed the Senyks that defendant would not honor the warranty because the windows had not been properly maintained. Plaintiffs concluded in the summer of 2009 that defendant was not going to honor the 10–year warranty even though the 10–year period had not yet expired. In 2012, plaintiffs noticed more rotting in a basement window, and by 2013, they realized that several windows had to be replaced because of serious rotting.

### F. *Matthew and Renee Deller*

**\*4** The Dellers reside in Troy, Ohio. Defendant's windows were installed in their new home in 2004 and came with a 10–year warranty and Wisconsin choice of law provision similar to that received by the Haleys. In 2008 or 2009, Renee Deller noticed that all of the windows on the northwest side of the house had been leaking down the middle of the pane during rain storms. Matthew Deller believed that it was due to the severity of the storms. When they later noticed leaks in windows in other areas of the house in 2013, they suspected that there could be a problem with the remaining windows. In the spring of 2013, Matthew Deller inspected the windows and saw that the weather stripping had separated from the sashes of two windows and was hanging off the outside of the house. After closer inspection, the Dellers learned that the windows were rotting. The distributor inspected the windows and told the Dellers that the problems were caused by humidity. Defendant agreed to replace two

2015 WL 3774496

sashes, but Matthew Deller found that unacceptable as he believed that defendant should replace all of the sashes showing water damage. Matthew Deller met with defendant and the distributor in October 2013 and asked that at least four sashes be replaced. Defendant agreed and stated that the other leaks could be dealt with by adjusting the windows. Because defendant replaced only four windows, plaintiffs concluded that defendant was not going to honor its warranty on the remaining windows.

### G. *Patricia Groome and Gary Samuels*

These plaintiffs reside in Deering, New Hampshire. The windows were installed in their new home in the fall of 2010 and came with a 10–year warranty and Wisconsin choice of law provision similar to that received by the Haleys. Plaintiffs first noticed moisture, ice and black growth on some of their windows in the winter of 2011–2012. Defendant told them that the problem was humidity in their house and recommended installing a dehumidifier. In January 2014, plaintiffs requested replacement products under the warranty. Defendant responded by mailing them information about controlling humidity in their home. From this, plaintiffs concluded that defendant was not going to honor its warranty.

### H. *Marie Lohr*

Plaintiff Lohr is a resident of Sun Prairie, Wisconsin, who had approximately 30 Kolbe windows installed when her home was built in 2001. The windows came with a 10–year warranty similar to the one the Haleys received but with no choice of law provision. The windows developed condensation within months of their installation and began to rot and deteriorate over the next few years. In 2010, plaintiff contacted the supplier and then defendant, which told her that finishing the bottom of the sashes was important. Defendant replaced some of the sashes in 2010 but the sashes began to rot in 2011. Plaintiff concluded that defendant was not going to honor its warranty when defendant told plaintiff that it would not replace any more sashes and that her replacement windows were not covered by a warranty.

### OPINION

### I. EXPRESS WARRANTY

**\*5** As an initial matter, I note that there is some confusion over what types of express warranty claims plaintiffs are bringing. In count 1 of their first amended complaint, plaintiffs allege that defendant breached its express warranty because their windows did not remain free from defects for a period of ten years and because defendant failed to repair, replace or refund the price of the defective windows as promised under the warranty. Dkt. # 34 at 21–22, ¶¶ 112 and 115. Defendant has interpreted these allegations as possibly stating two different types of express warranty claims: a "no defect express warranty claim" that relates to the windows failing and a "failure to honor express warranty claim" relating to defendant's denial of plaintiffs' warranty claims. In addition, plaintiffs generally allege in the fact section of their complaint that defendant breached promises it made in its advertising and product literature. Dkt. # 34 at ¶¶ 20–21, 36. Defendant states that even though it is not clear that plaintiffs are asserting an express warranty claim related to the advertising statements, it has assumed for the purpose of its summary judgment motion that plaintiffs have brought a separate "advertising statements express warranty claim."

Apart from including a short discussion of the merits of the advertising statement claims in their response brief, plaintiffs ignore defendant's characterization of their claims and make general arguments relating to accrual, equitable estoppel and the merits of their warranty claims. Although the parties do not cite any Wisconsin cases that have distinguished these types of warranty claims in the context of statutes of limitations, one treatise notes that an "area that has engendered considerable confusion in the courts regarding accrual of the cause of action is when the seller promises 'to repair or replace defective goods' for a set time period." 2 William D. Hawkland, *Uniform Commercial Code Series* § 2–725:2 (2015). Some courts have held that a promise to repair or replace is not truly a warranty because it does not relate to the goods or their quality, while others view such a promise as an express warranty. 9 *Business & Commercial Litigation Federal Courts* § 101:30 (3d ed.). *See also* 2 Hawkland, § 2–725:2 ("The correct analysis is to separate the cause of action for breach of the warranty and the cause of action for breach of the repair promise."); *Lewis v. Pella Corp.*, 2014 WL 7264893, at \*8 (D.S.C. Dec. 18, 2014) (analyzing the shipment of defective windows and failure to sufficiently repair or replace windows as separate breaches of plaintiffs express warranties). Because there is some support

for defendant's analysis, and plaintiffs do not object, I will consider the "no defect," "failure to honor" and "advertising statements" to be distinct express warranty claims for the purpose of deciding this motion and will analyze them separately.

### A. *The Buinewiczes' Warranty Period*

**\*6** It is undisputed that the warranty the Buinewiczes received in 1997 provided that "the windows shall be free from defects in materials and workmanship" for a period of one year from the date of purchase. Because the Buinewiczes first discovered rot in one of their windows in 2003, six years after the warranty period ended, defendant contends that they cannot show that defendant breached the "no defect" warranty. In response, plaintiffs point out that the K–Kron system applied to their windows was subject to a separate warranty that guaranteed "film integrity" that "will resist cracking, peeling, flaking, etc. of the applied paint film" for 10 years. Although defendant admits that plaintiffs had such a warranty, it contends in its reply brief that the Buinewicz plaintiffs have not alleged any failure in the paint film in the first amended complaint or adduced any evidence of cracking, peeling or flaking paint film in response to the motion for summary judgment. Plaintiffs note that defendant did not make any arguments related to the merits of their claim until defendant filed its reply brief. Plaintiffs have moved for leave to file a surreply brief to explain their allegations concerning the K–Kron warranty. Because the surreply will aid the court in deciding the motion for summary judgment and it is attached to its motion, I am granting plaintiffs' request and will take the arguments in the surreply brief into consideration.

As defendant argues, several allegations in plaintiffs' first amended complaint focus on rotting and leaking windows and not on the paint film. Dkt. # 1, ¶¶ 69–71. However, plaintiffs have made specific allegations concerning the K–Kron finishing process, including an allegation that defendant knew that "K–Kron was a defective sealant, yet continued to produce hundreds of thousands of windows using its K–Kron system." *Id.* at ¶¶ 20 and 36. Although plaintiffs did not adduce evidence specifically related to the K–Kron claim in response to the motion for summary judgment, they did not have to do so. Initially, defendant challenged the Buinewiczes' claim as untimely under the one-year warranty and assumed incorrectly that plaintiffs would not be proceeding on a claim under the 10–year KKron warranty. It is too late to address the

merits of the K–Kron warranty claim on summary judgment. Accordingly, defendant's motion for summary judgment will be granted with respect to the Buinewiczes' "no defect" and "failure to honor" express warranty claims only to the extent that plaintiffs seek to rely on the one-year express warranty. (Plaintiffs' advertising statement warranty claims will be addressed in a separate section of this opinion.)

### B. *"No Defect" Warranty*

Defendant contends that the "no defect" warranty claims brought by the Banks, Buinewicz and Lohr plaintiffs are barred by the six-year Wisconsin statute of limitations, Wis. Stat. § 402.725(1), and those brought by the McIver, Senyk and Deller plaintiffs are barred by the four-year statutes of limitations in their states of residence (Michigan, Pennsylvania and Ohio, respectively). (Although defendant argued that the Buinewiczes' warranty period was limited to one-year, it assumed for purposes of this argument that the windows failed within the warranty period.) Defendant does not seek dismissal of the "no defect" claims brought by the Haley, Samuels or Groome plaintiffs. The parties dispute four main issues with respect to these claims: (1) which state's statute of limitations apply to the McIver, Senyk and Deller plaintiffs; (2) when the statute of limitations began to accrue on each of the plaintiffs' claims under the applicable statute of limitations; (3) whether the statute of limitations should be tolled; and (4) whether defendant should be equitably estopped from asserting a statute of limitations defense.

#### 1. *McIver, Senyk and Deller statute of limitations*

##### a. Borrowing statute
**\*7** The parties agree that Wisconsin's borrowing statute, Wis. Stat. § 893.07(1), is triggered in diversity cases in which the laws of a foreign jurisdiction may be possibly implicated. *Faigin v. Doubleday Dell Publishing Group, Inc.,* 98 F.3d 268, 269 (7th Cir.1996) (court must look to borrowing statute to decide which statute of limitations will govern in diversity case). That statute provides that "[i]f an action is brought in this state on a foreign cause of action and the foreign limitation period of limitation which applies has expired, no action may be maintained in this state ." § 893.07(1). In the contracts context, a cause of action is "foreign" when "the final significant event giving rise to a suable claim occurs outside the state of Wisconsin." *Abraham v. General Casualty Co. of Wisconsin,* 217 Wis.2d 294, 31.1, 576 N.W.2d 46, 53–54 (1998) (agreeing with reasoning in *Terranova*

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 100 of 207
PageID: 13117
Haley v. Kolbe & Kolbe Millwork Co., Inc., Not Reported in F.Supp.3d (2015)
2015 WL 3774496

*v. Terranova,* 883 F.Supp. 1273, 1281 (W.D.Wis.1995)). Plaintiffs contend that their claims are not foreign because the final significant event was defendant's decision to deny the warranty, which was made in Wisconsin. Defendant argues that the final significant event was the appearance of the defects in the windows, which occurred in the plaintiffs' home states.

I agree with defendant. With respect to these particular claims, plaintiffs allege that defendant breached the warranty because plaintiffs' windows did not remain free from defects for a period of 10 years from the date of purchase. Because I am considering the "no defect" claims separately from the "failure to honor" claims, this means that the breach of the "no defect" claims was not defendant's refusal to repair, replace or pay for the defective windows, but the failure of the windows themselves, which occurred in the states in which the plaintiffs reside. *Selzer v. Brunsell Brothers,* 2002 WI App 232, ¶¶ 16–17, 257 Wis.2d 809, 822–23, 652 N.W.2d 806, 812 (plaintiff's breach of warranty claim accrued at time breach occurred, which was when he discovered window rot). Accordingly, under the borrowing statute, the McIver, Senyk and Deller claims are subject to a four-year statute of limitations. Although this resolves the question with respect to the statute of limitations applicable to the McIvers, the analysis is more complicated for the Senyks and the Dellers because their warranties contain a Wisconsin choice of law provision.

b. Contractual choice of law provision
Although defendant acknowledges that the Wisconsin choice of law provision in the Senyk and Deller warranties applies to the "no defect" claims, dkt. # 165 at 17–18, it argues that in the case of the Dellers, the borrowing statute trumps the choice of law provision in the warranty. (Defendant does not make this argument with respect to the Senyks because it maintains that their "no defect" claims are untimely under both the four- and six-year statutes of limitations periods. Dkt. # 165 at 21.) Defendant relies on this court's decision in *Jahn v. 1–800–FLOWERS.COM, Inc.,* 2002 WL 32362244, at *9 (W.D.Wis. Oct. 21, 2002),* in which the question was whether the choice of law provision in the contract at issue should determine the controlling statute of limitations. I noted that "Wisconsin courts respect the choice of law in the contract provided that 'to do so [will not be] at the expense of important public policies of a state whose law would be applicable if the parties choice of law provision were disregarded.' " *Id.* (quoting *Bush v. National School Studios, Inc.,* 139 Wis.2d 635, 407 N.W.2d 883, 886 (1987)). As in this case, the parties in *Jahn*

did not raise any public policy concerns on the part of the plaintiffs' home states. As a result, the determinative question was whether the language of the contract's choice of law provision encompassed the statute of limitations. *Id.* at 10. In *Jahn,* I concluded that because the parties' contract provided that the agreement "shall be ... *enforced in accordance with* the laws of the State of Texas," the choice of law provision unambiguously included Texas's statute of limitations. *Id.* (emphasis added).

*8 Defendant contends that the choice of law provision in this case cannot be interpreted to encompass the statute of limitations because it states that the warranty "shall be *governed by and construed in accordance with* the laws of the State of Wisconsin" and not "enforced in accordance with." Dkt. # 167, exh. C (emphasis added). Defendant does not explain why it believes that the distinction is important, and I see no reason why it should be.

The warranty does not define the term "govern," so I must assign the word its plain and ordinary meaning. *First Bank & Trust v. Firstar Info. Services, Corp.,* 276 F.3d 317, 323 (7th Cir.2001) (applying Wisconsin law in interpreting contract); *North Gate Corp. v. National Food Stores, Inc.,* 30 Wis.2d 317, 321, 140 N.W.2d 744, 747 (1966). To "govern" means "to control the way that (something) is done" or "to control or guide the actions of something or someone." http:// www.merriam-webster.com/dictionary/govern. Because the statute of limitations controls the way the warranty is enforced and dictates when the parties may take action with respect to the warranty, I conclude that the Dellers' choice of law provision unambiguously includes the Wisconsin statute of limitations. (Although defendant says that a choice of law analysis is not necessary for the Senyks' claim, the same reasoning would hold true for those plaintiffs.)

In sum, the "no defect" claims filed by the Senyk and Deller plaintiffs are subject to Wisconsin's six-year statute of limitations and the "no defect" claim filed by the McIver plaintiffs is subject to Michigan's four-year statute of limitations period.

2. *Date of accrual*
Plaintiffs contend that regardless whether they have a foreign cause of action under the borrowing statute, the date of accrual of their claims is determined by Wisconsin law. *Scott by Ricciardi v. First State Insurance Co.,* 155 Wis.2d 608, 619, 456 N.W.2d 152, 157 (1990) ("While the 'borrowed' foreign statute determines the applicable period of limitation, we look

to the Wisconsin tolling law to determine if that period has expired."). Defendant does not dispute this assertion. In any event, in both Wisconsin and Michigan, when the warranty "explicitly extends to future performance of the goods," the action accrues when the buyer discovers or should have discovered the breach. Wis. Stat. § 402.725(2); Mich. Comp. Laws § 440.2725(2).

Although I will address each of the plaintiffs' individual claims separately, a few matters applicable to all of the plaintiffs merit discussion. Defendant contends that plaintiffs' "no defect" claims accrued when they first noticed that their windows were leaking and rotting. However, plaintiffs argue that their warranty claims accrued "when they were on reasonable notice of a systemic defect in Defendant's windows and the connection between that defect and Kolbe." Dkt. # 199 at 18. Plaintiffs use the term "systemic defect" throughout their brief but they fail to explain what they mean by it or why it matters whether the problem was systemic. Even if only one window failed, the cause of action would accrue when the owners discovered that the window was defective, regardless whether other windows failed. Because plaintiffs state that they "fluidly over time realized that their windows suffered from systemic design and/or manufacturing defects and that these defects were caused by Kolbe's faulty design or manufacturing," dkt. # 199 at 11, I assume that they mean that they could not have discovered a defect until all, or at least a significant number, of the windows in their homes failed. Therefore, although plaintiffs focus on the concept of a "systemic defect," the crux of their argument is that they could not have discovered the defect until they had sufficient information about what caused the windows to fail.

*9 Plaintiffs cite a number of personal injury cases in which Wisconsin courts have held that the statute of limitations does not begin to run until the plaintiff knew or should have known the nature of their injury and its relationship to the defendant's conduct. Northridge Co. v. W.R. Grace & Co., 162 Wis.2d 918, 923, 471 N.W.2d 179, 180 (1991); Borello v. U.S.Oil Co., 130 Wis.2d 397, 415, 388 N.W.2d 140, 147 (1986); Rubenzer v. Associated Banc–Corp, 2012 WI App 62, ¶¶ 19–20, 341 Wis.2d 490, 815 N.W.2d 406; Williams v. Kaerek Builders, Inc., 212 Wis.2d 150, 157 (Ct.App.1997). Defendant attempts to distinguish these cases by pointing out that the discovery rule for tort actions does not apply to contract actions.

It is true that "[i]n the context of general contract law, public policy favors the current rule that the contract statute of limitations begins to run at the time of breach." CLL

Associates Ltd. Partnership v. Arrowhead Pacific Corp., 174 Wis.2d 604, 611, 497 N.W.2d 115, 117 (1993). However, in CLL Associates, 174 Wis.2d at 613, 497 N.W.2d at 118–19, the court made clear that it was considering the general statute of limitations for contracts, Wis. Stat. § 893.43, and explained that "[o]ur holding rests on the fact that policy considerations do not favor a broadly applied discovery rule in the contract context." The statute applicable in this case, § 402.725(2), specifically allows a discovery rule in a breach of warranty action related to future performance. Apart from pointing out that tort actions accrue from discovery of an "injury" and breach of warranty actions accrue from discovery of the "breach," defendant does not explain why the two rules should be treated differently or subject to a different analysis. To discover that a breach occurred, plaintiffs would have had to realize that the windows had a design or manufacturing defect, which means that defendant was the cause of the problem.

In any event, as I will discuss with respect to each plaintiff below, I find that plaintiffs have shown there is a genuine dispute of fact with respect to the accrual date of many of their claims. Stroh Die Casting Co. v. Monsanto Co., 177 Wis.2d 91, 104, 502 N.W.2d 132, 137 (Ct.App.1993) ("Generally, the 'date of discovery' is a question of fact for the jury."). It is undisputed that defendant inspected many of the windows and told the plaintiffs that other factors were causing their windows to fail. For example, defendant told the Banks over a period of several years that the problems with their windows were caused by short cladding, weep holes and inadequate waterproofing in the home. With other plaintiffs, defendant blamed the leaking and rotting on joint movement (McIvers), improper upkeep (Senyks), humidity (Dellers) and unfinished sashes (Lohr). Plaintiffs say that they relied reasonably on defendant's professional advice and exercised reasonable diligence in discovering the source of the leaking and rotting. Lawson v. London Arts Group, 708 F.2d 226, 229 (6th Cir.1983) (finding buyer reasonably relied on art dealer's assurance that piece was good investment).

*10 In addition, defendant either repaired or replaced the windows in the homes of the Banks, Deller and Lohr plaintiffs during the warranty period, which plaintiffs allege led to further delay in their discovery of the defects in windows that were inspected but not replaced. Defendant questions this reasoning, arguing that the need for replacement sashes should have been a sign of a defect. However, as plaintiffs point out, even though defendant replaced or repaired some

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 102 of 207
PageID: 13119
Haley v. Kolbe & Kolbe Millwork Co., Inc., Not Reported in F.Supp.3d (2015)
2015 WL 3774496

of the windows, it continued to tell many of the plaintiffs that something else was causing the problem.

As discussed, the Banks, Lohr, Senyk and Deller plaintiffs are all subject to a six-year statute of limitations, meaning that their "no defect" claims are not timely unless plaintiffs could not have discovered the existence of a defect until after February 2008. Because the McIvers are subject to a four-year statute of limitations, they would have to prove that they could not have discovered a defect until after February 2010. I will turn next to plaintiffs' individual claims. (It is unnecessary to address the Buinewiczes' claim because defendant's arguments relate to the accrual date of the one-year "no defect" warranty and not the 10–year K–Kron warranty.)

a. The Banks

These plaintiffs discovered rotten sashes in some of their windows before 2005. However, in 2006, they were advised that an exterior sealant would solve the problem, and defendant replaced every sash in their home in 2007. After plaintiffs' windows began leaking again in 2007, another water test showed that a window had failed because of leaking that had caused the failure of the milled joints. In response, defendant's representative visited the Banks' home in January 2008 and told them that the problem occurred because the window cladding had been cut too short. Defendant then replaced 25 of the sashes it had replaced once before. When plaintiffs' windows leaked again in 2010, defendant blamed the problem on "weep holes." Defendant performed further testing in 2011 and told plaintiffs that the water problems were caused by flaws in their home's waterproofing and not defects in the windows. From these facts, a reasonable jury could conclude that the Banks would not have been able to discover that the problem with their windows was caused by a manufacturing or design defect until after February of 2008.

b. Lohr

Lohr began seeing deterioration in her windows in approximately 2003 but did not contact defendant until 2010. The parties dispute the reason for the long wait. Plaintiff Lohr says that the problem manifested slowly and she was an inexperienced homeowner who did not know she could contact defendant. Because the windows were still under warranty in 2010, defendant replaced some rotten sashes at that time and told Lohr that the problem was not with the window and that she should have finished the wood on those sashes. However, in 2011, the replacement sashes also began

to rot. Lohr concluded that defendant was not going to honor its warranty when it told her that it would not replace any more sashes and that her replacement sashes were not covered by the warranty.

*11  Although it would be a close call, a jury could conclude that Lohr could not have known that her windows were defective in 2003 when she first noticed problems. In fact, when she contacted defendant in 2010, defendant led her to believe that unfinished sashes were the cause of the rot. From these facts, a jury could reasonably infer that Lohr could not have known of the defect until 2011 when the replacement sashes also began to rot and she concluded that defendant was not going to honor its warranty.

c. The Senyks

The Senyks noticed leaking and rotting windows in 2008 and contacted their distributor in the spring of 2009. The distributor inspected the windows and told plaintiffs in 2009 that defendant believed that the windows had not been properly maintained. Plaintiffs found further rotting in other windows in 2012 and 2013. Because the parties fail to identify exactly when in 2008 the Senylcs noticed the leaking and rotting, it is possible that the claim is timely, depending on when the Senyks first discovered a problem with their windows. However, because defendant led the Senyks to believe that it was poor maintenance and not a defect that had caused the windows to fail, a reasonable jury also could conclude that the Senyks could not have discovered the defects in their windows until other windows began to fail in 2012.

d. The Dellers

In 2008 or 2009, these plaintiffs noticed that the windows on one side of their house leaked during rainstorms. However, it was not until 2013 that the Dellers noticed that windows in other areas of their home were beginning to leak. The distributor told them that the problems were caused by humidity in their home and agreed to replace only two sashes. When Mr. Deller complained, defendant agreed to replace four windows. At that point, the Dellers concluded that defendant was not going to honor its warranty,

Because the parties fail to identify exactly when in 2008 or 2009 the Dellers noticed the leaking, it is possible that their claim is timely, again, depending on when the Dellers first discovered a problem with their windows. A reasonable jury could conclude that they would not have realized that the

windows were defective until after 2013, when more windows leaked and the Dellers concluded that defendant was not going to honor its warranty.

### e. The McIvers

Between 2005 and 2008, the McIvers discovered that their windows were cracking. Defendant's representative visited their home in the fall of 2008 and told them that the cracks were the result of normal joint movement. The McIvers concluded at that time that defendant was not going to honor its warranty. Plaintiffs have not adduced any facts showing that defendant had further discussions with the McIvers or engaged in any alleged delay tactics after 2008. Although plaintiffs argue that the McIvers only recently discovered "the systemic nature of the defect in their home," they have not supported this allegation with any admissible evidence. In their response brief, plaintiffs cite the affidavit of one of their attorneys who avers that "[d]iscovery in this matter has uncovered that the McIvers' windows suffer from extensive rot, which was only discovered through window inspections and testing by Plaintiffs' expert." Dkt. # 201 at ¶ 10. This vague reference to later discovery of rot does not suffice to raise a genuine issue of material fact with respect to the accrual date of the McIvers' claim. Without more, the McIvers cannot show that they discovered the defect in their windows after 2008. As a result, I find that the McIvers' "no defect" claim is barred by the four-year statute of limitations applicable to their claim unless an exception applies.

### 3. *Tolling and equitable estoppel*

**\*12** Because I have found that the "no defect" claims brought by the Banks, Lohr, Senyk and Deller plaintiffs survive defendant's motion for summary judgment, it is unnecessary to discuss any tolling or equitable estoppel arguments that plaintiffs may have made with respect to those claims. However, I will briefly address tolling and equitable estoppel with respect to the McIver plaintiffs.

Plaintiffs make only isolated references to tolling in their brief and do not make any mention of tolling with respect to the McIvers in particular. As defendant notes, plaintiffs seem to conflate the concepts of accrual of their claims under the discovery rule and tolling of the statute of limitations. The Court of Appeals for the Seventh Circuit has explained that

> Accrual is the date on which the statute of limitations begins to run. It is not the date on which the wrong that injures the plaintiff occurs, but the date—often the same,

but sometimes later—on which the plaintiff discovers that he has been injured. The rule that postpones the beginning of the limitations period from the date when the plaintiff is wronged to the date when he discovers he has been injured is the "discovery rule" ...

\* \* \*

Tolling doctrines stop the statute of limitations from running even if the accrual date has passed.

*Cada v. Baxter Healthcare Corp.,* 920 F.2d 446, 450 (7th Cir.1990). Plaintiffs generally state that the statute of limitations should be tolled because they did not know that their windows suffered from a systemic defect; they relied on a professional's advice (including defendant's advice); and they waited for defendant to repair or replace the defective windows. However, plaintiffs make these references either in a footnote or in a brief sentence without any legal citation. Further, their discussion of these factors focuses on when their claims accrued, not on whether the statute of limitations stopped once it had begun to run. Because plaintiffs have not developed any meaningful tolling argument separate from the discovery rule, I will consider it waived. *Long v. Teachers' Retirement System of Illinois,* 585 F.3d 344, 349 (7th Cir.2009) (unsupported and undeveloped arguments are waived; a party may waive an argument by disputing a district court's ruling only in footnote or one-sentence assertion that lacks citation to record evidence); *Garg v. Potter,* 521 F.3d 731, 736 (7th Cir.2008) (undeveloped arguments are waived).

Equitable estoppel comes into play if the defendant takes active steps to prevent the plaintiff from suing in time, as by promising not to plead the statute of limitations. *Cada,* 920 F.2d at 450–51 (internal citations omitted).

> Equitable estoppel in the limitations setting is sometimes called fraudulent concealment, but must not be confused with efforts by a defendant in a fraud case to conceal the fraud. To the extent that such efforts succeed, they postpone the date of accrual by preventing the plaintiff from discovering that he is a victim of a fraud. They are thus within the domain of the discovery rule. Fraudulent concealment in the law of limitations presupposes that the

plaintiff has discovered, or, as required by the discovery rule, should have discovered, that the defendant injured him, and denotes efforts by the defendant—above and beyond the wrongdoing upon which the plaintiffs claim is founded—to prevent the plaintiff from suing in time.

**\*13** *Id.* at 451. Wisconsin courts have used a six-part test to determine whether equitable estoppel is appropriate:

(1) Is the defendant guilty of fraudulent or inequitable conduct?

(2) Did plaintiff fail to timely commence the action because he or she relied on the defendant's conduct?

(3) Did the defendant's questionable conduct occur before the statute of limitations expired?

(4) Did the plaintiff diligently pursue the suit after the defendant's questionable conduct ceased?

(5) Did the plaintiff rely on the defendant's conduct to his or her disadvantage?

(6) The defendant need not have engaged in actual fraud.

*Williams,* 212 Wis.2d at 161, 568 N.W.2d at 318.

Plaintiffs generally argue that "Kolbe conducted itself inequitably, and the Plaintiffs, as outlined above, relied to their detriment on Kolbe's warranty process." Dkt. # 199 at 27. This conclusory assertion is not sufficient to defeat summary judgment. *Tones v. Merchants National Bank & Trust Co.,* 42 F.3d 1054, 1057 (7th Cir.1994) ("Self-serving assertions without factual support in the record will not defeat a motion for summary judgment.") (internal quotation marks omitted); *Marion v. Radtke,* 641 F.3d 874, 876–77 (7th Cir.2011) ("[W]hen a plaintiff fails to produce evidence, the defendant is entitled to judgment."). Further, it is not clear how the McIvers would have relied on defendant to their detriment within the statute of limitations period. It is undisputed that by the fall of 2008, the McIvers knew that defendant was not honoring its warranty, yet they waited almost six years, until February 2014, to file suit. Without any additional evidence of fraudulent or inequitable conduct on defendant's part, plaintiffs cannot prevail on their equitable

estoppel argument with respect to the McIvers' "no defect" claim.

### C. *"Failure to Honor" Warranties*

#### 1. *Applicable statute of limitations*
Defendant contends that the failure to honor claims brought by the McIvers and the Senyks are barred by the four-year statutes of limitations in their home states. However, as discussed above, the Senyks' warranty contained a Wisconsin choice of law provision that encompasses the six-year Wisconsin statute of limitations period. Because the McIvers' warranty did not contain a choice of law provision, the parties agree that Wisconsin's borrowing statute governs the choice of law analysis.

Defendant contends that the McIvers' claim is a foreign cause of action because the last significant act was defendant's failure to repair or replace the windows in the McIvers' home, which is located in Michigan. Plaintiffs argue that the action is not foreign because defendant made its decision to deny the claims at its office in Wisconsin. In support of their argument, plaintiffs cite *Abraham,* 217 Wis.2d at 312, 576 N.W.2d at 54, in which the Wisconsin Supreme Court held that a Wisconsin insurance company breached the parties' contract in Wisconsin when it denied the plaintiff's request for benefits, even though the plaintiff had sustained injuries and received medical treatment in Florida. *See also Ristow v. Threadneedle Insurance Co.,* 220 Wis.2d 644, 654, 583 N.W.2d 452, 455 (Ct.App.1998) (last significant event was defendant's nonperformance of the contract which was defendant's failure to tender payment).

**\*14** Defendant attempts to distinguish *Abraham* and *Ristow* on the ground that the place of performance under an insurance contract is categorically different from the place of performance for a warranty claim. Defendant says that performance under an insurance policy involves making a payment, which would occur at the insurer's location, whereas repairing or replacing the McIvers' windows would have had to occur in Michigan, where the windows were located. I am not persuaded by defendant's reasoning. Defendant identifies a non-event as the last significant event; the windows in the Senyks' and McIvers' homes were never actually replaced or repaired. Instead, as in the insurance cases, defendant made its decision with respect to the windows at its location in Wisconsin. Further, defendant's promise was not limited to repairing or replacing the windows; it also had the option of

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 105 of 207
PageID: 13122
Haley v. Kolbe & Kolbe Millwork Co., Inc., Not Reported in F.Supp.3d (2015)
2015 WL 3774496

paying for them, which would have involved cutting a check at its location in Wisconsin. As a result, I conclude that the McIvers' failure to honor claim is not a foreign cause of action and is subject to Wisconsin's six-year statute of limitations.

### 2. *Accrual*

Plaintiffs base their "failure to honor" claims on defendant's failure to repair, replace or pay for plaintiffs' defective windows. It is undisputed that the McIvers concluded in the fall of 2008 and the Senyks concluded in the summer of 2009 that defendant was not going to honor their warranties. Plaintiffs propose the same later dates of accrual for their "failure to honor" claims as their "no defect" claims, arguing generally that all of their warranty claims accrued "when they were on reasonable notice of a systemic defect in Defendant's windows and the connection between that defect and Kolbe." Dkt. # 199 at 18. However, as explained previously, warranty claims accrue when the buyer discovers or should have discovered the breach. For the "failure to honor" claims, the breach was not the discovery of a defect but defendant's refusal to repair, replace or pay for the windows. Plaintiffs do not attempt to explain why they would not have discovered this breach when they realized that defendant was not going to honor their warranty. Therefore, I find that the McIvers' "failure to honor" claims accrued in the fall of 2008 and the Senyks' claims accrued in the summer of 2009. Because plaintiffs filed this lawsuit on February 12, 2014, both the Senyks' and the McIvers' claims are timely under the six-year statute of limitations. Accordingly, defendant's motion for summary judgment with respect to the Senyk and McIver plaintiffs' "failure to honor" claims will be denied.

### D. *"Advertising Statements" Warranty*

#### 1. *Statute of limitations*

##### a. Accrual

Plaintiffs argue that defendant offered warranties through its marketing and advertising materials, which made general promises about the quality and durability of the windows. Although the bases for their claims are not entirely clear, in their responses to some of defendant's proposed findings of fact, plaintiffs state that they relied on statements in defendant's brochures that the windows were "low maintenance," "durable" and "rot free." *E. g.,* Pits' Resp. to Dft's PFOF ¶¶ 45, 47, 71 and 112. Defendant contends that all but the Haley, Samuels and Groome plaintiffs' advertising statement claims are barred by Wisconsin's six-year statute of

limitations because those claims accrued when their windows were delivered and not when the breach should have been discovered.

**\*15** Under Wis. Stat. § 402.725(2), "[a] breach of warranty occurs when tender of delivery is made." As noted previously, the discovery rule for breach of warranty claims in § 402.725(2) applies only "where a warranty explicitly extends to future performance of the goods." "The courts have applied a stringent standard in determining whether a warranty explicitly extends to future performance," requiring a "specific reference to a future time in the warranty." *Cooper Power Systems, Inc. v. Union Carbide Chemicals & Plastics Co., Inc.,* 123 F.3d 675, 684 (7th Cir.1997). This requirement is satisfied when a warranty guarantees a product for a particular number of years, or for a less precise, but still determinable period of time. *Selzer,* 2002 WI App 232, ¶ 19.

Plaintiffs say that their advertising statement warranties extended to future performance because defendant's brochures and catalogs stated that the windows were covered by 10– to 30–year warranties. (Plaintiffs do not propose any findings of fact to support this assertion, but they cited examples of the catalogs in their response brief.) Although the marketing materials state that there are express warranties related to various features of the windows, including the design and the K–Kron paint, plaintiffs have not adduced any evidence that the advertising materials themselves provided separate warranties regarding durability and low maintenance for a particular number of years. As defendant notes, "[c]ourts have consistently held that vague statements concerning product longevity do not comply with the requirement of a 'specific reference to a future time' that would create a warranty of future performance within the meaning of Wis. Stat. § 402.725(2)." *Selzer,* 2002 WI App 232, ¶ 22 (summarizing cases). Accordingly, I find that plaintiffs' advertising statement claims accrued on the dates that plaintiffs acquired their windows. Because it is undisputed that the Banks, Buinewicz, McIver, Senyk, Deller and Lohr plaintiffs acquired their windows more than six years before filing this lawsuit in 2014, their advertising statement claims are barred by the statute of limitations unless an exception applies.

##### b. Equitable estoppel

As discussed above, plaintiffs generally argue that equitable estoppel prevents defendant from asserting the statute of limitations as a defense. They do not discuss how or whether equitable estoppel relates to their advertising statement

warranty claims and they do not address the six-part test used to determine whether equitable estoppel is appropriate with respect to the Banks, Buinewicz, McIver, Senyk, Deller and Lohr plaintiffs in particular. *Mathis v. New York Life Insurance Co.,* 133 F.3d 546, 548 (7th Cir.1998) ("A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority ... forfeits the point."). I find that plaintiffs have not established that equitable estoppel prevents defendant from asserting a statute of limitations defense to these advertising statement claims.

2. *Merits of Haley, Samuels and Groome claims*
**\*16** As I will discuss separately with respect to each of these plaintiffs, defendant contends that plaintiffs have not pointed to specific affirmations of fact or promises that defendant made in its advertising materials that caused the Haleys or Samuels and Groome to choose defendant's windows. Under the Uniform Commercial Code, which has been adopted in Wisconsin and the states in which plaintiffs reside, express warranties can be created by statements made by the seller to the buyer. Wis. Stat. § 402.313; Mich. Comp Laws § 440.2313 (applicable to Haleys); N.H.Rev.Stat. § 382–A–2– 313 (applicable to Samuels and Groome). A seller makes an express warranty by making "[a]ny affirmation of fact or promise" that "relates to the goods and becomes part of the basis of the bargain." Wis. Stat. § 402.313(1); *Ewers v. Eisenzopf,* 88 Wis.2d 482, 487–88, 276 N.W.2d 802, 804 (1979). "It is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that the seller have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." Wis. Stat. § 402.313(2). "[T]he specificity of the statement is important" in determining whether a statement is merely an opinion. James J. White, Robert S. Summers & Robert A. Hillman, 1 *Uniform Commercial Code,* § 10:12 (6th ed.2012) (comparing "this is a topnotch car" to "this truck will give not less than 15.1 miles to the gallon ...").

Although defendant suggests that plaintiffs must have "relied" on the advertising statements, the statute does not make this an express requirement. White, Summers Sc Hillman, 1 *Uniform Commercial Code,* § 10:14 (discussing "basis of bargain" requirement and concluding that buyer's reliance may be relevant but not necessary consideration). As plaintiffs note, the Wisconsin Supreme Court has held that the statutory requirement that the affirmation be a " 'basis of the

bargain' does not require the affirmation to be the sole basis for the sale, only that it is A factor in the purchase." *Ewers,* 88 Wis.2d at 488, 276 N.W.2d at 804.

I will turn next to the plaintiffs' individual claims.

a. Haleys
The parties do not agree about which statements the Haleys read in defendant's brochures. In response to defendant's proposed findings of fact, plaintiffs point to Ms. Haley's deposition testimony in which she stated that she recalled seeing defendant's brochures and catalog in 2010. Dkt. # 200 at ¶ 18 (citing dkt. # 149 at 52–53). However, as defendant points out, Ms. Haley went on to testify that she no longer had the brochures and catalogs and did not remember specifically what they said about the qualities and features of defendant's windows. Dkt. # 149 at 53–54. Ms. Haley did state that "I remember reading about K–Kron. I remember about a preservative. I remember that a preservative had been put on the wood that was a difference between the old windows and the new windows. I remember the preservative was to protect against weathering." *Id.* at 79. She did not remember specifically where she saw that information or whether she read it online before or after purchasing the windows. *Id.* at 79–80. Plaintiffs also cite Ms. *Haley's* testimony that the brochures made statements about the windows being weather-tight, low maintenance and durable. *Id.* at 167–69. Mr. Haley did not have a specific recollection of looking at defendant's brochures or catalog and did not recall any specific statements that they may have contained:

> **\*17** I formed an impression and helped make a decision about this. But to say it was from which specific statement or what exact paragraph I read out of a warranty claim or something, you know, I can't do that.

Dkt. # 150 at 17.

I agree with defendant that plaintiffs have failed to identify through admissible evidence any statements defendant actually made. Moreover, they have not come forward with evidence that plaintiffs saw the statements before purchasing the windows so that the statements can be considered part of the basis of the bargain. Although plaintiffs argue in their brief

that the representations "plainly influenced" their decision to purchase defendant's windows, they have not proposed any facts from which a reasonable jury could reach this conclusion. A review of the Haleys' deposition testimony shows that they are unclear about exactly what they read or when they read it.

Although plaintiffs say that *"not once"* during Plaintiffs' depositions did the Defendant put in front of the Plaintiff specific brochures or other marketing materials to refresh Plaintiffs' recollection about their purchases," dkt. # 199 at 31 n. 25 (emphasis in original), defendant was under no obligation to clarify plaintiffs' testimony. Plaintiffs have the burden of proving their claims. If they thought the deposition testimony was incomplete or otherwise lacking, they should have submitted affidavits or other evidence in response to defendant's motion for summary judgment. *Marion,* 641 F.3d at 876–77 ("[W]hen a plaintiff fails to produce evidence, the defendant is entitled to judgment; a defendant moving for summary judgment need not produce evidence of its own."). The Court of Appeals for the Seventh Circuit has stated many times that, at summary judgment, the plaintiffs must "put up or shut up" or, in other words, they must "show what evidence [they have] that would convince a trier of fact to accept [their] version of events." *Johnson v. Cambridge Industries, Inc.,* 325 F.3d 892, 901 (7th Cir.2003). Because plaintiffs have not met their burden, I am granting defendant's motion for summary judgment on the Haleys' advertising statements warranty claim.

b. Samuels and Groome
As with the Haleys, Samuels and Groome have also failed to meet their burden with respect to the advertising statement claim. Plaintiffs allege that defendant's distributor was "strongly positive" about the windows and assured plaintiffs that defendant's windows were "high quality" and "American made." Such vague statements made verbally by a distributor are insufficient to constitute an affirmation of fact on the part of defendant. Further, both Samuels and Groome testified that the only windows offered through their builder were defendant's windows and that the fact that they were going to get defendant's windows did not influence their decision to buy their home through that builder. Dkt. # 159 at 37–38 and # 160 at 20. Because plaintiffs have not adduced any additional evidence showing that defendant's windows were a factor in their purchase, they can not meet the requirement that the distributor's statements were part of the basis of the bargain. Defendant's motion for summary judgment will be granted with respect to this claim.

## II. IMPLIED WARRANTY

**\*18** Defendant contends that the implied warranty claims filed by the Banks, Buinewicz, McIver, Senyk, Deller and Lohr plaintiffs are barred by Wisconsin's six-year statute of limitations, § 402.725(1). As defendant points out in its reply brief, it appears that plaintiffs have abandoned their implied warranty claims because they do not make any specific legal arguments related to implied warranties or identify the factual bases for these claims. *Bonte v. U.S. Bank, N.A.,* 624 F.3d 461, 466 (7th Cir.2010) ("Failure to respond to an argument ... results in waiver."); *Mathis,* 133 F.3d at 548 (failure to pursue point or support it with pertinent authority results in forfeiture). Although plaintiffs generally argue that their "contract claims" are not barred by the statute of limitations, their discussion addresses the application of the discovery rule. However, as defendant argues, the discovery rule is not applicable to implied warranty claims because "implied warranties cannot, by their very nature, explicitly extend to future performance." *Selzer,* 2002 WI App. 232, ¶ 24 (citing *Marvin Lumber & Cedar Co. v. PPG Industries, Inc.,* 223 F.3d 873, 879 (8th Cir.2000)). *See also* 2 Hawkland, § 2–725:2 (most courts find that statute of limitations runs from delivery of goods and not plaintiffs' discovery of defect). Because plaintiffs do not dispute this point, I conclude that they have waived it.

I note that even if plaintiffs did not abandon their implied warranty claims, those claims would be barred by the statute of limitations because it is undisputed that the Banks, Buinewicz, McIver, Senyk, Deller and Lohr plaintiffs acquired their windows more than six years before filing this lawsuit in 2014. To the extent that plaintiffs intended their general equitable estoppel arguments to apply to the implied warranty claims, those arguments fail for the same reasons that they failed with respect to advertising statement warranty claims. As a result, defendant is entitled to summary judgment with respect to the implied warranty claims brought by the Banks, Buinewicz, McIver, Senyk, Deller and Lohr plaintiffs.

## III. FRAUDULENT MISREPRESENTATION

Under Wis. Stat. § 100.18(1), plaintiffs must demonstrate three elements: (1) defendant made a representation to the public with the intent to induce an obligation; (2) the representation was untrue, deceptive or misleading; and (3)

2015 WL 3774496

the representation caused plaintiffs a pecuniary loss. *K & S Tool & Die Corp. v. Perfection Machinery Sales, Inc.,* 2007 WI 70, ¶ 19, 301 Wis.2d 109, 732 N.W.2d 792. *See also Hackel v. National Feeds, Inc.,* 986 F.Supp.2d 963, 979 (W.D.Wis.2013) (citing same). Defendant contends that Samuels and Groome have not identified any specific factual representation that it made with the intent to induce plaintiffs to purchase their windows. Plaintiffs point to the same conduct that they relied on in support of their advertising statement claim: defendant's distributor assured them that defendant's windows were of "high quality" and "American made" and "was strongly positive" about the windows.

**\*19** Defendant is correct that to be actionable under Wis. Stat. § 100 .18, a statement must constitute a misrepresentation of fact. *United Concrete & Const., Inc. v. Red–D–Mix Concrete, Inc.,* 2013 WI 72, ¶ 28, 349 Wis.2d 587, 607, 836 N.W.2d 807, 817. This means that the speaker must make a representation about the nature or quality of a product that is specific enough that its truth or falsity can be determined. *Id.* at ¶ 25–26. In contrast, "a salesperson engages in puffery when he gives voice to 'the exaggerations reasonably to be expected of a seller as to the degree of quality of his product, the truth or falsity of which cannot be precisely determined.' " *Id.* at ¶ 25 (quoting *State v. American TV & Appliance of Madison, Inc.,* 146 Wis.2d 292, 301–02, 430 N.W.2d 709 (1988)). Exaggerations do not subject the seller to liability under § 100.18 "because they convey only the seller's opinion and are 'not capable of being substantiated or refuted.' " *Id.* (quoting *Tietsworth v. Harley–Davidson, Inc.,* 2004 WI 32, ¶ 44, 270 Wis.2d 146, 677 N.W.2d 233). The distributor's general representation that defendant's windows were of high quality is too vague. *E.g., Tietsworth,* 270 Wis.2d 146, 11 43, 677 N.W .2d 233 (classifying as puffery claims that product was "a masterpiece" and of "premium quality"); *American TV,* 146 Wis.2d at 299, 430 N.W.2d 709 (endorsement of product as "the finest" was puffery); *Consolidated Papers, Inc. v. Dorr–Oliver, Inc.,* 153 Wis.2d 589, 594, 451 N.W.2d 456 (Ct.App.1989) (advertisement promising "long equipment life" was puffery). Accordingly, defendant's motion for summary judgment will be granted with respect to the claims brought by plaintiffs Samuels and Groome under § 100.18.

### IV. NEGLIGENCE, MISREPRESENTATION AND UNJUST ENRICHMENT

Plaintiffs have not responded to defendant's contentions that all of the plaintiffs' negligent misrepresentation, negligence and unjust enrichment claims are barred by the statute of limitations, the economic loss doctrine or plaintiffs' failure to establish all the elements of their claim. I construe plaintiffs' lack of response as a decision to abandon these claims. *Bonte,* 624 F.3d at 466 (failure to respond results in waiver); *Mathis,* 133 F.3d at 548 (failure to pursue point or support it with pertinent authority results in forfeiture). Accordingly, defendant's motion for summary judgment with respect to plaintiffs' negligent misrepresentation, negligence and unjust enrichment claims will be granted and those claims will be dismissed.

ORDER

IT IS ORDERED that

1. The Clerk of Court is directed to amend the caption to change the name of plaintiff "Patricia Samuels" to "Patricia Groome." In all future documents filed with the court, the parties should amend the caption to reflect this plaintiff's true name.

2. Plaintiffs' motion for leave to file a surreply brief, dkt. # 214, is GRANTED.

3. Defendant Kolbe & Kolbe Millwork Co.'s motion for partial summary judgment, dkt. # 164, is GRANTED with respect to the following claims, which are DISMISSED:

**\*20** a. The express warranty claims brought by plaintiffs Annie and Brian Buinewicz to the extent that those claims rely on a one-year warranty period.

b. The express warranty claim brought by plaintiffs Terrance and Jean Ann McIver related to the windows remaining free from defects for 10 years.

c. The express warranty claims brought by plaintiffs Mary and Michael Haley, Leslie and James Hal Banks, Annie and Brian Buinewicz, Terrance and Jean Ann McIver, Susan and Christian Senyk, Matthew and Renee Deller, Gary Samuels, Patricia Groome and Marie Lohr related to statements made by defendant in its advertising and product literature.

d. The implied warranty claims brought by the Banks, Buinewicz, McIver, Senyk, Deller and Lohr plaintiffs.

e. The fraudulent misrepresentation claim brought by the Groome and Samuels plaintiffs.

f. The negligence, negligent misrepresentation and unjust enrichment claims brought by all plaintiffs.

4. Defendant's motion for partial summary judgment, dkt. # 164, is DENIED with respect to (1) the Banks, Lohr, Senyk and Deller plaintiffs' express warranty claims related to the windows remaining free of defects for 10 years; and (2) the McIver and Senyk plaintiffs' express warranty claims related to defendant's failure to honor its promise to repair, replace or pay for the defective windows.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 3774496

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   15

# TAB 7

KeyCite Yellow Flag - Negative Treatment
Distinguished by In re Intel Corp. CPU Marketing, Sales Practices and
Products Liability Litigation, D.Or., March 27, 2020

2006 WL 2990524
United States District Court,
N.D. Oklahoma.

Lee Roy HARRISON, Plaintiff,

v.

LEVITON MANUFACTURING
COMPANY, INC., Defendant.

No. 05-CV-0491-CVE-FHM.
|
Oct. 19, 2006.

**Attorneys and Law Firms**

Andrew P. Bell, Seth R. Lesser, Locks Law Firm PLLC,
New York, NY, Charles William Shipley, Shipley & Kellogg
PC, Tulsa, OK, Hugh P. Lambert, Linda Nelson, Lambert &
Nelson, New Orleans, LA, for Plaintiff.

Scott Alan Law, Pierce Couch Hendrickson Baysinger &
Green LLP, Oklahoma City, OK, Carey Cobb Calvert, Pierce
Couch Hendrickson Baysinger & Green, Tulsa, OK, for
Defendant.

*OPINION AND ORDER*

CLAIRE V. EAGAN, Chief District Judge.

**\*1** Now before the Court is defendant's Motion to Dismiss
Plaintiff's Amended Class Action Complaint and Brief in
Support (Dkt.# 25). Defendant asks the Court to dismiss
the amended complaint for failure to state a claim under
Fed.R.Civ.P. 12(b)(6).

**I.**

Leviton Manufacturing Company, Inc. ("Leviton") designs
and manufactures backwire push-in electrical receptacles.
A receptacle is a device intended to provide a temporary
electrical connection with a fixed electrical plug, and such
devices are commonly used in residential homes. A receptacle
does not generate its own electrical power but, instead, each
receptacle contains terminals on the back that are connected

to wires or electrical equipment. Receptacles are normally
attached to wiring or electrical equipment within a wall
and are concealed, so that most homeowners are not aware
of the receptacle. The two most commonly used types of
receptacles are set-screw terminals and backwire push-in
terminals. Plaintiff alleges that backwire push-in terminals are
fundamentally unsafe and increase the risk of electrical fires.
In particular, plaintiff claims that backwire push-in terminals
degrade quickly due to environmental factors and have a
higher resistance to electrical flow, which creates excessive
heat at the point of contact. Plaintiff alleges that Leviton has
been aware, or should have been aware, of this danger since
at least 1989.

Plaintiff's theory seems to be that increased heat from use of
these plugs causes wiring to melt, which can result in short
circuits or electrical fires. The amended complaint contains
general allegations that backwire push-in receptacles have
damaged wiring in residential homes and started electrical
fires, but it is not clear from the amended complaint that
plaintiff has personally been injured in this way. Plaintiff
alleges that he is "informed and believes that the defects in the
particular receptacles of Defendant ... that are the subject of
Plaintiff's claims have resulted in residential homes sustaining
physical injury to tangible property...." Dkt. # 13, Amended
Class Action Complaint, at 5-6. Defective push-in receptacles
allegedly require homeowners to repair or replace wiring, but
the amended complaint does not contain any allegations that
plaintiff has discovered damaged wiring in his home. Instead,
plaintiff states the he intends to replace all push-in receptacles
in his home, and that he anticipates incurring expense or
inconvenience from this process. *Id.* at 9.

Plaintiff alleges five claims for relief in his amended
complaint: (1) violations of the Oklahoma Consumer
Protection Act, Okla. Stat. tit. 15, § 751 *et seq.* ("OCPA");
(2) breach of implied warranties of merchantability and
fitness for a particular purpose; (3) unjust enrichment; (4)
negligence; and (5) strict products liability. [1] Defendant
filed a motion to dismiss the amended complaint, or in the
alternative, requests that the Court dismiss specific claims.
The thrust of defendant's argument is that plaintiff has not
suffered a legally cognizable injury and, therefore, there is
no case or controversy before the Court. Plaintiff responds
that his complaint sufficiently alleges that class members have
incurred economic injuries from using defendant's product
and face a risk of imminent danger from use of defendant's
product.

[1]    The original complaint alleged claims for violations of the OCPA and breach of implied warranties of merchantability and fitness for a particular use only.

## II.

**\*2** When reviewing a motion to dismiss under Rule 12(b)(6), the court must construe the allegations of the complaint as true and view the allegations in the light most favorable to the nonmoving party. *Moffett v. Halliburton Energy Services, Inc.,* 291 F.3d 1227, 1231 (10th Cir.2002). A Rule 12(b)(6) motion "should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Sutton v. Utah State School for the Deaf & Blind,* 173 F.3d 1226, 1236 (10th Cir.1999).

## III.

Defendant argues that plaintiff lacks standing to pursue any of his claims under Article III of the federal constitution, because he has not suffered an injury-in-fact. Defendant raises issues of constitutional standing based on plaintiff's failure to allege that use of defendant's product has caused a concrete injury. Plaintiff responds that he has alleged property damage and an increased risk of personal harm, and that these allegations are sufficient to create a justiciable case or controversy.

Plaintiff does not address the issue of constitutional standing, but even if defendant had not raised the issue, the Court has a duty to consider whether plaintiff satisfies the three-part test for standing under Article III of the United States Constitution. *United States v. Parker,* 362 F.3d 1279, 1284 (10th Cir.2004); *People for the Ethical Treatment of Animals v. Rasmussen,* 298 F.3d 1198, 1203 (10th Cir.2002). The Supreme Court has recognized three elements for standing under Article III:

> First, the plaintiff must have suffered an "injury in fact"- an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.' " Second, there must be a causal connection between the injury and the conduct complained of-the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not

before the court. Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992). The standing requirement ensures that "the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 472 (1982). "Allegations of possible future injury do not satisfy the requirements of Art. III. A threatened injury must be 'certainly impending' to constitute injury in fact." *Nova Health Systems v. Gandy,* 416 F.3d 1149, 1155 (10th Cir.2005) (quoting *Whitmore v. Arkansas,* 495 U.S. 149, 158 (2005)). In the context of a potential class action, the named representative of the class must have standing to bring a claim, or the class action may not proceed. *Sosna v. Iowa,* 419 U.S. 393, 398-99 (1975); *James v. City of Dallas, Texas,* 254 F.3d 551, 562-63 (5th Cir.2001).

**\*3** The amended complaint contains conflicting statements regarding the type of injury plaintiff is alleging. Contrary to plaintiff's assertions, the amended complaint does not state that plaintiff has actually been harmed by Leviton's product, but he states that he believes he may incur expense in the future to remove defendant's product from his home. For example, plaintiff states that

> [he] must now, at considerable time and expense, remove and replace every one of the push-in receptacles installed in his house or which came with the house when Plaintiff purchased the house. Such a project also includes consequential inconveniences and expenses, such as loss of time, having to shut off all of the power in the house for the period of time necessary for the work to be completed.

Dkt. # 13, Amended Class Action Complaint, at 9. The alleged need to replace the push-in receptacles in his home has not arisen because plaintiff has not actually discovered any damage to the wiring in his home. He merely seeks to prevent any damage from occurring, based on his theory

2006 WL 2990524, 61 UCC Rep.Serv.2d 30

that increased heat caused by the receptacle will eventually cause the wiring to deteriorate. [2] In the first paragraph of the amended complaint, plaintiff clearly states that the putative class specifically excludes any "consumers who have sustained personal injury and/or property damage (other than damage to the receptacle and/or wire/insulation in the vicinity of the receptacle termination) as a result of Defendant's practices." *Id.* at 1. If this is true, plaintiff's concern over the increased risk of electrical fires and resulting personal injury are irrelevant to the Court's consideration. Plaintiff limits his claim for damages to the replacement cost of the defective product and related electrical equipment, but he does not allege that he has suffered any harm that would fall into this category.

[2]     Plaintiff points to a "general trend of increased current loading of household receptacle circuits" due the increased number of electrical devices in the average home. Plaintiff claims that he has alleged an injury because he states that "[d]efective Leviton backwire push-in receptacles damage the fixed wiring in homes, which is part of the residential structure and separate from the receptacle itself, thereby causing damages requiring the rewiring and/or replacement" of electrical wiring and equipment. However, plaintiff does not actually allege that wiring in his home has been damaged.

The primary focus for any analysis of standing under Article III "is whether plaintiff has suffered a present or imminent injury, as opposed to a mere possibility, or even probability, of future injury ." *Morgan v. McCotter,* 365 F.3d 882, 888 (10th Cir.2004). In cases where the plaintiff alleges an increased risk of injury, the plaintiff must show a risk of serious future harm and some tangible present injury. *Sutton v. St. Jude Medical S.C., Inc.,* 419 F.3d 568 (6th Cir.2005) (patient that received allegedly defective aortic connector faces substantial risk of future harm and current injury of increased medical monitoring sufficiently alleged injury-in-fact); *Rivera v. Wyeth-Ayerst Laboratories,* 283 F.3d 315, 321 (5th Cir.2002) (plaintiffs that purchased allegedly defective prescription drug but did not allege any present harm did not have standing to sue). Plaintiff's amended complaint specifically states that he is not seeking to bring a claim for the risk of future personal injury or property damage, and there is no indication that plaintiff will suffer an immediate injury. The amended complaint also does not contain any allegations that plaintiff has suffered a tangible present injury

to accompany his claims for potential future harm. Plaintiff has not carried his burden to demonstrate that he has standing under Article III, because he can not show that he has suffered or will immediately suffer a concrete injury-in-fact.

**\*4** Even though this is a putative class action, plaintiff may not base his right to sue on an injury allegedly suffered by other class members. Plaintiff may not represent a putative class if he has not actually suffered the injury for which the class seeks redress. The named representative of the class must have standing to bring a lawsuit or the court must dismiss the proposed class action. *Rector v. City & County of Denver,* 348 F.3d 935, 946 (10th Cir.2003) (dismissing class action brought under section 1983 challenging procedure assessing late fees for parking tickets because defendants did not assess or attempt to collect a late fee from class representatives). The named class representative can not base his standing to sue on the alleged injuries suffered by potential class members. *Allen v. Medrano,* 416 U.S. 802, 828-29 (1974); *O'Shea v. Littleton,* 414 U.S. 488, 675 (1974). Plaintiff must identify an independent basis for standing beyond the alleged injuries suffered by putative class members. Plaintiff's argument that members of the proposed class have replaced wiring in their homes will not suffice to save plaintiff's amended complaint from dismissal.

The Court finds that plaintiff's vague allegations related to an increased risk of injury are insufficient to meet the injury-in-fact requirement for standing under Article III. Accepting plaintiff's allegations as true, he had not suffered any economic or personal injury at the time he filed his lawsuit. Plaintiff's statements that he will suffer future economic harm and potential inconvenience from replacing any of defendant's receptacles in his home do not presently create a justiciable case or controversy. Therefore, plaintiff's amended complaint must be dismissed due to his lack of Article III standing.

## IV.

Even if the Court assumes that plaintiff meets the standing requirements of Article III, plaintiff has not alleged the type of injury that may be redressed by his legal claims. Plaintiff has alleged five claims, and each of those claims requires that plaintiff demonstrate an injury that was caused by defendant's conduct.

## A.

Plaintiff alleges that he has suffered economic injuries because of Leviton's unfair or deceptive conduct in violation of the OCPA. In order to state a prima facie case under the OCPA, plaintiff must allege four elements:

> (1) that the defendant engaged in an unlawful practice as defined at 15 O.S. (1991), § 753; (2) that the challenged practice occurred in the course of defendant's business; (3) that the plaintiff, as a consumer, suffered an injury in fact; and (4) that the challenged practice caused the plaintiff's injury.

*Patterson v. Beall,* 19 P.3d 839, 846 (Okla.2000). Defendants focus on the third and fourth elements and assert that plaintiff's amended complaint contains no allegations that he was injured by Leviton's allegedly unlawful business practices. *See* Okla. Stat. tit. 15, § 761.1. A person does not qualify as an aggrieved consumer under section 761.1 simply because he paid the purchase price for a product; he must have "suffered some detriment to successfully pursue a private right of action under § 761.1A." *Walls v. American Tobacco Co.,* 11 P.3d 626, 629 (Okla.2000). In order to show that he has a personal stake in the litigation, plaintiff must identify an "actual or threatened distinct injury which has a causal connection between the alleged wrong and the actions challenged." *Id.*

**\*5** Plaintiff alleges that he purchased a home that contained push-in receptacles and that he believes he must replace every such receptacle. Based on plaintiff's amended complaint, this injury could include the cost of replacing a defective receptacle or repairing melted wiring, or even an electrical fire. However, there are no allegations that he has actually suffered this type of injury from using the product or that has an imminent apprehension that these injuries will occur. It appears that members of the putative class may have incurred expense or even had an electrical fire, but that plaintiff has not personally been the victim of these adverse circumstances. Courts do not allow consumers to bring claims against manufacturers for products that are perceived to be harmful, but that have not actually cause an identifiable

injury. *See Coker v. DaimlerChrysler Corp.,* 617 S.E.2d 306, 313-14 (N.C.App.Ct.2005) (dismissing claim under North Carolina Unfair Trade and Deceptive Trade Practices Act for failure to show risk of immediate injury from product defect); *Verb v. Motorola, Inc.,* 672 N.E.2d 1287, 1295 (Ill.App.Ct.1996) (dismissing consumer fraud claims based on allegations that cellular telephone might increase risk for certain heath problems); *Ziegelmann v. DaimlerChrysler Corp.,* 649 N.W.2d 556 (N.D.2002) (dismissing proposed class action regarding allegedly defective brakes because no class member had actually been harmed by product defect).

As a consumer, plaintiff has not incurred any additional expense because defendant's product was installed in his home. Plaintiff claims that he is threatened by "the risk of fire and death as a result of the manifest defects in Leviton's receptacles." Dkt. # 28, at 16. However, his amended complaint disclaims that he is seeking relief for this type of injury, because he excludes any person from the putative class who has "sustained personal injury and/or property damage (other than damage to the receptacle and/or wire/insulation in the vicinity of the receptacle termination). Dkt. # 13, at 1. Plaintiff is seeking money damages for a product that will only hypothetically caused him any harm. This is not the type of "actual or threatened distinct injury" required to bring a claim under the OCPA, as plaintiff must allege actual damages to qualify as an "aggrieved consumer" under the act. *Walls,* 11 P .3d at 629. Such allegations are conspicuously absent from the amended complaint, and the Court finds that plaintiff's claim under the OCPA must be dismissed for failure to state a claim.

## B.

Plaintiff alleges that Leviton's push-in receptacles are defective, and fail to meet the applicable consumer safety codes regarding fire protection. He claims that product defects "have resulted in residential homes sustaining physical injury to tangible property including, but not limited to, damage to the wiring, electricity, and electrical systems of these homes which have incorporated" defendant's allegedly defective product. Defendant argues that plaintiff fails to allege that the product is presently defective but, instead, that plaintiff has merely stated his belief that the product is likely to cause an injury.

**\*6** Under Oklahoma law, a warranty of merchantability is implied in every contract for the sale of goods. Okla.

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 115 of 207
PageID: 13132
Harrison v. Leviton Mfg. Co., Inc., Not Reported in F.Supp.2d (2006)
2006 WL 2990524, 61 UCC Rep.Serv.2d 30

Stat. tit. 12A, § 2-314. A consumer may bring a claim for breach of warranty against the retailer and the manufacturer to recover the benefit of the bargain. *Waggoner v. Town & Country Mobile Homes, Inc.,* 808 P.2d 649, 652 (Okla.1990). The consumer has the burden to prove that the product was defective at the time it left the manufacturer's possession or control. *Thompson v. Trane Co.,* 500 P.2d 1329, 1333 (Okla.1972). The implied warranty of merchantability is not indefinite, but lasts for a reasonable time only. *Hoort v. Oklahoma Truck Parts, Inc.,* 650 P.2d 71, 73 (Okla.Civ.App.1981). A necessary part of every breach of warranty claim is that plaintiff suffer an actual loss that was proximately caused by defendant's breach of warranty. *American Fertilizer Specialists, Inc. v. Wood,* 635 P.2d 592, 595 (Okla.1981); *Collins Radio Co. of Dallas, Texas, v. Bell,* 623 P.2d 1039, 1052 (Okla.Civ.App.1980). Plaintiff must also allege that he has suffered an injury and damages when claiming a breach of the implied warranty of fitness for a particular purpose under Okla. Stat. tit. 12A, § 2-315. *Collins Radio Co.,* 623 P.2d at 1052.

Based on the amended complaint, it is not apparent that plaintiff has suffered a manifestation of the alleged defect or that the push-in receptacles in his home are actually defective. Plaintiff cites *Seely v. White Motor Co.,* 403 P.2d 145 (Cal.1965), for the proposition that the risk of physical injury is compensable in a breach of warranty action, because the plaintiff should not have to wait for a physical injury to occur before bringing suit. *Id.* at 155. The holding of *Seely* was that purely economic loss for an intrinsic product defect can not be recovered with a tort claim, and that plaintiff's economic injury was compensable through a breach of warranty claim only. *See Sharon Steel Corp. v. Lakeshore, Inc.,* 753 F.2d 851, 854 (10th Cir.1985). However, the economic loss doctrine does not create an injury where none exists. Plaintiff argues that Leviton's products are continuously malfunctioning, consequently causing an ongoing injury.

This case is analogous to *Briehl v. General Motors Corp.,* 172 F.3d 623 (8th Cir.1999), where the Eighth Circuit dismissed a putative class action based on a claim that defendants designed an inherently defective anti-lock braking system. *Id.* at 626. The case was dismissed because the plaintiffs did not allege that the defect had actually caused any plaintiff an injury, and none of the plaintiffs could show he or she was entitled to damages. The plaintiffs amended their complaint to include allegations that proposed class members had suffered an accident that was caused by the defective brakes, but also continued to pursue a class action based on a theory that

putative class members could recover for an unmanifested injury. *Id.* at 629. The court stated that "[w]here, as in this case, a product performs satisfactorily and never exhibits an alleged defect, no cause of action lies." *Id.* at 628. Plaintiff attempts to distinguish this case without success. He alleges that Leviton's receptacles are inherently defective and are likely to cause an injury, but he does not affirmatively state that he has suffered an injury. Therefore, plaintiff can not show that he is entitled to damages, which is a necessary element of any breach of warranty claim. *Id.* at 628-30; *Carlson v. General Motors Corp.,* 883 F.2d 287, 297 (4th Cir.1989).

**\*7** There is no possibility, based on the allegations of the amended complaint, that plaintiff will be entitled to recover for breach of an implied warranty of merchantability or fitness for a particular purpose and this claim should be dismissed.

## C.

Plaintiff has pled tort claims for unjust enrichment, negligence, and manufacturer's products liability. The Court finds that, absent any claim of current injury, plaintiff's tort claims can not survive a motion to dismiss for failure to state a claim. Plaintiff's vague references to potential harm, such as personal injury and fire loss, are negated by his stated intent to exclude any person from the putative class that has suffered a personal injury or property damage from using Leviton's receptacles.

Plaintiff's claim for unjust enrichment is based on the theory that Leviton has wrongfully retained a benefit by selling a product it should have known was defective. Under Oklahoma law, unjust enrichment "describes a condition resulting from the failure of a party to make restitution in circumstances where it is inequitable." *Lapkin v. Garland Bloodworth, Inc.,* 23 P.3d 958 (Okla.Div.App.2000). "A right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another." *N.C. Corff Partnership, Ltd. v. OXY USA, Inc.,* 929 P.2d 288, 295 (Okla.Civ.App.1996). However, a necessary element of this claim is that the unjust enrichment must be connected to a resulting injustice. *Teel v. Public Service Co. of Oklahoma,* 767 P.2d 391, 398 (Okla.1985). Plaintiff provides the following argument in support of his unjust enrichment claim:

2006 WL 2990524, 61 UCC Rep.Serv.2d 30

Leviton next argues that, until this point of time, Mr. Harrison's push-in receptacles have been functioning properly so no unjust enrichment remedy is be [sic] available. Whether or not M. Harrison's receptacles have malfunctioned to date, he has become aware of the imminent harm and will replace the unsafe receptacles. Leviton's refusal to reimburse him the cost of safe replacements amounts to an inequitable and unjust retention of a benefit.

Dkt. # 28, at 20. If plaintiff believes a product in his home creates an increased risk of danger, he may remove the product from his home. That does not automatically create an equitable right to recovery if he has not suffered a manifestation of the potential harm. Plaintiff is currently receiving the benefit of a product that is functioning as the manufacturer intended, but has not suffered any injury. *See Teel,* 767 P.2d at 398-99 (no finding of injustice when plaintiff received the benefit of the bargain). Without an accompanying injury, there is no injustice. Plaintiff has specifically limited his claim to economic injuries, which precludes him from asserting an injustice based on an increased risk of personal injury.

 **\*8** Plaintiff's claims for strict product liability and negligence are not barred by the economic loss rule stated in *Wagonner,* but by something more fundamental. In negligent or defective design cases, plaintiff's alleged injury must be something more than the defective design; he must have suffered injury caused by the defective design of the product. *Burton v. R.J. Reynolds Tobacco Co.,* 397 F.3d 906 (10th Cir.2005); *Prince v. B.F. Ascher Co., Inc.,* 90 P.3d 1020 (Okla.Civ.App.2004).* The allegations of the amended complaint establish that receptacles are functioning as intended, but that plaintiff believes there is an increased risk of harm. In order succeed on a claim for negligence or products liability, plaintiff must be able to prove that he suffered an injury caused by defendant's defective design. *Seay v. General Elevator Co.,* 522 P.2d 1022 (Okla.1974); *Kirkland v. General Motors Corp.,* 521 P.2d 1353, 1360-61 (Okla.1974).* These kinds of claims were not meant to preemptively prevent injury but, rather, they are designed to provide a legal theory to address injuries that have already occurred. Plaintiff's claim that he may have to expend money in the future to replace a product, or that he faces an increased risk of personal injury, can not be adjudicated as a strict products liability or negligence claim until the product has caused an injury. If the Court were to adopt plaintiff's theory, plaintiff could pursue these claims merely for owning a product that is allegedly defective, but that has not caused any actual harm. Neither a strict products liability claim nor a negligence claim is available in this situation.

**IT IS THEREFORE ORDERED** that defendant's Motion to Dismiss Plaintiff's Amended Class Action Complaint and Brief in Support (Dkt .# 25) is **granted.** The Amended Class Action Complaint (Dkt.# 13) is hereby **dismissed.**

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 2990524, 61 UCC Rep.Serv.2d 30

---

**End of Document**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 8

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 118 of 207
PageID: 13135

467 Mich. 864
(The decision of the Court is referenced in the North
Western Reporter in a table captioned "Supreme
Court of Michigan Applications for Leave to Appeal.")
Supreme Court of Michigan

Marwan Karadsheh

v.

Express Liquor, Inc., Ramzi F. Karachi, Hani
Karadsheh, Akram Karadsheh, jointly and severally

NO. 120885. COA No. 236599.

|

August 30, 2002

**Opinion**

Disposition: Application for leave to appeal from the
November 14, 2001 decision of the Court of Appeals is
DENIED.

**All Citations**

467 Mich. 864, 651 N.W.2d 912 (Table), 2002 WL 31047289

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 9

Maxwell v. Remington Arms Co., LLC, Not Reported in F.Supp.2d (2014)
2014 WL 5808795

🚩 KeyCite Yellow Flag - Negative Treatment
Distinguished by Jones v. BMW of North America, LLC, M.D.N.C.,
September 25, 2020

2014 WL 5808795
Only the Westlaw citation is currently available.
United States District Court,
M.D. North Carolina.

Ronnie MAXWELL, Plaintiff,
v.
REMINGTON ARMS COMPANY, LLC, Defendant.

No. 1:10CV918.
|
Signed Nov. 7, 2014.

**Attorneys and Law Firms**

Benjamin R. Bingham, Bingham & Lea, P.C., San Antonio,
TX, William Grainger Wright, Sr., Gary K. Shipman,
Shipman & Wright, LLP, Wilmington, NC, for Plaintiff.

Frederick Rom, Womble Carlyle Sandridge & Rice, Research
Triangle Park, NC, Andrew A. Lothson, James B. Vogts,
Martin & Bell, LLP, Chicago, IL, for Defendant.

*MEMORANDUM OPINION AND ORDER*

BEATY, District Judge.

**\*1** This matter is before the Court on Recommendation of
the U.S. Magistrate Judge [Doc. # 34] in the consolidated
cases of 1:12–cv–477 (Yancey, lead case), 1:12–cv–437
(Henderson, member case) and 1:10–cv–918 (Maxwell,
member case) that Plaintiffs' Complaints be dismissed under
Federal Rule of Civil Procedure 12(b)(6) for failure to state a
claim on which relief may be granted. The Recommendation
was filed on September 30, 2013, and notice was served on the
parties pursuant to 28 U.S.C. § 636(b). On October 17, 2013,
Plaintiff Ronnie Maxwell filed Objections [Docs. # 36, # 37].
Plaintiffs William S. Yancey and David C. Henderson filed
stipulations of dismissal thus terminating their respective
cases, therefore, only the case of *Maxwell v. Remington Arms
Company, LLC,* case number 1:10–cv–918, remains before
the Court.

Upon a de novo review of Plaintiff Ronnie Maxwell's
Objections and relevant portions of the Recommendation, the
Court finds that the Objections do not change the substance
of the Magistrate Judge's ruling. For the reasons discussed
below, the Court will affirm and adopt the Magistrate Judge's
Recommendation as to the case of Plaintiff Ronnie Maxwell
("Plaintiff"). In doing so, the Court will also deny as moot
Plaintiff's pending Motion for Extension of Time to file Class
Certification [Doc. # 22].

**I. FACTUAL AND PROCEDURAL BACKGROUND**
On November 29, 2010, Plaintiff Ronnie Maxwell, a citizen
of Texas, filed a Complaint [Doc. # 1] against Defendant
Remington Arms Company, LLC ("Defendant") in the
Middle District of North Carolina. On December 3, 2010,
Plaintiff filed an Amended Complaint [Doc. # 8]. Plaintiff
brought the case as a class action and asserted claims of breach
of warranty under the Magnuson–Moss Warranty Act, unjust
enrichment, and unfair and deceptive conduct under the North
Carolina Unfair and Deceptive Trade Practices Act.

Plaintiff's claims stem from his purchase of two of
Defendant's model number 597 17 HMR semi-automatic
rifles (the "597 17 HMR"). Plaintiff alleged that he purchased
the two firearms, but he did not specify when, where,
or from whom he made the purchases, or how much
he paid for each 597 17 HMR. Plaintiff listed several
advertising statements attributed to Defendant without any
further context and without stating that Plaintiff received or
encountered such statements prior to his purchases. Next,
Plaintiff alleged "Remington's representations concerning the
Remington Model 597 17 HMR rifles and ammunition were
false, misleading and deceptive." (*Id.* at 4.) Plaintiff alleged
that Defendant recalled all 597 17 HMRs "[d]ue to safety
and performance concerns," and that Defendant directed
owners to immediately cease using any 597 17 HMR and
corresponding ammunition. (*Id.* at 4) Plaintiff concluded his
factual allegations by asserting that due to this recall, he could
not use or sell his two 597 17 HMRs, and thus the rifles are
now worthless.[1]

| 1 | Plaintiff's Amended Complaint did not elaborate upon the reason for the recall beyond safety and performance issues and a brief allegation that "Remington also cannot sell a ... 597 17 HMR rifle due to inherent problems with the ammunition in semi-automatic weapons." (Pl.'s Am. Compl. [Doc. # 8], at 8.) However, Defendant explained and the Magistrate Judge observed that the recall was prompted when Defendant received notice |

from Federal Cartridge, the only manufacturer of ammunition for the 597 17 HMR, that the ammunition was not safe for use with any semi-automatic gun. Although Mr. Yancey brought independent claims against Federal Cartridge, Plaintiff did not include Federal Cartridge as a defendant in the present case.

Under his claim for breach of express warranty under the Magnuson–Moss Warranty Act ("MMWA"), 15 U.S.C. §§ 2301–2312, Plaintiff alleged that "[w]ith respect to all Remington 597 17 HMR rifles sold, Remington made a written limited warranty as defined by 15 U.S.C. §§ 2301(6) and 2303(a)." (Pl.'s Am. Compl.[Doc. # 8], at 6.) Plaintiff, however, did not provide any details as to the alleged contents of this warranty or as to Plaintiff's specific knowledge of the warranty before purchasing the firearms. Plaintiff further alleged that "Remington made known its breach of the limited warranty on or about August 2009 when it issued a recall of all Remington 597 17 HMR rifles." (Id.) Plaintiff further asserted that Defendant failed to "remedy the warranty" under the MMWA. (Id.) As a result, Plaintiff sought actual damages for the purchase prices of the 597 17 HMRs.

*2 In Plaintiff's second claim for unjust enrichment, he made general allegations that "Plaintiff and the Class paid for their rifles purchases in cash or its equivalent," and that "allow[ing] Remington to keep the cash or its equivalent ... would unjustly enrich Remington at the expense of the innocent Plaintiff and Class." (Id. at 7.) Plaintiff's third and final claim filed pursuant to the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA") alleged that "Defendant represented that the Model 597 17 HMR rifles and ammunition would be free from defects and fit for their intended purpose, under normal conditions of use, wear, and exposure." (Id.) Plaintiff asserted that Defendant knew or should have known that the 597 17 HMR and ammunition "did not or would not conform to Defendant's representations and promises" in its marketing materials. (Id.) Plaintiff alleged that Defendant intended for consumers to rely on these representations, and that because of these "misrepresentations, material omissions, and business practices, Plaintiff and the Class believed that Defendant was selling and providing a safe and reliable rifle for hunting and/or target practice." (Id. at 8.) Plaintiff also alleged that the transactions at issue were in or affecting commerce, and that the alleged unfair or deceptive acts of Defendant would lead reasonable consumers to believe that the 597 17 HMR and its ammunition "would be free from defects and fit for their intended purpose." (Id.) However, Plaintiff did not make any allegations as to his use of the 597

17 HMRs since he purchased them. Plaintiff complained that consumers were never informed what Defendant's response would be in the event of a recall, and that the coupons Defendant offered to owners of a 597 17 HMR "do not necessarily provide a full refund ... and ... require consumers to buy another Remington product." (Id.) Plaintiff concluded with general allegations that Defendant's "misrepresentations, material omissions, and business practices ... constitute unfair and/or deceptive acts or practices" under the UDTPA, which "proximately caused actual injury/damage" to the class, including Plaintiff. (Id. at 9.) Plaintiff nowhere specified any injury or how such an injury was caused by Defendant.

On January 20, 2011, Defendant filed a Motion to Dismiss [Doc. # 12] based upon Plaintiff's Amended Complaint's failure to state a claim. On June 7, 2012, Plaintiff filed a Motion for Extension of Time to File Class Certification [Doc. # 22]. On June 25, 2013, Magistrate Judge Joe L. Webster issued an Order [Doc. # 33] consolidating Plaintiff's case with *Henderson v. Remington Arms Company, LLC,* case number 1:12–cv–437, and *Yancey v. Remington Arms Company, LLC,* case number 12–cv–477, and the Magistrate Judge designated Yancey as the lead case. Defendant filed Motions to Dismiss in all three cases. On September 30, 2013, Magistrate Judge Webster issued his Memorandum Opinion and Recommendation [Doc. # 34] recommending that all three cases be dismissed.

## II. LEGAL STANDARD

*3 In evaluating a Motion to Dismiss under Rule 12(b)(6), the Fourth Circuit instructs that "[w]e 'take the facts in the light most favorable to the plaintiff,' but 'we need not accept the legal conclusions drawn from the facts.' " *Spaulding v. Wells Fargo Bank,* 714 F.3d 769, 776 (4th Cir.2013) (quoting *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship,* 213 F.3d 175, 180 (4th Cir.2000)). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 1974 167 L.Ed.2d 929 (2007)). Such "facial plausibility" is satisfied when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* However, "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement fail to constitute well-pled facts," and a court does not consider "unwarranted inferences, unreasonable conclusions, or arguments" when evaluating the legal sufficiency of a complaint on a 12(b)(6)

motion. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.,* 591 F.3d 250, 255 (4th Cir.2009) (citations omitted).

## III. DISCUSSION

Plaintiff objects to the Magistrate Judge's Recommendation as to his breach of warranty claim under the MMWA and his claim under the UDTPA.[2] Plaintiff's objections are largely restatements—sometimes verbatim—of his arguments offered in his Response in Opposition to Defendant's Motion to Dismiss [Doc. # 16]. Upon review, the Court finds that Plaintiff's arguments do not alter the nature or substance of the Magistrate Judge's Recommendation, as more fully discussed below.

[2]    Plaintiff does not contest the Magistrate Judge's recommendation to dismiss his unjust enrichment claim.

### A. Breach of Warranty under the Magnuson–Moss Warranty Act

In objecting to dismissal of his MMWA claim, Plaintiff argues that (1) reliance is not required for a breach of express warranty claim[3] and (2) regardless, Plaintiff did plead reliance. When a party brings a breach of warranty claim under the MMWA, courts apply state law for the breach of warranty action unless expressly altered by the federal statute. *Carlson v. Gen. Motors Corp.,* 883 F.2d 287, 291 (4th Cir.1989); *Baldwin v. Jarett Bay Yacht Sales, LLC,* 683 F.Supp.2d 385, 390 (E.D.N.C.2009) ("Where a 'consumer' seeks relief for breach of a 'written warranty' from a 'warrantor' or 'supplier,' Congress expected courts to look to state warranty law except as expressly modified in the MMWA."). "The Magnuson–Moss Warranty Act supplements, rather than supplants state law." *Doll v. Ford Motor Co.,* 814 F.Supp.2d 526, 545 (D.Md.2011).

[3]    In his Objections, Plaintiff argues only that he pled an express warranty and does not appear to argue that he pled or intended to plead an implied warranty of merchantability.

Under North Carolina law,[4] a breach of express warranty claim requires a showing of the following elements: (1) an express warranty of fact or a promise as to the product, (2) the plaintiff's reliance on the warranty in choosing to purchase the product, and (3) the defendant's breach of the warranty. *Earp v. Novartis Pharms. Corp.,* No. 5:11–CV–680–D, 2013 WL 4854488, at *5 (E.D.N.C. September 11,

2013); *Prichard Enters. v. Adkins,* 858 F.Supp.2d 576, 584–85 (E.D.N.C.2012); *Harbour Point Homeowners' Ass'n, Inc. v. DJF Enters., Inc.,* 206 N.C.App. 152, 162, 697 S.E.2d 439, 447 (2010). An express warranty may be a written document, or it may take the form of an "affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes the basis of the bargain." N.C. Gen.Stat. § 25–2–313(1)(a). However, an "affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." *Id.* at § 25–2–313(2). In determining whether a seller's affirmation or description becomes the "basis of the bargain," North Carolina courts look to certain factors, including "whether the buyer knew of the seller's statements." *Pake v. Byrd,* 55 N.C.App. 551, 553, 286 S.E.2d 588, 590 (1982).

[4]    The Magistrate Judge determined that application of North Carolina law was appropriate for all claims, and Plaintiff does not object to the Magistrate Judge's choice of law analysis or conclusion.

**\*4** Plaintiff challenges the Magistrate Judge's determination that Plaintiff failed to adequately plead the element of reliance. In making this objection, Plaintiff argues that reliance can be inferred from purchase or use of a product. However, even the portion of the case quoted by Plaintiff in making this argument undermines Plaintiff's position: "[T]he element of reliance can often be inferred from allegations of mere purchase or use if the natural tendency of the representations made is such as to induce such purchase or use." *Bernick v. Jurden,* 306 N.C. 435, 448, 293 S.E.2d 405, 413 (1982).[5] Plaintiff's allegations, however, are not sufficient to merit such an inference. Even more so, Plaintiff did not allege any of the circumstances of his purchase or use of the 597 17 HMRs.[6] Although Plaintiff alluded to Defendant's written limited warranty in his Complaint, Plaintiff never alleged the terms of that warranty, that he received the warranty prior to purchase, or that he otherwise relied on the warranty. To the extent that Plaintiff intended to premise his breach of warranty on Defendant's representations in its marketing materials, such allegations are likewise insufficient. For example, Plaintiff did not make any allegations of being induced into his purchase by Defendant's advertisements. Indeed, Plaintiff never alleged that he even observed Defendant's advertisements. Even viewed in the light most favorable to Plaintiff, the mere fact that he purchased two 597 17 HMRs, along with the fact

that Defendant made certain statements in its advertising materials, provides an insufficient basis in and of itself to support drawing an inference of reliance or inducement. Instead, the statements Plaintiff focused upon tend to be more of a "seller's opinion or commendation," *see* N.C. Gen.Stat. § 25–2–313(2), rather than promises of specific performance. Simply put, under the legal standards discussed above, Plaintiff's Complaint lacks sufficient facial plausibility as to his warranty claim with regards to the reliance element as identified by the Magistrate Judge.

[5]    The Court notes that *Bernick* is also distinguishable from the present matter. Procedurally, *Bernick* was decided at the summary judgment stage and thus did not consider the legal sufficiency of the complaint. 306 N.C. at 447–48, 293 S.E.2d at 413–14. Second, there was evidence of the plaintiff's purpose in purchasing the warranted product and the plaintiff's subsequent use of the product. *Id.* Here, Plaintiff did not make any allegations as to why he purchased the 597 17 HMRs nor did he describe what was his intended use of the rifles. Moreover, *Bernick* was decided prior to the Supreme Court's *Iqbal* and *Twombly* decisions which demand greater specificity in pleading actions than previously required.

[6]    Plaintiff's citation to *Bussian v. DaimlerChrysler Corp.,* 411 F.Supp.2d 614 (M.D.N.C.2006), is likewise misplaced. The plaintiff in *Bussian* specifically alleged that he "reasonably relied on Defendants' representations and warranties regarding the quality, durability, and other material characteristics ... and that those representations became a basis of the bargain between Defendants and Plaintiff." *Id.* at 621. Plaintiff did not make any such allegations here.

In addition, Plaintiff's argument that he is not required to plead reliance is severely diminished to the extent Plaintiff attempts to simultaneously argue that he did indeed sufficiently plead reliance. This is true especially in view of Plaintiff citing to multiple cases discussing reliance as an element of a breach of warranty claim. Regardless, as already discussed above, reliance is indeed a required element of a breach of warranty claim. *E.g.,* Earp, 2013 WL 4854488, at *5.

The Magistrate Judge's Recommendation focused on Plaintiff's failure to adequately allege the reliance element of a breach of an express warranty claim. In reviewing

the Recommendation, the Court finds that this fact alone is sufficient reason to dismiss Plaintiff's claim without the need to evaluate the other elements of Plaintiff's claim. Plaintiff nonetheless argued that he sufficiently pled both breach of warranty and a product defect. However, as it relates to the requirement of alleging a breach of warranty, Plaintiff never alleged a specific warranty term that was relied upon nor did he explain how such a term was breached. Instead, Plaintiff only provided the conclusory allegation that the fact of Defendant issuing a recall notice provided sufficient evidence of a breach of the purported express warranty.

**\*5** To the extent that Plaintiff's Complaint can be read to assert a claim of product defect,[7] the Court notes that Plaintiff did not make any allegation that his 597 17 HMRs manifested a defect, nor did Plaintiff allege any injury as a result of the defect. Even liberally construing his allegation that the guns are valueless, "[u]nder North Carolina law ... prospective class members whose [products] have not manifested any defects and who merely allege that they have suffered diminished resale value ... will not sufficiently allege actual injury." *Bussian v. DaimlerChrysler Corp.,* 411 F.Supp.2d 614, 630 (M.D.N.C.2005). Without any assertion of a defect and in view of the absence of an allegation for injury, Plaintiff's product defect claim must fail. For these reasons, the Court affirms and adopts the Magistrate Judge's recommendation that under the circumstances of this case, Plaintiff's MMWA claim should be dismissed.

[7]    The parties appear to conflate claims of product liability and breach of warranty. The Court notes that product defect is not an element of a breach of express warranty, as previously outlined above. Product defect may indeed be key to a claim of breach of implied warranty or a products liability claim. *See e.g., Harbour Point,* 206 N.C.App. at 162, 697 S.E.2d at 447 (listing elements for claims of breach of express warranty, breach of implied warranty of merchantability, and products liability based on negligence). However, Plaintiff did not allege such causes of action, but rather Plaintiff explicitly pled a breach of express warranty claim under MMWA.

### B. North Carolina's Unfair and Deceptive Trade Practices Act

Plaintiff nevertheless claims that he has sufficiently pled aggravating factors so as to sustain his allegation of a valid UDTPA claim. Specifically, Plaintiff argues that he

sufficiently pled that Defendant's acts were deceptive and unfair so as to place Defendant's conduct within the scope of the UDTPA and beyond a mere allegation of a breach of contract or breach of warranty claim. Nevertheless, the Court finds that to sufficiently allege an UDTPA claim, a plaintiff must plead that "(1) [the] defendant committed an unfair or deceptive act or practice; (2) the action in question was in or affecting commerce; and (3) the act proximately caused injury to the plaintiff." *Becker v. Graber Builders,* 149 N.C.App. 787, 794, 561 S.E.2d 905, 910 (2002). An act or practice is "unfair" under the UDTPA "when it offends established public policy and is unethical or unscrupulous," and an act is deceptive under the Act "if it has a tendency to deceive." *Id.; see also Kelly v. Georgia–Pacific LLC,* 671 F.Supp.2d 785, 798–99 (E.D.N.C .2009) ("The conduct must be immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers."). A plaintiff must specifically allege "some type of egregious or aggravating circumstances" beyond the mere allegations of a breach of warranty claim in order to have a viable UDTPA claim. *Kelly,* 671 F.Supp.2d at 799. In evaluating potentially unfair or deceptive conduct, the proper measurement is the effect of such conduct on an average consumer. *Becker,* 149 N.C.App. at 794, 561 S.E.2d at 911.

The Recommendation recommended that Plaintiff's UDTPA claim be dismissed as well. In objecting to the Magistrate Judge's ruling, Plaintiff points to Defendant's advertising statements attesting to the 17 597 HMR's quality, arguing that "[i]n direct contrast to Remington's representations, the rifle and ammunition in actuality had performance and safety concerns that were causing property damage and personal injuries...." (Pl.'s Mem. [Doc. # 37], at 14 .) However, Plaintiff never alleged that the 17 597 HMRs had caused any injury to Plaintiff or his property. Plaintiff also did not make any allegations showing how any of the statements listed within his Amended Complaint that Plaintiff attributed to Defendant were false or deceptive. Indeed, Plaintiff made conclusory allegations labeling Defendant's advertising statements as false, misleading, or deceptive without any allegation to support such an assertion. As such, the Court finds that Plaintiff failed to allege the requisite level of unscrupulous, unethical conduct, or aggravating circumstances to adequately state an UDTPA claim.

**\*6** As previously noted, the Magistrate Judge recommended dismissal of Plaintiff's UDTPA claim based on Plaintiff's failure to adequately allege aggravating factors. The Magistrate Judge, however, also briefly addressed the difficulty in construing Plaintiff's claim as one based upon a misrepresentation so as to create an unfair or deceptive act. The Magistrate Judge noted in a footnote that a misrepresentation claim fails because Plaintiff did not allege the necessary element of "actual reliance." (Mem. Op. [Doc. # 34], at 20 n. 12. (citing *Sunset Beach Dev. Inc. v. AMEC, Inc.,* 196 N.C.App. 202, 211, 675 S.E.2d 46, 53 (2009)). Indeed, "[w]here an unfair or deceptive practice claim is based upon an alleged misrepresentation by the defendant, the plaintiff must show 'actual reliance' on the alleged misrepresentation in order to establish that the alleged misrepresentation 'proximately caused' the injury of which plaintiff complains." *Tucker v. The Blvd. at Piper Glen LLC,* 150 N.C.App. 150, 154, 564 S.E.2d 248, 251 (2002); *Sunset Beach,* 196 N.C.App. at 211, 675 S.E.2d at 53. As already discussed above, Plaintiff failed to allege he relied on any of Defendant's advertising statements.

Plaintiff also argued that Defendant's statements constituted misrepresentations in the form of omissions, and that "[i]t would be impossible for Plaintiff to rely on information that was not disclosed to him." (Pl's Mem. [Doc. # 37], at 16). This argument is circular at best. Plaintiff argued that he alleged reliance on Defendant's representations that the 597 17 HMR was safe and reliable, while simultaneously arguing that he could not possibly allege reliance because Defendant failed to disclose that its rifles did not conform to those representations. Plaintiff's attempt to construe as omissions Defendant's alleged failures to inform consumers that the 597 17 HMR was actually unsafe and unreliable are the very characteristic that would qualify Defendant's representations as affirmative misrepresentations. Regardless of the nature of the alleged misrepresentation, Plaintiff never alleged reliance upon a misrepresentation, and thus any UDTPA claim based on misrepresentations fails. [8]

[8]    To the extent Plaintiff intended to assert a failure to disclose claim, Defendant correctly noted in its Response to Plaintiff's Objection [Doc. # 38] that such a duty to disclose arises only in specific contexts, such as that of a fiduciary relationship. *E.g. Salmons, Inc. v. First Citizens Bank & Trust Co.,* No. 2:10CV72, 2011 WL 4738656, at \*5 (E.D.Va. Oct. 7, 2011) (explaining that under the UDTPA, an omission may be actionable only if material and if there is a legal duty to disclose) (citing *Kron Med. Corp. v. Collier Cobb & Assoc.,* 107 N.C.App. 331, 340, 420 S.E.2d 192 (1992)). Plaintiff made no such allegations here.

2014 WL 5808795

Finally, although the Magistrate Judge did not reach the issue of injury under the UDTPA because Plaintiff's claim failed for lack of aggravating circumstances, Plaintiff renews his arguments that he adequately pled injury. However, Plaintiff's bare, conclusory allegation that his rifles are now valueless, standing alone, is insufficient to allege that Defendant's conduct injured Plaintiff in the context of what is required to state an UDTPA claim.

## IV. CONCLUSION

For all of the foregoing reasons, Plaintiff's Amended Complaint [Doc. # 8] is subject to dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6). Upon the Court reviewing the Magistrate Judge's Recommendation [Doc. #

34] and Plaintiff's Objections [Doc. # 36, # 37], the Court finds that the objections do not alter the nature or substance of the Magistrate Judge's reasoning and conclusions. As such, the Magistrate Judge's Recommendation is hereby affirmed and adopted.

**\*7** IT IS THEREFORE ORDERED that the Defendant's Motion to Dismiss [Doc. # 12] is GRANTED, and this matter is hereby DISMISSED with prejudice. Accordingly, Plaintiff's Motion for Extension of Time or file Class Certification [Doc. # 22] is DENIED as moot.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 5808795

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 10

Monte v. Toyota Motor Corp., Not Reported in N.W.2d (2001)
2001 WL 1152901, 46 UCC Rep.Serv.2d 967

KeyCite Yellow Flag - Negative Treatment
Declined to Follow by In re Bridgestone/Firestone Inc. Tires Products
Liability Litigation, S.D.Ind., December 31, 2001

2001 WL 1152901

UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

Court of Appeals of Michigan.

Michael John MONTE and Joanne
Monte, Plaintiff–Appellees,
v.
TOYOTA MOTOR CORPORATION, Toyota
Motor Sales U.S.A., Inc., Defendant–Appellants.

Nos. 220671, 220983.
|
Sept. 28, 2001.

Before: CAVANAGH, P.J., and ZAHRA and K.F. KELLY, JJ.

**Opinion**

PER CURIAM.

**\*1** In this products liability action, defendants Toyota Motor
Corporation (hereinafter "TMC") and Toyota Motor Sales,
U.S.A., Inc. (hereinafter "TMS") appeal as of right from
the trial court's decision denying their motion for judgment
notwithstanding the verdict.[1] We reverse.

[1]    Defendants raise other issues aside from the trial
court's failure to grant their motion JNOV. In light
of our disposition, we need not address the other
issues raised.

I. Background and Procedural History

Plaintiffs Michael and Joanne Monte leased a 1994 Toyota
Camry, manufactured by defendant TMC and sold by
defendant TMS. When plaintiffs leased the 1994 Camry,
airbags were not a required feature. According to plaintiffs,
the vehicle's airbag system and the protection that it offered
in addition to the seatbelt was their primary motivation for
leasing the Camry. Within twenty-four hours of leasing the
vehicle, plaintiffs read about the airbag system in the Owner's

Manuel and Owner's Guide, both of which were provided to
plaintiffs along with the automobile.

The Owner's Guide states:

> In addition to seat belts, many
> Toyota vehicles are equipped with
> both driver's and passenger's side
> supplemental restraint systems (SRS
> airbags). Airbags have been designed
> to supplement the three-point seat
> belt by providing additional protection
> by restraining the forward motion *in
> the event of a more serious frontal
> accident.* [Emphasis added.]

Further, the Owner's Manual states:

> The SRS (Supplemental Restraint System) airbags are
> designed to be activated *in response to a severe frontal
> impact* ... to provide the driver and front passenger with
> further protection in addition to the primary protection
> provided by the seat belts. [Emphasis added.]

> The SRS airbag system is not designed to protect the
> driver and front passenger from an impact from the side or
> rear, a vehicle overturn or *frontal collision at low speeds.*
> [Emphasis added.]

On March 17, 1995, plaintiff Michael Monte[2] was involved
in an automobile accident. Although plaintiff was wearing
his seat belt, the airbag did not deploy upon impact. Plaintiff
claims that the impact was indeed "severe" and that as a result
of the airbag's failure to deploy he sustained serious injuries
to his cervical spine and the lower lumbar region of his back.

[2]    Because Joann Monte's claim for loss of
consortium is a derivative cause of action, the
singular "plaintiff" refers to plaintiff Michael
Monte unless otherwise specified.

Plaintiffs filed a complaint alleging breach of express
warranty, breach of implied warranty, negligence and Mrs.
Monte's derivative claim for loss of consortium. Before
trial however, plaintiff voluntarily dismissed his claims for
negligence and breach of implied warranty, electing only to
proceed on the claim for breach of express warranty.

Monte v. Toyota Motor Corp., Not Reported in N.W.2d (2001)

2001 WL 1152901, 46 UCC Rep.Serv.2d 967

At trial, defendants' primary position was that the airbag in plaintiff's vehicle was not defective in either manufacture or design. Defendants maintained that the airbag did not deploy in response to plaintiff's collision because the airbag was neither designed nor manufactured to deploy in low speed collisions. In fact, before all of the repairs on plaintiff's vehicle were complete, defendant Mel Farr Imports, Inc. conducted a test on the airbag system in plaintiff's vehicle, which revealed that the airbag system was *fully operational;* i.e. free of any "defect." From the time that plaintiffs leased the vehicle up until and since the accident, plaintiffs never had the airbag replaced or otherwise repaired.

**\*2** After the trial, the jury returned its verdict in plaintiffs' favor in the amount of $225,778.39. After the judgment was entered, defendants filed, among other things, its motion for judgment notwithstanding the verdict (JNOV). The trial court denied the relief requested by defendants. Defendants appeal as of right arguing that plaintiff failed to establish a prima facie case of products liability in general and breach of an express warranty in particular.

## II. Motion for Judgment Notwithstanding the Verdict

Defendants argue that the trial court committed error requiring reversal when it denied defendants' motion for JNOV. We agree. This Court reviews a trial court's decision with regard to a motion for JNOV de novo. *Morinelli v Provident Life and Acc Ins Co,* 242 Mich.App 255, 260; 617 NW2d 777 (2000). A motion for JNOV should be granted only when, viewing the evidence and all legitimate inferences in a light most favorable to the nonmoving party, there remain no issues of material fact upon which reasonable minds could differ. *Cipri v Bellingham Frozen Foods, Inc,* 235 Mich.App 1, 14; 596 NW2d 620 (1999) (citations omitted.) As the court stated in *Morinelli,* "[i]f reasonable jurors could have honestly reached different conclusions, the jury verdict must stand." *Morinelli, supra* at 260–261.

## A. Products Liability

Defendants first argue that plaintiffs failed to establish a *prima facie* products liability case because there was no showing that the airbag system in plaintiffs' vehicle was "defective" either in manufacture or design.

Products liability action is defined in M.C.L. § 600.2945 as follows:

(h) "Product liability action" means an action based on a legal or equitable theory of liability brought for the death of a person or for an injury to a person or damage to property caused by or resulting from the production of a product.

(i) "Production" means manufacture, construction, design, formulation, development of standards, preparation, processing, assembly, inspection, testing, listing, certifying, warning, instructing, marketing, selling, advertising, packaging, or labeling.

In order to set forth a *prima facie* case, a plaintiff has the burden of establishing, either directly or by circumstantial evidence, that defendant "supplied a product that was *defective* and that the defect caused the injury." *Klinke v. Mitsubishi Motors Corp,* 219 Mich.App 500, 534; 556 NW2d 528 (1996). [Emphasis added.] The gravamen of a products liability case on a theory of breach of an express warranty is an injury caused by a *defect* in *design or manufacture* such that the product does not perform as expressly warranted. *Scott v. Illinois Tool Work, Inc,* 217 Mich.App 35; 550 NW2d 809 (1996).

To establish a design defect, a plaintiff must prove "evidence of the magnitude of risk posed by the design, alternatives to the design, or other factors concerning the unreasonableness of a particular design." *Lawrenchuk v. Riverside Arena, Inc.,* 214 Mich.App 431, 435; 542 NW2d 612 (1995) (citing *Owens v Allis–Chalmers Corporation,* 414 Mich. 413; 326 NW2d 372 (1982)). In determining the existence of a defect, "the trier of fact must balance the risk of harm occasioned by the design against the design's utility." *Id.* at 435–436 (*citing Prentis v Yale Manufacturing Company,* 421 Mich. 670; 365 NW2d 176 (1984)). To prove a manufacturing defect, a plaintiff must prove a defect attributable to the manufacturer. *Chalmers v General Motors Corporation,* 123 Mich.App 619, 621; 333 NW2d 9 (1982). A plaintiff satisfies this burden when the plaintiff "demonstrates by a reasonable probability, that the defect is attributable to the manufacturer and that such hypothesis is more probable than any other hypothesis reflected by the evidence." *Id.* See also *Holloway v. General Motors Corp,* 399 Mich. 617; 250 NW2d 736 (1977) and *Kupkowski v. Avis Ford Inc,* 395 Mich. 155; 235 NW2d 324 (1975) (both recognizing that to establish a *prima facie* case of breach of warranty in products liability and thus avoid a directed verdict, plaintiffs, 'must prove a defect attributable to the manufacturer (or seller) and a causal connection between

that defect and the injury or damage of which he complains.').
(Citations omitted.)

**\*3** The crucial issue in the case at bar is whether plaintiff satisfied his initial burden of proving the requisite "defect" necessary to sustain his cause of action in products liability. A careful review of the record establishes plaintiff did not produce any evidence at trial to establish that indeed, the airbag in plaintiff's vehicle had a "defect" that caused the product to fail and thus cause plaintiff's injuries. Antithetically, defendant presented evidence that the airbag functioned as designed and manufactured respecting all applicable Federal Motor Vehicle Safety Standards relative to airbags thus establishing the absence of any inherent defect attributable to the manufacturer. Plaintiffs failed to counter this evidence. The only "defect" identified by plaintiffs is that the airbag did not deploy under circumstances under which plaintiffs *thought* that it should *irrespective* of how the airbag is manufactured or designed. Plaintiff's mere expectations as a consumer are not sufficient in and of themselves to sustain an action in products liability. Absent an identifiable defect, recovery in products liability does not and cannot lie.

Plaintiff points out that there need not be direct evidence of a defect to sustain a cause of action in products liability and that the requisite "defect" may be established by circumstantial evidence. Indeed, the trier of fact may infer a defective condition "from circumstantial evidence alone." *Severn v. Sperry Corp,* 212 Mich.App 406, 413; 538 NW2d 50 (1995). However, as the *Holloway* court specifically noted, the burden to prove a defect and a causal connection to the injury always remains with the plaintiff. The defendant never has the burden to prove a non-defect. *Holloway,* 399 Mich. 617 at 739.

B. Breach of Express Warranty

Defendants also argue that plaintiff failed to prove the specific elements to establish a breach of express warranty. We agree. MCL 440.2313 provides in pertinent part that:

(1) Express warranties by the seller are created as follows:

(a) An affirmation of fact or promise made by the seller to the buyer which relates to the goods and *becomes part of the basis of the bargain* creates an express warranty

that the goods shall conform to the affirmation or promise. [Emphasis added.]

(b) A description of the goods *which is made part of the basis of the bargain* creates an express warranty that the goods shall conform to the description. [Emphasis added.]

The "affirmation" that comprises the express warranty at issue in the case at bar derives collectively from the Owners Manuel and the Owners Guide both provided to plaintiffs upon leasing the vehicle. Although plaintiff testified that the SRS airbag system was the primary reason that he ultimately leased the vehicle from defendants, plaintiff could not have relied on *any* of the statements included in either the Owner's Manuel or Owner's Guide considering that he received both *after* the bargain was already struck. [3]

[3]     We do note that the warranties contained in defendants' Owner's Manual and Owner's Guide were indeed ambiguous. In this case, the "defect" was really the nebulous warranty itself which may form the basis of a claim sounding in contract. However, in this case, even if plaintiff stated a claim based in contract, plaintiff's claim would still fail for lack of reliance.

**\*4** Viewing all of this evidence and all legitimate inferences drawn therefrom, in a light most favorable to plaintiffs, a complete review of the record indicates that plaintiff failed to establish a "defect attributable to the manufacturer" which is vital to plaintiffs claim sounding in products liability. *Kupkowski v. Avis Ford, Inc,* 395 Mich. 155, 161; 235 NW2d 324 (1975); *Klinke v. Mitsubishi Motors Corp,* 219 Mich.App 500, 510; 556 NW2d 528 (1996). Accordingly, we find that the trial court committed error requiring reversal by failing to grant defendants' motion for JNOV. In light of our disposition, we need not address the remaining issues raised on appeal.

Reversed and remanded for entry of an order consistent with this opinion. We do not retain jurisdiction.

**All Citations**

Not Reported in N.W.2d, 2001 WL 1152901, 46 UCC Rep.Serv.2d 967

---

      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 11

2020 WL 5849482
Only the Westlaw citation is currently available.
United States District Court, D.
Maryland, Southern Division.

Charlotte MORRIS, Plaintiff,

v.

BIOMET, INC., et al., Defendant.

Case No. GJH-18-2440
|
Signed 09/30/2020

**Attorneys and Law Firms**

Jill Rombro Marenberg, Scott B. Goldstein, Saiontz and Kirk PA, Baltimore, MD, Michael J. Miller, Tayjes M. Shah, Pro Hac Vice, The Miller Firm LLC, Orange, VA, for Plaintiff.

James A. Frederick, Goodell DeVries Leech and Dann LLP, Baltimore, MD, Matthew T. Albaugh, Pro Hac Vice, Faegre Baker Daniels LLP, Indianapolis, IN, for Defendant.

## MEMORANDUM OPINION

GEORGE J. HAZEL, United States District Judge

**\*1** Plaintiff Charlotte Morris brought this products liability action against Defendants Biomet Orthopedics, LLC, Biomet, Inc. Biomet Manufacturing LLC f/k/a Biomet Manufacturing Corps., and Biomet U.S. Reconstruction, LLC (collectively, "Biomet") based on injuries related to an artificial hip implant manufactured by Biomet that was used during Plaintiff's February 2008 right total hip replacement surgery. ECF No. 1. Specifically, Plaintiff alleges claims of manufacturing defect, failure to warn, negligence, design defect, fraudulent concealment, breach of implied warranties, breach of express warranty, and punitive damages. *Id.* Currently pending before the Court are Biomet's Motion to Exclude Plaintiff's Expert John I. Waldrop, M.D. ("Motion to Exclude Expert Testimony"), ECF No. 226, and Biomet's Motion for Summary Judgment, ECF No. 228.[1] No hearing is necessary to resolve the pending motions. *See* Loc. R. 105.6 (D. Md. 2018). For the following reasons, Biomet's Motion to Exclude Expert Testimony is granted, in part, and denied, in part, and Biomet's Motion for Summary Judgment is granted, in part, and denied, in part.

1    Also pending before the Court are Plaintiff's Motions to Compel Discovery, ECF Nos. 235, 239, and Biomet's Motion to Strike Certification of Conference or in the Alternative Motion to Narrow Issues, ECF No. 240. On August 14, 2020, the parties filed a Joint Notice of Potential Mootness of Pending Motions informing the Court that, on August 10, 2020, the MDL Court entered an order addressing the issues raised by these Motions, thus potentially rendering them moot, and asking the Court to withhold any ruling on the Motions. ECF No. 246. Subsequently, the parties filed a status report requesting that the motions be withdrawn. ECF No. 24. The Court will find that the Motions are rendered Moot.

## I. BACKGROUND[2]

2    These facts are either undisputed or viewed in the light most favorable to Plaintiff as the non-moving party.

### A. Total Right Hip Replacement Surgery

On March 19, 2002, Plaintiff sought treatment from Dr. Michael A. Jacobs for left hip, knee, and back pain. ECF No. 228-3 at 2–3.[3] Dr. Jacobs diagnosed Plaintiff with significant degenerative joint disease of the left hip and degenerative disc disease in the L-spine, and he recommended a left total hip replacement. *Id.* at 3. On June 19, 2002, at MedStar Good Samaritan Hospital, Dr. Jacobs performed a total left hip replacement on Plaintiff, for which he chose a DePuy metal-on-metal hip implant. *Id.* at 4–6.

3    Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

On November 8, 2005, Plaintiff sought treatment from Dr. Jacobs for right lower back and buttock pain, *id.* at 7, and in November 2007, Dr. Jacobs observed end-stage osteoarthritis in Plaintiff's right hip and symptoms of spinal stenosis and stiffness in her back, and he recommended surgery, *id.* at 8. On February 6, 2008, at MedStar Good Samaritan Hospital, Dr. Jacobs performed a right hip replacement on Plaintiff for which he chose a Biomet M2a Magnum metal-on-metal hip implant (the "Biomet Device"). *Id.* at 9–10. Plaintiff did not participate in the selection of her implant and trusted Dr. Jacobs to choose the device. ECF No. 228-4 at 3.

*Morris v. Biomet, Inc., Slip Copy (2020)*
2020 WL 5849482

**B. The Biomet Device**

**\*2** The Biomet Device is a metal-on-metal hip joint replacement. *See* ECF No. 228-7 at 2. It contains three components: a femoral head, a taper insert, and an acetabular cup. *Id.* The head and acetabular cup components are made from cobalt chrome molybdenum (CoCrMo) alloy, and the taper insert is made of a titanium alloy. *See id.* The acetabular cup, which is seated in the hip, is treated with a porous coating of titanium alloy. *Id.*

Biomet included a package insert, or Instructions for Use ("IFU"), with the Biomet Device. *See* ECF No. 228-7. The IFU for Plaintiff's Biomet Device included possible adverse effects of using the device, including:

1. Material sensitivity reactions. Implantation of foreign material in tissues may result in histological reactions involving various sizes of macrophages and fibroblasts. The clinical significance of this effect is uncertain, as similar changes may occur as a precursor to or during the healing process. Particulate wear debris and dislocation from metallic and polyethylene components of joint implants may be present in adjacent tissue or fluid. It has been reported that wear debris may initiate a cellular response resulting in osteolysis or osteolysis may be a result of loosening of the implant. Further, there has been a report regarding an association between articulating surfaces of: 1) CoCrMo alloy on CoCrMo alow, 2) CoCrMo alloy on polyethylene, and 3) Titanium alloy on polyethylene in hip replacements and increased genotoxicity. This report, however, did not assess either the clinical relevance of the data or make any definite conclusions as to which metal ions or interactions between metal ions or particulate metals might be responsible for the observed data. The report further cautioned that an association does not necessarily mean a causal relationship, and that any potentially increased risk associated with metal ions needs to be balanced against the benefits resulting from the hip replacement. A low incidence of metal hypersensitivity has been reported with failed metal-on-metal implants. The clinical relevance of these findings is unclear, and it is not known whether metal hypersensitivity causes implant failure.

2. Early or late postoperative infection and allergic reaction.

4. Loosening or migration of the implants may occur due to loss of fixation, trauma, malalignment, bone resorption, or excessive activity.

10. Fretting and crevice corrosion may occur at interfaces between components.

11. Wear and/or deformation of articulating surfaces.

15. Elevated metal ion levels have been reported with metal-on-metal articulating surfaces. Although mechanical testing demonstrates that metal-on-metal articulating surfaces produce a relatively low amount of particles, the total amount of particulate produced in vivo throughout the service life of the implants remains undetermined. The long-term biological effects of the particulate and metal ions are unknown.

ECF No. 228-7 at 2. Dr. Jacobs does not specifically recall whether he read the IFU prior to Plaintiff's implantation surgery, ECF No. 228-8 at 7–8, but it was his standard practice to familiarize himself generally with the indications received from the manufacturer, such as the surgical technique, which would include reviewing the IFU, *id.* at 4.

**C. Revision Surgery**

After Plaintiff's right hip surgery, Dr. Jacobs continued to see her once a year for routine follow-up appointments. ECF No. 228-8 at 5. On September 9, 2010, approximately two and a half years after her surgery, Plaintiff complained of right hip clicking, which Dr. Jacobs was able to reproduce upon examination. ECF No. 228-3 at 14. At the time of his examination, Dr. Jacobs suspected that the clicking was a soft tissue band catching. *Id.* The treatment plan involved seeing Plaintiff in a year if she was asymptomatic, but if the clicking became a problem or she developed any further symptoms, she was to have Dr. Jacobs evaluate her sooner. *Id.*

**\*3** On September 19, 2011, Dr. Davis Hahn, Plaintiff's oncologist, ordered her to undergo a CT scan of her abdomen and pelvis, which showed a low-density fluid collection, or pseudotumor, near her right iliopsoas muscle. *Id.* at 15–16. Dr. Hahn noted that "it seems fairly clear that Mr. Morris does not have a malignancy in her right pelvis causing the iliopsoas mass but simply has a degenerating right hip metal-on-metal prosthesis which is releasing cobalt and also causing a marked bursal reaction ..." *Id.* at 17. He also noted that her "cobalt level came back 41 which is in the toxic range." *Id.* Dr. Jacobs also suspected that the pseudotumor was related to a metal-

metal hypersensitivity. *Id.* at 18. Based on his concern that Plaintiff was experiencing a reaction to metal ions, Dr. Jacobs recommended revision surgery. ECF No. 228-8 at 6.

On November 15, 2011, at MedStar Good Samaritan Hospital, Dr. Jacobs performed revision surgery on Plaintiff's right hip. ECF No. 228-3 at 19–20. Before her surgery, Plaintiff had a cobalt level elevated at 58 and a chromium level at 19.6—both in the toxic range. ECF No. 229-5 at 2. During revision surgery, Dr. Jacobs discovered damage to Plaintiff's abductor muscle, noting that "the anterior half of the abductor was off and in a kind of thick fibrous membrane" and that "[i]t looked like the posterior abductor was also off and it was adherent to the fascia." ECF No. 228-3 at 19. Dr. Jacobs also noted that there was "marked metalosis [sic] of the entire hip" and that the acetabulum "was black from metalosis [sic]." *Id.* Dr. Jacobs removed the damaged tissue and the Biomet Device's femoral head and acetabular cup. *Id.* at 20. Upon dislocation, the femoral head was "not visibly damaged" and the acetabular cup was "not visibly loose." *Id.* Dr. Jacobs found "excellent bone behind the cup" and implanted a new Zimmer shell polyethylene liner and a new head. *Id.* at 19–20. No complications were reported during surgery. *See* ECF No. 228-3 at 19–20. Tests performed on January 20, 2012, a couple months after Plaintiff's surgery, showed that her cobalt level had decreased to 9.2 and her chromium level had decreased to 10.1. ECF No. 229-7 at 2.

**D. Post-Revision Treatment**

After her initial right hip revision surgery, Plaintiff suffered a series of right hip dislocations for which Dr. Jacobs performed close reductions on February 13, 2012 and May 19, 2012. *Id.* at 21–24. On August 21, 2012, at MedStar Samaritan Hospital, Dr. Jacobs performed a second right hip revision surgery on Plaintiff. *Id.* at 25–26. After her second revision surgery, Plaintiff developed an infection and subsequently underwent several irrigation and debridement ("I&D") procedures, temporary implantation of an antibiotic spacer, and wound vacuum-assisted closure ("V.A.C.") to cure the infection. *Id.* at 27–43. In May 2013, Dr. Jacobs evaluated Plaintiff, noting that she "look[ed] fantastic" and that he "aspirated about 3 mL of what looked to be benign fluid," suggesting that her infection was resolved. *Id.* at 44.

On July 2, 2013, Dr. Jacobs performed another right hip revision surgery to remove the antibiotic spacer and re-implant a total hip arthroplasty. *Id.* at 45–27. Plaintiff subsequently developed another right hip infection and underwent additional I&D procedures and another revision

surgery between December 2015 and February 2016. *Id.* at 48–53. As of December 6, 2018, Plaintiff was still receiving suppressive treatment for her chronic right hip infection. *Id.* at 54–55.

**E. Present Action**

On July 29, 2013, Plaintiff sued Biomet in the United States District Court for the Northern District of Indiana. ECF No. 1. On September 6, 2018, Plaintiff's case was transferred to this Court. ECF No. 201. She alleges eight claims based on the Biomet Device: (1) Strict Liability – Manufacturing Defect (Count I); (2) Strict Liability – Failure to Warn (Count II); (3) Negligence (Count III); (4) Negligence – Design Defect (Count IV); (5) Fraudulent Concealment (Count V); (6) Breach of Implied Warranties (Count VI); (7) Breach of Express Warranty (Count VII); and (8) Punitive Damages (Count VIII).

**\*4** On January 29, 2020, Biomet filed a Motion to Exclude Expert Testimony, ECF No. 226, and a Motion for Summary Judgment, ECF No. 228. Plaintiff filed a response to each motion on February 12, 2020, ECF Nos. 229, 230, and Biomet filed a reply in support of each motion on February 26, 2020, ECF Nos. 233, 234.

**II. MOTION TO EXCLUDE EXPERT TESTIMONY**

**A. Standard of Review**

Federal Rule of Evidence 702, which governs the admissibility of expert testimony, provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) The testimony is based on sufficient facts or data;
> >
> > (c) The testimony is the product of reliable principles and methods; and
> >
> > (d) The expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. *Daubert v. Merrell Dow Pharm., Inc.* requires the trial court to act as a "gatekeeper" of expert testimony, ensuring that the proposed testimony "both rests

on a reliable foundation and is relevant to the task at hand." *509 U.S. 579, 597 (1993)*. In applying *Rule 702*, the court balances "two guiding, and sometimes competing, principles." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999). On one hand, "*Rule 702* is intended to liberalize the introduction of relevant expert evidence." *Id.* On the other hand, "expert witnesses have the potential to 'be both powerful and quite misleading' ... [and] proffered evidence that has a greater potential to mislead than to enlighten should be excluded." *Id.* (internal citations omitted).

The proponent of the expert testimony bears the burden of establishing its admissibility, that is, "the burden of coming forward with evidence from which the trial court could determine that the evidence is admissible under *Daubert*." *Main St. Am. Grp. v. Sears, Roebuck, & Co.*, No. JFM-08-3292, 2010 WL 956178, at *3 (D. Md. Mar. 11, 2010) (citing *Daubert*, 509 U.S. at 592 n.10 (1993)). The court "must assess the proffered evidence using a two-pronged analysis," *Main St. Am. Grp.*, 2010 WL 956178, at *3 (citing *Newman v. Motorola, Inc.*, 218 F. Supp.2d 769, 772 (D. Md. 2002)), and determine whether the testimony is "reliable" and whether it is "relevant." *Id.* (citing *United States v. Barnette*, 211 F.3d 803, 815 (4th Cir. 2000)).

In assessing whether the testimony is reliable, the court may consider a variety of factors, including (1) "whether the theory or technique in question can be (and has been) tested," (2) "whether [the theory or technique] has been subjected to peer review and publication," (3) "its known or potential error rate," and (4) "whether it has attracted widespread acceptance within a relevant scientific community." *Daubert*, 509 U.S. at 580. "The inquiry is a flexible one, and its focus must be solely on principles and methodology, not on the conclusions that they generate." *Id.* Additionally, "although experiential expert testimony does not rely on anything like a scientific method, such testimony is admissible ... so long as an experiential witness explains how his experience leads to the conclusion reached, why his experience is a sufficient basis for the opinion, and how his experience is reliably applied to the facts." *United States v. Bynum*, 604 F.3d 161, 167 (4th Cir. 2010) (internal alterations and citations omitted).

**\*5** Expert testimony is relevant where it is "sufficiently tied to the facts of the case [so] that it will aid the jury in resolving a factual dispute." *Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 341 (D. Md. 2011) (citing *Daubert*, 509 U.S. at 591). Expert testimony "is presumed to be helpful unless it concerns matters within the everyday knowledge and experience of a lay juror." *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993). Thus, "*Rule 702* makes inadmissible expert testimony as to a matter which obviously is within the common knowledge of jurors because such a testimony, almost by definition, can be of no assistance." *Scott v. Sears, Roebuck & Co.*, 789 F.2d 1052, 1055 (4th Cir. 1986); *see, e.g., Page v. Supervalue, Inc.*, No. WGC-14-1508, 2015 WL 1439572, at *16 (D. Md. Mar. 26, 2015) (finding "[i]t is common knowledge that a grape on the floor creates a dangerously slippery condition" and "placing mats on the floor to prevent dangerously slippery conditions clearly lies within the range of a jury's common knowledge and experience.").

**B. Discussion**

Plaintiff has retained Dr. John I. Waldrop, an orthopedic surgeon, as a case-specific expert to support various elements of her products liability claims. Dr. Waldrop will testify about five phenomena he has observed during metal-on-metal hip revision surgeries that he has not observed in metal-on-poly or ceramic hip revisions. ECF No. 227-1 at 2–20. He believes these phenomena are the result of metallosis caused by metal particles from the weight-bearing surfaces of the metal-on-metal devices, and are thus the result of the failure of the devices to function properly and effectively. *Id.* He will testify further that the failure of Plaintiff's Biomet Device was due to metallosis, corrosion, and bone and tissue destruction associated with metal-on-metal hip failures, that he performed a differential diagnosis and ruled out any other potential cause for Plaintiff's condition, that Plaintiff's symptoms were consistent with his clinical findings on defective metal-on-metal devices, that Plaintiff's treatment was medically necessary, and that the amount billed for the treatment was reasonable. *Id.* at 24–25.

In its Motion to Exclude Expert Testimony, Biomet contends that certain portions of Dr. Waldrop's testimony are inadmissible. ECF No. 227 at 3. First, it contends that Dr. Waldrop's general opinions concerning metal-on-metal devices lack sufficient specificity to "fit" the case. *Id.* Next, it contends that Dr. Waldrop lacks an adequate methodology to identify a defect in the Biomet Device as the cause of Plaintiff's need for revision surgery and her subsequent difficulties. *Id.* Finally, it contends that Dr. Waldrop offers no reliable methodology for determining the reasonableness of the amount Plaintiff was billed for her medical treatment. *Id.* The Court will address each challenged portion of testimony separately.

First, Biomet objects to Dr. Waldrop's "general opinions" regarding metal-on-metal revision surgeries that are based on generalized observations. Specifically, it contends that his "general opinions about causes of failure of [metal-on-metal] devices do not provide an adequate 'fit' for this case" because they do not relate specifically to the Biomet Device. ECF No. 227 at 5. Although Biomet is correct that Dr. Waldrop's observations regarding metal-on-metal revision surgeries are not tied to the Biomet Device in particular, Biomet's purported "particularization" requirement appears to be specific to *United States v. Ancient Coin Collectors Guild*, 899 F.3d 295 (4th Cir. 2018), the sole case that Biomet cites in support of its position. In *Ancient Coin*, the Fourth Circuit affirmed the district court's application of a "particularization" requirement for expert testimony in a civil forfeiture case involving ancient coins under the Cultural Property Implementation Act ("CPIA"). *See* 899 F.3d at 318–19. The Fourth Circuit explained that "the CPIA requires an importer to establish the importability of designated archaeological material by reference to the 'article in question,' " and so it was therefore not an abuse of discretion for the district court to require that expert testimony be tailored to the specific ancient coins that the defendant sought to import. *See id.* This "particularization" requirement thus appears to be specific to the CPIA's requirement that importability be established with respect to the specific article in question; it is not rooted in *Daubert* and the Court has not located a similar requirement in any non-CPIA case. The Court will therefore decline to apply it to expert testimony in this products liability action.

*6 Having rejected Biomet's "particularization" requirement, Dr. Waldrop's general opinions are otherwise admissible. Plaintiff's primary allegation in this case appears to be that the Biomet Device's metal-on-metal design is a design defect, and Dr. Waldrop, an experienced orthopedic surgeon who has performed numerous metal-on-metal revision surgeries, will testify about what he has observed in metal-on-metal hip revisions. "[Dr.] Waldrop's expert testimony is [thus] sufficiently reliable, and [it] will assist the trier of fact in understanding the evidence in this case and to determine the issue of causation," *see In re Wright Med. Tech. Inc., Conserve Hip Implant Prods. Liab. Litig.*, 127 F. Supp. 3d 1306, 1337 (N.D. Ga. 2015) (admitting Dr. Waldrop's testimony in hip implant products liability litigation), and Biomet can challenge Dr. Waldrop's credibility or the content of his testimony on cross-examination or during the presentation of its case. Thus, Dr. Waldrop's general opinions need not be excluded under *Daubert*.

Next, Biomet objects to Dr. Waldrop's differential diagnosis. Specifically, it contends that Dr. Waldrop "employed an unreliable methodology in concluding that [Plaintiff's] right hip was revised due to 'metallosis, corrosion, and bone and tissue destruction associated with metal-on-metal hip failures,' " ECF No. 227 at 7, and that he employed no methodology with respect to his conclusion that all of Plaintiff's subsequent dislocations and infections were directly or indirectly caused by the failure of the Biomet Device, *id.* at 11. "[D]ifferential diagnosis is a standard scientific technique of identifying the cause of a medical problem ... by determining the possible causes for the patient's symptoms and then eliminating each of these potential causes until reaching one that cannot be ruled out or determining which of those that cannot be excluded is most likely." *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 200 (4th Cir. 2001) (citing *Westberry*, 178 F.3d at 262) (internal quotation marks omitted). "A medical expert's opinion based upon differential diagnosis should not be excluded because the expert has failed to rule out every possible alternative cause of a plaintiff's illness. In such cases, the alternative causes suggested by a defendant normally affect the weight that the jury should give the expert's testimony and not the admissibility of that testimony. However, a differential diagnosis that fails to take serious account of other potential causes may be so lacking that it cannot provide a reliable basis for an opinion on causation. Thus, if an expert utterly fails to consider alternative causes or fails to offer an explanation for why the proffered alternative cause was not the sole cause, a district court is justified in excluding the expert's testimony." *Id.* at 202 (internal citations quotation marks omitted).

Here, Dr. Waldrop's expert report demonstrates that he conducted a sufficient differential diagnosis with respect to Plaintiff's first revision surgery. Dr. Waldrop's differential diagnosis is based on the experience, training, and knowledge he has acquired from practicing orthopedics for over forty years, his observations of surgeries for removal of cobalt and chromium metal on metal-on-metal hip implants and revisions of cobalt and chromium hip implants, conversations and presentations by other orthopedic surgeons, his examination of Plaintiff's medical records, and the deposition testimony from Plaintiff and Dr. Jacobs. *See* ECF No. 227-1 at 24–25. He concludes that "[t]he failure of [Plaintiff's Biomet Device] was due to metallosis, corrosion, and bone and tissue destruction associated with metal-on-metal hip failures," *id.* at 25, and, contrary to Biomet's assertion, he appears to have considered and eliminated

several alternative causes, including the positioning and placement of the Biomet Device by Dr. Jacobs, *id.*; ECF No. 230-3; infection, ECF No. 230-10 at 8; procedural and post-operative complications, ECF No. 227-1 at 25; Plaintiff's medical history, *id.*; and metal sensitivity, ECF No. 227-3 at 6. Thus, the Court sees no reason to exclude Dr. Waldrop's testimony with respect to specific causation for Plaintiff's first revision surgery. *See Cooper*, 259 F.3d at 200.

**\*7** The same cannot be said with respect to Dr. Waldrop's conclusion that Plaintiff's subsequent revisions, dislocations, and infections were all the result of a defect in the original Biomet Device that was removed during the first revision surgery. Dr. Waldrop's expert report states in conclusory fashion that "[t]he injuries after the revision surgery including the multiple procedures for dislocations and infections and ongoing pain and loss of mobility were the result of the defective metal-on-metal prosthesis and/or secondarily caused by the necessary surgery of the defective metal-on-metal prosthesis." ECF No. 227-1 at 25. This conclusion does not appear to involve the same rigorous differential analysis that Dr. Waldrop conducted for the first revision surgery and instead seems to be based upon his speculation and subjective belief. *See* ECF No. 227-3 at 6. Dr. Waldrop has therefore provided little basis for testimony regarding causation with respect to Plaintiff's injuries after the first revision surgery, and because the Court need not "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert," *see Pugh v. Louisville Ladder, Inc.*, 361 F. App'x 448, 454 n.4 (4th Cir. 2010), the Court will exclude Dr. Waldrop's testimony on this issue, *see Zuckerman v. Wal-Mart Stores East, L.P.*, 611 F. App'x 138, 138 (4th Cir. 2015) ("Expert testimony rooted in 'subjective belief or unsupported speculation' does not suffice.").

Finally, Biomet objects to Dr. Waldrop testifying about the reasonableness of the amount that Plaintiff was billed for her medical treatment. In determining whether an expert's testimony is relevant and reliable, a court must aim "to prevent the fact-finder from being unduly swayed by opinions, presented as expert judgments, that in fact amount to no more than informed speculation." *Fireman's Fund Ins. Co. v. Tecumseh Prods. Co.*, 767 F. Supp. 2d 549, 553 (D. Md. 2011).

Here, Dr. Waldrop stated at his deposition that he is "not a biller," but instead just "looked" at Plaintiff's medical bills and determined that they "looked reasonable to [him]." ECF No. 227-3 at 7. He also stated that he does not issue invoices

or bills to patients and he does not routinely look at his patients' medical bills. *Id.* at 8. Thus, there is no basis for the Court to conclude that he has "specialized knowledge" regarding medical billing practices that will help the fact-finder determine whether Plaintiff was billed a reasonable amount for her medical treatment or that his testimony is the result of reliable principles and methods. *See* Fed. R. Evid. 702. Because Dr. Waldrop's testimony regarding the reasonableness of Plaintiff's medical bills would amount to no more than speculation, it must be excluded. [4]

> [4]    In her opposition, Plaintiff states, "To the extent [Biomet] argues, Good Samaritan's billing was not reasonable or any such care unnecessary, is grounds for cross-examination but not means for exclusion." ECF No. 230 at 11. However, she does not provide any legal authority to support her assertion, so the Court will disregard this argument.

In sum, the Court will permit Dr. Waldrop to testify about his general observations regarding metal-on-metal revisions and his conclusions regarding specific causation for Plaintiff's first revision surgery. Dr. Waldrop's testimony regarding causation for Plaintiff's subsequent injuries and the reasonableness of the amount Plaintiff was billed for her medical treatment is excluded. Accordingly, Biomet's Motion to Exclude Expert Testimony is granted, in part, and denied, in part.

Plaintiff's ability to create a genuine issue of material fact, however, is not necessarily vitiated by the Court's conclusions regarding Dr. Waldrop's expert testimony—an inquiry to which the Court now turns.

### III. MOTION FOR SUMMARY JUDGMENT

#### A. Standard of Review

"Under [Federal Rule of Civil Procedure] 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). The party moving for summary judgment bears the burden of demonstrating that no genuine dispute exists as to material facts. *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987). If the moving party demonstrates that there is no evidence to support the non-moving party's case, the

2020 WL 5849482

burden shifts to the non-moving party to identify specific facts showing that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 322–23. Importantly, at the summary judgment stage, it is not the Court's function to weigh the evidence but simply to decide if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A dispute of material fact is genuine if the conflicting evidence creates "fair doubt," *Cox v. Cty. of Prince William*, 249 F.3d 295, 299 (4th Cir. 2001), such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

**\*8** When ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. Nevertheless, a "mere scintilla of proof" is not enough to defeat a motion for summary judgment. *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003) (citing *Anderson*, 477 U.S. at 252). To defeat the motion, the party opposing summary judgment must submit evidentiary materials showing facts on the basis of which the finder of fact could reasonably decide the case in its favor. *Anderson*, 477 U.S. at 252. If a party fails to make a showing sufficient to establish the existence of an essential element on which that party will bear the burden of proof at trial, summary judgment is proper. *Id.*

### B. Discussion

In her Complaint, Plaintiff asserts claims for (1) Strict Liability – Manufacturing Defect (Count I); (2) Strict Liability – Failure to Warn (Count II); (3) Negligence (Count III); (4) Negligence – Design Defect (Count IV); (5) Fraudulent Concealment (Count V); (6) Breach of Implied Warranties (Count VI); (7) Breach of Express Warranty (Count VII); and (8) Punitive Damages (Count VIII). ECF No. 1. She also requests attorney's fees. *Id.* In her response to Biomet's Motion for Summary Judgment, Plaintiff states that she withdraws any claims related to "manufacturing defect," but maintains claims as to "design defect" in negligence and strict liability. ECF No. 229 at 12. She also states that she does not assert any freestanding negligence claims, but only asserts negligent failure to warn and negligent design defect claims. *Id.* at 16. Thus, Counts I and III are dismissed to the extent that they allege a manufacturing defect.[5]

[5]    In the Complaint, Count I is labeled as alleging only manufacturing defect, but it contains language that could also allege design defect. Because Plaintiff states that she alleges design defect in negligence and strict liability, and Biomet does not appear to

object, the Court will interpret Count I as alleging strict liability – design defect.

Biomet contends that (1) Plaintiff's claims fail for lack of medical causation because she has no expert evidence linking a defect in the Biomet Device to Plaintiff's injuries and because Biomet's experts disprove Plaintiff's claims; (2) Plaintiff's failure to warn claims fails as a matter of law because Biomet discharged its duty to warn under the learned intermediary doctrine, because the Biomet Device's IFU is adequate, and for lack of causation; (3) Plaintiff's fraudulent concealment claims fail for lack of particularity and lack of reliance; (4) Plaintiff's claim for breach of implied warranties fails because she did not give notice to Biomet; (5) Plaintiff's claim for breach of express warranty fails because Biomet did not make any express warranties to Plaintiff; (6) Plaintiff's claim for punitive damages fails because she cannot establish that Biomet acted with actual malice; and (7) Plaintiff is not entitled to attorney's fees because no statute, contract, or exception allows her to claim attorney's fees.

For the reasons that follow, the Court concludes that Biomet is entitled to summary judgment on Plaintiff's failure to warn, fraudulent concealment, breach of implied warranties, and breach of express warranty claims and on Plaintiff's claims for design defect, to the extent that they are based on harms that occurred after the first revision surgery. Plaintiff's design defect claims survive to the extent they pertain to her first revision surgery. The Court also concludes that Plaintiff's claims for punitive damages and attorney's fees must be dismissed.

### 1. Design Defect (Counts I and IV)

**\*9** Plaintiff alleges that Biomet is liable in negligence and strict liability for defectively designing a metal-on-metal device. A products liability design defect claim "focuses upon the specifications for the construction of the product and the risks and benefits associated with that design." *Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 411 (D. Md. 2001). "The negligence theory of product liability focuses on the conduct of the defendant, while the strict liability theory of products liability focuses primarily on the *product* (and whether or not it can be deemed defective)," but under both negligence and strict liability design defect theories of recovery, a plaintiff must show three product litigation basics: defect, attribution of defect to the seller, and a causal relationship between the defect and the injury. *Parker v. Allentown, Inc.*, 891 F. Supp. 2d 773, 780 (D. Md. 2012).

Here, Biomet contends that it is entitled to summary judgment because Plaintiff has presented no evidence establishing a causal relationship between a design defect in the Biomet Device and Plaintiff's injury. The Court disagrees.

As the Court has explained, Dr. Waldrop will provide expert testimony that the Biomet Device's metal-on-metal design was defective and that his differential diagnosis shows that Plaintiff's injuries associated with the first revision surgery were caused by this defective design. *See* ECF No. 228-12. And, as the Court has already determined, Dr. Waldrop's testimony regarding metal-on-metal implants and his differential diagnosis are admissible under the *Daubert* standard. Biomet is certainly permitted to present its own expert testimony to contradict Dr. Waldrop's testimony, proffer alternative causes for Plaintiff's injuries associated with her first revision surgery, and challenge Dr. Waldrop's methodology and conclusions, but that does not change the fact that Plaintiff has presented evidence to create a dispute of material fact with respect to causation for injuries associated with Plaintiff's first revision surgery. This dispute is a issue for the fact-finder to resolve and not a matter for the Court to resolve on summary judgment. *See Anderson*, 477 U.S. at 249. Accordingly, Biomet is not entitled to summary judgment on Plaintiff's design defect claim with respect to the first revision surgery.

However, as the Court has explained, Dr. Waldrop's testimony is not admissible with respect to harms that occurred after the first revision surgery. Plaintiff has cited no other causation evidence with respect to those harms, so Biomet is entitled to summary judgment on Counts I and IV to the extent that those counts allege a design defect with respect to harms that occurred after Plaintiff's first revision surgery.

### 2. Failure to Warn (Counts II and III)

Plaintiff alleges that Biomet is liable in negligence and strict liability for failure to warn of the risks of the Biomet Device. "Products liability law imposes on a manufacturer a duty to warn if the item produced has an inherent and hidden danger that the producer knows or should know could be a substantial factor in causing an injury." *Shreve*, 166 F. Supp. 2d at 413 (internal quotation marks omitted). Under Maryland law, "negligence concepts and those of strict liability have 'morphed together' " in failure to warn cases. *Gourdine v. Crews*, 405 Md. 722, 743 (2008). Thus, the traditional concepts of duty, breach, causation, and damage are required

for both causes of action. *Id.*; *see also Mazda Motor of Am., Inc. v. Rogowski*, 659 A.2d 391, 394 (1995) ("[I]t is true that a strict liability claim based on failure to warn bears a strong resemblance to a claim of negligence. Concepts of duty, breach, causation, and damages are present in both.").

Maryland courts apply the learned intermediary doctrine in failure to warn cases involving medical devices. *See, e.g., Brooks v. Medtronic, Inc.*, 750 F.2d 1227, 1231–32 (4th Cir. 1984); *Miller v. Bristol-Myers Squibb Co.*, 121 F. Supp. 2d 831, 838 (D. Md. 2000). "Under the learned intermediary doctrine, the manufacturer of medical devices ... has no duty to warn the patient of the risks associated with products used under the supervision of a doctor." *See Miller*, 121 F. Supp. 2d at 838. Rather, "[t]he manufacturer's duty to warn is limited to adequately informing the patients' doctor of any risks associated with the product's use." *Id.* "A warning is legally adequate when it explains the risk which the plaintiff alleges has caused the injury." *Lee v. Baxter Healthcare Corp.*, 721 F. Supp. 89, 95 (D. Md. 1989). "The warning must only be reasonable, not the best possible one." *Ames v. Apothecon, Inc.*, 431 F. Supp. 2d 566, 572 (D. Md. 2006); *see also Hartford Mut. Ins. Co. v. Apria Healthcare, Inc.*, 159 F. App'x 479, 483 (4th Cir. 2005) ("Maryland does not require an encyclopedic warning."). But even where a warning is inadequate, a failure to warn claim fails where the doctor was already aware of the risk the allegedly deficient warning should have communicated. *See McClure v. Scientific Spinal*, 11 F. App'x 154, 159 (4th Cir. 2001); *see also Gourdine*, 405 Md. at 743 (stating that "causation" is required for failure to warn claims alleged in strict liability and negligence).

**\*10** Here, as a manufacturer of a medical device, Biomet's duty to warn was owed to Dr. Jacobs, Plaintiff's treating physician. *See Miller*, 121 F. Supp. 2d at 838. In her response to Biomet's Motion for Summary Judgment, Plaintiff states that "the severity and prevalence of the risks of metal hips and the secondary consequences of long-term exposure to toxic metals in the blood" are "the very risks [Plaintiff claims] caused her injuries." ECF No. 229 at 14. But even if Plaintiff could prove that Biomet's warnings were inadequate with respect to these risks, [6] Dr. Jacobs was already independently aware of the risks that Plaintiff identifies. Dr. Jacobs testified that as of early 2008, he was aware of the "well-documented phenomenon" that metal-on-metal devices would cause elevated metal ion levels. ECF No. 228-8 at 10. He was also aware that metal-on-metal devices can cause a metal sensitivity reaction. *See id.* at 8, 10. Regarding the role that Biomet's warnings played in his selection of the Biomet

Device, although Dr. Jacobs testified that it is his standard practice to familiarize himself with the indications received from the manufacturer, *id.* at 4, he did not specifically recall whether he read the IFU prior to Plaintiff's surgery, *id.* at 7–8. And perhaps most notably, Dr. Jacobs testified, "I make my own decisions. I research it in peer-reviewed literature. I, by and large, don't rely on representatives of companies to give me information," *id.* at 7, "I get my information independently as opposed to from manufacturers," *id.* at 11, and "I would glean most of my information from the metal-metal world in general," *id.* at 12. Thus, the evidence overwhelmingly shows that Dr. Jacobs placed little weight on Biomet's warnings, indicating that different warnings would not have altered his decision-making. [7] Because Plaintiff cannot establish that Dr. Jacobs would have relied on more adequate warnings, she cannot prove her failure to warn claims. Accordingly, Biomet is entitled to summary judgment on Counts II and III.

[6] The Court is not prepared to conclude that Biomet's warnings were adequate as a matter of law, particularly with respect to the magnitude of the risks associated with metallosis and pseudotumors. *See In re DuPuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753, 773 (5th Cir. 2018) (denying summary judgment to defendant where "the warning fail[ed] to put surgeons on notice as to the distinctive risks that arise from [metal-on-metal devices]—'metallosis,' pseudotumors,' and 'tissue necrosis'—*or the magnitude of those risks.*" (emphasis added)).

[7] Dr. Jacobs testified that he was independently aware of the risks associated with metal-on-metal devices, but if Biomet had been aware that the Biomet Device in particular had a higher incidence rate of local adverse reactions when compared to metal-on-metal devices in general, that would have been relevant to him. *See* ECF No. 228-8 at 11. But a legally adequate warning need not include the incidence rate or prevalence of a particular adverse reaction. *See Ames*, 431 F. Supp. 2d at 573; *see also McDowell v. Eli Lilly & Co.*, 58 F. Supp. 3d 391, 405 (S.D.N.Y. 2014); *Ocasio v. C.R. Bard, Inc.*, No. 8:13-CV-1962-T-36AEP, 2015 WL 3496062, at *5 (M.D. Fla. June 3, 2015); *Hurley v. Lederle Labs., Div. of Am. Cyanamid Co.*, 651 F. Supp. 993, 1002 (E.D. Tex. 1986), *rev'd on other grounds*, 863 F.2d 1173 (5th Cir. 1988). Thus, Biomet was not obligated to include incidence rates, even if

that information would have been relevant to Dr. Jacobs, and so such evidence does not bar summary judgment on Plaintiff's failure to warn claims.

### 3. Fraudulent Concealment (Count V)

Plaintiff alleges that Biomet is liable for fraudulent concealment based on omissions and misrepresentations it made to Dr. Jacobs about the Biomet Device. To establish a claim for fraudulent concealment, a plaintiff must prove that the defendant owed a duty to the plaintiff to disclose a material fact, the defendant failed to disclose that fact, the defendant intended to defraud or deceive the plaintiff, the plaintiff took action in justifiable reliance on the concealment, and the plaintiff suffered damages as a result of the defendant's concealment. *Hill v. Brush Engineered Materials, Inc.*, 383 F. Supp. 2d 814, 823 (D. Md. 2005).

Here, Plaintiff has failed to cite any evidence demonstrating that she or Dr. Jacobs relied on any misleading information provided by Biomet. Plaintiff alleges that Biomet made three categories of misrepresentations: (1) falsely stating that the Biomet Device does not suffer from the same defects as the DePuy ASR implants, which cause metallosis and increased revision rates; (2) falsely stating that the Biomet Device has a 99.2% survivor rate over three years; and (3) generally downplaying and understating the serious risks associated with the use of the Biomet Device and the unacceptably high rate of failure and release of metal ion debris. ECF No. 1 ¶¶ 39, 76, 77. But Plaintiff cites to no evidence demonstrating that she relied on these statements in selecting the Biomet Device. She did not view any marketing materials or other information about Biomet hip replacements prior to her surgery, *see* ECF No. 228-4 at 45, 5, and she trusted Dr. Jacobs to choose the device for her hip replacement, *see id.* at 3, 5. And although Plaintiff correctly notes that misrepresentations made to third-parties, such as Dr. Jacobs, are actionable, *see Md. Nat'l Bank v. Resolution Trust Corp.*, 895 F. Supp. 762, 772 (D. Md. 1995), she must still demonstrate that Dr. Jacobs relied on those misrepresentations. She has not cited sufficient evidence to do so.

**\*11** With regard to his clinical decisions, Dr. Jacobs testified, "I make my own decisions. I research it in peer-reviewed literature. I, by and large, don't rely on representatives of companies to give me information." ECF No. 228-8 at 7. Further, although he testified that it is his general practice to familiarize himself with the indications provided by the manufacturer, *see id.* at 4; *see also id.* at 7 ("[I]f they had

provided me with adverse information, I certainly would have looked into it."), he does not specifically recollect doing so with the Biomet Device in this case, *see id.* at 8. Finally, although Dr. Jacobs did explain that the Biomet Device's stability was a factor in his decision to use that device, *id.* at 5, there is no evidence that he specifically relied on any misrepresentations by Biomet about the device's stability in making his selection. Because Plaintiff has cited to no evidence suggesting that she or Dr. Jacobs specifically relied on the three identified misrepresentations by Biomet in their decision to select the Biomet Device, she cannot prove her claim for fraudulent concealment. Accordingly, Biomet is entitled to summary judgment on Count V.

### 4. Breach of Implied Warranties (Count VI)

Plaintiff alleges that Biomet breached the implied warranties of merchantability and fitness because the Biomet Device was neither safe for its intended use nor of merchantable quality. A warranty of merchantability is implied in any contract for the sale of goods "if the seller is a merchant with respect to goods of that kind." MD. CODE ANN., COM. LAW § 2-314(1). A warranty of fitness for a particular purpose is implied in the sale of goods when "the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods." *Id.* § 2-315(1). Relevant here, "[t]he Uniform Commercial Code adopted in Maryland requires a buyer to give notice to the seller for a breach of implied warranty." *Doll v. Ford Motor Co.*, 814 F. Supp. 2d 526, 542 (D. Md. 2011) (citing MD. CODE ANN., COM. LAW § 2-607(3)(a)); *see also* MD. CODE ANN., COM. LAW § 2-714(1). "The Maryland Court of Appeals has interpreted this provision to require the buyer to inform the seller of the breach, the particular goods that have been impaired, and set forth the nature of the nonconformity." *Doll*, 814 F. Supp. 2d at 542. "[A] notification to a seller within a reasonable time is a 'prerequisite' for claiming a breach of implied warranty." *Id.* (citing *Lynx, Inc. v. Ordnance Prods.*, 273 Md. 1, 16 (1974)).

Here, Plaintiff claims that she provided proper notice because she was "unaware of any defect in the product until after her revision surgery in December 2011" and her Complaint "filed on July 29, 2013 served to timely notify [Biomet] of the breach of goods and the nature of the non-conformity." ECF No. 229 at 18. However, "a lawsuit cannot constitute notice of a breach" under Maryland law. *See Stanley v. Central Garden*

*and Pet Corp.*, 891 F. Supp. 2d 757, 772 (D. Md. 2012). Because Plaintiff has cited no other evidence of notice to Biomet, there is no evidence that she has met the prerequisite for filing a claim for breach of implied warranties. *See Doll*, 814 F. Supp. 2d at 542. Accordingly, Biomet is entitled to summary judgment on Count VI.

### 5. Breach of Express Warranty (Count VII)

Plaintiff alleges that Biomet is liable for breach of express warranty because it marketed the Biomet Device as a "pain free" hip implant that would permit an active lifestyle, even though it was actually unsafe for permanent implantation in the human body, and because it omitted from the IFU multiple known risks of using the device. In order to prevail on a claim for breach of express warranty, the plaintiff must prove that the seller created an express warranty, the product did not conform to the warranty, and the lack of conformity caused the injury suffered. *Shreve*, 166 F. Supp. 2d at 420. A seller creates an express warranty in any of the following ways:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

**\*12** (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

MD. CODE ANN., COM. LAW § 2-313(1). "[A]n affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." *Id.* § 2-313(2). But a seller need not have a specific intention to create a warranty so long as a representation "is made part of the basis of the bargain. In actual practice affirmations of fact made by the seller about the goods during a bargain are regarded as part of the description of those goods; hence no particular reliance on such statements need be shown in order to weave them into the fabric of the agreement. Rather, any fact which is to take such affirmations, once made, out of the agreement requires clear affirmative proof. The issue normally is one of fact." *Id.* § 2-313 cmt. 3; *see also Rite Aid Corp. v. Levy-Gray*, 391 Md. 608, 623 (2006). Relying on *Rite Aid,* Plaintiff argues that

Morris v. Biomet, Inc., Slip Copy (2020)

2020 WL 5849482

its breach of express warranty claim survives despite a lack of evidence that Plaintiff was ever made aware of any claim made by Biomet that the device was pain free. The Court disagrees.

*Rite-Aid* involved a breach of express warranty claim against a pharmacy based on a package insert it generated for a certain medication that read "take with food or milk if upset stomach occurs." *Id.* at 611. Rite-Aid argued that Plaintiff could not prevail on its breach of express warranty claim because Plaintiff was unaware this warranty existed at the time she purchased the medication.[8] The Court of Appeals for Maryland rejected that argument, holding that an express warranty can be formed "even after the sale has been consummated." *Id.* at 625-626. But the Court did not find that a plaintiff could bring a claim without *ever* having been aware of the existence of the warranty, rather, the court determined that a jury could have inferred that Plaintiff "relied on the veracity of Rite Aid's affirmation each time she took the dose of doxcylcine with milk," regardless of whether she had relied on the express warranty in making the original purchase. *Id.* at 635. Here, there is no evidence from which a jury could determine Plaintiff ever saw any express warranty from Biomet that the product was "pain-free."[9] Instead, she relied on the expertise of her doctor, who as discussed above, relied primarily on his own independent research. Thus, even assuming there was an express claim by Biomet that the product was "pain-free," it never became a basis of the bargain and, therefore, was not an express warranty.

[8]    The Court determined that the statement at issue was sufficient to establish that Rite-Aid was representing to the plaintiff that the medication was compatible with milk consumption. *Rite Aid,* 391 Md. at 624.

[9]    With respect to Biomet marketing the Biomet Device as a "pain free" hip implant that would permit an active lifestyle, Plaintiff cites only to a deposition in which the questioning attorney references an advertisement for the Biomet Device that depicts gymnast Mary Lou Retton and states, "Mary Lou lives pain-free and so should you." *See* ECF No. 229 at 21; ECF No. 229-24 at 8.

**\*13** Although Plaintiff is correct in stating that whether the seller creates an express warranty is typically a question of fact, *see* MD. CODE ANN., COM. LAW § 2-313 cmt. 3, she must still provide sufficient evidence from which the fact-

finder could find in her favor. Because she does not do so with respect to a warranty regarding a "pain free" device, this cannot serve as the basis for a breach of express warranty claim.

Plaintiff's claim based on the risks of using the Biomet Device also fails. She states that "[t]he IFU of the [Biomet Device] omitted multiple known risks, including risks of severe metallosis, pseudotumor, and bone and tissue destruction from metal ions." ECF No. 229 at 19. Under Maryland law, "in order to have an express warranty there must be an affirmative statement of fact by the seller about the goods." *Rite Aid Corp. v. Levy-Gray,* 162 Md. App. 673, 692 (Md. Ct. Spec. App. 2005) (citing MD. CODE ANN., COM. LAW § 2-313). Here, Plaintiff does not complain about affirmative representations made by Biomet about the risks of using the Biomet Device, but instead complains about Biomet's alleged omissions. "[W]arranty by omission," however, would be at odds with the Maryland definition of an express warranty, which requires an "affirmative statement." *See id.* (citing *Witherspoon v. Philip Morris Inc.,* 964 F. Supp. 455, 465 (D.D.C. 1997)). Because this claim appears to simply be a repackaging of Plaintiff's failure to warn claims, which the Court has already addressed, any omissions in the Biomet Device's IFU cannot serve as the basis for Plaintiff's breach of express warranty claim. Accordingly, Biomet is entitled to summary judgment on Count VII.

### 6. Punitive Damages (Count VIII)

Plaintiff claims she is entitled to punitive damages based on Biomet's conduct with respect to the Biomet Device. A plaintiff may be awarded punitive damages where she "has established that the defendant's conduct was characterized by evil motive, intent to injure, ill will, or fraud, *i.e.*, "actual malice." *Owens-Illinois, Inc. v. Zenobia,* 32 Md. 420, 460 (1992). "[I]n order for actual malice to be found in a products liability case, regardless of whether the cause of action for compensatory damages is based on negligence or strict liability, the plaintiff must prove (1) actual knowledge of the defect on the part of the defendant, and (2) the defendant's conscious or deliberate disregard of the foreseeable harm resulting from the defect." *Id.* at 462. "In either case, the evidence must show malicious conduct and not simply the supplying of a defective product or negligence." *Id.* at 465. A plaintiff must prove punitive damages by clear and convincing evidence, a "heightened standard." *Id.* at 469. "Clear and convincing evidence" is defined as "evidence ...

2020 WL 5849482

of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established." *Jimenez v. DaimlerChrysler Corp.*, 269 F.3d 439, 450 (4th Cir. 2001) (internal quotation marks omitted).

Here, Plaintiff simply has not cited to sufficient evidence from which a trier of fact could reasonably conclude that Biomet acted with actual malice with respect to the Biomet Device. Although Plaintiff's response to Biomet's Motion for Summary Judgment includes a three-page list of evidence she states demonstrates Biomet's actual malice, *see* ECF No. 229 at 20–22, this evidence falls short of meeting the "clear and convincing" standard. First, Plaintiff describes much of her evidence as demonstrating that Biomet willfully and intentionally ignored or misrepresented risks related to metal-on-metal devices or made false statements about the Biomet Device, but the Court's review of this evidence reveals that it simply shows that Biomet made certain statements about the Biomet Device that Plaintiff believes to be false, without actually demonstrating that the statements are false or that Biomet acted with any ill-intent. *See* ECF Nos. 229-17, 229-23, 229-24, 229-25. Plaintiff also provides evidence that shows Biomet entered into a settlement agreement related to paying surgeons to use metal-on-metal devices, *see* ECF No. 229-29, that Dr. John Cuckler, an orthopedic surgeon, consulted with Biomet on metal-on-metal devices and generally advocated in support of metal-on-metal devices in the public without disclosing his association with Biomet, *see* ECF Nos. 229-19, 229-20, 229-21, and that Dr. Hahn attempted to contact Biomet to ask about how to best treat Plaintiff's pseudotumor, but Biomet did not return his calls, *see* ECF Nos. 229-26, 229-27, but none of this evidence establishes that Biomet acted with actual knowledge of any defects in the Biomet Device or that it deliberately disregarded those defects. As far as the Court can tell, the only relevant evidence to the question of actual malice is evidence that, in 1995, a Philadelphia doctor notified Biomet that he had concerns about the potential long-term systemic effects of metal ion release from metal-on-metal devices, ECF No. 229-16, and in 2015, the Australian government released a hazard alert that metal-on-metal hip replacement implants had

a higher than expected revision rate, ECF No. 229-30. This evidence does not clearly and convincingly show that Biomet had actual knowledge of a defect in the Biomet Device and that it deliberately disregarded that defect. *See Owens-Illinois, Inc.*, 32 Md. at 462. Accordingly, Plaintiff has not put forth sufficient evidence from which a factfinder could determine she is entitled to punitive damages, and Biomet is therefore entitled to summary judgment on Count VIII.

### 7. Attorney's Fees

**\*14** Plaintiff also requests attorney's fees. "Maryland follows the common law 'American Rule,' which states that, generally, a prevailing party is not awarded attorney's fees 'unless (1) the parties to a contract have an agreement to that effect, (2) there is a statute that allows the imposition of such fees, (3) the wrongful conduct of a defendant forces a plaintiff into litigation with a third party, or (4) a plaintiff is forced to defend against a malicious prosecution." *Nova Research, Inc. v. Penske Truck Leasing Co.*, 405 Md. 435, 445 (2008).

Here, the parties do not have an agreement that provides for an award of attorney's fees, no statutory authority provides for the imposition of attorney's fees, Plaintiff has not been forced into litigation with a third party as a result of Biomet's wrongful conduct, and Plaintiff has not been forced to defend against malicious prosecution. Thus, even if Plaintiff were to prevail on her remaining claims, there would be no ground for awarding attorney's fees. Accordingly, this claim is dismissed.

### IV. CONCLUSION

For the foregoing reasons, Biomet's Motion to Exclude Expert Testimony is granted, in part, and denied, in part and Biomet's Motion for Summary Judgment is granted, in part, and denied, in part. A separate Order shall issue.

**All Citations**

Slip Copy, 2020 WL 5849482

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 12

National Mulch and Seed, Inc. v. Rexius Forest By-Products Inc., Not Reported in...
2007 WL 894833, 62 UCC Rep.Serv.2d 371

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 144 of 207
PageID: 13161

KeyCite Yellow Flag - Negative Treatment

Distinguished by Verizon Advanced Data, Inc. v. FrogNet, Inc., S.D.Ohio,
April 2, 2010

2007 WL 894833
United States District Court,
S.D. Ohio,
Eastern Division.

NATIONAL MULCH AND
SEED, INC., et al., Plaintiffs,
v.
REXIUS FOREST BY-PRODUCTS INC., d/
b/a Rexius Express Blowers, Defendant.

No. 2:02-cv-1288.
|
March 22, 2007.

**Attorneys and Law Firms**

Marion H. Little, Zeiger Tigges & Little LLP, Columbus, OH,
for Plaintiff.

Frederick A. Batson, Tanya C. O'Neil, Gleaves Swearingen
Potter & Scott LLP, Eugene, OR, Michael Roy Szolosi, Sr.,
McNamara and McNamara, Columbus, OH, for Defendant.

*MEMORANDUM OPINION AND ORDER*

JOHN D. HOLSCHUH, United States District Judge.

**\*1** Plaintiff, National Mulch and Seed, Inc., ("National
Mulch"), [1] brought this action alleging that certain trucks
purchased from Defendant Rexius Forest By-Products, Inc.,
("Rexius"), failed to perform as promised. Specifically,
National Mulch asserts claims of breach of express warranty,
negligent misrepresentation, breach of implied warranty of
merchantability, and breach of implied warranty of fitness
for a particular purpose. This matter is before the Court on
Rexius's three motions for partial summary judgment (R. at
73, 75, 88), on National Mulch's motion for partial summary
judgment (R. at 87), and on Rexius's objection to certain
evidence submitted by National Mulch. (R. at 92.)

[1]     On December 8, 2004, Central Ohio Topsoil
        and Mulch, Inc., voluntarily dismissed its claims
        against Defendant with prejudice. (R. at 61.)

**I. Background**

In the middle to late part of 1999, Richard Fischer and
Montford Will began discussing the possibility of starting a
mulching and landscaping business. (Fischer Decl. ¶ 4, Feb.
13, 2006; Fischer Dep. 13-16.) After obtaining information
regarding a similar business operated by Fischer's brother in
Florida, Fischer and Will developed a business plan for the
creation and operation of National Mulch in Ohio. (Fischer
Dep. 13-30; Will Dep. 18-37.) Pursuant to this business
plan, National Mulch contacted Rexius in November 1999
regarding the possibility of purchasing mulch-blowing trucks
to be used in its mulching and landscaping business. (Fischer
Decl. ¶ 5, Feb. 13, 2006.)

National Mulch contends that during negotiations regarding
the purchase of Rexius's Express Blower 60 mulch-blowing
trucks ("Express Blower," "EB-60," or "truck"), Rexius
made various oral and written representations regarding the
trucks' productivity, capability, and reliability. In particular,
National Mulch alleges that Rexius made the following
representations:

1. An Express Blower, using only one person, can blow 55
   cubic yards per hour.

2. The Rexius Express Blower can be used effectively by
   only one person.

3. The Express Blower is trouble-free, of superior
   craftsmanship, economical to operate, and built
   and manufactured with high-quality material and
   workmanship.

4. The maintenance cost for the Rexius Express Blower is
   minimal.

5. As to National Mulch, the Rexius Express Blower would
   effectively die [sic] mulch.

(Fischer Decl. ¶ 6, Feb. 13, 2006; Compl. ¶ 7.)

National Mulch contends that the representations made by
Rexius induced it to purchase the mulch-blowing trucks from
Rexius. (Fischer Decl. ¶¶ 4-7, Feb. 13, 2006.) National Mulch
personnel, including Fischer, traveled to Oregon in late March
2000 to observe Rexius's plant and receive training on the
operation of the trucks. (Fax from Rick Fischer to Denny
Drennan (Mar. 19, 2000), Def.'s Mot. Part. Summ. J. Certain
Claimed Damages Ex. 9.) On April 3, 2000, National Mulch
agreed to purchase its first EB-60 truck. (*See* Fischer Dep.

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 145 of 207
PageID: 13162
National Mulch and Seed, Inc. v. Rexius Forest By-Products Inc., Not Reported in...
2007 WL 894833, 62 UCC Rep.Serv.2d 371

152-53.) While in Oregon, Fischer, on behalf of National Mulch, and Denny Drennan, on behalf of Rexius, signed a "Sales Quote" setting forth various terms and conditions of the sale. (Fischer Dep. 137-38; Sales Quote, Apr. 3, 2000, O'Neil Decl. Ex. 4, Mar. 16, 2006.) The Sales Quote is two pages in length with the second page appearing on the reverse side of the first. (Fischer Dep. 137; Sales Quote, Apr. 3, 2000.) The first page includes the quantity, description, and price of the goods sold; the names and addresses of the parties; the signatures of Fischer and Drennan; and an indication at the bottom noting that there are terms and conditions of the agreement contained on the reverse side. (Sales Quote, Apr. 3, 2000.) The reverse side lists thirteen "ADDITIONAL TERMS AND CONDITIONS OF SALE." (*Id.*)

**\*2** Later, National Mulch agreed to purchase a second EB-60 truck. (Fischer Decl. ¶ 3, Feb. 13, 2006.) Rexius faxed a Sales Quote for this second truck, signed by Drennan, to National Mulch on May 20, 2000. (Fax from Denny Drennan to Rick Fischer (May 20, 2000), Def.'s Mot. Part. Summ. J. Certain Claimed Damages Ex. 59.) Although a copy of a Sales Quote signed by both parties with respect to the second purchase does not appear in the record, Fischer understood that the terms of the second sale and the forms used therewith were identical as National Mulch's first purchase. (Fischer Dep. 152-53.) Rexius appears to concur that the terms of the second sale were the same as the first. [2]

[2]
The Court notes that National Mulch has repeatedly stated that it purchased its first EB-60 truck "on or about Jan. 11, 2000, and a second vehicle on April 4, 2000." (*E.g.,* Pl.'s Mem. Contra Def.'s Mot. Partial Summ. J. Certain Claimed Damages 2 (citing Fischer Decl. ¶ 3, Feb. 13, 2006); Fischer Decl. ¶¶ 38-39, Feb. 13, 2006.) Even viewing the evidence before the Court in a light most favorable to National Mulch, the record cannot support this purported time line. National Mulch initially considered purchasing a model EB-90 truck. (Fischer Decl. ¶ 10, Feb. 13, 2006.) On January 11, 2000, Rexius faxed a Sales Quote for a model EB-90 truck to National Mulch. (Sales Quote, Jan. 11, 2000, Def.'s Mot. Partial Summ. J. Certain Claimed Damages Ex. 14.) This Sales Quote was signed by Rick Fischer (*see id.*), but the record does not reflect whether or not it was returned to Rexius. Regardless, as the January Sales Quote pertains to an EB-90, and neither party has ever claimed that National Mulch purchased this

model, it does not appear that National Mulch purchased a truck from Rexius in January 2000.

Instead, subsequent to receiving the Sales Quote for the EB-90, National Mulch decided to purchase a model EB-60 truck. Rexius says that it prepared the April 3, 2000 Sales Quote in conjunction with National Mulch's first EB-60 purchase and that both parties signed this Sales Quote the same day. Fischer admits that he signed this Sale Quote in Oregon. (Fischer Dep. 137-38.) Additionally, Fischer's testimony shows that the April purchase was National Mulch's first EB-60 purchase and that the second purchase came later that spring. During his deposition, Fischer agreed that National Mulch had owned its first truck for "a month, month and a half" at the time that it received the May 20, 2000 Sale Quote. (*Id.* at 152-53.)

National Mulch claims that the EB-60 trucks failed to meet the representations made by Rexius. Specifically, National Mulch contends that the EB-60 trucks could not blow 55 cubic yards of mulch per hour on most jobs, that it could not effectively operate an EB-60 truck with only one person, that the EB-60 trucks could not effectively dye mulch, and that the EB-60 trucks suffered various mechanical problems. (Fischer Decl. ¶ 14, Feb. 13, 2000.) National Mulch contends that this lack of productivity and reliability caused a loss of profits and ultimately caused it to go out of business. (*Id.* at ¶ 15-23.)

## II. Rexius's Objections to Evidence

Rexius has objected to certain evidence submitted by National Mulch. In support of its motion for partial summary judgment, National Mulch submitted the declarations of several other purchasers of mulch-blowing trucks from Rexius. Rexius argues that this evidence is not relevant at this stage of the litigation and, alternatively, that the probative value of such evidence is substantially outweighed by the risk of unfair prejudice.

National Mulch contends that the purpose of the disputed evidence is to support its claim that certain representations made by Rexius constitute express warranties. Rexius, however, does not deny that certain representations were made in connection with the sale of the EB-60 trucks to National Mulch and, as will be made clear *infra,* this Court has not relied upon this disputed evidence in resolving National Mulch's motion for partial summary judgment, nor any other dispositive motion. Rexius's objection is therefore moot.

National Mulch and Seed, Inc. v. Rexius Forest By-Products Inc.,..., Not Reported in...

2007 WL 894833, 62 UCC Rep.Serv.2d 371

## III. Motions for Partial Summary Judgment

### A. Standard

The parties have filed multiple motions for partial summary judgment. Although summary judgment should be cautiously invoked, it is an integral part of the Federal Rules, which are designed "to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986) (quoting Fed.R.Civ.P. 1). The standard for summary judgment is found in Federal Rule of Civil Procedure 56(c):

> [Summary judgment] ... shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

**\*3**  Summary judgment will be granted "only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is ... [and where] no genuine issue remains for trial, ... [for] the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try." *Poller v. Columbia Broad. Sys.,* 368 U.S. 464, 467 (1962) (quoting *Sartor v. Ark. Natural Gas Corp.,* 321 U.S. 620, 627 (1944); *see also Lansing Dairy, Inc. v. Espy,* 39 F.3d 1339, 1347 (6th Cir.1994).

Moreover, the purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried. *Lashlee v. Sumner,* 570 F.2d 107, 111 (6th Cir.1978). The court's duty is to determine only whether sufficient evidence has been presented to make the issue of fact a proper question for the jury; it does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986); *Weaver v. Shadoan,* 340 F.3d 398, 405 (6th Cir.2003).

In a motion for summary judgment, the moving party bears the initial burden of showing that no genuine issue as to any material fact exists and that it is entitled to a judgment as a matter of law. *Leary v. Daeschner,* 349 F.3d 888, 897 (6th Cir.2003). All the evidence and facts, as well as inferences to be drawn from the underlying facts, must be considered in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88 (1986); *Wade v. Knoxville Util. Bd.,* 259 F.3d 452, 460 (6th Cir.2001). Additionally, any "unexplained gaps" in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157-60 (1970).

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247-48. A "material" fact is one that "would have [the] effect of establishing or refuting one of [the] essential elements of a cause of action or defense asserted by the parties, and would necessarily affect [the] application of [an] appropriate principle of law to the rights and obligations of the parties." *Kendall v. Hoover Co.,* 751 F.2d 171, 174 (6th Cir.1984); *see also Anderson,* 477 U.S. at 248. An issue of material fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248; *see also Leary,* 349 F.3d at 897.

If the moving party meets its burden, and adequate time for discovery has been provided, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322. The nonmoving party must demonstrate that "there is a genuine issue for trial," and it "cannot rest on her pleadings." *Hall v. Tollett,* 128 F.3d 418, 422 (6th Cir.1997).

> **\*4**  When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that

National Mulch and Seed, Inc. v. Rexius Forest By-Products Inc., Not Reported in...
2007 WL 894833, 62 UCC Rep.Serv.2d 371

there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e).

The existence of a mere scintilla of evidence in support of the opposing party's position is insufficient; there must be evidence on which the jury could reasonably find for the opposing party. *Anderson,* 477 U.S. at 252. The nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Phillip Morris Cos.,* 8 F.3d 335, 340 (6th Cir.1993). The court may, however, enter summary judgment if it concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the presented evidence. *Anderson,* 477 U.S. at 251-52; *Lansing Dairy,* 39 F.3d at 1347.

**B. Choice of Law**

A federal court exercising diversity jurisdiction is required to apply the choice of law rules of the state in which it sits. *Int'l Ins. Co. v. Stonewall Ins. Co.,* 86 F.3d 601, 604 (6th Cir.1996). Accordingly, Ohio's choice of law rules apply in this diversity case. In Ohio, the rights and duties of parties to a contract are determined by the law of the state that has "the most significant relationship to the transaction and the parties." *Ohayon v. Safeco Ins. Co. of Ill.,* 91 Ohio St.3d 474, 477 (2001) (quoting Restatement (Second) of Conflict of Laws § 188(1)).

National Mulch is a corporation organized under the laws of Ohio with its principal place of business in Ohio. (Compl.¶ 2.) Rexius is an Oregon corporation with its principal place of business in Oregon. (Notice Removal ¶ 2.) Although a conflict between Ohio law and the law of Oregon could possibly exist, neither party has identified any relevant conflict. Moreover, both National Mulch and Rexius have consistently relied upon Ohio law in their memoranda since this action's inception. Consequently, the Court need not engage in a choice of law analysis at this point, but will simply apply Ohio law. *See Wilkes Assocs. v. Hollander Indus. Corp.,* 144 F.Supp.2d 944, 949 n. 4 (S.D.Ohio 2001) (citing *ECHO, Inc. v.. Whitson Co.,* 52 F.3d 702, 707 (7th Cir.1995) ("Where neither party argues that the forum state's choice of law rules

require the court to apply the substantive law of another state, the court should apply the forum state's substantive law.")). In any event, the parties appear to agree that Ohio law applies to the claims asserted in this case.

**C. Negligent Misrepresentation Claim**

In Count II of the Complaint, National Mulch asserts a claim for negligent misrepresentation. The Supreme Court of Ohio first recognized this cause of action in *Haddon View Investment Co. v. Coopers & Lybrand,* 70 Ohio St.2d 154, 156 & n. 1 (1988). Adopting the Restatement (Second) of Torts § 552, the Supreme Court of Ohio has defined a claim for negligent misrepresentation as follows:

> **\*5** One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Delman v. City of Cleveland Heights,* 41 Ohio St.3d 1, 4 (1989) (quotations, citations and emphasis omitted).

As a basis for its claim, National Mulch alleges that Rexius made the following representations:

a. The Rexius Express Blower, using only one person, can blow 55 cubic yards per hour.

b. The Rexius Express Blower could be used effectively by only one person.

c. The Rexius Express Blower was trouble-free, of superior craftsmanship, economical to operate, and built and manufactured with high quality material and workmanship.

d. The maintenance cost for the Rexius Express Blower was minimal.

National Mulch and Seed, Inc. v. Rexius Forest By-Products Inc., Not Reported in...
2007 WL 894833, 62 UCC Rep.Serv.2d 371

e. As to National Mulch, the die [sic] feature of the Rexius Express Blower would effectively die [sic] mulch.

(Compl.¶ 14.) Rexius has moved for summary judgment arguing that National Mulch's negligent misrepresentation claim is without merit because: (1) it is barred by the economic loss rule, (2) National Mulch has failed to establish the existence of a special relationship between itself and Rexius, and (3) National Mulch's claim is impermissibly based, at least in part, on omissions of fact.

**1. Economic Loss Rule**

The economic loss rule generally prevents recovery of damages for purely economic loss in connection with a tort claim. *Corporex Dev. & Constr. Mgmt., Inc. v. Shook, Inc.,* 106 Ohio St.3d 412, 414 (2005); *Floor Craft Floor Coverings, Inc. v. Parma Cmty. Gen. Hosp. Ass'n,* 54 Ohio St.3d 1, 3 (1990). The Supreme Court of Ohio explained the reasoning behind the economic loss rule:

> The reason for denying recovery in negligence for purely economic loss lies not in a failure to find "negligent" conduct by the manufacturer, nor in a lack of proximate relationship between that conduct and the consumer's injury. Rather, the key factor is the extent, and more important, the source, of the duty owed by the manufacturer to the consumer. In negligence, the law imposes upon the manufacturer of a product the duty of reasonable care. That duty protects the consumer from physical injury, whether to person or property. However the law of negligence does not extend the manufacturer's duty so far as to protect the consumer's economic expectations, for such protection would arise not under the law but rather solely by agreement between the parties.

*Chemtrol Adhesives, Inc. v. Am. Mfgs. Mut. Ins. Co.,* 42 Ohio St.3d 40, 45 (1989). The court later expounded upon this rationale by explaining that "[t]ort law is not designed ... to compensate parties for losses suffered as a result of a breach

of duties assumed only by agreement." *Floor Craft,* 54 Ohio St.3d at 7. Rexius argues that, under the economic loss rule, National Mulch cannot maintain a negligent representation action because economic losses are not recoverable in tort between commercial entities that have contracted with each other.

**\*6** Before deciding whether the economic loss rule applies, the Court must first determine the nature of the alleged losses resulting from Rexius's alleged negligent misrepresentation. Damages are generally characterized as either personal injury, property damage, or economic loss. *E.g., HDM Flugservice GMBH v. Parker Hannifin Corp .,* 332 F.3d 1025, 1028 (6th Cir.2003); *Chemtrol,* 42 Ohio St.3d at 43. "Personal injury" involves, quite obviously, injury done to one's person. In an action involving the sale of goods, "property damage" includes damages to both the goods sold to the plaintiff and other property of the plaintiff. *E.g., Chemtrol,* 42 Ohio St.3d at 43. "Economic loss" includes both direct and indirect loss. *Id.* "Direct" economic loss includes the loss attributable to the decreased value of the product itself.[3] "Indirect" economic loss includes the consequential losses sustained by the purchaser and can include items such as loss of time and profits. *Id.* at 44.

> [3]    Direct loss is normally measured by the difference in value of a defective product and that product's value had it not been defective. *E.g., Chemtrol,* 42 Ohio St.3d at 43.

National Mulch alleges that reliance upon misrepresentations made by Rexius caused the complete failure of its business. Precisely, National Mulch claims that it incurred damages in the form of substantial additional costs because the Rexius trucks did not perform as represented. These costs included, *inter alia,* expenses for repairs, tools, labor, interest, insurance, general maintenance, and the expense of purchasing the trucks themselves. (*See* Def.'s Mot. Partial Summ. J. Certain Claimed Damages Ex. 3; *see also* Fischer Decl. ¶¶ 27-32, Feb. 13, 2006.) All of the damages claimed by National Mulch are properly characterized as economic losses because they either relate to the value of the trucks or additional expenses, i.e., lost profits, incurred as a consequence to relying upon Rexius's alleged misrepresentations. As such, National Mulch's claim is without merit if the economic loss rule applies to the tort of negligent misrepresentation.

National Mulch and Seed, Inc. v. Rexius Forest By-Products Inc., Not Reported in...
2007 WL 894833, 62 UCC Rep.Serv.2d 371

The Supreme Court of Ohio has yet to specifically address the economic loss rule in the context of a claim for negligent misrepresentation; however, several Ohio appellate courts have done so.[4] A majority of these courts have recognized that a claim for negligent misrepresentation is actionable even when the plaintiff's damages consist only of economic loss. *E.g., Universal Contracting Corp. v. Aug,* No. C-030719, 2004 WL 3015325, at *3 (Ohio App. 1st Dist. Dec. 30, 2004); *Ferro Corp. v. Blaw Knox Food & Chem. Equip. Co.,* 121 Ohio App.3d 434, 440-41 (1997); *McCarthy, Lebit, Crystal & Haiman Co. v. First Union Mgmt., Inc.,* 87 Ohio App.3d 613, 631-32 (1993). In *McCarthy, Lebit,* the court reasoned that application of the economic loss rule to a negligent misrepresentation claim directly contradicts the express wording of the cause of action of negligent misrepresentation as stated by the Supreme Court of Ohio in *Haddon View. McCarthy, Lebit,* 87 Ohio App.3d at 632. Under the tort of negligent misrepresentation, a person who supplies false information to others in breach of the common law duty not to do so is liable for "pecuniary loss" to them. *Id.* Because " 'pecuniary loss' is by its very definition 'economic loss,' " the economic loss rule cannot logically be applied to a negligent misrepresentation claim. *Id.*

[4]    In diversity cases, federal courts must apply state law in accordance with controlling decisions of the highest state court, or, if the state's highest court has not spoken on a precise issue, on decisions of the state's lower courts. *E.g., Ziegler v. IBP Hog Mkt., Inc.,* 249 F.3d 509, 517 (6th Cir.2001); *see generally Erie R.R. v. Tompkins,* 304 U.S. 64 (1938).

**\*7** The Supreme Court of Ohio, although not directly addressing the issue, did provide some clarity regarding an action for negligent misrepresentation in *Corporex.* There, the plaintiff's negligence action was barred by the economic loss rule. *Corporex,* 106 Ohio St.3d at 415-16. In rejecting the plaintiff's argument that *Haddon View* applied to its case, the court stated that liability for negligent misrepresentation is based upon a duty in tort that preexists any contractual terms or rights accompanying privity. *See id.* at 415. "When a duty in tort exists, a party may recover in tort. When a duty is premised entirely upon the terms of a contract, a party may recover based upon breach of contract." *Id.* Thus, the critical determination is the source of the defendant's duty.

The Sixth Circuit, relying on *McCarthy, Lebit,* has specifically stated that the economic loss rule does not apply to a claim of negligent misrepresentation. *HDM,* 332 F.3d at 1032. In *HDM,* an owner of a helicopter brought a claim, *inter alia,* of negligent misrepresentation against the manufacturer of the helicopter's landing gear after an accident. *Id.* at 1027. The court first discussed Ohio's economic loss rule at length and then applied the rule to the plaintiff's tort claims of strict liability and implied warranty, following "cautionary dicta" in *Chemtrol. Id.* at 1029-30. The court thereafter noted that it is incorrect to apply the economic loss rule to a negligent misrepresentation claim. *Id.* at 1032.

Rexius argues that the statement in *HDM* regarding negligent misrepresentation claims and the economic loss rule was dictum and should not control the decision in this case. Although the defendant in *HDM* may have ultimately agreed that the economic loss rule would not bar a negligent misrepresentation claim under Ohio law, the court initially noted that the defendant had originally sought summary judgment on the negligent misrepresentation claim because of a *mistaken* belief that the economic loss rule prohibits recovery for any type of tort claim. *Id.* The court then concluded that the plaintiff had *correctly responded* that the economic loss rule does not apply to claims for negligent misrepresentation. *Id.*

Rexius also argues that, in any event, *McCarthy, Lebit,* which was cited in *HDM* and relied upon by National Mulch, is not consistent with the Supreme Court of Ohio's holding in *Floor Craft* or subsequent decisions by the United States District Court for the Northern District of Ohio in *Trgo v. Chrysler Corp.,* 34 F.Supp.2d 581, 595 (N.D.Ohio 1998), and *Picker International, Inc. v. Mayo Foundation,* 6 F.Supp.2d 685, 688-89 (N.D.Ohio 1998).

This Court cannot conclude that *McCarthy, Lebit* is inconsistent with *Floor Craft.* In *Floor Craft,* the plaintiff flooring installation contractor asserted a claim against an architectural firm for negligence in its design specifications. *Floor Craft,* 54 Ohio St.3d at 2. It does not appear that the *Floor Craft* court directly addressed the application of the economic loss rule to a claim of negligent misrepresentation. Instead, the court held that in the absence of privity, a party could not recover economic damages in tort. *Id.* at 8. Although the claim in *Floor Craft* against the architectural firm was for negligence, the court did briefly entertain the argument that *Haddon View* applied to the firm's design flaws. However, it settled the issue quickly and decided that the plaintiff could not rely upon *Haddon View* because the architects' services were extended to an unlimited number of persons who could

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 150 of 207
PageID: 13167
National Mulch and Seed, Inc. v. Rexius Forest By-Products Inc., Not Reported in...

2007 WL 894833, 62 UCC Rep.Serv.2d 371

possibly rely upon them. *Id.* at 7. The court never directly addressed whether the economic loss rule applied to a claim of negligent misrepresentation. Thus, *Floor Craft* stands for the general proposition that in the absence of privity between the parties, the economic loss rule bars recovery of economic losses in tort. *Id.* at 8.

**\*8** Consistent with this approach, *McCarthy, Lebit* recognizes that "[t]ort law is not designed ... to compensate parties for losses suffered as a result of a breach of duties assumed only by agreement." *McCarthy, Lebit,* 87 Ohio App.3d at 630 (quoting *Floor Craft,* 54 Ohio St.3d at 7). The court in *McCarthy, Lebit,* however, also found that adoption of the economic loss rule in *Floor Craft* did not necessarily preclude recovery under a negligent misrepresentation claim. *Id.* at 631. The *McCarthy, Lebit* court decided that a plaintiff claiming only economic damages was not barred from asserting an action for negligent misrepresentation. This holding is not inconsistent with *Floor Craft;* the *McCarthy, Lebit* court recognized that an exception to the general rule from *Floor Craft* must logically exist based upon the elements of the tort of negligent misrepresentation as articulated in *Haddon View.*

Moreover, since *Floor Craft* and *McCarthy, Lebit,* the Ohio appellate courts have routinely allowed a negligent misrepresentation cause of action when damages are exclusively economic in nature. *See Universal Contracting; Three-C Body Shops, Inc. v. Welsh Ohio, LLC,* No. 02AP-523, 2003 WL 360958, 2003-Ohio-756 (Ohio App. 10th Dist. Feb. 20, 2003); *Ferro; Bowling Trans., Inc. v. Gregg,* 103 Ohio App.3d 539 (1995); *Lippy v. Society Nat'l Bank,* 100 Ohio App.3d 37 (1995); *Foster Wheeler Envirespone, Inc. v. Franklin County Convention Facilities Auth.,* 88 Ohio App.3d 73 (1993).

This Court also finds Rexius's citations to *Picker* and *Trgo* unpersuasive. In *Picker,* the court stated that "[i]n Ohio it is well established that a party cannot bring a cause of action in tort (such as negligent misrepresentation) for economic losses." *Picker,* 6 F.Supp.2d at 688-89. This proposition was supported by citations to *Queen City Terminals, Inc. v. General American Transportation Corp.,* 73 Ohio St.3d 609, 614 (1995), and *Floor Craft.* However, neither of these decisions discussed negligent misrepresentation in their analysis of the economic loss rule. In any event, the court in *Picker* ultimately dismissed the negligent misrepresentation claim on other grounds.

Although *Trgo* involves facts that are somewhat similar to this case, the court's reasoning is unpersuasive. In *Trgo,* purchasers of a truck brought a diversity action against the manufacturer alleging *inter alia* negligent misrepresentation. The court concluded that the plaintiffs were "barred from pursuing the negligent misrepresentation claim by the economic loss doctrine." *Trgo,* 34 F.Supp.2d at 595. The authorities relied upon by the *Trgo* court, however, do not support this conclusion. The court first referred to *Chemtrol* and *Midwest Ford, Inc. v. C.T. Taylor Co.,* 118 Ohio App.3d 798, 801-05 (1997), in its discussion of the application of the economic loss rule to the plaintiffs' claim of tortious breach of warranty. *Trgo,* 34 F.Supp.2d at 594. Neither *Chemtrol* nor *Midwest Ford,* however, specifically addressed the application of the economic loss rule to claims of negligent misrepresentation.[5] *Trgo* also cited *Picker* in support of its conclusion. *Id.* at 595. However, as was discussed *supra, Picker* is unpersuasive on this issue. In addition, the Court notes that both *Picker* and *Trgo* were decided prior to HDM and *Corporex* and appear to be contrary to those decisions.[6]

[5]    Rexius relies on both *Midwest Ford* and *Sun Refining & Marketing Co. v. Crosby Valve & Gage Co.,* 68 Ohio St.3d 397, 398 (1994), in support of its claim that commercial parties cannot recover for solely economic loss under Ohio law. Both *Midwest Ford* and *Sun Refining* are distinguishable from the present case because in those cases the economic loss rule was applied to claims resulting from a defective product, not negligent misrepresentation claims.

[6]    Rexius also directs the Court's attention to *Bailey Farms, Inc. v. Nor-Am Chemical Co.,* 27 F.3d 188 (6th Cir.1994), and asks the Court to follow that decision. In addition to being decided nearly ten years before *HDM, Bailey Farms* is predicated on Michigan's interpretation of the economic loss rule, not Ohio's.

**\*9** Finally, Rexius attempts to distinguish cases cited by National Mulch as not involving commercial entities engaged in the sale of goods. Ohio courts, as Rexius notes, have stated that the economic loss rule denies recovery of purely economic damages when a commercial buyer has remedies available under article 2 of the U.C.C. *See Sun Refining & Marketing Co. v. Crosby Valve & Gage Co.,* 68 Ohio St.3d 397, 398 (1994) (citing *Chemtrol); Chemtrol,* 42 Ohio St.3d at 51; *Graphic Enters., Inc. v. TAS Int'l, Inc.,* No.1999CA00085,

2000 Ohio App. LEXIS 961, at * 15 (5th Dist. Mar. 13, 2000) (citing *Chemtrol* ). However, each case stating this proposition involved a buyer claiming that the goods were either defective or nonconforming; none confronted the issue of whether the U.C.C. precluded a claim for negligent misrepresentation.[7]

[7]    But, *See Universal Contracting,* 2004 WL 3015325, at *5, 2004-Ohio-7133 at ¶ 20, where the court stated that when parties have contracted with each other, "contract principles override the tort principles in *Section 552,* and economic damages are not recoverable except as provided in the contract or by the rules of contract interpretation." This proposition was supported by a Washington state case and one Ohio case, *Textron Financial Corp. v. Nationwide Mutual Insurance Co.,* 115 Ohio App.3d 137, 151 (1996). *Textron,* however, does not support barring recovery whenever the parties are related by privity. Consistent with *Corporex,* that case states that negligent representation will not lie for breaches of duties that are created by contract. *Id.* The defendant's duty to supply accurate information to the plaintiff in *Universal Contracting* was a specific contractual term, and therefore did not arise in tort. *Universal Contracting,* 2004 WL 3015325, at *6, 2004-Ohio-7133 at ¶ 22. In light of *Corporex,* this Court does not believe that *Universal Contracting's* general rule prohibiting contracting parties from maintaining a claim for negligent misrepresentation accurately reflects the law of Ohio.

The primary concern of the economic loss rule is the source of the duty, i.e., whether the duty arises under tort law or from an agreement between the parties. *See Chemtrol,* 42 Ohio St.3d at 45. The U.C.C. provides remedies for breaches of contractual duties; but, as was discussed *supra,* a cause of action for negligent misrepresentation is based upon a duty arising under the common law of torts. Ohio law does not support Rexius's contention that National Mulch cannot assert a negligent misrepresentation claim simply because it also has remedies available under the U.C.C.

Thus, for the reasons stated, the Court does not believe that under Ohio law a negligent misrepresentation claim is barred by the economic loss rule. Summary judgment on this ground is therefore denied.

**2. Special Relationship**

Next, Rexius argues that National Mulch's negligent misrepresentation claim lacks merit because National Mulch has failed to establish a "special relationship" between itself and Rexius. National Mulch argues in response that it is not required to establish a special relationship to succeed on its negligent misrepresentation claim. This Court agrees that a special relationship is not a formal element of a negligent misrepresentation claim under Ohio law. Instead, as was stated *supra,* in order to assert a negligent misrepresentation claim under Ohio law, a plaintiff must establish that the defendant supplied false information for the guidance of the plaintiff in its business transactions, that the plaintiff was justified in relying on the information, and that the defendant failed to exercise reasonable care or competence in obtaining and/or communicating the information. *Delman,* 41 Ohio St.3d at 4.

To the extent Ohio courts discuss a special relationship in connection with a negligent misrepresentation claim, the discussion appears to be related to the requirement that a defendant supply false information for the guidance of the plaintiff in its business transactions.[8] The "for the guidance of" language directs the court's attention to the duty owed and serves to limit the class of potential plaintiffs. As explained by the Supreme Court of Ohio, liability for negligent misrepresentation is limited to "the person or one of a limited group of persons for whose benefit and guidance [the defendant] intends to supply the information or knows that the recipient intends to supply it." *Gutter v. Dow Jones, Inc.,* 22 Ohio St.3d 286, 288 (1986); *accord Haddon View,* 70 Ohio St.2d at 157 (not requiring any special relationship but limiting liability to misrepresentations made to a foreseeable class of persons). "A contrary result would in effect extend liability to all the world and not a *limited* class...." *Gutter,* 22 Ohio St.3d at 289.

[8]    Rexius relies on *Picker* in support of its assertion that a special relationship is required. However, similar to Ohio courts addressing a "special relationship," the court in *Picker* specifically defined the "special relationship" as "the defendant suppl[ying] information to the plaintiff for the latter's guidance in its business transactions." *Picker,* 6 F.Supp.2d at 689. This is merely a reiteration of one of the elements of the cause of action for negligent misrepresentation.

**\*10** Understanding this, a person may not maintain an action for negligent misrepresentation when the alleged misrepresentation is intended to reach an extensive, unresolved class of persons. Representations made to the public-at-large cannot result in liability. *E.g., id.* (newspaper reader not a member of a limited group of persons intended to benefit from representation in newspaper); *Amann v. Clear Channel Commc'ns, Inc.,* 165 Ohio App.3d 291, 298-99 (2006) (radio station's general audience not a limited group); *Federated Mgmt. Co. v. Coopers & Lybrand,* 137 Ohio App.3d 366, 384-85 (2000) (investing public is an unlimited class of persons that cannot hold company's auditor liable for alleged negligent misrepresentations).

Conversely, liability may exist when the plaintiff is a person or member of a limited class of persons whom the defendant intends to benefit or guide with the information supplied. *See, e.g., Haddon View,* 70 Ohio St.2d at 157 (representation made to small group of limited partners); *Merrill v. William E. Ward Ins.,* 87 Ohio App.3d 583, 590-91 (1993) (beneficiaries of a life insurance policy were a foreseeable limited class intended to benefit from information supplied by insurance agent); *Sindel v. Toledo Edison Co.,* 87 Ohio App.3d 525, 528 (1993) (representation made to single customer of defendant electric company). All that is necessary is for " 'the maker of the representation [to] intend[ ] to reach and influence either a particular person or persons, known to him, or a group or class of persons, distinct from the much larger class who might reasonably be expected sooner or later to have access to the information.' " *Amann,* 165 Ohio App.3d at 299 (quoting Restatement (Second) of Torts § 552 cmt. h (1977)). Thus, National Mulch can prevail on its negligent misrepresentation claim only if the alleged misrepresentations were intended to benefit or guide a group of persons with a definable limit, and National Mulch was a member of that group.

The determination of whether the plaintiff is a member of a limited class of foreseeable persons is dependent upon the factual circumstances of the representations made and the relationship between the parties. *See id.* at 298. In this case, the alleged misrepresentations appear in marketing materials produced by Rexius. Certainly, the potential exists for these materials to be seen by a large, limitless group of people. However, it is undisputed that Rexius sent the materials directly to National Mulch via mail in response to the latter party's interest in the Rexius trucks. (Will Dep. 53-55; Def.'s Mem. Supp. Mot. Partial Summ. J. 3, R. at 88-2; *see* Pl.'s Mem. Contra Def.'s Mot. Partial Summ. J. Neg. Misrep. Exs. 3-4.) Further, National Mulch has put forth evidence that the alleged misrepresentations were made to it orally as well. (Fischer Decl. ¶ 4, Dec. 30, 2005.)

Viewing the facts in a light most favorable to National Mulch, it cannot be said that as a matter of law National Mulch was a member of a faceless or unresolved class of persons. Instead, reasonable minds could conclude that National Mulch was a member of a limited class of foreseeable persons that might rely upon the representations made. The marketing materials and oral representations were specifically directed to National Mulch. Although the marketing materials could eventually be disseminated to an indefinite number of persons, these representations were intended to reach and influence particular persons: National Mulch and its principals.

**\*11** Rexius also argues, in essence, that under Ohio law a party to an "ordinary business transaction" cannot provide information to the other party for guidance in that transaction. In support, Rexius points to language in *Picker* that states that the "special circumstances" where a person supplies information to another for guidance in a business transactions does not exist when the relationship between the parties is nothing more than an ordinary business transaction.[9] *Picker,* 6 F.Supp.2d at 689 (citing *Haddon View,* 70 Ohio St.2d at 157; *Gutter,* 22 Ohio St.3d at 288-89). The Court does not believe that Ohio law supports this limitation. First, neither *Haddon View* nor *Gutter* announces such an exclusion either expressly or implicitly, and neither case involved a business transaction between the plaintiff and the defendant. Second, a broad rule like this seemingly contradicts the inclusion of liability for negligent misrepresentation when a person supplies false information "in *any* ... transaction in which he has a pecuniary interest." *Delman,* 41 Ohio St.3d at 4 (emphasis added).

[9]  Other federal cases state the same proposition. *See Cuyahoga Metro. Hous. Auth. v. 10-8 Sys., Inc.,* No. 1:05-cv-0980, 2006 WL 543103, at \*5 (N.D.Ohio Mar. 2, 2006) (relying exclusively on *Picker); Hayes v. Computer Assocs. Intern, Inc.,* No. 3:02-cv-7452, 2003 WL 21478930, at \*6-7 (N.D. Ohio June 24, 2003) (relying exclusively on *Picker); Bank One v. Fin. Ventures, LLC,* No. C2-01-0049, 2002 WL 484394, at \*4-5 (S.D.Ohio Mar. 26, 2002) (rule stated identically to *Picker* ).

A number of Ohio courts have been confronted with a claim for negligent misrepresentation where the information was supplied to the opposite party in a business transaction.

National Mulch and Seed, Inc. v. Rexius Forest By-Products Inc., Not Reported in...
2007 WL 894833, 62 UCC Rep.Serv.2d 371

The majority of these cases do not support a determination that information supplied to a person in the course of a business transaction cannot be supplied for that person's guidance. *See, e.g., Lippy,* 100 Ohio App. 3 d at 45-46 (finding negligent misrepresentation made in the context of a business transaction with a bank actionable even in absence of a fiduciary relationship); *McCarthy, Lebit,* 87 Ohio App.3d at 634 (noting that nothing supports prohibiting a claim for negligent misrepresentation when parties are "directly related to each other pursuant to contract negotiations"); *see also Leal v. Holtvogt,* 123 Ohio App.3d 51, 61-64 (1998). But *see* discussion of *Universal Contracting supra* note 7. Admittedly, these Ohio cases do not involve transactions for the sale of goods. However, Rexius does not offer and this Court cannot ascertain any principled reason why the subject matter of the transaction should be relevant to determining whether a person supplies information to the opposite party in a business transaction for the latter party's guidance. Thus, the Court concludes that Ohio law does not support barring a cause of action for negligent misrepresentation because the defendant supplied information to guide the plaintiff in a business transaction with the defendant.

Therefore, as discussed *supra,* a "special relationship" is not a formal element of a claim for negligent misrepresentation under the law of Ohio. Rather, the "special relationship" is a characterization of the requirements that for liability to exist: (1) the defendant must provide false information for the guidance of the plaintiff in its business transactions and (2) the plaintiff must be the person or one of a limited group of persons for whose benefit and guidance the defendant intends to supply the information or knows that the recipient intends to supply it. The Court concludes that summary judgment should be denied as to the second requirement stated above because reasonable minds could conclude that National Mulch was a member of a limited class of foreseeable persons that might rely upon the representations made.

 **\*12** As to the first requirement stated above, the Court notes that in its motion Rexius did not raise the issue of whether it intended to provide guidance to National Mulch with the alleged misrepresentations. Furthermore, Rexius did not contest the alleged falsity of the statements at issue. Recognizing this, National Mulch did not address these issues in its Memorandum Contra. The Court will not consider these issues because the parties have not moved the Court for summary judgment on them.

### 3. Omissions

Finally, Rexius argues that National Mulch's negligent misrepresentation is impermissibly based, in part, on alleged omissions. In its complaint, National Mulch alleges:

In addition to the misrepresentations, Defendant failed to disclose the following:

 a. That the PTO was not sufficient and durable enough for the Rexius Express Blower's use, with the result being significant maintenance problems.

 b. That there would be significant bridging of the product, as a result of the problems with the conveyor, which results in significant delay.

 c. That the moisture content causes the product to colligate, thus further diminishing productivity.

(Compl.¶ 16.) Rexius asks the Court to grant summary judgment in its favor to the extent that National Mulch's claim of negligent misrepresentation is based upon these alleged omissions.

Rexius correctly states that " 'negligent misrepresentation does not lie for omissions; there must be some affirmative false statement.' " *Leal,* 123 Ohio App.3d at 62 (quoting *Zuber v. Ohio Dep't of Ins.,* 34 Ohio App.3d 42, 45-46 (1986)); *accord, e .g., Manno v. St. Felicitas Elementary Sch.,* 161 Ohio App.3d 715, 724 (2005); *Gentile v. Ristas,* 160 Ohio App.3d 765, 789 (2005). The defendant must *supply* information for a negligent misrepresentation to occur.

National Mulch does not dispute that a negligent misrepresentation claim requires affirmative false statements. It acknowledges that paragraph 16 the complaint alleges that Rexius failed to disclose certain information to National Mulch, but explains that these allegations go to the falsity of the affirmative representations made by Rexius, alleged in paragraph 14 of the complaint. Also, the allegations of Rexius's failure to disclose are immediately preceded in paragraph 16 by an allegation that Rexius did not exercise reasonable care in making affirmative statements.

Rexius has not disputed that the allegations contained in paragraph 16 do not allege facts relevant to the falsity of the affirmative statements or Rexius's exercise of care. Its argument is instead limited to its assertion that a failure to disclose information cannot support a claim for negligent misrepresentation. Because Rexius is correct in this regard, its motion is granted to the extent, if any, that National Mulch's

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 154 of 207
PageID: 13171

National Mulch and Seed, Inc. v. Rexius Forest By-Products Inc., Not Reported in...
2007 WL 894833, 62 UCC Rep.Serv.2d 371

claim of negligent misrepresentation is based upon omissions of fact.

### D. Warranty Claims

National Mulch has also asserted three warranty claims in this case: (1) breach of express warranties, (2) breach of implied warranty of merchantability, and (3) breach of implied warranty of fitness for a particular purpose. The parties have filed cross-motions for partial summary judgment with respect to National Mulch's warranty claims. In its motion for partial summary judgment, National Mulch seeks to establish that the representations made by Rexius constitute express warranties as a matter of law. Rexius, on the other hand, argues that the representations at issue, as alleged by National Mulch, do not constitute express warranties, that the parties effectively disclaimed all warranties in the Sales Quote, and that National Mulch is barred by the parol evidence rule from introducing evidence of any representations that contradict the terms of the Sales Quote. National Mulch responds that the disclaimer on the back of the Sales Quote did not become part of the parties' agreement and that the parol evidence rule has no application in this case. Finally, Rexius contends that summary judgment is appropriate regarding two of the representations at issue because, even if the representations are express warranties, Rexius did not breach them.

### 1. Express Warranties

**\*13** In Count I of the Complaint, National Mulch alleges that

> Defendant breached each express warranty in that the Rexius Express Blower (a) is not trouble-free, is not free from defects in material and workmanship, is not economical to operate, was not manufactured with high quality material and workmanship; (b) cannot be effectively operated with only one person; (c) cannot blow 55 cubic yards per hour with only one operator; (d) has significant maintenance costs; and (e) as to National Mulch, the dye feature does not effectively dye mulch.

(Compl.¶ 11.) In resolving the parties' cross-motions for partial summary judgment on National Mulch's express warranty claim, this Court must answer four questions: (1) does the parol evidence rule bar evidence of alleged express warranties extrinsic to the Sales Quote; (2) were any such express warranties actually created; (3) if so, were express warranties effectively disclaimed by the Sales Quote; and (4) if the agreement did include warranties that, with only one person, the Rexius trucks can blow 55 cubic yards per hour, were these warranties breached?

### a. Parol Evidence Rule

As noted by Rexius, National Mulch's express warranty claim is based on alleged warranties that are extrinsic to the Sales Quote. Rexius argues that National Mulch's express warranty claim must fail because the parol evidence rule bars evidence of any prior representations that are inconsistent with the Sales Quote. National Mulch, on the other hand, argues that the parol evidence rule does not apply under the facts of this case.

In this case involving the sale of commercial mulch-blowing trucks, there is no dispute that the Uniform Commercial Code as adopted by Ohio applies to the warranty claims asserted by National Mulch. [10] Ohio Revised Code § 1302.05 provides the relevant statutory language in connection with the parol evidence rule:

[10]  Again, this Court notes that the parties appear to agree that Ohio law applies. Moreover, this Court also notes that the U.C.C. sections applicable to this case are identical in all relevant respects under both Ohio and Oregon law. *Compare* Ohio Rev.Code §§ 1302.01-.98 *with* Or.Rev.Stat. §§ 72.1010-.7250.

Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented:

> (A) by course of dealing or usage of trade as provided in section 1301.11 of the Revised Code or by a course

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 155 of 207
PageID: 13172
National Mulch and Seed, Inc. v. Rexius Forest By-Products Inc., Not Reported in...
2007 WL 894833, 62 UCC Rep.Serv.2d 371

(B) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

Ohio Rev.Code § 1302.05. As recognized by the Supreme Court of Ohio, the parol evidence rule is a rule of substantive law that prohibits a party who has entered into a written contract from contradicting the terms of the contract with evidence of other alleged agreements. *Ed Schory & Sons, Inc. v. Soc'y Nat'l Bank,* 75 Ohio St.3d 433, 440 (1996). "When two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing." *Id.* (internal quotation and citation omitted).

*14 As was noted *supra,* the representations at issue in this case, as alleged by National Mulch, were made prior to the Sales Quote and are not referenced by that agreement. Such representations are therefore extrinsic to the Sales Quote. In order to determine whether the parol evidence rule bars evidence of such representations, this Court must first determine whether the Sales Quote represents the final agreement of the parties. If the parties did not intend for the Sales Quote to be a final expression of their agreement, then the parol evidence rule does not apply. If the Sales Quote does represent the parties' final agreement, then application of the parol evidence rule will depend upon whether the Sales Quote is a "complete and exclusive statement of the terms of the agreement between the parties."

Whether a document represents the final expression of the parties' agreement and, if so, whether it is "complete and exclusive" of other terms are questions of law to be resolved by the court. *Camargo Cadillac Co. v. Garfield Enters., Inc.,* 3 Ohio App.3d 435, 437-38 (1982). The court makes this determination by looking at the document itself and also considering all relevant evidence "presented by the parties about their intentions." *Id.*

The language of the Sales Quote is ambiguous with respect to whether it is the final agreement between the parties. Although not conclusive, the Sales Quote does not contain a traditional "merger" or "integration" clause. [11] *See Burke v. Manfroni,* No. 83231, 2004 WL 397276, at *3 (Ohio App. 8th

Dist. Mar. 4, 2004). In fact, the Sales Quote does not contain any statement that clearly indicates that the parties intended for the Sales Quote to represent their final agreement. On the contrary, the Sales Quote appears to anticipate the possibility, at least, for additional agreements. It specifically provides that "any additional or different terms proposed by Buyer are hereby rejected *unless* expressly assented to in writing by Seller." (Sales Quote ¶ 9, Apr. 3, 2000.)

[11]    Rexius's reliance on *Paragon Networks International v. Macola, Inc.,* No. 9-99-2, 1999 Ohio App. LEXIS 2091, at *9-10, 14 (Ohio App.3d Dist. Apr. 28, 1999), for its assertion that the Sales Quote contains an integration clause is not well-taken. Integration clauses are "[r]ecitations to the effect that a written contract is integrated, that all conditions, promises, or representations are contained in the writing [or] that the parties are not to be bound except by the writing." 11 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 33:21, at 661 (4th ed.1993). The license agreement in *Paragon* contained an integration clause that stated that "unless specifically covered by another license agreement, ... [this Agreement] is the complete agreement between us and it supersedes any prior purchase order, communications, advertising or representations." *Paragon,* 1999 Ohio App. LEXIS 2091, at *8 (alteration in original). This language clearly shows the parties' intent to not be bound in any way other than the writing. The Sales Quote in this case contains no similar language.

It is clear, based on the evidence and arguments made by National Mulch, that it did not consider the Sales Quote to be the final, complete, and exclusive statement of the terms of the agreement. The evidence also reflects that even Rexius did not consider the Sales Quote to represent the final, complete, and exclusive statement of the terms of the agreement. In connection with its argument earlier in this litigation regarding venue, Rexius submitted an "Express Blower Limited Warranty," which disclaimed other express warranties, and argued that this document was part of the parties' agreement. [12] Rexius Co-President Arlen Rexius testified that the Limited Warranty was routinely given in connection with the sale of its mulch-blowing trucks. (Rexius Aff. ¶ 9; *accord* Drennan Aff. ¶¶ 5, 14.) Drennan testified that National Mulch would have received this Limited Warranty during training, before the April 3, 2000 Sales Quote was

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 156 of 207
PageID: 13173
National Mulch and Seed, Inc. v. Rexius Forest By-Products Inc., Not Reported in...
2007 WL 894833, 62 UCC Rep.Serv.2d 371

signed. (Drennan Aff. ¶¶ 5-6.) The Limited Warranty is extrinsic to the Sales Quote and directly contradicts the latter document's clause disclaiming all warranties. Under these facts, the parol evidence rule prescribes that the Limited Warranty could only be a part of the agreement if the Sales Quote was not a final expression of the parties' agreement. As Rexius has continuously asserted that the Limited Warranty was part of the parties' agreement, it could not have intended for the Sales Quote to represent the final statement of the terms of the agreement.

12    Rexius makes the same argument now in its response to National Mulch's motion for partial summary judgment.

**\*15** In any event, this Court must construe any ambiguity contained in the Sales Quote against Rexius, the party responsible for preparing that agreement. *See Graham v. Drydock Coal Co.,* 76 Ohio St.3d 311, 314 (1996) (citing *Central Realty Co. v. Clutter,* 62 Ohio St.2d 411, 413 (1980)). Rexius has failed to demonstrate that the Sales Quote represents the final expression of the terms of the parties' agreement. Therefore, the parol evidence rule, as set forth in Ohio Revised Code § 1302.05, will not preclude National Mulch from introducing evidence of extrinsic representations made by Rexius.

### b. Creation of Express Warranties

Next, Rexius argues that any representations made regarding the EB-60 do not amount to express warranties, and that it is therefore entitled to partial summary judgment. National Mulch argues that partial summary judgment should be granted in its favor on this issue because several statements made by Rexius concerning the productivity and reliability of the EB-60 created express warranties.

As was noted *supra,* this case is governed by the U.C.C. as adopted by Ohio. The Ohio Revised Code makes it clear that formal words such as "warrant" or "guarantee" are not necessary to create an express warranty. Ohio Rev.Code § 1302.26(B). Instead, an express warranty is created by:

(1) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain....

(2) Any description of the goods which is made part of the basis of the bargain....

(3) Any sample or model which is made part of the basis of the bargain ....

§ 1302.26(A). A seller's advertisement of its product may constitute an express warranty so long as the statement in the advertisement fulfills the requirements of § 1302.26(A). *See, e.g .,* Jones v. Kellner, 5 Ohio App.3d 242, 242-43 (1982). However, an affirmation of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create an express warranty. § 1302.26(B).

#### i. Statements Regarding the Trucks' Productivity

With respect to productivity, National Mulch alleges that Rexius warranted that the EB-60 trucks, using only one person, could blow 55 cubic yards per hour and that they could be used effectively by only one person. [13] (Compl.¶ 7.) Rexius does not dispute that its sales materials indicated that, "[w]ith most material, the EB-60 can blow nearly a full cubic yard per minute, making even the biggest jobs manageable," that the "Express Blower, using only one person, can blow 55 cubic yards per hour," and that the Express Blower could be operated by one person. [14] (Rexius Marketing Lit., Exs. 3-4 to Pl.'s Mem. Contra Def.'s Mot. Partial Summ. J. Neg. Misrep.)

13    These statements will be referred to as the productivity statements.

14    Although the Complaint alleges that Rexius breached an express warranty that the "Express Blower, using only one person, can blow 55 cubic yards per hour," (Compl.¶ 7) National Mulch moves the Court for summary judgment on the issue of whether an express warranty was created warranting that the Express Blowers "can blow 55 cubic yards per hour using 'most material.' " ( Pl.'s Mem. in Opp'n 1 n. 1; *accord* Pl.'s Mot. Partial Summ. J. Creation Express Warr. & Failure to Disclaim Warr. 5.)

As an initial matter, Rexius asserts that its statement that the trucks could blow 55 cubic yards per hour with most material cannot be an express warranty because, as a matter of law, "statements of maximum performance do not create a warranty of guaranteed daily output." The Court does not find this contention supported by Ohio law. First, National Mulch has not alleged that Rexius made an express warranty about the guaranteed daily output of the trucks. By its plain

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 157 of 207
PageID: 13174
National Mulch and Seed, Inc. v. Rexius Forest By-Products Inc., Not Reported in...

2007 WL 894833, 62 UCC Rep.Serv.2d 371

meaning, the statement that the trucks "can blow 55 cubic yards per hour" does not make a guarantee of what the buyer's actual daily output will be with the trucks. The statement only concerns the trucks' maximum performance.

**\*16** Second, under § 1302.26(A), *any* affirmation of fact relating to the goods can create an express warranty. There is no logical reason to exclude statements of a product's maximum performance. Moreover, other courts have specifically found that statements of maximum performance can create express warranties. *E.g., Abele v. Bayliner Marine Corp.,* 11 F.Supp.2d 955, 964 (N.D.Ohio 1997) (rejecting the argument that a representation that a boat could go at least 40 mph could not create an express warranty under § 1302.26(A)). [15]

[15]    Contrary to Rexius's assertion, neither *Chic Promotion, Inc. v. Middletown Security Systems, Inc.,* 116 Ohio App.3d 363 (1996), nor *HDM Flugservice GMBH v. Parker Hannifin Corp.,* 332 F.3d 1025 (6th Cir.2003), holds otherwise as neither case involved statements of a product's maximum performance. In *Chic Promotion,* the statements included in an alarm systems manufacturer's brochure did not create express warranties because the brochure did not make statements concerning the specific alarm system configuration purchased by the plaintiff. *Chic Promotion,* 116 Ohio App.3d at 369. Instead, the brochure provided general descriptions of what the security system could do depending on how the system was customized. *Id.* The court in *HDM* held that a statement by a manufacturer that an aircraft part had a maximum "service life" of 3,500 hours did not create an express warranty that the part would properly perform for a minimum of 3,500 hours. *HDM,* 332 F.3d at 1033, 1035.

Rexius also argues that the productivity statements cannot be express warranties because they were not part of the basis of the parties' bargain. An affirmation of fact is part of the basis of the parties bargain if it induces the buyer to purchase the product. *Wagner v. Roche Labs.,* 85 Ohio St.3d 457, 459 (1999). To determine whether a representation is an affirmation of fact that became a part of the basis of the bargain, the Court must consider the surrounding circumstances of the sale, including: (1) the reasonableness of the buyer in believing the seller, (2) the reliance placed on the seller's statement by the buyer, [16] and (3) whether the seller

assumes to assert a fact of which the buyer is ignorant, or whether he merely states an opinion or expresses a judgment about a thing. *Abele,* 11 F.Supp.2d at 963; *Norcold, Inc. v. Gateway Supply Co.,* 154 Ohio App.3d 594, 600 (2003); *Slyman v. Pickwick Farms,* 15 Ohio App.3d 25, 28 (1984).

[16]    Under Ohio law, reliance is not a formal element of a claim for breach of an express warranty. *See Norcold, Inc. v. Gateway Supply Co.,* 154 Ohio App.3d 594, 596 (2003).

Construing the facts in the light most favorable to Rexius, this Court determines that reasonable minds could only conclude that these representations constitute affirmations of fact and/ or descriptions of the goods as set forth in Ohio Revised Code § 1302.26(A). This conclusion is supported by a number of cases decided under Ohio law where statements of a similar nature were deemed to be affirmations of fact or descriptions of the goods. *See, e.g., Abele,* 11 F.Supp.2d at 964; *Ohio Savings Bank v. H.L. Vokes Co.,* 54 Ohio App.3d 68, 71-72 (1989). A question remains, however, whether the representations regarding the EB-60's productivity became part of the basis of the bargain.

Rexius submits that the affirmations regarding the EB-60's productivity could not have become part of the basis of the bargain because National Mulch did not rely upon the statements when agreeing to the bargain. [17] In support, Rexius first argues that the Court must consider the warranty disclaimer contained on the reverse side of the Sales Quote in determining whether the productivity statements were part of the basis of the parties' bargain.

[17]    National Mulch responds to this argument by contending that facts that show no reliance on the statements should be ignored by this Court because they are irrelevant to the issue of whether express warranties were created and are therefore non-responsive to National Mulch's motion. This contention is incorrect for two reasons. First, National Mulch has moved for partial summary judgment on the issue of "creation of express warranties by Defendant." (Pl.'s Mot. Partial Summ. J. Creation Express Warr. & Failure to Disclaim Warr. 1.) As discussed *supra,* the creation of an express warranty is dependent upon whether the statement was part of the basis of the bargain, and the buyer's reliance is a factor in making this determination. Second, Rexius has moved

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 158 of 207
PageID: 13175
National Mulch and Seed, Inc. v. Rexius Forest By-Products Inc., Not Reported in...

2007 WL 894833, 62 UCC Rep.Serv.2d 371

for partial summary judgment on the same issue, arguing the absence of reliance. (*See* Def.'s Mot. Partial Summ. J. Breach Warr. Claims 2.) Thus, whether National Mulch relied upon the statements about the trucks' productivity is relevant to the disposition of both parties' motions.

Certainly the existence of a disclaimer in a written contract is a factor in deciding whether a warranty was part of the parties' agreement. However, creation of an express warranty and that warranty's negation are distinct issues under the U.C.C. Ohio Revised Code § 1302.26 governs the creation of express warranties while § 1302.29 controls the determination of whether warranties were negated or disclaimed. Words in a warranty disclaimer are evidence of an already existing warranty being negated or limited, not of a warranty's creation. *See* Ohio Rev.Code § 1302.29(A) (In deciding whether a warranty was disclaimed, "[w]ords or conduct relevant to the creation of an express warranty *and* words or conduct tending to negate or limit warranty shall be construed ... *with each other.*" (emphasis added)). Thus, any fact showing the existence of a warranty disclaimer in the written agreement is not relevant to the issue of whether an affirmation of fact or description of the goods became a part of the basis of the bargain. Rather, such evidence is properly applied to the determination of whether an express warranty created earlier was negated or limited. [18]

[18]   Whether the parties effectively disclaimed express warranties is discussed *infra.*

**\*17**  Other evidence, however, does suggest that National Mulch did not rely upon the statements concerning the EB-60's productivity. Will testified that National Mulch's business plan did not reflect operating the Rexius trucks with only one person. (Will Dep. 41-42.) National Mulch did not anticipate that its trucks would put out 55 cubic yards per hour during its jobs, and its business plan was not based on this output. (*Id.* at 56-57, 65.) Instead, National Mulch used more conservative numbers in its business plan. (Fischer Dep. 34-35; Fischer Decl. ¶ 12, Feb. 13, 2006; Fischer Decl. ¶ 3, Apr. 24, 2006; Will Dep. 52, 65.)

The marketing material containing the productivity statements also contains other information about the Rexius Express Blowers' productivity. Notably, the literature sent to National Mulch included an "Operating Cost Analysis" sheet that depicts costs estimates for a hypothetical mulch delivery job. (Rexius Marketing Lit.) Rexius argues, in essence, that this analysis shows that National Mulch, in making its

decision to purchase, could not have reasonably relied on the statement that the trucks can blow 55 cubic yards per hour. The analysis is based upon an assumption that a job requiring delivery of 45 cubic yards of mulch will take five hours to complete, including time spent for "loading, [40 miles of] travel, customer service, cleanup and blower time." (*Id.*) At the bottom of the sheet appears a note which states that "Rexius makes no claim, expressed or implied, as to what your actual costs might be" and that the analysis "should be used for general understanding only and not for the use in making financial commitments." (*Id.*)

Rexius states that the "Operating Cost Analysis" sheet shows "a real world application of 9 cubic yards an hour." This statement appears to be accurate so long as "application" is understood to mean the total time required to complete a job. However, as the sheet contains no statement of how long it takes to actually blow 45 cubic yards, [19] the analysis provides no discernable rate at which the trucks blow mulch in the "real world." Irrespective of what the hypothetical truck's actual productivity is, the analysis seems to suggest that the rate is something less than 55 cubic yards per hour. This and the note at the bottom of the sheet are relevant to show a lack of reliance by National Mulch upon the statements that the trucks can blow 55 cubic yards with most material.

[19]   Presumably, the actually blowing time in Rexius's hypothetical would be five hours minus the time spent loading, traveling 40 miles, providing customer service, and cleaning.

Additionally, there is evidence that shows that National Mulch was not completely ignorant regarding the trucks' productivity. Prior to entering into an agreement with Rexius, Fischer and Will had been in contact with Fischer's brother in Florida who had been operating Rexius trucks. (Fischer Dep. 13-15; Will Dep. 18-37.) In connection therewith, National Mulch received and considered information about Fischer's brother's business, Florida Mulch Express, Inc. ("Florida Mulch"), including its business plan. (Fischer Dep. 23-25.) Florida Mulch's business plan was based on an average throughput of 100 cubic yards per day per truck with each truck staffed by two employees. (Florida Mulch's Bus. Plan 9, 23, Def.'s Mot. Partial Summ. J. Certain Claimed Damages Ex. 54.)

**\*18**  National Mulch also had an opportunity to view how Rexius trucks operated under normal conditions when Fischer and Will visited Fischer's brother in Florida. (Fischer Dep.

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 159 of 207
PageID: 13176
National Mulch and Seed, Inc. v. Rexius Forest By-Products Inc., Not Reported in...
2007 WL 894833, 62 UCC Rep.Serv.2d 371

18-19; Will Dep. 23-24.) While there, Fischer and Will observed Florida Mulch's trucks on jobs. (Fischer Dep. 19-20; Will Dep. 26-32.) Both Fischer and Will testified that Florida Mulch had multiple workers assigned to a single Rexius truck. (Fischer Dep. 19; Will Dep. 29-30.) Fischer's and Will's testimony shows that National Mulch had independent knowledge of the trucks' productivity. This knowledge tends to diminish the reasonableness of its belief in the productivity statements made by Rexius.

In summary, there is considerable evidence to show that the productivity statements were not a part of the basis of the bargain between National Mulch and Rexius. However, the record also contains evidence supporting the opposite conclusion. Although Fischer and Will were able to learn much about the Rexius trucks in Florida, the information that they received was possibly not replete with enough facts for them to objectively determine the validity of Rexius's statements. Will testified that Florida Mulch provided its financial projections to National Mulch, but did not disclose any information about its actual profitability other than that it "had been very busy." (Will Dep. 31-32.) Florida Mulch did not give Fischer information about its actual profitability or its actual production, and Fischer did not review any Florida Mulch records other than its business plan. (Fischer Dep. 21-22). Regarding throughput, Fischer stated that he could not tell how much mulch the Rexius trucks were putting out while he was observing them, (id. at 20), and that he did not recall discussing the actual throughput that Florida Mulch was receiving from its Rexius trucks. (Id. at 34-36.) These portions of Fischer's and Will's testimonies depict National Mulch as lacking pertinent knowledge about the Rexius trucks' productivity. This evidence helps to support a finding that the productivity statements asserted facts of which National Mulch was not aware on its own and that National Mulch acted reasonably in believing them.

Other testimony by Will and Fischer reflects that National Mulch relied on the productivity statements. Will stated that National Mulch used the Rexius productivity statements as a guide for determining a conservative business plan. [20] (Will Dep. 37-38, 40.) Fischer testified that he believed, based on Rexius's representation of what the trucks could blow, that National Mulch would be able to have significantly greater throughput than the 100 cubic yards per day assumption in Florida Mulch's business plan. (Fischer Dep. 34-35.) According to Fischer, National Mulch "formulated its plan based in part on representations by Rexius that the EB-60 model Express blower could be operated effectively by only

one person and apply 55 cubic yards per hour, using most materials." (Fischer Decl. ¶ 2, Apr. 24, 2006.)

[20]    Will testified,

> [W]e used the literature from Rexius as a guide, and based on the conversations I had had with Rexius and information I had received from Rexius, and then [sic] we attempted to make [National Mulch's business plan] more conservative than the basic numbers that Rexius provided us with.... We saw that the Rexius equipment was being warranted as being able to put down 55 cubic yards of mulch with one person. We felt that was not conservative enough....

(Will Dep. 37-38, 40.)

*19    The Court is mindful that whether an affirmation becomes a part of the basis of the bargain and thereby becomes an express warranty is a question of fact normally left to the province of the jury. See *Lees v. Turek,* No. 87 C.A. 6, 1987 WL 15351, at *2 (Ohio App. 8th Dist. Aug. 6, 1987). Both parties have moved for partial summary judgment on this issue. As such, the Court must view the facts and reasonable inferences drawn thereon in favor of Rexius when deciding National Mulch's motion and in favor of National Mulch when deciding Rexius's motion. However, with the aforementioned facts viewed in a light most favorable to either party, it cannot be said that reasonable minds could come to only one conclusion as to whether the statements regarding the Rexius trucks' productivity became a part of the basis of the bargain between the parties. Instead, the record displays that, at this point in the litigation, whether the productivity statements were part of the basis of the bargain is a disputed issue of fact. Thus, the Court concludes that neither party is entitled to partial summary judgment on the issue of whether an express warranty was created by the statements that (1) the Rexius Express Blower could be used effectively by only one person or that (2) the Rexius Express Blower, using only one person, can blow 55 cubic yards per hour with most materials.

### ii. Statement Regarding the Trucks' Capability to Effectively Dye Mulch

National Mulch also alleges that Rexius made a representation that the EB-60 could effectively dye mulch. (Compl.¶ 7.) Fischer states that Rexius made this representation both orally and in writing. (Fischer Decl. ¶ 6, Feb. 13, 2006.) The Court notes that the Rexius marketing literature submitted to the

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 160 of 207
PageID: 13177
National Mulch and Seed, Inc. v. Rexius Forest By-Products Inc., Not Reported in...
2007 WL 894833, 62 UCC Rep.Serv.2d 371

Court does not include statements about the truck's mulch-dying capability; however, Rexius has put forth no evidence showing that it did not make this representation, either in writing or orally.

There is no dispute that the EB-60 trucks could dye mulch. (Fischer Dep. 222.) The dispute in this case is over the word "effectively." Fischer testified that when dyed mulch was applied, it would come out of the trucks wet. (*Id.*) Fischer contends that application of wet dye created clean-up and liability issues, and he therefore concluded that the EB-60 could not "effectively" dye mulch and discontinued use of they dye function. (*Id.*)

Rexius argues that use of the word "effectively" is merely a seller "puffing" its goods and does not create an express warranty. As was noted *supra,* if use of the word "effectively" merely represents Rexius's opinion, then no express warranty was created. *See Ohio Rev.Code § 1302.26(B).* However, if the word "effectively" was an affirmation of fact, then the Court must determine whether it became part of the basis for the bargain.

A seller's affirmations go beyond puffing when they express an objective fact. In *Barksdale v. Van's Auto Sales, Inc., 62 Ohio App.3d 724, 726 (1989),* a purchaser of an automobile specifically inquired about the condition of the transmission and was told that it was in good working order and that nothing was wrong with it. The court held that this representation went beyond puffing and was an affirmation of fact that became part of the "essence of the bargain." *Id. at 728.* Similarly, a seller's affirmation that a truck would be "just right for the purpose of commercial snow plowing" was held to be more than puffery in *Society National Bank v. Pemberton, 63 Ohio Misc. 26, 28, 409 N.E.2d 1073, 1076 (Ohio Mun.Ct.1979).*

**\*20** Subjective commendations of goods by the seller do not create warranties because the statements are merely the seller puffing its goods. Hence, in *Jordan v. Paccar, Inc., 37 F.3d 1181, 1185 (6th Cir.1994),* "rock-solid" and "strong" were subjective statements about a truck's fiberglass roof. Statements that a car was "good on gas" and "performed fine" were likewise deemed to be puffery in *Jackson v. Krieger Ford, Inc.,* No. 88AP-1030, 1989 Ohio App. LEXIS 1201, at * 17 (10th Dist. Mar. 28, 1989) (noting that the terms "good" and "fine" were expressions of the seller's opinion).

"Effective" means "adequate to accomplish a purpose; producing the intended or expected result." Dictionary.com Unabridged (v 1.0 .1), http:// dictionary.reference.com/ browse/ effective (last visited Oct. 20, 2006) (based on the Random House Unabridged Dictionary). Understanding this, it is apparent that Rexius's statement concerning the trucks' dying feature asserts that the Express Blower trucks can dye mulch adequately and in the manner expected. The Court determines that reasonable minds could only conclude that "effectively dye mulch" is an objective affirmation of fact, not sales puffery.

In this case, it appears that National Mulch was specifically interested in whether the EB-60 could dye mulch. In response, Rexius allegedly told National Mulch that the EB-60 could effectively dye mulch. Rexius clearly had superior knowledge in this regard, and National Mulch was justified in believing relying upon its representations. Under these circumstances, this Court concludes that this representation became part of the basis of the bargain. The statement that the EB-60 can "effectively dye mulch" therefore created an express warranty.

### iii. Statements Regarding the Trucks' Quality

Finally, National Mulch alleges that Rexius made representations regarding the quality and reliability of the EB-60 trucks. In particular, National Mulch alleges that Rexius represented, both in writing and orally, that the EB-60 was trouble-free, of superior craftsmanship, economical to operate, and built and manufactured with high-quality material and workmanship. (Compl. ¶ 7; Fischer Decl. ¶ 6, Feb. 13, 2006.) Additionally, National Mulch alleges that Rexius represented that the maintenance cost for the EB-60 was minimal. (Compl. ¶ 7; Fischer Decl. ¶ 6, Feb. 13, 2006.)

As with the alleged representation that the trucks could effectively dye mulch, Rexius has not argued that it did not make these statements to National Mulch, either in writing or orally. To the contrary, Rexius concedes that its brochures contain these representations of quality. (Def.'s Mem. Supp. Mot. Partial Summ. J. Warr. Claims 11.) Despite Rexius's concession, the Court notes that most of the statements allegedly made by Rexius regarding the trucks' quality do not appear in its marketing literature submitted to the Court. The material does describe the Express Blower's feed system as "trouble-free." (Rexius Marketing Lit. 1.) However, nowhere in the brochures is any part of the Express Blowers expressly described as "of superior craftsmanship," "economical to operate," "built and manufactured with high-quality material

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 161 of 207
PageID: 13178

National Mulch and Seed, Inc. v. Rexius Forest By-Products Inc., Not Reported in...
2007 WL 894833, 62 UCC Rep.Serv.2d 371

and workmanship," or having "minimal maintenance cost." The only reference to the Express Blower's quality comes in the Operating Cost Analysis sheet discussed *supra.* There, Rexius provides estimated per cubic yard costs for "General maintenance" ($0.27/cu .yd.), "Tires" ($0.02/cu.yd.), and "Fuel" ($0.42/cu.yd.) based upon its actual experience.

**\*21**  Of course, an affirmation of fact that relates to the goods or a description of the goods does not need to be written to create an express warranty. National Mulch has asserted that these representations were made orally as well as in writing. (Fischer Decl. ¶ 6, Feb. 13, 2006.) Although there is an absence of evidence on the record to show that the quality statements, other than "trouble-free," were made in writing, Fischer's averment that these representations were made orally has not been contradicted by Rexius with any evidence.

Rexius argues that these statements of the Express Blowers' quality are puffery and therefore cannot form express warranties. Unlike *Barksdale,* there is no indication that the representations regarding quality were made in response to a specific inquiry by National Mulch or with knowledge of special needs on the part of National Mulch.

Nevertheless, Ohio courts have often found that representations of quality can create express warranties. For instance, in *Jones,* the court upheld the trial court's finding that a representation that an automobile was mechanically in "A-1 condition" created an express warranty. *Jones,* 5 Ohio App.3d at 243. Similarly, in *Abele,* the court found that a representation that a boat was "unsurpassed for trouble-free operation" could create an express warranty. *Abele,* 11 F.Supp.2d at 964 (denying summary judgment in favor of the defendant). Neither court, however, found that these statements created express warranties as a matter of law.

Again, the determination depends on whether the representation is an objective affirmation of fact or merely the seller's opinion. Similar to the statements regarding quality in *Jones* and *Abele,* "trouble-free," "economical to operate," and "minimal maintenance cost" seem to be objective statements of the Express Blowers' level of reliability and cost of operation. However, the Court concludes that neither party is entitled to summary judgment regarding these three alleged statements. Viewing the facts most favorably to Rexius, a reasonable jury could conclude that these statements are nothing more than Rexius's opinion of the goods. Thus, National Mulch is not entitled to summary judgment on

the issue of whether these three statements created an express warranty. Likewise, with the facts viewed in favor of National Mulch, reasonable minds could determine that these three statements were either affirmations of fact relating to the goods or descriptions of the goods. As such, summary judgment on this issue in favor of Rexius would be inappropriate.

On the other hand, "superior craftsmanship" and "high-quality material and workmanship" cannot form express warranties under Ohio Revised Code § 1302.26. Neither statement is a description of the goods or an affirmation of fact that relates to the Express Blowers. Like the statements at issue in *Jordan* and *Jackson,* these two statements are Rexius's commendation of its goods. Both "superior" and "high-quality" are value judgments based upon the seller's opinion. No reasonable jury, viewing the facts in the light most favorable to National Mulch, could conclude otherwise. Therefore, Rexius is entitled to summary judgment on National Mulch's express warranty claims arising from these two statements.

### c. Disclaimer

**\*22**  Rexius argues that, even if express warranties were created, those warranties were effectively disclaimed in the Sales Quote. National Mulch argues that it cannot be bound by a disclaimer on the back of the Sales Quote that was not read by Fischer, who signed the Sales Quote on behalf of National Mulch. National Mulch argues alternatively that the disclaimer found on the back of the Sales Quote was not adequate to disclaim the prior express warranties made by Rexius.

### i. Validity of Disclaimer

National Mulch contends that it cannot be bound by language contained on the back of the Sales Quote because the record reflects that, while Fischer signed the front of the Sales Quote, he did not see the language referring to the back of the Sales Quote and, in any event, did not read the back of the Sales Quote. (Fischer Decl. ¶ 40, Feb. 13, 2006.) National Mulch therefore argues that the disclaimer did not become part of the parties' agreement.

Initially, this Court notes that National Mulch does not argue that Fischer lacked an opportunity to review the entire agreement prior to signing. In support of its opposition to Rexius's motion for partial summary judgment, National Mulch cites *Dyno Construction Co. v. McWane, Inc.,* 198

Case 1:19-md-02875-RBK-SAK   Document 598-4   Filed 10/16/20   Page 162 of 207
PageID: 13179

National Mulch and Seed, Inc. v. Rexius Forest By-Products Inc., Not Reported in...

2007 WL 894833, 62 UCC Rep.Serv.2d 371

F.3d 567 (6th Cir.1999). In *Dyno,* a purchaser of ductile iron pipe signed an agreement that was sent by fax. *Id.* at 570-71. However, the seller failed to fax the back side of the form, which contained a limited liability clause. *Id.* Thus, a genuine issue of material fact existed regarding whether the buyer had an opportunity to review the limited liability clause. *Id.* at 570-75.

In this case, Fischer was present in Oregon on behalf of National Mulch and was given the complete Sales Quote. The following language appears directly beneath the signature line on the Sales Quote:

> THIS AGREEMENT IS SUBJECT TO ALL TERMS AND CONDITIONS ON THE REVERSE SIDE INCLUDING THOSE WHICH **LIMIT WARRANTIES** AND THOSE WHICH AGREE TO A **GRANT OF SECURITY INTEREST.** *NOTE ALSO THE GEOGRAPHICAL USE LIMITATION DESCRIBED IN SECTION 13 ON THE REVERSE SIDE.*

(Sales Quote, Apr. 3, 2000.) This language conspicuously notifies National Mulch that there are additional terms and conditions on the reverse side and that warranties are limited. [21] The back of the Sales Quote provides a disclaimer which specifically states, in all capital letters,

[21] Ohio Revised Code § 1301.01(J) states that:
> a term or clause is "conspicuous" when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals (as: NONNEGOTIABLE BILL OF LADING) is "conspicuous." Language in the body of a form is "conspicuous" if it is in larger or other contrasting type or color.... Whether a term or clause is "conspicuous" is for decision by the court.

> THERE ARE NO UNDERSTANDINGS, AGREEMENTS, REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED

OR STATUTORY, INCLUDING ANY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE (EXCEPT AS TO TITLE).

(*Id.* at ¶ 7.)

As was recognized by the Supreme Court of Ohio,

> [a] person of ordinary mind cannot say that he was misled into signing a paper which was different from what he intended to sign when he could have known the truth by merely looking when he signed.... I[f] this were permitted, contracts would not be worth the paper on which they are written. If a person can read and is not prevented from reading what he signs, he alone is responsible for his omission to read what he signs.

**\*23** *Dice v. Akron, Canton & Youngstown R.R.,* 155 Ohio St. 185, 191 (1952), *rev'd on other grounds,* 342 U.S. 359 (1952); *see also Provident Bank v. Adriatic, Inc.,* No. CA2004-12-108, 2005 WL 2840741, at \*3 (Ohio App. 12th Dist. Oct. 31, 2005).

National Mulch notes that it did not initial the back of the Sales Quote. It suggests that this indicates that it did not assent to the terms and conditions contained on the back of the Sales Quote. However, upon review, it appears that the box for initialing found on the back of the Sales Quote pertains exclusively to paragraph 13, the geographical use limitation. Thus, this Court cannot conclude that the absence of initials on the back of the Sales Quote has any effect on the terms and conditions of the agreement. [22]

[22] Except of course paragraph 13, which is not relevant to this case.

Even with all of the facts viewed in favor of National Mulch, a reasonable jury could only conclude that when Fischer signed the Sales Quote, National Mulch assented to all of the terms of the document, including those on the reverse side. The Court therefore determines that the disclaimer contained on the back of the Sales Quote became part of the parties' agreement.

National Mulch and Seed, Inc. v. Rexius Forest By-Products Inc., Not Reported in...

2007 WL 894833, 62 UCC Rep.Serv.2d 371

#### ii. Adequacy of Disclaimer

National Mulch argues that, even if the disclaimer became part of the parties' agreement, the disclaimer is not adequate to disclaim the express warranties created by Rexius. The U.C.C. specifically provides for the exclusion of warranties under certain circumstances:

> Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of section 1302.05 of the Revised Code on parol or extrinsic evidence, negation or limitation is inoperative to the extent that such construction is unreasonable.

Ohio Rev.Code § 1302.29(A).

As has been recognized, "express warranties are difficult to disclaim since they usually go to the essence of the bargain and form the basis of the agreement between the parties." *Ohio Savings Bank,* 54 Ohio App.3d at 72 (citations omitted); *see also* Ohio Rev.Code § 1302.26 off. cmts. 1, 4. Disclaimers of express warranties are valid only to the extent that they are reasonably consistent with the warranties expressed. Thus, where the conflict is between a written disclaimer and other assertions which are part of the contract, the disclaimer is typically ineffective.

Ohio courts have addressed similar cases in which a pre-contractual oral representation conflicted with a disclaimer found in a subsequent written agreement. For example, in *Barksdale,* the seller of an automobile made pre-contractual oral representations that the transmission was in good working order. The parties then signed a written agreement stating that the automobile was sold "as is-no warranty." The court concluded that

> [w]hen a written contract for the sale of goods provides that the goods are sold "as is" and also disclaims all express and/or implied

warranties and such provisions cannot be reasonably construed as consistent with the seller's oral express warranty, the express warranty will prevail and the inconsistent provisions deemed inoperative to the extent they are unreasonable.

**\*24** *Barksdale,* 62 Ohio App.3d at 729. A similar result was reached by the court in *Pemberton,* 63 Ohio Misc. at 29, 409 N.E.2d at 1076.

Rexius argues that although an unreasonable disclaimer is inoperative to negate express warranties contained in the same document as the disclaimer, such a disclaimer can still operate to disclaim warranties expressed in prior advertisements. In support of its position, Rexius cites *Burton v. Elsea, Inc.,* No. 97CA2556, 1999 WL 1285874 (Ohio App. 4th Dist. Dec. 27, 1999). In *Burton,* the court found that "negation language found within a[n] unambiguous written contract intended as the final expression of the parties' agreement, to the extent consistent with the rest of the written agreement, will operate even if the parties reached a prior oral agreement that included an express warranty." *Id.* at \*6. However, in this case, as was discussed *supra,* the evidence does not support a conclusion that the Sales Quote constitutes the final statement of the terms of the parties' agreement and, therefore, the parol evidence rule does not apply.

Rexius next argues that cases cited by National Mulch invalidating disclaimers are distinguishable on their facts as they involve consumers and "extreme facts." According to Rexius, enforcement of the disclaimer in this case would not be unreasonable because, unlike the cases cited by National Mulch, this case involves sophisticated business entities and there is no evidence of the seller taking advantage of the buyer. Alternatively, Rexius argues that summary judgment in favor of National Mulch on this issue would be inappropriate because there are no facts indicating that enforcement of the disclaimer would be unreasonable.

Rexius's argument misses the point. The question to be answered under § 1302.29(A) is not whether *enforcement* of the disclaimer would be reasonable. Section 1302.29(A) clearly states that disclaimers are inoperative when their *construction* with express warranties is unreasonable. Thus, whether the parties to the contract are consumers or commercial entities is not determinative of whether a

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 164 of 207
PageID: 13181

National Mulch and Seed, Inc. v. Rexius Forest By-Products Inc., Not Reported in...
2007 WL 894833, 62 UCC Rep.Serv.2d 371

disclaimer is reasonable. Instead, the focus is on the "[w]ords or conduct relevant to the creation of an express warranty and the words or conduct tending to negate or limit [that] warranty." Ohio Rev.Code § 1302.29(A).

In this case, the statements alleged to create express warranties are directly contradicted by the language of the disclaimer on the back of the Sales Quote. No reasonable person could construe the two as consistent with each other. The Court concludes that allowing the written disclaimer of express warranties contained on the back of the Sales Quote to effect a waiver of the alleged express warranties made by Rexius prior thereto would be unreasonable. Therefore, the disclaimer of express warranties found in the Sales Quote is ineffective to disclaim express warranties related to the EB-60's productivity, reliability, and ability to effectively dye mulch.

### d. Breach of Warranty

**\*25** Finally, Rexius argues that it is entitled to summary judgment on National Mulch's express warranty claims based on the productivity statements because the facts show that Rexius did not breach those warranties. Specifically, Rexius states that the Express Blowers are able to be operated by just one person and can blow mulch at the rate represented to National Mulch.

Rexius finds support for its contention that the Express Blowers could be operated by one person from the testimony of Renn Beal, a former employee of National Mulch. During his deposition, Beal indicated that he was able to operate the truck by himself. (Beal Dep. 44.) National Mulch does not refute Beal's testimony; instead, it argues that the pertinent question is whether one person could be effectively operated by one person and apply most material at 55 cubic yards per hour.

In its Complaint, National Mulch alleges that Rexius breached two separate express warranties concerning the Express Blowers' productivity. The first is that the trucks could blow 55 cubic yards per hour using only one person. The second is that the trucks could be used effectively by only one person. Beal's testimony is directly relevant to the second of these alleged express warranties.[23]

[23]    Beal did not state the throughput rate at which he was able to operate the Express Blower by himself.

Viewing the evidence in favor of National Mulch, the Court cannot say that reasonable minds could come to only one conclusion as to whether Rexius breached the alleged warranty that the trucks could be effectively used by only one person. The small excerpt of Beal's deposition on the record does not show that, as a matter of law, the trucks could be used effectively by only one person.[24] Other evidence shows that effective one-person operation might not have been possible. For instance, Fischer testified that he observed an operator being "totally worn out" after operating the blower by himself for about fifteen minutes. (Fischer Dep. 147.) Rexius is not entitled to summary judgment on the issue of whether it breached the alleged express warranty that the Express Blowers could be effectively operated by one person.

[24]    The Rexius marketing literature on the record does not actually use the term "effectively" in describing how the trucks can be used by only one person. Nonetheless, it seems that the brochure affirms that one person can effectively operate the trucks. It states that "the entire truck/blowing system is operated by just one person with remote control! When the operator is ready to begin blowing, he simply picks up the end of the hose, turns the system on by remote control, and adjusts the flow of material to meet his needs as he moves from area to area." (Rexius Marketing Lit. 3.) Later, the brochure states that a "one-person crew can get large jobs done quickly." (*Id.* at 4.)

Rexius also argues that there is no genuine issue as to whether it breached the alleged warranty regarding the Express Blowers' throughput rate. It again relies upon Beal's testimony to support this assertion. Beal testified that he could blow a payload of 60 cubic yards of playground chips in "an hour, an hour and 15 minutes ." (Beal Dep. 35.) Rexius also argues that it is entitled to summary judgment on this claim because National Mulch admitted that the Express Blowers "were able to meet the represented production levels where the nature of the materials and the layout of the job made material application easy." (Fischer Decl. ¶ 19, Feb. 13, 2006.)

The Court agrees with Rexius that there is no genuine issue of fact regarding the question of whether the Express Blowers could blow 55 cubic yards per hour. However, National Mulch has specifically argued that the express warranty created by Rexius in regards to throughput is that the Express Blowers, operated by one person, can blow 55 cubic yards per hour with *most material.* Rexius's marketing literature clearly makes

National Mulch and Seed, Inc. v. Rexius Forest By-Products Inc., Not Reported in...
2007 WL 894833, 62 UCC Rep.Serv.2d 371

this statement. (Rexius Marketing Lit. 2.) Thus, Rexius is only entitled to summary judgment on the issue of breach of this alleged express warranty if there is no genuine issue of fact as to whether the Express Blowers could perform as National Mulch alleges that they were represented.

**\*26** The evidence advanced by Rexius does not show that it is entitled to summary judgment on this issue. First, the Court notes that Beal's testimony is ambiguous as to whether he was able to blow mulch at 55 cubic yards per hour. His testimony was that it took him about an hour to an hour and fifteen minutes to blow 60 cubic yards. This equates to a throughput of somewhere between 48 and 60 cubic yards per hour. Thus, contrary to Rexius's assertion, Beal's testimony does not definitely show that the Express Blowers could achieve 55 cubic yards per hour.

More importantly, Beal did not testify about his experience with "most material." His testimony concerned only one material-playground chips. Even if Beal's testimony did indicate unequivocally that he was able to get 55 cubic yards or more per hour blowing playground chips, it does not show that the Express Blowers could blow 55 cubic yards per hour with most material.

Additionally, National Mulch has put forth evidence to show that one person could not blow most material at 55 cubic yards per hour. Fischer states that achieving the 55 cubic yard per hour throughput was the "exception," possible only with limited materials. (Fischer Decl. ¶ 19, Feb. 13, 2006.) He also testified that one person could not physically operate the Express Blower for an extended time with the throughput increased to its maximum. (Fischer Dep. 147-48.)

Given the evidence on the record, Rexius has not met its burden of showing that there is no genuine issue of fact regarding whether it breached the alleged warranty that the Express Blowers could, with one person, blow 55 cubic yards per hour with most material. Therefore, Rexius is not entitled to summary judgment.

### 2. Implied Warranties

In Counts III and IV of the Complaint, National Mulch alleges that Rexius breached an implied warranty of merchantability and an implied warranty of fitness for a particular purpose, respectively. In moving for partial summary judgment, Rexius argues that the Sales Quote disclaims all implied warranties. National Mulch generally challenges the validity of the Sales Quote.

As was discussed *supra,* this Court concludes that the disclaimer found on the back of the Sales Quote became part of the agreement between the parties. Therefore, the only question is whether the disclaimer effectively disclaimed all implied warranties.

With respect to the disclaimer of implied warranties, the Ohio Revised Code provides that:

> Subject to division (C) of this section, to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states for example, that "There are no warranties which extend beyond the description on the face hereof."

**\*27** Ohio Rev.Code § 1302.29(B). Courts generally uphold a disclaimer of an implied warranty that complies with § 1302.29 between parties who have equal bargaining power. *See Ressallat v. Burglar & Fire Alarms, Inc.,* 79 Ohio App.3d 43, 51 (1992).

As was noted *supra,* the front page of the Sales Quote, directly below the signature line, contains a clause indicating that there are additional terms and conditions, including terms limiting warranties, contained on the back of the Sales Quote. The disclaimer on the reverse side conspicuously states that no implied warranties, including any implied warranties of merchantability and fitness for a particular purpose, have been made. [25] National Mulch offers no argument as to why this language would be ineffective to disclaim all implied warranties. This Court concludes that Rexius effectively disclaimed any implied warranty of merchantability or fitness for a particular purpose. Rexius, therefore, is granted summary judgment on Counts III and IV of the Complaint.

25      As was noted *supra,* note 21, a printed heading in capitals is conspicuous.

### E. Damages

Finally, Rexius has filed a motion for partial summary judgment with respect to National Mulch's request for damages. In particular, Rexius argues that the Sales Quote excludes all consequential and incidental damages and that,

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 166 of 207
PageID: 13183
National Mulch and Seed, Inc. v. Rexius Forest By-Products Inc., Not Reported in...
2007 WL 894833, 62 UCC Rep.Serv.2d 371

under the U.C.C., National Mulch is limited to the difference in value between the EB-60 trucks that they received, and the value of those trucks as warranted. Rexius also moves for summary judgment as to certain damages that National Mulch indicated in its initial disclosure.

The Court begins with the general position that the remedies provided under Chapter 1302 of the Ohio Revised Code are to be liberally administered for the purpose of putting a party aggrieved by a breach of contract or warranty in as good a position as if the other party had fully performed. Ohio Rev.Code § 1301.06(A); *see also* St. Henry Tile Co. v. Cain, No. 1371, 1995 WL 783603, at * 2 (Ohio App.2d Dist. Dec. 20, 1995). The Ohio Revised Code provides the following measure of damages for accepted goods:

(A) Where the buyer has accepted goods and given notification as provided in division (C) of section 1302.65 of the Revised Code, he may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

(B) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

(C) In a proper case any incidental and consequential damages under section 1302.89 of the Revised Code may also be recovered.

§ 1302.88. Subsections (A) and (B) are used to determine direct damages, while subsection (C) makes clear that separate, indirect damages are recoverable under § 1302.89. That section dictates what damages the buyer can recover as incidental and consequential damages. It states:

**\*28** (A) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation, and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses, or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

(B) Consequential damages resulting from the seller's breach include:

(1) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

(2) injury to person or property proximately resulting from any breach of warranty.

§ 1302.89.

A buyer's consequential damages frequently include profits lost as a result of the seller's breach. *E.g.,* Cyclops Corp. v. Home Ins. Co., 389 F.Supp. 476, 478-79 (W.D.Pa.1975) (applying Ohio law); Chemtrol, 42 Ohio St.3d at 44. Additional expenses incurred by the buyer resulting from the seller's breach, such as increased costs of repairs and labor, are also recoverable as consequential damages under § 1302.89. *E.g.,* World Metals, Inc. v.. AGA Gas, Inc., 142 Ohio App.3d 283, 289 (2001).

**1. Limitation of Remedy for Breach of Contract**
While the U.C.C. provides a remedy for consequential damages, it also allows the parties to agree to limit the buyer's remedy. Section 1302.93(A)(1) states that "[t]he agreement may provide for remedies in addition to or in substitution for those provided [under the Code] and may limit or alter the measure of damages recoverable." Under this section, parties to a contract may agree to exclude incidental and consequential damages from the amount recoverable flowing from a breach.

This Court concluded *supra* that the parties' agreement included the first twelve of the thirteen terms on the reverse side of the Sales Quote. Paragraph 2 of the Sales Quote states: "Seller shall not be liable for ... any incidental or consequential damages caused by or related to the goods sold...." By its plain language, this term limits the buyer's ability to recover incidental or consequential damages resulting from the seller's breach of the contract. Unless unenforceable as a matter of law, the parties' agreement excludes incidental and consequential damages from any amount National Mulch may recover for any breach of warranty by Rexius.

A term of an agreement to limit or exclude consequential damages will not limit a party's recovery if enforcement of the term is unconscionable. § 1302.93(C). However, "limitation of damages where the loss is commercial is not" prima facie

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 167 of 207
PageID: 13184

National Mulch and Seed, Inc. v. Rexius Forest By-Products Inc., Not Reported in...

2007 WL 894833, 62 UCC Rep.Serv.2d 371

unconscionable. *Id.; accord Stevens v. Protecto Auto Care, Inc.,* No CA-8607, 1991 Ohio App. LEXIS 6353, at *8 (5th Dist. Dec. 30, 1991); *Slemmons v. Ciba-Geigy Corp.,* 57 Ohio App.2d 43, 57 (1978). All of the losses that National Mulch alleges resulted from Rexius's breach of warranty are economic, i.e., commercial losses. In certain cases, enforcing the parties' agreement to exclude lost profits and increased business expenses from any recovery of damages could be unconscionable. However, there are no circumstances in this case to support such a conclusion. If the sellers of goods were not permitted to routinely exclude lost profits and increased expenses in their contracts, they would be forced to face nearly endless liability with each sale. Such a result is contrary to the rationale behind § 1302.93. Therefore, the Court determines that the term in the Sales Quote limiting recovery by excluding consequential damages is not unconscionable.

**\*29** National Mulch contends that the limited remedy available to it under the terms of paragraph 2 fails of its essential purpose and that, as a result, it is not precluded from recovering incidental and consequential damages. This argument lacks merit.

"Where circumstances cause an exclusive or limited remedy to fail of its essential purpose" damages that are normally available to the non-breaching party may be recovered. § 1302.93(B). A limited remedy fails of its essential purpose when the aggrieved party cannot obtain the intended benefit of the remedy for which it bargained. *See Abele,* 11 F.Supp.2d at 960-61; *Cyclops,* 389 F.Supp. at 482-83. This frequently occurs in the situation where the parties argue that the buyer's only remedy for the seller's breach of warranty is repair or replacement of the goods sold. The purpose of these limited remedies is "to give the seller an opportunity to cure the defect" and to limit the seller's risk "by excluding direct and consequential damages." *Abele,* 11 F.Supp.2d at 960. This type of limited remedy typically fails when evidence shows that the seller either refuses to repair or replace the goods or, despite attempting repair, the seller was not able to cure its breach. *See, e.g., id.* at 960-61.

Unlike the buyers in the cases cited in support of its argument, National Mulch's remedy is not limited to repair or replacement of the goods sold. Instead, paragraph 2 of the Sales Quote provides that National Mulch may not recover incidental or consequential damages, but this term leaves available to National Mulch damages directly caused by any breach of warranty by Rexius. These direct damages are recoverable under § 1302.88(B). National Mulch has put forth

no evidence to show that it cannot receive the benefit of this limited remedy for which it bargained. Therefore, the Court cannot conclude that the limited remedy of the parties' agreement fails of its essential purpose.

Because it is neither unconscionable nor fails of its essential purpose, paragraph 2 of the Sales Quote operates to exclude incidental and consequential damages from National Mulch's remedy for any breach of warranty by Rexius. Rexius is entitled to summary judgment on National Mulch's claims for incidental and consequential damages under Count I of the Complaint.[26]

[26]    Rexius argues in the alternative that National Mulch cannot recover startup and overhead costs that National Mulch claims as consequential damages because it would have incurred these costs irrespective of any breach of of warranty by Rexius. Because the Court concludes that the parties agreed to exclude consequential damages from any recovery for breach of warranty, there is no need to address this argument.

**2. Measure of Direct Damages for Breach of Warranty**
Rexius has also moved for summary judgment on National Mulch's claim for lease payments that it made on the Rexius trucks and the remaining balance owed on the leases. In support, Rexius argues that the proper measure of direct damages for breach of warranty in this case is the difference between the value of the trucks when accepted and the value that they would have had if they had been delivered as warranted. According to Rexius, National Mulch's claim for all of its lease payments would allow it to recover an amount much greater than this difference. National Mulch replies that it is not limited to the difference in value measure because the alleged breach of warranties by Rexius caused National Mulch to suffer a complete business failure.

**\*30** In a letter to Rexius dated April 28, 2005, National Mulch claimed as damages $370,567.02 in lease payments that it had made on the Rexius trucks and the $454.259.41 balance that it owes on the lease. (Damages Analysis Letter 2, Batson Decl. Ex. 3, R. at 75-2.) These amounts include both the principal and interest on the loan that National Mulch took to finance the trucks.[27] (*See* Fischer Dep. 185-87.) The combined price that National Mulch paid for the two Rexius trucks was $580,628.[28] National Mulch sold the

Case 1:19-md-02875-RMB-SAK   Document 598-4   Filed 10/16/20   Page 168 of 207
PageID: 13185

National Mulch and Seed, Inc. v. Rexius Forest By-Products Inc., Not Reported in...
2007 WL 894833, 62 UCC Rep.Serv.2d 371

two trucks in December 2005 for approximately $320,000. (Fischer Decl. ¶ 25, Feb. 13, 2006.)

27    National Mulch is correct in its assertion that a buyer can recover interest payments used to finance the purchase the goods that are the subject of the seller's alleged breach of warranty. *See, e.g., Bobb Forest Prods., Inc. v. Morbark Indus., Inc.,* 181 Ohio App.3d 63, 87-88 (2002). However, financing costs are consequential damages, *id.; Architectural Identification, Inc. v. Am. Bus. Equip.,* No. 85 AP-1048, 1986 WL 309, at * 4 (Ohio App. 10th Dist. Sept. 16, 1986), and are therefore not available as damages for any breach of warranty in this case because the parties excluded consequential damages from any recovery. *See supra.*

28    According to the April 3, 2000 Sales Quote, the first truck was sold to National Mulch for $291,933. The April 28, 2000 Sales Quote indicates that the second truck was sold for $288,695.

Section 1302.88(B)'s difference in value measure for damages resulting from a breach of warranty is the "usual, standard and reasonable method of ascertaining damages." *Simons Cadillac, Inc. v. Roddy,* No. 9970, 1987 WL 6242, at *4 (Ohio App. 2nd Dist. Feb. 3, 1987). However, a different measure is proper when "special circumstances show proximate damages of a different amount." § 1302 .88(B); *accord, e.g., Simons Cadillac,* 1987 WL 6242, at *4; *Gen. Motors Acceptance Corp. v. Grady,* 27 Ohio App.3d 321, 325 (1985). In *Simons Cadillac,* special circumstances existed because the difference in market value measure would not have resulted in an accurate determination of the buyer's proximate damages. *Simons Cadillac,* 1987 WL 6242, at *4 ($9700 difference in market value was not the proper measure of damages where buyer only incurred actual costs of $6,836 to remedy the seller's breach of title warranty. The difference in market value measure would have put the buyer in a better position then if there had been no breach). In *Grady,* the difference in market value measure was not used to determine damages because, although the buyer had accepted delivery of a car that she had purchased, the car was later repossessed. *Grady,* 27 Ohio App.3d at 325.

National Mulch asserts that its business failure is a special circumstance that allows it to recover the entire price of the trucks and the cost of financing them. It argues that, like the buyers in *Simons Cadillac* and *Grady,* the difference in market

value measure for damages will not make it whole. The Court disagrees. There is no evidence to suggest that the difference in market value measure for damages in § 1302.88(B) will not result in an accurate determination of National Mulch's proximate damages from any breach of warranty by Rexius. To the contrary, allowing National Mulch to recover the entire purchase price of the trucks plus financing costs ($824,826.43 according to National Mulch) as *direct* damages would put it in a better position than if the alleged breach of warranty never occurred. 29

29    With a recovery of the $824,826.43 in damages claimed as the price of the trucks and financing charges, National Mulch would receive in damages $244,198.43 more than it paid for the trucks. Together with the $320,000 that it received upon the sale of the trucks, National Mulch's total windfall would be $564,198.43 *plus* the value of possessing the trucks between spring 2000 and the end of 2005.

National Mulch argues at length that *Dynamic Recycling Services, Inc. v. Shred Pax Corp.,* 210 Ill.App.3d 602 (1991), supports a damages award of the entire purchase price of the trucks. Like National Mulch, the buyer in that case argued that the seller's breach of warranty resulted in the failure of its business. *Id.* at 607. The court in *Dynamic* relied upon the special circumstances exception in the Illinois equivalent to § 1302.88(B) when it affirmed the trial court's damage award of the entire amount paid for the goods. *Id.* at 615-16. Although the goods as accepted have value at the time of acceptance, the buyer went out of business due in part to the seller's breach, making the goods worthless. *Id.* at 615. The court stated that the difference in market value at the time of acceptance between the goods accepted and the value they would have had if they had been as warranted would not make the buyer whole in these special circumstances. *Id.*

 *31    The Court does not find *Dynamic* persuasive. First, the buyer in that case attempted to revoke its acceptance within two months of delivery of the goods. 30 *Id.* at 606. By contrast, National Mulch never revoked, or even attempted to revoke, its acceptance of the trucks. Instead, it used the trucks for several years. More importantly, unlike the goods in *Dynamic* that were worthless after the buyer's business failed, it is indisputable that the Rexius trucks retained immense value even after National Mulch closed its doors. Thus, this case is distinguishable from *Dynamic* and cases where the full price of the goods are awarded as damages because the

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 169 of 207
PageID: 13186
National Mulch and Seed, Inc. v. Rexius Forest By-Products Inc., Not Reported in...
2007 WL 894833, 62 UCC Rep.Serv.2d 371

goods as accepted by the buyer had no value. *E.g., Vitek v. Baker,* No. 86AP-865, 1987 Ohio App. LEXIS 7794, at *6-7 (10th Dist. June 30, 1987) (difference between value of goods accepted and value that they would have had if they had been as warranted was the contract price because the goods as accepted were worthless).

30    Under Ohio Revised Code § 1302.85, a buyer who justifiably revokes acceptance may recover the entire price that it has paid for the goods.

Viewing the evidence most favorably to National Mulch, the Court concludes there is no genuine issue for trial regarding the existence of special circumstances that would dictate a measure of damages other than that called for in § 1302.88(B). Instead, reasonable minds could only conclude that National Mulch's direct damages for any breach of warranty by Rexius are appropriately measured by the difference at the time of acceptance between the value of the trucks as accepted and the value they would have had if they had been as warranted. Therefore, the Court determines that direct damages for breach of warranty in excess of § 1302.88(B)'s difference in value measure are unavailable to National Mulch as a matter of law.

**3. Damages Claimed in National Mulch's Initial Disclosure**

Last, Rexius moves the Court for summary judgment on certain categories of damages included in National Mulch's initial computation of damages. In its initial disclosures, National Mulch listed the following as direct and consequential damages:

| | | |
|---|---|---|
| a. | Outstanding line of credit (including expenditure for parts and labor and lost utility) | $397,129.00 |
| b. | Balance of leases for vehicles | $550,000.00 |
| c. | Outstanding Shareholder loans to company | $232,429.75 |
| d. | Twenty percent margin of total sales lost profit | $430,931.68 |
| e. | Outstanding salary obligations to Rick Fisher [sic] | $336,000.00 |
| f. | Outstanding salary obligations to Monte Will | $ 42,000.00 |
| g. | Outstanding office rent | $ 25,200.00 |
| h. | Outstanding bookkeeping/office support | $ 38,472.00 |
| i. | Outstanding office equipment liability | $ 12,600.00 |
| Total Losses to Date | | $2,064,767.00 |

(Pl.'s Initial Disclosures 7, Batson Decl. Ex. 1.) Rexius asserts that it is entitled to summary judgment to the extent that National Mulch seeks damages on all of the above items, except for the balance of the leases on the trucks, because National Mulch has abandoned them. Alternatively, Rexius argues that no genuine issue of fact exists as to whether these items are recoverable in this case.

**\*32** National Mulch has twice updated its damages computation (*See* Batson Decl. Exs. 2-3.) While both updates include the balance that National Mulch owes on its leases for the trucks, neither includes as damages any of the other categories of damages included in National Mulch's initial disclosures. (*See id.*) Based upon this, Rexius argues that National Mulch has abandoned its claims for these categories of damages. In response, National Mulch concedes that it abandoned certain claims for damages after discovery commenced and that this is reflected in its updated damages analysis.

National Mulch and Seed, Inc. v. Rexius Forest By-Products Inc., Not Reported in...
2007 WL 894833, 62 UCC Rep.Serv.2d 371

Whether the categories of damages for which Rexius seeks summary judgment are recoverable is no longer at issue in this case because National Mulch concedes that it has abandoned its claims for these categories. As such, Rexius's motion for summary judgment on these damages is denied as moot.

### IV. Conclusion

WHEREUPON, Rexius's motion for partial summary judgment on National Mulch's negligent misrepresentation claim (R. at 73) is **GRANTED** in part and **DENIED** in part. Rexius's motion for partial summary judgment on National Mulch's negligent misrepresentation claim is **GRANTED** to the extent that the claim is based upon omissions of fact. Rexius's motion for partial summary judgment on National Mulch's negligent misrepresentation claim is otherwise **DENIED.**

National Mulch's motion for partial summary judgment on the issues of creation of express warranties and the disclaiming of warranties (R. at 87) is **GRANTED** in part and **DENIED** in part. National Mulch's motion for partial summary judgment on the issue of the creation of an express warranty that the Rexius Express Blowers could effectively dye mulch is **GRANTED.** National Mulch's motion for partial summary judgment on the issue of the creation of all other express warranties is **DENIED.** National Mulch's motion for partial summary judgment on the issue of whether Rexius effectively disclaimed express warranties is **GRANTED.**

Rexius's motion for partial summary judgment on National Mulch's warranty claims (R. at 88) is **GRANTED** in part and **DENIED** in part. Rexius's motion for partial summary judgment on National Mulch's claim of breach of express

warranty is **GRANTED** to the extent that the claim is based on statements that the Rexius Express Blowers are "of superior craftsmanship" and "built and manufactured with high quality material and workmanship." Rexius's motion for partial summary judgment on National Mulch's claim of breach of express warranties is otherwise **DENIED.** Rexius's motion for partial summary judgment on National Mulch's claims of breach of implied warranty of merchantability and breach of implied warranty of fitness for a particular purpose is **GRANTED.**

Rexius's motion for partial summary judgment on certain damages claimed by National Mulch (R. at 75) is **GRANTED** in part and **DENIED** in part. Rexius's motion for partial summary judgment on incidental and consequential damages resulting from any breach of warranty by Rexius is **GRANTED.** Rexius's motion for partial summary judgment on the measure of direct damages resulting from any breach of warranty by Rexius is **GRANTED.** Rexius's motion for partial summary judgment on certain categories of damages claimed by National Mulch in its initial disclosure is moot and is therefore **DENIED.**

*33 Finally, Rexius's objection to certain evidence submitted by National Mulch (R. at 92) is moot and is therefore **OVERRULED.**

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 894833, 62 UCC Rep.Serv.2d 371

---

End of Document                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 13

Sharp v. Tamko Roofing Products, Inc., 695 N.W.2d 43 (2004)
2004 WL 2579638, 55 UCC Rep.Serv.2d 226

KeyCite Yellow Flag - Negative Treatment
Distinguished by Brown v. Louisiana-Pacific Corporation, S.D.Iowa,
September 18, 2014

695 N.W.2d 43 (Table)
(The Court's decision is referenced in a
"Decisions Without Published Opinions"
table in the North Western Reporter.)
Court of Appeals of Iowa.

Bradley SHARP, Mark Bishop, Bob Achey,
Jerry's Homes, Inc., and Centennial Place
Apts., L.P., Walnut Hills United Methodist
Church, Rick and Susan Miller, and Darla
Hollinger, and All Others Similarly Situated,
Plaintiffs-Appellees/Cross-Appellants,
v.
TAMKO ROOFING PRODUCTS, INC.
and David Humphreys, Defendants-
Appellants/Cross-Appellees.

No. 02-0728.
|
Nov. 15, 2004.

Appeal from the Iowa District Court for Polk County, Scott
D. Rosenberg, Judge.
Defendants appeal the district court decision certifying
this suit as a class action and denying their request for
summary judgment on some issues. AFFIRMED IN PART,
REVERSED IN PART, AND REMANDED.

**Attorneys and Law Firms**

Wade R. Hauser III and Nathan J. Overberg of Ahlers &
Cooney, P.C ., Des Moines, for appellant Humphreys.

J. Stan Sexton of Shook, Hardy & Bacon L.L.P., Kansas City,
Missouri, for appellant TAMKO Roofing.

Kathryn S. Barnhill of Barnhill & Associates, P.C., West Des
Moines, for appellees.

Heard by HUITINK, P.J., MILLER and VAITHESWARAN,
JJ., and BROWN and HENDRICKSON, S.J. *

* Senior judges assigned by order pursuant to Iowa
Code section 602.9206 (2003).

HENDRICKSON, S.J.

*I. Background Facts & Proceedings*
 **\*1**  Bradley Sharp, Mark Bishop, and Bob Achey were the
first purchasers of homes built by Jerry's Homes, Inc. (JHI).
Rick and Susan Miller were the second homeowners of a
home built by JHI. All of their homes had shingles made by
TAMKO Roofing Products, Inc. (TAMKO) on their roofs.
The home of Darla Hollinger and the Walnut Hills United
Methodist Church were not built by JHI, but they also had
TAMKO shingles. JHI is a member of a partnership which
owns Centennial Place Apartments, L.P. Centennial Place has
TAMKO shingles.

Plaintiffs filed suit against TAMKO and its president, David
Humphreys, alleging that the shingles were defective in
their design and manufacture. They alleged the shingles
did not seal properly, which caused them to blow off of
roofs. They also alleged the shingles were subject to "face
cracking, curling, losing granules, excessively deteriorating
and aging prematurely...." Plaintiffs sought relief on grounds
of: (1) breach of express warranty; (2) breach of implied
warranty; (3) fraudulent misrepresentation; (4) negligent
misrepresentation; (5) rescission due to impermissible
liquidated damages; (6) rescission due to unconscionability
of express warranty; and (7) violation of Missouri Revised
Statute chapter 407 (2003), dealing with unfair merchandising
practices.

Plaintiffs sought to have their suit certified as a class action
to include all persons in Iowa who had purchased TAMKO
shingles between 1990 and the date the suit was filed, March
9, 2001. The district court determined the suit should be
certified as a class action, finding the common questions
of law or fact predominated over any questions affecting
only individual members. The court recognized, however,
that many of the homes with TAMKO shingles had been
constructed by JHI, and there was a potential conflict due
to allegations those plaintiffs may have against JHI (such as
improper installation of the shingles). The court then made
two subclasses. The first subclass contained JHI and plaintiffs
whose homes were not built by JHI. The second subclass
contained plaintiffs whose homes had been built by JHI.

Defendants appealed the class certification. The supreme
court granted a limited remand in the case to allow the
district court to address pending motions for summary
judgment. The district court granted summary judgment

Sharp v. Tamko Roofing Products, Inc., 695 N.W.2d 43 (2004)

2004 WL 2579638, 55 UCC Rep.Serv.2d 226

to defendants against JHI and Centennial Place on all issues based on issue and claim preclusion.[1] The court determined Humphreys was entitled to summary judgment on all issues, except fraudulent misrepresentation. The court granted summary judgment to TAMKO on the issues of negligent misrepresentation and violation of the Missouri statute dealing with unfair merchandising practices.

[1]    JHI was unsuccessful in a suit against TAMKO in federal court which sought relief on theories of fraud and promissory estoppel. *Jerry's Homes, Inc. v. TAMKO Roofing Prods., Inc.,* No. 01-3102 (8th Cir. July 8, 2002) (unpublished).

Defendants again appealed. They claim: (1) they are entitled to summary judgment on all issues; and (2) certification of this action as a class action was improper. Plaintiffs filed a cross-appeal, claiming summary judgment against Centennial Place based on issue and claim preclusion was improper. They also assert their claims under the Missouri statute should not be subject to summary judgment.

### II. Standard of Review

**\*2**  We review a district court's ruling on a motion for summary judgment for correction of errors of law. *Financial Mktg. Servs., Inc. v. Hawkeye Bank & Trust,* 588 N.W.2d 450, 455 (Iowa 1999). Summary judgment will be upheld when the moving party shows there are no genuine issues of material fact and the party is entitled to judgment as a matter of law. *See* Iowa R. Civ. P. 1.981(3). In reviewing a motion for summary judgment, we consider the evidence in a light most favorable to the party opposing the motion. *Crippen v. City of Cedar Rapids,* 618 N.W.2d 562, 565 (Iowa 2000).

### III. Express Warranty Based on Brochures

TAMKO provided an express limited warranty of its shingles for a period of twenty-five or thirty years, depending on the type of shingle. Plaintiffs claimed they were not bound by the terms of the express limited warranty. Plaintiffs' claims of breach of an express warranty were based on statements in product brochures and advertisements, which included statements such as "proven to last a long, long time," "long lasting," "years of maintenance free protection," and "durable."

This case involves the sale of goods, and comes under the Uniform Commercial Code (UCC). *See* Iowa Code § 554.2101 (2001); *Flanagan v. Consolidated Nutrition, L.C.,*

627 N.W.2d 573, 577 (Iowa Ct.App.2001). Representations in a product brochure may be considered part of an express warranty. *See Select Pork, Inc. v. Babcock Swine, Inc.,* 640 F.2d 147, 149 (8th Cir.1981). We note, however, that no affirmation of the value of goods, nor any statement purporting to be a statement of the seller's opinion only, should be construed as a warranty. *Dailey v. Holiday Distrib. Corp.,* 260 Iowa 859, 868-69, 151 N.W.2d 477, 484 (1967) (citing Iowa Code § 554.2313(2)).

Even if the statements cited by plaintiffs created an express warranty, plaintiffs have failed to present a genuine issue of material fact to show they relied on the statements in purchasing the shingles.[2] For a plaintiff to prove a breach of an express warranty based on sales representations, there must be a finding the sale would not have been made but for the representations. *Id.* at 869, 151 N.W.2d at 484. Under section 554.2313(1)(a), an express warranty must serve as part of the "basis of the bargain." *Moore v. Vanderloo,* 386 N.W.2d 108, 112 (Iowa 1986). We conclude TAMKO is entitled to summary judgment on plaintiffs' claims based on breach of an express warranty created by the product brochures.

[2]    There is no evidence plaintiffs relied on the statements which they identified as creating an express warranty, such as "proven to last a long, long time." The only statement which any of the plaintiffs stated they relied upon in purchasing the shingles was the statement that the shingles had a twenty-five year warranty. This statement is part of TAMKO's express limited warranty.

### IV. Disclaimers in Express Limited Warranty

TAMKO's express limited warranty contains several disclaimers. After the first year after purchase, TAMKO will pay only a prorated amount, based on the age of the shingles. The warranty applies only to the first consumer purchaser of the shingles. Additionally, any actions for breach of the warranty must be brought within one year after the cause of action has accrued.

**\*3**  Under section 554.2316, a company may provide a limited warranty. The disclaimers or limitations on liability are applicable to third-party or non-privity purchasers.[3] *See Tomka v. Hoechst Celanese Corp.,* 528 N.W.2d 103, 108 (Iowa 1995) (finding remote sellers may disclaim warranties under the UCC). *See also Theos & Sons, Inc. v. Mack Trucks, Inc.,* 729 N.E.2d 1113, 1118 (Mass.2000) ("[A] subsequent

Sharp v. Tamko Roofing Products, Inc., 695 N.W.2d 43 (2004)

2004 WL 2579638, 55 UCC Rep.Serv.2d 226

purchaser should be subject to disclaimers or limitations on warranties made to the original purchaser, and should not acquire greater rights than those held by the original purchaser .").

[3]    Plaintiffs are considered non-privity purchasers because they did not purchase the shingles directly from TAMKO. *See Tomka v. Hoechst Celanese Corp.,* 528 N.W.2d 103, 107 (Iowa 1995).

Plaintiffs claimed the terms of the express limited warranty were not applicable to them because they had not seen the warranty. Several other jurisdictions have found a warranty disclaimer is applicable to non-privity or remote purchasers, even when they do not see the disclaimer.[4] *See Transport Corp. of America, Inc. v. International Bus. Machs. Corp.,* 30 F.3d 953, 959 (8th Cir.1994) ("Even assuming that TCA did not receive a copy of the warranty disclaimer, TCA's claim of breach of implied warranty by IBM fails as a matter of law."); *Boston Helicopter Charter, Inc. v. Agusta Aviation Corp.,* 767 F.Supp. 363, 376 (D.Mass.1991) (noting a subsequent purchaser is subject to any limitations or exclusions contained in an express warranty, even if he does not receive a copy of it); *Winston Indus., Inc. v. Stuyvesant Ins. Co.,* 317 So.2d 493, 496 (Ala.Civ.App.1975) ("[D]espite the fact that the purchaser did not physically receive a copy of the written expressed warranty, an express warranty was, in fact, in existence and does inure to the benefit of appellee."); *Lecates v. Hertrich Pontiac Buick Co.,* 515 A.2d 163, 166 (Del.Super.Ct.1986) (finding disclaimers in warranty applied, even though non-privity purchaser had not seen the warranty); *Architectural Aluminum Corp. v. Macarr, Inc.,* 333 N.Y.S.2d 818, 822 (N.Y.Sup.Ct.1972) (finding there is no requirement in the UCC that a non-privity purchaser have actual knowledge of valid warranty disclaimers in order to make them effective).

[4]    We recognize that not all jurisdictions have followed this rule, and that some jurisdictions have determined a non-privity purchaser is not bound by a company's warranty disclaimers unless the purchaser had notice of the disclaimer. *See, e.g., Patty Precision Prods. Co. v. Brown & Sharp Mfg. Co.,* 846 F.2d 1247, 1254 (10th Cir.1988); *Wright v. Dow Chem. U.S.A.,* 845 F.Supp. 503, 511 (M.D.Tenn.1993).

One commentator has noted:

When the express warrantor specifies that a subpurchaser of the goods may apply for a transfer of the express warranty made to the original purchaser, the subpurchaser is subject to any limitation or exclusion contained in the express warranty even though the subpurchaser may not have ever received a copy of it.

3A Ronald A. Anderson, *Uniform Commercial Code,* § 2-316:152 (3d ed.1995). Here, TAMKO's express limited warranty expressly ran to the benefit of the first consumer purchaser of the shingles. Plaintiffs are the beneficiaries of the express written warranty, and we conclude they are also subject to valid limitations and disclaimers found in the warranty.[5]

[5]    While we have found that plaintiffs are bound by the disclaimers found in the express limited warranty, whether or not they received a copy of the warranty, we note the warranty was readily available to plaintiffs. TAMKO distributed copies of the express limited warranty to its distributors with the intent that they be given to purchasers. A copy of the warranty was on each bundle of shingles. Also, copies of the warranty could be obtained by calling TAMKO or by visiting its website

### *V. Implied Warranties*

Under section 554.2316(2), in order to exclude an implied warranty of merchantability or an implied warranty of fitness, the disclaimer must be conspicuous. *C & J Fertilizer, Inc. v. Allied Mut. Ins. Co.,* 277 N.W.2d 169, 178 (Iowa 1975). Plaintiffs claimed the terms of the express limited warranty were not sufficiently conspicuous.

**\*4**    TAMKO's express limited warranty provides, in bold and capitol letters, "**THE OBLIGATION CONTAINED IN THIS CONTRACT IS EXPRESSLY IN LIEU OF ANY OTHER OBLIGATIONS, GUARANTEES AND WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY**

Sharp v. Tamko Roofing Products, Inc., 695 N.W.2d 43 (2004)
2004 WL 2579638, 55 UCC Rep.Serv.2d 226

OF MERCHANTIBILITY OR FITNESS FOR A PARTICULAR PURPOSE....''

Under section 554.1201(10), a term or clause is conspicuous "when it is so written that a reasonable person against whom it is to operate ought to have noticed it." Language is considered conspicuous if it is in larger type or color. Iowa Code § 554.1201(10). Also, when a disclaimer is in bold, capitol letters, a reasonable person should have noticed it, and we may consider the disclaimer conspicuous. *See Bruce v. ICI Americas, Inc.,* 933 F.Supp. 781, 791 n. 11 (S.D.Iowa 1996). It is for the court to decide whether a term is conspicuous or not. Iowa Code § 554.1201(10); *Bruce,* 933 F.Supp. at 791.

The district court did not specifically determine whether the disclaimers of implied warranties in the express limited warranty were conspicuous. We conclude that this issue should be remanded to the district court.


### VI. Rescission of Contract

Plaintiffs claim that even if the express limited warranty applies to them, they are entitled to rescission of the warranty on the ground that it is unconscionable. [6] Rescission is an equitable remedy which attempts to restore the parties to their positions at the time the contract was executed. *Risse v. Thompson,* 471 N.W.2d 853, 856 (Iowa 1991). A party seeking rescission must show (1) he or she is not in default, (2) the breach of the contract was substantial and goes to the heart of the contract, and (3) remedies at law are inadequate. *Clark v. McDaniel,* 546 N.W.2d 590, 595 (Iowa 1996). Generally, the remedy of rescission is not granted where adequate relief is available in the form of a money judgment. *Id.* (citing 12A C.J.S. *Cancellation of Instruments* § 11, at 657 (1980)).

[6]   In their petition, plaintiffs also claimed they were entitled to rescission because the express limited warranty impermissibly liquidated damages. They later waived this claim, and we do not address it.

We note that under the election of remedies doctrine, a party may seek rescission of a contract or damages, but not both. *See Phipps v. Winneshiek County,* 593 N.W.2d 143, 146 (Iowa 1999). Here, plaintiffs sought rescission of the express limited warranty, and also compensatory and punitive damages. The problem with imposing the remedy of rescission in this case is that the express limited warranty is not a separate contract aside from the sale of the shingles. Plaintiffs did not pay a separate consideration for the warranty. At this point the parties could not be restored to their positions at the time the

contract was executed because plaintiffs have been using the shingles for a number of years. Plaintiffs have an adequate remedy in the pursuit of monetary damages. We determine the district court erred in not granting summary judgment to TAMKO on the issue of rescission of the express limited warranty.

Under section 554.2302, the unconscionability of a contract may be raised as a defense to a contract. *See Smith v. Harrison,* 325 N.W.2d 92, 94 (Iowa 1982). If a contract is determined to be unconscionable it is unenforceable. *Bruce,* 933 F.Supp. at 792. The unconscionability of a contract does not automatically lead to an equitable remedy, such as rescission. *See Vermeulen v. Meyer,* 238 Iowa 1033, 1036, 29 N.W.2d 232, 233 (1947).

**\*5** We consider the factors of assent, unfair surprise, notice, disparity of bargaining power, and substantive unfairness. *Gentile v. Allied Energy Prods., Inc.,* 479 N.W.2d 607, 609 (Iowa Ct.App.1991). A contract is unconscionable "if it is such as no man in his senses and not under delusion would make on one hand, and as no honest and fair man would accept on the other." *Farmers Sav. Bank v. Gerhart,* 372 N.W.2d 238, 244 (Iowa 1985). The question of unconscionability of a contract is for a court to determine, as a matter of law. Iowa Code § 554.2302(1); *Bruce,* 933 F.Supp. at 792.

We conclude the issue of unconscionability of the express limited warranty, as a defense, should also be remanded to the district court.


### VII. Fraudulent Misrepresentation

TAMKO and Humphreys contend they are entitled to summary judgment on the issue of fraudulent misrepresentation. To establish a claim of fraudulent misrepresentation, a plaintiff must prove: (1) representation; (2) falsity; (3) materiality; (4) scienter; (5) intent to deceive; (6) reliance; and (7) resulting injury and damage. *Gibson v. ITT Hartford Ins. Co.,* 621 N.W.2d 388, 391 (Iowa 2001).

The record is clear the defendants did not make any specific statements to the individual plaintiffs. The plaintiffs' claims are based on TAMKO product brochures. Only plaintiffs Sharp, Bishop and Hollinger stated they had seen a product brochure, and the only statement from the brochures which they indicated they had relied upon was the fact that TAMKO shingles had a twenty-five year warranty. This statement, however, was not false because TAMKO provided a twenty-five year express limited warranty of its shingles.

Sharp v. Tamko Roofing Products, Inc., 695 N.W.2d 43 (2004)
2004 WL 2579638, 55 UCC Rep.Serv.2d 226

These plaintiffs are unable to show they relied upon a false representation. The other plaintiffs, who had not seen the brochures, obviously could not have relied upon the statements.

We find there is no genuine issue of material fact to show the named plaintiffs relied on the statements in the brochures in selecting TAMKO shingles. *See Kaiser Agric. Chems. v. Ottumwa Prod. Credit Ass'n,* 428 N.W.2d 681, 683 (Iowa Ct.App.1988) (noting reliance is justifiable if a person acting with reasonable and ordinary prudence and caution would have a right to rely on the representations). We conclude defendants are entitled to summary judgment on the issue of fraudulent misrepresentation.

### VIII. Centennial Place

In their cross-appeal, plaintiffs contend the district court erred in granting summary judgment against Centennial Place based on issue and claim preclusion. They assert Centennial Place was not a party to the prior federal suit between JHI and TAMKO. Defendants agree that it was improper to enter summary judgment against Centennial Place on this ground. We determine Centennial Place should be restored as a plaintiff in this case. Our rulings on specific issues in this opinion, however, also apply to Centennial Place.

### IX. Missouri Statute

 **\*6** Plaintiffs assert Missouri Revised Statute chapter 407 (2003), dealing with unfair merchandising practices, should apply in this case. They point out that TAMKO is a Missouri corporation. The district court determined the Missouri statute was not applicable because Iowa law, and not Missouri law, should apply in this case.

We note section 407.025(1) authorizes a suit in Missouri circuit court and thus, under the terms of the statute, the Missouri law cannot be enforced in a different court. *See Foreman v. Discount Motors, Inc.,* 629 S.W.2d 635, 637 (Mo.Ct.App.1982) (noting that when a statute "gives a right of action, and at the same time prescribes the means by which, or the court in which, the right is to be enforced, resort cannot be had to any other means or court than that prescribed"). We conclude the district court properly granted summary judgment to the defendants on plaintiffs' claims based on chapter 407.

### X. Individual Plaintiffs

TAMKO also claims it is entitled to summary judgment against certain individual plaintiffs. TAMKO agreed to put new shingles on the west side of the home of plaintiff Bob Achey. Achey later complained to TAMKO about the east side of his roof. TAMKO agreed to pay Achey $860.80 if Achey would release TAMKO from any further liability. On July 28, 1998, Achey and his wife signed a release which provided they

> release, acquit and forever discharge TAMKO Roofing Products, Inc., its agent and representatives, from any and all claims, damages, demands, losses, causes of action and actions, whether known or unknown, and whether accrued or accruing, which the undersigned ever had, now have, or otherwise might have on account of, arising out of or related (directly or indirectly) to the TAMKO shingles installed on the Achey's residence....

TAMKO sent Achey a check for $860.80, which Achey endorsed and cashed. We conclude Achey is contractually barred from bringing a further action against TAMKO. TAMKO is entitled to summary judgment against Achey.

Plaintiff Darla Hollinger purchased TAMKO shingles in August 1994 to replace the shingles on her home. A roofing contractor, Richard Owens, installed the shingles. In the summer of 2001 the roof was damaged by a hailstorm. Hollinger received a settlement of about $9000 to $10,000 to replace the roof. We conclude TAMKO is entitled to summary judgment against Hollinger because Hollinger could cite no damages she suffered as a result of the TAMKO shingles. Hollinger is already having her roof replaced through the insurance settlement.

TAMKO claims it is entitled to summary judgment against the Millers because the limited express warranty only applies to the first consumer purchasers of the shingles, and the Millers were the second owners of their home. TAMKO additionally asserts that the other plaintiffs did not come within the one-year provision in the express limited warranty. These two provisions are part of the plaintiffs' claim that the express limited warranty was unconscionable. We have

2004 WL 2579638, 55 UCC Rep.Serv.2d 226

already determined that the issue of unconscionability should be remanded to the district court.

### XI. Class Action

**\*7** Finally, defendants claim the district court should not have certified this case as a class action. We review the district court's certification of a class action for an abuse of discretion. *Luttenegger v. Conseco Fin'l Servicing Corp.,* 671 N.W.2d 425, 436 (Iowa 2003). Under Iowa Rule of Civil Procedure 1.261, a suit may be certified as a class action if (1) the class is so numerous that joinder of all parties is impracticable, and (2) there is a question of law or fact common to the class. *Id.* In addition, a plaintiff must show the class action would permit the fair and efficient adjudication of the controversy and the representative parties fairly and adequately will protect the interests of the class. Iowa R. Civ. P. 1.262(2); *Vos v. Farm Bureau Life Ins. Co.,* 667 N.W.2d 36, 44 (Iowa 2003).

We note that we have granted summary judgment to Humphreys on all claims raised by plaintiffs. As to TAMKO, summary judgment has been granted except as to claims regarding breach of the express limited warranty, breach of an implied warranty, and the defense of unconscionability of the express limited warranty. We have determined the case should be remanded to the district court for specific findings regarding whether disclaimers of the implied warranties were sufficiently conspicuous and whether the express limited warranty was unconscionable.

Based on these findings, we find certification of this suit as a class action is premature. On remand the district court should first consider those issues regarding summary judgment which we have pointed out, and then in light of its decision, reconsider the matter of whether this case is suitable for certification as a class action. We do not retain jurisdiction.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

### All Citations

695 N.W.2d 43 (Table), 2004 WL 2579638, 55 UCC Rep.Serv.2d 226

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 14

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 179 of 207
PageID: 13196
Starks v. Coloplast Corp., Not Reported in F.Supp.2d (2014)
2014 WL 617130, 82 UCC Rep.Serv.2d 756, Prod.Liab.Rep. (CCH) P 19,330

2014 WL 617130
United States District Court,
E.D. Pennsylvania.

John STARKS

v.

COLOPLAST CORPORATION.

Civil Action No. 13–3872.
|
Feb. 18, 2014.

**Attorneys and Law Firms**

Jerry Lyons, Joseph Chaiken & Associates, PC, Philadelphia, PA, for Plaintiff.

Joseph N. Bongiovanni, IV, Marks O'Neill O'Brien Doherty & Kelly P.C., Philadelphia, PA, Leaf Dilts McGregor, Ronn B. Kreps, Fulbright & Jaworski LLP, Minneapolis, MN, for Defendant.

*MEMORANDUM*

McLAUGHLIN, District Judge.

**\*1** This action arises from the malfunction of the plaintiff's penile inflatable implant,[1] a Titan OTR Inflatable Penile Implant ("Titan implant"), which is manufactured by the defendant. The plaintiff, John Starks, sued the defendant, Coloplast Corp., for negligence, strict products liability, breach of warranties, and breach of contract. The Court considers here a motion to dismiss by Coloplast pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, the Court will grant Coloplast's motion, dismiss the negligence, strict liability, and breach of implied warranty claims with prejudice, and dismiss the breach of express warranty and breach of contract claims without prejudice.

[1]    A "penile inflatable implant" is a device that consists of two inflatable cylinders implanted in the penis, connected to a reservoir filled with radiopaque fluid implanted in the abdomen, and a subcutaneous manual pump implanted in the scrotum. When the cylinders are inflated, they provide rigidity to the penis. Such devices are used

in the treatment of erectile impotence. 21 C.F.R. § 876.3350(a).

I. *Background*[2]

[2]

    The Court accepts all well-pleaded facts in the complaint as true and draws all reasonable inferences in favor of the nonmoving party, while disregarding any legal conclusions. *See Fowler v. UPMC Shadyside,* 578 F.3d 203, 210–11 (3d Cir.2009).

A. *Premarket Approval of the Titan Implant*

The Court relies on the publicly available U.S. Food and Drug Administration ("FDA") documents attached to Coloplast's motion to dismiss on the issue of the premarket approval of the Titan implant.[3]

[3]

    Matters of public record may be considered without converting a motion to dismiss into a motion for summary judgment. *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir.1993). On a motion to dismiss, courts take judicial notice of documents that are matters of public record such as Securities and Exchange Commission filings, court-filed documents, and FDA reports published on the FDA website. *McGehean v. AF & L Ins. Co.,* No. 09–01792, 2009 WL 3172763, at *2 (E.D.Pa. Oct.2, 2009) (citing *In re Wellbutrin SR/Zyban Antitrust Litig.,* 281 F.Supp.2d 751, 754 n. 2 (E.D.Pa.2003)). The Court takes judicial notice of the documents attached to Coloplast's motion as public records of the FDA.

    The Court does not consider the documents attached to Starks's opposition to the motion to dismiss, which include Starks's medical records. Consideration of such documents would convert this motion into one for summary judgment.

The Titan implant, which was originally called the Mentor Alpha I Inflatable Penile Prosthesis, received premarket approval from the FDA on July 14, 2000. The original premarket approval application for the implant was submitted by Mentor Corporation.[4] Def.'s Mot ., Ex. 1.

[4]

    Coloplast asserts that Mentor is its predecessor-in-interest, and that Coloplast purchased the Titan implant in 2006. Def.'s Mot. at 7–8.

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 180 of 207
PageID: 13197
Starks v. Coloplast Corp., Not Reported in F.Supp.2d (2014)
2014 WL 617130, 82 UCC Rep.Serv.2d 756, Prod.Liab.Rep. (CCH) P 19,330

Since 2000, both Mentor and Coloplast have submitted several supplements to the original premarket approval, all of which have been approved by the FDA. On June 14, 2002, the FDA approved a supplemental premarket approval application that allowed the Titan implant to incorporate a hydrophilic coating. Def.'s Mot., Ex. 5. On January 14, 2003, the FDA approved another supplemental premarket approval application that allowed further hydrophilic coating of the implant and marketing of the device under a different name-the "Mentor Titan Inflatable Penile Prosthesis." Def.'s Mot., Ex. 6. Lastly, on June 13, 2008, the FDA approved a supplemental premarket approval application submitted by Coloplast that allowed several modifications to the device, as well as marketing of the device under the trade name "Titan OTR Inflatable Penile Prosthesis." Def.'s Mot., Ex. 7.

### B. *Starks's Titan Implant*

Starks was admitted to Hahnemann University Hospital in Philadelphia on or about March 15, 2010. Starks's urologist, Bruce Garber, MD, surgically implanted the Titan implant into Starks's penis at that time. Compl. ¶ 3.

On or about January 25, 2012, Starks's Titan implant stopped working, leaked, and "otherwise would not operate." *Id.* ¶ 6. Dr. Garber reported that the Coloplast penile implant "malfunctioned due to a fluid leak." *Id.* ¶ 7.

Starks underwent another surgery on March 20, 2012, at Lankenau Medical Center to remove the Titan implant and have another penile device implanted. *Id.* ¶ 8. Surgeon Max Ahn, MD, examined the implant and described the malfunction as a result of "a break in the tubing the right corporal cylinder." *Id.* ¶ 9.

**\*2** As a result of the malfunction in his Titan implant, Starks was forced to undergo additional surgery to remove the implant and have a new one implanted and is now subject to the related medical bills. He also suffered from post-surgical pain, additional scar tissue, other pain and suffering, loss of the pleasures of life, including his sexual life, embarrassment and humiliation, and impairments of his bodily functions. *Id.* ¶ 10.

### C. *Procedural History*

Starks initially filed this action in the Court of Common Pleas of Philadelphia County on May 31, 2013. Coloplast was served with the complaint on June 4, 2013, and

Coloplast timely removed the case to the Eastern District of Pennsylvania on July 2, 2013.

Coloplast filed its motion to dismiss on July 23, 2013, and briefing on that motion was completed with Coloplast's reply brief, filed on August 13, 2013.

### II. *Legal Standard*

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint. *Conley v. Gibson,* 355 U.S. 41, 45, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), *abrogated in other respects by Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A claim may be dismissed under Rule 12(b)(6) for "failure to state a claim upon which relief can be granted."

Generally, in ruling on a motion to dismiss, the court relies on the complaint, attached exhibits, and matters of public record. *Pension Benefit Guar. Corp.,* 998 F.2d at 196. FDA reports published on the FDA website are public records that the court may judicially notice. *McGehean,* 2009 WL 3172763, at *2.

Although Rule 8 of the Federal Rules of Civil Procedure requires only that the complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief" to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests," the plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555 (quoting Fed.R.Civ.P. 8(a)(2) and *Conley,* 355 U.S. at 47). Similarly, naked assertions devoid of further factual enhancement will not suffice. *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing *Twombly,* 550 U.S. at 557).

Although "conclusory" or "bare-bones" allegations will not survive a motion to dismiss, *Fowler,* 578 F.3d at 210, a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits. *Phillips v. Cnty. of Allegheny,* 515 F.3d 224, 231 (3d Cir.2008).

The court is required to conduct a two-part analysis when considering a Rule 12(b)(6) motion. First, the factual matters averred in the complaint, and any attached exhibits, should be separated from legal conclusions asserted. *Fowler,* 578 F.3d at 210. Any facts pleaded must be taken as true, and any legal conclusions asserted may be disregarded. *Id.* at 210–11. Second, the court must determine whether those factual

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 181 of 207
PageID: 13198
Starks v. Coloplast Corp., Not Reported in F.Supp.2d (2014)
2014 WL 617130, 82 UCC Rep.Serv.2d 756, Prod.Liab.Rep. (CCH) P 19,330

matters averred are sufficient to show that the plaintiff has a "plausible claim for relief." *Id.* at 211 (quoting *Iqbal,* 556 U.S. at 679).

**\*3** This two-part analysis is "context-specific" and requires the court to draw on "its judicial experience and common sense" to determine if the facts pleaded in the complaint have "nudged [plaintiff's] claims" over the line from "conceivable to plausible ." *Iqbal,* 556 U.S. at 679–80. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

The Third Circuit has summarized the post-*Twombly* standard as follows: " '[S]tating ... a claim requires a complaint with enough factual matter (taken as true) to suggest' the required element. This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element." *Phillips,* 515 F.3d at 234 (alteration in original) (citations omitted) (quoting *Twombly,* 550 U.S. at 556).

III. *Discussion*

A. *Negligence, Strict Liability, Breach of Warranty, and Preemption Under the Medical Device Amendments*

1. *The Medical Device Amendments*

The Titan implant is a Class III medical device approved by the FDA. [5] The FDA separates medical devices into three categories, depending on their level of risk. Class III devices include replacement heart valves, implanted cerebella stimulators, and pacemaker pulse generators. They receive the most oversight from the FDA. *Williams v. Cyberonics, Inc.,* 654 F.Supp.2d 301, 304 (E.D.Pa.2009) (citing *Riegel v. Medtronic, Inc.,* 552 U.S. 312, 317, 128 S.Ct. 999, 169 L.Ed.2d 892 (2008)), *aff'd,* 388 F. App'x 169 (2010).

[5]     FDA regulations classify penile inflatable implants as Class III medical devices. 21 C.F.R. § 876.3350(b).

The Medical Device Amendments of 1976, 21 U.S.C. §§ 360c et seq. ("Medical Device Amendments"), require new Class III devices to undergo a rigorous process known as premarket approval. [6] Premarket approval includes an in-depth review of scientific and clinical data. The FDA spends an average of 1,200 hours reviewing each application. *Williams,* 654

F.Supp.2d at 304 (citing *Riegel,* 552 U.S. at 317–18). The FDA is required to weigh "any probable benefit to health from the use of the device against any probable risk of injury or illness from such use." 21 U.S.C. § 360c(a)(2)(C). The FDA may approve devices that pose significant risks to the patient if they also offer large benefits. *Williams,* 654 F.Supp.2d at 304 (citing *Riegel,* 552 U.S. at 318). After a device has been approved, the manufacturer cannot change design specifications that affect safety or effectiveness without FDA permission. *Id.*

[6]     On April 12, 2000, the FDA promulgated a regulation requiring all "penile inflatable implants" to "have an approved [premarket approval] or a declared completed [product development protocol] in effect" in order to be placed in commercial distribution. 21 C.F.R. § 876.3350(c); *see also* Gastroenterology—Urology Devices; Effective Date of Requirement for Premarket Approval of the Penile Inflatable Implant, 65 Fed.Reg. 19,658 (Apr. 12, 2000) (codified at 21 C.F.R. pt. 876).

2. *Preemptive Effect of the Medical Device Amendments*

The Medical Device Amendments expressly preempt certain state law requirements, stating that:

Except as provided in subsection (b) of this section, no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement-

**\*4** (1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and

(2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

21 U.S.C. § 360k(a).

The Supreme Court addressed the Medical Device Amendments' preemption clause in *Riegel v. Medtronic, Inc.,* 552 U.S. 312, 128 S.Ct. 999, 169 L.Ed.2d 892 (2008), a case involving a Class III catheter approved by the FDA through the premarket approval process. The Supreme Court held that Riegel's strict liability claim, breach of implied warranty claim, and all of his negligence claims, except for

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 182 of 207
PageID: 13199
Starks v. Coloplast Corp., Not Reported in F.Supp.2d (2014)
2014 WL 617130, 82 UCC Rep.Serv.2d 756, Prod.Liab.Rep. (CCH) P 19,330

a negligent manufacturing claim, were preempted by the premarket approval of the catheter by the FDA. *Id.* at 324–25.

The Supreme Court established a two-part test for determining whether a claim is preempted. First, a court must determine whether the federal government has established requirements applicable to the medical device. *Id.* at 321–22. Second, a court must determine whether the state common law claims impose requirements that are "different from, or in addition to" those imposed by federal law. *Id.* [7]

[7]    Because state requirements are preempted only to the extent that they are "different from, or in addition to" the requirements imposed by federal law, the Medical Device Amendments do not prevent a state from providing a damages remedy for claims premised on a violation of FDA regulations; the state duties in such a case "parallel," rather than add to, federal requirements. *Riegel,* 552 U.S. at 330 (quoting *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 495, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (plurality opinion)).

3. *Preemption of State Law Torts* [8]

[8]    Starks argued in his opposition to the motion to dismiss that his claims were not preempted because the Titan implant was approved via the "substantial equivalency" § 510(k) procedure in 1989, rather than via the premarket approval process. Pl.'s Opp. at 2. Approval under § 510(k) does not result in the same preemptive effect as does premarket approval. The "substantial equivalence" clearance under the § 510(k) notification process "does not impose any federal 'requirement' applicable to the device, but is rather a 'generic federal standard.' " *Horn v. Thoratec Corp.,* 376 F.3d 163, 168 (3d Cir.2004) (quoting *Lohr,* 518 U.S. at 486–87 (plurality opinion)). *Riegel* distinguished the § 510(k) clearance in stating that the premarket approval process contained device-specific requirements that § 510(k) clearance did not. *Riegel,* 552 U.S. at 322–23. The § 510(k) clearance of a medical device's predicate or its components, however, does not change the preemptive effect of premarket approval of the current device. *See Smith v. Depuy Orthopaedics, Inc.,* No. 11–4139, 2013 WL 1108555, at *12 (D.N.J. Mar.18, 2013); *Gross v. Stryker Corp.,*

858 F.Supp.2d 466, 488 (W.D.Pa.2012); *Bentzley v. Medtronic, Inc.,* 827 F.Supp.2d 443, 451–52 (E.D.Pa.2011). The Titan implant received premarket approval in 2000, and that premarket approval has preemptive effect.

State common law claims against manufacturers of medical devices that are approved through premarket approval are subject to federal preemption. *Riegel,* 552 U.S. at 322–25. The Supreme Court determined that the Medical Device Amendments' express preemption clause "bars common-law claims challenging the safety and effectiveness of a medical device given premarket approval by the [FDA]." *Id.* at 315. The Court concluded that claims for strict liability, breach of implied warranty, and negligence suggest that "a device was designed, labeled, or manufactured in an unsafe or ineffective manner." *Id.* at 328.

The Supreme Court also concluded that premarket approval devices are subject to "requirements" that are "specific to individual devices." *Id.* at 322–23. Premarket approval was characterized as "[a] federal safety review" in which "the FDA may grant premarket approval only after it determines that a device offers a reasonable assurance of safety and effectiveness." *Id.* at 323 (citing 21 U.S.C. § 360e(d)). Therefore, state law claims premised on tort duties regarding effectiveness are "requirements" that are preempted by the premarket approval process. *Id.* at 323–25.

Here, the FDA documents attached to the defendant's motion to dismiss illustrate that the Titan implant received premarket approval. Several supplemental premarket approval applications were also approved for the Titan implant. *See* Def.'s Mot., Exs. 1, 5–7. Therefore, the federal government has imposed device-specific "requirements" on the Titan implant, and the first prong of the two-part test of express preemption under § 360(k) has been fulfilled. *See Riegel,* 552 U.S. at 322–23.

**\*5** The Court next determines whether Starks's claims based on negligence, strict liability, and breach of warranty are expressly preempted by the Medical Device Amendments. The second prong of express preemption under § 360(k) requires this Court to evaluate whether the state requirements underlying Starks's claims relate to the device's safety and effectiveness and are "different from or in addition to" the federal requirements. *Id.* at 323.

a. *Negligence*

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 183 of 207
PageID: 13200
Starks v. Coloplast Corp., Not Reported in F.Supp.2d (2014)
2014 WL 617130, 82 UCC Rep.Serv.2d 756, Prod.Liab.Rep. (CCH) P 19,330

Starks's claims of negligence regarding the Titan implant are preempted. *Riegel,* 552 U.S. at 320, 325 ("[T]ort law, applied by juries under a negligence or strict-liability standard," such as state tort claims alleging "negligence in the design, testing, inspection, distribution, labeling, marketing, and sale of [a Class III medical device]," is preempted by the Medical Device Amendments); *see also Horn v. Thoratec Corp.,* 376 F.3d 163, 173 (3d Cir.2004) ("[I]t is firmly established that a 'requirement' under § 360k(a) can include legal requirements that arise out of state common-law damages actions.").

Starks's complaint includes two paragraphs that allege a "fail[ure] to comply with state duties equal to, or substantially identical to, federal requirements" and a "fail[ure] to abide by and follow federal regulations such as identifying testing, inspections, adverse effects and other clinical and nonclinical information demonstrating that the inflatable penile implant is safe ." Compl. ¶ 12(l), (m). Starks's "broad references to federal regulations are insufficient to establish the duty element of a negligence state law claim which would parallel a violation of federal law." *Gross,* 858 F.Supp.2d at 494.

#### b. *Strict Liability*

Starks's strict liability claims are also expressly preempted. Strict liability theories based on a device's alleged manufacturing and design defects are state requirements that are preempted by the Medical Device Amendments because of their potential conflict with FDA labeling, design, and manufacturing requirements. *See Bentzley,* 827 F.Supp.2d at 453 (citing *Riegel,* 552 U.S. at 330); *see also Williams,* 388 F. App'x at 171–72.

Furthermore, Starks's strict liability allegations are even more general than his allegations of negligence and do not plead "a violation of FDA regulations." He alleged that Coloplast "manufactured, distributed, assembled ... tested, inspected, sold and placed into the stream of commerce a penile implant which it defectively designed" and "which malfunctioned and was unreasonably dangerous." Compl. ¶¶ 16–17. Starks did not assert that Coloplast has in any way failed to conform to the FDA requirements prescribed by its premarket approval or that Coloplast deviated from or violated any of the FDA's federal statutes or regulations. *See Horn,* 376 F.3d at 179.

#### c. *Breach of Implied Warranty*

Starks alleges one count regarding breach of warranties. *See* Compl. ¶¶ 22–27. There, Starks makes allegations regarding both express and implied warranties. The Court addresses here Starks's allegations regarding the implied warranties of merchantability and fitness for a particular purpose, while Starks's allegations regarding express warranties are addressed in the next section. Starks's allegations regarding implied warranties cite Pennsylvania statutes and include no discussion of any "violation of FDA regulations." *See* Compl. ¶¶ 23, 25–26.

**\*6** Starks's implied warranty claims are preempted by the Medical Device Amendments. Pennsylvania has adopted the Uniform Commercial Code formulations of the implied warranties of merchantability and fitness for a particular purpose. 13 Pa. Cons.Stat. § 2314, 2315. An implied warranty claim is centered on the accepted standards of design and manufacture of products in the state of Pennsylvania. *See Bentzley,* 827 F.Supp.2d at 454 (citing *Davenport v. Medtronic, Inc.,* 302 F.Supp.2d 419, 434 (E.D.Pa.2004)).

"The FDA, ... in its regulations and premarket approval relating to" the Titan implant, "has provided federal requirements relating to the design and manufacture" of the Titan implant. *Id* . Because Starks's allegations relate to standards that are different from, or in addition to, the federal requirements, Starks's implied warranty claims are preempted by the Medical Device Amendments. *See Riegel,* 552 U.S. at 325, 330; *Williams,* 388 F. App'x at 171.

### B. *Breach of Express Warranty*

Starks asserts a cause of action for breach of express warranty, alleging that "Defendant gave Plaintiff express warranties under 13 Pa.CSA § 2313, and assured Plaintiff that the penile implant was in good, working condition, and of good materials." Compl. ¶ 24. Starks makes several allegations regarding the substance of these warranties: the Titan implant "was advertised, marketed, represented and warranted by Defendant to be of superior quality, and to be reliable for five years"; the Titan implant was "dependable," "reliable," and "would provide satisfaction"; "the penile implant would work a minimum of five years"; and "a failed or malfunctioning penile implant would be replaced for a lifetime." *Id.* ¶¶ 5, 27.

Attached to the complaint is a Coloplast brochure entitled "Straight Talk about Erectile Dysfunction Patient Guide," addressed to Dr. Garber. Compl., Ex. A. Circled in that brochure is the statement "Lifetime replacement policy: Coloplast provides a lifetime replacement policy with all of its penile implants. Coloplast will replace the inflatable implant, or any component, for any reason during the lifetime of the patient." *Id.* In Starks's complaint, he references this

Starks v. Coloplast Corp., Not Reported in F.Supp.2d (2014)
2014 WL 617130, 82 UCC Rep.Serv.2d 756, Prod.Liab.Rep. (CCH) P 19,330

exhibit in his breach of contract count but not in his breach of warranties count. In Starks's opposition to the motion to dismiss, however, he does reference Coloplast's "promises and assurances in its own promotional and marketing materials." Pl.'s Opp. at 3.

A claim for breach of an express warranty is not preempted by the Medical Device Amendments. Express warranties do not independently arise by operation of state law, and the parties, not the state, define the obligations of the contract and therefore any express warranties. *See Bentzley,* 827 F.Supp.2d at 454–55.

Under Pennsylvania law, an express warranty arises out of the representations or promises of the seller. 13 Pa. Cons.Stat. § 2313. An express warranty is created by a seller through "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain." *Id.* A promise becomes the basis of the bargain if the plaintiff can prove "that she read, heard, saw or knew of the advertisement containing the affirmation of fact or promise." *Parkinson v. Guidant Corp.,* 315 F.Supp.2d 741, 452 (W.D.Pa.2004) (quoting *Cipollone v. Liggett Grp., Inc.,* 893 F.2d 541, 567 (3d Cir.1990), *rev'd on other grounds,* 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992)). Absent a demonstration that a promise or affirmative statement was made, how or by whom the promise was made, or what was in fact promised, a claim for breach of express warranty is not sufficiently plead. *Gross,* 858 F.Supp.2d at 501–02.

 *7 Starks has failed to allege any affirmation of fact or promise made by Coloplast that relates to the Trident implant that would amount to an express warranty. Additionally, Starks has not plead any details regarding the content of any express warranty, how it was made, that it became the basis of the bargain, or that it was directed to Starks. Therefore, Starks has not set forth the elements of a breach of express warranty cause of action. Starks's failure to support his conclusory statements regarding breach of an express warranty with any factual allegations does not meet the pleading standard set forth in *Twombly.* "Without any indication that an express warranty was made and without providing the content of any alleged warranty, it is impossible to find that an express warranty exists, let alone that a breach occurred." *Gross,* 858 F.Supp.2d at 502; *see also Delaney v. Stryker Orthopaedics,* No. 08–03210, 2009 WL 564243, at *6 (D.N.J. Mar.5, 2009). Therefore, Starks fails to state a claim for breach of express warranty.

The Court will dismiss this claim without prejudice and allow the plaintiff thirty days to file an amended complaint with regard to the breach of express warranty claim.

*C. Breach of Contract*

Pennsylvania law requires that a plaintiff seeking to proceed with a breach of contract action must establish "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages." *Ware v. Rodale Press, Inc.,* 322 F.3d 218, 225 (3d Cir.2003).

Starks alleges that he received a Coloplast implant in 2010 and that "Plaintiff and Defendant had a bargained for contract in which Defendant promised to replace the penile implant throughout Plaintiff's lifetime." Compl. ¶¶ 3, 29. Exhibit A, cited by Starks as containing the contract between Coloplast and himself, appears to the Court to be an excerpt from an advertising brochure addressed to Dr. Garber.

The Court agrees with Coloplast that Starks does not adequately allege the elements of a cause of action for breach of contract. Rather, Starks "mis-labels snippets from an advertising brochure mailed to a third party." Def.'s Reply at 10. The "Straight Talk" document attached at Exhibit A does discuss a lifetime replacement policy, but it is not clear to the Court that the brochure sets forth the terms of any agreement between the parties. For example, the document is not signed or dated. Starks has also not alleged that there was any offer and acceptance between Coloplast and himself. Therefore, Starks fails to state a claim for breach of contract.

The Court will dismiss this claim without prejudice and allow the plaintiff thirty days to file an amended complaint with regard to the breach of contract claim.

*IV. Conclusion*

For the reasons stated above, the Court will grant the defendant's motion to dismiss. The plaintiff's negligence, strict liability, and breach of implied warranty claims are dismissed without prejudice. The plaintiff's breach of express warranty and breach of contract claims are dismissed with prejudice.

 *8 An appropriate Order shall issue.

2014 WL 617130, 82 UCC Rep.Serv.2d 756, Prod.Liab.Rep. (CCH) P 19,330

*ORDER*

AND NOW, this 13th day of February, 2014, upon consideration of Defendant, Coloplast Corp.'s Motion to Dismiss Plaintiff's Complaint Pursuant to Fed.R.Civ.P. 12(b)(6) (Docket No. 5), and the opposition and reply thereto, IT IS HEREBY ORDERED, for the reasons stated in a memorandum of law bearing today's date, that the defendant's motion is GRANTED. This case is dismissed.

The plaintiff's negligence, strict liability, and breach of implied warranty claims are dismissed with prejudice.

The plaintiff's breach of express warranty and breach of contract claims are dismissed without prejudice. The plaintiff may file an amended complaint to re-plead the claims dismissed without prejudice within 30 days of the date of this Order.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 617130, 82 UCC Rep.Serv.2d 756, Prod.Liab.Rep. (CCH) P 19,330

---

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 15

1990 WL 105615
United States District Court, D. Massachusetts.

Ruth D. STUTO, Plaintiff,

v.

CORNING GLASS WORKS, Defendant.

CIV. A. No. 88–1150–WF.
|
July 23, 1990.

*MEMORANDUM AND ORDER*

WOLF, District Judge.

**\*1** Plaintiff Ruth D. Stuto filed this action against defendant Corning Glass Works ("Corning") on May 16, 1988 alleging that defendant's negligence, failure to warn, and breaches of implied and express warranties caused her mental and physical pain and injury as a result of a household accident that occurred on November 16, 1985. Defendant has moved for summary judgment on all counts of the complaint. For the reasons stated below, the motion must be granted. More specifically, plaintiff's claims fail because, among other things, defendant did not expressly warrant that its plate would not break if fallen upon by a grown woman and, in any event, it is undisputed that Stuto knew that this was not true.

I. *FACTS*

The following facts are not in dispute. On the morning of November 16, 1985, Ruth Stuto slipped while walking up the brick stairs in front of her house. Deposition of Ruth Stuto at 55 (August 3, 1988) (hereinafter "Stuto Dep."). At the time, she was carrying a Centura plate, manufactured by Corning, in her left hand. *Id.* at 56. She attempted to break her fall using her left hand, without releasing the plate. She was attempting the keep the plate from breaking by holding on to it. *Id.* at 61. As a result, the weight of her body was on her left hand as she fell, and the plate struck the brick landing beneath her hand. *Id.* at 59–61. The plate shattered and one of the pieces severed a tendon in her hand.

On May 16, 1988, Stuto brought the instant five-count complaint against Corning alleging, *inter alia,* that Corning was negligent in its inspection, marketing, advertising, selling, distribution, and release of the Centura plate, Complaint at ¶ 8, that the Centura plate was distributed in a defective condition, making it unreasonably dangerous to consumers, *id.,* and that Corning failed to warn Stuto that the Centura plate was unreasonably dangerous and defective and likely to cause personal injury, *id.* at ¶ 24. The complaint also alleged that Corning breached the implied warranties of merchantability and fitness for use, *id.* at ¶¶ 11–12, the implied warranty of fitness for a particular purpose, *id.* at ¶¶ 16–17, and an express warranty that the plate was safe, of merchantable quality and unbreakable, *id.* at ¶¶ 20–21. Stuto demanded a jury trial and relief in the amount of $175,000.

Stuto does not allege that the particular plate which caused her injury was defectively manufactured, nor does the record contain any such evidence. Rather, Stuto bases her claim primarily on an advertising campaign undertaken by Corning in which Centura plates are portrayed, in part, as "unbreakable." Ten such advertisements are included as Exhibits A–1 through A–10 to Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment (hereinafter "Pl.Mem."). *See* Responses of Defendant Corning Glass Works to Plaintiff's First Set of Interrogatories (hereinafter "Interrog.") at Answer 8. All of the advertisements include some assurance that the plates, whose production was discontinued in 1977, were guaranteed against breakage or were free from "breakage worry." Pl.Mem. at Ex. A–1–A–10; Interrog. at Ans. 6, 8. All but one of the publications noted that the plates would be replaced for free if they broke, chipped or cracked within three years of purchase. Five of the promotions contained this guarantee in the main text of the advertisement while four included it in a smaller type footnote. The tenth advertisement merely stated, "Every piece carries a breakage guarantee." Two of the advertisements contained photographs of Centura plates falling to a carpeted floor without breaking.

**\*2** Stuto received her Centura plates from her mother, who in turn got them from her aunt. Stuto Dep. at 40–41. She does not recall seeing the Use and Care pamphlet which Corning alleges came with every set. *Id.* at 43, 52–53; Interrog. at Ans. 7. Stuto cannot recall having ever seen or heard advertisements for the Centura line prior to this litigation. Stuto Dep. at 43–44, 51–52. Nor could she identify at her deposition any advertisements which represent the glassware as unbreakable. *Id.* She has a general belief that Corning is known for unbreakable products, which she formed from the knowledge that broken plates would be replaced by the company. *Id.* at 44–45. She also remembers being told by her aunt that the Centura plates were unbreakable and would be replaced if broken. *Id.* at 49.

Stuto recalls that her mother or her aunt had broken and replaced plates from the Centura set on at least two occasions prior to her accident. *Id.* at 45–47. She does not recall how those plates broke. *Id.* at 47.

## II. *DISCUSSION*

### A. Summary Judgment Standard

The court's discretion to grant summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure, which provides that the court may grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In addition, "the court must look at the record in the light most favorable to the party opposing the motion and must indulge all inferences favorable to that party." *Stepanischen v. Merchants Despatch Trans. Corp.,* 722 F.2d 922, 928 (1st Cir.1983).

However, to survive a summary judgment challenge on the basis of disputed material facts, the plaintiff must produce substantial evidence, going beyond the allegations of the complaint and supporting the claimed dispute, which would require a judge or jury to resolve the conflicting versions of the truth at trial. *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975), *cert. denied,* 425 U.S. 904 (1976). *See also Anderson v. Liberty Lobby,* 477 U.S. 242, 247–48 (1986); *Matsushita Electrical Industrial Co. v. Zenith Radio,* 475 U.S. 574, 586 (1986) (opponent must "do more than simply show that there is some metaphysical doubt as to the material facts").

In deciding motions for summary judgment, the court must make two inquiries: (1) whether the factual disputes are genuine, and (2) whether any fact genuinely in dispute is material. *Anderson,* 477 U.S. at 248. "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* To determine if the dispute about a material fact is "genuine," the court must decide whether "the evidence is such that a reasonable [fact-finder] could return a verdict for the nonmoving party." *Id.* The party opposing the motion must "provide the court with 'some indication that he can produce the requisite quantum

of evidence to enable him to reach the jury with his claim.' " *Arsenault v. Allegheny Airlines,* 485 F.Supp. 1373, 1378 (D.Mass.1980) (quoting *Hahn,* 523 F.2d at 468).

**\*3** B. Application of the Standard to This Case

1. *Breach of Implied Warranties and Negligence*

Plaintiff's claims of breach of implied warranties and manufacture of an unreasonably dangerous product fail as a matter of law and fact. [1]

First, the implied warranty of fitness for a particular purpose is not applicable to the Centura plate. This warranty "envisages a specific use by the buyer which is peculiar to the nature of his business whereas the ordinary purposes for which goods are used are those envisaged in the concept of merchantability and go to uses which are customarily made of the goods in question." Official Comment 2 to M.G.L. c. 106 § 2–315 (quoted in *Fernandes v. Union Bookbinding Co.,* 400 Mass. 27, 35 (1987)). The warranty only applies when the seller has reason to know that the buyer will put the goods to a particular unusual use and is relying on the seller's skill to provide suitable wares. *Fernandes,* 400 Mass. at 33. In this case, there is no evidence or allegation that plaintiff intended to put the Centura plate to any but its customary uses or that defendant would have had reason to know of such special uses had they existed. *See Hannon v. Original Gunite Aquatech Pools, Inc.,* 385 Mass. 813, 821 (1982) (no breach of warranty of fitness for particular purpose where plaintiff did not suggest that he would employ swimming pool for any noncustomary uses). Therefore, summary judgment for defendant is appropriate on plaintiff's claim of a breach of warranty of fitness for a particular purpose.

Second, a trier of fact could not reasonably find that defendant breached its implied warranties of fitness for use and merchantability in this case. The opinion of the Court of Appeals for the First Circuit in *Venezia v. Miller Brewing Co.,* 626 F.2d 188 (1st Cir.1980), is dispositive on this point. In *Venezia,* the court affirmed a grant of summary judgment to a brewing company and three bottle manufacturers on plaintiff's negligence and breach of warranty claims, holding as a matter of law that the companies were not liable for injuries sustained by an eight year-old who threw an empty beer bottle against a telephone pole. The court, after surveying applicable Massachusetts law, concluded that the implied warranties only extended to the bottle's ordinary purposes, which did

1990 WL 105615, Prod.Liab.Rep. (CCH) P 12,585

not include forceful impact against stationary objects. As the Court of Appeals said in *Venezia:*

We think it would be stretching too far to believe that the Massachusetts courts are presently prepared to expand their definition of "ordinary purposes" to include the deliberate misuse of an otherwise reasonably safe container in a manner totally unrelated to any normal or intended use of that item.

626 F.2d at 190.

Similarly, the forceful, if accidental, impact of an ordinary glass plate with a brick stoop cannot be deemed a normal or intended use of defendant's Centura product. Plaintiff argues that the accidental dropping of plates is a foreseeable event in the course of their use and that defendant therefore has a duty to render them "crashworthy." The *Venezia* court, however, recognized and rejected this contention, limiting the doctrine of crashworthiness to products whose ability to withstand collision is necessitated by the exigencies of their intended use. 626 F.2d at 190. This court agrees, finding that snowmobiles, *Smith v. Ariens Co.,* 375 Mass. 620 (1978), and mobile homes, *Back,* 375 Mass. at 633, may be unreasonably dangerous if not sufficiently crashworthy, but that glass plates do not fall into the same category. The court also observes that even if being dropped is incidental to the normal and expected use of glassware, being fallen upon is not.

**\*4**  The court also finds *Vincent v. Nicholas E. Tsiknas Co.,* 337 Mass. 726 (1958), persuasive concerning the implied warranty of fitness for use. In that case, the Massachusetts Supreme Judicial Court upheld denial of plaintiff's motion for judgment where she was injured when prying the cap off a glass jar with a pointed can opener. In ruling that no breach of implied warranty occurred when the container shattered under the pressure of the opener, the court noted, "The propensity of glass to break under pressure is common knowledge." *Id.* at 729.

For the same reasons, the court concludes that plaintiff's claim that defendant negligently tested, designed, manufactured and sold an unreasonably dangerous product fails. *See Venezia,* 626 F.2d at 191. In Massachusetts, no finding of negligent design or manufacture is possible unless an implied warranty has been breached. *Hayes v. Ariens Co.,* 391 Mass. 407, 413 (1984). As stated above, no reasonable consumer could expect that a glass plate would not shatter beneath the weight of a grown adult, and that the plate was therefore unmerchantable or unfit for its ordinary and intended uses.

Therefore, no question for the trier of fact exists. *Cf. Tibbetts v. Ford Motor Co.,* 4 Mass.App.Ct. 738, 741 (1976) (no jury question on negligent failure to test and inspect where inner surface of automobile wheel cover contained burrs which injured plaintiff's hand). The statement of the court in *Killeen v. Harmon Grain Products, Inc.,* 11 Mass.App.Ct. 20 (1980), is instructive:

Toothpicks, like pencils, pins, needles, knives, razor blades, tools of many kinds, *bottles and other objects made of glass,* present obvious dangers to users, but they are not unreasonably dangerous, in part because the very obviousness of the danger puts the user on notice. It is part of normal upbringing that one learns in childhood to cope with the dangers posed by such useful everyday items. It is foreseeable that some will be careless in using such items and will be injured, but the policy of our law in such cases is not to shift the loss from the careless user to a blameless manufacturer or supplier.

*Id.* at 23 (emphasis added). Therefore, summary judgment for defendant is warranted on all of plaintiff's breach of implied warranty and unreasonable dangerousness claims.

2. *Failure to Warn*

The court also concludes that summary judgment is required on plaintiff's failure to warn claim. In Massachusetts, there is no duty to warn unless "the person on whom [the] duty rests has some reason to suppose a warning is needed." *Carney v. Bereault,* 348 Mass. 502, 506 (1965) (quoted in *Killeen,* 11 Mass.App.Ct. at 24). Where the existence and scope of a hazard are obvious to nearly all, no warning is required. *Killeen,* 11 Mass.App.Ct. at 24. "[A]s to such dangers, if a warning to the consumer is needed, it will almost certainly do no good." *Id.* In the present case, where the dangers of subjecting glassware to crushing blows is obvious and where plaintiff in fact knew that the plates did break, no warning was necessary as a matter of law.

**\*5**  Alternatively, defendant's failure to warn of the inherent hazards of its product cannot support liability in this case, because plaintiff was aware that the plates could and did break. Where the injured party knows of the dangers before the accident, the absence of a required warning cannot be held a cause of injury. *Laaperi v. Sears, Roebuck & Co.,* 787 F.2d 726, 732 (1st Cir.1986) (applying Massachusetts law); *Plante v. Hobart Corp.,* 771 F.2d 617, 621 (1st Cir.1985).

1990 WL 105615, Prod.Liab.Rep. (CCH) P 12,585

3. *Breach of Express Warranty*

Superficially, Stuto's most compelling claim relates to her allegation that Corning guaranteed its Centura plates to be unbreakable. Analysis indicates, however, that Corning is entitled to summary judgment on this claim too.

In Massachusetts, the creation of express warranties is governed by *M.G.L. c. 106 § 2–313*, which provides in relevant part:

(1) Express warranties by the seller are created as follows:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

Express warranties can be created by statements in advertising literature, although not all such representations constitute express warranties. *Hannon, 385 Mass. at 822–23.* In the present case, a genuine disputed issue of fact exists as to whether defendant's advertising created an express warranty concerning the glassware's indestructibility. However, the court concludes that this issue is not material, because, even assuming creation of an express warranty, no genuine disputes exist concerning plaintiff's lack of reliance on the warranty, plaintiff's actual knowledge of the falsity of the warranty, and the express limitations on the warranty which were included in defendant's advertising.

In many states, reliance by the buyer is a necessary element for the creation of an express warranty. This element is derived from the U.C.C. requirement that for affirmations to comprise a warranty, they must become "part of the basis of the bargain." *See, e.g., Royal Typewriter Co. v. Xerographic Supplies, 719 F.2d 1092, 1101 (11th Cir.1983); Overstreet v. Norden Laboratories, Inc., 669 F.2d 1286, 1291 (6th Cir.1982); Royal Business Machines v. Lorraine Corp., 633 F.2d 34, 44 (7th Cir.1980).* Although no Massachusetts court has ruled explicitly on this issue, this court believes that some minimum of reliance is a required element of a breach of express warranty claim in this state. The Massachusetts Code Comments to *M.G.L. c. 106 § 2–313* state that the "part of the basis of the bargain" language "is much like, although not the equivalent of, the concept of "reliance" in section 12 of the Uniform Sales Act." *M.G.L. c. 106 § 2–313 at 249 (1958).* In addition, *Hannon, 385 Mass. at 822, Jacquot v. Wm. Filene's Sons Co., 337 Mass. 312, 314 (1958),* and *Roth v. Ray–Stel's Hair Stylists, Inc., 18 Mass.App.Ct. 975, 976 (1984),* three of the leading Massachusetts cases on express warranties, all note that the buyer relied on the seller's representations in discussing the existence of an express warranty.

**\*6** In the present case, the record clearly demonstrates that plaintiff could not have relied on the express warranty that she now claims defendant's advertisements created. She cannot recall having ever seen or heard advertisements for the Centura line prior to the litigation, nor can she now identify any such promotions which warrant the glassware as unbreakable. In fact, Stuto did not buy the plates herself, but received them as a gift from her mother, who in turn got them from her aunt. Plaintiff's alleged reliance on the public knowledge of the general unbreakability of defendant's products is insufficient to create an express warranty, as it reflects, at most, a mere affirmation of the value of defendant's goods by individuals not even related to defendant. *M.G.L. c. 106 § 2–313(2).*

The court finds the case of *DiIenno v. Libbey Glass Div., Owens–Illinois, Inc., 668 F.Supp. 373 (D.Del.1987),* instructive on this point. In that case, plaintiff cut her wrist when a jar manufactured by defendant shattered as she attempted to secure its lid. Plaintiff claimed that defendant had breached the express warranty, contained in its catalog, that the jar would open and close properly. *Id.* at 376. The court granted summary judgment for defendant on lack of reliance grounds, because the evidence showed that plaintiff had never seen defendant's catalog, let alone relied on it, but instead had obtained the jar when buying candy at a local store. *Id.*

In addition, the operation of any express warranty in this case is also negated by Stuto's knowledge that the seller's affirmations or promises were not true. *See, e.g., Royal Typewriter Co., 719 F.2d at 1101.* At best, such cognition precludes the affirmations from becoming part of the basis of

Stuto v. Corning Glass Works, Not Reported in F.Supp. (1990)
1990 WL 105615, Prod.Liab.Rep. (CCH) P 12,585

the bargain, unless the plaintiff can affirmatively demonstrate reliance despite her contrary insight. *Cipollone v. Liggett Group, Inc.,* 893 F.2d 541, 568 n. 31 (3rd Cir.1990).[2] In the present case, plaintiff has made no such showing. Rather, she has testified that she knew at least two other dishes from the same Centura set had broken prior to her accident, although she did not know the circumstances of their destruction. She also testified that she was attempting to keep the plate from breaking by holding on to it as she fell. This specific awareness of the plate's fragility negates the operation of any express warranty of indestructibility which defendant's advertisements may have created.

Finally, the language of the advertisements themselves is sufficient to defeat plaintiff's express warranty claim. "[E]xpress warranties must be construed in a manner consistent with language purporting to negate or limit warranties." *Gilbert & Bennett Mfg. Co. v. Westinghouse Elec. Corp.,* 445 F.Supp. 537, 546 (D.Mass.1977) (applying Massachusetts law). Thus, for example, the Supreme Judicial Court held in *Jacquot* that an "express warranty that the use of the product would "enhance" Mrs. Jacquot's hands, when taken with the instructions against its continued use by persons with allergies, would not support a finding that the express warranty meant more, or had a wider scope, than the statutory implied warranty" of fitness for use. 337 Mass. at 315.

*7 In the instant case, all but one of defendant's advertisements contained language which limited or clarified any alleged express warranty. Either in footnotes or in the main text, nine of the ten publications stated that defendant would replace any plates that broke, chipped or cracked within three years of purchase. This language implicitly rules out any assertion of indestructibility. Rather, it recognizes some risk of breakage and insures against that risk by promising replacement. The guarantee thus given limits by its own terms its scope and its remedy for breach to replacement of the broken plate, not to coverage of all consequential or incidental damages accruing from breakage of the product. Even the two advertisements which show plates being dropped without breaking portray the glassware striking a carpeted floor, not being crushed upon a brick stoop. The one advertisement which does not specifically state the terms of the three year guarantee merely reports, "Every piece carries a breakage guarantee." Pl.Mem. at Ex. A–1. This is insufficient to establish the broad, unqualified express warranty under which plaintiff seeks to recover.

In short, this is not a case where defendant's advertisements created a guarantee whose meaning or scope could have been misunderstood by a reasonable consumer. *Cf. Drayton v. Jiffee Chemical Corp.,* 591 F.2d 352, 358–59 (6th Cir.1978) (express warranty found where liquid drain cleaner advertised as "safe" and the danger of burns was not "commonly apparent" to users). The courts and this plaintiff have both acknowledged that glass will break when forcefully struck. Defendant's advertisements are insufficient to alter this understanding. In any event, any impression reasonably conveyed by defendant's advertisements were not relied upon by plaintiff and did not in any way contribute to her injury. Therefore, summary judgment is appropriate for defendant on this claim.

III. *ORDER*

Because plaintiff has failed to offer sufficient evidence to demonstrate that a genuine issue of material fact exists on her breach of express and implied warranties, negligence and strict liability claims, defendant's motion for summary judgment on all counts of plaintiff's complaint is hereby ALLOWED.

[1]    In Massachusetts, claims of unreasonable dangerousness are subsumed under the implied warranty of merchantability, rather than under a separate strict liability tort regime. *See Back v. Wickes Corp.,* 375 Mass. 633, 639 (1978).

[2]    The Court of Appeals for the Third Circuit undertook a careful analysis of the "basis of the bargain" language of U.C.C. § 2–313 in *Cipollone,* concluding that a three part analysis is appropriate in cases of express warranties created by public advertisements. 893 F.2d at 563–69. Under this approach, the plaintiff "effectuates the "basis of the bargain" requirement ... by proving that she read, heard, saw or knew of the advertisement containing the affirmation of fact or promise." *Id.* at 567. Once this is accomplished, "the statements are presumed to be part of the "basis of the bargain" unless the defendant, by "clear affirmative proof," shows that the buyer knew that the affirmation of fact or promise was untrue." *Id.* at 568. However, even if a defendant demonstrates disbelief, the plaintiff may still preserve the express warranty by proving that she nonetheless relied on the affirmations. *Id.* at 568 n. 31.

In this case, plaintiff has demonstrated neither awareness of the advertisements nor reliance on them, while defendant has provided clear and uncontroverted evidence that plaintiff knew the asserted warranty to be false. Thus, even under the more lenient standard set forth in *Cipollone,* plaintiff's claim fails as a matter of law. For this reason, this court need not decide whether the application of § 2–313 in Massachusetts

is governed by the *Cipollone* standard or by the more traditional rule of reliance, analyzed in the main text, which provides simply that knowledge of falsity defeats a claim for violation of an express warranty.

**All Citations**

Not Reported in F.Supp., 1990 WL 105615, Prod.Liab.Rep. (CCH) P 12,585

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 16

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 194 of 207
PageID: 13211

In re Trasylol Products Liability Litigation, Not Reported in F.Supp.2d (2010)
2010 WL 5140439

2010 WL 5140439
Only the Westlaw citation is currently available.
United States District Court,
S.D. Florida.

In re TRASYLOL PRODUCTS
LIABILITY LITIGATION—MDL–1928.
This Document Relates To: Summerlin V.
Bayer Corporation, et al., Case No. 08–80903.

No. 08–MD–01928.
|
Feb. 16, 2010.

*ORDER GRANTING MOTION
FOR SUMMARY JUDGMENT*

DONALD M. MIDDLEBROOKS, District Judge.

**\*1** THIS CAUSE comes before the Court upon Defendants' (hereinafter, collectively, "Bayer's") Motion for Summary Judgment ("Motion") (DE 2815), filed on November 25, 2009. Plaintiff filed a Response (DE 3143), to which Bayer replied (DE 3149). A hearing on the Motion was held before this Court on February 10, 2010. The Court has reviewed the pertinent parts of the record and is advised in the premises. For the reasons stated below, Bayer's Motion shall be granted as to all Counts.

**I. Background**

**A. Plaintiff's First Amended Complaint (DE 3143–1)**
Frances Summerlin underwent Coronary Artery Bypass Graft ("CABG") surgery in Alabama on March 16, 2006. (DE 3143 at 3.) She was administered Trasylol, a drug intended to decrease perioperative blood loss and the need for blood transfusion in patients undergoing cardiopulmonary bypass in the course of CABG surgery. Frances Summerlin began experiencing medical complications soon after her open heart surgery, including renal failure. She died on March 26, 2006. On April 24, 2008, Plaintiff Melvin E. Summerlin, Executor of the Estate of Frances Summerlin, became aware that his wife received Trasylol during her surgery. (DE 3143 at 3.) Plaintiff filed this action against Bayer, based on the sale and marketing of the drug Trasylol, on May 12, 2008, in the Southern District of Alabama. The case was transferred to this MDL on August 15, 2008.

The following facts were alleged in Plaintiff's First Amended Complaint. On January 26, 2006, the New England Journal of Medicine published an article by Dr. Mangano reporting an association of Trasylol with, among other things, serious renal toxicity. (DE 3143–1 at ¶ 19.) Within two weeks of the publication of Dr. Mangano's research, high-level managers at Bayer contacted Dr. Walker to conduct a study to determine whether Trasylol was as safe as its alternatives. (DE 3143–1 at ¶ 22.) This became known as the "i3 Study." (DE 3143–1 at ¶ 22.) Meanwhile, the FDA stated that it would hold an advisory meeting on Trasylol. (DE 3143–1 at ¶ 23.) In July 2006, members of Bayer's upper management met with FDA officials; no one informed the FDA officials of the i3 Study at that meeting. (DE3143–1 at ¶ 31.) The FDA Advisory Committee met on September 21, 2006 to discuss its findings regarding the safety of Trasylol and determine whether the warning on Trasylol needed to be changed. (DE 3143–1 at ¶ 41.) No one from Bayer mentioned the i3 Study or the preliminary report of the i3 Study's findings that Bayer received on or before September 14, 2006. (DE3143–1 at ¶ 41 .) After reviewing what it considered to be all of the available data on the safety of Trasylol, the 19–member advisory panel recommended to the FDA that Bayer did not need to strengthen a warning to doctors about the drug. (DE 3143–1 at ¶ 42.) On or about September 26, 2006, Dr. Walker told Bayer that the preliminary report had implications for public health and insisted that it be given to the FDA. (DE 3143–1 at ¶ 43.) Bayer disclosed the preliminary report to the FDA on September 27, 2006. (DE 3143–1 at ¶ 44.) In December 2006, Bayer revised the WARNING section of the label for Trasylol to include a specific statement that use of Trasylol creates an increased risk of renal dysfunction and renal failure. (DE 3143–1 at ¶ 46.) Bayer suspended worldwide marketing of Trasylol on November 5, 2007. (DE 3143–1 at ¶ 48.)

**\*2** Plaintiff's First Amended Complaint includes the following counts: (I) wrongful death on theory of negligence/wantonness; (II) wrongful death on theory of product liability under Alabama's Extended Manufacturer's Liability Doctrine (AEMLD); (III) breach of express and implied warranties; and (IV) fraudulent concealment/estoppel. (DE 3143–1 at ¶¶ 53–80.)

In Count I, Plaintiff alleges that Bayer acted "negligently and/or wantonly" in "designing, testing, manufacturing, licensing, packaging, promoting, advertising, selling and/or distributing Trasylol," in warning of the risks of Trasylol

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works. 1

Case 1:19-md-02875-RBM-SAK    Document 598-4    Filed 10/16/20    Page 195 of 207
PageID: 13212
In re Trasylol Products Liability Litigation, Not Reported in F.Supp.2d (2010)
2010 WL 5140439

use, and of conducting pre-clinical testing and post-marketing surveillance of Trasylol, and that Plaintiff's intestate died as a result. (DE 3143–1 at ¶¶ 53–59.)

In Count II, Plaintiff alleges that Trasylol "is defective in design and failure to warn" and that the defects "were a direct and proximate cause of the death of Frances Summerlin." (DE 3143–1 at ¶¶ 60–69.)

In Count III, Plaintiff alleges that Bayer, through its advertising and promotional materials, "expressly and impliedly warranted that Trasylol was safe for the use for which it were intended"; that Bayer "breached these express and implied warranties because Trasylol was unsafe in light of the risk of life-threatening side effects associated with its use"; and that "Frances Summerlin relied to her detriment" on the alleged warranties and died as a result of the alleged breach. (DE 3143–1 at ¶¶ 70–75.)

In Count IV, Plaintiff alleges that Bayer "suppressed and/or concealed" its knowledge "of [the] hazards [of Trasylol use] and the risks associated with administering Trasylol to the public, including the Plaintiff." (DE 3143–1 at ¶ 79.) Specifically, Plaintiff alleges that Bayer misrepresented and suppressed the findings from its own study that supported Dr. Mangano's findings that Trasylol increased a patient's risk of kidney failure, kidney damage, stroke and/or death. (DE 3143–1 at ¶ 79.) As a result of that alleged concealment, Plaintiff has suffered harm. (DE 3143–1 at ¶ 80.) It should be noted that Count IV is not brought on behalf of the decedent, but is a claim for fraud on Plaintiff himself.

Furthermore, because Bayer has fraudulently concealed or suppressed information regarding the dangers or risks of Trasylol, Plaintiff argues that "[t]he Court should hold that the applicable statute of limitations was tolled for the duration of the concealment" and find that Bayer is "estopped from asserting any statute of limitations as a defense to this action." (DE 3143–1 at ¶ 80.)

**B. Bayer's Motion for Summary Judgment (DE 2815)**
Bayer moves for summary judgment on all of Plaintiff's claims. Bayer argues that Plaintiff cannot sustain his wrongful death claims because they were not brought within two years after the death, as required by the Alabama Wrongful Death Act, which has no discovery rule or equitable tolling. [1] (DE 2815 at 1.) Bayer argues that Plaintiff's breach of warranty claims fail as a matter of law because Alabama does not

recognize a general implied warranty of product safety, and Plaintiff does not allege and cannot prove that an express warranty was made to him by any defendant. (DE 2815 at 1.) Bayer asserts that Plaintiff's fraud claim fails because there is no evidence that would allow a jury to conclude that either he or the decedent relied on a statement made by any defendant in electing to undergo heart surgery. (DE 2815 at 1.)

[1] According to Bayer, Alabama substantive law governs in this diversity case. (DE 2815 at 4.) The Court agrees, and Plaintiff does not argue for the application of another state's laws.

**\*3** More specifically, Bayer argues that Counts I (wrongful death on theory of negligence) and II (wrongful death on theory of product liability), brought pursuant to the Alabama Wrongful Death Act, ALA.CODE § 6–5–410, are time-barred. [2] (DE 2815 at 4.) Under that Act, wrongful death claims must be commenced within two years from and after the death of the testator or intestate; Plaintiff filed his claims two years and two months after the death of the decedent. (DE 2815 at 4.) Bayer argues that this is a firm limitation, not subject to any equitable extension or tolling. (DE 2815 at 5.) The time limitation is a part of the substantive cause of action, which expires after two years of the death of the decedent. (DE 2815 at 5.) According to Bayer, Plaintiff's claims accrued on March 26, 2006, when Frances Summerlin died. Because Plaintiff did not file suit until May 12, 2008, his wrongful death claims are time-barred pursuant to ALA.CODE § 6–5–410(d).

[2] According to Bayer, the Alabama Wrongful Death Act is the only vehicle by which these claims could be brought because under Alabama law, tort claims that were not filed before the death of a decedent do not survive in favor of the estate or personal representative. (DE 2815 at 4.)

In regards to Count III as it relates to breach of implied warranty, Bayer argues that under Alabama law, the implied warranty of merchantability "is one of commercial fitness and suitability, and a private right of action is afforded only where the user or consumer is injured by the breach of that warranty." (DE 2815 at 6 .) According to Bayer, Alabama law provides no general implied warranty cause of action for alleged injuries from a pharmaceutical product. (DE 2815 at 6.) According to Bayer, Plaintiff claims that Frances Summerlin was injured because Trasylol was unreasonably dangerous, not because Trasylol was unsuitable or commercially unfit. (DE 2815 at 7.) Therefore, Bayer

2010 WL 5140439

argues that Plaintiff does not have a viable cause of action under Alabama law for breach of the implied warranty of merchantability. (DE 2815 at 7.)

In regards to Count III as it relates to breach of express warranty, Bayer argues that Plaintiff cannot establish the existence of an express warranty relating to Trasylol. (DE 2815 at 7.) According to Bayer, under Alabama law, an express warranty is defined as an "afffirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain," or a "description of the goods which is made part of the basis of the bargain." ALA.CODE § 7–2–313(1). Bayer asserts that there is no evidence of any "affirmation," "promise," or "description" made to Plaintiff by Bayer in relation to Trasylol, nor any evidence that any affirmation, etc., by Bayer formed "the basis of the bargain" for the use of Trasylol in Frances Summerlin's surgery. (DE 2815 at 7–8.)

Finally, in regards to Count IV, Bayer argues that Plaintiff cannot establish the elements of fraudulent concealment under Alabama law. [3] (DE 2815 at 9.) According to Bayer, Plaintiff's fraudulent concealment claim fails because there is no evidence that Plaintiff acted in reliance on a concealment or suppression by Bayer. (DE 2815 at 10.)

[3]  According to Bayer, to sustain a claim for fraudulent concealment under Alabama law, ALA.CODE § 6–5–102, a plaintiff must produce substantial evidence establishing: (1) a duty on the part of the defendant to disclose; (2) the defendant's suppression of material facts; (3) the defendant's knowledge of the facts and their materiality; (4) action by the plaintiff in reliance on the suppression; and (5) damages resulting from the reliance action. (DE 2815 at 9–10.)

*4  Indeed, the evidence shows to the contrary. First, as noted above, plaintiff did not know until long after the decedent's surgery that Trasylol had been used in the surgery. As a result, he could not have taken action in connection with his wife's surgery in reliance on representations or omissions concerning Trasylol. Second, the only instance of purported concealment that plaintiff alleges—the failure to disclose preliminary results from the observational study conducted by i3 Drug Safety—did not occur until September 2006, six months after the decedent's surgery and death. To support a claim for fraudulent concealment, plaintiff must establish concealment of

'an existing, material fact.' The facts surrounding the preliminary results of the i3 study did not exist at the time of Mrs. Summerlin's surgery and cannot support the fraudulent concealment claim.
(DE 2815 at 10 (internal citations omitted).)

Bayer notes that Count IV purports to state a claim for fraud on Plaintiff himself because tort claims that were not filed before the decedent's death do not survive under Alabama law, ALA.CODE § 6–5–462. (DE 2815 at 9.) Therefore, the claim for fraudulent concealment can not be brought on behalf of Frances Summerlin, the decedent. (DE 2815 at 9.)

### C. Plaintiff's Response to Bayer's Motion for Summary Judgment (DE 3143)

In a "Counterstatement of Facts," Plaintiff mentions the following. Prior to her heart surgery, Frances Summerlin discussed the risks and benefits of her surgery with her surgeon, Dr. Ronson. (DE 3143 at 2.) Plaintiff testified that he was involved in all of his wife's medical care and decision-making and discussed the risks and benefits with his wife after discussing the same with Dr. Ronson. (DE 3143 at 2.) Plaintiff and Plaintiff's decedent relied upon the information provided to them by Dr. Ronson to make an informed decision regarding the surgery. (DE 3143 at 2.)

Dr. Ronson testified that he selects medications to be utilized during surgery where the benefits of the medications outweigh the risks known to be associated with them. (DE 3143 at 3.) He further testified that he learns of the risks associated with a particular drug from the package insert for the medication as well as conferences. (DE 3143 at 3.) Dr. Ronson testified that after reading publications disclosing significant risks associated with Trasylol, which were published after Plaintiff's decedent's surgery, he ceased using the drug. (DE 3143 at 3.)

According to Plaintiff, Bayer's argument that Plaintiff can not rely on Bayer's concealment of the i3 Study in support of his fraud claim belies the fact that such concealment is just "one in a long and tragic series of events where Bayer affirmatively withheld pertinent data critical of its drug Trasylol." (DE 3143 at 4.) Plaintiff sets out a "few examples of Bayer's efforts to conceal the dangers of Trasylol dating back to the turn of the century." (DE 3143 at 4.)

*5  In regards to Counts I and II, Plaintiff argues that his wrongful death claims are not barred by the limitations period for bringing these claims because: 1) the limitations period is extended by Bayer's fraudulent concealment and suppression,

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 197 of 207
PageID: 13214
In re Trasylol Products Liability Litigation, Not Reported in F.Supp.2d (2010)

2010 WL 5140439

and 2) a factual question exists as to whether Bayer is estopped from asserting a limitations defense. (DE 3143 at 12.) According to Plaintiff, Bayer's argument regarding the limitations period under Alabama's Wrongful Death Act is absurd: it would be unjust to relieve Bayer from liability for causing death by defrauding the public regarding the dangers of Trasylol for a sufficient period of time beyond the limitations period. (DE 3143 at 12, 16.)

> While the Defendants cite several cases on the time period by which a wrongful death action should be filed under Alabama law, none of the cases cited by Bayer give any guidance or indicia of how an Alabama Court may reconcile the concern that a drug company, whose product caused death, may be rewarded by concealing material information concerning the drug for a sufficient period of time, in an attempt to bar an otherwise meritorious wrongful death claim. However, an examination of cases in Alabama certainly suggests that Alabama has not created an absolute bar to a wrongful death claim sufficient for summary judgment, where the Defendants' fraudulent conduct prevented the identification of that cause of action.

(DE 3143 at 13.) Plaintiff argues that this is a case where the Alabama Supreme Court would not determine that, under an appropriate pleading, a claim of fraudulent concealment would not affect the two year limitations period for claims of wrongful death under § 6–5–410(d). (DE 3143 at 15.)

In addition to arguing what the Alabama Supreme Court *would* determine, Plaintiff cites to the decisions of other states that have analyzed wrongful death statutes similar to that of Alabama. (DE 3143 at 15–18.) While the Minnesota Supreme Court held that the limitations period should not be tolled under a discovery rule, it extended it as a result of the defendants' fraudulent concealment of facts underlying the cause of action. (DE 3143 at 15–16.) Similarly, while the North Dakota Supreme Court held that the state's wrongful death statute did not have a discovery rule attached to it, a

defendant's fraudulent concealment of information regarding the claim would extend the limitations period and estop a defendant from asserting the affirmative defense of statute of limitations. (DE 3143 at 17.)

Finally, Plaintiff argues that Alabama has recognized that estoppel would bar a defendant who has acted fraudulently from relying upon the statute of limitations as a defense. (DE 3143 at 19.) "In applying estoppel as a bar to the affirmative defense of statute of limitations, the issue of whether or not there is sufficient evidence to present a jury question on estoppel is based upon a 'scintilla of evidence' standard." (DE3143 at 19.) Plaintiff argues that the issue of estoppel should be presented as a jury question. (DE 3143 at 20.)

**\*6** In regards to Count III, Plaintiff responds that the issue of whether or not any implied or express warranties were breached is a question of fact for the jury, precluding summary judgment on these claims. (DE 3143 at 20, 22.) "Trayslol contained insufficient warnings regarding the risks of its use.... As a result of these risks ... Trasylol was not fit for its intended purpose. The significant risk and danger of Trasylol, in fact, made i[t] unfit for the purpose for which it was used." (DE 3143 at 21.)

Finally, Plaintiff responds to Bayer's argument that Plaintiff cannot meet the element of reliance in establishing a fraudulent concealment claim (Count IV).

> Plaintiff and his decedent, to their detriment, relied upon the truthful information provided to them by Dr. Ronson regarding the risks of her surgery. Plaintiff and his decedent reasonably relied upon the rislc/ benefit analysis provided by Dr. Ronson based upon the truth of the information available to him.... [I]t is abundantly clear that Dr. Ronson relied upon the information provided to him as a physician regarding Trasylol.... Mrs. Summerlin and Dr. Ronson relied upon the truth of the information Bayer decided to make available at the time.... Bayer fraudulently concealed studies and information from physicians, patients

and the general public.... [S]uch information was clearly concealed from Dr. Ronson who after obtaining the suppressed information, ceased utilization of the drug during his heart surgeries. To Plaintiff's detriment, such information was concealed and/ or suppressed at the time of Mrs. Summerlin's surgery on March 16, 2006.

(DE 3143 at 24–26.) Plaintiff argues that under Alabama law, as conceded by Bayer, it is not necessary to prove that a misrepresentation was made directly to the person who claims to have been injured. (DE 3143 at 26.) Plaintiff states that his and the decedent's reliance on the misinformation is a question for the jury and thus precludes summary judgment. (DE 3143 at 27.)

**D. Bayer's Reply in Support of Motion for Summary Judgment (DE 3149)**

In regards to Counts I and II, Bayer states that Plaintiff fails to rebut its showing that the two-year limitations period for wrongful death claims under Alabama law is not subject to any provision intended to suspend the running of a limitations period. (DE 3149 at 2.) Bayer argues that this Court is bound to apply existing Alabama law and can not make a ruling that is grounded in speculation that the Alabama Supreme Court *may* change the law in the future to allow wrongful death claims to be tolled by evidence of fraudulent concealment. (DE 3149 at 2.) According to Bayer, decisions from other states, applying other states' statutes of limitations, are irrelevant to this Case because they do not involve Alabama law, and Plaintiff cites to no Alabama cases that rely on those decisions or endorse their reasoning. (DE 3149 at 3.) Furthermore, Plaintiff may not recast "tolling" as "estoppel." (DE 3149 at 4.)

**\*7** In regards to Count III, Bayer argues that Plaintiff has not identified any questions of disputed fact that bear on his warranty claims. (DE 3149 at 4.) As for the implied warranty claim, Bayer states that Plaintiff does not counter its showing that Alabama law does not recognize implied warranty claims for injuries allegedly caused by a prescription drug. (DE 3149 at 5.) As for the express warranty claim, Bayer asserts that Plaintiff has not carried its burden of establishing the existence of an express warranty. (DE 3149 at 5.)

In regards to Count IV, Bayer states that "the only allegations of purported concealment in plaintiff's complaint are the allegations relating to the two-week delay in disclosing to the FDA the preliminary results of the i3 study in September 2006." According to Bayer, Plaintiff "does not dispute that showing, and thus concedes that there is no allegation of any representation or concealment by defendants on which plaintiff or anyone else could have relied in making decisions concerning Mrs. Summerlin's surgery." (DE 3149 at 5.) According to Bayer, the fraudulent concealment claim fails as a matter of law for that reason, and "plaintiff's arguments about third-party reliance ... are an irrelevant distraction." (DE 3149 at 6.)

**E. The Material, Uncontested Facts**

• The decedent in this action, Frances Summerlin, was a citizen of Alabama at the time of her death. She underwent surgery in Birmingham, Alabama on March 16, 2006 and died on March 26, 2006.

  • The decedent was administered Trasylol during the surgery. Plaintiff did not learn about this fact until April 24, 2008.

  • Plaintiff did not file this action until more than 2 years after the decedent's death:

  Plaintiff filed the original complaint on May 12, 2008 in the Southern District of Alabama.

  • During Plaintiff's deposition, he was asked "Did you or your wife ever see any warranty or language guaranteeing that Trasylol would work?" Plaintiff responded "No."

**II. Legal Standard**

Summary judgment is appropriate when "there is no genuine issue as to any material fact" and "the movant is entitled to judgment as a matter of law." [4] FED. R. CIV. P. 56(c). The purpose of summary judgment is to "isolate and dispose of factually unsupported claims or defenses." *Celotex v. Catrett,* 477 U.S. 317, 323–24 (1986). In considering a motion for summary judgment, the trial court "must consider all the evidence in the light most favorable to the non-moving party," and "resolve all reasonable doubts in favor of the non-moving party." *Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1080 (11th Cir.1990) (internal citations omitted).

Case 1:19-md-02875-RMB-SAK   Document 598-4   Filed 10/16/20   Page 199 of 207
PageID: 13216
In re trasylol Products Liability Litigation, Not Reported in F.Supp.2d (2010)
2010 WL 5140439

4    According to the Supreme Court, "As to
     materiality, the substantive law will identify which
     facts are material. Only disputes over facts that
     might affect the outcome of the suit under the
     governing law will properly preclude the entry
     of summary judgment. Factual disputes that are
     irrelevant or unnecessary will not be counted."
     *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248
     (1986). Furthermore, "Summary judgment will not
     lie if the dispute about a material fact is 'genuine,'
     that is, if the evidence is such that a reasonable jury
     could return a verdict for the non-moving party."
     *Id.*

The party seeking summary judgment "always bears the
initial responsibility of informing the district court of the
basis for its motion, and identifying those portions of
'the pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any,' which
it believes demonstrate the absence of a genuine issue of
material fact." *Celotex,* 477 U.S. at 323 (citing FED. R. CIV.
P. 56(c)). The movant can meet this burden by presenting
evidence showing there is no dispute of material fact, or by
pointing out to the district court that the nonmoving party has
failed to make a sufficient showing on an essential element
of its case with respect to which it has the burden of proof.
*Celotex,* 477 U.S. at 322–23.

 **\*8** Once the moving party has met its burden, the non-
moving party bears the burden of coming forward with
evidence of each essential element of its claim, such that
a reasonable jury could find in its favor. *See Earley,* 907
F.2d at 1080 (11th Cir.1990). Rule 56(e) "requires the
nonmoving party to go beyond the pleadings and by [its] own
affidavits, or by the 'depositions, answers to interrogatories,
and admissions on file,' designate 'specific facts showing that
there is a genuine issue for trial.' " *Celotex,* 477 U.S. 324.
"The mere existence of a scintilla of evidence in support of
the [non-movant's] position will be insufficient; there must be
evidence on which the jury could reasonably find for the [non-
movant]." [5] *Anderson v. Liberty Lobby,* 477 U.S. 242, 252
(1986). The failure of proof concerning an essential element
of the non-moving party's case necessarily renders all other
facts immaterial and requires the court to grant the motion for
summary judgment. *Celotex,* 477 U.S. at 322–23.

5    According to the *Anderson* court, "If the evidence
     is merely colorable, or is not significantly
     probative, summary judgment may be granted."

*Anderson,* 477 U.S. at 249–50 (internal citations
omitted).

### III. Analysis

#### A. Counts I and II: Wrongful Death
Alabama's wrongful death statute provides that wrongful
death actions "must be commenced within two years from
and after the death of the testator or intestate." [6] ALA.CODE
§ 6–5–410(d) (1975). The Supreme Court of Alabama has
repeatedly held that Alabama's wrongful death statute is a
statute of creation, and therefore, its two-year limitations
period is not subject to any tolling provisions. *E.g., Ogle
v. Gordon,* 706 So.2d 707, 708 (Ala.1997); *Cofer v. Ensor,*
473 So.2d 984, 992 (Ala.1985) ("It is well-settled that the
limitations period found in § 6–5–410(d) is a *statute of
creation,* and not subject to tolling provisions because it is 'of
the essence of the cause of action.' ").

6    Alabama's wrongful death statute states, in
     pertinent part: "A personal representative may
     commence an action and recover such damages
     as the jury may assess in a court of competent
     jurisdiction within the State of Alabama, and
     not elsewhere, for the wrongful act, omission, or
     negligence of any person, persons, or corporation,
     his or their servants or agents, whereby the death
     of his testator or intestate was caused, provided
     the testator or intestate could have commenced
     an action for such wrongful act, omission, or
     negligence if it had not caused death." ALA.CODE
     § 6–5–410(a) (1975). *See also Cofer v. Ensor,* 473
     So.2d 984, 995 ("There can be only one action for
     wrongful death.").

The *Cofer* court described the difference between a
limitations period that is a technical statute of limitations and
one that is a statute of creation.

     This Court has recognized the general
     rule that a distinction exists between a
     true statute of limitations and a statute
     which creates a new right of action
     with an express restriction on the time
     within which an action may be brought
     to enforce the right.... [W]here a
     prescriptive period is contained within
     the statutory grant of a cause of action,

Case 1:19-md-02875-RMB-SAK   Document 598-4   Filed 10/16/20   Page 200 of 207
PageID: 13217
In re Trasylol Products Liability Litigation, Not Reported in F.Supp.2d (2010)
2010 WL 5140439

it is a statute of creation, and the period is deemed a portion of the substantive right itself, not subject to tolling provisions. On the other hand, where the prescriptive period comes from without the statute, it is a statute of limitations, to which the tolling provisions apply.

473 So.2d at 987 (internal citations omitted). Because the two-year period is deemed a portion of the substantive right itself, the plaintiff has the burden of affirmatively showing that his action was commenced within the two-year period. *Cofer,* 473 So.2d at 992. "The two-year period is not a limitation against the remedy only, because after two years the cause of action expires." *Ex parte FMC Corp.,* 599 So.2d 592, 594 (Ala.1992) (internal citations omitted).

**\*9** The two-year limitations period is not subject to tolling despite the possibility that its application may result in an "unjust" outcome for the plaintiff. *See, e.g., Cofer,* 473 So.2d at 985, 995 ("Robin Cofer gave birth to a baby boy on February 10, 1980.... At the time she gave birth, Cofer was 16 years old and married. Later that year ... Cofer obtained a divorce, and therefore, she never reached the age of 18 while she was married, nor was she ever otherwise freed of the disabilities of non-age. On December 22, 1982, the day before her nineteenth birthday, Cofer brought an action against her doctor.... She also added a claim for the wrongful death of her minor son.") (affirming trial court's decision that plaintiff's wrongful death claim was time-barred because the action was filed two years and ten and a half months after the alleged wrongful death of her child).

Plaintiff cites to cases in support of the argument that "Alabama has not created an absolute bar to a wrongful death claim sufficient for summary judgment, where the Defendants' fraudulent conduct prevented the identification of that cause of action." (DE 3143 at 13.) However, the cited cases, *Johnson v. Brookwood Med. Cent. and Lowe v. East End Mem. Hosp. & Health Ctrs.,* do not support equitable tolling of the wrongful death claims.

In *Johnson,* the plaintiff did not argue that the trial court erred in applying the two-year limitations period in § 6–5–410 to his claim for wrongful death. 946 So.2d 849, 853 (Ala.2006). Instead, the plaintiff asserted that his action consisted of two separate claims: a wrongful death claim and a claim for

fraudulent concealment or suppression of a cause of action. *Id.* The plaintiff argued that the trial court erred in applying § 6–5–410 to his fraudulent concealment claim and concluding that his entire action was time-barred. *Id.* According to the *Johnson* court,

Assuming for the sake of argument that Alabama recognizes a separate cause of action for fraudulent concealment of a wrongful-death claim, Johnson's argument nevertheless fails. His contention that he presented such a claim to the circuit court is unsupported by the record. In its final form, Johnson's complaint consisted of only one 'count,' which contained claims ... alleging wrongful death. Within that 'count,' Johnson also asserted that [defendants] had suppressed the 'true cause of Lydia Darnell's death.' At no point ... did Johnson contend that this alleged suppression created a cause of action separate from his wrongful-death claim arising from alleged medical malpractice.

*Id.* The Johnson court held that the wrongful death claim was time-barred under § 6–5–410; it affirmed the trial court's dismissal of the "fraudulent concealment or suppression of a cause of action" claim because it was not presented to that court. *Id.* at 853–54.

Similarly, in *Lowe,* the plaintiff did not contest the fact that his action for wrongful death was time-barred. 477 So.2d 339, 340 (Ala.1985). Rather, plaintiff argued that he had a viable cause of action for fraud independent of the wrongful death claim because the defendant "suppressed facts relating to the death of Mrs. Lowe and misrepresented facts as to the involvement of the defendant hospital in Mrs. Lowe's care. As a result of the allegedly misleading statements in the letter, plaintiff contends, he was caused to lose his cause of action under Code 1975, § 6–5–410." *Id.* at 340–41. The plaintiff argued that his fraud claim, not the wrongful death claim, was tolled. *Id.* at 341. The *Lowe* court held that "Although plaintiff's theory is novel, we pretermit discussion of it inasmuch as any viable action for fraud would be negated by plaintiff's failure to adequately plead or support this cause of action in the present case." *Id.*

**\*10** In this Case, unlike the plaintiffs in *Johnson* and *Lowe,* Plaintiff does argue that the statute of limitations for the wrongful death claims should be tolled due to Bayer's fraudulent concealment of the dangers of Trasylol.[7] The cited cases do not support equitable tolling of the wrongful death claims.

In re Trasylol Products Liability Litigation, Not Reported in F.Supp.2d (2010)

2010 WL 5140439

[7]    In Section III.C., the Court will consider Plaintiff's argument that he has a separate claim for fraudulent concealment pursuant to *Johnson* and *Lowe*.

Plaintiff also cites to cases in support of the argument that "Alabama has recognized that estoppel would bar a Defendant who has acted fraudulently from relying upon the statute of limitations as a defense." (DE 3143 at 19.) However, the cited cases, *City of Birmingham v. Cochrane Roofing & Metal Co., Inc. and Mason v. Mobile County,* do not involve wrongful death claims and do not support the conclusion that Bayer should be estopped from raising the statute of limitations as a defense to Plaintiff's wrongful death claims.[8] Both cases hold that if a defendant either "fraudulently or innocently represents to the plaintiff that he will remedy a problem, and relying on these representations the plaintiff is induced not to file a lawsuit or take any action, the defendant may be estopped from raising the statute of limitations as a defense." *Cochrane Roofing,* 547 So.2d 1159, 1167 (Ala.1989) (citing *Mason,* 410 So.2d 19 (Ala.1982)). These cases are inapposite to Plaintiff's argument: there is no allegation or evidence that Bayer induced Plaintiff not to sue by promising to remedy a problem.

[8]    Furthermore, the plaintiff has the burden of *affirmatively* showing that his wrongful death claims were commenced within the two-year period. *Cofer,* 473 So.2d at 992.

In regards to Counts I and II, there is no genuine issue as to any material fact. Frances Summerlin died on March 26, 2006. Plaintiff did not file this action until more than 2 years after the decedent's death: Plaintiff filed the original complaint on May 12, 2008. The wrongful death claims can only be brought under Alabama's wrongful death statute, which provides that they must be commenced within two years from and after the death of the decedent. The Alabama Supreme Court has clearly stated that the two-year limitation is not subject to equitable tolling for any reason. Because Plaintiff filed his wrongful death claims after the two-year period for bringing these claims expired, summary judgment shall be entered in favor of Bayer on Counts I and II.

**B. Count HI: Breach of Express and Implied Warranties**

Under Alabama law, express warranties are created as follows:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

ALA.CODE § 7–2–313 (1975).

Bayer has met its initial burden on summary judgment by pointing out to this Court that Plaintiff has failed to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof. According to Bayer, Plaintiff did not present evidence of any "affirmation of fact," "promise," or "description of the goods" made to Plaintiff by any defendant in relation to Trasylol, nor evidence that any such affirmation or promise or description formed the "basis of the bargain" for the use of Trasylol in Mrs. Summerlin's surgery. Bayer cited to Plaintiff's deposition, during which he was asked whether he or his wife ever saw any warranty or language guaranteeing that Trasylol would work. Plaintiff's response was "No." (DE 2815–3 at 4.)

**\*11** On the other hand, Plaintiff, as the non-moving party, has not met the burden of coming forward with evidence of each essential element of the express warranty claim, such that a reasonable jury could find in Plaintiff's favor. Despite arguing that "questions of fact exist on the warranty claims which would preclude the granting of summary judgment," Plaintiff does not identify any questions of disputed fact that bear on the express warranty claim. Plaintiff does not specify any purported express warranty. Therefore, summary judgment shall be entered in favor of Bayer on Count III as it relates to breach of any express warranty.

Plaintiff also makes an implied warranty of merchantability claim under Alabama's version of the U.C.C. Accordingly, Plaintiff must prove: (1) the existence of the warranty; (2) a breach of that warranty; and (3) damages proximately resulting from that breach." *Bodie v. Purdue Pharma Co.,* 236 F. App'x 511, 522 (11th Cir.2007). Under Alabama law, "[A] warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to the goods of that kind." ALA.CODE § 7–2–314 (1975). The statute further provides that "Goods to be merchantable must be at least such as: Are fit for the ordinary purposes for which such goods are used." § 7–2–314(2)(c).

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 202 of 207
PageID: 13219
In re Trasylol Products Liability Litigation, Not Reported in F.Supp.2d (2010)
2010 WL 5140439

Alabama courts have recognized a clear distinction between causes of action arising under tort law and those arising under the U.C.C. as adopted in Alabama. *E.g., Shell v. Union Oil Co.,* 489 So.2d 569 (Ala.1986) ("The implied warranty mandated by this section of the U.C.C. is one of *commercial* fitness and suitability, and a private right of action is afforded only where the user or consumer is injured by the breach of *that* warranty. That is to say, the U.C.C. does not impose upon the seller the broader obligation to warrant against health hazards inherent in the use of that product when the warranty of commercial fitness has been complied with. Those injured by the use of or contact with such a product, under these circumstances, must find their remedy outside the warranty remedies afforded by the U.C.C"). *See also McClain v. Metabolife Int'l, Inc.,* 193 F.Supp.2d 1252, 1258 (N.D.Ala.2002) (summarizing the *Shell* decision as holding that "the U.C.C. is concerned with product *quality,* while products liability law (viz., the AEMLD [9]) is concerned with product *safety.*") (emphasis in original). *But see Allen v. Delchamps, Inc.,* 624 So.2d 1065 (Ala.1993) ("These two standards [AEMLD and implied warranty of merchantability] 'go hand-in-hand,' at least as applied to food products, 'for it is apparent that a food product is defective or unreasonably dangerous if it is unmerchantable or unfit for human consumption.' ") (internal citations omitted).

[9]    As previously discussed, AEMLD is the acronym for Alabama's Extended Manufacturer's Liability Doctrine. Under the AEMLD, "a manufacturer, or supplier, or seller, who markets a product not reasonably safe when applied to its intended use in the usual and customary manner, constitutes negligence as a Matter of law." *Casrell v. Altec Indus., Inc.,* 335 So.2d 128, 132 (Ala.1976).

In *Shell,* the plaintiff came into contact with a naphtha product, supplied by the defendants, which contained benzene, a carcinogen known to cause leukemia. 489 So.2d at 570. The plaintiff claimed that defendants breached the implied warranty of merchantability. According to the Shell court,

    **\*12**  Plaintiff's implied warranty of merchantability theory, as we understand it, is to the effect that because the substance supplied by Defendants caused cancer, it could not be 'fit for the ordinary purposes for which such goods are used'; that is, because this is a cancer-causing substance, it is unreasonably dangerous, and, therefore, cannot be merchantable.

*Id.* at 571. The Alabama Supreme Court affirmed the trial court's decision that the defendants were entitled to summary judgment on the implied warranty of merchantability claim because the plaintiff's argument ignored the distinction between a cause of action arising under AEMLD and one for breach of the implied warranty of merchantability. *Id.* at 571–72. "Whether this product was unreasonably dangerous, therefore, is not a question properly addressed in an action brought under the provisions of the U.C.C. That question could properly be raised in an action brought under Alabama's Extended Manufacturer's Liability Doctrine ... but not in this U.C.C. action for breach of warranty." *Id.* at 571 (noting that the product was fit for the ordinary purposes for which such goods are used because it performed the job it was intended to do, and the manufacturers' warnings were in keeping with their knowledge of its inherent dangers).

The parties disagree on whether *Bodie* and *Metabolife,* two cases interpreting Alabama's law on the implied warranty of merchantability as it applies to medications, support a finding of summary judgment in favor of Bayer on this claim. In *Bodie,* the Eleventh Circuit affirmed the district court's grant of summary judgment in favor of the defendant, finding that the plaintiff did not have a viable cause of action under Alabama law for breach of the implied warranty of merchantability. 236 F. App'x at 524. The court's reasoning was as follows:

    Bodie alleged that Purdue breached the implied warranty of merchantability because OxyContin was 'not of merchantable quality,' was 'unsafe' and was 'unreasonably dangerous[,]' thereby causing injury to plaintiff.' The evidence suggests, however, that OxyContin was, in fact, fit for its intended use as an analgesic treatment for chronic pain Bodie has offered scant evidence as to how OxyContin was not fit for its intended use; in effect his U.C.C. breach of warranty claim—based on the general allegation that the drug was 'unsafe' and 'dangerous'—is akin to the type of claim that the Alabama Supreme Court refused to recognize in *Shell.* As in *Shell,* there was no 'implied warranty of merchantability in the sense that [Purdue] promised [Bodie] that he would not be injured by his use or contact with their product.' In fact, Purdue provided warnings with respect to OxyContin's addictive qualities, and the product was fit for its intended pharmacological purpose of treating pain.

*Id.* (internal citations omitted). Similarly, in *Metabolife,* the court granted the defendant's motion for summary judgment

2010 WL 5140439

on the plaintiffs' claims for breach of the implied warranty of merchantability and fitness for a particular purpose. 193 F.Supp.2d at 1258. The court's reasoning was as follows:

> **\*13** Plaintiffs do not contend that Metabolife 356 was not fit for the purpose for which it was sold, i.e. weight loss. The essence of their claim is that Metabolife 356 is unreasonably dangerous, and lacked minimally appropriate warnings of the product's latent dangers. Plaintiffs' warranty claims are not so much 'subsumed' by the AEMLD as they are simply inapposite and non-responsive to Plaintiffs' alleged injuries and claims.

*Id.*

Plaintiff's claim for breach of implied warranty very much resembles the unsuccessful claims made in *Shell, Bodie,* and *Metabolife.* The First Amended Complaint alleges that Bayer "impliedly warranted that Trasylol was safe for the use for which it were intended, namely as a means to reduce perioperative bleeding in patients undergoing cardiac surgery." (DE 3143–1 at ¶ 72.) The First Amended Complaint further alleges that Bayer breached the implied warranty "because Trasylol was unsafe in light of the risk of life-threatening side effects associated with its use, including, but not limited to, renal failure." (DE 3143–1 at ¶ 73.) In response to Bayer's argument that Plaintiff's claims do not concern Trasylol's commercial fitness and suitability and instead relate to its unreasonable danger, Plaintiff asserts that "The significant risk and danger of Trasylol, in fact, made i[t] unfit for the purpose for which it was used." (DE 3143 at 21.) Plaintiff attempts to distinguish *Metabolife* from the facts of this Case by stating that "Plaintiff does in fact, contend that Defendants breached implied and express warranties making the drug unfit for its intended purpose." (DE 3143 at 22.) But this is exactly the type of claim that was rejected in *Bodie* and *Shell.* [10] In these cases, the plaintiffs unsuccessfully argued that the products in question were not merchantable because they were unreasonably dangerous. As in *Bodie* and *Shell,* Plaintiff does not argue that Trasylol was not fit for its intended use in reducing perioperative bleeding in patients undergoing cardiac surgery; Plaintiff provides

no evidence suggesting that Trasylol did not successfully reduce perioperitive bleeding. Instead, Plaintiff argues that Trasylol was commercially unfit because it was unreasonably dangerous (in causing renal failure, etc.). Therefore, summary judgment shall be entered in the favor of Bayer on Count III as it relates to breach of any implied warranty.

[10]      Plaintiff also argues that the facts of *Shell* and *Bodie* are distinguishable from the facts presented here. Plaintiff's argument relies largely on the fact that the product in *Shell* came with warnings that adequately described its inherent dangers, and the physician in *Bodie* "testified that he was aware what the propensity of Oxycontin to producing addiction and that there was a specific black box warning to that effect." (DE 3143 at 21–22.) Regardless of the fact that Plaintiff has not submitted any evidence regarding the warnings contained in Trasylol's package insert at the time of Mrs. Summerlin's surgery, the Court does not believe that the holdings of *Shell* and *Bodie* hinged on the presence of warnings in those cases. It should also be noted that Alabama courts have recognized claims for negligent failure to warn.

### C. Count IV: Fraudulent Concealment

To sustain a claim for fraudulent concealment or suppression under Alabama law, a plaintiff must establish: "(1) a duty on the part of the defendant to disclose; (2) the defendant's suppression of material facts; (3) the defendant's knowledge of the facts and their materiality; (4) action by the plaintiff in reliance on the suppression; and (5) damages resulting from the reliance action." [11] *E.g., Holton v. Blue Cross & Blue Shield of S.C.,* 56 F.Supp.2d 1338, 1344 (M.D.Ala.1999). Whether a plaintiff has reasonably relied on a defendant's misrepresentation is usually a question of fact. *McIver v. Bondy's Ford, Inc.,* 963 So.2d 136,142–43 (Ala.Civ.App.2007). Actual damages must be suffered as a proximate result of the reliance action. *Hardy v. Blue Cross & Blue Shield of Ala.,* 585 So.2d 29, 32 (Ala.1991). Damages may be awarded only where they are reasonably certain and may not be based upon speculation. *Wheelan v. Sessions,* 50 F.Supp.2d 1168, 1175 (M.D.Ala.1999) (internal quotations and citations omitted).

[11]      Under ALA.CODE § 6–5–102, "Suppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 204 of 207
PageID: 13221
In re Trasylol Products Liability Litigation, Not Reported in F.Supp.2d (2010)
2010 WL 5140439

to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case."

**\*14** In Alabama, a plaintiff is not always required to prove that a misrepresentation was made directly to him, so long as his injuries resulted from the misrepresentation. *E.g., Ex parte DaimlerChrysler Corp., 952 So.2d 1082, 1090–91 (Ala.2006).* However, the injured party must prove reliance on the alleged misrepresentation. *Id.*

A deceased's unfiled tort claims do not survive the death of the putative plaintiff. *E.g., Bassie v. OBGYN Assocs. of Nw. Ala., P.C., 828 So.2d 280, 282 (Ala.2002)* (citing ALA.CODE § 6–5–462 [12] (1975); *Bates v. L & N Employees Credit Union, 374 So.2d 323, 324 (Ala.1979)* ("The present action sounds in tort and no action having been filed before the death of the allegedly defrauded party, it does not survive in favor of his personal representative.").

[12]    Under ALA.CODE § 6–5–462, "In all proceedings not of an equitable nature, all claims upon which an action has been filed and all claims upon which no action has been filed on a contract, express or implied, and all personal claims upon which an action has been filed, except for injuries to the reputation, survive in favor of and against personal representatives; and all personal claims upon which no action has been filed survive against the personal representatives of a deceased tort-feasor."

As opposed to the rest of the claims in the First Amended Complaint, Plaintiff alleges the fraudulent concealment claim only on his behalf. [13] Accordingly,

[13]    Under Count I, Plaintiff alleges "As a direct and proximate cause of Defendants' negligent and/or wanton acts and/or omissions, Plaintiff's intestate died." Under Count II, Plaintiff alleges "The defects in the Trasylol administered to Frances Summerlin were a direct and proximate cause of the death of Frances Summerlin." Under Count III, Plaintiff alleges "Frances Summerlin relied to her detriment on Defendants' express and implied warranties."

Defendants had a duty to disclose to Plaintiff and the public the hazards associated with administering Trasylol during surgery. Defendants nevertheless intentionally suppressed

and/or concealed their knowledge of these hazards and the risks associated with administering Trasylol to the public, including the Plaintiff.... As a proximate result of Defendants' suppression and/or concealment of their knowledge of this information related to Trasylol, Plaintiff has suffered harm.

(DE 3143–1 at ¶¶ 76–80.) However, Plaintiff's Response to Bayer's Motion for Summary Judgment discusses both Plaintiff's and Plaintiff's decedent's reliance on the alleged misinformation provided by Bayer. Accordingly,

> Plaintiff and his decedent, to their detriment relied upon the truthful information provided to them by Dr. Ronson regarding the risks of her heart surgery.... Mrs. Summerlin, as evidenced by her consent to surgery, relied upon the risk benefit analysis performed by Dr. Ronson in deciding to undergo heart surgery on March 16, 2006, including the risks of medications like Trasylol that may be used.... To Plaintiff's detriment, such information was concealed and/or suppressed at the time of Mrs. Summerlin's surgery on March 16, 2006.... Hence, both Plaintiff and Plaintiff's decedent's reliance of the misinformation is a question for the jury precluding summary judgment.

(DE 3143 at 24–27.) A fraudulent concealment claim on behalf of Mrs. Summerlin is barred because it was not filed before her death. Further, it is not styled as a wrongful death claim. Even if it were, it would be time-barred for the same reason that Counts I and II are time-barred.

In its briefs, Bayer argued that *Plaintiff's* fraudulent concealment claim fails as a matter of law because there is "no evidence that plaintiff acted in reliance on a concealment or suppression by any defendant." (DE 2815 at 10.) According to Bayer, Plaintiff could not have relied on any concealment by Bayer because first, Plaintiff did not know Trasylol had been used in decedent's surgery until after the surgery and second, the only instance of purported concealment alleged (the 13 Study) did not occur until after the decedent's surgery. (DE 2815 at 10.) Plaintiff responded that, under Alabama law,

Case 1:19-md-02875-RMB-SAK    Document 598-4    Filed 10/16/20    Page 205 of 207
PageID: 13222
In re Trasylol Products Liability Litigation, Not Reported in F.Supp.2d (2010)

2010 WL 5140439

misrepresentation does not have to be made directly to the person who claims to have been injured. (DE 3143 at 26.) Plaintiff also provided evidence of acts of concealment taking place before Mrs. Summerlin's surgery.[14]

14    For example, according to Plaintiff, Bayer awarded Dr. David Kress, a CV Surgeon at St Luke's Medical Senter, a grant to perform a retrospective study on Trasylol. (DE 3143 at 4–5; DE 3143–7 at BAY04627748.) On March 21, 2003, Diana Isom of Bayer Corporation, Scientific Affairs, emailed Dawn Bradway and Artyom Sedrakyan about the preliminary data from Dr. Kress's study. Accordingly,

> [T]hey didn't see a difference in occurrence of atrial fibrillation with any of the doses of aprotinin vs no aprotinin.... What they did find with the greater than 600 ml group was that the incidence of renal failure ... was significantly higher than control and also the half and full dose aprotinin. So that, sort of set off a red flag with them.... [T]hey don't think they will be able to show, with the St Luke's database, that aprotinin decreases the incidence of atrial fibrillation.

(DE 3143–7 at BAY05253848.) On April 4, 2003, Isom emailed Sedrakyan, stating that

> the group there is more hung up on what they think is a renal failure concern with aprotinin at doses higher than half dose. What it amounts to is this. They have 30 cases of what they are defining as renal failure ... and they want to look more closely at these cases before doing anything else.... Right now, it looks like they are seriously considering going to half dose aprotinin due to this renal concern or going to some sort of wt based dosing regimen [W]e still want to try and get them to complete the protocol as is.

(DE 3143–7 at BAY05253845–6.) On April 10, 2003 Isom emailed Sedrakyan that "Dr. Kress is not on board with continuing with the current proposal as it stands and feels the answer to the proposal question has already been shown in the preliminary analysis of their database." (DE 3143–7 at BAY05253843.).

Plaintiff cites to "Draft # 7 of Final Report," dated November 20, 2003, titled "What is the Effect of Aprotinin (Trasylol) on the Incidence of Selected Outcomes after CABG," which was co-authored

by Dr. Kress. (DE 3143–7 at BAY05426839–46.) Accordingly,

> The study findings suggest abandonment of the use of a higher than full dose aprotinin regimen in the CABG population because of the 3.1 times higher risk of the development of postoperative renal failure. In practical terms, aprotinin should be discontinued in CABG patients once the full-dose has been administered, whether in the OR or ICU.

(DE 3143–7 at BAY05426842.)

In response to Plaintiff's requests for admission, Bayer admits that "BPC first referenced Dr. David C. Kress's research in an FDA submission in BPC's November 9, 2006 submission to the FDA." (DE 3143–8 at 81.)

**\*15** However, at the hearing on this Motion, Bayer shifted its focus from arguing that Plaintiff is not able to show reliance on Bayer's suppression of material facts to arguing that Plaintiff has no independent claim for fraud: a claim for fraud requires damages resulting from the reliance on the fraud, and in this Case, the only damages alleged relate to Frances Summerlin's death. Therefore, this claim is subsumed by the wrongful death statute, which prescribes a fixed two-year statute of limitations, as discussed in Section III.A.

In response, Plaintiff did not argue that he suffered damages independent of the wrongful death. Instead, Plaintiff argued that: (1) Ala.Code § 6–2–3 [15] acts as a savings clause for the wrongful death claim where fraud has been properly alleged; and (2) Plaintiff has an independent claim for fraudulent concealment, similar to the one alleged in *Johnson* and *Lowe.* [16]

15    ALA.CODE § 6–2–3, sets forth how a fraud claim is accrued: "In actions seeking relief on the ground of fraud where the statute has created a bar, the claim must not be considered as having accrued until discovery by the aggrieved party of the fact constituting the fraud, after which he must have two years within which to prosecute his action."

16    *Johnson* and *Lowe* were also discussed in Section III.A. of this Order.

As to Plaintiff's first argument, this Court has already concluded, in Section III.A. of this Order, that the statute of limitations for wrongful death is deemed a portion of the

substantive right itself and is not subject to tolling. Invocation of § 6–2–3 does not change this determination. [17]

> [17]  Further § 6–2–3 applies to actions seeking relief on the ground of fraud, setting forth how a fraud claim is accrued. The Plaintiff's wrongful death claim seeks relief on the ground of wrongful death, § 6–5–410, whereby "A personal representative may commence an action ... tor the wrongful act, omission, or negligence ... whereby the death of his testator or intestate was caused."

As to Plaintiff's second argument, even if this Court were to assume that Alabama would recognize a separate cause of action for fraudulent concealment of a wrongful death claim, [18] whereby a plaintiff loses his wrongful death claim due to a defendant's fraud, Plaintiff does not prevail on this claim on summary judgment. As the Alabama Supreme Court held in Johnson, [19] it appears that Summerlin's allegation of fraudulent concealment is nothing more than an attempt to evade the statute of limitations for his wrongful death claims. Further, the facts of this Case are drastically different from the ones presented in Johnson and Lowe. [20] Here, Plaintiff has had no contact with Bayer or its representatives. Plaintiff has not even alleged, much less shown, that Bayer knew about Frances Summerlin's death or suppressed facts relating to its involvement in her death after the death occurred. Instead, Plaintiff alleged that Bayer suppressed its knowledge of Trasylol's risks. [21] Therefore, even if this Court were to assume that Alabama would recognize a separate cause of action for fraudulent concealment of a wrongful death claim, the facts of Johnson and Lowe stand in the way of Plaintiff prevailing on summary judgment. Bayer is entitled to judgment as a matter of law on Count IV.

> [18]  Although the Supreme Court of Alabama has not expressly rejected a separate cause of action for the fraudulent concealment of a wrongful death claim, neither has it expressly held that such a cause of action exists. See Johnson, 946 So.2d 849; Lowe, 477 So.2d 339. The Plaintiff has not cited to any Alabama case where a plaintiff was granted relief on this claim.

> [19]  In Johnson, the plaintiff asked decedent's hospital and treating physician why decedent had died and claimed that the decedent's hospital and treating physician suppressed the true cause of decedent's

death, thereby fraudulently concealing that the plaintiff had a cause of action for wrongful death. 946 So.2d at 853. According to the Court, "Assuming for the sake of argument that Alabama recognizes a separate cause of action for fraudulent concealment of a wrongful-death claim, Johnson's argument fails.... Based on our review of the record, it appears Johnson's allegation of fraudulent concealment was nothing more than an attempt to impermissibly bootstrap his wrongful-death claim into the six-month discovery period for asserting actions under the Alabama Medical Liability Act." Id.

> [20]  In Lowe the plaintiff argued that although his action for wrongful death was time-barred he had a viable cause of action for fraud because "subsequent to, and independent of the alleged negligent acts of the defendant, the defendant, through a letter written by hospital officer Ralph Clark in 1981, suppressed facts relating to the death of Mrs. Lowe and misrepresented facts as to the involvement of defendant hospital in Mrs. Lowe's care. As a result of the allegedly misleading statements in the letter, plaintiff contends, he was caused to lose his cause of action under Code 1975, § 6–5–410. Furthermore, plaintiff argues that his fraud claim is tolled by Code 1975 § 6–2–3." 477 So.2d at 340–41. According to the Court, "Although plaintiff's theory is novel, we pretermit discussion of it inasmuch as any viable action for fraud would be negated by plaintiff's failure to adequately plead or support this cause of action in the present case." Id. at 341.

> [21]  The pertinent fraudulent concealment allegations in Plaintiff's First Amended Complaint are as follows:
> Defendants had a duty to disclose to Plaintiff and the public the hazards associated with administering Trasylol during surgery. Defendants nevertheless intentionally suppressed and/or concealed their knowledge of these hazards and the risks associated with administering Trasylol to the public, including the Plaintiff. Defendants intentionally misrepresented results of their own study as well as suppressed findings from its own study that supported Dr. Mangano's findings that Trasylol increased a patient's risk for kidney failure, kidney damage, stroke and/or death. As

2010 WL 5140439

a proximate result of Defendants suppression and/or concealment of their knowledge of this information related to Trasylol, Plaintiff has suffered harm.

(DE 3143–1 at ¶¶ 78–80.)

**IV. Conclusion**

Accordingly, it is hereby

**ORDERED AND ADJUDGED** that Bayer's Motion for Summary Judgment (DE 2815) is **GRANTED** as to all Counts in Plaintiff's First Amended Complaint.

**DONE AND ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 5140439

---

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.