## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | |
|---|---|
| **IN RE: VALSARTAN, LOSARTAN, AND IRBESARTAN PRODUCTS LIABILITY LITIGATION** | MDL No. 2875 |
| | Honorable Robert B. Kugler, District Court Judge |
| **This Document Relates to All Actions** | Honorable Joel Schneider, Magistrate Judge |

# EXHIBIT A TO REPLY MEMORANDUM OF LAW
# IN SUPPORT OF RULE 12 MOTION TO DISMISS
# SUBMITTED ON BEHALF OF
# ALL PHARMACY DEFENDANTS

*/s/ Sarah E. Johnston*
Sarah E. Johnston
Kara Kapke
Kristen L. Richer
BARNES & THORNBURG LLP
2029 Century Park East
Suite 300
Los Angeles, CA 90067
(310) 284-3798

*Counsel for CVS Pharmacy, Inc.*
(incorrectly named as CVS Health Corporation)

# TABLE OF CONTENTS

**Cases**                                                                 **Tab / Page**

*Altieri v. CVS Pharmacy, Inc.,*
   No. X06CV020171626S, 2002 WL 31898323 (Conn. Sup. Ct.
   Dec. 13, 2002) .........................................................................1 / A001

*Falat v. Cty. of Hunterdon,*
   No. CIV.A. 12-6804 SRC, 2013 WL 1163751 (D.N.J. Mar. 19,
   2013) ......................................................................................2 / A006

*Garza v. Endo Pharms.,*
   No. CV 12–1585–CAS, 2012 WL 5267897 (C.D. Cal. Oct. 24,
   2012) ......................................................................................3 / A011

*Henderson v. CVS Pharm., Inc.,*
   No. CV085017128, 2008 WL 3916444 (Conn. Sup. Ct. July 31,
   2008) ......................................................................................4 / A015

*In re Propulsid Prods. Liab. Litig.,*
   MDL No. 1355, 2002 WL 1446714 (E.D. La. July 2, 2002) .................5 / A021

*In re Welspun Litig.,*
   No. 16 CV 6792 (VB), 2019 WL 2174089 (S.D.N.Y. May 20,
   2019) ......................................................................................6 / A025

*Ramos v. Rite Aid Corp.,*
   No. CV106008649, 2010 WL 4277612 (Conn. Sup. Ct. Oct. 7,
   2010) ......................................................................................7 / A042

*Sheeran v. Blyth Shipholding S.A.,*
   No. CV 14-5482 (JBS/AMD), 2015 WL 9048979 (D.N.J. Dec. 16,
   2015) ......................................................................................8 / A045

*Stanko v. Bader,*
   No. CV030193669, 2003 WL 22413476 (Conn. Sup. Ct. Oct. 7,
   2003) ......................................................................................9 / A052

# TAB 1

Altieri v. CVS Pharmacy, Inc., Not Reported in A.2d (2002)

2002 WL 31898323, 33 Conn. L. Rptr. 524

2002 WL 31898323

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Connecticut.

Daren ALTIERI, Administrator of
the Estate of Donna Marie Altieri,
v.
CVS PHARMACY, INC. et al.

No. X06CV020171626S.
|
Dec. 13, 2002.

**Attorneys and Law Firms**

Damico, Griffin & Pettinicchi, Watertown, for Daren Altieri.

Edwards & Angell, Hartford, for CVS Pharmacy, Inc., Southington Main Street CVS, Inc. and CVS Rx Services, Inc.

Cramer, Alissi & Fontaine, P.C., Hartford, for Shyloe Vecchio.

**Opinion**

ROBERT F. McWEENY, J.

 *1 The plaintiff brings this complaint in his capacity as the administrator of the estate of his deceased mother, Donna Marie Altieri. The complaint alleges that on or about June 14, 2001, Ms. Altieri presented a prescription for opium tincture camphorated to a CVS Pharmacy located at 310 Main Street in Southington, Connecticut. Instead of properly filling the prescription, the defendants allegedly misfilled the prescription with opium tincture, which contains a substantially higher concentration of morphine than opium tincture camphorated. Ms. Altieri died on June 15, 2001.

The plaintiff in his amended complaint filed October 21, 2002, sets forth the following counts: first count against the defendant CVS Pharmacy, Inc., for pharmaceutical negligence pursuant to General Statutes § 52-555; second count against the defendant CVS Pharmacy, Inc. for wanton and reckless misconduct pursuant to General Statutes § 52-555; third count against the defendant CVS Pharmacy, Inc. under Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq.; fourth count against the defendant Shyloe Vecchio for professional negligence (the

defendant Shyloe Vecchio was a pharmacist employed by the defendant CVS at the 310 Main Street store in Southington); fifth count against the defendant Southington Main Street CVS, Inc. for pharmaceutical negligence; sixth count against the defendant Southington Main Street CVS, Inc. for wanton and reckless misconduct; seventh count against the defendant Southington Main Street CVS, Inc. under the Connecticut Products Liability Act, General Statutes § 52-572m et seq; eighth count against the defendant Southington Main Street CVS, Inc. under CUTPA; ninth count against the defendant CVS Rx Services, Inc. for pharmaceutical negligence (the defendant CVS Rx Services, Inc. employs the pharmacists at CVS Pharmacies, while the defendant Southington Main Street CVS, Inc. employed the pharmacy technicians and other staff who worked at the 310 Main Street CVS Pharmacy in Southington); tenth count against defendant CVS Rx Services, Inc. for wanton and reckless misconduct; eleventh count against CVS Rx Services, Inc. under CUTPA; and a twelfth count against defendant CVS Rx Services, Inc., for professional negligence.

The defendants CVS Pharmacy, Inc., Southington Main Street CVS, Inc. and CVS Rx Services, Inc. have by motion filed on October 31, 2002, moved to strike the second, third, sixth, seventh, eighth, tenth and eleventh counts of the amended complaint, along with the portions of the prayer for relief corresponding to such counts. The plaintiff has opposed the motion to strike.

The motion argues that the second, sixth and tenth counts, which set forth causes of action for recklessness against each of the defendants, are legally insufficient because they assert only conclusory allegations of recklessness, and merely repeat the allegations of negligence.

The motion seeks to have the CUTPA claims (third, eighth and eleventh counts) stricken on the ground that these claims cannot be based solely on allegations of professional negligence, and otherwise the allegations contained in the third, eighth and eleventh counts fail to conform with the "cigarette rule."

 *2 The defendant Southington Main Street CVS (Southington) seeks to have the seventh count stricken on the ground that it characterized its pharmacy function as the provision of a service, rather than as the sale of a product within the meaning of the products liability act. The motion by this defendant also argues that the complaint does not sufficiently allege the existence of a product defect.

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Southington also argues and the plaintiff concedes that if the court denies the motion to strike the products liability claim, then it must strike the other claims against Southington because the products liability act provides an exclusive remedy. The plaintiff contends, however, that the CUTPA claim would not be subsumed by the products liability count.

The function of a motion to strike is to test the legal sufficiency of a pleading. *Ferryman v. Groton,* 212 Conn. 138, 142, 561 A.2d 432 (1989); Practice Book § 10-39(a)(5). "[A motion to strike] does not admit legal conclusions or the truth or accuracy of opinions stated in the pleadings ..." (Citations omitted; emphasis omitted). *Mingachos v. CVS, Inc.,* 196 Conn. 91, 108, 498 A.2d 368 (1985). "A motion to strike is properly granted if the complaint alleges mere conclusions of law that are unsupported by the facts alleged." (Citations omitted.) *Novametrix Medical Systems v. BOC Group, Inc.,* 224 Conn. 210, 215, 618 A.2d 25 (1992). "The role of the trial court is to examine the pleadings and construe the allegations in the light most favorable to the pleader in order to determine whether the pleader has stated a legally sufficient cause of action or defense." *ATC Partnership v. Windham,* 251 Conn. 597, 603, 741 A.2d 305, cert. denied, 530 U.S. 1214, 120 S.Ct. 2217, 147 L.Ed.2d 249 (1999).

### I. Counts Based on Recklessness

The plaintiff correctly points out that the second, sixth and tenth counts, which allege reckless conduct against the respective corporate defendants, do not merely repeat the negligence allegations of the first, fifth and ninth counts. In the second count, paragraph 11, subsection a, the plaintiff's allegations include death as a specific significant danger associated with the misfilling of this prescription, of which the defendants had prior notice. The reckless counts also differ from the negligence counts by their inclusion at paragraph 11, subsection b, which adds the word "numerous" to the reference to the number of prior misfilled prescriptions. Viewing the facts alleged in the light most favorable to the plaintiff, if the plaintiff were to demonstrate numerous misfilled prescriptions of which the defendants had prior knowledge, and deaths resulting from such misfilled prescriptions, then such conduct could meet the legal standard of reckless conduct. *Dubay v. Irish,* 207 Conn. 518, 532, 542 A.2d 711 (1988); *Bishop v. Kelly,* 206 Conn. 608, 614-15, 539 A.2d 108 (1988); *Begley v. Kohl & Madden Printing Co., Inc.,* 157 Conn. 445, 450-51, 254 A.2d 907 (1969). The motion to strike is denied with respect to the second, sixth and tenth counts.

### II. Products Liability Act Claim Against Southington

**\*3** Southington seeks to have the products liability claim (seventh count) stricken on the basis that filling a prescription is a service and not the sale of a product as required by Connecticut products liability law. See *Potter v. Chicago Pneumatic Tool Co.,* 241 Conn. 199, 214, 694 A.2d 1319 (1997). Southington cites as authority the Connecticut Supreme Court decision in the *Zichichi v. Middlesex Memorial Hospital,* 204 Conn. 399, 528 A.2d 805 (1987), and the Supreme Court of California decision in *Murphy v. E.R. Squibb & Sons, Inc.,* 40 Cal.3d 672, 710 P.2d 247 (1985).

The *Zichichi* decision is instructive but not controlling because it was based on application of the Connecticut "blood shield" statute, General Statutes § 19a-280, which provides as follows: "The implied warranties of merchantability and fitness shall not be applicable to a contract for the sale of human blood, blood plasma, or other human tissue or organs from a blood bank or reservoir, such other tissues or organs. Such blood, blood plasma and the components, derivatives or a fraction thereof, or tissues of organs shall not be considered commodities subject to sale or barter, but shall be considered as medical services." The rationale for the "blood shield" statute was noted in the *Zichichi* as follows:

> One of the driving forces behind the promulgation of "blood shield" statutes ... is to ensure that certain medical services, namely, the provision of blood and tissue, remain available to citizens in need of such services ... These statutes reflect a legislative judgment that to require providers to serve as insurers of the safety of these materials might impose such an overwhelming [burden] as to discourage the gathering and distribution of blood. To ensure that such services remain adequate and affordable, legislatures have chosen to limit liability to defects that are a result of negligence, thus bringing the provision of such services necessary for medical treatment into the same

**Altieri v. CVS Pharmacy, Inc., Not Reported in A.2d (2002)**

2002 WL 31898323, 33 Conn. L. Rptr. 524

category as the provision of other medical services.

*Zichichi v. Middlesex Memorial Hospital, supra,* 204 Conn. at 409.

*Murphy v. E.R. Squibb & Sons, Inc., supra,* 40 Cal.3d at 672, is more comparable to what must be decided in this case because it specifically finds that a pharmacy may not be held strictly liable for dispensing a prescription drug on the basis that a pharmacist dispensing a prescription drug is primarily furnishing a service rather than selling a product. *Id., at 680.* The rationale for that conclusion is set forth at 40 Cal.3d 678-79:

> [T]he pharmacist is engaged in a hybrid enterprise, combining the performance of services and the sale of prescription drugs. It is pure hyperbole to suggest, as does plaintiff, that the role of a pharmacist is similar to that of a clerk in an ordinary retail store. With a few exceptions, only a licensed pharmacist may dispense prescription drugs, and as indicated above there are stringent educational and professional requirements for obtaining and retaining a license. A pharmacist must not only use skill and care in accurately filling and labeling a prescribed drug, but he must be aware of problems regarding the medication, and on occasion he provides doctors as well as patients with advice regarding such problems. In counseling patients, he imparts the same kind of information as would a medical doctor would about the effects of the drugs prescribed. A key factor is that the pharmacist who fills a prescription is in a different position from the ordinary retailer because he cannot offer a prescription for sale except by order of the doctor. In this respect, he is providing a service to the doctor in acting as an extension to the doctor in the same sense as

a technician who takes an x-ray or analyses a blood sample on a doctor's order.

**\*4** *Id.*

The plaintiff argues that the *Murphy* decision is distinguishable because the underlying facts involve a pharmacy that sold a properly compounded and properly labeled prescription drug, unlike the plaintiff's decedent, who received the wrong drug in the wrong dosage. The court does not read *Murphy* as so restrictive in application. The scenario involving a properly compounded and properly labeled prescription drug addresses a strict liability concern implicated by products liability law. In this case, the facts describe what is clearly a negligence claim, which is properly dealt with in the counts asserting negligence.

*Murphy* further notes that pharmaceutical services are similar to blood or plasma distribution, and as such, are clearly a service. The *Murphy* court observed that from a comparative functional aspect, pharmacy is more aptly characterized as performance of a service, rather than as a manufacture and sale of a blood product. *Id.,* at 679-80.

The court finds that Southington was engaged in a service when filling a prescription, and therefore is not subject to the products liability act. The seventh count is stricken.

### III. CUTPA Claims

The substance of the plaintiff's CUTPA claims is contained in paragraphs 12 and 13 of the third, eighth and eleventh counts, alleging that:

> (12) This misfiled prescription, and plaintiff's decedent's subsequent death, occurred because of the defendant's unfair and deceptive acts and/or practices in the conduct of its trade and commerce in violation of C.G.S. 42-110a et seq. and specifically in that: a) It continuously failed to implement and maintain appropriate systems and safe pharmaceutical practices, policies and procedures to avoid the misfilling of prescriptions, and the misfilling of this prescription in particular despite prior notice of the significant dangers, including death, associated with the misfilling of this prescription, and b) It continuously failed to implement and maintain appropriate systems and safe pharmaceutical practices, policies and procedures to avoid the misfilling of prescriptions and the misfilling of

this prescription in particular despite the occurrence of numerous prior misfilled prescriptions.

(13) The continued failure by this defendant to implement appropriate safety systems to prevent the distribution of potentially dangerous, and even fatal, misfilled prescriptions is deceptive and unfair to the consuming public, and plaintiff's decedent in particular, who rely on this defendant to dispense the medication which it claims to be dispensing.

The general rule in Connecticut is that professional negligence of a health care provider does not fall within the purview of CUTPA. *Haynes v. Yale-New Haven Hospital,* 243 Conn. 17, 34, 699 A.2d 964 (1997). The *Haynes* decision indicates that "the touchstone for a legally sufficient CUTPA claim against a health care provider is an allegation that an entrepreneurial or business aspect of the provision of services aside from medical competence is implicated, or aside from medical malpractice based on adequacy of staffing, training, equipment or support personnel. Medical malpractice claims recast as CUTPA claims cannot form the basis for a CUTPA violation." *Id.,* at 38.

*\*5* In the instant case, the allegations are that the defendants misfilled the prescription and "failed to implement and maintain appropriate systems and safe pharmaceutical practices, policies and procedures to avoid the misfilling." The allegations sound in professional negligence and do not implicate the "entrepreneurial aspects" of the business of pharmacies.

In *Sherwood v. Danbury Hospital,* 252 Conn. 193, 213-14, 746 A .2d 730 (2000), our Supreme Court determined that where the hospital failed to implement proper rules, regulations and quality assurance programs, such allegations did not relate to entrepreneurial aspects of the hospital.

In upholding a trial court's direction of a defendant's verdict on a CUTPA claim against a medical service provider (opthalmologist), the Connecticut Appellate Court in *Janusauskas v.. Fichman,* 68 Conn.App. 672, 793 A.2d 1109 (2002), noted that CUTPA claims against health providers are limited to the entrepreneurial or business aspect of the provision of services, aside from medical competence. With

respect to claims related to the entrepreneurial or business aspect of the provision of medical services, the court noted the following:

> Under CUTPA, an act or practice is deceptive if three conditions are met. First, there must be a representation, omission, or other practice likely to mislead consumers. Second, the consumers must interpret the message reasonably under the circumstances. Third, the misleading representation, omission, or practice must be material-that is, likely to affect consumer decisions or conduct.

(Citations omitted; internal quotation marks omitted.) *Id.,* at 681.

The allegations contained in paragraphs 12 and 13 of the third, eighth and eleventh counts fail to contain such assertions. What we are left with is the recast of the health care provider malpractice claim claimed as a CUTPA violation. The allegations of negligent practices compounded by failure to implement appropriate procedures or regulations in the area of quality assurance would transform every malpractice case into a CUTPA claim. This court will not endorse this result. The third, eighth and eleventh counts are stricken.

Conclusion

The motion to strike is granted with respect to the third, seventh, eighth and eleventh counts and their related prayers for relief contained in the amended complaint. The motion to strike the second, sixth and tenth counts of the amended complaint is denied.

**All Citations**

Not Reported in A.2d, 2002 WL 31898323, 33 Conn. L. Rptr. 524

---

    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 2

Falat v. County of Hunterdon, Not Reported in F.Supp.2d (2013)

2013 WL 1163751

KeyCite Yellow Flag - Negative Treatment

Distinguished by Transportation Insuance Company v. American Harvest
Baking Company, Inc., D.N.J., December 16, 2015

2013 WL 1163751
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

John FALAT, Jr., et al., Plaintiffs,

v.

The COUNTY OF HUNTERDON,
et al., Defendants.

Civil Action No. 12–6804 (SRC).
|
March 19, 2013.

**Attorneys and Law Firms**

William J. Courtney, Law Offices of William J. Courtney,
Flemington, NJ, for Plaintiffs.

**OPINION**

CHESLER, District Judge.

 **\*1**  This matter comes before the Court on the following
motions pursuant to Federal Rule of Civil Procedure 12(b)
(6): (1) motion to dismiss the Complaint by Defendants
Hunterdon County Prosecutor's Office ("Prosecutor's
Office"), Kenneth Rowe, and Edward DeFillipis (Docket
Entry 10); (2) motion to dismiss by Defendants the County of
Hunterdon (the "County"), George Melick, William Mennen,
Ronald Sworen, Matthew Holt, Erik Peterson, Robert Walton,
and Cynthia Yard (Docket Entry 12); (3) motion to dismiss
by Defendant J. Patrick Barnes (Docket Entry 13); (4) motion
to dismiss by Defendant Gaetano De Sapio (Docket Entry
15).[1] Plaintiffs John Falat, Jr., Deborah Trout, and Michael
Russo (collectively "Plaintiffs") have opposed the motions
in part. (Docket Entry 19) The Court will rule on the papers
submitted, and without oral argument, pursuant to Federal
Rule of Civil Procedure 78. For the reasons that follow, the
Court will dismiss certain of Plaintiffs' claims with prejudice
and the remaining claims without prejudice.

**I. The Facts**[2]

Plaintiffs Falat, Trout, and Russo are all former employees
of the Hunterdon County Sheriff's Office. Russo and Trout
sued the County, alleging various rights violations, in 1995
and 1998 respectively. Both claims were apparently settled
out of court. Broadly speaking, the Plaintiffs now allege
that, in retaliation for those prior lawsuits, the Defendants
engaged in a concerted campaign to harass and discredit
the Plaintiffs, remove them from their positions within
the Sheriff's Office, and prosecute them on trumped-up
charges. Plaintiffs have named sixteen separate defendants:
the County of Hunterdon, the Office of the Hunterdon
County Prosecutor, Prosecutors J. Patrick Barnes, Kenneth
Rowe, Edward DeFillippis, Bennett A. Barlyn, and William
McGovern, Hunterdon County Freeholders George Melick,
William Mennen, Ronald Sworen, Matthew Holt, Erik
Peterson, and Robert Walton, County Counsel Gaetano De
Sapio, County Administrator Cynthia Yard, and 2009 recall
campaign organizer Donna Simon.[3]

According to the Complaint, the Defendants' retaliatory
campaign began in 2007, shortly after Plaintiff Trout
announced she would seek the June 2007 Republican
nomination for Hunterdon County Sheriff. Trout had run for,
and lost, the Republican nomination for the same position in
2004. Russo and Falat, who had helped Trout in her earlier
run, again campaigned on her behalf.

Plaintiffs allege that the coordinated harassment by County
officials began in May 2007 when County Counsel De Sapio
sent Trout a letter demanding that she remove a picture of
herself in uniform, along with an insignia that resembled
the patch worn by Hunterdon County Sheriff's officers, from
her campaign website. When Trout won the election on
November 4, 2007, Defendant Melick allegedly told Trout
that he "couldn't believe the bitch won" and went on to state
that "[t]he bitch sued us and we're not going to make it easy
for her," or words to that effect. (Compl.¶ 37) Later that night,
Melick allegedly told Trout that "[j]ust because you won the
election, don't think we're going to make it easy for you."

 **\*2**  According to the Complaint, what followed was an
intense and coordinated effort by various County entities
and employees to frustrate her ability to run the Sheriff's
Department, which included preventing Trout from adding
Russo and Falat to the County payroll. Plaintiffs allege that
Trout's critics on the Board persuaded the County Prosecutor's
Office to launch an investigation into her activities within
days of her taking office, which produced a steady stream
of grand jury leaks to the press and, ultimately, indictments

against the Plaintiffs in 2010. After the indictments were released, the Freeholders issued a series of resolutions demanding, among other things, that Russo be suspended and Trout take a leave of absence and cede operational control as Sheriff. The criminal charges against the Plaintiffs were ultimately dropped after the New Jersey Attorney General's Office took over the case.

## II. Discussion

### A. Standard of Review

A complaint will survive a motion under Rule 12(b)(6) only if it states "sufficient factual allegations, accepted as true, to 'state a claim for relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The complaint must contain sufficient factual allegations to raise a right to relief above the speculative level, assuming the factual allegations are true. *Twombly,* 550 U.S. at 555; *Phillips v. County of Allegheny,* 515 F.3d 224, 234 (3d Cir.2008). The Supreme Court has made clear that "a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555; *see also Iqbal,* 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). The Third Circuit, following *Twombly* and *Iqbal,* has held that the pleading standard of Rule 8(a) "requires not merely a short and plain statement, but instead mandates a statement 'showing that the pleader is entitled to relief.' " *Phillips,* 515 F.3d at 234. In a Rule 12(b)(6) motion, the Court is limited in its review to a few basic documents: the complaint, exhibits attached to the complaint, matters of public record, and undisputedly authentic documents if the complainant's claims are based upon those documents. *See White Consol. Indus.,* 998 F.2d at 1196.

