# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY
# CAMDEN VICINAGE

| | |
|---|---|
| **IN RE: VALSARTAN, LOSARTAN, AND IRBESARTAN PRODUCTS LIABILITY LITIGATION**<br><br>**This Document Relates to All Actions** | MDL No. 2875<br><br>Honorable Robert B. Kugler, District Court Judge<br><br>Honorable Joel Schneider, Magistrate Judge |

## <u>COMPENDIUM OF UNREPORTED CASES CITED IN THE WHOLESALER DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS</u>

| Tab | Unreported Case |
|-----|-----------------|
| 1 | *Bannon v. Allstate Ins. Co.*, No. 14-1229 FLW (LHG), 2015 WL 778828 (D.N.J. Feb. 24, 2015) |
| 2 | *Cottrell v. Alcon Labs., Inc.* No. 14-5859 (FLW), 2016 WL 1163163 (D.N.J. Mar. 24, 2016) |
| 3 | *Geraczynski v. Nat'l R.R. Passenger Corp.*, No. 11-6385 (SRC), 2015 WL 4623466 (D.N.J. July 31, 2015) |
| 4 | *Gonzalez v. Estes, Inc.*, No. SA-10-CA-0038-XR, 2010 WL 610778 (W.D. Tex. Feb. 19, 2010) |
| 5 | *Dakota, Missouri Valley & W. R.R. Inc. v. JMA Rail Prod. Co.*, No. 1:06-CV-02, 2006 WL 2349976 (D.N.D. Aug. 9, 2006) |
| 6 | *Onyejekwe v. Uber Techs., Inc.*, No. 19-10196 (ES) (MAH), 2020 WL 2832566 (D.N.J. June 1, 2020) |
| 7 | *Sherfey v. Johnson & Johnson*, No. 12-4162, 2012 WL 3550037 (Ed. Pa. Aug. 17, 2012) |
| 8 | *In re Takata Airbags Prods. Liab. Litig.*, No. 15-02599-MD, 2020 WL 2892366 (S.D. Fla. June 1, 2020) |

# Tab 1

2015 WL 778828
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Susanne BANNON, Plaintiff,
v.
ALLSTATE INSURANCE CO., Defendant.

Civil Action No. 14–1229 FLW (LHG).
|
Signed Feb. 24, 2015.

**Attorneys and Law Firms**

Eugene David Kublanovsky, Montclair, NJ, for Plaintiff.

Mark John Walters, Donnelly & Associates PC, Freehold, NJ, for Defendant.

OPINION

WOLFSON, District Judge.

**\*1** This case arises out of a three-Count Second Amended Complaint, which alleges that Plaintiff Susanne Bannon's ("Plaintiff" or "Bannon") home was destroyed in Hurricane Sandy, and asserts that Defendant Allstate Insurance Co. ("Defendant" or "Allstate") has wrongfully denied coverage and underpaid for the damage to her home. Specifically, the Complaint alleges (Count I) breach of contract; (Count II) breach of the implied covenant of good faith and fair dealing; and (Count III) Violation of the New Jersey Consumer Fraud Act. Defendant moves, pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss Counts II and III, and Plaintiff's claims for punitive damages and attorney's fees.

For the reasons expressed below, Defendant's Motion to Dismiss is granted in part and denied in part. Specifically, the motions to dismiss Counts II, breach of the implied covenant of good faith and fair dealing, and Count III, for violation of the New Jersey Consumer Fraud Act, are denied; the motion to dismiss Plaintiff's claims for punitive damages is granted; and the motion to dismiss Plaintiff's claims for attorney's fees is granted with respect to Count II, but is denied as to Count III.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The facts provided here come from the Second Amended Complaint and from documents which form the basis for the Complaint. The Court assumes such facts to be true for the purposes of this Motion. Plaintiff, a resident of Union Beach, New Jersey, purchased a "Deluxe Homeowners Insurance Policy" from Defendant, with a liability limit of $241,231 for the dwelling, $24,123 for other structures, $168,862 for personal property, and up to nine months of living expenses.2d Am. Compl. at ¶¶ 1, 3; Walters Decl. Ex. B at 7 [1]. The policy provided that coverage for dwellings or other structures did not include loss caused by "flood, including, but not limited to, surface water, waves, tidal water or overflow of any body of water or spray from any of these things, whether or not driven by wind." Walters Decl. Ex. B. at 47. The same limits coverage for personal property. *Id.* at 53. Plaintiff paid all premiums when due, and the policy was in full force and effect when Hurricane Sandy made landfall on October 29, 2012.2d. Am. Compl. at ¶¶ 13–14.

[1]     Walters Declaration Exhibit B is Ms. Bannon's policy. Because these pages are not numbered consecutively, the page numbers given herein will be the numbers of the pages of the Exhibit when viewed as a PDF file.

On October 29, 2012, Plaintiff's home was destroyed by Hurricane Sandy.2d Am. Compl. at ¶ 1. Plaintiff suffered over $434,216 in damages. *Id.* at ¶¶ 4, 17. Plaintiff reported the damage and submitted the appropriate documentation and claim for damages to Allstate. *Id.* at ¶ 18. According to the Complaint, Allstate's adjuster, Steve Bryan Gladu, stated to Plaintiff that the destruction of Plaintiff's home was due to wind damage. *Id.* at ¶ 21. The Complaint alleges that other evidence, including statements from witnesses, photographic evidence, and professional opinions, support a finding that Plaintiff's home was destroyed as a result of wind damage. *Id.* at ¶¶ 22–24. On June 12, 2013, Plaintiff received a letter from Allstate denying the claim. *Id.* at ¶ 29. According to the Complaint, the letter did not cite to any clear evidence to support the position to deny coverage. *Id.* at ¶ 30. However, following the denial of coverage, an engineer inspected Plaintiff's home. *Id.* at ¶ 28. Plaintiff asserts that Allstate, its agents, servants, and employees, improperly adjusted and denied her claims, failed to properly investigate the damage,

and unjustifiably refused to perform its obligations. *Id.* at ¶¶ 31–34. [2]

2    Plaintiff evidently received insurance money for flood damage from a separate flood policy. *See* 2d. Am. Compl. at ¶ 47.

**\*2** On February 25, 2014, Plaintiff filed the original two-Count Complaint, alleging breach of contract and breach of the implied covenant of good faith and fair dealing. The First Amended Complaint, alleging the same two Counts, was filed on May 20, 2014. Following Defendant's Motion to Dismiss Count II of the First Amended Complaint and the claims for punitive damages and attorney's fees, Plaintiff filed the Second Amended Complaint on June 23, 2014, which added Count III, violation of the New Jersey Consumer Fraud Act. On July 7, 2014, Defendant filed the present Motion to Dismiss, which requests dismissal of Counts II (breach of the implied covenant of good faith and fair dealing) and III (violation of the New Jersey Consumer Fraud Act) of the Second Amended Complaint, as well as Plaintiff's claims for punitive damages and attorney's fees. [3]

3    On December 2, 2014, Plaintiff submitted a letter arguing that the Hurricane Sandy Case Management Order ("HSCMO") should apply to this case, and that, under the HSCMO, the Motion to Dismiss is premature. The HSCMO applies to "Hurricane Sandy cases involving standard flood insurance policies sold and administered by participating Write Your Own Program insurance companies in accordance with the National Flood Insurance Program ... in addition to direct claims against the Federal Emergency Management Agency pursuant to the NFIA." The HSCMO also provides that cases setting forth claims for damages caused by sources other than flooding "shall be reassigned to the same District Judge and Magistrate Judge and consolidated for discovery purposes." However, this case does not involve a Write Your Own Program insurance company, or a claim against the Federal Emergency Management Agency, nor is there a related case involving such claims. The HSCMO therefore does not apply here. The Court also notes with disapproval that this argument was not raised until approximately four months after the return date for the motion.

## II. STANDARD OF REVIEW

When considering a motion to dismiss a complaint for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6), a court must accept all well-pleaded allegations in the complaint as true and view them in the light most favorable to the plaintiff. *Evancho v. Fisher,* 423 F.3d 347, 351 (3d Cir.2005). It is well settled that a pleading is sufficient if it contains "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). However, "[a]lthough the Federal Rules of Civil Procedure do not require a claimant to set forth an intricately detailed description of the asserted basis for relief, they do require that the pleadings give defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Baldwin Cnty. Welcome Ctr. v. Brown,* 466 U.S. 147, 149–50 n. 3, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984) (quotation and citation omitted). A district court, in weighing a motion to dismiss, asks " 'not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim.' " *Bell Atlantic v. Twombly,* 550 U.S. 544, 583, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting *Scheuer v. Rhoades,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 684, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ("Our decision in *Twombly* expounded the pleading standard for all civil actions.") (internal citations omitted); *Fowler v. UPMC Shadyside,* 578 F.3d 203, 210 (3d Cir.2009) ("*Iqbal* ... provides the final nail-in-the-coffin for the 'no set of facts' standard that applied to federal complaints before *Twombly."*).

Following the *Twombly/Iqbal* standard, the Third Circuit applies a two-part analysis in reviewing a complaint under Rule 12(b)(6). First, a district court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. *Fowler,* 578 F.3d at 210. Second, a district court must determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief." *Id.* A complaint must do more than allege the plaintiff's entitlement to relief. *Id.* However, this standard " 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element." *Phillips v. Cnty. of Allegheny,* 515 F.3d 224, 234 (3d Cir.2008) (quoting *Twombly,* 127 U.S. at 1965); *see also Covington v. Int'l Ass'n of Approved Basketball Officials,* 710 F.3d 114, 118 (3d Cir.2013) ( "[A] claimant does not have to set out in detail the facts upon which he bases his claim.... The pleading standard is not akin to a probability requirement, ... to survive a

motion to dismiss, a complaint merely has to state a plausible claim for relief." (citations omitted)). Nonetheless, a court need not credit either "bald assertions" or "legal conclusions" in a complaint when deciding a motion to dismiss. *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1429–30 (3d Cir.1997). The defendant bears the burden of showing that no claim has been presented. *Hedges v. U.S.,* 404 F.3d 744, 750 (3d Cir.2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1409 (3d Cir.1991)).

 **\*3**  Finally, a court in reviewing a Rule 12(b)(6) motion must only consider the facts alleged in the pleadings, the documents attached thereto as exhibits, and matters of judicial notice. *Southern Cross Overseas Agencies, Inc. v. Kwong Shipping Grp. Ltd.,* 181 F.3d 410, 426 (3d Cir.1999). However, "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Ben. Guar. Corp. v. White Consol. Indus ., Inc.,* 998 F.2d 1192, 1196 (3d Cir.1993). Defendant has attached to its Motion to Dismiss a declaration from its counsel, Mark J. Walters, and four Exhibits, including, inter alia, Plaintiff's Homeowners Policy, a map fromGoogle.com showing the location of Plaintiff's property, and the report of an engineer retained by Allstate to determine the cause of damage to Plaintiff's property. Because Plaintiff's Complaint is based on the Homeowners Policy, this document may be considered by the Court; the remaining documents, including the statements made by counsel in the declaration, do not form the basis for plaintiff's claims, and therefore will not be considered for this Motion.

## III. DISCUSSION

Because the New Jersey Consumer Fraud Act expressly provides for the award of attorney's fees, and because the substantive claims may impact the availability of remedies, I shall first address the motions on the substantive claims, then the motions related to the remedies.

### A. Breach of Implied Covenant of Good Faith and Fair Dealing

Defendant argues that there can be no claim for a breach of the covenant of good faith and fair dealing if the claims decision is "fairly debateable." Def. Br. at 7. Defendant further asserts that the facts as alleged in the Complaint and the exclusions in the policy establish that Defendant's decision was at least fairly debatable, and therefore the claim for breach of the covenant of good faith and fair dealing should be dismissed.

*Id.* at 8. Plaintiff contends that the statements of Gladu are sufficient to find that Allstate accepted liability for her alleged wind damages, and that the later refusal of coverage was therefore in bad faith. Pl. Br. at 10.

The seminal case describing the cause of action in New Jersey for the violation of the breach of good faith and fair dealing in an insurance context is *Pickett v. Lloyd's,* 131 N.J. 457, 621 A.2d 445 (N.J.1993). The New Jersey Supreme Court held that "an insurance company owes a duty of good faith to its insured in processing a first-party claim." *Id.* at 450. However, for this cause of action, "[i]f a claim is 'fairly debatable,' no liability in tort will arise." *Id.* at 453 (internal quotation marks and citation omitted). In the context of denial of benefits, the "fairly debateable" standard means that "a claimant who could not have established as a matter of law a right to summary judgment on the substantive claim would not be entitled to assert a claim for an insurer's bad-faith refusal to pay the claim." *Id.* at 454.

 **\*4**  The question of whether the claim is "fairly debatable" is, clearly, a fact-specific question. Moreover, it is not obvious from the face of the Second Amended Complaint, including the alleged facts that an Allstate adjuster initially opined that the damage to Plaintiff's home was cause by wind, and that Allstate sent an engineer to inspect the property after its denial of coverage, that the denial of coverage for alleged wind damages was "fairly debateable."[4] While this claim may be subject to dismissal on a summary judgment motion, following discovery, the Second Amended Complaint states sufficient facts to permit the claim to go forward. Thus, Defendant's Motion to Dismiss Count II, breach of the implied covenant of good faith and fair dealing, is denied.

4          Indeed, Defendant has not moved to dismiss the breach of contract claim.

### B. Violation of the New Jersey Consumer Fraud Act

Defendant argues that the denial of insurance benefits does not fall within the scope of the New Jersey Consumer Fraud Act (CFA). Def. Br. at 11. Plaintiff points out that this determination has been called into question by recent New Jersey Supreme Court and Third Circuit precedents. Pl. Br. at 13.

New Jersey courts have, since the 1980s, held that the CFA does not apply to the payment of insurance benefits. *See Nikiper v. Motor Club of America,* 232 N.J.Super. 393, 557 A.2d 332, 336 (N.J.App.Div.), *certif. denied,* 117 N.J. 139,

564 A.2d 863 (N.J.1989); *Pierzga v. Ohio Casualty Group of Ins. Cos.,* 208 N.J.Super. 40, 504 A.2d 1200, 1203–04 (N.J.App. Div .), *certif. denied,* 104 N.J. 399, 517 A.2d 402 (N.J.1986). And, at one time, the Third Circuit agreed. *See Van Holt v. Liberty Mutual Fire Ins. Co.,* 163 F.3d 161, 168 (3d Cir.1998). In 1997, though, the New Jersey Supreme Court applied the CFA to the sale of insurance, holding that "the [CFA]'s language is ample enough to encompass the sale of insurance policies as goods and services that are marketed to consumers." *Lemelledo v. Benefit Mgmt. Corp.,* 150 N.J. 255, 696 A.2d 546, 551 (N.J.1997). While the New Jersey Supreme Court noted that "several lower courts have held that the payment of insurance *benefits* is not subject to the CFA," the Court expressly declined to rule on the validity of those holdings. *Id.* at 551, 551 n. 3. Ten years later, relying on *Lemelledo,* the Third Circuit overturned a District Court decision finding that the CFA did not apply to an alleged scheme to defraud insureds of their benefits. *Weiss v. First Unum Life Ins. Co.,* 482 F.3d 254, 266 (3d Cir.2007). The Third Circuit stated that that:

> while the New Jersey Supreme Court has been silent as to this specific application of CFA, its sweeping statements regarding the application of the CFA to deter and punish deceptive insurance practices makes us question why it would not conclude that the performance in the providing of benefits, not just sales, is covered.

[*Id.*]

Following the Third Circuit's decision, as noted by Plaintiffs, judges in this District have declined to dismiss insurance payment claims based on the CFA. *See Beekman v. Excelsior Ins. Co.,* No. 14–cv–363, 2014 U.S. WL 674042 (D.N.J. February 21, 2014); *Bartels v. Hudson Ins. Co.,* No. 05–cv–3890, 2008 WL 5070660 (D.N.J. Nov.24, 2008). However, the New Jersey Appellate Division has continued to hold that "while the CFA 'encompass[es] the sale of insurance policies as goods and services that are marketed to consumers,' 'the payment of insurance benefits is not subject to the CFA.' " *See Beaver v. Magellan Health Servs.,* 433 N.J.Super. 430, 80 A.3d 1160, 1168 n. 1 (N.J.App.Div.2013) (quoting *Lemelledo,* 696 A.2d at 551).

**\*5** To ascertain the controlling state law, in the absence of a decision by that State's highest court, a federal court must attempt to predict how the state Supreme Court would decide the question. *Hamme v. Dreis & Krump Mfg. Co.,* 716 F.2d 152, 155 (3d Cir.1982). "[T]he decisions of intermediate state courts having statewide jurisdiction are normally a strong

indication of what the state law is." *Id.* However, these decisions may be disregarded if the court "is convinced by other persuasive data that the highest court of the state would decide otherwise." *Id.* at 156 (emphasis removed). The Third Circuit, in *Weiss,* closely examined the "sweeping statements" made by the New Jersey Supreme Court with regard to the CFA and fraudulent insurance practices, and the Supreme Court's determination that applying the other regulations which apply to insurance did not bar the application of the CFA to the sale of insurance. 482 F.3d at 266. The Third Circuit thus predicted that the New Jersey Supreme Court will ultimately determine that the CFA does apply to the payment of insurance benefits. *Id.* The New Jersey Appellate Division, in contrast, has not performed a new analysis of the CFA's applicability to insurance benefits, despite the New Jersey Supreme Court's broad statements, but relies on the Court's non-determination of the issue. *See Beaver,* 433 N.J.Super. 430, 80 A.3d at 1168 n. 1.

I will follow the Third Circuit's lead by predicting that the New Jersey Supreme Court would find that the New Jersey CFA applies to the payment of insurance benefits. Accordingly, Defendant's Motion to Dismiss Count III, which asserts a violation of the CFA, is denied. [5]

5    Defendant has not argued that the Second Amended Complaint fails to state a substantive claim under the CFA, but relies solely on the assertion that the CFA does not cover the payment of insurance benefits.

### C. Punitive Damages

Defendant argues Plaintiff has failed to plead facts showing "egregious circumstances," "actual malice" or "wanton and willful disregard of persons," which are necessary to maintain a claim for punitive damages. Def. Br. at 8–9. Plaintiff argues that Defendant's actions, as alleged in the Second Amended Complaint, of "denying coverages for damages that an insurance company's agent has already admitted liability for, and then hiring an engineer to validate a decision already made when threatened with bad faith, all in an effort to enlarge profits" are sufficient to permit punitive damages. Pl. Br. at 11.

*Pickett,* while recognizing a cause of action for bad faith denial refusal to pay a first-party claim, held that "absent egregious circumstances, no right to recover for emotional distress or punitive damages exists for an insurer's allegedly wrongful refusal to pay a first-party claim." 621 A.2d at

Case 1:19-md-02875-RMB-SAK    Document 600-2    Filed 10/16/20    Page 8 of 65 PageID: 13369

455. Rather, according to the New Jersey Supreme Court "deliberate, overt, and dishonest dealings ... constitute torts entirely distinct from the bad-faith claim." *Id.* (internal quotation marks and citation omitted). In addition, the New Jersey Punitive Damages Act provides that punitive damages may only be awarded if the plaintiff proves that the defendant's acts or omissions "were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions." N.J. Stat. Ann. § 2A:15–5.12.

**\*6** Even if Plaintiff can show that Defendant acted in bad faith, Plaintiff has not pleaded facts that rise to the level of egregiousness necessary for punitive damages in an insurance contract case. Certainly the facts as alleged do not show actual malice, or a wanton and willful disregard of persons who might be harmed. Thus, the claim for punitive damages is dismissed. [6]

[6]
The New Jersey Consumer Fraud Act mandates the award of treble damages. N.J. Stat. Ann. 56:8–19. The dismissal of the claim for punitive damages does not impact Plaintiff's potential to receive treble damages under the CFA, if successful on that claim.

### D. Attorney Fees

The Second Amended Complaint includes two requests for attorneys' fees. In Count II, for breach of the implied covenant of good faith and fair dealing, Plaintiff asserts that "Allstate is liable to Ms. Bannon for compensatory, consequential, and punitive damages ... [including] attorneys' fees and expenses." 2d Am. Compl. at ¶ 52. In addition, Plaintiff's prayer for relief requests attorneys' fees.

Defendant argues that New Jersey law precludes granting attorney fees on first-party claims for insurance benefits. Indeed, while N.J. Court R. 4:42–9(a)(6) provides that attorney fees may be permitted "[i]n an action upon a liability or indemnity policy of insurance, in favor of a successful claimant," the New Jersey Supreme Court has stated that this Rule does not apply when an insured " 'brings direct suit against his insurer to enforce casualty or other direct coverage.' " *Auto Lenders Acceptance Corp. v. Gentilini Ford, Inc.,* 181 N.J. 245, 854 A.2d 378, 399 (N.J.2004) (quoting *Eagle Fire Prot. Corp. v. First Indem. of Am. Ins. Co.,* 145 N.J. 345, 678 A.2d 699, 708 (N.J.1996)). Plaintiff, however, relies on a New Jersey Appellate Division case, which stated, in dicta, that the measure of damages for a bad faith claim, under *Pickett,* "would be any foreseeable consequential damages. This might typically include, for example, costs of litigation, including expenses for experts and counsel fees, and prejudgment interest." *Taddei v. State Farm Indemnity Co.,* 401 N.J.Super. 449, 951 A.2d 1041, 1048 (N.J.App.Div.2008). There do not appear to be any cases that examine the Appellate Division's dicta stating that counsel fees may be a consequential damage of a breach of the covenant of good faith and fair dealing in light of the New Jersey Supreme Court's holding that the Court Rule permitting attorney fees does not apply to first-party insurance suits.

I find that the New Jersey Supreme Court's holding barring the recovery of attorney fees by an insured bringing direct suit against his insurer to enforce direct coverage applies in this case. Although the costs of litigation may be a foreseeable consequence of a breach of the covenant of good faith and fair dealing, under controlling New Jersey precedent, attorney's fees are not permitted in cases where an insured sues his insurer for direct coverage. Thus, the plaintiff's claim for attorney's fees with respect to Count II is dismissed.

However, the CFA mandates recovery of attorney's fees. N.J. Stat. Ann. § 56:8–19 ("In all actions under this section, ... the court shall also award reasonable attorneys' fees, filing fees and reasonable costs of suit."). Therefore, Plaintiff's general prayer for relief, requesting attorney's fees, cannot be dismissed. Thus, as applied to the general prayer for relief, and to Count III, breach of the CFA, the Motion to Dismiss Plaintiff's claim for attorney's fees is denied.

### IV. CONCLUSION

**\*7** For the reasons stated above, Defendant's Motion to Dismiss is granted in part and denied in part. Specifically, Defendant's Motion to Dismiss Count II, breach of the covenant of good faith and fair dealing, and Count III, for breach of the CFA is denied. Defendant's Motion to Dismiss Plaintiff's claims for punitive damages is granted, and this claim is dismissed. Defendant's Motion to Dismiss Plaintiff's claim for attorney's fees is granted only with respect to Count II; with respect to the general prayer for relief, Defendant's Motion to Dismiss the claim for attorney's fees is denied as it applies to Count III.

An appropriate Order shall follow.

**Bannon v. Allstate Ins. Co., Not Reported in F.Supp.3d (2015)**
2015 WL 778828

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 778828

---

**End of Document**                                        © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 2

Case 1:19-md-02875-RMB-SAK    Document 600-2    Filed 10/16/20    Page 11 of 65
PageID: 13372
Cottrell v. Alcon Laboratories, Inc., Not Reported in Fed. Supp. (2016)

KeyCite Red Flag - Severe Negative Treatment
Reversed by Cottrell v. Alcon Laboratories, 3rd Cir.(N.J.), October 18, 2017

2016 WL 1163163
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Lenoard COTTRELL, et al., Plaintiffs,
v.
ALCON LABORATORIES, INC., et al., Defendants.

Civ. Action No.: 14-5859(FLW)
|
Signed 03/24/2016

**Attorneys and Law Firms**

Jeffrey W. Herrmann, Cohn, Lifland, Pearlman, Herrmann & Knopf, LLC, Saddlebrook, NJ, for Plaintiffs.

Roger B. Kaplan, Greenberg Traurig, LLP, Florham Park, NJ, Robert J. McGuirl, Law Offices of Robert J. McGuirl, LLC, Park Ridge, NJ, Liza M. Walsh, Tricia B. O'Reilly, Christopher J. Borchert, Connell Foley LLP, Newark, NJ, Charles Blaine Casper, Montgomery, McCracken, Walker & Rhoads, Esqs., Cherry Hill, NJ, Kyle G. Everly, Megan E. Grossman, Walter H. Swayze, III, Segal, McCambridge, Singer & Mahoney, Ltd., Jersey City, NJ, for Defendants.

James P. Muehlberger, Lori A. McGroder, Doug Maddock, Shook, Hardy & Bacon L.L.P., Pro Hac Vice, for Defendants.

**OPINION**

WOLFSON, District Judge

**\*1** For lack of standing, the Court previously dismissed this putative consumer class action, comprised of in– and out-of-state plaintiffs [1] accusing defendant pharmaceutical manufacturers and distributors [2] of engaging in unfair and illegal business practices. *See Cottrell v. Alcon Labs, Inc., No. 14-5859, 2015 U.S Dist. LEXIS 81830, 2015 WL 3889367 (D.N.J. Jun. 24, 2015).* However, the Court provided Plaintiffs an opportunity to amend their Complaint to cure the deficiencies as to standing. In the instant matter, the Generic and Brand Name Defendants separately move once again to dismiss the Amended Complaint, challenging, *inter alia*, Plaintiffs' new theory of Article III standing. Because

the Court finds that Plaintiffs' amendments fare no better than their original allegations, for the reasons set forth here, Plaintiffs' Amended Complaint is dismissed for want of standing.

**BACKGROUND and PROCEDURAL HISTORY**

Because the relevant facts of this case were recounted in this Court's previous Opinion, to promote economy, they will be incorporated here. To summarize the alleged facts, Defendants are makers and distributors of various FDA-approved prescription eye drop medications. *See* Am. Compl., ¶ 1. These medications are sold as fluid, in a given volume, in plastic bottles. *Id.* at ¶ 4. Plaintiffs allege that Defendants set the price for these medications without "stating how many doses are contained in the bottles or how many days they will last." *Id.*

As a part of the alleged illegal and unfair business practices, Plaintiffs aver that Defendants have deliberately designed and manufactured the tips of the bottles to dispense larger than necessary drops of medication, in an effort to compel consumers, like Plaintiffs, "to pay for much more medication than the users of those medications needed." *Id.* at ¶ 1. In that connection, Plaintiffs allege that the large tips lead to dispensing excess fluid from the bottle that "cannot be used, is entirely wasted, provides no pharmaceutical benefit, and is often harmful." *Id.* at ¶ 5.

**\*2** Previously, the Court dismissed Plaintiff's original complaint based on a lack of standing. In that Opinion, I rejected Plaintiffs' theory that they were injured when Plaintiffs were precluded from using the wasted eye drops, because, absent any allegation that consumers were promised a specific number of doses or drops and that they failed to receive those amounts, Plaintiffs' theory of loss was too conjectural.

