```
 1                UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF NEW JERSEY
 2
 3   ━━━━━━━━━━━━━━━━━━━━━━━━           CIVIL ACTION NUMBER:
     IN RE:  VALSARTAN PRODUCTS
 4   LIABILITY LITIGATION               1:19-md-02875-RBK-JS
 5   ━━━━━━━━━━━━━━━━━━━━━━━━           STATUS CONFERENCE AND ORAL
                                       ARGUMENT ON THE
 6                                     TEVA/PLAINTIFFS' TAR
                                       DISCOVERY DISPUTE
 7                                     (Via telephone)
 8        Wednesday, November 11, 2020
          Commencing at 2:00 p.m.
 9
10   B E F O R E:            THE HONORABLE JOEL SCHNEIDER,
                             UNITED STATES MAGISTRATE JUDGE
11   A P P E A R A N C E S:
12        MAZIE SLATER KATZ & FREEMAN, LLC
          BY:  ADAM M. SLATER, ESQUIRE
13        103 Eisenhower Parkway
          Roseland, New Jersey 07068
14        For the Plaintiff
15        GOLOMB & HONIK PC
          BY:  DAVID JOHN STANOCH, ESQUIRE
16        1835 Market Street, Suite 2900
          Philadelphia, Pennsylvania 19103
17        For the Plaintiff
18        KANNER & WHITELEY LLC
          BY:  CONLEE S. WHITELEY, ESQUIRE
19        701 Camp Street
          New Orleans, Louisiana 70130
20        For the Plaintiff
21
22
23        Karen Friedlander, Official Court Reporter
               friedlanderreporter@gmail.com
24                  (856) 756-0160
25        Proceedings recorded by mechanical stenography;
          transcript produced by computer-aided transcription.
```

**A P P E A R A N C E S: - CONTINUED**

LEVIN PAPANTONIO
BY:  DANIEL A. NIGH, ESQUIRE
316 S. Baylen, Suite 600
Pensacola, Florida 32502
For the Plaintiff

GOLDENBERG LAW PLLC
BY:  MARLENE J. GOLDENBERG, ESQUIRE
800 Lasalle Avenue
Suite 2150
Minneapolis, Minnesota 55402
For the Plaintiff

KIRTLAND & PACKARD LLP
BY:  BEHRAM PAREKH, ESQUIRE
1638 South Pacific Coast Highway
Redondo Beach, California 90277
For the Plaintiff

DUANE MORRIS LLP
BY:  SETH A. GOLDBERG, ESQUIRE
     REBECCA BAZAN, ESQUIRE
30 S. 17th Street
Philadelphia, Pennsylvania 19103
For the Defendant ZHP and the Joint Defense Group

GREENBERG TRAURIG LLP
BY:  VICTORIA LOCKHARD, ESQUIRE
     JEFFREY W. GREENE, ESQUIRE
3333 Piedmont Road, NE, Suite 2500
Atlanta, Georgia 30305
For the Defendants, Teva Pharmaceutical Industries Ltd.,
Teva Pharmaceuticals USA, Inc., Actavis LLC, and Actavis
Pharma, Inc.

BARNES & THORNBURG LLP
BY:  SARAH E. JOHNSTON, ESQUIRE
2029 Century Park East, Suite 300
Los Angeles, CA 90067-2904
For the Defendant, CVS Health Co.

PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI LLP
BY:  CLEM C. TRISCHLER, ESQUIRE
One Oxford Centre, 38th Floor
Pittsburgh, Pennsylvania 15219
For the Defendant Mylan and the Joint Defense Group
     4

1
**A P P E A R A N C E S: - CONTINUED**
2
3      CIPRIANI & WERNER, P.C.
       BY:  JESSICA M. HEINZ, ESQUIRE
4      450 Sentry Parkway, Suite 200
       Blue Bell, PA  19422
5      For the Defendant, Aurobindo Pharma USA, Inc., Aurolife
       Pharma, LLC and Aurobindo Pharma, Ltd.
6
       NORTON ROSE FULBRIGHT
7      BY:  D'LESLI M. DAVIS, ESQUIRE
       1301 Avenue of the Americas
8      New York, NY 10019-6022
       For the Wholesalers and McKesson individually
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (OPEN COURT, November 11, 2020, 2:01 p.m.)

2          THE COURT:  We're on the record in the Valsartan MDL,

3     Docket No. 19-2875.  Whoever is not talking, can you please

4     put your phone on mute, because we hear some background noise.

5          Let's start with the entries of appearance for the

6     plaintiffs, who is likely to talk this afternoon.

7          Plaintiff?

8          MS. WHITELEY:  Good afternoon, Your Honor, this is

9     Conlee Whiteley on behalf of plaintiffs and Mr. Hart will be

10    joining us shortly.

11         MR. SLATER:  Hello, Your Honor, Adam Slater on behalf

12    of the plaintiffs.

13         MR. NIGH:  Hello, Your Honor, this is Daniel Nigh on

14    behalf of the plaintiffs.

15         THE COURT:  All right.  Let's turn to the defendants

16    who is likely to talk.

17         MR. GOLDBERG:  Good afternoon, Your Honor, this is

18    Seth Goldberg from Duane Morris on behalf of the ZHP parties

19    and defendants.  And joining me today also will likely be my

20    colleague, Barbara Schwartz and possibly Rebecca Bazan.

21         MS. LOCKARD:  Hi, Judge, it's Victoria Lockard from

22    Greenberg Traurig on behalf of the Teva defendants and the

23    defense executive group.  I also have from my firm on, Jeff

24    Greene to address the TAR issues and Dr. Maura Grossman is

25    here in the event we have any questions for her.

1          MR. TRISCHLER:  Good afternoon, Your Honor, this is

2    Clem Trischler representing Mylan Pharmaceuticals and

3    defendants executive committee.

4          MS. HEINZ:  Good afternoon, Your Honor, this is

5    Jessica Heinz on behalf of the Aurobindo defendants.

6          THE COURT:  All right.

7          MS. JOHNSTON:  Good afternoon, Your Honor, Sarah

8    Johnston on behalf of the retailer defendants, CVS and Rite

9    Aid.

10         THE COURT:  Anyone else want to enter their

11   appearances at the moment for the defendants?

12         All right.  We have two main items on the agenda

13   today.  One is the letters received from both sides.  I'd like

14   to address that first and then to address the oral argument on

15   the TAR issue involving Teva.

16         A couple of quick points to get them out of the way.

17   One, there was a note in one of the letters that the

18   completion date of the document production fell on a Sunday.

19   Obviously, that was unintended, so we'll make -- we'll make

20   the completion date Monday, which is November 30th.

21         Second issue is, if we can get it out of the way

22   quickly, if not, we'll deal with it later, the Court received

23   Mylan's letter in effect requesting the same relief that has

24   been ordered for Teva.  At least I got the impression from the

25   letter that Mylan and plaintiffs were still conferring about

1  this issue and there hasn't been a final resolution.  As long

2  as the parties are talking, I, of course, have no objection,

3  if we want to stay for the moment Mylan's deadline to produce

4  alleged, quote unquote, nonresponsive documents, it won't

5  affect the normal production, but those documents that Mylan

6  has culled out, that's the subject of this letter application.

7  If Mylan and plaintiffs agree, because they're going to talk

8  about the issue to try and work it out, I have no problem just

9  staying that deadline until those discussions are exhausted.

10  Presumably, that will be in the near future.

11        Mr. Trischler, do you want to talk to that?

12        MR. TRISCHLER:  Certainly, Your Honor.  Thank you.

13  We have -- you've correctly summarized our position in the

14  sense that through the use of technology, we believe the Mylan

15  production has reached the point where continuing the review

16  will not yield any substantially responsive documents, so

17  we've asked for the plaintiffs to consider cutting off the

18  review.  We've had ongoing discussions about that, most

19  recently last evening.  I thought the discussions were

20  productive and were continuing.

21        Obviously, Mr. Slater and Mr. Parekh can speak to

22  their view of that, and I'm certainly happy to continue the

23  discussions.  I think the one issue that may be standing in

24  the way is, you know, we are in a position, Your Honor, where

25  we believe that the documents from the Mylan collection, which

1   we believe -- which the computer and the technology suggests

2   to us will be relevant and responsive to plaintiffs' claims

3   will be produced by the November 30 deadline.  The so-called

4   null set is what will remain to be decided, as far as what

5   needs to be produced from there, what -- how much of that has

6   to be subject to a linear review, and what we can do to

7   satisfy plaintiff as far as the need to review those

8   materials.

9        We had proposed extending the deadline for that set

10  for 30 days so that the discussions between the parties can

11  continue and we can reach a satisfactory resolution.  I'm not

12  sure that that is necessarily agreeable to plaintiff.  I don't

13  want to speak for them, obviously, but I think that's really

14  the issue.  I think we have been -- plaintiffs have been very

15  cooperative with us, and, you know, we've tried to be

16  transparent with them as far as how we have conducted the

17  review and how we got to this point and shared material with

18  them and are going to continue to share material with them, so

19  that they can be satisfied that the validation that we've done

20  to make the determination of responsiveness is appropriate,

21  but I think the issue that we face that may not be resolved is

22  one of time, and I'm sure Mr. Slater can speak to that from

23  his side.

24       THE COURT:  I relayed the Court's position.  If the

25  parties agree that they're still discussing the issue, the

1  Court is agreeable to staying the deadline only for Mylan to

2  produce these documents that are culled out.  No other

3  deadlines will be treated similar, like we did with Teva, but

4  I just want to hear from plaintiffs.

5         MR. SLATER:  Thank you, Your Honor, Adam Slater.

6  We're obviously starting with the last topic, first.  We're

7  very concerned about any extensions of deadlines because we're

8  going to be in a position very soon where we have to start

9  taking depositions.  We don't know if there will be any

10 staggering of the different parties, we don't know where

11 that's going to stand, but going on the assumption that we

12 have to start deposing everybody in mid-January, we're

13 obviously concerned about, you know, extensions on these

14 deadlines because that will create major problems for us in

15 our preparations, so we didn't feel that we were in a position

16 at this point to agree to extensions, and also the Court's

17 obviously been very clear about not wanting to extend

18 deadlines for document production, perhaps foreseeing issues

19 like this.  So we didn't really feel that it was even in our,

20 you know, that it was even appropriate for us to entertain

21 that.

22        So I can say now, we have spoken to Mylan, we had --

23 I can tell you candidly, very different discussions with them

24 than we did with Teva, and we understand Your Honor always

25 wants us to talk and always wants us to try to work things

1    out.  So we are making every effort through discussions.  I am

2    not going to say this is easy or that we definitely are going

3    to work something out, because, you know, the deeper into the

4    process and now we're basically at the end, there's -- the

5    validation options are limited.  But I can tell the Court that

6    the discussions with Mylan, the reason they're continuing is

7    because their willingness to engage in a level of validation

8    that Teva would never discuss with us has been refreshing and

9    something that made us sit up and take notice so that we at

10   least had to take this very seriously, and again, a blanket

11   no, we're not going to speak to you, we felt was not in line

12   with how Your Honor expects us to conduct ourselves.

13       So we're talking, we're waiting for information,

14   we're -- we've agreed to continue to discuss this issue with

15   Mylan, but again, the contours of what's being discussed are

16   frankly very, very different than anything that Teva ever

17   discussed with us, or even anything that Teva ultimately

18   allowed to be put into the protocol that was never executed.

19       So, you know, with that background, Your Honor, we

20   obviously leave to Your Honor what to do, but perhaps the

21   thing to do is for us to continue to talk for about a week and

22   then let Your Honor know where we are, because I think, you

23   know, we can talk through deadlines if that's -- you know,

24   we've heard what Your Honor has stated, you know, taking into

25   account our concerns about getting jammed up at the end of

1    this process.

2             THE COURT:  That was my inclination as well.  I've

3    already expressed the Court's view that it is just distasteful

4    to think that parties are going to spend millions of dollars

5    to review documents that they may be able to show are

6    irrelevant.  I don't know if that showing is going to be able

7    to be made, and certainly, plaintiffs have to be satisfied

8    that that showing's made.

9             It sounds to me like the ball is still in the air

10   with Mylan.  It -- the parties may or may not work out a final

11   agreement, but at least until the parties can tell the Court

12   that they've reached an impasse, that the Court's ruling is to

13   stay the deadline, similar like we did with Teva, but the

14   Court has no intention and neither do I think plaintiffs to

15   let this issue linger.

16            So we'll address it at the next conference at the end

17   of the month, or right before Thanksgiving, I think it is, and

18   certainly no later than the mid-December conference.  This

19   issue will have to be put to a head.

20            So weighing the interests of the parties, I think --

21   I don't think plaintiffs will be materially prejudiced for the

22   reasons I've already said.  We're talking about alleged

23   nonresponsive or irrelevant documents.

24            This brief extension, we'll know one way or the other

25   which way we're going, certainly within the next two weeks or

1     four weeks, and weigh that against requiring a party to spend

2     maybe millions of dollars that may not be necessary, weighs in

3     favor of staying that deadline.

4          So I'm going to enter a order, Mr. Trischler, similar

5     to what we did with Teva.  Teva is a little bit different

6     situation because the Court is going to rule on their

7     application and they're going to get an order.  Hopefully,

8     you'll be able to work out your situation with plaintiffs.

9          So this takes care of that issue.

10          I wanted to address that first because I thought it

11     was one of the more straightforward issues.

12          So I received Mr. Goldberg's e-mail that there may

13     have been an agreement with plaintiffs, class action

14     plaintiffs.  I think it's best that we save that.  We'll go

15     down the letter -- and I'll start with Mr. Slater's letter.

16     We'll go down all those issues and when we get to the class

17     action plaintiff document issue, we'll deal with it at that

18     time.

19          So I have in front of me Mr. Slater's letter.  I

20     think a good way to proceed is just go down that letter in

21     order, we'll exhaust those issues, and if there's any issues

22     left, we'll go to Mr. Goldberg's letter and go to that letter

23     as well.

24          The Court's last order indicated that today was the

25     deadline for the finalization of the fact witness deposition

1   protocol.  We should be able to do that today.  I understand

2   the parties still have to work on the addendums which is going

3   to be finalized in, what is it, two weeks.

4            So I'm on Page 1 of your letter, Mr. Slater.  Let's

5   deal with the issues that are left with regard to the

6   deposition protocol, get them addressed and decided and put

7   that to bed.

8            One thing I didn't say at the outset of this call,

9   just as a general observation, that the Court couldn't be more

10  pleased at the level of cooperation the parties are working

11  on.  I said time and time again, I understand the parties can

12  act in complete good faith and still disagree on the issues,

13  and that's fine, but it's nice to see the parties roll up

14  their sleeves to get all these difficult issues done.

15           So, Mr. Slater, let's start on Page 1 and just go

16  through your letter, and hopefully, get it out of the way.

17           So the floor is yours.

18           MR. SLATER:  Thank you, Your Honor.

19           Defense counsel Mr. Goldberg submitted to Your Honor

20  in his letter as an exhibit, the current red line of the

21  deposition protocol, which I guess is our starting point.  I

22  think it would be, if Your Honor has that, we can walk through

23  the sections that are still in dispute and probably get this

24  wrapped up very quickly.

25           THE COURT:  Let's do it.  I have it right here.

1        MR. SLATER:  Great.  So the first section I believe,

2    and Mr. Goldberg, correct me if I'm wrong, is B3 and this

3    section, the red line part addresses -- it's language that

4    defense counsel had wanted to include regarding losartan and

5    irbesartan and Your Honor during the last hearing told the

6    parties to defer that until later in light of the language

7    that's already in there about duplicative questioning, and

8    Your Honor made it clear that this issue would be addressed,

9    and I'm not going to repeat what was on the record.

10        So our position simply is, Your Honor directed us to

11    defer that so it should not be in this protocol.

12        MR. GOLDBERG:  Your Honor, this is Seth Goldberg.

13    Should I weigh in now or do you want to go to the other issue?

14        THE COURT:  Yeah, let's go one by one, Mr. Goldberg.

15        MR. GOLDBERG:  Okay.  Sure.  Your Honor, we thought

16    this was important to bring back to the Court's attention,

17    one, because at the last conference, Your Honor, Your Honor

18    did -- did ask the parties, suggest the parties try to work

19    this out, and we've -- we've quoted some of the, you know,

20    language from Your Honor's statements in our letter brief at

21    Page 2, and as Your Honor noted, noted then, this doesn't seem

22    like a very controversial issue.  We have witnesses that are

23    going to be deposed pursuant to the Valsartan Master

24    Complaint.

25        Plaintiffs have not filed Master Complaints yet as to

1    irbesartan or losartan.  Assuming they do, and assuming we get

2    to a point of depositions pursuant to those Master Complaints,

3    it's likely that some of the witnesses that are deposed for

4    Valsartan are going to be deposed again as to irbesartan and

5    losartan, and what we're suggesting is that there be an

6    acknowledgement today, that when we get to that point, that

7    the parties will look at the transcripts of those witnesses

8    who might have been deposed pursuant to Valsartan and who are

9    renoticed for depositions as to the other drugs, and work

10    together to avoid those witnesses having to provide

11    duplicative testimony or testimony on overlapping issues.

12         It doesn't seem terribly controversial.  Your Honor

13    acknowledged that it seems to make sense, and we think it's

14    important to put it into this protocol now, because the

15    likelihood is that in a year or two years, we're going to need

16    to look back at this protocol to see what the parties agreed

17    to with respect to depositions.

18         THE COURT:  The Court doesn't see this as a big issue

19    and has no objection to including this except, Mr. Goldberg, I

20    would suggest making a change to avoid a dispute in the

21    future.  I don't think it's intended to limit questioning on

22    overlapping topics.  So, for example, if they question a

23    Valsartan witness about the cause of contamination, I don't

24    think the intent is to bar, with respect to, say, a losartan

25    witness to also ask them about what caused the contamination.

 1    I think what this is designed to get at, is to eliminate

 2    duplicative and cumulative testimony.

 3         So I would suggest instead of saying -- questioning

 4    on topics, issues that overlap, I would suggest saying

 5    something to the effect, to avoid duplicative and cumulative

 6    questioning, and I think that comports with the parties'

 7    intent and I don't see a problem in that being in there.

 8         MR. GOLDBERG:  Agreed, Your Honor.  We can make that

 9    change.

10         THE COURT:  Okay.  So that stays in with the change.

11         MR. SLATER:  Then next, Your Honor, Section D.  This

12    language we added because there's a lot of language about the

13    reasons why these depositions may need to be postponed or

14    moved.  So I thought it was important to have something in

15    here to make it clear to the parties that we're supposed to

16    try to proceed with these depositions.

17         THE COURT:  Is there any objection to, instead of

18    saying best efforts, Mr. Slater, to just saying good faith

19    efforts?

20         MR. SLATER:  Yeah, I have no objection if that's what

21    Your Honor --

22         THE COURT:  Yes, I just --

23         MR. SLATER:  -- prefers.

24         THE COURT:  -- arguments down the road about what

25    best efforts means.

1          Why don't you just change that to good faith efforts

2    and leave it in there.

3          MR. SLATER:  That's fine.  And I could tell Your

4    Honor the reason why we had some concern is because there's

5    been a lot of discussion in our negotiations about, well, what

6    if a defense lawyer or an attorney for any witness needs to be

7    sitting next to the witness and then can't get on a flight or,

8    you know, things like that, where I think we're going to have

9    to, you know, hopefully not have too many issues with that.

10    But I think that language is fine, as long as everybody

11    understands we're supposed to try to proceed if we can.

12          THE COURT:  One way that I'd like -- one thing I like

13    to do, and prefer to do, although it's not done a hundred

14    percent of the time, and you remember from *Benicar*, is that

15    when the parties agree on deposition dates, the Court orders

16    that they be done on a specific date, and it's only with leave

17    of Court can that date be changed and not at the whim of an

18    attorney, and if we do that, I think that that alleviates the

19    concern that you have.

20          MR. GOLDBERG:  Your Honor, this is Seth Goldberg.  I

21    would, you know, voice an objection to that, with all due

22    respect, only because of the circumstances we're dealing with

23    with COVID.

24          I think locking in a date is one thing.  I think

25    having a Court order as to that specific date might require us

1   to come to the Court, you know, at, you know, at a moment's

2   notice.  I think we're just concerned that -- the

3   circumstances with COVID, and we've all acknowledged this

4   before, so it's a little bit, you know, a little bit at odds

5   just to say we should have some certainty, because we've all

6   acknowledged the flexibility that we're going to need in light

7   of COVID.  And we're talking about global travel where you

8   have different time zones and different restrictions, and I

9   think all of the parties intend to use their good faith

10   efforts.

11          The good faith efforts language is consistent with

12   what the Court has required in other aspects of discovery

13   here.  But I think it would be consistent with the

14   circumstances we're dealing with with respect to COVID.

15          THE COURT:  But I don't think the Court needs to rule

16   on that issue now, Mr. Goldberg.  You know, we'll leave that

17   open for a future date, but right now, the Court is not

18   ordering that that be done.

19          Next issue, Mr. Slater.

20          MR. SLATER:  I believe we go to E3, and I think we're

21   in agreement on this, I think we should just confirm it

22   because we had an e-mail exchange a little earlier that --

23   with regard to the corporate representatives designated under

24   Rule 30(b)(6), they will be identified within 20 days after

25   the Court enters the order approving the notices, which is

1    fine with us, and as long as that's going to happen on

2    November 24 or within a day or so after that, because then

3    we'll have the designations by mid-December and we can, you

4    know, know who we're deposing because there's going to be an

5    enormous amount of work we're obviously going to have to do to

6    prepare for these depositions, including over the Christmas

7    and New Year's holidays to get ready to start deposing these

8    witnesses.  So you can imagine the organization it will take

9    once we know who the corporate reps are to do that.

10            So as long as that's the understanding, then we're

11    fine with that language.

12            MR. GOLDBERG:  Your Honor, this is Seth Goldberg.

13    The issue is really that plaintiffs wanted us to be

14    identifying 30(b)(6) witnesses within 20 days of the

15    meet-and-confer process as to the 30(b)(6) notice.  We thought

16    that that was a little bit less certain.  It's hard to know

17    exactly when a meet-and-confer process ends.  And so we

18    suggested timing it as to the Court's approval of the 30(b)(6)

19    notice.

20            Plaintiffs seem to be in agreement with that.  Of

21    course, the Court has said that it intends to rule on the

22    30(b)(6) notices on the 24th.  We just think whatever date

23    that ruling is, that should be the date that triggers the 20

24    days.

25            THE COURT:  No objection here.  So it looks like the

1  parties have agreement on that.

2          MR. SLATER:  Great.  Next is F1, Your Honor.

3          THE COURT:  F1.

4          MR. SLATER:  This has to do with who may be present

5  at the deposition, and we just wanted to -- we added the

6  phrase that who can attend would be subject to space

7  limitations, in the case of an in-person deposition if it ever

8  comes to that, and it was hard to understand why that would be

9  controversial because with this many parties, everybody can't

10 fit in the room, especially if there's still some social

11 distancing at the end of next -- at some point.

12         I mean, I don't anticipate these depositions really

13 happening in person, but supposing they do with this many

14 parties, you would need to take into account how big the room

15 is and how many seats there are.

16         MR. GOLDBERG:  Your Honor, this is Seth Goldberg.

17         THE COURT:  Yes.

18         MR. GOLDBERG:  I'm sorry, go ahead.

19         THE COURT:  No, go ahead, Mr. Goldberg.

20         MR. GOLDBERG:  Yeah.  Your Honor, we -- defendants

21 object to this insertion which, quite frankly, we're surprised

22 to see at the very late stages of the drafting of the

23 protocol, and it seems to be in response to the Court's order

24 two weeks ago clarifying that everybody can attend the

25 depositions.  And that we wanted to be sure that defendants

1    who have the right to attend the deposition are able to do so

2    and our primary concern is that, of course, at some point,

3    we're going to be deposing treating physicians who may want to

4    be deposed in their office, and we want to avoid, you know,

5    avoid any defendant who has the right to attend from being

6    excluded.

7            That said, as we have discussed throughout this

8    protocol and, you know, the last time we spoke, most

9    defendants are going to exercise discretion as to whether they

10   really need to attend.  But we don't want this kind of

11   language to be used to preclude attendance by a defendant who

12   has the right to attend.

13           THE COURT:  This thought occurs to me, Counsel, that

14   there very well may be space issues, but if there are, that

15   does not and should not prevent someone from participating by

16   video, or Zoom, and frankly, it occurs to me that in all

17   likelihood, except for a handful of people, most people are

18   going to wind up participating by video or Zoom or somehow

19   remotely.

20           So would it make sense to say -- and I have no

21   problem making it clear that even if a person can't attend in

22   person because of space limitations, that shall not limit

23   their right to participate at the deposition by Zoom or video

24   or remotely, if that's their decision.  It seems to me that

25   makes a lot of sense.  What do you think?

1          MR. GOLDBERG:  I think having an explicit -- and it
2    is stated explicitly elsewhere, that the defendants have the
3    right to attend the deposition.
4          But I think if plaintiffs would like to have language
5    about the space limitations being in here, that there be some
6    explicit language that says the space limitation should not
7    preclude attendance by some other means.
8          THE COURT:  And I would take it that the plaintiff --
9    I can't conceive, and I don't think you're going to tell me
10   that the plaintiffs would have any objection if people want to
11   participate remotely, rather than in person.
12         MR. SLATER:  No, of course not.  The reality of it is
13   that that's going to have to happen.
14         THE COURT:  Yeah, of course.
15         MR. SLATER:  There's no way around it.
16         THE COURT:  So I think we may have a resolution of
17   this issue.  I don't know how to word it, but there may be
18   space limitations that limit the number of people who could
19   participate in person, if they so choose, but that shall not
20   prohibit or bar or limit their right to participate remotely.
21         So I'm sure you can come up with language to put that
22   in place.
23         MR. SLATER:  That's fine, Your Honor, it's already in
24   here.  I think it's already here and nobody would ever object
25   to that.  And if somebody is actually a party to the case,

1   they can have their attorney participate.  That has never been

2   an issue.  So -- but if they want to -- if the defense wants

3   to propose something, we'll take a look.  I can't imagine it's

4   controversial.

5          THE COURT:  I think we have a resolution, then, on

6   that issue, Mr. Goldberg, so maybe you can just wordsmith that

7   one.

8          MR. GOLDBERG:  Will do.

9          THE COURT:  Next, Mr. Slater?

10         MR. SLATER:  G-1, the -- we would like to include a

11  presumptive 75 percent extension of the time for the

12  depositions where there's a translator involved.  When you

13  stack everything together, there's just no reasonable number

14  lower than that, and I'm sure we're going to end up running

15  into situations where we're going to have to, on a

16  deposition-by-deposition basis, ask for more time.  If there's

17  problems technically or the translators take longer than we

18  think they would in a normal world to do what they need to do,

19  because there's going to be so much decentralization of

20  everybody participating.

21         So it's hard to imagine that 75 percent would be

22  something the defense would have an issue with.  They want

23  50 percent, which is just not a workable starting point for so

24  many reasons that I think or should be obvious.  So we just

25  have to have this placed in here, and then obviously, if

1   there's an issue, we have a good cause provision built in.

2            MR. GOLDBERG:  Your Honor, this is Seth Goldberg.  A

3   couple of things here.  First, we put this issue in the

4   addendums because, obviously, the witnesses are going to need

5   the translators at least at this point.  We're not aware of

6   witnesses who will need translators that aren't employees of

7   the parties.  So we put them in the addendums.

8            So we did propose 50 percent and we did so because in

9   the case law that we've looked at, most of the cases that

10  we've seen add three hours to a seven-hour deposition, which

11  is actually less than 50 percent, which comes out to

12  43 percent in these cases, where there's a translator needed.

13           So we thought that, you know, 50 percent was the

14  right starting point.  You're talking about adding -- making a

15  deposition, a seven-hour deposition, a ten-hour deposition.

16           As we know, these depositions at least initially are

17  going to be done by Zoom and they're going to potentially have

18  to be broken up in some way.

19           So we thought the best place to start was where the

20  case law seems to be at three hours, or even more at

21  50 percent, and if it turns out that additional time is

22  needed, we can certainly address that.  But we don't think 75

23  should be presumptive, and, you know, I'm not sure that the

24  issue is really ripe, because I don't know that it should be

25  in this part of the protocol, but to the extent it is, you

1    know, we think it should be 50 percent and we think there's

2    good support for that in the case law.

3        MR. SLATER:  Your Honor, if I can just briefly

4    respond, please.

5        THE COURT:  Let me just --

6        MR. SLATER:  Okay, go ahead.

7        THE COURT:  The Court has personal experience in

8    having taken defendants' depositions with translators.  They

9    are incredibly difficult and incredibly cumbersome, add to the

10   fact that it's a document-intensive case and add to the fact

11   that in all likelihood, the depositions are going to be done

12   by Zoom and video rather than in person.  So for that reason,

13   I'm not sure what the case law is, I think 75 percent as a

14   presumption is more than fair.

15       I would suggest one change and addition to the

16   language that is in this paragraph.  It says, "requests for

17   further increases in time," et cetera, et cetera.  I think

18   that should say "increases or decreases."  There's nothing to

19   prevent the defendants from arguing or plaintiffs for that

20   matter, from arguing that for good cause, they don't need an

21   extra 75 percent, but right now, it just says "increases."

22       So I would say a 75 percent presumption is very fair

23   under the circumstances and also to make it clear that more

24   than likely, the -- if the defendant has good cause and they

25   want to move to reduce that time, they have the right to do

 1   it.

 2           So that takes care of that issue.

 3           Did you want to add anything, Mr. Slater?  I'm sorry,

 4   I think I interrupted you.

 5           MR. SLATER:  No, I was going to say what you said,

 6   about the complexity of the issues in this case and the

 7   scientific language, et cetera.  So Your Honor was on the

 8   issue.

 9           I'm worried about the decreases issue because my

10   guess is everybody is going to be filing applications to ask

11   for a decrease, but we will abide by that and hopefully, it

12   will be pretty smooth.

13           THE COURT:  I don't think that's going to happen.  I

14   would be surprised if that happened.  But we'll deal with it,

15   or the Court, whoever is dealing with it, will deal with it if

16   it comes up.

17           Next issue.

18           MR. SLATER:  I believe it's Section G -- let me see.

19   I might have written it wrong in my notes.

20           THE COURT:  I'm on page --

21           MR. SLATER:  Here it is.  It should be H-3, I believe

22   on Page 12, exactly.  And this is the same issue, that -- this

23   is the provision that talks about suspending a deposition.  If

24   there's some sort of a dispute, and because of the logistical

25   issues that are going to have to be overcome to get these

1   depositions scheduled, we thought that it was important to put

2   in language that would discourage somebody from ending the

3   deposition and suspending it as opposed to just preserving

4   issues if there's a true issue.

5           MR. GOLDBERG:  Your Honor, this is Seth Goldberg.  We

6   object to this language.  There actually was some more

7   language attached to this that we objected to as well that

8   plaintiffs agreed to take out.  Because this, you know, again,

9   it sort of goes back to the best efforts notion.  It's

10  imposing upon the parties a standard that is really

11  immeasurable.  You know, we're all operating under good faith,

12  but, you know, it's hard to predict what's going to happen in

13  any of these depositions.

14          Paragraph 3A, which came right from the *Benicar*

15  proposal or protocol seemed to be sufficient for the Court in

16  that case and there really is no reason to believe that any of

17  the counsel are not going to operate in good faith in this, in

18  this case.  But to have a last resort standard, I'm not even

19  sure, you know, how that -- if that's ever been used before.

20  But it certainly seems to add some, you know, potential for

21  disputes down the line that are unnecessary.

22          THE COURT:  I agree with the defendants on this one.

23  If the language was satisfactory in *Benicar*, it should be

24  satisfactory here.

25          I can't think of a situation where a deposition has

 1    been suspended, frankly, I would be shocked if it happens in

 2    this case.  And why don't we just go with the same language

 3    that was very successful in *Benicar*.

 4            So we'll leave it at that.

 5            MR. SLATER:  The last one is Section I, Number 1,

 6    with regard to the court reporter.  We --

 7            MR. GOLDBERG:  Adam -- Mr. Slater, sorry to

 8    interrupt, I think we have agreement on that.  I actually

 9    think --

10            MR. SLATER:  Oh, did I miss that?

11            MR. GOLDBERG:  Yeah, I think the version we sent to

12    the Court accepted those edits.

13            MR. SLATER:  Oh, then, that's fine.  I thought that

14    it was still red lined.

15            THE COURT:  Is this the issue about the court

16    reporter you're going to use?

17            MR. GOLDBERG:  No.  Oh, I'm sorry, that's a different

18    issue.  Yeah, that, we still have to talk about.  That's not a

19    controversial issue.  I think we're just waiting for a

20    proposal from Golkow but we also might want to consider using

21    -- having a second preferred vendor just given the

22    circumstances that, you know, it may be helpful to have

23    another vendor online in case, you know, for some reason

24    Golkow can't manage a deposition.

25            THE COURT:  I think that --

```
 1          MR. SLATER:  Your Honor.

 2          THE COURT:  I think that --

 3          MR. SLATER:  Your Honor, can I -- I'm sorry.

 4          THE COURT:  I said I think that's a wise idea to have

 5   a backup.

 6          MR. SLATER:  Well, Your Honor, I mean, we could talk

 7   about it between the parties.  I think that in practice, that

 8   would be very, very, it would be virtually unmanageable,

 9   because we're going to be having the court reporting company

10   scheduling and managing all of these depositions through

11   people that are going to be assigned to this matter, that the

12   court reporting company will work with counsel for both sides

13   in coordinating.  The transcripts will be going into one

14   repository, the exhibit charts will be going into one

15   repository, there will be costs and interaction on updating

16   the exhibit charts.  There's going to be confidentiality

17   designations potentially.  There's going to be all this going

18   on.

19          If we now have to start to merge two court reporter

20   companies into this, it will become, I can assure you, very

21   inefficient.  I don't think that there's going to be an issue.

22   I mean, this company handled the largest litigation, they

23   handled *Benicar* seamlessly, including all the depositions in

24   Hawaii.

25          They've committed to me that they're going to make
```

1    significant allocations of resources both in terms of people

2    and equipment and whatever is needed.

3         So, I mean, if we go to another court reporting

4    company, I think it would only be because something happened

5    to Golkow that was some catastrophic situation where they

6    couldn't operate anymore, because -- and because they're going

7    to commit major resources to this litigation.

8         I mean, we can talk about it more with the defense,

9    and I can tell you that we have -- we got an initial proposal,

10   I went back and asked some questions and asked them to tweak

11   some things and modify some things.  They may have gotten back

12   last night.  I want to look at it and then I'm going to give

13   that to the defense and talk to them.

14        I can't imagine it's not going to be acceptable, but

15   I just wanted to get that out, because if the idea is to have

16   two court reporting companies, it's going to become very, very

17   hard to manage.

18        MR. GOLDBERG:  Well, Your Honor, let me try to

19   clarify, or to provide a little clarity here.

20        THE COURT:  Can we leave it -- Mr. Goldberg, it

21   sounds like you and Mr. Slater can work this out, right?  I

22   don't know if there's an issue.

23        MR. GOLDBERG:  Yeah, I mean, I do think -- I think we

24   can.  I do think having -- I'm not suggesting that we would

25   have two court reporters that would, you know, be able to do

 1   any deposition.  Maybe the solution is to have Golkow as the

 2   primary court reporter, but the parties haven't agreed upon

 3   backup should Golkow not be able to cover a deposition, and

 4   that -- we agreed to that backup, we have agreed pricing on

 5   that backup.  I don't think we want to be doing that

 6   midstream.

 7          We haven't seen any of Golkow's pricing, so, you

 8   know, yes, we're agreeable in concept, but we certainly need

 9   to be able to, you know, have agreeable terms with Golkow.

10          THE COURT:  Mr. Slater, work that out with

11   Mr. Goldberg.  It doesn't sound like an issue the Court needs

12   to be involved in.

13          MR. SLATER:  Agreed.

14          THE COURT:  Okay.  Are there any other issues?

15          MR. SLATER:  None that I'm aware of.

16          THE COURT:  Great.  So get the final protocol to the

17   Court either Friday or Monday so that we can sign it and enter

18   it.

19          MR. GOLDBERG:  Will do, Your Honor.

20          MR. SLATER:  Okay.

21          THE COURT:  Okay.  Great.  Let's go back to

22   Mr. Slater's letter then, and get to the next issue, and that

23   is on Page 2, 30(b)(6) deposition notices.

24          MR. SLATER:  Yes, Your Honor.  This is more, I think,

25   in its current posture and update as opposed to we're not

1    requesting any rulings from Your Honor.

2         I've been in contact with counsel for Torrent,

3    Aurobindo, and Hetero regarding our meet and confer last week.

4    I promised in my letter to submit the current draft that was

5    sent to them after our meet and confer which hopefully

6    answered most or all of their issues or questions.  We're

7    going to be speaking with each of them this week and we'll

8    have this finalized hopefully, you know, very shortly.

9         As to the other parties, we're in the midst of

10   scheduling an initial meet and confer with Teva and we spoke

11   with ZHP last week.  That call was far more complex.  I'll use

12   the word "complex" than the discussions would be the entities

13   for which we've provided the revised versions, and we're

14   proceeding on the basis of each defendant negotiating a

15   separate protocol.

16        That was what we were told during the initial meet

17   and confer with the preference and in the conversations, it's

18   turned out that's fine, and it's working fine.  We had some

19   concerns, but it's working fine.  Presumably, we will speak

20   with Mylan as well, and our expectation is that, as we

21   discussed earlier, that these protocols will be done and ready

22   to go to the Court no later than November 24.  And what I

23   would suggest is, to the extent we can finalize for the

24   parties as we go forward between now and then, you know,

25   perhaps we could submit them as we go so that we can lighten

1    the load November 24, which is going to probably be a pretty

2    heavy conference as well.

3         THE COURT:  It's perfectly acceptable to the Court.

4    Any objection, Mr. --

5         MS. LOCKARD:  Your Honor, it's Victoria Lockard.  I

6    just want to address a couple of points here and I agree with

7    Mr. Slater that, you know, I don't think that we expect the

8    Court needs to make any rulings at this time.  Mr. Slater and

9    I have been e-mailing about trying to find a time to meet and

10   confer and we just haven't been able to mesh our schedules on

11   that yet, but I'm confident we'll be able to reach some sort

12   of a proposal for Teva.

13        But a couple of clarifications.  We just want to make

14   sure the Court is aware of and get out for the record.  At the

15   last conference the beginning of October, the Court issued a

16   ruling on October 2nd that directed plaintiffs to promptly

17   identify the person who would be primarily responsible for the

18   meet and confers with each defendant.

19        They haven't done that.  Maybe that's Mr. Slater, and

20   if so, that's fine, but we need to know, you know, who is

21   going to be responsible, and on an ongoing basis for

22   scheduling and coordinating those depositions.  We're getting

23   to a point in time where the Court will expect us to start

24   scheduling these and we've discussed this previously.

25        We've asked for some indication and transparency as

1    to how these will unfold.  We have quite a number of witnesses

2    for each defendant, quite a number of defendants and, you

3    know, it's getting to the time where plaintiffs need to

4    identify where they intend to start up with these, which

5    defendants, which manufacturers, which case.

6           We have witnesses we're meeting with and at this

7    point, we haven't been able to give them any idea in terms of

8    when we think their depositions will take place, and it's

9    starting to become an issue for us with our clients.  We need

10   to start honing in on this.

11          The other point that I want to make sure we're clear

12   on, is that as we complete these meet and confers and submit

13   these topics in finalized form, the defendants are operating

14   with the intent that these will be the finite set of topics

15   and absent good faith, we're not going to see, you know, a

16   rotating wheel of expansion and additional topics coming in.

17          Again, you know, certainly they will, you know,

18   they'll be entitled to their -- there's a good faith reason

19   for some new topic that could not have been foreseen.  But we

20   need to know that these are the world of topics so we can put

21   the right witnesses up, identify any overlapping issues and

22   get the depositions done in an orderly and efficient fashion.

23   I don't think that's disputed, but I want to make sure that's

24   clear.

25          The same goes for the fact witnesses.  You know,

1  plaintiffs need to hone in on this.  We've had discussions and

2  meet and confers, each of the manufacturers, certainly I know

3  Teva did, to talk about those priority witnesses that were

4  identified for our fact witness, personal knowledge

5  depositions.

6         And, you know, for Teva, for example, we have 11

7  individuals.  You know, given the number of topics that will

8  be covered in the 30(b)(6) deposition, we do not believe that

9  all 11 need to be deposed.  There's significant overlap above

10 those witnesses with personal knowledge, and we need to start

11 narrowing those and reach an agreement because we need to get

12 those confirmed before we go forward with those six so that we

13 can get those -- we need to start narrowing the list of

14 personal knowledge fact witnesses, we need to get to an

15 agreement on those as part of these meet-and-confer processes,

16 and know who those, the world of those witnesses will be

17 before we ever start scheduling 30(b)(6) because many of those

18 may be overlapping, and we will need to schedule their fact

19 witness depositions consecutively with the 30(b)(6).

20         MR. SLATER:  Should I respond to that, Judge, or --

21         THE COURT:  Well, I --

22         MR. SLATER:  Because there's a lot -- to appreciate.

23         THE COURT:  From my perspective, I'm trying to get on

24 to Pacer to look at the order Ms. Lockard referred to.  I

25 recall the order, but I think there might have been some

 1    additional language in the order about the deadline to

 2    identify someone who's the point person in concept.

 3              I can't get access on my iPad here.  We're having

 4    problems with it.

 5              MR. SLATER:  Judge, I can save you the trouble.  We

 6    already did, and, you know, I guess I need to address what

 7    counsel -- it's unfortunate, but let me just have a moment.

 8              Number 1, we haven't spoken to Teva yet, so it would

 9    be appreciated if before they would start to rattle off a list

10    of demands, they would actually have a conversation with us

11    first.

12              Number 2, we did designate who it is.  We told them

13    who's going to be on the call, myself, Daniel Nigh and David

14    Stanoch.  That's the team that's approaching it.  It will

15    likely be Mr. Stanoch that will be the contact for the Teva

16    depositions going forward, and it was a -- you directed us to

17    appoint somebody as a representative for each defendant, or

18    taking each defendant for coordination of the depositions and

19    the scheduling, which we're going to do, and that's -- the

20    people that are on these calls are going to be the point

21    people along with potentially some other people since it may

22    be a job that's too large for one person to do.  So that's

23    being done.

24              So counsel just simply had to ask the question and we

25    would have answered and said, this is our intent.

1        Next thing, when the depositions are going to

2   commence.  It's astounding that counsel would jump on this

3   call and say, why haven't the plaintiffs scheduled the

4   depositions and told us who they are deposing.  We don't even

5   know who their 30(b)(6) witnesses are going to be.  We haven't

6   finished discussing the logistics of who is where and when

7   they can be deposed, you know, in the United States versus

8   other locations.  So I'm just surprised at that coming up,

9   because it's obviously premature.

10        As far as whether we can serve more 30(b)(6) notices,

11   counsel recognized for good cause, we can in the future.  As

12   we get more information, if we believe there's a need, we

13   intend to serve an additional notice.  If it's inappropriate,

14   Your Honor will strike it.  I mean, that's what we would

15   expect to do.

16        So the process of narrowing the list of individual

17   witnesses is addressed in the next section, but that's a

18   process that's not over yet, because it's going to presuppose,

19   and again, in the meet and confers with the parties we've

20   spoken with, and in particular, Hetero, Aurobindo, and

21   Torrent, we have very positive conversation about the concept

22   of matching up the corporate reps with the individual

23   witnesses and scheduling around that and frankly, we discussed

24   that with ZHP also.  If we still need to figure out who and

25   where and they have really more logistical issues, perhaps

1   than some of the other parties, but that's been discussed

2   there.  So that's our intent.

3        So again, I think I would appreciate in the future

4   having the opportunity to talk to counsel about their concerns

5   before they air them on a call with Your Honor.

6        MS. LOCKARD:  Your Honor, this issue was set forth in

7   Mr. Goldberg's letter about identifying who would be

8   responsible, and the reason that I raised it is because we did

9   have a meet and confer with plaintiffs.  I spoke with Marlene

10  Goldenberg and Layne Hilton about the fact witnesses and the

11  fact witness depositions.

12       And so our request is, we need to be orchestrating

13  this and not, you know, having one conversation with one set

14  of lawyers about the corporate fact witnesses and another

15  conversation about the 30(b)(6) and try to get it more

16  orchestrated.  I mean, this is not a major issue for the Court

17  to rule on, but I think it could be handled a little more

18  efficiently and, you know, we'll make efforts to try to do so.

19       THE COURT:  Okay.  So I think the takeaway is that

20  certainly, this is an important issue and the parties are

21  going to be meeting and conferring in earnest over the next

22  few weeks about these issues, and if there's any issues that

23  the parties can't work out, that's what we're here for and

24  we'll work them out.  All right.

25       So I think the topic -- we talked about the 30(b)(6)

1    issue, Mr. Slater, I think we're done with that.

2         The goal is to finalize those dep notices by the

3    24th.  We'll leave the dates blank, but at least we'll deal

4    with the objections to the notice.

5         I think we're now on the topic on Page 3, meet and

6    confers on defendant employee deponents.  Is there anything to

7    say about this, other than the parties are going to be meeting

8    and conferring in earnest about this over the next few weeks

9    to start identifying individual dates and locations?

10        MR. SLATER:  I don't think there's anything else to

11   discuss, Your Honor.  We're continuing the conversations with

12   the party -- with the defendants and -- and I don't think

13   there's anything to add to it.

14        THE COURT:  All right.  Let's get then to a big

15   substantive issue, the issue of these third-party subpoenas.

16        In the first instance, we have these two motions that

17   were filed.  I received the affidavits and read them.  That's

18   fine.  Why don't we start with the two motions and I guess we

19   have to tee up those issues because a lot of those issues seem

20   to overlap with -- I would think with subpoenas directed to

21   other defendants.

22        So I'm not going to decide the issue on this phone

23   call.  I just want to discuss the mechanics of how we're going

24   to deal with the issue.  It sounds like at least the parties

25   have filed their motions, have filed meet and -- you know,

1    have attempted to resolve it.  They couldn't resolve it.

2           Plaintiffs, you tell me, when do you want to respond

3    to those motions?  I realize there's a lot on our plate.  I

4    don't think this is an issue that we have to decide right

5    away.  Certainly, I believe it's more important to work on the

6    deposition scheduling and finish the document production.

7           So you tell me, what's a reasonable date to respond

8    to it and following that, we'll have argument on it.

9           MR. SLATER:  I'll defer this to Marlene Goldenberg

10   from our team who is spearheading this issue, Your Honor.

11          Who is perhaps muted.

12          In order to move things along, I haven't personally

13   seen the motion.  If anybody wants to overrule me on the

14   plaintiffs' side, I would think we could respond within seven

15   days.  One of the concerns, Your Honor, is to the extent that

16   documents going to be obtained, we need those documents before

17   we depose witnesses.

18          THE COURT:  Let's circle back.  Let's circle back to

19   that, Mr. Slater, because there's some substantive issues we

20   have to deal with, and we'll circle back on when to respond to

21   the motions.

22          For example, on Page 4 of your letter, you raised the

23   issue whether the defendants have to accept service for

24   certain foreign entities.  I would, you know, of course, if

25   the defendants agree, that's great.  I'm not sure that's going

1    to happen in every instance.

2          Isn't the only way to tee up that issue is by a

3    motion?

4          MR. SLATER:  I certainly don't think so.  We're just

5    dealing with the motions that were filed, and obviously, Your

6    Honor gets the flip side to that issue, which is whether or

7    not the defendant would have possession, custody, or control,

8    because of the relationship with the entities is such that

9    they could get the documents from the other entity, whether

10   they're technically accepting service of the subpoena or not.

11         THE COURT:  Well, I'll be quite frank.  I read the

12   motions, but it's been a few weeks.  I don't remember that

13   this issue was teed up in the motion, because it was a motion

14   for protective order by the defendant.  It wasn't a motion to

15   compel.

16         MR. SLATER:  Your Honor, I'm agreeing with you that

17   this doesn't have to be decided today.  I mean, that -- just

18   -- I don't want to miss -- I don't want to confuse, you know,

19   where we're going with this.  I agree I think with adding

20   that, and I think you're right, that it may be that it's

21   something that needs to be teed up in two weeks.  It probably

22   makes a lot of sense.

23         THE COURT:  All right.

24         MR. GOLDBERG:  Your Honor --

25         THE COURT:  Go ahead.  Is that Mr. Goldberg?

```
 1            MR. GOLDBERG:  Yeah.  Your Honor, this is Seth
 2  Goldberg, and I also want to invite any of the defendant
 3  counsel to raise -- to jump in here.  There are a few
 4  different things going on here.
 5            The defendants or plaintiffs served all of these
 6  deposition notice -- the subpoenas.  Leaving aside for a
 7  moment the argument that the notice was improper, which we
 8  think it was, and it was improper as to every of the
 9  subpoenas, you know, as to every defendant, you've got a few
10  of the defendants who have filed a motion to -- for a
11  protective order.
12            Mylan has filed objections to these subpoenas.  A few
13  of the defendants have made their arguments in their
14  submission to the Court, ZHP being one of them, and it seems
15  like they're, you know, that the parties can use -- if the
16  Court is going to want to hear these issues in a few weeks,
17  some organization as to all of the parties, all of the
18  defendants, because we all have similar issues to raise as to
19  the subpoenas.  We've set those issues out in our letter,
20  issues about the scope of the subpoenas, issues that they go
21  beyond the Court's macro discovery order, that they seek
22  information that is not relevant to the case.
23            And this issue about -- that came up for the first
24  time, that we are somehow in possession, custody, and control
25  of documents in these third-party's hands, that is a new issue
```

1    which hasn't been addressed, but it certainly is not -- it's

2    certainly not accurate to say as to most if not all of these

3    third-party subpoenas, which are directed at, you know,

4    vendors and suppliers of companies through commercial

5    contracts, not agents of -- of the defendants.

6          So I just would note for Your Honor that you have got

7    each of the defendants wants to preserve their objections, has

8    gone about it in a different way because you are generally

9    trying to figure out how to do this.  We've all met and

10   conferred with the plaintiffs.  The plaintiffs have uniformly

11   refused to withdraw any of the subpoenas, uniformly refused to

12   narrow the scope of any of the subpoenas, and then -- so the

13   organization as to how the defendants can preserve their

14   objections and raise their issues, but it's important for the

15   Court to also keep in mind, the third parties themselves, of

16   course, have a right to respond to the subpoenas with

17   objections, with motions to quash.

18         They're not -- they're not represented by these

19   arguments and these letter briefs.  For all of them, their

20   dates to respond have not even -- are not ripe yet.

21         So I think most of the response dates would be

22   November 15th, as to the third parties for ZHP, the response

23   dates have been agreed to be moved out to November 30th.

24         But I just wanted to raise that for Your Honor if

25   Your Honor is not inclined to go through the specific

1    arguments today, that having some organization as to the

2    defendants' responses and then also keeping in mind that the

3    third parties themselves may have responses as well.

4         THE COURT:  I think you are a hundred percent right,

5    Mr. Goldberg, to try and get some organization to this.  I

6    don't even know, for example, how many third-party subpoenas

7    have been served.  Does anyone know?

8         MR. GOLDBERG:  Approximately 60.

9         THE COURT:  Okay.  So let's assume we live in a

10   perfect world, and we don't.  The ideal thing would be, if the

11   defendants who have an interest in those third-party subpoenas

12   could get together and file one omnibus motion about issues

13   that overlap on every single subpoena, you know, whether it's

14   service, timeliness, irrelevance, irrelevancy to common

15   topics, and then if each individual defendant who has their

16   own specific issues that don't overlap with the others,

17   somehow they raise those issues, we'll get plaintiffs'

18   response, but, listen, I've always said we live in the real

19   world.

20        It's unquestionably the case that we're going to get

21   some motions for protective order from some of those third

22   parties.  And the ideal thing would be if we could address

23   everyone's issues at the same time.  I just think it's

24   impractical to do it in a week or two.

25        Mr. Goldberg, do you think the defendants who have an

1    interest in these subpoenas could possibly get together and

2    file one?  You know, we don't need a long brief, the issues

3    have already been briefed, but sort of identify the issues

4    that overlap every subpoena, we could decide those, and then

5    if there's specific issues to a particular, we could deal with

6    those, and then somehow we'll have to coordinate with that,

7    with likely objections and motions from the third parties

8    themselves.

9         MR. GOLDBERG:  I think that makes a lot of sense,

10   Your Honor.  I would suggest that given that, you know, we've

11   gotten the 30(b)(6) issues to resolve by the 24th, all of the

12   defendants are meeting their document production deadline by

13   November 30th, I believe, that, you know, if we could put this

14   on a, you know, early December schedule for us to get you

15   that, that brief, you know, that would allow us to clear out

16   some of the other stuff and at the same time, we'll know if

17   some of the third parties themselves have filed objections or

18   other documents.

19        THE COURT:  Mr. Slater, I recognize plaintiffs'

20   interests in trying to get these documents as soon as

21   possible, but I think we ought not to forsake efficiency and

22   reasonableness for, you know, a timeliness concern.

23        What's the outside date for the third parties to

24   respond to these to take -- because they wanted to file a

25   motion for protective order, the third parties, what's the

     1    outside date when they have to file it by?

     2         MR. SLATER:  Your Honor, I'm happy to report that

     3    Ms. Goldenberg is back on the line, so I'm going to hand back

     4    off to somebody who actually knows what they're talking about.

     5         (Laughter.)

     6         MS. GOLDENBERG:  Hi, Your Honor, I apologize.  I had

     7    gotten cut off earlier.

     8         Just to back up a little bit.  We have, just in the

     9    spirit of transparency, gotten documents from some third

    10    parties and those should be produced shortly for the

    11    defendants if they haven't gotten them already, but we're also

    12    working out some issues with the defendants where they have

    13    privacy and protection concerns with one another.

    14         So we will get those to them, and I don't believe

    15    that anyone has produced documents, so far as an entity that

    16    the defendants have raised major concerns with.  Obviously,

    17    you know, we'll do our best to make sure that we facilitate

    18    document production within the scope of whatever schedule or

    19    order is contemplated by the Court, but sometimes these

    20    entities just send us documents without any response

    21    beforehand.

    22         So we will do our best to reach out to them and to

    23    make sure that we have a full understanding from each

    24    defendant of where there are disputes at issue.

    25         THE COURT:  Can I jump in here?  Can I jump in here

1    for a moment, Ms. Goldenberg?

2          MS. GOLDENBERG:  Sure.

3          THE COURT:  It just seems fair that if you get

4    documents from a party that object to one of the protective

5    order motions that have already been filed, it just seems fair

6    that you segregate those, don't look at them until the motion

7    is decided.

8          So if you happen to get those documents, could you

9    not look at them, put them aside, notify the other side,

10   because they are subject to a motion that's already been filed

11   with the Court.

12         MS. GOLDENBERG:  We can do that, Your Honor, and the

13   best of my memory, none of the entities that have produced

14   documents, but I think at this point, it's like one or two

15   have been entities that have been the subject of those

16   motions, but we'll double-check on that and we'll be happy to

17   quarantine those documents in the meantime.

18         THE COURT:  Okay.  Great.  It just seems like an

19   appropriate reasonable thing to do.

20         Okay.  So I think the question we were dealing with,

21   Ms. Goldenberg, is, what do you think is the -- if a third

22   party was going to file a motion for a protective order,

23   what's the outside date they have to do that?

24         MS. GOLDENBERG:  I am trying to pull up one of those

25   documents as we speak, Your Honor, but I believe that that

1    date is -- let's see.  I believe that that date was today.  I

2    have just -- and that date is a little bit of a moving target

3    for some entities because some have requested extensions and

4    we've granted them.  I'm sorry, it's the 15th.  So we're

5    almost there.

6         That was the date in the subpoena to respond.  And

7    then, of course, some entities have responded that they want

8    to meet and confer and we are engaging in those

9    meet-and-confer efforts right now and have given extensions

10   for some to respond to those.

11        THE COURT:  Okay.  What about setting a date, that if

12   any third party is going to file for a motion for protective

13   order, they have to file it by a date certain, or somehow get

14   notice to those parties, and that will be the same date that

15   the defendants file, one, their omnibus motion dealing with

16   overlapping issues and then specific issues because then we'll

17   have before the Court all the objections, plaintiffs can

18   respond and then the issue can be teed up and decided.

19        One, I don't know we have time to decide this issue

20   in the next week or two, and, two, we won't have all the

21   objections before the Court within a week or two.

22        MS. GOLDENBERG:  We can certainly communicate that

23   date to the entities.  We, of course, haven't, you know,

24   gotten confirmation from all of them that any of them -- or,

25   you know, from attorneys representing them, but we'll

1    certainly do our best to send that notice out at least to the

2    address where the subpoena was served if we haven't heard back

3    yet.

4              THE COURT:  All right.  Why don't we do this.  I'm

5    looking at my calendar and I agree with Mr. Goldberg, that I

6    think the parties' resources in the short term should be spent

7    on the issues that you're already working on, so that we can

8    get these depositions up and running in time.

9              Those seem to be more important than these

10   third-party issues, although, obviously, these are important,

11   too.  So why don't we say, by December 4, anybody and

12   everybody who's going to file a motion for protective order

13   regarding the subpoenas, has to file it.  Third party and

14   defendant, okay?  And then plaintiff will respond to that.

15             Ms. Goldenberg, you're probably going to be the

16   person who responds.  How much time do you want to respond?

17             MS. GOLDENBERG:  I think 14 days for the one filed by

18   the defendants and then hopefully, there won't be too many

19   motions for protective orders and that we will have worked

20   through most of the issues on the third parties.

21             So if we could say two weeks -- or 14 days for now,

22   just knowing that if there happen to be many, many, many of

23   these, we may need an extension at that time.  If that's all

24   right.

25             THE COURT:  How about this, Ms. Goldenberg.  How

1    about respond by December 31st, and then defendants can reply

2    by January 8th, and we'll put this on the agenda for the

3    January 13th call.

4            MS. LOCKARD:  Your Honor, it's Victoria Lockard for

5    the Teva defendants.  Can we also request, in addition to

6    having plaintiffs notify the defendants when they receive

7    documents and providing those documents, that they also

8    provide us with any objections or responses they receive and

9    communications about extensions?  There are these discussions

10   happening, we don't have transparency into them.  I would

11   think it may be most efficient, you know, if there are meet

12   and confers going on that we would want to be included in

13   those, or at least know where the objections are being lodged,

14   and we're not seeing any of that.

15           THE COURT:  That sounds like a reasonable request,

16   Ms. Goldenberg, doesn't it?

17           MS. GOLDENBERG:  We're happy to provide them notice

18   of the objections and when we receive responses.  I think just

19   from a pure standing standpoint, you know, these third parties

20   do have -- make different objections than what the defendants

21   do.  I don't know that the defendants really should have any

22   input into the documents that we're seeking outside of, you

23   know, the objections that they are permitted to make under the

24   rules.

25           So I would submit that I don't think they need to be

 1    on the meet-and-confer calls, but I'll defer to Your Honor.

 2           THE COURT:  No, no, I don't think that's what Ms.

 3    Lockard asked for.  I think you're right, they probably don't

 4    have, without an agreement of counsel, to participate on your

 5    separate meet and confers.  They just want to know if

 6    objections have been filed and requests for extensions and

 7    response dates have been set with regard to the third-party

 8    subpoenas that they have an interest in.

 9           That doesn't sound unreasonable.  I didn't hear

10    Ms. Lockard say that she wanted to participate in your

11    discussions with the third parties.

12           MS. GOLDENBERG:  If that's the way you understood it,

13    Your Honor, I'm more than happy to do all the things that you

14    just mentioned.

15           THE COURT:  Okay.  I'm right about that, right,

16    Ms. Lockard?

17           MS. LOCKARD:  Well, certainly if plaintiffs were

18    agreeable, we would participate.  If plaintiffs are going to

19    raise a standing objection to that, then, you know, I

20    understand there may be, you know, some legitimacy to that,

21    but we would at least want to know that those were taking

22    place.

23           THE COURT:  Okay.  And you very well, "you" being

24    defendants, may want to coordinate with the third parties.

25           MS. GOLDENBERG:  Correct.

1      MR. GOLDBERG:  Your Honor, this is Seth Goldberg.

2  Could you just clarify again or just give us your

3  understanding of what would happen with documents that

4  plaintiffs receive between -- from third parties between now

5  and when, you know, the objections are ruled on?

6      THE COURT:  Well, if they received -- the easy case,

7  Mr. Goldberg, would be, if they received documents from a

8  third party associated with one of the parties that already

9  filed a motion for a protective order, that's easy.

10      In Ms. Goldenberg's words, those documents are going

11  to be quarantined.  Plaintiffs aren't going to look at them

12  until the Court rules.

13      I guess the harder question is, suppose a package

14  comes in the mail tomorrow with documents but a motion for

15  protective order hasn't yet been filed regarding those

16  documents, and I suppose there's nothing to prevent plaintiffs

17  from looking at those.  Right?

18      MR. GOLDBERG:  Well, I think, Your Honor, that's what

19  I was trying to, you know, figure out, because, you know, I

20  think part of what we did in our letter, and it is the result

21  of meet and confers, we've had at least three meet and confers

22  with plaintiffs about the third-party subpoenas they served,

23  and we, we did not, I think only two of the defendants filed

24  a, quote, motion for a protective order.  I think ZHP raised

25  these issues by way of the motion, by way of the letter brief,

1    Your Honor, yesterday.

2          Mylan has raised these issues by way of an objection.

3    But I think at bottom, all of the defendants object to whether

4    these subpoenas were properly served and then there are

5    objections as to all of the subpoenas in terms of scope, in

6    terms of the macro discovery order and relevance.

7          So it may be the case that plaintiffs get in, over

8    the next week or two, documents that we would argue should not

9    have been provided, because they are outside of the macro

10   discovery order or because that subpoena was not properly

11   served and --

12         THE COURT:  Well, what do you suggest?

13         MR. GOLDBERG:  Well, we would propose that those

14   documents also be quarantined until the Court resolves these

15   issues.

16         THE COURT:  Ms. Goldenberg, let's hear from you.

17   What happens to the situation where you get an envelope

18   tomorrow with documents?  They're covered in part by the

19   motions that have already been filed, and it's likely that by

20   the December 4 deadline, additional motions are going to be

21   filed relevant to those documents.

22         MS. GOLDENBERG:  So I think, you know, this is

23   creating a large gray area for us, and just for the sake of

24   clarity, you know, I think it might be helpful if -- to me,

25   there's a difference between a defendant saying, you know,

1    there are some categories here that seem overly broad and some

2    saying, you shouldn't get documents from this entity at all.

3         If there are just going to be smaller objections

4    that, you know, we could maybe work through, I don't think we

5    should be prevented from seeing those documents.

6         If a defendant says, look, this entity has obviously

7    nothing to do with Valsartan whatsoever, and the entity

8    happens to, you know, to send us documents in the meantime,

9    that they've told us -- and the defendant has said, you

10   shouldn't get these documents at all.

11        I guess pursuant to what we've just been talking

12   about, maybe those should be quarantined, but if we got

13   documents from someone like Novartis, where if, you know,

14   during the meet and confer with ZHP, they had said to us, you

15   know, we can recognize the relevance of this entity, or why

16   you want documents from them, I don't think that we should

17   have to wait to look at those documents because they are going

18   to be really relevant to the depositions we need to be

19   starting to take at the beginning of January.

20        THE COURT:  Well, here's what I think, because I'm a

21   big fan of efficiency and reasonableness.  I think it would

22   make sense that all the documents that you receive, you have

23   to give the defendants notice of what you receive, but until

24   the Court rules on these third-party subpoenas, plaintiffs

25   should be barred from looking at the documents, because we

 1   don't know right now whether they're going to be objectionable

 2   or not.

 3          Can I see privileged information in there?  There

 4   might be irrelevant information in there, there might be

 5   information that the Court already ordered is not subject to

 6   discovery.  I don't know how we can segregate the different

 7   mailings you receive, and it's impractical to do it on an

 8   envelope-by-envelope basis.

 9          So I think the appropriate thing to do is to order

10   that all documents received via the subpoena should be held,

11   and not reviewed until the Court rules on the subpoenas, but

12   the defendants, of course, have to be given notice that those

13   documents or said envelope was received.

14          And I'll make a note of that and that will be in the

15   Court order.  I just think that's the simplest and clearest

16   way to proceed.  Again, I don't think plaintiffs are going to

17   be prejudiced.  We all have more than enough work to do before

18   January 13th, that you don't have to worry about reviewing

19   these third-party subpoena documents.  Okay.  So that takes

20   care of that.

21          So we'll have a briefing schedule for all objections,

22   parties and nonparties, we'll hear everything on January 13th,

23   and until then, plaintiffs are just going to hold anything

24   they happen to receive, and Ms. Goldenberg, this helps you

25   because you can tell the parties who call you for extensions,

1  that you'd love to give them extensions but the Court ordered

2  that everybody has to file objections by December 4th.  So

3  that protects you and gives you some cover.

4        All right.  I think that takes care of the

5  third-party subpoena issue.

6        Requests and depositions as to the medical

7  monitoring.  Plaintiffs, I'm on Page 8 of your letter.  Boy,

8  in an hour-and-a-half, we've done eight pages of your letter,

9  Mr. Slater.  We're just moving along here.

10        MR. SLATER:  I take full responsibility for that,

11  Your Honor, if it helps.

12        (Laughter.)

13        THE COURT:  What's the issue with regard to the

14  medical -- oh, here's my thoughts about the medical monitoring

15  plaintiffs.  I know plaintiffs have asked to put those issues

16  on ice a little bit.  Here's my thinking on that.

17        Judge Kugler had indicated to everyone that by the

18  end of this month, he's going to give them more clarification

19  on how he's going to proceed on the case.  I don't know what

20  he's going to say, but maybe we should defer the medical

21  monitoring plaintiff issue until November 24, because if after

22  -- because I'm thinking Judge Kugler's plan to proceed forward

23  might impact how soon or how much later we need to get

24  information from the medical monitoring plaintiffs.

25        So I would suggest deferring this until November 24.

1    Any objection?

2         MS. BAZAN:  Your Honor, this is Rebecca Bazan from

3    Duane Morris for the defendants.  The parties have now reached

4    agreement as to the document request to be served on the

5    medical monitoring class representatives.  So since the

6    document requests are agreed to and finalized, we don't see

7    any reason why they should not proceed the same way as the

8    document requests to the economic lost individual class

9    representative.  There is no reason to wait, there is no

10   longer a dispute, or anything to talk about in terms of the

11   document requests themselves.

12        In terms of the depositions of the medical monitoring

13   class representative, Your Honor's order was very clear that

14   the depositions of all of the class action plaintiffs have to

15   start January 18th and must be completed by March 26th.

16        It did not carve out any exception for medical

17   monitoring class representatives.  When defendants requested

18   an extension of this deadline, Your Honor was very clear, that

19   in order to keep this case moving, there would be -- there

20   would be no extension of these deadlines.  And finally, you

21   know, Judge Kugler has indicated, and indicated at the end of

22   September, that the general causation issues would proceed

23   along the parallel track as to the economic loss issues.  So

24   defendants think there is no reason to put the medical

25   monitoring class representative depos on a separate track.

1      THE COURT:  Let's hear from the plaintiffs.  I did

2  not know about the agreement on the documents.  Thank you for

3  informing the Court.

4      Plaintiffs, you want to be heard?  Defendants'

5  position is, there should be no change in the current

6  schedule.

7      MR. STANOCH:  Good afternoon, Your Honor, David

8  Stanoch for plaintiffs.  I agree that this morning we reached

9  agreement on the Rule 34 document requests, the medical

10  monitoring plaintiffs.  If we want those to be entered and

11  responded on the same timeframe as the other ones that the

12  parties have agreed upon in which Mr. Goldenberg -- Goldberg I

13  believe e-mailed you about, that's fine, there's no harm in

14  doing that.

15      The more practical issue, Your Honor, is whether

16  we're doubling the number of depositions we need to schedule

17  in the January 18th to March 26th window, which Your Honor

18  set.

19      And the order that set that window, while it did

20  refer to class plaintiffs, frankly, Judge, the whole

21  conversation and the depositions only came up from the prior

22  order and the prior CMC, where all the talk was about economic

23  loss plaintiffs, because those are the only requests that

24  defendants had said they want to propound, and it wasn't until

25  last week that they even told us, or less than a week ago,

1    that they want to serve document requests on the medical

2    monitoring plaintiffs, after we asked them multiple times

3    dating back to October 16th.

4         So we would say that the document requests could be

5    approved and we'll answer them, that's fine.  But if we're

6    going to wait to hear from Judge Kugler on the depositions,

7    the deposition of these folks can be staggered slightly from

8    the existing January 18th and March 26th window, to trail a

9    little bit based on what Judge Kugler will let us know at the

10   end of the month.

11        THE COURT:  Well, I have to say that defendants'

12   argument was very persuasive.

13        Counsel reminded the Court that we set that deadline.

14   There was absolutely no question in the Court's mind that when

15   it set the deadline for the class action plaintiffs, it was

16   not only talking about the economic class plaintiffs, it was

17   talking also about the medical monitoring plaintiffs.  Really,

18   that should not be debatable.

19        So we're going to keep the current schedule.  That's

20   the default setting.  If things radically change because of

21   what Judge Kugler tells us on November 24th, Mr. Stanoch, the

22   Court will hear you.  But as of now, let's stay with the

23   current schedule.

24        MR. STANOCH:  Very good, Judge.

25        THE COURT:  Next issue.  Wholesaler document

1    productions.  Page 11.

2          MR. STANOCH:  Yes, Your Honor, David Stanoch again

3    for plaintiffs.  Just to be brief and to round out Mr.

4    Slater's letter.  I believe Your Honor's order of I believe

5    July 16th, 2020, set an October 13th deadline.  It was

6    actually an extension of a deadline for downstream defendants,

7    wholesalers, and retailers to complete their productions to

8    plaintiffs' document requests.  In following up with the

9    defendants, it appears that Cardinal -- two of the three

10   wholesalers claim they produced -- they've completed their

11   productions, but for a supplemental data, which is by

12   agreement okay with us, and we're reviewing those productions

13   now.

14         But in the meantime, McKesson has suggested that

15   they've not fully completed their production.  Our view is it

16   should have been completed, they should be ordered to do so

17   promptly.

18         MS. DAVIS:  Yes, Your Honor, D'Lesli Davis for

19   McKesson.

20         So, Your Honor, just to give some perspective here,

21   McKesson has produced 2,000 pages of documents and about

22   two million rows of the sales and purchase data, line-by-line

23   items that the Court ordered.  We've covered some purchase and

24   sales histories, SOPs, document retention, inventory with

25   regard to recalls, recall VCDs return, recall employees,

1  distribution center indemnification agreements and

2  information, but we've been candid with the plaintiffs that

3  we're encountering some trouble figuring out where SOPs go

4  when they die.

5      There are some old SOPs we can't find, and

6  additionally, with regard to some of the hard copy exemplars

7  on shipping documents, it appears that since those VCDs for

8  Valsartan-containing drugs, NDCs, for National Drug Codes, I

9  apologize.

10      And we're seeing that some of these hard copy

11  documents that are old, are off-site, and it's looking like

12  maybe stored by date rather than National Drug Code number.

13      So we're trying to pour through that date and get

14  exemplars that are correct and that are a complete set, and

15  just taking a little bit longer than we wanted it to, but

16  we're asking in good faith and we're being candid with the

17  plaintiffs about it, Your Honor.  So we would ask that the

18  Court and the plaintiffs indulge us just a little bit longer

19  as we try to close the loop.

20      THE COURT:  Counsel, when are you going to finally

21  complete the production?

22      MS. DAVIS:  I'm hoping within 30 days we have all of

23  that, Your Honor.

24      THE COURT:  Counsel, that's not good enough.  That is

25  not good enough.  Everyone in this case is burning the

1    midnight oil to meet these deadlines.  A company of the size

2    and sophistication and resources of McKesson should be able to

3    comply with Court orders.

4        Now, I heard plaintiff say, and you can correct him

5    if he's wrong, that these documents were due October 13th.  Is

6    that right?

7        MS. DAVIS:  I think that was the expectation by all,

8    yes, Your Honor.

9        THE COURT:  So that means, I don't know offhand, that

10   means that if the deadline to produce the document was

11   October 13th, more than likely, correct me if I'm wrong, the

12   order requiring their production was entered months before.

13       So McKesson apparently had plenty of time to get to

14   the bottom of this.

15       I'll tell you what I'm going to do.  I'm going to

16   order McKesson to produce all responsive documents in two

17   weeks.  And just tell your client, if they have to put more

18   resources on it, to do it.  They've had enough time to do it.

19   It's not an unsophisticated party.  Everyone is rolling up

20   their sleeves to get things done, and that has to include

21   McKesson.  So --

22       MS. DAVIS:  We understand, Your Honor, we'll try to

23   accomplish that, and to the extent that things do not appear

24   to exist, we'll just -- we'll just make that clear.

25       THE COURT:  Okay.  All right.  So what else,

1   Mr. Stanoch, with regard to the wholesalers?

2            MR. STANOCH:  Thank you.  Mr. Stanoch again, Your

3   Honor.  Thank you.  And there's no other issue I think ripe

4   with the wholesalers.  We did -- in our letter, did just make

5   Your Honor aware that there was a substantive written

6   objection that all three wholesalers raised to two of the

7   Court-approved, argued and long negotiated document requests

8   which was very troubling to us, given the amount of resources

9   the parties and the effort to put -- and the Court, put into

10  coming up with the ultimately Court-approved requests that --

11  and then the first time we heard it was in the written

12  objection.

13           That said, we had a meet-and-confer call last week

14  and we're committed to working in good faith to address it, if

15  there's some workaround or compromise we can come up to.  But

16  we did want to put that on Your Honor's radar in case it comes

17  up at the next CMC and we can't reach an informal resolution.

18           THE COURT:  Fair enough.  Terrific.

19           Mr. Goldberg, let's turn to your letter.  Are there

20  any issues in your letter that we did not address thus far,

21  and if so, let's address them.

22           MR. GOLDBERG:  Sure, Your Honor, thank you.  I think

23  the only issue that we haven't covered is the Rule 34 document

24  requests that defendants served or proposed to serve on the

25  consumer class representatives and the TPPs.  All right.

1          I e-mailed you earlier today copying Mr. Stanoch and

2     counsel for the TPPs, with the four sets of document requests

3     that the parties have agreed to.

4          And, one, that the consumers will respond to the

5     requests that we -- that the Court will approve as to them,

6     the medical monitoring plaintiffs will respond to document

7     requests as to them, and Maine Automobile Dealers Association

8     and MSP will respond to document requests as to them.  With

9     respect to MSP, at this point, the parties have agreed that

10    three of the assignors, the three assignors that responded to

11    the plaintiff fact sheets will respond to the document

12    requests.

13         Defendants and MSP are still trying to reach

14    agreement as to the responses to those document requests by

15    other MSP assignors, and we'd ask that Your Honor give the

16    parties a few more days to see if we can reach an agreement

17    and to report to Your Honor about that on November 16th.

18         THE COURT:  No problem, Mr. Goldberg, I'm happy to

19    let the parties talk about it.  If it can't be resolved before

20    -- I think our next call is the 24th or the 23rd or somewhere

21    around that, but if it can't be resolved before then, we'll

22    finalize it at that date.  But --

23         MR. GOLDBERG:  Sounds good.

24         THE COURT:  But the parties are talking.  That's

25    great with the Court.  Perfectly fine.

1          MR. GOLDBERG:  Thank you, Your Honor.  I think that

2     is -- that does it for defendants' letter.

3          THE COURT:  Okay.  Great.

4          So I know we have the TAR issue.  We'll talk about

5     that.  But putting that aside for the moment, are there any

6     other issues that either side wants to talk about while we're

7     all together?

8          MR. GOLDBERG:  I don't believe there are any for

9     defendants, Your Honor.

10          THE COURT:  Mr. Slater, anything else?

11          MR. SLATER:  Nothing for plaintiffs, Your Honor.

12          THE COURT:  Okay.  So now we can turn to the Teva

13     oral argument issue.  Can I make the suggestion, if no one has

14     a strong objection, let's take a short break, it's 3:45 now.

15     We could convene back at 4 o'clock and then we'll hold oral

16     argument on the Teva TAR issue.

17          Karen, are you available to come back?

18          THE COURT REPORTER:  Yes, Judge.

19          THE COURT:  So why don't we do that.  Why don't we

20     take a short break, 15-minute break.  Come back at 4 o'clock

21     and then we'll address the TAR discovery dispute.  All right?

22     So we'll sign back in in 15 minutes and in the meantime, we're

23     adjourned.

24          (Recess.)

25          THE COURT:  Good afternoon, everyone, this is Judge

1    Schneider again.

2            MR. GOLDBERG:  Good afternoon, Your Honor.  This is

3    Seth Goldberg.

4            THE COURT:  Karen, are you there?

5            THE COURT REPORTER:  Yes, Judge, I'm here.

6            THE COURT:  Let's just wait one moment, people seem

7    to be buzzing in.

8            Okay.  We're back on the record, Karen, if that's

9    okay.

10           We're now going to turn to the portion of the

11   conference call where we address the Teva TAR issue.  Just to

12   let counsel know, the Court's not going to rule today on this

13   issue.  There are a number of questions that I have regarding

14   the background and that I'd like to get answers to and then,

15   you know, make sure I get all the case law that's available,

16   and you'll get the Court's ruling promptly.

17           As I stated before, I don't think not having an

18   immediate ruling is going to materially prejudice anyone.  We

19   have a lot of issues we're dealing with to get ready for the

20   upcoming depositions, and that's fine.

21           This issue that we're dealing with now will be

22   decided promptly and there will not be an undue delay, but you

23   just won't get a ruling today.

24           The Court has read all the papers and is very

25   familiar with the issue, having lived with the parties through

 1  this issue since, I suppose, June.  You know, having

 2  participated with the Court in a number of oral arguments what

 3  the Court's preference is, I've read the papers, I don't need

 4  to be educated on the background of the matter.  I have a

 5  number of questions I'd like to see if we could get those

 6  addressed upfront, but the parties should feel comfortable

 7  that they'll have sufficient time to make any argument they

 8  want to make, even if what they have to say is not addressed

 9  in the questions that the Court asks.

10        So let me -- I have a couple of notes here.

11        Let me just start with a real quick softball.  Teva

12  uses the term "nonresponsive" in its papers.  Is that just

13  another word for irrelevant?  Teva?

14        MR. GREENE:  Your Honor, this is Jeff Greene for

15  Teva.  I think it is.  You know, when we talk about

16  nonresponsive, we look at, you know, are the documents

17  nonresponsive or responsiveness to the claims, then issues in

18  the case, right?  And so whether a document is nonresponsive

19  or irrelevant, I think it's the same.  You know, I suppose

20  there could be a, you know, and I'd have to think it through a

21  little bit, Your Honor.  There could be a document that's

22  responsive that's irrelevant, but I'd have to -- I'd really

23  sort of have to noodle on that.

24        But in the end, a nonresponsive document is a

25  document that has -- that doesn't meet the fundamental tenets

1    of claims and defenses of the case, and otherwise responsive

2    to plaintiffs' discovery requests.

3          THE COURT:  That's what I thought.  So Teva argues in

4    its moving papers as follows:  "At this point, the issue

5    before the Court is not what the ESI protocol permits or does

6    not permit as it relates to CMML.  Rather, the Court must rule

7    on a straightforward proportionality ESI discovery dispute."

8          Is it Teva's position that in connection with the

9    Court's ruling on this issue, it should disregard whatever is

10   required under the ESI protocol?

11         MR. GREENE:  No, Your Honor, we're not saying you

12   have to disregard the ESI protocol, and I don't think there's

13   any evidence that we have disregarded the ESI protocol.

14         THE COURT:  Okay.  So what -- in terms of

15   terminology, what Teva has done, and we call that what?  What

16   do we call that, the CMML application?  Is there a name for it

17   so that we're all on the same page?  What do we call it?

18         MR. GREENE:  If you want to simplify it, Your Honor,

19   we can call it a CAL exercise, a Continuous Active Learning

20   exercise.

21         THE COURT:  Okay.  So after negotiations broke down

22   in trying to reach an agreement, it appears that CAL undertook

23   -- I'm sorry, Teva undertook this, what we're now going to

24   call CAL exercise.  Is that right?

25         MR. GREENE:  Yes.  So -- yes.  I think the -- we

1    were, since early July, Your Honor, when we first started

2    working, you know, understanding the true nature of the hit

3    report, we had started using CAL to assist us in prioritizing

4    the documents.

5         So helping -- using the computer to help us find the

6    most relevant documents and bubble those to the surface.

7         So I don't think it's fair or accurate, if I may, to

8    say that we just started using the CAL exercise when

9    negotiations fell apart.  We were using CAL throughout that

10   time to prioritize the documents.  Only in the last month or

11   so, did we reach an actual point where the cutoff, where we

12   reached a logical cutoff point, which is to say the CAL

13   exercise, after bubbling up all the most responsive documents

14   for the priority custodians, which have been produced, we got

15   to the point where it said, hey, the CAL system, the CAL

16   exercise said, hey, these documents are -- the system believes

17   to be nonresponsive to what you're looking for.

18        So at that point, after we had our discussions with

19   Your Honor and Mr. Slater in July and August, at that point,

20   we, you know, we continued doing our review with respect to

21   the priority custodians and we reached a point where -- within

22   the last month or so, that we've been able to cut things off

23   or reach a logical cutoff point that says, there are roughly

24   260,000 documents that the system has deemed as nonresponsive,

25   99 percent of which are nonresponsive.  We've tested those, so

 1   that's a validation process, and that's where we are today, if

 2   that makes sense.

 3          THE COURT:  Can you tell the Court what input

 4   plaintiffs had into the validation protocol or process that

 5   Teva used?

 6          MR. GREENE:  The -- we discussed, obviously, Your

 7   Honor, we discussed -- there were discussions about the steps

 8   we were taking, but to answer your question, we did not

 9   provide plaintiffs with any input into the validation

10   protocol.  But, Your Honor, if you recall from our

11   discussions, we were willing to do that, we were willing to

12   share information with them, and we have shared a significant

13   amount of information with them about our validation protocol,

14   but because we were unable to reach agreements with respect to

15   production of nonresponsive documents, you know, we conducted

16   our validation protocol, and I'll say, Your Honor, you know,

17   if the Court is -- is interested in hearing the specifics

18   about the validation protocol, we do have Dr. Grossman on the

19   line with us and she's happy to answer any of those questions.

20          And I note, Your Honor, that in terms of the

21   validation protocol that we did follow, it is -- and

22   Dr. Grossman has sworn to this in the form of a declaration

23   that it is the most robust validation protocol that she's ever

24   seen in her hundreds of TAR and CAL exercises that she's done

25   over the years.  And I think that has to say something when

1   you have the leading expert in the world saying, I've never

2   done as much validation as what was done here.

3        So we're very confident, Your Honor, that our

4   validation protocol was as robust as it could possibly be.

5        THE COURT:  In effect, isn't Teva asking the Court to

6   bless its CAL exercise and validation protocol?  You want the

7   Court to say it was complete, it was accurate, and, therefore,

8   the nonresponsive documents don't have to be reviewed.

9        In effect, that's what Teva is asking the Court to

10  do, is that right?

11       MR. GREENE:  Correct, Your Honor.

12       THE COURT:  So when we turn to plaintiff, their

13  argument is going to be, Judge, we had zero input into Teva's

14  CAL exercise.  We had zero input into Teva's validation

15  protocol.

16       The ESI protocol requires that the parties meet and

17  confer and cooperate in good faith regarding the disclosure

18  and formulation of appropriate search methodology, search

19  terms and protocols and the search methodology, et cetera,

20  regarding TAR.

21       Plaintiffs are going to argue, if they had zero input

22  into the CAL exercise and the validation protocol, how in the

23  world, Judge, can you say they satisfied the ESI protocol?

24       And let's take for granted that Dr. Grossman is the

25  world's leading expert, and let's take for granted what she

1  says in her affidavit.  How can we ignore the language in the

2  ESI protocol which requires the parties to meet and confer in

3  good faith about the TAR that's going to be done.  How do we

4  respond to that, Counsel?  What do I do when you tell me, this

5  is the greatest thing since sliced bread and you have the

6  affidavit from your expert and plaintiff says, they violated

7  the ESI protocol because we had zero input into it and we

8  don't agree with that.  How do we respond to that?

9        MR. GREENE:  Well, Your Honor, I think it's important

10  to understand we have met and conferred throughout.  You know,

11  obviously, there was initial discussion in November.

12  Obviously, there are different views of that initial

13  discussion in November.  Search term negotiations continued

14  through -- into June of 2020 this year, and at that point, I

15  think they were finally finalized on June 24th-ish of this

16  year.

17        Within a week of that, Your Honor, we raised the

18  issue of TAR -- of using CAL for the first time.  And if I

19  recall correctly, Mr. Slater on that call said, I have not

20  looked at your submissions but we have real problems with it

21  and we're not inclined to do it.

22        We sent a significant white paper to them, you know,

23  literally dozens of pages about what we were proposing to do,

24  and literally, Your Honor, we got this pretty dialed in,

25  38 minutes later, they wrote back and said, no, we don't

1    agree.  And I don't know how they could have read through all

2    of our white papers and all of the materials we proposed in

3    38 minutes to say, we don't agree.

4         So I don't agree with the Court that we've not met in

5    good faith and negotiated in good faith.  There have been

6    countless negotiations and discussions about the process that

7    we're willing -- that we were following to get to this point.

8    Unfortunately, despite the best efforts of all the parties and

9    Your Honor, we weren't able to reach agreement and that

10   agreement was fundamentally based on, or the lack of agreement

11   was fundamentally based on plaintiffs' insistence on

12   nonresponsive documents, so -- and for which there's no

13   support whatsoever.

14        I think it's also important to understand in terms of

15   a CAL exercise and again, I don't know how to do this, but we

16   have to separate out how TAR 1.0, a TAR 1.0 exercise which is

17   based on seed sets, how an exercise of TAR would work, TAR 1.0

18   versus CAL.  If we had elected to use a TAR 1.0 methodology or

19   process, I would say that there -- there would have been a

20   much more significant likelihood of sharing of seed sets and

21   input with respect to the -- the training of the system.

22        But under a CAL exercise, Your Honor, you just start

23   looking at documents and, you know, we've reviewed more than

24   700 -- we've used 700,000 documents as part of our review to

25   train our CAL system.

1          So in order for us to get input from plaintiffs on

2     the CAL training exercise, they would have to sit there with

3     us and train 700-and-something, 760,000 documents, which is

4     the number of documents we've reviewed so far.

5          So it's not so much we didn't let them do it, it's

6     just the way CAL works is, it's a -- you know, it's an

7     exercise in continuous active learning, okay?  So I think it's

8     important to make that distinction that, you know, throughout

9     this, and, you know, I'm sort of guided by 26(g) here, Your

10    Honor, we took, you know, we took reasonable efforts to go

11    through and find the most responsive documents.

12         We produced those to plaintiffs first.  But right

13    now, we're at a stage where we have hundreds of thousands and

14    when you look at all of the custodians we have, potentially

15    millions of documents that have nothing to do with anything,

16    not responsive to this case, and we're going to incur

17    substantial costs in order to review those.

18         So I don't agree, Your Honor, respectfully, that we

19    didn't meet and confer.  We did.  And I find it a little bit

20    odd that we're here today and Mylan has just raised this

21    issue, their issue of, you know, of using CAL for the first

22    time.

23         Mr. Slater didn't seem to raise any objections about

24    how prejudiced he was about hearing from Mylan for the first

25    time this late in the game.  We've been doing this, we've been

1    having these discussions since literally the first available

2    opportunity after the search terms were finalized in June.

3          So I disagree respectfully, Your Honor, that there

4    was no input.  I disagree that there was no opportunity for

5    reasonable meet and confer.  We used -- under 26(g), we used

6    our best reasonable efforts to produce documents.

7          And, Your Honor, I think it's important to remember

8    that we're doing everything we can to meet our discovery

9    deadlines and, you know, we have met our discovery deadlines

10   and we will produce all of the responsive documents for all of

11   the custodians by the discovery deadline.  We're just simply

12   asking for -- to avoid the cost or shift the cost associated

13   with reviewing potentially millions of documents that are

14   irrelevant to this case, or nonresponsive to this case.

15         THE COURT:  Mr. Greene, let me fast-forward a little

16   bit in the chronology of this dispute to the discussions, I

17   believe, over the summer or the fall, where the plaintiffs and

18   Teva attempted in earnest to agree on some sort of TAR

19   protocol.

20         Now, I'd really like the record to be clarified on

21   this, and we're going to obviously hear from plaintiffs on

22   this, but correct me if I'm wrong, I thought that after the

23   intensive discussions that the parties had and the Court was

24   involved in some of those discussions, there was a protocol

25   that was essentially agreed to.  And I think, if I remember

1    right, it's attached as Exhibit B to Mr. Slater's submission

2    to the Court on this TAR issue.

3          And there were two issues, if I remember right, that

4    Teva said we're not going to agree to.  One, they didn't want

5    the agreement memorialized in a Court order, and, two, they

6    didn't want plaintiffs to review alleged nonresponsive

7    documents, and I think the number was 5,000.

8          It was the Court's understanding and correct me if

9    I'm wrong, that apart from those two issues, the parties had

10   an agreement.  Am I wrong about that, Mr. Greene?

11         MR. GREENE:  Your Honor, there was never any

12   agreement, fundamental, you know, you can't -- if -- the

13   fundamental dispute from our perspective was production of

14   nonresponsive documents and once that was -- you know, once

15   Mr. Slater said, you know, he's not going to give up on that,

16   you know, that effectively eliminated any possibility of

17   agreement and at that point, we said, we'll do our validation

18   and we're going to do the most robust validation that we can

19   do under the circumstances.

20         So, no, I disagree that there was any kind of

21   agreement.  We never signed anything, there was never an

22   agreement on the record, and so, no, Your Honor, there wasn't.

23         THE COURT:  Okay.  I'm sorry about this, Mr. Greene,

24   but I'm going to hold your feet to the fire on this, because

25   this is, in the Court's view, this is a very important point.

1              Aside from, one, incorporating the terms into a Court

2    order, and aside from the review of the nonresponsive

3    documents, it was the Court's understanding that everything

4    else was agreed to.  Am I right about that?

5              MR. GREENE:  You are correct about that, Your Honor,

6    but it's difficult to look at an agreement, you know, in

7    component parts.

8              THE COURT:  Okay.  Were there differences between

9    what essentially broke down in the summer and the fall and the

10   ESI and CAL exercise that Teva is asking the Court to adopt,

11   were there differences?

12             MR. GREENE:  I think there are differences, Your

13   Honor.  I mean, obviously, we didn't turn over 5,000

14   nonresponsive documents for Mr. Slater to review.  If

15   anything, Your Honor, I would say we did a more robust process

16   in terms of reviewing and, you know, Dr. Grossman can talk to

17   that if you're so inclined to hear it, but I think the reality

18   is, yes, it was different, but -- and part of those

19   differences were based on, you know, as we worked our way

20   through the, you know, through the review, and, you know, we

21   did two levels of broiler's protocol, two levels of broiler's

22   validation protocols, a review of 15,000 documents,

23   nonresponsive documents of which we found 109 could be only

24   marginally responsive, and then we did 11 additional training

25   rounds of the CAL system to try to find additional documents,

1    responsive documents, which revealed -- which resulted in only

2    a very small number of additional documents being found.

3            So, yes, Your Honor, it's different but I also think

4    it was actually more robust and I think I -- if the Court, if

5    I could indulge the Court just to ask Dr. Grossman to weigh

6    in.

7            THE COURT:  Well, I don't want to hear from -- hold

8    on.  I don't want to hear from Dr. Grossman now.

9            MR. GREENE:  Okay.  That's fair.

10           THE COURT:  But if I need to hear from Dr. Grossman,

11   I'll ask for the doctor's input.

12           But I don't need to hear from her now because I don't

13   think the issue is, you're telling me that Teva used the gold

14   standard in what they're asking the Court to adopt.  Let's

15   assume for the sake of argument, maybe that's true.  Let's

16   just assume for the sake of argument.

17           We know that plaintiffs don't agree with you.  We

18   know it.  We know that they submitted an affidavit from their

19   consultant too, of course, you contest, no question about it,

20   but their consultant says they're not happy with the CAL

21   exercise that Teva did, but I keep on getting back to the ESI

22   protocol which requires the parties to meet and confer in good

23   faith about the methodology.

24           Here, you have -- "you" not you, Teva, and plaintiffs

25   had an agreement except for those two points, and it broke

1    down over those two points.  But yet, Teva went ahead and did

2    its own CAL exercise without any input from plaintiffs

3    whatsoever.  And what the Court is wrestling with is whether

4    that's consistent with what is required in the ESI protocol

5    and that is why, at the very beginning of this argument, I

6    pointed to the language in Teva's brief that in effect said,

7    Judge, ignore the ESI protocol and just do a proportionality

8    analysis.

9         We haven't talked one word yet almost about a

10   proportionality issue.  I'm focusing on, at least at this

11   early part of the argument, as to whether what Teva did is

12   consistent with the Court-ordered ESI protocol.  And is it

13   your position that what it did was consistent with the

14   protocol, right?  Is that what you're saying?

15        MR. GREENE:  Yes, Your Honor, we negotiated in good

16   faith throughout.

17        THE COURT:  Okay.  So let me ask you one more

18   question, and then I want to turn to plaintiffs.

19        The ESI protocol requires the parties to meet and

20   confer in good faith and one way to read it is to meet and

21   confer in good faith about the issue of whether the pool of

22   collected documents is going to be narrowed, okay?

23        In Teva's view, when was that duty to meet and confer

24   triggered in this case?

25        MR. GREENE:  Your Honor, the duty to -- as soon as

1    Teva realized, understood the true nature of the search term

2    hits, based on the file search terms, we understood that there

3    would be a tremendous number of documents to be reviewed, and

4    at that point, in early July, we raised the issue and that's

5    where the obligation to discuss the use of a CAL exercise was

6    triggered.  We didn't wait until the end of October when --

7    or, you know, until October, when we reached the logical

8    cutoff point.

9            We decided, it was our position, based on the

10   language of the ESI protocol that there was a substantial

11   likelihood that we would get there and, you know, the

12   discussions were, we're going to use the CAL exercise and at

13   that point, we were not sure whether or not we would use CAL

14   to cut off, because we didn't know, you know, obviously,

15   working our way through the CAL exercise, the reality is, Your

16   Honor, at some point over the summer, after the negotiations

17   fell apart, we reached a logical conclusion that it was

18   appropriate to use the cutoff, you know, to trust the system,

19   and say that, you know, these 260,000 documents for the

20   priority custodians were -- were irrelevant or nonresponsive.

21           And that's what we did.  So I think, Your Honor, if

22   anything, we, you know, we went beyond the scope of the ESI

23   protocol, because we, you know, we met and conferred early,

24   even before we intended to use CAL as a cutoff mechanism for

25   the nonresponsive documents.

1    And a final point, Your Honor, if I may, I do think

2  it's really important for the Court to weigh -- you know, you

3  referenced Mr. Jaffe and obviously, Dr. Grossman.  That's not

4  an equal fight between those two individuals.  We have an

5  expert, Your Honor, Dr. Grossman, who is the leading expert in

6  the world and Dr. Jaffe is just a guy who -- you know, he's a

7  smart guy, there's no doubt, he graduated Columbia, but the

8  sum and substance of his CAL experience, Your Honor, is one

9  line on his resumé that says something like predictive coding

10  recommendations.

11    So I think the -- what I would say, Your Honor,

12  respectfully, is to use caution when looking at what Mr. Jaffe

13  is saying, because he's not an expert, he's never been

14  certified as an expert in anything with respect to TAR.

15    He is, you know, he may know a few things about it

16  but, you know, I think it's instructive that -- to look at the

17  declaration that he submitted, which was challenged

18  significantly by Dr. Grossman and her submission from -- and

19  her declaration on July 28th, to which Mr. Jaffe has never

20  responded, and he can offer absolutely no empirical evidence

21  that we did anything wrong, that our system wasn't trained

22  right.

23    He just says, you didn't do it right, but there's no

24  evidence whatsoever to support that.  He's not an expert, he

25  is not at the same level, respectfully, as Dr. Grossman, and

1    so I think the Court has to establish some weight there in

2    terms of what it's willing to accept from a guy who might know

3    a thing or two about TAR versus the world's leading expert.

4    That's not a fair fight, Your Honor.

5            THE COURT:  Well, I think we're talking over each

6    other because Dr. Grossman is unquestionably qualified and Dr.

7    Grossman addresses how CAL works and its effectiveness and

8    this supposed gold standard that was applied in this case.

9            Dr. Grossman doesn't address whether Teva -- nor

10    should she, because it's a legal question, whether or not Teva

11    complied with the ESI protocol.  She's just -- the doctor --

12    it's not her role to make that decision understandably.

13            So let me get back to something you had said, because

14    I want to understand Teva's position.  Is it Teva's position

15    that the trigger in the protocol to meet and confer in good

16    faith and collaborate is triggered when, one, Teva makes a

17    subjective actual decision that it's going to use TAR to

18    reduce the documents to review or, two, there's a substantial

19    likelihood it's going to do that.  Is that Teva's position?

20            MR. GREENE:  Yes, Your Honor.

21            THE COURT:  Okay.  And before that time, before June

22    or July, was there a reasonable likelihood or possibility or

23    probability that Teva was going to use TAR to reduce the

24    universe of documents to review?

25            MR. GREENE:  I think it's a possibility.  At that

1    point, Your Honor, we didn't have, prior to the end of June,

2    we didn't have a clear sense in terms of what the final search

3    terms were, so I would say no.  We didn't have a reasonable

4    belief that there was going to be use of, you know, use of CAL

5    for cutoff purposes, and I think, Your Honor, we put in our

6    papers that, and letters to plaintiff, that, you know,

7    throughout the course of the summer, that we hadn't reached

8    that point yet.

9        Because of CAL -- as Your Honor, I'm sure is becoming

10   aware, you know, the CAL exercise should be a Continuous

11   Active Learning exercise and, you know, it's iterative in the

12   sense that, you know, from day to day, we don't know where the

13   system is going to have us go, and so obviously, we're

14   learning as much as the system is learning in terms of what

15   the system is telling us how much is responsive versus

16   nonresponsive.

17       So I can't tell you that, you know, in early June or

18   before June, that there was a belief that we were going to use

19   CAL for cutoff because I don't think there was.

20       THE COURT:  Teva knew, because this is in the

21   declaration of counsel that was submitted, that it was a

22   concern of plaintiffs as early as November whether or not Teva

23   was going to use TAR or CAL to reduce the universe of

24   documents to review; is that correct?

25       I mean, you don't dispute that, because it's in the

 1    declaration, right?

 2             MR. GREENE:  Correct, Your Honor.

 3             THE COURT:  All right.  Having that knowledge, why

 4    did we go through extensive negotiations and disputes about

 5    search terms that resulted in a December order, and a

 6    reduction of the search terms in June of 2020?  Why did we go

 7    through that exercise if Teva knew plaintiffs' concern and

 8    only after all that was done, did it tell plaintiffs for the

 9    first time that this is what they were going to do?  Why

10    didn't Teva back in the fall say, listen, we haven't made a

11    decision what we're going to do, so why don't -- we have

12    continued these discussions and we're not going to take all

13    this time talking about search terms, because we know

14    plaintiffs, that if we decide to use TAR to reduce the

15    universe, you're going to take the position that we have to

16    look at the whole universe of documents and not cull them down

17    by search terms, and we're going to disagree on that, so let's

18    go to Judge Schneider on it and get a decision on it.

19             Why wasn't the issue raised in November and December

20    and January and February and March and April and May?  Why

21    wait until June or July?

22             MR. GREENE:  Well, Your Honor, I think there's two

23    issues.  Number 1, you know, obviously, we didn't know what

24    the search term hits would have been until we got the final,

25    you know, the final review, the final search terms, and, you

1    know, same with custodians.

2          So I think it's, you know, obviously in a perfect

3    world, had we known the numbers and known the search terms and

4    the custodians back in November, I think we could have made a

5    more reasoned decision but we were negotiating and meeting and

6    conferring in good faith throughout, and I think, Your Honor,

7    it's important to understand, the ESI protocol and general

8    meet and confers in general, don't necessarily require

9    agreement, they require us to meet and confer in good faith

10   which we've done.  The ESI protocol does not say the parties

11   have to agree at the end of the day.

12         So I think there's this concern that, you know, if

13   the Court is concerned that we didn't follow the rules, I

14   think, you know, I'd respectfully disagree with that, you

15   know, because we did follow the rules, we did say, when we

16   were using CAL at the outset in July, in early July of 2020,

17   we did say we were going to use it, we told them we were not

18   sure whether we'd use it to cut out, but we were going to use

19   it for the purposes of the prioritization.

20         So at the end of the day, you know, it's difficult to

21   say in a vacuum, could we have done it sooner?  I don't think

22   so because we really didn't have the search terms finalized

23   until June.

24         THE COURT:  Well, Mr. Greene, I don't know if you

25   were involved in the case way back when, but I have to

1    disagree with your statement that you -- that Teva didn't know

2    what the search terms were until June, because the Court

3    entered an order on -- let me get the exact date, so there's

4    no misunderstanding.  I have it right here.

5        The Court entered an order on December 23rd, 2019,

6    listing the search terms that had to be used and the

7    custodians.  So why are you saying that Teva didn't know until

8    June what the search terms were?

9        MR. GREENE:  Well, I think, Your Honor, the -- what

10   the Court did thereafter was invite the parties to continue to

11   negotiate those search terms, and that's exactly what

12   happened.  We were hopeful, certainly, that the search terms

13   would continue to be narrowed, but at the same time, you know,

14   it's difficult for us to start a process in terms of discovery

15   when, you know, when nothing's been finalized because there

16   are costs associated with, you know, if we're going to collect

17   data and run search terms across data and promote data based

18   on search terms that aren't finalized, there's a cost

19   associated with that.

20       And, you know, Your Honor, we are here because this

21   is costing all of the defendants, let alone Teva, millions of

22   dollars in discovery, and, you know, for us to start a process

23   in November when we have no agreement on search terms, you

24   know, to -- sorry, in December, when there's no final, final

25   agreement, the Court has invited the parties to continue

1    discussion, I think that's dangerous from a cost perspective

2    because we could go down the road and say, you know, collect

3    all the data, load all the data, process it.  There's a cost

4    associated with every component, with every one of those

5    components, only to find out that later, we were able to

6    negotiate different search terms which may require additional

7    data or less data to be promoted into a platform.

8        So, Your Honor, I think our approach was reasonable

9    here in, you know, going through this exercise as best we

10   could, meet and confer.  We don't have to get agreement under

11   the ESI protocol, and at the same time, Your Honor, we did,

12   you know, Teva did switch e-discovery vendors, not specific,

13   you know, for this case, but they did a global switch for all

14   their litigation and that obviously impacted the analysis as

15   well, because the new vendor, which is Consilio, offered

16   different tools and different perspective on what could be

17   done in terms of reviewing all these documents.

18       So it's easy to look at it, Your Honor, and I

19   understand where you're coming from.  It's easy to look at it

20   in isolation and say, could you have done this sooner.  Well,

21   I suppose so, Your Honor, but the reality is, is that, you

22   know, when you look at all of the negotiations that were

23   taking place and all, you know, all of the costs associated

24   with doing discovery twice, which is what we would have

25   ultimately had to do, that's significant and that's real and

1    that must be taken into consideration.

2            THE COURT:  Mr. Greene, I'm not faulting you, because

3    I don't think you were involved in the case back then, but I'm

4    very confident that if you talk to your colleagues, they will

5    agree with me that it's a completely inaccurate statement to

6    say that the Court invited the parties, after its

7    December 23rd order, to reduce the search terms to be used.

8            That is not what happened.

9            What happened is Mylan raised, after the fact, after

10   the Court order was entered, Mylan said, wait a minute, these

11   search terms that we agreed to and you ordered, Judge, are too

12   broad.

13           And then the parties spoke and negotiated about

14   revisions, but in no way, shape or form, did this Court, quote

15   unquote, invite the parties to change the order that they had

16   agreed to.

17           You weren't there, but at that final meeting in

18   December, I specifically asked liaison counsel, are there any

19   objections to these exhibits to the order that I'm going to

20   enter listing the parties' search terms and custodians, and

21   the answer was no.

22           MS. LOCKARD:  Your Honor, it's Victoria Lockard.

23           THE COURT:  Hold on, Ms. Lockard.

24           MS. LOCKARD:  Sure.

25           THE COURT:  So my question is, why didn't -- we're

1    going to hear this from plaintiffs when it's their turn.  Why

2    didn't Teva, when Mr. Slater asked Teva and the other

3    defendants to run hit reports, to run sample reports, and this

4    was before the December 23rd order, Mr. Slater asked that that

5    be done, probably for the purpose of what eventually happened

6    to avoid a post-order argument that it's too burdensome, and

7    Teva said no.

8        So, I don't know if it's fair to state, one, that

9    Teva didn't know the search terms until June.  They knew the

10   December 23rd order.  They knew the negotiations that were

11   going on after -- between June and December with the key

12   search terms, or they knew the custodians.  They had the

13   opportunity to run test runs and sample reports, so I don't

14   know if the record really supports the notion that it was not

15   until June that Teva could know that there were so many

16   documents to review.

17       Ms. Lockard, I apologize.  I think I interrupted you.

18   Did you want to say something?

19       MS. LOCKARD:  No, absolutely, I jumped in there.  I

20   do, I do, because it, you know, to be fair to Mr. Greene, he

21   was not involved at that point in time, and may not be the

22   best person to speak to the absolute history of that, you

23   know.  I think using the term "invite" may be strong but the

24   way we read the 12-23 order and I've argued this before and we

25   put it in our papers, there was a clause in that that

1  discussed modifications to the search terms, with a good faith

2  basis therefore.

3       And so when we went into that, our understanding was

4  that, you know, there would be an opportunity to massage

5  those, as happens in virtually every litigation.  It is an

6  ongoing process.  That has been our experience, and I'm sure

7  Mr. Greene would agree with that.

8       But we did, we did negotiate throughout the period

9  after December with plaintiffs, but whether this Court invited

10 this or not, we made some progress with Mr. Parekh, but at the

11 end of the day, we weren't able to make the types of reviews

12 that would cut down on the volume of what we were finding

13 large number of just trash hits.

14      And so when Mr. Greene mentioned the June, not

15 knowing in June what we were dealing with, it's not that we

16 didn't know the search terms, we didn't know the volume yet

17 until we actually collected those, had our new vendor go

18 through and give us the hit counts for each of those.

19      And I understand there's been the argument about,

20 well, we should have test run on the custodians, but again,

21 when we were negotiating the custodians after the point in

22 time when the search terms were being ruled upon, we didn't

23 know who to be able to pull from.

24      It takes a great deal of effort to actually get those

25 documents, e-mails, data, downloaded from our client to the

1  vendor and until we know -- it's expensive, it's

2  time-consuming and until we know who the actual custodians

3  are, there was no way that we could actually pull those over

4  to the vendor and then have the vendor run those search terms

5  for us.

6         So I don't mean to jump in, this is Mr. Greene's

7  argument.  But I wanted to just clarify some of those points.

8         THE COURT:  No, thank you, Ms. Lockard, and I

9  appreciate that, because I know you were intimately involved

10 in this.  But from the plaintiffs' perspective, they had no

11 reason to believe that Teva was proposing to use TAR until

12 that letter that came out in June or July.

13        Why was that not disclosed before we went through

14 enormous efforts to negotiate search terms and custodians

15 because now plaintiffs are saying, and it's hard to dispute,

16 that they wouldn't have agreed to those search terms if they

17 had known Teva was going to use TAR as they proposed to do.

18        I mean, if everything was put on the table at the

19 very beginning, we wouldn't be arguing.  I have a feeling

20 plaintiff would be, you know, you would come to an agreement

21 on the protocol and you'd be on your merry way, but

22 plaintiffs' feeling is, that they were led down this primrose

23 path and that's why they negotiated those search terms, then

24 they reduced that number and then Teva tells them about TAR.

25        Why wasn't plaintiffs told about TAR before all the

1    effort went into the search term?

2            You were in the case at that time.

3            MS. LOCKARD:  They had been told that we were

4    considering using TAR.  Steve Harkins in our office submitted

5    an affidavit on that point and it has not been disputed in

6    this case.  They were told we were considering it.  They were

7    told we were considering using TAR.  We had a vendor on the

8    line in November.  The ESI protocol does not say it's either

9    search term or TAR.  And the case law doesn't support that

10   either.

11           There's case law that allows for layering.  There's

12   no reason to think, you know, the onus has been placed on

13   Teva, to say, well, Teva, why didn't you speak up, why did you

14   wait?  Have you ever considered that why didn't plaintiffs

15   say, oh, hey, I hear that you're considering using TAR, we're

16   also negotiating search terms.  By the way, Teva, we're doing

17   either/or.  It's one or the other.

18           They never spoke up and said that to us.  How were we

19   supposed to know that they were taking a hard line either/or

20   position.  They never mentioned it.  It's not in the ESI

21   protocol.

22           So layering procedure is blessed by the case law.

23           So, you know, perhaps we had some onus to speak up,

24   but they did, too.

25           THE COURT:  Okay.  Mr. Slater, or whoever is going to

1    talk for the plaintiffs, we've, you know, hashed out a lot of

2    issues with Teva.  I'd like to hear plaintiffs' position and

3    maybe you could start with what I started with.

4          Teva argued that we don't have to look at the ESI

5    protocol, it's a pure proportionality issue.

6          What say the plaintiffs?

7          MR. SLATER:  Thank you, Your Honor.  This is Adam

8    Slater.  I think that puts the cart before the horse or the

9    horse before the cart, however that term is.

10         Clearly, the ESI protocol which was entered more than

11   a year ago, at all times placed obligations on the parties

12   that we had to comply with.  And it's not disputed -- I mean,

13   not seriously disputed or disputable that the defendant, Teva,

14   did not comply with the protocol.  The language is very clear

15   that they needed to meet and confer with us and I'm happy to

16   go through the case law, but I know that Your Honor's read the

17   cases.

18         There isn't a case that we have seen or that anybody

19   has cited where anything close to this was allowed, where

20   there wasn't either a gleaning to it or that the defendants

21   had to provide, I think that the *Bridgestone* case talked about

22   significant openness and transparency and required the

23   defendant to produce or the -- the producing party to produce

24   the actual training documents, for example, and to provide,

25   and the Court emphasized it several times, and that's probably

1  their best case and they didn't comply with what that case

2  said, so you don't get to a proportionality analysis by

3  leapfrogging over the ESI protocol which was governing our

4  conduct throughout this litigation.

5         I think it was entered in June or July of last year

6  and it certainly had a big role in helping to shape our meet

7  and confer on the search terms and all of the other things

8  that happened later, and, you know, I certainly don't want to

9  over-argue any of these points, Your Honor.

10        But I certainly can, as bullet points, point out

11  things that Your Honor has asked defense counsel with to

12  emphasize the importance of what really went on.

13        When we asked about their potential use of TAR, that

14  was because we were very open to it.  Because, and Your Honor

15  knows from the case law, there may be benefits but it has to

16  be done in a way that's mutually agreeable, and that's what

17  the case law says, with tremendous cooperation and

18  transparency and the defense gave us, you know, really not

19  much.

20        I'm reading from Mr. Harkins' certification where he

21  said that -- he stated that they were evaluating -- I'm

22  quoting this.  We were evaluating whether or not to use TAR,

23  but had not made any determination as to how or whether we

24  would do so in the future, and as Your Honor knows, it's been

25  argued many times by the defense, that they are the master of

1    how they produce their documents, so they chose search terms.

2         We were not in a position to compel them to use TAR.

3    That issue was lost by plaintiffs in the *Mercedes Benz* case

4    where Judge Cavanaugh as the Special Master, made it clear

5    that once the defense chose that road, do not come back later

6    and ask for a retry.

7         The plaintiffs were asking for TAR.  We respected the

8    concept that, which we don't love as plaintiffs, that we have

9    little input into the decision as to how this will be

10   conducted.  So they chose search terms, they chose to move

11   forward that way.  All of the discussions centered on the

12   search terms, and I think Your Honor has hit on a very

13   important point, which is -- I almost felt like Chicken Little

14   back in the fall of 2019, when I kept saying, why won't you

15   sample, why won't you test, because they easily could have

16   done so.

17        They knew who the key custodians were going to be.

18   They provided a presumptive set of custodians and they knew

19   what the search terms were that we were negotiating, and they

20   should have been testing and they should have been

21   collaborating with us the entire time.

22        I mean, this, really a big part of this application

23   is about a lack of due diligence by Teva, because if Teva had

24   exercised due diligence, A, they would have tested and sampled

25   those search terms and then they would have shared the data

1   and we would have negotiated and if we couldn't agree, Your

2   Honor, they would have presented the issue to Your Honor and

3   Your Honor would have made the hard call on which search terms

4   are going to be included or not.

5          They ended up agreeing, as Your Honor said to the

6   full set, then as Your Honor noted, Mylan came forward and

7   said that they felt like the hit counts were too large and we,

8   in good faith, entered into negotiations with all of the

9   defendants to modify the search terms as they deemed

10  necessary, and the suggestion by defense counsel that somehow

11  we forced them to accept the modifications and no further

12  modifications, that's not accurate.

13         All they had to do was go to Your Honor and say, you

14  know what, we're not going to agree to these narrowed search

15  terms because we think they need to be narrowed more.  That

16  was not done.

17         And then, after that exhaustive process that went on

18  for months and months, and culminated with Your Honor entering

19  that order on June 24, at that point, they had now agreed

20  again, where was the diligence for the six months at the start

21  of the year?  And I think that it's very clear on this record

22  that this was all knowable and we should have engaged in this

23  conversation earlier.

24         And then we get the letter, July 1st, one week after

25  the new search terms were set, are we to believe that while

1    the new search terms were being negotiated and narrowed, that

2    they weren't running searches and getting hit count and

3    evaluating how many documents were coming up both under the

4    original search term set and the proposed modifications?  Were

5    they not running alternative searches to say, look, we want to

6    get rid of this term or that term or change these modifiers or

7    those modifiers, because it's reducing -- it's reducing the

8    document count significantly, and we've studied those

9    documents that are being excluded and they're not relevant and

10   let's talk about it.

11        All of those things could have happened and should

12   have happened if this was a legitimate issue.  It didn't

13   happen.

14        Then July 1st, they come forward and they -- and

15   let's be very clear, Your Honor.  At first, they said they

16   were going to run TAR and then it turned out they had already

17   started running it.

18        And Your Honor doesn't have to make any credibility

19   decisions, but I think that it's very, very plain that when

20   they began to run TAR, it wasn't solely to help prioritize

21   documents for plaintiffs' benefit, which is the story that's

22   being told.  We appreciated if that was something they were

23   hoping would happen, because it would be helpful to us, but

24   clearly, that was a decision that was made with an

25   understanding that this would likely lead to a narrowing

1    application, and the process started with that letter.

2            So, you know, there's so much here, and I'd be happy

3    to, if I had to, to walk through the case law, Your Honor, but

4    you asked us some particular questions on the record, and

5    we've answered those questions.  There is very good case law

6    including the Third Circuit recognizing the proposition that a

7    party, for example, can be compelled to produce documents

8    without responsiveness/relevancy reviews.  So we've answered

9    that question with multiple cases.

10           We've answered the questions about what occurred last

11   year in the discussions and that -- with regard to that letter

12   in November, and again, the case law makes it very clear, in

13   accordance with our ESI protocol, that a party that wants to

14   use TAR needs to meet and confer, it's the backbone of the

15   Sedona principles, cooperation and transparency and working

16   through this together, so that you could enter into a

17   validation protocol that makes both sides comfortable, and if

18   there's a dispute, the Court arbitrates that, makes the

19   decision and determines how you will proceed.

20           And, you know, Your Honor, the other thing I think

21   I'd like to mention and then I'll try to be quiet and see if

22   you have any other questions, obviously, I'm picking and

23   choosing a few things that seem significant to me but I may

24   miss an issue that Your Honor thinks is more significant, but

25   we had a protocol which counsel conceded on this call on the

1    record, during this hearing, that was agreed to, but for two

2    specific issues, whether it would be filed and whether or not

3    we would get the 5,000-document audit sample, which, by the

4    way, we were supposed to have the right to pick the criteria

5    and have a lot of input as to how those documents would be

6    collected.

7         So we know that it was agreed to, but for those two

8    issues, and we know, and I'm not going to do it, because it's

9    so clear, there was a multitude of protections built into that

10   protocol that we were willing to go forward with, to save them

11   this money as they said that's their concern, that would have

12   given us tremendous protections and confidence that at least

13   our interests were being protected.

14        I'm not going to walk through them, they're in the

15   record, Your Honor has them.  We, out of caution, did not file

16   that negotiated protocol, we don't think there's any reason

17   why it would not be filed on this docket, but we were being

18   careful and did not file it.  But there are levels and levels

19   and levels of reporting, and it went all the way back, Your

20   Honor, to, they agreed they were going to run TAR on the

21   entire document set, not the narrowed set.

22        They were going to use the core discovery documents

23   for the initial learning process.  They were never used to,

24   quote unquote, teach or educate the system.  Those are the

25   most relevant potentially documents in the whole litigation.

 1  Chock full of important vocabulary and terminology and none of

 2  those were used.  We knew that, we found that out in the meet

 3  and confer and they still didn't use it.

 4       I would have a very hard argument if they said, look,

 5  Judge, we ran exactly the protocol that the plaintiffs agreed

 6  to, and the only question now is whether we're going to have

 7  to give them documents.  I suppose that that would have been

 8  an argument that we would have had to really nail down, and

 9  frankly, it's astounding to us on the plaintiffs' side that's

10  not what they did, but they didn't.

11       And at this point in the litigation, we'd ask that

12  their application be denied.

13       THE COURT:  Question for you, plaintiff --

14  Mr. Slater.

15       We know that the protocol requires the parties to

16  meet in good faith, et cetera, et cetera.  One way, like I

17  said, one way to read this is, when someone is going to use

18  TAR to reduce the universe of documents to be reviewed, I

19  asked Mr. Greene, what's Teva's position about whether -- I

20  understood the response to be, one, when there's an actual

21  subjective decision that was made to do it that way, that's

22  easy, and, two, when there's a, quote unquote, substantial

23  likelihood that will be done.

24       Okay?  What is plaintiffs' position about when that

25  duty is triggered?  Is it only when there's a substantial

1    likelihood or subjective knowledge, or is it when there's a

2    reasonable prospect or reasonable possibility?  What is

3    plaintiffs' position on that?  When was that duty that's in

4    the ESI protocol, when was that duty triggered?

5         MR. SLATER:  I will start, Your Honor, with the best

6    case scenario for Teva.  Their best case scenario is that the

7    duty was triggered at the end of June when they claimed that

8    they first realized that there was this problem and they were

9    going to start to use TAR.  And that's -- and that's their

10   position, they had already put TAR into place, so they hadn't

11   met and conferred.

12        Now, it's taking their position to, again, its best

13   conclusion, which is, there came a point where they said to

14   us, we want to narrow the set, because we've realized we need

15   to do it.

16        If we take at face value what they're saying

17   occurred, we -- that either occurred and it's not really clear

18   from their argument, whether they're saying they realized that

19   in July or they didn't, so it was either in July or it was

20   later, but in either case, we met and conferred, we reached

21   agreement on a protocol, and they chose not to follow it, and

22   I believe they claimed at that point, so let's go with their

23   statement, they had still not yet decided whether or not they

24   were going to use the review tool to narrow the documents for

25   production.

1          Let's remember what they said.  Let's take them at

2     their word for a moment.  They said they had not made that

3     decision, and now they say, well, we finally made that

4     decision after the talks broke down on the protocol, based on

5     the new compiled information in -- I think counsel said

6     October.

7          If that's true, even if that's true, and even if

8     they're right that that was the trigger, they violated the ESI

9     protocol, because at that point, they were required to come to

10    us and say, look, this is something that we're going to do, we

11    want to talk to you about the parameters.

12         Now they know what our answer would have been

13    potentially, but who knows, they could have been more

14    forthcoming, they could have offered something different, we

15    could have had a discussion, they could have given us the

16    updated data.

17         Whatever options they had, they were required by the

18    ESI protocol to talk to us, even at that point, under their

19    best case scenario, and they didn't do it.

20         Now, what do we think the trigger point was?  The

21    trigger point, from our perspective, because they had said to

22    us during the meet and confer, we haven't made any decisions

23    on TAR.  We don't know anything, and I read you the quote from

24    Mr. Harkins' certification.  Now, they start to find problems,

25    again, this is giving them benefits of the doubt, early in

 1    2020.  They know that TAR is out there, they know that's a

 2    possibility.  If they're having a concern about this and

 3    they're actually -- there's a possibility to use it, they

 4    should bring it up.

 5            Now we know what occurred, I'm not going to go

 6    through it again.

 7            So even if -- however you slice it.  We believe it's

 8    when the possibility was raised.

 9            So at the point when Consilio started to talk to

10    them, if that's when it occurred, and we're making a lot of

11    inferences here, favorable to Teva's position, personally

12    every inference, if not all of them, they should have been

13    speaking to us then.

14            They certainly should not have implemented the TAR

15    before they sent their letter to us, which again, that was

16    conceded to us once we started talking, that they had already

17    put it into place and they were already running it with the

18    possibility that they were ultimately going to use it for

19    review and they didn't talk to us.

20            And the last thing I'll say on that is, for counsel

21    to say, there's no obligation to agree, all we have to do is

22    confer and talk to them, I think is obviously inconsistent

23    with how this litigation is managed, to the extent there was a

24    disagreement arising from that meet and confer, I think that

25    everybody understands, it would have been presented to Your

 1    Honor for determination.

 2              MR. GREENE:  Your Honor, if I could just --

 3              THE COURT:  Hold on, hold on, hold on.  I'm not done

 4    with Mr. Slater yet, okay?

 5              MR. PAREKH:  Your Honor, this is Behram Parekh.  Can

 6    I just add one item to what Mr. Slater just finished talking

 7    about?

 8              THE COURT:  Sure.

 9              MR. PAREKH:  Your Honor, I was in the room at the

10    November conference with Mr. Harkins, and Ms. Lockard raised

11    the issue, why didn't we speak up?  We did, at that conference

12    when they said to us, hey, we might use TAR.  We said, hey, if

13    you're going to use TAR, you need to tell us because right

14    now, we're negotiating search terms and TAR and search terms

15    are not compatible.  We made that statement, we knew that,

16    they knew that going in, that our position was, if you're

17    going to use TAR, that's a different negotiation.  If you're

18    going to use search terms, that's a different negotiation.

19              So in terms of when that duty arose, from my

20    perspective, having been in that room, that duty arose as soon

21    as they decided to go down the path of search terms.

22              THE COURT:  Okay.  Thank you, Counsel.  Let me ask --

23    I want to turn back to Mr. Slater.  Here's my question.

24              Dr. Grossman is unquestionably a qualified expert.  I

25    don't have to decide whether she's the world's best or next to

1    best.  That's neither here nor there.  She's qualified.  She

2    attests to the fact that this is -- that what Teva did is, in

3    effect, the gold standard, that it works, it's been validated

4    better than anything else, and here are the objective

5    statistics to show it works.

6         Why shouldn't the Court accept -- accept Teva's

7    representation that its system works and why should the Court

8    then turn around and then either order it to spend millions of

9    dollars on a document review or turn over potentially millions

10   of documents without giving them the opportunity to review

11   those documents?  What say you?

12        MR. SLATER:  The first thing I'll say is, I don't

13   believe that this application should be determined based on

14   the referendum over the benefits of TAR 2.0 or this program.

15   That's not what we're arguing here.

16        In fact, Dr. Grossman was the expert consultant for

17   the defendant, Teva, the entire time.  So she was heavily

18   involved in our negotiations when we came up with the protocol

19   that was agreed to, but for two issues.  All of the validation

20   -- the robust validation and our input into the learning

21   process and the fact they were going to stop threading the

22   e-mails so we could get all the proper e-mails, and the fact

23   that they were going to go back to the entire set of documents

24   and not just run the TAR on the search term set and so on and

25   so forth.  She was the expert the entire time and they agreed

1    to those provisions.

2           Now, so why -- and I guess the other part of the

3    question is, why shouldn't we credit what she says.  I don't

4    think Your Honor has to answer that question.  I will

5    anecdotally say, that in my experience and I'm sure Your

6    Honor's experience and the experience of all the experienced

7    trial lawyers on this call, we've all seen a whole host of

8    world famous experts who have not seemed so impressive when

9    they walked off the witness stand following cross-examination.

10          So I'll just put that there, and I'm not going to get

11   into the specifics, but we had a call with Dr. Grossman and

12   the defense during the process in July, and I had an

13   opportunity to talk to Dr. Grossman and I think it was clear

14   that, you know, what was being presented in the papers, there

15   was -- there was a lot of room for further interpretation and

16   for more input into how the picture really was being painted

17   based on some of the answers to some of the questions during

18   that conversation.

19          So, again, this isn't a referendum on TAR, it's not a

20   referendum on Dr. Grossman's credentials, and certainly,

21   there's not a full record if we're going to start to make a

22   decision based on the word of the experts.

23          We're not going to dispute that there could be some

24   benefits to using this type of technology, but that use of the

25   technology should have been done in accordance with an agreed

1    protocol that we basically had.

2         Again, it's astounding to us when we found out that

3    they were looking to narrow the documents, we could not

4    believe that we didn't read in the first or second line of

5    that letter, we used exactly the protocol you agreed to so you

6    have nothing complain about.  So we're not comfortable with

7    what they did here.  And Dr. Grossman, she may think it's a

8    good protocol, but you know what, there may be others that we

9    don't know about or we haven't gotten into and we haven't

10   deposed her on.

11        So there's a great deal of information that we would

12   get into, but the bottom line is, they ran something sight

13   unseen to the plaintiffs, without any input from the

14   plaintiffs and essentially are asking for an order from the

15   Court that where they have exhibited a lack of due diligence

16   for a year, that they get not only a do-over, but they get to

17   give us the documents that they want to and withhold the

18   documents that they don't want to give us.

19        They've done a unilateral protocol.  I mean, how do

20   the plaintiffs end up worse off than we should have been to

21   begin with, with all of the equities that flow into this, and

22   I'm sure Your Honor has already recognized, it's too late to

23   start negotiating further.  I mean, the rubber has finally hit

24   the road, almost hit the road once before and they withdrew

25   their application.

1          And then the last thing I'll say on this is, they

2    withdrew that application.  They didn't know how Your Honor

3    was going to rule, if they wanted you to call the shot.  I

4    mean, that was their decision.  We were ready to let Your

5    Honor rule on this, and we would have abided by whatever Your

6    Honor said.  They made the decision to pull this application

7    and to walk away from this, months and months ago and now we

8    are here.  I hope that answered the question.

9          THE COURT:  Mr. Slater, what relief do the plaintiffs

10   want?

11         MR. SLATER:  I think that, I think that the simple

12   answer is, we would prefer that Teva follow through and

13   complete its obligations.  The alternative is that Teva

14   produces the so-called nonresponsive documents, which even by

15   their own calculations, there's probably several thousands, at

16   the minimum, relevant documents in there, some potentially

17   very important to this case, that they give us those documents

18   to search as we see fit.

19         I don't really think that there's an alternative.

20   You know, as far as the concept of the time that we've spent

21   and the money that we've spent, if that's the outcome, you

22   know, we've asked for sanctions, but that's something we leave

23   to the Court and, you know, the most important thing to us is

24   what Your Honor does with the documents and what you order

25   Teva to do.

```
1        So again, either they complete their obligations or
2   they produce the documents to us, which again, there's more
3   than enough authority for that, as Your Honor asked us to look
4   into.
5        THE COURT:  When you say "complete their
6   obligations," you mean do a manual review to determine what's
7   relevant and what's not relevant?  Is that what you mean?
8        MR. SLATER:  Right.  That's the protocol, the search
9   term protocol which they agreed to, and that's the process
10  they agreed to, and I think that it's very hard to imagine
11  that they can, under these circumstances with the lack of
12  diligence that's been documented in the record, come back and
13  want to prejudice plaintiffs under these circumstances.  You
14  know, whatever the cost is, I can't imagine it's a surprise to
15  anybody.  We're all spending a lot of money.  I can assure
16  Your Honor we're spending an enormous amount of money getting
17  documents interpreted and doing all the things we're doing on
18  our side.  So nobody is getting a free ride here.
19        THE COURT:  Okay.  Mr. Greene, you wanted to --
20        MR. GREENE:  Thank you, Your Honor.  A few points.
21  Mr. Slater said that, you know, when we reached the conclusion
22  or when we reached the cutoff point, we should have come to
23  him and met and conferred, which was obviously in October.
24  Perhaps Mr. Slater is forgetting the fact that we met and
25  conferred on October 5th, and had, you know, and provided
```

 1    detail with respect to that meet and confer by letter of

 2    October 6th, and that -- from Ms. Lockard.

 3         That discussion was a meet and confer and so I'm a

 4    little surprised that Mr. Slater is misrepresenting the fact

 5    that we did not meet and confer on that point.

 6         There was a robust meet and confer.  Mr. Slater asked

 7    for time to consider our proposal -- the information we

 8    provided on October 6th.  On October 11th, the following

 9    Monday I believe it was, Your Honor, we learned that

10    Mr. Slater was not going to agree and, thereafter, on

11    October 13th, we filed our, you know, this motion.

12         So again, to say that we didn't meet and confer

13    throughout in good faith is just a fallacy, and Mr. Slater can

14    invent whatever timeline he wants, but the fact is, we

15    disclosed this at the very beginning when we recognized that

16    CAL is a process and it is an exercise that would be useful

17    here, and I think, Your Honor, it is important to understand

18    that CAL is -- CAL is very different than TAR 1.0.  It's not

19    like we're doing 500 seed set documents.  With CAL, you just

20    start reviewing documents, and we could have elected, you

21    know, you just start reviewing documents and we, in fact, we

22    reviewed 700,000 -- more than 700,000 documents today, and,

23    you know, throughout the CAL process, which was not started

24    before, you know, anytime before June of 2020.  So I want to

25    make that very clear on the record that we did not start CAL,

1   you know, without meeting and conferring.  We started CAL and

2   we disclosed to plaintiffs that we were going to use a CAL

3   system to assist with the prioritization of documents, which

4   is consistent with what we did.

5          At some point, we reached a process where we said,

6   hey, this is going to, you know, there's going to be a logical

7   cutoff point and when we reach that logical cutoff point and

8   we were confident that the cutoff point made sense, you know,

9   we disclosed that.

10         So I really struggle with, you know, any kind of

11  insinuation that we didn't meet and -- that Teva did not meet

12  and confer in good faith, which we absolutely did throughout.

13         Another point, Your Honor, with respect to, you know,

14  Mr. Slater says, there's no cases, and apparently Mr. Slater

15  is now the authority on TAR, but there are no cases on that

16  that say that there's no agreed -- you don't have agreement to

17  TAR and that there's no transparency.

18         I'm happy to provide the Court with that, with those

19  case citations.  The *Global Aerospace* case is one that comes

20  to mind, and in that case I believe, and I could be corrected

21  on this, but that case, only an 80 percent recall was accepted

22  by the Court.  And remember, recall is the measurement of how

23  many responsive documents, how much of the responsive

24  population was actually found.

25         Here, we found 92 percent of the responsive

1  documents, okay, so I think that's important and I'm happy --

2  I'm happy to provide the Court with a submission tomorrow,

3  Your Honor, of those cases where TAR wasn't disclosed, where

4  there was no transparency in the process, because, you know,

5  that is -- with CAL 2.0 or with TAR 2.0, that's a more

6  frequent position.  Obviously, Your Honor, I'm also amazed

7  frankly, Your Honor, astonished even, that there's talk that

8  Teva reached an agreement back over the summer, and, you know,

9  we're playing with words, we agreed to some of this but we

10 agreed to not some of this.  And, Your Honor, it's really

11 simple contract analysis.

12        If I go in and say I want to buy a car and I say to

13 the dealer, I will buy this car if you throw in a set of floor

14 mats and the dealer says no.  I didn't buy that car.  There is

15 no contract to buy that car.  Teva did not agree to the TAR

16 protocol because plaintiffs refused to accept that we would

17 not turn over nonresponsive documents.

18        Mr. Slater can talk all he wants about, that there

19 was an agreement.  There was no agreement.  There were terms

20 that made sense, there were terms that we would have agreed

21 to, if that final point of the 5,000 nonresponsive documents

22 that plaintiff had been wanting to give up on that, but they

23 didn't, and there was no agreement.

24        So I think that's really very important for us to

25 look at and say, you know, there was no agreement whatsoever.

1      I also think, Your Honor, you know, we're losing

2   sight of what's important here, which is the proportionality

3   of this.

4      You know, we're going to spend, if the Court orders

5   us to review these documents, millions of dollars to review

6   nonresponsive material.  And Mr. Slater says, oh, it's just

7   really easy, turn over all those documents and he says there's

8   unfounded -- you know, there's unfounded reasons for not, you

9   know, for plaintiffs to turn -- Teva to turn those documents

10  over.  There's no case law that says we have to turn over

11  nonresponsive documents.  It just doesn't exist.

12     So I think it's really important to say, you know,

13  Mr. Slater in his brief, he didn't cite to any cases that say,

14  you know, that require the turning over of nonresponsive

15  documents.

16     In *Progressive*, Your Honor, the *Progressive* case,

17  which plaintiffs cite prominently to, that case was, yes,

18  there were documents that were -- the Court required to turn

19  over.  But the reality, Your Honor, was, if *Progressive* in

20  that case had missed the discovery deadline and at that point,

21  the Court said, no, I'm not going to allow you to use TAR.

22  You just have to turn over what you got.

23     We made our production deadlines here, and so I think

24  it's a little disingenuous for Mr. Slater to say *Progressive*

25  stands for the proposition that the Court refused to allow

1    defendants to layer TAR on top of search terms.  That's not

2    what happened.

3         The Court said, you've already blown your deadline,

4    *Progressive,* we are not going to let you change.  So I think

5    it's, you know, some of the other points, we are talking about

6    proportionality.

7         This is not about, you know, we can fight about the

8    ESI protocol, but the fact is, Teva did exactly what it was

9    supposed to do in connection with the ESI protocol.  We met

10   and conferred in good faith.

11        The ESI protocol does not say we have to get

12   agreement.

13        We offered in connection with the, you know, in

14   connection with the -- you know, the protocol over the summer,

15   we offered a validation protocol.  Mr. Slater says he was

16   astonished to hear that there was a -- that we varied from

17   that agreement, which never happened.

18        The reality, of course, Your Honor, is, we did a more

19   robust validation protocol.  We did 15,000 documents, we did

20   two broiler's exercises, we did search terms to try to

21   identify, you know, certain categories of documents to find

22   the responsive material.  We did 11 additional rounds of CAML.

23   We did more than what we had agreed to over the summer, and

24   yet, I've not heard Mr. Slater say one thing about how he

25   disagrees with our validation protocol that we ultimately

1    ended up using, which we disclosed to him for the first time

2    on October 6th, and then, you know, it's obviously in the

3    record now as a result of the submission we've made.

4         So Mr. Slater says, this is not a recipe on TAR but

5    the reality is, Your Honor, they put forth nothing to say what

6    we did wrong or that there was anything done wrong with

7    respect to TAR.  We have the most -- the most robust

8    validation protocol that Dr. Grossman has ever seen, and I

9    think that has to stand for something at the end of the day.

10        Your Honor, I just, I think it's important also, you

11   know, with respect to the negotiation of the search terms.  I

12   want to apologize to the Court, and I did not intend to

13   misrepresent anything the Judge said, Your Honor said in terms

14   of inviting counsel, that was -- I apologize for that.  That

15   was not my intent.  I was obviously not at those meetings, I

16   was not involved in those cases -- in this case, you know, at

17   that point, so I do apologize to Your Honor.

18        I think it is important for the folks that were

19   there, including Ms. Lockard, my colleague, to set the record

20   straight in terms of the negotiations over the search terms,

21   and I think she's done that, and I don't know, Ms. Lockard, if

22   you have any other points to make there, but the reality is,

23   we negotiated in good faith throughout -- we worked

24   cooperatively with plaintiffs throughout, and I think at the

25   end of the day, we're here because plaintiffs have been

 1   unrealistic in their expectations in terms of what they think

 2   they're entitled to get.

 3           So, Ms. Lockard, I don't know if you have any final

 4   points on sort of the negotiations of search terms.

 5           MS. LOCKARD:  Just briefly and for the record, there

 6   are a couple of historical facts I do want to address.  And

 7   Mr. Parekh mentioned that at that November meet and confer,

 8   which, by the way, I did not attend that, but two of our

 9   lawyers did, Steve Harkins who has submitted an affidavit in

10   this case.  I don't think plaintiffs have submitted a

11   counter-affidavit responding to Mr. Harkins.

12           Brian Rubinstein, who was with our firm, was at that

13   November meeting as well and they will both attest that there

14   was no mention by plaintiffs that they would not agree to

15   layer it, and that it was either/or.

16           The second point of that, is that even if they had,

17   plaintiffs still would have had to go down the path of

18   negotiating search terms, because there were numerous

19   defendants who used search terms without TAR.  So there's no

20   prejudice at all to hear from plaintiffs that, well, we never

21   would have negotiated search terms if we had only known that

22   Teva was using TAR, is totally unfounded, because they would

23   have done the exact same thing with all the other defendants.

24           So to negotiate it now, is no more prejudice than it

25   would have been if we had been negotiating it in January,

1    February, or June.  Thank you, Your Honor, for allowing me to

2    clarify those points.

3            THE COURT:  Thank you.  Teva, it's your application,

4    so you're going to have the last word, but I want to find out

5    if plaintiff has anything to add.  They don't have to say

6    anything, but they can, but there was one point that Mr.

7    Greene had mentioned that I just want to check with Mr.

8    Slater.

9            If I recall correctly, and the record will reflect if

10   I'm not right about this, I think Mr. Greene had stated, not

11   in these words, that plaintiffs haven't pointed to anything

12   with regard to the CAL exercise that Teva did that was

13   deficient, and he went on to say that Teva went above and

14   beyond what the parties had negotiated, but I just want to

15   make sure I'm right about this, Mr. Slater, because I have a

16   reference to Page 4 from your October 30th, 2020, submission,

17   and I want you to tell me if this is right or if I got it

18   wrong.

19           Not in these words, but plaintiffs argue that they

20   didn't start with the entire set of all custodial files,

21   rather than the narrowed search term set.  Teva did not use

22   the core discovery documents to educate the system.  It

23   excluded documents from TAR review, such as video and

24   pictures.  It denied plaintiffs the ability to submit training

25   documents.  It gave plaintiffs no reports on the review as the

1   review proceeded.  It failed to employ an agreed-upon stopping

2   criteria and it failed to preclude e-mail threading.

3          So just -- I just want to be clear about this,

4   Mr. Slater.  Are you saying that those are either complaints

5   or deficiencies that -- from plaintiffs' perspective, they're

6   pointing out with regard to Teva's CAL exercise?  I just want

7   to get this point clear, because Mr. Greene had argued that

8   plaintiff never criticized their CAL exercise.

9          Could you help the Court understand what plaintiffs'

10  position is?

11         MR. SLATER:  Your Honor has a correct summary of the

12  points that we gave as examples of the deficiencies and what

13  they did.  These were all things that Your Honor just read off

14  that were listed in our brief as examples of things that were

15  in the protocol that we agreed to in July or August, that were

16  not utilized or employed in the protocol that was employed by

17  Teva after they withdrew their application, and there's

18  obviously much more, if Your Honor were to go through the

19  actual protocol that was provided to the Court -- was not put

20  on ECF, as I discussed earlier.

21         These were robust protocols so that we would be given

22  some comfort that this process was done appropriately.  And

23  again, just starting with the search term set as opposed to

24  the full set, it's very significant, because if Dr. Grossman

25  is correct, they would have unearthed documents by running TAR

 1    on a complete set that would not have been found through the

 2    search terms because it's an AI-type process that would have

 3    found things even without the search terms needed to locate

 4    them, and that's Dr. Grossman's -- that's her cause célèbre,

 5    that's what she does.  She has the patent and the inventor of

 6    a system that she says is better than search terms.

 7            So just from the starting point, we lost documents

 8    and all things that Your Honor listed, all of those things

 9    should have been done and more, all of the other things that

10    you could see in that protocol that we had agreed to, their

11    failure to do those things, we believe are all deficiencies in

12    this process.

13            THE COURT:  Okay.  Anything else from the plaintiffs?

14            MR. SLATER:  I don't believe there's anything else

15    that we need to add, Your Honor.

16            THE COURT:  Okay.  Teva, you have the last word.  You

17    don't have to add anything, but if you want to, the floor is

18    yours.

19            MR. GREENE:  Your Honor, thank you for that final

20    word, you know, with respect to just a couple points.

21            With respect to the core documents, you know, I don't

22    think it's accurate to say the core documents weren't used for

23    training.  You know, many if not --  I would say most of the

24    core documents, which would be FDA correspondence, inspection

25    communications and the like, those would be found within the

1    custodial files, so it's not accurate to say that, you know,

2    core documents weren't used to train the system.

3         They would have been reviewed, you know, consistent

4    with a Continuous Active Learning process.  They would have

5    been viewed and they were marked as responsive, and they were

6    produced.

7         So I don't think that's an exercise that, you know,

8    it's sort of based in reality.

9         Your Honor, there are numerous cases that say it's

10   appropriate to layer TAR on top of search terms, and we cited

11   to those cases.  You know, the fact is, what Mr. Slater is

12   looking for is more than what he's entitled to get.  If we

13   just did a linear review and, you know, reviewed all the

14   documents that hit on the search term, you would only get

15   those documents that, you know, the responsive documents that

16   hit on the search terms and nothing more.

17        So, you know, I don't agree that, you know,

18   Mr. Slater is being -- or plaintiffs are being gypped out of

19   anything and it's gone.

20        Your Honor, when I spoke of the validation protocol

21   that plaintiffs had nothing to, you know, nothing to say, I

22   was speaking specifically about the protocol that we followed,

23   the validation protocol that we followed on October 6th, you

24   know, that we outlined in our October 6th letter, and we've

25   not seen any indication that we should have run more sample

1    sets or done a different broiler's exercise or reviewed more

2    than 15,000 documents.

3            The fact is, we did, you know, as I said, we did more

4    in terms of validation than we had proposed to do over the

5    summer because, quite frankly, and I'm not revealing any, you

6    know, client communications or privileged material here, I

7    knew we would be challenged on the validation protocol and

8    that's why we brought in Dr. Grossman from the very beginning

9    here.

10           Again, Your Honor, we keep referring to an accrete

11   protocol.  I can't stress this enough.  I didn't buy the car

12   because the dealer didn't throw in the floor mats.  We didn't

13   agree to a protocol because plaintiffs insisted on production

14   of nonresponsive documents.  So I think we, you know, we have

15   to understand basic contract, basic agreement formation that

16   there was never a meeting of the minds of all of the

17   fundamental tenets of an agreement.  All of the terms were

18   never met.

19           So it's not accurate to say that there was any

20   agreement with respect to a TAR protocol over the summer.

21           I also don't think it's accurate to say, Your Honor,

22   that we did not meet and confer, or somehow violated the ESI

23   protocol.  We did exactly what we were supposed to do and I

24   think we did more than what we were supposed to do.  We told

25   plaintiffs that we were using CAML at a point where we didn't

 1   even have to, and that point was in July, in the early July,

 2   when we said we were going to use CAML, but at that point, we

 3   were not disclosing, we were not saying that, you know, we

 4   were going to use the cutoff because we simply didn't know,

 5   because that's what CAL does, the Continuous Active Learning

 6   process, and we didn't know at that point in time what the

 7   ultimate answer was.

 8          And if Your Honor recalls, the ESI protocol is fairly

 9   clear, we have to disclose and meet and confer in good faith

10   when we intend to use CAL to cut off the documents -- to cut

11   off documents.

12          We did that in October, on October 6th, I believe,

13   with the date of our letter, when we said, formally, here's

14   what we're doing.  So at that point, you know, we had reached

15   the conclusion that it was appropriate to use CAL as a cutoff.

16          So I respectfully disagree if there's any argument

17   associated with the, you know, that we did not do what we were

18   supposed to do.

19          And, Your Honor, if Your Honor is willing to consider

20   it, I'm happy to put forward a, you know, a short paper that

21   details those cases, let's say, where, you know, where Number

22   1 where, you know, where CAL was not disclosed and there was

23   no transparency throughout the process, because those cases

24   exist, and it's not a requirement that we have to open up a

25   kimono, so to speak, to show everything we did.

 1          But at the same time, Your Honor, I think we have

 2    been remarkably transparent throughout, throughout this

 3    process, and we've given them literally hundreds of pages of

 4    white papers and details, information about the process that

 5    we followed.

 6          So for plaintiffs to object, I just think it's, you

 7    know, I think we're losing the point here, which is, at the

 8    end of the day, if we -- if this order is denied, or if our

 9    application is denied, you know, we will spend millions of

10    dollars.  And I think at the end of the day, if -- if there is

11    any basis to assert proportionality, this is that basis.

12          And so if you don't assert proportionality in this

13    case, I don't know when you can get proportionality.

14          So I think that's about it from me, Your Honor.  You

15    know, we certainly appreciate the Court's attention to this

16    matter.  We know it's been a long road.

17          Your Honor, I think there's one final point, you

18    know, with respect to Mylan.  You know, Mr. Slater says he was

19    shocked at how different their proposal was in terms of, you

20    know, transparency.  What I will say, Your Honor, is if

21    there's a -- if there's an agreement to be made, you know,

22    with Mylan, we're certainly happy to consider it, you know,

23    and I certainly don't want to foreclose negotiations, but at

24    the end of the day, you know, if there is an agreement, we're

25    certainly happy to consider it.  I think the fundamental

1    tenets of where we were before are still in place, but, you

2    know, I certainly don't want to foreclose any opportunity.

3           If plaintiffs can somehow come up on an agreement

4    with Mylan, we're happy to consider it, but they've never

5    reached out to us and said, hey, this is where we're at with

6    Mylan, would you guys consider it.  We've never heard any --

7    we've never received any reach out from plaintiffs on that.

8           THE COURT:  Mr. Greene, what would happen, or is it

9    feasible for Teva -- you've made it a thousand percent clear

10   on the record that there was never any agreed protocol.  That

11   couldn't be clearer what Teva's position is.  So the Court

12   understands that.

13          But is it feasible and could it be done for Teva to

14   do with TAR in accordance with everything in that protocol

15   except at the end of the day, turning over 5,000 nonresponsive

16   documents for review.  Is that something that could be done?

17   Is it feasible?

18          MR. GREENE:  Anything is possible, Your Honor.  I

19   think the big challenge would be, and I would have to --

20   actually, I probably would have to get with the vendor to

21   determine.  So I think what you're saying, Your Honor, is

22   could we run TAR across all of the search -- all of the

23   documents, and -- and then sort of go from there, and I think

24   certainly anything is possible, Your Honor.

25          I think the issue is sort of twofold.  Would it

 1   require additional training of the system and how long would

 2   that take, and sort of the -- sort of the burden associated

 3   with that, and then, two, what the timeframe associated with

 4   that is.

 5          So with Your Honor's indulgence, if I could have a

 6   day to try to figure that out to answer that question for you,

 7   I just don't know the answer, and I would love to be able to

 8   say, yes, we can do that.  What I'd like to do, Your Honor,

 9   because I know we're mindful of the -- I know we're mindful of

10   the discovery deadlines in this case, and I want to be

11   realistic in sort of Court expectations, if we can do it

12   within X period of time without extraordinary burden, I would

13   say yes.

14          I just need to know those two -- those two data

15   points, which is, how long would it take, Number 1, and what

16   would the burden on Teva be, because if we have to go through

17   that process, it's certainly possible that we're going to

18   spend $2 million to do it, I would say we're right back where

19   we started.  So, Your Honor, if you could give us a day or two

20   to figure this out, that would be most appreciated.

21          THE COURT:  You don't have to worry about the

22   deadline to produce, quote unquote, nonresponsive documents

23   because the Court stayed that deadline.  So that's all we're

24   talking about with regard to this argument.  So that really

25   shouldn't be a concern of Teva.

1          Here's what I'm going to do, because this is

2     obviously a very important issue and I want to make sure the

3     parties have a full and complete opportunity to be heard on

4     anything they want to be heard.

5          So the Court will accept any additional letter briefs

6     or submissions the parties want to make within one week.

7     Please try and keep them as short as possible.  You have my

8     assurances that you're going to get a prompt decision on this.

9     It's not going to linger.  I know the issue.  I know you said,

10    Mr. Greene, you want an opportunity to submit additional case

11    law, that's fine.  Plaintiffs can do it if they want to do it.

12         You want to look into this issue about this other

13    protocol, that's fine, too.  And probably very soon after a

14    week, you'll get the Court's ruling.

15         So I just want to thank counsel for their robust

16    submissions and arguments.  It was excellent, complete, I

17    understand the parties' positions and if there's nothing else,

18    we can adjourn this call.  I'll enter an order about the

19    additional week and confirm in an order what we've discussed

20    earlier this afternoon.

21         Anything else anybody wants to address before we

22    adjourn?

23         MR. SLATER:  Yes, Your Honor, it's Adam Slater.  I

24    have a little bit of a concern about an open-ended brief.  I

25    was going to suggest that, can we limit the briefs to five

     1   pages.  I really don't -- I'm concerned that, you know, we

     2   don't feel like we have a lot to add and I always respect when

     3   you say last words.  So there's a lot that you heard just now

     4   that I could probably respond to in less than five minutes but

     5   I'm not going to do it because I don't want to violate the

     6   last word rule.  I would love to violate it but I'm not going

     7   to unless you say go ahead.

     8        But I'm concerned about an open-ended brief where

     9   you're going to get a whole slew of cases, we're not going to

    10   have a chance, you know, to comment on or anything, and I

    11   don't know what else is going to be in there because there

    12   were a few things that I just heard that basically differ from

    13   our understanding of what actually occurred, you know, and we

    14   can address those things in the letter if that's how you

    15   prefer to handle it, but really advocate for a much shorter

    16   brief, maybe even three pages.

    17        MR. GREENE:  I would say ten pages would be fine for

    18   us.

    19        MR. SLATER:  I'm sorry, I know I paused, so I just

    20   apologize.  The other issue is, the idea that they can

    21   implement this new protocol, this came up after I had stopped

    22   talking, so hopefully, there's a point of parliamentary

    23   procedure on that one, to quote Animal House, that -- I think

    24   that to implement this protocol, it's going to take a long

    25   time because basically, we'd have to go back to the drawing

1    board and give us supports and have interaction throughout the

2    rolling productions, so I just wanted to just point that out.

3             And the other thing, and this is basically was my

4    greatest concern, because counsel mentioned at the end, our

5    talks at Mylan.  We don't want this to be tethered together.

6    It's two completely different contexts, and, you know, I don't

7    want to be in a situation where Teva is essentially leaning

8    into the room and influencing those conversations.  I'm sure

9    Mylan wouldn't want that either.  So I want to just point that

10   out because, you know, we want to act in good faith, but we

11   don't see these two as being linked because the circumstances

12   are very, very different.  And again, you know, we think that

13   this application has been filed, it should be decided.

14            THE COURT:  Okay.  Let's make it ten pages and that

15   should be enough time, and that will be it.

16            Counsel, I want to thank you again.  It's been a long

17   afternoon, but I think we can adjourn.  I especially want to

18   thank the court reporter, who under difficult circumstances,

19   does her usual great job.  So, thank you very much, everybody.

20   We're adjourned.

21            RESPONSE:  Thank you, Your Honor.

22            (5:45 p.m.)

23            - - - - - - - - - - - - -

24            I certify that the foregoing is a correct transcript

25   from the record of proceedings in the above-entitled matter.

1  */S/ Karen Friedlander, CRR, RMR*
   *Court Reporter/Transcriber_____*

2

3  *November 12, 2020*
   *Date*

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*United States District Court*
*Camden, New Jersey*

**/**

/S [1] - 128:1

**0**

07068 [1] - 1:13

**1**

1 [7] - 12:4, 12:15, 27:5, 35:8, 83:23, 121:22, 124:15
1.0 [5] - 72:16, 72:17, 72:18, 109:18
10019-6022 [1] - 3:7
103 [1] - 1:13
109 [1] - 76:23
11 [7] - 1:8, 4:1, 34:6, 34:9, 59:1, 76:24, 113:22
11th [1] - 109:8
12 [2] - 25:22, 128:3
12-23 [1] - 88:24
1301 [1] - 3:7
13th [7] - 49:3, 54:18, 54:22, 59:5, 61:5, 61:11, 109:11
14 [2] - 48:17, 48:21
15 [1] - 64:22
15,000 [3] - 76:22, 113:19, 120:2
15-minute [1] - 64:20
15219 [1] - 2:24
15th [2] - 42:22, 47:4
1638 [1] - 2:10
16th [3] - 58:3, 59:5, 63:17
17th [1] - 2:13
1835 [1] - 1:16
18th [3] - 56:15, 57:17, 58:8
19-2875 [1] - 4:3
19103 [2] - 1:16, 2:14
19422 [1] - 3:4
1:19-md-02875-RBK-JS [1] - 1:4
1st [2] - 95:24, 96:14

**2**

2 [4] - 13:21, 30:23, 35:12, 124:18
2,000 [1] - 59:21
2.0 [3] - 104:14, 111:5
20 [3] - 17:24, 18:14, 18:23
200 [1] - 3:3
2019 [2] - 85:5, 94:14
2020 [10] - 1:8, 4:1,

59:5, 71:14, 83:6, 84:16, 102:1, 109:24, 116:16, 128:3
2029 [1] - 2:21
2150 [1] - 2:7
23rd [5] - 63:20, 85:5, 87:7, 88:4, 88:10
24 [6] - 18:2, 31:22, 32:1, 55:21, 55:25, 95:19
24th [6] - 18:22, 38:3, 44:11, 58:21, 63:20, 71:15
24th-ish [1] - 71:15
2500 [1] - 2:14
26(g [2] - 73:9, 74:5
260,000 [2] - 68:24, 79:19
26th [3] - 56:15, 57:17, 58:8
28th [1] - 80:19
2900 [1] - 1:16
2:00 [1] - 1:8
2:01 [1] - 4:1
2nd [1] - 32:16

**3**

3 [1] - 38:5
30 [4] - 2:13, 7:3, 7:10, 60:22
30(b)(6 [13] - 17:24, 18:14, 18:15, 18:18, 18:22, 30:23, 34:8, 34:17, 36:5, 36:10, 37:15, 37:25, 44:11
30(b)(6) [1] - 34:19
300 [1] - 2:21
30305 [1] - 2:17
30th [4] - 5:20, 42:23, 44:13, 116:16
316 [1] - 2:3
31st [1] - 49:1
32502 [1] - 2:4
3333 [1] - 2:17
34 [2] - 57:9, 62:23
38 [2] - 71:25, 72:3
38th [1] - 2:24
3:45 [1] - 64:14
3A [1] - 26:14

**4**

4 [7] - 2:25, 39:22, 48:11, 52:20, 64:15, 64:20, 116:16
43 [1] - 23:12
450 [1] - 3:3
4th [1] - 55:2

**5**

5,000 [4] - 75:7, 76:13, 111:21, 123:15
5,000-document [1] - 98:3
50 [6] - 22:23, 23:8, 23:11, 23:13, 23:21, 24:1
500 [1] - 109:19
55402 [1] - 2:7
5:45 [1] - 127:22
5th [1] - 108:25

**6**

60 [1] - 43:8
600 [1] - 2:3
6th [6] - 109:2, 109:8, 114:2, 119:23, 119:24, 121:12

**7**

700 [1] - 72:24
700,000 [3] - 72:24, 109:22
700-and-something [1] - 73:3
701 [1] - 1:19
70130 [1] - 1:19
75 [6] - 22:11, 22:21, 23:22, 24:13, 24:21, 24:22
756-0160 [1] - 1:24
760,000 [1] - 73:3

**8**

8 [1] - 55:7
80 [1] - 110:21
800 [1] - 2:6
856 [1] - 1:24
8th [1] - 49:2

**9**

90067-2904 [1] - 2:21
90277 [1] - 2:10
92 [1] - 110:25
99 [1] - 68:25

**A**

abide [1] - 25:11
abided [1] - 107:5
ability [1] - 116:24
able [18] - 10:5, 10:6, 11:8, 12:1, 20:1, 29:25, 30:3, 30:9, 32:10, 32:11, 33:7,

61:2, 68:22, 72:9, 86:5, 89:11, 89:23, 124:7
above-entitled [1] - 127:25
absent [1] - 33:15
absolute [1] - 88:22
absolutely [4] - 58:14, 80:20, 88:19, 110:12
accept [7] - 39:23, 81:2, 95:11, 104:6, 111:16, 125:5
acceptable [2] - 29:14, 32:3
accepted [2] - 27:12, 110:21
accepting [1] - 40:10
access [1] - 35:3
accomplish [1] - 61:23
accordance [3] - 97:13, 105:25, 123:14
account [2] - 9:25, 19:14
accrete [1] - 120:10
accurate [8] - 42:2, 68:7, 70:7, 95:12, 118:22, 119:1, 120:19, 120:21
acknowledged [3] - 14:13, 17:3, 17:6
acknowledgement [1] - 14:6
act [2] - 12:12, 127:10
Actavis [2] - 2:18
action [4] - 11:13, 11:17, 56:14, 58:15
ACTION [1] - 1:3
Active [4] - 67:19, 82:11, 119:4, 121:5
active [1] - 73:7
actual [6] - 68:11, 81:17, 90:2, 92:24, 99:20, 117:19
Adam [5] - 4:11, 8:5, 27:7, 92:7, 125:23
ADAM [1] - 1:12
add [11] - 23:10, 24:9, 24:10, 25:3, 26:20, 38:13, 103:6, 116:5, 118:15, 118:17, 126:2
added [2] - 15:12, 19:5
addendums [3] - 12:2, 23:4, 23:7
adding [2] - 23:14, 40:19
addition [2] - 24:15,

49:5
additional [14] - 23:21, 33:16, 35:1, 36:13, 52:20, 76:24, 76:25, 77:2, 86:6, 113:22, 124:1, 125:5, 125:10, 125:19
additionally [1] - 60:6
address [19] - 4:24, 5:14, 10:16, 11:10, 23:22, 32:6, 35:6, 43:22, 48:2, 62:14, 62:20, 62:21, 64:21, 65:11, 81:9, 115:6, 125:21, 126:14
addressed [6] - 12:6, 13:8, 36:17, 42:1, 66:6, 66:8
addresses [2] - 13:3, 81:7
adjourn [3] - 125:18, 125:22, 127:17
adjourned [2] - 64:23, 127:20
adopt [2] - 76:10, 77:14
advocate [1] - 126:15
Aerospace [1] - 110:19
affect [1] - 6:5
affidavit [6] - 71:1, 71:6, 77:18, 91:5, 115:9, 115:11
affidavits [1] - 38:17
afternoon [11] - 4:6, 4:8, 4:17, 5:1, 5:4, 5:7, 57:7, 64:25, 65:2, 125:20, 127:17
agenda [2] - 5:12, 49:2
agents [1] - 42:5
ago [4] - 19:24, 57:25, 92:11, 107:7
agree [29] - 6:7, 7:25, 8:16, 16:15, 26:22, 32:6, 39:25, 40:19, 48:5, 57:8, 71:8, 72:1, 72:3, 72:4, 73:18, 74:18, 75:4, 77:17, 84:11, 87:5, 89:7, 95:1, 95:14, 102:21, 109:10, 111:15, 115:14, 119:17, 120:13
agreeable [6] - 7:12, 8:1, 30:8, 30:9, 50:18, 93:16
agreed [38] - 9:14, 14:16, 15:8, 26:8,

30:2, 30:4, 30:13, 42:23, 56:6, 57:12, 63:3, 63:9, 74:25, 76:4, 87:11, 87:16, 90:16, 95:19, 98:1, 98:7, 98:20, 99:5, 104:19, 104:25, 105:25, 106:5, 108:9, 108:10, 110:16, 111:9, 111:10, 111:20, 113:23, 117:1, 117:15, 118:10, 123:10

**agreed-upon** [1] - 117:1

**agreeing** [2] - 40:16, 95:5

**agreement** [47] - 10:11, 11:13, 17:21, 18:20, 19:1, 27:8, 34:11, 34:15, 50:4, 56:4, 57:2, 57:9, 59:12, 63:14, 63:16, 67:22, 72:9, 72:10, 75:5, 75:10, 75:12, 75:17, 75:21, 75:22, 76:6, 77:25, 84:9, 85:23, 85:25, 86:10, 90:20, 100:21, 110:16, 111:8, 111:19, 111:23, 111:25, 113:12, 113:17, 120:15, 120:17, 120:20, 122:21, 122:24, 123:3

**agreements** [2] - 60:1, 69:14

**ahead** [6] - 19:18, 19:19, 24:6, 40:25, 78:1, 126:7

**AI** [1] - 118:2

**AI-type** [1] - 118:2

**Aid** [1] - 5:9

**aided** [1] - 1:25

**air** [2] - 10:9, 37:5

**ALFANO** [1] - 2:23

**alleged** [3] - 6:4, 10:22, 75:6

**alleviates** [1] - 16:18

**allocations** [1] - 29:1

**allow** [3] - 44:15, 112:21, 112:25

**allowed** [2] - 9:18, 92:19

**allowing** [1] - 116:1

**allows** [1] - 91:11

**almost** [4] - 47:5, 78:9, 94:13, 106:24

**alone** [1] - 85:21

**alternative** [3] - 96:5, 107:13, 107:19

**amazed** [1] - 111:6

**Americas** [1] - 3:7

**amount** [4] - 18:5, 62:8, 69:13, 108:16

**analysis** [4] - 78:8, 86:14, 93:2, 111:11

**AND** [1] - 1:5

**anecdotally** [1] - 105:5

**Angeles** [1] - 2:21

**Animal** [1] - 126:23

**answer** [10] - 58:5, 69:8, 69:19, 87:21, 101:12, 105:4, 107:12, 121:7, 124:6, 124:7

**answered** [6] - 31:6, 35:25, 97:5, 97:8, 97:10, 107:8

**answers** [2] - 65:14, 105:17

**anticipate** [1] - 19:12

**anytime** [1] - 109:24

**apart** [3] - 68:9, 75:9, 79:17

**apologize** [7] - 45:6, 60:9, 88:17, 114:12, 114:14, 114:17, 126:20

**appear** [1] - 61:23

**appearance** [1] - 4:5

**appearances** [1] - 5:11

**application** [14] - 6:6, 11:7, 67:16, 94:22, 97:1, 99:12, 104:13, 106:25, 107:2, 107:6, 116:3, 117:17, 122:9, 127:13

**applications** [1] - 25:10

**applied** [1] - 81:8

**appoint** [1] - 35:17

**appreciate** [4] - 34:22, 37:3, 90:9, 122:15

**appreciated** [3] - 35:9, 96:22, 124:20

**approach** [1] - 86:8

**approaching** [1] - 35:14

**appropriate** [8] - 7:20, 8:20, 46:19, 54:9, 70:18, 79:18, 119:10, 121:15

**appropriately** [1] - 117:22

**approval** [1] - 18:18

**approve** [1] - 63:5

**approved** [3] - 58:5, 62:7, 62:10

**approving** [1] - 17:25

**April** [1] - 83:20

**arbitrates** [1] - 97:18

**area** [1] - 52:23

**argue** [4] - 52:8, 70:21, 93:9, 116:19

**argued** [5] - 62:7, 88:24, 92:4, 93:25, 117:7

**argues** [1] - 67:3

**arguing** [4] - 24:19, 24:20, 90:19, 104:15

**argument** [20] - 5:14, 39:8, 41:7, 58:12, 64:13, 64:16, 66:7, 70:13, 77:15, 77:16, 78:5, 78:11, 88:6, 89:19, 90:7, 99:4, 99:8, 100:18, 121:16, 124:24

**ARGUMENT** [1] - 1:5

**arguments** [6] - 15:24, 41:13, 42:19, 43:1, 66:2, 125:16

**arising** [1] - 102:24

**arose** [2] - 103:19, 103:20

**aside** [5] - 41:6, 46:9, 64:5, 76:1, 76:2

**aspects** [1] - 17:12

**assert** [2] - 122:11, 122:12

**assigned** [1] - 28:11

**assignors** [3] - 63:10, 63:15

**assist** [2] - 68:3, 110:3

**associated** [9] - 51:8, 74:12, 85:16, 85:19, 86:4, 86:23, 121:17, 124:2, 124:3

**Association** [1] - 63:7

**assume** [3] - 43:9, 77:15, 77:16

**assuming** [2] - 14:1

**assumption** [1] - 8:11

**assurances** [1] - 125:8

**assure** [2] - 28:20, 108:15

**astonished** [2] - 111:7, 113:16

**astounding** [3] - 36:2, 99:9, 106:2

**Atlanta** [1] - 2:17

**attached** [2] - 26:7, 75:1

**attempted** [2] - 39:1, 74:18

**attend** [7] - 19:6, 19:24, 20:1, 20:5, 20:10, 20:12, 20:21, 21:3, 115:8

**attendance** [2] - 20:11, 21:7

**attention** [2] - 13:16, 122:15

**attest** [1] - 115:13

**attests** [1] - 104:2

**attorney** [3] - 16:6, 16:18, 22:1

**attorneys** [1] - 47:25

**audit** [1] - 98:3

**August** [2] - 68:19, 117:15

**Aurobindo** [5] - 3:4, 3:5, 5:5, 31:3, 36:20

**Aurolife** [1] - 3:4

**authority** [2] - 108:3, 110:15

**Automobile** [1] - 63:7

**available** [3] - 64:17, 65:15, 74:1

**Avenue** [2] - 2:6, 3:7

**avoid** [7] - 14:10, 14:20, 15:5, 20:4, 20:5, 74:12, 88:6

**aware** [5] - 23:5, 30:15, 32:14, 62:5, 82:10

**B**

**B3** [1] - 13:2

**backbone** [1] - 97:14

**background** [4] - 4:4, 9:19, 65:14, 66:4

**backup** [4] - 28:5, 30:3, 30:4, 30:5

**ball** [1] - 10:9

**bar** [2] - 14:24, 21:20

**Barbara** [1] - 4:20

**BARNES** [1] - 2:20

**barred** [1] - 53:25

**based** [13] - 58:9, 72:10, 72:11, 72:17, 76:19, 79:2, 79:9, 85:17, 101:4, 104:13, 105:17, 105:22, 119:8

**basic** [2] - 120:15

**basis** [7] - 22:16, 31:14, 32:21, 54:8, 89:2, 122:11

**Baylen** [1] - 2:3

**Bazan** [2] - 4:20, 56:2

**BAZAN** [2] - 2:13,

56:2

**Beach** [1] - 2:10

**become** [3] - 28:20, 29:16, 33:9

**becoming** [1] - 82:9

**bed** [1] - 12:7

**beforehand** [1] - 45:21

**began** [1] - 96:20

**begin** [1] - 106:21

**beginning** [6] - 32:15, 53:19, 78:5, 90:19, 109:15, 120:8

**behalf** [7] - 4:9, 4:11, 4:14, 4:18, 4:22, 5:5, 5:8

**BEHRAM** [1] - 2:9

**Behram** [1] - 103:5

**belief** [2] - 82:4, 82:18

**believes** [1] - 68:16

**Bell** [1] - 3:4

**benefit** [1] - 96:21

**benefits** [4] - 93:15, 101:25, 104:14, 105:24

**Benicar** [5] - 16:14, 26:14, 26:23, 27:3, 28:23

**Benz** [1] - 94:3

**best** [20] - 11:14, 15:18, 15:25, 23:19, 26:9, 45:17, 45:22, 46:13, 48:1, 72:8, 74:6, 86:9, 88:22, 93:1, 100:5, 100:6, 100:12, 101:19, 103:25, 104:1

**better** [2] - 104:4, 118:6

**between** [9] - 7:10, 28:7, 31:24, 51:4, 52:25, 76:8, 80:4, 88:11

**beyond** [3] - 41:21, 79:22, 116:14

**big** [7] - 14:18, 19:14, 38:14, 53:21, 93:6, 94:22, 123:19

**bit** [14] - 11:5, 17:4, 18:16, 45:8, 47:2, 55:16, 58:9, 60:15, 60:18, 66:21, 73:19, 74:16, 125:24

**blank** [1] - 38:3

**blanket** [1] - 9:10

**bless** [1] - 70:6

**blessed** [1] - 91:22

**blown** [1] - 113:3

**Blue** [1] - 3:4

**board** [1] - 127:1

**BOSICK** [1] - 2:23
**bottom** [3] - 52:3, 61:14, 106:12
**boy** [1] - 55:7
**bread** [1] - 71:5
**break** [3] - 64:14, 64:20
**Brian** [1] - 115:12
**Bridgestone** [1] - 92:21
**brief** [12] - 10:24, 13:20, 44:2, 44:15, 51:25, 59:3, 78:6, 112:13, 117:14, 125:24, 126:8, 126:16
**briefed** [1] - 44:3
**briefing** [1] - 54:21
**briefly** [2] - 24:3, 115:5
**briefs** [3] - 42:19, 125:5, 125:25
**bring** [2] - 13:16, 102:4
**broad** [2] - 53:1, 87:12
**broiler's** [4] - 76:21, 113:20, 120:1
**broke** [4] - 67:21, 76:9, 77:25, 101:4
**broken** [1] - 23:18
**brought** [1] - 120:8
**bubble** [1] - 68:6
**bubbling** [1] - 68:13
**built** [2] - 23:1, 98:9
**bullet** [1] - 93:10
**burden** [3] - 124:2, 124:12, 124:16
**burdensome** [1] - 88:6
**burning** [1] - 60:25
**buy** [5] - 111:12, 111:13, 111:14, 111:15, 120:11
**buzzing** [1] - 65:7
**BY** [12] - 1:12, 1:15, 1:18, 2:3, 2:6, 2:9, 2:12, 2:16, 2:20, 2:23, 3:3, 3:6

## C

**CA** [1] - 2:21
**CAL** [54] - 67:19, 67:22, 67:24, 68:3, 68:8, 68:9, 68:12, 68:15, 69:24, 70:6, 70:14, 70:22, 71:18, 72:15, 72:18, 72:22, 72:25, 73:2, 73:6, 73:21, 76:10, 76:25,

77:20, 78:2, 79:5, 79:12, 79:13, 79:15, 79:24, 80:8, 81:7, 82:4, 82:9, 82:10, 82:19, 82:23, 84:16, 109:16, 109:18, 109:19, 109:23, 109:25, 110:1, 110:2, 111:5, 116:12, 117:6, 117:8, 121:5, 121:10, 121:15, 121:22
**calculations** [1] - 107:15
**calendar** [1] - 48:5
**California** [1] - 2:10
**CAML** [3] - 113:22, 120:25, 121:2
**Camp** [1] - 1:19
**candid** [2] - 60:2, 60:16
**candidly** [1] - 8:23
**car** [5] - 111:12, 111:13, 111:14, 111:15, 120:11
**Cardinal** [1] - 59:9
**care** [4] - 11:9, 25:2, 54:20, 55:4
**careful** [1] - 98:18
**cart** [2] - 92:8, 92:9
**carve** [1] - 56:16
**case** [66] - 19:7, 21:25, 23:9, 23:20, 24:2, 24:10, 24:13, 25:6, 26:16, 26:18, 27:2, 27:23, 33:5, 41:22, 43:20, 51:6, 52:7, 55:19, 56:19, 60:25, 62:16, 65:15, 66:18, 67:1, 73:16, 74:14, 78:24, 81:8, 84:25, 86:13, 87:3, 91:2, 91:6, 91:9, 91:11, 91:22, 92:16, 92:18, 92:21, 93:1, 93:15, 93:17, 94:3, 97:3, 97:5, 97:12, 100:6, 100:20, 101:19, 107:17, 110:19, 110:20, 110:21, 112:10, 112:16, 112:17, 112:20, 114:16, 115:10, 122:13, 124:10, 125:10
**cases** [14] - 23:9, 23:12, 92:17, 97:9, 110:14, 110:15, 111:3, 112:13,

114:16, 119:9, 119:11, 121:21, 121:23, 126:9
**catastrophic** [1] - 29:5
**categories** [2] - 53:1, 113:21
**causation** [1] - 56:22
**caused** [1] - 14:25
**caution** [2] - 80:12, 98:15
**Cavanaugh** [1] - 94:4
**center** [1] - 60:1
**centered** [1] - 94:11
**Centre** [1] - 2:24
**Century** [1] - 2:21
**certain** [4] - 18:16, 39:24, 47:13, 113:21
**certainly** [31] - 6:12, 6:22, 10:7, 10:18, 10:25, 23:22, 26:20, 30:8, 33:17, 34:2, 37:20, 39:5, 40:4, 42:1, 42:2, 47:22, 48:1, 50:17, 85:12, 93:6, 93:8, 93:10, 102:14, 105:20, 122:15, 122:22, 122:23, 122:25, 123:2, 123:24, 124:17
**certainty** [1] - 17:5
**certification** [2] - 93:20, 101:24
**certified** [1] - 80:14
**certify** [1] - 127:24
**cetera** [6] - 24:17, 25:7, 70:19, 99:16
**challenge** [1] - 123:19
**challenged** [2] - 80:17, 120:7
**chance** [1] - 126:10
**change** [10] - 14:20, 15:9, 15:10, 16:1, 24:15, 57:5, 58:20, 87:15, 96:6, 113:4
**changed** [1] - 16:17
**charts** [2] - 28:14, 28:16
**check** [2] - 46:16, 116:7
**Chicken** [1] - 94:13
**Chock** [1] - 99:1
**choose** [1] - 21:19
**choosing** [1] - 97:23
**chose** [5] - 94:1, 94:5, 94:10, 100:21
**Christmas** [1] - 18:6
**chronology** [1] - 74:16
**CIPRIANI** [1] - 3:2

**circle** [3] - 39:18, 39:20
**Circuit** [1] - 97:6
**circumstances** [10] - 16:22, 17:3, 17:14, 24:23, 27:22, 75:19, 108:11, 108:13, 127:11, 127:18
**citations** [1] - 110:19
**cite** [2] - 112:13, 112:17
**cited** [2] - 92:19, 119:10
**CIVIL** [1] - 1:3
**claim** [1] - 59:10
**claimed** [2] - 100:7, 100:22
**claims** [3] - 7:2, 66:17, 67:1
**clarification** [1] - 55:18
**clarifications** [1] - 32:13
**clarified** [1] - 74:20
**clarify** [4] - 29:19, 51:2, 90:7, 116:2
**clarifying** [1] - 19:24
**clarity** [2] - 29:19, 52:24
**class** [12] - 11:13, 11:16, 56:5, 56:8, 56:13, 56:14, 56:17, 56:25, 57:20, 58:15, 58:16, 62:25
**clause** [1] - 88:25
**clear** [25] - 8:17, 13:8, 15:15, 20:21, 24:23, 33:11, 33:24, 44:15, 56:13, 56:18, 61:24, 82:2, 92:14, 94:4, 95:21, 96:15, 97:12, 98:9, 100:17, 105:13, 109:25, 117:3, 117:7, 121:9, 123:9
**clearer** [1] - 123:11
**clearest** [1] - 54:15
**clearly** [2] - 92:10, 96:24
**Clem** [1] - 5:2
**CLEM** [1] - 2:23
**client** [3] - 61:17, 89:25, 120:6
**clients** [1] - 33:9
**close** [2] - 60:19, 92:19
**CMC** [2] - 57:22, 62:17
**CMML** [2] - 67:6, 67:16
**Co** [1] - 2:22

**Coast** [1] - 2:10
**Code** [1] - 60:12
**Codes** [1] - 60:8
**coding** [1] - 80:9
**collaborate** [1] - 81:16
**collaborating** [1] - 94:21
**colleague** [2] - 4:20, 114:19
**colleagues** [1] - 87:4
**collect** [2] - 85:16, 86:2
**collected** [3] - 78:22, 89:17, 98:6
**collection** [1] - 6:25
**Columbia** [1] - 80:7
**comfort** [1] - 117:22
**comfortable** [3] - 66:6, 97:17, 106:6
**coming** [5] - 33:16, 36:8, 62:10, 86:19, 96:3
**commence** [1] - 36:2
**Commencing** [1] - 1:8
**comment** [1] - 126:10
**commercial** [1] - 42:4
**commit** [1] - 29:7
**committed** [2] - 28:25, 62:14
**committee** [1] - 5:3
**common** [1] - 43:14
**communicate** [1] - 47:22
**communications** [3] - 49:9, 118:25, 120:6
**companies** [3] - 28:20, 29:16, 42:4
**company** [5] - 28:9, 28:12, 28:22, 29:4, 61:1
**compatible** [1] - 103:15
**compel** [2] - 40:15, 94:2
**compelled** [1] - 97:7
**compiled** [1] - 101:5
**complain** [1] - 106:6
**Complaint** [1] - 13:24
**complaints** [1] - 117:4
**Complaints** [2] - 13:25, 14:2
**complete** [12] - 12:12, 33:12, 59:7, 60:14, 60:21, 70:7, 107:13, 108:1, 108:5, 118:1, 125:3, 125:16
**completed** [4] - 56:15, 59:10, 59:15, 59:16
**completely** [2] - 87:5, 127:6

completion [2] - 5:18,
5:20
complex [2] - 31:11,
31:12
complexity [1] - 25:6
complied [1] - 81:11
comply [4] - 61:3,
92:12, 92:14, 93:1
component [2] - 76:7,
86:4
components [1] - 86:5
comports [1] - 15:6
compromise [1] -
62:15
computer [3] - 1:25,
7:1, 68:5
computer-aided [1] -
1:25
conceded [2] - 97:25,
102:16
conceive [1] - 21:9
concept [5] - 30:8,
35:2, 36:21, 94:8,
107:20
concern [12] - 16:4,
16:19, 20:2, 44:22,
82:22, 83:7, 84:12,
98:11, 102:2,
124:25, 125:24,
127:4
concerned [6] - 8:7,
8:13, 17:2, 84:13,
126:1, 126:8
concerns [6] - 9:25,
31:19, 37:4, 39:15,
45:13, 45:16
conclusion [4] -
79:17, 100:13,
108:21, 121:15
conduct [2] - 9:12,
93:4
conducted [3] - 7:16,
69:15, 94:10
confer [41] - 18:15,
18:17, 31:3, 31:5,
31:10, 31:17, 32:10,
34:15, 37:9, 47:8,
47:9, 50:1, 53:14,
62:13, 70:17, 71:2,
73:19, 74:5, 77:22,
78:20, 78:21, 78:23,
81:15, 84:9, 86:10,
92:15, 93:7, 97:14,
99:3, 101:22,
102:22, 102:24,
109:1, 109:3, 109:5,
109:6, 109:12,
110:12, 115:7,
120:22, 121:9
conference [8] -

10:16, 10:18, 13:17,
32:2, 32:15, 65:11,
103:10, 103:11
CONFERENCE [1] -
1:5
conferred [8] - 42:10,
71:10, 79:23,
100:11, 100:20,
108:23, 108:25,
113:10
conferring [5] - 5:25,
37:21, 38:8, 84:6,
110:1
confers [10] - 32:18,
33:12, 34:2, 36:19,
38:6, 49:12, 50:5,
51:21, 84:8
confidence [1] - 98:12
confident [4] - 32:11,
70:3, 87:4, 110:8
confidentiality [1] -
28:16
confirm [2] - 17:21,
125:19
confirmation [1] -
47:24
confirmed [1] - 34:12
confuse [1] - 40:18
Conlee [1] - 4:9
CONLEE [1] - 1:18
connection [4] - 67:8,
113:9, 113:13,
113:14
consecutively [1] -
34:19
consider [8] - 6:17,
27:20, 109:7,
121:19, 122:22,
122:25, 123:4, 123:6
consideration [1] -
87:1
considered [1] - 91:14
considering [4] - 91:4,
91:6, 91:7, 91:15
Consilio [2] - 86:15,
102:9
consistent [7] - 17:11,
17:13, 78:4, 78:12,
78:13, 110:4, 119:3
consultant [3] - 77:19,
77:20, 104:16
consumer [1] - 62:25
consumers [1] - 63:4
consuming [1] - 90:2
contact [2] - 31:2,
35:15
containing [1] - 60:8
contamination [2] -
14:23, 14:25
contemplated [1] -

45:19
contest [1] - 77:19
contexts [1] - 118:24
continue [8] - 6:22,
7:11, 7:18, 9:14,
9:21, 85:10, 85:13,
85:25
CONTINUED [2] - 2:1,
3:1
continued [3] - 68:20,
71:13, 83:12
continuing [4] - 6:15,
6:20, 9:6, 38:11
Continuous [4] -
67:19, 82:10, 119:4,
121:5
continuous [1] - 73:7
contours [1] - 9:15
contract [3] - 111:11,
111:15, 120:15
contracts [1] - 42:5
control [2] - 40:7,
41:24
controversial [5] -
13:22, 14:12, 19:9,
22:4, 27:19
convene [1] - 64:15
conversation [7] -
35:10, 36:21, 37:13,
37:15, 57:21, 95:23,
105:18
conversations [3] -
31:17, 38:11, 127:8
cooperate [1] - 70:17
cooperation [3] -
12:10, 93:17, 97:15
cooperative [1] - 7:15
cooperatively [1] -
114:24
coordinate [2] - 44:6,
50:24
coordinating [2] -
28:13, 32:22
coordination [1] -
35:18
copy [2] - 60:6, 60:10
copying [1] - 63:1
core [6] - 98:22,
116:22, 118:21,
118:22, 118:24,
119:2
corporate [4] - 17:23,
18:9, 36:22, 37:14
correct [14] - 13:2,
50:25, 60:14, 61:4,
61:11, 70:11, 74:22,
75:8, 76:5, 82:24,
83:2, 117:11,
117:25, 127:24
corrected [1] - 110:20

correctly [3] - 6:13,
71:19, 116:9
correspondence [1] -
118:24
cost [6] - 74:12, 85:18,
86:1, 86:3, 108:14
costing [1] - 85:21
costs [4] - 28:15,
73:17, 85:16, 86:23
counsel [28] - 12:19,
13:4, 26:17, 28:12,
31:2, 35:7, 35:24,
36:2, 36:11, 37:4,
41:3, 50:4, 58:13,
60:20, 60:24, 63:2,
65:12, 82:21, 87:18,
93:11, 95:10, 97:25,
101:5, 102:20,
114:14, 125:15,
127:4, 127:16
Counsel [2] - 20:13,
71:4, 103:22
count [2] - 96:2, 96:8
counter [1] - 115:11
counter-affidavit [1] -
115:11
countless [1] - 72:6
counts [2] - 89:18,
95:7
couple [7] - 5:16,
23:3, 32:6, 32:13,
66:10, 115:6, 118:20
course [13] - 6:2,
18:21, 20:2, 21:12,
21:14, 39:24, 42:16,
47:7, 47:23, 54:12,
77:19, 82:7, 113:18
COURT [2] - 1:1, 4:1
court [5] - 28:19, 29:3,
29:16, 29:25, 30:2
Court [13] - 1:23,
16:17, 16:25, 61:3,
62:7, 62:10, 75:5,
76:1, 78:12, 87:14,
88:9, 124:11, 128:1
Court's [19] - 7:24,
8:16, 10:3, 10:12,
11:24, 13:16, 18:18,
19:23, 41:21, 58:14,
65:12, 65:16, 66:3,
67:9, 75:8, 75:25,
76:3, 122:15, 125:14
Court-approved [2] -
62:7, 62:10
Court-ordered [1] -
78:12
cover [2] - 30:3, 55:3
covered [4] - 34:8,
52:18, 59:23, 62:23
COVID [4] - 16:23,

17:3, 17:7, 17:14
create [1] - 8:14
creating [1] - 52:23
credentials [1] -
105:20
credibility [1] - 96:18
credit [1] - 105:3
criteria [2] - 98:4,
117:2
criticized [1] - 117:8
cross [1] - 105:9
cross-examination [1]
- 105:9
CRR [1] - 128:1
cull [1] - 83:16
culled [2] - 6:6, 8:2
culminated [1] - 95:18
cumbersome [1] -
24:9
cumulative [2] - 15:2,
15:5
current [6] - 12:20,
30:25, 31:4, 57:5,
58:19, 58:23
custodial [2] - 116:20,
119:1
custodians [16] -
68:14, 68:21, 73:14,
74:11, 79:20, 84:1,
84:4, 85:7, 87:20,
88:12, 89:20, 89:21,
90:2, 90:14, 94:17,
94:18
custody [2] - 40:7,
41:24
cut [7] - 45:7, 68:22,
79:14, 84:18, 89:12,
121:10
cutoff [14] - 68:11,
68:12, 68:23, 79:8,
79:18, 79:24, 82:5,
82:19, 108:22,
110:7, 110:8, 121:4,
121:15
cutting [1] - 6:17
CVS [2] - 2:22, 5:8
célèbre [1] - 118:4

### D

D'LESLI [1] - 3:6
D'Lesli [1] - 59:18
dangerous [1] - 86:1
DANIEL [1] - 2:3
Daniel [2] - 4:13,
35:13
data [13] - 59:11,
59:22, 85:17, 86:3,
86:7, 89:25, 94:25,
101:16, 124:14

**date** [26] - 5:18, 5:20, 16:16, 16:17, 16:24, 16:25, 17:17, 18:22, 18:23, 39:7, 44:23, 45:1, 46:23, 47:1, 47:2, 47:6, 47:11, 47:13, 47:14, 47:23, 60:12, 60:13, 63:22, 85:3, 121:13
**Date** [1] - 128:3
**dates** [7] - 16:15, 38:3, 38:9, 42:20, 42:21, 42:23, 50:7
**dating** - 58:3
**David** [3] - 35:13, 57:7, 59:2
**DAVID** [1] - 1:15
**Davis** [1] - 59:18
**DAVIS** [5] - 3:6, 59:18, 60:22, 61:7, 61:22
**days** [9] - 7:10, 17:24, 18:14, 18:24, 39:15, 48:17, 48:21, 60:22, 63:16
**deadline** [22] - 6:3, 6:9, 7:3, 7:9, 8:1, 10:13, 11:3, 11:25, 35:1, 44:12, 52:20, 56:18, 58:13, 58:15, 59:5, 59:6, 61:10, 74:11, 112:20, 113:3, 124:22, 124:23
**deadlines** [11] - 8:3, 8:7, 8:14, 8:18, 9:23, 56:20, 61:1, 74:9, 112:23, 124:10
**deal** [11] - 5:22, 11:17, 12:5, 25:14, 25:15, 38:3, 38:24, 39:20, 44:5, 89:24, 106:11
**dealer** [3] - 111:13, 111:14, 120:12
**Dealers** [1] - 63:7
**dealing** [9] - 16:22, 17:14, 25:15, 40:5, 46:20, 47:15, 65:19, 65:21, 89:15
**debatable** [1] - 58:18
**December** [17] - 10:18, 18:3, 44:14, 48:11, 49:1, 52:20, 55:2, 83:5, 83:19, 85:5, 85:24, 87:7, 87:18, 88:4, 88:10, 88:11, 89:9
**decentralization** [1] - 22:19
**decide** [6] - 38:22, 39:4, 44:4, 47:19,

83:14, 103:25
**decided** [10] - 7:4, 12:6, 40:17, 46:7, 47:18, 65:22, 79:9, 100:23, 103:21, 127:13
**decision** [16] - 20:24, 81:12, 81:17, 83:11, 83:18, 84:5, 94:9, 96:24, 97:19, 99:21, 101:3, 101:4, 105:22, 107:4, 107:6, 125:8
**decisions** [2] - 96:19, 101:22
**declaration** [5] - 69:22, 80:17, 80:19, 82:21, 83:1
**decrease** [1] - 25:11
**decreases** [2] - 24:18, 25:9
**deemed** [2] - 68:24, 95:9
**deeper** [1] - 9:3
**default** [1] - 58:20
**defendant** [22] - 20:5, 20:11, 24:24, 31:14, 32:18, 33:2, 35:17, 35:18, 38:6, 40:7, 40:14, 41:2, 41:9, 43:15, 45:24, 48:14, 52:25, 53:6, 53:9, 92:13, 92:23, 104:17
**Defendant** [4] - 2:14, 2:22, 2:25, 3:4
**defendants** [61] - 4:15, 4:19, 4:22, 5:3, 5:5, 5:8, 5:11, 19:20, 19:25, 20:9, 21:2, 24:19, 26:22, 33:2, 33:5, 33:13, 38:12, 38:21, 39:23, 39:25, 41:5, 41:10, 41:13, 41:18, 42:5, 42:7, 42:13, 43:11, 43:25, 44:12, 45:11, 45:12, 45:16, 47:15, 48:18, 49:1, 49:5, 49:6, 49:20, 49:21, 50:24, 51:23, 52:3, 53:23, 54:12, 56:3, 56:17, 56:24, 57:24, 59:6, 59:9, 62:24, 63:13, 64:9, 85:21, 88:3, 92:20, 95:9, 113:1, 115:19, 115:23
**Defendants** [1] - 2:18
**defendants'** [5] - 24:8, 43:2, 57:4, 58:11, 64:2

**defense** [14] - 4:23, 12:19, 13:4, 16:6, 22:2, 22:22, 29:8, 29:13, 93:11, 93:18, 93:25, 94:5, 95:10, 105:12
**Defense** [2] - 2:14, 2:25
**defenses** - 67:1
**defer** [5] - 13:6, 13:11, 39:9, 50:1, 55:20
**deferring** - 55:25
**deficiencies** [3] - 117:5, 117:12, 118:11
**deficient** [1] - 116:13
**definitely** [1] - 9:2
**delay** [1] - 65:22
**demands** [1] - 35:10
**denied** [4] - 99:12, 116:24, 122:8, 122:9
**dep** [1] - 38:2
**deponents** [1] - 38:6
**depos** [1] - 56:25
**depose** [1] - 39:17
**deposed** [8] - 13:23, 14:3, 14:4, 14:8, 20:4, 34:9, 36:7, 106:10
**deposing** [5] - 8:12, 18:4, 18:7, 20:3, 36:4
**deposition** [26] - 11:25, 12:6, 12:21, 16:15, 19:5, 19:7, 20:1, 20:23, 21:3, 22:16, 23:10, 23:15, 25:23, 26:3, 26:25, 27:24, 30:1, 30:3, 30:23, 34:8, 39:6, 41:6, 58:7
**deposition-by-deposition** [1] - 22:16
**depositions** [36] - 8:9, 14:2, 14:9, 14:17, 15:13, 15:16, 18:6, 19:12, 19:25, 22:12, 23:16, 24:8, 24:11, 26:1, 26:13, 28:10, 28:23, 32:22, 33:8, 33:22, 34:5, 34:19, 35:16, 35:18, 36:1, 36:4, 37:11, 48:8, 53:18, 55:6, 56:12, 56:14, 57:16, 57:21, 58:6, 65:20
**designate** [1] - 35:12
**designated** [1] - 17:23
**designations** [2] -

18:3, 28:17
**designed** [1] - 15:1
**despite** [1] - 72:8
**detail** [1] - 109:1
**details** [2] - 121:21, 122:4
**determination** [3] - 7:20, 93:23, 103:1
**determine** [2] - 108:6, 123:21
**determined** [1] - 104:13
**determines** [1] - 97:19
**dialed** [1] - 71:24
**die** [1] - 60:4
**differ** [1] - 126:12
**difference** [1] - 52:25
**differences** [4] - 76:8, 76:11, 76:12, 76:19
**different** [25] - 8:10, 8:23, 9:16, 11:5, 17:8, 27:17, 41:4, 42:8, 49:20, 54:6, 71:12, 76:18, 77:3, 86:6, 86:16, 101:14, 103:17, 103:18, 109:18, 120:1, 122:19, 127:6, 127:12
**difficult** [6] - 12:14, 24:9, 76:6, 84:20, 85:14, 127:18
**diligence** [5] - 94:23, 94:24, 95:20, 106:15, 108:12
**directed** [5] - 13:10, 32:16, 35:16, 38:20, 42:3
**disagree** [8] - 12:12, 74:3, 74:4, 75:20, 83:17, 84:14, 85:1, 121:16
**disagreement** [1] - 102:24
**disagrees** [1] - 113:25
**disclose** [1] - 121:9
**disclosed** [7] - 90:13, 109:15, 110:2, 110:9, 111:3, 114:1, 121:22
**disclosing** [1] - 121:3
**disclosure** [1] - 70:17
**discourage** [1] - 26:2
**DISCOVERY** [1] - 1:6
**discovery** [19] - 17:12, 41:21, 52:6, 52:10, 54:6, 64:21, 67:2, 67:7, 74:8, 74:9, 74:11, 85:14, 85:22, 86:12, 86:24, 98:22,

112:20, 116:22, 124:10
**discretion** [1] - 20:9
**discuss** [5] - 9:8, 9:14, 38:11, 38:23, 79:5
**discussed** [12] - 9:15, 9:17, 20:7, 31:21, 32:24, 36:23, 37:1, 69:6, 69:7, 89:1, 117:20, 125:19
**discussing** [2] - 7:25, 36:6
**discussion** [6] - 16:5, 71:11, 71:13, 86:1, 101:15, 109:3
**discussions** [24] - 6:9, 6:18, 6:19, 6:23, 7:10, 8:23, 9:1, 9:6, 31:12, 34:1, 49:9, 50:11, 68:18, 69:7, 69:11, 72:6, 74:1, 74:16, 74:23, 74:24, 79:12, 83:12, 94:11, 97:11
**disingenuous** [1] - 112:24
**disputable** [1] - 92:13
**DISPUTE** [1] - 1:6
**dispute** [12] - 12:23, 14:20, 25:24, 56:10, 64:21, 67:7, 74:16, 75:13, 82:25, 90:15, 97:18, 105:23
**disputed** [4] - 33:23, 91:5, 92:12, 92:13
**disputes** [3] - 26:21, 45:24, 83:4
**disregard** [2] - 67:9, 67:12
**disregarded** [1] - 67:13
**distancing** [1] - 19:11
**distasteful** [1] - 10:3
**distinction** [1] - 73:8
**distribution** [1] - 60:1
**DISTRICT** [2] - 1:1, 1:1
**do-over** [1] - 106:16
**Docket** [1] - 4:3
**docket** [1] - 98:17
**doctor** [1] - 81:11
**doctor's** [1] - 77:11
**document** [32] - 5:18, 8:18, 11:17, 24:10, 39:6, 44:12, 45:18, 56:4, 56:6, 56:8, 56:11, 57:9, 58:1, 58:4, 58:25, 59:8, 59:24, 61:10, 62:7, 62:23, 63:2, 63:6,

63:8, 63:11, 63:14, 66:18, 66:21, 66:24, 66:25, 96:8, 98:21, 104:9

**document-intensive** [1] - 24:10

**documented** [1] - 108:12

**documents** [150] - 6:4, 6:5, 6:16, 6:25, 8:2, 10:5, 10:23, 39:16, 40:9, 41:25, 44:18, 44:20, 45:9, 45:15, 45:20, 46:4, 46:8, 46:14, 46:17, 46:25, 49:7, 49:22, 51:3, 51:7, 51:10, 51:14, 51:16, 52:8, 52:14, 52:18, 52:21, 53:2, 53:5, 53:8, 53:10, 53:13, 53:16, 53:17, 53:22, 53:25, 54:10, 54:13, 54:19, 57:2, 59:21, 60:7, 60:11, 61:5, 61:16, 66:16, 68:4, 68:6, 68:10, 68:13, 68:16, 68:24, 69:15, 70:8, 72:12, 72:23, 72:24, 73:3, 73:4, 73:11, 73:15, 74:6, 74:10, 74:13, 75:7, 75:14, 76:3, 76:14, 76:22, 76:23, 76:25, 77:1, 77:2, 78:22, 79:3, 79:19, 79:25, 81:18, 81:24, 82:24, 83:16, 86:17, 88:16, 89:25, 92:24, 94:1, 96:3, 96:9, 96:21, 97:7, 98:5, 98:22, 98:25, 99:7, 99:18, 100:24, 104:10, 104:11, 104:23, 106:3, 106:17, 106:18, 107:14, 107:16, 107:17, 107:24, 108:2, 108:17, 109:19, 109:20, 109:21, 109:22, 110:3, 110:23, 111:1, 111:17, 111:21, 112:5, 112:7, 112:9, 112:11, 112:15, 112:18, 113:19, 113:21, 116:22, 116:23, 116:25, 117:25, 118:7, 118:21, 118:22, 118:24, 119:2,

119:14, 119:15, 120:2, 120:14, 121:10, 121:11, 123:16, 123:23, 124:22

**dollars** [6] - 10:4, 11:2, 85:22, 104:9, 112:5, 122:10

**done** [40] - 7:19, 12:14, 16:13, 16:16, 17:18, 23:17, 24:11, 31:21, 32:19, 33:22, 35:23, 38:1, 55:8, 61:20, 67:15, 69:24, 70:2, 71:3, 83:8, 84:10, 84:21, 86:17, 86:20, 88:5, 93:16, 94:16, 95:16, 99:23, 103:3, 105:25, 106:19, 114:6, 114:21, 115:23, 117:22, 118:9, 120:1, 123:13, 123:16

**double** [1] - 46:16

**double-check** [1] - 46:16

**doubling** [1] - 57:16

**doubt** [2] - 80:7, 101:25

**down** [16] - 11:15, 11:16, 11:20, 15:24, 26:21, 67:21, 76:9, 78:1, 83:16, 86:2, 89:12, 90:22, 99:8, 101:4, 103:21, 115:17

**downloaded** [1] - 89:25

**downstream** [1] - 59:6

**dozens** [1] - 71:23

**Dr** [26] - 4:24, 69:18, 69:22, 70:24, 76:16, 77:5, 77:8, 77:10, 80:3, 80:5, 80:6, 80:18, 80:25, 81:6, 81:9, 103:24, 104:16, 105:11, 105:13, 105:20, 106:7, 114:8, 117:24, 118:4, 120:8

**draft** [1] - 31:4

**drafting** [1] - 19:22

**drawing** [1] - 126:25

**Drug** [2] - 60:8, 60:12

**drugs** [2] - 14:9, 60:8

**DUANE** [1] - 2:12

**Duane** [2] - 4:18, 56:3

**due** [5] - 16:21, 61:5, 94:23, 94:24, 106:15

**duplicative** [4] - 13:7, 14:11, 15:2, 15:5

**during** [7] - 13:5, 31:16, 53:14, 98:1, 101:22, 105:12, 105:17

**duty** [8] - 78:23, 78:25, 99:25, 100:3, 100:4, 100:7, 103:19, 103:20

## E

**e-discovery** [1] - 86:12

**e-mail** [3] - 11:12, 17:22, 117:2

**e-mailed** [2] - 57:13, 63:1

**e-mailing** [1] - 32:9

**e-mails** [3] - 89:25, 104:22

**E3** [1] - 17:20

**early** [10] - 44:14, 68:1, 78:11, 79:4, 79:23, 82:17, 82:22, 84:16, 101:25, 121:1

**earnest** [3] - 37:21, 38:8, 74:18

**easily** [1] - 94:15

**East** [1] - 2:21

**easy** [7] - 9:2, 51:6, 51:9, 86:18, 86:19, 99:22, 112:7

**ECF** [1] - 117:20

**economic** [4] - 56:8, 56:23, 57:22, 58:16

**edits** [1] - 27:12

**educate** [2] - 98:24, 116:22

**educated** [1] - 66:4

**effect** [6] - 5:23, 15:5, 70:5, 70:9, 78:6, 104:3

**effectively** [1] - 75:16

**effectiveness** [1] - 81:7

**efficiency** [2] - 44:21, 53:21

**efficient** [2] - 33:22, 49:11

**efficiently** [1] - 37:18

**effort** [4] - 9:1, 62:9, 89:24, 91:1

**efforts** [13] - 15:18, 15:19, 15:25, 16:1, 17:10, 17:11, 26:9, 37:18, 47:9, 72:8, 73:10, 74:6, 90:14

**eight** [1] - 55:8

**Eisenhower** [1] - 1:13

**either** [12] - 30:17, 64:6, 91:8, 91:10, 92:20, 100:17, 100:19, 100:20, 104:8, 108:1, 117:4, 127:9

**either/or** [3] - 91:17, 91:19, 115:15

**elected** [2] - 72:18, 109:20

**eliminate** [1] - 15:1

**eliminated** [1] - 75:16

**elsewhere** [1] - 21:2

**emphasize** [1] - 93:12

**emphasized** [1] - 92:25

**empirical** [1] - 80:20

**employ** [1] - 117:1

**employed** [1] - 117:16

**employee** [1] - 38:6

**employees** [2] - 23:6, 59:25

**encountering** [1] - 60:3

**end** [23] - 9:4, 9:25, 10:16, 19:11, 22:14, 55:18, 56:21, 58:10, 66:24, 79:6, 82:1, 84:11, 84:20, 89:11, 100:7, 106:20, 114:9, 114:25, 122:8, 122:10, 122:24, 123:15, 127:4

**ended** [4] - 95:5, 114:1, 125:24, 126:8

**ending** [1] - 26:2

**ends** [1] - 18:17

**engage** [1] - 9:7

**engaged** [1] - 95:22

**engaging** [1] - 47:8

**enormous** [3] - 18:5, 90:14, 108:16

**enter** [6] - 5:10, 11:4, 30:17, 87:20, 97:16, 125:18

**entered** [8] - 57:10, 61:12, 85:3, 85:5, 87:10, 92:10, 93:5, 95:8

**entering** [1] - 95:18

**enters** [1] - 17:25

**entertain** [1] - 8:20

**entire** [6] - 94:21, 98:21, 104:17, 104:23, 104:25, 116:20

**entities** [9] - 31:12, 39:24, 40:8, 45:20,

46:13, 46:15, 47:3, 47:7, 47:23

**entitled** [4] - 33:18, 115:2, 119:12, 127:25

**entity** [6] - 40:9, 45:15, 53:2, 53:6, 53:7, 53:15

**entries** [1] - 4:5

**envelope** [4] - 52:17, 54:8, 54:13

**envelope-by-envelope** [1] - 54:8

**equal** [1] - 80:4

**equipment** [1] - 29:2

**equities** [1] - 106:21

**ESI** [35] - 67:5, 67:7, 67:10, 67:12, 67:13, 70:16, 70:23, 71:2, 71:7, 76:10, 77:21, 78:4, 78:7, 78:12, 78:19, 79:10, 79:22, 81:11, 84:7, 84:10, 86:11, 91:8, 91:20, 92:4, 92:10, 93:3, 97:13, 100:4, 101:8, 101:18, 113:8, 113:9, 113:11, 120:22, 121:8

**especially** [2] - 19:10, 127:17

**ESQUIRE** [14] - 1:12, 1:15, 1:18, 2:3, 2:6, 2:9, 2:12, 2:13, 2:16, 2:16, 2:20, 2:23, 3:3, 3:6

**essentially** [4] - 74:25, 76:9, 106:14, 127:7

**establish** [1] - 81:1

**et** [6] - 24:17, 25:7, 70:19, 99:16

**evaluating** [3] - 93:21, 93:22, 96:3

**evening** [1] - 6:19

**event** [1] - 4:25

**eventually** [1] - 88:5

**evidence** [3] - 67:13, 80:20, 80:24

**exact** [2] - 85:3, 115:23

**exactly** [7] - 18:17, 25:22, 85:11, 99:5, 106:5, 113:8, 120:23

**examination** [1] - 105:9

**example** [6] - 14:22, 34:6, 39:22, 43:6, 92:24, 97:7

**examples** [2] - 117:12, 117:14

**excellent** [1] - 125:16
**except** [4] - 14:19, 20:17, 77:25, 123:15
**exception** [1] - 56:16
**exchange** [1] - 17:22
**excluded** [2] - 20:6, 96:9, 116:23
**executed** [1] - 9:18
**executive** [2] - 4:23, 5:3
**exemplars** [2] - 60:6, 60:14
**exercise** [32] - 20:9, 67:19, 67:20, 67:24, 68:8, 68:13, 68:16, 70:6, 70:14, 70:22, 72:15, 72:16, 72:17, 72:22, 73:2, 73:7, 76:10, 77:21, 78:2, 79:5, 79:12, 79:15, 82:10, 82:11, 83:7, 86:9, 109:16, 116:12, 117:6, 117:8, 119:7, 120:1
**exercised** [1] - 94:24
**exercises** [2] - 69:24, 113:20
**exhaust** [1] - 11:21
**exhausted** [1] - 6:9
**exhaustive** [1] - 95:17
**Exhibit** [1] - 75:1
**exhibit** [3] - 12:20, 28:14, 28:16
**exhibited** [1] - 106:15
**exhibits** [1] - 87:19
**exist** [3] - 61:24, 112:11, 121:24
**existing** [1] - 58:8
**expansion** [1] - 33:16
**expect** [3] - 32:7, 32:23, 36:15
**expectation** [2] - 31:20, 61:7
**expectations** [2] - 115:1, 124:11
**expects** [1] - 9:12
**expensive** [1] - 90:1
**experience** [6] - 24:7, 80:8, 89:6, 105:5, 105:6
**experienced** [1] - 105:6
**expert** [12] - 70:1, 70:25, 71:6, 80:5, 80:13, 80:14, 80:24, 81:3, 103:24, 104:16, 104:25
**experts** [2] - 105:8, 105:22
**explicit** [2] - 21:1, 21:6

**explicitly** [1] - 21:2
**expressed** [1] - 10:3
**extend** [1] - 8:17
**extending** [1] - 7:9
**extension** [6] - 10:24, 22:11, 48:23, 56:18, 56:20, 59:6
**extensions** [9] - 8:7, 8:13, 8:16, 47:3, 47:9, 49:9, 50:6, 54:25, 55:1
**extensive** [1] - 83:4
**extent** [5] - 23:25, 31:23, 39:15, 61:23, 102:23
**extra** [1] - 24:21
**extraordinary** [1] - 124:12

## F

**F1** [2] - 19:2, 19:3
**face** [2] - 7:21, 100:16
**facilitate** [1] - 45:17
**fact** [23] - 11:25, 24:10, 33:25, 34:4, 34:14, 34:18, 37:10, 37:11, 37:14, 63:11, 87:9, 104:2, 104:16, 104:21, 104:22, 108:24, 109:4, 109:14, 109:21, 113:8, 119:11, 120:3
**facts** [1] - 115:6
**failed** [2] - 117:1, 117:2
**failure** [1] - 118:11
**fair** [10] - 24:14, 24:22, 46:3, 46:5, 62:18, 68:7, 77:9, 81:4, 88:8, 88:20
**fairly** [1] - 121:8
**faith** [31] - 12:12, 15:18, 16:1, 17:9, 17:11, 26:11, 26:17, 33:15, 33:18, 60:16, 62:14, 70:17, 71:3, 72:5, 77:23, 78:16, 78:20, 78:21, 81:16, 84:6, 84:9, 89:1, 95:8, 99:16, 109:13, 110:12, 113:10, 114:23, 121:9, 127:10
**fall** [4] - 74:17, 76:9, 83:10, 94:14
**fallacy** [1] - 109:13
**familiar** [1] - 65:25
**famous** [1] - 105:8
**fan** [1] - 53:21

**far** [9] - 7:4, 7:7, 7:16, 31:11, 36:10, 45:15, 62:20, 73:4, 107:20
**fashion** [1] - 33:22
**fast** [1] - 74:15
**fast-forward** [1] - 74:15
**faulting** [1] - 87:2
**favor** [1] - 11:3
**favorable** [1] - 102:11
**FDA** [1] - 118:24
**feasible** [3] - 123:9, 123:13, 123:17
**February** [2] - 83:20, 116:1
**feet** [1] - 75:24
**fell** [3] - 5:18, 68:9, 70:7
**felt** [3] - 9:11, 94:13, 95:7
**few** [12] - 37:22, 38:8, 40:12, 41:3, 41:9, 41:12, 41:16, 63:16, 80:15, 97:23, 108:20, 126:12
**fight** [3] - 80:4, 81:4, 113:7
**figure** [5] - 36:24, 42:9, 51:19, 124:6, 124:20
**figuring** [1] - 60:3
**file** [14] - 43:12, 44:2, 44:24, 45:1, 46:22, 47:12, 47:13, 47:15, 48:12, 48:13, 55:2, 79:2, 98:15, 98:18
**filed** [21] - 13:25, 38:17, 38:25, 40:5, 41:10, 41:12, 44:17, 46:5, 46:10, 48:17, 50:6, 51:9, 51:15, 51:23, 52:19, 52:21, 98:2, 98:17, 109:11, 127:13
**files** [2] - 116:20, 119:1
**filing** [1] - 25:10
**final** [15] - 6:1, 10:10, 30:16, 80:1, 82:2, 83:24, 83:25, 85:24, 87:17, 111:21, 115:3, 118:19, 122:17
**finalization** [1] - 11:25
**finalize** [3] - 31:23, 38:2, 63:22
**finalized** [9] - 12:3, 31:8, 33:13, 56:6, 71:15, 74:2, 84:22, 85:15, 85:18

**finally** [5] - 56:20, 60:20, 71:15, 101:3, 106:23
**fine** [19] - 12:13, 16:3, 16:10, 18:1, 18:11, 21:23, 27:13, 31:18, 31:19, 32:20, 38:18, 57:13, 58:5, 63:25, 65:20, 125:11, 125:13, 126:17
**finish** [1] - 39:6
**finished** [2] - 36:6, 103:6
**finite** [1] - 33:14
**fire** [1] - 75:24
**firm** [2] - 4:23, 115:12
**first** [21] - 5:14, 8:6, 11:10, 13:1, 23:3, 35:11, 38:16, 41:23, 62:11, 68:1, 71:18, 73:12, 73:21, 73:24, 74:1, 83:9, 96:15, 100:8, 104:12, 106:4, 114:1
**fit** [2] - 19:10, 107:18
**five** [2] - 125:25, 126:4
**flexibility** [1] - 17:6
**flight** [1] - 16:7
**flip** [1] - 40:6
**Floor** [1] - 2:24
**floor** [4] - 12:17, 111:13, 118:17, 120:12
**Florida** [1] - 2:4
**flow** [1] - 106:21
**focusing** [1] - 78:10
**folks** [2] - 58:7, 114:18
**follow** [5] - 69:21, 84:13, 84:15, 100:21, 107:12
**followed** [1] - 119:22, 119:23, 122:5
**following** [5] - 39:8, 59:8, 72:7, 105:9, 109:8
**follows** [1] - 67:4
**FOR** [1] - 1:1
**forced** [1] - 95:11
**foreclose** [2] - 122:23, 123:2
**foregoing** [1] - 127:24
**foreign** [1] - 39:24
**foreseeing** [1] - 8:18
**foreseen** [1] - 33:19
**forgetting** [1] - 108:24
**form** [3] - 33:13, 69:22, 87:14
**formally** [1] - 121:13
**formation** [1] - 120:15
**formulation** [1] -

**70:18
**forsake** [1] - 44:21
**forth** [3] - 37:6, 104:25, 114:5
**forthcoming** [1] - 101:14
**forward** [10] - 31:24, 34:12, 35:16, 55:22, 74:15, 94:11, 95:6, 96:14, 98:10, 121:20
**four** [2] - 11:1, 63:2
**frank** [1] - 40:11
**frankly** [9] - 19:6, 19:21, 20:16, 27:1, 36:23, 57:20, 99:9, 111:7, 120:5
**free** [1] - 108:18
**FREEMAN** [1] - 1:12
**frequent** [1] - 111:6
**Friday** [1] - 30:17
**Friedlander** [2] - 1:23, 128:1
**friedlanderreporter @gmail.com** [1] - 1:23
**front** [1] - 11:19
**FULBRIGHT** [1] - 3:6
**full** [7] - 45:23, 55:10, 95:6, 99:1, 105:21, 117:24, 125:3
**fully** [1] - 59:15
**fundamental** [5] - 66:25, 75:12, 75:13, 120:17, 122:25
**fundamentally** [2] - 72:10, 72:11
**future** [6] - 6:10, 14:21, 17:17, 36:11, 37:3, 93:24

## G

**G-1** [1] - 22:10
**game** [1] - 73:25
**general** [4] - 12:9, 56:22, 84:7, 84:8
**generally** [1] - 42:8
**Georgia** [1] - 2:17
**given** [10] - 27:21, 34:7, 44:10, 47:9, 54:12, 62:8, 98:12, 101:15, 117:21, 122:3
**gleaning** [1] - 92:20
**Global** [1] - 110:19
**global** [2] - 17:7, 86:13
**goal** [1] - 38:2
**gold** [3] - 77:13, 81:8, 104:3

**GOLDBERG** [32] -
2:12, 4:17, 13:12,
13:15, 15:8, 16:20,
18:12, 19:16, 19:18,
19:20, 21:1, 22:8,
23:2, 26:5, 27:7,
27:11, 27:17, 29:18,
29:23, 30:19, 40:24,
41:1, 43:8, 44:9,
51:1, 51:18, 52:13,
62:22, 63:23, 64:1,
64:8, 65:2
**Goldberg** [27] - 4:18,
12:19, 13:2, 13:12,
13:14, 14:19, 16:20,
17:16, 18:12, 19:16,
19:19, 22:6, 23:2,
26:5, 29:20, 30:11,
40:25, 41:2, 43:5,
43:25, 48:5, 51:1,
51:7, 57:12, 62:19,
63:18, 65:3
**Goldberg's** [3] -
11:12, 11:22, 37:7
**GOLDENBERG** [12] -
2:5, 2:6, 45:6, 46:2,
46:12, 46:24, 47:22,
48:17, 49:17, 50:12,
50:25, 52:22
**Goldenberg** [11] -
37:10, 39:9, 45:3,
46:1, 46:21, 48:15,
48:25, 49:16, 52:16,
54:24, 57:12
**Goldenberg's** [1] -
51:10
**Golkow** [6] - 27:20,
27:24, 29:5, 30:1,
30:3, 30:9
**Golkow's** [1] - 30:7
**GOLOMB** [1] - 1:15
**GORDON** [1] - 2:23
**governing** [1] - 93:3
**graduated** [1] - 80:7
**granted** [3] - 47:4,
70:24, 70:25
**gray** [1] - 52:23
**great** [11] - 13:1, 19:2,
30:16, 30:21, 39:25,
46:18, 63:25, 64:3,
89:24, 106:11,
127:19
**greatest** [2] - 71:5,
127:4
**GREENBERG** [1] -
2:15
**Greenberg** [1] - 4:22
**GREENE** [24] - 2:16,
66:14, 67:11, 67:18,
67:25, 69:6, 70:11,

71:9, 75:11, 76:5,
76:12, 77:9, 78:15,
78:25, 81:20, 81:25,
83:2, 83:22, 85:9,
103:2, 108:20,
118:19, 123:18,
126:17
**Greene** [17] - 4:24,
66:14, 74:15, 75:10,
75:23, 84:24, 87:2,
88:20, 89:7, 89:14,
99:19, 108:19,
116:7, 116:10,
117:7, 123:8, 125:10
**Greene's** [1] - 90:6
**Grossman** [23] - 4:24,
69:18, 69:22, 70:24,
76:16, 77:5, 77:8,
77:10, 80:3, 80:5,
80:18, 80:25, 81:6,
81:7, 81:9, 103:24,
104:16, 105:11,
105:13, 106:7,
114:8, 117:24, 120:8
**Grossman's** [2] -
105:20, 118:4
**Group** [2] - 2:14, 2:25
**group** [1] - 4:23
**guess** [7] - 12:21,
25:10, 35:6, 38:18,
51:13, 53:11, 105:2
**guided** [1] - 73:9
**guy** [3] - 80:6, 80:7,
81:2
**guys** [1] - 123:6
**gypped** [1] - 119:18

**H**

**H-3** [1] - 25:21
**half** [1] - 55:8
**hand** [1] - 45:3
**handful** [1] - 20:17
**handle** [1] - 126:15
**handled** [3] - 28:22,
28:23, 37:17
**hands** [1] - 41:25
**happy** [17] - 6:22,
45:2, 46:16, 49:17,
50:13, 63:18, 69:19,
77:20, 92:15, 97:2,
110:18, 111:1,
111:2, 121:20,
122:22, 122:25,
123:4
**hard** [12] - 18:16, 19:8,
22:21, 26:12, 29:17,
60:6, 60:10, 90:15,
91:19, 95:3, 99:4,
108:10

**harder** [1] - 51:13
**Harkins** [4] - 91:4,
103:10, 115:9,
115:11
**Harkins'** [2] - 93:20,
101:24
**harm** [1] - 57:13
**Hart** [1] - 4:9
**hashed** [1] - 92:1
**Hawaii** [1] - 28:24
**head** [1] - 10:19
**Health** [1] - 2:22
**hear** [20] - 4:4, 8:4,
41:16, 50:9, 52:16,
54:22, 57:1, 58:6,
58:22, 74:21, 76:17,
77:7, 77:8, 77:10,
77:12, 88:1, 91:15,
92:2, 113:16, 115:20
**heard** [11] - 9:24, 48:2,
57:4, 61:4, 62:11,
113:24, 123:6,
125:3, 125:4, 126:3,
126:12
**hearing** [4] - 13:5,
69:17, 73:24, 98:1
**heavily** [1] - 104:17
**heavy** [1] - 32:2
**Heinz** [1] - 5:5
**HEINZ** [2] - 3:3, 5:4
**held** [1] - 54:10
**hello** [2] - 4:11, 4:13
**help** [3] - 68:5, 96:20,
117:9
**helpful** [3] - 27:22,
52:24, 96:23
**helping** [2] - 68:5,
93:6
**helps** [2] - 54:24,
55:11
**Hetero** [2] - 31:3,
36:20
**hi** [1] - 4:21
**Hi** [1] - 45:6
**Highway** [1] - 2:10
**Hilton** [1] - 37:10
**historical** [1] - 115:6
**histories** [1] - 59:24
**history** [1] - 88:22
**hit** [10] - 68:2, 88:3,
89:18, 94:12, 95:7,
96:2, 106:23,
106:24, 119:14,
119:16
**hits** [3] - 79:2, 83:24,
89:13
**hold** [8] - 54:23,
64:15, 75:24, 77:7,
87:23, 103:3
**holidays** [1] - 18:7

**hone** [1] - 34:1
**HONIK** [1] - 1:15
**honing** [1] - 33:10
**Honor** [220] - 4:8,
4:11, 4:13, 4:17, 5:1,
5:4, 5:7, 6:12, 6:24,
8:5, 8:24, 9:12, 9:19,
9:20, 9:22, 9:24,
12:18, 12:19, 12:22,
13:5, 13:8, 13:10,
13:12, 13:15, 13:17,
13:21, 14:12, 15:8,
15:11, 15:21, 16:4,
16:20, 18:12, 19:2,
19:16, 19:20, 21:23,
23:2, 24:3, 25:7,
26:5, 28:1, 28:3,
28:6, 29:18, 30:19,
30:24, 31:1, 32:5,
36:14, 37:5, 37:6,
38:11, 39:10, 39:15,
40:6, 40:16, 40:24,
41:1, 42:6, 42:24,
42:25, 44:10, 45:2,
45:6, 46:12, 46:25,
49:4, 50:1, 50:13,
51:1, 51:18, 52:1,
55:11, 56:2, 56:18,
57:7, 57:15, 57:17,
59:2, 59:18, 59:20,
60:17, 60:23, 61:8,
61:22, 62:3, 62:5,
62:22, 63:15, 63:17,
64:1, 64:9, 64:11,
65:2, 66:14, 66:21,
67:11, 67:18, 68:1,
68:19, 69:7, 69:10,
69:16, 69:20, 70:3,
70:11, 71:9, 71:17,
71:24, 72:9, 72:22,
73:10, 73:18, 74:3,
74:7, 75:11, 75:22,
76:5, 76:13, 76:15,
77:3, 78:15, 78:25,
79:16, 79:21, 80:1,
80:5, 80:8, 80:11,
81:4, 81:20, 82:1,
82:5, 82:9, 83:2,
83:22, 84:6, 85:9,
85:20, 86:8, 86:11,
86:18, 86:21, 87:22,
92:7, 93:9, 93:11,
93:14, 93:24, 94:12,
95:2, 95:3, 95:5,
95:6, 95:13, 95:18,
96:15, 96:18, 97:3,
97:20, 97:24, 98:15,
98:20, 100:5, 103:1,
103:2, 103:5, 103:9,
105:4, 106:22,
107:2, 107:5, 107:6,

107:24, 108:3,
108:16, 108:20,
109:9, 109:17,
110:13, 111:3,
111:6, 111:7,
111:10, 112:1,
112:16, 112:19,
113:18, 114:5,
114:10, 114:13,
114:17, 116:1,
117:11, 117:13,
117:18, 118:8,
118:15, 118:19,
119:9, 119:20,
120:10, 120:21,
121:8, 121:19,
122:1, 122:14,
122:17, 122:20,
123:18, 123:21,
123:24, 124:8,
124:19, 125:23,
127:21
**Honor's** [7] - 13:20,
56:13, 59:4, 62:16,
92:16, 105:6, 124:5
**HONORABLE** [1] - 1:9
**hope** [1] - 107:8
**hopeful** [1] - 85:12
**hopefully** [8] - 11:7,
12:16, 16:9, 25:11,
31:5, 31:8, 48:18,
126:22
**hoping** [2] - 60:22,
96:23
**horse** [2] - 92:8, 92:9
**host** [1] - 105:7
**hour** [4] - 23:10,
23:15, 55:8
**hour-and-a-half** [1] -
55:8
**hours** [2] - 23:10,
23:20
**House** [1] - 126:23
**hundred** [2] - 16:13,
43:4
**hundreds** [3] - 69:24,
73:13, 122:3

**I**

**ice** [1] - 55:16
**idea** [4] - 28:4, 29:15,
33:7, 126:20
**ideal** [2] - 43:10, 43:22
**identified** [2] - 17:24,
34:4
**identify** [6] - 32:17,
33:4, 33:21, 35:2,
44:3, 113:21
**identifying** [3] - 18:14,

37:7, 38:9
**ignore** [2] - 71:1, 78:7
**imagine** [6] - 18:8,
22:3, 22:21, 29:14,
108:10, 108:14
**immeasurable** [1] -
26:11
**immediate** [1] - 65:18
**impact** [1] - 55:23
**impacted** [1] - 86:14
**impasse** [1] - 10:12
**implement** [2] -
126:21, 126:24
**implemented** [1] -
102:14
**importance** [1] - 93:12
**important** [28] - 13:16,
14:14, 15:14, 26:1,
37:20, 39:5, 42:14,
48:9, 48:10, 71:9,
72:14, 73:8, 74:7,
75:25, 80:2, 84:7,
94:13, 99:1, 107:17,
107:23, 109:17,
111:1, 111:24,
112:2, 112:12,
114:10, 114:18,
125:2
**imposing** [1] - 26:10
**impractical** [2] -
43:24, 54:7
**impression** [1] - 5:24
**impressive** [1] - 105:8
**improper** [2] - 41:7,
41:8
**IN** [1] - 1:3
**in-person** [1] - 19:7
**inaccurate** [1] - 87:5
**inappropriate** [1] -
36:13
**Inc** [3] - 2:18, 2:19, 3:4
**inclination** [1] - 10:2
**inclined** [3] - 42:25,
71:21, 76:17
**include** [3] - 13:4,
22:10, 61:20
**included** [2] - 49:12,
95:4
**including** [5] - 14:19,
18:6, 28:23, 97:6,
114:19
**inconsistent** [1] -
102:22
**incorporating** [1] -
76:1
**increases** [3] - 24:17,
24:18, 24:21
**incredibly** [2] - 24:9
**incur** [1] - 73:16
**indemnification** [1] -

60:1
**indicated** [4] - 11:24,
55:17, 56:21
**indication** [2] - 32:25,
119:25
**individual** [3] - 36:16,
36:22, 38:9, 43:15,
56:8
**individually** [1] - 3:8
**individuals** [2] - 34:7,
80:4
**indulge** [2] - 60:18,
77:5
**indulgence** [1] - 124:5
**Industries** [1] - 2:18
**inefficient** [1] - 28:21
**inference** [1] - 102:12
**inferences** [1] -
102:11
**influencing** [1] - 127:8
**informal** [1] - 62:17
**information** [14] -
9:13, 36:12, 41:22,
54:3, 54:4, 54:5,
55:24, 60:2, 69:12,
69:13, 101:5,
106:11, 109:7, 122:4
**informing** [1] - 57:3
**initial** [6] - 29:9, 31:10,
31:16, 71:11, 71:12,
98:23
**input** [17] - 49:22,
69:3, 69:9, 70:13,
70:14, 70:21, 71:7,
72:21, 73:1, 74:4,
77:11, 78:2, 94:9,
98:5, 104:20,
105:16, 106:13
**insertion** [1] - 19:21
**insinuation** [1] -
110:11
**insisted** [1] - 120:13
**insistence** [1] - 72:11
**inspection** [1] -
118:24
**instance** [2] - 38:16,
40:1
**instead** [2] - 15:3,
15:17
**instructive** [1] - 80:16
**intend** [5] - 17:9, 33:4,
36:13, 114:12,
121:10
**intended** [2] - 14:21,
79:24
**intends** [1] - 18:21
**intensive** [2] - 24:10,
74:23
**intent** [6] - 14:24,
15:7, 33:14, 35:25,

37:2, 114:15
**intention** [1] - 10:14
**interaction** [2] - 28:15,
127:1
**interest** [3] - 43:11,
44:1, 50:8
**interested** [1] - 69:17
**interests** [3] - 10:20,
44:20, 98:13
**interpretation** [1] -
105:15
**interpreted** [1] -
108:17
**interrupt** [1] - 27:8
**interrupted** [2] - 25:4,
88:17
**intimately** [1] - 90:9
**invent** [1] - 109:14
**inventor** [1] - 118:5
**inventory** [1] - 59:24
**invite** [4] - 41:2, 85:10,
87:15, 88:23
**invited** [3] - 85:25,
87:6, 89:9
**inviting** [1] - 114:14
**involved** [9] - 22:12,
30:12, 74:24, 84:25,
87:3, 88:21, 90:9,
104:18, 114:16
**involving** [1] - 5:15
**iPad** [1] - 35:3
**irbesartan** [3] - 13:5,
14:1, 14:4
**irrelevance** [1] - 43:14
**irrelevancy** [1] - 43:14
**irrelevant** [8] - 10:6,
10:23, 54:4, 66:13,
66:19, 66:22, 74:14,
79:20
**ish** [1] - 71:15
**isolation** [1] - 86:20
**issue** [97] - 5:15, 5:21,
6:1, 6:8, 6:23, 7:14,
7:21, 7:25, 9:14,
10:15, 10:19, 11:9,
11:17, 13:8, 13:13,
13:22, 14:18, 17:16,
17:19, 18:13, 21:17,
22:2, 22:6, 22:22,
23:1, 23:3, 23:24,
25:2, 25:8, 25:9,
25:17, 25:22, 26:4,
27:15, 27:18, 27:19,
28:21, 29:22, 30:11,
30:22, 33:9, 37:6,
37:16, 37:20, 38:1,
38:15, 38:22, 38:24,
39:4, 39:10, 39:23,
40:2, 40:6, 40:13,
41:23, 41:25, 45:24,

47:18, 47:19, 55:5,
55:13, 55:21, 57:15,
58:25, 62:3, 62:23,
64:4, 64:13, 64:16,
65:11, 65:13, 65:21,
65:25, 66:1, 67:4,
67:9, 71:18, 73:21,
75:2, 77:13, 78:10,
78:21, 79:4, 83:19,
92:5, 94:3, 95:2,
96:12, 97:24,
103:11, 123:25,
125:2, 125:9,
125:12, 126:20
**issued** [1] - 32:15
**issues** [62] - 4:24,
8:18, 11:11, 11:16,
11:21, 12:5, 12:12,
12:14, 14:11, 15:4,
16:9, 20:14, 25:6,
25:25, 26:4, 30:14,
31:6, 33:21, 36:25,
37:22, 38:19, 39:19,
41:16, 41:18, 41:19,
41:20, 42:14, 43:12,
43:16, 43:17, 43:23,
44:2, 44:3, 44:5,
44:11, 45:12, 47:16,
48:7, 48:10, 48:20,
51:25, 52:2, 52:15,
55:15, 56:22, 56:23,
62:20, 64:6, 65:19,
66:17, 75:3, 75:9,
83:23, 92:2, 98:2,
98:8, 104:19
**item** [1] - 103:6
**items** [2] - 5:12, 59:23
**iterative** [1] - 82:11

## J

**Jaffe** [4] - 80:3, 80:6,
80:12, 80:19
**jammed** [1] - 9:25
**January** [11] - 8:12,
49:2, 49:3, 53:19,
54:18, 54:22, 56:15,
57:17, 58:8, 83:20,
115:25
**Jeff** [2] - 4:23, 66:14
**JEFFREY** [1] - 2:16
**JERSEY** [1] - 1:1
**Jersey** [1] - 1:13
**JESSICA** [1] - 3:3
**Jessica** [1] - 5:5
**job** [2] - 35:22, 127:19
**JOEL** [1] - 1:9
**JOHN** [1] - 1:15
**JOHNSTON** [2] - 2:20,
5:7

**Johnston** [1] - 5:8
**joining** [2] - 4:10, 4:19
**Joint** [2] - 2:14, 2:25
**JUDGE** [1] - 1:10
**Judge** [22] - 4:21,
34:20, 35:5, 55:17,
55:22, 56:21, 57:20,
58:6, 58:9, 58:21,
58:24, 64:18, 64:25,
65:5, 70:13, 70:23,
78:7, 83:18, 87:11,
94:4, 99:5, 114:13
**July** [19] - 59:5, 68:1,
68:19, 79:4, 80:19,
81:22, 83:21, 84:16,
90:12, 93:5, 95:24,
96:14, 100:19,
105:12, 117:15,
121:1
**jump** [5] - 36:2, 41:3,
45:25, 90:6
**jumped** [1] - 88:19
**June** [24] - 66:1,
71:14, 71:15, 74:2,
81:21, 82:1, 82:17,
82:18, 83:6, 83:21,
84:23, 85:2, 85:8,
88:9, 88:11, 88:15,
89:14, 89:15, 90:12,
93:5, 95:19, 100:7,
109:24, 116:1

## K

**KANNER** [1] - 1:18
**Karen** [5] - 1:23,
64:17, 65:4, 65:8,
128:1
**KATZ** [1] - 1:12
**keep** [6] - 42:15,
56:19, 58:19, 77:21,
120:10, 125:7
**keeping** [1] - 43:2
**kept** [1] - 94:14
**key** [2] - 88:11, 94:17
**kimono** [1] - 121:25
**kind** [3] - 20:10, 75:20,
110:10
**KIRTLAND** [1] - 2:9
**knowable** [1] - 95:22
**knowing** [2] - 48:22,
89:15
**knowledge** [5] - 34:4,
34:10, 34:14, 83:3,
100:1
**known** [4] - 84:3,
90:17, 115:21
**knows** [4] - 45:4,
93:15, 93:24, 101:13
**Kugler** [5] - 55:17,

56:21, 58:6, 58:9,
58:21
**Kugler's** [1] - 55:22

## L

**lack** [4] - 72:10, 94:23,
106:15, 108:11
**language** [24] - 13:3,
13:6, 13:20, 15:12,
16:10, 17:11, 18:11,
20:11, 21:4, 21:6,
21:21, 24:16, 25:7,
26:2, 26:6, 26:7,
26:23, 27:2, 35:1,
71:1, 78:6, 79:10,
92:14
**large** [4] - 35:22,
52:23, 89:13, 95:7
**largest** [1] - 28:22
**Lasalle** [1] - 2:6
**last** [24] - 6:19, 8:6,
11:24, 13:5, 13:17,
20:8, 26:18, 27:5,
29:12, 31:3, 31:11,
32:15, 57:25, 62:13,
68:10, 68:22, 93:5,
97:10, 102:20,
107:1, 116:4,
118:16, 126:3, 126:6
**late** [3] - 19:22, 73:25,
106:22
**Laughter** [2] - 45:5,
55:12
**LAW** [1] - 2:5
**law** [16] - 23:9, 23:20,
24:2, 24:13, 65:15,
91:9, 91:11, 91:22,
92:16, 93:15, 93:17,
97:3, 97:5, 97:12,
112:10, 125:11
**lawyer** [1] - 16:6
**lawyers** [3] - 37:14,
105:7, 115:9
**layer** [3] - 113:1,
115:15, 119:10
**layering** [2] - 91:11,
91:22
**Layne** [1] - 37:10
**lead** [1] - 96:25
**leading** [4] - 70:1,
70:25, 80:5, 81:3
**leaning** [1] - 127:7
**leapfrogging** [1] -
93:3
**learned** [1] - 109:9
**Learning** [4] - 67:19,
82:11, 119:4, 121:5
**learning** [5] - 73:7,
82:14, 98:23, 104:20

**least** [13] - 5:24, 9:10,
10:11, 23:5, 23:16,
38:3, 38:24, 48:1,
49:13, 50:21, 51:21,
78:10, 98:12
**leave** [8] - 9:20, 16:2,
16:16, 17:16, 27:4,
29:20, 38:3, 107:22
**leaving** [1] - 41:6
**led** [1] - 90:22
**left** [2] - 11:22, 12:5
**legal** [1] - 81:10
**legitimacy** [1] - 50:20
**legitimate** [1] - 96:12
**less** [5] - 18:16, 23:11,
57:25, 86:7, 126:4
**letter** [39] - 5:23, 5:25,
6:6, 11:15, 11:19,
11:20, 11:22, 12:4,
12:16, 12:20, 13:20,
30:22, 31:4, 37:7,
39:22, 41:19, 42:19,
51:20, 51:25, 55:7,
55:8, 59:4, 62:4,
62:19, 62:20, 64:2,
90:12, 95:24, 97:1,
97:11, 102:15,
106:5, 109:1,
119:24, 121:13,
125:5, 126:14
**letters** [3] - 5:13, 5:17,
82:6
**level** [3] - 9:7, 12:10,
80:25
**levels** [5] - 76:21,
98:18, 98:19
**LEVIN** [1] - 2:2
**LIABILITY** [1] - 1:4
**liaison** [1] - 87:18
**light** [2] - 13:6, 17:6
**lighten** [1] - 31:25
**likelihood** [9] - 14:15,
20:17, 24:11, 72:20,
79:11, 81:19, 81:22,
99:23, 100:1
**likely** [10] - 4:6, 4:16,
4:19, 14:3, 24:24,
35:15, 44:7, 52:19,
61:11, 96:25
**limit** [5] - 14:21, 20:22,
21:18, 21:20, 125:25
**limitation** [1] - 21:6
**limitations** [4] - 19:7,
20:22, 21:5, 21:18
**limited** [1] - 9:5
**line** [13] - 9:11, 12:20,
13:3, 26:21, 45:3,
59:22, 69:19, 80:9,
91:8, 91:19, 106:4,
106:12

**line-by-line** [1] - 59:22
**linear** [2] - 7:6, 119:13
**lined** [1] - 27:14
**linger** [2] - 10:15,
125:9
**linked** [1] - 127:11
**list** [3] - 34:13, 35:9,
36:16
**listed** [2] - 117:14,
118:8
**listen** [2] - 43:18,
83:10
**listing** [2] - 85:6,
87:20
**literally** [4] - 71:23,
71:24, 74:1, 122:3
**LITIGATION** [1] - 1:4
**litigation** [8] - 28:22,
29:7, 86:14, 89:5,
93:4, 98:25, 99:11,
102:23
**live** [2] - 43:9, 43:18
**lived** [1] - 65:25
**LLC** [4] - 1:12, 1:18,
2:18, 3:5
**LLP** [5] - 2:9, 2:12,
2:15, 2:20, 2:23
**load** [2] - 32:1, 86:3
**locate** [1] - 118:3
**locations** [2] - 36:8,
38:9
**LOCKARD** [10] - 4:21,
32:5, 37:6, 49:4,
50:17, 87:22, 87:24,
88:19, 91:3, 115:5
**Lockard** [16] - 4:21,
32:5, 34:24, 49:4,
50:3, 50:10, 50:16,
87:22, 87:23, 88:17,
90:8, 103:10, 109:2,
114:19, 114:21,
115:3
**LOCKHARD** [1] - 2:16
**locking** [1] - 16:24
**lodged** [1] - 49:13
**logical** [6] - 68:12,
68:23, 79:7, 79:17,
110:6, 110:7
**logistical** [2] - 25:24,
36:25
**logistics** [1] - 36:6
**look** [25] - 14:7, 14:16,
22:3, 29:12, 34:24,
46:6, 46:9, 51:11,
53:6, 53:17, 66:16,
73:14, 76:6, 80:16,
83:16, 86:18, 86:19,
86:22, 92:4, 96:5,
99:4, 101:10, 108:3,
111:25, 125:12

**looked** [2] - 23:9,
71:20
**looking** [9] - 48:5,
51:17, 53:25, 60:11,
68:17, 72:23, 80:12,
106:3, 119:12
**looks** [1] - 18:25
**loop** [1] - 60:19
**Los** [2] - 2:21
**losartan** [4] - 13:4,
14:1, 14:5, 14:24
**losing** [1] - 112:1,
122:7
**loss** [2] - 56:23, 57:23
**lost** [3] - 56:8, 94:3,
118:7
**Louisiana** [1] - 1:19
**love** [4] - 55:1, 94:8,
124:7, 126:6
**lower** [1] - 22:14
**Ltd** [2] - 2:18, 3:5

## M

**macro** [4] - 41:21,
52:6, 52:9
**MAGISTRATE** [1] -
1:10
**mail** [4] - 11:12, 17:22,
51:14, 117:2
**mailed** [2] - 57:13,
63:1
**mailing** [1] - 32:9
**mailings** [1] - 54:7
**mails** [3] - 89:25,
104:22
**main** [1] - 5:12
**Maine** [1] - 63:7
**major** [4] - 8:14, 29:7,
37:16, 45:16
**manage** [2] - 27:24,
29:17
**managed** [1] - 102:23
**managing** [1] - 28:10
**manual** [1] - 108:6
**manufacturers** [2] -
33:5, 34:2
**March** [4] - 56:15,
57:17, 58:8, 83:20
**marginally** [1] - 76:24
**marked** [1] - 119:5
**Market** [1] - 1:16
**Marlene** [2] - 37:9,
39:9
**MARLENE** [1] - 2:6
**massage** [1] - 89:4
**Master** [4] - 13:23,
13:25, 14:2, 94:4
**master** [1] - 93:25
**matching** [1] - 36:22

**material** [5] - 7:17,
7:18, 112:6, 113:22,
120:6
**materially** [2] - 10:21,
65:18
**materials** [2] - 7:8,
72:2
**mats** [2] - 111:14,
120:12
**matter** [5] - 24:20,
28:11, 66:4, 122:16,
127:25
**Maura** [1] - 4:24
**MAZIE** [1] - 1:12
**McKesson** [8] - 3:8,
59:14, 59:19, 59:21,
61:2, 61:13, 61:16,
61:21
**MDL** [1] - 4:2
**mean** [20] - 19:12,
28:6, 28:22, 29:3,
29:8, 29:23, 36:14,
37:16, 40:17, 76:13,
82:25, 90:6, 90:18,
92:12, 94:22,
106:19, 106:23,
107:4, 108:6, 108:7
**means** [4] - 15:25,
21:7, 61:9, 61:10
**meantime** [4] - 46:17,
53:8, 59:14, 64:22
**measurement** [1] -
110:22
**mechanical** [1] - 1:25
**mechanics** [1] - 38:23
**mechanism** [1] -
79:24
**medical** [13] - 55:6,
55:14, 55:20, 55:24,
56:5, 56:12, 56:16,
56:24, 57:9, 58:1,
58:17, 63:6
**meet** [56] - 18:15,
18:17, 31:3, 31:5,
31:10, 31:16, 32:9,
32:18, 33:12, 34:2,
34:15, 36:19, 37:9,
38:5, 38:25, 47:8,
47:9, 49:11, 50:1,
50:5, 51:21, 53:14,
61:1, 62:13, 66:25,
70:16, 71:2, 73:19,
74:5, 74:8, 77:22,
78:19, 78:20, 78:23,
81:15, 84:8, 84:9,
86:10, 92:15, 93:6,
97:14, 99:2, 99:16,
101:22, 102:24,
109:1, 109:3, 109:5,
109:6, 109:12,

110:11, 115:7,
120:22, 121:9
**meet-and-confer** [6] -
18:15, 18:17, 34:15,
47:9, 50:1, 62:13
**meeting** [9] - 33:6,
37:21, 38:7, 44:12,
84:5, 87:17, 110:1,
115:13, 120:16
**meetings** [1] - 114:15
**memorialized** [1] -
75:5
**memory** [1] - 46:13
**mention** [2] - 97:21,
115:14
**mentioned** [6] - 50:14,
89:14, 91:20, 115:7,
116:7, 127:4
**Mercedes** [1] - 94:3
**merge** [1] - 28:19
**merry** [1] - 90:21
**mesh** [1] - 32:10
**met** [11] - 42:9, 71:10,
72:4, 74:9, 79:23,
100:11, 100:20,
108:23, 108:24,
113:9, 120:18
**methodology** [4] -
70:18, 70:19, 72:18,
77:23
**mid** [3] - 8:12, 10:18,
18:3
**mid-December** [2] -
10:18, 18:3
**mid-January** [1] - 8:12
**midnight** [1] - 61:1
**midst** [1] - 31:9
**midstream** [1] - 30:6
**might** [11] - 14:8,
16:25, 25:19, 27:20,
34:25, 52:24, 54:4,
55:23, 81:2, 103:12
**million** [2] - 59:22,
124:18
**millions** [9] - 10:4,
11:2, 73:15, 74:13,
85:21, 104:8, 104:9,
112:5, 122:9
**mind** [4] - 42:15, 43:2,
58:14, 110:20
**mindful** [2] - 124:9
**minds** [1] - 120:16
**minimum** [1] - 107:16
**Minneapolis** [1] - 2:7
**Minnesota** [1] - 2:7
**minute** [1] - 87:10
**minutes** [4] - 64:22,
71:25, 72:3, 126:4
**misrepresent** [1] -
114:13

**misrepresenting** [1] -
109:4
**miss** [3] - 27:10,
40:18, 97:24
**missed** [1] - 112:20
**misunderstanding** [1]
- 85:4
**modifications** [4] -
89:1, 95:11, 95:12,
96:4
**modifiers** [2] - 96:6,
96:7
**modify** [2] - 29:11,
95:9
**moment** [8] - 5:11,
6:3, 35:7, 41:7, 46:1,
64:5, 65:6, 101:2
**moment's** [1] - 17:1
**Monday** [3] - 5:20,
30:17, 109:9
**money** [4] - 98:11,
107:21, 108:15,
108:16
**monitoring** [12] - 55:7,
55:14, 55:21, 55:24,
56:5, 56:12, 56:17,
56:25, 57:10, 58:2,
58:17, 63:6
**month** [5] - 10:17,
55:18, 58:10, 68:10,
68:22
**months** [6] - 61:12,
95:18, 95:20, 107:7
**morning** [1] - 57:8
**Morris** [2] - 4:18, 56:3
**MORRIS** [1] - 2:12
**most** [20] - 6:18, 20:8,
20:17, 23:9, 31:6,
42:2, 42:21, 48:20,
49:11, 68:6, 68:13,
69:23, 73:11, 75:18,
98:25, 107:23,
114:7, 118:23,
124:20
**motion** [19] - 39:13,
40:3, 40:13, 40:14,
41:10, 43:12, 44:25,
46:6, 46:10, 46:22,
47:12, 47:15, 48:12,
51:9, 51:14, 51:24,
51:25, 109:11
**motions** [15] - 38:16,
38:18, 38:25, 39:3,
39:21, 40:5, 40:12,
42:17, 43:21, 44:7,
46:5, 46:16, 48:19,
52:19, 52:20
**move** [3] - 24:25,
39:12, 94:10
**moved** [2] - 15:14,

42:23
**moving** [4] - 47:2,
55:9, 56:19, 67:4
**MR** [112] - 4:11, 4:13,
4:17, 5:1, 6:12, 8:5,
12:18, 13:1, 13:12,
13:15, 15:8, 15:11,
15:20, 15:23, 16:3,
16:20, 17:20, 18:12,
19:2, 19:4, 19:16,
19:18, 19:20, 21:1,
21:12, 21:15, 21:23,
22:8, 22:10, 23:2,
24:3, 24:6, 25:5,
25:18, 25:21, 26:5,
27:5, 27:7, 27:10,
27:11, 27:13, 27:17,
28:1, 28:3, 28:6,
29:18, 29:23, 30:13,
30:15, 30:19, 30:20,
30:24, 34:20, 34:22,
35:5, 38:10, 39:9,
40:4, 40:16, 40:24,
41:1, 43:8, 44:9,
45:2, 51:1, 51:18,
52:13, 55:10, 57:7,
58:24, 59:2, 62:2,
62:22, 63:23, 64:1,
64:8, 64:11, 65:2,
66:14, 67:11, 67:18,
67:25, 69:6, 70:11,
71:9, 75:11, 76:5,
76:12, 77:9, 78:15,
78:25, 81:20, 81:25,
83:2, 83:22, 85:9,
92:7, 100:5, 103:2,
103:5, 103:9,
104:12, 107:11,
108:8, 108:20,
117:11, 118:14,
118:19, 123:18,
125:23, 126:17,
126:19
**MS** [28] - 4:8, 4:21,
5:4, 5:7, 32:5, 37:6,
45:6, 46:2, 46:12,
46:24, 47:22, 48:17,
49:4, 49:17, 50:12,
50:17, 50:25, 52:22,
56:2, 59:18, 60:22,
61:7, 61:22, 87:22,
87:24, 88:19, 91:3,
115:5
**MSP** [4] - 63:8, 63:9,
63:13, 63:15
**multiple** [2] - 58:2,
97:9
**multitude** [1] - 98:9
**must** [3] - 56:15, 67:6,
87:1
**mute** [1] - 4:4

**muted** [1] - 39:11
**mutually** [1] - 93:16
**Mylan** [26] - 2:25, 5:2,
5:25, 6:5, 6:7, 6:14,
6:25, 8:1, 8:22, 9:6,
9:15, 10:10, 31:20,
41:12, 52:2, 73:20,
73:24, 87:9, 87:10,
95:6, 122:18,
122:22, 123:4,
123:6, 127:5, 127:9
**Mylan's** [2] - 5:23, 6:3

### N

**nail** [1] - 99:8
**name** [1] - 67:16
**narrow** [4] - 42:12,
100:14, 100:24,
106:3
**narrowed** [7] - 78:22,
85:13, 95:14, 95:15,
96:1, 98:21, 116:21
**narrowing** [4] - 34:11,
34:13, 36:16, 96:25
**National** [2] - 60:8,
60:12
**nature** [2] - 68:2, 79:1
**NDCs** [1] - 60:8
**NE** [1] - 2:17
**near** [1] - 6:10
**necessarily** [2] - 7:12,
84:8
**necessary** [2] - 11:2,
95:10
**need** [41] - 7:7, 14:15,
15:13, 17:6, 19:14,
20:10, 22:18, 23:4,
23:6, 24:20, 30:8,
32:20, 33:3, 33:9,
33:20, 34:1, 34:9,
34:10, 34:11, 34:13,
34:14, 34:18, 35:6,
36:12, 36:24, 37:12,
39:16, 44:2, 48:23,
49:25, 53:18, 55:23,
57:16, 66:3, 77:10,
77:12, 95:15,
100:14, 103:13,
118:15, 124:14
**needed** [5] - 23:12,
23:22, 29:2, 92:15,
118:3
**needs** [7] - 7:5, 16:6,
17:15, 30:11, 32:8,
40:21, 97:14
**negotiate** [5] - 85:11,
86:6, 89:8, 90:14,
115:24
**negotiated** [11] - 62:7,

72:5, 78:15, 87:13,
90:23, 95:1, 96:1,
98:16, 114:23,
115:21, 116:14
**negotiating** [9] -
31:14, 84:5, 89:21,
91:16, 94:19,
103:14, 106:23,
115:18, 115:25
**negotiation** [3] -
103:17, 103:18,
114:11
**negotiations** [14] -
16:5, 67:21, 68:9,
71:13, 72:6, 79:16,
83:4, 86:22, 88:10,
95:8, 104:18,
114:20, 115:4,
122:23
**never** [21] - 9:8, 9:18,
22:1, 70:1, 75:11,
75:21, 80:13, 80:19,
91:18, 91:20, 98:23,
113:17, 115:20,
117:8, 120:16,
120:18, 123:4,
123:6, 123:7, 123:10
**NEW** [1] - 1:1
**new** [8] - 33:19, 41:25,
86:15, 89:17, 95:25,
96:1, 101:5, 126:21
**New** [4] - 1:13, 1:19,
3:7, 18:7
**next** [20] - 10:16,
10:25, 15:11, 16:7,
17:19, 19:2, 19:11,
22:9, 25:17, 30:22,
36:1, 36:17, 37:21,
38:8, 47:20, 52:8,
58:25, 62:17, 63:20,
103:25
**nice** [1] - 12:13
**Nigh** [2] - 4:13, 35:13
**NIGH** [2] - 2:3, 4:13
**night** [1] - 29:12
**nobody** [2] - 21:24,
108:18
**noise** [1] - 4:4
**none** [3] - 30:15,
46:13, 99:1
**nonparties** [1] - 54:22
**nonresponsive** [31] -
6:4, 10:23, 66:12,
66:16, 66:17, 66:18,
66:24, 68:17, 68:24,
68:25, 69:15, 70:8,
72:12, 74:14, 75:6,
75:14, 76:2, 76:14,
76:23, 79:20, 79:25,
82:16, 107:14,

111:17, 111:21, 112:6, 112:11, 112:14, 120:14, 123:15, 124:22
**noodle** [1] - 66:23
**normal** [2] - 6:5, 22:18
**NORTON** [1] - 3:6
**note** [4] - 5:17, 42:6, 54:14, 69:20
**noted** [3] - 13:21, 95:6
**notes** [2] - 25:19, 66:10
**nothing** [11] - 24:18, 51:16, 53:7, 64:11, 73:15, 106:6, 114:5, 119:16, 119:21, 125:17
**nothing's** [1] - 85:15
**notice** [13] - 9:9, 17:2, 18:15, 18:19, 36:13, 38:4, 41:6, 41:7, 47:14, 48:1, 49:17, 53:23, 54:12
**notices** [5] - 17:25, 18:22, 30:23, 36:10, 38:2
**notify** [2] - 46:9, 49:6
**notion** [2] - 26:9, 88:14
**Novartis** [1] - 53:13
**November** [26] - 1:8, 4:1, 5:20, 7:3, 18:2, 31:22, 32:1, 42:22, 42:23, 44:13, 55:21, 55:25, 58:21, 63:17, 71:11, 71:13, 82:22, 83:19, 84:4, 85:23, 91:8, 97:12, 103:10, 115:7, 115:13, 128:3
**null** [1] - 7:4
**Number** [6] - 27:5, 35:8, 35:12, 83:23, 121:21, 124:15
**number** [16] - 21:18, 22:13, 33:1, 33:2, 34:7, 57:16, 60:12, 65:13, 66:2, 66:5, 73:4, 75:7, 77:2, 79:3, 89:13, 90:24
**NUMBER** [1] - 1:3
**numbers** [1] - 84:3
**numerous** [2] - 115:18, 119:9
**NY** [1] - 3:7

### O

**o'clock** [2] - 64:15, 64:20
**object** [6] - 19:21,

21:24, 26:6, 46:4, 52:3, 122:6
**objected** [1] - 26:7
**objection** [14] - 6:2, 14:19, 15:17, 15:20, 16:21, 18:25, 21:10, 32:4, 50:19, 52:2, 56:1, 62:6, 62:12, 64:14
**objectionable** [1] - 54:1
**objections** [22] - 38:4, 41:12, 42:7, 42:14, 42:17, 44:7, 44:17, 47:17, 47:21, 49:8, 49:13, 49:18, 49:20, 49:23, 50:6, 51:5, 52:5, 53:3, 54:21, 55:2, 73:23, 87:19
**objective** [1] - 104:4
**obligation** [2] - 79:5, 102:21
**obligations** [4] - 92:11, 107:13, 108:1, 108:6
**observation** [1] - 12:9
**obtained** [1] - 39:16
**obvious** [1] - 22:24
**obviously** [34] - 5:19, 6:21, 7:13, 8:6, 8:13, 8:17, 9:20, 18:5, 22:25, 23:4, 36:9, 40:5, 45:16, 48:10, 53:6, 69:6, 71:11, 71:12, 74:21, 76:13, 79:14, 80:3, 82:13, 83:23, 84:2, 86:14, 97:22, 102:22, 108:23, 111:6, 114:2, 114:15, 117:18, 125:2
**occurred** [6] - 97:10, 100:17, 102:5, 102:10, 126:13
**occurs** [2] - 20:13, 20:16
**October** [21] - 32:15, 32:16, 58:3, 59:5, 61:5, 61:11, 79:6, 79:7, 101:6, 108:23, 108:25, 109:2, 109:8, 109:11, 114:2, 116:16, 119:23, 119:24, 121:12
**odd** [1] - 73:20
**odds** [1] - 17:4
**OF** [1] - 1:1
**off-site** [1] - 60:11
**offer** [1] - 80:20

**offered** [4] - 86:15, 101:14, 113:13, 113:15
**offhand** [1] - 61:9
**office** [2] - 20:4, 91:4
**Official** [1] - 1:23
**oil** [1] - 61:1
**old** [2] - 60:5, 60:11
**omnibus** [2] - 43:12, 47:15
**ON** [1] - 1:5
**once** [6] - 18:9, 75:14, 94:5, 102:16, 106:24
**One** [1] - 2:24
**one** [59] - 5:13, 5:17, 6:23, 7:22, 10:24, 11:11, 12:8, 13:14, 13:17, 16:12, 16:24, 22:7, 24:15, 26:22, 27:5, 28:13, 28:14, 35:22, 37:13, 39:15, 41:14, 43:12, 44:2, 45:13, 46:4, 46:14, 46:24, 47:15, 47:19, 48:17, 51:8, 63:4, 64:13, 65:6, 75:4, 76:1, 78:9, 78:17, 78:20, 80:8, 81:16, 86:4, 88:8, 91:17, 95:24, 99:16, 99:17, 99:20, 103:6, 110:19, 113:24, 116:6, 122:17, 125:6, 126:23
**ones** [1] - 57:11
**ongoing** [3] - 6:18, 32:21, 89:6
**online** [1] - 27:23
**onus** [2] - 91:12, 91:23
**open** [5] - 17:17, 93:14, 121:24, 125:24, 126:8
**OPEN** [1] - 4:1
**open-ended** [2] - 125:24, 126:8
**openness** [1] - 92:22
**operate** [2] - 26:17, 29:6
**operating** [2] - 26:11, 33:13
**opportunity** [10] - 37:4, 74:2, 74:4, 88:13, 89:4, 104:10, 105:13, 123:2, 125:3, 125:10
**opposed** [2] - 26:3, 30:25, 117:23
**options** [2] - 9:5, 101:17

**ORAL** [1] - 1:5
**oral** [4] - 5:14, 64:13, 64:15, 66:2
**orchestrated** [1] - 37:16
**orchestrating** [1] - 37:12
**order** [57] - 11:4, 11:7, 11:21, 11:24, 16:25, 17:25, 19:23, 34:24, 34:25, 35:1, 39:12, 40:14, 41:11, 41:21, 43:21, 44:25, 45:19, 46:5, 46:22, 47:13, 48:12, 51:9, 51:15, 51:24, 52:6, 52:10, 54:9, 54:15, 56:13, 56:19, 57:19, 57:22, 59:4, 61:12, 61:16, 73:1, 73:17, 75:5, 76:2, 83:5, 85:3, 85:5, 87:7, 87:10, 87:15, 87:19, 88:4, 88:6, 88:10, 88:24, 95:19, 104:8, 106:14, 107:24, 122:8, 125:18, 125:19
**ordered** [7] - 5:24, 54:5, 55:1, 59:16, 59:23, 78:12, 87:11
**ordering** [1] - 17:18
**orderly** [1] - 33:22
**orders** [4] - 16:15, 48:19, 61:3, 112:4
**organization** [5] - 18:8, 41:17, 42:13, 43:1, 43:5
**original** [1] - 96:4
**Orleans** [1] - 1:19
**otherwise** [1] - 67:1
**ought** [1] - 44:21
**ourselves** [1] - 9:12
**outcome** [1] - 107:21
**outlined** [1] - 119:24
**outset** [2] - 12:8, 84:16
**outside** [5] - 44:23, 45:1, 46:23, 49:22, 52:9
**over-argue** [1] - 93:9
**overcome** [1] - 25:25
**overlap** [6] - 15:4, 34:9, 38:20, 43:13, 43:16, 44:4
**overlapping** [5] - 14:11, 14:22, 33:21, 34:18, 47:16
**overly** [1] - 53:1
**overrule** [1] - 39:13

**own** [3] - 43:16, 78:2, 107:15
**Oxford** [1] - 2:24

### P

**P.C** [1] - 3:2
**p.m** [3] - 1:8, 4:1, 127:22
**PA** [1] - 3:4
**Pacer** [1] - 34:24
**Pacific** [1] - 2:10
**package** [1] - 51:13
**PACKARD** [1] - 2:9
**Page** [9] - 12:4, 12:15, 13:21, 25:22, 30:23, 38:5, 39:22, 55:7, 116:16
**page** [5] - 25:20, 59:1, 67:17
**pages** [8] - 55:8, 59:21, 71:23, 122:3, 126:1, 126:16, 126:17, 127:14
**painted** [1] - 105:16
**PAPANTONIO** [1] - 2:2
**paper** [2] - 71:22, 121:20
**papers** [9] - 65:24, 66:3, 66:12, 67:4, 72:2, 82:6, 88:25, 105:14, 122:4
**paragraph** [2] - 24:16, 26:14
**parallel** [1] - 56:23
**parameters** [1] - 101:11
**PAREKH** [3] - 2:9, 103:5, 103:9
**Parekh** [4] - 6:21, 89:10, 103:5, 115:7
**Park** [1] - 2:21
**Parkway** [1] - 1:13, 3:3
**parliamentary** [1] - 126:22
**part** [10] - 13:3, 23:25, 34:15, 51:20, 52:18, 72:24, 76:18, 78:11, 94:22, 105:2
**participate** [8] - 20:23, 21:11, 21:19, 21:20, 22:1, 50:4, 50:10, 50:18
**participated** [1] - 66:2
**participating** [3] - 20:15, 20:18, 22:20
**particular** [3] - 36:20, 44:5, 97:4

**parties** [84] - 4:18, 6:2, 7:10, 7:25, 8:10, 10:4, 10:10, 10:11, 10:20, 12:2, 12:10, 12:11, 12:13, 13:6, 13:18, 14:7, 14:16, 15:15, 16:15, 17:9, 19:1, 19:9, 19:14, 23:7, 26:10, 28:7, 30:2, 31:9, 31:24, 36:19, 37:1, 37:20, 37:23, 38:7, 38:24, 41:15, 41:17, 42:15, 42:22, 43:3, 43:22, 44:7, 44:17, 44:23, 44:25, 45:10, 47:14, 48:20, 49:19, 50:11, 50:24, 51:4, 51:8, 54:22, 54:25, 56:3, 57:12, 62:9, 63:3, 63:9, 63:16, 63:19, 63:24, 65:25, 66:6, 70:16, 71:2, 72:8, 74:23, 75:9, 77:22, 78:19, 84:10, 85:10, 85:25, 87:6, 87:13, 87:15, 92:11, 99:15, 116:14, 125:3, 125:6
**parties'** [4] - 15:6, 48:6, 87:20, 125:17
**parts** [1] - 76:7
**party** [22] - 11:1, 21:25, 38:12, 38:15, 42:3, 43:6, 43:11, 46:4, 46:22, 47:12, 48:10, 48:13, 50:7, 51:8, 51:22, 53:24, 54:19, 55:5, 61:19, 92:23, 97:7, 97:13
**party's** [1] - 41:25
**patent** [1] - 118:5
**path** [3] - 90:23, 103:21, 115:17
**paused** [1] - 126:19
**PC** [1] - 1:15
**Pennsylvania** [3] - 1:16, 2:14, 2:24
**Pensacola** [1] - 2:4
**people** [10] - 20:17, 21:10, 21:18, 28:11, 29:1, 35:20, 35:21, 65:6
**percent** [18] - 16:14, 22:11, 22:21, 22:23, 23:8, 23:11, 23:12, 23:13, 23:21, 24:1, 24:13, 24:21, 24:22, 43:4, 68:25, 110:21, 110:25, 123:9
**perfect** [2] - 43:10,

84:2
**perfectly** [2] - 32:3, 63:25
**perhaps** [7] - 8:18, 9:20, 31:25, 36:25, 39:11, 91:23, 108:24
**period** [2] - 89:8, 124:12
**permit** [1] - 67:6
**permits** [1] - 67:5
**permitted** [1] - 49:23
**person** [12] - 19:7, 19:13, 20:21, 20:22, 21:11, 21:19, 24:12, 32:17, 35:2, 35:22, 48:16, 88:22
**personal** [4] - 24:7, 34:4, 34:10, 34:14
**personally** [2] - 39:12, 102:11
**perspective** [9] - 34:23, 59:20, 75:13, 86:1, 86:16, 90:10, 101:21, 103:20, 117:5
**persuasive** [1] - 58:12
**Pharma** [4] - 2:19, 3:4, 3:5
**Pharmaceutical** [1] - 2:18
**Pharmaceuticals** [2] - 2:18, 5:2
**Philadelphia** [2] - 1:16, 2:14
**phone** [2] - 4:4, 38:22
**phrase** [1] - 19:6
**physicians** [1] - 20:3
**pick** [1] - 98:4
**picking** [1] - 97:22
**picture** [1] - 105:16
**pictures** [1] - 116:24
**Piedmont** [1] - 2:17
**PIETRAGALLO** [1] - 2:23
**Pittsburgh** [1] - 2:24
**place** [8] - 21:22, 23:19, 33:8, 50:22, 86:23, 100:10, 102:17, 123:1
**placed** [3] - 22:25, 91:12, 92:11
**plain** [1] - 96:19
**plaintiff** [17] - 4:7, 7:7, 7:12, 11:17, 21:8, 48:14, 55:21, 61:4, 63:11, 70:12, 71:6, 82:6, 90:20, 99:13, 111:22, 116:5, 117:8
**Plaintiff** [6] - 1:14, 1:17, 1:20, 2:4, 2:8,

2:11
**plaintiffs** [118] - 4:6, 4:9, 4:12, 4:14, 5:25, 6:7, 6:17, 7:14, 8:4, 10:7, 10:14, 10:21, 11:8, 11:13, 11:14, 13:25, 18:13, 18:20, 21:4, 21:10, 24:19, 26:8, 32:16, 33:3, 34:1, 36:3, 37:9, 39:2, 41:5, 42:10, 47:17, 49:6, 50:17, 50:18, 51:4, 51:11, 51:16, 51:22, 52:7, 53:24, 54:16, 54:23, 55:7, 55:15, 55:24, 56:14, 57:1, 57:4, 57:8, 57:10, 57:20, 57:23, 58:2, 58:15, 58:16, 58:17, 59:3, 60:2, 60:17, 60:18, 63:6, 64:11, 69:4, 69:9, 70:21, 73:1, 73:12, 74:17, 74:21, 75:6, 77:17, 77:24, 78:2, 78:18, 82:22, 83:8, 83:14, 88:1, 89:9, 90:15, 90:25, 91:14, 92:1, 92:6, 94:3, 94:7, 94:8, 99:5, 106:13, 106:14, 106:20, 107:9, 108:13, 110:2, 111:16, 112:9, 112:17, 114:24, 114:25, 115:10, 115:14, 115:17, 115:20, 116:11, 116:19, 116:24, 116:25, 118:13, 119:18, 119:21, 120:13, 120:25, 122:6, 123:3, 123:7, 125:11
**plaintiffs'** [17] - 7:2, 39:14, 43:17, 44:19, 59:8, 67:2, 72:11, 83:7, 90:10, 90:22, 92:2, 96:21, 99:9, 99:24, 100:3, 117:5, 117:9
**plan** [1] - 55:22
**plate** [1] - 39:3
**platform** [1] - 86:7
**playing** [1] - 111:9
**pleased** [1] - 12:10
**plenty** [1] - 61:13
**PLLC** [1] - 2:5
**point** [75] - 6:15, 7:17, 8:16, 12:21, 14:2,

14:6, 19:11, 20:2, 22:23, 23:5, 23:14, 32:23, 33:7, 33:11, 35:2, 35:20, 46:14, 63:9, 67:4, 68:11, 68:12, 68:15, 68:18, 68:19, 68:21, 68:23, 71:14, 72:7, 75:17, 75:25, 79:4, 79:8, 79:13, 79:16, 80:1, 82:1, 82:8, 88:21, 89:21, 91:5, 93:10, 94:13, 95:19, 99:11, 100:13, 100:22, 101:9, 101:18, 101:20, 101:21, 102:9, 108:22, 109:5, 110:5, 110:7, 110:8, 110:13, 111:21, 112:20, 114:17, 115:16, 116:6, 117:7, 118:7, 120:25, 121:1, 121:2, 121:6, 121:14, 122:7, 122:17, 126:22, 127:2, 127:9
**pointed** [2] - 78:6, 116:11
**pointing** [1] - 117:6
**points** [15] - 5:16, 32:6, 77:25, 78:1, 90:7, 93:9, 93:10, 108:20, 113:5, 114:22, 115:4, 116:2, 117:12, 118:20, 124:15
**pool** [1] - 78:21
**population** [1] - 110:24
**portion** [1] - 65:10
**position** [27] - 6:13, 6:24, 7:24, 8:8, 8:15, 13:10, 57:5, 67:8, 78:13, 79:9, 81:14, 81:19, 83:15, 91:20, 92:2, 94:2, 99:19, 99:24, 100:3, 100:10, 100:12, 102:11, 103:16, 111:6, 117:10, 123:11
**positions** [1] - 125:17
**positive** [1] - 36:21
**possession** [2] - 40:7, 41:24
**possibility** [5] - 75:16, 81:22, 81:25, 100:2, 102:2, 102:3, 102:8, 102:18

**possible** [5] - 44:21, 123:18, 123:24, 124:17, 125:7
**possibly** [3] - 4:20, 44:1, 70:4
**post** [1] - 88:6
**post-order** [1] - 88:6
**postponed** [1] - 15:13
**posture** [1] - 30:25
**potential** [2] - 26:20, 93:13
**potentially** [9] - 23:17, 28:17, 35:21, 73:14, 74:13, 98:25, 101:13, 104:9, 107:16
**pour** [1] - 60:13
**practical** [1] - 57:15
**practice** [1] - 28:7
**preclude** [3] - 20:11, 21:7, 117:2
**predict** [1] - 26:12
**predictive** [1] - 80:9
**prefer** [3] - 16:13, 107:12, 126:15
**preference** [2] - 31:17, 66:3
**preferred** [1] - 27:21
**prefers** [1] - 15:23
**prejudice** [4] - 65:18, 108:13, 115:20, 115:24
**prejudiced** [3] - 10:21, 54:17, 73:24
**premature** [1] - 36:9
**preparations** [1] - 8:15
**prepare** [1] - 18:6
**present** [1] - 19:4
**presented** [3] - 95:2, 102:25, 105:14
**preserve** [2] - 42:7, 42:13
**preserving** [1] - 26:3
**presumably** [2] - 6:10, 31:19
**presumption** [2] - 24:14, 24:22
**presumptive** [3] - 22:11, 23:23, 94:18
**presuppose** [1] - 36:18
**pretty** [3] - 25:12, 32:1, 71:24
**prevent** [3] - 20:15, 24:19, 51:16
**prevented** [1] - 53:5
**previously** [1] - 32:24
**pricing** [2] - 30:4, 30:7
**primarily** [1] - 32:17

**primary** [2] - 20:2, 30:2
**primrose** [1] - 90:22
**principles** [1] - 97:15
**prioritization** [2] - 84:19, 110:3
**prioritize** [2] - 68:10, 96:20
**prioritizing** [1] - 68:3
**priority** [4] - 34:3, 68:14, 68:21, 79:20
**privacy** [1] - 45:13
**privileged** [2] - 54:3, 120:6
**probability** [1] - 81:23
**problem** [5] - 6:8, 15:7, 20:21, 63:18, 100:8
**problems** [5] - 8:14, 22:17, 35:4, 71:20, 101:24
**procedure** [2] - 91:22, 126:23
**proceed** [9] - 11:20, 15:16, 16:11, 54:16, 55:19, 55:22, 56:7, 56:22, 97:19
**proceeded** [1] - 117:1
**proceeding** [1] - 31:14
**Proceedings** [1] - 1:25
**proceedings** [1] - 127:25
**process** [34] - 9:4, 10:1, 18:15, 18:17, 36:16, 36:18, 69:1, 69:4, 72:6, 72:19, 76:15, 85:14, 85:22, 86:3, 89:6, 95:17, 97:1, 98:23, 104:21, 105:12, 108:9, 109:16, 109:23, 110:5, 111:4, 117:22, 118:2, 118:12, 119:4, 121:6, 121:23, 122:3, 122:4, 124:17
**processes** [1] - 34:15
**produce** [12] - 6:3, 8:2, 61:10, 61:16, 74:6, 74:10, 92:23, 94:1, 97:7, 108:2, 124:22
**produced** [11] - 1:25, 7:3, 7:5, 45:10, 45:15, 46:13, 59:10, 59:21, 68:14, 73:12, 119:6
**produces** [1] - 107:14
**producing** [1] - 92:23

**production** [15] - 5:18, 6:5, 6:15, 8:18, 39:6, 44:12, 45:18, 59:15, 60:21, 61:12, 69:15, 75:13, 100:25, 112:23, 120:13
**productions** [5] - 59:1, 59:7, 59:11, 59:12, 127:2
**productive** [1] - 6:20
**PRODUCTS** [1] - 1:3
**program** [1] - 104:14
**progress** [1] - 89:10
**Progressive** [5] - 112:16, 112:19, 112:24, 113:4
**prohibit** [1] - 21:20
**prominently** [1] - 112:17
**promised** [1] - 31:4
**promote** [1] - 85:17
**promoted** [1] - 86:7
**prompt** [1] - 125:8
**promptly** [4] - 32:16, 59:17, 65:16, 65:22
**proper** [1] - 104:22
**properly** [2] - 52:4, 52:10
**proportionality** [10] - 67:7, 78:7, 78:10, 92:5, 93:2, 112:2, 113:6, 122:11, 122:12, 122:13
**proposal** [6] - 26:15, 27:20, 29:9, 32:12, 109:7, 122:19
**propose** [3] - 22:3, 23:8, 52:13
**proposed** [6] - 7:9, 62:24, 72:2, 90:17, 96:4, 120:4
**proposing** [2] - 71:23, 90:11
**proposition** [2] - 97:6, 112:25
**propound** [1] - 57:24
**prospect** [1] - 100:2
**protected** [1] - 98:13
**protection** [1] - 45:13
**protections** [2] - 98:9, 98:12
**protective** [12] - 40:14, 41:11, 43:21, 44:25, 46:4, 46:22, 47:12, 48:12, 48:19, 51:9, 51:15, 51:24
**protects** [1] - 55:3
**protocol** [101] - 9:18, 12:1, 12:6, 12:21, 13:11, 14:14, 14:16,

19:23, 20:8, 23:25, 26:15, 30:16, 31:15, 67:5, 67:10, 67:12, 67:13, 69:4, 69:10, 69:13, 69:16, 69:18, 69:21, 69:23, 70:4, 70:6, 70:15, 70:16, 70:22, 70:23, 71:2, 71:7, 74:19, 74:24, 76:21, 77:22, 78:4, 78:7, 78:12, 78:14, 78:19, 79:10, 79:23, 81:11, 81:15, 84:7, 84:10, 86:11, 90:21, 91:8, 91:21, 92:5, 92:10, 92:14, 93:3, 97:13, 97:17, 97:25, 98:10, 98:16, 99:5, 99:15, 100:4, 100:21, 101:4, 101:9, 101:18, 104:18, 106:1, 106:5, 106:8, 106:19, 108:8, 108:9, 111:16, 113:8, 113:9, 113:11, 113:14, 113:15, 113:19, 113:25, 114:8, 117:15, 117:16, 117:19, 118:10, 119:20, 119:22, 119:23, 120:7, 120:11, 120:13, 120:20, 120:23, 121:8, 123:10, 123:14, 125:13, 126:21, 126:24
**protocols** [4] - 31:21, 70:19, 76:22, 117:21
**provide** [9] - 14:10, 29:19, 49:8, 49:17, 69:9, 92:21, 92:24, 110:18, 111:2
**provided** [6] - 31:13, 52:9, 94:18, 108:25, 109:8, 117:19
**providing** [1] - 49:7
**provision** [2] - 23:1, 25:23
**provisions** [1] - 105:1
**pull** [4] - 46:24, 89:23, 90:3, 107:6
**purchase** [2] - 59:22, 59:23
**pure** [2] - 49:19, 92:5
**purpose** [1] - 88:5
**purposes** [2] - 82:5, 84:19
**pursuant** [4] - 13:23,

14:2, 14:8, 53:11
**put** [28] - 4:4, 9:18, 10:19, 12:6, 14:14, 21:21, 23:3, 23:7, 26:1, 33:20, 44:13, 46:9, 49:2, 55:15, 56:24, 61:17, 62:9, 62:16, 82:5, 88:25, 90:18, 100:10, 102:17, 105:10, 114:5, 117:19, 121:20
**puts** [1] - 92:8
**putting** [1] - 64:5

## Q

**qualified** [3] - 81:6, 103:24, 104:1
**quarantine** [1] - 46:17
**quarantined** [3] - 51:11, 52:14, 53:12
**quash** [1] - 42:17
**questioning** [4] - 13:7, 14:21, 15:3, 15:6
**questions** [12] - 4:25, 29:10, 31:6, 65:13, 66:5, 66:9, 69:19, 97:4, 97:5, 97:10, 97:22, 105:17
**quick** [2] - 5:16, 66:11
**quickly** [2] - 5:22, 12:24
**quiet** [1] - 97:21
**quite** [5] - 19:21, 33:1, 33:2, 40:11, 120:5
**quote** [8] - 6:4, 51:24, 87:14, 98:24, 99:22, 101:23, 124:22, 126:23
**quoted** [1] - 13:19
**quoting** [1] - 93:22

## R

**radar** [1] - 62:16
**radically** [1] - 58:20
**raise** [7] - 41:3, 41:18, 42:14, 42:24, 43:17, 50:19, 73:23
**raised** [13] - 37:8, 39:22, 45:16, 51:24, 52:2, 62:6, 71:17, 73:20, 79:4, 83:19, 87:9, 102:8, 103:10
**ran** [2] - 99:5, 106:12
**RASPANTI** [1] - 2:23
**rather** [5] - 21:11, 24:12, 60:12, 67:6, 116:21
**rattle** [1] - 35:9

**RE** [1] - 1:3
**reach** [14] - 7:11, 32:11, 34:11, 45:22, 62:17, 63:13, 63:16, 67:22, 68:11, 68:23, 69:14, 72:9, 110:7, 123:7
**reached** [16] - 6:15, 10:12, 56:3, 57:8, 68:12, 68:21, 79:7, 79:17, 82:7, 100:20, 108:21, 108:22, 110:5, 111:8, 121:14, 123:5
**read** [12] - 38:17, 40:11, 65:24, 66:3, 72:1, 78:20, 88:24, 92:16, 99:17, 101:23, 106:4, 117:13
**reading** [1] - 93:20
**ready** [4] - 18:7, 31:21, 65:19, 107:4
**real** [4] - 43:18, 66:11, 71:20, 86:25
**realistic** [1] - 124:11
**reality** [9] - 21:12, 76:17, 79:15, 86:21, 112:19, 113:18, 114:5, 114:22, 119:8
**realize** [1] - 39:3
**realized** [4] - 79:1, 100:8, 100:14, 100:18
**really** [32] - 7:13, 8:19, 18:13, 19:12, 20:10, 23:24, 26:10, 26:16, 36:25, 49:21, 53:18, 58:17, 66:22, 74:20, 80:2, 84:22, 88:14, 93:12, 93:18, 94:22, 99:8, 100:17, 105:16, 107:19, 110:10, 111:10, 111:24, 112:7, 112:12, 124:24, 126:1, 126:15
**reason** [13] - 9:6, 16:4, 24:12, 26:16, 27:23, 33:18, 37:8, 56:7, 56:9, 56:24, 90:11, 91:12, 98:16
**reasonable** [12] - 22:13, 39:7, 46:19, 49:15, 73:10, 74:5, 74:6, 81:22, 82:3, 86:8, 100:2
**reasonableness** [2] - 44:22, 53:21
**reasoned** [1] - 84:5

**reasons** [4] - 10:22, 15:13, 22:24, 112:8
**Rebecca** [2] - 4:20, 56:2
**REBECCA** [1] - 2:13
**receive** [8] - 49:6, 49:8, 49:18, 51:4, 53:22, 53:23, 54:7, 54:24
**received** [9] - 5:13, 5:22, 11:12, 38:17, 51:6, 51:7, 54:10, 54:13, 123:7
**recently** [1] - 6:19
**Recess** [1] - 64:24
**recipe** [1] - 114:4
**recognize** [2] - 44:19, 53:15
**recognized** [3] - 36:11, 106:22, 109:15
**recognizing** [1] - 97:6
**recommendations** [1] - 80:10
**record** [20] - 4:2, 13:9, 32:14, 65:8, 74:20, 75:22, 88:14, 95:21, 97:4, 98:1, 98:15, 105:21, 108:12, 109:25, 114:3, 114:19, 115:5, 116:9, 123:10, 127:25
**recorded** [1] - 1:25
**red** [3] - 12:20, 13:3, 27:14
**Redondo** [1] - 2:10
**reduce** [7] - 24:25, 81:18, 81:23, 82:23, 83:14, 87:7, 99:18
**reduced** [1] - 90:24
**reducing** [2] - 96:7
**reduction** [1] - 83:6
**refer** [1] - 57:20
**reference** [1] - 116:16
**referenced** [1] - 80:3
**referendum** [3] - 104:14, 105:19, 105:20
**referred** [1] - 34:24
**referring** [1] - 120:10
**reflect** [1] - 116:9
**refreshing** [1] - 9:8
**refused** [4] - 42:11, 111:16, 112:25
**regard** [12] - 12:5, 17:23, 27:6, 50:7, 55:13, 59:25, 60:6, 62:1, 97:11, 116:12, 117:6, 124:24

**regarding** [7] - 13:4, 31:3, 48:13, 51:15, 65:13, 70:17, 70:20
**relates** [1] - 67:6
**relationship** [1] - 40:8
**relayed** [1] - 7:24
**relevance** [2] - 52:6, 53:15
**relevant** [10] - 7:2, 41:22, 52:21, 53:18, 68:6, 96:9, 98:25, 107:16, 108:7
**relief** [2] - 5:23, 107:9
**remain** [1] - 7:4
**remarkably** [1] - 122:2
**remember** [7] - 16:14, 40:12, 74:7, 74:25, 75:3, 101:1, 110:22
**reminded** [1] - 58:13
**remotely** [4] - 20:19, 20:24, 21:11, 21:20
**renoticed** [1] - 14:9
**repeat** [1] - 13:9
**reply** [1] - 49:1
**report** [3] - 45:2, 63:17, 68:3
**REPORTER** [2] - 64:18, 65:5
**reporter** [5] - 27:6, 27:16, 28:19, 30:2, 127:18
**Reporter** [1] - 1:23
**Reporter/Transcriber** [1] - 128:1
**reporters** [1] - 29:25
**reporting** [5] - 28:9, 28:12, 29:3, 29:16, 98:19
**reports** [4] - 88:3, 88:13, 116:25
**repository** [2] - 28:14, 28:15
**representation** [1] - 104:7
**representative** [4] - 35:17, 56:9, 56:13, 56:25
**representatives** [4] - 17:23, 56:5, 56:17, 62:25
**represented** [1] - 42:18
**representing** [2] - 5:2, 47:25
**reps** [2] - 18:9, 36:22
**request** [4] - 37:12, 49:5, 49:15, 56:4
**requested** [2] - 47:3, 56:17

**requesting** [2] - 5:23, 31:1
**requests** [21] - 24:16, 50:6, 55:6, 56:6, 56:8, 56:11, 57:9, 57:23, 58:1, 58:4, 59:8, 62:7, 62:10, 62:24, 63:2, 63:5, 63:7, 63:8, 63:12, 63:14, 67:2
**require** [6] - 16:25, 84:8, 84:9, 86:6, 112:14, 124:1
**required** [7] - 17:12, 67:10, 78:4, 92:22, 101:9, 101:17, 112:18
**requirement** [1] - 121:24
**requires** [5] - 70:16, 71:2, 77:22, 78:19, 99:15
**requiring** [2] - 11:1, 61:12
**resolution** [5] - 6:1, 7:11, 21:16, 22:5, 62:17
**resolve** [3] - 39:1, 44:11
**resolved** [3] - 7:21, 63:19, 63:21
**resolves** [1] - 52:14
**resort** [1] - 26:18
**resources** [6] - 29:1, 29:7, 48:6, 61:2, 61:18, 62:8
**respect** [18] - 14:17, 14:24, 16:22, 17:14, 63:9, 68:20, 69:14, 72:21, 80:14, 109:1, 110:13, 114:7, 114:11, 118:20, 118:21, 120:20, 122:18, 126:2
**respected** [1] - 94:7
**respectfully** [6] - 73:18, 74:3, 80:12, 80:25, 84:14, 121:16
**respond** [22] - 24:4, 34:20, 39:2, 39:7, 39:14, 39:20, 42:16, 42:20, 44:24, 47:6, 47:10, 47:18, 48:14, 48:16, 49:1, 63:4, 63:6, 63:8, 63:11, 71:4, 71:8, 126:4
**responded** [4] - 47:7, 57:11, 63:10, 80:20
**responding** [1] - 115:11

**responds** [1] - 48:16
**response** [7] - 19:23, 42:21, 42:22, 43:18, 45:20, 50:7, 99:20
**RESPONSE** [1] - 127:21
**responses** [5] - 43:2, 43:3, 49:8, 49:18, 63:14
**responsibility** [1] - 55:10
**responsible** [3] - 32:17, 32:21, 37:8
**responsive** [18] - 6:16, 7:2, 61:16, 66:22, 67:1, 68:13, 73:11, 73:16, 74:10, 76:24, 77:1, 82:15, 110:23, 110:25, 113:22, 119:5, 119:15
**responsiveness** [2] - 7:20, 66:17
**responsiveness/relevancy** [1] - 97:8
**restrictions** [1] - 17:8
**result** [2] - 51:20, 114:3
**resulted** [2] - 77:1, 83:5
**resumé** [1] - 80:9
**retailer** [1] - 5:8
**retailers** [1] - 59:7
**retention** [1] - 59:24
**retry** [1] - 94:6
**return** [1] - 59:25
**revealed** [1] - 77:1
**revealing** [1] - 120:5
**review** [31] - 6:15, 6:18, 7:6, 7:7, 7:17, 10:5, 68:20, 72:24, 73:17, 75:6, 76:2, 76:14, 76:20, 76:22, 81:18, 81:24, 82:24, 83:25, 88:16, 100:24, 102:19, 104:9, 104:10, 108:6, 112:5, 116:23, 116:25, 117:1, 119:13, 123:16
**reviewed** [10] - 54:11, 70:8, 72:23, 73:4, 79:3, 99:18, 109:22, 119:3, 119:13, 120:1
**reviewing** [7] - 54:18, 59:12, 74:13, 76:16, 86:17, 109:20, 109:21
**reviews** [2] - 89:11, 97:8

**revised** [1] - 31:13
**revisions** [1] - 87:14
**rid** [1] - 96:6
**ride** [1] - 108:18
**ripe** [3] - 23:24, 42:20, 62:3
**Rite** [1] - 5:8
**RMR** [1] - 128:1
**Road** [1] - 2:17
**road** [6] - 15:24, 86:2, 94:5, 106:24, 122:16
**robust** [11] - 69:23, 70:4, 75:18, 76:15, 77:4, 104:20, 109:6, 113:19, 114:7, 117:21, 125:15
**role** [2] - 81:12, 93:6
**roll** [1] - 12:13
**rolling** [2] - 61:19, 127:2
**room** [6] - 19:10, 19:14, 103:9, 103:20, 105:15, 127:8
**ROSE** [1] - 3:6
**Roseland** [1] - 1:13
**rotating** [1] - 33:16
**roughly** [1] - 68:23
**round** [1] - 59:3
**rounds** [2] - 76:25, 113:22
**rows** [1] - 59:22
**rubber** [1] - 106:23
**Rubinstein** [1] - 115:12
**rule** [9] - 11:6, 17:15, 18:21, 37:17, 65:12, 67:6, 107:3, 107:5, 126:6
**Rule** [3] - 17:24, 57:9, 62:23
**ruled** [2] - 51:5, 89:22
**rules** [6] - 49:24, 51:12, 53:24, 54:11, 84:13, 84:15
**ruling** [8] - 10:12, 18:23, 32:16, 65:16, 65:18, 65:23, 67:9, 125:14
**rulings** [2] - 31:1, 32:8
**run** [12] - 85:17, 88:3, 88:13, 89:20, 90:4, 96:16, 96:20, 98:20, 104:24, 119:25, 123:22
**running** [7] - 22:14, 48:8, 96:2, 96:5, 96:17, 102:17, 117:25
**runs** [1] - 88:13

# S

sake [3] - 52:23, 77:15, 77:16
sales [2] - 59:22, 59:24
sample [5] - 88:3, 88:13, 94:15, 98:3, 119:25
sampled [1] - 94:24
sanctions [1] - 107:22
SARAH [1] - 2:20
Sarah [1] - 9:5
satisfactory [3] - 7:11, 26:23, 26:24
satisfied [2] - 7:19, 10:7, 70:23
satisfy [1] - 7:7
save [3] - 11:14, 35:5, 98:10
scenario [3] - 100:6, 101:19
schedule [8] - 34:18, 44:14, 45:18, 54:21, 57:6, 57:16, 58:19, 58:23
scheduled [2] - 26:1, 36:3
schedules [1] - 32:10
scheduling [8] - 28:10, 31:10, 32:22, 32:24, 34:17, 35:19, 36:23, 39:6
SCHNEIDER [1] - 1:9
Schneider [2] - 65:1, 83:18
Schwartz [1] - 4:20
scientific [1] - 25:7
scope [5] - 41:20, 42:12, 45:18, 52:5, 79:22
seamlessly [1] - 28:23
search [76] - 70:18, 70:19, 71:13, 74:2, 79:1, 79:2, 82:2, 83:5, 83:6, 83:13, 83:17, 83:24, 83:25, 84:3, 84:22, 85:2, 85:6, 85:8, 85:11, 85:12, 85:17, 85:18, 85:23, 86:6, 87:7, 87:11, 87:20, 88:9, 88:12, 89:1, 89:16, 89:22, 90:4, 90:14, 90:16, 90:23, 91:1, 91:9, 91:16, 93:7, 94:1, 94:10, 94:12, 94:19, 94:25, 95:3, 95:9, 95:14, 95:25, 96:1, 96:4, 103:14,

103:18, 103:21, 104:24, 107:18, 108:8, 113:1, 113:20, 114:11, 114:20, 115:4, 115:18, 115:19, 115:21, 116:21, 117:23, 118:2, 118:3, 118:6, 119:10, 119:14, 119:16, 123:22
searches [2] - 96:2, 96:5
seats [1] - 19:15
second [3] - 27:21, 106:4, 115:16
Second [1] - 5:21
Section [3] - 15:11, 25:18, 27:5
section [3] - 13:1, 13:3, 36:17
sections [1] - 12:23
Sedona [1] - 97:15
see [16] - 12:13, 14:16, 14:18, 15:7, 19:22, 25:18, 33:15, 47:1, 54:3, 56:6, 63:16, 66:5, 97:21, 107:18, 118:10, 127:11
seed [3] - 72:17, 72:20, 109:19
seeing [3] - 49:14, 53:5, 60:10
seek [1] - 41:21
seeking [1] - 49:22
seem [9] - 13:21, 14:12, 18:20, 38:19, 48:9, 53:1, 65:6, 73:23, 97:23
segregate [2] - 46:6, 54:6
send [3] - 45:20, 48:1, 53:8
sense [12] - 6:14, 14:13, 20:20, 20:25, 40:22, 44:9, 53:22, 69:2, 82:2, 82:12, 110:8, 111:20
sent [4] - 27:11, 31:5, 71:22, 102:15
Sentry [1] - 3:3
separate [4] - 31:15, 50:5, 56:25, 72:16
September [1] - 56:22
seriously [2] - 9:10, 92:13
serve [4] - 36:10, 36:13, 58:1, 62:24
served [8] - 41:5, 43:7, 48:2, 51:22,

52:4, 52:11, 56:4, 62:24
service [3] - 39:23, 40:10, 43:14
set [30] - 7:4, 7:9, 33:14, 37:6, 37:13, 41:19, 50:7, 57:18, 57:19, 58:13, 58:15, 59:5, 60:14, 94:18, 95:6, 95:25, 96:4, 98:21, 100:14, 104:23, 104:24, 109:19, 111:13, 114:19, 116:20, 116:21, 117:23, 117:24, 118:1
Seth [10] - 4:18, 13:12, 16:20, 18:12, 19:16, 23:2, 26:5, 41:1, 51:1, 65:3
SETH [1] - 2:12
sets [4] - 63:2, 72:17, 72:20, 120:1
setting [2] - 47:11, 58:20
seven [3] - 23:10, 23:15, 39:14
seven-hour [2] - 23:10, 23:15
several [2] - 92:25, 107:15
shall [2] - 20:22, 21:19
shape [2] - 87:14, 93:6
share [2] - 7:18, 69:12
shared [3] - 7:17, 69:12, 94:25
sharing [1] - 72:20
sheets [1] - 63:11
shift [1] - 74:12
shipping [1] - 60:7
shocked [2] - 27:1, 122:19
short [5] - 48:6, 64:14, 64:20, 121:20, 125:7
shorter [1] - 126:15
shortly [3] - 4:10, 31:8, 45:10
shot [1] - 107:3
show [3] - 10:5, 104:5, 121:25
showing [1] - 10:6
showing's [1] - 10:8
side [7] - 7:23, 39:14, 40:6, 46:9, 64:6, 99:9, 108:18
sides [3] - 5:13, 28:12, 97:17
sight [2] - 106:12, 112:2
sign [2] - 30:17, 64:22

signed [1] - 75:21
significant [10] - 29:1, 34:9, 69:12, 71:22, 72:20, 86:25, 92:22, 97:23, 97:24, 117:24
significantly [2] - 80:18, 96:8
similar [4] - 8:3, 10:13, 11:4, 41:18
simple [2] - 107:11, 111:11
simplest [1] - 54:15
simplify [1] - 67:18
simply [4] - 13:10, 35:24, 74:11, 121:4
single [1] - 43:13
sit [2] - 9:9, 73:2
site [1] - 60:11
sitting [1] - 16:7
situation [6] - 11:6, 11:8, 26:25, 29:5, 52:17, 127:7
situations [1] - 22:15
six [2] - 34:12, 95:20
size [1] - 61:1
SLATER [51] - 1:12, 1:12, 4:11, 8:5, 12:18, 13:1, 15:11, 15:20, 15:23, 16:3, 17:20, 19:2, 19:4, 21:12, 21:15, 21:23, 22:10, 24:3, 24:6, 25:5, 25:18, 25:21, 27:5, 27:10, 27:13, 28:1, 28:3, 28:6, 30:13, 30:15, 30:20, 30:24, 34:20, 34:22, 35:5, 38:10, 39:9, 40:4, 40:16, 45:2, 55:10, 64:11, 92:7, 100:5, 104:12, 107:11, 108:8, 117:11, 118:14, 125:23, 126:19
Slater [57] - 4:11, 6:21, 7:22, 8:5, 12:4, 12:15, 15:18, 17:19, 22:9, 25:3, 27:7, 29:21, 30:10, 32:7, 32:8, 32:19, 38:1, 39:19, 44:19, 55:9, 64:10, 68:19, 71:19, 73:23, 75:15, 76:14, 88:2, 88:4, 91:25, 92:8, 99:14, 103:4, 103:6, 103:23, 107:9, 108:21, 108:24, 109:4, 109:6, 109:10, 109:13, 110:14,

111:18, 112:6, 112:13, 112:24, 113:15, 113:24, 114:4, 116:8, 116:15, 117:4, 119:11, 119:18, 122:18, 125:23
Slater's [5] - 11:15, 11:19, 30:22, 59:4, 75:1
sleeves [2] - 12:14, 61:20
slew [1] - 126:9
slice [1] - 102:7
sliced [1] - 71:5
slightly [1] - 58:7
small [1] - 77:2
smaller [1] - 53:3
smart [1] - 80:7
smooth [1] - 25:12
so-called [2] - 7:3, 107:14
social [1] - 19:10
softball [1] - 66:11
solely [1] - 96:20
solution [1] - 30:1
someone [4] - 20:15, 35:2, 53:13, 99:17
sometimes [1] - 45:19
somewhere [1] - 63:20
soon [6] - 8:8, 44:20, 55:23, 78:25, 103:20, 125:13
sooner [2] - 84:21, 86:20
sophistication [1] - 61:2
SOPs [3] - 59:24, 60:3, 60:5
sorry [10] - 19:18, 25:3, 27:7, 27:17, 28:3, 47:4, 67:23, 75:23, 85:24, 126:19
sort [14] - 25:24, 26:9, 32:11, 44:3, 66:23, 73:9, 74:18, 115:4, 119:8, 123:23, 123:25, 124:2, 124:11
sound [2] - 30:11, 50:9
sounds [5] - 10:9, 29:21, 38:24, 49:15, 63:23
South [1] - 2:10
space [6] - 19:6, 20:14, 20:22, 21:5, 21:6, 21:18
speaking [3] - 31:7,

102:13, 119:22
**spearheading** [1] -
39:10
**Special** [1] - 94:4
**specific** [8] - 16:16,
16:25, 42:25, 43:16,
44:5, 47:16, 86:12,
98:2
**specifically** [2] -
87:18, 119:22
**specifics** [2] - 69:17,
105:11
**spend** [6] - 10:4, 11:1,
104:8, 112:4, 122:9,
124:18
**spending** [2] - 108:15,
108:16
**spent** [3] - 48:6,
107:20, 107:21
**spirit** [1] - 45:9
**spoken** [3] - 8:22,
35:8, 36:20
**stack** [1] - 22:13
**stage** [1] - 73:13
**stages** [1] - 19:22
**staggered** [1] - 58:7
**staggering** [1] - 8:10
**stand** [3] - 8:11,
105:9, 114:9
**standard** [4] - 26:10,
26:18, 77:14, 81:8,
104:3
**standing** [3] - 6:23,
49:19, 50:19
**standpoint** [1] - 49:19
**stands** [1] - 112:25
**Stanoch** [8] - 35:14,
35:15, 57:8, 58:21,
59:2, 62:1, 62:2,
63:1
**STANOCH** [5] - 1:15,
57:7, 58:24, 59:2,
62:2
**start** [33] - 4:5, 8:8,
8:12, 11:15, 12:15,
18:7, 23:19, 28:19,
32:23, 33:4, 33:10,
34:10, 34:13, 34:17,
35:9, 38:9, 38:18,
56:15, 66:11, 72:22,
85:14, 85:22, 92:3,
95:20, 100:5, 100:9,
101:24, 105:21,
106:23, 109:20,
109:21, 109:25,
116:20
**started** [11] - 68:1,
68:3, 68:8, 92:3,
96:17, 97:1, 102:9,
102:16, 109:23,

110:1, 124:19
**starting** [8] - 8:6,
12:21, 22:23, 23:14,
33:9, 53:19, 117:23,
118:7
**state** [1] - 88:8
**statement** [4] - 85:1,
87:5, 100:23, 103:15
**statements** [1] - 13:20
**STATES** [2] - 1:1, 1:10
**States** [1] - 36:7
**statistics** [1] - 104:5
**STATUS** [1] - 1:5
**stay** [3] - 6:3, 10:13,
58:22
**stayed** [1] - 124:23
**staying** [3] - 6:9, 8:1,
11:3
**stays** [1] - 15:10
**stenography** [1] -
1:25
**steps** [1] - 69:7
**Steve** [2] - 91:4, 115:9
**still** [15] - 5:25, 7:25,
10:9, 12:2, 12:12,
12:23, 19:10, 27:14,
27:18, 36:24, 63:13,
99:3, 100:23,
115:17, 123:1
**stop** [1] - 104:21
**stopped** [1] - 126:21
**stopping** [1] - 117:1
**stored** [1] - 60:12
**story** [1] - 96:21
**straight** [1] - 114:20
**straightforward** [2] -
11:11, 67:7
**Street** [3] - 1:16, 1:19,
2:13
**stress** [1] - 120:11
**strike** [1] - 36:14
**strong** [2] - 64:14,
88:23
**struggle** [1] - 110:10
**studied** [1] - 96:8
**stuff** [1] - 44:16
**subject** [6] - 6:6, 7:6,
19:6, 46:10, 46:15,
54:5
**subjective** [3] - 81:17,
99:21, 100:1
**submission** [6] -
41:14, 75:1, 80:18,
111:2, 114:3, 116:16
**submissions** [3] -
71:20, 125:6, 125:16
**submit** [6] - 31:4,
31:25, 33:12, 49:25,
116:24, 125:10
**submitted** [7] - 12:19,

77:18, 80:17, 82:21,
91:4, 115:9, 115:10
**subpoena** [9] - 40:10,
43:13, 44:4, 47:6,
48:2, 52:10, 54:10,
54:19, 55:5
**subpoenas** [21] -
38:15, 38:20, 41:6,
41:9, 41:12, 41:19,
41:20, 42:3, 42:11,
42:12, 42:16, 43:6,
43:11, 44:1, 48:13,
50:8, 51:22, 52:4,
52:5, 53:24, 54:11
**substance** [1] - 80:8
**substantial** [5] -
73:17, 79:10, 81:18,
99:22, 99:25
**substantially** [1] -
6:16
**substantive** [3] -
38:15, 39:19, 62:5
**successful** [1] - 27:3
**sufficient** [2] - 26:15,
66:7
**suggest** [10] - 13:18,
14:20, 15:3, 15:4,
24:15, 31:23, 44:10,
52:12, 55:25, 125:25
**suggested** [2] - 18:18,
59:14
**suggesting** [2] - 14:5,
29:24
**suggestion** [2] -
64:13, 95:10
**suggests** [1] - 7:1
**Suite** [6] - 1:16, 2:3,
2:7, 2:17, 2:21, 3:3
**sum** [1] - 80:8
**summarized** [1] - 6:13
**summary** [1] - 117:11
**summer** [9] - 74:17,
76:9, 79:16, 82:7,
111:8, 113:14,
113:23, 120:5,
120:20
**Sunday** [1] - 5:18
**supplemental** [1] -
59:11
**suppliers** [1] - 42:4
**support** [4] - 24:2,
72:13, 80:24, 91:9
**supports** [2] - 88:14,
127:1
**suppose** [6] - 51:13,
51:16, 66:1, 66:19,
86:21, 99:7
**supposed** [9] - 15:15,
16:11, 81:8, 91:19,
98:4, 113:9, 120:23,

120:24, 121:18
**supposing** [1] - 19:13
**surface** [1] - 68:6
**surprise** [1] - 108:14
**surprised** [4] - 19:21,
25:14, 36:8, 109:4
**suspended** [1] - 27:1
**suspending** [2] -
25:23, 26:3
**switch** [2] - 86:12,
86:13
**sworn** [1] - 69:22
**system** [18] - 68:15,
68:16, 68:24, 72:21,
72:25, 76:25, 79:18,
80:21, 82:13, 82:14,
82:15, 98:24, 104:7,
110:3, 116:22,
118:6, 119:2, 124:1

---

## T

**table** [1] - 90:18
**takeaway** [1] - 37:19
**talks** [3] - 25:23,
101:4, 127:5
**TAR** [71] - 1:6, 4:24,
5:15, 64:4, 64:16,
64:21, 65:11, 69:24,
70:20, 71:3, 71:18,
72:16, 72:17, 72:18,
74:18, 75:2, 80:14,
81:3, 81:17, 81:23,
82:23, 83:14, 90:11,
90:17, 90:24, 90:25,
91:4, 91:7, 91:9,
91:15, 93:13, 93:22,
94:2, 94:7, 96:16,
96:20, 97:14, 98:20,
99:18, 100:9,
100:10, 100:23,
102:1, 102:14,
103:12, 103:13,
103:14, 103:17,
104:14, 104:24,
105:19, 109:18,
110:15, 110:17,
111:3, 111:5,
111:15, 112:21,
113:1, 114:4, 114:7,
115:19, 115:22,
116:23, 117:25,
119:10, 120:20,
123:14, 123:22
**target** [1] - 47:2
**teach** [1] - 98:24
**team** [2] - 35:14, 39:10
**technically** [2] -
22:17, 40:10
**technology** [4] - 6:14,

7:1, 105:24, 105:25
**tee** [2] - 38:19, 40:2
**teed** [3] - 40:13, 40:21,
47:18
**telephone** [1] - 1:7
**ten** [3] - 23:15, 126:17,
127:14
**ten-hour** [1] - 23:15
**tenets** [3] - 66:25,
120:17, 123:1
**term** [17] - 48:6, 66:12,
71:13, 79:1, 83:24,
88:23, 91:1, 91:9,
92:9, 96:4, 96:6,
104:24, 108:9,
116:21, 117:23,
119:14
**terminology** [2] -
67:15, 99:1
**terms** [87] - 29:1, 30:9,
33:7, 52:5, 52:6,
56:10, 56:12, 67:14,
69:20, 70:19, 72:14,
74:2, 76:1, 76:16,
79:2, 81:2, 82:2,
82:3, 82:14, 83:5,
83:6, 83:13, 83:17,
83:25, 84:3, 84:22,
85:2, 85:6, 85:8,
85:11, 85:12, 85:14,
85:17, 85:18, 85:23,
86:6, 86:17, 87:7,
87:11, 87:20, 88:9,
88:12, 89:1, 89:16,
89:22, 90:4, 90:14,
90:16, 90:23, 91:16,
93:7, 94:1, 94:10,
94:12, 94:19, 94:25,
95:3, 95:9, 95:15,
95:25, 96:1, 103:14,
103:18, 103:19,
103:21, 111:19,
111:20, 113:1,
113:20, 114:11,
114:13, 114:20,
115:1, 115:4,
115:18, 115:19,
115:21, 118:2,
118:3, 118:6,
119:10, 119:16,
120:4, 120:17,
122:19
**terribly** [1] - 14:12
**terrific** [1] - 62:18
**test** [3] - 88:13, 89:20,
94:15
**tested** [2] - 68:25,
94:24
**testimony** [3] - 14:11,
15:2

**testing** [1] - 94:20
**tethered** [1] - 127:5
**Teva** [92] - 2:18, 2:18, 4:22, 5:15, 5:24, 8:3, 8:24, 9:8, 9:16, 9:17, 10:13, 11:5, 31:10, 32:12, 34:3, 34:6, 35:8, 35:15, 49:5, 64:12, 64:16, 65:11, 66:11, 66:13, 66:15, 67:3, 67:15, 67:23, 69:5, 70:5, 70:9, 74:18, 75:4, 76:10, 77:13, 77:21, 77:24, 78:1, 78:11, 79:1, 81:9, 81:10, 81:16, 81:23, 82:20, 82:22, 83:7, 83:10, 85:1, 85:7, 85:21, 86:12, 88:2, 88:7, 88:9, 88:15, 90:11, 90:17, 90:24, 91:13, 91:16, 92:2, 92:4, 92:13, 94:23, 100:6, 104:2, 104:17, 107:12, 107:13, 107:25, 110:11, 111:8, 111:15, 112:9, 113:8, 115:22, 116:3, 116:12, 116:13, 116:21, 117:17, 118:16, 123:9, 123:13, 124:16, 124:25, 127:7
**Teva's** [13] - 67:8, 70:13, 70:14, 78:6, 78:23, 81:14, 81:19, 99:19, 102:11, 104:6, 117:6, 123:11
**TEVA/PLAINTIFFS'** [1] - 1:6
**Thanksgiving** [1] - 10:17
**THE** [3] - 1:1, 1:5, 1:9
**The court** [222] - 4:2, 4:15, 5:6, 5:10, 5:22, 7:24, 7:25, 9:5, 10:2, 10:11, 10:13, 11:6, 12:9, 12:25, 13:14, 14:18, 15:10, 15:17, 15:22, 15:24, 16:12, 16:15, 17:1, 17:12, 17:15, 17:17, 17:25, 18:21, 18:25, 19:3, 19:17, 19:19, 20:13, 21:8, 21:14, 21:16, 22:5, 22:9, 24:5, 24:7, 25:13, 25:15, 25:20, 26:15, 26:22, 27:6, 27:12, 27:15,

27:25, 28:2, 28:4, 28:9, 28:11, 29:20, 30:10, 30:11, 30:14, 30:16, 30:21, 31:22, 32:3, 32:7, 32:14, 32:15, 32:23, 34:21, 34:23, 37:16, 37:19, 38:14, 39:18, 40:11, 40:23, 40:25, 41:14, 41:15, 42:14, 43:4, 43:9, 44:19, 45:19, 45:25, 46:3, 46:11, 46:18, 47:11, 47:17, 47:21, 48:4, 48:25, 49:15, 50:2, 50:15, 50:23, 51:6, 51:12, 52:12, 52:14, 52:16, 53:20, 53:24, 54:5, 54:11, 54:14, 55:1, 55:13, 57:1, 57:3, 58:11, 58:13, 58:21, 58:25, 59:23, 60:17, 60:20, 60:24, 61:9, 61:25, 62:9, 62:18, 63:5, 63:18, 63:24, 63:25, 64:3, 64:10, 64:12, 64:18, 64:19, 64:25, 65:4, 65:5, 65:6, 65:24, 66:2, 66:9, 67:3, 67:5, 67:6, 67:14, 67:21, 69:3, 69:17, 70:5, 70:6, 70:9, 70:12, 72:4, 74:15, 74:23, 75:2, 75:23, 76:8, 76:10, 77:4, 77:5, 77:7, 77:10, 77:14, 78:3, 78:17, 80:2, 81:1, 81:5, 81:21, 82:20, 83:3, 84:13, 84:24, 85:2, 85:5, 85:10, 85:25, 87:2, 87:6, 87:10, 87:23, 87:25, 90:8, 91:25, 92:25, 97:18, 99:13, 103:3, 103:8, 103:22, 104:6, 104:7, 106:14, 107:9, 107:23, 108:5, 108:19, 110:18, 110:22, 111:2, 112:4, 112:18, 112:21, 112:25, 113:3, 114:12, 116:3, 117:9, 117:19, 118:13, 118:16, 123:8, 123:11, 124:21, 124:23, 125:5, 127:14, 127:18

**themselves** [5] - 42:15, 43:3, 44:8, 44:17, 56:11
**thereafter** [2] - 85:10, 109:10
**therefore** [2] - 70:7, 89:2
**they've** [8] - 10:12, 28:25, 53:9, 59:10, 59:15, 61:18, 106:19, 123:4
**thinking** [2] - 55:16, 55:22
**thinks** [1] - 97:24
**third** [29] - 38:15, 41:25, 42:3, 42:15, 42:22, 43:3, 43:6, 43:11, 43:21, 44:7, 44:17, 44:23, 44:25, 45:9, 46:21, 47:12, 48:10, 48:13, 48:20, 49:19, 50:7, 50:11, 50:24, 51:4, 51:8, 51:22, 53:24, 54:19, 55:5
**Third** [1] - 97:6
**third-party** [10] - 38:15, 42:3, 43:6, 43:11, 48:10, 50:7, 51:22, 53:24, 54:19, 55:5
**third-party's** [1] - 41:25
**THORNBURG** [1] - 2:20
**thoughts** [1] - 55:14
**thousand** [1] - 123:9
**thousands** [2] - 73:13, 107:15
**threading** [2] - 104:21, 117:2
**three** [8] - 23:10, 23:20, 51:21, 59:9, 62:6, 63:10, 126:16
**throughout** [18] - 20:7, 68:9, 71:10, 73:8, 78:16, 82:7, 84:6, 89:8, 93:4, 109:13, 109:23, 110:12, 114:23, 114:24, 121:23, 122:2, 127:1
**throw** [2] - 111:13, 120:12
**time-consuming** [1] - 90:2
**timeframe** [2] - 57:11, 124:3
**timeline** [1] - 109:14
**timeliness** [2] - 43:14,

44:22
**timing** [1] - 18:18
**today** [14] - 4:19, 5:13, 11:24, 12:1, 14:6, 40:17, 43:1, 47:1, 63:1, 65:12, 65:23, 69:1, 73:20, 109:22
**together** [7] - 14:10, 22:13, 43:12, 44:1, 64:7, 97:16, 127:5
**tomorrow** [3] - 51:14, 52:18, 111:2
**took** [2] - 73:4
**tool** [1] - 100:24
**tools** [1] - 86:16
**top** [2] - 113:1, 119:10
**topic** [4] - 8:6, 33:19, 37:25, 38:5
**topics** [8] - 14:22, 15:4, 33:13, 33:14, 33:16, 33:20, 34:7, 43:15
**Torrent** [2] - 31:2, 36:21
**totally** [1] - 115:22
**TPPs** [2] - 62:25, 63:2
**track** [2] - 56:23, 56:25
**trail** [1] - 58:8
**train** [2] - 72:25, 73:3, 119:2
**trained** [1] - 80:21
**training** [7] - 72:21, 73:2, 76:24, 92:24, 116:24, 118:23, 124:1
**transcript** [2] - 1:25, 127:24
**transcription** [1] - 1:25
**transcripts** [2] - 14:7, 28:13
**translator** [2] - 22:12, 23:12
**translators** [4] - 22:17, 23:5, 23:6, 24:8
**transparency** [10] - 32:25, 45:9, 49:10, 92:22, 93:18, 97:15, 110:17, 111:4, 121:23, 122:20
**transparent** [2] - 7:16, 122:2
**trash** [1] - 89:13
**TRAURIG** [1] - 2:15
**Traurig** [1] - 4:22
**travel** [1] - 17:7
**treated** [1] - 8:3
**treating** [1] - 20:3
**tremendous** [3] - 79:3, 93:17, 98:12

**trial** [1] - 105:7
**tried** [1] - 7:15
**trigger** [4] - 81:15, 101:8, 101:20, 101:21
**triggered** [6] - 78:24, 79:6, 81:16, 99:25, 100:4, 100:7
**triggers** [1] - 18:23
**Trischler** [3] - 5:2, 6:11, 11:4
**TRISCHLER** [3] - 2:23, 5:1, 6:12
**trouble** [2] - 35:5, 60:3
**troubling** [1] - 62:8
**true** [6] - 26:4, 68:2, 77:15, 79:1, 101:7
**trust** [1] - 79:18
**try** [16] - 6:8, 8:25, 13:18, 15:16, 16:11, 29:18, 37:15, 37:18, 43:5, 60:19, 61:22, 76:25, 97:21, 113:20, 124:6, 125:7
**trying** [9] - 32:9, 34:23, 42:9, 44:20, 46:24, 51:19, 60:13, 63:13, 67:22
**turn** [18] - 4:15, 62:19, 64:12, 65:10, 70:12, 76:13, 78:18, 88:1, 103:23, 104:8, 104:9, 111:17, 112:7, 112:9, 112:10, 112:18, 112:22
**turned** [2] - 31:18, 96:16
**turning** [1] - 112:14, 123:15
**turns** [1] - 23:21
**tweak** [1] - 29:10
**twice** [1] - 86:24
**two** [46] - 5:12, 10:25, 12:3, 14:15, 19:24, 28:19, 29:16, 29:25, 38:16, 38:18, 40:21, 43:24, 46:14, 47:20, 47:21, 48:21, 51:23, 52:8, 59:9, 59:22, 61:16, 62:6, 75:3, 75:5, 75:9, 76:21, 77:25, 78:1, 80:4, 81:3, 81:18, 83:22, 98:1, 98:7, 99:22, 104:19, 113:20, 115:8, 124:3, 124:14, 124:19, 127:6, 127:11
**twofold** [1] - 123:25

*type* [2] - 105:24, 118:2
*types* [1] - 89:11

## U

*ultimate* [1] - 121:7
*ultimately* [5] - 9:17, 62:10, 86:25, 102:18, 113:25
*unable* [1] - 69:14
*under* [14] - 17:23, 24:23, 26:11, 49:23, 67:10, 72:22, 74:5, 75:19, 86:10, 96:3, 101:18, 108:11, 108:13, 127:18
*understandably* [1] - 81:12
*understood* [4] - 50:12, 79:1, 79:2, 99:20
*undertook* [2] - 67:22, 67:23
*undue* [1] - 65:22
*unearthed* [1] - 117:25
*unfold* [1] - 33:1
*unfortunate* [1] - 35:7
*unfortunately* [1] - 72:8
*unfounded* [3] - 112:8, 115:22
*uniformly* [2] - 42:10, 42:11
*unilateral* [1] - 106:19
*unintended* [1] - 5:19
*UNITED* [2] - 1:1, 1:10
*United* [1] - 36:7
*universe* [5] - 81:24, 82:23, 83:15, 83:16, 99:18
*unless* [1] - 126:7
*unmanageable* [1] - 28:8
*unnecessary* [1] - 26:21
*unquestionably* [3] - 43:20, 81:6, 103:24
*unquote* [5] - 6:4, 87:15, 98:24, 99:22, 124:22
*unrealistic* [1] - 115:1
*unreasonable* [1] - 50:9
*unseen* [1] - 106:13
*unsophisticated* [1] - 61:19
*up* [44] - 9:9, 9:25, 12:13, 12:24, 20:18, 21:21, 22:14, 23:18,

25:16, 33:4, 33:21, 36:8, 36:22, 38:19, 40:2, 40:13, 40:21, 41:23, 45:8, 46:24, 47:18, 48:8, 57:21, 59:8, 61:19, 62:10, 62:15, 62:17, 68:13, 75:15, 91:13, 91:18, 91:23, 95:5, 96:3, 102:4, 103:11, 104:18, 106:20, 111:22, 114:1, 121:24, 123:3, 126:21
*upcoming* [1] - 65:20
*update* [1] - 30:25
*updated* [1] - 101:16
*updating* [1] - 28:15
*upfront* [1] - 66:6
*USA* [2] - 2:18, 3:4
*useful* [1] - 109:16
*uses* [1] - 66:12
*usual* [1] - 127:19
*utilized* [1] - 117:16

## V

*vacuum* [1] - 84:21
*validated* [1] - 104:3
*validation* [30] - 7:19, 9:5, 9:7, 69:1, 69:4, 69:9, 69:13, 69:16, 69:18, 69:21, 69:23, 70:2, 70:4, 70:6, 70:14, 70:22, 75:17, 75:18, 76:22, 97:17, 104:19, 104:20, 113:15, 113:19, 113:25, 114:8, 119:20, 119:23, 120:4, 120:7
*VALSARTAN* [1] - 1:3
*Valsartan* [7] - 4:2, 13:23, 14:4, 14:8, 14:23, 53:7, 60:8
*Valsartan-containing* [1] - 60:8
*value* [1] - 100:16
*varied* [1] - 113:16
*VCDs* [2] - 59:25, 60:7
*vendor* [9] - 27:21, 27:23, 86:15, 89:17, 90:1, 90:4, 91:7, 123:20
*vendors* [2] - 42:4, 86:12
*version* [1] - 27:11
*versions* [1] - 31:13
*versus* [4] - 36:7, 72:18, 81:3, 82:15

*via* [1] - 54:10
*Via* [1] - 1:7
*VICTORIA* [1] - 2:16
*Victoria* [4] - 4:21, 32:5, 49:4, 87:22
*video* [5] - 20:16, 20:18, 20:23, 24:12, 116:23
*view* [5] - 6:22, 10:3, 59:15, 75:25, 78:23
*viewed* [1] - 119:5
*views* [1] - 71:12
*violate* [2] - 126:5, 126:6
*violated* [3] - 71:6, 101:8, 120:22
*virtually* [2] - 28:8, 89:5
*vocabulary* [1] - 99:1
*voice* [1] - 16:21
*volume* [2] - 89:12, 89:16

## W

*wait* [8] - 53:17, 56:9, 58:6, 65:6, 79:6, 83:21, 87:10, 91:14
*waiting* [2] - 9:13, 27:19
*walk* [4] - 12:22, 97:3, 98:14, 107:7
*walked* [1] - 105:9
*wants* [10] - 8:25, 22:2, 39:13, 42:7, 64:6, 97:13, 109:14, 111:18, 125:21
*Wednesday* [1] - 1:8
*week* [16] - 9:21, 31:3, 31:7, 31:11, 43:24, 47:20, 47:21, 52:8, 57:25, 62:13, 71:17, 95:24, 125:6, 125:14, 125:19
*weeks* [11] - 10:25, 11:1, 12:3, 19:24, 37:22, 38:8, 40:12, 40:21, 41:16, 48:21, 61:17
*weigh* [4] - 11:1, 13:13, 77:5, 80:2
*weighing* [1] - 10:20
*weighs* [1] - 11:2
*weight* [1] - 81:1
*WERNER* [1] - 3:2
*whatsoever* [5] - 53:7, 72:13, 78:3, 80:24, 111:25
*wheel* [1] - 33:16
*whim* [1] - 16:17

*white* [3] - 71:22, 72:2, 122:4
*WHITELEY* [3] - 1:18, 1:18, 4:8
*Whiteley* [1] - 4:9
*whole* [5] - 57:20, 83:16, 98:25, 105:7, 126:9
*wholesaler* [1] - 58:25
*Wholesalers* [1] - 3:8
*wholesalers* [5] - 59:7, 59:10, 62:1, 62:4, 62:6
*willing* [6] - 69:11, 72:7, 81:2, 98:10, 121:19
*willingness* [1] - 9:7
*wind* [1] - 20:18
*window* [3] - 57:17, 57:19, 58:8
*wise* [1] - 28:4
*withdraw* [1] - 42:11
*withdrew* [3] - 106:24, 107:2, 117:17
*withhold* [1] - 106:17
*witness* [9] - 11:25, 14:23, 14:25, 16:6, 16:7, 34:4, 34:19, 37:11, 105:9
*witnesses* [22] - 13:22, 14:3, 14:7, 14:10, 18:8, 18:14, 23:4, 23:6, 33:1, 33:6, 33:21, 33:25, 34:3, 34:10, 34:14, 34:16, 36:5, 36:17, 36:23, 37:10, 37:14, 39:17
*word* [10] - 21:17, 31:12, 66:13, 78:9, 101:2, 105:22, 116:4, 118:16, 118:20, 126:6
*words* [5] - 51:10, 111:9, 116:11, 116:19, 126:3
*wordsmith* [1] - 22:6
*workable* [1] - 22:23
*workaround* [1] - 62:15
*works* [5] - 73:6, 81:7, 104:3, 104:5, 104:7
*world* [10] - 22:18, 33:20, 34:16, 43:10, 43:19, 70:1, 70:23, 80:6, 84:3, 105:8
*world's* [3] - 70:25, 81:3, 103:25
*worried* [1] - 25:9
*worry* [2] - 54:18,

124:21
*worse* [1] - 106:20
*wrapped* [1] - 12:24
*wrestling* [1] - 78:3
*written* [3] - 25:19, 62:5, 62:11
*wrote* [1] - 71:25

## Y

*year* [8] - 14:15, 71:14, 71:16, 92:11, 93:5, 95:21, 97:11, 106:16
*Year's* [1] - 18:7
*years* [2] - 14:15, 69:25
*yesterday* [1] - 52:1
*yield* [1] - 6:16
*York* [1] - 3:7

## Z

*zero* [4] - 70:13, 70:14, 70:21, 71:7
*ZHP* [8] - 2:14, 4:18, 31:11, 36:24, 41:14, 42:22, 51:24, 53:14
*zones* [1] - 17:8
*Zoom* [5] - 20:16, 20:18, 20:23, 23:17, 24:12