Exhibit 3

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

```
─────────────────────────            CIVIL ACTION NUMBER:
IN RE:  VALSARTAN PRODUCTS
LIABILITY LITIGATION                 1:19-md-02875-RBK-JS

─────────────────────────            ORAL OPINION DECIDING THE
                                     PARTIES' "MACRO" ISSUES
                                     LISTED IN THE OCTOBER 22,
                                     2019 ORDER
                                        (DOCUMENT NO. 280)
```

```
        Mitchell H. Cohen Building & U.S. Courthouse
        4th & Cooper Streets
        Camden, New Jersey  08101
        Wednesday, November 20, 2019
        Commencing at 2:12 p.m.
```

**B E F O R E:**                **THE HONORABLE JOEL SCHNEIDER,**
                                **UNITED STATES MAGISTRATE JUDGE**

**A P P E A R A N C E S:**

```
        MAZIE SLATER KATZ & FREEMAN, LLC
        BY:  ADAM M. SLATER, ESQUIRE
        103 Eisenhower Parkway
        Roseland, New Jersey 07068
        For the Plaintiff

        LEVIN PAPANTONIO
        BY:  DANIEL A. NIGH, ESQUIRE
        316 S. Baylen, Suite 600
        Pennsacola, Florida 32502
        For the Plaintiff

        GOLOMB & HONIK PC
        BY:  RUBEN HONIK, ESQUIRE
             DAVID JOHN STANOCH, ESQUIRE
        1835 Market Street, Suite 2900
        Philadelphia, Pennsylvania 19103
        For the Plaintiff
```

        Karen Friedlander, Official Court Reporter
                friedlanderreporter@gmail.com
                    (856) 756-0160

        Proceedings recorded by mechanical stenography;
    transcript produced by computer-aided transcription.

1    **A P P E A R A N C E S:  - CONTINUED**

2        KANNER & WHITELEY LLC
         BY:   CONLEE S. WHITELEY, ESQUIRE
3            LAYNE CLARK HILTON, ESQUIRE
         701 Camp Street
4        New Orleans, Louisiana 70130
         For the Plaintiff

5

         FARR LAW FIRM
6        BY:  GEORGE T. WILLIAMSON, ESQUIRE
         99 Nesbit Street
7        Punta Gorda, Florida 33950
         For the Plaintiff

8

         KIRTLAND & PACKARD LLP
9        BY:  BEHRAM PAREKH, ESQUIRE
         1638 South Pacific Coast Highway
10       Redondo Beach, California 90277
         For the Plaintiff

11

         GOLDENBERG LAW PLLC
12       BY:  MARLENE J. GOLDENBERG, ESQUIRE
         800 Lasalle Avenue
13       Suite 2150
         Minneapolis, Minnesota 55402

14

         DUANE MORRIS LLP
15       BY:  SETH A. GOLDBERG, ESQ.
         30 S. 17th Street
16       Philadelphia, Pennsylvania 19103
         For the Defendant ZHP and the Joint Defense Group

17

         PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI LLP
18       BY:  JASON M. REEFER, ESQUIRE
         One Oxford Centre, 38th Floor
19       Pittsburgh, Pennsylvania 15219
         For the Defendant Mylan and the Joint Defense Group

20

         GREENBERG TRAURIG LLP
21       BY:  BRIAN H. RUBENSTEIN, ESQUIRE
         3333 Piedmont Road, NE, Suite 2500
22       Atlanta, Georgia 30305
         For the Defendants, Teva Pharmaceutical Industries Ltd.,
23       Teva Pharmaceuticals USA, Inc., Actavis LLC, and Actavis
         Pharma, Inc.

24

25

*United States District Court*
*District of New Jersey*

```
 1              THE DEPUTY CLERK:  All rise.

 2              (OPEN COURT; 2:12 p.m.)

 3              THE COURT:  Please be seated, counsel.

 4              Okay.  So, what the Court is going to do, it's going

 5     to read into the record its oral opinion ruling on all of the

 6     issues from today.

 7              I'm going to confirm all of the rulings in an order

 8     which I hopefully will enter before the end of the week.  In

 9     terms of the Court's oral opinion, the way it's organized is

10     I'm just going to start out with some background and discuss

11     some general issues, and then the meat of it is, obviously,

12     the rulings on each specific issue.

13              So I thank the parties for their excellent briefs and

14     argument.  I hope I'm right that staging discovery this way

15     helps advance the ball getting a decision, I hope, on the

16     big-picture issues will help in your meet and confer sessions

17     that are going to be ongoing in next few days.  So here goes.

18              Presently before the Court to decide are what the

19     Court has denominated macro discovery disputes.  Although the

20     term is not contained in the Federal Rules of Civil Procedure

21     and is not normally part of a litigator's lexicon, the Court

22     directed the parties to identify and brief important discovery

23     disputes which are identified in the Court's October 21, 2019

24     order.

25              The term refers to big-picture discovery issues that
```

