# Exhibit D

Case 1:19-md-02875-RMB-SAK   Document 731-4   Filed 01/12/21   Page 2 of 12 PageID: 19313

In re Takata Airbag Products Liability Litigation, Not Reported in Fed. Supp. (2017)
2017 WL 8812735

2017 WL 8812735
Only the Westlaw citation is currently available.
United States District Court, S.D. Florida,
Miami Division.

IN RE: TAKATA AIRBAG
PRODUCTS LIABILITY LITIGATION
This Document Relates to all Actions

Master File No. 15-02599-MD-MORENO
|
MDL No. 2599
|
Signed 07/19/2017

**SPECIAL MASTER'S REPORT AND RECOMMENDATION ON PLAINTIFFS' MOTION TO COMPEL THE DEPOSITION OF HONDA WITNESS TAKERU FUKUDA**

*1 This matter came before the Special Master on Plaintiffs' Motion to Compel the Deposition of Honda Witness Takeru Fukuda (Attachment 1). The undersigned has reviewed Plaintiffs' Motion and the Honda Defendants'[1] Response (Attachment 2). The undersigned also conducted a telephonic hearing with counsel for Plaintiffs and the Honda Defendants on July 10, 2017 (Attachment 3).

Following review and consideration of the parties' arguments, the undersigned recommends that the District Court should **GRANT** Plaintiffs' Motion to Compel the Deposition of Honda Witness Takeru Fukuda.

**I. PROCEDURAL HISTORY.**

This is the second discovery dispute related to Plaintiffs' efforts to depose Takeru Fukuda, an Assistant Chief Engineer at Honda R&D Co., Ltd. ("HGT"), who wrote a 2013 email describing himself as "a witness in the dark who knows the truth about Takata's inflator recall," and who stated that "[i]f I say something to [the National Highway Traffic Safety Administration ("NHTSA") ], it will cause a complete reversal in the auto industry which adopted Takata's inflators." Attach. 1, Ex. A at 1. In the same email, Mr. Fukuda compared himself to "Edward Snowden of former CIA," indicating that Honda would not "let [him] go easily," and explaining that Honda had taken him "off the work related to airbags" because of his knowledge. *Id.* Ironically, Honda has stated repeatedly—both in its written Response and during the hearing on the above motion—that it "has no objection to Fukuda-san sitting for a deposition if he were to consent to doing so" because "Fukuda-san would debunk plaintiffs' reading of his years-old e-mails." Attach. 2 at 1; Attach. 3 at 20, 61.

In the first discovery dispute, the undersigned was called upon to resolve the parties' impasse regarding Honda's claim that the deposition testimony of five Honda employees, including Mr. Fukuda, would be irrelevant and disproportionate to the needs of the case. Plaintiffs' Email Requesting Oral Hearing, Attachment 4 at 10. Plaintiffs' position was that these witnesses were involved in the investigation and development of ammonium-nitrate in the late 1990s, and could testify regarding whether Honda knew that Takata Corporation's ("Takata") airbags contained ammonium nitrate and, if so, whether it was dangerous. *See id.*; Transcript of April 12, 2017 Hearing, Attachment 5 at 25-26. The undersigned conducted an oral hearing to address the relevance and proportionality objections, and each party made detailed factual proffers about the five witnesses, including by summarizing emails and meetings that evidenced their involvement with the airbag inflators at issue in this matter. Attach. 5. at 23-45, 47-53. At the conclusion of the hearing, the undersigned orally overruled Honda's objections, finding that the "witnesses have information that strikes at the very, very heart of this case," such as "the selection of a new inflator, the batwing design, possible meetings related to ruptures, [and] testing of airbags related to ruptures." Attach. 5 at 68-69.

*2 Subsequently, Honda and Plaintiffs continued the "meet and confer" process on a distinct issue, namely, Honda's contention that none of the five employees, all of whom reside in Japan, could be compelled to testify pursuant to Rule 30(b)(1) Notices of Deposition. Attach. 1 at 3. Eventually, Honda agreed to produce two of the Honda witnesses for depositions in the United States, apparently because they held management positions and consented to the deposition. *Id.*; Attach. 3 at 36-37. As to Takeru Fukuda, however, Honda objected to his deposition pursuant to Rule 30(b)(1) for several reasons summarized below.

Consequently, Plaintiffs served the instant Motion on June 13, 2017, seeking to compel Mr. Fukuda's deposition pursuant to Rule 30(b)(1). Attach. 1. Plaintiffs resorted to Rule 30(b)(1),

Case 1:19-md-02875-RMB-SAK    Document 731-4    Filed 01/12/21    Page 3 of 12 PageID: 19314

In re Takata Airbag Products Liability Litigation, Not Reported in Fed. Supp. (2017)
2017 WL 8812735

rather than serving Mr. Fukuda with a subpoena pursuant to the applicable international treaty under Rule 45, because Mr. Fukuda has declined to have his deposition taken as is his right under the U.S.-Japan Consular Convention of 1963. Attach. 2, Ex. 1, ¶ 10. In their motion, Plaintiffs claimed that Honda could be compelled to present Mr. Fukuda for a deposition under Rule 30(b)(1) because Mr. Fukuda's job responsibilities show that he is a "managing agent" for purposes of giving testimony related to the subject matter of this litigation. Attach. 1 at 1. Plaintiffs complained, however, that they had to "piece[ ] together Mr. Fukuda's responsibilities from documents produced by Honda and Takata" because Honda still had not produced Mr. Fukuda's custodian file, or even an organizational chart for HGT.[2] *Id.*

Although Honda maintains that it "has no objection to Fukuda-san sitting for a deposition," it nonetheless filed a Response on June 23, 2017. Attach. 2. In its Response, Honda argued that it could not be compelled to produce Mr. Fukuda because he had not consented to the deposition, and because he was a union member with no decision-making authority and therefore not a "managing agent" within the meaning of Rule 30(b)(1). *Id.* at 1, 3-4.

