# EXHIBIT B-2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

IN RE: VALSARTAN, LOSARTAN, AND
IRBESARTAN PRODUCTS LIABILITY
LITIGATION

No. 1:19-md-2875-RBK
Hon. Robert Kugler
Hon. ~~Joel Schneider~~Karen Williams

**Jury Trial Demanded**

~~Consolidated Second Amended Class
Action Complaint~~

**THIRD AMENDED CONSOLIDATED ~~SECOND AMENDED~~
ECONOMIC
LOSS CLASS ACTION COMPLAINT**

{Cases; 00033778.DOCX}

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     PARTIES ..............................................................................................................4

        A.      Consumer Class Representatives ..............................................................4

        B.      The Third Party Payor ("TPP") Class Representatives.............................51

        C.      The Active Pharmaceutical Ingredient Manufacturer Defendants............57

                1.      Zhejiang Huahai Pharmaceutical Co., Ltd. Entities......................58

                2.      Hetero Labs, Ltd. Entities ..........................................................59

                3.      Mylan Laboratories, Ltd. Entities ...............................................61

                4.      Aurobindo Pharma, Ltd. Entities .................................................62

        D.      The Finished-Dose Defendants ..............................................................63

                1.      The Teva Defendants ..................................................................63

                2.      The Torrent Defendants ..............................................................65

        E.      Retail Pharmacy Defendants ..................................................................66

                1.      Walgreens ..................................................................................66

                2.      CVS ...........................................................................................67

                3.      Walmart......................................................................................69

                4.      Rite-Aid......................................................................................69

                5.      Express Scripts ...........................................................................70

                6.      Kroger ........................................................................................70

                7.      OptumRx ....................................................................................70

                8.      Albertson's LLC .........................................................................70

                9.      Humana Pharmacy, Inc. ..............................................................71

                10.     "John Doe" Pharmacies ...............................................................71

        F.      Wholesaler Defendants ..........................................................................71

                1.      Cardinal Health, Inc. ..................................................................72

                2.      McKesson Corporation ................................................................72

                3.      AmerisourceBergen Corporation .................................................73

                4.      "John Doe" Wholesalers ..............................................................73

        G.      Repackager and Relabeler Defendants ...................................................74

        H.      True Names / John Doe Defendants 1-50 ................................................76

III.    JURISDICTION AND VENUE .............................................................................76

IV.     FACTUAL ALLEGATIONS .................................................................................77

        A.      Prescription Drug Reimbursement...........................................................77

B.      Prescription Drug Product Identification and Tracing ................................. 80

C.      The Drug Supply Chain Security Act Requires Tracing of Product ................... 81

D.      Manufacturer Defendants' VCDs Are Identifiable by NDC Information ........... 85

E.      Generic Drugs Must Be Chemically the Same as Branded Drug Equivalents ..... 87

F.      Adulterated or Misbranded Drugs ........................................................... 88

G.      The Drugs Ingested by Plaintiffs Were Not Valsartan, But New, Unapproved
        VCDs Not of the Same Quality ............................................................. 91

H.      Defendants Made False Statements in the Labeling of their VCDs ................. 93

I.      The Generic Drug Supply Chain in the United States ................................. 94

J.      Background on Current Good Manufacturing Practices ("cGMPs") ................. 95

K.      The Generic Drug Approval Framework .................................................. 97

        1.      ANDA Applications Must Demonstrate Bioequivalence ..................... 98

        2.      ANDA Applications Must Provide Information About the Manufacturing
                Plants and Processes .......................................................... 99

        3.      ANDA Applications Must Comply with cGMPs ............................. 99

        4.      ANDA Approval is Contingent upon Continuing Compliance with ANDA
                Representations of Sameness .................................................. 99

L.      Approval of ANDAs Related to Valsartan ............................................. 100

        1.      DIOVAN and EXFORGE Background ...................................... 100

        2.      ANDA Applications for Generic Valsartan ................................. 101

M.      Starting as Early as 2007, Defendants Were Actively Violating cGMPs in Their
        Foreign Manufacturing Facilities ......................................................... 103

        1.      ZHP's Inadequate Manufacturing Processes Results in Contaminated,
                Adulterated, Misbranded, and/or Unapproved VCDs ..................... 104

N.      The Contamination of the VCDs ......................................................... 121

        1.      The Nitrosamine Contaminant NDMA ..................................... 121

        2.      The Nitrosamine Contaminant NDEA ...................................... 123

        3.      Formation of NDMA and/or NDEA in Defendants' Contaminated,
                Adulterated, Misbranded, and/or Unapproved VCDs ..................... 125

O.      Defendants Had Actual and/or Constructive Notice of NDMA and/or NDEA
        Contamination of their Contaminated, Adulterated, Misbranded, and/or
        Unapproved VCDs .......................................................................... 125

P.      Other Contaminants ....................................................................... 129

Q.      FDA Announces Voluntary Recall of Defendants' Contaminated, Adulterated
        and/or Misbranded VCDs ................................................................. 129

R.      Defendants' Warranties and Fraudulent and Deceptive Statements to Consumers
        Regarding Their Generic VCDs .......................................................... 130

{Cases: 00033778.DOCX}

**Formatted:** Font: 8 pt

1.     Warranties Common to All Manufacturer Defendants.........................131

2.     ZHP Defendants' Warranties.................................................135

3.     Hetero Defendants' Warranties..............................................136

4.     Mylan Defendants' Warranties...............................................138

5.     Torrent Defendants' Warranties.............................................140

6.     Aurobindo Defendants' Warranties .........................................140

7.     Teva Defendants' Warranties ................................................141

8.     Warranties Common to All Retail Pharmacy Defendants .................143

9.     Wholesaler Defendants' Warranties ........................................144

10.    Repackager and Relabeler Defendants' Warranties .....................144

S.     Wholesaler and Retail Pharmacy Defendants' Obligations to Ensure that the
       Product they Distribute and Sell Throughout the Stream of Commerce is Not
       Suspected to be Adulterated or Misbranded and therefore Illegal to Sell ..........145

1.     Defendant McKesson..........................................................154

2.     Cardinal Health................................................................157

3.     AmerisourceBergen...........................................................159

4.     CVS...............................................................................160

5.     Walgreens .......................................................................162

6.     Rite-Aid..........................................................................165

7.     Walmart...........................................................................166

T.     New Revelations Continue to Unfold About Other Manufacturing Plants .........169

U.     Fraudulent Concealment and Tolling.......................................169

V.     CLASS ACTION ALLEGATIONS ..................................................171

PRAYER FOR RELIEF ......................................................................223

JURY DEMAND ...............................................................................224

**Formatted:** Font: 8 pt

**CONSOLIDATED THIRD AMENDED ECONOMIC
LOSS CLASS ACTION COMPLAINT**

Formatted: Bottom: 0.75"

1.      COME NOW, the Consumer and Third Party Payor ("TPP") Plaintiffs (collectively the "Class Plaintiffs"), who file this Consolidated ~~Second~~Third Amended Economic Loss Class Action Complaint ("Master Class Complaint")[1] against the below-enumerated Defendants relating to their manufacturing, distribution, and/or sale of valsartan-containing drugs ("VCDs").

## I.      INTRODUCTION

2.      This case arises from ~~adulterated, misbranded,~~the marketing and ~~unapproved~~sale of valsartan-containing drugs ("VCDs") that were contaminated with unintended nitrosamine impurities, that were designed, manufactured, labeled, marketed, distributed, packaged, and sold by Defendants (identified and defined *infra* at Part II.C-H) in the United States, and/or for ultimate sale in the United States, in violation of state laws, and that were adulterated, misbranded, and unapproved, and which have been and remain the subject of one of the largest ongoing contaminated drug recalls ever in the United States. These VCDs ~~are~~were non-merchantable, and ~~are~~not of the quality or purity represented by Defendants named herein.

3.      Valsartan and its combination therapy with hydrochlorothiazide are the generic versions of the registered listed drugs ("RLDs") Diovan® ("DIOVAN") and Diovan HCT® ("DIOVAN HCT"), respectively. Amlodipine-valsartan and its combination therapy with hydrochlorothiazide are the generic versions of the RLDs of Exforge® ("EXFORGE") and Exforge HCT® ("EXFORGE HCT"), respectively. These RLDs are indicated for, *inter alia*, the treatment of high blood pressure, a condition affecting approximately 103 million Americans according to the American Heart Association.[2] Several million U.S. patients pay for (in whole or

---

[1] This is one of three master complaints being filed in this multi-district litigation.  The filing of three master complaints is to streamline the pleadings and issues for the parties' mutual convenience only.  Consumer Class Plaintiffs do not waive any claims that are not raised herein, or that are asserted in another master complaint.
[2] https://www.heart.org/en/news/2018/05/01/more-than-100-million-americans-have-high-blood-pressure-aha-says (last accessed ~~June 5, 2019~~January 26, 2021).

in part) and consume generic valsartan each year.

4.     The Class Plaintiffs bring this economic damages action on behalf of VCD consumers and third party payors who paid or made reimbursements for Defendants' contaminated, adulterated, misbranded, and/or unapproved VCDs illegally manufactured, sold, designed, packaged, labeled, marketed, and distributed in the United States as FDA approved generic versions of DIOVAN, DIOVAN HCT, EXFORGE, and EXFORGE HCT. Defendants' generic VCDs were in fact not FDA approved generic versions of these drugsFood and Drug Administration ("FDA") approved generic versions of these drugs, did not meet the quality standards and match the ingredients listed on the labels and package inserts, did not satisfy the criteria to be accurately described as generic equivalents, did not meet the applicable USP and Orange Book standards, and were instead of a lesser quality and were adulterated and/or misbranded (and thereby rendered worthless) throughby contamination with FDA, EMEA, EQDM, IARC- and EPA-listed probable human carcinogens known as N-nitrosodimethylamine ("NDMA") and N-nitrosodiethylamine ("NDEA").

5.     According to the Foodtesting performed by the Defendants and Drugs Administration ("the FDA") testing, the generic VCDs at issue in this case contained NDMA and/or NDEA contamination levels that were unacceptable under all applicable standards, and in some cases hundreds of times higher than the FDA's February 28, 2019 updated interim limits for NDMA and/or NDEA impurities. The FDA has yet to release testing results for other impurities such as N-Nitroso-N-methyl-4-aminobutyric acid ("NMBA").

6.     The contamination of Defendants' VCDs began in or around 2011 when Manufacturer Defendants changed the manufacturing process to include a solvent suspected of producing(s) that produced or contained NDMA, NDEA, and potentially other nitrosamine contaminants and impurities. Defendants had actual and constructive notice of the contamination

**Formatted:** Font: 8 pt

as early as 2011.

7.    Defendants have been illegally manufacturing, selling, labeling, marketing, designing, packaging and distributing the misbranded and/or adulterated VCDs in the United States since as far back as September 2012, when Defendant Mylan launched a DIOVAN HCT generic after its valsartan HCT Abbreviated New Drug Application ("ANDA") was approved by the FDA.

8.    At all times during the period alleged herein Defendants represented and warranted to consumers and TPPs that their generic VCDs were therapeutically equivalent to and otherwise the same as their RLDs, were fit for their ordinary uses, and were manufactured and distributed in accordance with current Good Manufacturing Practices ("cGMPs"), and applicable laws and regulations.

9.    However, for years, Defendants willfully ignored warningsdeficiencies and warning signs regarding the operating standards and manufacturing and testing conditions at several of the overseas manufacturing plants where the active pharmaceutical ingredient ("API") for Defendants' generic VCDs were manufactured for import todirect or ultimate sale to customer in the United States, and knowingly and fraudulently manufactured, sold, labeled, marketed, designed and/or distributed contaminated, adulterated and/or misbranded VCDs for purchase and reimbursement in the United States by U.S. consumers and TPPs.

10.    The Class Plaintiffs paid for or made reimbursements for generic VCDs that were illegally and willfully introduced into the market by Defendants, causing the Plaintiff Class(es) to sustain economic damages.

11.    Consumer Class Plaintiffs are natural persons who are reasonably expected to use, consume, or be affected by the goods and were injured by the breach of Defendants' Warranties.

12.    Defendants' generic VCDs were not fit for their ordinary use and Defendants have

{Cases; 00033778.DOCX}
-3-

Formatted: Font: 8 pt

been unjustly enriched through the sale of these knowingly adulterated and/or misbranded drugs since at least 2012.

~~10.~~13.  Defendants' conduct also constitutes actionable common law fraud, consumer fraud, and other violations of state and federal law as set forth herein.

## II.    PARTIES

### A.  Consumer Class Representatives

~~11.~~14.  Plaintiff Sandy Bell is a Louisiana resident and citizen.  ~~Plaintiff Alphonse Borkowski is a New York resident and citizen.~~ During the class period~~,~~ ~~he~~ Plaintiff Bell paid money for one or more of Defendants' VCDs, including purchases of VCDs manufactured, distributed, or sold by ~~one or more ZHP~~Aurobindo Defendants (as defined *infra* Part II.C)~~.~~  The product sold by the Aurobindo Defendants ("Aurobindo Product") bore a unique National Drug Code ("NDC") which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the Aurobindo Defendants.  Specifically, the Aurobindo Product that Plaintiff Bell purchased was manufactured by Defendant Aurobindo Pharma Ltd., Aurobindo Pharma USA and Aurolife Pharma, LLC, and sold in the United States by Defendants Aurobindo Pharma USA and Aurolife Pharma, LLC.  At least some of this Aurobindo Product ultimately purchased by Plaintiff Bell was purchased from Defendant Aurobindo by Retail Pharmacy Defendant CVS (among other Retail Pharmacy Defendants).  Defendant CVS, in turn, sold the Aurobindo Products to Plaintiff Bell and other consumers. Each Defendant mentioned in this paragraph expressly and impliedly warranted to Plaintiff ~~Borkowski that their respective generic VCDs~~ Bell (either directly, or indirectly by adopting warranties that were passed along to and incorporated by another Defendant further downstream and mentioned in this paragraph) that their respective generic VCDs were the same as their RLDs.  But in fact, Plaintiff ~~Borkowski~~Bell purchased a product that was not the same ~~to~~as the RLD.  Had Plaintiff ~~Borkowski~~Bell known the

{Cases; 00033778.DOCX}
-4-

Formatted: Font: 8 pt

product was not the same as the RLD, Plaintiff ~~Borkowski~~Bell would not have paid for these Defendants' VCDs.-_ Likewise, had Defendants' deception about the impurities within their products been made known earlier, Plaintiff ~~Borkowski~~Bell would not have paid for these Defendants' VCDs.

~~12.~~15.  Plaintiff Alphonse Borkowski is a New York resident and citizen. During the class period Plaintiff Borkowski paid money for one or more of Defendants' VCDs, including purchases of VCDs manufactured, distributed, or sold by one or more ZHP Defendants (as defined *infra* Part II.C).  This product ("ZHP Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the ZHP Defendants. Specifically, the ZHP Product that Plaintiff Borkowski purchased was manufactured by Defendant ZHP, and sold in the United States by Defendant Solco with the assistance of Defendant Huahai US and Defendant Prinston, who facilitated the regulatory approval of the ZHP product necessary for sale.  At least some of this ZHP Product ultimately purchased by Plaintiff Borkowski was purchased from Defendant ZHP by Defendant McKesson who then distributed and resold that ZHP Product to Defendant Rite Aid (among other Retail Pharmacy Defendants).  Defendant Rite Aid, in turn, sold the ZHP Product to Plaintiff Borkowski and other consumers. Each Defendant mentioned in this paragraph~~Plaintiff Billy Joe Bruner is a New Mexico resident and citizen. During the class period, Plaintiff Bruner paid money for one or more of Defendants' VCDs, including purchases of VCDs manufactured, distributed, or sold by ZHP Defendants (as defined *infra* Part II.C). Defendants~~ expressly and impliedly warranted to Plaintiff ~~Bruner~~Borkowski (either directly, or indirectly by adopting warranties that were passed along to and incorporated by another Defendant further downstream and mentioned in this paragraph) that their respective generic VCDs were the same as their RLDs. _ But in fact, Plaintiff ~~Bruner~~Borkowski purchased a product that was not the same ~~as~~to the RLD.-_ Had Plaintiff ~~Bruner~~Borkowski known the product was not

**Formatted:** Font: 8 pt

the same as the RLD, Plaintiff ~~Bruner~~Borkowski would not have paid for these Defendants'
VCDs.  Likewise, had these Defendants' deception about the impurities within their products been
made known earlier, Plaintiff ~~Bruner~~Borkowski would not have paid for these Defendants' VCDs.

16.    Plaintiff Billy Joe Bruner is a New Mexico resident and citizen. During the class
period, Plaintiff Bruner paid money for one or more of Defendants' VCDs, including purchases of
VCDs manufactured, distributed, or sold by ZHP Defendants (as defined *infra* Part II.C).   This
product ("ZHP Product") bore a unique NDC which denoted that it was indeed sold, manufactured,
or distributed into the United States drug supply chain by the ZHP Defendants.  Specifically, the
ZHP Product that Plaintiff Bruner purchased was manufactured by Defendant ZHP, and sold in
the United States by Defendant Solco with the assistance of Defendant Huahai US and Defendant
Prinston, who facilitated the regulatory approval of the ZHP product necessary for sale.  At least
some of this ZHP Product ultimately purchased by Plaintiff Bruner was purchased from Defendant
ZHP by Wholesaler Defendant AmerisourceBergen, who then distributed and resold that ZHP
Product to Retail Pharmacy Defendant Walgreens (among other Retail Pharmacy Defendants).
Defendant Walgreens, in turn, sold the ZHP Product to Plaintiff Bruner and other consumers. Each
Defendant mentioned in this paragraph expressly and impliedly warranted to Plaintiff Bruner
(either directly, or indirectly by adopting warranties that were passed along to and incorporated by
another Defendant further downstream and mentioned in this paragraph) that their respective
generic VCDs were the same as their RLDs.  But in fact, Plaintiff Bruner purchased a product that
was not the same as the RLD.  Had Plaintiff Bruner known the product was not the same as the
RLD, Plaintiff Bruner would not have paid for these Defendants' VCDs.  Likewise, had
Defendants' deception about the impurities within their products been made known earlier,
Plaintiff Bruner would not have paid for these Defendants' VCDs.

~~13.~~17.  Plaintiff Gary Burnett is a North Carolina resident and citizen. During the class

{Cases; 00033778.DOCX}

-6-

**Formatted:** Font: 8 pt

period, Plaintiff Burnett paid money for one or more of Defendants' VCDs, including purchases of VCDs manufactured, distributed, or sold by ZHP Defendants (as defined *infra* Part II.C). This product ("ZHP Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the ZHP Defendants. Specifically, the ZHP Product that Plaintiff Burnett purchased was manufactured by Defendant ZHP, and sold in the United States by Defendant Solco with the assistance of Defendant Huahai US and Defendant Prinston, who facilitated with the regulatory filings necessary for sale. At least some of this ZHP Product ultimately purchased by Plaintiff Burnett was purchased from Defendant ZHP to Retail Pharmacy Defendant Walmart. Defendant Walmart, in turn, sold the ZHP Product to Plaintiff Burnett and other consumers. Each Defendant mentioned in this paragraph expressly and impliedly warranted to Plaintiff Burnett (either directly, or indirectly by adopting warranties that were passed along to and incorporated by another Defendant further downstream and mentioned in this paragraph) that their respective generic VCDs were the same as their RLDs. But in fact, Plaintiff Burnett purchased a product that was not the same as the RLD. Had Plaintiff Burnett known the product was not the same as the RLD, Plaintiff Burnett would not have paid for these Defendants' VCDs. Likewise, had Defendants' deception about the impurities within their products been made known earlier, Plaintiff Burnett would not have paid for these Defendants' VCDs.

14.    Plaintiff Cecil Byrd is a South Carolina resident and citizen. During the class period, Plaintiff Byrd paid money for one or more of Defendants' VCDs, including purchases of VCDs manufactured, distributed, or sold by Aurobindo Defendants (as defined *infra* Part II.C). Defendants expressly and impliedly warranted to Plaintiff Byrd that their respective generic VCDs were the same as their RLDs. But in fact, Plaintiff Byrd purchased a product that was not the same as the RLD. Had Plaintiff Byrd known the product was not the same as the RLD, Plaintiff Byrd would not have paid for Defendants' VCDs. Likewise, had Defendants' deception about the

**Formatted:** Font: 8 pt

impurities within their products been made known earlier, Plaintiff Byrd would not have paid for Defendants' VCDs.

15.18.  Plaintiff Joseph Cacaccio is a New York resident and citizen. During the class period, Plaintiff Cacaccio paid money for one or more of Defendants' VCDs, including purchases of VCDs manufactured, distributed, or sold by Solco Defendants, Mylan Defendants, and Aurobindo Defendants (as defined *infra* Part II.C).  Defendants expressly and impliedly warranted to Plaintiff Cacacciothe ZHP Defendants, Mylan Defendants, and Aurobindo Defendants (as defined *infra* Part II.C).  The product sold by the ZHP Defendants ("ZHP Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the ZHP Defendants.  Specifically, the ZHP Product that Plaintiff Cacaccio purchased was manufactured by Defendant ZHP, and sold in the United States by Defendant Solco with the assistance of Defendant Huahai US and Defendant Prinston, who facilitated the regulatory filings necessary for sale.  At least some of this ZHP Product ultimately purchased by Plaintiff Cacaccio was purchased from Defendant ZHP by Wholesaler Defendant McKesson, who then distributed and resold that ZHP Product to Retail Pharmacy Defendant Rite-Aid (among other Retail Pharmacy Defendants).  The product sold by the Mylan Defendants ("Mylan Product") bore a unique NDC which denoted that it was, indeed sold, manufactured, or distributed into the United States drug supply chain by the Mylan Defendants.  Specifically, the Mylan Product that Plaintiff Cacaccio purchased was manufactured by Defendant Mylan Laboratories Limited and Mylan Laboratories, Ltd. And Mylan Pharmaceuticals, Inc., and sold in the United States by Defendant Mylan Pharmaceuticals, Inc.  At least some of this Mylan Product ultimately purchased by Plaintiff Cacaccio was purchased from Defendant Mylan by Wholesaler Defendant McKesson, who then distributed and resold that ZHP Product to Retail Pharmacy Rite-Aid (among other Retail Pharmacy Defendants).  The product sold by the Aurobindo Defendants ("Aurobindo Product")

{Cases; 00033778.DOCX}

-8-

**Formatted:** Font: 8 pt

bore a unique NDC which denoted that it was, indeed sold, manufactured, or distributed into the United States drug supply chain by the Aurobindo Defendants.  Specifically, the Aurobindo Product that Plaintiff Cacaccio purchased was manufactured by Defendant Aurobindo Pharma Ltd., Aurobindo Pharma USA and Aurolife Pharma, LLC, and sold in the United States by Defendants Aurobindo Pharma USA and Aurolife Pharma, LLC.  At least some of this Aurobindo Product ultimately purchased by Plaintiff Cacaccio was purchased from Defendant Aurobindo by Retail Pharmacy Retail Pharmacy Rite-Aid (among other Retail Pharmacy Defendants). Defendant Rite-Aid in turn, sold the ZHP, Mylan Product and Aurobindo Products to Plaintiff Cacaccio and other consumers. Each Defendant mentioned in this paragraph expressly and impliedly warranted to Plaintiff Cacaccio (either directly, or indirectly by adopting warranties that were passed along to and incorporated by another Defendant further downstream and mentioned in this paragraph) that their respective generic VCDs were the same as their RLDs. But in fact, Plaintiff Cacaccio purchased a product that was not the same as the RLD.  Had Plaintiff Cacaccio known the product was not the same as the RLD, Plaintiff Cacaccio would not have paid for these Defendants' VCDs.  Likewise, had Defendants' deception about the impurities within their products been made known earlier, Plaintiff Cacaccio would not have paid for these Defendants' VCDs.

16.19.  Plaintiff Anna CleaverMiranda Dudley is a New JerseyNorth Carolina resident and citizen.  During the class period, Plaintiff CleaverDudley paid money for one or more of Defendants' VCDs, including purchases of VCDs manufactured, distributed, or sold by the Teva Defendants and the ZHP Defendants (as defined *infra* Part II.C).  DefendantsThe product sold by Defendant Teva ("Teva Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the Teva Defendants. Specifically, the Teva Product that Plaintiff Nelson purchased was manufactured  by Defendant

{Cases: 00033778.DOCX}

Formatted: Font: 8 pt

Teva, and sold in the United States by Defendant Teva.  At least some of this Teva Product ultimately purchased by Plaintiff Dudley was purchased from Defendant Teva and distributed to Beulaville Pharmacy, (along with other Retail Pharmacy Defendants), who then sold the product to Plaintiff Dudley.  The product sold by the  ZHP Defendants ("ZHP Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the ZHP Defendants.  Specifically, the ZHP Product that Plaintiff Dudley purchased was manufactured by Defendant ZHP and sold in the United States by Defendant Solco, with assistance from Defendant Huahai US and Defendant Prinston, who facilitated the regulatory filings necessary for sale.  At least some of this ZHP Product ultimately purchased by Plaintiff Dudley was purchased from Defendant ZHP and distributed to Beulaville Pharmacy, (among other Retail Pharmacy Defendants) who then sold the product to Plaintiff Dudley. Each Defendant mentioned in this paragraph expressly and impliedly warranted to Plaintiff ~~Cleaver~~Dudley (either directly, or indirectly by adopting warranties that were passed along to and incorporated by another Defendant further downstream and mentioned in this paragraph) that their respective generic VCDs were the same as their RLDs. ~~But~~ in fact, Plaintiff ~~Cleaver~~Dudley purchased a product that was not the same as the RLD.  Had Plaintiff ~~Cleaver~~Dudley known the product was not the same as the RLD, Plaintiff ~~Cleaver~~Dudley would not have paid for these Defendants' VCDs. ~~ ~~ Likewise, had Defendants' deception about the impurities within their products been made known earlier, Plaintiff ~~Cleaver~~Dudley would not have paid for these Defendants' VCDs.

17.20.  Plaintiff John Duffy is a New York resident and citizen. During the class period, Plaintiff Duffy paid money for one or more of Defendants' VCDs, including purchases of VCDs manufactured, distributed, or sold by ZHP Defendants (as defined *infra* Part II.C). ~~Defendants expressly and impliedly warranted to Plaintiff Duffy~~This product ("ZHP Product") bore a unique NDC which denoted that it was, indeed sold, manufactured, or distributed into the United States

Formatted: Font: 8 pt

drug supply chain by the ZHP Defendants.  Specifically, the ZHP Product that Plaintiff Duffy purchased was manufactured by Defendant ZHP, and sold in the United States by Defendant Solco, with the assistance of Defendant Huahai US and Defendant Prinston, who facilitated the regulatory approval necessary for sale.  At least some of this ZHP Product ultimately purchased by Plaintiff Duffy was purchased from Defendant ZHP by Wholesaler Defendant AmerisourceBergen, who then distributed and resold that ZHP Product to Retail Pharmacy Defendant Walgreens (among other Retail Pharmacy Defendants).  Defendant Walgreens in turn, sold the ZHP Product to Plaintiff Duffy and other consumers. Each Defendant mentioned in this paragraph expressly and impliedly warranted to Plaintiff Duffy (either directly, or indirectly by adopting warranties that were passed along to and incorporated by another Defendant further downstream and mentioned in this paragraph) that their respective generic VCDs were the same as their RLDs.  But in fact, Plaintiff Duffy purchased a product that was not the same as the RLD.  Had Plaintiff Duffy known the product was not the same as the RLD, Plaintiff Duffy would not have paid for these Defendants' VCDs.  Likewise, had Defendants' deception about the impurities within their products been made known earlier, Plaintiff Duffy would not have paid for these Defendants' VCDs.

18.21.  Plaintiff Eric Erwin is a Texas resident and citizen. During the class period, hePlaintiff Erwin paid money for one or more of Defendants' VCDs, including purchases of VCDs manufactured, distributed, or sold by ZHP Defendants and Teva Defendants (as defined infra Part II.C).  Defendants expressly and impliedly warranted to Plaintiff Erwinf(as defined infra Part II.C).  This product ("ZHP Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the ZHP Defendants. Specifically, the ZHP Product that Plaintiff Erwin purchased was manufactured by Defendant ZHP, and sold in the United States by Defendant Solco, with the assistance of Defendant Huahai

**Formatted:** Font: 8 pt

US and Defendant Prinston, who facilitated the regulatory approval necessary for sale.  At least some of this ZHP Product ultimately purchased by Plaintiff Erwin was purchased from Defendant ZHP by Wholesaler Defendant AmerisourceBergen, who then distributed and resold that ZHP Product to Retail Pharmacy Defendant Walgreens (among other Retail Pharmacy Defendants). The product sold by the  Aurobindo Defendants ("Aurobindo Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the Aurobindo Defendants.  Specifically, the Aurobindo Product that Plaintiff Erwin purchased was manufactured by Defendant Aurobindo Pharma Ltd., Aurobindo Pharma USA and Aurolife Pharma, LLC, and sold in the United States by Defendants Aurobindo Pharma USA and Aurolife Pharma, LLC.  At least some of this Aurobindo Product ultimately purchased by Plaintiff Erwin was purchased from Defendant Aurobindo by Wholesaler Defendant AmerisourceBergen, who then distributed and resold that Aurobindo Product to Retail Pharmacy Defendant Walgreens (among other Retail Pharmacy Defendants).  The product sold by the Teva Defendants ("Teva Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the Teva Defendants.  Specifically, the Teva Product that Plaintiff Erwin purchased was manufactured and sold by Defendant Teva.  At least some of this Teva Product ultimately purchased by Plaintiff Erwin was purchased from Defendant Teva by Wholesaler Defendant AmerisourceBergen, who then distributed and resold that Teva  Product to Retail Pharmacy Defendant Walgreens (among other Retail Pharmacy Defendants).  Defendant Walgreens, in turn, sold the ZHP, Aurobindo  and Teva Products to Plaintiff Erwin and other consumers. Each Defendant mentioned in this paragraph expressly and impliedly warranted to Plaintiff Erwin (either directly, or indirectly by adopting warranties that were passed along to and incorporated by another Defendant further downstream and mentioned in this paragraph) that their respective generic VCDs were the same as their RLDs.  But in fact, Plaintiff Erwin purchased a

Formatted: Font: 8 pt

product that was not the same as the RLD.  Had Plaintiff Erwin known the product was not the same as the RLD, Plaintiff Erwin would not have paid for these Defendants' VCDs.  Likewise, had Defendants' deception about the impurities within their products been made known earlier, Plaintiff Erwin would not have paid for these Defendants' VCDs.

19.22.  Plaintiff Leland Gildner is an Indiana resident and citizen.  During the class period, Plaintiff Gildner paid money for one or more of Defendants' VCDs, including purchases of VCDs manufactured, distributed, or sold by Camber Defendants (as defined infra Part II.C).  Defendants expressly and impliedly warranted to Plaintiff GildnerHetero Defendants (as defined infra Part II.C).  This product ("Hetero Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the Hetero Defendants.  Specifically, the Hetero Product that Plaintiff Gildner purchased was manufactured by Defendant Hetero Labs Ltd., and sold in the United States by Defendant Camber, with the assistance of Defendant Hetero USA, who facilitated the necessary regulatory filings for sale.  At least some of this Hetero Product ultimately purchased by Plaintiff Gildner was purchased from Defendant Hetero  by Wholesaler Defendant Cardinal Health, who then distributed and resold that Hetero Product to Retail Pharmacy Defendant Kroger (among other Retail Pharmacy Defendants).  Defendant Kroger in turn, sold the Hetero Product to Plaintiff Gildner and other consumers. Each Defendant mentioned in this paragraph expressly and impliedly warranted to Plaintiff Gildner (either directly, or indirectly by adopting warranties that were passed along to and incorporated by another Defendant further downstream and mentioned in this paragraph) that their respective generic VCDs were the same as their RLDs.  But in fact, Plaintiff Gildner purchased a product that was not the same as the RLD.  Had Plaintiff Gildner known the product was not the same as the RLD, Plaintiff Gildner would not have paid for these Defendants' VCDs.  Likewise, had Defendants' deception about the impurities within their products been made known earlier,

Formatted: Font: 8 pt

Plaintiff Gildner would not have paid for these Defendants' VCDs.

20.23.  Plaintiff Lawrence Semmel is a Pennsylvania resident and citizen. During the class period, Semmel paid money for one or more of Defendants' VCDs, including purchases of VCDs manufactured, distributed, or sold by ZHP Defendants (as defined *infra* Part II.C). Defendants expressly and impliedly warranted to Plaintiff SemmelThis product ("ZHP Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the ZHP Defendants.  Specifically, the ZHP Product that Plaintiff Semmel purchased was manufactured by Defendant ZHP, and sold in the United States by Defendant Solco, with assistance from Defendant Huahai US and Defendant Prinston, who facilitated the regulatory filings necessary for sale.  At least some of this ZHP Product ultimately purchased by Plaintiff Semmel was purchased from Defendant ZHP by Wholesaler Defendants McKesson, who then distributed and resold that ZHP Product to Retail Pharmacy Defendant CVS  (among other Retail Pharmacy Defendants).  Defendant CVS, in turn, sold the ZHP Product to Plaintiff Semmel and other consumers. Each Defendant mentioned in this paragraph expressly and impliedly warranted to Plaintiff Semmel (either directly, or indirectly by adopting warranties that were passed along to and incorporated by another Defendant further downstream and mentioned in this paragraph) that their respective generic VCDs were the same as their RLDs. But in fact, Plaintiff Semmel purchased a product that was not the same as the RLD.  Had Plaintiff Semmel known the product was not the same as the RLD, Plaintiff Semmel would not have paid for these Defendants' VCDs. Likewise, had Defendants' deception about the impurities within their products been made known earlier, Plaintiff Semmel would not have paid for these Defendants' VCDs.

21.    Plaintiff Jo Ann Hamel is a California resident and citizen. During the class period, Hamel paid money for one or more of Defendants' VCDs, including purchases of VCDs manufactured, distributed, or sold by Teva Defendants (as defined *infra* Part II.C). Defendants

{Cases; 00033778.DOCX}

-14-

Formatted: Font: 8 pt

expressly and impliedly warranted to Plaintiff Hamel that their respective generic VCDs were the same as their RLDs. But in fact, Plaintiff Hamel purchased a product that was not the same as the RLD. Had Plaintiff Hamel known the product was not the same as the RLD, Plaintiff Hamel would not have paid for Defendants' VCDs. Likewise, had Defendants' deception about the impurities within their products been made known earlier, Plaintiff Hamel would not have paid for Defendants' VCDs.

22.24.  Plaintiff Dennis Kaplan is an Ohio resident and citizen. During the class period, Plaintiff Kaplan paid money for one or more of Defendants' VCDs, including purchases of VCDs manufactured, distributed, or sold by ZHP Defendants and Aurobindo Defendants (as defined *infra* Part II.C). Defendants expressly and impliedly warranted to Plaintiff KaplanThis product ("ZHP Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the ZHP Defendants.  Specifically, the ZHP Product that Plaintiff Kaplan purchased was manufactured by Defendant ZHP, and sold in the United States by Defendant Solco, with assistance from Defendant Huahai US and Defendant Prinston, who facilitated the regulatory filings necessary for sale.  At least some of this ZHP Product ultimately purchased by Plaintiff Kaplan was purchased from Defendant ZHP by Wholesaler Defendants McKesson, who then distributed and resold that ZHP Product to Retail Pharmacy Defendant Rite-Aid (among other Retail Pharmacy Defendants).  The product sold by the Aurobindo Defendants ("Aurobindo Product") bore a unique NDC which denoted that it was, indeed sold, manufactured, or distributed into the United States drug supply chain by the Aurobindo Defendants.  Specifically, the Aurobindo Product that Plaintiff Kaplan purchased was manufactured by Defendant Aurobindo Labs Limited, Aurobindo Pharma USA and Aurolife Pharma, LLC, and sold in the United States by Defendants Aurobindo Pharma USA and Aurolife Pharma, LLC.  At least some of this Aurobindo Product ultimately purchased by Plaintiff Kaplan was purchased from Defendant

{Cases; 00033778.DOCX}

-15-

**Formatted:** Font: 8 pt

Aurobindo by Wholesaler Defendant McKesson, who then distributed and resold that Aurobindo Product to Retail Pharmacy Defendant Rite-Aid (among other Retail Pharmacy Defendants). Defendant Rite-Aid, in turn, sold the ZHP and Aurobindo Products to Plaintiff Kaplan and other consumers. Each Defendant mentioned in this paragraph expressly and impliedly warranted to Plaintiff Kaplan (either directly, or indirectly by adopting warranties that were passed along to and incorporated by another Defendant further downstream and mentioned in this paragraph) that their respective generic VCDs were the same as their RLDs.  But in fact, Plaintiff Kaplan purchased a product that was not the same as the RLD.  Had Plaintiff Kaplan known the product was not the same as the RLD, Plaintiff Kaplan would not have paid for these Defendants' VCDs.  Likewise, had Defendants' deception about the impurities within their products been made known earlier, Plaintiff Kaplan would not have paid for these Defendants' VCDs.

23.25.  Plaintiff Jynona Gail Lee is a Texas resident and citizen. During the class period, Plaintiff Lee paid money for one or more of Defendants' VCDs, including purchases of VCDs manufactured, distributed, or sold by Torrent Defendants (as defined *infra* Part II.C).  Defendants expressly and impliedly warranted to Plaintiff Lee This product ("Torrent Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the Torrent Defendants.  Specifically, the Torrent Product that Plaintiff Lee purchased was manufactured and sold by Defendant Torrent.  At least some of this Torrent Product ultimately purchased by Plaintiff Lee was purchased from Defendant Torrent by Wholesaler Defendant McKesson, who then distributed and resold that ZHP Product to Retail Pharmacy Defendant Walmart (among other Retail Pharmacy Defendants).  Defendant Walmart, in turn, sold the Torrent Product to Plaintiff Lee and other consumers. Each Defendant mentioned in this paragraph expressly and impliedly warranted to Plaintiff Lee (either directly, or indirectly by adopting warranties that were passed along to and incorporated by another Defendant further

{Cases: 00033778.DOCX}
-16-

Formatted: Font: 8 pt

downstream and mentioned in this paragraph) that their respective generic VCDs were the same as their RLDs.  But in fact, Plaintiff Lee purchased a product that was not the same as the RLD.  Had Plaintiff Lee known the product was not the same as the RLD, Plaintiff Lee would not have paid for these Defendants' VCDs. Likewise, had Defendants' deception about the impurities within their products been made known earlier, Plaintiff Lee would not have paid for these Defendants' VCDs.

24.26.  Plaintiff Veronica Longwell is a Massachusetts resident and citizen. During the class period, Plaintiff Longwell paid money for one or more of Defendants' VCDs, including purchases of VCDs manufactured, distributed, or sold by Hetero Defendants (as defined *infra* Part II.C).  Defendants expressly and impliedly warranted to Plaintiff Longwelland Aurobindo Defendants (as defined *infra* Part II.C).  This product ("Hetero Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the Hetero Defendants.  Specifically, the Hetero Product that Plaintiff Longwell purchased was manufactured by Defendant Hetero Labs Ltd., and sold in the United States by Defendant Camber, with assistance from Defendant Hetero USA, who facilitated the regulatory filings necessary for sale.  At least some of this Hetero Product ultimately purchased by Plaintiff Longwell was purchased from Defendant Hetero by Wholesaler Defendant McKesson, who then distributed and resold that Hetero Product to Retail Pharmacy Defendant CVS (among other Retail Pharmacy Defendants).  The product sold by the  Aurobindo Defendants ("Aurobindo Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the Aurobindo Defendants.  Specifically, the Aurobindo Product that Plaintiff Longwell purchased was manufactured by Defendant Aurobindo Pharma Limited, Aurobindo Pharma USA and Aurolife Pharma, LLC, and sold in the United States by Defendants Aurobindo Pharma USA and Aurolife Pharma, LLC.  At least some of this Aurobindo

{Cases; 00033778.DOCX}

**Formatted:** Font: 8 pt

Product ultimately purchased by Plaintiff Longwell was purchased from Defendant Aurobindo by Wholesaler Defendant McKesson, who then distributed and resold that Aurobindo Product to Retail Pharmacy Defendant CVS (among other Retail Pharmacy Defendants). Defendant CVS, in turn sold the Hetero and Aurobindo Products to Plaintiff Longwell and other consumers. Each Defendant mentioned in this paragraph expressly and impliedly warranted to Plaintiff Longwell (either directly, or indirectly by adopting warranties that were passed along to and incorporated by another Defendant further downstream and mentioned in this paragraph) that their respective generic VCDs were the same as their RLDs. But in fact, Plaintiff Longwell purchased a product that was not the same as the RLD. Had Plaintiff Longwell known the product was not the same as the RLD, Plaintiff Longwell would not have paid for these Defendants' VCDs. Likewise, had Defendants' deception about the impurities within their products been made known earlier, Plaintiff Longwell would not have paid for these Defendants' VCDs.

25. 27. Plaintiff Flora McGilvery is a Mississippi resident and citizen. During the class period, Plaintiff McGilvery paid money for one or more of Defendants' VCDs, including purchases of VCDs manufactured, distributed, or sold by ZHP Defendants (as defined *infra* Part II.C). Defendants expressly and impliedly warranted to Plaintiff McGilvery This product ("ZHP Product") bore a unique NDC which denoted that it was indeed, sold, manufactured, or distributed into the United States drug supply chain by the ZHP Defendants. Specifically, the ZHP Product that Plaintiff McGilvery purchased was manufactured by Defendant ZHP, and sold in the United States by Defendant Solco, with assistance from Defendant Huahai US and Defendant Prinston, who facilitate the regulatory filings necessary for sale. At least some of this ZHP Product ultimately purchased by Plaintiff McGilvery was purchased from Defendant ZHP by Retail Pharmacy Defendant Walmart (among other Retail Pharmacy Defendants). Defendant Walmart, in turn, sold the ZHP Product to Plaintiff McGilvery and other consumers. Each Defendant

{Cases: 00033778.DOCX}

**Formatted:** Font: 8 pt

mentioned in this paragraph expressly and impliedly warranted to Plaintiff McGilvery (either directly, or indirectly by adopting warranties that were passed along to and incorporated by another Defendant further downstream and mentioned in this paragraph)that their respective generic VCDs were the same as their RLDs.  But in fact, Plaintiff McGilvery purchased a product that was not the same as the RLD.  Had Plaintiff McGilvery known the product was not the same as the RLD, Plaintiff McGilvery would not have paid for these Defendants' VCDs. Likewise, had Defendants' deception about the impurities within their products been made known earlier, Plaintiff McGilvery would not have paid for these Defendants' VCDs

26.28.  Plaintiff Ron Molinaro is a Florida resident and citizen. During the class period, Plaintiff Molinaro paid money for one or more of Defendants' VCDs, including purchases of VCDs manufactured, distributed, or sold by ZHP Defendants (as defined *infra* Part II.C).

Defendants expressly and impliedly warranted to Plaintiff MolinaroThis product ("ZHP Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the ZHP Defendants.  Specifically, the ZHP Product that Plaintiff Molinaro purchased was manufactured by Defendant ZHP, and sold in the United States by Defendant Solco, with assistance from Defendant Huahai US and Defendant Prinston, who facilitated the regulatory filings necessary for sale.  At least some of this ZHP Product ultimately purchased by Plaintiff Molinaro was purchased from Defendant ZHP by Retail Pharmacy Defendant CVS (among other Retail Pharmacy Defendants).  Defendant CVS in turn sold the ZHP Product to Plaintiff Molinaro and other consumers. Each Defendant mentioned in this paragraph expressly and impliedly warranted to Plaintiff Molinaro (either directly, or indirectly by adopting warranties that were passed along to and incorporated by another Defendant further downstream and mentioned in this paragraph) that their respective generic VCDs were the same as their RLDs. But in fact, Plaintiff Molinaro purchased a product that was not the same as the RLD.  Had Plaintiff

{Cases; 00033778.DOCX}

**Formatted:** Font: 8 pt

Molinaro known the product was not the same as the RLD, Plaintiff Molinaro would not have paid for Defendants' VCDs. Likewise, had Defendants' deception about the impurities within their products been made known earlier, Plaintiff Molinaro would not have paid for Defendants' VCDs.

27.29.  Plaintiff Cheryl Mullins is a Virginia resident and citizen. During the class period, Plaintiff Mullins paid money for one or more of Defendants' VCDs, including purchases of VCDs manufactured, distributed, or sold by ZHP Defendants (as defined *infra* Part II.C). ~~Defendants expressly and impliedly warranted to Plaintiff Mullins~~This product ("ZHP Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the ZHP Defendants.  Specifically, the ZHP Product that Plaintiff Mullins purchased was manufactured by Defendant ZHP, and sold in the United States by Defendant Solco, with assistance from Defendant Huahai US and Defendant Prinston, who facilitated the regulatory filings necessary for sale.  At least some of this ZHP Product ultimately purchased by Plaintiff Mullins was purchased from Defendant ZHP by Wholesaler Defendants McKesson, AmerisourceBergen and Cardinal Health, who then distributed and resold that ZHP Product to Retail Pharmacies such as Lonesome Pine Economy Drug, where Plaintiff Mullins (and other consumers) purchased the ZHP product.  Each Defendant mentioned in this paragraph expressly and impliedly warranted to Plaintiff Mullins (either directly, or indirectly by adopting warranties that were passed along to and incorporated by another Defendant further downstream and mentioned in this paragraph) that their respective generic VCDs were the same as their RLDs.  But in fact, Plaintiff Mullins purchased a product that was not the same as the RLD.  Had Plaintiff Mullins known the product was not the same as the RLD, Plaintiff Mullins would not have paid for these Defendants' VCDs.  Likewise, had Defendants' deception about the impurities within their products been made known earlier, Plaintiff Mullins would not have paid for these Defendants' VCDs.

Formatted: Font: 8 pt

28.30.  Plaintiff Talsie Neal is a Louisiana resident and citizen. During the class period, Plaintiff Neal paid money for one or more of Defendants' VCDs, including purchases of VCDs manufactured, distributed, or sold by ZHP Defendants (as defined *infra* Part II.C) . Defendants expressly and impliedly warranted to Plaintiff Neal This product ("ZHP Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the ZHP Defendants.  Specifically, the ZHP Product that Plaintiff Neal purchased was manufactured by Defendant ZHP, and sold in the United States by Defendant Solco, with assistance from Defendant Huahai US and Defendant Prinston, who facilitated the regulatory filings necessary for sale.  At least some of this ZHP Product ultimately purchased by Plaintiff Neal was purchased from Defendant ZHP by Wholesaler Defendants McKesson, who then distributed and resold that ZHP Product to Retail Pharmacy Defendant Walmart (among other Retail Pharmacy Defendants).  Defendant Walmart in turn, sold the ZHP Product to Plaintiff Neal and other consumers. Each Defendant mentioned in this paragraph expressly and impliedly warranted to Plaintiff Neal (either directly, or indirectly by adopting warranties that were passed along to and incorporated by another Defendant further downstream and mentioned in this paragraph) that their respective generic VCDs were the same as their RLDs.  But in fact, Plaintiff Neal purchased a product that was not the same as the RLD.  Had Plaintiff Neal known the product was not the same as the RLD, Plaintiff Neal would not have paid for these Defendants' VCDs. Likewise, had Defendants' deception about the impurities within their products been made known earlier, Plaintiff Neal would not have paid for these Defendants' VCDs.

29.31.  Plaintiff Gerald Nelson is a New York resident and citizen. During the class period, Plaintiff Nelson paid money for one or more of Defendants' VCDs, including purchases of VCDs manufactured, distributed, or sold by the Teva Defendants (as defined *infra* Part II.C)., the Mylan Defendants, the Aurobindo Defendants and the ZHP Defendants (as defined *infra* Part II.C).  The

Formatted: Font: 8 pt

product sold by Defendant Teva ("Teva Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the Teva Defendants. Specifically, the Teva Product that Plaintiff Nelson purchased was manufactured by Defendant Teva, and sold in the United States by Defendant Teva. At least some of this Teva Product ultimately purchased by Plaintiff Nelson was purchased from Defendant Teva by Wholesaler Defendant McKesson, who then distributed and resold that Teva Product to Retail Pharmacy Defendant Rite-Aid (among other Retail Pharmacy Defendants). The product sold by the ZHP Defendants ("ZHP Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the ZHP Defendants. Specifically, the ZHP Product that Plaintiff Nelson purchased was manufactured by Defendant ZHP and sold in the United States by Defendant Solco, with assistance from Defendant Huahai US and Defendant Prinston, who facilitated the regulatory filings necessary for sale. At least some of this ZHP Product ultimately purchased by Plaintiff Nelson was purchased from Defendant ZHP by Wholesaler Defendants McKesson, who then distributed and resold that ZHP Product to Retail Pharmacy Rite-Aid (among other Retail Pharmacy Defendants). The product sold by the Aurobindo Defendants ("Aurobindo Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the Aurobindo Defendants. Specifically, the Aurobindo Product that Plaintiff Nelson purchased was manufactured by Defendant Aurobindo Pharma Limited, Aurobindo Pharma USA and Aurolife Pharma, LLC, and sold in the United States by Defendants Aurobindo Pharma USA and Aurolife Pharma, LLC. At least some of this Aurobindo Product ultimately purchased by Plaintiff Nelson was purchased from Defendant Aurobindo by Wholesaler Defendant McKesson, who then distributed and resold that Aurobindo Product to Retail Pharmacy Defendant Rite-Aid (among other Retail Pharmacy Defendants). Defendant Aurobindo also sold some of the Aurobindo

{Cases; 00033778.DOCX}

Formatted: Font: 8 pt

Product ultimately purchased by Plaintiff Nelson to Wholesaler Defendant Cardinal Health, who then distributed and resold that Aurobindo Product to Retail Pharmacy Defendant CVS.  The product sold by the  Mylan Defendants ("Mylan Product") bore a unique NDC which denoted that it was, indeed sold, manufactured, or distributed into the United States drug supply chain by the Mylan Defendants.  Specifically, the Mylan Product that Plaintiff Nelson purchased was manufactured by Defendant Mylan Laboratories, Ltd., and Mylan Pharmaceuticals, Inc., and sold in the United States by Defendant Mylan Pharmaceuticals, Inc.  At least some of this Mylan Product ultimately purchased by Plaintiff Nelson was purchased from Defendant Mylan by Wholesaler Defendants Cardinal Health, who then distributed and resold that Mylan Product to Retail Pharmacy CVS (among other Retail Pharmacy Defendants).  Defendant Rite-Aid, in turn, sold the Teva, Aurobindo and ZHP Products to Plaintiff Nelson and other consumers. Defendant CVS, in turn, sold the Aurobindo and Mylan Products to Plaintiff Nelson and other consumers. Each Defendant mentioned in this paragraph expressly and impliedly warranted to Plaintiff Nelson that their respective generic VCDs(either directly, or indirectly by adopting warranties that were passed along to and incorporated by another Defendant further downstream and mentioned in this paragraph) that their respective generic VCDs were the same as their RLDs.  But in fact, Plaintiff Nelson purchased a product that was not the same as the RLD.  Had Plaintiff Nelson known the product was not the same as the RLD, Plaintiff Nelson would not have paid for these Defendants' VCDs.  Likewise, had Defendants' deception about the impurities within their products been made known earlier, Plaintiff Nelson would not have paid for these Defendants' VCDs.

30.32.  Plaintiff Richard O'NeillJoseph Kessinger is a Kansas resident and citizen. During the class period, Plaintiff O'NeillKessinger paid money for one or more of Defendants' VCDs, including purchases of VCDs manufactured, distributed, or sold by ZHP Defendants and Aurobindo Defendants (as defined *infra* Part II.C). Defendants The product sold by the Aurobindo

{Cases; 00033778.DOCX}

-23-

**Formatted:** Font: 8 pt

Defendants ("Aurobindo Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the Aurobindo Defendants.  Specifically, the Aurobindo Product that Plaintiff Kessinger purchased was manufactured by Defendant Aurobindo Pharma Ltd., Aurobindo Pharma USA and Aurolife Pharma, LLC, and sold in the United States by Defendants Aurobindo Pharma USA and Aurolife Pharma, LLC.  At least some of this Aurobindo Product ultimately purchased by Plaintiff Kessinger  was purchased from Defendant Aurobindo by Retail Pharmacy Defendant CVS (among other Retail Pharmacy Defendants).  Defendant CVS, in turn, sold the Aurobindo Products to Plaintiff Kessinger and other consumers. Each Defendant mentioned in this paragraph expressly and impliedly warranted to Plaintiff O'Neill Kessinger (either directly, or indirectly by adopting warranties that were passed along to and incorporated by another Defendant further downstream and mentioned in this paragraph) that their respective generic VCDs were the same as their RLDs. But in fact, Plaintiff O'Neill Kessinger purchased a product that was not the same as the RLD.  Had Plaintiff O'Neill Kessinger known the product was not the same as the RLD, Plaintiff O'Neill Kessinger would not have paid for these Defendants' VCDs.  Likewise, had Defendants' deception about the impurities within their products been made known earlier, Plaintiff O'Neill Kessinger would not have paid for these Defendants' VCDs.

     31.33.  Plaintiff Lubertha Powell is a Georgia and citizen.  During the class period, Plaintiff Powell paid money for one or more of Defendants' VCDs, including purchases of VCDs manufactured, distributed, or sold by ZHP Defendants (as defined *infra* Part II.C).  Defendants expressly and impliedly warranted to Plaintiff Powell that their respective generic VCDs were the same as their RLDs. The product sold by the  ZHP Defendants ("ZHP Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the ZHP Defendants.  Specifically, the ZHP Product that Plaintiff Powell

> **Formatted:** Font: 8 pt

purchased was manufactured by Defendant ZHP and sold in the United States by Defendant Solco, with assistance from Defendant Huahai US and Defendant Prinston, who facilitated the regulatory filings necessary for sale.  At least some of this ZHP Product ultimately purchased by Plaintiff Powell was purchased from Defendant ZHP by Wholesaler Defendant AmerisourceBergen, who then distributed and resold that ZHP Product to Retail Pharmacy Walgreens (among other Retail Pharmacy Defendants).  Defendant Walgreens, in turn, sold the ZHP Products to Plaintiff Powell and other consumers. Each Defendant mentioned in this paragraph expressly and impliedly warranted to Plaintiff Powell (either directly, or indirectly by adopting warranties that were passed along to and incorporated by another Defendant further downstream and mentioned in this paragraph) that their respective generic VCDs were the same as their RLDs.  But in fact, Plaintiff Powell purchased a product that was not the same as the RLD.  Had Plaintiff Powell known the product was not the same as the RLD, Plaintiff Powell would not have paid for Defendants' VCDs. Likewise, had Defendants' deception about the impurities within their products been made known earlier, Plaintiff Powell would not have paid for Defendants' VCDs.

32.34.  Plaintiff Robin Roberts is a Virginia resident and citizen. During the class period, Plaintiff Roberts paid money for one or more of Defendants' VCDs, including purchases of VCDs manufactured, distributed, or sold by Teva Defendants and Torrent Defendants (as defined *infra* Part II.C).  The product sold by the Teva Defendants ("Teva Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the Teva Defendants.  Specifically, the Teva Product that Plaintiff Roberts purchased was manufactured by Defendant Teva, and sold in the United States by Defendant Teva.  At least some of this Teva Product ultimately purchased by Plaintiff Roberts was purchased from Defendant Teva by Wholesaler Defendant AmerisourceBergen, who then distributed and resold that Teva Product to Retail Pharmacy Walgreens (among other Retail Pharmacy Defendants).  The product

{Cases; 00033778.DOCX}

**Formatted:** Font: 8 pt

sold by the Torrent Defendants ("Torrent Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the Torrent Defendants.  Specifically, the Torrent Product that Plaintiff Roberts purchased was manufactured and sold  by Defendant Torrent.  At least some of this Torrent Product ultimately purchased by Plaintiff Roberts   was purchased from Defendant Torrent by Wholesaler Defendant AmerisourceBergen, who then distributed and resold that ZHP Product to Retail Pharmacy Defendant Walgreens (among other Retail Pharmacy Defendants). Defendant Torrent also sold Torrent Product directly to Retailer Pharmacy Defendant Walmart.  Defendant Walgreens, in turn, sold the Teva and Torrent Products to Plaintiff Roberts and other consumers.  Defendant Walmart, in turn, sold the Torrent Product to Plaintiff Roberts and other consumers.  Each Defendant mentioned in this paragraph expressly and impliedly warranted to Plaintiff Roberts (either directly, or indirectly by adopting warranties that were passed along to and incorporated by another Defendant further downstream and mentioned in this paragraph) that their respective generic VCDs were the same as their RLDs.  But in fact, Plaintiff Roberts purchased a product that was not the same as the RLD.  Had Plaintiff Roberts known the product was not the same as the RLD, Plaintiff Roberts would not have paid for these Defendants' VCDs. Likewise, had Defendants' deception about the impurities within their products been made known earlier, Plaintiff Roberts would not have paid for these Defendants' VCDs.

33.    Plaintiff Dominic Stimma is a Connecticut resident and citizen.  During the class period, Plaintiff Stimma paid money for one or more of Defendants' VCDs, including purchases of VCDs manufactured, distributed, or sold by Hetero Defendants (as defined *infra* Part II.C). Defendants expressly and impliedly warranted to Plaintiff Stimma that their respective generic VCDs were the same as their RLDs.  But in fact, Plaintiff Stimma purchased a product that was not the same as the RLD.  Had Plaintiff Stimma known the product was not the same as the RLD,

Formatted: Font: 8 pt

~~Plaintiff Stimma would not have paid for Defendants' VCDs. Likewise, had Defendants' deception about the impurities within their products been made known earlier, Plaintiff Stimma would not have paid for Defendants' VCDs.~~

~~34.~~35.  Plaintiff Brian Wineinger is an Indiana resident and citizen. During the class period, Plaintiff Wineinger paid money for one or more of Defendants' VCDs, including purchases of VCDs manufactured, distributed, or sold by ZHP Defendants (as defined *infra* Part II.C). The product sold by the  ZHP Defendants ("ZHP Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the ZHP Defendants.  Specifically, the ZHP Product that Plaintiff Wineinger purchased was manufactured by Defendant ZHP and sold in the United States by Defendant Solco, with assistance from Defendant Huahai US and Defendant Prinston, who facilitated the regulatory filings necessary for sale.  At least some of this ZHP Product ultimately purchased by Plaintiff Wineinger was purchased from Defendant ZHP by Wholesaler Defendant McKesson, who then distributed and resold that ZHP Product to Retail Pharmacy Walmart (among other Retail Pharmacy Defendants).  Defendant Walmart, in turn, sold the ZHP Products to Plaintiff Wineinger and other consumers.  Each Defendant mentioned in this paragraph expressly and impliedly warranted to Plaintiff Wineinger ~~that~~(either directly, or indirectly by adopting warranties that were passed along to and incorporated by another Defendant further downstream and mentioned in this paragraph) that their respective generic VCDs were the same as their RLDs. But in fact, Plaintiff Wineinger purchased a product that was not the same as the RLD.  Had Plaintiff Wineinger known the product was not the same as the RLD, Plaintiff Wineinger would not have paid for these Defendants' VCDs. Likewise, had Defendants' deception about the impurities within their products been made known earlier, Plaintiff Wineinger would not have paid for these Defendants' VCDs.

36.     Plaintiff Marzanna Glab is a New Jersey resident and citizen. During the class

**Formatted:** Font: 8 pt

period, Plaintiff Glab paid money for one or more of Defendants' VCDs, including purchases of VCDs manufactured, distributed, or sold by the Mylan and Aurobindo Defendants (as defined *infra* Part II.C).  The product sold by the  Mylan Defendants ("Mylan Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the Mylan Defendants.  Specifically, the Mylan Product that Plaintiff Glab purchased was manufactured by Defendant Mylan Laboratories Limited and Mylan Pharmaceuticals, Inc., and sold in the United States by Defendant Mylan Pharmaceuticals, Inc.  At least some of this Mylan Product ultimately purchased by Plaintiff Glab was purchased from Defendant Mylan by John Doe Wholesaler Defendants, who then distributed and resold that Mylan Product to Retail Pharmacy CVS (among other Retail Pharmacy Defendants).  The product sold by the  Aurobindo Defendants ("Aurobindo Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the Aurobindo Defendants.  Specifically, the Aurobindo Product that Plaintiff Glab purchased was manufactured by Defendant Aurobindo Pharma Ltd., Aurobindo Pharma USA and Aurolife Pharma, LLC, and sold in the United States by Defendants Aurobindo Pharma USA and Aurolife Pharma, LLC.  At least some of this Aurobindo Product ultimately purchased by Plaintiff Glab was purchased from Defendant Aurobindo by John Doe Wholesaler Defendants, who then distributed and resold that Aurobindo Product to Retail Pharmacy Defendant CVS (among other Retail Pharmacy Defendants).  Defendant CVS, in turn, sold the Mylan and Aurobindo Products to Plaintiff Glab and other consumers. Each Defendant mentioned in this paragraph expressly and impliedly warranted to Plaintiff Glab (either directly, or indirectly by adopting warranties that were passed along to and incorporated by another Defendant further downstream and mentioned in this paragraph) that their respective generic VCDs were the same as their RLDs. But in fact, Plaintiff Glab purchased a product that was not the same as the RLD.  Had Plaintiff Glab known the product

{Cases; 00033778.DOCX}

**Formatted:** Font: 8 pt

was not the same as the RLD, Plaintiff Glab would not have paid for Defendants' VCDs. Likewise, had Defendants' deception about the impurities within their products been made known earlier, Plaintiff Glab would not have paid for Defendants' VCDs.

37.     Plaintiff Mary McLean is a Virginia resident and citizen. During the class period, Plaintiff McLean paid money for one or more of Defendants' VCDs, including purchases of VCDs manufactured, distributed, or sold by the Teva and Mylan Defendants (as defined *infra* Part II.C). The product sold by the Mylan Defendants ("Mylan Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the Mylan Defendants.  Specifically, the Mylan Product that Plaintiff McLean purchased was manufactured by Defendant Mylan Laboratories Limited and Mylan Pharmaceuticals, Inc., and sold in the United States by Defendant Mylan Pharmaceuticals, Inc.  At least some of this Mylan Product ultimately purchased by Plaintiff McLean was purchased from Defendant Mylan by John Doe Wholesalers, who then distributed and resold that Mylan Product to Costco (among other Retail Pharmacy Defendants).  The product sold by the Teva Defendants ("Teva Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the Teva Defendants.  Specifically, the Teva Product that Plaintiff McLean purchased was manufactured and sold by Defendant Teva.  At least some of this Teva Product ultimately purchased by Plaintiff McLean was purchased from Defendant Teva by John Doe Wholesalers, who then distributed and resold that Teva Product to Costco (among other Retail Pharmacy Defendants).  Costco, in turn, sold the Mylan and Teva Products to Plaintiff McLean and other consumers. Each Defendant mentioned in this paragraph expressly and impliedly warranted to Plaintiff McLean (either directly, or indirectly by adopting warranties that were passed along to and incorporated by another Defendant further downstream and mentioned in this paragraph) that their respective generic VCDs were the same as their RLDs. But in fact, Plaintiff

{Cases; 00033778.DOCX}

Formatted: Font: 8 pt

McLean purchased a product that was not the same as the RLD.  Had Plaintiff McLean known the product was not the same as the RLD, Plaintiff McLean would not have paid for these Defendants' VCDs.  Likewise, had Defendants' deception about the impurities within their products been made known earlier, Plaintiff McLean would not have paid for these Defendants' VCDs.

38.    Plaintiff Asha Lamy is an Alabama resident and citizen. During the class period, Plaintiff Lamy paid money for one or more of Defendants' VCDs, including purchases of VCDs manufactured, distributed, or sold by the Mylan Defendants (as defined *infra* Part II.C).  The product sold by the  Mylan Defendants ("Mylan Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the Mylan Defendants.  Specifically, the Mylan Product that Plaintiff Lamy purchased was manufactured by Defendant Mylan Laboratories Limited and Mylan Pharmaceuticals, Inc., and sold in the United States by Defendant Mylan Pharmaceuticals, Inc.  At least some of this Mylan Product ultimately purchased by Plaintiff Lamy was purchased from Defendant Mylan by John Doe Wholesalers, who then distributed and resold that Mylan Product to Retail Pharmacy Defendant Kroger (among other Retail Pharmacy Defendants).  Defendant Kroger, in turn, sold the Mylan Products to Plaintiff Lamy and other consumers. Each Defendant mentioned in this paragraph expressly and impliedly warranted to Plaintiff Lamy (either directly, or indirectly by adopting warranties that were passed along to and incorporated by another Defendant further downstream and mentioned in this paragraph) that their respective generic VCDs were the same as their RLDs. But in fact, Plaintiff Lamy purchased a product that was not the same as the RLD.  Had Plaintiff Lamy known the product was not the same as the RLD, Plaintiff Lamy would not have paid for these Defendants' VCDs.  Likewise, had Defendants' deception about the impurities within their products been made known earlier, Plaintiff Lamy would not have paid for these Defendants' VCDs.

**Formatted:** Font: 8 pt

39.     Plaintiff Jay Meader is a California resident and citizen. During the class period, Plaintiff Meader paid money for one or more of Defendants' VCDs, including purchases of VCDs manufactured, distributed, or sold by the Mylan Defendants (as defined *infra* Part II.C). The product sold by the Mylan Defendants ("Mylan Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the Mylan Defendants.  Specifically, the Mylan Product that Plaintiff Meader purchased was manufactured by Defendant Mylan Laboratories Limited and Mylan Pharmaceuticals, Inc., and sold in the United States by Defendant Mylan Pharmaceuticals, Inc.  At least some of this Mylan Product ultimately purchased by Plaintiff Meader was purchased from Defendant Mylan by John Doe Wholesalers, who then distributed and resold that Mylan Product to Retail Pharmacy Defendant CVS (among other Retail Pharmacy Defendants).  Defendant CVS, in turn, sold the Mylan Product to Plaintiff Meader and other consumers. Each Defendant mentioned in this paragraph expressly and impliedly warranted to Plaintiff Meader (either directly, or indirectly by adopting warranties that were passed along to and incorporated by another Defendant further downstream and mentioned in this paragraph) that  their respective generic VCDs were the same as their RLDs. But in fact, Plaintiff Meader purchased a product that was not the same as the RLD.  Had Plaintiff Meader known the product was not the same as the RLD, Plaintiff Meader would not have paid for these Defendants' VCDs.  Likewise, had Defendants' deception about the impurities within their products been made known earlier, Plaintiff Meader would not have paid for these Defendants' VCDs.

40.     Plaintiff Lawrence Edwards is a Georgia resident and citizen. During the class period, Plaintiff Edwards paid money for one or more of Defendants' VCDs, including purchases of VCDs manufactured, distributed, or sold by the Mylan and Aurobindo Defendants (as defined infra Part II.C).  The product sold by the Mylan Defendants ("Mylan Product") bore a unique

{Cases; 00033778.DOCX}

**Formatted:** Font: 8 pt

NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the Mylan Defendants. Specifically, the Mylan Product that Plaintiff Edwards purchased was manufactured by Defendant Mylan Laboratories Limited and Mylan Pharmaceuticals, Inc., and sold in the United States by Defendant Mylan Pharmaceuticals, Inc. At least some of this Mylan Product ultimately purchased by Plaintiff Edwards was purchased from Defendant Mylan by John Doe Wholesalers, who then distributed and resold that Mylan Product to Defendant Retail Pharmacies CVS and Rite-Aid (among other Retail Pharmacy Defendants). The product sold by the Aurobindo Defendants ("Aurobindo Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the Aurobindo Defendants. Specifically, the Aurobindo Product that Plaintiff Edwards purchased was manufactured by Defendant Aurobindo Pharma Ltd., Aurobindo Pharma USA and Aurolife Pharma, LLC, and sold in the United States by Defendants Aurobindo Pharma USA and Aurolife Pharma, LLC. At least some of this Aurobindo Product ultimately purchased by Plaintiff Edwards was purchased from Defendant Aurobindo by John Doe Wholesalers, who then distributed and resold that Aurobindo Product to Retail Pharmacy Defendants CVS and Rite-Aid (among other Retail Pharmacy Defendants). Defendants CVS and Rite-Aid, in turn, sold the Mylan and Aurobindo Products to Plaintiff Edwards and other consumers. Each Defendant mentioned in this paragraph expressly and impliedly warranted to Plaintiff Edwards (either directly, or indirectly by adopting warranties that were passed along to and incorporated by another Defendant further downstream and mentioned in this paragraph) that their respective generic VCDs were the same as their RLDs. But in fact, Plaintiff Edwards purchased a product that was not the same as the RLD. Had Plaintiff Edwards known the product was not the same as the RLD, Plaintiff Edwards would not have paid for Defendants' VCDs. Likewise, had Defendants' deception about the impurities within their products been made known earlier, Plaintiff Edwards

{Cases: 00033778.DOCX}

-32-

would not have paid for Defendants' VCDs.

41.    Plaintiff Estate of Elenora Deutenberg is and/or will be represented by Fernando Feijoo, a Florida resident and citizen. During the class period, Elenora Deutenberg paid money for one or more of Defendants' VCDs, including purchases of VCDs manufactured, distributed, or sold by ZHP and Aurobindo Defendants (as defined *infra* Part II.C).  The product sold by the Aurobindo Defendants ("Aurobindo Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the Aurobindo Defendants.  Specifically, the Aurobindo Product that Plaintiff purchased was manufactured by Defendant Aurobindo Pharma Ltd., Aurobindo Pharma USA and Aurolife Pharma, LLC, and sold in the United States by Defendants Aurobindo Pharma USA and Aurolife Pharma, LLC.  At least some of this Aurobindo Product ultimately purchased by Plaintiff was purchased from Defendant Aurobindo by John Doe Wholesalers, who then distributed and resold that Aurobindo Product to Retail Pharmacy Defendants CVS and Walgreens (among other Retail Pharmacy Defendants). Defendants CVS and Walgreens, in turn, sold the ZHP and Aurobindo Products to Plaintiff and other consumers. Each Defendant mentioned in this paragraph expressly and impliedly warranted to Plaintiff (either directly, or indirectly by adopting warranties that were passed along to and incorporated by another Defendant further downstream and mentioned in this paragraph) that their respective generic VCDs were the same as their RLDs. But in fact, Deutenberg purchased a product that was not the same as the RLD. Had Deutenberg known the product was not the same as the RLD, Deutenberg would not have paid for these Defendants' VCDs. Likewise, had Defendants' deception about the impurities within their products been made known earlier, Deutenberg would not have paid for these Defendants' VCDs.

42.    Plaintiff Linda Crocker is a Maine resident and citizen. During the class period, Plaintiff Crocker paid money for one or more of Defendants' VCDs, including purchases of VCDs

{Cases; 00033778.DOCX}

**Formatted:** Font: 8 pt

manufactured, distributed, or sold by the Aurobindo Defendants (as defined *infra* Part II.C). The product sold by the Aurobindo Defendants ("Aurobindo Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the Aurobindo Defendants. Specifically, the Aurobindo Product that Plaintiff Crocker purchased was manufactured by Defendant Aurobindo Pharma Ltd., Aurobindo Pharma USA and Aurolife Pharma, LLC, and sold in the United States by Defendants Aurobindo Pharma USA and Aurolife Pharma, LLC. At least some of this Aurobindo Product ultimately purchased by Plaintiff Crocker was purchased from Defendant Aurobindo by John Doe Wholesalers, who then distributed and resold that Aurobindo Product to Hannaford Food & Drug (in addition to Retail Pharmacy Defendants). Hannaford Food & Drug, in turn, sold the Aurobindo Product to Plaintiff Crocker and other consumers. Each Defendant mentioned in this paragraph expressly and impliedly warranted to Plaintiff Croker (either directly, or indirectly by adopting warranties that were passed along to and incorporated by another Defendant further downstream and mentioned in this paragraph) that their respective generic VCDs were the same as their RLDs. But in fact, Plaintiff Crocker purchased a product that was not the same as the RLD. Had Plaintiff Crocker known the product was not the same as the RLD, Plaintiff Crocker would not have paid for these Defendants' VCDs. Likewise, had Defendants' deception about the impurities within their products been made known earlier, Plaintiff Crocker would not have paid for these Defendants' VCDs.

43.    Plaintiff Antoinette Sims is a New Jersey resident and citizen. During the class period, Plaintiff Sims paid money for one or more of Defendants' VCDs, including purchases of VCDs manufactured, distributed, or sold by the Aurobindo Defendants (as defined *infra* Part II.C). The product sold by the Aurobindo Defendants ("Aurobindo Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply

**Formatted:** Font: 8 pt

chain by the Aurobindo Defendants. Specifically, the Aurobindo Product that Plaintiff Sims purchased was manufactured by Defendant Aurobindo Pharma Ltd., Aurobindo Pharma USA and Aurolife Pharma, LLC, and sold in the United States by Defendants Aurobindo Pharma USA and Aurolife Pharma, LLC. At least some of this Aurobindo Product ultimately purchased by Plaintiff Sims was purchased from Defendant Aurobindo by John Doe Wholesalers, who then distributed and resold that Aurobindo Product to Heights Specialty Pharmacy (in addition to Retail Pharmacy Defendants). Heights Speciality Pharmacy, in turn, sold the Aurobindo Products to Plaintiff Sims and other consumers. Each Defendant mentioned in this paragraph expressly and impliedly warranted to Plaintiff Sims (either directly, or indirectly by adopting warranties that were passed along to and incorporated by another Defendant further downstream and mentioned in this paragraph) that their respective generic VCDs were the same as their RLDs. But in fact, Plaintiff Sims purchased a product that was not the same as the RLD. Had Plaintiff Sims known the product was not the same as the RLD, Plaintiff Sims would not have paid for these Defendants' VCDs. Likewise, had Defendants' deception about the impurities within their products been made known earlier, Plaintiff Sims would not have paid for these Defendants' VCDs.

44. Plaintiff Jennifer Johnson is a Minnesota resident and citizen. During the class period, Plaintiff Johnson paid money for one or more of Defendants' VCDs, including purchases of VCDs manufactured, distributed, or sold by ZHP and Aurobindo Defendants (as defined *infra* Part II.C). The product sold by the ZHP Defendants ("ZHP Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the ZHP Defendants. Specifically, the ZHP Product that Plaintiff Johnson purchased was manufactured by Defendant ZHP and sold in the United States by Defendant Solco, with assistance from Defendant Huahai US and Defendant Prinston, who facilitated the regulatory filings necessary for sale. At least some of this ZHP Product ultimately purchased by Plaintiff Johnson

{Cases; 00033778.DOCX}

Formatted: Font: 8 pt

was purchased from Defendant ZHP by John Doe Wholesalers, who then distributed and resold that ZHP Product to Retail Pharmacy Defendant Walmart (among other Retail Pharmacy Defendants). The product sold by the Aurobindo Defendants ("Aurobindo Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the Aurobindo Defendants. Specifically, the Aurobindo Product that Plaintiff Johnson purchased was manufactured by Defendant Aurobindo Pharma Ltd., Aurobindo Pharma USA and Aurolife Pharma, LLC, and sold in the United States by Defendants Aurobindo Pharma USA and Aurolife Pharma, LLC. At least some of this Aurobindo Product ultimately purchased by Plaintiff Johnson was purchased from Defendant Aurobindo by John Doe Wholesalers, who then distributed and resold that Aurobindo Product to Retail Pharmacy Defendant Walmart (among other Retail Pharmacy Defendants). Defendant Walmart, in turn, sold the ZHP and Aurobindo Products to Plaintiff Johnson and other consumers. Each Defendant mentioned in this paragraph expressly and impliedly warranted to Plaintiff Johnson (either directly, or indirectly by adopting warranties that were passed along to and incorporated by another Defendant further downstream and mentioned in this paragraph) that their respective generic VCDs were the same as their RLDs. But in fact, Plaintiff Johnson purchased a product that was not the same as the RLD. Had Plaintiff Johnson known the product was not the same as the RLD, Plaintiff Johnson would not have paid for these Defendants' VCDs. Likewise, had Defendants' deception about the impurities within their products been made known earlier, Plaintiff Johnson would not have paid for these Defendants' VCDs.

45.    Plaintiff Marlin Anderson is an Illinois resident and citizen. During the class period, Plaintiff Anderson paid money for one or more of Defendants' VCDs, including purchases of VCDs manufactured, distributed, or sold by the Aurobindo and Mylan Defendants (as defined *infra* Part II.C). The product sold by the Aurobindo Defendants ("Aurobindo Product") bore a

{Cases: 00033778.DOCX}

**Formatted:** Font: 8 pt

unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the Aurobindo Defendants. Specifically, the Aurobindo Product that Plaintiff Anderson purchased was manufactured by Defendant Aurobindo Pharma Ltd., Aurobindo Pharma USA and Aurolife Pharma, LLC, and sold in the United States by Defendants Aurobindo Pharma USA and Aurolife Pharma, LLC. At least some of this Aurobindo Product ultimately purchased by Plaintiff Anderson was purchased from Defendant Aurobindo by John Doe Wholesalers, who then distributed and resold that Aurobindo Product to Retail Pharmacy Defendant CVS (among other Retail Pharmacy Defendants). The product sold by the Mylan Defendants ("Mylan Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the Mylan Defendants. Specifically, the Mylan Product that Plaintiff Anderson purchased was manufactured by Defendant Mylan Laboratories Limited and Mylan Pharmaceuticals, Inc., and sold in the United States by Defendant Mylan Pharmaceuticals, Inc. At least some of this Mylan Product ultimately purchased by Plaintiff Anderson was purchased from Defendant Mylan by John Doe Wholesalers, who then distributed and resold that Mylan Product to Retail Pharmacy Defendant CVS (among other Retail Pharmacy Defendants). Defendant CVS, in turn, sold the Aurobindo and Mylan Products to Plaintiff Anderson and other consumers. Each Defendant mentioned in this paragraph expressly and impliedly warranted to Plaintiff Anderson (either directly, or indirectly by adopting warranties that were passed along to and incorporated by another Defendant further downstream and mentioned in this paragraph) that their respective generic VCDs were the same as their RLDs. But in fact, Plaintiff Anderson purchased a product that was not the same as the RLD. Had Plaintiff Anderson known the product was not the same as the RLD, Plaintiff Anderson would not have paid for these Defendants' VCDs. Likewise, had Defendants' deception about the impurities within their products been made known earlier, Plaintiff Anderson would not have paid for these

{Cases; 00033778.DOCX}

Formatted: Font: 8 pt

Defendants' VCDs.

46.     Plaintiff James Lawson is a New Jersey resident and citizen. During the class period, Plaintiff Lawson paid money for one or more of Defendants' VCDs, including purchases of VCDs manufactured, distributed, or sold by the Mylan and Aurobindo Defendants (as defined *infra* Part II.C). The product sold by the Mylan Defendants ("Mylan Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the Mylan Defendants. Specifically, the Mylan Product that Plaintiff Lawson purchased was manufactured by Defendant Mylan Laboratories Limited and Mylan Pharmaceuticals, Inc., and sold in the United States by Defendant Mylan Pharmaceuticals, Inc. At least some of this Mylan Product ultimately purchased by Plaintiff Lawson was purchased from Defendant Mylan by John Doe Wholesalers, who then distributed and resold that Mylan Product to Retail Pharmacy Defendant CVS (among other Retail Pharmacy Defendants). The product sold by the Aurobindo Defendants ("Aurobindo Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the Aurobindo Defendants. Specifically, the Aurobindo Product that Plaintiff Lawson purchased was manufactured by Defendant Aurobindo Pharma Ltd., Aurobindo Pharma USA and Aurolife Pharma, LLC, and sold in the United States by Defendants Aurobindo Pharma USA and Aurolife Pharma, LLC. At least some of this Aurobindo Product ultimately purchased by Plaintiff Lawson was purchased from Defendant Aurobindo by John Doe Wholesalers, who then distributed and resold that Aurobindo Product to Retail Pharmacy Defendant CVS (among other Retail Pharmacy Defendants). Defendant CVS, in turn, sold the Mylan and Aurobindo Products to Plaintiff Lawson and other consumers. Each Defendant mentioned in this paragraph expressly and impliedly warranted to Plaintiff Lawson (either directly, or indirectly by adopting warranties that were passed along to and incorporated by another Defendant further downstream and mentioned in this

{Cases; 00033778.DOCX}

**Formatted:** Font: 8 pt

paragraph) that their respective generic VCDs were the same as their RLDs. But in fact, Plaintiff Lawson purchased a product that was not the same as the RLD. Had Plaintiff Lawson known the product was not the same as the RLD, Plaintiff Lawson would not have paid for these Defendants' VCDs. Likewise, had Defendants' deception about the impurities within their products been made known earlier, Plaintiff Lawson would not have paid for these Defendants' VCDs.

47.    Plaintiff James Childs is a New Jersey resident and citizen. During the class period, Plaintiff Childs paid money for one or more of Defendants' VCDs, including purchases of VCDs manufactured, distributed, or sold by the ZHP, Hetero, Mylan and Aurobindo Defendants (as defined *infra* Part II.C). The product sold by the ZHP Defendants ("ZHP Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the ZHP Defendants. Specifically, the ZHP Product that Plaintiff Childs purchased was manufactured by Defendant ZHP and sold in the United States by Defendant Solco, with assistance from Defendant Huahai US and Defendant Prinston, who facilitated the regulatory filings necessary for sale. At least some of this ZHP Product ultimately purchased by Plaintiff Childs was purchased from Defendant ZHP by John Doe Wholesalers who then distributed and resold that ZHP Product to Main Line Health Pharmacy (in addition to Retail Pharmacy Defendants). The product sold by the Hetero Defendants ("Hetero Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the Hetero Defendants. Specifically, the Hetero Product that Plaintiff Childs purchased was manufactured by Defendant Hetero Labs Ltd. and sold in the United States by Defendant Camber, with assistance from Defendant Hetero USA, who facilitated the regulatory filings necessary for sale. At least some of this Hetero Product ultimately purchased by Plaintiff Childs was purchased from Defendant Hetero by John Doe Wholesalers, who then distributed and resold that Hetero Product to Main Line Health Pharmacy (in addition to Retail Pharmacy

{Cases; 00033778.DOCX}

Formatted: Font: 8 pt

Defendants).  The product sold by the  Mylan Defendants ("Mylan Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the Mylan Defendants.  Specifically, the Mylan Product that Plaintiff Childs purchased was manufactured by Defendant Mylan Laboratories Limited and Mylan Pharmaceuticals, Inc., and sold in the United States by Defendant Mylan Pharmaceuticals, Inc.  At least some of this Mylan Product ultimately purchased by Plaintiff Childs was purchased from Defendant Mylan by John Doe Wholesalers, who then distributed and resold that Mylan Product to Retail Pharmacy Main Line Health Pharmacy (among other Retail Pharmacy Defendants). The product sold by the  Aurobindo Defendants ("Aurobindo Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the Aurobindo Defendants.  Specifically, the Aurobindo Product that Plaintiff Childs purchased was manufactured by Defendant Aurobindo Pharma Ltd., Aurobindo Pharma USA and Aurolife Pharma, LLC, and sold in the United States by Defendants Aurobindo Pharma USA and Aurolife Pharma, LLC.  At least some of this Aurobindo Product ultimately purchased by Plaintiff Childs was purchased from Defendant Aurobindo by John Doe Wholesalers, who then distributed and resold that Aurobindo Product to Main Line Health Pharmacy (in addition to Retail Pharmacy Defendants).  Main Line Health Pharmacy, in turn, sold the ZHP, Hetero, Mylan and Aurobindo Products to Plaintiff Childs and other consumers. Each Defendant mentioned in this paragraph expressly and impliedly warranted to Plaintiff Childs (either directly, or indirectly by adopting warranties that were passed along to and incorporated by another Defendant further downstream and mentioned in this paragraph) that their respective generic VCDs were the same as their RLDs. But in fact, Plaintiff Childs purchased a product that was not the same as the RLD.  Had Plaintiff Childs known the product was not the same as the RLD, Plaintiff Childs would not have paid for these Defendants' VCDs.  Likewise, had Defendants' deception about the impurities within their

{Cases: 00033778.DOCX}

**Formatted:** Font: 8 pt

products been made known earlier, Plaintiff Childs would not have paid for these Defendants' VCDs.

48.    Plaintiff Sandra Kelly is an Alabama resident and citizen. During the class period, Plaintiff Kelly paid money for one or more of Defendants' VCDs, including purchases of VCDs manufactured, distributed, or sold by ZHP Defendants (as defined *infra* Part II.C).  The product sold by the  ZHP Defendants ("ZHP Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the ZHP Defendants.  Specifically, the ZHP Product that Plaintiff Kelly purchased was manufactured by Defendant ZHP and sold in the United States by Defendant Solco, with assistance from Defendant Huahai US and Defendant Prinston, who facilitated the regulatory filings necessary for sale.  At least some of this ZHP Product ultimately purchased by Plaintiff Kelly was purchased from Defendant ZHP by John Doe Wholesalers who then distributed and resold that ZHP Product to Emerging Home Care Pharmacy (in addition to other Retail Pharmacy Defendants).  Emerging Home Care Pharmacy, in turn, sold the ZHP Products to Plaintiff Kelly and other consumers. Each Defendant mentioned in this paragraph expressly and impliedly warranted to Plaintiff Kelly (either directly, or indirectly by adopting warranties that were passed along to and incorporated by another Defendant further downstream and mentioned in this paragraph) that their respective generic VCDs were the same as their RLDs. But in fact, Plaintiff Kelly purchased a product that was not the same as the RLD.  Had Plaintiff Kelly known the product was not the same as the RLD, Plaintiff Kelly would not have paid for these Defendants' VCDs.  Likewise, had Defendants' deception about the impurities within their products been made known earlier, Plaintiff Kelly would not have paid for these Defendants' VCDs.

49.    Plaintiff Radhakrishna Shetty is a New Jersey resident and citizen. During the class period, Plaintiff Shetty paid money for one or more of Defendants' VCDs, including purchases of

**Formatted:** Font: 8 pt

VCDs manufactured, distributed, or sold by ZHP Defendants (as defined *infra* Part II.C). The product sold by the ZHP Defendants ("ZHP Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the ZHP Defendants. Specifically, the ZHP Product that Plaintiff Shetty purchased was manufactured by Defendant ZHP and sold in the United States by Defendant Solco, with assistance from Defendant Huahai US and Defendant Prinston, who facilitated the regulatory filings necessary for sale. At least some of this ZHP Product ultimately purchased by Plaintiff Shetty was purchased from Defendant ZHP by John Doe Wholesalers who then distributed and resold that ZHP Product to Retail Pharmacy Defendant Walgreens (among other Retail Pharmacy Defendants). Defendant Walgreens, in turn, sold the ZHP Products to Plaintiff Shetty and other consumers. Each Defendant mentioned in this paragraph expressly and impliedly warranted to Plaintiff Shetty (either directly, or indirectly by adopting warranties that were passed along to and incorporated by another Defendant further downstream and mentioned in this paragraph) that their respective generic VCDs were the same as their RLDs. But in fact, Plaintiff Shetty purchased a product that was not the same as the RLD. Had Plaintiff Shetty known the product was not the same as the RLD, Plaintiff Shetty would not have paid for these Defendants' VCDs. Likewise, had Defendants' deception about the impurities within their products been made known earlier, Plaintiff Shetty would not have paid for these Defendants' VCDs.

50. Plaintiff Raleigh Wolfe is an Indiana resident and citizen. During the class period, Plaintiff Wolfe paid money for one or more of Defendants' VCDs, including purchases of VCDs manufactured, distributed, or sold by ZHP Defendants (as defined *infra* Part II.C). The product sold by the ZHP Defendants ("ZHP Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the ZHP Defendants. Specifically, the ZHP Product that Plaintiff Wolfe purchased was manufactured by

{Cases: 00033778.DOCX}

**Formatted:** Font: 8 pt

Defendant ZHP and sold in the United States by Defendant Solco, with assistance from Defendant Huahai US and Defendant Prinston, who facilitated the regulatory filings necessary for sale. At least some of this ZHP Product ultimately purchased by Plaintiff Wolfe was purchased from Defendant ZHP by John Doe Wholesalers who then distributed and resold that ZHP Product to Retail Pharmacy Defendant Walgreens (among other Retail Pharmacy Defendants). Defendant Walgreens, in turn, sold the ZHP Products to Plaintiff Wolfe and other consumers. Each Defendant mentioned in this paragraph expressly and impliedly warranted to Plaintiff Wolfe (either directly, or indirectly by adopting warranties that were passed along to and incorporated by another Defendant further downstream and mentioned in this paragraph) that their respective generic VCDs were the same as their RLDs. But in fact, Plaintiff Wolfe purchased a product that was not the same as the RLD. Had Plaintiff Wolfe known the product was not the same as the RLD, Plaintiff Wolfe would not have paid for the Defendants' VCDs. Likewise, had Defendants' deception about the impurities within their products been made known earlier, Plaintiff Wolfe would not have paid for these Defendants' VCDs.

51.    Plaintiff Georgia Fatigato is an Illinois resident and citizen. During the class period, Plaintiff Fatigato paid money for one or more of Defendants' VCDs, including purchases of VCDs manufactured, distributed, or sold by ZHP Defendants (as defined *infra* Part II.C). The product sold by the ZHP Defendants ("ZHP Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the ZHP Defendants. Specifically, the ZHP Product that Plaintiff Fatigato purchased was manufactured by Defendant ZHP and sold in the United States by Defendant Solco, with assistance from Defendant Huahai US and Defendant Prinston, who facilitated the regulatory filings necessary for sale. At least some of this ZHP Product ultimately purchased by Plaintiff Fatigato was purchased from Defendant ZHP by John Doe Wholesalers who then distributed and resold that ZHP Product to

{Cases; 00033778.DOCX}

**Formatted:** Font: 8 pt

Retail Pharmacy. Defendant Walgreens (among other Retail Pharmacy Defendants). Defendant Walgreens, in turn, sold the ZHP Products to Plaintiff Fatigato and other consumers. Each Defendant mentioned in this paragraph expressly and impliedly warranted to Plaintiff Fatigato (either directly, or indirectly by adopting warranties that were passed along to and incorporated by another Defendant further downstream and mentioned in this paragraph) that their respective generic VCDs were the same as their RLDs. But in fact, Plaintiff Fatigato purchased a product that was not the same as the RLD. Had Plaintiff Fatigato known the product was not the same as the RLD, Plaintiff Fatigato would not have paid for these Defendants' VCDs. Likewise, had Defendants' deception about the impurities within their products been made known earlier, Plaintiff Fatigato would not have paid for these Defendants' VCDs.

52.    Plaintiff Brittney Means is a Texas resident and citizen. During the class period, Plaintiff Means paid money for one or more of Defendants' VCDs, including purchases of VCDs manufactured, distributed, or sold by the Teva Defendants (as defined *infra* Part II.C). The product sold by the Teva Defendants ("Teva Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the Teva Defendants. Specifically, the Teva Product that Plaintiff Means purchased was manufactured and sold by Defendant Teva. At least some of this Teva Product ultimately purchased by Plaintiff Means was purchased from Defendant Teva by John Doe Wholesalers who then distributed and resold that Teva  Product to Defendants Walgreens and CVS (among other Retail Pharmacy Defendants). Defendants Walgreens and CVS, in turn, sold the Teva Products to Plaintiff Means and other consumers. Each Defendant mentioned in this paragraph expressly and impliedly warranted to Plaintiff Means (either directly, or indirectly by adopting warranties that were passed along to and incorporated by another Defendant further downstream and mentioned in this paragraph) that their respective generic VCDs were the same as their RLDs. But in fact, Plaintiff

{Cases; 00033778.DOCX}

**Formatted:** Font: 8 pt

Means purchased a product that was not the same as the RLD.  Had Plaintiff Means known the product was not the same as the RLD, Plaintiff Means would not have paid for these Defendants' VCDs.  Likewise, had Defendants' deception about the impurities within their products been made known earlier, Plaintiff Means would not have paid for these Defendants' VCDs.

53.    Plaintiff Mark Hays is a California resident and citizen.  During the class period, Plaintiff Hays paid money for one or more of Defendants' VCDs, including purchases of VCDs manufactured, distributed, or sold by the Hetero Defendants, Mylan Defendants and Aurobindo Defendants (as defined *infra* Part II.C).  The product sold by the  Hetero Defendants ("Hetero Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the Hetero Defendants.  Specifically, the Hetero Product that Plaintiff Hays purchased was manufactured by Defendant Hetero Labs Ltd. and sold in the United States by Defendant Camber, with assistance from Defendant Hetero USA, who facilitated the regulatory filings necessary for sale.  At least some of this Hetero Product ultimately purchased by Plaintiff Hays was purchased from Defendant Hetero by John Doe Wholesalers, who then distributed and resold that Hetero Product to Defendant Express Scripts and CVS (in addition to Retail Pharmacy Defendants).  The product sold by the  Mylan Defendants ("Mylan Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the Mylan Defendants.  Specifically, the Mylan Product that Plaintiff Hays purchased was manufactured by Defendant Mylan Laboratories Limited and Mylan Pharmaceuticals, Inc., and sold in the United States by Defendant Mylan Pharmaceuticals, Inc.  At least some of this Mylan Product ultimately purchased by Plaintiff Hays was purchased from Defendant Mylan by John Doe Wholesalers, who then distributed and resold that Mylan Product to Defendants Express Scripts and CVS (among other Retail Pharmacy Defendants). Each Defendant mentioned in this paragraph expressly and impliedly warranted to Plaintiff Hays (either

{Cases: 00033778.DOCX}

**Formatted:** Font: 8 pt

directly, or indirectly by adopting warranties that were passed along to and incorporated by another Defendant further downstream and mentioned in this paragraph) that their respective generic VCDs were the same as their RLDs. But in fact, Plaintiff Hays purchased a product that was not the same as the RLD. Had Plaintiff Hays known the product was not the same as the RLD, Plaintiff Hays would not have paid for these Defendants' VCDs. Likewise, had Defendants' deception about the impurities within their products been made known earlier, Plaintiff Hays would not have paid for these Defendants' VCDs.

54.    Plaintiff Charlie Johnston is a California resident and citizen. During the class period Plaintiff Johnston paid money for one or more of Defendants' VCDs, including purchases of VCDs manufactured, distributed or sold by the ZHP Defendants (as defined *infra* Part II.C). The product sold by the ZHP Defendants ("ZHP Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the ZHP Defendants. Specifically, the ZHP Product that Plaintiff Johnston purchased was manufactured by Defendant ZHP and sold in the United States by Defendant Solco, with assistance from Defendant Huahai US and Defendant Prinston, who facilitated the regulatory filings necessary for sale. At least some of this ZHP Product ultimately purchased by Plaintiff Johnston was purchased from Defendant ZHP by John Doe Wholesalers who then distributed and resold that ZHP Product to OptumRx (among other Retail Pharmacy Defendants). Defendant OptumRx, in turn, sold the ZHP Products to Plaintiff Johnston and other consumers. Each Defendant mentioned in this paragraph expressly and impliedly warranted to Plaintiff Johnston (either directly, or indirectly by adopting warranties that were passed along to and incorporated by another Defendant further downstream and mentioned in this paragraph) that their respective generic VCDs were the same as their RLDs. But in fact, Plaintiff Johnston purchased a product that was not the same as the RLD. Had Plaintiff Johnston known the product was not the same as the RLD,

{Cases: 00033778.DOCX}

**Formatted:** Font: 8 pt

Plaintiff Johnston would not have paid for these Defendants' VCDs.  Likewise, had Defendants'

deception about the impurities within their products been made known earlier, Plaintiff Johnston

would not have paid for these Defendants' VCDs.

55.     Plaintiff Merilyn Andre is a California resident and citizen.  During the class period,

Plaintiff Andre paid money for one or more of Defendants VCDs, including purchases of VCDs

manufactured, distributed or sold by the ZHP Defendants and the Aurobindo Defendants (as

defined *infra* Part II.C).  The product sold by the ZHP Defendants ("ZHP Product") bore a unique

NDC which denoted that it was indeed sold, manufactured, or distributed into the United States

drug supply chain by the ZHP Defendants.  Specifically, the ZHP Product that Plaintiff Andre

purchased was manufactured by Defendant ZHP and sold in the United States by Defendant Solco,

with assistance from Defendant Huahai US and Defendant Prinston, who facilitated the regulatory

filings necessary for sale.  At least some of this ZHP Product ultimately purchased by Plaintiff

Andre was purchased from Defendant ZHP by John Doe Wholesalers who then distributed and

resold that ZHP Product to Defendants Express Scripts (among other Retail Pharmacy Defendants)

and Sav-On.  The product sold by the Aurobindo Defendants ("Aurobindo Product") bore a unique

NDC which denoted that it was indeed sold, manufactured, or distributed into the United States

drug supply chain by the Aurobindo Defendants.  Specifically, the Aurobindo Product that Plaintiff

Andre purchased was manufactured by Defendant Aurobindo Pharma Ltd., Aurobindo Pharma

USA and Aurolife Pharma, LLC, and sold in the United States by Defendants Aurobindo Pharma

USA and Aurolife Pharma, LLC.  At least some of this Aurobindo Product ultimately purchased

by Plaintiff Andre  was purchased from Defendant Aurobindo by John Doe Wholesalers, who then

distributed and resold that Aurobindo Product to Defendants Express Scripts (in addition to Retail

Pharmacy Defendants) and Sav-On.  Defendant Express Scripts, in turn, sold the ZHP and

Aurobindo Products to Plaintiff Andre and other consumers. Each Defendant mentioned in this

{Cases: 00033778.DOCX}

-47-

Formatted: Font: 8 pt

paragraph expressly and impliedly warranted to Plaintiff Andre (either directly, or indirectly by adopting warranties that were passed along to and incorporated by another Defendant further downstream and mentioned in this paragraph) that their respective generic VCDs were the same as their RLDs. But in fact, Plaintiff Andre purchased a product that was not the same as the RLD.  Had Plaintiff Andre known the product was not the same as the RLD, Plaintiff Andre would not have paid for these Defendants' VCDs.   Likewise, had Defendants' deception about the impurities within their products been made known earlier, Plaintiff Andre would not have paid for these Defendants' VCDs.

56.    Plaintiff Peter O'Brien is a Connecticut resident and citizen.  During the class period Plaintiff O'Brien paid money for for one or more of Defendants' VCDs, including purchases of VCDs manufactured, distributed, or sold by the Hetero Defendants (as defined *infra* Part II.C). The product sold by the  Hetero Defendants ("Hetero Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the Hetero Defendants.  Specifically, the Hetero Product that Plaintiff O'Brien purchased was manufactured by Defendant Hetero Labs Ltd. and sold in the United States by Defendant Camber, with assistance from Defendant Hetero USA, who facilitated the regulatory filings necessary for sale.  At least some of this Hetero Product ultimately purchased by Plaintiff O'Brien was purchased from Defendant Hetero by John Doe Wholesalers, who then distributed and resold that Hetero Product to Defendant CVS (in addition to Retail Pharmacy Defendants). Defendant CVS, in turn, sold the Hetero Products to Plaintiff O'Brien  and other consumers. Each Defendant mentioned in this paragraph expressly and  impliedly warranted to Plaintiff O'Brien (either directly, or indirectly by adopting warranties that were passed along to and incorporated by another Defendant further downstream and mentioned in this paragraph) that their respective generic VCDs were the same as their RLDs. But in fact, Plaintiff O'Brien purchased a product that

{Cases; 00033778.DOCX}

**Formatted:** Font: 8 pt

was not the same as the RLD.  Had Plaintiff O'Brien known the product was not the same as the RLD, Plaintiff O'Brien would not have paid for these Defendants' VCDs.  Likewise, had Defendants' deception about the impurities within their products been made known earlier, Plaintiff O'Brien would not have paid for these Defendants' VCDs.

57.    Plaintiff Glenda Cooper is a Kentucky resident and citizen.  During the class period, Plaintiff Glenda Cooper paid money for one or more of Defendants' VCDs, including purchases of VCDs manufactured, distributed, or sold by the Mylan Defendants and the ZHP Defendants (as defined *infra* Part II.C).  The product sold by the  Mylan Defendants ("Mylan Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the Mylan Defendants.  Specifically, the Mylan Product that Plaintiff Cooper purchased was manufactured by Defendant Mylan Laboratories Limited and Mylan Pharmaceuticals, Inc., and sold in the United States by Defendant Mylan Pharmaceuticals, Inc.  At least some of this Mylan Product ultimately purchased by Plaintiff Cooper was purchased from Defendant Mylan by John Doe Wholesalers, who then distributed and resold that Mylan Product to Smith Drug Co. (among other Retail Pharmacy Defendants).  The product sold by the  ZHP Defendants ("ZHP Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the ZHP Defendants.  Specifically, the ZHP Product that Plaintiff Cooper purchased was manufactured by Defendant ZHP and sold in the United States by Defendant Solco, with assistance from Defendant Huahai US and Defendant Prinston, who facilitated the regulatory filings necessary for sale.  At least some of this ZHP Product ultimately purchased by Plaintiff Cooper was purchased from Defendant ZHP by John Doe Wholesalers who then distributed and resold that ZHP Product to Smith Drug Co. (in addition to other Retail Pharmacy Defendants).  Smith Drug Co., in turn, sold the Mylan Products and the ZHP Products to Plaintiff Cooper and other consumers. Each Defendant mentioned in this

**Formatted:** Font: 8 pt

paragraph expressly and impliedly warranted to Plaintiff Cooper (either directly, or indirectly by adopting warranties that were passed along to and incorporated by another Defendant further downstream and mentioned in this paragraph) that their respective generic VCDs were the same as their RLDs. But in fact, Plaintiff Cooper purchased a product that was not the same as the RLD. Had Plaintiff Cooper known the product was not the same as the RLD, Plaintiff Cooper would not have paid for these Defendants' VCDs. Likewise, had Defendants' deception about the impurities within their products been made known earlier, Plaintiff Cooper would not have paid for these Defendants' VCDs.

58.    Plaintiff Samuel Cisneros is a Texas resident and citizen. During the class period, Plaintiff Cisneros paid money for one or more of Defendants' VCDs, including purchases of VCDs manufactured, distributed, or sold by the Torrent Defendants (as defined *infra* Part II.C). The product sold by the Torrent Defendants ("Torrent Product") bore a unique NDC which denoted that it was indeed sold, manufactured, or distributed into the United States drug supply chain by the Torrent Defendants. Specifically, the Torrent Product that Plaintiff Cisneros purchased was manufactured and sold by Defendant Torrent. At least some of this Torrent Product ultimately purchased by Plaintiff Cisneros was purchased from Defendant Torrent by John Doe Wholesalers, who then distributed and resold that Torrent Product to Retail Pharmacy Defendant Walmart (among other Retail Pharmacy Defendants). Defendant Walmart, in turn, sold the Torrent Product Products to Plaintiff Cisneros and other consumers. Each Defendant mentioned in this paragraph expressly and impliedly warranted to Plaintiff Cisneros (either directly, or indirectly by adopting warranties that were passed along to and incorporated by another Defendant further downstream and mentioned in this paragraph) that their respective generic VCDs were the same as their RLDs. But in fact, Plaintiff Cisneros purchased a product that was not the same as the RLD. Had Plaintiff Cisneros known the product was not the same as the RLD, Plaintiff Cisneros would not have paid

Formatted: Font: 8 pt

for these Defendants' VCDs. Likewise, had Defendants' deception about the impurities within their products been made known earlier, Plaintiff Cisneros would not have paid for these Defendants' VCDs.

**B.  The Third Party Payor ("TPP") Class Representatives**

35.59.  Plaintiff MSP Recovery Claims, Series LLC ("MSPRC") is a Delaware series limited liability company with its principal place of business at 5000 S.W. 75th Avenue, Suite 400, Miami, Florida 33155. MSPRC's limited liability company agreement provides for the establishment of one or more specific series. All records of all series are maintained together with all assets of MSPRC.

36.60.  Certain healthcare benefit providers have assigned their recovery rights to assert the claims alleged in this Complaint to Series LLCs of MSPRC. Pursuant to MSPRC's limited liability agreement, all rights arising from the assignment to its series (including the assignments discussed below), along with the right to bring any lawsuit in connection with that assignment (including those below), belong to MSPRC. As such, MSPRC has the right and power to sue defendants to recover the payments at issue in this action.

37.61.  Certain series of MSPRC have executed irrevocable assignments of any and all rights to recover payments made on behalf of their assignors' health plan members and enrollees. These assignments authorize the series and, in turn MSPRC through its operating agreement, to pursue and enforce all legal rights of recovery and reimbursement for health care services and Medicare benefits. For example, and only to serve to further demonstrate standing, MSPRC alleges a few of the assignments below as examples.

38.62.  On March 20, 2018, Group Health Incorporated and Health Insurance Plan of Greater New York (otherwise known as "EmblemHealth" or "Emblem") irrevocably assigned all its rights and claims to recovery against any liable entity (including defendants) for payments made

Formatted: Font: 8 pt

on behalf of their enrollees under Medicare Parts A, B, and D to Series 16-08-483, a designated

series of MSPRC. Specifically, the assignments provide the following:

> Assignor hereby irrevocably assigns, transfers, conveys, sets over and
> delivers to Assignee, and any of its successors and assigns, any and all of
> Assignor's right, title, ownership and interest in and to all [claims against
> third parties], whether based in contract, tort, statutory right, and any and
> all rights (including, but not limited to, subrogation) to pursue and/or
> recover monies that Assignor had, may have had, or has asserted against
> any party in connection with the [claims] and all rights and claims against
> primary payers and/or . . . third parties that may be liable to Assignor arising
> from or relating to the [claims], including claims under consumer protection
> statutes and laws, and all information relating thereto, as may be applicable.

39.63.  On May 12, 2017, Summacare, Inc. ("Summacare") irrevocably assigned all its

rights and claims to recovery against any liable entity (including defendants) for payments made

on behalf of its enrollees under Medicare Parts A, B, and D to MSP Recovery, LLC ("MSP

Recovery"). Specifically, the assignment provides the following language:

> [Summacare] hereby irrevocably assigns, transfers, conveys, sets over and
> delivers to MSP Recovery, and any of its successors and assigns, any and
> all of [Summacare's] right, title, ownership and interest in and to all Claims
> existing on the date hereof, whether based in contract, tort, statutory right,
> and any and all rights (including, but not limited to, subrogation) to pursue
> and/or recover monies for [Summacare] that [Summacare] had, may have
> had, or has asserted against any party in connection with the Claims and all
> rights and claims against primary payers and/or third parties that may be
> liable to [Summacare] arising from or relating to the Claims, including
> claims under consumer protection statutes and laws, and all information
> relating thereto, all of which shall constitute the "Assigned Claims".

40.64.  On June 12, 2017, MSP Recovery irrevocably assigned all rights acquired under

the Summacare Assignment to Series 16-11-509, a designated series of MSPRC:

> [Assignor] irrevocably assigns, sells, transfers, conveys, sets over and
> delivers to Assignee and its successors and assigns, any and all of
> Assignor's right, title, ownership and interest in and to the [claims] (and all
> proceeds and products thereof) as such terms are defined in the Recovery
> Agreement dated May 12, 2017, by and among [Summacare] . . . and [MSP
> Recovery] . . . .

41.65.  Summacare consented to, acknowledged, approved, and ratified the assignment

from MSP Recovery to Series 16-11-509, which is memorialized in a letter dated September 5, 2018.

42.66.  On March 20, 2018, Connecticare, Inc. ("Connecticare") irrevocably assigned all its rights and claims to recovery against any liable entity (including defendants) for payments made on behalf of its enrollees under Medicare Parts A, B, and D to Series 15-09-157, a designated series of MSPRC.  Specifically, the assignment provides the following language:

> Assignor hereby irrevocably assigns, transfers, conveys, sets over and delivers to Assignee, and any of its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to all [claims against third parties], whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party in connection with the [claims] and all rights and claims against primary payers and/or . . . third parties that may be liable to Assignor arising from or relating to the [claims], including claims under consumer protection statutes and laws, and all information relating thereto, as may be applicable.

43.67.  Defendants have manufactured and distributed VCDs throughout the United States, for which the plaintiff consumers made co-payments, and TPPs paid. Specifically, MSRPC's assignors paid $79 million on behalf of their enrollees. On information and belief, the MSPRC's payments include those payments for defendants' VCDs, which were also manufactured, distributed, and sold during that same period. MSPRC's payments include payment made on behalf of beneficiaries in the following states and territories: Alabama, Arizona, California, Colorado, Connecticut, Delaware, Florida, Georgia, Indiana, Louisiana, Massachusetts, Maryland, Maine, Michigan, Missouri, Mississippi, North Carolina, New Jersey, Nevada, New York, Ohio, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, Tennessee, Texas, Virginia, Wisconsin, and West Virginia.

44.68.  For example, and only to further demonstrate standing, MSPRC alleges some exemplar payments made by its assignors for the VCDs in the table below. In each instance, one

**Formatted:** Font: 8 pt

of MSPRC's assignors received a request to reimburse a prescription drug on behalf of an enrollee

for a particular date of service indicated below. The assignors paid the amounts indicated for

contaminated, FDA-recalled lots of VCDs. To be clear, the table below does not demonstrate all

of MSPRC's assignors' payments for VCDs, let alone all of MSPRC's damages.[3]

---

[3] The representative payments in the table below correspond to the FDA's list of recalled VCDs with expiration dates ranging from 2018 through 2020. The table below does not list any payments made for VCDs whose contamination was not disclosed prior to the FDA's recall.

{Cases; 00033778.DOCX}
-54-

**Formatted:** Font: 8 pt

| Assignor | Assignor's Enrollee[4] | Date of Service | NDC | Manufacturer | Amount Paid |
|---|---|---|---|---|---|
| Emblem | Patient A | 12/18/2~~017~~17 | 591231919 | Actavis Pharma | $195.19 |
| Emblem | Patient B | ~~7/21/20~~1/1/17 | ~~$193.30~~378581577 | Mylan | $15.89 |
| Emblem | Patient C | ~~9/11/20~~1/1/17 | ~~$192.026586~~2057190 | Aurobindo | $13.90 |
| Emblem | Patient D | 8/11/17 | 43547036909 | ZHP/Solco | ~~6/$19/2017.96~~$174.63 |
| Emblem | Patient E | ~~9/11/20~~3/2/16 | ~~$170.949374~~3298 | Teva | $16.24 |
| Summacare | Patient F | ~~10/10/20~~4/5/17 | ~~$89.9331722~~074690 | Hetero/Camber | $16.66 |
| Summacare | Patient G | 9/9/17 | 378581577 | Mylan | ~~$12/13/2016.45~~$503.89 |
| Summacare | Patient H | ~~3/31/20~~1/1/16 | ~~$39.6093743~~398 | Teva | $34.02 |
| ~~Summacare~~ | ~~Patient I~~ | ~~5/30/2017~~ | | ~~$69.12~~ | |
| Summacare | Patient ~~I~~J | ~~11/14/20~~11/14/2015 | ~~$239.141366~~8006890 | Torrent | $21.67 |
| Connecticare | Patient ~~K~~J | ~~8/24/20~~11/12/15 | ~~$103.456586~~2054790 | Aurobindo | $25.19 |
| Connecticare | Patient ~~L~~K | 10/6/15 ~~/2017~~ | ~~$75.2037858~~1577 | Mylan | $25.46 |
| Connecticare | Patient ~~M~~L | ~~8/3/201~~5/6/16 | ~~$71.1543547~~037009 | ZHP/Solco | $64.74 |
| ~~Connecticare~~ | ~~Patient N~~ | ~~9/21/2017~~ | | ~~$69.45~~ | |
| ~~Connecticare~~ | ~~Patient O~~ | ~~3/9/2017~~ | | ~~$52.34~~ | |

---

[4] To ensure that this complaint complies with federal law under the Health Insurance Portability and Accountability Act ("HIPAA"), the individual enrollees are referred to by these pseudonyms.

Formatted: Not Highlight

45.69.  Plaintiff Maine Automobile Dealers Association, Inc. Insurance Trust is a duly organized and existing 501(c)(9) tax-exempt trust that qualifies as a multiple employer welfare benefit plan or arrangement established or maintained for the purpose of offering or providing health benefits, including prescription drug coverage, to the employees of multiple employers and to their beneficiaries under the authority of the Maine Multiple-Employer Welfare Arrangements law, Title 24-A, Chapter 81, §§ 6601-6616 of the Maine Revised Statutes Annotated and the Employee Retirement Income Security Act of 1974. The Trust was organized in Maine and has its principal place of business in Maine.

46.70.  The Trust administers a multiple-employer welfare arrangement for the sole purpose of funding a plan of benefits, both on a self-funded basis and through the purchase of policies of insurance.

71.    The Trust provides health benefit coverage, including a prescription drug benefit, to its members.  The Trust's members received prescriptions for and it paid for VCDs listed as recalled by the United States Food and Drug Administration and that were manufactured, distributed, or sold by at least the ZHP Defendants, the Hetero Defendants, the Mylan Defendants, the Aurobindo Defendants, and the Torrent Defendants (as defined *infra* Part II.C).  MADA's payments include payments made on behalf of members in Maine, Florida and New Jersey.

72.    For example, and only to further demonstrate standing, MADA alleges some exemplar payments it made for the VCDs in the table below. In each instance, MADA received a request to reimburse a prescription drug filed on behalf of a member for a particular date filled indicated below. MADA paid the amounts indicated for contaminated, FDA-recalled lots of VCDs. To be clear, the table below does not demonstrate all of MADA's payments for VCDs, let alone

Formatted: Font: 8 pt

all of MADA's damages.[5]

| Member | Date Filled | NDC | Manufacturer | Total Plan Paid |
|--------|-------------|-----|--------------|-----------------|
| Patient A | 6/2/2016 | 43547036809 | ZHP/Solco | 307.79 |
| Patient B | 3/16/2017 | 13668020430 | Torrent | 576.57 |
| Patient B | 4/2/2018 | 13668020430 | Torrent | 526.80 |
| Patient C | 5/30/2016 | 31722074690 | Hetero/Camber | 330.50 |
| Patient D | 10/7/2018 | 65862057390 | Aurobindo | 495.58 |
| Patient E | 12/13/2017 | 00378581577 | Mylan | 516.72 |
| Patient F | 3/28/2018 | 31722074790 | Hetero/Camber | 84.30 |
| Patient G | 5/18/2015 | 378581577 | Mylan | 496.72 |
| Patient H | 4/9/2018 | 43547037009 | ZHP/Solco | 406.36 |
| Patient I | 7/8/2015 | 00378581577 | Mylan | 471.80 |
| Patient J | 7/14/2015 | 31722074790 | Hetero/Camber | 317.69 |
| Patient K | 4/18/2018 | 43547037009 | ZHP/Solco | 337.54 |

47.

**C. The Active Pharmaceutical Ingredient Manufacturer Defendants**

48.73.  For ease of reading, this Master Complaint generally organizes Defendants by the

distribution level at which they principally operate.  The following Defendants

manufacture manufactured the active pharmaceutical ingredient ("API") for Defendants' VCDs, or

are were closely affiliated with an entity that does did so.  The inclusion of certain Defendants in

this section does not mean they are not properly classifiable as another type of defendant, or vice

versa (e.g., a Defendant listed in this subsection may also be a distributor; a Defendant listed in

---

[5] The representative payments in the table below correspond to the FDA's list of recalled VCDs with expiration dates ranging from 2018 through 2020. The table below does not list any payments made for VCDs whose contamination was not disclosed prior to the FDA's recall.

the distributor subsection may also be an API manufacturer).

### 1. *Zhejiang Huahai Pharmaceutical Co., Ltd. Entities*

49.74. Defendant Zhejiang Huahai Pharmaceutical Co., Ltd. ("ZHP") is a Chinese corporation, with its principal place of business at Xunqiao, Linhai, Zhejiang 317024, China.  The company also has a United States headquarters located at 2009 and 2002 Eastpark Blvd., Cranbury, NJ 08512. ZHP on its own and/or through its subsidiaries regularly conducts business throughout the United States and its territories and possessions. At all times material to this action, ZHP has been engaged in the manufacturing, marketing, design sale, and distribution of contaminated, adulterated and/or misbranded and/or misbranded generic VCDs throughout the United States.

50.75. Defendant Huahai US Inc. ("Huahai US") is a New Jersey corporation, with its principal place of business located at 2002 Eastpark Blvd., Cranbury, New Jersey 08512. Huahai US is the wholly-owned subsidiary of ZHP. Huahai US "focus[es] on the sales and marketing of [ZHP's] APIs and Intermediates."[6] At all times material to this case, Huahai has been engaged in the manufacture, marketing, sale, and distribution of contaminated, adulterated and/or misbranded generic VCDs in the United States.

51.76. Defendant Prinston Pharmaceutical Inc. d/b/a Solco Healthcare LLC ("Prinston") is a Delaware corporation with its principal place of business located at 2002 Eastpark Blvd., Cranbury, New Jersey 08512. Defendant Prinston is a majority-owned subsidiary of ZHP. At all times material to this case, Prinston has been engaged in the manufacturing, marketing, sale, and distribution of contaminated, adulterated and/or misbranded generic VCDs in the United States.

52.77. Defendant Solco Healthcare US, LLC ("Solco") is a Delaware limited liability company with its principal place of business located at 2002 Eastpark Blvd., Cranbury, New Jersey

---

[6] Huahai US, HOMEPAGE, https://www.huahais.com/index.html http://www.huahaius.com/about%20us.html (last accessed Apr. 5, 2019). April 9, 2021).

Formatted: Font color: Red

Formatted: Font: 8 pt

08512. Solco is a wholly-owned subsidiary of Prinston and ZHP. At all times material to this case, Solco has been engaged in the manufacturing, marketing, sale, and distribution of contaminated, adulterated and/or misbranded generic VCDs in the United States.

53.78.  Collectively, ZHP, Huahai US, Prinston, and Solco will be referred to as the ZHP Defendants. Much of the VCDs manufactured by the ZHP Defendants containscontained NDMA levels **hundreds of times** higher than acceptable limits for human consumption, according to laboratory results published by the FDA.[7] Some of its VCDs also contained unacceptable levels of NDEA.[8]

54.79.  The ZHP Defendants also manufactured valsartan-containing API for sale to the following other finished-dose manufacturers: Defendants Teva Pharmaceutical Industries Ltd., Teva Pharmaceuticals USA, Inc., and Torrent Pharmaceuticals, Ltd.

55.80.  In turn, the finished-dose manufacturer defendants' VCDs have unique labelers/distributors, as well as repackagers.

**2.  *Hetero Labs, Ltd. Entities***

56.81.  Defendant Hetero Labs, Ltd. ("Hetero Labs") is a foreign corporation, with its principal place of business at 7-2-A2, Hetero Corporate, Industrial Estates, Sanath Nagar, Hyderabad – 500 018, Telangana, India. Hetero Labs on its own and/or through its subsidiaries regularly conducts business in New Jersey and throughout the United States and its territories and possessions. At all times material to this action, Hetero Labs has been engaged in the manufacturing, marketing, sale, and distribution of contaminated, adulterated and/or misbranded and/or misbranded generic VCDs throughout the United States.

57.82.  Defendant Hetero Drugs, Limited ("Hetero") is a foreign corporation, with its

---

[7] FDA, LABORATORY ANALYSIS OF VALSARTAN PRODUCTS, https://www.fda.gov/drugs/drug-safety-and-availability/laboratory-analysis-valsartan-products  (last accessed June 5, 2019January 26, 2021).
[8] Torrent has only recalled VCDs by ZHP.

{Cases; 00033778.DOCX}
-59-

Formatted: Font: 8 pt

principal place of business at 7-2-A2, Hetero Corporate, Industrial Estates, Sanath Nagar, Hyderabad - 500 018, Telangana, India. "Hetero has a strong established global presence with 36 manufacturing facilities and a robust network of business partners and marketing offices strategically located across the world."[9] Hetero on its own and/or through its subsidiaries regularly conducts business throughout the United States and its territories and possessions. Hetero Labs is the wholly-owned subsidiary of Hetero. At all times material to this action, Hetero has been engaged in the manufacturing, marketing, sale, and distribution of contaminated, adulterated and/or misbranded and/or misbranded generic VCDs throughout the United States.

58.83.  Defendant Hetero USA Inc. ("Hetero USA") is "the US representation of HETERO, a privately owned; researched based global pharmaceutical company."[10] Hetero USA is a Delaware corporation with its principal place of business located at 1035 Centennial Avenue, Piscataway, New Jersey 08854. Hetero USA is the wholly-owned subsidiary of Hetero. At all times material to this action, Hetero USA has been engaged in the manufacturing, marketing, sale, and distribution of contaminated, adulterated and/or misbranded and/or misbranded generic VCDs throughout the United States.

59.84.  Defendant Camber Pharmaceuticals, Inc. ("Camber") is a Delaware corporation, with its principal place of business at 1031 Centennial Avenue, Piscataway, NJ 08854. Camber is the wholly owned subsidiary of Hetero Drugs. At all times material to this action, Camber has been engaged in the manufacturing, marketing, sale, and distribution of contaminated, adulterated, misbranded, and/or unapproved VCDs throughout the United States.

60.85.  Collectively, Hetero Labs, Hetero, Hetero USA, and Camber will be referred to as

---

[9] Hetero, GLOBAL FOOTPRINT, https://www.heteroworld.com/global-footprint.php (last accessed June 6, 2019January 26, 2021).
[10] Hetero USA, LINKEDIN, https://www.linkedin.com/company/hetero-usa-inc/about/ (last accessed June 5, 2019January 26, 2021).

the Hetero Defendants in this Complaint.

61.86.  The valsartan-containing API manufactured by the Hetero Defendants was distributed to Hetero's U.S. subsidiaries or affiliates including Hetero USA and Camber. In turn, Camber supplied Hetero-manufactured valsartan API to at least three repackagers, including AvKARE, Inc., RemedyRepack, Inc., and Preferred Pharmaceuticals.

### 3. *Mylan Laboratories, Ltd. Entities*

62.87.  Defendant Mylan Laboratories, Ltd. ("Mylan Laboratories") is a foreign corporation, with its principal place of business at Plot No. 564/A/22, Road No. 92, Jubilee Hills 500034, Hyderabad, India. Mylan Laboratories on its own and/or through its subsidiaries regularly conducts business throughout the United States and its territories and possessions. At all times material to this action, Mylan Laboratories has been engaged in the manufacturing, marketing, sale, and distribution of contaminated, adulterated and/or misbranded and/or misbranded generic VCDs throughout the United States.

63.88.  Defendant Mylan N.V. ("Mylan") is a global generic and specialty pharmaceuticals company registered in the Netherlands, with principal executive offices in Hatfield, Hertfordshire, UK and a Global Center in Canonsburg, Pennsylvania. According to Mylan's website: "[t]he Chief Executive Officer and other executive officers of Mylan carry out the day-to-day conduct of Mylan's worldwide businesses at the company's principal offices in Canonsburg, Pennsylvania." Mylan Laboratories is a wholly owned subsidiary of Mylan.  At all times material to this action, Mylan on its own and/or through its subsidiaries regularly conducted business throughout the United States and its territories and possessions. Mylan has been engaged in the manufacturing, marketing, sale, and distribution of contaminated, adulterated and/or misbranded and/or misbranded generic VCDs throughout the United States.

64.89.  Defendant Mylan Pharmaceuticals, Inc. ("Mylan Pharmaceuticals") is a West

{Cases; 00033778.DOCX}
-61-

Formatted: Font: 8 pt

Virginia corporation, with its principal place of business at 1500 Corporate Drive, Canonsburg, Pennsylvania 15317. Mylan Pharmaceuticals is the registered holder of Mylan Laboratories' ANDA for its VCDs. At all times material to this action, Mylan Pharmaceuticals has been engaged in the manufacturing, marketing, sale, and distribution of contaminated, adulterated and/or misbranded and/or misbranded generic VCDs throughout the United States.

65.90. Collectively, Mylan Laboratories, Mylan, and Mylan Pharmaceuticals will be referred to as the Mylan Defendants in this Complaint.

66.91. The Mylan Defendants' valsartan-containing API was supplied in large part to itself due to Mylan's vertically integrated supply chain. According to Mylan's website, "[b]eing a manufacturer of API makes Mylan one of the few global generics companies with a comprehensive, vertically integrated supply chain" that Mylan touts as "provid[ing] us with an extra measure in the quality process that we can own[.]"[11]

67.92. Some of the Mylan Defendants' valsartan-containing API was also supplied to Defendant Teva Pharmaceuticals USA, Inc., which is named and identified below.

### 4. *Aurobindo Pharma, Ltd. Entities*

68.93. Defendant Aurobindo Pharma, Ltd. ("Aurobindo") is a foreign corporation with its principal place of business at Plot no. 2, Maitrivihar, Ameerpet, Hyderabad-500038 Telangana, India, and a United States headquarters at 279 Princeton Hightstown Road, East Windsor, New Jersey 08520. Aurobindo on its own and/or through its subsidiaries regularly conducts business throughout the United States and its territories and possessions. At all times material to this case, Aurobindo has been engaged in the manufacturing, marketing, sale, and distribution of contaminated, adulterated and/or misbranded VCDs in the United States.

---

[11] https://www.mylan.com/en/products/active-pharmaceutical-ingredients (last accessed June 6, 2019January 26, 2021).

Formatted: Font: 8 pt

69.94. Defendant Aurobindo Pharma USA, Inc. ("Aurobindo USA") is a Delaware

corporation with its principal place of business at 279 Princeton Hightstown Road, East Windsor,

New Jersey 08520. It is a wholly-owned subsidiary of Aurobindo. At all times material to this

case, Aurobindo USA has been engaged in the manufacturing, marketing, sale, and distribution of

contaminated, adulterated and/or misbranded VCDs in the United States.

70.95. Defendant Aurolife Pharma, LLC ("Aurolife") is a Delaware limited liability

company with its principal place of business at 2400 US- 130, North, Dayton, New Jersey 08810.

It is a wholly-owned subsidiary of Aurobindo USA. At all times material to this case, Aurolife has

been engaged in the manufacturing, marketing, sale, and distribution of contaminated, adulterated

and/or misbranded VCDs in the United States.

71.96. Aurobindo, Aurobindo USA, and Aurolife are collectively referred to as the

Aurobindo Defendants in this Complaint.

72.97. Aurobindo's valsartan-containing API was supplied in large part to itself due to its

vertically integrated supply chain. "Aurobindo adds value through superior customer service in the

distribution of a broad line of generic pharmaceuticals, leveraging vertical integration and efficient

controlled processes."[12]

    **D. The Finished-Dose Defendants**[13]

        ***1. The Teva Defendants***

73.98. Defendant Teva Pharmaceutical Industries Ltd. ("Teva") is a foreign company

incorporated and headquartered in Petah Tikvah, Israel. Teva on its own and/or through its

subsidiaries regularly conducts business throughout the United States and its territories and

---

[12] Aurobindo USA, OUR STORY, https://www.aurobindousa.com/company/our-story/ (last accessed June 5, 2019January 26, 2021).
[13] The ZHP, Hetero, Mylan, and Aurobindo Defendants also qualify as finished dose Defendants, but the party allegations are listed above.

possessions. At all times material to this case, Teva has been engaged in the manufacturing, marketing, sale, and distribution of contaminated, adulterated and/or misbranded generic VCDs in the United States.

74.99.   Defendant Teva Pharmaceuticals USA, Inc. ("Teva USA") is a Delaware corporation, with its principal place of business at 400 Interpace Parkway, Parsippany, New Jersey 07054, and is a wholly owned subsidiary of Teva. At all times material to this case, Teva USA has been engaged in the manufacturing, marketing, sale, and distribution of contaminated, adulterated and/or misbranded generic VCDs in the United States.   Teva and Teva USA are collectively referred to as the Teva Defendants in this Complaint.

75.100.        Arrow Pharm Malta Ltd. ("Arrow") is a foreign corporation headquartered at HF62 HalFar Industrial Estate, HalFar, BBG 300, Malta. Teva owns the entirety of Arrow, which on its own and/or through its parent company and subsidiaries regularly conducts business throughout the United States of America and its territories and possessions. At all times material to this case, Arrow has been engaged in the manufacturing, marketing, sale, and distribution of contaminated, adulterated and/or misbranded VCDs in the United States.

76.101.        Actavis Pharma, Inc. ("Actavis Pharma") is a Delaware corporation with its principal place of business at 400 Interpace Parkway, Parsippany, New Jersey 07054, and is Teva's wholly owned subsidiary. At all times material to this case, Actavis Pharma has been engaged in the manufacturing, marketing, sale, and distribution of contaminated, adulterated and/or misbranded VCDs in the United States.

77.102.        Actavis, LLC ("Actavis") is a Delaware corporation with its principal place of business at 400 Interpace Parkway, Parsippany, New Jersey 07054, and is Teva's wholly owned subsidiary. At all times material to this case, Actavis has been engaged in the manufacturing,

{Cases; 00033778.DOCX}
-64-

marketing, sale, and distribution of contaminated, adulterated and/or misbranded VCDs in the
United States.

## 2. *The Torrent Defendants*

78.    Defendant Torrent Private Limited ("Torrent") is a foreign corporation with its
principal place of business at Torrent House, Off. Ashram Road, Ahmedabad - 380009, Gujarat,
India, and a United States headquarters at 150 Allen Road, Suite 102 Basking Ridge, New Jersey
07920. Torrent on its own and/or through its subsidiaries regularly conducts business throughout
the United States of America and its territories and possessions. At all times material to this case,
Torrent has been engaged in the manufacturing, sale, and distribution of adulterated and/or
misbranded VCDs in the United States.

79. 103.        Defendant Torrent Pharmaceuticals, Ltd. ("Torrent Pharmaceuticals") is a
foreign corporation with its principal place of business at Torrent House, Off. Ashram Road,
Ahmedabad - 380009, Gujarat, India, and a United States headquarters at 150 Allen Road, Suite
102 Basking Ridge, New Jersey 07920. Over seventy percent of Torrent Pharmaceuticals is owned
by Torrent. Torrent Pharmaceuticals on its own and/or through its subsidiaries regularly conducts
business throughout the United States and its territories and possessions. At all times material to
this case, Torrent Pharmaceuticals has been engaged in the manufacturing, marketing, sale, and
distribution of contaminated, adulterated and/or misbranded VCDs in the United States.

80. 104.        Defendant Torrent Pharma, Inc. ("Torrent Pharma") is a Delaware
corporation with its principal place of business at 150 Allen Road, Suite 102 Basking Ridge, New
Jersey 07920. It is a wholly-owned subsidiary of Torrent Pharmaceuticals. At all times material to
this case, Torrent Pharma has been engaged in the manufacturing, marketing, sale, and distribution
of contaminated, adulterated and/or misbranded VCDs in the United States.

Formatted: Font: 8 pt

81.105.    Torrent, Torrent Pharmaceuticals, and Torrent Pharma are referred to collectively as the Torrent Defendants in this Complaint.

**E.  Retail Pharmacy Defendants**

82.106.    Retail pharmacies have supply arrangements with finished-dose manufacturers or other entities to obtain prescription drugs to dispense to consumers. The retail pharmacy defendants stand in direct contractual privity with consumers, insofar as retail pharmacies (be they brick-and-mortar or mail-order) are the entities that dispensed and received payment for the contaminated, adulterated and/or misbranded VCDs for which consumers paid and TPPs reimbursed. The retail pharmacy defendants failed to take any steps to test or otherwise confirm the purityquality, purity, generic equivalence, therapeutic equivalence, or bioequivalence of the contaminated, adulterated and/or misbranded VCDs.

107.    Retail pharmacies contract directly with Defendant Manufacturers, as well as wholesalers, for the sale of VCDs.

83.108.    The following Defendants are collectively referred to as the "Retail Pharmacy Defendants."

**1.  *Walgreens***

84.109.    Defendant Walgreens Boots Alliance, IncCo. ("Walgreens") is a national retail pharmacy chain incorporated in the State of Delaware with its principal place of business located at 108 Wilmot Road, Deerfield, Illinois.

85.110.    Walgreens is one of the retail pharmacy chains in the United States, offering retail pharmacy services and locations in all 50 states including the District of Columbia, Puerto Rico, and the U.S. Virgin Islands. As of August 31, 2018, Walgreens operated 9,560 retail pharmacies across the United States, with 78% of the U.S. population living within five 5 miles of a store location. In addition, Walgreens recently purchased an additional 1,932 store locations from

{Cases; 00033778.DOCX}

rival Rite Aid Corporation, further consolidating the industry. Walgreens' sales amounted to a staggering $98.4 billion in 2018, most of which are generated for prescription sales. Walgreens accounts for nearly 20% of the U.S. market for retail prescription drug sales.

86.111.    Walgreens is one of the largest purchasers of pharmaceuticals in the world, and according to its Form 10-K for 2018, the wholesaler AmerisourceBergen "supplies and distributes a significant" volume of generic and branded pharmaceutical products to the [Walgreens] pharmacies.".

87.112.    In or about 2017, Walgreens acquired control of Diplomat Pharmacy. "Walgreens," as defined herein, includes any current or former Diplomat pharmacy.

88.113.    Defendant Walgreens sold a large portion of the contaminated, adulterated and/or misbranded VCDs to U.S. consumers and TPPs during the class period as defined below.

114.    These sales included sales made to Plaintiff Bruner, Plaintiff Duffy, Plaintiff Erwin, Plaintiff Powell, Plaintiff Roberts, Plaintiff Shetty and Plaintiff Fatigato.

## 2. *CVS*

89.115.    Defendant CVS Health CorporationPharmacy, Inc. ("CVS Health") is a national retail pharmacy chain incorporated in Delaware with its principal place of business located at One CVS Drive, Woonsocket, Rhode Island.

90.116.    As of March 31, 2019, Defendant CVS Health maintained approximately 9,900 retail pharmacy locations across the United States, making it one of the largest in the country. Defendant CVS Health also operates approximately 1,100 walk-in medical clinics and a large pharmacy benefits management service with approximately 94 million plan members.

91.117.    According to its 2018 Annual Report, Defendant CVS Health's "Pharmacy Services" segment:

> provides a full range of pharmacy benefit management ("PBM")

{Cases; 00033778.DOCX}

solutions, including plan design offerings and administration, formulary management, retail pharmacy network management services, mail order pharmacy, specialty pharmacy and infusion services, Medicare Part D services, clinical services, disease management services and medical spend management. The Pharmacy Services segment's clients are primarily employers, insurance companies, unions, government employee groups, health plans, Medicare Part D prescription drug plans ("PDPs"), Medicaid managed care plans, plans offered on public health insurance exchanges and private health insurance exchanges, other sponsors of health benefit plans and individuals throughout the United States.

92.118.    CVS Health's Pharmacy Services segment generated U.S. sales of approximately $134.1 billion in 2018.

93.119.    CVS Health's Retail/LTC segment is responsible for the sale of prescription drugs and general merchandise. The Retail/LTC segment generated approximately $84 billion in U.S. sales in 2018, with approximately 75% of that attributed to the sale of pharmaceuticals.pharmaceutical products. During 2018 the Retail/LTC segment filled approximately 1.3 billion prescriptions on a 30-day equivalent basis. In December 2018, CVS's share of U.S. retail prescriptions accounted for 26% of the United States retail pharmacy market.

94.120.    In or about 2015, CVS Health acquired all of Target Corporation's pharmacies. "CVS," as defined herein, includes any current or former Target pharmacy.

95.121.    In 2014, CVS Health and wholesaler Cardinal Health, Inc. ("Cardinal") established a joint venture to source and supply generic pharmaceutical products through a generic pharmaceutical sourcing entity named Red Oak Sourcing, LLC ("Red Oak"), of which CVS Health and Cardinal each own fifty percent. Most or all of the valsartan-containing drugs purchased by CVS Health were acquired through this joint venture with Cardinal.

96.122.    Defendant CVS Health sold a large portion of the contaminated, adulterated and/or misbranded VCDs to U.S. consumers and TPPs during the class period as defined below.

123.    These sales included sales made to Plaintiffs Semmel, Kessinger, Longwell,

{Cases; 00033778.DOCX}
-68-

**Formatted:** Font: 8 pt

Molinaro, Nelson, Glab, and Edwards.

### 3. *Walmart*

97. 124.    Defendant Walmart Stores, Inc. ("Wal-Mart") is a Delaware corporation with its principal place of business in Bentonville, Arkansas.

98. 125.    According to Defendant Wal-Mart's 2018 Form 10-K, Wal-Mart maintains approximately 4,769 retail locations in all fifty states nationwide and the District of Columbia and Puerto Rico (including supercenters, discount stores, and neighborhood markets and other small format locations). Most or all of these locations have Wal-Mart health and wellness products and services, which includes include prescription pharmaceutical services. There are another approximate 600 Sam's Club locations across the United States, all or nearly all offering prescription pharmaceutical services.

99. 126.    Defendant Wal-Mart (including Sam's Club) sold a large portion of the contaminated, adulterated and/or misbranded VCDs to U.S. consumers and TPPs across the country during the class period as defined below.

127.    These sales included sales made to Plaintiffs Burnett, Lee, McGilvery, Neal, Roberts and Wineinger.

### 4. *Rite-Aid*

100. 128.    Defendant Rite-Aid Corporation ("Rite-Aid") is a Delaware corporation with its principal place of business in Camp Hill, Pennsylvania.

101. 129.    Defendant Rite-Aid sold a large portion of the contaminated, adulterated and/or misbranded VCDs to U.S. consumers and TPPs during the class period as defined below.

130.    These sales included sales made to Plaintiff Borkowski, Plaintiff Kaplan, Plaintiff Nelson, and Plaintiff Edwards.

### 5. *Express Scripts*

102.131.　　Defendant Express Scripts, Inc. ("Express Scripts") is a corporation with its principal place of business at One Express Way, St. Louis, MO 63121. Defendant Express Scripts, Inc. is a subsidiary of Express Scripts Holding Company.

103.132.　　Express Scripts sold a large portion of the contaminated, adulterated and/or misbranded VCDs to U.S. consumers and TPPs during the class period as defined below.

133.　　These sales included sales made to Plaintiff Andre.

### 6. *Kroger*

104.134.　　Defendant The Kroger, Co., ("Kroger") is a corporation, with its principal place of business at 1014 Vine Street, Cincinnati, OH 45202.

105.135.　　Defendant Kroger, the largest supermarket/pharmacy chain in North America with nearly 3000 locations, sold a large portion of the contaminated, adulterated and/or misbranded VCDs to U.S. consumers and TPPs during the class period as defined below.

136.　　These sales included sales made to Plaintiff Gildner and Plaintiff Lamy.

### 7. *OptumRx*

106.137.　　Defendant OptumRx is a Minnesota corporation, with its principal place of business at 2300 Main Street, Irvine, CA 92614.

107.138.　　Defendant OptumRx sold a large portion of the contaminated, adulterated and/or misbranded VCDs to U.S. consumers and TPPs during the class period as defined below.

### 8. *Albertson's LLC*

108.139.　　Defendant Albertson's LLC ("Albertsons") is a limited liability company with its principal place of business in Boise, Idaho.

109.140.　　Defendant Albertsons, the second largest multi-billion dollar supermarket chain in North America with over 2200 stores, sold a large portion of the contaminated, adulterated

{Cases; 00033778.DOCX}

-70-

and/or misbranded VCDs to U.S. consumers such as Plaintiffs.

### 9. *Humana Pharmacy, Inc.*

~~110.~~141.    Defendant Humana Pharmacy, Inc. is a corporation, with its principal place of business at 500 West Main Street, Louisville, KY 40202.

~~111.~~142.    Defendant Humana Pharmacy, Inc. sold a large portion of the contaminated, adulterated and/or misbranded VCDs to U.S. consumers and TPPs during the class period as defined below.

### 10. *"John Doe" Pharmacies*

~~112.~~143.    Upon information and belief, one or more additional pharmacies distributed contaminated, adulterated, misbranded, and/or unapproved VCDs that were ultimately purchased by consumer class members, or reimbursed for by TPP class members. The true names, affiliations, and/or capacities of John Doe Pharmacies are not presently known.  However, each John Doe proximately caused damages to Plaintiffs as alleged ~~below~~herein, and each John Doe is liable to Plaintiffs for the acts and omissions alleged ~~below~~herein as well as the resulting damages. Plaintiffs will amend this Master Class Complaint to allege the true names and capacities of the John Does when evidence reveals their identities.

### F. Wholesaler Defendants

~~113.~~144.    Wholesalers or distributors are entities that purchase, among other things, drugs from finished-dose manufacturers and sell or provide those drugs to retail pharmacies and others.[14]  The wholesaler defendants failed to take any steps to test or otherwise confirm the ~~purity~~quality, purity, generic equivalence, therapeutic equivalence, or bioequivalence of the

---

[14] ~~It is believed~~Plaintiffs have purchased VCDs that ~~three wholesalers~~were distributed by each of the Wholesaler Defendants, as set forth above, who comprise at least 90% of the wholesale drug market, and ~~likely as such~~ were the entities that distributed the vast majority of the contaminated, adulterated, misbranded, and/or unapproved VCDs.

{Cases; 00033778.DOCX}

contaminated, adulterated and/or misbranded VCDs.

145.    Wholesalers act as the intermediary between the Manufacturer Defendants and the Retail Pharmacy Defendants.

146.    Wholesalers contract with the Manufacturer Defendants for the purchase of VCDs. Upon information and belief, these contracts include indemnification agreements with the Manufacturer Defendants.

147.    Wholesalers contract with the Retail Pharmacy Defendants for the sale of VCDs.

148.    At all times, Plaintiffs, as the purchasers of VCDs, were the intended beneficiaries of the contracts between the Manufacturers, Wholesalers, and Retail Pharmacies.

114.149.    The following Defendants are collectively referred to as the "Wholesaler Defendants."

### 1.   *Cardinal Health, Inc.*

115.150.    Defendant Cardinal Health, Inc. is a corporation, with its principal place of business at 7000 Cardinal Place, Dublin, OH 43017.

116.151.    Defendant Cardinal Health, Inc. sold a large portion of the contaminated, adulterated and/or misbranded VCDs that were ultimately paid for by U.S. consumers and TPPs during the class period as defined below.

152.    The VCDs distributed by Defendant Cardinal Health, Inc. included VCDs manufactured by all Manufacturer Defendants and ultimately sold to Plaintiff Gildner, Nelson, and other similarly situated consumers.

### 2.   *McKesson Corporation*

117.153.    Upon information and belief, Defendant McKesson Corporation is a Delaware corporation with its principal place of business located at 6535 North State Highway

{Cases; 00033778.DOCX}

161, Irving, Texas 75039.

118. 154.    Defendant McKesson Corporation sold a large portion of the contaminated, adulterated and/or misbranded VCDs that were ultimately paid for by U.S. consumers and TPPs during the class period as defined below.

155.    The VCDs distributed by Defendant McKesson Corporation included VCDs manufactured by all Manufacturer Defendants, which were ultimately sold to Plaintiffs Borkowski, Cacaccio, Semmel, Kaplan, Lee, Longwell, Neal, Nelson, Wineinger, and other similarly situated consumers.

### 3. *AmerisourceBergen Corporation*

119. 156.    Defendant AmerisourceBergen Corp. is a Delaware corporation with its principal place of business located at 1300 Morris Drive, Chesterbrook, PA 19087.

120. 157.    Defendant AmerisourceBergen Corp. sold a large portion of the contaminated, adulterated and/or misbranded VCDs that were ultimately paid for by U.S. consumers and TPPs during the class period as defined below.

158.    The VCDs distributed by Defendant AmerisourceBergen Corporation included VCDs Manufactured by all Manufacturer Defendants, which were ultimately sold to Plaintiffs Bruner, Duffy, Erwin, Powell, Roberts and other similarly situated consumers.

### 4. *"John Doe" Wholesalers*

121. 159.    Upon information and belief, one or more wholesalers distributed contaminated, adulterated, misbranded, and/or unapproved VCDs that were ultimately purchased by consumer class members, or paid or reimbursed for by TPP class members. The true names, affiliations, and/or capacities of John Doe Wholesalers are not presently known. However, each John Doe proximately caused damages to Plaintiffs as alleged below, and each John Doe is liable to Plaintiffs for the acts and omissions alleged below as well as the resulting damages. Plaintiffs

{Cases; 00033778.DOCX}

will amend this Master Class Complaint to allege the true names and capacities of the John Does when evidence reveals their identities.

      **G. Repackager and Relabeler Defendants**

    ~~122.~~160.    Drug repackagers and relabelers purchase or obtain drugs from manufacturers or wholesalers, and then repackage and/or relabel the drugs in small quantities for sale to pharmacies, doctors, or others.[15]

~~123.    Defendant A-S Medication Solutions, LLC is a Nebraska corporation with its principal place of business at 224 North Park Avenue, Fremont, NE 68025.~~

~~124.    A-S Medication Solutions is a repackaging company and is listed as the recalling firm for certain batches of VCDs manufactured by Teva Pharmaceuticals and Prinston Pharmaceuticals, Inc., with the active pharmaceutical ingredient ("API") from Defendant Zhejiang Huahai Pharmaceutical Co., Ltd.~~

~~125.    Upon information and belief, A-S Medication Solutions sold adulterated and/or misbranded VCDs during the class period.~~

~~126.    Defendant Bryant Ranch Prepack, Inc. is a California corporation with its principal place of business at 1919 N. Victory Place Burbank, CA 91504.~~

~~127.    Bryant Ranch Prepak, Inc. is a repackager for the Teva and Actavis Defendants, and sold API from Defendant Zhejiang Huahai Pharmaceutical Co., Ltd.~~

~~128.    Upon information and belief, Bryant Ranch Prepak, Inc. sold adulterated and/or misbranded VCDs during the class period.~~

~~129.    Defendant H J Harkins Co., Inc., dba Pharma Pac is a California corporation, with its principal place of business at 1400 West Grand Avenue, Suite F, Grover Beach, CA, 93433.~~

---

[15] Many of the Re-Packager Defendants have been dismissed without prejudice pursuant to the Court's stipulated dismissal process, but for the sake of completeness, Plaintiffs identify them herein.

**Formatted:** Font: 8 pt

130. H.J. Harkins Co. Inc. is a repackager for VCDs manufactured by Prinston Pharmaceutical, Inc., which contained API from Defendant Zhejiang Huahai Pharmaceutical Co., Ltd.

131. Upon information and belief, H.J. Harkins Co. Inc. sold adulterated and/or misbranded VCDs during the class period.

132.161. Defendant Major is a repackager for VCDs sold by the Teva and Actavis Defendants which contained API from Defendant Zhejiang Huahai Pharmaceutical Co., Ltd

133. Upon information and belief, Major sold adulterated and/or misbranded VCDs during the class period.

134. Defendant RemedyRepack, Inc. is a Pennsylvania corporation, with its principal place of business at 625 Kolter Drive, Suite 4, Indiana, PA 15701.

135. Remedy Repack is a repackager for VCDs manufactured by Prinston Pharmaceutical, Inc and by Torrent Pharmaceuticals, Ltd., with API coming from Defendant Zhejiang Huahai Pharmaceutical Co., Ltd.

136. Upon information and belief, RemedyRepack sold adulterated and/or misbranded VCDs during the class period.

137. Defendant Northwind Pharmaceuticals is an Indiana corporation with its principal place of business at 9402 Uptown Drive, Suite 1100, Indianapolis, IN, 46256.

138. Northwind Pharmaceuticals is also a repackager for the Teva and Actavis Defendants.

139. Upon information and belief, Northwind Pharmaceuticals sold adulterated and/or misbranded VCDs during the class period.

140. Defendant Preferred Pharmaceuticals, Inc. is a California corporation with its principal place of business at 1250 North Lakeview Ave., Unit O, Anaheim CA 92807. Preferred

Formatted: Font: 8 pt

Pharmaceuticals, Inc. is a repackager for VCDs manufactured by the Hetero and Camber Defendants.

141.162.    Upon information and belief, Preferred Pharmaceuticals, Inc. sold contaminated, adulterated and/or misbranded VCDs during the class period.

142.163.    Defendant AvKARE, Inc. is a Tennessee corporation with its principal place of business at 615 N 1st Street, Pulaski, TN 38478-2403.  Defendant AvKARE, Inc. serves as a repackager for the Hetero/Camber Defendants, as well as the Teva and Actavis Defendants.

143.164.    Upon information and belief, AvKARE, Inc. sold contaminated, adulterated and/or misbranded VCDs during the class period.

**H.  True Names / John Doe Defendants 1-50**

144.165.    The true names, affiliations, and/or capacities, whether individual, corporate, partnership, associate, governmental, or otherwise, of John Does 1 through 50 are unknown to Plaintiffs at this time. Plaintiffs therefore sue these defendants using fictitious names. Each John Doe proximately caused damages to Plaintiffs as alleged below, and each John Doe is liable to Plaintiffs for the acts and omissions alleged below as well as the resulting damages. Plaintiffs will amend this Master Class Complaint to allege the true names and capacities of the John Does when evidence reveals their identities.

145.166.    At all times relevant to this Master Class Complaint, each of the John Does was the agent, servant, employee, affiliate, and/or joint venturer of the other co-defendants and other John Does. Moreover, each Defendant and each John Doe acted in the full course, scope, and authority of that agency, service, employment, and/or joint venture.

**III.    JURISDICTION AND VENUE**

146.167.    This Court has original jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because (a) at least one member of the proposed class is a citizen of a

{Cases: 00033778.DOCX}
-76-

Formatted: Font: 8 pt

state different from that of Defendants, (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, (c) the proposed class consists of more than 100 class members, and (d) none of the exceptions under the subsection apply to this action.

147.168.    This Court has personal jurisdiction over Defendants pursuant to 28 U.S.C. § 1407, and because Defendants have sufficient minimum contacts in New Jersey, and because Defendants have otherwise intentionally availed themselves of the markets within New Jersey through their business activities, such that the exercise of jurisdiction by this Court is proper and necessary.

148.169.    Venue is proper in this District on account of the MDL consolidation pursuant to 28 U.S.C. § 1407 and because Defendants reside in this District, 28 U.S.C. § 1391(b)(1); "a substantial part of the events or omissions giving rise to the claim occurred" in this District, 28 U.S.C. § 1391(b)(2); and Defendants are subject to the personal jurisdiction of this Court, 28 U.S.C. § 1391(b)(3).

## IV.    FACTUAL ALLEGATIONS

### A.    Prescription Drug Reimbursement

149.    Venue is proper in this District on account of the MDL consolidation pursuant to 28 U.S.C. § 1407 and because Defendants reside in this District, 28 U.S.C. § 1391(b)(1); "a substantial part of the events or omissions giving rise to the claim occurred" in this District, 28 U.S.C. § 1391(b)(2); and Defendants are subject to the personal jurisdiction of this Court, 28 U.S.C. § 1391(b)(3).

150.170.    The pharmaceutical supply chain in the United States consists of four major actors: pharmaceutical manufacturers, wholesale distributors, pharmacies, and Pharmacy Benefit Managers ("PBMs").

151.171.    Pharmaceutical manufacturers produce drugs which they distribute to

Formatted: Font: 8 pt

wholesale distributors, who further distribute to retail or mail-order pharmacies. Pharmacies dispense the prescription drugs to beneficiaries for consumption. Prescription drugs are processed through quality and utilization management screens by PBMs.

152.172.    TPPs contract with and pay PBMs to administer their drug programs. PBMs, acting as agents for the TPPs, are tasked with developing drug formularies (the list of drugs included in coverage at various pricing "tiers"), processing claims, creating a network of retail pharmacies, and negotiating with pharmaceutical manufacturers. TPPs pay PBMs to control prescription drug costs. In some instances, PBMs are responsible for placing generic drugs, such as VCDs, on the TPPs' formularies.

153.173.    In conducting formulary management, TPPs and their PBMs reasonably expect that generic prescription drugs reimbursable on their formularies are bioequivalent or legally compliant in terms of generic equivalence, therapeutic equivalence, bioequivalence or are otherwise the same as their RLD counterparts. As is the case with all generic drugs, and in keeping with the policy goals of the Hatch Waxman Act, TPPs seek to include the lowest cost generic drugs possible in their formularies. This is only made possible because of the manufacturers' and distributors' representations that these generic drugs, such as the Defendants' VCDs, comply with their respective ANDAs, which state that the generic drugs are bioequivalent to their respective branded drug. Thus, the TPPs permitted the VCDs to be included on their formularies based on the Defendants' misrepresentations that their VCDs were generic equivalent, therapeutic equivalent, and bioequivalent to brand-named Diovan, satisfied all compendia, quality, purity and other requirements, complied with all cGMPs, and were safe for consumption.

154.174.    The formulary placement corresponds with the amount that a plan participant must contribute as a co-payment when purchasing a drug—the higher the placement, the lower the co-payment, and the higher likelihood that the drug will be purchased by plan

{Cases; 00033778.DOCX}

Formatted: Font: 8 pt

beneficiaries in lieu of a more expensive alternative, and vice versa. As such, higher formulary placement increases the likelihood that a doctor will prescribe the drug. TPPs provide copies of their PBMs' formularies to providers, pharmacists, and patients in their network to aid prescribers' adherence to the formulary.

155.175.    The following chart, published by the Wall Street Journal, broadly illustrates the pharmaceutical supply chain:[16]





156.176.    When a patient presents his/her prescription at a pharmacy, the drug's placement on the TPP's formulary will determine the amount of the patient's co-payment. Once the patient's prescription is filled, the pharmacy submits a claim to the PBMs for reimbursement. PBMs then cumulate those individual reimbursements and present them to TPPs for payment.

---

[16] Joseph Walker, *Drugmakers Point Finger at Middlemen for Rising Drug Prices*, WALL ST. J. (Oct. 3, 2016), available at https://www.wsj.com/articles/drugmakers-point-finger-at-middlemen-for-rising-drug-prices-1475443336 (last accessed June 11, 2019January 26, 2021).

**B. Prescription Drug Product Identification and Tracing**

177.    For each approved product (whether brand or generic) the FDA issues a unique 10-digit code (the National Drug Code, or NDC) that follows the product from manufacturing through retail dispensing. The NDC embeds details about the specific product, including the identity of the manufacturer (or labeler), the strength, dosage form, and formulation of the drug, and the package size and type.[17]

178.    The NDC is a critical component of each and every transfer of a prescription drug (from the manufacturer to the wholesaler; from the wholesaler to the retailer; and from the retailer to the consumer) and therefore every transaction is accompanied by and labeled with the NDC. This same code is used by TPPs in the real-time claims adjudication process to identify the precise dollar amount they will reimburse the pharmacy for a particular prescription drug purchase.

179.    Retail prescription labels display the NDC of the dispensed product and this is part of the electronic dispensing record. In many cases, the "Lot" number will also appear on the prescription bottle provided to the consumer and, thus, specifically indicate information including whether a recall applies to the particular pills in the bottle. [18]

180.    The Lot number is also used to report issues arising around a particular drug. For example, lot numbers are used by pharmacists to report Adverse Events ("AE") (patient-specific side effects or complications associated with the use of a prescription drug). This is an important part of drug safety monitoring in the United States and has led to recalls or relabeling of numerous drugs. Pharmacists make such reports using the FDA's MedWatch system using Form 3500.[19]

---

[17] United States Food and Drug Administration, "National Drug Code Directory," accessed January 26, 2021 at https://www.fda.gov/Drugs/InformationOnDrugs/ucm142438.htm; FDA, "National Drug Codes Explained," accessed January 26, 2021 at https://www.drugs.com/ndc.html.
[18] A lot number is an identification number tied to a particular lot of pills from a single manufacturer.
[19] FDA, "Instructions for Completing Form FDA 3500," accessed January 26, 2021 at https://www.fda.gov/safety/medwatch-forms-fda-safety-reporting/instructions-completing-form-fda-3500#Section%20B:%20Adverse%20Event%20or%20Product%20Problem.

**Formatted:** Font: 8 pt

### C.  The Drug Supply Chain Security Act Requires Tracing of Product

181.   The Drug Supply Chain Security Act ("DSCSA")[20] was enacted in 2013, and requires prescription drug manufacturers, wholesalers, repackagers, and pharmacies to "Exchange information about a drug and who handled it each time it is sold in the U.S. market."

182.   The DSCSA was implemented as one part of the Drug Quality and Security Act (DQSA), aimed at addressing vulnerabilities in the drug supply chain, and facilitating tracing of certain prescription drugs in finished dosage form through the supply chain.[21]

183.   While the DSCSA was enacted in 2013, participants in the pharmaceutical supply chain (including the Manufacturer Defendants, Wholesaler Defendants and Retail Pharmacy Defendants) maintained similar information as a part of their ordinary course of business prior to the enactment of the DSCSA, and thus undertook a duty to so in a reasonable manner.

184.   The DSCSA generally requires participants in the drug supply manufacturing chain (starting from the manufacturer, through the wholesaler, to the retail pharmacy) to retain, for every pharmaceutical drug transaction, the following information about that transaction:  product name; NDC; container size; number of containers; lot number; date of transaction; date of shipment; and name and address of the entity transferring ownership and taking ownership of the product.

185.   The DSCSA requires that this data be kept in a manner to allow these authorized participants to respond within 48 hours to requests from appropriate federal or state officials — in the event of a recall or for the purpose of investigating suspect product or an illegitimate product — for the transaction history of the pharmaceutical product. [22]

186.   The supply chain for distribution of prescription drugs in the U.S. is highly

---

[20] 21 U.S. Code § 360eee.
[21] U.S. Department of Health and Human Services, Drug Supply Chain Security: Dispensers Received Most Tracing Information, March 2018, accessed January 26, 2021 at https://oig.hhs.gov/oei/reports/oei-05-16-00550.pdf, at p. 2.
[22] FDA, Title II of the Drug Quality and Security Act, December 16, 2014, accessed January 26, 2021 at https://www.fda.gov/drugs/drug-supply-chain-security-act-dscsa/title-ii-drug-quality-and-security-act.

{Cases; 00033778.DOCX}

**Formatted:** Font: 8 pt

concentrated. This means that data obtained from a relatively small number of market participants can provide detailed information about the large majority of VCD sales, transfers and prescription fills.

187.    The entire process of reimbursing pharmacies and consumers for end-purchases depends upon the ability to know the precise drug and packaging that was dispensed, as well as the manufacturer of that drug. Making this system work has necessarily resulted in very high levels of data standardization in this industry. Although pharmacies maintain their own "pharmacy log" data reflecting dispensing, sales and return activity, the key elements are fundamentally similar.

188.    Because pharmacies require similar information for their own tracking and inventory systems, and wholesalers sell to multiple pharmacy chains, the key elements are fundamentally the same.

189.    Further, all pharmacies must use the basic data fields, definitions and formats provided in the Telecommunications Guidelines developed by the National Council for Prescription Drug Programs, the use of which was made mandatory in 2003 under regulations implementing the Health Insurance Portability and Accountability Act (HIPAA).[23] Because of these HIPAA requirements, all of these inter-related systems (Manufacturers, Wholesalers, Retail Pharmacies, and TPPs) use a common language to identify products.

190.    As a general matter, for Medicare and Medicaid compliance, pharmacies typically keep prescription records for ten years.[24]

191.    For instance, in its Pharmacy Manual, Defendant Walgreens states the following: "Unless otherwise set forth in your Pharmacy Network Agreement with Walgreens Health Initiatives, records are required to be maintained and accessible for: (i) ten years following each

---

[23] Federal Register, August 17, 2000 (Volume 65, Number 160), at pp. 50311-50372; NCPDP, *Pharmacy: A Prescription for Improving the Healthcare System*, October 2009
[24] CFR § 423.505(d)

**Formatted:** Font: 8 pt

year of the term in which the pharmacy provides services under the Pharmacy Network Agreement or longer as mandated by CMS (Centers for Medicare and Medicaid), for Medicare Part D; (ii) six years for the Medicare Drug Discount Card; and (iii) five years or per applicable federal or state law, whichever is longer, for any other Walgreens Health Initiatives' business records."[25]

192.    In discussing its Medicare Part D network standards, Defendant CVS says that each of its pharmacies is required to "maintain its books and records relating to [its] services, for a period of at least ten (10) years, or longer as otherwise required by law".[26]

193.    A key part of the DSCSA is the requirement that "product tracing information should be exchanged" for each transaction and retained for at least six years, including the following transaction information[27] ("TI"):[28]

- Proprietary or established name or names of the product
- Strength and dosage form of the product
- National Drug Code (NDC) number of the product
- Container size
- Number of containers
- **Lot number of the product**
- Date of the transaction
- Date of the shipment, if more than 24 hours after the date of the transaction
- Business name and address of the person from whom and to whom ownership is being transferred

194.    For example, the DSCSA additionally mandates use of a composite "product identifier" that Manufacturer Defendants were required to begin applying to prescription drug

---

[25] Walgreens Pharmacy Manual, page 6, available at http://www.walgreenshealth.com/pdf/forms/Revised_Pharmacy_Manual_2010_Revised_04072010.pdf (last accessed April 9, 2021).
[26] CVS/Caremark Medicare Part D Compliance / Fraud, Waste & Abuse, page 30, available at https://www.caremark.com/portal/asset/MedicarePartD.pdf (last accessed January 26, 2021).
[27] FDA, *Protect Your Patients*, accessed January 26, 2021 at https://www.fda.gov/media/113114/download; DSCSA, Sections 582 (b)(1)(A)(ii), 582 (e)(bb)(BB)(II)(v)(I), 582 (d)(1)(A)(iii).
[28] FDA, *Drug Supply Chain Security Act (Title II of the Drug Quality and Security Act) Overview of Product Tracing Requirements*, September 2015, accessed January 26, 2021 at https://www.fda.gov/media/93779/download, at pp. 8-9.

**Formatted:** Font: 8 pt

packages and cases.[29]

195.    The term "product identifier" "means a standardized graphic that includes, in both human-readable form and on a machine-readable data carrier . . . , the standardized numerical identifier, lot number, and expiration date of the product."[30]

196.    Publicly available Guidelines published by Defendant AmerisourceBergen require that "each Prescription Drug lowest saleable unit" it receives from a manufacturer must have the clearly indicated product identifier on the unit label.[31]  In addition, case labels, and partial case labels must list the lot number and expiration date.[32] The Guidelines illustrate these requirements as reproduced below.

*AmerisourceBergen Manufacturer Labeling Requirements[33]*



DSCSA RX Serialized Unit Label

[29] Enforcement of this rule was delayed by the FDA until November 2018. DA, Product Identifier Requirements Under the Drug Supply Chain Security Act – Compliance Policy Guidance for Industry, September 2018, accessed January 26, 2021 at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/product-identifier-requirements-under-drug-supply-chain-security-act-compliance-policy-guidance.
[30] 21 U.S. Code § 360eee.(14).
[31] AmerisourceBergen, *AmerisourceBergen Manufacturer Packaging and Logistics Requirements Guide*, accessed January 26, 2021 at https://www.amerisourcebergen.com/-/media/assets/amerisourcebergen/manufacturer/manufacturer-logistics-guideline-final-v14.pdf?la=en&hash=5297B4C716DBBE9A956F31CD2B194BD165F97465, at p. 14.
[32] AmerisourceBergen, *AmerisourceBergen Manufacturer Packaging and Logistics Requirements Guide*, accessed January 26, 2021 at https://www.amerisourcebergen.com/-/media/assets/amerisourcebergen/manufacturer/manufacturer-logistics-guideline-final-v14.pdf?la=en&hash=5297B4C716DBBE9A956F31CD2B194BD165F97465, at pp. 15-16.
[33] AmerisourceBergen, *AmerisourceBergen Manufacturer Packaging and Logistics Requirements Guide*, accessed January 26, 2021 at https://www.amerisourcebergen.com/-/media/assets/amerisourcebergen/manufacturer/manufacturer-logistics-guideline-final-v14.pdf?la=en&hash=5297B4C716DBBE9A956F31CD2B194BD165F97465, at p. 14, 15, 16.

**Formatted:** Font: 8 pt



Example of Rx Serialized Homogenous Case Label



Example Partial Case Labeled with SSCC

**D. Manufacturer Defendants' VCDs Are Identifiable by NDC Information**

197.    The Manufacturer Defendants' VCDs were no exception to the requirements of the federal regulations requiring the products to bear a unique NDC.

198.    Indeed, when Manufacturer Defendants initiated their unprecedented consumer level recall of their VCDs, they did so by identifying them by NDC.

199.    The information kept and maintained by all participants in the supply chain was so accurate that both Wholesaler Defendants and Retail Pharmacy Defendants were able to communicate with their customers about which recalled VCDs were in their customers' possessions and should be returned and recalled.

200.    For example, on May 14, 2018, one of the consumer Plaintiffs purchased a

**Formatted:** Font: 8 pt

prescription of the ZHP Defendants' VCDs (320mg of ValsartanHCTZ) for $10.71 from Defendant Rite-Aid.

201.    This ZHP VCD purchased by the consumer Plaintiff bore the following NDC Code: 43547-315-09.

202.    On July 18, 2018, the ZHP Defendants issued a nation-wide recall[34] for all ZHP VCDs bearing this NDC.

203.    As a result of the recall initiated by the ZHP Defendants, Defendant McKesson sent a letter[35] to Defendant Rite-Aid on July 13, 2018, indicating that all ZHP Product bearing the NDC No. 43547-315-09 must be recalled.

### MCKESSON

| | |
|---|---|
| **To:** | DC Managers |
| **From:** | Shayan Akberali |
| **Date:** | July 13, 2018 |
| **RC:** | **18-115** |

**URGENT!!!**        **DRUG RECALL!!!**        **URGENT!!!**

**FDA/SUPPLIER CLASS OF RECALL:**   **Not Yet Classified**
**LEVEL OF NOTIFICATION:**   McKesson Customer
**SUPPLIER:**   Solco - # 42174/42175

| Description | Lot # | NDC | UPC | Econo # |
|---|---|---|---|---|
| VALS+HCTZ TAB 160/25MG SOLC90 | ALL LOTS | 43547031309 | 34354731309 | 3553807 |
| VALS+HCTZ TAB 320/25MG SOLC90 | ALL LOTS | 43547031509 | 34354731509 | 3553856 |
| VALS+HCTZ TAB 80/12.5MG SOLC90 | ALL LOTS | 43547031109 | 34354731109 | 3553278 |
| VALS+HCTZ TB 160/12.5MG SOLC90 | ALL LOTS | 43547031209 | 34354731209 | 3553781 |
| VALS+HCTZ TB 320/12.5MG SOLC90 | ALL LOTS | 43547031409 | 34354731409 | 3553823 |
| VALSARTAN TAB 160MG SOLC 90@ | ALL LOTS | 43547036909 | 34354736909 | 3484748 |
| VALSARTAN TAB 320MG SOLC 90@ | ALL LOTS | 43547037009 | 34354737009 | 3484755 |
| VALSARTAN TAB 40MG SOLC 30@ | ALL LOTS | 43547036703 | 34354736703 | 3484722 |
| VALSARTAN TAB 80MG SOLC 90@ | ALL LOTS | 43547036809 | 34354736809 | 3484730 |

Solco is voluntarily recalling the above items/lots due to the detection of a trace amount of an unexpected impurity, Nnitrosodimethylamine (NDMA), made by the manufacturer – Z hejiang Huahai Pharmaceutical Co. Ltd. -- that is used in the manufacture of the subject product lots. This impurity has been classified as a probable human carcinogen as per International Agency for Research on Cancer (IARC) classification. No adverse events have been reported to date. This recall is to the McKesson Customer level. Affected product started shipping October 01, 2015.

204.    On July 19, 2018, Defendant Rite-Aid issued a letter to consumers who purchased ZHP Product bearing NDC No. 43547-315-09, including to the consumer Plaintiff.

---

[34] https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/prinston-pharmaceutical-inc-issues-voluntary-nationwide-recall-valsartan-and-valsartan-hctz-tablets (last accessed January 24, 2021)
[35] RiteAid_MDL2875_0000000538

**Formatted:** Font: 8 pt



205.    The process occurred every time one of the Manufacturer Defendants' proceeded to recall their VCDs.

### ~~B.~~E.    Generic Drugs Must Be Chemically the Same as Branded Drug Equivalents

~~157.~~206.    According to FDA, "[a] generic drug is a medication created to be the same as an already marketed brand-name drug in dosage form, safety, strength, route of administration, quality, performance characteristics, and intended use. These similarities help to demonstrate bioequivalence, which means that **a generic medicine works in the same way and provides the same clinical benefit as its brand-name version.** In other words, you can take a generic medicine as an equal substitute for its brand-name counterpart."[36]

~~158.~~207.    While brand-name medications undergo a more rigorous review before being approved, generic manufacturers are permitted to submit an Abbreviated New Drug

---

[36] https://www.fda.gov/Drugs/ResourcesForYou/Consumers/QuestionsAnswers/ucm100100.htm (last accessed ~~June 5, 2019~~April 9, 2021) (emphasis in original).

Formatted: Font: 8 pt

Application ("ANDA,")., which only requires a generic manufacturer to demonstrate that the generic medicine is the ~~same as~~equivalent to the brand name version in the following ways:

    a.  The active ingredient(s) in the generic medicine is/are the same as in the brand-name drug/innovator drug.

    b.  The generic medicine has the same strength, use indications, form (such as a tablet or an injectable), and route of administration (such as oral or topical).

    c.  The inactive ingredients of the generic medicine are acceptable.

    d.  The generic medicine is manufactured under the same strict standards as the brand-name medicine.

    e.  The container in which the medicine will be shipped and sold is appropriate, and the label is the same as the brand-name medicine's label.[37]

~~159.~~208.    The drugs ingested by Plaintiffs were approved by the FDA, based upon Defendants' representations that they met the above criteria, and were equivalent to the RLD.

~~160.~~209.    ANDA applications do not require drug manufacturers to repeat animal studies or clinical research on ingredients or dosage forms already approved for safety and effectiveness.[38]

~~161.~~210.    Further, because generic drugs are supposed to be nearly identical to their brand-name counterparts, they are also supposed to have the same risks and benefits.[39]

~~C.~~F.    **Adulterated or Misbranded Drugs**

~~162.~~211.    The manufacture and sale of any adulterated or misbranded drug is

---

[37] https://www.fda.gov/Drugs/ResourcesForYou/Consumers/~~BuyingUsingMedicineSafely/GenericDrugs/ucm167991~~QuestionsAnswers/ucm100100.htm~~.~~ (last accessed April 9, 2021)

[38] https://www.fda.gov/Drugs/ResourcesForYou/Consumers/QuestionsAnswers/ucm100100.htm. (last accessed, January 26, 2021).

[39] https://www.fda.gov/Drugs/ResourcesForYou/Consumers/QuestionsAnswers/ucm100100.htm. (last accessed April 9, 2021).

prohibited under federal law.[40]

163.212.    The introduction into commerce of any misbranded or adulterated or misbranded drug is similarlyalso prohibited.[41]

164.213.    Similarly, the receipt in interstate commerce of any adulterated or misbranded or misbranded drug is alsolikewise unlawful.[42]

165.214.    Among the ways a drug may be adulterated and/or misbranded are:

a. "if it has been prepared, packed, or held under unsanitary conditions whereby it may have been contaminated with filth, or whereby it may have been rendered injurious to health;"[43]

b. "if . . . the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice…as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess;"[44]

c. "If it purports to be or is represented as a drug the name of which is recognized in an official compendium, and … its quality or purity falls below, the standard set forth in such compendium. …"[45]

d. "If . . . any substance has been (1) mixed or packed therewith so as to reduce its quality or strength or (2) substituted wholly or in part therefor."[46]

166.215.    A drug is misbranded:

---

[40] 21 U.S.C. § 331(g).
[41] 21 U.S.C. § 331(a).
[42] 21 U.S.C. § 331(c).
[43] 21 U.S.C. § 351(a)(2)(A).
[44] 21 U.S.C. § 351(a)(2)(B).
[45] 21 U.S.C. § 351(b).
[46] 21 U.S.C. § 351(d).

{Cases; 00033778.DOCX}

Formatted: Font: 8 pt

a.  "If its labeling is false or misleading in any particular."[47]

b.  "If any word, statement, or other information required…to appear on the label or labeling is not prominently placed thereon…in such terms as to render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use."[48]

c.  If the labeling does not contain, among other things, "the proportion of each active ingredient…"[49]

d.  "Unless its labeling bears (1) adequate directions for use; and (2) such adequate warnings … against unsafe dosage or methods or duration of administration or application, in such manner and form, as are necessary for the protection of users. …"[50]

e.  "If it purports to be a drug the name of which is recognized in an official compendium, unless it is packaged and labeled as prescribed therein."[51]

f.  "if it is an imitation of another drug;"[52]

g.  "if it is offered for sale under the name of another drug."[53]

h.  "If it is dangerous to health when used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof."[54]

i.  If the drug is advertised incorrectly in any manner;[55] or

---

[47] 21 U.S.C. § 352(a)(1).
[48] 21 U.S.C. § 352(c).
[49] 21 U.S.C. § 352(e)(1)(A)(ii)
[50] 21 U.S.C. § 352(f).
[51] 21 U.S.C. § 352(g).
[52] 21 U.S.C. § 352(i)(2).
[53] 21 U.S.C. § 352(i)(3).
[54] 21 U.S.C. § 352(j).
[55] 21 U.S.C. § 352(n).

{Cases; 00033778.DOCX}

-90-

Formatted: Font: 8 pt

j. If the drug's "packaging or labeling is in violation of an applicable regulation…"[56]

~~167.~~216.    As articulated in this Complaint, Defendants' ~~unapproved drug was~~VCD's were contaminated, adulterated and/or misbranded in violation of all of the above-cited reasons.

**~~D.~~G.     The Drugs Ingested by Plaintiffs Were Not Valsartan, But New, Unapproved VCDs Not of the Same Quality**

~~168.~~217.    The FDA's website provides the definition for a drug:

The Federal Food Drug and Cosmetic Act (FD&C Act) and FDA regulations define the term drug, in part, by reference to its intended use, as "articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease" and "articles (other than food) intended to affect the structure or any function of the body of man or other animals." Therefore, almost any ingested or topical or injectable product that, through its label or labeling (including internet websites, promotional pamphlets, and other marketing material), is claimed to be beneficial for such uses will be regulated by FDA as a drug. The definition also includes components of drugs, such as active pharmaceutical ingredients.[57]

~~169.~~218.    An "active ingredient," as defined by 21 C.F.R. § 210.3(b)(7) ~~defines an "active ingredient" in a drug as~~is "any component that is intended to furnish pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or prevention of disease, or to affect the structure or any function of the body of man or other animals. The term includes those components that may undergo chemical change in the manufacture of the drug product and be present in the drug product in a modified form intended to furnish the specified activity or effect."[58]

219.    Active ingredients are meant to change the structure or function of the body, this

---

[56] 21 U.S.C. § 352(p).
[57] https://www.fda.gov/ForIndustry/ImportProgram/ImportBasics/RegulatedProducts/ucm511482.htm#drug. ~~(last accessed January 26, 2021).~~
[58] https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfcfr/CFRSearch.cfm?fr=210.3. ~~(last accessed January 26, 2021).~~

**Formatted:** Font: 8 pt

includes instances where the ingredient causes a mutation in human cells.

~~170.~~220.     NDMA and NDEA ~~both~~ have ~~the ability to cause cancer by triggering~~shown to trigger human genetic mutations ~~in humans.  This mutation affects the structure of the human body, and thus,~~ causing cancer, therefore, NDMA and NDEA are~~, by definition,~~ definable as active ingredients~~ in a drug.~~.

~~171.~~221.     Further, the FDA ~~further requires~~has clarified that whenever a new active ingredient is added to a drug, the drug becomes an entirely new drug, necessitating a submission of a New Drug Application by the manufacturer.  Absent such an application, followed by a review and approval by the FDA, this new drug remains a distinct, unapproved product.[59]

~~172.~~222.     This new and unapproved drug with additional active ingredients (such as nitrosamines in the subject VCDs) cannot ~~be required to~~ have the same label as the brand-name drug, as the ~~two products are~~drug with the new active ingredient is no longer the same~~.~~ as the brand-name drug.

~~173.~~223.     At the very least and alternatively, drugs with different and dangerous ingredients than their brand-name counterparts are defective, and adulterated or misbranded under federal and state law, and the sale or introduction into commerce of adulterated or misbranded drugs is illegal.[60]

~~174.~~224.     Because the VCDs ingested by Plaintiffs were never approved or even reviewed by the FDA, the FDA never conducted an assessment of safety or effectiveness for these drugs.

~~175.~~225.     The ~~inclusion of~~ additional active ingredients (NDMA and NDEA), and potentially other deviations from Defendants' ANDA approvals rendered Defendants' VCDs of a

---

[59] *See* 21 C.F.R. § 310.3(h).
[60] *See generally* https://www.justice.gov/opa/pr/generic-drug-manufacturer-ranbaxy-pleads-guilty-and-agrees-pay-500-million-resolve-false  (last accessed ~~June 6, 2019~~January 26, 2021).

~~{Cases; 00033778.DOCX}~~

**Formatted:** Font: 8 pt

lesser quality, purity, and distinctly different from a chemical standpoint than FDA-approved generic valsartan.

176.226.    Plaintiffs reference federal law in this Complaint not in any attempt to enforce it, but to demonstrate that their state-law tort claims do not impose any additional obligations on Defendants, beyond what is was already required of them under federal law.

**E.H.    Defendants Made False Statements in the Labeling of its their VCDs**

177.227.    A manufacturer is required to give adequate directions for the use of a pharmaceutical drug such that a "layman can use a drug safely and for the purposes for which it is intended,"[61] and conform to requirements governing the appearance of the label.[62]

178.228.    "Labeling" encompasses all written, printed or graphic material accompanying the drug or device,[63] and therefore broadly encompasses nearly every form of promotional activity, including not only "package inserts" but also advertising.

179.229.    "Most, if not all, labeling is advertising.  The term 'labeling' is defined in the FDCA as including all printed matter accompanying any article.  Congress did not, and we cannot, exclude from the definition printed matter which constitutes advertising."[64]

180.230.    If a manufacturer labels a drug but omits ingredients, that renders the drug misbranded.[65]

181.231.    Because NDMA and/or NDEA were not disclosed by Defendants as ingredients in the VCDs ingested by Plaintiffs, the subject drugs were misbranded.

182.232.    In addition, by referring to their drugs as "valsartan" or "valsartan HCT" or "amlodipine-valsartan" or "amlodipine-valsartan HCT"", as well as in including the USP

---

[61] 21 C.F.R. § 201.5.
[62] 21 C.F.R. § 801.15.
[63] *Id.* 65 Fed. Reg. 14286 (March 16, 2000).
[64] *U.S. v. Research Labs.,* 126 F.2d 42, 45 (9th Cir. 1942).
[65] 21 C.F.R. § 201.6; 201.10.

Formatted: Font: 8 pt

designation indicating compliance with compendial standards, Defendants were making false statements regarding their VCDs.

183.233.    It is unlawful to introduce a misbranded drug into interstate commerce.[66] Thus, the VCDs ingested by individual Plaintiffs were unlawfully distributed and sold.

### F.I. The Generic Drug Supply Chain in the United States

184.234.    The generic drug supply chain from manufacturer to end consumer involves several groups of actors and links.

185.235.    At the top of the supply chain are generic drug manufacturers (and whomever they contract with to manufacture components of pharmaceuticals including, for example, the active pharmaceutical ingredient manufacturer ("API")). Generic drug manufacturers may sell to other manufacturers or to so-called repackagers or labelers who sell a particular generic drug formulation.

236.    Generic drug manufacturers contract directly with wholesalers and retail pharmacies for the sale of pharmaceutical products, and Plaintiffs are the intended third-party beneficiaries of these contracts, including all representations and warranties provided.

186.237.    Wholesalers in turn purchase bulk generic drug product from the generic manufacturers and/or labelers and repackager entities. The wholesaler market is extremely concentrated, with three entities holding about 92% of the wholesaler market: Cardinal Health, Inc.; McKesson Corporation; and Amerisource Bergen Corporation.

187.238.    Wholesalers sell the generic drug products they acquire to retail pharmacies, who sell them to patients with prescriptions in need of fulfillment. The retail pharmacy market is also dominated by several major players companies.

---

[66] 21 U.S.C. § 331(a).

**Formatted:** Font: 8 pt

### ~~G.~~J.     Background on Current Good Manufacturing Practices ("cGMPs")

~~188.~~239.     Under federal law, pharmaceutical drugs must be manufactured in accordance with "current Good Manufacturing Practices" ("cGMPs") to ensure they meet safety, quality, purity, identity, and strength standards. *See* 21 U.S.C. § 351(a)(2)(B).  Defendants violated cGMP's in the manufacture of the VCD's, including the failure to ensure that the VCD's met required safety, quality, purity, and identity standards, both under state law and parallel federal law.

~~189.~~240.     21 C.F.R. § 210.1(a) states that the cGMPs establish "minimum current good manufacturing practice for methods to be used in, and the facilities or controls to be used for, the manufacture, processing, packing, or holding of a drug to assure that such drug meets the requirements of the act as to safety, and has the identity and strength and meets the quality and purity characteristics that it purports or is represented to possess."  In other words, entities at all phases of the design, manufacture, and distribution chain are bound by these requirements.

~~190.~~241.     The FDA's cGMP regulations are found in 21 C.F.R. Parts 210 and 211. These detailed regulations set forth minimum standards regarding: organization and personnel (Subpart B); buildings and facilities (Subpart C); equipment (Subpart D); control of components and drug product containers and closures (Subpart E); production and process controls (Subpart F); packaging and label controls (Subpart G); holding and distribution (Subpart H); laboratory controls (Subpart I); records and reports (Subpart J); and returned and salvaged drug products (Subpart K). ~~The~~These regulations are applicable to any facility manufacturing drugs intended to be distributed in the United States and the FDA has worldwide jurisdiction to enforce these regulations if the facility is making drugs intended to be distributed in the United States.

~~191.~~242.     Any drug not manufactured in accordance with cGMPs is deemed "adulterated and/or misbranded" or "misbranded" and may not be distributed or sold in the United

**Formatted:** Font: 8 pt

States. *See* 21 U.S.C. §§ 331(a), 351(a)(2)(B). States have enacted laws adopting or mirroring these federal standards.

192.243.    Per federal law, cGMPs includeThe cGMPs necessary to ensure that product is not adulterated and/or misbranded under state law require "the implementation of oversight and controls over the manufacture of drugs to ensure quality, including managing the risk of and establishing the safety of raw materials, materials used in the manufacturing of drugs, and finished drug products." 21 U.S.C. § 351(j). Accordingly, it is a cGMP violation for a manufacturer to contract out prescription drug manufacturing without sufficiently ensuring continuing quality of the subcontractors' operations.

193.244.    FDA regulations require a "quality control unit" to independently test drug product manufactured by another company on contract:

> There shall be a quality control unit that shall have the responsibility and authority to approve or reject all components, drug product containers, closures, in-process materials, packaging material, labeling, and drug products, and the authority to review production records to assure that no errors have occurred or, if errors have occurred, that they have been fully investigated. The quality control unit shall be responsible for approving or rejecting drug products manufactured, processed, packed, or held under contract by another company.  21 C.F.R. § 211.22(a).

194.245.    Indeed, FDA regulations require a drug manufacturer to have "written procedures for production and process control designed to assure that the drug products have the identity, strength, quality, and purity they purport or are represented to possess." 21 C.F.R. § 211.100.

195.246.    A drug manufacturer's "[l]aboratory controls shall include the establishment of scientifically sound and appropriate specifications, standards, sampling plans, and test procedures designed to assure that components, drug product containers, closures, in-

{Cases; 00033778.DOCX}

**Formatted:** Font: 8 pt

process materials, labeling, and drug products conform to appropriate standards of identity, strength, quality, and purity." 21 C.F.R. § 211.160.

~~196.~~247.    "Laboratory records shall include complete data derived from all tests necessary to assure compliance with established specifications and standards, including examinations and assays" and a "statement of the results of tests and how the results compare with established standards of identity, strength, quality, and purity for the component, drug product container, closure, in-process material, or drug product tested." 21 C.F.R. § 211.194.

**~~H.~~K.        The Generic Drug Approval Framework**

~~197.~~248.    The Drug Price Competition and Patent Term Restoration Act of 1984 – more commonly referred to as the Hatch-Waxman Act – is codified at 21 U.S.C. § 355(j).

~~198.~~249.    The stated purpose of Hatch-Waxman is to strike a balance between rewarding genuine innovation and drug discovery by affording longer periods of brand drug marketing exclusivity while at the same time encouraging generic patent challenges and streamlining generic drug competition so that consumers gain the benefit of generic drugs at lower prices as quickly as possible.

~~199.~~250.    Brand drug companies submitting a New Drug Application ("NDA") are required to demonstrate clinical safety and efficacy through well-designed clinical trials. 21 U.S.C. § 355 *et seq.*

~~200.~~251.    By contrast, generic drug companies submit an ANDA. Instead of demonstrating clinical safety and efficacy, generic drug companies need only demonstrate equivalence, including bioequivalence to the brand or reference listed drug ("RLD"). Bioequivalence is the "absence of significant difference" in the pharmacokinetic profiles of two pharmaceutical products. 21 C.F.R. § 320.1(e).

Formatted: Font: 8 pt

### 1. *ANDA Applications Must Demonstrate Bioequivalence*

~~201.~~252.     The bioequivalence basis for ANDA approval is premised on the generally accepted proposition that equivalence of pharmacokinetic profiles of two drug products is evidence of therapeutic equivalence.  In other words, if (1) the RLD is proven to be safe and effective for the approved indication through well-designed clinical studies accepted by the FDA, and (2) the generic company has shown that its ANDA product is bioequivalent to the RLD, then (3) the generic ANDA product must be safe and effective for the same approved indication as the RLD.

~~202.~~253.     As part of its showing of bioequivalence pursuant to 21 C.F.R. § 314.50(d), the ANDA must also contain specific information establishing the drug's stability, including:

- a full description of the drug's substance, including its physical and chemical characteristics and stability; and

- the specifications necessary to ensure the identity, strength, quality and purity of the drug substance and the bioavailability of the drug products made from the substance, including, for example, tests, analytical procedures, and acceptance criteria relating to stability.

~~203.~~254.     Generic drug manufacturers have an ongoing federal duty of sameness in their products. Under 21 U.S.C. § 355(j), the generic manufacturer must show the following things as relevant this case: the active ingredient(s) are the same as the RLD, § 355(j)(2)(A)(ii); and, that the generic drug is "bioequivalent" to the RLD and "can be expected to have the same therapeutic effect," *id.* at (A)(iv). A generic manufacturer (like a brand manufacturer) must also make "a full statement of the composition of such drug" to the FDA. *Id.* at (A)(vi); *see also* § 355(b)(1)(C).

~~204.~~255.     A generic manufacturer must also submit information to show that the "labeling proposed for the new drug is the same as the labeling approved for the [RLD][.]" 21

---

U.S.C. § 355(j)(2)(A)(v).

### 2. ANDA Applications Must Provide Information About the Manufacturing Plants and Processes

~~205.~~256.     The ANDA application must also include information about the manufacturing facilities of the product, including the name and full address of the facilities, contact information for an agent of the facilities, and the function and responsibility of the facilities.

~~206.~~257.     The ANDA application must include a description of the manufacturing process and facility and the manufacturing process flow chart showing that there are adequate controls to ensure the reliability of the process.

~~207.~~258.     Furthermore, the ANDA application must contain information pertaining to the manufacturing facility's validation process which ensures that the manufacturing process produces a dosage that meets product specifications.

### 3. ANDA Applications Must Comply with cGMPs

~~208.~~259.     Additionally, the ANDA ~~applications~~application must include certain representations pertaining to compliance with cGMPS.

~~209.~~260.     The ANDA application is required to contain cGMP certifications for both the ANDA applicant itself, and also the drug product manufacturer (if they are different entities).

### 4. ANDA Approval is Contingent upon Continuing Compliance with ANDA Representations of Sameness

~~210.~~261.     Upon granting final approval for a generic drug, the FDA will typically state that the generic drug is "therapeutically equivalent" to the branded drug. The FDA codes generic drugs as "A/B rated" to the RLD[67] branded drug. Pharmacists, physicians, and patients can expect

---

[67] The FDA's Drug Glossary defines an RLD as follows: "A Reference Listed Drug (RLD) is an approved drug product to which new generic versions are compared to show that they are bioequivalent. A drug company seeking approval to market a generic equivalent must refer to the Reference Listed Drug in its **Abbreviated New Drug Application** (ANDA). By designating a single reference listed drug as the standard to which all generic versions must

such generic drugs to be therapeutically interchangeable with the RLD, and generic manufacturers expressly warrant as much through the inclusion of the same labeling as the RLD delivered to consumers in each prescription of its generic products. Further, by simply marketing generic drugs pursuant to the brand-name drug's label under the generic name (e.g., valsartan or valsartan HCT), generic manufacturers impliedly warrant and represent that the generic drug is therapeutically equivalent to the brand-name drug.

211.262.    If a generic drug manufacturer ceases to manufacture a drug that meets all terms of its ANDA approval, or in other words, when the drug is not the same as its corresponding brand-name drug, then the manufacturer has created an entirely new and unapproved drug.

212.263.    If a generic drug manufacturer ceases to manufacture a drug that meets all terms of its ANDA approval, or in other words, when the drug is not the same as its corresponding brand-name drug, the generic manufacturer may no longer rely on the brand-name drug's labeling.

213.264.    According to the FDA, there are at least sixteen ANDAs approved for generic DIOVAN, nine for generic DIOVAN HCT, nine for generic EXFORGE, and five for generic EXFORGE HCT.

### I.L.    Approval of ANDAs Related to Valsartan

#### 1.    *DIOVAN and EXFORGE Background*

214.265.    Valsartan is a potent, orally active nonpeptide tetrazole derivative which causes a reduction in blood pressure, and is used in the treatment of hypertension, heart failure, and post-myocardial infarction. Millions of American consumers use VCDs for the treatment of these serious conditions, both as a stand-alone drug, and in combination with other therapies (such as amlodipine and hydrochlorothiazide.

---

be shown to be bioequivalent, FDA hopes to avoid possible significant variations among generic drugs and their brand name counterpart."

215.266.    Valsartan and its combination therapy with hydrochlorothiazide are the generic versions of the DIOVAN and DIOVAN HCT, which were marketed in tablet form by Novartis AG ("Novartis") beginning in July 2001 (in tablet form) and March 1998, respectively, upon approval by the FDA.

216.267.    Valsartan's combination therapy with amlodipine, as well as the combination therapy of valsartan, amlodipine and hydrochlorothiazide, are the generic versions of Novartis's branded products EXFORGE and EXFORGE HCT.  Novartis received the FDA's approval for EXFORGE in June 2007 and for EXFORGE HCT in April 2009.

217.268.    These Valsartan based branded drugs proved to be blockbuster products for Novartis.  Globally, DIOVAN and DIOVAN HCT generated $5.6 billion in sales in 2011 according to Novartis's Form 20-F for that year, of which $2.33 billion was from the United States. The same year, EXFORGE and EXFORGE HCT had $325,000,000 in U.S. sales and $884,000,000 globally.

218.269.    DIOVAN's, DIOVAN HCT's, EXFORGE's, and EXFORGE HCT's FDA-approved labels specify the active and inactive ingredients. None of the contaminants at issue here (including NDMA, NDEA, or other nitrosamines) are FDA-approved ingredients of DIOVAN, DIOVAN HCT, EXFORGE, or EXFORGE HCT. Nor are any of these contaminants FDA-approved ingredients of any generic valsartan-containing product approved pursuant to an ANDA.

219.270.    Novartis's DIOVAN and EXFORGE patents expired in September 2012. Defendant Mylan launched a DIOVAN HCT generic in or about September 2012 when its valsartan HCT ANDA was approved by the FDA.  Generic versions of the other drugs followed in the intervening years.

### 2.    *ANDA Applications for Generic Valsartan*

220.271.    Almost a full decade before the DIOVAN patents were set to expire, generic

Formatted: Font color: Auto
Formatted: Font: Not Italic, Font color: Auto
Formatted: Heading 3,  No bullets or numbering
Formatted: Font: 8 pt

drug manufacturers started filing ANDA applications for their own generic versions of the Valsartan drug.

221.272.    Hatch-Waxman rewards the first generic company to file a substantially complete ANDA containing a Paragraph IV certification with a 180-day period of marketing exclusivity. 21 U.S.C. § 355(j)(5)(B)(iv). The 180-day exclusivity period is triggered upon either a first commercial marketing of the drug (including of the RLD) by the 180-day exclusivity holder or the date on which a court has entered a judgment finding that the patent subject to the Paragraph IV certification is invalid, unenforceable, or not infringed.

222.273.    On December 24, 2004, Ranbaxy Labs ("Ranbaxy") filed the first ANDA application for Valsartan (the generic equivalent of the DIOVAN product).

223.274.    On January 7, 2005, Teva filed the second ANDA application for Valsartan (the generic equivalent of the DIOVAN product), for which it received tentative approval on January 7, 2005.

224.275.    On September 15, 2008, Mylan filed an ANDA application for Valsartan (the generic equivalent of the DIOVAN product).

225.276.    In the intervening years after these three initial ANDA applications, all other Defendants filed ANDA applications for either Valsartan (the generic equivalent of the DIOVAN product), Valsartan hydrochlorothiazide (the generic equivalent of the DIOVAN HCT product), Valsartan Amlodipine (the generic equivalent of the EXFORGE product), and Valsartan Amlodipine Hydrochlorothiazide (the generic equivalent of the EXFORGE HCT product).

226.277.    Despite the number of ANDAs that had been filed as early as 2004, when DIOVAN's patent expired in 2012, no generic entered the market.

227.278.    As the first to have filed their ANDA application in December of 2004, Ranbaxy was entitled to exclusivity, and as such, no other ANDAs would be approved until

{Cases; 00033778.DOCX}

**Formatted:** Font: 8 pt

Ranbaxy received final approval.

228.279.    Defendants Mylan and Teva were among those who had tentative approval and were ready to launch their generic DIOVAN Product upon expiration of the DIOVAN patent in 2012.

229.280.    Indeed, Defendant Mylan launched its generic DIOVAN HCT product, for which it had filed an ANDA and received approval, on September 21, 2012, the same day the DIOVAN patent was set to expire.

230.281.    After delaying its approval due to gross manufacturing defects plaguing Ranbaxy's Indian API manufacturing facilities, the FDA finally approved Ranbaxy's generic Valsartan in June of 2014.

231.282.    Six months later, after Ranbaxy's period of exclusivity expired, Mylan's generic DIOVAN product launched on January 5, 2015, and Teva's generic VCDs launched January 6, 2015. The entry of the rest of the purported generic equivalents of these drugs followed thereafter.

232.283.    Par Pharmaceuticals received approval of the first generic EXFORGE in September 2014, and Teva received approval of the first generic EXFORGE HCT in December 2014. The entry of the rest of the generic equivalents of these drugs followed thereafter.

### J.M.    Starting as Early as 2007, Defendants Were Actively Violating cGMPs in Their Foreign Manufacturing Facilities

233.284.    For some time, Defendants have known that generic drugs manufactured overseas, particularly in China and India, were found or suspected to be less safe and effective than their branded equivalents or domestically-made generics due to their grossly inadequate manufacturing and quality processes, procedures, and compliance with cGMPs.

234.285.    Defendants' own foreign manufacturing operations were no exception to

{Cases: 00033778.DOCX}
-103-

Formatted: Font: 8 pt

this.

### 1. *ZHP's Inadequate Manufacturing Processes Results in Contaminated, Adulterated, Misbranded, and/or Unapproved VCDs*

**Formatted:** Font: Not Bold, Not Italic, Font color: Auto

~~235.~~286.      ZHP has Active Pharmaceutical Ingredient ("API") manufacturing facilities located in Linhai City, Zhejiang Province, China. According to ZHP's website, ZHP was one of the first Chinese companies approved to sell generic drugs in the United States, and it remains one of China's largest exporters of pharmaceuticals to the United States and the European Union.

~~236.~~287.      ZHP serves as a contract API manufacturer of numerous defendants' VCDs as set forth *supra* at Part II, and Defendants thus have a quality assurance obligation with respect to ZHP's processes and finished products as set forth above pursuant to state and federal law.

~~237.~~288.      ZHP has a history of deviations from safe and reasonable manufacturing practices, and FDA's cGMP standards that ~~began~~were documented almost as soon as ZHP was approved to export pharmaceuticals to the United States.

~~238.~~289.      On or about March 27-30, 2007, the FDA inspected ZHP's Xunqiao Linhai City facilities. That inspection revealed "deviations from current good manufacturing processes (~~CGMP~~cGMP)" at the facility. Those deviations supposedly were later corrected by ZHP. The results of the inspection and the steps purportedly taken subsequent to it were not made fully available to the public.

~~239.~~290.      The FDA inspected ZHP's same Xunqiao facility again on November 14-18, 2016. The inspection revealed four violations of cGMPs. First, "[w]ritten procedures designed to prevent contamination of drug products purporting to be sterile are not followed." Second, ZHP had failed "to establish laboratory controls that include scientifically sound and appropriate specifications, standards, sampling plans, and test procedures designed to assure that drug products conform to appropriate standards of identity, strength, quality, and purity." Third, "[p]rocessing

**Formatted:** Font: 8 pt

areas are deficient regarding the system for cleaning and disinfecting the equipment." Last, "data is not recorded contemporaneously."

240.291.    On May 15-19, 2017, the FDA inspected ZHP's facility at Coastal Industrial Zone, Chuannan No. 1 Branch, Linhai City, Zhejiang Province, China. ZHP manufacturesmanufactured all of its valsartan API at this Chuannan facility. That inspection resulted in the FDA's finding that ZHP repeatedly re-tested out of specification ("OOS") samples until obtaining a desirable result. This practice allegedly dated back to at least September 2016 per the FDA's letter and investigation up to that point. The May 2017 inspection also resulted in FDA's finding that "impurities occurring during analytical testing are not consistently documented/quantitated." These findings were not made fully available to the public. However, this information was shared or available to ZHP's finished-dose manufacturers, as well as those Defendants further down the distribution chain., all of whom were on notice of these defects and lack of adequate quality control.

241.292.    Furthermore, for OOS sampling results, ZHP routinely invalidated these results without conducting any kind of scientific investigation into the reasons behind the OOS sample result. In fact, in one documented instance, the OOS result was attributed to "pollution from the environment" surrounding the facility. These manipulations of sampling were components of a pattern and practice of systematic data manipulation designed to fail to detect and/or intentionally conceal and recklessly disregard the presence of harmful impurities such as NDMA and NDEA.

242.293.    The May 2017 inspection also found that ZHP's "facilities and equipment [were] not maintained to ensure [the] quality of drug product" manufactured at the facility. These issues included the FDA's finding that: equipment that was rusting and rust was being deposited into drug product; equipment was shedding cracking paint into drug product; there was an

{Cases; 00033778.DOCX}

-105-

Formatted: Font: 8 pt

accumulation of white particulate matter; and there were black metallic particles in API batches.

243.294.    The FDA inspector "noted reoccurring complaints pertained to particulate matter in API . . . and for discrepancies in testing between [ZHP] and their consignees. . . . . To address the firm's handling of complaints describing testing disparities, [the inspector] had the firm generate a list of such complaints, as well as associated pie charts . . . . From 2015 until May 2017, 13 complaints related to discrepancies between [ZHP]'s test results and their consignees results. Of these complaints 85% had what the firm termed 'Customer has no subsequent feedback or treatment.' Specifically, this 85% was further broken down into 3 categories: the batch subject to the complaint was sent to other consignees who did not report a complaint, there is a test method discrepancy and feedback was provided to the consignee without a response and the consignee failed to respond but continued to purchase API from [ZHP]."

244.295.    On November 29, 2018, the FDA issued Warning Letter 320-19-04 to ZHP based on its July 23 to August 3, 2018 inspection of its Chuannan facility.  The letter summarized "significant deviations from [cGMPs] for [APIs]." The FDA consequently informed ZHP that its "API are adulterated and/or misbranded within the meaning of section 501(a)(2)(B) of the Federal Food, Drug, and Cosmetic Act (FD&C Act), 21 U.S.C. 351(a)(2)(B)."

245.296.    The FDA explained that ZHP repeatedly failed "to ensure that quality-related complaints are investigated and resolved," including complaints related to peaks of NDMA in its products as early as 2012, which ZHP willfully ignored rather than utilize existing technology to identify the nitrosamine contamination that would have been easily identified.

246.297.    ZHP also failed "to evaluate the potential effect that changes in the manufacturing process may have on the quality of [its] API." More specifically, ZHP "approved a [V]alsartan API process change . . . that included the use of the solvent [redacted]. [ZHP's] intention was to improve the manufacturing process, increase product yield, and lower production

Formatted: Font: 8 pt

costs. However, [ZHP] failed to adequately assess the potential formation of mutagenic impurities[, such as NDMA,] when [it] implemented the new process. Specifically, [it] did not consider the potential for mutagenic or other toxic impurities to form from [redacted] degradants, including the primary [redacted] degradant, [redacted]. According to [ZHP's] ongoing investigation, [redacted] is required for the probable human carcinogen NDMA to form during the valsartan API manufacturing process."

247.298.    The FDA added that ZHP "also failed to evaluate the need for additional analytical methods to ensure that unanticipated impurities were appropriately detected and controlled in [its] [V]alsartan API before [it] approved the process change. [ZHP is] responsible for developing and using suitable methods to detect impurities when developing, and making changes to, [its] manufacturing processes."

248.299.    While ZHP claimed that it had followed "common industry practice." Importantly, the FDA," the FDA rejected ZHP's attempt to evade responsibility for its gross violations of safe and reasonable manufacturing and quality processes, and reminded ZHP that "common industry practice may not always be consistent with CGMP requirements and that [it is] responsible for the quality of drugs [it] produce[s]." The FDA "strongly" recommended that ZHP hire a cGMP consultant and referred ZHP to four guides on cGMPs.

249.300.    On September 28, 2018, the FDA stopped allowing ZHP to deliver drugs made at its Chuannan facility into the United States. The Warning Letter stated that "[f]ailure to correct these deviations may also result in FDA continuing to refuse admission of articles manufactured at [ZHP's Chuannan facility] into the United States under section 801(a)(3) of the FD&C Act, 21 U.S.C. 381(a)(3). Under the same authority, articles may be subject to refusal of admission, in that the methods and controls used in their manufacture do not appear to conform to CGMP within the meaning of section 501(a)(2)(B) of the FD&C Act, 21 U.S.C. 351(a)(2)(B)."

Formatted: Font: 8 pt

250.301.      After the recalls of ZHP's VCDs, FDA Laboratory Analysis testing would later reveal that valsartan API manufactured by ZHP at its Linhai City facilities contained NDMA levels hundreds of times in excess of the FDA's interim limits[68] of 96 ng/day or 0.3 ppm.[69] Specifically, VCDs manufactured at ZHP for ZHP's subsidiary Prinston Pharmaceutical contained NDMA levels of between 15,180 and 16,300 ng, while Valsartan HCT manufactured at ZHP contained NDMA levels of between 13,180 and 20,190 ng.[70]  ZHP valsartan API manufactured for Teva and Torrent Pharmaceuticals contained similarly high levels of NDMA.

251.302.      In addition, FDA Laboratory Analysis testing would later reveal that valsartan API manufactured by ZHP at ZHP's Linhai City facilities for Torrent Pharmaceuticals contained NDEA levels upwards of fifty times in excess of the FDA's interim limits[71] of 26.5 ng/day or 0.083 ppm. Specifically, FDA testing reveals up to 1,310 ng of NDEA in Torrent Pharmaceuticals' VCDs. ZHP valsartan API manufactured for Teva contained similarly high levels of NDEA (up to 770 ng).

### 2.1.*Aurobindo's Inadequate Manufacturing Processes Results in Contaminated, Adulterated, Misbranded, and/or Unapproved VCDs*

252.303.      Aurobindo has API manufacturing facilities located in Hyderabad, Telangana, India.

253.304.      Aurobindo manufactures VCDVCD's for each Aurobindo Defendant at these facilities, and Aurobindo Defendants thus have quality assurance obligations with respect to Aurobindo's processes and finished products as set forth above pursuant to federal law.

---

[68] To be clear, ZHP's VCDs should not contain any NDMA.
[69] https://www.fda.gov/drugs/drug-safety-and-availability/laboratory-analysis-valsartan-products; *see also* https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-angiotensin-ii-receptor-blocker-arb-recalls-valsartan-losartan (last accessed June 5, 2019)  https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-angiotensin-ii-receptor-blocker-arb-recalls-valsartan-losartan (last accessed April 9, 2021).
[70] *Id.*
[71] To be clear, Torrent Pharmaceuticals' and Teva's VCDs should not contain any NDEA.

{Cases; 00033778.DOCX}

Formatted: Font: Not Italic

Formatted: Font: 8 pt

254.305.    Aurobindo has a history of deviations from FDA's cGMP standards.

255.306.    After an inspection of a Hyderabad facility from June 27 to July 1, 2016, the FDA told Aurobindo that its "[i]nvestigations are inadequate." The FDA explained that Aurobindo failed to initiate stability testing, and "[t]he deviation record contains field 'Number of previous deviations in this product/system.' This field requires previous deviations of the same product or deviation type to be reported, no previous deviations were reported in this field." Moreover, "[t]his is a repeat observation from the 2014 inspection."

256.307.    Three months later, the FDA returned to Aurobindo's Hyderabad facilities and found four noteworthy manufacturing problems. First, "[a]n [redacted] Field Alert was not submitted within three working days of receipt of information concerning significant chemical, physical, or other change or deterioration in a distributed drug product." Second, "[l]aboratory controls do not include the establishment of scientifically sound and appropriate test procedures designed to assure that conform [sic] to appropriate standards of identity, strength, quality and purity." Third, "[t]here are no written procedures for production and process controls designed to assure that the drug products have the identity, strength, quality, and purity they purport or are represented to possess." Fourth, the "use of instruments and recording devices not meeting establishes specifications was observed."

257.308.    In October 2016, the FDA observed that Aurobindo's nearby Borpatla facility had inadequately validated equipment cleaning procedures.

258.309.    In April 2017, the FDA observed that the manufacturing equipment in Aurobindo's Hyderabad facilities "is not always maintained to achieve its intended purposes." "Laboratory controls do not include the establishment of scientifically sound and appropriate test procedures designed to assure that components and drug products conform to appropriate standards of identity, strength, quality and purity." "Changes to written procedures are not drafted,

Formatted: Font: 8 pt

reviewed and approved by the appropriate organizational unit." "[C]orrective and preventative actions (CAPAs), identified and initiated because of out of specifications (OOS) laboratory investigations, do not correlate to the identified root cause. In certain cases, CAPAs are not initiated at all." "Equipment used in the manufacture, processing, packing or holding of drug products is not of appropriate design to facilitate operations for its intended use." "Appropriate controls are not exercised over computers or related systems to assure that changes in master production and control records or other records are instituted only by authorized personnel." "Procedures designed to prevent microbiological contamination of drug products purporting to be sterile are not established."

259.310.     Four months later, the FDA reiterated that "[t]here are no written procedures for production and process controls designed to assure that the drug products have the identity, strength, quality, and purity they purport or are represented to possess." Second, "[c]ontrol procedures are not established which validate the performance of those manufacturing processes that may be responsible for causing variability in the characteristics of in-process material and the drug product."

260.311.     In February 2018, the FDA made nine more disturbing observations at Aurobindo's Hyderabad facilities. First, "[a]septic processing areas are deficient regarding systems for maintaining any equipment used to control the aseptic conditions." Second, "[e]quipment and utensils are not cleaned, maintained and sanitized at appropriate intervals to prevent contamination that would alter the safety, identity, strength, quality or purity of the drug product." Third, "[e]quipment used in the manufacture, processing, packing or holding of drug products is not of appropriate design to facilitate operations for its intended use." Fourth, "[b]uildings used in manufacture, processing, packing or holding of drug products are not free of infestation by rodents, birds[,] insects, and other vermin." Fifth, "[p]rocedures for the cleaning and

Formatted: Font: 8 pt

maintenance of equipment are deficient regarding sufficient detail of the methods, equipment, and materials used in the cleaning and maintenance operation, and the methods of disassembly and reassembling equipment as necessary to assure proper cleaning and maintenance." Sixth, "[e]mployees engaged in the manufacture, processing, packing and holding of a drug product lack the training required to perform their assigned functions." Seventh, the "statistical quality control criteria fail to include appropriate acceptance levels and rejection levels." Eighth, "[e]stablished laboratory control mechanisms are not followed and documented at the time of performance." Lastly, "[a]ppropriate controls are not exercised over computers or related systems to assure that changes in master production and control records or other records are instituted only by authorized personnel."

261.312.    It is clear Aurobindo has made no efforts at correct any of the previously identified errors, and continues to engage in grossly inadequate manufacturing processes. During an inspection one month ago this year (in May 2019), an investigator made note of a panoply of serious issues which continue to call the integrity of the API manufacturing operations into question.

262.313.    For example, in determining that the Medchal, Telangaga facility was not following quality control measures, and likewise did not have quality control procedures in place, the investigator observed "loose handwritten notebooks with what appears to be laboratory test data results."

263.314.    Additionally, while Aurobindo claimed to have performed tests and quality control activities on API as a result of the FDA's investigation into adulterated VCDs, during the inspection, the investigator found that the API was not being adequately retained and/or appropriately identified, calling Aurobindo's testing of this API into question. More troubling, the API sampled and analyzed by the investigator was to set to be shipped into the United States.

**Formatted:** Font: 8 pt

264.315.    The investigator also found a slew of data integrity issues.  The investigator observed "multiple sequences where interrupted sample injections were injected and showed that the sample did not run, shown on the chromatogram as "incomplete data." The testing systems also allowed certain employees to "verify incomplete data in raw data file."  The investigator found that the quality control reviewers attested to practices which "contradict actual review practices performed by reviews." Were these baseline data issues not enough, the investigator also noted that the facility did not retain adequate backup of the data, other than the assorted loose notebooks found lying around the facility.

265.316.    The investigator also noted that in addition to all of the gross processing and data integrity issues, *even the building itself* did not have the "suitable construction to facility cleaning, maintenance and proper operations."  The investigator noted that in a stability sample storage room, they observed a "PVC pipe connected to an air conditioner unit on one end, and paced in a blue plastic bucket on the other end with approximate 50% of the bucket filled with condensate water." There were four other similar setups in other critical rooms in the facility.

266.317.    After the recalls of Aurobindo's VCDs, FDA Laboratory Analysis testing would later reveal that valsartan API manufactured by Aurobindo contained NDEA exceedances well in excess of the FDA's interim limits[72] of 26.5 ng/day or 0.083 ppm.[73]

3.2.*Mylan's Inadequate Manufacturing Processes Results in Contaminated, Adulterated, Misbranded, and/or Unapproved VCDs*

267.318.    While ZHP and Aurobindo started off as foreign companies who eventually expanded their operations into the United States, Mylan's history begins in the United States back in 1961, in White Sulfur Springs, West Virginia.

[72] To be clear, Aurobindo's valsartan products should not contain any NDEA.
[73]    https://www.fda.gov/drugs/drug-safety-and-availability/laboratory-analysis-valsartan-products;  *see  also* https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-angiotensin-ii-receptor-blocker-arb-recalls-valsartan-losartan  (last accessed June 5, 2019January 26, 2021).

{Cases: 00033778.DOCX}

**Formatted:** Font: 8 pt

268.319.    From the founding of the company, to roughly the mid-2000s, Mylan either manufactured their own products domestically in the United States, or contracted with foreign companies to order API for their finished dosage products.

269.320.    However, in late 2005, Mylan's CEO at the time, Robert Coury, was facing a crisis due to the fact that the US-based company was losing market share to Indian drug companies that made their own API in-house and operated at rock-bottom costs. At the time, Mylan was having to order API from Chinese and Indian suppliers.

270.321.    Consequently, in December of 2005, Coury hammered out a deal to acquire Matrix Laboratories, an India-based company which had been one of Mylan's ingredient suppliers. At the time of the acquisition of Matrix Laboratories, a former Ranbaxy employee[74] named Rajiv Malik was the CEO of Matrix.

271.322.    After the Mylan acquisition in 2006, Malik became the executive vice president in charge of global technical operations.

272.323.    Malik's impact on Mylan was immediate – he reoriented the company towards India. Very quickly, the number of drug applications for generics Mylan submitted to the FDA tripled, and the approvals doubled.

273.324.    Indeed, Malik's compensation structure was based, in part, on the number of ANDA applications filed with global regulators.

274.325.    As the focus shifted to bringing more and more drugs to market, employees in both India and the United States began to experience a shift in the company, where speed was prized above all else. Employees who insisted on adhering to cGMPs felt sidelined and were tagged

---

[74] A full narrative into Ranbaxy's grossly inadequate manufacturing processes can be found in Katherine Eban's *Bottle of Lies*. Ranbaxy faced criminal and civil sanctions as a result of their grossly inadequate fraudulent, and, indeed, criminal, manufacturing processes and procedures. The book details how Malik was described by Ranbaxy colleagues as the "Houdini of the generic drug world." Katherine Eban, *Bottle of Lies* (2019) at p. 28. Rajiv Malik is still a President of Mylan, N.V., and sits on the Board of Directors to this day.

**Formatted:** Font: 8 pt

as slow.

275.326.    In 2013, Malik was tasked with overseeing Mylan's biggest foreign acquisition yet – a $1.6 billion purchase of Agila Specialties, a manufacturing facility in India.

276.327.    In comments regarding the potential acquisition, Mylan CEO Heather Bresch touted the "state-of-the-art, high quality" manufacturing platforms in the industry.[75]

277.328.    However, months after Mylan announced the acquisition, the FDA conducted an investigation of the facility in June of 2013.  In a scathing investigation report, it found that key pieces of equipment were stored in non-sterile areas, and then never resanitized before use; employees failed to wash their hands in the bathroom; technicians were wearing gloves that were flaking and had pinholes; and supposedly sterile gloves were found to be stored in boxes with crushed insects.[76]

278.329.    Making matters worse, after the June inspection, in a letter written by the FDA in September, the FDA found that Agila's written response "minimizes the importance of ensuring glove integrity and its potential impact on product quality."  It also found that the issues led the FDA to "question [Agila's] understanding of basic microbiology and microbial controls that are critical for the manufacture of sterile products."[77]

279.330.    However, despite these gross manufacturing issues, Mylan moved full-speed ahead on its billion-dollar acquisition, eventually obtaining the company and their manufacturing facilities.

280.331.    Throughout 2014 and 2015, the FDA continued to investigate Mylan's

---

[75] http://newsroom.mylan.com/press-releases?item=122875 (last accessed June 14, 2019) https://investor.mylan.com/news-releases/news-release-details/mylan-acquire-agila-create-leading-global-injectables-platform (last accessed April 9, 2021).

[76] Katherine Eban, *Bottle of Lies* (2019) at p. 324.

[77] https://www.fiercepharma.com/regulatory/fda-warns-agila-plant-over-torn-gloves (last accessed June 14, 2019January 26, 2021); https://www.law360.com/articles/475958/print?section=lifesciences (last accessed May 23, 2019January 26, 2021).

{Cases; 00033778.DOCX}

Formatted: Font color: Red

Formatted: Font: 8 pt

Indian manufacturing facilities, routinely uncovering a multitude of violations of the cGMPs, and finding that Mylan responded with letters that lacked corrective action. These violations included failure to establish and follow written procedures to prevent microbiological contamination of drug products, lack of assurance that the manufacturing facilities were sterile, and failures to thoroughly investigate unexplained discrepancies in batches or whether the components met specifications.[78]

281.332.    In 2015, a former Mylan employee sat down with FDA employees and alleged that the research and development centers in Hyderabad had become a hub for data fraud.[79]

282.333.    The Mylan whistleblower identified specific applications for drugs that were due to be launched into the American market, claiming that in order to generate passing results for some drug products, Mylan had manipulated the testing, by switching the tests from batch testing to pilot batches (which were easier to control, but not as reliable in ensuring the results as they were smaller in size).[80]

283.334.    The Mylan whistleblower also claimed that the Mylan team had evolved its fraudulent methods to evade detection. For example, instead of deleting manipulated data from the plant's software systems, which would have left a trail of metadata that could be uncovered by the FDA, plant managers were deliberately corrupting the data they wanted to hide. [81]

284.335.    In July of 2016, upset by the failure of the FDA to investigate, the Mylan whistleblower sent an email to FDA officials that said: "I learned that Mylan's strategy of providing employment to FDA members has been working very well…Perhaps the agency awaits a definitive tragedy to occur on U.S. soil to due sub-standard generic products not meeting the

---

[78] https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/mylan-laboratories-limited-464863-08062015 (last accessed May 23, 2019)January 26, 2021).
[79] *See* Katherine Eban, *Bottle of Lies* (2019) at p. 328.
[80] *Id.*
[81] *Id.*

**Formatted:** Font: 8 pt

safety & efficacy standards." [82]

285.336.    The email had the intended effect. Two months later, in September 2016, the FDA inspected the Mylan India facilities.[83]

286.337.    Over the course of the week-long inspection, the FDA found evidence that the plant's software system was riddled with error messages showing "instrument malfunction," or "power loss," as though Mylan was literally pulling the plug from the wall to stop the creation of metadata showing failed testing.

287.338.    In confidential correspondence with the FDA, Mylan tried to explain the high number of data error messages (42 over a seven-day period), but provided insufficient and illogical responses, arguing that there may have been accidental knocking of cables off of tables, or through electronic loss of signals.  For another error that was observed (150 times over seven days), the partial explanation given by Mylan was that some software settings led to the "unintended consequence of a number of repetitive error messages." [84]

288.339.    The FDA didn't buy these excuses.  In a stern warning letter sent to Malik in April of 2017, the FDA effectively froze the site's applications until the company took corrective actions.  The letter noted that Mylan's quality systems did not "adequately ensure the accuracy and integrity of the data." [85]

289.340.    But Mylan's issues were not solely limited to its India operations.  Several months after the April 2017 letter regarding the India operations, Mylan operations in West Virginia were under scrutiny.  The allegations were that laboratory technicians had failed to investigate anomalous results and had instead falsified records to cover-up any anomalous results.

---

[82] *See* Katherine Eban, *Bottle of Lies* (2019) at p. 329.
[83] *Id.*
[84] *See* Katherine Eban, *Bottle of Lies* (2019) at p. 331
[85] *Id.*

**Formatted:** Font: 8 pt

Regulators were "stunned" by the lapses, finding the practices "egregious," and questioned whether Mylan was being "transparent at all of its sites." [86]

290.341.    The inspectors also found bins full of shredded documents, including quality-control records, in parts of the factory where every piece of paper is supposed to be saved. [87]

291.342.    The list of alleged infractions became so long that a fourth inspector was added. A warning letter, the FDA's strongest rebuke, was drafted. [88]

292.343.    Ultimately, the FDA's director of the Office of Manufacturing Quality, Tom Cosgrove, made the controversial decision, over the strenuous objections of staff in two separate FDA divisions, to downgrade the investigators' negative findings at Morgantown, WV from Official Action Indicated to Voluntary Action Indicated. [89]

293.344.    In an email to FDA colleagues, Cosgrove acknowledged their view that the company's practices were "more widespread and that Mylan's investigation was insufficient," but ultimately defended his decision and said that he had no reason to believe that Mylan would not "remediate voluntarily." [90]

294.345.    However, while Mylan's Morgantown plant was no longer receiving intensive agency scrutiny, it did little to resolve the issues.

295.346.    In early 2018, a whistleblower from inside the Morgantown plant reached out to the FDA to report deteriorating conditions, from understaffing to cleaning lapses. The whistleblower from inside the plant claimed that Mylan management was focused on creating a

---

[86] *See* Katherine Eban, *Bottle of Lies* (2019) at p. 332
[87] https://www.bloomberg.com/news/features/2019-01-29/america-s-love-affair-with-cheap-drugs-has-a-hidden-cost (last accessed January 26, 2021).
[88] https://www.bloomberg.com/news/features/2019-01-29/america-s-love-affair-with-cheap-drugs-has-a-hidden-cost (last accessed January 26, 2021).
[89] *See* Katherine Eban, *Bottle of Lies* (2019) at p. 333
[90] *Id.*

{Cases; 00033778.DOCX}

**Formatted:** Font: 8 pt

"façade of documents" to fend off the FDA, according to an agency memo that detailed the allegations. The whistleblower also notified the FDA that Mylan had brought in a team of employees from India to the Morgantown, WV facility, to rapidly close a backlog of company investigations, and that employees were instructed not to question their work.[91]

~~296.~~347.    Consequently, the FDA inspected the Morgantown, WV facility again in March and April of 2018. The inspectors found a host of new violations, including that Mylan's manufacturing equipment was not cleaned at appropriate intervals to prevent contamination, and that Mylan's attempts to address the purported testing from the 2016 inspection was "not adequate." [92]

~~297.~~348.    On November 20, 2018, Mylan initiated a recall on the consumer level of select lots of VCDs, due to adulteration of the products with NDEA.

### ~~4.~~3. *Hetero's Inadequate Manufacturing Processes Results in Contaminated, Adulterated, Misbranded, and/or Unapproved VCDs*

~~298.~~349.    Defendant Hetero maintains six API manufacturing facilities in India, which have been approved by the FDA to produce active ingredients for drugs being sold and marketed in the United States.

~~299.~~350.    Hetero has a history of deviations from FDA's cGMP standards.

~~300.~~351.    In December of 2016, during an inspection of an oral solid dose drug product manufacturing facility, the FDA observed, through closed circuit TV surveillance, that Hetero Quality Assurance technicians and "other individuals" were recorded destroying and altering records pertaining to commercial batch manufacturing immediately before the FDA's onsite regulatory inspection. According to a scathing letter, the FDA noted that the following

---

[91] *Id.*
[92] https://www.bloomberg.com/news/features/2019-01-29/america-s-love-affair-with-cheap-drugs-has-a-hidden-cost (last accessed January 26, 2021).

Formatted: Font: 8 pt

occurred:

    a. Hetero employees brought in a document shredder into the "DOCUMENTS STORAGE AREA" four days prior to the FDA inspection;

    b. The FDA observed extensive shredding of what appeared to be "controlled documents" as well as "extensive signing of documents" by Quality Assurance technicians. The FDA noted that the documents were of a color consistent with batch packaging records and batch manufacturing record. Hetero failed to maintain documentation of what had been shredded;

    c. One day prior to the FDA inspection a Hetero contract employee in the Quality Assurance division removed documents from the shredder and placed them in his pocket; and

    d. At 1:13am the morning the FDA inspectors were set to arrive at Hetero for their regulatory inspections, individuals were seen shredding documents.

301.352.    In addition to the documented destruction of these manufacturing records, the FDA further observed that production and control records were not prepared for each batch of drug product produced and did not include complete information relating to the production and control of each batch.

302.353.    Additionally, data derived from Hetero's programmable logic controller for compression machines was inconsistent with batch records and validation reports that were submitted to the FDA in support of applications to manufacture and market drugs in the United States.

303.354.    Hetero also failed to include findings of any investigations and follow-up that occurred as a result of investigations into complaints about their drugs.

304.355.    During the December 2016 inspection, equipment at Hetero was found to have not been cleaned and maintained at appropriate intervals to "prevent contamination that would alter the safety, identity, strength, quality and purity" of Hetero drug products.

305.356.    During the December 2016 visit, FDA inspectors found that "accuracy, sensitivity and reproducibility of test methods" were not established and documented.

306.357.    In an August 15, 2017, warning letter, the FDA strongly recommended that

**Formatted:** Font: 8 pt

Hetero engage "a consultant, qualified as set forth in 21 CFR 211.34" to assist Hetero Labs in meeting cGMP requirements, but emphasized that, ultimately, "executive management remains responsible for fully resolving all deficiencies and ensuring ongoing cGMP compliance."

307.358.    In February of 2018, FDA investigators discovered other manufacturing flaws at an API Manufacturing facility.

308.359.    For example, the FDA found that there was a "failure" by Hetero to "thoroughly review any unexplained discrepancy and failure of a batch or any of its components to meet any of its specifications," whether or not the batch had been already distributed.

309.360.    The FDA investigators further found during that February 2018 inspection that Hetero employees who were engaged in the processing, holding and testing of a drug product lacked the training and experience required to perform their assigned functions. Indeed, in a walk-through with FDA investigators, several quality-control personnel could not explain their assigned functions and processes after "repeated opportunities" to do so.

310.361.    Additionally, FDA investigators concluded that there was "no assurance" that equipment used in API production was being maintained and/or kept under proper conditions for manufacturing operations "to prevent the contamination of the products handled and/or processed in the equipment." Likewise, equipment at the Hetero facility was found to have not been cleaned and maintained at appropriate intervals to "prevent contamination that would alter the safety, identity, strength, quality and purity" of Hetero's drug products.

311.362.    After the recalls of Hetero's VCDs, FDA Laboratory Analysis testing would later reveal that valsartan 320mg API manufactured by Hetero contained NDMA levels in excess

Formatted: Font: 8 pt

of the FDA's interim limits[93] of 96 ng/day or 0.3 ppm.[94]

### K.N.    The Contamination of the VCDs

#### 1.   *The Nitrosamine Contaminant NDMA*

312.363.    N-nitrosodimethylamine, commonly known as NDMA, is an odorless, yellow liquid.[95]

313.364.    According to the U.S. Environmental Protection Agency, "NDMA is a semivolatile chemical that forms in both industrial and natural processes."[96]

314.365.    NDMA can be unintentionally produced in and released from industrial sources through chemical reactions involving other chemicals called alkylamines.

315.366.    The American Conference of Governmental Industrial Hygienists classifies NDMA as a confirmed animal carcinogen.[97]

316.367.    The US Department of Health and Human Services (DHHS) similarly states that NDMA is reasonably anticipated to be a human carcinogen.[98]  This classification is based upon DHHS's findings that NDMA caused tumors in numerous species of experimental animals, at several different tissue sites, and by several routes of exposure, with tumors occurring primarily in the liver, respiratory tract, kidney, and blood vessels.[99]

317.368.    Exposure to NDMA can occur through ingestion of food, water, or

---

[93] To be clear, Hetero's valsartan products should not contain any NDMA.
[94] https://www.fda.gov/drugs/drug-safety-and-availability/laboratory-analysis-valsartan-products (last accessed January 26, 2021) ; *see also* https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-angiotensin-ii-receptor-blocker-arb-recalls-valsartan-losartan  (last accessed January 26, 2021).
[95] https://www.atsdr.cdc.gov/toxprofiles/tp141.pdf  (last accessed January 26, 2021).
[96] https://www.epa.gov/sites/production/files/2017-10/documents/ndma_fact_sheet_update_9-15-17_508.pdf. (last accessed January 26, 2021).
[97]  https://www.epa.gov/sites/production/files/2017-10/documents/ndma_fact_sheet_update_9-15-17_508.pdf.  (last accessed January 26, 2021).
[98]  https://www.epa.gov/sites/production/files/2017-10/documents/ndma_fact_sheet_update_9-15-17_508.pdf.  (last accessed January 26, 2021).
[99]  https://www.epa.gov/sites/production/files/2017-10/documents/ndma_fact_sheet_update_9-15-17_508.pdf.  (last accessed January 26, 2021).

medication containing nitrosamines.[100]

318.369.    Exposure to high levels of NDMA has been linked to liver damage in humans.[101]

370.    Anecdotally, NDMA has also been used in intentional poisonings.[102]

319.371.    According to the Agency for Toxic Substances and Disease Registry, "NDMA is very harmful to the liver of humans and animals. People who were intentionally poisoned on one or several occasions with unknown levels of NDMA in beverage or food died of severe liver damage accompanied by internal bleeding."[103]

320.372.    Other studies showed an increase in other types of cancers, including but not limited to stomach, colorectal, intestinal, kidney, liver, and other digestive tract cancers.

321.373.    On July 27, 2018, the FDA put out a press release, explaining the reason for its concern regarding the presence of NDMA found in VCDs. In that statement, the FDA provided, in relevant part:

> NDMA has been found to increase the occurrence of cancer in animal studies…Consuming up to 96 nanograms NDMA/day is considered reasonably safe for human ingestion.[2]
> …
> The amounts of NDMA found in the recalled batches of valsartan exceeded these acceptable levels.[104]

322.374.    The Environmental Protection Agency classified NDMA as a probable human carcinogen "based on the induction of tumors at multiple sites in different mammal species

---

[100]  https://www.epa.gov/sites/production/files/2017-10/documents/ndma_fact_sheet_update_9-15-17_508.pdf. (last accessed January 26, 2021).
[101]  https://www.epa.gov/sites/production/files/2017-10/documents/ndma_fact_sheet_update_9-15-17_508.pdf. (last accessed January 26, 2021).
[102]  *See* Quartz, A COMMON BLOOD-PRESSURE MEDICINE IS BEING RECALLED BECAUSE OF A TOXIC INGREDIENT, https://qz.com/1330936/the-fda-is-recalling-a-common-blood-pressure-drug-because-it-was-mixed-with-ndma/ (last accessed June 5, 2019January 26, 2021).
[103]  https://www.atsdr.cdc.gov/toxprofiles/tp141.pdf, p. 2. (last accessed January 26, 2021).
[104]  https://www.fda.gov/Drugs/DrugSafety/ucm613916.htm. (last accessed January 26, 2021).

{Cases; 00033778.DOCX}

-122-

exposed to NDMA by various routes."[105]

~~323~~.375.      The World Health Organization's ("WHO") International Agency for Research on Cancer ("IARC") classifies NDMA as one of sixty-six agents that are "probably carcinogenic to humans" (Classification 2A).  The FDA's 2008 Guidance for Industry titled "Genotoxic and Carcinogenic Impurities in Drug Substances and Products: Recommended Approaches"  identified nitrosamines including NDMA as having extremely high carcinogenic potency, thus excluding nitrosamines from the threshold approach to control of genotoxic impurities.  Similarly, European Medicines Agency's Guideline on Limits of Genotoxic Impurities in effect from January 1, 2007 to January 31, 2018 included nitrosamines in a group of structural groups described as high potency genotoxic carcinogens, "to be of such high potency that intakes even below the TTC [Threshold of Toxicological Concern] would be associated with a high probability of significant carcinogenic risk."

~~324.1.   Anecdotally, NDMA has also been used in intentional poisonings.[106]~~

### 2.  *The Nitrosamine Contaminant NDEA*

~~325~~.376.      N-Nitrosodiethylamine, often referred to as NDEA, is a yellow, oily liquid that is soluble in water.[107]

~~326~~.377.      Like NDMA, NDEA is also classified by DHHS and EPA as a probable human carcinogen and a known animal carcinogen.[108]

~~327~~.378.      NDEA is an even more potent carcinogen than NDMA.

---

[105] https://www.epa.gov/sites/production/files/2017-10/documents/ndma_fact_sheet_update_9-15-17_508.pdf. (last accessed January 26, 2021).
[106] ~~See Quartz, A COMMON BLOOD-PRESSURE MEDICINE IS BEING RECALLED BECAUSE OF A TOXIC INGREDIENT, https://qz.com/1330936/the-fda-is-recalling-a-common-blood-pressure-drug-because-it-was-mixed-with-ndma/ (last accessed June 5, 2019January 26, 2021).~~
[107] https://www.epa.gov/sites/production/files/2016-09/documents/n-nitrosodimethylamine.pdf. (last accessed January 26, 2021).
[108] https://healthycanadians.gc.ca/recall-alert-rappel-avis/hc-sc/2018/68448a-eng.php (last accessed January 26, 2021); *see also* https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm620499.htm (last accessed January 26, 2021).

{Cases; 00033778.DOCX}

-123-

~~328.~~379.    According to the U.S. Environmental Protection Agency, even short-term exposure to NDEA can damage the liver in humans.  Animal studies also demonstrate that chronic ingestion of NDEA can cause liver tumors and other types of tumors as well, including in the kidneys.

~~329.~~380.    Hematological effects were also reported in animal studies.[109]

~~330.~~381.    Tests conducted on rats, mice, and hamsters demonstrated that NDEA has high-to-extreme toxicity from oral exposure.[110]

~~331.~~382.    The New Jersey Department of Health notes that NDEA "should be handled as a CARCINOGEN and MUTAGEN – WITH EXTREME CAUTION."[111]

~~332.~~383.    The New Jersey Department of Health also states that "[t]here may be no safe level of exposure to a carcinogen, so all contact should be reduced to the lowest possible level."[112]

~~333.~~384.    The New Jersey Department of Health notes that NDEA is classified as a probable human carcinogen, as it has been shown to cause liver and gastrointestinal tract cancer, among others.[113]

~~334.~~385.    The IARC of WHO classifies NDEA as one of sixty-six agents that are "probably carcinogenic to humans" (Classification 2A).  The above cited FDA and EMA references apply to NDEA.

---

[109]    https://www.epa.gov/sites/production/files/2016-09/documents/n-nitrosodimethylamine.pdf.  (last accessed January 26, 2021).
[110]    https://www.epa.gov/sites/production/files/2016-09/documents/n-nitrosodimethylamine.pdf.  (last accessed January 26, 2021).
[111]    https://nj.gov/health/eoh/rtkweb/documents/fs/1404.pdf (emphasis in original).  (last accessed January 26, 2021).
[112]    https://nj.gov/health/eoh/rtkweb/documents/fs/1404.pdf.  (last accessed January 26, 2021).
[113]    https://nj.gov/health/eoh/rtkweb/documents/fs/1404.pdf.  (last accessed January 26, 2021).

Formatted: Left

Formatted: Font: 8 pt

### 3. *Formation of NDMA and/or NDEA in Defendants' Contaminated, Adulterated, Misbranded, and/or Unapproved VCDs*

335.386.     NDMA and NDEA are both considered genotoxic compounds, as they both contain nitroso groups, which are gene-mutating groups.[114]

336.387.     The reason Defendants' manufacturing process produced these compounds is linked to the tetrazole group that most ARB drugs have, including VCDs. Solvents used to produce the tetrazole ring, such as N-Dimethylformamide (DMF), can result in the formation of drug impurities or new active ingredients, such as NDMA and NDEA, as a byproduct of the chemical reactions.[115]

337.388.     The pharmaceutical industry has been aware of the potential for the formation of nitrosamines in pharmaceutical drugs at least as far back as 2005.[116]

**L.O.     Defendants Had Actual and/or Constructive Notice of NDMA and/or NDEA Contamination of their Contaminated, Adulterated, Misbranded, and/or Unapproved VCDs**

338.389.     The FDA has concluded that "NDMA and NDEA are probable human carcinogens and should not be present in drug products." As alleged aboveset forth herein, the VCDs manufactured by the API and Finished Dose Manufacturer defendants were found to contain dangerously high levels of nitrosamines, including NDMA and NDEA, sometimes reaching levels hundreds of times higher than the FDA's interim safety limits.

339.390.     NDMA and NDEA are not FDA-approved ingredients for DIOVAN, EXFORGE, or their generic equivalents, and are not included in the USP or Orange Book requirements. Moreover, none of Defendants' VCDs identify NDMA, NDEA, or other

---

[114] https://www.pharmaceuticalonline.com/doc/nitroso-impurities-in-valsartan-how-did-we-miss-them-0001. (last accessed January 26, 2021).
[115] https://www.pharmaceuticalonline.com/doc/nitroso-impurities-in-valsartan-how-did-we-miss-them-0001. (last accessed January 26, 2021).
[116] http://www.pharma.gally.ch/UserFiles/File/proofs%20of%20article.pdf. (last accessed January 26, 2021).

{Cases; 00033778.DOCX}

nitrosamines as an ingredient on the products' labels or elsewhere. This is because these nitrosamines are probable human carcinogen carcinogens, unreasonably dangerous active ingredients, and are not approved to be included in valsartan API. Their inclusion in Defendants' VCDs renders the VCDs contaminated, defective, adulterated and misbranded compared to and in violation of Defendants' warranties and representations.

340.391.    If Defendants had not routinely disregarded the FDA's reasonable and safe manufacturing practices, quality processes, and cGMPs, including those discussed throughout this Complaint, and the FDA's investigation reports and warning letter letters, and not deliberately manipulated and disregarded sampling data suggestive of impurities, or and had fulfilled their quality assurance obligations, Defendants would have prevented outright, or identified the presence of these nitrosamine contaminants almost immediately, upon manufacture including during the development process and thereafter.

341.392.    ZHP changed its valsartan manufacturing processes in or about 2012, if not earlier. It is not yet known when the processes changed at Defendants' other API manufacturing facilities. Other Manufacturer Defendants similarly changed their manufacturing process in material ways which resulted in the formation of NDMA or NDEA in their respective valsartan APIs.

342.393.    According to the European Medicines Agency ("EMA") – which has similar jurisdiction to that of the FDA – "NDMA was an unexpected impurity believed to have formed as a side product after [ZHP] introduced changes to its manufacturing process in 2012."[117]

343.394.    Most assuredly, NDMA and NDEA are not FDA-approved ingredients, whether active or inactive, for DIOVAN, EXFORGE, or their generic equivalents. None of

---

[117] *See* European Medicines Agency, UPDATE ON REVIEW OF RECALLED VALSARTAN MEDICINES, *at* http://www.ema.europa.eu/ema/index.jsp?curl=pages/news_and_events/news/2018/08/news_detail_003000.jsp&mid=WC0b01ac058004d5c1 (last accessed June 5, 2019 January 26, 2021).

**Formatted:** Font: 8 pt

Defendants' VCDs identifies NDMA, NDEA, or any other nitrosamine as an ingredient on the products' labels or elsewhere. Their inclusion in Defendants' VCDs renders the VCDs contaminated, adulterated and misbranded compared to and in violation of Defendants' warranties and representations.

344.395.    If Defendants had not routinely disregarded the FDA's reasonable and safe manufacturing practices, quality processes, and cGMPs and had not deliberately manipulated and disregarded sampling data suggestive of impurities, or had fulfilled their quality assurance obligations, Defendants would have prevented outright or found the NDMA and NDEA contamination almost immediately upon manufacture including during the development process and thereafter.

345.396.    21 C.F.R. § 211.110 contains the cGMPs regarding the "Sampling and testing of in-process materials and drug products[.]" Subsection (c) states the following:

> In-process materials shall be tested for identity, strength, quality, and purity as appropriate, and approved or rejected by the quality control unit, during the production process, e.g., at commencement or completion of significant phases or after storage for long periods.

21 C.F.R. § 211.110(c). This requirement was violated by the Defendants.

346.397.    And as shown above, Defendants' own quality control units are and were responsible for approving or rejecting drug products manufactured, processed, packed, or held under contract by each API manufacturer.

347.398.    If these sampling-related and quality-control-related cGMPs were properly observed by Defendants, the nitrosamine contamination in Defendants' VCDs would have been prevented outright, or discovered in 2012 (or perhaps earlier for other API manufacturers). Defendants were thus on (at minimum) constructive notice that their VCDs were contaminated, adulterated and/or misbranded as early as 2012.

**Formatted:** Font: 8 pt

348.399. However, there are indications that Defendants had actual knowledge of their VCDs' contamination with NDMA and NDEA and unacceptable lack of quality, and made efforts to conceal or destroy the evidence.

349.400. As alleged above, FDA investigators visited ZHP's facilities in May 2017. In the words of FDA inspectors, ZHP "invalidat[ed] [OOS] results [without] scientific justification" and did not implement "appropriate controls … to ensure the integrity of analytical testing," and routinely disregarded sampling anomalies suggestive of impurities.

350.401. These discoveries by the FDA's investigators suggest that ZHP and Defendants were specifically aware of impurities in the drugs being manufactured by ZHP, including specifically contamination of Defendants' VCDs with NDMA. The efforts to manipulate data constituted an explicit effort to conceal and destroy evidence and to willfully and recklessly introduce contaminated, adulterated and/or misbranded VCDs into the U.S. market. With specific disregard for human health concerns, ZHP's lack of interest in protecting the health and safety was further demonstrated by its attempts to re-sell returned, contaminated API to countries other than the United States.

351.402. Defendants were or should have been aware of ZHP's manufacturing, quality, and cGMP violations as early as 2012, if not earlier.

352.403. Indeed, Defendant Solco and ZHP (as well as Huahai US) are owned by the same corporate parent, Huahai Pharmaceutical. All of these entities should be imputed with actual knowledge of ZHP's willful deviations from cGMPs because of their corporate affiliations and overlapping operations and employees or agents. For instance, Solco and Huahai US have offices in the same office building in Cranbury, New Jersey.

353.404. And yet, Defendants knowingly, recklessly, and/or negligently introduced contaminated, adulterated and/or misbranded VCDs containing dangerous amounts of

{Cases: 00033778.DOCX}
-128-

nitrosamines into the U.S. market. Defendants failed to recall their generic VCDs because they feared permanently ceding market share to competitors. And Defendants issued the "voluntary" recall of their VCDs only after the FDA had threatened an involuntary recall.

### ~~M.~~P.    Other Contaminants

~~354.~~405.    Testing and evaluation is ongoing of VCDs manufactured, distributed, or sold by Defendants. Besides NDMA and NDEA, ongoing investigation suggests other impurities, such as NMBA, may exist as well in the VCDs at issue.

### ~~N.~~O.    FDA Announces Voluntary Recall of Defendants' Contaminated, Adulterated and/or Misbranded VCDs

~~355.~~406.    On or about July 13, 2018, the FDA announced voluntary recalls by Defendants and other manufacturers for their VCDs manufactured by ZHP.[118] The recall is for products distributed as early as October 2015. However, as alleged above, it is likely that Defendants' VCDs manufactured beginning in 2012 and beyond were also contaminated with nitrosamines including NDMA and NDEA.

~~356.~~407.    On or about July 27, 2018, the FDA announced expanded recalls of additional VCDs manufactured by Defendants and non-parties, and repackaged by third parties.[119]

~~357.~~408.    As stated in the FDA's July 13, 2018 statement:

> The U.S. Food and Drug Administration is alerting health care professionals and patients of a voluntary recall of several drug products containing the active ingredient valsartan, used to treat high blood pressure and heart failure. This recall is due to an impurity, N-nitrosodimethylamine (NDMA), which was found in the recalled products. However, not all products containing valsartan are being recalled. NDMA is classified as a probable human carcinogen (a substance that could cause cancer) based on results from laboratory tests. The presence of NDMA was

---

[118] FDA News Release, FDA ANNOUNCES VOLUNTARY RECALL OF SEVERAL MEDICINES CONTAINING VALSARTAN FOLLOWING DETECTION OF IMPURITY, *at* https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm613532.htm (last accessed ~~June 5, 2019~~January 26, 2021)
[119] FDA News Release, FDA UPDATES ON VALSARTAN RECALLS, *at* https://www.fda.gov/Drugs/DrugSafety/ucm613916.htm (last accessed ~~June 5, 2019~~January 26, 2021).

{Cases: 00033778.DOCX}

unexpected and is thought to be related to changes in the way the active substance was manufactured.

358.409.    Subsequently, the FDA announced numerous additional recalls of VCDs and other similar products manufactured, distributed, or sold by Defendants as well as non-parties.[120] The FDA has not released the results of its investigation into when Hetero, Mylan, and Aurobindo started manufacturing adulterated and/or misbranded VCDs.

359.410.    The recalls caused direct economic loss to consumers and TPPs. When the FDA announced the recalls of VCDs, consumers were notified (typically by their pharmacies among others) and were advised to obtain prescriptions for safe alternative drugdrugs to VCDs. Upon receipt of a prescription for a safe alternative drug, patients presented their prescriptions to be filled at a pharmacy and they and their TPPs paid for replacement drugs. Upon receipt of substitute drugs, patients stopped using Defendants' inferior recalled VCDs, which were worthless and illegally sold to them. In addition to the damages suffered throughout the entirety of the class period for purchases or reimbursements of worthless product, Consumers and TPPs also suffered additional economic damage when they thereby paid to replace the recalled VCDs with substitute drugs. This resulted in consumers and TPPs effectively paying twice for drugs intended to treat the same medical conditions and for use over the same (or an overlapping) time period, when they should only have paid once.

**O.R.    Defendants' Warranties and Fraudulent and Deceptive Statements to Consumers Regarding Their Generic VCDs**

360.411.    Each Defendant made and breached express and implied warranties and also made affirmative misrepresentations and omissions of material facts to consumers about their contaminated, adulterated and/or misbranded VCDs.

---

[120] FDA UPDATES ON ANGIOTENSIN II RECEPTOR BLOCKER (ARB) RECALLS INCLUDING VALSARTAN, LOSARTAN AND IRBESARTAN, https://www.fda.gov/Drugs/DrugSafety/ucm613916.htm (last accessed June 5, 2019January 26, 2021).

{Cases; 00033778.DOCX}

**Formatted:** Font: 8 pt

412.    Consumers, including the Class Representatives named herein, are natural persons who are reasonably expected to use, consume, or be affected by the contaminated, adulterated and/or misbranded VCDs manufactured and sold by Defendants.

**1.** *Warranties Common to All Manufacturer Defendants*

~~361.~~413.    The FDA maintains a list of "Approved Drug Products with Therapeutic Equivalence Evaluations" commonly referred to as the Orange Book.[121]  The Orange Book is a public document; Defendants sought and received the inclusion of their VCD products in the Orange Book upon approval of their ANDAs. In securing FDA approval to market generic VCDs in the United States as an Orange Book-listed drug, Defendants were required to demonstrate that their generic VCDs ~~was~~were therapeutically, pharmaceutically, and bioequivalent to their RLDs.

~~362.~~414.    Therapeutic equivalence for purposes of generic substitution is a continuing obligation on the part of the manufacturer. For example, according to the FDA's Orange Book, therapeutic equivalence depends in part on the manufacturer's continued compliance with cGMPs.

~~363.~~415.    Each Defendant's VCD(s) is/are accompanied by an FDA-approved label. By presenting consumers with an FDA-approved VCD label, Defendants, as generic manufacturers, made representations and express or implied warranties to consumers and TPPs of the "sameness" of their products to the VCD's RLD, and that their products were consistent with the safety, quality, purity, identity, and strength characteristics reflected in the FDA-approved labels and/or were not ~~adulterated and/or misbranded or misbranded.~~contaminated, adulterated and/or misbranded.  The representations and warranties in the labels and packaging included the designation of the VCDs as USP, and thus in compliance with the compendial standards. The

---

[121] FDA, Approved Drug Products with Therapeutic Equivalence Evaluations (Orange Book) Short Description, *at* https://www.fda.gov/drugs/informationondrugs/approveddrugs/approveddrugproductswiththerapeuticequivalenceevaluationsorangebook/default.htm (last accessed ~~June 5, 2019~~January 26, 2021).

{Cases; 00033778.DOCX}

consumer Plaintiffs and TPPs have no option but to reply on the manufacturers' identification that a generic drug meets the compendial standards and is bioequivalent to the RLD.

416. Each Defendant's VCDs also contained patient information leaflets (sometimes referred to as medication guides), which were authored by the Manufacturer Defendants and specifically addressed to the patients.

417. These medication patient information leaflets or medication guides made express warranties about the VCDs, including the identifying the active or inactive ingredients, and that it was Valsartan and was the same as brand RLD.

~~364.~~418. By introducing their respective VCDs into the United States market as a therapeutic equivalent to their RLDs, USP designated, and with the FDA-approved label that is the same as that of the RLDs, Defendants ~~represent~~represented and ~~warrant~~warranted to physicians, end users and TPPs that their VCDs ~~are~~were in fact the same as and ~~are~~were therapeutically interchangeable with their RLDs. Much of the generic drugs supply chain, including the most critical components of that supply chain (end-user patients and reimbursing TPPs) rely on these representations and warranties.

~~365.~~419. In addition, each Defendant affirmatively misrepresented and warranted to consumers and TPPs through their websites, brochures, and other marketing or informational materials that their VCDs complied with cGMPs and did not contain (or were not likely to contain) any ingredients besides those identified on the products' FDA-approved labels. None suggested that dangerous, unacceptable genotoxic impurities including nitrosamines were or possibly could be included.

~~366.~~420. The presence of nitrosamines in Defendants' VCDs: (1) renders Defendants' VCDs non-bioequivalent (*i.e.*, not the same) to their RLDs and thus non-therapeutically interchangeable with them, thus breaching Defendants' express warranties of

{Cases; 00033778.DOCX}

-132-

Formatted: Font: 8 pt

sameness; (2) was the result of gross deviations from cGMPs rendering Defendants' VCDs non-therapeutically equivalent to their RLDs, thus breaching Defendants' express warranties of sameness; and (3) results in Defendants' VCDs containing an ingredient that is not also contained in their RLDs, also breaching Defendants' express warranty of sameness (and express warranty that the products contained the ingredients listed on and met the criteria set forth on each Defendant's FDA-approved label). Each Defendant willfully, recklessly, or negligently failed to ensure their VCDs' labels and other advertising or marketing statements accurately conveyed information about their products, which were not the generic equivalent of the RLSs.

367.421.    The presence of nitrosamines in Defendants' VCDs and Defendants' serial and willful failures to comply with cGMPs and other shortcomings in Defendants' generic drug manufacturing processes have resulted in Defendants' VCDs being contaminated, adulterated and/or misbranded compared to and in violation of Defendants' representations and warranties.

368.422.    At all relevant times, Defendants have also impliedly warranted that their VCDs were merchantable and fit for their ordinary purposes.

369.423.    Naturally, due to their status as probable human carcinogens as listed by both the IARC and the U.S. EPA, NDMA and NDEA are not FDA-approved ingredients in VCDs. The presence of NDMA, NDEA and other similar nitrosamines or impurities in Defendants' VCDs means that Defendants have violated implied warranties to Plaintiffs and Class Members. The presence of NDMA and/or NDEA in Defendants' VCDs results in Defendants' VCDs being non-merchantable and not fit for its ordinary purposes (i.e., as a therapeutically interchangeable generic version of their RLDs), breaching Defendants' implied warranty of merchantability and/or fitness for ordinary purposes.

370.424.    For these and other reasons, Defendants' VCDs are therefore dangerously contaminated, adulterated, misbranded, and/or unapproved, and it was illegal for Defendants to

{Cases; 00033778.DOCX}
-133-

Formatted: Font: 8 pt

have introduced such VCDs in the United States. *See* 21 U.S.C. §§ 331(a), 351(a)(2)(B), 331(g).

~~371.~~425.    ~~Adulterated~~Contaminated, adulterated, misbranded, and/or unapproved VCDs contaminated with cancer-causing nitrosamine compounds are ~~essentially~~ worthless.  No reasonable consumer (including Plaintiffs), and no downstream purchaser in the supply chain, would purchase (or reimburse for) these nitrosamine-laden VCDs, nor would any manufacturer knowingly market or sell VCDs contaminated with nitrosamines.  Nor could they, as ~~an~~a nitrosamine contaminated, adulterated, misbranded, and/or unapproved VCD cannot even be legally sold or purchased within the United States. At a minimum, contaminated, adulterated, misbranded, and/or unapproved VCDs were worth less than their non-contaminated equivalents. Further, contaminated, adulterated, misbranded, and/or unapproved VCDs do not possess the same safety and efficacy profile as their branded equivalents.  As such, the VCDs were not what they were supposed to be.

~~372.~~426.    Moreover, every consumer (and every TPP's insured) who purchased and ingested a VCD, including Plaintiffs (or Plaintiffs' insureds), has been exposed to a non-bargained for carcinogenic agent with potent mutagenic properties that operates at the cellular and sub-cellular levels, and may give rise to future potential health consequences.

~~373.~~427.    The recalls were meant to quickly remove unsafe products from the market. While FDA advised patients to continue taking VCDs for a short time until pharmacists could find a replacement due to supply concerns, or their doctor prescribed a different medication for the same condition, it only did so because of the more immediate risks associated with untreated high blood pressure.

~~374.~~428.    In response to the recall, pharmacies and health care providers throughout the United States contacted affected patients to advise them of the recall and to recommend that they contact their doctors to request a replacement or an alternative treatment option.

Formatted: Font: 8 pt

375.429. Because of the seriousness of the impurity—unsafe levels of a carcinogen—all or virtually all patients immediately stopped taking the tainted drug products after receiving notice of the recall. They were prescribed a safe alternative. The contaminated and potentially contaminated VCDs had no use and were discarded.

**2.  *ZHP Defendants' Warranties***

376.430. On its January 29, 2019 website,[122] which was fully consistent with and representative of ZHP's representations and warranties throughout the entire period that ZHP was marketing and selling VCD's, ZHP stated that it "has established an independent, strict and sound quality mangement [sic] system in accordance with GMP." ZHP further claimsclaimed that it "ensure[s] that production is operated in accordance with GMPcGMP and product quality meets the required specifications," and that ZHP's "workshops of formulation are designed in strict compliance with the international cGMP standard, where the most advanced automatic pharmaceutical production equipment in the world was introduced."

377.431. Huahai US assisted Prinston in obtaining approval of its ANDA for its VCDs.

378.432. Prinston listslisted its valsartan as equivalent to Diovan on its website.[123] Prinston's website, and its other marketing materials, have at all times relevant represented that the drugs sold by Prinston were manufactured by ZHP in accordance with the highest quality standards, and all cGMP requirements.

379.433. Furthermore, Solco statesstated on the "About Solco" page of its website that "[b]y using the same active ingredients, [Solco] produce[s] products which are identical

---

[122] ZHP completely changed its website sometime in February or March 2019.
[123] Prinston, PRODUCT LIST, http://www.prinstonpharm.com/Products_List.html#v (last visitedaccessed Apr. 5, 2019).

**Formatted:** Font: 8 pt

(equivalent) to the branded medication."[124] Solco's website, and its other marketing materials, have at all times relevant represented that the drugs sold by Prinston were manufactured by ZHP in accordance with the highest quality standards, and all cGMP requirements.

380.434.    On the "Drug Safety" page of its website, Solco ~~states~~stated that "Solco Healthcare is committed in providing . . . its patients with high quality, FDA-approved generic medications."[125]

381.435.    Solco ~~lists~~listed its valsartan products on its website with the statement that the "Reference Listed Drug" is "Diovan®" along with a link to download Solco's valsartan Prescribing Information.[126]

### 3. *Hetero Defendants' Warranties*

382.436.    In touting itself, Hetero ~~claims~~has at all times relevant claimed that it was manufacturing high quality drugs in accordance with all applicable quality standards.  For example, Hetero claimed that it has "over 36 advanced manufacturing facilities strategically located across the world – including India, USA, China, Russia, Egypt, Mexico and Indonesia. Approved by stringent global regulatory authorities, Hetero facilities have integrated quality systems and processes to ensure adherence to cGMP (current Good Manufacturing practices). They are also vertically integrated and can be utilised for large-scale production of APIs, formulations in various dosage forms rapidly. We make continuous investments in upgradation of manufacturing facilities with special emphasis on deploying advanced machinery and adopting latest technologies to comply with 21 CFR. Besides enabling us consistently to produce high quality medicines at an affordable cost, it also helps us in passing through regulatory audits with

---

[124] Solco, OVERVIEW, http://solcohealthcare.com/about-solco.html  (last accessed Apr. 5, 2019).
[125] Solco, TRADE PARTNER INFORMATION, http://solcohealthcare.com/trade-partner-information.html#DrugSafety (last accessed Apr. 5, 2019).
[126] Solco, VALSARTAN TABLETS, http://www.solcohealthcare.com/product/valsartan-tablets#NDC-43547-367-03 (last accessed Apr. 5, 2019).

{Cases; 00033778.DOCX}
-136-

**Formatted:** Font: 8 pt

relative ease. It is these advantages that make us the partner of choice for major global pharmaceutical companies."[127]

383.437.    Indeed, Hetero further describes itself as "a research-driven pharmaceutical company, is committed to the development, manufacturing and marketing of active pharmaceutical ingredients (APIs), intermediates and finished dosages. Today, Hetero is recognized as a world leader in process chemistry, API manufacturing, formulation development, manufacturing and commercialization. Hetero has around 18 state-of-the-art manufacturing facilities, which are cGMP compliant and have been approved by various Ministries of Health and regulatory authorities like US FDA, WHO, MCC - South Africa, MHRA-UK, TGA – Australia, PMDA – Japan, KFDA (Korea) among others. The company has a rich manufacturing product portfolio of over 200 products across a wide range of therapeutic categories. Hetero has a strong global presence in over 120 countries and has been offering API's and generic formulations to partners across the globe. . . . . Hetero, a privately-owned company, is recognized as one of the top 10 companies in the Indian pharmaceutical industry with an annual turnover of US$ 1.2 billion. With a dedication and support of its 15,000 employees, Hetero continues its commitment to manufacture high-quality drugs and save millions of lives across the world."[128]

384.438.    Specifically with respect to its manufacturing of API, Hetero purports to be "proficient in achieving regulatory approvals worldwide of both APIs and formulations. With an integrated quality system to ensure adherence to cGMP practices, Hetero is committed to quality and its manufacturing facilities are approved by global regulatory agencies. In addition, Hetero continues to invest in its state-of-the-art manufacturing facilities and capabilities to ensure that it

---

[127] Hetero, MANUFACTURING CAPABILITIES, https://www.heteroworld.com/manufacturing.php (last accessed June 6, 2019January 26, 2021).
[128] Camber, OUR PARENT COMPANY: HETERO, http://camberpharma.com/about-us/hetero  (last accessed June 6, 2019January 26, 2021).

Formatted: Font: 8 pt

is able to provide the highest level of quality standards in the pharmaceutical industry."[129]

~~385.~~439.     Hetero likewise goes to great lengths in describing its products as the same as the brand drug.  It states that its generic drugs are "copies of brand-name drugs and are the same as those brand name drugs in dosage form, safety, strength, route of administration, quality, performance characteristics and intended use. Health care professionals and consumers can be assured that FDA approved generic drug products have met the same rigid standards as the innovator drug. All generic drugs approved by FDA have the same high quality, strength, purity and stability as brand-name drugs. And, the generic manufacturing, packaging, and testing sites must pass the same quality standards as those of brand name drugs. . . . . Generic drugs look different because certain inactive ingredients, such as colors and flavorings, may be different. These ingredients do not affect the performance, safety or effectiveness of the generic drug. They look different because trademark laws in the U.S. do not allow a generic drug to look exactly like other drugs already on the market. . . . . To find out if there is a generic equivalent for your brand-name drug, visit FDA.gov to view a catalog of FDA-approved drug products, as well as drug labeling. Since there is a lag time after generic products are approved and they appear in the "Orange Book", you should also consult the most recent monthly approvals for "First Generics" at FDA.gov."[130]

~~386.~~440.     Camber compares its valsartan to DIOVAN on its website's product catalog.[131]

### 4.  *Mylan Defendants' Warranties*

~~387.~~441.     ~~Mylan has~~Mylan has at all times relevant represented that its drugs were

---

[129] Camber, GLOBAL RESOURCES, http://camberpharma.com/global-resources  (last accessed ~~June 6, 2019~~January 26, 2021).
[130] Camber, ABOUT GENERICS, http://camberpharma.com/generics  (last accessed ~~June 6, 2019~~January 26, 2021).
[131] Camber, PRODUCT, http://camberpharma.com/products?&filter=V  (last accessed ~~June 6, 2019~~January 26, 2021).

{Cases; 00033778.DOCX}

-138-

**Formatted:** Font: 8 pt

manufactured in accordance with strict quality standards.  For example, a section of its website

discussing generics, and claims that "[g]eneric pharmaceuticals are the same as existing approved

brand-name drugs in active ingredient, dosage form, safety, strength, route of administration,

quality and performance characteristics. Generic medications are just as safe and effective as their

brand-name counterparts, and often cost less." [132]

388.442.      Mylan also guarantees that "consumers can be assured that FDA-approved

generic products have netmet the same rigid manufacturing standards as the innovator drug."

389.443.      According to its website as of November 2018, "Mylan offers one of the

broadest portfolios of active pharmaceutical ingredients (API)—the ingredients responsible for the

therapeutic effects of different medicines—to more than 100 countries. Quality begins at step one.

Mylan uses an established testing and verification process to ensure the suitability of active

ingredients used in our medicines. Direct access to API makes Mylan one of the few global

generics companies with a comprehensive, vertically integrated supply chain and helps us maintain

deep insight into diverse markets and therapeutic segments. . . . . With a commitment to quality,

state-of-the-art API manufacturing facilities, global regulatory accreditations, a strong pipeline and

speed-to-market capabilities, Mylan is an ideal API partner."[133]

390.444.      According to Mylan's website, "[b]eing a manufacturer of API makes

Mylan one of the few global generics companies with a comprehensive, vertically integrated

supply chain" that Mylan touts as "provid[ing] us with an extra measure in the quality process that

we can own[.]"[134]

391.445.      Mylan's online product catalog lists its generic VCDs as equivalent to their

---

[132] https://www.mylan.com/en/products/generics (last accessed June 5, 2019January 26, 2021).

[133] Mylan changed this part of its website sometime after November 2018.

[134] https://www.mylan.com/en/products/active-pharmaceutical-ingredients (last accessed June 6, 2019January 26, 2021).

Formatted: Font: 8 pt

RLDs.[135]

### 5. *Torrent Defendants' Warranties*

~~392.~~446.    Torrent has at all times relevant represented and warranted that it manufactured drugs in accordance with strict quality standards. For example, Torrent Pharmaceutical's website ~~states~~state that they, "strongly believe in providing quality medicines at affordable price to the patients. In this quest, primarily, we have inclined ourselves towards safeguarding both the qualitative and quantitative aspects with the help of our robust manufacturing technologies and manufacturing facilities."[136]

### 6. *Aurobindo Defendants' Warranties*

~~393.~~447.    At all times relevant, Aurobindo has represented and warranted that it manufactured drugs in accordance with strict quality standards. For example, Aurobindo's website states that it is "Committed to Quality and Safety."[137]

~~394.~~448.    On January 6, 2015, Aurobindo announced that it had received FDA approval to manufacture and market valsartan, adding that valsartan is the "the generic equivalent to the reference listed drug product (RLD) Diovan®."

~~395.~~449.    According to Aurobindo USA, "[a]s a truly integrated company, we assure continuity and quality from start to finish."[138] Aurobindo also "[s]eek[s] to attain the highest quality standards."[139]

---

[135] Mylan, PRODUCT CATALOG, https://www.mylan.com/en/products/product-catalog/ (last accessed ~~June 6, 2019~~January 26, 2021) (clicking on the relevant product shows the page and RLD reference for each VCD).
[136] Torrent Pharmaceuticals, MANUFACTURING, ~~http://www.~~https://torrentpharma.com/~~Index~~index.php/site/info/manufacturing  (last accessed ~~June 5, 2019).~~April 9, 2021).
[137] Aurobindo, HOMEPAGE, https://www.aurobindo.com/ (last ~~visited June 5, 2019~~accessed January 26, 2021).
[138] Aurobindo USA, AUROCONTROL, https://www.aurobindousa.com/company/our-story/aurocontrol/  (last accessed ~~June 5, 2019~~January 26, 2021).
[139] Aurobindo USA, OUR STORY,  https://www.aurobindousa.com/company/our-story/  (last accessed ~~June 5, 2019~~January 26, 2021).

**Formatted:** Font: 8 pt

396.450.    Aurobindo USA's website lists listed DIOVAN as its valsartan's "Brand Reference."[140]

397.451.    Aurolife states, "The Aurolife family consists of an experienced management team with expertise in manufacturing, R&D, Quality Assurance and Quality control, finance and regulatory affairs. Aurolife has 100,000 square feet state-of-the-art US FDA approved cGMP compliant manufacturing facility with an investment of over US $50 million."[141]

### 7. *Teva Defendants' Warranties*

398.452.    At all times relevant, Teva has represented and warranted that it manufactured drugs in accordance with strict quality standards. For example, Teva has a "Generics FAQs" on its website.[142] In response to the question "Are generic drugs safe?" Teva states the following:

> A generic drug is bioequivalent to the original innovative drug and meets the same quality standards. The active ingredient, the content, the dosage form and the usage of a generic drug are similar to those of an innovative drug. Generic drugs are essentially the same as the original drug, but are offered at a lower price.

399.453.    In response to the question "How do you ensure generic drug safety, having tried it in only a limited number of patients?" Teva states the following:

> The generic product's active pharmaceutical ingredient (API) is identical to that of the innovative drug, its purity profile is similar and it is found to be bioequivalent; therefore its safety and efficacy are also comparable.

400.454.    Similarly, under the webpage titled "Uncompromising Quality," Teva states that it knows that its products affect patient health. Teva further states that it "guarantee[s] the

---

[140] Aurobindo USA, VALSARTAN TABLETS, https://www.aurobindousa.com/product-category/valsartan-tablets/ (last accessed June 5 April 15, 2019).

[141] Aurolife, ABOUT AUROLIFE, http://aurolifepharma.com/aboutus.html (last accessed June 5, 2019 January 26, 2021).

[142] Teva, PRODUCTS, *at* http://www.tevapharm.com/our_products/generic_qa/ https://www.teva.mt/our-products/generic-medicines/generic-medicine-faqs/ (last accessed June 5, 2019). April 9, 2021).

{Cases; 00033778.DOCX}

-141-

quality of our products" ~~with~~ through Teva's "impeccable adherence to … [cGMPs][.]"

~~401.~~455.    Teva's website states that "Our state-of-the-art manufacturing facilities feature the most advanced testing equipment to guarantee the quality of our products. Equipment is tested and certified, and every manufacturing process is validated. All supplier procedures are strictly supervised to ensure that only the highest grade materials are used in our products."[143]

~~402.~~456.    According to Teva, "[o]ur manufacturing network is continuously optimized so that our customers can have full confidence in our supply chain. This is enabled by high-volume, technologically-advanced distribution facilities. These facilities allow us to deliver new products swiftly and reliably. We continually review our capabilities and capacity. This ensures that we can consistently deliver best-in-class products. Our customers know that their end-consumers are receiving high-quality healthcare and wellness pharmaceuticals."[144]

~~403.~~457.    In a May 16, 2018 catalog of "all Teva and Actavis products," Teva, Actavis, Teva USA, Arrow, and Actavis Pharma all stated that their VCDs were "bioequivalent" to their RLDs.

~~404.~~458.    Teva USA's website states, "Teva's commitment to quality is uncompromising and we manufacture according to the highest quality and compliance standards. This focus is evident at every stage of the development and production of our medicines. All of our manufacturing processes are validated and products are tested and certified, using state-of-the-art testing equipment throughout the manufacturing process designed to ensure adherence to the highest quality and compliance standards."[145]

---

[143] Teva, Company PROFILE: ~~UNCOMPROMISING~~ QUALITY~~,~~
~~https://www.tevapharm.com/about/profile/quality_assurance/~~ YOU CAN TRUST
https://www.tevapharma.com.au/our-products/article-pages/quality/ (last accessed ~~June 5, 2019)~~April 9, 2021).
[144] Id.
[145] Teva USA, ABOUT TEVA: QUALITY YOU CAN TRUST, https://www.tevausa.com/About-Teva/article-pages/quality/ (last accessed ~~June 5, 2019~~January 26, 2021).

~~{Cases; 00033778.DOCX}~~

Formatted: Font color: Red

Formatted: Font: 8 pt

405.459.    Teva USA's Code of Conduct affirms, "To ensure we are in compliance and working in accordance with sound quality principles in our research laboratories, in our clinical trials, and in our manufacturing plants and distribution centers, we adhere to the systems and internal controls for 'Good Operating Practices,' or 'GxP,' including Good Laboratory Practices (GLP), Good Clinical Practices (GCP), Good Manufacturing Practices (GMP) Good Pharmacovigilance Practices (GVP) and Good Distribution Practices (GDP)."[146]

406.460.    Teva USA maintains a Brand-to-Generic Medication Reference on its website.[147] Before its recall of VCDs, this Reference included VCDs and their RLD equivalents.

8.  *Warranties Common to All Retail Pharmacy Defendants*

407.461.    Retail pharmacies are where consumers purchase and fill prescriptions for pharmaceuticals. As a result, retail pharmacies and consumers have direct privity of contract. With each sale of prescription drugs, retail pharmacies impliedly warrant to consumers that the prescription drugs being sold to them are merchantable and/or fit for its ordinary uses.

408.462.    By selling pharmaceutical prescription drugs in the stream of commerce, each Retail Pharmacy Defendant warrants that the generic drugs for which they receive payments from are the same as existing brand-named drugs in active ingredient, dosage form, safety, strength, methods of administration, quality, and performance characteristics. More generally, Retail Pharmacy Defendants warrant that prescription drugs they sell are of a standard quality.

409.463.    On account of the existence of these strict liability implied warranties, most retail pharmacies secure indemnification from manufacturer defendants for breach of such warranties.

---

[146] Teva USA, TEVA CODE OF CONDUCT, https://www.tevausa.com/About-Teva/article-pages/Code-of-Conduct/ (last accessed June 5, 2019January 26, 2021).
[147] Teva USA. PATIENTS: RESOURCES, https://www.tevagenerics.com/patients/resources/  (last accessed June 5, 2019January 26, 2021).

Formatted: Font: 8 pt

410.464.    Further, each Retail Pharmacy Defendant is obligated under the Drug Supply Chain Security Act to quarantine and investigate potentially illegitimate (including adulterated and/or misbranded) drugs. Retail Pharmacy Defendants knew or should have known, based on information provided or available from each manufacturer or Wholesaler Defendant, of the actual or potential adulteration, misbranding, or contamination of VCDs they purchased from manufacturer defendants. Retail Pharmacy Defendants expressly or impliedly warranted VCDs they sold were not adulterated, misbranded, or contaminated, when in fact that was not the case.

9.  *Wholesaler Defendants' Warranties*

411.465.    Each Wholesaler Defendant is obligated under the Drug Supply Chain Security Act to quarantine and investigate potentially illegitimate (including adulterated and/or misbranded) drugs. Wholesaler Defendants knew or should have known, based on information provided or available from each manufacturer defendant, of the actual or potential adulteration, misbranding, or contamination of VCDs they purchased from manufacturer defendants. Wholesaler Defendants expressly or impliedly warranted VCDs they sold were not adulterated, misbranded, or contaminated, when in fact that was not the case.

10.  *Repackager and Relabeler Defendants' Warranties*

412.466.    By selling drugs in the stream of commerce, each repackager and relabeler defendant warrants that the generic drugs they sell are same as existing brand-named drugs in active ingredient, dosage form, safety, strength, methods of administration, quality, and performance characteristics.

413.467.    Further, each repackager and relabeler defendant is obligated under the Drug Supply Chain Security Act to quarantine and investigate potentially illegitimate (including adulterated and/or misbranded) drugs.

Formatted: Font: 8 pt

**S.   Wholesaler and Retail Pharmacy Defendants' Obligations to Ensure that the Product they Distribute and Sell Throughout the Stream of Commerce is Not Suspected to be Adulterated or Misbranded and therefore Illegal to Sell**

468.    The three leading wholesalers, Defendants McKesson, AmerisourceBergen and Cardinal Health, ("Wholesaler Defendants") dominate close to 95% of the total market, a feat they achieved during the years that the VCDs were launched onto the market and sold.

469.    This included an increase in revenues of over $100 billion.

| Big Three Wholesalers, Market Share for U.S. Drug Distribution and Related Revenues, 2012 vs. 2018 | | |
|---|---|---|
| | Share of Total U.S. Market[1] | |
| **Company (Stock Ticker)** | **2012** | **2018** |
| AmerisourceBergen Corp. (ABC) | 24% | 34% |
| Cardinal Health, Inc. (CAH) | 29% | 26% |
| McKesson Corporation (MCK) | 34% | 35% |
| Other / Direct distribution | 13% | 5% |
| **Total share** | **100%** | **100%** |
| **Total distribution revenues (billions)[2]** | **$317.8** | **$482.8** |

Dollar figures in billions. Total may not sum due to rounding.
1. Revenue share based on calendar year. Note that fiscal years and segment definitions differ among the three companies. Share of revenue data includes certain related businesses that are not reported separately. Data exclude international drug distribution. Market share is not adjusted for acquisitions or divestitures.
2. Total market includes sales via wholesale distribution and direct sales by manufacturers.
Source: Drug Channels Institute analysis

This chart appears as Exhibit 11 in The 2019–20 Economic Report on Pharmaceutical Wholesalers and Specialty Distributors (https://drugch.nl/wholesale)

**DRUG CHANNELS**
INSTITUTE

470.    It is estimated that four out of every five drugs sold in the United States passes through one of the Wholesaler Defendants.

471.    Given their position between the Manufacturer Defendants and the Retailer Defendants, the Wholesaler Defendants are uniquely situated in the supply chain, and provide valuable data both in terms up the upstream supply, as well as the downstream demands.

472.    Wholesalers also increase their buying power in the larger drug supply chain by forming strategic partnerships with retail chains.

473.    It is estimated that 90% of generic pharmaceuticals provided to consumers are procured through generic sourcing programs.

**Formatted:** Font: 8 pt

474.    These generic sourcing programs include AmerisourceBergen's Walgreens Boots Alliance Development program, Cardinal's "Red Oak Sourcing" joint venture with CVS, and McKesson's ClarusOne Sourcing Services program.

475.    Because these three entities control 90% or more of the generic market, this structure makes it difficult for generic manufacturers to stay profitable, which in turns, leads some generic manufacturers to either make serious changes to the manufacturing process to save cost, or leave the market. [148]

476.    Indeed, in assessing the drug supply chain, the FDA cited the role of the market conditions created by the consolidation of market power from the Wholesaler Defendants as a cause for reduction of generic pharmaceutical company's motivation to "to invest in manufacturing quality." [149]

477.    Manufacturer Defendants, including Defendant ZHP, often make presentations to both Wholesaler Defendants and Retail Pharmacy Defendants before entering into contractual arrangements with them for the purchase of bulk generic pharmaceutical products, including VCDs.

478.    Employees at manufacturing companies, such as Defendants ZHP, Mylan, Teva, Aurobindo, Hetero and Torrent often met with Wholesalers and Retail Pharmacies seeking generic drug products at yearly industry conferences, including the National Association of Chain Drug Store ("NACDS") Conference, the Healthcare Distribution Management Association ("HDMA")

---

[148] The generic drug industry has brought huge cost savings to purchasers. That may be changing, Washington Post (Aug. 1, 2017) (https://www.washingtonpost.com/business/economy/the-generic-drug-industry-has-brought-huge-costsavings-that-may-be-changing/2017/08/01/ee128d0a-68cf-11e7-8eb5-cbccc2e7bfbf_story.html) (last accessed January 26, 2021).
[149] https://www.fda.gov/media/131130/download (last accessed January 26, 2021).

**Formatted:** Font: 8 pt

Conference, the Generic Pharmaceutical Association ("GPhA") Conference and the Efficient Collaborative Retail Marketing ("ECRM") Conference.

479.    Defendants Torrent, Camber, and Solco, as one example, each met with numerous Wholesalers and Retailer Pharmacies, including the meetings described below, during the 2017 NACDS.

480.    During such presentations and contractual negotiations, Wholesalers and Retail Pharmacies are afforded a unique opportunity to probe the manufacturers for their manufacturing practices in order to assess whether those manufacturing practices are up to the industry standard.

481.    During these presentations made by the Manufacturer Defendants to Wholesalers and Retail Pharmacy customers, many Defendants often tout their track records with FDA inspections as part of describing their commitment to quality and the security of their supply chain.

482.    Wholesaler Defendants and Retail Pharmacy Defendants bestow awards to Manufacturers they believe are abiding by best practices.

483.    Receipt of these awards allows pharmaceutical manufacturers, including the Manufacturer Defendants in this case, to tout their industry vetted excellence to other participants in the drug supply chain.

484.    Because of their unique position and prominence in the supply chain, Wholesalers play a critical role in ensuring that the drugs distributed in the supply chain are safe and effective for their intended purposes.

485.    Drugs entering the U.S. Supply Chain can pose a threat to public health and safety, especially if they are contaminated.

486.    In 2008, contaminated heparin sourced from Chinese API resulted in the deaths of as many as 81 people.

Formatted: Font: 8 pt

487.    This incident, and others, spurred the Congress to take action to improve the security of the U.S. drug supply chain.

488.    These legislative efforts resulted in the Congressional enaction of the DSCSA (as discussed *supra*) as part of the DQSA, aimed at addressing vulnerabilities in the drug supply train, and the facilitates the tracing of certain prescription drugs in finished dosage form through the supply chain.

489.    As part of the DSCSA, Wholesaler Defendants and Retailer Pharmacy Defendants must develop verification methods to determine whether a product is a valid, suspect or illegitimate product.

490.    Upon determining it is in possession of such a product, a participant in the secure drug supply chain must notify its trading partners in order to prevent further circulation of potentially compromised medication.

491.    Authorized participants in the drug supply chain must also respond within 48 hours to requests from appropriate federal or state officials — in the event of a recall or for the purpose of investigating suspect product or an illegitimate product — for the transaction history of the pharmaceutical product.

492.    Further, Wholesaler Defendants and Retail Pharmacy Defendants were obligated to comply with both cGMPs as well as Good Distribution Practices ("GDP").

493.    One aspect of the GDP is the implementation of a strong quality management system.

494.    A robust quality management system program would include processes and procedures in place for managing risk, documentation, storage, transport and temperature.

**Formatted:** Font: 8 pt

495.    The World Health Organization's guidance on GDPs delineates that distributors should have adequate quality assurance measures in place to "ensure adequate confidence that a product or service and its documentation will satisfy given requirements for quality." [150]

496.    These measures include "[a]uthorized procurement and release procedures for all administrative and technical operations performed should be in place to ensure that appropriate pharmaceutical products are sourced only from approved suppliers and distributed by approved entities. The approval should come from the competent authority of the individual country where the legal entity is registered." *Id.*

497.    This obligation did not end upon confirmation that a pharmaceutical supplier was manufacturing product in a facility that had been approved by a regulatory body.  Indeed, Good Distributor Practices dictate that: "Distributors should from time to time conduct risk assessments to assess potential risks to the quality and integrity of pharmaceutical products. The quality system should be developed and implemented to address any potential risks identified. The quality system should be reviewed and revised periodically to address new risks identified during a risk assessment." *Id.*

498.    A good faith risk assessment would undoubtedly identify the dangers of product contamination in this case. The Defendants have long known that FDA oversight alone is inadequate to ensure the safety of prescription drug products.  In fact, the FDA conceded as much in a 2015 report, stating that it "has no formal means for quality surveillance, except through inspections" and admitted that "inspection findings have not been a reliable predictor of the state of quality."[151] The FDA further noted that "product recall and defect reporting data demonstrate unacceptably high occurrences of problems attributed to inherent defects in product and process

---

[150] https://www.who.int/medicines/areas/quality_safety/quality_assurance/GoodDistributionPracticesTRS957Annex5.pdf (last accessed January 26, 2021).
[151] https://www.fda.gov/media/91721/download

**Formatted:** Font: 8 pt

design; these data further indicate failures in the implementation of manufacturing process scale-up as well as routine production."[152]

499.    The limitations of FDA oversight, and the accompanying risks to consumers, are particularly serious where the drugs are manufactured overseas, as is the case here. Repeated United States Government Accountability Office reports warned of the FDA's lack of oversight concerning overseas manufacturers.[153] For example, a 2008 investigation estimated that only 8% of foreign drug manufacturing establishments subject to FDA inspection were inspected.[154]

500.    Even where the FDA manages to inspect an overseas manufacturing facility, the value of these investigations pale in comparison to those conducted onshore. For example, while most domestic manufacturing inspections are unannounced, overseas inspections are usually preceded by a warning of up to twelve weeks in advance.[155] Moreover, FDA inspectors utilize translators provided by the companies being inspected, further undermining the reliability of the information being questioned.

501.    The risks associated with inadequately regulated overseas manufacturers were not abstract to the Defendants. The Ranbaxy Laboratories scandal, which featured an injunctive consent decree in early 2012[156] and 500 million dollar criminal and civil settlement for the distribution of adulterated drugs in 2013,[157]  represented a warning more than sufficient to put the Defendants on constructive notice.

---

[152] *Id.*
[153] https://www.gao.gov/assets/gao-20-262t.pdf p. 4
[154] *Id.*
[155] https://www.gao.gov/assets/gao-20-262t-highlights.pdf
[156] https://wayback.archive-it.org/7993/20170113105916/http://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm289224.htm
[157] https://www.justice.gov/opa/pr/generic-drug-manufacturer-ranbaxy-pleads-guilty-and-agrees-pay-500-million-resolve-false

{Cases; 00033778.DOCX}

Formatted: Font: 8 pt

502. In light of well-documented regulatory enforcement failures, numerous prescription drug recalls, and high-profile cases of adulterated drugs, the Wholesaler Defendants and Retail Pharmacy Defendants knew very well that the drug products they sold presented serious risks of contamination.

503. Even where prescription drug products are produced without adulteration, the risk of contamination in the supply chain remains. As a result, the testing of prescription drug products before sale to consumers is doubly important. David Light, CEO of the retail pharmacy Valisure testified before the Senate on June 2, 2020 and explained his company's rationale for testing drugs as follows:

> "A useful metaphor for understanding the immense complexity of the drug supply chain and the critical need for independent analysis is to think of a bottle of medication like a used car. When you go to pick up a medication from your local pharmacy, it will often be a year or two old, have traveled thousands of miles, and touched dozens of hands all around the world. No one who buys a used car is satisfied to know that the original manufacturer vouched for its quality. Buyers want a Carfax report; a 100-point inspection on that specific car, or more. None of that transparency is available for medications. To ensure quality, we must do more than just review a manufacturer's paperwork and facilities: we need independent chemical analysis of the medication itself."[158]

504. Wholesaler Defendants receive shipments of pharmaceutical products, including VCDs, from manufacturers such as the API and Finished Dose Manufacturers.

505. In order to comply with the DSCSA, Wholesaler Defendants require manufacturers to prepare electronic records and manifests that provide the details of the product being shipped.[159]

506. These records are called "transaction data."[160] For example, Cardinal Health requires manufacturers to provide Cardinal with a record of the product's ship date, contents,

---

[158] https://www.finance.senate.gov/download/06022020-light-testimony (last accessed April 12, 2021).
[159] 21 U.S.C. § 360eee.
[160] https://www.cardinalhealth.com/en/services/acute/pharmacy-services/pharmaceutical-distribution.html (last accessed Apr. 6, 2021).

Formatted: Font: 8 pt

NDC, Lot number, and the name of the product itself.[161]

507.    When Wholesaler Defendants receive shipments of VCDs, they distribute these shipments into smaller pallets sometimes referred to as "totes," which are then sent to the Pharmacy Defendants.[162]

508.    To comply with the DSCSA, Wholesaler Defendants also prepare an electronic record or manifest, in which the Wholesaler Defendants warrant that the tote contains a certain product.  For example, Cardinal Health provides Pharmacy Defendants with transaction data that describes the shipping date of the tote, the number of containers, the Lot Numbers, the NDCs, the name of the API or Finished Dose Manufacturer, and the description of the product itself.[163]

509.    A sample record provided by Cardinal Health on its website includes an affirmative statement by Cardinal Health, warranting that "Cardinal Health has complied with each applicable subsection of FDCA Sec. 581(27)(A)-(G)."[164]

510.    The statement refers to the Drug Supply Chain and Security Act, 21 U.S.C. § 351 *et seq.*, which requires, *inter alia*, that wholesalers have practices and protocols in place to ensure the quality and integrity of the pharmaceuticals they distribute, and require them to affix labels on their totes that describe the product being distributed.[165]

511.    The affirmative statement of compliance, as well as the creation and transmittal of the electronic transaction data record, represent an explicit warranty made by the Wholesaler Defendants to their downstream customers, including Class Plaintiffs, that the shipped product

---

[161] https://www.cardinalhealth.com/content/dam/corp/web/documents/brochure/CardinalHealth-transaction-data-elements-requirements.pdf (last accessed April 12, 2021).
[162] https://www.cardinalhealth.com/content/dam/corp/web/documents/brochure/CARDINAL-HEALTH.Cold-Chain-Pallet-Shipper.pdf (last accessed April 12, 2021).
[163] https://www.cardinalhealth.com/content/dam/corp/web/documents/brochure/CardinalHealth-DrugTransactionDataUserGuide.pdf (last accessed April 12, 2021).
[164] *Id.*
[165] 21 U.S.C. § 351(27)(A)-(G).

**Formatted:** Font: 8 pt

was pure valsartan when in fact, it was adulterated and/or misbranded VCDs.

512.   In each instance that the Wholesaler Defendants shipped a tote containing VCDs to the Pharmacy Defendants, the Wholesaler Defendants impliedly warranted that the shipped product was pure valsartan when in fact it was adulterated and/or misbranded VCDs.

513.   At all times, Wholesaler Defendants intended that their downstream customers, including Class Plaintiffs, rely on the representation that the distributed totes of VCDs were pure.

514.   Pharmacy Defendants receive totes of pharmaceutical products, including VCDs, from the Wholesaler Defendants.

515.   Pharmacy Defendants then dispense these products into prescription bottles as needed.  When filling a prescription bottle, Pharmacy Defendants affix a label with an electronic bar code that serves as a record of the product's description and details.

516.   For example, CVS states that it includes "a description of what the medication looks like on each and every prescription label. . .[and] a detailed drug description information sheet."[166]

517.   Pharmacy Defendants also state that they implement quality assurance methods, including electronic prescribing, electronic pill imaging, and quality assurance training.[167]

518.   Accordingly, Pharmacy Defendants received totes of VCDs from the Wholesaler Defendants and dispensed VCDs into prescription bottles.  On each of these bottles, Pharmacy Defendants affixed a label and created an electronic record stating that the product was pure valsartan, when in fact it was adulterated and/or misbranded VCDs.

519.   Each dispensation, affixing of a label, and creation of corresponding electronic record represents an explicit warranty made by the Pharmacy Defendants to Class Plaintiffs, that

---

[166] https://cvshealth.com/thought-leadership/ensuring-quality-and-safety-in-the-pharmacy (last accessed April 12, 2021).
[167] https://cvshealth.com/thought-leadership/ensuring-quality-and-safety-in-the-pharmacy (last accessed April 12, 2021).

{Cases; 00033778.DOCX}

**Formatted:** Font: 8 pt

the dispensed product was pure valsartan when in fact, it was adulterated and/or misbranded VCDs.

520.    In each instance that the Pharmacy Defendants provided a prescription bottle containing VCDs to Plaintiffs, Pharmacy Defendants impliedly warranted that the dispensed product was pure valsartan when in fact it was adulterated and/or misbranded VCDs.

521.    At all times, Pharmacy Defendants intended that Class Plaintiffs rely on the representation that the dispensed prescription bottles of VCDs were pure.

### 1.  *Defendant McKesson*

522.    At all times relevant, McKesson has represented and warranted that it sells drugs manufactured in accordance with quality standards.  For example, and consistent with representations throughout the relevant time period, on its website, McKesson touts that it complies with "applicable laws and regulations concerning product quality in the countries where we do business. These include the Drug Supply Chain Security Act in the U.S., the Food and Drugs Act in Canada, and the Good Distribution Practice and Good Manufacturing Practice guidelines in Europe. These laws and regulations commit us to keeping our products traceable, handling hazardous products appropriately and continuing to work with authorized trading partners." [168]

523.    McKesson further proudly proclaims that "suppliers must agree to the McKesson Sustainable Supply Chain Principles (MSSP). The MSSP covers compliance with appropriate laws along with adherence to our strict policies on protecting workers, preparing for emergencies, identifying and managing environmental risk, and protecting the environment."

524.    McKesson also claims these quality assurance efforts are ongoing: "Adherence by suppliers to MSSP is not optional. McKesson Global Procurement & Sourcing Limited (MGPSL)

---

[168] https://www.mckesson.com/documents/about-mckesson/corporate-citizenship/fy18-mckesson-corporate-responsibility-report/ (2018 McKesson Corporate Responsibility Report) (last accessed January 26, 2021).

**Formatted:** Font: 8 pt

is stringent in regard to remediation efforts. These are made by suppliers when audits reveal any gaps in working conditions, health and safety, or environmental standards. To maintain high sustainable principle standards in factories we purchase products from, we follow up periodically on initial audits and closely monitor corrective actions."

525.    McKesson repeated their primary concern in making sure that patients are not exposed to "counterfeit and harmful drugs" in a letter to the HHS Secretary opposing a change in the DSCSA.

526.    In fact, in briefing before Congress, McKesson described itself as "protecting the safety and security of the supply chain." [169]

527.    However, in practice, McKesson's oft touted quality assurance programs in place to monitor the facilities and suppliers from which it sourced its VCDs from was woefully lacking.

528.    For instance, McKesson has the unenviable position of being the first Wholesaler to receive a warning letter from the FDA for non-compliance with the DSCSA. [170]

529.    During a twenty-four day inspection of McKesson's corporate headquarters, the FDA observed failures in having quality systems in place to enable regulatory compliance and were deficient in identifying, or quarantining suspect or illegitimate product. [171]

530.    The FDA further found that McKesson did not have an adequate policy in place regarding suspect or illegitimate product. [172]

531.    McKesson, for its part, recognized that these deficiencies were only the tip of the iceberg, and stated that the "specific incidents referenced in the Warning Letter and the underlying

---

[169] https://www.warren.senate.gov/imo/media/doc/2018-08-17%20Response%20from%20PBMs%20and%20Drug%20Distributors.pdf (last accessed January 26, 2021).
[170] https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/mckesson-corporation-headquarters-2719-565854-02072019 (last accessed January 26, 2021).
[171] FDA Form 483 for July 25-July 3, 2018 Inspection of McKesson Corporate Headquarters.
[172] Id.

{Cases; 00033778.DOCX}

Formatted: Font: 8 pt

FDA Form 483 issued on July 3, 2018, are only examples of deficiencies" and conceded that McKesson did not provide "sufficient information" during its FDA inspection. [173]

532.    McKesson also entered into arrangements with Retail Pharmacies including Defendant Rite-Aid, Defendant Walmart, and others, to provide generic drug sourcing services for these retailers.

533.    McKesson failed to ensure that the VCDs it purchased from Manufacturer Defendants were properly made in a cGMP-compliant manner, unadulterated, and not misbranded.

534.    Ordinary diligence by McKesson would have revealed that the VCDs it purchased from Manufacturer Defendants were improperly made, adulterated, or misbranded.  For example, McKesson knew or should have known that Manufacturer Defendants utilized different manufacturing and quality practices or controls than those used by the brand-reference drug manufacturer, on account of the public availability of the regulatory submissions on file with the FDA, the information available to McKesson upon request to each Defendant Manufacturer pursuant to the contracts, the information available to McKesson upon request to manufacturers of Diovan or other valsartan, and the price differential between Manufacturer Defendants' VCDs and other properly made, non-adulterated, or non-misbranded valsartan.

535.    But-for McKesson's wrongful actions or inactions, at a minimum, at least some of Plaintiffs Borkowski, Cacaccio, Semmel, Kaplan, Lee, Longwell, Neal, Nelson, Wineinger, and other consumers' purchases of valsartan would not have been of improperly made, adulterated, or misbranded VCDs.  McKesson's wrongful actions or inactions were a substantial factor in Plaintiffs Borkowski, Cacaccio, Semmel, Kaplan, Lee, Longwell, Neal, Nelson, Wineinger, and other consumers' purchases of improperly made, adulterated, and misbranded VCD.

---

[173] https://www.mckesson.com/documents/about-mckesson/corporate-citizenship/fda-warning-letter-response/ (last accessed January 26, 2021).

{Cases; 00033778.DOCX}

Formatted: Font: 8 pt

### 2.   Cardinal Health

536.    At all times relevant, Cardinal Health has represented and warranted that it sells drugs manufactured in accordance with quality standards.  For example, and consistent with representations throughout the relevant time period, Cardinal Health proudly proclaims that it is their responsibility, as a distributor, to "provide a safe and secure channel to deliver medications of all kinds, from the hundreds of manufacturers who make them to the thousands of government-authorized pharmacies that fill doctors' prescription for patients.[174]

537.    Cardinal describes the business practice of supplying "a safe, cost-efficient and secure channel" between the manufacturers who make drugs and the pharmacies who dispense them as Cardinal's "obligation to society." [175]

538.    In a letter to Senator Elizabeth Warren, Cardinal claimed that because of their efforts, "[t]he supply chain for pharmaceuticals in the United States is as safe, secure, effective and efficient as anywhere in the world." [176]

539.    In Cardinal Health's Vendor Code of Conduct, Cardinal mandates that all with whom they do business must follow the "industry practices" even if the legal requirements of the jurisdiction in which they are operating require less. [177]

540.    Moreover, Cardinal claims that in addition to its own obligation to society to provide "safe" channels for drug, they also are "continually working to provide [their] pharmacy customers with the resources they need to ensure the drugs in the supply chain are safe." [178]

---

[174] https://www.cardinalhealth.com/content/dam/corp/web/documents/infographic/cardinal-health-anti-diversion-infographic.pdf (last accessed January 26, 2021).
[175] https://s1.q4cdn.com/238390398/files/doc_financials/annual/2017/2017_Cardinal-Health_AR-FINAL.pdf (last accessed January 18, 2021).
[176] https://www.warren.senate.gov/imo/media/doc/2018-08-17%20Response%20from%20PBMs%20and%20Drug%20Distributors.pdf (last accessed January 26, 2021).
[177] https://www.cardinalhealth.com/content/dam/corp/web/documents/Policy/cardinal-health-vendor-code-of-conduct-policy.pdf (last accessed January 26, 2021).
[178] https://cardinalhealth.pr/includes/pdfs/DTDRGuideEN.pdf (last accessed January 26, 2021).

{Cases; 00033778.DOCX}

**Formatted:** Font: 8 pt

541.    Cardinal describes its quality management practices as a "sustainable quality management system that…establishes a culture of engagement and participation where our employees are driven by the highest quality objectives."[179]

542.    For partners who Cardinal believes abide by the rigorous standards it sets forth, Cardinal Health bestows an annual "Supply Chain Excellence Award."

543.    Cardinal Health bestowed this honor to Defendant Solco in 2014, and 2017. Employees of Cardinal Health also met with Defendant Solco on numerous occasions throughout the class period, including at an October 2017 National Association of Chain Drug Stores meeting as well as the ECRM Meetings.

544.    Cardinal Health also entered into agreements with large Retail Pharmacies, including Defendant CVS, to provide generic drug sourcing services for those retailers.

545.    Cardinal Health  failed to ensure that the VCDs it purchased from Manufacturer Defendants were properly made in a cGMP-compliant manner, unadulterated, and not misbranded.

546.    Ordinary diligence by Cardinal Health would have revealed that the VCDs it purchased from Manufacturer Defendants were improperly made, adulterated, or misbranded.  For example, Cardinal Health knew or should have known that Manufacturer Defendants utilized different manufacturing and quality practices or controls than those used by the brand-reference drug manufacturer, on account of the public availability of the regulatory submissions on file with the FDA, the information available to Cardinal Health upon request to each Defendant Manufacturer pursuant to the contracts, the information available to Cardinal Health upon request to manufacturers of Diovan or other valsartan, and the price differential between Manufacturer Defendants' VCDs and other properly made, non-adulterated, or non-misbranded valsartan.

---

[179] https://www.cardinalhealth.com/en/services/manufacturer/packaging-solutions/quality-assurance-and-compliance.html (last accessed January 26, 2021).

**Formatted:** Font: 8 pt

547.    But for Cardinal Health's wrongful actions or inactions, at a minimum, at least some of Plaintiffs Gildner, Nelson, and other consumers' purchases of valsartan would not have been of improperly made, adulterated, or misbranded VCDs.  Cardinal Health's wrongful actions or inactions were a substantial factor in Plaintiffs Gildner, Nelson, and other consumers' purchases of improperly made, adulterated, or misbranded VCD.

### 3.    *AmerisourceBergen*

548.    At all times relevant, AmerisourceBergen has represented and warranted that it sells drugs manufactured in accordance with quality standards.  For example, and consistent with representations throughout the relevant time period, AmerisourceBergen Corp. ("ABC") states that it "understands the important role our supply chain plays in achieving our purpose of creating healthier futures.[180]

549.    In a letter to Senator Elizabeth Warren, ABC described their commitment to providing "secure" and "efficient" access to medicines, describing their operations at the "highest level" as helping patients "obtain medicines when and where they need them."[181]

550.    To this end, ABC purports to utilize a "third-party supply chain risk management tool" which allows them to ensure they are "sourcing [their] products from reliable, stable and responsible suppliers.

551.    Employees of ABC met with Manufacturer Defendants, including Defendant Solco at the 2017 NACDS Annual Conference.

552.    ABC also entered into agreements with large Retail Pharmacies, including Defendants Walgreens, to provide generic drug sourcing services for those retailers.

---

[180] https://s24.q4cdn.com/386340686/files/doc_downloads/2020/02/AmerisourceBergen-Supplier-Statement.pdf (last accessed January 26, 2021).
[181] https://www.warren.senate.gov/imo/media/doc/2018-08-17%20Response%20from%20PBMs%20and%20Drug%20Distributors.pdf (last accessed January 26, 2021).

{Cases; 00033778.DOCX}

-159-

**Formatted:** Font: 8 pt

553.    ABC failed to ensure that the VCDs it purchased from Manufacturer Defendants were properly made in a cGMP-compliant manner, non-contaminated, unadulterated, and not misbranded, contrary to its representations and warranties.

554.    Ordinary diligence by ABC would have revealed that the VCDs it purchased from Manufacturer Defendants were improperly made, contaminated, adulterated, or misbranded.  For example, ABC knew or should have known that Manufacturer Defendants utilized different manufacturing and quality practices or controls than those used by the brand-reference drug manufacturer, on account of the public availability of the regulatory submissions on file with the FDA, the information available to ABC upon request to each Defendant Manufacturer pursuant to their contracts, the information available to ABC upon request to manufacturers of Diovan or other valsartan, and the price differential between Manufacturer Defendants' VCDs and other properly made, non-adulterated, or non-misbranded valsartan.

555.    But for ABC's wrongful actions or inactions, at a minimum, at least some of Plaintiffs Bruner, Duffy, Erwin, Powell, Roberts, and other consumers' purchases of valsartan would not have been of improperly made, adulterated, or misbranded VCDs.  ABC's wrongful actions or inactions were a substantial factor in Plaintiffs Bruner, Duffy, Erwin, Powell, Roberts, and other consumers' purchases of improperly made, adulterated, and misbranded VCDs.

### 4.   *CVS*

556.    At all times relevant, CVS has represented and warranted that it sells drugs manufactured in accordance with quality standards.  For example, and consistent with representations throughout the relevant time period, CVS loftily claims that their "purpose" in

Formatted: Font: 8 pt

helping people on a path to better health means ensuring "a safe working environment" for the "suppliers worldwide." [182]

557.    To achieve this goal CVS claims it was the first health care retailer to join the "Responsible Factory Initiative" which is dedicated to corporate social responsibility in global supply chains.

558.    This partnership includes training on what CVS purports are the "most critical risks" in the manufacturing supply chain, including health and safety, chemical management, environmental sustainability, recognizing forced labor and corrective action planning.

559.    CVS proclaims that it maintains the "highest level of performance" in the areas of supply chain responsibility.[183]

560.    In December of 2013, CVS entered into an agreement with Defendant Cardinal Health to form, at that time, the largest generic drug sourcing operating in the United States.[184]

561.    CVS's CEO described the agreement as allowing CVS to maintain its "leadership role in navigating the dynamic U.S. generics market."[185]

562.    CVS stated that all customers would "benefit from the enhanced volume and sourcing capabilities created by this partnership."[186]

563.    CVS  failed to ensure that the VCDs it purchased from Manufacturer Defendants were properly made in a cGMP-compliant manner, non-contaminated, unadulterated, and not misbranded.

[182] https://cvshealth.com/news-and-insights/articles/strengthening-our-commitment-to-ethical-sourcing-across-our-supply-chain (last accessed January 26, 2021).
[183] https://cvshealth.com/sites/default/files/2018-csr-full-report.pdf (last accessed January 26, 2021).
[184] https://www.reuters.com/article/us-cvs-cardinalhealth/cvs-cardinal-health-form-u-s-generic-drug-venture-idUSBRE9B90VB20131210 (last accessed January 26, 2021).
[185] https://www.prnewswire.com/news-releases/cvs-caremark-and-cardinal-health-announce-creation-of-largest-generic-sourcing-entity-in-us-235240881.html (last accessed January 26, 2021).
[186] https://www.prnewswire.com/news-releases/cvs-caremark-and-cardinal-health-announce-creation-of-largest-generic-sourcing-entity-in-us-235240881.html (last accessed January 26, 2021).

{Cases; 00033778.DOCX}

Formatted: Font: 8 pt

564.    Ordinary diligence by CVS would have revealed that the VCDs it purchased from Manufacturer Defendants were improperly made, contaminated, adulterated, or misbranded.  For example, CVS knew or should have known that Manufacturer Defendants utilized different manufacturing and quality practices or controls than those used by the brand-reference drug manufacturer, on account of the public availability of the regulatory submissions on file with the FDA, the information available to CVS upon request to each Defendant Manufacturer pursuant to their contracts, the information available to CVS upon request to manufacturers of Diovan or other valsartan, and the price differential between Manufacturer Defendants' VCDs and other properly made, non-contaminated, non-adulterated, or non-misbranded valsartan.

565.    But for CVS's wrongful actions or inactions, at a minimum, at least some of Plaintiffs Semmel, Longwell, Molinaro, Nelson, Kessinger, Glab, Edwards, and other consumers' purchases of valsartan would not have been of improperly made, adulterated, or misbranded VCDs.  CVS's wrongful actions or inactions were a substantial factor in Plaintiffs Semmel, Longwell, Molinaro, Nelson, Kessinger, Glab, Edwards, and other consumers' purchases of improperly made, adulterated, and misbranded VCDs.

### 5.  *Walgreens*

566.    At all times relevant, Walgreens has represented and warranted that it sells drugs manufactured in accordance with quality standards.  For example, and consistent with representations throughout the relevant time period, Walgreens states that it understands that consumers "want to feel confident the products they use are safe for their intended purposes."[187]

---

[187] https://www.walgreens.com/topic/sr/sr_product_integrity_home.jsp (last accessed January 26, 2021).

{Cases; 00033778.DOCX}

**Formatted:** Font: 8 pt

567.    Walgreens claims it aims to do "business fairly and with integrity" which has led Walgreens to "drive responsible sourcing practices throughout our supply chain, protecting human rights and engaging with suppliers around ethical and environmental issues." [188]

568.    According to Walgreens, "[p]atient safety lies at the heart of our management of pharmacy operations, and we strive to be the industry leader by continuously seeking ways to minimize risks to patients in our dispensing, pharmacy services and advance and pharmacy supply chain operations." [189]

569.    Walgreens claims it engages in "ongoing supplier ethical compliance assessments" which includes "engaging with suppliers to improve when issues are detected."

570.    Walgreens also claims to screen suppliers against a matrix which assess the suppliers' management systems to discern whether they are operating in any way which violates Walgreens' ethical sourcing commitments.[190]

571.    Walgreens entered into an agreement with Defendant AmerisourceBergen in 2014 to begin sourcing generic drug products.[191]

572.    The CEO of Walgreens called the agreement "an unprecedented and efficient global pharmacy-led, health and wellbeing network" and served Walgreens' ultimate goal of becoming "the first choice in health and daily living for everyone in America and beyond."

---

[188] https://www.walgreensbootsalliance.com/sites/www/files/asset/Walgreens-Boots-Alliance-2019-Corporate-Social-Responsibility-Report_2.pdf (last accessed January 26, 2021).
[189] https://www.walgreensbootsalliance.com/sites/www/files/asset/Walgreens-Boots-Alliance-2019-Corporate-Social-Responsibility-Report_2.pdf (last accessed January 26, 2021).
[190] https://www.walgreensbootsalliance.com/sites/www/files/asset/Walgreens-Boots-Alliance-2019-Corporate-Social-Responsibility-Report_2.pdf (last accessed January 26, 2021).
[191] https://drugstorenews.com/pharmacy/walgreens-alliance-boots-announce-blockbuster-partnership-amerisourcebergen (last accessed January 24, 2021)

{Cases; 00033778.DOCX}

Formatted: Font: 8 pt

573.    For its part, AmerisourceBergen described the agreement as "a unique opportunity to unlock value in the pharmaceutical supply chain by collaborating to leverage our proven strengths." [192]

574.    Walgreens failed to ensure that the VCDs it purchased from Manufacturer Defendants were properly made in a cGMP-compliant manner, non-contaminated, unadulterated, and not misbranded.

575.    Ordinary diligence by Walgreens would have revealed that the VCDs it purchased from Manufacturer Defendants were improperly made, contaminated, adulterated, or misbranded. For example, Walgreens knew or should have known that Manufacturer Defendants utilized different manufacturing and quality practices or controls than those used by the brand-reference drug manufacturer, on account of the public availability of the regulatory submissions on file with the FDA, the information available to Walgreens upon request to each Defendant Manufacturer pursuant to their contracts, the information available to Walgreens upon request to manufacturers of Diovan or other valsartan, and the price differential between Manufacturer Defendants' VCDs and other properly made, non-contaminated, non-adulterated, or non-misbranded valsartan.

576.    But for Walgreens' wrongful actions or inactions, at a minimum, at least some of Plaintiffs Bruner, Duffy, Erwin, Powell, Roberts, Shetty, Fatigato, and other consumers' purchases of valsartan would not have been of improperly made, adulterated, or misbranded VCDs. Walgreens' wrongful actions or inactions were a substantial factor in Plaintiffs Bruner, Duffy, Erwin, Powell, Roberts, Shetty, Fatigato, and other consumers' purchases of improperly made, adulterated, and misbranded VCD.

---

[192] https://drugstorenews.com/pharmacy/walgreens-alliance-boots-announce-blockbuster-partnership-amerisourcebergen (last accessed January 26, 2021).

**Formatted:** Font: 8 pt

### 6.   Rite-Aid

577.   At all times relevant, Rite-Aid has represented and warranted that it sells drugs manufactured in accordance with quality standards.   For example, and consistent with representations throughout the relevant time period, Ride-Aid states that its mission is to "improve the health and wellness of our communities through engaging in experiences that provide our customers with the best products, services and advice to meet their unique needs." [193]

578.   To further their goal of providing their customers with the "best" products, on February 18, 2014, Rite-Aid entered into a five-year agreement with Defendant McKesson to expand generic distribution. [194]

579.   As part of the agreement, McKesson assumed responsibility for the sourcing and distribution of generic pharmaceuticals for Rite-Aid as part of McKesson's One Stop proprietary generics program. [195]

580.   McKesson claimed that because of the strength of its "global sourcing and supply chain capabilities," it would be able to deliver "the right products at the right time" to customers of Rite-Aid. [196]

581.   Rite-Aid  failed to ensure that the VCDs it purchased from Manufacturer Defendants were properly made in a cGMP-compliant manner, non-contaminated, unadulterated, and not misbranded.

582.   Ordinary diligence by Rite-Aid would have revealed that the VCDs it purchased from Manufacturer Defendants were improperly made, contaminated, adulterated, or misbranded.

---

[193] https://www.riteaid.com/about-us/mission-statement (last accessed January 24, 2021).
[194] https://drugstorenews.com/pharmacy/mckesson-rite-aid-re-generic-distribution-deal-new-five-year-agreement (last accessed January 24, 2021).
[195] https://drugstorenews.com/pharmacy/mckesson-rite-aid-re-generic-distribution-deal-new-five-year-agreement (last accessed January 26, 2021).
[196] https://drugstorenews.com/pharmacy/mckesson-rite-aid-re-generic-distribution-deal-new-five-year-agreement (last accessed January 26, 2021).

{Cases; 00033778.DOCX}
-165-

**Formatted:** Font: 8 pt

For example, Rite-Aid knew or should have known that Manufacturer Defendants utilized different manufacturing and quality practices or controls than those used by the brand-reference drug manufacturer, on account of the public availability of the regulatory submissions on file with the FDA, the information available to Rite-Aid upon request to each Defendant Manufacturer pursuant to their contracts, the information available to Rite-Aid upon request to manufacturers of Diovan or other valsartan, and the price differential between Manufacturer Defendants' VCDs and other properly made, non-contaminated, non-adulterated, and non-misbranded valsartan.

583.    But for Rite-Aid's wrongful actions or inactions, at a minimum, at least some of Plaintiff Borkowski, Plaintiff Kaplan, Nelson, Edwards, and other consumers' purchases of valsartan would not have been of improperly made, adulterated, or misbranded VCDs.  Rite-Aid's wrongful actions or inactions were a substantial factor in Plaintiffs Borkowski, Kaplan, Nelson, Edwards, and other consumers' purchases of improperly made, adulterated, or misbranded VCD.

### 7.  *Walmart*

584.    At all times relevant, Walmart has represented and warranted that it sells drugs manufactured in accordance with quality standards.    For example, and consistent with representations throughout the relevant time period, Walmart Pharmacy requires all suppliers that provide prescription pharmaceutical products to its Pharmacy Distribution Centers, either directly or indirectly, to abide by its Responsible Sourcing Standards for Suppliers. [197]

585.    This includes requiring all suppliers to provide "transparency" about the facilities used to produce any materials sold in Walmart stores. [198]

---

[197] https://cdn.corporate.walmart.com/cc/a8/5def88ed41bd82ece9d82124c4ce/final-02212017-prescription-product-supplier-requirements.pdf (last accessed January 26, 2021).
[198] https://one.walmart.com/content/dam/responsiblesourcing/guidancedocuments/disclosure_policy_and_guidance-/Resource_DisclosurePolicyGuidance_ENG.pdf (last accessed January 26, 2021).

{Cases; 00033778.DOCX}

Formatted: Font: 8 pt

586.     Walmart claims that the transparency "allows Walmart to assess supply chain risk, monitor for compliance…and deploy resources in a risk-based manner."[199]

587.     In order to ship any pharmaceutical product into any of Walmart's Pharmacy Distribution Centers, Walmart claims that the supplier must meet or exceed all applicable laws and requirements, as well as adhere to any additional requirements stated in the agreement.[200]

588.     Walmart also claims that "[f]acility disclosure is essential to achieving true supply chain transparency." To this end, Walmart requires that each facility that engages in the manufacture, preparation, propagation, compounding, processing, packaging, labeling, storage, and distribution of sourced product must be disclosed to Walmart's "Health & Wellness Product Safety" department. [201]

589.     As part of this commitment, prior to sourcing materials from the Manufacturer Defendants, Walmart often required that pharmaceutical companies provide to it certificates of conformance for each product it purchased, information regarding CAPAs submitted to the FDA, inspection documents related to regulatory inspections, and audits conducted by third-party companies which contracted with Walmart.

590.     Walmart also requires any wholesalers, such as Defendants McKesson, Cardinal Health or AmerisourceBergen, to ensure the "integrity, legitimacy, and authenticity of prescription drug and device purchase orders and deliveries." [202]

---

[199] https://one.walmart.com/content/dam/responsiblesourcing/guidancedocuments/disclosure_policy_and_guidance-/Resource_DisclosurePolicyGuidance_ENG.pdf (last accessed January 26, 2021).
[200] https://cdn.corporate.walmart.com/cc/a8/5def88ed41bd82ece9d82124c4ce/final-02212017-prescription-product-supplier-requirements.pdf (last accessed January 26, 2021).
[201] https://cdn.corporate.walmart.com/cc/a8/5def88ed41bd82ece9d82124c4ce/final-02212017-prescription-product-supplier-requirements.pdf (last accessed January 26, 2021).
[202] https://cdn.corporate.walmart.com/cc/a8/5def88ed41bd82ece9d82124c4ce/final-02212017-prescription-product-supplier-requirements.pdf (last accessed January 26, 2021).

{Cases; 00033778.DOCX}

**Formatted:** Font: 8 pt

591.    Walmart partnered with Defendant McKesson to form ClarusOne, which is described as a partnership for "strategic pharmaceutical sourcing services" which builds on the "25-year history of the two companies working together."[203]

592.    ClarusOne states that it "ensures both companies have access to the right generic pharmaceuticals to meet customer demand at market competitive costs." [204]

593.    Multiple Manufacturer Defendants, including Defendant ZHP and Defendant Torrent, made presentations to ClarusOne in an attempt to secure their business, and made representations regarding the quality of their facilities and their track record with regulatory inspections.

594.    However, despite what they claimed, Walmart failed to ensure that the VCDs it purchased from Manufacturer Defendants were properly made in a cGMP-compliant manner, non-contaminated, unadulterated, and not misbranded.

595.    Ordinary diligence by Walmart would have revealed that the VCDs it purchased from Manufacturer Defendants were improperly made, contaminated, adulterated, or misbranded. For example, Walmart knew or should have known that Manufacturer Defendants utilized different manufacturing and quality practices or controls than those used by the brand-reference drug manufacturer, on account of the public availability of the regulatory submissions on file with the FDA, the information available to Walmart upon request to each Defendant Manufacturer pursuant to their contracts, the information available to Walmart upon request to manufacturers of Diovan or other valsartan, and the price differential between Manufacturer Defendants' VCDs and other properly made, non-contaminated, non-adulterated, or non-misbranded valsartan.

---

[203] https://www.clarusonesourcing.com/ (last accessed February 5, 2021).
[204] https://www.clarusonesourcing.com/ (last accessed February 5, 2021).

**Formatted:** Font: 8 pt

596.   But for Walmart's wrongful actions or inactions, at a minimum, at least some of Plaintiffs Burnett, Lee, McGilvery, Neal, Roberts, Wineinger and other consumers purchases of valsartan would not have been of improperly made, contaminated, adulterated, or misbranded VCDs.  Walmart's wrongful actions or inactions were a substantial factor in Plaintiffs Burnett, Lee, McGilvery, Plaintiff Neal, Roberts, Wineinger, and other consumers' purchases of improperly made, adulterated, or misbranded VCDs.

### P.T.    New Revelations Continue to Unfold About Other Manufacturing Plants

414.597.    The recall of Defendants' VCDs is only the tip of the iceberg.  Just two weeks after the FDA's initial recall announcement, the FDA issued another announcement expanding the recall to other VCDs manufactured at another plant in India, and by other non-parties. *See supra* at Part II.N. On August 20, 2018 the FDA announced that it was going to test all VCDs for NDMA.[205]  Because of Defendants' and non-parties' ongoing fraud and deception, the full scope of Defendants' and non-parties' unlawful conduct is not yet known. Indeed, grossly inadequate manufacturing processes have been observed in Aurobindo's facility as recently as one month ago (May, 2019), nearly a year after the recall of the VCDs. The same can be said for Defendant Mylan, who received a warning letter, the FDA's harshest rebuke, regarding the facility that manufactured Valsartan API, placing the facility in Official Action Indicated "OAI" status.

### Q.U.    Fraudulent Concealment and Tolling

415.598.    Plaintiffs' and Class Members' causes of action accrued, at the earliest, on the date the FDA announced that many of Defendants' valsartan VCDs. Alternatively, the statute of limitation prescriptive period is equitably

---

[205] FDA Statement, STATEMENT FROM FDA COMMISSIONER, *at* http://freepdfhosting.com/1c7e5ed26e.pdf  (last accessed June 5, 2019January 26, 2021).

Formatted: Font: 8 pt

tolled on account of fraudulent concealment. Defendants each affirmatively concealed from Plaintiffs and other Class Members their unlawful conduct. Each Defendant affirmatively strove to avoid disclosing their knowledge of their and other Defendants' cGMP violations with respect to their VCDs, and of the fact that their VCDs were adulterated and/or misbranded and contaminated with nitrosamines, and were not the ~~same as~~equivalent of their RLDs.

~~417.~~600.    For instance, no Defendant revealed to the public that their VCDs contained nitrosamines or was otherwise adulterated, misbranded, and/or unapproved, or non-therapeutically equivalent to their RLDs until the FDA's recall announcement in July 2018.  The inspection report which preceded the recall announcement was heavily redacted (including the names of the drugs affected by ZHP's cGMP violations), and prior inspection reports or warnings were not fully available to the public, if at all.

~~418.~~601.    To the contrary, each Defendant continued to represent and warrant that their generic VCDs were the same as and therapeutically interchangeable with their RLDs.

~~419.~~602.    For instance, ~~Huahai US~~Solco publicly announced on its website that, contrary to the FDA's pronouncements, that no impurity was discovered until June 2018.[206]

~~420.~~603.    Because of this, Plaintiffs and other Class Members did not discover, nor could they have discovered through reasonable and ordinarily diligence, each Defendant's deceptive, fraudulent, and unlawful conduct alleged herein. Defendants' false and misleading explanations, or obfuscations, lulled Plaintiffs and Class Members into believing that the prices paid for their VCDs were appropriate for what they believed to be quality, non-contaminated, non-adulterated or misbranded drugs despite their exercise of reasonable and ordinary diligence.

~~421.~~604.    As a result of each Defendant's affirmative and other acts of concealment,

---

[206] ~~HUAHAI US, PRESS RELEASE – UPDATE ON VALSARTAN API – A STATEMENT FROM THE COMPANY, *at* https://www.huahaius.com/media.html (last accessed June 5, 2019).~~ https://www.solcohealthcare.com/press-release-update-on-valsartan-api-a-statement-from-the-company (last accessed April 9, 2021).

~~{Cases: 00033778.DOCX}~~

any applicable statute of limitations affecting the rights of Plaintiffs and other Class Members has
been tolled.  Plaintiffs and/or other Class Members exercised reasonable diligence by among other
things promptly investigating and bringing the allegations contained herein.  Despite these or other
efforts, Plaintiffs were unable to discover, and could not have discovered, the unlawful conduct
alleged herein at the time it occurred or at an earlier time so as to enable this complaint to be filed
sooner.

### V.    CLASS ACTION ALLEGATIONS

422.605.    Plaintiffs bring this action both individually and as a class action pursuant
to Fed. R. Civ. P. 23(a), 23(b)(2) and 23(b)(3) against Defendants on their own behalf and on
behalf of the Nationwide Class defined below:

> All individuals and entities in the United States and its territories
> and possessions who, since at least January 1, 2012 to the present,
> paid any amount of money for a valsartan-containing drug (intended
> for personal or household use) that was manufactured, distributed,
> or sold by any Defendant.

423.606.    The Nationwide Class has two sub-classes:

> All consumers in the United States and its territories and possessions
> who, since at least January 1, 2012 to the present, paid any amount
> of money for a valsartan-containing drug (intended for personal or
> household use) that was manufactured, distributed, or sold by any
> Defendant.

> All TPPs in the United States and its territories and possessions that,
> since at least January 1, 2012 to the present, paid any amount of
> money for a valsartan-containing drug (intended for personal or
> household use) that was manufactured, distributed, or sold by any
> Active Pharmaceutical Ingredient, Finished Dose, Wholesaler, or
> Repackager/Relabeler, or Retail Pharmacy Defendant.

607.    Plaintiffs allege additional sub-classes for all individuals and TPPs in each State,
territory, or possession – or combination(s) of States, territories, or possessions to the extent class
members from these jurisdictions can be grouped together for purposes of class treatment –given

**Formatted:** Font: 8 pt

that Rule 23 and choice of law principles permit certification of subgroups of states and provide that relatively minor differences in state law that can be overcome by grouping  similar laws together. [207]

424.608.    These additional sub-classes include sub-classes of all individuals and TPPs who, since at least January 1, 2012 to the present, paid any amount of money out of pocket for a valsartan-containing drug (intended for personal or household use) that was manufactured, distributed, or sold by any Defendant (in the case of consumers) or by any Active Pharmaceutical Ingredient, Finished Dose, Wholesaler or Repackager/Relabeler Defendant (in the case of TPPs). These include but are not limited to the following:

  a.  Plaintiffs Borkowski, Cacaccio, Duffy, and Nelson seek to represent a New York sub-class and/or subclass(es) of states with similar applicable laws to New York.

  b.  Plaintiff Bruner seeks to represent a New Mexico sub-class and/or sub-class(es) of states with similar applicable laws to New Mexico.

  c.  PlaintiffPlaintiffs Burnett seeksand Dudley seek to represent a North Carolina sub-class and/or sub-class(es) of states with similar applicable laws to North Carolina.

  d.  Plaintiff Byrd seeks to represent a South Carolina sub-class and/or sub-class(es) of states with similar applicable laws to South Carolina.

  e.d. Plaintiff Cleaver seeksPlaintiffs Glab, Lawson, Childs, Sims and Shetty seek to represent a New Jersey sub-class and/or sub-class(es) of states with similar applicable laws to New Jersey.

  f.e. Plaintiffs Erwin, Means, Cisneros, and Lee seek to represent a Texas sub-class

---

[207] *See also, e.g., Phillips Petro. Co. v. Shutts,* 472 U.S. 797, 816 (1985) ("[t]here can be no injury in applying Kansas law if it is not in conflict with that of any other jurisdiction connected to this suit").

**Formatted:** Font: 8 pt

and/or sub-class(es) of states with similar applicable laws to Texas.

g.f. Plaintiffs Gildner, Wolfe, and Wineinger seek to represent an Indiana sub-class and/or sub-class(es) of states with similar applicable laws to Indiana.

h.g. Plaintiff Plaintiffs Semmel seeks to represent a Pennsylvania sub-class and/or sub-class(es) of states with similar applicable laws to Pennsylvania.

i.h. Plaintiff Hamel seeksPlaintiffs Meader, Hays, Johnston, and Andre seek to represent a California sub-class and/or sub-class(es) of states with similar applicable laws to California.

j.i. Plaintiff Kaplan seeks to represent an Ohio sub-class and/or sub-class(es) of states with similar applicable laws to Ohio.

k.j. Plaintiff Longwell seeks to represent a Massachusetts sub-class and/or sub-class(es) of states with similar applicable laws to Massachusetts.

l.k. Plaintiff McGilvery seeks to represent a Mississippi sub-class and/or sub-class(es) of states with similar applicable laws to Mississippi.

m.l. Plaintiff Plaintiffs Molinaro seeksand Feijoo (on behalf of Elenora Deutenberg) seek to represent a Florida sub-class and/or sub-class(es) of states with similar applicable laws to Florida.

n.m. Plaintiffs Mullins, McLean and Roberts seek to represent a Virginia sub-class and/or sub-class(es) of states with similar applicable laws to Virginia.

o.n. Plaintiff Plaintiffs Bell and Neal seeksseek to represent a Louisiana sub-class and/or sub-class(es) of states with similar applicable laws to Louisiana.

p.o. Plaintiff O'NeillKessinger seeks to represent a Kansas sub-class and/or sub-class(es) of states with similar applicable laws to Kansas.

q.p. Plaintiff Plaintiffs Powell seeksand Edwards seek to represent a Georgia sub-class

Formatted: Font: 8 pt

and/or sub-class(es) of states with similar applicable laws to Georgia.

r.q.    PlaintiffPlaintiffs Stimma seeksand O'Brien seek to represent a Connecticut sub-class and/or sub-class(es) of states with similar applicable laws to Connecticut.

r.    Plaintiffs Lamy and Kelly seek to represent an Alabama sub-class and/or sub-class(es) of states with similar applicable laws to Alabama.

s.    Plaintiff Crocker seeks to represent a Maine sub-class and/or sub-class(es) of states with similar applicable laws to Maine.

t.    Plaintiff Johnson seeks to represent a Minnesota sub-class and/or sub-class(es) of states with similar applicable laws to Minnesota.

u.    Plaintiffs Anderson and Fatigato seek to represent a Illinois sub-class and/or sub-class(es) of states with similar applicable laws to Illinois.

s.v.    Plaintiffs reserve the right to amend this Complaint to add additional class representatives as appropriate or necessary for additional sub-classes for one or more states.

425.609.    Collectively, the foregoing Nationwide Class and its sub-classes are referred to as the "Class."

426.610.    Excluded from the Class are: (a) any judge or magistrate presiding over this action, and members of their families; (b) Defendants and affiliated entities, and their employees, officers, directors, and agents; (c) Defendants' legal representatives, assigns and successors; and (d) all persons who properly execute and file a timely request for exclusion from any Court-approved class.

611.    As alleged throughout this Complaint, the Defendants engaged in uniform and standardized conduct towards the Classes. The Defendants did not differentiate, in their degree of care or candor, their actions or inactions or in the content of their statements or omissions, among

{Cases: 00033778.DOCX}

Formatted: Font: 8 pt

individual Class Members.  The objective facts on these subjects are the same for all Class Members.  Within each Claim for Relief asserted by the respective Classes, the same legal standards govern.  Additionally, many states share the same legal standards and elements of proof, facilitating the certification of multistate classes for some or all of the claims.

612.    No actual conflicts of laws exist between the laws of Plaintiffs' home states, and the laws of other class members' states.  Or alternatively, any potential conflict is a false one.  The lack of conflict, or the false conflict, between the laws of Plaintiffs' home states and the laws of other class members' states means it is appropriate to certify the Nationwide Class under the laws of the fifty states, District of Columbia, and District of Puerto Rico.

427.613.    Plaintiffs reserve the right to narrow or expand the foregoing class definition, or to create or modify subclasses as the Court deems necessary.

428.614.    Plaintiffs meet the prerequisites of Rule 23(a) to bring this action on behalf of the Class.

429.615.    **Numerosity**: While the exact number of Class Members cannot be determined without discovery, they are ~~believed to consist of~~ potentially millions of valsartan consumers nationwide and potentially thousands of TPPs nationwide. The Class Members are therefore so numerous that joinder of all members is impracticable.

430.616.    **Commonality**:  Common questions of law and fact exist as to all Class Members, including but not limited to:

a.  Whether each Defendant made express or implied warranties of "sameness" to Plaintiffs and Class Members regarding their generic VCDs;

b.  Whether each Defendant's VCDs were in fact the same as their RLDs consistent with such express or implied warranties;

**Formatted:** Font: 8 pt

c.  Whether each Defendant's VCDs were contaminated with NDMA, NDEA, or similar contaminants;

d.  Whether each Defendant's VCDs containing NMDA, NDEA, or similar contaminants were adulterated and/or misbranded;

e.  Whether Defendants violated cGMPs regarding the manufacture of their VCDs;

f.  Whether each Defendant falsely claimed that its VCDs were the same as their RLDs and thus therapeutically interchangeable;

g.  Whether each Defendant affirmatively misrepresented or omitted facts regarding its compliance with cGMPs;

h.  Whether Plaintiffs and other Class Members have been injured as a result of each Defendant's unlawful conduct, and the amount of their damages;

i.  Whether a common damages model can calculate damages on a class-wide basis;

j.  When Plaintiffs' and Class Members' causes of action accrued; and

k.  Whether Defendants fraudulently concealed Plaintiffs' and Class Members' causes of action.

~~431.~~ 617.     **Typicality**:  Plaintiffs' claims are typical of Class Members' claims. Plaintiffs and Class Members all suffered the same type of economic harm.  Plaintiffs have substantially the same interest in this matter as all other Class Members, and their claims arise out of the same set of facts and conduct as the claims of all other Class Members.

~~432.~~ 618.     **Adequacy of Representation**:  Plaintiffs are committed to pursuing this action and have retained competent counsel experienced in pharmaceutical litigation, consumer fraud litigation, class actions, and federal court litigation. Accordingly, Plaintiffs and their counsel will fairly and adequately protect the interests of Class Members. Plaintiffs' claims are coincident with, and not antagonistic to, those of the other Class Members they seek to represent. Plaintiffs

{Cases; 00033778.DOCX}

-176-

Formatted: Font: 8 pt

have no disabling conflicts with Class Members and will fairly and adequately represent the interests of Class Members.

433.619.    The elements of Rule 23(b)(2) are met. Defendants have acted on grounds that apply generally to Class Members so that preliminary and/or final injunctive relief and corresponding declaratory relief is appropriate respecting the Class as a whole.

434.620.    The requirements of Rule 23(b)(3) are met. The common questions of law and fact enumerated above predominate over the questions affecting only individual Class Members, and a class action is the superior method for fair and efficient adjudication of the controversy.  Although many other Class Members have claims against Defendants, the likelihood that individual Class Members will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation. Serial adjudication in numerous venues would not be efficient, timely or proper. Judicial resources would be unnecessarily depleted by resolution of individual claims. Joinder on an individual basis of thousands of claimants in one suit would be impractical or impossible. In addition, individualized rulings and judgments could result in inconsistent relief for similarly situated Plaintiffs. Plaintiffs' counsel, highly experienced in pharmaceutical litigation, consumer fraud litigation, class actions, and federal court litigation, foresee little difficulty in the management of this case as a class action.

### FIRST CAUSE OF ACTION
### BREACH OF EXPRESS WARRANTIES
### (INDIVIDUALLY AND ON BEHALF OF CONSUMER CLASS MEMBERS
### AGAINST ALL DEFENDANTS)

435.621.    Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

436.622.    This cause of action is alleged on behalf of consumer Class Members against all Defendants.

Formatted: Font: 8 pt

437.623.    Plaintiffs, and each member of the Class, formed a contract with Defendants at the time Plaintiffs and the other Class members Members purchased the VCDs. The terms of the contract include the promises and affirmations of fact made by Defendants on the VCDs' packaging and through marketing and advertising, including that the product would be bioequivalent to the name-brand medication, and would be of same "quality" and have the same safety and efficacy profile as the RLD. This labeling, marketing, and advertising constitute express warranties and became part of the basis of the bargain, and are part of the standardized contract between Plaintiffs and the members of the Class and Defendants.

438.624.    Each Defendant expressly warranted that its VCDs were fit for its ordinary use, i.e., as an FDA-approved generic pharmaceutical that is therapeutically equivalent to and interchangeable with their RLDs. In other words, Defendants expressly warranted that their products were the same as their RLDs.

439.625.    Each Defendant sold VCDs that they expressly warranted were compliant with compendial standards, USP requirements, Orange Book requirements, compliant with cGMP and not contaminated, adulterated or misbranded.

440.626.    Each Defendant's VCDs did not conform to each Defendant's express representations and warranties because the product was not manufactured in compliance with cGMP and was adulterated and misbranded.

627.    Each Defendant's VCDs were goods that were meant to be consumed.

441.628.    At all times relevant all fifty States and the District of Columbia and Puerto Rico have codified and adopted the provisions of the Uniform Commercial Code governing the implied warranty of merchantability and fitness for ordinary purpose: Ala.: Ala. Code § 7-2-313; Alaska Stat. § 45.02.313; Ariz. Rev. Stat. Ann. § 47-2313; Ark. Code. Ann. § 4-2-313; Cal. Com. Code § 2313;  Colo. Rev. Stat. § 4-2-313;  Conn. Gen. Stat. Ann. § 42a-2-313;  6 Del. Code. § 2-

{Cases: 00033778.DOCX}

313;  D.C. Code. § 28:2-313;  Fla. Stat. Ann. § 672.313;  Ga. Code. Ann. § 11-2-313;  Haw. Rev. Stat. § 490:2-313;  Idaho Code § 28-2-313;  810 Ill. Comp. Stat. Ann. 5/2-313;  Ind. Code Ann. § 26-1-2-313; Kan. Stat. Ann. § 84-2-313; Ky. Rev. Stat. Ann. § 355.2-313;  11 Me. Rev. Stat. Ann. § 2-313;  Md. Code. Ann. § 2-313;  Mass. Gen. Law Ch. 106 § 2-313;  Mich. Comp. Laws Ann. § 440.2313;  Minn. Stat. Ann. § 336.2-313;  Miss. Code Ann. § 75-2-313;  Mo. Rev. Stat. § 400.2-313;  Mont. Code Ann. § 30-2-313;  Nev. Rev. Stat. U.C.C. § 104.2313;  N.H. Rev. Ann. § 382-A:2-313;  N.J. Stat. Ann. § 12A:2-313;  N.M. Stat. Ann. § 55-2-313;  N.Y. U.C.C. Law § 2-313;  N.C. Gen. Stat. Ann. § 25-2-313;  N.D. Stat. § 41-02-313; Ohio Rev. Code Ann. § 1302.26;  Okla. Stat. tit. 12A § 2-313;  Or. Rev. Stat. § 72.3130; 13 Pa. C.S. § 2313; P.R. Laws. Ann. Tit. 31, § 3841*, et seq.*; R.I. Gen. Laws § 6A-2-313;  S.C. Code Ann. § 36-2-313;  S.D. Stat. § 57A-2-313;  Tenn. Code Ann. § 47-2-313;  Tex. Bus. & Com. Code Ann. § 2-313;  Utah Code Ann. § 70A-2-313;  Va. Code § 8.2-313;  Vt. Stat. Ann. 9A § 2-313;  W. Va. Code § 46-2-313;  Wash. Rev. Code § 62A 2-313;  Wis. Stat. Ann. § 402.313 and Wyo. Stat. § 34.1-2-313.

442.629.    At the time that each Defendant marketed and sold its VCDs, they recognized the purposes for which the products would be used, and expressly warranted the products were the same as their RLDs, and cGMP compliant and not adulterated or misbranded. These affirmative representations became part of the basis of the bargain in every purchase by Plaintiffs and other Class Members including but not limited to express representations made in referring to their VCDs as valsartan, valsartan HCT, amlodipine-valsartan, and and/or amlodipine-valsartan HCT.

630.    Plaintiffs and each member of the Class are natural persons who are reasonably expected to use, consume, or be affected by the adulterated and/or misbranded VCDs manufactured and sold by Defendants.

443.631.    Each Defendant breached its express warranties with respect to its VCDs as

they were not of merchantable quality, were not fit for their ordinary purpose, and did not comply
with cGMP and was adulterated and misbranded.

444.632.    Plaintiffs and each member of the Class would not have purchased the
VCDs had they known these drugs were not the same as the RLD, did not contain the same
ingredients, did not have the same safety and efficacy profile of the RLD, and contained NDMA
and NDEA.

445.633.    As a direct and proximate result of each Defendant's breach of
impliedexpress warranty, Plaintiffs and other Class Members have been injured and suffered
damages in the amount of the purchase price of their medications, the purchase price of any
replacement medications, and any consequential damages resulting from the purchases, in that the
VCDs they purchased were so inherently flawed, unfit, or unmerchantable as to have no market
value.

### SECOND CAUSE OF ACTION
### BREACH OF EXPRESS WARRANTIES
### (INDIVIDUALLY AND ON BEHALF OF TPP CLASS MEMBERS AGAINST
### ALL DEFENDANTS EXCEPT PHARMACY DEFENDANTS)

446.634.    Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set
forth herein, except as to Retail Pharmacy Defendants.

447.635.    This cause of action is alleged on behalf of TPP Class Members against all
Defendants except Retail Pharmacy Defendants ("TPP Claim Defendants"), and to the extent
applicable law permits non-consumers to assert this cause of action.

448.636.    Each TPP Claim Defendant expressly warranted that its VCDs were fit for
its ordinary use, i.e., as an FDA-approved generic pharmaceutical that is therapeutically to and
interchangeable with their RLDs. In other words, TPP Claim Defendants expressly warranted that
their products were the same as their RLDs.

**Formatted:** Font: 8 pt

449.637.    Each TPP Claim Defendant sold VCDs that they expressly warranted were compliant with cGMP and/or not adulterated and/or misbranded.

450.638.    Each TPP Claim Defendant's VCDs did not conform to each TPP Claim Defendant's express representations and warranties because the product was not manufactured in compliance with cGMP and was adulterated and misbranded.

451.639.    At all times relevant all fifty States and the District of Columbia and Puerto Rico have codified and adopted the provisions of the Uniform Commercial Code governing the implied warranty of merchantability and fitness for ordinary purpose: Ala.: Ala. Code § 7-2-313; Alaska Stat. § 45.02.313; Ariz. Rev. Stat. Ann. § 47-2313; Ark. Code. Ann. § 4-2-313; Cal. Com. Code § 2313; Colo. Rev. Stat. § 4-2-313; Conn. Gen. Stat. Ann. § 42a-2-313; 6 Del. Code. § 2-313; D.C. Code. § 28:2-313; Fla. Stat. Ann. § 672.313; Ga. Code. Ann. § 11-2-313; Haw. Rev. Stat. § 490:2-313; Idaho Code § 28-2-313; 810 Ill. Comp. Stat. Ann. 5/2-313; Ind. Code Ann. § 26-1-2-313; Kan. Stat. Ann. § 84-2-313; Ky. Rev. Stat. Ann. § 355.2-313; 11 Me. Rev. Stat. Ann. § 2-313; Md. Code. Ann. § 2-313; Mass. Gen. Law Ch. 106 § 2-313; Mich. Comp. Laws Ann. § 440.2313; Minn. Stat. Ann. § 336.2-313; Miss. Code Ann. § 75-2-313; Mo. Rev. Stat. § 400.2-313; Mont. Code Ann. § 30-2-313; Nev. Rev. Stat. U.C.C. § 104.2313; N.H. Rev. Ann. § 382-A:2-313; N.J. Stat. Ann. § 12A:2-313; N.M. Stat. Ann. § 55-2-313; N.Y. U.C.C. Law § 2-313; N.C. Gen. Stat. Ann. § 25-2-313; N.D. Stat. § 41-02-313; Ohio Rev. Code Ann. § 1302.26; Okla. Stat. tit. 12A § 2-313; Or. Rev. Stat. § 72.3130; 13 Pa. C.S. § 2313; P.R. Laws. Ann. Tit. 31, § 3841, *et seq.*; R.I. Gen. Laws § 6A-2-313; S.C. Code Ann. § 36-2-313; S.D. Stat. § 57A-2-313; Tenn. Code Ann. § 47-2-313; Tex. Bus. & Com. Code Ann. § 2-313; Utah Code Ann. § 70A-2-313; Va. Code § 8.2-313; Vt. Stat. Ann. 9A § 2-313; W. Va. Code § 46-2-313; Wash. Rev. Code § 62A 2-313; Wis. Stat. Ann. § 402.313 and Wyo. Stat. § 34.1-2-313.

452.640.    At the time that each TPP Claim Defendant marketed and sold its VCDs,

they recognized the purposes for which the products would be used, and expressly warranted the products were the same as their RLDs, and cGMP compliant and not adulterated or misbranded. These affirmative representations became part of the basis of the bargain in every purchase by Plaintiffs and other Class Members, including but not limited to express representations made in referring to their VCDs as valsartan, valsartan HCT, amlodipine-valsartan, and and/or amlodipine-valsartan HCT.

453.641.    Each TPP Claim Defendant breached its express warranties with respect to its VCDs as they were not of merchantable quality, were not fit for its ordinary purpose, and did not comply with cGMP and were adulterated and misbranded.

454.642.    As a direct and proximate result of each TPP Claim Defendant's breach of implied express warranty, Plaintiffs and other Class Members have been injured and suffered damages, in that TPP Claim Defendants' VCDs they purchased were so inherently flawed, unfit, or unmerchantable as to have significantly diminished or no intrinsic market value.

**THIRD CAUSE OF ACTION**
**BREACH OF IMPLIED WARRANTIES OF MERCHANTABILITY**
**AND FITNESS**
**(INDIVIDUALLY AND ON BEHALF OF CONSUMER CLASS MEMBERS**
**AGAINST ALL DEFENDANTS)**

455.643.    Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

456.644.    This cause of action is alleged on behalf of consumer Class Members against all Defendants.

457.645.    At all times relevant all fifty States and the District of Columbia and Puerto Rico have codified and adopted the provisions of the Uniform Commercial Code governing the implied warranty of merchantability and fitness for ordinary purpose:  Ala. Code § 7-2-314; Alaska Stat. § 45.02.314; Ariz. Rev. Stat. Ann. § 47-2314;  Ark. Code. Ann. § 4-2-314;  Cal. Com. Code

{Cases: 00033778.DOCX}

**Formatted:** Font: 8 pt

§ 2314;  Colo. Rev. Stat. § 4-2-314;  Conn. Gen. Stat. Ann. § 42a-2-314;  6 Del. Code. § 2-314;

D.C. Code. § 28:2-314;  Fla. Stat. Ann. § 672.314;  Ga. Code. Ann. § 11-2-314;  Haw. Rev. Stat.

§ 490:2-314;  Idaho Code § 28-2-314;  810 Ill. Comp. Stat. Ann. 5/2-314;  Kan. Stat. Ann. § 84-

2-314;  Ky. Rev. Stat. Ann. § 355.2-314;  La. Civ. Code Ann. Art. § 2520;  11 Me. Rev. Stat. Ann.

§ 2-314;  Md. Code. Ann. § 2-314;  Mass. Gen. Law Ch. 106 § 2-314;  Mich. Comp. Laws Ann. §

440.2314;  Minn. Stat. Ann. § 336.2-314;  Miss. Code Ann. § 75-2-314;  Mo. Rev. Stat. § 400.2-

314;  Mont. Code Ann. § 30-2-314;  Nev. Rev. Stat. U.C.C. § 104.2314;  N.H. Rev. Ann. § 382-

A:2-314;  N.J. Stat. Ann. § 12A:2-314;  N.M. Stat. Ann. § 55-2-314;  N.Y. U.C.C. Law § 2-314;

N.C. Gen. Stat. Ann. § 25-2-314;  N.D. Stat. § 41-02-314;  Ohio Rev. Code Ann. § 1302.27;  Okla.

Stat. tit. 12A § 2-314;  Or. Rev. Stat. § 72.3140;  13 Pa. C.S. § 2314;  P.R. Laws. Ann. Tit. 31,

§ 3841, *et seq*.; R.I. Gen. Laws § 6A-2-314;  S.C. Code Ann. § 36-2-314;  S.D. Stat. § 57A-2-314;

Tenn. Code Ann. § 47-2-314;  Tex. Bus. & Com. Code Ann. § 2-314;  Utah Code Ann. § 70A-2-

314;  Va. Code § 8.2-314;  Vt. Stat. Ann. 9A § 2-314;  W. Va. Code § 46-2-314;  Wash. Rev. Code

§ 62A 2-314;  Wis. Stat. Ann. § 402.314 and Wyo. Stat. § 34.1-2-314.

458. 646.    Each Defendant was a merchant within the meaning of the above statutes.

459. 647.    Each Defendant's VCDs constituted "goods" or the equivalent within the meaning of the above statutes.

648.    Each Defendant's VCDs were goods that were meant to be consumed.

649.    Manufacturer Defendants placed their VCDs in sealed packaging or other closed containers and placed them on the market.

650.    Plaintiffs and each member of the Class are natural persons who are reasonably expected to use, consume, or be affected by the adulterated and/or misbranded VCDs manufactured and sold by Defendants.

651.    Plaintiffs and each member of the Class are the intended third-party beneficiary

recipients of all contracts between the Manufacturer Defendants and the downstream Wholesaler or Retail Pharmacy Defendants.

652.    Plaintiffs and each member of the Class are the intended third-party beneficiary recipients of all contracts that included express warranties between the Wholesaler Defendants and the Retailer Defendants who sold the VCDs.

653.    Plaintiffs and each member of the Class are the persons for whose benefit any promises made in the contracts that included express warranties between Manufacturer Defendants and the downstream Wholesaler or Retail Pharmacy Defendants.

654.    For Plaintiffs and each member of the classes in Florida, Georgia, Illinois, and Vermont, because the Manufacturer has made express warranties to Plaintiffs and each member of those classes, privity exists.

460.655.    Each Defendant was obligated to provide Plaintiffs and other Class Members reasonably fit VCDs for the purpose for which the product was sold, and to conform to the standards of the trade in which Defendants are involved such that the product was of fit and merchantable quality.

461.656.    Each Defendant knew or should have known that its VCDs were being manufactured and sold for the intended purpose of human consumption as a therapeutic equivalent to their RLDs (or is strictly liable in the event of lack of actual or constructive knowledge), and impliedly warranted that their VCDs were of merchantable quality and fit for that purpose.

462.657.    Each Defendant breached its implied warranty because each Defendant's VCDs were not of merchantable quality, nor fit for the product's ordinary purpose, and did not conform to the standards generally applicable to such goods.

463.658.    Plaintiffs and other Class members Members purchased the VCDs in reliance upon Defendants' skill and judgment and the implied warranties of fitness for the purpose.

**Formatted:** Font: 8 pt

464.659.     The VCDs were not altered by Plaintiffs or Class membersMembers.

465.660.     As a direct and proximate result of each Defendant's breach of implied warranty, Plaintiffs and other Class Members have been injured and suffered damages, in that Defendants' VCDs they purchased was so inherently flawed, unfit, or unmerchantable as to have significantly diminished or no intrinsic market value.

**FOURTH CAUSE OF ACTION**
**BREACH OF IMPLIED WARRANTIES OF MERCHANTABILITY**
**AND FITNESS**
**(INDIVIDUALLY AND ON BEHALF OF TPP CLASS MEMBERS AGAINST**
**ALL DEFENDANTS EXCEPT PHARMACY DEFENDANTS)**

466.661.     Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein, except as to Retail Pharmacy Defendants.

467.662.     This cause of action is alleged on behalf of TPP Class Members against all Defendants except Retail Pharmacy Defendants ("TPP Claim Defendants"), and to the extent applicable law permits non-consumers to assert this cause of action.

468.663.     At all times relevant all fifty States and the District of Columbia and Puerto Rico have codified and adopted the provisions of the Uniform Commercial Code governing the implied warranty of merchantability and fitness for ordinary purpose: Ala. Code § 7-2-314; Alaska Stat. § 45.02.314; Ariz. Rev. Stat. Ann. § 47-2314; Ark. Code. Ann. § 4-2-314; Cal. Com. Code § 2314; Colo. Rev. Stat. § 4-2-314; Conn. Gen. Stat. Ann. § 42a-2-314; 6 Del. Code. § 2-314; D.C. Code. § 28:2-314; Fla. Stat. Ann. § 672.314; Ga. Code. Ann. § 11-2-314; Haw. Rev. Stat. § 490:2-314; Idaho Code § 28-2-314; 810 Ill. Comp. Stat. Ann. 5/2-314; Kan. Stat. Ann. § 84-2-314; Ky. Rev. Stat. Ann. § 355.2-314; La. Civ. Code Ann. Art. § 2520; 11 Me. Rev. Stat. Ann. § 2-314; Md. Code. Ann. § 2-314; Mass. Gen. Law Ch. 106 § 2-314; Mich. Comp. Laws Ann. § 440.2314; Minn. Stat. Ann. § 336.2-314; Miss. Code Ann. § 75-2-314; Mo. Rev. Stat. § 400.2-314; Mont. Code Ann. § 30-2-314; Nev. Rev. Stat. U.C.C. § 104.2314; N.H. Rev. Ann. § 382-

A:2-314;  N.J. Stat. Ann. § 12A:2-314;  N.M. Stat. Ann. § 55-2-314;  N.Y. U.C.C. Law § 2-314;

N.C. Gen. Stat. Ann. § 25-2-314;  N.D. Stat. § 41-02-314;  Ohio Rev. Code Ann. § 1302.27;  Okla.

Stat. tit. 12A § 2-314;  Or. Rev. Stat. § 72.3140;  13 Pa. C.S. § 2314;  P.R. Laws. Ann. Tit. 31,

§ 3841, *et seq.*; R.I. Gen. Laws § 6A-2-314;  S.C. Code Ann. § 36-2-314;  S.D. Stat. § 57A-2-314;

Tenn. Code Ann. § 47-2-314;  Tex. Bus. & Com. Code Ann. § 2-314;  Utah Code Ann. § 70A-2-

314;  Va. Code § 8.2-314;  Vt. Stat. Ann. 9A § 2-314;  W. Va. Code § 46-2-314;  Wash. Rev. Code

§ 62A 2-314;  Wis. Stat. Ann. § 402.314 and Wyo. Stat. § 34.1-2-314.

469.664.    Each TPP Claim Defendant was a merchant within the meaning of the above

statutes.

470.665.    Each TPP Claim Defendant's VCDs constituted "goods" or the equivalent

within the meaning of the above statutes.

666.    Plaintiffs and each member of the Class are the intended third-party beneficiary

recipients of all contracts between the Manufacturer Defendants and the downstream Wholesaler

Defendants or Retail Pharmacies.

667.    Plaintiffs and each member of the Class are the intended third-party beneficiary

recipients of all contracts that included express warranties between the Wholesaler Defendants and

the Retail Pharmacies.

668.    Plaintiffs and each member of the Class are the persons for whose benefit any

promises made in the contracts that included express warranties between Manufacturer Defendants

and the downstream Wholesaler Defendants or Retail Pharmacies.

471.669.    Each TPP Claim Defendant was obligated to provide Plaintiffs and other

Class Members reasonably fit VCDs for the purpose for which the product was sold, and to

conform to the standards of the trade in which TPP Claim Defendants are involved such that the

product was of fit and merchantable quality.

{Cases; 00033778.DOCX}
-186-

472.670.    Each TPP Claim Defendant knew or should have known that its VCDs were being manufactured and sold for the intended purpose of human consumption as a therapeutic equivalent to their RLDs (or is strictly liable in the event of lack of actual or constructive knowledge), and impliedly warranted that same was of merchantable quality and fit for that purpose.

473.671.    Each TPP Claim Defendant breached its implied warranty because each TPP Claim Defendant's VCDs were not of merchantable quality, nor fit for the product's ordinary purpose, and did not conform to the standards generally applicable to such goods.

474.672.    As a direct and proximate result of each TPP Claim Defendant's breach of implied warranty, Plaintiffs and other Class Members have been injured and suffered damages, in that TPP Claim Defendants' VCDs they purchased were so inherently flawed, unfit, or unmerchantable as to have significantly diminished or no intrinsic market value.

FIFTH CAUSE OF ACTION
MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. § 2301, *ET SEQ.*
(INDIVIDUALLY AND ON BEHALF OF CONSUMER CLASS MEMBERS
AGAINST ALL DEFENDANTS)

475.    Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

476.    This cause of action is alleged on behalf of consumer Class Members against all Defendants.

477.    Each Defendant is a "warrantor" within the meaning of the Magnuson-Moss Warranty Act.

478.    Plaintiffs and other Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act.

479.    Each Defendant expressly or impliedly warranted their VCDs as alleged in the First

**Formatted:** Font: 8 pt

and Second Causes of Action.

480.    Under 15 U.S.C. § 2310(d)(1), Plaintiffs and Other Class Members were "damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this chapter, or under a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief." 15 U.S.C. § 2310(d)(1). Plaintiffs sue pursuant to this section to recover money damages and for legal and equitable relief on behalf of itself and the Class Members.

481.    No Defendant has acted on the opportunity to cure its failure with respected to its warranted VCDs.

482.    Likewise, pursuant to 15 U.S.C. § 2310(d)(2), upon prevailing in this action, Plaintiffs are entitled to receive an award of attorneys' fees and expenses and pray for the same.

**SIXTH CAUSE OF ACTION**
**MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. § 2301, *ET SEQ.***
**(INDIVIDUALLY AND ON BEHALF OF TPP CLASS MEMBERS AGAINST ALL DEFENDANTS EXCEPT PHARMACY DEFENDANTS)**

483.    Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein, except as to Retail Pharmacy Defendants.

484.    This cause of action is alleged on behalf of TPP Class Members against all Defendants except Retail Pharmacy Defendants ("TPP Claim Defendants"), and to the extent applicable law permits non-consumers to assert this cause of action.

485.    Each TPP Claim Defendant is a "warrantor" within the meaning of the Magnuson-Moss Warranty Act.

486.    Plaintiffs and other Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act.

487.    Each TPP Claim Defendant expressly or impliedly warranted their VCDs as alleged

{Cases; 00033778.DOCX}
-188-

in the First and Second Causes of Action.

488. Under 15 U.S.C. § 2310(d)(1), Plaintiffs and Other Class Members were "damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this chapter, or under a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief." 15 U.S.C. § 2310(d)(1). Plaintiffs sue pursuant to this section to recover money damages and for legal and equitable relief on behalf of themselves and the Class Members.

489. No TPP Claim Defendant has acted on the opportunity to cure its failure with respected to its warranted VCDs.

490. Likewise, pursuant to 15 U.S.C. § 2310(d)(2), upon prevailing in this action, Plaintiffs are entitled to receive an award of attorneys' fees and expenses and pray for the same.

### ~~SEVENTH~~FIFTH CAUSE OF ACTION
### FRAUD (AFFIRMATIVE MISREPRESENTATION, OMISSION, AND CONCEALMENT)
### (INDIVIDUALLY AND ON BEHALF OF CONSUMER CLASS MEMBERS AGAINST ALL DEFENDANTS)

~~491.~~673. Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

~~492.~~674. This cause of action is alleged on behalf of consumer Class Members against all Defendants.

675. The API and Finished Dose Manufacturer Defendants knew, or should have known that the VCDs they produced were not therapeutically equivalent to their RLDs and did not comply with cGMPs and/or were adulterated, misbranded, and/or unapproved.

676. As set forth herein, Defendants knew, or should have known that the VCDs were not therapeutically equivalent to their RLDs and did not comply with cGMPs and/or were

{Cases; 00033778.DOCX}
-189-

Formatted: Font: 8 pt

contaminated, adulterated, misbranded, and/or unapproved.

493.677.    Despite this, Defendants affirmatively misrepresented material facts including, *inter alia*, that their VCDs were therapeutically equivalent to their RLDs and/or complied with cGMPs and/or were not adulterated and/or misbrandedcontaminated, adulterated and/or misbranded. These misrepresentations were present on, among other things, the patient package inserts, medication guides, instructions for use, and the transaction data produced by the Wholesaler Defendants and the API and Finished Dose Manufacturer Defendants. The Wholesaler Defendants further misrepresented material facts by lauding their safety and risk mitigation approaches on their websites, brochures, and other marketing or informational materials.

494.678.    Defendants omitted material facts including, *inter alia*, that their VCDs were not therapeutically equivalent to their RLDs and did not comply with cGMPs and/or were adulterated, misbranded, and/or unapproved.

495.679.    Defendants' actions had the effect of fraudulently inducing customers to pay in whole or in part for Defendants' VCDs – products which Defendants knew or should have known were not therapeutically equivalent to their RLDs and/or did not comply with GMPs and/or were adulterated and/or misbranded. Plaintiffs and other Class Members would not have purchased Defendants' VCDs had they known the truth. Indeed, Plaintiffs and other Class Members could not have paid for Defendants' VCDs had they known the truth because Defendants' VCDs were illegally manufactured, illegally imported, illegally distributed, and illegally sold to Plaintiffs and Class Members based on Defendants' fraudulent misrepresentations and omissions.

496.680.    Defendants knew, or reasonably should have known, that their misrepresentations were materially false or misleading, or that the omission of material facts rendered such representations false or misleading.

497.681.    Defendants also knew, or had reason to know, that their misrepresentations

**Formatted:** Font: 8 pt

and omissions would induce Class ~~members~~Members to pay for some or all of the cost of Defendants' VCDs.

~~498.~~682.    Defendants' misrepresentations and omissions were material.

~~499.~~683.    Defendants' actively concealed their misrepresentations and omissions from the Class, ~~government regulators,~~ and the public.

~~500.~~684.    To the extent applicable, Defendants intended their misrepresentations and omissions to induce Plaintiffs and other Class Members to pay for Defendants' VCDs.

~~501.~~685.    But for these misrepresentations and omissions, Plaintiffs and other Class Members would have not have paid for Defendants' VCDs.

~~502.~~686.    To the extent applicable, Plaintiffs and other Class Members were justified in relying on Defendants' misrepresentations and omissions.  The same or substantively identical misrepresentations and omissions were communicated, to each Class ~~member~~Member, including through product labeling and other statements by Defendants.  No reasonable consumer would have paid what they did for Defendants' VCDs but for Defendants' unlawful conduct.  To the extent applicable, reliance may be presumed in these circumstances.

~~503.~~687.    Plaintiffs and other Class Members were damaged by reason of Defendants' misrepresentations and omissions alleged herein.

### ~~EIGHTH~~SIXTH CAUSE OF ACTION
**FRAUD (AFFIRMATIVE MISREPRESENTATION, OMISSION, AND CONCEALMENT)**
**(INDIVIDUALLY AND ON BEHALF OF TPP CLASS MEMBERS AGAINST ALL DEFENDANTS EXCEPT PHARMACY DEFENDANTS)**

~~504.~~688.    Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein, except as to Retail Pharmacy Defendants.

~~505.~~689.    This cause of action is alleged on behalf of TPP Class Members against all

Formatted: Font: 8 pt

Defendants except Retail Pharmacy Defendants ("TPP Claim Defendants"), and to the extent applicable law permits non-consumers to assert this cause of action.

690.    The API and Finished Dose Manufacturer Defendants knew, or should have known that the VCDs they produced were not therapeutically equivalent to their RLDs and did not comply with cGMPs and/or were adulterated, misbranded, and/or unapproved.

691.    The Wholesaler Defendants knew, or should have known that the VCDs were not therapeutically equivalent to their RLDs and did not comply with cGMPs and/or were adulterated, misbranded, and/or unapproved.

506.692.    Despite this, TPP Claim Defendants affirmatively misrepresented material facts including, *inter alia*, that their VCDs were therapeutically equivalent to their RLDs and/or complied with cGMPs and/or were not adulterated and/or misbranded. . These misrepresentations were present on, among other things, the patient package inserts, medication guides, instructions for use, and the transaction data produced by the Wholesaler Defendants and the API and Finished Dose Manufacturer Defendants. The Wholesaler Defendants further misrepresented material facts by lauding their safety and risk mitigation approaches on their websites, brochures, and other marketing or informational materials.

507.693.    TPP Claim Defendants omitted material facts including, *inter alia*, that their VCDs were not therapeutically equivalent to their RLDs and did not comply with cGMPs and/or were adulterated, misbranded, and/or unapproved.

508.694.    TPP Claim Defendants' actions had the effect of fraudulently inducing customers to pay in whole or in part for TPP Claim Defendants' VCDs – product which TPP Claim Defendants knew or should have known was not therapeutically equivalent to their RLDs and did not comply with GMPs and were adulterated and misbranded. Plaintiffs and other Class Members would not have paid some or all of the amounts they paid for TPP Claim Defendants' VCDs had

Formatted: Font: 8 pt

they known the truth. Indeed, Plaintiffs and other Class Members could not have paid for TPP Claim Defendants' VCDs had they known the truth because TPP Claim Defendants' VCDs were illegally manufactured, illegally imported, illegally distributed, and illegally sold to Plaintiffs and Class Members based on TPP Claim Defendants' fraudulent misrepresentations and omissions.

509.695.    TPP Claim Defendants knew, or reasonably should have known, that their misrepresentations were materially false or misleading, or that the omission of material facts rendered such representations false or misleading.

510.696.    TPP Claim Defendants also knew, or had reason to know, that their misrepresentations and omissions would induce Class membersMembers to pay for some or all of the cost of TPP Claim Defendants' VCDs.

511.697.    TPP Claim Defendants' misrepresentations and omissions were material.

512.698.    TPP Claim Defendants actively concealed their misrepresentations and omissions from the Class, government regulators, and the public.

513.699.    To the extent applicable, TPP Claim Defendants intended their misrepresentations and omissions to induce Plaintiffs and other Class Members to pay for TPP Claim Defendants' VCDs.

514.700.    But for these misrepresentations and omissions, Plaintiffs and other Class Members would not have paid for TPP Claim Defendants' VCDs.

515.701.    To the extent applicable, Plaintiffs and other Class Members were justified in relying on TPP Claim Defendants' misrepresentations and omissions.  The same or substantively identical misrepresentations and omissions were communicated to each Class memberMember, including through product labeling and other statements by TPP Claim Defendants.  No reasonable consumer would have paid what they didselected the TPP Claim Defendants' VCDs and thus no TPP would have been required to reimburse for TPP Claim

**Formatted:** Font: 8 pt

Defendants' VCDs but for TPP Claim Defendants' unlawful conduct.  To the extent applicable, reliance may be presumed in these circumstances.

516.702.    Plaintiffs and other Class Members were damaged by reason of TPP Claim Defendants' misrepresentations and omissions alleged herein.

### NINTHSEVENTH CAUSE OF ACTION
### NEGLIGENT MISREPRESENTATION AND OMISSION
### (INDIVIDUALLY AND ON BEHALF OF CONSUMER CLASS MEMBERS AGAINST ALL DEFENDANTS)

517.703.    Plaintiffs re-allege and incorporate the preceding paragraphs 1 through 611 as if fully set forth herein.

518.704.    This cause of action is alleged on behalf of consumer Class Members against all Defendants.

519.705.    Each Defendant had or undertook a duty to accurately and truthfully represent to the quality, nature, and characteristics of its VCDs.

706.    EachEach Defendant further had the opportunity to investigate, make appropriate inquiries, and test the VCDs to ensure their safety.

707.    The API and Finished Dose Manufacturer Defendants knew, or should have known that the VCDs they produced were not therapeutically equivalent to their RLDs and did not comply with cGMPs and/or were adulterated, misbranded, and/or unapproved.

708.    As set forth herein, the Wholesaler Defendants and Retail Pharmacy Defendants knew, or should have known that the VCDs were not therapeutically equivalent to their RLDs and did not comply with cGMPs and/or were contaminated, adulterated, misbranded, and/or unapproved.

520.709.    Despite their awareness of the risk to consumers, and the information asymmetry between the Defendants and the patients utilizing the VCDs each Defendant failed to

{Cases; 00033778.DOCX}
-194-

**Formatted:** Font: 8 pt

exercise ordinary care in making representations (or in failing to disclose facts) concerning the quality, nature, and characteristics of its VCDs.

521. 710.    Each Defendant negligently misrepresented or omitted facts regarding the quality, nature, and characteristics of its VCDs. The Defendants misrepresented material facts including, *inter alia*, that their VCDs were therapeutically equivalent to their RLDs and/or complied with cGMPs and/or were not adulterated and/or misbranded. These misrepresentations were present on, among other things, the VCD labels, patient package inserts, medication guides, instructions for use, and the transaction data produced by the Wholesaler Defendants and the API and Finished Dose Manufacturer Defendants. The Defendants further misrepresented material facts by lauding their safety and risk mitigation approaches on their websites, brochures, and other marketing or informational materials.

**Formatted:** Font: +Body (Calibri)

522. 711.    Each Defendant's statements were false at the time the misrepresentations were made (or at the time omissions were not made).

523. 712.    Each Defendant knew, or reasonably should have known, that its representations alleged herein were materially false or misleading, or that omission of material facts rendered such representations false or misleading. Each Defendant also knew, or had reason to know, that its misrepresentations and omissions would induce Class members Members to make purchases of each Defendant's VCDs.

524. 713.    As a direct and proximate result of each Defendant's acts and omissions described herein, Plaintiffs and other Class Members have suffered harm, and will continue to do so.

525. 714.    Each Defendant's misrepresentations or omissions were material and a substantial factor in Plaintiffs' and other Class Members' paying for VCDs.

526. 715.    Each Defendant intended its misrepresentations or omissions to induce

**Formatted:** Font: 8 pt

Plaintiff and Class ~~members~~Members to make purchases of VCDs, , or had reckless disregard for same.

527.716.    But for these misrepresentations (or omissions), Plaintiffs and other Class Members would not have made purchases of Defendants' VCDS.

528.717.    Plaintiffs and other Class Members were justified in relying on Defendants' misrepresentations or omissions.  The same or substantively identical misrepresentations were communicated, and/or the same or substantively identical omissions were not communicated, to each Class Member.

529.718.    Plaintiffs and other Class Members were damaged by reason of each Defendant's misrepresentations or omissions alleged herein.

### ~~TENTH~~EIGHTH CAUSE OF ACTION
### NEGLIGENT MISREPRESENTATION AND OMISSION
### (INDIVIDUALLY AND ON BEHALF OF TPP CLASS MEMBERS AGAINST ALL DEFENDANTS EXCEPT PHARMACY DEFENDANTS)

530.719.    Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein, except as to Retail Pharmacy Defendants.

531.720.    This cause of action is alleged on behalf of TPP Class Members against all Defendants except Retail Pharmacy Defendants ("TPP Claim Defendants"), and to the extent applicable law permits non-consumers to assert this cause of action.

532.721.    Each TPP Claim Defendant had or undertook a duty to accurately and truthfully represent to the quality, nature, and characteristics of its VCDs.

722.    The API and Finished Dose Manufacturer Defendants knew, or should have known that the VCDs they produced were not therapeutically equivalent to their RLDs and did not comply with cGMPs and/or were adulterated, misbranded, and/or unapproved.

723.    As Wholesaler Defendants knew, or should have known that the VCDs were not

**Formatted:** Font: 8 pt

therapeutically equivalent to their RLDs and did not comply with cGMPs and/or were adulterated, misbranded, and/or unapproved.

533. 724.    Each TPP Claim Defendant failed to exercise ordinary care in making representations (or in failing to disclose facts) concerning the quality, nature, and characteristics of its VCDs.

534.    Each TPP Claim Defendant negligently misrepresented or omitted facts regarding the quality, nature, and characteristics of its VCDs.

725.    Despite their awareness of the risk to consumers, and the information asymmetry between the Defendants and the patients utilizing the VCDs, each TPP Claim Defendant negligently misrepresented or omitted facts regarding the quality, nature, and characteristics of its VCDs. TPP Claim Defendants affirmatively misrepresented material facts including, *inter alia*, that their VCDs were therapeutically equivalent to their RLDs and/or complied with cGMPs and/or were not adulterated and/or misbranded. These misrepresentations were present on, among other things, the patient package inserts, medication guides, instructions for use, and the transaction data produced by the Wholesaler Defendants and the API and Finished Dose Manufacturer Defendants. The Wholesaler Defendants further misrepresented material facts by lauding their safety and risk mitigation approaches on their websites, brochures, and other marketing or informational materials.

535. 726.    Each TPP Claim Defendant's statements were false at the time the misrepresentations were made (or at the time omissions were not made).

536. 727.    Each TPP Claim Defendant knew, or reasonably should have known, that its representations alleged herein were materially false or misleading, or that omission of material facts rendered such representations false or misleading. Each TPP Claim Defendant also knew, or had reason to know, that its misrepresentations and omissions would induce Class

{Cases; 00033778.DOCX}
-197-

Formatted: Font: 8 pt

members Members to make purchases of each TPP Claim Defendant's VCDs for which TPPs would be required to reimburse.

537. 728.    As a direct and proximate result of each TPP Claim Defendant's acts and omissions described herein, Plaintiffs and other Class Members have suffered harm, and will continue to do so.

538. 729.    Each TPP Claim Defendant's misrepresentations or omissions were material and a substantial factor in Plaintiffs' and other Class Members' paying for VCDs.

539. 730.    Each TPP Claim Defendant intended its misrepresentations or omissions to induce Plaintiff and Class members Members to make purchases of VCDs, or had reckless disregard for whether they would do so.

540. 731.    But for these misrepresentations (or omissions), Plaintiffs and other Class Members would not have purchased TPP Claim Defendants' VCDS VCDs.

541. 732.    Plaintiffs and other Class Members were justified in relying on TPP Claim Defendants' misrepresentations or omissions.    The same or substantively identical misrepresentations were communicated, and/or the same or substantively identical omissions were not communicated, to each Class Member.

542. 733.    Plaintiffs and other Class Members were damaged by reason of each TPP Claim Defendant's misrepresentations or omissions alleged herein.

## ELEVENTH NINTH CAUSE OF ACTION
### VIOLATION OF STATE CONSUMER PROTECTION LAWS
### (INDIVIDUALLY AND ON BEHALF OF CONSUMER CLASS MEMBERS
### AGAINST ALL DEFENDANTS)

543. 734.    Plaintiffs re-allege and incorporate the preceding paragraphs 1 through 611 as if fully set forth herein.

544. 735.    This cause of action is alleged on behalf of consumer Class Members

{Cases; 00033778.DOCX}

**Formatted:** Font: 8 pt

against all Defendants.

~~545.~~736.    Each Defendant has violated the consumer protection statutes as follows:

    a.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ala. Code § 8-19-1, *et seq.*;

    b.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. § 45.50.471, *et seq.*;

    c.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arizona Rev. Stat. § 44-1522, *et seq.*;

    d.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code § 4-88-101, *et seq.*;

    e.    Defendants have violated the California Unfair Competition Law by engaging in unfair or deceptive acts or practices in violation of Cal. Bus. Prof. Code § 17200, *et seq.*;

    f.    Defendants have violated the California Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.*;

    g.    Defendants have violated the California False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.*

    h.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colo. Rev. Stat. § 6-1-105, *et seq.*;

    i.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Conn. Gen. Stat. § 42-110b, *et seq.*;

    j.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 6 Del. Code § 2511, *et seq.*;

    k.    Defendants have engaged in unfair competition or unfair or deceptive acts

Formatted: Font: 8 pt

or practices in violation of D.C. Code § 28-3901, *et seq.*;

l.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201, *et seq.*;

m.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ga. State 10-1-392, *et seq.*;

n.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Haw. Rev. Stat. § 480, *et seq.*;

o.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Idaho Code § 48-601, *et seq.*;

p.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation 815 ILCS 505/1, *et seq.*;

q.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ind. Code Ann. § 24-5-0.5.1, *et seq.*;

r.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Iowa Code Ann. § 714H, *et seq.*;

s.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Kan. Stat. § 50-623, *et seq.*;

t.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ky. Rev. Stat. § 367.110, *et seq.*;

u.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of La. Rev. Stat. § 51:1401, *et seq.*;

v.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 5 Me. Rev. Stat. § 207, *et seq.*; Defendants have engaged in unfair competition or unfair or deceptive acts or practices in

Formatted: Font: 8 pt

violation of Md. Com. Law Code § 13-101, *et seq.*;

w.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. L. Ch. 93A, *et seq.*;

x.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Stat. § 445.901, *et seq.*;

y.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325F.67, *et seq.*;

z.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Miss. Code Ann. § 75-24-1, *et seq.*;

aa.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vernon's Mo. Rev. Stat. § 407.0 10, *et seq.*;

bb.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code § 30-14-101, *et seq.*;

cc.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq.*;

dd.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. § 598.0903, *et seq.*;

ee.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq.*;

ff.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.J. Stat. Ann. § 56:8-1, *et seq.*;

gg.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. Ann. § 57-12-1, *et seq.*;

hh.    Defendants have engaged in unfair competition or unfair or deceptive acts

Formatted: Font: 8 pt

or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*;

ii.    Defendants have engaged in unfair competition or unfair or deceptive acts

or practices in violation of N.Y. Gen. Bus. Law § 350, et seq.;

jj.    Defendants have engaged in unfair competition or unfair or deceptive acts

or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq.*;

kk.    Defendants have engaged in unfair competition or unfair or deceptive acts

or practices in violation of N.D. Cent. Code § 51-15-01, *et seq.*;

ll.    Defendants have engaged in unfair competition or unfair or deceptive acts

or practices in violation of Ohio Rev. Stat. § 1345.01, *et seq.*

mm.    Defendants have engaged in unfair competition or unfair or deceptive acts

or practices in violation of Okla. Stat. tit. 15 § 751, *et seq.*;

nn.    Defendants have engaged in unfair competition or unfair or deceptive acts

or practices in violation of Or. Rev. Stat. § 646.605, *et seq.*;

oo.    Defendants have engaged in unfair competition or unfair or deceptive acts

or practices in violation of 73 Pa. Stat. § 201-1, *et seq.*;

pp.    Defendants have engaged in unfair competition or unfair or deceptive acts

or practices in violation of R.I. Gen. Laws § 6-13.1-1, *et seq.*;

qq.    Defendants have engaged in unfair competition or unfair or deceptive acts

or practices in violation of S.C. Code Laws § 39-5-10, *et seq.*;

rr.    Defendants have engaged in unfair competition or unfair or deceptive acts

or practices in violation of S.D. Code Laws § 37-24-1, *et seq.*;

ss.    Defendants have engaged in unfair competition or unfair or deceptive acts

or practices in violation of Tenn. Code § 47-18-101, *et seq.*;

tt.    Defendants have engaged in unfair competition or unfair or deceptive acts

Formatted: Font: 8 pt

or practices in violation of Tex. Bus. & Com. Code § 17.41, *et seq.*;

uu.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code Ann. § 13-11-1, *et seq.*;

vv.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vt. Stat. Ann. Tit. 9, § 2451, *et seq.*;

ww.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Va. Code § 59.1-196, *et seq.*;

xx.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wash. Rev. Code § 19.86.010, *et seq.*; Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W. Va. Code § 46A-6-101, *et seq.*;

yy.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wis. Stat. § 100.20, *et seq.*;

zz.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wyo. Stat. § 40-12-100, *et seq.*; and

aaa.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 23 L.P.R.A. § 1001, *et seq.*, the applicable statute for the Commonwealth of Puerto Rico.

~~546.~~737.    Each Defendant's conduct constitutes trade or commerce or other actionable activity within the meaning of the above statutes.

738.    Plaintiffs and Class Members purchased VCDs for personal purposes.

~~547.~~739.    Each Plaintiff and other Class Member is a consumer or person aggrieved by Defendants' misconduct within the meaning of the above statutes.

740.    Defendants, through a pervasive pattern of unfair, false and misleading statements

{Cases; 00033778.DOCX}
-203-

**Formatted:** Font: 8 pt

and omissions, manufactured and/or sold VCDs without revealing to consumers that the products were not therapeutically equivalent to their RLDs and did not comply with cGMPs and/or were contaminated, adulterated, misbranded, and/or unapproved.

741.   In addition to these material omissions, Defendants affirmatively and unfairly misrepresented material facts including, inter alia, that their VCDs were generically equivalent, pharmaceutically equivalent, and therapeutically equivalent to their RLDs and/or complied with cGMPs and/or were not contaminated, adulterated and/or misbranded. These misrepresentations were present on, among other things, the VCD labels, the patient package inserts, medication guides, instructions for use, and the transaction data produced by the Wholesaler Defendants and the API and Finished Dose Manufacturer Defendants. The Defendants, as set forth herein, further misrepresented material facts by lauding their safety and risk mitigation approaches on their websites, brochures, and other marketing or informational materials.

742.   Defendants' conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of VCDs that offended public policy; was immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

743.   The Wholesaler Defendants' deliberate decision not to test the VCDs further constitutes unfair and unconscionable conduct. As set forth herein, the Defendants were aware of the risks that the VCDs were contaminated, misbranded and adulterated. Despite the risks to consumers, the Defendants elected not to conduct risk assessment, quality analysis, and testing that would have prevented the Plaintiffs' exposure. The failure to ensure the safety of prescription drugs sold to consumers offends established public policy and constitutes immoral, unethical,

{Cases: 00033778.DOCX}

-204-

Formatted: Font: 8 pt

oppressive, outrageous, unscrupulous, and substantially injurious conduct. The failure to test causes substantial harm to consumers that greatly outweighs any possible utility.  The act of sale of the VCDs by the Wholesaler Defendants constituted an affirmative act in conjunction with the accompanying labels and other documents, representing that the VCDs were equivalent to the RLS's, safe, of the specified quality, and met all applicable standards, including but not limited to USP, Orange Book, and other applicable regulations.

744.   Defendants engaged in deceptive conduct because the affirmative misrepresentations and omissions at issue were likely to, and in fact did, mislead, deceive, or cheat reasonable consumers including the Plaintiffs, who relied on these misrepresentations and omissions. In addition, the misrepresentations and omissions were the type that tend to create a false impression. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that the VCDs were not therapeutically or otherwise equivalent to their RLDs and did not comply with cGMPs and/or were contaminated, adulterated, misbranded, and/or unapproved. Knowledge of these facts would have been a substantial factor in Plaintiffs' decisions to purchase the VCDs, and they would not have made these purchases in the absence of Defendants' wrongful conduct.

745.   Defendants' advertising in the conduct of business was deceptive because the misrepresentations and omissions had the capacity, tendency, and effect of deceiving reasonable consumers, including the Plaintiffs. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that VCDs were not therapeutically or otherwise equivalent to their RLDs and did not comply with cGMPs and/or were contaminated, adulterated, misbranded, and/or unapproved.

746.   Defendants owed Plaintiffs and Class Members a duty to disclose these facts because they were known and/or accessible exclusively to Defendants (and potentially other

{Cases; 00033778.DOCX}

-205-

unnamed parties other than Plaintiffs and Class Members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because Defendants concealed them; because Defendants intended for consumers to rely on the omissions in question; and because Defendants made misleading partial representations concerning the same subject matter as the omitted facts.

548.747.    To the extent applicable, each Defendant knew, intended, or should have known that their fraudulent and deceptive acts, omissions, or concealment would and did induce reliance and that reliance can be presumed under the circumstances. As a direct and proximate result of Defendants' unfair methods of competition and unfair or deceptive acts or practices, Plaintiffs and other Class Members have suffered damages– an ascertainable loss – in an amount to be proved at trial.

748.    TWELFTHPlaintiffs justifiably relied on Defendants' representations that the VCDs they were purchasing and ingesting were equivalent to the RLD's, safe and free from contamination. Plaintiffs further relied on the Defendants' advertised reputations and representations that they exercised the highest degree of care to ensure safety and quality at all times, along with their failure to disclose the contamination of VCDs and manufacturing and quality control problems, and the Defendants' affirmative assurances that their VCDs were safe for human consumption and/or ingestion.

749.    Defendants engaged in unfair and deceptive conduct by misleading, through affirmative misrepresentation and omission, consumers as to the content of the VCDs. In fact, the products never should have been offered to consumers in the first place, and could not have been in the absence of the stated wrongful conduct.

750.    As demonstrated herein, Defendants engaged in patently unlawful conduct through their manufacturing, receipt, and sale of contaminated, adulterated and misbranded prescription

{Cases; 00033778.DOCX}

**Formatted:** Font: 8 pt

drugs.[208]

751.    Defendants' conduct actually and proximately caused actual damages to Plaintiffs. Absent Defendants' unfair and deceptive conduct, Plaintiffs and class members would have behaved differently and would not have purchased the VCDs h. Defendants' misrepresentations and omissions induced Plaintiffs to purchase the VCDs they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into, economically harming and damaging Plaintiffs.

### TENTH CAUSE OF ACTION
**VIOLATION OF STATE CONSUMER PROTECTION LAWS
(INDIVIDUALLY AND ON BEHALF OF TPP CLASS MEMBERS AGAINST
ALL DEFENDANTS EXCEPT PHARMACY DEFENDANTS)**

549. 752.    Plaintiffs re-allege and incorporate the preceding paragraphs 1 through 611 as if fully set forth herein, except as to Retail Pharmacy Defendants.

550. 753.    This cause of action is alleged on behalf of TPP Class Members against all Defendants except Retail Pharmacy Defendants ("TPP Claim Defendants"), and to the extent applicable law permits non-consumers to assert this cause of action.

551. 754.    Each TPP Claim Defendant has violated the consumer protection statutes as follows:

   a.    TPP Claim Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ala. Code § 8-19-1, *et seq.*;

   b.    TPP Claim Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. § 45.50.471, *et seq.*;

   c.    TPP Claim Defendants have engaged in unfair competition or unfair or

---
[208] *See* 21 U.S.C. §§ 331(a-c), 331(g)

{Cases; 00033778.DOCX}
-207-

**Formatted:** Font: 8 pt

deceptive acts or practices in violation of Arizona Rev. Stat. § 44-1522, *et seq.*;

d.     TPP Claim Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code § 4-88-101, *et seq.*;

e.     TPP Claim Defendants have violated the California Unfair Competition Law by engaging in unfair or deceptive acts or practices in violation of Cal. Bus.   Prof. Code § 17200, *et seq.*;

f.     TPP Claim Defendants have violated the California Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.*;

g.     TPP Claim Defendants have violated the California False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.*

h.     TPP Claim Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colo. Rev. Stat. § 6-1-105, *et seq.*;

i.     TPP Claim Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Conn. Gen. Stat. § 42-110b, *et seq.*;

j.     TPP Claim Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 6 Del. Code § 2511, *et seq.*;

k.     TPP Claim Defendants have engaged in unfair competition or unfair or deceptive acts  or practices in violation of D.C. Code § 28-3901, *et seq.*;

l.     TPP Claim Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201, *et seq.*;

m.     TPP Claim Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ga. State 10-1-392, *et seq.*;

**Formatted:** Font: 8 pt

n.      TPP Claim Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Haw. Rev. Stat. § 480, *et seq.*;

o.      TPP Claim Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Idaho Code § 48-601, *et seq.*;

p.      TPP Claim Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation 815 ILCS 505/1, *et seq.*;

q.      TPP Claim Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ind. Code Ann. § 24-5-0.5.1, *et seq.*;

r.      TPP Claim Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Iowa Code Ann. § 714H, *et seq.*;

s.      TPP Claim Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Kan. Stat. § 50-623, *et seq.*;

t.      TPP Claim Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ky. Rev. Stat. § 367.110, *et seq.*;

u.      TPP Claim Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of La. Rev. Stat. § 51:1401, *et seq.*;

v.      TPP Claim Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 5 Me. Rev. Stat. § 207, *et seq.*;

TPP Claim Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Com. Law Code § 13-101, *et seq.*;

w.      TPP Claim Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. L. Ch. 93A, *et seq.*;

Formatted: Font: 8 pt

x.      TPP Claim Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Stat. § 445.901, *et seq.*;

y.      TPP Claim Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325F.67, *et seq.*;

z.      TPP Claim Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Miss. Code Ann. § 75-24-1, *et seq.*;

aa.     TPP Claim Defendants have engaged in unfair competition or unfair or deceptive acts  or practices in violation of Vernon's Mo. Rev. Stat. § 407.0 10, *et seq.*;

bb.     TPP Claim Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code § 30-14-101, *et seq.*;

cc.     TPP Claim Defendants have engaged in unfair competition or unfair or deceptive acts  or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq.*;

dd.     TPP Claim Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. § 598.0903, *et seq.*;

ee.     TPP Claim Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq.*;

ff.     TPP Claim Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.J. Stat. Ann. § 56:8-1, *et seq.*;

gg.     TPP Claim Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. Ann. § 57-12-1, *et seq.*;

hh.     TPP Claim Defendants have engaged in unfair competition or unfair or

Formatted: Font: 8 pt

deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*;

ii.    TPP Claim Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 350, et seq.;

jj.    TPP Claim Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq.*;

kk.    TPP Claim Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. Cent. Code § 51-15-01, *et seq.*;

ll.    TPP Claim Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ohio Rev. Stat. § 1345.01, *et seq.*

mm.    TPP Claim Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Okla. Stat. tit. 15 § 751, *et seq.*;

nn.    TPP Claim Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. § 646.605, *et seq.*;

oo.    TPP Claim Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 Pa. Stat. § 201-1, *et seq.*;

pp.    TPP Claim Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws § 6-13.1-1, *et seq.*;

qq.    TPP Claim Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Laws § 39-5-10, *et seq.*;

rr.    TPP Claim Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Code Laws § 37-24-1, *et seq.*;

ss.    TPP Claim Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code § 47-18-101, *et seq.*;

**Formatted:** Font: 8 pt

tt.    TPP Claim Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tex. Bus. & Com. Code § 17.41, *et seq.*;

uu.    TPP Claim Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code Ann. § 13-11-1, *et seq.*;

vv.    TPP Claim Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vt. Stat. Ann. Tit. 9, § 2451, *et seq.*;

ww.    TPP Claim Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Va. Code § 59.1-196, *et seq.*;

xx.    TPP Claim Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wash. Rev. Code § 19.86.010, *et seq.*; TPP Claim Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W. Va. Code § 46A-6-101, *et seq.*;

yy.    TPP Claim Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wis. Stat. § 100.20, *et seq.*;

zz.    TPP Claim Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wyo. Stat. § 40-12-100, *et seq.*; and

aaa.    TPP Claim Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 23 L.P.R.A. § 1001, *et seq.*, the applicable statute for the Commonwealth of Puerto Rico.

552.755.    Each TPP Claim Defendant's conduct constitutes trade or commerce or

**Formatted:** Font: 8 pt

other actionable activity within the meaning of the above statutes.

756.    Plaintiffs and TPP Claim Class Members purchased VCDs for personal purposes, as the ultimate intended users were individuals.

553. 757.    Each Plaintiff and other Class Member is a consumer or persons aggrieved by TPP Claim Defendants' misconduct within the meaning of the above statutes.

758.    TPP Claim Defendants, through a pervasive pattern of unfair, false and misleading statements and omissions, manufactured and/or sold VCDs without revealing to consumers that the products were not therapeutically or otherwise equivalent to their RLDs and did not comply with cGMPs and/or were contaminated, adulterated, misbranded, and/or unapproved.

759.    In addition to these material omissions, TPP Claim Defendants affirmatively and unfairly misrepresented material facts including, inter alia, that their VCDs were generically equivalent, pharmaceutically equivalent, and therapeutically equivalent to their RLDs and/or complied with cGMPs and/or were not contaminated, adulterated and/or misbranded. These misrepresentations were present on, among other things, the patient package inserts, medication guides, instructions for use, and the transaction data produced by the Wholesaler Defendants and the API and Finished Dose Manufacturer Defendants. The TPP Claim Defendants, as discussed herein, further misrepresented material facts by lauding their safety and risk mitigation approaches on their websites, brochures, and other marketing or informational materials.

760.    TPP Claim Defendants' conduct was unfair and unconscionable in that it included (i) the manufacture and sale of products with a heightened propensity to cause physical injuries and (ii) misrepresentations and omissions of material facts concerning the characteristics and safety of VCDs that offended public policy; was immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm to consumers that greatly outweighs any possible utility from the conduct.

{Cases; 00033778.DOCX}

Formatted: Font: 8 pt

761. The Wholesaler Defendants' deliberate decision not to test the VCDs further constitutes unfair and unconscionable conduct. As set forth herein, the Defendants were aware of the risks that the VCDs were contaminated, misbranded and adulterated. Despite the risks to consumers, the Defendants elected not to conduct testing that would have prevented the Plaintiffs' exposure. The failure to ensure the safety of prescription drugs sold to consumers offends established public policy and constitutes immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious conduct. The failure to test causes substantial harm that greatly outweighs any possible utility. The act of sale of the VCDs by the Wholesaler Defendants constituted an affirmative act in conjunction with the accompanying labels and other documents, representing that the VCDs were equivalent to the RLS's, safe, of the specified quality, and met all applicable standards, including but not limited to USP, Orange Book, and other applicable regulations.

762. TPP Claim Defendants engaged in deceptive conduct because the misrepresentations and omissions at issue were likely to, and in fact did, mislead, deceive, or cheat reasonable consumers including the Plaintiffs. In addition, the misrepresentations and omissions were the type that tend to create a false impression. Reasonable consumers, including the Plaintiffs, would have found it material to their purchasing decisions that the VCDs were not therapeutically or otherwise equivalent to their RLDs and did not comply with cGMPs and/or were contaminated, adulterated, misbranded, and/or unapproved. Knowledge of these facts would have been a substantial factor in Plaintiffs' decisions to purchase the VCDs, and Plaintiffs would not have made these purchases in the absence of the stated wrongful conduct.

763. TPP Claim Defendants' advertising in the conduct of business was unfair and deceptive because the misrepresentations and omissions had the capacity, tendency, or effect of deceiving reasonable consumers, including the Plaintiffs. Reasonable consumers, including the

**Formatted:** Font: 8 pt

Plaintiffs, would have found it material to their purchasing decisions that VCDs were not therapeutically or otherwise equivalent to their RLDs and did not comply with cGMPs and/or were contaminated, adulterated, misbranded, and/or unapproved.

764.    TPP Claim Defendants owed Plaintiffs and Class Members a duty to disclose these facts because they were known and/or accessible exclusively to TPP Claim Defendants (and potentially other unnamed parties other than Plaintiffs and TPP Claim Class Members), who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because TPP Claim Defendants concealed them; because TPP Claim Defendants intended for consumers to rely on the omissions in question; and because TPP Claim Defendants made misleading partial representations concerning the same subject matter as the omitted facts.

554.765.    To the extent applicable, each TPP Claim Defendant knew, intended, or should have known that their fraudulent and deceptive acts, omissions, or concealment would and did induce reliance and that reliance can be presumed under the circumstances. As a direct and proximate result of TPP Claim Defendants' unfair methods of competition and unfair or deceptive acts or practices, Plaintiffs and other Class Members have suffered damages– an ascertainable loss – in an amount to be proved at trial.

766.    THIRTEENTHPlaintiffs justifiably relied on TPP Claim Defendants' representations that the VCDs they were purchasing and ingesting were safe and free from contamination. Plaintiffs further relied on the TPP Claim Defendants' advertised reputations, and representations that they exercised the highest degree of care to ensure safety and quality at all times, along with their failure to disclose the contamination of VCDs and manufacturing and quality control problems, and the TPP Claim Defendants' affirmative assurances that their VCDs were equivalent to the RLDs, and safe for human consumption and/or ingestion.

767.    TPP Claim Defendants engaged in unfair and deceptive conduct by misleading,

{Cases; 00033778.DOCX}

-215-

through affirmative misrepresentation and omission, consumers as to the content of the VCDs. In fact, the products never should have been offered to consumers in the first place, and could not have been sold in the absence of the stated wrongful conduct.

768.    As set forth herein, TPP Claim Defendants engaged in patently unlawful conduct through their manufacturing, receipt, and sale of contaminated, adulterated and misbranded prescription drugs.[209]

769.    TPP Claim Defendants' conduct actually and proximately caused actual damages to Plaintiffs. Absent TPP Claim Defendants' unfair and deceptive conduct, Plaintiffs and class members would have behaved differently and would not have purchased the VCDs or would have paid less for them. TPP Claim Defendants' misrepresentations and omissions induced Plaintiffs to purchase the VCDs they would not otherwise have purchased and enter into purchase contracts they would not otherwise have entered into, suffering economic damages and harm as a result.

**ELEVENTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(INDIVIDUALLY AND ON BEHALF OF CONSUMER CLASS MEMBERS**
**AGAINST ALL DEFENDANTS)**

~~555.~~770.    Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

~~556.~~771.    This cause of action is alleged on behalf of consumer Class Members against all Defendants.

~~557.~~772.    As alleged herein, Defendants were unjustly enriched at the expense of Plaintiffs and other Class Members by virtue of the latter's paying for Defendants' VCDs.

~~558.~~773.    Defendants profited immensely from introducing ~~a~~VCDs with an undisclosed carcinogen misbranded and marketed as Valsartan into the United States for human

---

[209] *See* 21 U.S.C. §§ 331(a-c), 331(g)

{Cases; 00033778.DOCX}

-216-

**Formatted:** Font: 8 pt

consumption. ~~On top of that, because~~Because Defendants' VCDs were contaminated, adulterated and misbranded, they were worthless, and their distribution and sale in the United States was illegal.

~~559.~~774.    Plaintiffs and other Class Members were unjustly deprived of money obtained by Defendants as a result of the improper amounts paid for Defendants' VCDs. It would be inequitable and unconscionable for Defendants to retain the profit, benefit, and other compensation obtained from Plaintiffs and other Class Members as a result of their wrongful conduct alleged in this Complaint.

~~560.~~775.    Plaintiffs and other Class Members are entitled to seek and do seek restitution from Defendants as well as an order from this Court requiring disgorgement of all profits, benefits, and other compensation obtained by Defendants by virtue of its wrongful conduct.

776.    ~~FOURTEENTH~~Plaintiffs and other Class Members plead this claim in the alternative in the event it is subsequently determined that no adequate remedy at law exists.

777.    Plaintiffs an other Class Members do not have adequate remedy at law.

### TWELFTH CAUSE OF ACTION
**UNJUST ENRICHMENT**
**(INDIVIDUALLY AND ON BEHALF OF TPP CLASS MEMBERS AGAINST ALL DEFENDANTS EXCEPT PHARMACY DEFENDANTS)**

~~561.~~778.    Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein, except as to Retail Pharmacy Defendants.

~~562.~~779.    This cause of action is alleged on behalf of TPP Class Members against all Defendants except Retail Pharmacy Defendants ("TPP Claim Defendants"), and to the extent applicable law permits non-consumers to assert this cause of action.

~~563.~~780.    As alleged herein, TPP Claim Defendants were unjustly enriched at the expense of Plaintiffs and other Class Members by virtue of the latter's paying for TPP Claim

{Cases; 00033778.DOCX}

-217-

Formatted: Font: 8 pt

Defendants' VCDs.

564.781.    TPP Claim Defendants profited immensely from introducing aVCDs containing an undisclosed carcinogen into the United States for human consumption. On top of that, because TPP Claim Defendants' VCDs were contaminated, adulterated and/or misbranded, their distribution and sale in the United States was illegal.

565.782.    Plaintiffs and other Class Members were unjustly deprived of money obtained by TPP Claim Defendants as a result of the improper amounts paid for TPP Claim Defendants' VCDs.  It would be inequitable and unconscionable for TPP Claim Defendants to retain the profit, benefit, and other compensation obtained from Plaintiffs and other Class Members as a result of their wrongful conduct alleged in this Complaint.

566.783.    Plaintiffs and other Class Members are entitled to seek and do seek restitution from TPP Claim Defendants as well as an order from this Court requiring disgorgement of all profits, benefits, and other compensation obtained by TPP Claim Defendants by virtue of its wrongful conduct.

784.    FIFTEENTHPlaintiffs and other Class Members plead this claim in the alternative in the event it is subsequently determined that no adequate remedy at law exists.

785.    Plaintiffs and other Class Members have no adequate remedy at law.

### THIRTEENTH CAUSE OF ACTION
### NEGLIGENCE
### (INDIVIDUALLY AND ON BEHALF OF CONSUMER CLASS MEMBERS AGAINST ALL DEFENDANTS)

567.786.    Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

568.787.    This cause of action is alleged on behalf of consumer Class Members against all Defendants.

{Cases; 00033778.DOCX}

-218-

**Formatted:** Font: 8 pt

569.788.    Each Defendant owed a duty to Plaintiffs and the Class to use and exercise reasonable and due care in the manufacturing of its VCDs.

570.789.    Each Defendant owed a duty to Plaintiffs and the Class to ensure that the VCDs it sold in the United States were therapeutically equivalent to their RLDs and complied with cGMPs and were not contaminated, adulterated or misbranded.

571.790.    Each Defendant owed a duty to care to Plaintiffs and the Class because they were the foreseeable, reasonable, and probable user of VCDs and victim of each Defendant's fraudulent and deceptive activities.  Each Defendant knew, or should have known, that its VCDs were not therapeutically equivalent to their RLDs and did not comply with cGMPs and were adulterated and misbranded, and each was in the best position to uncover and remedy these shortcomings.

572.791.    Each Defendant failed to do this.discharge its duties of reasonable care.  Each Defendant inadequately oversaw the manufacture and sale of its own VCDs.  Each Defendant knew that ignoring the manufacturing issues surrounding itsthe VCDs would damage Plaintiffs and the Class and increase its own profits.

573.792.    Each Defendant maintained or should have maintained a special relationship with Plaintiffs and the Class, as they were obligated to ensure that its VCDs complied with cGMPs and was not contaminated, adulterated or misbranded.

574.793.    Each Defendant's own actions and inactions created a foreseeable risk of harm to Plaintiffs and the Class.  Each Defendant's misconduct included, but was not limited to, failing to oversee actions taken in the manufacture and sale of its VCDs.

575.794.    Each Defendant breached duties owed to Plaintiffs and the Class by failing to exercise reasonable care sufficient to protect the interests and meet the needs of Plaintiffs and the Class.

Formatted: Font: 8 pt

576.795.    As a direct and proximate result of each Defendant's negligent or grossly negligent conduct, Plaintiffs and the Class has suffered injury and are entitled to damages in an amount to be proven at trial.

### SIXTEENTHFOURTEENTH CAUSE OF ACTION
### NEGLIGENCE
### (INDIVIDUALLY AND ON BEHALF OF TPP CLASS MEMBERS AGAINST ALL DEFENDANTS EXCEPT PHARMACY DEFENDANTS)

577.796.    Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein, except as to Retail Pharmacy Defendants.

578.797.    This cause of action is alleged on behalf of TPP Class Members against all Defendants except Retail Pharmacy Defendants ("TPP Claim Defendants"), and to the extent applicable law permits non-consumers to assert this cause of action.

579.798.    Each TPP Claim Defendant owed a duty to Plaintiffs and the Class to use and exercise reasonable and due care in the manufacturing of its VCDs.

580.799.    Each TPP Claim Defendant owed a duty to Plaintiffs and the Class to ensure that the VCDs it sold in the United States were therapeutically equivalent to their RLDs and complied with cGMPs and were not adulterated or misbranded.

581.800.    Each TPP Claim Defendant owed a duty to care to Plaintiffs and the Class because they were the foreseeable, reasonable, and probable user of VCDs and victim of each TPP Claim Defendant's fraudulent and deceptive activities.  Each TPP Claim Defendant knew, or should have known, that its VCDs were not therapeutically equivalent to their RLDs and did not comply with cGMPs and were adulterated and misbranded, and each was in the best position to uncover and remedy these shortcomings.

582.801.    Each TPP Claim Defendant failed to do this.  Each TPP Claim Defendant

Formatted: Font: 8 pt

inadequately oversaw the manufacture and sale of ~~its own~~ VCDs. Each TPP Claim Defendant knew that ignoring the manufacturing issues surrounding its VCDs would damage Plaintiffs and the Class and increase its own profits.

~~583.~~802.    Each TPP Claim Defendant maintained or should have maintained a special relationship with Plaintiffs and the Class, as they were obligated to ensure that its VCDs complied with cGMPs and were not adulterated or misbranded.

~~584.~~803.    Each TPP Claim Defendant's own actions and inactions created a foreseeable risk of harm to Plaintiffs and the Class. Each TPP Claim Defendant's misconduct included, but was not limited to, failing to oversee actions taken in the manufacture and sale of its VCDs.

~~585.~~804.    Each TPP Claim Defendant breached the duties owed to Plaintiffs and the Class by failing to exercise reasonable care sufficient to protect the interests and meet the needs of Plaintiffs and the Class.

~~586.~~805.    As a direct and proximate result of each TPP Claim Defendant's negligent ~~and possibly~~ or grossly negligent conduct, Plaintiffs and the Class have suffered injury and are entitled to damages in an amount to be proven at trial.

### ~~SEVENTEENTH~~FIFTEENTH CAUSE OF ACTION
### NEGLIGENCE PER SE
### (INDIVIDUALLY AND ON BEHALF OF CONSUMER CLASS MEMBERS AGAINST ALL DEFENDANTS)

~~587.~~806.    Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

~~588.~~807.    This cause of action is alleged on behalf of consumer Class Members against all Defendants.

~~589.~~808.    Each Defendant owed a duty to Plaintiffs and the Class to use and exercise

~~{Cases; 00033778.DOCX}~~

**Formatted:** Font: 8 pt

reasonable and due care in the manufacturing of its VCDs.

590.809.    Each Defendant owed a duty to Plaintiffs and the Class to ensure that the VCDs it sold in the United States were therapeutically equivalent to their RLDs and complied with cGMPs and were not adulterated or misbranded.

591.810.    Each Defendant owed a duty to Plaintiffs and the Class because each state, territory, and possession has adopted /or adheres to federal cGMP and adulteration standards.

592.811.    Each Defendant failed to comply with federal cGMPs and federal adulteration standards.

593.812.    As a result of each Defendant's failures to do so, each Defendant's own actions and inactions created a foreseeable risk of harm to Plaintiffs and the Class.

594.813.    As a direct and proximate result of each Defendant's negligent conduct, Plaintiffs and the Class have suffered injury and are entitled to damages in an amount to be proven at trial.

### EIGHTEENTHSIXTEENTH CAUSE OF ACTION
### NEGLIGENCE PER SE
### (INDIVIDUALLY AND ON BEHALF OF TPP CLASS MEMBERS AGAINST ALL DEFENDANTS EXCEPT PHARMACY DEFENDANTS)

595.814.    Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein, except as to Retail Pharmacy Defendants.

596.815.    This cause of action is alleged on behalf of TPP Class Members against all Defendants except Retail Pharmacy Defendants ("TPP Claim Defendants"), and to the extent applicable law permits non-consumers to assert this cause of action.

597.816.    Each TPP Claim Defendant owed a duty to Plaintiffs and the Class to use and exercise reasonable and due care in the manufacturing of its VCDs.

598.817.    Each TPP Claim Defendant owed a duty to Plaintiffs and the Class to ensure

Formatted: Font: 8 pt

that the VCDs it sold in the United States were therapeutically equivalent to their RLDs and complied with cGMPs and were not adulterated or misbranded.

599.818.    Each TPP Claim Defendant owed a duty to Plaintiffs and the Class because each state, territory, and possession has adopted or adheres to federal cGMP and adulteration standards.

600.819.    Each TPP Claim Defendant failed to comply with federal cGMPs and federal adulteration standards.

601.820.    As a result of each TPP Claim Defendant's failures to do so, each TPP Claim Defendant's own actions and inactions created a foreseeable risk of harm to Plaintiffs and the Class.

602.821.    As a direct and proximate result of each TPP Claim Defendant's negligent conduct, Plaintiffs and the Class have suffered injury and are entitled to damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following judgment:

A.    An order certifying this action as a class action;

B.    An order appointing Plaintiffs as Class Representatives, and appointing undersigned counsel as Class Counsel to represent the Class;

C.    A declaration that Defendants are liable pursuant to each and every one of the above-enumerated causes of action;

D.    An order awarding appropriate preliminary and/or final injunctive relief against the conduct of Defendants described herein;

E.    Payment to Plaintiffs and Class Members of all damages, exemplary or punitive damages, and/or restitution associated with the conduct for all causes of action in

**Formatted:** Font: 8 pt

an amount to be proven at trial, including but not limited to the full amounts paid or reimbursed for the VCDs; the costs to replace or return VCDs because of recalls; Defendants' ill-gotten gains; and/or the increases in the amounts paid for non-adulterated, non-misbranded, VCDs in the wake of the recalls;

F.      An award of attorneys' fees, expert witness fees, and costs, as provided by applicable law and/or as would be reasonable from any recovery of monies recovered for or benefits bestowed on the Class Members;

G.      An award of statutory penalties to the extent available;

H.      Interest as provided by law, including but not limited to pre-judgment and post-judgment interest as provided by rule or statute; and

I.      Such other and further relief as this Court may deem just, equitable, or proper.

## JURY DEMAND

Plaintiffs respectfully request a trial by jury on all causes of action so triable.

Dated: ~~March 13, 2020~~April 12, 2021                     Respectfully Submitted,

/s/ Ruben Honik                            /s/ Daniel Nigh
Ruben Honik                                Daniel Nigh
GOLOMB & HONIK, P.C.                       LEVIN, PAPANTONIO, THOMAS, MITCHELL
1835 Market Street, Ste. 2900                RAFFERTY & PROCTOR, P.A.
Philadelphia, PA 19103                     316 South Baylen Street
Phone (215) 985-9177                       Pensacola, FL 32502
rhonik@golombhonik.com                     Phone: (850) 435-7013
                                           dnigh@levinlaw.com

/s/ Adam Slater                            /s/ Conlee S. Whiteley

Adam Slater                                Conlee S. Whiteley
MAZIE, SLATER, KATZ & FREEMAN, LLC         KANNER & WHITELEY, LLC
103 Eisenhower Pkwy, 2nd Flr.              701 Camp Street
Roseland, NJ 07068                         New Orleans, LA 70130
Phone (973) 228-9898                       Phone: (504)-524-5777

Formatted: Not Highlight

Formatted: Font: 8 pt

{Cases; 00033778.DOCX}

aslater@mazieslater.com                    c.whiteley@kanner-law.com

*MDL Plaintiffs' Co-Lead Counsel*

*/s/ Andrés Rivero*
Andrés Rivero
RIVERO MESTRE LLP
2525 Ponce de Leon Blvd., Suite 1000
Miami, FL 33134
Phone (305) 445-2500
ariveros@riveromestre.com

*Counsel for MSP Recovery Claims, Series LLC*

*/s/ Peter D. St. Phillip, Jr.*                   */s/ Gregory P. Hansel*
Peter D. St. Phillip, Jr.                         Gregory P. Hansel
LOWEY DANNENBERG, P.C.                            PRETI, FLAHERTY, BELIVEAU & PACHIOS LLP
44 S. Broadway, Suite 1100                        One City Center
White Plains, NY 10601                            P.O. Box 9546
Phone: (914) 997-0500                             Portland, ME 04112
pstphillip@lowey.com                              Phone: (207) 791-3000
                                                  ghansel@preti.com

*Counsel for Maine Auto Dealers Association, Inc.
Insurance Trust*