## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | |
|---|---|
| **IN RE: VALSARTAN, LOSARTAN, AND IRBESARTAN PRODUCTS LIABILITY LITIGATION**<br><br>**This Document Relates to All Actions** | MDL No. 2875<br><br>Honorable Robert B. Kugler, District Court Judge<br><br>Special Master, The Honorable Thomas I. Vanaskie |

## THE ZHP PARTIES' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PROTECTIVE ORDER REGARDING PLAINTIFFS' DEPOSITIONS OF CHINESE NATIONAL WITNESSES

## I.    INTRODUCTION

It is a well-settled principle of due process and equal protection that questioning a witness about a document the witness cannot read because it is written in a language the witness does not speak would be unfair and prejudicial. This Court has implicitly recognized and acknowledged this principle, and held that as a *"matter of fairness,"* ZHP Party witnesses who cannot read English should be shown English documents translated into Chinese. As the Court explained, *"there needs to be a way to make sure that these witnesses are being, essentially, in the equivalent position [as if] they spoke the language in which the document they're being questioned on is written."* *See* 4-1-21 Hrg. Tr. at 30:23-25, 31:1. It is also settled that an incomplete translation of a document is the

functional equivalent of no translation, and inaccurate translations are not certifiable for admission at trial.

The ZHP Parties' document production was substantially complete by November 29, 2020, and the core discovery, which contained many of the key FDA communications being shown to ZHP Party witnesses during the current period of depositions, was produced in 2019.  Likewise, Plaintiffs have known since negotiating over the identity of the ESI custodians in September-October 2019, if not earlier, that many of the Chinese employees at ZHP do not speak or read English.  Nevertheless, even to this date, Plaintiffs have refused to obtain complete, accurate, and certifiable Chinese translations of English documents to show ZHP Party witnesses who do not read English, arguing, in recent weeks, that Plaintiffs should not have to shoulder the cost and time burden now that the depositions of ZHP Party witnesses are underway.

Plaintiffs' resistance to providing accurate and complete translations to ZHP Party witnesses who need them resulted in the Court attempting to reach a compromise in order to facilitate the completion of the ZHP Party depositions under the current case management schedule; Plaintiffs would be able to show ZHP Party witnesses machine translations of English documents, which can be obtained quicker and cheaper than human translation, and the ZHP Parties' objection to the accuracy of the machine translations would be preserved.

However, Plaintiffs have selected an online service called Reverso for such translations, which is so wholly inaccurate, incomplete, and unintelligible that the Reverso translations are not just the functional equivalent of no translation, they are actually befuddling the witnesses being questioned about them, causing the witness to have to offer a best guess as to what a document says and means.

Given that it does not achieve the objective of treating the Chinese witnesses who do not speak or read English fairly, and because it results in inadmissible evidence, the compromise of using Reverso does not work. Where a witness is questioned about a document the witness cannot read, fairness dictates the witness should be able to refrain from answering. Plaintiffs may avail themselves of complete and accurate Chinese translations of English documents, which would potentially provide admissible evidence, but until they do, a ZHP Party witness who does not read English should not be forced to answer questions based on English documents and unintelligible translations thereof.

To protect due process and uphold equal treatment under the law, this Court should enter a protective order that allows the witnesses to refrain from answering questions about documents the witness cannot read because they are written in a language the witness does not speak.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Court has Ruled that Questioning a Witness About A Document The Witness Cannot Read is Unfair and Prejudicial.

Seven of the nine Chinese nationals being deposed in this action cannot read English.  During the deposition of Peng Dong, one of those Chinese nationals, Plaintiffs refused to present Mr. Peng with documents translated from English to Chinese, and instead insisted that the interpreter of record translate the specific portions of the English documents being questioned about on sight, *i.e.*, "sight translation."  ECF 1102 at 11.  Plaintiffs also insisted on "stopping the clock" for any such sight translations, meaning the deposition would be prolonged every time a sight translation was necessary.  *See* 4-7-21 Hrg. Tr. at 72:14-25, 73:1-7.  The sight translations of specific sentences or paragraphs of documents containing highly technical terms relating to the manufacture of a pharmaceutical drug was confusing and fraught with error, as Mr. Peng was not able to review the remainder of the English document in order to place the translated language into context.  ECF 1102 at 11.

On April 1, 2021, the Court held a telephonic status conference during which the ZHP Parties argued that questioning Chinese nationals who cannot speak English about English documents not translated into Chinese was prejudicial.  *See* 4-1-21 Hrg. Tr. at 14:15-17 (Chinese nationals who cannot speak English "have the right to look at a document that they are being asked about, to determine what

4

the document is [and] what the context for the document is.").  Rather than agree to
provide such translations, Plaintiffs argued that the ZHP Parties should "appoint a
second witness" to testify on behalf of the ZHP Parties "who might be able to more
easily address the English language documents." *Id*. at 20:17-23.[1]  Plaintiffs
further argued against any kind of human or machine translation that costs money
because the documents are "lengthy" and "extensive." *Id*. at 4-1-21 Hrg. Tr.
20:12-16. (MR. SLATER: "So, you know, for all those reasons, there's absolutely
no call for us to do a translation of these documents. They're lengthy, they're
extensive, and I don't think there's any example that counsel can point to where
there was some unfair use of the document.").

The Court disagreed with Plaintiffs, ruling that it was a ***"matter of fairness"***
that the witnesses be presented with Chinese translations of English-language
documents, and ***"that needs to be accomplished going forward." Id.*** at 24:20-22.
The Court elaborated on this point, stating it is ***"extremely sensitive to a witness
who doesn't speak English being asked questions about documents that are only***

---

[1] The ZHP Parties requested the Court not to "endorse the view that a witness is
not adequate because they do not speak English," *see id.* at 21, and explained that
the ZHP Parties "designated the witnesses who have the most knowledge on the
topics in the 30(b)(6) notice, and that is regardless of origin, it's regardless of
language, it's regardless of race or sex, it is what the witness knows about [the]
topics." *Id*.

