# Exhibit H

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

IN RE: VALSARTAN, LOSARTAN, AND IRBESARTAN PRODUCTS LIABILITY LITIGATION

CIVIL ACTION NUMBER:

1:19-md-02875-RBK-KW

STATUS CONFERENCE
(Via telephone)

Wednesday, March 24, 2021
Commencing at 11:00 a.m.

B E F O R E: SPECIAL MASTER, THE HONORABLE THOMAS I. VANASKIE

A P P E A R A N C E S:

MAZIE SLATER KATZ & FREEMAN, LLC
BY: ADAM M. SLATER, ESQUIRE
103 Eisenhower Parkway
Roseland, New Jersey 07068
For the Plaintiffs

GOLOMB & HONIK PC
BY: RUBEN HONIK, ESQUIRE
1835 Market Street, Suite 2900
Philadelphia, Pennsylvania 19103
For the Plaintiffs

SLACK & DAVIS, LLP
BY: JOHN RANDOLPH DAVIS, ESQUIRE
2705 Bee Cove Road, Suite 220
Austin, Texas 78746
For the Plaintiffs

LEVIN PAPANTONIO
BY: DANIEL A. NIGH, ESQUIRE
316 S. Baylen, Suite 600
Pensacola, Florida 32502
For the Plaintiffs

Karen Friedlander, Official Court Reporter
friedlanderreporter@gmail.com
(856) 756-0160

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

**A P P E A R A N C E S: - CONTINUED**

GOLDENBERG LAW PLLC
BY: MARLENE J. GOLDENBERG, ESQUIRE
800 Lasalle Avenue
Suite 2150
Minneapolis, Minnesota 55402
For the Plaintiffs

DUANE MORRIS LLP
BY: SETH A. GOLDBERG, ESQUIRE
30 S. 17th Street
Philadelphia, Pennsylvania 19103
For the Defendant, ZHP and the Joint Defense Group

ULMER & BERNE LLP
BY: JEFFREY DANIEL GEOPPINGER, ESQUIRE
600 Vine Street
Suite 2800
Cincinnati, OH 45202
For the Defendant, AmerisourceBergen

CIPRIANI & WERNER, P.C.
BY: JESSICA M. HEINZ, ESQUIRE
ETHAN FELDMAN, ESQUIRE
450 Sentry Parkway, Suite 200
Blue Bell, PA 19422
For the Defendant, Aurobindo Pharma USA, Inc., Aurolife Pharma, LLC and Aurobindo Pharma, Ltd.

PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI LLP
BY: CLEM C. TRISCHLER, ESQUIRE
One Oxford Centre, 38th Floor
Pittsburgh, Pennsylvania 15219
For the Defendant, Mylan and the Joint Defense Group

BARNES & THORNBURG LLP
BY: KRISTEN LEE RICHER, ESQUIRE
SARAH E. JOHNSTON, ESQUIRE
2029 Century Park East, Suite 300
Los Angeles, CA 90067-2904
For the Defendant, CVS Health Co.

HILL WALLACK LLP
BY: NAKUL SHAH, ESQUIRE
575 Lexington Avenue
4th Floor, Suite 4057
New York, NY 10022
For the Defendant, Hetero Labs

(ALL PARTIES VIA TELEPHONE, March 24, 2021, 11:00 a.m.)

JUDGE VANASKIE: We may still have others joining, but I think we can get started.

Mr. Slater, are you comfortable proceeding now?

MR. SLATER: Yes, Your Honor, thank you very much.

JUDGE VANASKIE: All right. Mr. Goldberg, are you comfortable proceeding now?

MR. GOLDBERG: Yes, Your Honor, I believe so. I believe all of defense counsel are back on.

JUDGE VANASKIE: Okay. We'll give it another minute or two.

All right. We will start now and we'll start with my apology. This snafu is my fault. On March 4th, I received an e-mail from Loretta Smith asking whether we could change this CMC from March 24th to March 31st, due to the unavailability of Judge Kugler today, and I said, of course, and then proceeded to forget about it and that's why this happened.

So there will be a notice going out for a CMC for next Wednesday, March 31st, at 10:00 a.m., but I was hoping we could have dialogue now with respect to some other significant matters that have been raised in the letters that I received yesterday.

With that said, again, I'm sorry, because the mess-up was on my end and we'll try to make sure we don't do this

again.

I wanted to proceed with the matters that are within my bailiwick that are set forth in the letters that we received yesterday.

MS. GOLDENBERG: Judge, this is Marlene Goldenberg. I'm so sorry to interrupt. I just wanted to confirm, there are a number of plaintiffs' counsel on the phone who are here because of plaintiff fact sheet deficiencies, and typically, that is an issue addressed with Judge Kugler.

Would it be okay if I told them they were all right to hang up the phone?

JUDGE VANASKIE: Yes, yes. Ms. Goldenberg, they are free to hang up the phone, that will not be addressed on this call, but will be addressed next Wednesday in the call when Judge Kugler's available.

MS. GOLDENBERG: Thank you very much.

JUDGE VANASKIE: Thank you for letting me know that. All right. We'll continue to proceed then.

I wanted to pursue this matter in the order of the items that were listed in Mr. Slater's letter of yesterday, but there were three other issues that I was hoping we could address.

One, I flagged for you earlier this week, and that is the work product assertions that have been -- and attorney/client privilege assertions that have been raised

 with respect to third-party subpoenas served on ToxRox, and I wanted to get a clarification on this because the other party's name has sometimes been typed out as Meridian and other times as Meridan. So I didn't know if it was Meridian or Meridan, and I just wanted to get clarification on that.

MR. FELDMAN: Good morning, Your Honor, this is Ethan Feldman on behalf of the Aurobindo defendants. It is Meridan.

JUDGE VANASKIE: Okay. All right. So I did want to talk about that matter later in our conference call. I wanted to talk about the issue of whether documents withheld as unresponsive are responsive, and I have sent out an e-mail today, a list of the rows of the documents that I have, using a random number generator, identified as documents that should be produced for in-camera review, but I wanted to have a brief discussion about that first, hopefully.

If you're caught unaware or unprepared, we can always postpone that discussion to next week.

And then, finally, at the conclusion of going through the matters on counsel's letters, I wanted to get an understanding of the outstanding issues before me and get your sense of what I should prioritize.

But starting off with Mr. Slater's letter of March 23rd, I wanted to start there. I am concerned that we continue to have substantial discovery issues with respect to production of documents, but there's no avoiding it, so I'd

like to start there, and Mr. Slater, I'll give you the opportunity to be heard first with respect to Hetero discovery status.

MR. SLATER: Thank you, Your Honor. And I'm going to do this. This is Adam Slater for the record, and I'm going to do this in as a condensed fashion as possible taking into account, you know, the timing issues. I think I have a solution to how do we get to where we need to get to.

So we've cataloged for Your Honor our concerns over the course of the last several weeks, and Hetero has provided their responses, and in their most recent submission to Your Honor in yesterday's agenda letter, Hetero essentially is representing now that they have completely complied with all of their production obligations.

So, you know, from that starting point, there's two things I'd like to submit to Your Honor.

One, there are still submissions that we have been discussing in this process and requests for information and documents that have not yet been addressed even by the agenda letter from Hetero yesterday.

For example, as they've acknowledged to us, these e-mails, just in the last 24 hours, they are still searching to try to find and identify e-mails and other documents surrounding the revisions and the preparation of these standard operating procedures, the quality manuals and their

other quality booklets, because we basically have nothing showing the drafting, the back and forth you would expect to see, and the decisionmaking.

Second, we've asked multiple times and been told we would be provided a list of the applications, the databases, the structured databases, the share points and other software that they have now collected documents from, and identified through the interview process with their client, which they're required to perform in order to produce ESI.

We've asked for that multiple times. It's not been produced, along with confirmation that all of the responsive documents from those sources have been provided.

We also are waiting for audit reports to be confirmed as having been provided in full. Master SOP indexes, FDA meeting notes and compliant-production indexes that actually list all of the custodian Bates ranges.

So those are some examples of things that we have not -- that were not addressed to Hetero's letter yesterday.

No. 2, Hetero had made a representation they have completed production of the various categories of documents they listed in their agenda letter. One of them, I'll just note for the record, and we're going to have to now look at their production and discuss with them further, Analyst Labs which is a third party that Hetero agreed to produce documents for. The production is still very questionable to us and I'm

 just stating that for the record. It doesn't have to be resolved today, but there are three documents relating to Valsartan testing, and the rest relates to Losartan.

We find that to be difficult to understand or to believe that can be complete. It may still be amended data or production issue, but we will have to figure that out over the next week.

The balance of the productions that were made, many of them were made yesterday. Some of the key productions where they're claiming they've now completed their production, we have to obviously review those, review the overlay files and make sure they are functional and correct, et cetera.

So what I would suggest, Your Honor, is this. Since we haven't even had an opportunity to see the documents, because they're just being loaded since last night, I would suggest this. We are going to go through everything they've produced. We have put them on notice of the ongoing issues, and if Hetero wants to stand on saying they've produced everything, despite our ongoing concerns and knowing that we have raised issues that haven't been raised, and subject to our review of their documents, my sense is that next week's conference may be fortuitous that we've been kicked forward a week, because we would like to then be able to present in definitive fashion where we stand, and if despite the representation from Hetero in their agenda letter that it

 turns out they have not completed production and material documents and information remain outstanding, I think at that point we're going to have to come to an understanding with Your Honor as to what remains outstanding and what the appropriate way forward is, including potential litigation-wide sanctions, including what we're going to do with depositions.

Because as Your Honor appreciates, we can't keep putting off depositions forever.

If it turns out that the productions are up to date and that the other issues that I've listed and the other issues we've been discussing get resolved by next Wednesday, then we will be all the happier and we will then be able to move forward with the depositions.

JUDGE VANASKIE: All right. Very well. Thank you, Mr. Slater. Who will be addressing this for Hetero?

MR. SHAH: Good morning, Your Honor, this is Nakul Shah on behalf of Hetero Labs and Hetero Drugs. I just wanted to make one quick clarification with respect to plaintiffs' statement that our agenda letter indicated that all productions are complete.

It's actually not what our agenda letter stated. We stated that we are complete with respect to the Analyst Lab production, and additionally, that we have produced all of the SOP-related documents that plaintiffs have requested.

So notwithstanding that point, Your Honor, I just wanted to emphasize that Hetero's been working diligently to address each and every point that plaintiffs have raised with respect to our document productions.

As we've stated in our last status letter to Your Honor, we transmitted several overlay files to correct metadata deficiencies, we've provided updated privilege logs. We've provided specific data that the plaintiffs are requesting. We dedesignated consensual documents that plaintiffs requested, and we made two productions with respect to Analyst Labs.

Since that time, we've made additional supplemental document productions of -- plaintiffs are requesting. We've additionally provided a final cast of characters. We've remedied additional metadata deficiencies and we've produced the particular documents that plaintiffs have previously stated were particularly relevant and important in order to proceed with depositions. Which are versions of SOP-related documents, in addition to site master files and quality system manuals and master SOP indexes.

All of these documents have been produced to plaintiffs and we're working diligently and tirelessly to ensure that we address each and every point that plaintiffs have raised.

What remains now is a very narrow discrete set of

outstanding issues that Hetero is confident that we can work with plaintiffs to remedy quite expeditiously.

We believe that we've made significant progress since our last status letter to the Court, and we don't believe that it would require significantly more time in order to address the outstanding issues.

JUDGE VANASKIE: Well, I'm encouraged by that report, and as Mr. Slater indicated, many documents were received just yesterday.

I agree with you, Mr. Slater, that you should review those -- the latest production and then make a determination as to whether it is complete and what issues remain outstanding. I understand there may be some issues that are outstanding and there is a commitment to continue to have a dialogue to resolve those disputes, but hopefully they can be resolved by next Wednesday so at least we can get these matters addressed today and keep the matter moving, hopefully, with final resolution coming next Wednesday.

I certainly wouldn't relish the receipt of sanctions motions for discovery problems, but if it comes down to that, it has to come down to that. So I'm hoping we can avoid that, but understand that that might not be avoidable.

But I'll encourage you to continue to work together to get this matter resolved. I know it's extremely complex and extremely voluminous, but it needs to be done.

Anything else on Hetero, on this particular point right now?

MR. SLATER: No, Your Honor, not for the plaintiffs. Thank you for your guidance.

JUDGE VANASKIE: All right. Okay. Anything else from Hetero?

MS. SHAH: No, Your Honor, thank you.

JUDGE VANASKIE: All right. Thank you.

The next item that I had was Aurobindo, and there's many pages taken up in the plaintiffs' letter on Aurobindo. Mr. Slater?

MR. SLATER: I'm going to hand this off, Your Honor, to Marlene Goldenberg and --

JUDGE VANASKIE: Okay.

MR. SLATER: -- she will then handle this issue, and I don't think I'll be handling too many other issues today, if any, so I'll be handing off to my colleagues. Thank you.

JUDGE VANASKIE: Very well, thank you.

MS. GOLDENBERG: Good morning, Your Honor.

JUDGE VANASKIE: Ms. Goldenberg, good morning.

MS. GOLDENBERG: Yes. And so there is a lot in here, and because it sounds like you've -- thankfully, we appreciate you taking the time to read it, so I'm not going to rehash everything in the letter. I'm just going to start with what we're asking for in each section, and if you have questions,

I'll be happy to delve into why.

But the first thing that we're asking Aurobindo to do is to search the noncustodial files that we've been asking them to search for months now, because we've now taken a deposition and found that there are at least three or four shared drives as well as a number of software programs that are regularly utilized by Aurobindo employees, and as we've demonstrated in the last deposition, the only documents we had received as to that custodian, all had a file path that shows those documents were only from Outlook and were not searched anywhere else.

We also determined that there were a number of documents that were kept in paper form, and as we have no documents that appear to have been scanned up for that custodian, we also learned that were missing batch records, for example, as well as all of the notebooks that that witness regularly kept in the course of doing his job for Valsartan.

And so we're asking the Court to order Aurobindo to search those shared drives to produce the paper files and to produce the notebooks that that witness kept.

JUDGE VANASKIE: All right. I'll interrupt you just for a minute now. I understand they've agreed to search the S drive; is that right, S as in Sam?

MS. GOLDENBERG: Yep. My understanding is they've only volunteered to search the S drive and not the others.

JUDGE VANASKIE: Okay. And who will be addressing this issue on behalf of Aurobindo?

MS. HEINZ: Good morning, Your Honor, this is Jessica Heinz for the Aurobindo parties. Ms. Marlene is --

JUDGE VANASKIE: Good morning.

MS. HEINZ: Good morning, Your Honor. That is not totally accurate, Your Honor. I responded to Ms. Marlene that we would search the S drive data. I did not refuse to search any other of the other drives that she mentioned. I'm still discussing that with my client. It's my understanding that all of the proper noncustodial data sources were searched and produced from, I'm working on going back to my client and communicating Ms. Goldenberg's concerns to them, and I offered to meet and confer with her about this later this week.

If Your Honor recalls, the last time we met on March 10th, this issue was brought up by the plaintiffs and Your Honor asked them to be more specific about the documents that they believe are missing, and, you know, we appreciate that they have now attempted to do so, but there has to be time for us to evaluate this and have a meet-and-confer process.

This was just raised since the last conference and we're trying to go back and -- to make sure we're doing everything that we, you know -- make sure that we're complying with all of the requests and having a good faith

meet-and-confer process with the plaintiffs.

We hope we can discuss this with them later this week, if not sooner than that, and report back to the Court next week.

JUDGE VANASKIE: What about noncustodial sources? Have you had a discussion on that particular issue, Ms. Goldenberg?

MS. GOLDENBERG: Your Honor, just to clarify. These are noncustodial sources and so these drives that were discussed in our agenda letter are drives that are accessible by all employees, and the reason that we've asked Ms. Heinz to confirm that she searched all these noncustodial sources is that, you know, our fears are being realized that Aurobindo seems to be waiting to get caught, and I know about those four drives. I don't know what other ones exist.

We have another deposition tomorrow, but, you know, our hope is that Aurobindo is going to comply with the discovery obligations, identify the relevant noncustodial sources and produce those documents.

JUDGE VANASKIE: All right.

MS. HEINZ: Your Honor, I just wanted to say one thing. I think it's a little improper to characterize what we're doing as "waiting to get caught." I think that's inappropriate. There's no sort of evidence that we have engaged in any -- that we haven't produced what we should

have. We're engaged in this meet-and-confer process. We're producing everything that we believe are responsive to the requests, so I just wanted to clarify that I think that statement is unfair and a little improper and unprofessional.

JUDGE VANASKIE: Do you want to respond, Ms. Goldenberg?

MS. GOLDENBERG: Well, I think it goes without saying that I disagree with the characterization of that, but I don't want to belabor the point and take up more time on the record about that, so I'll just return to my ask that, you know, we get documents from these shared drives and that we get it soon so that we can take meaningful depositions and not have to take them again.

JUDGE VANASKIE: When I referred just now to noncustodial sources, I was having in mind the items or applications that you listed on the top of Page 5 of plaintiffs' letter, Trackwise, Oracle, LIMS and QAMS.

Did you want to say anything about that, Ms. Goldenberg?

MS. GOLDENBERG: Yes, Your Honor. So the witness that we deposed, Mr. Doshi last week, testified that these were all software programs where things like batch records and standard operating procedures and other documents that he needed to do his job to ensure that Valsartan was made properly were housed in.

It sounds like this is where a lot of his work took place, and so our ask, also, is that these systems be searched for any relevant documents as noncustodial sources, not just in relation to this one custodian, and that those documents be produced promptly as well.

JUDGE VANASKIE: All right. And, Ms. Heinz, are you endeavoring to do that?

MS. HEINZ: Your Honor, we have produced the noncustodial documents responsive to the request. I believe Ms. Goldenberg is misstating Mr. Doshi's testimony. They have not filed a motion here. We're certainly happy to respond to a motion, if they think that's necessary, but like I said, we are endeavoring to engage in this meet-and-confer process with them about this, and I am communicating their concerns to my client, and we're happy to, you know, if there are any disputes remaining, we're happy to address them next week at the case management conference.

But I'll just say that, you know, just because somebody testified -- and let me clarify one thing, Mr. Doshi is a fact witness, he was not produced as a 30(b)(6) witness. Just because a fact witness testifies that a computer drive exists does not mean that it has responsive information that should be produced here, and it doesn't mean that it hasn't been searched.

So, you know, I just hope that we can continue to

engage in a meet-and-confer process to work -- to try and work these things out so that the Court doesn't have to intervene and issue any orders, because I am confident and hopeful that we can reach a resolution just between the parties.

JUDGE VANASKIE: All right. Very well. Has there been any effort to find out whether the notebooks that Mr. Doshi talked about are available? Ms. Heinz?

MS. HEINZ: Yes, Your Honor, I've asked him to send those to me and it's my understanding they may have been received yesterday. I haven't had a chance to look at them yet, but I will get those over to Ms. Goldenberg later today.

JUDGE VANASKIE: All right. Very well. Where do things stand with respect to the hard drives that were sent to India? Ms. Heinz, can you update us on that?

MS. HEINZ: Yes, Your Honor. So it's my understanding as of yesterday, I heard that the FedEx package was received in India, that copies were being made and we are hopeful we will be getting those shipments soon.

JUDGE VANASKIE: All right. Ms. Goldenberg, do you want to be heard on the hard drive issues? You asked for a couple of -- you've proposed a couple of options here.

MS. GOLDENBERG: I have -- yes, Your Honor, thank you. My understanding, and Ms. Heinz can correct me if I'm wrong -- but what I heard her say just now was that the hard drives had been received in India. Is that accurate, Ms.

Heinz?

MS. HEINZ: Yes. I'm referring to the replacement hard drives that were sent when we were unable to try and get the -- I believe the others are still held in Customs. I haven't received any updates on those. The package via FedEx was received March 18th and it should be on its way back, I believe, which is why we're expecting to receive the shipments soon.

MS. GOLDENBERG: So, Your Honor, I think, you know, the problem with that is that these are empty hard drives and these empty hard drives just made it to India. And what Ms. Heinz -- what the rest of this process looks like is that they then have to be -- the documents have to be loaded on to these hard drives and then Aurobindo intends to mail them back, which means they again have to go through Customs.

This is all -- the easiest way to get these documents is by choosing Option A or Option B, or I think I called them 1 and 2 in our agenda letter. This is not hard, and it is baffling, frankly, to the plaintiffs that this option has been selected by the defendants, particularly when there is a court order that these documents be produced in time. And with these options available, I guess I'm just now at a loss for why they haven't been taken, but we're asking the Court to order that Aurobindo use FTP or Dropbox to get these documents to them so that we can move forward.

JUDGE VANASKIE: Ms. Heinz, why are either option not doable from Aurobindo's perspective; that is, purchase a Dropbox account or transfer the data by FTP?

MS. HEINZ: It's my understanding from Aurobindo that they have been unable transfer the data via FTP. I will say, and this is just from my knowledge of FTPs and Dropbox, but they are not very -- this is a lot of data that's being transferred, and I believe there is a lot of security, cyber security concerns transferring things via Dropbox.

But as far as Aurobindo goes, all the information that I have is that they've been unable to transfer the data via FTP.

MS. GOLDENBERG: Your Honor, if I could --

JUDGE VANASKIE: Yes, Ms. Goldenberg.

MS. GOLDENBERG: I'm going to call on Behram Parekh, who is our resident CSI expert and I think he's going to chime in here.

JUDGE VANASKIE: Very well. That would be helpful.

MR. PAREKH: Good morning, Your Honor, Behram Parekh. I honestly cannot understand why FTP is not being used here. I mean, we have regularly transferred hundreds of gigabytes of data via FTP, based in our own practice and in other litigations. Dropbox may not be as secure as direct FTP transfer, however, that can be ameliorated by encrypting the data before putting it on Dropbox and decrypting data on the

other end.

There are -- even without FTP, vendors have other file transfer protocols that are available, that are more secure, such as SFTP. I mean, there's numerous ways of transferring this data that does not involve shipping hard drives back and forth, and given the volume of data as Ms. Heinz has stated, which is approximately one million documents, it should not have taken more than a few hours to transfer this data, at the most, six to eight. So it's mind boggling that we're now a week and a half later and the data is still supposedly sitting in India.

JUDGE VANASKIE: Anything else, Ms. Heinz?

MS. HEINZ: Your Honor, as stated in our position statement, we are happy to provide an affidavit from KLD Discovery regarding the events that transpired on the shipments of the hard drive. That may be helpful for the Court to hear -- for the Court to see, and we'd appreciate the opportunity to submit that, if Your Honor will accept.

JUDGE VANASKIE: Well, I mean you can submit that, but I'm going to order that you first try to transfer the files via an appropriate file transfer protocol. I know you've said you've tried and it hasn't been successful, but I'm perplexed as to why that cannot be accomplished. And then if it can't be accomplished by file transfer protocol, then I think you should go use option one, encrypt the data and use

an account through Dropbox to transfer it. I think that takes care of the security concerns, and I'm going to ask that that be accomplished within seven days of today. You can give me an update for our call next Wednesday, but it needs to get done, and this is frustrating that it hasn't been done, and so I will issue an order after the conclusion of this call to that effect.

MS. HEINZ: Understood Your Honor. Thank you.

JUDGE VANASKIE: Thank you.

Now, the next issue I had with respect to Aurobindo, Ms. Goldenberg, were the purchases from ZHP. Where does that stand?

MS. GOLDENBERG: Yes, Your Honor, we detailed Ms. Heinz about that, but haven't received a response. And so just to cut to the chase on this one, our request is that documents relate, those purchases from ZHP.

(Reporter asks Ms. Goldenberg to repeat.)

MS. GOLDENBERG: For once I think I actually had a short sentence. Our request is just that we get these documents relating to Aurobindo purchases from ZHP.

JUDGE VANASKIE: Ms. Heinz?

MS. HEINZ: Your Honor, I did not fail to respond to Ms. Goldenberg. I told her that I am discussing this with my client. I asked for a copy of the document that they referenced, which was from a codefendant. They produced it to

me yesterday. This is something that they raised just, I think it was last week. I'm happy to continue meeting and conferring with them about this, as I said to Ms. Goldenberg in my e-mail yesterday, or maybe the day before, I just, I need to speak to my client about it.

