# Exhibit V

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____          CIVIL ACTION NUMBER:
IN RE:  VALSARTAN PRODUCTS
LIABILITY LITIGATION                     1:19-md-02875-RBK-JS

_____          **ORAL ARGUMENT ON "MACRO"**
                                         **DISCOVERY ISSUES**

**Mitchell H. Cohen Building & U.S. Courthouse**
**4th & Cooper Streets**
**Camden, New Jersey  08101**
**Wednesday, November 20, 2019**
**Commencing at 10:09 a.m.**

**B E F O R E:**              **THE HONORABLE JOEL SCHNEIDER,**
                             **UNITED STATES MAGISTRATE JUDGE**


**A P P E A R A N C E S:**

MAZIE SLATER KATZ & FREEMAN, LLC
BY:  ADAM M. SLATER, ESQUIRE
103 Eisenhower Parkway
Roseland, New Jersey 07068
For the Plaintiff

LEVIN PAPANTONIO
BY:  DANIEL A. NIGH, ESQUIRE
316 S. Baylen, Suite 600
Pennsacola, Florida 32502
For the Plaintiff

GOLOMB & HONIK PC
BY:  RUBEN HONIK, ESQUIRE
     DAVID JOHN STANOCH, ESQUIRE
1835 Market Street, Suite 2900
Philadelphia, Pennsylvania 19103
For the Plaintiff



Karen Friedlander, Official Court Reporter
        friedlanderreporter@gmail.com
           (856) 756-0160

Proceedings recorded by mechanical stenography;
transcript produced by computer-aided transcription.

```
 1   A P P E A R A N C E S: - CONTINUED

 2       KANNER & WHITELEY LLC
         BY:  CONLEE S. WHITELEY, ESQUIRE
 3            LAYNE CLARK HILTON, ESQUIRE
         701 Camp Street
 4       New Orleans, Louisiana 70130
         For the Plaintiff
 5
         FARR LAW FIRM
 6       BY:  GEORGE T. WILLIAMSON, ESQUIRE
         99 Nesbit Street
 7       Punta Gorda, Florida 33950
         For the Plaintiff
 8
         KIRTLAND & PACKARD LLP
 9       BY:  BEHRAM PAREKH, ESQUIRE
         1638 South Pacific Coast Highway
10       Redondo Beach, California 90277
         For the Plaintiff
11
         GOLDENBERG LAW PLLC
12       BY:  MARLENE J. GOLDENBERG, ESQUIRE
         800 Lasalle Avenue
13       Suite 2150
         Minneapolis, Minnesota 55402
14
         DUANE MORRIS LLP
15       BY:  SETH A. GOLDBERG, ESQ.
         30 S. 17th Street
16       Philadelphia, Pennsylvania 19103
         For the Defendant ZHP and the Joint Defense Group
17
         PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI LLP
18       BY:  JASON M. REEFER, ESQUIRE
         One Oxford Centre, 38th Floor
19       Pittsburgh, Pennsylvania 15219
         For the Defendant Mylan and the Joint Defense Group
20
         GREENBERG TRAURIG LLP
21       BY:  BRIAN H. RUBENSTEIN, ESQUIRE
         3333 Piedmont Road, NE, Suite 2500
22       Atlanta, Georgia 30305
         For the Defendants, Teva Pharmaceutical Industries Ltd.,
23       Teva Pharmaceuticals USA, Inc., Actavis LLC, and Actavis
         Pharma, Inc.
24

25
```

*United States District Court*
*Camden, New Jersey*

1           THE DEPUTY CLERK:  All rise.

2           (OPEN COURT, November 20, 2019, 10:09 a.m.)

3           THE COURT:  Good morning, everybody, please be

4      seated.  Welcome back to Camden.

5           We're on the record in the Valsartan MDL, Docket

6      No. 19-2875.  Whoever is going to speak today, if you could

7      just state your name.  Let's start with plaintiffs.

8           MR. NIGH:  Daniel Nigh for the plaintiffs.

9           MR. SLATER:  Good morning, Your Honor, Adam Slater

10     for plaintiffs.

11          MR. HONIK:  Good morning, Your Honor, Ruben Honik.

12          MS. WHITELEY:  Good morning, Your Honor, Conlee

13     Whiteley for plaintiffs.

14          MR. PAREKH:  Good morning, Your Honor, Behram Parekh

15     for plaintiffs.

16          MS. GOLDENBERG:  Good morning, Marlene Goldenberg for

17     plaintiffs.

18          MR. WILLIAMSON:  George Williamson for plaintiffs.

19          MS. HILTON:  Layne Hilton for the plaintiffs.

20          MR. GOLDBERG:  Your Honor, Seth Goldberg for ZHP and

21     the defendants.

22          MR. RUBENSTEIN:  Good morning, Your Honor, Brian

23     Rubenstein for Teva defendants and other defendants.

24          MR. REEFER:  Good morning, Your Honor, Jason Reefer

25     for Mylan and the other defendants.

1          THE COURT:  Okay.  This is what we have planned for

2     today.  This morning we'll hear oral argument on all of the,

3     what I call macro discovery issues that you all have briefed.

4     If things go according to plan, I'd like to take a relatively

5     short lunch break and barring unforeseen circumstances, when

6     you come back from lunch, you'll get rulings on all of the

7     issues before the Court today.

8          It's the Court's desire and intent that these rulings

9     will set the groundwork for your discussions over the next few

10    weeks, for ultimate resolution on December 11, when we're

11    dealing with what I call the granular issues, the request for

12    production of documents.

13         After the Court reads its rulings into the record,

14    Judge Kugler is available today, and I thought it would be a

15    good idea if we meet with Judge Kugler.  He's available for

16    all of you if there's any questions or issues that you'd like

17    to address with him.

18         So, if you'll just indulge me, let's get right into

19    it.  I have a few questions, I've read all the papers.  I

20    think I understand the issues.  If we could just go through a

21    couple of questions to get through the background and then

22    we'll get to the nitty gritty.

23         Before we get into the issues in the Court's order,

24    there was one issue I regret not putting into the order that

25    came to my attention from reading the briefs.  I just want to

1   raise it with the parties now.  We're not going to decide it

2   today, and that's the redaction issue.  I'd like to hear from

3   the parties on whether, one, it's appropriate to redact any of

4   the core discovery that the Court ordered to be produced.  I

5   did not know that that had happened until I read the parties'

6   briefs, and I'm especially concerned about the redactions

7   about any correspondence sent to or received from the FDA.  I

8   don't know.  I just don't know if it's appropriate.

9          So here's what I'd like to do.  We're not going to

10  decide the issue today.  But what I'd like to do is resolve

11  the issue on December 11th, set a date for simultaneous

12  briefs.  It's not that complicated of an issue.

13         Plaintiff, do you have just a guesstimate of -- are

14  we talking about a lot of documents, a little number of

15  documents, do you know?

16         MR. PAREKH:  It's a significant number of documents,

17  Your Honor.

18         THE COURT:  Okay.  Here's what I'd like you to do.

19  I'd like you to identify, pick a number, 20 documents, 20

20  representative documents that you believe should be

21  unredacted, identify them for the defendant.

22         I'm going to ask plaintiff what their submission to

23  send the Court copies of what you receive, the unredacted

24  document, and I'm going to ask the defendants to send -- I'm

25  sorry, you got the redacted document and I'm going to ask the

1    defendants to send the Court the unredacted documents.

2         Defendants, you pick 20 documents that you think are

3    representative of the appropriateness of the redactions, send

4    the Court, of course identify them for the defendant, send the

5    Court the unredacted copy and the redacted copy.

6         So the Court will have 20 representative documents

7    from each side.  I'm going to review those documents in camera

8    to see if they should be unredacted, as representative of the

9    entire scope, and you'll get the Court's ruling on

10   December 11th.

11        So we're not dealing with a terribly complicated

12   issue if we get together -- is there any reason -- can we do

13   simultaneous briefs by December 4?

14        MR. SLATER:  Yes.

15        THE COURT:  All right.  And make sure you identify

16   fairly promptly the 20 documents you want defendants to

17   produce to the Court for in-camera review.  We'll get all

18   those documents December 4 with the simultaneous letter briefs

19   and you'll get the Court's ruling.

20        Plaintiffs, is that the only set of documents that

21   you're concerned about redactions?

22        MR. PAREKH:  Those are the only documents that we

23   have at this point, so, yes.  One point that we would like to

24   bring up, though, and we've brought this to defendant's

25   attention multiple times, is that we've never received a

 1    privilege log with regards to the redaction documents, which

 2    is required under the ESI protocol and we still haven't.

 3         THE COURT:  Well, let me suggest this.  Let's hold

 4    off on -- it wouldn't be a privilege log, it would be a

 5    redaction log.

 6         MR. PAREKH:  Redaction log, but it falls under the

 7    privilege log provision of the ESI protocol.

 8         THE COURT:  So let -- I would suggest you hold off on

 9    that because if the Court rules on December 11 that unredacted

10    copies have to be produced, then that issue is moot.  If the

11    Court orders that they will stay redacted, then I assume the

12    parties are going to comply with the agreed-upon Court order

13    protocol.  Okay?

14         I think -- now I remember what I was thinking of.

15    I'm not sure, it might have been Teva -- it was either Teva or

16    Mylan, but I think it was Teva, they reproduced redacted

17    documents but agreed to produce unredacted documents with

18    their document production.  Am I right about that?  Do you

19    remember that?

20         MS. HILTON:  Yes, Your Honor.  Those represent --

21    Layne Hilton on behalf of the plaintiffs.  Those represent

22    e-mails that they produced in the course of core discovery

23    which attached regulatory filings, and the e-mails were from

24    the custodial file of a regulatory department chair, and they

25    redacted the internal e-mail, but kept unredacted all of the

1   attachments.

2            THE COURT:  But they agreed to produce unredacted

3   copies.

4            MS. HILTON:  Yes.

5            THE COURT:  So why in the -- Teva, why in the world

6   won't you just produce them now?  Why do we have to wait?

7            MR. RUBENSTEIN:  Your Honor, a point of

8   clarification.  They weren't redacted documents.  They were

9   just withheld.  They were strictly internal communications

10  that were withheld.  The communications that went to the FDA

11  were produced as part of the core discovery.  What was

12  withheld, not redacted, withheld, were the strictly internal

13  communications within Teva.

14           THE COURT:  So the internal communications were not

15  sent to the FDA.

16           MR. RUBENSTEIN:  Correct.

17           THE COURT:  So your position is, now it's clarified,

18  that that wasn't classically within the definition of core

19  discovery, that's why you held off producing them.

20           MR. RUBENSTEIN:  Correct, and we discussed it here

21  and you agreed with us.

22           THE COURT:  Okay.  That's a little different than

23  what was in the papers.  So it wasn't redacted, it was just

24  withheld, right?

25           MS. HILTON:  Well, the functional -- if I may, the

 1   functional practical implication was that we had an e-mail,

 2   the e-mail had a redaction box and then we had -- you know, we

 3   didn't know that this, you know, other than counsel telling us

 4   that it was an internal communication, but it attached, you

 5   know, 15 correspondences with the FDA, and so we didn't --

 6   our -- functionally, it looked like a redacted document.

 7   That's what we saw.

 8           THE COURT:  Okay.  Well, it's clarified now.  You'll

 9   get the actual document with the production.

10           MR. SLATER:  And, Judge, it ties in with one other

11   issue we've been bringing up to the Court.  We still do not

12   have all of the documents that are referenced in the core

13   discovery communications between the manufacturers and the

14   FDA.

15           For example, they refer to documents that were

16   provided to the FDA that we do not yet have.  It's still --

17   it's something we've brought up multiple times just to let you

18   know.  We're still waiting for those things and it's going to

19   come up during the course of the arguments, most likely,

20   today.

21           THE COURT:  These are documents that the Court

22   already ordered to be produced.

23           MR. SLATER:  Right.

24           THE COURT:  Has it been brought to the attention what

25   we're talking about?  I haven't seen that anywhere.

 1          MR. SLATER:  No.  We've mentioned it a couple times,

 2   but we were -- we keep -- we're assuming the defense, because

 3   we've talked to them about it, were going to make sure we had

 4   everything, and we have so much going on, now the rubber is

 5   hitting the road, so they have to complete the production of

 6   everything they gave the FDA.

 7          THE COURT:  Is it one company or more than one

 8   company?

 9          MR. SLATER:  It's multiple.

10          THE COURT:  All right.  Is there a reason why it

11   hasn't been produced, Mr. Goldberg?

12          MR. GOLDBERG:  Your Honor, assuming I'm understanding

13   what Mr. Slater is referring to, some of the FDA documents

14   refer to documents that were made available to the FDA in

15   China and in India on inspections.

16          So the FDA documents that we've produced might say,

17   see Exhibit 7.  Exhibit 7 is still in China.  It was something

18   that was reviewed on the inspection, so whether it was in a

19   room, whether it was in a lab, whether it was in some other

20   part of the facility, when the FDA is doing their walk-through

21   in China, there are documents they are looking at.

22          When we produced our documents in core discovery, I

23   don't think we had that appreciation, so we produced

24   everything that we had that we understood to be core

25   discovery, the FDA communications.

1          At some point, plaintiffs raised the fact and it was

2     only recently brought to our attention that there were

3     exhibits referred to that weren't produced.

4          We discussed this in a meet and confer on

5     November 8th, and we told plaintiffs, we will assemble those

6     documents for you, and we intend to produce those.

7          I don't know how else to do it.  The core discovery

8     order was talking about readily available documents and

9     certainly not documents that were someplace else in China.

10          MR. SLATER:  And for obvious reasons, Your Honor, our

11     view is the order was violated.  These documents should have

12     been produced.  They're actually referenced in the documents

13     that were produced.  There could have been no ambiguity on the

14     Court's order.  Whatever they exchanged with the FDA or showed

15     the FDA should have been produced, and what we keep getting

16     told is, you have all this core discovery, you're ready to set

17     search terms and custodianship, that's incomplete.  There's

18     some org charts that are not in our possession yet.  There are

19     some that are not fully translated yet, et cetera.

20          I just want as a background for the Court's

21     consideration during the arguments today, to know this, that

22     we're not armed with everything we're even supposed to have,

23     which is still a small part of what we ultimately will need.

24          THE COURT:  The documents, Mr. Goldberg, that we're

25     talking about, is it fair to characterize them as documents

1    that were made available to the FDA for inspection that have

2    not already been produced?

3          MR. PAREKH:  Your Honor, just to clarify, it's our

4    understanding that during the EIR process, the FDA gets a copy

5    and takes with it a copy of those documents.  They're not just

6    looked at on-site, but a copy is actually produced and taken

7    by the FDA, which is why we continue to maintain that those

8    are communications that were given to the FDA.

9          THE COURT:  Did you not receive those documents in

10   response to your FOIA request?  And if not, why not?

11         MS. WHITELEY:  Your Honor, this is Conlee Whiteley

12   speaking.  And when we got the establishment inspection

13   report, it's full of redactions and that's something the FDA

14   does, but we believe these are documents that would normally

15   not be redacted under our discovery rules and that we would

16   want to get from defendants.

17         THE COURT:  The redactions we're talking about, if we

18   step back, I'm talking about the defendant's redactions, not

19   the FDA's redactions.

20         MR. SLATER:  Separate issue, different issue.

21         MS. WHITELEY:  That's right, Your Honor.

22         THE COURT:  All right.  Mr. Goldberg, am I correct,

23   could we characterize what we're talking about as documents

24   that were either made available to the FDA for inspection or

25   produced to the FDA?

```
 1            MR. GOLDBERG:  If they were produced to the FDA, they
 2    were produced to the FDA in China.  It's not something that
 3    happened here.  And so that's why when we produced the EIR
 4    reports or the 483s or whatever it is that referred to these
 5    documents, we had what we had in the U.S., we produced that.
 6    We were not sensitive to this issue, that there were documents
 7    that were made available by inspection.
 8            THE COURT:  So it's in the works.
 9            MR. GOLDBERG:  It is in the works, absolutely, yes,
10    Your Honor.
11            THE COURT:  Is ZHP the only party that this issue
12    pertains to?
13            MR. SLATER:  No.
14            THE COURT:  Who else does it pertain to?
15            MS. HILTON:  Your Honor, to the extent that any one
16    was inspected by the FDA, they necessarily provided the FDA
17    with documentation, and every single EIR produced by every
18    single defendant to date lists, you know, at the end of the
19    EIR -- and I'll refer you to Exhibit 1, you can see at the end
20    of Exhibit 1, you'll see such a list of documentation that is
21    provided.  So every single inspection comes with an exchange
22    of documents.
23            THE COURT:  All right.  So I just made a note about
24    what we're talking about.  Documents that were made available
25    to the FDA for inspection and/or produced to the FDA during
```

```
 1    their inspections of defendants', what, API manufacturing

 2    facilities?

 3            MR. SLATER:  And finished dose.

 4            MS. HILTON:  And finished dose manufacturing

 5    facilities.

 6            THE COURT:  Okay.  All right.  I'll clarify that that

 7    has to be produced.  But based on what Mr. Goldberg

 8    represented, it sounds like this is in the works and

 9    plaintiffs are going to get these documents.

10            MR. SLATER:  Just, Your Honor, one clarification on

11    the wording.  I can't stand here and tell you the only example

12    of a document that we don't have that was referenced in a core

13    discovery document is something that was made available during

14    inspection.  So we just wouldn't want to --

15            THE COURT:  Or produced.

16            MR. SLATER:  Yeah, I mean it could be during their

17    correspondence or their back and forth, outside of the

18    inspections or following the inspections.  We just don't want

19    it to be -- cut out something that may have occurred in the

20    course of their back and forth.

21            MR. RUBENSTEIN:  Your Honor, just a small point of

22    clarification.  During the core discovery process, EIRs,

23    inspection reports, things like that, were not required to be

24    produced by the finished dose manufacturers.  So it was just

25    the API manufacturers at this point.
```

```
 1            THE COURT:  That's one of the issues for today, isn't

 2   it?

 3            MR. RUBENSTEIN:  It is.

 4            THE COURT:  All right.  Okay.  So indulge me.  I just

 5   have a few questions and we'll get into the nitty gritty.

 6            First, plaintiffs.  One of the themes that seems to

 7   be running through defendants' papers is that the die has

 8   already been cast on the cause of this contamination, when it

 9   started.  Defendants represent in their briefs that there was

10   no test to identify these contaminants until July 18, and

11   based on that, defendants, you know, then go on to their

12   argument, and I just want to clarify.

13            If plaintiffs agree to certain prevailing theories,

14   that's great, that will help us with the scope of discovery,

15   but I'm not sure that's the case.  Can you speak to that?

16            MR. SLATER:  Right.  First of all, Your Honor,

17   there's evidence that we've presented to the Court already on

18   this briefing that contamination with nitrosamines predated

19   the manufacturing change to what we're going to call the third

20   methodology, the one that was the last one they were using --

21            THE COURT:  So are we talking now just about one

22   party or all API manufacturers?

23            MR. SLATER:  Well, I'm talking -- I'm starting out in

24   the context of ZHP, because we have more information about

25   what happened there, of necessity we do.  We have evidence
```

1    that the contamination predated this change.

2         So we're not at all convinced that this is such a

3    simple case where, oh, we made a manufacturing change and it

4    started at that point, because we have evidence that

5    contamination with nitrosamines predated that date, which is

6    why the starting point for the effective date, as you're going

7    to get to, needs to be pushed back to the beginning.

8         No. 2, the suggestion that no test existed until

9    after this came to light that could have disclosed it, is -- I

10   think I learned this word in law school -- silly, because we

11   know how ZHP found out and how this was discovered, which was

12   when Novartis looked at their API, which was going to be a

13   finished dose downstream user of their API and found the

14   problem and sent it back and said, you have a problem here.

15        So, you know, that covers a lot of issues.  You have

16   a finished dose where a downstream entity actually discovering

17   the problem, which shows they actually do things beyond just

18   cobble it together and shove it into a box, because they have

19   obligations under the regulatory scheme to look.

20        So their suggestion that this couldn't have been

21   discovered makes absolutely no sense.  There was testing that

22   was done, there was so-called ghost peaks being seen for a

23   long time that were being ignored.  We believe that we're

24   going to be able to show that there was plenty of evidence

25   that if they didn't actually know it, which there's reason to

1  believe that they did know and kind of just kept going, but

2  there was certainly plenty of evidence that it could have been

3  figured out if they just looked at the test results and

4  actually evaluated them appropriately.

5          THE COURT:  So this is my question, and we're not

6  going to solve the issue of who's right and who's wrong, but I

7  just want to clarify for the record whether or not a

8  representation or a statement made by the defendants is

9  correct.

10          On Page 10 of defendants' November 18th letter, they

11  say, quote:  "And there were simply no testing procedures that

12  could quantify or detect nitrosamine impurities at such trace

13  amounts until the FDA introduced new testing procedures in

14  June 2018."

15          We're not going to -- we can't decide today whether

16  that's true or not.  I just want to know if plaintiffs agree

17  with that statement.

18          MR. SLATER:  No.

19          THE COURT:  Okay.  And then I understand what the

20  prevailing theory is about how this contamination occurred.

21  Later on in the same paragraph that I referred to, the

22  defendants say:  "The purported nitrosamine impurity was

23  introduced during the API manufacturing process."

24          What are plaintiffs' thoughts about that?

25          MR. SLATER:  Oh, we believe that the nitrosamine

1    contamination occurred during the API manufacturing process.

2    That's what we believe from what we've seen.  Whether or not

3    there also could have been contamination in the finished dose

4    or downstream facility, we don't have enough information to

5    prove that, but it's something we obviously have to look at,

6    because there's obviously going to be cross-claims among the

7    defendants and we have to see how they're going to handle that

8    as between one another.

9        THE COURT:  Will you be pursuing in the case, whether

10   or not ultimately you pursue this theory, but at least in

11   discovery, are you going to explore that there might have been

12   some contamination introduced into the Valsartan during the

13   finished dose manufacturing process?

14       MR. SLATER:  We're certainly taking discovery on that

15   and investigating it thoroughly.  If it were to turn out that

16   we have evidence that establishes that, then that would be an

17   additional basis for liability as to the finished dose

18   manufacturing.

19       THE COURT:  Are you able to rule that out now?

20       MR. SLATER:  We're not.

21       THE COURT:  Is that one of the reasons why you want

22   to conduct fulsome discovery directed to the finished dose

23   manufacturers?

24       MR. SLATER:  It's a reason, but it's probably a much

25   smaller reason than the reason that the finished dose

1    manufacturers have regulatory obligations and had to test, to

2    audit the API facilities and to be essentially fully

3    conversant with everything that had happened.

4         For example, take Teva that bought the API from ZHP.

5    Teva had a regulatory obligation to audit what had happened in

6    China during the manufacturing process, to look at the test

7    results, to look at the chromatography, to look at whatever

8    information -- there's a whole host of things they're supposed

9    to look at to make sure that they could comply with their good

10   manufacturing processes obligations.

11        So, you know, they had an independent obligation --

12   if the API manufacturers weren't involved in this case, the

13   finished dose manufacturers would be fully responsible for

14   everything that the API manufacturers did, because they had an

15   independent obligation to audit and make sure that these were

16   bioequivalent, that they met the regulations, that they could

17   comply with all of the generic drug regulations and that they

18   were safe to be sold, to be ingested by humans in the United

19   States of America.

20        THE COURT:  Did this, in your view, maybe

21   disagreement on this, did this obligation arise under the

22   DSCSA, or some other regulatory or statutory authority?

23        MR. SLATER:  I think that's part of it.

24        MS. HILTON:  Your Honor, if I may, surely we cite to

25   the drug supply security control act, but they have these

1    obligations under the basic Food & Drug Administration

2    regulations and because they are the ANDA holders who submit

3    their Abbreviated New Drug Applications to the FDA, the API is

4    not obligated to test, but the ANDA holders indeed are.

5         So their obligations actually arise from their

6    Abbreviated New Drug Applications.

7         MR. HONIK:  And at the risk of being old-fashioned,

8    Judge, the common law imposes a duty as well.  I mean, if

9    Boeing puts an airplane out and there's a defective engine

10   that's a component part that it got from another party, which

11   would be roughly equivalent to an API, and puts it into its

12   plane, it can't raise its hands and say we had no obligation

13   surrounding that.

14        So in addition to the regulatory scheme, which is as

15   tight and formative as one could find in any regulated

16   industry, certainly the common law imposes a duty on the

17   seller, the finished dose manufacturer, who is incorporating

18   this component part, that may very well be the rub of this

19   case.

20        THE COURT:  Let me ask one more question of the

21   plaintiffs and I definitely want to hear from the defendants

22   on this.  I'm not quite sure how to phrase this question, but

23   I think it's important because so much of the theme running

24   through defendants' papers is, we should defer to the FDA's

25   thinking and prevailing theories and if this is what the FDA

1    thinks, why, Judge, are you letting plaintiffs go off on these

2    alternative theories.

3        How much stock are plaintiffs going to put in the

4    FDA's findings and prevailing theories?

5        MR. SLATER:  The plaintiffs are going to consider

6    what the FDA found, we're going to consider the information

7    that they have accumulated through this process and

8    ultimately, though, we are not going to rely on the FDA's

9    conclusions for multiple reasons, including the fact that the

10   FDA, we think, has a part to play in this, because they missed

11   this, they failed to follow through on some warning letters

12   and to take some steps against at least ZHP, that probably

13   should have been taken and we think that the FDA probably has

14   some incentives to play down the ultimate significance of this

15   issue.  I mean, we could talk about that more another time.

16       So we're going to use the evidence that we're getting

17   through the FDA.  We think a lot of it is very damaging to the

18   defendants, obviously, because this caused -- I think it's the

19   largest Class 1 recall ever.  So obviously, the FDA wasn't

20   happy about what happened here and determined these drugs

21   could not be sold in that form, so we think they've done a lot

22   to prove our case, but we're going to go well beyond that and

23   we're going to have to establish in a more granular way the

24   elements of our case here.

25       MR. HONIK:  There's another piece to this as well, if

1    I may, Your Honor.  This is an ongoing investigation which,

2    frankly, has a political component.  And what I mean by that

3    is, that the defendants, through their counsel, have engaged

4    and continue to engage with the FDA in a very active way.

5    We're not a part of that, consumers are not a part of that,

6    buyers are not a part of that.

7              THE COURT:  How do you know that?

8              MR. HONIK:  Well, because it's in the public domain

9    and because, as we get FOIA information, we see the contact

10   between counsel.

11             THE COURT:  Shouldn't you be getting -- apart from

12   FOIA, didn't the Court order that contemporaneous

13   communications have to be produced?

14             MR. SLATER:  Yeah, it's a big problem because we

15   don't know -- we don't think they're being updated and the --

16             THE COURT:  I court-ordered that twice.

17             MR. SLATER:  Yes, and Duane Morris, for example, is

18   the liaison to the FDA on what's -- on this investigation

19   that's ongoing.  So Duane Morris is in, as Mr. Honik just

20   said, in direct communication with the FDA on this issue.  So,

21   yeah, and we don't believe that we have updated

22   communications.  We think there's probably some significant

23   gaps, but again, you know, we're not able to say, we don't

24   have something, we just don't think we have a lot of what's

25   been exchanged and continues to be.

```
 1            THE COURT:  One more question.

 2            And I don't know how to put it delicately, but to put

 3     it bluntly, will the plaintiffs be questioning FDA's findings

 4     because they have issues with their potential biases and

 5     motivations in connection with this recall and investigation?

 6            MR. SLATER:  I would think that there's probably some

 7     conclusions by the FDA that we're going to differ in our

 8     conclusions and our experts will differ, and there may be some

 9     areas that we're going to want to go much deeper into than the

10     FDA did, because we think there might be some answers there

11     that they may not want or need, for what they're doing.

12            THE COURT:  So, Mr. Goldberg, if you have anything to

13     say, I don't want to cut you off, I'd like to hear from you on

14     this.  You may not have anything to say, but in light of

15     plaintiffs' theory of the case, obviously you may disagree

16     with it, you're entitled to do that.  But plaintiffs -- I'm

17     sorry, defendants argue again on Page 10 of the same letter,

18     that finished dose testing and anything downstream is simply

19     irrelevant.  That's the defendants' argument.

20            How can you take that position in light of

21     plaintiffs' theories of the case?

22            MR. GOLDBERG:  Your Honor, if I can just sort of back

23     up and then come to that question.

24            THE COURT:  Absolutely.

25            MR. GOLDBERG:  Okay.  Can I approach, Your Honor,
```

1    with a couple of documents, please?

2        THE COURT:  Sure.

3        MR. GOLDBERG:  Your Honor, I think one of the ways

4    you started this conversation was about the manufacturing

5    process and whether plaintiffs agree that this is about a

6    specific part of the manufacturing process.

7        THE COURT:  No, what they said was -- if I'm wrong,

8    they will clarify it, but I think -- my takeaway from what the

9    plaintiffs said is, yes, they seem to agree with the

10   prevailing theory that this contamination occurred during the

11   manufacturing process, but they're not ruling out at this time

12   that there also may have been contamination caused during the

13   finished dose manufacturing process.

14       That's how I understood -- they're not saying

15   exclusively the manufacturing process.  That's how I

16   understood what they were saying.

17       MR. GOLDBERG:  I agree with you, that is their theory

18   that they can't rule out that there was some other

19   contamination.

20       Your Honor, I've handed you what is the current

21   manufacturing process for ZHP's Valsartan, and I just think it

22   would be helpful, we haven't really talked about the science

23   too much and I'm not an expert in the science and there's

24   going to be experts here, but, Your Honor, what I've given you

25   is the multistep process to make Valsartan.

```
 1          THE COURT:  You know, this is exactly why I was a
 2   political science major.
 3          MR. GOLDBERG:  Me too, me too.
 4          (Laughter.)
 5          MR. GOLDBERG:  But, Your Honor, I just want to show
 6   you, if you turn to the bottom, to Prinston 612, bottom left,
 7   this is Page 7 of 21, this is Step 4 of the multistep process,
 8   and what this -- what I understand from the documents that
 9   I've reviewed, from the different briefs in the case,
10   including Page 4 of plaintiffs' brief, where they're talking
11   about a specific moment where solvents are introduced to the
12   -- to the manufacturing process, that happens right here,
13   Step 4, where you see it says tetrazole reaction at the top,
14   it says quenching, and if you look to the left, you'll see
15   where it says DMF solution in a box.
16          THE COURT:  Yes.
17          MR. GOLDBERG:  Okay.  This is -- DMF is the solvent
18   that's being introduced.  This is what's been talked about.
19   This is the moment, this is the chemical reaction.  If there
20   is one, this is the moment that they're referring to.  This is
21   what this case appears to be about at this point.
22          Don't -- we don't know exactly what happens, you'll
23   hear from experts about what happens, but this is really
24   important to sort of isolate this moment in time, because you
25   can see all of the steps that happen before, all of the steps
```

1    that happen after.  This is in the moment of creating the

2    powder at the API facility.  This is not the moment of making

3    a pill at the finished dose facility, putting it in a bottle,

4    selling it.

5           Plaintiffs may say to you they can't rule it out, but

6    the logical conclusion is that the contaminations that are

7    caused -- allegedly caused by DMF, that they've pled in their

8    case are happening here where the DMF is introduced.  That's

9    the answer to the question.  That's their theory.  We don't

10   see how it translates to the finished dose manufacturing

11   process.  No evidence that DMF or any other contaminant is

12   being put into the drug at that point in time.  This is the

13   process.

14          I wanted to just address the testing question, the

15   question about whether testing was around at the time to

16   detect NDMA.  I've handed you the FDA's press release, Your

17   Honor.

18          The second page of the FDA's press release, this is

19   August -- January 25th, 2019.  This says -- Page 4 of 6, which

20   is in the very bottom, bottom left of the page.  During this

21   time -- this is in the time since the recall, so we're in

22   January of 2019, we're talking about the last six months.

23   During this time, our scientists have developed and refined

24   novel and sophisticated testing methods, specifically designed

25   to detect and quantify the NDMA and NDEA in all ARB medicines.

1    And then it goes on to describe the three or four tests.  At

2    the time that the recall happened, I don't think we're saying

3    that there was no ability to identify NDMA.  Chromatography

4    existed.  Gas chromatography, liquid chromatography existed.

5    I think the point is that nobody had their machines at the

6    sensitivity, nor did the FDA, to detect NDMA and NDEA at the

7    trace amounts that were found.

8         Did a customer have their machine at the right

9    sensitivity?  Apparently.  And so since that time, the FDA and

10   all of the other manufacturers have been spending their effort

11   in this investigation to refine the testing, to get it to be

12   sensitive enough to identify the trace amounts of NDMA and

13   NDEA in the drug, and that's -- that's the point of what we

14   said in Page 10.  Maybe it wasn't as specific as it should

15   have been, but that's what we intended by the fact that -- and

16   that -- and that was the state of the art at the time.

17        MR. REEFER:  Excuse me, Your Honor, may I just make

18   one statement?  Judge, I know that --

19        THE COURT:  I'm sorry.

20        MR. REEFER:  I'm sorry, Jason Reefer for Mylan

21   Pharmaceuticals.

22        I know that the issue of foreign evidence is going to

23   come up today, and so with the magic of Google, I tried to

24   look at some of the foreign regulatory documents that might be

25   out there, and, you know, this is a statement from the

 1   European Medicines Agency, EMA, which in my mind is sort of

 2   like the European FDA, that might not be precisely correct,

 3   but this is a line from an April 17th, 2019, statement that

 4   they made with respect to the nitrosamine impurities and the

 5   recalls.

 6           THE COURT:  What's the date again, sir?

 7           MR. REEFER:  Sure.  April 17, 2019.

 8           It says:  "Before June 2018, NDMA and NDEA were not

 9   among the impurities identified in sartan medicines and were

10   therefore not detected by routine tests."  That's the EMA.

11           THE COURT:  I don't think that really helps advance

12   the ball, except to clarify what the Court has to rely on when

13   it decides the scope of discovery; one, plaintiffs' claims and

14   your defenses in the case; and two, that's exactly why I asked

15   Mr. Slater one of the questions, are they deferring to the FDA

16   and the EMA, and they're clearly not, because they question

17   their biases and motivations.

18           So the Court has to take that into consideration when

19   it rules on the scope of discovery.  It can't take as gospel

20   the FDA's statement that this may have been the state of the

21   art, or what this test was or was not available, because

22   plaintiffs are challenging those assertions.

23           MR. REEFER:  But I don't know that they're

24   necessarily challenging the assertion that routine testing

25   would have picked up these impurities at the levels we're

 1    seeing.

 2            THE COURT:  But I don't want to take the wind out of

 3    plaintiffs' sails, but it's no surprise that their --

 4    plaintiffs are going to argue that the routine testing was

 5    wrong, that the defendants knew or should have known that the

 6    routine testing was inadequate.  I don't think -- it's no

 7    surprise you're making that argument, plaintiffs, right?

 8            MR. SLATER:  Not only that, but that the routine

 9    testing, if it was actually evaluated appropriately, would

10    have led any reasonable person in the defendants' position to

11    say, we need more information.  We're seeing artifacts and

12    impurities and, quote unquote, their terminology, ghost peaks

13    on chromatography, that we don't understand why we're seeing

14    these things, and instead of doing what they did which is

15    saying, oh, it's just an artifact, we don't have to worry

16    about and moving on and plowing over it, that they should have

17    taken a step back because they sit here and say, well, there

18    wasn't a test to specifically identify a nitrosamine because

19    they didn't know to look for a nitrosamine, but they certainly

20    knew to look on the chromatography for the purity and to see

21    if there were peaks and findings that didn't correlate to what

22    they expected to see, which under the law, under the

23    regulatory responsibilities, triggered their obligation to do

24    more, and they -- and if they had done that, they would have

25    found out, oh, these are nitrosamines, if they did what they

1    should have done, because again, they sit here and say, nobody

2    could have found it out, but somebody did find it out, a

3    downstream purchaser did test it, did find it, did go to ZHP

4    and say, hey, we're not taking this, you have a problem here

5    and that's how this entire thing came out.

6           So every time they stand up and say, well, the FDA

7    says no one could have figured it out, it's absurd, because

8    somebody else actually did and that's why we know about it.

9           MR. GOLDBERG:  Your Honor, I --

10          MR. SLATER:  Oh, and the other thing I'll say is

11   this, just -- I'm sorry, Mr. Goldberg.

12          I thank Mr. Reefer for making a good part of our

13   argument on foreign regulatory and acknowledging the relevance

14   of foreign regulatory findings and documents by referring to

15   the EMA because that is one of the reasons why that it's

16   relevant, because they've been looking at this question, too,

17   and there may be communications with those regulatory

18   authorities different from those with the FDA.  That's why we

19   need all of them.

20          MR. GOLDBERG:  Your Honor, I kind of was talk -- the

21   documents that I've shown you, I don't, I don't think there's

22   a disagreement about what plaintiffs' theory is, and you're

23   right, that statement doesn't necessarily advance the ball as

24   to their theory, should have known, should we have identified

25   in the test.  But what Mr. Slater just did was exactly what we

1    have been trying to do, which is to demonstrate to Your Honor

2    the narrow issue in the case, which is chromatography testing

3    about these nitrosamines, about impurities and residual

4    solvents.

