**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

|  |  |
|---|---|
| IN RE: VALSARTAN, LOSARTAN, AND IRBESARTAN PRODUCTS LIABILITY LITIGATION<br><br>This document relates to:<br>*All Actions* | No. 19-md-2875-RBK-KW<br><br>Honorable Robert Kugler<br>Magistrate Karen Williams<br>Special Master Thomas Vanaskie<br><br>**CERTIFICATION OF ADAM M. SLATER IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS WITHHELD AS CHINESE STATE SECRETS** |

I, ADAM M. SLATER, hereby certify as follows:

1.      I am an attorney at law of the State of New Jersey, and a partner at the law firm of Mazie Slater Katz & Freeman, LLC, attorneys for Plaintiffs.  I make this Certification in support of Plaintiffs' motion to compel the production of documents withheld as Chinese state secrets.

2.      The facts set forth in this certification are based upon my personal knowledge, information, and belief, unless otherwise stated.

3.      Attached hereto as **Exhibit A** is a true and accurate copy of *Munoz v. China Expert Tech., Inc.*, No. No. 07 Civ. 10531, 2011 WL 5346323 (S.D.N.Y. Nov. 7, 2001).

4.      Attached hereto as **Exhibit B** is a true and accurate copy of *Meggit (Orange Cty.), Inc. v. Nie Yongzhon*, No. SACV 13–0239–DOC, 2015 WL 1809354 (C.D. Cal. Apr. 21, 2015).

5.      Attached hereto as **Exhibit C** is a true and accurate copy of *Autodesk, Inc. v. ZWCAD Software Co. Ltd.*, No. 5:14–cv–01409–EJD, 2015 WL 1928184 (N.D. Cal. Mar. 27, 2015).

6.      Attached hereto as **Exhibit D** is a true and accurate copy of *Masimo Corp. v. Mindray DS USA, Inc.*, No.: SACV 12-02206, 2014 WL 12589321 (C.D. Cal. May 28, 2014).

7.      Attached hereto as **Exhibit E** is a true and accurate copy of the transcript of the Parties' March 26, 2021 meet and confer regarding the document withheld as Chinese state secrets.

8.      Attached hereto as **Exhibit F** is a true and accurate copy of the Law of the People's Republic of China on Guarding State Secrets.

9.      Attached hereto as **Exhibit G** is a true and accurate copy of the Implementing Regulations of the Law of the People's Republic of China on Guarding State Secrets.

10.     Attached hereto as **Exhibit H** is a true and accurate copy of the Regulations of the Peoples Republic of China on Disclosure of Government Information.

I hereby certify that the aforementioned statements made by me are true.  I am aware that if any of the aforementioned statements made by me are willfully false, I am subject to punishment. Dated: May 10, 2021.

Respectfully Submitted,

_____
Adam M. Slater (NJ Bar 046211993)
MAZIE SLATER KATZ & FREEMAN, LLC
103 Eisenhower Parkway, 2nd Floor
Roseland, New Jersey 07068
Tel.: 973-228-9898
Fax: 973-228-0303
aslater@mazieslater.com
*Attorneys for Plaintiffs*

# Exhibit A

2011 WL 5346323
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Carlos MUNOZ, et al., Plaintiffs,

v.

CHINA EXPERT TECHNOLOGY,
INC., et al., Defendants.

No. 07 Civ. 10531(AKH).
|
Nov. 7, 2011.

### ORDER REGULATING DISCOVERY

ALVIN K. HELLERSTEIN, District Judge.

**\*1** I have reviewed the parties' memoranda recommending how discovery should proceed, I rule as follows:

1. Rules 33 and 34 interrogatories and requests to produce shall be served upon the parties, pursuant to a schedule requiring:

a. Service within 20 days from this order;

b. Responses 30 days thereafter;

c. Answers to interrogatories and production of documents 60 days after service (¶ 1a, above)

d. Production will be made, to the extent practical, in strict conformity to Federal and Local Rules, in searchable, electronic format, at the offices of requesting counsel.

e. Disputes will be tendered to me promptly, using the procedures of Individual Rule 2E.

2. Defendants argue that the procedures of the Hague Convention should first be followed. These procedures are slow and cumbersome, and subject discovery to the law of the country where the producing party is located. However, this lawsuit is four years old, and discovery just now beginning. The lawsuit is properly in this Court's jurisdiction, involves securities sold in the United States and under the protection of United States' laws governing United States capital markets, and implicates important United States' policies

and practices. In the circumstances, discovery will proceed under the Federal Rules of Civil Procedure. *See*

*Societe Nationale mdustrielle Aerospatiale v. United States Dist. Ct., S.D. Iowa,* 482 U.S. 522, 542–44, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987).

3. Defendants argue that the laws of the People's Republic of China limit discovery, impose secrecy, and punish violations under the criminal laws. Defendants will have to choose how to proceed, whether pursuant to the Federal Rules of Civil Procedure and the orders of this Court, or out of concern for their perceptions of the real strictures of Chinese laws, to the extent that such laws purport to punish compliance with the orders of this court. If defendants do not act in accordance with the law and practices of the United States courts, sanctions may be appropriate, including the striking of pleadings and other appropriate sanctions.

China's state secrecy and other related laws (as outlined in Section III.A. of Defendants' Joint Memorandum of Law in Response to Plaintiffs' Brief Regarding Discovery) criminalize the disclosure of information that relates to Chinese national security and other potentially sensitive interests. These laws have broad sweep and can preclude disclosure of a host of nebulously defined categories of information. *See* *Richmark Corp. v. Timber Falling Consultants,* 959 F.2d 1468, 1477 (9th Cir.1992). And thus they are viewed with some skepticism in U.S. courts. The Supreme Court has stated that "[i]t is well settled that [foreign 'blocking'] statutes do not deprive an American court of the power to order a party subject to its jurisdiction to produce evidence even though the act of production may violate that statute," *Societe Nationals,* 482 U.S. at 544 n. 29. Rather, any deference to state secrets laws should be decided by examining the facts in each individual case. *See id.*

**\*2** The Ninth Circuit was presented with a case similar to this one, where a company with information in China feared sanctions if it were to comply with a U.S. court's discovery order. Nonetheless, the Ninth Circuit deemed discovery under the Federal Rules appropriate, and I find that court's reasons for doing so to be helpful in the case at hand. Following *Societe Nationale,* the *Richmark* court employed a multi-factor balancing test to determine whether discovery was appropriate under the Federal Rules. And "the most important" factor was the "balance of national interests"— the determination as to "whether disclosure would affect

Case 1:19-md-02875-RMB-SAK    Document 1231-2    Filed 05/10/21    Page 5 of 296
PageID: 27744
Munoz v. China Expert Technology, Inc., Not Reported in F.Supp.2d (2011)
2011 WL 5346323

important substantive policies or interests of either the United States or the PRC." *Richmark,* 959 F.2d at 1476 (internal quotation marks omitted).

This factor alone is enough to tip the balance in favor of a presumption of disclosure in this case. The national interest of the United States is observably strong; China's is speculative. China Expert Technology, Inc. ("CXTI") was incorporated in the United States, and its shares were traded publicly in this country. CXTI filed disclosure statements with the SEC, And the alleged fraud affected U.S. investors and U.S. capital markets. The United States has a strong interest in both regulating its domestic corporations and ensuring the integrity of its financial markets.

The effect of disclosure on China's national interests, however, is at this stage unproven and uncertain. Though CXTI apparently contracted with local Chinese governments, any state secret sensitivity China may claim is immediately put into question by the fact that China knew that the company with which it contracted was subject to American disclosure laws. CXTI communicated openly with investors about its financial condition, and filed documents with the SEC. Furthermore, as plaintiffs point out, all discovery they seek has already been turned over to PKF Hong Kong and PKF New York. Memorandum Outlining Plaintiffs' Suggestions For Discovery Against Foreign–Based Defendants In This Case at 22. Finally, the defendants have not explained how Chinese state secrecy laws apply to Hong Kong, where certain defendants are located.

I do not, by stating these propositions, intend to pre-judge discovery issues that may arise, or deter parties from exercising their rights to seek specific judicial rulings regarding specific discovery issues. As I understand from the pleadings, CXTI was engaged to develop computer capability and facilities in China, and there could be broad reach to the laws of China regarding state secrets, confidentiality of contracts filed with the government, and accountants' work. I suspect that many of the documents that may be subject to assertions of state and archival secrecy may be relevant—perhaps, highly relevant—to the issues of this case. There may be need for this Court, as the Court presiding over these proceedings and any trial, to make rulings that balance relevance against assertions of secrecy, and which seek to preserve the policies of China's laws on state secrets and federal policy in relation to issuer's and accountants' obligations. I fully understand that specific issues will require specific hearings and rulings, and I intend to provide an appropriate forum to consider such issues, whether raised by using Individual Rule 2E or motion practice under the Federal Rules of Civil Procedure.

**\*3** 4. Approximately 30 days after production is made, on a date and time that plaintiffs' counsel will obtain from chambers, counsel shall attend a conference in my Courtroom 14D to discuss the witnesses whose depositions are to be taken, and deposition practice.

a. Depositions will take place convenient to witnesses, the witness being the person examined rather than the party that was noticed.

b. Persons resident in China will be produced for examination in Hong Kong, provided that the depositions are conducted according to the laws and practices of the Federal Rules of Civil Procedure and Local Rules of Court. If such laws and practices cannot be or are not followed, the depositions will be resumed in New York City, with costs (including attorneys' fees and expenses) to be taxed against the party responsible for such failures.

c. Disputes that arise in the course of depositions, to the extent that they cannot feasibly be resolved through joint letters submitted under Individual Rule 2E, will be resolved through telephone conferences, either with me or with Hon. James C. Francis IV, the magistrate judge appointed to the case.

5. This order does not treat discovery of third parties. Plaintiffs' papers state that the identities of third parties are not now known. We do know that CXTI operated through Chinese subsidiary corporations, and that CXTI was a shell corporation, incorporated in Nevada and operating and headquartered in China. The parties should proceed through party-discovery first (including, to be treated as parties, the Chinese subsidiary corporations), and, to the extent feasible, before raising issues of third-party discovery.

This order also does not treat discovery of plaintiffs' investigator in China, nor whether such discovery would be appropriate. If discovery is desired, it should be the subject of a special proceeding.

6. Simultaneous with the procedures outlined in the preceding paragraphs of this order, and within 20 days of this order, the parties shall propose a plan for conducting

Case 1:19-md-02875-RMB-SAK    Document 1231-2    Filed 05/10/21    Page 6 of 296
PageID: 27745
Munoz v. China Expert Technology, Inc., Not Reported in F.Supp.2d (2011)
2011 WL 5346323

discovery relevant to the certification of a class, followed by appropriate motions.

7. Questions as to any of the above may be submitted by joint letter following the practices of Individual Rules 1D and 2E.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 5346323

---

**End of Document**    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit B

2015 WL 1809354
Only the Westlaw citation is currently available.
United States District Court,
C.D. California,
Southern Division.

MEGGITT (ORANGE
COUNTY), INC., et al., Plaintiffs,
v.
NIE YONGZHONG, et al., Defendants.

No. SACV 13–0239–DOC (DFMx).
|
Signed April 21, 2015.

**Attorneys and Law Firms**

Charles August Kertell, Yasser M. El–Gamal, Manatt Phelps and Phillips LLP, Costa Mesa, CA, Lawrence Robert Laporte, Robert W. Dickerson, Jr., Manatt, Phelps & Phillips, LLC, Los Angeles, CA, for Plaintiffs.

Christian Anstett, Jaime W. Marquart, Baker Marquart LLP, Los Angeles, CA, Daniel Johnson, Jr., Corey R. Houmand, Jacob Joseph Orion Minne, Jason Evan Gettleman, Michael J. Lyons, Morgan Lewis and Bockius LLP, Palo Alto, CA, Christopher J. Banks, Lorraine M. Casto, Morgan Lewis & Bockius LLP, San Francisco, CA, Todd William Smith, Morgan, Lewis & Bockius LLP, Irvine, CA, for Defendants.

**ORDER GRANTING IN PART AND
DENYING IN PART PLAINTIFFS'
MOTION FOR SANCTIONS [480]**

DAVID O. CARTER, District Judge.

**\*1** Before the Court is Plaintiffs' Motion for Sanctions ("Motion") (Dkt.480). This matter came for hearing on April 20, 2015. Having considered the briefing, oral arguments, and relevant exhibits, the Motion is GRANTED IN PART. The Court finds that sanctions are an appropriate remedy for a number of the discovery abuses described in Plaintiffs' Motion. However, terminating sanctions are inappropriate. The Court will impose monetary sanctions and may instruct the jury or preclude evidence as described below. In addition, the Court finds it appropriate at this time to STRIKE Defendants' affirmative defense of unclean hands,

as Defendants concede that Plaintiffs did not engage in the wrongful conduct described in the Answer.

**I. Background**

This is a trade secrets case in which Plaintiffs Meggitt (Orange County), Inc. ("Meggitt OC") (formerly, Meggitt San Juan Capistrano, Inc.) and Meggitt (Maryland), Inc. ("Meggitt MA") (collectively, "Meggitt" or "Plaintiffs") are suing former Meggitt (Xiamen) Sensors & Controls Co. Ltd. ("Meggitt Xiamen") employee Nie Yongzhong (who also goes by Bill Nie) ("Nie") and his company Xiamen Niell Electronics Co. Ltd. ("Niell–Tech") for stealing Meggitt trade secrets, and eventually using those trade secrets to manufacture several products using Meggitt's trade secret information. *See* Fourth Amended Complaint ("FOAC") (Dkt.386). Plaintiffs also bring claims for federal false advertising regarding the promotion of products that Defendant Niell–Tech did not actually produce and unfair competition.

This Motion is premised upon Defendants' purported discovery misconduct and misrepresentations to the Court over the course of this litigation.

**A. Facts**

Plaintiffs make the following allegations in the FOAC.

Meggitt MA and Meggitt OC are leading designers and manufacturers of sensors and accelerometers for vibration, shock, and pressure measurements, which have a variety of uses including in aircraft engines, pacemakers, and seismic measurements. FOAC ¶ 13. Meggitt manufactures products at Meggitt Xiamen [1]—where Defendant Nie was employed as an engineer between October 2005 and August 2011. *Id.* ¶ 14.

While working at Meggitt Xiamen, Nie had access to Meggitt's trade secret, confidential, and proprietary information which he specifically agreed not to disclose or use. *Id.* ¶ 16.

In April 2010, Nie founded Niell–Tech, while he was still employed at Meggitt Xiamen. *Id.* ¶ 17. Niell–Tech now manufactures and markets sensors and accelerometers of the same shape and size, with the identical specifications, as several Meggitt products. *Id.* ¶ 18. Plaintiffs allege that Niell–Tech's products could not have been developed and manufactured to precisely match Meggitt's dimensions and specifications unless Defendants

2015 WL 1809354

possessed and used Meggitt's trade secret, confidential, and proprietary information (for example, its assembly instructions, calibration software/source code). *Id.* ¶¶ 19–20. Plaintiffs identify "job travelers" as a specific source of substantial trade secret information. *Id.* ¶¶ 21–23. Nie was instructed on Meggitt PLC's Code of Conduct, including the need to protect the intellectual property and confidential information of the company. *Id.* ¶ 23.

**\*2** Plaintiffs contend that Defendants could not have achieved the same quality for its products, or achieved the same specifications of Meggitt's products, without a significant investment of capital and labor and more time than elapsed before Defendants started selling products. *Id.* ¶ 25.

Based on the foregoing, Plaintiffs bring suit for trade secret misappropriation under California Civil Code § 3426.

Plaintiffs also bring a cause of action for federal false advertising under 15 U.S.C. § 1125(a), based upon Defendants' false representation of "being a well-established, strong, reputable and reliable company with qualified engineers, and a wide range of product offerings." *Id.* ¶ 32. Plaintiffs identify material misrepresentations to support their position, including Defendants advertisement in product brochures and data sheets for 47 products that do not exist or were not manufactured, *id.* ¶¶ 33, 40–73; advertisements for products in data sheets that used Meggitt's trade secret, confidential, and proprietary information, mimicking the specifications for Meggitt's products, *id.* ¶¶ 34–35, 74–80; and Defendants' advertisement on Niell–Tech's website about having experts and engineers from Endevco (Meggitt OC) and Wilcoxon (Meggitt Maryland). *Id.* ¶¶ 36, 81–83.

Finally, Plaintiffs assert an unfair competition claim under California Business and Professions Code § 17200 and common law.

Defendants filed an answer to the FOAC on December 4, 2014 ("Answer") (Dkt.388). In the Answer, Defendants assert several affirmative defenses, including an affirmative defense for "unclean hands." The defense is premised on allegedly defective "Meggitt" and Meggitt Xiamen products. Answer ¶ 106. Specifically, Nie charges that "[t]his shifting of weld positions compromised the strength, quality, and accuracy of the Meggitt speed sensors that were being manufactured at Meggitt Xiamen." *Id.* ¶ 108. Nie allegedly supported the recall of Meggitt products, which management disagreed with. *Id.*

¶ 114. Nie purportedly resigned as a result. *Id.* ¶ 117. In addition, Nie asserts that he opposed cost-cutting measures by "Meggitt and Meggitt Xiamen," including the shut-down of central air-conditioners. *Id.* ¶ 119. In the Opposition to the Motion to Strike this affirmative defense, Defendants asserted that "Mr. Nie was forced to retain those documents in order to clear his name in the event of a catastrophic failure associated with Meggitt's defective sensor products." Opp'n Mot. to Strike (Dkt.395) at 5–6.

**B. Procedural History**

A complaint was filed on February 2, 2013 (Dkt.1). On September 26, 2013, the Court granted Plaintiff Meggitt (San Juan Capistrano)'s motion for a preliminary injunction. Order Re: Plaintiff's Motion for a Preliminary Injunction, Sept. 26, 2013 (Dkt.41); Order Granting Plaintiff's Motion for Preliminary Injunction and Expedited Discovery (Dkt.43).[2]

**\*3** The Preliminary Injunction provided, among other things, that:

- Defendants are enjoined from marketing, selling, or offering for sale, the following products: Niell–Tech's model CAYD051V product; Niell–Tech's model CAYD053–50 product; and Niell–Tech's model CAYD063V product.

- Defendants shall return to Plaintiff any and all records or documents reflecting Plaintiff's trade secret, confidential, and/or proprietary information, including, but not limited to, job travelers, photographs, drawings, work instructions, acceptance test procedures, and any other proprietary or confidential information belonging to Meggitt, or any records, documents and/or information derived therefrom, and any and all documents created or recreated from memory or otherwise by Defendant Nie either during or after his employment with Meggitt (Xiamen) Sensors & Controls Co. Ltd. that contain information pertaining to Meggitt's confidential, proprietary information, or trade within fifteen (15) days of this Order.

- Defendant shall respond to Plaintiff's First Set of Interrogatories to Defendant Nie, Plaintiff's First Set of Interrogatories to Defendant Niell–Tech, Plaintiff's First Set of Requests for Production of Documents and Things to Defendant Nie, and Plaintiff's First Set of Requests for Production of Documents and Things to Defendant

Niell–Tech with fifteen (15) days of the date this Order is entered.

On November 15, 2013, the Court set initial dates in this matter. Scheduling Order, Nov. 15, 2013 (Dkt.52). The discovery cut-off date was set for July 18, 2014; expert discovery for November 7, 2014; motion cut off for January 12, 2015; and trial set for March 10, 2015.

On June 16, 2014, Plaintiffs filed a Motion for Sanctions ("June Motion") (Dkt.190). The June Motion was based upon false interrogatory responses, failure to produce Meggitt documents covered by the Preliminary Injunction, and non-compliance with discovery orders, among other issues. *See generally* Memorandum in Support of Motion for Sanctions (Dkt.191). The Court denied the Motion on November 3, 2014. Order Granting Motion for Relief from Scheduling Order, Denying Motion for Sanctions, and Denying Motion to Review Magistrate Judge Orders, Nov. 3, 2014 (Dkt.377). The Court wrote:

> It is clear that each side is deeply frustrated by the other's purported gamesmanship. The Court is often called upon to referee discovery disputes, but the caustic tone of this litigation is deeply troubling and strays from the cordiality and respect that the legal profession—and, indeed, the courts—hope to cultivate. For its part, the Court regrettably contributed to this problem by describing one of the party's tactics as "artful," which has served only to further sour matters. In light of the increased time for discovery, the Court is confident that reason and professionalism will prevail, and most of these disputes can be amicably resolved by the parties and their counsel.

**\*4** Of Plaintiffs' grievances, the Court is disinclined to sanction Defendants for the filing of various motions or the assertions of various defenses. Furthermore, even if Plaintiffs' complaints were all true and meritorious, it is very doubtful that terminating sanctions would be the appropriate relief in this case.

Therefore, the Court DENIES the Motion for Sanctions WITHOUT PREJUDICE. The Court invites the parties to reconsider whether sanctions, an extraordinary remedy, are appropriate. If either Plaintiffs or Defendants conclude that sanctions are truly necessary and elect to file another motion, then they should be mindful of at least two issues: (1) the Court will strictly enforce Local Rule 7–3's requirement to meet and confer, and insists that such a conference take place in person; and (2) the Court is

inclined to grant such a motion only upon a substantial showing of either material misrepresentations to the Court or clear non-compliance with the Court's orders.

The Order also modified the applicable dates in this case—setting the discovery cut-off date for January 16, 2015, the motion cut-off for March 16, 2015, the final pre-trial conference for April 27, 2015, and trial for May 19, 2015. *Id.* at 3.

On December 22, 2014, Plaintiffs moved to strike Defendants' affirmative defenses, including their unclean hands defense (Dkt.389). The Court granted in part and denied in part the Motion, but declined to strike the unclean hands defense, based upon the allegations in the Answer. "Taking the allegations as true, Defendant has pled sufficient facts to establish the potential, if farfetched, relationship between the Plaintiffs' claims and the bad acts alleged by Defendants." Order Re: Motion to Strike (Dkt.389) at 4. The Court found that "Defendants [pled] sufficient facts to provide [fair] notice" and that "the facts as pled [did] not foreclose the existence of a nexus as required for the unclean hands defense.... Defendants' theory, although implausible, raises issues of fact and law such that the issue is unsuited for resolution at this juncture.... Thus, for purposes of the present motion, Defendants' fourth affirmative defense is pled sufficiently to overcome a motion to strike an 'insufficient' defense." *Id.*

Neither party filed a summary judgment motion.

In the past several months, discovery has been ongoing and heated. Magistrate Judge McCormick has ruled on several last-minute discovery motions. *See, e.g.,* Discovery Orders (Dkts.459, 462, 470).

Plaintiffs filed the present Motion on March 23, 2015 (Dkts.480, 481). The Motion raises many of the same issues presented in the June Motion, for example, inconsistent interrogatory responses and the failure to produce Meggitt documents in Defendants' possession (in fact, denying their existence). *See* Memorandum in Support of Motion for Sanctions (Dkt.481). Defendants filed an Opposition on March 30, 2015 (Dkt. 507; Sealed Dkt. 516). Plaintiffs filed a Reply on April 6, 2015 (Dkt.534).

**\*5** The alleged discovery abuses on which Plaintiffs base their Motion are detailed below.

## C. Discovery History

### 1. Meggitt Documents in General

After the Court entered the Preliminary Injunction on September 26, 2013, Defendants were required to promptly (within 15 days) return to Meggitt (1) all of Meggitt's trade secret, confidential, and/or proprietary information, including, but not limited to, job travelers, photographs, drawings, work instructions, acceptance test procedures, (2) any other proprietary or confidential information belonging to Meggitt, (3) any records, documents and/or information derived from Meggitt's information, and (4) any and all documents created or recreated from memory or otherwise by Defendant Nie either during or after his employment with Meggitt Xiamen.

Defendants returned no documents to Meggitt by the October 11, 2013 deadline. At the time, Defendants represented that they had none of Meggitt's documents. *See, e.g.,* Defendant Nie's Responses to Plaintiff Meggitt, Inc.'s First Set of Requests for Production of Documents and Things, October 11, 2013 ("Nie October Responses") (Dkt.69–10) at 10–11 (*e.g.,* RFP 7 for "documents in your possession, custody, or control that Nie obtained from Meggitt or any parent, subsidiary, or affiliate of Meggitt." "Responding Party has no responsive documents in his possession, custody or control."); Defendant Xiamen Niell Electronics Co., Ltd.'s Responses To Plaintiff Meggitt, Inc.'s First Set of Requests For Production of Documents and Things, October 11, 2013 ("Niell–Tech October Reponses") (Dkt.69–11) at 10–11 (same). On November 13, 2013, Nie again asserted that he had none of Meggitt's documents in his possession, custody, or control. Defendant Bill Nie's First Supplemental Responses to Plaintiff Meggitt, Inc.'s Interrogatories (Set One) (Verified) ("November Responses") (Sealed Dkt. 76) at 10–11.

Meggitt filed Motions to Compel with Magistrate Judge McCormick on December 20, 2013 (Dkts. 65 & 66). Defendants opposed the motions, representing that they had no Meggitt documents in their possession, custody, or control. Joint Stipulations Re: Motions to Compel (Sealed Dkt. 75) at 49:7–8, (Sealed Dkt. 74) at 40:17–18.

Based upon these numerous representations, on January 6, 2014, Magistrate Judge McCormick did not compel production of Meggitt documents, as it was not clear to the Court at that point that Defendants had not fulfilled their discovery obligations. He wrote:

> Plaintiff takes issue with Defendants' assertion that they have no responsive documents in their possession, custody, or control. Rule 26(e) imposes upon Defendants a duty to supplement or correct these responses if they learn that their prior responses have been incorrect. To the extent Defendants fail to abide by this requirement, the consequences of such a failure are set forth in Rule 37(c)(1). It does not appear to the Court that at this point in the proceedings it is appropriate or necessary for the Court to address any such consequences, as it is not clear that Defendants have failed to abide by their responsibilities to produce all responsive documents and/or supplement or correct their discovery responses. If and when such a failure becomes arguably apparent, the parties are invited to bring the appropriate motion.

**\*6** Order Re: Motions to Compel, Jan. 6, 2014 ("January Order") (Dkt.80) at 3.

Defendants made similar representations (to the Court or Plaintiffs' counsel) over the next several months, expressly denying being in possession, custody, or control of Meggitt's documents and representing that they were in substantial compliance with their discovery obligations and had complied with Court orders. *See* Def. Nie's Response to Pls. First Set of Requests for Production of Docs. and Things, January 31, 2014 (Dkt.166–1) at 5:15–8:8; Def. Niell–Tech's Supp. Resp. to Pls. First Set of Requests for Production of Docs. and Things, January 31, 2014 (Dkt.166–2) at 5:15–8:8; Defs' Opp'n to Pls' Mot to Continue, May 19, 2014 (Dkt.174) at 4:22–5:22; Email from Defense counsel Michael J. Lyons to Plaintiffs' Counsel, May 21, 2014 (Dkt 198–1) Ex. B at 8 ("It is important for Defendants to be made aware of the[ ] issues [supporting Plaintiffs' June Motion], because we believe that we have fully complied with our discovery obligations, as we explained in our most recent filing with the Court on Monday."); Letter from Mario Moore to Lawrence LaPorte, June 6, 2014 (Dkt.200–1) ("As an

2015 WL 1809354

initial matter, discovery has been ongoing for months—defendants have produced voluminous discovery including product samples, technical documents and allowed Plaintiffs access to Defendants' trade secret materials in their secure room on multiple occasions. Thus, and contrary to their objections, Plaintiffs have received 'complete discovery from Defendants,' and this objection should be overruled.").

Despite these representations, on April 10, 2014, Defendant Nie sent an email to Eric Ladiere, an executive at Meggitt, indicating that Nie had Meggitt documents in his possession ("April 2014 Email") (Sealed Dkt. 196). In the email, Nie complained about bad practices that Meggitt or its affiliates had engaged in while he was employed at Meggitt Xiamen. The email also revealed, however, that Nie still had in his possession documents that Nie retained when he left Meggitt Xiamen in 2011. Nie wrote, "I am keeping all of the evidence (email) both on the defect products (airplane engine sensor and pacemaker sensor) which shipped to the end customer with dutiful attitude.... I hope you can stop the hurt to me and investigate this issue." *Id.*

On June 20, 2014, Defendants began producing additional documents, including documents containing Meggitt confidential and trade secret information. Rothwell Decl. (Dkt.202) ¶ 4. In all, over 300 boxes of documents were produced (comprised of over 700,000 pages of information). *Id.* ¶¶ 2–6. Prior to that, approximately 3,000 pages of documents had been produced—with no Meggitt documents among them. Rothwell Decl. (Dkt.177) ¶ 12. Defendants later admitted that the documents came from a hard drive that Nie took from Meggitt Xiamen in August 2011.

In their Opposition to Meggitt's June Motion, Defendants represented that the production "consist[ed] of documents uncovered recently." Opp'n to Mot. for Sanctions (Dkt.198) at 11. Defendants explain that, after Morgan, Lewis & Bockius LLP appeared in the case to represent Defendants, counsel conducted interviews and "learned of an external hard drive in Mr. Nie's possession." Opp'n at 9. Defendants did not otherwise explain the inconsistencies in Nie's and Niell–Tech's earlier discovery responses.

### 2. Hard Drive

**\*7** Plaintiffs also complain that Defendants failed to produce to them a forensic copy of the hard drive that Nie retained when he left Meggitt Xiamen. Defendants originally maintained that they could not produce a physical hard drive because the the of the risk it would be retained by Chinese

authorities leaving the country. Later, Defendants offered to return the original device to Meggitt Xiamen. Lyons Decl. Ex. 6, Letter from Daniel Johnson, July 18, 2014 (Dkt.508) at 2. Plaintiffs did not respond.

Plaintiffs received a copy of the hard drive in January 2015, after it had been analyzed by a Defense expert, Robert Young. Young Report, LaPorte Decl., Ex. 2 (Sealed Dkt. 492). Young assessed items including "most recent access date for any of the files cited by [Meggitt's expert] as containing Meggitt's Trade Secrets." *Id* . at 1.

Plaintiffs' expert also used the copy of the hard drive to develop a report as to whether the hard drive had been accessed. Smith Report (Sealed Dkt. 517). Plaintiffs expert concluded the drive was extensively accessed in May 2014.

Meggitt also notes that Defendants' counsel had been in possession of the hard drive since May 2014, HD Chain of Custody Documents, LaPorte Ex. 3 (Dkt.482–3), but only acknowledged having the documents in late June.

### 3. CAYD053–50 Accelerometer Product–Chinese State Secrets

The Preliminary Injunction enjoined Defendants from marketing, selling, or offering for sale their Niell–Tech CAYD053–50 accelerometer product, and granted expedited discovery into Defendants' technical and sales documents and information related to this product.

Defendants initially refused to turn over these documents, asserting various discovery objections. In the January Order, Magistrate Judge McCormick rejected most of Defendants' objections, including Defendants' initial attempt to invoke protections from disclosure under Chinese state secrets law. He wrote:

> Defendants object to many of Plaintiff's document requests and interrogatories on the basis that disclosure of the information sought therein "would possibly subject defendants to criminal penalties in China." Defendants also object that Chinese law precludes them from identifying their government customers. Tellingly, however, Defendants do not cite a specific Chinese law that would bar production of either category of information. A party relying on foreign law has the burden of showing that such law bars production. *Roberts v. Heim,* 130 F.R.D. 430, 438 (N.D.Cal.1990) (citing *United States v. Vetco, Inc.,* 691 F.2d 1281, 1289 (9th Cir.1981)). In the absence of such

authority, the Court overrules Defendants' confidentiality objections based on Chinese law."

On January 10, 2014, Defendants moved for a protective order based on Plaintiffs' failure to identify its trade secrets with sufficient particularity (Dkt.83). In addition, during the process of constructing a protective order, Defendants attempted to invoke Chinese law to govern disclosure of documents. Joint Protective Order (Dkt.104–2) at 55 (export control). Judge McCormick declined to adopt their position, and refused to apply Chinese export law absent a showing that it was controlling. Minutes of Motion for a Protective Order (Dkt.112). At the same time, Judge McCormick adopted Plaintiffs' proposal that protected information be produced in Orange County, California. *Id.* at 4–5; Protective Order (Dkt.121) ¶ 7.6(a).

**\*8** On March 12, 2014, Defendants again moved for a protective order, this time explicitly based on "state secrets" (Dkt.139). The Motion argued that "[t]he requested technical information for CAYD053–50 falls under the ambit of the People's Republic of China ("PRC") state secrecy laws and any disclosure is potentially subject to criminal sanction and jail time." *Id.* at 1; Nie Decl. (Dkt.139–2) ¶ 2.[3] Judge McCormick denied the motion on March 21, 2014 (Dkt.151). After a well-reasoned analysis, weighing the PRC's interest in secrecy against the U.S. and Plaintiffs' interest in disclosure, he concluded:

> [A] balancing of the *Richmark* factors weighs in favor of ordering Defendants to produce the discovery about which they assert the applicability of China's state secrets law. This result is particularly warranted in light of (1) Defendants' failure to demonstrate an actual likelihood that production would result in criminal or civil liability in the PRC, (2) the United States's interest in providing a remedy for the clear harm caused by trade secret misappropriation to parties like Plaintiff, and (3) the Court's skepticism about the validity of PRC's interest in preventing disclosure.

*Id.* at 8. Therefore Defendants were foreclosed from invoking China's state secrets law to avoid disclosure of documents in California.

Plaintiffs also note that the CAYD053–50 product has been marketed and promoted in the United States and Europe, rendering Defendants' state secrets objection highly suspect. Mot. at 14; Mendoza Decl. (Dkt.17) ¶ 22, Ex. E.

Defendants failed to produce the documents to Meggitt in California. Nevertheless, Defendants agreed to allow inspection of the documents in China (although, forbidding the removal of the documents from China). Opp'n to June Mot. (Dkt.198) at 5. Plaintiffs declined to inspect the documents in China.

On March 6, 2015, Defendants produced certain documents related to the CAYD053–50 product after "successfully applying to the Chinese government to have these documents declassified as PRC State Secrets." Mot. at 13 n. 11, Opp'n at 10.

### 4. Interrogatory Responses

Meggitt also bases its request for sanctions on Defendants' various interrogatory responses.

First, in November 2013, Nie represented that he did not have any Meggitt documents in his possession, custody, or control. November Responses (Sealed Dkt. 76). This was clearly false, as evidenced by his April 2014 Email.

Second, Meggitt asked Defendants to identify "all products Niell–Tech has manufactured from April 2010 to the present." First Set of Interrogatories (Dkt.69–1) Interrogatory No. 1. Nie initially asserted over 90 accelerometers and sensors had been produced (Sealed Dkt. 76) ("November List"), but two months later trimmed the list to 64 sensors and accelerometers. Houmand Decl. (Dkt.412) Ex. 3 ("January List"). Plaintiffs identify 38 products that were on the November List but were not on the January List.

**\*9** Third, Meggitt identifies a discrepancy regarding the sales data for Product CA3XYD048. Mot. at 21. Defendants represented that the product was manufactured prior to September 2010 (November Responses at 12:16–19), but failed to identify sales data for the product (November Responses at 9:12–10:5; Supplemental Interrogatory Responses (Sealed Dkt. 432)). Defendants note that Plaintiffs withdrew a motion to compel covering this point, and believed that they had complied with their obligations. Opp'n at 23.

Fourth, Meggitt notes that Nie originally represented that the CAYD053–50 product was classified as a state secret in January 2012 (Dkt.139–2). In Defendants' Third Supplemental Objections to Plaintiffs Second Set of Interrogatories, Defendants maintained that the official classification occurred by the end of 2013 (although

Defendants stated that by July 10, 2012 it had received a "certification to produce a military use product," mandating strict secrecy) (Sealed Dkt. 500).

Fifth, Meggitt asserts that Defendants have failed to produce information regarding their CAYD053–10 product. This product was not identified on either the November or January List of products manufactured by Niell–Tech. On January 29, 2014, Nie attested that "technical documents relating to CAYD053–50 and CAYD053–10 have been classified as State Secrets" (Dkt.139–2). The alleged certification indicated that the product had been manufactured (Sealed Dkt. 142). Defendants maintain that there is no CAYD053–10 product and that it was still in development at the time of the certification. Opp'n at 23.

Sixth, Meggitt asserts that Defendants have failed to provide all technical documents related to their CAYD172–25 and CAYD051V–100B products. These documents were identified by Defendants as having been manufactured. As to the first product, CAYD172–25, Defendants assert that "[d]evelopment of the product is not yet complete." LaPorte Decl. Ex. 11 (Sealed Dkt. 501) at 5:18–19. Plaintiffs note that Defendants produced a physical sample of the product to Meggitt in March 2014. Reply at 1; Transmission Letter, March 25, 2014 (Dkt.166–14). However, in oral arguments Defendants noted that this was just a prototype, and only three were actually manufactured. Defendants also asserted that a prototype for the CAYD051V–100B has not been manufactured, although they have since retracted that position. Supplemental Interrogatory Responses (Dkt.432) Ex. 2 No. 47.

## II. Legal Standard

### A. Discovery Sanctions

Under Federal Rule of Civil Procedure 37, the Court may sanction a party for failure to comply with a court order or failing to supplement earlier discovery responses under Rule 26. Fed.R.Civ.P. 37(b)-(c). Sanctions may include:

(i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

(ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

**\*10** (iii) striking pleadings in whole or in part;

(iv) staying further proceedings until the order is obeyed;

(v) dismissing the action or proceeding in whole or in part;

(vi) rendering a default judgment against the disobedient party; or

(vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

Fed.R.Civ.P. 37. Alternately, or in addition, the court may impose on the disobedient party reasonable expenses caused by the failure, "unless the failure was substantially justified or other circumstances make an award of expenses unjust." Id.

A terminating sanction, whether default judgment against a defendant or dismissal of a plaintiff's action, is very severe. Because there is a strong preference for adjudicating cases on their merits, only "willfulness, bad faith, and fault" justify terminating sanctions. Jorgensen v. Cassiday, 320 F.3d 906, 912 (9th Cir.2003). "Disobedient conduct not shown to be outside the control of the litigant is sufficient to demonstrate willfulness, bad faith, or fault." Id. at 912 (quoting Hyde & Drath v. Baker, 24 F.3d 1162, 1167 (9th Cir.1994)).

Courts apply a five-part test, with three subparts to the fifth part, to determine whether a case-dispositive sanction is just:

(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions." The sub-parts of the fifth factor are whether the court has considered lesser sanctions, whether it tried them, and whether it warned the recalcitrant party about the possibility of case-dispositive sanctions. This "test" is not mechanical. It provides the district court with a way to think about what to do, not a set of conditions

Meggitt (Orange County), Inc. v. Nie Yongzhong, Not Reported in F.Supp.3d (2015)

2015 WL 1809354

precedent for sanctions or a script that the district court must follow.

*Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills,* 482 F.3d 1091, 1096 (9th Cir.2007).

"What is most critical for case-dispositive sanctions, regarding risk of prejudice and of less drastic sanctions, is whether the discovery violations 'threaten to interfere with the rightful decision of the case.' " *Id. at 1097* (quoting *Valley Eng'rs v. Electric Eng'g Co.,* 158 F.3d 1051, 1057 (9th Cir.1998)).

### B. Striking Insufficient Defenses

The court may, on its own, strike from a pleading an insufficient defense. *Fed.R.Civ.P. 12(f).* The essential function of *Rule 12(f)* is to "avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial." *Fantasy, Inc. v. Fogerty,* 984 F.2d 1524, 1527 (9th Cir.1993) (internal quotation marks and citation omitted), *overruled on other grounds,* 510 U.S. 517, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994); *Sidney–Vinstein v. A.H. Robins Co.,* 697 F.2d 880, 885 (9th Cir.1983). The grounds for striking a defense must appear on the face of the pleading under attack, or from matters that the court may take judicial notice. *SEC v. Sands,* 902 F.Supp. 1149, 1165 (C.D.Cal.1995).

### III. Analysis

### A. General Discovery Sanctions

**\*11** Plaintiffs argue that Defendants' discovery misconduct, chronicled above, merits the award of terminating sanctions. [4]

### 1. Previous Sanctions Order

Defendants argue generally that, because the Court previously declined to issue sanctions on some overlapping issues, the Court should not or will not now issue sanctions. In its November Order, the Court denied the June Motion without prejudice. The Court was under the sincere hope that cooler minds would prevail. Nevertheless, the Court's

ruling by no means foreclosed Plaintiffs from raising the same issues after all parties had been provided additional time for discovery. The Court's ruling also did not decide the propriety of Defendants' discovery practices. Specifically, Defendants claim—with regards to its production obligations for the CAYD053–50 technical documents—that they "reasonably believed that their inspection proposal complied with discovery" in light of the Court's denial of the previous sanctions motion. Opp'n at 13. This inference has no foundation in the text of the Court's November Order or any of its previous orders. Typically, Courts do not modify explicit orders *sub rosa,* and this case was no exception. The denial of sanctions did not tacitly imply Defendants had complied with their obligations.

### 2. Substantive Discovery Complaints

Having reviewed the record and arguments from both parties, this much has become clear to the Court:

- Defendants knowingly and willfully misrepresented to the Court and Meggitt that they did not have Meggitt documents in their possession, custody, or control. Defendant Nie clearly knew Meggitt documents were in his possession, as is evidenced by the April 2014 Email and Defendants' subsequent conduct. Nie knowingly had in his possession a hard drive with Meggitt documents that he did not turn over to Meggitt for approximately nine months after the Court's Preliminary Injunction, in violation of the terms of the injunction.

- However, the Court does not find defense counsels' representations about when the hard drive was revealed to them to be intentionally misleading. In the course of complex litigation, a few-week delay between becoming aware of a device and revealing it to opposing counsel is excusable. Further, the allegedly late disclosure of the physical hard drive by defendants counsel (as opposed to documents) does not appear to be in bad faith.

- Defendants' failure to turn over CAYD053–50 documents violated Court orders dated February 19, 2014 and March 21, 2014 (Dkts.Dkt.121, 151). The Magistrate Judge had fully considered and rejected Defendants' state-secrets defense. Nothing in the record demonstrates that Defendants sought reconsideration of the Magistrate Judge's order. Although Defendants clearly disagreed with the Magistrate Judge's position, "[d]isagreement with the court is not an excuse for failing to comply with court orders." *Adriana Int'l Corp. v. Thoeren,*

2015 WL 1809354

*913 F.2d 1406, 1411 (9th Cir.1990)*. Finally, the fact that Defendants, in February, could apparently petition and obtain consent to disclose these documents, Opp'n at 13, raises serious questions as the legitimacy of this defense—a defense that had nevertheless been explicitly rejected by the Court. The failure to turn over these documents constitutes a substantial showing of willful noncompliance with the Court's orders.

**\*12**  • As to the inconsistent interrogatory responses, the Court does not find that the responses evince bad faith or intentional misrepresentations (outside of Nie's representation regarding possession of Meggitt's documents). The inconsistencies may be attributable to inadvertence and the volume of discovery. The Court notes the inconsistency with regards to the CAYD172–25 product. While this draws into question the reliability of Defendants' records, the inconsistency does not indicate willfulness or bad faith.

Therefore, for failing to timely comply with Court orders regarding the disclosure of Plaintiffs' documents and disclosure of technical documents for the CAYD053–50 product, Defendants are subject to sanctions.

### 3. Appropriate Remedy

Having found that sanctionable conduct occurred, the Court must now turn to the appropriate remedy. Plaintiffs seek terminating sanctions-the entry of a default judgment against Defendants. Terminating sanctions are a measure of last resort, and are appropriate only where the Court has employed other methods to achieve compliance with Court orders.

The Court will consider the *Malone* five-factor test in determining whether to impose terminating sanctions: "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to the other party; (4) the public policy favoring the disposition of cases on their merits; and (5) the availability of less drastic sanctions." *Adriana Int'l Corp.,* 913 F.2d at 1412 (citing *Malone v. U.S. Postal Serv.,* 833 F.2d 128 (9th Cir.1987)).

"Where a court order is violated, the first two factors support sanctions and the fourth factor cuts against a default. Therefore, it is the third and fifth factors that are decisive." *Id.*

A party suffers prejudice if the opposing party's actions "impair the [party's] ability to go to trial or threaten to interfere with the rightful decision of the case." *Id.* (citing *Malone,* 833 F.2d at 131). The Ninth Circuit has found that "[d]elay alone has been held to be insufficient prejudice." *Id.* (citing *U.S. for Use & Ben. of Wiltec Guam, Inc. v. Kahaluu Const. Co.,* 857 F.2d 600, 604 (9th Cir.1988)). Failure to produce documents as ordered, however, is considered sufficient prejudice. *Securities and Exchange Comm'n v. Seaboard Corp.,* 666 F.2d 414, 417 (9th Cir.1982).

Although the Court concludes that Defendants' non-compliance with its orders was willful, Defendants failures—especially in light of the extension of time for discovery—do not "threaten to interfere with the rightful decision of the case." Plaintiffs have had time to review the late-disclosed documents from Nie's hard drive and examine relevant evidence in the case. "[W]hile [Defendants' misconduct] certainly caused serious inconvenience for [Plaintiffs]," it does not appear that the interference was so significant that it will prejudice the outcome of this action. *Kahaluu Const. Co.,* 857 F.2d at 604. Thus, the third factor weighs against terminating sanctions.

**\*13**  The Court also finds that less drastic sanctions are available in this instance. While Plaintiffs invite the Court to "set an example to future litigants" that discovery misconduct will not be condoned, Reply at 4, this message can be conveyed with less dire means. Terminating sanctions, which must be employed sparingly, are not the right vehicle to get across the message. Monetary and evidentiary sanctions can remedy the wrongful conduct. The fifth factor weighs against terminating sanctions.

As the third, fourth, and fifth factors all weigh against terminating sanctions, the Court finds that terminating sanctions are inappropriate.

The Court must then assess other available sanctions.

First: monetary sanctions are appropriate for Defendants' failure to disclose the hard drive that Bill Nie retained and the failure to turn over the CAYD053–50 documents in a timely manner. The amount will be determined as addressed below.

Second: the Court will also consider evidentiary preclusion or an adverse inference instruction regarding the late disclosed documents. That said, the Court finds that the appropriate

Meggitt (Orange County), Inc. v. Nie Yongzhong, Not Reported in F.Supp.3d (2015)

2015 WL 1809354

time to consider the scope of any evidentiary preclusion or structure the (potential) instruction is in the course of ruling on motions in limine and developing the jury instructions. Therefore, the Court will decline to issue a final ruling on preclusion or jury instructions at this time.

**B. Unclean Hands Affirmative Defense**

The Court has twice allowed Defendants' "unclean hands" defense to proceed, over Plaintiffs objections. Plaintiffs now raise the issue of Defendants' unclean hands defense in this Motion, arguing that the Defendants used misleading language in their Answer to defeat the Motion to Strike. The Court will decline to issue sanctions as a result of the language in the Answer, but finds it appropriate to exercise its power under 🔖 Rule 12(f) to strike the defense at this juncture.

In order to prevail on an unclean hands defense, "the defendant must demonstrate that the *plaintiff's* conduct is inequitable and that the conduct relates to the subject matter of its claims." 🔖 *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.,* 826 F.2d 837, 847 (9th Cir.1987) (citations omitted) (emphasis added). Therefore, it is presupposed that in order for Defendants to present an unclean hands defense, the inequitable conduct must have been perpetrated by Plaintiffs. Defendants, in their Opposition, essentially concede that it was not.

Defendants complain about two alleged areas of impropriety-failure to recall defective products and manipulating the air conditioning in manufacturing facilities. As alleged in the Answer, "Meggitt," necessarily implying Plaintiffs, perpetrated this activity. Contrary to this apparent representation, Defendants point out that the defective products were never meant to imply Plaintiffs' products, and the shut-down of the air-conditioning was committed by Meggitt Xiamen with Plaintiffs' knowledge.

**\*14** Plaintiffs request sanctions premised on the fact that Defendants intentionally misled the Court with the unclean hands defense by implying Plaintiffs products were defective or that Plaintiffs had employed cost-cutting measures such as shutting down the air-conditioning. Defendants deny that this impression was imparted intentionally. The Court declines to issue sanctions as to this issue. Discerning between Meggitt's several different corporate entities is not straightforward, and the Court cannot conclude that Defendants willfully misled the Court by using the term "Meggitt" in its Answer,

rather than specifying which Meggitt entity in particular was involved in certain actions.

Nevertheless, the Court disagrees that the Answer "clearly delineates between actions taken by different Meggitt entities." Opp'n at 18. To the contrary, the Answer made it appear that Meggitt (Plaintiffs) products were defective and subject to recall. Defendants now concede that the Answer should be interpreted such that Plaintiffs' products were not implicated in potential product failures. Opp'n at 19. Further, Defendants concede it was Meggitt Xiamen that shut-down the air conditioning in its manufacturing facilities. *Id.* at 20. Therefore, Plaintiffs' actions and products were not directly implicated in the misconduct that was alleged.

Defendants may not use the unclean hands defense as a tunnel through which to introduce extraneous information about the misconduct of other corporate entities at trial. 6 McCarthy on Trademarks and Unfair Competition (4th ed. 2010) § 31:48 ("The unclean hands maxim is not a search warrant authorizing the defendant to probe into all the possible types of inequitable conduct ever engaged in by the plaintiff. Plaintiff's inequitable conduct is the basis for a valid defense only if it relates in some way to the subject matter in litigation."). Indeed, "misconduct in the abstract, unrelated to the claim which it is asserted as a defense, does not constitute unclean hands." *Campagnolo S.R.L. v. Full Speed Ahead, Inc.,* 258 F.R.D. 663, 665–66 (W.D.Wash.2009) (citing 🔖 *Republic Molding Corp. v. B.W. Photo Utilities,* 319 F.2d 347, 349 (9th Cir.1963)). Therefore "equity requires that those seeking its protection shall have acted fairly and without fraud or deceit *as to the controversy in issue."* 🔖 *Ellenburg v. Brockway, Inc.,* 763 F.2d 1091, 1097 (9th Cir.1985) (emphasis added).

Defendants now assert that Plaintiffs mere knowledge of purported bad acts by other entities within the corporate structure is sufficient to trigger the unclean hands defense. Opp'n at 18–19. This argument falls short. The doctrine of unclean hands "bars relief to a plaintiff who has violated conscience, good faith or other equitable principles in his prior conduct, as well as to a plaintiff who has dirtied his hands in acquiring the right presently asserted." 🔖 *Pom Wonderful LLC v. Welch Foods, Inc.,* 737 F.Supp.2d 1105, 1109 (C.D.Cal.2010) (citing 🔖 *Dollar Systems, Inc. v. Avcar Leasing Systems, Inc.,* 890 F.2d 165, 173 (9th Cir.1989)). The purported knowledge of wrongdoing by other corporate entities is not related to the subject matter of the current

Case 1:19-md-02875-RMB-SAK    Document 1231-2    Filed 05/10/21    Page 18 of 296
PageID: 27757
Meggitt (Orange County), Inc. v. Nie Yongzhong, Not Reported in F.Supp.3d (2015)
2015 WL 1809354

controversy, the theft of Meggitt OC and Meggitt MD's trade secrets and Defendants' false advertising. [5] Thus, it is appropriate to strike the affirmative defense on this basis.

**\*15** The inconsistency in Defendants' positions involving the unclean hands defense is not lost on the Court. Defendants represented from September 2013 to June 2014 that it had none of Plaintiffs' documents. Defendants now are attempting to argue that Meggitt's (or its affiliates') bad acts substantially justified taking Meggitt documents (those documents that Defendants did not have). Nie's April 2014 Email makes it glaringly apparent that Nie knew in April 2014 that he was still in possession of Meggitt's information and nevertheless represented to the Court and to Meggitt that he did not. It is beyond credible that Nie had forgotten about taking a hard-drive containing several hundred thousand pages of documents when he originally responded to discovery requests. Given this gross inconsistency, misrepresentations to the Court, and willful violations of the Court's orders, the Court also strikes the affirmative defense on the independent grounds of failing to comply with the Court's orders to produce Meggitt documents. Fed. R. Civ. Proc. 37(b)(2)(A) (iii).

For the foregoing reasons, the Court STRIKES Defendants' fourth affirmative defense of unclean hands.

### IV. Disposition
For the reasons above, the Motion is GRANTED IN PART.

1) Monetary sanctions will be awarded for Defendants' violations of Court orders in the amount of Plaintiffs' attorneys' fees and costs incurred seeking compliance with (1) the Court's original order to produce Meggitt documents, between September 2013 and June 2014, and (2) the Court's original order to produce technical documents regarding the CAYD053–50 product and the March order rejecting Defendants state secrets defense, between March 2014 and March 2015.

2) In order to determine the appropriate amount of monetary sanctions, by **April 29, 2015,** Plaintiffs should provide support for all expenses:

  a. to bring the motions to compel with regards to Meggitt documents prior to June 2014;

  b. to meet and confer regarding production of these documents;

  c. to bring the motions for sanctions; and

  d. incurred in any other attempts to obtain Meggitt documents in Defendants' possession prior to June 2014 and the CAYD053–50 technical documents since Magistrate Judge McCormick's March 21, 2014 ruling denying Defendants' state secrets defense.

3) Defendants may file a written response by **May 1, 2015.**

4) A hearing will be held on **May 4, 2015** at 8:30 a.m. to determine the final amount of the sanctions award.

5) The Court will consider an adverse inference instruction and/or evidentiary preclusion as to the withheld documents and the CAYD053–50 product, to be addressed during review of the motions in limine and forming the jury instructions.

6) The Court strikes Defendants' unclean hands defense.

### All Citations

Not Reported in F.Supp.3d, 2015 WL 1809354

### Footnotes

1  Meggitt OC, Meggitt Maryland, and Meggitt Xiamen are all indirectly owned subsidiaries of Meggitt PLC.
2  Defendants appealed (Dkt.45), and the injunction was affirmed (Dkt.197).
3  Nie attested that "In January 2012, one of Niell–Tech's accelerometer products, CAYD053–50, was classified as a military use product that involves the state secrets of the People's Republic of China ... From then on, Niell–Tech was required to strictly keep technical documents, including engineering drawings, R & D documents as well as other technical documents relating to CAYD053–50 as highly confidential as required by relevant laws and regulations of PRC concerning state secrets."

**Meggitt (Orange County), Inc. v. Nie Yongzhong, Not Reported in F.Supp.3d (2015)**
2015 WL 1809354

4    Plaintiffs' alternative "lesser" sanctions essentially get to the same result. *See* Proposed Order (Dkt.480–1).

5    Had the wrongdoing been committed directly by Plaintiffs this argument would be colorable, but farfetched, as explained in the Court's previous order (Dkt.458). Previously, Defendants argued that Meggitt's documents were retained in the event of a product failure. However, as noted by Plaintiffs, if the products at issue were not Plaintiffs' products, there can be no nexus between the retention of those documents and the purported fear of a product failure. The acknowledgement that Plaintiffs products were not implicated and that they took no direct action in either of the purported bad acts is a bridge too far. Thus, the Court finds it appropriate to strike the unclean hands defense.

---

**End of Document**                          © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit C

Case 1:19-md-02875-RMB-SAK    Document 1231-2    Filed 05/10/21    Page 21 of 296
PageID: 27760

Autodesk, Inc. v. ZWCAD Software Co. Ltd., Not Reported in Fed. Supp. (2015)

2015 WL 1928184

2015 WL 1928184
Only the Westlaw citation is currently available.
United States District Court, N.D. California,
San Jose Division.

AUTODESK, INC., Plaintiff,

v.

ZWCAD SOFTWARE CO. LTD., ZWCAD Design
Co., Ltd., HK ZWCAD Software Ltd. and Global
Force Direct, LLC. d/b/a ZWCADUSA, Defendants.

Case No. 5:14–cv–01409–EJD
|
Signed March 27, 2015

**Attorneys and Law Firms**

Michael A. Jacobs, Richard S.J. Hung, Morrison & Foerster
LLP, San Francisco, CA, for Plaintiff.

Kenneth Michael Walczak, Charles Hyunchul Jung, Nassiri
& Jung LLP, San Francisco, CA, for Defendants.

**ORDER DENYING MOTION TO ADOPT THE
HAGUE CONVENTION OR IN THE ALTERNATIVE
TO MODIFY THE PROTECTIVE ORDER**

**(Re: Docket No. 52)**

PAUL S. GREWAL, United States Magistrate Judge

**\*1** Not happy with what it says is the wholesale theft of
its proprietary source code, Plaintiff Autodesk, Inc. brought
this suit against Defendants ZWCAD Software Co., Ltd. and
ZWCAD Design Co., Ltd. [1] for copyright infringement and
misappropriation of trade secrets. [2] That much is not all that
unusual; this district is no stranger to such claims. What
is a bit unusual is that much of the evidence relevant to
the plaintiff's claims is located in the People's Republic of
China. To mitigate the risk that discovery of its data and
documents outside of China may subject it to liability under
Chinese state secret and privacy laws, ZWSoft moves for a
protective order directing that discovery be conducted under
the Hague Convention on Taking Evidence Abroad in Civil or
Commercial Matters. [3] ZWSoft alternatively seeks an order
that ZWSoft's source code already deposited in Beijing be
made available for inspection only in China and the parties
adopt ZWSoft's amended protective order. [4]

Because the court agrees with Autodesk that ZWSoft has
not shown that a genuine risk of liability under Chinese law
or other factors justify the additional protective measures it
seeks, ZWSoft's motion is DENIED.

**I.**

Fed.R.Civ.P. 26(c)(1) provides that "[a] party or any person
from whom discovery is sought may move for a protective
order in the court where the action is pending." "The court
may, for good cause," issue an order "requiring that a
trade secret or other confidential research, development, or
commercial information not be revealed or be revealed only
in a specified way." [5]

The Supreme Court has "long recognized the demands of
comity in suits involving foreign states, either as parties or
as sovereigns with a coordinate interest in the litigation." [6]
American courts considering whether to order discovery from
a foreign litigant should therefore "take care to demonstrate
due respect for any special problem confronted by the foreign
litigant on account of its nationality or the location of its
operations, and for any sovereign interest expressed by a
foreign state." [7]

When a conflict exists between the discovery authorized
under the Federal Rules of Civil Procedure and sovereign
interests implicated by such discovery, a court may direct
parties to conduct discovery under the Hague Convention
on Taking of Evidence Abroad in Civil and Commercial
Matters. [8] However, the Hague Convention does not deprive
the court of its ordinary powers to compel a foreign litigant to
produce evidence [9] or require "the use of its procedures to the
exclusion of the Federal Rules procedures whenever evidence
located abroad is sought for use in an American court." [10]

**\*2** Rather, a party seeking to apply the Hague Convention
procedures has the burden to "demonstrate appropriate
reasons for employing Convention procedures." [11] Although
the Supreme Court has not "articulate[d] specific rules to
guide" whether adoption of the Hague Convention procedures
is proper, a court may consider "the particular facts, sovereign

interests and likelihood that resort to [Hague Convention] procedures will prove effective." [12]

Autodesk provides computer-aided design software which "create[s] digital models and workflows that allow visualization, simulation and analysis of designs before implementation." [13] AutoCAD is Autodesk's "flagship product" and largest revenue-generating product. [14] Autodesk alleges that ZWSoft engaged in wholesale copying of "large portions of Autodesk source code" in order to create its software program ZWCAD+. [15]

In 2014, Autodesk filed suit against ZWSoft and its United States-based distributor Global Force Direct, LLC in the Northern District of California, San Francisco Division for copyright infringement and trade secret misappropriation. [16] Autodesk later amended its complaint to add Hong Kong-based corporation HK ZWCAD Software Ltd. as a defendant. [17]

Autodesk also initiated summary proceedings against ZWSoft before the Hague District Court in the Netherlands. [18] ZWSoft opposed discovery of its source code outside of China, and the parties ultimately agreed that ZWSoft could produce its source code in China for the purposes of the Dutch action. [19] The Dutch court then ordered ZWSoft to produce its source code to a custodian in China. [20]

Meanwhile, in the Northern District of California, GFD answered the complaint, and the parties entered into a stipulated protective order. [21] After ZWSoft appeared in the case, [22] the case was reassigned to the San Jose division for all further proceedings. [23] ZWSoft then moved to dismiss the case [24] and also asked Autodesk to stipulate to follow Hague Convention procedures with regard to the data being sought from China or to amend the protective order to allow for examination of ZWSoft's data in China. [25] Autodesk declined to consent to adoption of Hague Convention procedures and the parties could not reach a compromise on how to amend the protective order. [26]

**\*3** ZWSoft then filed this motion, seeking that the court order the parties to conduct discovery under the Hague Convention, or in the alternative, that the court order ZWSoft's source code to be made available for inspection in

China and order adoption of ZWSoft's amended protective order. [27]

## II.

This court has jurisdiction under 28 U.S.C. § 1332. This motion was referred to the undersigned pursuant to Civ. L.R. 72–1. [28]

## III.

At issue is whether the court should order the adoption of the Hague Convention procedures or in the alternative order adoption of ZWSoft's amended protective order. Because ZWSoft has not shown that application of the Hague Convention procedures here is justified under *Aerospatiale,* the court denies ZWSoft's request to order its adoption. [29] Because ZWSoft has not shown that good cause exists for the additional procedures outlined in its amended protective order, the court also denies ZWSoft's request that the court amend the protective order and require examination of its source code and related documents in China.

**\*4** ***First,*** ZWSoft has not established that genuine sovereign interests pertain to production of the source code and related documents at issue here. As both parties acknowledge, Chinese law prohibits exporting state secrets from China without the government's permission. [30] However, ZWSoft has not shown that production of its source code and related documents necessarily implicates this prohibition. In particular, ZWSoft does not adequately support its contention that China "may" consider its source code to be or contain state secret information. [31] While ZWSoft may be right that information that could be considered "ordinary business information in the United States" may constitute a state secret under Chinese law, ZWSoft offers nothing specific to the materials at issue here. [32]

ZWSoft also do not adequately support its claim that it is "reasonable" to believe that the Chinese government could consider its source code to contain state secrets. [33] Article 2 of China's State Secrets Law defines state secrets as "matters that have a vital bearing on state security and national interests and, as specified by legal procedure, are entrusted to a limited number of people for a given period of

Autodesk, Inc. v. ZWCAD Software Co. Ltd., Not Reported in Fed. Supp. (2015)

2015 WL 1928184

Case 1:19-md-02875-RMB-SAK    Document 1231-2    Filed 05/10/21    Page 23 of 296
PageID: 27762

time." [34] Article 8 expands this definition to include, among other materials, matters that involve "national economic and social development" and "science and technology." [35] ZWSoft claims that because government interpretation of these "broad" categories is "lacking," it is "reasonable" to believe that China could find that ZWSoft's source code is a secret state because it constitutes "technology" the exportation of which from a "successful and growing PRC corporation" would impact China's "national and economic development." [36]

However, ZWSoft not only does not cite to authority or expert declarations that support this belief, but also fails to respond to testimony from Autodesk's expert Hui Zhang, a former intellectual property judge on the Supreme People's Court of the People's Republic of China and an intellectual property attorney, who challenges ZWSoft's assertions about Chinese secrecy law. [37] In particular, Zhang contends that contrary to ZWSoft's claims, "Chinese law does not prohibit the disclosure of source code developed by Chinese companies outside of China" and that "there is no broad prohibition against exporting documents relating to 'science and technology.' " [38] Rather, the Chinese government "[n]ormally" considers documents to contain state secrets only if they are "prepared by government agencies or are related to a government-funded project." [39] Further, Zhang contends that in order to be a state secret, ZWSoft's source code must be designated as such by the Chinese government. [40] Because ZWSoft's source code was developed by "a private company, for private business purposes," Zhang opines that "it is highly unlikely that the source code contains state secrets." [41]

Rather than presenting expert testimony or other authority that contradicts Zhang's assertions about Chinese law, ZWSoft claims that Autodesk disregards the "very real and potentially [severe] consequences" ZWSoft could face under Chinese law. [42] In particular, ZWSoft contends that the court must "gloss" over Zhang's qualification that the Chinese government "[n]ormally" considers only documents prepared by government agencies or in relation to a government-fund project to be state secrets and Zhang's acknowledgment that she is not "aware" of any cases in which the CAD software or documents relating to CAD software were found to contain state secrets in order to conclude that there is no real risk of liability here. [43] ZWSoft is correct that Zhang's declaration is not equivalent to a "guarantee" that ZWSoft

will not "face stiff and severe government penalties for cross-border production." [44] However, in light of ZWSoft's failure to respond with expert testimony or other authority that contradicts Zhang's assertions, the court cannot credit ZWSoft's unsubstantiated claims that production of its source code and related document would subject it to genuine risk of violating Chinese state secrecy laws.

**\*5** Further, ZWSoft's reliance on the *Xue Feng* case for the proposition that China's willingness to designate information as a state secret years after it is removed from China presents a risk of liability here is misplaced. [45] A Beijing court sentenced American geologist Xue Feng to eight years in prison after he was found guilty of "spying and collecting state secrets." [46] The Beijing court found that he had sold documents "on geological conditions of onshore oil wells and a database that gave the coordinates of more than 30,000 oil and gas wells" that belonged to a government-owned company and its subsidiary to a United States energy company. [47] In contrast, as Autodesk notes, here there is no indication that ZWSoft's source code and related documents contain information about government-owned companies or that ZWSoft would be required to produce its source code for any other purpose than in connection with this litigation under a protective order. [48]

ZWSoft also does not adequately support its claim that exporting its source code and related documents outside of China presents a legitimate risk of violating China's "amorphous" privacy laws. [49] ZWSoft claims that China's Ministry of Industry and Information Technology issued nonbinding data privacy guidelines that do not clearly define "sensitive data" and "suggest" that the Chinese government must consent to transfers of information outside of China's borders. [50] However, even if ZWSoft is correct that Chinese privacy laws are not clear, a generalized assertion that production of ZWSoft's source code *may* violate Chinese privacy laws is not sufficient to establish that a genuine sovereign interest is at issue.

ZWSoft's reliance on the *Peter Humphrey* case is similarly insufficient to show that production of ZWSoft's source code presents a genuine risk of violating Chinese privacy laws. [51] There, a Shanghai court sentenced antifraud specialists Peter Humphrey and Yu Yingzeng to fines and over two years of prison for misusing Chinese citizens' personal information. [52] The defendants acknowledged that they had "purchased

Autodesk, Inc. v. ZWCAD Software Co. Ltd., Not Reported in Fed. Supp. (2015)
2015 WL 1928184

personal information about Chinese citizens on behalf of clients." [53] In contrast, here there is no indication that ZWSoft's source code and other related documents contain personal information about Chinese citizens.

ZWSoft may be correct that ZWSoft cannot allege precisely what information within its source code and related documents the Chinese government might consider to be a state secret because "the ambiguity in the PRC's state secrecy laws" makes it "unclear when and how they can be applied." [54] However, Chinese companies may not avoid producing documents in United States litigation by citing to broad concerns that liability may be imposed under "unclear" or "amorphous" Chinese laws. [55] Because ZWSoft has not cited to expert testimony or other authorities that support its characterizations of Chinese state secrecy and privacy laws, ZWSoft's generalized allegations that production of its source code and related documents may subject it to liability under Chinese laws are insufficient to establish that a genuine sovereign interest is at issue here.

**\*6  Second**, the "likelihood that "resort to [Hague Convention] procedures will [not] prove effective" weighs against use of the Hague Convention here. [56] In particular, the Hague Convention procedures are not an effective alternative because these procedures may limit discovery to exclude relevant source code and related documents. To obtain discovery under the Hague Convention, the district court must submit a Letter of Request to the Central Authority in China, which will forward the letter to the Supreme People's Court. [57] The Supreme People's Court will "only execute pretrial discovery requests for documents which ... are of direct and close connection to the subject matter of the litigation." [58]

Although "there is evidence that China has honored many judicial requests for documents," [59] this evidence does not negate the risk the "direct and close connection" limitation may not allow for broad enough discovery here. In particular, the Supreme People's Court may limit ZWSoft's production to portions of its source code that directly relate to "common bugs, errors and idiosyncrasies" which Autodesk stated in the complaint even though Autodesk contends that ZWSoft engaged in "wholesale copying of the underlying source code" rather than merely copying the bugs. [60]

Further, discovery under the Hague Convention is too slow to be an effective alternative to the Federal Rules of Civil Procedure. "[I]t is generally recognized that procedures under the Hague Convention are far more cumbersome than under the Federal Rules of Civil Procedure." [61] As ZWSoft notes, the court in *Tiffany* rejected the plaintiff's assertion that "China's Hague Convention procedures 'do not offer a meaningful avenue to discovery' because the process is likely to be 'unduly time consuming and expensive, as well as less certain to produce needed evidence than direct use of the Federal Rules.' " [62] However, in *Tiffany* the court ultimately concluded that application of Hague Convention procedures was proper in part because the discovery requests at issue implicated China's "significant interest in enforcing its bank secrecy laws." [63] In contrast, here ZWSoft has not shown that production of its source code and related documents presents a genuine risk of liability under Chinese law such that "the benefits of compliance with PRC laws" justify the costs imposed by application of the Hague Convention. [64]

**\*7  Third**, ZWSoft has not shown that the "particular facts" of this case warrant application of Hague Convention procedures. [65] ZWSoft's assertion that Autodesk has "propounded extensive and largely unnecessary discovery" lacks merit because at the time ZWSoft took this position, Autodesk had not even served discovery on ZWSoft. [66] Despite this lack of discovery, ZWSoft argues that Autodesk has propounded discovery requests on its United States distributor GFD which are "overly broad as to both time and geographic location and not rationally limited to the needs of the case" and which indicate that ZWSoft "will also receive overly broad written discovery." [67] However, Autodesk's assertion that it propounded these discovery requests on GFD because Autodesk believed that GFD is a small entity with "only three known employees" whose entire business "appears to be directed to the subject matter of this lawsuit" suggests that Autodesk is unlikely to propound similarly broad discovery requests on ZWSoft. [68]

Further, even if the requests Autodesk propounded on GFD did indicate that ZWSoft "will be served with substantially the same requests," ZWSoft's belief that these "anticipated" discovery requests will be overly broad is not sufficient to justify imposition of Hague Convention procedures. [69] Likewise, ZWSoft's citation to its motion to dismiss in support of its assertion that Autodesk is trying to use overly broad discovery requests as a "fishing license" to make up for its

Autodesk, Inc. v. ZWCAD Software Co. Ltd., Not Reported in Fed. Supp. (2015)

2015 WL 1928184

failure to put ZWSoft on notice of "what specific software source code is at issue" and to state a claim upon which relief can be granted is unavailing. [70] Regardless of merits of these claims, ZWSoft's concerns about the potentially overly broad nature of discovery Autodesk may make in the future are not sufficient to justify imposition of the Hague Convention procedures here.

ZWSoft also has not established that inspection of the source code in China is more efficient than production of the source code in the United States. ZWSoft contends that inspection of the source code in China will serve "judicial economy" and avoid duplicative production because ZWSoft has already made the source code available in Beijing under an order of the Dutch court. [71] However, as Autodesk notes, the source code in China was deposited for the use of a neutral expert which the Dutch court had not yet appointed and which Autodesk had not yet analyzed at the time Autodesk's opposition was filed. [72]

ZWSoft's argument that having the data examined by a "native speaker" in China is less expensive than bringing the data to the United States and translating it before production similarly lacks merit. [73] Autodesk asserts that it intends to use local attorneys and experts to examine the source code in the United States and that multiple rounds of source code examination as well as motion practice related to the adequacy of the initial deposit of source code are likely. [74] Requiring Autodesk's attorneys and experts to travel to Beijing every time they need to examine the source code would be more burdensome and expensive than sending the source code to the United States.

ZWSoft is correct that as a large multinational company with multiple offices in China, Autodesk is more able than ZWSoft to shoulder burdens imposed by onerous or expensive discovery. [75] But, as explained above, ZWSoft has not shown than a sovereign interest or other factor justifies the additional expense and burden that examination of the source code in China imposes on Autodesk.

**Fourth**, ZWSoft has not met its burden to show that good cause exists under Rule 26(c) to amend the protective order to require ZWSoft to collect and make available its source code and related documents for inspection in China rather to produce this data in the United States. "A party asserting good cause [under Rule 26(c) ] bears the burden, for each particular document it seeks to protect, of showing that

specific prejudice or harm will result if no protective order is granted." [76]

**\*8** ZWSoft's claim the process outlined in the amended order "is authorized under the Federal Rules of Civil Procedure" lacks merit because this assertion does not establish that production and examination of ZWSoft's source code and related documents in United States will cause a specific prejudice or harm. [77] For instance, ZWSoft claims that Rule 26 authorizes examination of the source code in China because Rule 26 allows courts to limit discovery to promote international comity and because the factors described in proposed amendments to the Federal Rules of Civil Procedure favor adoption of ZWSoft's suggested procedures. [78] ZWSoft also contends that the court may properly order adoption of its amended protective order because Rule 34 allows a party to make documents available "as they are kept in the usual course of business" and because the timelines provided in the amended protective order are consistent with the Federal Rules of Civil Procedure. [79]

However, even if ZWSoft is correct that the Federal Rules of Civil Procedure authorize the production process outlined in its amended order, this compliance is not sufficient to show that good cause exists for amending the order under Rule 26(c). To the contrary, "[b]road allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test." [80] Further, although ZWSoft is that correct that production of trade secrets and source code presents inherent risks that the information produced may lose its trade secret status or value because it can be "copied or stolen without proper security measures," this risk does not justify amendment of the order. [81] As Autodesk notes, ZWSoft does not state why the existing protective order does not sufficiently protect ZWSoft's information or how the amended order will provide more protection against these risks. [82] ZWSoft itself acknowledges that these risks are "inherent in the production of source code even in the PRC." [83] Similarly, ZWSoft's contentions that it was not meaningfully involved in the current protective order because it was not in the case when the order was entered and that this case allows Autodesk access into the "highly proprietary data of a competitor" do not identify specific prejudice or harm that will result if the current protective order is not amended. [84]

Case 1:19-md-02875-RMB-SAK    Document 1231-2    Filed 05/10/21    Page 26 of 296
PageID: 27765

Autodesk, Inc. v. ZWCAD Software Co. Ltd., Not Reported in Fed. Supp. (2015)

2015 WL 1928184

ZWSoft also does not show that there is a genuine risk that production of its source code and related documents under the current protective order could subject ZWSoft to liability under Chinese state secret and privacy laws. ZWSoft is correct that China has imposed "severe" penalties upon people who have violated its state secrecy or privacy laws. [85] But once again, ZWSoft's generalized, unsubstantiated claims about Chinese law do not establish that there is a "present danger that application of the PRC blocking statutes" could subject ZWSoft to liability if it produces its source code and related documents in the United States. [86]

**IV.**

**\*9** Because ZWSoft has not shown that good cause exists for the application of the Hague Convention or amendment of the protective order, ZWSoft's motion is DENIED.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2015 WL 1928184

---

## Footnotes

1    The court will refer to these defendants collectively as ZWSoft.

2    *See* Docket No. 62 at ¶¶ 2–3, 24, 33.

3    *See* Docket No. 52 at 1–2; *see also* Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, Mar.18, 1970, 23 U.S.T. 2555, 847 U.N.T.S. 231.

4    *See* Docket No. 52 at 1.

5    Fed.R.Civ.P. 26(c)(1)(G).

6    *See* *Socie#te# Nationale Industrielle Ae#rospatiale v. United States Dist. Ct. for the S. Dist. of Iowa,* 482 U.S. 522, 546 (1987) (citing *Hilton v. Guyot,* 159 U.S. 113 (1895)).

7    *See id.*

8    *See, e.g., In re Perrier Bottled Water Litig.,* 138 F.R.D. 348, 356 (D.Conn.1991) (ordering "plaintiffs to employ the procedures set forth in the Hague Evidence Convention in pursuing any discovery from [the defendant], or of materials or information otherwise located in France"); *Husa v. Laboratoires Servier SA,* 740 A.2d 1092, 1096–97 (N.J.1999) (requiring use of Hague Convention procedures in part because a French "blocking statute" is a "cogent expression" of French interests which "should be accommodated, when possible").

9    *See* *Ae#rospatiale,* 482 U.S. at 539–40 (holding that "the Hague Convention did not deprive the District Court of the jurisdiction it would otherwise possess to order a foreign national party before it to produce evidence physically located within a signatory nation").

10    *See In re Perrier,* 138 F.R.D. at 353 (citing *Ae#rospatiale,* 482 U.S. at 533).

11    *See* *In re Auto. Refinishing Paint Antitrust Litig.,* 358 F.3d 288, 305 (3d Cir.2004) (citing *Ae#rospatiale,* 482 U.S. at 547).

12    *See* *Ae#rospatiale,* 482 U.S. at 544–46; *see also Valois of Am., Inc. v. Risdon Corp.,* 183 F.R.D. 344, 346 (D.Conn.1997).

13    *See* Docket No. 62 at ¶ 1.

14    *See id.* at ¶¶ 12, 15.

15    *See id.* at ¶¶ 21–24.

16    *See* Docket No. 1 at ¶¶ 4, 32–48.

17    *See* Docket No. 62 at ¶ 4.

18    *See* Docket No. 68–3 at ¶ 9.

19    *See id.* at ¶ 10.

Autodesk, Inc. v. ZWCAD Software Co. Ltd., Not Reported in Fed. Supp. (2015)

Case 1:19-md-02875-RMB-SAK    Document 1231-2    Filed 05/10/21    Page 27 of 296
PageID: 27766

2015 WL 1928184

20    *See* Docket No. 68–7 at §§ 4.15, 4.16; Docket No. 68–8 at §§ 3.2, 3.3.

21    *See* Docket Nos. 22, 34.

22    Autodesk contends that ZWSoft refused to accept service in China in order to delay the process of the case. *See* Docket No. 68 at 3–4. ZWSoft, in turn, claims that its refusal of service was unintentional and is not an indication that it is unwilling to proceed with the case. *See* Docket No. 71 at 7. The court does not address this dispute because ZWSoft has not established that it is entitled to the requested protective measures regardless of whether denial of service was intentional.

23    *See* Docket Nos. 40, 44.

24    *See* Docket No. 48. This motion is noticed for hearing before the court on April 30, 2015. *See id.* at 1.

25    *See* Docket No. 52–1 at ¶¶ 6–9.

26    *See id.* at ¶¶ 10–16.

27    *See* Docket No. 52 at 1.

28    *See* Docket No. 53.

29    ZWSoft claims that the court should use a five-factor comity analysis that New York district courts have employed in "cases involving whether or not to abide by the Hague Convention" to determine whether application of the Hague Convention is proper here. *See* Docket No. 52 at 13. Autodesk, in turn, contends that the court should consider the factors set forth in *Ae#rospatiale*. *See* Docket No. 52 at 13; *see also Ae#rospatiale,* 482 U.S. at 544 (noting that courts may consider "the particular facts, sovereign interests and likelihood that resort to [Hague Convention] procedures will prove effective"). The comity analysis requires courts to consider "(1) the importance of the documents or information requested to the litigation; (2) the degree of specificity of the request; (3) whether the information originated in the United States; (4) the availability of alternative means of retrieving the information; and (5) the extent to which noncompliance with the request would undermine important interests of the United States or compliance with the request would undermine the important interests of the state where the information is located." *See Tiffany (NJ) LLC v. Qi Andrew,* 276 F.R.D. 143, 151 (S.D.N.Y.2011) (internal citations omitted). As stated above, because ZWSoft does not show that production of its source code pertains to a sovereign interest, ZWSoft has not established that adoption of the Hague Convention procedures is warranted under either analysis.
      However, as Autodesk notes, whereas this motion does not address a particular request for ZWSoft to produce documents, in the cases to which ZWSoft cites, the foreign litigants seeking application of Hague Convention procedures had already been requested to produce certain categories of documents or other items. *See* Docket No. 52 at 13; Docket No. 68 at 5–6; *see also Tiffany,* 276 F.R.D. at 146 (noting objection to plaintiff's motion to compel production of "all documents called for by the subpoenas"); *Strauss v. Credit Lyonnais,* 249 F.R.D. 429, 435 (E.D.N.Y.2008) (noting defendant's objection to plaintiff's discovery requests); *Gucci America, Inc. v. Weixing Li,* 768 F.3d 122, 125 (2d Cir.2014) (noting appeal from district court's order granting plaintiff's motion to compel compliance with a subpoena and an asset freeze injunction). Since the several factors of the five-factor analysis such as the "degree of specificity of the request" cannot be readily analyzed in the absence of a specific request for ZWSoft to produce documents, the court analyzes whether adoption of the Hague Convention is proper under the three factors set forth in *Ae#rospatiale* rather than the five-factor comity analysis used by the New York district courts.

30    *See* Docket No. 52 at 7; Docket No. 68 at 7.

31    *See* Docket No. 52 at 9.

32    *See id.* at 7–8.

33    *See* Docket No. 52 at 9.

34    *See id.* at 8.

35    *See id.* at 8–9.

36    *See id.* at 9.

37    *See* Docket No. 68 at 7–8; Docket No. 68–1 at ¶¶ 1–2; Docket No. 68–2.

Autodesk, Inc. v. ZWCAD Software Co. Ltd., Not Reported in Fed. Supp. (2015)

2015 WL 1928184

38    *See* Docket No. 68–1 at ¶¶ 10–11.

39    *See id.* at ¶ 14.

40    *See id.* at ¶ 13.

41    *See id.* at ¶ 15.

42    *See* Docket No. 71 at 8.

43    *See id.*; *see also* Docket No. 68–1 at ¶¶ 14–15.

44    *See* Docket No. 71 at 5.

45    *See* Docket No. 52 at 8.

46    *See id.* at 8 (citing Charles Hutzler, "Xue Feng, U.S. Geologist, Gets 8–Year Sentence, Was Tortured in China," The Huffington Post, May 25, 2011, http://www.huffingtonpost.com/2010/07/05/xue-feng-us-geologist-get_n_635534.html).

47    *See id.*; *see also* Docket No. 68–1 at ¶¶ 17–18.

48    *See* Docket No. 68 at 8.

49    *See* Docket No. 52 at 9.

50    *See id.*

51    *See* Docket No. 52 at 9–10 (citing James T. Areddy & Laurie Burkitt, "Chinese Privacy Case Raises Risks of Doing Business in Country," The Wall Street Journal, Aug. 12, 2014, http://www.wsj.com/articles/chinese–privacy–case–raises–risks–of–doing–business–in–country–1407860680).

52    *See id.*

53    *See id.*; Docket No. 68–1 at ¶¶ 22–23 (noting that this case involved "tactics used to obtain personal information, such as household records and cell phone usage information" and that defendants were "accused of illegally purchasing, selling and providing personal information about citizens").

54    *See* Docket No. 71 at 7.

55    *See* Docket No. 52 at 7, 9.

56    *See* *Ae#rospatiale,* 482 U.S. at 544.

57    *See* Hague Evidence Convention, art. 2; *see also* Docket No. 68–1 at ¶¶ 7–9.

58    *See* *Tiffany,* 276 F.R.D. at 155; *see also* Docket No. 68–1 at ¶ 7 ("Pursuant to Article 23 of the Hague Evidence Convention, China has declared that it will execute Letters of Request issued for the purpose of obtaining pre-trial discovery of documents from common law countries, but it may require production of only such documents as are directly and closely related to the subject matter of the litigation.").

59    *See* *Tiffany,* 276 F.R.D. at 156 (noting that "in the first half of 2010, the Chinese Judicial Assistance Center reported that it provided assistance to the Foreign Affairs Department of the Ministry of Justice in respect of judicial assistance requests for civil and commercial cases including ... investigation and evidence collection for 37 cases and 11 other cases.") (internal citations omitted); *see also* Docket No. 52, Exhibit D.

60    *See* Docket No. 68 at 9.

61    *See* *Valois of Am.,* 183 F.R.D. at 349; *see also* Docket No. 52 at 11 (acknowledging that discovery under the Hague Convention "typically takes longer than conducting discovery under the Federal Rules of Civil Procedure.").

62    *See* Docket No. 52 at 15; *see also* *Tiffany,* 276 F.R.D. at 152–53, 156.

63    *See id.* at 156–57, 160–61.

64    *See* Docket No. 52 at 11.

65    *See* *Ae#rospatiale,* 482 U.S. at 544.

66    *See* Docket No. 52 at 14.

67    *See id.* at 5.

68    *See* Docket No. 68 at 10.

69    *See* Docket No. 52 at 5.

70    *See* Docket No. 71 at 1–3.

Autodesk, Inc. v. ZWCAD Software Co. Ltd., Not Reported in Fed. Supp. (2015)

2015 WL 1928184

71    *See* Docket No. 71 at 5–6.

72    *See* Docket No. 68 at 11.

73    *See* Docket No. 52 at 6.

74    *See* Docket No. 68 at 11.

75    *See* Docket No. 52 at 6.

76    *See* 🔖 *Foltz v. State Farm Mut. Auto. Ins. Co.,* 331 F.3d 1122, 1130 (9th Cir.2003) (internal citations omitted).

77    *See* Docket No. 52 at 16.

78    *See id.* at 16–19.

79    *See id.* at 19–21; *see also* Fed.R.Civ.P. 34(b)(2)(E)(i) ("A party must produce documents as they are kept in the usual course of business or must organize and label them to correspond to the categories in the request.").

80    *See* 🔖 *Beckman Indus., Inc. v. Int'l Ins. Co.,* 966 F.2d 470, 476 (9th Cir.1992) (internal citations omitted); *see also* 🔖 *Foltz,* 331 F.3d at 1130–31 (citing 🔖 *Deford v. Schmid Prods. Co.,* 120 F.R.D. 648, 653 (D.Md.1987) (requiring party seeking a protective order to provide "specific demonstrations of fact, supported where possible by affidavits and concrete examples, rather than broad, conclusory allegations of potential harm").

81    *See* Docket No. 52 at 18.

82    *See* Docket No. 68 at 12.

83    *See* Docket No. 52 at 18.

84    *See* Docket No. 71 at 7–8.

85    *See* Docket No. 71 at 6 n.4 (citing Erik Echholm, "China 'State Secret': Daily Newspapers," Chicago Tribune, April 27, 2000, http://articles.chicagotribune.com/2000–04–27/news/0004270268_1_xinjiang–radio–free–asia–rebiya–kadeer) (describing how Chinese court sentenced woman to eight years in prison in 2000 for sending local newspapers on which she had marked "official speeches and articles" relating to "the government's fight against ethnic separatism" to her husband in the United States).

86    *See* Docket No. 71 at 6; *see also* 🔖 *Beckman Indus., Inc.,* 966 F.2d at 476. Autodesk requests that the court admonish ZWSoft not to delay producing the accused source code according to the terms of the existing protective order if it denies ZWSoft's motion. *See* Docket No. 68 at 12–13. However, as ZWSoft notes, because Autodesk had not propounded discovery upon ZWSoft at the time it made this request. Autodesk has "no evidence" to establish that Z–WSoft will not timely produce its source code. *See* Docket No. *71* at 8. The court therefore denies this request.

---

**End of Document**                                   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit D

Masimo Corporation v. Mindray DS USA, Inc., Not Reported in Fed. Supp. (2014)
2014 WL 12589321

2014 WL 12589321
Only the Westlaw citation is currently available.
United States District Court, C.D.
California, Southern Division.

MASIMO CORPORATION, Plaintiff,

v.

MINDRAY DS USA, INC., et al., Defendants.

Case No.: SACV 12-02206-CJC(JPRx)
|
Signed 05/28/2014

**Attorneys and Law Firms**

Brian C. Horne, Karen V. Weil, Mark D. Kachner, Knobbe Martens Olson and Bear LLP, Los Angeles, CA, Adam Powell, Knobbe Martens Olson and Bear LLP, San Diego, CA, Irfan A. Lateef, Jon W. Gurka, Joseph R. Re, Michael C. Lee, Nicholas Andrew Belair, Perry D. Oldham, Stephen W. Larson, Knobbe Martens Olson and Bear LLP, Irvine, CA, Michael J. Stephan, Hueston Hennigan LLP, Newport Beach, CA, for Plaintiff.

Ary Chang, Justin E. Gray, Nicola A. Pisano, Jose L. Patino, Scott Adam Penner, Shawn E. McDonald, Foley and Lardner LLP, David Benjamin West, Caldarelli Hejmanowski and Page LLP, San Diego, CA, Pooja Nair, Foley and Lardner LLP, Lara J. Dueppen, Perkins Coie LLP, Los Angeles, CA, Connor A. Sabatino, Foley and Lardner LLP, Madison, WI, Elizabeth A. N. Haas, James T. McKeown, Foley and Lardner LLP, Milwaukee, WI, Francis J. Burke, Jr., Michael A. Naranjo, Foley and Lardner LLP, San Francisco, CA, Jonathan M. James, Perkins Coie LLP, Phoenix, AZ, Lori A. Rubin, Foley and Lardner LLP, Washington, DC, for Defendants.

ORDER DENYING DEFENDANT'S MOTION FOR RECONSIDERATION OF THE COURT'S APRIL 15, 2014 ORDER, OR IN THE ALTERNATIVE, FOR REVIEW OF THE MAGISTRATE JUDGE'S APRIL 16, 2014 ORDER

CORMAC J. CARNEY, UNITED STATES DISTRICT JUDGE

I. INTRODUCTION

*1 Shenzhen Mindray asks the Court to review Magistrate Judge Rosenbluth's March 16 order denying its *ex parte* application for a partial stay of the magistrate's March 6 discovery order (Dkt. No. 119 ["March 6 Order"] ), or in the alternative, for reconsideration of this Court's April 15 order denying Shenzhen Mindray's motion for review of the magistrate judge's March 6 order. Shenzhen Mindray's motion is **DENIED**. [1]

II. BACKGROUND

On March 6, 2014, Judge Rosenbluth granted Masimo's motion to compel production of Shenzhen Mindray's source code, and ordered Shenzhen Mindray to comply with the order by April 14, 2014. (March 6 Order) The order was issued after a lengthy hearing at which Judge Rosenbluth considered, as relevant here, both parties' arguments regarding Shenzhen Mindray's assertion that its source code is protected from disclosure under Chinese state secrecy law. (*See* Dkt. No. 122 ["March 6 Hearing Tr."] at 64:16–72:11.) Judge Rosenbluth rejected Shenzhen Mindray's claim, noting that it had not provided her anything beyond its own speculative arguments to substantiate the claim that disclosing the source code in discovery would violate Chinese law. (*Id.*) However, Judge Rosenbluth provided that if Shenzhen Mindray could return to her before April 14 with "something real from the Chinese government that says, ... X, Y, and Z are state secrets," she would consider amending her order. (*Id.* at 70:12–71:3.)

Shenzhen Mindray moved this Court to review Judge Rosenbluth's March 6 Order. (Dkt. No. 125.) On April 10, 2014, Shenzhen Mindray submitted a supplemental reply to its motion, informing the Court that Shenzhen Food and Drug Agency ("SFDA") had issued an order that the source code constituted "state secrets covered by" four Chinese laws. [2] (Dkt. No. 145.) Then, on April 11, 2014, Shenzhen Mindray submitted an *ex parte* application to Judge Rosenbluth to inform her of the SFDA order and seek a stay of the production deadline imposed by her March 6 Order. (Dkt. No. 148.)

The Court declined Shenzhen Mindray's motion on April 15, 2014, stating that the initial determination of whether the March 6 Order should be amended based on the SFDA Order should be made by Judge Rosenbluth. (Dkt. No. 152.) Then, on April 16, 2014, Judge Rosenbluth denied Shenzhen Mindray's *ex parte* application. (Dkt. No. 153 ["April 16 Order"].) In her order, Judge Rosenbluth noted that Shenzhen

*Masimo Corporation v. Mindray DS USA, Inc., Not Reported in Fed. Supp. (2014)*

2014 WL 12589321

Mindray was at fault for creating the crisis that required *ex parte* relief because it had "repeatedly delayed submitting the [source code] to the Chinese authorities for determination of whether they constitute state secrets." (*Id.*) Moreover, Judge Rosenbluth stated that Shenzhen Mindray was not entitled to relief because it had still failed to comply with her directive to return with some "real" indication from the Chinese government that the source code was a state secret. (*Id.* at 3.) In reaching that conclusion, Judge Rosenbluth found that Shenzhen Mindray had apparently still "not submitted the documents to the Chinese government for review, in contravention of what it itself stated was the necessary procedure," and that the letter that Shenzhen Mindray had submitted to the SFDA seeking evaluation of whether the source code is in fact a state secret was "a piece of advocacy and in some instances inaccurate." (*Id.*)

## III. ANALYSIS

**\*2** A magistrate judge has the authority to resolve and issue orders on nondispositive pretrial matters, including issues related to discovery. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(a); Local Rule 72-2.1; *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1414 (9th Cir. 1991). The district judge in the case must consider timely objections to a magistrate's order and "modify or set aside any part of the order that is clearly erroneous or is contrary to law." Fed. R. Civ. P. 72(a); *see also* 28 U.S.C. § 636(b)(1)(A) (the district judge may reconsider a magistrate's order that is "clearly erroneous or contrary to law"). The clearly erroneous standard means that the district court must accept the magistrate's decision unless the district court is left with the "definite and firm conviction that a mistake has been committed." *Concrete Pipe & Prods. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 622 (1993) (citing *United States v. Gypsum Co.*, 333 U.S. 364, 395 (1948)). If the magistrate's account of the evidence is plausible in light of the record viewed in its entirety, the district court may not reverse it even though convinced that it would have weighed the evidence differently. *Anderson v. Bessemer City*, 470 U.S. 564, 573–74 (1985); *Phoenix Eng'g & Supply v. Universal Elec. Co., Inc.*, 104 F.3d 1137, 1141 (9th Cir. 1997). "An order is contrary to law when it fails to apply or misapplies relevant statutes, case law, or rules of procedure." *Defazio v. Wallis*, 459 F. Supp. 2d 159, 163 (E.D.N.Y 2006) (citation and quotes omitted).

To finally resolve this protracted discovery dispute in as clear a manner as possible, the Court begins, simply, by answering the question whether Magistrate Judge Rosenbluth's March 6 Order was clearly erroneous or contrary to law. It was not. Where a party seeks to rely on foreign law to prevent production of discoverable information, that party "has the burden of showing such law bars production." *United States v. Vetco, Inc.*, 691 F.2d 1281, 1288 (9th Cir.), *cert. denied*, 454 U.S. 1098 (1981). "If the party [seeking to bar production] fails to produce evidence in support, then he fails to meet his burden on the comity issue, and the district court need not consider it." *In re Grand Jury Proceedings (Marsoner)*, 40 F.3d 959, 964 (9th Cir. 1994). Even where foreign law prohibits disclosure of requested information, an American court retains the power to "order a party subject to its jurisdiction to produce evidence even though the act of production may violate that statute." *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for S. Dist. of Iowa*, 482 U.S. 522, 544 n.29 (1987). In making this determination, the court considers five general factors, including (1) the importance to the litigation of the requested information, (2) the specificity of the request, (3) the origin and location of the information, (4) the availability of alternative means to secure the information, and (5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the foreign state where the information is located. *See Richmark Corp v. Timber Falling Consultants*, 959 F.2d 1468, 1475 (9th Cir. 1992) (citing Restatement (Third) of Foreign Relations Law § 442(1)(c)).

Contrary to Shenzhen Mindray's assertions otherwise, at the hearing on March 6, Judge Rosenbluth conducted as thorough a comity analysis as necessary given the circumstances. Judge Rosenbluth clearly recognized *Richmark* as the applicable law, and endeavored to determine whether the Chinese government had any interest in the source code. (March 6 Hearing Tr. at 64:16–65:9.) Judge Rosenbluth specifically noted that a key factor in the *Richmark* analysis was whether the foreign government had shown any interest in protecting the information at issue, and determined that here, no such interest has been shown. (*Id.* at 71:21–72:3.) Given that Shenzhen Mindray had produced no actual indication from the Chinese government that the source code was a state secret, and instead relied on its own assertion that it might be, that determination was not incorrect. (*Id.* at 68:13–22; 71:8–72:10.) There was scant evidence available that there

2014 WL 12589321

were competing national interests to balance, and to the extent that there were such interests, Shenzhen Mindray's showing of the Chinese government's interest was so minimal that it would clearly have been overwhelmed by the United States' competing interest in "vindicating the rights of American plaintiffs." *See* Richmark, 959 F.2d at 1477; *see also* (Dkt. No. 111-4, Exh. D ["Liu Decl."]) (asserting Shenzhen Mindray's position that there is a reasonable basis to believe that *some* Shenzhen Mindray documents might contain Chinese state secrets, but providing no indication as to which documents might be covered or why the declarant believed them to be covered).)

**\*3** Judge Rosenbluth's April 16 Order denying Shenzhen Mindray's *ex parte* application to stay the March 6 Order was similarly not clearly erroneous or contrary to law. Judge Rosenbluth applied the correct legal standard, that relief should be granted only where the moving party is not itself at fault for causing the need for emergency relief. *See* Mission Power Eng'g Co. v. Cont'l Cas. Co., 883 F. Supp. 488, 492–93 (C.D. Cal. 1995). Judge Rosenbluth found that based on Shenzhen Mindray's litigation conduct, including not actually submitting any source code to Chinese government authorities for a determination whether it was considered a state secret, even though it knew at least as early as February 2014 that such a determination would be needed, Shenzhen Mindray caused the need for *ex parte* relief. [3] That determination was not clearly erroneous, and the Court declines to set it aside now. As Judge Rosenbluth correctly found, Shenzhen Mindray could have made an effort to present actual evidence that the Chinese government considered its source code to be a state secret prior to the March 6 hearing and order, or at the very least, could have made a good faith attempt to do so. That it did not do so then, but claims to have evidence to support its position now, does not mean that Judge Rosenbluth committed error.

Indeed, had Judge Rosenbluth conducted a new analysis of the *Richmark* factors in light of the SFDA Order and still denied Shenzhen Mindray's application, the Court would uphold her order. The SFDA Order does give some indication that the Chinese government has an interest in keeping secret the Shenzhen Mindray source code, but that interest does not overcome the United States' interest in vindicating the rights of American plaintiffs, or the other *Richmark* factors favoring disclosure.

First, even presuming the validity of the SFDA Order, and recognizing that "every foreign state has strong interests in

enforcing its secrecy laws," that interest is diminished where the court has entered a protective order preventing disclosure of the secret information. *See* In re Air Crash, 211 F.R.D. 374, 378–79 (C.D. Cal. 2002); Vetco, Inc., 691 F.2d at 1289 (finding that a foreign government's interest in secrecy is diminished when the party seeking records is required to keep them confidential). In contrast, the United States' interest in "vindicating the rights of American plaintiffs" remains substantial. At best then, the first and most important factor, requiring a balance of national interests, is neutral. Then, as to the necessity of the secret information to the lawsuit at hand, Judge Rosenbluth found, and the Court agrees, that given the nature of the patents asserted, access to the source code is substantially necessary to proving Masimo's claim. That factor therefore weighs strongly in Masimo's favor. Similarly, as to whether there are other means for Masimo to obtain the necessary information, there seems to be no disagreement that no such means exist, again militating in favor of disclosure.

As to the burden on the opposing party imposed by production, Shenzhen Mindray argues that disclosure could subject it to criminal sanction in China, a certainly "weighty excuse" for nonproduction. *See* Societe Internationale Pour Participations Industrielles et Commerciales v. Rogers, 357 U.S. 197, 211 (1958). However, it has presented no evidence regarding the extent to which the Chinese government enforces its secrecy laws, or the likelihood that any *criminal* as opposed to only civil or administrative penalties will be issued, making that factor similarly less persuasive in its favor. [4] *See* In re Air Crash, 211 F.R.D. at 379 (citing In re Grand Jury Proceedings, 873 F.2d at 240, for the proposition that a party who fails to demonstrate what action the foreign government might take in response to compliance with a discovery order does not meet its burden). The only *Richmark* factor then that substantially supports Shenzhen Mindray's opposition to disclosure is that the source code is located in China. However, that fact alone is not enough to meet Shenzhen Mindray's burden of showing that the source code should not be disclosed as a result of the invocation of Chinese secrecy law.

**\*4** Finally, substantially for reasons already outlined above, the Court declines to reconsider its March 15 Order denying Shenzhen Mindray's motion to review Judge Rosenbluth's March 6 Order—the previous determination upholding Judge Rosenbluth's March 6 Order was correct. Reconsideration is only appropriate if: (1) the court is presented with newly discovered, previously unavailable, evidence; (2) the court committed a clear error of law and the initial decision was

Masimo Corporation v. Mindray DS USA, Inc., Not Reported in Fed. Supp. (2014)

2014 WL 12589321

Case 1:19-md-02875-RMB-SAK   Document 1231-2   Filed 05/10/21   Page 34 of 296
PageID: 27773

manifestly unjust; or (3) there has been an intervening change in controlling law. *Sch. Dist. No. 1J, Multnomah County, Or. v. AC and S, Inc.*, 5 F.3d 1255, 1262 (9th Cir. 1993). None of these conditions are satisfied here, and in any event, as noted above, even consideration of the untimely SFDA Order would not require a different result.

## IV. CONCLUSION

For the foregoing reasons, Shenzhen Mindray's motion is **DENIED**.

**All Citations**

Not Reported in Fed. Supp., 2014 WL 12589321

## Footnotes

1    Having read and considered the papers presented by the parties, the Court finds this matter appropriate for disposition without a hearing. *See* Fed. R. Civ. P. 78; Local Rule 7-15. Accordingly, the hearing set for June 2, 2014 at 1:30 p.m. is hereby vacated and off calendar.

2    Shenzhen Mindray has since submitted a different translation of the document showing that in fact, the SFDA considered the source code to be "confidential information covered by" four Chinese laws, not "state secrets." (*See* Dkt. No. 164-2, Exh. G ["SFDA Order"].)

3    Notably, this Court had previously also denied a similar *ex parte* request by Shenzhen Mindray to set aside Judge Rosebluth's March 6 Order, on the ground that "Shenzhen Mindray is not blameless in creating [the] harm." (Dkt. No. 129 at 2.) In fact, the record indicates that Shenzhen Mindray did not even contact Chinese authorities about the discovery dispute over its source code until several days after the Court denied its *ex parte* request, and even then, as Judge Rosenbluth found, it did not actually submit the source code in question for review.

4    This is particularly relevant because Chinese law appears to provide that "[t]hose who divulge confidential level state secrets and those with minor circumstances shall, upon discretion, be exempted of or be given lighter administrative punishments." (Dkt. 164-2, Exh. J ["Implementation Measures for the Law of the People's Republic of China on Guarding State Secrets"] at 6.) As Shenzhen Mindray's translation of the SFDA Order shows, the source code at issue appears to be considered "confidential" information by the Chinese government. (SFDA Order.) While the Court does not profess to be expert in Chinese law, the point here is that the evidence Shenzhen Mindray has submitted does not necessarily support the proposition that criminal sanctions will befall the company or its agents as a result of compliance with the production order. Chinese law clearly allows for disclosure of confidential information in certain circumstances. No evidence has been presented to suggest that this cannot be one of those circumstances.

**End of Document**    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit E

Page 1

1                 UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF NEW JERSEY,

3                       MDL No. 2875

4     _____

5     IN RE: VALSARTAN, PRODUCTS          )

      LIABILITY LITIGATION                )

6                                         )

                                          )

7                                         )

      - - - - - - - - - - - - - - - - - -

8

                          March 26, 2021

9                         8:00 a.m.

10

11        TRANSCRIPT of the stenographic notes of the meet and

12    confer as taken by and before Sara K. Killian, a

13    Registered Professional Reporter, Certified Court Reporter

14    and Notary Public remotely via Zoom videoconferencing.

15

16

17

18

19

20

21

22

23

24

25

Page 2

1   A P P E A R A N C E S:

2

3   MAZIE SLATER KATZ & FREEMAN, LLC

4   Attorneys for Plaintiffs

5   103 Eisenhower Parkway, Second Floor

6   Roseland, New Jersey  07068

7   BY: ADAM SLATER, ESQ.

8       CHRISTOPHER GEDDIS, ESQ.

9

10

11  DUANE MORRIS, LLP

12  Attorneys for Defendants

13  30 South 17th Street

14  Philadelphia, Pennsylvania  19103

15  BY: SETH A. GOLDBERG, ESQ.

16      BARBARA SCHWARTZ, ESQ.

17      LAUREN PUGH, ESQ.

18

19  ALSO PRESENT:

20       YANG XUEYU, ESQ., Hui Zhong Law Firm

21

22

23

24

25

Page 3

1              MR. GOLDBERG:  Adam, I guess you can

2      ask some questions and I can ask some

3      questions and we could try to get through

4      this.

5              MR. SLATER:  Terrific.

6              I'd like to start first by confirming

7      something.  I went through the cast of

8      characters that was provided and I just want

9      to make sure I understand a couple things, if

10     I could please.

11             The first listing is an email with no

12     name.  I'm assuming that's some sort of a

13     government email address.

14             Is that correct?

15             MR. GOLDBERG:  Can you be more

16     descriptive of what you're referring to?

17             MR. SLATER:  The first entry on the

18     cast of characters, the list of individuals

19     and email addresses.

20             The first name is one not applicable.

21     The email is CSFDA@163.com and the

22     organization is Food and Drug Administration

23     of Zhejiang province.

24             I apologize in advance for

25     mispronouncing words.

Page 4

1          MR. GOLDBERG:  Hang on one second.  I

2     want to make sure we understand what you're

3     talking about in terms of the cast of

4     characters list.

5          MR. SLATER:  You sent us a list the

6     other day.  I'm looing at the document you

7     sent us.  List of individuals and email

8     addresses, ZHPSSR log.

9          MR. GEDDIS:  This is Chris.  It was

10    sent March 17th, I believe.

11         MR. SLATER:  I thought this was going

12    to be the easiest question of the day.

13         MR. GOLDBERG:  It may not be.

14         MR. GEDDIS:  Joe sent it March 17th.

15         MR. GOLDBERG:  Hang on a second.

16    This is -- this may not be -- hang on one

17    second.

18         MR. SLATER:  What's the issue?

19         MR. GOLDBERG:  The issue is that this

20    is a list that we created in the US for the

21    cast of characters issue.  This isn't really

22    what we expected to be talking about in terms

23    of the states secret log, even though I

24    understand this is the cast of characters on

25    the state secret log.

```
                                          Page 5
 1              If you could just give me a
 2       question --
 3              MR. SLATER:  Seth, if we're going
 4       to -- if I gotta convince you that this
 5       simple question needs to be answered, I'm
 6       just going to email the judge now.
 7              MR. GOLDBERG:  No, you don't have --
 8              MR. SLATER:  I have to prep for a
 9       deposition.  Can we --
10              MR. GOLDBERG:  Adam, slow down for a
11       second.  This isn't a deposition -- please.
12              MR. SLATER:  I'm not doing this.
13              MR. GOLDBERG:  Then you can --
14              MR. SLATER:  I have to prep for a
15       deposition for Pen Dong --
16              MR. GOLDBERG:  Adam, you know what?
17       I will call the judge.
18              MR. SLATER:  Go ahead.
19              MR. GOLDBERG:  You're making -- you
20       are making a mountain out of a mole hill.
21       This is not a deposition and nobody can or
22       can't instruct anyone to answer.  I'm just
23       trying to pull up the document because I
24       don't have it.
25              What we were expecting to do is go
```

Page 6

1      through the substance of the state secret

2      log.  I want to make sure I have it and

3      counsel in China has it because I don't think

4      she does.

5            This was a document created in

6      response to the court's order on the state's

7      secret log and one that may not have

8      necessitated involving Chinese counsel.  If

9      you wouldn't mind waiting for 30 seconds, I

10     could pull up the document.  This is supposed

11     to be a collegial meet and confer, not a

12     combative one.

13           MR. SLATER:  I'm going to read from

14     the transcript right now, the transcript of

15     the conference where the judge ordered this

16     meet and confer on March 16th.  This is on

17     page 26, line 23 starting.

18           He said "So what I'm going to do is

19     by the end of business tomorrow or maybe it's

20     11:59 p.m., the cast of characters is to be

21     provided for these 91 documents and then I'm

22     going to direct that you meet and confer with

23     a court reporter present and make a record

24     either document by document or category by

25     category and then you certainly, Mr. Slater,

Page 7

```
 1        will have the opportunity to -- and we'll do

 2        it on an expedited basis -- move to compel

 3        all or some of the documents and Ms.

 4        Priselac, you'll certainly have an

 5        opportunity to respond to that."

 6              So this is not just a discussion on

 7        the dissertation -- let me finish.  This is

 8        our chance to go through the document I

 9        prepared last night until after midnight for

10        this call.  I'm very well prepared.

11              If we're not going to be able to

12        proceed, I'm just going to either email Judge

13        Vanaskie or we're going to move on this next

14        week.  I can't take the time -- you have to

15        understand I have other things to do.  We're

16        already being completely imposed on to be on

17        a conference call at 8:00 a.m.

18              MR. GOLDBERG:  There's no opposition.

19        I'm asking you to hold on 30 seconds so I

20        could make sure that the Chinese counsel has

21        this document.  That's it.

22              MR. SLATER:  You made a statement to

23        me that this isn't the purpose of the call.

24              MR. GOLDBERG:  No, I -- Adam, I

25        didn't say this wasn't the purpose of the
```

Page 8

1      call.  Okay?  This is simply a matter of

2      making sure that the lawyer in China can

3      answer your question.

4              MR. SLATER:  You can answer the

5      question.

6              MR. GOLDBERG:  If you want to proceed

7      in a productive way, then just wait 30

8      seconds.  If you think you're prejudiced by

9      waiting 30 seconds, then you could call the

10     judge and tell him you're prejudiced by

11     waiting 30 seconds.

12             MR. SLATER:  I'm prejudiced when you

13     said discussion as the cast of characters as

14     part of this call is not within the scope of

15     this call.

16             MR. GOLDBERG:  I didn't say that.

17             MR. SLATER:  Yes, you did.  You

18     didn't hear yourself.

19             MR. GOLDBERG:  Okay.  If you would

20     like to ask the question, go ahead.  I just

21     wanted to make sure that the document had

22     been provided because, again, this wasn't

23     something that was necessary to involve

24     Chinese counsel in creating this log.

25             MR. SLATER:  Seth, I didn't ask to

Page 9

1         involve Chinese counsel to begin with.  This

2         was your choice, so I don't know why you keep

3         saying that.

4                 MR. GOLDBERG:  Okay.  Go ahead.

5                 You can proceed, Adam.

6                 MR. SLATER:  Thank you.

7                 The first entry says not applicable

8         and then there's an email.  So that we

9         understand what that is, is that -- does that

10        mean it's some sort of a government generic

11        email address or is that the email for a

12        person?

13                MR. GOLDBERG:  This is the Chinese

14        CDE.

15                MR. SLATER:  Okay.  I need to

16        understand because the name says not

17        applicable.  So I'm asking why it says not

18        applicable.

19                MR. GOLDBERG:  That may be a question

20        for who created the state secret log and if

21        we have to get Jessica on the line, we can

22        because I'm not sure she created that.

23                MR. SLATER:  We'll come back to

24        that --

25                MR. GOLDBERG:  That's fine.

Page 10

1           MR. SLATER:  The next question I had

2      is John Hu and Luke Wang, the next two people

3      listed, it says the organization is Weihai

4      US, Inc.  So I just want to confirm that

5      these are US employees based in the US.

6           MR. GOLDBERG:  Let us -- we'll

7      confirm that.  Again, Jessica is not on the

8      call right now.  We can confirm that for you.

9           MR. SLATER:  Okay.

10          Then the next five people, their last

11     name Zhou, Tsai, Yee, Tian -- she's on there

12     on most of the documents or a lot of them --

13     and Tina Liu, Prinberry Biopharm Limited, I

14     just want to make sure -- are these people

15     based in China or anywhere else?

16          MR. GOLDBERG:  I believe these people

17     are based in China, but we can confirm.

18     Prinberry is in China.  Eric Tsai is one of

19     the witnesses who is going to be deposed in

20     this case.

21          MR. SLATER:  Right.  I just wanted to

22     make sure.  Okay.  Those are my questions on

23     the cast of characters for now.

24          MR. GOLDBERG:  Okay.

25          MR. SLATER:  So the next thing I'd

Page 11

```
 1        like to do, if we could, is let's go to the

 2        log, the very first document, which is --

 3        Chris, my version of this log doesn't have

 4        the Bates number on it.  I assume that's

 5        because we couldn't fit all the columns on to

 6        print it.

 7              MR. GEDDIS:  In order to read it on

 8        the paper --

 9              MR. SLATER:  Well, the beginning --

10        the document numbers are there, so we'll go

11        by the numbered documents on the log.  So

12        this entry says -- I'm going to start with

13        the custodian is, I guess, Tusai Ge --

14              MR. GOLDBERG:  Adam, does Chris have

15        the Bates number, so that we could just be

16        sure we're talking about the same document?

17        Is he looking at something --

18              MR. SLATER:  Seth, let me slow down

19        here.  You have the log, I assume, that you

20        gave us, the updated --

21              MR. GOLDBERG:  I do.

22              MR. SLATER:  I'm going by the

23        document number in the left column, you have

24        the document number, this is document number

25        one.
```

Page 12

```
 1              MR. GOLDBERG:  Okay.  Chris, do you
 2      have the Bates number just to confirm that
 3      it's ZHP 02440332?
 4              MR. GEDDIS:  I'm pulling it up.  Just
 5      a second.
 6              MR. SLATER:  It's document number
 7      one.
 8              MR. GEDDIS:  We used the most recent
 9      version you have.  Yes, it ends 332.
10              MR. GOLDBERG:  Okay.
11              MR. SLATER:  The description says
12      "Summary sheet of information concerning drug
13      marketing licenses provided from Shanghai
14      Municipal Drug Administration."
15              So my first question is -- I think
16      this is going to help us -- I'm hopeful -- to
17      move through things, set a baseline for how
18      to do this.
19              I've been through the state secret
20      laws that are cited in the column prior,
21      Basis for Withholding, and my reading of the
22      laws -- I've read all the laws -- this
23      citation is very similar across the board.
24      Either Article 27 is in or out of the
25      implementing regulations, but otherwise the
```

Page 13

1    sections cited are identical for every single

2    document.  I've heard every one of them.

3         My question is this:  My first one,

4    it looks like the laws of the Chinese state

5    secrets on guarding state secrets, that's the

6    first substantive section, where it actually

7    defines what is something that's a "state

8    secret."

9         Article 2 and Article 9 and

10   subsections one to seven and then in the

11   regulations of China on the disclosure of

12   government information, there's a substantive

13   information which is Article 16, which

14   actually -- yeah, Article 16 -- which,

15   basically, my reading was that that protects

16   internal administrative information.

17        So that's my first question.  Do I

18   have an understanding of the substantive

19   provisions of the laws that were cited in

20   terms of what information is protected, so I

21   understand that I'm reading the laws the way

22   you guys read it.

23        MS. YANG:  I think Article 2 and

24   Article 9 define the scope of state secret

25   on Chinese law generally.  You also mentioned

Page 14

```
1        Article 16 of the regulations.  Article 16 of
2        the regulation -- you're right -- it's about
3        the internal administration, the
4        administration of information.
5                MR. SLATER:  Okay.  I appreciate
6        that.  I just wanted to make sure I was
7        reading all the laws correctly.
8                Now, what I'm trying to understand,
9        since a lot of provisions are listed here,
10       some of which are not -- well, rephrase.
11               I forgot I'm not in a deposition.
12       When there's a court reporter, I go into
13       rephrase mode.  Sorry about that.
14               I want to understand which provision
15       specifically are you saying applies to this
16       document to require that it's withheld?
17               MS. YANG:  It would be Article 2 and
18       four of the PRC law on guarding state
19       secrets.
20               MR. SLATER:  You're saying there's
21       something about this document that is -- has
22       a vital bearing on state security and
23       national interests?
24               MS. YANG:  Right.  Also Article 9.4
25       of the same law.
```

Page 15

1              MR. SLATER:  9.4 would be secrets in

2        the national economic and social development?

3              MS. YANG:  Yes.

4              MR. SLATER:  Is there anything else

5        you can tell me about the document just so I

6        can understand -- I can read what's there,

7        but in terms of substantively, not the

8        substantive information, but what type of

9        information is this providing.

10             MS. YANG:  This document basically

11       describes license holder qualification from

12       high government from supervision.

13             MR. SLATER:  License holder

14       requirements?

15             MS. YANG:  Yes.

16             MR. SLATER:  To be allowed to market

17       drugs in China?

18             MS. YANG:  Yes, in China.  To

19       entering the drug market in China.

20             MR. SLATER:  So it's to be allowed to

21       hold the position to be able to market drugs

22       in China?

23             MS. YANG:  Right.

24             MR. SLATER:  Since the custodian is

25       Ju Sidegood, is this applicable to this

Page 16

1      person?
2              MS. YANG:  Well, this document has
3      nothing to do with the custodian.  I think
4      this custodian just happened to have this
5      document from the government.
6              MR. SLATER:  If you could just
7      explain to me what it is that's secret about
8      the license holder requirements to be able to
9      market drugs in China that makes it --
10             MS. YANG:  In this document, the
11     government discussing, you know, what kind
12     of -- they are kind of considering new laws
13     and new requirements and they kind of are
14     thinking about, you know, kind of reflecting,
15     you know, what's been done in the past and
16     what to do in the future.  So it reflects
17     government's view about, you know, regulating
18     Chinese market.
19             MR. SLATER:  When you say what's done
20     in the past and will be done in the future,
21     I'm assuming it's in somehow a way that
22     recounts the valsartan issues?  That's what
23     brings it within our case, I assume?
24             MS. YANG:  You mean recounts -- no,
25     no.  It does not mention valsartan at all.

Page 17

1            MR. SLATER:  Can you tell me who

2       specifically this applies to do?  Does it

3       apply to the company?  A company?  I just

4       want to know who it's applicable to.

5            MS. YANG:  All companies that want to

6       enter into the PRC drug market.

7            MR. SLATER:  Which companies does

8       this apply to?  ZHP?  Does it apply to some

9       other -- I'm just trying to get a sense of

10      who this specific document applies to.

11           MS. YANG:  Well, this document

12      applies to everyone once you enter into this

13      market.  It's about the regulation which

14      generally applies to our market, so not

15      specifically relating to a particular

16      company.

17           MR. SLATER:  The reason I'm asking

18      these questions is because from what you're

19      telling me, it sounds like a generic type of

20      document and I'm trying to figure out why it

21      would be relevant to the valsartan

22      litigation.  I'm just trying to get a sense

23      of what it is that I'm missing so I'm trying

24      to figure out whether there's any need to

25      challenge the designation, if you understand.

Page 18

1           MS. YANG:  Yes, I got it.

2           The document, the responsiveness of

3     this document was not reviewed by our firm,

4     so I was not sure what kind of standard the

5     firm had when they reviewed this document.  I

6     know today I'm here, I'm just answering the

7     questions about state secrets, so --

8           MR. SLATER:  I'm sorry.  I didn't --

9           MS. YANG:  -- if you ask my

10    opinion --

11          MR. SLATER:  Anybody can answer.  I

12    wasn't necessarily just going -- I was just

13    trying to understand substantively what the

14    document relates to, so I have some idea is

15    this something we need to concern ourselves

16    with to challenge.  That's really what I'm

17    getting at.

18          MR. GOLDBERG:  Can I ask a few

19    questions?

20          MS. YANG:  Sure.

21          MR. SLATER:  Are you asking questions

22    of your co-counsel?

23          MR. GOLDBERG:  Yes.  That's part of

24    this -- that's part of the exercise.  That's

25    what Judge Vanaskie ordered.

Page 19

1              You said it does not mention

2       valsartan at all?

3              MS. YANG:  Correct.

4              MR. GOLDBERG:  Does that mean it

5       doesn't mention the valsartan impurities?

6              MS. YANG:  Right.

7              MR. GOLDBERG:  Or the cause of the

8       impurities?

9              MS. YANG:  No.

10             MR. GOLDBERG:  Does it talk about the

11      recall of valsartan in the US?

12             MS. YANG:  No.

13             MR. GOLDBERG:  Is this a document

14      that has to do with the US market for

15      valsartan?

16             MS. XUEYU:  No.  Just for Chinese

17      market.

18             MR. SLATER:  The next document is

19      document number three.

20             I don't know who can answer this

21      question, but this is the first one where

22      Sophie Tian is named as a custodian and I saw

23      she is custodian on a bunch of documents.

24             I'm just curious who she is.

25             MR. GOLDBERG:  I don't know, but I

Page 20

1      suspect she might be on your original list of

2      custodians.

3                    MR. SLATER:  She's on.  I'm not -- I

4      just was curious.  I see her title.  It's not

5      that important.  We'll figure it out if it

6      matters as we go through it.

7                    This document, the description is

8      meeting minutes of a meeting dated 12

9      June 2017 between ZHP and Chinese Center for

10     Drug Evaluation regarding improving the

11     quality of the product and registered to the

12     Center for Drug Evaluation, CDE of the China

13     National Medical Products Administration.

14     Then you list obviously the state secret

15     provisions.

16                    The first question is which state

17     secret provisions specifically are you saying

18     apply to this?

19                    MS. YANG:  Article 2 and 9.4 of the

20     PRC on guiding our state secrets.

21                    MR. SLATER:  So when the other

22     provisions are listed, they're listed just

23     because they deal with the penalties and the

24     consequences and the processes but those

25     aren't -- they don't actually say something

Page 21

1      is a state secret, right?

2              MS. YANG:  Article 48 of the PRC on

3      guarding state secrets is about -- the

4      articles of the regulation of the PRC on

5      disclosure of government information is also

6      relevant because, you know, as I said in my

7      declaration, almost every state secret

8      document -- every document contains state

9      secrets and those documents are kept or

10     prepared or drafted or circulated by the

11     governments, so it's essentially this

12     regulation applies to every document,

13     government document.  Then the government has

14     the right to classify which and whether the

15     document is a state secret document.

16             MR. SLATER:  Got it.

17             So this is the same section as the

18     first document, Article 2 of the first -- of

19     the state secret law, 9.4, of the

20     regulations?

21             MS. YANG:  Right.

22             MR. SLATER:  Okay.

23             This says June 27th, 2017 meeting

24     minutes for this meeting, improving the

25     quality of the product.

Page 22

```
 1              Is the product valsartan?
 2              MS. YANG:  The product is including
 3         valsartan.
 4              MR. SLATER:  Is there anything you
 5         can tell me about the substantive issue
 6         with -- of what issue -- what needed to be
 7         improved so we can get a sense of how
 8         relevant it is to our issues?
 9              MS. YANG:  Okay.  So basically this
10         document is a Chinese government agency.
11         They're trying to perform their functions to
12         regulate Chinese market.  They are comparing,
13         you know, the Chinese standards and US
14         standards in terms of packaging isomer sort
15         of things.  They want Weihai to apply the US
16         standards when they seek approval in China.
17         That's what this document is all about.
18              MR. SLATER:  When you say they,
19         you're saying the Chinese government wants
20         the US standards to be applied when they
21         apply to sell the drug in China?
22              MS. YANG:  Yes.  At least some
23         requirements discussed in these meeting
24         minutes.
25              MR. SLATER:  Are the requirements
```

1          discussed in the meeting minutes inclusive of

2          the purity or quality of the drug substance

3          itself?

4                  MS. YANG:  No.  It's about the BE --

5          bioequivalence -- requirements -- if I'm

6          right on the abbreviation -- isomer

7          stability, packaging.  Those kinds of things.

8                  MR. SLATER:  Bioequivalence is kind

9          of broad.

10                  When you say that, is that including

11          it has the same safety profile as required by

12          the FDA?

13                  MS. YANG:  It did not mention that.

14                  MR. SLATER:  Does it define what the

15          terms mean, what it's talking about?

16                  MS. YANG:  It was about the BE

17          testing diagrams.

18                  MR. SLATER:  Testing diagrams?

19                  MS. YANG:  Right.  Or research

20          diagrams.

21                  MR. SLATER:  Diagrams that have to do

22          with what --

23                  MS. YANG:  Lab diagrams.  I'm not

24          sure about those technical terms.  Diagrams

25          they use in the lab.

Page 24

 1              MR. SLATER:  When I look at Article

 2       2, it says "State secrets should be those

 3       that have a vital bearing on state security

 4       and national interests."

 5              Why would that document fall within

 6       that provision --

 7              MS. YANG:  Because this is the

 8       discussion between the company and the

 9       government.  There's a government's viewpoint

10       recorded in this document.

11              MR. SLATER:  I'm just trying to

12       understand.  Every single document of every

13       single discussion with the government is

14       defined by you to be by definition of a vital

15       bearing on state security and national

16       interests.

17              MS. YANG:  And also by Article 4 of

18       the law.

19              MR. SLATER:  I get it.  We'll get to

20       9.4.

21              So you're saying if it documents

22       anything that the Chinese government says,

23       it, by definition, has a vital bearing on

24       state security and national interest?

25              I just want to know how you define

Page 25

1    the term because it will help to shorten the

2    call maybe.

3              MS. YANG:  Right.  The right

4    provision would be Article 2 and if you look

5    at the criticism in any declaration in

6    practice actually requirements is kind of

7    loose.

8              So you will see any unpublished

9    documents basically could be state -- contain

10   state secrets.

11             MR. SLATER:  I get you're saying that

12   the document could, but I just want to

13   understand because this seems to be something

14   that is -- how can this company sell this

15   drug in China?  I don't see how that has a

16   vital bearing on state security national

17   interest.  It seems like it's just a routine

18   regulatory oversight function.

19             MS. YANG:  Because it reflects

20   government thinking about, you know, how they

21   could improve Chinese regulatory system and

22   this is -- should be kept confidential.  It's

23   not public.

24             MR. SLATER:  Are there some parts of

25   the document that don't contain the

Page 26

 1          government's thinking about how they can

 2          improve the system and some parts of the that

 3          are factual about the drug or the

 4          manufacturing process?

 5                    MS. YANG:  I will say the whole

 6          document reflects the government's views.

 7                    MR. SLATER:  Okay.

 8                    Then 9.4, which is "The following

 9          matters involving state security and national

10          interests shall be determined as state

11          secrets if the divulgence of such matters is

12          likely to prejudice state security and

13          national interests in the fields such as

14          political affairs, economy, national defense

15          and foreign affairs."

16                    You're saying that -- then it has

17          seven subsections of examples and you're

18          saying sub suction four, "Secrets in the

19          National Economic and Social Development,"

20          that's the section that applies here?

21                    MS. YANG:  Yes.

22                    MR. SLATER:  So, again, I'm trying to

23          understand how that information is likely to

24          prejudice state security and national

25          interests if it were to get to us.  I don't

Page 27

1      understand.

2              MS. YANG:  Well, because this

3      document is -- it's an internal discussion

4      between the government -- I shouldn't say

5      internal.  It's a private, confidential

6      discussion between the government and the

7      manufacturer and there are discussions, you

8      know, that are not public, not for public use

9      and nothing is final when they discuss those

10     issues.  So if we disclose those documents to

11     the public, you know, things may change or,

12     you know, it's just to reflect the point

13     of -- viewpoint of the government at that

14     time and because this is not final, I think

15     this could be involving state secrets

16     considering the public house and social

17     development in national economy.

18             MR. GOLDBERG:  Adam, can I ask a few

19     questions about this document?

20             MR. SLATER:  Sure.

21             MR. GOLDBERG:  You said that this is

22     a document that looks at the US standards and

23     the Chinese standard.

24             Is this a document about the Chinese

25     market for valsartan and the standards to be

Page 28

 1          applied for the Chinese market?

 2                    MS. YANG:  Right.  It's about Chinese

 3          market.

 4                    MR. GOLDBERG:  Does it involve the

 5          impurities relating to valsartan?

 6                    MS. YANG:  No.

 7                    MR. GOLDBERG:  Does it concern the

 8          valsartan recall in 2018?

 9                    MS. YANG:  No.

10                    MR. GOLDBERG:  Does it have anything

11          to do with the satisfaction by ZHP of FDA

12          requirements in the US?

13                    MS. YANG:  No.

14                    MR. GOLDBERG:  Does it have anything

15          to do with regulatory violations in China?

16                    MS. YANG:  No.

17                    MR. GOLDBERG:  Okay.

18                    Do you want to go on, Adam, or do you

19          have --

20                    MR. SLATER:  I want to come back to

21          something.  I don't want to challenge a

22          document if it's not necessary, but for every

23          one of these -- I don't know.  I'm not going

24          to presuppose, but I need to get an

25          understanding of what the substance is, what

Page 29

1    it is as opposed to what it's not.

2            So you said that it deals with

3    bioequivalence requirements and testing

4    designs.

5            Does it analyze or discuss in some

6    way the manufacturer or the testing of

7    valsartan?

8            MS. YANG:  I beg your pardon?

9            MR. SLATER:  It's addressing, at some

10   level, the manufacturer of valsartan, right?

11   To make sure it's bioequivalent?

12           MS. YANG:  Well, in the

13   bioequivalence section, I do not see they

14   specifically mention valsartan.

15           MR. SLATER:  I don't know what that

16   means.  You said the document, it says the

17   product, you said the product that's

18   discussed, one of them is valsartan.

19           MS. YANG:  Right.

20           MR. SLATER:  So how does it discuss

21   valsartan?  What is it discussing about

22   valsartan in terms of the general topic?

23           MS. YANG:  The solution task, crowd

24   translation --

25           MR. SLATER:  Okay.  Anything else?

1          MS. YANG:  That's it.

2          MR. SLATER:  Okay.  Let's go to

3     document seven.  I think that's the next one.

4          MR. GOLDBERG:  Since we just jumped a

5     few, Chris, can you confirm the Bates number,

6     so we could be sure we're all looking at the

7     same document?  I have Syncore and it ends in

8     37103.

9          MR. GEDDIS:  That's correct.

10          MR. SLATER:  I might as well walk

11     through this just to make sure when we skip

12     them, we tell why we're skipping them, so

13     it's not unclear for the record.

14          Document two, we were advised that

15     one is now being produced.  Document six, we

16     were told that's also being produced.  We

17     were told that four and five were duplicates

18     of three, which is why we skipped those.

19          Okay.

20          Now number seven, it lists the same

21     group of laws, but this one also throws in

22     Article 27 of the implementing regulations on

23     guarding state secrets as well.

24          MS. YANG:  Right.

25          MR. SLATER:  In terms of the

Page 31

1    provisions from the other two laws, the laws

2    of China on state secrets and the law of

3    regulation on disclosure of government

4    information -- well, you tell me actually.

5              Let me ask this question.

6              For document seven, which specific

7    provisions are you saying define this

8    document as a state secret subject to the

9    law?

10             MS. YANG:  The same provisions are

11   Article 2 and 9.5 of the PRC law on guiding

12   state secrets.  Also, I should mention that

13   Article 27 of the implementation -- Article

14   27 specifically requires when the government

15   holds a meeting that may involve the state

16   secrets, the government should take certain

17   measures to protect state secrets, including

18   asking the party to keep the document

19   confidential and this is the exact read of

20   the document that the government asks Weihai

21   -- asks the person who receive it to keep it

22   confidential.

23             MR. SLATER:  In terms of establishing

24   it's a state secret to begin with, that's

25   Article 2 and 9.5?

Page 32

1           MS. YANG:  Correct.

2           MR. SLATER:  9.4 is secrets

3     concerning science and technology?

4           MS. YANG:  9.4, I said.

5           MR. SLATER:  I thought you said 9.5.

6           MS. YANG:  Sorry.  9.4.

7           MR. SLATER:  So I don't have to keep

8     asking for every document, am I correct that

9     in terms of every other document that's on

10    here where these articles are listed, in

11    every case, is it Article 2 and 9.4 that

12    you're relying on?

13          MS. YANG:  Yes.

14          MR. SLATER:  So I don't have to keep

15    asking the question same.

16          MS. YANG:  That'll save time.

17          MR. SLATER:  This one, article -- let

18    me come back.

19          The document number seven, it's

20    described as a guideline for the study of

21    nitrosamine impurities in drugs from the

22    Center for Drug Evaluation, CDE, of the China

23    National Medical Products Administration in

24    which the CDE expressly required the company

25    to keep confidential and it's November 18,

Page 33

1      2019.

2              First of all, this guideline, is this

3      a guideline that the government is now

4      discussing with ZHP and they're discussing

5      establishing a guideline or is it already an

6      established guideline?

7              MS. YANG:  The government wanted to

8      establish a guideline to, you know, to ensure

9      the safety and, you know, to control the

10     safety of the drugs and control the quality

11     of the drugs for the Chinese market.

12             MR. SLATER:  Specific to nitrosamine

13     impurities?  That's what this says, right?

14             MS. YANG:  Correct.  The government

15     notes that according to public source,

16     there's very limited evidence to prove

17     nitrosamine may cause cancer in human beings,

18     but they still want to do this thing to set

19     up -- to issue guideline for research and

20     registration, approval, etc.

21             MR. SLATER:  Is the document just the

22     proposed guideline or is the document also

23     containing information, for example, that ZHP

24     provided to the government on this topic?

25             MS. YANG:  No, there's nothing about

Page 34

1          the information provided by ZHP.

2                  MR. SLATER:  So it's just a draft

3          guideline at this point?

4                  MS. YANG:  Right.

5                  MR. SLATER:  Okay.

6                  Looking at number eight -- at this

7          point, we could just go to the descriptions

8          and look at them.  That's why I established

9          what you told me about about Article 2 and

10         9.4.  Good.  We're finding a quicker way to

11         do this.  I just realized I'm starting my

12         day, you're looking to go to bed.

13                 MS. YANG:  That's right.

14                 MR. SLATER:  This is ZHP meeting

15         minutes discussing the plan to communicate

16         with CDE regarding to the reply of valsartan

17         tablet deficiency letter.

18                 So these are internal meeting minutes

19         at ZHP?

20                 MS. YANG:  Right.

21                 MR. SLATER:  I just have to ask one

22         other question.  I'm sorry.

23                 I forgot on document seven where it

24         says "The CDE expressly required the company

25         to keep confidential," is that a request that

Page 35

1      was made by a specific government official or

2      is that sort of standard language on a

3      document from the government?

4              MS. YANG:  It's a specific

5      requirement from official.

6              MR. SLATER:  Do you know who that

7      official is that requested that?

8              MS. YANG:  An official from CDE.

9              MR. SLATER:  It doesn't say who.

10             MS. YANG:  Mr. Li, Li Zhou Fung.

11             MR. SLATER:  When you say he asked

12     ZHP to keep it confidential, I'm just trying

13     to get a sense of how that was stated.  Is it

14     in the cover letter saying "Here's our draft

15     guideline.  Please keep it confidential" or

16     is it language at the bottom or at the start

17     that says "This is information that must be

18     kept confidential"?

19             I'm trying to get some sense of how

20     that is being communicated.

21             MS. YANG:  It was communicated in the

22     email, so this document, document seven we

23     just looked at, it was an attachment to that

24     email.

25             MR. SLATER:  Does the government

Page 36

```
1        official say why to keep it confidential or
2        cite any of these legal provisions?
3                 MS. YANG:  It did not say so in the
4        email, but according to Article 27 of the
5        implementation rules, when the government is
6        holding a meeting that may contain state
7        secrets, they are perfectly okay to require
8        the participants to keep it confidential.
9        That's why they mention that in the email.
10                MR. SLATER:  Do they say in the
11       email, for example, do they cite Article 2
12       and 9.4 as the basis to say it's secret or do
13       they skip over that?
14                MS. YANG:  They didn't say that.
15       It's not -- they are not lawyers or --
16                MR. SLATER:  Okay.
17                MS. YANG:  -- general counsel of the
18       government, so they do what they need to do.
19                MR. SLATER:  I understand.
20                I was just trying to understand if
21       they defined and said this is a state secret
22       because of XYZ.  But they don't do that, they
23       just said keep it confidential?
24                MS. YANG:  Correct.  Because the PRC
25       is a government that has the power to
```

Page 37

1           classify documents beforehand or afterwards.

2                    MR. SLATER:  What is the Center for

3           Drug Evaluation, the CDE?  I'm just curious

4           so I could understand some of this

5           terminology.  What is the CDE?

6                    MS. YANG:  CDE is an internal

7           department of the China National Medical

8           Products Administration.

9                    MR. SLATER:  So it's a department

10          within that government entity?

11                   MS. YANG:  Yes.

12                   MR. SLATER:  The China National

13          Medical Products Administration -- I'm going

14          to ask my next dumb question -- what is that?

15          Just so I make sure I understand, I

16          understand the CDE is a department with that

17          entity, right?

18                   MS. YANG:  I think it's similar to US

19          FDA.  It's Chinese FDA, in my view.

20                   MR. SLATER:  Got it.

21                   MR. GOLDBERG:  Can I ask a few

22          questions about this document?

23                   MS. YANG:  Sure.

24                   MR. GOLDBERG:  So is this the Chinese

25          government regulating -- in its capacity --

Page 38

```
 1        regulating the Chinese market?

 2              MS. YANG:  Correct.  Yes.

 3              MR. GOLDBERG:  When the Chinese

 4        government asks to have a document marked

 5        confidential, does it have to cite to a law

 6        to do that?

 7              MS. YANG:  No.  Not necessarily.  In

 8        practice, they actually don't do that.

 9              MR. GOLDBERG:  Does this -- okay.

10              I think that's fine.

11              MR. SLATER:  Let's go to document

12        eight where I went to and then I moved on.

13              The description says ZHP meeting

14        minutes and I think you told me that these

15        are internal meeting minutes at ZHP, right?

16              MS. YANG:  Yes.  It's an internal

17        meeting and it's about an upcoming meeting

18        with the government.

19              MR. SLATER:  Does it say who was

20        involved in the meeting?

21              MS. YANG:  You mean this internal --

22        for this internal meeting?

23              MR. SLATER:  Yes.

24              MS. YANG:  Yes.

25              MR. SLATER:  Can you tell me that?
```

Page 39

1           MS. YANG:  It's from the research

2     department, some people from the research

3     department and some people from Prinberry and

4     some people from API and one person from

5     Beijing.

6           MR. SLATER:  One person from where?

7     I'm sorry.

8           MS. YANG:  Beijing.  It says Beijing,

9     so I don't know which company or which

10    department it is.

11          MR. SLATER:  Are you able to tell me

12    any of the names or does it not list their

13    names?

14          MS. YANG:  There's a bunch of names.

15    You want me to read all those names to you?

16          MR. SLATER:  Let me ask you this:

17    Eric Tsai, it's in his custodial file, so

18    he's -- did he participate?

19          MS. YANG:  No.  No.

20          MR. SLATER:  How about Linda Lin?

21          MS. YANG:  Linda, yes.  Linda is

22    involved.  I'm sorry.  Eric Tsai was

23    involved, too.

24          MR. SLATER:  You said there's a bunch

25    of names?  I don't want to make you read the

Page 40

1        names off.

2                How about Pen Dong?

3                MS. YANG:  No.

4                MR. SLATER:  Min Lee Zhang?

5                MS. YANG:  No.

6                MR. SLATER:  Eric Goo?

7                MS. YANG:  No.

8                MR. SLATER:  Those are some of the

9        people coming up for depositions, so I'm not

10       going to make you list everybody.  I wanted

11       to figure out if it related to people we were

12       deposing.

13               Then it says "Discussing the plan to

14       communicate with the CDE" --

15               MS. YANG:  Right.

16               MR. SLATER:  -- "regarding reply of

17       valsartan tablet deficiency letter."

18               So something came from the Chinese

19       government identifying some sort of

20       deficiency with the valsartan tablet and

21       they're deciding how to respond?

22               MS. YANG:  Right.  It's about the

23       Chinese deficiency letter.

24               MR. SLATER:  Is there anything you

25       can tell me about what about that deficiency

Page 41

1          related to?  What the subject matter is?

2                    MS. YANG:  It didn't say so, so ...

3                    MR. SLATER:  So it doesn't talk about

4          the substance of what the Chinese government

5          had said its concern was in the deficiency

6          letter?

7                    MS. YANG:  No.

8                    MR. GOLDBERG:  Can I ask a few

9          questions about that document?

10                   MR. SLATER:  Sure.

11                   MR. GOLDBERG:  Does the document

12         mention nitrosamine?

13                   MS. YANG:  No.

14                   MR. GOLDBERG:  Does it mention

15         impurities in valsartan?

16                   MS. YANG:  No.

17                   MR. GOLDBERG:  Does it have anything

18         to do with the US market for valsartan?

19                   MS. YANG:  No.

20                   MR. GOLDBERG:  Does it say anything

21         about chromatography or chromatograms?

22                   MS. YANG:  No.

23                   MR. GOLDBERG:  Does it have anything

24         to do with the safety for patients -- safety

25         for consumers of valsartan in the US?

Page 42

1              MS. YANG:  No.

2              MR. SLATER:  Let me go back.

3              Are you done, Seth?  I didn't mean to

4        interrupt.

5              MR. GOLDBERG:  Yes.

6              MR. SLATER:  I'm trying to understand

7        why an internal discussion within ZHP about a

8        deficiency that's not even identified

9        specifically that was identified by the

10        government in a separate letter, why

11        disclosing those meeting minutes from ZHP

12        would somehow threaten the security, the

13        vital security interests of China.

14              MS. YANG:  Because this is part of

15        the communication between company and

16        government.  This internal meeting was held

17        for preparing for the -- to set out the

18        agenda for the meeting with the government.

19        So it's part of the communication between the

20        company and the government.

21              MR. SLATER:  You're saying it's

22        preparation to make a communication?

23              MS. YANG:  Right.  How they -- the

24        company -- was going to address the

25        government's concerns and questions, those

Page 43

```
 1          sorts of things.
 2                    MR. SLATER:  Does it identify what
 3          the Chinese government's concerns were?
 4                    MS. YANG:  According to the language,
 5          it did not say so.  I think the topic they
 6          want to discuss is, you know, based on the
 7          government's concerns or requirements.
 8                    MR. SLATER:  All right.
 9                    Let's skip forward to number nine.
10                    MR. GOLDBERG:  Can I just get one
11          clarification?
12                    Does the document reflect the
13          viewpoints of the Chinese government?
14                    MS. YANG:  Well, I would say so
15          because this was prepared based on the
16          requirements and views of the Chinese
17          government.  That's why they had this
18          internal meeting to prepare.
19                    MR. GOLDBERG:  Okay.
20                    MR. SLATER:  But it doesn't say what
21          those specific concerns were, right?
22                    MS. YANG:  Right.
23                    MR. SLATER:  Okay.
24                    MS. YANG:  It did not say the
25          government concerns as follows.  They didn't
```

Page 44

1        say that, but they are preparing a different

2        way.  They discuss what they are going to

3        say, what they are going to do in the meeting

4        with the government.

5                MR. SLATER:  Okay.

6                If I understand, so what they're

7        saying they're going to do in a meeting with

8        the government, you're applying a law that

9        says that divulging that information is

10       likely to impact vital state security for

11       China?

12               MS. YANG:  Right.  It potentially

13       involves the government's viewpoints and also

14       nonpublic information of the government.

15               MR. SLATER:  I get that, but the

16       meeting minutes don't reflect what the

17       government's view was.

18               MR. GOLDBERG:  I think the transcript

19       took down nonprofit.

20               Did you mean nonpublic?

21               MS. YANG:  Nonpublic.

22               MR. SLATER:  Looking at document

23       nine, it says Meeting minutes between ZHP and

24       Taizhou Medical Products Administration

25       concerning irebesartan genotoxic impurities

Page 45

1        January 8, 2019.

2                First of all, just so I understand,

3        what is the Taizhou Medical Products

4        Administration?

5                MS. YANG:  Taizhou is a city in the

6        Tianjin province.

7                MR. SLATER:  It's a medical products

8        administration, a local --

9                MS. YANG:  Yes.  Right.

10               MR. SLATER:  They had a meeting to

11       discuss the genotoxic impurities in

12       irebesartan?

13               MS. YANG:  In irebesartan, right.

14               MR. SLATER:  Apart from anything that

15       the government may have said or done, does

16       the document contain information regarding

17       those genotoxic impurities separate and apart

18       from what the government might say or ask?

19               MS. YANG:  Yes.  This document

20       records the questions the government asks and

21       answers provided, so it's kind of a Q & A.

22               MR. SLATER:  I see.  So questions

23       were asked during the meeting, answers were

24       provided.  Got it.

25               MS. YANG:  Yes.

Page 46

1              MR. SLATER:  When it says concerning

2      irebesartan genotoxic impurities, are we

3      talking about how they occurred?  Are we

4      talking about how to prevent them?  The risk

5      from them?  Is there a -- can you give me

6      anything more specific about what the subject

7      matter is about the genotoxic impurities?

8              MS. YANG:  The government was asking

9      questions about the current status of the

10      information of genotoxic impurities in

11      irebesartan.

12              MR. SLATER:  Okay.

13              Now looking at number ten, which is

14      dated 11/1/2019, it says "Document concerning

15      an invitation for a seminar on quality

16      control of genotoxic impurities of chemical

17      drugs in which the Center for Drug Evaluation

18      (CDE) of China National Medical Products

19      Administration expressly required the company

20      to keep confidential."

21              So when it says "concerning an

22      invitation for a seminar," it's literally

23      just inviting somebody to come to a seminar?

24              MS. YANG:  Right.  It invites someone

25      to come to the seminar and set up agenda for

Page 47

1          the seminar.
2                    MR. SLATER:  Who is it inviting?
3                    MS. YANG:  A professor, a Professor
4          Lee Ming.
5                    MR. SLATER:  That's the person who is
6          the custodian, Lee Ming?
7                    MS. YANG:  I don't think this person
8          was one of the custodians.
9                    MR. SLATER:  I think Ming Lee is --
10         the custodian is listed as Ming Lee.
11                   You said there's an agenda for this
12         meeting?
13                   MS. YANG:  Right.
14                   MR. SLATER:  What is the agenda?
15                   MS. YANG:  Time, place --
16                   MR. SLATER:  I'm sorry.  Why would
17         the agenda -- I didn't -- I was mumbling.
18                   Why would the agenda -- disclosure of
19         the agenda for this meeting -- somehow risk
20         the vital national interests of China if we
21         were to see it?
22                   MS. YANG:  Because this document
23         itself -- the government who issued this
24         agenda said, you know, not for public
25         disclosure.

Page 48

```
 1              MR. GOLDBERG:  Dissemination?

 2              MS. YANG:  Dissemination.  Yes.

 3              MR. SLATER:  I get it.

 4              But in terms of why this would be --

 5         it still has to be a state secret.  I'm

 6         trying to understand why from your

 7         perspective -- let me understand.

 8              You're saying you have to withhold it

 9         because of that direction.  You're not

10         analyzing whether it's a state secret or not.

11         You're saying look, if the government says it

12         is, we have to abide by that?

13              MS. YANG:  No, that's not what I

14         mean.  The document was not supposed to be

15         public.  It was one of the measures taken by

16         the government to protect its secrecy, state

17         secrecy.  Because this examiner was not

18         public examiner, it's a closed door

19         examination.

20              They're going to discuss something

21         which is not -- it mentions in this document

22         the topics they're going to discuses involve

23         important public health problem, so they want

24         to have this seminar to discuss their -- some

25         common issues.  So this is an important
```

Page 49

1     seminar.

2              MR. SLATER:  I don't have the

3     realtime in front of me.  You said important

4     issues.  What is it that they define this as?

5     Important -- I just couldn't understand what

6     you said because I don't have the realtime.

7              MS. YANG:  Because the genotoxic

8     impurities problems, this could involve

9     important public health concern and issue, so

10    they want to have this seminar to discuss how

11    to control the products, the genotoxic

12    problem in the drugs.

13             MR. SLATER:  Okay.

14             Going now to number 12 --

15             MR. GOLDBERG:  Can I ask a few

16    questions about this document?

17             When you say this is a seminar,

18    you're not talking about, like, a seminar

19    that's for, like, a lecture series that

20    anybody could attend?  This is -- is this

21    more of, like, a meeting between the Chinese

22    government and the drug manufacturers?

23             MS. YANG:  Right.  As I said, it's a

24    closed door meeting.  It's only inviting some

25    experts in this industry to participate and

```
                                                    Page 50

 1        to attend.

 2                 MR. GOLDBERG:  Okay.

 3                 Does this talk at all about the

 4        recall of valsartan in the US?

 5                 MS. YANG:  No, not at all.

 6                 MR. GOLDBERG:  Does it talk about FDA

 7        regulations in the US?

 8                 MS. YANG:  No.

 9                 MR. GOLDBERG:  Does it talk about the

10        root cause of nitrosamines in valsartan?

11                 MS. YANG:  No.

12                 MR. GOLDBERG:  Okay.  Thank you.

13                 MR. SLATER:  The description says

14        "Quality control of genotoxic impurities in

15        the chemical drugs."  I think what you

16        explained, they're trying to address how do

17        they prevent that happening.

18                 Do I understand that?

19                 MS. YANG:  How they're going to

20        control the quality of the sartan products,

21        drugs.

22                 MR. SLATER:  How to control the

23        quality of the sartan products specific to

24        controlling genotoxic impurities?

25                 MS. YANG:  Mm-hmm.
```

Page 51

1              MR. GOLDBERG:  Is that for the

2      Chinese market?  Certain drugs sold in the

3      Chinese market.

4              MS. YANG:  Yes, yes, of course for

5      Chinese market.

6              MR. SLATER:  Can I jump to number 12?

7              MS. YANG:  Okay.

8              MR. SLATER:  Twelve is meeting

9      minutes with the National Medical Products

10     Administration and Zhejiang Medical Products

11     Administration concerning feedback of an

12     inspection on ZHP site.

13              With regard to the inspection -- and

14     it says it's February 8, 2019 -- what's the

15     general subject matter of the inspection?

16              MS. YANG:  It's a Chinese inspection.

17     Inspection on process manufacturing and

18     Nanataco testing.

19              MR. SLATER:  I assume this relates to

20     they're inspecting to make sure the drugs are

21     going to be manufactured in quality --

22              MS. YANG:  Yes.

23              MR. SLATER:  -- in a quality way?

24              Okay.

25              MR. GOLDBERG:  Can I ask some

Page 52

1          questions about 12?

2                  Does 12 have any reference to

3          valsartan?

4                  MS. YANG:  No.

5                  MR. GOLDBERG:  Does it have any

6          reference to the FDA or FDA inspections?

7                  MS. YANG:  No.

8                  MR. GOLDBERG:  Does it discuss

9          nitrosamines?

10                 MS. YANG:  No.

11                 MR. GOLDBERG:  Okay.

12                 MR. SLATER:  Does it name any drugs?

13                 MS. YANG:  This inspection is for

14         certain batches of Chinese drugs, but I'm not

15         sure what kind of sartans it is.

16                 MR. SLATER:  It's sartans, but you

17         don't know which?

18                 MS. YANG:  I think it's sartan.

19                 MR. SLATER:  Going now to number 13,

20         which is a July 17, 2017 document, meeting

21         minutes with the National Medical Products

22         Administration concerning irebesartan API

23         process and nitrosamine impurities.

24                 Can you give me anymore specificity

25         on what they're specifically talking about?

Page 53

1          For example, are they trying to prevent them?
2          Are they trying to figure out why they
3          occurred?
4                    MS. YANG:  It's about the -- they
5          talk about the difference of process
6          manufacturing in China and foreign countries.
7                    MR. SLATER:  Comparing how they
8          manufacture in China versus other countries?
9                    MS. YANG:  Right.  The manufacturing
10         method, manufacturing process for
11         irebesartan.
12                   MR. SLATER:  Okay.
13                   And the focus being on how
14         nitrosamine impurities can occur, based on
15         the description, right?
16                   MS. YANG:  No, it's not about how the
17         impurities occur.  It's just basically
18         discussing the difference between the Chinese
19         standards and foreign standards.
20                   MR. SLATER:  The description says
21         concerning irebesartan API process and
22         nitrosamine impurities, so I assume it talks
23         about how nitrosamine impurities can result
24         from the process, right?
25                   MS. YANG:  No.  It talks about the

Page 54

1          method to assess the impurity.

2                    MR. SLATER:  I got you.

3                    Methods to determine to test for

4          them?

5                    MS. YANG:  Right.

6                    MR. SLATER:  Got it.

7                    Let's look at 15.

8                    MR. GOLDBERG:  Can I ask a few

9          questions about this?

10                   MS. YANG:  Yes.

11                   MR. GOLDBERG:  You said this refers

12         to the difference between the Chinese

13         standards and the standards of foreign

14         countries.

15                   Does it talk specifically about the

16         US standards?

17                   MS. YANG:  It mentions one time here

18         it mention the FDA method to test the

19         impurities.

20                   MR. GOLDBERG:  Okay.

21                   MS. YANG:  So that's for the purpose

22         of comparison.

23                   MR. GOLDBERG:  I see.

24                   Is it applying -- is it looking at

25         the standards to be applied for irebesartan

Page 55

```
 1        to be sold in the Chinese market?
 2              MS. YANG:  Yes, for the Chinese
 3        market and the purpose of comparison is, you
 4        know, to -- after this comparison, Weihai
 5        said they will -- they would do assessment
 6        according to official method.  So I think
 7        they would do so according to FDA method.
 8              MR. GOLDBERG:  Is this the Chinese --
 9        this is satisfying the requirements of the
10        Chinese government?
11              MS. YANG:  Yes.
12              MR. GOLDBERG:  Does this provide any
13        information about the root cause of the
14        nitrosamine impurities --
15              MS. YANG:  No.
16              MR. GOLDBERG:  -- in irebesartan?
17              MS. YANG:  No.
18              MR. GOLDBERG:  Does it set any
19        standards for -- is it setting standards for
20        the Chinese market?
21              MS. YANG:  Yes.
22              MR. GOLDBERG:  Does it reference
23        valsartan or is it only irebesartan?
24              MS. YANG:  Only irebesartan.
25              MR. GOLDBERG:  Okay.  Thank you.
```

Page 56

```
 1              MR. SLATER:  Going to 15, it's a note
 2       regarding a meeting with the Taizhou Medical
 3       Products Administration concerning the
 4       valsartan event.
 5              When you say in the description "the
 6       valsartan event," what does that mean?
 7              MS. YANG:  This is very simple
 8       document, only nine bullet points, so it does
 9       not contain enough information about, you
10       know, what kind of event this is talking
11       about --
12              MR. SLATER:  What does it talk about?
13              MS. YANG:  It doesn't mention
14       valsartan at all, but according to the
15       language and the context, we believe it is
16       about the valsartan event.  The government
17       was asking questions.
18              MR. SLATER:  What is the valsartan
19       event?
20              MS. YANG:  I don't know.
21              MR. SLATER:  What is the subject
22       matter of what the document is talking about?
23              MS. YANG:  The subject matter is the
24       government's opinion and they have nine
25       questions.
```

Page 57

1              MR. SLATER:  The government has nine

2       question and then they were answered from

3       somebody by ZHP?

4              MS. YANG:  Yes.  It was supposed to

5       be answered by ZHP, but this document only

6       contained --

7              MR. SLATER:  It's just the questions?

8              MS. YANG:  Yes, just the questions.

9              MR. SLATER:  Great.

10             We could move to 16.

11             MR. GOLDBERG:  Well, Adam, does that

12       mean you're not challenging number 15?

13             MR. SLATER:  I'm not challenging that

14       document.

15             MR. GOLDBERG:  Okay.

16             MR. SLATER:  I'm not only not

17       challenging, I'm also trying to dutifully get

18       us done by 10:00 a.m. hopefully.

19             MS. YANG:  That's great.

20             MR. GOLDBERG:  If you want -- if

21       you're going through documents and you're

22       going to -- if you come to a conclusion about

23       a document and you say you're not challenging

24       it, then I won't ask any questions about it,

25       if you want to expedite it that way.

Page 58

 1              MR. SLATER:  That's a good idea.

 2              Number 16, it says it's meeting

 3     minutes concerning irebesartan, the CDE.

 4              Can you just tell me in general what

 5     the -- is this another set of questions and

 6     answers?

 7              MS. YANG:  It is a discussion between

 8     the government and ZHP.  It discuss the

 9     difference between a foreign market and

10     Chinese market in terms of process,

11     manufacturing process method.

12              MR. SLATER:  Does it discuss that in

13     the context of the quality or purity of the

14     drugs that are yielded from those processes?

15              MS. YANG:  I think that's just the

16     general discussion, general comparison.

17              MR. SLATER:  I'm not challenging that

18     document.

19              That was a good idea, Seth.  Just

20     don't let that get in the transcript that I

21     said that.

22              MR. GOLDBERG:  Okay.

23              MR. SLATER:  Number 19, it's May 10,

24     2019, it says "Note of key issues for the

25     meeting concerning irebesartan with the CDE."

Page 59

1              So is this an internal document

2      addressing points that are going to come up

3      in the meeting?

4              MS. YANG:  This is basically four

5      questions from the government.  There's no

6      answers.  Just questions from the government.

7              MR. SLATER:  Okay.  I'm not

8      challenging that.

9              MR. GOLDBERG:  Can we take a quick

10     bio break?

11             MR. SLATER:  Sure.

12             MR. GOLDBERG:  Thank you.

13             (Time noted: 9:26 a.m.)

14             (Recess taken)

15             (Time noted: 9:30 a.m.)

16             MR. SLATER:  Number 20 is a July 14,

17     2018, a letter concerning assessment of the

18     control of NDMA impurities in the production

19     process from the CDE and you say the CDE

20     required to keep confidential?

21             MS. YANG:  Yes.

22             MR. SLATER:  With regard to the

23     assessment, is this an assessment by the

24     government or an assessment by ZHP provided

25     to the state government?

Page 60

1           MS. YANG:  Assessment by the company,

2      by ZHP to be provided to the government for

3      the valsartan API in the Chinese market.

4           MR. SLATER:  This is July --

5           MS. YANG:  This letter is very

6      simple, just requirements from the government

7      asking ZHP to do this assessment.

8           MR. SLATER:  You said it's a letter

9      from the company to the government?

10          MS. YANG:  It's from CDE to the

11     company.

12          MR. SLATER:  Oh.  Asking the company

13     to do an assessment?

14          MS. YANG:  Right.

15          MR. SLATER:  Does it give any

16     substantive information about what the

17     government wanted the company to assess

18     specifically?

19          MS. YANG:  To assess the

20     manufacturing process on the cause of the

21     impurity.  That's the general requirement of

22     this assessment.

23          MR. SLATER:  So it's asking the

24     government -- it's asking the company to do

25     this assessment.  It doesn't provide the

Page 61

1          company's information back?

2                MS. YANG:  No.

3                MR. SLATER:  If it's just a request

4          for information from the government with no

5          information provided by ZHP, then I'm not

6          going to challenge it.

7                Do I understand the document?

8                MS. YANG:  Yes, you're right about

9          the document.

10                MR. SLATER:  Great.

11                We'll go to 21 which is a July 14,

12          2018 document.

13                It says it's a report on the

14          detection of NDMA impurities in the valsartan

15          API prepared to send to the National Medical

16          Products Administration.

17                Is this the response to document

18          20 basically, the draft response?

19                MS. YANG:  No.  It's unrelated.

20                MR. SLATER:  But it's the same day?

21          It just happens to be the same day?

22                MS. YANG:  Okay.

23                MR. SLATER:  So it's what?  It's a

24          report on the detection.  What does this

25          mean, just telling the government it happened

Page 62

1        or explaining why?

2              MS. YANG:  Yes, just telling the

3        government what happened and what measures

4        the company has already taken.

5              MR. SLATER:  So it's factual

6        information the company is preparing to

7        provide to the government?

8              MS. YANG:  Yes.

9              MR. SLATER:  How would that draft of

10       information to be provided to the government

11       regarding what occurred with the NDMA

12       impurities, how would giving that to us

13       somehow jeopardize the national interests of

14       China?

15             MS. YANG:  Well, in addition to the

16       factual description of the detection of

17       impurities, the company also is asking the

18       government to provide some guidance on

19       registration and approval of new process in

20       China.

21             MR. SLATER:  Okay.

22             This one is one, based on what I

23       heard, is one that I'm going to challenge.

24             MR. GOLDBERG:  Can I ask a few

25       questions?

Page 63

1          Does this document have anything to

2     do with the US market for valsartan?

3          MS. YANG:  No.

4          MR. GOLDBERG:  Does it discuss the US

5     market for valsartan?

6          MS. YANG:  No.

7          MR. GOLDBERG:  Does it discuss the

8     FDA, the US FDA?

9          MS. YANG:  No.

10         MR. GOLDBERG:  Does it mention that

11    US FDA's investigation into valsartan?

12         MS. YANG:  It talks about, you know,

13    the company has reported this thing to the US

14    FDA, if that counts.

15         MR. GOLDBERG:  Does this document

16    provide to the Chinese government the root

17    cause of the impurities in valsartan?

18         MS. YANG:  No.

19         MR. GOLDBERG:  Does it talk about the

20    recall of valsartan in the US?

21         MS. YANG:  No.

22         MR. GOLDBERG:  Is this about

23    satisfying Chinese regulations for the

24    Chinese market?

25         MS. YANG:  Yes.

Page 64

1          MR. GOLDBERG:  Is this the Chinese

2    government acting in the role of a regulatory

3    agency for the Chinese market?

4          MS. YANG:  Yes.  This document is in

5    response to the Chinese government's

6    requirements when they are performing their

7    functions.

8          MR. GOLDBERG:  I don't have anymore

9    questions.

10          MR. SLATER:  Great.

11          Let's go to document 28.  It's

12    July 16, 2018, daily inspection report on

13    drug production of Shen Dong Yijian made by

14    Jing Li Administration for Market Regulation.

15          Can you give me an idea what that

16    means?

17          MS. YANG:  It's a report by a local

18    central government agency of ZHP's valsartan

19    API in the inventory of another company, San

20    Dong Company.  So it's really about a recall

21    of another PRC company.

22          MR. SLATER:  It's a recall of

23    valsartan API that was manufactured by ZHP?

24          MS. YANG:  The central company used

25    for ZHP's valsartan API to produce their own

Page 65

1          drugs, it's the recall of the central

2          company's own drugs.

3                    MR. SLATER:  ZHP sold its API to

4          another company in China and that company was

5          using the API to manufacture and sell drugs

6          in China?

7                    MS. YANG:  Right.

8                    MR. SLATER:  This is the API that was

9          contaminated with the NDMA?

10                   MS. YANG:  It didn't say so.

11                   MR. SLATER:  What is it saying?

12         What's the issue?  If it's a recall, what's

13         the reason?

14                   MS. YANG:  It doesn't say the reason

15         of the recall.  It just says how many

16         batches, the facts of what was affected.

17                   MR. SLATER:  Just a quantity?

18                   MS. YANG:  Yes.

19                   MR. SLATER:  Okay.  I'm not

20         challenging that.

21                   Twenty-nine.

22                   It says July 31, 2018 email with the

23         Direct General of China's Food and Drug

24         Administration of Zhejiang province regarding

25         the announcement of NDMA in valsartan.

Page 66

```
 1              So what does that mean?  They emailed
 2      this government -- so they emailed the
 3      Chinese FDA to tell them about the -- let me
 4      ask you this.  I don't want to presuppose.
 5              What is it that's being communicated
 6      here?
 7              MS. YANG:  Zhejiang government asked
 8      eight to ten questions, asking ZHP to answer
 9      them.
10              MR. SLATER:  Is this just the
11      questions or does it contain the answers?
12              MS. YANG:  In this email, there's no
13      questions and answers.  There are just
14      government comments about the answers
15      provided by ZHP, whether it's sufficient or
16      not, etc.
17              MR. SLATER:  So does it contain the
18      answers ZHP provided and then give the
19      comments?
20              MS. YANG:  It doesn't contain the
21      answers.  Neither the questions nor answers.
22      Just the comments on the answers provided,
23      general comments on the answers.
24              MR. SLATER:  For example, are some of
25      these comments to the effect of that answer
```

Page 67

1      is not sufficient, anything like that?

2              MS. XUEYU:  No, it's not -- it's not

3      clear, you know.  According to ZHP's answers,

4      the government's view is for some questions,

5      ZHP's answers are not clear enough.

6              MR. SLATER:  But we don't know what

7      those answers were because we don't have the

8      answer?

9              MS. YANG:  No.  I don't have the

10     answers.

11             MR. SLATER:  Do you know if it's

12     referring to information that was provided

13     per another document, for example, like 21 or

14     something?  Do we have other documents where

15     information was going to be provided to the

16     government?  Do we know whether that's one of

17     the other documents listed here?  Presumably,

18     it would be, right?

19             MS. YANG:  I think it's document 30.

20     There are two attachments to document 30 and

21     one of the attachments seems related to 29.

22             MR. SLATER:  So you're saying 29 has

23     the email with the questions about the

24     answers and you're saying 30 is the document

25     that's submitted where we could see what the

Page 68

1          information was that's submitted that's being

2          responded to in 29?

3                    MS. YANG:  29 didn't have any

4          attachments, but according to the email

5          chain, I suppose one of the attachments to 30

6          is the document mentioned in 29.

7                    MR. SLATER:  Bear with me.  I'm just

8          making some notes.  Sorry.

9                    So on document 30, just because they

10         need to be read together, the attachment

11         you're referring to is what?  What date is

12         that document?  Is it July 29th?

13                   MS. YANG:  There's no date on the

14         attachment.

15                   MR. SLATER:  The date of the document

16         says July 29, 2018.

17                   Is that the date of the email or the

18         communication and then --

19                   MS. YANG:  Yes.

20                   MR. SLATER:  -- then there's

21         attachments that have the information?

22                   MS. YANG:  Yes.

23                   MR. SLATER:  What is the attachment

24         that you're referring to?  How is it titled?

25         What does it say on it?

Page 69

 1              MS. YANG:  The title of the

 2      attachment is "Explanation of valsartan

 3      impurities."  That's it.

 4              So this document contains several

 5      questions from the government and answers

 6      from ZHP.

 7              MR. SLATER:  So the government is

 8      basically asking questions about how this

 9      occurred and ZHP is providing information

10      about that?

11              MS. YANG:  The government basically

12      was asking about the reason of the recall and

13      whether the company had timely informed the

14      PRC government, how many companies were

15      affected by the recall, how to -- the reason

16      why there's NDMA.  Yeah.

17              MR. SLATER:  All right.  Let's go

18      to --

19              MR. GOLDBERG:  Can I -- are you

20      potentially challenging these, so I should

21      ask some questions?

22              MR. SLATER:  I'm definitely

23      challenging 29 and 30 and I can say to let

24      you know, Seth, we were told 30 was an exact

25      duplicate of 29, so I wasn't even going to

Page 70

1      ask about 30, so I'm glad we're having this

2      discussion because based on the information

3      we were provided the last couple days, I've

4      crossed off my list all the ones that we were

5      told in the right-hand column were duplicate

6      columns.  I'm not touching on those because

7      we were told they're duplicates and there's a

8      key that tells us what they're duplicates to,

9      so they're obviously not exact duplicates

10     because 30 contains attachments 29 didn't

11     have which are substantive, so I'm not going

12     to go through every single document on this

13     list today because we don't have the time,

14     but I'm concerned about that.

15             I think your team is going to go back

16     and make sure there's all these "duplicate"

17     are actually duplicates.

18             MR. GEDDIS:  This is Chris.

19             Also, I just want to flag something.

20     Thirty-two and 33 also have attachments, but

21     we probably want to know if those are the

22     same attachments that are in 30.

23             MR. GOLDBERG:  Well, let me ask some

24     questions about 29.

25             When you say there's duplicates, I'm

Page 71

1    looking at 30 and I'm looking at the log.  It

2    says document 30 is a duplicate of -- there

3    are duplicates of document 30.  What's the

4    confusion?  It doesn't say 30 is a duplicate

5    of 29.

6              MR. SLATER:  That's what it says.

7              MR. GOLDBERG:  No, it doesn't.

8              MR. SLATER:  What are you talking

9    about?

10             MR. GOLDBERG:  Unless I'm looking at

11   the wrong line.  Just hang on a second.

12             MR. SLATER:  You're look at the wrong

13   line.

14             Document 30 in the Duplicate

15   Documents column, it says 29.  It says the

16   same thing for 31 and it says the same thing

17   for 32.  It says the same thing for -- Chris,

18   you misspoke.  You meant 31 and 32, not 32

19   and 33.

20             MR. GEDDIS:  Thirty-two has one --

21             MR. SLATER:  Let's be careful how we

22   say things.  We're on the record.

23             So it's 32.  It's not 33 that Chris

24   was referring to.  It says 29 and 30 are the

25   same document.  It says that 29 and 31 are

Page 72

1          the same document.  It says 29 and 32 are the

2          same document.

3                    MR. GOLDBERG:  Let me ask a question.

4                    Is this an email string?  Are

5          these -- is this an email string?

6                    MS. YANG:  Yes, it's an email string

7          and the document 30 and 32 are the same.  So

8          they contain same attachments.  Twenty-nine

9          and 31, those two emails do not have

10         attachments.  That's the only difference.

11         But they all come from the same email string.

12                    MR. GOLDBERG:  I see.

13                    Is it the case that 29 -- let me look

14         at it this way.

15                    The same email appears at document 29

16         and 31 and the same attachments appear at

17         documents 30 and 32?

18                    MS. YANG:  Correct.

19                    MR. SLATER:  But all four of them

20         have the same cover emails.  It's the same

21         email string, just that 30 and 32 actually

22         have the attachments and 29and 31 don't have

23         the attachments?

24                    MS. YANG:  Right.

25                    MR. GOLDBERG:  So they're all -- so

Page 73

1    we may have -- Adam, we may have expressed

2    this in an awkward way, I guess, but they are

3    all duplicates.

4            MR. SLATER:  If they don't have the

5    same content, meaning there's attachment to

6    some and not to others, I wouldn't interpret

7    those to be duplicates.

8            MR. GOLDBERG:  I think what document

9    29 and 31 are is the same email and document

10   32 -- 30 and 32 are the attachments to that

11   email.

12           MR. SLATER:  That's not what she's

13   saying, Seth.  She's saying all four of those

14   documents are the same email, but 30 and 32

15   actually have the attachments, 29 and 31

16   don't have the attachments.

17           The point being the way the log was

18   set up, when we were told that 30, 31 and 32

19   were duplicates of 29, we thought they were

20   exactly the same with the same contents, so I

21   was skipping with 30, 31, 32.  That's what

22   I've been doing throughout and that's how I

23   set up all my notes for all the documents.

24           All I'm saying is this:  Someone is

25   going to have to go back and look at it after

Page 74

 1          we're done.  I'm not going to walk through

 2          all the duplicates, is this an exact

 3          duplicate, can you look for attachments --

 4                  MR. GOLDBERG:  We'll confirm that.

 5          We'll confirm.  I think that the point is

 6          that the documents are the same.  We may have

 7          not -- we may have not explained it the right

 8          way in terms of putting it on the log as a

 9          duplicate, but they are duplicates, but we

10          probably can explain it better.  We'll

11          confirm that.  If there's any document that

12          we determine isn't a duplicate, then we can

13          discuss that.

14                  MR. SLATER:  You understand what I'm

15          saying, which is the two documents may be the

16          same, but if one has two substantive

17          attachments and the other has no attachments,

18          I look at it being not a duplicate because it

19          doesn't have all the same information.

20                  Do you understand?

21                  MR. GOLDBERG:  I understand.  We

22          could discuss it.  So long as we're covering

23          the attachments, yes, I understand.  I

24          just -- what I don't want to do is -- I want

25          to make sure we're talking about all of the

Page 75

1    documents today.  We can clear up --

2              MR. SLATER:  Look, I don't think that

3    anyone is prepared right now.  I'm not

4    prepared to go through all the duplicates to

5    confirm whether they're duplicates.

6              You want to go back and check that

7    yourself because if this the only example of

8    this happening, there's no reason for us to

9    spend an extra hour and a half figuring that

10   out.

11             MR. GEDDIS:  This is the first time

12   there's been attachments --

13             MR. GOLDBERG:  We'll confirm and if

14   there's something we're missing, we'll let

15   you know and we'll straighten it out in terms

16   of how the duplicates appear.

17             MR. SLATER:  That's fine.  I'm hoping

18   it's the only time.  It could be an

19   oversight.  It's not a big deal.

20             MR. GOLDBERG:  Let me just ask a

21   couple of substantive questions before you

22   move on.

23             The document that's at 29, is that a

24   document that concerns the Chinese market or

25   the US market?

Page 76

1              MS. YANG:  Mainly concerns the

2       Chinese market.

3              MR. GOLDBERG:  Does it discuss the

4       valsartan recall in the US market?

5              MS. YANG:  So Seth, you are referring

6       to document 29 itself, right?

7              MR. GOLDBERG:  Yes.

8              MS. YANG:  You're not talking about

9       the attachment?

10              MR. GOLDBERG:  I'm talking about

11       document 29.

12              MS. YANG:  Okay.  I'm sorry.

13              What is your question?

14              MR. GOLDBERG:  Is 29 -- does document

15       29 refer to the US market for valsartan?

16              MS. YANG:  No.

17              MR. GOLDBERG:  Does it concern the

18       Chinese market for valsartan?

19              MS. YANG:  Yes.

20              MR. GOLDBERG:  Is it talking about

21       the recall of valsartan for the Chinese

22       domestic market?

23              MS. YANG:  Yes.  Yes.

24              MR. GOLDBERG:  Is it reflecting the

25       viewpoints of the Chinese government?

Page 77

```
 1              MS. YANG:  Yes.

 2              MR. GOLDBERG:  Okay.

 3              Then in 30, you said this is an

 4       explanation of -- that the attachment that

 5       you referred to as an explanation of sartan

 6       impurities, is this talking about sartan

 7       impurities as they relate to the Chinese

 8       market?

 9              MS. YANG:  Mostly related to Chinese

10       market.  The government was asking why the

11       Chinese recalls were later than the US

12       recall.  So that's the only reason, only

13       place this document referred to the US

14       recall.

15              MR. GOLDBERG:  I see.

16              Does it talk about the US -- the

17       FDA's investigation into valsartan,

18       impurities in valsartan with specific detail?

19              MS. YANG:  No.

20              MR. GOLDBERG:  Does it talk about

21       the -- is this the Chinese regulator asking

22       questions about how ZHP will comply with the

23       Chinese regulations in the Chinese domestic

24       market?

25              MS. YANG:  Yes.
```

Page 78

1              MR. SLATER:  Seth?

2              MR. GOLDBERG:  Yes?

3              MR. SLATER:  I understand what you're

4       doing, but to try to, like, address this a

5       little bit, we already have an order that

6       says that foreign regulatory information

7       should be produced to the extent it has to do

8       with communications about what occurred with

9       the valsartan contamination.

10             I'm hyper simplifying it, but I don't

11      think there's any dispute on that.  So I'm

12      not sure -- there's all these questions about

13      whether there's specific discussion about is

14      this China or is it US.  If it's dealing with

15      the NDMA genotoxic impurities issue for the

16      API they manufactured in China, we're

17      entitled to those documents in terms of their

18      relevance.

19             It's already been ruled on.

20             MR. GOLDBERG:  We can debate that in

21      terms of the Chinese state secret rules with

22      Judge Vanaskie.

23             I'm just going to ask the questions.

24             The attachment that we've been

25      discussing, does that reflect the viewpoints

Page 79

1          of the Chinese government?

2                    MS. YANG:  Yes.

3                    MR. GOLDBERG:  It reflects the

4          viewpoints of the Chinese government as it

5          relates to the Chinese market for valsartan?

6                    MS. YANG:  Yes.

7                    MR. GOLDBERG:  All right.

8                    We can go on.

9                    MR. SLATER:  Ms. Yang, just to be

10         clear for this, I just want to be sure

11         because you signed the declaration.  You're

12         an attorney in China retained by ZHP, right?

13                    MS. YANG:  Yes, I would say so.  Yes.

14                    MR. SLATER:  Okay.

15                    MS. YANG:  Our firm was engaged by

16         ZHP, yes.

17                    MR. SLATER:  I was just putting that

18         in there in case somebody would pick up the

19         transcript and not know the context and think

20         we were questioning an expert witness or a

21         fact witness.

22                    MS. YANG:  We are one of the firms

23         doing the FTI document review.

24                    MR. SLATER:  Got it.  Okay.

25                    MR. GOLDBERG:  Can we hang on for one

Page 80

```
1       second before we go to the next document,

2       please?  I just need to go off camera for one

3       second.

4               MR. SLATER:  All right.  Sorry.  I

5       was doing a bootleg private Zoom with Chris.

6               Are we up to 33?

7               So 33, it says ZHP's response to

8       questions raised by the Medical Products

9       Administration.

10              MS. YANG:  Yes.

11              MR. SLATER:  It's July 29, 2018.

12              Is this different than the other

13      responses we were talking about on the couple

14      prior emails?  Is this something different?

15              MS. YANG:  Different set of

16      questions.

17              MR. GOLDBERG:  What do they relate

18      to?

19              MS. YANG:  Relating to occurrence of

20      impurities.

21              MR. SLATER:  The NDMA?

22              MS. YANG:  Mm-hmm.

23              MR. SLATER:  This is July of 2018.

24              It's got to be talking about the

25      NDMA, right?
```

Page 81

```
 1              MS. YANG:  Yes.
 2              MR. SLATER:  It's ZHP providing
 3    factual information?
 4              MS. YANG:  Right.  Timeline of the --
 5    I think it's the US valsartan event, just a
 6    timeline.
 7              MR. SLATER:  It's titled "The
 8    timeline for the US valsartan event."
 9              MS. YANG:  Mm-hmm.  Yes.
10              MR. SLATER:  Okay.  I'm going to go
11    to 34 now.
12              MR. GOLDBERG:  Just let me see if I
13    have any questions about 33.
14              So this sets forth a timeline of the
15    NDMA impurities in valsartan?
16              MS. YANG:  The timeline of the -- how
17    they discovered the impurities in valsartan
18    in the US and Europe.
19              MR. GOLDBERG:  Does this refer to the
20    cause of NDMA in valsartan?
21              MS. YANG:  Well, it refers to how the
22    impurities occurred.  Nothing about the cause
23    of the impurity according to the questions
24    and answers.
25              MR. GOLDBERG:  Okay.
```

Page 82

1              This is a Q & A between ZHP and the

2      Chinese government?

3              MS. YANG:  Yes.

4              MR. GOLDBERG:  Is ZHP explaining the

5      manufacturing process for valsartan in its

6      answers.

7              MS. YANG:  ZHP was explaining the

8      reason for change of manufacturing process.

9              MR. GOLDBERG:  I see.

10             MS. YANG:  It says -- also, for the

11     record, I want to go back to the previous

12     question.

13             It asked for the cause of NDMA in

14     valsartan and actually this document, you

15     know, records ZHP's view of -- about the

16     potential cause of the NDMA.

17             MR. GOLDBERG:  Is this explaining

18     information that ZHP provided to the FDA?

19             MS. YANG:  No.

20             MR. GOLDBERG:  Is it referring to the

21     FDA investigation when it's talking about the

22     timeline?

23             MS. YANG:  Yes.

24             MR. GOLDBERG:  Okay.

25             MS. YANG:  But when they answer the

Page 83

1        questions, they did not mention FDA.  They

2        just provided their answer, their answer at

3        this time.  Their analysis of the potential

4        reason of the NDMA.

5                    MR. GOLDBERG:  Okay.

6                    When it provides their analysis of

7        the potential reason for NDMA, are they

8        referring to -- are they referring to a -- do

9        they refer to a residual solvent or a

10       solvent?

11                   MS. YANG:  No.

12                   MR. GOLDBERG:  Is this reflecting

13       that ZHP is somehow doing an investigation

14       for the Chinese government that's different

15       than the investigation for the FDA?

16                   MS. YANG:  No.

17                   MR. GOLDBERG:  Does it talk about the

18       measures -- does it talk about what ZHP has

19       done in response to the FDA investigation?

20                   MS. YANG:  Yes.  Timeline of the

21       events listing the measures ZHP has taken.

22                   MR. GOLDBERG:  The measures ZHP has

23       taken in connection with the FDA

24       investigation?

25                   MS. YANG:  Including the FDA

Page 84

1          investigation and also Chinese market also.

2                    MR. GOLDBERG:  I see.

3                    MR. SLATER:  And also other markets

4          as well?

5                    MS. YANG:  In terms of the measures

6          ZHP has taken, yes, also Europe.

7                    MR. GOLDBERG:  Does this document

8          reflect the viewpoints of the Chinese

9          government?

10                   MS. YANG:  Yes.

11                   MR. SLATER:  When you say it reflects

12         the viewpoints, are you saying it has

13         questions on it that were asked?

14                   MS. YANG:  There's questions and

15         requirements from the Chinese government.

16                   MR. SLATER:  Okay.

17                   MR. GOLDBERG:  Does this discuss at

18         all the US sales of valsartan?

19                   MS. YANG:  No.

20                   MR. GOLDBERG:  I don't have any other

21         questions.

22                   MR. SLATER:  I have one question I

23         meant to ask earlier.

24                   There's no request to keep this

25         confidential, right?

     Case 1:19-md-02875-RMB-SAK     Document 1231-2     Filed 05/10/21     Page 120 of 296
PageID: 27859

Page 85

```
 1              MS. YANG:  On the document itself, it
 2        does not say so.  But again this -- it was
 3        part of the communication between the company
 4        and the government and it's not public.
 5              MR. SLATER:  Why in your
 6        interpretation is the disclosure of this
 7        document going to somehow jeopardize national
 8        security for China and national interests of
 9        China?
10              MS. YANG:  Because it concerns a very
11        important public health event in China and
12        the discussion is meant to be kept
13        confidential between the company and the
14        government, although it did not say so on the
15        face of the document that it was required.
16        Otherwise, you know, everybody can have
17        access to this document.  That would be a
18        disaster.  This is part of the process
19        because the PRC government is finding the
20        cause of the problem, so that was not
21        supposed to be public.
22              Also, this kind of document is
23        received by the government.  It becomes part
24        of government information.  Everyone wants
25        to -- for ZHP, if they want to disclose this
```

Veritext Legal Solutions

800-227-8440                                                    973-410-4040

Page 86

1      document, they need to seek consent from the

2      government because it may contain important

3      public health information and relating to

4      national economy and social development.

5              MR. SLATER:  So basically the Chinese

6      national interests and national security will

7      be jeopardized if this document explaining

8      what happened with the valsartan NDMA

9      contamination around the world would be

10     disclosed?

11             MS. YANG:  It would be prejudice on

12     the national economy and social development

13     because multi -- the process, how Chinese

14     government is dealing with their function as

15     a regulatory agency, regulating the Chinese

16     market.  It's part of the process of finding

17     the cause.

18             MR. SLATER:  Presumably, all the

19     information ZHP provided to the Chinese

20     authority they should have provided the same

21     information to the FDA, right?

22             MS. YANG:  Yes, I would agree.

23             MR. SLATER:  So there shouldn't be

24     any difference between what's in this

25     document and what we've already been told, so

Page 87

```
 1          there's no risk of giving us this information
 2          because we already have it presumably if
 3          they're telling everyone the same story,
 4          right?
 5                  MS. YANG:  The timeline is the same,
 6          I think.  It should be the same.  The part
 7          reflecting the government viewpoints is in
 8          the Q & A section, it's not in addition to
 9          timeline events.  That's the part that may
10          concern -- that may contain these state
11          secrets.
12                  MR. SLATER:  You think that the
13          questions that the regulators in China are
14          asking about a public health crisis that's
15          occurring in the US and around the world
16          because of contamination somehow jeopardizes
17          Chinese --
18                  MS. YANG:  This is document is not
19          only about Chinese market.  The government is
20          asking the status of the recall for of all
21          foreign companies.  For example, in the US,
22          in Europe, every country is affected by this
23          impurity event.  So I agree, so for the
24          timelines, they should be the same.  The same
25          information provided to Chinese government,
```

Page 88

1      US government and every government around the

2      world.  But I'm saying that the Q & A

3      section, which reflects the government

4      viewpoints of, you know, regulating the

5      Chinese market, that would be part of the

6      information that may contain state secrets.

7              MR. SLATER:  You're telling us it

8      would be a disaster if we were to see the

9      questions the Chinese market asked about how

10     this occurred?

11             MS. YANG:  Because it's not public

12     information.  It's not public -- not for

13     public to have access to this kind of

14     information.

15             MR. SLATER:  Why not?

16             MS. YANG:  It's part of an

17     investigation.

18             MR. SLATER:  So what?

19             MR. GOLDBERG:  All right.

20             MR. SLATER:  Look, I --

21             MR. GOLDBERG:  It's not a deposition.

22             MR. SLATER:  What I'm trying to get

23     at is -- I'm trying to work through this.

24     This is a meet and confer.  My view,

25     Ms. Yang, is that I think you guys very

Page 89

1     overly designated documents that really

2     aren't going to jeopardize Chinese interests

3     and that's what I'm trying to get at.

4              MR. GOLDBERG:  That's really an

5     argument for Judge --

6              MR. SLATER:  No, this is us

7     negotiating to try to get some documents

8     released by agreement rather than trying to

9     Judge Vanaskie rule on them.  That's part of

10    this conversation, to try to reach agreement.

11             MR. GOLDBERG:  Again, it's not a

12    deposition.  If you want to move to compel

13    the document, if the Chinese counsel has --

14             MR. SLATER:  Seth, I'm trying to talk

15    through with you guys can you agree to

16    produce the documents 29, 30 -- I mean, these

17    documents are clearly in the wheelhouse of

18    this case, 29, 30, 33.

19             MR. GOLDBERG:  We can discuss it, but

20    again, Adam, it's not really a question

21    about -- it's not simply a question about

22    the -- the state secret issues and the

23    analysis for whether and when a document

24    should be provided and if the -- we certainly

25    can discuss it, but at this point, it sounds

Page 90

1      like Chinese counsel has -- views this as

2      potentially violating the state secret rules.

3              MR. SLATER:  I understand.  That's

4      what I'm trying to negotiate right now.

5              MR. GOLDBERG:  I said we'll discuss

6      it, but at this point, you have established

7      your record for the document.  We've

8      established a record for the document.

9              MR. SLATER:  I'm asking you guys to

10     think about it.  There's clearly a bunch of

11     documents on here that are factual documents

12     that are directly relevant.  I don't think

13     there's any reasonable argument China is

14     going to somehow be in jeopardy if we get the

15     documents.

16              Let me finish.

17              Maybe we could reach an agreement if

18     you'll release the documents that sound to be

19     most significant, maybe we'll agree to waive

20     our other challenges.

21              MR. GOLDBERG:  I think the thing

22     is -- I don't think the standard is a

23     disaster for the Chinese government.  The

24     standard is what the standard is.  That's in

25     the rules and laws.  The Chinese company has

Page 91

1      material concerns about violating Chinese law

2      and information that is, as you have put it,

3      if it's the same information, if it's

4      information, then whether -- it still may be

5      a violation of the Chinese law to provide it.

6      Even though it may be the same information,

7      the questions that are being set forth by the

8      Chinese government and the Chinese

9      government's role as a regulator of the

10     Chinese laws, that's something that the

11     Chinese counsel is viewing as being subject

12     to the state secret rules.

13           We can discuss it, but I don't think

14     the standard is a disaster to the Chinese --

15           MR. SLATER:  I was reflecting what

16     Ms. Yang said, that was her quote.  I was

17     using her language --

18           MS. YANG:  Let me clarify.

19           The definition of state secrecy is

20     well defined on Article 2 and Article 9 of

21     the law, so I should defer to the legal

22     definition of the law.

23           MR. GOLDBERG:  We'll certainly

24     discuss it.  I think if we get done with this

25     call and you think about the record and you

Page 92

```
 1          think about the different documents, if there
 2          are specific documents that you think you
 3          would like us to consider closely or consider
 4          in a different way, we'll do that.  But I
 5          don't think it's -- we are not --
 6                    MR. SLATER:  I got it.  We don't have
 7          to --
 8                    MR. GOLDBERG:  We're not in a
 9          position at this point to say --
10                    MR. SLATER:  I got it.  I'm just
11          trying to create a dialogue because if we
12          identify X number of document and say "If you
13          give us these, we'll waive our challenges to
14          the others," that's what we're going to try
15          to drive forward.
16                    I think it's reasonable to try to
17          make those sorts of compromises, but I guess
18          we'll see.
19                    MR. GOLDBERG:  I don't think this is
20          that -- this isn't really like a horse
21          trading situation.  Each document stands on
22          its own in terms of it's -- whether it
23          violates or not the state secret rules.
24                    MR. SLATER:  Seth, let's be
25          realistic, though.  You guys listed documents
```

Page 93

1      on your original log and then took the
2      position they had to be kept secret, then you
3      reviewed them and said actually, we're going
4      to release a lot of these and then even since
5      our meet and confer the other day, you
6      identified four or five documents that you
7      had taken this strong position on and changed
8      it, so it's not like it's some kind of an
9      objective, immutable standard.
10             MR. GOLDBERG:  But it's not a horse
11     trade.  If a document that you think may be
12     important violates the state secret, we're
13     not going to produce it just because you're
14     offering to not waive --
15             MR. SLATER:  I understand that.  I
16     understand.  By the way, on exhibit --
17     rephrase.
18             On document 33, there's an attachment
19     apparently.
20             Is that the timeline?
21             MS. YANG:  You're talking about
22     attachment to 33, right?
23             MR. SLATER:  Yes.
24             MS. YANG:  Sorry.  I was talking
25     about attachment to 33 all the time.  The

Page 94

1      previous answer I gave was about

2      attachment -- the email itself is very

3      simple.

4              MR. SLATER:  Got it.  Okay.  It's an

5      email with the attachment.  Okay.

6              MS. YANG:  Right.

7              MR. SLATER:  It would be helpful to

8      know that because we don't know, so maybe

9      when you guys go back and recheck the

10     document and see if the duplicates are exact

11     duplicates, it would be helpful for us to

12     know it's there attachments, to be able to

13     discriminate the exact attachments.

14              All right.

15              Thirty-four, May 21, 2019 email from

16     the Center of Drug Evaluations regarding

17     evaluation for irebesartan API.

18              What's the evaluation with regard to?

19              MS. YANG:  So this document -- in

20     this document, there are three comments from

21     the PRC government about the irebesartan, the

22     manufacturing process of irebesartan.

23              MR. SLATER:  Is there any factual

24     information provided in that document by ZHP?

25              MS. YANG:  No, just questions.

Page 95

```
1              MR. SLATER:  Okay.  It's just

2        questions.  I don't think I'm going to

3        challenge just a series of questions.

4              Then we're up to 37.  It's dated

5        January 16, 2020, official letters from ZHP

6        to these government entities that are listed

7        regarding examination and approval of

8        valsartan tablets.

9              What is that regarding?

10             MS. YANG:  This is application from

11       ZHP to the Zhoushan government about the

12       approval of valsartan for the Chinese market.

13       Then Zhoushan government sends the request to

14       the national government.

15             MR. SLATER:  So are these valsartan

16       tablets that have now been manufactured in a

17       way that they think avoids the NDMA?

18             MS. YANG:  Yes.

19             MR. SLATER:  Does it explain what the

20       process is for manufacturing in order to

21       avoid the NDMA?

22             MS. YANG:  No.

23             MR. SLATER:  Okay.

24             I'm going to take a flyer on 37 and

25       say we're not going to challenge it.
```

Page 96

1          Thirty-nine, as we continue to cruise

2      along -- I'm going to make you fall asleep at

3      some point.

4          MS. YANG:  I'm fine.

5          MR. SLATER:  Thirty-nine.  It's a

6      communication -- actually, it's June 30, 2017

7      communications regarding the meeting between

8      ZHP and officials from the CDE on the

9      specification and exception of products dated

10     June 12th, 17.

11         I assume those products include

12     either generally or specifically valsartan,

13     right?  Otherwise it wouldn't have been

14     relevant.

15         MR. GOLDBERG:  Adam, I think --

16         MS. YANG:  Yes.

17         MR. SLATER:  Okay.

18         With regard to the specification and

19     exemption, what we are talking about?  In

20     what context?

21         MS. YANG:  This is in the context of

22     the meeting between Weihai and ZHP.

23         MR. SLATER:  I get it there was a

24     meeting.

25         When you refer to specification and

Page 97

```
1          exemption of products, I'm trying to get a
2          sense of specifications in what context and
3          exempting from what sort of requirements, so
4          I can determine whether it really matters in
5          the context of what we're doing here.
6                  MS. YANG:  It's the specification of
7          the domestic valsartan, the BE data --
8                  MR. SLATER:  What data?
9                  MS. YANG:  BE.
10                 MR. SLATER:  B?
11                 MS. YANG:  Bioequivalence data.
12                 MR. SLATER:  BE data.  Got it.
13                 MS. YANG:  And dissolution test
14         method, I should say.  So this email only
15         contains very general information.  So I
16         can't say more about that.  That's it.
17         That's from the government.
18                 MR. SLATER:  Does it have anything to
19         do with exemption from any sort of quality
20         standards?
21                 MS. YANG:  Not according to -- so
22         it's about the examination -- exemption
23         standard of the domestic drugs which was
24         subject to CDE approval.  So they were
25         basically discussing whether CDE approved
```

Page 98

1      this.

2              MR. SLATER:  ZHP is asking the CDE

3      whether they'll approve these exemptions?

4              MS. YANG:  Based on the meeting

5      between ZHP and the CDE, there was meeting

6      minutes and in this email, ZHP employees,

7      they were discussing whether CDE has approved

8      the exemption standards, so this is a

9      discussion between themselves, citing the

10     comments from the meeting minutes.

11             MR. SLATER:  I see.  It's an

12     internal -- well, actually -- what are these?

13     Communication about a meeting?

14             MS. YANG:  The email is about a

15     meeting.

16             MR. SLATER:  There's a bunch of

17     duplicates that are listed.  Are they all the

18     identical email chain?

19             MS. YANG:  You mean 40 --

20             MR. SLATER:  I mean 41, 42, 43, 52,

21     53 --

22             MS. YANG:  They're from the same

23     email chain.  Let me check if any of these

24     emails has attachments.  Just one second.

25     Forty is attachment to 39.

Page 99

1                MR. SLATER:  Forty is the attachment

2        to 39?

3                MS. YANG:  Right.  Those are the

4        meeting minutes between government and ZHP.

5                MR. GOLDBERG:  This is the same as

6        document three?

7                MR. SLATER:  Right.  I got it.  It's

8        just helping us to understand how they all

9        fit together.  That would be good to know,

10       too, like if a document that's listed is the

11       attachment to another document, it'll help us

12       to know if we want to challenge just if we

13       know if it fits in the same context or not or

14       if it's free standing.

15               Okay.  Let's go to the next page.

16               MR. GOLDBERG:  Are you --

17               MR. SLATER:  I'm not sure what I'm

18       doing with that at this point.

19               MR. GOLDBERG:  Thirty-nine?

20               MR. SLATER:  Yes, I don't know.  I

21       haven't made a decision.

22               MR. GOLDBERG:  Let me just -- this is

23       a document from June of 2017, right?

24               MS. YANG:  Yes.

25               MR. GOLDBERG:  This document has no

Page 100

 1       relation to or doesn't discuss the

 2       nitrosamine impurities in valsartan in 2018?

 3              MS. YANG:  No.

 4              MR. SLATER:  That would be -- if the

 5       answer to that was yes, I would say thank

 6       you, Seth.

 7              MR. GOLDBERG:  Does it --

 8              MR. SLATER:  That would be wonderful.

 9              MR. GOLDBERG:  You said it refers to

10       the bioequivalency data.

11              Just confirming that's for the

12       bioequivalence of valsartan to be sold in the

13       Chinese market?

14              MS. YANG:  Yes.

15              MR. GOLDBERG:  Is it concerning --

16       you said dissolution testing.

17              The dissolution testing of valsartan

18       for the Chinese market?

19              MS. YANG:  Yes.

20              MR. GOLDBERG:  Is this set of

21       communications between ZHP and the Chinese

22       government where the CDE --

23              MS. YANG:  Yes.

24              MR. GOLDBERG:  -- where the CDE is

25       implementing its routine regulatory function?

Page 101

1              MS. YANG:  Yes.

2              MR. GOLDBERG:  All right.  I don't

3      have any other questions.

4              MR. SLATER:  I have a really -- maybe

5      the dumbest question of the day.

6              I was under the impression that ZHP

7      didn't sell valsartan as a finished dose in

8      China.  They only sold API to other

9      manufacturers to then sell finished doses in

10     China.

11             Do I have that right?

12             MR. GOLDBERG:  I don't know the

13     answer to that.

14             MS. YANG:  I don't know either.

15             MR. SLATER:  Let's go to document 56.

16     That's the next one that's not marked as a

17     duplicate to something else.

18             MR. GOLDBERG:  Did you say 56?

19             MR. SLATER:  Yes.  I think between

20     where we were -- after 39, everything has a

21     duplicate.

22             MR. GOLDBERG:  Chris, if you want to

23     confirm, the Bates number ends in 5167?

24             MR. GEDDIS:  Which exhibit?

25             MR. GOLDBERG:  56.  The Bates number

Page 102

1    ends in 5167?

2              MR. GEDDIS:  Yes.

3              MR. GOLDBERG:  Okay.

4              MR. SLATER:  I have this as a

5    July 14, 2017 letter in Linda Lin's custodial

6    file.  It's described as "Summary of the

7    reports provided to the authorities."

8              Which authorities is it referring to

9    I guess is the first question.  Let me ask

10   you this:  This is an internal document,

11   right"

12             MS. YANG:  No.  It was a summary, the

13   summary itself is internal document, but

14   there's hyper link to the letters finally

15   sent to the government, different levels of

16   government.

17             MR. SLATER:  To the Chinese

18   government and different governments around

19   the world?

20             MS. YANG:  To the Chinese government.

21             MR. SLATER:  So this is a summary

22   document that summarizes the reports provided

23   to the Chinese government about the valsartan

24   and NDMA contamination basically?

25             MS. YANG:  Yes.  Some updates, some

Page 103

1      explanations, yes.

2                    MR. SLATER:  The summary is for

3      internal use, right?

4                    MS. YANG:  Yes.  The sheet is for

5      internal use.  Yes.

6                    MR. SLATER:  I don't have any

7      questions.  I'm reserving the right to

8      challenge it because I think we have the

9      right to know what internally they were

10     saying that they had told the Chinese

11     government to see if it's consistent with

12     what they told the US government.

13                    The next document that's not --

14                    MR. GOLDBERG:  Hang on one second.

15                    So you're adding -- the last point

16     you made is you think what they told the

17     Chinese government is --

18                    MR. SLATER:  From what I understand,

19     this is a document summarizing what various

20     government entities in China were told by ZHP

21     about the valsartan contamination issue.

22     This is July 14, 2018, so it's right after it

23     came out, so I think we have the right -- but

24     it's a summary of what they told other

25     governments.  Maybe we could argue about

Page 104

1    whether we got the notification that was

2    actually sent.  I think we should be able to

3    get those because I don't see why that's

4    going to jeopardize Chinese national interest

5    if we see what ZHP told the government in

6    China about what just happened.

7            MR. GOLDBERG:  Looking at this, does

8    this reflect -- is ZHP providing the

9    information to the Chinese government that it

10   provided to other governments?  Is it

11   basically saying "This is what we told other

12   governments and we're telling you?"

13           MS. YANG:  This question is for me,

14   right?

15           MR. GOLDBERG:  Yes.  I'm sorry.

16           Is it sharing with the Chinese

17   government the investigation that ZHP shared

18   with other government agencies like the FDA?

19           MS. YANG:  I think so.  I think they

20   share the same information.

21           MR. GOLDBERG:  If information was

22   provided to the FDA about the nitrosamine

23   impurities, ZHP is now reporting to the

24   Chinese government that it provided this

25   information to the FDA?

Page 105

1          MS. YANG:  Yes.

2          MR. GOLDBERG:  It's not providing

3     different information that is sort of being

4     requested by the Chinese government; is that

5     right?

6          MS. YANG:  Right.

7          MR. GOLDBERG:  It's simply reporting

8     what it told to the US FDA or another -- is

9     it just the US FDA or are there other

10    government agencies too around the world?

11         MS. YANG:  It told the Chinese

12    government about the US and CEP, Korea,

13    Japan.

14         MR. GOLDBERG:  It's summarizing the

15    reports that -- it's summarizing the

16    information that ZHP provided to those

17    government agencies?

18         MS. YANG:  Right.

19         MR. GOLDBERG:  Does it provide any

20    independent investigation in response to a

21    Chinese government request?

22         MS. YANG:  From documents themselves,

23    I don't know whether they are particularly in

24    response to a Chinese government's

25    requirements, no.

Page 106

1           MR. GOLDBERG:  I guess what I'm

2      asking is does it appear from your review

3      that ZHP is sort of generating new

4      information for the Chinese government that

5      it hasn't already generated for the US FDA?

6           MS. YANG:  No, there's no new

7      information, just general reports.  On the

8      status and one of the documents, I think it

9      was issued by the government, so in this

10     summary, there's most of the documents was

11     sent by ZHP to different levels of

12     government, but there's one document that's

13     from the government, so in this document,

14     there's a conclusion that viewpoints of the

15     National Drug Administration about the

16     Chinese product.

17          MR. GOLDBERG:  I don't have any other

18     questions.

19          MR. SLATER:  I think the next one is

20     61.  This is in May of 2020, having to do

21     with a data protection law.  I'm trying to

22     figure out how it relates to valsartan.

23          MR. GOLDBERG:  I think this is --

24     some of this is a function of just the

25     breadth of the search terms, so you're going

Page 107

1      to pick up some things that are arguably --

2               MR. SLATER:  It's gotten through a

3      relevance review, so I'm trying to figure out

4      if I care.  It's a quick question --

5               MR. GOLDBERG:  It's potentially

6      gotten through a responsiveness review, but

7      not a relevance review.

8               MR. SLATER:  Okay.

9               I'm just trying to understand the

10     guidance on the data protection law in 2020.

11     I'm just curious like subject matters wise,

12     is there anything you can tell me so I can

13     move on to the next one comfortably?

14               MS. YANG:  This document is about,

15     you know, ZHP is -- was seeking the Chinese

16     government's view about the compliance with

17     state secrets, given there's a US litigation

18     ongoing.  So they are asking the government,

19     you know, how -- what's the requirement, how

20     to comply with the Chinese state secrets

21     requirements mandatory requirements.

22               MR. SLATER:  Okay.  I got it.

23               So it's pretty relevant to our

24     conversation.

25               Was this a submission to the Chinese

Page 108

1          government by counsel or by the company

2          itself?

3                    MS. YANG:  By the company itself.

4                    MR. SLATER:  Why is it that we can't

5          see the request that was sent to the Chinese

6          government?  Why would that somehow have an

7          impact on national security?

8                    MS. YANG:  Because it was a matter of

9          national security of information.  That's the

10         purpose, the whole purpose of the --

11         actually, part of the purpose of the state

12         secrecy law, to protect information.  This

13         document was sent from the company to the

14         government and it was part of the government

15         document.

16                    MR. SLATER:  I'm sorry.  I didn't

17         mean to interrupt you.

18                    MS. YANG:  So if you -- again, if

19         you -- if ZHP wants to disclose this

20         document, it needs to seek consent from

21         government and unless, in terms of substance,

22         as I just explained, this document concerns

23         protection of the safety national

24         information.  So it's a matter of social

25         development or national economy.

Page 109

1           MR. SLATER:  Well, if I understand
2       it, ZHP is saying to this Chinese government
3       entity we need guidance on whether we can
4       produce certain information in the US
5       litigation.
6           MS. YANG:  They want to seek the
7       government's views about the state secrets
8       law and requirements.
9           MR. SLATER:  This document doesn't
10      contain the government's views.  It contains
11      the question from ZHP.
12          MS. YANG:  It is a question from ZHP,
13      but it was part of the communication between
14      ZHP and government.
15          MR. SLATER:  All right.
16          Sixty-two and 63 -- I'm going to
17      definitely request that document.
18          MR. GOLDBERG:  You're challenging --
19      so let me just ask a couple of clarifying
20      questions.
21          MR. SLATER:  Seth, so you know before
22      you do it, this was something I think we
23      specifically discussed with Judge Vanaskie
24      and he actually asked "When did you contact
25      the government?  Was it in writing?" and I

Page 110

1    don't remember what the answers were at the

2    hearing, so I'm not going to -- I know it's

3    something we discussed during the last meet

4    and confer, so --

5                MR. GOLDBERG:  You can draw whatever

6    conclusions you want.  This is not for debate

7    now.  Just in terms of these specific

8    communications, this is somebody -- this is

9    an employee from ZHP communicating with the

10   Chinese government about how the state

11   secrecy laws might apply to information.

12               MS. YANG:  Yes, because according to

13   the regulation I just cited, those

14   information -- the disclosure of those

15   information is subject to the government's

16   approval.  Those information may contain the

17   state secrets, so that's why.

18               MR. GOLDBERG:  Does the communication

19   discuss specific documents or specific kinds

20   of information?

21               MS. YANG:  No.

22               MR. GOLDBERG:  Is the custodian Linda

23   Lin or the person communicating Linda Lin?

24               MS. YANG:  Yes, the custodian is

25   Linda Lin.

Page 111

1              MR. SLATER:  Okay.  All right.  Let's

2      go to 62.  It's an August 15, 2018 document

3      from Zhejiang Medical Products Administration

4      to ZHP regarding the conclusion of recall

5      review and appraisal.

6              What is this relating to

7      specifically?

8              MS. YANG:  It's relating to the

9      Chinese recall.

10             MR. SLATER:  What in general is it

11     saying?  It relates to the recall.  Is it

12     saying -- I don't know.  I'm trying to

13     understand more specifically.

14             MS. YANG:  The government basically

15     arrived to a conclusion that ZHP has followed

16     all the requirements of the law.  This

17     document only has one paragraph.  It's very

18     simple.

19             MR. SLATER:  Just basically saying

20     this is to confirm you've met our

21     requirements without listing what those

22     requirements were?

23             MS. YANG:  No.  No listing.

24             MR. SLATER:  We're not going to

25     challenge that.

Page 112

1          Sixty-three looks very similar to 62,

2     but it's 12 days earlier.  8/3/2018.  A

3     report from the Zhejiang Medical Organization

4     regarding the conclusion of recall, review

5     and appraisal.

6          So is this when they laid out the

7     requirements were that were commented on in

8     document 62?

9          MS. YANG:  No.  No.  This is about

10    the Chinese recall again, but not also just

11    ZHP.  Also involved other companies.

12          MR. SLATER:  Related to --

13          MS. YANG:  The Chinese recall.

14          MR. SLATER:  -- the Chinese recall of

15    valsartan API or valsartan?

16          MS. YANG:  API and valsartan drugs.

17          MR. SLATER:  Okay.

18          MS. YANG:  The other companies used

19    API in their final products.

20          MR. SLATER:  That's what I was

21    asking.  It's purely the Chinese government

22    requirements for China recall?

23          MS. YANG:  Yes, for China recall.

24          MR. GOLDBERG:  Can we take a quick

25    break, please?

Page 113

1            MR. SLATER:  Sure.

2            (Time noted: 10:51 a.m.)

3            (Recess taken)

4            (Time noted: 10:58 a.m.)

5            MR. SLATER:  We're on 64.  It's a

6       report August 3, 2018 from Zhejiang Medical

7       Products Administration to ZHP regarding on

8       site inspection.

9            What was that inspection with regard

10      to, if you could tell me?

11           MS. YANG:  Regarding the valsartan

12      sold in China.

13           MR. SLATER:  I want to be clear.

14           When you say valsartan sold in China,

15      it's valsartan manufactured in the facility

16      that was manufacturing -- let me ask this

17      actually:  Was it inspection of a different

18      facility from where the valsartan was being

19      manufactured to be sold in the US or the same

20      facility?

21           MS. YANG:  I don't know what's the

22      location of the manufacturer facility of

23      valsartan for the US.

24           MR. SLATER:  I know I'm

25      mispronouncing this, but I thought it was

Page 114

1    Chuanon.  I don't remember which workshop.

2    It was my understanding it was all

3    manufactured in this same workshop whether

4    it's going to US, China, wherever.  My

5    understanding is it was all manufactured at

6    the same plant.

7            When you keep saying for China, if

8    it's manufactured in the same facility, in

9    the same place, the distinction from our

10   judge was it doesn't matter.  If it's

11   manufactured in that place, it's relevant.

12           MS. YANG:  The manufacturing place in

13   China and Zhejiang, I'm not sure whether

14   that's the place that you asked for that

15   manufacturer.

16           MR. SLATER:  So it's on on-site

17   inspection?

18           By the way, I got the arm there.  I

19   see somebody with the white shirt.  I know

20   what's going on.  I know you have

21   reinforcements.  I see what's happening.  If

22   there's somebody else participating, they

23   shouldn't be shy.  I'm happy to have them

24   tell us they're in the room with you.  Is

25   that another lawyer?

Page 115

1              MS. YANG:  That's my colleague.  He's

2      helping me to -- I'm not --

3              MR. SLATER:  I'm just joking with

4      you.

5              MS. YANG:  I need to know the

6      location of the US manufacturing place and

7      the Chinese manufacturing place.

8              MR. SLATER:  My understanding is it

9      was all made in the same place and it would

10     be sold wherever it got sold.

11             Anyway, this was an on-site

12     inspection.  What's it specific to?  What

13     were they inspecting for?

14             MS. YANG:  Inspecting for valsartan

15     sold in China.

16             MR. SLATER:  I understand.

17             What was the subject matter of the

18     inspection?

19             MS. YANG:  Manufacturing process,

20     inventory, Chinese recall.

21             MR. SLATER:  So it's a regulatory

22     inspection document?

23             MS. YANG:  Yes.

24             MR. SLATER:  Does it find

25     deficiencies?

Page 116

1          MS. YANG:  There are some

2     recommendation from the government.

3          MR. SLATER:  Sort of like a 483, like

4     what we have from the FDA when they inspect

5     and give a 483?  Same type of thing?

6          MS. YANG:  I'm not sure about that.

7          MR. SLATER:  I'm going to reserve my

8     right on that one.  I think it falls within

9     the core discovery.

10         MR. GOLDBERG:  Can I ask some

11    questions?  This is 64, right?

12         Does this talk about any reference to

13    NDMA in valsartan?

14         MS. YANG:  No.

15         MR. GOLDBERG:  Any reference to

16    impurities in valsartan?

17         MS. YANG:  No.

18         MR. GOLDBERG:  Any reference to the

19    valsartan recall in the US?

20         MS. YANG:  No.

21         MR. GOLDBERG:  Is there any reference

22    to valsartan sold in the US market?

23         MS. YANG:  No.

24         MR. GOLDBERG:  Is there any reference

25    or discussion about risks to patients of

Page 117

1      valsartan?

2              MS. YANG:  No.

3              MR. GOLDBERG:  Impurities in

4      valsartan?

5              MS. YANG:  No.

6              MR. GOLDBERG:  Is there any reference

7      to chromatography like GCMS or HPLC?

8              MS. YANG:  No.

9              MR. GOLDBERG:  Any reference to the

10     levels of NDMA in valsartan?

11             MS. YANG:  No.

12             MR. GOLDBERG:  I don't have any other

13     questions about 64.

14             MR. SLATER:  Now looking at 65, it's

15     January 11, 2019 document.  It says it's an

16     inspection summary of experts from the

17     National Institute for Food and Drug Control,

18     center for Drug Evaluation, Zhejiang Food and

19     Drug Administration, etc. between January 10

20     and January 11, 2019.

21             So this was an inspection of what?

22             MS. YANG:  This was the inspection of

23     irebesartan sold in the Chinese market.

24             MR. SLATER:  Again, you keep saying

25     solely in the Chinese market.

Page 118

1              Was it manufactured -- was the

2         irebesartan for the Chinese market marketed

3         differently or in a different location than

4         the irebesartan being sold in the United

5         States?  I don't think so.

6              MS. YANG:  I don't know because this

7         document didn't say the location of

8         manufacturing.

9              MR. SLATER:  I'm just saying because

10        we've been told it's the same, so I don't see

11        why you keep making that distinction.

12             MS. YANG:  I'm not sure about that

13        fact.

14             MR. SLATER:  Does it talk at all

15        about the purity of the API?

16             MS. YANG:  You said API?

17             MR. SLATER:  Yes.  The purity of the

18        quality of the API, the issue in this case.

19             MS. YANG:  Yes.  In irebesartan, yes.

20             MR. SLATER:  I assume it's talking

21        about an optimized process to try to prevent

22        the quality and purity issues with NDMA.

23             MS. YANG:  Well, basically this

24        document just records discussion between the

25        government and ZHP.  The questions were asked

Page 119

1       and answers were given --

2               MR. SLATER:  Got it.

3               So this is an internal summary within

4       the company about what happened during the

5       meeting?

6               MS. YANG:  Yes, during the

7       inspection.  Yes.

8               MR. SLATER:  Was the document sent to

9       the government?

10              MS. YANG:  No.  The government I

11      think is internal.  But that recorded the

12      inspection of the government and discussion

13      between the government and ZHP and also the

14      viewpoints of the government.

15              MR. SLATER:  Okay.

16              Having to do with how irebesartan is

17      manufactured?

18              MS. YANG:  Yeah.

19              MR. SLATER:  Okay.

20              And how irebesartan is manufactured

21      is something of vital national interest?

22              MS. YANG:  Oh, yes.  I would say so

23      because this whole case is about public

24      health in China.

25              MR. SLATER:  What about the public

Page 120

1          health in the rest of the world, too?

2                    MS. YANG:  I don't think that this

3          inspection is for the -- for the public

4          health of foreign countries.  They were just

5          talking about the irebesartan solely in

6          China, so it's public health in China.

7                    MR. SLATER:  I got it, but we were

8          talking about before -- if I'm right -- that

9          it was manufactured and sold in the same

10         place outside the country, it's the same

11         issue.

12                   MR. GOLDBERG:  It's not a deposition.

13         This is not argument and --

14                   MR. SLATER:  I'm just trying to --

15                   MR. GOLDBERG:  This is a meet and

16         confer, so let's keep it at that level.  You

17         have your viewpoints --

18                   MR. SLATER:  That's fine.

19                   MR. GOLDBERG:  Keep it at that level.

20                   MR. SLATER:  I'm reserving on that.

21                   MR. GOLDBERG:  Let me ask you about

22         the document, some questions about 65.

23                   Does it have -- you said it expresses

24         the viewpoints of the Chinese government.

25                   Does it provide any observations or

Page 121

1          recommendations about ZHP's manufacturing

2          process for irebesartan?

3                    MS. YANG:  There's some observations,

4          but not the recommendation.  I don't see the

5          recommendation with the Chinese government --

6          they were checking documents, checking

7          records and asking questions, so there were

8          some observation based on records.

9                    MR. GOLDBERG:  It's the Chinese

10         government's observations about ZHP about

11         records that ZHP provided?

12                    MS. YANG:  Yes.

13                    MR. GOLDBERG:  Does it reflect any

14         conclusions the Chinese government reached?

15                    MS. YANG:  No.

16                    MR. GOLDBERG:  Does it -- are the

17         observations -- are they referring at all to

18         any deficiencies in the manufacturing process

19         of irebesartan?

20                    MS. YANG:  I didn't say that.

21                    MR. GOLDBERG:  Okay.

22                    Is there any reference to the US

23         market for irebesartan?

24                    MS. YANG:  No.

25                    MR. GOLDBERG:  To the recall of

Page 122

1          irebesartan in the US?

2                    MS. YANG:  No.

3                    MR. GOLDBERG:  Okay.  I don't have

4          any other questions about 65.

5                    MR. SLATER:  Let's go to 67.

6                    Actually, let me ask you this, to see

7          if I could confirm it.

8                    Our log says that 66 is the same as

9          65.  Can you confirm that?

10                   MS. YANG:  Yes.  Sixty-six is part of

11         65 because it's two-day inspection, so 65 has

12         the summary of two-day inspection, full

13         report and 66 only contained the information

14         of the first day.

15                   MR. SLATER:  Got it.

16                   So looking now at 67, it says that

17         it's a report to the Taizhou municipal

18         government regarding public sentiment.

19         December 17, 2018 is the date.

20                   What does that mean when it's

21         referring to public sentiment?

22                   MS. YANG:  This document was about

23         the -- some untrue and misleading information

24         published online by some websites, so this

25         may be a matter of -- that may cause public

Page 123

1          concern about public health.  It's a matter

2          of state secrets.

3                    MR. SLATER:  What type of misleading

4          information?

5                    MS. YANG:  About the -- how ZHP

6          seriously violation of CGMP and the

7          information about ZHP should be subject to

8          the Chinese government sanctions and sort of

9          things.

10                   MR. SLATER:  I don't understand.

11                   What do you mean?

12                   MS. YANG:  There's information online

13         saying they -- because of the FDA warning

14         letters, they believed ZHP was also subject

15         to the sanction of the Chinese government.

16                   MR. SLATER:  That's what was said

17         online?  So ZHP is telling the Chinese

18         government about things they found online

19         about the ZHP contamination issue with the

20         valsartan?

21                   MS. YANG:  Right.

22                   MR. SLATER:  I would think that would

23         be pretty easy to produce since the

24         information that's being communicated was

25         found on the internet.

Page 124

1          MS. YANG:  But this is the report

2     itself.  The information I would say is

3     publicly available.  The report itself is

4     just the reporting to the government that

5     there's untrue information online and that

6     that may, you know, cause them unnecessary

7     concern about public health in China.

8          MR. SLATER:  Okay.  We're going to

9     challenge that document.

10         MR. GOLDBERG:  Let me ask some

11    questions about it.

12         First, is this -- is ZHP, when it's

13    communicating with the Chinese government, is

14    it seeking guidance from the Chinese

15    government?

16         MS. YANG:  What do you mean seeking

17    guidance?  They want to bring that to

18    attention to the government in a matter that

19    may cause public concern, unnecessary

20    concern.  Guidance on that point.

21         MR. GOLDBERG:  Okay.

22         This was a communication that was

23    sent to the government?

24         MS. YANG:  Yes.

25         MR. GOLDBERG:  Okay.

Page 125

 1              Does it refer at all to the

 2       impurities that were found in valsartan?

 3              MS. YANG:  I mean, the whole thing

 4       was caused by the FDA letters, so we're

 5       talking about misleading and untrue

 6       information about cause of the impurity they

 7       found online.

 8              MR. GOLDBERG:  Does it talk about --

 9       does it talk about ZHP's -- ZHP's root cause

10       investigation into the impurities?

11              MS. YANG:  No.

12              MR. GOLDBERG:  Does it talk about the

13       manufacturing process of valsartan?

14              MS. YANG:  No.

15              MR. GOLDBERG:  Does it talk about how

16       ZHP tested for valsartan either before or

17       after --

18              MS. YANG:  No.

19              MR. GOLDBERG:  -- the recall?

20              MS. YANG:  No.

21              MR. GOLDBERG:  Does it talk about the

22       levels of NDMA in valsartan?

23              MS. YANG:  No.

24              MR. GOLDBERG:  Does it have any

25       reference to any health risks resulting from

Page 126

1          the impurities in valsartan?

2                  MS. YANG:  No.  I'm sorry.  There was

3          something about, you know, the untrue

4          information about the health -- public

5          health.

6                  MR. GOLDBERG:  I see.  Is it -- so

7          this is somebody put -- somebody put

8          something on the internet that sort of cast

9          ZHP in a negative light and ZHP is discussing

10         that with the Chinese government?

11                 MS. YANG:  Yes.

12                 MR. GOLDBERG:  And discussing how to

13         respond to that?

14                 MS. YANG:  Well, they were asking the

15         guidance from the government, you know, how

16         to deal with those kinds of untrue and

17         misleading information.

18                 MR. GOLDBERG:  Okay.

19                 I don't think I have anything

20         further.

21                 MR. SLATER:  Okay.

22                 Sixty-eight.  July 29, 2018, a report

23         to Taizhou municipal government regarding

24         valsartan event.

25                 The valsartan event, is that the

Page 127

```
 1      contamination?
 2              MS. YANG:  The FDA investigation,
 3      inspection.
 4              MR. SLATER:  The FDA inspection is
 5      the --
 6              MS. YANG:  Valsartan, yes.  NDMA.
 7              MR. SLATER:  Right.  The FDA
 8      information regarding NDMA, that's the
 9      valsartan event referred to here?
10              MS. YANG:  Yes, this is the timeline.
11      Not timeline.  It's an update on the status.
12              MR. SLATER:  So it's factual
13      information?
14              MS. YANG:  Yes.  Part of the document
15      is factual information about update on FDA
16      inspection.
17              MR. SLATER:  Okay.
18              Does the document contain any
19      specific information about what the Chinese
20      government was thinking or asking about?
21              MS. YANG:  This document, yes, it
22      contained the views --
23              MR. SLATER:  What's that?
24              MS. YANG:  The Taizhou, the local
25      government's viewpoints.
```

Page 128

1            MR. SLATER:  The local government's

2       viewpoints are in the document?

3            MS. YANG:  Yes.

4            MR. SLATER:  When you say their

5       viewpoints, can you give me a general idea of

6       what we're talking about?

7            MS. YANG:  Basically it's about --

8       you know, I think I can't answer this

9       question without divulging the state secrets.

10            MR. SLATER:  Okay.

11            The factual information could be

12       provided and the local government viewpoints

13       could be redacted, right?

14            MS. YANG:  Yes, I think that's one

15       way to do it.

16            MR. SLATER:  Okay.  I'm hopeful that

17       when you go back and you guys take a look at

18       everything afterwards that maybe on some of

19       these document that's something that can be

20       offered.

21            On some of these documents where

22       there's factual information provided by ZHP

23       or documents, maybe that could be provided

24       and if there's something that's sensitive

25       that the government said, maybe that could be

Page 129

1          redacted, then we'll get the factual

2          information without seeing what the

3          government may have said or asked.

4                    MR. GOLDBERG:  We'll consider it.

5                    MR. SLATER:  That's something I'm

6          asking you to consider.  What the government

7          said, I'm hoping that we could get some of

8          the questions, but I'll leave it to you to

9          figure out how far you can go and then we

10         could talk about it at that point.

11                   MR. GOLDBERG:  Can I ask some

12         questions about 68?

13                   You said this was a summary of the

14         FDA investigation?

15                   MS. YANG:  Yes.

16                   MR. GOLDBERG:  An update on what ZHP

17         is doing in response to the FDA

18         investigation?

19                   MS. YANG:  Yes.

20                   MR. SLATER:  Does it talk

21         specifically about -- does it provide

22         specific information about the levels of NDMA

23         in valsartan?

24                   MS. YANG:  No.

25                   MR. GOLDBERG:  I'm sorry?

Page 130

1          MS. YANG:  No.

2          MR. GOLDBERG:  Does it talk about the

3     FDA's findings or conclusions?

4          MS. YANG:  No.  It's just agenda of

5     the FDA's inspection.

6          MR. GOLDBERG:  Does it talk about any

7     specific chromatography testing?

8          MS. YANG:  No.

9          MR. GOLDBERG:  Does it provide any

10    new information that -- to the Chinese

11    government that is sort of original

12    information generated that hasn't been

13    provided to the FDA?

14         MS. YANG:  No.

15         MR. SLATER:  How would you know that?

16         MS. YANG:  Because according to the

17    measures ZHP has taken, they are basically

18    cooperating with FDA audit.

19         MR. SLATER:  Have you compared the

20    information to say there's nothing different

21    than what they told the FDA?  How do you know

22    that?

23         MS. YANG:  Well, you know, I reviewed

24    some of the documents that was assigned to us

25    by --

Page 131

1               MR. GOLDBERG:  Maybe I can ask -- my
2        question is a little different than that,
3        Adam.  I'm not asking if there's -- all I'm
4        saying is what is being reported here is
5        limited to information -- it's limited to a
6        report -- it's limited to an update on the
7        FDA investigation.
8               MR. SLATER:  Okay.
9               MS. YANG:  Yes.  Yes.
10              MR. SLATER:  Should I go to the next
11       one?
12              MR. GOLDBERG:  Yes.  Sorry.
13              MR. SLATER:  That was 68, now we're
14       on 69.
15              It's January 7, 2019, report to
16       Taizhou market regulation regarding valsartan
17       event.
18              What is this addressing in general,
19       this report?
20              MS. YANG:  This report is update on
21       FDA warning letters.
22              MR. SLATER:  Update on the status of
23       what they're doing to comply?
24              MS. YANG:  Update on -- update on the
25       information published online relating to the

Page 132

 1          FDA warn letters.  Again, this is about the
 2          misleading information published online.
 3                  MR. SLATER:  It's ZHP providing this
 4          information to this government entity?
 5                  MS. YANG:  Yes.
 6                  MR. SLATER:  I don't have any other
 7          questions.  I'm going to request that.
 8                  MR. GOLDBERG:  Does this document --
 9          number 69 -- does it refer to or does it
10          reflect any of the viewpoints of the Chinese
11          government?
12                  MS. YANG:  I think this is part of
13          the communication between the government and
14          ZHP.  ZHP sent routine reports to the
15          government based on government requirements.
16                  MR. GOLDBERG:  Does this discuss the
17          FDA warning letters, the substance of the FDA
18          warning letters?
19                  MS. YANG:  Not substance of the FDA
20          warning letter, just some public information
21          relating to the FDA warning letters.
22                  MR. GOLDBERG:  Does it discuss the
23          valsartan manufacturing process?
24                  MS. YANG:  No.
25                  MR. GOLDBERG:  Does it discuss

Page 133

1          testing valsartan for impurities?

2                    MS. YANG:  No.

3                    MR. GOLDBERG:  Does it refer to

4          chromatography in any way?

5                    MS. YANG:  No.

6                    MR. GOLDBERG:  Does it discuss the US

7          market for valsartan?

8                    MS. YANG:  No.

9                    MR. GOLDBERG:  Does it discuss the

10         risks to patients of any alleged impurities

11         in valsartan?

12                   MS. YANG:  No.

13                   MR. GOLDBERG:  Does it discuss ZHP's

14         root cause investigation into the impurities

15         of valsartan?

16                   THE WITNESS:  No.

17                   MR. GOLDBERG:  This is part of the

18         communications that ZHP is required to

19         provide to the Chinese government?

20                   MS. YANG:  Yes.

21                   MR. GOLDBERG:  I don't have any other

22         questions about 69.

23                   MR. SLATER:  Okay.  Going to 70.

24                   I'll start over.

25                   Seventy is a November 5, 2018, a

Page 134

1          report to Taizhou municipal government

2          regarding valsartan event.

3                    Is this -- what is this -- what is

4          this addressing?  Sorry.

5                    MS. YANG:  No problem.

6                    Again, this is about untrue

7          information published online.

8                    MR. SLATER:  Regarding the valsartan

9          contamination issue?

10                   MS. YANG:  Yes.

11                   MR. SLATER:  What specifically --

12         what's the subject matter of the "untrue"

13         information?

14                   MS. YANG:  It didn't say.  Just

15         reading the document, it doesn't say the

16         subject of the information.

17                   MR. SLATER:  You said they were

18         reporting that there's untrue information

19         reported online.

20                   Do they give any information about

21         what the untrue information relates to?

22                   MS. YANG:  It's about the valsartan.

23                   MR. SLATER:  Does it give anymore

24         information other than it's about the

25         valsartan contamination?

Page 135

1           MS. YANG:  No.  Just general

2      information.  General description.

3           MR. SLATER:  So it's saying we're

4      letting you know there's untrue information

5      out there about the valsartan contamination

6      and it doesn't give any specifics about what

7      that information is?

8           MS. YANG:  According to the links,

9      there's subjects of the links, I think.  The

10     untrue information is about other -- that

11     valsartan can cause cancer in human beings.

12          MR. SLATER:  So they attach links to

13     show what the untrue information is?

14          MS. YANG:  Yes, there are three

15     links.

16          MR. SLATER:  So it's three links of

17     information found on the public internet that

18     they're just sending those to the government

19     and saying "By the way, what these links say

20     isn't true"?

21          MS. YANG:  Yes.

22          MR. SLATER:  We'll request that.

23          MR. GOLDBERG:  Let me just say you

24     can I guess we -- I don't know that

25     requesting is the thing.  You'll move to

Page 136

```
 1      compel it.
 2              Let me ask you a few questions about
 3      it.
 4              Is there an exchange of
 5      information -- is there an exchange of
 6      information between the Chinese government
 7      and ZHP about why ZHP is seeking guidance
 8      from the Chinese government?
 9              MS. YANG:  No.  It's a one-page
10      document mainly about the links.
11              MR. GOLDBERG:  Okay.
12              MR. SLATER:  Seth, I don't mean to
13      interrupt.  You said why they're seeking
14      guidance.  I missed that.  Is that what the
15      document is doing, seeking guidance?
16              MR. GOLDBERG:  I was about to ask
17      that question.
18              MR. SLATER:  I was going to give you
19      a foundation objection there.
20              MR. GOLDBERG:  I realized when I said
21      it -- is ZHP sending this so that it can get
22      guidance from the Chinese government about
23      these communications?
24              MS. YANG:  Well, if you look at the
25      other documents we just looked at, probably
```

Page 137

1          this is part of the communications.

2                    MR. GOLDBERG:  What do you mean by

3          that?

4                    MS. YANG:  Part of the communications

5          of untrue information and that it may cause

6          unnecessary concern about public health, so

7          they want to flag out that, this untrue

8          information to the government's attention and

9          seeking their guidance.

10                   MR. GOLDBERG:  So it is seeking

11         guidance from the Chinese government?

12                   MS. YANG:  I was saying looking at

13         other documents together, the two documents

14         we just looked at, I think this document is

15         similar, but this document itself did not say

16         ZHP was seeking guidance.

17                   MR. SLATER:  What do you call it when

18         one lawyer asks a leading question of their

19         co-counsel during a meet and confer?

20                   MR. GOLDBERG:  We call it a meet and

21         confer.

22                   MR. SLATER:  Seth, I have a smile on

23         my face.

24                   MR. GOLDBERG:  I'm not looking at the

25         camera.  I'm trying to understand the

Page 138

1           document in the same way you are.

2                     MR. SLATER:  I'm joking.

3                     MR. GOLDBERG:  With the other

4           documents, is there any -- is there anything

5           specific in the email about the testing of

6           valsartan by ZHP?

7                     MS. YANG:  No.

8                     MR. GOLDBERG:  Is there anything

9           specific about the levels of NDMA in

10          valsartan?

11                    MS. YANG:  No.

12                    MR. GOLDBERG:  Is there anything

13          about the manufacturing process of valsartan?

14                    MS. YANG:  No.

15                    MR. GOLDBERG:  Or the root cause

16          investigation by ZHP?

17                    MS. YANG:  No.

18                    MR. GOLDBERG:  Does it have any

19          reference to chromatography testing?

20                    MS. YANG:  No.

21                    MR. GOLDBERG:  Is it simply

22          concerning that somebody put some negative

23          press or negative comments on the internet?

24                    MS. YANG:  Yes.

25                    MR. GOLDBERG:  I don't have any other

Page 139

1          questions.

2                    MR. SLATER:  Okay.

3                    Flipping the page, another six, seven

4          hours, we'll be done.  I know we have a hard

5          stop in less than 30 minutes, so I'd like to

6          hope we could get through this.

7                    MS. YANG:  Let's hope so.

8                    MR. SLATER:  I would like to.

9                    Seventy-one, July 20, 2018, it's a

10         report from -- I can't even read that word --

11                   MS. YANG:  Chongqing government.

12                   MR. SLATER:  To the Chongqing --

13                   MS. YANG:  Chongqing company.  This

14         is about the -- another company, you know,

15         from another PRC government because this

16         Chongqing company, they used the ZHP

17         valsartan batch.

18                   MR. SLATER:  Okay.  So they're

19         just -- we're not going to challenge that

20         document.

21                   MR. GOLDBERG:  What number was that?

22         Seventy-one?

23                   MR. SLATER:  Seventy-one.

24                   Seventy-two, July 22, 2018, a summary

25         of communications with the Medical Products

Page 140

1          Administration Authorities of Shandong

2          province and Jiangsu province.

3                    This is an internal document, right?

4                    MS. YANG:  Internal documents just

5          summarizing the -- Jiangsu and Shandong

6          government's viewpoints and their

7          investigation into valsartan sold in China.

8                    MR. SLATER:  It summarizes the

9          government viewpoints and investigation.

10                    Does it also include factual

11          information that ZHP has regarding those

12          issues?

13                    MS. YANG:  I don't think there's much

14          factual information.  Just mainly their

15          viewpoints.

16                    MR. SLATER:  Great.  No challenge.

17                    Next document, 73, August 10, 2018.

18                    A letter from the National Food and

19          Drug Administration to the local Food and

20          Drug Administration of a whole bunch of

21          different places regarding the NDMA risk of

22          valsartan API.

23                    Can you tell me what the purpose of

24          this letter is, what its function is?

25                    MS. YANG:  The purpose of this letter

Page 141

1        is for the Chinese recall.  So the national

2        government is sending this letter to local

3        administrations regarding recall of affected

4        Chinese companies for valsartan products.

5                    MR. SLATER:  It's just the recall in

6        China?

7                    MS. YANG:  Just the recall in China.

8                    MR. SLATER:  I'm not challenging

9        that.

10                   Seventy-nine.  October 22, 2018.

11                   It says a document dated October 22,

12       2018 of ZHP regarding valsartan event

13       intended for Taizhou municipal government.

14                   So what type of a document is this?

15       Is it a letter?  Is it a memo?

16                   MS. YANG:  It's an update on the

17       status.  It's about the EDQM inspection

18       report and also recording some viewpoints of

19       the government.

20                   MR. SLATER:  So it's providing

21       factual information as well as some

22       information -- let me ask this:  It provides

23       factual information from ZHP regarding this

24       EDQM inspection report?

25                   MS. YANG:  No.  Just this document

Page 142

1        just recorded the EDQM reports, how many

2        deficiencies they find by the EDQM report.

3               MR. SLATER:  So it's recounting to

4        the Chinese government what this other

5        regulatory authority found?

6               MS. YANG:  Right.  So the number of

7        the deficiencies.

8               MR. SLATER:  Okay.

9               MS. YANG:  Nothing specific.

10              MR. SLATER:  Nothing specific.  We'll

11       request that.  It sounds like it's pretty

12       harmless.

13              MR. GOLDBERG:  Let me ask a few

14       questions about it.

15              Does this discuss the root cause of

16       NDMA in valsartan?

17              MS. YANG:  No.

18              MR. GOLDBERG:  Does it discuss the

19       AP's investigation into NDMA and valsartan?

20              MS. YANG:  No.

21              MR. GOLDBERG:  Does it have any

22       reference to the levels of NDMA in valsartan?

23              MS. YANG:  No.

24              MR. GOLDBERG:  Does it have any

25       reference to the US market for valsartan?

Page 143

1              MS. YANG:  No.

2              MR. GOLDBERG:  Does it reference any

3       testing of valsartan?  I'm sorry.  Any

4       testing of alleged impurities in valsartan?

5              MS. YANG:  No.

6              MR. GOLDBERG:  Does it discuss at all

7       the manufacturing process for valsartan?

8              MS. YANG:  No.

9              MR. GOLDBERG:  I don't have any other

10      questions.

11             MR. SLATER:  What deficiencies does

12      it list then?

13             MS. YANG:  It doesn't say any.

14             MR. SLATER:  So it says there's

15      deficiency -- I thought you said it listed

16      the deficiencies --

17             MS. YANG:  I said it's a total number

18      of deficiencies they find.

19             MR. SLATER:  Other than telling the

20      number of deficiencies found, does it provide

21      any other information about this -- in this

22      update?

23             MS. YANG:  No.

24             MR. SLATER:  It says the EDQM

25      inspection report found how many

Page 144

1          deficiencies?

2                    MS. YANG:  Seventeen.

3                    MR. SLATER:  So all those questions

4          Seth just asked you, they may have all the

5          related to all the issues he just asked you

6          about.  You just don't know.

7                    MS. YANG:  According to a document,

8          it did not say anything about that.

9                    MR. SLATER:  You just told me it says

10         the number of deficiencies.  It doesn't

11         say -- yes or no? -- what the subject matter

12         is of any of those deficiencies, right?

13                    MS. YANG:  That's correct.

14                    MR. SLATER:  They may have been that

15         they violated CGMP.  It may be all sorts of

16         terrible deficiencies.  You don't know.

17                    MS. YANG:  The question is asking me

18         about any discussion and a mention of the

19         levels or testing, I would say no.  Right?

20         The document doesn't say anything about that.

21                    MR. SLATER:  Okay.  That's all I need

22         to ask you on that.

23                    Let's go to 81.  September 29, 2018,

24         a report to Zhejiang Medical Products

25         Administration regarding progress of

Page 145

 1          rectification and plan for next stage, so

 2          this is ZHP providing information to this

 3          government entity or is this a draft report?

 4                    MS. YANG:  Yes, ZHP providing

 5          information to the government.

 6                    MR. SLATER:  Is it a draft of a

 7          report or was the report actually sent?

 8                    MS. YANG:  The report was actually

 9          sent.

10                    MR. SLATER:  Does it provide factual

11          information about what they're doing to try

12          to mitigate this problem with the NDMA?

13                    MS. YANG:  They talk about, you know,

14          what kind of measures the company is going to

15          take, the next steps.

16                    MR. SLATER:  I don't have any other

17          questions.

18                    MR. GOLDBERG:  Is this a document

19          you're challenging?

20                    MR. SLATER:  Yes.

21                    MR. GOLDBERG:  Is this a document

22          about the Chinese market for valsartan?

23                    MS. YANG:  Well, it summarizes the --

24          the current status of the FDA and Europe

25          investigations.

Page 146

```
 1              MR. GOLDBERG:  Okay.

 2              So it's providing an update on the

 3       investigations of the FDA and European

 4       regulatory agencies?

 5              MS. YANG:  Yes.

 6              MR. GOLDBERG:  Is it -- it's

 7       discussing what ZHP has done in terms of the

 8       FDA.  Is it discussing what ZHP has done to

 9       respond to the FDA investigation?

10              MS. YANG:  Briefly mentions that.

11       You know, ZHP is going to review all the

12       requirements of FDA.

13              MR. GOLDBERG:  Is it talking about --

14       we're talking about rectification and plan

15       for next stage.  Is it that the plan for the

16       next stages of the -- of responding to the

17       FDA investigation or is it a plan for the

18       Chinese regulators?

19              MR. SLATER:  Or something else?

20              MS. YANG:  I think all of them, the

21       Chinese market, US FDA, European.

22              MR. GOLDBERG:  Can you say that

23       again?  You kind of broke up there.

24              MS. YANG:  The next step of the world

25       regarding the Chinese market and FDA and
```

Page 147

1      European government.  Very general

2      description.

3                MR. GOLDBERG:  It's a general

4      description of how ZHP is going to -- going

5      to cooperate with the Chinese authorities and

6      the Chinese investigation?

7                MR. SLATER:  Huh?

8                MR. GOLDBERG:  I'm trying to

9      understand what the go-forward plan is that's

10     being referred to.  Is it --

11               MS. YANG:  Yes.

12               MR. SLATER:  What was the go-forward

13     plan relating to?

14               MR. GOLDBERG:  It's a plan for

15     going -- for the Chinese -- for responding to

16     the Chinese regulators?

17               MS. YANG:  Yes.  And for all of them,

18     Chinese, FDA, European.

19               MR. GOLDBERG:  I see.

20               Is it doing anything other than

21     providing an update on the status?

22               MS. YANG:  In this document, ZHP is

23     also seeking the guidance from the Chinese

24     government on the information published

25     online.

Page 148

1          MR. GOLDBERG:  I just want to make

2      sure I'm on the same.  We're looking at

3      document 81 or 82?

4          MS. YANG:  Eighty-one.

5          MR. GOLDBERG:  Okay.

6          Does it have any specific references

7      to levels of NDMA in valsartan?

8          MS. YANG:  No.

9          MR. GOLDBERG:  Does it discuss the

10     root cause of NDMA in valsartan?

11         MS. YANG:  No.

12         MR. GOLDBERG:  Does it reference or

13     discuss any specific testing of valsartan?

14         MS. YANG:  No.

15         MR. GOLDBERG:  Does it discuss the

16     manufacturing process for valsartan?

17         MS. YANG:  No.

18         MR. GOLDBERG:  Okay.

19         I don't have any other questions.

20         MR. SLATER:  The information that was

21     published online was publically available

22     internet information, right?

23         MS. YANG:  There's no links on these

24     documents.  I suppose so.

25         MR. SLATER:  Does it say what the

Page 149

1          subject matter of the online information is?

2                    MS. YANG:  No.

3                    MR. SLATER:  Okay.

4                    So was it attached or something,

5          submitted with it as an attachment?

6                    MS. YANG:  There's no attachments.

7                    MR. SLATER:  But does it refer to an

8          attachment that just isn't attached to the

9          document?

10                   MS. YANG:  No.  There's no

11         attachment.

12                   MR. SLATER:  They just said there's

13         this online information that isn't true,

14         didn't tell what the subject matter is and

15         didn't submit it?

16                   MS. YANG:  Yeah.

17                   MR. SLATER:  That's weird.

18                   MS. YANG:  If you look at all

19         documents we looked at, I think the

20         government is pretty much informed about this

21         situation.  So they are just, you know,

22         making updates on that.

23                   MR. SLATER:  So they're just saying

24         there's more things on the internet, don't

25         believe what you read?

Page 150

1            MS. YANG:  Well --

2            MR. SLATER:  We're not going to tell

3     you what we're specifically referring to?

4            MS. YANG:  It's not that.  The untrue

5     information may cause publish concern,

6     unnecessary concern.

7            MR. SLATER:  But it doesn't define

8     what the untrue information is.  It doesn't

9     say anything about what it is.

10            MS. YANG:  The other documents we

11     just looked at, they do contain, you know,

12     some general description.

13            MR. SLATER:  I understand.

14            MR. GOLDBERG:  Is this sort of like

15     there's an ongoing discussion with the

16     Chinese government about this issue?

17            MS. YANG:  Yes.  I think it's part of

18     ongoing communication and, you know, routine

19     report to the government.

20            MR. GOLDBERG:  This is the Taizhou

21     government and the documents --

22            MR. SLATER:  No, it's Zhejiang.  It's

23     document 81.  Taizhou is the next one.

24            MR. GOLDBERG:  I'm looking at the

25     wrong document.  Sorry.  Got it.

Page 151

1          So this is -- okay.  I don't have any

2     other questions about it.

3          MR. SLATER:  Let's go to 82, which is

4     again September 29, 2018.  The description is

5     a report to Taizhou Commerce Bureau regarding

6     the import ban of CHP product by EU and USA.

7          What type of information is being

8     provided regarding the import ban?

9          MS. YANG:  Just telling the

10    government the -- why this import ban

11    occurred, what measures the company has

12    taken.

13         MR. SLATER:  So this is just

14    information being provided to the company by

15    this government entity?

16         MS. YANG:  Yes.  Also I think this is

17    based on -- it's a good part of the routine

18    part.

19         MR. SLATER:  So it contains factual

20    information about the status and reason for

21    the import bans?

22         MS. YANG:  Yes.

23         MR. SLATER:  I have no other

24    questions.

25         MR. GOLDBERG:  Does it have any

Page 152

1       reference to the testing of NDMA in

2       valsartan?

3                   MS. YANG:  No.

4                   MR. SLATER:  Does it discuss the

5       levels of NDMA in valsartan?

6                   MS. YANG:  No.

7                   MR. SLATER:  Does it discuss

8       chromatography testing for valsartan?

9                   MS. YANG:  No.

10                  MR. GOLDBERG:  Does it discuss --

11      other than the fact that there's a warning

12      letter, does it discuss specific observations

13      made by the FDA?

14                  MR. SLATER:  It's actually about an

15      import ban.

16                  MR. GOLDBERG:  I'm sorry.  Import

17      ban.

18                  Does it discuss any specific

19      observations made by the FDA?

20                  MS. YANG:  No.

21                  MR. GOLDBERG:  Does it discuss any of

22      the manufacturing processes for value?

23                  MS. YANG:  No.

24                  MR. GOLDBERG:  Were they chemicals

25      used in making valsartan?

Page 153

1              MS. YANG:  No.

2              MR. GOLDBERG:  Other than the fact of

3      the import ban, does it discuss the US market

4      for valsartan?

5              MS. YANG:  No.

6              MR. GOLDBERG:  Okay.

7              I don't have any question other

8      questions.

9              MR. SLATER:  In the spirit of meet

10     and confer, I understand you're asking all

11     those questions, Seth, to make a record for

12     an ero speciale argument.  You've been doing

13     that the whole time.  I get it.  I understand

14     what you're doing.

15             You realize the import ban is due to

16     all those factors that you just listed.

17     Every one of those was deficient.  That's why

18     the import ban was laid out.

19             So I don't understand why you want to

20     make an argument that the document can't come

21     to us when the import ban was caused by all

22     those issues that you just listed.

23             MR. GOLDBERG:  We can debate about

24     the -- I mean, I don't think this is a debate

25     about the ero speciale factors.  I want to

Page 154

1          understand what the document has to do with

2          this litigation and what the document

3          contains.

4                    MR. SLATER:  Just to put something on

5          the table, this discussion you're asking

6          right now with your co-counsel, presumably

7          your team has had this discussion already in

8          determining that you would agree, yes, this

9          belongs on this log.

10                   I mean, your firm served the log.

11         You're acting as if you're in the same shoes

12         as me and don't know anything about it and

13         then you're saying you're wondering how to

14         prove it's relevant.  Your firm already

15         determined it is relevant.  You already put

16         it --

17                   MR. GOLDBERG:  Relevance and

18         responsive -- relevance and responsive are

19         two different things.  The question of

20         whether it should be produced in this

21         litigation in light of the state secret rules

22         is an entirely different question.  That's --

23         the purpose of this meet and confer is to

24         determine whether the documents should be

25         produced in light of the state secret rules,

Page 155

1    so I'm trying to understand the bounds of

2    what these documents say.

3           MR. SLATER:  I get it.  I'm trying to

4    cut to the chase.  I guess you're asking

5    these questions, but it's the import ban.

6    ZHP was banned from selling drugs into Europe

7    and United States because of contaminating

8    its drugs with NDMA.  It's the reason why the

9    import ban was imposed.  I don't know why you

10   would go through those questions --

11          MR. GOLDBERG:  We're at a different

12   place here.

13          We're talking about the applicability

14   of the state secret laws to documents and

15   there are standards for which this court will

16   determine whether to apply or whether to

17   require the production of documents and we

18   need to understand the documents in the

19   context of those standards.

20          You're arguing about relevancy, which

21   is not pertinent.

22          MR. SLATER:  No, you brought it up.

23          MR. GOLDBERG:  I didn't.  You did.

24   You said the letter is obviously relevant and

25   that's not the question here.

Page 156

1           MR. SLATER:  Seth, you said "I'm

2      trying to figure out how this document is

3      relevant to litigation."  I was responding to

4      you.

5           MR. GOLDBERG:  In the context of the

6      state secret rules, absolutely.  Relevancy is

7      not the determination.

8           MR. SLATER:  I got it.  All right.

9      Document 83.  We're almost done.

10          October 3, 2018, a report to Zhejiang

11     Medical Products Administration regarding

12     valsartan in the Europe and the United

13     States.

14          What does this relate to?  What type

15     of information is being provided?

16          MS. YANG:  It relates to the import

17     ban.

18          MR. SLATER:  The import ban resulting

19     from the contamination of the valsartan with

20     NDMA, correct?  I'm asking that's the import

21     ban we're talking about, we're not talking

22     about --

23          MR. GOLDBERG:  You're doing

24     cross-examination.

25          MS. YANG:  I'm not a factual witness.

Page 157

1              MR. SLATER:  Let me ask you this:

2       When you say the import ban, which import ban

3       are you talking about?  What was the reason

4       for the import ban?

5              I want to make sure it's clear for

6       the record we're talking about the import ban

7       due to valsartan contamination with NDMA.

8              MS. YANG:  It's an import ban from

9       FDA, Italy and EMA.

10             MR. SLATER:  The only import ban you

11      know about is the valsartan NDMA import ban,

12      right?  That's the one we're talking about,

13      right?  I'm making sure it's the same one we

14      all think we're talking about.

15             MS. YANG:  To be honest, I don't

16      really know much about the import ban.

17             MR. SLATER:  We want that document,

18      too.

19             MR. GOLDBERG:  I thought we just had

20      been talking about that document.

21             MR. SLATER:  This is 83.  Eighty-two

22      was the one we talked about.  Now 83 is five

23      days later.

24             MR. GOLDBERG:  Okay.

25             MR. SLATER:  The same subject, it's

Page 158

1         all the same questions, it's the same issue.

2              MR. GOLDBERG:  In these documents, is

3         ZHP seeking the government's guidance on

4         relative to the import ban?

5              MS. YANG:  Seeking the guidance on

6         the public information.

7              MR. GOLDBERG:  Can you explain that?

8              THE WITNESS:  They found out there's

9         some incomplete and misleading information,

10        which is some website was trying to interpret

11        this event, so they were worrying about that

12        information and so they are seeking the

13        government's guidance on those misleading

14        information.

15             MR. GOLDBERG:  I see.  Does this --

16        does 83 make any reference to the testing of

17        valsartan?

18             MS. YANG:  You mean specific to the

19        test of valsartan?

20             MR. GOLDBERG:  Yes.

21             MS. YANG:  No.

22             MR. GOLDBERG:  Does it make any

23        reference to levels of NDMA in valsartan?

24             MS. YANG:  No.

25             MR. GOLDBERG:  Does it discuss the

Page 159

1          manufacturing process for valsartan?

2                    MS. YANG:  No.

3                    MR. GOLDBERG:  Does it discuss the

4          chemicals that are used in the manufacturing

5          of valsartan?

6                    MS. YANG:  No.

7                    MR. GOLDBERG:  Does it discuss any

8          changes made to the manufacturing process in

9          valsartan?

10                   MS. YANG:  No.

11                   MR. GOLDBERG:  Does it discuss any

12         alleged risks to patients who consume

13         valsartan?

14                   MS. YANG:  No.

15                   MR. GOLDBERG:  Okay.  I have no other

16         questions on that document.

17                   MR. SLATER:  When you say they're

18         asking for government guidance, can you tell

19         me the phrase whereby ZHP said "Please give

20         us guidance"?

21                   MS. YANG:  I think I can't answer

22         this question without divulging the state

23         secrets.

24                   MR. SLATER:  Do they actually say in

25         the letter or this report to them "Please

Page 160

1          tell us what to do" or something to that

2          effect?

3                    MS. YANG:  Well, it's the same

4          question, isn't it?

5                    MR. SLATER:  That's fine.  I'm going

6          to move on to the next document.

7                    Number 88, July 12, 2018, a report

8          sent to National Food and Drug Administration

9          regarding NDMA and valsartan.

10                   So this is July 12th, 2018.

11                   What type of information is being

12         provided regarding NDMA in valsartan?

13                   MS. YANG:  This is one of the

14         documents we talk about the summary.

15         Document 56, document 56 is the summary, a

16         list of documents provided by ZHP to the

17         government, all from the government to ZHP,

18         so this document 88 is one of the documents

19         referred to in 56.

20                   MR. SLATER:  Okay.

21                   What is this document providing?

22         What type of information?

23                   MS. YANG:  It's about the information

24         about NDMA and valsartan API.

25                   MR. SLATER:  Factual information?

Page 161

1          MS. YANG:  Potential.  Potential,

2     yes.  Potential cause, factual information.

3          MR. SLATER:  Does it also provide

4     information about the health risk?

5          MS. YANG:  No.  I didn't see any

6     discussion about health risk.

7          MR. SLATER:  You said it's the

8     potential cause?  It provides factual

9     information about how it was potentially

10     caused?

11          MS. YANG:  Yes.

12          MR. SLATER:  We're going to request

13     that document.

14          MR. GOLDBERG:  Is this providing --

15     is this providing -- is this report

16     summarizing information that was provided to

17     the FDA or is it information -- can you tell

18     me if it was information provided to the FDA?

19          MS. YANG:  I think this document is

20     not summarizing information providing to the

21     FDA.  Well, at least according to the

22     document itself, it does not say this

23     information is provided to the FDA.  But it

24     discussed FDA standards of the limits of

25     NDMA.

Page 162

1          MR. GOLDBERG:  Is it talking about

2      ZHP's performing testing in relation to the

3      FDA investigation?

4          MS. YANG:  No.

5          MR. GOLDBERG:  Or the FDA standards?

6          MS. YANG:  The FDA limit about the

7      NDMA.

8          MR. GOLDBERG:  Okay.

9          So it's referring to the FDA's limit

10     for NDMA in valsartan?

11         MS. YANG:  Yes.

12         MR. GOLDBERG:  And is it discussing

13     ZHP's root cause investigation into the NDMA

14     impurities?

15         MS. YANG:  No.

16         MR. SLATER:  Can I just stop for a

17     second?

18         You said they discussed the potential

19     cause?

20         MS. YANG:  Yes.  It's potential

21     cause.  My understanding about root cause is

22     something for sure.

23         MR. GOLDBERG:  Is it discussing -- is

24     it discussing the impurity --

25         MR. SLATER:  How thin are you going

Page 163

1          to slice this one, Seth?

2               MR. GOLDBERG:  I'm just trying to

3          understand what it is.  I guess we can move

4          on.  We can move on.

5               MR. SLATER:  Now, I'm on the

6          partially redacted document list.  I need to

7          double check one thing relative to this

8          document.

9               So the first document on the

10         partially redacted is document one.  It says

11         document two is a duplicate.

12              First of all, are you able to confirm

13         those are the same document, one and two?

14              MS. YANG:  Yes, I confirm.

15              MR. SLATER:  This is dated May 21,

16         2020, discussing -- it's an email of ZHP

17         discussing the materials prepared to send to

18         national and provincial Medical Products

19         Administrations.

20              So this is an internal email?

21              MS. YANG:  Yes.

22              MR. SLATER:  What type of information

23         are we talking about that they're preparing

24         to send?

25              MS. YANG:  It's the document sent to

Page 164

1          the Zhejiang province and the National

2          Administration.

3                    MR. SLATER:  What's the subject

4          matter?  I don't understand what it relates

5          to.

6                    MS. YANG:  It relates to FDA 483

7          deficiency response and GMP deficiency

8          response.

9                    MR. SLATER:  Okay.  So it's telling

10         this Chinese entity what the responses are to

11         the 483 deficiency letter and the GMP, I

12         guess, the response -- what was flagged in

13         the 483 regarding GMP?

14                   MS. YANG:  Yes, I think so.  I think

15         they have this kind of routine report

16         procedure.

17                   MR. GOLDBERG:  Can I ask a question?

18         The information that's redacted, is that the

19         information -- is that government -- the

20         information that's being redacted, is that

21         somehow reflecting the viewpoints of the

22         government?

23                   MS. YANG:  Yes.

24                   MR. GOLDBERG:  Why is there -- so

25         I -- what is the information?  Can you

Page 165

1      describe the information that's being

2      redacted?  Because I think that's the

3      question about the state secret.

4            MS. YANG:  That's the comments from

5      the official of a PRC government.  I don't

6      know which government.

7            MR. GOLDBERG:  So the redacted

8      information is comments by the PRC

9      government; is that right?

10            MS. YANG:  Yes.

11            MR. GOLDBERG:  Okay.

12            MR. SLATER:  Does the redaction

13      include any factual information that was

14      provided by ZHP?

15            MS. YANG:  No.

16            MR. SLATER:  Okay.

17            MR. GEDDIS:  What about the

18      attachments to the document?

19            MS. YANG:  Are there attachments to

20      this document?

21            MR. GEDDIS:  The log says there is an

22      attachment.

23            MS. YANG:  Yes.  There is documents,

24      there's attachment.  There's an attachment

25      basically that ZHP telling the Chinese

Page 166

1          government what's the content of this, you

2          know, for ZHP and what is the reply of Weihai

3          and some comments and explanation, additional

4          comments and explanation from ZHP.

5                    MR. SLATER:  Let me understand this.

6                    So document one, is that an email

7          from -- who wrote that email?

8                    MS. YANG:  Document one is an email

9          chain.  There are two emails.  The first

10         email is from Linda Lin and the second is

11         from John Du.  So in the emails I think they

12         mention the government official's opinion or

13         comments.

14                    MR. SLATER:  Let's go through.

15                    The bottom email is the one that's

16         from John Du to Linda Lin.  That's the first

17         in the chain, right?

18                    MS. YANG:  The bottom email is from

19         Linda Lin to John Du.

20                    MR. SLATER:  I'm trying to figure out

21         which one is first and which one is

22         responding to the other one.  That's what I'm

23         figuring out.  John Du wrote to Linda Lin

24         first and she responded or --

25                    MS. YANG:  Linda Lin wrote the first

Page 167

1      email and John Du replied.

2              MR. SLATER:  So Linda Lin wrote to

3      John Du saying something to the effect of "Ju

4      Chu communicated with me at noon today,

5      stating that she wishes to see the report

6      tomorrow morning so that she can check the

7      overall work arrangement."

8              Is my translation that I was provided

9      on or off?

10             MS. YANG:  It's redacted, right?

11             MR. SLATER:  Not the whole document.

12     Part is redacted, part is not.

13             MS. YANG:  Okay.

14             MR. SLATER:  Then it says "Attached,

15     please find the organized synopsis which will

16     be used as an attachment in the report for

17     the local and state agencies.  Please review

18     the following" and it has three attachments

19     listed.

20             Correct?

21             MS. YANG:  Yes.

22             MR. SLATER:  The first one is the

23     summary of the response to the FDA 483

24     observation, right?

25             MS. YANG:  Yes.

Page 168

1              MR. SLATER:  I'm just making sure I

2        have the right info.

3              Attachment two is the summarized

4        response to the GMP audit deficiencies with

5        EDQM?

6              MS. YANG:  Yes.

7              MR. SLATER:  Attachment three is a

8        summary of all correspondence with FDA and EU

9        regulatory authorities through CMC?

10             MS. YANG:  Yes.

11             MR. SLATER:  She says "I'm still

12       working on the body of the report and will

13       send it for your review tomorrow."

14             Is that --

15             MS. YANG:  Yes.

16             MR. SLATER:  He responded "Attached

17       modified response and status explanation of

18       483 and warning letter."

19             So he edited what she had sent?

20             MS. YANG:  Yes.

21             MR. SLATER:  That's attached to his

22       email, right?

23             MS. YANG:  Yes.

24             MR. SLATER:  Then it says "For the

25       response to EDQM, we do whatever we have to

Page 169

1          do."  The third, he says "I have no way of

2          verifying the correspondence with the filing

3          registration."

4                   I'm getting that right?

5                   MS. YANG:  Yes.

6                   MR. SLATER:  So when we got document

7          one, we didn't get the attachments to the

8          John Du email where he actually had attached

9          a revised version of the response and status

10         explanation, right?  If we didn't get

11         document two, we didn't get that attachment,

12         right?

13                  MS. YANG:  I don't know.

14                  MR. SLATER:  I'm making a request --

15         I'm requesting both of these documents in

16         full with both of the attachments.  It seems

17         to be very relevant.  I can't imagine how

18         this is some kind of risk to national

19         security to China for us to have these

20         documents when they're summarizing what's

21         going on around the world regarding valsartan

22         contamination.  We're getting to -- it's

23         showing John Du editing how they're going to

24         tell a government authority what's going on.

25         I think we have an absolute right to see his

Page 170

1    thought process.  We're going to be deposing

2    him and Linda Lin.  I think we have the right

3    to these documents.  Obviously I'm not

4    expecting you to agree right now, but I just

5    wanted to make that clear.

6            MR. GOLDBERG:  Okay.

7            MR. SLATER:  We've gone over time and

8    we've got to get moving.

9            MS. YANG:  We're almost there.

10           MR. SLATER:  Almost.

11           The last document is document three,

12   which is May 21, 2020, an email discussing

13   the materials prepared to send to national

14   and provincial medical products

15   administrations.

16           So I'm just -- who is that email sent

17   by and what's the subject matter?  Why is

18   it -- what's it about?  I can't tell from

19   that.

20           MS. YANG:  I think it's the same

21   email chain, just another layer of email on

22   top of the email we just looked at.

23           MR. SLATER:  It's a lot later, we're

24   talk -- actually, it's not.  It's the same

25   day.  Okay.  You're right.  It's the same

Page 171

1       day.  I actually was looking at -- actually,

2       I'm looking at the date created versus the

3       document date.  It's the document date that

4       matters.  Okay.  So it's part of the same

5       discussion?

6              MS. YANG:  Right.

7              MR. SLATER:  That was all rambling.

8       I hate for Judge Vanaskie to read that part.

9       You can skip what you just saw, Judge.

10             I'll confirm this is another email in

11      the same line of discussion as the first two

12      documents, right?

13             MS. YANG:  Yes.

14             MR. SLATER:  It's same issues.

15             MS. YANG:  Yes.

16             MR. SLATER:  Are there attachments to

17      this one?

18             MS. YANG:  I think so.

19             MR. SLATER:  How many attachments?

20             MS. YANG:  One attachment.

21             MR. SLATER:  What is that attachment?

22             MS. YANG:  Hold on a second.  Let me

23      open.  It's a report, NDMA related event.

24             MR. SLATER:  Is it the same report

25      that they were going back and forth with?  Is

Page 172

1    it one of the reports attached to the other
2    two?
3          MS. YANG:  No.  It's different
4    reports.
5          MR. SLATER:  But it's another report
6    about regulatory actions in the US and Europe
7    and elsewhere?
8          MS. YANG:  It looks like --
9          MR. SLATER:  I don't want to hold up
10   too long on this.  It relates to the same
11   subject matter --
12         MS. YANG:  Yes.  It summarizes all
13   the impurities events that occurred in other
14   countries, in foreign countries.
15         MR. SLATER:  Okay.
16         The impurity events in the foreign
17   countries?
18         MS. YANG:  Yes.  Korea.
19         MR. SLATER:  Okay.  We're requesting
20   these three documents in full with the
21   attachments.
22         MR. GOLDBERG:  If any of these
23   documents, Adam, are containing the same
24   information that was provided to the FDA, do
25   you still need them?

Page 173

 1            MR. SLATER:  Yes.  Because the way

 2       that it's couched and the way it's described

 3       and the fact that you have editing going on

 4       and how they're choosing to describe this, I

 5       think we have a right to see it and there's

 6       certainly -- the issue is I don't see how

 7       that can be within a state secret.

 8            I read the law.  I don't see how that

 9       can be a risk to national security in China

10       if we get these documents.  Especially, you

11       know, you produced them with redactions to

12       begin with, so I would say as a first step to

13       produce them with redaction of any purely

14       Chinese government conclusions.

15            I mean, if you redact that in the

16       first instance, we may be fine with what we

17       get.  If something more is going to be

18       redacted, I would want to know so we could

19       understand the level of redaction.  I would

20       hope in this approach that you guys can

21       consider with a lot of the documents we've

22       discussed today that it seems pretty clear to

23       me where there's factual information being

24       provided and separately in the document

25       there's also some information being

Page 174

1          communicated by the Chinese government.

2          That's where I think your argument for state

3          secret is, that factual information provided

4          to ZHP to me --

5                    MR. GOLDBERG:  If the factual

6          information is the same information already

7          produced in the litigation, do you agree that

8          you don't need that to be provided?

9                    MR. SLATER:  No, I don't because the

10         context is important, the framing of it, how

11         it's described and we have a right to

12         determine on our own whether it's identical

13         and whether it raises different issues.  One

14         phrase somewhere could be very significant in

15         terms of how things are described.  One word

16         can matter.

17                   MR. GOLDBERG:  So how it's described

18         to the Chinese government would bear on the

19         litigation in the US?

20                   MR. SLATER:  Let's say that they said

21         to the Chinese government -- I'm making up an

22         extreme example so it makes the point -- this

23         contamination is very dangerous for people

24         and it poses a significant risk for cancer.

25         I have a right to see that.  If they said the

Page 175

1        cause of this contamination is because we

2        were asleep at the wheel on risk assessment,

3        that would be relevant.

4                MR. GOLDBERG:  And if all they did

5        was say here's the information we provided to

6        the FDA without recharacterizing it in those

7        ways, then it wouldn't be anything that you

8        didn't already have.

9                MR. SLATER:  This is not an exercise

10       of figuring out if we have it already or not.

11       In the exact words, it's couched here.

12       That's not the exercise.  The exercise is

13       whether or not we should have the documents

14       and be able to use them.

15               I might choose to use this version

16       rather than other versions for reasons that

17       make sense to us based on our work product.

18       I mean, that's not the argument.  I don't

19       think Judge Vanaskie is going to entertain an

20       argument on do you really need it if it's

21       similar to something else that you already

22       have.

23               To me, the fact that it's similar and

24       if you're right, the same as what was in

25       documents that we already have makes my point

Page 176

1      that there's no basis to withhold it from us.

2      To me, the more similar it is to what we

3      already have, there's an argument to be made

4      there's absolutely no risk.

5              So that's -- with regard to these

6      documents and how these documents are being

7      framed in this discussion, I'm not saying

8      that to the exclusion of other documents in

9      other context with regard to this.  I don't

10     see where the harm is or the risk if it's

11     information that's publically available

12     already.  I don't understand how that becomes

13     a state secret if it's being repackaged for

14     the Chinese government.

15             That's our last document.  I'm

16     perfectly satisfied to say good night and

17     good day.  We could certainly resume this

18     discussion.  I think we both have to digest

19     what we learned today and then we could

20     probably reconvene and then we have to give

21     the judge an update next week.

22             MS. YANG:  I'm sorry.  One more point

23     on state secrecy, there's different levels of

24     state secrecy, there's higher level, there's

25     lower level that's just confidential.  So

Page 177

1          it's not -- it's subject to the PRC

2          government's view whether that concerns the

3          state secrecy.  Their criteria is not whether

4          this information is the same information

5          that's provided to you that FDA or anything

6          like that.  They have their own criteria, so

7          if this is matter considered by major

8          company, pharmaceutical manufacturer in China

9          and the US event relates to the Chinese

10         recall and everything in China, it may

11         concern a public health issue and national

12         economy, so in their view and also according

13         to the cases I cited in my declaration, I

14         would say there will be state secrecy issues.

15                It's not our view, it's not -- it's

16         just how the PRC government will look at it,

17         will look at that document.  At least those

18         documents are subject to the PRC government's

19         approval if we want to release them.

20                MR. SLATER:  It looks like somebody

21         from the company wrote to the government in

22         May of last year and my understanding was

23         that there's been further communications.  I

24         mean, has a request been made to --

25                MS. YANG:  I think you can ask this

Page 178

1    question to the fact witness.  I'm not sure

2    whether there's any ongoing continued

3    discussion about that.  I'm trying to tell

4    you from the legal point of view I think this

5    information of public -- appears as the

6    government's information.

7              MR. SLATER:  When you say you're not

8    sure if there's any ongoing discussion with

9    China, if there was, you'd be involved with

10   it.  That's what your law firm does, right?

11             MS. YANG:  No.  We were involved, but

12   just a couple months ago.  I mean, last year

13   when we're doing the document review and

14   state secrets, it was not part of our

15   original assignment, so we don't know.

16             MR. SLATER:  You don't know.  Okay.

17             Seth, do you know?

18             MR. GOLDBERG:  Adam, I think there

19   was an affidavit along these lines and I

20   think it's set forth in the affidavit.  I

21   understand that requests have been made.

22   There was a document -- if you're referring

23   to the document that was in the log that was

24   something that had to be followed up with.

25             MR. SLATER:  I'm referring to on

Page 179

1       March 26, 2021, I'm asking is there an

2       ongoing effort.

3              MR. GOLDBERG:  I don't about -- I

4       don't know about ongoing.  I don't know what

5       that meanings.  I know there's -- requests

6       have been made.

7              MR. SLATER:  There's a request you're

8       waiting for a response on?

9              MR. GOLDBERG:  I believe that's the

10      case because that was what was set forth in

11      our papers, I believe.

12             MR. SLATER:  If I understand,

13      Ms. Yang, there's different levels of state

14      secrets, you said.  Because ultimately,

15      you're making a decision on these about

16      whether or not they're covered or not.  It

17      sounded to me like there may be room to work

18      through this to the extents you can redact

19      the Chinese state government impressions, but

20      leave in the factual information.

21             So I'm asking you to reconsider doing

22      more of what you did with the three documents

23      on the last page, but we obviously want the

24      attachments, too, which were not provided to

25      us.  I'd ask you to consider that and we've

Page 180

1       made the requests.

2               I'm not going to belabor it, but we

3       have a real issue with attachments, we need

4       to have listed attachments, we need to know

5       those have been reviewed too, etc.

6               So I would suggest that we probably

7       both have to digest this while we have no

8       time to over the next few days and we

9       probably have to reconvene and give the judge

10      an update.  I would hope that we could

11      probably discuss this Monday or Tuesday and

12      tell the judge where we stand.  I don't think

13      we'll be able to qualify by then, but I'd

14      like to hope that we're close.

15              I know one of those documents is a

16      Pen Dong document.  At least he's listed on

17      one of them.  So maybe that one you can take

18      a look at because I'm deposing him starting

19      tomorrow night.

20              MR. GOLDBERG:  Do you know which

21      document that is?

22              MR. SLATER:  Not for the life of me,

23      but let me look and see if I could find it

24      while I'm on the phone with you.

25              I think it's one document that I saw

Page 181

1          his name on as a custodian or a from/to.  I

2          gotta tell you, I'm trying to read this on my

3          desk and the type is so small --

4                  MR. GEDDIS:  Document 75 has Pen Dong

5          on it.

6                  MR. SLATER:  Which is a duplicate of

7          34.  Good find.  So 34/75, I guess, is one.

8                  We can look.  That might be the only

9          one I saw.  I don't think there was another

10         one unless Chris corrects me once again.

11                 MR. GEDDIS:  I'm searching and it's

12         the only one I see.

13                 MR. SLATER:  It's actually

14         interesting, 34, since it's a duplicate of 35

15         and a duplicate --

16                 MR. GOLDBERG:  Those are documents

17         that you did not -- you said no challenge to.

18         You're not challenging 34.

19                 MR. SLATER:  All right.  That's good.

20         That solves the problem.

21                 MR. GOLDBERG:  It's 12:30.  I do want

22         to conclude this for the folks in China.

23                 MR. SLATER:  All right.  Goodbye

24         then.

25                 MR. GOLDBERG:  Adam, we could let

Page 182

1          them go.  They're not part of the process.

2                    MR. SLATER:  Thank you very much.

3          Have a nice night.  I appreciate it.

4                    MS. YANG:  Thank you.  Have a good

5          day.

6                    MR. SLATER:  We should talk --

7                    MR. GOLDBERG:  We can go off the

8          record.  Thank you.

9                    (Time noted: 12:30 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 183

1                    CERTIFICATION

2            I, SARA K. KILLIAN, RPR, CCR

3    and Notary Public of the State of New

4    York, do hereby certify I am not related

5    to any of the parties to this action by

6    action by blood or marriage, and that I

7    am in no way interested in the outcome of

8    this matter.

9                IN WITNESS WHEREOF, I have hereunto

10   set my hand this 29th day of March, 2021.

11

12

13

14        SARA K. KILLIAN, RPR, CCR

15    Notary Public of the State of New York

16

17

18

19

20

21

22

23

24

25

[& - 8]                                                                    Page 1

| & | 2 | 2875  1:3 | 4 |
|---|---|---|---|

**&**  2:3 45:21 82:1
87:8 88:2

**0**

**02440332**  12:3
**07068**  2:6

**1**

**10**  58:23 117:19
140:17
**103**  2:5
**10:00**  57:18
**10:51**  113:2
**10:58**  113:4
**11**  117:15,20
**11/1/2019**  46:14
**11:59**  6:20
**12**  20:8 49:14 51:6
52:1,2 112:2
160:7
**12:30**  181:21
182:9
**12th**  96:10 160:10
**13**  52:19
**14**  59:16 61:11
102:5 103:22
**15**  54:7 56:1 57:12
111:2
**16**  13:13,14 14:1,1
57:10 58:2 64:12
95:5
**163.com**  3:21
**16th**  6:16
**17**  52:20 96:10
122:19
**17th**  2:13 4:10,14
**18**  32:25
**19**  58:23
**19103**  2:14

**2**  13:9,23 14:17
20:19 21:18 24:2
25:4 31:11,25
32:11 34:9 36:11
91:20
**20**  59:16 61:18
139:9
**2017**  20:9 21:23
52:20 96:6 99:23
102:5
**2018**  28:8 59:17
61:12 64:12 65:22
68:16 80:11,23
100:2 103:22
111:2 113:6
122:19 126:22
133:25 139:9,24
140:17 141:10,12
144:23 151:4
156:10 160:7,10
**2019**  33:1 45:1
51:14 58:24 94:15
117:15,20 131:15
**2020**  95:5 106:20
107:10 163:16
170:12
**2021**  1:8 179:1
183:10
**21**  61:11 67:13
94:15 163:15
170:12
**22**  139:24 141:10
141:11
**23**  6:17
**26**  1:8 6:17 179:1
**27**  12:24 30:22
31:13,14 36:4
**27th**  21:23
**28**  64:11

**29**  67:21,22 68:2,3
68:6,16 69:23,25
70:10,24 71:5,15
71:24,25 72:1,13
72:15 73:9,15,19
75:23 76:6,11,14
76:15 80:11 89:16
89:18 126:22
144:23 151:4
**29and**  72:22
**29th**  68:12 183:10

**3**

**3**  113:6 156:10
**30**  2:13 6:9 7:19
8:7,9,11 67:19,20
67:24 68:5,9
69:23,24 70:1,10
70:22 71:1,2,3,4
71:14,24 72:7,17
72:21 73:10,14,18
73:21 77:3 89:16
89:18 96:6 139:5
**31**  65:22 71:16,18
71:25 72:9,16,22
73:9,15,18,21
**32**  71:17,18,18,23
72:1,7,17,21 73:10
73:10,14,18,21
**33**  70:20 71:19,23
80:6,7 81:13
89:18 93:18,22,25
**332**  12:9
**34**  81:11 181:7,14
181:18
**34/75**  181:7
**35**  181:14
**37**  95:4,24
**37103**  30:8
**39**  98:25 99:2
101:20

**4**  24:17
**40**  98:19
**41**  98:20
**42**  98:20
**4268**  183:13
**43**  98:20
**48**  21:2
**483**  116:3,5 164:6
164:11,13 167:23
168:18

**5**

**5**  133:25
**5167**  101:23 102:1
**52**  98:20
**53**  98:21
**56**  101:15,18,25
160:15,15,19

**6**

**61**  106:20
**62**  111:2 112:1,8
**63**  109:16
**64**  113:5 116:11
117:13
**65**  117:14 120:22
122:4,9,11,11
**66**  122:8,13
**67**  122:5,16
**68**  129:12 131:13
**69**  131:14 132:9
133:22

**7**

**7**  131:15
**70**  133:23
**73**  140:17
**75**  181:4

**8**

**8**  45:1 51:14

[8/3/2018 - approval]                                                    Page 2

**8/3/2018**  112:2
**81**  144:23 148:3
  150:23
**82**  148:3 151:3
**83**  156:9 157:21,22
  158:16
**88**  160:7,18
**8:00**  1:9 7:17

**9**

**9**  13:9,24 91:20
**9.4**  14:24 15:1
  20:19 21:19 26:8
  32:2,4,11 36:12
**9.4.**  24:20 32:6
  34:10
**9.5**  31:11,25
**9.5.**  32:5
**91**  6:21
**9:26**  59:13
**9:30**  59:15

**a**

**a.m.**  1:9 7:17
  57:18 59:13,15
  113:2,4
**abbreviation**  23:6
**abide**  48:12
**able**  7:11 15:21
  16:8 39:11 94:12
  104:2 163:12
  175:14 180:13
**absolute**  169:25
**absolutely**  156:6
  176:4
**access**  85:17 88:13
**acting**  64:2 154:11
**action**  183:5,6
**actions**  172:6
**adam**  2:7 3:1 5:10
  5:16 7:24 9:5
  11:14 27:18 28:18

57:11 73:1 89:20
  96:15 131:3
  172:23 178:18
  181:25
**adding**  103:15
**addition**  62:15
  87:8
**additional**  166:3
**address**  3:13 9:11
  42:24 50:16 78:4
**addresses**  3:19 4:8
**addressing**  29:9
  59:2 131:18 134:4
**administration**
  3:22 12:14 14:3,4
  20:13 32:23 37:8
  37:13 44:24 45:4
  45:8 46:19 51:10
  51:11 52:22 56:3
  61:16 64:14 65:24
  80:9 106:15 111:3
  113:7 117:19
  140:1,19,20
  144:25 156:11
  160:8 164:2
**administrations**
  141:3 163:19
  170:15
**administrative**
  13:16
**advance**  3:24
**advised**  30:14
**affairs**  26:14,15
**affidavit**  178:19
  178:20
**agencies**  104:18
  105:10,17 146:4
  167:17
**agency**  22:10 64:3
  64:18 86:15

**agenda**  42:18
  46:25 47:11,14,17
  47:18,19,24 130:4
**ago**  178:12
**agree**  86:22 87:23
  89:15 90:19 154:8
  170:4 174:7
**agreement**  89:8,10
  90:17
**ahead**  5:18 8:20
  9:4
**alleged**  133:10
  143:4 159:12
**allowed**  15:16,20
**analysis**  83:3,6
  89:23
**analyze**  29:5
**analyzing**  48:10
**announcement**
  65:25
**answer**  5:22 8:3,4
  18:11 19:20 66:8
  66:25 67:8 82:25
  83:2,2 94:1 100:5
  101:13 128:8
  159:21
**answered**  5:5 57:2
  57:5
**answering**  18:6
**answers**  45:21,23
  58:6 59:6 66:11
  66:13,14,18,21,21
  66:22,23 67:3,5,7
  67:10,24 69:5
  81:24 82:6 110:1
  119:1
**anybody**  18:11
  49:20
**anymore**  52:24
  64:8 134:23

**anyway**  115:11
**ap's**  142:19
**apart**  45:14,17
**api**  39:4 52:22
  53:21 60:3 61:15
  64:19,23,25 65:3,5
  65:8 78:16 94:17
  101:8 112:15,16
  112:19 118:15,16
  118:18 140:22
  160:24
**apologize**  3:24
**apparently**  93:19
**appear**  72:16
  75:16 106:2
**appears**  72:15
  178:5
**applicability**
  155:13
**applicable**  3:20
  9:7,17,18 15:25
  17:4
**application**  95:10
**applied**  22:20 28:1
  54:25
**applies**  14:15 17:2
  17:10,12,14 21:12
  26:20
**apply**  17:3,8,8
  20:18 22:15,21
  110:11 155:16
**applying**  44:8
  54:24
**appraisal**  111:5
  112:5
**appreciate**  14:5
  182:3
**approach**  173:20
**approval**  22:16
  33:20 62:19 95:7
  95:12 97:24

110:16 177:19
**approve** 98:3
**approved** 97:25
98:7
**arguably** 107:1
**argue** 103:25
**arguing** 155:20
**argument** 89:5
90:13 120:13
153:12,20 174:2
175:18,20 176:3
**arm** 114:18
**arrangement**
167:7
**arrived** 111:15
**article** 12:24 13:9
13:9,13,14,23,24
14:1,1,17,24 20:19
21:2,18 24:1,17
25:4 30:22 31:11
31:13,13,25 32:11
32:17 34:9 36:4
36:11 91:20,20
**articles** 21:4 32:10
**asked** 35:11 45:23
66:7 82:13 84:13
88:9 109:24
114:14 118:25
129:3 144:4,5
**asking** 7:19 9:17
17:17 18:21 31:18
32:8,15 46:8
56:17 60:7,12,23
60:24 62:17 66:8
69:8,12 77:10,21
87:14,20 90:9
98:2 106:2 107:18
112:21 121:7
126:14 127:20
129:6 131:3
144:17 153:10

154:5 155:4
156:20 159:18
179:1,21
**asks** 31:20,21 38:4
45:20 137:18
**asleep** 96:2 175:2
**assess** 54:1 60:17
60:19
**assessment** 55:5
59:17,23,23,24
60:1,7,13,22,25
175:2
**assigned** 130:24
**assignment** 178:15
**assume** 11:4,19
16:23 51:19 53:22
96:11 118:20
**assuming** 3:12
16:21
**attach** 135:12
**attached** 149:4,8
167:14 168:16,21
169:8 172:1
**attachment** 35:23
68:10,14,23 69:2
73:5 76:9 77:4
78:24 93:18,22,25
94:2,5 98:25 99:1
99:11 149:5,8,11
165:22,24,24
167:16 168:3,7
169:11 171:20,21
**attachments** 67:20
67:21 68:4,5,21
70:10,20,22 72:8
72:10,16,22,23
73:10,15,16 74:3
74:17,17,23 75:12
94:12,13 98:24
149:6 165:18,19
167:18 169:7,16

171:16,19 172:21
179:24 180:3,4
**attend** 49:20 50:1
**attention** 124:18
137:8
**attorney** 79:12
**attorneys** 2:4,12
**audit** 130:18 168:4
**august** 111:2
113:6 140:17
**authorities** 102:7
102:8 140:1 147:5
168:9
**authority** 86:20
142:5 169:24
**available** 124:3
148:21 176:11
**avoid** 95:21
**avoids** 95:17
**awkward** 73:2

**b**

**b** 97:10
**back** 9:23 28:20
32:18 42:2 61:1
70:15 73:25 75:6
82:11 94:9 128:17
171:25
**ban** 151:6,8,10
152:15,17 153:3
153:15,18,21
155:5,9 156:17,18
156:21 157:2,2,4,6
157:8,10,11,16
158:4
**banned** 155:6
**bans** 151:21
**barbara** 2:16
**based** 10:5,15,17
43:6,15 53:14
62:22 70:2 98:4
121:8 132:15

151:17 175:17
**baseline** 12:17
**basically** 13:15
15:10 22:9 25:9
53:17 59:4 61:18
69:8,11 86:5
97:25 102:24
104:11 111:14,19
118:23 128:7
130:17 165:25
**basis** 7:2 12:21
36:12 176:1
**batch** 139:17
**batches** 52:14
65:16
**bates** 11:4,15 12:2
30:5 101:23,25
**bear** 68:7 174:18
**bearing** 14:22
24:3,15,23 25:16
**bed** 34:12
**beg** 29:8
**beginning** 11:9
**beijing** 39:5,8,8
**beings** 33:17
135:11
**belabor** 180:2
**believe** 4:10 10:16
56:15 149:25
179:9,11
**believed** 123:14
**belongs** 154:9
**better** 74:10
**big** 75:19
**bio** 59:10
**bioequivalence**
23:5,8 29:3,13
97:11 100:12
**bioequivalency**
100:10

**bioequivalent**
29:11
**biopharm** 10:13
**bit** 78:5
**blood** 183:6
**board** 12:23
**body** 168:12
**bootleg** 80:5
**bottom** 35:16
166:15,18
**bounds** 155:1
**breadth** 106:25
**break** 59:10
112:25
**briefly** 146:10
**bring** 124:17
**brings** 16:23
**broad** 23:9
**broke** 146:23
**brought** 155:22
**bullet** 56:8
**bunch** 19:23 39:14
39:24 90:10 98:16
140:20
**bureau** 151:5
**business** 6:19

**c**

**c** 2:1
**call** 5:17 7:10,17
7:23 8:1,9,14,15
10:8 25:2 91:25
137:17,20
**camera** 80:2
137:25
**cancer** 33:17
135:11 174:24
**capacity** 37:25
**care** 107:4
**careful** 71:21
**case** 10:20 16:23
32:11 72:13 79:18

89:18 118:18
119:23 179:10
**cases** 177:13
**cast** 3:7,18 4:3,21
4:24 6:20 8:13
10:23 126:8
**category** 6:24,25
**cause** 19:7 33:17
50:10 55:13 60:20
63:17 81:20,22
82:13,16 85:20
86:17 122:25
124:6,19 125:6,9
133:14 135:11
137:5 138:15
142:15 148:10
150:5 161:2,8
162:13,19,21,21
175:1
**caused** 125:4
153:21 161:10
**ccr** 183:2,14
**cde** 9:14 20:12
32:22,24 34:16,24
35:8 37:3,5,6,16
40:14 46:18 58:3
58:25 59:19,19
60:10 96:8 97:24
97:25 98:2,5,7
100:22,24
**center** 20:9,12
32:22 37:2 46:17
94:16 117:18
**central** 64:18,24
65:1
**cep** 105:12
**certain** 31:16 51:2
52:14 109:4
**certainly** 6:25 7:4
89:24 91:23 173:6
176:17

**certification** 183:1
**certified** 1:13
**certify** 183:4
**cgmp** 123:6
144:15
**chain** 68:5 98:18
98:23 166:9,17
170:21
**challenge** 17:25
18:16 28:21 61:6
62:23 95:3,25
99:12 103:8
111:25 124:9
139:19 140:16
181:17
**challenges** 90:20
92:13
**challenging** 57:12
57:13,17,23 58:17
59:8 65:20 69:20
69:23 109:18
141:8 145:19
181:18
**chance** 7:8
**change** 27:11 82:8
**changed** 93:7
**changes** 159:8
**characters** 3:8,18
4:4,21,24 6:20
8:13 10:23
**chase** 155:4
**check** 75:6 98:23
163:7 167:6
**checking** 121:6,6
**chemical** 46:16
50:15
**chemicals** 152:24
159:4
**china** 6:3 8:2
10:15,17,18 13:11
15:17,18,19,22

16:9 20:12 22:16
22:21 25:15 28:15
31:2 32:22 37:7
37:12 42:13 44:11
46:18 47:20 53:6
53:8 62:14,20
65:4,6 78:14,16
79:12 85:8,9,11
87:13 90:13 101:8
101:10 103:20
104:6 112:22,23
113:12,14 114:4,7
114:13 115:15
119:24 120:6,6
124:7 140:7 141:6
141:7 169:19
173:9 177:8,10
178:9 181:22
**china's** 65:23
**chinese** 6:8 7:20
8:24 9:1,13 13:4
13:25 16:18 19:16
20:9 22:10,12,13
22:19 24:22 25:21
27:23,24 28:1,2
33:11 37:19,24
38:1,3 40:18,23
41:4 43:3,13,16
49:21 51:2,3,5,16
52:14 53:18 54:12
55:1,2,8,10,20
58:10 60:3 63:16
63:23,24 64:1,3,5
66:3 75:24 76:2
76:18,21,25 77:7,9
77:11,21,23,23
78:21 79:1,4,5
82:2 83:14 84:1,8
84:15 86:5,13,15
86:19 87:17,19,25
88:5,9 89:2,13

[chinese - conclusion]                                                          Page 5

90:1,23,25 91:1,5
91:8,8,10,11,14
95:12 100:13,18
100:21 102:17,20
102:23 103:10,17
104:4,9,16,24
105:4,11,21,24
106:4,16 107:15
107:20,25 108:5
109:2 110:10
111:9 112:10,13
112:14,21 115:7
115:20 117:23,25
118:2 120:24
121:5,9,14 123:8
123:15,17 124:13
124:14 126:10
127:19 130:10
132:10 133:19
136:6,8,22 137:11
141:1,4 142:4
145:22 146:18,21
146:25 147:5,6,15
147:16,18,23
150:16 164:10
165:25 173:14
174:1,18,21
176:14 177:9
179:19
**choice** 9:2
**chongqing** 139:11
139:12,13,16
**choose** 175:15
**choosing** 173:4
**chp** 151:6
**chris** 4:9 11:3,14
12:1 30:5 70:18
71:17,23 80:5
101:22 181:10
**christopher** 2:8

**chromatograms**
41:21
**chromatography**
41:21 117:7 130:7
133:4 138:19
152:8
**chu** 167:4
**chuanon** 114:1
**circulated** 21:10
**citation** 12:23
**cite** 36:2,11 38:5
**cited** 12:20 13:1
13:19 110:13
177:13
**citing** 98:9
**city** 45:5
**clarification** 43:11
**clarify** 91:18
**clarifying** 109:19
**classify** 21:14 37:1
**clear** 67:3,5 75:1
79:10 113:13
157:5 170:5
173:22
**clearly** 89:17
90:10
**close** 180:14
**closed** 48:18 49:24
**closely** 92:3
**cmc** 168:9
**colleague** 115:1
**collegial** 6:11
**column** 11:23
12:20 70:5 71:15
**columns** 11:5 70:6
**combative** 6:12
**come** 9:23 28:20
32:18 46:23,25
57:22 59:2 72:11
153:20

**comfortably**
107:13
**coming** 40:9
**commented** 112:7
**comments** 66:14
66:19,22,23,25
94:20 98:10
138:23 165:4,8
166:3,4,13
**commerce** 151:5
**common** 48:25
**communicate**
34:15 40:14
**communicated**
35:20,21 66:5
123:24 167:4
174:1
**communicating**
110:9,23 124:13
**communication**
42:15,19,22 68:18
85:3 96:6 98:13
109:13 110:18
124:22 132:13
150:18
**communications**
78:8 96:7 100:21
110:8 133:18
136:23 137:1,4
139:25 177:23
**companies** 17:5,7
69:14 87:21
112:11,18 141:4
**company** 17:3,3
17:16 24:8 25:14
32:24 34:24 39:9
42:15,20,24 46:19
60:1,9,11,12,17,24
62:4,6,17 63:13
64:19,20,21,24
65:4,4 69:13 85:3

**85:13** 90:25 108:1
108:3,13 119:4
139:13,14,16
145:14 151:11,14
177:8,21
**company's** 61:1
65:2
**compared** 130:19
**comparing** 22:12
53:7
**comparison** 54:22
55:3,4 58:16
**compel** 7:2 89:12
136:1
**completely** 7:16
**compliance**
107:16
**comply** 77:22
107:20 131:23
**compromises**
92:17
**concern** 18:15
28:7 41:5 49:9
76:17 87:10 123:1
124:7,19,20 137:6
150:5,6 177:11
**concerned** 70:14
**concerning** 12:12
32:3 44:25 46:1
46:14,21 51:11
52:22 53:21 56:3
58:3,25 59:17
100:15 138:22
**concerns** 42:25
43:3,7,21,25 75:24
76:1 85:10 91:1
108:22 177:2
**conclude** 181:22
**conclusion** 57:22
106:14 111:4,15
112:4

conclusions 110:6
121:14 130:3
173:14
confer 1:12 6:11
6:16,22 88:24
93:5 110:4 120:16
137:19,21 153:10
154:23
conference 6:15
7:17
confidential 25:22
27:5 31:19,22
32:25 34:25 35:12
35:15,18 36:1,8,23
38:5 46:20 59:20
84:25 85:13
176:25
confirm 10:4,7,8
10:17 12:2 30:5
74:4,5,11 75:5,13
101:23 111:20
122:7,9 163:12,14
171:10
confirming 3:6
100:11
confusion 71:4
connection 83:23
consent 86:1
108:20
consequences
20:24
consider 92:3,3
129:4,6 173:21
179:25
considered 177:7
considering 16:12
27:16
consistent 103:11
consume 159:12
consumers 41:25

contact 109:24
contain 25:9,25
36:6 45:16 56:9
66:11,17,20 72:8
86:2 87:10 88:6
109:10 110:16
127:18 150:11
contained 57:6
122:13 127:22
containing 33:23
172:23
contains 21:8 69:4
70:10 97:15
109:10 151:19
154:3
contaminated
65:9
contaminating
155:7
contamination
78:9 86:9 87:16
102:24 103:21
123:19 127:1
134:9,25 135:5
156:19 157:7
169:22 174:23
175:1
content 73:5 166:1
contents 73:20
context 56:15
58:13 79:19 96:20
96:21 97:2,5
99:13 155:19
156:5 174:10
176:9
continue 96:1
continued 178:2
control 33:9,10
46:16 49:11 50:14
50:20,22 59:18
117:17

controlling 50:24
conversation
89:10 107:24
convince 5:4
cooperate 147:5
cooperating
130:18
core 116:9
correct 3:14 19:3
30:9 32:1,8 33:14
36:24 38:2 72:18
144:13 156:20
167:20
correctly 14:7
corrects 181:10
correspondence
168:8 169:2
couched 173:2
175:11
counsel 6:3,8 7:20
8:24 9:1 18:22
36:17 89:13 90:1
91:11 108:1
137:19 154:6
countries 53:6,8
54:14 120:4
172:14,14,17
country 87:22
120:10
counts 63:14
couple 3:9 70:3
75:21 80:13
109:19 178:12
course 51:4
court 1:1,13 6:23
14:12 155:15
court's 6:6
cover 35:14 72:20
covered 179:16
covering 74:22

create 92:11
created 4:20 6:5
9:20,22 171:2
creating 8:24
crisis 87:14
criteria 177:3,6
criticism 25:5
cross 156:24
crossed 70:4
crowd 29:23
cruise 96:1
csfda 3:21
curious 19:24 20:4
37:3 107:11
current 46:9
145:24
custodial 39:17
102:5
custodian 11:13
15:24 16:3,4
19:22,23 47:6,10
110:22,24 181:1
custodians 20:2
47:8
cut 155:4

**d**

daily 64:12
dangerous 174:23
data 97:7,8,11,12
100:10 106:21
107:10
date 68:11,13,15
68:17 122:19
171:2,3,3
dated 20:8 46:14
95:4 96:9 141:11
163:15
day 4:6,12 34:12
61:20,21 93:5
101:5 122:11,12
122:14 170:25

[day - dissolution]                                                                Page 7

171:1 176:17
182:5 183:10
**days** 70:3 112:2
157:23 180:8
**deal** 20:23 75:19
126:16
**dealing** 78:14
86:14
**deals** 29:2
**debate** 78:20
110:6 153:23,24
**december** 122:19
**deciding** 40:21
**decision** 99:21
179:15
**declaration** 21:7
25:5 79:11 177:13
**defendants** 2:12
**defense** 26:14
**defer** 91:21
**deficiencies**
115:25 121:18
142:2,7 143:11,16
143:18,20 144:1
144:10,12,16
168:4
**deficiency** 34:17
40:17,20,23,25
41:5 42:8 143:15
164:7,7,11
**deficient** 153:17
**define** 13:24 23:14
24:25 31:7 49:4
150:7
**defined** 24:14
36:21 91:20
**defines** 13:7
**definitely** 69:22
109:17
**definition** 24:14
24:23 91:19,22

**department** 37:7,9
37:16 39:2,3,10
**deposed** 10:19
**deposing** 40:12
170:1 180:18
**deposition** 5:9,11
5:15,21 14:11
88:21 89:12
120:12
**depositions** 40:9
**describe** 165:1
173:4
**described** 32:20
102:6 173:2
174:11,15,17
**describes** 15:11
**description** 12:11
20:7 38:13 50:13
53:15,20 56:5
62:16 135:2 147:2
147:4 150:12
151:4
**descriptions** 34:7
**descriptive** 3:16
**designated** 89:1
**designation** 17:25
**designs** 29:4
**desk** 181:3
**detail** 77:18
**detection** 61:14,24
62:16
**determination**
156:7
**determine** 54:3
74:12 97:4 154:24
155:16 174:12
**determined** 26:10
154:15
**determining** 154:8
**development** 15:2
26:19 27:17 86:4

86:12 108:25
**diagrams** 23:17,18
23:20,21,23,24
**dialogue** 92:11
**difference** 53:5,18
54:12 58:9 72:10
86:24
**different** 44:1
80:12,14,15 83:14
92:1,4 102:15,18
105:3 106:11
113:17 118:3
130:20 131:2
140:21 154:19,22
155:11 172:3
174:13 176:23
179:13
**differently** 118:3
**digest** 176:18
180:7
**direct** 6:22 65:23
**direction** 48:9
**directly** 90:12
**disaster** 85:18
88:8 90:23 91:14
**disclose** 27:10
85:25 108:19
**disclosed** 86:10
**disclosing** 42:11
**disclosure** 13:11
21:5 31:3 47:18
47:25 85:6 110:14
**discovered** 81:17
**discovery** 116:9
**discriminate**
94:13
**discuses** 48:22
**discuss** 27:9 29:5
29:20 43:6 44:2
45:11 48:20,24
49:10 52:8 58:8

58:12 63:4,7
74:13,22 76:3
84:17 89:19,25
90:5 91:13,24
100:1 110:19
132:16,22,25
133:6,9,13 142:15
142:18 143:6
148:9,13,15 152:4
152:7,10,12,18,21
153:3 158:25
159:3,7,11 180:11
**discussed** 22:23
23:1 29:18 109:23
110:3 161:24
162:18 173:22
**discussing** 16:11
29:21 33:4,4
34:15 40:13 53:18
78:25 97:25 98:7
126:9,12 146:7,8
162:12,23,24
163:16,17 170:12
**discussion** 7:6
8:13 24:8,13 27:3
27:6 42:7 58:7,16
70:2 78:13 85:12
98:9 116:25
118:24 119:12
144:18 150:15
154:5,7 161:6
171:5,11 176:7,18
178:3,8
**discussions** 27:7
**dispute** 78:11
**dissemination**
48:1,2
**dissertation** 7:7
**dissolution** 97:13
100:16,17

[distinction - duplicates]                                          Page 8

**distinction** 114:9
  118:11
**district** 1:1,2
**divulgence** 26:11
**divulging** 44:9
  128:9 159:22
**document** 4:6 5:23
  6:5,10,24,24 7:8
  7:21 8:21 11:2,10
  11:16,23,24,24
  12:6 13:2 14:16
  14:21 15:5,10
  16:2,5,10 17:10,11
  17:20 18:2,3,5,14
  19:13,18,19 20:7
  21:8,8,12,13,15,15
  21:18 22:10,17
  24:5,10,12 25:12
  25:25 26:6 27:3
  27:19,22,24 28:22
  29:16 30:3,7,14,15
  31:6,8,18,20 32:8
  32:9,19 33:21,22
  34:23 35:3,22,22
  37:22 38:4,11
  41:9,11 43:12
  44:22 45:16,19
  46:14 47:22 48:14
  48:21 49:16 52:20
  56:8,22 57:5,14,23
  58:18 59:1 61:7,9
  61:12,17 63:1,15
  64:4,11 67:13,19
  67:20,24 68:6,9,12
  68:15 69:4 70:12
  71:2,3,14,25 72:1
  72:2,7,15 73:8,9
  74:11 75:23,24
  76:6,11,14 77:13
  79:23 80:1 82:14
  84:7 85:1,7,15,17

85:22 86:1,7,25
  87:18 89:13,23
  90:7,8 92:12,21
  93:11,18 94:10,19
  94:20,24 99:6,10
  99:11,23,25
  101:15 102:10,13
  102:22 103:13,19
  106:12,13 107:14
  108:13,15,20,22
  109:9,17 111:2,17
  112:8 115:22
  117:15 118:7,24
  119:8 120:22
  122:22 124:9
  127:14,18,21
  128:2,19 132:8
  134:15 136:10,15
  137:14,15 138:1
  139:20 140:3,17
  141:11,14,25
  144:7,20 145:18
  145:21 147:22
  148:3 149:9
  150:23,25 153:20
  154:1,2 156:2,9
  157:17,20 159:16
  160:6,15,15,18,21
  161:13,19,22
  163:6,8,9,10,11,13
  163:25 165:18,20
  166:6,8 167:11
  169:6,11 170:11
  170:11 171:3,3
  173:24 176:15
  177:17 178:13,22
  178:23 180:16,21
  180:25 181:4
**documents** 6:21
  7:3 10:12 11:11
  19:23 21:9 24:21

25:9 27:10 37:1
  57:21 67:14,17
  71:15 72:17 73:14
  73:23 74:6,15
  75:1 78:17 89:1,7
  89:16,17 90:11,11
  90:15,18 92:1,2,25
  93:6 105:22 106:8
  106:10 110:19
  121:6 128:21,23
  130:24 136:25
  137:13,13 138:4
  140:4 148:24
  149:19 150:10,21
  154:24 155:2,14
  155:17,18 158:2
  160:14,16,18
  165:23 169:15,20
  170:3 171:12
  172:20,23 173:10
  173:21 175:13,25
  176:6,6,8 177:18
  179:22 180:15
  181:16
**doing** 5:12 73:22
  78:4 79:23 80:5
  83:13 97:5 99:18
  129:17 131:23
  136:15 145:11
  147:20 153:12,14
  156:23 178:13
  179:21
**domestic** 76:22
  77:23 97:7,23
**dong** 5:15 40:2
  64:13,20 180:16
  181:4
**door** 48:18 49:24
**dose** 101:7
**doses** 101:9

**double** 163:7
**draft** 34:2 35:14
  61:18 62:9 145:3
  145:6
**drafted** 21:10
**draw** 110:5
**drive** 92:15
**drug** 3:22 12:12
  12:14 15:19 17:6
  20:10,12 22:21
  23:2 25:15 26:3
  32:22 37:3 46:17
  49:22 64:13 65:23
  94:16 106:15
  117:17,18,19
  140:19,20 160:8
**drugs** 15:17,21
  16:9 32:21 33:10
  33:11 46:17 49:12
  50:15,21 51:2,20
  52:12,14 58:14
  65:1,2,5 97:23
  112:16 155:6,8
**du** 166:11,16,19
  166:23 167:1,3
  169:8,23
**duane** 2:11
**due** 153:15 157:7
**dumb** 37:14
**dumbest** 101:5
**duplicate** 69:25
  70:5,16 71:2,4,14
  74:3,9,12,18
  101:17,21 163:11
  181:6,14,15
**duplicates** 30:17
  70:7,8,9,17,25
  71:3 73:3,7,19
  74:2,9 75:4,5,16
  94:10,11 98:17

**dutifully** 57:17

**e**

**e** 2:1,1
**earlier** 84:23
  112:2
**easiest** 4:12
**easy** 123:23
**economic** 15:2
  26:19
**economy** 26:14
  27:17 86:4,12
  108:25 177:12
**edited** 168:19
**editing** 169:23
  173:3
**edqm** 141:17,24
  142:1,2 143:24
  168:5,25
**effect** 66:25 160:2
  167:3
**effort** 179:2
**eight** 34:6 38:12
  66:8 126:22
**eighty** 148:4
  157:21
**eisenhower** 2:5
**either** 6:24 7:12
  12:24 96:12
  101:14 125:16
**ema** 157:9
**email** 3:11,13,19
  3:21 4:7 5:6 7:12
  9:8,11,11 35:22,24
  36:4,9,11 65:22
  66:12 67:23 68:4
  68:17 72:4,5,6,11
  72:15,21 73:9,11
  73:14 94:2,5,15
  97:14 98:6,14,18
  98:23 138:5
  163:16,20 166:6,7

166:8,10,15,18
167:1 168:22
169:8 170:12,16
170:21,21,22
171:10
**emailed** 66:1,2
**emails** 72:9,20
  80:14 98:24 166:9
  166:11
**employee** 110:9
**employees** 10:5
  98:6
**ends** 12:9 30:7
  101:23 102:1
**engaged** 79:15
**ensure** 33:8
**enter** 17:6,12
**entering** 15:19
**entertain** 175:19
**entirely** 154:22
**entities** 95:6
  103:20
**entitled** 78:17
**entity** 37:10,17
  109:3 132:4 145:3
  151:15 164:10
**entry** 3:17 9:7
  11:12
**eric** 10:18 39:17
  39:22 40:6
**ero** 153:12,25
**especially** 173:10
**esq** 2:7,8,15,16,17
  2:20
**essentially** 21:11
**establish** 33:8
**established** 33:6
  34:8 90:6,8
**establishing** 31:23
  33:5

**eu** 151:6 168:8
**europe** 81:18 84:6
  87:22 145:24
  155:6 156:12
  172:6
**european** 146:3,21
  147:1,18
**evaluation** 20:10
  20:12 32:22 37:3
  46:17 94:17,18
  117:18
**evaluations** 94:16
**event** 56:4,6,10,16
  56:19 81:5,8
  85:11 87:23
  126:24,25 127:9
  131:17 134:2
  141:12 158:11
  171:23 177:9
**events** 83:21 87:9
  172:13,16
**everybody** 40:10
  85:16
**evidence** 33:16
**exact** 31:19 69:24
  70:9 74:2 94:10
  94:13 175:11
**exactly** 73:20
**examination** 48:19
  95:7 97:22 156:24
**examiner** 48:17,18
**example** 33:23
  36:11 53:1 66:24
  67:13 75:7 87:21
  174:22
**examples** 26:17
**exception** 96:9
**exchange** 136:4,5
**exclusion** 176:8
**exempting** 97:3

**exemption** 96:19
  97:1,19,22 98:8
**exemptions** 98:3
**exercise** 18:24
  175:9,12,12
**exhibit** 93:16
  101:24
**expected** 4:22
**expecting** 5:25
  170:4
**expedite** 57:25
**expedited** 7:2
**expert** 79:20
**experts** 49:25
  117:16
**explain** 16:7 74:10
  95:19 158:7
**explained** 50:16
  74:7 108:22
**explaining** 62:1
  82:4,7,17 86:7
**explanation** 69:2
  77:4,5 166:3,4
  168:17 169:10
**explanations**
  103:1
**expressed** 73:1
**expresses** 120:23
**expressly** 32:24
  34:24 46:19
**extent** 78:7
**extents** 179:18
**extra** 75:9
**extreme** 174:22

**f**

**face** 85:15 137:23
**facility** 113:15,18
  113:20,22 114:8
**fact** 79:21 118:13
  152:11 153:2
  173:3 175:23

[fact - genotoxic]                                                                 Page 10

178:1
**factors** 153:16,25
**facts** 65:16
**factual** 26:3 62:5
62:16 81:3 90:11
94:23 127:12,15
128:11,22 129:1
140:10,14 141:21
141:23 145:10
151:19 156:25
160:25 161:2,8
165:13 173:23
174:3,5 179:20
**fall** 24:5 96:2
**falls** 116:8
**far** 129:9
**fda** 23:12 28:11
37:19,19 50:6
52:6,6 54:18 55:7
63:8,8,14 66:3
82:18,21 83:1,15
83:19,23,25 86:21
104:18,22,25
105:8,9 106:5
116:4 123:13
125:4 127:2,4,7,15
129:14,17 130:13
130:18,21 131:7
131:21 132:1,17
132:17,19,21
145:24 146:3,8,9
146:12,17,21,25
147:18 152:13,19
157:9 161:17,18
161:21,23,24
162:3,5,6 164:6
167:23 168:8
172:24 175:6
177:5
**fda's** 63:11 77:17
130:3,5 162:9

**february** 51:14
**feedback** 51:11
**fields** 26:13
**figure** 17:20,24
20:5 40:11 53:2
106:22 107:3
129:9 156:2
166:20
**figuring** 75:9
166:23 175:10
**file** 39:17 102:6
**filing** 169:2
**final** 27:9,14
112:19
**finally** 102:14
**find** 115:24 142:2
143:18 167:15
180:23 181:7
**finding** 34:10
85:19 86:16
**findings** 130:3
**fine** 9:25 38:10
75:17 96:4 120:18
160:5 173:16
**finish** 7:7 90:16
**finished** 101:7,9
**firm** 2:20 18:3,5
79:15 154:10,14
178:10
**firms** 79:22
**first** 3:6,11,17,20
9:7 11:2 12:15
13:3,6,17 19:21
20:16 21:18,18
33:2 45:2 75:11
102:9 122:14
124:12 163:9,12
166:9,16,21,24,25
167:22 171:11
173:12,16

**fit** 11:5 99:9
**fits** 99:13
**five** 10:10 30:17
93:6 157:22
**flag** 70:19 137:7
**flagged** 164:12
**flipping** 139:3
**floor** 2:5
**flyer** 95:24
**focus** 53:13
**folks** 181:22
**followed** 111:15
178:24
**following** 26:8
167:18
**follows** 43:25
**food** 3:22 65:23
117:17,18 140:18
140:19 160:8
**foreign** 26:15 53:6
53:19 54:13 58:9
78:6 87:21 120:4
172:14,16
**forgot** 14:11 34:23
**forth** 81:14 91:7
171:25 178:20
179:10
**forty** 98:25 99:1
**forward** 43:9
92:15 147:9,12
**found** 123:18,25
125:2,7 135:17
142:5 143:20,25
158:8
**foundation** 136:19
**four** 14:18 26:18
30:17 59:4 72:19
73:13 93:6 94:15
**framed** 176:7
**framing** 174:10

**free** 99:14
**freeman** 2:3
**front** 49:3
**fti** 79:23
**full** 122:12 169:16
172:20
**function** 25:18
86:14 100:25
106:24 140:24
**functions** 22:11
64:7
**fung** 35:10
**further** 126:20
177:23
**future** 16:16,20

**g**

**gcms** 117:7
**ge** 11:13
**geddis** 2:8 4:9,14
11:7 12:4,8 30:9
70:18 71:20 75:11
101:24 102:2
165:17,21 181:4
181:11
**general** 29:22
36:17 51:15 58:4
58:16,16 60:21
65:23 66:23 97:15
106:7 111:10
128:5 131:18
135:1,2 147:1,3
150:12
**generally** 13:25
17:14 96:12
**generated** 106:5
130:12
**generating** 106:3
**generic** 9:10 17:19
**genotoxic** 44:25
45:11,17 46:2,7,10
46:16 49:7,11

| | | | |
|---|---|---|---|
| 50:14,24 78:15 | 67:15 69:25 70:11 | 72:3,12,25 73:8 | 143:2,6,9 145:18 |
| **getting**   18:17 | 70:15 73:25 74:1 | 74:4,21 75:13,20 | 145:21 146:1,6,13 |
| 169:4,22 | 78:23 81:10 85:7 | 76:3,7,10,14,17,20 | 146:22 147:3,8,14 |
| **give**   5:1 46:5 52:24 | 89:2 90:14 92:14 | 76:24 77:2,15,20 | 147:19 148:1,5,9 |
| 60:15 64:15 66:18 | 93:3,13 95:2,24,25 | 78:2,20 79:3,7,25 | 148:12,15,18 |
| 92:13 116:5 128:5 | 96:2 104:4 106:25 | 80:17 81:12,19,25 | 150:14,20,24 |
| 134:20,23 135:6 | 109:16 110:2 | 82:4,9,17,20,24 | 151:25 152:10,16 |
| 136:18 159:19 | 111:24 114:4,20 | 83:5,12,17,22 84:2 | 152:21,24 153:2,6 |
| 176:20 180:9 | 116:7 124:8 132:7 | 84:7,17,20 88:19 | 153:23 154:17 |
| **given**   107:17 | 133:23 136:18 | 88:21 89:4,11,19 | 155:11,23 156:5 |
| 119:1 | 139:19 145:14 | 90:5,21 91:23 | 156:23 157:19,24 |
| **giving**   62:12 87:1 | 146:11 147:4,4,15 | 92:8,19 93:10 | 158:2,7,15,20,22 |
| **glad**   70:1 | 150:2 160:5 | 96:15 99:5,16,19 | 158:25 159:3,7,11 |
| **gmp**   164:7,11,13 | 161:12 162:25 | 99:22,25 100:7,9 | 159:15 161:14 |
| 168:4 | 169:21,23,24 | 100:15,20,24 | 162:1,5,8,12,23 |
| **go**   5:18,25 7:8 | 170:1 171:25 | 101:2,12,18,22,25 | 163:2 164:17,24 |
| 8:20 9:4 11:1,10 | 173:3,17 175:19 | 102:3 103:14 | 165:7,11 170:6 |
| 14:12 20:6 28:18 | 180:2 | 104:7,15,21 105:2 | 172:22 174:5,17 |
| 30:2 34:7,12 | | 105:7,14,19 106:1 | 175:4 178:18 |
| 38:11 42:2 61:11 | **goldberg**   2:15 3:1 | 106:17,23 107:5 | 179:3,9 180:20 |
| 64:11 69:17 70:12 | 3:15 4:1,13,15,19 | 109:18 110:5,18 | 181:16,21,25 |
| 70:15 73:25 75:4 | 5:7,10,13,16,19 | 110:22 112:24 | 182:7 |
| 75:6 79:8 80:1,2 | 7:18,24 8:6,16,19 | 116:10,15,18,21 | **goo**   40:6 |
| 81:10 82:11 94:9 | 9:4,13,19,25 10:6 | 116:24 117:3,6,9 | **good**   34:10 58:1 |
| 99:15 101:15 | 10:16,24 11:14,21 | 117:12 120:12,15 | 58:19 99:9 151:17 |
| 111:2 122:5 | 12:1,10 18:18,23 | 120:19,21 121:9 | 176:16,17 181:7 |
| 128:17 129:9 | 19:4,7,10,13,25 | 121:13,16,21,25 | 181:19 182:4 |
| 131:10 144:23 | 27:18,21 28:4,7,10 | 122:3 124:10,21 | **goodbye**   181:23 |
| 147:9,12 151:3 | 28:14,17 30:4 | 124:25 125:8,12 | **gotta**   5:4 181:2 |
| 155:10 166:14 | 37:21,24 38:3,9 | 125:15,19,21,24 | **gotten**   107:2,6 |
| 182:1,7 | 41:8,11,14,17,20 | 126:6,12,18 129:4 | **government**   3:13 |
| **going**   4:11 5:3,6 | 41:23 42:5 43:10 | 129:11,16,25 | 9:10 13:12 15:12 |
| 6:13,18,22 7:11,12 | 43:19 44:18 48:1 | 130:2,6,9 131:1,12 | 16:5,11 21:5,13,13 |
| 7:13 10:19 11:12 | 49:15 50:2,6,9,12 | 132:8,16,22,25 | 22:10,19 24:9,13 |
| 11:22 12:16 18:12 | 51:1,25 52:5,8,11 | 133:3,6,9,13,17,21 | 24:22 25:20 27:4 |
| 28:23 37:13 40:10 | 54:8,11,20,23 55:8 | 135:23 136:11,16 | 27:6,13 31:3,14,16 |
| 42:24 44:2,3,7 | 55:12,16,18,22,25 | 136:20 137:2,10 | 31:20 33:3,7,14,24 |
| 48:20,22 49:14 | 57:11,15,20 58:22 | 137:20,24 138:3,8 | 35:1,3,25 36:5,18 |
| 50:19 51:21 52:19 | 59:9,12 62:24 | 138:12,15,18,21 | 36:25 37:10,25 |
| 56:1 57:21,22 | 63:4,7,10,15,19,22 | 138:25 139:21 | 38:4,18 40:19 |
| 59:2 61:6 62:23 | 64:1,8 69:19 | 142:13,18,21,24 | 41:4 42:10,16,18 |
| | 70:23 71:7,10 | | |

42:20 43:13,17,25
44:4,8,14 45:15,18
45:20 46:8 47:23
48:11,16 49:22
55:10 56:16 57:1
58:8 59:5,6,24,25
60:2,6,9,17,24
61:4,25 62:3,7,10
62:18 63:16 64:2
64:18 66:2,7,14
67:16 69:5,7,11,14
76:25 77:10 79:1
79:4 82:2 83:14
84:9,15 85:4,14,19
85:23,24 86:2,14
87:7,19,25 88:1,1
88:3 90:23 91:8
94:21 95:6,11,13
95:14 97:17 99:4
100:22 102:15,16
102:18,20,23
103:11,12,17,20
104:5,9,17,18,24
105:4,10,12,17,21
106:4,9,12,13
107:18 108:1,6,14
108:14,21 109:2
109:14,25 110:10
111:14 112:21
116:2 118:25
119:9,10,12,13,14
120:24 121:5,14
122:18 123:8,15
123:18 124:4,13
124:15,18,23
126:10,15,23
127:20 128:12,25
129:3,6 130:11
132:4,11,13,15,15
133:19 134:1
135:18 136:6,8,22

137:11 139:11,15
140:9 141:2,13,19
142:4 145:3,5
147:1,24 149:20
150:16,19,21
151:10,15 159:18
160:17,17 164:19
164:22 165:5,6,9
166:1,12 169:24
173:14 174:1,18
174:21 176:14
177:16,21 179:19
**government's**
16:17 24:9 26:1,6
42:25 43:3,7
44:13,17 56:24
64:5 67:4 91:9
105:24 107:16
109:7,10 110:15
121:10 127:25
128:1 137:8 140:6
158:3,13 177:2,18
178:6
**governments**
21:11 102:18
103:25 104:10,12
**great** 57:9,19
61:10 64:10
140:16
**group** 30:21
**guarding** 13:5
14:18 21:3 30:23
**guess** 3:1 11:13
73:2 92:17 102:9
106:1 135:24
155:4 163:3
164:12 181:7
**guidance** 62:18
107:10 109:3
124:14,17,20
126:15 136:7,14

136:15,22 137:9
137:11,16 147:23
158:3,5,13 159:18
159:20
**guideline** 32:20
33:2,3,5,6,8,19,22
34:3 35:15
**guiding** 20:20
31:11
**guys** 13:22 88:25
89:15 90:9 92:25
94:9 128:17
173:20

## h

**half** 75:9
**hand** 70:5 183:10
**hang** 4:1,15,16
71:11 79:25
103:14
**happened** 16:4
61:25 62:3 86:8
104:6 119:4
**happening** 50:17
75:8 114:21
**happens** 61:21
**happy** 114:23
**hard** 139:4
**harm** 176:10
**harmless** 142:12
**hate** 171:8
**health** 48:23 49:9
85:11 86:3 87:14
119:24 120:1,4,6
123:1 124:7
125:25 126:4,5
137:6 161:4,6
177:11
**hear** 8:18
**heard** 13:2 62:23
**hearing** 110:2

**held** 42:16
**help** 12:16 25:1
99:11
**helpful** 94:7,11
**helping** 99:8 115:2
**hereunto** 183:9
**high** 15:12
**higher** 176:24
**hill** 5:20
**hmm** 50:25 80:22
81:9
**hold** 7:19 15:21
171:22 172:9
**holder** 15:11,13
16:8
**holding** 36:6
**holds** 31:15
**honest** 157:15
**hope** 139:6,7
173:20 180:10,14
**hopeful** 12:16
128:16
**hopefully** 57:18
**hoping** 75:17
129:7
**horse** 92:20 93:10
**hour** 75:9
**hours** 139:4
**house** 27:16
**hplc** 117:7
**hu** 10:2
**huh** 147:7
**hui** 2:20
**human** 33:17
135:11
**hyper** 78:10
102:14

## i

**idea** 18:14 58:1,19
64:15 128:5

**identical** 13:1
98:18 174:12
**identified** 42:8,9
93:6
**identify** 43:2
92:12
**identifying** 40:19
**imagine** 169:17
**immutable** 93:9
**impact** 44:10
108:7
**implementation**
31:13 36:5
**implementing**
12:25 30:22
100:25
**import** 151:6,8,10
151:21 152:15,16
153:3,15,18,21
155:5,9 156:16,18
156:20 157:2,2,4,6
157:8,10,11,16
158:4
**important** 20:5
48:23,25 49:3,5,9
85:11 86:2 93:12
174:10
**imposed** 7:16
155:9
**impression** 101:6
**impressions**
179:19
**improve** 25:21
26:2
**improved** 22:7
**improving** 20:10
21:24
**impurities** 19:5,8
28:5 32:21 33:13
41:15 44:25 45:11
45:17 46:2,7,10,16

49:8 50:14,24
52:23 53:14,17,22
53:23 54:19 55:14
59:18 61:14 62:12
62:17 63:17 69:3
77:6,7,18 78:15
80:20 81:15,17,22
100:2 104:23
116:16 117:3
125:2,10 126:1
133:1,10,14 143:4
162:14 172:13
**impurity** 54:1
60:21 81:23 87:23
125:6 162:24
172:16
**include** 96:11
140:10 165:13
**including** 22:2
23:10 31:17 83:25
**inclusive** 23:1
**incomplete** 158:9
**independent**
105:20
**individuals** 3:18
4:7
**industry** 49:25
**info** 168:2
**information** 12:12
13:12,13,16,20
14:4 15:8,9 21:5
26:23 31:4 33:23
34:1 35:17 44:9
44:14 45:16 46:10
55:13 56:9 60:16
61:1,4,5 62:6,10
67:12,15 68:1,21
69:9 70:2 74:19
78:6 81:3 82:18
85:24 86:3,19,21
87:1,25 88:6,12,14

91:2,3,4,6 94:24
97:15 104:9,20,21
104:25 105:3,16
106:4,7 108:9,12
108:24 109:4
110:11,14,15,16
110:20 122:13,23
123:4,7,12,24
124:2,5 125:6
126:4,17 127:8,13
127:15,19 128:11
128:22 129:2,22
130:10,12,20
131:5,25 132:2,4
132:20 134:7,13
134:16,18,20,21
134:24 135:2,4,7
135:10,13,17
136:5,6 137:5,8
140:11,14 141:21
141:22,23 143:21
145:2,5,11 147:24
148:20,22 149:1
149:13 150:5,8
151:7,14,20
156:15 158:6,9,12
158:14 160:11,22
160:23,25 161:2,4
161:9,16,17,18,20
161:23 163:22
164:18,19,20,25
165:1,8,13 172:24
173:23,25 174:3,6
174:6 175:5
176:11 177:4,4
178:5,6 179:20
**informed** 69:13
149:20
**inspect** 116:4
**inspecting** 51:20
115:13,14

**inspection** 51:12
51:13,15,16,17
52:13 64:12 113:8
113:9,17 114:17
115:12,18,22
117:16,21,22
119:7,12 120:3
122:11,12 127:3,4
127:16 130:5
141:17,24 143:25
**inspections** 52:6
**instance** 173:16
**institute** 117:17
**instruct** 5:22
**intended** 141:13
**interest** 24:24
25:17 104:4
119:21
**interested** 183:7
**interesting** 181:14
**interests** 14:23
24:4,16 26:10,13
26:25 42:13 47:20
62:13 85:8 86:6
89:2
**internal** 13:16
14:3 27:3,5 34:18
37:6 38:15,16,21
38:22 42:7,16
43:18 59:1 98:12
102:10,13 103:3,5
119:3,11 140:3,4
163:20
**internally** 103:9
**internet** 123:25
126:8 135:17
138:23 148:22
149:24
**interpret** 73:6
158:10

**interpretation**
85:6
**interrupt** 42:4
108:17 136:13
**inventory** 64:19
115:20
**investigation**
63:11 77:17 82:21
83:13,15,19,24
84:1 88:17 104:17
105:20 125:10
127:2 129:14,18
131:7 133:14
138:16 140:7,9
142:19 146:9,17
147:6 162:3,13
**investigations**
145:25 146:3
**invitation** 46:15
46:22
**invites** 46:24
**inviting** 46:23
47:2 49:24
**involve** 8:23 9:1
28:4 31:15 48:22
49:8
**involved** 38:20
39:22,23 112:11
178:9,11
**involves** 44:13
**involving** 6:8 26:9
27:15
**irebesartan** 44:25
45:12,13 46:2,11
52:22 53:11,21
54:25 55:16,23,24
58:3,25 94:17,21
94:22 117:23
118:2,4,19 119:16
119:20 120:5
121:2,19,23 122:1

**isomer** 22:14 23:6
**issue** 4:18,19,21
22:5,6 33:19 49:9
65:12 78:15
103:21 118:18
120:11 123:19
134:9 150:16
158:1 173:6
177:11 180:3
**issued** 47:23 106:9
**issues** 16:22 22:8
27:10 48:25 49:4
58:24 89:22
118:22 140:12
144:5 153:22
171:14 174:13
177:14
**it'll** 99:11
**italy** 157:9

**j**

**january** 45:1 95:5
117:15,19,20
131:15
**japan** 105:13
**jeopardize** 62:13
85:7 89:2 104:4
**jeopardized** 86:7
**jeopardizes** 87:16
**jeopardy** 90:14
**jersey** 1:2 2:6
**jessica** 9:21 10:7
**jiangsu** 140:2,5
**jing** 64:14
**joe** 4:14
**john** 10:2 166:11
166:16,19,23
167:1,3 169:8,23
**joking** 115:3 138:2
**ju** 15:25 167:3
**judge** 5:6,17 6:15
7:12 8:10 18:25

78:22 89:5,9
109:23 114:10
171:8,9 175:19
176:21 180:9,12
**july** 52:20 59:16
60:4 61:11 64:12
65:22 68:12,16
80:11,23 102:5
103:22 126:22
139:9,24 160:7,10
**jump** 51:6
**jumped** 30:4
**june** 20:9 21:23
96:6,10 99:23

**k**

**k** 1:12 183:2,14
**katz** 2:3
**keep** 9:2 31:18,21
32:7,14,25 34:25
35:12,15 36:1,8,23
46:20 59:20 84:24
114:7 117:24
118:11 120:16,19
**kept** 21:9 25:22
35:18 85:12 93:2
**key** 58:24 70:8
**killian** 1:12 183:2
183:14
**kind** 16:11,12,13
16:14 18:4 23:8
25:6 45:21 52:15
56:10 85:22 88:13
93:8 145:14
146:23 164:15
169:18
**kinds** 23:7 110:19
126:16
**know** 5:16 9:2
16:11,14,15,17
17:4 18:6 19:20
19:25 21:6 22:13

24:25 25:20 27:8
27:11,12 28:23
29:15 33:8,9 35:6
39:9 43:6 47:24
52:17 55:4 56:10
56:20 63:12 67:3
67:6,11,16 69:24
70:21 75:15 79:19
82:15 85:16 88:4
94:8,8,12 99:9,12
99:13,20 101:12
101:14 103:9
105:23 107:15,19
109:21 110:2
111:12 113:21,24
114:19,20 115:5
118:6 124:6 126:3
126:15 128:8
130:15,21,23
135:4,24 139:4,14
144:6,16 145:13
146:11 149:21
150:11,18 154:12
155:9 157:11,16
165:6 166:2
169:13 173:11,18
178:15,16,17
179:4,4,5 180:4,15
180:20
**korea** 105:12
172:18

**l**

**lab** 23:23,25
**laid** 112:6 153:18
**language** 35:2,16
43:4 56:15 91:17
**lauren** 2:17
**law** 2:20 13:25
14:18,25 21:19
24:18 31:2,9,11
38:5 44:8 91:1,5

[law - manufacturing]                                                Page 15

91:21,22 106:21
107:10 108:12
109:8 111:16
173:8 178:10
**laws** 12:20,22,22
13:4,19,21 14:7
16:12 30:21 31:1
31:1 90:25 91:10
110:11 155:14
**lawyer** 8:2 114:25
137:18
**lawyers** 36:15
**layer** 170:21
**leading** 137:18
**learned** 176:19
**leave** 129:8 179:20
**lecture** 49:19
**lee** 40:4 47:4,6,9
47:10
**left** 11:23
**legal** 36:2 91:21
178:4
**letter** 34:17 35:14
40:17,23 41:6
42:10 59:17 60:5
60:8 102:5 132:20
140:18,24,25
141:2,15 152:12
155:24 159:25
164:11 168:18
**letters** 95:5 102:14
123:14 125:4
131:21 132:1,17
132:18,21
**letting** 135:4
**level** 29:10 120:16
120:19 173:19
176:24,25
**levels** 102:15
106:11 117:10
125:22 129:22

138:9 142:22
144:19 148:7
152:5 158:23
176:23 179:13
**li** 35:10,10 64:14
**liability** 1:5
**license** 15:11,13
16:8
**licenses** 12:13
**life** 180:22
**light** 126:9 154:21
154:25
**limit** 162:6,9
**limited** 10:13
33:16 131:5,5,6
**limits** 161:24
**lin** 39:20 110:23
110:23,25 166:10
166:16,19,23,25
167:2 170:2
**lin's** 102:5
**linda** 39:20,21,21
102:5 110:22,23
110:25 166:10,16
166:19,23,25
167:2 170:2
**line** 6:17 9:21
71:11,13 171:11
**lines** 178:19
**link** 102:14
**links** 135:8,9,12
135:15,16,19
136:10 148:23
**list** 3:18 4:4,5,7,20
20:1,14 39:12
40:10 70:4,13
143:12 160:16
163:6
**listed** 10:3 14:9
20:22,22 32:10
47:10 67:17 92:25

95:6 98:17 99:10
143:15 153:16,22
167:19 180:4,16
**listing** 3:11 83:21
111:21,23
**lists** 30:20
**literally** 46:22
**litigation** 1:5
17:22 107:17
109:5 154:2,21
156:3 174:7,19
**little** 78:5 131:2
**liu** 10:13
**llc** 2:3
**llp** 2:11
**local** 45:8 64:17
127:24 128:1,12
140:19 141:2
167:17
**location** 113:22
115:6 118:3,7
**log** 4:8,23,25 6:2,7
8:24 9:20 11:2,3
11:11,19 71:1
73:17 74:8 93:1
122:8 154:9,10
165:21 178:23
**long** 74:22 172:10
**looing** 4:6
**look** 24:1 25:4
34:8 48:11 54:7
71:12 72:13 73:25
74:3,18 75:2
88:20 128:17
136:24 149:18
177:16,17 180:18
180:23 181:8
**looked** 35:23
136:25 137:14
149:19 150:11
170:22

**looking** 11:17 30:6
34:6,12 44:22
46:13 54:24 71:1
71:1,10 104:7
117:14 122:16
137:12,24 148:2
150:24 171:1,2
**looks** 13:4 27:22
112:1 172:8
177:20
**loose** 25:7
**lot** 10:12 14:9 93:4
170:23 173:21
**lower** 176:25
**luke** 10:2

**m**

**major** 177:7
**making** 5:19,20
8:2 68:8 118:11
149:22 152:25
157:13 168:1
169:14 174:21
179:15
**mandatory** 107:21
**manufacture** 53:8
65:5
**manufactured**
51:21 64:23 78:16
95:16 113:15,19
114:3,5,8,11 118:1
119:17,20 120:9
**manufacturer**
27:7 29:6,10
113:22 114:15
177:8
**manufacturers**
49:22 101:9
**manufacturing**
26:4 51:17 53:6,9
53:10 58:11 60:20
82:5,8 94:22

**[manufacturing - municipal]**                                    Page 16

95:20 113:16
114:12 115:6,7,19
118:8 121:1,18
125:13 132:23
138:13 143:7
148:16 152:22
159:1,4,8
**march**  1:8 4:10,14
6:16 179:1 183:10
**marked**  38:4
101:16
**market**  15:16,19
15:21 16:9,18
17:6,13,14 19:14
19:17 22:12 27:25
28:1,3 33:11 38:1
41:18 51:2,3,5
55:1,3,20 58:9,10
60:3 63:2,5,24
64:3,14 75:24,25
76:2,4,15,18,22
77:8,10,24 79:5
84:1 86:16 87:19
88:5,9 95:12
100:13,18 116:22
117:23,25 118:2
121:23 131:16
133:7 142:25
145:22 146:21,25
153:3
**marketed**  118:2
**marketing**  12:13
**markets**  84:3
**marriage**  183:6
**material**  91:1
**materials**  163:17
170:13
**matter**  8:1 41:1
46:7 51:15 56:22
56:23 108:8,24
114:10 115:17

122:25 123:1
124:18 134:12
144:11 149:1,14
164:4 170:17
172:11 174:16
177:7 183:8
**matters**  20:6 26:9
26:11 97:4 107:11
171:4
**mazie**  2:3
**mdl**  1:3
**mean**  9:10 16:24
19:4 23:15 38:21
42:3 44:20 48:14
56:6 57:12 61:25
66:1 89:16 98:19
98:20 108:17
122:20 123:11
124:16 125:3
136:12 137:2
153:24 154:10
158:18 173:15
175:18 177:24
178:12
**meaning**  73:5
**meanings**  179:5
**means**  29:16 64:16
**meant**  71:18 84:23
85:12
**measures**  31:17
48:15 62:3 83:18
83:21,22 84:5
130:17 145:14
151:11
**medical**  20:13
32:23 37:7,13
44:24 45:3,7
46:18 51:9,10
52:21 56:2 61:15
80:8 111:3 112:3
113:6 139:25

144:24 156:11
163:18 170:14
**meet**  1:11 6:11,16
6:22 88:24 93:5
110:3 120:15
137:19,20 153:9
154:23
**meeting**  20:8,8
21:23,24 22:23
23:1 31:15 34:14
34:18 36:6 38:13
38:15,17,17,20,22
42:11,16,18 43:18
44:3,7,16,23 45:10
45:23 47:12,19
49:21,24 51:8
52:20 56:2 58:2
58:25 59:3 96:7
96:22,24 98:4,5,10
98:13,15 99:4
119:5
**memo**  141:15
**mention**  16:25
19:1,5 23:13
29:14 31:12 36:9
41:12,14 54:18
56:13 63:10 83:1
144:18 166:12
**mentioned**  13:25
68:6
**mentions**  48:21
54:17 146:10
**met**  111:20
**method**  53:10 54:1
54:18 55:6,7
58:11 97:14
**methods**  54:3
**midnight**  7:9
**min**  40:4
**mind**  6:9

**ming**  47:4,6,9,10
**minutes**  20:8
21:24 22:24 23:1
34:15,18 38:14,15
42:11 44:16,23
51:9 52:21 58:3
98:6,10 99:4
139:5
**misleading**  122:23
123:3 125:5
126:17 132:2
158:9,13
**mispronouncing**
3:25 113:25
**missed**  136:14
**missing**  17:23
75:14
**misspoke**  71:18
**mitigate**  145:12
**mm**  50:25 80:22
81:9
**mode**  14:13
**modified**  168:17
**mole**  5:20
**monday**  180:11
**months**  178:12
**morning**  167:6
**morris**  2:11
**mountain**  5:20
**move**  7:2,13 12:17
57:10 75:22 89:12
107:13 135:25
160:6 163:3,4
**moved**  38:12
**moving**  170:8
**multi**  86:13
**mumbling**  47:17
**municipal**  12:14
122:17 126:23
134:1 141:13

**n**

**n** 2:1
**name** 3:12,20 9:16
10:11 52:12 181:1
**named** 19:22
**names** 39:12,13,14
39:15,25 40:1
**nanataco** 51:18
**national** 14:23
15:2 20:13 24:4
24:15,24 25:16
26:9,13,14,19,24
27:17 32:23 37:7
37:12 46:18 47:20
51:9 52:21 61:15
62:13 85:7,8 86:4
86:6,6,12 95:14
104:4 106:15
108:7,9,23,25
117:17 119:21
140:18 141:1
160:8 163:18
164:1 169:18
170:13 173:9
177:11
**ndma** 59:18 61:14
62:11 65:9,25
69:16 78:15 80:21
80:25 81:15,20
82:13,16 83:4,7
86:8 95:17,21
102:24 116:13
117:10 118:22
125:22 127:6,8
129:22 138:9
140:21 142:16,19
142:22 145:12
148:7,10 152:1,5
155:8 156:20
157:7,11 158:23
160:9,12,24

161:25 162:7,10
162:13 171:23
**necessarily** 18:12
38:7
**necessary** 8:23
28:22
**necessitated** 6:8
**need** 9:15 17:24
18:15 28:24 36:18
68:10 80:2 86:1
109:3 115:5
144:21 155:18
163:6 172:25
174:8 175:20
180:3,4
**needed** 22:6
**needs** 5:5 108:20
**negative** 126:9
138:22,23
**negotiate** 90:4
**negotiating** 89:7
**neither** 66:21
**new** 1:2 2:6 16:12
16:13 62:19 106:3
106:6 130:10
183:3,15
**nice** 182:3
**night** 7:9 176:16
180:19 182:3
**nine** 43:9 44:23
56:8,24 57:1
65:21 72:8 96:1,5
99:19 141:10
**nitrosamine** 32:21
33:12,17 41:12
52:23 53:14,22,23
55:14 100:2
104:22
**nitrosamines**
50:10 52:9

**nonprofit** 44:19
**nonpublic** 44:14
44:20,21
**noon** 167:4
**notary** 1:14 183:3
183:15
**note** 56:1 58:24
**noted** 59:13,15
113:2,4 182:9
**notes** 1:11 33:15
68:8 73:23
**notification** 104:1
**november** 32:25
133:25
**number** 11:4,15
11:23,24,24 12:2,6
19:19 30:5,20
32:19 34:6 43:9
46:13 49:14 51:6
52:19 57:12 58:2
58:23 59:16 92:12
101:23,25 132:9
139:21 142:6
143:17,20 144:10
160:7
**numbered** 11:11
**numbers** 11:10

**o**

**objection** 136:19
**objective** 93:9
**observation** 121:8
167:24
**observations**
120:25 121:3,10
121:17 152:12,19
**obviously** 20:14
70:9 155:24 170:3
179:23
**occur** 53:14,17
**occurred** 46:3
53:3 62:11 69:9

78:8 81:22 88:10
151:11 172:13
**occurrence** 80:19
**occurring** 87:15
**october** 141:10,11
156:10
**offered** 128:20
**offering** 93:14
**official** 35:1,5,7,8
36:1 55:6 95:5
165:5
**official's** 166:12
**officials** 96:8
**oh** 60:12 119:22
**okay** 8:1,19 9:4,15
10:9,22,24 12:1,10
14:5 21:22 22:9
26:7 28:17 29:25
30:2,19 34:5 36:7
36:16 38:9 43:19
43:23 44:5 46:12
49:13 50:2,12
51:7,24 52:11
53:12 54:20 55:25
57:15 58:22 59:7
61:22 62:21 65:19
76:12 77:2 79:14
79:24 81:10,25
82:24 83:5 84:16
94:4,5 95:1,23
96:17 99:15 102:3
107:8,22 111:1
112:17 119:15,19
121:21 122:3
124:8,21,25
126:18,21 127:17
128:10,16 131:8
133:23 136:11
139:2,18 142:8
144:21 146:1
148:5,18 149:3

151:1 153:6
157:24 159:15
160:20 162:8
164:9 165:11,16
167:13 170:6,25
171:4 172:15,19
178:16
once   17:12 181:10
ones   70:4
ongoing   107:18
150:15,18 178:2,8
179:2,4
online   122:24
123:12,17,18
124:5 125:7
131:25 132:2
134:7,19 147:25
148:21 149:1,13
open   171:23
opinion   18:10
56:24 166:12
opportunity   7:1,5
opposed   29:1
opposition   7:18
optimized   118:21
order   6:6 11:7
78:5 95:20
ordered   6:15
18:25
organization   3:22
10:3 112:3
organized   167:15
original   20:1 93:1
130:11 178:15
outcome   183:7
outside   120:10
overall   167:7
overly   89:1
oversight   25:18
75:19

## p

p   2:1,1
p.m.   6:20 182:9
packaging   22:14
23:7
page   6:17 99:15
136:9 139:3
179:23
paper   11:8
papers   179:11
paragraph   111:17
pardon   29:8
parkway   2:5
part   8:14 18:23,24
42:14,19 85:3,18
85:23 86:16 87:6
87:9 88:5,16 89:9
108:11,14 109:13
122:10 127:14
132:12 133:17
137:1,4 150:17
151:17,18 167:12
167:12 171:4,8
178:14 182:1
partially   163:6,10
participants   36:8
participate   39:18
49:25
participating
114:22
particular   17:15
particularly
105:23
parties   183:5
parts   25:24 26:2
party   31:18
patients   41:24
116:25 133:10
159:12
pen   5:15 40:2
180:16 181:4

penalties   20:23
pennsylvania   2:14
people   10:2,10,14
10:16 39:2,3,4
40:9,11 174:23
perfectly   36:7
176:16
perform   22:11
performing   64:6
162:2
person   9:12 16:1
31:21 39:4,6 47:5
47:7 110:23
perspective   48:7
pertinent   155:21
pharmaceutical
177:8
philadelphia   2:14
phone   180:24
phrase   159:19
174:14
pick   79:18 107:1
place   47:15 77:13
114:9,11,12,14
115:6,7,9 120:10
155:12
places   140:21
plaintiffs   2:4
plan   34:15 40:13
145:1 146:14,15
146:17 147:9,13
147:14
plant   114:6
please   3:10 5:11
35:15 80:2 112:25
159:19,25 167:15
167:17
point   27:12 34:3,7
73:17 74:5 89:25
90:6 92:9 96:3
99:18 103:15

124:20 129:10
174:22 175:25
176:22 178:4
points   56:8 59:2
political   26:14
poses   174:24
position   15:21
92:9 93:2,7
potential   82:16
83:3,7 161:1,1,2,8
162:18,20
potentially   44:12
69:20 90:2 107:5
161:9
power   36:25
practice   25:6 38:8
prc   14:18 17:6
20:20 21:2,4
31:11 36:24 64:21
69:14 85:19 94:21
139:15 165:5,8
177:1,16,18
prejudice   26:12
26:24 86:11
prejudiced   8:8,10
8:12
prep   5:8,14
preparation   42:22
prepare   43:18
prepared   7:9,10
21:10 43:15 61:15
75:3,4 163:17
170:13
preparing   42:17
44:1 62:6 163:23
present   2:19 6:23
press   138:23
presumably   67:17
86:18 87:2 154:6
presuppose   28:24
66:4

**pretty** 107:23
123:23 142:11
149:20 173:22
**prevent** 46:4
50:17 53:1 118:21
**previous** 82:11
94:1
**prinberry** 10:13
10:18 39:3
**print** 11:6
**prior** 12:20 80:14
**priselac** 7:4
**private** 27:5 80:5
**probably** 70:21
74:10 136:25
176:20 180:6,9,11
**problem** 48:23
49:12 85:20 134:5
145:12 181:20
**problems** 49:8
**procedure** 164:16
**proceed** 7:12 8:6
9:5
**process** 26:4 51:17
52:23 53:5,10,21
53:24 58:10,11
59:19 60:20 62:19
82:5,8 85:18
86:13,16 94:22
95:20 115:19
118:21 121:2,18
125:13 132:23
138:13 143:7
148:16 159:1,8
170:1 182:1
**processes** 20:24
58:14 152:22
**produce** 64:25
89:16 93:13 109:4
123:23 173:13

**produced** 30:15
30:16 78:7 154:20
154:25 173:11
174:7
**product** 20:11
21:25 22:1,2
29:17,17 106:16
151:6 175:17
**production** 59:18
64:13 155:17
**productive** 8:7
**products** 1:5
20:13 32:23 37:8
37:13 44:24 45:3
45:7 46:18 49:11
50:20,23 51:9,10
52:21 56:3 61:16
80:8 96:9,11 97:1
111:3 112:19
113:7 139:25
141:4 144:24
156:11 163:18
170:14
**professional** 1:13
**professor** 47:3,3
**profile** 23:11
**progress** 144:25
**proposed** 33:22
**protect** 31:17
48:16 108:12
**protected** 13:20
**protection** 106:21
107:10 108:23
**protects** 13:15
**prove** 33:16
154:14
**provide** 55:12
60:25 62:7,18
63:16 91:5 105:19
120:25 129:21
130:9 133:19

143:20 145:10
161:3
**provided** 3:8 6:21
8:22 12:13 33:24
34:1 45:21,24
59:24 60:2 61:5
62:10 66:15,18,22
67:12,15 70:3
82:18 83:2 86:19
86:20 87:25 89:24
94:24 102:7,22
104:10,22,24
105:16 121:11
128:12,22,23
130:13 151:8,14
156:15 160:12,16
161:16,18,23
165:14 167:8
172:24 173:24
174:3,8 175:5
177:5 179:24
**provides** 83:6
141:22 161:8
**providing** 15:9
69:9 81:2 104:8
105:2 132:3
141:20 145:2,4
146:2 147:21
160:21 161:14,15
161:20
**province** 3:23 45:6
65:24 140:2,2
164:1
**provincial** 163:18
170:14
**provision** 14:14
24:6 25:4
**provisions** 13:19
14:9 20:15,17,22
31:1,7,10 36:2

**public** 1:14 25:23
27:8,8,11,16 33:15
47:24 48:15,18,23
49:9 85:4,11,21
86:3 87:14 88:11
88:12,13 119:23
119:25 120:3,6
122:18,21,25
123:1 124:7,19
126:4 132:20
135:17 137:6
158:6 177:11
178:5 183:3,15
**publically** 148:21
176:11
**publicly** 124:3
**publish** 150:5
**published** 122:24
131:25 132:2
134:7 147:24
148:21
**pugh** 2:17
**pull** 5:23 6:10
**pulling** 12:4
**purely** 112:21
173:13
**purity** 23:2 58:13
118:15,17,22
**purpose** 7:23,25
54:21 55:3 108:10
108:10,11 140:23
140:25 154:23
**put** 91:2 126:7,7
138:22 154:4,15
**putting** 74:8 79:17

**q**

**qualification**
15:11
**qualify** 180:13
**quality** 20:11
21:25 23:2 33:10

46:15 50:14,20,23
51:21,23 58:13
97:19 118:18,22
**quantity** 65:17
**question** 4:12 5:2
5:5 8:3,5,20 9:19
10:1 12:15 13:3
13:17 19:21 20:16
31:5 32:15 34:22
37:14 57:2 72:3
76:13 82:12 84:22
89:20,21 101:5
102:9 104:13
107:4 109:11,12
128:9 131:2
136:17 137:18
144:17 153:7
154:19,22 155:25
159:22 160:4
164:17 165:3
178:1
**questioning** 79:20
**questions** 3:2,3
10:22 17:18 18:7
18:19,21 27:19
37:22 41:9 42:25
45:20,22 46:9
49:16 52:1 54:9
56:17,25 57:7,8,24
58:5 59:5,6 62:25
64:9 66:8,11,13,21
67:4,23 69:5,8,21
70:24 75:21 77:22
78:12,23 80:8,16
81:13,23 83:1
84:13,14,21 87:13
88:9 91:7 94:25
95:2,3 101:3
103:7 106:18
109:20 116:11
117:13 118:25

120:22 121:7
122:4 124:11
129:8,12 132:7
133:22 136:2
139:1 142:14
143:10 144:3
145:17 148:19
151:2,24 153:8,11
155:5,10 158:1
159:16
**quick** 59:9 107:4
112:24
**quicker** 34:10
**quote** 91:16

**r**

**r** 2:1
**raised** 80:8
**raises** 174:13
**rambling** 171:7
**reach** 89:10 90:17
**reached** 121:14
**read** 6:13 11:7
12:22 13:22 15:6
31:19 39:15,25
68:10 139:10
149:25 171:8
173:8 181:2
**reading** 12:21
13:15,21 14:7
134:15
**real** 180:3
**realistic** 92:25
**realize** 153:15
**realized** 34:11
136:20
**really** 4:21 18:16
64:20 89:1,4,20
92:20 97:4 101:4
157:16 175:20
**realtime** 49:3,6

**reason** 17:17
65:13,14 69:12,15
75:8 77:12 82:8
83:4,7 151:20
155:8 157:3
**reasonable** 90:13
92:16
**reasons** 175:16
**recall** 19:11 28:8
50:4 63:20 64:20
64:22 65:1,12,15
69:12,15 76:4,21
77:12,14 87:20
111:4,9,11 112:4
112:10,13,14,22
112:23 115:20
116:19 121:25
125:19 141:1,3,5,7
177:10
**recalls** 77:11
**receive** 31:21
**received** 85:23
**recess** 59:14 113:3
**recharacterizing**
175:6
**recheck** 94:9
**recommendation**
116:2 121:4,5
**recommendations**
121:1
**reconsider** 179:21
**reconvene** 176:20
180:9
**record** 6:23 30:13
71:22 82:11 90:7
90:8 91:25 153:11
157:6 182:8
**recorded** 24:10
119:11 142:1
**recording** 141:18

**records** 45:20
82:15 118:24
121:7,8,11
**recounting** 142:3
**recounts** 16:22,24
**rectification** 145:1
146:14
**redact** 173:15
179:18
**redacted** 128:13
129:1 163:6,10
164:18,20 165:2,7
167:10,12 173:18
**redaction** 165:12
173:13,19
**redactions** 173:11
**refer** 76:15 81:19
83:9 96:25 125:1
132:9 133:3 149:7
**reference** 52:2,6
55:22 116:12,15
116:18,21,24
117:6,9 121:22
125:25 138:19
142:22,25 143:2
148:12 152:1
158:16,23
**references** 148:6
**referred** 77:5,13
127:9 147:10
160:19
**referring** 3:16
67:12 68:11,24
71:24 76:5 82:20
83:8,8 102:8
121:17 122:21
150:3 162:9
178:22,25
**refers** 54:11 81:21
100:9

**reflect** 27:12 43:12
  44:16 78:25 84:8
  104:8 121:13
  132:10
**reflecting** 16:14
  76:24 83:12 87:7
  91:15 164:21
**reflects** 16:16
  25:19 26:6 79:3
  84:11 88:3
**regard** 51:13
  59:22 94:18 96:18
  113:9 176:5,9
**regarding** 20:10
  34:16 40:16 45:16
  56:2 62:11 65:24
  94:16 95:7,9 96:7
  111:4 112:4 113:7
  113:11 122:18
  126:23 127:8
  131:16 134:2,8
  140:11,21 141:3
  141:12,23 144:25
  146:25 151:5,8
  156:11 160:9,12
  164:13 169:21
**registered** 1:13
  20:11
**registration** 33:20
  62:19 169:3
**regulate** 22:12
**regulating** 16:17
  37:25 38:1 86:15
  88:4
**regulation** 14:2
  17:13 21:4,12
  31:3 64:14 110:13
  131:16
**regulations** 12:25
  13:11 14:1 21:20
  30:22 50:7 63:23

77:23
**regulator** 77:21
  91:9
**regulators** 87:13
  146:18 147:16
**regulatory** 25:18
  25:21 28:15 64:2
  78:6 86:15 100:25
  115:21 142:5
  146:4 168:9 172:6
**reinforcements**
  114:21
**relate** 77:7 80:17
  156:14
**related** 40:11 41:1
  67:21 77:9 112:12
  144:5 171:23
  183:4
**relates** 18:14
  51:19 79:5 106:22
  111:11 134:21
  156:16 164:4,6
  172:10 177:9
**relating** 17:15
  28:5 80:19 86:3
  111:6,8 131:25
  132:21 147:13
**relation** 100:1
  162:2
**relative** 158:4
  163:7
**release** 90:18 93:4
  177:19
**released** 89:8
**relevance** 78:18
  107:3,7 154:17,18
**relevancy** 155:20
  156:6
**relevant** 17:21
  21:6 22:8 90:12
  96:14 107:23

114:11 154:14,15
  155:24 156:3
  169:17 175:3
**relying** 32:12
**remember** 110:1
  114:1
**remotely** 1:14
**repackaged**
  176:13
**rephrase** 14:10,13
  93:17
**replied** 167:1
**reply** 34:16 40:16
  166:2
**report** 61:13,24
  64:12,17 112:3
  113:6 122:13,17
  124:1,3 126:22
  131:6,15,19,20
  134:1 139:10
  141:18,24 142:2
  143:25 144:24
  145:3,7,7,8 150:19
  151:5 156:10
  159:25 160:7
  161:15 164:15
  167:5,16 168:12
  171:23,24 172:5
**reported** 63:13
  131:4 134:19
**reporter** 1:13,13
  6:23 14:12
**reporting** 104:23
  105:7 124:4
  134:18
**reports** 102:7,22
  105:15 106:7
  132:14 142:1
  172:1,4
**request** 34:25 61:3
  84:24 95:13

105:21 108:5
  109:17 132:7
  135:22 142:11
  161:12 169:14
  177:24 179:7
**requested** 35:7
  105:4
**requesting** 135:25
  169:15 172:19
**requests** 178:21
  179:5 180:1
**require** 14:16 36:7
  155:17
**required** 23:11
  32:24 34:24 46:19
  59:20 85:15
  133:18
**requirement** 35:5
  60:21 107:19
**requirements**
  15:14 16:8,13
  22:23,25 23:5
  25:6 28:12 29:3
  43:7,16 55:9 60:6
  64:6 84:15 97:3
  105:25 107:21,21
  109:8 111:16,21
  111:22 112:7,22
  132:15 146:12
**requires** 31:14
**research** 23:19
  33:19 39:1,2
**reserve** 116:7
**reserving** 103:7
  120:20
**residual** 83:9
**respond** 7:5 40:21
  126:13 146:9
**responded** 68:2
  166:24 168:16

responding   146:16
  147:15 156:3
  166:22
response   6:6 61:17
  61:18 64:5 80:7
  83:19 105:20,24
  129:17 164:7,8,12
  167:23 168:4,17
  168:25 169:9
  179:8
responses   80:13
  164:10
responsive   154:18
  154:18
responsiveness
  18:2 107:6
rest   120:1
result   53:23
resulting   125:25
  156:18
resume   176:17
retained   79:12
review   79:23
  106:2 107:3,6,7
  111:5 112:4
  146:11 167:17
  168:13 178:13
reviewed   18:3,5
  93:3 130:23 180:5
revised   169:9
right   6:14 10:8,21
  14:2,24 15:23
  19:6 21:1,14,21
  23:6,19 25:3,3
  28:2 29:10,19
  30:24 33:13 34:4
  34:13,20 37:17
  38:15 40:15,22
  42:23 43:8,21,22
  44:12 45:9,13
  46:24 47:13 49:23

53:9,15,24 54:5
  60:14 61:8 65:7
  67:18 69:17 70:5
  72:24 74:7 75:3
  76:6 79:7,12 80:4
  80:25 81:4 84:25
  86:21 87:4 88:19
  90:4 93:22 94:6
  94:14 96:13 99:3
  99:7,23 101:2,11
  102:11 103:3,7,9
  103:22,23 104:14
  105:5,6,18 109:15
  111:1 116:8,11
  120:8 123:21
  127:7 128:13
  140:3 142:6
  144:12,19 148:22
  154:6 156:8
  157:12,13 165:9
  166:17 167:10,24
  168:2,22 169:4,10
  169:12,25 170:2,4
  170:25 171:6,12
  173:5 174:11,25
  175:24 178:10
  181:19,23
risk   46:4 47:19
  87:1 140:21 161:4
  161:6 169:18
  173:9 174:24
  175:2 176:4,10
risks   116:25
  125:25 133:10
  159:12
role   64:2 91:9
room   114:24
  179:17
root   50:10 55:13
  63:16 125:9
  133:14 138:15

142:15 148:10
  162:13,21
roseland   2:6
routine   25:17
  100:25 132:14
  150:18 151:17
  164:15
rpr   183:2,14
rule   89:9
ruled   78:19
rules   36:5 78:21
  90:2,25 91:12
  92:23 154:21,25
  156:6

## s

s   2:1
safety   23:11 33:9
  33:10 41:24,24
  108:23
sales   84:18
san   64:19
sanction   123:15
sanctions   123:8
sara   1:12 183:2,14
sartan   50:20,23
  52:18 77:5,6
sartans   52:15,16
satisfaction   28:11
satisfied   176:16
satisfying   55:9
  63:23
save   32:16
saw   19:22 171:9
  180:25 181:9
saying   9:3 14:15
  14:20 20:17 22:19
  24:21 25:11 26:16
  26:18 31:7 35:14
  42:21 44:7 48:8
  48:11 65:11 67:22
  67:24 73:13,13,24

74:15 84:12 88:2
  103:10 104:11
  109:2 111:11,12
  111:19 114:7
  117:24 118:9
  123:13 131:4
  135:3,19 137:12
  149:23 154:13
  167:3 176:7
says   9:7,16,17
  10:3 11:12 12:11
  21:23 24:2,22
  29:16 33:13 34:24
  35:17 38:13 39:8
  40:13 44:9,23
  46:1,14,21 48:11
  50:13 51:14 53:20
  58:2,24 61:13
  65:15,22 68:16
  71:2,6,15,15,16,17
  71:24,25 72:1
  78:6 80:7 82:10
  117:15 122:8,16
  141:11 143:14,24
  144:9 163:10
  165:21 167:14
  168:11,24 169:1
schwartz   2:16
science   32:3
scope   8:14 13:24
search   106:25
searching   181:11
second   2:5 4:1,15
  4:17 5:11 12:5
  71:11 80:1,3
  98:24 103:14
  162:17 166:10
  171:22
seconds   6:9 7:19
  8:8,9,11

**secrecy** 48:16,17
91:19 108:12
110:11 176:23,24
177:3,14
**secret** 4:23,25 6:1
6:7 9:20 12:19
13:8,24 16:7
20:14,17 21:1,7,15
21:19 31:8,24
36:12,21 48:5,10
78:21 89:22 90:2
91:12 92:23 93:2
93:12 154:21,25
155:14 156:6
165:3 173:7 174:3
176:13
**secrets** 13:5,5
14:19 15:1 18:7
20:20 21:3,9 24:2
25:10 26:11,18
27:15 30:23 31:2
31:12,16,17 32:2
36:7 87:11 88:6
107:17,20 109:7
110:17 123:2
128:9 159:23
178:14 179:14
**section** 13:6 21:17
26:20 29:13 87:8
88:3
**sections** 13:1
**security** 14:22
24:3,15,24 25:16
26:9,12,24 42:12
42:13 44:10 85:8
86:6 108:7,9
169:19 173:9
**see** 20:4 25:8,15
29:13 45:22 47:21
54:23 67:25 72:12
77:15 81:12 82:9

84:2 88:8 92:18
94:10 98:11
103:11 104:3,5
108:5 114:19,21
118:10 121:4
122:6 126:6
147:19 158:15
161:5 167:5
169:25 173:5,6,8
174:25 176:10
180:23 181:12
**seeing** 129:2
**seek** 22:16 86:1
108:20 109:6
**seeking** 107:15
124:14,16 136:7
136:13,15 137:9
137:10,16 147:23
158:3,5,12
**sell** 22:21 25:14
65:5 101:7,9
**selling** 155:6
**seminar** 46:15,22
46:23,25 47:1
48:24 49:1,10,17
49:18
**send** 61:15 163:17
163:24 168:13
170:13
**sending** 135:18
136:21 141:2
**sends** 95:13
**sense** 17:9,22 22:7
35:13,19 97:2
175:17
**sensitive** 128:24
**sent** 4:5,7,10,14
102:15 104:2
106:11 108:5,13
119:8 124:23
132:14 145:7,9

160:8 163:25
168:19 170:16
**sentiment** 122:18
122:21
**separate** 42:10
45:17
**separately** 173:24
**september** 144:23
151:4
**series** 49:19 95:3
**seriously** 123:6
**served** 154:10
**set** 12:17 33:18
42:17 46:25 55:18
58:5 73:18,23
80:15 91:7 100:20
178:20 179:10
183:10
**seth** 2:15 5:3 8:25
11:18 42:3 58:19
69:24 73:13 76:5
78:1 89:14 92:24
100:6 109:21
136:12 137:22
144:4 153:11
156:1 163:1
178:17
**sets** 81:14
**setting** 55:19
**seven** 13:10 26:17
30:3,20 31:6
32:19 34:23 35:22
139:3
**seventeen** 144:2
**seventy** 133:25
139:9,22,23,24
141:10
**shandong** 140:1,5
**shanghai** 12:13
**share** 104:20

**shared** 104:17
**sharing** 104:16
**sheet** 12:12 103:4
**shen** 64:13
**shirt** 114:19
**shoes** 154:11
**shorten** 25:1
**show** 135:13
**showing** 169:23
**shy** 114:23
**sidegood** 15:25
**signature** 183:13
**signed** 79:11
**significant** 90:19
174:14,24
**similar** 12:23
37:18 112:1
137:15 175:21,23
176:2
**simple** 5:5 56:7
60:6 94:3 111:18
**simplifying** 78:10
**simply** 8:1 89:21
105:7 138:21
**single** 13:1 24:12
24:13 70:12
**site** 51:12 113:8
114:16 115:11
**situation** 92:21
149:21
**six** 30:15 122:10
139:3
**sixty** 109:16 112:1
122:10 126:22
**skip** 30:11 36:13
43:9 171:9
**skipped** 30:18
**skipping** 30:12
73:21
**slater** 2:3,7 3:5,17
4:5,11,18 5:3,8,12

5:14,18 6:13,25
7:22 8:4,12,17,25
9:6,15,23 10:1,9
10:21,25 11:9,18
11:22 12:6,11
14:5,20 15:1,4,13
15:16,20,24 16:6
16:19 17:1,7,17
18:8,11,21 19:18
20:3,21 21:16,22
22:4,18,25 23:8,14
23:18,21 24:1,11
24:19 25:11,24
26:7,22 27:20
28:20 29:9,15,20
29:25 30:2,10,25
31:23 32:2,5,7,14
32:17 33:12,21
34:2,5,14,21 35:6
35:9,11,25 36:10
36:16,19 37:2,9,12
37:20 38:11,19,23
38:25 39:6,11,16
39:20,24 40:4,6,8
40:16,24 41:3,10
42:2,6,21 43:2,8
43:20,23 44:5,15
44:22 45:7,10,14
45:22 46:1,12
47:2,5,9,14,16
48:3 49:2,13
50:13,22 51:6,8,19
51:23 52:12,16,19
53:7,12,20 54:2,6
56:1,12,18,21 57:1
57:7,9,13,16 58:1
58:12,17,23 59:7
59:11,16,22 60:4,8
60:12,15,23 61:3
61:10,20,23 62:5,9
62:21 64:10,22

65:3,8,11,17,19
66:10,17,24 67:6
67:11,22 68:7,15
68:20,23 69:7,17
69:22 71:6,8,12,21
72:19 73:4,12
74:14 75:2,17
78:1,3 79:9,14,17
79:24 80:4,11,21
80:23 81:2,7,10
84:3,11,16,22 85:5
86:5,18,23 87:12
88:7,15,18,20,22
89:6,14 90:3,9
91:15 92:6,10,24
93:15,23 94:4,7,23
95:1,15,19,23 96:5
96:17,23 97:8,10
97:12,18 98:2,11
98:16,20 99:1,7,17
99:20 100:4,8
101:4,15,19 102:4
102:17,21 103:2,6
103:18 106:19
107:2,8,22 108:4
108:16 109:1,9,15
109:21 111:1,10
111:19,24 112:12
112:14,17,20
113:1,5,13,24
114:16 115:3,8,16
115:21,24 116:3,7
117:14,24 118:9
118:14,17,20
119:2,8,15,19,25
120:7,14,18,20
122:5,15 123:3,10
123:16,22 124:8
126:21 127:4,7,12
127:17,23 128:1,4
128:10,16 129:5

129:20 130:15,19
131:8,10,13,22
132:3,6 133:23
134:8,11,17,23
135:3,12,16,22
136:12,18 137:17
137:22 138:2
139:2,8,12,18,23
140:8,16 141:5,8
141:20 142:3,8,10
143:11,14,19,24
144:3,9,14,21
145:6,10,16,20
146:19 147:7,12
148:20,25 149:3,7
149:12,17,23
150:2,7,13,22
151:3,13,19,23
152:4,7,14 153:9
154:4 155:3,22
156:1,8,18 157:1
157:10,17,21,25
159:17,24 160:5
160:20,25 161:3,7
161:12 162:16,25
163:5,15,22 164:3
164:9 165:12,16
166:5,14,20 167:2
167:11,14,22
168:1,7,11,16,21
168:24 169:6,14
170:7,10,23 171:7
171:14,16,19,21
171:24 172:5,9,15
172:19 173:1
174:9,20 175:9
177:20 178:7,16
178:25 179:7,12
180:22 181:6,13
181:19,23 182:2,6

slice   163:1
slow   5:10 11:18
small   181:3
smile   137:22
social   15:2 26:19
    27:16 86:4,12
    108:24
sold   51:2 55:1 65:3
    100:12 101:8
    113:12,14,19
    115:10,10,15
    116:22 117:23
    118:4 120:9 140:7
solely   117:25
    120:5
solution   29:23
solvent   83:9,10
solves   181:20
somebody   46:23
    57:3 79:18 110:8
    114:19,22 126:7,7
    138:22 177:20
sophie   19:22
sorry   14:13 18:8
    32:6 34:22 39:7
    39:22 47:16 68:8
    76:12 80:4 93:24
    104:15 108:16
    126:2 129:25
    131:12 134:4
    143:3 150:25
    152:16 176:22
sort   3:12 9:10
    22:14 35:2 40:19
    97:3,19 105:3
    106:3 116:3 123:8
    126:8 130:11
    150:14
sorts   43:1 92:17
    144:15

sound 90:18
sounded 179:17
sounds 17:19
  89:25 142:11
source 33:15
south 2:13
speciale 153:12,25
specific 17:10 31:6
  33:12 35:1,4
  43:21 46:6 50:23
  77:18 78:13 92:2
  110:7,19,19
  115:12 127:19
  129:22 130:7
  138:5,9 142:9,10
  148:6,13 152:12
  152:18 158:18
specifically 14:15
  17:2,15 20:17
  29:14 31:14 42:9
  52:25 54:15 60:18
  96:12 109:23
  111:7,13 129:21
  134:11 150:3
specification 96:9
  96:18,25 97:6
specifications 97:2
specificity 52:24
specifics 135:6
spend 75:9
spirit 153:9
stability 23:7
stage 145:1 146:15
stages 146:16
stand 180:12
standard 18:4
  27:23 35:2 90:22
  90:24,24 91:14
  93:9 97:23
standards 22:13
  22:14,16,20 27:22

27:25 53:19,19
54:13,13,16,25
55:19,19 97:20
98:8 155:15,19
161:24 162:5
standing 99:14
stands 92:21
start 3:6 11:12
  35:16 133:24
starting 6:17
  34:11 180:18
state 4:25 6:1 9:20
  12:19 13:4,5,7,24
  14:18,22 18:7
  20:14,16,20 21:1,3
  21:7,8,15,19 24:2
  24:3,15,24 25:9,10
  25:16 26:9,10,12
  26:24 27:15 30:23
  31:2,8,12,15,17,24
  36:6,21 44:10
  48:5,10,16 59:25
  78:21 87:10 88:6
  89:22 90:2 91:12
  91:19 92:23 93:12
  107:17,20 108:11
  109:7 110:10,17
  123:2 128:9
  154:21,25 155:14
  156:6 159:22
  165:3 167:17
  173:7 174:2
  176:13,23,24
  177:3,14 178:14
  179:13,19 183:3
  183:15
state's 6:6
stated 35:13
statement 7:22
states 1:1 4:23
  118:5 155:7

156:13
stating 167:5
status 46:9 87:20
  106:8 127:11
  131:22 141:17
  145:24 147:21
  151:20 168:17
  169:9
stenographic 1:11
step 146:24 173:12
steps 145:15
stop 139:5 162:16
story 87:3
straighten 75:15
street 2:13
string 72:4,5,6,11
  72:21
strong 93:7
study 32:20
sub 26:18
subject 31:8 41:1
  46:6 51:15 56:21
  56:23 91:11 97:24
  107:11 110:15
  115:17 123:7,14
  134:12,16 144:11
  149:1,14 157:25
  164:3 170:17
  172:11 177:1,18
subjects 135:9
submission 107:25
submit 149:15
submitted 67:25
  68:1 149:5
subsections 13:10
  26:17
substance 6:1 23:2
  28:25 41:4 108:21
  132:17,19
substantive 13:6
  13:12,18 15:8

22:5 60:16 70:11
74:16 75:21
substantively 15:7
  18:13
suction 26:18
sufficient 66:15
  67:1
suggest 180:6
summarized 168:3
summarizes
  102:22 140:8
  145:23 172:12
summarizing
  103:19 105:14,15
  140:5 161:16,20
  169:20
summary 12:12
  102:6,12,13,21
  103:2,24 106:10
  117:16 119:3
  122:12 129:13
  139:24 160:14,15
  167:23 168:8
supervision 15:12
suppose 68:5
  148:24
supposed 6:10
  48:14 57:4 85:21
sure 3:9 4:2 6:2
  7:20 8:2,21 9:22
  10:14,22 11:16
  14:6 18:4,20
  23:24 27:20 29:11
  30:6,11 37:15,23
  41:10 51:20 52:15
  59:11 70:16 74:25
  78:12 79:10 99:17
  113:1 114:13
  116:6 118:12
  148:2 157:5,13
  162:22 168:1

178:1,8
**suspect**  20:1
**syncore**  30:7
**synopsis**  167:15
**system**  25:21 26:2

**t**

**table**  154:5
**tablet**  34:17 40:17
  40:20
**tablets**  95:8,16
**taizhou**  44:24 45:3
  45:5 56:2 122:17
  126:23 127:24
  131:16 134:1
  141:13 150:20,23
  151:5
**take**  7:14 31:16
  59:9 95:24 112:24
  128:17 145:15
  180:17
**taken**  1:12 48:15
  59:14 62:4 83:21
  83:23 84:6 93:7
  113:3 130:17
  151:12
**talk**  19:10 41:3
  50:3,6,9 53:5
  54:15 56:12 63:19
  77:16,20 83:17,18
  89:14 116:12
  118:14 125:8,9,12
  125:15,21 129:10
  129:20 130:2,6
  145:13 160:14
  170:24 182:6
**talked**  157:22
**talking**  4:3,22
  11:16 23:15 46:3
  46:4 49:18 52:25
  56:10,22 71:8
  74:25 76:8,10,20

77:6 80:13,24
82:21 93:21,24
96:19 118:20
120:5,8 125:5
128:6 146:13,14
155:13 156:21,21
157:3,6,12,14,20
162:1 163:23
**talks**  53:22,25
  63:12
**task**  29:23
**team**  70:15 154:7
**technical**  23:24
**technology**  32:3
**tell**  8:10 15:5 17:1
  22:5 30:12 31:4
  38:25 39:11 40:25
  58:4 66:3 107:12
  113:10 114:24
  140:23 149:14
  150:2 159:18
  160:1 161:17
  169:24 170:18
  178:3 180:12
  181:2
**telling**  17:19 61:25
  62:2 87:3 88:7
  104:12 123:17
  143:19 151:9
  164:9 165:25
**tells**  70:8
**ten**  46:13 66:8
**term**  25:1
**terminology**  37:5
**terms**  4:3,22 13:20
  15:7 22:14 23:15
  23:24 29:22 30:25
  31:23 32:9 48:4
  58:10 74:8 75:15
  78:17,21 84:5
  92:22 106:25

108:21 110:7
146:7 174:15
**terrible**  144:16
**terrific**  3:5
**test**  54:3,18 97:13
  158:19
**tested**  125:16
**testing**  23:17,18
  29:3,6 51:18
  100:16,17 130:7
  133:1 138:5,19
  143:3,4 144:19
  148:13 152:1,8
  158:16 162:2
**thank**  9:6 50:12
  55:25 59:12 100:5
  182:2,4,8
**thin**  162:25
**thing**  10:25 33:18
  63:13 71:16,16,17
  90:21 116:5 125:3
  135:25 163:7
**things**  3:9 7:15
  12:17 22:15 23:7
  27:11 43:1 71:22
  107:1 123:9,18
  149:24 154:19
  174:15
**think**  6:3 8:8
  12:15 13:23 16:3
  27:14 30:3 37:18
  38:10,14 43:5
  44:18 47:7,9
  50:15 52:18 55:6
  58:15 67:19 70:15
  73:8 74:5 75:2
  78:11 79:19 81:5
  87:6,12 88:25
  90:10,12,21,22
  91:13,24,25 92:1,2
  92:5,16,19 93:11

95:2,17 96:15
101:19 103:8,16
103:23 104:2,19
104:19 106:8,19
106:23 109:22
116:8 118:5
119:11 120:2
123:22 126:19
128:8,14 132:12
135:9 137:14
140:13 146:20
149:19 150:17
151:16 153:24
157:14 159:21
161:19 164:14,14
165:2 166:11
169:25 170:2,20
171:18 173:5
174:2 175:19
176:18 177:25
178:4,18,20
180:12,25 181:9
**thinking**  16:14
  25:20 26:1 127:20
**third**  169:1
**thirty**  70:20 71:20
  94:15 96:1,5
  99:19
**thought**  4:11 32:5
  73:19 113:25
  143:15 157:19
  170:1
**threaten**  42:12
**three**  19:19 30:18
  94:20 99:6 112:1
  135:14,16 167:18
  168:7 170:11
  172:20 179:22
**throws**  30:21
**tian**  10:11 19:22

tianjin 45:6
time 7:14 27:14
  32:16 47:15 54:17
  59:13,15 70:13
  75:11,18 83:3
  93:25 113:2,4
  153:13 170:7
  180:8 182:9
timeline 81:4,6,8
  81:14,16 82:22
  83:20 87:5,9
  93:20 127:10,11
timelines 87:24
timely 69:13
tina 10:13
title 20:4 69:1
titled 68:24 81:7
today 18:6 70:13
  75:1 167:4 173:22
  176:19
told 30:16,17 34:9
  38:14 69:24 70:5
  70:7 73:18 86:25
  103:10,12,16,20
  103:24 104:5,11
  105:8,11 118:10
  130:21 144:9
tomorrow 6:19
  167:6 168:13
  180:19
top 170:22
topic 29:22 33:24
  43:5
topics 48:22
total 143:17
touching 70:6
trade 93:11
trading 92:21
transcript 1:11
  6:14,14 44:18
  58:20 79:19

translation 29:24
  167:8
true 135:20
  149:13
try 3:3 78:4 89:7
  89:10 92:14,16
  118:21 145:11
trying 5:23 14:8
  17:9,20,22,23
  18:13 22:11 24:11
  26:22 35:12,19
  36:20 42:6 48:6
  50:16 53:1,2
  57:17 88:22,23
  89:3,8,14 90:4
  92:11 97:1 106:21
  107:3,9 111:12
  120:14 137:25
  147:8 155:1,3
  156:2 158:10
  163:2 166:20
  178:3 181:2
tsai 10:11,18 39:17
  39:22
tuesday 180:11
tusai 11:13
twelve 51:8
twenty 65:21 72:8
two 10:2 30:14
  31:1 67:20 70:20
  71:20 72:9 74:15
  74:16 109:16
  122:11,12 137:13
  139:24 154:19
  157:21 163:11,13
  166:9 168:3
  169:11 171:11
  172:2
type 15:8 17:19
  116:5 123:3
  141:14 151:7

156:14 160:11,22
163:22 181:3

**u**

ultimately 179:14
unclear 30:13
understand 3:9
  4:2,24 7:15 9:9,16
  13:21 14:8,14
  15:6 17:25 18:13
  24:12 25:13 26:23
  27:1 36:19,20
  37:4,15,16 42:6
  44:6 45:2 48:6,7
  49:5 50:18 61:7
  74:14,20,21,23
  78:3 90:3 93:15
  93:16 99:8 103:18
  107:9 109:1
  111:13 115:16
  123:10 137:25
  147:9 150:13
  153:10,13,19
  154:1 155:1,18
  163:3 164:4 166:5
  173:19 176:12
  178:21 179:12
understanding
  13:18 28:25 114:2
  114:5 115:8
  162:21 177:22
united 1:1 118:4
  155:7 156:12
unnecessary 124:6
  124:19 137:6
  150:6
unpublished 25:8
unrelated 61:19
untrue 122:23
  124:5 125:5 126:3
  126:16 134:6,12
  134:18,21 135:4

135:10,13 137:5,7
150:4,8
upcoming 38:17
update 127:11,15
  129:16 131:6,20
  131:22,24,24
  141:16 143:22
  146:2 147:21
  176:21 180:10
updated 11:20
updates 102:25
  149:22
usa 151:6
use 23:25 27:8
  103:3,5 175:14,15

**v**

valsartan 1:5
  16:22,25 17:21
  19:2,5,11,15 22:1
  22:3 27:25 28:5,8
  29:7,10,14,18,21
  29:22 34:16 40:17
  40:20 41:15,18,25
  50:4,10 52:3
  55:23 56:4,6,14,16
  56:18 60:3 61:14
  63:2,5,11,17,20
  64:18,23,25 65:25
  69:2 76:4,15,18,21
  77:17,18 78:9
  79:5 81:5,8,15,17
  81:20 82:5,14
  84:18 86:8 95:8
  95:12,15 96:12
  97:7 100:2,12,17
  101:7 102:23
  103:21 106:22
  112:15,15,16
  113:11,14,15,18
  113:23 115:14
  116:13,16,19,22

117:1,4,10 123:20
125:2,13,16,22
126:1,24,25 127:6
127:9 129:23
131:16 132:23
133:1,7,11,15
134:2,8,22,25
135:5,11 138:6,10
138:13 139:17
140:7,22 141:4,12
142:16,19,22,25
143:3,4,7 145:22
148:7,10,13,16
152:2,5,8,25 153:4
156:12,19 157:7
157:11 158:17,19
158:23 159:1,5,9
159:13 160:9,12
160:24 162:10
169:21
**value**  152:22
**vanaskie**  7:13
  18:25 78:22 89:9
  109:23 171:8
  175:19
**various**  103:19
**verifying**  169:2
**version**  11:3 12:9
  169:9 175:15
**versions**  175:16
**versus**  53:8 171:2
**videoconferenci...**
  1:14
**view**  16:17 37:19
  44:17 67:4 82:15
  88:24 107:16
  177:2,12,15 178:4
**viewing**  91:11
**viewpoint**  24:9
  27:13

**viewpoints**  43:13
  44:13 76:25 78:25
  79:4 84:8,12 87:7
  88:4 106:14
  119:14 120:17,24
  127:25 128:2,5,12
  132:10 140:6,9,15
  141:18 164:21
**views**  26:6 43:16
  90:1 109:7,10
  127:22
**violated**  144:15
**violates**  92:23
  93:12
**violating**  90:2 91:1
**violation**  91:5
  123:6
**violations**  28:15
**vital**  14:22 24:3,14
  24:23 25:16 42:13
  44:10 47:20
  119:21

**w**

**wait**  8:7
**waiting**  6:9 8:9,11
  179:8
**waive**  90:19 92:13
  93:14
**walk**  30:10 74:1
**wang**  10:2
**want**  3:8 4:2 6:2
  8:6 10:4,14 14:14
  17:4,5 22:15
  24:25 25:12 28:18
  28:20,21 33:18
  39:15,25 43:6
  48:23 49:10 57:20
  57:25 66:4 70:19
  70:21 74:24,24
  75:6 79:10 82:11
  85:25 89:12 99:12

101:22 109:6
110:6 113:13
124:17 137:7
148:1 153:19,25
157:5,17 172:9
173:18 177:19
179:23 181:21
**wanted**  8:21 10:21
  14:6 33:7 40:10
  60:17 170:5
**wants**  22:19 85:24
  108:19
**warn**  132:1
**warning**  123:13
  131:21 132:17,18
  132:20,21 152:11
  168:18
**way**  8:7 13:21
  16:21 29:6 34:10
  44:2 51:23 57:25
  72:14 73:2,17
  74:8 92:4 93:16
  95:17 114:18
  128:15 133:4
  135:19 138:1
  169:1 173:1,2
  183:7
**ways**  175:7
**we've**  78:24 86:25
  90:7 118:10 170:7
  170:8 173:21
  179:25
**website**  158:10
**websites**  122:24
**week**  7:14 176:21
**weihai**  10:3 22:15
  31:20 55:4 96:22
  166:2
**weird**  149:17
**went**  3:7 38:12

**wheel**  175:2
**wheelhouse**  89:17
**whereof**  183:9
**white**  114:19
**wise**  107:11
**wishes**  167:5
**withheld**  14:16
**withhold**  48:8
  176:1
**withholding**  12:21
**witness**  79:20,21
  133:16 156:25
  158:8 178:1 183:9
**witnesses**  10:19
**wonderful**  100:8
**wondering**  154:13
**word**  139:10
  174:15
**words**  3:25 175:11
**work**  88:23 167:7
  175:17 179:17
**working**  168:12
**workshop**  114:1,3
**world**  86:9 87:15
  88:2 102:19
  105:10 120:1
  146:24 169:21
**worrying**  158:11
**writing**  109:25
**wrong**  71:11,12
  150:25
**wrote**  166:7,23,25
  167:2 177:21

**x**

**x**  92:12
**xueyu**  2:20 19:16
  67:2
**xyz**  36:22

| y | | | |
|---|---|---|---|

**yang** 2:20 13:23
14:17,24 15:3,10
15:15,18,23 16:2
16:10,24 17:5,11
18:1,9,20 19:3,6,9
19:12 20:19 21:2
21:21 22:2,9,22
23:4,13,16,19,23
24:7,17 25:3,19
26:5,21 27:2 28:2
28:6,9,13,16 29:8
29:12,19,23 30:1
30:24 31:10 32:1
32:4,6,13,16 33:7
33:14,25 34:4,13
34:20 35:4,8,10,21
36:3,14,17,24 37:6
37:11,18,23 38:2,7
38:16,21,24 39:1,8
39:14,19,21 40:3,5
40:7,15,22 41:2,7
41:13,16,19,22
42:1,14,23 43:4,14
43:22,24 44:12,21
45:5,9,13,19,25
46:8,24 47:3,7,13
47:15,22 48:2,13
49:7,23 50:5,8,11
50:19,25 51:4,7,16
51:22 52:4,7,10,13
52:18 53:4,9,16,25
54:5,10,17,21 55:2
55:11,15,17,21,24
56:7,13,20,23 57:4
57:8,19 58:7,15
59:4,21 60:1,5,10
60:14,19 61:2,8,19
61:22 62:2,8,15
63:3,6,9,12,18,21
63:25 64:4,17,24

65:7,10,14,18 66:7
66:12,20 67:9,19
68:3,13,19,22 69:1
69:11 72:6,18,24
76:1,5,8,12,16,19
76:23 77:1,9,19,25
79:2,6,9,13,15,22
80:10,15,19,22
81:1,4,9,16,21
82:3,7,10,19,23,25
83:11,16,20,25
84:5,10,14,19 85:1
85:10 86:11,22
87:5,18 88:11,16
88:25 91:16,18
93:21,24 94:6,19
94:25 95:10,18,22
96:4,16,21 97:6,9
97:11,13,21 98:4
98:14,19,22 99:3
99:24 100:3,14,19
100:23 101:1,14
102:12,20,25
103:4 104:13,19
105:1,6,11,18,22
106:6 107:14
108:3,8,18 109:6
109:12 110:12,21
110:24 111:8,14
111:23 112:9,13
112:16,18,23
113:11,21 114:12
115:1,5,14,19,23
116:1,6,14,17,20
116:23 117:2,5,8
117:11,22 118:6
118:12,16,19,23
119:6,10,18,22
120:2 121:3,12,15
121:20,24 122:2
122:10,22 123:5

123:12,21 124:1
124:16,24 125:3
125:11,14,18,20
125:23 126:2,11
126:14 127:2,6,10
127:14,21,24
128:3,7,14 129:15
129:19,24 130:1,4
130:8,14,16,23
131:9,20,24 132:5
132:12,19,24
133:2,5,8,12,20
134:5,10,14,22
135:1,8,14,21
136:9,24 137:4,12
138:7,11,14,17,20
138:24 139:7,11
139:13 140:4,13
140:25 141:7,16
141:25 142:6,9,17
142:20,23 143:1,5
143:8,13,17,23
144:2,7,13,17
145:4,8,13,23
146:5,10,20,24
147:11,17,22
148:4,8,11,14,17
148:23 149:2,6,10
149:16,18 150:1,4
150:10,17 151:9
151:16,22 152:3,6
152:9,20,23 153:1
153:5 156:16,25
157:8,15 158:5,18
158:21,24 159:2,6
159:10,14,21
160:3,13,23 161:1
161:5,11,19 162:4
162:6,11,15,20
163:14,21,25
164:6,14,23 165:4

165:10,15,19,23
166:8,18,25
167:10,13,21,25
168:6,10,15,20,23
169:5,13 170:9,20
171:6,13,15,18,20
171:22 172:3,8,12
172:18 176:22
177:25 178:11
179:13 182:4
**yeah** 13:14 69:16
119:18 149:16
**year** 177:22
178:12
**yee** 10:11
**yielded** 58:14
**yijian** 64:13
**york** 183:4,15

| z | | | |
|---|---|---|---|

**zhang** 40:4
**zhejiang** 3:23
51:10 65:24 66:7
111:3 112:3 113:6
114:13 117:18
144:24 150:22
156:10 164:1
**zhong** 2:20
**zhou** 10:11 35:10
**zhoushan** 95:11
95:13
**zhp** 12:3 17:8 20:9
28:11 33:4,23
34:1,14,19 35:12
38:13,15 42:7,11
44:23 51:12 57:3
57:5 58:8 59:24
60:2,7 61:5 64:23
65:3 66:8,15,18
69:6,9 77:22
79:12,16 81:2
82:1,4,7,18 83:13

**[zhp - zoom]**                                                      Page 30

83:18,21,22 84:6
85:25 86:19 94:24
95:5,11 96:8,22
98:2,5,6 99:4
100:21 101:6
103:20 104:5,8,17
104:23 105:16
106:3,11 107:15
108:19 109:2,11
109:12,14 110:9
111:4,15 112:11
113:7 118:25
119:13 121:10,11
123:5,7,14,17,19
124:12 125:16
126:9,9 128:22
129:16 130:17
132:3,14,14
133:18 136:7,7,21
137:16 138:6,16
139:16 140:11
141:12,23 145:2,4
146:7,8,11 147:4
147:22 155:6
158:3 159:19
160:16,17 163:16
165:14,25 166:2,4
174:4
**zhp's**  64:18,25
  67:3,5 80:7 82:15
  121:1 125:9,9
  133:13 162:2,13
**zhpssr**  4:8
**zoom**   1:14 80:5

Exhibit F


Westlaw CHINA

# 中华人民共和国保守国家秘密法

## Law of the People's Republic of China on Guarding State Secrets

| | |
|---|---|
| 颁布机关:<br>Promulgating Institution: | 全国人民代表大会常务委员会<br>Standing Committee of the National People's Congress |
| 文　　号:<br>Document Number: | 中华人民共和国主席令第二十八号<br>Order No. 28 of the President of the People's Republic of China |
| 颁布时间:<br>Promulgating Date: | 04/29/2010<br>04/29/2010 |
| 实施时间:<br>Effective Date: | 10/01/2010<br>10/01/2010 |
| 效力状态:<br>Validity Status: | 有效<br>Valid |

### 中华人民共和国主席令

### 第二十八号

《中华人民共和国保守国家秘密法》已由中华人民共和国第十一届全国人民代表大会常务委员会第十四次会议于２０１０年４月２９日修订通过，现将修订后的《中华人民共和国保守国家秘密法》公布，自２０１０年１０月１日起施行。

中华人民共和国主席 胡锦涛

2010年4月29日

### Order of the President of the People's Republic of China

### No. 28

The Law of the People's Republic of China on Guarding State Secrets has been adopted at the 14th Session of the 11th Standing Committee of the National People's Congress of the People's Republic of China on April 29, 2010, and the revised Law of the People's Republic of China on Guarding State Secrets is hereby promulgated and shall become effective from October 1, 2010.

Hu Jintao, President of the People's Republic of China

April 29, 2010

### 中华人民共和国保守国家秘密法

（1988年9月5日第七届全国人民代表大会常务委员会第三次会议通过 2010年4月29日第十一届全国人民代表大会常务委员会第十四次会议修订）

目录

第一章 总则
第二章 国家秘密的范围和密级
第三章 保密制度
第四章 监督管理
第五章 法律责任
第六章 附则

**Westlaw.** CHINA

## Law of the People's Republic of China on Guarding State Secrets

(Adopted at the Third Session of the Seventh Standing Committee of the National People's Congress of the People's Republic of China on September 5, 1988; and revised at the 14th Session of the 11th Standing Committee of the National People's Congress of the People's Republic of China on April 29, 2010)

Contents

Chapter 1: General Provisions

Chapter 2: Scopes and Categories of State Secrets

Chapter 3: Security Rules

Chapter 4: Supervision and Administration

Chapter 5: Legal Liability

Chapter 6: Supplementary Provisions

第一章 总则

## Chapter 1: General Provisions

第一条 为了保守国家秘密,维护国家安全和利益,保障改革开放和社会主义建设事业的顺利进行,制定本法。

Article 1　This Law is enacted for the purpose of guarding State secrets, safeguarding State security and national interests and ensuring the smooth progress of reform, of opening to the outside world, and of socialist construction.

第二条 国家秘密是关系国家安全和利益,依照法定程序确定,在一定时间内只限一定范围的人员知悉的事项。

Article 2　State secrets shall be matters that have a vital bearing on State security and national interests and, as determined according to statutory procedures, are known by people within a certain scope for a given period of time.

第三条 国家秘密受法律保护。

一切国家机关、武装力量、政党、社会团体、企业事业单位和公民都有保守国家秘密的义务。

任何危害国家秘密安全的行为,都必须受到法律追究。

Article 3　State secrets shall be protected by the law.

All State organs, armed forces, political parties, social groups, enterprises, public institutions and citizens shall have the obligation to guard State secrets.

Any act that jeopardizes the security of a State secret shall be subject to legal liability.

第四条 保守国家秘密的工作(以下简称保密工作),实行积极防范、突出重点、依法管理的方针,既确保国家秘密安全,又便利信息资源合理利用。

法律、行政法规规定公开的事项,应当依法公开。

Article 4　The work of guarding State secrets (hereinafter referred to as "the secret-guarding work") shall be in line with the principles of actively preventing their divulgence, laying emphasis on priorities

Westlaw. CHINA

and carrying out administration legally so that State secrets are kept while the rational use of information resources is facilitated.

The matters that are publicized as required by the laws and administrative regulations shall be publicized in accordance with the law.

第五条　国家保密行政管理部门主管全国的保密工作。县级以上地方各级保密行政管理部门主管本行政区域的保密工作。

Article 5　The State secret-guarding administrative department shall take charge of the national secret-guarding work. The local secret-guarding administrative department at or above the county level shall take charge of the secret-guarding work within their respective administrative area.

第六条　国家机关和涉及国家秘密的单位(以下简称机关、单位)管理本机关和本单位的保密工作。
中央国家机关在其职权范围内,管理或者指导本系统的保密工作。

Article 6　State organs and the organizations that involve State secrets (hereinafter referred to as "organs and organizations") shall administer the secret-guarding work of their own organs and organizations.

The central State organs shall, within the scope of their functions and powers, administer or guide the secret-guarding work within their own system.

第七条　机关、单位应当实行保密工作责任制,健全保密管理制度,完善保密防护措施,开展保密宣传教育,加强保密检查。

Article 7　The organs and organizations shall adopt the secret-guarding accountability system, improve the secret-guarding management system, perfect protective secret-guarding measures, carry out secret-guarding publicity and education, and strengthen the secret-guarding inspection.

第八条　国家对在保守、保护国家秘密以及改进保密技术、措施等方面成绩显著的单位或者个人给予奖励。

第二章　国家秘密的范围和密级

Article 8　The State shall grant awards to the organizations or individuals that have made notable achievements in guarding and protecting State secrets and improving techniques and measures, etc. for guiding secrets.

Chapter 2: Scopes and Categories of State Secrets

第九条　下列涉及国家安全和利益的事项,泄露后可能损害国家在政治、经济、国防、外交等领域的安全和利益的,应当确定为国家秘密:
(一)国家事务重大决策中的秘密事项;
(二)国防建设和武装力量活动中的秘密事项;
(三)外交和外事活动中的秘密事项以及对外承担保密义务的秘密事项;
(四)国民经济和社会发展中的秘密事项;
(五)科学技术中的秘密事项;
(六)维护国家安全活动和追查刑事犯罪中的秘密事项;
(七)经国家保密行政管理部门确定的其他秘密事项。
政党的秘密事项中符合前款规定的,属于国家秘密。

Westlaw. CHINA

Article 9    The following matters involving State security and national interests shall be determined as State secrets if the divulgence of such matters is likely to prejudice State security and national interests in the fields such as political affairs, economy, national defense and foreign affairs:

(1) secrets concerning major policy decisions on State affairs;

(2) secrets in the building of national defense and in the activities of the armed forces;

(3) secrets in diplomatic activities and in the activities related to foreign affairs as well as secrets to be kept as commitments to foreign countries;

(4) secrets in the national economic and social development;

(5) secrets concerning science and technology;

(6) secrets concerning the activities for safeguarding State security and the investigation of criminal offences; and

(7) other matters that are classified as State secrets by the State secret−guarding department.

Secrets of political parties that conform to the provisions of the preceding paragraph shall be State secrets.

第十条  国家秘密的密级分为绝密、机密、秘密三级。
绝密级国家秘密是最重要的国家秘密,泄露会使国家安全和利益遭受特别严重的损害;机密级国家秘密是重要的国家秘密,泄露会使国家安全和利益遭受严重的损害;秘密级国家秘密是一般的国家秘密,泄露会使国家安全和利益遭受损害。

Article 10    State secrets shall fall into three categories: most confidential, classified and confidential.

The most confidential information refers to vital State secrets, the divulgence of which will cause extremely serious harm to State security and national interests; classified information refers to important State secrets, the divulgence of which will cause serious harm to State security and national interests; and confidential information refers to ordinary State secrets, the divulgence of which will cause harm to State security and national interests.

第十一条  国家秘密及其密级的具体范围,由国家保密行政管理部门分别会同外交、公安、国家安全和其他中央有关机关规定。
军事方面的国家秘密及其密级的具体范围,由中央军事委员会规定。
国家秘密及其密级的具体范围的规定,应当在有关范围内公布,并根据情况变化及时调整。

Article 11    The specific scopes and categories of State secrets shall be determined by the State secret−guarding department respectively with the ministries of foreign affairs, public security and State security and other central organs concerned.

The specific scopes and categories of State secrets related to military affairs shall be determined by the Central Military Commission.

Stipulations on the specific scopes and categories of State secrets shall be made known within relevant scope, and adjusted in a timely manner in response to changing circumstances.

第十二条  机关、单位负责人及其指定的人员为定密责任人,负责本机关、本单位的国家秘密确定、变更和解除工作。

Westlaw. CHINA

机关、单位确定、变更和解除本机关、本单位的国家秘密,应当由承办人提出具体意见,经定密责任人审核批准。

**Article 12** The responsible person of an organ or organization or the person designated by such responsible person shall be the person in charge of classifying State secrets, and be responsible for the work of classifying, modifying and declassifying State secrets of the organ or organization.

When an organ or organization classifies, modifies or declassifies its own State secrets, the person who handles the matter shall formulate a specific opinion thereon, to be examined, verified and approved by the person in charge of classifying State secrets.

**第十三条** 确定国家秘密的密级,应当遵守定密权限。

中央国家机关、省级机关及其授权的机关、单位可以确定绝密级、机密级和秘密级国家秘密;设区的市、自治州一级的机关及其授权的机关、单位可以确定机密级和秘密级国家秘密。具体的定密权限、授权范围由国家保密行政管理部门规定。

机关、单位执行上级确定的国家秘密事项,需要定密的,根据所执行的国家秘密事项的密级确定。下级机关、单位认为本机关、本单位产生的有关定密事项属于上级机关、单位的定密权限,应当先行采取保密措施,并立即报请上级机关、单位确定;没有上级机关、单位的,应当立即提请有相应定密权限的业务主管部门或者保密行政管理部门确定。

公安、国家安全机关在其工作范围内按照规定的权限确定国家秘密的密级。

**Article 13** The categories of State secrets shall be subject to the authority for classifying State secrets.

A central State organ or an organ at the level of province or its authorized organ or organization may classify State secrets as most confidential, classified and confidential; and the organ at the level of city with districts or autonomous prefecture or its authorized organ or organization may classify State secrets as classified and confidential. Specific authority for classifying State secrets and the scope of authorization shall be determined by the State secret−guarding administrative department.

Where an organ or organization carries out a matter that is determined as State secrets by its superior department and needs to classify the matter, such classification shall be made according to the category of the State secret. Where the organ or organization at a lower level considers that the relevant matter to be classified arising in the organ or organization falls under the authority of its superior department, security measures shall be taken in advance, and the matter shall be forthwith reported to the superior department for classification; in the absence of such superior department, the matter shall be forthwith reported to the competent department or secret−guarding administrative department with the appropriate authority for classification.

A public security organ or State security organ shall, within the scope of its responsibilities, classify State secrets according to the specified authority limits.

**第十四条** 机关、单位对所产生的国家秘密事项,应当按照国家秘密及其密级的具体范围的规定确定密级,同时确定保密期限和知悉范围。

**Article 14** An organ or organization shall, in accordance with the provisions on the specific scopes of State secrets and their categories, classify the State secrets arising in the organ or organization, and determine the time limit for guarding the State secrets and the scope of availability of the State secrets.

**第十五条** 国家秘密的保密期限,应当根据事项的性质和特点,按照维护国家安全和利益的需要,限定在



必要的期限内;不能确定期限的,应当确定解密的条件。

国家秘密的保密期限,除另有规定外,绝密级不超过三十年,机密级不超过二十年,秘密级不超过十年。

机关、单位应当根据工作需要,确定具体的保密期限、解密时间或者解密条件。

机关、单位对在决定和处理有关事项工作过程中确定需要保密的事项,根据工作需要决定公开的,正式公布时即视为解密。

Article 15　The period for guarding a State secret shall, based on the nature and characteristics of the State secret, be restricted to a necessary time limit according to the needs of maintaining State security and national interests; if the period fails to be determined, the conditions for declassifying the secret shall be determined.

Unless otherwise provided, the period for guarding a State secret that is most confidential shall not exceed 30 years, the period for guarding a State secret that is classified shall not exceed 20 years, and the period for guarding a State secret that is confidential shall not exceed ten years.

An organ or organization shall, according to the actual needs, determine specific period for guarding State secrets, or date or conditions for declassifying State secrets.

Where an organ or organization decides, according to the actual needs, to publicize the matters determined as State secrets in deciding on or handling relevant matters, the matters shall be deemed as having been declassified upon formal publicity.

第十六条　国家秘密的知悉范围,应当根据工作需要限定在最小范围。

国家秘密的知悉范围能够限定到具体人员的,限定到具体人员;不能限定到具体人员的,限定到机关、单位,由机关、单位限定到具体人员。

国家秘密的知悉范围以外的人员,因工作需要知悉国家秘密的,应当经过机关、单位负责人批准。

Article 16　The availability of a State secret shall be limited to the minimum scope according to the actual needs.

The scope of availability of a State secret shall be defined to specific personnel if possible, and, if not possible, to the organ or organization which shall limit the scope to specific personnel.

Where the personnel out of the scope of availability of a State secret need to know the State secret according to the actual needs, the approval of the responsible person of the relevant organ or organization shall be required.

第十七条　机关、单位对承载国家秘密的纸介质、光介质、电磁介质等载体(以下简称国家秘密载体)以及属于国家秘密的设备、产品,应当做出国家秘密标志。

不属于国家秘密的,不应当做出国家秘密标志。

Article 17　An organ or organization shall indicate the mark of State secret on carriers bearing State secrets such as paper and optical or magnetic media (hereinafter referred to as "State secret carriers") and equipment and products that are State secrets.

The mark of State secret shall not be indicated on those that do not fall within State secrets.

第十八条　国家秘密的密级、保密期限和知悉范围,应当根据情况变化及时变更。国家秘密的密级、保密期限和知悉范围的变更,由原定密机关、单位决定,也可以由其上级机关决定。

国家秘密的密级、保密期限和知悉范围变更的,应当及时书面通知知悉范围内的机关、单位或者人员。



Article 18    The categories of State secrets, the periods for guarding them and the scope of their availability shall be modified in response to changing circumstances. Such modifications shall be decided by the organ or organization that originally determined the categories of the secrets and the periods for guarding them and the scope of their availability or by the relevant superior departments.

The organs or organizations or personnel within the scope of availability of State secrets shall be notified, in writing and in a timely manner, of modifications of the categories of the State secrets, the periods for guarding them and the scope of their availability if any.

第十九条 国家秘密的保密期限已满的,自行解密。
机关、单位应当定期审核所确定的国家秘密。对在保密期限内因保密事项范围调整不再作为国家秘密事项,或者公开后不会损害国家安全和利益,不需要继续保密的,应当及时解密;对需要延长保密期限的,应当在原定密期限届满前重新确定保密期限。提前解密或者延长保密期限的,由原定密机关、单位决定,也可以由其上级机关决定。

Article 19    A State secret shall be automatically declassified upon the expiration of the period for guarding it.

An organ or organization shall regularly examine and verify State secrets as determined. Where the matters are no longer kept as State secrets within the periods for guarding them due to the adjustment of the scope of State secrets, or it is unnecessary to continue to keep the State secrets because the publicity of the State secrets will not prejudice State security and national interests, the State secrets shall be declassified in a timely manner; where it is necessary to extend the periods for guiding secrets, the periods shall be determined anew prior to the expiration thereof. The earlier declassification of the State secrets or the extension of the period for guarding them shall be decided by the organ or organization that originally determined the declassification of the State secrets or the extension of the periods or by its superior department.

第二十条 机关、单位对是否属于国家秘密或者属于何种密级不明确或者有争议的,由国家保密行政管理部门或者省、自治区、直辖市保密行政管理部门确定。
第三章 保密制度

Article 20    Where an organ or organization is unclear about or has dispute in determining as to whether or not a matter is a State secret or which category, it should be classified into, the determination shall be made by the State secret−guarding department or the secret−guarding administrative department of a province, autonomous region or municipality directly under the Central Government.

Chapter 3: Secret−guiding Rules

第二十一条 国家秘密载体的制作、收发、传递、使用、复制、保存、维修和销毁,应当符合国家保密规定。
绝密级国家秘密载体应当在符合国家保密标准的设施、设备中保存,并指定专人管理;未经原定密机关、单位或者其上级机关批准,不得复制和摘抄;收发、传递和外出携带,应当指定人员负责,并采取必要的安全措施。

Article 21    The preparation, receipt, dispatch, delivery, use, reproduction, preservation, maintenance and destruction of State secret carriers shall conform to the secret−guiding provisions of the State.

The carriers of State secrets that are most confidential shall be preserved on the facilities or equipment that comply with the secret−guiding standard of the State, and personnel shall be specially designated

Westlaw. CHINA

to manage the said facilities or equipment; the reproduction and extraction of such carriers shall not be made without the approval by the organ or organization that originally classified the State secrets or its superior department; personnel shall be designated to take charge of the receipt, dispatch, delivery or carrying of such carriers, and necessary security measures shall be taken.

第二十二条 属于国家秘密的设备、产品的研制、生产、运输、使用、保存、维修和销毁,应当符合国家保密规定。

Article 22    The development, production, transportation, use, preservation, maintenance and destruction of equipment or products that are State secrets shall conform to the secret−guiding provisions of the State.

第二十三条 存储、处理国家秘密的计算机信息系统(以下简称涉密信息系统)按照涉密程度实行分级保护。

涉密信息系统应当按照国家保密标准配备保密设施、设备。保密设施、设备应当与涉密信息系统同步规划,同步建设,同步运行。

涉密信息系统应当按照规定,经检查合格后,方可投入使用。

Article 23    Hierarchical protection shall be applied to the computer information systems that store or handle State secrets (hereinafter referred to as "secret−related information systems") according to the extent to which they are related to secrets.

A secret−related system shall be equipped with the secret−guiding facilities or equipment according to the secret−guarding standard of the State. The secret−guiding facilities or equipment shall be planned, constructed and operated synchronously with the secret−related information system.

The secret−related information system shall, in accordance with the provisions, not be put into use before passing inspection.

第二十四条 机关、单位应当加强对涉密信息系统的管理,任何组织和个人不得有下列行为:
(一)将涉密计算机、涉密存储设备接入互联网及其他公共信息网络;
(二)在未采取防护措施的情况下,在涉密信息系统与互联网及其他公共信息网络之间进行信息交换;
(三)使用非涉密计算机、非涉密存储设备存储、处理国家秘密信息;
(四)擅自卸载、修改涉密信息系统的安全技术程序、管理程序;
(五)将未经安全技术处理的退出使用的涉密计算机、涉密存储设备赠送、出售、丢弃或者作其他用途。

Article 24    An organ or organization shall strengthen the management of secret−related information systems, and no organization or individual may conduct the following acts:

(1) Connecting a secret−related computer or secret−related storage equipment to the Internet or any other public information network;

(2) Without taking any protective measures, exchanging information between a secret−related information system and the Internet or any other public information systems;

(3) Using a non−secret−related computer or non−secret−relate storage equipment to handle information pertaining to State secrets;

(4) Uninstalling or revising the security technology programs or management programs of a secret−related information system without approval; and



(5) Presenting as a gift, selling, discarding, or altering the purpose of a secret−related computer or secret−related storage equipment that is no longer in use and has not been approached with security technology.

**第二十五条** 机关、单位应当加强对国家秘密载体的管理,任何组织和个人不得有下列行为:
(一)非法获取、持有国家秘密载体;
(二)买卖、转送或者私自销毁国家秘密载体;
(三)通过普通邮政、快递等无保密措施的渠道传递国家秘密载体;
(四)邮寄、托运国家秘密载体出境;
(五)未经有关主管部门批准,携带、传递国家秘密载体出境。

Article 25    An organ or organization shall strengthen the management of State secret carriers, and no organization or individual may conduct the following acts:

(1) Illegally obtaining or possessing State secret carriers;

(2) Buying, selling, transmitting or privately destroying State secret carriers;

(3) Transmitting State secret carriers through channels without any security measures such as ordinary mail and express delivery;

(4) Mailing or consigning State secret carriers out of China; and

(5) Carrying or transmitting State secret carriers out of China without approval by the relevant authority.

**第二十六条** 禁止非法复制、记录、存储国家秘密。
禁止在互联网及其他公共信息网络或者未采取保密措施的有线和无线通信中传递国家秘密。
禁止在私人交往和通信中涉及国家秘密。

Article 26    State secrets shall be prohibited from being illegally reproduced, recorded or stored.

State secrets shall be prohibited from being transmitted on the Internet or any other public information network or via wire or wireless communications without any security measures.

No State secrets may be involved in private contacts or correspondence.

**第二十七条** 报刊、图书、音像制品、电子出版物的编辑、出版、印制、发行,广播节目、电视节目、电影的制作和播放,互联网、移动通信网等公共信息网络及其他传媒的信息编辑、发布,应当遵守有关保密规定。

Article 27    The editing, publication, printing and distribution of newspapers, books, audio−video products and electronic publications, the production and broadcasting of broadcasts, television programs and films, the information compilation and release on the Internet, mobile communications networks and other public information networks and via other media shall comply with the secret−guiding provisions.

**第二十八条** 互联网及其他公共信息网络运营商、服务商应当配合公安机关、国家安全机关、检察机关对泄密案件进行调查;发现利用互联网及其他公共信息网络发布的信息涉及泄露国家秘密的,应当立即停止传输,保存有关记录,向公安机关、国家安全机关或者保密行政管理部门报告;应当根据公安机关、国家安全机关或者保密行政管理部门的要求,删除涉及泄露国家秘密的信息。

Article 28    Internet operators and other public information network operators and service providers shall provide cooperation in the investigation over cases involving the divulgence of State secrets



conducted by the public security organs, State security organs and procuratorial organs; when discovering that the information released on the Internet or any other public information network involves divulgence of State secrets, the operators and providers shall immediately stop the transmission thereof, keep the relevant records, and make a report to the public security organs, the State security organs or the secret−guarding administrative departments; the information involving the divulgence of State secrets shall be deleted as required by the public security organs, the State security organs or the secret−guarding administrative departments.

第二十九条 机关、单位公开发布信息以及对涉及国家秘密的工程、货物、服务进行采购时,应当遵守保密规定。

Article 29　An organ or organization shall observe the secret−guiding provisions in publicly releasing information and making purchase in connection with the construction, goods and services that involve State secrets.

第三十条 机关、单位对外交往与合作中需要提供国家秘密事项,或者任用、聘用的境外人员因工作需要知悉国家秘密的,应当报国务院有关主管部门或者省、自治区、直辖市人民政府有关主管部门批准,并与对方签订保密协议。

Article 30　Where an organ or organization needs to provide a State secret for the benefits of contacts and co−operation with foreign countries, or a foreign−appointed or foreign−employed person needs to know a State secret because of the actual needs, the organ or organization shall report the same to the relevant competent department of the State Council or the relevant competent department of the people's government of a province, autonomous region or municipality directly under the Central Government for approval, and conclude an agreement on confidentiality with the other party.

第三十一条 举办会议或者其他活动涉及国家秘密的,主办单位应当采取保密措施,并对参加人员进行保密教育,提出具体保密要求。

Article 31　Where meetings and other activities involve State secrets, the sponsor organizations shall take secret−guiding measures, conduct secret−guiding education among the participants, and formulate specific requirements for guiding secrets.

第三十二条 机关、单位应当将涉及绝密级或者较多机密级、秘密级国家秘密的机构确定为保密要害部门,将集中制作、存放、保管国家秘密载体的专门场所确定为保密要害部位,按照国家保密规定和标准配备、使用必要的技术防护设施、设备。

Article 32　An organ or organization shall determine its section that involves the most confidential State secrets or a relatively large number of classified or confidential State secrets as a key secret−guarding department, determine the special place where the manufacture, storage and custody of State secret carriers are conducted on a centralized basis as a key location, and provide and use necessary technical protection facilities or equipment in accordance with the secret−guiding provisions and standards of the State.

第三十三条 军事禁区和属于国家秘密不对外开放的其他场所、部位,应当采取保密措施,未经有关部门批准,不得擅自决定对外开放或者扩大开放范围。

Article 33　Military forbidden zones and other places and locations that are State secrets and are not open to the public shall be protected by security measures; without approval of the relevant department, no decision may be made to open them to the public or to enlarge the area that is open to the public.

第三十四条 从事国家秘密载体制作、复制、维修、销毁,涉密信息系统集成,或者武器装备科研生产等涉及国家秘密业务的企业事业单位,应当经过保密审查,具体办法由国务院规定。

Westlaw CHINA

机关、单位委托企业事业单位从事前款规定的业务,应当与其签订保密协议,提出保密要求,采取保密措施。

Article 34    An enterprise or public institution that engages in the manufacture, reproduction, maintenance and destruction of State secret carriers, the integration of secret−related information systems, or the business involving State secrets such as scientific research and production of weaponry shall be subject to confidentiality review, and specific measures shall be provided by the State Council.

When appointing an enterprise or public institution to engage in the business set forth in the preceding paragraph, the organ or organization shall conclude an agreement on confidentiality with the enterprise or public institution, lay down the requirements for guarding secrets and take confidentiality measures.

第三十五条  在涉密岗位工作的人员(以下简称涉密人员),按照涉密程度分为核心涉密人员、重要涉密人员和一般涉密人员,实行分类管理。
任用、聘用涉密人员应当按照有关规定进行审查。
涉密人员应当具有良好的政治素质和品行,具有胜任涉密岗位所要求的工作能力。
涉密人员的合法权益受法律保护。

Article 35    Personnel who hold secret−related posts (hereinafter referred to as "secret−related personnel") shall, based on the extent to which they are related to secrets, be classified as core secret−related personnel, important secret−related personnel and ordinary secret−related personnel, and shall be subject to classified management.

Examination shall be conducted in respect of appointment or employment of secret−related personnel in accordance with the relevant provisions.

Secret−related personnel shall have good political quality and behavior, and be competent for a secret−related post.

Legitimate rights and interests of secret−related personnel shall be protected by law.

第三十六条  涉密人员上岗应当经过保密教育培训,掌握保密知识技能,签订保密承诺书,严格遵守保密规章制度,不得以任何方式泄露国家秘密。

Article 36    Before taking post, secret−related personnel shall receive secret−guarding education and training, master secret−guarding knowledge and skills, sign a confidentiality undertaking, and strictly observe security rules and regulations, and shall not divulge State secrets in any way.

第三十七条  涉密人员出境应当经有关部门批准,有关机关认为涉密人员出境将对国家安全造成危害或者对国家利益造成重大损失的,不得批准出境。

Article 37    Secret−related personnel shall only leave China upon approval of the relevant departments. If the relevant organs consider that secret−related personnel's leaving China will cause harm to State security or cause heavy loss to national interests, secret−related personnel shall not be approved to leave China.

第三十八条  涉密人员离岗离职实行脱密期管理。涉密人员在脱密期内,应当按照规定履行保密义务,不得违反规定就业,不得以任何方式泄露国家秘密。

Article 38    Secret−related personnel shall be subject to the administration whereby they are kept away from secrets during a specific period of time when leaving their post or position. Within such

Westlaw. CHINA

period, secret−related personnel shall perform their obligation for guarding secrets in accordance with the provisions, and shall not be employed in violation of the provisions or divulge State secrets in any way.

**第三十九条** 机关、单位应当建立健全涉密人员管理制度,明确涉密人员的权利、岗位责任和要求,对涉密人员履行职责情况开展经常性的监督检查。

Article 39    An organ or organization shall establish and improve the management system for secret−related personnel, specify the rights of secret−related personnel and their post responsibilities and requirements, and constantly supervise and inspect secret−related personnel's performance of responsibilities.

**第四十条** 国家工作人员或者其他公民发现国家秘密已经泄露或者可能泄露时, 应当立即采取补救措施并及时报告有关机关、单位。机关、单位接到报告后, 应当立即作出处理, 并及时向保密行政管理部门报告。

### 第四章 监督管理

Article 40    When a functionary or any other citizen discovers that a State secret has been divulged or is likely to be divulged, he or she shall forthwith take remedial measures and report the same to the relevant organ or organization in a timely manner. The organ or organization shall, after receiving the report, forthwith handle the matter and report the same to the relevant secret−guarding administrative department in a timely manner.

### Chapter 4: Supervision and Administration

**第四十一条** 国家保密行政管理部门依照法律、行政法规的规定,制定保密规章和国家保密标准。

Article 41    The State secret−guarding administrative department shall, in accordance with the provisions of laws and administrative regulations, formulate secret−guarding rules and the State secret−guarding standard.

**第四十二条** 保密行政管理部门依法组织开展保密宣传教育、保密检查、保密技术防护和泄密案件查处工作,对机关、单位的保密工作进行指导和监督。

Article 42    A secret−guarding administrative department shall, in accordance with the law, organize and carry out the work relating to the dissemination of the knowledge about secret guarding, secret−guarding inspection, and investigation and punishment of cases involving the protection of secret−guarding technology and secret divulgation, and guide and supervise the secret−guarding work of organs and organizations.

**第四十三条** 保密行政管理部门发现国家秘密确定、变更或者解除不当的,应当及时通知有关机关、单位予以纠正。

Article 43    Where a secret−guarding administrative department discovers any inappropriate classification, modification or declassification of a State secret, the department shall promptly notify the relevant organ or organization to make corrections.

**第四十四条** 保密行政管理部门对机关、单位遵守保密制度的情况进行检查,有关机关、单位应当配合。保密行政管理部门发现机关、单位存在泄密隐患的,应当要求其采取措施,限期整改;对存在泄密隐患的设施、设备、场所,应当责令停止使用;对严重违反保密规定的涉密人员,应当建议有关机关、单位给予处分并调离涉密岗位;发现涉嫌泄露国家秘密的,应当督促、指导有关机关、单位进行调查处理。涉嫌犯罪的,移送司法机关处理。


CHINA

Article 44    When a secret-guarding administrative department inspects an organ or organization in terms of its compliance with security rules, the relevant organ or organization shall provide cooperation. Where a secret-guarding administrative department discovers that there is a hidden danger for divulgation of secrets with an organ or organization, the department shall require the organ or organization to take measures and make corrections within a specified time limit; the department shall order the organ or organization to suspend the use of any facilities, equipment or place with a hidden trouble for divulgation of secrets; the department shall make a suggestion to the relevant organ or organization for imposing disciplinary measures on secret-related personnel who seriously violate the provisions regarding secret-guarding and removing them from their secret-related post; if it is discovered that the personnel are suspected of divulgating a State secret, the department shall supervise or guide the relevant organ or organization to conduct investigation and impose punishment accordingly. If the personnel are suspected of committing a criminal offense, the case shall be transferred to the relevant judicial organ for handling.

第四十五条  保密行政管理部门对保密检查中发现的非法获取、持有的国家秘密载体,应当予以收缴。

Article 45    A secret-guarding administrative department shall take over any illegally obtained or possessed State secret carriers that are discovered in the secret-guarding inspection.

第四十六条  办理涉嫌泄露国家秘密案件的机关,需要对有关事项是否属于国家秘密以及属于何种密级进行鉴定的,由国家保密行政管理部门或者省、自治区、直辖市保密行政管理部门鉴定。

Article 46    Where an organ that handles a case involving suspected divulgation of a State secret needs to determine whether or not the relevant matter is a State secret or which category it should be classified into, such determination shall be made by the State secret-guarding administrative department or the secret-guarding administrative department of the relevant province, autonomous region or municipality directly under the Central Government.

第四十七条  机关、单位对违反保密规定的人员不依法给予处分的,保密行政管理部门应当建议纠正,对拒不纠正的,提请其上一级机关或者监察机关对该机关、单位负有责任的领导人员和直接责任人员依法予以处理。

第五章 法律责任

Article 47    Where an organ or organization fails to impose disciplinary measures in accordance with the law on a person who violates the secret-guarding provisions, the relevant secret-guarding administrative department shall make a suggestion on making corrections and, in the event of refusal to make corrections, shall submit the same to the organ or supervision organ at the next higher level for dealing with the leaders bearing responsibility and persons subject to direct liability of the organ or organization in accordance with the law.

Chapter 5: Legal Liability

第四十八条  违反本法规定,有下列行为之一的,依法给予处分;构成犯罪的,依法追究刑事责任:
(一)非法获取、持有国家秘密载体的;
(二)买卖、转送或者私自销毁国家秘密载体的;
(三)通过普通邮政、快递等无保密措施的渠道传递国家秘密载体的;
(四)邮寄、托运国家秘密载体出境,或者未经有关主管部门批准,携带、传递国家秘密载体出境的;
(五)非法复制、记录、存储国家秘密的;
(六)在私人交往和通信中涉及国家秘密的;
(七)在互联网及其他公共信息网络或者未采取保密措施的有线和无线通信中传递国家秘密的;
(八)将涉密计算机、涉密存储设备接入互联网及其他公共信息网络的;

Westlaw CHINA

（九）在未采取防护措施的情况下，在涉密信息系统与互联网及其他公共信息网络之间进行信息交换的；

（十）使用非涉密计算机、非涉密存储设备存储、处理国家秘密信息的；

（十一）擅自卸载、修改涉密信息系统的安全技术程序、管理程序的；

（十二）将未经安全技术处理的退出使用的涉密计算机、涉密存储设备赠送、出售、丢弃或者改作其他用途的。

有前款行为尚不构成犯罪，且不适用处分的人员，由保密行政管理部门督促其所在机关、单位予以处理。

Article 48　　In the case of any of the following acts in violation of the provisions of this Law, disciplinary measures shall be imposed in accordance with the law; if the act constitutes a criminal offense, criminal liability shall be imposed in accordance with the law:

(1) Illegally obtaining or possessing State secret carriers;

(2) Buying, selling, transmitting or privately destroying State secret carriers;

(3) Transmitting State secret carriers through channels without any security measures such as ordinary mail and express delivery;

(4) Mailing or consigning State secret carriers out of China or carrying or transmitting State secret carriers out of China without approval by the relevant authority;

(5) Illegally reproducing, recording or storing State secrets;

(6) Involving State secrets in private contacts or correspondence;

(7) Transmitting State secrets on the Internet or any other public information network or via wire or wireless communications without any security measures;

(8) Connecting a secret−related computer or secret−related storage equipment to the Internet or any other public information network;

(9) Without taking any protective measures, exchanging information between a secret−related information system and the Internet or any other public information systems;

(10) Using a non−secret−related computer or non−secret−related storage equipment to handle information pertaining to State secrets;

(11) Uninstalling or revising the security technology programs or management programs of a secret−related information system without approval; and

(12) Presenting as a gift, selling, discarding, or altering the purpose of, a secret−related computer or secret−related storage equipment that is no longer in use and has not been approached with security technology.

Where a person commits any of the acts set forth in the preceding paragraph but such act does not constitute a criminal offense and disciplinary measures are not applicable, the relevant secret−guarding administrative department shall urge his or her organ or organization to deal with the person.

第四十九条　机关、单位违反本法规定，发生重大泄密案件的，由有关机关、单位依法对直接负责的主管人员和其他直接责任人员给予处分；不适用处分的人员，由保密行政管理部门督促其主管部门予以处理。

机关、单位违反本法规定，对应当定密的事项不定密，或者对不应当定密的事项定密，造成严重后果的，由有关机关、单位依法对直接负责的主管人员和其他直接责任人员给予处分。

Article 49　　Where an organ or organization violates the provisions of this Law resulting in the



occurrence of a significant case involving divulgation of secrets, the relevant organ or organization shall impose disciplinary measures on the person directly in charge and the persons subject to direct liability; for the persons to whom the disciplinary measures are not applicable, the secret−guarding administrative department shall urge the department in charge of the person to deal with the person.

Where, in violation of the provisions of this Law, an organ or organization fails to classify a matter that is required to be classified or classifies a matter that is not required to be classified, thereby causing serious consequences, the relevant organ or organization shall impose disciplinary measures on the person directly in charge and the persons subject to direct liability.

**第五十条** 互联网及其他公共信息网络运营商、服务商违反本法第二十八条规定的,由公安机关或者国家安全机关、信息产业主管部门按照各自职责分工依法予以处罚。

Article 50  Where an Internet operator or any other public information network operator or service provider violates the provisions of Article 28 of this Law, the relevant public security organ or State security organ and the competent information industry department shall, according to their respective functions and duties, impose a penalty thereon in accordance with the law.

**第五十一条** 保密行政管理部门的工作人员在履行保密管理职责中滥用职权、玩忽职守、徇私舞弊的，依法给予处分;构成犯罪的，依法追究刑事责任。

**第六章 附则**

Article 51  Where a staff member of a secret−guarding administrative department is derelict in his or her duties, practices favoritism or commits irregularities, disciplinary measures shall be imposed thereon in accordance with the law; if the act constitutes a criminal offense, criminal liability shall be imposed thereon in accordance with the law.

**Chapter 6: Supplementary Provisions**

**第五十二条** 中央军事委员会根据本法制定中国人民解放军保密条例。

Article 52  The Central Military Commission shall formulate the Regulations of the Chinese People's Liberation Army on the Guarding of Secrets in accordance with this Law.

**第五十三条** 本法自2010年10月1日起施行。

Article 53  This Law shall become effective from October 1, 2010.

# Exhibit G

Westlaw. CHINA

# 中华人民共和国保守国家秘密法实施条例

## Implementing Regulations of the Law of the People's Republic of China on Guarding State Secrets

| | |
|---|---|
| 颁布机关:<br>Promulgating Institution: | 国务院<br>State Council |
| 文　号:<br>Document Number: | 国务院令第646号<br>Order No. 646 of the State Council |
| 颁布时间:<br>Promulgating Date: | 01/17/2014<br>01/17/2014 |
| 实施时间:<br>Effective Date: | 03/01/2014<br>03/01/2014 |
| 效力状态:<br>Validity Status: | 有效<br>Valid |

中华人民共和国国务院令

第646号

现公布《中华人民共和国保守国家秘密法实施条例》,自2014年3月1日起施行。

总理李克强

2014年1月17日

中华人民共和国保守国家秘密法实施条例

第一章　总则

Order No. 646 of the State Council of the People's Republic of China

The Implementing Regulations of the Law of the People's Republic of China on Guarding State Secrets is hereby promulgated, and shall come into effect on March 1, 2014.

Premier Li Keqiang

January 17, 2014

Implementing Regulations of the Law of the People's Republic of China on Guarding State Secrets

Chapter 1: General Provisions

**第一条**　根据《中华人民共和国保守国家秘密法》(以下简称保密法)的规定,制定本条例。

Article 1　These Regulations are formulated in accordance with the Law of the People's Republic of China on Guarding State Secrets (hereinafter referred to as the "Law on Guarding State Secrets").

**第二条**　国家保密行政管理部门主管全国的保密工作。县级以上地方各级保密行政管理部门在上级保密行政管理部门指导下,主管本行政区域的保密工作。

Article 2　The State administrative department for protection of State secrets shall be in charge of confidentiality work at the national level. Local administrative departments for protection of State secrets at and above the county level shall be in charge of confidentiality work within their respective administrative regions under the guidance of superior administrative departments for protection of State secrets.

**第三条**　中央国家机关在其职权范围内管理或者指导本系统的保密工作,监督执行保密法律法规,可以

Westlaw. CHINA

根据实际情况制定或者会同有关部门制定主管业务方面的保密规定。

Article 3    State organs at the central level shall manage or direct the confidentiality work of their respective systems within their respective scope of authority, supervise the compliance with confidentiality laws and regulations, and may formulate, independently or in conjunction with relevant departments, the confidentiality provisions applicable to the business activities for which they are responsible according to actual situations.

第四条  县级以上人民政府应当加强保密基础设施建设和关键保密科技产品的配备。

省级以上保密行政管理部门应当加强关键保密科技产品的研发工作。

保密行政管理部门履行职责所需的经费,应当列入本级人民政府财政预算。机关、单位开展保密工作所需经费应当列入本机关、本单位的年度财政预算或者年度收支计划。

Article 4    The people's governments at and above the county level shall strengthen the construction of confidentiality infrastructures, and equip themselves with more key technological products for confidentiality.

Administrative departments for protection of State secrets at and above the provincial level shall step up the research and development of key technological products for confidentiality.

The funds needed by an administrative department for protection of State secrets to fulfil its duties shall be included in the fiscal budget of the people's government at the same level. The funds needed by an organ or entity to carry out confidentiality work shall be included in its own annual fiscal budget or annual revenue and expenditure plan.

第五条  机关、单位不得将依法应当公开的事项确定为国家秘密,不得将涉及国家秘密的信息公开。

Article 5    Organs and entities shall not determine matters that should be disclosed in accordance with the law as State secrets, and shall not make public information involving State secrets.

第六条  机关、单位实行保密工作责任制。机关、单位负责人对本机关、本单位的保密工作负责,工作人员对本岗位的保密工作负责。

机关、单位应当根据保密工作需要设立保密工作机构或者指定人员专门负责保密工作。

机关、单位及其工作人员履行保密工作责任制情况应当纳入年度考评和考核内容。

Article 6    A confidentiality work accountability system shall be adopted by organs and entities. The person in charge of an organ or entity shall be responsible for the confidentiality work of the organ or entity, while the staff members shall be responsible for the confidentiality work of their respective positions.

Organs and entities shall set up confidentiality work bodies or designate persons to be specifically in charge of confidentiality work according to the needs of confidentiality work.

The execution of the confidentiality work accountability system by an organ or entity and its staff members shall be included in annual assessment and appraisal.

第七条  各级保密行政管理部门应当组织开展经常性的保密宣传教育。机关、单位应当定期对本机关、本单位工作人员进行保密形势、保密法律法规、保密技术防范等方面的教育培训。

第二章 国家秘密的范围和密级

Article 7    Administrative departments for protection of State secrets at all levels shall organize regular publicity and education on confidentiality work. Organs and entities shall provide their own staff members with regular education and training in terms of confidentiality work situations, confidentiality laws and regulations, confidentiality technical precautions, etc.

Westlaw. CHINA

## Chapter 2: Scope and Classification Levels of State Secrets

**第八条** 国家秘密及其密级的具体范围(以下称保密事项范围)应当明确规定国家秘密具体事项的名称、密级、保密期限、知悉范围。

保密事项范围应当根据情况变化及时调整。制定、修订保密事项范围应当充分论证,听取有关机关、单位和相关领域专家的意见。

**Article 8**　The specific scope of State secrets and their classification levels (hereinafter referred to as the "Scope of Confidential Matters") shall specify the titles, classification levels, confidentiality periods and the scope of insiders of the specific matters of State secrets.

The Scope of Confidential Matters shall be promptly adjusted according to changes in circumstances. During the determination and revision of the Scope of Confidential Matters, it is imperative to conduct sufficient discussion, and listen to the opinions of relevant organs and entities, as well as experts from related fields.

**第九条**　机关、单位负责人为本机关、本单位的定密责任人,根据工作需要,可以指定其他人员为定密责任人。

专门负责定密的工作人员应当接受定密培训,熟悉定密职责和保密事项范围,掌握定密程序和方法。

**Article 9**　The person in charge of an organ or entity shall be responsible for determining secrets of the organ or entity. Other persons of the organ or entity may be designated as persons responsible for determining secrets based on work needs.

The staff members of an organ or entity who are specifically responsible for determining secrets shall receive training on determining secrets, familiarize themselves with the duties of determining secrets and the Scope of Confidential Matters, and master the procedures and methods for determining secrets.

**第十条**　定密责任人在职责范围内承担有关国家秘密确定、变更和解除工作。具体职责是:
(一)审核批准本机关、本单位产生的国家秘密的密级、保密期限和知悉范围;
(二)对本机关、本单位产生的尚在保密期限内的国家秘密进行审核,作出是否变更或者解除的决定;
(三)对是否属于国家秘密和属于何种密级不明确的事项先行拟定密级,并按照规定的程序报保密行政管理部门确定。

**Article 10**　A person of an organ or entity who is responsible for determining secrets shall be in charge of the work for determining, changing and declassifying State secrets. His/her specific duties include:

(1) To review and approve the classification levels, confidentiality periods and scope of insiders of the State secrets generated by the organ or entity;

(2) To review the State secrets generated by the organ or entity that are still within their respective confidentiality period, and decide whether to change or declassify such State secrets; and

(3) To preliminarily determine the classification levels of matters that may or may not be State secrets and matters whose classification level is unclear, and submit such preliminarily–determined classification levels to the relevant administrative department for protection of State secrets for final determination according to prescribed procedures.

**第十一条**　中央国家机关、省级机关以及设区的市、自治州级机关可以根据保密工作需要或者有关机关、单位的申请,在国家保密行政管理部门规定的定密权限、授权范围内作出定密授权。

定密授权应当以书面形式作出。授权机关应当对被授权机关、单位履行定密授权的情况进行监督。

中央国家机关、省级机关作出的授权,报国家保密行政管理部门备案;设区的市、自治州级机关作出的授权,报省、自治区、直辖市保密行政管理部门备案。

Article 11    State organs at the central level, provincial organs and organs at the level of cities with districts and autonomous prefectures may, based on the needs of confidentiality work or according to the applications from relevant organs or entities, grant authorization for determining secrets within the authority for determining secrets and the scope of authorization prescribed by the State administrative department for protection of State secrets.

The authorization for determining secrets shall be granted in writing. The organ that grants the authorization shall supervise the authorized organ or entity in its exercise of the authority for determining secrets.

Authorization granted by State organs at the central level and provincial organs shall be reported to the State administrative department for protection of State secrets for record-filing, while authorization granted by organs at the level of cities with districts and autonomous prefectures shall be reported to the administrative departments for protection of State secrets of the relevant provinces, autonomous regions and municipalities directly under the Central Government for record-filing.

第十二条  机关、单位应当在国家秘密产生的同时,由承办人依据有关保密事项范围拟定密级、保密期限和知悉范围,报定密责任人审核批准,并采取相应保密措施。

Article 12    As soon as a State secret is generated in an organ or entity, the handling officer concerned shall preliminarily determine the classification level, confidentiality period and scope of insiders of the State secret based on the Scope of Confidential Matters, submit the same to the person in charge of determining secrets for review and approval, and take appropriate confidentiality measures.

第十三条  机关、单位对所产生的国家秘密,应当按照保密事项范围的规定确定具体的保密期限;保密事项范围没有规定具体保密期限的,可以根据工作需要,在保密法规定的保密期限内确定;不能确定保密期限的,应当确定解密条件。
国家秘密的保密期限,自标明的制发日起计算;不能标明制发日的,确定该国家秘密的机关、单位应当书面通知知悉范围内的机关、单位和人员,保密期限自通知之日起计算。

Article 13    An organ or entity shall determine the specific confidentiality period for a State secret generated as prescribed by the Scope of Confidential Matters, and may determine the same within the confidentiality period prescribed by the Law on Guarding State Secrets according to work needs in the absence of any specific confidentiality period prescribed by the Scope of Confidential Matters. Where the confidentiality period cannot be determined, the organ or entity shall determine the conditions for declassification.

The confidentiality period of a State secret shall commence from the date indicated for the generation of the State secret. Where the date on which the State secret is generated cannot be explicitly indicated, the organ or entity that determines the State secret shall notify the organs, entities and personnel within the scope of insiders in writing, and the confidentiality period shall commence from the date of such notification.

第十四条  机关、单位应当按照保密法的规定,严格限定国家秘密的知悉范围,对知悉机密级以上国家秘密的人员,应当作出书面记录。

Article 14    An organ or entity shall strictly limit the scope of insiders of State secrets in accordance with the Law on Guarding State Secrets, and record in writing persons with knowledge of State secrets at and above the strictly-confidential level.

第十五条  国家秘密载体以及属于国家秘密的设备、产品的明显部位应当标注国家秘密标志。国家秘密标志应当标注密级和保密期限。国家秘密的密级和保密期限发生变更的,应当及时对原国家秘密标志作出变更。

Westlaw CHINA

无法标注国家秘密标志的,确定该国家秘密的机关、单位应当书面通知知悉范围内的机关、单位和人员。

**Article 15**    Labels of State secrets shall be affixed to eye-catching parts of the carriers of State secrets, and the equipment and products that are State secrets. A label of State secrets shall indicate the classification level and the confidentiality period of a State secret, and shall be promptly modified in the event of changes to the classification level or confidentiality period of the State secret.

Where the label of State secrets is unable to be affixed, the organ or entity that determines the relevant State secret shall notify the organs, entities and personnel within the scope of insiders of the State secret in writing.

**第十六条**  机关、单位对所产生的国家秘密,认为符合保密法有关解密或者延长保密期限规定的,应当及时解密或者延长保密期限。

机关、单位对不属于本机关、本单位产生的国家秘密,认为符合保密法有关解密或者延长保密期限规定的,可以向原定密机关、单位或者其上级机关、单位提出建议。

已经依法移交各级国家档案馆的属于国家秘密的档案,由原定密机关、单位按照国家有关规定进行解密审核。

**Article 16**    An organ or entity shall promptly declassify or extend the confidentiality period of a State secret generated if it is of the opinion that the conditions for declassification or extension of the confidentiality period as prescribed by the Law on Guarding State Secrets have been satisfied.

Where an organ or entity is of the opinion that a State secret not generated thereby satisfies the conditions for declassification or extension of the confidentiality period as prescribed by the Law on Guarding State Secrets, it may put forward relevant suggestions to the original secret-determining organ or entity or the superior organ or entity thereof.

The original secret-determining organs or entities shall, in accordance with relevant provisions of the State, conduct declassification review of the files of State secrets that have been transferred to national archives at all levels in accordance with the law.

**第十七条**  机关、单位被撤销或者合并的,该机关、单位所确定国家秘密的变更和解除,由承担其职能的机关、单位负责,也可以由其上级机关、单位或者保密行政管理部门指定的机关、单位负责。

**Article 17**    Where an organ or entity is closed down or merged with another organ or entity, the change and declassification of the State secrets determined by the cancelled or merged organ or entity shall be undertaken by the organ or entity succeeding to its duties. Alternatively, such change and declassification may be undertaken by the organ or entity designated by the superior organ or entity of the cancelled or merged organ or entity, or designated by the relevant administrative department for protection of State secrets.

**第十八条**  机关、单位发现本机关、本单位国家秘密的确定、变更和解除不当的,应当及时纠正;上级机关、单位发现下级机关、单位国家秘密的确定、变更和解除不当的,应当及时通知其纠正,也可以直接纠正。

**Article 18**    An organ or entity shall promptly make correction if it finds that it has inappropriately determined, changed or declassified State secrets. A superior organ or entity shall promptly notify a subordinate organ or entity to make correction, or may directly make correction itself, if it finds that the subordinate organ or entity has inappropriately determined, changed or declassified State secrets.

**第十九条**  机关、单位对符合保密法的规定,但保密事项范围没有规定的不明确事项,应当先行拟定密级、保密期限和知悉范围,采取相应的保密措施,并自拟定之日起10日内报有关部门确定。拟定为绝密级


Westlaw. CHINA

的事项和中央国家机关拟定的机密级、秘密级的事项,报国家保密行政管理部门确定;其他机关、单位拟定的机密级、秘密级的事项,报省、自治区、直辖市保密行政管理部门确定。

保密行政管理部门接到报告后,应当在10日内作出决定。省、自治区、直辖市保密行政管理部门还应当将所作决定及时报国家保密行政管理部门备案。

**Article 19**　　Where an unclear matter meets the requirements of the Law on Guarding State Secrets but is not prescribed within the Scope of Confidential Matters, an organ or entity shall preliminarily determine the classification level, confidentiality period and scope of insiders of the unclear matter, take appropriate confidentiality measures, and report the unclear matter to relevant departments for final determination within ten days of the preliminary determination. Matters preliminarily determined as top secrets, as well as matters preliminarily determined as strictly confidential or confidential by State organs at the central level shall be submitted to the State administrative department for protection of State secrets for final determination, while matters preliminarily determined as strictly confidential or confidential by other organs and entities shall be reported to the administrative departments for protection of State secrets of all provinces, autonomous regions and municipalities directly under the Central Government for final determination.

An administrative department for protection of State secrets shall make a decision within ten days upon receipt of such a report. Administrative departments for protection of State secrets of all provinces, autonomous regions and municipalities directly under the Central Government shall also submit the decisions made thereby to the State administrative department for protection of State secrets for record-filing in a timely manner.

**第二十条**　机关、单位对已定密事项是否属于国家秘密或者属于何种密级有不同意见的,可以向原定密机关、单位提出异议,由原定密机关、单位作出决定。

机关、单位对原定密机关、单位未予处理或者对作出的决定仍有异议的,按照下列规定办理:

(一)确定为绝密级的事项和中央国家机关确定的机密级、秘密级的事项,报国家保密行政管理部门确定。

(二)其他机关、单位确定的机密级、秘密级的事项,报省、自治区、直辖市保密行政管理部门确定;对省、自治区、直辖市保密行政管理部门作出的决定有异议的,可以报国家保密行政管理部门确定。

在原定密机关、单位或者保密行政管理部门作出决定前,对有关事项应当按照主张密级中的最高密级采取相应的保密措施。

第三章　保密制度

**Article 20**　　An organ or entity that holds different opinions on whether a matter already determined as a secret is indeed a State secret or on the classification level thereof may raise objections to the original secret-determining organ or entity for the latter to make relevant decisions.

Where the organ or entity still has objections to the decision made by the original secret-determining organ or entity or because the original secret-determining organ or entity fails to address its previous objections, the following provisions shall apply:

(1) The matter shall be submitted to the State administrative department for protection of State secrets for determination, if it is determined as a top secret, or as strictly confidential or confidential by State organs at the central level; and

(2) The matter shall be submitted to the administrative department for protection of State secrets of the relevant province, autonomous region or municipality directly under the Central Government for determination, if it is determined as strictly confidential or confidential by other organs or entities; and where the first-mentioned organ or entity has objections to the decision made by the said administrative department, the matter may be submitted to the State administrative department for protection of State secrets for determination.


Westlaw CHINA

Before the original secret−determining organ or entity, or the relevant administrative department for protection of State secrets makes a decision, corresponding confidentiality measures shall be taken against the matter according to the highest classification level of the classification levels contended.

## Chapter 3: Confidentiality Systems

第二十一条 国家秘密载体管理应当遵守下列规定:

(一)制作国家秘密载体,应当由机关、单位或者经保密行政管理部门保密审查合格的单位承担,制作场所应当符合保密要求。

(二)收发国家秘密载体,应当履行清点、编号、登记、签收手续。

(三)传递国家秘密载体,应当通过机要交通、机要通信或者其他符合保密要求的方式进行。

(四)复制国家秘密载体或者摘录、引用、汇编属于国家秘密的内容,应当按照规定报批,不得擅自改变原件的密级、保密期限和知悉范围,复制件应当加盖复制机关、单位戳记,并视同原件进行管理。

(五)保存国家秘密载体的场所、设施、设备,应当符合国家保密要求。

(六)维修国家秘密载体,应当由本机关、本单位专门技术人员负责。确需外单位人员维修的,应当由本机关、本单位的人员现场监督;确需在本机关、本单位以外维修的,应当符合国家保密规定。

(七)携带国家秘密载体外出,应当符合国家保密规定,并采取可靠的保密措施;携带国家秘密载体出境的,应当按照国家保密规定办理批准和携带手续。

Article 21    Carriers of State secrets shall be managed pursuant to the following provisions:

(1) Carriers of State secrets shall be prepared by organs, entities or entities that have passed the confidentiality review by administrative departments for protection of State secrets, and the premises for such preparation shall be in compliance with confidentiality requirements;

(2) The procedures for sorting, numbering, registration and receipt acknowledgement shall be performed when carries of State secrets are received or sent;

(3) Carries of State secrets shall be delivered via classified communications, classified correspondence or other means in compliance with confidentiality requirements;

(4) Reproduction of carriers of State secrets, or the extraction, quotation and compilation of contents classified as State secrets shall be subject to approval as required, and the classification levels, confidentiality periods and scope of insiders of the original State secrets may not be changed without authorization. In addition, the duplicated copies of the State secrets shall be affixed with the stamps of the organs or entities making the reproduction, and be managed as the originals thereof;

(5) The premises, facilities and equipment for keeping carriers of State secrets shall be in compliance with the confidentiality requirements of the State;

(6) Carriers of State secrets shall be repaired by the specialized technicians of the organs or entities to which such carriers belong; where such carriers genuinely need to be repaired by personnel from other entities, personnel of the organs or entities to which such carriers belong shall conduct on−site supervision; and where such carriers genuinely need to be repaired outside the organs or entities to which they belong, the confidentiality provisions of the State shall be complied with; and

(7) Where carriers of State secrets are to be taken out of the organs or entities to which they belong, the confidentiality provisions of the State shall be complied with and reliable confidentiality measures shall be taken; and, where carriers of State secrets are to be taken abroad, procedures for approval and carriage shall be gone through in accordance with the confidentiality provisions of the State.

第二十二条 销毁国家秘密载体应当符合国家保密规定和标准,确保销毁的国家秘密信息无法还原。

销毁国家秘密载体应当履行清点、登记、审批手续,并送交保密行政管理部门设立的销毁工作机构或者保密行政管理部门指定的单位销毁。机关、单位确因工作需要,自行销毁少量国家秘密载体的,应当使

用符合国家保密标准的销毁设备和方法。

Article 22　　Carriers of State secrets shall be destroyed in accordance with the confidentiality provisions and standards of the State, so as to ensure that the State secrets destroyed are non-recoverable.

　　Sorting, registration, and examination and approval procedures shall be gone through for the destruction of carriers of State secrets. Carriers of State secrets shall be destroyed by the destruction agencies established by administrative departments for protection of State secrets or entities designated by administrative departments for protection of State secrets. Where an organ or entity destroys a small number of carriers of State secrets on its own due to work needs, it shall use destruction equipment and methods in compliance with the confidentiality standards of the State.

　　第二十三条　涉密信息系统应当按照涉密程度分为绝密级、机密级、秘密级。机关、单位应当根据涉密信息系统存储、处理信息的最高密级确定系统的密级,按照分级保护要求采取相应的安全保密防护措施。

Article 23　　Secret-involved information systems shall be classified at the top-secret level, the strictly-confidential level and the confidential level based on the classification levels of the State secrets contained therein. Organs and entities shall determine the classification levels of secret-involved information systems according to the highest classification level of the information stored or processed by the said systems, and adopt relevant security and confidentiality protection measures according to the requirements on graded protection.

　　第二十四条　涉密信息系统应当由国家保密行政管理部门设立或者授权的保密测评机构进行检测评估,并经设区的市、自治州级以上保密行政管理部门审查合格,方可投入使用。
　　公安、国家安全机关的涉密信息系统投入使用的管理办法,由国家保密行政管理部门会同国务院公安、国家安全部门另行规定。

Article 24　　A secret-involved information system shall not be put into use until it has been tested and assessed by the relevant confidentiality testing and assessment agency established or authorized by the State administrative department for protection of State secrets, and has passed the examination by the relevant administrative department for protection of State secrets at or above the level of cities with districts or autonomous prefectures.

The administrative measures for putting into use secret-involved information systems of public security organs and State security organs shall be separately formulated by the State administrative department for protection of State secrets in conjunction with the public security department and the State security department of the State Council.

　　第二十五条　机关、单位应当加强涉密信息系统的运行使用管理,指定专门机构或者人员负责运行维护、安全保密管理和安全审计,定期开展安全保密检查和风险评估。
　　涉密信息系统的密级、主要业务应用、使用范围和使用环境等发生变化或者涉密信息系统不再使用的,应当按照国家保密规定及时向保密行政管理部门报告,并采取相应措施。

Article 25　　Organs and entities shall strengthen the management of the operation and use of secret-involved information systems, designate specialized departments or personnel to be responsible for their operational maintenance, security and confidentiality management and security audit, and conduct regular security and confidentiality inspection and risk assessment.

In the event of changes to the classification level, main business applications, scope of use or operating environment of a secret-involved information system, or in the event that a secret-involved information



system is no longer in use, the relevant organ or entity shall promptly report the situations to the competent administrative department for protection of State secrets and take corresponding measures in accordance with the confidentiality provisions of the State.

第二十六条 机关、单位采购涉及国家秘密的工程、货物和服务的,应当根据国家保密规定确定密级,并符合国家保密规定和标准。机关、单位应当对提供工程、货物和服务的单位提出保密管理要求,并与其签订保密协议。

政府采购监督管理部门、保密行政管理部门应当依法加强对涉及国家秘密的工程、货物和服务采购的监督管理。

Article 26    Where an organ or entity is to procure projects, goods and services involving State secrets, the organ or entity shall determine the classification levels of such projects, goods and services in accordance with the confidentiality provisions of the State, and comply with the confidentiality provisions and standards of the State. The organ or entity shall raise confidentiality management requirements on the entities providing such projects, goods and services, and enter into confidentiality agreements with the same.

Departments in charge of the supervision and administration of government procurement and administrative departments for protection of State secrets shall strengthen the supervision and administration over the procurement of projects, goods and services involving State secrets in accordance with the law.

第二十七条 举办会议或者其他活动涉及国家秘密的,主办单位应当采取下列保密措施:
(一)根据会议、活动的内容确定密级,制定保密方案,限定参加人员范围;
(二)使用符合国家保密规定和标准的场所、设施、设备;
(三)按照国家保密规定管理国家秘密载体;
(四)对参加人员提出具体保密要求。

Article 27    The entity that holds a meeting or organizes any other activity that involves State secrets shall take the following confidentiality measures:

(1) It shall determine the classification level of the meeting or activity according to its contents, work out the confidentiality plan and limit the scope of participants;

(2) It shall use the premises, equipment and facilities that are in compliance with the confidentiality provisions and standards of the State;

(3) It shall manage carriers of State secrets in accordance with the confidentiality provisions of the State; and

(4) It shall impose specific confidentiality requirements on the participants.

第二十八条 企业事业单位从事国家秘密载体制作、复制、维修、销毁,涉密信息系统集成或者武器装备科研生产等涉及国家秘密的业务(以下简称涉密业务),应当由保密行政管理部门或者保密行政管理部门会同有关部门进行保密审查。保密审查不合格的,不得从事涉密业务。

Article 28    To engage in the production, reproduction, maintenance and destruction of carriers of State secrets, the integration of secret-involved information systems, the scientific research and manufacturing of weaponry and other business involving State secrets (hereinafter referred to as the "Secret-involved Business"), enterprises and public institutions shall pass the confidentiality review conducted by administrative departments for protection of State secrets either independently or in conjunction with other departments concerned. No enterprise or public institution may engage in Secret-involved Business unless it has passed the confidentiality review.

Westlaw CHINA

**第二十九条** 从事涉密业务的企业事业单位应当具备下列条件:
(一)在中华人民共和国境内依法成立3年以上的法人,无违法犯罪记录;
(二)从事涉密业务的人员具有中华人民共和国国籍;
(三)保密制度完善,有专门的机构或者人员负责保密工作;
(四)用于涉密业务的场所、设施、设备符合国家保密规定和标准;
(五)具有从事涉密业务的专业能力;
(六)法律、行政法规和国家保密行政管理部门规定的其他条件。

Article 29    To engage in Secret–involved Business, an enterprise or public institution shall satisfy the following conditions:

(1) It is a legal person without any illegal or criminal record that is duly established within the territory of the People's Republic of China three or more years ago;

(2) Its personnel engaging in Secret–involved Business are persons with the nationality of the People's Republic of China;

(3) It has a robust confidentiality system, and specialized departments or persons responsible for confidentiality work;

(4) The premises, facilities and equipment used for Secret–involved Business are in compliance with the confidentiality provisions and standards of the State;

(5) It has the professional capability for engaging in Secret–involved Business; and

(6) It satisfies other conditions prescribed by laws, administrative regulations and the State administrative department for protection of State secrets.

**第三十条** 涉密人员的分类管理、任(聘)用审查、脱密期管理、权益保障等具体办法,由国家保密行政管理部门会同国务院有关主管部门制定。

第四章 监督管理

Article 30    Specific measures for the classified management, appointment (recruitment) review, management during the secrecy release period, protection of rights and interests, etc. relating to secret–involved personnel shall be formulated by the State administrative department for protection of State secrets in conjunction with relevant competent departments of the State Council.

Chapter 4: Supervision and Administration

**第三十一条** 机关、单位应当向同级保密行政管理部门报送本机关、本单位年度保密工作情况。下级保密行政管理部门应当向上级保密行政管理部门报送本行政区域年度保密工作情况。

Article 31    An organ or entity shall report its annual confidentiality work situations to the administrative department for protection of State secrets at the same level. An inferior administrative department for protection of State secrets shall submit the situations of the annual confidentiality work within its administrative jurisdictions to the relevant superior administrative department for protection of State secrets.

**第三十二条** 保密行政管理部门依法对机关、单位执行保密法律法规的下列情况进行检查:
(一)保密工作责任制落实情况;
(二)保密制度建设情况;
(三)保密宣传教育培训情况;
(四)涉密人员管理情况;
(五)国家秘密确定、变更和解除情况;
(六)国家秘密载体管理情况;
(七)信息系统和信息设备保密管理情况;

Westlaw CHINA

(八)互联网使用保密管理情况;

(九)保密技术防护设施设备配备使用情况;

(十)涉密场所及保密要害部门、部位管理情况;

(十一)涉密会议、活动管理情况;

(十二)信息公开保密审查情况。

Article 32    An administrative department for protection of State secrets shall inspect the compliance with confidentiality laws and regulations by an organ or entity pursuant to the law, covering the following aspects:

(1) Implementation of the confidentiality work accountability system;

(2) Establishment of confidentiality systems;

(3) Confidentiality publicity, education and training;

(4) Management of secret−involved personnel;

(5) Determination, change and declassification of State secrets;

(6) Management of carriers of State secrets;

(7) Confidentiality management of information systems and information equipment;

(8) Confidentiality management of the use of the Internet;

(9) Availability and use of the technological protection facilities and equipment for confidentiality;

(10) Management of secret−involved premises and key confidentiality departments or positions;

(11) Management of secret−involved meetings and activities; and

(12) Confidentiality review of information disclosure.

第三十三条  保密行政管理部门在保密检查过程中,发现有泄密隐患的,可以查阅有关材料、询问人员、记录情况;对有关设施、设备、文件资料等可以依法先行登记保存,必要时进行保密技术检测。有关机关、单位及其工作人员对保密检查应当予以配合。

保密行政管理部门实施检查后,应当出具检查意见,对需要整改的,应当明确整改内容和期限。

Article 33    Where an administrative department for protection of State secrets finds hazards for the divulgement of secrets during the confidentiality inspection of an organ or entity, it may inspect relevant materials, question relevant personnel and record relevant situations, register and keep the facilities, equipment, documents, materials, etc. concerned in advance in accordance with the law, and conduct confidentiality technological testing where necessary. The organ or entity and its staff members shall cooperate with the confidentiality inspection.

The administrative department for protection of State secrets shall issue inspection opinions after the inspection, and specify the contents for, and the period of, rectification if rectification is necessary.

第三十四条  机关、单位发现国家秘密已经泄露或者可能泄露的,应当立即采取补救措施,并在24小时内向同级保密行政管理部门和上级主管部门报告。

地方各级保密行政管理部门接到泄密报告的,应当在24小时内逐级报至国家保密行政管理部门。

Article 34    Where an organ or entity finds that a State secret has been or is likely to be divulged, it shall immediately take remedial measures and report the case to the administrative department for protection of State secrets at the same level and the competent department at a higher level within 24 hours.

Upon receipt of a report on the divulgement of a State secret, a local administrative department for

Westlaw. CHINA

protection of State secrets shall report the case to the State administrative department for protection of State secrets level by level within 24 hours.

第三十五条　保密行政管理部门对公民举报、机关和单位报告、保密检查发现、有关部门移送的涉嫌泄露国家秘密的线索和案件,应当依法及时调查或者组织、督促有关机关、单位调查处理。调查工作结束后,认为有违反保密法律法规的事实,需要追究责任的,保密行政管理部门可以向有关机关、单位提出处理建议。有关机关、单位应当及时将处理结果书面告知同级保密行政管理部门。

Article 35　　As regards the clues and cases of suspected divulgement of State secrets as reported by citizens, organs or entities, discovered during confidentiality inspection or transferred by relevant departments, administrative departments for protection of State secrets shall promptly conduct investigation in accordance with the law, or organize or urge relevant organs or entities to conduct investigation and handling. Upon completion of investigation, where the administrative departments for protection of State secrets are of the opinion that there are facts in violation of confidentiality laws and regulations, and that the liabilities for divulgement shall be investigated for, they may put forward handling suggestions to the organs or entities concerned, and the latter shall promptly inform the administrative departments for protection of State secrets at the same level of the handling results in writing.

第三十六条　保密行政管理部门收缴非法获取、持有的国家秘密载体,应当进行登记并出具清单,查清密级、数量、来源、扩散范围等,并采取相应的保密措施。

保密行政管理部门可以提请公安、工商行政管理等有关部门协助收缴非法获取、持有的国家秘密载体,有关部门应当予以配合。

Article 36　　An administrative department for protection of State secrets shall register and issue a list of the confiscated carriers of State secrets that are illegally acquired or held. It shall ascertain the classification levels, quantity, sources and dissemination scope of such confiscated carriers of State secrets, and take corresponding confidentiality measures.

Administrative departments for protection of State secrets may request public security organs, administrations for industry and commerce and other relevant departments to provide assistance in confiscating carriers of State secrets that are illegally acquired or held, in which case the relevant departments shall provide cooperation.

第三十七条　国家保密行政管理部门或者省、自治区、直辖市保密行政管理部门应当依据保密法律法规和保密事项范围,对办理涉嫌泄露国家秘密案件的机关提出鉴定的事项是否属于国家秘密、属于何种密级作出鉴定。

保密行政管理部门受理鉴定申请后,应当自受理之日起30日内出具鉴定结论;不能按期出具鉴定结论的,经保密行政管理部门负责人批准,可以延长30日。

Article 37　　The State administrative department for protection of State secrets or the administrative departments for protection of State secrets of all provinces, autonomous regions and municipalities directly under the Central Government shall, in accordance with confidentiality laws and regulations and according to the Scope of Confidential Matters, determine whether the matters submitted for appraisal by organs handling cases of suspected divulgement of State secrets are State secrets or not, as well as their classification levels.

An administrative department for protection of State secrets shall issue appraisal conclusions within 30 days upon acceptance of an appraisal application. Where appraisal conclusions are unable to be issued as scheduled, the time period may be extended by 30 days upon approval by the person in charge of the said administrative department.

Westlaw. CHINA

第三十八条 保密行政管理部门及其工作人员应当按照法定的职权和程序开展保密审查、保密检查和泄露国家秘密案件查处工作,做到科学、公正、严格、高效,不得利用职权谋取利益。

第五章 法律责任

Article 38 An administrative department for protection of State secrets and its staff members shall conduct confidentiality review and confidentiality inspection, and investigate and handle cases of divulgement of State secrets in a scientific, impartial, rigorous and efficient manner according to statutory authority and procedures, and shall not seek for benefits by taking advantage of their authority.

Chapter 5: Legal Liabilities

第三十九条 机关、单位发生泄露国家秘密案件不按照规定报告或者未采取补救措施的,对直接负责的主管人员和其他直接责任人员依法给予处分。

Article 39 Where an organ or entity fails to report, or take remedial measures against, a case of divulgement of State secrets as required, the person directly in charge and other personnel subject to direct liabilities shall be given disciplinary sanctions pursuant to the law.

第四十条 在保密检查或者泄露国家秘密案件查处中,有关机关、单位及其工作人员拒不配合,弄虚作假,隐匿、销毁证据,或者以其他方式逃避、妨碍保密检查或者泄露国家秘密案件查处的,对直接负责的主管人员和其他直接责任人员依法给予处分。

企业事业单位及其工作人员协助机关、单位逃避、妨碍保密检查或者泄露国家秘密案件查处的,由有关主管部门依法予以处罚。

Article 40 Where, during confidentiality inspection or the investigation of a case of divulgement of State secrets, the relevant organ or entity and its staff members refuse to provide cooperation, practice fraud, conceal or destroy evidence, or otherwise avoid or obstruct such inspection or investigation, the person directly in charge and other personnel subject to direct liabilities shall be given disciplinary sanctions pursuant to the law.

Any enterprise or public institution and its staff members that assist an organ or entity to avoid or obstruct confidentiality inspection or the investigation of a case of divulgement of State secrets shall be punished by relevant competent departments pursuant to the law.

第四十一条 经保密审查合格的企业事业单位违反保密管理规定的,由保密行政管理部门责令限期整改,逾期不改或者整改后仍不符合要求的,暂停涉密业务;情节严重的,停止涉密业务。

Article 41 Where an enterprise or public institution that has passed the confidentiality review violates relevant provisions on confidentiality management, the competent administrative department for protection of State secrets shall order the same to make correction within the prescribed time limit. The said enterprise or public institution shall be suspended from Secret-involved Business if it fails to make correction by the prescribed deadline or still fails to meet relevant requirements after the correction, and its Secret-involved Business shall be ceased under grave circumstances.

第四十二条 涉密信息系统未按照规定进行检测评估和审查而投入使用的,由保密行政管理部门责令改正,并建议有关机关、单位对直接负责的主管人员和其他直接责任人员依法给予处分。

Article 42 Where a secret-involved information system is put into use without testing, assessment and examination as required, the competent administrative department for protection of State secrets shall order the relevant organ or entity to make correction, and suggest the same to take disciplinary actions against the person directly in charge and other personnel subject to direct liabilities in accordance with the law.

第四十三条 机关、单位委托未经保密审查的单位从事涉密业务的,由有关机关、单位对直接负责的



主管人员和其他直接责任人员依法给予处分。

　　未经保密审查的单位从事涉密业务的,由保密行政管理部门责令停止违法行为;有违法所得的,由工商行政管理部门没收违法所得。

　　Article 43　　Where an organ or entity entrusts an entity that has not passed the confidentiality review to engage in Secret−involved Business, the organ or entity shall take disciplinary actions against the person directly in charge and other personnel subject to direct liabilities in accordance with the law.

　　An entity that engages in Secret−involved Business without passing the confidentiality review shall be ordered to stop its illegal activities by the competent administrative department for protection of State secrets, and have its illegal gains, if any, confiscated by the relevant administration for industry and commerce.

　　第四十四条　保密行政管理部门未依法履行职责,或者滥用职权、玩忽职守、徇私舞弊的,对直接负责的主管人员和其他直接责任人员依法给予处分;构成犯罪的,依法追究刑事责任。

第六章　附则

　　Article 44　　Where an administrative department for protection of State secrets fails to perform duties pursuant to the law, or abuses power, neglects duties or practices favouritism for personal gains, the person directly in charge and other personnel subject to direct liabilities shall be given disciplinary sanctions in accordance with the law, and shall be investigated for criminal liabilities pursuant to the law if the act constitutes criminal offenses.

Chapter 6: Supplementary Provisions

　　第四十五条　本条例自2014年3月1日起施行。1990年4月25日国务院批准、1990年5月25日国家保密局发布的《中华人民共和国保守国家秘密法实施办法》同时废止。

　　Article 45　　These Regulations shall come into effect on March 1, 2014. The Implementing Measures for the Law of the People's Republic of China on Guarding State Secrets approved by the State Council on April 25, 1990 and promulgated by the National Administration for the Protection of State Secrets on May 25, 1990 shall be simultaneously repealed.

# Exhibit H


Westlaw. CHINA

# 中华人民共和国政府信息公开条例

## Regulations of the People's Republic of China on Disclosure of Government Information

| | |
|---|---|
| 颁布机关: <br> Promulgating Institution: | 国务院 <br> State Council |
| 文　　号: <br> Document Number: | 国务院令第711号 <br> Decree No.711 of the State Council |
| 颁布时间: <br> Promulgating Date: | 04/03/2019 <br> 04/03/2019 |
| 实施时间: <br> Effective Date: | 05/15/2019 <br> 05/15/2019 |
| 效力状态: <br> Validity Status: | 有效 <br> Valid |

中华人民共和国国务院令

第711号

现公布修订后的《中华人民共和国政府信息公开条例》，自2019年5月15日起施行。

总理 李克强

2019年4月3日

中华人民共和国政府信息公开条例

（2007年4月5日中华人民共和国国务院令第492号公布 2019年4月3日中华人民共和国国务院令第711号修订）

第一章 总则

### Order No. 711 of the State Council of the People's Republic of China

The revised Regulations of the People's Republic of China on Disclosure of Government Information is hereby promulgated and shall come into force on May 15, 2019.

Premier Li Keqiang

April 3, 2019

### Regulations of the People's Republic of China on Disclosure of Government Information

(Promulgated by the Order No. 429 of the State Council of the People's Republic of China on April 5, 2007 and revised by the Order No. 711 of the State Council of the People's Republic of China on April 3, 2019)

### Chapter 1: General Provisions

**第一条** 为了保障公民、法人和其他组织依法获取政府信息，提高政府工作的透明度，建设法治政府，充分发挥政府信息对人民群众生产、生活和经济社会活动的服务作用，制定本条例。

**Article 1**　These Regulations are formulated in order to ensure that citizens, legal persons and other organizations legally obtain government information, to enhance the transparency of the government work, to build the government based on rule of law and to give full play to government information in serving the people in production, daily living as well as social and economic activities.

**第二条** 本条例所称政府信息，是指行政机关在履行行政管理职能过程中制作或者获取的，以一定形式记录、保存的信息。

Westlaw CHINA

**Article 2**　　For the purposes of these Regulations, the term "government information" shall mean the information prepared or obtained by administrative organs in the process of performance of administrative duties and functions and recorded and preserved in a certain form.

第三条　各级人民政府应当加强对政府信息公开工作的组织领导。

国务院办公厅是全国政府信息公开工作的主管部门,负责推进、指导、协调、监督全国的政府信息公开工作。

县级以上地方人民政府办公厅(室)是本行政区域的政府信息公开工作主管部门,负责推进、指导、协调、监督本行政区域的政府信息公开工作。

实行垂直领导的部门的办公厅(室)主管本系统的政府信息公开工作。

**Article 3**　　The people's governments at all levels shall strengthen the organization and leadership of the disclosure of government information.

The General Office of the State Council is the department in charge of the disclosure of the government information nationwide and shall be responsible for promoting, guiding, coordinating and supervising the disclosure of the government information nationwide.

The general office of a local people's government at or above county level is the department in charge of the disclosure of the government information in the administrative region concerned and shall be responsible for promoting, guiding, coordinating and supervising the disclosure of government information in the administrative region concerned.

The general office of a department implementing vertical leadership system shall be in charge of the disclosure of the government information in the system concerned.

第四条　各级人民政府及县级以上人民政府部门应当建立健全本行政机关的政府信息公开工作制度,并指定机构(以下统称政府信息公开工作机构)负责本行政机关政府信息公开的日常工作。

政府信息公开工作机构的具体职能是:

(一)办理本行政机关的政府信息公开事宜;

(二)维护和更新本行政机关公开的政府信息;

(三)组织编制本行政机关的政府信息公开指南、政府信息公开目录和政府信息公开工作年度报告;

(四)组织开展对拟公开政府信息的审查;

(五)本行政机关规定的与政府信息公开有关的其他职能。

**Article 4**　　The people's governments at all levels and the departments of the people's governments at or above the county level shall establish and improve their respective government information disclosure system and designate agencies (hereinafter referred to as "government information disclosure agencies") to take charge of their respective administrative organs' day-to-day work in connection with the disclosure of government information.

Specific duties and functions of a government information disclosure agency include:

(1) Handling the matters concerning disclosure of the government information of the administrative organ;

(2) Maintaining and updating the government information disclosed by the administrative organ;

(3) Organizing the preparation of the guidelines for disclosure of government information, the catalogue of government information disclosure and annual work report on disclosure of government information by the administrative organ;

(4) Organizing the review for the government information to be disclosed; and

(5) Other duties and functions relating to the disclosure of government information as prescribed by the

**Westlaw.** CHINA

administrative organ.

第五条 行政机关公开政府信息,应当坚持以公开为常态、不公开为例外,遵循公正、公平、合法、便民的原则。

Article 5    In disclosure of government information, administrative organs shall stick to disclosure as normal and nondisclosure as exception and accord with the principles of impartiality, fairness, legality and convenience for the public.

第六条 行政机关应当及时、准确地公开政府信息。

行政机关发现影响或者可能影响社会稳定、扰乱社会和经济管理秩序的虚假或者不完整信息的,应当发布准确的政府信息予以澄清。

Article 6    Administrative organs shall disclose government information in a timely and accurate manner.

Upon discovering any false or incomplete information affecting or likely to affect social stability or to disturb the order of social and economic management, the relevant administrative organ shall make clarification by releasing the relevant accurate government information.

第七条 各级人民政府应当积极推进政府信息公开工作,逐步增加政府信息公开的内容。

Article 7    People's governments at all levels shall actively push forward the work in connection with disclosure of government information and gradually increase the content of the disclosure of government information.

第八条 各级人民政府应当加强政府信息资源的规范化、标准化、信息化管理,加强互联网政府信息公开平台建设,推进政府信息公开平台与政务服务平台融合,提高政府信息公开在线办理水平。

Article 8    People's governments at all levels shall strengthen the normalized, standardized and information−based management of government information resources, strengthen the construction of the Internet−based government information disclosure platform, propel the integration of the government information disclosure platform and the government service platform and improve the level of online processing of government information disclosure.

第九条 公民、法人和其他组织有权对行政机关的政府信息公开工作进行监督，并提出批评和建议。

Article 9    Citizens, legal persons and other organizations shall have the right to supervise the work of administrative organs for disclosure of government information and present criticism and suggestions.

第二章 公开的主体和范围

## Chapter 2: Subject and Scope of Disclosure

第十条 行政机关制作的政府信息,由制作该政府信息的行政机关负责公开。行政机关从公民、法人和其他组织获取的政府信息,由保存该政府信息的行政机关负责公开;行政机关获取的其他行政机关的政府信息,由制作或者最初获取该政府信息的行政机关负责公开。法律、法规对政府信息公开的权限另有规定的,从其规定。

行政机关设立的派出机构、内设机构依照法律、法规对外以自己名义履行行政管理职能的,可以由该派出机构、内设机构负责与所履行行政管理职能有关的政府信息公开工作。

两个以上行政机关共同制作的政府信息,由牵头制作的行政机关负责公开。

Article 10    Government information prepared by an administrative organ shall be disclosed by the administrative organ preparing such government information. The government information obtained by an

Westlaw CHINA

administrative organ from citizens, legal persons and other organizations shall be disclosed by the administrative organ preserving such government information; the government information obtained by an administrative organ from other administrative organs shall be disclosed by the administrative organ preparing or originally obtaining such government information. Where the authority for disclosing government information is otherwise provided for by laws and regulations, such provisions shall prevail.

A dispatched office or internal department of administrative organs, if externally performing administrative duties and functions in its own name in accordance with laws and regulations, may be responsible for disclosing the government information relating to the administrative duties and functions performed thereby.

The government information prepared by two or more administrative organs jointly shall be disclosed by the administrative organ taking the lead in the preparation.

**第十一条** 行政机关应当建立健全政府信息公开协调机制。行政机关公开政府信息涉及其他机关的,应当与有关机关协商、确认,保证行政机关公开的政府信息准确一致。

行政机关公开政府信息依照法律、行政法规和国家有关规定需要批准的,经批准予以公开。

Article 11    An administrative organ shall establish and improve a mechanism for coordinating the disclosure of government information. An administrative organ, if its disclosure of the government information involves another administrative organ, shall consult and confirm with the relevant administrative organ to ensure the accuracy and consistency of the government information disclosed by administrative organs.

Where the disclosure of government information by administrative organs is subject to approval according to laws, administrative regulations and relevant provisions of the State, the disclosure shall be made upon approval.

**第十二条** 行政机关编制、公布的政府信息公开指南和政府信息公开目录应当及时更新。

政府信息公开指南包括政府信息的分类、编排体系、获取方式和政府信息公开工作机构的名称、办公地址、办公时间、联系电话、传真号码、互联网联系方式等内容。

政府信息公开目录包括政府信息的索引、名称、内容概述、生成日期等内容。

Article 12    The guidelines for disclosure of government information and the catalogue of government information disclosure prepared or published by administrative organs shall be updated in a timely manner.

The guidelines for disclosure of government information shall include the classification, arrangement system and obtaining methods of government information, the names, office addresses, office hours, contact telephone and fax numbers and the Internet-based contact information of government information disclosure agencies, as well as other relevant content.

The catalogue of government Information disclosure shall include an index, name, summary of content, date on which information is generated and other relevant content of such government information.

**第十三条** 除本条例第十四条、第十五条、第十六条规定的政府信息外,政府信息应当公开。

行政机关公开政府信息,采取主动公开和依申请公开的方式。

Article 13    Government information other than that prescribed in Article 14, Article 15 and Article 16 hereof shall be disclosed.

Administrative organs shall disclose government information by way of disclosure on their own initiatives and disclosure upon application

**第十四条** 依法确定为国家秘密的政府信息,法律、行政法规禁止公开的政府信息,以及公开后可能危

Westlaw. CHINA

及国家安全、公共安全、经济安全、社会稳定的政府信息,不予公开。

**Article 14**      The government information legally determined as the State's secrets, the government information prohibited to be disclosed under laws and administrative regulations and the government information of which the disclosure may endanger the national security, public security, economic security or social stability shall not be disclosed.

**第十五条** 涉及商业秘密、个人隐私等公开会对第三方合法权益造成损害的政府信息,行政机关不得公开。但是,第三方同意公开或者行政机关认为不公开会对公共利益造成重大影响的,予以公开。

**Article 15**      An administrative organ shall not disclose the government information involving trades secrets or personal privacy, etc. of which the disclosure will cause harm to the lawful rights and interests of any third party. However, such information shall be disclosed if the third party consents to the disclosure or if the administrative organ believes that non-disclosure will materially affect public interests.

**第十六条** 行政机关的内部事务信息,包括人事管理、后勤管理、内部工作流程等方面的信息,可以不予公开。

行政机关在履行行政管理职能过程中形成的讨论记录、过程稿、磋商信函、请示报告等过程性信息以及行政执法案卷信息,可以不予公开。法律、法规、规章规定上述信息应当公开的,从其规定。

**Article 16**      Information on the internal affairs of administrative organs, including the information on personnel management, logistics management, internal work process and other aspects, may not be disclosed.

The records of discussions, process drafts, consultation letters, instruction request reports and other process-related information formed by administrative organs during performance of administrative duties and functions as well as the information on administrative law enforcement case files may not be disclosed. However if disclosure of such information is required under the provisions of laws, regulations or rules, the provisions shall prevail.

**第十七条** 行政机关应当建立健全政府信息公开审查机制,明确审查的程序和责任。

行政机关应当依照《中华人民共和国保守国家秘密法》以及其他法律、法规和国家有关规定对拟公开的政府信息进行审查。

行政机关不能确定政府信息是否可以公开的,应当依照法律、法规和国家有关规定报有关主管部门或者保密行政管理部门确定。

**Article 17**      Administrative organs shall set up and improve the government information disclosure review mechanism and specify the procedures and responsibilities for the review.

Administrative organs shall, in accordance with the Law of the People's Republic of China on Guarding State Secrets as well as other laws, regulations and the relevant provisions of the State, review the government information to be disclosed.

If an administrative organ cannot determine whether or not the relevant government information may be disclosed, it shall, in accordance with laws, regulations and the relevant provisions of the State, report such matter to the relevant competent department or the secret-guarding administrative department for decision.

**第十八条** 行政机关应当建立健全政府信息管理动态调整机制,对本行政机关不予公开的政府信息进行定期评估审查,对因情势变化可以公开的政府信息应当公开。

**Article 18**      An administrative organ shall establish and improve the dynamic adjustment mechanism

 Westlaw CHINA

for management of government information, evaluate and review the government information not disclosed by the administrative organ on regular basis and disclose the government information that may be disclosed due to change of circumstances.

第三章 主动公开

## Chapter 3: Disclosure on their own Initiatives

**第十九条** 对涉及公众利益调整、需要公众广泛知晓或者需要公众参与决策的政府信息,行政机关应当主动公开。

Article 19　　Administrative organs shall disclose on their own initiatives the government information involving adjustment to public interests, requiring the extensive awareness of the public or requiring the public participation for decision making.

**第二十条** 行政机关应当依照本条例第十九条的规定,主动公开本行政机关的下列政府信息:
(一)行政法规、规章和规范性文件;
(二)机关职能、机构设置、办公地址、办公时间、联系方式、负责人姓名;
(三)国民经济和社会发展规划、专项规划、区域规划及相关政策;
(四)国民经济和社会发展统计信息;
(五)办理行政许可和其他对外管理服务事项的依据、条件、程序以及办理结果;
(六)实施行政处罚、行政强制的依据、条件、程序以及本行政机关认为具有一定社会影响的行政处罚决定;
(七)财政预算、决算信息;
(八)行政事业性收费项目及其依据、标准;
(九)政府集中采购项目的目录、标准及实施情况;
(十)重大建设项目的批准和实施情况;
(十一)扶贫、教育、医疗、社会保障、促进就业等方面的政策、措施及其实施情况;
(十二)突发公共事件的应急预案、预警信息及应对情况;
(十三)环境保护、公共卫生、安全生产、食品药品、产品质量的监督检查情况;
(十四)公务员招考的职位、名额、报考条件等事项以及录用结果;
(十五)法律、法规、规章和国家有关规定规定应当主动公开的其他政府信息。

Article 20　　An administrative organ shall disclose on its own initiatives the following government information of the administrative organ in accordance with Article 19 hereof:

(1) Administrative regulations, rules and regulatory documents;

(2) Duties and functions, departmental setup, office address, office hours, contact information and name of the persons in charge of the organ;

(3) National economic and social development plans, special planning, regional planning and the relevant policies;

(4) Statistic information pertaining to national economy and social development;

(5) Basis, conditions and procedures for handling administrative permits and other external management and service matters as well as the results of handling;

(6) Basis, conditions and procedures for implementing administrative punishment and administrative enforcement as well as the administrative punishment decisions as deemed by the administrative organ to have certain social influence;

(7) Information on fiscal budget and final accounts;

(8) Items, basis and rates for charging administrative and institutional fees;

Westlaw. CHINA

(9) Catalogue, standards and the implementation of centralized government procurement projects;

(10) Information on approval and implementation of major construction projects;

(11) Policies and measures for poverty alleviation, education, medical care, social security, and employment promotion etc. and the implementation thereof;

(12) Contingency plans for, information on early warning of and responses to, public emergencies;

(13) Supervision and inspection of environmental protection, public health, work safety, food and drugs, and product quality;

(14) Positions and number of the public servants to be recruited, conditions for applying for the positions and other relevant matters as well as the results of recruitment; and

(15) Other government information that the administrative organ is required to disclose on its own initiatives in accordance with laws, regulations, rules and relevant provisions of the State.

第二十一条 除本条例第二十条规定的政府信息外,设区的市级、县级人民政府及其部门还应当根据本地方的具体情况,主动公开涉及市政建设、公共服务、公益事业、土地征收、房屋征收、治安管理、社会救助等方面的政府信息;乡(镇)人民政府还应当根据本地方的具体情况,主动公开贯彻落实农业农村政策、农田水利工程建设运营、农村土地承包经营权流转、宅基地使用情况审核、土地征收、房屋征收、筹资筹劳、社会救助等方面的政府信息。

Article 21　　In addition to the government information prescribed in Article 20 hereof, the people's government at the level of city divided into districts or at county level and the departments thereof shall also, according to local specific situation, take the initiatives to disclose the government information involving municipal construction, public services, public-welfare undertakings, land expropriation, housing expropriation, public security management, social assistance and other aspects; township people's governments shall also, according to the local specific situation, take the initiatives to disclose the government information on implementation of the policies on agriculture and rural areas, construction and operation of farmland and water conservancy projects, circulation of contracted land operation right in rural areas, examination and verification of the use of homestead, land expropriation, housing expropriation, raising of funds and labor, social assistance and other aspects.

第二十二条 行政机关应当依照本条例第二十条、第二十一条的规定,确定主动公开政府信息的具体内容,并按照上级行政机关的部署,不断增加主动公开的内容。

Article 22　　Administrative organs shall determine the specific content of the government information to be disclosed on their own initiatives in accordance with Article 20 and Article 21 hereof and constantly increase the content of such disclosure according to the arrangement of the administrative organs at higher levels.

第二十三条 行政机关应当建立健全政府信息发布机制,将主动公开的政府信息通过政府公报、政府网站或者其他互联网政务媒体、新闻发布会以及报刊、广播、电视等途径予以公开。

Article 23　　Administrative organs shall establish and improve the government information release mechanism and disclose the government information to be disclosed on their own initiatives via government gazettes, government websites or other Internet-based government affairs media, press conferences, newspapers, periodicals, radio or television broadcasting or other channels.

第二十四条 各级人民政府应当加强依托政府门户网站公开政府信息的工作,利用统一的政府信息公开平台集中发布主动公开的政府信息。政府信息公开平台应当具备信息检索、查阅、下载等功能。

Article 24　　People's governments at all levels shall strengthen the work of disclosing government

Westlaw CHINA

information by relying on portals of governments and make use of the unified government information disclosure platform to release on centralized basis the government information disclosed on their own initiatives. The government information disclosure platform shall have the functions such as information retrieval, consultation and downloading.

**第二十五条** 各级人民政府应当在国家档案馆、公共图书馆、政务服务场所设置政府信息查阅场所,并配备相应的设施、设备,为公民、法人和其他组织获取政府信息提供便利。

行政机关可以根据需要设立公共查阅室、资料索取点、信息公告栏、电子信息屏等场所、设施,公开政府信息。

行政机关应当及时向国家档案馆、公共图书馆提供主动公开的政府信息。

**Article 25** The people's governments at all levels shall maintain sites equipped with appropriate facilities and equipment for consulting government information within national archives, public libraries and government service sites to facilitate the access of citizens, legal persons or other organizations to government information.

An administrative organ may, according to actual needs, establish public reading rooms, data access point, information bulletin boards, electronic information screens, and other places or facilities to disclose government information.

Administrative organs shall, in a timely manner, provide national archives and public libraries with government information disclosed on their own initiatives..

**第二十六条** 属于主动公开范围的政府信息,应当自该政府信息形成或者变更之日起20个工作日内及时公开。法律、法规对政府信息公开的期限另有规定的,从其规定。

**Article 26** The government information falling within the scope of disclosure on their own initiatives shall be disclosed within 20 working days after the formulation or modification of such government information. If the time limit for the disclosure of such government information is otherwise provided for in laws and regulations, such provisions shall apply.

第四章 依申请公开

## Chapter 4: Disclosure upon Application

**第二十七条** 除行政机关主动公开的政府信息外,公民、法人或者其他组织可以向地方各级人民政府、对外以自己名义履行行政管理职能的县级以上人民政府部门(含本条例第十条第二款规定的派出机构、内设机构)申请获取相关政府信息。

**Article 27** Apart from the government information disclosed by administrative organs on their own initiatives, a citizen, legal person or other organization may apply to local people's governments at all levels and the departments of the people's governments at or above the county level that externally perform administrative duties and functions in their own names (including the dispatched offices and internal departments prescribed in Paragraph 2 of Article 10 hereof) for obtaining relevant government information.

**第二十八条** 本条例第二十七条规定的行政机关应当建立完善政府信息公开申请渠道,为申请人依法申请获取政府信息提供便利。

**Article 28** Administrative organs stated in Article 27 hereof shall set up and improve the channels for applying for disclosure of government information and provide convenience for applicants to apply for access to government information in accordance with the law.

**第二十九条** 公民、法人或者其他组织申请获取政府信息的,应当向行政机关的政府信息公开工作机



构提出,并采用包括信件、数据电文在内的书面形式;采用书面形式确有困难的,申请人可以口头提出,由受理该申请的政府信息公开工作机构代为填写政府信息公开申请。

政府信息公开申请应当包括下列内容:

(一)申请人的姓名或者名称、身份证明、联系方式;

(二)申请公开的政府信息的名称、文号或者便于行政机关查询的其他特征性描述;

(三)申请公开的政府信息的形式要求,包括获取信息的方式、途径。

Article 29　　A citizen, legal person or other organization applying for access to government information shall file application with the government information disclosure agency of the administrative organ in written form including letter and data message; if it is difficult to file an application in written form, the applicant may file a verbal application, and the government information disclosure agency that accepts such application shall fill out the application for the disclosure of government information on the applicant's behalf.

An application for disclosure of government information shall include the following contents:

(1) Applicant's name, identity certificate and contact information;

(2) Name, document number and other characteristic descriptions facilitating the search by government organs of the government information under application for disclosure; and

(3) Requirements on the form of the government information under application for disclosure, including the methods and channels for access to the information.

第三十条　政府信息公开申请内容不明确的,行政机关应当给予指导和释明,并自收到申请之日起7个工作日内一次性告知申请人作出补正,说明需要补正的事项和合理的补正期限。答复期限自行政机关收到补正的申请之日起计算。申请人无正当理由逾期不补正的,视为放弃申请,行政机关不再处理该政府信息公开申请。

Article 30　　If the content of the application for disclosure of government information is not clear, the administrative organ shall provide instruction and clarification and notify on one-time basis the applicant of the supplement and correction to be made within seven working days from the date of receipt of the application specifying the matters to be supplemented and corrected and the reasonable time limit for the supplement and correction. The time limit for reply shall be calculated from the date of receipt of the supplemented and corrected application by the administrative organ. The applicant that fails to make the supplement and correction within the time limit without justification shall be deemed as waiving the application and the administrative organ shall no longer process such application for disclosure of government information.

第三十一条　行政机关收到政府信息公开申请的时间,按照下列规定确定:

(一)申请人当面提交政府信息公开申请的,以提交之日为收到申请之日;

(二)申请人以邮寄方式提交政府信息公开申请的,以行政机关签收之日为收到申请之日;以平常信函等无需签收的邮寄方式提交政府信息公开申请的,政府信息公开工作机构应当于收到申请的当日与申请人确认,确认之日为收到申请之日;

(三)申请人通过互联网渠道或者政府信息公开工作机构的传真提交政府信息公开申请的,以双方确认之日为收到申请之日。

Article 31　　The time when an administrative organ receives an application for disclosure of government information shall be determined according to the following provision:

(1) Where the applicant submits the application for disclosure of government information in person, the date of submission shall be the date of receipt of the application;

(2) Where the applicant submits the application for disclosure of government information by post, the



Westlaw CHINA

date of signing for receipt by the administrative organ shall be the date of receipt of the application; where the applicant submits the application for disclosure of government information through ordinary letter or any other method not requiring signing for receipt, the government information disclosure agency shall confirm with the applicant on the date of receiving the application and the date of confirmation shall be the date of receipt of the application; and

(3) Where the applicant submits the application for disclosure of government information via the channel of the Internet or the fax of the government information disclosure agency, the date of confirmation by both parties shall be the date of receipt of the application.

第三十二条　依申请公开的政府信息公开会损害第三方合法权益的,行政机关应当书面征求第三方的意见。第三方应当自收到征求意见书之日起15个工作日内提出意见。第三方逾期未提出意见的,由行政机关依照本条例的规定决定是否公开。第三方不同意公开且有合理理由的,行政机关不予公开。行政机关认为不公开可能对公共利益造成重大影响的,可以决定予以公开,并将决定公开的政府信息内容和理由书面告知第三方。

Article 32　Where the disclosure of the information to be disclosed upon application will harm the lawful rights and interests of a third party, the administrative organ shall solicit the opinions of the third party in writing. The third party shall present opinions within 15 working days after receiving the written solicitation of opinions. Where the third party fails to present opinions within the prescribed time limit, the administrative organ shall decide whether to disclose the information in accordance with these Regulations. If the third party does not consent to the disclosure with justification, the administrative organ shall not disclose the information. The administrative organ, if believing the non−disclosure may materially affect the public interests, may decide to disclose the information and notify in writing the third party of the content of the government information decided to be disclosed and the reasons for the disclosure.

第三十三条　行政机关收到政府信息公开申请,能够当场答复的,应当当场予以答复。

行政机关不能当场答复的,应当自收到申请之日起20个工作日内予以答复;需要延长答复期限的,应当经政府信息公开工作机构负责人同意并告知申请人,延长的期限最长不得超过20个工作日。

行政机关征求第三方和其他机关意见所需时间不计算在前款规定的期限内。

Article 33　An administrative organ shall give a reply immediately, if possible, upon receiving an application for the disclosure of government information.

If the administrative organ cannot reply immediately, it shall provide reply within 20 working days after receiving the application. If extension of the said time limit is required, it shall be subject to the approval by the person in charge of the government information disclosure agency and shall be notified to the applicant. The maximum period of extension shall not exceed 20 working days.

The time required for the administrative organ to solicit opinions from any third party and other organs shall not be included in the time limit specified in the preceding paragraph.

第三十四条　申请公开的政府信息由两个以上行政机关共同制作的,牵头制作的行政机关收到政府信息公开申请后可以征求相关行政机关的意见,被征求意见机关应当自收到征求意见书之日起15个工作日内提出意见,逾期未提出意见的视为同意公开。

Article 34　Where the government information under application for disclosure is prepared jointly by two or more administrative organs, the administrative organ taking the lead in preparation may, after receiving the application for disclosure of government information, solicit the opinions from relevant administrative organs which shall present opinions within 15 working days after receipt of the written solicitation of opinions and shall be deemed as consenting to the disclosure if failing to present opinions



within the specified time limit.

第三十五条 申请人申请公开政府信息的数量、频次明显超过合理范围,行政机关可以要求申请人说明理由。行政机关认为申请理由不合理的,告知申请人不予处理;行政机关认为申请理由合理,但是无法在本条例第三十三条规定的期限内答复申请人的,可以确定延迟答复的合理期限并告知申请人。

Article 35     Where an applicant applies for disclosure of government information in the quantity or frequency obviously beyond reasonable scope, the administrative organ may require the applicant to explain the reason. If the administrative organ believes that the application is not justified, it shall notify the applicant of its refusal to handle the application; if the administrative organ believes that the application is justified but it cannot provide rely to the applicant within the time limit specified in Article 33 hereof, it may determine reasonable time limit for the postponement of the reply and notify the applicant thereof.

第三十六条 对政府信息公开申请,行政机关根据下列情况分别作出答复:
(一)所申请公开信息已经主动公开的,告知申请人获取该政府信息的方式、途径;
(二)所申请公开信息可以公开的,向申请人提供该政府信息,或者告知申请人获取该政府信息的方式、途径和时间;
(三)行政机关依据本条例的规定决定不予公开的,告知申请人不予公开并说明理由;
(四)经检索没有所申请公开信息的,告知申请人该政府信息不存在;
(五)所申请公开信息不属于本行政机关负责公开的,告知申请人并说明理由;能够确定负责公开该政府信息的行政机关的,告知申请人该行政机关的名称、联系方式;
(六)行政机关已就申请人提出的政府信息公开申请作出答复、申请人重复申请公开相同政府信息的,告知申请人不予重复处理;
(七)所申请公开信息属于工商、不动产登记资料等信息,有关法律、行政法规对信息的获取有特别规定的,告知申请人依照有关法律、行政法规的规定办理。

Article 36     With respect to government information under application for disclosure, the relevant administrative organ shall make a reply respectively according to the following circumstances:

(1) Inform the applicant of the method and approach of obtaining the relevant government information if the information under application for disclosure has been disclosed on its own initiatives;

(2) Provide the applicant with the government information or notifying the applicant of the methods, approach and time for obtaining the government information if the government information under application for disclosure can be disclosed;

(3) Inform the applicant of its decision not to make disclosure and state the reasons therefor if the administrative organ decides not to disclose the government information in accordance with these Regulations;

(4) Inform the applicant of nonexistence of the government information if the search fails to find the information under application for disclosure;

(5) Inform, if the government information under application for disclosure is not under the responsibility of the administrative organ for disclosure, the applicant thereof and state reasons therefor; inform the applicant of the name and contact information of the administrative organ responsible for disclosing such government information if such administrative organ can be determined;

(6) Inform the applicant of refusal to handle repetitively if the administrative organ has replied to the application of the applicant for disclosure of the government information or the applicant repetitively applies for disclosure of the same government information; and

(7) Advise the applicant to handle in accordance with relevant laws and administrative regulations if

Westlaw CHINA

the information under application for disclosure falls under the information such as data of industrial and commercial registration and real estate registration and relevant laws and administrative regulations contain special provisions on the access thereto.

**第三十七条** 申请公开的信息中含有不应当公开或者不属于政府信息的内容,但是能够作区分处理的,行政机关应当向申请人提供可以公开的政府信息内容,并对不予公开的内容说明理由。

**Article 37** Where the information under application for disclosure contains any content that shall not be disclosed or does not fall within government information but is separable, the relevant administrative organ shall provide the applicant with the part of the government information that is allowed to be disclosed and provide an explanation of the reasons regarding the content not disclosed.

**第三十八条** 行政机关向申请人提供的信息,应当是已制作或者获取的政府信息。除依照本条例第三十七条的规定能够作区分处理的外,需要行政机关对现有政府信息进行加工、分析的,行政机关可以不予提供。

**Article 38** The information provided by administrative organs to applicants shall be the government information already prepared or obtained. Except for the government information that is separable as prescribed in Article 37 hereof, if an administrative organ is required to process or analyze the existing government information, it may refuse to provide the information.

**第三十九条** 申请人以政府信息公开申请的形式进行信访、投诉、举报等活动,行政机关应当告知申请人不作为政府信息公开申请处理并可以告知通过相应渠道提出。

申请人提出的申请内容为要求行政机关提供政府公报、报刊、书籍等公开出版物的,行政机关可以告知获取的途径。

**Article 39** Where the applicant conducts the activities such as filing petition, complaint or report on violations in the form the application for disclosure of government information, the administrative organ shall advise the applicant that such activity shall not be treated as the application for disclosure of government information for handling and may advise the applicant to raise the same through corresponding channels.

If, in the application, the applicant requires the administrative organ to provide any government gazettes, newspapers, periodicals, books and any other public publications, the administrative organ may inform the applicant of the channels for obtaining the same.

**第四十条** 行政机关依申请公开政府信息,应当根据申请人的要求及行政机关保存政府信息的实际情况,确定提供政府信息的具体形式;按照申请人要求的形式提供政府信息,可能危及政府信息载体安全或者公开成本过高的,可以通过电子数据以及其他适当形式提供,或者安排申请人查阅、抄录相关政府信息。

**Article 40** In disclosing government information upon application, an administrative organ shall determine the specific form for providing the government information in light of the requirements of the applicant and the actual situation of the preservation of government information by the administrative organ; if the supply of the government information in the form required by the applicant may endanger the security of the government information carrier or results in excessively high cost of disclosure, the administrative organ may supply the information in the form of electronic data and other appropriate forms or arrange for the applicant to consult or make a copy of relevant government information.

**第四十一条** 公民、法人或者其他组织有证据证明行政机关提供的与其自身相关的政府信息记录不准确的,可以要求行政机关更正。有权更正的行政机关审核属实的,应当予以更正并告知申请人;不属于本行政机关职能范围的,行政机关可以转送有权更正的行政机关处理并告知申请人,或者告知申请人向有权更正的行政机关提出。

Westlaw. CHINA

**Article 41**     If citizens, legal persons or other organizations have evidence showing that certain government information relating to themselves, as provided by an administrative organ, is not accurate, they may require the administrative organ to make correction. If the administrative organ with power to make such correction verifies the same to be true, it shall make the correction and notify the applicant thereof; if the correction does not fall within the scope of duties and functions of the administrative organ, the administrative organ may transfer the same to the administrative organ with power to make the correction to handle and notify the applicant thereof or advise the applicant to file the request with the administrative organ with power to make the correction..

第四十二条　行政机关依申请提供政府信息,不收取费用。但是,申请人申请公开政府信息的数量、频次明显超过合理范围的,行政机关可以收取信息处理费。

行政机关收取信息处理费的具体办法由国务院价格主管部门会同国务院财政部门、全国政府信息公开工作主管部门制定。

**Article 42**     An administrative organ shall not charge any fee for providing government information upon application. However, if the applicant applies for disclosure of government information in the quantity or frequency obviously beyond the reasonable scope, the administrative organ may charge information processing fee.

Specific measures for administrative organs to charge information processing fee shall be formulated by the competent price department of the State Council in conjunction with the State Council's department of finance and the department in charge of government information disclosure nationwide.

第四十三条　申请公开政府信息的公民存在阅读困难或者视听障碍的,行政机关应当为其提供必要的帮助。

**Article 43**     If a citizen applying for disclosure of government information has difficulty in reading or trouble in hearing or seeing, the relevant administrative organ shall provide necessary assistance to such citizen.

第四十四条　多个申请人就相同政府信息向同一行政机关提出公开申请,且该政府信息属于可以公开的,行政机关可以纳入主动公开的范围。

对行政机关依申请公开的政府信息,申请人认为涉及公众利益调整、需要公众广泛知晓或者需要公众参与决策的,可以建议行政机关将该信息纳入主动公开的范围。行政机关经审核认为属于主动公开范围的,应当及时主动公开。

**Article 44**     Where several applicants apply to the same administrative organ for disclosure of same government information and such government information is allowed to be disclosed, the administrative organ may include the government information in the scope of disclosure on its own initiatives.

If the applicant believes that government information under application for disclosure involves adjustment to public interests or requires the extensive awareness of the public or requires the public participation for decision making, the applicant may suggest the administrative organ for including such information in the scope of disclosure on the initiatives of the administrative organ. The administrative organ shall take the initiatives to disclose the information in a timely manner if finding, upon examination and verification, the information to fall within the scope of disclosure on its own initiatives.

第四十五条　行政机关应当建立健全政府信息公开申请登记、审核、办理、答复、归档的工作制度, 加强工作规范。

**Article 45**     An administrative organ shall establish and improve the work system for registering, reviewing, processing, replying to and archiving the applications for disclosure of government information



and strengthen the specification of work.

第五章 监督和保障

## Chapter 5: Supervision and Guarantee

**第四十六条** 各级人民政府应当建立健全政府信息公开工作考核制度、社会评议制度和责任追究制度,定期对政府信息公开工作进行考核、评议。

Article 46      The people's governments at all levels shall establish and improve the assessment system, social appraisal system and accountability system for the work on disclosure of government information to assess and appraise the work relating to government information disclosure on a regular basis.

**第四十七条** 政府信息公开工作主管部门应当加强对政府信息公开工作的日常指导和监督检查,对行政机关未按照要求开展政府信息公开工作的,予以督促整改或者通报批评;需要对负有责任的领导人员和直接责任人员追究责任的,依法向有权机关提出处理建议。

公民、法人或者其他组织认为行政机关未按照要求主动公开政府信息或者对政府信息公开申请不依法答复处理的,可以向政府信息公开工作主管部门提出。政府信息公开工作主管部门查证属实的,应当予以督促整改或者通报批评。

Article 47      The department in charge of the disclosure of government information shall strengthen the routine guidance, supervision and inspection of the disclosure of government information, urge any administrative organ that fails to conduct the work for disclosure of government information as required to make rectification or circulate a notification of criticism of such administrative organ; if the leading personnel who are responsible and the persons who are directly liable need to be held accountable, proposals on disposal shall be presented to the competent organ in accordance with the law.

A citizen, legal person or other organization, if believing that the administrative organ fails to take the initiatives to disclose government information as required or fails to reply to the application for disclosure of government information in accordance with the law, may report the same to the department in charge of the disclosure of government information. The department in charge of the disclosure of government information, if verifying the same to be true, shall urge the administrative organ to make rectification and circulate a notification of criticism.

**第四十八条** 政府信息公开工作主管部门应当对行政机关的政府信息公开工作人员定期进行培训。

Article 48      The department in charge of the disclosure of government information shall conduct regular training of the personnel working on disclosure of government information of administrative organs.

**第四十九条** 县级以上人民政府部门应当在每年1月31日前向本级政府信息公开工作主管部门提交本行政机关上一年度政府信息公开工作年度报告并向社会公布。

县级以上地方人民政府的政府信息公开工作主管部门应当在每年3月31日前向社会公布本级政府上一年度政府信息公开工作年度报告。

Article 49      A department of the people's government at or above the county level shall, before January 31 each year, submit to the department in charge of the disclosure of government information at the same level the annual report on the work of the administrative organ relating to the disclosure of government information in the last year and release the same to the public.

The department in charge of the disclosure of government information of the local people's government at or above the county level shall, before March 31 each year, release the annual report on the disclosure



of government information by the government at the same level in the last year.

第五十条 政府信息公开工作年度报告应当包括下列内容:
(一)行政机关主动公开政府信息的情况;
(二)行政机关收到和处理政府信息公开申请的情况;
(三)因政府信息公开工作被申请行政复议、提起行政诉讼的情况;
(四)政府信息公开工作存在的主要问题及改进情况,各级人民政府的政府信息公开工作年度报告还应当包括工作考核、社会评议和责任追究结果情况;
(五)其他需要报告的事项。
全国政府信息公开工作主管部门应当公布政府信息公开工作年度报告统一格式,并适时更新。

Article 50    The annual report on the disclosure of government information shall include the following content:

(1) Disclosure of government information by the administrative organ on its own initiatives;

(2) Information on receipt and handling of the applications for disclosure of government information by the administrative organ;

(3) Information on the application for administrative review filed and administrative litigation initiated against the administrative organ due to the work relating to disclosure of government information;

(4) Main problems existing with the work relating to disclosure of government information and the improvement of the work; the annual report on the disclosure of government information by the people's government at all levels shall also include the results of work assessment, social appraisal and accountability; and

(5) Other matters that need to be reported.

The department in charge of the disclosure of government information nationwide shall publish the unified format of the annual report on the disclosure of government information and update the same when appropriate.

第五十一条 公民、法人或者其他组织认为行政机关在政府信息公开工作中侵犯其合法权益的,可以向上一级行政机关或者政府信息公开工作主管部门投诉、举报,也可以依法申请行政复议或者提起行政诉讼。

Article 51    Citizens, legal persons or other organizations, if believing that the administrative organ infringes upon their lawful rights and interests in the work of government information disclosure, may file complaint or report on the infringement to the administrative organ at the next higher level or the department in charge of the disclosure of government information or may apply for administrative review or initiate administrative lawsuit in accordance with the law.

第五十二条 行政机关违反本条例的规定,未建立健全政府信息公开有关制度、机制的,由上一级行政机关责令改正;情节严重的,对负有责任的领导人员和直接责任人员依法给予处分。

Article 52    Where an administrative organ, in violation of the provisions hereof, fails to establish and improve relevant system or mechanism for disclosure of government information, the administrative organ at the next higher level shall order it to make correction and, if circumstances are serious, impose disciplinary sanction on the leaders who are responsible and the persons who are directly liable in accordance with the law.

第五十三条 行政机关违反本条例的规定,有下列情形之一的,由上一级行政机关责令改正;情节严重的,对负有责任的领导人员和直接责任人员依法给予处分;构成犯罪的,依法追究刑事责任:
(一)不依法履行政府信息公开职能;

Westlaw CHINA

（二）不及时更新公开的政府信息内容、政府信息公开指南和政府信息公开目录;

（三）违反本条例规定的其他情形。

Article 53　　Where an administrative organ, in violation of the provisions hereof, is involved in any of the following circumstances, the administrative organ at the next higher level shall order it to make correction and, if circumstances are serious, impose disciplinary sanction on the leaders who are responsible and the persons who are directly liable in accordance with the law; if the violation constitutes a criminal offense, criminal liability shall be imposed in accordance with the law:

(1) Failing to perform the duties and functions for disclosure of government information in accordance with the law;

(2) Failing to update in a timely manner the content of government information, the guidelines for disclosure of government information and the catalogue of government information disclosure; and

(3) Other circumstances in violation of these Regulations;

第六章　附则

## Chapter 6: Supplementary Provisions

**第五十四条**　法律、法规授权的具有管理公共事务职能的组织公开政府信息的活动,适用本条例。

Article 54　　These Regulations shall apply to the activities of the organizations with the duties and functions for management of public affairs as authorized by laws and regulations in disclosure of government information.

**第五十五条**　教育、卫生健康、供水、供电、供气、供热、环境保护、公共交通等与人民群众利益密切相关的公共企事业单位,公开在提供社会公共服务过程中制作、获取的信息,依照相关法律、法规和国务院有关主管部门或者机构的规定执行。全国政府信息公开工作主管部门根据实际需要可以制定专门的规定。

前款规定的公共企事业单位未依照相关法律、法规和国务院有关主管部门或者机构的规定公开在提供社会公共服务过程中制作、获取的信息,公民、法人或者其他组织可以向有关主管部门或者机构申诉,接受申诉的部门或者机构应当及时调查处理并将处理结果告知申诉人。

Article 55　　The public enterprises and institutions closely relating to the interests of the people such as those of education, healthcare, water supply, power supply, gas supply, heat supply, environmental protection and public transport shall comply with relevant laws, regulations and the provisions of relevant competent departments or institutions under the State Council in disclosing the information prepared or obtained in the process of supplying social and public services. The department in charge of the disclosure of government information nationwide may formulate special provisions according to actual need.

Where any of the public enterprises or institutions stated in the preceding paragraph fails to disclose the information prepared or obtained in the process of supplying social and public services as required under the laws, regulations and provisions of relevant competent departments or institutions under the State Council, a citizen, legal person or other organization may file petition with relevant competent department or institution and the department or institution accepting the petition shall handle the petition in a timely manner and inform the petitioner of the results of the handling.

**第五十六条**　本条例自2019年5月15日起施行。

Article 56　　These Regulations shall come into force on May 15, 2019