# Exhibit JJ

# The Sedona Conference Journal

Volume 20                                                    2019

## The Sedona Conference
## Commentary on Legal Holds, Second Edition:
## The Trigger & The Process

The Sedona Conference



Recommended Citation:

The Sedona Conference, *Commentary on Legal Holds, Second Edition: The Trigger & The Process*, 20 SEDONA CONF. J. 341 (2019).

Copyright 2019, The Sedona Conference

For this and additional publications see: https://thesedonaconference.org/publications

THE SEDONA CONFERENCE
COMMENTARY ON LEGAL HOLDS, SECOND EDITION:
THE TRIGGER & THE PROCESS

*A Project of The Sedona Conference Working Group on
Electronic Document Retention and Production (WG1)*

*Author:*
The Sedona Conference

*Drafting Team:*

| | |
|---|---|
| Jeffrey Goreski | Robert L. Levy |
| Brad Harris | J. Alex Lovo |
| Taylor M. Hoffman | Anthony S. Lowe |
| Laura A. Hunt | Kathy K. Malamis |
| Henry J. Kelston | Leeanne Mancari |
| Geoffrey C. Klingsporn | Jana Mills |
| Corey Lee | Jesse Weisshaar |

*WG1 Steering Committee
Liaisons and Editors-in-Chief:*
Kevin F. Brady
Timothy M. Opsitnick
Gina Trimarco

*Drafting Team Leaders:*
John Tredennick
Gina Trimarco

*Staff Editors:*

| | |
|---|---|
| David Lumia | Susan McClain |

Copyright 2019, The Sedona Conference.
All Rights Reserved.

The opinions expressed in this publication, unless otherwise attributed, represent consensus views of the members of The Sedona Conference Working Group 1. They do not necessarily represent the views of any of the individual participants or their employers, clients, or any other organizations to which any of the participants belong, nor do they necessarily represent official positions of The Sedona Conference.

We thank all of our Working Group Series Annual Sponsors, whose support is essential to our ability to develop Working Group Series publications. For a listing of our sponsors, just click on the "Sponsors" navigation bar on the homepage of our website.

This publication may be cited as follows:

> The Sedona Conference, *Commentary on Legal Holds, Second Edition: The Trigger & The Process*, 20 SEDONA CONF. J. 341 (2019).

## PREFACE

Welcome to the final, June 2019, version of The Sedona Conference *Commentary on Legal Holds, Second Edition: The Trigger & The Process*, a project of The Sedona Conference Working Group on Electronic Document Retention and Production (WG1). This is one of a series of Working Group commentaries published by The Sedona Conference, a 501(c)(3) research and educational institute dedicated to the advanced study of law and policy in the areas of antitrust law, complex litigation, and intellectual property rights. The mission of The Sedona Conference is to move the law forward in a reasoned and just way.

In 2007, The Sedona Conference published, for public comment, the First Edition of the *Commentary on Legal Holds: The Trigger & The Process*, which provided practical guidelines for determining when the duty to preserve relevant information arises as well as the scope of preservation. In 2010, The Sedona Conference published its final, post-public comment version of the First Edition, which reflected the evolution of law and best practices as well as informal and formal suggestions and comments that The Sedona Conference received since the 2007 public comment version was published. After the 2015 amendments to the Federal Rules of Civil Procedure, updating the 2010 *Commentary* was a topic of dialogue at both the Annual and Midyear WG1 Meetings in 2016. The subsequently formed Legal Holds drafting team presented redlined drafts to the WG1 membership and entertained feedback at both the Annual and Midyear Meetings in 2017. The guidelines and commentary in this Second Edition account for the 2015 amendments emphasizing proportionality in discovery and sharpening the analysis of sanctions for the loss of discoverable electronically stored information (ESI), developments in state and federal case law on preservation and spoliation, new and novel sources of ESI requiring preservation and collection, and advances in electronic

document management technology. The Second Edition also includes new guidance on how organizations should address data protection laws and regulations that may affect an organization's ability to implement legal hold data preservation measures outside of the United States. Finally, this Second Edition incorporates the knowledge and guidance embodied in *The Sedona Principles, Third Edition: Best Practices, Recommendations & Principles for Addressing Electronic Document Production*, which was published in October 2017. This Second Edition was first published for public comment in December 2018. Where appropriate, the comments received during the public comment period have now been incorporated into this final version of the *Commentary on Legal Holds, Second Edition: The Trigger & The Process*.

The Sedona Conference acknowledges the efforts of Drafting Team Leaders John Tredennick and Gina Trimarco, both of whom were invaluable to driving this project forward. Gina also serves as one of the Editors-in-Chief and Steering Committee Liaisons, along with Kevin F. Brady and Timothy M. Opsitnick—we are thankful for their service. For their efforts and commitments in time and attention to this project, we are grateful to our drafting team members: Jeffrey Goreski, Brad Harris, Taylor M. Hoffman, Laura A. Hunt, Henry J. Kelston, Geoffrey C. Klingsporn, Corey Lee, Robert L. Levy, J. Alex Lovo, Anthony S. Lowe, Kathy K. Malamis, Leeanne Mancari, Jana Mills, and Jesse Weisshaar. Finally, we thank Thomas Y. Allman, Erick Drobinski, Philip Favro, Ruth Anne French-Hodson, Ted S. Hiser, Will Hoffman, Charles R. Ragan, David C. Shonka, Ariana J. Tadler, and Kenneth J. Withers, as well as The Honorable Xavier Rodriguez, all of whom contributed to this project, either initially through their research efforts or later at the editorial stage.

We encourage your active engagement in the dialogue. Membership in The Sedona Conference Working Group Series

is open to all. The Series includes WG1 and several other Working Groups in the areas of international electronic information management, discovery, and disclosure; patent damages and patent litigation best practices; data security and privacy liability; trade secrets; and other "tipping point" issues in the law. The Sedona Conference hopes and anticipates that the output of its Working Groups will evolve into authoritative statements of law, both as it is and as it should be. Information on membership and a description of current Working Group activities is available at https://thesedonaconference.org/wgs.

Craig Weinlein
Executive Director
The Sedona Conference
June 2019

## TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................347

      A.  Legal Framework for the Duty to Preserve ...................349

          1.  Requiring Early Consideration of Preservation ........349

          2.  Proportionality and Accessibility ..............................350

          3.  Requiring Reasonable Efforts—Not Perfection.........351

      B.  Triggering the Duty to Preserve .....................................354

      C.  Implementing the Legal Hold .........................................355

      D.  Role of Counsel ..............................................................357

      E.  Benefits of Implementing a Proper Legal Hold .............359

      F.  Other Preservation Obligations ......................................360

      G.  Non-Party Subpoenas .....................................................362

II.   THE GUIDELINES .................................................................366

III.  COMMENTARY ....................................................................370

      Guideline 1    .................................................................370

      Guideline 2    .................................................................377

      Guideline 3    .................................................................379

      Guideline 4    .................................................................381

      Guideline 5    .................................................................383

      Guideline 6    .................................................................385

      Guideline 7    .................................................................389

      Guideline 8    .................................................................399

      Guideline 9    .................................................................404

      Guideline 10   .................................................................405

      Guideline 11   .................................................................408

      Guideline 12   .................................................................409

## I.  INTRODUCTION

Information lies at the core of civil litigation and our legal discovery system. Accordingly, the law has developed rules regarding the way information should be treated in connection with litigation. One of the principal rules is that when an organization reasonably anticipates litigation (as either the initiator or the target of litigation), the organization has a duty to undertake reasonable actions to preserve paper documents, electronically stored information (ESI), and tangible items that are relevant to the parties' claims and defenses and proportional to the needs of the case.[1] Separate obligations may be imposed by statutes or other rules when an investigation is reasonably anticipated.[2] The use of a "legal hold" has become a common means by which organizations initiate meeting their preservation obligations.

This *Commentary* provides practical guidelines for determining (a) when the duty to preserve discoverable information arises, and (b) once that duty is triggered, what should be preserved and how the preservation process should be undertaken.

### *Commentary* Terminology

Before diving into the substance of this *Commentary*, a brief explanation is in order about the terms used throughout.

---

1.  FED. R. CIV. P. 26(b)(1). *See* FED. R. CIV. P. 37(e); The Sedona Conference, *The Sedona Principles, Third Edition: Best Practices, Recommendations & Principles for Addressing Electronic Production*, 19 SEDONA CONF. J. 1, 93–96 (2018) [hereinafter *The Sedona Principles, Third Edition*].

2.  *Id.* at 93. *See In re* Delta/Airtran Baggage Fee Antitrust Litig., 770 F. Supp. 2d 1299, 1307–08 (N.D. Ga. 2011) (recognizing that preservation obligations apply to government investigations). This *Commentary* applies the legal hold standard to government investigations in civil contexts. We note that separate preservation obligations may be imposed by statutes when a government investigation is reasonably anticipated. Criminal investigations are outside the scope of this *Commentary*.

- "Legal hold" refers to the process by which an organization seeks to satisfy an obligation to preserve, initially by issuing a communication designed to suspend the normal disposition of information pursuant to a policy or through automated functions of certain systems. The term "legal hold notice" is used when referring to the actual communication.

- The term "legal hold" is used rather than "litigation hold" (or other similar terms)[3] to recognize that a legal hold may apply in non-litigation circumstances (e.g., pre-litigation, government investigation, or tax audit).

- "Discoverable information" refers to information that is relevant to the parties' claims and defenses and proportional to the needs of the case.[4] This phrase is used in lieu of the phrases "potentially relevant information" and "relevant information," from earlier versions of this *Commentary* (and in other Sedona Conference publications), to clarify that both relevance and proportionality apply to preservation decisions.

---

3.   *See* The Sedona Conference, *The Sedona Conference Glossary: E-Discovery & Digital Information Management (Fourth Edition)*, 15 SEDONA CONF. J., 305, 336–37 (2014).

4.   *Cf.* FED. R. CIV. P. 26(b)(1). The definition of "discoverable information" is not meant to imply that the duty to preserve does not extend to privileged information because it does. *See* EPAC Techs., Inc. v. Thomas Nelson, Inc., No. 3:12-CV-00463, 2016 WL 11339512, at *11, n.28 (M.D. Tenn. Jan. 29, 2016) ("[T]he duty to preserve applies to relevant, potentially-privileged material, even if such material is ultimately exempt from discovery."); Taylor v. Mitre Corp., No. 1:11-cv-01247, 2012 WL 5473715, at *6 (E.D. Va. Sept. 10, 2012).

- "Litigation" refers primarily to civil litigation. State or federal statutes may impose obligations in the face of criminal proceedings or government investigations.
- Where appropriate, the term "organization" includes natural persons, government agencies, and other legal entities, for example, corporations.

## A. Legal Framework for the Duty to Preserve

The preservation obligation typically arises from the common-law duty[5] to avoid spoliation of relevant evidence that may be used at trial[6] and is not explicitly defined in the Federal Rules of Civil Procedure. Nonetheless, the Federal Rules and state counterparts governing the scope and conduct of discovery provide a framework for interpreting the duty to preserve, which the guidelines set forth below interpret and apply.

### 1.  Requiring Early Consideration of Preservation

In 2006, Rule 26(f)(2) was amended to require discussion of "issues about preserving discoverable information" when the parties meet and confer prior to the Scheduling Conference required by Rule 16(b). The Advisory Committee intended that,

---

5.  *See* Robert Keeling, *Sometimes Old Rules Know Best: Returning to Common Law Conceptions of the Duty to Preserve in the Digital Information Age*, 67 CATH. U. L. 67 (2018) (providing a historical background of the common law duty to preserve and comparing to the application of today's standard).

6.  *See, e.g.*, Silvestri v. Gen. Motors Corp., 271 F.3d 583 (4th Cir. 2001) (applying the federal common law of spoliation); Armory v. Delamirie, (1722) 93 Eng. Rep. 664 (K.B.) (*Armory* is recognized as the origin of the doctrine of spoliation. A chimney sweep found a jewel, took it to a jeweler to be appraised, and the jeweler subsequently lost it. The chimney sweep sued the jeweler for the loss of the jewel, and the court held that he was entitled to an inference that the stone was "of the finest water.").

by encouraging early discussion, parties would reach agreement on reasonable preservation steps.

In 2015, Rule 26(f)(3)(C) was amended to require that the parties' views on preservation of ESI be included in the discovery plan. In addition, Rule 16(b)(3)(B)(iii) now explicitly permits a scheduling order to address ESI preservation. The Committee noted that "[o]nce litigation has commenced, if the parties cannot reach agreement about preservation issues, promptly seeking judicial guidance about the extent of reasonable preservation may be important," and "[p]reservation orders may become more common."

## 2. Proportionality and Accessibility

In 2015, Rule 26(b)(1) was amended to clarify that proportionality must be analyzed when determining the proper scope of discovery.[7] Under the amended Rule and subject to possible limitations for inaccessible ESI,[8] "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and *proportional* to the needs of the case . . . ."[9]

---

7. FED. R. CIV. P. 26(b)(1).

8. FED. R. CIV. P. 26(b)(2)(B) provides that information stored in sources that are not reasonably accessible because of undue burden or cost are not initially discoverable; a court, however, may order that such information be produced for "good cause." Moreover, the 2006 advisory committee note to the Rule cautions that identification of ESI as not reasonably accessible does not relieve the party of its duty to preserve evidence. In addition, *The Sedona Principles, Third Edition* warns that unilateral preservation decisions are not without risk. *Supra* note 1, at 96–97.

9. FED. R. CIV. P. 26(b)(1) (emphasis added). *See* FED. R. CIV. P. 37(e) advisory committee's note to 2015 amendment ("Another factor in evaluating the reasonableness of preservation efforts is proportionality. The court should be sensitive to party resources; aggressive preservation efforts can be extremely costly, and parties (including governmental parties) may have limited staff

### 3. Requiring Reasonable Efforts—Not Perfection

The principle that an organization has a duty to preserve discoverable information in the anticipation or conduct of litigation is easy to state. Its application in practice, however, often requires careful analysis and difficult decisions. Nonetheless, each day, organizations must apply the principle to real-world circumstances, first confronting the issue of whether an obligation is triggered, and then determining the scope of their obligation.

The 2015 Amendments to the Federal Rules of Civil Procedure provide a measure of comfort and guidance on these fronts, as they were intended to reduce both the costs generally associated with ESI discovery and fears about making preservation decisions that might be second-guessed in later spoliation motion practice.[10] The Rules recognize that the situation described in 1993 as an information "explosion" has been exacerbated by the geometric increase in the volume of information (90 percent of the data in the world has been generated over the last two years[11]), as well as the variety of constantly emerging data types, and the speed with which they evolve.

In particular, amended Rule 37(e) regarding the failure to preserve ESI imposes sanctions "only if the lost [ESI] should

---

and resources to devote to those efforts."). *See also* Little Hocking Water Assn., Inc. v. E.I. Du Pont de Nemours & Co., 94 F. Supp. 3d 893, 918 (S.D. Ohio 2015) ("[T]he scope of the duty to preserve is a highly fact-bound inquiry that involves considerations of proportionality and reasonableness.") (quoting Tracy v. NVR, Inc., No. 04-cv-6541L, 2012 WL 1067889, at *29 (W.D.N.Y. Mar. 26, 2012)).