### B. Abandoned Claims

At the outset, the Court notes that Plaintiffs have voluntarily abandoned a number of their claims against the moving Defendants.[4] Accordingly, Count One of the Complaint ("NJ LAD/Gender Discrimination") will be dismissed with prejudice as against all moving Defendants except the County. Count Two of the Complaint ("Hostile Work Environment") will be dismissed with prejudice as against all moving Defendants except the County. Count Three of the Complaint ("First and Fourteenth Amendments, 42 U.S.C. § 1983") will be dismissed with prejudice as against

the County, the Prosecutor's Office, Barnes, Barlyn, and McGovern. Count Four of the Complaint ("Equal Protection/ Due Process, 42 U.S.C. § 1983") will be dismissed with prejudice as against all moving Defendants. Count Five of the Complaint ("Conspiracy Under § 1983, § 1985, and NJ Constitution") will be dismissed with prejudice as against the Prosecutor's Office, Barnes, Barlyn, and McGovern. Count Six of the Complaint ("Failure to Supervise Under 42 U.S.C. § 1986 and the NJ Constitution") will be dismissed with prejudice as against all moving Defendants. Count Seven of the Complaint ("New Jersey Constitution/Civil Rights Act") will be dismissed with prejudice as against the Prosecutor's Office, Barnes, Barlyn, and McGovern. Count Eight of the Complaint ("Public Policy Violations of the State of New Jersey") will be dismissed with prejudice as against all moving Defendants. Count Nine of the Complaint ("Retaliation") will be dismissed with prejudice as against all moving Defendants except for the County. Count Ten of the Complaint ("Constructive Discharge") will be dismissed with prejudice as against all moving Defendants except the County. Count Eleven of the Complaint ("Aider and Abettor Liability as to Individual Defendants") will be dismissed as against all moving Defendants except Yard and De Sapio. Count Twelve of the Complaint ("Conscientious Employee Protection Act") will be dismissed with prejudice as against all moving Defendants. Count Thirteen of the Complaint ("Respondeat Superior") will be dismissed with prejudice as against all moving Defendants except the County. Count Fourteen of the Complaint ("Official Policy") will be dismissed as against all moving Defendants except the County. Counts Fifteen ("Negligence"), Sixteen ("Tortious Interference with Contractual Relations"), Seventeen ("Tortious Interference With Prospective Economic Gain"), and Eighteen ("Abuse of Process") of the Complaint will be dismissed with prejudice as against all moving Defendants. Count Nineteen of the Complaint ("Malicious Prosecution") will be dismissed with prejudice as against Barnes, Barlyn, and McGovern. Count Twenty of the Complaint ("Open Public Meetings Act") will be dismissed with prejudice as against all moving Defendants.

### C. Remaining Claims

**\*3** With respect to Plaintiffs' remaining claims, the Court concludes that, as currently pled, the Complaint does not satisfy the pleading requirements enunciated by the Supreme Court in *Iqbal, supra,* and *Twombly, supra.* Accordingly, the remaining claims in the Complaint will be dismissed without prejudice.

The Court notes that some of the Complaint relies on impermissibly vague group pleading, in which it is alleged that "Defendants" engaged in certain wrongful conduct. For example, Plaintiffs allege that "Defendants chose to enlist the services of the Prosecutor's office to pursue Plaintiff Trout criminally for what constituted their perceived 'non-compliance' with the County's hiring policies." (Compl. ¶ 54) Later in the Complaint, in a section dealing with the alleged hacking of Russo's computer, it is alleged that "Defendants then took this illegally obtained private communication and provided it to the Prosecutor's Office and apparently disseminated the information to Defendants Rowe and DeFillippis." (Compl. ¶ 93) It may at times be appropriate and convenient for a pleading to use the short-hand term "Defendants," but when the Complaint has named 16 separate defendants (exclusive of fictitiously named defendants) who occupied different positions and presumably had distinct roles in the alleged misconduct, Plaintiffs cannot merely state that *"Defendants* did *x"*—they must specifically allege *which* Defendants engaged in what wrongful conduct. *See In re Sagent Tech., Inc.,* 278 F.Supp.3d 1079, 1094 (N.D.Cal.2003) ("[T]he complaint fails to state a claim because plaintiffs do not indicate which individual defendant or defendants were responsible for which alleged wrongful act."). Without knowing exactly what wrongful conduct they are alleged to have engaged in, the individuals Defendants have not been given fair notice of the allegations against them. *See Twombly,* 550 U.S. at 555 (stating that Rule 8(a)(2) requires a complaint to "give the defendant fair notice of what the claim is and the grounds upon which it rests") (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In their opposition brief, Plaintiffs have conceded that they do not assert claims by each Plaintiff against every Defendant on all of the Complaint's 20 counts, and Plaintiffs have provided a chart aimed at clarifying exactly what claims are being maintained. But "[i]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." *Pennsylvania ex rel. Zimmerman v. Pepsico, Inc.,*

836 F.2d 173, 181 (3d Cir.1988) (quoting *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1107 (7th Cir.1984)). While Plaintiffs' clarification does help the Court determine which claims have been abandoned, it does not obviate the need for a clean, well-organized Complaint articulating precisely which claims each Plaintiff is making against whom.

To the extent that the Complaint does include specific allegations against particular Defendants, it largely fails to connect these factual allegations to the specific counts in the Complaint. Each of the Complaint's 20 counts engages in the common practice of incorporating by reference every allegations already made. (*E.g.,* Compl. ¶ 149 ("Plaintiffs repeat and reallege the allegations contained in paragraphs 1–148 of the Complaint as if fully alleged herein at length.")) But the Counts themselves leave it to the Court to guess which factual assertions in the 57–page Complaint are intended to support which legal claims. This, the Court refuses to do. It is not the Court's job to laboriously search the Complaint for factual assertions that could, in theory, be used to support one legal claim or another. "District judges are not archaeologists. They need not excavate masses of papers in search of revealing tidbits ...." *Northwestern Nat'l Ins. Co. v. Baltes,* 15 F.3d 660, 662 (7th Cir.1994).

**\*4** Should the Plaintiffs wish to proceed in this action, they will furnish the Court with a Complaint that clearly spells out which individual plaintiffs are making what legal claims against whom and set forth specific factual allegations to support each of those claims. To that end, the Court will dismiss the remaining claims without prejudice and grant Plaintiffs leave to file an Amended Complaint. An appropriate Order accompanies this Opinion.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 1163751

Footnotes

1    Two other Defendants, Bennett Barlyn and William McGovern, also moved to dismiss the claims against them on December 10, 2012. (Docket Entry 14) Plaintiffs responded to that motion by filing a notice voluntarily dismissing the claims against Barlyn and McGovern without prejudice (Docket Entry 16), which the Court ordered on January 22, 2013 (Docket Entry 17). On January 23, 2013, Barlyn and McGovern requested that the Court enter an order dismissing the claims against them with prejudice. (Docket Entry 18) On February 5, 2013, Plaintiffs filed a single brief in partial opposition to the various motions to dismiss (Docket Entry 19) but offered no opposition to Barlyn and McGovern's request to convert the non-prejudicial dismissal into a dismissal with prejudice. Plaintiffs having failed to include any counts against Barlyn or McGovern in the chart setting forth the causes of action Plaintiffs intend to maintain going forward (*See* Pls.' Opp'n

2013 WL 1163751

Br. 2–3), the Court will grant Barlyn and McGovern's request to convert their dismissal without prejudice into a dismissal with prejudice.

2    In a Rule 12(b)(6) motion, the Court is limited in its review primarily to the complaint and a few basic documents. *See Pension Benefit Guar. Corp. v. White Consol. Indus.,* 998 F.2d 1192, 1196 (3d Cir.1993). Accordingly, the Court's statement of the facts is derived from the allegations contained in the Complaint (Docket Entry 1, Att. 2) and does not represent factual findings by the Court.

3    Simon is the only defendant who has not moved to dismiss the Complaint.

4    Defendant Simon has not moved before this Court and is therefore not considered a moving Defendant. Defendants Barlyn and McGovern, though already technically terminated as Defendants, have moved before the Court and are considered moving defendants for the purposes of this Opinion.

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 3

A011

2012 WL 5267897
Only the Westlaw citation is currently available.
United States District Court,
C.D. California.

Jessica GARZA, et al.

v.

ENDO PHARMACEUTICALS, et al.

No. CV 12–1585–CAS (OPx).
|
Oct. 24, 2012.

**Attorneys and Law Firms**

George Baltaxe, Law Offices of George Baltaxe, Encino, CA;
Michael Patrick Caruso, The Caruso Firm, San Diego, CA,
for Jessica Garza.

Pamela J. Yates, Robert G. Barnes, Kaye Scholer LLP, Los
Angeles, CA, for Endo Pharmaceuticals, et al.

**Proceedings: (In Chambers:) DEFENDANT
GARFIELD BEACH CVS'S MOTION TO DISMISS
PLAINTIFFS' COMPLAINT** (filed September 24, 2012)

CHRISTINA A. SNYDER, Judge.

*\*1* Catherine Jeang, Deputy Clerk.

## I. INTRODUCTION & BACKGROUND

The Court finds this motion appropriate for decision
without oral argument. Fed.R.Civ.P. 78; Local Rule 7–15.
Accordingly, the hearing date of October 29, 2012 is vacated,
and the matter is hereby taken under submission.

On August 20, 2012, plaintiffs Jessica and David Garza
initiated their suit against Endo Pharmaceuticals, Qualitest
Pharmaceuticals, CVS Caremark, and Does 1–20 in the
Superior Court of California, County of San Bernardino.
Dkt. No. 1.[1] Plaintiffs bring four claims for relief: (1)
products liability; (2) breach of warranty; (3) negligence; and
(4) loss of consortium. Compl. Plaintiffs principally allege
that defendants mislabeled or incorrectly packaged plaintiff
Jessica Garza's birth control pills, which led to an unexpected
pregnancy and birth of their child. Id. On September 18, 2012,

defendants removed to this Court on the basis of diversity
jurisdiction. Dkt. No. 1.[2]

Plaintiff alleges facts as follows. Between September 2010
and August 2011, plaintiff purchased birth control pills known
as Tri–Previfem at defendant Garfield Beach CVS. Compl. ¶
3. These pills were manufactured and packaged by defendants
Endo Pharmaceuticals and Qualitest Pharmaceuticals. Id.
Each time she obtained the pills, plaintiff received a package
with a four-week supply of pills, one-quarter of which were
placebos. Id. ¶ 4. However, at some point, the pills were
purportedly packaged in the wrong order, such that plaintiff
took the placebos at a time when conception could occur. Id.
In September 2011, plaintiff discovered that she was pregnant
with her fourth child. Id. ¶ 6. She gave birth on March 9, 2012.
Id. She then filed the instant suit.

On September 24, 2012, defendant CVS filed a motion to
dismiss plaintiff's complaint. Dkt. No. 5. Plaintiff opposed
the motion on October 11, 2012. Dkt. No. 11. Defendant
responded on the same date. Dkt. No. 10. Defendant's motion
is presently before the Court.

## II. LEGAL STANDARD

### A. Federal Rule of Civil Procedure 12(b)(6)

A Rule 12(b)(6) motion tests the legal sufficiency of the
claims asserted in a complaint. "While a complaint attacked
by a Rule 12(b)(6) motion to dismiss does not need detailed
factual allegations, a plaintiff's obligation to provide the
'grounds' of his 'entitlement to relief' requires more than
labels and conclusions, and a formulaic recitation of the
elements of a cause of action will not do." Bell Atlantic Corp.
v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d
929 (2007). "[F]actual allegations must be enough to raise a
right to relief above the speculative level." Id.

In considering a motion pursuant to Rule 12(b)(6), a court
must accept as true all material allegations in the complaint,
as well as all reasonable inferences to be drawn from them.
Pareto v. F.D.I.C., 139 F.3d 696, 699 (9th Cir.1998). The
complaint must be read in the light most favorable to the
nonmoving party. Sprewell v. Golden State Warriors, 266 F.3d
979, 988 (9th Cir.2001); Parks Sch. of Bus., Inc. v. Symington,
51 F.3d 1480, 1484 (9th Cir.1995). However, "[i]n keeping
with these principles a court considering a motion to dismiss
can choose to begin by identifying pleadings that, because
they are no more than conclusions, are not entitled to the
assumption of truth. While legal conclusions can provide the

framework of a complaint, they must be supported by factual allegations." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1950, 173 L.Ed.2d 868 (2009); *Moss v. United States Secret Service,* 572 F.3d 962, 969 (9th Cir.2009) ("[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief .") (citing *Twombly* and *Iqbal); Sprewell,* 266 F.3d at 988; W. *Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir.1981). Ultimately, "[d]etermining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 129 S.Ct. at 1950.

**\*2** Furthermore, unless a court converts a Rule 12(b) (6) motion into a motion for summary judgment, a court cannot consider material outside of the complaint (e.g., facts presented in briefs, affidavits, or discovery materials). *In re American Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.,* 102 F.3d 1524, 1537 (9th Cir.1996), *rev'd on other grounds sub nom Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach,* 523 U.S. 26, 118 S.Ct. 956, 140 L.Ed.2d 62 (1998). A court may, however, consider exhibits submitted with or alleged in the complaint and matters that may be judicially noticed pursuant to Federal Rule of Evidence 201. *In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 986 (9th Cir.1999); *Lee v. City of Los Angeles,* 250 F.3d 668, 689 (9th Cir.2001).

For all of these reasons, it is only under extraordinary circumstances that dismissal is proper under Rule 12(b)(6). *United States v. City of Redwood City,* 640 F.2d 963, 966 (9th Cir.1981).

### III. ANALYSIS
Plaintiffs' first claim for strict products liability cannot withstand defendant's motion to dismiss. Under the authority of *Murphy v. Squibb,* 40 Cal.3d 672, 221 Cal.Rptr. 447, 710 P.2d 247 (1985), strict liability for defective pharmaceutical products does not extend to the pharmacies that dispense drugs to patients. Because pharmacies are primarily in the business of providing a service to patients, rather than being merely a retailer of drugs, the California Supreme Court found that the doctrine of strict products liability should not apply. *Id.* at 679–80, 221 Cal.Rptr. 447, 710 P.2d 247. Plaintiffs attempt to distinguish *Murphy* by arguing that the decision did not contemplate a case where the pharmacist "mislabeled" the drug in question, *id.* at 676, 221 Cal.Rptr. 447, 710 P.2d 247, but plaintiffs' argument is unavailing. The clear import of *Murphy,* in accordance with other jurisdictions to consider

the issue, is that pharmacies are not properly named in a strict liability products action related to defective drugs-which would include the alleged mispackaging by defendants here. Accordingly, the Court grants defendant's motion to dismiss plaintiffs' claim of strict liability.

In addition, plaintiffs' breach of warranty claim against CVS is also unavailing. Because under California law pharmacies primarily provide a service, not a product, a breach of warranty claim does not lie. *See Hector v. Cedars–Sinai Med. Ctr.,* 180 Cal.App.3d 493, 508 n. 3, 225 Cal.Rptr. 595 (1986) (no breach of warranty claim where strict products liability claim is also unavailable against a hospital). Plaintiffs' attempt to distinguish the reasoning of *Murphy* fails here as well, for it applies in full force to claims of implied breach of warranty. *See In re Rezulin Products Liab. Litig.,* 133 F.Supp.2d 272, 292 n. 75 (S.D.N.Y.2001) (collecting cases finding no breach of warranty liability for pharmacies).

Plaintiffs could potentially state a claim against defendant CVS for negligence, although plaintiffs have failed to do so here. Plaintiffs allegations are that: (1) plaintiff Jessica Garza purchased defectively packaged Tri–Previfem from defendant CVS; and (2) defendants Endo Pharmaceuticals and Qualitest pharmaceuticals are the ones who packaged the pills. Compl. ¶¶ 3–4. Nowhere does plaintiff allege any sort of negligent act, or even a potential negligent act, on the part of defendant CVS. To survive a motion to dismiss brought by CVS, plaintiffs must at least allege some facts demonstrating how CVS was allegedly involved in the purported mispackaging or mislabeling of plaintiff Jessica Garza's birth control medication. Plaintiffs present a number of potential theories by which CVS may have acted negligently in their opposition, Opp'n at 2–3, but arguments in an opposition are not factual allegations that this Court may consider on a motion to dismiss plaintiffs' *complaint.* Accordingly, the Court grants defendant's motion to dismiss plaintiffs' negligence claim.[3]

### IV. CONCLUSION
**\*3** In accordance with the foregoing, the Court hereby GRANTS defendant Garfield Beach CVS's motion to dismiss without prejudice. Plaintiffs shall have **twenty days (20)** from the date of this order to file an amended complaint addressing the deficiencies identified herein. Failure to do so may result in the dismissal of CVS from this action with prejudice.

IT IS SO ORDERED.

Garza v. Endo Pharmaceuticals, Not Reported in F.Supp.2d (2012)
2012 WL 5267897

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 5267897

Footnotes

1    Defendant Garfield Beach CVS, LLC ("CVS") is erroneously named as "CVS Caremark."

2    Neither party has challenged this Court's jurisdiction here, but the Court notes that an LLC has the residency of every one of its members or owners. *See Johnson v. Columbia Properties Anchorage, LP,* 437 F.3d 894, 899 (9th Cir.2006). Because the sole member of Garfield Beach CVS, LLC is CVS Pharmacy, Inc., a Delaware corporation with its principal place of business in Rhode Island, the requirement of diversity of citizenship is met here.

3    Plaintiffs' claim for loss of consortium is derivative of their other claims. *See Tucker v. CBS Radio Stations, Inc.,* 194 Cal.App.4th 1246, 1256, 124 Cal.Rptr.3d 245 (2011). As such, the Court also grants defendant's motion to dismiss this claim without prejudice.

---

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 4

Case 1:19-md-02875-RMB-SAK    Document 599-1    Filed 10/16/20    Page 18 of 57
PageID: 13270

Henderson v. CVS Pharmacy, Not Reported in A.2d (2008)
2008 WL 3916444, 46 Conn. L. Rptr. 25

2008 WL 3916444
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Superior Court of Connecticut,
Judicial District of New Haven.

Caroline HENDERSON et al.

v.

CVS PHARMACY.

No. CV085017128.
|
July 31, 2008.

**Attorneys and Law Firms**

Biller Sachs Raio & Zito, Hamden, for Caroline Henderson et al.

Cramer Alissi & Fontaine P.C., Hartford, for CVS Pharmacy.

**Opinion**

COSGROVE, J.

*1 Caroline Henderson (d.o.b.12/21/2004) is a minor and the child of Diana and Stephen Henderson. The Hendersons are all plaintiffs in this matter and have brought suit against CVS Pharmacy, Inc. and Katie Boynes, a pharmacist employed by CVS. The plaintiffs allege that the defendants provided incorrect prescription medication and instructions for use by Caroline Henderson.

The plaintiffs' complaint alleges that Caroline Henderson was prescribed Augmentin Suppression and A/B Otic Ear Drops QUA, but that the defendants negligently and recklessly provided Zithromax instead. The plaintiffs allege that Caroline Henderson ingested high dosages of Zithromax and experienced related side effects; that the conditions for which her medications were prescribed were exacerbated as a result of receiving improper medication and instructions; and that she experienced loss of sleep, underwent physical and mental suffering, and has been unable to resume and enjoy her usual activities. Consequently, the plaintiffs claim they have all had to expend large sums of money to help Caroline Henderson recover from these injuries and that she

may possibly have to continue such treatment in the future and, therefore, expend even greater sums. Finally, Diana and Stephen Henderson claim that, as a result of their daughter's suffering, they too have experienced emotional distress that is likely to lead to future physical suffering.

There are five counts in the complaint made by the plaintiffs. In order, the counts allege negligence, recklessness, statutory violations of Connecticut General Statutes § 52-42b (products liability), economic loss by the parents, and emotional distress suffered by the parents. The defendants have filed a motion to strike each count of the complaint. At oral argument the defendant did not pursue the motion as to the first and fourth counts. This memorandum addresses the second (recklessness), third (products liability), and fifth (emotional distress) counts.

*DISCUSSION*

The defendants' motion to strike is "[t]he proper method to challenge the legal sufficiency of a complaint ... prior to trial." *Gulack v. Gulack,* 30 Conn.App. 305, 309, 620 A.2d 181 (1993). "A motion to strike challenges the legal sufficiency of a pleading ... and, consequently, requires no factual findings by the trial court ... [I]f facts provable in the complaint would support a cause of action, the motion to strike must be denied." (Internal quotation marks omitted.) *Batte-Holmgren v. Commissioner of Public Health,* 281 Conn. 277, 294, 914 A.2d 996 (2007). "Moreover ... [w]hat is necessarily implied [in an allegation] need not be expressly alleged ... Indeed, pleadings must be construed broadly and realistically, rather than narrowly and technically." (Internal quotation marks omitted.) *Violano v. Fernandez,* 280 Conn. 310, 318, 907 A.2d 1188 (2006).

*Second Count-Recklessness*

In claiming that the defendants acted recklessly in improperly dispensing medicine for use by Caroline Henderson, the plaintiffs allege in paragraph 9 of their complaint that "[t]he injuries suffered by ... Caroline Henderson ... were caused by the Defendants' reckless disregard for customers in that ... they provided ... Caroline Henderson ... with the wrong medication and wrong instructions for her condition and did nothing to check the accuracy of the medications provided to her despite their clear professional responsibility to do so,

Case 1:19-md-02875-RMB-SAK    Document 599-1    Filed 10/16/20    Page 19 of 57
PageID: 13271

Henderson v. CVS Pharmacy, Not Reported in A.2d (2008)

2008 WL 3916444, 46 Conn. L. Rptr. 25

and the grave danger posed to her by virtue of dispensing the wrong medications and instructions."

**\*2** The defendants counter that the facts, as set forth in the plaintiffs' complaint, do not satisfy the requirements for a claim of recklessness. The defendants argue that the second count merely alleges negligence, but labels it as recklessness by stating conclusions of law.