In their Amended Complaint, to be clear, Plaintiffs are not complaining of physical injuries from the use of these eye drops, but rather, Plaintiffs theorize that if the tips were made smaller, Plaintiffs would necessarily be able to use the wasted drops, and that would produce a cost savings to Plaintiffs. In that regard, Plaintiffs premise their standing on the "invasion of [a] legally protected interest," that is, "the practice of Defendants in selling their products in a form that compelled Plaintiffs to waste large quantities of medication that were not useful for treatment of their disease." Id. at ¶

Case 1:19-md-02875-RMB-SAK Document 600-2 Filed 10/16/20 Page 12 of 65 PageID: 13373

Cottrell v. Alcon Laboratories, Inc., Not Reported in Fed. Supp. (2016)

175. Plaintiffs aver that they would personally benefit from a court order "requiring that Defendants reimburse them for the amount they spent on the not-useful amounts of medication." *Id.* "Alternatively, as to standing, Plaintiffs allege that their therapy would have cost less if their eye drops had been smaller." *Id.* at ¶ 178.

In support of their theories of standing, Plaintiffs included various scientific literature opining that 1) a smaller drop volume would provide patients with the maximum therapeutic result; and correspondingly, 2) smaller drop sizes would lead to economic benefits, i.e., cost savings. *See* Am. Compl., ¶¶ 179, 183, 185, 188, 196, 200. For example, one article stated "smaller drops would be preferable to minimize systemic exposure and spilled or wasted medication. Obviously, a smaller drop size would mean that more doses could be dispensed form each bottle of medication, providing cost savings to patients and managed care providers." *Id.* at ¶ 200.

Plaintiffs also included charts that set forth the amount that each of the named Plaintiffs spent on purchasing the medication, the amount of medication in milliliter, the alleged wasted portion of the drop, and, allegedly, the amount of money spent on the wasted portion. *See Id.* at ¶¶ 225-231. To calculate the money spent on the wasted portion, it appears from the charts that Plaintiffs simply divided the purchase price by the amount of medication, and then multiplied that number by the amount of the alleged wasted portion of the drop.

In their Amended Complaint, Plaintiffs assert twenty-three causes of action against Defendants. Plaintiffs seek to bring these claims individually, and on behalf of classes of consumers and third-party payors who have paid all or part of the purchase prices of prescription eye drops manufactured and sold by Defendants. More specifically, each of the named plaintiffs asserts consumer fraud related claims applicable in the state in which he/she resides. Those state laws include: New Jersey Consumer Fraud Act, California Unfair Competition Law, Florida Deceptive and Unfair Trade Practices Act, Illinois Consumer Fraud Act, North Carolina Unfair and Deceptive Trade Practices Act and Texas Deceptive Trade Practices Act.

On these current motions, the Brand Name and Generic Defendants move separately to dismiss all of Plaintiffs' claims based on standing, preemption and failure to state a claim.[3] Because I find that Plaintiffs have failed to cure their standing

requirements, I will confine my discussion only to that issue. And, because standing is dispositive of this case, I am deprived of jurisdiction to hear the case on its merits. *See Finkelman v. National Football League*, 810 F.3d 187, 193 (3d Cir. 2016) ("[a] federal court's obligation to assure itself that it has subject matter jurisdiction over a claim is antecedent to its power to reach the merits of that claim.") (citations omitted).

## DISCUSSION

### I. Standing

**\*3** I will reiterate my previous recitation of the law with regard to standing. Article III of the Constitution limits the scope of the federal judicial power to the adjudication of "cases" or "controversies." U. S. Const. art. III, § 2. This "bedrock requirement," *see Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982), protects the system of separation of powers and respect for the coequal branches by restricting the province of the judiciary to "decid[ing] on the rights of individuals." *Marbury v. Madison*, 5 U.S. 137 (1803). Indeed, " '[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.' " *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976)).

Courts have developed several justiciability doctrines to enforce the case-or-controversy requirement, and "perhaps the most important of these doctrines" is the requirement that "a litigant have 'standing' to invoke the power of a federal court." *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 244 (3d Cir. 2012)(quoting *Allen v. Wright*, 468 U.S. 737, 750 (1984)). The seminal standing question is "whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his [or her] invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his [or her] behalf." *Id.* (internal quotations and citations omitted).

To establish Article III standing, a plaintiff bears the burden of sufficiently alleging three elements: 1) an injury-in-fact;

Case 1:19-md-02875-RMB-SAK    Document 600-2    Filed 10/16/20    Page 13 of 65 PageID: 13374

Cottrell v. Alcon Laboratories, Inc., Not Reported in Fed. Supp. (2016)

(2) a sufficient causal connection between the injury and the conduct complained of; and 3) a likelihood that the injury will be redressed by a favorable decision. *Finkelman*, 810 F.3d at 193.

First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotations, alterations, and citations omitted). In addressing this element, the Third Circuit recently stressed that "to be concrete, an injury must be real, or distinct and palpable, as opposed to merely abstract." *Finkelman*, 810 F.3d at 193 (citations and quotations omitted). To be particularized, "an injury must affect the plaintiff in a personal and individual way." *Id.* In that regard, "Plaintiffs do not allege an injury-in-fact when they rely on a chain of contingencies or mere speculation." *Id.*

Second, there must be a causal connection between the injury and the conduct complained of — the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. *Lujan*, 504 U.S. at 560-61. This requirement is "akin to but-for causation in tort and may be satisfied even where the conduct in question might not have been a proximate cause of the harm, i.e., indirect causal relationship." *Finkelman*, 810 F.3d at 193. Finally, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan*, 504 U.S. at 561.

Of these three elements, the Third Circuit has advised that "the injury-in-fact element is often determinative." *Toll Bros., Inc. v. Twp. of Readington*, 555 F.3d 131, 138 (3d Cir. 2009). Hence, it bears repeating that the complained-of injury must not be abstract or subjective. *See Id.*; *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972). Allegations of a potential future injury, or the mere possibility of a future injury, will not establish standing. *See Whitmore v. Arkansas, 495 U.S. 149*, 158 (1990); *Employer's Ass'n of New Jersey v. New Jersey*, 601 F. Supp. 232, 238 (D.N.J. 2003), aff'd 774 F.2d 1151 (3d Cir. 1985). While economic injury is one of the paradigmatic forms of standing, *see Danvers Motor Co., Inc. v. Ford Motor Co.*, 432 F.3d 286, 291 (3d Cir. 2005), a demand for damages, by itself, will not establish an injury-in-fact. *See Rivera v. Wyeth-Ayerst*, 283 F.3d 315, 320 (5th Cir. 2002); *Koronthaly v. L'Oreal USA, Inc.*, No. 07-5588, 2008 U.S. Dist. LEXIS 59024, at *13, 2008 WL 2938045 (D.N.J. Jul. 29, 2008).

**\*4** Moreover, "the 'injury-in-fact' test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself [or herself] among the injured." *Id.* at 563 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 734-35 (1972)). The injury must also be "an invasion of a legally protected interest." *Id.* at 560. In other words, the injury-in-fact requirement exists to assure that litigants have a "personal stake" in the litigation. *See The Pitt News v. Fisher*, 215 F.3d 354, 360 (3d Cir. 2000). By ensuring that litigants present actual cases and controversies, courts can keep the judicial branch from encroaching on legislative prerogatives, thereby preserving the separation of powers. *See Valley Forge v. Americans United for Separation of Church and State*, 454 U.S. 464, 473-74 (1982).

"[T]he standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." *Allen*, 468 U.S. at 752. In that regard, at the pleading stage, "[a]lthough general factual allegations of injury resulting from the defendant's conduct may suffice, the complaint must still 'clearly and specifically set forth facts sufficient to satisfy' Article III." *Reilly v. Ceridian Corp.*, 664 F.3d 38, 41 (3d Cir. 2011) (quoting *Lujan*, 504 U.S. at 561); *Whitmore*, 495 U.S. at 155; *see, e.g.*, *Anjelino v. N.Y. Times Co.*, 200 F.3d 73, 88 (3d Cir. 2000) ("Standing is established at the pleading stage by setting forth specific facts that indicate that the party has been injured in fact or that injury is imminent, that the challenged action is causally connected to the actual or imminent injury, and that the injury may be redressed by the cause of action.").

In assessing the sufficiency of the plaintiff's allegations related to standing, the Third Circuit has summed up the process:

First, we "tak[e] note of the elements a plaintiff must plead to state a claim"—here, the three elements of Article III standing. Second, we eliminate from consideration any allegations that, "because they are no more than

conclusions, are not entitled to the assumption of truth." Third, "where there are well-pleaded factual allegations, [we] assume their veracity and then determine whether they plausibly" establish the prerequisites of standing. In conducting this analysis, we are mindful of the Supreme Court's teaching that all aspects factual of a complaint must rest on "well-pleaded allegations" and not "mere conclusory statements." Thus, to survive lack of standing, a plaintiff a motion to dismiss for "must allege facts that affirmatively and plausibly suggest that it has standing to sue."

*Finkelman, 810 F.3d at 194* (citations omitted). To be sure, the plaintiff cannot rely on assertions that are merely "speculative or conjectural." *Id.*

## A. Plaintiffs' Pricing Theory

In Plaintiffs' original complaint, they allege that if Defendants made the tips of the dispensers smaller, the cost of the medications would decrease, thereby producing a cost savings to consumers. I rejected this theory as hypothetical and conjectural, because Plaintiffs failed to allege any bases for their assertion that Defendants would price "smaller-tipped" bottles less expensively than their current version.

On their second attempt to establish standing, Plaintiffs did not abandon this theory, but rather, they devote multiple pages of their Amended Complaint to citing various articles and studies that express those authors' opinions regarding the size of the drop volume. *See* Am. Compl., ¶¶ 178-216. Indeed, according to those articles, from a therapeutic stand point, smaller drop sizes would be more beneficial to the patients. But, it appears these articles go on to opine on the economic effects of the decreased drop sizes; that is, lower costs. However, reliance on these articles does not cure the speculative nature of Plaintiffs' pricing theory.

*5 While it is difficult — from the allegations — for the Court to discern the methodology from which these articles base their conclusion regarding pricing, one of the articles Plaintiffs cite, however, provides some insight:

> The economic impact of using a smaller drop may be illustrated by Propine 0.1%. An average bottle labeled 15.0 ml actually contained an average of 15.5 ml with a drop volume

determined to be 39.8 μl. The average bottle yielded 389 eyedrops, sufficient for 13.9 weeks of therapy (both eyes, twice eyedrops could be reduced bottle would yield 1,0333 daily use) .... If the to 15 μl ... the average drops, sufficient for 36.9 weeks of therapy .... systems and alteration Alteration of eyedrop of the medication's delivery physical greatly properties to produce smaller drops could diminish the cost of topical glaucoma therapy ....

Am. Compl., ¶ 185. It appears, simply, that the author assumes as true that manufacturers of eye drops would price their medication solely based on the volume of the fluid contained in the bottles. That same assumption underlies Plaintiff's own theory, which is reflected in Plaintiffs' charts.

On the other hand, some articles are not as unequivocal; for example, in ¶ 192 of the Amended Complaint, Plaintiff relies on an article entitled, *Cost Consideration of the New Fixed Combinations for Glaucoma Medical Therapy*, which only suggests that the "[f]inal cost of therapy may be based on **several** factors beyond that of the retail price and include the drop size and the amount of drops per bottle." Am. Compl., ¶ 192 (emphasis added); *see also* § 199 ("[m]any factors influence the daily cost of therapy for eyedrops.").

Additionally, the remaining articles to which Plaintiff cite, state in passing and conclusory terms that smaller drop volume would likely produce lower costs. *See, e.g., Id.* at ¶ 179 ("[a]n important benefit of using a smaller instilled volume, in addition to improved drug activity and lower cost, is a potential decrease in side effects from ophthalmic drugs."); ¶ 183 ("Drop size and method of delivery are also important from an economic standpoint since tips that deliver large or multiple drops increase costs."); ¶ 188 ("From a biopharmaceutical and economic point of view, however, smaller volumes ... should be instilled."); ¶ 194 ("it has been suggested that the decrease in drop size ... would reduce the rate of drug loss ... and, in addition, the cost of therapy."); ¶ 196 (same); and ¶ 200 (same).

Putting aside the fact that some of these articles conflict as to how they arrive at their opinions on costs, the main point to take away from Plaintiffs' allegations based on the articles is that the authors assume — just as Plaintiffs do —

Cottrell v. Alcon Laboratories, Inc., Not Reported in Fed. Supp. (2016)

Case 1:19-md-02875-RMB-SAK    Document 600-2    Filed 10/16/20    Page 15 of 65
PageID: 13376

that if Defendants replace their bottles with smaller tips, the medications would somehow cost less. The flaw in relying on these opinions is that they do not specifically address or discuss Defendants' pricing model as to the ophthalmic medications at issue. Rather, Plaintiffs and these authors resort to hypothesizing what manufactures would do if tip dispensers were made smaller. Indeed, Plaintiffs concede as much: Plaintiff's theory of pricing is based on "a comparison to a hypothetical world in which Defendants might have produced smaller drops." Am. Compl., ¶ 176. Plaintiffs have not pled any basis for alleging that the way Defendants price their products will take into account the drop sizes. This is the very type of speculative pleading that the Third Circuit has recently cautioned against.

**\*6** In *Finkelman*, one of the plaintiffs purchased a Super Bowl ticket for an allegedly inflated price on the ticket resale market. *Finkelman*, 810 F.3d at 190-91. As a result, that plaintiff sued the National Football League ("NFL") under New Jersey's Consumer Fraud Act for a refund of the cost in excess of the printed ticket price. *Id.* at 190. Plaintiff's cause of action was premised on the NFL's practice of withholding tickets. In that connection, as to standing, Plaintiff reasoned that such a practice reduced the supply of tickets and inflated ticket resale price, thereby causing him injury.

The Third Circuit, in the context of a motion to dismiss, found that the plaintiff's allegations were not sufficient to meet standing requirements. First, the Third Circuit found that the alleged increased price that the plaintiff paid on the resale market was based on the plaintiff's "basic" assumption that a "reduction in supply will cause prices to rise." *Id.* at 199 (citations omitted). However, the court explained that there may be other factors that have caused the prices to inflate: "while it *might* be the case that the NFL's withholding increased ticket prices on the resale market, it might also be the case that it had no effect on the resale market." *Id.* at 200. To state the problem succinctly, courts "have no way of knowing whether the NFL's withholding of tickets would have had the effect of increasing or decreasing prices on the secondary market. [Courts] can only speculate — and speculation is not enough to sustain Article III standing." *Id.* The Third Circuit further commented that, although the plaintiff's theory of standing is based on an application of a "basic economic logic," that logic, however, is premised on his supposition. *Id.* at 201. In fact, the Third Circuit

concluded that "[i]t [was] pure conjecture about what the ticket resale market might have looked like if the NFL had sold its tickets differently." *Id.*

The Third Circuit's advisement is well taken by this Court. Like their original complaint, Plaintiffs' newly revised pleadings have not offered any facts — other than their speculation — that the pricing of a hypothetical bottle design with smaller dispensing tips would be based on the volume of fluids. And, indeed, just like the type of allegations made by the plaintiff in *Finkelman*, Plaintiffs, here, premise their theory on the "basic principle" that pricing is solely based on volume. The articles that Plaintiffs cite rely on that same principle, and there is no indication in those articles that any of the defendants would manufacture products that dispense fewer eye drops at a less expensive price. Importantly, it appears that all the studies on which Plaintiffs rely examine the medical aspect of the drop volume relating to ophthalmic medicines, not on any economic aspects of how manufacturers of those medicines price their products. Indeed, Plaintiffs have not identified any of these authors to be experts on such economic issues. Thus, while volume may be a pricing factor — just as some of the articles opined — this Court has no way of knowing whether Defendants would price their products in such a way, particularly since the pricing of pharmaceuticals is complex and multi-factored. *Cf. Fulgenzi v. PLIVA, Inc.*, 711 F.3d 578, 585 (6th Cir. 2013); *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 115 (2011). Therefore, the Court cannot credit Plaintiffs' bald assertions that Defendants would base the prices of their products on the volume of fluids as the determinative factor, or a factor at all. [4] Indeed, "Article III injuries require a firmer foundation." *Finkelman*, 810 F.3d at 201; *Dominguez v. UAL Corp.*, 666 F.3d 1359, 1364 (D.C. Cir. 2012)(finding that the plaintiffs had no Article III standing when their theory concerning airline tickets required "pil[ing] speculation atop speculation" as to how the tickets would be priced in the future); *Carter v. Alcon Labs, Inc.*, No. 13-997, 2014 U.S. Dist. LEXIS 32381, at \*12-13, 2014 WL 989002 (E.D. Mo. Mar. 13, 2014)("even if Defendants sold bottles with less medication, Plaintiff has not suggested there is anything to preclude them from charging what they now charge for the bottles currently available for purchase."). [5]

### B. Reimbursement of Costs

**\*7** The reimbursement theory that Plaintiffs propose was previously rejected by this Court. In the Amended Complaint,

Plaintiffs reiterate that they have suffered a concrete injury because they "did not receive the full use and therapeutic benefit of the medication they purchased as a result of Defendants' actions" and that they were compelled "to purchase amounts of medication that were not useful and therefore wasted." Am. Compl., ¶¶ 175-176. In that regard, Plaintiffs claim that they are entitled to receive reimbursement from Defendants for those wasted drops. But, these allegations do not assuage any of the Court's concerns.

First and foremost, Plaintiffs' causes of action sound in fraud. Yet, Plaintiffs do no allege that they were promised by Defendants a specific number of doses or drops and that the consumers failed to receive those amounts. Nor are there any allegations that Plaintiffs were forced to purchase additional prescriptions because the medications were depleted prematurely. Indeed, Plaintiffs do not allege that the eye medications failed to perform as intended such that Plaintiffs did not receive the benefit of their bargain. Moreover, there are no allegations that Plaintiffs were induced by any deception on the part of the defendants to purchase the medications. And, importantly, there are no allegations that any Plaintiffs would have purchased comparable cheaper products that dispense smaller drops, in lieu of Defendants' products.

What I have just outlined above are theories of injuries normally attendant to consumer fraud claims. In fact, I advised Plaintiffs that there are, generally, two theories of economic harm associated with consumer fraud actions: benefit-of-the bargain and out-of-pocket expenses. The former relates to economic damages caused by a product failing to perform as advertised and, therefore, the consumer would not have received the benefit of his/her bargain. *See, e.g.,* *Koronthaly v. L'Oreal USA, Inc.*, 374 Fed. Appx. 257, 259 (3d Cir. 2010) ("[a]bsent any allegation that [plaintiff] received a product that failed to work for its intended purpose or was worth objectively less than what one could reasonably expect, [plaintiff] has not demonstrated a concrete injury-in-fact."). The latter encompasses any expenses that a plaintiff incurred as a result of purchasing the defective product, *e.g.*, replacement costs. *See, e.g.,* *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 606 (3d Cir. 2012); *Dicuio v. Brother Intern. Corp.*, No. 11-1447, 2012 U.S. Dist. LEXIS 112047, at *7, 2012 WL 3278917 (D.N.J. Aug. 9, 2012) ("The out-of-pocket rule applies when a plaintiff can demonstrate that he paid money, and is now, out-of-pocket."). I further advised Plaintiffs that they must allege sufficiently to establish a viable economic harm such that they have standing to sue. However, none of the new pleadings asserted by Plaintiffs demonstrate such a harm.

Rather, Plaintiffs' reimbursement theory rests on their disagreement with how Defendants designed their bottles — a design that has been specifically approved by the FDA in a medical context — and their insistence that they should be reimbursed for drops that were wasted as a result of the design, although Plaintiffs were never promised a certain number of doses. This is not sufficient. Suppose Plaintiffs' claims were based on allegations that the packaging of Defendants' products were excessive such that they had overpaid for the products. Further suppose that if Defendants changed such packaging, consumers would pay less for the medications. Clearly, however, Plaintiffs would not have standing to sue Defendants for consumer fraud based on the packaging allegations because Plaintiffs would have suffered no injuries since no deception by Defendants was made in that regard. In sum, such a hypothetical example and Plaintiffs' reimbursement theory alike, merely rely on an "unsupported conclusion regarding [an] alleged loss." *see* *Lieberman v. Johnson & Johnson Consumer Cos.*, 865 F. Supp. 2d 529, 541 (D.N.J. 2011).

**\*8** In conclusion, the Court holds that Plaintiffs have failed to sufficiently allege Article III standing. Therefore, it deprives this Court of subject matter jurisdiction. *See* *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007). Absent jurisdiction, the Court is without authority to address the parties' remaining merit-based arguments. *See* *Adams v. Ford Motor Co.*, 653 F.3d 299, 304 (3d Cir. 2010) ("[i]f plaintiffs do not possess Article III standing, both the District Court and this Court lack subject matter jurisdiction to address the merits of plaintiff's case.").

### CONCLUSION

For the reasons set forth above, Defendants' motions to dismiss are **GRANTED** as Plaintiffs lack standing to bring suit. As a result, Plaintiffs' motion for leave to file supplemental exhibits relating to issues involving the merits of this Case is denied as **MOOT**.

### All Citations

Not Reported in Fed. Supp., 2016 WL 1163163

Cottrell v. Alcon Laboratories, Inc., Not Reported in Fed. Supp. (2016)
Case 1:19-md-02875-RMB-SAK    Document 600-2    Filed 10/16/20    Page 17 of 65
PageID: 13378

# Footnotes

1    These plaintiffs include: Leonard Cottrell, Sandra Henon, William Reeves, George Herman, Simon Nazzal, Carol Freburger, Jack Liggett, Patricia Bough, Mack Brown, Dolores Gillespie, Deborah Harrington, Robert Ingino, Edward Rogers, Jr., Deborah Rusignulolo, Dorothy Stokes, Josephine Troccoli, Hurie Whitfield, Thomas Layloff, Carolyn Tanner, Patsy Tate, John Sutton, Jesus Renteria, Glendelia Franco and Nadine Lampkin (collectively, "Plaintiffs").

2    Plaintiffs name as defendants both brand-name and generic pharmaceutical manufacturers and their distributors. The brand name companies include: Alcon Laboratories, Inc., Alcon Research, Ltd., Allergan, Inc., Allergan USA, Inc., Allergan Sales, LLC, Pfizer Inc., Valeant Pharmaceuticals International, Inc., Bausch & Lomb, Inc., Aton Pharma, Inc., Merck & Co., Inc., and Merck, Sharpe & Dohme Corp. (collectively, the "Brand Name Defendants"). The generic companies are Falcon Pharmaceuticals, Ltd., Sandoz Inc., Prasco LLC, Akorn, Inc. (collectively, the "Generic Defendants.") All defendants will be collectively referred to as "Defendants."

3    As I have stated in my previous Opinion, to date, similar claims against Defendants have been brought in three other federal jurisdictions: Florida, Missouri, and Illinois. In the Florida action, *Freburger v. Alcon Labs.*, No. 13-24446 (S.D. Fla.), plaintiffs voluntarily dismissed the lawsuit before oral argument on a pending motion to dismiss. In the Illinois case, *Eike v. Allergan, Inc.*, No. 12-1141 (S.D. Ill.), the court there denied defendants' motion to dismiss based on similar grounds to those asserted here. However, the district court in the Eastern District of Missouri dismissed Plaintiffs' claims on identical arguments raised by Defendants in this matter.

     See 📄 *Thompson v. Allergan USA, Inc.*, 993 F. Supp. 2d 1007 (E.D. Mo. 2014).

4    Finally, in an effort to support their pricing theory, specifically with respect to defendant Alcon, Plaintiffs included allegations regarding conversations Alcon's expert, Dr. Alan Robin allegedly had with other Alcon marketing executives in the 1990s. Am. Compl., ¶¶ 210-216. While Plaintiffs alleged the same conversations in the original complaint, and the Court rejected as conclusory, Plaintiffs included additional facts that these executives told the expert that Alcon was unwilling to reduce drop size because it would make less money. *Id.* As the Court held previously, these allegations do not address "how it would impact Alcon's discretion, much less the discretion of the thirteen other Defendants, in setting the prices of redesigned products." *Cottrell*, 2015 U.S Dist. LEXIS 81830 at *18-19 n.5, 2015 WL 3889367. Plaintiffs' additional allegations, again, do not explain how these 20-year old conversations with former executives have any impact on Alcon's discretion now — or any other defendants in this case — to set the prices of certain hypothetically redesigned bottles in the Alcon's set the future.

5    I cited a plethora of cases in my previous opinion that I found supported my conclusion in this regard. I will not repeat them here. *See Cottrell*, 2015 U.S. Dist. LEXIS 81830 at *19-20, 2015 WL 3889367.

---

# Tab 3

Case 1:19-md-02875-RMB-SAK   Document 600-2   Filed 10/16/20   Page 19 of 65
PageID: 13380
Geraczynski v. National R.R. Passenger Corp., Not Reported in F.Supp.3d (2015)
2015 WL 4623466

2015 WL 4623466
Only the Westlaw citation is currently available.
Not For Publication
United States District Court, D. New Jersey.

William GERACZYNSKI and
Christine Geraczynski, Plaintiffs,
v.
NATIONAL RAILROAD PASSENGER
CORPORATION, d/b/a Amtrak, et al., Defendants.

Civil Action No. 11–6385 (SRC).
|
Signed July 31, 2015.

**Attorneys and Law Firms**

Samuel J. Rosenthal, Barish Rosenthal, Philadelphia, PA, for Plaintiffs.

Andrew B. Charkow, Brad M. Gallagher, Landman, Corsi, Ballaine & Ford, Newark, NJ, Glenn Alan Montgomery, Montgomery, Chapin & Fetten, PC, Bridgewater, NJ, Cynthia V. Fitzgerald, Daniel W London, Anthony D. Capasso, London Fischer, LLP, New York, NY, Roseann Primerano, Law Office of Joseph Carolan, Parsippany, NJ, for Defendants.

**OPINION**

CHESLER, District Judge.

**\*1** This matter comes before the Court upon various motions for summary judgment filed by Defendants and one motion to dismiss brought by the Third–Party Defendant. The motions, which concern Defendants' cross-claims for indemnification and a third-party claim for insurance coverage, have all been opposed and fully briefed. The Court has considered the papers filed by the parties in connection with these motions and proceeds to issue its ruling based on the written submissions and without oral argument, as authorized by Federal Rule of Civil Procedure 78.

**I. BACKGROUND**

The core of this product liability action concerned allegations of a defectively manufactured chair, which failed and collapsed, resulting in injuries to Plaintiff William Geraczynski in the course of his employment with Defendant Amtrak. In addition to bringing a negligence claim against Amtrak pursuant to the Federal Employers' Liability Act, Geraczynski a New Jersey resident, also sought to hold various companies liable under the New Jersey Product Liability Act, based on their commercial involvement with the allegedly defective chair. Those Defendants are as follows: SAFCO Products Company ("SAFCO") and its parent company Liberty Diversified International (collectively "SAFCO"); and Staples, Inc. and its predecessor company Corporate Express (collectively "Staples"). The background facts out of which this litigation arose have been set forth in this Court's November 1, 2013 Opinion, issued in connection with motions for summary judgment with respect to Plaintiff's product liability claims.