1   overarch the scope of relevant discovery.  Experience has

2   shown that the prompt identification and rulings on these

3   disputes goes a long way towards effectively and efficiently

4   managing the discovery process, especially in complex

5   litigation like this MDL.  The Court's rulings are a necessary

6   precedent to deciding the more granular discovery disputes

7   the Court will address and decide on December 11, 2019.

8           At the moment, the Court is just addressing discovery

9   disputes between plaintiffs and the API and finished dose

10  manufacturing defendants.  The current API manufacturing

11  defendants participating in the case are ZHP and Mylan.

12  Aurobindo and Hetero have not yet been served pursuant to The

13  Hague Convention, or if they have been served, they have not

14  entered an appearance.

15          The finished dose manufacturers currently

16  participating in the case, and I'm not providing the exact

17  precise technical corporate name, are Aurolife or Aurobindo,

18  Teva and Torrent.

19          The parties are obviously familiar with the

20  background of this matter, so only a short summary will be

21  provided.

22          This MDL arises out of contamination discovered in

23  defendants' Valsartan medication in July 2018.  Plaintiffs

24  generally contend the contamination contained cancer-causing

25  chemicals that has or will cause personal injuries, such as

cancer and liver damage, as well as economic losses.
Defendants do not deny their Valsartan was contaminated but
denied the contamination caused any injuries or damages.

The parties dispute important issues, such as the
start date of the contamination, whether only the API was
contaminated, the entire list of contaminating chemicals, and
the facilities where the contamination occurred or should have
been discovered.

The defendants in the case include manufacturers of
the active pharmaceutical ingredient, or API manufacturers,
finished dose manufacturers, wholesalers, distributors,
repackagers and pharmacies.  As noted, the discovery disputes
to be addressed by the Court today only pertain to the API and
finished dose manufacturers.  Some of these parties are
located in China and India.  Macro and granular discovery
disputes concerning the other categories of defendants will be
addressed at a future date.

Plaintiffs' claims in the case have been grouped in
the general categories that are reflected in the three filed
master Complaints.  The first master Complaint addresses the
claims of individual plaintiffs who generally allege they
contracted various forms of cancer from consuming defendants'
contaminated Valsartan.  To date, in excess of 125 personal
injury cases of this type have been filed.  Plaintiffs'
counsel estimates approximately or perhaps 2,000 cases may

1    eventually be filed.

2         The second master Complaint is a nationwide medical

3    monitoring class action filed on behalf of all "individuals

4    who consumed contaminated generic Valsartan-containing drugs

5    at least since January 1, 2012."

6         The potential class size is undoubtedly in the tens

7    of thousands.

8         The third master Complaint is a nationwide economic

9    class action filed on behalf of "all individuals and entities

10   who since at least January 1, 2012, to the present, paid any

11   amount of money for a Valsartan-containing drug."

12        Before it gets to the specific issues in dispute, the

13   Court will address the general legal parameters that guide its

14   rulings.  The parties, of course, know the scope of relevant

15   discovery is set forth in Rule 26(b)(1).  Parties may obtain

16   discovery of non-privileged information relevant to any

17   party's claim or defense that is proportional to the needs of

18   the case.

19        Although this MDL is or is likely to be massive in

20   scope in terms of the number of potential claimants and the

21   amount in controversy, the Court will not disregard the

22   necessity of proportionality when it comes to deciding the

23   discovery plaintiffs will be permitted to take.

24        The fact that this MDL is likely to involve thousands

25   of potential claimants and disputes over hundreds of millions

1    of dollars is no reason to approve duplicative, unnecessary,

2    cumulative, and unduly burdensome discovery.

3            On the other hand, when it evaluates the

4    proportionality of plaintiffs' discovery requests, the Court

5    cannot ignore the fact that hundreds of millions of dollars,

6    perhaps even a billion dollars, may be in dispute.