### II. LEGAL STANDARD.

It is axiomatic that only a party to the litigation may be compelled to give testimony pursuant to a notice of deposition under Fed. R. Civ. P. 30(b). *See In re Honda Am. Motor Co., Inc. Dealership Relations Litig.*, 168 F.R.D. 535, 540 (D. Md. 1996). Under Rule 30(b)(1), the examining party may notice the deposition of a specific employee of a corporate party only if that person is its officer, director, or managing agent. *Id.*; *see also Procaps S.A. v. Patheon, Inc.*, 12-24356-CIV, 2014 WL 352226, at *2 (S.D. Fla. Jan. 30, 2014). If not an officer, director or managing agent, then a foreign employee must be issued a subpoena under "the procedures of The Hague Convention or other applicable treaty." *Calderon v. Experian Info. Solutions, Inc.*, 287 F.R.D. 629, 631 (D. Idaho 2012), *aff'd*, 290 F.R.D. 508 (D. Idaho 2013).

Generally, courts determine a person's managing agent status based on the employee's job responsibilities at the time of the deposition. Employees who have been reassigned to a new position in the corporation, however, may still be managing agents if they "retained some role in the corporation or at least maintained interests consonant with rather than adverse to its interests." *Calixto v. Watson Bowman Acme Corp.*, 07-60077-CIV, 2008 WL 4487679, at *3 (S.D. Fla. Sept. 29, 2008); *see also In re Honda Am. Motor Co., Inc. Dealership Relations Litig.*, 168 F.R.D. at 541; *accord Curry v. States Marine of Delaware*, 16 F.R.D. 376, 377 (S.D.N.Y. 1954) (explaining that the rule was intended "to protect a party from the admissions of a disgruntled former employee").

*\*3 The examining party bears the burden of establishing that the person to be examined qualifies as a managing agent. *Procaps S.A.*, 2014 WL 352226, at *3. This burden is a modest one, however, because discovery rules are interpreted liberally. *Calderon*, 287 F.R.D. at 633. Thus, if an employee's status as a managing agent is a "close question," doubts are resolved in favor of the examining party, particularly when discovery on the issue is not complete. *Id.* at 632-33; *see also Calixto*, 2008 WL 4487679, at *3 (compelling deposition to determine with precision whether the deponent's interests were aligned with the corporate party and the scope of his current duties). The determination of whether the corporation is bound by the witness's testimony is left for trial. *Calderon*, 287 F.R.D. at 629, 634

Importantly, whether a deponent is a managing agent does not depend on the witness' job title, but is determined by examining the witness' actual job responsibilities. *Procaps S.A.,* 2014 WL 352226, at *3. The term "managing agent" is not interpreted literally. "Although employees of a corporation may not be managing agents regarding their everyday duties, they may still be managing agents about their testimony concerning their important activities in the underlying facts" or where their activities are closely linked with events giving rise to the lawsuit. *Id.* (citing *Magdalena v. Toyota Motor Corp.*, No. 12-20661-CIV, 2012 U.S. Dist. LEXIS 178666 (S.D. Fla. Dec. 12, 2012) (finding two inspectors of the vehicle at issue to be managing agents) ); *Tomingas v. Douglas Aircraft Co.,* 45 F.R.D. 94, 96 (S.D.N.Y. 1968); *Zurich Ins. Corp. v. Essex Crane Rental Corp.*, 90 CIV. 2263 (SWK), 1991 WL 12133, at *2 (S.D.N.Y. Jan. 29, 1991).

Importantly, the determination of whether a person is a managing agent is not formulaic; rather, it is a fact-specific inquiry involving consideration of the following factors:

> (1) whether the individual has general power to exercise discretion in corporate matters; (2) whether he or she can be expected to testify at the employer's request; (3) whether there are persons within the corporation with greater authority regarding the information sought; (4) the general responsibilities of the individual regarding the matters under litigation; and (5) whether the witness identifies with the interests of the corporation.

Case 1:19-md-02875-RMB-SAK   Document 731-4   Filed 01/12/21   Page 4 of 12 PageID: 19315

In re Takata Airbag Products Liability Litigation, Not Reported in Fed. Supp. (2017)
2017 WL 8812735

*Al-Ghena Int'l Corp. v. Radwan*, 13-61557-CIV, 2015 WL 13035062, at *2 (S.D. Fla. Sept. 22, 2015) (quoting *Procaps S.A.*, 2014 WL 352226, at *3).

Some courts have held that the fifth factor is the "paramount test," particularly where managing agent status is a "close question." *Calderon*, 287 F.R.D. at 632; *Boston Diagnostics Dev. Corp., Inc. v. Kollsman Mfg. Co., Div. of Sequa Corp.*, 123 F.R.D. 415, 416 (D. Mass. 1988). However, managing agent status cannot "extend to one who was not a manager in some capacity" simply because the employee identifies with the interests of the corporation. *E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.*, 268 F.R.D. 45, 53 (E.D. Va. 2010).

### III. ANALYSIS.

The present dispute is a critical one. If Mr. Fukuda is found to be a "managing agent," then Plaintiffs can take his deposition and confirm whether he "knows the truth about Takata's inflator recall when they were developed." Attach. 1, Ex. A at 1. If Mr. Fukuda is not found to be a "managing agent" for purposes of Rule 30(b)(1), Plaintiffs will be unable to take Mr. Fukuda's deposition – even though Honda itself does not object – because Mr. Fukuda has not consented to having his deposition taken pursuant to the U.S.-Japan Consular Convention of 1963. Attach. 2 at 1; Attach. 2, Ex. 1, ¶ 10. Not surprisingly, the parties have conflicting and irreconcilable views of Mr. Fukuda's responsibilities.

 **\*4**  The undersigned notes, at the outset, that the below analysis of the five-factor test for "managing agent" status is primarily focused on the time period from 1997 to 2000, during which the Defendants concede that Mr. Fukuda "was assigned to a group that worked on PSDI inflators" and "conducted a test of a Takata prototype PSDI airbag module assembly that occurred at HGT on October 16, 1999," resulting in an unexpected rupture. Attach. 2, Ex. 1, ¶¶ 2-4. The undersigned finds it appropriate to ascertain whether Mr. Fukuda was a "managing agent" during the 1997-2000 timeframe, rather than at the present time, because he was reassigned to a new position in the corporation, but nonetheless "retains some role in the corporation or at least maintained interests consonant with rather than adverse to its interests." *Calixto*, 2008 WL 4487679, at *3.[3]