*in English, that the witness doesn't have an opportunity to review." Id.* at 30:13-16.

As the Court noted, it is ***"standard practice when you're dealing with a single language to give the witness an opportunity to review the document,"*** and "***[t]hat opportunity is not being afforded here under these circumstances." Id.*** at 30:17-19. Thus, the Court concluded that ***"there needs to be a way to make sure that these witnesses are being, essentially, in the equivalent position [as if] they spoke the language in which the document they're being questioned on is written." Id.*** at 30:23-25, 31:1.

### B. As a Compromise, the Court Ordered that Plaintiffs may use Machine Translations of English Documents in Depositions of ZHP Party Witnesses.

During the April 1, 2020 Conference, the ZHP Parties mentioned that "[e]ven a machine-translated document would be better than no translation because it would allow the witness" to evaluate at least some of the context surrounding the portion about which he was being questioned. *Id.* at 15:21-24. Based on this suggestion, the Court requested the parties provide the Court with information about the costs of translation. *Id.* at 24:23-25, 25:1-3. The parties submitted letter briefs on this issue on April 1, 2021. *See* ECF 1102, ECF 1104; *see also* ECF 1129, ECF 1130.

6

The Court held a video conference on April 7, 2021. In advance of that hearing, in a letter dated April 6, 2021, ECF 1130, Plaintiffs argued that "manual/human translation would be extremely burdensome, time consuming, and expensive, and should not be ordered,"[2] but they conceded that translation was necessary, arguing "Plaintiffs should only be required to provide a translation of the page in question, and if in a large document, the prior and subsequent page for surrounding context. Translation of the entire documents is not necessary and would be burdensome and unreasonable, especially since most of the document will not be referenced." ECF 1130.

During the hearing on April 7, Plaintiffs contended that they should be permitted to use a free service like Google Translate should they be required to show Chinese witnesses translated English documents. *See* 4-7-21 Hrg. Tr. at 7:2-8. The ZHP Parties vehemently objected to the use of a free service like Google Translate because it was not the kind of machine translation that could produce

---

[2] Plaintiffs' claim of burden is not credible because the only documents that need to be translated to Chinese are those English documents Plaintiffs intend to introduce as exhibits in the depositions of the seven Chinese witnesses who do not read English. Even if Plaintiff were to introduce 50 such exhibits per witness, which is unlikely, Plaintiffs would only have to translate 350 documents. Moreover, Plaintiffs resistance to procuring adequate translations is at odds with Plaintiffs' burden to present admissible evidence at trial.

translated documents with high levels of accuracy. *Id.* at 8:22-25, 9:1-5, 3-20.[3]
Plaintiffs resisted a more robust machine translation, arguing Google Translate was
"one of the best systems around," *id.* at 11:25, 12:1, and that using a more robust
machine translation service would require "hours and hours" of time to reformat
the translated documents. *Id.* at 48:16-19.

The Court ruled that Plaintiffs could use Google Translate for non-
confidential documents, but noted that the ZHP Parties preserved their objection
with respect to the accuracy of those translations. *Id.* at 17:2-8.  The Court stated
that "this way at least we get beyond where we are right now, where the witness is
being asked questions about documents in English without being able to see them."
*Id.* at 17:5-8.  The Court further ruled that documents that are 20-pages or less
should be entirely translated, and documents longer than 20-pages should have the
relevant portion translated, along with the ten pages before and the ten pages after
the relevant portion, in order to provide context to the witness. *Id.* at 17:9-17.

The Court held a telephonic status conference on April 12, 2021, during
which the Court reiterated that it would allow "plaintiffs [to] use Google
Translate," or another free, but more secure, translation service, "to translate those

---

[3] The ZHP Parties' expressed a willingness to use machine translation in order to
facilitate the depositions, but nonetheless preserved their objections to the
admissibility of the translations due to their inaccuracy as well as to any testimony
elicited thereon. *Id.* at 17:2-8.

documents that have not been marked as confidential." *See* 4-12-21 Hrg. Tr. at

16:16-18.  Plaintiffs specified that they would use a translation service called

"Reverso."  *Id.* at 22:24-25.  "It is an online website" that allows Plaintiffs to

"upload documents and obtain the translated version," and has a "privacy policy

that appears to state that those documents will not be kept and won't be looked at."

*Id.* at 23:2-6.  Like Google Translate, Reverso is an online translation service.[4]

### C.    Reverso Translations Are Inaccurate and Unintelligible and thus Just as Prejudicial as Having No Translations of Documents.

Qiangming Li, ZHP's Director of Quality Control, was the first Chinese

witness to be deposed following the Court's rulings allowing Plaintiffs' to use

Reverso translations.  His deposition was conducted over four consecutive nights

from April 12-16, 2021.  As the following examples demonstrate, the Reverso

translations impeded Mr. Li's deposition, confused Mr. Li, and produced

inadmissible evidence.

### 1.    Exhibits ZHP259A and ZHP259B

Exhibit ZHP259A is an inspection report written in English.  When shown

the Reverso translation of Exhibit ZHP259A, which was marked as Exhibit

ZHP259B, Mr. Li stated the text of the Reverso translation was "messed up."  *See*

Ex. A at 119:23-24, 120:1-2.  Plaintiffs' counsel conceded the inadequacy of the

---

[4] *See* Reverso, available at https://www.reverso.net/text_translation.aspx?lang=EN.