And I -- and I haven't had any time to do that. I mean, there needs to be a reasonable meet-and-confer process here, and I would just ask for more time to do that so we can happily -- I hope that we can get this resolved before the next conference, but if we don't, that we give the Court an update.

JUDGE VANASKIE: All right. Let's proceed on that basis. I'll ask for an update by next Tuesday, so in advance of Wednesday's conference call, in terms of where you stand with respect to purchases from ZHP. Hopefully, you can have that all resolved.

The next item on the Aurobindo list was missing standard operating procedures. Ms. Goldenberg, where does that stand?

MS. GOLDENBERG: Yes, Your Honor. This is one where we sent Ms. Heinz an e-mail, I believe it was a week or two ago, and once again, all we've gotten back from her is we'd like to meet and confer and they've offered always after these case management conferences and, you know, we don't have an answer, so here it is on the agenda. But we would like them

to produce all of the standard operating procedures.

JUDGE VANASKIE: All right. Ms. Heinz?

MS. HEINZ: Your Honor, my clients on March 4th produced 80,000 pages of standard operating procedures. I received Mrs. Goldenberg's list of an additional 80 standard operating procedures that she believed are responsive to the request.

We are evaluating those and discussing them with my client. I told Marlene that I believe we're going to be able to reach an agreement on many of those. And I offered to meet and confer if -- I don't even know if we'll have to have a meet and confer because I'm hoping I'll have a production out to her, a supplemental production, within the next week.

It's, you know, it's another thing they've raised since the last conference. There just hasn't been that much time to get through everything.

JUDGE VANASKIE: All right. Well, thank you. What I'll ask is that you continue to see if you can work this out, see if the supplemental production will include you said 80 SOPs that are being sought. See how many of those will be produced, and I'll ask that in the status report you send to me by next Tuesday you address this issue as well so we can see where that stands.

And then the next Aurobindo issue deals with privilege log challenges. And, Ms. Goldenberg, where does

that stand?

MS. GOLDENBERG: Yes, Your Honor, we have asked Aurobindo to dedesignate a number of documents. As this conversation started awhile back and then we held pursuant to Your Honor's request that we get the cast of characters. We now have the cast of characters and we sent Ms. Heinz challenges and, you know, there are a lot of them, as you can see, but the short way of summarizing where we're at right now is that of the cast of characters only three people on it are attorneys. And so our position is that Aurobindo should have voluntarily dedesignated a lot of these documents themselves, but as you heard Ms. Heinz say, she asked us to point out what was missing and what's wrong, and so we've done that. And we once again received a request from Ms. Heinz asking if we could meet and confer later this week, but, you know, we've got a deposition tomorrow, we have another one in two weeks, and many of the documents here are relevant to Mr. Gorijavolu, who is being deposed tomorrow, and Blessy Johns who is being deposed in two weeks. And again, we really just need to move this process forward.

JUDGE VANASKIE: Ms. Heinz?

MS. HEINZ: Yes, Your Honor. Mrs. Goldenberg is referring to a letter that plaintiff sent me Friday night, and we told her that we are evaluating it. We did not refuse to cooperate with them on the meet-and-confer process. We

offered to meet and confer later this week once we have a chance to go through everything that they have identified in their letter which they essentially appears to have copied and pasted into their position statement.

This is another thing similar to the SOPs where we're hopeful we can, you know, work some -- we can -- once we review everything, you know, we've agreed to go back and re-review everything and see if there's anything that we can agree to produce.

I think that Ms. Goldenberg is misstating the legend of our SOPs. I believe there are many more legal personnel on that than just three.

So it's just another one of those things that we need more time to evaluate and talk to our clients about, and we're confident that we're going to be able to work something out with the plaintiffs. We just -- we need a little bit more time to finish that meet-and-confer process.

MS. GOLDENBERG: Your Honor, if I could just respond to that.

JUDGE VANASKIE: You certainly may.

MS. GOLDENBERG: I'll keep it short. What I've heard as to every topic that we've raised today is that Aurobindo needs more time, that they're considering things, and, you know, we did actually offer two different times yesterday to speak with Ms. Heinz but got no response whatsoever, and it is

frustrating that we get to these case management conferences and we hear over and over again that things are being considered, they would like to meet and confer, that this all just appears to be a delay process, and we're going to have to keep leaving depositions open if we don't get these issues resolved.

JUDGE VANASKIE: Yes, I understand that, and as I said, this is frustrating to be listening to this and it does seem that we're -- I've heard it recently expressed as death by meet and confer. So I want this process to go forward.

Go ahead, Ms. Heinz.

MS. HEINZ: I am sorry to interrupt.

JUDGE VANASKIE: No, that's all right.

MS. HEINZ: This is a letter that I just received -- I'm sorry, go ahead, Your Honor.

JUDGE VANASKIE: Go ahead. You proceed, I'm sorry.

MS. HEINZ: Thank you. This is a letter that we received Friday night after a six-hour deposition that day, that plaintiffs proceeded with, it was a fact witness, and then the one scheduled for tomorrow is another fact witness and Ms. Marlene is correct, we don't have a 30(b)(6) witness scheduled until -- I believe it's the third week in March -- I'm sorry, April, but this is a letter that I just received Friday night, and as Your Honor can see, they've identified a lot of documents here, you know, and we are not conceding that

they're right about anything, but this is a lot to go back and review, and we're willing to do that and work through that with them, but to send me a letter Friday night and expect me to turn it around, you know, when I'm dealing with -- with clients that are in India as well, is just, it's unreasonable, and I would appreciate, you know, like I offered to meet with them later this week or early next week, once we have a chance to digest all this and get back to them on it.

JUDGE VANASKIE: All right. I greatly appreciate that explanation, and you're right, that's a brief period of time from Friday night until now to have expected to have had an opportunity to make your client's position with respect to this host of documents that are listed at Pages 16 through 18 of the plaintiffs' letter.

I want you to have a meaningful meet and confer, I expect to get an update on this in writing by next Tuesday. I know that's only six days away, but I want to know where things stand and we'll address it again next Wednesday.

Now, there was one other item in the plaintiffs' letter, and that dealt with a list of 42 documents withheld on the basis of draft and other products.

Did you want to address that, Ms. Goldenberg?

MS. GOLDENBERG: Yes, Your Honor. This again is a summary of documents that was sent to Ms. Heinz awhile ago. So this is not something that she received last week, even

though I'll note that Aurobindo's privilege log is less than 200 documents, so I don't think that was too big of an ask.

But this is 45 documents and a number of these, I'll note, I think there's at least four on the spreadsheet that relates to Mr. Gorijavolu who again is being deposed tomorrow, and these are -- these have been withheld by Aurobindo and we've identified these through searches within our system, but if you look at the spreadsheet, all clearly appear to be relevant to this case. I mean, we see things titled Valsartan statement.doc. You know, Valsartan virgin drug recall letter two times in this log. EPI testing proposals, Aurobindo.pdf with additional Valsartan information in there.

So I mean, we just can't understand why these have been withheld and on these, I'm not really sure why additional meet and confers would be helpful. I think that Aurobindo just needs to produce them.

JUDGE VANASKIE: All right. Ms. Heinz?

MS. HEINZ: Your Honor, there was a ruling early on in the litigation when we were going back and forth among the parties with the Court on the plaintiffs' request for production, and I recall there being a ruling that the defendants did not have to produce draft documents.

Now, with that being said, I did tell Ms. Goldenberg that we're going to go through every single document and re-review those that are on her list. It's my understanding

that my colleagues are almost complete, if not already complete with that process, and we just -- we're going to be discussing with our clients and we should hopefully be able to reach an agreement with the plaintiffs' counsel on, you know, some additional documents that I think we're going to be able to agree to produce.

But again, you know, there's a lot going on here, and we're trying to get through it all. We're not refusing to go through this meet-and-confer process with the plaintiffs. We are trying to evaluate everything so that we can -- that we produce everything that is responsive prior to these depositions.

MS. GOLDENBERG: Your Honor, if I could.

JUDGE VANASKIE: Yeah, go ahead, Ms. Goldenberg.

MS. GOLDENBERG: The draft document ruling that Ms. Heinz is referring to, I assume what she's talking about is the discussion that we all had about third-party subpoenas and the -- I don't have the hearing transcript date in front of me, but I can tell you I have read it fairly recently and that ruling was made by JUDGE VANASKIE only as to third-party recall vendors.

It has nothing to do with draft documents for the manufacturers, and I think it's notable that no other manufacturer, to my knowledge, has been holding documents back on this basis. Every other defendant has produced draft

documents and I'm not really sure why Aurobindo is choosing to interpret a ruling in that way.

But to the extent Your Honor is considering asking us to have -- further about these documents, I would just ask that at a minimum, the documents relating to Prasad Gorijavolu which is entries Line 6, 7, and 35 on our spreadsheet be produced today, so that at least we have the benefit of those for tomorrow.

JUDGE VANASKIE: Ms. Heinz?

MS. HEINZ: Yes, thank you, Your Honor. The ruling I'm referring to was not the one that Ms. Goldenberg mentioned. I don't recall when exactly it was, off the top of my head. I'm happy to pull that information and send it to Your Honor, if you would like, but -- and I can certainly provide an update if we're not able to reach, you know, work out this dispute before the CMC next week, but I do recall, and I'll let the other manufacturers speak for themselves, but I do recall there being a ruling when we were finalizing the plaintiffs' Rule 34 request for production, I believe it was in 2019, that the parties do not have to produce draft documents.

JUDGE VANASKIE: Now, Ms. Goldenberg just identified by -- I guess by row or line number three particular documents. Did you say 6, 7, and 35, Ms. Goldenberg?

MS. GOLDENBERG: Yes, Your Honor, and those are the

three where the custodian is Prasad Gorijavolu.

JUDGE VANASKIE: Well, I'm going to order that they be produced so that the deposition can proceed.

MS. HEINZ: And, Your Honor --

JUDGE VANASKIE: Go ahead.

MS. HEINZ: We actually -- I think that we are willing to produce those. We don't need an order to produce those.

JUDGE VANASKIE: Okay. Good. Great.

MS. HEINZ: That's fine with us.

JUDGE VANASKIE: So they'll be produced. You can send me the order that you are referring to, Judge Schneider's order with respect to these other documents, but let's get this deposition moving forward. Great.

All right. Anything else on Aurobindo, Ms. Goldenberg?

MS. GOLDENBERG: Now in our agenda letter, Your Honor. If you want to do ToxRox and Meridan now, I'm happy to do that. Otherwise, we can save it to the end.

JUDGE VANASKIE: Are you prepared to talk about ToxRox and Meridan, Ms. Heinz?

MS. HEINZ: Your Honor, my colleague, Ethan Feldman is on the line and he's going to address that.

JUDGE VANASKIE: All right. Well, let's address that right now. All right. Here's the problem I'm having, having

read the submissions concerning the subpoenas to ToxRox and Meridan.

How am I -- what's my basis for determining whether the documents were prepared primarily in anticipation of litigation as opposed to for business purposes?

And I'm going to ask that question first of you, Ms. Goldenberg. How am I to make that determination?

MS. GOLDENBERG: Your Honor, my understanding of the role that these two companies played was that they had nothing to do with litigation. These companies were hired by Aurobindo so that they could help Aurobindo respond to the FDA 483 letters, and I believe that Ms. Heinz actually dropped a footnote in her brief when we originally briefed this issue, indicating that her firm wasn't even in the picture at the time these two entities were hired. And so I think the easiest way to draw that line is, that's not why these companies are here.

JUDGE VANASKIE: All right. Mr. Feldman?

MR. FELDMAN: Yes, Your Honor. I would just like to point out that at the time the law firm of Hogan and Lovells was retained by Aurobindo, and with regard to preparation in anticipation of litigation, I mean, you know, Aurobindo received this SBA warning letter, you know, and it's reasonable to believe that after receiving a warning letter that future regulatory compliance is on the horizon.

You know, I don't think it would be reasonable to think that the FDA would just issue a warning letter and that would be the end of it. So as far as -- in that regard, you know, future regulatory compliance was contemplated in the *Todd V STAAR Surgical* case, and it was found that the consultant's documents were protected by work product.

JUDGE VANASKIE: So you're relying solely on that case, is that it?

MR. FELDMAN: Yes, Your Honor.

MS. GOLDENBERG: Your Honor, I'll just point out that when this issue was originally raised by Aurobindo in the context of the third-party subpoena hearing, JUDGE VANASKIE specifically pointed to his In Re *Riddell* Concussion Reduction litigation decision, and notably, in that case, you know, he said, it is true that many of *Riddell's* documents were prepared because of Congressional inquiries into concussions, however, no evidence exists to show this was likely to lead to a litigation, and that is directly analogous to the situation here.

Just because the FDA inspects your facility and issues a warning letter, that doesn't mean automatically that there's going to be litigation.

These facilities, as a precursor to being -- as a prerequisite to being able to sell drugs in the United States submit themselves to investigations by the Food & Drug

Administration. These are conducted regularly, and that's just part and parcel of being a manufacturer of a drug that's sold in the United States to United States consumers.

JUDGE VANASKIE: All right. Anything else, Mr. Feldman?

MR. FELDMAN: Yeah, I believe most of the documents at issue in Riddell had to deal with the public relations firm and I think that, you know, consultants hired with respect to FDA compliance, it's a little bit different than that, so that's all I would like to point out.

JUDGE VANASKIE: Well, I have the subpoena addressed to ToxRox in front of me, and some of these documents, I don't see how they could -- are you seeking to quash the entire production? But some of these documents wouldn't seem to be covered by work product protection. I mean, to go through each category of documents that are sought and identify what might be covered by work product and what wouldn't be.

MS. GOLDENBERG: Your Honor, we actually have an agreement with Aurobindo that they were going to produce documents, and so the only issue that we need you to rule on today is whether the documents on their privilege log are actually protected by privilege or work product doctrine.

JUDGE VANASKIE: Thank you very much for that.

All right. Well, that clarified the matter for me, and I'll take a look at those particular items that are listed

on that log for purposes of making a determination to the extent that I can, that the documents would not have been prepared primarily for -- in anticipation of litigation. I think that's the key question, and I'm somewhat familiar with this issue more recently doing work in the data breach context for consultants. Reports have been found not to have been prepared in anticipation of litigation, and in those instances that I have in mind, there usually was some preexisting relationship between the consultant and the party that would suggest a business purpose for them.

So I have to take a careful look at this, I understand, but I will get you a prompt ruling with respect to that matter. We don't need to address it any further right now.

MS. GOLDENBERG: Appreciate it. Thank you, Your Honor.

JUDGE VANASKIE: All right. Thank you.

MR. FELDMAN: Thank you, Your Honor.

JUDGE VANASKIE: Anything else on Aurobindo?

MS. GOLDENBERG: Just to circle back to the first issue, Your Honor, because I wasn't clear on whether or not there was a ruling as to the noncustodial documents.

Can you just let the parties know where you ended up on that, so that we can make sure that we move forward in compliance with your guidance?

JUDGE VANASKIE: Now again, I'm going to go back to you then with the question by -- what is encompassed by noncustodial documents? Are those the shared drives as well as the third-party programs that are mentioned?

MS. GOLDENBERG: They are both of those things, Your Honor, and any other shared drives that I don't know about yet, but that have responsive information to our request for production.

JUDGE VANASKIE: Ms. Heinz, correct me if I'm wrong on this, but my understanding is that you will be going back to your client to ascertain whether those shared -- as to the shared drives and to those programs, call them programs, that are mentioned in the letter, things like Oracle have been searched; is that correct, that you're going back to verify that?

MS. HEINZ: Correct, Your Honor.

JUDGE VANASKIE: Yeah, I don't think I meant to issue any order or ruling with respect to that, Ms. Goldenberg. I thought it was going to be a matter that you all were going to continue to address and that I'll get a status report next Tuesday. That will be included in the status report next Tuesday.

MS. GOLDENBERG: Got it. Thanks, Your Honor.

JUDGE VANASKIE: Okay. Thanks. All right. Now we're up to Mylan.

MR. DAVIS: Your Honor, this is John Davis for the plaintiff.

JUDGE VANASKIE: Okay.

MR. DAVIS: I think it makes sense to handle this one discrete issue regarding Unit 7 in conjunction with the review of the 4,000 documents, because this is one of the areas of Mylan's withholding as nonresponsive documents that we think are highly relevant.

So I think, you know, the two sort of complement each other and probably should be handled together, but if Your Honor's willing, I'll start with Unit 7.

JUDGE VANASKIE: Yeah, I interrupted, but I agree they should be handled together. Go ahead.

MR. DAVIS: Sure. So Unit 7 -- and let me just give you a little background on Unit 7. Unit 7 is an API manufacturing facility in India. It's operated by Mylan Labs Limited, which also operates the other Indian facilities at issue in this case, namely, Unit 8, for example, which is the API manufacturing facility that manufactured Valsartan API for the U.S. market.

It does manufacture other sartans, we've learned, including Irbesartan. The same Mylan Labs Limited leadership oversees both Unit 7 and Unit 8, including, for example, Dr. Anthony Gomes, whose deposition we've had to postpone. It was supposed to be yesterday, but we've had to postpone due to

certain document production deficiencies we've identified for Mylan and Mylan is, for the most part, is going to be producing documents, but it forced a slight delay in that deposition.

Dr. Gomes is the global head of generic -- or sorry, global head of API quality. It has oversight of Unit 7 and Unit 8.

Unit 7 used ortho-xylene manufactured by Vega Life Sciences. Ortho-xylene has been identified by Mylan in its root cause investigation as being the primary culprit for introducing nitrosamine contamination into the Valsartan API recovered o-xylene or ortho-xylene. Vega is a recovered solvent manufacturer that Mylan used for that ortho-xylene recovery, both in Unit 7 and Unit 8, and the FDA inspected Unit 7 in February 2020 and issued a very recent establishment inspection report in September 2020, an EIR, that found, you know, a number of serious deficiencies, and, you know, the letter laid out two of them that are, in my opinion, highly relevant to this case.

One that is in 2020, you know, we're talking almost two years after Mylan's discovery of its nitrosamine contamination issue and, you know, supposed implementation of corrective actions related to that, that Mylan was not testing its recovered o-xylene for impurities in 2020 at Unit 7.

And furthermore, that Mylan was not adequately

vetting its recovered solvent vendors, and Vega is the primary example there. There's a lot of discussion in that EIR, the FDA issued to Mylan regarding Vega, and for example, an audit that Mylan itself conducted of Vega, which I believe Mylan has said they're willing to produce to us, but had not been produced before.

So, you know, just those two observations are highly relevant to this case, because our, you know, one of the things we're establishing in depositions with Mylan, is that Mylan never tested its recovered ortho-xylene, not only in 2020, but at any point before that. And it's particularly baffling that they're still not doing it in 2020, but that's neither here nor there for now, but, you know, Mylan gave a set of responses to the initial observations, what's called a 483.

Mylan's initial responses to that 483 said, hey, don't worry about this, you know, we've implemented some corrective actions at Unit 8 as a result of our learning from the Valsartan contamination, and we're going to be applying those here to Unit 7.

And so not only, you know, is -- so Mylan is basically telling the FDA, hey, look at what we did here at Unit 8, but then they're telling us in this litigation that it's not relevant.

So I think it's highly relevant. I spent about

probably an hour and a half questioning Mylan's witness, 30(b)(6) designee on it the other week, and that's without the benefit of the documents we're asking for.

I had -- I believe I got the 483 observations from FDA Villa, and the EIR was just, I suppose accidentally produced by Mylan to us, but we don't have the benefit of any of the other correspondence with the FDA, any of the other documents generated as a result of that.

And so our request here for Unit 7 is not, you know, at this point, to have Mylan go back and reintroduce search terms. Actually, I probably think that our previous search terms would cover a lot of these documents anyways, they were just withheld in the review process is my understanding, but I think the Court should order Mylan to produce these and to produce them posthaste, because we do have a lot of depositions coming up.

We've had to postpone the third day of Mr. Glover, as well as Dr. Gomes to resolve some of the document issues that we discovered and to have this Unit 7 issue resolved as well.

So I'll start with that and then if Your Honor has any questions on the 4,000-ish documents, I'm happy to address those as well.

JUDGE VANASKIE: Well, we'll come back to that. Who will be addressing this on behalf of Mylan?

MR. TRISCHLER: Your Honor, this is Clem Trischler.

Good afternoon.

JUDGE VANASKIE: Good afternoon, Mr. Trischler.

MR. TRISCHLER: There's a great deal too on the line to Mr. Davis's statements to the Court, but let me start with this. I took note of the Court's stated concern at the outset of this hearing about the frustration over the continued discovery induced. Indeed, the Court has expressed that frustration multiple times during this hearing, and on behalf of Mylan and I suspect all the defendants, I echo that concern and frustration, and in this case it particularly stems from the fact that all of this -- of all of these issues that are now being raised with respect to Mylan relate to an attempt by the plaintiff to set aside a core discovery ruling that was entered by JUDGE VANASKIE well over a year ago.

And so what we are doing here now, and when we wonder why we are continuing to argue discovery issues, what we are doing here now is, you know, a clever attempt by the plaintiffs to set aside a ruling from the Court in which the Court was clear that the scope of discovery in this -- in this litigation, will be on the facilities that were involved in producing the API and in producing the finished dose products.

Unit 7 is a separate plant operated by Mylan that is 250 miles away from Unit 8 where the Valsartan API was produced. Valsartan API was never produced at Unit 7.

Finished dose Valsartan products were never produced

at Unit 7. Mr. Davis mentioned that while some sartans were produced at Unit 7, well, none of Mylan's other sartan products are at issue in this litigation. Mylan is not named in the master complaints involving Irbesartan and Losartan. There were no recalls of Mylan's other sartan products. There were no recalls of any products at Unit 7. Unit 7 has nothing to do with this case.

JUDGE VANASKIE made that determination over a year ago, and it is somewhat frustrating that we continue to argue discovery matters particularly in cases where Mylan has produced over -- well over a million pages of documents in this litigation collectively and my client's productions are representative of that of the other defendants. I can safely say to the Court that five to ten million pages of documents have been produced in this litigation, and now we're arguing about whether or not we need to open the door a little further and go down the slippery slope of revisiting a core discovery ruling.

I don't think there's -- there's absolutely no basis for it. And we argued this in front of Your Honor, I think a couple of weeks ago, Mr. Honik and I had a discussion in front of the Court on it. There's no basis to expand discovery to other facilities that were not involved in the production of this product. Mr. Davis made the suggestion that Mylan's not testing recovered solvent. That's absolutely untrue. Mylan

may not be conducting tests that the plaintiffs want to ask the facts suggest it necessary, but Mylan tested recovered solvent pursuant to requirements established by the FDA at the time the recovered solvents were being used in Valsartan. Mylan tested the recovered solvents pursuant to its -- pursuant to specifications and consistent with industry practices. The fact that they don't like the tests or that they now want to argue that the tests are -- additional tests were required, that, you know, that may be their argument, but to suggest to the Court that no testing was done, that's simply not true.

I would ask this Court, if we ever want to bring an end to the discovery battles in this case, I would ask that the Court maintain that the core discovery rulings apply to this case and that the plaintiffs can't revisit them at each and every opportunity, and if that's the case, then the plaintiffs' motion to expand discovery to Unit 7 should be denied, because it will be a very slippery slope, Your Honor.

When we talked about this two weeks ago, Mr. Honik told the Court, well, we just want the regulatory communications, we just want the EIR, we just want the 483, we just want Mylan's response to the warning letter.

Today, I hear Mr. Davis tell you something completely different, that Mylan should now run search terms against all the Unit 7 custodians and try and find out what other

documents that there might be relevant.

And we will be here two years from now arguing the same thing, and then when witnesses are deposed, they'll be subject to requests for second and third depositions. It has to come to an end and it won't come to an end if we're not going to pay heed to discovery rulings that were made over 15 months ago.

JUDGE VANASKIE: All right. Thank you.

MR. DAVIS: Your Honor, may I respond?

JUDGE VANASKIE: Yes, I'd like your response.