5          That's the theme in our briefing.  That's what this

6    case really is about, and it's really up to the parties and

7    the Court to figure out, can we stay focused on that issue or

8    are we going to expand this to something that has, you know,

9    far more to do with general manufacturing practices, far more

10   to do with slinging mud about Chinese and Indian companies,

11   far more to do about different aspects of a manufacturing

12   process that have no bearing on that moment in time, that

13   moment in the process where the chemical reaction happens, the

14   moment that's being investigated by all of these agencies.

15         And if we can't stay focused on that, we're going to

16   be in a quagmire.  We'll be here for years, looking at

17   hundreds of thousands of millions of pages of documents that

18   have nothing to do with the chemical reaction that happens at

19   the moment when DMF is introduced in Step 4 of the process.

20         That's the task at hand here.  And to get side -- you

21   know, go sideways and get sidetracked with so many other

22   things is -- is going to result in, A, a morass and, B,

23   exactly what discovery is not intended to do, which is to

24   somehow raise costs and expense so high that it forces a

25   settlement.

```
 1            THE COURT:  Okay.  I would say in response to one of
 2   the comments you made that testing is -- we're going to deal
 3   with it today, it's certainly a very big issue.  I would be
 4   delighted if plaintiffs stand up and say, we agree that the
 5   only relevant test to detect nitrosamines is these chrome --
 6   whatever they are.
 7            MR. GOLDBERG:  Sure.
 8            THE COURT:  If they agree to that, I would be
 9   delighted, but -- but my instinct tells me that's not going to
10   happen.
11            MR. GOLDBERG:  And I don't expect them to.
12            THE COURT:  And I don't think -- clearly, they're not
13   going to get tests, have to do with color and taste and shape
14   and size.  Those issues aren't relevant to the case.  They're
15   not going to get those tests.  But suppose they say, you know,
16   Judge, this type of test could lead someone to identify
17   whether there's a contaminant of concern in the API or
18   finished dose.
19            MR. GOLDBERG:  If they come up with that kind of test
20   and present it to Your Honor, it's a great thing for us to
21   talk about at that point in time.
22            THE COURT:  Okay.
23            MR. GOLDBERG:  Simply, the theory that some other
24   test may indicate, without identifying what kind of test that
25   is, and I think we actually aren't that far apart on testing
```

 1   after hearing their -- reading their brief.  I mean, it seems

 2   like the parties are in general agreement about chromatography

 3   testing and bioequivalence, and that does seem to be where we

 4   would want be on testing, and it doesn't seem like there's a

 5   whole lot of dispute there.

 6         Now, later in the case, should there be this issue,

 7   how could we say no at that point?  But we -- that hasn't been

 8   presented in that way to the Court yet.

 9         THE COURT:  Okay.  We'll get to testing in a few

10   moments.

11         Another question for the plaintiffs, and it relates

12   to the one issue I really don't have my arms around yet, and

13   that's the relevant time for discovery for each of the

14   defendants.  Everything else I think is going to fall into

15   place and I need your help on it.

16         Plaintiffs -- I'm sorry, defendants.  The Court's

17   understanding is defendants' argument is that only -- the only

18   Valsartan at issue in this case is the Valsartan that was

19   recalled.  That's defendants' theory.  And the follow up to

20   that is, so since only the recalled Valsartan is at issue,

21   only the facilities that made the recalled Valsartan are at

22   issue in the case.

23         What's plaintiffs' thinking on that issue?

24         MR. SLATER:  Well, there's a lot of contaminated

25   Valsartan that people took from lots and batches that were

```
 1   used up before the recalls occurred, No. 1.

 2           THE COURT:  How do we know that?  Why is that the

 3   case?

 4           MR. SLATER:  Even if we take, for argument's sake,

 5   Mr. Goldberg's theory or ZHP's theory that this started when

 6   they made their change in their process and started to sell

 7   this drug into the U.S., they were selling it to the U.S. for

 8   several years before one of their customers brought to light

 9   that this was a contamination problem with nitrosamine.

10           THE COURT:  The change in process was when?

11           MR. SLATER:  2011.  Correct?

12           MR. GOLDBERG:  December 2013 is when the change was

13   finalized and approved, Your Honor.

14           MR. SLATER:  Oh, you're right.  In 2013, they put it

15   into place.

16           So -- but they were selling into the U.S. for a long

17   time before this came to light, so there were drugs that were

18   taken that were -- and those lots and batches, there's no

19   reason to recall it because it's already been used, and if

20   they're right, that this is when -- that this process created

21   the contamination, then it was all contaminated.

22           THE COURT:  So let me ask you this question.  I'm

23   sorry for interrupting, Mr. Slater, but if this manufacturing

24   process, let's say, was put into place online in December '13,

25   and the contamination wasn't discovered until July 2018, you
```

1    know, four or five years, plaintiffs' theory is -- is

2    plaintiffs' theory that all Valsartan made during that time,

3    using the same manufacturing process, was contaminated?

4         MR. SLATER:  Yes, unless they can prove it wasn't,

5    which is where I've been for months with the defense and with

6    the Court to say, let's get together and define the entire

7    field of all Valsartan that was sold in the U.S., let's

8    identify that which the defendants' agree was contaminated,

9    let's identify that which they say may have been contaminated,

10   and let's identify that which they say wasn't, and then we can

11   really take the defendants at their word and say, now we can

12   focus a very important issue in the case, because you'll see,

13   when we ask those questions in core discovery, we got a

14   gauntlet of objections to -- trying to establish that.

15        But why wouldn't it be all contaminated?  They've

16   just told us, this is the part of their process that caused

17   the contamination.  If they use the same process for every

18   pill, every pill was subject to the same contamination.  That

19   is -- I don't see how they argue against that and I don't

20   know, maybe they can make a statement for the Court to try to

21   narrow issues right now.

22        I would assume they agree, yes, every single

23   Valsartan pill we sold into the United States, certainly ZHP

24   will say, yes, it was all contaminated or likely contaminated.

25        MR. HONIK:  Your Honor, let me, if I may, to shed

1   some light because you are asking a critical question about

2   scope, right?  What facilities, what products, and temporally,

3   what are we talking about here.

4        THE COURT:  Absolutely critical questions.

5        MR. HONIK:  Let me direct your attention to -- this

6   is a recipe, right?  What Mr. Goldberg handed the Court is a

7   recipe with many, many steps, and he says to the Court, the

8   only step you need to worry about is on Page 7 of 21, Step 4,

9   that's when we introduced the DMF solution.  Now, we quarrel

10  with that for the reasons you've already heard.  But let me

11  spin this out so you can understand and hopefully appreciate

12  the scope and the temporality that we're talking about here.

13       If it's true that the DMF solution is the main

14  culprit, maybe the sole culprit, then we have to ask

15  ourselves, when were they starting to introduce this DMF into

16  their process?

17       THE COURT:  Fair question.

18       MR. HONIK:  And the answer, Your Honor, is, it began

19  in Process 1 in 2007, September.  That's when they started to

20  introduce this ingredient into the recipe in their pills.

21       We have already seen, albeit not a lot, but we have

22  already seen peaks from testing that they've produced to us

23  that goes back before the timeframe in question.

24       That's DMF in Process 1.  They continued to use it in

25  Process 2, which they submitted to the FDA for approval as

1    early as 2010.  The manufacturing change in question was then

2    subsequently proposed in November of 2011 and as Mr. Goldberg

3    pointed out, finalized in 2013.

4        Sitting here today, even if we were to agree that the

5    DMF and its use was somehow the culprit here, we can't say

6    with absolute certainty without looking back, why did they

7    choose it, why did they put it in their DMF application to the

8    FDA?  We have to see the thinking process behind their choice

9    of Step 4 in this recipe, A, to validate whether, in fact,

10   that's the immaculate conception, I mean, that's the theory

11   they're coming up with, that you don't have to look at

12   anything before or after, because it occurred at that split

13   second.

14       We don't know that.  As plaintiffs in court, we

15   should be permitted to supply to our experts and allow them to

16   verify whether the theory they're presenting is really true,

17   if it holds water a little bit or a lot.  But the fact that

18   this step dates back to their own application to the FDA in

19   2007, implicates their choosing that DMF solution, implicates

20   the process that they chose.

21       I think this best exemplifies how, at this point in

22   the litigation, where we haven't really undertaken substantive

23   discovery beyond the core discovery, that we need to go back

24   and ask the questions.

25       It's fair to do so, and it's a mistake to think that

```
 1   plaintiffs are simply creating tasks for the defendants to do.

 2   Whatever they produce, we have to look at, on our time, at our

 3   expense, and we're not interested in making work for

 4   ourselves, but we are interested in understanding whether the

 5   recipe theory that Mr. Goldberg has proposed to us, actually

 6   holds water.  That's what we want to look at.

 7           THE COURT:  Let me ask you a question, and I remember

 8   asking these questions at -- if not the first conference, one

 9   of the first conferences.  We know that the FDA recalled X

10   number of lots.  Presumably, the reason they recalled those

11   lots, presumably, I don't know, is because those lots were

12   tested or a sample of those lots were tested and they were

13   positive for contamination.

14           Are those all the lots that were made during that

15   time?

16           MR. SLATER:  No.

17           THE COURT:  Were there tests done on lots that didn't

18   detect contamination, and those specific lots were not

19   recalled?  Were some lots -- were some tests positive and some

20   tests negative?

21           MR. SLATER:  I think you have to go defendant by

22   defendant.

23           THE COURT:  Does anybody know that?

24           MR. SLATER:  I think you have to go defendant by

25   defendant and look at the test results, because there's
```

1    different findings per defendant, and that's again -- what

2    we're trying to do is to establish what were all the tests

3    done and I'm sure there's a lot of tests that we don't know

4    about yet that weren't done as part of the recall, that may or

5    may not have shown impurities that should have been disclosed,

6    but all of the pills were not tested, for sure.

7        MR. NIGH:  Your Honor, in terms of our understanding,

8    the FDA directed the defendants to go back and test the pills

9    that were unexpired at the time that the FDA was -- found out

10   about this issue.

11       So we even heard Mylan, I believe, Clem months ago

12   say and agree that that's what they did, they only tested the

13   unexpired pills.  We have reason to believe Mylan has been

14   selling this since 2012 or 2013.  They would have only been

15   testing back to 2016 because that's when unexpired pills --

16       THE COURT:  So hypothetically, I'm just making this

17   up.  Mylan has a hundred lots of unexpired pills.

18       MR. NIGH:  Right.

19       THE COURT:  I don't even know -- how many pills?  No

20   one ever told us how many pills are in a lot or how many

21   bottles are in a lot.

22       MR. NIGH:  Yes.

23       THE COURT:  The recalled lots, was that all 100, or

24   was it 25 of the 100 lots, and if so, does that mean that some

25   tests were positive for contamination and some tests

```
 1   weren't --

 2           MR. NIGH:  Right.

 3           THE COURT:  -- didn't detect contamination?  Do we

 4   know the answer to that?

 5           MR. NIGH:  We don't.  We have an incomplete set of

 6   testing from my eyes, and from our risk assessment expert

 7   looking at it, says, we're missing a lot of pieces to what we

 8   would want for testing.  It would be not only important to see

 9   the testing for what hits is a contamination for over 96

10   nanograms, but it would also be important to understand all

11   the testing for the not detected nanograms in that same lot,

12   and that's what we -- we don't have a full picture on the

13   testing.

14           THE COURT:  Do we know how the FDA determined that

15   certain lots were going to be recalled and certain lots were

16   not going to be recalled, and the identity of the not recalled

17   lots, and hypothetically, because I don't know, suppose

18   there's a hundred lots, 25 were recalled, what does that do to

19   the theory that every pill or all API made during that time

20   period was contaminated, if there were 75 of a hundred lots

21   that were not recalled?

22           MR. NIGH:  Yeah, and I think this is a defendant by

23   defendant issue.  ZHP, my understanding, they've come out,

24   they've expressed that every Valsartan pill that made its way

25   into the U.S. was over -- was heavily contaminated over the 96
```

1    nanograms.  The other defendants would have been -- the

2    direction, my understanding is the FDA looked to the other

3    defendants and said, test your unexpired pills for each lot,

4    come up with a protocol as to -- but if it's over 96

5    nanograms, we need to issue a recall of that lot.

6        So we were still going to have contamination even

7    under 96 nanograms for unrecalled lots in the unexpired.

8        THE COURT:  Do you have all the test results -- once

9    the contamination was discovered, and the FDA directed that

10   testing be done in order to identify what had to be recalled

11   or not, do you have all of those test results?

12       MR. NIGH:  No, no.  I mean, one example would be --

13   I'm certain we don't have all the testing results for Teva.

14   You know, Teva is -- they have the combination that has a

15   lower level of contamination and they have just Valsartan that

16   clearly has their higher level of contamination.  We don't

17   have that testing for the higher level.  So that's just one

18   example.

19       THE COURT:  Is there anything you want to add on

20   this, Mr. Goldberg?

21       MR. GOLDBERG:  I guess a couple of points to clarify.

22   One thing to clarify with respect to ZHP, and going back as

23   Mr. Honik was saying.  The only ZHP pills that have been sold

24   in the U.S., APIs sold into the U.S., only happened after

25   2015, when we -- when ANDA filers using our API were approved.

1          So we were manufacturing product prior to 2013 using

2     a different process, and if Mr. Honik is correct that DMF was

3     used during that process, so be it.

4          Drugs made from that process were not sold into the

5     U.S., which is why in our briefing, we tried to draw a line

6     with respect to the relevant time period as it relates to ZHP

7     and I think probably as to some of the other defendants.

8          THE COURT:  Do I take it then ZHP was selling API

9     around the world before 2015 but only as to the United States

10    after 2015?

11         MR. GOLDBERG:  I believe that's correct.  I'm not

12    sure which countries around the world.  I know in China they

13    were, but I'm not sure which, but for U.S. sales of ZHP API,

14    it only occurred after 2015 -- since 2015, and we provided

15    that information to plaintiffs, our letters of authorization

16    are in the document.

17         So our thinking on relevant time period is, and it

18    does go back to this.  I don't know that it's a recipe, and

19    I'm not suggesting that this one moment in time is the only

20    relevant part of the process, but what I am suggesting is that

21    this is -- you know, this is the most important part that

22    should really guide how we look at discovery.

23         The -- sorry, I lost my train of thought, about the

24    -- oh, I think what I would -- what we are suggesting about

25    this process, with respect to relevant time period is, to the

```
 1   extent there are specific questions about the process that
 2   predate 2015, then let's focus on those, but certainly general
 3   discovery as to all of these other topics in the 122-some-odd
 4   requests don't need to go back that far, and that a cut is
 5   2015, and then, you know, if there are specific questions,
 6   specific questions about residual solvents, impurities, this
 7   step in the process, some other key step, then raise it that
 8   way, and so that we're not mired down in a morass of documents
 9   that date back into, not only more than a dozen years as to
10   some defendants, but also with respect to processes and pills
11   that are not at issue in the U.S.
12           MR. NIGH:  Your Honor, if I can clarify a few things.
13   For ZHP, they have three different processes as to how they
14   make their Valsartan from what we understand.  They've got a
15   TEN process, it's called Process 1.  They have a TEA process
16   called Process 2, and then a DMF Process 2.  Those are the
17   three different types of processes.  So the recipe that was
18   shown is DMF Process 2.
19           The problem with what we just -- and the Chinese --
20   ZHP alerted the FDA, they said, this is the reason for their
21   problem, it's Process 2 DMF, and we're hearing it again that
22   we should limit it to just DMF Process 2.  That's the issue.
23           But the problem is, we've submitted a Claussen
24   report, 58-page inspection report from Claussen in 2018.  She
25   asked Jun Du and asked, well, did you test, did you get
```

1   testing results on the other processes, and they again said,

2   there's no problem with the other processes, but the FDA said,

3   but did you test them.

4        Well, guess what happens?  The day before the

5   inspection concludes, they come back and they reveal, there

6   are very high levels for TEA Process 2, so now it's not just

7   Process 2 DMF, it's also Process 2 TEA, that we don't know

8   even utilizes DMF.  So I don't think that we can just define

9   this and say, that's the only problem that we know about, and

10  also to say that Process 2 DMF is the only one that makes its

11  way to the United States.

12       I don't believe that's accurate, but I'm not certain,

13  but I don't believe that's accurate.  I believe it's being

14  sold to Torrent and it makes its way into the United States.

15       So that's another reason why we need to find this

16  out.  We would then need to understand, if all that's

17  accurate, we would need to understand why is it, if Process 1

18  doesn't have a high impurity finding, but Process 2 TEA does

19  and Process 2 DMF does, that could be our answer.  That's why

20  we would need discovery into all three of the processes for

21  ZHP.

22            THE COURT:  Okay.  Real quickly, couple of questions.

23            Are you going to orally argue the motion in December

24  before the JPML panel?

25            MR. NIGH:  I am not, because they are not asking for

```
 1   oral argument.

 2           THE COURT:  Okay.  Am I correct that Hetero Aurobindo

 3   India, they haven't been served yet?  Is their counsel here

 4   for the U.S. entity?

 5           MS. POLETO:  I am here, Your Honor.

 6           MS. HEINZ:  Yes, Your Honor.

 7           THE COURT:  They know -- you don't have to answer

 8   this.  The train has left the station.  When they eventually

 9   come into this case, they're going to have a lot of catching

10   up to do quickly, because they're on notice of everything

11   that's been going on in the case, so they had the opportunity

12   -- they're exercising their right, perfectly appropriate, no

13   problem with it.

14           But if they think they're going to come into this

15   case and we're going to start at ground zero, they're

16   mistaken.  That's the only thing I wanted to say.  You don't

17   have to respond, but I just want to make sure they know that

18   the train has left the station.  Okay?

19           MS. POLETTO:  Duly noted, Your Honor.

20           MS. HILTON:  And, Your Honor, if I may, Hetero Drugs

21   did receive a Complaint in India.  Counsel for Hetero USA

22   forwarded it to me.  It was one of the Longwell class

23   Complaint and was filed in the District Massachusetts --

24   Hetero Drugs in India received a copy of our Complaint, we

25   received a copy of it from counsel for Hetero USA and it
```

1    included the Indian certificate on the front and it was -- it

2    was one of our Massachusetts class complaints, and so they are

3    in receipt of the Complaint, but we just have not received --

4    I personally have not received a signed certificate back from

5    India which takes, you know, a month or two months.

6            THE COURT:  Once the two companies are properly

7    served pursuant to the Hague or at least you get evidence of

8    that, do you know how long they have to respond to the --

9    well, no answers have been filed, so I guess what I'm asking

10   is, how long after they're served, do they enter an

11   appearance?

12           Or let me put it this way.  As soon as -- will you be

13   the person who gets notice that the two companies have been

14   properly served pursuant to the Hague?

15           MS. HILTON:  I believe I'll get some sort of

16   documentation from India.  I don't know what that looks like.

17           THE COURT:  All right.  The Court wants to know

18   immediately, because we will order that an entry of appearance

19   be entered, and if we have to, we'll enter an order saying

20   those specific parties have to file answers to the Complaint,

21   and if they don't, there's going to be a default, because I

22   don't want any undue delay after they're served while they

23   wait and finally get around to entering an appearance.

24           I want them in the case as soon as they're properly

25   served.  So let us know when that happens.  Okay?

1          We're not going to grant undue extensions of time to

2    enter an appearance or file this or file that, clerk's order,

3    blah, blah, blah.  Those days are over.  Okay?

4          One more question and then we'll get to the specific

5    issues that we have to deal with.

6          Teva's counsel.

7          MR. RUBENSTEIN:  Yes, Your Honor.

8          THE COURT:  I'm not quite understanding this Malta

9    facility issue.  If it's just a question of whether they fit

10   into the category of facility that has to respond to

11   discovery, that's fine, we'll deal with this, but do we have a

12   successor liability issue that has to be addressed in the

13   first instance before we get to that?

14         MR. RUBENSTEIN:  No, I don't know, there is no issue.

15   Teva is not going to be withholding documents from Malta.

16   Malta was one of the manufacturing facilities that made

17   Valsartan for sale in the United States.

18         Teva will be producing documents regarding the

19   manufacture, you know, the process and everything, the testing

20   that was done there.  Teva will be producing those documents,

21   so there is no that I, you know, issue with the Malta

22   facility.

23         THE COURT:  Okay.  So there will be --

24         MR. RUBENSTEIN:  It doesn't exist anymore as a legal

25   entity.

```
 1          THE COURT:  We don't have to deal with the successor
 2   liability.
 3          MR. RUBENSTEIN:  No.
 4          THE COURT:  Okay.  Let's -- now I'm ready to -- or
 5   the Court is ready to get to the specific issues in the
 6   dispute, and in looking at it, it made sense to me to start
 7   with the issues that plaintiffs started on, and then we'll go
 8   to defendants, and I suggest we just go down the order -- in
 9   the order.
10          The first issue is what the Court called boilerplate
11   objections.  The Court -- that's the only issue the Court
12   doesn't need oral argument on.
13          I read the briefs, read the papers.  I understand
14   everything.  I don't think you can add anything to the record.
15          So let's move on to issue No. 2.  What entities or
16   facilities must respond to plaintiffs' discovery.  Pretty
17   important issue.
18          Let me ask you this:  Do we at least know how many
19   facilities and what the facilities are that we're talking
20   about?
21          MS. HILTON:  Well, all of the facilities, if I may,
22   Your Honor, all of the facilities that are used in the
23   manufacture of finished pills that enter the U.S. market
24   pursuant to --
25          THE COURT:  Let's start with the API.
```

1          MS. HILTON:  We know which facilities were used that

2    manufacture, and you'll note that defendants were very clear

3    in their language.  Valsartan API, that was subject to recall.

4    This leads me to believe that there are, perhaps, facilities

5    they have not identified.

6          THE COURT:  Well, that's the question.  That's the

7    question I asked.  Do we know at least the universe of

8    facilities that made API as a starting point and then we can

9    identify the facilities that had recalled API, the facilities

10   that sold U.S. API and the facilities that only sold foreign

11   API.  Do we know that?

12         MS. HILTON:  No, Your Honor, we don't.  We only know

13   which facilities manufactured API that was subject to a

14   recall.  That is what defendants have given us.  We know the

15   universe of facilities that defendants have generally, but it

16   is possible that some facility or some process may make API,

17   and in another facility may make finished dose.  They have

18   just been very clear that they are only providing us with --

19         THE COURT:  Let's just start with it -- first, we're

20   going to start with API.  That's different from finished dose.

21   Are they separate facilities?

22         MS. HILTON:  Based on my understanding, sometimes

23   they are not.

24         THE COURT:  Okay.  So defendants say, we want to

25   limit the facilities at issue to only those that sold the

```
 1    recalled API.  Do we know right now whether or not that's the
 2    universe of all API facilities?
 3              MS. HILTON:  We don't know that, and we have reason
 4    to believe that it's not the universe of all API facilities.
 5              THE COURT:  So what facilities do you think should be
 6    at issue in the case?
 7              MS. HILTON:  We believe any facility that
 8    manufactured Valsartan API should be subject to discovery.
 9              THE COURT:  Suppose I don't know, we don't know -- I
10    wish we had the answers to these questions.  Suppose there's
11    an API facility that only made APIs sold to Belgium and
12    France, obviously I'm making this up, they didn't sell any API
13    that entered into the United States.  Is it your position that
14    discovery as to that facility is relevant?
15              MS. HILTON:  Yes, Your Honor.
16              THE COURT:  Why?
17              MS. HILTON:  We understand that the defendants
18    utilized different manufacturing processes, recipes as it
19    were, for different countries, based on different guidelines
20    and requirements those countries had.
21              So to the extent Belgium had no adulterated
22    contaminated Valsartan with nitrosamines, we would be
23    interested in seeing what those testing results look like,
24    what those documents look like and whether, you know, because
25    another Valsartan was showing aberrant peaks, the defendants
```

```
 1   should have been on notice.  If there was a country that had

 2   an adulteration or contamination that was at even higher

 3   levels than the United States, you know, we would want to see

 4   that testing so we could compare.

 5            THE COURT:  Mr. Goldberg, isn't it just a basic,

 6   basic, basic fact to identify the universe of potential

 7   facilities at issue?

 8            MR. GOLDBERG:  Yeah, I'm not sure -- I'm not sure

 9   they haven't been, Your Honor.

10            THE COURT:  Okay, so --

11            MR. GOLDBERG:  I know for ZHP, plaintiffs know where

12   the stuff is made.

13            THE COURT:  Okay.  Just as -- I'll ask the other

14   party, just ZHP.  ZHP wants -- as well as the other API

15   people, want to limit the facilities at issue to only the

16   facilities that made the recalled API, right?

17            MR. GOLDBERG:  Well, for us, that's our Valsartan.

18            THE COURT:  So as to --

19            MR. GOLDBERG:  We voluntarily recalled everything

20   that came to the U.S.

21            THE COURT:  So it's all of your API manufacturing

22   facilities?

23            MR. SLATER:  We have Chuannan and we have Xunqiao.

24   And Chuannan is where the API is made.  Xunqiao -- Chuannan

25   has two -- we have two zones and Xunqiao, I believe, is where
```

1    the finished dose is made, and we have said they can have

2    discovery as to both.

3          THE COURT:  Okay.  So it's easy with regard to your

4    client.

5          MR. GOLDBERG:  Correct.

6          THE COURT:  Mylan?

7          MR. REEFER:  Hi, Judge.  Yeah, Mylan has identified

8    all of the facilities that have manufactured Valsartan API,

9    they're referred to as Unit 8 and Unit 3 and we've provided

10   their identification information.

11         THE COURT:  Did they both sell recalled API?

12         MR. REEFER:  I believe so, Judge.

13         THE COURT:  So we don't have an issue -- well, are

14   those the only two facilities that made API for your client?

15         MR. REEFER:  Valsartan API, yes, Judge.

16         THE COURT:  So we don't -- so far we don't have an

17   issue with ZHP, we don't have an issue with Mylan.

18         MS. HILTON:  Your Honor, if I may.  I mean, could we

19   get confirmation that they're not limiting it to just the

20   United States and that they are answering with respect to all

21   of their processes around the world, because --

22         THE COURT:  They just said that they only have -- you

23   have two facilities, you have three facilities, right?

24         Do you have any -- all right.

25         Mylan, do you have any API manufacturing facilities

 1    that exclusively sells to non U.S. customers?

 2              MR. REEFER:  No, Judge.

 3              THE COURT:  ZHP?

 4              MR. GOLDBERG:  No, Your Honor.

 5              THE COURT:  So right now, Mylan and ZHP are the only

 6    API manufacturers in the case, right?  Because Hetero and

 7    Aurobindo are not in the case yet, right?  Okay.

 8              MR. GOLDBERG:  I believe that's correct.

 9              THE COURT:  So we don't really have -- well, that's

10    API.  Let's go to finished dose.

11              MS. HILTON:  Yes, Your Honor.  So the defendants --

12    first of all, I think Mr. Rubenstein said earlier that they

13    did not produce establishment inspection reports in core

14    discovery.  That's actually not correct.  The finished dose

15    manufacturers did.  I looked at some last night.  So I know

16    that some of the finished dose facilities, Aurolife, for

17    example, did produce establishment inspection reports.

18              And so we know, we believe that we are entitled to

19    discover especially quality assurance-related documents.

20              THE COURT:  No, no, no, let's not move on to the next

21    issue.  We're just talking first --

22              MS. HILTON:  Oh, identification.

23              THE COURT:  Right.  First, we're going to identify

24    the facilities at issue, and then we'll get into the specific

25    documents.

```
 1              So I take it, you want the defendants to produce
 2    responsive discovery for all finished dose manufacturing
 3    facilities, not just those that sold recalled products?
 4              MS. HILTON:  Yes, Your Honor.
 5              THE COURT:  Okay.  We don't have an issue with ZHP,
 6    Mr. Goldberg, as I understand it, right?
 7              MR. GOLDBERG:  Correct, to the extent we're going to
 8    produce finished dose manufacturing-related documents, they're
 9    at Xunqiao and that's the one.
10              THE COURT:  Right.  So Mylan, do you have finished --
11    separate finished dose manufacturing facilities?
12              MR. REEFER:  Yes, Judge.  Nashik in India.
13              THE COURT:  Is this apart from the three API
14    facilities?
15              MR. REEFER:  To clarify, Judge, we have two API
16    facilities, one's called Unit 3.  It no longer manufactures
17    Valsartan API as of, I believe, 2017.  Presently, the only
18    Valsartan API manufactured by Mylan is done at Unit 8 which
19    again has also been identified.
20              Separately, we have finished dose facilities in
21    Nashik, India, and Morgantown, West Virginia.
22              THE COURT:  Did both of those facilities sell
23    recalled finished dose products?
24              MR. REEFER:  Yes, I believe so, Judge.
25              THE COURT:  Okay.  So we don't have an issue with
```

1  Mylan.

2        MS. HILTON:  So we have several issues with Mylan but

3  in terms of identification --

4        THE COURT:  Of their facilities.

5        MS. HILTON:  -- of their facilities.

6        THE COURT:  One step at a time.

7        MS. HILTON:  Yes, Your Honor.

8        THE COURT:  Teva, your finished dose manufacturing

9  facilities are located where?

10        MR. RUBENSTEIN:  In Jerusalem and Malta.

11        THE COURT:  Did both of those sell -- well, I'm not

12  sure about Malta.  Did both of those sell recalled Valsartan?

13        MR. RUBENSTEIN:  Yes.  They're the only two

14  facilities that manufactured Valsartan for sale in the United

15  States, whether they were recalled or not.

16        THE COURT:  Is there a -- I know we're going to get

17  into specifically what documents, each of facilities has to

18  produce, but is there a dispute that documents are going to be

19  produced from both of those facilities?

20        MR. RUBENSTEIN:  No.

21        THE COURT:  Torrent.  Your finished dose

22  manufacturing facility is located in India?

23        MS. NAGLE, correct.

24        THE COURT:  Is there only one?

25        MS. NAGLE:  Yes.

```
 1              THE COURT:  Did they sell recalled product?

 2              MS. NAGLE:  Yes.

 3              THE COURT:  Okay.  So we don't -- we don't have any

 4   dispute anymore because all API -- API manufacturing

 5   facilities and all finished dose manufacturing facilities of

 6   the defendants sold recalled product, so we don't have an

 7   issue so far.

 8              MR. SLATER:  Your Honor, I may have missed it.  But

 9   on Teva, what we were told is those were the facilities that

10   sold to the U.S., I think we just lost the one piece.  Did

11   they have facilities that manufactured Valsartan for sale in

12   other countries solely and not in the U.S.?

13              MR. RUBENSTEIN:  Yes, they have other facilities.

14              MR. SLATER:  So we're looking for discovery from

15   those facilities as well.  So we need to make sure we have

16   those.  I don't know that we do.

17              THE COURT:  Okay.  That was -- I'm sorry, Teva.

18              MR. RUBENSTEIN:  Correct.

19              THE COURT:  The two facilities that sold recalled

20   product, they're located where?

21              MR. RUBENSTEIN:  In Jerusalem and formerly in Malta.

22              THE COURT:  And the finished dose facilities that

23   sold only to non-U.S. customers, that's located where?

24              MR. RUBENSTEIN:  There are multiple.  I don't know

25   off the top of my head.
```

1          THE COURT:  Okay.  So plaintiffs' position is all of

2     the facilities, whether or not they sold recalled product,

3     have to be subject to discovery.

4          Defendants' position is, it's only -- really only

5     pertaining to your client, that the facilities that didn't

6     sell recalled product should not be subject to discovery.

7          MR. RUBENSTEIN:  That didn't -- that didn't

8     manufacture product for sale in the United States.  Whether it

9     was recalled or not.

10          So if a facility that may have manufactured Valsartan

11     solely for sale outside the United States should not be

12     subject to discovery, but the two facilities, Jerusalem

13     formerly Malta manufactured Valsartan that was for sale,

14     they're the only two facilities that manufactured Valsartan,

15     finished dose products for sale in the United States.

16          THE COURT:  Okay.  The issue is joined.  I understand

17     the issue, I understand the arguments.  Yes, Mr. Slater.

18          MR. SLATER:  There's just one thing Your Honor needs

19     to be aware of.  It may be that a Teva facility may have sold

20     solely to a non-U.S. market, but that someone in that non-U.S.

21     market may have then repackaged and sold it into the U.S.,

22     so --

23          MR. RUBENSTEIN:  That's not my understanding.

24          MR. SLATER:  We just want to make sure we don't miss

25     something because our understanding was some foreign entities

 1    may have purchased the drug from -- higher in the stream of

 2    supply, and then directed it into the U.S.  We just want to

 3    make sure we don't miss something like that.

 4            THE COURT:  Are most, for the finished dose

 5    manufacturers, is the stream of commerce, if they're going to

 6    sell the finished dose pill, would it go directly to the

 7    United States or would it go through somebody else to the

 8    United States?

 9            MR. RUBENSTEIN:  My understanding is that it goes

10    through the -- directly through the United States.

11            THE COURT:  Is that the same for Mylan and ZHP?

12            MR. REEFER:  Your Honor, with respect to Morgantown,

13    it is in the United States so --

14            THE COURT:  That's easy.

15            MR. REEFER:  That's the easy one.  With respect to

16    the Nashik facility, my understanding is it is distributed

17    through Mylan Pharmaceuticals, Inc., which is a West Virginia

18    entity that operates the Morgantown plant as well.

19            THE COURT:  Correct.

20            MR. REEFER:  So does that -- I think that's answering

21    the question.

22            MR. GOLDBERG:  And for ZHP, Your Honor, the finished

23    dose that we make in China comes straight from our distributor

24    in the U.S.

25            THE COURT:  Okay.  All right.  That issue is joined

```
 1    and we'll address that probably right after lunch.

 2              Third issue, whether defendants should be required to

 3    identify and produce discovery regarding other products using

 4    the same manufacturing processes, solvents and/or testing as

 5    those for Valsartan API, plaintiffs in effect are requesting

 6    to open up discovery as to -- I take it all sartans and all

 7    processes that use, what, DMF?

 8              MR. SLATER:  I don't think limited to the DMF

 9    process, because there's a prior process as well.

10              THE COURT:  Okay.  That's a pretty big expansion,

11    plaintiffs.  Why do we need that?

12              MR. STANOCH:  Hi, Your Honor.  David Stanoch for

13    plaintiff.  Judge, we know that certain sartans have the same

14    chemical structure, right, that's the same Step 4 -- step

15    we've seen on the ingredient list, that same thing is

16    happening with the other sartans.  We know that they're

17    manufactured the same or substantially similar way, using the

18    same or similar solvents, and that the testing results for the

19    carcinogenic -- the impurities that we know from the recalls

20    that's been found, at least some of these other drugs.

21              For the same reasons we were talking about earlier,

22    if we're -- if we're detecting NDMA in losartan, that's a

23    flag, that's a signal, that's a notice that it may be

24    occurring in the same process, using the same solvents for the

25    same chemical step for Valsartan.
```

```
 1            THE COURT:  Is there any evidence, any evidence, that

 2   any contamination was discovered in any sartan before

 3   July '18?

 4            MR. STANOCH:  I'm not personally aware of that,

 5   Judge.

 6            THE COURT:  I mean, plaintiffs are arguing they

 7   should have been aware of it, I know that.

 8            MR. STANOCH:  Correction, Judge, there were, of

 9   course, ghost peaks and other types of signals which we

10   believe, at least from the limited discovery we have gotten so

11   far, which should suggest that, that there was something there

12   or at least further investigation should have happened.

13            THE COURT:  So if you get discovery with regard to

14   Valsartan, why then do you need all these other sartans?

15            MR. STANOCH:  Well, again, again, Judge, we're not --

16   we don't want full discovery of every single thing about

17   losartan, we're not saying losartan for example, is a search

18   term, we're saying to the extent the manufacturing process in

19   solvents were being used, which ones are being used for both

20   processes, and if they were different and yielding different

21   results, that's going to go to the knowledge and notice of the

22   defendants.

23            THE COURT:  So hypothetically, if you had a wish list

24   of what you could find, what would you hope exists that you're

25   not going to get through the Valsartan discovery?
```

1          MR. STANOCH:  Well, it could be, hypothetically, you

2    know, one of two things.  Let's say, you know, we know for

3    example, at some point ZHP was using a recycled solvent which

4    some have suggested, one of multiple hypotheses, that the

5    solvent itself might be the source of the contamination.

6          For example, we submitted with our briefing a 2019

7    statement about Lantech that was supplying the solvent where

8    it was said that the solvent was what contained the NDMA.  If

9    they're doing the same process, with a different solvent for

10   losartan and they're not finding that problem, then we know

11   there's probably the problem on the Valsartan side.  If

12   they're using different solvents, right?

13         THE COURT:  Last question.  When -- again, not to

14   take the wind out of his hand -- out of his sails, but I

15   expect to hear from the defendants that these other products

16   are not at issue in the case, these other processes are not at

17   issue in the case.  You're going to get, plaintiffs are going

18   to get extensive Valsartan discovery.

19         The discovery that plaintiffs are requesting as to

20   this issue is disproportional to its importance in the case.

21   It's cumulative, duplicative, what have you.

22         How do you respond to that?

23         MR. STANOCH:  I'd say that the defendants have not

24   made a particularized showing of what that burden may be at

25   this stage, Your Honor.

1          They're probably using the same or similar testing,

2     using the same or similar machines, kept in the same or

3     similar database, with the same or similar results.