10. *See* FED. R. CIV. P. 26(b)(1) and FED. R. CIV. P. 37(e) advisory committee's note to 2015 amendment.

11. Bernard Marr, *How Much Data Do We Create Every Day? The Mind-Blowing Stats Everyone Should Read*, FORBES (May 21, 2018), https://www-forbes-com.cdn.ampproject.org/c/s/www.forbes.com/sites/bernard-marr/2018/05/21/how-much-data-do-we-create-every-day-the-mind-blowing-stats-everyone-should-read/amp/.

have been preserved in the anticipation or conduct of litigation and the party failed to take reasonable steps to preserve it."[12] Further, the Rule prohibits severe sanctions unless a "party acted with the intent to deprive another party."[13]

In addition, "[d]ue to the ever-increasing volume of electronically stored information and the multitude of devices that generate such information, perfection in preserving all relevant electronically stored information is often impossible."[14] Thus, the "rule recognizes that 'reasonable steps' to preserve suffice; it does not call for perfection."[15] *The Sedona Principles, Third Edition*[16] similarly suggests that preservation obligations require "reasonable and good faith efforts," and that it is "unreasonable to expect parties to take every conceivable step or disproportionate steps to preserve each instance of relevant electronically stored information."[17]

While the amended Rule 37(e) by its terms only applies to ESI, the proposition that preservation requires reasonableness and good faith has been broadly applied—even outside the

---

12.  FED. R. CIV. P. 37(e) advisory committee's note to 2015 amendment. The note also advises that "it is important not to be blinded to [the reality that preservation decisions may be based on limited information] by hindsight arising from familiarity with an action as it is actually filed." *Id.*

13.  FED. R. CIV. P. 37(e)(1) and (2).

14.  FED. R. CIV. P. 37(e) advisory committee's note to 2015 amendment.

15.  *Id.* ("This rule recognizes that 'reasonable steps' to preserve suffice; it does not call for perfection."); Agerbrink v. Model Service LLC, No. 14 Civ. 7841, 2017 WL 933095, at *5 (S.D.N.Y. Mar. 8, 2017) ("The standard for evaluating discovery is reasonableness, not perfection.").

16.  *See supra* note 1, Principle 5 and Cmts. 5.d. and 5.e., at 106–09.

17.  *Id.* at Principle 5. *But see* Franklin v. Howard Brown Health Center, No. 17 C 8376, 2018 WL 4784668 (N.D. Ill. Oct. 4, 2018) (holding that defendant failed to take reasonable steps to preserve relevant emails and instant messages when its counsel neglected to oversee the preservation process after perfunctorily issuing litigation hold).

context of ESI—by numerous courts.[18] The amended Rule 37(e) refines the old concept of "good faith," explaining in the Advisory Committee Notes that "the routine, good-faith operation of an electronic information system would be a relevant factor for the court to consider in evaluating whether a party failed to take reasonable steps to preserve lost information."[19]

---

[18].   *See, e.g.*, Chin v. Port Auth. of N.Y. & N.J., 685 F.3d 135, 161–63 (2d Cir. 2012); Snider v. Danfoss, LLC, 15 CV 4748, 2017 WL 2973464 (N.D. Ill. July 12, 2017); Rimkus Consulting Grp., Inc. v. Cammarata, 688 F. Supp. 2d 598, 613 (S.D. Tex. 2010) ("Whether preservation or discovery conduct is acceptable in a case depends on what is reasonable"); Witt v. GC Servs. Ltd. P'ship, 307 F.R.D. 554, 568 (D. Colo. 2014) ("The court does not expect perfection and will not 'infer nefarious intent or bad faith' from 'ordinary discovery errors.'") (citation omitted); Fisher v. Ciba Specialty Chems. Corp., No. 03-0566-WS-B, 2007 WL 987457, at *3 (S.D. Ala. Mar. 30, 2007) ("The rules of discovery do not demand perfection, clairvoyance, or miracle workings in the production of documents.").

For hard-copy documents and tangible things, federal courts continue to apply circuit-specific case law—including the use of inherent authority—to allegations of spoliation of such evidence. *E.g.*, EEOC v. GMRI, Inc., No. 15-20561-civ, 2017 WL 5068372, at *2 (S.D. Fla. Nov. 1, 2017) (applying Rule 37(e) to alleged spoliation of email and Eleventh Circuit common law to alleged spoliation of paper documents); Jimenez v. Menzies Aviation Inc., No. 15-cv-2392, 2016 WL 3232793 (N.D. Cal. June 13, 2016) (not applying amended Rule 37(e) when addressing loss of hard-copy documents). Likewise, state courts continue to apply state-specific law to ESI spoliation claims. In both cases, most courts will take into consideration at least: (1) the party's obligation to preserve, (2) the party's culpability in losing the information, and (3) the effect that losing such information has on the opposing party's case. Moody v. CSX Transp., Inc., 271 F. Supp. 3d 410, 426–32 (W.D.N.Y. 2017) (In a personal injury action, the defendant railroad did not take reasonable steps to preserve train's event recorder data, but sanctions for the destruction of a laptop containing the relevant data would be limited under Rule 37(e), despite the plaintiff's argument that the laptop was "physical evidence" as opposed to "electronically stored information.").

[19].   FED. R. CIV. P. 37(e) advisory committee's note to 2015 amendment.

Thus, whenever an organization makes a preservation decision, or a court analyzes a claim of spoliation, the guiding principle is reasonableness under the circumstances. Whether a party issued a legal hold notice and, if so, when, how, and to whom, are all important factors, although not dispositive, in determining the reasonableness of the party's preservation efforts.

## B. Triggering the Duty to Preserve

The duty to preserve discoverable information is certainly triggered when a complaint is served. The duty to preserve, however, may arise earlier, if an organization is bringing the action or is the target of the action. The touchstone is "reasonable anticipation" or "reasonably foreseeable."[20] The standard is an objective one, "asking not whether the party in fact reasonably foresaw litigation, but whether a reasonable party in the same factual circumstances would have reasonably foreseen litigation."[21]

Determining if a duty to preserve has been triggered is fact-specific and not amenable to a one-size-fits-all or checklist approach.[22] Instead, a number of factors should be considered,

---

20. *See* Alter v. Rocky Point Sch. Dist., No. 13-1100, 2014 WL 4966119, at *8 (E.D.N.Y. Sept. 30, 2014) ("The duty to preserve arises, not when litigation is certain, but rather when it is 'reasonably foreseeable.'") (quoting Byrnie v. Town of Cromwell Bd. of Educ., 243 F.3d 93, 107 (2d Cir. 2001)); *In re* Abilify (Aripiprazole) Prod. Liab. Litig., No. 16-MD-2734, 2018 WL 4856767, *3–6 (N.D. Fla. Oct. 5, 2018) (finding that defendant did not reasonably anticipate litigation and rejecting plaintiffs' assertion that industry-wide events created a "reasonable anticipation of litigation" and a duty to preserve).

21. Micron Tech., Inc. v. Rambus Inc., 645 F.3d 1311, 1320 (Fed. Cir. 2011); *see also* Storey v. Effingham Cnty., 2017 WL 2623775, at *3 (S.D. Ga. June 16, 2017).

22. *Micron Tech., Inc.,* 645 F.3d at 1320 ("When litigation is 'reasonably foreseeable' is a flexible fact-specific standard that allows a district court to

including the level of knowledge within the organization about the claim and the risk to the organization posed by the claim. *See infra* Guidelines 1 and 4, and associated commentary. Weighing these factors will enable an organization to decide when litigation is reasonably anticipated and when a duty to take affirmative steps to preserve discoverable information has arisen.

## C. *Implementing the Legal Hold*

Once the duty to preserve is triggered, an organization must decide what to preserve and how to preserve it. In some circumstances, the duty to preserve requires only identifying and preserving only a modest amount of information. In other circumstances, the scope of the information is broader, and the sources of the information may not be immediately known.

The proportionality principle applies to all efforts to plan and implement preservation, and in the assessment of those efforts.[23] In *Rimkus Consulting v. Cammarata*, the court noted that "[w]hether preservation or discovery conduct is acceptable in a case depends on what is *reasonable,* and that in turn depends on whether what was done—or not done—was *proportional* to that case and consistent with clearly established applicable standards."[24] Similarly, the Seventh Circuit Council on eDiscovery

---

exercise the discretion necessary to confront the myriad factual situations inherent in the spoliation inquiry.").

23. *See, e.g.*, FED. R. CIV. P. 37(e) advisory committee's note to 2015 amendment (One "factor in evaluating the reasonableness of preservation efforts is proportionality."); Hon. Joy Flowers Conti & Richard N. Lerrieri, *E-Discovery Ethics: Emerging Standards of Technological Competence*, FED. LAW. 28, 31 (Oct./Nov. 2015) ("Proportionality is a guiding principle in determining the breadth and extent of the preservation required" under the Federal Rules.).

24. 688 F. Supp. 2d 598, 613 (S.D. Tex. 2010) (emphasis in original).

and Digital Information[25] provides, in Principle 2.04 (Scope of Preservation), that "[e]very party to litigation and its counsel are responsible for taking reasonable and proportionate steps to preserve relevant and discoverable ESI within its possession, custody or control." [26, 27]

As has been noted by several courts, there is no broad requirement to preserve *all* information. "Must a corporation, upon recognizing the threat of litigation, preserve every shred of paper, every email or electronic document, and every backup tape? The answer is clearly, 'no.' Such a rule would cripple large corporations."[28]

---

25. Formerly the "7th Circuit E-Discovery Pilot Program," https://www.ediscoverycouncil.com/.

26. 7th Circuit Electronic Discovery Committee, *Principles Relating to the Discovery of Electronically Stored Information*, Principle 2.04, 7TH CIRCUIT COUNCIL ON EDISCOVERY AND DIGITAL INFORMATION (2d ed. Jan. 2018), https://www.ediscoverycouncil.com/sites/default/files/7thCircuitESIPilot-ProgramPrinciplesSecondEdition2018.pdf.

27. *See also* FED. R. CIV. P. 26(b)(1). Notably, the scope of discovery under Rule 26(b)(1)—as amended in December 2015—no longer includes "any matter relevant to the subject matter involved in the action" or information "reasonably calculated to lead to the discovery of admissible evidence." FED. R. CIV. P. 26(b)(1) (2006). The former phrase was removed because "[p]roportional discovery relevant to any party's claim or defense suffices," and the latter phrase was removed because it had "been used by some, incorrectly, to define the scope of discovery." FED. R. CIV. P. 26 advisory committee's note to 2015 amendment. *See also* Cole's Wexford Hotel, Inc. v. Highmark Inc., 209 F. Supp. 3d 810, 817–23 (W.D. Pa. 2016); *In re* BARD Filters Prod. Liab. Litig., 317 F.R.D. 562, 563–64 (D. Ariz. 2016).

28. Zubulake v. UBS Warburg, 220 F.R.D. 212, 217 (S.D.N.Y. 2003); *see also, e.g., In re* Ethicon, Inc. Pelvic Repair Sys. Prod. Liab. Litig., 299 F.R.D. 502, 517 (S.D.W. Va. 2014) (It is "uniformly agreed that a corporation under a duty to preserve is not required to keep 'every shred of paper, every e-mail or electronic document, and every backup tape' . . . [as] such a requirement 'would cripple large corporations.'") (quoting *Zubulake*, 220 F.R.D. at 217).

The typical legal hold notice focuses on key custodians and data stewards,[29] directing them to take steps to preserve discoverable information and to prevent losses due to routine business or systems operations.

Identifying and preserving discoverable information can be a complex process. It may include creating teams to identify the sources, custodians, and data stewards of discoverable information, to define what needs to be preserved, and to coordinate with outside counsel. When ESI is at issue, personnel with particular knowledge and expertise, and the use of specific processes and technology, may be needed.[30] For large preservation efforts, a process that is planned, systemized, and scalable is useful, although *ad hoc* manual processes may be appropriate for cases involving a small number of key custodians and identifiable issues.

## D.  Role of Counsel

Regardless of the process employed, counsel (both in-house and outside) usually play important roles in an organization's

---

29.  *I.e.*, persons responsible for maintaining and operating relevant computer systems, files, or databases. *See The Sedona Principles, Third Edition, supra* note 1, Cmt. 5.d., at 105.

30.  *See, e.g.*, The Sedona Conference, *Database Principles Addressing the Preservation and Production of Databases and Database Information in Civil Litigation*, 15 SEDONA CONF. J. 171 (2014); Leidig v. Buzzfeed, Inc., 16 Civ. 542, 2017 WL 6512353 (S.D.N.Y. Dec. 19, 2017) (In a defamation suit, the plaintiffs failed to take reasonable steps to collect and preserve web-based evidence, including screenshots, email, and metadata; the court, however, noted the plaintiffs' lack of technical sophistication and "amateurish" preservation efforts, did not find intent to deprive, and limited remedies to evidentiary preclusions and instructions.).

efforts to satisfy its preservation obligation.[31] The traditional role of counsel is to advise the client of its duty to preserve discoverable information in the client's possession, custody, or control and the possible consequences if the information is not preserved.[32] But numerous decisions hold that counsel also owe an independent duty to monitor and supervise or participate in a party's efforts to comply with the duty to preserve.[33]

---

31. *See* EPAC Techs. v. HarperCollins Christian Publ'g., Case No. 3:12-cv-00463, 2018 WL 1542040, at *22 (M.D. Tenn. March 29, 2018) ("Counsel must take an active and primary role in implementing a litigation hold.").

32. ABA CIVIL DISCOVERY STANDARDS, Standard 10 (2004) ("This Standard is . . . an admonition to counsel that it is counsel's responsibility to advise the client as to whatever duty exists, to avoid spoliation issues."). *See also* Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68, 73 (S.D.N.Y. 1991) (The preservation obligation runs first to counsel, who has a duty to advise, with "corporate managers" having the responsibility to convey that information to the relevant employees.).

33. FED. R. CIV. P. 37(e) advisory committee's note to 2015 amendment (recognizing counsel's role in matters related to preservation: "It is important that counsel become familiar with their clients' information systems and digital data . . . to address these issues."); *cf.* Sunderland v. Suffolk Cty., No. CV 13-4838, 2016 WL 3264169, at *3 (E.D.N.Y. June 14, 2016) (It is counsel's obligation to "supervise and oversee the search for and production of electronically stored information and documents."); Browder v. City of Albuquerque, 187 F. Supp. 3d. 1288, 1295 (D.N.M. 2016) ("Counsel must go beyond mere notification and 'take affirmative steps to monitor compliance,'. . . to continually ensure that the party is preserving relevant evidence."); Phoenix Four, Inc. v. Strategic Res. Corp., No. 05 Civ 4837, 2006 WL 1409413, at *5 (S.D.N.Y. May 23, 2006) ("Counsel has the duty to properly communicate with its client" to ensure adequate preservation, which "would involve communicating with information technology personnel and the key players in the litigation to understand how electronic information is stored."); Zubulake v. UBS Warburg, 229 F.R.D. 422, 432 (S.D.N.Y. 2004) ("A party's discovery obligations do not end with the implementation of a 'litigation hold'—to the contrary, that's only the beginning. Counsel must oversee compliance with the litigation hold, monitoring the party's efforts to retain and produce the relevant documents."). *See also* State of Cal. Standing Comm. on Prof'l Responsibility

Following that logic, counsel's duty does not end with issuance of a legal hold notice but remains in effect as long as the client's duty to preserve exists.