"[Recklessness] requires an extreme departure from ordinary care ... [N]egligence and wilful and wanton misconduct are separate and distinct causes of action ... There is a wide difference between negligence and a reckless disregard of the rights or safety of others, and a complaint should employ language explicit enough to clearly inform the court and opposing counsel that reckless misconduct is relied on ... Merely using the term 'recklessness' to describe conduct previously alleged as negligence is insufficient as a matter of law." (Citations omitted; Internal quotation marks omitted.) *Angiolillo v. Buckmiller,* 102 Conn.App. 697, 705, 927 A.2d 312, cert. denied, 284 Conn. 927, 934 A.2d 243 (2007).

"Recklessness entails something more than a failure to exercise a reasonable degree of watchfulness to avoid danger to others or to take reasonable precautions to avoid injury to them ... Wanton misconduct is reckless misconduct ... It is such conduct as indicates a reckless disregard of the just rights or safety of others or of the consequences of the action ... Willful, wanton, or reckless conduct tends to take on the aspect of highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent ... It is at least clear ... that such aggravated negligence must be more than any mere mistake resulting from inexperience, excitement, or confusion, and more than mere thoughtlessness or inadvertence, or simply inattention." (Internal quotation marks omitted.) *Hanks v. Powder Ridge Restaurant Corp.,* 276 Conn. 314, 350 n. 11, 885 A.2d 734 (2005).

In this matter, the plaintiffs allege that the pharmacy dispensed the wrong medicine and provided incorrect instructions. The Superior Court has previously held that an allegation of recklessness was sufficient when the pharmacy was given notice that the medication they provided was of the wrong kind, but still failed to remedy their error when given the opportunity. See *Stanko v. Bader,* Superior Court, judicial district of Stamford-Norwalk, Docket No. CV 03 0193669 (October 7, 2003, D'Andrea, J.T.R.) (35 Conn. L. Rptr. 605). In *Altieri v. CVS Pharmacy, Inc.,* Superior Court, judicial

district of Waterbury, Docket No. X06-CV-02-0171626 S (December 13, 2002, McWeeny, J.) (3 Conn. L. Rptr. 605), the court found that the plaintiffs had distinguished their recklessness claim from their negligence claim by adding terms that, when viewed in a light most favorable to the plaintiff, made it possible for a trier of fact to find that the defendant had acted recklessly.

In reviewing the allegations made by the plaintiffs in the present matter, they have done more than just relabel their negligence claim. Paragraph 8 of the first count, alleging only negligence, states that the harm to Caroline Henderson was caused by "the failure of the Defendants ... to exercise reasonable care and skill in the provision of pharmaceutical services, in that they improperly filled prescriptions for Augmentin Suppression and A/B Otic Ear Drops QUA for the Plaintiff ..." Whereas, in paragraph 9 of the second count, alleging recklessness, the plaintiffs have distinguished their allegation by stating that the defendants not only provided the wrong medication and instructions, but also "did nothing to check the accuracy of the medications provided [to the plaintiffs] despite their clear professional responsibility to do so, and the grave danger posed to [the plaintiffs] by virtue of dispensing the wrong medications and instructions." The plaintiffs have, in fact, differentiated the first two counts by alleging in the second count that the defendants had a professional responsibility that was ignored by them and that they did so even in the face of great danger that could befall someone who was to receive the medication they dispensed. The plaintiffs have not merely appended adjectives to their negligence complaint. The foreseeable danger is inherent in that a mistake by them regarding type of medicine, dosage, or instructions as to use could have serious health risks for someone taking those medicines.

**\*3** The plaintiff's allegations of recklessness are not merely allegations of negligence suffused with legal conclusions. When the pleadings are construed broadly, it is apparent that there are alleged facts contained within the second count that could allow for a finding that the defendants acted recklessly.

The motion to strike the second count is denied.

*Count Three-Product Liability*

The motion to strike the third count of the plaintiffs' complaint is based on the defendants' assertion that, because a pharmacist is not a product seller, the Connecticut Product

Henderson v. CVS Pharmacy, Not Reported in A.2d (2008)

2008 WL 3916444, 46 Conn. L. Rptr. 25

Liability Act (CPLA) does not apply to the present case. The CPLA, § 52-572m et seq., provides for a liability claim to be brought for "all claims or actions brought for personal injury ... caused by the manufacture, construction, design, formulation, preparation, assembly, installation, testing, warning, instructions, marketing, packaging or labeling of any product ... [and] shall include, but is not limited to, all actions based on ... [s]trict liability in tort [or] negligence ..." General Statutes § 52-572m(b). According to § 52-572n(a), claims made under the CPLA are only available against a "product seller." As defined in the statute, a "product seller" is "any person or entity, including a manufacturer, wholesaler, distributor or retailer who is engaged in the business of selling such products whether the sale is for resale or for use or consumption." General Statutes § 52-572m(a).

There does not appear to be any appellate level guidance as to whether a pharmacist who misfills a prescription qualifies as a product seller under the CPLA. In the Superior Court there is a split of authority. See *Silva v. Walgreens Eastern Co.,* Superior Court, judicial district of Fairfield, Docket No. CV 04 4001615 (October 24, 2005, Radcliffe, J.) (40 Conn. L. Rptr 187) (Holding that misfilling pharmacists *are* product sellers); *Silber v. Walgreen Co.,* Superior Court, judicial district of New Haven, Docket No. CV 04 4009662 (May 4, 2005, Thompson, J.) (39 Conn. L. Rptr. 271) (Holding that misfilling pharmacists are *not* product sellers); *Altieri v. CVS Pharmacy, Inc., supra,* at 3 Conn. L. Rptr. 524 (Holding that misfilling pharmacists are *not* product sellers); *Stanko v. Bader, supra,* at 35 Conn. L. Rptr. 605 (Holding that misfilling pharmacists *are* a product seller); and *Stevens v. Romer,* Superior Court, judicial district of Stamford-Norwalk at Stamford, Docket No, CV 98 0168402 (March 24, 1999, D'Andrea, J.) (24 Conn. L. Rptr. 279) (Holding that misfilling pharmacists *are* a product seller).

To reach an answer, the court must consider the relationship between the pharmacist and the customer. In *Truglio v. Hayes Construction Co.,* 66 Conn.App. 681, 785 A.2d 1153 (2001), the court guided the product seller inquiry toward an examination of whether "a sale of a product is a principal part of the transaction and where the essence of the relationship between the buyer and seller is *not* the furnishing of professional skill or services." (Internal quotation marks omitted.) *Id.,* at 685. The *Truglio* inquiry is especially helpful when, as the split in Superior Court decisions have shown, a transaction has characteristics that could qualify the seller in the transaction as a product seller under the CPLA or as exempt under the CPLA for providing a professional skill or

service. Prescription drugs have, arguably, been determined to be products in the context of the CPLA. See *Vitanza v. Upjohn Co.,* 257 Conn. 365, 778 A.2d 829 (2001) (The Supreme Court, by permitting an affirmative defense on behalf of a prescription drug manufacturer in a products liability case, implicitly recognized prescription drugs as products). But, for a more complete analysis of the transaction, in light of the *Truglio* inquiry, it is necessary to determine whether pharmacists, even if dealing with products, are providing professional services or skill in the transaction.

**\*4** Though the CPLA itself is silent on pharmacists, and there is no binding appellate authority on the subject, it is helpful to look at how Connecticut has defined pharmacists through other legislation. "In construing [§ 52-572m et seq.] it is therefore necessary and proper for this court to look to other statutes to determine whether [an activity] is the sale of a product." *Zichichi v. Middlesex Memorial Hospital,* 204 Conn. 399, 403-04, 528 A.2d 805 (1987) (Considering whether blood transfused to a patient by a hospital constituted a product sale under the CPLA). Section 20-571(17) of the General Statutes defines "pharmacist" as "an individual who is licensed to practice pharmacy under the provisions of section 20-590, 20-591, 20-592 or 20-593, and who is thereby recognized as a health care provider by the state of Connecticut." Within the same title of the General Statutes, "health care provider" is considered "a person licensed to provide health care services under [the Pharmacy chapter of the General Statutes (400j) ]." General Statutes § 20-7f(a) (2). Under § 19a-17b(1) a health care provider "means any person, corporation, limited liability company, facility or institution operated, owned or licensed by this state to provide health care or professional services, or an officer, employee or agent thereof acting in the course and scope of his employment." A pharmacist then is a health care provider and, as such, provides health care or professional services. That pharmacists provide professional services is further reinforced under §§ 33-182a(1) and 34-101(23), where pharmacists are specifically categorized as providing professional services.

In the context of the transaction between the plaintiffs and defendants, it is important to note that § 20-571(21) defines the practice of pharmacy as "the sum total of knowledge, understanding, judgments, procedures, securities, controls and ethics used by a pharmacist to assure optimal safety and accuracy in the distributing, dispensing and use of drugs and devices." More specifically, to "dispense" prescription drugs is considered, under § 20-571(9), to be "those acts of

Henderson v. CVS Pharmacy, Not Reported in A.2d (2008)

2008 WL 3916444, 46 Conn. L. Rptr. 25

processing a drug or device for delivery or for administration for a patient pursuant to a prescription consisting of: (A) Comparing the directions on the label with the directions on the prescription to determine accuracy; (B) the selection of the drug or device from stock to fill the prescription; (C) the counting, measuring, compounding or preparation of the drug or device; (D) the placing of the drug or device in the proper container; (E) the affixing of the label to the container; and (F) the addition to a written prescription of any required notations."[1] The overall effect of these statutes permits the court to discern that a pharmacist provides a professional skill or service when practicing pharmacy, which he does when he dispenses prescription drugs.

"Once a particular transaction is labeled a 'service,' as opposed to a 'sale' of a 'product,' it is outside the purview of our product liability statute." *Zichichi v. Middlesex Memorial Hospital, supra,* 204 Conn. at 403. A pharmacist then is considered, under Connecticut statutes, to be a licensed health care provider providing professional services and, therefore, cannot be a product seller for the purposes of a suit brought under the CPLA.

**\*5** The motion to strike the third count is granted.

*Count Five-Bystander Emotional Distress*

In the fifth count of the complaint, the plaintiffs allege that Caroline Henderson's parents and guardians, Diana and Stephen Henderson, experienced emotional distress as a result of the harm done to their daughter. The defendants correctly point out the elements of bystander distress as laid down by the Connecticut Supreme Court. For a claim of bystander distress to be successful, it must be shown that: "[A] bystander may recover damages for emotional distress under the rule of reasonable foreseeability if the bystander satisfies the following conditions: (1) he or she is closely related to the injury victim, such as the parent or the sibling of the victim; (2) the emotional injury of the bystander is caused by the contemporaneous sensory perception of the event or conduct that causes the injury, or by arriving on the scene soon thereafter and before substantial change has occurred in the victim's condition or location; (3) the injury of the victim

must be substantial, resulting in his or her death or serious physical injury; and (4) the bystander's emotional injury must be serious, beyond that which would be anticipated in a disinterested witness and which is not the result of an abnormal response." *Clohessy v.. Bachelor,* 237 Court. 1, 56, 675 A.2d 852 (1996).

The defendants claim that the plaintiffs fail to provide sufficient facts regarding the third element required by *Clohessy.* The plaintiffs do not allege the death of Caroline Henderson, so it is incumbent upon them to have alleged facts sufficient to qualify as "serious physical injury." The plaintiffs have alleged that Caroline Henderson "has suffered the following injuries some or all of which may be permanent in nature: a. ingested high doses of zithromax; b. suffered from side effects related to ingesting high doses of zithromax; c. exacerbation of bilateral otitis media;[2] d. loss of sleep; and e. pain and suffering, both mental and physical." Reviewing these allegations the court, while mindful of how stressful it is for parents to have a sick child, concludes that they do not in and of themselves allege a "substantial injury" or "serious physical injury." It may be that there are other injuries or consequences for the minor child but they have not been plead in a sufficient manner to withstand a motion to strike.

The defendant further argues, that the court should adopt Connecticut caselaw regarding bystander distress and medical malpractice.[3] The court declines the defendants' invitation to expand the restriction to include pharmacists.

The motion to strike the fifth count is granted.

*CONCLUSION*

In summary, the defendant has withdrawn its motion to strike as to counts one and four, the court denies the motion to strike the second count and the court grants the motion to strike as to the third and fifth counts.

**All Citations**

Not Reported in A.2d, 2008 WL 3916444, 46 Conn. L. Rptr. 25

Footnotes

1    The statute continues by saying: " 'Dispense' does not include the acts of delivering a drug or device to a patient or of administering the drug or device to the patient." For the transaction between the Hendersons and CVS it is important

2008 WL 3916444, 46 Conn. L. Rptr. 25

to note that the plaintiffs complaint alleges that CVS "packaged" the medication it sold to the Hendersons. This would appear to indicate that the plaintiffs' are asserting the defendants did more than just deliver or administer the drugs. The language of the complaint would seem to qualify the defendants' acts as "dispensing," at least, under subsections (B), (C), and (D) of § 20-571(9).

2    Otitis media, as described on the website of the National Institute on Deafness and other Communication Disabilities (www.nidc . nih.gov) "is an infection or inflammation of the middle ear. This inflammation often begins when infections that cause sore throats, colds, or other respiratory or breathing problems spread to the middle ear. These can be viral or bacterial infections. Seventy-five percent of children experience at least one episode of otitis media by their third birthday. Almost half of these children will have three or more ear infections during their first 3 years."

3    In those cases it has been found that deference must be given to medical professionals to attend to the patient, and that to provide bystanders with the ability to assert bystander distress claims could lead to strains on hospitals that are too great to expect them to bear. See *Maloney v. Conroy,* 208 Conn. 392, 545 A.2d 1059 (1988); *Estate of Mandile v. Dziczkowski,* Superior Court, judicial district of Hartford, Docket No. CV 06 5002429 (September 26, 2007, Miller, J.) [44 Conn. L. Rptr. 245]. Of the costs mentioned in *Maloney* are that hospitals might be forced to restrict the ability of the patient to receive visitors, or that medical staff would have to attend to all concerns visitors had about the patients, even when such concerns are "uninformed." *Maloney v. Conroy, supra,* 208 Conn. at 403. *Maloney* and the resulting line of cases that have denied bystander emotional distress claims have done so based on the public policy interest of permitting hospitals to use their expert judgment at providing medical care and focus their attention on the patient in their care. It is not clear that this public policy concern is applicable to a situation where a pharmacy provides an incorrect prescription. A pharmacist who dispenses medicine from a retail store does not have the same relationship with the recipient of the medicine as a doctor does with a patient who is brought to a hospital and cared for on the hospital premises. The concerns echoed by *Maloney* are not readily apparent in the pharmacist-customer relationship. Expanding the medical malpractice restriction on bystander emotional distress to cases involving off-site retail pharmacists has no basis in the current caselaw.

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 5

Case 1:19-md-02875-RMB-SAK    Document 599-1    Filed 10/16/20    Page 24 of 57
PageID: 13276
In re Propulsid Products Liability Litigation, Not Reported in F.Supp.2d (2002)

2002 WL 1446714

2002 WL 1446714
Only the Westlaw citation is currently available.
United States District Court, E.D. Louisiana.

In re: PROPULSID PRODUCTS
LIABILITY LITIGATION

No. MDL 1355, CIV.A. 01–1300.
|
July 2, 2002.

## Synopsis

Consumers brought state court products liability action against manufacturers of prescription drug as well as certain pharmacies which allegedly sold drug to consumers. Defendants obtained removal. On defendant pharmacy's motion to dismiss, the District Court, Fallon, J., held that: (1) pharmacy was not a manufacturer under the Louisiana Products Liability Act (LPLA); (2) consumers stated claim for negligent and intentional misrepresentation; and (3) consumers stated a claim in redhibition.

Denied in part and granted in part.

West Headnotes (3)

[1]    **Products Liability** 🔑 Manufacturers in general; identification

    **Products Liability** 🔑 Drugs in general

    Pharmacy which allegedly sold prescription drug to consumers could not be deemed a "manufacturer," under the Louisiana Products Liability Act (LPLA), because pharmacy did not make the product nor did it have any input into the design of the product nor did it have any control over either the construction or quality of the product. LSA-R.S. 9:2800.53(1, 2).

[2]    **Fraud** 🔑 Statements recklessly made; negligent misrepresentation

    **Fraud** 🔑 Fraudulent representations or concealment as to particular facts

    Allegation that pharmacies affirmatively misrepresented side effects of prescription drug,

by acting as independent advisors to prescribing physicians and offering objective professional opinions and advice concerning possible side effects of drug, and misrepresented to consumers the drug's possible side effects, stated claim for negligent and intentional misrepresentation under Louisiana law, as allegations were not based on failure to warn but suggested that pharmacies may have voluntarily assumed a duty of care which was not ordinarily imposed and accordingly could be liable in negligence for breach of that duty.

[3]    **Sales** 🔑 Redhibitory defects or vices

    Consumers' allegation that pharmacy knew or should have known that prescription drug dispensed and sold by pharmacy was defective and unreasonably dangerous stated claim in redhibition under Louisiana law. LSA-C.C. art. 2520, 2545.

## ORDER & REASONS

FALLON, District J.

 *1 Before the Court is the motion of defendant Forshag's Drug Store, Inc. ("Forshag's") in consolidated civil action No. 01–1300 captioned *Yvonne Adams, et al. v. Forshag's Drug Store, Inc., et al.* In its motion, Forshag's seeks dismissal of all claims asserted against it pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For reasons set forth below, the motion is DENIED IN PART AND GRANTED IN PART.

I. *Background*

This litigation concerns the alleged harmful side-effects of the prescription drug Propulsid which was developed, manufactured, and distributed by Johnson & Johnson, Co. and its wholly owned subsidiary, Janssen Pharmaceutica, Inc. In this consolidated case plaintiffs have named as defendants both the manufacturers of the drug as well as certain Louisiana pharmacies which allegedly sold Propulsid to the plaintiffs. Plaintiffs initially filed this action in the Civil District Court for the Parish of Washington, State of

2002 WL 1446714

Louisiana. On April 27, 2001, the action was removed to this Court on the basis of diversity jurisdiction. The defendants argued that there was complete diversity believing the non-diverse pharmacies to be fraudulently joined. Plaintiffs did not seek remand. Subsequently, the action was consolidated with *In re Propulsid Products Liability Litigation* MDL–1355. On December 12, 2001, defendant Forshag's Drug Store, Inc. filed the present motion to dismiss.

Plaintiffs allege that the prescription drug Propulsid carries the risk of serious side effects including heart rhythm disorders, such as ventricular tachycardia, ventricular fibrillation, torsades de point and QT prolongation. Plaintiffs contend that they have suffered physical and emotional damages from their use of the drug and assert numerous theories of liability against the various defendants including products liability, negligence, breach of implied warranty, negligent misrepresentation, and fraud. With regard to the pharmacy defendants in particular, plaintiffs allege that (i) the pharmacies offered objective professional opinions and advice to physicians and intentionally and/or negligently misrepresented the effects and side effects caused by the drug, and (ii) that in selling the drug, the pharmacies breached an implied warranty that the drug was reasonably safe for the purpose for which it was intended. In support of its motion to dismiss, Forshag's argues that under Louisiana law the duty of a pharmacist is limited in scope and the pharmacist cannot be held liable for failing to tell patients of the harmful side effects of a drug.

II. *Analysis*

The Federal Rules of Civil Procedure permit a defendant to seek dismissal of a complaint based on the "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). When considering a motion to dismiss under Rule 12(b)(6), a district court should construe the complaint liberally in favor of the plaintiff, assuming all factual allegations to be true. *See Leleux v. United States,* 178 F.3d 750, 754 (5th Cir.1999). A complaint may not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* (quoting *Lowrey v. Texas A & M Univ. Sys.,* 117 F.3d 242, 247 (5th Cir.1997)).

*1. Claims Based on Louisiana Products Liability Act*

**\*2** **[1]** Under the Louisiana Products Liability Act ("LPLA"), La. R.S. § 9:2800.51, *et seq.,* a manufacturer is liable to consumers if a condition of its product caused harm

to the consumer, the condition made the product unreasonably dangerous to normal use, and the condition existed at the time the product left the manufacturers control. *Klem v. E.I. DuPont De Nemours Co.,* 19 F.3d 997 (5th Cir.1994).

The LPLA defines "manufacturer" as follows:

(1) "Manufacturer" means a person or entity who is in the business of manufacturing a product for placement into trade or commerce. "Manufacturing a product" means producing, making, fabricating, constructing, designing, remanufacturing, reconditioning or refurbishing a product.

"Manufacturer" also means:

(a) A person or entity who labels a product as his own or who otherwise holds himself out to be the manufacturer of the product.

(b) A seller of a product who exercises control over or influences a characteristic of the design, construction or quality of a product that causes damages.

(c) A manufacturer of a product who incorporates into the product a component or part manufactured by another manufacturer.

(d) A seller of a product of an alien manufacturer if the seller is in the business of importing or distributing the product for resale and the seller is the alter ego of the alien manufacturer....

La. R.S. § 9:2800.53(1).

The LPLA defines "seller" as a "person or entity who is not a manufacturer and who is in the business of conveying title to or possession of a product to another person or entity in exchange for anything of value." La. R.S. § 9:2800.53(2).

In the present case, plaintiffs allege in Count Eight of their complaint that the pharmacy defendants "kept in stock, ordered and sold the Propulsid drug, a defective product, to the [p]laintiffs serving as a seller and/or conduit for the defective drug" and thereby breached both express and implied warranties that the drug was "safe for the purpose for which it was intended." However, based on the facts alleged, defendant Forshag's does not meet the criteria under which a seller may be treated as a manufacturer according to the LPLA. Forshag's did not make the product nor did it have any input into the design of the product nor did it have any control over either the construction or quality of the product. Accordingly, as a mere seller in this matter, Forshag's is not

subject to the liability for defective products established by the LPLA. These claims, therefore, must be dismissed.

### 2. Claims Based on Negligent and Intentional Misrepresentation

**[2]**    In Count Eight of the complaint, plaintiffs claim that the pharmacies made express warranties that the drug was safe for its intended use. Defendant contends that there is no basis for holding a pharmacy liable for dispensing an FDA-approved drug to the plaintiff in accordance with a lawful prescription from a licensed physician in the dosage and amount properly prescribed. Plaintiffs correctly note that the Louisiana courts impose a duty upon pharmacists to do more than accurately fill prescriptions. Indeed, the Louisiana courts have held that pharmacists have a limited duty not only to fill prescriptions correctly, but also to inquire with the prescribing physician when clear errors or mistakes are apparent on the face of the prescription, such as when excessive dosages have been prescribed. *See Gassen v. East Jefferson Gen. Hosp.,* 628 So.2d 256, 258–59 (La.App. 5th Cir.1993). However, a pharmacist does not have a duty to warn a patient of adverse reactions. *See id.; Guillory v. Dr. X,* 679 So.2d 1004 (La.App. 3rd Cir.1996); *Pilet v. Ciba–Geigy Corp.,* 1996 WL 89262 (E.D.La.).