Plaintiff settled his claims against all Defendants, with the product manufacturer, Oasyschair, bearing full responsibility for the settlement. Left unresolved were Defendants' cross-claims against each other for indemnification. Various motions were filed, which the Court held in abeyance at the request of the parties, while they endeavored to mediate their dispute. These efforts were only partially successfully. Amtrak's motion, concerning its cross-claim against Staples for contractual indemnification, is now moot, as its settlement with Staples has extinguished that claim. The Court now proceeds to rule on the remaining motions. They are: (1) Staples' motion for summary judgment on its cross-claims against SAFCO; (2) SAFCO's motion for summary judgment on its cross-claims against Oasyschair; (3) Third–Party Defendant Columbia Casualty Co.'s ("Columbia") motion to dismiss SAFCO's third-party claim for a declaration of insurance coverage; and (4) SAFCO's motion for summary judgment on its declaratory judgment claim for coverage.[1]

---

[1]   Summary judgment is appropriate under Federal Rule of Civil Procedure 56(a) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Case 1:19-md-02875-RMB-SAK    Document 600-2    Filed 10/16/20    Page 20 of 65
PageID: 13381
Geraczynski v. National R.R. Passenger Corp., Not Reported in F.Supp.3d (2015)
2015 WL 4623466

## II. DISCUSSION

### A. Staples' Indemnification Cross–Claim Against SAFCO

Staples seeks contractual indemnification from SAFCO for the losses incurred in defending against Plaintiffs' claims as well as losses associated with Amtrak's cross-claim for contractual indemnification. Staples, seller of the allegedly defective chair to ultimate consumer Amtrak, obtained the product from distributor SAFCO. At the time of the wholesale purchase transaction involving the subject chair, Staples and SAFCO were parties to a Vendor Agreement, which applied to all furniture products purchased by Staples from SAFCO from January 1, 2005 to December 31, 2011. The Vendor Agreement contains an indemnification provision, which provides as follows:

**\*2** Vendor [SAFCO] agrees, at Vendor's expense, to promptly indemnify and hold Staples harmless against any and all third party claims, actions, proceedings or investigations (each a "Claim") arising from an actual or alleged breach of any representations, warranties or covenants made by Vendor under this Vendor Agreement. (Spencer Aff., Ex. A: Vendor Agreement, ¶ 19.) Under the Vendor Agreement, SAFCO "represents and warrants to Staples that: (a) all Product is free from defects...." (*Id.*, ¶ 15.)

Amtrak's cross-claims against Staples fall squarely within the Vendor Agreement's obligation on SAFCO to indemnify Staples. There is no dispute that Amtrak is a third party with respect to the Vendor Agreement. Amtrak's cross-claims against Staples asserted that, under its own contract with Staples, Staples was obligated to indemnify it for medical expenses associated with the injuries Plaintiff sustained in the collapse of the allegedly defective chair and for the legal expenses incurred in defending Plaintiff's negligence claims related to the chair failure. Amtrak's cross-claims against Staples were based on Staples's contractual obligation (1) to provide it with products that were "free from defects in design, material and workmanship" and (2) to hold Amtrak harmless from any claims, losses or expenses incurred as a result of Staples' breach of that warranty and/or as result of injuries directly or indirectly caused by products supplied by Staples. In the Vendor Agreement governing the relationship between SAFCO and Staples, SAFCO expressly warranted to Staples that the product was "free from defects" and undertook the obligation to indemnify Staples against claims arising from breach of that representation. Indeed, the warranty made by Staples in the contract covering the sale of the chair to Amtrak essentially mirrors the warranty made by SAFCO in the Vendor Agreement covering SAFCO's sale of the chair to Staples.

SAFCO does not controvert or dispute these material facts concerning the nature of the claims against Staples or the scope of the indemnification provision in the Vendor Agreement. Instead, it attempts to re-cast the dispute as a choice of law issue and in that way avoid enforcement of the Vendor Agreement's indemnification obligation. SAFCO argues that the contractual indemnification claim made by Staples conflicts with the statutory scheme of the New Jersey Product Liability Act, which imposes liability on the product manufacturer, in this case, named party Oasyschair. SAFCO stresses that, as the product distributor, it is an innocent party under the Product Liability Act and should not bear the costs and fees sought by another participant in the product distribution chain, particularly where the indemnity claim, SAFCO argues, has arisen from indemnitee Staples' independent fault under its own agreement with Amtrak. Staples's indemnity claim, however, arises from the alleged breach of an express warranty by SAFCO in the Vendor Agreement, and SAFCO cites no authority to support its argument that the New Jersey Product Liability Act precludes agreements between parties in the chain of distribution to allocate responsibility for losses stemming from product defect. *Cf. Promaulayko v. Johns Manville Sales Corp.,* 116 N.J. 505, 515, 562 A.2d 202 (1989) (holding that while, as a general rule, a party higher up the chain of product distribution should indemnify a party lower in the chain, "parties in a distributive chain may contract for a different allocation of the risk of loss."). SAFCO also invokes the principle that "an indemnitee who has defended against allegations of its independent fault may not recover its defense costs." *Mantilla v. NC Mall Assoc.,* 167 N.J. 262, 272, 770 A.2d 1144 (2001). The argument fails, however, because that rule is inapposite to the facts of this case. As the Court has noted, the warranties made by Staples to Amtrak concerning the subject product are essentially the same as those it received from SAFCO about the product SAFCO provided.

**\*3** There is no genuine issue of material fact concerning SAFCO's obligation to indemnify Staples for losses incurred in connection with Amtrak's cross-claims, and thus summary judgment is warranted as to this portion of the indemnification claim against SAFCO.

2015 WL 4623466

Insofar as Staples seeks indemnification against Plaintiffs' claims, summary judgment is also warranted. Plaintiffs' claims sought relief for injuries allegedly caused by the defectively manufactured chair provided by distributor SAFCO to Staples. They therefore implicate SAFCO's warranty in the Vendor's Agreement that the product was not defective. Indemnity is required not only as a matter of contract but also as a matter of common law, which requires a product distributor to indemnify other distributors and sellers further down the chain of distribution, with the ultimate responsibility for losses caused by product defect resting at the top of the chain with the manufacturer. This latter point regarding common law indemnity will be discussed in the section below.

**B. SAFCO's Indemnification Cross–Claim Against Oasyschair**

In is uncontroverted that SAFCO has not adduced evidence of a written contract requiring Oasyschair to indemnify it for losses arising from claims of a defective product. New Jersey courts, however, recognize the common-law right of a downstream distributor or seller to indemnification from an upstream participant in the chain of product distribution. *Promaulayko v. Johns Manville Sales Corp.,* 116 N.J. 505, 513–15, 562 A.2d 202 (1989). In this lawsuit, Plaintiff's sole theory of product defect maintained that the subject chair had been defectively manufactured. (See November 1, 2013 Op. at 2–3, 9.) SAFCO is a downstream distributor in relation to product manufacturer Oasyschair and as such is entitled to indemnification from Oasyschair on all claims against SAFCO in this lawsuit.

Oasyschair argues that the general rule of indemnity as set forth by the New Jersey Supreme Court in *Promaulayko* does not apply in this situation because Plaintiffs, in their Complaint, had also claimed that SAFCO breached an express warranty. This claim, Oasyschair contends, transforms SAFCO's responsibility from one of passive wrongdoing to one of independent, active fault, thus invalidating SAFCO's claim of entitlement to indemnity. This argument is unavailing. Oasyschair has come forward with no evidence that SAFCO was at fault on any basis other than its role as a conduit in the distribution of the chair indisputably manufactured by Oasyschair. Indeed, the Court had noted in its Opinion granting summary judgment in favor of SAFCO on Plaintiffs' Product Liability Act claims that it refrained from granting summary judgment on the breach of express warranty claim because the request was raised in a reply brief,

not because of proof indicating that Plaintiff's claim against SAFCO might be meritorious.

Here, on the cross-motions brought by SAFCO and Oasyschair regarding the latter's duty of indemnification, the record is clear that the claims and cross-claims against SAFCO stem from its distribution of a product placed in the stream of commerce by Oasyschair with an alleged manufacturing defect. Accordingly, SAFCO's motion for summary judgment on its cross-claim for indemnification from Oasyschair will be granted, and Oasyschair's cross-motion on the claim will be denied.

**C. Insurance Coverage Dispute Between SAFCO and Columbia**

**\*4** Defendant SAFCO filed a Third–Party Complaint against Columbia, asserting a single claim for insurance coverage. SAFCO claims it is entitled to coverage as an additional insured under a commercial general liability policy issued by Columbia to Oasyschair. Columbia has moved to dismiss that claim pursuant to Rule 12(b)(6), arguing that no relief can be granted because the Third–Party Complaint has failed to set forth that SAFCO meets a condition precedent to coverage under the policy's additional insured endorsement. SAFCO opposes the motion, and has filed its own motion seeking summary judgment on the claim, asserting that there are no genuine issues of fact that it is entitled to coverage.

The policy at issue contains an endorsement which modifies the policy in that it provides coverage to vendors for losses relating to "all products insured under this policy." (Lem Cert., Ex. D.) The endorsement does not name any particular vendor but rather identifies an additional insured according to the following terms: "as required by written contract or agreement executed prior to the occurrence." (*Id.*) Columbia has argued that SAFCO cannot meet the requirements for coverage because it has failed to produce a contract between SAFCO and Oasyschair which required Oasyschair to provide insurance coverage and/or name it as an additional insured in any applicable commercial general liability policy.

Columbia's motion to dismiss the claim must be denied. A claim survives a Rule 12(b)(6) motion if the complaint contains "sufficient factual allegations, accepted as true, to 'state a claim for relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly,* 550 U.S. at 556.) The declaratory judgment claim asserted by SAFCO, asserting its entitlement to insurance coverage, alleges a loss falling within the Oasyschair policy and further alleges that SAFCO and its parent company Liberty are additional insureds under the policy per the vendor's endorsement. It also avers that "prior to the date of the incident that is the subject matter of this litigation, SAFCO/LIBERTY entered into an agreement with Oasyschair as a downstream distributor of the chair manufactured by Oasyschair." (Am. Third Party Compl., ¶ 8.) The Third Party Complaint contains a factual allegation, which, taken as true, establishes that SAFCO and Liberty meet the endorsement's terms for coverage as additional insureds. These allegations suffice to state a plausible claim for relief, that is, a declaration that SAFCO is entitled to coverage. Columbia's argument regarding the absence of a contract or agreement in the record goes to SAFCO's ability, or lack thereof, to prove the allegation. Challenges to a claim for lack of evidentiary support fall within the purview of summary judgment under Federal Rule of Civil Procedure 56(a). The Court will accordingly proceed to consider SAFCO's motion for summary judgment on the claim.

**\*5** SAFCO concedes that it has not produced a written contract in which Oasyschair was required to secure insurance coverage for SAFCO for losses and claims related to product defects. It nevertheless argues that it meets the conditions of the vendor's endorsement based on the existence of an agreement, evidenced by the course of dealing between SAFCO and Oasyschair, to name SAFCO as additional insured. Before reaching the question of whether SAFCO has proffered sufficient evidence to demonstrate that a reasonable juror would conclude that there is such an agreement, the Court must address the issue of whether, under the terms of the endorsement, an unwritten agreement can satisfy the requirement for additional insured status. This task is one of contract interpretation.

Columbia submits that the Court should apply the law of the state of New Jersey with regard to matters of insurance contracts, taking the position that New Jersey has the most significant relationship to this case. SAFCO does not disagree, and in fact supports its arguments for summary judgment on the insurance coverage claim with New Jersey caselaw. As the parties agree on the application of New Jersey state law to their insurance coverage dispute, and the

substantive law of this state would apply according to the *Erie* doctrine, the Court will examine the claim accordingly.

Facts regarding the applicable insurance policy and the endorsement at issue are not in dispute, and as such the interpretation of vendor's endorsement is a question for the court to decide as a matter of law. *Am Cas. Co. of Reading, Pa. v. Continisio,* 819 F.Supp. 385, 396 (D.N.J.1993) (citing *Weedo v. Stone–E–Brick, Inc.,* 155 N.J.Super. 474, 479, 382 A.2d 1241 (App.Div.1977), *rev'd on other grounds,* 81 N.J. 233, 405 A.2d 788 (1979)). In construing an insurance contract, a court must "search broadly for the probable common intent of the parties to find a reasonable meaning in keeping with the express general purposes thereof." *Bello v. Hurley Limousines, Inc.,* 249 N.J.Super. 31, 40, 591 A.2d 1356 (App.Div.1991). "If the terms of the contract are susceptible to at least two reasonable alternative interpretations, an ambiguity exists." *Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am.,* 195 N.J. 231, 238, 948 A.2d 1285 (2008). A court may look to extrinsic evidence to resolve the ambiguity. *Id.* It must construe the ambiguous terms so as to apply the interpretation which sustains coverage. *Mazzilli v. Accident & Casualty Ins. Co.,* 35 N.J. 1, 7, 170 A.2d 800 (1961); *see also Sparks v. St. Paul Ins. Co.,* 100 N.J. 325, 336, 495 A.2d 406 (1985) (holding that ambiguities in an insurance contract should be resolved against the insurance company). However, where the contract language is unambiguous, a court should enforce an insurance contract in accordance with its plain language. *Chubb,* 195 N.J. at 238, 948 A.2d 1285. "Indeed, in the absence of an ambiguity, a court should not 'engage in a strained construction to support the imposition of liability' or write a better policy for the insured than the one purchased." *Id.* (quoting *Progressive Cas. Ins. Co. v. Hurley,* 166 N.J. 260, 272–73, 765 A.2d 195 (2001)).

**\*6** The vendor's endorsement at issue here states that, for the endorsement to apply, there must be a "written contract or agreement executed" which requires policyholder Oasyschair to name the vendor in question as an additional insured. SAFCO contends that the endorsement accepts either a "written contract" or "agreement" as sufficient to trigger coverage, and thus the Court should consider the parties' course of dealing to determine whether such an agreement was in place. At the very least, according to SAFCO, the endorsement contains an ambiguity as to whether an agreement must be in writing, and the court should resolve that ambiguity in favor of the insured.

Geraczynski v. National R.R. Passenger Corp., Not Reported in F.Supp.3d (2015)

2015 WL 4623466

SAFCO's argument implies that the word "written" qualifies only the word "contract" but not "agreement," as a different interpretation would render use of the generally interchangeable terms redundant. Citing the Uniform Commercial Code's definition of the word "agreement," SAFCO notes that the terms can be distinct. The UCC, it points out, defines the term as follows: " 'Agreement,' as distinguished from contract, means the bargain of the parties in fact, as found in their language or inferred from other circumstances, including course of performance, course of dealing, or usage of trade." *N.J.S.A.* 12A:1–201(3).

The flaw in SAFCO's argument, however, is that the vendor's endorsement also uses the term "executed" to describe the kind of "written contract or agreement" required to secure additional insured status under the Oasyschair policy with Columbia. The pertinent definitions of "execute" in Black's Law Dictionary state that the term means "to perform or complete (a contract or duty)" or "to make (a legal document) valid by signing; to bring (a legal document) into its final, legally enforceable form." *Black's Law Dictionary* (10th ed.2014). The former meaning would have at best a strained application to the endorsement language, as an agreement between policyholder Oasyschair and any vendor to be named as an additional insured would require no performance, beyond the mere meeting of the minds between the parties that the vendor would, in fact, be covered under the Oasyschair insurance policy. The latter meaning of "execute," signifying the act of formalizing the agreement by signing, is the only one that makes sense in the context of the insurance contract and vendor's endorsement. Thus, contrary to SAFCO's argument, the endorsement language is not susceptible to alternative reasonable meanings, and thus does not call for the Court to consider extraneous evidence to aid in deciphering it. It clearly provides that coverage will be provided to an additional insured where there has been a written or signed manifestation of a commitment by Oasyschair to include the vendor in the policy.

SAFCO bears the burden of proof on its claim against Columbia for insurance coverage, but it has not come forward with a written contract or signed agreement to establish that it is an additional insured. On this record, the Court cannot conclude that no reasonable trier of fact could find in Columbia's favor. In other words, SAFCO has failed to demonstrate that it is entitled to a declaration of insurance coverage as a matter of law.

**\*7** The Court further concludes that even if it were to find the language of the vendor's endorsement ambiguous, and construe it in SAFCO's favor to mean that an unwritten agreement for additional insured coverage would suffice, SAFCO would not have established that summary judgment on the insurance coverage claim is warranted. SAFCO argues that the course of dealing between Oasyschair and SAFCO establishes that an agreement exists but fails to provide evidence to establish such an implied contract-in-fact. The risk manager for Liberty Diversified, SAFCO's parent company, states in his certification that "on many prior occasions (10 to 15), Oasyschair and/or its carrier, would always step forward and defend and indemnify SAFCO [on product claims.]" (Towne Cert. ¶ 11.) This assertion that "Oasychair and/or its carrier" has indemnified SAFCO in the past does not necessarily indicate that Oasyschair has routinely named SAFCO as an additional insured or that Columbia has routinely provided coverage to SAFCO on product claims pursuant to the vendor's endorsement. SAFCO also relies on the Certificate of Liability Insurance issued by Oasyschair's insurance broker, which pertains to the Columbia commercial general liability policy held by Oasyschair. The certificate states that "SAFCO Products Company is named as an additional insured per broad form vendors endorsement where required by writ [sic] contract or agreement." (SAFCO Mot., Ex. B.) This may constitute relevant evidence on the insurance coverage claim but does not establish SAFCO's entitlement to judgment on the claim as a matter of law. The representation made in the certificate by and large parrots the language of the vendor's endorsement, and as discussed, SAFCO has failed to establish an agreement requiring that SAFCO be named as an additional insured. Moreover, the certificate does not amend or enlarge the coverage provided by the Oasyschair commercial general liability policy issued by Columbia. In fact, it expressly cautions as follows:

> This certificate is issued as a matter of information only and confers no rights upon the certificate holder. This certificate does not affirmatively amend, extend or alter the coverage afforded by the policies below. This certificate of insurance does not constitute a contract between the issuing insurer(s), authorized

representative or producer and the certificate holder.

(SAFCO Mot., Ex. B.)

While SAFCO has failed to satisfy the burden for summary judgment on its claim against Columbia, its motion has placed before the Court those parts of the record pertinent to the claim. Upon searching the record, the Court concludes that no reasonable juror could find in SAFCO's favor on the insurance coverage claim, making summary judgment appropriate in favor of Columbia pursuant to Rule 56(f)(1). While notice of a court's intent to grant summary judgment pursuant to this rule is typically required, an exception to this rule applies when there is a fully developed record, a lack of prejudice to the parties, and a decision on a purely legal issue. *Gibson v. Mayor & Council of City of Wilmington,* 355 F.3d 215, 223–24 (3d Cir.2004). Moreover, the Third Circuit has held a party may be deemed to be on notice of a *sua sponte* summary judgment ruling when "the targeted party had reason to believe the court might reach the issue and received a fair opportunity to put its best foot forward." *Id.* (affirming district court's grant of summary judgment *against* a party that brought a motion for summary judgment, without first giving notice to that party); *see also Zimmerlink v. Zapotsky,* 539 F. App'x 45, 49 (3d Cir.2013) (holding same and quoting *Gibson).* Here, SAFCO has put the merits of the insurance coverage claim squarely before the Court on its motion for summary judgment on a claim on which it bears the burden of proof, and in so doing, has had the opportunity to present all evidence and arguments supporting its claim, that is, "to put its best foot forward." It has had, consistent with the Third Circuit's guidance in *Gibson* and *Zimmerlink,*

sufficient notice for this Court to exercise its authority under Rule 56(f)(1) .[2]

[2]    The Court notes that, in addition, the circumstances presented justify an exception to the notice requirement. For the reasons discussed, there is no surprise or unfairness to SAFCO. Clearly, with discovery long completed, the record is fully developed, and the threshold issue on the insurance coverage claim concerns interpretation of the vendor's endorsement, a purely legal question of contract construction.

**8**  Accordingly, SAFCO's motion for summary judgment on the third-party claim against Columbia must be denied, and the Court will grant Columbia summary judgment SAFCO's insurance coverage claim pursuant to Rule 56(f)(1).

## III. CONCLUSION

For the reasons discussed, the pending motions will be adjudicated as follows: Staples' and SAFCO/Liberty's motions for summary judgment on the indemnification cross-claims will be granted, and Oasyschair's cross-motion will be denied. Columbia's motion to dismiss the Third–Party Complaint filed by SAFCO will be denied. SAFCO's motion for summary judgment on its Third–Party Complaint against Columbia will be denied, and summary judgment in favor of Columbia on the insurance coverage claim brought by SAFCO will be granted. Amtrak's motion for summary judgment on its cross-claim against Staples will be dismissed as moot. An appropriate order will be filed.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 4623466

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 4

2010 WL 610778
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial
staff and not assigned editorial enhancements.**

United States District Court,
W.D. Texas,
San Antonio Division.

George GONZALEZ, Plaintiff,
v.
ESTES, INC. and Whitmire Microgen
Research Laboratories, Inc., Defendants.

Civil Action No. SA-10-CA-0038-XR.
|
Feb. 19, 2010.

**Attorneys and Law Firms**

Thomas C. Hall, Hall & Bates, LLP, San Antonio, TX, for
Plaintiff.

Richard J. Reynolds, III, Thornton, Summers, Biechlin,
Dunham & Brown, L.C., San Antonio, TX, Kevin Thomas
Jacobs, Baker Botts, Richard L. Josephson, Baker Botts, LLP,
Houston, TX, for Defendant.

**ORDER ON MOTION TO REMAND**

XAVIER RODRIGUEZ, District Judge.

 *1  On this date, the Court considered Plaintiff George
Gonzalez's Motion to Remand (docket no. 3), and
Defendant Whitmire's Response in Opposition. After careful
consideration, the Court will grant the motion to remand.

**I. Background**

Plaintiff filed his original petition in state court on March
5, 2009, against Defendant Estes, Inc., alleging that he was
injured in the course of his employment by the use of
chemicals supplied by Estes. Estes was served through its
registered agent on March 11, 2009, and filed an answer on
April 15, 2009.

In August 2009, Plaintiff filed an amended petition,
which added claims against Defendant Whitmire Micro-Gen
Research Laboratories ("Whitmire"). The amended petition
alleges that Plaintiff was harmed by the use of chemicals
supplied by Estes and manufactured by Whitmire. Defendant
Estes filed a First Amended Original Answer on August
14, 2009, asserting a general denial and, in the alternative,
"specifically plead[ing] that as a non-manufacturing seller, it
is entitled to the protections and exemptions from liability
prescribed in TEX. CIV. PRAC. & REM. CODE, Section
82.003." Whitmire also filed its answer.

On January 8, 2010, Estes filed a motion for summary
judgment on Plaintiff's claims against it, asserting immunity
under Texas Civil Practice & Remedies Code § 82.003. The
brief motion states only:

> As is conclusively demonstrated by
> the affidavit of the President of
> this Defendant, a copy of which
> is attached hereto and incorporated
> herein for all purposes, this Defendant
> is a non-manufacturing seller. As
> such, this Defendant has and can
> have no liability to Plaintiff under
> the terms of Tex.Civ.Prac.Rem.Code
> § 82.003. No exceptions to the
> protections afforded by that chapter
> and section of such chapter exist and,
> therefore, this Defendant is entitled to
> summary judgment on all issues in this
> cause as against Plaintiff as a non-
> manufacturing seller.

The affidavit of Tim Akins, President of Estes, states that
Plaintiff alleges exposure to two pesticide products, which
Estes, as a distributor, did sell to Plaintiff's employer,
Worldwide Pest Control. Akins states that Estes did not
manufacture the products or participate in their design. He
states that the products were manufactured by Whitmire,
Estes purchased them from Whitmire and Paragon, an
upstream distributor, and then sold or distributed them to
Worldwide Pest Control. Akins states Estes did not label or
package the products or participate in the design of the label or
packaging, did not modify or alter the products, did not install
or participate in installation of the products, or make any
representations about the product to Plaintiff or Worldwide.

Case 1:19-md-02875-RMB-SAK    Document 600-2    Filed 10/16/20    Page 27 of 65
PageID: 13388
Gonzalez v. Estes, Inc., Not Reported in F.Supp.2d (2010)
2010 WL 610778

Akins states Estes was unaware of any defect. Estes also filed a cross-claim for indemnification against Whitmire, and moved for summary judgment on that claim, using the same affidavit as evidence.

On January 19, 2010, Defendant Whitmire removed, asserting that this Court has diversity jurisdiction because Defendant Estes was improperly joined. Defendant asserted that removal was proper because it was effected within one year of suit being filed and within thirty days of Estes's motion for summary judgment, which provided the affidavit of Tim Akins (who had not yet been deposed). On January 25, Plaintiff moved to remand, arguing that (1) the amount in controversy does not exceed $75,000; (2) Defendant Estes was not improperly joined; and (3) Whitmire's removal is untimely.

## II. Applicable Law

**\*2** Under 28 U.S.C. § 1441(a), any state court civil action over which the federal courts would have original jurisdiction may be removed from state to federal court. District courts have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states. 28 U.S.C. § 1332(a)(1). In this case, Plaintiff Gonzalez and Defendant Estes are both citizens of Texas. Thus, Estes's presence in this action negates the existence of diversity jurisdiction and would also preclude removal based on diversity under the forum-defendant rule. *See* 28 U.S.C. § 1441(b) (when original federal jurisdiction is based on diversity, a defendant may remove only "if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought"). Defendant Whitmire, however, argues that removal is proper because Estes is improperly joined. If Estes is improperly joined, its presence is disregarded.

To demonstrate improper joinder of a resident defendant, the removing defendant must demonstrate either: "(1) actual fraud in the pleading of jurisdictional facts, or (2) inability of the plaintiff to establish a cause of action against the non-diverse party in state court." *Crockett v. RJ Reynolds Tobacco Co.,* 436 F.3d 529, 532 (5th Cir.2006). Whitmire relies on the second prong in this case, and thus the inquiry is whether "there is no reasonable basis for the district court to predict that the plaintiff might be able to recover against an in-state defendant." *Smallwood v. Ill. Cent. R.R. Co.,* 385 F.3d 568, 573 (5th Cir.2004) (en banc). The burden of proof is on the removing party. *Guillory v. PPG Indus., Inc.,* 434 F.3d 303, 308 (5th Cir.2005). In deciding whether a party was improperly joined, this Court must resolve all contested factual issues and ambiguities of state law in favor of the plaintiff. *Id.* Further, the Fifth Circuit has held that the Court may resolve the issue in one of two ways:

> The court may conduct a Rule 12(b)(6)-type analysis, looking initially at the allegations of the complaint to determine whether the complaint states a claim under state law against the in-state defendant. Ordinarily, if a plaintiff can survive a Rule 12(b)(6) challenge, there is no improper joinder. That said, there are cases, hopefully few in number, in which a plaintiff has stated a claim, but has misstated or omitted discrete facts that would determine the propriety of joinder. In such cases, the district court may, in its discretion, pierce the pleadings and conduct a summary inquiry.

*Smallwood,* 385 F.3d at 573-74. Because "the effect of removal is to deprive the state court of an action properly before it, removal raises significant federalism concerns," and thus any doubt about the propriety of removal must be resolved in favor of remand. *Carpenter v. Wichita Falls Indep. Sch. Dist.,* 44 F.3d 362, 365-66 (5th Cir.1995).

**\*3** The timeliness of removal in a civil case is governed by section 1446(b), which provides:

The notice of removal of a civil action or proceeding shall be filed within thirty days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based, or within thirty days after the service of summons upon the defendant if such initial pleading has then been filed in court and is not required to be served on the defendant, whichever period is shorter.