7            The Court also cannot ignore the fact that Valsartan

8    was and is a very popular high blood pressure medication

9    perhaps taken by millions of people and that serious health

10   concerns have been raised, although not yet proven, about the

11   present and future health effects resulting from taking

12   contaminated Valsartan.

13           It is beyond dispute that the public has a keen

14   interest in the results of this litigation, and the issues in

15   dispute are undoubtedly important to the public health and

16   welfare.  In addition, it is just as apparent that plaintiffs

17   do not have access to the relevant information they need to

18   prove their case, and that key information, such as when and

19   how the Valsartan contamination occurred is within defendants'

20   exclusive possession.  These are relevant factors Rule 26

21   directs this Court to consider in its proportionality

22   analysis.

23           The Court also wants to make a few general

24   observations about the parties' discovery disputes so it does

25   not have to repeat itself when it separately addresses each

1  dispute.  As a general matter, the Court agrees that

2  plaintiffs' discovery requests ask for relevant information.

3  However, the Court would not be fulfilling its mission to

4  secure the just, speedy, and inexpensive determination of this

5  litigation if it gives plaintiffs everything they ask for.

6       A good example is plaintiffs' request for regulatory

7  information from not only the FDA, but numerous other

8  regulatory bodies around the world.  It is hard to dispute

9  that all work product related to the investigation of

10 Valsartan contamination is relevant.  Nevertheless, leaning on

11 its experience and common sense, it is apparent that a lot of

12 this discovery will be repetitive.  The Court, therefore, must

13 reasonably limit plaintiffs' discovery in order to prevent

14 duplicative, cumulative, and minimally important discovery.

15      As to defendants, a common theme running throughout

16 their briefs is that "the deal has already been sealed" on the

17 cause of the Valsartan contamination, when it started, the

18 chemicals at issue, the exposure levels that may be harmful,

19 and when tests existed to identify the contaminants at issue.

20 The Court does not agree.

21      Certainly, there are working theories regarding these

22 issues, but by no means have the issues been finally resolved

23 to everyone's satisfaction.  In any event, plaintiffs are not

24 bound to the prevailing theories and have the right to reach

25 their own conclusions after obtaining relevant discovery from

1    defendants.

2        Importantly, the Court will not necessarily bind

3    plaintiffs to the prevailing theories and assumptions made by

4    the FDA, and as noted today, plaintiffs are not agreeing to be

5    so bound.  Plaintiffs have a right to reach their own

6    conclusions.  It is no secret, and today plaintiffs

7    acknowledged, that as the case progresses, plaintiffs may

8    question the FDA's competency, biases, and motivations.

9        Another general comment the Court makes relates to

10   Judge Kugler's justifiable comment that discovery should focus

11   on the crux of the merits.  This Court obviously agrees.

12   However, by no means did Judge Kugler intend to foreclose

13   plaintiffs from obtaining otherwise relevant discovery that

14   does not fit squarely into defendants' notion of a critical

15   issue.

16       The Court does not intend to give plaintiffs free

17   reign to discovery, but on the other hand, the Court will not

18   tie plaintiffs' hands at this early stage of the case, which

19   will prevent plaintiffs from investigating whether the current

20   working theories of liability and causation are viable.

21       The Court adds the comment that it disagrees with and

22   rejects any notion that the parties have not had sufficient

23   time to meet and confer about the discovery issues in dispute.

24   From the outset of the case, plaintiffs have urged defendants

25   to meet in person to hammer out discovery issues, but

1    generally, plaintiffs faced resistance from defendants.

2         In fact, as a last resort, on November 7, 2019, the

3    Court was compelled to order defendants to meet in person with

4    plaintiffs.  Further, plaintiffs' document request was served

5    on August 31, 2019; therefore, defendants have had two months'

6    notice of what plaintiffs requested.

7         In addition, the parties have been on notice of the

8    specific macro issues in dispute no later than the Court's

9    October 22, 2019 order.  Therefore, the Court will not defer

10   its decision on any relevant issue on account of the fact

11   defendants want more time to meet and confer.

12        Last, the Court makes it clear that it is deciding

13   the party's discovery disputes on the present record.  If

14   material new facts are raised that could not previously have

15   been known, the parties may make a new application to the

16   Court.  Since most of the Court's rulings weigh discretionary

17   factors, for the most part, the Court's rulings are without

18   prejudice.