#### a. Whether the Individual Has General Power to Exercise Discretion in Corporate Matters.

Plaintiffs have submitted several emails and exhibits that do not directly prove, but that nonetheless support an *inference*, that Mr. Fukuda was vested with general power to exercise discretion in corporate matters related to airbag inflators. For instance, in Exhibit D, Mr. Fukuda sent a highly-detailed and technical email dated July 1, 1999 to Takata engineers instructing them to use certain control ranges for the propellant and tank pressure for the inflators of a P-NAPI airbag. Exhibit E is a report demonstrating that Mr. Fukuda was one of only five (5) witnesses present during the October 16, 1999 Takata airbag rupture incident at HGT. Exhibit F, which the undersigned found to be particularly persuasive, is an email that Mr. Fukuda sent to Takata engineers shortly after Takata issued a technical engineering report identifying the cause of the October 16, 1999 rupture incident as a welding defect. In that email, Mr. Fukuda posed several follow-up questions to Takata's engineers regarding their report, instructed them to perform additional verification testing, instructed them to issue a new report, told them that "the above are questions and indications of analysis errors," and openly challenged their technical conclusions, stating "I don't think at all [that the cause of the problem] was solely due to the welding defect of the divider disc." Attach. 1, Ex. F at 2-5. Finally, in Exhibit I, Mr. Fukuda is listed as a primary contact in 2007 for "Dr. Airbag module," design (seat belt) and "Side airbag module," design (seat belt). The undersigned believes that these exhibits, taken together, suggest that Mr. Fukuda had repeated substantive contact with Takata, gave them technical instructions and orders, and apparently had sufficient standing within Honda to question and critique Takata's conclusions on a critical question: the cause of the unexpected October 16, 1999 rupture of a P-SDI Takata airbag that had not yet been installed in any Honda vehicles.

In response to the above, Honda submitted an affidavit from Mr. Yamato, a Honda Human Resource Manager, but that affidavit is primarily focused on Mr. Fukuda's current work as an Assistant Chief Engineer, and not on the work he performed from 1997-2000. Mr. Yamato explains, for example, that Assistant Chief Engineers, including Mr. Fukuda, are members of a labor union, are not part of management, do not have decision-making authority, and are not solely responsible for interacting with suppliers or overseeing projects. Attach. 2, Ex. 2, ¶¶ 4, 5. In the concluding paragraph of the affidavit, Mr. Yamato makes two broad, conclusory statements, not expressly limited to Assistant Chief Engineers, that Fukuda's "position at HGT has *not* provided him with general corporate authority or power to exercise discretion in HGT corporate matters" and "*never*

Case 1:19-md-02875-RMB-SAK   Document 731-4   Filed 01/12/21   Page 5 of 12 PageID: 19316

In re Takata Airbag Products Liability Litigation, Not Reported in Fed. Supp. (2017)
2017 WL 8812735

had management responsibilities related to airbag inflators." Attach. 2, Ex. 2, ¶ 7 (emphasis added). In the overall context of the affidavit, however, it is unclear whether these broad, conclusory statements just refer to Mr. Fukuda's current role as Assistant Chief Engineer, or the role he filled from 1997-2000. And although Mr. Fukuda held a lower-level position before he was promoted to Assistant Chief Engineer, the courts have made it clear that job responsibilities, not job titles, are dispositive. Neither Mr. Yamato nor Mr. Fukuda offer a detailed explanation of Fukuda's job responsibilities during the 1997-2000 timeframe, other than to say he was "assigned to a group that worked on PSDI inflator development," and witnessed the October 16, 1999 airbag rupture. Attach. 2, Ex. 1, ¶¶ 2-3. Indeed, as Plaintiffs pointed out during the hearing, it is not surprising that Mr. Fukuda's affidavit failed to address certain of Plaintiffs' arguments and exhibits because it was executed on June 1, 2017, almost two weeks before Plaintiffs filed the instant motion.[4] Attach. 3 at 12.

**\*5** In addition to offering the affidavits of Mr. Yamato and Mr. Fukuda, Honda argued during the hearing, and Plaintiffs' exhibits confirm, that Mr. Fukuda's supervisors typically attended his meetings with suppliers and colleagues, and were also copied on important emails. *See, e.g.*, Attach. 1, Exs. F, G, L; Attach. 3 at 70-71, 73, 79-82. Honda's counsel argued that this demonstrates that Mr. Fukuda was merely acting under the direction of his supervisors, carrying out their orders, and communicating information as instructed. Attach. 3 at 70-71, 73, 79-82.

Weighing all the facts and arguments above, the undersigned finds that this factor militates in favor of Honda, albeit by a very slim margin. Plaintiffs' exhibits show that Mr. Fukuda communicated with suppliers on key issues that are germane to this litigation, but they do not necessarily show that he exercised independent discretion, or that he engaged in these interactions without being authorized to do so by the senior managers. Although it can be inferred that Mr. Fukuda was a trusted employee, Plaintiffs' exhibits do not establish that he had the power to exercise unbridled discretion regarding his communications with suppliers about propellant specifications. *See In re Honda Am. Motor Co., Inc. Dealership Relations Litig.*, 168 F.R.D. at 541.

**b. Whether the Employee Can Be Expected to Testify at the Employer's Request.**

Plaintiffs argued in their Motion that Mr. Fukuda remains employed by Honda, could be compelled to testify by Honda, and is "no differently situated than the senior engineers whom Honda has already brought to the United States to testify." Attach. 1 at 6; Attach. 3 at 14, 38-39. Honda's conclusory response was that Mr. Fukuda, unlike the other Honda engineers, "declined to testify voluntarily." Attach. 2 at 3; Attach. 2, Ex. 1, ¶ 10. The undersigned notes, however, that Mr. Fukuda's consent is irrelevant to this analysis because Plaintiffs are not attempting to subpoena Mr. Fukuda under Rule 45 or the U.S.-Japan Consular Convention of 1963; instead, they are attempting to depose him under Rule 30(b)(1). Attach. 1 at 3. Thus, the Defendant's written response was inapposite on this point.

At the hearing, however, Honda stated for the first time that a Japanese law might preclude Honda from compelling Mr. Fukuda to testify even if he was deemed to be a "managing agent." Attach. 3 at 33-37. Critically, Honda failed to specifically cite or describe the Japanese law during the hearing, and did not seek to supplement the record after the hearing to identify the law or explain how the Japanese law would apply in these circumstances.[5] Moreover, the undersigned notes that in *In re Honda Am. Motor Co., Inc. Dealership Relations Litig.*, 168 F.R.D. at 541, the court determined that a Japanese Honda America Motor Company, Inc., employee could be compelled to testify by Honda. The undersigned has not been given any reason to reach a different conclusion here.