Reverso translation, "There's not much we can do about that because it's a machine translation of a scanned document." *Id.* at 119:3-6. However, Mr. Li still could not understand the questions about Exhibit ZHP259B:

> I just took a glance of this document. I just read the first two pages. I notice that ***there are a lot of mistakes, so that would create a lot of misunderstandings***, because a lot of the names of the personnel were incorrect and there were other inaccuracies as well.
>
> If you look at page 3, it lists the names of five people from our factory who joined a section. However, there are first five – the first four names were incorrect.

*Id.* at 120: 15-24, 121:1. Plaintiffs' counsel simply replied, "Well, let's do the best that we can with it." *Id.* at 121: 3-4.[5]

Similarly, when Plaintiffs' counsel read aloud from a different page of Exhibit ZHP259A, the reading was then orally translated into Chinese by the interpreter. *Id.* at 125:17-24, 126:1-4. Mr. Li responded that the oral translation of the English document[6] did not match the Reverso translation:

---

[5] During the first day of Mr. Li's deposition, counsel for the ZHP Parties asked Plaintiffs for an English translation of an exhibit to which Plaintiffs' counsel was referring. *See* Ex. B at 59:3-6. Plaintiffs' counsel asked, "What would I need an English translation for?" *Id*. at 59:7-8. ZHP Party counsel stated that he needed an English translation to be able to follow along and adequately represent the witness, and Plaintiffs' counsel replied, "Well, that's your problem." *Id*. at 59:9-12. The Court had to intervene and order Plaintiffs to provide an English translation to ZHP Party counsel. *See* 67:10-11 (Zoom Hrg. Tr. 4-12-21).

[6] Rather than present Mr. Li with accurate and complete Chinese translations, throughout Mr. Li's deposition Plaintiffs' counsel read aloud sentences or paragraphs of English documents for oral translation by the interpreter. Not only

> I see that. However, in the Chinese translation, the name – the Chinese name of [V]alsartan was translated into something else.
>
> Under the circumstances, ***I am not sure whether the English version and the Chinese versions are consistent or not. Otherwise, it would mislead me in answering the question and communicating about the matter***.

*Id.* at 126:5-14. In response, Plaintiffs' counsel offered another concession:

> Yes. One thing I'd like to make clear is that the machine translation is not always going to be correct.

*Id.* at 127:9-11.

### 2.    Exhibits ZHP260 and ZHP260A

Plaintiffs marked Exhibit ZHP260, an email chain written in English, and ZHP260A, a Reverso translation of Exhibit ZHP260. *Id.* at 130:14-19. After Mr. Li reviewed the Reverso translation counsel asked, "Are you ready to proceed?" *Id.* at 131:14. Mr. Li responded: "I have roughly read through it. However, ***there were many terms that were incorrect.***" *Id.* at 131:15-17 (emphasis added).

Plaintiffs' counsel then read aloud a portion of the English document, Exhibit ZHP260, and after his reading was translated by the interpreter, Plaintiffs' counsel asked, "Do you see that?" *Id.* at 132:23. Mr. Li then pointed out that he

---

are such translations not "certifiable" document translations, but the process wasted time, exhausted the interpreter, and was still unfair to Mr. Li, who was not able to read the other portions of the English document or the unintelligible Reverso translation.

saw discrepancies between the English and the Reverso translation.  *Id.* at 133:5-

11.  Plaintiffs' counsel then became frustrated:

> So I'll just reiterate for one more time.  The Chinese
> translation is a machine-translated document.  It's not
> going to be perfect.  There will be inaccuracies in the
> translation.
>
> ***The translation that you should rely on today for your
> deposition is the translation that the translator is
> providing to you when I asked questions.***  Okay?

*Id.* at 133:12-20.  In response, Mr. Li explained:

> Okay.  That's fine.  However, if there's any discrepancies
> between the translation from the interpreter versus what I
> read, I need to raise the issue, because that would involve
> two different concepts.
>
> For instance, you mentioned the word "issue," which is a
> neutral one.  However, I saw the word "concern," which
> may indicate the severity of the issue, so I need to raise
> that.

*Id.* at 133:21-24, 134:1-6.  Counsel for both parties then discussed the matter off

the record.

Back on the record, Plaintiffs' counsel repeated his admonition that Mr. Li

needed to answer the question based on the English document despite not being

able to review an accurate translation, stating that the Reverso translations are "for

reference purposes" and "won't be completely accurate."  *Id.* at 135:15-23.  Mr. Li

responded again, noting, "However, if I find out that whatever the interpreter says

is very different from what I read in my Chinese translations, I'm going to raise the

issue.  Is that okay?"  *Id.* at 136:4-9.  Plaintiffs' counsel replied, "Sure."  *Id*. at

136:10.

### 3.    Exhibits ZHP277 and ZHP 277B

Plaintiffs' counsel marked Exhibit ZHP277, an email chain written in

English, and Exhibit ZHP277B, its Chinese Reverso translation, and, reading aloud

from the English document, asked the following question:

> Q.    So this is an e-mail from Sun Pharmaceutical to ZHP
> dated November 17, 2016, and in the body of this e-mail
> it says, "Please find query received from Our RA team."
> And then further down there's a listing of five points.  And
> the first point says, "Against point No. 1 (Trial mail), we
> have again found interference at the retention time of
> Toluene which is having an area of about 1.2 in blank and
> when this interference is calculated against the standard
> area it was found to be around 1.8 ppm, which is greater
> than LOQ (1 ppm). When the interference is greater than
> LOQ, how come we can disregard this peak.  Please ask
> vendor to either justify or provide a control for the same."
>
> MR. WILLIAMSON:  So if you could translate that for
> me so I can ask him a question about that.