MR. DAVIS: Thank you. Just a few points. Again, this is John Davis for the record.

First of all, JUDGE VANASKIE, when he entered the macro discovery order, he explicitly said on the record that with good cause, it could and should be revisited. That was entered a long time ago, long before a lot of the issues in case were fully elucidated.

So it is proper for us to go back and revisit it, particularly where -- it's here, what the FDA is telling Mylan, they're doing wrong, that Unit 7 directly bears on what we allege. They were doing wrong long before the Valsartan recall.

And, you know, Mr. Trischler brought up, you know, that the plaintiffs -- you know, and this is, granted, I believe, a factual dispute that a jury will want to resolve

eventually, but it's not plaintiff saying that Mylan wasn't testing its recovered solvent, it's the FDA who was saying that, and that's why these regulatory communications are highly relevant, because not only -- it provides insight into, you know, the FDA's position, which -- and position for a long time about what's required in terms of testing, and what's required in terms of validating your use of recovered solvent. And those communications between Mylan and the FDA regarding Unit 7 are highly relevant for that very reason.

I mean, this is an emerging fact dispute even on this call today, as to what's proper testing and not testing. And given the FDA's, you know, thoughts on that as written to Mylan and getting Mylan's responses to that as to Unit 7 bear directly on, you know, what the FDA has been telling Mylan at Unit 8. And same thing for, you know, Mylan telling the FDA that it, you know, what it's doing in Unit 7 in response was based on learning Unit 8.

Finally, one point of clarification is, I'm not asking for search terms at this point, that's not what I said. I accepted, you know, that I wanted the communications, the -- nothing's changed between what, you know, Mr. Honik brought up the last time and what I'm asking for today. I said at this point, I'm not asking for search terms. So I just wanted to clarify that for the record.

MR. TRISCHLER: Your Honor -- sorry, John. And, Your

Honor, the key point that -- what I heard Mr. Davis say is "at this point." That's the slippery slope, that's the crack in the door that I'm talking about. That's why discovery never comes to an end, and keep in mind, the timeline. This is a 2020 inspection done in a facility that never made Valsartan. And whatever comments FDA may have made two years after these recalls concerning inspection procedures at a facility that never made a drug, that any plaintiff in this case took, has no bearing, no relevance, which is the touchstone for discovery, to what Mylan should have done in 2018. Has none.

MR. HONIK: Your Honor, this is Ruben Honik. May I be permitted to briefly underscore a part of this argument?

JUDGE VANASKIE: Yes, Mr. Honik, briefly.

MR HONIK: I will be very brief, Your Honor. 15 months ago JUDGE VANASKIE would have had no ability to know that the problem and the root cause for Mylan's contamination of its drug had to do not with the direct chemical process, but with the manner in which they used recovered solvent.

That was unknowable, and Mr. Davis is correct, that for good cause, if you show a relationship or relevancy, of course JUDGE VANASKIE would be entertaining our request today just as you should.

The plain fact is, that the problem, the root cause, as identified by the FDA and not denied by Mylan, was this recovered solvent use, which was used in both Unit 7 and

Unit 8.

And both of the inspections undertaken by the FDA specifically zero in on that, and Mylan, not anyone else, but Mylan specifically referred to its operation at Unit 8 and the recovered solvent in addressing the 483 concerns raised about Unit 7. There is a direct linkage, and this idea that we should fear a slippery slope in the face of obviously relevant information, the only information we've sought thus far, should not worry the Court, because it is so directly on point to what we need to discover in this case.

That's the only thing I wanted to emphasize.

JUDGE VANASKIE: If you want to respond, you can.

MR. TRISCHLER: I need to, thank you. And with all due with respect, what Mr. Honik just said to the Court is absolutely wrong. I'm looking at a transcript from the hearing on the -- what preceded the entry of the macro discovery orders, and my colleague, Jason Reefer was speaking to the Court and Mr. Reefer told the Court, this was before the macro discovery orders were entered, quote: Judge, I'm not a process chemist, but the short story is that Mylan has shown that the impurity was the result of -- I'm sorry, we used some solvent with respect to a very, very specific sort of chemical pathway that occurs in the two steps of the API manufacturing process, end quote.

And then there goes on to be a further discussion on

the record prior to the entry of the macro discovery order. The Court was told, the plaintiffs were told, what Mylan's root cause analysis was.

And so to suggest that the Court made this ruling in a vacuum without any knowledge, this revisionist history of the highest order.

MR HONIK: Your Honor, this proves my point exactly. JUDGE VANASKIE had no idea that that same recovered solvent root cause issue was present anywhere but Unit 8. It now comes to light that it was the identical problem in Unit 7 with other sartans and that Mylan of its own accord in addressing the concerns of FDA lumped the two units' use of recovered solvent together.

This is a shell game being played by Mylan so that we can't see the substance of their material responses to the FDA concerning the very same problem present in Unit 7 that was present in Unit 8.

There was no way for JUDGE VANASKIE to know that. There was no way for JUDGE VANASKIE to know that the solvent issue was present at any facility, other than the single facility where the Valsartan was made.

But we now know differently. We now know that the FDA uncovered that the root cause of the problem was present at two of their units, and we are predictably trying to seek discovery about it.

JUDGE VANASKIE: All right. This is an important issue, obviously. I am very much concerned about this slippery slope and about expansion of discovery that may have marginal relevance here. I'm not in a position right now to -- I want to issue a written ruling on this so that my reasoning is clear in terms of which way I go on this. You've given me, both sides, great argument.

So what I'll do is, promptly issue a written ruling on whether this discovery with respect to Unit 7 should go forward. If there is any discovery that goes forward, it would be limited to regulatory communications, but I'll issue a written decision on that.

Now, I did want to transition, if we could -- and Karen, are you all right to continue?

THE COURT REPORTER: Yes, Judge, I'm fine.

JUDGE VANASKIE: Okay. On the documents withheld as nonresponsive. Now, you were kind enough to send to me 12 documents that have been withheld as nonresponsive that were specifically flagged by plaintiffs.

And I've looked at those documents and I'm having a hard time understanding why they would be nonresponsive. I'm looking at a document now that's called Deviation Investigation Report, dated September 9, 2016, dealing with Unit 8, and the matter of residual solvents, and maybe this is my lack of familiarity in the matter, and then it makes it

more difficult, residual solvents for Valsartan VS22 batches. And we're not meeting the specifications with respect to o-xylene content after 12 hours.

Now, I'm not a chemist. I was pretty good in chemistry, but I wasn't -- I'm not a chemist, and so looking at this, how could I determine whether it's responsive or not?

MR. DAVIS: I think our argument here from - if you want to hear from me, John Davis, I think that's highly relevant, Your Honor. Residual solvent testing is the testing we're interested in for API. This is Unit 8, it's Valsartan. It's Valsartan for the U.S. market using the VST code.

It's o-xylene. I mean, this has all the hallmarks of being highly relevant. Obviously, I haven't seen the document, but, Your Honor, I would encourage you to order Mylan to produce it, because when something is questionably responsive or not responsive, it should be produced. And that is by both sides in the adversarial nature of the proceedings that we have. But to me, I don't even think this is questionable. I think that's a highly relevant document. Thank you.

JUDGE VANASKIE: All right. Are you ready to address this, Mr. Trischler?

MR. TRISCHLER: Sure, Your Honor. And my apologies, I'm at a bit of a disadvantage at the moment, because unless -- unless I was mistaken, I did not see this issue on the

agenda, so I don't have the document or the 12 documents in front of me, so I'm not -- I'm not prepared to make -- I'm not a chemist nor did I do very well in chemistry, so I'm not prepared to answer the Court's direct question about those 12 documents.

My recollection from our last hearing was, we submitted those 12 documents to Your Honor along with a list of the other withheld documents, because you may recall that the issue was, you know, as part of the discovery agreements and orders, the defendants were permitted to withhold nonresponsive attachments to otherwise responsive documents, and these 4,000 or so documents fell within that category, and the Court was going to request a random sampling of those documents.

So I did not do anything to prepare for this issue or to -- and would not be able to frankly, intelligently respond to your question about this particular document at the moment, because I perhaps wrongly assumed that we were waiting for further direction from the Court as to what was going to take place with respect to this issue.

JUDGE VANASKIE: No, I think your assumption was reasonable, Mr. Trischler, and we'll give you the opportunity to prepare adequately, and we'll discuss it at our conference call next Wednesday.

But I would urge that you take a look at these 12

specific documents and be prepared to tell me why they're not responsive, because I'm having a difficult time making that -- based on the face of it, I find them to be responsive. So you understand where I'm coming from.

MR. TRISCHLER: I do, Your Honor.

JUDGE VANASKIE: Okay.

MR. DAVIS: Your Honor, this is John Davis. I feel like I need to put on the record my concern about, you know, these seem like highly relevant documents and we have depositions that are going forward imminently. We've got, for example, next week, I'm taking the deposition of Dr. Daniel Snyder who is designated on Mylan's root cause investigation, as well as risk assessment topics, and, you know, even that document that Your Honor referred to, is the document that I sure would like to have in my hand when taking that deposition.

So I have some --

JUDGE VANASKIE: What day is the deposition?

MR. DAVIS: March 31st, I think next Wednesday actually, so I won't even be on the CMC, and I doubt Mr. Trischler will be either. He probably will be attending that deposition.

JUDGE VANASKIE: All right.

MR. TRISCHLER: Well, that was certainly the plan, but in light of the fact that the CMC was just rescheduled

today. But I can have somebody on the call with the Court to address this issue, Your Honor, while John and I are in the deposition.

JUDGE VANASKIE: Well, Mr. Trischler, would you be in a position to give me by Monday of next week a written statement as to why -- just as to these 12 documents, why they are not responsive, and -- because if I find that they are responsive, at least as to the 12 documents, a determination could be made to require their production. Obviously they exist, can be easily produced, so that they are available for the deposition. Would you be able to do that?

MR. TRISCHLER: Sure.

JUDGE VANASKIE: Okay. So I'll ask by Monday of next week I get a written statement of position from Mylan with respect to these 12 particular documents as to why they're not responsive.

All right. I think that covers the issues involving Mylan. Is there anything else? Okay.

MR. DAVIS: Your Honor, just for one question of clarification. I note, and I believe I might have missed this at the outset when Your Honor brought this up, but I just wanted to see where we were on -- and if there's anything plaintiffs' side can do in terms of the random sampling. I believe that Your Honor had mentioned the last time.

JUDGE VANASKIE: All right. Here's what I -- I'm

glad you brought it up because I needed to circle back to that, because I did want to cover that.

I've determined and I want to find out if anybody disagrees, that a sample size of 352 documents out of those 4,198 documents would be statistically significant. It would have a margin of error of plus or minus 5 percent and then 95 percent confidence level.

I've used a random number generator, and I will send out via e-mail the number -- the rows, the numbered rows, that documents should be produced to me for in-camera review, and I'm hopeful that can be done promptly.

As I said, it's 352 documents. Unless, and I'll ask this first of you, Mr. Davis, do you think the sample size is too small?

MR. DAVIS: I personally don't have any issue with that. I think that should be sufficient for our purposes.

JUDGE VANASKIE: And, Mr. Trischler, is that a problem from the defense perspective?

MR. TRISCHLER: Your Honor, my phone cut out when you stated the number, but I'm willing to accept whatever, whatever number you propose.

JUDGE VANASKIE: Yeah, it's 352.

MR. TRISCHLER: Thank you.

JUDGE VANASKIE: And we'll e-mail to you the row numbers for the documents that should produced for in-camera

review. I'm assuming, and that's not always a good thing to do, that they can all be produced to me electronically.

MR. TRISCHLER: I believe that should be doable.

JUDGE VANASKIE: All right. Okay. And then I'll undertake my review for purposes of determining responsiveness. But I'm not committing to have that completed by next Wednesday. All right? But hopefully, it won't take too long.

Anything else on that, Mr. Davis?

MR. DAVIS: Nothing here, Your Honor. Thank you.

JUDGE VANASKIE: All right. And anything else on your end, Mr. Trischler, on Mylan discovery?

MR. TRISCHLER: No, Your Honor.

JUDGE VANASKIE: Okay. Now, going again, I'm back on plaintiffs' letter at Page 20. The next thing on the agenda is defense request for dismissal of Louisiana plaintiff claims, and I take it that's an issue for Judge Kugler. Is my understanding correct?

MR. SLATER: Yes, Your Honor, this is Adam Slater. We agree, this is a Judge Kugler issue.

JUDGE VANASKIE: Okay.

MR. GOLDBERG: Yes, Your Honor, that's correct.

JUDGE VANASKIE: Thanks, Mr. Goldberg.

The next issue was downstream defendants' obligations regarding defendants' fact sheets.

MR. WILLIAMSON: Your Honor, this is George Williamson for the plaintiffs. If I may provide some background on this issue.

JUDGE VANASKIE: All right.

MR. WILLIAMSON: So the defense fact sheets were negotiated over the course of many months, and plaintiffs had requested that all of the defendants complete one fact sheet. In other words, all of the information would be contained in one fact sheet and served on the plaintiffs at one time.

The defendants insisted that they needed a staggered fact sheet. So in other words, the pharmacy defendants would have their own fact sheets, the wholesalers, the finished dose manufacturers, and the API manufacturers all have their own fact sheets, and there was also a lengthy timeline that was put in place to allow the, you know, all four of the various categories of defendants to complete a fact sheet.

So in other words, what happened is, pharmacy defendants complete a fact sheet, they originally had 60 days, I think it was extended to 90 days. Then the wholesalers would take the information from the pharmacies, complete their fact sheets, they have 60 days to do it. The finish dose manufacturers then had 60 days and the API manufacturers had 60 days.

So at the conclusion of the defense fact sheet process, we're talking about a period of nine months to

 complete the fact sheet.

Now, that's what the defendants asked for and the Court entered an order on August 6, entering these specific fact sheets that each defendant would have to complete.

Now, the Court then said, plaintiffs, you select 20 cases for the defense fact sheet to be completed for. So in other words, the defendants don't have to complete a fact sheet for every single case filed in the MDL, only at least originally for 20 cases, and the trigger date for the beginning of those 20 cases, for the beginning of the fact sheet was August 31st of last year, 2020.

JUDGE VANASKIE: Excuse me. I think I understand the background here. So my question to you, are we dealing with just four cases right now?

MR. WILLIAMSON: So in the immediate term, yes, we're dealing with four cases. There's also an additional 18 cases where this issue might be implicated.

Now, I will say we received an e-mail from the wholesaler defendants at -- just the same time that we were submitting our letter to the Court, and so we see now that the wholesalers are interested in completing a fact sheet for those four defendants -- excuse me, for those four bellwether plaintiffs, but there's an additional 18th bellwether plaintiff where this fact sheet process has just started, and to the extent that there's an issue where a pharmacy has not

been named as a defendant in any of those 18 cases, we would also ask that the wholesalers complete a fact sheet in those cases.

Now, I can't tell you right now if that even exists, but I suspect that it's probably not a very big issue and it will not increase the number from four very much.

And so, you know, our request is that the wholesalers complete fact sheets at least for the four, within seven days, and then we'll continue to meet and confer with them to the extent that there are -- that this issue pops up on the other 18, recognizing that we have sort of staggered the fact sheet process for bellwether plaintiffs.

JUDGE VANASKIE: All right. Who will be addressing this issue for the defendants?

MR. GEOPPINGER: Good afternoon, Your Honor, Jeff Geoppinger, G-E-O-P-P-I-N-G-E-R, on behalf of the wholesaler defendants.

JUDGE VANASKIE: Good afternoon.

MR. GEOPPINGER: Your Honor, as Mr. Williamson alluded to it and as in our submissions, you know, we'd like -- you know, we're agreeable to having some written agreement to get these four cases done and be done with those.

We did -- you know, there are four cases where there is no pharmacy fact sheet, so we didn't do one because the defense fact sheet process. The order says, you know, we need

to do one when we get a pharmacy one identifying us, which is what we did. Since there's no pharmacy in the case, there's no fact sheet from the pharmacy, there's no way for us to do it, at least according to the order.

But we'll take care of the four. The issue is the other 18. And I'll take Ms. Winston's word for the numbers on that, I don't have them off the top of my head. But, you know, the four, as I understand from the plans, they have depositions that we're going to try and get done on these people and they want to expedite them and we'll do those, we'll get them expedited as fast as we can. I don't know about seven days, but, you know, we expedited the last fact sheets we did, and we'll turn them around as quick as we can.

The one issue, though, of course, is that in these four cases, all three wholesaler defendants are going to have to, you know, review their records and produce a fact sheet, right, and the other instance is, we had the pharmacy fact sheet, they were targeted to -- the pharmacy told us who they bought from and the wholesaler who was at issue, you know, filled out a fact sheet.

Here, we're going to be going wider than that because all three of us are going to have to do the work and respond and say whether or not we're involved, and there's a thin possibility given who the pharmacies are in these cases, none of us are involved.

But with respect to the other 18, you know, I would, you know, I'm not necessarily looking for a Court order, but I'm asking, you know, for the plaintiffs to have some skin in the game here. If this situation exists out there and there's another plaintiff with a pharmacy that they have not filed a lawsuit against, was not going to be doing a pharmacy fact sheet, I think, you know, the plaintiffs should take the opportunity to do a little discovery and do a little legwork on that.

I don't understand if there's any time pressure with those, and apparently, there may not be very many of them, but to go out and find out, you know, hey, Mr., you know, pharmacy, while we're getting the pharmacy records, can you tell us where you got this stuff from? Was it one of these wholesalers, was it somebody else.

And then once we have that information, they can come back to the -- if it is indeed one of the three wholesalers who are involved in the litigation, they can target their request for a fact sheet to that wholesaler as opposed to asking all three of us to put together a fact sheet, you know, and likely two of us, at least two of us are probably going to say, we don't have any information, if not all three of us.

JUDGE VANASKIE: Let's just resolve the issue as to the four right now. And I'm hearing that there's an agreement to produce those defense fact sheets for those four cases

 where pharmacy -- pharmacies have not been identified as defendants. Is that correct?

MR. WILLIAMSON: Yes, Your Honor, and if I may offer -- I'm sorry, this is George Williamson again.

JUDGE VANASKIE: Thanks, Mr. Williamson.

MR. WILLIAMSON: If I may just offer that in this situation where a wholesaler defendant does not -- has not distributed a proper -- you know, a drug to a pharmacy that's identified in a plaintiff fact sheet, I wouldn't think that the wholesaler has an obligation to actually complete a fact sheet. I think only the implicated wholesalers would necessarily be required to complete a fact sheet.

So I don't think it's three for all four. Certainly, the three wholesalers would have to check their records, but if they didn't distribute the product, you know, I don't think that they -- all three of them need to complete a fact sheet.

JUDGE VANASKIE: Well, that was my understanding, Mr. Williamson, that -- well, Mr. Geoppinger was saying that all three have to do the search. Did I understand that correctly, Mr. Geoppinger?

MR. GEOPPINGER: Certainly, Your Honor. We will all have -- all three will have to do the search, but we're certainly -- back to your original question, yes, we agree to do it for these four. We can, we can -- and we will all search for the four, and if anybody comes up with data, we

will produce a fact sheet for that wholesaler. I guess we will communicate otherwise when, you know, another wholesaler looks and doesn't have anything. We can send an e-mail or otherwise communicate to the plaintiff that the other two wholesalers or -- maybe in one case all three wholesalers don't have any information, but we're certainly happy to not have to do three for every -- all -- the four plaintiffs and can do it in that fashion.

And then I think all we have to figure out, Your Honor, is the timeline. I know the plaintiffs have asked for seven days. That seems quick to me. I guess a better way to do it was, and again, I apologize, doing it off my head, but perhaps Mr. Williamson does, about when these plaintiffs are set to be deposed, and maybe we can come up with a timeframe that works to make sure it's done in abeyance of that.

MR. WILLIAMSON: And, Your Honor, this is George Williamson again. This sort of dovetails into one of our other requests that the defense fact sheet be completed at all levels prior to the plaintiffs' deposition, and so, you know, we're asking for seven days because -- it's the information that's contained in these fact sheets is critical preparing our plaintiffs for deposition.

And so, you know, the information that we receive from a wholesaler, for example, has information about, you know, when recall notices were sent, you know, that's

 extremely important for us, because we, you know, potentially need to know on what dates the statute of limitations might have been triggered. We need to be aware of these dates prior to our client's deposition. I could go on and on with other --

JUDGE VANASKIE: No need to go on and on. No need to go on and on.

But you have four individual plaintiffs that are at issue here. Are their depositions presently scheduled?

MR. WILLIAMSON: I believe that we have depositions scheduled for all ten of the -- of the first -- of the first set of bellwether plaintiff depositions.

JUDGE VANASKIE: When are those depositions scheduled for?

MR. WILLIAMSON: So I can only give you the date for my specific bellwether plaintiffs on the phone right now, Your Honor, and I apologize. You know, I might have to get with the defendants who might have a better idea of when each bellwether plaintiff is scheduled for deposition. I can tell you that my bellwether plaintiff is scheduled for deposition on April 20th. I think there are some that are scheduled for sooner than that, I think in the middle of April, I believe, there are depositions set.

JUDGE VANASKIE: Well, I'm going to suggest that you confer with Mr. Williamson to come up with a date by which

these defense fact sheets can be produced suitably in advance of the scheduled depositions. It seems to me that's easily done and should be able to be accomplished by assertions on it. So I'll ask that you do that with the understanding as to these four, they will be produced and we'll address questions about others if and when they arise.

MR. WILLIAMSON: Okay. Thank you, Your Honor.

JUDGE VANASKIE: Thank you.

MS. JOHNSTON: Your Honor, this is Sarah Johnston on behalf of the pharmacy defendants. I just wanted to ask for a slight clarification on this issue, if I may.

JUDGE VANASKIE: Sure.

MS. JOHNSTON: So on Page 22 of the plaintiffs' submission to the Court, there is a request that raises the issue of asking for a Court order that the pharmacies named in the PFS complete a DFS for these four cases, even though those pharmacies aren't named as defendants either in the Master Complaint or Short Form Complaint, and I think, based on this discussion, that that request has been withdrawn and the issues been resolved with the wholesalers, but I do want to clarify that that is the case here. We don't see there being an obligation for a pharmacy to complete a fact sheet if they're not parties to a particular case, but I want to make sure that that issue has been taken off the table for these four cases.

MR. WILLIAMSON: Your Honor, if I may respond, this is George Williamson again. I believe that our request is -- to the extent that a pharmacy defendant is in the MDL, in other words, they've been sued in various cases, if they are identified in a plaintiffs' fact sheet, even if they haven't been sued in that particular case, we still believe that they have an obligation to complete a fact sheet. No different than a wholesaler who is not sued, frankly, in most cases, when they're filed because plaintiff doesn't have the information, but they're still required because they're in the MDL to complete a fact sheet.

So we would ask the same of the pharmacy defendants to the extent that they're in the MDL.

Now, where you have a mom and pop pharmacy that hasn't been sued, they're not in the MDL, we don't believe that at least at this point that the Court has the ability to require them to complete a fact sheet, and to the extent that that's an issue for any plaintiff, we can discuss directly with that plaintiffs' attorney whether it makes sense to bring the retailer into the case.

However, in situations where a pharmacy defendant is already in the MDL, we would ask that they be required to complete a fact sheet, even if they haven't been sued in a particular plaintiffs' case.

MS. RICHER: Your Honor, this is Kristen Richer, also

on behalf of the pharmacy defendants. If I could just respond to that point that Mr. Williamson made.

JUDGE VANASKIE: Yes.

MS. RICHER: Our position on this is one that we've communicated via prior meet and confers, although we were not aware that plaintiffs were planning to seek this relief in their letter, but our position on this differs from Mr. Williamson. Understanding that there are pharmacies who are active in the MDL because they have been actually sued in specific PI cases or in the class action complaint, and we do not feel that it is fair or correct process-wise to require a pharmacy who has not been sued in a personal injury Short Form Complaint to respond to a defense fact sheet just based on plaintiff having identified that pharmacy as a pharmacy who dispensed Valsartan in Section 1 of the PFS.