4          We have had no showing that it's going to be some

5     humongous process to go to a different facility with different

6     custodians, different chromatogram machines, and different

7     data extraction.  It's all probably going to be on the same

8     thing because they're all going to be coming off the same

9     facility line using the same chromatography machine, going

10    into the same computer.

11         They can just hit -- I know it's a simplification.

12    I've been on that side myself, but the point is, it's going to

13    be all in one place.  And if you're queuing the data and you

14    have to say Code 1 Valsartan, it's not burdensome to say also

15    Codes 2 and 3, losartan, irbesartan.

16         THE COURT:  Thank you.  Mr. Goldberg, do you want to

17    be heard?

18         MR. GOLDBERG:  Thank you, Your Honor.  I think Your

19    Honor took the wind out of my sails.

20         THE COURT:  Did I take the wind out of your sails?

21    Excuse me for that, Mr. Goldberg.

22         MR. GOLDBERG:  And obviously, this is an obvious

23    significant expansion to this case.  We do have the JPML

24    motion and the JPML hasn't decided whether these drugs are

25    even in this MDL.  Obviously, discovery looks different as to

1    these drugs.  If it does, until it does, the drugs, merely

2    because they have a similar chemical composition, are not --

3    that doesn't make them relevant as to all of the same issues

4    that are the subject of general discovery with respect to

5    Valsartan.

6         Mr. Stanoch identified really what seems to be the

7    issue which is not different than the issue for Valsartan.

8    Chromatographic testing about impurities and with respect to

9    solvents.

10         Now our view is, that information is going to be

11   produced as to Valsartan.  We've already produced batch

12   testing for all of our Valsartan produced since 2013.  We've

13   already given them all of the batch testing records that would

14   -- that's chromatographic testing as to NDMA, and the other

15   defendants, I'm assuming are going to do the same thing.

16         At some point in time, if there's an issue that comes

17   up that suggests, you know, we need to look at one of these

18   other ARBs, with respect to a specific issue, maybe that very

19   narrow discovery becomes pertinent at that point in time.  But

20   to open the door to four other drugs as to some general

21   discovery, or even as to the chromatographic testing simply

22   because they had a similar chemical structure, that is going

23   to result in disproportion.

24         Now, I can't tell you, I think Mr. Stanoch is right,

25   I can't tell you how many batch records that is, but we've

1  produced for just Valsartan and for defendants are produced

2  with respect to ANDAs and DMFs, 200,000 pages.

3        So you're talking about ANDAs, DMFs, for all of these

4  other drugs.  If they want regulatory correspondence for all

5  of these other drugs, if they want to get into custodial

6  discovery as to these other drugs, they want to apply search

7  terms as to these other drugs, they want to find out

8  organizational charts as to these other drugs, they want sales

9  as to these other drugs, whatever it is, we are going to,

10  again, trying to keep the eye on the ball here, which is, you

11  know, DMF or some residual solvent, impurities with respect to

12  Valsartan.  That's where the Court's going -- the parties are

13  going to provide that discovery and this kind of an issue, if

14  it's pertinent at all, should be revealed in specificity later

15  in the process.

16        THE COURT:  Okay.  This here is joined -- oh, wait,

17  we want to hear from some others.

18        MR. SLATER:  Free fall.

19        THE COURT:  Let's finish up the defendants, then we

20  will give plaintiffs the last word.

21        MR. REEFER:  Judge, I think I would be remiss if I

22  stood idly by because I think that as has been alluded to

23  several times over the process, there are defendant-specific

24  issues.  And so, for example, Mylan has recalled only

25  Valsartan.  Mylan has not had any issues with recalls of

1   losartan, irbesartan or any other sartans.

2          The solvent that's being referred to is DMF.  Mylan

3   does not use that solvent in its API manufacturing process.

4          So you see, Judge, I'm not sure what the Court is

5   envisioning in terms of the issuance of an order, but I think

6   that it would be outlandish to suggest that Mylan should be

7   compelled to engage in discovery with respect to products that

8   no one has alleged are defective.

9          THE COURT:  So what's the working theory about what

10  caused the contamination in Mylan's API?

11         MR. REEFER:  Sure.  You'll forgive me, Judge, I'm not

12  a process chemist, but the short story is that Mylan has shown

13  that this was a result of a recall -- I'm sorry, reuse of

14  solvent with respect to a very, very specific sort of chemical

15  pathway that occurs in the two steps of the API manufacturing

16  process.

17         THE COURT:  And when did that start?

18         MR. REEFER:  That process was in place since -- I

19  believe since Mylan entered the market, United States, in

20  2012.

21         THE COURT:  So is Mylan acknowledging that from 2012

22  until July 2018, it sold contaminated API?

23         MR. REEFER:  No, Judge.  I don't think that that

24  blanket statement is necessarily true, because, again, I'm not

25  a process chemist, but for one, only batches where solvent was

```
 1   reused would be potentially implicated in the nitrosamine --

 2   and again, this is NDEA, it's a separate nitrosamine versus

 3   NDMA, which is sort of the July 2018 origin.

 4        And so there are certainly instances, I believe,

 5   Judge, where if fresh solvent, non-reused solvent was used in

 6   a particular lot, you might not see any level of contamination

 7   in that particular lot, and there may be other nuances I can't

 8   explain.  But no, Judge, I'm not going to, you know, concede

 9   here that every single batch from 2012 to 2018 was necessarily

10   contaminated.

11        THE COURT:  Thank you, Counsel.

12        All right, Mr. Slater.

13        MR. SLATER:  I'm just going to clarify.  The only

14   thing we're interested in with regard to the other sartans is

15   the manufacturing process and the test results.

16        We're not asking for all the other things that

17   Mr. Goldberg listed, and, you know, the suggestion that let's

18   wait and see what happens, Your Honor knows as well as we do

19   and the defense knows, the depositions of their key witnesses

20   on why did this happen by necessity, are going to go to, well,

21   did you manufacture other similar drugs where you didn't have

22   this issue and why?  Or did you have a more significant issue?

23        I mean, the Court has available to it, through the

24   defendants, samples of actual manufacturing and test results

25   of multiple drugs, where -- variations in the manufacturing
```

1    processes, for example, what solvent was used, was it a reuse,

2    was it new, was it DMF, and we're going -- the more

3    information we can all have, which is in their file cabinets

4    that shows us the various manufacturing processes and the

5    various test results, that information is what we would depose

6    a witness on and say, well, you have this for three years,

7    never saw these aberrant peaks.  This one, you started to see

8    aberrant peaks.  Did you ever triangulate to try to figure

9    out, well, why are we seeing this here, why aren't we seeing

10   this here.

11          And I mean, I could go down the line.  Your Honor

12   knows well what I'm talking about.  This is a directly

13   relevant questioning of these companies in terms of their

14   knowledge, their notice, the steps they took, the

15   reasonableness of their reactions, et cetera.

16          So the comparisons as between the manufacturing

17   processes and the test results of these various drugs, which

18   are all in the same class and is very similar, is going to be

19   very important for the parties, for their experts and for the

20   Court, to ultimately land on why did this happen.  Because

21   Your Honor just, you know, basically laid out, we have

22   different manufacturing processes, we have different

23   contaminants, but why would one happen here and not happen

24   here, and it's helpful that we're having this open discussion

25   here in court, but clearly, we need this information.  Again,

1    all we want is the process and the test results.

2           THE COURT:  Okay.  Moving on, Issue No. 4, litigation

3    hold.  That's a pretty straightforward issue.

4           Plaintiff, is there anything to add to what you put

5    in your briefs?

6           MR. SLATER:  I think I wanted to just suggest to Your

7    Honor, having read your decision in *Major Tours* a couple of

8    times, it may be a process that Your Honor may have already

9    contemplated, but to suggest a process to handle this in a

10   practical way.

11          The first thing is that we would ask that Your Honor

12   order in-camera production of all the hold letters from all

13   the defendants for all the facilities that are at issue to the

14   Court to even determine whether or not a privilege is

15   implicated.  Because there may not be information within those

16   letters that even implicates a privilege and then, Your Honor,

17   we don't have to talk about privilege.

18          You may look at these letters and say, you know what,

19   this letter was written by the chief financial officer, it

20   didn't come from a lawyer, I don't know.  I mean, I'm giving a

21   very simple example, but I think Your Honor has to see the

22   letters, we can't just talk in a vacuum, No. 1.

23          In the interim, I think that there should be no delay

24   in them providing the key information that we're going to

25   need, without production of the letters, they can give that

1    information, and one of the things that we need to know is the

2    dates, when were the letters issued by each party, to which

3    facilities, and to which -- by each defendant, No. 1, we have

4    to know the dates, and I'm reading *Major Tours* because Your

5    Honor drew the inference in that case, that because of the

6    delay and because of the scope of who was actually notified of

7    these obligations, there's an inference of spoliation which

8    triggered the production.

9         THE COURT:  But keep in my mind, in that case, that

10   the Court was talking in the context of a case where there was

11   evidence of spoliation.

12        MR. SLATER:  Well, my reading of the case and I

13   understand it when I drilled down on it and I can certainly be

14   missing something, ultimately, Your Honor drew the inference

15   that there was spoliation because you said, look, there's no

16   way that relevant documents weren't destroyed when you waited,

17   what, three or four years before you instituted this.

18        So there clearly had to be relevant information that

19   was destroyed or lost.

20        THE COURT:  Yes, but the Court -- we knew that, we

21   knew that in *Major Tours,* we didn't take discovery to find

22   that out.

23        MR. SLATER:  You knew about the delay.  So the first

24   thing we need to know is the dates.  There's no -- nothing

25   privileged about the dates on which litigation holds were

 1  issued.  It's a legal obligation.  We've given you plenty of

 2  law on the other side, and I'm not going to try to argue the

 3  law on whether it's privileged or not, there's obviously cases

 4  that say it's not, and say that giving an instruction is

 5  different than giving advice.

 6          Putting that all aside, the date is not privileged,

 7  the distribution list is not privileged, again, very

 8  important.  We need to know everybody that got it, because, A,

 9  did they give it to everyone that they needed to and, B, it's

10  going to help us to identify custodians or confirm custodial

11  lists, which is very, very important to us.

12          The third thing is, the description of what is

13  supposed to be held.  Very important for us, so we can make

14  sure the scope of the instructions is adequate, for, again,

15  reasons that Your Honor discussed in *Major Tours* and

16  commensurate with that, the way that the terminology is used

17  and the actual terms that are used will help to inform our

18  understanding potentially of certain search terms, because we

19  don't know how they described what should be preserved and

20  then last, what did they tell people to do.

21          There is nothing about that that's privileged.  There

22  is nothing that is arguably privileged in that.  That is basic

23  information, it's factual information, so they should be able

24  to provide those components to us now.  They should produce

25  the letters to Your Honor in camera to -- and make whatever

1    argument they're going to make as to why it's privileged.

2         There's nothing for us to say because we won't have

3    seen them, and then Your Honor I think can make a decision as

4    to whether or not the letters can be redacted and produced,

5    whether they could be produced in whole or whether or not we

6    just need the information that we've asked for today.  I think

7    that's a reasonable approach to this issue.

8         MR. REEFER:  Judge, respectfully, I think the

9    plaintiffs are putting the cart before the horse.  I think

10   Your Honor has already identified, you know, the flaw in the

11   argument.  If you look at *Major Tours,* Your Honor is correct

12   that before the Court entered the order to produce the

13   litigation hold, there was already evidence of the spoliation.

14        The spoliation doesn't relate to the failure to

15   adhere to a litigation hold.  The spoliation refers to when

16   was the duty to retain relevant evidence in place, when was

17   litigation reasonably foreseeable.

18        And so in this instance, plaintiffs have not come

19   anywhere close to showing spoliation as that precondition to

20   the discovery that they're seeking, Judge.

21        The *Bull* case out of the Third Circuit clearly lays

22   out the four conditions, the evidence that's cited in the

23   plaintiffs' brief is, I think from 2016 or 2017.  There was no

24   suggestion of any litigation regarding nitrosamines or

25   Valsartan at that time.  There was no recall occurring at that

```
 1  time, and moreover, they haven't shown that any relevant

 2  evidence was discarded before litigation -- I'm sorry, after

 3  litigation became reasonably foreseeable.

 4          And with respect to the counterproposal that instead

 5  of producing litigation holds, the defendants just produce all

 6  contents of litigation holds, it would -- the proposal

 7  swallows the rule, Judge.  If we're going to give them the

 8  description of the scope of the hold, the recipients of the

 9  hold, when we issued the hold and, Judge, I'll represent on

10  the record, that at least with respect to Mylan, the

11  litigation hold was put in place by attorneys, and so --

12          THE COURT:  Do you have any objection or do the

13  defendants object to identifying who received the litigation

14  holds and the dates?

15          MR. REEFER:  Yes, Judge, I believe so.

16          THE COURT:  Why is that not relevant and why is that

17  privileged?

18          MR. REEFER:  It's privileged, Your Honor, because

19  that reflects the mindsets and thought process of the

20  attorneys who drafted the hold.  Respectfully, Judge, we are

21  engaged in a process right now in the identification of

22  relevant custodians.  The defendants are participating in that

23  process.  We've had an in-person meeting last Friday to

24  further that process.  The information itself, we are

25  providing.  There's no need to pierce what is a privileged
```

1    document in order to get at the same information.

2         THE COURT:  Let me ask you a question.  Suppose

3    plaintiffs are taking the deposition of Ms. Jane Doe who was

4    the quality assurance manager for your client, and the

5    plaintiffs ask Ms. Doe, did you receive a litigation hold

6    letter and when.

7         Do you object to that question on the ground of

8    privilege?

9         MR. REEFER:  I don't believe so, Your Honor.

10        THE COURT:  So why, then, can't plaintiff find out

11   tomorrow who was sent a litigation hold and the date?

12        MR. REEFER:  Because, again, Your Honor, it reflects

13   the process of the in-house counsel, the lawyers in

14   formulating that list -- it reflects --

15        THE COURT:  But my question is, why is it okay to ask

16   it at a deposition, but not to give plaintiff that information

17   tomorrow?  If it's privileged tomorrow, isn't it privileged at

18   a deposition?  And you acknowledge it's not privileged.

19        MR. REEFER:  I'm sorry, Judge, I think I need to

20   retract my prior statement.  I would object, then, if that

21   question were posed.

22        MR. GOLDBERG:  I don't know that that question

23   wouldn't be objectionable and I'd certainly assert it on

24   that --

25        THE COURT:  On what grounds?  Is it privileged?

```
 1              MR. GOLDBERG:  I think it does reflect --
 2              THE COURT:  Why?
 3              MR. GOLDBERG:  Because that's my client and --
 4              THE COURT:  That's your client.
 5              MR. GOLDBERG:  If that litigation hold letter went
 6    from counsel to the witness, that reveals privileged
 7    communication.
 8              THE COURT:  The fact that the witness received the
 9    litigation hold letter is privileged?
10              MR. GOLDBERG:  I would think so, yes.
11              THE COURT:  Suppose -- suppose plaintiffs ask the
12    witness, what did you -- did you do anything to preserve
13    documents?  Is that privileged?
14              MR. GOLDBERG:  If the witness -- and I would instruct
15    the witness, to the extent you can answer without disclosing
16    privileged information, you can answer the question.
17              And if the witness says, you know, the only thing I
18    did was listen to my attorney, when I got a -- says to
19    herself, okay, that's the point.  I can say -- I can make that
20    objection.  To the extent you can disclose this information
21    without disclosing communications with your counsel, you can
22    answer the question.  Witness says, hmm, can't do that,
23    because the only thing I did was not do anything because my
24    attorney told me not to do anything, says it to herself.
25              THE COURT:  So is there any way for the plaintiffs
```

```
 1   then to find out if that witness preserved any information?

 2              MR. GOLDBERG:  Yes.

 3              THE COURT:  How?

 4              MR. GOLDBERG:  When there's spoliation, and that's

 5   what the cases said.  Let them come to court when they have

 6   evidence of spoliation and then that witness needs to say, how

 7   come on the record, you told us you didn't destroy a document

 8   when you did.  That's the whole point here.

 9              We cannot let the cart get before the horse.

10              THE COURT:  Okay.  All right.  Thank you.  I don't

11   need to hear anything else, Mr. Slater.

12              MR. SLATER:  Please.

13              THE COURT:  Okay.

14              MR. SLATER:  30 seconds.  There's evidence of

15   spoliation in this case.  We gave it to Your Honor.

16              THE COURT:  No, there isn't.

17              MR. SLATER:  Where they have shredding bins and

18   shredding machines and the FDA for both Hetero and Mylan

19   finding that information was being destroyed.

20              THE COURT:  But in fairness, Mr. Slater, I read, you

21   know, I read the papers, I read the master Complaints, it's

22   true that -- it's true that there are references in those

23   papers to shredding and et cetera, et cetera, in 2016, maybe

24   even in 2017, but the fact of the matter is, I'm not ruling on

25   this issue, but I think it probably will turn out that the
```

1  trigger for litigation is when this contamination was

2  discovered in July '18.

3        So if the duty to preserve did not arise until

4  July 2018, there can be no spoliation because something may

5  have been destroyed in 2016 or '17, and I think based on the

6  record, it's -- it would be very problematic at this time --

7  I'm not saying it's impossible in the future, but at this time

8  to argue that the defendants could foresee this litigation in

9  2016 and 2017.

10        MR. SLATER:  We don't know what they foresaw yet.  We

11  will find out.  We may find out that there was a litigation

12  hold issue in 2015 because somebody was actually thinking

13  about what could happen.

14        THE COURT:  Maybe.

15        MR. SLATER:  So that's why we need to know.  The

16  other thing is, I wanted to bring to your attention.  There

17  were third parties to this litigation who likely have very

18  important information and documents.  Consultants they brought

19  in to do testing, analysis, who created some of the

20  manufacturing processes, et cetera.  Did they get the

21  litigation hold, what did they do, et cetera.  So I just

22  wanted -- I know Your Honor knows that but I just wanted to

23  make it clear.  Thank you.

24        THE COURT:  All right.  Moving along.  Let's go to

25  the issues where defendants took the lead first, first issue,

1    extent of discovery regarding foreign regulatory materials and

2    communications.  Keep in mind, Counsel, the Court read the

3    papers.  I think it understands the issues.

4         Mr. Goldberg, is there anything you want to add to

5    what's in the papers?

6         MR. GOLDBERG:  This is your issue.  This is foreign

7    regulatory.

8         MR. REEFER:  Judge, I think context is important

9    because we're dealing under Rule 26 with both relevance and

10   proportionality, and we've discussed at some length some of

11   the issues with regard to the processes in the facilities, but

12   what hasn't been mentioned is that Mylan, for example, markets

13   Valsartan finished dose medications in 46 countries and has

14   been -- received approval from 14 regulatory bodies.

15        THE COURT:  Let me ask you this hypothetical.  The

16   European agency, what is it, EMA or --

17        MR. REEFER:  Yes, Your Honor.

18        THE COURT:  Okay.  EMA did an inspection of Mylan's

19   plant in February 2018, and -- this is hypothetical -- and

20   discovered all sorts of problems.  They are a foreign

21   regulatory agency body.  Is not that inspection report

22   relevant to the case?

23        MR. REEFER:  Not necessarily, Judge, no.

24        THE COURT:  Suppose, again, purely hypothetical,

25   suppose that inspection report says, be on the lookout for

 1   NDEA contamination because of X, Y, Z.  Hypothetical, I'm

 2   making that up.

 3        Foreign regulatory inspection under defendants'

 4   proposal, that wouldn't be produced, right?  Is that not

 5   relevant to the case?

 6        MR. REEFER:  I think, Judge, like I said, the

 7   argument is twofold.  One is relevance and one is

 8   proportionality.

 9        THE COURT:  Might there be certain categories of

10   information that are so important and relevant that they have

11   to be produced even though they're coming from a foreign

12   regulatory body?

13        MR. REEFER:  That category of documents, Your Honor,

14   would be very, very narrow.  But hypothetically, yes.

15        THE COURT:  Let me hear from the plaintiffs and I

16   guess my question to the plaintiffs is this.  The Court has

17   and will order fulsome discovery from the FDA, no question

18   about it.  What material information might exist in foreign

19   regulatory bodies that you're not going to get from the FDA,

20   especially since I read in the papers, there's a sharing

21   agreement amongst the different agencies for anything related

22   to this recall issue, and is it really likely that any other

23   defendants, Mylan, Teva, ZHP, whatever, would give information

24   to the European agency that's relevant to the case that they

25   wouldn't give the FDA.  Because if the FDA has it, you're

```
 1   going to get it.  How do you answer that?
 2          MR. NIGH:  Well, I think very basic, I think it's
 3   important to understand that if it goes to notice, and the
 4   defendants already conceded this, if it goes to notice, that's
 5   -- those are those lines of cases where this information from
 6   foreign regulatory agencies is discoverable.
 7          THE COURT:  It's relevant.
 8          MR. NIGH:  It's relevant.
 9          THE COURT:  It may not necessarily be discoverable.
10          MR. NIGH:  It's relevant.
11          THE COURT:  It's relevant, but my question is what
12   are you going to get from a foreign regulatory agency that
13   you're not going to get from the FDA?
14          MR. NIGH:  So when we look at the four different
15   types of notices -- and I think it's important to understand
16   that.  First, their limited definition is when you actually
17   discover NDMA contamination.  But there are three other types
18   of notices that we know -- contamination, that you see in
19   contamination cases that are -- and are here as well.
20          It would be when you start to receive abnormal
21   testing or customer complaints that are received, such that
22   when you take a look at those, you could see a trend.  They
23   were -- information that had you investigated further, you
24   could have become aware of this problem.  That's another one.
25          Another -- so that would go to testing and/or DMF of
```

 1    these other drug processes, for example, that we talked about

 2    earlier, where if another country, they're selling this to

 3    another country, the other country has the DMF for one that's

 4    not contaminated, we -- that would be important for us.

 5           If we were to see the testing levels for one that's

 6    not contaminated versus one that's contaminated, because we

 7    can compare the two and we can see what's the difference, that

 8    would give us some insight as to how the contamination

 9    occurred.

10           THE COURT:  Do you know how many different foreign

11    regulatory agencies, bodies, what have you, might have

12    hands-on contact with the manufacturer's facilities?

13           MR. NIGH:  Well, there's at least 15.

14           THE COURT:  Okay.  And you want discovery from all

15    15?

16           MR. NIGH:  Yes.

17           THE COURT:  Now, do you -- I guess this is my

18    question:  What are the odds that there is any material

19    relevant information that is in the hands of those 15

20    regulatory bodies that is not in the hands of the FDA, given

21    the worldwide attention, given this problem.

22           MR. NIGH:  Well, we see it all the time.  I mean,

23    I've seen it in other litigations all the time, that one

24    foreign regulatory agency has information that the FDA doesn't

25    have.  And because there is information being shared --

```
 1          THE COURT:  The biggest Class 1 recall in history?
 2          MR. NIGH:  Well, this is the biggest Class 1 recall,
 3   so I can't say other cases.  But I would say that when we come
 4   to information here -- and another part is, we talked about
 5   sharing.  So that's 11 of the foreign regulatory agencies.
 6   But there are four that don't share.  We've got China, India,
 7   Israel.  They're not a part of that agreement.  So just to
 8   assume if they give information to China, that that
 9   information made its way to the FDA, I think that's an
10   illogical assumption, that the FDA is going to have all the
11   information that China's regulatory agency has or that India's
12   regulatory agency has.
13          So the other types of notice that I think are
14   important.  When you're notified that you are engaging in
15   risky behavior that can lead to increased chance of
16   contamination, so that would be like a violation of good
17   manufacturing practices.
18          So whether or not the FDA has every single inspection
19   report, I don't know that they do and that's something that we
20   wouldn't know unless we were to look at some of these other --
21   if we had an order that said all inspection reports from the
22   other regulatory agencies, then we would be able to see if
23   they have the same inspections.
24          THE COURT:  So you want the Court to order all of
25   that to be produced even though the FDA may already have it?
```

```
 1          MR. NIGH:  Yes.

 2          The other one would be, you know, another example

 3  with the notice, utilizing a solvent like DMF that is known in

 4  the industry to be risky and often riddled with contamination

 5  problems.  This would go to the fourth notice, which is type

 6  2.  When you're first developing a drug and you have that risk

 7  assessment that takes place when you first develop the drug,

 8  that's when a lot of times here you look at the chemistry of

 9  it, and we've already seen publications already where chemists

10  would come out with this issue and said, had they looked at

11  the chemistry on the front end, they would have been aware

12  that they should be on heightened alert with the potential of

13  NDMA formulation.

14          Well, this is important too because this was marketed

15  overseas before it was marketed here in the U.S.

16          THE COURT:  Can you identify for me any specific type

17  of document and any specific regulatory body that in your view

18  is important to this case?

19          MR. PAREKH:  So the three regulatory bodies that are

20  very, very important are the regulatory bodies where the

21  manufacturing facilities were; China, India, Israel,

22  obviously, because they had much more hands-on inspections and

23  ability to inspect than the FDA did.

24          MR. NIGH:  And we don't have -- the FDA does not have

25  a sharing agreement with those.
```

```
 1            THE COURT:  So would you be happy just getting the

 2  inspection reports?

 3            MR. PAREKH:  So let me go a little bit more.  So

 4  inspection reports for those, obviously, any testing results

 5  that were communicated back and forth from those entities

 6  would be very important to have.  And also the processes that

 7  they used to get approval from those bodies to manufacture

 8  these, and what they told those bodies versus what they told

 9  the FDA they were doing is also very important.

10            Because we've seen in other cases where -- for

11  example, in Abilify, which we just finished, we saw that what

12  the defendant was telling the EMA was different than what they

13  were telling the FDA in the same type of submission.

14            And so until we know what they were telling these

15  bodies, we don't know what they have.  In addition to those

16  three, India, China, and Israel, both the EMA and Canada did

17  independent testing of Valsartan and so those results and what

18  tests they did may or may not have been communicated to the

19  FDA.

20            The other problem with saying, well, they were all

21  communicated to the FDAs, we don't have access to what the FDA

22  has.  We have FOIA requests.  We can get some information from

23  what the FDA got from other regulatory agencies, but it's not

24  like we can ask the FDA, hey, please produce to us everything

25  that you got on Valsartan that you got from other regulatory
```

```
 1    agencies.  They don't -- one, it's a burden that they don't
 2    want to do, and two, they have to spend the time to redact all
 3    of that information.  So at the end of the day, we get
 4    redacted documents.  If we get them directly from the
 5    defendants, we don't have that issue.
 6              THE COURT:  Okay.
 7              MR. SLATER:  Your Honor, one last thing.  You asked
 8    the question of what -- is there a likelihood we'll get
 9    different information.
10              THE COURT:  Materially different information.
11              MR. SLATER:  Yeah.  And the answer is a hundred
12    percent yes, because A, those products were being sold, I
13    think for the most part, in other countries before the U.S.
14    So the dates on which the interactions took place, I would
15    say -- I'll say are close to a hundred percent and the
16    probability is going to be different.  So when was notice and
17    when were things being discussed specifically germane to the
18    issues in this case, it's going to be different because the
19    interactions took place at different times, and that's going
20    to be critical.  As Mr. Parekh just said, what did they tell
21    those foreign regulatory agencies, and was it the same or
22    different.  In the Abilify case which was just mentioned, the
23    labels were changed for that drug, which Judge Rodgers handled
24    that MDL, four or five years or more before they were changed
25    in the U.S. because different information had been provided to
```

 1    Europe than to the FDA.  So the FDA didn't have the

 2    information and Europe said, you have to change these labels

 3    and start warning of these side effects years before they were

 4    warned of in the United States.

 5            So there's no expectation that identical information

 6    was being provided and, in fact, there may be communications,

 7    especially perhaps in China where something was mentioned in

 8    some back and forth but there wasn't the incentive to push it

 9    years before they went to market in the U.S.

10            So there's very good reason to produce these

11    documents.  The burden -- you haven't heard anything to

12    establish a burden.  Relevance has already been established

13    and agreed to.  So we need the documents that Your Honor

14    believes and we've defined what they're most important,

15    inspection reports, purity, testing.  That's what we need to

16    know.  And when I say "purity" --

17            THE COURT:  What's purity?

18            MR. SLATER:  Bioequivalence.  Purity has to do with

19    whether there's contamination or not.  Because again, there

20    may be findings on tests that are not labeled as this is what

21    this is, but they're aberrant and they require investigation.

22            THE COURT:  Okay.  No. 2 is done.

23            No. 3, the extent of discovery regarding each

24    applicable defendants' finished dose manufacturing process.

25    Anything you want to add to the papers?

          1          MR. RUBENSTEIN:  No, just that, you know, we're not

          2     trying to say that any --

          3          THE COURT:  I'm sorry, I skipped an issue.  I

          4     apologize.  We'll get there.

          5          MR. RUBENSTEIN:  Okay.

          6          THE COURT:  2, the extent of discovery regarding

          7     foreign sales, marketing, and agreements.

          8          Defendants, anything you want to add to what's in the

          9     papers?

         10          MR. REEFER:  Judge, I think the briefs are laid out

         11     there pretty well.

         12          The only thing I would mention, Judge, is that the

         13     stated justification that plaintiffs provide for, you know,

         14     what could be construed as a very broad category of discovery,

         15     which is foreign sales and marketing, that the retort is,

         16     well, how would we know if a customer, presumably a finished

         17     dose customer like Novartis, would have alerted the API

         18     manufacturer of an issue if we're not entitled to this very

         19     wide swath of information.  And the response I would have to

         20     that is, if that's what the plaintiffs are looking for, if

         21     they would like the defendants to produce core communications

         22     from customers relating to what's referred to in the papers as

         23     aberrant spikes in chromatographs, that's something that we

         24     would be willing to reproduce, but the problem is, you know,

         25     going beyond that, there's no justification for it, there

 1    hasn't been any stated justification for it, and so with that

 2    proviso, Judge, I think the papers lay it out there.

 3         THE COURT:  Thank you.  Anything you wanted to add to

 4    that?

 5         MR. PAREKH:  Just a couple of things.  One is -- I

 6    mean, we're not asking for every single piece of sales

 7    information and every single piece of marketing data.  That's

 8    not what the RFPs ask for.  And so, you know, the things that

 9    we're looking for are what we laid out in the brief, which is

10    communications between either end users or, you know,

11    somewhere along the supply chain, talking about things like

12    out-of-spec situations where they've returned product.  We

13    know that that happened.  We don't know who that happened

14    with, because that information is redacted, and if they

15    happened to be foreign customers, according to defendants'

16    position, we don't get any of that.  I mean, their position in

17    their brief.  They stated a different position at this point,

18    saying that they will provide some of that.  But we need to be

19    able to pin that down.

20         The other aspect of it is we also need to know what

21    the process differences are between some of these customers.

22    For example, the process that was used for sale to customers

23    in Japan, specifically, required one extra step in the solvent

24    quenching process -- I think it's the quenching process --

25    that apparently resulted in an end product with no NDMA

```
 1   impurity.   Why was that used solely for the Japanese

 2   customer?  What did the Japanese customer know that other

 3   people didn't?

 4            THE COURT:  So why are you just bringing this issue

 5   to the Court's attention now, and why wasn't this issue in the

 6   extensive letter briefs the Court received?

 7            MR. PAREKH:  It was in the letter briefs.

 8            THE COURT:  It was?

 9            MR. PAREKH:  Yes.

10            THE COURT:  Specifically referring to Japan?

11            MR. PAREKH:  It didn't refer to Japan.  We had to do

12   some digging to figure out that it was Japan, but I think that

13   happened last night, and I apologize, but we did put in that a

14   customer had this, we just didn't know that it was Japan at

15   that point, or we missed it, and I apologize.  But, you know,

16   we know that that happened.  We don't know as to other

17   customers, whether or not they had their own specs.  We

18   believe one of the other customers, Par, actually was buying

19   ZHP's product using Process 1 when ZHP discontinued Process 1,

20   Par decided that we're not going to buy API from ZHP anymore.

21   It would be really good to know why they decided that.  What

22   about their Process 2 did Par not like?  What did they know?

23   What did they communicate to ZHP about it?

24            I mean, these are just things that we gleaned from

25   bits and pieces in the core discovery.  We don't know what we
```

1    don't know a lot of the time.  This is us trying to piece

2    together that puzzle.  That's why we need this information.

3           THE COURT:  Issue 4, the extents of discovery

4    regarding Valsartan testing.

5           Oh, I'm sorry, here we go again, I skipped one.

6           3, the extent of discovery regarding each applicable

7    defendants' finished dose manufacturing process.  Back to

8    Teva.

9           MR. RUBENSTEIN:  Right.  So, you know, we're not

10   saying that documents are wholesale barred from the finished

11   dose manufacturers.  You know, things like the API testing,

12   the certificates of analysis, quality complaints, they would

13   clearly be discoverable, but in terms of the actual, you know,

14   nuts and bolts converting, formulating the API from the API

15   into the finished dose pill, you know, they've asked for

16   documents identifying, you know, patented machinery that was

17   used and, you know, all the external excipients and inactive

18   ingredients, things like that that were used.  You know,

19   that's clearly irrelevant, overly burdensome, you know, not

20   going to lead anywhere.

21          You know, we keep talking about inspection reports

22   and things like that.  So, you know, these manufacturing

23   facilities for the finished dose, they make dozens if not

24   hundreds of products.  So if there's an inspection report or

25   an observation about a product that's completely unrelated to

1    Valsartan, we don't see why that that's relevant because, you

2    know, it's not connected to Valsartan or, you know, detection

3    of impurities or anything like that.  So we don't see how

4    something like that would be relevant if it's, you know, about

5    a completely different drug, because like I said, these

6    facilities make dozens if not hundreds of different products.

7            So, you know, we're just trying to reign in the scope

8    here.  You know, clearly, there's going to be some things that

9    are discoverable but clearly there's -- requests they are

10   beyond the pale.

11           THE COURT:  You're not taking the position that all

12   discovery regarding the finished dose manufacturers is off

13   limits --

14           MR. RUBENSTEIN:  No.

15           THE COURT:  -- it just has to be focused and relevant

16   to the case.

17           MR. RUBENSTEIN:  Correct.

18           THE COURT:  All right.

19           Plaintiff?

20           MS. HILTON:  Your Honor, if I may, I'm glad to hear

21   that the finished dose manufacturers are committing to some

22   production, but, you know, first of all, I think, you know, I

23   need to make the point that API manufacturers in this case are

24   also finished dose manufacturers and so they have taken the

25   position that they are some separate and silent entity and,

```
 1   therefore, not required to do the same amount of discovery in
 2   into their finished dose practices as a Teva or a Torrent or
 3   an Aurolife.  So that's our first issue here.  We want to make
 4   sure that both the API manufacturers are going to commit to
 5   the same level of discovery of their finished dose facilities,
 6   as the finished dose manufacturers, because API manufacturers
 7   are finished dose manufacturers.
 8          So, that's sort of like a -- we have a schism up
 9   there, and so that's something that, you know, we sort of seek
10   the Court's --
11          THE COURT:  Correct me if I'm wrong, but I was
12   assuming that although it may be one facility, the API
13   manufacturing and the finished dose manufacturing are
14   segregated.
15          MS. HILTON:  They are, Your Honor.
16          THE COURT:  So, it's not like if the FDA comes and
17   does an inspection, they necessarily will do both at the same
18   time.  They might do one and not the other.  That was my
19   assumption, I don't know, but it's not like it's one -- maybe
20   I'm wrong.  I didn't assume it's one big room where everything
21   is done finished dose and API manufacturing.
22          MS. HILTON:  You're correct, Your Honor, but the --
23   you know, I'll state this, finished dose manufacturers in core
24   discovery produced establishment inspection reports for their
25   finished dose manufacturing facilities.
```

1          API manufacturers are of the position that they are

2    not required to produce this discovery at all.

3          And so this is the schism we have.  So we're trying

4    to seek a commitment that first of all before we decide what

5    finished dose manufacturers are going to produce, that API

6    manufacturers are going to fall in line with what the other

7    finished dose manufacturers are producing when we decide what

8    that scope is.

9          THE COURT:  You want it to be coextensive?  In other

10    words, whatever the API produces, the finished dose produces?

11          MS. HILTON:  No, I want it to be whatever the

12    finished dose produces, the API produces.  Because the way

13    that -- you know, my understanding of it is, and like everyone

14    in this room, I'm not a process chemist, but, you know, the

15    API is made in one facility.  It is then shipped to another

16    facility where it is tested, you know, you go -- stability

17    testing, the chromatography, it is then manufactured in a pill

18    and then distributed, right?  API manufacturers, as I

19    understand it, and they can surely correct me if I'm wrong,

20    are saying that they are only going to produce documents

21    related to the API and not what happens once the API leaves

22    and arrives at their finished dose facilities, whereas the

23    finished dose manufacturers, Teva, Torrent, Aurolife, have

24    comitted to producing documents at these finished dose

25    facilities, and so that's the schism that we find ourselves

1    in.

2            THE COURT:  Okay.

3            MS. HILTON:  And that's just -- that's just the

4    larger issue, but we also have issues of what the finished

5    dose manufacturers would produce, which is to say, you know --

6            THE COURT:  What do you want?

7            MS. HILTON:  Well, first of all, with respect to --

8    you know, I was a participant in the request for production,

9    the meet and confers on manufacturing.  You know, surely at

10   this point in time, like you've said, can't commit to what we

11   don't know, what we don't know happens at the finished dose

12   process, but there are key documents that we can receive.