### E.  Benefits of Implementing a Proper Legal Hold

If a party takes reasonable steps to implement a legal hold and preserve discoverable ESI, under the 2015 Amendments to Rule 37(e), that party should not be sanctioned, or have curative measures imposed upon it, even if discoverable information is lost.[34] Instead, the curative measures in Rule 37(e)(1) and (2) apply *only if* (i) the ESI was subject to a preservation obligation,[35] (ii) the organization failed to take "reasonable steps" to preserve

---

and Conduct Formal Op. No. 2015-193, *available at* https://www.cal-bar.ca.gov/Portals/0/documents/ethics/Opinions/CAL%202015-193%20%5B11-0004%5D%20(06-30-15)%20-%20FINAL.pdf.

34.  *The Sedona Principles, Third Edition* takes the position, contrary to the express terms of Rule 37(e), that sanctions may be imposed against an incompetent spoliator, i.e., if information is lost due to the efforts of one intending to deprive a party of the use of that information in litigation even though it is otherwise restored or replaced; and there is some authority for this position. *Supra* note 1, Cmt. 14.d., at 197. *See, e.g.*, Cat3, LLC v. Black Lineage, Inc., 164 F. Supp. 3d 488, 2016 WL 154116 (S.D.N.Y. 2016); Hon. James C. Francis IV and Eric P. Mandel, *Limits on Limiting Inherent Authority: Rule 37(e) and the Power to Sanction*, 17 SEDONA CONF. J. 613 (2016). *See also* Tera Brostoff, *Reports of Death of Inherent Judicial Authority Exaggerated?*, BLOOMBERG BNA (Nov. 15, 2016) ("'37(e) didn't take action to make inherent authority unavailable. . . . [Rather, under amended rules,] [y]ou couldn't say to yourself that I don't like the fact that with 37(e) you can't get specific serious sanctions, and so I'm going to use inherent authority instead.' [In other words,] inherent authority can't be used merely to circumvent 37(e).") (quoting Judge Paul W. Grimm (D. Md. and former Federal Rules of Civil Procedure Advisory Committee member)).

35.  FED. R. CIV. P. 37(e). *See also, e.g.*, Marten Transp., Ltd. v. Plattform Adver., Inc., No. 14-cv-02464, 2016 WL 492743, at *10 (D. Kan. Feb. 8, 2016) (denying sanctions under Rule 37(e) when plaintiff had no duty to preserve ESI at issue until after its destruction).

the ESI,[36] (iii) as a result, the ESI was lost,[37] and (iv) "the information cannot be restored or replaced through additional discovery."[38] And sanctions under Rule 37(e)(2) are available only if the ESI was destroyed "with the intent to deprive another party of the information's use in the litigation."[39]

### F.  Other Preservation Obligations

Preservation obligations also may arise and be enforced pursuant to statutes or regulations.[40] Criminal penalties at the

---

36.  FED. R. CIV. P. 37(e). *See also, e.g.*, Best Payphones, Inc. v. City of New York, 1-CV-3924, 1-CV-8506, 3-CV-0192, 2016 WL 792396, at *5 (E.D.N.Y. Feb. 26, 2016) ("[T]he Court cannot find that [the party] acted unreasonably as is required for the Court to issue sanctions under Rule 37(e)."); *but see* GN Netcom v. Plantronics, Inc., No. 12-1318, 2016 WL 3792833 (D. Del. July 12, 2016) (sanctions imposed for senior executive's bad-faith destruction of evidence); GN Netcom v. Plantronics, Inc., No. 12-1318, 2017 WL 4417810 (D. Del. Oct. 5, 2017) (pre-trial order with "stipulated facts" and permissive adverse inference instruction); GN Netcom v. Plantronics, Inc., No. 12-1318, 2018 WL 273649 (D. Del. Jan. 3, 2018) (court refuses to grant new trial after jury found for defendant despite permissive adverse inference).

37.  FED. R. CIV. P. 37(e).

38.  *Id. See also, e.g.,* Eshelman v. Puma Biotech., 2017 WL 2483800 (E.D.N.C. June 7, 2017); Fiteq Inc. v. Venture Corp., No. 13-cv-01946, 2016 WL 1701794, at *3 (N.D. Cal. Apr. 28, 2016) (refusing to award sanctions under Rule 37(e) when plaintiff failed to offer "persuasive evidence to show that the ESI was not 'restored or replaced through additional discovery'").

39.  FED. R. CIV. P. 37(e)(2).

40.  *See* Byrnie v. Town of Cromwell Bd. of Educ., 243 F.3d 93, 108–09 (2d Cir. 2001) ("Several courts have held that destruction of evidence in violation of a regulation that requires its retention can give rise to an inference of spoliation."). However, some record retention regulations that create preservation obligations are not necessarily enforceable for the benefit of private parties. *See* Zubulake v. UBS Warburg LLC, 217 F.R.D. 309, 322 n.70 (S.D.N.Y. 2003) (plaintiff was not an intended beneficiary of 17 C.F.R. § 240.17a-4, the U.S. Securities and Exchange Commission rule mandating retention of communications by members, brokers, or dealers); EEOC v. Jetstream Ground

federal and state level may also be invoked in specific cases within the coverage of those laws.[41] An order entered in another case or a party's own information-retention protocols may also give rise to preservation obligations.[42] However, "court[s] should be sensitive . . . to the fact that such independent preservation requirements may be addressed to a wide variety of concerns unrelated to the current litigation. The fact that a party had an independent obligation to preserve information does not necessarily mean that it had such a duty with respect to the litigation, and the fact that the party failed to observe some other preservation obligation does not itself prove that its efforts to preserve were not reasonable with respect to a particular case."[43]

---

Servs., Inc., 878 F.3d 960 (10th Cir. 2017) (In a Title VII action, the defendant disposed of relevant employment records contrary to a federal regulation, but the destruction did not require the imposition of an adverse inference jury instruction or other severe sanction, as no intent to deprive was found, and substitute testimonial evidence obviated prejudice.).

41.  *See, e.g.,* 18 U.S.C. § 1519 (Sarbanes-Oxley Act § 802).

42.  FED. R. CIV. P. 37(e) advisory committee's note to 2015 amendment. *See, e.g.,* Williams v. Kohl's Dep't. Stores, Inc., No. 3:12-cv-01385, 2014 U.S. Dist. LEXIS 78084, at *29 (D. Or. Mar. 31, 2014) (holding that, while "a company's internal policy, by itself, does not create a legal duty to preserve evidence . . . a *company's* internal policy may reflect that a certain type of incident is likely to give rise to litigation"); Coale v. Metro-N. R.R. Co., No. 3:08-cv-01307, 2016 WL 1441790, at *2 (D. Conn. Apr. 11, 2016) ("[N]o rule dictates that an entity's self-imposed obligation to preserve evidence for internal purposes creates an automatic obligation to preserve that *evidence* for purposes of litigation. Nevertheless, in this case . . . , the Court has little difficulty in holding that the [defendant's Incident Investigation and Reporting] Manual's discrete requirements may be construed as obligations to preserve evidence for purposes of litigation.").

43.  FED. R. CIV. P. 37(e) advisory committee's note to 2015 amendment.

### G. *Non-Party Subpoenas*

Prior sections addressed a *party's* duty to preserve discoverable information when a lawsuit or government investigation is reasonably anticipated. In a lawsuit, a non-party may receive a subpoena commanding the production of documents, information, or tangible things. The subpoenaed non-party then must decide whether the receipt of such a subpoena triggers a duty to preserve and, if not, what obligation for the non-party is triggered by receipt of the subpoena.

A non-party receiving a subpoena may not have a copy of the operative pleadings in the matter and may know little or nothing about the dispute. In that situation, the non-party would be unlikely to understand the scope of discovery (including relevance and proportionality) without some discussion with party counsel.[44]

---

44.   In rare circumstances, the subpoena recipient may have knowledge of the principal dispute and may have a reasonable expectation of being made a party to the lawsuit. In those circumstances, a duty to preserve discoverable information arises (employing the same standards discussed in Guidelines 1–4, *infra*). *Cf. In re* Napster, Inc. Copyright Litig., 462 F. Supp. 2d 1060, 1068–69 (N.D. Cal. 2006). The *Napster* court found no circumstances existed at the time a venture capital firm received a non-party subpoena to create a reasonable expectation that *the specific venture capital firm* would be named as a party in any pending or future litigation. *Id*. at 1068. Instead, the court held that the venture capital firm's duty to preserve relevant ESI attached *one month after service of the subpoena* when, in the court's view, there was a "clear indication . . . that the recording industry would be targeting [downloading service's] investors" and the venture capital firm "should have reasonably believed that litigation against it was probable." *Id*. at 1069. A complaint against the venture capital firm was not filed until almost three years later—April 2003. *Id*. at 1065.

Rule 45, which governs subpoenas issued in federal court matters, says nothing about preservation.[45] However, the Rule does require that the party issuing the subpoena[46] (and the court on any ensuing motion[47]) takes steps to avoid imposing undue burden or expense on the subpoenaed person, and that the subpoenaed person respond in one of three ways—produce the requested information, object to the subpoena, or move to quash.

This does not mean that the non-party can destroy or discard information responsive to the subpoena, because the non-party may be subject to contempt sanctions if it "fails without adequate excuse to obey the subpoena or order related to it."[48] The receipt of a subpoena, however, usually does not trigger implementation of a preservation protocol as described elsewhere in this Commentary.

If the non-party serves a timely objection, performance is suspended and "acts may be required only as directed" in a court order. In the event of a motion to quash or a motion to compel over objections, the court may find the subpoena facially overbroad and inconsistent with the issuing attorney's obligation to protect the non-party from undue burden or expense. In other cases, a court may conclude that the requests exceed the relevant and proportional discovery scope for the matter. And, in some cases, a court may order the subpoena enforced as prepared and served on the non-party, in which case the non-party must produce the information responsive to the subpoena as served.

---

45.   Rule 45 was last amended as relevant to this discussion in 2006, in connection with the original ESI amendment package. Preservation was not mentioned in the main discovery rules until the 2015 amendments.

46.   *See* FED. R. CIV. P. 45(d)(1), and advisory committee's note to 1991 amendment.

47.   *See* FED. R. CIV. P. 45(d)(2)(B)(ii) and (3)(B) and (C).

48.   *See* FED. R. CIV. P. 45(g).

Once a responsive production is provided (either in the ab-
sence of timely objection or motion, or after court order), there
is no ongoing duty for the non-party to retain documents and
ESI.[49] The non-party may wish to inform the subpoenaing party
that it considers its duty to respond to the subpoena to have
been fulfilled, and that going forward it intends to manage the
subpoenaed information consistent with its internal policies and
procedures. If the non-party gave such notice, it would then be
incumbent upon the subpoenaing party to inform the non-party
of any desire for prolonged retention beyond the timeframe dis-
closed by the non-party (for example, to retain originals of spe-
cific information for potential trial use), and the subpoenaing
party may have to shoulder the costs associated with the desire
for prolonged retention.[50]

---

49.  *See* FED. R. CIV. P. 45(d), (e), & (g). *See also* The Sedona Conference, *Com-
mentary on Non-Party Production & Rule 45 Subpoenas*, at 7–8, THE SEDONA
CONFERENCE (Apr. 2008), https://thesedonaconference.org/publication/Com-
mentary_on_Non-Party_Production_and_Rule_45_Subpoenas ("The dura-
tion of a non-party's duty to ***preserve*** is not coextensive with a party's duty
to preserve. In the ordinary course, a non-party subpoena recipient's duties
should terminate once the non-party has produced, in conformity with their
discovery obligations, either: (i) all information responsive to the subpoena;
(ii) all information responsive to the subpoena except information excluded
pursuant to timely objections by the producing party pursuant to Rule
45(c)(2)(B); or (iii) information responsive to the subpoena and satisfying any
agreement with the party issuing the subpoena (i.e., after the issuance of the
subpoena, the recipient and the issuer may negotiate and agree to a narrower
scope of production that will satisfy the party.)") (emphasis added).

50.  In some cases in which the commencement of discovery is delayed,
generally due to a statutory stay, or lengthy pre-discovery motion practice,
such as securities actions subject to the Private Securities Litigation Reform
Act of 1995 (PSLRA), courts have issued orders, based upon specific eviden-
tiary showings, permitting the issuance of so-called preservation subpoenas
to a non-party requiring preservation of relevant documents or ESI. *See, e.g.,*
*In re* Smith Barney Transfer Agent Litig., No. 05 Civ. 7583(WHP), 2012 WL
1438241, at *3 (S.D.N.Y. Apr. 25, 2012). Such court orders, however,

In some cases, a non-party to litigation may have a special, affiliated, or contractual relationship with a party, obligating the non-party to provide information to that party upon reasonable notice and request. The party may be deemed to have actual or constructive control of discoverable information in the possession of the non-party, and may have an obligation to notify the non-party to preserve information. Regardless of whether notice is provided, such non-parties need to consider these relationships and their related obligations when deciding whether a duty to preserve discoverable information is triggered.

In sum, where there is no "special relationship" with a party and there are no grounds to reasonably anticipate becoming a party to the action, the non-party receiving a subpoena has an affirmative obligation to (i) not destroy knowingly responsive documents and ESI; and (ii) after negotiation of the scope of the subpoena or resolution of objections, undertake reasonable collection of responsive documents and ESI. If expeditious collection is not possible, the non-party may choose to issue an appropriately tailored legal hold until its production obligations to the subpoena have been fulfilled (at which time the hold may be terminated). The non-party receiving the subpoena has *no obligation to* (i) suspend ordinary information management policies and procedures; (ii) issue legal hold notices; and (iii) absent extraordinary circumstances, preserve documents and ESI after collection and production.[51]

---

presumably include Rule 45 protections against undue burden and expense by requiring the subpoenas to avoid overbroad requests and to properly tailor preservation to the scope of discovery required by the circumstances, including relevance and proportionality.

51.   The non-party may wish to keep the relevant and responsive materials at least through production and, ideally, until receiving confirmation that the original documents will not be needed for trial.

## II.  THE GUIDELINES

The Sedona Conference offers the following guidelines to help a party meet its duty to preserve discoverable information and to provide pragmatic suggestions and a framework for creating a set of preservation procedures.[52] *The guidelines are not intended to be, and should not be, used as an all-encompassing "checklist" or set of rules to be followed mechanically.* Instead, they should guide organizations in articulating policies to implement legal holds tailored to their needs.

The guidelines are illuminated by illustrations of hypothetical situations. These illustrations are intended to impart an understanding of the applicable analytical framework. If other factors were added to the illustrations, a different analysis and result might be required. In short, the illustrations should not be considered the sole basis for reaching a particular result, as all factors in any particular circumstance must be considered.

**Guideline 1:**  A reasonable anticipation of litigation arises when an organization is on notice of a credible probability that it will become involved in litigation, seriously contemplates initiating litigation, or when it takes specific actions to commence litigation.