**\*3**    In the present case, plaintiffs allege that the pharmacies affirmatively misrepresented the side effects of the drug. In particular, plaintiffs claim that the pharmacies acted as "independent advisors" to the prescribing physicians and "offered objective professional opinions and advice" concerning the possible side effects of the drug. Further, plaintiffs claim that the pharmacies misrepresented to the plaintiff themselves the possible side effects of the drug. The misrepresentation claims asserted are not based on a failure to warn, rather the claims are based on an alleged affirmative misrepresentation. Assuming the truth of the allegations, which the Court must do in 12(b)(6) motions, the pharmacies may have voluntarily assumed a duty of care which is not ordinarily imposed and accordingly, they may be liable in negligence for a breach of that duty. *See generally, Baker v. Arbor Drugs, Inc.,* 215 Mich.App. 198, 544 N.W.2d 727 (Mich.Ct.App.1995). Thus, these claims survive a 12(b)(6) motion. They may, however, encounter a significant challenge in sustaining a subsequent motion for summary judgment.

### 3. Claims Based on Redhibition

**[3]**    In Count Six of their complaint, plaintiffs allege that the pharmacy defendants knew or should have known that the drug they dispensed and sold was defective and unreasonably dangerous. While this claim is cast in terms of negligence, the claim may be construed as one in redhibition. Louisiana Civil Code article 2545 provides that "a seller who knows that the thing he sells has a defect but omits to declare it, or a seller who declares that the thing has a quality that he knows it does not have, is liable to the buyer for the return of the price with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale and those incurred for the preservation of the thing, and also for damages and reasonable attorney fees." In contrast, Article 2531 provides that "a seller who did not know that the thing he sold had a defect is only bound to repair, remedy, or correct the defect. If he is unable or fails so to do, he is then bound to return the price to the buyer with interest from the time it was paid, and to reimburse him for the reasonable expenses occasioned by the sale, as well as those incurred for the preservation of the thing ...." Article 2520 defines a redhibitory defect as one that "renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect. The existence of such a defect gives a buyer the right to obtain recission of the sale." Insofar as the plaintiffs have alleged that the defendants knew of the defect, plaintiffs have stated a claim in redhibition under which they may seek damages.

### III. Conclusion

For the reasons set forth above, the motion is DENIED IN PART AND GRANTED IN PART. To the extent the present motion seeks dismissal of the claims asserted against Forshag's which are based on alleged affirmative misrepresentations and those which are based on redhibition, the motion is DENIED. As to all other claims asserted against Forshag's the motion to dismiss is GRANTED.

### All Citations

Not Reported in F.Supp.2d, 2002 WL 1446714

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 6

Case 1:19-md-02875-RMB-SAK    Document 599-1    Filed 10/16/20    Page 28 of 57
PageID: 13280

2019 WL 2174089
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

IN RE WELSPUN LITIGATION

16 CV 6792 (VB)
|
Signed 05/20/2019

**OPINION AND ORDER**

Vincent L. Briccetti, United States District Judge

**\*1** Plaintiffs Harold Brower, Judi Talili, and Ashley Mistler (the "California plaintiffs"), and Samuel Jividen and Susan Gettings (the "New York plaintiffs"), bring this putative class action against defendants Welspun India Ltd. ("WIL") and Welspun USA Inc. ("WUSA") (collectively, the "Welspun Defendants"), and defendants Wal-Mart Stores, Inc. d/b/a Walmart, Bed Bath and Beyond, Inc. ("BB&B"), and Target Corporation (collectively, the "Retailer Defendants"), for allegedly distributing, marketing, and selling bed linens falsely labeled "100% Egyptian cotton."

Plaintiffs bring the following claims:

- First, the California plaintiffs bring claims individually and on behalf of a proposed California subclass against all defendants for violation of (i) California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 et seq., (ii) California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 et seq., and (iii) California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500 et seq.;

- Second, the California plaintiffs bring claims individually and on behalf of a proposed nationwide class against all defendants for (iv) breach of express warranty, (v) breach of the implied warranty of merchantability, (vi) unjust enrichment, and (vii) violation of the federal Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301 et seq.;

- Third, all plaintiffs bring claims individually and on behalf of a proposed nationwide class against all defendants for (viii) negligent misrepresentation and (ix) fraud; and

- Fourth, the New York plaintiffs bring claims individually and on behalf of a proposed New York subclass for (x) violation of N.Y. Gen. Bus. Law ("NYGBL") §§ 349 & 350.

Now pending are (i) the Welspun Defendants' motion to dismiss the consolidated second amended class action complaint ("CSAC") pursuant to Rules 8, 9(b), 12(b)(1), 12(b)(2), and 12(b)(6) (Doc. #182); (ii) the Retailer Defendants' motion to dismiss the CSAC pursuant to Rule 12(b)(6) and to strike class allegations pursuant to Rule 12(f) (Doc. #185); (iii) plaintiffs' request for leave to amend pursuant to Rule 15; and (iv) the Welspun Defendants and Target's accountings for sanctions (Docs. ##172, 174).

For the following reasons, the Welspun Defendants' and Retailer Defendants' motions to dismiss are GRANTED IN PART and DENIED IN PART. The Retailer Defendants' motion to strike is DENIED. Plaintiffs' request for leave to amend is DENIED. And the Welspun Defendants' and Target's accountings for sanctions are DENIED.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d).

**BACKGROUND**

The following factual background is drawn from the CSAC and the parties' submissions in support of and in opposition to the pending motions. In deciding the pending motions, the Court accepts as true all well-pleaded factual allegations in the CSAC and draws all reasonable inferences in plaintiffs' favor.

I. Factual Background

A. The Welspun Defendants

WIL, based in Mumbai, India, is one of the world's largest textile manufacturers. It exports more than sixty-eight percent of its production to the United States and supplies textile products to retail stores in New York, including BB&B, Target, and Walmart.

**\*2** WUSA is a textile company and WIL's wholly owned subsidiary, incorporated in Delaware with its principal place of business in New York. According to the CSAC, "[WIL] has publicly described [WUSA] as the 'sales arm' of [WIL], and

A026

2019 WL 2174089

says that [WUSA's] purpose is to 'look after [WIL's] North American' business." (Doc. #171 ("CSAC") ¶ 11).

Plaintiffs allege WIL "describes itself [ ]as having two 'corporate headquarters,' one in Mumbai, and the other in New York where [WUSA] is located." (CSAC ¶ 12). For instance, according to plaintiffs, WIL's 2016–2017 annual report states WIL maintains a "Corp. HQ/Marketing Office" in New York. (Id.). Further, plaintiffs allege WIL reports on WUSA's finances in its own annual reports and guarantees loans to WUSA.

### B. Egyptian Cotton
Plaintiffs allege "Egyptian cotton (i.e., gossypium barbadense cotton grown in Egypt) is considered some of the highest-quality cotton in the world." (CSAC ¶ 19). Plaintiffs allege standard cotton uses fibers that are twisted and combined to produce the right length. But according to plaintiffs, Egypt's climate and Egyptian cultivation methods yield cotton with longer cotton fibers (or staples) than other types of cotton. Longer fibers mean more uninterrupted fiber to use when making yarn and threads, resulting in fewer splices and a stronger, more durable fabric. Longer fibers also generate finer yarn, which allows manufacturers to pack more thread into each square inch, resulting in cotton linens with higher thread counts that are "softer and more lustrous than linens made of other types of cotton." (Id. ¶ 20). In addition, according to plaintiffs, Egyptian cotton is more porous than regular cotton. That means it absorbs moisture better, making it more comfortable, and absorbs dye better, allowing for richer colors that resist fading longer.

### C. The Bed Linens
Plaintiffs allege the Welspun Defendants manufacture, market, and sell linens that are purportedly "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton" in the United States. (CSAC ¶ 30). Allegedly, at least six products with such representations are in fact made with non-Egyptian cotton: (i) Fieldcrest 500 thread count "100% Long-Staple Egyptian Cotton" bed linens; (ii) Better Homes and Gardens 400 thread count "100% Egyptian Cotton" bed linens; (iii) Canopy 400 thread count damask stripe "100% Egyptian Cotton" bed linens; (iv) Crowning Touch 500 and 800 thread count "100% Egyptian Cotton" bed linens; (v) Perfect Touch 625 thread count "100% Egyptian Cotton" bed linens; and (vi) Royal Velvet 400 thread count "100% Egyptian Cotton" bed linens (collectively, the "Bed Linens"). (Id. ¶ 30). Plaintiffs

allege the Bed Linens are sold online and in retail stores across the United States, including Walmart, BB&B, and Target.

### D. Retailer Defendants
Plaintiffs allege the Retailer Defendants each contracted with the Welspun Defendants to market and sell the Welspun Defendants' products in the Retailer Defendants' physical and online stores. However, according to plaintiffs, the Retailer Defendants knew or should have known, before they discontinued sales of the Bed Linens, that the Bed Linens were falsely labeled.

First, plaintiffs allege in 2008, a Walmart employee expressed concern that Welspun was supplying Walmart with fake Egyptian cotton sheets, and that Walmart employees may have been colluding with the Welspun Defendants. According to the CSAC, Walmart responded by conducting an investigation that exposed "systematic fraud by Welspun," but Walmart "buried the results of that investigation and continued to market, sell, and deliver Welspun products labeled '100% Egyptian Cotton.' " (CSAC ¶ 48). Then, in November 2015, "the Cotton Egypt Association warned Walmart that the levels of fraudulent merchandise on offer as Egyptian cotton had reached a crisis point," yet Walmart took no action. (Id. ¶ 49). Walmart allegedly pulled the Welspun Defendants' products from its shelves only after knowledge of the alleged false labeling became public in August 2016.

**\*3** Second, plaintiffs allege Target began investigating the Welspun Defendants as early as December 2015. According to plaintiffs, a whistleblower then contacted Target in January 2016 saying "Welspun had asked him or her to falsify invoices to make it appear that Welspun used Egyptian cotton when it did not." (CSAC ¶ 52). Plaintiffs allege the whistleblower also disclosed "that Welspun did not purchase enough Egyptian cotton to meet the needs of its retailers [and] had a history of falsifying invoices." (Id.).

Plaintiffs further allege another employee for one of the Welspun Defendants later told a Target employee in India that "Welspun" used non-Egyptian cotton for Target's products. (CSAC ¶ 53). The employee then allegedly stole a trove of incriminating documents and passed the documents to other Target employees. Nevertheless, plaintiffs allege Target continued to market, sell, and deliver the Bed Linens, and even gave "Welspun" its "Vendor of the Year" award in April 2016. (Id. ¶ 54).

Case 1:19-md-02875-RMB-SAK    Document 599-1    Filed 10/16/20    Page 30 of 57
PageID: 13282
In re Welspun Litigation, Not Reported in Fed. Supp. (2019)
2019 WL 2174089

Third, plaintiffs allege BB&B learned in August 2015 its Perfect Touch and other supposedly Egyptian cotton bed linens were not made with Egyptian cotton, but took no action at that time. BB&B then allegedly began auditing the Bed Linens on August 24, 2016, but continued to sell the products for another three months while the audit was pending. According to plaintiffs, however, BB&B knew one month into their audit that "Welspun had no way to show that its Egyptian cotton sheets were really made with Egyptian cotton." (CSAC ¶ 55).

## II. Procedural History

Plaintiffs filed a consolidated amended class action complaint ("CAC") on February 27, 2017, after which defendants submitted a joint pre-motion letter addressing their anticipated motions to dismiss and to strike the CAC. Among other things, the letter identified the CAC's failure to allege any named plaintiff purchased products from Target or Walmart in New York, exposing a potentially fatal flaw in plaintiffs' claims under NYGBL Sections 349 and 350.

On October 13, 2017, the Welspun Defendants moved to dismiss and the Retailer Defendants moved to dismiss and to strike class allegations. One of defendants' arguments was the CAC failed to allege any named plaintiff purchased products from Target, Walmart, or BB&B in New York. In opposition to the Retailer Defendants' motion, plaintiffs requested leave to amend the CAC to allow the addition of a New York plaintiff asserting claims against Target and Walmart.

After Defendants' motions were fully briefed, Judge Richard J. Sullivan, to whom this case was previously assigned, ordered plaintiffs to submit a pre-motion letter regarding their request for leave to amend. Judge Sullivan also ordered defendants, in opposition to plaintiffs' letter, to address the propriety of awarding attorney's fees and costs, pursuant to Rule 11, 28 U.S.C. § 1927, or the Court's inherent equitable powers, for plaintiffs' failure to address the deficiencies raised in defendants' pre-motion to dismiss letter before fully briefing the motions to dismiss.

Judge Sullivan subsequently granted plaintiffs permission to file a consolidated second amended class action complaint. However, Judge Sullivan also ordered defendants to submit accountings of fees associated with briefing the portions of their motions to dismiss pertaining to the deficiencies defendants had previously raised regarding plaintiffs' NYGBL claims.

Plaintiffs filed the CSAC on August 20, 2018. Target then requested an award of $ 41,640.28 in attorney's fees and costs. The Welspun Defendants requested $ 9,002.18. Plaintiffs' counsel filed an answering memorandum in opposition to the accountings.

 **\*4** On September 14, 2018, the Welspun Defendants and Retailer Defendants moved to dismiss the CSAC. The case was subsequently reassigned to the undersigned.

## DISCUSSION

### I. Standard of Review

#### A. Rule 12(b)(1)

"[F]ederal courts are courts of limited jurisdiction and lack the power to disregard such limits as have been imposed by the Constitution or Congress." Durant, Nichols, Houston, Hodgson, & Cortese-Costa, P.C. v. Dupont, 565 F.3d 56, 62 (2d Cir. 2009) (internal quotation omitted). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Nike, Inc. v. Already, LLC, 663 F.3d 89, 94 (2d Cir. 2011) (internal quotation omitted). The party invoking the Court's jurisdiction bears the burden of establishing jurisdiction exists. Conyers v. Rossides, 558 F.3d 137, 143 (2d Cir. 2009).

When, as here, the case is at the pleading stage, in deciding a motion to dismiss under Rule 12(b)(1), the Court "must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor." Conyers v. Rossides, 558 F.3d at 143. But "argumentative inferences favorable to the party asserting jurisdiction should not be drawn." Buday v. N.Y. Yankees P'ship, 486 F. App'x 894, 895 (2d Cir. 2012) (summary order) (quoting Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd., 968 F.2d 196, 198 (2d Cir. 1992)). When a factual challenge to the Court's jurisdiction has been raised, "the court may resolve [any] disputed jurisdictional fact issues by referring to evidence outside of the pleadings, such as affidavits." Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi, 215 F.3d 247, 253 (2d Cir. 2000) (internal citation omitted). When a defendant moves to dismiss for lack of subject matter jurisdiction and on other grounds, the court typically should consider the Rule 12(b)(1) challenge first. Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n, 896 F.2d 674, 678 (2d Cir. 1990).

2019 WL 2174089

### B. Rule 12(b)(2)

On a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), "plaintiff bears the burden of showing that the court has jurisdiction over the defendant." In re Magnetic Audiotape Antitrust Litig., 334 F.3d 204, 206 (2d Cir. 2003). Prior to discovery, a plaintiff may defeat a motion to dismiss "by pleading in good faith legally sufficient allegations of jurisdiction." Ball v. Metallurgie Hoboken-Overpelt, S.A., 902 F.2d 194, 197 (2d Cir. 1990) (internal citation omitted). However, when, as here, a plaintiff has engaged in jurisdictional discovery, but no evidentiary hearing was conducted, "the plaintiff's prima facie showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited, would suffice to establish jurisdiction over the defendant." In re Magnetic Audiotape Antitrust Litig., 334 F.3d at 206 (internal citation and alteration removed). When there has been no hearing on the merits, "all pleadings and affidavits must be construed in the light most favorable to [the plaintiff,] and all doubts must be resolved in the ... plaintiff's favor." Landoil Res. Corp. v. Alexander & Alexander Servs., Inc., 918 F.2d 1039, 1043 (2d Cir. 1990).

**\*5** As this is a diversity action, the Court must "resolve the question of personal jurisdiction with reference to New York law, the forum in which the district court sits." Ash v. Richards, 572 F. App'x 52, 53 (2d Cir. 2014) (summary order). Moreover, when a defendant moves to dismiss under Rules 12(b)(2) and 12(b)(6), the court must resolve the Rule 12(b)(2) motion first. See Arrowsmith v. United Press Int'l, 320 F.2d 219, 221 (2d Cir. 1963); Phillips v. Reed Grp., Ltd., 955 F. Supp. 2d 201, 224 (S.D.N.Y. 2013).

### C. Rule 12(b)(6)

In deciding a Rule 12(b)(6) motion for failure to state a claim, the Court evaluates the sufficiency of the operative complaint under the "two-pronged approach" articulated by the U.S. Supreme Court in Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). First, plaintiffs' legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the assumption of truth and thus are not sufficient to withstand a motion to dismiss. Id. at 678; Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010). Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Ashcroft v. Iqbal, 556 U.S. at 679.

To survive a Rule 12(b)(6) motion, the complaint's allegations must meet a standard of "plausibility." Ashcroft v. Iqbal, 556 U.S. at 678; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 564 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 556).

### D. Rule 12(f)

Under Rule 12(f), "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "Motions to strike are generally looked upon with disfavor." Chenensky v. N.Y. Life Ins. Co., 2011 WL 1795305, at \*1 (S.D.N.Y. Apr. 27, 2011) (internal quotation and citation omitted). Motions to strike class allegations are "even more disfavored" because they seek "to preemptively terminate the class aspects of litigation, solely on the basis of what is alleged in the complaint, and before plaintiffs are permitted to complete the [class certification] discovery to which they would otherwise be entitled." Id. (alteration and internal quotation omitted). Thus, unless a motion to strike class allegations "addresses issues separate and apart from the issues that will be decided on a class certification motion," the motion should be denied as premature. Chen-Oster v. Goldman, Sachs & Co., 877 F. Supp. 2d 113, 117 (S.D.N.Y. 2012) (internal quotation omitted).

### E. Rule 8

Rule 8(a)(2) requires "[a] pleading that states a claim for relief" to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Dismissal pursuant to Rule 8 "is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." Wynder v. McMahon, 360 F.3d 73, 80 (2d Cir. 2004) (quoting Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988)).

### F. Sanctions

**\*6** "A district court has inherent power to award attorneys' fees against the offending party and his attorney when it determines a party has acted in bad faith, vexatiously,

Case 1:19-md-02875-RMB-SAK    Document 599-1    Filed 10/16/20    Page 32 of 57
PageID: 13284

*In re Welspun Litigation, Not Reported in Fed. Supp. (2019)*
2019 WL 2174089

wantonly, or for oppressive reasons." Agee v. Paramount Commc'ns, Inc., 114 F.3d 395, 398 (2d Cir. 1997) (internal quotation omitted). "Similarly, under 28 U.S.C. § 1927, the court may require any attorney to pay costs if he or she 'so multiplies the proceedings in any case unreasonably and vexatiously.' " Id. "To impose sanctions under either authority, the trial court must find clear evidence that (1) the offending party's claims were entirely meritless and (2) the party acted for improper purposes." Id.

Rule 11 permits sanctions if a party presents "[a] pleading, motion, or other paper" that "has been interposed for any improper purpose, or where, after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law." United States v. Int'l Bhd. of Teamsters, 948 F.2d 1338, 1344 (2d Cir. 1991) (internal quotation, citations, and emphasis omitted). Courts have broad discretion in determining whether to impose sanctions under Rule 11. Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 407 (1990). "In deciding whether the signer of a pleading, motion, or other paper has crossed the line between zealous advocacy and plain pettifoggery, the court applies an objective standard of reasonableness." United States v. Int'l Bhd. of Teamsters, 948 F.2d at 1344 (citing Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc., 498 U.S. 533, 549–50 (1991)).

## II. Injunctive Relief

Plaintiffs lack standing to sue for injunctive relief.

"The doctrine of standing asks whether a litigant is entitled to have a federal court resolve his grievance." Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, Nat'l Ass'n, 747 F.3d 44, 48 (2d Cir. 2014) (internal citation omitted). To establish standing in federal court, a litigant must demonstrate, among other things, he or she has suffered an injury. Deshawn E. by Charlotte E. v. Safir, 156 F.3d 340, 344 (2d Cir. 1998). "A plaintiff seeking injunctive or declaratory relief cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he or she will be injured in the future." Peck v. Baldwinsville Cent. Sch. Dist., 351 F. App'x 477, 479 (2d Cir. 2009) (summary order) (quoting Deshawn E. by Charlotte E. v. Safir, 156 F.3d at 344). Thus, a plaintiff who concedes she is no longer likely to purchase a product because she knows of a defendant's alleged deception and false advertising does not have standing to enjoin the defendant's sales practices. See

Kommer v. Bayer Consumer Health, 710 F. App'x 43, 44 (2d Cir. 2018) (summary order).

Plaintiffs concede that they would not have purchased the Bed Linens had they known the products were not made from "100 Egyptian Cotton" or "100% Long-Staple Egyptian Cotton." (See, e.g., CSAC ¶¶ 74). Nor do plaintiffs allege they intend to purchase the Bed Linens in the future. Therefore, plaintiffs cannot show a likelihood of future injury.

Accordingly, plaintiffs' claims for injunctive relief must be dismissed.

## III. Personal Jurisdiction

The Welspun Defendants argue plaintiffs fail to establish personal jurisdiction over non-domiciliary defendant WIL.

The Court agrees only as to the California plaintiffs' claims against WIL. As to all other claims against WIL, the Court either finds it has specific personal jurisdiction or defers resolution until a motion for class certification.

**\*7** The Court first analyzes whether WUSA acted as WIL's agent for purposes of personal jurisdiction, and therefore whether the Court may consider WUSA's contacts with the forum when determining whether to exercise personal jurisdiction over WIL. Then, to determine whether personal jurisdiction exists over WIL, the Court engages in a two-step inquiry. Chloe v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158, 163 (2d Cir. 2010) (citation omitted). First, the Court determines whether the forum state's law permits the exercise of jurisdiction over the defendant. Id. "[T]he second step is to analyze whether personal jurisdiction comports with the Due Process Clause of the United States Constitution." Id. at 164.