If the case stated by the initial pleading is not removable, a notice of removal may be filed within thirty days after

receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable, except that a case may not be removed on the basis of jurisdiction conferred by section 1332 of this title more than 1 year after commencement of the action.

28 U.S.C. § 1446(b). It is clear that the initial pleading was not removable because it involved only Plaintiff and Estes, both citizens of Texas. See Harden v. Field Mem'l Comm. Hosp., 265 Fed. App'x 405 (5th Cir.2008) ( "Here, it is undisputed that the initial pleading-the first complaint-was not removable because it did not include Quorum as a defendant."). Thus, removal of this case is governed by the second paragraph.

The information supporting removal in a copy of an amended pleading, motion, order or other paper must be "unequivocally clear and certain" to start the time limit running for a notice of removal under the second paragraph of section 1446(b). Bosky v. Kroger Tex., 288 F.3d 208, 211 (5th Cir.2002). [1] In addition, the thirty-day time period begins to run from the time the improper joinder may first be ascertained. Jernigan v. Ashland Oil Inc., 989 F.2d 812, 815 (5th Cir.1993) (diverse defendants were "entitled to remove the case within thirty days following their discovery of the improper joinder," which was when in-state defendant filed its answer); Frisby v. Lumbermens Mut. Cas. Co., Civ. A. No. H-07-015, 2007 WL 2300331 (S.D.Tex. Feb.20, 2007) ("[T]he Fifth Circuit has been quite clear that in cases of improper joinder, the 30 day time period begins to run from the time the improper joinder is discovered."); Delaney v. Viking Freight, Inc., 41 F.Supp.2d 672, 674 (E.D.Tex.1999) ("In the fraudulent joinder context, a defendant has 30 days from the date that the fraudulent joinder could first be ascertained in which to file a notice of removal."); see also Baden v. Nabisco, 224 F.3d 382, 390 n. 13 (5th Cir.2000) (noting that defendant's answer in Jernigan was a pleading or other paper from which it could first be ascertained that in-state defendant was improperly joined and that case was thus removable).

[1]    Although the Fifth Circuit has held that an amended pleading, motion, order, or other paper must be the result of a voluntary act of the plaintiff to permit removal under § 1446(b), improper joinder is an exception to that requirement. Crockett v. RJ Reynolds Tobacco Co., 436 F.3d 529, 531-33 (5th Cir.2006). Accordingly, this Court respectfully disagrees with the decisions in Case v. Phillips 66 Co., Civ. A. No. 1:08-CV-985, 2008 WL 5101333 (S.D.Miss. Nov.26, 2008) and Joiner v. Mississippi AG Co., Civ. A. No. 3:06-CV-337, 2006 WL 2884523 (Oct. 10, 2006), in which the courts held that the in-state defendant's motion for summary judgment could not serve as a motion or other paper for purposes of § 1446(b) because it was not a voluntary act of the plaintiff, even though removal was based on improper joinder.

### III. Analysis

Defendant Whitmire contends that it timely removed this case because it removed within thirty days of Estes's filing the motion for summary judgment contending that it is immune from liability under Texas Civil Practice & Remedies Code § 82.003. Chapter 82 of the Texas Civil Practice and Remedies Code was added by the Legislature to protect innocent sellers from products liability suits unless they had significantly and intentionally participated in the design or production of the product. Manchester Tank & Equip. Co. v. Engineered Controls Int'l, --- S.W.3d ----, ---- (Tex.App.-Waco 2009, Rule 53.7(f) motion granted). Section 82.003 sets out seven specific situations where a non-manufacturing seller of a product may be independently liable to a claimant for harm caused by that product. FLS Miljo, Inc. v. Munters Corp., --- F.Supp.2d ----, ---- (N.D.Tex.2010). The plaintiff has the burden of proving one of the exceptions to nonliability. In re Atlas Tubular, L.P., 296 S.W.3d 363, 365 (Tex.App.-Corpus Christi 2009, orig. proceeding). Section 82.003 provides:

**\*4** 82.003. Liability of Nonmanufacturing Sellers

(a) A seller that did not manufacture a product is not liable for harm caused to the claimant by that product unless the claimant proves:

(1) that the seller participated in the design of the product;

(2) that the seller altered or modified the product and the claimant's harm resulted from that alteration or modification;

(3) that the seller installed the product, or had the product installed, on another product and the claimant's harm resulted from the product's installation onto the assembled product;

(4) that:

(A) the seller exercised substantial control over the content of a warning or instruction that accompanied the product;

the warning or instruction was inadequate; and

the claimant's harm resulted from the inadequacy of the warning or instruction;

(5) that:

(A) the seller made an express factual representation about an aspect of the product;

(B) the representation was incorrect;

(C) the claimant relied on the representation in obtaining or using the product; and

(D) if the aspect of the product had been as represented, the claimant would not have been harmed by the product or would not have suffered the same degree of harm;

(6) that:

(A) the seller actually knew of a defect to the product at the time the seller supplied the product; and

(B) the claimant's harm resulted from the defect; or

(7) that the manufacturer of the product is:

(A) insolvent; or

(B) not subject to the jurisdiction of the court.

Whitmire contends that it was not "unequivocally clear and certain" that Estes had been improperly joined until Estes filed the motion for summary judgment addressing all of the aspects of § 82.003. [2]

[2]      It does not appear to be seriously in dispute that section 82.003 precludes liability with regard to Estes. Plaintiff presents no evidence indicating that he has a reasonable probability of recovery against Estes. Rather, he makes only the erroneous assertion that "an innocent retailer is properly joined in a products liability cause of action." Plaintiff cites *Norris v. Bombardier Recreational Products*, 2009 WL 94531 (Jan. 12, 2009) for support. However, in *Norris,* the district court concluded that the Plaintiff had adequately pleaded

facts demonstrating an exception to nonliability under 82.003(a)(4) and (6). *Id.* at *5. In this case, Plaintiff has not pleaded any facts invoking an exception to nonliability.

Plaintiff contends that the notice of removal in this case was not timely filed because Whitmire was on notice of Estes's claim under § 82.003 more than thirty days before the removal. Plaintiff points to Estes's amended answer filed August 14, 2009, in which it asserted that it was immune from liability pursuant to § 82.003, and Estes's Responses to Plaintiff's Interrogatories and Requests for Disclosure, which were served on Whitmire on September 21, 2009.

Whitmire states that the bare-bones assertion in the answer was insufficient to trigger the removal clock, and if such a bare-bones assertion were sufficient, defendants would have to remove every time an in-state defendant asserted an affirmative defense or filed a general denial. Whitmire also argues that the responses to the discovery were insufficient to trigger the removal clock because they do not address many of § 82.003's exceptions, [3] including designing and altering of the products, making representations regarding the products, and knowing about alleged defects in the product. Whitmire contends that the disclosure responses, which were unsworn, [4] did not unequivocally or with certainty demonstrate that Estes was entitled to § 82.003 immunity.

[3]      The Court disagrees with this assertion, finding that the discovery responses negated all of the possible exceptions except whether Estes knew of the alleged defect under 82.003(a)(6). (The discovery responses also did not negate 82.003(a)(7), but Whitmire, as the manufacturer, would have known that it did not apply.)

[4]      The Court notes that the Responses to Plaintiff's Interrogatories are sworn.

**\*5** The Court concludes that Whitmire's notice of removal was untimely.

First and most importantly, the Court notes that Plaintiff's pleadings do not allege any specific facts that would invoke an exception to a non-manufacturing seller's immunity. Section 82.003 clearly places the burden of proof upon a plaintiff to establish one of the exceptions to non-liability; it is not an affirmative defense. The amended petition states that the chemicals were supplied by Estes and manufactured by Whitmire, and alleges only generally that "the chemicals in

question were defectively manufactured or marketed." There are no factual allegations that would invoke any exception to nonliability on the part of Estes. The allegations in the amended petition would be insufficient to overcome a motion to dismiss under Rule 12(b)(6). Thus, the Court finds that Whitmire could ascertain the improper joinder when Estes filed its answer and asserted nonliability under § 82.003. Whitmire should have removed within thirty days of Estes's filing its answer.[5]

[5]    The Court is aware that removal procedure should not encourage premature, protective removals. As noted, Whitmire argues that, if the answer here were sufficient to trigger removal, parties would have to remove every time a defendant asserts a general denial or affirmative defense or risk waiving the right to remove. This argument is not well taken on these facts, however, because Plaintiff bears the burden of pleading and proving an exception to non-liability under § 82.003 and Plaintiff's amended petition would not survive a 12(b)(6) motion. The Court bases its remand on that fact, and would reach a different conclusion if Plaintiff's amended petition asserted any facts sufficient to invoke liability on the part of Estes.

Second, even if the answer was insufficient to trigger removal, the discovery responses adequately demonstrated the lack of a reasonable probability of recovery against Estes in light of the pleadings. In the Response to Plaintiff's Requests for Disclosure, Estes stated "it is our contention that as a non-manufacturing seller, we are not liable for any harm alleged to have been caused inasmuch as we did not participate in the design of the product, we did not alter or modify the product, we did not install or have the product installed on another product, and did not exercise any control over the content of a warning or instruction and we did not make any express representation about any aspect of the product which was false." In its responses to Plaintiff's first interrogatory, Estes asserted that it never packaged or installed the products, but purchased them from the manufacturer or an upstream distributor and sold them to Worldwide. In response to interrogatory three, it stated that it was not aware of any

changes in the product, the packaging, the warning, or the instructions for use occurring after the time the products left the hands of Defendant Whitmire, which would negate a finding that Estes made any changes to the product, packaging, warnings, or instructions for use. When asked if it "performed any auxiliary services in relation to the sale or installation of the product," Estes stated that it did not know what "auxiliary services" meant, but referred Plaintiff to its response to interrogatory one for its "role in the distribution of the products." In response to interrogatory number five, Estes stated that it performed no tests or inspections of the product. When asked to describe any warnings given by Estes to the Plaintiff or owner of the product, Estes stated it gave none "other than those included with or affixed to the products by the manufacturer." In response to interrogatory fifteen, Estes stated that it did not cause to be affixed or attached to the product or the package in which the product was sold prior to the alleged occurrence any label, tag, directions, instructions for use, or other writings.

**6** Thus, these discovery responses, coupled with the lack of any pleadings invoking an exception to non-liability in section 82.003, were sufficient for Whitmire to ascertain that there was no reasonable basis to predict that Plaintiff might be able to recover against Estes. Whitmire should have removed, at the latest, within thirty days of receiving these discovery responses.

### Conclusion

The Court finds that Whitmire's notice of removal was not timely filed. Accordingly, the Court GRANTS Plaintiff's Motion to Remand (docket no. 3) and REMANDS this case to state court. Remand is ordered pursuant to 28 U.S.C. § 1447(c).

It is so ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2010 WL 610778

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 5

2006 WL 2349976
Only the Westlaw citation is currently available.
United States District Court, D. North
Dakota, Southwestern Division.

DAKOTA, MISSOURI VALLEY AND
WESTERN RAILROAD INC., Plaintiff,

v.

JMA RAIL PRODUCTS CO., JMA Railroad
Supply Co., and Miba Bearings U.S., LLC, a
foreign limited liability company, Defendants.

No. 1:06–CV–02.
|
Aug. 9, 2006.

**Attorneys and Law Firms**

Jerry W. Evenson, Zuger Kirmis & Smith, Bismarck, ND, for
Plaintiff.

David S. Maring, Maring Williams Law Office, PC, Larry
L. Boschee, Tiffany L. Johnson, Pearce & Durick, Bismarck,
ND, Alexander Andrews, Ulmer and Berne LLP Columbus
Office, Columbus, OH, for Defendants.

ORDER GRANTING JMA RAIL PRODUCTS CO. AND
JMA RAILROAD SUPPLY CO.'S MOTION TO DISMISS

DANIEL L. HOVLAND, Chief District Judge.

 **\*1** Before the Court is Defendants' JMA Rail Products Co.,
and JMA Railroad Supply Co.'s, (collectively referred to as
JMA) Motion to Dismiss filed on January 27, 2006. The
motion is opposed by the plaintiff, Dakota, Missouri Valley
and Western Railroad Inc. For the following reasons, the
Defendants' motion is granted.

I. BACKGROUND

The plaintiff originally commenced this action in state court
in the District Court of Burleigh County. On January 19,
2006, Defendant Miba Bearings U.S., LLC (Miba) removed
the action to the United States District Court for the District
of North Dakota. See Docket No. 1. The pleadings establish
that the plaintiff purchased upper rod bearings from JMA
to be installed in locomotive engines and that the upper rod
bearings were manufactured by Miba.

In the complaint, the plaintiff alleged that JMA breached
implied warranties of merchantability and fitness for a
particular purpose. See Docket No. 1–3. The alleged breach
of warranty claims stemmed from the failure of the upper rod
bearings after installation in and operation of two locomotive
engines. See Docket No. 1–3. The plaintiff further alleged that
the failure of the rod bearings resulted in damages including
loss of revenue from the use of the locomotives as well as the
cost of parts and labor to rebuild the locomotive engines. See
Docket No. 1–3.

On January 27, 2006, JMA filed an Affidavit of Seller
Pursuant to Section 28–01.3–04 of the North Dakota Century
Code, which the Court treated as a motion to dismiss pursuant
to the Order Re Caption Correction and Additional Briefing
Schedule dated April 14, 2006. See Docket Nos. 15, 20.

II. STANDARD OF REVIEW

The standard for a district court to employ in ruling on a
motion to dismiss is well-established. *Crumpley–Patterson
v. Trinity Lutheran Hosp.,* 388 F.3d 588, 590 (8th Cir.2004).
"A district court must accept the allegations contained in
the complaint as true, and all reasonable inferences from
the complaint must be drawn in favor of the nonmoving
party." *Id.* (citing *Hishon v. King & Spalding,* 467 U.S. 69, 73
(1984); *Hafley v. Lohman,* 90 F.3d 264, 266 (8th Cir.1996)).
"[D]ismissal is inappropriate 'unless it appears beyond doubt
that the plaintiff can prove no set of facts in support of his
claim which would entitle him to relief.' " *McCormack v.
Citibank, N.A.,* 979 F.2d 643, 646 (8th Cir.1992) (quoting
*Conley v. Gibson,* 355 U.S. 41, 45–46 (1957)). "A motion to
dismiss should be granted 'as a practical matter ... only in the
unusual case in which there is some insuperable bar to relief.'
" *Strand v. Diversified Collection Service, Inc.,* 380 F.3d
316, 317 (8th Cir.2004) (citing *Frey v. Herculaneum,* 44 F.3d
667, 671 (8th Cir.1995) (quoting *Bramlet v. Wilson,* 495 F.2d
714, 716 (8th Cir.1974))). It is clear under the Federal Rules
that it is not necessary to plead every fact with formalistic
particularity. *BJC Health System v. Columbia Gas. Co.,* 348
F.3d 685, 688 (8th Cir.2003). "A pleading which sets forth
a claim for relief ... shall contain a short and plain statement
of the claim showing that the pleader is entitled to relief...."
Fed.R.Civ.P. 8(a).

III. LEGAL DISCUSSION

 **\*2** The motion to dismiss is made pursuant to specific
statutory authorization under Section 28–01.3–04 of the

2006 WL 2349976

North Dakota Century Code. Section 28–01.3–04 provides as follows:

> 1. In any products liability action maintained against a seller of a product who did not manufacture the product, the seller shall upon answering or otherwise pleading file an affidavit certifying the correct identity of the manufacturer of the product allegedly causing the personal injury, death, or damage to property.

> 2. After the plaintiff has filed a complaint against the manufacturer and the manufacturer has or is required to have answered or otherwise pleaded, the court shall order the dismissal of the claim against the certifying seller, unless the plaintiff can show any of the following:

>> a. That the certifying seller exercised some significant control over the design or manufacture of the product, or provided instructions or warnings to the manufacturer relative to the alleged defect in the product which caused the personal injury, death, or damage to property.

>> b. That the certifying seller had actual knowledge of the defect in the product which caused the personal injury, death, or damage to property.

>> c. That the certifying seller created the defect in the product which caused the personal injury, death, or damage to property.

> 3. The plaintiff may at any time prior to the beginning of the trial move to vacate the order of dismissal and reinstate the certifying seller if the plaintiff can show any of the following:

>> a. That the applicable statute of limitation bars a product liability action against the manufacturer of the product allegedly causing the injury, death, or damage.

>> b. That the identity of the manufacturer given to the plaintiff by the certifying defendant was incorrect.

N.D.C.C. § 28–01.3–04 (2005).

Section 28–01.3–04(2) of the North Dakota Century Code provides that the court "shall order the dismissal of the claim against the certifying seller" when the plaintiff has filed a complaint against the manufacturer and the manufacturer has or is required to have answered, unless the plaintiff can show that the seller fits into one of the exceptions set forth in Section 28–01.3–04(2)(a–c). It is undisputed that

JMA is a "seller"[1] and that Miba is a "manufacturer"[2] as defined by Section 28–01.3–01. Further, Miba has answered the complaint, and, as required under Section 28–01.3–04(1), JMA has filed an affidavit certifying the correct identity of the manufacturer. See Docket No. 20. Thus, the requirements of Section 28–01.3–04(2) have been satisfied. As a result, it is clear that the Court shall dismiss the claims against the certifying seller (JMA) unless the plaintiff can show that an exception applies under Section 28–01.3–04(2)(a–c). The burden is on the plaintiff to show that JMA fits into one of the exceptions and is not merely a passive seller.

[1]   The term "seller" is defined as follows:
      "Seller" means any individual or entity, including a manufacturer, wholesaler, distributor, or retailer, who is engaged in the business of selling or leasing any product for resale, use, or consumption. ...
      N.D.C.C. § 28–01.3–01(3).

[2]   The term "manufacturer" is defined as follows:
      "Manufacturer" means a person or entity who designs, assembles, fabricates, produces, constructs, or otherwise prepares a product or a component part of a product prior to the sale of the product to a user or consumer. The term includes any seller of a product who is owned in whole or significant part by the manufacturer or who owns, in whole or significant part, the manufacturer.
      N.D.C.C. § 28–01.3–01(1).

The subcategories of Section 28–01.3–04(2) would prevent dismissal of the claim against the non-manufacturing seller if the plaintiff can show that the seller exercised significant control over the design or manufacture of the product, provided instructions or warnings to the manufacturer concerning the alleged defect, had actual knowledge of the defect, or created the defect. N.D.C.C. Section 28–01.3–04(2)(a–c). The plaintiff has neither alleged, shown, nor attempted to show that JMA satisfied any of these elements. Instead, the plaintiff has based its claims against JMA on breach of warranty grounds and merely alleged that JMA knew of the particular purpose for which the rod bearings were purchased. To support a finding that JMA does not fit within a subcategory of section (2), JMA has filed an affidavit stating that it ordered the upper rod bearings from Miba and that the bearings were shipped from Miba to the plaintiff without coming into the possession or control of JMA. See Docket No. 18, ¶ 2. This is further supported by Miba's admission that JMA ordered bearings from Miba which were shipped directly from Miba to the plaintiff without coming

into possession or control of JMA. See Docket No. 3, ¶ 23, and Docket No. 11, ¶ 2.

**\*3** Based on the complaint and the answers submitted by the parties, and after a careful review of the entire record, the Court finds that JMA was a passive, non-manufacturing seller and that the requirements of Section 28–01.3–04(2) have been satisfied. The Court further finds that JMA is entitled to dismissal with regard to the product liability claims.

### . A. BREACH OF WARRANTY CLAIMS

The question that remains is whether the dismissal language of Section 28–01.3–04(2) encompasses the breach of warranty claims asserted against JMA as a "seller." By its terms, Section 28–01.3–04(2) applies only to a product liability action which is defined as follows:

> "Product liability action" means any action brought against a manufacturer or seller of a product, regardless of the substantive legal theory or theories upon which the action is brought, for or on account of personal injury, death, or property damage caused by or resulting from the manufacture, construction, design, formula, installation, preparation, assembly, testing, packaging, labeling, or sale of any product, or the failure to warn or protect against a danger or hazard in the use, misuse, or unintended use of any product, or the failure to provide proper instructions for the use of any product.

N.D.C.C. § 28–01.3–01(2) (emphasis added).

The North Dakota Products Liability Act does not distinguish between the type of claim that is being brought, but rather is focused on relieving the passive, non-manufacturing seller from liability, "regardless of the substantive legal theory or theories upon which the action is brought." N.D.C.C. § 28–01.3–01(2). Under the plain meaning of the statute, a " 'product liability action' means any action brought against a manufacturer or seller of a product, regardless of the substantive legal theory or theories upon which the action is brought." N.D.C.C. § 28–01.3–01(2). The purpose of Section 28–01.3–04 is to allow for the dismissal of non-manufacturing sellers in cases where they did nothing more than resell a product claimed to be defective, and had no involvement in the design manufacturing, or labeling of the product. To that end, Section 28–01.3–04(2) operates to dismiss the breach of warranty claims asserted by the plaintiff against JMA in this product liability action.

Having carefully reviewed the relevant statutory and case law, the Court finds that a product liability action under Section 28–01.3–01(2) of the North Dakota Century Code includes claims based on breach of warranty. The dismissal language of Section 28–01.3–04(2) includes the dismissal of breach of warranty claims against a non-manufacturing seller who has certified that it meets the requirements of that statutory provision.

### IV. CONCLUSION

The Court expressly finds that the claims or legal theories asserted against JMA in the complaint are entitled to dismissal under Section 28–01.3–04 North Dakota Century Code. Accordingly, the Motion to Dismiss filed by defendants JMA Rail Products Co. and JMA Railroad Supply Co. (Docket No. 20) is GRANTED. The only remaining claims are those asserted by the plaintiff against Miba Bearings U.S ., LLC and the cross-claim of the JMA defendants against Miba. The Clerk of Court is directed to enter judgment accordingly.

**\*4** IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 2349976

---

End of Document                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.    3

# Tab 6

2020 WL 2832566
Only the Westlaw citation is currently available.
**Not for Publication**
United States District Court, D. New Jersey.

ONYEJEKWE, et al., Plaintiffs,

v.

UBER TECHNOLOGIES, INC., et al., Defendants.

Civil Action No. 19-10196 (ES) (MAH)
|
Filed 06/01/2020

**Attorneys and Law Firms**

Sylvia Ifeyinwa Onyejekwe, Onyejekwe & Associates LLP, East Orange, NJ, for Plaintiffs.

Elizabeth Anne Chang, Goldberg Segalla, LLP, Princeton, NJ, for Defendant Uber Technologies, Inc.

Steven J. Wiederhorn, Faust Goetz Schenker & Blee, Livingston, NJ, for Defendant Valentine Almonte Correa.

**OPINION**

Salas, District Judge

**\*1** Plaintiffs Chukwuemeka N. Onyejekwe ("Onyejekwe") and Stephanie Baez ("Baez") (collectively, "Plaintiffs") bring this action against Uber Technologies, Inc. (d/b/a Raiser, LLC) ("Uber") and Valentine Almonte Correa ("Correa") (collectively, "Defendants") for various causes of action in connection with an automobile incident that allegedly injured Plaintiffs. (D.E. No. 4 ("Amended Complaint" or "Am. Compl.")). Before the Court is Uber's motion to dismiss Plaintiffs' claim for punitive damages under Federal Rule of Civil Procedure 12(b)(6) and motion to strike certain allegations in the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(f). (D.E. No. 12). The Court reviewed the parties' submissions in support and in opposition and decided the motion without oral argument. *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). For the reasons stated below, Uber's motion to dismiss is GRANTED, and its motion to strike is DENIED.

**I. Background**

Plaintiffs allege that on January 14, 2019, they requested an Uber to take them, along with their 17-month-old son, home from the son's swimming lesson at a local fitness center. (Am. Compl. ¶ 25). When Correa, the driver, arrived at the Plaintiffs' pickup location, he was engaged in a conversation on his cellphone and was allegedly distracted. (*Id.* ¶¶ 26 & 27). Baez entered the vehicle while Onyejekwe attempted to strap his son in a car seat. (*Id.* ¶ 26). Before the child was secure in the car seat, and before Onyejekwe closed the car door, Correa began to drive and rolled over Onyejekwe's foot with his vehicle. (*Id.* ¶¶ 26 & 27). Plaintiffs requested that Correa reverse his car off of Onyejekwe's foot, which Correa did after about ten seconds. (*Id.* ¶ 27). Correa then "apologized profusely" and proceeded to take Plaintiffs and their son home. (*Id.* ¶ 29). As a result of the incident, Onyejekwe allegedly suffered multiple injuries, including, but not limited to, injuries to both of his feet and his back. (*Id.* ¶¶ 31–34).

Plaintiffs' Amended Complaint raises several causes of action under New Jersey state law including: (i) negligence; (ii) respondeat superior liability; (iii) negligent training; (iv) fraudulent misrepresentation; (v) negligent misrepresentation; (vi) emotional distress; (vii) loss of consortium; and (viii) punitive damages. (*Id.* ¶¶ 37–100).

**II. Legal Standard**

**A. Motion to Dismiss**

To withstand a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although a complaint "does not need detailed factual allegations," the "allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations pleaded must show "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.

**\*2** "When reviewing a motion to dismiss, '[a]ll allegations in the complaint must be accepted as true, and the plaintiff must be given the benefit of every favorable inference to be drawn therefrom.' " *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011) (quoting *Kulwicki v. Dawson*, 969 F.2d 1454, 1462 (3d Cir. 1992)). But the Court is not required to accept

as true "legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Finally, in deciding a Rule 12(b)(6) motion, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

### B. Motion to Strike

Pursuant to Federal Rule of Civil Procedure 12(f), the Court may, upon motion or sua sponte, "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "The purpose of a motion to strike is to simplify the pleadings and save time and expense by excising from a plaintiff's complaint any redundant, immaterial, impertinent, or scandalous matter which will not have any possible bearing on the outcome of the litigation." *Garlanger v. Verbeke*, 223 F.Supp.2d 596, 609 (D.N.J. 2002) (internal quotation marks omitted). However, "[b]ecause of the drastic nature of the remedy, ... motions to strike are usually 'viewed with disfavor' and will generally 'be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues.' " *Id.* (quoting *Tonka Corp. v. Rose Art Indus., Inc.*, 836 F. Supp. 200, 217 (D.N.J. 1993)).