19        Moving on to the macro issues in dispute, the Court

20   will first address the issues raised by plaintiffs and then

21   proceed to defendants' issues.  For the most part, the Court

22   will give the parties general rulings on broad topics.  The

23   more granular issues will be addressed and decided on

24   December 11, 2019, after the parties have had additional meet

25   and confer sessions.

1       The first issue the Court will address is plaintiffs'

2   request to strike all of defendants' boilerplate objections to

3   their document requests.  Plaintiffs referred to the

4   objections filed by ZHP, Teva, Mylan, Aurobindo, and Torrent.

5   Defendants argue the issue is moot because revised objections

6   have been served, except for Mylan.

7       As a general matter, the Court agrees defendants

8   initially served boilerplate objections.  To say this is

9   disappointing is an understatement.  Given the caliber and

10  experience of defense counsel and their law firms, one would

11  think defendants would know better.  This is especially true

12  since the Court put defendants on notice of its disdain for

13  boilerplate objections.

14      It is not hard for the Court to decide defendants'

15  initial objections were improper.  The harder question is what

16  to do about it.  The fact that except for Mylan, defendants

17  served revised and updated objections is of no moment.  The

18  objections were served too late for plaintiffs to address them

19  and for the Court to have a meaningful opportunity to rule on

20  their merits.

21      While the Court would be fully justified in striking

22  all of defendants' objections to plaintiffs' document

23  requests, it will not do this.  One, the Court's paramount

24  concern is to make sure the case is decided on the merits, not

25  procedural irregularities.

1          Two, the Court unfortunately recognizes it is not

2    easy to change a defense culture that has built up over the

3    years, but, however, this has to and will change.

4          Three, plaintiffs do not have complete clean hands.

5    As defendants point out, the purpose of ordering core

6    discovery was to get in plaintiffs' hands early in the case

7    key information to enable plaintiffs to focus and narrow their

8    discovery requests.

9          For the most part, plaintiffs did not do this, but

10   instead served general and overbroad requests.  While

11   defendants' boilerplate objections were not appropriate, many

12   of plaintiffs' document requests were facially inappropriate.

13         Rather than striking defendants' objections, the

14   Court will leave defendants with a stern warning:  In the

15   future, the Court will not permit boilerplate objections and

16   resistance to meaningful meet and confer sessions.  Defendants

17   are on notice that if this occurs in the future, their

18   objections will be stricken and/or company representatives

19   will be ordered to informally meet with plaintiffs.  The Court

20   is confident that in the future, only appropriate objections

21   will be served and it will not see resistance to meaningful

22   meet and confer sessions.

23         The second issue to be addressed by the Court is the

24   manufacturing facilities that must respond to discovery.

25         Defendants want to limit discovery to only the API

1   facilities that made Valsartan that was recalled.  In

2   defendants' papers, they argue they also want to hold off on

3   discovery regarding the finished dose manufacturing facilities

4   until plaintiffs' document requests are served, albeit this

5   position may have changed during oral argument.

6        Plaintiffs want discovery from every entity and

7   manufacturing facility in the Valsartan distribution chain; in

8   other words, as plaintiffs write, "Every facility with any

9   role for Valsartan."

10       Starting with defendants' API manufacturing

11  facilities, the Court rules that every facility that

12  manufactured Valsartan API that was sold in the United States

13  is a proper subject of discovery and not just those facilities

14  that manufactured Valsartan that was recalled.

15       The reason is because it is not clear that only

16  recalled Valsartan is at issue in the case.  The recalled

17  Valsartan presumably contained contaminants that were

18  detected.  Plaintiffs are arguing that the defendants'

19  Valsartan may have been contaminated, even though there are no

20  available, as of yet, confirmatory tests.  At the end of the

21  day, it may be clear when Valsartan contamination started and

22  what facilities the Valsartan came from.  This is not known at

23  the moment.  Discovery directed to all of defendants'

24  manufacturing facilities that sold Valsartan in the United

25  States is the only way for plaintiffs to learn the answers to

1  these key questions.

2       The Court adds that the specific documents each API

3  manufacturing facility must produce remains to be decided,

4  however, a good start is defendants' testing results,

5  regulatory inspection reports and warning letters.

6       The Court also adds it does not expect the discovery

7  to produced by the finished dose manufacturers to be as

8  extensive as that produced by the API manufacturers.

9       As to the finished dose manufacturers, the Court

10 rules that all of defendants' finished dose manufacturing

11 facilities that made finished dose Valsartan that was sold in

12 the United States is a proper subject of discovery.