**c. Whether There Are Persons Within the Corporation with Greater Authority Regarding the Information Sought.**

Review of the parties' exhibits clearly demonstrates that Mr. Fukuda has always had senior colleagues at Honda. Mr. Yamato stated in his declaration that Mr. Fukuda is currently an Assistant Chief Engineer, which is a union position junior to Chief Engineers and Senior Chief Engineers, which are in management. Attach. 2, Ex. 2, ¶ 4. Moreover, as Honda observed in its Response and at the hearing, individuals who "outrank" Mr. Fukuda are copied on the emails or attended the meetings cited in Plaintiffs' exhibits. Attach. 2 at 3; Attach. 3 at 79-81, 84, 89-90, 93; Attach. 1, Exs. F, G, L.

**\*6** Courts, however, do not limit this inquiry to whether there are colleagues senior to Mr. Fukuda; rather, as noted above, an employee's title is not dispositive and courts appear

Case 1:19-md-02875-RMB-SAK   Document 731-4   Filed 01/12/21   Page 6 of 12 PageID: 19317

In re Takata Airbag Products Liability Litigation, Not Reported in Fed. Supp. (2017)
2017 WL 8812735

to consider whether an employee is in the "best position" to testify concerning the information sought. For instance, in *Magdalena v. Toyota Motor Corp.*, No. 12–20661–CIV, Slip. Op. at 2 (S.D. Fla. Dec. 18, 2012) (ECF No. 95), Magistrate Judge O'Sullivan found that two low-level Toyota employees tasked with inspecting a vehicle that was the subject of the litigation were managing agents "regarding giving testimony about the inspection of the car" because they were "in the best position to testify as to what occurred at the inspection." Likewise, in *Zurich Ins. Corp.*, 1991 WL 12133, at *2, the court noted that the third factor favored a finding that two inspectors of a crane were managing agents because no one else at the corporation was "in a better position to testify as to the events surrounding the accident" because they were the only employees with "first-hand knowledge of the accident." Finally, in *Calderon*, 287 F.R.D. at 634, the court considered whether "entry level" dispute agents that processed the plaintiff's request to correct his credit reports could be managing agents. The court found that they were, reasoning that these entry level employees were the "only people who might have information about what was actually done, as opposed to simply what Experian's policies and procedures theoretically required." Thus, this factor can favor Plaintiffs if Mr. Fukuda is in the best position to testify concerning the information sought.

Plaintiffs argued that it does not appear that any Honda witnesses with greater authority are available to testify regarding the inflator rupture in 1999, all of his interactions with Takata, or his claim to knowing "the truth" about Takata's inflators. Attach. 1 at 6. Indeed, Plaintiffs argued and Honda conceded that Mr. Fukuda is the only remaining witness to the 1999 inflator rupture event available to testify, and Plaintiffs argued that he is the only individual who can describe the rupture event and explain how that experience led him to challenge Takata's cause assessment and distrust Takata. Attach. 3 at 18, 76, 145-46; Attach. 1 at 6. Moreover, Plaintiffs argued that other Honda employees who were deposed, including Mr. Kanazawa and Mr. Kobayashi, lacked knowledge regarding Mr. Fukuda's 2013 email indicating he knew the "truth" about Takata's inflator recall, concerning all of Mr. Fukuda's communications with airbag suppliers, or relating to meetings Mr. Fukuda attended. Attach. 1 at 6; Attach. 1, Ex. H at 257-62; Attach. 1, Ex. O at 456-58; Attach. 3 at 95-97, 99-101.

Notably, at the April 12, 2017 hearing, Plaintiffs also quoted Honda's amended and supplemental response to Plaintiffs' Second Set of Interrogatories. Attach. 5 at 28. Therein, Honda swore that "the development of Takata inflators PSDI, PI, SDI, and SBI containing Takata's 2004 propellant, which contained phase stabilized ammonium nitrate ... took place from 1988 to 2000," and that Honda engineers "may have learned that the propellant ... contained phase stabilized ammonium nitrate [from] 1999 through 2000." *Id.* Moreover, Honda stated that it was difficult to determine when Honda learned this information because "[m]any of the Honda engineers involved in the project have either retired or died." *Id.*

In response to Plaintiffs' argument that there are no witnesses with greater authority, Honda argued generally that employees senior to Mr. Fukuda had "knowledge about the issues in this case" and, as more specifically testified to by Toru Kobayashi, that Mr. Fukuda "was not a member of the root cause investigation team, so 'there *should* not be anything that he alone knows but nobody else does.' " Attach 2 at 3; Attach. 1, Ex. H at 260 (emphasis added). At the hearing, Honda also cited the following individuals as having attended the same meetings as Mr. Fukuda or having knowledge regarding the "issues in the case": Mr. Kamiji, Mr. Kanichi Fukuda, Mr. Seki, Mr. Takahashi, Mr. Kanazawa, and Mr. Takai.[6] Honda also argued that senior colleagues led the investigation regarding the 1999 rupture, including Mr. Kamiji, and that the 1999 rupture is otherwise irrelevant because that inflator was not aged or exposed to moisture. Attach. 3 at 25-28, 119-24, 143.

**\*7** Weighing these arguments, the undersigned finds that this factor narrowly favors Plaintiffs, particularly with respect to the 1997-2000 period. In light of the difficulties Honda described concerning the gathering of evidence from the period of 1997-2000, and given that many witnesses have died or retired, it is significant that Mr. Fukuda's declaration states that he "worked in airbag module development for driver and passenger airbag modules containing dual stage airbag inflators" and "[f]rom 1997 until 1999, [he] was assigned to a group that worked on PSDI inflator development." Attach. 2, Ex. 1, ¶ 2.

Moreover, Mr. Fukuda conducted and is the only available witness to the 1999 test that resulted in the Takata inflator rupture, attended both the 1999 and 2000 meetings concerning Takata inflator ruptures, aggressively challenged Takata's findings as to the cause of the 1999 rupture, and communicated his concerns with Takata's findings and apparently told his colleagues at Honda about his distrust of Takata. *Id.* at ¶¶ 3, 5; Attach. 1, Exs. G, F; Attach. 3 at 18,

Case 1:19-md-02875-RMB-SAK   Document 731-4   Filed 01/12/21   Page 7 of 12 PageID: 19318

In re Takata Airbag Products Liability Litigation, Not Reported in Fed. Supp. (2017)
2017 WL 8812735

76. Thus, although Mr. Kamiji may have led the investigation regarding the cause of the 1999 rupture, Mr. Fukuda appears to be the only available Honda witness who conducted the test, witnessed the rupture, attended meetings concerning the ruptures, participated in the investigation of the cause of the rupture, and expressed concern and distrust regarding the cause determination.