Ex. C at 294:14-24, 295:1-10.

Mr. Li could not answer the question based on the interpreter's oral

translation of the English exhibit because the Reverso translation that he was

viewing did not match the English translation read by the interpreter:

> What I read in Chinese was "Against point number 1 (trial
> mail), we have again found interference at the retention
> time of toluene which has a blank area of about 1.2" -- I
> don't know what the "blank area" means.

13

> It says also, "and when this interference is calculated against the standard area, it was found to be around 1.8 ppm, which is greater than LOQ 1 ppm. When the interference is greater than LOQ, how come we can disregard this peak. Please ask the vendor to either provide a justification or a control."

*Id.* at 295:11-24. Plaintiffs' counsel responded, confused as to what Mr. Li just read:

> So, just so I understand, the witness just read the Chinese translation version back to me? Is that what happened?

*Id.* at 296:1-4. Mr. Li answered, "That is correct." *Id.* at 296:5.

Plaintiffs' counsel then asserted that, in effect, the Reverso translation does not matter for purposes of the question:

> Okay. So the machine translation is just to help you get an idea of what the document is saying to give you some reference for the actual document. The actual document that we're looking at is going to control.

> So if you have a question about anything in the document that you want clarification on, you can ask for a sight translation to be performed, and we'll stop the timer and then you can have the translator read to you any portion of this document that you need. Okay?

*Id.* at 296:6-18. Mr. Li responded, stating that while he understood that the English document was what he was being asked about, he could not answer the question because the Reverso translation did not match:

> Okay. However, if you open the Chinese version, the translation says, "the blank area." What is a blank area?

> Also it says, "the standard area." What is a standard area?

14

*Id.* at 296:12-23.

In response, Plaintiffs' counsel again asserted that it is the English document

"that's going to control":

> I can't provide you any guidance on what the Chinese
> translation says. All I can tell you is what the actual
> document says, and that's what I just read to you and was
> translated to you. That's the document that's going to
> control.

> And so, again, if you have a question about the document
> itself and you want any portion of it translated to you, we
> can have the translator perform a sight translation for you.

*Id.* at 296:24, 297:1-10. Counsel for both parties then went off the record to

discuss the translation issue, and the deposition was adjourned not long after.

### 4.    Exhibits ZHP282 and ZHP282A

Plaintiffs marked Exhibit ZHP282, which is an investigation report written

in Mandarin, and Defense counsel was provided with an English translation,

ZHP282A, to follow along. *See* Ex. D. at 361:11-15. Before he asked his

question, Plaintiffs' counsel insisted that Mr. Li read a portion of the document on

the record. *Id.* at 364:3-7. Accordingly, Mr. Li read aloud the following in

Chinese, which was translated into English by the interpreter:

> A.    Okay. First of all, I have to say that the page number
> for this page is page number 1, not page number 2.

> …

> "Number 1. Background. Customers Sun Pharma and
> Glenmark requested our company to identify the structure

of a total of seven unknown impurity peaks in the testing methods for the residual solvents in our company's Valsartan finished products using gas chromatography, namely the peaks at RT 5.3 minute, RT 8.1 minute, RT 10.6 minute, RT 14.1 minute, RT 14.2 minute, RT 14.4 minute, and RT 14.6 minute, respectively, and trace back the sources for these impurities. In the synthetic route for Valsartan, the solvents used are methanol, pentanoyl chloride," spelled as P-E-N-T-A-N-O-Y-L chloride, "dichloromethane, DMF, methyl T-butyl ether, and ethyl acetate. In ZHP's valsartan API synthetic process, for the used solvents, we use both the recovered solvents and the fresh solvents likely. See Table 1 for the typical batch numbers for the tested solvents. Our company's Center of Excellence for Modern Analytical Technologies (CEMAT) determined the known solvents and the unknown residual solvents in the Valsartan finished products in terms of their structures and speculated possible sources or formation routes through tests of used raw materials and solvents in the Valsartan synthetic routes and GC-MS analysis to determine other possible unknown impurities."

*Id.* at 366: 10-24, 367:1-22. The Reverso translation of the same paragraph in

ZHP282A reads as follows:

Customer 8^11? 11&1013 And 016111113^ require that 0 5.3 and 11, 0 8.1 in the detection methodology for vapor-phase residual solvents in the company's finished products be tested for less than 10.6 1111 in the Shamachi method. 0 14.1 111 out, III 14.2 and 11, machi 14.4 and 11 and machi 14.6 010 the structure of a total of 7 unknown impurity peaks is identified and the source of these impurities can be traced. Methanol, pentylchloro, dichloromethane, 0^1 are used in the synthesis path of xtan? , methyl tert-butyl and ethyl acetate, in the Huahai Pistam synthesis process, these reagents may contain both recycled and fresh solvents, and a typical batch number of solvents sent for inspection can be found in 131) 16 1, The

16

> company's Advanced analytical Technology Center
> (source) detects the raw materials and solvents used in the
> synthetic path of tastan, and at the same time identifies
> other potentially unknown impurities through 62 domestic
> servants, to confirm the structure of known solvents and
> unknown residual solvents in the finished product of xtam
> and to speculate on their possible sources or ways of
> generation.

See ZHP282A.  As this comparison demonstrates, Reverso does not produce

adequate translations.

Not surprisingly, Defense counsel objected: "Let me just note for the record

that the machine translation of the English version does not say anything like what

the witness just read, and I suspect that's why, George, you had him read the

Chinese version into the record.  But I just want to note that the English translation

does not at all correspond to what the witness just read, and so I'm having trouble

following along here."  Ex. D at 368:3-16.