If, you know, process-wise, the way that this should work is that if plaintiffs, when they pull their pharmacy records and they fill out their PFS decide that they're going to identify a pharmacy in Section 1 of the PFS as having dispensed Valsartan to a plaintiff, then plaintiff should amend their Short Form Complaint to actually sue that pharmacy if they want discovery from the pharmacy.

These are individual personal injury cases. There's a reason that we have Short Form Complaints so that parties know, are on notice that they're a defendant in the litigation

for that plaintiff, and if you don't, if that process is not in place, then every pharmacy is going to have to look at every PFS that's served and decide if they have to act like they are a defendant in the case, despite not having been named as a defendant in that case.

So it seems to me that the six years are relatively simple if plaintiffs are concerned that this is an issue, then they can amend their Short Form Complaint where applicable and name the relevant pharmacy as defendant, and that solves the problem, I think.

MR. WILLIAMSON: Your Honor, this is George Williamson. If I may respond.

JUDGE VANASKIE: You may.

MR. WILLIAMSON: We are talking about four cases here. We're not talking about every case in the MDL, we're talking about --

MS. RICHER: Well, I think -- sorry, George, I didn't mean to interrupt you. Go ahead.

MR. WILLIAMSON: We're talking about the four cases that are currently at issue here. We're not talking about every case in the MDL. In fact, the defendants only have to complete a fact sheet for a total of 28 cases.

And to the extent that a pharmacy is already in the MDL, the plaintiffs will identify where that situation has happened and will communicate directly with the defendant who

is already in the MDL and request that they complete a plaintiff fact sheet.

Now, I'm surprised that I've heard a defense counsel suggest that we should sue the client, but I think the easier way to do it is just to identify in the four cases where that has occurred and reach out directly to those counsel and request that a defense fact sheet be completed.

MS. RICHER: Well -- this is Kristen Richer again. I want a direct distinction here. When we're talking about the four cases that are getting thrown around, those are cases in which it is my understanding, and this is based on my review of the pleadings and the cases and the PFS, which are pharmacies that have been identified in the PFS are not defendants and are not participants in the litigation, and I don't know if that's because they haven't been sued or what's going on there.

So those are not active pharmacies. So we should stop using those as being example of what active defendants should be doing with respect to their PFS and DFS obligations because are completely separately situated cases.

When we're talking about circumstances where you do have an active defendant in the litigation, trying to determine whether it needs to respond to discovery, I don't think anyone should be surprised that a defendant wants to have actually been sued in the case before they're forced to

respond to discovery in the case. That seems pretty par for the course to me.

And so I don't think that's an unfair request. I don't think it's a high burden for plaintiffs. They are the masters of their pleadings and that, of course, applies to individual plaintiffs in the litigation as well. These are Short Form Complaints that should be amended and served for relative use. If a party is an active defendant in the litigation and we're simply asking for there to be a process, because of the pretty ordinary process in litigation by which parties are put on notice of claims against them so that they know that they have to monitor discovery in those cases.

JUDGE VANASKIE: All right. I understand the arguments. I would not require pharmacy defendants who are not named in those four cases as defendants to prepare a defense fact sheet. I think the better argument is that they would have had to have been named, and if you have information to suggest that they should be a defendant in the matter, their Complaint should be amended to identify them as a defendant in that particular matter.

But to ask pharmacy defendants who have not been named to prepare defense fact sheets for cases in which they are not parties, simply because they are a party in the overall MDL is asking too much. So that's my determination on that issue.

 All right. Is there anything else to discuss today?

MR. NIGH: Yes, Your Honor, this is Daniel Nigh. I wanted to raise an issue on timing of completion of defense fact sheets before bellwether plaintiff depositions.

JUDGE VANASKIE: Go ahead.

MR. NIGH: So, you know, we've all understood from the very beginning that one of the purposes is to be able to understand, you know, how the product moved through the chain of supply, and that was the reason -- one of the reasons for the DFS from the outset. And so in understanding that, you know, that's why we've always looked at it, need of the pharmacy, the wholesaler, the finished dose manufacturer and the API. So that's how this was presented.

So we actually need, you know, the whole chain of DFSs before our plaintiffs' depositions pursue forward. In terms of those four cases where pharmacies are not named, we will revisit that issue, but we may have to move quickly in terms of asking for leave to amend those Complaints.

But the larger issue is, you know, even on the four, we get the wholesaler, we still have to have the finished dose manufacturer DFS, and we still have to have the API manufacturer DFS before those depositions can go forward, and I think that's always been the understanding as we presented the plan to have these ten bellwether plaintiff depositions go forward first in the first timeframe, because those were the

ten that came from the set of 20 that were having DFSs worked up since August of 2020.

And so that's why those can have an earlier date to get their plaintiff depositions taken.

What I'm seeing more and more here, just in terms of, you know, we understood that the wholesalers, you know, didn't do an DFS and so because of that, the finished dose manufacturers felt like that their DFS obligation wasn't triggered, and then, of course, the APIs wouldn't have been triggered at that point. So we're just --

JUDGE VANASKIE: Somebody is talking over somebody. If you're not speaking, please mute your phone. Go ahead.

MR. NIGH: So in terms of the four, you know, we're behind the ball. There's a lot of defense fact sheets to be completed, because the wholesalers are starting now and they -- even if they got it done in seven days, that gives the finished dose manufacturer, they've got to get it done and then the API got to get it done before plaintiff depositions. That's always been the understanding, and so I just put that out there. It's a heavy lift.

I mean, we're going to meet and confer with the defendants on that, but that's going to be an issue. It's not even just the four, though, it's the other six we still have not received the API DFS, and so we wouldn't be able to move forward with those plaintiffs' depositions until we get those

as well.

But my understanding is, we're going to try to continue to work on that. However, we do -- I mean, we have dates for plaintiff depositions but if we don't have those DFSs, we're going to have to move those back.

So I wanted to make that aware at this point while we were talking about timing and DFS issues.

JUDGE VANASKIE: Well, thanks for that, Mr. Nigh. All I can say to you right now is that you all have to try to coordinate, get together and coordinate the production of those DFS so that depositions can proceed on schedule and continue to raise the issue with me so that it can be accomplished.

So if I'm hearing you correctly, Mr. Nigh, first, you have to get the retailer and wholesale DFS -- DFSs, and then you go up the chain; is that correct?

MR. NIGH: That's correct, and it may not be contingent that we have to have the retailer to get the wholesaler DFS done, but certainly from there, you know, the finished dose manufacturers are going to likely need to have the wholesalers' DFS and then the API manufacturer is going to need to have the finished dose manufacturers' DFS. That's correct.

JUDGE VANASKIE: Okay. All right. Well, all I can urge is that you work cooperatively to get this accomplished.

Is there anything else now?

MR. DAVIS: Your Honor, John Davis for the plaintiffs. Just one quick point of clarification, and I believe this is what Your Honor contemplated with regard to Mr. Trischler's submission on Monday, but plaintiffs' counsel will be copied on that, correct?

JUDGE VANASKIE: Certainly.

MR. DAVIS: Thank you.

JUDGE VANASKIE: We're not talking about privileged documents here, unless, Mr. Trischler, you determine that one of those 12 documents sent to me was privileged. But, no, I don't see any reason why you should not be copied on it.

MR. DAVIS: Thank you.

JUDGE VANASKIE: Anything else? All right. Thank you all very much for your understanding today. Again, my apologies for our late start, and I will be talking to you next Wednesday, if not sooner. Thank you.

RESPONSE: Thank you, Your Honor.

(12:52 p.m.)

- - - - - - - - - - - - - - -

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/S/ Karen Friedlander, CRR, RMR*
*Court Reporter/Transcriber*

March 24, 2021
Date

**/**

**/S** [1] - 74:25

**0**

**07068** [1] - 1:13

**1**

**1** [3] - 19:18, 67:15, 67:19
**10022** [1] - 2:25
**103** [1] - 1:12
**10:00** [1] - 3:20
**10th** [1] - 14:16
**11:00** [2] - 1:8, 3:2
**12** [10] - 50:17, 51:3, 52:1, 52:4, 52:7, 52:25, 54:6, 54:8, 54:15, 74:11
**12:52** [1] - 74:19
**15** [2] - 45:6, 47:14
**15219** [1] - 2:18
**16** [1] - 28:13
**17th** [1] - 2:7
**18** [6] - 28:13, 58:16, 59:1, 59:11, 60:6, 61:1
**1835** [1] - 1:15
**18th** [2] - 19:6, 58:23
**19103** [2] - 1:16, 2:7
**19422** [1] - 2:14
**1:19-md-02875-RBK-KW** [1] - 1:5

**2**

**2** [2] - 7:19, 19:18
**20** [5] - 56:15, 58:5, 58:9, 58:10, 72:1
**200** [2] - 2:14, 29:2
**2016** [1] - 50:23
**2018** [1] - 47:10
**2019** [1] - 31:20
**2020** [9] - 39:15, 39:16, 39:20, 39:24, 40:11, 40:12, 47:5, 58:11, 72:2
**2021** [3] - 1:7, 3:1, 75:2
**2029** [1] - 2:21
**20th** [1] - 64:21
**2150** [1] - 2:4
**22** [1] - 65:13
**220** [1] - 1:18
**23rd** [1] - 5:23
**24** [4] - 1:7, 3:1, 6:22, 75:2
**24th** [1] - 3:16
**250** [1] - 42:23
**2705** [1] - 1:18
**28** [1] - 68:22
**2800** [1] - 2:10
**2900** [1] - 1:15

**3**

**30** [1] - 2:7
**30(b)(6** [3] - 17:20, 27:21, 41:2
**300** [1] - 2:21
**316** [1] - 1:21
**31st** [4] - 3:16, 3:20, 53:19, 58:11
**32502** [1] - 1:22
**34** [1] - 31:19
**35** [2] - 31:6, 31:24
**352** [3] - 55:4, 55:12, 55:22
**38th** [1] - 2:17

**4**

**4,000** [2] - 38:6, 52:12
**4,000-ish** [1] - 41:21
**4,198** [1] - 55:5
**4057** [1] - 2:24
**42** [1] - 28:20
**45** [1] - 29:3
**450** [1] - 2:14
**45202** [1] - 2:11
**483** [6] - 33:12, 40:15, 40:16, 41:4, 44:21, 48:5
**4th** [3] - 2:24, 3:14, 24:3

**5**

**5** [2] - 16:16, 55:6
**55402** [1] - 2:4
**575** [1] - 2:24

**6**

**6** [3] - 31:6, 31:24, 58:3
**60** [4] - 57:18, 57:21, 57:22, 57:23
**600** [2] - 1:21, 2:10

**7**

**7** [33] - 31:6, 31:24, 38:5, 38:11, 38:14, 38:15, 38:23, 39:6, 39:8, 39:14, 39:15, 39:24, 40:20, 41:9, 41:19, 42:22, 42:24, 43:1, 43:2, 43:6, 44:17, 44:25, 45:20, 46:9, 46:13, 46:16, 47:25, 48:6, 49:10, 49:16, 50:9
**756-0160** [1] - 1:24
**78746** [1] - 1:19

**8**

**8** [15] - 38:18, 38:23, 39:7, 39:14, 40:18, 40:23, 42:23, 46:15, 46:17, 48:1, 48:4, 49:9, 49:17, 50:24, 51:10
**80** [2] - 24:5, 24:19
**80,000** [1] - 24:4
**800** [1] - 2:3
**856** [1] - 1:24

**9**

**9** [1] - 50:23
**90** [1] - 57:19
**90067-2904** [1] - 2:21
**95** [1] - 55:7

**A**

**a.m** [3] - 1:8, 3:2, 3:20
**abeyance** [1] - 63:15
**ability** [2] - 47:15, 66:16
**able** [13] - 8:23, 9:13, 24:9, 26:15, 30:3, 30:5, 31:15, 34:24, 52:16, 54:11, 65:3, 71:7, 72:24
**above-entitled** [1] - 74:23
**absolutely** [3] - 43:19, 43:25, 48:15
**accept** [2] - 21:18, 55:20
**accepted** [1] - 46:20
**accessible** [1] - 15:10
**accidentally** [1] - 41:5
**accomplished** [6] - 21:23, 21:24, 22:3, 65:3, 73:13, 73:25
**accord** [1] - 49:11
**according** [1] - 60:4
**account** [3] - 6:7, 20:3, 22:1
**accurate** [2] - 14:7, 18:25
**acknowledged** [1] - 6:21
**act** [1] - 68:3
**ACTION** [1] - 1:4
**action** [1] - 67:10
**actions** [2] - 39:23, 40:18
**active** [5] - 67:9, 69:17, 69:18, 69:22, 70:8
**Adam** [2] - 6:5, 56:19
**ADAM** [1] - 1:12
**addition** [1] - 10:19
**additional** [9] - 10:12, 10:15, 24:5, 29:12, 29:14, 30:5, 44:8, 58:16, 58:23
**additionally** [2] - 9:24, 10:14
**address** [16] - 4:22, 10:3, 10:23, 11:5, 17:16, 24:22, 28:18, 28:22, 32:23, 32:24, 36:13, 37:20, 41:21, 51:21, 54:2, 65:5
**addressed** [7] - 4:9, 4:13, 4:14, 6:19, 7:18, 11:17, 35:11
**addressing** [6] - 9:16, 14:1, 41:24, 48:5, 49:12, 59:13
**adequately** [2] - 39:25, 52:23
**Administration** [1] - 35:1
**advance** [2] - 23:13, 65:1
**adversarial** [1] - 51:17
**affidavit** [1] - 21:14
**afternoon** [4] - 42:1, 42:2, 59:15, 59:18
**agenda** [12] - 6:12, 6:19, 7:21, 8:25, 9:20, 9:22, 15:10, 19:18, 23:25, 32:17, 52:1, 56:15
**ago** [9] - 23:22, 28:24, 42:14, 43:9, 43:21, 44:19, 45:7, 45:16, 47:15
**agree** [6] - 11:10, 26:9, 30:6, 38:12, 56:20, 62:23
**agreeable** [1] - 59:21
**agreed** [3] - 7:24, 13:22, 26:7
**agreement** [5] - 24:10, 30:4, 35:19, 59:22, 61:24
**agreements** [1] - 52:9
**ahead** [9] - 27:11, 27:15, 27:16, 30:14, 32:5, 38:13, 68:18, 71:5, 72:12
**aided** [1] - 1:25
**ALFANO** [1] - 2:16
**ALL** [1] - 3:1
**allege** [1] - 45:21
**allow** [1] - 57:15
**alluded** [1] - 59:20
**almost** [2] - 30:1, 39:20
**ameliorated** [1] - 20:24
**amend** [3] - 67:21, 68:8, 71:18
**amended** [3] - 8:5, 70:7, 70:19
**AmerisourceBergen** [1] - 2:11
**analogous** [1] - 34:18
**analysis** [1] - 49:3
**Analyst** [3] - 7:23, 9:23, 10:11
**AND** [1] - 1:5
**Angeles** [1] - 2:21
**answer** [2] - 23:25, 52:4
**Anthony** [1] - 38:24
**anticipation** [4] - 33:4, 33:22, 36:3, 36:7
**anyways** [1] - 41:12
**API** [17] - 38:15, 38:19, 39:6, 39:11, 42:21, 42:23, 42:24, 48:23, 51:10, 57:13, 57:22, 71:13, 71:21, 72:18, 72:24, 73:21
**APIs** [1] - 72:9
**apologies** [2] - 51:23, 74:16
**apologize** [2] - 63:12, 64:17
**apology** [1] - 3:14
**appear** [2] - 13:14, 29:8
**applicable** [1] - 68:8
**applications** [2] - 7:5, 16:16
**applies** [1] - 70:5
**apply** [1] - 44:14
**applying** [1] - 40:19
**appreciate** [6] - 12:22, 14:18, 21:17, 28:6, 28:9, 36:15
**appreciates** [1] - 9:8
**appropriate** [2] - 9:5, 21:21
**April** [3] - 27:23, 64:21, 64:22
**areas** [1] - 38:6
**argue** [3] - 42:16, 43:9, 44:8
**argued** [1] - 43:20
**arguing** [2] - 43:15,

45:2
**argument** [5] - 44:9, 47:12, 50:7, 51:7, 70:16
**arguments** [1] - 70:14
**arise** [1] - 65:6
**ascertain** [1] - 37:11
**aside** [2] - 42:13, 42:18
**assertions** [3] - 4:24, 4:25, 65:3
**assessment** [1] - 53:13
**assume** [1] - 30:16
**assumed** [1] - 52:18
**assuming** [1] - 56:1
**assumption** [1] - 52:21
**attachments** [1] - 52:11
**attempt** [2] - 42:12, 42:17
**attempted** [1] - 14:19
**attending** [1] - 53:21
**attorney** [1] - 66:19
**attorney/client** [1] - 4:25
**attorneys** [1] - 25:10
**audit** [2] - 7:13, 40:3
**August** [3] - 58:3, 58:11, 72:2
**Aurobindo** [34] - 2:15, 2:15, 5:7, 12:9, 12:10, 13:2, 13:7, 13:18, 14:2, 14:4, 15:13, 15:17, 19:14, 19:24, 20:4, 20:10, 22:10, 22:20, 23:17, 24:24, 25:3, 25:10, 26:22, 29:6, 29:15, 31:1, 32:15, 33:11, 33:21, 33:22, 34:11, 35:19, 36:19
**Aurobindo's** [2] - 20:2, 29:1
**Aurobindo.pdf** [1] - 29:11
**Aurolife** [1] - 2:15
**Austin** [1] - 1:19
**automatically** [1] - 34:21
**available** [5] - 4:15, 18:7, 19:22, 21:3, 54:10
**Avenue** [2] - 2:3, 2:24
**avoid** [1] - 11:21
**avoidable** [1] - 11:22
**avoiding** [1] - 5:25
**aware** [3] - 64:3, 67:6, 73:6
**awhile** [2] - 25:4, 28:24

**B**

**background** [3] - 38:15, 57:3, 58:13
**baffling** [2] - 19:19, 40:12
**bailiwick** [1] - 4:3
**balance** [1] - 8:8
**ball** [1] - 72:14
**BARNES** [1] - 2:19
**based** [6] - 20:22, 46:17, 53:3, 65:18, 67:13, 69:11
**basis** [6] - 23:13, 28:21, 30:25, 33:3, 43:19, 43:22
**batch** [2] - 13:15, 16:22
**batches** [1] - 51:1
**Bates** [1] - 7:16
**battles** [1] - 44:13
**Baylen** [1] - 1:21
**bear** [1] - 46:13
**bearing** [1] - 47:9
**bears** [1] - 45:20
**Bee** [1] - 1:18
**beginning** [3] - 58:10, 71:7
**behalf** [8] - 5:7, 9:18, 14:2, 41:24, 42:8, 59:16, 65:10, 67:1
**behind** [1] - 72:14
**Behram** [2] - 20:15, 20:19
**belabor** [1] - 16:9
**Bell** [1] - 2:14
**bellwether** [9] - 58:22, 58:23, 59:12, 64:12, 64:16, 64:19, 64:20, 71:4, 71:24
**benefit** [3] - 31:7, 41:3, 41:6
**BERNE** [1] - 2:9
**better** [3] - 63:11, 64:18, 70:16
**between** [4] - 18:4, 36:9, 46:8, 46:21
**big** [2] - 29:2, 59:5
**bit** [3] - 26:16, 35:9, 51:24
**Blessy** [1] - 25:18
**Blue** [1] - 2:14
**boggling** [1] - 21:10
**booklets** [1] - 7:1
**BOSICK** [1] - 2:16
**bought** [1] - 60:19
**breach** [1] - 36:5
**brief** [4] - 5:14, 28:10, 33:13, 47:14
**briefed** [1] - 33:13
**briefly** [2] - 47:12, 47:13
**bring** [2] - 44:12, 66:19
**brought** [5] - 14:16, 45:23, 46:21, 54:21, 55:1
**burden** [1] - 70:4
**business** [2] - 33:5, 36:10
**BY** [11] - 1:12, 1:15, 1:18, 1:21, 2:3, 2:6, 2:9, 2:13, 2:17, 2:20, 2:23

**C**

**CA** [1] - 2:21
**camera** [3] - 5:14, 55:10, 55:25
**cannot** [2] - 20:20, 21:23
**care** [2] - 22:2, 60:5
**careful** [1] - 36:11
**case** [32] - 17:17, 23:24, 27:1, 29:9, 34:5, 34:8, 34:14, 38:18, 39:19, 40:8, 42:10, 43:7, 44:13, 44:15, 44:16, 45:17, 47:8, 48:10, 58:8, 60:2, 63:5, 65:21, 65:23, 66:6, 66:20, 66:24, 68:4, 68:5, 68:15, 68:21, 69:25, 70:1
**cases** [32] - 43:10, 58:6, 58:9, 58:10, 58:14, 58:16, 59:1, 59:3, 59:22, 59:23, 60:15, 60:24, 61:25, 65:16, 65:25, 66:4, 66:8, 67:10, 67:23, 68:14, 68:19, 68:22, 69:5, 69:10, 69:12, 69:20, 70:12, 70:15, 70:22, 71:16
**cast** [4] - 10:14, 25:5, 25:6, 25:9
**cataloged** [1] - 6:9
**categories** [2] - 7:20, 57:16
**category** [2] - 35:16, 52:12
**caught** [3] - 5:16, 15:14, 15:23
**Centre** [1] - 2:17
**Century** [1] - 2:21
**certain** [1] - 39:1
**certainly** [11] - 11:19, 17:11, 26:20, 31:14, 53:24, 62:13, 62:21, 62:23, 63:6, 73:19, 74:7
**certify** [1] - 74:22
**cetera** [1] - 8:12
**chain** [3] - 71:8, 71:14, 73:16
**challenges** [2] - 24:25, 25:7
**chance** [3] - 18:10, 26:2, 28:7
**change** [1] - 3:15
**changed** [1] - 46:21
**characterization** [1] - 16:8
**characterize** [1] - 15:22
**characters** [4] - 10:14, 25:5, 25:6, 25:9
**chase** [1] - 22:15
**check** [1] - 62:14
**chemical** [2] - 47:17, 48:23
**chemist** [4] - 48:20, 51:4, 51:5, 52:3
**chemistry** [2] - 51:5, 52:3
**chime** [1] - 20:16
**choosing** [2] - 19:17, 31:1
**cincinnati** [1] - 2:11
**CIPRIANI** [1] - 2:12
**circle** [2] - 36:20, 55:1
**circumstances** [1] - 69:21
**CIVIL** [1] - 1:4
**claiming** [1] - 8:10
**claims** [2] - 56:17, 70:11
**clarification** [7] - 5:2, 5:5, 9:19, 46:18, 54:20, 65:11, 74:3
**clarified** [1] - 35:24
**clarify** [5] - 15:8, 16:3, 17:19, 46:24, 65:21
**class** [1] - 67:10
**clear** [3] - 36:21, 42:19, 50:6
**clearly** [1] - 29:8
**Clem** [1] - 41:25
**CLEM** [1] - 2:17
**clever** [1] - 42:17
**client** [9] - 7:8, 14:10, 14:12, 17:15, 22:24, 23:5, 24:9, 37:11, 69:4
**client's** [3] - 28:12, 43:12, 64:4
**clients** [4] - 24:3, 26:14, 28:5, 30:3
**CMC** [5] - 3:16, 3:19, 31:16, 53:20, 53:25
**Co** [1] - 2:22
**code** [1] - 51:11
**codefendant** [1] - 22:25
**colleague** [2] - 32:22, 48:17
**colleagues** [2] - 12:17, 30:1
**collected** [1] - 7:7
**collectively** [1] - 43:12
**comfortable** [2] - 3:5, 3:8
**coming** [3] - 11:18, 41:16, 53:4
**Commencing** [1] - 1:8
**comments** [1] - 47:6
**commitment** [1] - 11:14
**committing** [1] - 56:6
**communicate** [3] - 63:2, 63:4, 68:25
**communicated** [1] - 67:5
**communicating** [2] - 14:13, 17:14
**communications** [5] - 44:21, 46:3, 46:8, 46:20, 50:11
**companies** [3] - 33:9, 33:10, 33:17
**Complaint** [6] - 65:18, 67:13, 67:21, 68:8, 70:19
**complaint** [1] - 67:10
**complaints** [1] - 43:4
**Complaints** [3] - 67:24, 70:7, 71:18
**complement** [1] - 38:9
**complete** [26] - 8:5, 9:21, 9:23, 11:12, 30:1, 30:2, 57:7, 57:16, 57:18, 57:20, 58:1, 58:4, 58:7, 59:2, 59:8, 62:10, 62:12, 62:16, 65:16, 65:22, 66:7, 66:11, 66:17, 66:23, 68:22, 69:1
**completed** [8] - 7:20, 8:10, 9:1, 56:6, 58:6, 63:18, 69:7, 72:15
**completely** [3] - 6:13, 44:23, 69:20
**completing** [1] - 58:21