13           THE COURT:  Such as?

14           MS. HILTON:  Such as establishment inspection reports

15   that list all of the exhibits that are provided by the

16   finished dose manufacturer.

17           THE COURT:  What else?

18           MS. HILTON:  Quality assurance documents, standard

19   operating --

20           THE COURT:  Wait a minute.  See, quality assurance

21   documents, you want to know if it's the right color or the

22   right size or the right weight?

23           MS. HILTON:  I think when I say "quality assurance

24   documents," you know, we want to know specifically, and I'm

25   not limiting it to this, but we want to know what they are

1    going to do when they receive the API, what is the testing

2    protocol for that, what is the model testing protocol, what

3    are they supposed to do when they notice an aberrant peak with

4    respect to the API.  Are those testing protocols validated.

5    All of these things go to, you know, back to the issue of

6    Novartis.  How did Novartis identify a problem when all of the

7    defendants did not?

8         And so that's sort of -- that discovery will help

9    inform upon whether there is some aspect of the finished dose

10   manufacturing that may be implicated.  But we need to see

11   those deviation reports, we need to see, you know, those

12   out-of-spec testings and out-of-trend testings before we can

13   make a determination as to, you know, whether we don't need X,

14   Y or Z, and that's what we told the defendants in our meet and

15   confer, with respect to the API manufacturing, too.  We have

16   to understand where the problems are being presented before we

17   can start limiting.

18         THE COURT:  Okay.  Next.  Extent of discovery

19   regarding Valsartan testing.  There is no issue regarding the

20   -- pronouncing it right, chroma --

21         MR. GOLDBERG:  Chromatography, Your Honor.

22         THE COURT:  Chromatography.  Is there an issue with

23   bioequivalence?

24         MR. GOLDBERG:  I don't think there is.  I just think

25   when it gets to chromatography, chromatography could be used

1    in different ways and what we're talking about, where we think

2    the focus should be is with respect to impurities, like

3    nitrosamines and potentially residual solvents, because we're

4    using a solvent, Mylan is using a different solvent, but that

5    should be where the chromatography testing focuses and then

6    the bioequivalence to the extent it hasn't already been

7    produced, and mind you, most of it's been produced because

8    that is in the DMFs and what we communicate with the FDA on.

9    But that's where we think it should be.

10           THE COURT:  Plaintiffs, is that a good place to

11    start?

12           MR. WILLIAMSON:  Well, that's a good starting point,

13    Your Honor, but I believe that, again, we don't know what we

14    don't know.  What we would like for the defendants to do is to

15    produce a list of all of the testing that is performed at

16    their facilities.  We can then take the list to our experts

17    and have our experts review and tell us whether they believe

18    in addition to what they've already agreed to give us if

19    anything else is relevant and we can meet and confer with the

20    defendants and if we both agree, then there'll be productions.

21    If not, we can come back to Your Honor on December 11th or

22    whenever you advise us to do that and we will say, Your Honor,

23    we need X, Y and Z because of this.

24           THE COURT:  Got it.

25           MR. GOLDBERG:  Your Honor, just one point on that

1    list.  We produced, and I'm sure it's with the other

2    manufacturers, a list of the kinds of things we test for.

3    It's not a mystery.  This is Page 9782 of Prinston's

4    production.  They have experts.  Their experts should know if

5    testing about appearance or solubility or identification are

6    things that would bear on testing about impurities.  So that

7    list is there.

8            THE COURT:  All right.  With regard to this list, and

9    we're getting to the end, 7 and 8, I, Court, understands have

10   been -- are agreed upon.  So the last issue, and I'm glad

11   we're saving it for last and then we'll take a break, is the

12   relevant time period for the custodial search, and I've

13   already confessed that this is the issue the Court needs help

14   with.

15           I think a good place to start is let's, for each

16   defendant that we're talking about, find out what the proposal

17   is from each side.

18           So Mr. Goldberg, ZHP, what are you proposing?

19           MR. GOLDBERG:  Your Honor, ZHP proposes that --

20           THE COURT:  Just give me the date.

21           MR. GOLDBERG:  Sure.

22           THE COURT:  And then we'll come back to argument.

23           MR. GOLDBERG:  I would say January 1st, 2015 for

24   general custodial discovery with respect to the document

25   request and how the Court rules as to those things.  With

 1    respect to manufacturing specific questions, questions about

 2    chromatographic testing, about impurities, bioequivalency, to

 3    the extent we can be specific and go back in a manufacturing

 4    process, we acknowledge that we have made a change in

 5    December 2013, we acknowledge that change started in 2011, and

 6    if there are specific questions about the process even before

 7    2011 -- granted, it should be very specific as to the

 8    pertinent issues, we think we can go back there.  But for

 9    general discovery, January 1, 2015, because any of our API

10    only could have been sold in the U.S. after that point in

11    time.

12              THE COURT:  Plaintiff, we'll start with the date,

13    we're going to circle back to the argument.  What date are you

14    proposing?

15              MR. HONIK:  Your Honor, the date we propose coincides

16    with the first Drug Master File application, would be

17    September of 2007, and in point of fact, certain of the

18    questions we've propounded or requests for documents predate

19    that.

20              And the reason that we've done that, if you want to

21    hear a little argument on that.

22              THE COURT:  Can we come back to argument?

23              MR. HONIK:  Yes, we can.

24              THE COURT:  I just want to get this list.

25              Mylan, what are you proposing?

```
 1            MR. REEFER:  Judge, we propose September 21, 2012,
 2   the date that the first finished dose product was approved by
 3   FDA for market in the United States, with the proviso that in
 4   core discovery we all be produced three ANDA files and the
 5   DMF, which sheds light on the process development issues.
 6            THE COURT:  What are you proposing for Mylan,
 7   plaintiffs?
 8            MR. HONIK:  Your Honor, let me just point out
 9   something generally for each of these.  The answer in every
10   instance is whenever their research and development began
11   related to their manufacturing process.  In the case of API,
12   when they did the research that led to their submission of
13   their Drug Master File.
14            In Mylan's case, they did that in August of 2006, and
15   that's not a hard cutoff and we need to articulate that the
16   starting date in our mind is when the run-up to that occurred,
17   when they were doing research and development activities --
18   and this is true for all the defendants, whether finished dose
19   or API, where they were deliberating on the choice of a
20   solvent, the choice of catalyst, the risk benefit profiles,
21   inspecting, for example, the patent that Novartis had as the
22   innovator.  All of that consideration that the defendants had
23   is directly germane to the issue in this case and nothing
24   exemplifies it, frankly, more than the ZHP example that
25   Mr. Nigh spoke to earlier.
```

1          I have may engendered some confusion by using the

2    term "DMF" because there's DMF solvent and there's the Drug

3    Master File.  And what I had meant to convey -- and this is

4    very important to illustrate our thinking about the timeline

5    here.

6          In 2007, when they first received approval for

7    Process 1, which did not use DMF, they had no problems with

8    contamination.  Lo and behold, with the beginning of Process 2

9    in 2010 and then the second iteration of that, in both

10   instances, they did have a problem.

11         Our experts need to understand why they didn't have a

12   problem with Process 1, which in ZHP's case goes back to 2007

13   and understand what their research and development told them

14   in the run-up to that, about that process, which was

15   apparently a good process, it didn't produce impurities.

16         So, what I'm getting at is I can tell you, when they

17   either put in their ANDAs or put in their DMFs with FDA, but

18   we think with respect to those processes, we need to have the

19   research and development that led up to that.  So I can give

20   you the date, but in point of fact, we want the period that

21   led up to that as well.

22         THE COURT:  So I wrote down August 2006, but you may

23   want earlier than that.

24         MR. HONIK:  Yes.  And our request for production is

25   specific.  So in the handful that we focus on around the ANDA

1    filing, we are specific and use words not dates to suggest

2    that we want your research that led up to certain components

3    of their ANDA filing, because that's their representation to

4    the regulatory body saying, this is how we want to make this

5    pill, this is the possess we want to employ, these are the

6    quality controls that we want to use and we -- and our experts

7    need to understand what that was, what their thinking was,

8    what the basis for that approval was.

9           THE COURT:  I got it.

10          MR. HONIK:  So long-winded way of saying, yes, the

11   ANDA filing for Mylan was August of 2006.

12          THE COURT:  Teva, what's your proposed date?

13          MR. RUBENSTEIN:  So, the first time that Teva ever

14   sold a Valsartan drug in the United States was March of 2013,

15   and we propose to go back to January 1st of 2013 for the

16   run-up to the launch for whatever testing of API for the

17   product that was going to ultimately be sold would have been

18   happening.

19          THE COURT:  And plaintiff?

20          MR. HONIK:  Teva was a second filer.  In January of

21   2005 they did a ton of research and development with respect

22   to that Abbreviated New Drug Application.

23          THE COURT:  Got it.

24          MR HONIK:  But we'd like to see the run-up to that as

25   well.

```
 1              THE COURT:  Torrent?

 2              MS. NAGLE:  Torrent proposes January 21st, 2014,

 3    which is a few months prior to the first time that Torrent

 4    sold Valsartan in the U.S.

 5              THE COURT:  And plaintiff as for Torrent.

 6              MR. HONIK:  Their ANDA filing was in June of 2009 and

 7    we'd like the run-up data and research on that as well.

 8              THE COURT:  Okay.  Is there a party Aurolife.

 9              MS. HEINZ:  Yes, Your Honor.

10              THE COURT:  Sorry, I forgot all about you today.

11              MS. HEINZ:  No problem.  Jessica Heinz.

12              We took the position that the relevant time period is

13    March 21st, 2013.  That's when our first ANDA was approved by

14    the FDA for a Valsartan product.

15              THE COURT:  And plaintiffs' date for Aurolife?

16              MR. HONIK:  Your Honor, we have yet to receive any

17    discovery regarding Aurobindo Limited and thus we don't know

18    the date on which the Indian entity filed its DMF for

19    Valsartan API.  So we don't know with any degree of certainty,

20    but at a minimum we should begin at sometime prior to June of

21    2010, certainly.  And that's the date by which the U.S. entity

22    submitted their ANDA submission to the FDA.  But it could be

23    earlier.

24              THE COURT:  Okay.  Let's circle back.

25              Is ZHP now -- you're proposing general custodian
```

1    January 1, 2015 testing, may go back to 2013 or 2011.  The

2    2015 date, that is what?

3         MR. GOLDBERG:  That's triggered by the ANDAs that

4    were -- the ANDA that was approved for our finished dose and

5    that the API that we supplied was approved with the ANDAs.

6    Like Torrent's ANDA happened in 2015.

7         So any of our API could only have been sold in the

8    U.S. after January 1, 2015.

9         THE COURT:  But before that, ZHP was selling API

10   around the world?

11        MR. GOLDBERG:  Not in the U.S.

12        THE COURT:  When did it start selling API around the

13   world?

14        MR. GOLDBERG:  That, I don't have the answer to now.

15   I can certainly get that to you.

16        THE COURT:  Do you know, plaintiffs?  But plaintiffs

17   are saying that it was --

18        MR. HONIK:  We don't know the precise date.  I

19   presume it predates 2007.

20        THE COURT:  That's what I was going to say.  At least

21   as to --

22        MR. HONIK:  At least as far back at 2007.

23        THE COURT:  Okay.  And the plaintiffs propose

24   September 2007 because that was the date of the first DMF --

25        MR. HONIK:  Correct, to the FDA.

```
 1              THE COURT:  Okay.  And Mylan is proposing

 2    September 21, 2012, because that's the date of FDA approval

 3    for sale in the U.S.?

 4              MR. REEFER:  Correct, Your Honor.

 5              THE COURT:  Were they selling finished dose Valsartan

 6    somewhere else before that date?

 7              MR. REEFER:  I don't know, Judge, frankly.

 8              THE COURT:  But you want, plaintiff, August '06?

 9              MR. HONIK:  Yes, sir.

10              THE COURT:  Because -- at least August '06 because

11    the problem --

12              MR. HONIK:  That's when the ANDA filing occurred.

13              THE COURT:  Teva, January 1st, 2013, that's a little

14    before the start of actual U.S. sales?

15              MR. RUBENSTEIN:  Correct.

16              THE COURT:  And when was ANDA approval?

17              MR. RUBENSTEIN:  In May of -- I'm not exactly sure.

18              MR. HONIK:  The ANDA was substantially completed

19    January 7th, 2005.

20              MR. RUBENSTEIN:  But that's not when it was approved.

21              MR. HONIK:  That's when it was substantially

22    completed, where the approval is largely irrelevant, but the

23    work that Teva did in supplying the information to the FDA was

24    complete by 2005.

25              THE COURT:  So let's use Teva as an example.  The
```

1    parties are disputing whether discovery should be produced

2    between January '05 and January 2013.  That's a long time.

3    That's eight years.  What are you looking for during that

4    eight years that wouldn't be produced if we used the start

5    date as January '13?

6          MR. HONIK:  We would be losing all of the information

7    that Teva researched and developed in evaluating the process

8    for making the pill that they put into this marketplace.

9          We know, because of the process of building into an

10   ANDA, that the company invariably had to do extensive

11   evaluation of processes and evaluation of, for example, the

12   innovator patent.  All of that is spadework that all of these

13   companies do in the run-up to it.

14         And so if it's true what Mr. Goldberg has suggested

15   all along, that this is about the manufacturing process, the

16   choices that were made surrounding that, the solutions that

17   were employed, the solvents that were employed, we need to

18   understand the thinking that went into the company's choices

19   and the thing that would most reveal that to us, as far as we

20   can see, would be the support for their Abbreviated New Drug

21   Applications.

22         THE COURT:  So suppose, hypothetically, when we

23   identify the custodians for Teva, I don't know how many, let's

24   just pick a number, 10, out of X number, people who worked in

25   the laboratory and the quality control department, you're

 1   saying to Teva, because we want to know how you developed this

 2   manufacturing process back to January '05, these people who

 3   had nothing to do with that, we're going to search eight years

 4   worth of their records.  Right?  Because you want January '05,

 5   Teva wants January '13 and that's eight years.  You're

 6   interested in the manufacturing process.  Suppose these

 7   quality assurance people and laboratory people who had nothing

 8   to do with the manufacturing process, you're saying to Teva,

 9   they have to search those eight years of records?

10        MR. HONIK:  Well, if I understand the hypothetical,

11   Judge, it will be self-limiting because we're going to agree

12   separately to search terms, and if under your hypothetical

13   they've had nothing to do with it, then nothing will come up.

14        THE COURT:  No, nothing will come up, but they still

15   have to search.

16        MR. HONIK:  But your hypothetical says -- we're

17   talking about these 10 custodians, right?  And we're going to

18   agree at some point, or the Court will direct appropriate

19   search terms and the question is how far back do you have to

20   go in the database.

21        THE COURT:  Exactly.

22        MR. HONIK:  And, yes, I would -- I want them to go

23   back to the point in the company's history when it was

24   weighing and considering all the options about how they were

25   going to manufacture this bill and it will be self-limiting if

 1    indeed one of the ten, in your hypothetical, if he or she

 2    doesn't have anything in their cache of data, then nothing

 3    will come up.

 4         But the question it seems to me is, should we have

 5    the right to ask to go back.  Is there some factual basis that

 6    supports the idea that going back to this more distant point

 7    in time -- I understand it's eight more years, it's not an

 8    insignificant period of time.  Is there a basis to suggest

 9    that there may be something there that is germane, if not in

10    this custodian, then in that custodian.  And because we know

11    in the run-up to an ANDA filing, not when they launched, but

12    in the development prior to the launch, that is -- we know it

13    from many cases reveals a great deal of their internal

14    thinking and weighing, should they use Process 1.  What's the

15    reason that Par said, we don't want the DMF solvent process,

16    we want the other process.

17         We know that much in this very case.  Are there other

18    customers, are there other experiences that these finished

19    dose manufacturers have that inform the way they elected to

20    support their ANDA.

21         It's relevant to go back and if there are no

22    documents, or it's -- you know, it will be self-limiting.

23         MR. SLATER:  Can I just add one thing to that?

24    Specific example.  During the process of developing these

25    manufacturing processes, they had to consider, for example,

 1   solvents.  They had to evaluate which ones we're going to use.

 2   Are we going to use reused solvents?  Are we going to use new

 3   solvents?  What are the risks?  What is the quality assurance

 4   evaluation?  Because, for example, we know a lot more about

 5   CHP at this point, because we had that meeting.  What was

 6   quality assurance's role in this?  What did they find?  What

 7   did they say; what were their concerns?

 8           I mean, the whole run-up is their body of knowledge

 9   that leads up to where we get to.  It's not like at a fixed

10   point in time everything starts.  It's not like a baby is

11   being born.  This is a process where it was being constructed

12   for years and years and their process is going to be relevant,

13   and it's clearly relevant, it's clearly very significant

14   because when we depose these witnesses, obviously we're going

15   to say, well, what went into this decision, and are we going

16   to get objections, you can only go back to 2013, January 1st,

17   even though the decision was made based on information they've

18   developed for six or seven or eight years before that.  That

19   would be inequitable and I think it would cut us off from

20   very, very directly relevant evidence.

21           MR. HONIK:  So to use a metaphor that Ms. Goldenberg

22   used last night, she said, the baby's baked by 2013, the

23   baby's baked.  And so we need to go back in this case, in

24   Teva's example, to 2005, when the baby was starting to be

25   created.

1          MR. RUBENSTEIN:  Your Honor, if the ANDA file was

2    submitted in 2005, to the extent there were any changes

3    between 2005 and March to that ANDA file, that would be in the

4    FDA correspondence with respect to that ANDA file, which the

5    plaintiffs have.

6          So, you know, I don't know what they're talking about

7    all these different solvents that need to be considered.

8    That's not in the finished dose product.  And, you know, quite

9    frankly, all that really matters is what did they come to

10   market with.  Not always considered seven years before they

11   came to market.  What did they sell on the market?

12         MR. HONIK:  Here's a perfect Teva example, and I was

13   reminded of this.  Teva at one point in time bought a

14   pharmaceutical entity called Cobalt, C-O-B-A-L-T, who bought

15   ZHP API.  They specifically requested Process 1 when Process 2

16   was in place.  They refused to take Process 2 for reasons we

17   suspect having to do with impurities associated with that

18   process.

19         That's a Teva entity.  If the Court cuts this off at

20   2013 or something close in time that's arbitrary, we will miss

21   that sort of judgment making on the part of Teva, a defendant

22   in this case.

23         There's a reason their predecessor company which they

24   acquired requested Process 1, and if we have an arbitrary

25   cutoff that postdates that decisionmaking, it will never be

1    revealed to us.  And if it's true, as Mr. Goldberg has said

2    time and again, it's about the manufacturing process, the

3    decisions and choices that these companies made around it, we

4    need to pull back the curtain and understand their thinking

5    about it.

6         MR. RUBENSTEIN:  And, Your Honor, that -- I mean,

7    that might be a specific example, but I don't even know that

8    that relates to the ANDA that was filed in 2005.  That could

9    have been a different ANDA, which I believe it was.

10        So, I mean, you know, coming up with these

11   hypothetical situations doesn't justify Teva having to go back

12   an additional eight years, find all the different custodians

13   that there could have been during that eight-year time period,

14   you know, just to pull a rabbit out of a hat, basically.

15        THE COURT:  Got it.

16        Torrent, January 1st, 2014, can you refresh my

17   recollection about why you picked that date?

18        MS. NAGLE:  Sure, Your Honor.  That date is a few

19   months prior to the first sales of Valsartan in the U.S.

20        THE COURT:  And I have defendant -- I'm sorry,

21   plaintiff at least as early as June 2009.

22        MR. HONIK:  That's correct.

23        THE COURT:  And last but not least, Aurolife, could

24   you refresh my recollection about May 21st, 2013.

25        MS. HEINZ:  Yeah, it was March 21st, 2013.

```
 1              THE COURT:  I'm sorry, March 21st.

 2              MS. HEINZ:  That was when the FDA approved our first

 3    Valsartan product for sale in the U.S.

 4              THE COURT:  When was FDA approval of Torrent?  You

 5    gave me the sale date.  What was the FDA approval date?

 6              MS. NAGLE:  I'm not quite sure.

 7              THE COURT:  It had to have been earlier than that,

 8    right?

 9              MS. NAGLE:  Yes.

10              THE COURT:  All right.

11              MR. HONIK:  Your Honor, it was pointed out to me that

12    we missed or haven't thus far discussed Hetero or Camber from

13    whom we have --

14              THE COURT:  Oh, are they finished dose people, too?

15              I know Hetero and Camber -- well, I thought Hetero

16    wasn't served yet.

17              MS. HILTON:  That's the U.S. entity, Hetero USA,

18    which is served, which is represented and acted as the

19    regulatory U.S. agent for Hetero Drugs, Hetero Labs.

20              THE COURT:  That reminds me of an issue.  The FDA

21    liaison issue, is that what they are?

22              MS. HILTON:  Yeah, they are the registry agent,

23    they're the liaison.

24              THE COURT:  And they're taking the position that

25    they're not an API manufacturer or finished dose manufacturer.
```

```
 1              MS. HILTON:  Correct, and there Camber is a similarly
 2    situated entity.  It is taking the position that it is neither
 3    a manufacturer, but it is the distributor of the product, the
 4    seller of the product in the United States.
 5              THE COURT:  Distributors are a different category, we
 6    agree.  I think we're going to finalize that in January,
 7    but --
 8              MS. HILTON:  Correct.  But distributors, as to, like
 9    a McKesson or a Cardinal, is, to us, to plaintiffs, is a
10    different type of distributor than a vertically integrated
11    U.S. arm that sells drugs to McKesson and Cardinal.
12              THE COURT:  Let's put them in the same category.
13              How many different FDA liaisons do we have in the
14    case besides Hetero?
15              MS. HILTON:  Huahai U.S. is in this case.
16              THE COURT:  I'm sorry?
17              MS. HILTON:  Huahai U.S.
18              THE COURT:  Well, we're dealing with that.
19              MS. HILTON:  I think Hetero USA is the only one --
20              THE COURT:  So what do you want from them that you
21    don't have?
22              MS. HILTON:  Well, you know, first of all, I think we
23    have basic agreement, but we believe that we should be
24    selecting custodians for these entities and we believe.
25              THE COURT:  Have you started yet?
```

```
 1            MS. HILTON:  We've sort of started the process.

 2            THE COURT:  Can we put that until January?  Because

 3    that would open up a whole new door.  I should -- if I had to

 4    do it again, I would put that on the macro issue, what to do

 5    with the FDA liaisons, but we didn't.  Can we save that for

 6    January?  I think we have our hands full with the API and

 7    finished dose people.  Okay?

 8            MS. HILTON:  Yes, Your Honor.

 9            THE COURT:  All right.  Before we break for lunch --

10    when we come back from lunch, 2 o'clock, you'll get the

11    Court's oral opinion on all these issues, then we will meet

12    with Judge Kugler.  Any other issues you want to address now?

13            MS. GOLDENBERG:  Yes, Your Honor, issue No. 5 from

14    the defendants' brief that we didn't cover, relating to other

15    adverse health effects.

16            THE COURT:  Oh, did I skip an issue?  I'm sorry.

17            MS. GOLDENBERG:  We did.  I think we can keep it

18    pretty quick.

19            THE COURT:  Okay.

20            MS. GOLDENBERG:  Here's what we want, so we'll start

21    with that.

22            THE COURT:  How refreshing.

23            MS. GOLDENBERG:  We want information, of course,

24    pertaining to cancer and I think we're on the same page about

25    that.
```

1          THE COURT:  Are we talking about about from day one

2     or after the contamination was discovered?

3          MS. GOLDENBERG:  No, from day one, Your Honor.

4          THE COURT:  See, here's the problem.  How do we deal

5     with this?  They're a drug company.  Clearly, they had to do

6     health tests on whether this drug causes heart problems,

7     probably cancer.  You want -- I mean, that's not relevant to

8     the case, is it?  You want to know health effects related to

9     the contamination.

10          MS. GOLDENBERG:  Well, here's why it's important

11     because I think we all remember from our previous case

12     management conference where we saw a very long list of

13     conditions that the defendants gave is that they're going to

14     use to defend as specific causation.  So this issue, really on

15     the personal injury side, it relates to specific causation,

16     and on the class action side, it relates to bioequivalence and

17     the benefit of the bargain.  So on the specifics causation

18     side, if the defendants are saying, look, the only injuries in

19     this case are cancer, we're on the same page, then we need

20     that information.

21          But beyond that, they're going to say to our clients,

22     were you ever exposed to wood or kryptonite, as we joked last

23     time.  But to the extent they have any information about

24     anything that they've put on the plaintiff fact sheet causing

25     cancer, we should be entitled to that information.

```
 1              THE COURT:  So you want to know, like, when they were

 2    developing Valsartan, whether they investigated whether it

 3    causes cancer?

 4              MS. GOLDENBERG:  Not whether Valsartan causes --

 5    well, I mean I would think that they would, but if there's

 6    information that they have about the drug or any of the

 7    contaminants causing cancer, precancerous condition or injury

 8    to any of the organs that we have talked about, digestive

 9    tract, then that's going to be important.

10              The other --

11              THE COURT:  Okay.  So right now, we're just dealing

12    with health effects of exposure to NDEA NMBA, whatever it is,

13    right?  You want to know that, basic?

14              MS. GOLDENBERG:  Right, that's one thing we want to

15    know.

16              THE COURT:  Okay.

17              MS. GOLDENBERG:  On the class side, what we've seen

18    on Page 4 of the defendants' brief is a heading that says

19    Valsartan was the active pharmaceutical ingredient contained

20    in a safe, effective and life-saving heart medication.

21              So now we have a defense that we have to rebut that

22    says Valsartan is going to save lives, right?  That's what

23    they're going to get up and say to the jury, that this drug

24    saved our clients' lives and if they hadn't taken it, they

25    would have suffered some other type of health problem.
```

1          So on the class action side, there are going to be

2     arguments about efficacy and whether or not the drug actually

3     does its job.  And when it's contaminated with --

4          THE COURT:  But that's not what this case is about.

5          MS. GOLDENBERG:  Well, as a personal injury lawyer

6     that's not what my case is about, but on the class action

7     side, I think we are going to see that defense.

8          THE COURT:  In terms of discovery, this case isn't

9     about the health effects of taking uncontaminated Valsartan,

10    is it?  That's what you want.

11         MS. GOLDENBERG:  We want uncontaminated Valsartan,

12    absolutely.

13         THE COURT:  No, no, no.  You want discovery regarding

14    the health effects of uncontaminated Valsartan.

15         MS. GOLDENBERG:  We want discovery about the health

16    effects of contaminated Valsartan.

17         THE COURT:  Yes, I understand -- that, I understand.

18         MS. GOLDENBERG:  Sure.

19         THE COURT:  What else do you want?

20         MS. GOLDENBERG:  Adverse health effects about cancer,

21    anything the defendants asked about in the plaintiff fact

22    sheet, precancerous tumors or mutagenic diseases or disorders,

23    and then anything relating to injuries to the digestive system

24    that's implicated by taking Valsartan.

25         THE COURT:  Whether or not it's contaminated.

```
 1            MS. GOLDENBERG:  Yes.

 2            THE COURT:  Okay.  I don't think I need to hear from

 3    the defendants.  Any other issues we need to address before

 4    lunch?  Okay -- one more.

 5            MR. PAREKH:  Sorry.  One item is just in their issue

 6    No. 8.  The submission by defendants is not quite right and I

 7    just want to make sure that we have the agreement that we've

 8    actually reached on the record, which is the agreement

 9    regarding the translation of foreign language documents, is

10    that -- and you can correct me if I'm wrong, but it's our

11    understanding that any translations that were created by

12    defendants for reasons other than this litigation, that is,

13    translations created during the normal course of business will

14    be provided to us with the translated document.  It's only

15    translations that were created for purposes of this litigation

16    that will be withheld.

17            THE COURT:  I think that's fair.

18            So let me see if I can put that down in language,

19    because I think that's important to be documented.

20    Translations in the -- translations not specifically done just

21    for this litigation?

22            MR. PAREKH:  Correct, Your Honor.

23            THE COURT:  Okay.  I would assume, I don't know, that

24    when they made submissions to the FDA, they had to be in

25    English?
```

1          MR. PAREKH:  Yes, there's definitely translated

2     documents.

3          THE COURT:  So someone translated Chinese too.

4          MR. PAREKH:  Absolutely.  And we just want to make

5     sure that there's no miscommunication as to what is and isn't

6     produced.

7          THE COURT:  Okay.  Any problem with that, defendants?

8          MR. GOLDBERG:  No, You Honor.  We have agreed any

9     documents that have been translated in the normal course of

10    business will been produced and they have been.

11         THE COURT:  Okay.  So we'll be back here at

12    2 o'clock, you'll get the Court's rulings and then we will

13    meet with Judge Kugler.  Unless something unforeseen happens,

14    I don't foresee that meeting with Judge Kugler being very

15    long, but I asked Judge Kugler to be available, because, you

16    know, frankly, you haven't seen Judge Kugler for a couple of

17    our last meetings and maybe there's issues you want to address

18    with him, so you'll have your opportunity to do that.

19         Thank you.  We're adjourned.

20         THE DEPUTY CLERK:  All rise.

21         (12:57 p.m.)

22         - - - - - - - - - - - - - - - - -

23         I certify that the foregoing is a correct transcript

24    from the record of proceedings in the above-entitled matter.

25    */S/ Karen Friedlander, CRR, RMR*
      *Court Reporter/Transcriber____11-22-19/Date*

**'**

*109:16*

**2**

**2** *[24]* - 16:8, 36:25, 43:16, 43:18, 43:21, 43:22, 44:6, 44:7, 44:10, 44:18, 44:19, 48:15, 62:15, 82:6, 85:22, 86:6, 88:22, 99:8, 108:15, 108:16, 112:10, 117:12
**20** *[7]* - 1:8, 3:2, 5:19, 6:2, 6:6, 6:16
**200,000** *[1]* - 64:2
**2005** *[7]* - 100:21, 103:19, 103:24, 107:24, 108:2, 108:3, 109:8
**2006** *[3]* - 98:14, 99:22, 100:11
**2007** *[8]* - 36:19, 37:19, 97:17, 99:6, 99:12, 102:19, 102:22, 102:24
**2009** *[2]* - 101:6, 109:21
**2010** *[3]* - 37:1, 99:9, 101:21
**2011** *[5]* - 34:11, 37:2, 97:5, 97:7, 102:1
**2012** *[6]* - 39:14, 65:20, 65:21, 66:9, 98:1, 103:2
**2013** *[18]* - 34:12, 34:14, 37:3, 39:14, 42:1, 63:12, 97:5, 100:14, 100:15, 101:13, 102:1, 103:13, 104:2, 107:16, 107:22, 108:20, 109:24, 109:25
**2014** *[2]* - 101:2, 109:16

**'05** *[3]* - 104:2, 105:2, 105:4
**'06** *[2]* - 103:8, 103:10
**'13** *[3]* - 34:24, 104:5, 105:5
**'17** *[1]* - 76:5
**'18** *[2]* - 60:3, 76:2

**/**

**/S** *[1]* - 117:25

**0**

**07068** *[1]* - 1:14
**08101** *[1]* - 1:7

**1**

**1** *[23]* - 13:19, 13:20, 21:19, 34:1, 36:19, 36:24, 43:15, 44:17, 62:14, 68:22, 69:3, 81:1, 81:2, 88:19, 97:9, 99:7, 99:12, 102:1, 102:8, 106:14, 108:15, 108:24
**10** *[5]* - 17:10, 23:17, 27:14, 104:24, 105:17
**100** *[2]* - 39:23, 39:24
**103** *[1]* - 1:13
**10:09** *[2]* - 1:8, 3:2
**11** *[3]* - 4:10, 7:9, 81:5
**11-22-19/Date** *[1]* - 117:25
**11th** *[3]* - 5:11, 6:10, 95:21
**122-some-odd** *[1]* - 43:3
**12:57** *[1]* - 117:21
**14** *[1]* - 77:14
**15** *[4]* - 9:5, 80:13, 80:15, 80:19
**15219** *[1]* - 2:19
**1638** *[1]* - 2:9
**17** *[1]* - 28:7
**17th** *[2]* - 2:15, 28:3
**18** *[1]* - 15:10
**1835** *[1]* - 1:20
**18th** *[1]* - 17:10
**19-2875** *[1]* - 3:6
**19103** *[2]* - 1:20, 2:16
**1:19-md-02875-RBK-JS** *[1]* - 1:4
**1st** *[5]* - 96:23, 100:15, 103:13, 107:16,

**2019** *[7]* - 1:8, 3:2, 26:19, 26:22, 28:3, 28:7, 61:6
**21** *[4]* - 25:7, 36:8, 98:1, 103:2
**2150** *[1]* - 2:13
**21st** *[5]* - 101:2, 101:13, 109:24, 109:25, 110:1
**25** *[2]* - 39:24, 40:18
**2500** *[1]* - 2:21
**25th** *[1]* - 26:19
**26** *[1]* - 77:9
**2900** *[1]* - 1:20

**3**

**3** *[5]* - 52:9, 54:16, 62:15, 85:23, 89:6
**30** *[2]* - 2:15, 75:14
**30305** *[1]* - 2:22
**316** *[1]* - 1:16
**32502** *[1]* - 1:14
**3333** *[1]* - 2:21
**33950** *[1]* - 2:7
**38th** *[1]* - 2:18

**4**

**4** *[13]* - 6:13, 6:18, 25:7, 25:10, 25:13, 26:19, 31:19, 36:8, 37:9, 59:14, 68:2, 89:3, 114:18
**46** *[1]* - 77:13
**483s** *[1]* - 13:4
**4th** *[1]* - 1:7

**5**

**5** *[1]* - 112:13
**55402** *[1]* - 2:13
**58-page** *[1]* - 43:24

**6**

**6** *[1]* - 26:19
**600** *[1]* - 1:16
**612** *[1]* - 25:6

**7**

**7** *[5]* - 10:17, 25:7, 36:8, 96:9
**701** *[1]* - 2:3
**70130** *[1]* - 2:4
**75** *[1]* - 40:20
**756-0160** *[1]* - 1:24
**7th** *[1]* - 103:19

**8**

**8** *[4]* - 52:9, 54:18, 96:9, 116:6
**800** *[1]* - 2:12
**856** *[1]* - 1:24
**8th** *[1]* - 11:5

**9**

**90277** *[1]* - 2:10
**96** *[4]* - 40:9, 40:25, 41:4, 41:7
**9782** *[1]* - 96:3
**99** *[1]* - 2:6

**A**

**a.m** *[2]* - 1:8, 3:2
**Abbreviated** *[4]* - 20:3, 20:6, 100:22, 104:20
**aberrant** *[6]* - 50:25, 67:7, 67:8, 85:21, 86:23, 94:3
**Abilify** *[2]* - 83:11, 84:22
**ability** *[2]* - 27:3, 82:23
**able** *[6]* - 16:24, 18:19, 22:23, 70:23, 81:22, 87:19
**abnormal** *[1]* - 79:20
**above-entitled** *[1]* - 117:24
**absolute** *[1]* - 37:6
**absolutely** *[6]* - 13:9, 16:21, 23:24, 36:4, 115:12, 117:4
**absurd** *[1]* - 30:7
**access** *[1]* - 83:21
**according** *[2]* - 4:4, 87:15
**accumulated** *[1]* - 21:7
**accurate** *[3]* - 44:12, 44:13, 44:17
**acknowledge** *[3]* - 73:18, 97:4, 97:5
**acknowledging** *[2]* - 30:13, 65:21
**acquired** *[1]* - 108:24
**act** *[1]* - 19:25
**Actavis** *[2]* - 2:23
**acted** *[1]* - 110:18
**ACTION** *[1]* - 1:3
**action** *[3]* - 113:16, 115:1, 115:6
**active** *[2]* - 22:4, 114:19
**activities** *[1]* - 98:17

**actual** *[5]* - 9:9, 66:24, 70:17, 89:13, 103:14
**Adam** *[1]* - 3:9
**ADAM** *[1]* - 1:13
**add** *[8]* - 41:19, 48:14, 68:4, 77:4, 85:25, 86:8, 87:3, 106:23
**addition** *[3]* - 20:14, 83:15, 95:18
**additional** *[2]* - 18:17, 109:12
**address** *[6]* - 4:17, 26:14, 59:1, 112:12, 116:3, 117:17
**addressed** *[1]* - 47:12
**adequate** *[1]* - 70:14
**adhere** *[1]* - 71:15
**adjourned** *[1]* - 117:19
**Administration** *[1]* - 20:1
**adulterated** *[1]* - 50:21
**adulteration** *[1]* - 51:2
**advance** *[2]* - 28:11, 30:23
**adverse** *[2]* - 112:15, 115:20
**advice** *[1]* - 70:5
**advise** *[1]* - 95:22
**agencies** *[9]* - 31:14, 78:21, 79:6, 80:11, 81:5, 81:22, 83:23, 84:1, 84:21
**agency** *[7]* - 77:16, 77:21, 78:24, 79:12, 80:24, 81:11, 81:12
**Agency** *[1]* - 28:1
**agent** *[2]* - 110:19, 110:22
**ago** *[1]* - 39:11
**agree** *[15]* - 15:13, 17:16, 24:5, 24:9, 24:17, 32:4, 32:8, 35:8, 35:22, 37:4, 39:12, 95:20, 105:11, 105:18, 111:6
**agreed** *[8]* - 7:12, 7:17, 8:2, 8:21, 85:13, 95:18, 96:10, 117:8
**agreed-upon** *[1]* - 7:12
**agreement** *[7]* - 33:2, 78:21, 81:7, 82:25, 111:23, 116:7, 116:8
**agreements** *[1]* - 86:7
**aided** *[1]* - 1:25
**airplane** *[1]* - 20:9
**albeit** *[1]* - 36:21
**alert** *[1]* - 82:12