**Guideline 2:**  Adopting and consistently following a policy governing an organization's preservation

---

52.  James S. Kurz & Daniel D. Mauler, *A Real Safe Harbor: The Long-Awaited Proposed FRCP Rule 37(e), Its Workings, And Its Guidance For ESI Preservation*, 62 FED. L. 62, 65–66 (Aug. 2015) (suggesting that this *Commentary* provides guidelines for "designing processes that provide an ESI preservation solution that should meet the . . . Rule 37(e) 'reasonable steps' standard").

obligations are factors that may demonstrate reasonableness and good faith.

**Guideline 3:**  Adopting a procedure for reporting information relating to possible litigation to a responsible decision maker may assist in demonstrating reasonableness and good faith.

**Guideline 4:**  Determining whether litigation is or should be reasonably anticipated should be based on a good-faith and reasonable evaluation of relevant facts and circumstances.

**Guideline 5:**  Evaluating an organization's preservation decisions should be based on the good faith and reasonableness of the decisions (including whether a legal hold is necessary and how it should be implemented) at the time they are made.

**Guideline 6:**  Fulfilling the duty to preserve involves reasonable and good-faith efforts, taken as soon as is practicable and applied proportionately, to identify persons likely to have information relevant to the claims and defenses in the matter and, as necessary, notify them of their obligation to preserve that information.

**Guideline 7:**  Factors that may be considered in determining the scope of information that should be preserved include the nature of the issues raised in the matter, the accessibility of the information, the probative value of the

information, and the relative burdens and costs of the preservation effort.

**Guideline 8:**  In circumstances where issuing a legal hold notice is appropriate, such a notice is most effective when the organization identifies the custodians and data stewards most likely to have discoverable information, and when the notice:

(a) communicates in a manner that assists persons in taking actions that are, in good faith, intended to be effective;

(b) is in an appropriate form, which may be written, and may be sent by email;

(c) provides information on how preservation is to be undertaken, and identifies individuals who can answer questions about preservation;

(d) includes a mechanism for the recipient to acknowledge that the notice has been received, read, and understood;

(e) addresses features of discoverable information systems that may make preservation of discoverable information more complex (e.g., auto-delete functionality that should be suspended, or small sections of elaborate accounting or operational databases);

(f) is periodically reviewed and amended when necessary; and

2019]    COMMENTARY ON LEGAL HOLDS, SECOND EDITION    369

(g) is followed up by periodic reminder notices, so the legal hold stays fresh in the minds of the recipients.[53]

**Guideline 9:**    An organization should consider documenting the procedure of implementing the legal hold in a specific case when appropriate.

**Guideline 10:**    Compliance with a legal hold should be regularly monitored.

**Guideline 11:**    Any legal hold process should include provisions for releasing the hold upon the termination of the duty to preserve, so that the organization can resume adherence to policies for managing information through its useful life cycle in the absence of a legal hold.

**Guideline 12:**    An organization should be mindful of local data protection laws and regulations when initiating a legal hold and planning a legal hold policy outside of the United States.

---

53.    *See The Sedona Principles, Third Edition, supra* note 1, Cmt. 5.d., at 103–04.

### III. COMMENTARY

**Guideline 1:    A reasonable anticipation of litigation arises when an organization is on notice of a credible probability that it will become involved in litigation, seriously contemplates initiating litigation, or when it takes specific actions to commence litigation.**

In many instances, there is no ambiguity about when the duty to preserve arises. For example, the receipt of a summons or complaint or the receipt of a formal notice that an organization is the target of a government investigation puts an organization on notice that it has a duty to preserve information. However, other events may trigger a duty to preserve only when considered in the context of an organization's history and experience or the facts of the case.

For instance, an insurer's receipt of a claim from an insured often will not indicate the probability of litigation, as the insurer is in the business of paying claims often without litigation. On the other hand, the occurrence of an accident[54] or the receipt of

---

54.    *Compare, e.g.*, Browder v. City of Albuquerque, 187 F. Supp. 3d. 1288, 1296 n.3 (D.N.M. 2016) ("The Court would find that litigation was 'reasonably foreseeable' the moment the City became aware that a police officer was involved in a fatal traffic accident.") *and* Williams v. Kohl's Dep't. Stores, Inc., No. 3:12-cv-01385, 2014 U.S. Dist. LEXIS 78084, at *29–30 (D. Or. Mar. 31, 2014) ("Courts have routinely found that a defendant is on notice of possible litigation simply by virtue of the fact that an accident occurred on the premises.") *with* McCabe v. Wal-Mart Stores, Inc., No. 2:14-cv-01987, 2016 WL 706191, at *2 (D. Nev. Feb. 22, 2016) ("While all slip-and-fall incidents may not result in litigation, the incident report made at the scene by [plaintiff] is sufficient to trigger Wal-Mart's duty to preserve relevant evidence.") *and* Harrell v. Pathmark, No. 14-5260, 2015 WL 803076, at *4 (E.D. Pa. Feb. 26, 2015) ("Even in a highly litigious community or culture, just because a person falls in a grocery store does not mean that litigation is imminent. . . . While the incident itself did cause [defendant's employee] to create an incident

a preservation notice letter from an opposing party may give rise to a credible probability of litigation, depending on the circumstances. In most circumstances, service of a subpoena on an organization will not trigger a duty to preserve information unless, at the time the organization receives the subpoena, it reasonably anticipates that the organization will become a party to that litigation.

*Plaintiff Claims:* On the plaintiff's side, seeking advice of counsel, sending a cease-and-desist letter, or taking specific steps to commence litigation may trigger the duty to preserve. The activities of the plaintiffs prior to litigation came under close examination in *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*[55] and *Rimkus Consulting Grp., Inc. v. Cammarata*.[56] The test of when the duty to preserve is triggered is often based on when the plaintiff "determined [that] legal action was appropriate."[57] Thus, in *Best Payphones, Inc. v. City of N.Y.*, a plaintiff was held to be under a duty to preserve evidence once it decided to bring an action.[58]

*Defense Claims:* On the defendant's side, credible information that it is the target of legal action may be sufficient to trigger the duty to preserve. The degree to which litigation must be certain is debatable. In *Goodman v. Praxair Servs., Inc.*, the court refused to require an unequivocal notice of impending

---

report, nothing about it was so immediately dramatic to create an objectively foreseeable likelihood of litigation.").

55.  685 F. Supp. 2d 456, 475 (S.D.N.Y. 2010), *abrogated in part by* Chin v. Port Auth. of N.Y. & N.J., 685 F.3d 135 (2nd Cir. 2012).

56.  688 F. Supp. 2d 598, 611, 641 (S.D. Tex. 2010).

57.  Milenkamp v. Davisco Foods Int'l, Inc., 562 F.3d 971, 981 (9th Cir. 2009) (no duty to preserve since destruction of evidence occurred "by the time" that plaintiffs determined legal action was appropriate).

58.  Nos. 1-CV-3924, 1-CV-8506, 3-CV-0192, 2016 WL 792396, at *4 (E.D.N.Y. Feb. 26, 2016).

litigation.[59] In *Apple Inc. v. Samsung Elecs. Co., Ltd.*, a presentation among senior executives in which Apple informed Samsung that it believed Samsung was infringing its patents was held to trigger Samsung's duty to preserve.[60]

However, there are circumstances when the threat of litigation is not credible, and it would be unreasonable to anticipate litigation based on that threat. For example, in *Cache LaPoudre Feeds, LLC v. Land O'Lakes, Inc.*, a letter referencing potential "exposure" but also mentioning the possibility of amicable resolution was held not to trigger the obligation to preserve, since a mere possibility of litigation does not necessarily make it likely.[61]

This guideline provides that a duty to preserve is triggered *only* when an organization concludes (or should have concluded), based on credible facts and circumstances, that litigation or a government investigation is probable. Whether litigation can be reasonably anticipated should be based on a good-faith and reasonable evaluation of the facts and circumstances as they are known at the time.

---

59.  632 F. Supp. 2d 494, 510 n.7 (D. Md. 2009) ("[W]here, as here, [a] letter openly threatens litigation, then the recipient is on notice that litigation is reasonably foreseeable and the duty to preserve evidence relevant to that dispute is triggered.").

60.  881 F. Supp. 2d 1132, 1145 (N.D. Cal. 2012). In *Phillip M. Adams & Assocs., L.L.C. v. Dell, Inc.*, 621 F. Supp. 2d 1173 (D. Utah 2009), the duty to preserve was held to have been triggered many years before suit was filed because of mere awareness of similar litigation involving others in the industry.

61.  244 F.R.D. 614, 623 (D. Colo. 2007) ("[A] party's duty to preserve evidence in advance of litigation must be predicated on something more than an equivocal statement of discontent."); *see also* Hixson v. City of L.V., No. 2:12-cv-00871, 2013 WL 3677203, at *5 (D. Nev. July 11, 2013) ("It is not reasonably foreseeable [*sic*] that every internal employment complaint may result in litigation if not resolved to the employee's satisfaction.").

A reasoned analysis of the available facts and circumstances is necessary to conclude whether litigation or a government investigation is "reasonably anticipated." That determination is fact-specific and should be made by an experienced person who can make a reasoned judgment.

Of course, later information may require an organization to reevaluate its determination and may result in a conclusion that (a) litigation that previously had not been reasonably anticipated (and consequently did not trigger a preservation obligation) is then reasonably anticipated or (b) new information alters the scope of the preservation obligation for anticipated or pending litigation.[62] Conversely, new information may enable an organization to determine that it should no longer reasonably anticipate a particular litigation and is, consequently, no longer subject to a preservation obligation. A party that obtains new information, after the initial decision is made, should reevaluate the situation as soon as practicable. Parties and counsel should give careful consideration to documenting their analysis.[63]

---

62. *See, e.g.*, Marten Transp., Ltd. v. Plattform Adver., Inc., No. 14-cv-02464, 2016 WL 492743, at *10 (D. Kan. Feb. 8, 2016) (Although plaintiff's duty to preserve was triggered by correspondence between counsel in 2013, it did not include a key employee's internet browser history until 2015, when defendant first made allegations to which the history was potentially relevant.); *In re* Pradaxa (Dabigatran Etexilate) Prods. Liab. Litig., No. 3:12-md-02385, 2013 WL 6486921, at *1 (S.D. Ill. Dec. 9, 2013), *mandamus granted on other grounds, In re* Pet. of Boehringer Ingelheim Pharms. Inc.,745 F.3d 216 (7th Cir. 2014) ("[W]hile the defendants may have been able to justify adopting a narrow litigation hold as to *some* employees prior to June 2012, they cannot justify failing to adopt a company-wide litigation hold as of June 2012—when they knew nationwide Pradaxa product liability litigation was imminent.") (emphasis in original).

63. *See, e.g.*, Stevenson v. Union Pac. R.R. Co., 354 F.3d 739, 749–50 (8th Cir. 2004) (affirming the imposition of sanctions against defendant that selectively preserved evidence that was favorable to its litigation position and

To help understand when the duty to preserve arises, one should consider when the duty does *not* arise. For example, a vague rumor or indefinite threat of litigation does not trigger the duty; nor does a threat of litigation that is not credible or not made in good faith. A lack of credibility may arise from the nature of the threat itself, past experience regarding the type of threat, the person who made the threat, the legal basis upon which the threat is purportedly founded, or any similar facts.

Another issue to be considered is what constitutes notice to the organization. For corporations, this can be a complicated issue. If one employee or agent of the organization learns of facts that might lead one to reasonably believe litigation will be forthcoming, should that knowledge be imputed to the organization as a whole, thereby triggering its preservation obligations? Often, the answer will depend on the nature of the knowledge, the potential litigation,[64] and the agent. Generally, an organization is considered to "'know' what its employees know—at least, what employees know on subjects within the scope of their duties."[65]

Organizations that become aware of a credible threat from which litigation could arise may have a duty to make a reasonable inquiry or undertake a more detailed investigation regarding the facts related to the "threat." Whether an inquiry or

---

failed to preserve an audio recording that was likely material to plaintiff's claims).

64.   Attorneys and organizations should be cognizant of the possibility of arguments that the labeling of information as attorney work product (either at the time of creation or in later logs) is tantamount to admitting a preservation obligation existed at the time the information was created because both doctrines depend on a reasonable anticipation of litigation.

65.   NECA-IBEW Rockford Local Union 364 Health & Welfare Fund v. A&A Drug Co., 736 F.3d 1054, 1059 (7th Cir. 2013). Some courts require that the knowledge be "material" to the employee's duties. *See, e.g.,* Huston v. Proctor & Gamble Paper Prods. Corp., 568 F.3d 100, 107 (3d Cir. 2009).

detailed investigation is warranted will be fact-driven and based on reasonableness and good faith. Thus, while there may be no duty to affirmatively disprove allegations associated with a threat before concluding that it lacks credibility, the facts and circumstances may suggest the prudence of making an inquiry before reaching such a conclusion.[66]

## ILLUSTRATIONS

*Illustration i:* An organization receives a letter that contains a vague threat of a trade secret misappropriation claim. The letter does not specifically identify the trade secret. Based on readily available information, it appears that the information claimed to be the misappropriated trade secret had been publicly known for many years. Furthermore, the person making the threat had made previous threats without initiating litigation. Given these facts, the recipient of the threat could reasonably conclude that there was no credible threat of litigation, and the organization had no duty to initiate preservation efforts.

*Illustration ii:* An organization receives a demand letter from an attorney on behalf of a client that contains a specific threat of a trade secret misappropriation claim. Furthermore, the organization is aware that others have been sued by the attorney's client on similar claims. Given these facts, there is a credible threat of litigation, and the organization has a duty to preserve discoverable information. The client's duty to preserve arises no later than the date of the decision to send the letter, and, in some circumstances, may arise earlier.

---

66.  *See* Stallings v. Bil-Jax, Inc., 243 F.R.D. 248, 252 (E.D. Va. 2007) (Although plaintiff's letter was vague, it provided "some notice" of possible litigation and defendant "had ample time to make a timely request for additional information regarding the nature of the incident referred to in the letter.").

*Illustration iii:* An organization learns of a report in a reputable news source that includes sufficient facts, consistent with information known to the organization, concerning the possibility of an impending government investigation of the organization for a possible violation of law. Under these circumstances, a government investigation (and possibly litigation) can reasonably be anticipated, and a preservation obligation has arisen.

*Illustration iv:* An event occurs that, in the experience of the organization, typically results in litigation. Examples of such events may include a plant explosion with severe injuries, an airplane crash, or an employment discrimination claim. The experience of the organization when these events or claims arose in the past would be sufficient to give rise to a reasonable anticipation of litigation.

*Illustration v:* A cease-and-desist letter for misuse of a trademark is received by a business. The recipient replies with an agreement to comply with the demand and, in fact, does comply. The recipient does not have a reasonable basis to anticipate litigation and does not have an obligation to preserve discoverable information. However, the duty to preserve on the part of the sender arises no later than the date of the decision to send the letter.