### A. Agency

Plaintiffs aver facts that, if credited, would establish that WUSA acted as WIL's agent for purposes of personal jurisdiction.

"To establish an agency relationship for purposes of personal jurisdiction, a plaintiff must show that the alleged agent acts for the benefit of, and with the knowledge and consent of, the non-resident principal, and over which that principal exercises some control." GEM Advisors, Inc. v. Corporacion Sidenor, S.A., 667 F. Supp. 2d 308, 318 (S.D.N.Y. 2009) (internal quotation omitted). "In determining if an agency relationship exists for purposes of personal jurisdiction, a

2019 WL 2174089

court should analyze the realities of the relationship in question rather than the formalities of agency law." Id. (internal quotation and citation omitted). A plaintiff need not demonstrate either a formal agency agreement or that the defendant exercised direct control over its putative agent. Klonis v. Nat'l Bank of Greece, S.A., 492 F. Supp. 2d 293, 301 (S.D.N.Y. 2007).

"To establish that a subsidiary is an agent of the parent, the plaintiff must show that the subsidiary 'does all the business which [the parent corporation] could do were it here by its own officials.' " Jazini v. Nissan Motor Co., 148 F.3d 181, 184 (2d Cir. 1998) (quoting Frummer v. Hilton Hotels Int'l, Inc., 19 N.Y.2d 533, 537 (1967)).

> This 'means that a foreign corporation is doing business in New York when its New York representative provides services beyond mere solicitation and these services are sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar activities.'
> Klonis v. Nat'l Bank of Greece, S.A., 492 F. Supp. 2d at 301 (quoting Gelfand v. Tanner Motor Tours, Ltd., 385 F.3d 116, 121 (2d Cir. 1967) (alterations omitted)). When "the alleged reason for the subsidiary's existence is to perform services in furtherance of its parent's business that would otherwise have to be performed by the parent, there seems to be little question that the subsidiary is acting as the parent's agent—even if it performs other tasks as well." Yousef v. Al Jazeera Media Network, 2018 WL 1665239, at *11 (S.D.N.Y. Mar. 22, 2018).

Here, crediting the evidence plaintiffs have produced at this early stage of the case and construing the facts in the light most favorable to plaintiff, the Court finds that if not for WUSA, WIL would perform substantially similar services, including importing goods into New York and selling goods to third-party retailers who in turn sell WIL's goods in the United States. In particular, plaintiffs have produced evidence that WUSA has described itself as "the sales, marketing and distribution arm for Welspun's textile business." (Doc. #189 ("Klorczyk Decl.") Ex. 7 at WS106645).[1] Similarly, WIL's 2011–2012 annual report states, "WIL has subsidiaries based out of New York in USA ... to look after its North American ... business[ ]." (Doc. #187 ("Jiwani Decl.") Ex. C at ECF 6).

*8  In a letter to U.S. Customs and Border Protection, WUSA lays out the entities' joint structure: WIL is the manufacturer, Welspun Global Brands Limited ("WGBL") the middleman, and WUSA the marketer and wholesaler. (See Klorczyk Decl. Ex. 8 at WS127362–67). Similarly, in a prospective licensee questionnaire, WUSA states WIL, WGBL, and WUSA comprise "a vertically integrated manufacturer" of products including bed sheets. (Id. Ex. 7 at WS106646). And in the letter to U.S. Customers and Border Protection, WUSA states it imports merchandise for both WGBL and WIL. (Id. Ex. 8 at WS127362).

Further, at this stage, plaintiffs' evidence adequately shows WIL treated WUSA's New York office like its own. One Target witness testified WIL employees told him they had offices in New York, where WUSA was located. Plaintiffs also produced an email from WIL's CEO and Joint Managing Director referring to "our New York office" (Klorczyk Decl. Ex. 5 at WS056196) and a WIL PowerPoint presentation doing the same (id. Ex. 6 at WS028871).

At this stage, plaintiffs' evidence also adequately shows the Retailer Defendants treated WUSA as WIL's agent. A Rule 30(b)(6) witness for Walmart testified: "Welspun India and Welspun U.S., although they are two separate companies, for Walmart, we work with them like they are one company." (Klorczyk Decl. Ex. 2 at 13). A Rule 30(b)(6) witness for Target similarly testified Target considered WUSA and WIL to be "one entity." (Id. Ex. 3 at 49). Moreover, witnesses for both Walmart and Target testified representatives from the Welspun Defendants referred to their employers as "Welspun" without specifying WUSA or WIL. (Id. Ex. 2 at 13–14; Ex. 3 at 52).

WIL argues imputing WUSA's ties with New York to WIL would violate the corporate separateness doctrine that applies when a litigant seeks to pierce the corporate veil. The Court disagrees. "Establishing the exercise of personal jurisdiction over an alleged alter ego requires application of a less stringent standard than that necessary to pierce the corporate veil for purposes of liability." GEM Advisors, Inc. v. Corporacion Sidenor, S.A., 667 F. Supp. 2d at 319.

Therefore, plaintiffs have produced sufficient evidence that, if credited, would show WUSA acted as WIL's agent for purposes of personal jurisdiction.

B. New York's Long-Arm Statute

In re Welspun Litigation, Not Reported in Fed. Supp. (2019)

2019 WL 2174089

Moreover, the New York plaintiffs have averred facts that, if credited, would satisfy New York's Long Arm statute for purposes of their claims against WIL.[2]

"CPLR § 302 is New York's 'long-arm' statute permitting jurisdiction over an out-of-state defendant." Bidonthecity.com LLC v. Halverston Holdings Ltd., 2014 WL 1331046, at *3 (S.D.N.Y. Mar. 31, 2014) (internal citations omitted). Section 302(a)(1) provides, "As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, ... who in person or through an agent[,] transacts any business within the state." N.Y. C.P.L.R. § 302(a)(1). "To establish personal jurisdiction under section 302(a)(1), two requirements must be met: (1) The defendant must have transacted business within the state; and (2) the claim asserted must arise from that business activity." Eades v. Kennedy, PC Law Offices, 799 F.3d 161, 168 (2d Cir. 2015) (internal quotation omitted). "There can be no doubt" a company transacts business in New York when it is headquartered in and rents facilities to carry on its operations in the state. Yousef v. Al Jazeera Media Network, 2018 WL 1665239, at *13.

**\*9** As for the second requirement, "a claim arises from a particular transaction when there is some articulable nexus between the business transacted and the cause of action sued upon, or when there is a substantial relationship between the transaction and the claim asserted." Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC, 450 F.3d 100, 103 (2d Cir. 2006) (internal quotations and alteration omitted). "A connection that is 'merely coincidental' is insufficient to support jurisdiction." Id. (quoting Johnson v. Ward, 4 N.Y.2d 516, 520 (2005)). The inquiry is fact-specific. Id.

WIL transacted business in New York, satisfying Section 302(a)(1)'s first requirement. According to plaintiffs, WUSA's principal place of business is in New York and maintained an office there. Moreover, as discussed above, the Court imputes WUSA's contacts to WIL because WUSA acted as WIL's agent for purposes of personal jurisdiction over WIL.

Further, the New York plaintiffs' claims arise from WIL's business activity in New York, satisfying Section 302(a)(1)'s second requirement. As noted above, plaintiffs have produced evidence that WUSA, which is headquartered in New York, has described itself as "the sales, marketing and distribution arm for Welspun's textile business," from which the New York plaintiffs' claims arise. (Klorczyk Decl. Ex. 7 at WS10645). Moreover, the New York plaintiffs allege they purchased Bed Linens from the Retailer Defendants in New York. Therefore, there is an articulable nexus between WIL's business and the New York plaintiffs' claims against WIL.

Accordingly, plaintiffs have produced evidence that, if credited, would establish personal jurisdiction over the New York plaintiffs' claims against WIL under Section 302(a)(1).

### C. Due Process

The Court now turns to whether exercising personal jurisdiction would comport with due process. The Court concludes it (i) lacks general jurisdiction over WIL; (ii) has specific jurisdiction over the New York plaintiffs' claims against WIL; and (iii) lacks specific jurisdiction over the California plaintiffs' claims against WIL. In addition, the Court defers decision on whether it may exercise specific personal jurisdiction over unnamed class members' out-of-state claims until a motion for class certification.

"[T]o satisfy the Due Process Clause of the United States Constitution, the exercise of long-arm jurisdiction by New York must be based on defendants' 'minimum contacts' with the state and must comport with 'traditional notions of fair play and substantial justice.' " Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp., 98 F.3d 25, 32 (2d Cir. 1996) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)). A court may exercise two types of jurisdiction, differentiated by the kind of minimum contacts the defendant has had with the forum state. "These are specific (also called 'case-linked') jurisdiction and general (or 'all-purpose') jurisdiction." Brown v. Lockheed Martin Corp., 814 F.3d 619, 624 (2d Cir. 2016).

The Court addresses each in turn.

### 1. General Jurisdiction Over WIL

The Court's exercise of general jurisdiction over WIL would not comport with due process.

"A court may assert general jurisdiction over [a] foreign (sister-state or foreign-country) corporation[ ] to hear any and all claims against [the corporation] when [the corporation's] affiliations with the State ... render [it] essentially at home in the forum State." Goodyear Dunlop Tires Operations,

A032

Case 1:19-md-02875-RMB-SAK Document 599-1 Filed 10/16/20 Page 35 of 57 PageID: 13287

In re Welspun Litigation, Not Reported in Fed. Supp. (2019)

2019 WL 2174089

S.A. v. Brown, 564 U.S. 915, 919 (2011). "[T]he general jurisdiction inquiry 'is not whether a foreign corporation's in-forum contacts can be said to be in some sense continuous and systematic,' but rather ... 'whether that corporation's affiliations with the State are so continuous and systematic as to render it essentially at home in the forum.' " Brown v. Lockheed Martin Corp., 814 F.3d at 627 (quoting Daimler AG v. Bauman, 134 S. Ct. 746, 761 (2014) [hereinafter Daimler] ). A corporation is "essentially at home" in its state of incorporation and the state of its principal place of business. Daimler, 134 S. Ct. 760–61. Only in a "truly exceptional case" may a corporate defendant be treated as "essentially at home" in a jurisdiction besides its states of incorporation and principal place of business. Brown v. Lockheed Martin Corp., 814 F.3d at 627 (internal quotation marks omitted). In addition, an agent's contacts with a forum state, even if imputed to the principal company, do not allow a court to exercise general jurisdiction over the principal company unless they render the principal company essentially at home in the forum state. See Sonera Holding B.V. v. Cukurova Holding A.S., 750 F.3d 221, 226 (2d Cir. 2014) (holding principal not essentially at home in New York because even if agents' contacts were imputed to the principal company, "they do not shift the company's primary place of business (or place of incorporation) away from Turkey.").

**\*10** This is not an exceptional case. WIL is incorporated and has its principal place of business in India. According to WIL's CFO, WIL has "seven direct subsidiaries in India and 13 indirect subsidiaries located in six other countries." (Jiwani Decl. ¶ 19). Moreover, WIL's CFO states WIL's top managers are Indian nationals who work primarily in India; WIL's stock trades on the Bombay Stock Exchange and the National Stock Exchange of India; all members of WIL's board of directors are Indian nationals who reside in India; WIL's board of directors meets in Mumbai; WIL's annual shareholder meetings are in Gujarat, India; WIL's factories are all located in India; all of WIL's products are manufactured in India; and as of the third quarter of 2016, WIL had approximately 22,000 employees, all of whom were employed in India. Moreover, despite the fact that WUSA has extensive contacts with New York, those contacts "do not shift [WIL]'s primary place of business (or place of incorporation) away from" India. Sonera Holding B.V. v. Cukurova Holding A.S., 750 F.3d at 226.

Therefore, WIL is essentially at home in India, not New York, and the Court's exercise of general jurisdiction over WIL would not comport with due process.

2. Specific Jurisdiction over the New York Plaintiffs' Claims

The Court's exercise of specific jurisdiction over the New York plaintiffs' claims against WIL, however, does comport with due process pursuant to a stream of commerce theory of specific jurisdiction.

Specific jurisdiction over a nonresident defendant satisfies due process when: "(1) the defendant has 'purposefully availed itself of the privilege of conducting activities within the forum State'; (2) the claim at issue 'arises out of or relates to the defendant's forum conduct'; and (3) the exercise of jurisdiction is 'reasonable under the circumstances.' " Ramiro Aviles v. S & P Glob., Inc., 2019 WL 1407473, at *16 (S.D.N.Y. Mar. 28, 2019) (quoting U.S. Bank Nat'l Ass'n v. Bank of Am. N.A., 916 F.3d 143, 150 (2d Cir. 2019)).[3]

Under a stream of commerce theory of specific jurisdiction, a plaintiff must show a "regular flow or regular course of sales" in the forum state or other purposeful activity directed there, such as "special state-related design, advertising, advice, marketing," or regular attendance at trade shows in the forum state. See J. McIntyre Mach., Ltd. v. Nicastro, 564 U.S. 873, 889 (2011) (Breyer, J., concurring) (internal quotations and alterations omitted). "Courts have considered 'an expectation of true national distribution' of the products at issue to suggest an expectation that the product in question (or other products) would enter the forum state's stream of commerce." Melissa & Doug, LLC v. LTD Commodities, LLC, 2016 WL 4367975, at *4 (S.D.N.Y. Aug. 15, 2016) (internal citations omitted). In addition, "establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State" also "may indicate an intent or purpose to serve the market in the forum State." Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102, 112 (1987).

The Supreme Court has cast doubt on the continued viability of specific jurisdiction based on a product's placement into the forum state's stream of commerce. See J. McIntyre Mach., Ltd. v. Nicastro, 564 U.S. at 886 (Kennedy, J., plurality opinion) (finding defendant had not "availed itself" of New Jersey's market simply because defendant directed sales and marketing efforts at the United States and four of its products entered New Jersey's stream of commerce); Asahi Metal Indus. Co. v. Superior Court, 480 U.S. at 112 (O'Connor, J., plurality opinion) ("The placement of a product into the stream of commerce, without more, is not an act of the

Case 1:19-md-02875-RMB-SAK Document 599-1 Filed 10/16/20 Page 36 of 57 PageID: 13288

In re Welspun Litigation, Not Reported in Fed. Supp. (2019)

2019 WL 2174089

defendant purposefully directed toward the forum State."). Nevertheless, the stream of commerce theory survives. See, e.g., AFTG-TG, LLC v. Nuvoton Tech. Corp., 689 F.3d 1358, 1363 (Fed. Cir. 2012) (holding "because [J. McIntyre Mach., Ltd. v. Nicastro] did not produce a majority opinion," courts must follow Justice Breyer's concurrence, "the crux of [which] was that the Supreme Court's framework applying the stream-of-commerce theory ... had not changed").

**\*11** Here, there is sufficient evidence to conclude at this stage that WIL expected true national distribution of the Bed Linens. WIL's 2016–2017 annual report states WIL, India's "largest exporter of home textile products," was "[r]anked #1 in Home Textile Supplier Giants to USA by Home & Textiles Today magazine for the 5th Year in a row." (Jiwani Decl. Ex. A at ECF 4–5). The annual report further states that "every 5th towel and every 9th bedsheet sold in the US is manufactured by [WIL]." (Id.). Similarly, WIL's 2011–2012 annual report states "nearly 70% of WIL revenues come from the US markets," down from the "nearly 90% of business coming from the US nearly a decade ago." (Id. Ex. C at ECF 6).

Plaintiffs' evidence regarding the size of the New York market also supports this conclusion. Plaintiffs aver Walmart and BB&B each have approximately 100 stores in New York and Target has seventy-nine. Plaintiffs also filed evidence under seal showing significant Walmart sales of Welspun products in New York.

Other evidence further supports finding WIL purposely availed itself of the privilege of conducting business in New York. WUSA—WIL's subsidiary and allegedly "the sales, marketing and distribution arm for Welspun's textile business" (Klorczyk Decl. Ex. 7 at WS106645)—had its principal place of business and an office in New York that, at least at this stage of the case, the Court finds WIL treated as its own. Further, plaintiffs produced evidence that WUSA shipped goods into New York on WIL's behalf, and that WIL representatives attended New York's Home Fashions Market Week in 2016.

Accordingly, plaintiffs have produced sufficient evidence that, if credited, would satisfy due process for purposes of establishing specific jurisdiction over the New York plaintiffs' claims against WIL.

### 3. Specific Jurisdiction over the California Plaintiffs' Claims

However, pursuant to the Supreme Court's decision in Bristol-Myers Squibb Co. v. Superior Court of Cal., S.F. Cty., 137 S. Ct. 1773 (2017) [hereinafter Bristol-Myers], the Court lacks specific jurisdiction over the California plaintiffs' claims against WIL.

In Bristol-Myers, a state-court mass tort action with more than 600 named plaintiffs, the Court explained:

> for a court to exercise specific jurisdiction over a claim, there must be an 'affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State.' When there is no such connection, specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State.

137 S. Ct. at 1781 (alteration in original) (quoting Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. at 919). Emphasizing that specific jurisdiction requires "the suit [to] arise out of or relate to the defendant's contacts with the forum," id. at 1780 (alterations omitted) (quoting Daimler, 571 U.S. 117) (citations omitted), the Court found the California courts lacked specific jurisdiction over named plaintiffs foreign to California who had not alleged any injury there, see id. at 1782.

The Bristol-Myers Court explicitly left open the question whether the Fifth Amendment imposed the same restrictions on the exercise of personal jurisdiction by a federal court. See Bristol-Myers, 137 S. Ct. at 1784.[4] Moreover, although most district courts have held Bristol-Myers does not apply to federal class actions, Bank v. CreditGuard of Am., 2019 WL 1316966, at *12 n.11 (E.D.N.Y. Mar. 22, 2019), reconsideration denied sub nom. Bank v. Freedom Debt Relief, LLC, 2019 WL 1865196 (E.D.N.Y. Apr. 24, 2019), several courts have deferred resolution of Bristol-Myers' applicability to unnamed class members' claims until a motion for class certification, see, e.g., Gonzalez v. Costco Wholesale Corp., 2018 WL 4783962, at *8 (E.D.N.Y. Sept. 29, 2018).

**\*12** The California plaintiffs did not purchase any of the Bed Linens in New York. They therefore rely on WIL's contacts with New York through WUSA, which plaintiffs allege maintains its headquarters in New York and functions as WIL's sales, marketing, and distribution arm in the United States. But "[f]or specific jurisdiction, a defendant's general

Case 1:19-md-02875-RMB-SAK    Document 599-1    Filed 10/16/20    Page 37 of 57
PageID: 13289
In re Welspun Litigation, Not Reported in Fed. Supp. (2019)
2019 WL 2174089

connections with the forum are not enough." Bristol-Myers, 137 S. Ct. at 1781. Thus, because the California plaintiffs' claims do not arise from WIL's contacts with New York, the Court lacks personal jurisdiction over the California plaintiffs' claims against WIL.

Bristol-Myers' applicability to the New York plaintiffs' out-of-state class action claims, however, is less clear. Accordingly, the Court defers resolution of Bristol-Myers' applicability to the New York plaintiffs' out-of-state class action claims until plaintiffs move for class certification.

### D. Pendent Jurisdiction
Plaintiffs argue the Court should exercise pendent personal jurisdiction over the California plaintiffs' claims against WIL.

Pendent jurisdiction is not applicable in these circumstances.

"Pendent jurisdiction traditionally refers to the joinder of a state-law claim by a party already presenting a federal question claim against the same defendant." Baylis v. Marriott Corp., 843 F.2d 658, 663–64 (2d Cir. 1988) (internal citation omitted). "[W]here a federal statute authorizes nationwide service of process, and the federal and state claims 'derive from a common nucleus of operative fact,' ... the district court may assert personal jurisdiction over the parties to the related state law claims even if personal jurisdiction is not otherwise available." Charles Schwab Corp. v. Bank of Am. Corp., 883 F.3d 88 (2d Cir. 2018) (quoting IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1056 (2d Cir. 1993)).

Plaintiffs have not brought a claim under a federal statute authorizing nationwide service of process. Nor is a non-traditional application of pendent jurisdiction appropriate here. See, e.g., DeMaria v. Nissan N. Am., Inc., 2016 WL 374145, at *8 (N.D. Ill. Feb. 1, 2016) (application of pendent jurisdiction inappropriate "where each plaintiff's claim is predicated on the law of the particular state where he or she purchased a car and the claims of the other plaintiffs as alleged remain unrelated to anything that transpired in Illinois"); Tulsa Cancer Inst., PLLC v. Genetech Inc., 2016 WL 141859, at *4 (N.D. Okla. Jan. 12, 2016) ("The doctrine of pendent personal jurisdiction does not negate Plaintiffs' obligation to establish jurisdiction based on the relationship between Defendant, the forum, and each Plaintiff's claims.").

Therefore, the Court will not exercise pendent jurisdiction over the California plaintiffs' claims against WIL.

### E. Conclusion
In sum, the Court has specific jurisdiction over the New York plaintiffs' claims against WIL, lacks jurisdiction over the California plaintiffs' claims against WIL, and defers resolution of Bristol-Myers' applicability to the New York plaintiffs' out-of-state class action claims until plaintiffs move for class certification.

### IV. Failure to State a Claim
The Court now assesses defendants' challenges to several of the CSAC's claims for relief.

For the following reasons, the Court will allow the California plaintiffs' claims against WUSA and the Retailer Defendants for unjust enrichment, negligent misrepresentation, and for violation of the UCL, CLRA, and FAL, to proceed. However, the following claims are dismissed: (i) the California plaintiffs' claims for implied warranty against WUSA and the Retailer Defendants; (ii) the New York plaintiffs' claims for negligent misrepresentation against all defendants; (iii) all plaintiffs' claims for violation of the MMWA against all defendants; and (iv) all plaintiffs' claims for fraud against the Retailer Defendants.

### A. Implied Warranty
*13 The Welspun Defendants argue the California plaintiffs' implied warranty claims under California law fail because the California plaintiffs fail to allege privity.

The Court agrees.