### III. Discussion

### A. Motion to Dismiss

First, Uber moves to dismiss Plaintiffs' punitive damages claim under Federal Rule of Civil Procedure 12(b)(6) for failure to plead the requisite level of misconduct under state law. Punitive damages may be awarded in limited circumstances as proscribed under New Jersey statute. *See* N.J. Stat. Ann. § 2A:15-5.12. The defendant's acts or omissions must have been "actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions." *Id.* The statute defines "actual malice" as "an intentional wrongdoing in the sense of an evil-minded act." *Id.* § 2A:15-5.10. "Wanton and willful disregard" is defined as "a deliberate act or omission with knowledge of a high degree of probability of harm to another and reckless indifference to the consequences of such act or omission." *Id.*

A plaintiff cannot satisfy his burden of proof by "any degree of negligence including gross negligence." *Id.* § 2A:15-5.12; *see also* In re Paulsboro Derailment Cases, 704 F. App'x 78, 88 (3d Cir. 2017) (affirming dismissal of punitive damages claim and noting that if true, the allegations would amount to "negligence or even gross negligence"); *Onyiuke v. Cheap Tickets, Inc.*, 435 F. App'x 137, 139 (3d Cir. 2011) (agreeing with the district court's finding that plaintiff "failed to allege facts sufficient to demonstrate that the [d]efendants acted with the requisite malice or willful disregard to justify [plaintiff's] demand for punitive damages"); *Tafaro v. Six Flags Great Adventure, LLC*, No. 17-5607, 2018 WL 1535289, at *9 (D.N.J. Mar. 29, 2018); *Higgins v. Route 17 Auto., LLC*, No. 11-6240, 2012 WL 3284846, at *3 (D.N.J. Aug. 10, 2012). Rather, to invoke punitive damages, conduct must occur with malice or "with knowledge of a high degree of probability of harm and reckless indifference to the consequences." *Smith v. Whitaker*, 734 A.2d 243, 254 (N.J. 1999) (quoting *Berg v. Reaction Motors Div.*, 181 A.2d 487, 496 (N.J. 1962)); *see also* In re Paulsboro, 704 F. App'x at 87–88 (noting that even at the pleading stage, "[a] generalized allegation of a naked legal conclusion that someone acted 'willfully' or 'maliciously' cannot convert what otherwise is a state-court negligence suit into a federal diversity action for punitive damages").

**\*3** Plaintiffs seemingly attempt to assert a standalone cause of action for punitive damages which is limited to the allegations set forth in paragraphs 92 through 101 [1] in the Amended Complaint because, unlike their other claims, Plaintiffs did not incorporate all preceding allegations under their claim for punitive damages. (*Compare* Am. Compl. ¶¶ 37, 44, 52, 66, 71, 76 & 87, *with* ¶¶ 92–101). As a preliminary matter, however, the Court notes that "[p]unitive damages are a remedy *incidental* to [a] cause of action, not a substantive cause of action in and of themselves." *Hassoun v. Cimmino*, 126 F. Supp. 2d 353, 372 (D.N.J. 2000) (emphasis added); *see also* N.J. Stat. Ann. § 2A:15–5.13(c) (providing that punitive damages may be awarded under New Jersey law only if compensatory damages have been awarded). Accordingly, the Court dismisses Count VIII for punitive damages because Plaintiffs improperly assert their request for punitive damages as a separate cause of action. *See Smith v. Covidien LP*, No. 19-11981, 2019 WL 7374793, at *10 (D.N.J. Dec. 31, 2019) (dismissing plaintiff's punitive damages claim because a standalone cause of action for punitive damages is not cognizable, and disregarding the defendant's argument that plaintiff insufficiently pled conduct to warrant such damages).

[1]     The Court notes that Plaintiffs include two consecutive paragraphs numbered "100" under its claim for punitive damages. The Court will refer to the second allegation numbered "100" as "101" in this Opinion.

Despite Plaintiffs attempt to improperly fashion a standalone claim for punitive damages, the Court finds that the preceding claims and allegations in the Amended Complaint (Am. Compl. ¶¶ 1–91) do not support the inference that Uber —by its own conduct or under the doctrine of respondeat superior—acted maliciously or "with knowledge of a high degree of probability of harm and reckless indifference to the consequences." *See Smith*, 734 A.2d at 254 (quoting *Berg*, 181 A.2d at 496). Instead, Plaintiffs allege conduct that may, if true, amount to negligence or gross negligence.

For example, Plaintiff cannot recover punitive damages for any negligent or even grossly negligent conduct alleged against Uber. *See In re Paulsboro*, 704 F. App'x at 87–88 ("even gross negligence will not suffice to make punitive damages available"); (*see also* Am. Compl. ¶¶ 37–43 (negligence); 44–51 (respondeat superior liability premised on negligence); 52–65 (negligent training); 71–75 (negligent misrepresentation); 76–86 (emotional distress premised on Uber's negligence); & 87–91 (loss of consortium premised on negligence)). To the extent Plaintiffs allege a claim for fraudulent misrepresentation (Am. Compl. ¶¶ 66–70), the Court cannot reasonably infer, based on any of the allegations, that Uber's alleged conduct rises to the level that supports a finding of punitive damages such as malicious, willful or reckless behavior.[2] *See In re Paulsboro*, 704 F. App'x at 87–88; *see also McKenna v. Toll Bros.*, No. 14-6543, 2015 WL 1874236, at *3 (E.D. Pa. Apr. 23, 2015). For the reasons stated above, Uber's motion to dismiss Plaintiffs' claim for punitive damages is granted. Accordingly, Plaintiffs' claim for punitive damages is dismissed against Uber, *without prejudice*.

[2]     In any event, to the extent Plaintiffs seek punitive damages under their claim for fraudulent misrepresentations, the Court notes that this claim is subject to the heightened pleading standard under Federal Rule of Civil Procedure 9(b). *DiMare v. MetLife Ins. Co.*, 369 F. App'x 324, 329 (3d Cir. 2010).

## B. Motion to Strike

To strike a pleading is a "drastic remedy to be resorted to only when required for the purposes of justice." *Tonka Corp.*, 836 F.Supp. at 217. In instances where a party moves to strike allegations, courts will not grant such motions unless the movant establishes that "the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues." *Garlanger*, 223 F.Supp.2d at 609 (quoting *Tonka Corp.*, 836 F.Supp. at 217); *see also Weske v. Samsung Elecs., Am., Inc.*, 934 F. Supp. 2d 698, 706–07 (D.N.J. 2013). "When faced with allegations that could possibly serve to achieve a better understanding of plaintiff's claims or perform any useful purpose in promoting the just disposition of the litigation, courts generally deny such motions to strike." *Del. Health Care, Inc. v. MCD Holding Co.*, 893 F.Supp. 1279, 1292 (D. Del. 1995) (quoting 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1382, at 695–96 (2d ed. 1990)). Accordingly, under Rule 12(f)'s "strict" standard, "only allegations that are *so unrelated* to plaintiffs' claims as to be unworthy of any consideration should be stricken." *Johnson v. Anhorn*, 334 F.Supp.2d 802, 809 (E.D. Pa. 2004) (emphasis added) (internal quotation and citation omitted); *see also Weske*, 934 F. Supp. 2d at 706–07. When the allegations challenged involve factual disputes, a Rule 12(f) motion will be denied because of the inherent "practical difficulty of deciding cases without a factual record." *Tonka Corp.*, 836 F.Supp. at 217. Moreover, "[a] court possesses considerable discretion in disposing of a motion to strike under Rule 12(f)." *Kim v. Baik*, No. 06-3604, 2007 WL 674715, at *5 (D.N.J. Feb. 27, 2007) (quoting *River Road Dev. Corp. v. Carlson Corp.*, No. 89-7037, 1990 WL 69085, at *2 (E.D. Pa. May 23, 1990)).

**\*4** Here, Uber moves to strike over thirty-five paragraphs in the Amended Complaint, which contains 101 total paragraphs. (*See* D.E. No. 12-2 at 19 (requesting that this Court strike paragraphs 4–13, 41–43, 50, 53–65, 67–69 and 93–101 of the Amended Complaint)). Uber proffers three bases to dismiss these allegations, including (i) allegations that relate to and disparage Uber's business model (D.E. No. 12-2 at 13 (citing Am. Compl. ¶¶ 8–13, 50, 53–65, 67–69 & 93–101)); (ii) allegations that reference cellphone statistics and disparage Uber's operations (D.E. No. 12-2 at 14 (citing Am. Compl. ¶¶ 42, 43, 50, 61–64 & 95–101)); and (iii) allegations that are argumentative, speculative, immaterial and redundant in light of Plaintiffs' negligence claims (D.E. No. 12-2 at 16 & 18 (citing Am. Compl. ¶¶ 4–13, 41, 50, 53–65, 67–69, 93–101)).

Uber contends that numerous paragraphs should be stricken from the Amended Complaint because they disparage Uber's business model and operations. (D.E. No. 12-2 at 13 (citing Am. Compl. ¶¶ 8–13, 50, 53–65, 67–69 & 93–101); D.E. No. 12-2 at 14 (citing Am. Compl. ¶¶ 42, 43, 50, 61–64 & 95–101)). However, the Court finds that most of these paragraphs actually relate to the present controversies. Here, Plaintiffs claim that Uber acted negligently by failing to enact safety policies and train its drivers on safety issues such as pick-up and drop-off procedures and cellphone use while driving. (Am. Compl. ¶¶ 52–65 (negligent training claim)). Plaintiffs also assert a claim against Uber under the doctrine of respondeat superior for Correa's conduct in his capacity as an Uber driver. (*Id.* ¶¶ 44–51 (respondeat superior claim)). Thus, paragraphs that relate to or speak of Uber's policies, employment and training processes, or alleged lack thereof, (*id.* ¶¶ 9–13, 50, 53–60, 62–65, 67–69, 93–94 & 97–101) are undoubtedly related to the controversies at hand. *See Garlanger,* 223 F.Supp.2d at 609. Similarly, the allegations concerning a lawsuit about Uber's alleged misrepresentations with respect to its screening of drivers (Am. Compl. ¶¶ 8 & 68) are related to Plaintiffs' misrepresentation claims which generally allege that Uber falsely represented its safety standards to passengers. (*See id.* ¶¶ 66–75 (fraudulent and negligent misrepresentation claims)). Although paragraphs 61, 95 and 96 of the Amended Complaint do not concern Uber specifically,[3] these allegations "serve to achieve a better understanding of [Plaintiffs'] claims," namely, that Uber should consider current developments with respect to cellphone use while driving in its design and implementation of training and safety protocols. *See Del. Health Care, Inc.,* 893 F.Supp. at 1292 (quoting 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1382, at 695–96 (2d ed. 1990)).

[3]     Paragraph 61 alleges that "several studies" have shown "the dangers of distracted driving while talking on a cell phone" and claims that certain states have banned cell phone use while driving, which has reduced accidents. It continues to allege that this "inexpensive safeguard ... is even more paramount when you have a higher duty of care (common carrier) such as transporting another person safely in exchange for money." (*Id.* ¶ 61). Paragraphs 95 and 96 of the Amended Complaint respectively allege that "[t]he National Security Council reports that cellphone use while driving leads to 1.6 million crashes per year" and "as earlier stated, several cities have begun to restrict the use of cellphones while transporting passengers."

For the same reason stated above, the Court finds Uber's argument regarding allegations that relate to cellphone statistics (specifically paragraphs 61, 95, 96 & 97 of the Amended Complaint) unavailing because these allegations help achieve a better understanding of the present claims. *Id.*; (*see* D.E. No. 12-2 at 14–16). Moreover, as stated above, the remaining allegations that Uber categorizes as disparaging to its operations (Am. Compl. ¶¶ 42, 43, 50, 62–64 & 98–101), are related to the Plaintiffs' specific incident and causes of action at issue, including claims for negligence, negligent training, and fraudulent and negligent misrepresentations. *See Garlanger,* 223 F.Supp.2d at 609.

 **\*5**  Finally, Uber argues that various allegations are argumentative, speculative, immaterial and redundant in light of Plaintiffs' claims for negligence. (D.E. No. 12-2 at 16 & 18 (citing Am. Compl. ¶¶ 4–13, 41, 50, 53–65, 67–69, 93–101)). For the reasons previously stated, the Court finds that these allegations pertain to the controversies at issue and help the Court understand the Plaintiffs' claims. In addition, many of these allegations also involve factual disputes that are not ripe for dismissal at this juncture. *See Tonka Corp.,* 836 F.Supp. at 217. Overall, the Court finds that the paragraphs Uber seeks to strike are not "so unrelated to plaintiffs' claims as to be unworthy of any consideration." *See Johnson,* 334 F.Supp.2d at 809 (quoting *Becker v. Chicago Title Ins. Co.,* No. 03-2292, 2004 WL 228672, at \*6 (E.D. Pa. Feb. 4, 2004)); *see also Weske,* 934 F. Supp. 2d at 706–07. Accordingly, Uber's motion to strike is denied.

## IV. Conclusion

For the foregoing reasons, the Court GRANTS Uber's motion to dismiss Count VIII of the Amended Complaint. Accordingly, Plaintiffs' claim for punitive damages against Uber is dismissed *without prejudice*. Further, the Court DENIES Uber's motion to strike paragraphs 4–13, 41–43, 50, 53–65, 67–69 and 93–101 of the Amended Complaint. To the extent Plaintiffs can cure the deficiencies outlined in this Opinion, it may do so in a second amended complaint within 30 days.

An appropriate Order accompanies this Opinion.

## All Citations

Slip Copy, 2020 WL 2832566

**Onyejekwe v. Uber Technologies, Inc., Slip Copy (2020)**

2020 WL 2832566

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 7

2012 WL 3550037
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

Stacy SHERFEY, et al.

v.

JOHNSON & JOHNSON, et al.

Civil Action No. 12–4162.
|
Aug. 17, 2012.

**Attorneys and Law Firms**

Irene M. McLafferty, Joseph L. Messa, Jr., Thomas N. Sweeney, Messa & Associates, PC, Philadelphia, PA, for Plaintiffs.

Melissa A. Graff, Drinker, Biddle & Reath, LLP, Philadelphia, PA, for Defendants.

*MEMORANDUM*

McLAUGHLIN, District Judge.

**\*1** This action was filed in the Court of Common Pleas of Philadelphia County on June 27, 2012 by Stacy Sherfey, as an individual and as administrator of the estate of her son, Tracen, and her husband Neil Sherfey. The Sherfeys are residents of Nevada. They allege that when Stacy Sherfey administered three doses of Infant's Tylenol to Tracen over two days in February, 2009, he experienced acute liver failure and died. Compl. ¶¶ 102–08. They bring products liability claims against Johnson & Johnson ("J & J"); Johnson & Johnson Sales and Logistics Company; McNeil–PPC, Inc. ("McNeil"); a number of their high-level executives; Wal–Mart Stores, Inc., where the plaintiffs allege they purchased the Infants' Tylenol; Inmar, Inc.; Carolina Supply Chain Services, LLC; and Carolina Logistics Services, LLC. The plaintiffs allege that an improper or inadequately publicized recall of medicines by the defendants led them to remain ignorant of risks associated with Infants' Tylenol and caused their son's death.

The defendants removed the action to this Court on July 20, 2012, asserting that complete diversity exists between the plaintiffs and all properly joined defendants. As part of their Notice of Removal, the defendants designated this action as related, under Local Rule 40.1, to two actions before the undersigned, one recently dismissed and one pending: *In re McNeil Consumer Healthcare, et al., Marketing and Sales Practices Litigation,* MDL No. 2190 ("the MDL"), and *Moore v. Johnson & Johnson, et al.,* No. 12–490. As a result of that designation, this action was assigned to the undersigned.

In the MDL, a number of actions were consolidated in this Court on behalf of plaintiffs who had suffered only economic injury as a result of having purchased drugs manufactured at plants with quality control problems and the alleged inadequate recall referred to above. *See In re McNeil,* ––– F.Supp.2d ––––, 2012 WL 2885392, at \*1 (E.D.Pa. July 13, 2012). The *Moore* plaintiffs are Washington residents who purchased "Very Berry" Children's Tylenol at a Costco store in Union Gap, Washington, and have brought a products liability action against a similar set of defendants. *Moore v. Johnson & Johnson,* Civil No. 12–490, Docket No. 1 Ex. A at ¶ 22 (E.D.Pa.).

The plaintiffs moved on July 24, 2012 to strike the defendants' designation and have the case reassigned by the Clerk of Court pursuant to this Court's random assignment system. The Court will grant the motion because this case is not "related" to *Moore* or the MDL under Local Rule 40.1.

I. *The Rule*

Local Rule 40.1 ("Assignment of Court Business") provides:

....

(b)....

(3) Related Cases. At the time of filing any civil action or proceeding, counsel shall indicate on the appropriate form whether the case is related to any other pending or within one (1) year previously terminated action of this court.

A. Civil cases are deemed related when a case filed relates to property included in another suit, or involves the same issue of fact or grows out of the same transaction as another suit ....

**\*2** Newly filed cases marked by counsel as "related" to earlier cases are automatically given to the judge before whom those earlier cases were assigned. The case may be referred to the assignment clerk for reassignment if the judge "is of the opinion that the relationship does not exist." Local Rule 40.1(c)(1).

Case 1:19-md-02875-RMB-SAK   Document 600-2   Filed 10/16/20   Page 43 of 65
PageID: 13404
Sherfey v. Johnson & Johnson, Not Reported in F.Supp.2d (2012)

2012 WL 3550037

II. *Discussion*

The plaintiffs assert that this action "diverge[s] significantly" from *Moore* and the MDL. The defendants argue that (1) there are a number of factual allegations that are identical or nearly identical in both *Moore* and the instant case; (2) both cases ultimately assert the same products liability theories of recovery; (3) almost all the same defendants are named; (4) the same "transactions or occurrences" are at issue in all three cases, namely quality control problems at McNeil and a deficient recall of medicines produced at its plants. The Court concludes that although similar issues of fact and law as those in *Moore* and the MDL are undoubtedly raised by this case, the similarities are insufficient to render this case "related" to either as defined by Local Rule 40.1.

In interpreting the language of Rule 40.1(b)(3)(A), other judges of this Court have concluded that setting forth similar legal theories and having the same general factual basis giving rise to the claims in suit do not suffice for a case to be "related" to another. The case of *Sellers v. Phila. Police Comm'r Timoney,* No. 01–3760, 2002 WL 32348499 (E.D.Pa. Feb.7, 2002), is instructive. Four cases had been filed in this Court alleging police misconduct in connection with the Republican National Convention; the first-filed, *Franks v. City of Philadelphia,* was randomly assigned to Judge Pollak, and three subsequent cases were marked by plaintiffs' counsel as related: *Fried v. City of Philadelphia, Cooper v. Mitchell,* and *Sellers.* All four cases set forth the same general set of allegations: federal, state, and municipal law enforcement had "conspired to frustrate the activities of ... demonstrators" at the convention. *Sellers,* 2002 WL 32348499 at *1.

Judge Pollak concluded that *Fried* and *Cooper* were related to *Franks* under Rule 40.1, but that *Sellers* was not. Although *Fried* and *Cooper* were "hardly identical," they arose out of arrests resulting from surveillance and undercover activity by police officers occurring at a single warehouse where protesters were organizing, as had the *Franks* plaintiffs. *Sellers,* by contrast, involved an "arrest and detention [that] took place at a different time and place and under different circumstances" than in *Franks,* and was thus unrelated. *Id.* at *2–*3.

Indeed, another judge of this Court concluded that cases are not related even if similar legal theories are advanced against largely the same defendants. *See, e.g., Ignatyev v. Chertoff,* No. 08–1547, 2008 WL 1757841, at *2 (E.D.Pa. Apr.16, 2008)* (Baylson, J.) (rejecting relatedness argument, because

naturalization case was "as 'related' to [the earlier action] as it is to any other naturalization case in this district"). Rule 40.1 should be applied sparingly because the policies underpinning the system of random assignment encourage transparency, fairness, and avoiding the appearance of arbitrariness. *See id.; In re Yagman,* 796 F.2d 1165, 1177–78 (9th Cir.1986) (in interpreting Central District of California local rule permitting "direct transfer" of cases, cautioning courts to be "meticulously careful" in actions that diverge from random assignment).

**\*3** As with *Ignatyev* and *Sellers,* the general facts giving rise to the claims in the MDL, *Moore,* and this case are similar and may well require similar proof. That this case is a wrongful death suit, however, ensures that factual issues relating to the plaintiffs' pre-injury behavior, injury, and causation will be distinct from any such issues in *Moore* or in the MDL. The plaintiffs in this action allege the purchase of a different medicine on a different date and from a different retailer than those in *Moore,* and they set forth a categorically different injury than that alleged by the plaintiffs in the MDL.

Finally, the Court has considered the argument raised by the defendants that the issue of relatedness was decided by the undersigned at oral argument in *Moore* on April 5, 2012. See *Moore,* Tr. Hr'g Apr. 5, 2012 at 21 (No. 12–490 Docket No. 54) ("[L]ooking at the standard, I do think they are related."). However, the circumstances of the relatedness argument at the *Moore* hearing, which was held on a pending motion to remand, were far more limited than that before the Court on the instant motion. In *Moore,* the Court repeatedly inquired of plaintiffs' counsel whether or not he intended to argue that that case had been marked related (to the MDL) improperly. *See id.* at 11. The *Moore* hearing itself was held almost three months after the case had been removed, and although the Court did not address the waiver argument, *see id.,* its decision was not made on briefing as thorough as that on the instant motion.

The Court will grant the motion and refer this case to the assignment clerk for random assignment. The virtues of transparency, avoiding the appearance of arbitrariness, and upholding the integrity of the random assignment system weigh in favor of a narrow interpretation of Rule 40.1 and for random assignment despite the similarities between this case, *Moore,* and the MDL.

An appropriate order will issue separately.

Case 1:19-md-02875-RMB-SAK    Document 600-2    Filed 10/16/20    Page 44 of 65
PageID: 13405

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 3550037

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 8

2020 WL 2892366
Only the Westlaw citation is currently available.
United States District Court, S.D. Florida,
Miami Division.

IN RE TAKATA AIRBAG PRODUCTS
LIABILITY LITIGATION
Bridget Boyd, et al., individually and on behalf
of all others similarly situated, Plaintiffs,
v.
FCA US LLC, Defendant.

MDL No. 2599
|
Master File No. 15-02599-MD-MORENO
|
Economic Loss No. 14-24009-CV-MORENO
|
Signed 06/01/2020

**Synopsis**
**Background:** Consumers brought class actions against distributor vehicles with purportedly defective airbags asserting a claim under Magnuson-Moss Warranty Act (MMWA), state law claims for breach of implied warranty, negligence, unjust enrichment, and fraud, as well as violations of state consumer protection statutes. After actions were consolidated in multidistrict litigation (MDL), distributor moved to dismiss.

**Holdings:** The District Court, Federico A. Moreno, J., held that:

consumers stated a fraud claim against distributor;

consumer's claim against vehicle distributor for violation of Arizona Consumer Fraud Act, accrued when consumer discovered airbag defect;

intentional misrepresentation exception to Massachusetts economic loss rule applied to consumers' claim against distributor;

under Ohio law, economic loss rule did not bar consumers' fraud-based claims against distributor;

consumers satisfied "personal purpose" requirement to bring class action claims under the Michigan Consumer Protection Act and the Missouri Merchandising Practices Act;

named-plaintiffs lacked standing to assert nationwide-class claim under MMWA; and

fraudulent concealment tolling applied to consumers statewide-class breach of implied warranty claims against distributor.

Motion granted in part and denied in part.

**Procedural Posture(s):** Motion to Dismiss for Failure to State a Claim; Motion to Dismiss for Lack of Standing.

## ORDER GRANTING IN PART AND DENYING IN PART FCA US LLC'S MOTION TO DISMISS

FEDERICO A. MORENO, UNITED STATES DISTRICT JUDGE

### I. INTRODUCTION

**\*1** This multidistrict litigation consolidates allegations of economic loss and personal injury related to airbags manufactured by former-defendants Takata Corporation and TK Holdings (collectively, "Takata") and equipped in vehicles distributed by FCA US LLC. The allegations are that FCA's vehicles were equipped with Takata airbags containing the chemical ammonium nitrate, which creates a small explosion to inflate the airbags during a crash. Plaintiffs, who are consumers of FCA's vehicles, contend that when exposed to high heat and humidity, the explosion is much more forceful and can cause significant injuries and even death.

The crux of Plaintiffs' legal claims is that FCA knew or should have known of the Takata inflator defect prior to installing the Takata airbags in their vehicles, and that FCA concealed from, or failed to notify, the Plaintiffs and the general public of the full and complete nature of the inflator defect. Plaintiffs allege that as a result of FCA's concealment, Plaintiffs would not have purchased their vehicles or would not have paid as much for them as they did.

FCA vigorously contests the sufficiency of the allegations supporting the myriad of claims remaining in the 46-count Complaint. The Court has thoroughly reviewed the allegations in the Complaint and the arguments in the parties' moving papers. This Order resolves all remaining claims asserted by the Consumer Plaintiffs against FCA.

For the reasons explained below, FCA's Motion to Dismiss **(D.E. 2983)** is **GRANTED IN PART** as follows:

- The nationwide-class Magnuson-Moss Warranty Act claim (Count 1) is **DISMISSED** in full;

- The statewide-class breach of implied warranty claims under the laws of Indiana, New York, and North Carolina (Counts 22, 36, and 38), and the duplicative claim under California law (Count 15), are **DISMISSED**;

- The statewide-class statutory consumer protection claims under the laws of Alabama, Florida, Indiana, and Pennsylvania (Counts 7, 16, 21, and 40) are **DISMISSED** in full, and the claims under the laws of California, Georgia, and Illinois (Counts 12, 18, and 20) are **DISMISSED** only to the extent they seek damages;

- The fraud claim (Count 4) is **DISMISSED** as to named-Plaintiffs Arlen Sturgis (Mississippi), and T'Keya Cooper, Jamelle Lowery, and Michael McClellion (South Carolina), and as to all putative class members whose fraud claims are governed under the laws of Alabama, Florida, Indiana, Mississippi, and South Carolina;

- **\*2** • The unjust enrichment claim (Count 5) is **DISMISSED** as to all putative class members whose unjust enrichment claims are governed under the laws of Alabama, Arizona, Florida, Indiana, Maryland, Mississippi, New Jersey, North Carolina, and Ohio, and as to these named-Plaintiffs: Laurie Reynolds (Arizona); Ronaldo Maldia (California); Daniel Dwinnells (Maryland); Michael Eikenberry, Kenneth Fischer, Deborah Hillyer, Dave Krzeminski, and Elizabeth Washington (Michigan); Arlen Sturgis (Mississippi); Gene Marsilio (New Jersey); Laquintha O'Neal and Terrie Swanson (North Carolina); Victoria Lykins and Reginald Price (Ohio); Jamelle Lowery (South Carolina); and Bridget Boyd (Texas); and

- The negligence claim (Count 6) is **DISMISSED** as to all named-Plaintiffs whose negligence claims are governed under the laws of Alabama, Arizona, Florida, Georgia,

Indiana, Mississippi, Missouri, New Jersey, New York, Ohio, and Texas, and as to all putative class members whose negligence claims are governed under the laws of these states.

Furthermore, the Motion to Dismiss is **DENIED** as to the following claims, which will proceed to summary judgment:

- The statewide-class statutory consumer protection and breach of implied warranty claims in Counts 8–14, 17–20, 23–35, 37, 39, and 41–46;

- Claims for fraud (Count 4) asserted by all named-Plaintiffs whose claims are governed under the laws of Arizona, Arkansas, California, Georgia, Illinois, Maryland, Massachusetts, Michigan, Missouri, New Jersey, New York, North Carolina, Ohio, and Texas;

- Claims for unjust enrichment (Count 5) asserted by these named-Plaintiffs: Cathy Parker and Bobbie Simmons (Arkansas); Rushelle Gonder and Pedro Lucero (California); Michelle Gibson and Debrah Johnson (Georgia); John Fuesting and Priscilla Fuesting (Illinois); Carla Campagnone (Massachusetts); Randy Nielsen (Michigan); Jason Williams (Missouri); Rmzy Abdallah (New York); Marcia Griffith (Pennsylvania); T'Keya Cooper (South Carolina); and Shanna Moore (Texas); and

- Claims for negligence (Count 6) asserted by these named-Plaintiffs: Cathy Parker and Bobbie Simmons (Arkansas) and Daniel Dwinnells (Maryland).