13      Even if these facilities did not cause the

14 contamination, a fact not yet confirmed, plaintiffs are

15 arguing these facilities had an independent duty to

16 investigate and discover the contamination.  In this regard,

17 plaintiffs need to find out if these facilities followed

18 current good manufacturing procedures or practices.

19 Plaintiffs are entitled to find out if these facilities had

20 actual or constructive notice of the contaminated Valsartan

21 API.

22      One plainly relevant topic of discovery is whether

23 the finished dose manufacturers did or should have conducted

24 tests to detect NDMA and NDEA.  Plaintiffs argue defendants

25 have a quality assurance obligation with regard to its API

suppliers' processes and finished product.  Plaintiffs are
entitled to discover what steps the finished dose
manufacturers took in this regard and whether they knew or
should have known about problems with their API suppliers'
tests and processes.

For the same reasons, discovery directed to all of
defendants' API manufacturing facilities that made Valsartan
API sold in the United States are relevant for discovery
purposes and not just the facilities that made the recalled
lots.  All of defendants' finished dose manufacturing
facilities that sold product in the United States are
relevant.

In order to foster productive meet and confer
sessions, within one week and to the extent not already done,
the Court orders the API and finished dose manufacturing
defendants to identify each of their facilities that will be
subject to discovery.

As to the specific documents the finished dose
manufacturing facilities must produce, that will be decided by
December 11, however, to be clear, the Court rules that
defendants' finished dose manufacturing facilities that sold
product in the United States are not off limits for discovery.
At a minimum, these facilities must produce API testing
results, inspection reports, and communications regarding
potential or actual nitrosamine contamination.  As to other

1    downstream facilities such as bottlers, repackagers, or

2    labelers, these discovery issues will be addressed in January.

3              The third issue to be addressed is plaintiffs'

4    request for discovery regarding other products using the same

5    manufacturing processes, solvents and testing as those for

6    Valsartan API.  In other words, plaintiffs want discovery

7    regarding other sartans, even though only Valsartan is

8    currently at issue thus far in the case.  For several reasons,

9    plaintiffs' request for this discovery is denied, except for

10   one caveat.  First, even though other sartans may be similar

11   to Valsartan, only Valsartan is at issue in the case at the

12   present time.  The discovery directed to Valsartan will

13   undoubtedly be extensive.  The Court is skeptical that any

14   materially relevant information will be gleaned from

15   non-Valsartan discovery that will not be learned from the

16   Valsartan discovery.

17             Thus, the burden and expense of the non-Valsartan

18   discovery is disproportional to its importance and relevance.

19   The same is true for other processes using the same solvents

20   at issue in this case.

21             Two, pending before the MDL panel is plaintiffs'

22   application to expand the scope of this MDL to include other

23   sartans.  The panel should weigh in on the issue before the

24   Court effectively makes other sartans part of the case.

25             Three, until the panel tells this Court otherwise,

1   the Court wants to keep the focus of the case on the

2   penultimate Valsartan contamination issue.  Discovery directed

3   to other sartans' processes, testing and solvents will divert

4   the parties' resources and attention away from the core issues

5   in dispute.

6          As mentioned, there is one caveat to the Court's

7   ruling cutting off plaintiffs' discovery directed to other

8   sartans.  Because of the importance of the issue and the

9   closeness of the chemical structure of the different sartans,

10  the Court will direct defendants to produce all documents

11  reflecting the presence of any nitrosamine in any sartan

12  product made prior to July 2018.  This includes not only

13  documents involving Valsartan, but other sartans, such as

14  losartan, irbesartan, olmesartan and candesartan.

15         The fourth issue to be addressed is plaintiffs'

16  requests for the dates, distribution lists, and preservation

17  instructions in defendants' litigation hold letters for

18  e-mails.  Plaintiffs' request for this information is granted

19  in part and denied in part.  The Court relies on its

20  discussion in *Major Tours*, 2009, Westlaw, 2413631, District of

21  New Jersey, August 4, 2009, for the applicable law.  There,

22  the Court held that as a general matter, litigation hold

23  letters are not discoverable unless there is a good faith

24  basis to believe spoliation occurred.

25         The Court agrees now with what it said then.  The

1   Court does not find that plaintiffs have as yet made a case

2   that spoliation occurred in this case.  The Court carefully

3   reviewed plaintiffs' master Complaints and identified the

4   instances where plaintiff cited to actual or potential

5   destruction of documents.  In those instances, however, they

6   occurred long before July 2018 when defendants could

7   reasonably foresee litigation.