Accordingly, although Honda is correct that many Honda colleagues senior to Mr. Fukuda attended the same meetings or have knowledge concerning several issues central to the litigation, Mr. Fukuda likely possesses unique information during a critical period regarding his statements shared to other colleagues, many of whom are unavailable according to Honda, including what he communicated and the basis of those concerns. Attach. 3 at 97, 99-101. Thus, Mr. Fukuda appears to be the best source of the information. In that regard, Mr. Fukuda is similar to the employees in *Magdalena, Zurich*, and *Calderon*.

Additionally, the undersigned is mindful that Plaintiffs were somewhat hamstrung because Honda does not maintain an organizational chart for any of its Japanese entities and is unable to produce Mr. Fukuda's custodial file. Attach. 3 at 64-65. Accordingly, the undersigned resolves any doubt as to this factor in favor of Plaintiffs. *Calderon*, 287 F.R.D. at 632-33.

### d. The General Responsibilities of the Individual Regarding the Matters Under Litigation.

This factor was difficult to assess because, as noted several times during the hearing on this matter, it was exceedingly difficult to harmonize Plaintiffs' exhibits with statements made in Honda's brief and supporting declarations, especially when the undersigned focused on the 1997 to 2000 timeframe. Attach. 3 at 5, 71-75, 109-114, 119-125. For example, Honda's brief stated that "Fukuda-san has spent his career working primarily on research and development related to airbag *modules*—not airbag *inflators*, the subject of this litigation." Attach. 2 at 2 (emphasis in original). But Honda's qualifying word—"primarily"—is an important one because Plaintiffs submitted multiple exhibits to prove, and Mr. Fukuda's own declaration confirms, that he worked on "PSDI *inflator* development," which is most certainly a matter under litigation, from 1997 to 1999. *See* Attach. 1, Exs. D-G; *see* Attach. 2, Ex. 2, ¶ 2; Attach. 3 at 86-87. (emphasis added).

Honda's brief also states that Mr. Fukuda's research "does not involve Takata inflators or the propellant used in them," although it's unclear whether Honda intended for this sentence to describe Fukuda's current work as Assistant Chief Engineer or the work he was performing in the late 1990s. Attach. 2 at 2. Notwithstanding this ambiguity, Plaintiffs' exhibits, many of which were described in detail in Section III.A., *supra*, make it emphatically clear that Fukuda's work *did* involve airbag inflators prior to his reassignment in 2000. *See, e.g.*, Attach. 1, Exs. D-G.[7]

**\*8** Finally, Honda's brief states that "Fukuda-san could not have exercised 'discretion to instruct Takata, on behalf of Honda, regarding inflator specifications,' as Plaintiffs contend, because he has '*never done any work or research related to airbag inflator or propellant aging specifications.*'" Attach. 2 at 3 (emphasis added). Although Honda may be correct that Fukuda did not exercise *discretion* independent from senior engineers, as discussed in Section III.A., *supra*, he most certainly performed work related to airbag inflators and propellants, as well as the specifications for them. Indeed, Mr. Fukuda wrote an email in July 1999 to Takata engineers "concerning the inflators," and clearly instructed them to "set control ranges for the tank pressure and the amount of propellant" at specific levels. Attach. 1, Ex. D at 1. Later, following the October 16, 1999 Takata inflator rupture at HGT, Fukuda wrote an email with several questions for Takata's engineers, including questions specific to the inflators and propellant. Attach. 1, Ex. F.

Despite Plaintiffs' exhibits cited above, Honda argues that Mr. Fukuda did not have general responsibility for the "matters under litigation" from 1997-2000 by re-defining the scope of the litigation in the narrowest possible terms. For example, upon a close reading of Mr. Fukuda's declaration, Honda inserts an important word of limitation: "I have never done any work or research related to airbag or inflator *aging* specifications." Attach. 2, Ex. 1, ¶ 9 (emphasis added). Thus, even though Exhibits D-G clearly show that Mr. Fukuda sent emails and attended meetings specifically related to inflators, propellants, ruptures, ammonium nitrate and even recalls, it appears Honda is arguing that he did not have responsibility over "matters under litigation" because his experience was not specifically related to *aging*. After reviewing the complaint, the undersigned believes this is too narrow of a distinction. Indeed, liberally construed, Plaintiffs' theory of liability is not just that Takata's airbags become dangerous after environmental aging; it is that ammonium nitrate is an inherently unstable and dangerous compound. *See*

Case 1:19-md-02875-RMB-SAK   Document 731-4   Filed 01/12/21   Page 8 of 12 PageID: 19319
In re Takata Airbag Products Liability Litigation, Not Reported in Fed. Supp. (2017)
2017 WL 8812735

Second Amended Complaint, ECF No. 121 at 2 ("All Takata airbags at issue in this litigation share a common, uniform defect: the use of ammonium nitrate, a notoriously volatile and unstable compound, as the propellant in their defectively designed inflators"); Attach. 3 at 119, 125.

Honda uses similar rationale to minimize the importance of the 1999 rupture event that Mr. Fukuda personally witnessed, as well as Mr. Fukuda's questioning of Takata regarding the cause of that rupture, and of Mr. Fukuda's conclusion it was predictive of Takata airbag field ruptures and the related recalls. Attach. 2, Ex. 2, ¶¶ 3-7; Attach. 3 at 119-124. Put simply, Honda seems to argue that the 1999 rupture incident is not a "matter under litigation" because, as it turns out, Mr. Fukuda's conclusion turned out to incorrect. Indeed, Honda used Mr. Fukuda's declaration to point out that NHTSA eventually concluded the ruptures were caused by "degradation of the propellant over a period of years due to exposure to moisture and repeated thermal cycling," whereas the prototype inflator involved in the October 1999 rupture was never exposed to environment aging. Attach. 2, Ex. 1, ¶ 7; Attach. 3 at 119-124. But whether Fukuda's opinions about the cause of the 1999 rupture event were accurate is beside the point; instead, the important point is whether Fukuda sounded a warning alarm in 1999 (even if a false or misguided alarm) that should have put Honda on notice or caused it to investigate further.