5.    Exhibits ZHP289 and ZHP289A

Plaintiffs' counsel sought to question Mr. Li about ZHP289, a report written

in English, and its Reverso translation, ZHP289A.  When Mr. Li opened the

Reverso translation, he noted that "the content is really scrambled, with blank

pages."  Id. at 417:1-2.  Plaintiffs' counsel asked Mr. Li to notify him once he

reviewed the document.  Id. at 417:13-14.  Mr. Li responded, "Since I cannot read

the Chinese version, why don't you ask me the question, and then I will ask the

translator to conduct such sight translation."  Id. at 417:15-18.  Thus, Mr. Li was

17

repeatedly forced to answer specific sentences of the English document read aloud and translated into Chinese by the interpreter. *Id*. 421:23-24, 422:1-4, 21-24, 423:-3, 424:7-13.

### D. Reverso, As An Online Translation Service, Is a Bottom-Tier Translation Service That Cannot Produce True and Correct Translations of Documents.

Meg Ruthenburg is a Senior Director of Operations at GLOBO Language Solutions. *See* Ex. E. She explains that "[t]he industry-standard for quality translation entails a three-step process of translation by one linguist, editing by a second linguist, and proofreading by a third linguist." *Id*. at ¶ 3. Using multiple human translators to review every translated document reduces the risk of error, and this industry standard for translation is what is required for certification by the International Organization for Standardization ("ISO"). *Id*. This process allows for certification of translations as true, accurate, and complete translations of the original document. *Id.* at ¶ 4.

Reverso translation is a "[n]on-professional machine translation" that is "unable to match the quality and accuracy of translations that have undergone the human translation process" as called for by the ISO. *Id.* at ¶ 5. "[N]on-professional machine translation" like Reverso "is particularly unreliable for highly-technical content." *Id.* at ¶ 6. "Since there is no human translator or editor, machine translations produced in this manner cannot be certified." *Id.*

18

"Non-professional machine translation" is different "from some of the advanced machine translation technologies that use artificial intelligence and neural networks to produce superior-quality translations." *Id*. at ¶ 7. "These advanced systems depend on training the translation engine to produce accurate translations by inputting data sets and validating the translation choices produced by the engine." *Id.* "This requires the input of humans or pre-existing databases of validated translations to help the translation engine learn." *Id*. "This is not the type of machine translation users of Reverso access." *Id.*

At Ms. Ruthenburg's direction, Globo translated Exhibits 266 and 272 from Chinese into English using human translation. A comparison of those translations to the Reverso translations of the same documents demonstrates that Reverso is woefully inadequate for use in legal proceedings.

## III.    ARGUMENT

The principle that parties and witnesses in litigation who do not read or speak English must be provided with accurate translations and interpreters is well established in the law.  "It is long-settled that a competent translation is fundamental to a full and fair hearing." *Perez-Lastor v. I.N.S.*, 208 F.3d 773, 778 (9th Cir. 2000).  "Moreover, an incorrect or incomplete translation is the functional equivalent of no translation."  *Id*.  Indeed, this Court has ruled that it would be unfair to require a ZHP Party witness to answer questions about a document

19

written in English if the witness cannot read English.  However, the compromise of

allowing Plaintiffs to present Chinese witnesses with English documents translated

using Reverso has not facilitated the depositions, but rather has resulted in a record

fraught with witness confusion, testimony inaccuracies, and inadmissible evidence.

As demonstrate above, the Reverso translations are "the functional equivalent of

no translation." *Id.*  Accordingly, the Court should grant a protective order

allowing ZHP Party witnesses to refrain from answering questions based on

documents they cannot read and inadequate translations that they do not

understand.

## A.  Plaintiffs' Use of Inadequate Translations for Depositions of ZHP Chinese National Witnesses Is Unfair to the Witnesses.

### 1.  Courts and scholars consistently recognize the inadequacy of online translation services.

"Google Translate *or other analogous automated services* do not constitute

professional translation or interpretation services." *Sec. & Exch. Comm'n v.*

*Shaohua Yin*, No. 17-CV-972 (JPO), 2020 WL 6801915, at *6 (S.D.N.Y. Nov. 19,

2020) (emphasis added).  Notably, scholars who have evaluated online translation

services have determined that Google Translate is the best at translating Chinese to

English.  *See* Chunyu Kit & Tak Ming Wong, Comparative Evaluation of Online

Machine Translation Systems with Legal Texts, 100 Law Libr. J. 299, 316 (2008)

(comparing six online translation services).[7]  Although Reverso was not a part of

that study, it is nonetheless telling that courts across the country have rejected

Google Translate, despite it being the best among the online translation platforms.

*See, e.g., Novelty Textile, Inc. v. Windsor Fashions, Inc.*, No. CV 12-05602 DDP

MANX, 2013 WL 1164065, at *3 (C.D. Cal. Mar. 20, 2013) (finding that "a

translation by Google Translate is not sufficiently reliable to make it admissible,"

and explaining that "[t]he translation's unreliability is clear on its face"); *Cory*

*Longo v. OSI Systems, Inc., et al.,* No. CV 17-8841 FMO (SKX), 2021 WL

1232678, at *7 (C.D. Cal. Mar. 31, 2021) (noting that there is "no basis or

evidence to conclude that Google's translate feature is sufficient to accurately

translate extremely complicated legal and financial documents").