**completion** [1] - 71:3
**complex** [1] - 11:24
**compliance** [4] - 33:25, 34:4, 35:9, 36:25
**compliant** [1] - 7:15
**compliant-production** [1] - 7:15
**complied** [1] - 6:13
**comply** [1] - 15:17
**complying** [1] - 14:24
**computer** [2] - 1:25, 17:21
**computer-aided** [1] - 1:25
**conceding** [1] - 27:25
**concern** [3] - 42:5, 42:9, 53:8
**concerned** [3] - 5:23, 50:2, 68:7
**concerning** [3] - 33:1, 47:7, 49:16
**concerns** [8] - 6:9, 8:19, 14:13, 17:14, 20:9, 22:2, 48:5, 49:12
**conclusion** [3] - 5:18, 22:6, 57:24
**Concussion** [1] - 34:13
**concussions** [1] - 34:16
**condensed** [1] - 6:6
**conducted** [2] - 35:1, 40:4
**conducting** [1] - 44:1
**confer** [21] - 14:14, 14:20, 15:1, 16:1, 17:13, 18:1, 23:7, 23:23, 24:11, 24:12, 25:15, 25:25, 26:1, 26:17, 27:3, 27:10, 28:15, 30:9, 59:9, 64:25, 72:21
**CONFERENCE** [1] - 1:6
**conference** [8] - 5:9, 8:22, 14:22, 17:17, 23:10, 23:14, 24:15, 52:23
**conferences** [2] - 23:24, 27:1
**conferring** [1] - 23:3
**confers** [2] - 29:15, 67:5
**confidence** [1] - 55:7
**confident** [3] - 11:1, 18:3, 26:15
**confirm** [2] - 4:6, 15:12
**confirmation** [1] - 7:11
**confirmed** [1] - 7:13
**Congressional** [1] - 34:16
**conjunction** [1] - 38:5
**consensual** [1] - 10:9
**considered** [1] - 27:3
**considering** [2] - 26:23, 31:3
**consistent** [1] - 44:6
**consultant** [1] - 36:9
**consultant's** [1] - 34:6
**consultants** [2] - 35:8, 36:6
**consumers** [1] - 35:3
**contained** [2] - 57:8, 63:21
**contamination** [4] - 39:11, 39:22, 40:19, 47:16
**contemplated** [2] - 34:4, 74:4
**content** [1] - 51:3
**context** [2] - 34:12, 36:5
**contingent** [1] - 73:18
**continue** [13] - 4:18, 5:24, 11:14, 11:23, 17:25, 23:2, 24:18, 37:20, 43:9, 50:14, 59:9, 73:3, 73:12
**CONTINUED** [1] - 2:1
**continued** [1] - 42:6
**continuing** [1] - 42:16
**conversation** [1] - 25:4
**cooperate** [1] - 25:25
**cooperatively** [1] - 73:25
**coordinate** [2] - 73:10
**copied** [3] - 26:3, 74:6, 74:12
**copies** [1] - 18:17
**copy** [1] - 22:24
**core** [3] - 42:13, 43:17, 44:14
**correct** [17] - 8:12, 10:6, 18:23, 27:21, 37:9, 37:14, 37:16, 47:19, 56:18, 56:22, 62:2, 67:11, 73:16, 73:17, 73:23, 74:6, 74:22
**corrective** [2] - 39:23, 40:18
**correctly** [2] - 62:20, 73:14
**correspondence** [1] - 41:7
**counsel** [6] - 3:10, 4:7, 30:4, 69:3, 69:6, 74:5
**counsel's** [1] - 5:19
**couple** [3] - 18:21, 43:21
**course** [9] - 3:17, 6:10, 13:17, 47:21, 57:6, 60:14, 70:2, 70:5, 72:9
**COURT** [1] - 1:2
**court** [1] - 19:20
**Court** [5] - 1:23, 44:12, 61:2, 65:15, 74:25
**Court's** [2] - 42:5, 52:4
**Cove** [1] - 1:18
**cover** [2] - 41:12, 55:2
**covered** [2] - 35:15, 35:17
**covers** [1] - 54:17
**crack** [1] - 47:2
**critical** [1] - 63:21
**CRR** [1] - 74:25
**CSI** [1] - 20:16
**culprit** [1] - 39:10
**custodian** [5] - 7:16, 13:9, 13:15, 17:4, 32:1
**custodians** [1] - 44:25
**Customs** [2] - 19:4, 19:15
**cut** [2] - 22:15, 55:19
**CVS** [1] - 2:22
**cyber** [1] - 20:8

**D**

**DANIEL** [2] - 1:21, 2:9
**Daniel** [2] - 53:11, 71:2
**data** [18] - 8:5, 10:8, 14:8, 14:11, 20:3, 20:5, 20:7, 20:11, 20:22, 20:25, 21:5, 21:6, 21:9, 21:10, 21:25, 36:5, 62:25
**databases** [2] - 7:5, 7:6
**date** [6] - 9:10, 30:18, 58:9, 64:15, 64:25, 72:3
**Date** [1] - 75:2
**dated** [1] - 50:23
**dates** [3] - 64:2, 64:3, 73:4
**DAVIS** [16] - 1:17, 1:18, 38:1, 38:4, 38:14, 45:9, 45:11, 51:7, 53:7, 53:19, 54:19, 55:15, 56:10, 74:2, 74:8, 74:13
**Davis** [12] - 38:1, 43:1, 43:24, 44:23, 45:12, 47:1, 47:19, 51:8, 53:7, 55:13, 56:9, 74:2
**Davis's** [1] - 42:4
**days** [12] - 22:3, 28:17, 57:18, 57:19, 57:21, 57:22, 57:23, 59:8, 60:12, 63:11, 63:20, 72:16
**deal** [2] - 35:7, 42:3
**dealing** [4] - 28:4, 50:23, 58:13, 58:16
**deals** [1] - 24:24
**dealt** [1] - 28:20
**death** [1] - 27:9
**decide** [2] - 67:18, 68:3
**decision** [2] - 34:14, 50:12
**decisionmaking** [1] - 7:3
**decrypting** [1] - 20:25
**dedesignate** [1] - 25:3
**dedesignated** [2] - 10:9, 25:11
**Defendant** [6] - 2:8, 2:11, 2:15, 2:18, 2:22, 2:25
**defendant** [16] - 30:25, 58:4, 59:1, 62:7, 66:3, 66:21, 67:25, 68:4, 68:5, 68:9, 68:25, 69:22, 69:24, 70:8, 70:18, 70:20
**defendants** [31] - 5:7, 19:20, 29:22, 42:9, 43:13, 52:10, 57:7, 57:10, 57:11, 57:16, 57:18, 58:2, 58:7, 58:19, 58:22, 59:14, 59:17, 60:15, 62:2, 64:18, 65:10, 65:17, 66:12, 67:1, 68:21, 69:14, 69:18, 70:14, 70:15, 70:21, 72:22
**defendants'** [2] - 56:24, 56:25
**Defense** [2] - 2:8, 2:18
**defense** [17] - 3:10, 55:18, 56:16, 57:5, 57:24, 58:6, 59:25, 61:25, 63:18, 65:1, 67:13, 69:3, 69:7, 70:16, 70:22, 71:3, 72:14
**deficiencies** [5] - 4:8, 10:7, 10:15, 39:1, 39:17
**definitive** [1] - 8:24
**delay** [2] - 27:4, 39:3
**delve** [1] - 13:1
**demonstrated** [1] - 13:8
**denied** [2] - 44:18, 47:24
**deposed** [6] - 16:21, 25:18, 25:19, 29:5, 45:3, 63:14
**deposition** [20] - 13:5, 13:8, 15:16, 25:16, 27:18, 32:3, 32:14, 38:24, 39:4, 53:11, 53:16, 53:18, 53:22, 54:3, 54:11, 63:19, 63:22, 64:4, 64:19, 64:20
**depositions** [27] - 9:7, 9:9, 9:14, 10:18, 16:12, 27:5, 30:12, 40:9, 41:16, 45:4, 53:10, 60:9, 64:9, 64:10, 64:12, 64:13, 64:23, 65:2, 71:4, 71:15, 71:22, 71:24, 72:4, 72:18, 72:25, 73:4, 73:11
**designated** [1] - 53:12
**designee** [1] - 41:2
**despite** [3] - 8:19, 8:24, 68:4
**detailed** [1] - 22:13
**determination** [6] - 11:11, 33:7, 36:1, 43:8, 54:8, 70:24
**determine** [3] - 51:6, 69:23, 74:10
**determined** [2] - 13:12, 55:3
**determining** [2] - 33:3, 56:5
**Deviation** [1] - 50:22
**DFS** [14] - 65:16, 69:19, 71:10, 71:21, 71:22, 72:7, 72:8, 72:24, 73:7, 73:11, 73:15, 73:19, 73:21, 73:22
**DFSs** [4] - 71:15, 72:1, 73:5, 73:15
**dialogue** [2] - 3:21, 11:15
**different** [4] - 26:24, 35:9, 44:24, 66:7
**differently** [1] - 49:22
**differs** [1] - 67:7

**difficult** [3] - 8:4, 51:1, 53:2
**digest** [1] - 28:8
**diligently** [2] - 10:2, 10:22
**direct** [5] - 20:23, 47:17, 48:6, 52:4, 69:9
**direction** [1] - 52:19
**directly** [7] - 34:18, 45:20, 46:14, 48:9, 66:18, 68:25, 69:6
**disadvantage** [1] - 51:24
**disagree** [1] - 16:8
**disagrees** [1] - 55:4
**discover** [1] - 48:10
**discovered** [1] - 41:19
**discovery** [33] - 5:24, 6:2, 11:20, 15:18, 39:21, 42:7, 42:13, 42:16, 42:19, 43:10, 43:17, 43:22, 44:13, 44:14, 44:17, 45:6, 45:14, 47:3, 47:10, 48:17, 48:19, 49:1, 49:25, 50:3, 50:9, 50:10, 52:9, 56:12, 61:8, 67:22, 69:23, 70:1, 70:12
**Discovery** [1] - 21:15
**discrete** [2] - 10:25, 38:5
**discuss** [5] - 7:23, 15:2, 52:23, 66:18, 71:1
**discussed** [1] - 15:10
**discussing** [6] - 6:18, 9:12, 14:10, 22:23, 24:8, 30:3
**discussion** [8] - 5:15, 5:17, 15:6, 30:17, 40:2, 43:21, 48:25, 65:19
**dismissal** [1] - 56:16
**dispensed** [2] - 67:15, 67:20
**dispute** [3] - 31:16, 45:25, 46:10
**disputes** [2] - 11:15, 17:16
**distinction** [1] - 69:9
**distribute** [1] - 62:15
**distributed** [1] - 62:8
**DISTRICT** [2] - 1:2, 1:2
**doable** [2] - 20:2, 56:3
**doctrine** [1] - 35:22
**document** [14] - 10:4, 10:13, 22:24, 29:24, 30:15, 39:1, 41:18, 50:22, 51:14, 51:19, 52:1, 52:17, 53:14
**documents** [101] - 5:10, 5:12, 5:13, 5:25, 6:19, 6:23, 7:7, 7:12, 7:20, 7:24, 8:2, 8:14, 8:21, 9:2, 9:25, 10:9, 10:16, 10:19, 10:21, 11:8, 13:8, 13:10, 13:13, 13:14, 14:17, 15:19, 16:11, 16:23, 17:3, 17:4, 17:9, 19:13, 19:16, 19:21, 19:24, 21:8, 22:16, 22:20, 25:3, 25:11, 25:17, 27:25, 28:13, 28:20, 28:24, 29:2, 29:3, 29:22, 30:5, 30:22, 30:24, 31:1, 31:4, 31:5, 31:21, 31:24, 32:13, 33:4, 34:6, 34:15, 35:6, 35:12, 35:14, 35:16, 35:20, 35:21, 36:2, 36:22, 37:3, 38:6, 38:7, 39:3, 41:3, 41:8, 41:12, 41:21, 43:11, 43:14, 45:1, 50:16, 50:18, 50:20, 52:1, 52:5, 52:7, 52:8, 52:11, 52:12, 52:14, 53:1, 53:9, 54:6, 54:8, 54:15, 55:4, 55:5, 55:10, 55:12, 55:25, 74:10, 74:11
**done** [17] - 11:25, 22:5, 25:13, 44:10, 47:5, 47:10, 55:11, 59:22, 60:9, 63:15, 65:3, 72:16, 72:17, 72:18, 73:19
**door** [2] - 43:16, 47:3
**dose** [10] - 42:21, 42:25, 57:12, 57:21, 71:12, 71:20, 72:7, 72:17, 73:20, 73:22
**Doshi** [3] - 16:21, 17:19, 18:7
**Doshi's** [1] - 17:10
**doubt** [1] - 53:20
**dovetails** [1] - 63:17
**down** [3] - 11:20, 11:21, 43:17
**downstream** [1] - 56:24
**Dr** [4] - 38:24, 39:5, 41:18, 53:11
**draft** [6] - 28:21, 29:22, 30:15, 30:22, 30:25, 31:20
**drafting** [1] - 7:2
**draw** [1] - 33:16
**drive** [6] - 13:23, 13:25, 14:8, 17:21, 18:20, 21:16
**drives** [17] - 13:6, 13:19, 14:9, 15:9, 15:10, 15:15, 16:11, 18:13, 18:25, 19:3, 19:10, 19:11, 19:14, 21:6, 37:3, 37:6, 37:12
**Dropbox** [7] - 19:24, 20:3, 20:6, 20:9, 20:23, 20:25, 22:1
**dropped** [1] - 33:12
**Drug** [1] - 34:25
**drug** [5] - 29:10, 35:2, 47:8, 47:17, 62:8
**drugs** [1] - 34:24
**Drugs** [1] - 9:18
**DUANE** [1] - 2:6
**due** [3] - 3:16, 38:25, 48:14
**during** [1] - 42:8

**E**

**e-mail** [8] - 3:15, 5:11, 23:4, 23:21, 55:9, 55:24, 58:18, 63:3
**e-mails** [2] - 6:22, 6:23
**early** [2] - 28:7, 29:18
**easier** [1] - 69:4
**easiest** [2] - 19:16, 33:16
**easily** [2] - 54:10, 65:2
**East** [1] - 2:21
**echo** [1] - 42:9
**effect** [1] - 22:7
**effort** [1] - 18:6
**eight** [1] - 21:9
**EIR** [4] - 39:16, 40:2, 41:5, 44:21
**Eisenhower** [1] - 1:12
**either** [3] - 20:1, 53:21, 65:17
**electronically** [1] - 56:2
**elucidated** [1] - 45:17
**emerging** [1] - 46:10
**emphasize** [2] - 10:2, 48:11
**employees** [2] - 13:7, 15:11
**empty** [2] - 19:10, 19:11
**encompassed** [1] - 37:2
**encourage** [2] - 11:23, 51:14
**encouraged** [1] - 11:7
**encrypt** [1] - 21:25
**encrypting** [1] - 20:24
**end** [10] - 3:25, 21:1, 32:19, 34:3, 44:13, 45:5, 47:4, 48:24, 56:12
**endeavoring** [2] - 17:7, 17:13
**ended** [1] - 36:23
**engage** [2] - 17:13, 18:1
**engaged** [2] - 15:25, 16:1
**ensure** [2] - 10:23, 16:24
**entered** [5] - 42:14, 45:13, 45:16, 48:19, 58:3
**entering** [1] - 58:3
**entertaining** [1] - 47:21
**entire** [1] - 35:13
**entities** [1] - 33:15
**entitled** [1] - 74:23
**entries** [1] - 31:6
**entry** [2] - 48:16, 49:1
**EPI** [1] - 29:11
**error** [1] - 55:6
**ESI** [1] - 7:9
**ESQUIRE** [13] - 1:12, 1:15, 1:18, 1:21, 2:3, 2:6, 2:9, 2:13, 2:13, 2:17, 2:20, 2:20, 2:23
**essentially** [2] - 6:12, 26:3
**established** [1] - 44:3
**establishing** [1] - 40:9
**establishment** [1] - 39:15
**et** [1] - 8:12
**Ethan** [2] - 5:6, 32:22
**ETHAN** [1] - 2:13
**evaluate** [3] - 14:20, 26:14, 30:10
**evaluating** [2] - 24:8, 25:24
**events** [1] - 21:15
**eventually** [1] - 46:1
**evidence** [2] - 15:24, 34:17
**exactly** [2] - 31:12, 49:7
**example** [9] - 6:21, 13:16, 38:18, 38:23, 40:2, 40:3, 53:11, 63:24, 69:18
**examples** [1] - 7:17
**excuse** [2] - 58:12, 58:22
**exist** [2] - 15:15, 54:10
**exists** [4] - 17:22, 34:17, 59:4, 61:4
**expand** [2] - 43:22, 44:17
**expansion** [1] - 50:3
**expect** [3] - 7:2, 28:3, 28:16
**expected** [1] - 28:11
**expecting** [1] - 19:7
**expedite** [1] - 60:10
**expedited** [2] - 60:11, 60:12
**expeditiously** [1] - 11:2
**expert** [1] - 20:16
**explanation** [1] - 28:10
**explicitly** [1] - 45:14
**expressed** [2] - 27:9, 42:7
**extended** [1] - 57:19
**extent** [8] - 31:3, 36:2, 58:25, 59:10, 66:3, 66:13, 66:17, 68:23
**extremely** [3] - 11:24, 11:25, 64:1

**F**

**face** [2] - 48:7, 53:3
**facilities** [4] - 34:23, 38:17, 42:20, 43:23
**facility** [7] - 34:20, 38:16, 38:19, 47:5, 47:7, 49:20, 49:21
**fact** [65] - 4:8, 17:20, 17:21, 27:19, 27:20, 42:11, 44:7, 46:10, 47:23, 53:25, 56:25, 57:5, 57:7, 57:9, 57:11, 57:12, 57:14, 57:16, 57:18, 57:21, 57:24, 58:1, 58:4, 58:6, 58:7, 58:10, 58:21, 58:24, 59:2, 59:8, 59:11, 59:24, 59:25, 60:3, 60:12, 60:16, 60:17, 60:20, 61:6, 61:19, 61:20, 61:25, 62:9, 62:10, 62:12, 62:16, 63:1, 63:18, 63:21, 65:1, 65:22, 66:5, 66:7, 66:11, 66:17, 66:23, 67:13, 68:21, 68:22,

69:2, 69:7, 70:16, 70:22, 71:4, 72:14
**facts** [1] - 44:2
**factual** [1] - 45:25
**fail** [1] - 22:22
**fair** [1] - 67:11
**fairly** [1] - 30:19
**faith** [1] - 14:25
**familiar** [1] - 36:4
**familiarity** [1] - 50:25
**far** [3] - 20:10, 34:3, 48:8
**fashion** [3] - 6:6, 8:24, 63:8
**fast** [1] - 60:11
**fault** [1] - 3:14
**FDA** [22] - 7:14, 33:11, 34:2, 34:20, 35:9, 39:14, 40:3, 40:22, 41:5, 41:7, 44:3, 45:19, 46:2, 46:8, 46:14, 46:15, 47:6, 47:24, 48:2, 49:12, 49:15, 49:23
**FDA's** [2] - 46:5, 46:12
**fear** [1] - 48:7
**fears** [1] - 15:13
**February** [1] - 39:15
**FedEx** [2] - 18:16, 19:5
**FELDMAN** [6] - 2:13, 5:6, 33:19, 34:9, 35:6, 36:18
**Feldman** [4] - 5:7, 32:22, 33:18, 35:5
**fell** [1] - 52:12
**felt** [1] - 72:8
**few** [2] - 21:8, 45:11
**figure** [2] - 8:6, 63:9
**file** [4] - 13:9, 21:3, 21:21, 21:24
**filed** [4] - 17:11, 58:8, 61:5, 66:9
**files** [6] - 8:11, 10:6, 10:19, 13:3, 13:19, 21:21
**fill** [1] - 67:18
**filled** [1] - 60:20
**final** [2] - 10:14, 11:18
**finalizing** [1] - 31:18
**finally** [2] - 5:18, 46:18
**fine** [2] - 32:10, 50:15
**finish** [2] - 26:17, 57:21
**finished** [9] - 42:21, 42:25, 57:12, 71:12, 71:20, 72:7, 72:17, 73:20, 73:22
**firm** [3] - 33:14, 33:20, 35:7
**first** [13] - 5:15, 6:2, 13:2, 21:20, 33:6, 36:20, 45:13, 55:13, 64:11, 71:25, 73:14
**five** [1] - 43:14
**flagged** [2] - 4:23, 50:19
**Floor** [2] - 2:17, 2:24
**Florida** [1] - 1:22
**Food** [1] - 34:25
**footnote** [1] - 33:13
**FOR** [1] - 1:2
**forced** [2] - 39:3, 69:25
**foregoing** [1] - 74:22
**forever** [1] - 9:9
**forget** [1] - 3:18
**Form** [6] - 65:18, 67:12, 67:21, 67:24, 68:8, 70:7
**form** [1] - 13:13
**forth** [4] - 4:3, 7:2, 21:6, 29:19
**fortuitous** [1] - 8:22
**forward** [15] - 8:22, 9:5, 9:14, 19:25, 25:20, 27:10, 32:14, 36:24, 50:10, 53:10, 71:15, 71:22, 71:25, 72:25
**four** [34] - 13:5, 15:14, 29:4, 57:15, 58:14, 58:16, 58:22, 59:6, 59:8, 59:22, 59:23, 60:5, 60:8, 60:15, 61:24, 61:25, 62:13, 62:24, 62:25, 63:7, 64:8, 65:5, 65:16, 65:25, 68:14, 68:19, 69:5, 69:10, 70:15, 71:16, 71:19, 72:13, 72:23
**frankly** [3] - 19:19, 52:16, 66:8
**free** [1] - 4:13
**FREEMAN** [1] - 1:11
**Friday** [5] - 25:23, 27:18, 27:24, 28:3, 28:11
**Friedlander** [2] - 1:23, 74:25
**friedlanderreporter@gmail.com** [1] - 1:23
**front** [5] - 30:18, 35:12, 43:20, 43:21, 52:2
**frustrating** [4] - 22:5, 27:1, 27:8, 43:9
**frustration** [3] - 42:6, 42:8, 42:10
**FTP** [8] - 19:24, 20:3, 20:5, 20:12, 20:20, 20:22, 20:23, 21:2
**FTPs** [1] - 20:6
**full** [1] - 7:14
**fully** [1] - 45:17
**functional** [1] - 8:12
**furthermore** [1] - 39:25
**future** [2] - 33:25, 34:4