*alerted* [2] - 43:20, 86:17
*ALFANO* [1] - 2:17
*alleged* [1] - 65:8
*allegedly* [1] - 26:7
*allow* [1] - 37:15
*alluded* [1] - 64:22
*alternative* [1] - 21:2
*ambiguity* [1] - 11:13
*America* [1] - 19:19
*amount* [1] - 91:1
*amounts* [3] - 17:13, 27:7, 27:12
*analysis* [2] - 76:19, 89:12
*ANDA* [23] - 20:2, 20:4, 41:25, 98:4, 99:25, 100:3, 100:11, 101:6, 101:13, 101:22, 102:4, 102:6, 103:12, 103:16, 103:18, 104:10, 106:11, 106:20, 108:1, 108:3, 108:4, 109:8, 109:9
*ANDAs* [5] - 64:2, 64:3, 99:17, 102:3, 102:5
*answer* [12] - 26:9, 36:18, 40:4, 44:19, 45:7, 74:15, 74:16, 74:22, 79:1, 84:11, 98:9, 102:14
*answering* [2] - 52:20, 58:20
*answers* [4] - 23:10, 46:9, 46:20, 50:10
*apart* [3] - 22:11, 32:25, 54:13
*API* [89] - 14:1, 14:25, 15:22, 16:12, 16:13, 17:23, 18:1, 19:2, 19:4, 19:12, 19:14, 20:3, 20:11, 26:2, 32:17, 40:19, 41:25, 42:8, 42:13, 48:25, 49:3, 49:8, 49:9, 49:10, 49:11, 49:13, 49:16, 49:20, 50:1, 50:2, 50:4, 50:8, 50:11, 50:12, 51:14, 51:16, 51:21, 51:24, 52:8, 52:11, 52:14, 52:15, 52:25, 53:6, 53:10, 54:13, 54:15, 54:17, 54:18, 56:4, 59:5, 65:3, 65:10, 65:15, 65:22, 86:17, 88:20, 89:11, 89:14,

90:23, 91:4, 91:6, 91:12, 91:21, 92:1, 92:5, 92:10, 92:12, 92:15, 92:18, 92:21, 94:1, 94:4, 94:15, 97:9, 98:11, 98:19, 100:16, 101:19, 102:5, 102:7, 102:9, 102:12, 108:15, 110:25, 112:6
*APIs* [2] - 41:24, 50:11
*apologize* [3] - 86:4, 88:13, 88:15
*appearance* [5] - 46:11, 46:18, 46:23, 47:2, 96:5
*applicable* [2] - 85:24, 89:6
*application* [3] - 37:7, 37:18, 97:16
*Application* [1] - 100:22
*Applications* [3] - 20:3, 20:6, 104:21
*apply* [1] - 64:6
*appreciate* [1] - 36:11
*appreciation* [1] - 10:23
*approach* [2] - 23:25, 71:7
*appropriate* [4] - 5:3, 5:8, 45:12, 105:18
*appropriately* [2] - 17:4, 29:9
*appropriateness* [1] - 6:3
*approval* [10] - 36:25, 77:14, 83:7, 99:6, 100:8, 103:2, 103:16, 103:22, 110:4, 110:5
*approved* [8] - 34:13, 41:25, 98:2, 101:13, 102:4, 102:5, 103:20, 110:2
*April* [2] - 28:3, 28:7
*ARB* [1] - 26:25
*arbitrary* [2] - 108:20, 108:24
*ARBs* [1] - 63:18
*areas* [1] - 23:9
*arguably* [1] - 70:22
*argue* [6] - 23:17, 29:4, 35:19, 44:23, 70:2, 76:8
*arguing* [1] - 60:6
*ARGUMENT* [1] - 1:5
*argument* [15] - 4:2, 15:12, 23:19, 29:7, 30:13, 33:17, 45:1,

48:12, 71:1, 71:11, 78:7, 96:22, 97:13, 97:21, 97:22
*argument's* [1] - 34:4
*arguments* [4] - 9:19, 11:21, 57:17, 115:2
*arise* [3] - 19:21, 20:5, 76:3
*arm* [1] - 111:11
*armed* [1] - 11:22
*arms* [1] - 33:12
*arrives* [1] - 92:22
*art* [2] - 27:16, 28:21
*articulate* [1] - 98:15
*artifact* [1] - 29:15
*artifacts* [1] - 29:11
*aside* [1] - 70:6
*aspect* [2] - 87:20, 94:9
*aspects* [1] - 31:11
*assemble* [1] - 11:5
*assert* [1] - 73:23
*assertion* [1] - 28:24
*assertions* [1] - 28:22
*assessment* [2] - 40:6, 82:7
*associated* [1] - 108:17
*assume* [5] - 7:11, 35:22, 81:8, 91:20, 116:23
*assuming* [4] - 10:2, 10:12, 63:15, 91:12
*assumption* [2] - 81:10, 91:19
*assurance* [7] - 53:19, 73:4, 93:18, 93:20, 93:23, 105:7, 107:3
*assurance's* [1] - 107:6
*assurance-related* [1] - 53:19
*Atlanta* [1] - 2:22
*attached* [2] - 7:23, 9:4
*attachments* [1] - 8:1
*attention* [8] - 4:25, 6:25, 9:24, 11:2, 36:5, 76:16, 80:21, 88:5
*attorney* [2] - 74:18, 74:24
*attorneys* [2] - 72:11, 72:20
*audit* [3] - 19:2, 19:5, 19:15
*August* [6] - 26:19, 98:14, 99:22, 100:11, 103:8, 103:10

*Aurobindo* [3] - 45:2, 53:7, 101:17
*Aurolife* [6] - 53:16, 91:3, 92:23, 101:8, 101:15, 109:23
*authorities* [1] - 30:18
*authority* [1] - 19:22
*authorization* [1] - 42:15
*available* [12] - 4:14, 4:15, 10:14, 11:8, 12:1, 12:24, 13:7, 13:24, 14:13, 28:21, 66:23, 117:15
*Avenue* [1] - 2:12
*aware* [5] - 57:19, 60:4, 60:7, 79:24, 82:11

**B**

*baby* [2] - 107:10, 107:24
*baby's* [2] - 107:22, 107:23
*background* [2] - 4:21, 11:20
*baked* [2] - 107:22, 107:23
*ball* [3] - 28:12, 30:23, 64:10
*bargain* [1] - 113:17
*barred* [1] - 89:10
*barring* [1] - 4:5
*based* [6] - 14:7, 15:11, 49:22, 50:19, 76:5, 107:17
*basic* [8] - 20:1, 51:5, 51:6, 70:22, 79:2, 111:23, 114:13
*basis* [4] - 18:17, 100:8, 106:5, 106:8
*batch* [4] - 63:11, 63:13, 63:25, 66:9
*batches* [3] - 33:25, 34:18, 65:25
*Baylen* [1] - 1:16
*Beach* [1] - 2:10
*bear* [1] - 96:6
*bearing* [1] - 31:12
*became* [1] - 72:3
*become* [1] - 79:24
*becomes* [1] - 63:19
*began* [2] - 36:18, 98:10
*begin* [1] - 101:20
*beginning* [2] - 16:7, 99:8
*behalf* [1] - 7:21
*behavior* [1] - 81:15

*behind* [1] - 37:8
*behold* [1] - 99:8
*BEHRAM* [1] - 2:9
*Behram* [1] - 3:14
*Belgium* [2] - 50:11, 50:21
*believes* [1] - 85:14
*benefit* [2] - 98:20, 113:17
*best* [1] - 37:21
*between* [9] - 9:13, 18:8, 22:10, 67:16, 87:10, 87:21, 104:2, 108:3
*beyond* [6] - 16:17, 21:22, 37:23, 86:25, 90:10, 113:21
*biases* [2] - 23:4, 28:17
*big* [4] - 22:14, 32:3, 59:10, 91:20
*biggest* [2] - 81:1, 81:2
*bill* [1] - 105:25
*bins* [1] - 75:17
*bioequivalence* [5] - 33:3, 85:18, 94:23, 95:6, 113:16
*bioequivalency* [1] - 97:2
*bioequivalent* [1] - 19:16
*bit* [2] - 37:17, 83:3
*bits* [1] - 88:25
*blah* [3] - 47:3
*blanket* [1] - 65:24
*bluntly* [1] - 23:3
*bodies* [9] - 77:14, 78:19, 80:11, 80:20, 82:19, 82:20, 83:7, 83:8, 83:15
*body* [5] - 77:21, 78:12, 82:17, 100:4, 107:8
*Boeing* [1] - 20:9
*boilerplate* [1] - 48:10
*bolts* [1] - 89:14
*born* [1] - 107:11
*BOSICK* [1] - 2:17
*bottle* [1] - 26:3
*bottles* [1] - 39:21
*bottom* [4] - 25:6, 26:20
*bought* [3] - 19:4, 108:13, 108:14
*box* [3] - 9:2, 16:18, 25:15
*break* [3] - 4:5, 96:11, 112:9
*BRIAN* [1] - 2:21

**Brian** [1] - 3:22
**brief** [7] - 25:10, 33:1, 71:23, 87:9, 87:17, 112:14, 114:18
**briefed** [1] - 4:3
**briefing** [4] - 15:18, 31:5, 42:5, 61:6
**briefs** [12] - 4:25, 5:6, 5:12, 6:13, 6:18, 15:9, 25:9, 48:13, 68:5, 86:10, 88:6, 88:7
**bring** [2] - 6:24, 76:16
**bringing** [2] - 9:11, 88:4
**broad** [1] - 86:14
**brought** [6] - 6:24, 9:17, 9:24, 11:2, 34:8, 76:18
**building** [1] - 104:9
**Building** [1] - 1:6
**Bull** [1] - 71:21
**burden** [4] - 61:24, 84:1, 85:11, 85:12
**burdensome** [2] - 62:14, 89:19
**business** [2] - 116:13, 117:10
**buy** [1] - 88:20
**buyers** [1] - 22:6
**buying** [1] - 88:18
**BY** [10] - 1:13, 1:16, 1:19, 2:2, 2:6, 2:9, 2:12, 2:15, 2:18, 2:21

### C

**cabinets** [1] - 67:3
**cache** [1] - 106:2
**California** [1] - 2:10
**Camber** [3] - 110:12, 110:15, 111:1
**Camden** [2] - 1:7, 3:4
**camera** [4] - 6:7, 6:17, 68:12, 70:25
**Camp** [1] - 2:3
**Canada** [1] - 83:16
**cancer** [7] - 112:24, 113:7, 113:19, 113:25, 114:3, 114:7, 115:20
**cannot** [1] - 75:9
**carcinogenic** [1] - 59:19
**Cardinal** [2] - 111:9, 111:11
**cart** [2] - 71:9, 75:9
**case** [61] - 15:15, 16:3, 18:9, 19:12, 20:19,

21:22, 21:24, 23:15, 23:21, 25:9, 25:21, 26:8, 28:14, 31:2, 31:6, 32:14, 33:6, 33:18, 33:22, 34:3, 35:12, 45:9, 45:11, 45:15, 46:24, 50:6, 53:6, 53:7, 61:16, 61:17, 61:20, 62:23, 69:5, 69:9, 69:10, 69:12, 71:21, 75:15, 77:22, 78:5, 78:24, 82:18, 84:18, 84:22, 90:16, 90:23, 98:11, 98:14, 98:23, 99:12, 106:17, 107:23, 108:22, 111:14, 111:15, 113:8, 113:11, 113:19, 115:4, 115:6, 115:8
**cases** [7] - 70:3, 75:5, 79:5, 79:19, 81:3, 83:10, 106:13
**cast** [1] - 15:8
**catalyst** [1] - 98:20
**catching** [1] - 45:9
**categories** [1] - 78:9
**category** [5] - 47:10, 78:13, 86:14, 111:5, 111:12
**causation** [3] - 113:14, 113:15, 113:17
**caused** [6] - 21:18, 24:12, 26:7, 35:16, 65:10
**causes** [3] - 113:6, 114:3, 114:4
**causing** [2] - 113:24, 114:7
**Centre** [1] - 2:18
**certain** [10] - 15:13, 40:15, 41:13, 44:12, 59:13, 70:18, 78:9, 97:17, 100:2
**certainly** [13] - 11:9, 17:2, 18:14, 20:16, 29:19, 32:3, 35:23, 43:2, 66:4, 69:13, 73:23, 101:21, 102:15
**certainty** [2] - 37:6, 101:19
**certificate** [2] - 46:1, 46:4
**certificates** [1] - 89:12
**certify** [1] - 117:23
**cetera** [6] - 11:19, 67:15, 75:23, 76:20, 76:21

**chain** [1] - 87:11
**chair** [1] - 7:24
**challenging** [2] - 28:22, 28:24
**chance** [1] - 81:15
**change** [10] - 15:19, 16:1, 16:3, 34:6, 34:10, 34:12, 37:1, 85:2, 97:4, 97:5
**changed** [2] - 84:23, 84:24
**changes** [1] - 108:2
**characterize** [2] - 11:25, 12:23
**charts** [2] - 11:18, 64:8
**chemical** [8] - 25:19, 31:13, 31:18, 59:14, 59:25, 63:2, 63:22, 65:14
**chemist** [3] - 65:12, 65:25, 92:14
**chemistry** [2] - 82:8, 82:11
**chemists** [1] - 82:9
**chief** [1] - 68:19
**China** [13] - 10:15, 10:17, 10:21, 11:9, 13:2, 19:6, 42:12, 58:23, 81:6, 81:8, 82:21, 83:16, 85:7
**China's** [1] - 81:11
**Chinese** [3] - 31:10, 43:19, 117:3
**choice** [3] - 37:8, 98:19, 98:20
**choices** [3] - 104:16, 104:18, 109:3
**choose** [1] - 37:7
**choosing** [1] - 37:19
**chose** [1] - 37:20
**CHP** [1] - 107:5
**chroma** [1] - 94:20
**chromatogram** [1] - 62:6
**chromatographic** [4] - 63:8, 63:14, 63:21, 97:2
**chromatographs** [1] - 86:23
**chromatography** [15] - 19:7, 27:3, 27:4, 29:13, 29:20, 31:2, 33:2, 62:9, 92:17, 94:21, 94:22, 94:25, 95:5
**chrome** [1] - 32:5
**Chuannan** [3] - 51:23, 51:24
**circle** [1] - 97:13,

101:24
**Circuit** [1] - 71:21
**circumstances** [1] - 4:5
**cite** [1] - 19:24
**cited** [1] - 71:22
**CIVIL** [1] - 1:3
**claims** [2] - 18:6, 28:13
**clarification** [3] - 8:8, 14:10, 14:22
**clarified** [2] - 8:17, 9:8
**clarify** [11] - 12:3, 14:6, 15:12, 17:7, 24:8, 28:12, 41:21, 41:22, 43:12, 54:15, 66:13
**CLARK** [1] - 2:3
**class** [7] - 45:22, 46:2, 67:18, 113:16, 114:17, 115:1, 115:6
**Class** [3] - 21:19, 81:1, 81:2
**classically** [1] - 8:18
**Claussen** [2] - 43:23, 43:24
**clear** [3] - 49:2, 49:18, 76:23
**clearly** [13] - 28:16, 32:12, 41:16, 67:25, 69:18, 71:21, 89:13, 89:19, 90:8, 90:9, 107:13, 113:5
**Clem** [1] - 39:11
**CLERK** [2] - 3:1, 117:20
**clerk's** [1] - 47:2
**client** [6] - 52:4, 52:14, 57:5, 73:4, 74:3, 74:4
**clients** [1] - 113:21
**clients'** [1] - 114:24
**close** [3] - 71:19, 84:15, 108:20
**Coast** [1] - 2:9
**Cobalt** [1] - 108:14
**COBALT** [1] - 108:14
**cobble** [1] - 16:18
**Code** [1] - 62:14
**Codes** [1] - 62:15
**coextensive** [1] - 92:9
**Cohen** [1] - 1:6
**coincides** [1] - 97:15
**color** [2] - 32:13, 93:21
**combination** [1] - 41:14
**coming** [4] - 37:11, 62:8, 78:11, 109:10
**comitted** [1] - 92:24

101:24
**Commencing** [1] - 1:8
**commensurate** [1] - 70:16
**comments** [1] - 32:2
**commerce** [1] - 58:5
**commit** [2] - 91:4, 93:10
**commitment** [1] - 92:4
**committing** [1] - 90:21
**common** [2] - 20:8, 20:16
**communicate** [2] - 88:23, 95:8
**communicated** [3] - 83:5, 83:18, 83:21
**communication** [3] - 9:4, 22:20, 74:7
**communications** [15] - 8:9, 8:10, 8:13, 8:14, 9:13, 10:25, 12:8, 22:13, 22:22, 30:17, 74:21, 77:2, 85:6, 86:21, 87:10
**companies** [6] - 31:10, 46:6, 46:13, 67:13, 104:13, 109:3
**company** [5] - 10:7, 10:8, 104:10, 108:23, 113:5
**company's** [2] - 104:18, 105:23
**compare** [2] - 51:4, 80:7
**comparisons** [1] - 67:16
**compelled** [1] - 65:7
**Complaint** [5] - 45:21, 45:23, 45:24, 46:3, 46:20
**Complaints** [1] - 75:21
**complaints** [3] - 46:2, 79:21, 89:12
**complete** [2] - 10:5, 103:24
**completed** [2] - 103:18, 103:22
**completely** [2] - 89:25, 90:5
**complicated** [2] - 5:12, 6:11
**comply** [3] - 7:12, 19:9, 19:17
**component** [3] - 20:10, 20:18, 22:2
**components** [2] - 70:24, 100:2
**composition** [1] - 63:2
**computer** [2] - 1:25, 62:10

**computer-aided** [1] - 1:25
**concede** [1] - 66:8
**conceded** [1] - 79:4
**conception** [1] - 37:10
**concern** [1] - 32:17
**concerned** [2] - 5:6, 6:21
**concerns** [1] - 107:7
**concludes** [1] - 44:5
**conclusion** [1] - 26:6
**conclusions** [3] - 21:9, 23:7, 23:8
**condition** [1] - 114:7
**conditions** [2] - 71:22, 113:13
**conduct** [1] - 18:22
**confer** [3] - 11:4, 94:15, 95:19
**conference** [2] - 38:8, 113:12
**conferences** [1] - 38:9
**confers** [1] - 93:9
**confessed** [1] - 96:13
**confirm** [1] - 70:10
**confirmation** [1] - 52:19
**confusion** [1] - 99:1
**CONLEE** [1] - 2:2
**Conlee** [2] - 3:12, 12:11
**connected** [1] - 90:2
**connection** [1] - 23:5
**consider** [3] - 21:5, 21:6, 106:25
**consideration** [3] - 11:21, 28:18, 98:22
**considered** [2] - 108:7, 108:10
**considering** [1] - 105:24
**constructed** [1] - 107:11
**construed** [1] - 86:14
**consultants** [1] - 76:18
**consumers** [1] - 22:5
**contact** [2] - 22:9, 80:12
**contained** [2] - 61:8, 114:19
**contaminant** [2] - 26:11, 32:17
**contaminants** [3] - 15:10, 67:23, 114:7
**contaminated** [19] - 33:24, 34:21, 35:3, 35:8, 35:9, 35:15, 35:24, 40:20, 40:25, 50:22, 65:22, 66:10,

80:4, 80:6, 115:3, 115:16, 115:25
**contamination** [42] - 15:8, 15:18, 16:1, 16:5, 17:20, 18:1, 18:3, 18:12, 24:10, 24:12, 24:19, 34:9, 34:21, 34:25, 35:17, 35:18, 38:13, 38:18, 39:25, 40:3, 40:9, 41:9, 41:9, 41:15, 41:16, 51:2, 60:2, 61:5, 65:10, 66:6, 76:1, 78:1, 79:17, 79:18, 79:19, 80:8, 81:16, 82:4, 85:19, 99:8, 113:2, 113:9
**contaminations** [1] - 26:6
**contemplated** [1] - 68:9
**contemporaneous** [1] - 22:12
**contents** [1] - 72:6
**context** [3] - 15:24, 69:10, 77:8
**continue** [2] - 12:7, 22:4
**CONTINUED** [1] - 2:1
**continued** [1] - 36:24
**continues** [1] - 22:25
**control** [2] - 19:25, 104:25
**controls** [1] - 100:6
**conversant** [1] - 19:3
**conversation** [1] - 24:4
**converting** [1] - 89:14
**convey** [1] - 99:3
**convinced** [1] - 16:2
**Cooper** [1] - 1:7
**copies** [3] - 5:23, 7:10, 8:3
**copy** [7] - 6:5, 12:4, 12:5, 12:6, 45:24, 45:25
**core** [18] - 5:4, 7:22, 8:11, 8:18, 9:12, 10:22, 10:24, 11:7, 11:16, 14:12, 14:22, 35:13, 37:23, 53:13, 86:21, 88:25, 91:23, 98:4
**correct** [30] - 8:16, 8:20, 12:22, 17:9, 28:2, 34:11, 42:2, 42:11, 45:2, 52:5, 53:8, 53:14, 54:7, 55:23, 56:18, 58:19, 71:11, 90:17, 91:11,

91:22, 92:19, 102:25, 103:4, 103:15, 109:22, 111:1, 111:8, 116:10, 116:22, 117:23
**correction** [1] - 60:8
**correlate** [1] - 29:21
**correspondence** [4] - 5:7, 14:17, 64:4, 108:4
**correspondences** [1] - 9:5
**costs** [1] - 31:24
**Counsel** [2] - 66:11, 77:2
**counsel** [10] - 9:3, 22:3, 22:10, 45:3, 45:21, 45:25, 47:6, 73:13, 74:6, 74:21
**counterproposal** [1] - 72:4
**countries** [6] - 42:12, 50:19, 50:20, 56:12, 77:13, 84:13
**country** [4] - 51:1, 80:2, 80:3
**couple** [8] - 4:21, 10:1, 24:1, 41:21, 44:22, 68:7, 87:5, 117:16
**course** [8] - 6:4, 7:22, 9:19, 14:20, 60:9, 112:23, 116:13, 117:9
**COURT** [2] - 1:1, 3:2
**Court** [4] - 1:23, 7:12, 96:9, 117:25
**court** [4] - 22:16, 37:14, 67:25, 75:5
**Court's** [12] - 4:8, 4:23, 6:9, 6:19, 11:14, 11:20, 33:16, 64:12, 88:5, 91:10, 112:11, 117:12
**court-ordered** [1] - 22:16
**Courthouse** [1] - 1:6
**cover** [1] - 112:14
**covers** [1] - 16:15
**created** [6] - 34:20, 76:19, 107:25, 116:11, 116:13, 116:15
**creating** [2] - 26:1, 38:1
**critical** [3] - 36:1, 36:4, 84:20
**cross** [1] - 18:6
**cross-claims** [1] -

18:6
**CRR** [1] - 117:25
**culprit** [3] - 36:14, 37:5
**cumulative** [1] - 61:21
**current** [1] - 24:20
**curtain** [1] - 109:4
**custodial** [5] - 7:24, 64:5, 70:10, 96:12, 96:24
**custodian** [3] - 101:25, 106:10
**custodians** [7] - 62:6, 70:10, 72:22, 104:23, 105:17, 109:12, 111:24
**custodianship** [1] - 11:17
**customer** [7] - 27:8, 79:21, 86:16, 86:17, 88:2, 88:14
**customers** [10] - 34:8, 53:1, 56:23, 86:22, 87:15, 87:21, 87:22, 88:17, 88:18, 106:18
**cut** [4] - 14:19, 23:13, 43:4, 107:19
**cutoff** [2] - 98:15, 108:25
**cuts** [1] - 108:19

## D

**damaging** [1] - 21:12
**Daniel** [1] - 3:8
**DANIEL** [1] - 1:16
**data** [5] - 62:7, 62:13, 87:7, 101:7, 106:22
**database** [2] - 62:3, 105:20
**date** [29] - 5:11, 13:18, 16:5, 16:6, 28:6, 43:9, 70:6, 73:11, 96:20, 97:12, 97:13, 97:15, 98:2, 98:16, 99:20, 100:12, 101:15, 101:18, 101:21, 102:2, 102:18, 102:24, 103:2, 103:6, 104:5, 109:17, 109:18, 110:5
**dates** [8] - 37:18, 69:2, 69:4, 69:24, 69:25, 72:14, 84:14, 100:1
**DAVID** [1] - 1:19
**David** [1] - 59:12
**days** [1] - 47:3
**deal** [6] - 32:2, 47:5, 47:11, 48:1, 106:13,

113:4
**dealing** [5] - 4:11, 6:11, 77:9, 111:18, 114:11
**December** [11] - 4:10, 5:11, 6:10, 6:13, 6:18, 7:9, 34:12, 34:24, 44:23, 95:21, 97:5
**decide** [5] - 5:1, 5:10, 17:15, 92:4, 92:7
**decided** [3] - 62:24, 88:20, 88:21
**decides** [1] - 28:13
**decision** [4] - 68:7, 71:3, 107:15, 107:17
**decisionmaking** [1] - 108:25
**decisions** [1] - 109:3
**deeper** [1] - 23:9
**default** [1] - 46:21
**defective** [2] - 20:9, 65:8
**defend** [1] - 113:14
**defendant** [16] - 5:21, 6:4, 13:18, 38:21, 38:22, 38:24, 38:25, 39:1, 40:22, 40:23, 64:23, 69:3, 83:12, 96:16, 108:21, 109:20
**Defendant** [2] - 2:16, 2:19
**defendant's** [2] - 6:24, 12:18
**defendant-specific** [1] - 64:23
**defendants** [70] - 3:21, 3:23, 3:25, 5:24, 6:1, 6:2, 6:16, 12:16, 15:9, 15:11, 17:8, 17:22, 18:7, 20:21, 21:18, 22:3, 23:17, 29:5, 33:14, 33:16, 35:11, 38:1, 39:8, 41:1, 41:3, 42:7, 43:10, 48:8, 49:2, 49:14, 49:15, 49:24, 50:17, 50:25, 53:11, 54:1, 56:6, 59:2, 60:22, 61:15, 61:23, 63:15, 64:1, 64:19, 66:24, 68:13, 72:5, 72:13, 72:22, 76:8, 76:25, 78:23, 79:4, 84:5, 86:8, 86:21, 94:7, 94:14, 95:14, 95:20, 98:18, 98:22, 113:13, 113:18, 115:21,

116:3, 116:6, 116:12, 117:7
**Defendants** [1] - 2:22
**defendants'** [16] - 14:1, 15:7, 17:10, 20:24, 23:19, 29:10, 33:17, 33:19, 35:8, 57:4, 78:3, 85:24, 87:15, 89:7, 112:14, 114:18
**Defense** [2] - 2:16, 2:19
**defense** [5] - 10:2, 35:5, 66:19, 114:21, 115:7
**defenses** [1] - 28:14
**defer** [1] - 20:24
**deferring** [1] - 28:15
**define** [2] - 35:6, 44:8
**defined** [1] - 85:14
**definitely** [2] - 20:21, 117:1
**definition** [2] - 8:18, 79:16
**degree** [1] - 101:19
**delay** [4] - 46:22, 68:23, 69:6, 69:23
**deliberating** [1] - 98:19
**delicately** [1] - 23:2
**delighted** [2] - 32:4, 32:9
**demonstrate** [1] - 31:1
**department** [2] - 7:24, 104:25
**depose** [2] - 67:5, 107:14
**deposition** [3] - 73:3, 73:16, 73:18
**depositions** [1] - 66:19
**DEPUTY** [2] - 3:1, 117:20
**describe** [1] - 27:1
**described** [1] - 70:19
**description** [2] - 70:12, 72:8
**designed** [1] - 26:24
**desire** [1] - 4:8
**destroy** [1] - 75:7
**destroyed** [4] - 69:16, 69:19, 75:19, 76:5
**detect** [7] - 17:12, 26:16, 26:25, 27:6, 32:5, 38:18, 40:3
**detected** [2] - 28:10, 40:11
**detecting** [1] - 59:22
**detection** [1] - 90:2
**determination** [1] -

94:13
**determine** [1] - 68:14
**determined** [2] - 21:20, 40:14
**develop** [1] - 82:7
**developed** [4] - 26:23, 104:7, 105:1, 107:18
**developing** [3] - 82:6, 106:24, 114:2
**development** [7] - 98:5, 98:10, 98:17, 99:13, 99:19, 100:21, 106:12
**deviation** [1] - 94:11
**die** [1] - 15:7
**differ** [2] - 23:7, 23:8
**difference** [1] - 80:7
**differences** [1] - 87:21
**different** [48] - 8:22, 12:20, 25:9, 30:18, 31:11, 39:1, 42:2, 43:13, 43:17, 49:20, 50:18, 50:19, 60:20, 61:9, 61:12, 62:5, 62:6, 62:25, 63:7, 67:22, 70:5, 78:21, 79:14, 80:10, 83:12, 84:9, 84:10, 84:16, 84:18, 84:19, 84:22, 84:25, 87:17, 90:5, 90:6, 95:1, 95:4, 108:7, 109:9, 109:12, 111:5, 111:10, 111:13
**digestive** [2] - 114:8, 115:23
**digging** [1] - 88:12
**direct** [3] - 22:20, 36:5, 105:18
**directed** [4] - 18:22, 39:8, 41:9, 58:2
**direction** [1] - 41:2
**directly** [6] - 58:6, 58:10, 67:12, 84:4, 98:23, 107:20
**disagree** [1] - 23:15
**disagreement** [2] - 19:21, 30:22
**discarded** [1] - 72:2
**disclose** [1] - 74:20
**disclosed** [2] - 16:9, 39:5
**disclosing** [2] - 74:15, 74:21
**discontinued** [1] - 88:19
**discover** [2] - 53:19, 79:17
**discoverable** [4] - 79:6, 79:9, 89:13,

90:9
**discovered** [8] - 16:11, 16:21, 34:25, 41:9, 60:2, 76:2, 77:20, 113:2
**discovering** [1] - 16:16
**DISCOVERY** [1] - 1:5
**discovery** [79] - 4:3, 5:4, 7:22, 8:11, 8:19, 9:13, 10:22, 10:25, 11:7, 11:16, 12:15, 14:13, 14:22, 15:14, 18:11, 18:14, 18:22, 28:13, 28:19, 31:23, 33:13, 35:13, 37:23, 42:22, 43:3, 44:20, 47:11, 48:16, 50:8, 50:14, 52:2, 53:14, 54:2, 56:14, 57:3, 57:6, 57:12, 59:3, 59:6, 60:10, 60:13, 60:16, 60:25, 61:18, 61:19, 62:25, 63:4, 63:19, 63:21, 64:6, 64:13, 65:7, 69:21, 71:20, 77:1, 78:17, 80:14, 85:23, 86:6, 86:14, 88:25, 89:3, 89:6, 90:12, 91:1, 91:5, 91:24, 92:2, 94:8, 94:18, 96:24, 97:9, 98:4, 101:17, 104:1, 115:8, 115:13, 115:15
**discussed** [6] - 8:20, 11:4, 70:15, 77:10, 84:17, 110:12
**discussion** [1] - 67:24
**discussions** [1] - 4:9
**diseases** [1] - 115:22
**disorders** [1] - 115:22
**disproportion** [1] - 63:23
**disproportional** [1] - 61:20
**dispute** [4] - 33:5, 48:6, 55:18, 56:4
**disputing** [1] - 104:1
**distant** [1] - 106:6
**distributed** [2] - 58:16, 92:18
**distribution** [1] - 70:7
**distributor** [3] - 58:23, 111:3, 111:10
**distributors** [2] - 111:5, 111:8
**District** [1] - 45:23
**DISTRICT** [2] - 1:1, 1:1

**DMF** [37] - 25:15, 25:17, 26:7, 26:8, 26:11, 31:19, 36:9, 36:13, 36:15, 36:24, 37:5, 37:7, 37:19, 42:2, 43:16, 43:18, 43:21, 43:22, 44:7, 44:8, 44:10, 44:19, 59:7, 59:8, 64:11, 65:2, 67:2, 79:25, 80:3, 82:3, 98:5, 99:2, 99:7, 101:18, 102:24, 106:15
**DMFs** [4] - 64:2, 64:3, 95:8, 99:17
**Docket** [1] - 3:5
**document** [13] - 5:24, 5:25, 7:18, 9:6, 9:9, 14:12, 14:13, 42:16, 73:1, 75:7, 82:17, 96:24, 116:14
**documentation** [3] - 13:17, 13:20, 46:16
**documented** [1] - 116:19
**documents** [78] - 4:12, 5:14, 5:15, 5:16, 5:19, 5:20, 6:1, 6:2, 6:6, 6:7, 6:16, 6:18, 6:20, 6:22, 7:1, 7:17, 8:8, 9:12, 9:15, 9:21, 10:13, 10:14, 10:16, 10:21, 10:22, 11:6, 11:8, 11:9, 11:11, 11:12, 11:24, 11:25, 12:5, 12:9, 12:14, 12:23, 13:5, 13:6, 13:22, 13:24, 14:9, 24:1, 25:8, 27:24, 30:14, 30:21, 31:17, 43:8, 47:15, 47:18, 47:20, 50:24, 53:19, 53:25, 54:8, 55:17, 55:18, 69:16, 74:13, 76:18, 78:13, 84:4, 85:11, 85:13, 89:10, 89:16, 92:20, 92:24, 93:12, 93:18, 93:21, 93:24, 97:18, 106:22, 116:9, 117:2, 117:9
**Doe** [2] - 73:3, 73:5
**domain** [1] - 22:8
**done** [14] - 16:22, 21:21, 29:24, 30:1, 38:17, 39:3, 39:4, 41:10, 47:20, 54:18, 85:22, 91:21, 97:20, 116:20
**door** [2] - 63:20, 112:3

**dose** [74] - 14:3, 14:4, 14:24, 16:13, 16:16, 18:3, 18:13, 18:17, 18:22, 18:25, 19:13, 20:17, 23:18, 24:13, 26:3, 26:10, 32:18, 49:17, 49:20, 52:1, 53:10, 53:14, 53:16, 54:2, 54:8, 54:11, 54:20, 54:23, 55:8, 55:21, 56:5, 56:22, 57:15, 58:4, 58:6, 58:23, 77:13, 85:24, 86:17, 89:7, 89:11, 89:15, 89:23, 90:12, 90:21, 90:24, 91:2, 91:5, 91:6, 91:7, 91:13, 91:21, 91:23, 91:25, 92:5, 92:7, 92:10, 92:12, 92:22, 92:23, 92:24, 93:5, 93:11, 93:16, 94:9, 98:2, 98:18, 102:4, 103:5, 106:19, 108:8, 110:14, 110:25, 112:7
**down** [8] - 21:14, 43:8, 48:8, 67:11, 69:13, 87:19, 99:22, 116:18
**downstream** [5] - 16:13, 16:16, 18:4, 23:18, 30:3
**dozen** [1] - 43:9
**dozens** [2] - 89:23, 90:6
**drafted** [1] - 72:20
**draw** [1] - 42:5
**drew** [2] - 69:5, 69:14
**drilled** [1] - 69:13
**drug** [17] - 19:17, 19:25, 26:12, 27:13, 34:7, 58:1, 80:1, 82:6, 82:7, 84:23, 90:5, 100:14, 113:5, 113:6, 114:6, 114:23, 115:2
**Drug** [8] - 20:1, 20:3, 20:6, 97:16, 98:13, 99:2, 100:22, 104:20
**drugs** [18] - 21:20, 34:17, 42:4, 59:20, 62:24, 63:1, 63:20, 64:4, 64:5, 64:6, 64:7, 64:8, 64:9, 66:21, 66:25, 67:17, 111:11
**Drugs** [3] - 45:20, 45:24, 110:19
**DSCSA** [1] - 19:22
**Du** [1] - 43:25

*DUANE* [1] - 2:14
*Duane* [2] - 22:17, 22:19
*duly* [1] - 45:19
*duplicative* [1] - 61:21
*during* [23] - 9:19, 11:21, 12:4, 13:25, 14:13, 14:16, 14:22, 17:23, 18:1, 18:12, 19:6, 24:10, 24:12, 26:20, 26:23, 35:2, 38:14, 40:19, 42:3, 104:3, 106:24, 109:13, 116:13
*duty* [4] - 20:8, 20:16, 71:16, 76:3