**Guideline 2:    Adopting and consistently following a policy governing an organization's preservation obligations are factors that may demonstrate reasonableness and good faith.**

A policy[67] setting forth a procedure[68] for determining whether the duty to preserve information has arisen can help ensure that the decision is made in a defensible manner. As stated in *The Sedona Principles, Third Edition,* such a policy can be part of a larger information governance ("IG") program, although "an organization's compliance with discovery obligations cannot be judged by the state or lack of its IG program."[69] Any policies that provide for management of an organization's information should include provisions for implementing procedures to preserve discoverable information in ongoing or reasonably anticipated litigation, or relevant for government investigations or audits.[70] The nomenclature used (e.g., "legal hold" or "information governance") is not important; what is important is that the organization have explicit and consistent policies and procedures to guide compliance with its preservation obligations.[71]

Organizations will have different policies depending on their size, business needs, culture, and other structural factors.

---

67.   Policy refers to the general statement of a course of action which may be operational, aspirational, or a combination of both. Operational in this context means that the course of action can be executed without further articulation.

68.   Procedure refers to a plan of action to implement a policy. Although a policy statement may incorporate procedures, procedures should not be used as a synonym for policy. *See also* the definition of Process, *infra* note 72.

69.   *See The Sedona Principles, Third Edition, supra* note 1, Cmt. 1.b., at 59–64; *see also id.,* Cmt. 5.b., at 99.

70.   *Id.*

71.   *See id.* at 100.

The key is to have a process[72] that is followed.[73] In cases where the preservation efforts are likely to be challenged, it can be helpful to memorialize the steps taken to follow that process, so the organization can demonstrate its compliance with the process. A defined policy and evidence of compliance should provide strong support if the organization is called upon to demonstrate the reasonableness of its decision-making process.

### ILLUSTRATIONS

*Illustration i:* Upon receipt of an anonymous threat of litigation sent to a corporation's ombudsman, the ombudsman consults the legal hold policy. The policy provides criteria for an assessment of the threat and whether the issues raised by it, including the circumstances surrounding its receipt, indicate the potential for litigation or government investigation. It also provides for a preliminary evaluation of the allegations before determining whether a legal hold should be implemented. Based on the policy, the ombudsman concludes that the corporation does not reasonably anticipate litigation and memorializes that decision in a memorandum to the file. In a subsequent challenge, the corporation can demonstrate that it considered its legal hold policy and the likelihood of litigation occurring, and it exercised reasonable and good-faith judgment in determining that litigation was not reasonably anticipated.

*Illustration ii:* A citizen complaint is forwarded to the city attorney for a medium-sized municipality. Following her standard practice (which has been consistently followed and was developed and memorialized in consultation with city officials),

---

72.   Process refers to the articulation of the steps employed to implement a procedure.

73.   *See The Sedona Principles, Third Edition, supra* note 1, Cmt. 5.b., at 100, and Cmt. 1.b., at 62 n.31 ("[O]rganizations must not only communicate what the IG policy is, but why it is important to follow the policy.").

the city attorney considers the type of complaint, seriousness of the alleged behavior, and history of past similar complaints, among other factors. After determining that the city does not reasonably anticipate litigation based on the complaint, she memorializes that decision in an email to the city agency that initially forwarded the complaint. In a subsequent challenge, the city can use the existence of its consistent process (and the existence of the email, although its content may be privileged) to demonstrate the reasonableness and good faith of the city's decision regarding preservation.

**Guideline 3:    Adopting a procedure for reporting information relating to possible litigation to a responsible decision maker may assist in demonstrating reasonableness and good faith.**

In any organization—but particularly large organizations—individuals within the organization may have information indicating a threat of litigation that the organization's decision makers do not have. An organization should consider how to communicate that information to persons charged with evaluating the threat and, if warranted, instituting legal holds. The particulars of such a procedure will vary from organization to organization, based on the nature of the business, the way the business is conducted, and the culture of the organization.

One important consideration is the threshold for reporting. A procedure for reporting information should discourage spurious or trivial reports, while still encouraging the candid flow of information to appropriate decision makers. The reporting threshold, like other particulars of the procedure, will vary among organizations. Generally, the threshold for reporting should be lower than the threshold for determining whether a legal hold is warranted. Legal hold determinations require an understanding and application of the law; a reporting threshold need not.

To be effective, any such procedure should be simple and practical, and individuals within the organization should be trained on how to follow the procedure. The organization should periodically evaluate the effectiveness of its procedure, including the frequency with which it is used, and the quality of the information being received.

### ILLUSTRATIONS

***Illustration i:*** Westerberg Products (Westerberg) is a large corporation with tens of thousands of employees and offices throughout the United States. Westerberg establishes an internal compliance website through which employees can submit information regarding matters they believe may become subjects of litigation. The information received via the website is forwarded to the legal department, which is charged with determining whether and when to implement a legal hold. All Westerberg employees are trained on how to use the website and are periodically reminded that they should use it to report any concerns. A member of the legal department is assigned to make an annual evaluation of the effectiveness of the procedure. Westerberg can use these procedures to demonstrate its good-faith efforts to ensure it is aware of information that may lead it to conclude there is a reasonable anticipation of litigation.

***Illustration ii:*** Stinson Software (Stinson) is a small software developer with eight employees. Every month, all eight employees attend a staff meeting, and a regular topic of discussion is whether any employee is aware of any ongoing threats to the company, including possible claims or demands that might result in litigation by or against the company. Stinson's Chief Operations Officer follows up on any tips with Stinson's outside counsel. Stinson can use this procedure to demonstrate its good-faith effort to ensure it is aware of information that may lead it to conclude there is a reasonable anticipation of litigation.

**Guideline 4:   Determining whether litigation is or should be reasonably anticipated should be based on a good-faith and reasonable evaluation of relevant facts and circumstances.**

Determining whether litigation is or should be reasonably anticipated—either on behalf of or against an organization—requires consideration of many factors. Depending on the nature of the organization, factors that may be pertinent include the following:

- The nature and specificity of the notice of potential claim or threat
- The person or entity making the claim
- The business relationship between the accused and accusing parties
- Whether the threat is direct, implied, or inferred
- Whether the party or counsel making the claim is known to be aggressive or litigious
- Whether a party who could assert a claim is aware of the claim
- The strength, scope, or value of a known, reasonably anticipated, or threatened claim
- Whether the organization has knowledge or information about similar claims
- The relevant experience in the industry with regard to such claims
- Reputable press or industry coverage of the issue, either directly pertaining to the organization or regarding complaints against others similarly situated
- Whether a party has retained counsel or is seeking advice of counsel in connection with defending against or filing a claim

- Whether an organization that is considering bringing a claim has begun to mark documents to indicate that they fall under the work-product doctrine
- Whether a potential claimant has sent or received a demand, cease-and-desist, or complaint letter

These factors are not exhaustive, and no single factor is necessarily determinative of what response is reasonable. All factors must be evaluated reasonably and in good faith.

ILLUSTRATIONS

*Illustration i:* A musician writes a song that sounds very similar to a famous song. Immediately, there are critical reviews and radio disc jockeys calling the song a "blatant rip-off." Although the copyright owners of the original song have not yet made any claim, the high-profile nature of the criticism is a consideration that may lead the musician's publisher to determine that a preservation obligation has arisen.

*Illustration ii:* A restaurant chain's central management office receives a series of anonymous emails purported to be from customers claiming food poisoning after the much-publicized introduction of a new dish. In the absence of any corroborating reports from the restaurants and with no specific details on which to act, the chain's counsel may reasonably conclude that litigation is not reasonably anticipated.

**Guideline 5:    Evaluating an organization's preservation decisions should be based on the good faith and reasonableness of the decisions (including whether a legal hold is necessary and how it should be implemented) at the time they were made.**

The reasonableness of an organization's preservation decisions, such as whether to implement a legal hold and the scope of such a hold, should be made in light of the facts and circumstances reasonably known to it at the time of its decisions, and should not be evaluated on the basis of hindsight or information acquired after the decisions are made.[74] An organization seeking to determine whether a preservation obligation has arisen and the scope of any such obligation has no choice but to rely on the information available to it. Consequently, whether reasonable decisions were made should turn on what the organization knew or reasonably should have known at that time, and not on other circumstances of which the organization was unaware.[75]

---

74.    Any subsequent judicial evaluation of an organization's legal hold implementation should be based on the good faith and reasonableness of the implementation at the time the hold was implemented. In doing so, proportionality considerations are relevant. FED. R. CIV. P. 37(e) advisory committee's note to 2015 amendment (One "factor in evaluating the reasonableness of preservation efforts is proportionality.").

75.    *See* FED. R. CIV. P. 37(e) advisory committee's note to 2015 amendment (In deciding whether and when a duty to preserve arose in advance of litigation, "it is important not to be blinded . . . by hindsight arising from familiarity with an action as it is actually filed."); *see also* Marten Transp., Ltd. v. Plattform Adver., Inc., No. 14-cv-02464, 2016 WL 492743, at *10 (D. Kan. Feb. 8, 2016) (denying sanctions under Rule 37(e) because the party took reasonable steps to preserve relevant information; the party "had no knowledge or information from which it should have known that [the lost ESI] would become relevant in the case" before the ESI was lost); *In re* Delta/AirTran Baggage Fee Antitrust Litig., No. 1:09-md-2089, 2015 WL 4635729, at *10 (N.D. Ga. Aug. 3, 2015) ("The fact that, with perspective adjusted by hindsight and

ILLUSTRATIONS

*Illustration i:* The One, Inc. offers an online dating service that uses state-of-the-art software it licenses from Tech Savvy to "match" its couples. Tech Savvy also licenses its software to SO Finder, which runs its own online dating service. In January, SO Finder receives reports that many of its members are being matched to people whose characteristics align with their "dislike" and "can't stand" lists instead of with their "love" or "like" lists. After investigating, SO Finder determines that the mismatching is caused by a flaw in the software it licenses from Tech Savvy. The news of SO Finder's mismatching is kept out of the media, and the class action case brought by SO Finder's members is settled out of court by March. In April, The One, Inc., which had no knowledge of the suit against SO Finder or the subsequent settlements, disposes of certain information relating to its use of Tech Savvy's software, pursuant to its information management and data destruction policies. In May, The One, Inc. begins receiving complaints from its members about mismatching and is sued by its members a month later. Because The One, Inc. had no knowledge or reason to know of the problems with the software it licenses from Tech Savvy, its decision to dispose of information in April was not in violation of a duty to preserve.

*Illustration ii:* In January, Polly Pliff sues Farma Firm alleging that its product, Xpill, caused Pliff to develop a side effect about which Farma Firm failed to properly warn consumers. Xpill has been on the market for more than 10 years. Pliff's case is the first relating to Xpill brought against Farma Firm, and Farma Firm has no reason to believe there will be other such

---

over a year of discovery, it might have been helpful for Delta to preserve the data sources now at issue is insufficient to support a motion for sanctions if it is not shown that the duty to preserve reached this evidence to begin with.") (internal quotation omitted).

cases. Farma Firm acts promptly to issue a legal hold to key custodians, including Ron Rep, the sales representative who detailed Xpill to Pliff's prescribing doctor. Pursuant to Farma Firm's information governance policy, at the end of its fiscal year in March, Farma Firm destroys its sales representative detail call records that are more than five years old. Because of the legal hold issued to Ron Rep, records of his Xpill detail calls are retained, but records of Xpill detail calls by all other Farma Firm sales representatives are destroyed. In July, several new cases alleging claims similar to Pliff's are filed against Farma Firm by patients who received their Xpill prescriptions from doctors who had been detailed by other Farma Firm sales representatives. Because Farma Firm had no knowledge or reason to know of the relevance of detail call records for sales representatives other than Ron Rep when it destroyed such records in March, its decision to do so was reasonable and not in violation of a duty to preserve.

**Guideline 6:**   **Fulfilling the duty to preserve involves reasonable and good-faith efforts, taken as soon as is practicable and applied proportionately, to identify persons likely to have information relevant to the claims and defenses in the matter and, as necessary, notify them of their obligation to preserve that information.**

After an organization determines it has a duty to preserve, it should begin to identify information to be preserved. The obligation to preserve requires reasonable and good-faith efforts.[76]

---

76. FED. R. CIV. P. 37(e) advisory committee's note to 2015 amendment ("A variety of events may alert a party to the prospect of litigation. Often these events provide only limited information about that prospective litigation, however, so that the scope of information that should be preserved may

But it is "unreasonable to expect parties to take every conceivable step or disproportionate steps to preserve all potentially relevant data."[77] The organization should consider the sources of information within its "possession, custody, or control"[78] that would likely include discoverable information. The most obvious of these sources are those that the organization has physically in its possession or custody—for example, file cabinets of documents in its office, and emails or office files on its servers (wherever located)—but also may include sources such as thumb drives, company-furnished laptops, and mobile devices used by employees for business purposes.[79]

Some sources of information within the possession or custody of third parties may also be deemed to be within the control of the organization because of contractual or other

---

77.    *The Sedona Principles, Third Edition, supra* note 1, Principle 5, at 93. *See also* Cmt. 5.e., at 108 ("Preservation efforts need not be heroic or unduly burdensome.").

78.    *See* FED. R. CIV. P. 34 and its state equivalents; *see also, e.g.,* Lindholm v. BMW of N. Am., LLC, No. 3:15-CV-03003, 2016 WL 452315, at *3–4 (D.S.D. Feb. 5, 2016) (Plaintiffs were not entitled to discovery of information that was in the possession of defendant's non-party indirect subsidiary when the non-party was a separate legal entity and had no agency relationship with defendant.); *In re* NTL, Inc., Secs. Litig., 244 F.R.D. 179, 195 (S.D.N.Y. 2007) (Defendant was obliged to produce responsive records in the physical possession of a non-party when defendant had the legal right and practical ability to obtain the records.).

79.    *See* Paisley Park Enters., Inc. v. Boxill, 330 F.R.D. 226 , 2019 WL 1036058 (D. Minn. Mar. 5, 2019) (holding that defendants violated their duty to preserve relevant information by failing to take affirmative steps to keep relevant text messages); NuVasive, Inc. v. Kormanis, 18-cv-0282, 2019 WL 1171486 (M.D.N.C. Mar. 13, 2019), *report and recommendation adopted,* 2019 WL 1418145 (M.D.N.C. Mar. 29, 2019) (finding that defendant should have disabled the automated destruction feature on his mobile phone to properly preserve relevant text messages).

relationships. Examples include information held by out-sourced service providers, storage facility operators, and providers of software as a service (SaaS).[80] With respect to those sources, the organization should consider providing appropriate notice concerning the need to preserve material likely to be discoverable.

It must be noted that a mere delay in implementing a legal hold is not necessarily fatal. In *Rahman v. The Smith & Wollensky Restaurant Grp., Inc.*, the court concluded that "even assuming there was, in fact, no litigation hold" until late in the litigation, the plaintiff had failed to establish that there was "any gap" in production "attributable to the failure to institute [a] litigation hold at an earlier date."[81] The test is what was reasonable under the circumstances, with the goal of preserving discoverable information. Thus, there is no per se negligence rule, and if the organization otherwise preserved the information, there is no violation of the duty to preserve.[82]

---

80.    Notably, the advent of "cloud computing" has increased substantially the number of organizations using third parties to host, manage, store, and dispose of electronic information in the course of business. *See generally* The Sedona Conference, *Commentary on Rule 34 and Rule 45 "Possession, Custody, or Control,"* 17 SEDONA CONF. J. 467 (2016).