"Under California Commercial Code section 2314, ... a plaintiff asserting breach of warranty claims must stand in vertical contractual privity with the defendant." Clemens v. DaimlerChrysler Corp., 534 F.3d 1017, 1023 (9th Cir. 2008). "One exception to the general rule is where 'the purchaser of a product relied on representations made by the manufacturer in labels or advertising material.' " Allen v. Hyland's Inc., 300 F.R.D. 643, 669 (C.D. Cal. 2014) (quoting Clemens v. DaimlerChrysler Corp., 534 F.3d at 1023). Although the Ninth Circuit implied in Clemens v. DaimlerChrysler Corp. that this exception to the privity requirement extends to claims for breach of implied warranty, 547 F.2d at 1023, it relied on Burr v. Sherwin Williams Co., in which the California Supreme Court held the exception was "applicable only to express warranties." 42 Cal. 2d 682, 696 (1954). Courts that have noted this discrepancy have held the privity exception is

2019 WL 2174089

limited to claims for breach of the express warranty. See, e.g., Hilsley v. Ocean Spray Cranberries, Inc., 2018 WL 6300479, at *11 n.8 (S.D. Cal. Nov. 29, 2018).

The Court agrees that California's privity exception for claims based on label or advertising misrepresentations applies only to claims for breach of express warranty. Thus, because plaintiffs do not allege privity with the Welspun Defendants, their claim for breach of implied warranty under California law fails.

Accordingly, the California plaintiffs' claims for breach of implied warranty under California law against the Welspun Defendants are dismissed.

### B. Unjust Enrichment

Defendants argue the California plaintiffs' unjust enrichment claims under California law fail because California does not recognize unjust enrichment as a standalone claim for relief.

The Court disagrees.

California courts generally do not recognize a standalone claim for unjust enrichment, "which is synonymous with 'restitution.' " Astiana v. Hain Celestial Group, Inc., 783 F.3d 753, 762 (9th Cir. 2015) (quoting Durell v. Sharp Healthcare, 183 Cal. App. 4th 1350, 1370 (2010) (citation omitted)). However, "[w]hen a plaintiff alleges unjust enrichment, a court may 'construe the cause of action as a quasi-contract claim seeking restitution.' " Id. (quoting Rutherford Holdings, LLC v. Plaza Del Rey, 223 Cal. App. 4th 221 (2014)). Thus, in Astiana v. Hain Celestial Group, Inc., the Ninth Circuit held an allegation that a defendant "enticed plaintiffs to purchase their products through false and misleading labeling, and that [the defendant] was unjustly enriched as a result," sufficed to state a quasi-contract cause of action. 783 F.3d at 762 (internal quotations and alteration omitted). Further, to the extent plaintiffs' restitution claim is duplicative or superfluous, "this is not grounds for dismissal." Id. (citing Fed. R. Civ. P. 8(d)(2)). Courts have since "permitted what were previously considered to be superfluous unjust enrichment claims to survive the pleading stage in light of the Ninth Circuit's decision in Astiana." Valencia v. Volkswagen Grp. of Am. Inc., 119 F. Supp. 3d 1130, 1142 (N.D. Cal. 2015) (collecting cases).

**\*14** Here, the California plaintiffs allege defendants misrepresented the Bed Linens were "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton," and that

defendants were unjustly enriched as a result. Although the California plaintiffs' restitution claims may be duplicative or superfluous, the Court will not dismiss the claims for that reason at this time.

Accordingly, the California plaintiffs' unjust enrichment claims under California law may proceed.

### C. Negligent Misrepresentation

Defendants argue plaintiffs fail to state claims for negligent misrepresentation under New York or California law because plaintiffs fail to allege a special relationship between plaintiffs and defendants.

Plaintiffs do not oppose dismissal of the New York negligent misrepresentation claims, and therefore the Court dismisses them. See M.M. ex rel. J.M. v. N.Y.C. Dep't of Educ., 2010 WL 2985477, at *6 (S.D.N.Y. July 27, 2010) (collecting cases). However, the Court will not dismiss plaintiffs' negligent misrepresentation claims under California law because California's economic loss rule—upon which defendants rely in arguing for dismissal—does not apply to those claims.

"In actions for negligence in California, recovery of purely economic loss is foreclosed in the absence of '(1) personal injury, (2) physical damage to property, (3) a special relationship existing between the parties, or (4) some other common law exception to the rule.' " Minkler v. Apple, Inc., 65 F. Supp. 3d 810, 820 (N.D. Cal. 2014) (quoting Kalitta Air, LLC v. Cent. Tex. Airborne Sys., Inc., 315 F. App'x 603, 605 (9th Cir. 2008) (non-precedential memorandum)). This "economic loss rule requires a purchaser to recover in contract," not in tort, "for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise." Robinson Helicopter Co. v. Dana Corp., 34 Cal. 4th 979, 988 (2004); see also Bret Harte Union High Sch. Dist. v. FieldTurf, USA, Inc., 2016 WL 3519294, at *4 (E.D. Cal. June 27, 2016).

Courts are split regarding whether California's economic loss rule applies to negligent misrepresentation claims. See Bret Harte Union High Sch. Dist. v. FieldTurf, USA, Inc., 2016 WL 3519294, at *5 (collecting cases). However, the Ninth Circuit held—albeit in a non-precedential memorandum— that "California law classifies negligent misrepresentation as a species of fraud, for which economic loss is recoverable." Kalitta Air, L.L.C. v. Cent. Tex. Airborne Sys., Inc., 315 F. App'x at 607 (internal citations omitted). Moreover, some

A036

Case 1:19-md-02875-RMB-SAK    Document 599-1    Filed 10/16/20    Page 39 of 57
PageID: 13291

In re Welspun Litigation, Not Reported in Fed. Supp. (2019)

2019 WL 2174089

courts have noted the difference between breach of contract claims based on conduct after formation of the contract and negligent misrepresentation claims based on pre-contract conduct. See, e.g., Bret Harte Union High Sch. Dist. v. FieldTurf, USA, Inc., 2016 WL 3519294, at *5.

In light of the Ninth Circuit's non-precedential memorandum and the district court's persuasive reasoning in Bret Harte Union High Sch. Dist. v. FieldTurf, USA, Inc., 2016 WL 3519294, the Court holds California's economic loss rule does not apply to plaintiffs' negligent misrepresentation claims.

Accordingly, the New York plaintiffs' negligent misrepresentation claims are dismissed, but the California plaintiffs' negligent misrepresentation claims may proceed.

### D. Fraud-Based Claims

The Welspun Defendants argue plaintiffs' CLRA, UCL, FAL, negligent misrepresentation, and fraud claims fail to satisfy Rule 9(b)'s particularity requirement because the CSAC fails to explain how the Bed Linens' "100% Egyptian cotton" labels were false. Further, the Retailer Defendants argue plaintiffs' UCL, CLRA, FAL, negligent misrepresentation, and fraud claims against them should be dismissed because plaintiffs fail to plead the Retailer Defendants' fraudulent intent.

**\*15** The Court disagrees with the Welspun Defendants because plaintiffs adequately explain how the "100% Egyptian cotton" labels were false. Moreover, the Court finds plaintiffs need not allege scienter to state claims under the UCL, CLRA, FAL, or for negligent misrepresentation. However, plaintiffs fail to raise a strong inference of fraudulent intent on their fraud claims against the Retailer Defendants, and therefore those claims are dismissed.

"Under New York law, fraud requires proof of (1) a material misrepresentation or omission of a fact, (2) knowledge of that fact's falsity, (3) an intent to induce reliance, (4) justifiable reliance by the plaintiff, and (5) damages." Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160, 170 (2d Cir. 2015) (internal citations omitted) [hereinafter Loreley]. Similarly, "[t]he elements of a cause of action for fraud in California are: '(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.' " Kearns v. Ford Motor Co., 567 F.3d 1120, 1126 (9th Cir. 2009) (quoting Engalla v. Permanente Med.

Grp., Inc., 15 Cal. 4th 951, 974 (1997)). Rule 9(b) imposes two additional pleading burdens on fraud plaintiffs—one concerning the circumstances of the fraud and the other the defendant's mental state. Loreley, 797 F.3d at 171.

First, Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Thus, "the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290 (2d Cir. 2006). That said, the rule "does not require factual pleadings that demonstrate the probability of wrongdoing." Loreley, 797 F.3d at 174 (alteration omitted) (quoting Ashcroft v. Iqbal, 556 U.S. at 678). "At the pleadings stage, the alleged fraud need only be plausible based on the complaint; it need not be more likely than other possibilities." Id. (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556).

Second, "though mental states may be pleaded generally, [a plaintiff] must nonetheless allege facts that give rise to a strong inference of fraudulent intent." Loreley, 797 F.3d at 171 (internal quotations omitted). "An inference is strong if it is cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 176–77 (internal quotations omitted). Such an inference "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Lerner v. Fleet Bank, N.A., 459 F.3d at 290–91 (internal quotation omitted).

"Generalized motives, such as the desire to earn profits, which could be imputed to any publicly-owned, for-profit endeavor, are not sufficiently concrete for purposes of inferring scienter." In re Lyman Good Dietary Supplements Litig., 2018 WL 3733949, at *4 (S.D.N.Y. Aug. 6, 2018) (alteration removed) (quoting Chill v. Gen. Elec. Co., 101 F.3d 263, 268 (2d Cir. 1996)). Further, ordering an investigation is "a prudent course of action that weakens rather than strengthens an inference of scienter." Slayton v. Am. Exp. Co., 604 F.3d 758, 777 (2d Cir. 2010) (internal quotation and citation omitted).

### 1. Alleged Falsity of "100% Egyptian Cotton" Labels

**\*16** Plaintiffs' allegations concerning the falsity of the "100% Egyptian cotton" labels satisfy the Rule 9(b) standard. As discussed in the Background section above, plaintiffs allege specific characteristics unique to Egyptian cotton, including longer cotton fibers and more porous cotton, and describe how those unique characteristics result in higher-quality cotton. Further, plaintiffs allege defendants misrepresented the Bed Linens as "100 Egyptian Cotton" or "100% Long-Staple Egyptian Cotton."

2. Scienter

Plaintiffs' UCL, CLRA, FAL, and negligent misrepresentation claims do not require plaintiffs to plead the Retailer Defendants' fraudulent intent. See Mazza v. Am. Honda Motor Co., Inc., 666 F.3d 581, 591 (9th Cir. 2012) ("[T]he California laws at issue here"—the UCL, CLRA, and FAL—"have no scienter requirement." (citations omitted); Dougherty v. Bank of Am., N.A., 177 F. Supp. 3d 1230, 1245 (E.D. Cal. 2016) (stating a plaintiff need not allege a defendant made an intentionally false statement to state claim for negligent misrepresentation). Thus, the Court will not dismiss those claims for failure to allege scienter plausibly.

However, plaintiffs' fraud claims against the Retailer Defendants do fail because plaintiffs do not raise a strong inference of fraudulent intent.[5] Plaintiffs merely allege Target and BB&B knew they were selling fake Egyptian cotton sheets after they began investigating the Welspun Defendants. However, the investigations indicate "a prudent course of action," not an intent to perpetrate a fraud. Slayton v. Am. Exp. Co., 604 F.3d at 777 (internal quotation and citation omitted). Plaintiffs alternatively allege Target and BB&B should have been aware of issues with the Welspun Defendants' products before investigating them, yet plaintiffs' allegations are entirely conclusory.

As for Walmart, plaintiffs allege in 2008, a Walmart employee expressed concerns about the Welspun Defendants' products; Walmart investigated the Welspun Defendants; and Walmart "buried the results" of that investigation. (CSAC ¶ 48.) But plaintiffs plead no specific facts supporting the conclusory allegation that Walmart buried the results of its investigation, and Walmart's investigation of the Welspun Defendants indicates prudence.

Plaintiffs also allege in 2015, the Cotton Egypt Association warned Walmart, "the levels of fraudulent merchandise on offer as Egyptian cotton had reached a crisis point." (CSAC ¶ 49). But plaintiffs' allegation is far too general to generate a strong inference of intent to defraud—in particular, plaintiffs do not allege the Cotton Egypt Association warned Walmart specifically about the Bed Linens or about the Welspun Defendants.

Accordingly, plaintiffs' claims under the UCL, CLRA, and FAL, and for negligent misrepresentation under California law, may proceed. Plaintiffs' fraud claims against the Retailer Defendants under New York and California law, however, are dismissed.

E. MMWA

Defendants proffer several arguments why the Court should dismiss plaintiffs' claims under the MMWA. Two of those arguments contest the Court's subject matter jurisdiction over plaintiffs' MMWA claims. Although neither argument is convincing, the Court must address those arguments first.

**\*17** Defendants argue the Court lacks subject matter jurisdiction because plaintiffs fail to name at least 100 plaintiffs. However, "where, as here, the jurisdictional prerequisites of [the Class Action Fairness Act] are satisfied, [the Court] may exercise subject-matter jurisdiction over a claim under the MMWA without regard for whether the jurisdictional prerequisites of that statute are also met." Weisblum v. Prophase Labs, Inc., 88 F. Supp. 3d 283, 295 (S.D.N.Y. 2015).

Defendants also argue the federal Textile Act preempts the MMWA pursuant to 15 U.S.C. § 2311(d), which states the MMWA is "inapplicable to any written warranty the making or content of which is governed by Federal law." But because "the representations appearing on the labels of the Class Products do not constitute a written warranty under the MMWA, section 2311(d)"—upon which defendants' argument relies—"is wholly inapplicable." Forcellati v. Hyland's, Inc., 2015 WL 9685557, at \*6 (C.D. Cal. Jan. 12, 2015); see also 15 U.S.C. § 2301(6) (defining "written warranty" for purposes of the MMWA).

Nevertheless, the California plaintiffs fail to state a claim under the MMWA. Although the MMWA is a federal statute, liability under the MMWA is based on state warranty laws. See Ebin v. Kangadis Food Inc., 2013 WL 3936193, at \*3 n.2 (S.D.N.Y. July 26, 2013) (noting the MMWA "incorporates and federalizes state-law breach of warranty claims, including state-law standards for liability and damages"). Thus, a

A038

Case 1:19-md-02875-RMB-SAK    Document 599-1    Filed 10/16/20    Page 41 of 57
PageID: 13293
In re Welspun Litigation, Not Reported in Fed. Supp. (2019)
2019 WL 2174089

plaintiff's claim under the MMWA "stand[s] or fall[s]" with the plaintiff's state law claims. See Brady v. Basic Research, L.L.C., 101 F. Supp. 3d 217, 234 (E.D.N.Y. 2015).

Plaintiffs' claims under the MMWA are based entirely on the California plaintiffs' claims for breach of the implied warranty of merchantability. The Court has dismissed those claims. Therefore, plaintiffs' MMWA claims are likewise dismissed.

V. Motion to Strike Class Allegations

The Retailer Defendants move to strike the CSAC's class allegations, arguing (i) a class action is not a superior method of resolving the dispute and (ii) common issues do not predominate. The Retailer Defendants also argue plaintiffs' claims for express warranty under New York law, negligent misrepresentation, and fraud require individualized proof to assess reliance, and therefore the Court should strike all class allegations pertaining to plaintiffs' proposed subclasses with respect to those claims.

Because the motion raises issues "that would be decided in connection with determining the appropriateness of class certification," the motion must be denied as premature, without prejudice to renewal at the class certification stage." Kassman v. KPMG LLP, 925 F. Supp. 2d at 464–65.

VI. Rule 8

The Welspun Defendants argue the CSAC fails to meet the basic notice pleading requirements of Rule 8(a)(2) because it does not distinguish between WIL and WUSA.

The Court disagrees.

"The key to Rule 8(a)'s requirements is whether adequate notice is given." Wynder v. McMahon, 360 F.3d at 79 (internal citation omitted). Adequate notice is "that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so that it may be assigned the proper form of trial." Id. (quoting Simmons v. Abruzzo, 49 F.3d 83, 86 (2d Cir. 1995)).

Rule 8 "does not necessarily require ... that the complaint separate out claims against individual defendants." Wynder v. McMahon, 360 F.3d at 80. Nevertheless, courts have dismissed complaints that fail to "distinguish at all between any of the Defendants." Angermeir v. Cohen, 14 F. Supp. 3d 134, 143 (S.D.N.Y. 2014) (collecting cases). However, in Loreley, which addressed Rule 9(b)'s higher pleading

standard for fraud claims, the Second Circuit held the plaintiffs' references to three corporate entities collectively as "Wachovia," who allegedly acted together to structure and offer securities at issue in the case, sufficed to inform the defendants of the nature of their alleged participation in the fraud. 797 F.3d at 171–72.

**\*18** This is not a case in which the complaint fails to distinguish at all between WIL and WUSA. On the contrary, plaintiffs allege WUSA acted as WIL's "sales arm" in North America, and that WUSA's work included "distributing textile products and working directly with United States retailers on textile product labeling and marketing." (CSAC ¶ 11). Moreover, the very nature of plaintiffs' allegations is that WUSA acted as WIL's agent in selling the Bed Linens. Thus, the Court is "hard-pressed" to see how plaintiffs could have done anything but refer to WIL and WUSA collectively. Loreley, 797 F.3d at 172.

Accordingly, the CSAC satisfies Rule 8.

VII. Sanctions

The Court will not sanction plaintiffs or plaintiffs' counsel under Rule 11, 28 U.S.C. § 1927, or the Court's inherent equitable powers for failure to amend the CAC in response to defendants' pre-motion letter, which made apparent obvious defects in plaintiffs' pleading. The Court sympathizes with Judge Sullivan's frustration for plaintiffs' needless delay and complication of this case. Nevertheless, the Court is not convinced plaintiffs or their counsel acted in bad faith or for an improper purpose.

Accordingly, the Court will not award sanctions at this time.

VIII. Leave to Amend

The Court also declines to grant plaintiffs leave to file a consolidated third amended class action complaint to cure deficiencies identified in this Opinion and Order.

Rule 15(a)(2) instructs that courts "should freely give leave" to amend a complaint "when justice so requires." However, leave to amend may "properly be denied for: 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.' " Ruotolo v. City of New York, 514 F.3d 184, 191 (2d Cir. 2008) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)). A

plaintiff's "failure to fix deficiencies in the previous pleading, after being provided notice of them, is alone sufficient ground to deny leave to amend." Jeanty v. Newburgh Beacon Bus Corp., 2018 WL 6047343, at *12 (S.D.N.Y. Nov. 19, 2018) (collecting cases), appeal docketed, No. 18-3677 (2d Cir. Dec. 10, 2018). Moreover, the Court need not grant a plaintiff leave to amend if she has not suggested she is in possession of facts that would cure deficiencies identified by the Court. See id. (collecting cases).

This is plaintiffs' consolidated second amended class action complaint. Indeed, both the Welspun Defendants and the Retailer Defendants previously filed motions to dismiss, which were fully briefed before the Court granted plaintiffs leave to file the CSAC. The CSAC does not cure the deficiencies with the dismissed claims, deficiencies that were specifically identified in those earlier-filed motions. This alone is sufficient to deny leave to amend. Further, plaintiffs have not suggested they possess facts that would cure the deficiencies identified in this Opinion and Order.

In addition, having carefully reviewed the CSAC, the Court does not find any allegations that suggest plaintiffs have valid claims that they have merely "inadequately or inartfully pleaded" and therefore should be "given a chance to reframe." Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000). Thus, because the problems with the dismissed claims in plaintiffs' CSAC are substantive, and supplementary or improved pleading would not cure those claims' deficiencies, the Court finds that repleading again would be futile.

Finally, this case is not at all like Loreley, 797 F.3d 160, upon which plaintiffs rely in requesting leave to amend. In that case, the district court held a pre-motion conference and "presented Plaintiffs with a Hobson's choice: agree to cure deficiencies not yet fully briefed and decided or forfeit the opportunity to replead." Id. at 190. Plaintiffs declined to amend, and the court dismissed the complaint in its entirety and with prejudice. Id. at 169. The Second Circuit held "the procedure by which the district court denied leave to amend was improper." Id. at 190. The Second Circuit reasoned, "Without the benefit of a ruling, many a plaintiff will not see the necessity of amendment or be in a position to weigh the practicality and possible means of curing specific deficiencies." Id. Nevertheless, the Second Circuit left "unaltered the grounds on which denial of leave to amend has long been held proper, such as undue delay, bad faith, dilatory motive, and futility." Id. at 190.

*19 Here, several of plaintiffs' claims survive defendants' motions to dismiss; plaintiffs have had the benefit of two full rounds of briefing on defendants' motions to dismiss; plaintiffs amended their CAC after the first full round of briefing; and, as discussed above, the problems with the dismissed claims are substantive and plaintiffs have not suggested they possess facts that would cure the deficiencies identified herein. Thus, if Loreley left open any possibility for a district court to deny leave to amend without having first issued what amounts to an advisory opinion, this case unquestionably presents those circumstances.

Accordingly, the Court declines to grant plaintiffs leave to file a consolidated third amended class action complaint.

## CONCLUSION

The Welspun Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART.

The Retailer Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART.

The Retailer Defendants' motion to strike is DENIED.

Plaintiffs' request for leave to amend is DENIED.

The Welspun Defendants' and Target's accountings for sanctions are DENIED.

The remaining claims are as follows:

- The California plaintiffs' claims, individually and on behalf of the proposed California subclass, against WUSA and the Retailer Defendants for violation of the CLRA, UCL, and FAL;

- The California plaintiffs' claims, individually and on behalf of the proposed nationwide class, for breach of express warranty and unjust enrichment against WUSA and the Retailer Defendants;

- The California plaintiffs' claims, individually and on behalf of the proposed nationwide class, for negligent misrepresentation against WUSA and the Retailer Defendants;

Case 1:19-md-02875-RMB-SAK   Document 599-1   Filed 10/16/20   Page 43 of 57
PageID: 13295

In re Welspun Litigation, Not Reported in Fed. Supp. (2019)

2019 WL 2174089

- The California plaintiffs' claims, individually and on behalf of the proposed nationwide class, for fraud against WUSA;

- The New York plaintiffs' claims, individually and on behalf of the proposed nationwide class, for fraud against WIL and WUSA; and

- The New York plaintiffs' claims, individually and on behalf of the proposed New York subclass, for violation of NYGBL §§ 349 & 350 against all defendants.

By June 3, 2019, defendants shall file answers to the surviving claims.

By May 31, 2019, the parties shall submit a joint letter, no more than three pages in length, regarding the status of discovery (and to the extent necessary, a proposed schedule for remaining discovery), settlement discussions, and, if applicable, a proposed briefing schedule for a motion for class certification.

In addition, the parties are directed to appear for an in-person status conference on June 7, 2019, at 9:30 a.m., at the United States Courthouse in White Plains, Courtroom 620.

The Clerk is instructed to terminate the motions. (Docs. ##182, 185).