## II. LEGAL STANDARD

"A pleading that states a claim for relief must contain ... a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To survive a motion to dismiss, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

A claim has facial plausibility when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556, 127 S.Ct.

1955). Although legal conclusions can provide the framework of the complaint, they must be supported by factual allegations. *Id.* at 679, 129 S.Ct. 1937. Detailed factual allegations are not required, but the complaint must offer more than "labels and conclusions" or "a formulaic recitation of the elements of the cause of action." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955 (citation omitted). The factual allegations must be enough to "raise a right to relief above the speculative level." *Id.* (citations omitted).

Where a cause of action sounds in fraud, the allegations in the complaint must satisfy the particularity pleading requirement of Federal Rule of Civil Procedure 9(b). Under Rule 9(b), "a party must state with particularity the circumstances constituting fraud or mistake"; although "conditions of a person's mind," such as malice, intent, and knowledge may be alleged generally. Fed. R. Civ. P. 9(b). To comply with Rule 9(b), a plaintiff must allege: (1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the plaintiffs; and (4) what the defendants gained by the alleged fraud. *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1380–81 (11th Cir. 1997) (*per curiam*) (citation omitted). In other words, a plaintiff is required to plead the "who, what, when, where, and how" pertaining to the underlying fraud. *See Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006) (citation omitted). The purpose of particularity pleading is to alert the defendants to their precise misconduct and protect them against baseless charges of fraudulent behavior. *See Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir. 1988) (citation omitted).

**\*3** Finally, at the motion to dismiss stage, the Court must view the allegations in the complaint in the light most favorable to the plaintiffs and accept well-pleaded facts as true. *See St. Joseph's Hosp., Inc. v. Hosp. Corp. of Am.*, 795 F.2d 948, 954 (11th Cir. 1986).

### III. DISCUSSION

In a previous order, the Court resolved FCA's personal jurisdiction challenge and ruled on the sufficiency of the allegations supporting the Racketeer Influenced and Corrupt Organizations Act claims. *See In re Takata Airbag Prods. Liab. Litig.*, 396 F. Supp. 3d 1101 (S.D. Fla. 2019). After thoroughly reviewing the Complaint and the moving papers, the Court dismissed the RICO claims (Counts 2 and 3), and

the "Direct-File Action" in its entirety for lack of personal jurisdiction.

The Court will now resolve FCA's challenges to the claims remaining in the 46-count Complaint, which includes: a nationwide-class claim under the Magnuson-Moss Warranty Act (Count 1); nationwide-class common-law claims for fraud, unjust enrichment, and negligence (Counts 4–6); and statewide-class claims alleging breach of implied warranty and violations of various state unfair and deceptive trade practices statutes (Counts 7–46). Before addressing the sufficiency of the allegations, the Court will determine the substantive law governing the claims of each named-Plaintiff.

### A. APPLICABLE LAW

Questions of federal law in cases transferred under 28 U.S.C. Section 1407 are governed by the clearly settled law of the transferee court's circuit. *See In re Managed Care Litig.*, 150 F. Supp. 2d 1330, 1336 (S.D. Fla. 2001) (citing *Murphy v. F.D.I.C.*, 208 F.3d 959, 966 (11th Cir. 2000) ("Since the federal courts are all interpreting the same federal law, uniformity does not require that transferee courts defer to the law of the transferor circuit.") (citing *In re Korean Air Lines Disaster of September 1, 1983*, 829 F.2d 1171, 1176 (D.C. Cir. 1987) (ruling, in the context of a Section 1407(a) transfer, that "[b]inding precedent for all is set only by the Supreme Court, and for the district courts within a circuit, only by the court of appeals for that circuit"))).

Questions arising under state law are generally governed by the substantive state law dictated by the choice of law rules of the federal court's state. *See Grupo Televisa, S.A. v. Telemundo Commc'ns Grp., Inc.*, 485 F.3d 1233, 1240 (11th Cir. 2007). But in cases transferred under Section 1407, the transferee court must apply the substantive state law dictated by the choice of law rules of the transferor court's state. *See In re Takata Airbag Prods. Liab. Litig.*, 193 F. Supp. 3d 1324, 1332 (S.D. Fla. 2016) (quoting *In re Managed Care Litig.*, 298 F. Supp. 2d 1259, 1296 (S.D. Fla. 2003)).

### B. CHOICE-OF-LAW ANALYSIS

The Complaint consolidates the Plaintiffs and the claims that were filed in the *Dwinnells* Complaint in the Eastern District of Michigan and later transferred to this Court by the Judicial Panel on Multidistrict Litigation, with the claims of Plaintiff Victor Khoury, the only plaintiff to file his claims directly in this MDL proceeding. *See In re Takata Airbag Prods. Liab. Litig.*, 379 F. Supp. 3d 1333, 1336–37 (S.D. Fla.

2019) (summarizing procedural and substantive background of the *Dwinnells* Complaint). The claims asserted by Khoury were previously dismissed in their entirety, thus obviating any choice of law analysis here. *See In re Takata Airbag Prods. Liab. Litig.*, 396 F. Supp. 3d at 1169 & n.17.

**\*4** For the remaining named-Plaintiffs, the Court will now apply Michigan choice of law rules, which recognize a presumption in favor of *lex fori* and apply Michigan law "unless a 'rational reason' to do otherwise exists." *Std. Fire Ins. Co. v. Ford Motor Co.*, 723 F.3d 690, 693 (6th Cir. 2013) (quoting *Sutherland v. Kennington Truck Serv., Ltd.*, 454 Mich. 274, 562 N.W. 2d 466, 471 (1997)). In determining whether there is a rational reason to displace Michigan law, the Court must undertake a two-step analysis. *Sutherland*, 562 N.W. 2d at 471. First, the Court "must determine if any foreign state has an interest in having its law applied. If no state has such an interest, the presumption that Michigan law will apply cannot be overcome." *Id.* On the other hand, if a foreign state does have an interest in having its law applied, the Court "must then determine if Michigan's interests mandate that Michigan law be applied, despite the foreign interests." *Id.* (citing *Olmstead v. Anderson*, 428 Mich. 1, 400 N.W. 2d 292, 304–05 (1987)).

As in the *Whitaker* Order, the Court finds that for the named-Plaintiffs that purchased or leased their vehicle in their state of residence, there is a "rational reason" to depart from applying Michigan substantive law. (D.E. 3838 at 7–8 (the "*Whitaker* Order") (citing *In re Takata Airbag Prods. Liab. Litig.*, No. 14-24009-CV, 2016 WL 5848843, at \*5 (S.D. Fla. Sept. 21, 2016); *In re Takata Airbag Prods. Liab. Litig.*, No. 14-24009-CV, 2016 WL 6072406, at \*6 (S.D. Fla. Oct. 14, 2016)).) Accordingly, substantive law applies to these named-Plaintiffs as follows: **Arizona** law to Laurie Reynolds; **Arkansas** law to Cathy Parker and Bobbie Simmons; **California** law to Rushelle Gonder, Pedro Lucero, and Ronaldo Maldia; **Georgia** law to Michelle Gibson and Debrah Johnson; **Illinois** law to John Fuesting and Priscilla Fuesting; **Maryland** law to Daniel Dwinnells; **Massachusetts** law to Carla Campagnone; **Michigan** law to Deborah Hillyer and Dave Krzeminski; **Mississippi** law to Arlen Sturgis; **Missouri** law to Jason Williams; **New Jersey** law to Gene Marsilio; **New York** law to Rmzy Abdallah; **North Carolina** law to Laquintha O'Neal and Terrie Swanson; **Ohio** law to Victoria Lykins and Reginald Price; **Pennsylvania** law to Marcia Griffith; **South Carolina** law to T'Keya Cooper, Jamelle Lowery, and Michael McClellion; and **Texas** law to Bridget Boyd and Shanna Moore.

Also like the *Whitaker* Order, the Court finds that Michigan substantive law applies to the named-Plaintiffs that purchased or leased their vehicle in a state where they do not live. (*See* D.E. 3838 at 8–9 (citing *In re Takata Airbag Prods. Liab. Litig.*, 2016 WL 6072406, at \*6).) These named-Plaintiffs include: Michael Eikenberry, Kenneth Fischer, Randy Nielsen, and Elizabeth Washington.

Based on this choice-of-law analysis, certain claims must be dismissed. Because the substantive laws of Alabama, Florida, and Indiana do not apply to any named-Plaintiffs, the statutory claims arising under the laws of these states (Counts 7, 16, and 21–22) are **DISMISSED** in full; as are the common law claims (Counts 4–6) to the extent they are asserted under the laws of these states. By extension, all these counts are also **DISMISSED** as to all putative class members with these claims. *See Wooden v. Bd. of Regents of Univ. Sys. of Georgia*, 247 F.3d 1262, 1288 (11th Cir. 2001) ("[A] claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim.") (quoting *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1280 (11th Cir. 2000)).

Even though FCA attacks these claims with several arguments, for sake of brevity and clarity, the Court will not specifically reference these claims or FCA's corresponding arguments elsewhere in this Order. For the same reasons, the Court also will not reference these claims in the conclusion sections of each heading. Where applicable, however, the Court refers to these dismissals as the "choice-of-law dismissals."

**\*5** Having determined the substantive law that governs the claims of each named-Plaintiff, the Court will now address the sufficiency of Plaintiffs' allegations. The Court will begin by reviewing the fraud-based claims (common law and statutory), and then evaluate the remaining common law claims (negligence and unjust enrichment). Next, the Court will analyze the nationwide-class Magnuson-Moss Warranty Act claim and the statewide-class breach of implied warranty claims. And finally, the Court will assess FCA's argument that the Sale Order bars all claims by certain named-Plaintiffs.

## C. NATIONWIDE-CLASS COMMON-LAW FRAUD AND STATEWIDE-CLASS STATUTORY CONSUMER PROTECTION CLAIMS

Plaintiffs assert a nationwide-class common-law fraud claim (Count 4) and numerous statewide-class statutory consumer protection claims (Counts 7–9, 12–14, 16–21, 24–25, 27, 30–32, 34–35, 37, 39–40, 42–43, and 45). The Court will first address the arguments common to both types of "fraud-based" claims, and then address claim-specific arguments. For ease of reference, the Court refers to the common-law fraud and statutory consumer protection claims as "fraud-based" claims; this term accurately describes the claims and is consistent with the *Puhalla* and *Whitaker* Orders. (*See In re Takata Airbag Prods. Liab. Litig.*, — F. Supp. 3d ——, 2020 WL 2764196, at *6 (S.D. Fla. May 27, 2020) ("*Puhalla* Order"); D.E. 3838 at 10.)

### 1. Common Challenges

FCA argues that all fraud-based claims should be dismissed because Plaintiffs fail to adequately allege: (1) that FCA had actual knowledge of the alleged inflator defect; (2) that FCA made material misrepresentations or omissions; and (3) that Plaintiffs relied on any of FCA's material misrepresentations or omissions. FCA also urges that certain fraud-based claims are either time-barred, barred by the economic loss rule, or fail for lack of privity. The Court addresses each argument in turn.

### a) Knowledge of Inflator Defect

First, FCA argues that all fraud-based claims must be dismissed because Plaintiffs fail to allege that FCA had actual knowledge of the inflator defect. Notably, "knowledge may be alleged generally." *In re Takata Airbag Prods. Liab. Litig.*, 396 F. Supp. 3d at 1118 (quoting Fed. R. Civ. P. 9(b)). And after closely reviewing the allegations in the Complaint, the Court found in a previous order that Plaintiffs sufficiently alleged that FCA had knowledge of the risks posed by installing Takata airbags in their vehicles. *See id.* at 1159.[1] Accordingly, the Court declines to dismiss the fraud-based claims on this basis.

[1]    Throughout this litigation, the Court has made the same finding on similar allegations. *See In re Takata Airbag Products Liab. Litig.*, — F. Supp. 3d ——, 2020 WL 2764196, at *6 & n.5; *In re Takata Airbag Products Liab. Litig.*, 193 F. Supp. 3d at 1336 ("The Court finds that Plaintiffs have sufficiently alleged Mazda's knowledge of the alleged inflator defect ...."); *In re Takata Airbag*

*Products Liab. Litig.*, 255 F. Supp. 3d 1241, 1258 (S.D. Fla. 2017) (same as to Honda).

### b) Omissions and Misstatements

Second, FCA argues that all fraud-based claims must be dismissed because Plaintiffs do not adequately allege that FCA either failed to disclose the Takata inflator defect, or made any actionable misstatements about the safety of its vehicles. Plaintiffs maintain that FCA breached a duty owed to the Plaintiffs by failing to fully inform them about the nature of the Takata inflator defect. Plaintiffs also contend that FCA made actionable misstatements by falsely touting the safety of their vehicles.

In the *Puhalla* and *Whitaker* Orders, the Court resolved a similar challenge brought by Mercedes, Audi, Volkswagen, and General Motors. Looking to prior rulings in this case, the Court explained that, by definition, Plaintiffs cannot point to one particular statement because an *omission* is a non-statement. (*See In re Takata Airbag Prods. Liab. Litig.*, —— F. Supp. 3d ——, 2020 WL 2764196, at *7 (citing *In re Takata Airbag Prods. Liab. Litig.*, 193 F. Supp. 3d at 1337–38); D.E. 3838 at 11 (citing same).) After reviewing those plaintiffs' allegations, the Court found that they sufficiently alleged that Mercedes, Audi, Volkswagen, and General Motors had a duty to disclose the inflator defect, and thus declined to dismiss any of those plaintiffs' claims. *See id.*

*6  Like the plaintiffs in *Puhalla* and *Whitaker*, Plaintiffs here also allege that FCA had a duty to disclose the inflator defect because it had exclusive and/or far superior knowledge and access to facts that were not known to or reasonably discoverable by Plaintiffs, and which FCA intentionally concealed from Plaintiffs, all the while making incomplete representations about the safety and reliability of their vehicles. (*See* D.E. 2758 at ¶¶ 235(a)–(c).) Therefore, for the reasons explained in the *Puhalla* and *Whitaker* Orders, and as the Court has throughout this litigation on similar allegations, the Court declines to dismiss any fraud-based claims on this ground.

As for FCA's "puffery" argument, the Court explained in the *Puhalla* and *Whitaker* Orders that "[a]lthough marketing materials about safety features may be construed as puffery when viewed in isolation, such marketing can 'cross the line from mere puffery to active misrepresentations' when statements about safety are read next to allegations that an automotive manufacturer had actual knowledge of the alleged

safety defect." (*See In re Takata Airbag Prods. Liab. Litig.*, ——— F. Supp. 3d ———, 2020 WL 2764196, at *8 (quoting *In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 457 (S.D.N.Y. 2017); citing *see also In re Toyota Motor Corp.*, No. 8:10ML 02151 JVS (FMOx), 2012 WL 12929769, at *18 (C.D. Cal. May 4, 2012) ("Advertising a car as safe and reliable when it actually has a safety-related defect that may render it unable to stop is not 'within the tolerable range of commercial puffery,' especially because Toyota allegedly had exclusive knowledge of the SUA defect.")); D.E. 3838 at 14 (citing same).)

Like the plaintiffs in *Puhalla* and *Whitaker*, Plaintiffs here allege that FCA distributed marketing materials that touted FCA's commitment to vehicle safety. (*See* D.E. 2758 at ¶¶ 127(a)–(h).) Among other examples, Plaintiffs allege that FCA: (1) promoted two vehicle models as receiving an Insurance Institute for Highway Safety "top safety pick" (both models later subject to recalls for the inflator defect); (2) published a press release touting that two vehicle models had achieved 5-star safety ratings from the National Highway Traffic Safety Administration (both models later subject to recalls for the inflator defect); and (3) published brochures for four vehicle models that specifically promoted the vehicles' airbag features (each model later subject to recalls for the inflator defect). *See id.* at ¶¶ 73, 127(c)–(h). Plaintiffs also allege that, through these promotions, FCA "continuously maintained that Chrysler-branded vehicles were safe and reliable," yet "uniformly concealed the Inflator Defect"— which was "material to decisions to purchase or lease Class Vehicles." *Id.* at ¶ 126. And as discussed above, Plaintiffs sufficiently allege that FCA had actual knowledge of the inflator defect. *See supra* Sec.III.C.1.a; *see also In re Takata Airbag Prods. Liab. Litig.*, 396 F. Supp. 3d at 1159. Taken together, the Court finds that Plaintiffs sufficiently allege that the promotion of vehicle safety in FCA's marketing materials crosses the line from mere "puffery" to active misrepresentation.

So, in addition to the duty to disclose, the Court also finds that Plaintiffs' allegations of material misstatements—*i.e.* that FCA continued to promote the safety of their vehicles despite having actual knowledge of the inflator defect—are sufficient to survive the Motion to Dismiss. Of course, at summary judgment or trial, FCA can present evidence to disprove these allegations. But for now, the claims survive dismissal.

#### c) Reliance

**\*7** Third, FCA argues that all fraud-based claims must be dismissed because Plaintiffs fail to adequately allege reliance on any statements made by FCA. In the *Puhalla* Order, this Court rejected the same argument and ruled that the plaintiffs sufficiently alleged reliance against Mercedes, Audi, and Volkswagen. *See In re Takata Airbag Prods. Liab. Litig.*, ——— F. Supp. 3d ———, 2020 WL 2764196, at *8–9 (citing *In re Takata Airbag Prods. Liab. Litig.*, No. 14-24009, 2017 WL 2406711, at *6 (S.D. Fla. June 1, 2017) (ruling same as to allegations against Takata); *In re Takata Airbag Prods. Liab. Litig.*, No. 14-24009-CV, 2016 WL 5884872, at *3–4 (ruling same as to allegations against Subaru)).

Like many of the plaintiffs before them, Plaintiffs here allege that they "were unaware of ... omitted material facts," "would not have acted as they did if they had known of the concealed or suppressed facts," and that "[h]ad they been aware of the Defective Airbags ... [they] either would not have paid as much for their Class Vehicles, or they would not have purchased or leased them at all." (D.E. 2758 ¶¶ 240–41.) Once more, these allegations sufficiently plead reliance. Accordingly, the Court will not dismiss any fraud-based claims on this ground.

#### d) Time Bars

Fourth, FCA argues that fraud-based claims under the laws of Arizona, Georgia, Ohio, and Texas are barred by the statute of limitations. Plaintiffs disagree.

##### (1) Discovery Rule (Arizona)

To start, the statute of limitations for a claim under the Arizona Consumer Fraud Act is "within one year after the cause of action accrues." Ariz. Rev. Stat. Ann. § 12-541(5). FCA argues that Plaintiff Laurie Reynolds' fraud-based claims under Arizona law, filed on March 14, 2018, [2] are barred by the one-year statute of limitations because a recall for her vehicle was announced on December 9, 2016 and thus her claim expired one year later on December 9, 2017.

[2]  Prior to transfer to this MDL proceeding, Reynolds's fraud-based claims were initially filed

In re Takata Airbag Products Liability Litigation, --- F.Supp.3d ---- (2020)
2020 WL 2892366

in the *Dwinnells* Complaint in the Eastern District
of Michigan on March 14, 2018.

Although Arizona does not recognize fraudulent concealment
tolling, under Arizona's discovery rule, the statute of
limitations for a claim under the Arizona Consumer Fraud
Act begins running "when the defrauded party discovers or
with reasonable diligence could have discovered the fraud."
*Alaface v. Nat'l Inv. Co.*, 181 Ariz. 586, 892 P.2d 1375,
1379 (1994) (quoting *Mister Donut of Am., Inc. v. Harris*,
150 Ariz. 321, 723 P.2d 670, 672 (1986) (*en banc*)). "When
discovery occurs and a cause of action accrues are usually
and necessarily questions of fact for the jury." *Schellenbach v.
GoDaddy.com LLC*, No. CV-16-00746-PHX-DGC, 2017 WL
192920, at *4 (D. Ariz. Jan. 18, 2017) (quoting *Doe v. Roe*,
191 Ariz. 313, 955 P.2d 951, 961 (1998) (*en banc*); citing *Walk
v. Ring*, 202 Ariz. 310, 44 P.3d 990, 996 (2002) (*en banc*);
*Alaface*, 892 P.2d at 1379). "The jury must determine at what
point Plaintiff's knowledge, understanding, and acceptance in
the aggregate provided sufficient facts to constitute a cause of
action." *Schellenbach*, 2017 WL 192920, at *4 (quoting *Doe*,
955 P.2d at 962).

Even though the statute of limitations is an affirmative
defense that is properly raised in a motion to dismiss, where
it appears from the face of the complaint that the claim is
barred, "the motion should not be granted 'unless it appears
certain plaintiff will not be entitled to relief under any set
of facts susceptible of proof under the claims stated.' " *Id.*
(quoting *Anson v. Am. Motors Corp.*, 155 Ariz. 420, 747 P.2d
581, 582 (Ariz. Ct. App. 1987)). As, indeed, the statute of
limitations defense "is never favored" by courts. *Id.* (quoting
*Gust, Rosenfeld & Henderson v. Prudential Ins. Co. of Am.*,
182 Ariz. 586, 898 P.2d 964, 968 (1995)).

*8 Aside from summarily asserting the date the recall
was announced and the date Reynolds's claim should
have expired, FCA advances no argument regarding when
Reynolds actually received notice of the recall. And, as
Plaintiffs contend, "though the relevant recall was *announced*
on December 9, 2016, it does not follow as a matter of law
that Plaintiff Reynolds received notice on that date." (D.E.
3034 at 136 (emphasis in original).) The Court agrees with
Plaintiffs on this point, and FCA cites no legal authority
ruling otherwise. Therefore, the Court declines to dismiss at
this time Reynolds's Arizona Consumer Fraud Act claim on
statute of limitations grounds. At summary judgment or trial,
though, FCA may renew its argument and present evidence
showing when Reynolds was put on notice of her fraud-based
claims.

FCA also argues that the statute of limitations bars Reynolds's
common law fraud claim. The Court disagrees here as well.
Under FCA's theory, Reynolds's fraud claim accrued on
December 9, 2016, when a recall was announced for her
vehicle. But the statute of limitations for a common law fraud
claim in Arizona is "within three years after the cause of
action accrues." Ariz. Rev. Stat. Ann. § 12-543(3). So, even
under FCA's theory, Reynolds's common law fraud claim,
filed on March 14, 2018, was filed within the statute of
limitations period (which would have expired on December
9, 2019). Thus, the Court also declines to dismiss Reynolds's
fraud claim on statute of limitations grounds.

### (2) Fraudulent Concealment
### Tolling (Georgia, Ohio, and Texas)

As for the states that remain, this Court has recognized that
fraudulent concealment tolling applies in Ohio and Texas.
*See In re Takata Airbag Prods. Liab. Litig.*, —— F. Supp.
3d ——, 2020 WL 2764196, at *25 (ruling the plaintiffs
invoked fraudulent concealment tolling under Texas law)
(citing *KPMG Peat Marwick v. Harrison County Hous.
Fin. Corp.*, 988 S.W. 2d 746, 750 (Tex. 1999)); *In re
Takata Airbag Prods. Liab. Litig.*, 2017 WL 2406711, at *13
(ruling same under Ohio law). And Georgia also recognizes
fraudulent concealment tolling. *See Daniel v. Amicalola Elec.
Membership Corp.*, 289 Ga. 437, 711 S.E.2d 709, 716 (2011)
(citing *Jim Walter Corp. v. Ward*, 245 Ga. 355, 265 S.E. 2d
7 (1980); *McElmurray v. Augusta–Richmond County*, 274
Ga.App. 605, 618 S.E. 2d 59, 68 (2005)).

For the reasons fully explained in the *Puhalla* and *Whitaker*
Orders, and other previous orders, the Court finds that
Plaintiffs' allegations, taken as true and viewed in the
light most favorable to them, sufficiently invoke fraudulent
concealment tolling under the laws of Georgia, Ohio, and
Texas.

### e) Economic Loss Bars

Fifth, FCA argues that certain statutory and common law
fraud claims are barred by the economic loss rule because
Plaintiffs only seek to recover economic loss damages.
Plaintiffs urge that several states recognize a fraud exception
to the economic loss rule, and thus their statutory and common

law fraud-based claims can proceed under the laws of these states.

### (1) Statutory Consumer Protection Claims

In the *Puhalla* and *Whitaker* Orders, the Court resolved economic loss challenges under North Carolina's Unfair or Deceptive Trade Practices Act and Pennsylvania's Unfair Trade Practices and Consumer Protection Law. (*See In re Takata Airbag Prods. Liab. Litig.*, —— F. Supp. 3d ——, 2020 WL 2764196, at *9–10; D.E. 3838 at 18–19.) For the same reasons explained in those Orders, the claim under North Carolina's Unfair or Deceptive Trade Practices Act (Count 37) is not barred by the economic loss rule and is hereby not exposed to summary judgment; but the claim under Pennsylvania's Unfair Trade Practices and Consumer Protection Law (Count 40) is barred by the economic loss rule, and is accordingly **DISMISSED**.

### (2) Common Law Claims

Turning to the common law claims, FCA argues that the economic loss rule bars fraud claims under the laws of Arizona, Massachusetts, Michigan, Mississippi, Missouri, New Jersey, New York, Ohio, and South Carolina. Plaintiffs respond that all these states recognize a fraud exception to the economic loss rule—with the lone exception of Mississippi, and thus, Count 4 is **DISMISSED** as to Arlen Sturgis, the lone named-Plaintiff with a Mississippi fraud claim.

**\*9** In the *Puhalla* Order, the Court found that Arizona, Michigan, New Jersey, New York, and Ohio all recognize a fraud exception to the economic loss rule, and then ruled that the plaintiffs' fraudulent concealment[3] allegations sufficiently invoked the fraud exception in these states. (*See In re Takata Airbag Prods. Liab. Litig.*, —— F. Supp. 3d ——, 2020 WL 2764196, at *10 (citing *Martin v. Weed Inc.*, No. CV-18-00027-TUC-RM, 2018 WL 2431837, at *6–7 (D. Ariz. May 30, 2018) (applying fraud exception to economic loss rule under Arizona law); *Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc.*, 209 Mich.App. 365, 532 N.W. 2d 541, 545 (2001) (same under Michigan law); *G & F Graphic Services, Inc. v. Graphic Innovators, Inc.*, 18 F. Supp. 3d 583, 593 (D.N.J. 2014) (same under New Jersey law); *In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d at 432–33 (same under New York law) (collecting

cases); *Agilysys, Inc. v. Gordon*, No. 1:06 CV 1665, 2008 WL 11377731, at *6–7 (N.D. Ohio Jan. 11, 2008) (same under Ohio law) (collecting cases)).) And in an earlier order, the Court found and ruled the same under Missouri law because, "similar to the reasoning applied under Michigan law," the fraudulent concealment claim was "independent of any contract." *See In re Takata Airbag Prods. Liab. Litig.*, 2017 WL 2406711, at *8.

3    Although the claim in Count 4 is styled as fraud—as opposed to fraudulent concealment or inducement—as the Court explained in the *Whitaker* Order, what matters legally is what Plaintiffs allege. (*See* D.E. 3838 at 17 (citing *Huber v. Crop Prod. Servs., Inc.*, No. 06-14564-BC, 2007 WL 2746625, at *6 (E.D. Mich. Sept. 19, 2007)).) And there, the Court ruled that because the plaintiffs alleged that General Motors's precontractual concealment of material facts induced the plaintiffs to purchase their vehicles, the fraud claim was not barred by Michigan's economic loss rule. Like the plaintiffs in *Whitaker*, Plaintiffs here allege the same against FCA. (*See* D.E. 2758 at ¶¶ 236–37.) Thus, the styling of the claim as "fraud" does not change the Court's analysis here.