8           Without the reasonable foreseeability of litigation,

9   there was no duty to preserve documents under the common law

10  and, therefore, no spoliation.  Plaintiffs did not cite to or

11  rely on any regulatory requirement to support their spoliation

12  argument.

13          Despite the fact that defendants do not have to

14  produce their hold letters or e-mails, they do have to

15  identify all recipients of the hold letters or e-mails and

16  when they were sent.  As plaintiffs argue, these objective

17  facts are relevant to the identification of knowledgeable

18  witnesses and custodians and is not privileged or protected

19  work product.  To avoid any confusion or unnecessary disputes

20  in the future, the Court wants to make one point clear, that

21  is, that although defendants do not have to produce copies of

22  their actual letters or e-mails, plaintiff may address

23  preservation issues with defendants' deponents.  Plaintiffs

24  are entitled to know whether a witness received a hold request

25  and what he or she did to preserve relevant information.  This

1    topic is not privileged or work product and is not off limits

2    at defendants' depositions.  Last, the Court declines

3    plaintiffs' request to review defendants' hold letters in

4    camera.

5         Now that the Court has addressed the four issues

6    raised in plaintiffs' opening brief, the Court will turn to

7    the eight issues raised in defendants' opening brief.  The

8    first issue to be addressed is plaintiffs' request for foreign

9    regulatory documents.  Unfortunately, plaintiffs do not

10   identify the specific regulatory bodies from whom they request

11   documents, nor the specific documents they request.

12        Plaintiffs ask for all documents regarding the

13   Valsartan recall, foreign inspection reports, foreign

14   regulatory submissions and other similar documents.

15   Defendants argue plaintiffs' discovery should be limited to

16   the FDA.

17        As to regulatory documents in general, the Court has

18   already ordered fulsome discovery of FDA documents.  This was

19   covered in the Court's core discovery order, an order

20   requiring plaintiffs be sent copies of all ongoing relevant

21   communications between the FDA and defendants.  Thus, in the

22   Court's belief, it is likely that all non-privileged relevant

23   FDA information regarding the issues in this case has or will

24   get into plaintiffs' hands.

25        The Court finds that plaintiffs have not shown that

1  carte blanche regulatory discovery is needed.  No persuasive

2  evidence has been presented that hoards of relevant

3  information is in foreign regulatory hands but not in the

4  possession of the FDA.

5      The Court believes that if it opens the door wide to

6  foreign regulatory discovery, the parties will get bogged down

7  in duplicative discovery.

8      The Court does not rule, however, that all foreign

9  regulatory discovery is off limits.  Plaintiffs are entitled

10  to materially relevant discovery that is not likely already in

11  FDA's possession.

12      The Court, therefore, will order defendants to

13  produce for each of the relevant facilities in the case,

14  regulatory inspection reports, warning letters akin to what

15  the FDA sends, 483-like documents, defendants' responses to

16  these documents, root cause analyses and communications

17  regarding potential or actual nitrosamine contamination prior

18  to July 2008 that were sent to or received from any foreign

19  regulatory body during the designated relevant time period.

20      The next issue defendants raise is plaintiffs'

21  request for foreign sales marketing materials and agreements.

22  This request is denied as the requested discovery is far

23  afield from the material issues in the case.

24      The case involves sales of Valsartan in the United

25  States and that is where the focus of plaintiffs' discovery

1    should and will be.  Nonetheless, to the extent defendants

2    have possession, custody, or control of documents from

3    whatever source regarding unknown and unidentified testing

4    peaks or general toxic impurities, the documents have to be

5    produced.  Plaintiffs' requests for all out-of-specification

6    documents is too broad.  This could involve issues such as the

7    color, shape, texture, et cetera, of Valsartan, which is not

8    relevant to the issues in the case.

9         Plaintiffs are directed to meet and confer with

10   defendants on what they specifically want in this regard and

11   raise disputes with the Court for the December 11th

12   conference.

13        The next issue raised by defendants is the extent of

14   discovery regarding each applicable defendants' finished dose

15   manufacturing process.  The Court has already discussed this

16   issue and has nothing to add.

17        The fourth issue raised by defendants relates to what

18   testing documents have to be produced.  Although this is

19   obviously one of the most important issues in the case, the

20   plaintiffs are hamstrung in their discovery efforts, so they

21   say, because they do not know the types of tests defendants

22   conducted.