Finally, Honda has attempted to minimize Mr. Fukuda's responsibility for the "matters under litigation" by emphasizing that he spent most of his career primarily on "research and development related to airbag *modules*— not airbag *inflators*, the subject of this litigation." Attach. 2 at 2; Attach. 3 at 21-23. Indeed, the parties spent a significant amount of time at the hearing discussing modules and inflators, and debating whether they were distinct or overlapping devices. Attach. 3 at 21-28, 51-53. For several reasons, however, the distinction between modules and airbags is not critical to the undersigned's analysis. First and foremost, Mr. Fukuda was not yet assigned to be the "module guy" during the 1997 to 2000 timeframe that is the focus of this report and recommendation; instead, according to Honda's own description, he was "assigned to a group that worked on PSDI inflator development." Attach. 2, Ex. 1, ¶ 2; Attach. 3 at 22. Second, as discussed during the hearing, the fact that Mr. Fukuda has been assigned since 2010 to airbag *modules* does not preclude the possibility that he attended important meetings about airbag *inflators*, as evidenced by Plaintiffs' Exhibit L, or that he independently formulated thoughts and conclusions about airbag *inflator* defects that he shared with others, as evidenced by Plaintiffs' Exhibit N. Thus, Honda's attempted distinction between *modules* and *inflators*, does not preclude a finding that Mr. Fukuda is a managing agent, particularly regarding his work during the 1997 to 2000 timeframe.

**\*9** Nonetheless, Honda's arguments and declarations concerning Mr. Fukuda's responsibilities regarding inflators and propellants are more persuasive with respect to Mr. Fukuda's career after 2000. First, Mr. Fukuda's declaration stated that after 2000 he was "primarily" researching side curtain airbag modules, and that he began research related to aging specifications for airbag modules in 2011. Attach. 2, Ex. 1, ¶ 2. Plaintiffs, on the other hand, do not have any exhibits from 2000 to 2007. Thus, there is no evidence that Mr. Fukuda's responsibilities regarded the matters under litigation from 2000 to 2007.

Thereafter, however, Plaintiffs' exhibits and Honda's declarations are again difficult to harmonize, and Honda's use of the qualifying word—"primarily"—is again an important one. For instance, Mr. Fukuda was listed as Takata's primary contact for side airbag module *and* "Dr. airbag module" design in 2007, and he stated in his declaration that he began researching ammonium nitrate in July 2009. Attach. 2, Ex. 1, ¶ 2; Attach. 1, Ex. I; Attach. 3 at 61-62. It is unclear whether this research was part of his job responsibilities, or whether Mr. Fukuda conducted this research based on his independent interest in the rupture events, but in any event, he concluded that the ruptures he witnessed in October 1999 had the same root cause as the ruptures occurring in the field. Attach. 2, Ex. 1, ¶ 6.

Later, in 2011, Fukuda sent an email to Honda colleagues documenting his recent visit to a Takata facility. Attach. 1 at 2, Ex. K. His email referenced heat-aging resistance, Honda airbag specifications, and a potential evaluation of another supplier's light-weight inflators with new propellants and aging conducted according to Honda's specifications. *Id.* Later that year, he attended a meeting with Honda engineers wherein the engineers discussed Takata inflator recalls, and concluded that "press load" could not be the only cause and that a common aspect of the ruptures was that ammonium nitrate was the "main component." Attach. 1, Ex. L. The engineers also concluded that the "degree of doubt" concerning ammonium nitrate was "MAX" and decided "not [to] adopt the combination of [a]mmonium nitrate or Batwing or Wafer tablet shape." *Id.*

Case 1:19-md-02875-RMB-SAK   Document 731-4   Filed 01/12/21   Page 9 of 12 PageID: 19320

In re Takata Airbag Products Liability Litigation, Not Reported in Fed. Supp. (2017)
2017 WL 8812735

Mr. Fukuda informed Takata about the discussions held at that meeting, and shared his belief with Takata and HGT that ammonium nitrate was not safe because of a "chemical reaction due to contamination of ammonium nitrate by oil or water in the manufacturing process." Attach. 1, Ex. M at 1. This email, together with Plaintiffs' Exhibit N, also creates an inference that Mr. Fukuda, who purportedly "got moving again" because he was instructed by Mr. Kamiji to analyze propellants, was part of a team researching the causes of the Takata inflator ruptures, but Defendants vehemently deny that point, citing the deposition of Toru Kobayashi. Attach. 1, Exs. M, N; Attach. 1, Ex. H at 260.

Then, in March 2012, Mr. Fukuda sent an email to Takata indicating that ammonium nitrate cannot have contact with "corrosive materials such as polyethylene, vinyl, acid, alkali, oil, steel, iron, tin, and zinc." Attach. 1, Ex. N at 2. The email also reflects that Mr. Fukuda had been "instructed by Kamiji-san to 'investigate in a different route than Seki-san's,'" and to "analyze propellants." *Id.* at 1. Importantly, the email's subject line was "HGT PSDI propellant analysis." *Id.*

Finally, in July 2013, Mr. Fukuda emailed Toru Kobayashi of Honda stating that he was "a witness in the dark who knows the truth about Takata's inflator recall when they were developed" compared to "Edward Snowden of former CIA," and thus, "was taken off the work related to airbags and [was] doing material research exclusively." Attach. 1, Ex. A at 1.

 **\*10** To explain Mr. Fukuda's inclusion on these emails, and his attendance at sensitive and critical meetings related to inflators, ammonium nitrate, inflator recalls, and other relevant topics during this time period, Honda argued that it is very "collaborative." Attach. 3 at 114. Honda also argued that these emails do not reflect Mr. Fukuda's actual responsibilities, and that "the fact that he was mistaken" regarding the cause of the rupture demonstrates he was "a bystander." *Id.* at 63.

The undersigned finds these arguments unpersuasive. A collaborative work environment does not explain why Mr. Fukuda, an individual purported to have no understanding of relevant issues, would be invited to a meeting to discuss inflators, propellants, and ruptures, or why he would be instructed to analyze propellants. Moreover, although these exhibits do not necessarily show that Mr. Fukuda's *primary* responsibilities from 2009 to 2013 concerned the "matters under litigation," they do show that Mr. Fukuda had at least some responsibility for and involvement with these topics. It can also be inferred from Mr. Fukuda's 2013 email wherein he explains his belief that he was reassigned from airbag work to "material research" because of his purported knowledge of the "truth about Takata's airbag recall." Attach. 1, Ex. A at 1. Also, as Plaintiffs argued at the hearing, Mr. Fukuda purportedly raised questions regarding Takata on multiple occasions, suggesting his responsibilities included the matters under litigation. Attach. 3 at 52-53.