Moreover, scholars have pointed out that online translations are particularly

bad at translating Asian languages, including Chinese.  *See* Kit &

Wong, Comparative Evaluation of Online Machine Translation Systems with

Legal Texts, 100 Law Libr. J. at 315 (explaining that the performance of online

translations on "Chinese, Japanese, and Korean … *are remarkably poorer* than that

on other languages" because "[t]he three Asian languages differ greatly from

---

[7] At the time of the study, Reverso had a word limit that precluded its inclusion in
the study.  Kit & Wong, Comparative Evaluation of Online Machine Translation
Systems with Legal Texts, 100 Law Libr. J. at 311, n.67.

English in terms of their idiosyncratic linguistic features and structures at all morphologic, syntactic, and semantic levels").[8]  "[C]ontext is very important when performing interpretations," and "Google Translate cannot take context into consideration."  *United States v. Cruz-Zamora*, 318 F. Supp. 3d 1264, 1267, 1271 (D. Kan. 2018).  This is especially true with regard to Asian languages, like Mandarin.  *See Shaohua Yin*, 2020 WL 6801915, at *6.

"[G]iven the nature of language interpretation," statements in English documents that are translated to another language "are not one and the same."  *United States v. Charles*, 722 F.3d 1319, 1324 (11th Cir. 2013).  Translating words from one language into another requires interpretation.  *Id*.  "Language interpretation … does not provide for a 'one-to-one correspondence between words or concepts in different languages.'"  *Id.* (quoting National Association of Judiciary Interpreters and Translators, *Frequently Asked Questions about Court and Legal Interpreting and Translating*, http://www.najit.org/certification/faq.php#techniques (last visited June 17, 2013)).

Interpreting and translating meaning from one language to another requires accounting for "'the contextual, pragmatic meaning of specific language.'"  *Id.*

---

[8] Morphologic features of languages relates to the forms of words, in particular inflected forms.  Syntax is the order or arrangement of words and phrases to form proper sentences.  And Semantics is the relationship between words and how to draw meaning from words.

(quoting Muneer I. Ahmad, *Interpreting Communities: Lawyering Across Language Difference,* 54 UCLA L. Rev. 999, 1035 (2007)). "Google Translate or other analogous automated services," like Reverso, cannot translate in a way that accounts for context, and are thus not fit for court proceedings. *Shaohua Yin*, 2020 WL 6801915, at *6.

In sum, United States Courts and scholars uniformly agree with the analysis provided by Ms. Ruthenburg that translation programs like Reverso cannot accurately translate documents. *See* Ex. E. *See Shaohua Yin*, 2020 WL 6801915, at *6; *Novelty Textile, Inc.*, 2013 WL 1164065, at *3; *Cory Longo.,* 2021 WL 1232678, at *7; Kit & Wong, Comparative Evaluation of Online Machine Translation Systems with Legal Texts, 100 Law Libr. J. at 315. Reverso cannot accurately capture the contextual cues in the documents in this case, and even fails to translate word-for-word. Reverso does not meet industry standards for translation, and is a bottom-tier, "non-professional" translation service unfit for Court proceedings. *See* Exhibit E.

2.   Courts protect parties and witnesses from the unfair use of inadequate translations in court proceedings.

When a party or witness claims that an incompetent translation is being used in court proceedings, "unresponsive answers by the witness provide circumstantial evidence of translation problems." *Perez-Lastor*, 208 F.3d at 778. Another "indicator of an incompetent translation is the witness's expression of difficulty

23

understanding what is said to him." *Id*.  Where this circumstantial evidence is present, the "evidence is more than sufficient" to establish "that the translation … [i]s not competent."  *Id.* at 780.

The principle "that a competent translation is fundamental to a full and fair hearing" operates in criminal, immigration, and civil litigation, because it can lead to convictions based on insufficient evidence, the deprivation of due process, and the improper entry of summary judgment.  *Id*.

For example, *Murphy v. Lazarev*, No. 3:10-cv-0530, 2012 WL 6188471 (M.D. Tenn. Dec. 12, 2012) illustrates the danger of inadequate and incomplete translations of documents in civil litigation.  In *Murphy*, the district court reversed its own grant of summary judgment after the plaintiffs "filed complete translations of the Producer's Agreement and Supplemental Producer's Agreement," which contained "previously untranslated portions of the record."  *Id.* at *2, *4.  Previously, the defendant had "provide[d] only partial translations and … ma[d]e sworn representations about the context of those records, including untranslated portions thereof."  *Id.* at *4.  The court, "[h]aving reexamined the complete record," was "persuaded that summary judgment on the plaintiffs' copyright claims [wa]s not warranted."  *Id*.

*United States v. Nippon Paper Industries Co., Ltd.*, 62 F. Supp. 2d 173 (D. Mass. 1999) also illustrates the importance of fairness in translating documents and

24

questioning witnesses, this time in the context of antitrust litigation.  The defendant

filed a motion for acquittal after the jury deadlocked.  *Id.* at 177.  Specifically, the

defendant contested "the translation of the [Japanese] word 'Sando.'"  *Id.* at 184.

The government alleged that "Sando" means "agreement," while the defendant

argued that it means "concurrence."  *Id.*  Partly based on this translation dispute,

the district court found "that the government has failed to current its burden of

proof on any of the three elements of the price-fixing conspiracy."  *Id.* at 196.

And in *Augustin v. Sava*, 735 F.2d 32 (2d Cir. 1984), an immigrant applied

for relief from deportation, alleging that the district court violated his right to due

process when it failed to furnish him "with an accurate and complete translation of

official proceedings."  *Id.* at 37.  The Second Circuit agreed, stating that

"translations services must be sufficient to enable the applicant to place his claim

before the judge."  *Id.*  The Court reasoned that "[t]he very essence of due process

is a meaningful opportunity to be heard."  *Id.* (internal quotation marks omitted).