### G

**game** [2] - 49:14, 61:4
**generated** [1] - 41:8
**generator** [2] - 5:13, 55:8
**generic** [1] - 39:5
**GEOPPINGER** [5] - 2:9, 59:15, 59:16, 59:19, 62:21
**Geoppinger** [2] - 59:16, 62:20
**geoppinger** [1] - 62:18
**George** [6] - 57:1, 62:4, 63:16, 66:2, 68:11, 68:17
**gigabytes** [1] - 20:21
**given** [4] - 21:6, 46:12, 50:7, 60:24
**glad** [1] - 55:1
**global** [2] - 39:5, 39:6
**Glover** [1] - 41:17
**Goldberg** [2] - 3:7, 56:23
**GOLDBERG** [3] - 2:6, 3:9, 56:22
**Goldenberg** [28] - 4:5, 4:12, 12:13, 12:20, 15:7, 16:6, 16:19, 17:10, 18:11, 18:19, 20:14, 22:11, 22:17, 22:23, 23:3, 23:18, 24:25, 25:22, 26:10, 28:22, 29:23, 30:14, 31:11, 31:22, 31:24, 32:16, 33:7, 37:18
**GOLDENBERG** [32] - 2:2, 2:3, 4:5, 4:16, 12:19, 12:21, 13:24, 15:8, 16:7, 16:20, 18:22, 19:9, 20:13, 20:15, 22:13, 22:18, 23:20, 25:2, 26:18, 26:21, 28:23, 30:13, 30:15, 31:25, 32:17, 33:8, 34:10, 35:18, 36:15, 36:20, 37:5, 37:23
**Goldenberg's** [2] - 14:13, 24:5
**GOLOMB** [1] - 1:14
**Gomes** [3] - 38:24, 39:5, 41:18
**GORDON** [1] - 2:16
**Gorijavolu** [4] - 25:17, 29:5, 31:5, 32:1
**granted** [1] - 45:24
**great** [4] - 32:9, 32:14, 42:3, 50:7
**greatly** [1] - 28:9
**Group** [2] - 2:8, 2:18
**guess** [4] - 19:22, 31:23, 63:1, 63:11
**guidance** [2] - 12:4, 36:25

### H

**half** [2] - 21:10, 41:1
**hallmarks** [1] - 51:12
**hand** [2] - 12:12, 53:15
**handing** [1] - 12:17
**handle** [2] - 12:15, 38:4
**handled** [2] - 38:10, 38:13
**handling** [1] - 12:16
**hang** [2] - 4:11, 4:13
**happier** [1] - 9:13
**happily** [1] - 23:9
**happy** [10] - 13:1, 17:11, 17:15, 17:16, 21:14, 23:2, 31:13, 32:18, 41:21, 63:6
**hard** [11] - 18:13, 18:20, 18:24, 19:3, 19:10, 19:11, 19:14, 19:18, 21:5, 21:16, 50:21
**head** [5] - 31:13, 39:5, 39:6, 60:7, 63:12
**Health** [1] - 2:22
**hear** [4] - 21:17, 27:2, 44:23, 51:8
**heard** [9] - 6:2, 18:16, 18:20, 18:24, 25:12, 26:21, 27:9, 47:1, 69:3
**hearing** [8] - 30:18, 34:12, 42:6, 42:8, 48:16, 52:6, 61:24, 73:14
**heavy** [1] - 72:20
**heed** [1] - 45:6
**HEINZ** [24] - 2:13, 14:3, 14:6, 15:21, 17:8, 18:8, 18:15, 19:2, 20:4, 21:13, 22:8, 22:22, 24:3, 25:22, 27:12, 27:14, 27:17, 29:18, 31:10, 32:4, 32:6, 32:10, 32:22, 37:16
**Heinz** [28] - 14:4, 15:11, 17:6, 18:7, 18:14, 18:23, 19:1, 19:12, 20:1, 21:7, 21:12, 22:14, 22:21, 23:21, 24:2, 25:6, 25:12, 25:14, 25:21, 26:25, 27:11, 28:24, 29:17, 30:16, 31:9, 32:21, 33:12, 37:9
**held** [2] - 19:4, 25:4
**help** [1] - 33:11
**helpful** [3] - 20:18, 21:16, 29:15
**Hetero** [15] - 2:25, 6:2, 6:10, 6:12, 6:20, 7:19, 7:24, 8:18, 8:25, 9:16, 9:18, 11:1, 12:1, 12:6
**Hetero's** [2] - 7:18, 10:2
**high** [1] - 70:4
**highest** [1] - 49:6
**highly** [10] - 38:8, 39:18, 40:7, 40:25, 46:4, 46:9, 51:8, 51:13, 51:19, 53:9
**HILL** [1] - 2:23
**hired** [3] - 33:10, 33:15, 35:8
**history** [1] - 49:5
**Hogan** [1] - 33:20
**holding** [1] - 30:24
**honestly** [1] - 20:20
**HONIK** [5] - 1:14, 1:15, 47:11, 47:14, 49:7
**honik** [1] - 43:21
**Honik** [5] - 44:19, 46:21, 47:11, 47:13, 48:14
**Honor** [109] - 3:6, 3:9, 5:6, 6:4, 6:9, 6:12, 6:16, 8:13, 9:4, 9:8, 9:17, 10:1, 10:6, 12:3, 12:7, 12:12, 12:19, 14:3, 14:6, 14:7, 14:15, 14:17, 15:8, 15:21, 16:20, 17:8, 18:8, 18:15, 18:22, 19:9, 20:13, 20:19, 21:13, 21:18, 22:8, 22:13, 22:22,

23:20, 24:3, 25:2, 25:22, 26:18, 27:15, 27:24, 28:23, 29:18, 30:13, 31:3, 31:10, 31:14, 31:25, 32:4, 32:18, 32:22, 33:8, 33:19, 34:9, 34:10, 35:18, 36:16, 36:18, 36:21, 37:6, 37:16, 37:23, 38:1, 41:20, 41:25, 43:20, 44:18, 45:9, 46:25, 47:1, 47:11, 47:14, 49:7, 51:9, 51:14, 51:23, 52:7, 53:5, 53:7, 53:14, 54:2, 54:19, 54:21, 54:24, 55:19, 56:10, 56:13, 56:19, 56:22, 57:1, 59:15, 59:19, 62:3, 62:21, 63:10, 63:16, 64:17, 65:7, 65:9, 66:1, 66:25, 68:11, 71:2, 74:2, 74:4, 74:18
**Honor's** [2] - 25:5, 38:11
**HONORABLE** [1] - 1:9
**hope** [4] - 15:2, 15:17, 17:25, 23:9
**hopeful** [4] - 18:3, 18:18, 26:6, 55:11
**hopefully** [6] - 5:15, 11:15, 11:17, 23:15, 30:3, 56:7
**hoping** [4] - 3:20, 4:21, 11:21, 24:12
**horizon** [1] - 33:25
**host** [1] - 28:13
**hour** [2] - 27:18, 41:1
**hours** [3] - 6:22, 21:8, 51:3
**housed** [1] - 16:25
**hundreds** [1] - 20:21

**I**

**idea** [3] - 48:6, 49:8, 64:18
**identical** [1] - 49:10
**identified** [14] - 5:13, 7:7, 26:2, 27:24, 29:7, 31:22, 39:1, 39:9, 47:24, 62:1, 62:9, 66:5, 67:14, 69:13
**identify** [7] - 6:23, 15:18, 35:16, 67:19, 68:24, 69:5, 70:19
**identifying** [1] - 60:1
**immediate** [1] - 58:15
**imminently** [1] - 53:10
**implementation** [1] - 39:22
**implemented** [1] - 40:17
**implicated** [2] - 58:17, 62:11
**important** [3] - 10:17, 50:1, 64:1
**improper** [2] - 15:22, 16:4
**impurities** [1] - 39:24
**impurity** [1] - 48:21
**IN** [1] - 1:4
**in-camera** [3] - 5:14, 55:10, 55:25
**inappropriate** [1] - 15:24
**Inc** [1] - 2:15
**include** [1] - 24:19
**included** [1] - 37:21
**including** [4] - 9:5, 9:6, 38:22, 38:23
**increase** [1] - 59:6
**indeed** [2] - 42:7, 61:17
**indexes** [3] - 7:14, 7:15, 10:20
**India** [7] - 18:14, 18:17, 18:25, 19:11, 21:11, 28:5, 38:16
**Indian** [1] - 38:17
**indicated** [2] - 9:20, 11:8
**indicating** [1] - 33:14
**individual** [3] - 64:8, 67:23, 70:6
**induced** [1] - 42:7
**industry** [1] - 44:6
**information** [19] - 6:18, 9:2, 17:22, 20:10, 29:12, 31:13, 37:7, 48:8, 57:8, 57:20, 61:16, 61:22, 63:6, 63:20, 63:23, 63:24, 66:10, 70:17
**initial** [2] - 40:14, 40:16
**injury** [2] - 67:12, 67:23
**inquiries** [1] - 34:16
**insight** [1] - 46:4
**insisted** [1] - 57:10
**inspected** [1] - 39:14
**inspection** [3] - 39:16, 47:5, 47:7
**inspections** [1] - 48:2
**inspects** [1] - 34:20
**instance** [1] - 60:17
**instances** [1] - 36:7
**intelligently** [1] - 52:16
**intends** [1] - 19:14
**interested** [2] - 51:10, 58:21
**interpret** [1] - 31:2
**interrupt** [4] - 4:6, 13:21, 27:12, 68:18
**interrupted** [1] - 38:12
**intervene** [1] - 18:2
**interview** [1] - 7:8
**introducing** [1] - 39:11
**Investigation** [1] - 50:23
**investigation** [2] - 39:10, 53:12
**investigations** [1] - 34:25
**involve** [1] - 21:5
**involved** [5] - 42:20, 43:23, 60:23, 60:25, 61:18
**involving** [2] - 43:4, 54:17
**Irbesartan** [2] - 38:22, 43:4
**IRBESARTAN** [1] - 1:5
**issue** [63] - 4:9, 5:10, 8:6, 12:15, 14:2, 14:16, 15:6, 18:3, 22:6, 22:10, 24:22, 24:24, 33:13, 34:2, 34:11, 35:7, 35:20, 36:5, 36:21, 37:17, 38:5, 38:18, 39:22, 41:19, 43:3, 49:9, 49:20, 50:2, 50:5, 50:8, 50:11, 51:25, 52:9, 52:15, 52:20, 54:2, 55:15, 56:17, 56:20, 56:24, 57:3, 58:17, 58:25, 59:5, 59:10, 59:14, 60:5, 60:14, 60:19, 61:23, 64:9, 65:11, 65:15, 65:24, 66:18, 68:7, 68:20, 70:25, 71:3, 71:17, 71:19, 72:22, 73:12
**issued** [2] - 39:15, 40:3
**issues** [23] - 4:21, 5:20, 5:24, 6:7, 8:17, 8:20, 9:11, 9:12, 11:1, 11:6, 11:12, 11:13, 12:16, 18:20, 27:5, 34:21, 41:18, 42:11, 42:16, 45:16, 54:17, 65:20, 73:7
**item** [3] - 12:9, 23:17, 28:19
**items** [3] - 4:20, 16:15, 35:25
**itself** [1] - 40:4

**J**

**Jason** [1] - 48:17
**Jeff** [1] - 59:15
**JEFFREY** [1] - 2:9
**JERSEY** [1] - 1:2
**Jersey** [1] - 1:13
**Jessica** [1] - 14:3
**JESSICA** [1] - 2:13
**job** [2] - 13:17, 16:24
**John** [7] - 38:1, 45:12, 46:25, 51:8, 53:7, 54:2, 74:2
**JOHN** [1] - 1:18
**Johns** [1] - 25:18
**Johnston** [1] - 65:9
**JOHNSTON** [3] - 2:20, 65:9, 65:13
**joining** [1] - 3:3
**Joint** [2] - 2:8, 2:18
**JUDGE** [119] - 3:3, 3:7, 3:11, 4:12, 4:17, 5:8, 9:15, 11:7, 12:5, 12:8, 12:14, 12:18, 12:20, 13:21, 14:1, 14:5, 15:5, 15:20, 16:5, 16:14, 17:6, 18:5, 18:12, 18:19, 20:1, 20:14, 20:18, 21:12, 21:19, 22:9, 22:21, 23:12, 24:2, 24:17, 25:21, 26:20, 27:7, 27:13, 27:16, 28:9, 29:17, 30:14, 30:20, 31:9, 31:22, 32:2, 32:5, 32:9, 32:11, 32:20, 32:24, 33:18, 34:7, 34:12, 35:4, 35:11, 35:23, 36:17, 36:19, 37:1, 37:9, 37:17, 37:24, 38:3, 38:12, 41:23, 42:2, 42:14, 43:8, 45:8, 45:10, 45:13, 47:13, 47:15, 47:21, 48:12, 49:8, 49:18, 49:19, 50:1, 50:16, 51:21, 52:21, 53:6, 53:18, 53:23, 54:4, 54:13, 54:25, 55:17, 55:22, 55:24, 56:4, 56:11, 56:14, 56:21, 56:23, 57:4, 58:12, 59:13, 59:18, 61:23, 62:5, 62:17, 64:6, 64:13, 64:24, 65:8, 65:12, 67:3, 68:13, 70:13, 71:5, 72:11, 73:8, 73:24, 74:7, 74:9, 74:14
**Judge** [9] - 3:17, 4:5, 4:9, 4:15, 32:12, 48:19, 50:15, 56:17, 56:20
**jury** [1] - 45:25

**K**

**Karen** [3] - 1:23, 50:14, 74:25
**KATZ** [1] - 1:11
**keep** [5] - 9:8, 11:17, 26:21, 27:5, 47:4
**kept** [3] - 13:13, 13:17, 13:20
**key** [3] - 8:9, 36:4, 47:1
**kicked** [1] - 8:22
**kind** [1] - 50:17
**KLD** [1] - 21:14
**knowing** [1] - 8:19
**knowledge** [3] - 20:6, 30:24, 49:5
**Kristen** [2] - 66:25, 69:8
**KRISTEN** [1] - 2:20
**Kugler** [4] - 3:17, 4:9, 56:17, 56:20
**Kugler's** [1] - 4:15

**L**

**Lab** [1] - 9:23
**Labs** [6] - 2:25, 7:23, 9:18, 10:11, 38:16, 38:22
**lack** [1] - 50:25
**laid** [1] - 39:18
**larger** [1] - 71:19
**Lasalle** [1] - 2:3
**last** [17] - 6:10, 6:22, 8:15, 10:5, 11:4, 13:8, 14:15, 14:22, 16:21, 23:2, 24:15, 28:25, 46:22, 52:6, 54:24, 58:11, 60:12
**late** [1] - 74:16
**latest** [1] - 11:11
**law** [1] - 33:20
**LAW** [1] - 2:2
**lawsuit** [1] - 61:6
**lead** [1] - 34:17
**leadership** [1] - 38:22

**learned** [2] - 13:15, 38:21
**learning** [2] - 40:18, 46:17
**least** [10] - 11:16, 13:5, 29:4, 31:7, 54:8, 58:8, 59:8, 60:4, 61:21, 66:16
**leave** [1] - 71:18
**leaving** [1] - 27:5
**LEE** [1] - 2:20
**legal** [1] - 26:11
**legend** [1] - 26:10
**legwork** [1] - 61:8
**lengthy** [1] - 57:14
**less** [1] - 29:1
**letter** [36] - 4:20, 5:22, 6:12, 6:20, 7:18, 7:21, 8:25, 9:20, 9:22, 10:5, 11:4, 12:10, 12:24, 15:10, 16:17, 19:18, 25:23, 26:3, 27:14, 27:17, 27:23, 28:3, 28:14, 28:20, 29:10, 32:17, 33:23, 33:24, 34:2, 34:21, 37:13, 39:18, 44:22, 56:15, 58:20, 67:7
**letters** [4] - 3:22, 4:3, 5:19, 33:12
**letting** [1] - 4:17
**level** [1] - 55:7
**levels** [1] - 63:19
**LEVIN** [1] - 1:20
**Lexington** [1] - 2:24
**LIABILITY** [1] - 1:5
**Life** [1] - 39:8
**lift** [1] - 72:20
**light** [2] - 49:10, 53:25
**likely** [3] - 34:17, 61:21, 73:20
**limitations** [1] - 64:2
**limited** [1] - 50:11
**Limited** [2] - 38:17, 38:22
**LIMS** [1] - 16:17
**Line** [1] - 31:6
**line** [4] - 31:23, 32:23, 33:16, 42:3
**linkage** [1] - 48:6
**list** [8] - 5:12, 7:5, 7:16, 23:17, 24:5, 28:20, 29:25, 52:7
**listed** [6] - 4:20, 7:21, 9:11, 16:16, 28:13, 35:25
**listening** [1] - 27:8
**litigation** [22] - 9:6, 29:19, 33:5, 33:10, 33:22, 34:14, 34:18, 34:22, 36:3, 36:7, 40:23, 42:20, 43:3, 43:12, 43:15, 61:18, 67:25, 69:14, 69:22, 70:6, 70:9, 70:10
**LITIGATION** [1] - 1:5
**litigation-wide** [1] - 9:6
**litigations** [1] - 20:23
**LLC** [2] - 1:11, 2:15
**LLP** [6] - 1:17, 2:6, 2:9, 2:16, 2:19, 2:23
**loaded** [2] - 8:15, 19:13
**log** [5] - 24:25, 29:1, 29:11, 35:21, 36:1
**logs** [1] - 10:7
**look** [8] - 7:22, 18:10, 29:8, 35:25, 36:11, 40:22, 52:25, 68:2
**looked** [2] - 50:20, 71:11
**looking** [4] - 48:15, 50:22, 51:5, 61:2
**looks** [2] - 19:12, 63:3
**Loretta** [1] - 3:15
**Los** [1] - 2:21
**LOSARTAN** [1] - 1:4
**Losartan** [2] - 8:3, 43:4
**loss** [1] - 19:22
**Louisiana** [1] - 56:16
**Lovells** [1] - 33:20
**Ltd** [1] - 2:15
**lumped** [1] - 49:12

## M

**macro** [4] - 45:14, 48:16, 48:19, 49:1
**mail** [9] - 3:15, 5:11, 19:14, 23:4, 23:21, 55:9, 55:24, 58:18, 63:3
**mails** [2] - 6:22, 6:23
**maintain** [1] - 44:14
**management** [3] - 17:17, 23:24, 27:1
**manner** [1] - 47:18
**manuals** [2] - 6:25, 10:20
**manufacture** [1] - 38:21
**manufactured** [2] - 38:19, 39:8
**manufacturer** [8] - 30:24, 35:2, 39:13, 71:12, 71:21, 71:22, 72:17, 73:21
**manufacturers** [8] - 30:23, 31:17, 57:13, 57:22, 72:8, 73:20
**manufacturers'** [1] - 73:22
**manufacturing** [3] - 38:16, 38:19, 48:24
**March** [13] - 1:7, 3:1, 3:14, 3:16, 3:20, 5:23, 14:16, 19:6, 24:3, 27:22, 53:19, 75:2
**margin** [1] - 55:6
**marginal** [1] - 50:4
**market** [2] - 38:20, 51:11
**Market** [1] - 1:15
**Marlene** [6] - 4:5, 12:13, 14:4, 14:7, 24:9, 27:21
**MARLENE** [1] - 2:3
**master** [4] - 7:14, 10:19, 10:20, 43:4
**Master** [1] - 65:17
**MASTER** [1] - 1:9
**masters** [1] - 70:5
**material** [2] - 9:1, 49:15
**matter** [12] - 4:19, 5:9, 11:17, 11:24, 35:24, 36:13, 37:19, 50:24, 50:25, 70:18, 70:20, 74:23
**matters** [5] - 3:22, 4:2, 5:19, 11:17, 43:10
**MAZIE** [1] - 1:11
**MDL** [12] - 58:8, 66:3, 66:11, 66:13, 66:15, 66:22, 67:9, 68:15, 68:21, 68:24, 69:1, 70:24
**mean** [16] - 17:22, 17:23, 20:21, 21:4, 21:19, 23:7, 29:9, 29:13, 33:22, 34:21, 35:15, 46:10, 51:12, 68:18, 72:21, 73:3
**meaningful** [2] - 16:12, 28:15
**means** [1] - 19:15
**meant** [1] - 37:17
**mechanical** [1] - 1:25
**meet** [23] - 14:14, 14:20, 15:1, 16:1, 17:13, 18:1, 23:7, 23:23, 24:10, 24:12, 25:15, 25:25, 26:1, 26:17, 27:3, 27:10, 28:6, 28:15, 29:15, 30:9, 59:9, 67:5, 72:21
**meet-and-confer** [9] - 14:20, 15:1, 16:1, 17:13, 18:1, 23:7, 25:25, 26:17, 30:9
**meeting** [3] - 7:15, 23:2, 51:2
**mentioned** [6] - 14:9, 31:12, 37:4, 37:13, 43:1, 54:24
**Meridan** [6] - 5:4, 5:5, 5:7, 32:18, 32:21, 33:2
**Meridian** [2] - 5:3, 5:4
**mess** [1] - 3:24
**mess-up** [1] - 3:24
**met** [1] - 14:15
**metadata** [2] - 10:7, 10:15
**middle** [1] - 64:22
**might** [8] - 11:22, 35:17, 45:1, 54:20, 58:17, 64:2, 64:17, 64:18
**miles** [1] - 42:23
**million** [3] - 21:7, 43:11, 43:14
**mind** [4] - 16:15, 21:9, 36:8, 47:4
**minimum** [1] - 31:5
**Minneapolis** [1] - 2:4
**Minnesota** [1] - 2:4
**minus** [1] - 55:6
**minute** [2] - 3:11, 13:22
**missed** [1] - 54:20
**missing** [4] - 13:15, 14:18, 23:17, 25:13
**misstating** [2] - 17:10, 26:10
**mistaken** [1] - 51:25
**mom** [1] - 66:14
**moment** [2] - 51:24, 52:17
**Monday** [3] - 54:5, 54:13, 74:5
**monitor** [1] - 70:12
**months** [5] - 13:4, 45:7, 47:15, 57:6, 57:25
**morning** [8] - 5:6, 9:17, 12:19, 12:20, 14:3, 14:5, 14:6, 20:19
**MORRIS** [1] - 2:6
**most** [5] - 6:11, 21:9, 35:6, 39:2, 66:8
**motion** [3] - 17:11, 17:12, 44:17
**motions** [1] - 11:20
**move** [7] - 9:14, 19:25, 25:19, 36:24, 71:17, 72:24, 73:5
**moved** [1] - 71:8
**moving** [2] - 11:17, 32:14
**MR** [64] - 3:6, 3:9, 5:6, 6:4, 9:17, 12:3, 12:12, 12:15, 20:19, 33:19, 34:9, 35:6, 36:18, 38:1, 38:4, 38:14, 41:25, 42:3, 45:9, 45:11, 46:25, 47:11, 47:14, 48:13, 49:7, 51:7, 51:23, 53:5, 53:7, 53:19, 53:24, 54:12, 54:19, 55:15, 55:19, 55:23, 56:3, 56:10, 56:13, 56:19, 56:22, 57:1, 57:5, 58:15, 59:15, 59:19, 62:3, 62:6, 62:21, 63:16, 64:10, 64:15, 65:7, 66:1, 68:11, 68:14, 68:19, 71:2, 71:6, 72:13, 73:17, 74:2, 74:8, 74:13
**MS** [60] - 4:5, 4:16, 12:7, 12:19, 12:21, 13:24, 14:3, 14:6, 15:8, 15:21, 16:7, 16:20, 17:8, 18:8, 18:15, 18:22, 19:2, 19:9, 20:4, 20:13, 20:15, 21:13, 22:8, 22:13, 22:18, 22:22, 23:20, 24:3, 25:2, 25:22, 26:18, 26:21, 27:12, 27:14, 27:17, 28:23, 29:18, 30:13, 30:15, 31:10, 31:25, 32:4, 32:6, 32:10, 32:17, 32:22, 33:8, 34:10, 35:18, 36:15, 36:20, 37:5, 37:16, 37:23, 65:9, 65:13, 66:25, 67:4, 68:17, 69:8
**multiple** [3] - 7:4, 7:10, 42:8
**mute** [1] - 72:12
**Mylan** [47] - 2:18, 37:25, 38:16, 38:22, 39:2, 39:9, 39:13, 39:23, 39:25, 40:3, 40:4, 40:9, 40:10, 40:13, 40:21, 41:6, 41:10, 41:14, 41:24, 42:9, 42:12, 42:22, 43:3, 43:10, 43:25,

44:2, 44:5, 44:24, 45:20, 46:1, 46:8, 46:13, 46:14, 46:15, 47:10, 47:24, 48:3, 48:4, 48:20, 49:11, 49:14, 51:15, 54:14, 54:18, 56:12
**Mylan's** [12] - 38:7, 39:21, 40:16, 41:1, 43:2, 43:5, 43:24, 44:22, 46:13, 47:16, 49:2, 53:12