## E

*e-mail* [3] - 7:25, 9:1, 9:2
*e-mails* [2] - 7:22, 7:23
*early* [2] - 37:1, 109:21
*easy* [3] - 52:3, 58:14, 58:15
*effect* [1] - 59:5
*effective* [2] - 16:6, 114:20
*effects* [8] - 85:3, 112:15, 113:8, 114:12, 115:9, 115:14, 115:16, 115:20
*efficacy* [1] - 115:2
*effort* [1] - 27:10
*eight* [9] - 104:3, 104:4, 105:3, 105:5, 105:9, 106:7, 107:18, 109:12, 109:13
*eight-year* [1] - 109:13
*EIR* [4] - 12:4, 13:3, 13:17, 13:19
*EIRs* [1] - 14:22
*Eisenhower* [1] - 1:13
*either* [4] - 7:15, 12:24, 87:10, 99:17
*elected* [1] - 106:19
*elements* [1] - 21:24
*EMA* [13] - 28:1, 28:10, 28:16, 30:15, 77:16, 77:18, 83:12, 83:16
*employ* [1] - 100:5
*employed* [2] - 104:17
*end* [7] - 13:18, 13:19, 82:11, 84:3, 87:10, 87:25, 96:9
*engage* [2] - 22:4, 65:7
*engaged* [2] - 22:3,

72:21
*engaging* [1] - 81:14
*engendered* [1] - 99:1
*engine* [1] - 20:9
*English* [1] - 116:25
*enter* [4] - 46:10, 46:19, 47:2, 48:23
*entered* [4] - 46:19, 50:13, 65:19, 71:12
*entering* [1] - 46:23
*entire* [3] - 6:9, 30:5, 35:6
*entities* [4] - 48:15, 57:25, 83:5, 111:24
*entitled* [5] - 23:16, 53:18, 86:18, 113:25, 117:24
*entity* [11] - 16:16, 45:4, 47:25, 58:18, 90:25, 101:18, 101:21, 108:14, 108:19, 110:17, 111:2
*entry* [1] - 46:18
*envisioning* [1] - 65:5
*equivalent* [1] - 20:11
*ESI* [2] - 7:2, 7:7
*especially* [4] - 5:6, 53:19, 78:20, 85:7
*ESQ* [1] - 2:15
*ESQUIRE* [11] - 1:13, 1:16, 1:19, 1:19, 2:2, 2:3, 2:6, 2:9, 2:12, 2:18, 2:21
*essentially* [1] - 19:2
*establish* [4] - 21:23, 35:14, 39:2, 85:12
*established* [1] - 85:12
*establishes* [1] - 18:16
*establishment* [5] - 12:12, 53:13, 53:17, 91:24, 93:14
*et* [6] - 11:19, 67:15, 75:23, 76:20, 76:21
*Europe* [2] - 85:1, 85:2
*European* [4] - 28:1, 28:2, 77:16, 78:24
*evaluate* [1] - 107:1
*evaluated* [2] - 17:4, 29:9
*evaluating* [1] - 104:7
*evaluation* [3] - 104:11, 107:4
*eventually* [1] - 45:8
*evidence* [20] - 15:17, 15:25, 16:4, 16:24, 17:2, 18:16, 21:16, 26:11, 27:22, 46:7,

60:1, 69:11, 71:13, 71:16, 71:22, 72:2, 75:6, 75:14, 107:20
*exactly* [7] - 25:1, 25:22, 28:14, 30:25, 31:23, 103:17, 105:21
*example* [28] - 9:15, 14:11, 19:4, 22:17, 41:12, 41:18, 53:17, 60:17, 61:3, 61:6, 64:24, 67:1, 68:21, 77:12, 80:1, 82:2, 83:11, 87:22, 98:21, 98:24, 103:25, 104:11, 106:24, 106:25, 107:4, 107:24, 108:12, 109:7
*except* [1] - 28:12
*exchange* [1] - 13:21
*exchanged* [2] - 11:14, 22:25
*excipients* [1] - 89:17
*exclusively* [2] - 24:15, 53:1
*excuse* [2] - 27:17, 62:21
*exemplifies* [2] - 37:21, 98:24
*exercising* [1] - 45:12
*Exhibit* [4] - 10:17, 13:19, 13:20
*exhibits* [2] - 11:3, 93:15
*exist* [2] - 47:24, 78:18
*existed* [3] - 16:8, 27:4
*exists* [1] - 60:24
*expand* [1] - 31:8
*expansion* [2] - 59:10, 62:23
*expect* [2] - 32:11, 61:15
*expectation* [1] - 85:5
*expected* [1] - 29:22
*expense* [1] - 31:24, 38:3
*experiences* [1] - 106:18
*expert* [2] - 24:23, 40:6
*experts* [11] - 23:8, 24:24, 25:23, 37:15, 67:19, 95:16, 95:17, 96:4, 99:11, 100:6
*explain* [1] - 66:8
*explore* [1] - 18:11
*exposed* [1] - 113:22
*exposure* [1] - 114:12
*expressed* [1] - 40:24

*extensions* [1] - 47:1
*extensive* [3] - 61:18, 88:6, 104:10
*extent* [16] - 13:15, 43:1, 50:21, 54:7, 60:18, 74:15, 74:20, 77:1, 85:23, 86:6, 89:6, 94:18, 95:6, 97:3, 108:2, 113:23
*extents* [1] - 89:3
*external* [1] - 89:17
*extra* [1] - 87:23
*extraction* [1] - 62:7
*eye* [1] - 64:10
*eyes* [1] - 40:6

## F

*facilities* [71] - 14:2, 14:5, 19:2, 33:21, 36:2, 47:16, 48:16, 48:19, 48:21, 48:22, 49:1, 49:4, 49:8, 49:9, 49:10, 49:13, 49:15, 49:21, 49:25, 50:2, 50:4, 50:5, 51:7, 51:15, 51:16, 51:22, 52:8, 52:14, 52:23, 52:25, 53:16, 53:24, 54:3, 54:11, 54:14, 54:16, 54:20, 54:22, 55:4, 55:5, 55:9, 55:14, 55:17, 55:19, 56:5, 56:9, 56:11, 56:13, 56:15, 56:19, 56:22, 57:2, 57:5, 57:12, 57:14, 68:13, 69:3, 77:11, 80:12, 82:21, 89:23, 90:6, 91:5, 91:25, 92:22, 92:25, 95:16
*facility* [21] - 10:20, 18:4, 26:2, 26:3, 47:9, 47:10, 47:22, 49:16, 49:17, 50:7, 50:11, 50:14, 55:22, 57:10, 57:19, 58:16, 62:5, 62:9, 91:12, 92:15, 92:16
*fact* [11] - 11:1, 21:9, 27:15, 37:9, 37:17, 51:6, 74:8, 75:24, 85:6, 97:17, 99:20, 113:24, 115:21
*factual* [2] - 70:23, 106:5
*failed* [1] - 21:11
*failure* [1] - 71:14
*fair* [4] - 11:25, 36:17, 37:25, 116:17

*fairly* [1] - 6:16
*fairness* [1] - 75:20
*fall* [3] - 33:14, 64:18, 92:6
*falls* [1] - 7:6
*far* [12] - 31:9, 31:11, 32:25, 43:4, 52:16, 56:7, 60:11, 102:22, 104:19, 105:19, 110:12
*FARR* [1] - 2:5
*fashioned* [1] - 20:7
*FDA* [96] - 5:7, 8:10, 8:15, 9:5, 9:14, 9:16, 10:6, 10:13, 10:14, 10:16, 10:20, 10:25, 11:14, 11:15, 12:1, 12:4, 12:7, 12:8, 12:13, 12:24, 12:25, 13:1, 13:2, 13:16, 13:25, 17:13, 20:3, 20:25, 21:6, 21:10, 21:13, 21:17, 21:19, 22:4, 22:18, 22:20, 23:7, 23:10, 27:6, 27:9, 28:2, 28:15, 30:6, 30:18, 36:25, 37:8, 37:18, 38:9, 39:8, 39:9, 40:14, 41:2, 41:9, 43:20, 44:2, 75:18, 78:17, 78:19, 78:25, 79:13, 80:20, 80:24, 81:9, 81:10, 81:18, 81:25, 82:23, 82:24, 83:9, 83:13, 83:19, 83:21, 83:23, 83:24, 85:1, 91:16, 95:8, 98:3, 99:17, 101:14, 101:22, 102:25, 103:2, 103:23, 108:4, 110:2, 110:4, 110:5, 110:20, 111:13, 112:5, 116:24
*FDA's* [8] - 12:19, 20:24, 21:4, 21:8, 23:3, 26:16, 26:18, 28:20
*FDAs* [1] - 83:21
*February* [1] - 77:19
*few* [7] - 4:9, 4:19, 15:5, 33:9, 43:12, 101:3, 109:18
*field* [1] - 35:7
*figure* [3] - 31:7, 67:8, 88:12
*figured* [2] - 17:3, 30:7
*file* [8] - 7:24, 46:20, 47:2, 67:3, 108:1,

108:3, 108:4
**File** [3] - 97:16, 98:13, 99:3
**filed** [4] - 45:23, 46:9, 101:18, 109:8
**filer** [1] - 100:20
**filers** [1] - 41:25
**files** [1] - 98:4
**filing** [6] - 100:1, 100:3, 100:11, 101:6, 103:12, 106:11
**filings** [1] - 7:23
**finalize** [1] - 111:6
**finalized** [2] - 34:13, 37:3
**finally** [1] - 46:23
**financial** [1] - 68:19
**findings** [6] - 21:4, 23:3, 29:21, 30:14, 39:1, 85:20
**fine** [1] - 47:11
**finish** [1] - 64:19
**finished** [77] - 14:3, 14:4, 14:24, 16:13, 16:16, 18:3, 18:13, 18:17, 18:22, 18:25, 19:13, 20:17, 23:18, 24:13, 26:3, 26:10, 32:18, 48:23, 49:17, 49:20, 52:1, 53:10, 53:14, 53:16, 54:2, 54:8, 54:10, 54:11, 54:20, 54:23, 55:8, 55:21, 56:5, 56:22, 57:15, 58:4, 58:6, 58:22, 77:13, 83:11, 85:24, 86:16, 89:7, 89:10, 89:15, 89:23, 90:12, 90:21, 90:24, 91:2, 91:5, 91:6, 91:7, 91:13, 91:21, 91:23, 91:25, 92:5, 92:7, 92:10, 92:12, 92:22, 92:23, 92:24, 93:4, 93:11, 93:16, 94:9, 98:2, 98:18, 102:4, 103:5, 106:18, 108:8, 110:14, 110:25, 112:7
**FIRM** [1] - 2:5
**first** [31] - 15:6, 15:16, 38:8, 38:9, 47:13, 48:10, 49:19, 53:12, 53:21, 53:23, 68:11, 69:23, 76:25, 79:16, 82:6, 82:7, 90:22, 91:3, 92:4, 93:7, 97:16, 98:2, 99:6,

100:13, 101:3, 101:13, 102:24, 109:19, 110:2, 111:22
**fit** [1] - 47:9
**five** [2] - 35:1, 84:24
**fixed** [1] - 107:9
**flag** [1] - 59:23
**flaw** [1] - 71:10
**Floor** [1] - 2:18
**Florida** [2] - 1:17, 2:7
**focus** [4] - 35:12, 43:2, 95:2, 99:25
**focused** [3] - 31:7, 31:15, 90:15
**focuses** [1] - 95:5
**FOIA** [4] - 12:10, 22:9, 22:12, 83:22
**follow** [2] - 21:11, 33:19
**following** [1] - 14:18
**Food** [1] - 20:1
**FOR** [1] - 1:1
**forces** [1] - 31:24
**foregoing** [1] - 117:23
**foreign** [22] - 27:22, 27:24, 30:13, 30:14, 49:10, 57:25, 77:1, 77:6, 77:20, 78:3, 78:11, 78:18, 79:6, 79:12, 80:10, 80:24, 81:5, 84:21, 86:7, 86:15, 87:15, 116:9
**foresaw** [1] - 76:10
**foresee** [2] - 76:8, 117:14
**foreseeable** [2] - 71:17, 72:3
**forgive** [1] - 65:11
**forgot** [1] - 101:10
**form** [1] - 21:21
**formative** [1] - 20:15
**formerly** [2] - 56:21, 57:13
**formulating** [2] - 73:14, 89:14
**formulation** [1] - 82:13
**forth** [4] - 14:17, 14:20, 83:5, 85:8
**forwarded** [1] - 45:22
**four** [8] - 27:1, 35:1, 63:20, 69:17, 71:22, 79:14, 81:6, 84:24
**fourth** [1] - 82:5
**France** [1] - 50:12
**frankly** [5] - 22:2, 98:24, 103:7, 108:9, 117:16
**free** [1] - 64:18

**FREEMAN** [1] - 1:12
**fresh** [1] - 66:5
**Friday** [1] - 72:23
**Friedlander** [2] - 1:23, 117:25
**friedlanderreporter @gmail.com** [1] - 1:23
**front** [2] - 46:1, 82:11
**full** [4] - 12:13, 40:12, 110:6, 112:6
**fully** [3] - 11:19, 19:2, 19:13
**fulsome** [2] - 18:22, 78:17
**functional** [2] - 8:25, 9:1
**functionally** [1] - 9:6
**future** [1] - 76:7

### G

**gaps** [1] - 22:23
**gas** [1] - 27:4
**gauntlet** [1] - 35:14
**general** [8] - 31:9, 33:2, 43:2, 63:4, 63:20, 96:24, 97:9, 101:25
**generally** [2] - 49:15, 98:9
**generic** [1] - 19:17
**GEORGE** [1] - 2:6
**George** [1] - 3:18
**Georgia** [1] - 2:22
**germane** [3] - 84:17, 98:23, 106:9
**ghost** [3] - 16:22, 29:12, 60:9
**given** [7] - 12:8, 24:24, 49:14, 63:13, 70:1, 80:20, 80:21
**glad** [2] - 90:20, 96:10
**gleaned** [1] - 88:24
**GOLDBERG** [51] - 2:15, 3:20, 10:12, 13:1, 13:9, 23:22, 23:25, 24:3, 24:17, 25:3, 25:5, 25:17, 30:9, 30:20, 32:7, 32:11, 32:19, 32:23, 34:12, 41:21, 42:11, 51:8, 51:11, 51:17, 51:19, 52:5, 53:4, 53:8, 54:7, 58:22, 62:18, 62:22, 73:22, 74:1, 74:3, 74:5, 74:10, 74:14, 75:2, 75:4, 77:6, 94:21, 94:24, 95:25, 96:19,

96:21, 96:23, 102:3, 102:11, 102:14, 117:8
**Goldberg** [20] - 3:20, 10:11, 11:24, 12:22, 14:7, 23:12, 30:11, 36:6, 37:2, 38:5, 41:20, 51:5, 54:6, 62:16, 62:21, 66:17, 77:4, 96:18, 104:14, 109:1
**Goldberg's** [1] - 34:5
**GOLDENBERG** [18] - 2:11, 2:12, 3:16, 112:13, 112:17, 112:20, 112:23, 113:3, 113:10, 114:4, 114:14, 114:17, 115:5, 115:11, 115:15, 115:18, 115:20, 116:1
**Goldenberg** [2] - 3:16, 107:21
**GOLOMB** [1] - 1:18
**Google** [1] - 27:23
**Gorda** [1] - 2:7
**GORDON** [1] - 2:17
**gospel** [1] - 28:19
**grant** [1] - 47:1
**granted** [1] - 97:7
**granular** [2] - 4:11, 21:23
**great** [3] - 15:14, 32:20, 106:13
**GREENBERG** [1] - 2:20
**gritty** [2] - 4:22, 15:5
**ground** [2] - 45:15, 73:7
**grounds** [1] - 73:25
**groundwork** [1] - 4:9
**Group** [2] - 2:16, 2:19
**guess** [5] - 41:21, 44:4, 46:9, 78:16, 80:17
**guesstimate** [1] - 5:13
**guide** [1] - 42:22
**guidelines** [1] - 50:19

### H

**Hague** [2] - 46:7, 46:14
**hand** [2] - 31:20, 61:14
**handed** [3] - 24:20, 26:16, 36:6
**handful** [1] - 99:25
**handle** [2] - 18:7, 68:9

**handled** [1] - 84:23
**hands** [6] - 20:12, 80:12, 80:19, 80:20, 82:22, 112:6
**hands-on** [2] - 80:12, 82:22
**happy** [2] - 21:20, 83:1
**hard** [1] - 98:15
**hat** [1] - 109:14
**head** [1] - 56:25
**heading** [1] - 114:18
**health** [9] - 112:15, 113:6, 113:8, 114:12, 114:25, 115:9, 115:14, 115:15, 115:20
**hear** [12] - 4:2, 5:2, 20:21, 23:13, 25:23, 61:15, 64:17, 75:11, 78:15, 90:20, 97:21, 116:2
**heard** [4] - 36:10, 39:11, 62:17, 85:11
**hearing** [2] - 33:1, 43:21
**heart** [2] - 113:6, 114:20
**heavily** [1] - 40:25
**heightened** [1] - 82:12
**Heinz** [1] - 101:11
**HEINZ** [5] - 45:6, 101:9, 101:11, 109:25, 110:2
**held** [2] - 8:19, 70:13
**help** [6] - 15:14, 33:15, 70:10, 70:17, 94:8, 96:13
**helpful** [2] - 24:22, 67:24
**helps** [1] - 28:11
**herself** [2] - 74:19, 74:24
**Hetero** [15] - 45:2, 45:20, 45:21, 45:24, 45:25, 53:6, 75:18, 110:12, 110:15, 110:17, 110:19, 111:14, 111:19
**hi** [1] - 52:7
**Hi** [1] - 59:12
**high** [3] - 31:24, 44:6, 44:18
**higher** [4] - 41:16, 41:17, 51:2, 58:1
**Highway** [1] - 2:9
**Hilton** [2] - 3:19, 7:21
**HILTON** [44] - 2:3, 3:19, 7:20, 8:4, 8:25, 13:15, 14:4, 19:24,

45:20, 46:15, 48:21, 49:1, 49:12, 49:22, 50:3, 50:7, 50:15, 50:17, 52:18, 53:11, 53:22, 54:4, 55:2, 55:5, 55:7, 90:20, 91:15, 91:22, 92:11, 93:3, 93:7, 93:14, 93:18, 93:23, 110:17, 110:22, 111:1, 111:8, 111:15, 111:17, 111:19, 111:22, 112:1, 112:8

**history** [2] - 81:1, 105:23

**hit** [1] - 62:11

**hits** [1] - 40:9

**hitting** [1] - 10:5

**hmm** [1] - 74:22

**hold** [17] - 7:3, 7:8, 68:3, 68:12, 71:13, 71:15, 72:8, 72:9, 72:11, 72:20, 73:5, 73:11, 74:5, 74:9, 76:12, 76:21

**holders** [2] - 20:2, 20:4

**holds** [6] - 37:17, 38:6, 69:25, 72:5, 72:6, 72:14

**Honik** [4] - 3:11, 22:19, 41:23, 42:2

**HONIK** [33] - 1:18, 1:19, 3:11, 20:7, 21:25, 22:8, 35:25, 36:5, 36:18, 97:15, 97:23, 98:8, 99:24, 100:10, 100:20, 100:24, 101:6, 101:16, 102:18, 102:22, 102:25, 103:9, 103:12, 103:18, 103:21, 104:6, 105:10, 105:16, 105:22, 107:21, 108:12, 109:22, 110:11

**Honor** [108] - 3:9, 3:11, 3:12, 3:14, 3:20, 3:22, 3:24, 5:17, 7:20, 8:7, 10:12, 11:10, 12:3, 12:11, 12:21, 13:10, 13:15, 14:10, 14:21, 15:16, 19:24, 22:1, 23:22, 23:25, 24:3, 24:20, 24:24, 25:5, 26:17, 27:17, 30:9, 30:20, 31:1, 32:20,

34:13, 35:25, 36:18, 39:7, 43:12, 45:5, 45:6, 45:19, 45:20, 47:7, 48:22, 49:12, 50:15, 51:9, 52:18, 53:4, 53:11, 54:4, 55:7, 56:8, 57:18, 58:12, 58:22, 59:12, 61:25, 62:18, 62:19, 66:18, 67:11, 67:21, 68:7, 68:8, 68:11, 68:16, 68:21, 69:5, 69:14, 70:15, 70:25, 71:3, 71:10, 71:11, 72:18, 73:9, 73:12, 75:15, 76:22, 77:17, 78:13, 84:7, 85:13, 90:20, 91:15, 91:22, 94:21, 95:13, 95:21, 95:22, 95:25, 96:19, 97:15, 98:8, 101:9, 101:16, 103:4, 108:1, 109:6, 109:18, 110:11, 112:8, 112:13, 113:3, 116:22, 117:8

**HONORABLE** [1] - 1:9

**hope** [1] - 60:24

**hopefully** [1] - 36:11

**horse** [2] - 71:9, 75:9

**host** [1] - 19:8

**house** [1] - 73:13

**Huahai** [2] - 111:15, 111:17

**humans** [1] - 19:18

**humongous** [1] - 62:5

**hundred** [5] - 39:17, 40:18, 40:20, 84:11, 84:15

**hundreds** [3] - 31:17, 89:24, 90:6

**hypotheses** [1] - 61:4

**hypothetical** [9] - 77:15, 77:19, 77:24, 78:1, 105:10, 105:12, 105:16, 106:1, 109:11

**hypothetically** [6] - 39:16, 40:17, 60:23, 61:1, 78:14, 104:22

---

**I**

**idea** [2] - 4:15, 106:6

**identical** [1] - 85:5

**identification** [5] - 52:10, 53:22, 55:3, 72:21, 96:5

**identified** [7] - 28:9, 30:24, 49:5, 52:7,

54:19, 63:6, 71:10

**identify** [21] - 5:19, 5:21, 6:4, 6:15, 15:10, 27:3, 27:12, 29:18, 32:16, 35:8, 35:9, 35:10, 41:10, 49:9, 51:6, 53:23, 59:3, 70:10, 82:16, 94:6, 104:23

**identifying** [3] - 32:24, 72:13, 89:16

**identity** [1] - 40:16

**idly** [1] - 64:22

**ignored** [1] - 16:23

**illogical** [1] - 81:10

**illustrate** [1] - 99:4

**immaculate** [1] - 37:10

**immediately** [1] - 46:18

**implicated** [4] - 66:1, 68:15, 94:10, 115:24

**implicates** [3] - 37:19, 68:16

**implication** [1] - 9:1

**importance** [1] - 61:20

**important** [28] - 20:23, 25:24, 35:12, 40:8, 40:10, 42:21, 48:17, 67:19, 70:8, 70:11, 70:13, 76:18, 77:8, 78:10, 79:3, 79:15, 80:4, 81:14, 82:14, 82:18, 82:20, 83:6, 83:9, 85:14, 99:4, 113:10, 114:9, 116:19

**imposes** [2] - 20:8, 20:16

**impossible** [1] - 76:7

**impurities** [17] - 17:12, 28:4, 28:9, 28:25, 29:12, 31:3, 39:5, 43:6, 59:19, 63:8, 64:11, 90:3, 95:2, 96:6, 97:2, 99:15, 108:17

**impurity** [3] - 17:22, 44:18, 88:1

**IN** [1] - 1:3

**in-camera** [2] - 6:17, 68:12

**in-house** [1] - 73:13

**in-person** [1] - 72:23

**inactive** [1] - 89:17

**inadequate** [1] - 29:6

**Inc** [3] - 2:23, 2:23, 58:17

**incentive** [1] - 85:8

**incentives** [1] - 21:14

**included** [1] - 46:1

**including** [2] - 21:9, 25:10

**incomplete** [2] - 11:17, 40:5

**incorporating** [1] - 20:17

**increased** [1] - 81:15

**indeed** [2] - 20:4, 106:1

**independent** [3] - 19:11, 19:15, 83:17

**India** [12] - 10:15, 45:3, 45:21, 45:24, 46:5, 46:16, 54:12, 54:21, 55:22, 81:6, 82:21, 83:16

**India's** [1] - 81:11

**Indian** [3] - 31:10, 46:1, 101:18

**indicate** [1] - 32:24

**indulge** [2] - 4:18, 15:4

**Industries** [1] - 2:22

**industry** [2] - 20:16, 82:4

**inequitable** [1] - 107:19

**inference** [3] - 69:5, 69:7, 69:14

**inform** [3] - 70:17, 94:9, 106:19

**information** [58] - 15:24, 18:4, 19:8, 21:6, 22:9, 29:11, 42:15, 52:10, 63:10, 67:3, 67:5, 67:25, 68:15, 68:24, 69:1, 69:18, 70:23, 71:6, 72:24, 73:1, 73:16, 74:16, 74:20, 75:1, 75:19, 76:18, 78:10, 78:18, 78:23, 79:5, 79:23, 80:19, 80:24, 80:25, 81:4, 81:8, 81:9, 81:11, 83:22, 84:3, 84:9, 84:10, 84:25, 85:2, 85:5, 86:19, 87:7, 87:14, 89:2, 103:23, 104:6, 107:17, 112:23, 113:20, 113:23, 113:25, 114:6

**ingested** [1] - 19:18

**ingredient** [3] - 36:20, 59:15, 114:19

**ingredients** [1] - 89:18

**injuries** [2] - 113:18, 115:23

**injury** [3] - 113:15,

114:7, 115:5

**innovator** [2] - 98:22, 104:12

**insight** [1] - 80:8

**insignificant** [1] - 106:8

**inspect** [1] - 82:23

**inspected** [1] - 13:16

**inspecting** [1] - 98:21

**inspection** [27] - 10:18, 12:1, 12:12, 12:24, 13:7, 13:21, 13:25, 14:14, 14:23, 43:24, 44:5, 53:13, 53:17, 77:18, 77:21, 77:25, 78:3, 81:18, 81:21, 83:2, 83:4, 85:15, 89:21, 89:24, 91:17, 91:24, 93:14

**inspections** [6] - 10:15, 14:1, 14:18, 81:23, 82:22

**instance** [3] - 47:13, 71:18, 98:10

**instances** [2] - 66:4, 99:10

**instead** [2] - 29:14, 72:4

**instinct** [1] - 32:9

**instituted** [1] - 69:17

**instruct** [1] - 74:14

**instruction** [1] - 70:4

**instructions** [1] - 70:14

**integrated** [1] - 111:10

**intend** [1] - 11:6

**intended** [2] - 27:15, 31:23

**intent** [1] - 4:8

**interactions** [2] - 84:14, 84:19

**interested** [5] - 38:3, 38:4, 50:23, 66:14, 105:6

**interim** [1] - 68:23

**internal** [6] - 7:25, 8:9, 8:12, 8:14, 9:4, 106:13

**interrupting** [1] - 34:23

**introduce** [2] - 36:15, 36:20

**introduced** [8] - 17:13, 17:23, 18:12, 25:11, 25:18, 26:8, 31:19, 36:9

**invariably** [1] - 104:10

**investigated** [3] - 31:14, 79:23, 114:2

**investigating** [1] -

18:15
**investigation** [6] - 22:1, 22:18, 23:5, 27:11, 60:12, 85:21
**involved** [1] - 19:12
**irbesartan** [2] - 62:15, 65:1
**irrelevant** [3] - 23:19, 89:19, 103:22
**isolate** [1] - 25:24
**Israel** [3] - 81:7, 82:21, 83:16
**issuance** [1] - 65:5
**issue** [95] - 4:24, 5:2, 5:10, 5:11, 5:12, 6:12, 7:10, 9:11, 12:20, 13:6, 13:11, 17:6, 21:15, 22:20, 27:22, 31:2, 31:7, 32:3, 33:6, 33:12, 33:18, 33:20, 33:22, 33:23, 35:12, 39:10, 40:23, 41:5, 43:11, 43:22, 47:9, 47:12, 47:14, 47:21, 48:10, 48:11, 48:15, 48:17, 49:25, 50:6, 51:7, 51:15, 52:13, 52:17, 53:21, 53:24, 54:5, 54:25, 56:7, 57:16, 57:17, 58:25, 59:2, 61:16, 61:17, 61:20, 63:7, 63:16, 63:18, 64:13, 66:22, 68:3, 68:13, 71:7, 75:25, 76:12, 76:25, 77:6, 78:22, 82:10, 84:5, 86:3, 86:18, 88:4, 88:5, 89:3, 91:3, 93:4, 94:5, 94:19, 94:22, 96:10, 96:13, 98:23, 110:20, 110:21, 112:4, 112:13, 112:16, 113:14, 116:5
**Issue** [1] - 68:2
**issued** [3] - 69:2, 70:1, 72:9
**issues** [29] - 4:3, 4:7, 4:11, 4:16, 4:20, 4:23, 15:1, 16:15, 23:4, 32:14, 35:21, 47:5, 48:5, 48:7, 55:2, 63:3, 64:24, 64:25, 76:25, 77:3, 77:11, 84:18, 93:4, 97:8, 98:5, 112:11, 112:12, 116:3, 117:17
**ISSUES** [1] - 1:5

**item** [1] - 116:5
**iteration** [1] - 99:9
**itself** [2] - 61:5, 72:24

**J**

**Jane** [1] - 73:3
**January** [22] - 26:19, 26:22, 96:23, 97:9, 100:15, 100:20, 101:2, 102:1, 102:8, 103:13, 103:19, 104:2, 104:5, 105:2, 105:4, 105:5, 107:16, 109:16, 111:6, 112:2, 112:6
**Japan** [5] - 87:23, 88:10, 88:11, 88:12, 88:14
**Japanese** [2] - 88:1, 88:2
**JASON** [1] - 2:18
**Jason** [2] - 3:24, 27:20
**JERSEY** [1] - 1:1
**Jersey** [2] - 1:7, 1:14
**Jerusalem** [3] - 55:10, 56:21, 57:12
**Jessica** [1] - 101:11
**job** [1] - 115:3
**JOEL** [1] - 1:9
**JOHN** [1] - 1:19
**joined** [3] - 57:16, 58:25, 64:16
**Joint** [2] - 2:16, 2:19
**joked** [1] - 113:22
**JPML** [3] - 44:24, 62:23, 62:24
**Judge** [46] - 4:14, 4:15, 9:10, 20:8, 21:1, 27:18, 32:16, 52:7, 52:12, 52:15, 53:2, 54:12, 54:15, 54:24, 59:13, 60:5, 60:8, 60:15, 64:21, 65:4, 65:11, 65:23, 66:5, 66:8, 71:8, 71:20, 72:7, 72:9, 72:15, 72:20, 73:19, 77:8, 77:23, 78:6, 84:23, 86:10, 86:12, 87:2, 98:1, 103:7, 105:11, 112:12, 117:13, 117:14, 117:15, 117:16
**JUDGE** [1] - 1:10
**judgment** [1] - 108:21
**July** [7] - 15:10, 34:25, 60:3, 65:22, 66:3, 76:2, 76:4
**Jun** [1] - 43:25

**June** [5] - 17:14, 28:8, 101:6, 101:20, 109:21
**jury** [1] - 114:23
**justification** [3] - 86:13, 86:25, 87:1
**justify** [1] - 109:11

**K**

**KANNER** [1] - 2:2
**Karen** [2] - 1:23, 117:25
**KATZ** [1] - 1:12
**keep** [7] - 10:2, 11:15, 64:10, 69:9, 77:2, 89:21, 112:17
**kept** [3] - 7:25, 17:1, 62:2
**key** [4] - 43:7, 66:19, 68:24, 93:12
**kind** [5] - 17:1, 30:20, 32:19, 32:24, 64:13
**kinds** [1] - 96:2
**KIRTLAND** [1] - 2:8
**knowledge** [3] - 60:21, 67:14, 107:8
**known** [3] - 29:5, 30:24, 82:3
**knows** [4] - 66:18, 66:19, 67:12, 76:22
**kryptonite** [1] - 113:22
**Kugler** [7] - 4:14, 4:15, 112:12, 117:13, 117:14, 117:15, 117:16

**L**

**lab** [1] - 10:19
**labeled** [1] - 85:20
**labels** [2] - 84:23, 85:2
**laboratory** [2] - 104:25, 105:7
**Labs** [1] - 110:19
**laid** [3] - 67:21, 86:10, 87:9
**land** [1] - 67:20
**language** [3] - 49:3, 116:9, 116:18
**Lantech** [1] - 61:7
**largely** [1] - 103:22
**larger** [1] - 93:4
**largest** [1] - 21:19
**Lasalle** [1] - 2:12
**last** [15] - 15:20, 26:22, 53:15, 61:13, 64:20, 70:20, 72:23, 84:7, 88:13, 96:10, 96:11, 107:22,

109:23, 113:22, 117:17
**Laughter** [1] - 25:4
**launch** [2] - 100:16, 106:12
**launched** [1] - 106:11
**law** [6] - 16:10, 20:8, 20:16, 29:22, 70:2, 70:3
**LAW** [2] - 2:5, 2:11
**lawyer** [2] - 68:20, 115:5
**lawyers** [1] - 73:13
**lay** [1] - 87:2
**Layne** [2] - 3:19, 7:21
**LAYNE** [1] - 2:3
**lays** [1] - 71:21
**lead** [4] - 32:16, 76:25, 81:15, 89:20
**leads** [2] - 49:4, 107:9
**learned** [1] - 16:10
**least** [15] - 18:10, 21:12, 46:7, 48:18, 49:7, 59:20, 60:10, 60:12, 72:10, 80:13, 102:20, 102:22, 103:10, 109:21, 109:23
**leaves** [1] - 92:21
**led** [5] - 29:10, 98:12, 99:19, 99:21, 100:2
**left** [5] - 25:6, 25:14, 26:20, 45:8, 45:18
**legal** [2] - 47:24, 70:1
**length** [1] - 77:10
**letter** [9] - 6:18, 17:10, 23:17, 68:19, 73:6, 74:5, 74:9, 88:6, 88:7
**letters** [10] - 21:11, 42:15, 68:12, 68:16, 68:18, 68:22, 68:25, 69:2, 70:25, 71:4
**letting** [1] - 21:1
**level** [5] - 41:15, 41:16, 41:17, 66:6, 91:5
**levels** [4] - 28:25, 44:6, 51:3, 80:5
**LEVIN** [1] - 1:15
**liability** [3] - 18:17, 47:12, 48:2
**LIABILITY** [1] - 1:4
**liaison** [3] - 22:18, 110:21, 110:23
**liaisons** [2] - 111:13, 112:5
**life** [1] - 114:20
**life-saving** [1] - 114:20

**light** [7] - 16:9, 23:14, 23:20, 34:8, 34:17, 36:1, 98:5
**likelihood** [1] - 84:8
**likely** [4] - 9:19, 35:24, 76:17, 78:22
**limit** [3] - 43:22, 49:25, 51:15
**Limited** [1] - 101:17
**limited** [3] - 59:8, 60:10, 79:16
**limiting** [6] - 52:19, 93:25, 94:17, 105:11, 105:25, 106:22
**limits** [1] - 90:13
**line** [5] - 28:3, 42:5, 62:9, 67:11, 92:6
**lines** [1] - 79:5
**liquid** [1] - 27:4
**list** [14] - 13:20, 59:15, 60:23, 70:7, 73:14, 93:15, 95:15, 95:16, 96:1, 96:2, 96:7, 96:8, 97:24, 113:12
**listed** [1] - 66:17
**listen** [1] - 74:18
**lists** [2] - 13:18, 70:11
**LITIGATION** [1] - 1:4
**litigation** [25] - 37:22, 68:2, 69:25, 71:13, 71:15, 71:17, 71:24, 72:2, 72:3, 72:5, 72:6, 72:11, 72:13, 73:5, 73:11, 74:5, 74:9, 76:1, 76:8, 76:11, 76:17, 76:21, 116:12, 116:15, 116:21
**litigations** [1] - 80:23
**lives** [2] - 114:22, 114:24
**LLC** [3] - 1:12, 2:2, 2:23
**LLP** [4] - 2:8, 2:14, 2:17, 2:20
**lo** [1] - 99:8
**located** [4] - 55:9, 55:22, 56:20, 56:23
**log** [5] - 7:1, 7:4, 7:5, 7:6, 7:7
**logical** [1] - 26:6
**long-winded** [1] - 100:10
**Longwell** [1] - 45:22
**look** [26] - 16:19, 18:5, 19:6, 19:7, 19:9, 25:14, 27:24, 29:19, 29:20, 37:11, 38:2, 38:6, 38:25, 42:22,

50:23, 50:24, 63:17, 68:18, 69:15, 71:11, 79:14, 79:22, 81:20, 82:8, 113:18
**looked** [7] - 9:6, 12:6, 16:12, 17:3, 41:2, 53:15, 82:10
**looking** [10] - 10:21, 30:16, 31:16, 37:6, 40:7, 48:6, 56:14, 86:20, 87:9, 104:3
**lookout** [1] - 77:25
**looks** [2] - 46:16, 62:25
**losartan** [6] - 59:22, 60:17, 61:10, 62:15, 65:1
**losing** [1] - 104:6
**Louisiana** [1] - 2:4
**lower** [1] - 41:15
**Ltd** [1] - 2:22
**lunch** [6] - 4:5, 4:6, 59:1, 112:9, 112:10, 116:4