81.    No. 06 Civ. 6198, 2009 WL 773344, at *6 (S.D.N.Y. Mar. 18, 2009) (emphasizing that the proof is directed at the failure to produce or destruction of relevant evidence, not, per se, the institution of a legal hold).

82.    FED. R. CIV. P. 37(e); Matthew Enter., Inc. v. Chrysler Grp. LLC, No. 13-cv-04236-BLF, 2016 WL 2957133, at *1 (N.D. Cal. May 23, 2016) ("Rule 37(e) now provides a genuine safe harbor for those parties that take 'reasonable steps' to preserve their electronically stored information."); Chin v. Port Auth. of N.Y. & N.J., 685 F.3d 135, 162 (2nd Cir. 2012) ("We reject the notion that a failure to institute a 'litigation hold' constitutes gross negligence *per se*. . . . Rather, we agree that 'the better approach is to consider [the failure to adopt good preservation practices] as one factor' in the determination of whether discovery sanctions should issue.") (internal citations omitted).

ILLUSTRATION

*Illustration i:* Strummer Holdings (Strummer) is a large corporation that sends many of its historic documents to an offsite storage facility managed by Jones Storage. Typically, documents older than five years are sent to Jones Storage. At all times, Strummer retains all legal rights with respect to the documents and has the right to require their return from Jones Storage at any time. Jones Storage has standing instructions from Strummer to automatically destroy certain documents when they are 10 years old.

Strummer reasonably anticipates litigation relating to events that occurred nine years ago. As a result, its preservation obligations are triggered with respect to documents stored at Jones Storage that Strummer believes may include unique information. If Strummer does not take steps to ensure that the discoverable documents (if any) it has stored at Jones Storage are preserved, it may be subject to curative measures or sanctions under the court's inherent authority with respect to hard-copy documents. If ESI was destroyed and cannot be replaced, Strummer may be subject to curative measures or sanctions under Federal Rule of Civil Procedure 37(e).[83]

---

83. *See supra* notes 12–19 and accompanying text for a discussion of this Rule.

**Guideline 7:   Factors that may be considered in determining the scope of information that should be preserved include the nature of the issues raised in the matter, the accessibility of the information, the probative value of the information, and the relative burdens and costs of the preservation effort.**

Determining the scope of preservation obligations typically involves an initial focus on information available in accessible or "active" sources.[84] "Only when electronically stored information is not available through such primary sources should parties move down a continuum of less accessible sources until the information requested to be preserved or produced is no longer proportional."[85] As noted earlier, there is no requirement to preserve *all* information.[86]

The Federal Rules and *The Sedona Principles, Third Edition* recognize the value of conferring with opposing parties about the preservation and production of ESI.[87] Rule 26(f) provides parties with the opportunity at the discovery planning stage to discuss and agree on a reasonable preservation scope. The Rules emphasize cooperative action,[88] as promoted by The Sedona

---

84.   *See The Sedona Principles, Third Edition, supra* note 1, Principle 8, at 134.

85.   *Id*.

86.   Zubulake v. UBS Warburg, 220 F.R.D. 212, 217 (S.D.N.Y. 2003); *see also, e.g., In re* Ethicon, Inc. Pelvic Repair Sys. Prod. Liab. Litig., 299 F.R.D. 502, 517 (S.D.W. Va. 2014) (It is "uniformly agreed that a corporation under a duty to preserve is not required to keep 'every shred of paper, every e-mail or electronic document, and every backup tape' . . . [as] such a requirement 'would cripple large corporations.'") (quoting *Zubulake*, 220 F.R.D. at 217).

87.   *See The Sedona Principles, Third Edition, supra* note 1, Principle 3, at 71.

88.   FED. R. CIV. P. 1 advisory committee's note to 2015 amendment ("Effective advocacy is consistent with—and indeed depends upon—cooperative and proportional use of procedure."); *The Sedona Principles, Third Edition,*

Conference *Cooperation Proclamation*.[89] Parties are admonished to pay particular attention to the balance between the competing needs to preserve discoverable information and to continue routine business operations critical to ongoing activities.[90]

Unfortunately, it is not always feasible to secure prior agreement on preservation steps to be taken.[91] This is particularly true when preservation decisions must be made in the pre-litigation context, but it also can be a problem after commencement of litigation. In these circumstances, under the amended Federal Rules, the organization should base preservation decisions on its best judgment, made upon reasonable inquiry and in good faith, considering all the circumstances.[92] In some cases, this

---

*supra* note 1, Cmt. 3.b. at 76; *see also* Loop AI Labs Inc. v. Gatti, No. 15-CV-00798, 2016 WL 1273914, at *1 (N.D. Cal. Feb. 5, 2016) (noting that the parties' obligations under the discovery rules require cooperation and warning that "[o]bstructionist behavior will not be tolerated").

89.   10 SEDONA CONF. J. 331 (2009 Supplement) (calling for cooperative action by participants in relation to the discovery process).

90.   FED. R. CIV. P. 26(f) advisory committee's note to 2006 amendment (parties' Rule 26(f) conference "discussion should pay particular attention to the balance between the competing needs to preserve relevant evidence and to continue routine operations critical to ongoing activities"); FED. R. CIV. P. 37(e) advisory committee's note to 2015 amendment ("[T]he prospect of litigation may call for reasonable steps to preserve information by intervening in that routine operation.").

91.   For example, in rare cases, an organization may have questions about whether ephemeral data would be discoverable or could be preserved except by extraordinary measures not reasonably warranted. *See* Kenneth J. Withers, *"Ephemeral Data" and the Duty to Preserve Discoverable Electronically Stored Information*, 37 U. BALT. L. REV. 349, 377 (2008) ("By the time the parties sit down at the Rule 26(f) conference, the preservation issues surrounding ephemeral data may be moot and the fate of the responding party may already be sealed, if sanctions are later found to be warranted.").

92*.   The Sedona Principles, Third Edition, supra* note 1, Cmt. 8.a., at 136. *The Sedona Principles, Third Edition* also notes that there are risks to making

may include the preservation of both historical and future data (if information created in the future is relevant to claims or defenses in the litigation).[93]

### Key Factors to be Considered

There are numerous factors to be weighed when determining the scope of a particular hold.

*Issues in Dispute:* First, the scope of any legal preservation effort is bounded by the claims made or issues involved in the matter. There is no obligation to preserve data that falls outside those boundaries.[94]

*Accessibility:* A second factor is the accessibility of the information, especially when ESI is involved. Data that is not reasonably accessible may not need to be preserved.

"[T]he routine, good-faith operation of an electronic information system would be a relevant factor for the court to consider in evaluating whether a party failed to take reasonable steps to preserve lost information."[95] Consistent with the principle of proportionality embodied in the Federal Rules,[96] The Sedona Conference *Commentary on Preservation, Management and Identification of Sources of Information That Are Not Reasonably*

---

unilateral decisions, especially if an opportunity to confer has been avoided. *See id.*, Cmt. 5.a., at 96–97.

93. Courts have recognized that a duty to preserve applies to discoverable information that exists at the time the duty attaches, and that is created after the duty arises. *See, e.g.*, Zubulake v. UBS Warburg, 220 F.R.D. 212, 218 (S.D.N.Y. 2003).

94. *See* discussion and footnotes for Guideline 5, *supra* (preservation decisions based on good faith and reasonableness at the time they are made).

95. FED. R. CIV. P. 37(e) advisory committee's note to 2015 amendment.

96. *See* FED. R. CIV. P. 26(b)(1).

*Accessible*[97] stated that in the absence of agreement, it may be "reasonable to decline to preserve" inaccessible sources if the party concludes that the "burdens and costs of preservation are disproportionate to the potential value of the source of data."[98]

For example, *Zubulake IV* concluded that "as a general rule," a "litigation hold does not apply to inaccessible backup tapes," which "may continue to be recycled."[99] *Zubulake IV* also established an exception: if the producing party "can identify where particular employee documents are stored on backup tapes, then the tapes storing the documents of 'key players' [i.e., custodians] to the existing or threatened litigation should be preserved if the information contained on those tapes is not

---

97.   10 SEDONA CONF. J. 281, 291 (2009). In determining accessibility, a combination of "media based factors" and "data complexity factors" should be used. *Id*. at 289.

98*.   Id.* (proposing a "decision tree" form of analysis under which the burdens and costs of accessing and preserving are balanced against the "reasonably anticipated need and significance of the information"). *See also The Sedona Principles, Third Edition, supra* note 1 at 95–96; The Sedona Conference, *Commentary on Proportionality in Electronic Discovery*, 18 SEDONA CONF. J. 141, Principle 1, at 150 (2017) ("The burdens and costs of preserving relevant [ESI] should be weighed against the potential value and uniqueness of the information when determining the appropriate scope of preservation.").

99.   Zubulake v. UBS Warburg, 220 F.R.D. 212, 217 n.22 (S.D.N.Y. 2003). *See also, e.g.*, Gen. Elec. Co. v. Wilkins, No. 1:10-cv-00674, 2012 WL 570048, at *5 (E.D. Cal. Feb. 21, 2012) (noting that backup tapes are generally considered to be inaccessible or at least not reasonably accessible due to undue burden and cost); United States ex rel. Carter v. Bridgepoint Educ., Inc., 305 F.R.D. 225, 241 (S.D. Cal. 2015) (suggesting that backup tapes are per se inaccessible).

otherwise available."[100] *The Sedona Principles, Third Edition* is in accord with this view.[101]

The logic of this conclusion is reinforced by the emphasis on proportionality in the amended Federal Rules, and which was presaged by earlier case law. For example, in *Escobar v. City of Houston*, the fact that the discoverable information had been pre-served and was available from a more accessible source miti-gated concern about the failure to preserve audio tapes.[102] Nota-bly, the reasoning behind the general rule excluding

---

100.  *Zubulake*, 220 F.R.D. at 218. *See also* Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 685 F. Supp. 2d 456, 480 n.99 (S.D.N.Y. 2010), *abrogated on other grounds by* Chin v. Port Auth. of N. Y. & N. J., 685 F.3d 135 (2nd Cir. 2012) ("I am not requiring that *all* backup tapes must be preserved. Rather, if such tapes are the *sole* source of relevant information (e.g., the active files of key players are no longer available), then such backup tapes should be segregated and preserved. When accessible data satisfies the requirement to search for and produce relevant information, there is no need to save or search backup tapes.") (emphasis in original); Forest Labs., Inc. v. Caraco Pharm. Labs., Ltd., No. 06-CV-13143, 2009 WL 998402, at *7 (E.D. Mich. Apr. 14, 2009) (announcing proceedings limited to assessing *Zubulake* exception on delayed decision to cease recycling backup media).

101.  *The Sedona Principles, Third Edition, supra* note 1, Cmt. 5.h., at 112 ("Ab-sent good cause, preservation obligations should not extend to disaster re-covery storage systems."); *see id.* at Cmt. 8.a., at 136 ("[M]ere suspicion that a source may contain discoverable, but duplicative ESI is not sufficient to re-quire preservation of that source 'just in case.'").

102.  No. 04-1945, 2007 WL 2900581, at *17–19 (S.D. Tex. Sept. 29, 2007); *see also, e.g.*, West v. Talton, No. 5:13-CV-338, 2015 WL 6675565, at *2 (M.D. Ga. Nov. 2, 2015) (The routine destruction of backup tapes did not warrant spo-liation sanctions where defendant still had access to the hard drive in ques-tion and could restore it and recover responsive emails.); *In re* Delta/AirTran Baggage Fee Antitrust Litig., 770 F. Supp. 2d 1299, 1310–11 (N.D. Ga. 2011) (Defendants' delay in preserving backup tape information was not sanction-able in part because defendants produced some documents from the time period at issue from alternate sources and plaintiffs had an opportunity to depose all key employees.).

inaccessible data (such as backup tapes) from preservation is not based simply on the expense of saving a tape—which, in isolation, is relatively slight. Instead, it is based upon principles of proportionality—i.e., the need for preservation of information balanced against the ultimate cost of later restoring data sources and culling them for particular content.[103]

Ultimately, "[a] party's identification of sources of ESI as not reasonably accessible does not relieve the party of its common-law or statutory duties to preserve evidence."[104] However, this observation should be read in conjunction with Rule 37(e), which allows for the imposition of sanctions or curative measures in the face of lost ESI *only* if the party "failed to take reasonable steps to preserve it."[105]

***Probative Value:*** A third factor to consider in weighing preservation obligations is the nature of the information involved[106] and whether the data is unique and non-duplicative.[107]

---

103.   *See, e.g.,* FED. R. CIV. P. 37(e) advisory committee's note to 2015 amendment (One "factor in evaluating the reasonableness of preservation efforts is proportionality."); Hon. Joy Flowers Conti & Richard N. Lerrieri, *E-Discovery Ethics: Emerging Standards of Technological Competence,* FED. LAW. 28, 31 (Oct./Nov. 2015) ("Proportionality is a guiding principle in determining the breadth and extent of the preservation required" under the Federal Rules.). *See also The Sedona Principles, Third Edition, supra* note 1, Cmt. 2.d., at 68 (noting the "full range" of considerations when assessing proportionality), and Cmt. 5.h., at 116 (referring to the role of "proportionality considerations" in preservation of backup tape).

104.   FED. R. CIV. P. 26 advisory committee's note to 2006 amendment.

105.   FED. R. CIV. P. 37(e).

106.   The Sedona Conference, *Commentary on BYOD: Principles and Guidance for Developing Policies and Meeting Discovery Obligations,* 19 SEDONA CONF. J. 495, Cmt. 3.d., at 534 (2018) ("The concept of proportionality also limits the scope of discovery of ESI on employee-owned devices.").

107.   *See* Oracle America, Inc. v. Hewlett Packard Enter. Co., 328 F.R.D. 543 (N.D. Cal. 2018) (declining to impose sanctions on plaintiff after its Chief

Arguably, marginal or repetitive data falls outside the scope of proportionality and its probative value may be outweighed by the cost to preserve and produce information.[108]

*Relative Burdens (Costs):* A fourth factor to be considered in deciding whether to preserve data is the relative burden it will impose on the organization to preserve it. Data stored on backup tapes, for example, can be expensive to recover while the value of that data is marginal, often because it is substantively duplicative of data that exists from a more accessible source, or it is of lesser importance to the issues in dispute.[109]

## Other Preservation Issues

There are several other issues to consider when making preservation decisions.

*Transient or Ephemeral Data:* Transient or ephemeral data not kept in the ordinary course of business (and that the organization may have no means of preserving) may not need to be preserved.[110] Absent a showing of special need, *The Sedona*

---

Executive Officer destroyed over 500 electronic documents given that plaintiff still maintained alternative sources of such information).

108.    *See* The Sedona Conference, *Commentary on Proportionality in Electronic Discovery*, 18 SEDONA CONF. J. 141, Principle 1, at 150 (2017) ("The burdens and costs of preserving relevant [ESI] should be weighed against the potential value and uniqueness of the information when determining the appropriate scope of preservation.").