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 2174089

Footnotes

1   Unless otherwise noted, "Ex. # ___ at WS ___" refers to the Bates-stamped numbers on the bottom of plaintiffs' exhibits, and "Doc. # ___ at ECF ___" refers to page numbers automatically assigned by the Court's Electronic Case Filing system.

2   Because the Court finds _infra_ that the exercise of personal jurisdiction over the California plaintiffs would not comport with due process, the Court analyzes here only whether New York's long-arm statute is satisfied for purposes of the New York plaintiffs' claims against WIL.

3   The Welspun Defendants do not challenge whether the exercise of jurisdiction over the New York plaintiffs' claims is reasonable under the circumstances.

4   In leaving open that question, the Bristol-Myers Court relied on Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., 484 U.S. 97, 102 n.5 (1987). In that case, the Supreme Court stated it had no occasion to address whether a "federal court could exercise personal jurisdiction, consistent with the Fifth Amendment, based on an aggregation of the defendant's contacts with the Nation as a whole, rather than on its contacts with the State in which the federal court sits." _Id._ Here, plaintiffs have not argued that they can aggregate their nationwide contacts to satisfy personal jurisdiction. Therefore, the Court does not address whether the California plaintiffs could satisfy personal jurisdiction in federal court under an aggregation theory.

5   The Retailer Defendants argue plaintiffs' claims against BB&B should be dismissed for lack of standing because no named plaintiff purchased Bed Linens from BB&B after BB&B allegedly learned of labeling issues with the Bed Linens in August 2015. The Court is not persuaded that BB&B was required to know of labeling issues with the Bed Linens at the time of a plaintiff's purchase for the plaintiff to have standing to pursue a fraud claim. Nevertheless, as discussed _infra_, plaintiffs' fraud claims against BB&B fail for other reasons.

End of Document                                                      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 7

A042

Ramos v. Rite Aid Corp., Not Reported in A.3d (2010)
2010 WL 4277612

2010 WL 4277612
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

**This decision was reviewed by West editorial
staff and not assigned editorial enhancements.**

Superior Court of Connecticut,
Judicial District of Fairfield.

Evelyn RAMOS

v.

RITE AID CORPORATION.

No. CV106008649.
|
Oct. 7, 2010.

**Attorneys and Law Firms**

Daly Weihing & Bodell, Bridgeport, for Evelyn Ramos.

Gordon Muir & Foley, Hartford, for Rite Aid Corporation.

**Opinion**

BRUCE L. LEVIN, Judge of the Superior Court.

*\*1* The issue raised by the defendant's motion to strike is
whether a products liability claim may be brought against a
pharmacy for dispensing the wrong medication to a customer.
The court holds it may not.

The plaintiff's complaint alleges that the plaintiff's physician
prescribed her an anti-anxiety medication. The plaintiff had
the prescription filled at the defendant's pharmacy. Instead
of properly filling her prescription, the pharmacy provided
her with Naproxin. The plaintiff ingested the Naproxin and
became ill. At oral argument, the plaintiff conceded that there
was nothing defective about the Naproxin, just that it was
mistakenly given to the plaintiff.

The plaintiff has brought this action in three counts. The first
count alleges negligence by the defendant. The second count
alleges negligent infliction of emotional distress. The third
count alleges a products liability pursuant to General Statutes
§ 52-572m et seq. The defendant has moved to strike the

third count on the grounds that the dispensing of the wrong
medication by a pharmacy is the negligent performance
of a service, and not within the ambit of the products
liability action. The plaintiff disagrees. In the alternative, the
defendant moves to strike the first and second counts on the
grounds that where a products liability action lies, it is the
exclusive remedy. See General Statutes § 52-572n (a).

"General Statutes 52-572m(b) defines a product liability
claim as including 'all claims or actions brought for personal
injury ... caused by the ... marketing ... of any product.'
Section 52-572n(a) allows such claims to be brought against
'product sellers.' Section 52-572m(a) defines 'product seller,'
in pertinent part, as 'any person or entity ... who is engaged
in the business of selling such products whether the sale is
for resale or for use or consumption.' To maintain a product
liability action under § 52-572m et seq., the plaintiff must
establish and prove, *inter alia,* 'that ... the defendant was
engaged in the business of *selling* the product ... [and] the
defect existed at the time of the sale ...' *Giglio v. Connecticut
Light & Power Co.,* 180 Conn. 230, 234, 429 A.2d 486
(1980); *Coe-Park Donuts, Inc. v. Robertshaw Controls Co.,*
1 Conn.App. 84, 86, 468 A.2d 292 (1983); 2 Restatement
(Second), Torts § 402A. Once a particular transaction is
labeled a 'service,' as opposed to a 'sale' of a 'product,'
it is outside the purview of our product liability statute.
See General Statutes § 52-572m et seq.; *Coffee v. Cutter
Biological,* 809 F.2d 191, 193 (2d Cir.1987) (transfer of blood
not a 'sale' but a service; therefore, not within purview of
§ 52-572m et seq.) ..." (Emphasis in original.) *Zichichi v.
Middlesex Memorial Hospital,* 204 Conn. 399, 403, 528 A.2d
805 (1987).

While it is true that "the pharmacist is engaged in a hybrid
enterprise, combining the performance of services and the
sale of prescription drugs"; *Murphy v. E.R. Squibb & Sons,
Inc.,* 40 Cal.3d 672, 678, 710 P.2d 247, 221 Cal.Rptr.
447 (1985); where the gist of a claim is that the wrong
medication was dispensed on prescription to a customer,
and that there was nothing defective about the medication
itself, the transaction is a service and is outside the purview
of our products liability statute. See *Henderson v. CVS
Pharmacy,* Superior Court, judicial district of New Haven,
CV 08 5017128 (July 31, 2008, *Cosgrove, J.*) (46 Conn. L.
Rptr. 25); *Silber v. Walgreen Co.,* Superior Court, judicial
district of New Haven, Docket No. 04 4009662 (May 4,
2005, *Thompson, J.*) (39 Conn. L. Rptr. 271); *Altieri v. CVS
Pharmacy, Inc.,* Superior Court, complex litigation docket at
Waterbury, No. X06-CV-02-017 1626 (December 13, 2002,

Case 1:19-md-02875-RMB-SAK    Document 599-1    Filed 10/16/20    Page 46 of 57
PageID: 13298

*McWeeney, J.) (33 Conn. L. Rptr. 524); Madison v. American Home Products Corp.,* 358 S.C. 449, 455, 595 S.E.2d 493 (2004); contra *Silva v. Walgreen Co.,* Superior Court, judicial district of Fairfield, No. CV 04 4001615 (November 24, 2006, *Hiller, J.) (42 Conn. L. Rptr. 407); Silva v. Walgreen Co.,* Superior Court, judicial district of Fairfield, No. CV 04 4001615 (October 25, 2005, *Radcliffe, J.) (40 Conn. L. Rptr. 187); Stanko v. Bader,* Superior Court, judicial district of Stamford-Norwalk at Stamford, No. CV 03 0193669 (October 7, 2003, *D'Andrea, J.T. R.) (35 Conn. L. Rptr. 605); Stevens v. Romer,* Superior Court, judicial district of Stamford-Norwalk at Stamford, No. CV 98 0168402 (March 24, 1999, *D'Andrea, J.) (24 Conn. L. Rptr. 279);* cf. *Dunn v. Upjohn Co.,* 350 So.2d 127, 129 (1977) ("we consider that the filling of a prescription by a pharmacist is more in the nature of processing a product than it is a personal service"). The motion to strike the third count is granted.

**All Citations**

Not Reported in A.3d, 2010 WL 4277612

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 8

Case 1:19-md-02875-RMB-SAK    Document 599-1    Filed 10/16/20    Page 48 of 57
PageID: 13300

Sheeran v. Blyth Shipholding S.A., Not Reported in Fed. Supp. (2015)

2015 WL 9048979

2015 WL 9048979
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

Steven SHEERAN and
Kelly Sheeran, Plaintiffs,
v.
BLYTH SHIPHOLDING
S.A., et al. Defendants.

Civil No. 14-5482 (JBS/AMD)
|
Signed 12/16/2015

**Attorneys and Law Firms**

Brian D. Kent, Esq., Laffey Bucci & Kent LLP, 1435 Walnut Street, 7th Floor, Philadelphia, PA 19102 –and– Bruce David Zeidman, Esq., Cosky & Zeidman, Attorneys at Law, 209 Haddon Ave., Haddonfield, NJ 08033, for Plaintiffs.

Patrick M. Northen, Esq., Francis P. Maneri, Esq., Jordan M. Rand, Esq., Dilworth Paxson, LLP, 457 Haddonfield Road, Suite 700, Cherry Hill, NJ 08002, for Defendant Holt Logistics Corp.

**OPINION**

SIMANDLE, Chief Judge:

**I. INTRODUCTION**

*1 Plaintiff Steven Sheeran filed this action under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 905(b), after he was injured while working aboard the M/V Swan Chacabuco in the Port of Gloucester, New Jersey. His Complaint names a number of different defendants and alleges that all defendants were negligent by collectively breaching two dozen different duties.

Presently before the Court is a motion to dismiss under Fed. R. Civ. P. 12(b)(6) and a motion for sanctions under Fed. R. Civ. P. 11(c) by Holt Logistics Corp. [Docket Items 36 & 53.] Defendant argues that the Complaint must be dismissed because it fails to place Defendant on notice of the particular claims against it, and that sanctions are warranted because the claims against Holt Logistics are entirely groundless. For the reasons set forth below, the Court will grant Defendant's motion to dismiss but will deny Defendant's motion for sanctions.

**II. FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiffs' Complaint (Second Amended Complaint ("SAC") [Docket Item 15] ) is short and straightforward.[1] On January 13, 2012, Steven Sheeran was working in the hold of the vessel M/V Swan Chacabucco ("the Swan Chacabucco" or "the Ship"), which was berthed in the Port of Gloucester, when his leg was crushed underneath a crane-controlled tray, causing permanent and severe injuries. (SAC ¶¶ 18-19; 22.) He subsequently brought this action,[2] which named eight business entities as defendants in the Second Amended Complaint, including Holt Logistics Corp. ("Holt Logistics").[3]

Before Holt Logistics Corp. filed the instant motions, the parties had agreed to dismiss three of the entities from the case. (See Mar. 11, 2015 Stip. [Docket Item 30] ¶ 4). A fourth has since been dismissed (see June 29, 2015 Stip. [Docket Item 46] ), leaving only Blyth Shipholding S.A. ("Blyth Shipholding"), Inchape Shipping Services ("Inchape Shipping"), NYK Cool a/k/a Cool Carriers AB ("NYK Cool"), and Holt Logistics as the named defendants.

The Complaint does not allege the specific roles and duties of each Defendant in the action. Rather, it pleads generally that all Defendants "owned, leased, operated, managed, possessed and/or controlled" the Swan Chacabuco. (SAC ¶ 9.) It also alleges that "all Defendants owned, leased, operated, occupied, maintained, managed and/or otherwise controlled the Ship and/or the Port and specifically maintained, managed, oversaw, directed, controlled, contracted for and/or participated in the operation of stevedoring and/or longshoring services on the Ship and/or at the Port." (Id. ¶ 11.)

*2 Holt Logistics is identified as a "business entity with a registered place of business" in Gloucester City, New Jersey. The Complaint alleges that Holt Logistics and Inchape Shipping "were responsible for training, screening, certifying, hiring and/or providing crane operators and/or other persons involved in stevedoring and/or longshoring operations at the Port." (SAC ¶ 10.)

The Complaint contains three causes of action. Count One alleges negligence. Without identifying each individual defendant's negligent conduct, Count One enumerates 24 duties allegedly violated by all Defendants, including but

Sheeran v. Blyth Shipholding S.A., Not Reported in Fed. Supp. (2015)

2015 WL 9048979

not limited to: violating OSHA regulations; failing to properly train employees; failing to warn of dangerous and unsafe conditions; failing to "comply with federal and state statutes, local ordinances, and all other rules, enactments, or regulations applicable"; failing to properly supervise; failing to provide adequate safety protection; failing to evaluate the work performed for potential hazards; and negligently controlling the work performed on premises. (Id. ¶ 20.)

Count Two is a personal injury claim brought against all Defendants "in their capacity as 'owner' or 'owner pro hac vice' of the aforementioned Ship" under the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 905(b). (Id. ¶¶ 18-24.) Section 905(b) provides an injured longshoreman with a cause of action against a ship owner for negligence, and Plaintiffs allege that Defendants "owned, operated, managed, possessed and/or controlled the Ship which it operated in the navigable waters of the United States." (Id. ¶ 24.) Finally, Count Three is an action by Sheeran's spouse, Kelly Sheeran, for loss of consortium. (Id. ¶¶ 29-31.)[4]

### III. DEFENDANT'S MOTION TO DISMISS WILL BE GRANTED

Holt Logistics filed this motion to dismiss, arguing that in lumping all of the defendants together and accusing them all of the same general negligent conduct, the Complaint fails to put Holt Logistics on notice of the claims against them, as required by Fed. R. Civ. P. Rule 8(a). (Mot. to Dismiss [Docket Item 36-1] at 8-10.) Defendant also contends that Count Two must be dismissed because the Complaint does not contain any factual basis for its allegations that Holt Logistics is the "ship owner" or "owner pro hac vice" of the Swan Chacabuco for purposes of an LHWCA claim. (Id. at 10-11.)

The Court agrees with Defendant that Plaintiffs' Complaint fails to plead the liability of Holt Logistics with the requisite specificity and must be dismissed.

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." A to dismiss under Fed. R. Civ. P. 12(b)(6) may be granted if a court concludes that the plaintiff has failed to set forth fair notice of what the claim is and the grounds upon which it rests that make such a claim plausible on its face. Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007).

*3 Although a complaint does not require detailed factual allegations, it must contain enough well-pleaded facts to show that the claim is facially plausible. This "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). The plaintiff must plead enough facts to "raise a reasonable expectation that discovery will reveal evidence of the necessary element," Twombly, 550 U.S. at 556. Although all well-pleaded factual allegations must be accepted as true, the court may disregard any legal conclusions couched as factual allegations. Id.; Iqbal, 556 U.S. at 678; Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009). If the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not "show[n]" – "that the pleader is entitled to relief." Iqbal, 556 U.S. at 679.

Plaintiffs' Complaint fails to separate out the liability for each defendant. Instead, it lumps Defendants together as a group and asserts general common factual allegations against all of them. Count One, for example, contains 24 different allegations of negligence that vary widely, from violation of OSHA regulations to failure to provide a safe work place to failure to properly train employees to failure to supervise to negligent hiring. Rather than specify which Defendants were responsible for which duties, the Complaint merely states that all Defendants were negligent in the enumerated ways. Without any additional guidance as to the Defendants themselves and what functions they performed, it is impossible to untangle Plaintiffs' specific theory of liability against each individual Defendant.

Courts in this district generally agree that this type of "group pleading" does not satisfy Rule 8, because it does not place Defendants on notice of the claims against each of them. See, e.g., Ingris v. Borough of Caldwell, No. 14-855, 2015 WL 3613499, at *5 (D.N.J. June 9, 2015) ("[T]o the extent Plaintiff seeks to lump several defendants together without setting forth what each particular defendant is alleged to have done, he has engaged in impermissibly vague group pleading."); Shaw v. Housing Auth. of Camden, No. 11-4291, 2012 WL 3283402, at *2 (D.N.J. Aug. 10, 2012) (dismissing complaint because it failed to contain allegations showing how each defendant was liable and noting that "[e]ven under the most liberal notice pleading requirements of Rule 8(a), a plaintiff must differentiate between defendants." (citing Pietrangelo v. NUI Corp., No. 04-3223, 2005 WL 1703200 (D.N.J. July 20, 2005))); see also H2O Plus, LLC v. Arch Personal Care Prods., L.P., 2011 WL 2038775, at *2 (D.N.J.

May 22, 2011) (holding that complaint did not violate Rule 8 because while plaintiff "did lump the Arch Defendants together in the description of facts, looking to the Complaint and the attached exhibits as a whole clearly shows which claims are made against Arch PCP and which against Arch Chemicals.")

Had the Complaint described the nature of each entity Defendant and precisely what they were responsible for on the Ship, the Court would have been able to infer the theory of liability for each Defendant by comparing the specific role each played on the Swan Chacabucco with the list of duties allegedly breached.[5] But the Complaint does not do even that. Holt Logistics, like the other named Defendants in the case, is identified only as a "business entity" with a registered place of business; the Complaint describes neither its line of work nor its function on the ship. Instead, eight named Defendants are collectively alleged to have "owned, leased, operated, occupied, maintained, managed and/or otherwise controlled the Ship and/or the Port" and to have "maintained, managed, oversaw, directed, controlled, contracted for and/or participated in the operation of stevedoring and/or longshoring services on the Ship and/or at the Port." (SAC ¶ 11.) The "and/or" conjunction appears no less than five times in this single sentence, making it impossible to determine Plaintiffs' theory of liability for each Defendant – and for Holt Logistics in particular.

**\*4** Contrary to Plaintiffs' contention (see Opp'n to Mot. to Dismiss [Docket Item 38] at 3), the mere fact that the Complaint recites the type of negligent conduct at issue does not place the parties sufficiently on notice of the claims against them. Even though the misconduct is alleged with some specificity, Rule 8 is not satisfied because the allegations do not inform each Defendant of the particular claims against it. Moreover, lumping all defendants together for different misconduct fails to demonstrate each defendant's individual liability. Without pleading how, if at all, Holt Logistics was involved with the alleged conduct at issue, the Complaint lacks sufficient facts to draw a reasonable inference that Holt Logistics is actually responsible for any the negligence alleged. See Phillips v. Cnty. of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008) ("We caution that without some factual allegation in the complaint, a claimant cannot satisfy the requirement [under Rule 8(a)(2)] that he or she provide not only 'fair notice,' but also the 'grounds' on which the claim rests." (quoting Twombly, 550 U.S. at 555)).

Nor is the Court persuaded by Plaintiffs' citations to In re Riddell Concussion Reduction Litig., 77 F.Supp.3d 422 (D.N.J. 2015) (Simandle, J.), and the two unpublished district court opinions, Capitol Records LLC v. ReDigi Inc., No. 12-95, 2014 WL 4354675 (S.D.N.Y. Sept. 2, 2014), and Toback v. GNC Holdings, Inc., No. 13-80526, 2013 WL 5206103 (S.D. Fla. Sept. 13, 2013), which may have weight in this Circuit. In Riddell, this Court rejected an argument that the complaint violated Rule 8 by lumping all defendants together without specifying the alleged misconduct of each defendant, because it was "apparent" that the claims were asserted against all defendants "for their concerted conduct under the 'Riddell' brand." 77 F. Supp. 3d at 431. The Court emphasized that group pleading was permissible in that particular case because the defendants did not dispute their collective role in the manufacture, sale, and marketing of the product in question, and they were related entities operating under a single brand, accepting service as a single entity, and represented by the same counsel. Id. at 432. Capitol Records and Toback similarly involve closely related Defendants. See Capitol Records, 2014 WL 4354675, at *3 (noting that the defendants were a small start-up and two corporate officers "who directed and controlled essentially all of its activities"); Toback, 2013 WL 5206103 (holding that complaint satisfied Rule 8 despite referring to defendants – GNC Holdings, Inc., GNC Corp, General Nutrition Corporation, and General Nutrition Centers, Inc. – collectively as "GNC" because defendants were interrelated corporate defendants and demonstrated their understanding of the allegations against them).

Riddell, Capitol Records, and Toback provide no support that collective-style pleading is permissible in this case, since there are no allegations that Defendants acted jointly or in concert or are closely related corporate entities, such that conduct by one may be ascribed to the others.[6] See T.J. McDermott Transp. Co., Inc. v. Cummins, Inc., 2015 WL 1119475, at *7 (D.N.J. Mar. 11, 2015) (holding Rule 8 was satisfied even though complaint failed to distinguish defendants' respective conduct because complaint specifically alleged that defendants formed a partnership).

Because Counts One, Two, and Three all suffer from the same infirmity by asserting that the injuries sustained by Plaintiff "were caused by the carelessness and negligence of all Defendants," (SAC ¶ 23), and failing to allege any specific act of misconduct by Holt Logistics, the Complaint as a whole must be dismissed for failing to place Holt Logistics on notice of the claims against it.

**\*5** Count Two of the Complaint must additionally be dismissed because Plaintiffs have not pleaded sufficient facts to establish a plausible cause of action against Holt Logistics under the Longshore and Harbor Workers' Compensation Act. Specifically, the Complaint does not plead that Holt Logistics qualifies as a "vessel" for purposes of the LHWCA. (Mot. to Dismiss at 10-11; Reply in Supp. of Mot. to Dismiss [Docket Item 40] at 6-7.) Section 905(b) of the LHWCA codifies the exclusive remedy for longshoremen and permits an "action against [a] vessel as a third party" for injuries "caused by the negligence of [such] vessel." 33 U.S.C. § 905(b). The LHWCA, in turn, defines a "vessel" within the meaning of section 905(b) to include the "vessel's owner, owner pro hac vice, agent, operator, charter or bare boat charterer, master, officer, or crew member." 33 U.S.C. § 902(21).

A "vessel owner pro hac vice" is "one who assumes by charter or otherwise exclusive possession, control, command and navigation of the vessel for a specified period of time." DeArmond v. Southwire Co., 109 Fed. App'x 722, 724 (6th Cir. 2004) (internal quotations and citation omitted); see also Bossard v. Port Allen Marine Serv., Inc., 624 F. 2d 671, 672-73 (5th Cir. 1980) ("[T]he charterer takes over the ship, lock, stock and barrel, and mans her with his own people. He becomes ... the owner pro hac vice." (internal quotations and citation omitted)); Irby v. Tokai Lines, No. 88-6890, 1990 WL 18880, at \*3 (E.D. Pa. Feb. 23, 1990) (noting requirement of "exclusive possession, control, command, and navigation"). The term "vessel," in other words, encompasses "the ship's owner and the owner's agents." Browning v. Safmarine, Inc., No. 11-2436, 2012 WL 6089481, at 3 n.1 (D.N.J. Dec. 5, 2012).

This Court recently had occasion to explicate the duties of the "vessel" and the "pro hac vice owner" to an offloading stevedore under the LHWCA in Jones v. Sanko Steamship Co., ___ F. Supp. 3d ____, 2015 WL 8361745 (D.N.J. Dec. 8, 2015). The LHWCA requires that the liability of defendants be separately determined in light of their respective functions relating to the ship and its cargo. Id. at 7-8. Such an assessment of LHWCA duties for a particular defendant is not viable where the plaintiff engages in group pleading against unrelated, disparate parties.