For the same reasons explained in those orders, the Court finds that Plaintiffs' allegations sufficiently invoke the fraud exception to the economic loss rule in Arizona, Michigan, Missouri, New Jersey, New York, and Ohio. The Court will now address Massachusetts and South Carolina, the only states not previously addressed.

### (i) Massachusetts

In Massachusetts, "purely economic losses are unrecoverable in tort and strict liability actions in the absence of personal injury or property damage." *FMR Corp. v. Boston Edison Co.*, 415 Mass. 393, 613 N.E. 2d 902, 903 (1993). But the economic loss rule "does not apply to 'pecuniary loss incurred as a result of an actionable misrepresentation.' " *Passatempo v. McMenimen*, 461 Mass. 279, 960 N.E. 2d 275, 294 (2012) (quoting *Nota Constr. Corp. v. Keyes Assocs., Inc.*, 45 Mass.App.Ct. 15, 694 N.E. 2d 401, 405 n.1 (1998)); *see also Arthur D. Little Intern., Inc. v. Dooyang Corp.*, 928 F. Supp. 1189, 1205 (D. Mass. 1996) ("The economic loss rule does not apply to harm caused by intentional misrepresentations")

(citing *Canal Elec. Co. v. Westinghouse Elec. Co.*, 973 F.2d 988, 998 (1st Cir. 1992) (noting economic loss does not preclude recovery for intentional torts)).

This rule extends to intentional misrepresentation claims regarding the quality of products made in a commercial setting to induce the purchase of products where the product is subject to certain warranties. *See Softub, Inc. v. Mundial, Inc.*, 53 F. Supp. 3d 235, 239, 260 (D. Mass. 2014) (ruling economic loss rule did not bar intentional misrepresentation claim) (citing *Passatempo*, 960 N.E. 2d at 295; *Canal Elec. Co.*, 973 F.2d at 998). Although FCA points to a ruling by the Superior Court of Massachusetts that a plaintiff could not recover "under her fraud claim because it [was] barred by the economic loss rule," *Costa v. Del La Femina*, No. 20053536, 2006 WL 3201070, at \*10 (Mass. Super. Ct. Oct. 17, 2006), the Court finds that *Costa* runs against the weight of authority interpreting Massachusetts law, which recognizes an intentional misrepresentation exception to the economic loss rule.

 **\*10**  To state a claim for intentional or fraudulent misrepresentation, the plaintiff must allege that the defendant "made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff reasonably relied upon the representation as true and acted upon it to his damage." *Russell v. Cooley Dickinson Hosp., Inc.*, 437 Mass. 443, 772 N.E. 2d 1054, 1066 (2002).

Here, like their predecessor plaintiffs, Plaintiffs allege: that FCA had knowledge of the risks posed by installing Takata airbags in its vehicles; that FCA had a duty to disclose the inflator defect; that FCA made material misstatements regarding the safety of its vehicles; and that but-for the omissions of the inflator defect, Plaintiffs would not have purchased their vehicles or would not have paid as much for them as they did. *See supra* Sec.III.C.1.a–c. Based on these allegations, the Court finds that Plaintiffs sufficiently invoke the intentional misrepresentation exception to the Massachusetts economic loss rule.

### (ii) South Carolina

Although the Court has not previously addressed whether a fraud claim is barred by South Carolina's economic loss rule, earlier in this case, the Court dismissed a negligence claim as barred by the economic loss rule under *Sapp v. Ford*

*Motor Co.*, 386 S.C. 143, 687 S.E. 2d 47 (2009). *See In re Takata Airbag Prods. Liab. Litig.*, No. 14-24009-CV, 2016 WL 5848843, at \*8. In *Sapp*, the controlling economic loss case in South Carolina, the Supreme Court of South Carolina clarified the scope of the economic loss rule and explained that the court did not intend, through its previous rulings, for "the exception to the economic loss rule to be applied well beyond the scope of real estate construction in[to] an ordinary products liability claim." at 150, 687 S.E.2d 47. In short, the Supreme Court of South Carolina explained that "when personal injury or other property damage occurs, a tort remedy may be appropriate." *Id.* at 147, 687 S.E.2d 47.

Applying the law to the facts there, the Supreme Court of South Carolina affirmed summary judgment for Ford on the plaintiff's tort claims—which included a fraud/misrepresentation claim based on the theory that Ford knew about a design defect in the cruise control switch, which would short circuit and cause a fire in the engine compartment, *id.* at 146, 687 S.E.2d 47—because "[t]he only damage caused by the defect in the trucks was damage to the trucks themselves—purely an economic loss." *Id.* at 150, 687 S.E.2d 47.

In view of the Supreme Court of South Carolina's careful analysis in *Sapp*, which limited the application of the economic loss rule,[4] and consistent with the Court's previous ruling regarding negligence claims under South Carolina law, the Court finds that South Carolina does not recognize a fraud exception to the economic loss rule. Consequently, Count 4 is **DISMISSED** as to Plaintiffs T'Keya Cooper, Jamelle Lowery, and Michael McClellion, whose fraud claims are governed under South Carolina law.

4   Although some federal district courts have interpreted *Sapp* as recognizing a fraud exception to the economic loss rule, *see In re Volkswagen Timing Chain Prod. Liab. Litig.*, No. CV 16-2765 (JLL), 2017 WL 1902160, at \*18 (D.N.J. May 8, 2017) and *Trevillyan v. APX Alarm Sec. Sys., Inc.*, No. 2:10-1387-MBS, 2011 WL 11611, at \*8 (D.S.C. Jan. 3, 2011), the Court declines to follow these rulings. The Supreme Court of South Carolina, the final arbiter of South Carolina law, carefully clarified the scope of the "narrow" exception to the economic loss rule that applies in the residential real estate construction context. Notably, the Supreme Court of South Carolina stopped short of affirmatively recognizing a fraud-

based exception to the economic loss rule in the products liability context.

### f) <u>Privity (Ohio)</u>

**\*11**  Finally, FCA argues in a footnote that the fraud-based claims under Ohio law must be dismissed because there is no privity between FCA and Plaintiffs Victoria Lykins and Reginald Price. (D.E. 2983 at 56 n.26 (citing *Corporex Dev. & Constr. Mgt., Inc. v. Shook, Inc.*, 835 N.E. 2d 701, 703 (Ohio 2005)).)

It appears that FCA stretches *Corporex* too far. In *Corporex*, the Supreme Court of Ohio explained that liability can be "based exclusively upon [a] discrete, preexisting duty in tort and not upon any terms of a contract or rights accompanying privity." 835 N.E. 2d at 705 (quoting *Haddon View Inv. Co. v. Coopers & Lybrand*, 70 Ohio St.2d 154, 436 N.E. 2d 212, 215 (1982)). The Supreme Court of Ohio further explained that "*[i]n addition to* generally recognized duties in tort ... privity or a sufficient nexus that could serve as a substitute for privity may impose only those contractual duties and liability for breach of those duties agreed to by the parties to the contract, and no more." *Id.* It is clear, though, that "[w]hen a duty in tort exists, a party may recover in tort." *Id.* Thus, privity is not required to plead a fraud-based claim under Ohio law.

Since *Corporex*, Ohio courts have continued to recognize that fraud claims do not require privity. *See Clemens v. Nelson Fin. Grp., Inc.*, No. 14AP-537, 2015 WL 1432604, *8 (Ohio Ct. App. 2015) ("Although the economic-loss rule sweeps widely, it does not preclude all tort claims for economic damages. A plaintiff may pursue such a tort claim if it is 'based exclusively upon [a] discrete, preexisting duty in tort and not upon any terms of a contract or rights accompanying privity.' ") (quoting *Corporex*, 835 N.E. 2d at 705); *Campbell v. Krupp*, 195 Ohio App.3d 573, 961 N.E. 2d 205, 213 (2011) ("[T]here is no question that privity is not required to assert a claim of common law fraud, out of a concern that an innocent party should not suffer at the hands of an intentional wrongdoer.") (quoting *Haddon View Inv. Co.*, 436 N.E. 2d at 215).

Under Ohio law, a duty arises in business transactions only where: (1) the parties are in a fiduciary relationship; (2) both parties to the transaction understand that a special trust or confidence has been reposed; or (3) full disclosure is necessary to dispel misleading impressions that are or might have been created by partial revelation of the facts. *Gator Dev.*

*Corp. v. VHH, Ltd.*, No. C-080193, 2009 WL 1027584, at *6 (Ohio Ct. App. 2009) (citing *Blon v. Bank One, Akron, N.A.*, 35 Ohio St.3d 98, 519 N.E. 2d 363, 367 (1988)).

Here, as discussed above, Plaintiffs sufficiently allege that FCA had a duty to disclose the inflator defect because it had exclusive and/or far superior knowledge and access to facts that were not known to or reasonably discoverable by Plaintiffs, and which FCA intentionally concealed from Plaintiffs, all the while making incomplete representations about the safety and reliability of their vehicles. (*See supra* Sec.III.C.1.a–c; *see also* D.E. 2758 at ¶¶ 235(a)–(c).) Thus, the Court finds that FCA had a duty to disclose under Ohio law. And because this duty is grounded in tort, the economic loss rule does not bar the fraud-based claims under Ohio law.

### 2. <u>Specific Challenges to Statutory Consumer Protection Claims</u>

Next, FCA advances three challenges specific to the statutory consumer protection claims. First, FCA argues that the claims under the laws of Arkansas and South Carolina must be dismissed because the consumer protection statutes of these states bar class actions. Second, FCA argues that the claims under the Michigan Consumer Protection Act and the Missouri Merchandising Practices Act should be dismissed because Plaintiffs fail to allege that they purchased their vehicles for "personal purposes." And finally, FCA argues that the claims under the Uniform Deceptive Trade Practices Act of Georgia and Illinois, and California's Unfair Competition Law must be limited to injunctive relief.[5] Plaintiffs insist that none of these claims should be dismissed.

[5]    In a footnote, FCA also argues that the Safety Act bars the Plaintiffs' request for the Court to enjoin FCA from continuing its negligence by continuing to install defective airbags in class vehicles. (*See* D.E. 2983 at 57 n.29.) In a previous order, the Court rejected a similar argument by Mercedes, Audi, and Volkswagen. *See In re Takata Airbag Products Liab. Litig.*, 396 F. Supp. 3d at 1133 ("[T]o the extent Plaintiffs seek injunctive relief going forward that will 'unduly and directly interfere with NHTSA's investigatory and regulatory functions,' or interfere with NHTSA's Coordinated Remedy Order, the Court can address this issue at that time.") (quoting *In re Takata Airbag Prod. Liab. Litig.*, No. 14-24009-CV, 2015 WL 12641693, at *3 (S.D. Fla. Sept. 21, 2015)). Likewise here, if and

when this issue arises, the Court can address it at that time.

### a) Class Action Bars

**\*12**  First, FCA argues that the statutory consumer protection claims under the laws of Arkansas and South Carolina must be dismissed because the statutes of these states bar class action claims. As explained fully in the *Puhalla* Order, in the Eleventh Circuit, Rule 23 controls whether a plaintiff can assert a class action claim under a state statute that forbids class actions. *See In re Takata Airbag Prods. Liab. Litig.*, --- F. Supp. 3d ----, 2020 WL 2764196, at \*11–12 (citing *Lisk v. Lumber One Wood Preserving, LLC*, 792 F.3d 1331, 1336 (11th Cir. 2015)). Following *Lisk*, the Court ruled that the plaintiffs could assert class action claims under the Arkansas Deceptive Trade Practices Act and the South Carolina Unfair Trade Practices Act (as well as under the Alabama Deceptive Trade Practices Act). *See id.* at \*12 (citing *Lisk*, 792 F.3d at 1335–38 (ruling Rule 23 did not bar a class claim under the Alabama Deceptive Trade Practices Act); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 510, 553 (N.D. Ill. 2019) (ruling same under the Arkansas Deceptive Trade Practices Act and the South Carolina Unfair Trade Practices Act)). Consequently, the Court declines to dismiss these class action claims on this basis.

### b) Failure to Allege "Personal Purposes"

Second, FCA argues that the claims under the Michigan Consumer Protection Act and the Missouri Merchandising Practices Act should be dismissed because Plaintiffs fail to allege that they purchased their vehicles for "personal purposes." (D.E. 2983 at 57 (citing *Zine v. Chrysler Corp.*, 236 Mich.App. 261, 600 N.W. 2d 384, 393 (1999); *Murphy v. Stonewall Kitchen, LLC*, 503 S.W. 3d 308, 311 (Mo. Ct. App. 2016)).)

Here, Plaintiffs allege in paragraph 28 of the Complaint that all Plaintiffs "purchased or leased their Class Vehicles primarily for personal, family, and household use." (*See* D.E. 2758 at ¶ 28.) Reviewing *Zine* and *Murphy*, the Court finds that this allegation is sufficient to satisfy the "personal purpose" requirement under Michigan and Missouri law. FCA does not press the argument in its Reply. Accordingly, the claims can proceed.

### c) Injunctive Relief

Finally, FCA argues that the claims under California's Unfair Competition Law (Count 12) and under the Uniform Deceptive Trade Practices Act of Georgia (Count 18) and Illinois (Count 20) must be limited to injunctive relief. Plaintiffs disagree.

#### (1) California's Unfair Competition Law

Starting with California's Unfair Competition Law, the Court finds that Plaintiffs are correct that they can seek restitution and injunctive relief. (D.E. 3034 at 148 (citing *De La Torre v. CashCall, Inc.*, 236 Cal.Rptr.3d 353, 422 P.3d 1004, 1012 (2018)).) But read in full, the sentence from *De la Torre* that Plaintiffs cite makes clear that plaintiffs "cannot obtain damages or attorney fees" under California's Unfair Competition Law. *De La Torre*, 236 Cal.Rptr.3d 353, 422 P.3d at 1021 (citation omitted); *see also Valdez v. Seidner-Miller, Inc.*, 33 Cal.App.5th 600, 245 Cal. Rptr. 3d 268, 280 (2019) ("The UCL provides for injunctive relief, restitution, and civil penalties.") (citing *Bus. & Prof. Code, §§ 17203, 17206*; *De La Torre*, 236 Cal.Rptr.3d 353, 422 P.3d at 1021).

Through their Unfair Competition Law claim, Plaintiffs seek "such orders or judgments as may be necessary to enjoin New Chrysler from continuing its unfair, unlawful, and/or deceptive practices ... and for such other relief set forth below." (D.E. 2758 at ¶ 365.) In view of the foregoing, Count 12 is dismissed only to the extent it seeks damages.

#### (2) Georgia and Illinois Uniform Deceptive Trade Practices Acts

Turning to the Georgia and Illinois statutes, both Acts provide that "[a] person likely to be damaged by a deceptive trade practice of another *may be granted injunctive relief* upon terms that the court considers reasonable. Proof of monetary damage, loss of profits or intent to deceive is not required." *See* 815 Ill. Comp. Stat. Ann. 510/3 (emphasis added); Ga. Code Ann. § 10-1-373(a). Both acts also authorize a court to assess costs and award attorneys' fees in certain situations. *See* 815 Ill. Comp. Stat. Ann. 510/3; Ga. Code Ann. § 10-1-373(b).

**\*13** Although the parties' briefing does not specifically address Georgia law, the Court finds that relief under Georgia's Uniform Deceptive Trade Practices Act "is limited to an injunction." *See Divis v. Gen. Motors LLC*, No. 18-13025, 2019 WL 4735405, at \*9 (E.D. Mich. Sept. 27, 2019). And it is equally true that a plaintiff cannot seek damages under Illinois's Uniform Deceptive Trade Practices Act. *See Universal Gaming Grp. v. Taft Stettinius & Hollister LLP*, No. 1-15-0878, 2017 WL 1240860 at \*9 (Ill. App. Ct. 2017) (quoting *Chicago's Pizza, Inc. v. Chicago's Pizza Franchise Ltd. USA*, 384 Ill.App.3d 849, 323 Ill.Dec. 507, 893 N.E. 2d 981, 996 (2008)).

Although Plaintiffs argue otherwise, the Court finds that they misread FCA's authority—*Dorr-Oliver Inc. v. Fluid-Quip, Inc.*, 834 F. Supp. 1008, 1014 (N.D. Ill. 1993)—and mistakenly conflate the Illinois Uniform Deceptive Trade Practices Act with the Illinois Consumer Fraud and Deceptive Business Practices Act. Although similar, the latter "allows damages as well as injunctive relief," *id.* (citing 815 ILCS ¶¶ 505/7, 505/10a), whereas the former "provides only for injunctive relief but allows costs and attorneys fees if defendants willfully engaged in a deceptive trade practice," *id.* (citing 815 ILCS ¶ 510/3).

With their claims under the Georgia and Illinois Deceptive Trade Practices Acts, Plaintiffs seek "an order enjoining New Chrysler's deceptive practices, attorneys' fees, and any other just and proper relief available under the [Acts]." (D.E. 2758 at ¶¶ 488, 522.) In view of the foregoing, Counts 18 and 20 are dismissed only to the extent they seek damages.

### 3. Conclusion

To summarize the fraud-based claims, Count 4 is **DISMISSED** as to named-Plaintiffs Arlen Sturgis (Mississippi), and T'Keya Cooper, Jamelle Lowery, and Michael McClellion (South Carolina). By extension, Count 4 is also **DISMISSED** as to all putative class members with fraud claims governed under Mississippi and South Carolina law. *See Wooden*, 247 F.3d at 1288 ("[A] claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim.") (quoting *Prado-Steiman*, 221 F.3d at 1280). After accounting for the choice-of-law dismissals and the states excluded by Plaintiffs (Florida and Pennsylvania), Count 4 will proceed for all other named-Plaintiffs.

As for the statutory consumer protection claims, the claim under Pennsylvania's Unfair Trade Practices and Consumer

Protection Law (Count 40) is **DISMISSED** in full, and the claims under California's Unfair Competition Law (Count 12), and Georgia's and Illinois's Uniform Deceptive Trade Practices Act (Counts 18 and 20) are **DISMISSED** only to the extent they seek damages. The state statutory consumer protection claims in Counts 8–9, 12–14, 17–20, 24–25, 27, 30–32, 34–35, 37, 39, 42–43, and 45 will proceed.

### D. REMAINING NATIONWIDE-CLASS COMMON-LAW CLAIMS

The Court will now address FCA's challenges to the nationwide-class common-law unjust enrichment (Count 5) and negligence (Count 6) claims. These claims are asserted "under the common law of" negligence and unjust enrichment "as there are no true conflicts (case-dispositive differences) among various states' laws." (*See* D.E. 2758 at ¶¶ 247, 253.) Alternatively, though, Plaintiffs assert these claims under the laws of the states where the vehicles were purchased. At this stage, the Court will determine whether Plaintiffs have stated negligence and unjust enrichment claims under applicable state common law. *Cf. In re Takata Airbag Prods. Liab. Litig.*, 2017 WL 2406711, at \*5 (evaluating nationwide fraudulent concealment claims under applicable state common law). The Court begins with the unjust enrichment claims and then proceeds to the negligence claims.

### 1. Unjust Enrichment (Count 5)

**\*14** FCA argues that certain unjust enrichment claims should be dismissed because: (1) either there is no privity or Plaintiffs did not purchase their vehicles from an FCA-affiliated dealership; (2) certain Plaintiffs allege the existence of an express warranty; (3) California and Texas do not recognize unjust enrichment as a standalone cause of action; and (4) they are barred by the statute of limitations. The Court addresses each argument in turn.

### a) Direct Benefit

First, FCA argues that all unjust enrichment claims should be dismissed for lack of privity. Specifically, FCA argues that "[a]s this Court has previously recognized, for states that require privity to maintain an unjust enrichment claim, such claims must be dismissed if a plaintiff cannot demonstrate that they have conferred a direct benefit on a defendant." (D.E. 2983 at 55.) Noticeably, though, FCA does not cite a single authority supporting this statement. (*See id.*; *see also* D.E. 2983-4 at 2–5.) Nor does FCA cite a single ruling in this case

showing that privity is *required* to state an unjust enrichment claim under the laws of any state. *See id.* And this is because the Court has not issued such a ruling. The privity argument thus fails.

Instead, the Court has ruled that under the laws of numerous states, a direct benefit is conferred on an automotive manufacturer where a plaintiff purchases or leases his or her vehicle from a dealership affiliated with the automotive manufacturer. *See In re Takata Airbag Prods. Liab. Litig., ––– F. Supp. 3d ––––, 2020 WL 2764196, at \*15–21* (ruling such under the laws of Alabama, Arizona, Connecticut, Florida, Georgia, Illinois, Indiana, Louisiana, Massachusetts, Michigan, Mississippi, New York, Ohio, Pennsylvania, Tennessee, Virginia, and Wisconsin) (citing *In re Takata Airbag Prods. Liab. Litig., 255 F. Supp. 3d at 1260–64* (ruling same under the laws of Alabama, Arizona, California, Connecticut, Florida, Georgia, Hawaii, Illinois, Indiana, Massachusetts, Nevada, New Jersey, Ohio, Oregon, Rhode Island, Tennessee, Texas, Virginia, West Virginia, and Washington); *In re Takata Airbag Prods. Liab. Litig., 2016 WL 5848843, at \*10–11* (ruling same under the laws of Alabama, Florida, Massachusetts, Nevada, Pennsylvania, and South Carolina)).

Following these rulings, FCA advances a second argument: that unjust enrichment claims should be dismissed for 16 named-Plaintiffs who did not purchase their vehicles from an FCA-affiliated dealership. It is clear (from a footnote, in one of FCA's six appendices) that FCA specifically seeks to dismiss the unjust enrichment claims of these named-Plaintiffs: Laurie Reynolds (Arizona), Ronaldo Maldia (California); Daniel Dwinnells (Maryland); Deborah Hillyer and Dave Krzeminski (Michigan); Arlen Sturgis (Mississippi); Gene Marsilio (New Jersey); Laquintha O'Neal and Terrie Swanson (North Carolina); Victoria Lykins, and Reginald Price (Ohio); Jamelle Lowery (South Carolina); and Bridget Boyd (Texas). (*See* D.E. 2983-1 at 3 n.6.) Although FCA also seeks to dismiss the claims of Plaintiff Elizabeth Washington under Illinois law, Plaintiff Michael Eikenberry under Indiana law, and Plaintiff Kenneth Fischer under Ohio, *see id.*, as discussed in the choice-of-law analysis above, Michigan law applies to the claims of these Plaintiffs, *see* Sec.III.B.

Following its prior rulings on this issue, the Court will now analyze, on a state-by-state basis, the unjust enrichment allegations of these named-Plaintiffs.

### (1) Arizona

**\*15** Arizona law applies to Plaintiff Laurie Reynolds's unjust enrichment claim. And her claim is **DISMISSED** because her Dodge was purchased "from Anderson Toyota" and she offers no additional allegations from which the Court could infer that Anderson Toyota has any affiliation with FCA. (D.E. 2758 at ¶ 62.)

### (2) California

California law applies to Plaintiff Ronaldo Maldia's unjust enrichment claim. And his claim is **DISMISSED** because his Dodge was purchased "from Balboa Motors" and he offers no additional allegations from which the Court could infer that Balboa Motors has any affiliation with FCA. *Id.* at ¶ 54.

### (3) Maryland

Maryland law applies to Plaintiff Daniel Dwinnells's unjust enrichment claim. The Court has not previously addressed unjust enrichment claims under Maryland law.

Maryland courts have recognized three required elements of unjust enrichment: (1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) the acceptance or retention of the benefit by the defendant of the benefit under such circumstances as to make it inequitable for the defendants to retain the benefit without payment of its value. *See ADCS Inc. v. Kimbrough, Jr., 30 F. App'x. 225, 228 (4th Cir. 2002)* (quoting *Berry & Gould, P.A. v. Berry, 360 Md. 142, 757 A.2d 108, 113 (2000)*). Aside from these required elements, the Court is not aware of any authority also requiring a plaintiff to directly confer a benefit on a defendant in order to state an unjust enrichment claim under Maryland law.

Turning to the allegations, Dwinnells's claim is **DISMISSED** because he purchased his Dodge "from Ideal Buick GMC" and he offers no additional allegations from which the Court could infer that Ideal Buick GMC has any affiliation with FCA. (D.E. 2758 at ¶ 39.)

### (4) Michigan

Michigan law applies to the unjust enrichment claims of Plaintiffs Michael Eikenberry, Kenneth Fischer, Deborah Hillyer, Dave Krzeminski, and Elizabeth Washington. And the claims of each Plaintiff are **DISMISSED** because their vehicles were not purchased from FCA-affiliated dealerships, and they offer no additional allegations from which the Court could infer the dealerships have any affiliation with FCA. *See id.* at ¶ 40 (Eikenberry purchased his used Chrysler "from Auto World"); *id.* at ¶ 41 (Fischer purchased his used Dodge "from Troy Auto Group"); *id.* at ¶ 47 (Hillyer purchased her used Chrysler "from AM Automotive LLC"); *id.* at ¶ 50 (Krzeminski purchased his used Dodge "from a used car dealership"); *id.* at ¶ 66 (Washington purchased her used Dodge "from Howard Automotive").

### (5) Mississippi

Mississippi law applies to Plaintiff Arlen Sturgis's unjust enrichment claim. And his claim is **DISMISSED** because his Chrysler was purchased "from Southern Imports, Inc." and he offers no additional allegations from which the Court could infer that Southern Imports, Inc. has any affiliation with FCA. *Id.* at ¶ 64.

### (6) New Jersey

New Jersey law applies to Plaintiff Gene Marsilio's unjust enrichment claim. As noted in the *Puhalla* Order, under New Jersey law, "[w]hen a plaintiff fails to allege a direct relationship, that plaintiff has failed to assert a claim for unjust enrichment, and under those circumstances, dismissal is appropriate." *See In re Takata Airbag Prods. Liab. Litig.*, —— F. Supp. 3d ——, 2020 WL 2764196, at *19 (quoting *Glass v. BMW of N. Am., LLC*, Civil Action No. 10-5259 (ES), 2011 WL 6887721, at *16 (D.N.J. Dec. 29, 2011)).

*16 Turning to the allegations, Marsilio's claim is **DISMISSED** because his used Dodge was purchased "from Luxury Haus" and he offers no additional allegations from which the Court could infer that Luxury Haus is directly owned and operated by FCA. (D.E. 2758 at ¶ 55.)

### (7) North Carolina

North Carolina law applies to the unjust enrichment claims of Plaintiffs Laquintha O'Neal and Terrie Swanson. The Court also has not previously addressed unjust enrichment claims under North Carolina law.

To state a claim for unjust enrichment under North Carolina law, a plaintiff must allege that he or she "conferred a benefit on the other party" that is "measurable" and not "gratuitous." *Krawiec v. Manly*, 370 N.C. 602, 811 S.E. 2d 542, 552 (2018) (quoting *Booe v. Shadrick*, 322 N.C. 567, 369 S.E. 2d 554, 556 (1988)). Aside from these elements, the Court is not aware of any authority that also requires the plaintiff to directly confer the benefit on the defendant in order to state an unjust enrichment claim under North Carolina law.