23        Clearly, plaintiffs are entitled to obtain discovery

24   regarding any test that could identify the presence of

25   nitrosamine contamination, such as NMBA and NDEA.  The parties

1   apparently concede chromatography testing is relevant, but

2   there may be other relevant tests.  Defendants, therefore, and

3   to the extent not already done, will be ordered to identify

4   the types and purposes of the tests they ran at the subject

5   facilities and to meet and confer with plaintiffs regarding

6   the test results to be produced.

7           Disputes will be addressed on December 11.  For the

8   reasons already discussed, this ruling not only applies to API

9   manufacturers but also to finished dose manufacturers.  The

10  parties should keep in mind that the facilities at issue are

11  those that made products sold in the United States.

12          As to bioequivalence testing, this testing is

13  relevant to the master economic loss claims and whether the

14  purchasers got what they paid for.  The testing is also

15  relevant to whether defendants were or should have been aware

16  of quality control issues, thus, bioequivalence testing shall

17  be produced.  Disputes regarding what testing should be

18  produced, if any, should be raised in time to be addressed at

19  the December 11 conference.

20          In order to avoid potential disputes, testing and

21  results regarding other carcinogens, general toxic impurities

22  or residual solvents in the Valsartan is relevant.

23          It would be anomalous to require defendants to

24  produce test results revealing actual or potential NMBA or

25  NDEA contamination, but not to reveal other similar toxic

1  contaminants.  Albeit, one would think if this information

2  existed, it would have already been turned over to the FDA.

3       The next issue to be addressed is the scope of health

4  risk discovery.  Defendants will be ordered to produce all

5  documents, communications, and studies, et cetera, regarding

6  the health effects of exposure to Valsartan contaminated with

7  nitrosamines.  Plaintiffs' request for health effect discovery

8  regarding non-contaminated Valsartan is denied.

9       The next issue to be addressed is the relevant

10  timeframe for general custodial searches.  This is not an easy

11  issue to decide, as both sides makes valid points.  The Court

12  ultimately concludes that it will not order the extensive time

13  period plaintiff requests for general custodial searches.

14  However, this does not foreclose plaintiffs from asking for

15  earlier, discrete, and identifiable categories of documents or

16  individual documents.  To the extent plaintiffs and defendants

17  cannot work out their issues, the Court will entertain the

18  parties' discovery dispute and for good cause shown will order

19  the production of earlier documents.

20       As to the relevant time period for general custodial

21  searches, the Court will use the earliest date defendants

22  proposed plus one year, starting from January 1.  These dates

23  are as follows:  ZHP, January 1, 2010; Mylan, January 1, 2011;

24  Teva, January 1, 2012; Torrent, January 1, 2013; Aurolife,

25  January 1, 2012.

1          To repeat, the Court understands there are likely

2   relevant older documents, but these will not be searched for

3   until plaintiffs make a showing of good cause to produce

4   discrete and identifiable documents or categories of

5   documents.

6          As to Issues 7 and 8 in the Court's October 22nd,

7   2019 order, the parties have advised the Court that these

8   issues are not in dispute, except the Court notes for the

9   record a clarification that if a defendant has otherwise

10  translated a document in the normal course of business and not

11  just for litigation purposes, it will be produced by the

12  defendants.

13         That completes the Court's oral opinion to be

14  confirmed in an order to be entered.  Counsel, if there are

15  any other issues you want to address, I'll address them, but

16  we can adjourn and head over to courtroom 4D to meet with

17  Judge Kugler.

18         For the good of the order, plaintiffs, any other

19  issues to address?

20         MR. SLATER:  Nothing, Your Honor.  We thank you for

21  your hard work on this.

22         THE COURT:  Thanks.

23         Defendants?

24         MR. GOLDBERG:  Nothing, Your Honor.  Thank you.

25         THE COURT:  We're adjourned.

1          See you in courtroom 4D.

2          THE DEPUTY CLERK:  All rise.

3          (2:55 p.m.)

4          - - - - - - - - - - - - - - -

5

6          I certify that the foregoing is a correct transcript

7    from the record of proceedings in the above-entitled matter.

8

9    */S/ Karen Friedlander, CRR, RMR*
     *Court Reporter/Transcriber*

10

11   *11-21-19*
     *Date*

12

13

14

15

16

17

18

19

20

21

22

23

24

25