Finally, for the reasons described in this section and Section III.A., *supra*, the undersigned finds that the declarations of Mr. Yamato and Mr. Fukuda do not undermine or erode the clear evidence and inferences derived from Plaintiffs' exhibits. Mr. Yamato's affidavit mostly describes Mr. Fukuda's *current* work as an Assistant Chief, and clarifies that he is a union member and not a member of management, labels that *both* parties agree are not dispositive. *See* Attach. 2, Ex. 2; Attach. 3 at 44-46. The only other relevant portion of Mr. Yamato's declaration is the statement that Mr. Fukuda "never had management responsibilities related to airbag inflators," which is consistent with the undersigned's conclusion in Section III.A. Likewise, Mr. Fukuda's declaration is primarily directed at clarifying the meaning of his July 2013 email, Attach. 1, Ex. A, and states that he did not work or conduct research on *aging* specifications for inflators or propellants which, for the reasons discussed above, reflects an overly narrow view of the "matters under litigation." Attach. 2, Ex. 1, ¶ 9. What these carefully articulated declarations did not do, however, is address Plaintiffs' exhibits, disclaim he had general responsibilities for inflators or propellants, or deny that he shared the responsibility of interacting with suppliers or overseeing projects.

This is not unlike the circumstance in *Procaps S.A.*, 12-24356-CIV, 2014 WL 352226, at \*5, in which Magistrate Judge Goodman disregarded what he referred to as a "carefully crafted" affidavit, finding that the contents of the affidavit "did not mean [the employees] are not managing agents for deposition purposes" and were otherwise "belied by the record." Likewise, here, Honda's conclusory declarations are, at times, inconsistent with Plaintiffs' exhibits and do not directly address facts relevant to this inquiry.

Nonetheless, the undersigned notes that Plaintiffs' showing with respect to the period from 1997 to 2000 is stronger than its showing regarding the period from 2009 to 2013. Specifically, Plaintiffs' exhibits from 2009 to 2013 do not

Case 1:19-md-02875-RMB-SAK   Document 731-4   Filed 01/12/21   Page 10 of 12
                              PageID: 19321
In re Takata Airbag Products Liability Litigation, Not Reported in Fed. Supp. (2017)
2017 WL 8812735

show whether Mr. Fukuda's involvement with the "matters under litigation" was anything more than sporadic emails and meetings. Thus, even though the undersigned finds on this record that this factor clearly favors Plaintiffs regarding Mr. Fukuda's responsibilities from 1997 to 2000, the evidence is less clear that Mr. Fukuda's responsibilities regarded the "matters under litigation" from 2009 to 2013. Nevertheless, because Plaintiffs' record is limited through no fault of their own, and Plaintiffs have presented at least a "close question" on the issue, the undersigned resolves any doubts on this factor regarding Mr. Fukuda's responsibilities from 2009 to 2013 in favor of Plaintiffs.

### e. Whether the Witness Identifies with the Interests of the Corporation.

**\*11** Honda conceded during the hearing that Mr. Fukuda, a 25-year employee of Honda, "certainly has allegiance to Honda" but has "no allegiance to plaintiffs." Attach. 3 at 44. Accordingly, Honda conceded this factor, which is sometimes considered the "paramount test" where the other factors present a "close question." See *Calderon*, 287 F.R.D. at 632.

### IV. CONCLUSION: THE FIVE FACTORS WEIGH IN FAVOR OF COMPELLING MR. FUKUDA'S DEPOSITION

In summary, Plaintiffs have satisfied their burden, described by at least one court as a "modest burden," *Calderon*, 287 F.R.D. at 632, to show that Mr. Fukuda had "general responsibility ... regarding the matters under litigation," certainly during the 1997 to 2000 timeframe, and likely beyond from 2009 to 2013. Plaintiffs have also satisfied their burden to show that Mr. Fukuda can be expected to testify for Honda, which can be fairly inferred from the fact that he is a current employee with a 25-year history at Honda. The fact that Fukuda did not "consent" to a deposition pursuant to the U.S.-Japan Consular Convention has no bearing on whether Honda can *compel* him to appear for a Rule 30(b)(1) deposition, and Honda has not cited any Japanese law that would prohibit such compulsion. Finally, Honda has conceded that Mr. Fukuda identifies with the interests of the corporation, not Plaintiffs. Because some courts treat this as the "paramount test," particularly where there is a close question concerning an individual's status, the undersigned finds that Mr. Fukuda is a "managing agent" for purposes of his deposition testimony on issues related to the litigation. Indeed, even the factors that weigh in Honda's favor— including the undersigned's finding that Mr. Fukuda did not exercise discretion with respect to airbags and inflators— were "close questions."

In reaching this conclusion, the undersigned has been mindful of three concepts: (i) "to err on the side of the examining party is to err on the side of caution"; (ii) discovery rules are interpreted liberally; and (iii) Plaintiffs have had less than full discovery on Mr. Fukuda's role and responsibilities. See *Herbert v. Lando*, 441 U.S. 153, 177, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979); *Hickman v. Taylor*, 329 U.S. 495, 507, 67 S.Ct. 385, 91 L.Ed. 451 (1947); and *E.I. DuPont de Nemours & Co.*, 268 F.R.D. at 49. Moreover, the undersigned believes that ordering the deposition to clarify doubts resolved in Plaintiffs' favor is more appropriate given that Plaintiffs would not be able to take Mr. Fukuda's deposition otherwise, and likely will not have time to supplement the record to revisit this issue before the close of fact discovery. Accord *Calixto*, 2008 WL 4487679, at \*2-\*3.

Finally, the undersigned disagrees with Honda's argument that a "managing agent" must either be a high-level executive or, if lower-level, possess "extensive and exclusive knowledge" about the central issue in the case. The cited cases do not require such a rigid, inflexible analysis. First, it is notable that the functional test for managing agency was developed to accommodate the variety of factual circumstances confronted by the courts on a case-by-case basis. *See, e.g., E.I. DuPont de Nemours & Co.*, 268 F.R.D. at 48 (quotation omitted). A rigid application of the test would be antithetical to its purpose.