Thus, the Court held that the petitioner was "very likely" denied "due process …

where the translation of the asylum application was nonsensical."  *Id.* at 38.

Technical pharmaceutical concepts that are difficult to translate predominate

in this lawsuit.  Plaintiffs have fought tooth-and-nail to avoid providing adequate

translations of documents, and it repeatedly became clear throughout Mr. Li's

deposition that the Reverso translations were incorrect and incomplete.  In fact,

Plaintiffs' counsel conceded the "inaccuracies" and stated: "The translation that you should rely on today for your deposition is the translation that the translator is providing to you when I asked questions." Ex. A at 133:17-20. Thus, Plaintiffs' counsel conceded that the Reverso translation leaves witnesses like Mr. Li with *nothing to review*, and admitted that Mr. Li was forced to rely on the oral or sight translation of specific sentences or paragraphs of an English document, which is exactly what this Court forbade during the April 1 Conference. *See* 4-1-21 Hrg. Tr. at 24:20-22 (requiring as a "matter of fairness" be given a meaningful opportunity to review each document during depositions), 30:23-25, 31:1 ("[T]here needs to be a way to make sure that these witnesses are being, essentially, in the equivalent position [as if] they spoke the language in which the document they're being questioned on is written.").

Mr. Li repeatedly expressed difficulties with the Reverso translated documents about which he was being questioned, and he repeatedly revealed discrepancies between the English and translated versions of the documents. Ex. A at 120:15-24, 121:1, 126:5-14, 131:15-17; Ex. C at 296:12-23; Ex. D at 417:1-2. *See Perez-Lastor*, 208 F.3d at 778 (holding that unresponsive answers and difficulty answering questions regarding translated material is sufficient evidence of incompetent translation). As set forth above, the Reverso translation is so bad that, in one instance, Plaintiff's counsel *used Mr. Li to read the Chinese document*

26

*into the record so that the deposition interpreter could translate the document into English for Plaintiff's counsel to make up for the fact that the Reverso translation was unusable*, and only then could Plaintiff's counsel ask his question about the document.  Ex. D at 364:3-7.

Mr. Li's difficulties are consistent with the conclusions of the Ruthenburg Declaration, the scholarly literature, and the analysis of the courts that online translation services cannot accurately translate between English and Chinese, particularly with regard to technical terms or documents.  *See* Ex. E.  *See Shaohua Yin*, 2020 WL 6801915, at *6; *Novelty Textile, Inc.*, 2013 WL 1164065, at *3; *Cory Longo.,* 2021 WL 1232678, at *7; Kit & Wong, <u>Comparative Evaluation of Online Machine Translation Systems with Legal Texts</u>, 100 Law Libr. J. at 315.

As a result, Plaintiffs' use of inadequate translations threatens the ZHP Parties' due process rights and equal protection.  *See Augustin*, 735 F.2d at 37-38 (reasoning that "[t]he very essence of due process is a meaningful opportunity to be heard" and that the petitioner was "very likely" denied "due process … where the translation of the asylum application was nonsensical").  In order to have a meaningful opportunity to be heard, the ZHP party witnesses need to be able to provide facts based on accurate translations.  Currently, however, they are being forced into guesswork.

Because the record is so fraught with error, the Reverso translations threaten to introduce errors into the litigation as a whole. *See Murphy*, 2012 WL 6188471, at *4 (revoking summary judgment because the prior order was based on partial translations of important documents that, based on a lack of context, altered the perceived meaning of important contract terms); *Nippon Paper Industries Co., Ltd.*, 62 F. Supp. 2d at 184, 196 (entering judgment of acquittal because the government never proved that a Japanese word unambiguously conveyed agreement to price-fixing). Thus, the depositions may produce no admissible evidence at trial, or create a record that is inherently appealable.

This Court has repeatedly cautioned Plaintiffs that the ZHP party witnesses who do not speak or read English must be fairly questioned based on accurate translations and placed in the equivalent position of an English speaking witness. *See* 4-1-21 Hrg. Tr. at 24:20-22, 30:23-25, 31:1. In an effort to cut costs by using an extremely basic program like Reverso, Plaintiffs have failed to honor that obligation. As a matter of law, "an incorrect or incomplete translation is the functional equivalent of no translation." *Perez-Lastor*, 208 F.3d at 778. Thus, Plaintiffs' use of Reverso places us right back where we started—ZHP Party witnesses are left only with the sight translation of specific sentences or paragraphs of a document, which this Court ruled was inadequate and unfair. This Court should enter an order that ZHP Party witnesses who do not read English should be

28

permitted to refuse to answer questions based on inadequate translations of English documents.

### B. Plaintiffs' Manner of Deposing the Chinese National Witnesses Is Discriminatory.

Refusing to provide adequate translations for party witnesses is discriminatory. As a matter of professional ethics, lawyers must not "engage in conduct that the lawyer knows or reasonably should know is … discrimination on the basis of race, … national origin, [or] ethnicity … in conduct related to the practice of law." Model Rule of Professional Conduct 8.4(g). Proceedings that penalize non-English speakers based on their inability to speak or read English are discriminatory.

For example, in *Yellen v. Baez*, 676 N.Y.S.2d 724 (N.Y. Civ. Ct. 1997), a landlord brought a summary proceeding for nonpayment of rent against one of his tenants who did not speak English. *Id.* at 724. The proceeding needed to be adjoined in order to secure an interpreter for the tenant. *Id.* State law required that all adjournments of a summary proceeding be charged against the respondent. *Id.* at 727. The court held that this law violated the equal protection clause of the New York State Constitution when applied to adjournments necessary to obtain an interpreter because, as applied, it discriminated on the basis of nationality by effectively penalizing non-English speakers. *Id* at 726-27.