**N**

**NAKUL** [1] - 2:23
**Nakul** [1] - 9:17
**name** [2] - 5:3, 68:9
**named** [9] - 43:3, 59:1, 65:15, 65:17, 68:5, 70:15, 70:17, 70:22, 71:16
**namely** [1] - 38:18
**narrow** [1] - 10:25
**nature** [1] - 51:17
**necessarily** [2] - 61:2, 62:12
**necessary** [2] - 17:12, 44:2
**need** [22] - 6:8, 23:5, 25:19, 26:13, 26:16, 32:7, 35:20, 36:13, 43:16, 48:10, 48:13, 53:8, 59:25, 62:16, 64:2, 64:3, 64:6, 71:11, 71:14, 73:20, 73:22
**needed** [3] - 16:24, 55:1, 57:10
**needs** [6] - 11:25, 22:4, 23:7, 26:23, 29:16, 69:23
**negotiated** [1] - 57:6
**never** [6] - 40:10, 42:24, 42:25, 47:3, 47:5, 47:8
**NEW** [1] - 1:2
**New** [2] - 1:13, 2:25
**next** [34] - 3:20, 4:14, 5:17, 8:7, 8:21, 9:12, 11:16, 11:18, 12:9, 15:4, 17:16, 22:4, 22:10, 23:10, 23:13, 23:17, 24:13, 24:22, 24:24, 28:7, 28:16, 28:18, 31:16, 37:20, 37:21, 52:24, 53:11, 53:19, 54:5, 54:13, 56:7, 56:15, 56:24, 74:17
**NIGH** [5] - 1:21, 71:2, 71:6, 72:13, 73:17
**Nigh** [3] - 71:2, 73:8, 73:14
**night** [6] - 8:15, 25:23, 27:18, 27:24, 28:3, 28:11
**nine** [1] - 57:25
**nitrosamine** [2] - 39:11, 39:21
**noncustodial** [11] - 13:3, 14:11, 15:5, 15:9, 15:12, 15:18, 16:15, 17:3, 17:9, 36:22, 37:3
**none** [3] - 43:2, 47:10, 60:24
**nonresponsive** [5] - 38:7, 50:17, 50:18, 50:21, 52:11
**notable** [1] - 30:23
**notably** [1] - 34:14
**note** [5] - 7:22, 29:1, 29:4, 42:5, 54:20
**notebooks** [3] - 13:16, 13:20, 18:6
**notes** [1] - 7:15
**nothing** [5] - 7:1, 30:22, 33:9, 43:6, 56:10
**nothing's** [1] - 46:21
**notice** [4] - 3:19, 8:17, 67:25, 70:11
**notices** [1] - 63:25
**notwithstanding** [1] - 10:1
**number** [13] - 4:7, 5:13, 13:6, 13:12, 25:3, 29:3, 31:23, 39:17, 55:8, 55:9, 55:20, 55:21, 59:6
**NUMBER** [1] - 1:4
**numbered** [1] - 55:9
**numbers** [2] - 55:25, 60:6
**numerous** [1] - 21:4
**NY** [1] - 2:25

**O**

**o-xylene** [4] - 39:12, 39:24, 51:3, 51:12
**obligation** [4] - 62:10, 65:22, 66:7, 72:8
**obligations** [4] - 6:14, 15:18, 56:24, 69:19
**observations** [3] - 40:7, 40:14, 41:4
**obviously** [5] - 8:11, 48:7, 50:2, 51:13, 54:9
**occurred** [1] - 69:6
**occurs** [1] - 48:23
**OF** [1] - 1:2
**offer** [3] - 26:24, 62:3, 62:6
**offered** [5] - 14:13, 23:23, 24:10, 26:1, 28:6
**Official** [1] - 1:23
**OH** [1] - 2:11
**once** [7] - 22:18, 23:22, 25:14, 26:1, 26:6, 28:7, 61:16
**One** [1] - 2:17
**one** [38] - 4:23, 6:17, 7:21, 9:19, 15:21, 17:4, 17:19, 21:7, 21:25, 22:15, 23:20, 25:16, 26:13, 27:20, 28:19, 31:11, 38:4, 38:6, 39:20, 40:8, 46:18, 54:19, 57:7, 57:9, 59:24, 60:1, 60:14, 61:14, 61:17, 63:5, 63:17, 67:4, 71:7, 71:9, 74:3, 74:10
**ones** [1] - 15:15
**ongoing** [2] - 8:17, 8:19
**open** [2] - 27:5, 43:16
**operated** [2] - 38:16, 42:22
**operates** [1] - 38:17
**operating** [6] - 6:25, 16:23, 23:18, 24:1, 24:4, 24:6
**operation** [1] - 48:4
**opinion** [1] - 39:18
**opportunity** [7] - 6:2, 8:14, 21:18, 28:12, 44:16, 52:22, 61:8
**opposed** [2] - 33:5, 61:19
**Option** [2] - 19:17
**option** [3] - 19:19, 20:1, 21:25
**options** [2] - 18:21, 19:22
**Oracle** [2] - 16:17, 37:13
**order** [24] - 4:19, 7:9, 10:17, 11:5, 13:18, 19:21, 19:24, 21:20, 22:6, 32:2, 32:7, 32:12, 32:13, 37:18, 41:14, 45:14, 49:1, 49:6, 51:14, 58:3, 59:25, 60:4, 61:2, 65:15
**orders** [4] - 18:3, 48:17, 48:19, 52:10
**ordinary** [1] - 70:10
**original** [1] - 62:23
**originally** [4] - 33:13, 34:11, 57:18, 58:9
**ortho** [5] - 39:8, 39:9, 39:12, 39:13, 40:10
**ortho-xylene** [5] - 39:8, 39:9, 39:12, 39:13, 40:10
**otherwise** [4] - 32:19, 52:11, 63:2, 63:4
**Outlook** [1] - 13:10
**outset** [3] - 42:5, 54:21, 71:10
**outstanding** [7] - 5:20, 9:2, 9:4, 11:1, 11:6, 11:13, 11:14
**overall** [1] - 70:24
**overlay** [2] - 8:11, 10:6
**oversees** [1] - 38:23
**oversight** [1] - 39:6
**own** [4] - 20:22, 49:11, 57:12, 57:13
**Oxford** [1] - 2:17

**P**

**P.C** [1] - 2:12
**p.m** [1] - 74:19
**PA** [1] - 2:14
**package** [2] - 18:16, 19:5
**Page** [3] - 16:16, 56:15, 65:13
**Pages** [1] - 28:13
**pages** [4] - 12:10, 24:4, 43:11, 43:14
**PAPANTONIO** [1] - 1:20
**paper** [2] - 13:13, 13:19
**par** [1] - 70:1
**parcel** [1] - 35:2
**Parekh** [2] - 20:15, 20:19
**PAREKH** [1] - 20:19
**Park** [1] - 2:21
**Parkway** [2] - 1:12, 2:14
**part** [4] - 35:2, 39:2, 47:12, 52:9
**participants** [1] - 69:14
**particular** [11] - 10:16, 12:1, 15:6, 31:23, 35:25, 52:17, 54:15, 65:23, 66:6, 66:24, 70:20
**particularly** [6] - 10:17, 19:20, 40:11, 42:10, 43:10, 45:19
**PARTIES** [1] - 3:1
**parties** [9] - 14:4, 18:4, 29:20, 31:20, 36:23, 65:23, 67:24, 70:11, 70:23
**party** [9] - 5:1, 7:24, 30:17, 30:20, 34:12, 36:9, 37:4, 70:8, 70:23
**party's** [1] - 5:3
**pasted** [1] - 26:4
**path** [1] - 13:9
**pathway** [1] - 48:23
**pay** [1] - 45:6
**PC** [1] - 1:14
**Pennsylvania** [3] - 1:16, 2:7, 2:18
**Pensacola** [1] - 1:22
**people** [2] - 25:9, 60:10
**percent** [2] - 55:6, 55:7
**perform** [1] - 7:9
**perhaps** [2] - 52:18, 63:13
**period** [2] - 28:10, 57:25
**permitted** [2] - 47:12, 52:10
**perplexed** [1] - 21:23
**personal** [2] - 67:12, 67:23
**personally** [1] - 55:15
**personnel** [1] - 26:11
**perspective** [2] - 20:2, 55:18
**PFS** [8] - 65:16, 67:15, 67:18, 67:19, 68:3, 69:12, 69:13, 69:19
**Pharma** [3] - 2:15, 2:15
**pharmacies** [9] - 57:20, 60:24, 62:1, 65:15, 65:17, 67:8, 69:13, 69:17, 71:16
**pharmacy** [35] - 57:11, 57:17, 58:25, 59:24, 60:1, 60:2, 60:3, 60:17, 60:18, 61:5, 61:6, 61:13, 62:1, 62:8, 65:10, 65:22, 66:3, 66:12, 66:14, 66:21, 67:1, 67:12, 67:14, 67:17, 67:19, 67:21, 67:22, 68:2,

68:9, 68:23, 70:14, 70:21, 71:12
**Philadelphia** [2] - 1:16, 2:7
**phone** [6] - 4:7, 4:11, 4:13, 55:19, 64:16, 72:12
**PI** [1] - 67:10
**picture** [1] - 33:14
**PIETRAGALLO** [1] - 2:16
**Pittsburgh** [1] - 2:18
**place** [4] - 17:2, 52:20, 57:15, 68:2
**plain** [1] - 47:23
**plaintiff** [26] - 4:8, 25:23, 38:2, 42:13, 46:1, 47:8, 56:16, 58:24, 61:5, 62:9, 63:4, 64:12, 64:19, 64:20, 66:9, 66:18, 67:14, 67:20, 68:1, 69:2, 71:4, 71:24, 72:4, 72:18, 73:4
**plaintiffs** [43] - 9:25, 10:3, 10:8, 10:10, 10:13, 10:16, 10:22, 10:23, 11:2, 12:3, 14:16, 15:1, 19:19, 26:16, 27:19, 30:9, 42:18, 44:1, 44:15, 45:24, 49:2, 50:19, 57:2, 57:6, 57:9, 58:5, 58:23, 59:12, 61:3, 61:7, 63:7, 63:10, 63:13, 63:22, 64:8, 64:16, 67:6, 67:17, 68:7, 68:24, 70:4, 70:6, 74:3
**Plaintiffs** [5] - 1:13, 1:16, 1:19, 1:22, 2:5
**plaintiffs'** [20] - 4:7, 9:19, 12:10, 16:17, 28:14, 28:19, 29:20, 30:4, 31:19, 44:17, 54:23, 56:15, 63:19, 65:13, 66:5, 66:19, 66:24, 71:15, 72:25, 74:5
**plan** [2] - 53:24, 71:24
**planning** [1] - 67:6
**plans** [1] - 60:8
**plant** [1] - 42:22
**played** [2] - 33:9, 49:14
**pleadings** [2] - 69:12, 70:5
**PLLC** [1] - 2:2
**plus** [1] - 55:6
**point** [25] - 6:15, 9:3, 10:1, 10:3, 10:23, 12:1, 16:9, 25:12, 33:20, 34:10, 35:10, 40:11, 41:10, 46:18, 46:19, 46:23, 47:1, 47:2, 48:9, 49:7, 66:16, 67:2, 72:10, 73:6, 74:3
**pointed** [1] - 34:13
**points** [2] - 7:6, 45:11
**pop** [1] - 66:14
**pops** [1] - 59:10
**position** [11] - 21:13, 25:10, 26:4, 28:12, 46:5, 50:4, 54:5, 54:14, 67:4, 67:7
**possibility** [1] - 60:24
**possible** [1] - 6:6
**posthaste** [1] - 41:15
**postpone** [4] - 5:17, 38:24, 38:25, 41:17
**potential** [1] - 9:5
**potentially** [1] - 64:1
**practice** [1] - 20:22
**practices** [1] - 44:7
**Prasad** [2] - 31:5, 32:1
**preceded** [1] - 48:16
**precursor** [1] - 34:23
**predictably** [1] - 49:24
**preexisting** [1] - 36:8
**preparation** [2] - 6:24, 33:21
**prepare** [4] - 52:15, 52:23, 70:15, 70:22
**prepared** [8] - 32:20, 33:4, 34:16, 36:3, 36:7, 52:2, 52:4, 53:1
**preparing** [1] - 63:21
**prerequisite** [1] - 34:24
**present** [6] - 8:23, 49:9, 49:16, 49:17, 49:20, 49:23
**presented** [2] - 71:13, 71:23
**presently** [1] - 64:9
**pressure** [1] - 61:10
**pretty** [3] - 51:4, 70:1, 70:10
**previous** [1] - 41:11
**previously** [1] - 10:16
**primarily** [2] - 33:4, 36:3
**primary** [2] - 39:10, 40:1
**prioritize** [1] - 5:21
**privilege** [6] - 4:25, 10:7, 24:25, 29:1, 35:21, 35:22
**privileged** [2] - 74:9, 74:11
**problem** [9] - 19:10, 32:25, 47:16, 47:23, 49:10, 49:16, 49:23, 55:18, 68:10
**problems** [1] - 11:20
**procedures** [7] - 6:25, 16:23, 23:18, 24:1, 24:4, 24:6, 47:7
**proceed** [7] - 4:2, 4:18, 10:18, 23:12, 27:16, 32:3, 73:11
**proceeded** [2] - 3:18, 27:19
**proceeding** [2] - 3:5, 3:8
**proceedings** [2] - 51:17, 74:23
**Proceedings** [1] - 1:25
**process** [29] - 6:18, 7:8, 14:21, 15:1, 16:1, 17:13, 18:1, 19:12, 23:7, 25:20, 25:25, 26:17, 27:4, 27:10, 30:2, 30:9, 41:13, 47:17, 48:20, 48:24, 57:25, 58:24, 59:12, 59:25, 67:11, 67:16, 68:1, 70:9, 70:10
**process-wise** [2] - 67:11, 67:16
**produce** [22] - 7:9, 7:24, 13:19, 13:20, 15:19, 24:1, 26:9, 29:16, 29:22, 30:6, 30:11, 31:20, 32:7, 35:19, 40:5, 41:14, 41:15, 51:15, 60:16, 61:25, 63:1
**produced** [37] - 1:25, 5:14, 7:11, 8:17, 8:18, 9:24, 10:15, 10:21, 14:12, 15:25, 17:5, 17:8, 17:20, 17:23, 19:21, 22:25, 24:4, 24:21, 30:25, 31:7, 32:3, 32:11, 40:6, 41:6, 42:24, 42:25, 43:2, 43:11, 43:15, 51:16, 54:10, 55:10, 55:25, 56:2, 65:1, 65:5
**producing** [4] - 16:2, 39:3, 42:21
**product** [8] - 4:24, 34:6, 35:15, 35:17, 35:22, 43:24, 62:15, 71:8
**production** [22] - 5:25, 6:14, 7:15, 7:20, 7:23, 7:25, 8:6, 8:10, 9:1, 9:24, 11:11, 24:12, 24:13, 24:19, 29:21, 31:19, 35:14, 37:8, 39:1, 43:23, 54:9, 73:10
**productions** [8] - 8:8, 8:9, 9:10, 9:21, 10:4, 10:10, 10:13, 43:12
**products** [6] - 28:21, 42:21, 42:25, 43:3, 43:5, 43:6
**PRODUCTS** [1] - 1:5
**programs** [5] - 13:6, 16:22, 37:4, 37:12
**progress** [1] - 11:3
**prompt** [1] - 36:12
**promptly** [3] - 17:5, 50:8, 55:11
**proper** [4] - 14:11, 45:18, 46:11, 62:8
**properly** [1] - 16:25
**proposals** [1] - 29:11
**propose** [1] - 55:21
**proposed** [1] - 18:21
**protected** [2] - 34:6, 35:22
**protection** [1] - 35:15
**protocol** [2] - 21:21, 21:24
**protocols** [1] - 21:3
**proves** [1] - 49:7
**provide** [3] - 21:14, 31:15, 57:2
**provided** [7] - 6:10, 7:5, 7:12, 7:14, 10:7, 10:8, 10:14
**provides** [1] - 46:4
**public** [1] - 35:7
**pull** [2] - 31:13, 67:17
**purchase** [1] - 20:2
**purchases** [4] - 22:11, 22:16, 22:20, 23:15
**purpose** [1] - 36:10
**purposes** [5] - 33:5, 36:1, 55:16, 56:5, 71:7
**pursuant** [4] - 25:4, 44:3, 44:5, 44:6
**pursue** [2] - 4:19, 71:15
**put** [6] - 8:17, 53:8, 57:15, 61:20, 70:11, 72:19
**putting** [2] - 9:9, 20:25

### Q

**QAMS** [1] - 16:17
**quality** [4] - 6:25, 7:1, 10:19, 39:6
**quash** [1] - 35:13
**questionable** [2] - 7:25, 51:19
**questionably** [1] - 51:15
**questioning** [1] - 41:1
**questions** [3] - 12:25, 41:21, 65:5
**quick** [4] - 9:19, 60:13, 63:11, 74:3
**quickly** [1] - 71:17
**quite** [1] - 11:2
**quote** [2] - 48:19, 48:24

### R

**raise** [2] - 71:3, 73:12
**raised** [13] - 3:22, 4:25, 8:20, 10:3, 10:24, 14:22, 23:1, 24:14, 26:22, 34:11, 42:12, 48:5
**raises** [1] - 65:14
**RANDOLPH** [1] - 1:18
**random** [4] - 5:13, 52:13, 54:23, 55:8
**ranges** [1] - 7:16
**RASPANTI** [1] - 2:16
**re** [2] - 26:8, 29:25
**RE** [1] - 1:4
**Re** [1] - 34:13
**re-review** [2] - 26:8, 29:25
**reach** [5] - 18:4, 24:10, 30:4, 31:15, 69:6
**read** [3] - 12:23, 30:19, 33:1
**ready** [1] - 51:21
**realized** [1] - 15:13
**really** [3] - 25:19, 29:14, 31:1
**reason** [5] - 15:11, 46:9, 67:24, 71:9, 74:12
**reasonable** [4] - 23:7, 33:24, 34:1, 52:22
**reasoning** [1] - 50:6
**reasons** [1] - 71:9
**receipt** [1] - 11:19
**receive** [2] - 19:7, 63:23
**received** [20] - 3:14, 3:22, 4:4, 11:8, 13:9,

18:10, 18:17, 18:25, 19:5, 19:6, 22:14, 24:5, 25:14, 27:14, 27:18, 27:23, 28:25, 33:23, 58:18, 72:24
**receiving** [1] - 33:24
**recent** [2] - 6:11, 39:15
**recently** [3] - 27:9, 30:19, 36:5
**recognizing** [1] - 59:11
**recollection** [1] - 52:6
**record** [10] - 6:5, 7:22, 8:1, 16:9, 45:12, 45:14, 46:24, 49:1, 53:8, 74:23
**recorded** [1] - 1:25
**records** [6] - 13:15, 16:22, 60:16, 61:13, 62:14, 67:18
**recovered** [16] - 39:12, 39:24, 40:1, 40:10, 43:25, 44:2, 44:4, 44:5, 46:2, 46:7, 47:18, 47:25, 48:5, 49:8, 49:13
**recovery** [1] - 39:14
**Reduction** [1] - 34:13
**Reefer** [2] - 48:17, 48:18
**referenced** [1] - 22:25
**referred** [3] - 16:14, 48:4, 53:14
**referring** [5] - 19:2, 25:23, 30:16, 31:11, 32:12
**refuse** [2] - 14:8, 25:24
**refusing** [1] - 30:8
**regard** [3] - 33:21, 34:3, 74:4
**regarding** [5] - 21:15, 38:5, 40:3, 46:8, 56:25
**regularly** [4] - 13:7, 13:17, 20:21, 35:1
**regulatory** [5] - 33:25, 34:4, 44:20, 46:3, 50:11
**rehash** [1] - 12:23
**reintroduce** [1] - 41:10
**relate** [2] - 22:16, 42:12
**related** [3] - 9:25, 10:18, 39:23
**relates** [2] - 8:3, 29:5
**relating** [3] - 8:2, 22:20, 31:5
**relation** [1] - 17:4
**relations** [1] - 35:7
**relationship** [2] - 36:9, 47:20
**relative** [1] - 70:8
**relatively** [1] - 68:6
**relevance** [2] - 47:9, 50:4
**relevancy** [1] - 47:20
**relevant** [19] - 10:17, 15:18, 17:3, 25:17, 29:9, 38:8, 39:19, 40:8, 40:24, 40:25, 45:1, 46:4, 46:9, 48:7, 51:9, 51:13, 51:19, 53:9, 68:9
**relief** [1] - 67:6
**relish** [1] - 11:19
**relying** [1] - 34:7
**remain** [2] - 9:2, 11:12
**remaining** [1] - 17:16
**remains** [2] - 9:4, 10:25
**remedied** [1] - 10:15
**remedy** [1] - 11:2
**repeat** [1] - 22:17
**replacement** [1] - 19:2
**report** [6] - 11:7, 15:3, 24:21, 37:20, 37:21, 39:16
**Report** [1] - 50:23
**REPORTER** [1] - 50:15
**Reporter** [1] - 1:23
**reporter** [1] - 22:17
**Reporter/ Transcriber** [1] - 74:25
**reports** [2] - 7:13, 36:6
**representation** [2] - 7:19, 8:25
**representative** [1] - 43:13
**representing** [1] - 6:13
**request** [21] - 17:9, 22:15, 22:19, 24:7, 25:5, 25:14, 29:20, 31:19, 37:7, 41:9, 47:21, 52:13, 56:16, 59:7, 61:19, 65:14, 65:19, 66:2, 69:1, 69:7, 70:3
**requested** [3] - 9:25, 10:10, 57:7
**requesting** [2] - 10:9, 10:13
**requests** [5] - 6:18, 14:25, 16:3, 45:4, 63:18
**require** [5] - 11:5, 54:9, 66:17, 67:11, 70:14
**required** [7] - 7:9, 44:9, 46:6, 46:7, 62:12, 66:10, 66:22
**requirements** [1] - 44:3
**rescheduled** [1] - 53:25
**resident** [1] - 20:16
**residual** [3] - 50:24, 51:1, 51:9
**resolution** [2] - 11:18, 18:4
**resolve** [4] - 11:15, 41:18, 45:25, 61:23
**resolved** [9] - 8:2, 9:12, 11:16, 11:24, 23:9, 23:16, 27:6, 41:19, 65:20
**respect** [25] - 3:21, 5:1, 5:24, 6:2, 9:19, 9:23, 10:4, 10:10, 18:13, 22:10, 23:15, 28:12, 32:13, 35:8, 36:12, 37:18, 42:12, 48:14, 48:22, 50:9, 51:2, 52:20, 54:15, 61:1, 69:19
**respond** [15] - 16:5, 17:11, 22:22, 26:18, 33:11, 45:9, 48:12, 52:16, 60:22, 66:1, 67:1, 67:13, 68:12, 69:23, 70:1
**responded** [1] - 14:7
**RESPONSE** [1] - 74:18
**response** [5] - 22:14, 26:25, 44:22, 45:10, 46:16
**responses** [5] - 6:11, 40:14, 40:16, 46:13, 49:15
**responsive** [17] - 5:11, 7:11, 16:2, 17:9, 17:22, 24:6, 30:11, 37:7, 51:6, 51:16, 52:11, 53:2, 53:3, 54:7, 54:8, 54:16
**responsiveness** [1] - 56:6
**rest** [2] - 8:3, 19:12
**result** [3] - 40:18, 41:8, 48:21
**retailer** [3] - 66:20, 73:15, 73:18
**retained** [1] - 33:21
**return** [1] - 16:10
**review** [16] - 5:14, 8:11, 8:21, 11:10, 26:7, 26:8, 28:2, 29:25, 38:5, 41:13, 55:10, 56:1, 56:5, 60:16, 69:11
**revisionist** [1] - 49:5
**revisions** [1] - 6:24
**revisit** [3] - 44:15, 45:18, 71:17
**revisited** [1] - 45:15
**revisiting** [1] - 43:17
**RICHER** [5] - 2:20, 66:25, 67:4, 68:17, 69:8
**Richer** [2] - 66:25, 69:8
**Riddell** [2] - 34:13, 35:7
**Riddell's** [1] - 34:15
**risk** [1] - 53:13
**RMR** [1] - 74:25
**Road** [1] - 1:18
**role** [1] - 33:9
**root** [7] - 39:10, 47:16, 47:23, 49:3, 49:9, 49:23, 53:12
**Roseland** [1] - 1:13
**row** [2] - 31:23, 55:24
**rows** [3] - 5:12, 55:9
**Ruben** [1] - 47:11
**RUBEN** [1] - 1:15
**Rule** [1] - 31:19
**rule** [1] - 35:20
**ruling** [16] - 29:18, 29:21, 30:15, 30:20, 31:2, 31:10, 31:18, 36:12, 36:22, 37:18, 42:13, 42:18, 43:18, 49:4, 50:5, 50:8
**rulings** [2] - 44:14, 45:6
**run** [1] - 44:24