59:17, 92:17
**manufacturer** [6] - 20:17, 86:18, 93:16, 110:25, 111:3
**manufacturer's** [1] - 80:12
**manufacturers** [32] - 9:13, 14:24, 14:25, 15:22, 18:23, 19:1, 19:12, 19:13, 19:14, 27:10, 53:6, 53:15, 58:5, 89:11, 90:12, 90:21, 90:23, 90:24, 91:4, 91:6, 91:7, 91:23, 92:1, 92:5, 92:6, 92:7, 92:18, 92:23, 93:5, 96:2, 106:19
**manufactures** [1] - 54:16
**manufacturing** [67] - 14:1, 14:4, 15:19, 16:3, 17:23, 18:1, 18:13, 18:18, 19:6, 19:10, 24:4, 24:6, 24:11, 24:13, 24:15, 24:21, 25:12, 26:10, 31:9, 31:11, 34:23, 35:3, 37:1, 42:1, 47:16, 50:18, 51:21, 52:25, 54:2, 54:8, 54:11, 55:8, 55:22, 56:4, 56:5, 59:4, 60:18, 65:3, 65:15, 66:15, 66:24, 66:25, 67:4, 67:16, 67:22, 76:20, 81:17, 82:21, 85:24, 89:7, 89:22, 91:13, 91:21, 91:25, 93:9, 94:10, 94:15, 97:1, 97:3, 98:11, 104:15, 105:2, 105:6, 105:8, 106:25, 109:2
**manufacturing-related** [1] - 54:8
**March** [5] - 100:14, 101:13, 108:3, 109:25, 110:1
**market** [9] - 48:23, 57:20, 57:21, 65:19, 85:9, 98:3, 108:10, 108:11
**Market** [1] - 1:20
**marketed** [2] - 82:14, 82:15
**marketing** [3] - 86:7, 86:15, 87:7
**marketplace** [1] - 104:8

**markets** [1] - 77:12
**Marlene** [1] - 3:16
**MARLENE** [1] - 2:12
**Massachusetts** [2] - 45:23, 46:2
**master** [1] - 75:21
**Master** [3] - 97:16, 98:13, 99:3
**material** [2] - 78:18, 80:18
**materially** [1] - 84:10
**materials** [1] - 77:1
**matter** [2] - 75:24, 117:24
**matters** [1] - 108:9
**MAZIE** [1] - 1:12
**McKesson** [2] - 111:9, 111:11
**MDL** [3] - 3:5, 62:25, 84:24
**mean** [22] - 14:16, 20:8, 21:15, 22:2, 33:1, 37:10, 39:24, 41:12, 52:18, 60:6, 66:23, 67:11, 68:20, 80:22, 87:6, 87:16, 88:24, 107:8, 109:6, 109:10, 113:7, 114:5
**meant** [1] - 99:3
**mechanical** [1] - 1:25
**medication** [1] - 114:20
**medications** [1] - 77:13
**medicines** [2] - 26:25, 28:9
**Medicines** [1] - 28:1
**meet** [7] - 4:15, 11:4, 93:9, 94:14, 95:19, 112:11, 117:13
**meeting** [3] - 72:23, 107:5, 117:14
**meetings** [1] - 117:17
**mention** [1] - 86:12
**mentioned** [4] - 10:1, 77:12, 84:22, 85:7
**merely** [1] - 63:1
**met** [1] - 19:16
**metaphor** [1] - 107:21
**methodology** [1] - 15:20
**methods** [1] - 26:24
**might** [13] - 7:15, 10:16, 18:11, 23:10, 27:24, 28:2, 61:5, 66:6, 78:9, 78:18, 80:11, 91:18, 109:7
**millions** [1] - 31:17
**mind** [5] - 28:1, 69:9, 77:2, 95:7, 98:16

**mindsets** [1] - 72:19
**minimum** [1] - 101:20
**Minneapolis** [1] - 2:13
**Minnesota** [1] - 2:13
**minute** [1] - 93:20
**mired** [1] - 43:8
**miscommunication** [1] - 117:5
**miss** [3] - 57:24, 58:3, 108:20
**missed** [4] - 21:10, 56:8, 88:15, 110:12
**missing** [2] - 40:7, 69:14
**mistake** [1] - 37:25
**mistaken** [1] - 45:16
**Mitchell** [1] - 1:6
**model** [1] - 94:2
**moment** [11] - 25:11, 25:19, 25:20, 25:24, 26:1, 26:2, 31:12, 31:13, 31:14, 31:19, 42:19
**moments** [1] - 33:10
**month** [1] - 46:5
**months** [6] - 26:22, 35:5, 39:11, 46:5, 101:3, 109:19
**moot** [1] - 7:10
**morass** [2] - 31:22, 43:8
**moreover** [1] - 72:1
**Morgantown** [3] - 54:21, 58:12, 58:18
**morning** [9] - 3:3, 3:9, 3:11, 3:12, 3:14, 3:16, 3:22, 3:24, 4:2
**MORRIS** [1] - 2:14
**Morris** [2] - 22:17, 22:19
**most** [7] - 9:19, 42:21, 58:4, 84:13, 85:14, 95:7, 104:19
**motion** [2] - 44:23, 62:24
**motivations** [2] - 23:5, 28:17
**move** [2] - 48:15, 53:20
**moving** [3] - 29:16, 68:2, 76:24
**MR** [243] - 3:8, 3:9, 3:11, 3:14, 3:18, 3:20, 3:22, 3:24, 5:16, 6:14, 6:22, 7:6, 8:7, 8:16, 8:20, 9:10, 9:23, 10:1, 10:9, 10:12, 11:10, 12:3, 12:20, 13:1, 13:9, 13:13, 14:3, 14:10,

14:16, 14:21, 15:3, 15:16, 15:23, 17:18, 17:25, 18:14, 18:20, 18:24, 19:23, 20:7, 21:5, 21:25, 22:8, 22:14, 22:17, 23:6, 23:22, 23:25, 24:3, 24:17, 25:3, 25:5, 25:17, 27:17, 27:20, 28:7, 28:23, 29:8, 30:9, 30:10, 30:20, 32:7, 32:11, 32:19, 32:23, 33:24, 34:4, 34:11, 34:12, 34:14, 35:4, 35:25, 36:5, 36:18, 38:16, 38:21, 38:24, 39:7, 39:18, 39:22, 40:2, 40:5, 40:22, 41:12, 41:21, 42:11, 43:12, 44:25, 47:7, 47:14, 47:24, 48:3, 51:8, 51:11, 51:17, 51:19, 51:23, 52:5, 52:7, 52:12, 52:15, 53:2, 53:4, 53:8, 54:7, 54:12, 54:15, 54:24, 55:10, 55:13, 55:20, 56:8, 56:13, 56:14, 56:18, 56:21, 56:24, 57:7, 57:18, 57:23, 57:24, 58:9, 58:12, 58:15, 58:20, 58:22, 59:8, 59:12, 60:4, 60:8, 60:15, 61:1, 61:23, 62:18, 62:22, 64:18, 64:21, 65:11, 65:18, 65:23, 66:13, 68:6, 69:12, 69:23, 71:8, 72:15, 72:18, 73:9, 73:12, 73:19, 73:22, 74:1, 74:3, 74:5, 74:10, 74:14, 75:2, 75:4, 75:12, 75:14, 75:17, 76:10, 76:15, 77:6, 77:8, 77:17, 77:23, 78:6, 78:13, 79:2, 79:8, 79:10, 79:14, 80:13, 80:16, 80:22, 81:2, 82:1, 82:19, 82:24, 83:3, 84:7, 84:11, 85:18, 86:1, 86:5, 86:10, 87:5, 88:7, 88:9, 88:11, 89:9, 90:14, 90:17, 94:21, 94:24, 95:12, 95:25, 96:19, 96:21, 96:23, 97:15, 97:23, 98:1, 98:8, 99:24, 100:10, 100:13, 100:20,

**M**

**machine** [2] - 27:8, 62:9
**machinery** [1] - 89:16
**machines** [4] - 27:5, 62:2, 62:6, 75:18
**MACRO** [1] - 1:5
**macro** [2] - 4:3, 112:4
**magic** [1] - 27:23
**MAGISTRATE** [1] - 1:10
**mail** [3] - 7:25, 9:1, 9:2
**mails** [2] - 7:22, 7:23
**main** [1] - 36:13
**maintain** [1] - 12:7
**major** [1] - 25:2
**Major** [5] - 68:7, 69:4, 69:21, 70:15, 71:11
**Malta** [8] - 47:8, 47:15, 47:16, 47:21, 55:10, 55:12, 56:21, 57:13
**management** [1] - 113:12
**manager** [1] - 73:4
**manufacture** [7] - 47:19, 48:23, 49:2, 57:8, 66:21, 83:7, 105:25
**manufactured** [11] - 49:13, 50:8, 52:8, 54:18, 55:14, 56:11, 57:10, 57:13, 57:14,

100:24, 101:6,
101:16, 102:3,
102:11, 102:14,
102:18, 102:22,
102:25, 103:4,
103:7, 103:9,
103:12, 103:15,
103:17, 103:18,
103:20, 103:21,
104:6, 105:10,
105:16, 105:22,
106:23, 107:21,
108:1, 108:12,
109:6, 109:22,
110:11, 116:5,
116:22, 117:1,
117:4, 117:8
**MS** [76] - 3:12, 3:16,
3:19, 7:20, 8:4, 8:25,
12:11, 12:21, 13:15,
14:4, 19:24, 45:5,
45:6, 45:19, 45:20,
46:15, 48:21, 49:1,
49:12, 49:22, 50:3,
50:7, 50:15, 50:17,
52:18, 53:11, 53:22,
54:4, 55:2, 55:5,
55:7, 55:23, 55:25,
56:2, 90:20, 91:15,
91:22, 92:11, 93:3,
93:7, 93:14, 93:18,
93:23, 101:2, 101:9,
101:11, 109:18,
109:25, 110:2,
110:6, 110:9,
110:17, 110:22,
111:1, 111:8,
111:15, 111:17,
111:19, 111:22,
112:1, 112:8,
112:13, 112:17,
112:20, 112:23,
113:3, 113:10,
114:4, 114:14,
114:17, 115:5,
115:11, 115:15,
115:18, 115:20,
116:1
**mud** [1] - 31:10
**multiple** [7] - 6:25,
9:17, 10:9, 21:9,
56:24, 61:4, 66:25
**multistep** [2] - 24:25,
25:7
**must** [1] - 48:16
**mutagenic** [1] -
115:22
**Mylan** [34] - 2:19,
3:25, 7:16, 27:20,
39:11, 39:13, 39:17,
52:6, 52:7, 52:17,

52:25, 53:5, 54:10,
54:18, 55:1, 55:2,
58:11, 58:17, 64:24,
64:25, 65:2, 65:6,
65:12, 65:19, 65:21,
72:10, 75:18, 77:12,
78:23, 95:4, 97:25,
98:6, 100:11, 103:1
**Mylan's** [3] - 65:10,
77:18, 98:14
**mystery** [1] - 96:3

**N**

**NAGLE** [7] - 55:23,
55:25, 56:2, 101:2,
109:18, 110:6, 110:9
**name** [1] - 3:7
**nanograms** [5] -
40:10, 40:11, 41:1,
41:5, 41:7
**narrow** [4] - 31:2,
35:21, 63:19, 78:14
**Nashik** [3] - 54:12,
54:21, 58:16
**NDEA** [7] - 26:25,
27:6, 27:13, 28:8,
66:2, 78:1, 114:12
**NDMA** [13] - 26:16,
26:25, 27:3, 27:6,
27:12, 28:8, 59:22,
61:8, 63:14, 66:3,
79:17, 82:13, 87:25
**NE** [1] - 2:21
**necessarily** [8] -
13:16, 28:24, 30:23,
65:24, 66:9, 77:23,
79:9, 91:17
**necessity** [2] - 15:25,
66:20
**need** [49] - 11:23,
23:11, 29:11, 30:19,
33:15, 36:8, 37:23,
41:5, 43:4, 44:15,
44:16, 44:17, 44:20,
48:12, 56:15, 59:11,
60:14, 63:17, 67:25,
68:25, 69:1, 69:24,
70:8, 71:6, 72:25,
73:19, 75:11, 76:15,
85:13, 85:15, 87:18,
87:20, 89:2, 90:23,
94:10, 94:11, 94:13,
95:23, 98:15, 99:11,
99:18, 100:7,
104:17, 107:23,
108:7, 109:4,
113:19, 116:2, 116:3
**needed** [1] - 70:9
**needs** [4] - 16:7,
57:18, 75:6, 96:13

**negative** [1] - 38:20
**Nesbit** [1] - 2:6
**never** [3] - 6:25, 67:7,
108:25
**new** [4] - 17:13, 67:2,
107:2, 112:3
**NEW** [1] - 1:1
**New** [7] - 1:7, 1:14,
2:4, 20:3, 20:6,
100:22, 104:20
**next** [3] - 4:9, 53:20,
94:18
**Nigh** [2] - 3:8, 98:25
**NIGH** [21] - 1:16, 3:8,
39:7, 39:18, 39:22,
40:2, 40:5, 40:22,
41:12, 43:12, 44:25,
79:2, 79:8, 79:10,
79:14, 80:13, 80:16,
80:22, 81:2, 82:1,
82:24
**night** [3] - 53:15,
88:13, 107:22
**nitrosamine** [9] -
17:12, 17:22, 17:25,
28:4, 29:18, 29:19,
34:9, 66:1, 66:2
**nitrosamines** [8] -
15:18, 16:5, 29:25,
31:3, 32:5, 50:22,
71:24, 95:3
**nitty** [2] - 4:22, 15:5
**NMBA** [1] - 114:12
**nobody** [2] - 27:5,
30:1
**non** [5] - 53:1, 56:23,
57:20, 66:5
**non-reused** [1] - 66:5
**non-U.S** [3] - 56:23,
57:20
**normal** [2] - 116:13,
117:9
**normally** [1] - 12:14
**note** [2] - 13:23, 49:2
**noted** [1] - 45:19
**nothing** [12] - 31:18,
69:24, 70:21, 70:22,
71:2, 98:23, 105:3,
105:7, 105:13,
105:14, 106:2
**notice** [13] - 45:10,
46:13, 51:1, 59:23,
60:21, 67:14, 79:3,
79:4, 81:13, 82:3,
82:5, 84:16, 94:3
**notices** [2] - 79:15,
79:18
**notified** [2] - 69:6,
81:14
**Novartis** [5] - 16:12,

86:17, 94:6, 98:21
**novel** [1] - 26:24
**November** [5] - 1:8,
3:2, 11:5, 17:10,
37:2
**nuances** [1] - 66:7
**number** [6] - 5:14,
5:16, 5:19, 38:10,
104:24
**NUMBER** [1] - 1:3
**nuts** [1] - 89:14

**O**

**o'clock** [2] - 112:10,
117:12
**object** [3] - 72:13,
73:7, 73:20
**objection** [2] - 72:12,
74:20
**objectionable** [1] -
73:23
**objections** [3] - 35:14,
48:11, 107:16
**obligated** [1] - 20:4
**obligation** [7] - 19:5,
19:11, 19:15, 19:21,
20:12, 29:23, 70:1
**obligations** [6] -
16:19, 19:1, 19:10,
20:1, 20:5, 69:7
**observation** [1] -
89:25
**obvious** [2] - 11:10,
62:22
**obviously** [12] - 18:5,
18:6, 21:18, 21:19,
23:15, 50:12, 62:22,
62:25, 70:3, 82:22,
83:4, 107:14
**occurred** [10] - 14:19,
17:20, 18:1, 24:10,
34:1, 37:12, 42:14,
80:9, 98:16, 103:12
**occurring** [2] - 59:24,
71:25
**occurs** [1] - 65:15
**odds** [1] - 80:18
**OF** [1] - 1:1
**officer** [1] - 68:19
**Official** [1] - 1:23
**often** [1] - 82:4
**old** [1] - 20:7
**old-fashioned** [1] -
20:7
**ON** [1] - 1:5
**on-site** [1] - 12:6
**once** [3] - 41:8, 46:6,
92:21
**One** [1] - 2:18

**one** [83] - 4:24, 5:3,
6:23, 9:10, 10:7,
13:15, 14:10, 15:1,
15:6, 15:20, 15:21,
18:8, 18:21, 20:15,
20:20, 23:1, 24:3,
25:20, 27:18, 28:13,
28:15, 30:7, 30:15,
32:1, 33:12, 34:8,
38:8, 39:20, 41:12,
41:17, 41:22, 42:19,
44:10, 45:22, 46:2,
47:4, 47:16, 54:9,
55:6, 55:24, 56:10,
57:18, 58:15, 61:2,
61:4, 62:13, 63:17,
65:8, 65:25, 67:7,
67:23, 69:1, 78:7,
79:24, 80:3, 80:5,
80:6, 80:23, 82:2,
84:1, 84:7, 87:5,
87:23, 88:18, 89:5,
91:12, 91:18, 91:19,
91:20, 92:15, 95:25,
106:1, 106:23,
108:13, 111:19,
113:1, 113:3,
114:14, 116:4, 116:5
**one's** [1] - 54:16
**ones** [2] - 60:19, 107:1
**ongoing** [2] - 22:1,
22:19
**online** [1] - 34:24
**OPEN** [1] - 3:2
**open** [4] - 59:6, 63:20,
67:24, 112:3
**operates** [1] - 58:18
**operating** [1] - 93:19
**opinion** [1] - 112:11
**opportunity** [2] -
45:11, 117:18
**options** [1] - 105:24
**ORAL** [1] - 1:5
**oral** [4] - 4:2, 45:1,
48:12, 112:11
**orally** [1] - 44:23
**order** [20] - 4:23, 4:24,
7:12, 11:8, 11:11,
11:14, 22:12, 41:10,
46:18, 46:19, 47:2,
48:8, 48:9, 65:5,
68:12, 71:12, 73:1,
78:17, 81:21, 81:24
**ordered** [3] - 5:4, 9:22,
22:16
**orders** [1] - 7:11
**org** [1] - 11:18
**organizational** [1] -
64:8
**organs** [1] - 114:8

**origin** [1] - 66:3
**Orleans** [1] - 2:4
**ourselves** [3] - 36:15, 38:4, 92:25
**out-of-spec** [2] - 87:12, 94:12
**out-of-trend** [1] - 94:12
**outlandish** [1] - 65:6
**outside** [2] - 14:17, 57:11
**overly** [1] - 89:19
**overseas** [2] - 82:15
**own** [2] - 37:18, 88:17
**Oxford** [1] - 2:18

**P**

**p.m** [1] - 117:21
**Pacific** [1] - 2:9
**PACKARD** [1] - 2:8
**page** [4] - 26:18, 26:20, 112:24, 113:19
**Page** [9] - 17:10, 23:17, 25:7, 25:10, 26:19, 27:14, 36:8, 96:3, 114:18
**pages** [2] - 31:17, 64:2
**pale** [1] - 90:10
**panel** [1] - 44:24
**PAPANTONIO** [1] - 1:15
**papers** [14] - 4:19, 8:23, 15:7, 20:24, 48:13, 75:21, 75:23, 77:3, 77:5, 78:20, 85:25, 86:9, 86:22, 87:2
**Par** [4] - 88:18, 88:20, 88:22, 106:15
**paragraph** [1] - 17:21
**PAREKH** [16] - 2:9, 3:14, 5:16, 6:22, 7:6, 12:3, 82:19, 83:3, 87:5, 88:7, 88:9, 88:11, 116:5, 116:22, 117:1, 117:4
**Parekh** [2] - 3:14, 84:20
**Parkway** [1] - 1:13
**part** [20] - 8:11, 10:20, 11:23, 19:23, 20:10, 20:18, 21:10, 22:5, 22:6, 24:6, 30:12, 35:16, 39:4, 42:20, 42:21, 81:4, 81:7, 84:13, 108:21
**participant** [1] - 93:8
**participating** [1] -

72:22
**particular** [2] - 66:6, 66:7
**particularized** [1] - 61:24
**parties** [10] - 5:1, 5:3, 7:12, 31:6, 33:2, 46:20, 64:12, 67:19, 76:17, 104:1
**parties'** [1] - 5:5
**party** [6] - 13:11, 15:22, 20:10, 51:14, 69:2, 101:8
**patent** [2] - 98:21, 104:12
**patented** [1] - 89:16
**pathway** [1] - 65:15
**PC** [1] - 1:18
**peak** [1] - 94:3
**peaks** [8] - 16:22, 29:12, 29:21, 36:22, 50:25, 60:9, 67:7, 67:8
**Pennsacola** [1] - 1:17
**Pennsylvania** [3] - 1:20, 2:16, 2:19
**people** [10] - 33:25, 51:15, 70:20, 88:3, 104:24, 105:2, 105:7, 110:14, 112:7
**per** [1] - 39:1
**percent** [2] - 84:12, 84:15
**perfect** [1] - 108:12
**perfectly** [1] - 45:12
**performed** [1] - 95:15
**perhaps** [2] - 49:4, 85:7
**period** [9] - 40:20, 42:6, 42:17, 42:25, 96:12, 99:20, 101:12, 106:8, 109:13
**permitted** [1] - 37:15
**person** [3] - 29:10, 46:13, 72:23
**personal** [2] - 113:15, 115:5
**personally** [2] - 46:4, 60:4
**pertain** [1] - 13:14
**pertaining** [2] - 57:5, 112:24
**pertains** [1] - 13:12
**pertinent** [3] - 63:19, 64:14, 97:8
**Pharma** [1] - 2:23
**pharmaceutical** [2] - 108:14, 114:19
**Pharmaceutical** [1] -

2:22
**Pharmaceuticals** [3] - 2:23, 27:21, 58:17
**Philadelphia** [1] - 1:20, 2:16
**phrase** [1] - 20:22
**pick** [3] - 5:19, 6:2, 104:24
**picked** [2] - 28:25, 109:17
**picture** [1] - 40:12
**piece** [5] - 21:25, 56:10, 87:6, 87:7, 89:1
**pieces** [2] - 40:7, 88:25
**Piedmont** [1] - 2:21
**pierce** [1] - 72:25
**PIETRAGALLO** [1] - 2:17
**pill** [11] - 26:3, 35:18, 35:23, 40:19, 40:24, 58:6, 89:15, 92:17, 100:5, 104:8
**pills** [12] - 36:20, 39:6, 39:8, 39:13, 39:15, 39:17, 39:19, 39:20, 41:3, 41:23, 43:10, 48:23
**pin** [1] - 87:19
**Pittsburgh** [1] - 2:19
**place** [13] - 33:15, 34:15, 34:24, 62:13, 65:18, 71:16, 72:11, 82:7, 84:14, 84:19, 95:10, 96:15, 108:16
**plaintiff** [14] - 5:13, 5:22, 59:13, 68:4, 73:10, 73:16, 90:19, 97:12, 100:19, 101:5, 103:8, 109:21, 113:24, 115:21
**Plaintiff** [6] - 1:14, 1:17, 1:21, 2:4, 2:7, 2:10
**plaintiffs** [59] - 3:7, 3:8, 3:10, 3:13, 3:15, 3:17, 3:18, 3:19, 6:20, 7:21, 11:1, 11:5, 14:9, 15:6, 15:13, 17:16, 20:21, 21:1, 21:3, 21:5, 23:3, 23:16, 24:5, 24:9, 26:5, 28:22, 29:4, 29:7, 32:4, 33:11, 33:16, 37:14, 38:1, 42:15, 48:7, 51:11, 59:5, 59:11, 60:6, 61:17, 61:19,

64:20, 71:9, 71:18, 73:3, 73:5, 74:11, 74:25, 78:15, 78:16, 86:13, 86:20, 95:10, 98:7, 102:16, 102:23, 108:5, 111:9
**plaintiffs'** [14] - 17:24, 23:15, 23:21, 25:10, 28:13, 29:3, 30:22, 33:23, 35:1, 35:2, 48:16, 57:1, 71:23, 101:15
**plan** [1] - 4:4
**plane** [1] - 20:12
**planned** [1] - 4:1
**plant** [2] - 58:18, 77:19
**play** [2] - 21:10, 21:14
**pled** [1] - 26:7
**plenty** [3] - 16:24, 17:2, 70:1
**PLLC** [1] - 2:11
**plowing** [1] - 29:16
**point** [38] - 6:23, 8:7, 11:1, 14:21, 14:25, 16:4, 16:6, 25:21, 26:12, 27:5, 27:13, 32:21, 33:7, 37:21, 49:8, 61:3, 62:12, 63:16, 63:19, 74:19, 75:8, 87:17, 88:15, 90:23, 93:10, 95:12, 95:25, 97:10, 97:17, 98:8, 99:20, 105:18, 105:23, 106:6, 107:5, 107:10, 108:13
**pointed** [2] - 37:3, 110:11
**points** [1] - 41:21
**POLETO** [1] - 45:5
**POLETTO** [1] - 45:19
**political** [2] - 22:2, 25:2
**posed** [1] - 73:21
**position** [15] - 8:17, 23:20, 29:10, 50:13, 57:1, 57:4, 87:16, 87:17, 90:11, 90:25, 92:1, 101:12, 110:24, 111:2
**positive** [3] - 38:13, 38:19, 39:25
**possess** [1] - 100:5
**possession** [1] - 11:18
**possible** [1] - 49:16
**postdates** [1] - 108:25
**potential** [3] - 23:4, 51:6, 82:12

**potentially** [3] - 66:1, 70:18, 95:3
**powder** [1] - 26:2
**practical** [2] - 9:1, 68:10
**practices** [3] - 31:9, 81:17, 91:2
**precancerous** [2] - 114:7, 115:22
**precise** [1] - 102:18
**precisely** [1] - 28:2
**precondition** [1] - 71:19
**predate** [2] - 43:2, 97:18
**predated** [3] - 15:18, 16:1, 16:5
**predates** [1] - 102:19
**predecessor** [1] - 108:23
**present** [1] - 32:20
**presented** [3] - 15:17, 33:8, 94:16
**presenting** [1] - 37:16
**presently** [1] - 54:17
**preserve** [2] - 74:12, 76:3
**preserved** [2] - 70:19, 75:1
**press** [2] - 26:16, 26:18
**presumably** [3] - 38:10, 38:11, 86:16
**presume** [1] - 102:19
**pretty** [5] - 48:16, 59:10, 68:3, 86:11, 112:18
**prevailing** [5] - 15:13, 17:20, 20:25, 21:4, 24:10
**previous** [1] - 113:11
**Prinston** [1] - 25:6
**Prinston's** [1] - 96:3
**privilege** [7] - 7:1, 7:4, 7:7, 68:14, 68:16, 68:17, 73:8
**privileged** [18] - 69:25, 70:3, 70:6, 70:7, 70:21, 70:22, 71:1, 72:17, 72:18, 72:25, 73:17, 73:18, 73:25, 74:6, 74:9, 74:13, 74:16
**probability** [1] - 84:16
**problem** [26] - 16:14, 16:17, 22:14, 30:4, 34:9, 43:19, 43:21, 43:23, 44:2, 44:9, 45:13, 61:10, 61:11, 79:24, 80:21, 83:20,

86:24, 94:6, 99:10,
99:12, 101:11,
103:11, 113:4,
114:25, 117:7
**problematic** [1] - 76:6
**problems** [5] - 77:20,
82:5, 94:16, 99:7,
113:6
**procedures** [2] -
17:11, 17:13
**Proceedings** [1] -
1:25
**proceedings** [1] -
117:24
**process** [92] - 12:4,
14:22, 17:23, 18:1,
18:13, 19:6, 21:7,
24:5, 24:6, 24:11,
24:13, 24:15, 24:21,
24:25, 25:7, 25:12,
26:11, 26:13, 31:12,
31:13, 31:19, 34:6,
34:10, 34:20, 34:24,
35:3, 35:16, 35:17,
36:16, 37:8, 37:20,
42:2, 42:3, 42:4,
42:20, 42:25, 43:1,
43:7, 43:15, 47:19,
49:16, 59:9, 59:24,
60:18, 61:9, 62:5,
64:15, 64:23, 65:3,
65:12, 65:16, 65:18,
65:25, 66:15, 68:1,
68:8, 68:9, 72:19,
72:21, 72:23, 72:24,
73:13, 85:24, 87:21,
87:22, 87:24, 89:7,
92:14, 93:12, 97:4,
97:6, 98:5, 98:11,
99:14, 99:15, 104:7,
104:9, 104:15,
105:2, 105:6, 105:8,
106:15, 106:16,
106:24, 107:11,
107:12, 108:18,
109:2, 112:1
**Process** [27] - 36:19,
36:24, 36:25, 43:15,
43:16, 43:18, 43:21,
43:22, 44:6, 44:7,
44:10, 44:17, 44:18,
44:19, 88:19, 88:22,
99:7, 99:8, 99:12,
106:14, 108:15,
108:16, 108:24
**processes** [24] -
19:10, 43:10, 43:13,
43:17, 44:1, 44:2,
44:20, 50:18, 52:21,
59:4, 59:7, 60:20,
61:16, 67:1, 67:4,

67:17, 67:22, 76:20,
77:11, 80:1, 83:6,
99:18, 104:11,
106:25
**produce** [24] - 6:17,
7:17, 8:2, 8:6, 11:6,
38:2, 53:13, 53:17,
54:1, 54:8, 55:18,
59:3, 70:24, 71:12,
72:5, 83:24, 85:10,
86:21, 92:2, 92:5,
92:20, 93:5, 95:15,
99:15
**produced** [48] - 1:25,
5:4, 7:10, 7:22, 8:11,
9:22, 10:11, 10:16,
10:22, 10:23, 11:3,
11:12, 11:13, 11:15,
12:2, 12:6, 12:25,
13:1, 13:2, 13:3,
13:5, 13:17, 13:25,
14:7, 14:15, 14:24,
22:13, 36:22, 55:19,
63:11, 63:12, 64:1,
71:4, 71:5, 78:4,
78:11, 81:25, 91:24,
95:7, 96:1, 98:4,
104:1, 104:4, 117:6,
117:10
**produces** [4] - 92:10,
92:12
**producing** [6] - 8:19,
47:18, 47:20, 72:5,
92:7, 92:24
**product** [18] - 42:1,
56:1, 56:6, 56:20,
57:2, 57:6, 57:8,
87:12, 87:25, 88:19,
89:25, 98:2, 100:17,
101:14, 108:8,
110:3, 111:3, 111:4
**production** [11] - 4:12,
7:18, 9:9, 10:5,
68:12, 68:25, 69:8,
90:22, 93:8, 96:4,
99:24
**productions** [1] -
95:20
**PRODUCTS** [1] - 1:3
**products** [10] - 36:2,
54:3, 54:23, 57:15,
59:3, 61:15, 65:7,
84:12, 89:24, 90:6
**profiles** [1] - 98:20
**promptly** [1] - 6:16
**pronouncing** [1] -
94:20
**properly** [3] - 46:6,
46:14, 46:24
**proportionality** [2] -

77:10, 78:8
**proposal** [3] - 72:6,
78:4, 96:16
**propose** [4] - 97:15,
98:1, 100:15, 102:23
**proposed** [3] - 37:2,
38:5, 100:12
**proposes** [2] - 96:19,
101:2
**proposing** [6] - 96:18,
97:14, 97:25, 98:6,
101:25, 103:1
**propounded** [1] -
97:18
**protocol** [6] - 7:2, 7:7,
7:13, 41:4, 94:2
**protocols** [1] - 94:4
**prove** [3] - 18:5,
21:22, 35:4
**provide** [4] - 64:13,
70:24, 86:13, 87:18
**provided** [9] - 9:16,
13:16, 13:21, 42:14,
52:9, 84:25, 85:6,
93:15, 116:14
**providing** [3] - 49:18,
68:24, 72:25
**provision** [1] - 7:7
**proviso** [2] - 87:2,
98:3
**public** [1] - 22:8
**publications** [1] - 82:9
**pull** [2] - 109:4, 109:14
**Punta** [1] - 2:7
**purchased** [1] - 58:1
**purchaser** [1] - 30:3
**purely** [1] - 77:24
**purity** [5] - 29:20,
85:15, 85:16, 85:17,
85:18
**purported** [1] - 17:22
**purposes** [1] - 116:15
**pursuant** [3] - 46:7,
46:14, 48:24
**pursue** [1] - 18:10
**pursuing** [1] - 18:9
**push** [1] - 85:8
**pushed** [1] - 16:7
**put** [19] - 21:3, 23:2,
26:12, 34:14, 34:24,
37:7, 46:12, 68:4,
72:11, 88:13, 99:17,
104:8, 111:12,
112:2, 112:4,
113:24, 116:18
**puts** [2] - 20:9, 20:11
**putting** [4] - 4:24,
26:3, 70:6, 71:9
**puzzle** [1] - 89:2

## Q

**quagmire** [1] - 31:16
**quality** [11] - 53:19,
73:4, 89:12, 93:18,
93:20, 93:23, 100:6,
104:25, 105:7,
107:3, 107:6
**quantify** [2] - 17:12,
26:25
**quarrel** [1] - 36:9
**quenching** [3] - 25:14,
87:24
**questioning** [2] - 23:3,
67:13
**questions** [18] - 4:16,
4:19, 4:21, 15:5,
28:15, 35:13, 36:4,
37:24, 38:8, 43:1,
43:5, 43:6, 44:22,
50:10, 97:1, 97:6,
97:18
**queuing** [1] - 62:13
**quick** [1] - 112:18
**quickly** [2] - 44:22,
45:10
**quite** [5] - 20:22, 47:8,
108:8, 110:6, 116:6
**quote** [2] - 17:11,
29:12

## R

**rabbit** [1] - 109:14
**raise** [4] - 5:1, 20:12,
31:24, 43:7
**raised** [1] - 11:1
**RASPANTI** [1] - 2:17
**RE** [1] - 1:3
**reached** [1] - 116:8
**reaction** [4] - 25:13,
25:19, 31:13, 31:18
**reactions** [1] - 67:15
**read** [10] - 4:19, 5:5,
48:13, 68:7, 75:20,
75:21, 77:2, 78:20
**readily** [1] - 11:8
**reading** [4] - 4:25,
33:1, 69:4, 69:12
**reads** [1] - 4:13
**ready** [3] - 11:16,
48:4, 48:5
**real** [1] - 44:22
**really** [17] - 24:22,
25:23, 28:11, 31:6,
33:12, 35:11, 37:16,
37:22, 42:22, 53:9,
57:4, 63:6, 78:22,
88:21, 108:9, 113:14
**reason** [16] - 6:12,

10:10, 16:25, 18:24,
18:25, 34:19, 38:10,
39:13, 43:20, 44:15,
50:3, 85:10, 97:20,
106:15, 108:23
**reasonable** [2] -
29:10, 71:7
**reasonableness** [1] -
67:15
**reasonably** [2] -
71:17, 72:3
**reasons** [9] - 11:10,
18:21, 21:9, 30:15,
36:10, 59:21, 70:15,
108:16, 116:12
**rebut** [1] - 114:21
**recalled** [29] - 33:19,
33:20, 33:21, 38:9,
38:10, 38:19, 39:23,
40:15, 40:16, 40:18,
40:21, 41:10, 49:9,
50:1, 51:16, 51:19,
52:11, 54:3, 54:23,
55:12, 55:15, 56:1,
56:6, 56:19, 57:2,
57:6, 57:9, 64:24
**receipt** [1] - 46:3
**receive** [8] - 5:23,
12:9, 45:21, 73:5,
79:20, 93:12, 94:1,
101:16
**received** [12] - 5:7,
6:25, 45:24, 45:25,
46:3, 46:4, 72:13,
74:8, 77:14, 79:21,
88:6, 99:6
**recently** [1] - 11:2
**recipe** [7] - 36:6, 36:7,
36:20, 37:9, 38:5,
42:18, 43:17
**recipes** [1] - 50:18
**recipients** [1] - 72:8
**recollection** [2] -
109:17, 109:24
**record** [9] - 3:5, 4:13,
17:7, 48:14, 72:10,
75:7, 76:6, 116:8,
117:24
**recorded** [1] - 1:25
**records** [4] - 63:13,
63:25, 105:4, 105:9
**recycled** [1] - 61:3
**redact** [2] - 5:3, 84:2
**redacted** [13] - 5:25,
6:5, 7:11, 7:16, 7:25,
8:8, 8:12, 8:23, 9:6,
12:15, 71:4, 84:4,
87:14
**redaction** [5] - 5:2,
7:1, 7:5, 7:6, 9:2

**redactions** [7] - 5:6,
6:3, 6:21, 12:13,
12:17, 12:18, 12:19
**Redondo** [1] - 2:10
**Reefer** [3] - 3:24,
27:20, 30:12
**REEFER** [35] - 2:18,
3:24, 27:17, 27:20,
28:7, 28:23, 52:7,
52:12, 52:15, 53:2,
54:12, 54:15, 54:24,
58:12, 58:15, 58:20,
64:21, 65:11, 65:18,
65:23, 71:8, 72:15,
72:18, 73:9, 73:12,
73:19, 77:8, 77:17,
77:23, 78:6, 78:13,
86:10, 98:1, 103:4,
103:7
**refer** [4] - 9:15, 10:14,
13:19, 88:11
**referenced** [3] - 9:12,
11:12, 14:12
**references** [1] - 75:22
**referred** [6] - 11:3,
13:4, 17:21, 52:9,
65:2, 86:22
**referring** [4] - 10:13,
25:20, 30:14, 88:10
**refers** [1] - 71:15
**refine** [1] - 27:11
**refined** [1] - 26:23
**reflect** [1] - 74:1
**reflects** [3] - 72:19,
73:12, 73:14
**refresh** [2] - 109:16,
109:24
**refreshing** [1] - 112:22
**refused** [1] - 108:16
**regard** [5] - 52:3,
60:13, 66:14, 77:11,
96:8
**regarding** [14] - 47:18,
59:3, 71:24, 77:1,
85:23, 86:6, 89:4,
89:6, 90:12, 94:19,
101:17, 115:13,
116:9
**regards** [1] - 7:1
**registry** [1] - 110:22
**regret** [1] - 4:24
**regulated** [1] - 20:15
**regulations** [3] -
19:16, 19:17, 20:2
**regulatory** [37] - 7:23,
7:24, 16:19, 19:1,
19:5, 19:22, 20:14,
27:24, 29:23, 30:13,
30:14, 30:17, 64:4,
77:1, 77:7, 77:14,