109.    *Id.*

110.    See Kenneth J. Withers, *"Ephemeral Data" and the Duty to Preserve Discoverable Electronically Stored Information*, 37 U. BALT. L. REV. 349, 377 (2008); *See* 7th Circuit Electronic Discovery Committee, *Principles Relating to the Discovery of Electronically Stored Information*, Principle 2.04(d), 7TH CIRCUIT COUNCIL ON EDISCOVERY AND DIGITAL INFORMATION (2d ed. Jan. 2018), https://www.ediscoverycouncil.com/sites/default/files/7thCircuitESIPilot-ProgramPrinciplesSecondEdition2018.pdf (deleted, slack, fragmented, unallocated, RAM, or ephemeral data among categories of ESI generally not discoverable); U.S. DIST. CT, DIST. OF DEL., DEFAULT STANDARD FOR DISCOVERY,

*Principles, Third Edition* states that a responding party should not be required to "preserve, review, or produce deleted, shadowed, fragmented, or residual [ESI]."[111]

Instant messages and other forms of chat are increasingly used by organizations for substantive communications, both internally and externally. In the past, such data was often labeled "ephemeral," because it was not retained as a general practice and in many cases did not persist in an easily recoverable form. More modern chat and messaging applications store their conversations in a form that can be maintained and more easily recovered. The data maintained in these applications may be appropriate for preservation and should not be deemed inaccessible in most cases.[112]

The same may be true for voicemail messages. In some cases, the voice message is stored temporarily as an audio recording, which by virtue of the recording application is neither permanent nor easily accessible. In others, the voice message is transcribed or transmitted via email with an audio copy attached. In the latter case, the data (recording or transcription) is not ephemeral and would not likely qualify as inaccessible.

---

INCLUDING DISCOVERY OF ELECTRONICALLY STORED INFORMATION (ESI), Sched. A, *available at* http://www.ded.uscourts.gov/sites/default/files/pages/Electronic%20Discovery%20Default%20Standard.pdf (last visited Nov. 6, 2018).

111.    *The Sedona Principles, Third Edition, supra* note 1, Principle 9, at 144.

112.    *See* Siras Partners LLC v. Activity Kuafu Hudson Yards LLC, 2019 N.Y. Slip Op. 03303, 2019 WL 1905478 (N.Y. App. Div. Apr. 30, 2019) (failure to preserve WeChat messages or to recover data from later-damaged phones constitutes gross negligence justifying adverse inference and spoliation sanction); *cf.* Monolithic Power Systems, Inc. v. Intersil Corp., No. 16-1125, 2018 WL 6075046, at *3 (D. Del. Nov. 19, 2018) ("Intersil's motion with respect to WeChat messages also must be denied. Intersil has not disproven MPS's representation that the WeChat messages were 'deleted in the ordinary course of business, prior to MPS's legal department becoming aware of the issue.'").

*Snapshots or Mirror Images:* Parties sometimes seek to compel creation of a "mirror image" of hard drives to preserve data pending forensic examinations.[113] Rule 34(a) recognizes the right to "test or sample" information, but that right does not create a "routine right of direct access" for such purposes.[114] Instead, such access is granted on a proper showing and perhaps with certain defined conditions.[115] *The Sedona Principles, Third Edition* recognizes that "Rule 34 inspections of electronic information systems are disfavored."[116]

In some cases, parties may wish to affirmatively create "snapshots" of data as a defensive measure.[117] For example, the

---

113.  Bank of Mongolia v. M&P Global Fin. Servs., Inc., 258 F.R.D. 514, 520 (S.D. Fla. 2009) (expert appointed to "retrieve any deleted responsive files" in light of (i) discrepancies between defendants' discovery responses and their concession that not all documents had yet been produced and (ii) production of responsive documents from third-party sources).

114.  FED. R. CIV. P. 34(a) advisory committee's note to 2006 amendment.

115.  *See, e.g.,* Klayman v. City Pages, No. 5:13-cv-143-Oc-22PRL, 2014 WL 5426515, at *5 (M.D. Fla. Oct. 22, 2014) ("[C]onclusory and unpersuasive assertions are inadequate to meet [plaintiff's] burden of showing good cause to warrant a forensic examination."); *Bank of Mongolia*, 258 F.R.D. at 520–21 (establishing procedure for review of defendants' computer records to "minimize intrusion"); Covad Commc'ns v. Revonet, Inc., 258 F.R.D. 5, 9–10 (D.D.C. 2009) (ordering forensic imaging of email servers for purposes of "preserv[ing] information as it currently exists").

116.  *The Sedona Principles, Third Edition, supra* note 1, Comment 6.d., at 127.

117.  It should be noted that forensic collection is not, nor should it be, the default method of collection and preservation. Instead, the duty to collect and preserve forensically arises only if: (i) the facts known to the preserving party or which the party should reasonably know would establish the need; or (ii) the requesting party has specifically requested it, and the producing party has either agreed or notified the requesting party upon receiving the request that it will not comply, at which point the requesting party seeks judicial intervention and obtains an order compelling such preservation and collection. *See The Sedona Principles, Third Edition, supra* note 1, Comment 8.c., at 141 ("[w]hile [forensic data acquisition] clearly is appropriate in some

ability to access the hard drives of laptops issued to key employees upon their departure may be useful if it is the sole source of deleted information.[118] While doing so is an option, that action is not required unless there is a reasonable anticipation of litigation involving issues relating to that employee.

*Collection vs. Preservation:* If there are many custodians or there is ongoing business information subject to the legal hold, *collecting* data at the outset of the legal hold may not be feasible. Sequestering the data can be disruptive to the business or technically unworkable in such circumstances. As a result, it is important to distinguish between preserving information in place, and collecting and sequestering it. It is possible that a technical solution, such as placing a custodian's data on hold on the server side, may preserve both current and subsequently created discoverable information.

If collecting data at an initial stage is not warranted, reasonable, or feasible, communications and monitoring processes become more important. It is critical that recipients of hold notices understand their duty to preserve information and how to meet that duty. Training sessions on legal hold compliance can be a useful tool to foster the effectiveness of legal holds.

---

circumstances . . . , it should not be required unless circumstances specifically warrant the additional cost and burden and there is no less burdensome option available"; also noting the need for careful protocols to address such collections).

118.   *See, e.g.,* Cache La Poudre Feeds v. Land O'Lakes, 244 F.R.D. 614, 629 (D. Colo. 2007) (failure to refrain from "expunging" former key employees' hard drives sanctioned where backup tapes were no longer available for use in seeking deleted email).

**Guideline 8:**   **In circumstances where issuing a legal hold notice is appropriate, such a notice is most effective when the organization identifies the custodians and data stewards most likely to have discoverable information, and when the notice:**

(a) **communicates in a manner that assists persons in taking actions that are, in good faith, intended to be effective;**

(b) **is in an appropriate form, which may be written, and may be sent by email;**

(c) **provides information on how preservation is to be undertaken, and identifies individuals who can answer questions about preservation;**

(d) **includes a mechanism for the recipient to acknowledge that the notice has been received, read, and understood;**

(e) **addresses features of discoverable information systems that may make preservation of discoverable information more complex (e.g., auto-delete functionality that should be suspended, or small sections of elaborate accounting or operational databases;**

(f) **is periodically reviewed and amended when necessary; and**

(g) **is followed up by periodic reminder notices, so the legal hold stays fresh in the minds of the recipients.**

When preparing a legal hold notice, it is particularly important that it be understandable by diverse groups within an organization. Counsel should review relevant pleadings or

other documents and then describe the litigation in a way that will be understood by those with responsibility for preserving information.

The initial and subsequent hold notices and reminders should describe the matter at issue, provide specific examples of the types of information at issue, identify potential sources of information, inform recipients of their legal obligations to pre- serve information (and suspend disposition practices, whether manual or automated), and include a reference to the potential consequences to the individual and the organization for non- compliance.[119] It should be in a form—which may include email, written hard-copy, or, in limited cases, oral notice—that is ap- propriate to the circumstances. The notice should also inform recipients whom they should contact if they have questions or need additional information. Again, a legal hold notice must be adapted to conform to the facts and circumstances unique to each case.

Because of the distributed nature of an organization's infor- mation, it may be appropriate to communicate a legal hold no- tice not only to relevant data-generating or -receiving custodi- ans, but also to appropriate data stewards, records management personnel, information technology (IT) personnel, and other personnel to preserve other information sources and reposito- ries within the organization. For example, IT personnel or others may need to suspend auto-delete functions or records disposi- tion function.

---

119. *See* N.M. Oncology and Hematology Consultants v. Presbyterian Healthcare Servs., No. 1:12-cv-00527, 2017 WL 3535293 (D.N.M. Aug. 16, 2017) (directed preservation of all relevant information, described forms of information to be retained, detailed 17 subject matters, directed suspension of auto-delete programs, solicited identity of additional persons with rele- vant information, and required acknowledgement).

In addition, the organization should consider whether a preservation notice should be sent to third parties, such as contractors or vendors, including those that provide information technology services.

Organizations should consider requiring confirmations of compliance with such legal hold notices as a means of verifying that recipients understand and agree to comply with their preservation duties and obligations.[120] Appropriate responses to legal hold notices and the organization's expectations for compliance with them should be documented and, depending on the organization's structure, included in its compliance programs.

Importantly, while the use of a written legal hold notice is often appropriate, it is simply one method of executing preservation obligations, not the only method. An organization should consider whether a written notice—or a formal legal hold notice in any form—is necessary to implement the hold effectively and preserve the requisite information. In some instances, a notice may not be necessary and, in fact, may be an encumbrance or source of confusion.[121] One example of when notices need not

---

120.   *See The Sedona Principles, Third Edition, supra* note 1, Cmt. 5.d., at 105; Guideline 10, *infra*.

121.   Orbit One Commc'ns, Inc. v. Numerex Corp., 271 F.R.D. 429, 441 (S.D.N.Y. 2010) ("[D]epending upon the circumstances of an individual case, the failure to [issue a written legal hold] does not necessarily constitute negligence, and certainly does not warrant sanctions if no relevant information is lost. For instance, in a small enterprise, issuing a written litigation hold may not only be unnecessary, but it could be counterproductive, since such a hold would likely be more general and less tailored to individual records custodians than oral directives could be. Indeed, under some circumstances, a formal litigation hold may not be necessary at all."). *See also* Bouchard v. U.S. Tennis Ass'n, 15 Civ. 5920, 2017 WL 3868801, *2 (E.D.N.Y. Sept. 5, 2017) (Failure to institute a "litigation hold" notice is only one factor; the "absence of a litigation hold is not dispositive" because the parties had fully complied

be issued to effectuate preservation is a situation in which sources of likely discoverable information are subject to retention for sufficiently long periods pursuant to the organization's information management or record retention policy such that they will be preserved for the duration of the litigation without the need for a formal legal hold. Another is when sources of discoverable information can be immediately secured without requiring preservation actions by employees; for example, a read-only system of record for all pertinent research-and-development and product-quality information harnessed by a document management system. Nevertheless, some organizations in these situations may prefer to take a conservative approach and issue a written legal hold notice despite a very low risk of disposition.

There are also circumstances where the collection of information prior to any notice may be prudent; for example, where the custodian is the subject of the litigation or government investigation and there is reason to believe that he or she might take steps to delete or destroy discoverable information if aware of the circumstances.

## ILLUSTRATIONS

*Illustration i:* Lydon Enterprises (Lydon) obtains information that leads it to reasonably anticipate litigation. Lydon issues a written legal hold notice to certain employees. The notice describes in easily understandable terms the information that falls within the scope of the employees' preservation duties. The notice also explains how employees are expected to gather and preserve discoverable information. Whenever Lydon obtains new information regarding the litigation that could affect the scope of the legal hold, its in-house counsel reviews the notice.

---

with their preservation obligations by preserving the videotaped footage that was relevant to the accident.).

The notice is revised and reissued as necessary, and a periodic reminder is issued to all employees with preservation obligations. Compliance with the notice is periodically assessed. This legal hold is likely to be considered effective or reasonable.

*Illustration ii:* Jones, Inc., (Jones) obtains information that leads it to reasonably anticipate litigation. In-house counsel for Jones identifies 40 people who she thinks might have discoverable information and instructs her secretary to call them and tell them to hold any information relevant to the potential litigation, which she describes in general terms. The secretary calls the employees but is unable to answer many of their questions. In-house counsel does not follow up on any of the employee questions. No written hold notice is issued. Litigation does not occur until 18 months later; at that point, in-house counsel begins collecting discoverable information. This approach may or may not be reasonable, depending upon the circumstances, including whether discoverable information was lost because of the failure to issue a written legal hold or follow up with identified custodians, and the prejudice, if any, caused by the loss of such information.

*Illustration iii:* Acme Industries (Acme), which owns various properties, completes its financial accounting for 2008 and files its tax returns. Under its record retention policy and supporting schedules, tax-related papers are held for five years or until that tax year's audit is complete (whichever occurs later), and documentation supporting its financial reports is held for eight years. In 2010, Acme was audited by the IRS, and questions were raised about Acme's valuation of certain properties, but no litigation was filed. If Acme reasonably concludes that the information needed to respond to questions during the audit are being retained pursuant to the company's information management and retention policy, it need not issue a formal legal hold notice. If, however, litigation is later filed, either by the government or by Acme for a refund after an adverse agency

determination, and it is reasonably likely that information beyond the parameters of the retained records may be necessary to address claims or defenses in the action, Acme would then be well-advised to issue a legal hold notice and take other steps discussed above to ensure the preservation of discoverable information.

**Guideline 9:    An organization should consider documenting the procedure of implementing the legal hold in a specific case when appropriate.**

When appropriate, an organization should consider documenting the steps taken to ensure the appropriate and defensible implementation of specific holds. The documentation should include sufficient information to demonstrate that the legal hold was implemented in a reasonable and good-faith manner should there be a need to defend the process. In most cases, the process of issuing and implementing the legal hold and following up to preserve the data will provide sufficient documentation. Appropriate documentation of the legal hold process may include the following:

- The date and by whom the hold was initiated, and a brief analysis of the triggering event
- The initial scope of information, custodians, sources, and systems involved, including reasons the hold was scoped with these parameters
- Information from custodians in response to questionnaires, interviews, checklists, or other means, noting additional sources of information

- Reasoning for subsequent scope changes as new custodians or data are identified or initial sources are eliminated
- Notices and reminders sent, confirmations of compliance received (if any), and handling of exceptions
- A master list of data stewards, custodians, or data "owners" involved in the preservation effort

While it may never be necessary to disclose this information, or disclosure may be made only to the court *in camera* to preserve privileged legal advice and work-product information, the availability of documentation will preserve for the organization the option of disclosing the information if a challenge to its preservation efforts is raised. Documentation also may prove a valuable resource when responding to discovery requests. If the organization chooses to memorialize legal hold implementation efforts, the possibility of this voluntary or forced disclosure should be considered when drafting. Additionally, while the contents of a legal hold notice are not typically discoverable, the recipients and the date of the notice are discoverable information.

Having documentation of legal hold processes and implementation efforts can be an effective method of demonstrating that an organization has taken reasonable steps to comply with its preservation obligations and of invoking the protections afforded by amended Rule 37(e).