Count Two alleges only that all Defendants, including Holt Logistics, "owned, operated, managed, possessed and/or controlled the Ship which it operated in the navigable waters of the United States." (Id. ¶ 24) (emphasis added). This

assertion, however, does not rule out the possibility that Holt Logistics merely "controlled" the Ship. Generally speaking, "those who exercise control over a vessel for a particular purpose such as repairing, cleaning or unloading are not considered to be owners pro hac vice." DeArmond, 109 Fed. App'x at 725. In DeArmond, the Sixth Circuit gave the example of a stevedore hired to unload a barge and who exercises control and dominion over the barge in order to do so, and noted that the stevedore was clearly not an owner pro hac vice. The Court explained that this was because even though a party may "control command and navigate the vessel while it is in their possession to accomplish the designated task, the owner of the vessel has not relinquished complete dominion and control of the vessel tantamount to a demise of the vessel." Id. Because the Complaint fails to contain a well-pleaded factual allegation that Holt Logistics was the owner or owner pro hac vice of the Swan Chacabucco, Plaintiffs have not stated a plausible claim for relief under Count Two.

For all the reasons above, Defendant's motion to dismiss will be granted in its entirety. The Court will, however, dismiss Plaintiffs' claims against Holt Logistics without prejudice and permit Plaintiffs to file a motion to amend, along with a Proposed Amended Complaint which corrects the multiple deficiencies discussed herein. In so doing, the Court again emphasizes that it is not sufficient to fail to identify each defendant's role and function or say that each of the defendants is responsible for everything. Plaintiffs must be careful to specify the basis (i.e., the factual grounds) for Defendant's liability under each Count.

## IV. THE COURT WILL DENY DEFENDANT'S MOTION FOR SANCTIONS

**\*6** Defendant argues that sanctions are warranted because there are no facts to support Plaintiffs' claim that Holt Logistics was in any way liable for Sheeran's injury. (Mot. for Sanctions [Docket Item 49-1], at 9-12; Reply in Support of Mot. for Sanctions [Docket Item 53], at 4-9.)

Federal Rule of Civil Procedure 11 requires an attorney to conduct a "reasonable inquiry" into the law and facts before filing a pleading with the court, and to certify that the legal arguments contained therein are not being presented for any improper purpose and are not frivolous, and the factual contentions have or "will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b)(1)-(3). By discouraging the filing of frivolous, unsupported, or unreasonable claims, and permitting sanctions to be imposed for violations, Rule 11

A049

"seeks to strike a balance between the need to curtail abuse of the legal system and the need to encourage creativity and vitality in the law." Fed. R. Civ. P. 11(c); *Gaiardo v. Ethyl Corp.,* 835 F.2d 479, 483–84 (3d Cir. 1987); see also *Lieb v. Topstone Indus. Inc.,* 788 F.2d 151, 157 (3d Cir. 1986); *Leuallen v. Borough of Paulsboro,* 180 F. Supp. 2d 615, 618 (D.N.J. 2002).

When evaluating whether conduct violates Rule 11, the Third Circuit applies a "reasonableness under the circumstances" standard, which is defined as "an objective knowledge or belief at the time of the filing of a challenged paper that the claim was well grounded in law and fact." *Ford Motor Co. v. Summit Motor Prod., Inc.,* 930 F.2d 277, 289 (3d Cir. 1991). The wisdom of hindsight should be avoided, and the attorney's conduct must be judged by "what was reasonable to believe at the time the pleading, motion, or other paper was submitted." Fed. R. Civ. P. 11 advisory committee note; *Mary Ann Pensiero, Inc. v. Lingle,* 847 F. 2d 90, 94 (3d Cir. 1988).[7]

The Court does not find that the circumstances of this case meets the "high standard for imposing sanctions under Rule 11," *Oswell v. Morgan Stanley Dean Witter & Co., Inc.,* 507 F. Supp.2d 484, 492 (D.N.J. 2007) (Simandle, J.). Counsel for Plaintiffs had a good-faith basis to believe that Defendant had a hand in controlling stevedoring activities at the site where Steven Sheeran was injured. In particular, it was reasonable for counsel to believe that the operations of Sheeran's employer, Gloucester Terminals, LLC, at the Port of Gloucester, were being overseen by Holt Logistics. The N.L.R.B. decision, upon which counsel asserts he relied, describes the involvement of the Holt brothers and their various companies (including Holt Logistics) in operations in and around the Port of Gloucester, where the Swan Chacabucco was berthed. (Ex. 1 to Opp'n to Mot. for Sanctions [Docket Item 52-2].) The decision identifies Holt as the CEO of Gloucester Terminals, LLC, and also identifies an individual named Walter Curran who was hired by Holt and who "actively managed" the work of Gloucester Terminals, LLC. (Id. at 9.)

**\*7** Thus, Defendant's argument that Sheeran, who has already settled a claim with Gloucester Terminals, LLC, is barred from asserting a claim against Holt Logistics,[8] holds no water. Counsel for Plaintiffs had a good-faith basis to believe that Holt Logistics was not Sheeran's employer "via common ownership" with Gloucester Terminals, LLC, but rather an entity that owned and supervised Sheeran's employer and its stevedoring operations. Counsel thus had

a reasonable basis to believe that Sheeran's settlement with his direct employer did not extinguish his rights under the LHWCA to file suit against Holt Logistics.

Counsel's belief that Holt Logistics should remain in the action is also not unreasonable under the high Rule 11 standard. Counsel notes that depositions taken after the Complaint continue to raise the possibility that Gloucester Terminals, LLC was managed by Holt Logistics, because certain higher-level employees seemed to be affiliated with both entities. While depositions from individuals employed by Gloucester Terminals, LLC, identified John Florkiewicz and P.J. Inskeep as the stevedore manager and Vice President of Gloucester Terminals, LLC, respectively, both had Holt Logistics-affiliated email addresses. (Quigley Dep., Ex. 3 to Opp'n to Mot. for Sanctions [Docket Item 52-4], at 39:8-41:9; Mountney Dep., Id. Ex. 4 [Docket Item 52-5], at 20:8-21:2.) Moreover, an operations representative for Defendant Inchape Shipping identified Florkiewicz and Inskeep as being from Holt Logistics, and additionally testified that he copied several people from Holt Logistics on every email that he sent regarding vessel movements and berthing details. (Hubbard Dep., Id. Ex. 2 [Docket Item 52-3], at 53:20-56:7.)

Given the evidence indicating a close relationship between Defendant and Sheeran's employer, it was not palpably unreasonable for Plaintiffs' counsel to believe that Holt Logistics maintained some supervisory role over the stevedoring work of Gloucester Terminals, LLC. Although counsel may not have had a precise understanding of Holt Logistics' responsibilities, it was not unreasonable for counsel to infer that Defendant had a separate duty to ensure the safety of the premises, and that the duty was breached.

"Rule 11 is intended for only exceptional circumstances," *Gaiardo,* 835 F.2d at 483, and a "district court must exercise discretion and sound judgment in dealing with the myriad methods with which lawyers may abuse the judicial process." *Eavenson, Auchmuty & Greenwald v. Holtzman,* 775 F.2d 535, 540 (3d Cir. 1985). While it remains to be seen whether Plaintiffs can plead sufficient facts to plausibly establish Holt Logistics' liability in this case, the Court is satisfied that counsel did not drag Holt Logistics into this case based solely upon unsupported, unreasonable, and frivolous allegations. Defendant's motion for sanctions is denied.

## IV. CONCLUSION

Sheeran v. Blyth Shipholding S.A., Not Reported in Fed. Supp. (2015)

2015 WL 9048979

For the foregoing reasons, the Court will grant Defendant's motion to dismiss. The dismissal is without prejudice to Plaintiffs' right to file a motion for leave to file an Amended Complaint within fourteen (14) days of the date of entry of this Order, accompanied by a Proposed Amended Complaint which remedies the deficiencies discussed herein. The Court will deny Defendant's motion for sanctions, but takes this opportunity to remind counsel that any attempt to replead against Holt or any other defendant is governed by the requirements of Rule 11(b), including that the legal claims are warranted by existing law and that the factual contentions have evidentiary support or (if specifically identified) will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, see Rule 11(b)(2) & (3), Fed. R. Civ. P. An accompanying Order will be entered.

**All Citations**

Not Reported in Fed. Supp., 2015 WL 9048979

**Footnotes**

1   The facts are taken from Plaintiffs' Second Amended Complaint ("SAC"). For purposes of this motion, the Court must accept Plaintiffs' allegations as true.

2   Plaintiffs filed a separate identical complaint under Sheeran v. Blyth Shipholding S.A., Civ. No. 15-272 (Jan. 14, 2015), but both cases have since been consolidated under this action. (Stip. [Docket Item 30] ¶ 1.)

3   The Complaint named the following entities: NYK Container Line, Ltd; NYK Line (North America), Inc.; NYK Cool, a/k/a/ Cool Carriers AB; Cool Carriers Chile SA; Cool Carriers USA Inc.; Chartwold Shipping Corp.; Inchape Shipping Services; and Holt Logistics Corp. (SAC ¶¶ 1-8), along with unnamed entities ABC Companies 1-10 and Def. Companies 1-20. Blyth Shipholding S.A. was later substituted as a named defendant for Chartworld Shipping Corp. (Mar. 11, 2015 Stip. [Docket Item 30] ¶ 2.)

4   Because Plaintiffs allege that the Swan Chacabucco was berthed in the Port of Gloucester, New Jersey when the injuries occurred (SAC ¶ 22), the Court exercises subject matter jurisdiction over Plaintiffs' claims under the maritime jurisdiction statute, 28 U.S.C. § 1333. The Court also has diversity jurisdiction under 28 U.S.C. § 1332, because Plaintiffs are citizens of Pennsylvania and all Defendants have principal places of business outside of Pennsylvania, and the matter in controversy exceeds $75,000. (SAC ¶¶ 1-9; 15.)

5   For example, had Plaintiffs identified Holt Logistics as the entity responsible for hiring and providing stevedores for work on the Ship, and another Defendant as the entity responsible for the day-to-day supervision of their work, it may have been possible to partially deduce, based on the list of alleged negligent conduct, some of the duties each defendant is alleged to have breached. The only thing that comes close is Plaintiffs' allegation that Holt Logistics and Inchape Shipping "were responsible for training, screening, certifying, hiring and/or providing crane operators and/or other persons involved in stevedoring and/or longshoring operations at the Port." (SAC ¶ 10.) But even this assertion continues to lump Holt Logistics together with an unconnected entity, Inchape Shipping, and asserts seven different duties that either Defendant or Inchape Shipping could have been responsible for. The allegation can hardly be said to narrow down Defendants' liability in this case.

6   The fact that Defendants are all represented by different counsel and that no other defendant has joined Holt Logistics' motion to dismiss is an additional indication that Defendants are independent and concerted action is lacking.

7   The Court notes that Defendant has complied with the "safe harbor" provision of Rule 11, which requires a moving party to notify the party against which it seeks sanctions of its intention to move for sanctions, and allows the non-moving party 21 days to take remedial action before the court imposes sanctions. Fed. R. Civ. P. 11(c)(2); see Hockley by Hockley v. Shan Enterp. Ltd., 19 F. Supp. 2d 235, 240 (D.N.J. 1998). Defendant sent a "safe harbor" letter together with a copy of the motion on September 18, 2015, 25 days before filing the instant motion with the Court. (See Sept. 18, 2015 Letter, Ex. 1 to Mot. for Sanctions [Docket Item 49-2].)

8   Specifically, Defendant argues that because a plaintiff who recovers against an employer under LHWCA worker's compensation scheme is barred from suing that employer under the LHWCA for further damages, see 33 U.S.C. §§ 904(b), 905(a), counsel lacked a good-faith basis to file suit against Holt Logistics because Sheeran had already settled a claim with Gloucester Terminals, LLC, and Holt Logistics was his co-employer. (Opp'n to Mot. for Sanctions, at 11-12.)

**End of Document**                                                     © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 9

Stanko v. Bader, Not Reported in A.2d (2003)

2003 WL 22413476, 35 Conn. L. Rptr. 605

KeyCite Yellow Flag - Negative Treatment

Distinguished by Lake Road Trust, LTD. v. ABB, Inc., Conn.Super., July 5, 2012

2003 WL 22413476

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Connecticut,
Judicial District of Stamford-Norwalk.

Stephen STANKO,

v.

Elaine BADER, R.Ph.

No. CV030193669.
|
Oct. 7, 2003.

**Attorneys and Law Firms**

Silver Golub & Teitell, Stamford, for Stephen Stanko.

Williams Cooney & Sheehy, Trumbull, for Elaine Bader and Stop and Shop Supermarket Co. Inc.

**Opinion**

D'ANDREA, J.

*\*1* The plaintiff, Stephen Stanko, filed a four-count complaint against Elaine Bader and Stop and Shop Supermarket, Inc. d/b/a Stop and Shop Pharmacy (Stop and Shop or defendant). According to the complaint on April 17, 2002 the plaintiff went to the pharmacy department at Stop and Shop in Norwalk to fill a prescription for Requip, a drug used to treat the effects of Parkinson's disease. However, instead of correctly filling the prescription for Requip, the defendant Bader placed risperidone, an anti-psychotic drug, in the bottle labeled for Requip and sold it to the plaintiff. Four days later, after ingesting multiple doses of the risperidone, the plaintiff's symptoms worsened.

After calling Stop and Shop to inquire about the medication, Stop and Shop sent an employee to the plaintiff's home to correct the mistake. The employee told the plaintiff that he was given the wrong dosage of Requip, but never mentioned that the bottle contained risperidone. Three days later the plaintiff became "disoriented" and fell to the floor and

remained there for more than twenty-four hours. He was then hospitalized and has suffered permanent injuries.

On February 20, 2003 the defendants filed a motion to strike (# 102) counts three and four.[1] Counts three and four are directed solely at Stop and Shop and contain claims for strict products liability and recklessness, respectively. The plaintiff filed opposition papers.

"A motion to strike challenges the legal sufficiency of a pleading, and, consequently, requires no factual findings by the trial court." (Internal quotation marks omitted.) *Macomber v. Travelers Property & Casualty Corp.,* 261 Conn. 620, 629, 804 A.2d 180 (2002). "It is fundamental that in determining the sufficiency of a [pleading] challenged by a ... motion to strike, all well-pleaded facts and those facts necessarily implied from the allegations are taken as admitted ... Indeed, pleadings must be construed broadly and realistically, rather than narrowly and technically." (Citation omitted; internal quotation marks omitted.) *Doe v. Yale University,* 252 Conn. 641, 667, 748 A.2d 834 (2000).

Count three alleges a products liability claim. A products liability claim "includes all claims or actions brought for personal injury, death or property damage caused by the manufacture, construction, design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging or labeling of *any product.*" (Emphasis added.) General Statutes § 52-572m(b). Products liability claims also include, *inter alia,* "all actions based on ... strict liability in tort [and] negligence." *Id.*

The defendant argues that the filling of a prescription by a pharmacy is "not the sale of a product" within the meaning of the Connecticut's Products Liability Act, General Statutes § 52-572m et seq. (CPLA). The defendant further contends that the dispensing of a prescription drug is more akin to a professional service and not product sales. The plaintiff argues that prescription drugs are products within the CPLA and that a pharmacy is not a service business. As set forth below, this court agrees with the plaintiff.

*\*2* The first issue to be decided is whether a misfilled prescription drug qualifies as a defective "product" under the CPLA. Initially, it is important to note that the CPLA does not define the term "product," see *Zichichi v. Middlesex Memorial Hospital,* 204 Conn. 399, 403, 528 A.2d 805 (1987); nor have the appellate courts explicitly determined that prescription drugs are "products" under the products liability statute.

2003 WL 22413476, 35 Conn. L. Rptr. 605

Interestingly, in *Vitanza v. Upjohn Co.,* 257 Conn. 365, 778 A.2d 829 (2001), the Supreme Court ruled that the learned intermediary doctrine remains a viable affirmative defense in products liability actions against a drug manufacturer. If a prescription drug was not a "product" under the CPLA, the Supreme Court would have certainly not reached this conclusion.

This court previously ruled on this precise issue. In *Stevens v. Romer,* Superior Court, judicial district of Stamford/Norwalk, Docket No. CV 980168402 (March 24, 1999, D'Andrea, J.) (24 Conn. L. Rptr. No. 8, 279), this court denied a motion to strike on facts nearly identical to the case at bar. In *Stevens,* the plaintiff sued a pharmacy for products liability for dispensing the wrong medication. This court ruled that when a pharmacy misfills a prescription, a plaintiff can allege that the "product" was defective. *Id.* at 280, citing *Potter v. Pneumatic Tool Co.,* 241 Conn 199, 211, 694 A.2d 1319 (1997).

In this case, the plaintiff alleges that his doctor prescribed Requip. However, when refilling his prescription, the defendant incorrectly sold him risperidone. This court finds no reason to exempt prescription medication from the definition of "product" under the CPLA, thus the plaintiff's complaint sufficiently alleges that he was injured by a defective product.

The next issue involves whether a pharmacy is a "product seller" under the CPLA. A products liability claim can only be asserted against one who is a "product seller." General Statutes § 52-572m(a); *Zichichi v. Middlesex Memorial Hospital, supra,* 204 Conn. at 403; *Gerrity v. R.J. Reynolds Tobacco Co.,* 263 Conn. 120, 126, 818 A.2d 769 (2003). Whether the defendant is a "product seller" is a question of law for the court to decide. *Burkert v. Petrol Plus of Naugatuck, Inc.,* 216 Conn. 65, 72, 579 A.2d 26 (1990). Under the CPLA, a "product seller" is defined as "any person or entity, including a manufacturer, wholesaler, distributor or *retailer who is engaged in the business of selling such products whether the sale is for resale or for use or consumption.*" (Emphasis added.) General Statutes § 52-572m(a). On its face, this definition encompasses the defendant's retail pharmacy business because the defendant's business involves retail sales of prescription medication to consumers.

The defendants argue that its pharmacy is a service and, consequently, cannot be held liable in products liability. "Once a particular transaction is labeled a 'service,' as

opposed to the sale of a 'product,' it is outside the purview of our product liability statute." *Zichichi v. Middlesex Memorial Hospital, supra,* 204 Conn. at 403. Although our appellate courts have not decided this issue, the Superior Court, in *Altieri v. CVS Pharmacy, Inc.,* Superior Court, judicial district of Waterbury, Docket No. CV 020171626 (December 13, 2002, McWeeny J.) (33 Conn. L. Rptr. 524), cited by the defendant, ruled that the defendant-pharmacy was "primarily furnishing a service" and not subject to the products liability statute. However, this court finds *Alteri* unpersuasive. First, that decision relied solely on a California decision based on a manufacturer's design defect that specifically excluded from its holding cases involving pharmacies that fail to exercise "due care." *Murphy v. E.R. Squibb & Sons, Inc.,* 40 Cal.3d 672, 676, 710 P.2d 247 (1985).

**\*3** Second, the definition of "product seller" under the CPLA does not address hybrid transactions, those that, arguably, involve a combination of sales and service. In *Truglio v. Hayes Construction Co.,* 66 Conn.App. 681, 684, 785 A.2d 1153 (2001), the court looked to the commentary of the Draft Uniform Products Liability Act,[2] upon which the CPLA was based, see *Potter v. Pneumatic Tool Co., supra,* 241 Conn. at 230, for guidance into the meaning of "product seller." That commentary suggested that "a party be considered a product seller where a sale of a product is a principal part of the transaction and where the essence of the relationship between the buyer and seller is *not* the furnishing of professional skill or services." (Emphasis in original.) *Truglio v. Hayes Construction Co., supra,* 66 Conn.App. at 685, citing, Fed.Reg. 3003. Similarly, courts have looked to the nature of the contract. *Acmat Corp. v. Jansen & Rogan Construction,* Superior Court, judicial district of New Britain, Docket No. CV 96 0474249 (Aug. 23, 1999, Robinson, J.) (25 Conn. L. Rptr. 463).

In this case, the plaintiff went to the pharmacy to purchase a prescription drug and nothing more. Although the filling of a prescription may involve some service, such as checking for conflicts in medication, it seems clear that the plaintiff primarily expected to receive Requip, a drug prescribed by his doctor. This court finds that the defendant pharmacy is a "product seller" under the CPLA, because the principal part of the transaction was the sale of medication.

The defendant also moves to strike the fourth count (recklessness) for legal insufficiency. To determine whether the plaintiff's complaint sufficiently states a cause of action for recklessness, this court must define reckless behavior.

2003 WL 22413476, 35 Conn. L. Rptr. 605

"Recklessness is a state of consciousness with reference to the consequences of one's acts ... It is more than negligence, more than gross negligence ... The state of mind amounting to recklessness may be inferred from conduct. But in order to infer it, there must be something more than a failure to exercise a reasonable degree of watchfulness to avoid danger to others or to take reasonable precautions to avoid injury to them." *Frillici v. Westport,* 264 Conn. 266, 277-78 (2003). "It is well established that causes of action for negligence and [recklessness] are separate and distinct causes of action. There is a substantial difference between negligence and [reckless] conduct, and a complaint should employ language explicit enough to inform the court and opposing counsel clearly that [reckless] conduct is being asserted." *Warner v. Leslie-Elliot Constructors, Inc.,* 194 Conn. 129, 138, 479 A.2d 231 (1984).

In this case, recklessness was sufficiently alleged in the complaint. The plaintiff alleged that he called the defendant's pharmacy to inform it about the wrong medication he was given. The defendant sent an employee to the plaintiff's home to retrieve the incorrect prescription and supply the correct medication. The plaintiff next alleges that the defendant's employee told the plaintiff that he was simply given the "wrong dosage," even though, by implication, the defendant knew that the plaintiff had ingested risperidone. These allegations, if proven, could evidence a reckless disregard for the plaintiff's safety and welfare.

**\*4** Accordingly, defendant's motion to strike count three (products liability) and count four (recklessness) is denied.

### All Citations

Not Reported in A.2d, 2003 WL 22413476, 35 Conn. L. Rptr. 605

---

Footnotes

1   For some reason the defendants filed a duplicate motion to strike (# 107), which is identical to the first with the exception that the second has copies of different cases attached.

2   Draft Uniform Products Liability Law, § 102(1), 44 Fed.Reg. 2996, 2997-98 (1979).

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.