Turning to the allegations, O'Neal's and Swanson's claims are **DISMISSED** because their vehicles were purchased "from Carmax" and "from Hickory Used Car Superstore," respectively, and they offer no additional allegations from which the Court could infer that Carmax or the Hickory Used Car Superstore have any affiliation with FCA. (D.E. 2758 at ¶¶ 59, 65.)

### (8) Ohio

Ohio law applies to the unjust enrichment claims of Plaintiffs Victoria Lykins and Reginald Price. And Lykins's and Price's claims are **DISMISSED** because their vehicles were purchased "from Jeff Wyler, Eastgate Automall" and "from Dixie Import," respectively, and they offer no additional allegations from which the Court could infer that these dealerships have any affiliation with FCA. *Id.* at ¶¶ 53, 61.

### (9) South Carolina

South Carolina law applies to Plaintiff Jamelle Lowery's unjust enrichment claim. And Lowery's claim is **DISMISSED** because her used Chrysler was purchased "from Crown Nissan" and she offers no additional allegations from which the Court could infer that Crown Nissan has any affiliation with FCA. *Id.* at ¶ 51.

### (10) Texas

Texas law applies to Plaintiff Bridget Boyd's unjust enrichment claim. And her claim is **DISMISSED** because her used Chrysler was purchased "from Driver's Choice" and she offers no additional allegations from which the Court could

infer that Driver's Choice has any affiliation with FCA. *Id.* at ¶ 36.

### b) Adequate Remedy at Law (Express Warranties)

Second, FCA argues in a footnote that unjust enrichment claims should be dismissed for the 12 named-Plaintiffs who allege the existence of an express warranty, as these plaintiffs fail to adequately allege unconscionability. (D.E. 2983 at 55 n.24.) As the Court explained in the *Puhalla* and *Whitaker* Orders, this argument is unavailing because not only has FCA failed to provide the Court with any written express warranties covering any of Plaintiffs' vehicles, but also, Plaintiffs allege that they do not have an adequate remedy at law, and that the warranties are procedurally and substantively unconscionable and are thus not enforceable. (*See In re Takata Airbag Prods. Liab. Litig.*, ––– F. Supp. 3d ––––, 2020 WL 2764196, at *14–15; D.E. 3838 at 25–26; D.E. 2758 at ¶¶ 182–84, 251.) And although FCA also summarily argues in passing in its footnote that Plaintiffs fail to offer any facts showing unconscionability (D.E. 2983 at 55 n.24), FCA has not produced the applicable written express warranties. Thus, the Court need not reach this cursory contention. (*See* D.E. 1208 at 20 (addressing Nissan's unconscionability argument only after "Nissan attached the express warranty covering [the plaintiff's vehicle] to its Motion," and then only after the Court found that the warranty was "central to Plaintiffs' claims and that Plaintiffs ha[d] not disputed the authenticity of the attached warranty").)

**\*17** In addition, Plaintiffs are allowed to maintain an unjust enrichment claim in the alternative to their other claims. *See In re Takata Airbag Prods. Liab. Litig.*, ––– F. Supp. 3d ––––, 2020 WL 2764196, at *15 (citing *Tershakovec v. Ford Motor Co.*, No. 17-21087-CIV, 2018 WL 3405245, at *14 (S.D. Fla. July 12, 2018) ("Plaintiffs may maintain an unjust enrichment claim in the alternative to their breach of express warranty claim.") (citing *Martorella v. Deutsche Bank Nat. Tr. Co.*, 931 F. Supp. 2d 1218, 1227–28 (S.D. Fla. 2013) ("Plaintiff may, however, maintain an equitable unjust enrichment claim in the alternative to her legal claims against Defendants."); Fed. R. Civ. P. 8(a)(3), (d)(2) (permitting pleading in the alternative))). This is because it is only upon a showing that an express contract exists between the parties that the unjust enrichment count fails. *See id.* at *15 (quoting *In re Takata Airbag Prods. Liab. Litig.*, 193 F. Supp. 3d at 1344). And FCA has not made this showing here. Thus, it would be premature

to dismiss the unjust enrichment claims on this basis. *Id.* (quoting *Martorella*, 931 F. Supp. 2d at 1228).

Finally, even though equitable relief ultimately may not be awarded because there is an adequate remedy at law, Plaintiffs "certainly may plead alternative equitable relief" at this stage. *Id.* (quoting *Adelphia Cable Partners, Inc. v. E & A Beepers Corp.*, 188 F.R.D. 662, 666 (S.D. Fla. 1999)). Provided there is evidence proving the existence of enforceable written express warranties, FCA may renew its argument at summary judgment. But for now, the claims survive.

### c) Standalone Causes of Action (California and Texas)

Third, FCA argues that California and Texas unjust enrichment claims should be dismissed because these states do not recognize unjust enrichment as a standalone cause of action. Plaintiffs again disagree.

### (1) California

As explained in the *Whitaker* Order, California recognizes the principle behind unjust enrichment by requiring "restitution if [a defendant] is unjustly enriched at the expense of another. The recipient of the benefit is liable only if the circumstances are such that, as between two persons, it is unjust for the recipient to retain it." (D.E. 3838 at 26–27 (quoting *In re Takata Airbag Prods. Liab. Litig.*, 255 F. Supp. 3d at 1261 (quoting *City of Chula Vista v. Gutierrez*, 207 Cal.App.4th 681, 143 Cal. Rptr. 3d 689, 692 (2012)))).)

Here, California law applies to the unjust enrichment claims of Plaintiffs Rushelle Gonder and Pedro Lucero. And their claims can proceed because their vehicles were purchased from FCA-affiliated dealerships. (*See* D.E. 2758 at ¶ 45 (Gonder purchased her used Chrysler "from Scott Robinson Chrysler"); *id.* at ¶ 52 (Lucero purchased his new Chrysler "from Elk Grove Chrysler").)

### (2) Texas

Texas courts have ruled that unjust enrichment "is not an independent cause of action but rather characterizes the result of a failure to make restitution benefits either wrongfully or passively received under circumstances that give rise to an implied or quasi-contractual obligation to repay." *In re*

*Takata Airbag Prods. Liab. Litig.*, 255 F. Supp. 3d at 1263–64 (quoting *Foley v. Daniel*, 346 S.W.3d 687, 690 (Tex. Ct. App. 2009)). In some circumstances, however, "overpayments under a valid contract may give rise to a claim for restitution or unjust enrichment." *Id.* (quoting *Foley*, 346 S.W. 3d at 690–91). But because the Court is only deciding "the sufficiency of Plaintiffs' claims under a motion to dismiss standard"—"and not whether Plaintiffs actually overpaid for their vehicles"—their claims should not be summarily dismissed on this basis. *See id.* The overpayment inquiry is appropriate at summary judgment or trial; but for now, the Court can determine whether plaintiffs allege that they purchased their vehicles from an FCA-affiliated dealership such that their claim can proceed. *See id.*

**\*18** Here, Texas law applies to Plaintiff Shanna Moore's unjust enrichment claim. And her claim can proceed because her Dodge was purchased "from Team Dodge," an FCA-affiliated dealership. (D.E. 2758 at ¶ 57.)

### d) Time Bars

Finally, FCA argues that the statute of limitations bars certain unjust enrichment claims under the laws of Arkansas, Georgia, North Carolina, and Texas. As discussed above, fraudulent concealment tolling applies to claims under Georgia and Texas law, *see supra* Sec.III.C.1.d.2, as well as under Arkansas law, *see In re Takata Airbag Prods. Liab. Litig.*, —— F. Supp. 3d ——, 2020 WL 2764196, at \*25 (citing *Martin v. Arthur*, 339 Ark. 149, 3 S.W. 3d 684, 687 (1999) (citing *Adams v. Arthur*, 333 Ark. 53, 969 S.W. 2d 598, 602–03 (1998))). Like these states, North Carolina also recognizes fraudulent concealment tolling. *See Friedland v. Gales*, 131 N.C.App. 802, 509 S.E. 2d 793, 797 (1998) (citing *Connor v. Schenck*, 240 N.C. 794, 84 S.E. 2d 175 (1954); *Stallings v. Gunter*, 99 N.C.App. 710, 394 S.E. 2d 212 (990)). For the reasons explained earlier and in previous orders, fraudulent concealment tolling applies to the unjust enrichment claims under the laws of these states.

### e) Conclusion

In sum, Count 5 is **DISMISSED** as to the following named-Plaintiffs: Laurie Reynolds (Arizona); Ronaldo Maldia (California); Daniel Dwinnells (Maryland); Michael Eikenberry, Kenneth Fischer, Deborah Hillyer, Dave Krzeminski, and Elizabeth Washington (Michigan); Arlen Sturgis (Mississippi); Gene Marsilio (New Jersey); Laquintha O'Neal and Terrie Swanson (North Carolina); Victoria Lykins and Reginald Price (Ohio); Jamelle Lowery (South Carolina); and Bridget Boyd (Texas). By extension, because there are no class representatives with unjust enrichment claims under the laws of Arizona, Maryland, Mississippi, New Jersey, North Carolina, and Ohio, Count 5 is also **DISMISSED** as to all putative class members whose negligence claims are governed under the laws of these states. *See Wooden*, 247 F.3d at 1288 ("[A] claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim.") (quoting *Prado-Steiman*, 221 F.3d at 1280).

As for the claims that survive, Count 5 will proceed for the following named-Plaintiffs: Cathy Parker and Bobbie Simmons (Arkansas); Rushelle Gonder and Pedro Lucero (California); Michelle Gibson and Debrah Johnson (Georgia); John Fuesting and Priscilla Fuesting (Illinois); Carla Campagnone (Massachusetts); Randy Nielsen (Michigan); Jason Williams (Missouri); Rmzy Abdallah (New York); Marcia Griffith (Pennsylvania); T'Keya Cooper (South Carolina); and Shanna Moore (Texas). [6]

[6]    The Court notes that Plaintiff Michael McClellion (South Carolina) is excluded from this claim. (D.E. 2758 at ¶ 247.)

### 2. Negligence (Count 6)

Plaintiffs also assert a nationwide-class common-law negligence claim. FCA argues that this claim should be dismissed in its entirety for lack of causation, and that alternatively, certain negligence claims should be dismissed under the economic loss rule or the statute of limitations.

### a) Causation

First, FCA argues that all negligence claims should be dismissed because Takata's criminal acts—which Takata admitted to in the Takata Plea Agreement—break any causal connection between FCA's allegedly negligent conduct and Plaintiffs' purported injuries.

**\*19** The Court previously declined to judicially notice the contents of the Takata Plea Agreement for its truth because, regardless of reliability, meaning, or actual proof, the parties heavily disputed the contents. *See In re Takata*

*Airbag Prods. Liab. Litig.*, 396 F. Supp. 3d at 1128–29. By extension, the Court declined to dismiss the entire complaint for lack of standing on the grounds that Takata's admissions demonstrated that Plaintiffs' injuries were not "fairly traceable" to certain defendants' actions. *Id.* at 1129. Likewise here, because the contents of the Takata Plea Agreement are heavily disputed, it is premature to dismiss any negligence claims on this basis at this stage. Whether Takata's admissions are sufficient to sever the causal connection between Plaintiffs' injuries and FCA's allegedly negligent conduct is an issue appropriate for resolution at summary judgment or trial. (*See* D.E. 3838 at 23 (ruling same).)

### b) Economic Loss Bars

After accounting for the choice-of-law dismissals and the states excluded by Plaintiffs,[7] negligence claims remain under the laws of Arizona, Arkansas, Georgia, Maryland, Mississippi, Missouri, New Jersey, New York, Ohio, and Texas.

[7]     The Complaint specifically excludes from this claim consumers from Alabama, California, Florida, Illinois, Massachusetts, Michigan, Nevada, North Carolina, Pennsylvania, and South Carolina. (*See* D.E. 2758 at ¶ 253.)

FCA's second argument is that the economic loss rule bars negligence claims under the laws of Arizona, Georgia, Missouri, New Jersey, New York, Ohio, and Texas. Plaintiffs do not appear to contest this argument, and instead maintain that negligence claims should proceed under the laws of Arkansas and Maryland because these states have not adopted the economic loss rule. In turn, FCA does not appear to contest this argument. And the only remaining state, Mississippi, bars negligence claims under the economic loss doctrine if the only damage sustained was to the product. *See Herman Cronier & Sons, Inc. v. Carrier Corp.*, No. 1:11CV364-HSO-RHW, 2013 WL 12090326, at *6 (S.D. Miss. Sept. 6, 2013) (citing *State Farm Mut. Auto. Ins. Co. v. Ford Motor Co.*, 736 So. 2d 384, 387 (Miss. Ct. App. 1999)). Accordingly, negligence claims can proceed under Arkansas and Maryland law.

### c) Time Bars

Finally, FCA argues that the statute of limitations bars the negligence claims of Plaintiffs Michelle Gibson and Shanna Moore, which are asserted under the laws of Georgia and Texas, respectively. As discussed above, fraudulent concealment tolling applies to claims under Georgia and Texas law. *See supra* Sec.III.C.1.d.2. For the reasons explained earlier, fraudulent concealment tolling applies to these negligence claims.

### d) Conclusion

Taken together, Count 6 is **DISMISSED** as to all named-Plaintiffs whose negligence claims are governed under the laws of Arizona, Georgia, Mississippi, Missouri, New Jersey, New York, Ohio, and Texas. By extension, Count 6 is also **DISMISSED** as to all putative class members whose negligence claims are governed under the laws of these states. *See Wooden*, 247 F.3d at 1288 ("[A] claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim.") (quoting *Prado-Steiman*, 221 F.3d at 1280).

As for the claims that survive, Count 6 will proceed for named-Plaintiffs Cathy Parker and Bobbie Simmons (Arkansas) and Daniel Dwinnells (Maryland).

### E. NATIONWIDE-CLASS MAGNUSON-MOSS WARRANTY ACT AND STATEWIDE-CLASS BREACH OF IMPLIED WARRANTY CLAIMS

Next, Plaintiffs assert a nationwide-class Magnuson-Moss Warranty Act claim. In the alternative, they assert statewide-class breach of implied warranty claims under the laws of several states. FCA argues that the Magnuson-Moss Warranty Act claim must be dismissed because Plaintiffs fail to assert implied warranty claims under the laws of every state, and additionally, because Plaintiffs do not meet the 100-plaintiff requirement to bring a class action under the Act. As to the alternative claims for breach of implied warranty under state law, FCA argues that certain claims are barred by the statute of limitations, and that claims under New York and North Carolina law should be dismissed for lack of privity.

### 1. Nationwide-Class Magnuson-Moss Warranty Act Claim (Count 1)

**\*20** Despite asserting a *nationwide*-class Magnuson-Moss Warranty Act claim, Plaintiffs assert breach of implied warranty claims under the laws of only *14 states*. For the

reasons fully explained in the *Puhalla* Order, the nationwide-class Magnuson-Moss Warranty Act claim in Count 1 is **DISMISSED** for lack of standing. *See In re Takata Airbag Prods. Liab. Litig.*, --- F. Supp. 3d ----, 2020 WL 2764196, at *24 ("Because standing is a claim-specific determination and implied warranty claims under the [Magnuson-Moss Warranty] Act 'arise out of and are defined by' state law, the Court finds that the named-Plaintiffs lack standing to represent putative class members of states for which there are no breach of implied warranty claims."). Furthermore, Count 1 is dismissed in its entirety because—unlike the nationwide-class common-law claims—Plaintiffs explicitly assert that "[i]n the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act," they assert statewide-class breach of implied warranty claims under the laws of several states. (D.E. 2758 at ¶¶ 326, 334, 406, 549, 555, 608, 636, 642, 675, 703, 740, 771, 823, 857, 888.) Because Count 1 is dismissed for lack of standing, the Court need not address FCA's separate argument regarding the 100-plaintiff requirement. The Court will now address the state breach of implied warranty claims.

### 2. Statewide-Class Breach of Implied Warranty Claims (Counts 10–11, 15, 23, 26, 28–29, 33, 41, 44, and 46)

Plaintiffs assert breach of implied warranty claims under laws of Arkansas, California,[8] Maryland, Massachusetts, Michigan, Mississippi, Missouri, New Jersey, New York, North Carolina, Pennsylvania, South Carolina, and Texas. FCA argues that the statute of limitations bars certain implied warranty claims under the laws of Arkansas, California, Maryland, Michigan, Mississippi, Missouri, New Jersey, North Carolina, Pennsylvania, and Texas. FCA also argues that the implied warranty claims under New York and North Carolina law should be dismissed for lack of privity; because Plaintiffs do not dispute this argument and agree to dismiss Counts 36 and 38, these claims are **DISMISSED**.

[8]   Plaintiffs asserts two claims under California's Song-Beverly Consumer Warranty Act (Counts 11 and 15). Finding no discernable difference between these two claims, Count 15 is **DISMISSED** as duplicative. *See Kuchenbecker v. Johnson & Johnson*, No. 19-61712-CIV, 2019 WL 4416079, at *2 (S.D. Fla. Sept. 16, 2019) ("To promote judicial economy, a court should dismiss claims that are duplicative of other claims.") (citations and internal quotations omitted).

As explained in the *Puhalla* and *Whitaker* Orders, fraudulent concealment tolling applies in Arkansas, California, Michigan, Mississippi, Missouri, New Jersey, Pennsylvania, and Texas. (*See In re Takata Airbag Prods. Liab. Litig.*, --- F. Supp. 3d ----, 2020 WL 2764196, at *25 (Arkansas, California, Michigan, Mississippi, New Jersey, Pennsylvania, and Texas); D.E. 3838 at 29 (Missouri).) The only states left unaccounted for here, Maryland and North Carolina, also recognize fraudulent concealment tolling. *See Doll v. Ford Motor Co.*, 814 F. Supp. 2d 526, 536 (D. Md. 2011) (quoting Md. Code. Ann., Cts. & Jud. Proc. § 5–203); *Friedland*, 509 S.E. 2d at 797 (citing *Connor*, 240 N.C. 794, 84 S.E. 2d 175; *Stallings*, 99 N.C.App. 710, 394 S.E. 2d 212).

Here, as explained above, Plaintiffs assert numerous allegations detailing FCA's knowledge of the risks posed by the Takata airbags installed in their vehicles, their alleged failure to fully investigate or disclose the seriousness of the issue to consumers or regulatory authorities, and their continued selling and leasing of vehicles installed with Takata airbags. *See supra* Sec.III.C.1.a–c. Viewing these allegations in the light most favorable to Plaintiffs, as the Court must at this stage, the Court finds that fraudulent concealment tolling applies to the breach of implied warranty claims.

### 3. Conclusion

In sum, Counts 1, 15, 36, and 38 are **DISMISSED**, and the state breach of implied warranty claims in Counts 10–11, 23, 26, 28–29, 33, 41, 44, and 46 will proceed.

### F. SALE ORDER BAR

Finally, FCA urges that *all* the claims of the named-Plaintiffs who own vehicles manufactured by Chrysler LLC ("Old Chrysler")—not FCA—are barred by the bankruptcy Sale Order governing FCA's acquisition of certain of Old Chrysler's assets.[9] FCA argues that its liability for vehicles manufactured by Old Chrysler and sold prior to the closing date of the Sale Order is "limited to certain expressly Assumed Liabilities," as defined in the Master Transaction Agreement. Plaintiffs insist that the Sale Order does not bar *any* of these claims because these Plaintiffs purchased their vehicles *after* the Sale Order closed, and because their claims are premised on FCA's *post*-closing wrongful conduct.

[9]   In June 2009, FCA purchased substantially all of Old Chrysler's assets pursuant to a Sale Motion and Purchase Agreement that was approved by the

United States Bankruptcy Court for the Southern District of New York. (D.E. 2758 at ¶ 3.)

**\*21** The moving papers frame the issue as all or nothing. But the Master Transaction Agreement expressly delineates both "Assumed Liabilities" and "Excluded Liabilities." (*See* D.E. 2989-2 at 69–72.) For instance, Sections 2.08(g) and 2.08(h) list as Assumed Liabilities "all Liabilities pursuant to product warranties, product returns and rebates on vehicles sold by Sellers prior to the Closing" and "all Product Liability Claims arising from the sale after the Closing of Products or Inventory manufactured by Sellers or their Subsidiaries in whole or in part prior to the Closing." *Id.* at 70. And Sections 2.09(i) and 2.09(j) list as Excluded Liabilities "all Product Liability Claims arising from the sale of Products or Inventory prior to the Closing" and "all Liabilities in strict liability, negligence, gross negligence or recklessness for acts or omissions arising prior to or ongoing at the Closing." *See id.* at 71. It follows from these definitions that application of the Sale Order is claim specific. *See In re Old Carco LLC*, 492 B.R. 392, 403–06 (Bankr. S.D.N.Y. 2013) (deciding separately whether the claims for breach of implied warranty, and the claims for negligence under various theories of liability, were barred by the Sale Order).

Although FCA argues in a footnote that liability for fraud, failure to warn, and breach of implied warranty are not Assumed Liabilities under the Master Transaction Agreement, FCA's Reply does not sufficiently address Plaintiffs' core contention that FCA's *post*-closing wrongful conduct is actionable—a contention supported by interpretive case law. *See In re Old Carco LLC*, 582 B.R. 838, 845 (Bankr. S.D.N.Y. 2018) ("At bottom, *a post-Closing breach of an independent duty gives rise to a post-Closing right to payment*, and the 'free and clear' provisions of the Sale Order cannot cut off New Chrysler's liability for its own wrongful, post-Closing conduct.") (emphasis added and citation omitted); *Castleman v. FCA US LLC*, No. 2:18-cv-00342-JNP-PMW, 2019 WL 1406611, at \*4 (D. Utah Mar. 28, 2019) ("The Sale Order is not so broad as to preclude FCA's liability for post-Sale duty to warn."); *Holland v. FCA U.S. LLC*, No. 1:15 CV 121, 2015 WL 5172996, at \*5 (N.D. Ohio Sept. 3, 2015) ("[T]his case is not one that argues liability simply because FCA is a successor to Old Chrysler, but rather whether FCA had a duty to act based knowledge it acquired and actions it took post Sale Order ....").

Plaintiffs' post-closing conduct argument highlights the claim-specific nature of the Sale Order analysis, and FCA's ensuing failure to respond to this argument seals the Court's

refusal to dismiss any of Plaintiffs' claims under the Sale Order. [10]

[10]  The Court notes that the definitions of Assumed Liabilities and Excluded Liabilities in the Master Transaction Agreement were subsequently amended. *See In re Old Carco LLC*, 492 B.R. at 396. The parties' briefing makes no mention of these amendments and only provides the Court with Amendment No. 1. Although it ultimately may not be relevant to the parties' arguments, it appears that Amendment No. 4 "expanded the category of Assumed Liabilities to include certain product liability claims." *See id.* at 396 & n.8.

In the end, holding aside whether Plaintiffs can state certain claims for post-closing wrongful conduct, they will ultimately have to prove at summary judgment or trial that FCA's post-closing conduct was a proximate cause of their economic losses. *See Castleman v. FCA US LLC*, 2019 WL 1406611, at \*6 ("[T]he court would have to determine whether the post-Closing or pre-Closing conduct was the proximate cause of [plaintiff's] harm. But the question of proximate cause is a question reserved for the fact finder. Accordingly, it is not appropriately decided at the motion to dismiss stage.") (citing *In re Old Carco LLC*, 582 B.R. at 846 ("[A]ssuming that the Plaintiff can assert legally sufficient claims based solely on New Chrysler's post-Closing wrongful conduct, the question of what proximately caused the Decedents' fatal injuries is for the factfinder.")).

For now, the Court declines to dismiss any of the Plaintiffs' claims under the Sale Order. FCA may, however, renew claim-specific arguments at summary judgment.

## CONCLUSION

**\*22**  For all the reasons explained above, it is

**ADJUDGED** that FCA's Motion to Dismiss is **GRANTED IN PART** as follows:

- The nationwide-class Magnuson-Moss Warranty Act claim (Count 1) is **DISMISSED** in full;

- The statewide-class breach of implied warranty claims under the laws of Indiana, New York, and North Carolina (Counts 22, 36, and 38), and the duplicative claim under California law (Count 15), are **DISMISSED**;

- The statewide-class statutory consumer protection claims under the laws of Alabama, Florida, Indiana, and Pennsylvania (Counts 7, 16, 21, and 40) are **DISMISSED** in full, and the claims under the laws of California, Georgia, and Illinois (Counts 12, 18, and 20) are **DISMISSED** only to the extent they seek damages;

- The fraud claim (Count 4) is **DISMISSED** as to named-Plaintiffs Arlen Sturgis (Mississippi), and T'Keya Cooper, Jamelle Lowery, and Michael McClellion (South Carolina), and as to all putative class members whose fraud claims are governed under the laws of Alabama, Florida, Indiana, Mississippi, and South Carolina;

- The unjust enrichment claim (Count 5) is **DISMISSED** as to all putative class members whose unjust enrichment claims are governed under the laws of Alabama, Arizona, Florida, Indiana, Maryland, Mississippi, New Jersey, North Carolina, and Ohio, and as to these named-Plaintiffs: Laurie Reynolds (Arizona); Ronaldo Maldia (California); Daniel Dwinnells (Maryland); Michael Eikenberry, Kenneth Fischer, Deborah Hillyer, Dave Krzeminski, and Elizabeth Washington (Michigan); Arlen Sturgis (Mississippi); Gene Marsilio (New Jersey); Laquintha O'Neal and Terrie Swanson (North Carolina); Victoria Lykins and Reginald Price (Ohio); Jamelle Lowery (South Carolina); and Bridget Boyd (Texas); and

- The negligence claim (Count 6) is **DISMISSED** as to all named-Plaintiffs whose negligence claims are governed under the laws of Alabama, Arizona, Florida, Georgia, Indiana, Mississippi, Missouri, New Jersey, New York, Ohio, and Texas, and as to all putative class members whose negligence claims are governed under the laws of these states.

Furthermore, the Motion to Dismiss is **DENIED** as to the following claims, which will proceed to summary judgment:

- The statewide-class statutory consumer protection and breach of implied warranty claims in Counts 8–14, 17–20, 23–35, 37, 39, and 41–46;

- Claims for fraud (Count 4) asserted by all named-Plaintiffs whose claims are governed under the laws of Arizona, Arkansas, California, Georgia, Illinois, Maryland, Massachusetts, Michigan, Missouri, New Jersey, New York, North Carolina, Ohio, and Texas;

- Claims for unjust enrichment (Count 5) asserted by these named-Plaintiffs: Cathy Parker and Bobbie Simmons (Arkansas); Rushelle Gonder and Pedro Lucero (California); Michelle Gibson and Debrah Johnson (Georgia); John Fuesting and Priscilla Fuesting (Illinois); Carla Campagnone (Massachusetts); Randy Nielsen (Michigan); Jason Williams (Missouri); Rmzy Abdallah (New York); Marcia Griffith (Pennsylvania); T'Keya Cooper (South Carolina); and Shanna Moore (Texas); and

- Claims for negligence (Count 6) asserted by these named-Plaintiffs: Cathy Parker and Bobbie Simmons (Arkansas) and Daniel Dwinnells (Maryland).

**\*23** It is further

**ADJUDGED** that FCA must answer the remaining claims in the *Boyd* Complaint **no later than July 23, 2020**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 1st of June 2020.

**All Citations**

--- F.Supp.3d ----, 2020 WL 2892366

---

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.