Moreover, the cited cases do not *require* that a low-level employee have extensive or even exclusive knowledge about a subject to support a finding that the employee is a "managing agent." In *Magdalena*, No. 12–20661–CIV, Slip. Op. at 2, Judge O'Sullivan found two Toyota employees who inspected a vehicle to be managing agents "regarding giving testimony about the inspection of the car in [that] matter." Importantly, Judge O'Sullivan did not indicate whether the two employees had "extensive and exclusive knowledge" about the inspections or the vehicles, noting only that they would be "in the best position to testify as to what occurred at the inspection." *Id.*; *see also Al-Ghena Int'l Corp.*, 2015 WL 13035062, at \*2 (quoting *Procaps S.A.*, 2014 WL 352226, at \*3 (employees may "still be managing agents about their testimony concerning their important activities in the underlying facts").

**\*12** Moreover, even if a low-level employee must be required to be "in a better position" to testify because of "first-hand knowledge," and the undersigned assumes that Mr. Fukuda is a "low-level" employee, Plaintiffs have made such a showing regarding Mr. Fukuda as the undersigned found in Section III.C.

Finally, based on the record before the undersigned, it cannot be said that Mr. Fukuda only has "some information regarding some aspects of the litigation," such as the witness in *Procaps S.A.*, 2014 WL 352226, at \*5, who was not considered a managing agent because the record before the court showed only that the witness was copied on one email and prepared a business forecast relying on information provided to him by management. Likewise, it cannot be said that Mr. Fukuda is simply a witness to a traditional tort with no other responsibilities related to the litigation, such as the Target employee who happened to witness a slip and fall in *Rutsky v. Target Corp.*, No. 12-61828-Civ-Marra/Matthewman, 2013 WL 12009695, at \*1 (S.D. Fla. June 17, 2013).

For the foregoing reasons, the undersigned Special Master hereby reports and recommends that the District Court should enter an Order:

**GRANTING** Plaintiffs' Motion to Compel the Deposition of Honda Witness Takeru Fukuda. The undersigned further recommends that Honda should be ordered to provide Plaintiffs with three proposed deposition dates for Mr. Fukuda within thirty (30) days, and that such proposed deposition dates be within ninety (90) days, if the District Court affirms this order.

PURSUANT TO THE COURT'S ORDER OF APPOINTMENT OF SPECIAL MASTER [E.C.F. No. 453], OBJECTIONS TO THE SPECIAL MASTER'S REPORT AND RECOMMENDATION MUST BE FILED WITHIN 5 DAYS OF THE FILING OF THE REPORT, WITH A RESPONSE DUE BY OPPOSING COUNSEL WITHIN 5 DAYS OF THE FILING OF OBJECTIONS.

Respectfully submitted this 19th day of June, 2017.

s/ Ryan K. Stumphauzer
Ryan K. Stumphauzer, Esq. (Florida Bar No. 12176)
Special Master
rstumphauzer@sslawyers.com
Stumphauzer & Sloman, PLLC
SunTrust International Center
One SE 3rd Avenue, Suite 1820
Miami, FL 33131
Tel: (305) 371-9686
Fax: (305) 371-9687

**All Citations**

Not Reported in Fed. Supp., 2017 WL 8812735

---

Footnotes

1. American Honda Motor Co., Inc., Honda of America Mfg., Inc., Honda Motor Co., Ltd., and Honda R&D Co. Ltd. are collectively referred to as "Honda" or "the Honda Defendants."
2. The undersigned advised Honda, in advance of the July 10, 2017 hearing on this matter, that it should be prepared to discuss whether and when it intended to produce Mr. Fukuda's custodian file and HGT's organizational chart, which had been requested by Plaintiffs in discovery. At the hearing, Honda responded that there was no custodial file for Mr. Fukuda because of HGT's email retention policy, and that HGT does not maintain organizational charts. Attach. 3 at 64-65. Thus, it appears there is no forthcoming discovery that will further illuminate this issue.
3. As discussed herein, the undersigned recognizes there is also significant evidence that Mr. Fukuda sent emails and attended meetings related to airbag inflators, propellants, ruptures, and recalls after he was reassigned to research side curtain airbags and airbag modules in 2000 and 2011, respectively.
4. Both parties agree that Mr. Fukuda is currently an Assistant Chief Engineer, but neither party knew his prior title. Plaintiffs' exhibits suggest he was a "researcher" or "chief researcher" until at least 2012. Attach. 1, Ex. G, J, L, M, and N. Notably, Mr. Yamato stated in his affidavit that he has "knowledge of the organizational and management responsibilities of Assistant Chief Engineers, Chief Engineers, and Senior Chief Engineers within HGT." Attach. 2, Ex. 2, ¶ 2. This supports the conclusion that his affidavit is mostly relevant to Mr. Fukuda's current position, not his past work.
5. It appears that Honda was aware of the Japanese law issue because it indicated in an email to the undersigned dated April 7, 2017, that it needed to brief Japanese law *and* the U.S.-Japan Consular Convention of 1963. Attach. 4 at 6.
6. Mr. Kanazawa attended the 1999 and 2000 meetings regarding the Takata inflator rupture witnessed by Mr. Fukuda and a separate inflator rupture, and has already had his deposition taken. Attach. 1, Ex. G. Mr. Takaishi also attended both

Case 1:19-md-02875-RMB-SAK   Document 731-4   Filed 01/12/21   Page 12 of 12
                              PageID: 19323

**In re Takata Airbag Products Liability Litigation,** Not Reported in Fed. Supp. (2017)
2017 WL 8812735

|   |   |
|---|---|
|   | of those meetings, but does not appear to have had his deposition taken and does not appear to have had his deposition scheduled. *Id.* Mr. Kamiji attended the 2000 meeting regarding the second Takata inflator rupture and has already had his deposition taken. *Id.* Mr. Kanichi Fukuda attended a 2011 meeting with Honda engineers, and is currently scheduled for a deposition. Attach. 1, Ex. L. Mr. Seki and Mr. Takahashi also attended the 2011 meeting with Honda engineers and will have their depositions taken. *Id.* |
| 7 | There are also exhibits that show Mr. Fukuda attended important meetings about inflators, propellant, ammonium nitrate, the batwing shape and other germane topics in 2011. *See* Attach. 1, Ex. L.; Attach. 3 at 109-114. |

---

**End of Document**                                                © 2021 Thomson Reuters. No claim to original U.S. Government Works.