Here, the Court has cautioned Plaintiffs that it is "extremely sensitive" to issues where "a witness who doesn't speak English [is] being asked questions about documents" that "the witness doesn't have an opportunity to review." *See* 4-1-21 Hrg. Tr. at 30:13-16. The Court explained, it is "standard practice when you're dealing with a single language to give the witness an opportunity to review the document," and forcing witnesses to rely on sight translations means "[t]hat opportunity is not being afforded here." *See id*. at 30:16-20. Nevertheless, Plaintiffs are not placing the Chinese, non-English speaking ZHP party witnesses in the position that English-speaking deponents enjoy. That is, by definition, discrimination based on national origin. The Court should enter a protective order that allows the ZHP party witnesses to refrain from being forced to answer questions based on documents written in a language they cannot read without adequate translations.

## C.    The Obligation to Translate a Document for Use in a Deposition Is the Questioning Attorney's Obligation.

Plaintiffs have argued that it is the ZHP Parties' responsibility to provide them with translated documents for use in *their depositions* of ZHP party witnesses, and also argued that they should not have to bear the cost of providing an accurate translation to the witnesses. Both arguments are utterly contrary to law.

The party noticing the deposition bears the obligation to translate documents to a witness's native language. *See Dude v. Cong. Plaza, LLC*, No. 17-80522-CIV, 2019 WL 3937974, at *3 (S.D. Fla. Aug. 20, 2019) (noting that for a deposition of a German-speaking witness, the noticing party "will need to have documents translated and obtain a translator and court reporter"). The party noticing the deposition also bears the translation costs. *See, e.g., Warner Bros. Int'l Television Distrib. v. Golden Channels & Co.*, No. CV 02-09326-MMM (SHSX), 2003 WL 27384422, at *7 (C.D. Cal. Aug. 15, 2003) ("The party seeking discovery generally bears the costs of translation services."); *E. Bos. Ecumenical Cmty. Council, Inc. v. Mastrorillo*, 124 F.R.D. 14, 15 (D. Mass. 1989) (placing the costs of translation on the party noticing the deposition). Nor should ZHP be under any obligation to provide Plaintiffs with translations. "[T]he requesting party should do the translating." *In re Puerto Rico Elec. Power Auth.*, 687 F.2d 501, 508 (1st Cir. 1982).

In *In re Puerto Rico Electric Power Authority*, the district court ordered the party responding to requests for documents under Rule 34 of the Federal Rules of Civil Procedure to translate documents from Spanish to English before producing them. *Id.* at 508. The First Circuit reversed the district court, holding that Rule 34 only permitted shifting the burden of translation electronically stored information

31

or data into a usable form, *not* the translation from one human language to another. *Id.* at 509-10.

Plaintiffs' attempt to shirk their burden of accurately translating documents that it intends to question ZHP Party witnesses on is contrary to law.

### D. Uncertified Translations Are Not Admissible at Trial, and the Common and Best Practice for Deposing Foreign Nationals Is to Prepare Certified Translations.

Under Federal Rule of Evidence 901, a party must authenticate a document with "evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). "A translated document must be properly authenticated, and any translation must be shown to be accurate and done by a competent translator." *Jiajie Zhu v. Jing Li*, No. 19-cv-02534-JSW, 2019 WL 6050961, at *5 (N.D. Cal. Nov. 15, 2019) (citing Fed. R. Evid. 604, 901); *see also Consejo de Desarrollo Economico de Mexicali, AC v. United States*, 438 F. Supp. 2d 1207, 1226 (D. Nev. 2006), *rev'd on other grounds by* 482 F.3d 1157 (9th Cir. 2007) (requiring that translated documents be "true and correct translations"). This requires a certification of accuracy by a competent translator. *See NV Petrus SA v. LPG Trading Corp.*, No. 14-CV-3138 (NGG) (PK), 2017 WL 1905820, at *2 (E.D.N.Y. May 8, 2017) ("Plaintiffs are … must provide certified translations of any foreign language documents that they seek to introduce at trial."); *United States v. Gasperini*, No. 16-CR-441 (NGG), 2017 WL 3140366, at *4 (E.D.N.Y.

32

July 21, 2017) ("[F]oreign language documents for which certified translations are not provided … will be held inadmissible at trial.").

The utterly inadequate Reverso translations being provided to ZHP Party witnesses at their depositions are not certified translations.  Therefore, these depositions are filled with documents and testimony thereon that are not admissible evidence.  *See Sicom S.P.A. v. TRS Inc.*, 168 F. Supp. 3d 698, 709 (S.D.N.Y. 2016) ("[F]oreign-language documents … cannot be reviewed or relied on by the Court, even if otherwise properly authenticated in the declaration to which they are attached, unless they are accompanied by certified translations in English.").

## IV.    CONCLUSION

WHEREFORE, the Court should enter a protective order allowing ZHP Party witnesses who do not speak English to refrain from answering questions based on documents written in English and not accompanied with an accurate and complete translation in Chinese because an answer to a question based on a document a witness cannot read is inherently unreliable, unfairly prejudicial, and inadmissible.

Respectfully submitted,


By: /s/ Seth A. Goldberg

DUANE MORRIS LLP
Seth A. Goldberg, Lead Counsel and
Liaison Counsel for Defendants
30 South 17th Street Philadelphia,
Pennsylvania 19103
Tel.: (215) 979-1000
Fax: (215) 979-1020
SAGoldberg@duanemorris.com

*Attorney for Zhejiang Huahai
Pharmaceutical Co, Ltd., Huahai
U.S., Inc., Prinston Pharmaceutical
Inc., and Solco Healthcare US, LLC*