**S**

**safely** [1] - 43:13
**Sam** [1] - 13:23
**sample** [2] - 55:4, 55:13
**sampling** [2] - 52:13, 54:23
**sanctions** [2] - 9:6, 11:19
**SARAH** [1] - 2:20
**Sarah** [1] - 65:9
**sartan** [2] - 43:2, 43:5
**sartans** [3] - 38:21, 43:1, 49:11
**save** [1] - 32:19
**SBA** [1] - 33:23
**scanned** [1] - 13:14
**schedule** [1] - 73:11
**scheduled** [9] - 27:20, 27:22, 64:9, 64:11, 64:13, 64:19, 64:20, 64:21, 65:2
**Schneider's** [1] - 32:12
**Sciences** [1] - 39:9
**scope** [1] - 42:19
**search** [15] - 13:3, 13:4, 13:19, 13:22, 13:25, 14:8, 41:10, 41:11, 44:24, 46:19, 46:23, 62:19, 62:22, 62:25
**searched** [6] - 13:10, 14:11, 15:12, 17:2, 17:24, 37:14
**searches** [1] - 29:7
**searching** [1] - 6:22
**second** [2] - 7:4, 45:4
**Section** [2] - 67:15, 67:19
**section** [1] - 12:25
**secure** [2] - 20:23, 21:4
**security** [3] - 20:8, 20:9, 22:2
**see** [18] - 7:3, 8:14, 21:17, 24:18, 24:19, 24:20, 24:23, 25:8, 26:8, 27:24, 29:9, 35:13, 49:15, 51:25, 54:22, 58:20, 65:21, 74:12
**seeing** [1] - 72:5
**seek** [2] - 49:24, 67:6
**seeking** [1] - 35:13
**seem** [3] - 27:9, 35:14, 53:9
**select** [1] - 58:5
**selected** [1] - 19:20
**sell** [1] - 34:24
**send** [8] - 18:8, 24:21, 28:3, 31:13, 32:12, 50:17, 55:8, 63:3
**sense** [4] - 5:21, 8:21, 38:4, 66:19
**sent** [9] - 5:11, 18:13, 19:3, 23:21, 25:6, 25:23, 28:24, 63:25, 74:11
**sentence** [1] - 22:19
**Sentry** [1] - 2:14
**separate** [1] - 42:22
**separately** [1] - 69:20
**September** [2] - 39:16, 50:23

**serious** [1] - 39:17
**served** [4] - 5:1, 57:9, 68:3, 70:7
**set** [9] - 4:3, 10:25, 40:14, 42:13, 42:18, 63:14, 64:12, 64:23, 72:1
**SETH** [1] - 2:6
**seven** [6] - 22:3, 59:8, 60:12, 63:11, 63:20, 72:16
**several** [2] - 6:10, 10:6
**SFTP** [1] - 21:4
**SHAH** [3] - 2:23, 9:17, 12:7
**Shah** [1] - 9:18
**share** [1] - 7:6
**shared** [7] - 13:6, 13:19, 16:11, 37:3, 37:6, 37:11, 37:12
**sheet** [41] - 4:8, 57:7, 57:9, 57:11, 57:16, 57:18, 57:24, 58:1, 58:6, 58:8, 58:11, 58:21, 58:24, 59:2, 59:11, 59:24, 59:25, 60:3, 60:16, 60:18, 60:20, 61:7, 61:19, 61:20, 62:9, 62:11, 62:12, 62:16, 63:1, 63:18, 65:22, 66:5, 66:7, 66:11, 66:17, 66:23, 67:13, 68:22, 69:2, 69:7, 70:16
**sheets** [14] - 56:25, 57:5, 57:12, 57:14, 57:21, 58:4, 59:8, 60:13, 61:25, 63:21, 65:1, 70:22, 71:4, 72:14
**shell** [1] - 49:14
**shipments** [3] - 18:18, 19:7, 21:16
**shipping** [1] - 21:5
**Short** [6] - 65:18, 67:12, 67:21, 67:24, 68:8, 70:7
**short** [4] - 22:19, 25:8, 26:21, 48:20
**show** [2] - 34:17, 47:20
**showing** [1] - 7:2
**shown** [1] - 48:21
**shows** [1] - 13:9
**side** [1] - 54:23
**sides** [2] - 50:7, 51:17
**significant** [3] - 3:21, 11:3, 55:5
**significantly** [1] - 11:5
**similar** [1] - 26:5
**simple** [1] - 68:7
**simply** [3] - 44:11, 70:9, 70:23
**single** [3] - 29:24, 49:20, 58:8
**site** [1] - 10:19
**sitting** [1] - 21:11
**situated** [1] - 69:20
**situation** [4] - 34:18, 61:4, 62:7, 68:24
**situations** [1] - 66:21
**six** [5] - 21:9, 27:18, 28:17, 68:6, 72:23
**six-hour** [1] - 27:18
**size** [2] - 55:4, 55:13
**skin** [1] - 61:3
**SLACK** [1] - 1:17
**SLATER** [8] - 1:11, 1:12, 3:6, 6:4, 12:3, 12:12, 12:15, 56:19
**Slater** [8] - 3:5, 6:1, 6:5, 9:16, 11:8, 11:10, 12:11, 56:19
**Slater's** [2] - 4:20, 5:22
**slight** [2] - 39:3, 65:11
**slippery** [5] - 43:17, 44:18, 47:2, 48:7, 50:3
**slope** [5] - 43:17, 44:18, 47:2, 48:7, 50:3
**small** [1] - 55:14
**Smith** [1] - 3:15
**snafu** [1] - 3:14
**Snyder** [1] - 53:12
**software** [3] - 7:6, 13:6, 16:22
**sold** [1] - 35:3
**solely** [1] - 34:7
**solution** [1] - 6:8
**solvent** [14] - 39:13, 40:1, 43:25, 44:3, 46:2, 46:7, 47:18, 47:25, 48:5, 48:22, 49:8, 49:13, 49:19, 51:9
**solvents** [4] - 44:4, 44:5, 50:24, 51:1
**solves** [1] - 68:9
**sometimes** [1] - 5:3
**somewhat** [2] - 36:4, 43:9
**soon** [3] - 16:11, 18:18, 19:8
**sooner** [3] - 15:3, 64:22, 74:17
**SOP** [4] - 7:14, 9:25, 10:18, 10:20
**SOP-related** [2] - 9:25, 10:18
**SOPs** [3] - 24:20, 26:5, 26:11
**sorry** [11] - 3:24, 4:6, 27:12, 27:15, 27:16, 27:23, 39:5, 46:25, 48:21, 62:4, 68:17
**sort** [5] - 15:24, 38:9, 48:22, 59:11, 63:17
**sought** [3] - 24:20, 35:16, 48:8
**sounds** [2] - 12:22, 17:1
**sources** [8] - 7:12, 14:11, 15:5, 15:9, 15:12, 15:19, 16:15, 17:3
**speaking** [2] - 48:17, 72:12
**SPECIAL** [1] - 1:9
**specific** [7] - 10:8, 14:17, 48:22, 53:1, 58:3, 64:16, 67:10
**specifically** [4] - 34:13, 48:3, 48:4, 50:19
**specifications** [2] - 44:6, 51:2
**spent** [1] - 40:25
**spreadsheet** [3] - 29:4, 29:8, 31:6
**STAAR** [1] - 34:5
**staggered** [2] - 57:10, 59:11
**stand** [8] - 8:18, 8:24, 18:13, 22:12, 23:14, 23:19, 25:1, 28:18
**standard** [6] - 6:25, 16:23, 23:18, 24:1, 24:4, 24:5
**stands** [1] - 24:23
**start** [9] - 3:13, 5:23, 6:1, 12:24, 38:11, 41:20, 42:4, 74:16
**started** [3] - 3:4, 25:4, 58:24
**starting** [3] - 5:22, 6:15, 72:15
**statement** [6] - 9:20, 16:4, 21:14, 26:4, 54:6, 54:14
**statement.doc** [1] - 29:10
**statements** [1] - 42:4
**States** [3] - 34:24, 35:3
**STATES** [1] - 1:2
**stating** [1] - 8:1
**statistically** [1] - 55:5
**status** [6] - 6:3, 10:5, 11:4, 24:21, 37:20, 37:21
**STATUS** [1] - 1:6
**statute** [1] - 64:2
**stems** [1] - 42:10
**stenography** [1] - 1:25
**steps** [1] - 48:23
**still** [14] - 3:3, 6:17, 6:22, 7:25, 8:5, 14:9, 19:4, 21:11, 40:12, 66:6, 66:10, 71:20, 71:21, 72:23
**stop** [1] - 69:18
**story** [1] - 48:20
**Street** [3] - 1:15, 2:7, 2:10
**structured** [1] - 7:6
**stuff** [1] - 61:14
**subject** [2] - 8:20, 45:4
**submission** [3] - 6:11, 65:14, 74:5
**submissions** [3] - 6:17, 33:1, 59:20
**submit** [4] - 6:16, 21:18, 21:19, 34:25
**submitted** [1] - 52:7
**submitting** [1] - 58:20
**subpoena** [2] - 34:12, 35:11
**subpoenas** [3] - 5:1, 30:17, 33:1
**substance** [1] - 49:15
**substantial** [1] - 5:24
**successful** [1] - 21:22
**sue** [2] - 67:21, 69:4
**sued** [9] - 66:4, 66:6, 66:8, 66:15, 66:23, 67:9, 67:12, 69:15, 69:25
**sufficient** [1] - 55:16
**suggest** [9] - 8:13, 8:16, 36:10, 44:2, 44:10, 49:4, 64:24, 69:4, 70:18
**suggestion** [1] - 43:24
**suitably** [1] - 65:1
**Suite** [7] - 1:15, 1:18, 1:21, 2:4, 2:14, 2:21, 2:24
**suite** [1] - 2:10
**summarizing** [1] - 25:8
**summary** [1] - 28:24
**supplemental** [3] - 10:12, 24:13, 24:19
**supply** [1] - 71:9
**suppose** [1] - 41:5
**supposed** [2] - 38:25, 39:22
**supposedly** [1] - 21:11
**Surgical** [1] - 34:5
**surprised** [2] - 69:3, 69:24
**surrounding** [1] - 6:24
**suspect** [2] - 42:9, 59:5
**system** [2] - 10:19, 29:7
**systems** [1] - 17:2

### T

**table** [1] - 65:24
**target** [1] - 61:18
**targeted** [1] - 60:18
**TELEPHONE** [1] - 3:1
**telephone** [1] - 1:6
**ten** [4] - 43:14, 64:11, 71:24, 72:1
**term** [1] - 58:15
**terms** [14] - 23:14, 41:11, 41:12, 44:24, 46:6, 46:7, 46:19, 46:23, 50:6, 54:23, 71:16, 71:18, 72:5, 72:13
**tested** [3] - 40:10, 44:2, 44:5
**testified** [2] - 16:21, 17:19
**testifies** [1] - 17:21
**testimony** [1] - 17:10
**testing** [11] - 8:3, 29:11, 39:23, 43:25, 44:10, 46:2, 46:6, 46:11, 51:9
**tests** [4] - 44:1, 44:7, 44:8
**Texas** [1] - 1:19
**thankfully** [1] - 12:22
**THE** [2] - 1:2, 1:9
**the Court** [34] - 11:4, 13:18, 15:3, 18:2, 19:23, 21:16, 21:17, 23:10, 29:20, 41:14, 42:4, 42:7, 42:18, 43:14, 43:22, 44:10, 44:14, 44:20, 48:9, 48:14, 48:18, 49:2, 49:4, 50:15, 52:13, 52:19, 54:1, 58:2, 58:5, 58:20, 65:14, 66:16
**themselves** [3] - 25:11, 31:17, 34:25
**they've** [12] - 6:21, 8:10, 8:16, 8:18,

13:22, 13:24, 20:11, 23:23, 24:14, 27:24, 66:4, 72:17
**thin** [1] - 60:23
**third** [9] - 5:1, 7:24, 27:22, 30:17, 30:20, 34:12, 37:4, 41:17, 45:4
**third-party** [5] - 5:1, 30:17, 30:20, 34:12, 37:4
**THOMAS** [1] - 1:9
**THORNBURG** [1] - 2:19
**thoughts** [1] - 46:12
**three** [19] - 4:21, 8:2, 13:5, 25:9, 26:12, 31:23, 32:1, 60:15, 60:22, 61:17, 61:20, 61:22, 62:13, 62:14, 62:16, 62:19, 62:22, 63:5, 63:7
**thrown** [1] - 69:10
**timeframe** [2] - 63:14, 71:25
**timeline** [3] - 47:4, 57:14, 63:10
**timing** [3] - 6:7, 71:3, 73:7
**tirelessly** [1] - 10:22
**titled** [1] - 29:9
**today** [17] - 3:17, 5:12, 8:2, 11:17, 12:16, 18:11, 22:3, 26:22, 31:7, 35:21, 44:23, 46:11, 46:22, 47:21, 54:1, 71:1, 74:15
**Todd** [1] - 34:5
**together** [6] - 11:23, 38:10, 38:13, 49:13, 61:20, 73:10
**tomorrow** [6] - 15:16, 25:16, 25:18, 27:20, 29:5, 31:8
**took** [3] - 17:1, 42:5, 47:8
**top** [3] - 16:16, 31:12, 60:7
**topic** [1] - 26:22
**topics** [1] - 53:13
**total** [1] - 68:22
**totally** [1] - 14:7
**touchstone** [1] - 47:9
**ToxRox** [5] - 5:1, 32:18, 32:21, 33:1, 35:12
**Trackwise** [1] - 16:17
**transcript** [4] - 1:25, 30:18, 48:15, 74:22
**transcription** [1] - 1:25
**transfer** [10] - 20:3, 20:5, 20:11, 20:24, 21:3, 21:9, 21:20, 21:21, 21:24, 22:1
**transferred** [2] - 20:8, 20:21
**transferring** [2] - 20:9, 21:5
**transition** [1] - 50:13
**transmitted** [1] - 10:6
**transpired** [1] - 21:15
**tried** [1] - 21:22
**trigger** [1] - 58:9
**triggered** [3] - 64:3, 72:9, 72:10
**TRISCHLER** [13] - 2:17, 41:25, 42:3, 46:25, 48:13, 51:23, 53:5, 53:24, 54:12, 55:19, 55:23, 56:3, 56:13
**Trischler** [10] - 41:25, 42:2, 45:23, 51:22, 52:22, 53:21, 54:4, 55:17, 56:12, 74:10
**Trischler's** [1] - 74:5
**true** [2] - 34:15, 44:11
**try** [9] - 3:25, 6:23, 18:1, 19:3, 21:20, 44:25, 60:9, 73:2, 73:9
**trying** [5] - 14:23, 30:8, 30:10, 49:24, 69:22
**Tuesday** [5] - 23:13, 24:22, 28:16, 37:21, 37:22
**turn** [2] - 28:4, 60:13
**turns** [2] - 9:1, 9:10
**two** [23] - 3:12, 6:15, 10:10, 23:21, 25:16, 25:19, 26:24, 29:11, 33:9, 33:15, 38:9, 39:18, 39:21, 40:7, 44:19, 45:2, 47:6, 48:23, 49:12, 49:24, 61:21, 63:4
**typed** [1] - 5:3
**typically** [1] - 4:8

**U**

**U.S** [2] - 38:20, 51:11
**ULMER** [1] - 2:9
**unable** [3] - 19:3, 20:5, 20:11
**unavailability** [1] - 3:16
**unaware** [1] - 5:16
**uncovered** [1] - 49:23
**underscore** [1] - 47:12
**understood** [3] - 22:8, 71:6, 72:6
**undertake** [1] - 56:5
**undertaken** [1] - 48:2
**unfair** [2] - 16:4, 70:3
**unit** [1] - 42:22
**Unit** [45] - 38:5, 38:11, 38:14, 38:15, 38:18, 38:23, 39:6, 39:7, 39:8, 39:14, 39:15, 39:24, 40:18, 40:20, 40:23, 41:9, 41:19, 42:23, 42:24, 43:1, 43:2, 43:6, 44:17, 44:25, 45:20, 46:9, 46:13, 46:15, 46:16, 46:17, 47:25, 48:1, 48:4, 48:6, 49:9, 49:10, 49:16, 49:17, 50:9, 50:24, 51:10
**UNITED** [1] - 1:2
**United** [3] - 34:24, 35:3
**units** [1] - 49:24
**units'** [1] - 49:12
**unknowable** [1] - 47:19
**unless** [4] - 51:24, 51:25, 55:12, 74:10
**unprepared** [1] - 5:16
**unprofessional** [1] - 16:4
**unreasonable** [1] - 28:5
**unresponsive** [1] - 5:11
**untrue** [1] - 43:25
**up** [21] - 3:24, 4:11, 4:13, 9:10, 12:10, 13:14, 14:16, 16:9, 36:23, 37:25, 41:16, 45:23, 46:21, 54:21, 55:1, 59:10, 62:25, 63:14, 64:25, 72:2, 73:16
**update** [6] - 18:14, 22:4, 23:11, 23:13, 28:16, 31:15
**updated** [1] - 10:7
**updates** [1] - 19:5
**urge** [2] - 52:25, 73:25
**USA** [1] - 2:15
**utilized** [1] - 13:7

**V**

**vacuum** [1] - 49:5
**validating** [1] - 46:7
**Valsartan** [21] - 8:3, 13:17, 16:24, 29:9, 29:10, 29:12, 38:19, 39:11, 40:19, 42:23, 42:24, 42:25, 44:4, 45:21, 47:5, 49:21, 51:1, 51:10, 51:11, 67:15, 67:20
**VALSARTAN** [1] - 1:4
**VANASKIE** [120] - 1:9, 3:3, 3:7, 3:11, 4:12, 4:17, 5:8, 9:15, 11:7, 12:5, 12:8, 12:14, 12:18, 12:20, 13:21, 14:1, 14:5, 15:5, 15:20, 16:5, 16:14, 17:6, 18:5, 18:12, 18:19, 20:1, 20:14, 20:18, 21:12, 21:19, 22:9, 22:21, 23:12, 24:2, 24:17, 25:21, 26:20, 27:7, 27:13, 27:16, 28:9, 29:17, 30:14, 30:20, 31:9, 31:22, 32:2, 32:5, 32:9, 32:11, 32:20, 32:24, 33:18, 34:7, 34:12, 35:4, 35:11, 35:23, 36:17, 36:19, 37:1, 37:9, 37:17, 37:24, 38:3, 38:12, 41:23, 42:2, 42:14, 43:8, 45:8, 45:10, 45:13, 47:13, 47:15, 47:21, 48:12, 49:8, 49:18, 49:19, 50:1, 50:16, 51:21, 52:21, 53:6, 53:18, 53:23, 54:4, 54:13, 54:25, 55:17, 55:22, 55:24, 56:4, 56:11, 56:14, 56:21, 56:23, 57:4, 58:12, 59:13, 59:18, 61:23, 62:5, 62:17, 64:6, 64:13, 64:24, 65:8, 65:12, 67:3, 68:13, 70:13, 71:5, 72:11, 73:8, 73:24, 74:7, 74:9, 74:14
**various** [3] - 7:20, 57:15, 66:4
**Vega** [5] - 39:8, 39:12, 40:1, 40:3, 40:4
**vendors** [3] - 21:2, 30:21, 40:1
**verify** [1] - 37:14
**versions** [1] - 10:18
**vetting** [1] - 40:1
**Via** [1] - 1:6
**via** [8] - 19:5, 20:5, 20:9, 20:12, 20:22, 21:21, 55:9, 67:5
**VIA** [1] - 3:1
**Villa** [1] - 41:5
**Vine** [1] - 2:10
**virgin** [1] - 29:10
**volume** [1] - 21:6
**voluminous** [1] - 11:25
**voluntarily** [1] - 25:11
**volunteered** [1] - 13:25
**VS22** [1] - 51:1
**VST** [1] - 51:11

**W**

**waiting** [4] - 7:13, 15:14, 15:23, 52:18
**WALLACK** [1] - 2:23
**wants** [2] - 8:18, 69:24
**warning** [5] - 33:23, 33:24, 34:2, 34:21, 44:22
**ways** [1] - 21:4
**Wednesday** [12] - 1:7, 3:20, 4:14, 9:12, 11:16, 11:18, 22:4, 28:18, 52:24, 53:19, 56:7, 74:17
**Wednesday's** [1] - 23:14
**week** [24] - 4:23, 5:17, 8:7, 8:23, 14:14, 15:3, 15:4, 16:21, 17:16, 21:10, 23:2, 23:21, 24:13, 25:15, 26:1, 27:22, 28:7, 28:25, 31:16, 41:2, 53:11, 54:5, 54:14
**week's** [1] - 8:21
**weeks** [5] - 6:10, 25:16, 25:19, 43:21, 44:19
**WERNER** [1] - 2:12
**whatsoever** [1] - 26:25
**whole** [1] - 71:14
**wholesale** [1] - 73:15
**wholesaler** [14] - 58:19, 59:16, 60:15, 60:19, 61:19, 62:7, 62:10, 63:1, 63:2, 63:24, 66:8, 71:12, 71:20, 73:19
**wholesalers** [14] - 57:12, 57:19, 58:21, 59:2, 59:7, 61:15, 61:17, 62:11, 62:14, 63:5, 65:20, 72:6,

72:15
**wholesalers'** [1] - 73:21
**wide** [1] - 9:6
**wider** [1] - 60:21
**WILLIAMSON** [13] - 57:1, 57:5, 58:15, 62:3, 62:6, 63:16, 64:10, 64:15, 65:7, 66:1, 68:11, 68:14, 68:19
**Williamson** [12] - 57:2, 59:19, 62:4, 62:5, 62:18, 63:13, 63:17, 64:25, 66:2, 67:2, 67:8, 68:12
**willing** [5] - 28:2, 32:7, 38:11, 40:5, 55:20
**Winston's** [1] - 60:6
**wise** [2] - 67:11, 67:16
**withdrawn** [1] - 65:19
**withheld** [8] - 5:10, 28:20, 29:6, 29:14, 41:13, 50:16, 50:18, 52:8
**withhold** [1] - 52:10
**withholding** [1] - 38:7
**witness** [10] - 13:16, 13:20, 16:20, 17:20, 17:21, 27:19, 27:20, 27:21, 41:1
**witnesses** [1] - 45:3
**wonder** [1] - 42:15
**word** [1] - 60:6
**words** [5] - 57:8, 57:11, 57:17, 58:7, 66:4
**works** [1] - 63:15
**worry** [2] - 40:17, 48:9
**writing** [1] - 28:16
**written** [7] - 46:12, 50:5, 50:8, 50:12, 54:5, 54:14, 59:21
**wrongly** [1] - 52:18

**X**

**xylene** [9] - 39:8, 39:9, 39:12, 39:13, 39:24, 40:10, 51:3, 51:12

**Y**

**year** [3] - 42:14, 43:8, 58:11
**years** [4] - 39:21, 45:2, 47:6, 68:6
**yesterday** [13] - 3:23, 4:4, 4:20, 6:20, 7:18, 8:9, 11:9, 18:10, 18:16, 23:1, 23:4, 26:24, 38:25
**yesterday's** [1] - 6:12
**York** [1] - 2:25

**Z**

**zero** [1] - 48:3
**ZHP** [5] - 2:8, 22:11, 22:16, 22:20, 23:15