77:21, 78:3, 78:12,
78:19, 79:6, 79:12,
80:11, 80:20, 80:24,
81:5, 81:11, 81:12,
81:22, 82:17, 82:19,
82:20, 83:23, 83:25,
84:21, 100:4, 110:19
**reign** [1] - 90:7
**relate** [1] - 71:14
**related** [6] - 53:19,
54:8, 78:21, 92:21,
98:11, 113:8
**relates** [3] - 33:11,
42:6, 109:8, 113:15,
113:16
**relating** [3] - 86:22,
112:14, 115:23
**relatively** [1] - 4:4
**release** [2] - 26:16,
26:18
**relevance** [4] - 30:13,
77:9, 78:7, 85:12
**relevant** [37] - 30:16,
32:5, 32:14, 33:13,
42:6, 42:17, 42:20,
42:25, 50:14, 63:3,
67:13, 69:16, 69:18,
71:16, 72:1, 72:16,
72:22, 77:22, 78:5,
78:10, 78:24, 79:7,
79:8, 79:10, 79:11,
80:19, 90:1, 90:4,
90:15, 95:19, 96:12,
101:12, 106:21,
107:12, 107:13,
107:20, 113:7
**rely** [2] - 21:8, 28:12
**remember** [4] - 7:14,
7:19, 38:7, 113:11
**reminded** [1] - 108:13
**reminds** [1] - 110:20
**remiss** [1] - 64:21
**repackaged** [1] -
57:21
**report** [7] - 12:13,
43:24, 77:21, 77:25,
81:19, 89:24
**Reporter** [1] - 1:23
**Reporter/**
**Transcriber** [1] -
117:25
**reports** [12] - 13:4,
14:23, 53:13, 53:17,
81:21, 83:2, 83:4,
85:15, 89:21, 91:24,
93:14, 94:11
**represent** [4] - 7:20,
7:21, 15:9, 72:9
**representation** [2] -
17:8, 100:3

**representative** [4] -
5:20, 6:3, 6:6, 6:8
**represented** [2] - 14:8,
110:18
**reproduce** [1] - 86:24
**reproduced** [1] - 7:16
**request** [5] - 4:11,
12:10, 93:8, 96:25,
99:24
**requested** [2] -
108:15, 108:24
**requesting** [2] - 59:5,
61:19
**requests** [4] - 43:4,
83:22, 90:9, 97:18
**require** [1] - 85:21
**required** [6] - 7:2,
14:23, 59:2, 87:23,
91:1, 92:2
**requirements** [1] -
50:20
**research** [8] - 98:10,
98:12, 98:17, 99:13,
99:19, 100:2,
100:21, 101:7
**researched** [1] - 104:7
**residual** [4] - 31:3,
43:6, 64:11, 95:3
**resolution** [1] - 4:10
**resolve** [1] - 5:10
**respect** [26] - 28:4,
41:22, 42:6, 42:25,
43:10, 52:20, 58:12,
58:15, 63:4, 63:8,
63:18, 64:2, 64:11,
65:7, 65:14, 72:4,
72:10, 93:7, 94:4,
94:15, 95:2, 96:24,
97:1, 99:18, 100:21,
108:4
**respectfully** [2] - 71:8,
72:20
**respond** [5] - 45:17,
46:8, 47:10, 48:16,
61:22
**response** [3] - 12:10,
32:1, 86:19
**responsibilities** [1] -
29:23
**responsible** [1] -
19:13
**responsive** [1] - 54:2
**result** [3] - 31:22,
63:23, 65:13
**resulted** [1] - 87:25
**results** [18] - 17:3,
19:7, 38:25, 41:8,
41:11, 41:13, 44:1,
50:23, 59:18, 60:21,
62:3, 66:15, 66:24,

67:5, 67:17, 68:1,
83:4, 83:17
**retain** [1] - 71:16
**retort** [1] - 86:15
**retract** [1] - 73:20
**returned** [1] - 87:12
**reuse** [2] - 65:13, 67:1
**reused** [3] - 66:1,
66:5, 107:2
**reveal** [2] - 44:5,
104:19
**revealed** [2] - 64:14,
109:1
**reveals** [2] - 74:6,
106:13
**review** [3] - 6:7, 6:17,
95:17
**reviewed** [2] - 10:18,
25:9
**RFPs** [1] - 87:8
**riddled** [1] - 82:4
**rise** [2] - 3:1, 117:20
**risk** [4] - 20:7, 40:6,
82:6, 98:20
**risks** [1] - 107:3
**risky** [2] - 81:15, 82:4
**RMR** [1] - 117:25
**Road** [1] - 2:21
**road** [1] - 10:5
**Rodgers** [1] - 84:23
**role** [1] - 107:6
**room** [3] - 10:19,
91:20, 92:14
**Roseland** [1] - 1:14
**roughly** [1] - 20:11
**routine** [5] - 28:10,
28:24, 29:4, 29:6,
29:8
**rub** [1] - 20:18
**rubber** [1] - 10:4
**RUBEN** [1] - 1:19
**Ruben** [1] - 3:11
**RUBENSTEIN** [32] -
2:21, 3:22, 8:7, 8:16,
8:20, 14:21, 15:3,
47:7, 47:14, 47:24,
48:3, 55:10, 55:13,
55:20, 56:13, 56:18,
56:21, 56:24, 57:7,
57:23, 58:9, 86:1,
86:5, 89:9, 90:14,
90:17, 100:13,
103:15, 103:17,
103:20, 108:1, 109:6
**Rubenstein** [2] - 3:23,
53:12
**Rule** [1] - 77:9
**rule** [4] - 18:19, 24:18,
26:5, 72:7
**rules** [4] - 7:9, 12:15,

28:19, 96:25
**ruling** [4] - 6:9, 6:19,
24:11, 75:24
**rulings** [4] - 4:6, 4:8,
4:13, 117:12
**run** [8] - 98:16, 99:14,
100:16, 100:24,
101:7, 104:13,
106:11, 107:8
**run-up** [8] - 98:16,
99:14, 100:16,
100:24, 101:7,
104:13, 106:11,
107:8
**running** [2] - 15:7,
20:23

**S**

**safe** [2] - 19:18,
114:20
**sails** [4] - 29:3, 61:14,
62:19, 62:20
**sake** [1] - 34:4
**sale** [11] - 47:17,
55:14, 56:11, 57:8,
57:11, 57:13, 57:15,
87:22, 103:3, 110:3,
110:5
**sales** [7] - 42:13, 64:8,
86:7, 86:15, 87:6,
103:14, 109:19
**sample** [1] - 38:12
**samples** [1] - 66:24
**sartan** [2] - 28:9, 60:2
**sartans** [6] - 59:6,
59:13, 59:16, 60:14,
65:1, 66:14
**save** [2] - 112:5,
114:22
**saved** [1] - 114:24
**saving** [2] - 96:11,
114:20
**saw** [4] - 9:7, 67:7,
83:11, 113:12
**scheme** [2] - 16:19,
20:14
**schism** [3] - 91:8,
92:3, 92:25
**SCHNEIDER** [1] - 1:9
**school** [1] - 16:10
**science** [3] - 24:22,
24:23, 25:2
**scientists** [1] - 26:23
**scope** [11] - 6:9,
15:14, 28:13, 28:19,
36:2, 36:12, 69:6,
70:14, 72:8, 90:7,
92:8
**search** [10] - 11:17,

60:17, 64:6, 70:18, 96:12, 105:3, 105:9, 105:12, 105:15, 105:19
**seated** [1] - 3:4
**second** [4] - 26:18, 37:13, 99:9, 100:20
**seconds** [1] - 75:14
**security** [1] - 19:25
**see** [38] - 6:8, 10:17, 13:19, 13:20, 18:7, 22:9, 25:13, 25:14, 25:25, 26:10, 29:20, 29:22, 35:12, 35:19, 37:8, 40:8, 51:3, 65:4, 66:6, 66:18, 67:7, 68:21, 79:18, 79:22, 80:5, 80:7, 80:22, 81:22, 90:1, 90:3, 93:20, 94:10, 94:11, 100:24, 104:20, 113:4, 115:7, 116:18
**seeing** [6] - 29:1, 29:11, 29:13, 50:23, 67:9
**seek** [2] - 91:9, 92:4
**seeking** [1] - 71:20
**seem** [3] - 24:9, 33:3, 33:4
**segregated** [1] - 91:14
**selecting** [1] - 111:24
**self** [3] - 105:11, 105:25, 106:22
**self-limiting** [3] - 105:11, 105:25, 106:22
**sell** [10] - 34:6, 50:12, 52:11, 54:22, 55:11, 55:12, 56:1, 57:6, 58:6, 108:11
**seller** [2] - 20:17, 111:4
**selling** [9] - 26:4, 34:7, 34:16, 39:14, 42:8, 80:2, 102:9, 102:12, 103:5
**sells** [2] - 53:1, 111:11
**send** [5] - 5:23, 5:24, 6:1, 6:3, 6:4
**sense** [2] - 16:21, 48:6
**sensitive** [2] - 13:6, 27:12
**sensitivity** [2] - 27:6, 27:9
**sent** [4] - 5:7, 8:15, 16:14, 73:11
**separate** [5] - 12:20, 49:21, 54:11, 66:2, 90:25

**separately** [2] - 54:20, 105:12
**September** [5] - 36:19, 97:17, 98:1, 102:24, 103:2
**served** [8] - 45:3, 46:7, 46:10, 46:14, 46:22, 46:25, 110:16, 110:18
**set** [5] - 4:9, 5:11, 6:20, 11:16, 40:5
**Seth** [1] - 3:20
**SETH** [1] - 2:15
**settlement** [1] - 31:25
**seven** [2] - 107:18, 108:10
**several** [3] - 34:8, 55:2, 64:23
**shape** [1] - 32:13
**share** [1] - 81:6
**shared** [1] - 80:25
**sharing** [3] - 78:20, 81:5, 82:25
**shed** [1] - 35:25
**sheds** [1] - 98:5
**sheet** [2] - 113:24, 115:22
**shipped** [1] - 92:15
**short** [2] - 4:5, 65:12
**shove** [1] - 16:18
**show** [2] - 16:24, 25:5
**showed** [1] - 11:14
**showing** [4] - 50:25, 61:24, 62:4, 71:19
**shown** [5] - 30:21, 39:5, 43:18, 65:12, 72:1
**shows** [2] - 16:17, 67:4
**shredding** [3] - 75:17, 75:18, 75:23
**side** [13] - 6:7, 31:20, 61:11, 62:12, 70:2, 85:3, 96:17, 113:15, 113:16, 113:18, 114:17, 115:1, 115:7
**sidetracked** [1] - 31:21
**sideways** [1] - 31:21
**signal** [1] - 59:23
**signals** [1] - 60:9
**signed** [1] - 46:4
**significance** [1] - 21:14
**significant** [5] - 5:16, 22:22, 62:23, 66:22, 107:13
**silent** [1] - 90:25
**silly** [1] - 16:10
**similar** [10] - 59:17,

59:18, 62:1, 62:2, 62:3, 63:2, 63:22, 66:21, 67:18
**similarly** [1] - 111:1
**simple** [2] - 16:3, 68:21
**simplification** [1] - 62:11
**simply** [5] - 17:11, 23:18, 32:23, 38:1, 63:21
**simultaneous** [3] - 5:11, 6:13, 6:18
**single** [9] - 13:17, 13:18, 13:21, 35:22, 60:16, 66:9, 81:18, 87:6, 87:7
**sit** [2] - 29:17, 30:1
**site** [1] - 12:6
**sitting** [1] - 37:4
**situated** [1] - 111:2
**situations** [2] - 87:12, 109:11
**six** [2] - 26:22, 107:18
**size** [2] - 32:14, 93:22
**skip** [1] - 112:16
**skipped** [2] - 86:3, 86:9
**SLATER** [56] - 1:12, 1:13, 3:9, 6:14, 9:10, 9:23, 10:1, 10:9, 11:10, 12:20, 13:13, 14:3, 14:10, 14:16, 15:16, 15:23, 17:18, 17:25, 18:14, 18:20, 18:24, 19:23, 21:5, 22:14, 22:17, 23:6, 29:8, 30:10, 33:24, 34:4, 34:11, 34:14, 35:4, 38:16, 38:21, 38:24, 51:23, 56:8, 56:14, 57:18, 57:24, 59:8, 64:18, 66:13, 68:6, 69:12, 69:23, 75:12, 75:14, 75:17, 76:10, 76:15, 84:7, 84:11, 85:18, 106:23
**Slater** [3] - 3:9, 10:13, 28:15, 30:25, 34:23, 57:17, 66:12, 75:11, 75:20
**slinging** [1] - 31:10
**small** [2] - 11:23, 14:21
**smaller** [1] - 18:25
**so-called** [1] - 16:22
**sold** [27] - 19:18, 21:21, 35:7, 35:23, 41:23, 41:24, 42:4, 44:14, 49:10, 49:25,

50:11, 54:3, 56:6, 56:10, 56:19, 56:23, 57:2, 57:19, 57:21, 65:22, 84:12, 97:10, 100:14, 100:17, 101:4, 102:7
**sole** [1] - 36:14
**solely** [4] - 56:12, 57:11, 57:20, 88:1
**solubility** [1] - 96:5
**solution** [4] - 25:15, 36:9, 36:13, 37:19
**solutions** [1] - 104:16
**solve** [1] - 17:6
**solvent** [21] - 25:17, 61:3, 61:5, 61:7, 61:8, 61:9, 64:11, 65:2, 65:3, 65:14, 65:25, 66:5, 67:1, 82:3, 87:23, 95:4, 98:20, 99:2, 106:15
**solvents** [15] - 25:11, 31:4, 43:6, 59:4, 59:18, 59:24, 60:19, 61:12, 63:9, 95:3, 104:17, 107:1, 107:2, 107:3, 108:7
**someone** [3] - 32:16, 57:20, 117:3
**someplace** [1] - 11:9
**sometime** [1] - 101:20
**sometimes** [1] - 49:22
**somewhere** [2] - 87:11, 103:6
**soon** [2] - 46:12, 46:24
**sophisticated** [1] - 26:24
**sorry** [20] - 5:25, 23:17, 27:19, 27:20, 30:11, 33:16, 34:23, 42:23, 56:17, 65:13, 72:2, 73:19, 86:3, 89:5, 101:10, 109:20, 110:1, 111:16, 112:16, 116:5
**sort** [11] - 23:22, 25:24, 28:1, 46:15, 65:14, 66:3, 91:8, 91:9, 94:8, 108:21, 112:1
**sorts** [1] - 77:20
**sounds** [1] - 14:8
**source** [1] - 61:5
**South** [1] - 2:9
**spadework** [1] - 104:12
**speaking** [1] - 12:12
**spec** [2] - 87:12, 94:12

**specific** [26] - 24:6, 25:11, 27:14, 38:18, 43:1, 43:5, 43:6, 46:20, 47:4, 48:5, 53:24, 63:18, 64:23, 65:14, 82:16, 82:17, 97:1, 97:3, 97:6, 97:7, 99:25, 100:1, 106:24, 109:7, 113:14, 113:15
**specifically** [9] - 26:24, 29:18, 55:17, 84:17, 87:23, 88:10, 93:24, 108:15, 116:20
**specificity** [1] - 64:14
**specifics** [1] - 113:17
**specs** [1] - 88:17
**spend** [1] - 84:2
**spending** [1] - 27:10
**spikes** [1] - 86:23
**spin** [1] - 36:11
**split** [1] - 37:12
**spoliation** [11] - 69:7, 69:11, 69:15, 71:13, 71:14, 71:15, 71:19, 75:4, 75:6, 75:15, 76:4
**stability** [1] - 92:16
**stage** [1] - 61:25
**stand** [3] - 14:11, 30:6, 32:4
**standard** [1] - 93:18
**Stanoch** [3] - 59:12, 63:6, 63:24
**STANOCH** [7] - 1:19, 59:12, 60:4, 60:8, 60:15, 61:1, 61:23
**start** [17] - 3:7, 45:15, 48:6, 48:25, 49:19, 49:20, 65:17, 79:20, 85:3, 94:17, 95:11, 96:15, 97:12, 102:12, 103:14, 104:4, 112:20
**started** [11] - 15:9, 16:4, 24:4, 34:5, 34:6, 36:19, 48:7, 67:7, 97:5, 111:25, 112:1
**starting** [7] - 15:23, 16:6, 36:15, 49:8, 95:12, 98:16, 107:24
**starts** [1] - 107:10
**state** [4] - 3:7, 27:16, 28:20, 91:23
**statement** [11] - 17:8, 17:17, 27:18, 27:25, 28:3, 28:20, 30:23, 35:20, 61:7, 65:24,

73:20
**STATES** [2] - 1:1, 1:10
**States** [22] - 19:19,
35:23, 42:9, 44:11,
44:14, 47:17, 50:13,
51:3, 52:20, 55:15,
57:8, 57:11, 57:15,
58:7, 58:8, 58:10,
58:13, 65:19, 85:4,
98:3, 100:14, 111:4
**station** [2] - 45:8,
45:18
**statutory** [1] - 19:22
**stay** [3] - 7:11, 31:7,
31:15
**stenography** [1] -
1:25
**step** [10] - 12:18,
29:17, 36:8, 37:18,
43:7, 55:6, 59:14,
59:25, 87:23
**Step** [6] - 25:7, 25:13,
31:19, 36:8, 37:9,
59:14
**steps** [6] - 21:12,
25:25, 36:7, 65:15,
67:14
**still** [8] - 7:2, 9:11,
9:16, 9:18, 10:17,
11:23, 41:6, 105:14
**stock** [1] - 21:3
**stood** [1] - 64:22
**story** [1] - 65:12
**straight** [1] - 58:23
**straightforward** [1] -
68:3
**stream** [2] - 58:1, 58:5
**Street** [4] - 1:20, 2:3,
2:6, 2:15
**Streets** [1] - 1:7
**strictly** [2] - 8:9, 8:12
**structure** [2] - 59:14,
63:22
**stuff** [1] - 51:12
**subject** [8] - 35:18,
49:3, 49:13, 50:8,
57:3, 57:6, 57:12,
63:4
**submission** [5] - 5:22,
83:13, 98:12,
101:22, 116:6
**submissions** [1] -
116:24
**submit** [1] - 20:2
**submitted** [5] - 36:25,
43:23, 61:6, 101:22,
108:2
**subsequently** [1] -
37:2
**substantially** [3] -

59:17, 103:18,
103:21
**substantive** [1] -
37:22
**successor** [2] - 47:12,
48:1
**suffered** [1] - 114:25
**suggest** [5] - 7:3, 7:8,
48:8, 60:11, 65:6,
68:6, 68:9, 100:1,
106:8
**suggested** [2] - 61:4,
104:14
**suggesting** [3] -
42:19, 42:20, 42:24
**suggestion** [4] - 16:8,
16:20, 66:17, 71:24
**suggests** [1] - 63:17
**Suite** [4] - 1:16, 1:20,
2:13, 2:21
**supplied** [1] - 102:5
**supply** [4] - 19:25,
37:15, 58:2, 87:11
**supplying** [2] - 61:7,
103:23
**support** [2] - 104:20,
106:20
**supports** [1] - 106:6
**suppose** [11] - 32:15,
40:17, 50:9, 50:10,
73:2, 74:11, 77:24,
77:25, 104:22, 105:6
**supposed** [4] - 11:22,
19:8, 70:13, 94:3
**surely** [3] - 19:24,
92:19, 93:9
**surprise** [2] - 29:3,
29:7
**surrounding** [2] -
20:13, 104:16
**suspect** [1] - 108:17
**swallows** [1] - 72:7
**swath** [1] - 86:19
**system** [1] - 115:23

---

**_T_**

**takeaway** [1] - 24:8
**task** [1] - 31:20
**tasks** [1] - 38:1
**taste** [1] - 32:13
**TEA** [4] - 43:15, 44:6,
44:7, 44:18
**temporality** [1] - 36:12
**temporally** [1] - 36:2
**ten** [1] - 106:1
**TEN** [1] - 43:15
**term** [2] - 60:18, 99:2
**terminology** [2] -
29:12, 70:16

**terms** [12] - 11:17,
39:7, 55:3, 64:7,
65:5, 67:13, 70:17,
70:18, 89:13,
105:12, 105:19,
115:8
**terribly** [1] - 6:11
**test** [28] - 15:10, 16:8,
17:3, 19:1, 19:6,
20:4, 28:21, 29:18,
30:3, 30:25, 32:5,
32:16, 32:19, 32:24,
38:25, 39:8, 41:3,
41:8, 41:11, 43:25,
44:3, 66:15, 66:24,
67:5, 67:17, 68:1,
96:2
**tested** [5] - 38:12,
39:6, 39:12, 92:16
**testing** [61] - 16:21,
17:11, 17:13, 23:18,
26:14, 26:15, 26:24,
27:11, 28:24, 29:4,
29:6, 29:9, 31:2,
32:2, 32:25, 33:3,
33:4, 33:9, 36:22,
39:15, 40:6, 40:8,
40:9, 40:11, 40:13,
41:10, 41:13, 41:17,
44:1, 47:19, 50:23,
51:4, 59:4, 59:18,
62:1, 63:8, 63:12,
63:13, 63:14, 63:21,
76:19, 79:21, 79:25,
80:5, 83:4, 83:17,
85:15, 89:4, 89:11,
92:17, 94:1, 94:2,
94:4, 94:19, 95:5,
95:15, 96:5, 96:6,
97:2, 100:16, 102:1
**testings** [2] - 94:12
**tests** [14] - 27:1,
28:10, 32:13, 32:15,
38:17, 38:19, 38:20,
39:2, 39:3, 39:25,
83:18, 85:20, 113:6
**tetrazole** [1] - 25:13
**Teva** [39] - 2:22, 2:23,
3:23, 7:15, 7:16, 8:5,
8:13, 19:4, 19:5,
41:13, 41:14, 47:15,
47:18, 47:20, 55:8,
56:9, 56:17, 57:19,
78:23, 89:8, 91:2,
92:23, 100:12,
100:13, 100:20,
103:13, 103:23,
103:25, 104:7,
104:23, 105:1,
105:5, 105:8,
108:12, 108:13,

108:19, 108:21,
109:11
**Teva's** [2] - 47:6,
107:24
**THE** [4] - 1:1, 1:9, 3:1,
117:20
**The Court** [317] - 3:3,
4:1, 4:7, 4:13, 5:4,
5:18, 5:23, 6:1, 6:4,
6:6, 6:15, 6:17, 7:3,
7:8, 7:9, 7:10, 8:2,
8:5, 8:14, 8:17, 8:22,
9:8, 9:11, 9:21, 9:24,
10:7, 10:10, 11:24,
12:9, 12:17, 12:22,
13:8, 13:11, 13:14,
13:23, 14:6, 14:15,
15:1, 15:4, 15:17,
15:21, 17:5, 17:19,
18:9, 18:19, 18:21,
19:20, 20:20, 22:7,
22:11, 22:12, 22:16,
23:1, 23:12, 23:24,
24:2, 24:7, 25:1,
25:16, 27:19, 28:6,
28:11, 28:12, 28:18,
29:2, 31:7, 32:1,
32:8, 32:12, 32:22,
33:8, 33:9, 34:2,
34:10, 34:22, 35:6,
35:20, 36:4, 36:6,
36:7, 36:17, 38:7,
38:17, 38:23, 39:16,
39:19, 39:23, 40:3,
40:14, 41:8, 41:19,
42:8, 44:22, 45:2,
45:7, 46:6, 46:17,
47:8, 47:23, 48:1,
48:4, 48:5, 48:10,
48:11, 48:25, 49:6,
49:19, 49:24, 50:5,
50:9, 50:16, 51:5,
51:10, 51:13, 51:18,
51:21, 52:3, 52:6,
52:11, 52:13, 52:16,
52:22, 53:3, 53:5,
53:9, 53:20, 53:23,
54:5, 54:10, 54:13,
54:22, 54:25, 55:4,
55:6, 55:8, 55:11,
55:16, 55:21, 55:24,
56:1, 56:3, 56:17,
56:19, 56:22, 57:1,
57:16, 58:4, 58:11,
58:14, 58:19, 58:25,
59:10, 60:1, 60:6,
60:13, 60:23, 61:13,
62:16, 62:20, 64:16,
64:19, 65:4, 65:9,
65:17, 65:21, 66:11,
66:23, 67:19, 68:2,

68:13, 69:6, 69:10,
69:20, 71:12, 72:12,
72:16, 73:2, 73:10,
73:15, 73:25, 74:2,
74:4, 74:8, 74:11,
74:25, 75:3, 75:10,
75:13, 75:16, 75:20,
76:14, 76:24, 77:2,
77:15, 77:18, 77:24,
78:9, 78:15, 78:16,
79:7, 79:9, 79:11,
80:10, 80:14, 80:17,
81:1, 81:24, 82:16,
83:1, 84:6, 84:10,
85:17, 85:22, 86:3,
86:6, 87:3, 88:4,
88:6, 88:8, 88:10,
89:3, 90:11, 90:15,
90:18, 91:11, 91:16,
92:9, 93:2, 93:6,
93:13, 93:17, 93:20,
94:18, 94:22, 95:10,
95:24, 96:8, 96:13,
96:20, 96:22, 96:25,
97:12, 97:22, 97:24,
98:6, 99:22, 100:9,
100:12, 100:19,
100:23, 101:1,
101:5, 101:8,
101:10, 101:15,
101:24, 102:9,
102:12, 102:16,
102:20, 102:23,
103:1, 103:5, 103:8,
103:10, 103:13,
103:16, 103:25,
104:22, 105:14,
105:18, 105:21,
108:19, 109:15,
109:20, 109:23,
110:1, 110:4, 110:7,
110:10, 110:14,
110:20, 110:24,
111:5, 111:12,
111:16, 111:18,
111:20, 111:25,
112:2, 112:9,
112:16, 112:19,
112:22, 113:1,
113:4, 114:1,
114:11, 114:16,
115:4, 115:8,
115:13, 115:17,
115:19, 115:25,
116:2, 116:17,
116:23, 117:3,
117:7, 117:11
**theme** [2] - 20:23,
31:5
**themes** [1] - 15:6
**theories** [5] - 15:13,

20:25, 21:2, 21:4, 23:21
**theory** [19] - 17:20, 18:10, 23:15, 24:10, 24:17, 26:9, 30:22, 30:24, 32:23, 33:19, 34:5, 35:1, 35:2, 37:10, 37:16, 38:5, 40:19, 65:9
**there'll** [1] - 95:20
**therefore** [2] - 28:10, 91:1
**they've** [14] - 21:21, 26:7, 30:16, 35:15, 36:22, 40:23, 40:24, 43:14, 87:12, 89:15, 95:18, 105:13, 107:17, 113:24
**thinking** [11] - 7:14, 20:25, 33:23, 37:8, 42:17, 76:12, 99:4, 100:7, 104:18, 106:14, 109:4
**thinks** [1] - 21:1
**Third** [1] - 71:21
**third** [4] - 15:19, 59:2, 70:12, 76:17
**thoroughly** [1] - 18:15
**thoughts** [1] - 17:24
**thousands** [1] - 31:17
**three** [12] - 27:1, 43:13, 43:17, 44:20, 52:23, 54:13, 67:6, 69:17, 79:17, 82:19, 83:16, 98:4
**ties** [1] - 9:10
**tight** [1] - 20:15
**timeframe** [1] - 36:23
**timeline** [1] - 99:4
**today** [15] - 3:6, 4:2, 4:7, 4:14, 5:2, 5:10, 9:20, 11:21, 15:1, 17:15, 27:23, 32:3, 37:4, 71:6, 101:10
**together** [4] - 6:12, 16:18, 35:6, 89:2
**tomorrow** [3] - 73:11, 73:17
**ton** [1] - 100:21
**took** [7] - 33:25, 62:19, 67:14, 76:25, 84:14, 84:19, 101:12
**top** [2] - 25:13, 56:25
**topics** [1] - 43:3
**Torrent** [10] - 44:14, 55:21, 91:2, 92:23, 101:1, 101:2, 101:3, 101:5, 109:16, 110:4
**Torrent's** [1] - 102:6
**Tours** [5] - 68:7, 69:4,

69:21, 70:15, 71:11
**trace** [3] - 17:12, 27:7, 27:12
**tract** [1] - 114:9
**train** [3] - 42:23, 45:8, 45:18
**transcript** [2] - 1:25, 117:23
**transcription** [1] - 1:25
**translated** [5] - 11:19, 116:14, 117:1, 117:3, 117:9
**translates** [1] - 26:10
**translation** [1] - 116:9
**translations** [5] - 116:11, 116:13, 116:15, 116:20
**TRAURIG** [1] - 2:20
**trend** [2] - 79:22, 94:12
**triangulate** [1] - 67:8
**tried** [2] - 27:23, 42:5
**trigger** [1] - 76:1
**triggered** [3] - 29:23, 69:8, 102:3
**true** [9] - 17:16, 36:13, 37:16, 65:24, 75:22, 98:18, 104:14, 109:1
**try** [3] - 35:20, 67:8, 70:2
**trying** [8] - 31:1, 35:14, 39:2, 64:10, 86:2, 89:1, 90:7, 92:3
**tumors** [1] - 115:22
**turn** [3] - 18:15, 25:6, 75:25
**twice** [1] - 22:16
**two** [17] - 28:14, 46:5, 46:6, 46:13, 51:25, 52:14, 52:23, 54:15, 55:13, 56:19, 57:12, 57:14, 61:2, 65:15, 80:7, 84:2
**twofold** [1] - 78:7
**type** [6] - 32:16, 82:5, 82:16, 83:13, 111:10, 114:25
**types** [5] - 43:17, 60:9, 79:15, 79:17, 81:13

**U**

**U.S** [43] - 1:6, 13:5, 34:7, 34:16, 35:7, 40:25, 41:24, 42:5, 42:13, 43:11, 45:4, 48:23, 49:10, 51:20, 53:1, 56:10, 56:12,

56:23, 57:20, 57:21, 58:2, 58:24, 82:15, 84:13, 84:25, 85:9, 97:10, 101:4, 101:21, 102:8, 102:11, 103:3, 103:14, 109:19, 110:3, 110:17, 110:19, 111:11, 111:15, 111:17
**ultimate** [2] - 4:10, 21:14
**ultimately** [6] - 11:23, 18:10, 21:8, 67:20, 69:14, 100:17
**uncontaminated** [3] - 115:9, 115:11, 115:14
**under** [12] - 7:2, 7:6, 12:15, 16:19, 19:21, 20:1, 29:22, 41:7, 77:9, 78:3, 105:12
**understood** [3] - 10:24, 24:14, 24:16
**undertaken** [1] - 37:22
**undue** [4] - 46:22, 47:1
**unexpired** [6] - 39:9, 39:13, 39:15, 39:17, 41:3, 41:7
**unforeseen** [2] - 4:5, 117:13
**Unit** [4] - 52:9, 54:16, 54:18
**UNITED** [2] - 1:1, 1:10
**United** [22] - 19:18, 35:23, 42:9, 44:11, 44:14, 47:17, 50:13, 51:3, 52:20, 55:14, 57:8, 57:11, 57:15, 58:7, 58:8, 58:10, 58:13, 65:19, 85:4, 98:3, 100:14, 111:4
**universe** [5] - 49:7, 49:15, 50:2, 50:4, 51:6
**unless** [3] - 35:4, 81:20, 117:13
**unquote** [1] - 29:12
**unrecalled** [1] - 41:7
**unredacted** [9] - 5:21, 5:23, 6:1, 6:5, 6:8, 7:9, 7:17, 7:25, 8:2
**unrelated** [1] - 89:25
**up** [41] - 6:24, 9:11, 9:17, 9:19, 23:23, 27:23, 28:25, 30:6, 31:6, 32:4, 32:19, 33:19, 34:1, 37:11, 39:17, 41:4, 45:10,

50:12, 59:6, 63:17, 64:19, 78:2, 91:8, 98:16, 99:14, 99:19, 99:21, 100:2, 100:16, 100:24, 101:7, 104:13, 105:13, 105:14, 106:3, 106:11, 107:8, 107:9, 109:10, 112:3, 114:23
**updated** [2] - 22:15, 22:21
**USA** [5] - 2:23, 45:21, 45:25, 110:17, 111:19
**user** [1] - 16:13
**users** [1] - 87:10
**utilized** [1] - 50:18
**utilizes** [1] - 44:8
**utilizing** [1] - 82:3

**V**

**vacuum** [1] - 68:22
**validate** [1] - 37:9
**validated** [1] - 94:4
**VALSARTAN** [1] - 1:3
**Valsartan** [69] - 3:5, 18:12, 24:21, 24:25, 33:18, 33:20, 33:21, 33:25, 35:2, 35:7, 35:23, 40:24, 41:15, 43:14, 47:17, 49:3, 50:8, 50:22, 50:25, 51:17, 52:8, 52:15, 54:17, 54:18, 55:12, 55:14, 56:11, 57:10, 57:13, 57:14, 59:5, 59:25, 60:14, 60:25, 61:11, 61:18, 62:14, 63:5, 63:7, 63:11, 63:12, 64:1, 64:12, 64:25, 71:25, 77:13, 83:17, 83:25, 89:4, 90:1, 90:2, 94:19, 100:14, 101:4, 101:14, 101:19, 103:5, 109:19, 110:3, 114:2, 114:4, 114:19, 114:22, 115:9, 115:11, 115:14, 115:16, 115:24
**variations** [1] - 66:25
**various** [3] - 67:4, 67:5, 67:17
**verify** [1] - 37:16
**versus** [3] - 66:2, 80:6, 83:8

**vertically** [1] - 111:10
**view** [4] - 11:11, 19:20, 63:10, 82:17
**violated** [1] - 11:11
**violation** [1] - 81:16
**Virginia** [2] - 54:21, 58:17
**voluntarily** [1] - 51:19

**W**

**wait** [5] - 8:6, 46:23, 64:16, 66:18, 93:20
**waited** [1] - 69:16
**waiting** [1] - 9:18
**walk** [1] - 10:20
**walk-through** [1] - 10:20
**wants** [3] - 46:17, 51:14, 105:5
**warned** [1] - 85:4
**warning** [2] - 21:11, 85:3
**water** [2] - 37:17, 38:6
**ways** [2] - 24:3, 95:1
**Wednesday** [1] - 1:8
**weeks** [1] - 4:10
**weighing** [2] - 105:24, 106:14
**weight** [1] - 93:22
**welcome** [1] - 3:4
**West** [2] - 54:21, 58:17
**whereas** [1] - 92:22
**Whiteley** [2] - 3:13, 12:11
**WHITELEY** [5] - 2:2, 2:2, 3:12, 12:11, 12:21
**whole** [6] - 19:8, 33:5, 71:5, 75:8, 107:8, 112:3
**wholesale** [1] - 89:10
**wide** [1] - 86:19
**Williamson** [1] - 3:18
**WILLIAMSON** [3] - 2:6, 3:18, 95:12
**willing** [1] - 86:24
**wind** [4] - 29:2, 61:14, 62:19, 62:20
**winded** [1] - 100:10
**wish** [2] - 50:10, 60:23
**withheld** [6] - 8:9, 8:10, 8:12, 8:24, 116:16
**withholding** [1] - 47:15
**witness** [10] - 67:6, 74:6, 74:8, 74:12, 74:14, 74:15, 74:17,

*74:22, 75:1, 75:6*

**witnesses** [2] - *66:19,*
*107:14*

**wood** [1] - *113:22*

**word** [3] - *16:10,*
*35:11, 64:20*

**wording** [1] - *14:11*

**words** [2] - *92:10,*
*100:1*

**works** [3] - *13:8, 13:9,*
*14:8*

**world** [6] - *8:5, 42:9,*
*42:12, 52:21,*
*102:10, 102:13*

**worldwide** [1] - *80:21*

**worry** [2] - *29:15, 36:8*

**worth** [1] - *105:4*

**written** [1] - *68:19*

**wrote** [1] - *99:22*

---

**X**

**Xunqiao** [4] - *51:23,*
*51:24, 51:25, 54:9*

---

**Y**

**year** [1] - *109:13*

**years** [20] - *31:16,*
*34:8, 35:1, 43:9,*
*67:6, 69:17, 84:24,*
*85:3, 85:9, 104:3,*
*104:4, 105:3, 105:5,*
*105:9, 106:7,*
*107:12, 107:18,*
*108:10, 109:12*

**yielding** [1] - *60:20*

---

**Z**

**zero** [1] - *45:15*

**ZHP** [38] - *2:16, 3:20,*
*13:11, 15:24, 16:11,*
*19:4, 21:12, 30:3,*
*35:23, 40:23, 41:22,*
*41:23, 42:6, 42:8,*
*42:13, 43:13, 43:20,*
*44:21, 51:11, 51:14,*
*52:17, 53:3, 53:5,*
*54:5, 58:11, 58:22,*
*61:3, 78:23, 88:19,*
*88:20, 88:23, 96:18,*
*96:19, 98:24,*
*101:25, 102:9,*
*108:15*

**ZHP's** [4] - *24:21,*
*34:5, 88:19, 99:12*

**zones** [1] - *51:25*