**Guideline 10:  Compliance with a legal hold should be regularly monitored.**

Organizations should develop ways to periodically monitor legal hold compliance. Some tools to accomplish this may include requiring periodic confirmations from custodians and

data stewards, and annual compliance training concerning negative consequences for noncompliance. Organizations may also consider employing technological tools, such as automated solutions and dedicated "legal hold" platforms, to facilitate and track employee compliance.

Organizations may also consider tailoring their monitoring processes depending on the recipient of the legal hold notice. For example, a recipient who is intimately familiar with the discoverable information may require more initial education but less instruction on implementing specific holds. An employee who has received several legal hold notices in the past may need less instruction on the importance of hold compliance but benefit from periodic reminders of which holds remain active. An employee who is receiving his or her first legal hold notice, particularly an employee who is not familiar with the U.S. litigation system, may benefit from more education on the implications of noncompliance. A one-size-fits-all approach is unlikely to be successful.

Organizations may also consider designating one or more individuals within the legal department to be responsible for issuing the legal hold notice, answering employee questions, and conducting training to maintain ongoing compliance with the notice. For smaller organizations, outside counsel may be retained to perform this oversight function. These individuals may also be tasked with following up with unacknowledged legal holds, either personally or through auto-generated requests for acknowledgement.

The effort to ensure affected employees comply with their preservation obligations is an ongoing process throughout the course of litigation.[122] This may include distributing periodic

---

122.   Alabama Aircraft Indus. v. Boeing Co., 319 F.R.D. 730, 746 (N.D. Ala. 2017) (finding "sufficient circumstantial evidence . . . to conclude that

reminders of the legal hold, as well as issuing updated legal hold notices reflecting changes in the scope of the legal hold.[123] Also, if the organization learns that additional employees may have discoverable information, the legal hold notice should be sent to those employees.

Likewise, if the legal hold applies to information created on a going-forward basis and pertains to a matter that represents substantial benefits or risks to the organization, the organization may wish to consider additional means of ensuring compliance. For example, for holds requiring preservation of newly created information, organizations may consider periodic reminders to ensure ongoing compliance.

The argument has been made in some matters that sole reliance on individuals to comply with preservation notices is unreasonable.[124] For example, a special master in a case involving a massive legal hold questioned the efficacy of preservation requirements that relied on recipients to move emails to avoid automatic deletion.[125] Another court expressed the view that "it is *not* sufficient to notify all employees of a legal hold and expect that the party will then retain and produce all relevant information."[126] In *Pension Committee*, the same court noted that "not

---

Boeing's agents acted with an intent to delete (or destroy) ESI . . . by an affirmative act which has not been credibly explained," where defendant's preservation efforts were uneven, with some employees' email deleted instead of collected, two compact discs lost from the legal department, and the ESI of departing employees never preserved).

123.   This parallels Guideline 8, Illustration i, *supra*, on communicating changes in the scope of the legal hold.

124.   *E.g.*, Treppel v. Biovail Corp., 249 F.R.D. 111, 115–20 (S.D.N.Y. 2008) (noting inadequacies of mere notification to employees of a legal hold).

125.   *In re* Intel Corp. Microprocessor Antitrust Litig., 258 F.R.D. 280, 282–85 (D. Del. 2008).

126.   Zubulake v. UBS Warburg, 229 F.R.D. 422, 432 (S.D.N.Y. 2004) (emphasis in original).

every employee will require hands-on supervision from an attorney[. But] attorney oversight of the process, including the ability to review, sample, or spot-check the collection efforts is important."[127]

However, in most cases, a careful combination of notification as described above, collection, and individual action should enable parties to rely on the good-faith actions of their employees. For example, in *Concord Boat Corp. v. Brunswick Corp.*, the court held that "[t]he fact that Defendant allowed individual employees to use discretion whether to retain e-mail is simply not indicative of bad faith." This is consistent with Principle 6 of *The Sedona Principles, Third Edition*: "Responding parties are best situated to evaluate the procedures, methodologies, and technologies appropriate for preserving and producing their own electronically stored information."[128]

**Guideline 11:** **Any legal hold process should include provisions for releasing the hold upon the termination of the duty to preserve, so that the organization can resume adherence to policies for managing information through its useful life cycle in the absence of a legal hold.**

An organization creating a legal hold process should include procedures for releasing the holds once the organization is no longer obligated to preserve the information that was subject to a legal hold. These release procedures should include a process for conducting a custodian and data cross-check, so the organization can determine whether the information to be released is subject to any other ongoing preservation obligations.

---

127. Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC, 685 F. Supp. 2d 456, 473 n.68 (S.D.N.Y. 2010).

128. *The Sedona Principles, Third Edition, supra* note 1, Principle 6, at 118.

Organizations may consider using automated software that can perform custodian, system, and data cross-checking and provide for efficient legal hold management.

When the organization is satisfied that the information is not subject to other preservation obligations, reasonable efforts should be made to provide notice that the legal hold has been terminated to the recipients of the original notice (and any modifications or updated notices) and to records management, IT, and other relevant personnel, as well as any third parties notified of their obligation to preserve. Organizations may wish to conduct periodic audits to ensure that information no longer subject to preservation obligations is not unnecessarily retained and is being appropriately disposed of in accordance with the organization's records and information management policy.[129]

**Guideline 12:  An organization should be mindful of local data protection laws and regulations when initiating a legal hold and planning a legal hold policy outside of the United States.**

Data protection laws and regulations may affect an organization's ability to implement legal hold data preservation measures. Even within the United States, a patchwork of sectoral laws and regulations may govern how data is stored, managed, accessed, or disclosed, including for preservation

---

129.  *See* The Sedona Conference, *Commentary on Information Governance, Second Edition*, 20 SEDONA CONF. J. 95, 139–42 (2019), *available at* https://thesedonaconference.org/publication/Commentary_on_Information_Governance (discussing the need to dispose of information "that no longer needs to be retained"). *See also* The Sedona Conference, *Principles and Commentary on Defensible Disposition*, 20 SEDONA CONF. J. 179 (2019), *available at* https://thesedonaconference.org/publication/Commentary_on_Defensible_Disposition.

purposes.[130] Outside the United States, this effect is amplified in countries—especially non-common law countries—where U.S.-style preservation and discovery is unknown, and stricter, more comprehensive data protection laws and regulations are in place.[131]

---

130.  Examples of U.S. federal laws that affect data management include: The Health Insurance Portability and Accountability Act of 1996 (Pub. L. 104–191) (HIPAA) and Health Information Technology for Economic and Clinical Health Act of 2009 (Pub. L. 111–5) (HITECH) (healthcare data); the Gramm-Leach Bliley Act (GLBA), also known as the Financial Services Modernization Act of 1999 (Pub. L. 106–102, 113 Stat. 1338) (financial data); and the Electronic Communications Privacy Act of 1986, 18 U.S.C. § 2510–22 (ECPA) (electronic communications). At the state level, Massachusetts sets strict requirements for management of certain data types. *See* STANDARDS FOR THE PROTECTION OF PERSONAL INFORMATION OF RESIDENTS OF THE COMMONWEALTH, 201 C.M.R. 17.00. Moreover, case law may restrict an organization's ability to preserve privileged and personal employee data accessible from within the organization's systems. *See, e.g.,* Pure Power Boot Camp v. Warrior Fitness Boot Camp, 759 F. Supp. 2d 417 (S.D.N.Y. 2010); Stengart v. Loving Care Agency, Inc., 408 N.J. Super. 54 (App. Div. 2009), *aff'd as modified and remanded*, 201 N.J. 300 (2010).

131.  *See, e.g.,* Regulation (EU) 2016/679 of the European Parliament and of the Council of 27 April 2016 on the Protection of Natural Persons with Regard to the Processing of Personal Data and on the Free Movement of Such Data, and Repealing Directive 95/46/EC (General Data Protection Regulation), 2016 O.J. (L 119/1), *available at* https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX:32016R0679#PP3Contents [hereinafter GDPR]. The GDPR, which applies to entities established in the European Union (EU) or that offer goods or services to or monitor the behavior of data subjects in the EU, is a comprehensive data privacy law that impacts how companies can process personal data. The GDPR regulates the ability of companies to process personal data or transfer it outside the EU, especially for purposes—like litigation or investigations—that were unforeseen when data are collected or obtained. *See* GDPR, arts. 13.3, 14.4, 49.1(e). Although the GDPR allows a company to process and transfer personal data for the "establishment, exercise or defence of legal claims" in certain situations, it imposes very strict criteria for doing so. *Id.*

In the European Union (EU), for example, personal data protection is considered a fundamental human right.[132] European laws and regulations are designed to protect this right, including the protection of an individual's workplace data. These laws and regulations may prohibit or restrict an organization from "processing" such data, including retaining it *in situ* outside of a routine schedule, or copying, moving, or otherwise targeting it, including for purposes of U.S. preservation.[133] Beyond preservation, data protection laws and regulations may affect the range of activity covered by the Electronic Discovery Reference Model (EDRM) (e.g., collection, processing, analysis, review, and production), because transferring and disclosing personal data outside of the EU (and certain other approved countries with similar protections) is also restricted or prohibited.[134]

"Personal data" is defined broadly to include information from which an individual can be identified, directly or indirectly, including, for example, email and Internet Protocol (IP) addresses.[135] Heightened protection is afforded to classes of

---

132. *See, e.g.*, GDPR, *supra* note 131, at Recital 1. Effective May 25, 2018, the GDPR replaced Directive 95/46/EC of the European Parliament and of the Council of 24 October 1995 on the Protection of Individuals with Regard to the Processing of Personal Data and on the Free Movement of Such Data, 1995 O.J. (L 281), *available at* https://eur-lex.europa.eu/legal-content/EN/ALL/?uri=CELEX:31995L0046 [hereinafter EU Data Protection Directive].

133. "Processing" is defined as "any operation or set of operations which is performed on personal data or on sets of personal data, whether or not by automated means, such as collection, recording, organisation, structuring, storage, adaptation or alteration, retrieval, consultation, use, disclosure by transmission, dissemination or otherwise making available, alignment or combination, restriction, erasure or destruction." GDPR, *supra* note 131, at art. 4(2).

134. *See generally* GDPR, *supra* note 131, at ch. V.

135. "Personal data" is defined as "any information relating to an identified or identifiable natural person ('data subject'); an identifiable natural person is one who can be identified, directly or indirectly, in particular by reference

sensitive personal data, including some information that may be found in Human Resource (HR) records.[136] Moreover, U.S.-style general waivers or consent may be deemed invalid in the employer/employee context.[137] The General Data Protection Regulation (GDPR) includes a range of penalties for violations, up to the higher of €20 million or 4 percent of total worldwide annual turnover (i.e., gross revenue) for the preceding year.[138]

Many countries outside the EU have data protection laws and regulations in place that may similarly restrict or prohibit U.S. preservation and discovery activity.[139] In addition to data

---

to an identifier such as a name, an identification number, location data, an online identifier or to one or more factors specific to the physical, physiological, genetic, mental, economic, cultural or social identity of that natural person." GDPR, *supra* note 131, at art. 4(1).

136.   Sensitive data is personal data that reveals "racial or ethnic origin, political opinions, religious or philosophical beliefs, or trade union membership" and also includes "genetic data, biometric data for the purpose of uniquely identifying a natural person, data concerning health or data concerning a natural person's sex life or sexual orientation." GDPR, *supra* note 131, at art. 9.

137.   *See, e.g.,* Art. 29 Data Protection Working Party, *Guidelines on Consent Under Regulation 2016/679,* WP 259 (Adopted Nov. 28, 2017, revised and adopted Apr. 10, 2018), http://ec.europa.eu/newsroom/article29/document.cfm?action=display&doc_id=51030. Although WP 29 ceased operations when the GDPR became effective in May 2018, its opinions continue to be authoritative. Indeed, the date the GDPR became effective, the European Data Protection Board (EDPB), which took over the functions of WP 29, issued Guidelines on the transfer of personal data that expressly endorsed WP 259. EDPB, *Guidelines 2/2018 on Derogations of Article 49 Under Regulation 2016/679,* https://edpb.europa.eu/our-work-tools/our-documents/guidelines/guidelines-22018-derogations-article-49-under-regulation_en.

138.   GDPR, *supra* note 131, at art. 83.

139.   For a general overview and "heat map" of global data protection laws, *see* DLA Piper, *Data Protection Laws of the World, available at* https://www.dlapiperdataprotection.com/index.html#handbook/world-map-section (last visited Nov. 6, 2018).

protection laws, other laws that may affect an organization's ability to preserve data and implement a legal hold include local privacy laws, labor laws, laws designed to protect national sovereignty interests, "blocking statutes," telecom laws, and other industry-specific and sectoral laws.[140] Parties should consider the effect, if any, that these laws may have on their U.S. discovery obligations, including preservation.

To minimize conflicts between data protection laws and other laws limiting an organization's ability to manage data for U.S. preservation and discovery processes, an organization may implement checks and safeguards as outlined in several Sedona Conference publications, including the *International Principles on Discovery, Disclosure & Data Protection in Civil Litigation*;[141] *International Principles for Addressing Data Protection in Cross-Border Government & Internal Investigations: Principles, Commentary & Best Practices*;[142] and *Practical In-House Approaches for Cross-Border Discovery & Data Protection*.[143] Such measures may include taking a tiered approach to preservation in the United States and elsewhere, and limiting the scope of preservation outside the United States to data that is necessary—and unique—for the specific legal purpose. Moreover, organizations should ensure

---

140. *See generally* The Sedona Conference, *International Principles on Discovery, Disclosure & Data Protection in Civil Litigation (Transitional Edition)*, THE SEDONA CONFERENCE (Jan. 2017), https://thesedonaconference.org/publication/International_Litigation_Principles.

141. *Id.*

142. The Sedona Conference, *International Principles for Addressing Data Protection in Cross-Border Government & Internal Investigations: Principles, Commentary & Best Practices*, 19 SEDONA CONF. J. 557 (2018).

143. The Sedona Conference, *Practical In-House Approaches for Cross-Border Discovery & Data Protection: Principles, Commentary & Best Practices*, 17 SEDONA CONF. J. 397 (2016); *see also* Taylor Hoffman and James Sherer, *Cross-Border Legal Holds: Challenges and Best Practices*, PRAC. L. J., at 28–37 (Oct/Nov. 2017).

timely legal hold releases, i.e., hold the information only for the duration that it is necessary to undertake preservation efforts.[144]

## ILLUSTRATION

*Illustration i:* Multinational Corporation ("MNC") is sued in U.S. Federal Court by a former employee alleging discrimination based on gender, religion, national origin, and a disability. Plaintiff's supervisors were based in France and Canada, and plaintiff was seconded by affiliated entities in both countries during her employment. Assessing its U.S. preservation duties pursuant to its global legal hold program, MNC preserves data specifically related to the plaintiff from plaintiff's supervisors, including communications with and about the plaintiff. MNC does not extend preservation further up the chain of command or to entire departments where plaintiff worked outside the United States. MNC documents steps taken to comply with U.S. preservation obligations and with local data protection and other relevant laws, and outlines preservation scope in the Rule 26(f) conference. MNC's actions should be an appropriate means to mitigate the potential conflict between non-U.S. data protection regulations and U.S. data preservation obligations.

---

144.   *See* GDPR, *supra* note 131, at Recital 39.