**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

1

2

3  _____

4  IN RE:  VALSARTAN PRODUCTS                 CIVIL ACTION NUMBER:
   LIABILITY LITIGATION

5                                             **19-md-02875-RBK-KMW**

6  _____           **STATUS CONFERENCE**
                                              **VIA REMOTE ZOOM**
7                                             **VIDEOCONFERENCE**

8       Mitchell H. Cohen Building & U.S. Courthouse
        4th & Cooper Streets
9       Camden, New Jersey  08101
        May 12, 2021
10      Commencing at 4:00 p.m.

11  **B E F O R E:**                    **SPECIAL MASTER THE HONORABLE**
                                        **THOMAS I. VANASKIE**
12
**A P P E A R A N C E S:**

13      MAZIE SLATER KATZ & FREEMAN, LLC
        BY:  ADAM M. SLATER, ESQUIRE
14      103 Eisenhower Parkway
        Roseland, New Jersey  07068
15      For the Plaintiffs

16      KIRTLAND & PACKARD, LLP
        BY:  BEHRAM V. PAREKH, ESQUIRE
17      1638 South Pacific Coast Highway
        Redondo Beach, California  90277
18      For the Plaintiffs

19      GOLDENBERG LAW, LLC
        BY:  MARLENE J. GOLDENBERG, ESQUIRE
20      800 Lasalle Avenue, Suite 2150
        Minneapolis, Minnesota  55402
21      For the Plaintiffs

22
              Camille Pedano, Official Court Reporter
23                   camillepedano@gmail.com
                       609-774-1494
24
     Proceedings recorded by mechanical stenography; transcript
25         produced by computer-aided transcription.

```
 1    A P P E A R A N C E S (Continued):

 2         KANNER & WHITELEY, LLC
           BY:  DAVID J. STANOCH, ESQUIRE
 3         701 Camp Street
           New Orleans, Louisiana  70130
 4         For the Plaintiffs

 5         LEVIN PAPANTONIO THOMAS MITCHELL RAFFERTY PROCTOR, P.A.
           BY:  DANIEL A. NIGH, ESQUIRE
 6         316 S. Baylen, Suite 600
           Pensacola, Florida 32502
 7         For the Plaintiffs

 8         DUANE MORRIS, LLP
           BY:  JESSICA PRISELAC, ESQUIRE
 9         30 South 17th Street
           Philadelphia, Pennsylvania  19103
10         For the Defendants, Prinston Pharmaceuticals,
           Solco Healthcare U.S. LLC, and
11         Zhejiang Huahai Pharmaceuticals Ltd.

12         GREENBERG TRAURIG, LLP
           BY:  VICTORIA DAVIS LOCKARD, ESQUIRE
13         3333 Piedmont Road, NE, Suite 2500
           Atlanta, Georgia  30305
14         For the Defendants, Teva Pharmaceutical Industries Ltd.,
           Teva Pharmaceuticals USA, Inc., Actavis LLC,
15         and Actavis Pharma, Inc.

16         CIPRIANI & WERNER, P.C.
           BY:  JILL FERTEL, ESQUIRE
17         450 Sentry Parkway
           Blue Bell, Pennsylvania  19422
18                   And
           MORGAN LEWIS & BOCKIUS, LLP
19         BY:  JOHN P. LAVELLE, JR.
           502 Carnegie Center
20         Princeton, New Jersey  08540
           For the Defendants, Aurolife Pharma LLC
21         and Aurobindo Pharma USA, Inc.

22         HILL WALLACK, LLP
           BY:  ERIC I. ABRAHAM, ESQUIRE
23             NAKUL Y. SHAH, ESQUIRE
           21 Roszel Road
24         Princeton, New Jersey 08540
           Attorney for Defendants, Hetero Drugs and Hetero Labs

25
```

1    **ALSO PRESENT:**

2        LORETTA SMITH, ESQUIRE
         Judicial Law Clerk to The Honorable Robert B. Kugler
3
         Larry MacStravic, Courtroom Deputy
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1            (PROCEEDINGS held remotely via Zoom videoconference

 2   before Special Master The Honorable Thomas I. Vanaskie at 4:00

 3   p.m.)

 4            JUDGE VANASKIE:  We will get started.  I'm wanting to

 5   see who's going to be speaking on behalf of plaintiffs.  I

 6   don't see Mr. Slater here yet.

 7            MS. GOLDENBERG:  Your Honor, I can probably take it on

 8   if he's not here yet.  There will be a variety of us speaking

 9   on different issues as usual.

10            JUDGE VANASKIE:  All right.  We will wait until we

11   have everybody on.  I did want to say, just to give you a heads

12   up, Ms. Goldenberg, that I will take up last the motion to

13   strike Aurobindo's defenses.

14            MS. GOLDENBERG:  Then I'll wait in the background.

15            JUDGE VANASKIE:  All right.  We will get started.  I

16   see Mr. Slater is now present.

17            MR. SLATER:  Hello, Your Honor.

18            JUDGE VANASKIE:  Hello.  Mr. Goldberg won't be with us

19   this afternoon, that's my understanding.

20            I did want to remind you to please mute your mics

21   unless you're speaking.  And when you are speaking, especially

22   if you're not on the screen, please identify yourself so

23   Camille can accurately record who is speaking for the

24   transcript.

25            We're going to follow the order of -- the agenda
```

1  today, we'll follow the order of Mr. Goldberg's letter of

2  yesterday.

3       I did receive an email from Mr. Goldberg where he

4  asked that ZHP be permitted to address today the question of

5  the timing of the additional discovery that was directed in

6  Special Master Order Number 20, and we will -- I told him I

7  will keep an open mind with respect to that and we will address

8  that in due course this afternoon.

9       Now, I did say we'd follow Mr. Goldberg's letter in

10 terms of the order of things in the agenda, but at the outset I

11 did want to repeat that with respect to the first item, that is

12 the plaintiffs' motion to strike Aurobindo's defenses, I will

13 take that up at the end or last today.  That may take a little

14 bit of time.

15      The first item, though, I have on the agenda concerns

16 Aurobindo's privilege log.  And who will be addressing this on

17 behalf of Aurobindo?

18      MS. FERTEL:  Good afternoon, Your Honor.  Jill Fertel

19 on behalf of Aurobindo.  I will be addressing any concerns with

20 regard to the privilege log.

21      JUDGE VANASKIE:  All right.  And is it Marlene, Ms.

22 Goldenberg, are you addressing this?

23      MS. GOLDENBERG:  I am, Your Honor, yes.

24      JUDGE VANASKIE:  Where do we stand with respect to

25 this matter?  The request I have is that there is, essentially,

 1  a request that defer consideration of this so that you can all

 2  have a more robust meet and confer.

 3       What is your position, Ms. Goldenberg?

 4       MS. GOLDENBERG:  Your Honor, we've now had that meet

 5  and confer and I'll distill this down to a really simple issue.

 6  This privilege log has gone from 3,500, roughly, entries down

 7  to a little bit less than a thousand, and my colleague, Andrew

 8  Obergfell, who wasn't available today, was on the meet and

 9  confer, but what he has conveyed to me is that there are now

10  only 32 entries on the log that have any attorney on them at

11  all.  Everything else doesn't have an attorney on it.  It

12  involves issues ranging from things that we think are just

13  flat-out relevant to things that are regulatory communications.

14  And our position is that based on Judge Schneider's opinion in

15  the *In Re Riddell* case, unless this was something prepared

16  expressly for litigation, it's not protected by privilege and

17  it should be disclosed.

18       JUDGE VANASKIE:  All right.  Let's hear Aurobindo's

19  position.

20       MS. FERTEL:  Thank you, Your Honor.

21       And, unfortunately, there was not a meet and confer

22  that occurred yesterday.  We did have one planned for 4:30 p.m.

23  Shortly before our meet and confer was scheduled, I did hear

24  from Andrew, who has been handling this, indicating that they

25  wish for us to disclose or de-designate all but 32 items and if

1  we're not willing to do that, then there was -- my

2  understanding was that he felt that there was no reason to have

3  a meet and confer yesterday.

4       I do believe that we can make some additional

5  progress.  I have -- as counsel has indicated, there were

6  numerous items that were initially withheld that were disclosed

7  voluntarily by Aurobindo during the course of our review.  We

8  are continuing to go through all of the documents that have

9  been withheld, and, frankly, I'd break it into two different

10 categories with regards to attorney-client privilege and work

11 product.

12      It's been the position of plaintiffs' counsel that

13 only communications where the sender is either -- is an

14 attorney or the recipient is an attorney that that's a

15 privileged communication.  As we've tried to explain, and I'm

16 hoping that we can have a thorough conversation to better delve

17 this out, many of these communications are communications where

18 the topmost email does not have a sender that is an attorney

19 but additional portions of the email, if not a majority of the

20 email chain, are correspondence from attorneys.

21      Additionally, we have provided an updated cast of

22 characters which name several different attorneys which I'm

23 hoping better provides an example of some of these

24 communications and some of the relevant players.

25      Additionally, there are documents on the privilege log

1    that are not emails.  So there's no identification of a sender

2    or recipient on those documents but these documents, as

3    indicated in the privilege log themselves, are documents that

4    were drafted specifically by an attorney and are privileged and

5    confidential documents drafted by an attorney.

6         Beyond that, with regards to work product, I've had

7    this conversation, and I'm hoping that we can further, again,

8    develop this, it's been plaintiffs' position that work product

9    is something solely that involves an attorney communication.

10   It's our position that the law expressly says that's not the

11   case.

12        We have numerous documents that were prepared solely

13   in response to or preparation for imminent or ongoing

14   litigation that we're withholding.

15        That being said, as I've indicated, we have, despite

16   our inability to have a thorough meet and conferral with

17   plaintiffs, we continue to review.  And I point out that of the

18   I think it's 856 documents on that privilege list, over 200 of

19   them are documents that were produced but were produced with

20   redactions.  I've been going over to see if there are

21   additional documents that we can produce either in part or with

22   redactions and I found a fair amount of additional documents

23   that we're preparing for another overlay production to do that.

24        All I'm asking is for a good-faith meet and conferral

25   where both parties can at least try to come to a mutual

1  understanding in order to resolve that without bringing this

2  issue again to the Court without an opportunity to see if we

3  can really hash things out.  We are interested in trying to

4  resolve this without bringing this back yet again.

5          JUDGE VANASKIE:  All right.  Ms. Goldenberg?

6          MS. GOLDENBERG:  Your Honor, I guess all I can say is

7  Aurobindo's had multiple chances to issue a privilege log that

8  shows what they think it shows and we're on, I think, round two

9  or three now and if their position is we're going to continue

10  to de-designate things, I guess this dovetails into our motion

11  later, which is, this should have been done sooner and I'm not

12  really sure why we have to continue to wait for them to produce

13  documents that aren't privileged.  But at this point, we can

14  only go off the information that's on the log and what we can

15  see is that there are attorneys on 32 entries and on no others.

16  So, you know, our request is that the rest have to be produced.

17          If the Court feels that there needs to be some other

18  process in place, we would ask for an *in camera* review of any

19  documents Aurobindo isn't willing to produce from here.

20          JUDGE VANASKIE:  Has the privilege log been presented

21  to me?

22          MS. GOLDENBERG:  I believe that a prior iteration has

23  been.  I don't know that this one was just because the

24  documents were going back and forth so late that I -- it was

25  not submitted with this agenda letter.

```
 1          JUDGE VANASKIE:  All right.

 2          MS. GOLDENBERG:  We'll be happy to provide it, though.

 3          JUDGE VANASKIE:  I'm just -- yes, I have one I guess

 4   from March 5th that was provided to me.

 5          MS. GOLDENBERG:  Yeah, it's been updated a few times

 6   by Aurobindo since then.  And if you'd like, we'd be happy to

 7   provide you the most up-to-date one that we received I believe

 8   it was earlier this week, but Ms. Fertel can correct me if I've

 9   got my dates mixed up.

10          MS. FERTEL:  The most recent -- I'm sorry.

11          JUDGE VANASKIE:  Go ahead.

12          MS. FERTEL:  The most recent privilege log was

13   provided on Sunday.  I believe actually there was one update

14   last night.  There had been additional productions on May 2nd,

15   May 3rd and May 6.  So as discovery had been ongoing and

16   additional documents have been produced, additional review has

17   necessarily been conducted of any document that's been

18   withheld.

19          JUDGE VANASKIE:  All right.  Now, different numbers

20   have been thrown around here in terms of how many documents are

21   on the privilege log.  The one I'm looking at right now has

22   only 56 or 57 documents on it.

23          MS. GOLDENBERG:  It swelled at one point to about

24   3,500 and I think Ms. Fertel said the current number is 856.

25          MS. FERTEL:  859.  I misspoke.
```

1          JUDGE VANASKIE:  So I don't even have a current

2    privilege log to look to.  So it seems to -- go ahead.  I'm

3    sorry.

4          MS. FERTEL:  I apologize.

5          My proposal would be, and, honestly, the conversation

6    that I would have with counsel, were we able to develop this

7    further, is, I'm happy to break down the exact categories and

8    try and better elaborate because I think the issue is there's

9    only so much that we can disclose on a privilege log without

10   going into territory of privileged communications, but there

11   are basically categories of documents that we are going to

12   remain insistent on withholding.

13         Right now there are -- there's correspondence between

14   attorneys, whether they are on the topmost email or throughout

15   the course of an email that's been withheld, there are

16   documents that are created by attorneys.

17         Additionally, we had the documents and drafts created

18   by consultants, which is a matter that's been fully briefed

19   before the Court but we are awaiting the Court's decision.  And

20   then there are documents that are work product that we have

21   withheld as they were prepared for the purpose of advancing or

22   responding to litigation.

23         JUDGE VANASKIE:  Well, it seems to me premature for me

24   to do anything right now.  I don't even have a privilege log

25   against which to assess the assertion of either work product

1    protection or attorney-client privilege.

2          I would ask that -- I know it can be frustrating but I

3    would ask that you again meet and confer.  The fact that an

4    attorney is not on a particular document or even involved in a

5    particular communication wouldn't necessarily foreclose the

6    document from being protected under either work product or

7    attorney-client privilege.  So that's not enough.

8          Now, perhaps, Ms. Goldenberg, what you're all saying

9    to me is that the log is inadequate and you're asking for a new

10   log.  I certainly have seen that enough times.  Is that what

11   you're suggesting?

12         MS. GOLDENBERG:  Well, I think, Your Honor, if the

13   assertion that's coming from Aurobindo is that there's more to

14   this than meets the eye, we can't assess it unless it's there.

15   So our assessment is based on the log that they have given us

16   and, you know, we would really like to put this issue to rest.

17   So if that's what you'd like us to do, we're happy to meet and

18   confer again, but we'd like it to be based on a log that

19   actually, you know, lays out all the reasons why they think

20   these claims are legitimate.

21         JUDGE VANASKIE:  From the Aurobindo's side, can that

22   be done?

23         MS. FERTEL:  I'd certainly be willing to do that.  I'm

24   just hopeful that we can have the meet and conferral with that

25   basis.  I am happy to speak and try and resolve that.  I do

1  think that if we are able to have a good-faith conversation, we

2  can at least reduce some of the issues.  But if it is

3  plaintiffs' position that only correspondence that names an

4  attorney, which was what was articulated most recently to me

5  yesterday, then that's the only issue that I think just cannot

6  be resolved as a matter of principle and a matter of law.

7      JUDGE VANASKIE:  Well, I think I've indicated that the

8  presence of an attorney's name in the communication is not

9  necessarily essential for it to be protected.  So if that's

10  plaintiffs' position, I think that they're being told that

11  that's not necessarily the case.  So that shouldn't be the

12  beginning and the end of the discussion.  The fact that an

13  attorney is not -- attorney's name doesn't appear on a document

14  wouldn't necessarily foreclose it being protected, and I would

15  expect that you could explore why the document has been

16  withheld in this meet-and-conferral process.

17      Now, I know there are a lot, 859 documents, that's a

18  lot to talk about.  Perhaps it can be handled by categories.

19  But the number I had earlier was 3,479 documents, so at least

20  we're getting smaller.

21      I'm going to direct that you meet and confer and we'll

22  address this matter at our next conference.  All right?

23      MS. GOLDENBERG:  Understood, Your Honor.

24      And could we set a deadline for Aurobindo to produce

25  their updated log by, say, Friday?

1          JUDGE VANASKIE:  Well, let me ask Aurobindo, can you

2    do it by Friday?

3          MS. FERTEL:  I'm not sure by Friday, given the time of

4    day.  I can perhaps say by Sunday.  I'm just trying to work

5    with the amount of time.  I know that from my end I can be done

6    in advance of that timeline but I -- I am concerned of making

7    sure that I get all of the information from my vendor by that

8    time.

9          JUDGE VANASKIE:  We'll give you until Monday --

10         MS. FERTEL:  Thank you, Your Honor.

11         JUDGE VANASKIE:  -- in order to get that done.  All

12   right?

13         MS. FERTEL:  Thank you.

14         JUDGE VANASKIE:  All right.  The next item I have on

15   the agenda deals with ZHP discovery issues.  And why don't we

16   address, first, this question of the additional productions

17   that are to be made as directed by the order issued earlier

18   this week, Special Master Order 20.  I'm losing my voice.

19         I had -- we're dealing now just with the timing.

20   Plaintiffs had asked for production within two weeks of the

21   letter they sent to me on May 7th, so I did provide for

22   production by May 21st.  And other documents to be produced

23   within five days, I think I made that production due May 17th.

24   ZHP has indicated that's impossible to accomplish.

25         Has there been any further discussion about what would

1  be a reasonable period of time within which to have these

2  productions made?

3          MS. PRISELAC:  Your Honor, this is --

4          JUDGE VANASKIE:  Go ahead, Ms. Priselac.

5          MS. PRISELAC:  Thank you, Your Honor.  This is Jessica

6  Priselac for the ZHP parties.

7          We haven't had any further discussion.  But just to

8  give Your Honor the backdrop of this is that the first step we

9  have to go through in order to complete this production,

10  because I don't think the plaintiffs want our clients engaging

11 in self-collection, and our clients have never engaged in

12 self-collection in this process, is to get our ESI vendor out

13 to the physical site and try to collect these documents.

14         The plaintiffs well know, and I'm glad to see Mr.

15 Parekh is on the phone, we've been in constant touch with them

16 about various aspects of the discovery process throughout this

17 litigation.  And they're aware that our clients not only keep

18 electronic data but also keep a large volume of hardcopy data

19 that pursuant to the ESI protocol must be scanned and have

20 metadata manually entered in for each piece of paper that's

21 collected, and that's the ESI protocol they insisted on.

22         In addition to that, there are over a thousand

23 versions of search terms that have to be applied to electronic

24 data.

25         So before we can even talk about a timeframe, what's

1  necessary for our client is to be able to collect all of the

2  data that they've requested, have it processed, have the search

3  terms and all of the other aspects of the ESI protocol applied

4  so that we get a set of documents that's the review set.  And

5  once I have a number on the review set, I can certainly

6  extrapolate a timeline.  But our vendor is not even able to go

7  to the site in China until next week.  And so we hope to have

8  the collection done by the end of next week.  But at that --

9  you know, one thing we -- we're happy to provide Your Honor,

10  for example, is an update every week of exactly where this

11  process stands, but at this point it would be irresponsible of

12  me to even try to project a timeline, having absolutely no

13  information about the volume of data that we're talking about.

14  And the only way we would have possibly been able to do that,

15  Your Honor, is if our clients were engaging in self-collection,

16  which they're not.

17          JUDGE VANASKIE:  All right.  Who will be addressing

18  this for plaintiffs?

19          MR. SLATER:  I will, Your Honor, Adam Slater.

20          JUDGE VANASKIE:  All right, Mr. Slater.

21          MR. SLATER:  Thank you.

22          Your Honor, from our perspective, notwithstanding

23  defense counsel's concerns, we think that the deadlines we

24  requested were reasonable.  I looked at the letter that ZHP

25  sent in terms of why they think this should take so much

1  longer, and we don't -- remember, they're not even giving you

2  an outside date.  They're saying it's going to take as long as

3  it's going to take and I don't think at this stage of the

4  litigation that's really a good working model.

5         I looked at some of the things they said they have to

6  do.  They said they have to do interviews with these

7  custodians.  I don't know why these interviews haven't happened

8  already.  There's a -- there's a template I'm sure they follow,

9  they know what they need to ask, so I'm not sure why these new

10 custodians haven't been interviewed.

11        They said they need to thread the emails.  The

12 threading's for their benefit, not ours.  So don't thread the

13 emails.  That doesn't need to be done.

14        They need to do a state secret and privacy revision --

15 privacy revisions.  That's for their benefit, not for ours.

16 Again, they have clawback rights.  They can certainly do some

17 sort of prophylactic scanning of certain terminology to

18 determine whether they want to review certain documents more

19 fulsomely.

20        And then the responsiveness and privilege reviews,

21 again, there's privilege filters that can be used.  They have

22 clawback rights.

23        So a lot of these things that they're saying are going

24 to be the most time consuming don't really need to happen or

25 can happen in a much more streamlined fashion.  Because we're

1    not actually in a position to discuss a deadline that's being

2    suggested by ZHP, again, it's very, very hard for us to say,

3    fine, don't impose these deadlines because, from our

4    perspective, that can go on forever, and we, obviously, need to

5    bring these things to an end.  And I would say if Your Honor

6    has any inclination to extend any time, I think we should

7    probably figure out certain priorities and certain things that

8    won't take as long as opposed to doing it all in one shot with

9    everything being extended.  You know, perhaps there's a couple

10   of these custodians that can take a little bit longer to get to

11   us and maybe prioritize a custodian and prioritize some of

12   these other documents and information, again, things which I

13   would think they already would have these answers.

14           MS. PRISELAC:  Your Honor --

15           MR. SLATER:  I don't really understand why it almost

16   sounds like the process is just beginning.  For example, what

17   happened with the broken computers from Min Li and Eric Gu?

18   I'm just picking an example off the list.  I don't really see

19   why that's going to take so long.  Their list of what their

20   hold procedures were, who they collected from and when, et

21   cetera, that's in documents that have to exist already.

22           So I'm not exhausting my arguments in the sense of

23   going through every item because I don't think anyone wants me

24   to do that, but I think that there has to be a much more

25   reasoned approach than just saying we need a long time and we

1    don't know how long it's going to take and we're going to give

2    you weekly updates until the cows come home, basically, without

3    any endpoint.

4            JUDGE VANASKIE:  Ms. Priselac.

5            MS. PRISELAC:  Your Honor, if I can just add, you

6    know, I went back and confirmed with my vendor, the document

7    that started this whole set of new requests from the plaintiffs

8    was actually produced to them on September 15th, 2020, almost

9    eight months ago.  In those eight months, and I'm glad Mr.

10   Parekh is on the phone, they have asked for multiple additional

11   custodians, multiple additional documents, and we have

12   voluntarily produced a vast majority of their requests.  So for

13   them to sit on this document for eight months and spring these

14   requests on us now and then put us in a position that will

15   prejudice my client seriously, when all it is trying to do is

16   adhere to the best practices in ESI, is absolutely unfair in

17   this circumstance.

18           MR. SLATER:  Can I just address that in 30 seconds,

19   Your Honor?

20           JUDGE VANASKIE:  Yes.

21           MR. SLATER:  Because this has been stated a couple

22   times and it's, from our side of the V, the plaintiffs' side,

23   it's been really an eye-opener that ZHP's counsel is saying,

24   well, this document you've had for however long, so why are you

25   coming after us now, and I just want to make clear for the

1    record, the document in question is a copy of an email in

2    Chinese that was specific to Min Li and wasn't included in

3    anyone else's custodial file.  It was found when we prepared

4    for that deposition.  Nobody held it back.  I think that for

5    ZHP to take an aggressive stance on this is very distressing

6    because this is the document that in unequivocal terms points

7    out that ZHP already knew there was NDMA in Valsartan going

8    back at least to July 2017.  And what ZHP's United States

9    counsel should be doing, from our perspective, is a massive

10   fire drill to figure out how could this happen where it's not

11   found in duplicate custodian files, where the report that was

12   written in connection with that can't be found, et cetera.

13          So I just wanted to say it's a little hard for us to

14   really swallow the idea that this is somehow our fault when

15   we're doing what we're supposed to do and this is a significant

16   document which contradicts everything ZHP has told this Court

17   and the world regulatory authorities throughout this process

18   and all their customers, and it's something they're going to

19   have to deal with in the upcoming weeks and months.

20          MS. PRISELAC:  Your Honor, obviously, we -- we,

21   obviously, disagree with the characterization of that document.

22   And to put it in the black-and-white terms that Mr. Slater puts

23   it is just not true on the face of the document.  It doesn't

24   prove all of the things that he's claiming it proves.

25          What it proves is that there was a project about a

1  totally different drug, irbesartan, and one employee made a

2  side comment that is being misconstrued by Mr. Slater.  As a

3  result of their requests, we are going back and doing a full

4  collection related to what they've asked for now, which they

5  didn't ask for before, which is related to the specific

6  irbesartan, not valsartan, project.  So it's not even as if

7  these documents are some way deficient from the old requests.

8  This is a totally new request, a different line of questioning.

9        And, quite frankly, in order to debunk this conspiracy

10  theory that Mr. Slater has created, our client is willing to go

11  back and voluntarily collect this.  But especially given the

12  fact that Mr. Slater has already implied that our eDiscovery

13  efforts are somehow lacking, we absolutely need to be able to

14  make sure that the vendor is -- has the time to do a

15  comprehensive collection, that the ESI protocol is followed to

16  a T, which we have done throughout this litigation, and that

17  just takes time.

18        JUDGE VANASKIE:  What I'm not inclined to do is to

19  provide -- provide for an open-ended period of discovery.  I

20  regarded this as supplemental discovery.  Maybe I was wrong to

21  look at it in that simplistic term, since you added new

22  custodians, new search terms, et cetera.

23        I am sympathetic to the information that's been

24  provided to me that explains the complexity of the production.

25  I will grant additional time to provide the additional ESI, the

```
 1  additional documents that you've agreed to produce, but I'm
 2  going to put a deadline on it.  I'm going to put a deadline on
 3  it of June 4th.  That gives you an additional two weeks beyond
 4  the deadline that had been established, but I don't want weekly
 5  updates to say we're making progress.  I want that to be a
 6  hard-stop deadline, and I haven't heard anything that tells me
 7  that's not possible.  I did hear -- I did hear information that
 8  indicated to me that it would not be possible to accomplish it
 9  by May 21st, the original deadline.  I'm now giving you two
10  additional weeks, but it has to be completed by then.
11          MS. PRISELAC:  Your Honor --
12          JUDGE VANASKIE:  Go ahead, Ms. Priselac.
13          MS. PRISELAC:  -- I would just request that, you
14  know -- this is an incredibly serious issue for my client who
15  has spent millions of dollars to follow this, to be
16  transparent, to provide the fullest amount of metadata, to
17  adhere to the best practices of eDiscovery, and it has done so
18  throughout this litigation and that's why there aren't multiple
19  issues going on in ZHP in terms of discovery at every agenda --
20  at every one of these conferences.  This is very new.  And I am
21  more than happy to have our consultant, FTI Consulting, report
22  to Your Honor about all of the technical issues, most of which
23  are because of -- you know, Mr. Parekh is silent, but I would
24  love to hear from Mr. Parekh if he actually thinks that the
25  over 1,000 terms that they have required us to apply to these
```

1    documents can be applied to a set of data and then reviewed for

2    privilege and responsiveness in a week's time.

3            MR. SLATER:  We don't need to ask for Mr. Parekh to

4    address it.  I think that, you know --

5            JUDGE VANASKIE:  Well, it's more than a week's time

6    now from the point --

7            MS. PRISELAC:  Well, if you think about -- well, Your

8    Honor, it will be collected next week.

9            JUDGE VANASKIE:  Please don't interrupt me.  Please

10   don't interrupt me.

11           You had agreed that you would make this production

12   prior to the order being issued in this matter.  That had been

13   agreed.  The order was intended to memorialize and put into

14   effect in the form of an order that which had been agreed to.

15   Now, you hadn't agreed to do it within two weeks, the point in

16   time which the plaintiffs had asked for.  I'm now giving you an

17   additional two weeks beyond that, so you have until June 4th.

18   I think that's adequate time, under these circumstances, for

19   that to be completed.

20           Now, that's -- I mean, as far as I'm concerned, that's

21   it.  I haven't heard enough to tell me that that's being

22   unreasonable.  It's not a week's time.  It's four weeks' time

23   from when you agreed to produce them.

24           MS. PRISELAC:  Your Honor, if I could be clear about

25   the timeline, and I think we put it in our letter, we were not

1  able -- you know, we don't have a captive ESI vendor and our

2  client was closed, and most of China was closed, last week.  We

3  were able to schedule them to go to the site in China next

4  week.  So that begins May 17th.  That's a document collection

5  that they think will probably take that entire week.  Then they

6  go back to Shanghai, process the data, add all of the search

7  terms.  That takes another week.  Then the actual review of the

8  documents has to take place by attorneys, bilingual attorneys,

9  you know, and I don't even have a set of -- I don't have a

10 volume to know how long that review will take.  But in best

11 case scenario what the schedule you've just proposed is that

12 that would -- that could all be done by attorneys, an entire

13 review, within two weeks.

14        Now, I hope the data is so small that that's possible,

15 but I just want to make sure that we are clear about the timing

16 here because if I do have to come back to Your Honor in two

17 weeks and describe to you why, you know, we are, you know, only

18 this part of the way done with the review rather than having it

19 complete, I -- I don't want Your Honor to be surprised that

20 we're -- we might have to come back and make that request.

21        Now, obviously, we're totally interested in complying

22 with Your Honor's order and we'll do everything we can, but,

23 you know, we're happy to try to prioritize certain items and

24 certainly would do a rolling production; but I don't see any

25 way we could commit to being able to produce all of those

```
 1   documents under the current circumstances.

 2         JUDGE VANASKIE:  All right.  And you're making a

 3   compelling case.  And Mr. Slater had mentioned perhaps

 4   prioritizing production by custodian or some other manner.  I

 5   guess I'm asking you to use your best efforts to have it

 6   completed by June 4th.

 7         MS. PRISELAC:  Absolutely, Your Honor.

 8         JUDGE VANASKIE:  But if it cannot be done and you show

 9   me that best efforts have been used and what has been

10   accomplished, then you can ask for additional time.

11         MS. PRISELAC:  Thank you, Your Honor.

12         JUDGE VANASKIE:  But I do expect there to be

13   substantial progress and I want you to consider, to the extent

14   that you can, doing a rolling production or getting something

15   into plaintiffs' hands.

16         MS. PRISELAC:  Absolutely, Your Honor.

17         JUDGE VANASKIE:  All right.

18         MS. PRISELAC:  Thank you, Your Honor.

19         JUDGE VANASKIE:  All right.  Thank you.

20         The next item I have is ZHP -- or plaintiffs' request

21   for ZHP's litigation hold letters or information regarding

22   them.

23         Mr. Slater?

24         MR. SLATER:  Yes, Your Honor.

25         I think we may have discussed this briefly, I didn't
```

1  get to it, but in light of the issues with the devices not

2  being collected, apparently, at least from the testimony it

3  didn't sound like devices were collected, in light of the fact

4  that we have no emails for Peng Dong, who was a custodian

5  predating December 12, 2017, and in light of this report that's

6  unable to be found, and the other issues you've seen in our

7  letters, at this point we believe it's reasonable to have the

8  litigation hold letters produced and, at the very least, to

9  have a -- have the documents produced to lay out for us what

10  efforts were made to comply with litigation hold obligations,

11  what devices were collected and when, when data was collected

12  and to be able to let us look at that as against the custodians

13  so we can understand what happened when, who did it, et cetera,

14  because we want to be able to have all the blanks filled in now

15  and start to bring this to some sort of conclusion.

16          JUDGE VANASKIE:  All right.  Ms. Priselac?

17          MS. PRISELAC:  Your Honor, I think I -- C and D of

18  your order, 8C and 8D, about the litigation hold letters and

19  just all this information about the actual collection, the

20  processing, are kind of -- are definitely viewed under the same

21  standard in the case law and that's that there has to be some

22  kind of evidence of misconduct or spoliation.  And at this

23  point, we don't believe that the plaintiffs have presented that

24  evidence.  And, in fact, part of the reason we're engaging in

25  this current collection is to debunk this idea that there has

1    been any type of misconduct.

2            I do not think the plaintiffs have presented Your

3    Honor with sufficient evidence of misconduct or bad faith or

4    spoliation that would warrant that.  And I think it's telling

5    that the plaintiffs did not cite one case in any of these

6    letters, any of these briefing, to tell you what the standard

7    was.  We did.  And that's because the standard is evidence of

8    misconduct and they know they don't have that.

9            Now, if we get through this entire new production and

10   they want to bring this issue back up to Your Honor and do

11   discovery on discovery, which is generally frowned upon, then I

12   think that's the time to do it; but we should be given an

13   opportunity to make this new production before those kinds of

14   rulings are made.

15           JUDGE VANASKIE:  Anything else on this issue?

16           MR. SLATER:  I'll just --

17           JUDGE VANASKIE:  Mr. Slater?

18           MR. SLATER:  -- respond.  We've presented what we've

19   learned in depositions that devices were not collected from key

20   custodians.  We have documents that can't be located, including

21   a report which is potentially very relevant to the heart of the

22   case.  There's emails that are missing from at least one

23   custodian where he worked for the company for years yet there's

24   no emails predating December of 2017.  I'm not sure what more

25   we would need to produce besides a witness telling us under

```
 1  oath, well, yeah, there are some key documents that we -- that
 2  we decided to destroy.  And, frankly, the email that we've been
 3  talking about that disclosed the contamination, we've had at
 4  least two witnesses tell us they may have -- they may have just
 5  deleted it.  So there -- I think we have a lot of showing that
 6  there's something to look at here.
 7          MS. PRISELAC:  Your Honor, I would just say that it's
 8  exactly what Mr. Slater just pointed to as his evidence is --
 9  are the bases for his current requests in this new round of
10  discovery.  So until we get to the point where that is -- where
11  those documents are produced, I don't think -- I think this is
12  premature, given the case law.
13          JUDGE VANASKIE:  All right.  I won't order at this
14  time the production of the litigation hold letters.  We'll wait
15  and see how this develops factually in terms of the devices
16  that have either been lost or not preserved.  And I understand
17  that there will be additional information provided with respect
18  to those -- to Mr. Gu's and the other person's computer,
19  cellphones that have gone missing, Dr. Min Li and Dr. Eric Gu.
20  So at this time I'm not going to direct that the litigation
21  hold letters be produced.
22          The next item I have is Maggie Kong's custodial file.
23          MR. SLATER:  Do you want me to address that first,
24  Your Honor?
25          JUDGE VANASKIE:  Yes, I suppose so, Mr. Slater; it's
```

1    your request.

2              MR. SLATER:  I'm trying to keep everything briefer

3    today because I know you have a long argument coming up as part

4    of this so I'm trying to be expeditious.

5              JUDGE VANASKIE:  I appreciate that.

6              MR. SLATER:  Maggie Kong is the chief of staff for

7    Baohua Chen, the chairman of the company.

8              JUDGE VANASKIE:  I understand that.

9              MR. SLATER:  And we've already established that he has

10   had substantive involvement with the matters that matter in

11   this case.  The defense now tells us she was the conduit

12   between attorneys and ZHP custodians, et cetera, and there are

13   no documents of that that we've been produced so far.

14             She's a central player and we think that it would make

15   sense, if there's going to be further custodial files produced,

16   to have her file produced, especially in light of the open

17   question on Baohua Chen.  If his deposition does happen, it's

18   certainly going to be helpful to have her documents as well.

19             That's our argument.  Thank you.

20             JUDGE VANASKIE:  Thank you.

21             Ms. Priselac, you say that she was the principal

22   conduit between ZHP's lawyers and Mr. Chen, I take it.  But why

23   would that make everything privileged?

24             MS. PRISELAC:  Sure, Your Honor.

25             So, it's not our -- our position that it would make

1    everything privileged.  Our position is that this becomes an

2    issue of proportionality.  The point that in -- that at least

3    Mr. Slater had made before in his letter was that her -- her

4    files were needed in order to confirm dates of certain emails.

5    At least that's the proffer they previously made.  I'm sorry,

6    the dates of certain meetings that she coordinated.  At least

7    that's the proffer they previously made.  However, Min Li, who

8    testified and who they cited in their papers, said that Ms.

9    Kong made all of these meeting arrangements by telephone.  She

10   has confirmed that she doesn't keep a hardcopy or an electronic

11   calendar.  And the production we have made to date shows that

12   ZHP is not a company that uses kind of an Outlook calendaring

13   system that we're familiar with in the United States.  And,

14   instead, the witnesses have testified that Ms. Kong coordinates

15   these meetings with the chairman by phone.

16          So, you know, collecting her custodial file isn't

17   going to get these, you know, meeting invites they say they're

18   looking for.  So that's kind of where we're coming from in

19   terms of relevant documents.

20          She's not involved in making valsartan, selling

21   valsartan, manufacturing valsartan, researching valsartan.  In

22   fact, she only came to the company in late 2017 when most of

23   the key events at issue had already taken place.

24          Now, the reason we're talking about the fact that

25   there's no general counsel's office so she's the person who

1  interacts with ZHP's outside counsel, not just in this

2  litigation but in many legal affairs, is that there's a

3  proportionality and a burden argument, Your Honor, in terms of

4  you have to weigh against the relevancy and, you know, the

5  probative value of what else is left in her file because

6  collecting her emails is necessarily going to put a burden on

7  us to log quite a few privileged documents.  And our feeling,

8  based on what we know about her job responsibilities, is that

9  it's more likely than not that documents that are responsive to

10  the search terms that the plaintiffs have insisted on would be

11  more likely than not related to communications with this

12  litigation's attorneys about this litigation, given her overall

13  job responsibility.

14      JUDGE VANASKIE:  I don't have a sense for how

15  extensive the collection is.  You're making a proportionality

16  argument but I'm having difficulty determining what the burden

17  would be.

18      MS. PRISELAC:  Well, you know, Your Honor, for

19  example, if we did it -- you know, the way we've been

20  collecting the prior custodians, right, is going all the way

21  back to 2010.  Now, she wouldn't be 20 -- she wouldn't be

22  involved in anything in 2010 but, you know, she has emails

23  starting in 2017 when she came to the company to today, right,

24  2021, that's four years.  This litigation itself has been going

25  on for many years and presumably she has privileged emails from

1  soon after this -- from soon after the discovery of valsartan

2  -- of nitrosamines in valsartan and reaching out to their

3  attorneys.  So there's a very small timeframe here where she

4  would have non-privileged documents related to this issue.

5          JUDGE VANASKIE:  You say "presumably," that's where I

6  have a little bit of trouble because we don't know.  We're

7  presuming right now --

8          MS. PRISELAC:  That's true.

9          JUDGE VANASKIE:  -- in terms of what the burden would

10 be.

11         Mr. Slater, anything else on this issue?

12         MR. SLATER:  I apologize, I muted myself.

13         I don't believe so, Your Honor.

14         JUDGE VANASKIE:  All right.  Well, here's what I'm

15 going to direct.  I'm going to direct that Ms. Kong be added as

16 a custodian, for her custodial file to be reviewed.  If there

17 then is a proportionality objection to be asserted based upon

18 what volume of documents we're looking at and some evidentiary

19 basis for the assertion that the overwhelming majority of those

20 documents would be privileged, then I'd be willing to say

21 nothing needs to be produced, that on proportionality grounds,

22 it doesn't need to be produced.  But right now I don't have an

23 adequate evidentiary foundation to make that conclusion, and

24 the only way that we can get there is to at least identify

25 Maggie Kong as a custodian, review her custodial file and let

 1    us know what the volumes look like.

 2            MS. PRISELAC:  Your Honor, would it be possible for us

 3    to modify the current collection parameters to limit her

 4    collection to end essentially the day the first complaint was

 5    filed in this case?  That might help us in terms of the

 6    attorney-client privilege.

 7            JUDGE VANASKIE:  Mr. Slater?

 8            MR. SLATER:  I'm not really sure.  They want -- if Ms.

 9    Priselac -- I'm assuming what she's saying, from what I just

10    heard, they don't want to collect documents that predate the

11    filing of the first complaint or that don't postdate the

12    filing --

13            MS. PRISELAC:  Postdate.  Postdate.

14            MR. SLATER:  It's hard to say because there are

15    meetings that have been going on for years after this was

16    disclosed and there's been discourse within the company about

17    this problem for years.  So I think that perhaps once the

18    collection's made, if there's certain proportionality arguments

19    that apply differently to pre or post the first complaint, I --

20    then maybe we can talk about it.  I'm not sure what the date of

21    that first complaint is, so that might help also for us to

22    understand.

23            Are we talking sometime in 2019?

24            MS. PRISELAC:  Yes.

25            MR. SLATER:  Maybe if counsel, once they make their

```
 1   collection, if they can let us know how the documents break

 2   down in the custodial file as before and after, you know, we'll

 3   certainly make a reasoned decision on that because I understand

 4   what Your Honor's saying, so we understand what your concerns

 5   are.

 6           Is that maybe a reasonable way to go?  Then when we

 7   know the quantification, you can make that call?

 8           JUDGE VANASKIE:  I believe that's a reasonable means

 9   of moving forward here.  Let us know what the number of

10   documents are prior to the first complaint and then you have a

11   total so you know what comes afterwards and that can inform the

12   proportionality analysis.  All right?

13           MS. PRISELAC:  Thank you, Your Honor.

14           JUDGE VANASKIE:  All right.  The next issue I have

15   deals with errata sheets for the deposition of Chinese-speaking

16   witnesses.  I understand ZHP wants to stay the 45-day review

17   period for those errata sheets and plaintiffs oppose that.

18           So, Ms. Priselac, why do you need to stay the 45-day

19   period?

20           MS. PRISELAC:  So, Your Honor, under the protocol, all

21   of the -- all of the depositions were presumptively read and

22   sign.  And the problem we're having is that the only thing our

23   clients -- and there's only a few of them that only read

24   Chinese and not English, and this is only a few of them, the

25   only statement they would be able to sign is, I don't
```

1  understand English so could not review this transcript.  And,

2  you know, translating it is also not an option because it

3  becomes essentially a triple translation.  Right?

4       And so we were only asking for 45 days to kind of talk

5  to the plaintiffs about what is the type of, you know,

6  statement they could sign that would be amenable to both sides

7  because I don't think Mr. Slater would be, I was presuming,

8  amenable to a statement that says, I can't read it, I can't

9  read and understand and sign this deposition.

10       JUDGE VANASKIE:  So let me see if I can understand.

11  What exactly is ZHP requesting?  What are you requesting on

12  behalf of ZHP?

13       MS. PRISELAC:  Just to have 45 extra days so that we

14  can hopefully work out an agreement with the plaintiffs about

15  an acceptable type of stipulation or signing.

16       JUDGE VANASKIE:  All right.  Mr. Slater?

17       MR. SLATER:  If I understand, the ask is to extend the

18  45-day deadline to another 45 days in order to work out the

19  language of a stipulation to be signed by the few non-English-

20  reading ZHP witnesses.

21       I don't -- I don't really particularly understand why

22  that needs -- why that couldn't have already been discussed and

23  we couldn't have already met and conferred on it.  We've

24  certainly -- counsel said we don't want an errata that says, I

25  couldn't read it.  Frankly, from the plaintiffs' perspective,

```
1    we don't care if an errata sheet is even filed.  They're not
2    -- most cases you don't even get an errata sheet, so it's not
3    something we're hoping for.
4          So, you know, our goal is to get these transcripts
5    finalized so that there's no more dangling participles where
6    someone can come back at some point and say, well, you know, in
7    that sentence there should be a "not" in there or there should
8    be an "and."  And I think that once we say nothing will happen,
9    we're guaranteed to have an issue.  So our goal is to just get
10   these done.  I don't -- I don't -- again, I'm not really
11   concerned about what they say.  If they have a correction, they
12   can make it; if not, I think they should just finalize or not
13   do it.
14         So I guess what we're saying is we oppose this
15   request.
16         MS. PRISELAC:  Well, I think it's unfortunate that Mr.
17   Slater's refusing to even engage in this.  We've asked -- we
18   asked for a stay just so that we could have this conversation.
19   And there's no time concern here.  There's no pressing issue to
20   get these finalized.  So all we're asking is that we have the
21   time to come up with a meet -- to meet and confer with them and
22   it's disappointing that Mr. Slater won't even do that.
23         JUDGE VANASKIE:  Well, why would you need 45 days as
24   opposed to, say, 20 days?
25         MS. PRISELAC:  I'm happy to do 20 days, Your Honor.
```

```
 1            JUDGE VANASKIE:  And the purpose of this additional

 2   time is to give you an opportunity to confer with the

 3   plaintiffs' side about the nature of the signing, nature of the

 4   certification that the witness will provide?

 5            MS. PRISELAC:  Right.  Your Honor, I -- I -- we were

 6   hoping to be able to come to some kind of a, you know, way

 7   that -- you know, the plaintiffs had been very concerned about

 8   the admissibility of these depositions with the foreign

 9   language.  We didn't think that they would want some kind of

10   statement that says that, you know, the witness doesn't

11   understand what this says.  So we were hoping to come to some

12   kind of agreement about, you know, something that they could

13   sign that the plaintiffs could live with.

14            MR. SLATER:  I'm certainly not trying to be

15   unreasonable.  I'm not -- it's a -- it's an interesting request

16   but whether there's an errata sheet or what it says or not, the

17   transcript is what it is.  There's an official court reporter

18   that took it down, so the testimony -- even if the person

19   wrote, I couldn't read my transcript, that doesn't stop us from

20   using it.

21            So, you know, all I was saying is I would think that

22   if there is an ask to try to get us to stipulate to language,

23   I'm not sure what language it would have other than the

24   standard language.  If -- I'm not really sure what we can do

25   about that.
```

1          The transcript says what it says.  We're certainly not

2    going to agree to language that's going to somehow dilute the

3    strength of the testimony or the meaning or whatever, so...

4          And I would have hoped, as I said before, that this

5    would have been presented to us, you know, a month and a half

6    ago when the issue would have been known to ZHP to say, well,

7    we're going to have this issue, let's talk about it.  Because,

8    again, I would think if this request was being made today, we'd

9    already know what language was being proposed.  I'm not really

10   sure how we can hammer that out or what's even being sought

11   because there's nothing concrete.

12         So I'm uncomfortable with some open-ended, again,

13   issue being left out there because --

14         MS. PRISELAC:  It's only 20 days.

15         MR. SLATER:  I certainly don't -- I don't oppose a

16   ten-day extension or something, if that's what they want, for

17   somebody that's already been deposed so that they can talk to

18   us.  I can't imagine it's going to take more than a couple days

19   to figure out yes or no because we don't even have an example

20   of what ZHP's looking for us to agree to.

21         JUDGE VANASKIE:  All right.  Well, I threw out 20 days

22   and Ms. Priselac indicated that would be all right with ZHP.

23   So we'll extend the deadline for the signing by an additional

24   20 days but not beyond that.

25         You know, I'm not exactly sure what you're trying to

1  accomplish, Ms. Priselac, in terms of the statement to be made,

2  but you'll get 20 more days to do it in lieu of the language

3  difficulties.

4          MS. PRISELAC:  Thank you, Your Honor.

5          MR. SLATER:  Your Honor, does that apply to the

6  witnesses who have already been deposed, not to the witnesses

7  to be deposed going forward?  Is that --

8          JUDGE VANASKIE:  Yeah, that will apply to the

9  witnesses already deposed.

10          MS. PRISELAC:  Understood.

11          JUDGE VANASKIE:  Not who are to be deposed, because I

12  expect if you work something out, it will apply to all.  And if

13  you don't work something out, there's no need to extend the

14  time any further.  All right?

15          MS. PRISELAC:  Thank you, Your Honor.

16          JUDGE VANASKIE:  Thank you.

17          The last thing I have on the ZHP discovery is a motion

18  to compel that has been filed by the plaintiffs and the

19  briefing schedule on that motion.

20          And, Mr. Slater, do you oppose following the normal

21  briefing schedule?

22          MR. SLATER:  We would certainly like to do this much

23  more quickly, especially with the depositions that are coming

24  up at the end of May and in early June.  To the extent that

25  Your Honor may grant our motion to some extent, we would want

1    to get those documents in time to use them in the depositions

2    of Jun Du and Mr. Chen.  So it would seem to make more sense to

3    get it done quicker rather than later.

4              We've, obviously, met and conferred and spent a lot of

5    time with the defense so I would think the arguments wouldn't

6    be that difficult for ZHP to present.  We've already, frankly,

7    argued this with Your Honor before.

8              JUDGE VANASKIE:  Yes.  Ms. Priselac?

9              MS. PRISELAC:  Thank you, Your Honor.

10             You know, the reality is that if the plaintiffs

11   thought this was so important, they could have filed this

12   protective order -- this motion to compel back when Your Honor

13   instructed them to do so.  They didn't.  And the reality of it

14   is is that not only do we have to respond to their -- to their

15   motion, we have to work with our Chinese counsel to get the

16   necessary affidavit -- declarations and expert input that is

17   required under the Supreme Court's rulings.  And that takes

18   time.  We're working in two countries, in two different time

19   zones, and the reality is if these -- if these documents were

20   so necessary for the depositions that are upcoming, the

21   plaintiffs could have filed a motion to compel weeks ago when

22   Your Honor directed them to.

23             JUDGE VANASKIE:  All right.  I understand the need for

24   time to respond.  I also understand the need for urgency here.

25   I'm pulling up the calendar now.  I'm trying to pull up a

 1   calendar now.

 2           I have the brief currently due -- the opposition brief

 3   currently due May 24th.  I'm going to move that deadline to May

 4   20th, in light of the circumstances that exist here.  And so

 5   accelerate it by just a few days.  But that gives me more time

 6   to resolve it.

 7           Go ahead.

 8           MS. PRISELAC:  Your Honor, I'd just point out that we

 9   have briefs also due on Friday and Monday on the ZHP side and

10   so if you could at least -- if Your Honor could give us to the

11   21st even, that would be helpful.

12           JUDGE VANASKIE:  All right.  You have until the 21st.

13           MS. PRISELAC:  Thank you, Your Honor.

14           JUDGE VANASKIE:  All right.  I think that's all I had

15   on the ZHP discovery.

16           Is there anything else?

17           MS. PRISELAC:  I think on the -- on your order, Your

18   Honor, there was, in Section 8B and 8E, I think they're pretty

19   minor issues.

20           8B I think was a technical issue that, unless Mr.

21   Slater disagrees, I think it can be easily resolved.  My

22   colleague, Forrest Hansen, can weigh in if Mr. Slater thinks

23   it's necessary.

24           But just to quickly wrap this up, on 8E, I think there

25   was just a miscommunication because this request wasn't

 1  initially included in the original plaintiffs' letter, but

 2  we're happy to provide 8E to the plaintiffs.

 3          MR. SLATER:  Then we're good, Your Honor.  8E was the

 4  Min Li meetings with multinational companies.

 5          JUDGE VANASKIE:  Right.  Yes.

 6          MR. SLATER:  And that's fine, if that's added to the

 7  list.

 8          And 8B was the unredacted copies with the hyperlinks

 9  working, and my understanding from my team is that we're

10  expecting that's going to get worked out so I don't think a

11  ruling is needed from Your Honor today.

12          JUDGE VANASKIE:  All right.  Great.  That should

13  cover --

14          MS. PRISELAC:  Thank you, Your Honor.

15          JUDGE VANASKIE:  That should cover ZHP then.

16          MS. PRISELAC:  Thank you, Your Honor.

17          JUDGE VANASKIE:  Thank you.

18          All right.  The next issue I have then deals with --

19  make sure I have this right -- Hetero discovery.

20          MR. ABRAHAM:  Hello, again, Your Honor.  Eric Abraham

21  for Hetero.

22          JUDGE VANASKIE:  Hi, Mr. Abraham.

23          MR. ABRAHAM:  Hello, Judge.

24          MR. PAREKH:  Good afternoon, Your Honor.  Behram

25  Parekh for plaintiffs.

1          JUDGE VANASKIE:  All right.

2          MR. ABRAHAM:  I'm also joined by Nakul Shah, Your

3    Honor.

4          MR. SHAH:  Good afternoon, Your Honor.

5          JUDGE VANASKIE:  I think Mr. Abraham indicated he is

6    also joined by Mr. Shah, Nakul Shah.

7          MR. ABRAHAM:  Yes, sir.

8          JUDGE VANASKIE:  All right.

9          MR. PAREKH:  Your Honor, the main issues are that, you

10    know, these are documents -- specific documents that we've

11    asked for Hetero to produce that have not been produced yet,

12    and when we do get production, it tends to be documents that

13    reflect a small portion of the documents that we've asked to be

14    produced.

15          In addition, there are other documents being produced

16    at the same time that are not directly responsive to those

17    documents.  And so we're also having a large amount of trouble

18    trying to figure out what has been produced in response to our

19    deficiency letters and what has not.

20          Just one example is we asked for audit reports that

21    Unit V of Hetero Labs Limited did of Unit I.  Mr. Shah wrote

22    back saying, you know, he's reviewed things that were in the

23    production.  We went back and we looked, we couldn't find them.

24          So what we're asking for is a firm deadline to be set

25    by the Court as to when all of these deficiencies should be

1    corrected and also an agreement by HLL to provide specific

2    Bates numbers of the documents that they are producing that

3    respond to each of our deficiency requests rather than a

4    general statement that, you know, all of the documents in these

5    three productions are somehow responsive to a bunch of these

6    deficiencies.

7            JUDGE VANASKIE:  Mr. Abraham?

8            MR. ABRAHAM:  Thank you, Judge.

9            We met and conferred with Mr. Parekh on this subject

10   yesterday.  On this general subject, we agree with what Mr.

11   Parekh has requested.  In other words, we're going to be

12   identifying the documents by Bates range.  It's a little

13   complicated.  Not to get too, sort of, deep in the weeds on

14   this, Judge, but the actual Bates number on the documents that

15   we've produced isn't visible to us when we use our vendor's

16   database.  So what we have to do to comply with what we agreed

17   with Mr. Parekh is to work with our document vendor to tie the

18   document that we've produced to the specific Bates number so

19   that we can then identify them to Mr. Parekh that way.  And

20   that's what we're going to do.

21           There are a number of, sort of, other specific

22   document issues that plaintiffs have raised.  I don't know if

23   Your Honor wants me to address them now, issues that came up

24   during depositions, or if Mr. Parekh intends to speak about

25   them first.

```
 1          JUDGE VANASKIE:  Well, it seems to me that's a pretty
 2    basic problem with the vendor's product, you don't get to see
 3    the Bates numbers of the documents.
 4          MR. ABRAHAM:  I agree with you, Judge.  It is -- but
 5    it's surmountable, as I've said.
 6          JUDGE VANASKIE:  All right.  So you're working to
 7    either produce or provide the Bates numbers of documents that
 8    have already been produced.
 9          MR. ABRAHAM:  Yes, sir.
10          JUDGE VANASKIE:  Mr. Parekh, what else remains?  You
11    gave me nine pages -- I think nine pages of documents that you
12    were missing.
13          MR. PAREKH:  Right.  And that's what remains.  We just
14    want for Your Honor to set a date by which all of those
15    documents are either produced or a statement at least saying
16    that those documents are unavailable so that we can have some
17    finality as to, you know, okay, now we have all the documents.
18          JUDGE VANASKIE:  Well, I have been pretty poor at
19    picking deadlines so far.
20          Mr. Abraham, how much time do you need?
21          MR. ABRAHAM:  I'll defer to Mr. Shah on that, if I
22    could.  But before he speaks, I just want to be clear with Your
23    Honor about what documents we're talking about.
24          So, in other words, some of plaintiffs' letter refers
25    to documents that were produced in Mr. Ramarao's deposition on
```

1   April 29th.  Some of the documents in their letter relate to

2   document requests that were made during Dr. Venkata's

3   deposition, which was yesterday and today.  So this is a

4   slightly different subset than the kind of more generalized

5   documents that Mr. Parekh is talking about now.

6           So perhaps let me let Mr. Shah respond to Your Honor's

7   question on that Bates identification issue and then we can go

8   from there.

9           JUDGE VANASKIE:  All right.

10          MR. SHAH:  Your Honor, with respect to identifying

11  specific Bates numbers, that should not take more than about a

12  week for us to be able to locate documents that have already

13  been produced and provide the Bates numbers to Mr. Parekh.

14          With respect to the collection of additional documents

15  that plaintiffs are requesting for which we may not have yet

16  produced, I would ask Your Honor for at least three weeks in

17  order to be able to collect the documents, process them through

18  our ESI vendor and prepare them for production to plaintiffs.

19          JUDGE VANASKIE:  All right.  That takes us to June

20  2nd.

21          And, Mr. Parekh, what's your view?

22          MR. PAREKH:  The only issue that we have is that, you

23  know, we, obviously, have depositions set between now and June

24  2nd.  All of our depositions are supposed to end that week, I

25  believe is the last deposition set for Hetero.  And just as

```
 1   with other defendants, I mean, you know, we're sort of being
 2   pushed against the wall in terms of when our expert reports are
 3   due and being able to incorporate all this information and
 4   still take depositions.
 5          I understand Mr. Shah wants three weeks.  We would
 6   suggest two weeks for the documents where we identified them in
 7   letters for -- they've been identified for several weeks at
 8   this point, and for documents that were requested specifically
 9   with regard to the depositions that were recently taking place
10   and any other documents that get requested in the future, a
11   sort of a two-week rolling production deadline for those
12   specific documents that are identified at the depositions as
13   they come up.
14          JUDGE VANASKIE:  All right.  Mr. Shah or Mr. Abraham?
15          MR. ABRAHAM:  Yes, I have no problem with a rolling
16   production.  I mean, the difficulty I have is we've, in the
17   past, have had complaints from plaintiffs that by producing
18   things in a piecemeal basis it's worse for them, not better.
19   But if they'd like us to prioritize any of these documents, I'm
20   happy to do that.  If they'd like a rolling production, no
21   problem.
22          I mean, the thing to remember is, particularly, like,
23   for example, the documents that were requested during Mr.
24   Ramarao's deposition on April 29th, we worked through the night
25   with our client in India to be able to prepare those documents
```

1    and produce them by the very next morning, and they were, in

2    fact, used by plaintiffs' counsel during his deposition.  So

3    it's not that we're not trying to work as quickly on these

4    things as we possibly can.  We are.

5           So I'd like to hear Mr. Shah, if he thinks that two

6    weeks on a rolling basis is doable, I have no problem with

7    that.

8           MR. SHAH:  Your Honor, I believe two weeks is doable,

9    just with the caveat that to the extent that particular

10   documents require additional time in order to locate or process

11   through our ESI vendor, that we have the opportunity to meet

12   and confer with Mr. Parekh in order to advise him of those

13   specific documents to the extent we need additional time.

14          JUDGE VANASKIE:  That's a reasonable approach.  That's

15   how we'll handle this.  A rolling production to be completed

16   within two weeks of today but if you are unable to make that

17   deadline, Mr. Shah, that you would then confer with Mr. Parekh

18   and come to some agreement, some understanding, about when the

19   production is to be completed.  All right?

20          MR. ABRAHAM:  Yes, sir.

21          MR. SHAH:  Thank you, Your Honor.

22          MR. PAREKH:  Thank you, Your Honor.

23          JUDGE VANASKIE:  Thank you all very much.

24          I guess we have issues with respect to Hetero's

25   privilege log.

```
 1          MR. ABRAHAM:  Yes, sir.  We did meet and confer
 2   further about that subject yesterday with Mr. Parekh and with
 3   another member of plaintiffs' team who's sort of tasked with
 4   leading the charge on this issue.  We're down to 49 documents
 5   that are currently being withheld.  In our meet and conferral
 6   yesterday we talked conceptionally about our basis for
 7   withholding the remaining documents.  We're considering further
 8   de-designations.  I believe that Mr. Parekh can confirm this
 9   but I believe that we agreed that we would wrap that process up
10   by a week from yesterday.
11          So I'm hopeful that there's nothing further for Your
12   Honor's attention on this subject, but I think we won't know
13   that for certain until next week.
14          MR. PAREKH:  Our suggestion would be -- and we do
15   agree on the timeframe.  Our suggestion would be that any
16   issues that remain that we submit either in camera or via a
17   brief, a very short brief, to Your Honor for the next CMC.
18          MR. ABRAHAM:  I have no problem with that.
19          JUDGE VANASKIE:  All right.
20          MR. ABRAHAM:  I have the sort of off-the-wall
21   suggestion to Mr. Parekh that when we do get down to the final
22   documents, maybe we'll pick an exemplar and he and I can
23   actually review that document together.  We'll see where that
24   goes.  But I'm hopeful that this won't be necessary for Your
25   Honor's attention.
```

```
 1            JUDGE VANASKIE:  All right.  Very well.  I'll look for

 2    a status report from you by the end of next week in terms of

 3    where things stand with respect to the, I guess, 49 documents

 4    on the privilege log.  All right?

 5            MR. ABRAHAM:  Yes, sir.  Thank you, Your Honor.

 6            MR. PAREKH:  Thank you, Your Honor.

 7            JUDGE VANASKIE:  Thank you.

 8            The next item I have is the Teva litigation holds, the

 9    scope and production of Teva's litigation holds.  And who will

10    be addressing this issue?

11            MR. STANOCH:  Good afternoon, Your Honor.  David

12    Stanoch for the plaintiffs.

13            JUDGE VANASKIE:  Good afternoon, Mr. Stanoch.

14            MR. STANOCH:  Thank you, Judge.

15            I know we have a lot to cover still so I'll try to be

16    very succinct.

17            I think our letter lays out both the procedural

18    background of this issue, Your Honor, as well as our basis for

19    our request.  I'm happy to get into the details but I'm sure

20    Your Honor read that, that this was an issue that Magistrate

21    Judge Schneider punted to discovery.  We're now into discovery.

22    We've set forth how, in discovery, we've ascertained that Teva

23    has, in fact, destroyed both finished dose valsartan pills

24    post-initiation of this litigation, as well as many metric tons

25    of the API that went into that finished dose product.  Their
```

1    30(b)(6) witness testified to that.  The 30(b)(6) witness could

2    not testify as to whether Teva's hold ever encompassed this

3    product because he said he didn't have the notice and that's

4    why we're requesting the notice.  We think we've made a

5    sufficient preliminary showing, especially under Magistrate

6    Judge Schneider's opinion in *Major Tours*.

7           The only issue I would take with defendant's response

8    in their letter is the issue that this is not ripe.  We

9    disagree.  We made the request for the litigation hold on April

10   15th at the day two deposition of Mr. Baretto.  We heard

11   nothing.  April 19th we sent a follow-up communication to them

12   listing the reasons why we need the hold.  Again, we heard

13   nothing.  April 29th we reiterated and followed up again and,

14   in fact, we said, as a courtesy to you, we're not putting this

15   on the CMC letter for the then-pending conference but we need

16   to discuss this.  April 30th Teva responded finally and said,

17   we disagree on your position on the litigation holds.

18          May 4th we had a meet and confer on several items,

19   including the litigation holds.  Teva said, we still disagree

20   but we'll get back to you.  I said, oh, let me confer.  We have

21   to hear back from you, otherwise, I'm giving you fair warning,

22   we need to put this on the CMC letter.  We never heard back

23   and, thus, it's now presented to Your Honor.

24          So the suggestion that we need to have more

25   opportunity to meet and confer, we think it's been exhausted

1    over the last month.

2            JUDGE VANASKIE:  All right.  Let me ask a question,

3    Mr. Stanoch, and then we'll hear from Ms. Lockard.

4            The product apparently has been destroyed, the

5    contaminated product has been destroyed, but not all of it, I

6    take it?

7            MR. STANOCH:  That's part of what we're still trying

8    to ascertain, Your Honor, correct.

9            JUDGE VANASKIE:  How are you prejudiced by the fact

10   that product has been destroyed, if there is evidence that it

11   was contaminated?  I mean, I'm trying to understand why this

12   gets you to the litigation hold letter.

13           MR. STANOCH:  Yes, Your Honor.

14           Obviously, whether the product was contaminated is an

15   issue that's important in the case.  What -- what drugs and API

16   would be available and still held and sequestered we don't know

17   from Teva.  They've never told us.  The 30(b)(6) witness who

18   was designated on sequestration could not tell us for which

19   batches samples were retained or not and still exists or where

20   any of those samples might be.

21           So what we're trying to figure out, Your Honor, is --

22   the drugs are made in lots and batches, right?  If they were

23   destroying product all from one lot, and we have another lot,

24   we don't -- we wouldn't be able to test the lots that's been

25   destroyed.  So, yes, there might be some product being held,

```
1    that's a good thing, it should have been held; but the fact

2    that they destroyed some other products and we don't know what

3    lots and which batches have been destroyed or not, that's a

4    potential problem for knowing, if it has to come down to it,

5    which product is available to test or not and which should have

6    been retained or at least discussed with us in the last three

7    years.

8            JUDGE VANASKIE:  All right.  Ms. Lockard.

9            MS. LOCKARD:  Yes, Your Honor.  Thank you.

10           This is exactly why I felt that we needed to have a

11   substantial meet and confer.  As I had explained to Mr. Stanoch

12   when he first brought this up at the deposition of Mr. Baretto,

13   we needed to take some time to understand exactly the documents

14   that were being presented, which lots they affected and ensure

15   that we have retained samples from those lots and exactly what

16   the facts are.  And it's not as straightforward when you're

17   dealing with a recall of this size.  It does take some time to

18   clarify and that is what we have been doing and trying to do.

19           But, you know, just to frame this issue, as plaintiffs

20   noted in their submission, this was previously addressed by

21   Judge Schneider.  Back in November of 2019, Judge Schneider

22   ruled that the manufacturers need not produce their litigation

23   holds but we needed to identify the recipients of the hold

24   letters, the emails, the sender, and when they were sent.  We

25   did that.  Teva complied.  That's the information plaintiff has
```

 1    at hand.

 2         The parties continued to have discussions over the

 3    preservation issue.  We exchanged letters and this -- the

 4    preservation issue was ultimately addressed with Judge

 5    Schneider in the January 15, 2020, conference.  And the

 6    discussion there is important because it frames exactly what

 7    the duty is that applies to manufacturers and what was expected

 8    to be preserved.  And you hit the nail right on the head when

 9    you asked about the samples.  Judge Schneider had similar

10    sentiments.  His statement, and -- and it's a quote, he said,

11    "The odds that every single recalled pill has to be preserved,

12    at least commonsense-wise, doesn't sound reasonable.  So there

13    has to be some identification of some kind of representative

14    group or sample of recalled pills that are preserved."

15         He went on to say, "Commonsense tells me that not

16    every last pill has to be preserved, but a representative

17    sample would have to be preserved."

18         And Layne Hilton, Counsel Hilton, arguing for the

19    plaintiff, was arguing that all of the pills should be

20    preserved.  And her response is that, "The pills are already

21    within defendant's possession, they've received them from

22    various customers or entities, they have to be kept."

23         And Judge Schneider pressed Ms. Hilton and said,

24    "Isn't it what you want is a representative sample of the

25    recalled product?"

1          And she agreed and said, "Okay, yes, we can work with

2   plaintiffs on what is a representative sample."

3          The judge, Judge Schneider, then instructed the

4   parties to confer and if plaintiffs weren't satisfied, they

5   could file a motion with the Court.  They never did that.  They

6   never filed a motion on this issue.  And so we're left with the

7   expectation, at the direction from Judge Schneider, about

8   preserving representative samples and that's exactly what Teva

9   has done.

10          The week after the January 2020 conference, Teva

11   received an email from Ms. Hilton asking Teva to confirm that

12   there were no recalled products that have been destroyed and we

13   did confirm that, and that's true to this day.

14          What we're talking about is recalled products.  We're

15   not talking about API ingredients.  If you look at the

16   transcript from 2020 before Judge Schneider, the word pills,

17   pills, P-I-L-L-S, was referenced 18 times in the discussion of

18   preservation.  There was not one reference to preservation of

19   API ingredients.  Okay?

20          Also, the discussion also focused on recalled products

21   received from consumers and customers.  And so that's really

22   what is at issue and what's relevant to the case.  It's not API

23   ingredients and those sorts of things.  This is all critical

24   because it really frames what is Teva's duty to preserve and

25   what has to be preserved.

1        You know, plaintiffs are now crying spoliation over,

2    you know, items that, you know, we think are far outside the

3    bounds of our duty.  And, you know, they point to, for example,

4    an email between -- emails between a Teva witness that are

5    asking for clearance from the FDA for destruction of product.

6    However, there's nothing in those emails that indicate product

7    was destroyed.  In fact, FDA said if you -- if they gave

8    approval clearance from a regulatory perspective and said, if

9    you do destroy, send us the certificate of destruction.  We've

10   looked, there are none.  It was not sent to FDA.  The product

11   that was recalled was not destroyed.

12       So, the fact that Connie Trumper was getting clearance

13   from FDA from a regulatory perspective has no bearing on the

14   legal hold itself.  They're separate and distinct.  It doesn't

15   indicate she was unaware of the legal hold.  It doesn't

16   indicate that products were, in fact, destroyed.  And there's a

17   reference in plaintiffs' submission letter that is inaccurate

18   about when Ms. Trumper received the litigation hold notice.

19   She actually received it in July, on July 17th of 2018, not

20   later as plaintiffs claim.  We produced documentation to that

21   effect.  So that's just inaccurate.

22       So, the exchange with FDA is not evidence of

23   spoliation at all.  It pertains to the regulatory clearance

24   that is part of the normal process for closing a recall,

25   managing a recall, and it doesn't mean just that FDA says that

they are okay, they have no objections to the destruction.  It

doesn't have any bearing on whether or not the company's

complying with the legal hold, which is different.

        Now, the second basis plaintiffs raise in their letter

relates to the destruction of these API ingredients.  There

were emails confirming the API ingredients were incinerated,

that's correct, but we -- we have no obligation to preserve API

ingredients that were never used in recalled product.  It was

never used in product that was commercialized or issued to the

market.  So that is a red herring, it is not evidence of

spoliation, and it simply offers no prejudice to plaintiffs

that they don't have API ingredients there.

        And then the third relates to Mr. Baretto's testimony

about a document that appears to show that a few lots of

finished dose pills that were never distributed to customers,

that were never commercialized, that were in a distribution

center, that they were destroyed.  And we have confirmed that

we have retained samples from every lot of recalled product.

        So, again, there's no prejudice there.  The fact that

there were some product that was destroyed doesn't prejudice

plaintiff at all if they do have the ability to prove their

case with the remaining evidence, which they do.

        The Court, you know, as you're well aware, needs to

have -- there needs to be at least a preliminary finding of

spoliation.  These three elements by no means present any sort

1    of preliminary finding of spoliation of evidence.  The

2    evidence -- you know, in order for there to be spoliation,

3    there -- there has to be an established prejudice, the evidence

4    has to be relevant to the claims, there has to be actual

5    suppression or withholding, and there has to be a duty to

6    preserve that was reasonable -- reasonably foreseeable, and we

7    don't think any of these elements have been met, certainly not

8    by the submission that plaintiff has made to date.

9         So, you know, on the issue of, you know, there can't

10   be spoliation without prejudice, plaintiffs have to show that

11   their ability to prove their case has been impacted.  They've

12   never made such showing.  There's been no prejudice here.

13        This litigation has been going on for close to three

14   years.  Not once, not once have plaintiffs ever asked for any

15   of these samples, they've never referenced that they want to

16   arrange any testing.  We still have retained samples available

17   if they so desire.  However, at this point, these products have

18   a limited shelf life.  They have stability limitations.  The

19   reliability of any testing at this point is questionable, at

20   best.

21        So, you know, aside from their not being prejudiced,

22   the relevance of this evidence is also missing.

23        So, you know, that's particularly true as well where,

24   you know, Mr. Stanoch indicates he needs this evidence to

25   establish the presence of the impurity.  That is really not

disputed in this case.  You know, there's -- there's -- the

testing of those samples to establish that there was an

impurity present is not going to provide any additional

information than what plaintiffs already have available at

their disposal.  They have ample testing already from drugs

that were actually recalled and drugs that were sent to

patients.  They have the testing from our own files, the

testing we did.  They have the testing from the FDA and other

sources.  You know, we're not fighting in this case over

whether there was an impurity in the medication.

        So I fail to see the relevance to this or if there's

any prejudice or they've been somehow impacted in their ability

to bring their claim.  And so, you know, they're, at this

point, asking for the litigation hold, you know, they have to

come forward with more than this.  They have to make a

preliminary showing and, you know, we have not seen that.

        To the extent they have some other argument or

evidence or suggestion that they need to, you know, to

establish to get over that hurdle, you know, I do think that we

should hear about it, have an opportunity to meet and confer

and have a full opportunity to brief this issue, given, you

know, the significance of the allegations that are being made

against Teva.

        JUDGE VANASKIE:  All right.  Mr. Stanoch.

        MR. STANOCH:  Thank you, Your Honor.  There was a lot

1    there.  I'll try to be brief again.

2          Just as an aside, the fact that some product now today

3    might be expired or has an expiring shelf life, I think that's

4    a red herring.  The FDA required Teva and a number of other

5    manufacturers to test, back in 2018 and 2019, both expired and

6    unexpired product, so I don't think there would be any issue in

7    that respect.

8          I think I heard Ms. Lockard saying or stopping short

9    of saying Teva did not have a duty to preserve recalled

10   valsartan pills sitting in a Teva warehouse that might have

11   been ready to go to a customer but because it was sitting there

12   and wasn't given back to them by a customer, that they had no

13   obligation to withhold it.

14         I think I also heard her suggest that Teva had no

15   obligation to sequester and hold the very API at issue in this

16   case that contained the contamination, in fact, the 16 metric

17   tons of it which she admits was incinerated.  Maybe there's

18   more, we're still investigating.  The question of the scope of

19   that duty, the only way we're going to get more evidence and

20   facts of that is if we get the litigation hold.  Their 30(b)(6)

21   witness could not testify on the scope of what was sequestered

22   or not.  We, frankly -- you know, it was a very fine line and

23   perhaps we weren't reading closely enough, shame on us, when

24   they said, "We can confirm on behalf of the Teva defendants

25   that no recalled product has been destroyed as of today,

 1   January 27th, 2020."  Perhaps we should have pressed and said,

 2   oh, does that include recalled product that's sitting in your

 3   warehouse versus some that has been returned to you by

 4   customers.  We don't think that was a reasonable distinction

 5   regardless.  This isn't where we are today.  We've developed

 6   the record already.  We think the first step in the issue is

 7   whether Teva ever thought it had an obligation or duty to hold

 8   any of this product, the pills or the API, in the first place.

 9        JUDGE VANASKIE:  I guess what I'm missing, Mr.

10   Stanoch, is how are you prejudiced by this?  I mean, I come

11   back to the fact that you do have recalled product that you can

12   test.  You weren't going to test 16 metric tons of API.  Why do

13   you need the product?

14        MR. STANOCH:  We don't know which lots and batches and

15   what product was retained and for which samples still exists.

16   We asked their witness and said, for what product do you have

17   samples?  Say, okay, if you didn't have the entire lot, which

18   ones do you have samples for?  Couldn't say.  Where are those

19   samples?  Couldn't say.

20        JUDGE VANASKIE:  How does having the litigation hold

21   letter help you?

22        MR. STANOCH:  Because if Teva never informed its

23   appropriate personnel to preserve the samples for all the pills

24   and the API that's at issue in this case, then we're entitled

25   to argue and prove a spoliation inference based on that.  They

might have had samples to begin with three years ago but then

they might have had procedures, Judge, where we hear, oh, well,

it's out of expiration now and that was in the warehouse, not

returned by a customer in the ordinary course, let's just

destroy it.  In fact, we know that's what they did.

JUDGE VANASKIE:  Well, if you know they destroyed

product -- well, I understand your point in terms of it would

strengthen your case to have the litigation hold letter if it

wasn't adequate.  If it was adequate, it would strengthen your

case because they ignored it.

MR. STANOCH:  That's right, Your Honor.  If -- if they

cannot tell us that they have samples for all the product and

all of the API, then we should know whether they endeavored in

the beginning whether to hold that in the first place or not,

yes.

JUDGE VANASKIE:  I am reluctant to order the

production of the litigation hold letters.  I know that they

can be ordered produced but we do have concerns with respect to

attorney work product.

Ms. Lockard, anything else on this issue?

MS. LOCKARD:  Yes, Your Honor.

You know, if the information that counsel wants is

confirmation of the samples that were retained from the lots,

we can provide that.  You know, certainly, you know, I know we

met and conferred over Mr. Baretto's testimony and we had very

1   broad topics that, you know, we endeavored to prepare him on,

2   but he was not prepared to discuss specific lot numbers and the

3   number retained for all of the recalled lots.  But that

4   information is available, we can provide that.

5          You know, I think we can provide assurance that we

6   have sufficient representative samples, which is -- which is

7   what Judge Schneider referenced.  He -- he made very clear

8   there was no expectation that we were to retain every recalled

9   pill in this litigation.  If you read that transcript, it's

10  patently clear.

11         So, you know, we do feel like we have complied with

12  everything.  There's obviously, you know, a dispute over what,

13  you know, that duty is; but, you know, we believe we were

14  following the Court's guidance.  You know, we have the samples

15  available.  There hasn't been any prejudice.  Providing the

16  litigation hold notice itself, you know, I don't think it would

17  warrant this process because the question that plaintiffs seem

18  to want is do we have representative samples and we can confirm

19  that we do.  We can provide that information.

20         JUDGE VANASKIE:  All right.  I am not going to require

21  at this time the production of the litigation hold letters.

22  You can continue to discuss the matter in terms of providing

23  information that Hetero has -- or that Teva has, I'm sorry,

24  Teva has with respect to the product that has not been

25  destroyed and the product that has been destroyed.  I'm just

1    having trouble, Mr. Stanoch, seeing how you're prejudiced by

2    not being able to test everything.  And absent a showing that

3    it would be important to know what particular lot number, or

4    however it's identified, was lost, how that makes the case any

5    different or more difficult from the plaintiffs' perspective, I

6    just don't see a need for the litigation hold letter.

7            The point is they acknowledged that they did not

8    retain everything, so you have that information.  And to

9    suggest, well, they got rid of product after they were told not

10   to get rid of product, I don't know that that strengthens you

11   all that much.  So I'm not going to order production of the

12   litigation hold letter.

13           I think that's all we have on Teva.

14           And then we have Torrent deposition dates which I hope

15   are being worked out.

16           Who's addressing this issue?

17           MR. NIGH:  Your Honor, this is Daniel Nigh for the

18   plaintiffs.

19           We were able to work out the deposition date issues.

20           JUDGE VANASKIE:  Okay.  Great.

21           All right.  So that brings us back to the beginning,

22   and that's the question of the motion for sanctions filed on

23   behalf of the plaintiffs against Aurobindo.

24           MS. GOLDENBERG:  Yes, Your Honor.  This is Marlene

25   Goldberg on behalf of the plaintiffs.

          1          MR. LAVELLE:  Your Honor, John Lavelle from Morgan

          2   Lewis.  I'll be arguing on behalf of the Aurobindo defendants.

          3          JUDGE VANASKIE:  All right.  Very well.

          4          MS. GOLDENBERG:  I assume I'm first, Your Honor?

          5          JUDGE VANASKIE:  Well, it's your motion.  I do have --

          6   I do have some questions on this.  Just give me a minute here.

          7          I guess the fist question I have deals with the

          8   question of prejudice.  Certainly discovery has been delayed

          9   and it's been frustrating and much of that discovery came after

         10   the November -- much of the production came after the November

         11   30th deadline.  But where is the prejudice to plaintiffs with

         12   respect to the late production?

         13          MS. GOLDENBERG:  Sure.  It's in a number of places,

         14   Your Honor.  But the biggest thing is that this MDL right now

         15   is on one track.  We have one expert disclosure deadline, one

         16   class certification deadline, and one *Daubert* hearing.  And

         17   what Aurobindo has suggested that we do in response to all of

         18   their late production -- and when we say late production, I

         19   mean, we need to be straight about what we're talking about.

         20   We're talking about 80 percent of the U.S. entities' documents

         21   and all of the noncustodial documents from India.

         22          What Aurobindo has suggested we do is retake every

         23   single deposition in this case.  So, you know, we've seen the

         24   case law that's been cited by Aurobindo where they've said that

         25   sanctions aren't warranted under situations that they believe

1   are similar to this; but the only case law they found shows

2   that maybe plaintiffs have had to go back and take one or two

3   depositions but never have we seen a case where the suggestion

4   by the defendant has been, this is no big deal, you can do

5   discovery twice.  And that alone is prejudicial but when you

6   combine that with the fact that it would set the entire MDL

7   back, that's a big problem for us.

8          JUDGE VANASKIE:  Let me ask you in terms of, have you

9   identified depositions that need to be retaken based upon

10  documents produced either on the eve of the deposition or after

11  the deposition?

12         MS. GOLDENBERG:  Well, we've left all of them open at

13  this point because every single deponent has had documents

14  produced later, but certainly Blessy Johns, who is a 30(b)(6)

15  deponent, you know, we got a ton of documents on the eve of

16  that deposition.  Jasleen Gupta had a number of documents

17  produced on the eve of her deposition that we just didn't have

18  time to get through.  And, quite frankly, we've had to shift

19  away from those documents and towards documents for other

20  witnesses that we've had depositions for, and I haven't even

21  looked at all of these yet because we've had to look at

22  everything for the depositions coming up, but we'll need to

23  take those again.

24         And the other two deponents who have gone so far --

25  there's three, I'm sorry.  Dr. Rao, we got a number of

```
 1   documents in advance of that deposition.  We'll probably have
 2   to take that one again.  He's the chief quality officer and so
 3   far the only fact witness from India that we have.
 4        And then we've also deposed Bhadresh Doshi and Prasad
 5   Gorijavolu.  Candidly, I think if there was one that we didn't
 6   need to depose again, it would probably be Ms. Martinez.  But
 7   both Mr. Doshi and Mr. Gorijavolu had documents that were
 8   produced on the eve of their deposition and we've gotten things
 9   since then as well.
10        So, yeah, I mean, we're looking at potentially having
11   to redo everything.
12        JUDGE VANASKIE:  Now, I'm familiar with the Wachtel
13   case, I cover it in my class, but there the judge conducted 11
14   days of hearings.  If memory serves me right, there were
15   hundreds of discovery orders in the case.  There was plenty of
16   fault on the part of the defendant in that case.  This doesn't
17   seem to rise to that level.
18        How could I find that it rises to that level?
19        MS. GOLDENBERG:  You only need to look in one place
20   and it's the production index from Aurobindo.  And we submitted
21   an updated production index from them with our reply brief and
22   it's Exhibit GG, GG, and what we've done in that exhibit is we
23   have taken Aurobindo's production index and we have added to it
24   the dates of the depositions.  And what you can see there is a
25   very clear timeline of intentional behavior.
```

1          So what we have in this timeline is the core discovery

2    productions, and then we get to the November 20th deadline, and

3    we've got at that point a roughly 13,000 documents, and this

4    is, you know, in the record as well and cited in our brief, but

5    that's how many documents both Aurobindo entities had produced

6    at the end of the November 2020 deadline.

7          We hit December and Aurobindo goes on the record and

8    says, we have produced everything we have.  Plaintiffs start

9    auditing the production, we go through, we repeatedly ask why

10   don't we have everything, and Aurobindo's response is, you need

11   to tell us what's missing.  And we've also cited case law to

12   show that that's not correct; but, nonetheless, we go through

13   the production and we find things that are missing.  And we did

14   not get any custodial documents from Aurobindo, the U.S.

15   entity, from November 2020 until the night before the

16   deposition of Bhadresh Doshi.

17         Now, this is important because in its response to our

18   motion, Aurobindo said that this 80 percent balloon of

19   documents that we got after the production deadline was the

20   product of an IT error that happened at Aurobindo that was

21   discovered in February.  Well, if you look at the production

22   index, there are no custodial productions from Aurobindo in the

23   U.S. -- or the U.S. Aurobindo entities in February.  There are

24   no productions at all from the U.S. Aurobindo entities from

25   November until the night before the Doshi deposition.  And what

1   we got before the Doshi deposition wasn't a flood of documents,

2   it was only documents relating to Bhadresh Doshi.

3        What you'll see later on in the production index is

4   that the same thing happened before the deposition of Prasad

5   Gorijavolu.  The same thing happened before the deposition of

6   Blessy Johns and Jasleen Gupta.

7        And so had this actually been an accident, had this

8   been a recent discovery, what we would have expected to see, if

9   this behavior wasn't willful, was an immediate email from

10  Aurobindo saying, hey, we just found this, we'd like to talk to

11  you about it; and we would also expect to see the documents

12  would start to roll out.  But they didn't.  And not only did

13  they not roll out, when we finally started getting them, they

14  were only produced as to the people who were being deposed.

15       And so this does rise to the level of what we've seen

16  in cases where these sanctions have been imposed and this is

17  precisely the type of situation that this Rule 37 sanction was

18  created for.

19       JUDGE VANASKIE:  Could I impose that kind of sanction

20  without conducting an evidentiary hearing?  You're asking me to

21  draw inferences from facts, but do I need to hear from

22  witnesses?

23       MS. GOLDENBERG:  The case law says that Courts have a

24  great amount of discretion here and I don't believe that you

25  do.  If you felt that you needed to, we're certainly open to

1   that but the case law does not require it.

2          JUDGE VANASKIE:  I mention the *Wachtel* case on which

3   you placed heavy reliance, the Judge conducted 11 days of

4   hearings in that case.

5          MS. GOLDENBERG:  Yes, in that case that is what

6   happened.  But there are other cases that say that, you know,

7   Courts are given a great amount of latitude and that it really

8   is a fact-intensive inquiry.  And, you know, I don't know what

9   happened during those 11 days of hearings.

10         What I can tell you is that here, we've given the

11  Court hard evidence.  Aurobindo has had a chance to respond to

12  say that it wasn't intentional and to provide some evidence

13  that this behavior wasn't willful, but all they did in their

14  response was say that their promises to the Court that they

15  produced everything shouldn't be taken as a statement of

16  finality, and that they somehow had this mixup that they

17  refused to disclose; and, oh, by the way, that they had

18  computers of two custodians get wiped that they never disclosed

19  prior to the brief that they filed.  And this all comes

20  together to show a clear pattern of a disregard for the Court's

21  orders and for the Rules of Civil Procedure and all of the

22  discovery proceedings that have happened in this MDL.

23         JUDGE VANASKIE:  Why isn't a lesser sanction

24  appropriate?  Why wouldn't a sanction of requiring that they

25  pay the costs of these additional depositions or when a witness

1    has to be redeposed, they pay the costs, including counsel

2    fees, for having that happen, as long as you can get your

3    information to your experts in time for their expert witness

4    reports?

5          MS. GOLDENBERG:  Well, I think that ship sailed.  Our

6    expert reports are due at the beginning of July and that would

7    be an awful lot of work to do all of that again and review all

8    the documents before our expert reports.

9          But I think the more important answer to your question

10   about why lesser sanctions aren't appropriate is because that

11   would send a message to every defendant that this is just the

12   cost of doing business; that they can delay their discovery,

13   not produce documents, and flout court orders and build that

14   into the cost of litigation.

15         JUDGE VANASKIE:  To what extent should I take into

16   consideration the unique and unprecedented circumstances

17   confronted by everyone with respect to discovery in this

18   matter, specifically the pandemic?

19         MS. GOLDENBERG:  Your Honor, I think all the evidence

20   you need is the fact that every other defendant was able to

21   produce the vast majority of their documents by the discovery

22   deadline.

23         Now, I looked yesterday at the number of documents

24   that had been produced since November and the vast majority of

25   them have come from Aurobindo, and that's considering, you

1    know, there are five other defendants who were either API

2    manufacturers or finished dose manufacturers in this case; but

3    the other big distinction is that everyone else at least was

4    honest about what they had, or at least that's what I think

5    right now.  But I haven't seen anything that even comes close

6    to the misrepresentations that have been made by Aurobindo

7    about their productions.  And -- and in response to COVID, this

8    is the U.S. entity that withheld 80 percent of their

9    production.  This wasn't an issue that was derailed by India or

10   China.  And there, contrary to what Aurobindo has written in

11   its brief, are no language barriers here.  Again, these people

12   all work in the United States, these files were all available

13   to them, and Aurobindo also represented on the record back in

14   June of 2020 that it had collected all of its data already.

15           JUDGE VANASKIE:  Well, I always caution against making

16   those kind of representations, but that's from an academic

17   perspective.

18           Anything else, Ms. Goldenberg?

19           MS. GOLDENBERG:  You know, Your Honor, I can tell from

20   your questions that you've already read everything that I

21   submitted, so I certainly don't want to rehash everything that

22   we put in here.  But, you know, I'll just say that this is --

23   I've never seen anything like this.  Their -- Aurobindo is

24   asking to be forgiven for telling the Court incorrectly that it

25   has made productions, that its productions are complete, and

1   that it can -- it has repeatedly misstated facts to the Court

2   and has now come before the Court telling us that it's not a

3   big deal.  And the fact that that's its position just

4   underscores the need for these sanctions.  And I'll -- go

5   ahead.  I'm sorry.

6          JUDGE VANASKIE:  And do you agree that I'm restricted

7   to imposing the least -- I'm restricted to imposing a sanction

8   no greater than necessary to cure the prejudice?

9          MS. GOLDENBERG:  The case law certainly supports that

10  and I think that's where we are.  You know, we have considered

11  other sanctions that might be available, including costs and

12  fees, which you and I just discussed, we've considered, you

13  know, what would happen if we simply did discovery all over

14  again; but, again, that sends a pretty disturbing message to

15  litigants that that is all that needs to happen if this type of

16  thing transpires in the future.  And it also pushes this entire

17  MDL back.

18         We represent a number of people who have cancer, who

19  have been waiting for their day in court, and for any plaintiff

20  who even has a mixed-use case, so if they took ZHP's product

21  and Aurobindo's product, this doesn't just derail the

22  plaintiffs' cases who had Aurobindo.  This delays every

23  plaintiff who has a mixed-use case.  And so this is -- it's

24  very easy for this problem to get messy and spill over into the

25  rest of this litigation.

```
 1            JUDGE VANASKIE:  All right.  Thank you.

 2        Mr. Lavelle?

 3            MR. LAVELLE:  Thank you, Your Honor.

 4        Let me start by saying we are relatively new to this

 5    case.  I think this is the first time I've had the opportunity

 6    to argue in front of Your Honor on this case.  We just came in

 7    as counsel for the Aurobindo defendants a couple of weeks ago.

 8    And while we do not have the history that counsel had with

 9    this, we have had an opportunity to work with our client and to

10    get up to speed on this.

11        The plaintiffs are seeking the most extreme sanctions

12    available under Rule 37, that is striking the Aurobindo

13    defendants' answer and defenses for Aurobindo's failure to

14    achieve perfection, but perfection's not possible, as Your

15    Honor has aptly observed in previous proceedings in this case,

16    and the standard really is have reasonable efforts, has

17    reasonable diligence been engaged in.  And as Your Honor

18    pointed out in colloquy with opposing counsel, the Third

19    Circuit's recognized in the Poulis case that dispositive

20    sanctions must be a sanction of last, not first, resort.  And

21    plaintiffs here are seeking it as their first resort rather

22    than last resort.

23        The Aurobindo defendants have not engaged in conduct

24    deserving sanctions at all, much less the extraordinary

25    sanctions the plaintiffs seek in their motion.  We've devoted
```

1  significant resources to document production and made extensive

2  productions.

3         I'd like to start with the point that Your Honor

4  raised, which is, what is the prejudice that plaintiffs can

5  claim here.  The complaints that plaintiffs have raised in this

6  motion are largely complaints about supplemental productions

7  that were completed months ago.  And if you look at this

8  Exhibit GG, which I'll note that if it were so important to

9  plaintiffs, why did they submit it for the first time in their

10  reply brief, which was just submitted yesterday as opposed to

11  their original motion?  Because this Exhibit GG shows that of

12  the depositions they're complaining about now that they don't

13  want to have to redo, two were taken in March and two were

14  taken in April.  They've had those documents that they're

15  complaining about in this motion for many weeks now, and we

16  have offered, we offered in opposition to this motion and we've

17  offered in communications with plaintiffs' counsel, do you want

18  to schedule supplemental depositions of any of these deponents

19  in order to address any documents that you claim were produced

20  late?  We've not heard anything from plaintiffs.  The colloquy

21  we heard today during the argument is the first time they've

22  identified anybody.

23         I will note, Your Honor, that having to take a

24  deposition of a witness on late-produced documents does not

25  mean that you're doing the deposition all over again from

1  ground zero; it just means that you are going to be questioning

2  the witness on late-produced or newly produced documents.  This

3  is not unheard of in discovery, it happens fairly often, and in

4  this case, there's ample reason to understand why there were

5  late productions.

6          I'd like to just spend a couple of minutes, Your

7  Honor, discussing the enormous efforts and resources that

8  Aurobindo has devoted to discovery in this case, and

9  specifically to document collection, review and production,

10  because from plaintiffs' production today and from their

11  motions, you might expect that Aurobindo did not consider its

12  discovery obligations to be serious.  That is not the case.

13  Aurobindo has taken discovery very seriously, has made

14  extensive efforts to comply with its obligations, and the

15  document production by the Aurobindo defendants has been

16  extensive.

17          The U.S. entities, and there are two of them, have

18  produced over 75,000 documents.  That's over a half a million

19  pages.  APL, the Indian entity, has produced over 367,000

20  documents.  That's over two million pages.  There have been

21  hundreds of attorneys who spent over 45,000 hours reviewing

22  documents collected for production.  And contrary to what

23  plaintiffs argued in their papers, although they didn't argue

24  it today, it's not just email documents that were produced by

25  the Aurobindo defendants.

1          With respect to the U.S. entities, we produced core

2    discovery timely in June of 2019, the custodians were

3    designated in December of '19, the search terms were finalized

4    in June of '20, and we discovered early this year, in February

5    '21, that there had been an internal miscommunication within

6    the IT team that led to a product -- production deficiency for

7    the U.S. custodians.

8          JUDGE VANASKIE:  What does that mean, internal

9    miscommunication?

10         MR. LAVELLE:  My understanding is, Your Honor, that

11   there was a -- the IT team had represented to the lawyers that

12   the documents had been collected in a certain way and it turned

13   out not to be the case and it was only discovered in February.

14         JUDGE VANASKIE:  One of the things that troubles me

15   here deals with the claims that they couldn't transfer files

16   that were in India -- and, Ms. Goldenberg, correct me if I'm

17   wrong on my facts on this -- but it dealt with using the FTP,

18   file transfer protocol, for purposes -- and it was, like, well,

19   we can't do it because it takes forever to load and it just

20   cannot be done.  And we find out in the reply brief that I've

21   seen that Aurobindo used FTP all the time and they ultimately

22   were able to do it.  So it sort of rings hollow the excuse

23   that, well, it was going to take too long to send it over the

24   Internet, we are going to have to send it by some courier

25   service or Federal Express.

 1          MR. LAVELLE:  Yes, Your Honor.

 2          Here's my understanding of what happened there.  The

 3   issue is really the volume of material that was going to be

 4   sent.  And as I understand it, it was a terabyte of data, which

 5   is an enormous amount of data.  I believe the concern that was

 6   expressed about using FTP transfer was that it was going to

 7   take too long, given the enormous amount of data, to be

 8   practicable or to work, and the concern that the FTP connection

 9   would get knocked out and then it would resume.  In any event,

10   the Court ordered it.

11          While discussions between the parties were not as

12   productive as they should have been on that, it's a matter

13   that's been resolved.  We agree, in retrospect, that it's

14   something that could have been done by FTP and I would submit,

15   Your Honor, that that is a mistake that was made but it's been

16   rectified.  And with respect to many of the issues that have

17   been raised in this motion, I'd say that's a fair way to

18   describe them.

19          When you have discovery of the size and scope that we

20   have here, you expect experienced counsel, like we have

21   representing the plaintiffs and representing Aurobindo, to have

22   productive meet-and-confer discussions.  It's fair to say that

23   there was a period of time when those discussions were

24   productive and more recently, unfortunately, they have been

25   less productive.  We're hopeful that we can get back on the

1    right track going forward.  But I believe that the record

2    that's here is clear that where issues have been raised by

3    plaintiffs, Aurobindo has made extensive efforts to address

4    those issues and to try to rectify them.

5         A lot of what the plaintiffs raise in this today is

6    the point that Your Honor referred to earlier, and that is,

7    whether or not there were representations made earlier in the

8    case that production was complete.  And I harken back to the

9    discussion that Your Honor had about a month ago in the

10   previous conference where you shared that in your Electronic

11   Evidence case -- course, you tell your students not to say you

12   have produced everything because you don't know that you

13   produced everything.  There always could be something else out

14   there.  And that what you expect is a diligent, good-faith

15   effort to produce the documents that are responsive.

16        We would submit that that is what's happened here;

17   that the issues that plaintiffs raise with respect to

18   statements that were made are largely ones where they are

19   either taken out of context or, in a couple of instances,

20   counsel was perhaps overly optimistic about the state of

21   production.  But there's no evidence here that these statements

22   were made in bad faith, that there were attempts to hide

23   documents from production.  To the contrary, what's happened is

24   the document production that's been made, in order to rectify

25   it, in order to supplement production, has now been spun by

1  plaintiffs as evidence that there was an effort to hide

2  documents.  It's true that no good deed goes unpunished.

3       We think that as a matter of policy and as a matter of

4  the facts of this case, what should happen is the parties

5  should be directed to continue discussion and to rectify the

6  issues as they come up and to try to resolve them.

7       With respect to the --

8       JUDGE VANASKIE:  So is it your position -- well, let

9  me ask you your position on this, Mr. Lavelle.

10       MR. LAVELLE:  Yes.

11       JUDGE VANASKIE:  Can I make a finding that Aurobindo

12  has acted in bad faith without conducting an evidentiary

13  hearing in this matter?

14       MR. LAVELLE:  Certainly not on the record that's been

15  presented here, Your Honor.  And we would submit that if -- if

16  Your Honor were inclined to even consider that, that there

17  would have to be an evidentiary hearing.  That's what Judge

18  Hochberg did in the *Wachtel* case, as you pointed out was an

19  extraordinary case, and it was one where there was a vastly

20  different record than the one that's been presented here.  But

21  we would submit, Your Honor, there's no need to even get to

22  that point.

23       What we have here are complaints about late production

24  of documents that can be rectified readily by if plaintiffs

25  wish to do supplemental depositions of individual witnesses who

```
 1   they've already taken depositions of to complete those

 2   depositions and to do them.  And we will be happy to arrange

 3   for those witnesses to be reproduced to be questioned on any

 4   new or recently produced documents.

 5        I will note that in the case management conference

 6   today there were discussions of other parties, other

 7   defendants, who are still in the process of producing

 8   documents.  And so document production is not complete in this

 9   case and we're not the only defendant who is in this position

10   of still having to do some clean-up document production.

11        Obviously, we want to do what we can to get that

12   production completed here.  We're working hard on that.  We are

13   devoting the resources necessary to do that.  But we would

14   submit this is very different from the Wachtel case.  This does

15   not even approach it.  There's really no showing of prejudice

16   here and there's no evidence that there was an effort to try to

17   hide documents.

18        As Your Honor discussed in the Baliodis case, and

19   that's a decision from Middle District of Pennsylvania when

20   Your Honor was on that Court, where there's no bad faith on the

21   part of the spoliating party and the prejudice is not severe, a

22   sanction of witness preclusion or entry of judgment is

23   unwarranted.  And that's where, at most, we would say we are

24   here.  There's no evidence of spoliation at all, and there's

25   certainly no prejudice at all, much less severe prejudice.
```

1           So we would submit that the extraordinary sanction

2    that plaintiffs have asked for is not warranted.

3           The document production's been very challenging for

4    the Aurobindo defendants.  And as Your Honor pointed out in

5    questioning plaintiffs' counsel earlier, we're in the middle of

6    an unprecedented global pandemic.  We have a client that is in

7    India that is particularly hard hit right now.  So working

8    through some of these remaining issues with people in India,

9    dealing with the crisis that they are dealing with, has been

10   very difficult.  We admit and acknowledge that the document

11   production by the Aurobindo defendants was not perfect but we

12   submit that it was made in good faith.  And --

13          JUDGE VANASKIE:  Is it appropriate, Mr. Lavelle, would

14   it be appropriate for me to reserve ruling on this motion for

15   sanctions to allow plaintiffs to identify depositions that need

16   to be retaken so that I can understand how that would impact

17   their ability to provide information to their expert witnesses

18   on a timely basis for purposes of assessing prejudice and,

19   therefore, appropriate sanction?

20          MR. LAVELLE:  Well, Your Honor, if that is the issue,

21   and that's what I heard plaintiffs' counsel raise, we would

22   submit that there's no need to keep the motion for sanctions in

23   abeyance, that it should be denied and we should go forward

24   with producing those witnesses for deposition and completing

25   their depositions.  And we are prepared to arrange for that.

1          JUDGE VANASKIE:  Thank you.

2          Ms. Goldenberg?

3          MS. GOLDENBERG:  Yes, Your Honor.  I wanted to respond

4     to a few things that Mr. Lavelle said.

5          I heard him call the statements to the Court

6     optimistic and I think there's a little bit of a difference

7     between optimistic and multiple, repeated misrepresentations to

8     the Court.  And as we've set forth in our brief, there are many

9     of them and, in fact, they continued through last week.

10         Last week Aurobindo was questioned on the record, have

11    they -- you know, you, I believe, asked them where they were on

12    their productions and they said, we have completed our

13    production as to the custodial side of the Aurobindo Pharma

14    Limited custodians.  Yesterday we got a 60,000-page production

15    from Aurobindo Pharma Limited and of that, 7,534 are custodial

16    documents.  It hasn't ended, and that's a problem.

17         And I also heard Aurobindo classify its production as

18    imperfect, but there is a difference between imperfection and

19    80 percent of documents being held back from a production and

20    disclosed in the way that we previously discussed in the

21    production log strategically in drabs only by the custodians

22    whose deposition was coming up and the rest of it came after we

23    threatened sanctions.

24         They have not been candid with the Court, they have

25    not been candid with plaintiffs, and they're now asking the

1    Court to trust them to do it right.  They haven't earned that

2    trust.  And they also are asking the Court to derail a

3    scheduling order that's already been pushed back, for COVID, by

4    the way, twice based on concerns for U.S. deponents who, again,

5    don't have a language barrier and who were accessible to them

6    the entire time.

7          And, by the way, Aurobindo Pharma Limited's

8    production, they sat on plaintiffs' Rule 34 discovery requests

9    for months.  Up through -- between the time that they made

10   their core discovery production and the November 2020

11   production deadline, they produced two documents from

12   noncustodial sources, two.  There is no world in which that is

13   the result of a diligent or good-faith search.

14         And I think it's telling that Aurobindo has brought in

15   new counsel to argue this motion because the people who were

16   involved aren't the ones speaking to you today about what

17   happened.  But what we have seen over multiple hearings, over

18   multiple weeks and months, is that plaintiffs have repeatedly

19   questioned Aurobindo and the only documents we've ever gotten

20   are the ones that we specifically found.

21         What we know now, just as a result of filing this

22   motion, is that there are two custodians whose computers were

23   wiped, and what Aurobindo said in their response is that they

24   have endeavored to put that data back together.  But what

25   you'll see in the declaration that I filed along with our

```
 1   motion is that there are distinct gaps in the custodial files

 2   of those two custodians where all of a sudden there are emails

 3   and then there are holes, there are emails and there are holes

 4   again.  And so this is like discovery whack-a-mole.  We can't

 5   play this forever.  We can't push this whole MDL back.

 6          I think that there's been more than a sufficient

 7   showing to demonstrate to the Court that this is intentional,

 8   it's calculated, and the lack of candor to the Court does not

 9   deserve a second chance or a fifth, for that matter, which is

10   really where we're at right now.

11          JUDGE VANASKIE:  All right.  Thank you.

12          Anything else, Mr. Lavelle?

13          MR. LAVELLE:  Yes.  I'd like to make a couple of

14   points in response to what Ms. Goldenberg just said.

15          Starting with respect to the -- the issues with the

16   two witnesses -- or the two individuals whose laptops were

17   erased after they left the company.  It's noteworthy that

18   plaintiffs' counsel attached as exhibits to their reply brief

19   three documents that they found in the document production that

20   were either sent to or from those individuals.  So the point is

21   that they have those documents.  They were obviously produced

22   as part of Aurobindo's production.

23          As we explained in our briefs, we went back to backup

24   tapes, which is an accepted way to find documents, we were able

25   to make production from those, and we went to get statistics
```

1    from our eDiscovery vendor and we understand that over 5,000

2    documents have been produced that relate to Mr. Raju is one

3    custodian and about 1,500 relating to a custodian, Reddy.  So

4    plaintiffs have asserted, without evidence, that there were

5    documents that were missing but, in fact, it is not at all

6    unusual for people to work on projects and then to go off

7    projects that would leave the kind of gaps that have been shown

8    in the exhibit that Ms. Goldenberg attached.

9           An argument that she's made repeatedly is that we are

10   seeking to derail the scheduling order.  That's not the case.

11   We haven't asked for the scheduling order to be changed.  We

12   don't think that there has to be any change to the scheduling

13   order in order to accommodate any makeup or additional

14   supplemental depositions.  There's ample time for those

15   depositions to be rescheduled, and it's noteworthy that we

16   didn't hear anything from Ms. Goldenberg about wanting to

17   schedule those.  And, again, we remain willing to schedule

18   those depositions if they want to.

19          Finally, I need to address the repeated assertions by

20   plaintiffs' counsel that we think are really inappropriate and

21   baseless that documents were held back.  That is rhetoric that

22   is unsupported by substance.  It's inappropriate to make those

23   kind of assertions.  There is no evidence that's been presented

24   by counsel here that there was an intent to hold back

25   documents, and to make that assertion without evidence, we

1  submit, is inappropriate.

2       And the bottom line is, even if they were right, those

3  documents have been in plaintiffs' possession for months; and

4  rather than just schedule the depositions to question witnesses

5  on them, they filed the present motion.  They'd rather complain

6  about not being able to conduct the discovery rather than just

7  conduct the discovery.

8       JUDGE VANASKIE:  All right.  All right.  Thank you.

9       I just want to say this -- what I saw transpire here

10 over the last several months since I've been involved in this

11 matter is very troubling.  I have a hard time understanding why

12 it took so long to make productions.  I don't understand at all

13 the position taken by Aurobindo with respect to the transfer of

14 files.  You know, whether it's a terabyte or not, it can be

15 done.  So I just am troubled by the conduct of Aurobindo.  I'm

16 not making any finding yet.  I'm going to take the matter under

17 advisement because the sanction being sought here is, of

18 course, what I call in my class the death penalty sanction and

19 it's reserved for the most egregious of cases.  I'm not sure

20 we're there.  I'm not making a judgment one way or another.

21 All I'm saying is that the conduct is troubling.  It's not even

22 close to perfection or anything approaching that.  It's

23 difficult to fathom.

24      And so we'll take a careful look at this and issue a

25 written decision hopefully in the very near future.

1          Anything else?

2          MS. GOLDENBERG:  That's it, Your Honor.  Thank you.

3          MR. LAVELLE:  Thank you, Your Honor.

4          JUDGE VANASKIE:  Thank you all very much.  We'll

5    conclude the conference for today.  And I'll go back and look

6    at the transcript and see if there's any order that needs to be

7    issued.  All right?

8          Anything else on behalf of any of the other counsel

9    who are here?

10         MR. SLATER:  No, Your Honor.  Thank you for your

11   patience through this long hearing.

12         MS. PRISELAC:  Thank you, Your Honor.

13         JUDGE VANASKIE:  Thank you all very much.  Have a good

14   evening.

15         (The proceedings concluded at 6:10 p.m.)

16         - - - - - - - - - - - - - - - - -

17

18         I certify that the foregoing is a correct transcript

19   from the record of proceedings in the above-entitled matter.

20

21   */S/ Camille Pedano, CCR, RMR, CRR, CRC, RPR*
     *Court Reporter/Transcriber*

22

23   *05/14/2021*
     *Date*

24

25

**'**

**'19** [1] - 77:3
**'20** [1] - 77:4
**'21** [1] - 77:5

**/**

**/S** [1] - 88:21

**0**

**05/14/2021** [1] - 88:23
**07068** [1] - 1:14
**08101** [1] - 1:8
**08540** [2] - 2:20, 2:24

**1**

**1,000** [1] - 22:25
**1,500** [1] - 86:3
**103** [1] - 1:14
**11** [3] - 67:13, 70:3, 70:9
**12** [2] - 1:9, 26:5
**13,000** [1] - 68:3
**15** [1] - 54:5
**15th** [2] - 19:8, 51:10
**16** [2] - 60:16, 61:12
**1638** [1] - 1:17
**17th** [4] - 2:9, 14:23, 24:4, 56:19
**18** [1] - 55:17
**19-md-02875-RBK-KMW** [1] - 1:4
**19103** [1] - 2:9
**19422** [1] - 2:17
**19th** [1] - 51:11

**2**

**20** [9] - 5:6, 14:18, 31:21, 36:24, 36:25, 38:14, 38:21, 38:24, 39:2
**200** [1] - 8:18
**2010** [2] - 31:21, 31:22
**2017** [5] - 20:8, 26:5, 27:24, 30:22, 31:23
**2018** [2] - 56:19, 60:5
**2019** [4] - 33:23, 53:21, 60:5, 77:2
**2020** [9] - 19:8, 54:5, 55:10, 55:16, 61:1, 68:6, 68:15, 72:14, 84:10
**2021** [2] - 1:9, 31:24
**20th** [2] - 41:4, 68:2
**21** [1] - 2:23
**2150** [1] - 1:20
**21st** [4] - 14:22, 22:9, 41:11, 41:12

**24th** [1] - 41:3
**2500** [1] - 2:13
**27th** [1] - 61:1
**29th** [3] - 46:1, 47:24, 51:13
**2nd** [3] - 10:14, 46:20, 46:24

**3**

**3,479** [1] - 13:19
**3,500** [2] - 6:6, 10:24
**30** [2] - 2:9, 19:18
**30(b)(6** [5] - 51:1, 52:17, 60:20, 66:14
**30305** [1] - 2:13
**30th** [2] - 51:16, 65:11
**316** [1] - 2:6
**32** [3] - 6:10, 6:25, 9:15
**32502** [1] - 2:6
**3333** [1] - 2:13
**34** [1] - 84:8
**367,000** [1] - 76:19
**37** [2] - 69:17, 74:12
**3rd** [1] - 10:15

**4**

**45** [4] - 35:4, 35:13, 35:18, 36:23
**45,000** [1] - 76:21
**45-day** [3] - 34:16, 34:18, 35:18
**450** [1] - 2:17
**49** [2] - 49:4, 50:3
**4:00** [2] - 1:9, 4:2
**4:30** [1] - 6:22
**4th** [5] - 1:8, 22:3, 23:17, 25:6, 51:18

**5**

**5,000** [1] - 86:1
**502** [1] - 2:19
**55402** [1] - 1:20
**56** [1] - 10:22
**57** [1] - 10:22
**5th** [1] - 10:4

**6**

**6** [1] - 10:15
**60,000-page** [1] - 83:14
**600** [1] - 2:6
**609-774-1494** [1] - 1:23
**6:10** [1] - 88:15

**7**

**7,534** [1] - 83:15
**701** [1] - 2:3
**70130** [1] - 2:3
**75,000** [1] - 76:18
**7th** [1] - 14:21

**8**

**80** [4] - 65:20, 68:18, 72:8, 83:19
**800** [1] - 1:20
**856** [2] - 8:18, 10:24
**859** [2] - 10:25, 13:17
**8B** [3] - 41:18, 41:20, 42:8
**8C** [1] - 26:18
**8D** [1] - 26:18
**8E** [4] - 41:18, 41:24, 42:2, 42:3

**9**

**90277** [1] - 1:17

**A**

**abeyance** [1] - 82:23
**ability** [4] - 57:21, 58:11, 59:12, 82:17
**able** [24] - 11:6, 13:1, 16:1, 16:6, 16:14, 21:13, 24:1, 24:3, 24:25, 26:12, 26:14, 34:25, 37:6, 46:12, 46:17, 47:3, 47:25, 52:24, 64:2, 64:19, 71:20, 77:22, 85:24, 87:6
**above-entitled** [1] - 88:19
**ABRAHAM** [15] - 2:22, 42:20, 42:23, 43:2, 43:7, 44:8, 45:4, 45:9, 45:21, 47:15, 48:20, 49:1, 49:18, 49:20, 50:5
**Abraham** [6] - 42:20, 42:22, 43:5, 44:7, 45:20, 47:14
**absent** [1] - 64:2
**absolutely** [5] - 16:12, 19:16, 21:13, 25:7, 25:16
**academic** [1] - 72:16
**accelerate** [1] - 41:5
**acceptable** [1] - 35:15
**accepted** [1] - 85:24
**accessible** [1] - 84:5
**accident** [1] - 69:7
**accommodate** [1] -

86:13
**accomplish** [3] - 14:24, 22:8, 39:1
**accomplished** [1] - 25:10
**accurately** [1] - 4:23
**achieve** [1] - 74:14
**acknowledge** [1] - 82:10
**acknowledged** [1] - 64:7
**Actavis** [2] - 2:14, 2:15
**acted** [1] - 80:12
**ACTION** [1] - 1:3
**actual** [4] - 24:7, 26:19, 44:14, 58:4
**ADAM** [1] - 1:13
**Adam** [1] - 16:19
**add** [2] - 19:5, 24:6
**added** [4] - 21:21, 32:15, 42:6, 67:23
**addition** [2] - 15:22, 43:15
**additional** [27] - 5:5, 7:4, 7:19, 8:21, 8:22, 10:14, 10:16, 14:16, 19:10, 19:11, 21:25, 22:1, 22:3, 22:10, 23:17, 25:10, 28:17, 37:1, 38:23, 46:14, 48:10, 48:13, 59:3, 70:25, 86:13
**additionally** [3] - 7:21, 7:25, 11:17
**address** [11] - 5:4, 5:7, 13:22, 14:16, 19:18, 23:4, 28:23, 44:23, 75:19, 79:3, 86:19
**addressed** [2] - 53:20, 54:4
**addressing** [6] - 5:16, 5:19, 5:22, 16:17, 50:10, 64:16
**adequate** [4] - 23:18, 32:23, 62:9
**adhere** [2] - 19:16, 22:17
**admissibility** [1] - 37:8
**admit** [1] - 82:10
**admits** [1] - 60:17
**advance** [2] - 14:6, 67:1
**advancing** [1] - 11:21
**advise** [1] - 48:12
**advisement** [1] - 87:17
**affairs** [1] - 31:2
**affected** [1] - 53:14

**affidavit** [1] - 40:16
**afternoon** [7] - 4:19, 5:8, 5:18, 42:24, 43:4, 50:11, 50:13
**afterwards** [1] - 34:11
**agenda** [6] - 4:25, 5:10, 5:15, 9:25, 14:15, 22:19
**aggressive** [1] - 20:5
**ago** [7] - 19:9, 38:6, 40:21, 62:1, 74:7, 75:7, 79:9
**agree** [7] - 38:2, 38:20, 44:10, 45:4, 49:15, 73:6, 78:13
**agreed** [9] - 22:1, 23:11, 23:13, 23:14, 23:15, 23:23, 44:16, 49:9, 55:1
**agreement** [4] - 35:14, 37:12, 44:1, 48:18
**ahead** [6] - 10:11, 11:2, 15:4, 22:12, 41:7, 73:5
**aided** [1] - 1:25
**allegations** [1] - 59:22
**allow** [1] - 82:15
**almost** [2] - 18:15, 19:8
**alone** [1] - 66:5
**ALSO** [1] - 3:1
**amenable** [2] - 35:6, 35:8
**amount** [8] - 8:22, 14:5, 22:16, 43:17, 69:24, 70:7, 78:5, 78:7
**ample** [3] - 59:5, 76:4, 86:14
**analysis** [1] - 34:12
**Andrew** [2] - 6:7, 6:24
**answer** [2] - 71:9, 74:13
**answers** [1] - 18:13
**API** [15] - 50:25, 52:15, 55:15, 55:19, 55:22, 57:5, 57:6, 57:7, 57:12, 60:15, 61:8, 61:12, 61:24, 62:13, 72:1
**APL** [1] - 76:19
**apologize** [2] - 11:4, 32:12
**appear** [1] - 13:13
**applied** [3] - 15:23, 16:3, 23:1
**applies** [1] - 54:7
**apply** [5] - 22:25, 33:19, 39:5, 39:8, 39:12

**appreciate** [1] - 29:5
**approach** [3] - 18:25, 48:14, 81:15
**approaching** [1] - 87:22
**appropriate** [6] - 61:23, 70:24, 71:10, 82:13, 82:14, 82:19
**approval** [1] - 56:8
**April** [7] - 46:1, 47:24, 51:9, 51:11, 51:13, 51:16, 75:14
**aptly** [1] - 74:15
**argue** [4] - 61:25, 74:6, 76:23, 84:15
**argued** [2] - 40:7, 76:23
**arguing** [3] - 54:18, 54:19, 65:2
**argument** [7] - 29:3, 29:19, 31:3, 31:16, 59:17, 75:21, 86:9
**arguments** [3] - 18:22, 33:18, 40:5
**arrange** [3] - 58:16, 81:2, 82:25
**arrangements** [1] - 30:9
**articulated** [1] - 13:4
**ascertain** [1] - 52:8
**ascertained** [1] - 50:22
**aside** [2] - 58:21, 60:2
**aspects** [2] - 15:16, 16:3
**asserted** [2] - 32:17, 86:4
**assertion** [4] - 11:25, 12:13, 32:19, 86:25
**assertions** [2] - 86:19, 86:23
**assess** [2] - 11:25, 12:14
**assessing** [1] - 82:18
**assessment** [1] - 12:15
**assume** [1] - 65:4
**assuming** [1] - 33:9
**assurance** [1] - 63:5
**Atlanta** [1] - 2:13
**attached** [2] - 85:18, 86:8
**attempts** [1] - 79:22
**attention** [2] - 49:12, 49:25
**Attorney** [1] - 2:24
**attorney** [16] - 6:10, 6:11, 7:10, 7:14, 7:18, 8:4, 8:5, 8:9, 12:1, 12:4, 12:7,

13:4, 13:13, 33:6, 62:19
**attorney's** [2] - 13:8, 13:13
**attorney-client** [4] - 7:10, 12:1, 12:7, 33:6
**attorneys** [12] - 7:20, 7:22, 9:15, 11:14, 11:16, 24:8, 24:12, 29:12, 31:12, 32:3, 76:21
**audit** [1] - 43:20
**auditing** [1] - 68:9
**Aurobindo** [55] - 2:21, 5:17, 5:19, 7:7, 9:19, 10:6, 12:13, 13:24, 14:1, 64:23, 65:2, 65:17, 65:22, 65:24, 67:20, 68:5, 68:7, 68:14, 68:18, 68:20, 68:22, 68:23, 68:24, 69:10, 70:11, 71:25, 72:6, 72:10, 72:13, 72:23, 73:22, 74:7, 74:12, 74:23, 76:8, 76:11, 76:13, 76:15, 76:25, 77:21, 78:21, 79:3, 80:11, 82:4, 82:11, 83:10, 83:13, 83:15, 83:17, 84:7, 84:14, 84:19, 84:23, 87:13, 87:15
**Aurobindo's** [11] - 4:13, 5:12, 5:16, 6:18, 9:7, 12:21, 67:23, 68:10, 73:21, 74:13, 85:22
**Aurolife** [1] - 2:20
**authorities** [1] - 20:17
**available** [10] - 6:8, 52:16, 53:5, 58:16, 59:4, 63:4, 63:15, 72:12, 73:11, 74:12
**Avenue** [1] - 1:20
**awaiting** [1] - 11:19
**aware** [2] - 15:17, 57:23
**awful** [1] - 71:7

**B**

**backdrop** [1] - 15:8
**background** [2] - 4:14, 50:18
**backup** [1] - 85:23
**bad** [4] - 27:3, 79:22, 80:12, 81:20
**Baliodis** [1] - 81:18
**balloon** [1] - 68:18
**Baohua** [2] - 29:7,

29:17
**Baretto** [2] - 51:10, 53:12
**Baretto's** [2] - 57:13, 62:25
**barrier** [1] - 84:5
**barriers** [1] - 72:11
**based** [8] - 6:14, 12:15, 12:18, 31:8, 32:17, 61:25, 66:9, 84:4
**baseless** [1] - 86:21
**bases** [1] - 23:9
**basic** [1] - 45:2
**basis** [8] - 12:25, 32:19, 47:18, 48:6, 49:6, 50:18, 57:4, 82:18
**batches** [4] - 52:19, 52:22, 53:3, 61:14
**Bates** [9] - 44:2, 44:12, 44:14, 44:18, 45:3, 45:7, 46:7, 46:11, 46:13
**Baylen** [1] - 2:6
**Beach** [1] - 1:17
**bearing** [2] - 56:13, 57:2
**becomes** [2] - 30:1, 35:3
**begin** [1] - 62:1
**beginning** [5] - 13:12, 18:16, 62:14, 64:21, 71:6
**begins** [1] - 24:4
**behalf** [9] - 4:5, 5:17, 5:19, 35:12, 60:24, 64:23, 64:25, 65:2, 88:8
**behavior** [3] - 67:25, 69:9, 70:13
**Behram** [1] - 42:24
**BEHRAM** [1] - 1:16
**Bell** [1] - 2:17
**benefit** [2] - 17:12, 17:15
**best** [6] - 19:16, 22:17, 24:10, 25:5, 25:9, 58:20
**better** [4] - 7:16, 7:23, 11:8, 47:18
**between** [10] - 11:13, 29:12, 29:22, 46:23, 56:4, 78:11, 83:7, 83:18, 84:9
**beyond** [4] - 8:6, 22:3, 23:17, 38:24
**Bhadresh** [3] - 67:4, 68:16, 69:2
**big** [4] - 66:4, 66:7,

72:3, 73:3
**biggest** [1] - 65:14
**bilingual** [1] - 24:8
**bit** [5] - 5:14, 6:7, 18:10, 32:6, 83:6
**black** [1] - 20:22
**black-and-white** [1] - 20:22
**blanks** [1] - 26:14
**Blessy** [2] - 66:14, 69:6
**Blue** [1] - 2:17
**BOCKIUS** [1] - 2:18
**bottom** [1] - 87:2
**bounds** [1] - 56:3
**break** [3] - 7:9, 11:7, 34:1
**brief** [14] - 41:2, 49:17, 59:21, 60:1, 67:21, 68:4, 70:19, 72:11, 75:10, 77:20, 83:8, 85:18
**briefed** [1] - 11:18
**briefer** [1] - 29:2
**briefing** [3] - 27:6, 39:19, 39:21
**briefly** [1] - 25:25
**briefs** [2] - 41:9, 85:23
**bring** [4] - 18:5, 26:15, 27:10, 59:13
**bringing** [2] - 9:1, 9:4
**brings** [1] - 64:21
**broad** [1] - 63:1
**broken** [1] - 18:17
**brought** [2] - 53:12, 84:14
**build** [1] - 71:13
**Building** [1] - 1:7
**bunch** [1] - 44:5
**burden** [4] - 31:3, 31:6, 31:16, 32:9
**business** [1] - 71:12
**BY** [9] - 1:13, 1:16, 1:19, 2:2, 2:5, 2:8, 2:12, 2:16, 2:19

**C**

**calculated** [1] - 85:8
**calendar** [3] - 30:11, 40:25, 41:1
**calendaring** [1] - 30:12
**California** [1] - 1:17
**Camden** [1] - 1:8
**camera** [2] - 9:18, 49:16
**Camille** [3] - 1:22, 4:23, 88:21
**camillepedano@ gmail.com** [1] - 1:23

**Camp** [1] - 2:3
**cancer** [1] - 73:18
**candid** [2] - 83:24, 83:25
**candidly** [1] - 67:5
**candor** [1] - 85:8
**cannot** [4] - 13:5, 25:8, 62:12, 77:20
**captive** [1] - 24:1
**care** [1] - 36:1
**careful** [1] - 87:24
**Carnegie** [1] - 2:19
**case** [57] - 6:15, 8:11, 13:11, 24:11, 25:3, 26:21, 27:5, 27:22, 28:12, 29:11, 33:5, 52:15, 55:22, 57:22, 58:11, 59:1, 59:9, 60:16, 61:24, 62:8, 62:10, 64:4, 65:23, 65:24, 66:1, 66:3, 67:13, 67:15, 67:16, 68:11, 69:23, 70:1, 70:2, 70:4, 70:5, 72:2, 73:9, 73:20, 73:23, 74:5, 74:6, 74:15, 74:19, 76:4, 76:8, 76:12, 77:13, 79:8, 79:11, 80:4, 80:18, 80:19, 81:5, 81:9, 81:14, 81:18, 86:10
**cases** [5] - 36:2, 69:16, 70:6, 73:22, 87:19
**cast** [1] - 7:21
**categories** [4] - 7:10, 11:7, 11:11, 13:18
**caution** [1] - 72:15
**caveat** [1] - 48:9
**CCR** [1] - 88:21
**cellphones** [1] - 28:19
**center** [1] - 57:17
**Center** [1] - 2:19
**central** [1] - 29:14
**certain** [10] - 17:17, 17:18, 18:7, 24:23, 30:4, 30:6, 33:18, 49:13, 77:12
**certainly** [21] - 12:10, 12:23, 16:5, 17:16, 24:24, 29:18, 34:3, 35:24, 37:14, 38:1, 38:15, 39:22, 58:7, 62:24, 65:8, 66:14, 69:25, 72:21, 73:9, 80:14, 81:25
**certificate** [1] - 56:9
**certification** [2] - 37:4, 65:16

**certify** *[1]* - 88:18
**cetera** *[5]* - 18:21,
20:12, 21:22, 26:13,
29:12
**chain** *[1]* - 7:20
**chairman** *[2]* - 29:7,
30:15
**challenging** *[1]* - 82:3
**chance** *[2]* - 70:11,
85:9
**chances** *[1]* - 9:7
**change** *[1]* - 86:12
**changed** *[1]* - 86:11
**characterization** *[1]* -
20:21
**characters** *[1]* - 7:22
**charge** *[1]* - 49:4
**Chen** *[4]* - 29:7, 29:17,
29:22, 40:2
**chief** *[2]* - 29:6, 67:2
**China** *[4]* - 16:7, 24:2,
24:3, 72:10
**Chinese** *[4]* - 20:2,
34:15, 34:24, 40:15
**Chinese-speaking** *[1]*
- 34:15
**CIPRIANI** *[1]* - 2:16
**Circuit's** *[1]* - 74:19
**circumstance** *[1]* -
19:17
**circumstances** *[4]* -
23:18, 25:1, 41:4,
71:16
**cite** *[1]* - 27:5
**cited** *[4]* - 30:8, 65:24,
68:4, 68:11
**Civil** *[1]* - 70:21
**CIVIL** *[1]* - 1:3
**claim** *[4]* - 56:20,
59:13, 75:5, 75:19
**claiming** *[1]* - 20:24
**claims** *[3]* - 12:20,
58:4, 77:15
**clarify** *[1]* - 53:18
**class** *[3]* - 65:16,
67:13, 87:18
**classify** *[1]* - 83:17
**clawback** *[2]* - 17:16,
17:22
**clean** *[1]* - 81:10
**clean-up** *[1]* - 81:10
**clear** *[9]* - 19:25,
23:24, 24:15, 45:22,
63:7, 63:10, 67:25,
70:20, 79:2
**clearance** *[4]* - 56:5,
56:8, 56:12, 56:23
**Clerk** *[1]* - 3:2
**client** *[12]* - 7:10, 12:1,
12:7, 16:1, 19:15,

21:10, 22:14, 24:2,
33:6, 47:25, 74:9,
82:6
**clients** *[5]* - 15:10,
15:11, 15:17, 16:15,
34:23
**close** *[3]* - 58:13, 72:5,
87:22
**closed** *[2]* - 24:2
**closely** *[1]* - 60:23
**closing** *[1]* - 56:24
**CMC** *[3]* - 49:17,
51:15, 51:22
**Coast** *[1]* - 1:17
**Cohen** *[1]* - 1:7
**colleague** *[2]* - 6:7,
41:22
**collect** *[5]* - 15:13,
16:1, 21:11, 33:10,
46:17
**collected** *[11]* - 15:21,
18:20, 23:8, 26:2,
26:3, 26:11, 27:19,
72:14, 76:22, 77:12
**collecting** *[3]* - 30:16,
31:6, 31:20
**collection** *[15]* - 15:11,
15:12, 16:8, 16:15,
21:4, 21:15, 24:4,
26:19, 26:25, 31:15,
33:3, 33:4, 34:1,
46:14, 76:9
**collection's** *[1]* -
33:18
**colloquy** *[2]* - 74:18,
75:20
**combine** *[1]* - 66:6
**coming** *[7]* - 12:13,
19:25, 29:3, 30:18,
39:23, 66:22, 83:22
**Commencing** *[1]* - 1:9
**comment** *[1]* - 21:2
**commercialized** *[2]* -
57:9, 57:16
**commit** *[1]* - 24:25
**commonsense** *[1]* -
54:12
**Commonsense** *[1]* -
54:15
**commonsense-wise**
*[1]* - 54:12
**communication** *[5]* -
7:15, 8:9, 12:5, 13:8,
51:11
**communications** *[8]* -
6:13, 7:13, 7:17,
7:24, 11:10, 31:11,
75:17
**companies** *[1]* - 42:4
**company** *[7]* - 27:23,

29:7, 30:12, 30:22,
31:23, 33:16, 85:17
**company's** *[1]* - 57:2
**compel** *[3]* - 39:18,
40:12, 40:21
**compelling** *[1]* - 25:3
**complain** *[1]* - 87:5
**complaining** *[2]* -
75:12, 75:15
**complaint** *[5]* - 33:4,
33:11, 33:19, 33:21,
34:10
**complaints** *[4]* -
47:17, 75:5, 75:6,
80:23
**complete** *[6]* - 15:9,
24:19, 72:25, 79:8,
81:1, 81:8
**completed** *[8]* - 22:10,
23:19, 25:6, 48:15,
48:19, 75:7, 81:12,
83:12
**completing** *[1]* - 82:24
**complexity** *[1]* - 21:24
**complicated** *[1]* -
44:13
**complied** *[2]* - 53:25,
63:11
**comply** *[3]* - 26:10,
44:16, 76:14
**complying** *[1]* - 24:21,
57:3
**comprehensive** *[1]* -
21:15
**computer** *[2]* - 1:25,
28:18
**computer-aided** *[1]* -
1:25
**computers** *[3]* - 18:17,
70:18, 84:22
**conceptionally** *[1]* -
49:6
**concern** *[3]* - 36:19,
78:5, 78:8
**concerned** *[4]* - 14:6,
23:20, 36:11, 37:7
**concerns** *[6]* - 5:15,
5:19, 16:23, 34:4,
62:18, 84:4
**conclude** *[1]* - 88:5
**concluded** *[1]* - 88:15
**conclusion** *[2]* -
26:15, 32:23
**concrete** *[1]* - 38:11
**conduct** *[5]* - 74:23,
87:6, 87:7, 87:15,
87:21
**conducted** *[3]* - 10:17,
67:13, 70:3
**conducting** *[2]* -

69:20, 80:12
**conduit** *[2]* - 29:11,
29:22
**confer** *[21]* - 6:2, 6:5,
6:9, 6:21, 6:23, 7:3,
12:3, 12:18, 13:21,
36:21, 37:2, 48:12,
48:17, 49:1, 51:18,
51:20, 51:25, 53:11,
55:4, 59:20, 78:22
**CONFERENCE** *[1]* -
1:5
**conference** *[7]* -
13:22, 51:15, 54:5,
55:10, 79:10, 81:5,
88:5
**conferences** *[1]* -
22:20
**conferral** *[5]* - 8:16,
8:24, 12:24, 13:16,
49:5
**conferred** *[4]* - 35:23,
40:4, 44:9, 62:25
**confidential** *[1]* - 8:5
**confirm** *[6]* - 30:4,
49:8, 55:11, 55:13,
60:24, 63:18
**confirmation** *[1]* -
62:23
**confirmed** *[3]* - 19:6,
30:10, 57:17
**confirming** *[1]* - 57:6
**confronted** *[1]* - 71:17
**connection** *[2]* -
20:12, 78:8
**Connie** *[1]* - 56:12
**consider** *[3]* - 25:13,
76:11, 80:16
**consideration** *[2]* -
6:1, 71:16
**considered** *[2]* -
73:10, 73:12
**considering** *[2]* - 49:7,
71:25
**conspiracy** *[1]* - 21:9
**constant** *[1]* - 15:15
**consultant** *[1]* - 22:21
**consultants** *[1]* -
11:18
**Consulting** *[1]* - 22:21
**consumers** *[1]* - 55:21
**consuming** *[1]* - 17:24
**contained** *[1]* - 60:16
**contaminated** *[3]* -
52:5, 52:11, 52:14
**contamination** *[2]* -
28:3, 60:16
**context** *[1]* - 79:19
**continue** *[5]* - 8:17,
9:9, 9:12, 63:22,

80:5
**Continued** *[1]* - 2:1
**continued** *[2]* - 54:2,
83:9
**continuing** *[1]* - 7:8
**contradicts** *[1]* - 20:16
**contrary** *[3]* - 72:10,
76:22, 79:23
**conversation** *[5]* -
7:16, 8:7, 11:5, 13:1,
36:18
**conveyed** *[1]* - 6:9
**Cooper** *[1]* - 1:8
**coordinated** *[1]* - 30:6
**coordinates** *[1]* -
30:14
**copies** *[1]* - 42:8
**copy** *[1]* - 20:1
**core** *[3]* - 68:1, 77:1,
84:10
**correct** *[6]* - 10:8,
52:8, 57:7, 68:12,
77:16, 88:18
**corrected** *[1]* - 44:1
**correction** *[1]* - 36:11
**correspondence** *[3]* -
7:20, 11:13, 13:3
**cost** *[2]* - 71:12, 71:14
**costs** *[3]* - 70:25, 71:1,
73:11
**counsel** *[25]* - 7:5,
7:12, 11:6, 19:23,
20:9, 31:1, 33:25,
35:24, 40:15, 48:2,
62:22, 71:1, 74:7,
74:8, 74:18, 75:17,
78:20, 79:20, 82:5,
82:21, 84:15, 85:18,
86:20, 86:24, 88:8
**Counsel** *[1]* - 54:18
**counsel's** *[2]* - 16:23,
30:25
**countries** *[1]* - 40:18
**couple** *[7]* - 18:9,
19:21, 38:18, 74:7,
76:6, 79:19, 85:13
**courier** *[1]* - 77:24
**course** *[6]* - 5:8, 7:7,
11:15, 62:4, 79:11,
87:18
**Court** *[23]* - 1:22, 9:2,
9:17, 11:19, 20:16,
43:25, 55:5, 57:23,
70:11, 70:14, 72:24,
73:1, 73:2, 78:10,
81:20, 83:5, 83:8,
83:24, 84:1, 84:2,
85:7, 85:8, 88:21
**COURT** *[1]* - 1:1
**court** *[3]* - 37:17,

71:13, 73:19
**Court's** [4] - 11:19,
40:17, 63:14, 70:20
**courtesy** [1] - 51:14
**Courthouse** [1] - 1:7
**Courtroom** [1] - 3:3
**Courts** [2] - 69:23,
70:7
**cover** [4] - 42:13,
42:15, 50:15, 67:13
**COVID** [2] - 72:7, 84:3
**cows** [1] - 19:2
**CRC** [1] - 88:21
**created** [4] - 11:16,
11:17, 21:10, 69:18
**crisis** [1] - 82:9
**critical** [1] - 55:23
**CRR** [1] - 88:21
**crying** [1] - 56:1
**cure** [1] - 73:8
**current** [6] - 10:24,
11:1, 25:1, 26:25,
28:9, 33:3
**custodial** [12] - 20:3,
28:22, 29:15, 30:16,
32:16, 32:25, 34:2,
68:14, 68:22, 83:13,
83:15, 85:1
**custodian** [9] - 18:11,
20:11, 25:4, 26:4,
27:23, 32:16, 32:25,
86:3
**custodians** [16] - 17:7,
17:10, 18:10, 19:11,
21:22, 26:12, 27:20,
29:12, 31:20, 70:18,
77:2, 77:7, 83:14,
83:21, 84:22, 85:2
**customer** [3] - 60:11,
60:12, 62:4
**customers** [5] - 20:18,
54:22, 55:21, 57:15,
61:4

### D

**dangling** [1] - 36:5
**Daniel** [1] - 64:17
**DANIEL** [1] - 2:5
**data** [14] - 15:18,
15:24, 16:2, 16:13,
23:1, 24:6, 24:14,
26:11, 72:14, 78:4,
78:5, 78:7, 84:24
**database** [1] - 44:16
**Date** [1] - 88:23
**date** [7] - 10:7, 17:2,
30:11, 33:20, 45:14,
58:8, 64:19
**dates** [5] - 10:9, 30:4,
30:6, 64:14, 67:24

**Daubert** [1] - 65:16
**DAVID** [1] - 2:2
**David** [1] - 50:11
**DAVIS** [1] - 2:12
**days** [16] - 14:23,
35:4, 35:13, 35:18,
36:23, 36:24, 36:25,
38:14, 38:18, 38:21,
38:24, 39:2, 41:5,
67:14, 70:3, 70:9
**de** [3] - 6:25, 9:10,
49:8
**de-designate** [2] -
6:25, 9:10
**de-designations** [1] -
49:8
**deadline** [21] - 13:24,
18:1, 22:2, 22:4,
22:6, 22:9, 35:18,
38:23, 41:3, 43:24,
47:11, 48:17, 65:11,
65:15, 65:16, 68:2,
68:6, 68:19, 71:22,
84:11
**deadlines** [3] - 16:23,
18:3, 45:19
**deal** [3] - 20:19, 66:4,
73:3
**dealing** [4] - 14:19,
53:17, 82:9
**deals** [5] - 14:15,
34:15, 42:18, 65:7,
77:15
**dealt** [1] - 77:17
**death** [1] - 87:18
**debunk** [2] - 21:9,
26:25
**December** [4] - 26:5,
27:24, 68:7, 77:3
**decided** [1] - 28:2
**decision** [4] - 11:19,
34:3, 81:19, 87:25
**declaration** [1] - 84:25
**declarations** [1] -
40:16
**deed** [1] - 80:2
**deep** [1] - 44:13
**defendant** [5] - 66:4,
67:16, 71:11, 71:20,
81:9
**defendant's** [2] - 51:7,
54:21
**Defendants** [4] - 2:10,
2:14, 2:20, 2:24
**defendants** [11] -
47:1, 60:24, 65:2,
72:1, 74:7, 74:23,
76:15, 76:25, 81:7,
82:4, 82:11
**defendants'** [1] -

74:13
**defense** [3] - 16:23,
29:11, 40:5
**defenses** [3] - 4:13,
5:12, 74:13
**defer** [2] - 6:1, 45:21
**deficiencies** [2] -
43:25, 44:6
**deficiency** [3] - 43:19,
44:3, 77:6
**deficient** [1] - 21:7
**definitely** [1] - 26:20
**delay** [1] - 71:12
**delayed** [1] - 65:8
**delays** [1] - 73:22
**deleted** [1] - 28:5
**delve** [1] - 7:16
**demonstrate** [1] - 85:7
**denied** [1] - 82:23
**deponent** [2] - 66:13,
66:15
**deponents** [3] - 66:24,
75:18, 84:4
**depose** [1] - 67:6
**deposed** [7] - 38:17,
39:6, 39:7, 39:9,
39:11, 67:4, 69:14
**deposition** [29] - 20:4,
29:17, 34:15, 35:9,
45:25, 46:3, 46:25,
47:24, 48:2, 51:10,
53:12, 64:14, 64:19,
65:23, 66:10, 66:11,
66:16, 66:17, 67:1,
67:8, 68:16, 68:25,
69:1, 69:4, 69:5,
75:24, 75:25, 82:24,
83:22
**depositions** [29] -
27:19, 34:21, 37:8,
39:23, 40:1, 40:20,
44:24, 46:23, 46:24,
47:4, 47:9, 47:12,
66:3, 66:9, 66:20,
66:22, 67:24, 70:25,
75:12, 75:18, 80:25,
81:1, 81:2, 82:15,
82:25, 86:14, 86:15,
86:18, 87:4
**Deputy** [1] - 3:3
**derail** [3] - 73:21,
84:2, 86:10
**derailed** [1] - 72:9
**describe** [2] - 24:17,
78:18
**deserve** [1] - 85:9
**deserving** [1] - 74:24
**designate** [2] - 6:25,
9:10
**designated** [2] -

52:18, 77:3
**designations** [1] -
49:8
**desire** [1] - 58:17
**despite** [1] - 8:15
**destroy** [3] - 28:2,
56:9, 62:5
**destroyed** [17] -
50:23, 52:4, 52:5,
52:10, 52:25, 53:2,
53:3, 55:12, 56:7,
56:11, 56:16, 57:17,
57:20, 60:25, 62:6,
63:25
**destroying** [1] - 52:23
**destruction** [4] - 56:5,
56:9, 57:1, 57:5
**details** [1] - 50:19
**determine** [1] - 17:18
**determining** [1] -
31:16
**develop** [2] - 8:8, 11:6
**developed** [1] - 61:5
**develops** [1] - 28:15
**devices** [5] - 26:1,
26:3, 26:11, 27:19,
28:15
**devoted** [2] - 74:25,
76:8
**devoting** [1] - 81:13
**difference** [2] - 83:6,
83:18
**different** [12] - 4:9,
7:9, 7:22, 10:19,
21:1, 21:8, 40:18,
46:4, 57:3, 64:5,
80:20, 81:14
**differently** [1] - 33:19
**difficult** [4] - 40:6,
64:5, 82:10, 87:23
**difficulties** [1] - 39:3
**difficulty** [2] - 31:16,
47:16
**diligence** [1] - 74:17
**diligent** [2] - 79:14,
84:13
**dilute** [1] - 38:2
**direct** [4] - 13:21,
28:20, 32:15
**directed** [4] - 5:5,
14:17, 40:22, 80:5
**direction** [1] - 55:7
**directly** [1] - 43:16
**disagree** [4] - 20:21,
51:9, 51:17, 51:19
**disagrees** [1] - 41:21
**disappointing** [1] -
36:22
**disclose** [3] - 6:25,
11:9, 70:17

**disclosed** [6] - 6:17,
7:6, 28:3, 33:16,
70:18, 83:20
**disclosure** [1] - 65:15
**discourse** [1] - 33:16
**discovered** [3] -
68:21, 77:4, 77:13
**discovery** [39] - 5:5,
10:15, 14:15, 15:16,
21:19, 21:20, 22:19,
27:11, 28:10, 32:1,
39:17, 41:15, 42:19,
50:21, 50:22, 65:8,
65:9, 66:5, 67:15,
68:1, 69:8, 70:22,
71:12, 71:17, 71:21,
73:13, 76:3, 76:8,
76:12, 76:13, 77:2,
78:19, 84:8, 84:10,
85:4, 87:6, 87:7
**discretion** [1] - 69:24
**discuss** [4] - 18:1,
51:16, 63:2, 63:22
**discussed** [6] - 25:25,
35:22, 53:6, 73:12,
81:18, 83:20
**discussing** [1] - 76:7
**discussion** [8] -
13:12, 14:25, 15:7,
54:6, 55:17, 55:20,
79:9, 80:5
**discussions** [5] -
54:2, 78:11, 78:22,
78:23, 81:6
**disposal** [1] - 59:5
**dispositive** [1] - 74:19
**dispute** [1] - 63:12
**disputed** [1] - 59:1
**disregard** [1] - 70:20
**distill** [1] - 6:5
**distinct** [2] - 56:14,
85:1
**distinction** [2] - 61:4,
72:3
**distressing** [1] - 20:5
**distributed** [1] - 57:15
**distribution** [1] -
57:16
**DISTRICT** [2] - 1:1,
1:1
**District** [1] - 81:19
**disturbing** [1] - 73:14
**doable** [2] - 48:6, 48:8
**document** [29] -
10:17, 12:4, 12:6,
13:13, 13:15, 19:6,
19:13, 19:24, 20:1,
20:6, 20:16, 20:21,
20:23, 24:4, 44:17,
44:18, 44:22, 46:2,

49:23, 57:14, 75:1,
76:9, 76:15, 79:24,
81:8, 81:10, 82:3,
82:10, 85:19
**documentation** [1] -
56:20
**documents** [138] - 7:8,
7:25, 8:2, 8:3, 8:5,
8:12, 8:18, 8:19,
8:21, 8:22, 9:13,
9:19, 9:24, 10:16,
10:20, 10:22, 11:11,
11:16, 11:17, 11:20,
13:17, 13:19, 14:22,
15:13, 16:4, 17:18,
18:12, 18:21, 19:11,
21:7, 22:1, 23:1,
24:8, 25:1, 26:9,
27:20, 28:1, 28:11,
29:13, 29:18, 30:19,
31:7, 31:9, 32:4,
32:18, 32:20, 33:10,
34:1, 34:10, 40:1,
40:19, 43:10, 43:12,
43:13, 43:15, 43:17,
44:2, 44:4, 44:12,
44:14, 45:3, 45:7,
45:11, 45:15, 45:16,
45:17, 45:23, 45:25,
46:1, 46:5, 46:12,
46:14, 46:17, 47:6,
47:8, 47:10, 47:12,
47:19, 47:23, 47:25,
48:10, 48:13, 49:4,
49:7, 49:22, 50:3,
53:13, 65:20, 65:21,
66:10, 66:13, 66:15,
66:16, 66:19, 67:1,
67:7, 68:3, 68:5,
68:14, 68:19, 69:1,
69:2, 69:11, 71:8,
71:13, 71:21, 71:23,
75:14, 75:19, 75:24,
76:2, 76:18, 76:20,
76:22, 76:24, 77:12,
79:15, 79:23, 80:2,
80:24, 81:4, 81:8,
81:17, 83:16, 83:19,
84:11, 84:19, 85:19,
85:21, 85:24, 86:2,
86:5, 86:21, 86:25,
87:3
**dollars** [1] - 22:15
**done** [18] - 9:11,
12:22, 14:5, 14:11,
16:8, 17:13, 21:16,
22:17, 24:12, 24:18,
25:8, 36:10, 40:3,
55:9, 67:22, 77:20,
78:14, 87:15
**Dong** [1] - 26:4

**dose** [4] - 50:23,
50:25, 57:15, 72:2
**Doshi** [6] - 67:4, 67:7,
68:16, 68:25, 69:1,
69:2
**dovetails** [1] - 9:10
**down** [8] - 6:5, 6:6,
11:7, 34:2, 37:18,
49:4, 49:21, 53:4
**Dr** [4] - 28:19, 46:2,
66:25
**drabs** [1] - 83:21
**drafted** [2] - 8:4, 8:5
**drafts** [1] - 11:17
**draw** [1] - 69:21
**drill** [1] - 20:10
**drug** [1] - 21:1
**Drugs** [1] - 2:24
**drugs** [4] - 52:15,
52:22, 59:5, 59:6
**Du** [1] - 40:2
**DUANE** [1] - 2:8
**due** [7] - 5:8, 14:23,
41:2, 41:3, 41:9,
47:3, 71:6
**duplicate** [1] - 20:11
**during** [7] - 7:7, 44:24,
46:2, 47:23, 48:2,
70:9, 75:21
**duty** [8] - 54:7, 55:24,
56:3, 58:5, 60:9,
60:19, 61:7, 63:13

### E

**early** [2] - 39:24, 77:4
**earned** [1] - 84:1
**easily** [1] - 41:21
**easy** [1] - 73:24
**eDiscovery** [3] -
21:12, 22:17, 86:1
**effect** [2] - 23:14,
56:21
**effort** [3] - 79:15, 80:1,
81:16
**efforts** [8] - 21:13,
25:5, 25:9, 26:10,
74:16, 76:7, 76:14,
79:3
**egregious** [1] - 87:19
**eight** [3] - 19:9, 19:13
**Eisenhower** [1] - 1:14
**either** [12] - 7:13, 8:21,
11:25, 12:6, 28:16,
45:7, 45:15, 49:16,
66:10, 72:1, 79:19,
79:20
**elaborate** [1] - 11:8
**Electronic** [1] - 79:10
**electronic** [3] - 15:18,
15:23, 30:10

**elements** [2] - 57:25,
58:7
**email** [12] - 5:3, 7:18,
7:19, 7:20, 11:14,
11:15, 20:1, 28:2,
55:11, 56:4, 69:9,
76:24
**emails** [16] - 8:1,
17:11, 17:13, 26:4,
27:22, 27:24, 30:4,
31:6, 31:22, 31:25,
53:24, 56:4, 56:6,
57:6, 85:2, 85:3
**employee** [1] - 21:1
**encompassed** [1] -
51:2
**end** [10] - 5:13, 13:12,
14:5, 16:8, 18:5,
33:4, 39:24, 46:24,
50:2, 68:6
**endeavored** [3] -
62:13, 63:1, 84:24
**ended** [3] - 21:19,
38:12, 83:16
**endpoint** [1] - 19:3
**engage** [1] - 36:17
**engaged** [3] - 15:11,
74:17, 74:23
**engaging** [3] - 15:10,
16:15, 26:24
**English** [3] - 34:24,
35:1, 35:19
**enormous** [3] - 76:7,
78:5, 78:7
**ensure** [1] - 53:14
**entered** [1] - 15:20
**entire** [7] - 24:5,
24:12, 27:9, 61:17,
66:6, 73:16, 84:6
**entities** [6] - 54:22,
68:5, 68:23, 68:24,
76:17, 77:1
**entities'** [1] - 65:20
**entitled** [2] - 61:24,
88:19
**entity** [3] - 68:15,
72:8, 76:19
**entries** [3] - 6:6, 6:10,
9:15
**entry** [1] - 81:22
**erased** [1] - 85:17
**ERIC** [1] - 2:22
**Eric** [3] - 18:17, 28:19,
42:20
**errata** [6] - 34:15,
34:17, 35:24, 36:1,
36:2, 37:16
**error** [1] - 68:20
**ESI** [10] - 15:12, 15:19,
15:21, 16:3, 19:16,

21:15, 21:25, 24:1,
46:18, 48:11
**especially** [5] - 4:21,
21:11, 29:16, 39:23,
51:5
**ESQUIRE** [11] - 1:13,
1:16, 1:19, 2:2, 2:5,
2:8, 2:12, 2:16, 2:22,
2:23, 3:2
**essential** [1] - 13:9
**essentially** [3] - 5:25,
33:4, 35:3
**establish** [3] - 58:25,
59:2, 59:19
**established** [3] - 22:4,
29:9, 58:3
**et** [5] - 18:20, 20:12,
21:22, 26:13, 29:12
**eve** [4] - 66:10, 66:15,
66:17, 67:8
**evening** [1] - 88:14
**event** [1] - 78:9
**events** [1] - 30:23
**evidence** [26] - 26:22,
26:24, 27:3, 27:7,
28:8, 52:10, 56:22,
57:10, 57:22, 58:1,
58:2, 58:3, 58:22,
58:24, 59:18, 60:19,
70:11, 70:12, 71:19,
79:21, 80:1, 81:16,
81:24, 86:4, 86:23,
86:25
**Evidence** [1] - 79:11
**evidentiary** [5] -
32:18, 32:23, 69:20,
80:12, 80:17
**exact** [1] - 11:7
**exactly** [9] - 16:10,
28:8, 35:11, 38:25,
53:10, 53:13, 53:15,
54:6, 55:8
**example** [9] - 7:23,
16:10, 18:16, 18:18,
31:19, 38:19, 43:20,
47:23, 56:3
**exchange** [1] - 56:22
**exchanged** [1] - 54:3
**excuse** [1] - 77:22
**exemplar** [1] - 49:22
**exhausted** [1] - 51:25
**exhausting** [1] - 18:22
**Exhibit** [3] - 67:22,
75:8, 75:11
**exhibit** [2] - 67:22,
86:8
**exhibits** [1] - 85:18
**exist** [2] - 18:21, 41:4
**exists** [2] - 52:19,
61:15

**expect** [7] - 13:15,
25:12, 39:12, 69:11,
76:11, 78:20, 79:14
**expectation** [2] - 55:7,
63:8
**expected** [2] - 54:7,
69:8
**expecting** [1] - 42:10
**expeditious** [1] - 29:4
**experienced** [1] -
78:20
**expert** [7] - 40:16,
47:2, 65:15, 71:3,
71:6, 71:8, 82:17
**experts** [1] - 71:3
**expiration** [1] - 62:3
**expired** [2] - 60:3,
60:5
**expiring** [1] - 60:3
**explain** [1] - 7:15
**explained** [2] - 53:11,
85:23
**explains** [1] - 21:24
**explore** [1] - 13:15
**Express** [1] - 77:25
**expressed** [1] - 78:6
**expressly** [2] - 6:16,
8:10
**extend** [4] - 18:6,
35:17, 38:23, 39:13
**extended** [1] - 18:9
**extension** [1] - 38:16
**extensive** [5] - 31:15,
75:1, 76:14, 76:16,
79:3
**extent** [7] - 25:13,
39:24, 39:25, 48:9,
48:13, 59:17, 71:15
**extra** [1] - 35:13
**extraordinary** [3] -
74:24, 80:19, 82:1
**extrapolate** [1] - 16:6
**extreme** [1] - 74:11
**eye** [2] - 12:14, 19:23
**eye-opener** [1] - 19:23

### F

**face** [1] - 20:23
**fact** [27] - 12:3, 13:12,
21:12, 26:3, 26:24,
30:22, 30:24, 48:2,
50:23, 51:14, 52:9,
53:1, 56:7, 56:12,
56:16, 57:19, 60:2,
60:16, 61:11, 62:5,
66:6, 67:3, 70:8,
71:20, 73:3, 83:9,
86:5
**fact-intensive** [1] -
70:8

**facts** [6] - 53:16,
60:20, 69:21, 73:1,
77:17, 80:4
**factually** [1] - 28:15
**fail** [1] - 59:11
**failure** [1] - 74:13
**fair** [4] - 8:22, 51:21,
78:17, 78:22
**fairly** [1] - 76:3
**faith** [9] - 8:24, 13:1,
27:3, 79:14, 79:22,
80:12, 81:20, 82:12,
84:13
**familiar** [2] - 30:13,
67:12
**far** [6] - 23:20, 29:13,
45:19, 56:2, 66:24,
67:3
**fashion** [1] - 17:25
**fathom** [1] - 87:23
**fault** [2] - 20:14, 67:16
**FDA** [8] - 56:5, 56:7,
56:10, 56:13, 56:22,
56:25, 59:8, 60:4
**February** [4] - 68:21,
68:23, 77:4, 77:13
**Federal** [1] - 77:25
**fees** [2] - 71:2, 73:12
**felt** [3] - 7:2, 53:10,
69:25
**Fertel** [3] - 5:18, 10:8,
10:24
**FERTEL** [11] - 2:16,
5:18, 6:20, 10:10,
10:12, 10:25, 11:4,
12:23, 14:3, 14:10,
14:13
**few** [8] - 10:5, 31:7,
34:23, 34:24, 35:19,
41:5, 57:14, 83:4
**fifth** [1] - 85:9
**fighting** [1] - 59:9
**figure** [5] - 18:7,
20:10, 38:19, 43:18,
52:21
**file** [10] - 20:3, 28:22,
29:16, 30:16, 31:5,
32:16, 32:25, 34:2,
55:5, 77:18
**filed** [10] - 33:5, 36:1,
39:18, 40:11, 40:21,
55:6, 64:22, 70:19,
84:25, 87:5
**files** [8] - 20:11, 29:15,
30:4, 59:7, 72:12,
77:15, 85:1, 87:14
**filing** [3] - 33:11,
33:12, 84:21
**filled** [1] - 26:14
**filters** [1] - 17:21

**final** [1] - 49:21
**finality** [2] - 45:17,
70:16
**finalize** [1] - 36:12
**finalized** [3] - 36:5,
36:20, 77:3
**finally** [3] - 51:16,
69:13, 86:19
**fine** [3] - 18:3, 42:6,
60:22
**finished** [4] - 50:23,
50:25, 57:15, 72:2
**fire** [1] - 20:10
**firm** [1] - 43:24
**first** [21] - 5:11, 5:15,
14:16, 15:8, 28:23,
33:4, 33:11, 33:19,
33:21, 34:10, 44:25,
53:12, 61:6, 61:8,
62:14, 65:4, 74:5,
74:20, 74:21, 75:9,
75:21
**fist** [1] - 65:7
**five** [3] - 14:23, 72:1
**flat** [1] - 6:13
**flat-out** [1] - 6:13
**flood** [1] - 69:1
**Florida** [1] - 2:13
**flout** [1] - 71:13
**focused** [1] - 55:20
**follow** [6] - 4:25, 5:1,
5:9, 17:8, 22:15,
51:11
**follow-up** [1] - 51:11
**followed** [2] - 21:15,
51:13
**following** [2] - 39:20,
63:14
**FOR** [1] - 1:1
**foreclose** [2] - 12:5,
13:14
**foregoing** [1] - 88:18
**foreign** [1] - 37:8
**foreseeable** [1] - 58:6
**forever** [3] - 18:4,
77:19, 85:5
**forgiven** [1] - 72:24
**form** [1] - 23:14
**Forrest** [1] - 41:22
**forth** [3] - 9:24, 50:22,
83:8
**forward** [5] - 34:9,
39:7, 59:15, 79:1,
82:23
**foundation** [1] - 32:23
**four** [2] - 23:22, 31:24
**frame** [1] - 53:19
**frames** [2] - 54:6,
55:24
**frankly** [7] - 7:9, 21:9,

28:2, 35:25, 40:6,
60:22, 66:18
**FREEMAN** [1] - 1:13
**Friday** [4] - 13:25,
14:2, 14:3, 41:9
**front** [1] - 74:6
**frowned** [1] - 27:11
**frustrating** [2] - 12:2,
65:9
**FTI** [1] - 22:21
**FTP** [5] - 77:17, 77:21,
78:6, 78:8, 78:14
**full** [2] - 21:3, 59:21
**fullest** [1] - 22:16
**fully** [1] - 11:18
**fulsomely** [1] - 17:19
**future** [3] - 47:10,
73:16, 87:25

## G

**gaps** [2] - 85:1, 86:7
**general** [3] - 30:25,
44:4, 44:10
**generalized** [1] - 46:4
**generally** [1] - 27:11
**Georgia** [1] - 2:13
**GG** [4] - 67:22, 75:8,
75:11
**given** [11] - 12:15,
14:3, 21:11, 27:12,
28:12, 31:12, 59:21,
60:12, 70:7, 70:10,
78:7
**glad** [2] - 15:14, 19:9
**global** [1] - 82:6
**goal** [2] - 36:4, 36:9
**Goldberg** [3] - 4:18,
5:3, 64:25
**Goldberg's** [2] - 5:1,
5:9
**GOLDENBERG** [26] -
1:19, 1:19, 4:7, 4:14,
5:23, 6:4, 9:6, 9:22,
10:2, 10:5, 10:23,
12:12, 13:23, 64:24,
65:4, 65:13, 66:12,
67:19, 69:23, 70:5,
71:5, 71:19, 72:19,
73:9, 83:3, 88:2
**Goldenberg** [11] -
4:12, 5:22, 6:3, 9:5,
12:8, 72:18, 77:16,
83:2, 85:14, 86:8,
86:16
**good-faith** [4] - 8:24,
13:1, 79:14, 84:13
**Gorijavolu** [3] - 67:5,
67:7, 69:5
**grant** [2] - 21:25,
39:25

**great** [4] - 42:12,
64:20, 69:24, 70:7
**greater** [1] - 73:8
**GREENBERG** [1] -
2:12
**ground** [1] - 76:1
**grounds** [1] - 32:21
**group** [1] - 54:14
**Gu** [2] - 18:17, 28:19
**Gu's** [1] - 28:18
**guaranteed** [1] - 36:9
**guess** [9] - 9:6, 9:10,
10:3, 25:5, 36:14,
48:24, 50:3, 61:9,
65:7
**guidance** [1] - 63:14
**Gupta** [2] - 66:16, 69:6

## H

**half** [2] - 38:5, 76:18
**hammer** [1] - 38:10
**hand** [1] - 54:1
**handle** [1] - 48:15
**handled** [1] - 13:18
**handling** [1] - 6:24
**hands** [1] - 25:15
**Hansen** [1] - 41:22
**happy** [13] - 10:2,
10:6, 11:7, 12:17,
12:25, 16:9, 22:21,
24:23, 36:25, 42:2,
47:20, 50:19, 81:2
**hard** [8] - 18:2, 20:13,
22:6, 33:14, 70:11,
81:12, 82:7, 87:11
**hard-stop** [1] - 22:6
**hardcopy** [2] - 15:18,
30:10
**harken** [1] - 79:8
**hash** [1] - 9:3
**head** [1] - 54:8
**heads** [1] - 4:11
**Healthcare** [1] - 2:10
**hear** [12] - 6:18, 6:23,
22:7, 22:24, 48:5,
51:21, 52:3, 59:20,
62:2, 69:21, 86:16
**heard** [13] - 22:6,
23:21, 33:10, 51:10,
51:12, 51:22, 60:8,
60:14, 75:20, 75:21,
82:21, 83:5, 83:17
**hearing** [5] - 65:16,
69:20, 80:13, 80:17,
88:11
**hearings** [4] - 67:14,
70:4, 70:9, 84:17
**heart** [1] - 27:21
**heavy** [1] - 70:3
**held** [7] - 4:1, 20:4,

52:16, 52:25, 53:1,
83:19, 86:21
**Hello** [1] - 42:23
**hello** [3] - 4:17, 4:18,
42:20
**help** [3] - 33:5, 33:21,
61:21
**helpful** [2] - 29:18,
41:11
**herring** [1] - 57:10,
60:4
**Hetero** [8] - 2:24,
42:19, 42:21, 43:11,
43:21, 46:25, 63:23
**Hetero's** [1] - 48:24
**Hi** [1] - 42:22
**hide** [3] - 79:22, 80:1,
81:17
**Highway** [1] - 1:17
**HILL** [1] - 2:22
**Hilton** [4] - 54:18,
54:23, 55:11
**history** [1] - 74:8
**hit** [3] - 54:8, 68:7,
82:7
**HLL** [1] - 44:1
**Hochberg** [1] - 80:18
**hold** [29] - 18:20,
25:21, 26:8, 26:10,
26:18, 28:14, 28:21,
51:2, 51:9, 51:12,
52:12, 53:23, 56:14,
56:15, 56:18, 57:3,
59:14, 60:15, 60:20,
61:7, 61:20, 62:8,
62:14, 62:17, 63:16,
63:21, 64:6, 64:12,
86:24
**holds** [5] - 50:8, 50:9,
51:17, 51:19, 53:23
**holes** [2] - 85:3
**hollow** [1] - 77:22
**home** [1] - 19:2
**honest** [1] - 72:4
**honestly** [1] - 11:5
**Honor** [121] - 4:7,
4:17, 5:18, 5:23, 6:4,
6:20, 9:6, 12:12,
13:23, 14:10, 15:3,
15:5, 15:8, 16:9,
16:15, 16:19, 16:22,
18:5, 18:14, 19:5,
19:19, 20:20, 22:11,
22:22, 23:8, 23:24,
24:16, 24:19, 25:7,
25:11, 25:16, 25:18,
25:24, 26:17, 27:3,
27:10, 28:7, 28:24,
29:24, 31:3, 31:18,
32:13, 33:2, 34:13,

34:20, 36:25, 37:5,
39:4, 39:5, 39:15,
39:25, 40:7, 40:9,
40:12, 40:22, 41:8,
41:10, 41:13, 41:18,
42:3, 42:11, 42:14,
42:16, 42:20, 42:24,
43:3, 43:4, 43:9,
44:23, 45:14, 45:23,
46:10, 46:16, 48:8,
48:21, 48:22, 49:17,
50:5, 50:6, 50:11,
50:18, 50:20, 51:23,
52:8, 52:13, 52:21,
53:9, 59:25, 62:11,
62:21, 64:17, 64:24,
65:1, 65:4, 65:14,
71:19, 72:19, 74:3,
74:6, 74:15, 74:17,
75:3, 75:23, 76:7,
77:10, 78:1, 78:15,
79:6, 79:9, 80:15,
80:16, 80:21, 81:18,
81:20, 82:4, 82:20,
83:3, 88:2, 88:3,
88:10, 88:12
**Honor's** [5] - 24:22,
34:4, 46:6, 49:12,
49:25
**HONORABLE** [1] -
1:10
**Honorable** [2] - 3:2,
4:2
**hope** [3] - 16:7, 24:14,
64:14
**hoped** [1] - 38:4
**hopeful** [4] - 12:24,
49:11, 49:24, 78:25
**hopefully** [2] - 35:14,
87:25
**hoping** [6] - 7:16,
7:23, 8:7, 36:3, 37:6,
37:11
**hours** [1] - 76:21
**Huahai** [1] - 2:11
**hundreds** [2] - 67:15,
76:21
**hurdle** [1] - 59:19
**hyperlinks** [1] - 42:8

### I

**idea** [2] - 20:14, 26:25
**identification** [3] - 8:1,
46:7, 54:13
**identified** [6] - 47:6,
47:7, 47:12, 64:4,
66:9, 75:22
**identify** [5] - 4:22,
32:24, 44:19, 53:23,
82:15

**identifying** [2] - 44:12,
46:10
**ignored** [1] - 62:10
**imagine** [1] - 38:18
**immediate** [1] - 69:9
**imminent** [1] - 8:13
**impact** [1] - 82:16
**impacted** [2] - 58:11,
59:12
**imperfect** [1] - 83:18
**imperfection** [1] -
83:18
**implied** [1] - 21:12
**important** [7] - 40:11,
52:15, 54:6, 64:3,
68:17, 71:9, 75:8
**impose** [2] - 18:3,
69:19
**imposed** [1] - 69:16
**imposing** [2] - 73:7
**impossible** [1] - 14:24
**impurity** [3] - 58:25,
59:3, 59:10
**IN** [1] - 1:4
**inability** [1] - 8:16
**inaccurate** [2] - 56:17,
56:21
**inadequate** [1] - 12:9
**inappropriate** [3] -
86:20, 86:22, 87:1
**Inc** [3] - 2:14, 2:15,
2:21
**incinerated** [2] - 57:6,
60:17
**inclination** [1] - 18:6
**inclined** [2] - 21:18,
80:16
**include** [1] - 61:2
**included** [2] - 20:2,
42:1
**including** [4] - 27:20,
51:19, 71:1, 73:11
**incorporate** [1] - 47:3
**incorrectly** [1] - 72:24
**incredibly** [1] - 22:14
**index** [5] - 67:20,
67:21, 67:23, 68:22,
69:3
**India** [1] - 47:25,
65:21, 67:3, 72:9,
77:16, 82:7, 82:8
**Indian** [1] - 76:19
**indicate** [3] - 56:6,
56:15, 56:16
**indicated** [8] - 7:5,
8:3, 8:15, 13:7,
14:24, 22:8, 38:22,
43:5
**indicates** [1] - 58:24
**indicating** [1] - 6:24

**individual** [1] - 80:25
**individuals** [2] -
85:16, 85:20
**Industries** [1] - 2:14
**inference** [1] - 61:25
**inferences** [1] - 69:21
**inform** [1] - 34:11
**information** [19] -
9:14, 14:7, 16:13,
18:12, 21:23, 22:7,
25:21, 26:19, 28:17,
47:3, 53:25, 59:4,
62:22, 63:4, 63:19,
63:23, 64:8, 71:3,
82:17
**informed** [1] - 61:22
**ingredients** [7] -
55:15, 55:19, 55:23,
57:5, 57:6, 57:8,
57:12
**initiation** [1] - 50:24
**input** [1] - 40:16
**inquiry** [1] - 70:8
**insisted** [2] - 15:21,
31:10
**insistent** [1] - 11:12
**instances** [1] - 79:19
**instead** [1] - 30:14
**instructed** [2] - 40:13,
55:3
**intended** [1] - 23:13
**intends** [1] - 44:24
**intensive** [1] - 70:8
**intent** [1] - 86:24
**intentional** [3] - 67:25,
70:12, 85:7
**interacts** [1] - 31:1
**interested** [2] - 9:3,
24:21
**interesting** [1] - 37:15
**internal** [2] - 77:5,
77:8
**Internet** [1] - 77:24
**interrupt** [2] - 23:9,
23:10
**interviewed** [1] -
17:10
**interviews** [2] - 17:6,
17:7
**investigating** [1] -
60:18
**invites** [1] - 30:17
**involved** [5] - 12:4,
30:20, 31:22, 84:16,
87:10
**involvement** [1] -
29:10
**involves** [2] - 6:12, 8:9
**irbesartan** [2] - 21:1,
21:6

**irresponsible** [1] -
16:11
**issue** [47] - 6:5, 9:2,
9:7, 11:8, 12:16,
13:5, 22:14, 27:10,
27:15, 30:2, 30:23,
32:4, 32:11, 34:14,
36:9, 36:19, 38:6,
38:7, 38:13, 41:20,
42:18, 46:7, 46:22,
49:4, 50:10, 50:18,
50:20, 51:7, 51:8,
52:15, 53:19, 54:3,
54:4, 55:6, 55:22,
58:9, 59:21, 60:6,
60:15, 61:6, 61:24,
62:20, 64:16, 72:9,
78:3, 82:20, 87:7
**issued** [4] - 14:17,
23:12, 57:9, 88:7
**issues** [22] - 4:9, 6:12,
13:2, 14:15, 22:19,
22:22, 26:1, 26:6,
41:19, 43:9, 44:22,
44:23, 48:24, 49:16,
64:19, 78:16, 79:2,
79:4, 79:17, 80:6,
82:8, 85:15
**IT** [3] - 68:20, 77:6,
77:11
**item** [7] - 5:11, 5:15,
14:14, 18:23, 25:20,
28:22, 50:8
**items** [5] - 6:25, 7:6,
24:23, 51:18, 56:2
**iteration** [1] - 9:22
**itself** [3] - 31:24,
56:14, 63:16

### J

**January** [3] - 54:5,
55:10, 61:1
**Jasleen** [2] - 66:16,
69:6
**JERSEY** [1] - 1:1
**Jersey** [4] - 1:8, 1:14,
2:20, 2:24
**Jessica** [1] - 15:5
**JESSICA** [1] - 2:8
**Jill** [1] - 5:18
**JILL** [1] - 2:16
**job** [2] - 31:8, 31:13
**JOHN** [1] - 2:19
**John** [1] - 65:1
**Johns** [2] - 66:14,
69:6
**joined** [2] - 43:2, 43:6
**JR** [1] - 2:19
**judge** [2] - 55:3, 67:13
**Judge** [20] - 6:14,

42:23, 44:8, 44:14,
45:4, 50:14, 50:21,
51:6, 53:21, 54:4,
54:9, 54:23, 55:3,
55:7, 55:16, 62:2,
63:7, 70:3, 80:17
**JUDGE** [115] - 4:4,
4:10, 4:15, 4:18,
5:21, 5:24, 6:18, 9:5,
9:20, 10:1, 10:3,
10:11, 10:19, 11:1,
11:23, 12:21, 13:7,
14:1, 14:9, 14:11,
14:14, 15:4, 16:17,
16:20, 19:4, 19:20,
21:18, 22:12, 23:5,
23:9, 25:2, 25:8,
25:12, 25:17, 25:19,
26:16, 27:15, 27:17,
28:13, 28:25, 29:5,
29:8, 29:20, 31:14,
32:5, 32:9, 32:14,
33:7, 34:8, 34:14,
35:10, 35:16, 36:23,
37:1, 38:21, 39:8,
39:11, 39:16, 40:8,
40:23, 41:12, 41:14,
42:5, 42:12, 42:15,
42:17, 42:22, 43:1,
43:5, 43:8, 44:7,
45:1, 45:6, 45:10,
47:14, 48:14, 48:23,
49:19, 50:1, 50:7,
50:13, 52:2, 52:9,
53:8, 59:24, 61:9,
61:20, 62:6, 62:16,
63:20, 64:20, 65:3,
65:5, 66:8, 67:12,
69:19, 70:2, 70:23,
71:15, 72:15, 73:6,
74:1, 77:8, 77:14,
80:8, 80:11, 82:13,
83:1, 85:11, 87:8,
88:4, 88:13
**judgment** [2] - 81:22,
87:20
**Judicial** [1] - 3:2
**July** [4] - 20:8, 56:19,
71:6
**Jun** [1] - 40:2
**June** [9] - 22:3, 23:17,
25:6, 39:24, 46:19,
46:23, 72:14, 77:2,
77:4

### K

**KANNER** [1] - 2:2
**KATZ** [1] - 1:13
**keep** [6] - 5:7, 15:17,

15:18, 29:2, 30:10, 82:22
**kept** [1] - 54:22
**key** [3] - 27:19, 28:1, 30:23
**kind** [14] - 26:20, 26:22, 30:12, 30:18, 35:4, 37:6, 37:9, 37:12, 46:4, 54:13, 69:19, 72:16, 86:7, 86:23
**kinds** [1] - 27:13
**KIRTLAND** [1] - 1:16
**knocked** [1] - 78:9
**knowing** [1] - 53:4
**known** [1] - 38:6
**Kong** [5] - 29:6, 30:9, 30:14, 32:15, 32:25
**Kong's** [1] - 28:22
**Kugler** [1] - 3:2

## L

**Labs** [2] - 2:24, 43:21
**lack** [1] - 85:8
**lacking** [1] - 21:13
**language** [10] - 35:19, 37:9, 37:22, 37:23, 37:24, 38:2, 38:9, 39:2, 72:11, 84:5
**laptops** [1] - 85:16
**large** [2] - 15:18, 43:17
**largely** [2] - 75:6, 79:18
**larry** [1] - 3:3
**Lasalle** [1] - 1:20
**last** [14] - 4:12, 5:13, 10:14, 24:2, 39:17, 46:25, 52:1, 53:6, 54:16, 74:20, 74:22, 83:9, 83:10, 87:10
**late** [10] - 9:24, 30:22, 65:12, 65:18, 75:20, 75:24, 76:2, 76:5, 80:23
**late-produced** [2] - 75:24, 76:2
**latitude** [1] - 70:7
**Lavelle** [6] - 65:1, 74:2, 80:9, 82:13, 83:4, 85:12
**LAVELLE** [10] - 2:19, 65:1, 74:3, 77:10, 78:1, 80:10, 80:14, 82:20, 85:13, 88:3
**LAW** [1] - 1:19
**law** [10] - 8:10, 13:6, 26:21, 28:12, 65:24, 66:1, 68:11, 69:23, 70:1, 73:9

**Law** [1] - 3:2
**lawyers** [2] - 29:22, 77:11
**lay** [1] - 26:9
**Layne** [1] - 54:18
**lays** [2] - 12:19, 50:17
**leading** [1] - 49:4
**learned** [1] - 27:19
**least** [21] - 8:25, 13:2, 13:19, 20:8, 26:2, 26:8, 27:22, 28:4, 30:2, 30:5, 30:6, 32:24, 41:10, 45:15, 46:16, 53:6, 54:12, 57:24, 72:3, 72:4, 73:7
**leave** [1] - 86:7
**led** [1] - 77:6
**left** [5] - 31:5, 38:13, 55:6, 66:12, 85:17
**legal** [4] - 31:2, 56:14, 56:15, 57:3
**legitimate** [1] - 12:20
**less** [4] - 6:7, 74:24, 78:25, 81:25
**lesser** [2] - 70:23, 71:10
**letter** [21] - 5:1, 5:9, 9:25, 14:21, 16:24, 23:25, 30:3, 42:1, 45:24, 46:1, 50:17, 51:8, 51:15, 51:22, 52:12, 56:17, 57:4, 61:21, 62:8, 64:6, 64:12
**letters** [13] - 25:21, 26:7, 26:8, 26:18, 27:6, 28:14, 28:21, 43:19, 47:7, 53:24, 54:3, 62:17, 63:21
**level** [3] - 67:17, 67:18, 69:15
**LEVIN** [1] - 2:5
**LEWIS** [1] - 2:18
**Lewis** [1] - 65:2
**Li** [5] - 18:17, 20:2, 28:19, 30:7, 42:4
**LIABILITY** [1] - 1:4
**lieu** [1] - 39:2
**life** [2] - 58:18, 60:3
**light** [5] - 26:1, 26:3, 26:5, 29:16, 41:4
**likely** [2] - 31:9, 31:11
**limit** [1] - 33:3
**limitations** [1] - 58:18
**Limited** [3] - 43:21, 83:14, 83:15
**limited** [1] - 58:18
**Limited's** [1] - 84:7
**line** [3] - 21:8, 60:22,

87:2
**list** [4] - 8:18, 18:18, 18:19, 42:7
**listing** [1] - 51:12
**litigants** [1] - 73:15
**litigation** [38] - 6:16, 8:14, 11:22, 15:17, 17:4, 21:16, 22:18, 25:21, 26:8, 26:10, 26:18, 28:14, 28:20, 31:2, 31:12, 31:24, 50:8, 50:9, 50:24, 51:9, 51:17, 51:19, 52:12, 53:22, 56:18, 58:13, 59:14, 60:20, 61:20, 62:8, 62:17, 63:9, 63:16, 63:21, 64:6, 64:12, 71:14, 73:25
**LITIGATION** [1] - 1:4
**litigation's** [1] - 31:12
**live** [1] - 37:13
**LLC** [6] - 1:13, 1:19, 2:2, 2:10, 2:14, 2:20
**LLP** [5] - 1:16, 2:8, 2:12, 2:18, 2:22
**load** [1] - 77:19
**locate** [2] - 46:12, 48:10
**located** [1] - 27:20
**LOCKARD** [2] - 2:12, 53:9, 62:21
**Lockard** [4] - 52:3, 53:8, 60:8, 62:20
**log** [23] - 5:16, 5:20, 6:6, 6:10, 7:25, 8:3, 9:7, 9:14, 9:20, 10:12, 10:21, 11:2, 11:9, 11:24, 12:9, 12:10, 12:15, 12:18, 13:25, 31:7, 48:25, 50:4, 83:21
**look** [13] - 11:2, 21:21, 26:12, 28:6, 33:1, 50:1, 55:15, 66:21, 67:19, 68:21, 75:7, 87:24, 88:5
**looked** [6] - 16:24, 17:5, 43:23, 56:10, 66:21, 71:23
**looking** [5] - 10:21, 30:18, 32:18, 38:20, 67:10
**LORETTA** [1] - 3:2
**losing** [1] - 14:18
**lost** [2] - 28:16, 64:4
**Louisiana** [1] - 2:3
**love** [1] - 22:24
**Ltd** [2] - 2:11, 2:14

## M

**MacStravic** [1] - 3:3
**Maggie** [3] - 28:22, 29:6, 32:25
**Magistrate** [2] - 50:20, 51:5
**main** [1] - 43:9
**Major** [1] - 51:6
**majority** [5] - 7:19, 19:12, 32:19, 71:21, 71:24
**makeup** [1] - 86:13
**management** [1] - 81:5
**managing** [1] - 56:25
**manner** [1] - 25:4
**manually** [1] - 19:10
**manufacturers** [5] - 53:22, 54:7, 60:5, 72:2
**manufacturing** [1] - 30:21
**March** [2] - 10:4, 75:13
**market** [1] - 57:10
**MARLENE** [1] - 1:19
**Marlene** [2] - 5:21, 64:24
**Martinez** [1] - 67:6
**massive** [1] - 20:9
**Master** [3] - 4:2, 5:6, 14:18
**MASTER** [1] - 1:10
**material** [1] - 78:3
**matter** [17] - 5:25, 11:18, 13:6, 13:22, 23:12, 29:10, 63:22, 71:18, 78:12, 80:3, 80:13, 85:9, 87:11, 87:16, 88:19
**matters** [1] - 29:10
**MAZIE** [1] - 1:13
**MDL** [5] - 65:14, 66:6, 70:22, 73:17, 85:5
**mean** [11] - 23:20, 47:1, 47:16, 47:22, 52:11, 56:25, 61:10, 65:19, 67:10, 75:25, 77:8
**meaning** [1] - 38:3
**means** [3] - 34:8, 57:25, 76:1
**mechanical** [1] - 1:24
**medication** [1] - 59:10
**meet** [23] - 6:2, 6:4, 6:8, 6:21, 6:23, 7:3, 8:16, 8:24, 12:3, 12:17, 12:24, 13:16, 13:21, 36:21, 48:11, 49:1, 49:5, 51:18,

51:25, 53:11, 59:20, 78:22
**meet-and-confer** [1] - 78:22
**meet-and-conferral** [1] - 13:16
**meeting** [2] - 30:9, 30:17
**meetings** [4] - 30:6, 30:15, 33:15, 42:4
**meets** [1] - 12:14
**member** [1] - 49:3
**memorialize** [1] - 23:13
**memory** [1] - 67:14
**mention** [1] - 70:2
**mentioned** [1] - 25:3
**message** [2] - 71:11, 73:14
**messy** [1] - 73:24
**met** [5] - 35:23, 40:4, 44:9, 58:7, 62:25
**metadata** [2] - 15:20, 22:16
**metric** [3] - 50:24, 60:16, 61:12
**mics** [1] - 4:20
**Middle** [1] - 81:19
**middle** [1] - 82:5
**might** [11] - 24:20, 33:5, 33:21, 52:20, 52:25, 60:3, 60:10, 62:1, 62:2, 73:11, 76:11
**million** [2] - 76:18, 76:20
**millions** [1] - 22:15
**Min** [5] - 18:17, 20:2, 28:19, 30:7, 42:4
**mind** [1] - 5:7
**Minneapolis** [1] - 1:20
**Minnesota** [1] - 1:20
**minor** [1] - 41:19
**minute** [1] - 65:6
**minutes** [1] - 76:6
**miscommunication** [3] - 41:25, 77:5, 77:9
**misconduct** [4] - 26:22, 27:1, 27:3, 27:8
**misconstrued** [1] - 21:2
**misrepresentations** [2] - 72:6, 83:7
**missing** [8] - 27:22, 28:19, 45:12, 58:22, 61:9, 68:11, 68:13, 86:5
**misspoke** [1] - 10:25
**misstated** [1] - 73:1

*mistake* [1] - 78:15
**MITCHELL** [1] - 2:5
**Mitchell** [1] - 1:7
*mixed* [3] - 10:9, 73:20, 73:23
*mixed-use* [2] - 73:20, 73:23
*mixup* [1] - 70:16
*model* [1] - 17:4
*modify* [1] - 33:3
*mole* [1] - 85:4
**Monday** [2] - 14:9, 41:9
*month* [3] - 38:5, 52:1, 79:9
*months* [9] - 19:9, 19:13, 20:19, 75:7, 84:9, 84:18, 87:3, 87:10
**Morgan** [1] - 65:1
**MORGAN** [1] - 2:18
*morning* [1] - 48:1
**MORRIS** [1] - 2:8
*most* [12] - 10:7, 10:10, 10:12, 13:4, 17:24, 22:22, 24:2, 30:22, 36:2, 74:11, 81:23, 87:19
*motion* [26] - 4:12, 5:12, 9:10, 39:17, 39:19, 39:25, 40:12, 40:15, 40:21, 55:5, 55:6, 64:22, 65:5, 68:18, 74:25, 75:6, 75:11, 75:15, 75:16, 78:17, 82:14, 82:22, 84:15, 84:22, 85:1, 87:5
*motions* [1] - 76:11
*move* [1] - 41:3
*moving* [1] - 34:9
**MR** [69] - 4:17, 16:19, 16:21, 18:15, 19:18, 19:21, 23:3, 25:24, 27:16, 27:18, 28:23, 29:2, 29:6, 29:9, 32:12, 33:8, 33:14, 33:25, 35:17, 37:14, 38:15, 39:5, 39:22, 42:3, 42:6, 42:20, 42:23, 42:24, 43:2, 43:4, 43:7, 43:9, 44:8, 45:4, 45:9, 45:13, 45:21, 46:10, 46:22, 47:15, 48:8, 48:20, 48:21, 48:22, 49:1, 49:14, 49:18, 49:20, 50:5, 50:6, 50:11, 50:14, 52:7, 52:13, 59:25, 61:14,

61:22, 62:11, 64:17, 65:1, 74:3, 77:10, 78:1, 80:10, 80:14, 82:20, 85:13, 88:3, 88:10
**MS** [74] - 4:7, 4:14, 5:18, 5:23, 6:4, 6:20, 9:6, 9:22, 10:2, 10:5, 10:10, 10:12, 10:23, 10:25, 11:4, 12:12, 12:23, 13:23, 14:3, 14:10, 14:13, 15:3, 15:5, 18:14, 19:5, 20:20, 22:11, 22:13, 23:7, 23:24, 25:7, 25:11, 25:16, 25:18, 26:17, 28:7, 29:24, 31:18, 32:8, 33:2, 33:13, 33:24, 34:13, 34:20, 35:13, 36:16, 36:25, 37:5, 38:14, 39:4, 39:10, 39:15, 40:9, 41:8, 41:13, 41:17, 42:14, 42:16, 53:9, 62:21, 64:24, 65:4, 65:13, 66:12, 67:19, 69:23, 70:5, 71:5, 71:19, 72:19, 73:9, 83:3, 88:2, 88:12
*multinational* [1] - 42:4
*multiple* [7] - 9:7, 19:10, 19:11, 22:18, 83:7, 84:17, 84:18
*must* [2] - 15:19, 74:20
*mute* [1] - 4:20
*muted* [1] - 32:12
*mutual* [1] - 8:25

## N

*nail* [1] - 54:8
**NAKUL** [1] - 2:23
**Nakul** [2] - 43:2, 43:6
*name* [3] - 7:22, 13:8, 13:13
*names* [1] - 13:3
*nature* [2] - 37:3
**NDMA** [1] - 20:7
**NE** [1] - 2:13
*near* [1] - 87:25
*necessarily* [6] - 10:17, 12:5, 13:9, 13:11, 13:14, 31:6
*necessary* [7] - 16:1, 40:16, 40:20, 41:23, 49:24, 73:8, 81:13
*need* [39] - 17:9, 17:11, 17:13, 17:14,

17:24, 18:4, 18:25, 21:13, 23:3, 27:25, 32:22, 34:18, 36:23, 39:13, 40:23, 40:24, 45:20, 48:13, 51:12, 51:15, 51:22, 51:24, 53:22, 59:18, 61:13, 64:6, 65:19, 66:9, 66:22, 67:6, 67:19, 68:10, 69:21, 71:20, 73:4, 80:21, 82:15, 82:22, 86:19
*needed* [6] - 30:4, 42:11, 53:10, 53:13, 53:23, 69:25
*needs* [8] - 9:17, 32:21, 35:22, 57:23, 57:24, 58:24, 73:15, 88:6
*never* [15] - 15:11, 51:22, 52:17, 55:5, 55:6, 57:8, 57:9, 57:15, 57:16, 58:12, 58:15, 61:22, 66:3, 70:18, 72:23
*NEW* [1] - 1:1
*new* [13] - 12:9, 17:9, 19:7, 21:8, 21:21, 21:22, 22:20, 27:9, 27:13, 28:9, 74:4, 81:4, 84:15
*New* [5] - 1:8, 1:14, 2:3, 2:20, 22:4
*newly* [1] - 76:2
*next* [15] - 13:22, 14:14, 16:7, 16:8, 23:8, 24:3, 25:20, 28:22, 34:14, 42:18, 48:1, 49:13, 49:17, 50:2, 50:8
*Nigh* [1] - 64:17
**NIGH** [2] - 2:5, 64:17
*night* [4] - 10:14, 47:24, 68:15, 68:25
*nine* [2] - 45:11
*nitrosamines* [1] - 32:2
*nobody* [1] - 20:4
*non* [2] - 32:4, 35:19
*non-English* [1] - 35:19
*non-privileged* [1] - 32:4
*noncustodial* [2] - 65:21, 84:12
*none* [1] - 56:10
*nonetheless* [1] - 68:12
*normal* [2] - 39:20, 56:24

*note* [3] - 75:8, 75:23, 81:5
*noted* [1] - 53:20
*noteworthy* [2] - 85:17, 86:15
*nothing* [7] - 32:21, 36:8, 38:11, 49:11, 51:11, 51:13, 56:6
*notice* [4] - 51:3, 51:4, 56:18, 63:16
*notwithstanding* [1] - 16:22
*November* [9] - 53:21, 65:10, 68:2, 68:6, 68:15, 68:25, 71:24, 84:10
*number* [15] - 10:24, 13:19, 16:5, 34:9, 44:14, 44:18, 44:21, 60:4, 63:3, 64:3, 65:13, 66:16, 66:25, 71:23, 73:18
*Number* [1] - 5:6
**NUMBER** [1] - 1:3
*numbers* [7] - 10:19, 44:2, 45:3, 45:7, 46:11, 46:13, 63:2
*numerous* [2] - 7:6, 8:12

## O

*oath* [1] - 28:1
**Obergfell** [1] - 6:8
*objection* [1] - 32:17
*objections* [1] - 57:1
*obligation* [4] - 57:7, 60:13, 60:15, 61:7
*obligations* [3] - 26:10, 76:12, 76:14
*observed* [1] - 74:15
*obviously* [10] - 18:4, 20:20, 20:21, 24:21, 40:4, 46:23, 52:14, 63:12, 81:11, 85:21
*occurred* [1] - 6:22
*odds* [1] - 54:11
**OF** [1] - 1:1
*off-the-wall* [1] - 49:20
*offered* [3] - 75:16, 75:17
*offers* [1] - 57:11
*office* [1] - 30:25
*officer* [1] - 67:2
**Official** [1] - 1:22
*official* [1] - 37:17
*often* [1] - 76:4
*old* [1] - 21:7
*once* [6] - 16:5, 33:17, 33:25, 36:8, 58:14
*one* [29] - 6:22, 9:23,

10:3, 10:7, 10:13, 10:21, 10:23, 16:9, 18:8, 21:1, 22:20, 27:5, 27:22, 43:20, 52:23, 55:18, 65:15, 65:16, 66:2, 67:2, 67:5, 67:19, 77:14, 80:19, 80:20, 86:2, 87:20
*ones* [4] - 61:18, 79:18, 84:16, 84:20
*ongoing* [2] - 8:13, 10:15
*open* [6] - 5:7, 21:19, 29:16, 38:12, 66:12, 69:25
*open-ended* [2] - 21:19, 38:12
*opener* [1] - 19:23
*opinion* [2] - 6:14, 51:6
*opportunity* [9] - 9:2, 27:13, 37:2, 48:11, 51:25, 59:20, 59:21, 74:5, 74:9
*oppose* [4] - 34:17, 36:14, 38:15, 39:20
*opposed* [3] - 18:8, 36:24, 75:10
*opposing* [1] - 74:18
*opposition* [2] - 41:2, 75:16
*optimistic* [3] - 79:20, 83:6, 83:7
*option* [1] - 35:2
*order* [33] - 4:25, 5:1, 5:10, 9:1, 14:11, 14:17, 15:9, 21:9, 23:12, 23:13, 23:14, 24:22, 26:18, 28:13, 30:4, 35:18, 40:12, 41:17, 46:17, 48:10, 48:12, 58:2, 62:16, 64:11, 75:19, 79:24, 79:25, 84:3, 86:10, 86:11, 86:13, 88:6
*Order* [2] - 5:6, 14:18
*ordered* [2] - 62:18, 78:10
*orders* [3] - 67:15, 70:21, 71:13
*ordinary* [1] - 62:4
*original* [3] - 22:9, 42:1, 75:11
*Orleans* [1] - 2:3
*otherwise* [1] - 51:21
*Outlook* [1] - 30:12
*outset* [1] - 5:10
*outside* [3] - 17:2, 31:1, 56:2

**overall** [1] - 31:12
**overlay** [1] - 8:23
**overly** [1] - 79:20
**overwhelming** [1] -
32:19
**own** [1] - 59:7

**P**

**P.A** [1] - 2:5
**P.C** [1] - 2:16
**p.m** [4] - 1:9, 4:3, 6:22,
88:15
**Pacific** [1] - 1:17
**PACKARD** [1] - 1:16
**pages** [4] - 45:11,
76:19, 76:20
**pandemic** [2] - 71:18,
82:6
**PAPANTONIO** [1] -
2:5
**paper** [1] - 15:20
**papers** [2] - 30:8,
76:23
**parameters** [1] - 33:3
**Parekh** [20] - 15:15,
19:10, 22:23, 22:24,
23:3, 42:25, 44:9,
44:11, 44:17, 44:19,
44:24, 45:10, 46:5,
46:13, 46:21, 48:12,
48:17, 49:2, 49:8,
49:21
**PAREKH** [8] - 1:16,
42:24, 43:9, 45:13,
46:22, 48:22, 49:14,
50:6
**Parkway** [2] - 1:14,
2:17
**part** [9] - 8:21, 24:18,
26:24, 29:3, 52:7,
56:24, 67:16, 81:21,
85:22
**participles** [1] - 36:5
**particular** [4] - 12:4,
12:5, 48:9, 64:3
**particularly** [4] -
35:21, 47:22, 58:23,
82:7
**parties** [7] - 8:25,
15:6, 54:2, 55:4,
78:11, 80:4, 81:6
**party** [1] - 81:21
**past** [1] - 47:17
**patently** [1] - 63:10
**patience** [1] - 88:11
**patients** [1] - 59:7
**pattern** [1] - 70:20
**pay** [2] - 70:25, 71:1
**Pedano** [1] - 1:22,
88:21

**penalty** [1] - 87:18
**pending** [1] - 51:15
**Peng** [1] - 26:4
**Pennsylvania** [3] -
2:9, 2:17, 81:19
**Pensacola** [1] - 2:6
**people** [6] - 69:14,
72:11, 73:18, 82:8,
84:15, 86:6
**percent** [4] - 65:20,
68:18, 72:8, 83:19
**perfect** [1] - 82:11
**perfection** [2] - 74:14,
87:22
**perfection's** [1] -
74:14
**perhaps** [10] - 12:8,
13:18, 14:4, 18:9,
25:3, 33:17, 46:6,
60:23, 61:1, 79:20
**period** [5] - 15:1,
21:19, 34:17, 34:19,
78:23
**permitted** [1] - 5:4
**person** [2] - 30:25,
37:18
**person's** [1] - 28:18
**personnel** [1] - 61:23
**perspective** [8] -
16:22, 18:4, 20:9,
35:25, 56:8, 56:13,
64:5, 72:17
**pertains** [1] - 56:23
**Pharma** [6] - 2:15,
2:20, 2:21, 83:13,
83:15, 84:7
**Pharmaceutical** [1] -
2:14
**Pharmaceuticals** [3] -
2:10, 2:11, 2:14
**Philadelphia** [1] - 2:9
**phone** [3] - 15:15,
19:10, 30:15
**physical** [1] - 15:13
**pick** [1] - 49:22
**picking** [2] - 18:18,
45:19
**piece** [1] - 15:20
**piecemeal** [1] - 47:18
**Piedmont** [1] - 2:13
**pill** [3] - 54:11, 54:16,
63:9
**PILLS** [1] - 55:17
**pills** [10] - 50:23,
54:14, 54:19, 54:20,
55:16, 55:17, 57:15,
60:10, 61:8, 61:23
**place** [7] - 9:18, 24:8,
30:23, 47:9, 61:8,
62:14, 67:19

**placed** [1] - 70:3
**places** [1] - 65:13
**plaintiff** [6] - 53:25,
54:19, 57:21, 58:8,
73:19, 73:23
**plaintiffs** [63] - 4:5,
8:17, 14:20, 15:10,
15:14, 16:18, 19:7,
23:16, 26:23, 27:2,
27:5, 31:10, 34:17,
35:5, 35:14, 37:7,
37:13, 39:18, 40:10,
40:21, 42:2, 42:25,
44:22, 46:15, 46:18,
47:17, 50:12, 53:19,
55:2, 55:4, 56:1,
56:20, 57:4, 57:11,
58:10, 58:14, 59:4,
63:17, 64:18, 64:23,
64:25, 65:11, 66:2,
68:8, 74:11, 74:21,
74:25, 75:4, 75:5,
75:9, 75:20, 76:23,
78:21, 79:3, 79:5,
79:17, 80:1, 80:24,
82:2, 82:15, 83:25,
84:18, 86:4
**Plaintiffs** [5] - 1:15,
1:18, 1:21, 2:4, 2:7
**plaintiffs'** [25] - 5:12,
7:12, 8:8, 13:3,
13:10, 19:22, 25:15,
25:20, 35:25, 37:3,
42:1, 45:24, 48:2,
49:3, 56:17, 64:5,
73:22, 75:17, 76:10,
82:5, 82:21, 84:8,
85:18, 86:20, 87:3
**planned** [1] - 6:22
**play** [1] - 85:5
**player** [1] - 29:14
**players** [1] - 7:24
**plenty** [1] - 67:15
**point** [25] - 8:17, 9:13,
10:23, 16:11, 23:6,
23:15, 26:7, 26:23,
28:10, 30:2, 36:6,
41:8, 47:8, 56:3,
58:17, 58:19, 59:14,
62:7, 64:7, 66:13,
68:3, 75:3, 79:6,
80:22, 85:20
**pointed** [4] - 28:8,
74:18, 80:18, 82:4
**points** [2] - 20:6,
85:14
**policy** [1] - 80:3
**poor** [1] - 45:18
**portion** [1] - 43:13
**portions** [1] - 7:19

**position** [19] - 6:3,
6:14, 6:19, 7:12, 8:8,
8:10, 9:9, 13:3,
13:10, 18:1, 19:14,
29:25, 30:1, 51:17,
73:3, 80:8, 80:9,
81:9, 87:13
**possession** [2] -
54:21, 87:3
**possible** [5] - 22:7,
22:8, 24:14, 33:2,
74:14
**possibly** [2] - 16:14,
48:4
**post** [2] - 33:19, 50:24
**post-initiation** [1] -
50:24
**postdate** [3] - 33:11,
33:13
**potential** [1] - 53:4
**potentially** [2] - 27:21,
67:10
**Poulis** [1] - 74:19
**practicable** [1] - 78:8
**practices** [2] - 19:16,
22:17
**Prasad** [2] - 67:4, 69:4
**pre** [1] - 33:19
**precisely** [1] - 69:17
**preclusion** [1] - 81:22
**predate** [1] - 33:10
**predating** [2] - 26:5,
27:24
**prejudice** [18] - 19:15,
57:11, 57:19, 57:20,
58:3, 58:10, 58:12,
59:12, 63:15, 65:8,
65:11, 73:8, 75:4,
81:15, 81:21, 81:25,
82:18
**prejudiced** [4] - 52:9,
58:21, 61:10, 64:1
**prejudicial** [1] - 66:5
**preliminary** [4] - 51:5,
57:24, 58:1, 59:16
**premature** [2] - 11:23,
28:12
**preparation** [1] - 8:13
**prepare** [3] - 46:18,
47:25, 63:1
**prepared** [6] - 6:15,
8:12, 11:21, 20:3,
63:2, 82:25
**preparing** [1] - 8:23
**presence** [2] - 13:8,
58:25
**PRESENT** [1] - 3:1
**present** [5] - 4:16,
40:6, 57:25, 59:3,
87:5

**presented** [10] - 9:20,
26:23, 27:2, 27:18,
38:5, 51:23, 53:14,
80:15, 80:20, 86:23
**preservation** [4] -
54:3, 54:4, 55:18
**preserve** [5] - 55:24,
57:7, 58:6, 60:9,
61:23
**preserved** [8] - 28:16,
54:8, 54:11, 54:14,
54:16, 54:17, 54:20,
55:25
**preserving** [1] - 55:8
**pressed** [2] - 54:23,
61:1
**pressing** [1] - 36:19
**presumably** [2] -
31:25, 32:5
**presuming** [2] - 32:7,
35:7
**presumptively** [1] -
34:21
**pretty** [4] - 41:18,
45:1, 45:18, 73:14
**previous** [2] - 74:15,
79:10
**previously** [4] - 30:5,
30:7, 53:20, 83:20
**Princeton** [2] - 2:20,
2:24
**principal** [1] - 29:21
**principle** [1] - 13:6
**Prinston** [1] - 2:10
**priorities** [1] - 18:7
**prioritize** [4] - 18:11,
24:23, 47:19
**prioritizing** [1] - 25:4
**priselac** [1] - 15:4
**PRISELAC** [39] - 2:8,
15:3, 15:5, 18:14,
19:5, 20:20, 22:11,
22:13, 23:7, 23:24,
25:7, 25:11, 25:16,
25:18, 26:17, 28:7,
29:24, 31:18, 32:8,
33:2, 33:13, 33:24,
34:13, 34:20, 35:13,
36:16, 36:25, 37:5,
38:14, 39:4, 39:10,
39:15, 40:9, 41:8,
41:13, 41:17, 42:14,
42:16, 88:12
**Priselac** [10] - 15:6,
19:4, 22:12, 26:16,
29:21, 33:9, 34:18,
38:22, 39:1, 40:8
**privacy** [2] - 17:14,
17:15
**privilege** [23] - 5:16,

5:20, 6:6, 6:16, 7:10,
7:25, 8:3, 8:18, 9:7,
9:20, 10:12, 10:21,
11:2, 11:9, 11:24,
12:1, 12:7, 17:20,
17:21, 23:2, 33:6,
48:25, 50:4
**privileged** [10] - 7:15,
8:4, 9:13, 11:10,
29:23, 30:1, 31:7,
31:25, 32:4, 32:20
**probative** [1] - 31:5
**problem** [11] - 33:17,
34:22, 45:2, 47:15,
47:21, 48:6, 49:18,
53:4, 66:7, 73:24,
83:16
**procedural** [1] - 50:17
**Procedure** [1] - 70:21
**procedures** [2] -
18:20, 62:2
**Proceedings** [1] -
1:24
**PROCEEDINGS** [1] -
4:1
**proceedings** [4] -
70:22, 74:15, 88:15,
88:19
**process** [14] - 9:18,
13:16, 15:12, 15:16,
16:11, 18:16, 20:17,
24:6, 46:17, 48:10,
49:9, 56:24, 63:17,
81:7
**processed** [1] - 16:2
**processing** [1] - 26:20
**PROCTOR** [1] - 2:5
**produce** [15] - 8:21,
9:12, 9:19, 13:24,
22:1, 23:23, 24:25,
27:25, 43:11, 45:7,
48:1, 53:22, 71:13,
71:21, 79:15
**produced** [53] - 1:25,
8:19, 9:16, 10:16,
14:22, 19:8, 19:12,
26:8, 26:9, 28:11,
28:21, 29:13, 29:15,
29:16, 32:21, 32:22,
43:11, 43:14, 43:15,
43:18, 44:15, 44:18,
45:8, 45:15, 45:25,
46:13, 46:16, 56:20,
62:18, 66:10, 66:14,
66:17, 67:8, 68:5,
68:8, 69:14, 70:15,
71:24, 75:19, 75:24,
76:2, 76:18, 76:19,
76:24, 77:1, 79:12,
79:13, 81:4, 84:11,

85:21, 86:2
**producing** [4] - 44:2,
47:17, 81:7, 82:24
**product** [44] - 7:11,
8:6, 8:8, 11:20,
11:25, 12:6, 45:2,
50:25, 51:3, 52:4,
52:5, 52:10, 52:14,
52:23, 52:25, 53:5,
54:25, 56:5, 56:6,
56:10, 57:8, 57:9,
57:18, 57:20, 60:2,
60:6, 60:25, 61:2,
61:8, 61:11, 61:13,
61:15, 61:16, 62:7,
62:12, 62:19, 63:24,
63:25, 64:9, 64:10,
68:20, 73:20, 73:21,
77:6
**production** [66] - 8:23,
14:20, 14:22, 14:23,
15:9, 21:24, 23:11,
24:24, 25:4, 25:14,
27:9, 27:13, 28:14,
30:11, 43:12, 43:23,
46:18, 47:11, 47:16,
47:20, 48:15, 48:19,
50:9, 62:17, 63:21,
64:11, 65:10, 65:12,
65:18, 67:20, 67:21,
67:23, 68:9, 68:13,
68:19, 68:21, 69:3,
72:9, 75:1, 76:9,
76:10, 76:15, 76:22,
77:6, 79:8, 79:21,
79:23, 79:24, 79:25,
80:23, 81:8, 81:10,
81:12, 82:11, 83:13,
83:14, 83:17, 83:19,
83:21, 84:8, 84:10,
84:11, 85:19, 85:22,
85:25
**production's** [1] -
82:3
**productions** [15] -
10:14, 14:16, 15:2,
44:5, 68:2, 68:22,
68:24, 72:7, 72:25,
75:2, 75:6, 76:5,
83:12, 87:12
**productive** [4] - 78:12,
78:22, 78:24, 78:25
**PRODUCTS** [1] - 1:4
**products** [6] - 53:2,
55:12, 55:14, 55:20,
56:16, 58:17
**proffer** [2] - 30:5, 30:7
**progress** [3] - 7:5,
22:5, 25:13
**project** [3] - 16:12,

20:25, 21:6
**projects** [2] - 86:6,
86:7
**promises** [1] - 70:14
**prophylactic** [1] -
17:17
**proportionality** [7] -
30:2, 31:3, 31:15,
32:17, 32:21, 33:18,
34:12
**proposal** [1] - 11:5
**proposed** [2] - 24:11,
38:9
**protected** [4] - 6:16,
12:6, 13:9, 13:14
**protection** [1] - 12:1
**protective** [1] - 40:12
**protocol** [6] - 15:19,
15:21, 16:3, 21:15,
34:20, 77:18
**prove** [4] - 20:24,
57:21, 58:11, 61:25
**proves** [2] - 20:24,
20:25
**provide** [20] - 10:2,
10:7, 14:21, 16:9,
21:19, 21:25, 22:16,
37:4, 42:2, 44:1,
45:7, 46:13, 59:3,
62:24, 63:4, 63:5,
63:19, 70:12, 82:17
**provided** [5] - 7:21,
10:4, 10:13, 21:24,
28:17
**provides** [1] - 7:23
**providing** [2] - 63:15,
63:22
**pull** [1] - 40:25
**pulling** [1] - 40:25
**punted** [1] - 50:21
**purpose** [2] - 11:21,
37:1
**purposes** [2] - 77:18,
82:18
**pursuant** [1] - 15:19
**push** [1] - 85:5
**pushed** [2] - 47:2,
84:3
**pushes** [1] - 73:16
**put** [11] - 12:16, 19:14,
20:22, 22:2, 23:13,
23:25, 31:6, 51:22,
72:22, 84:24
**puts** [1] - 20:22
**putting** [1] - 51:14

# Q

**quality** [1] - 67:2
**quantification** [1] -
34:7

**questionable** [1] -
58:19
**questioned** [3] - 81:3,
83:10, 84:19
**questioning** [3] - 21:8,
76:1, 82:5
**questions** [2] - 65:6,
72:20
**quicker** [1] - 40:3
**quickly** [3] - 39:23,
41:24, 48:3
**quite** [3] - 21:9, 31:7,
66:18
**quote** [1] - 54:10

# R

**RAFFERTY** [1] - 2:5
**raise** [4] - 57:4, 79:5,
79:17, 82:21
**raised** [5] - 44:22,
75:4, 75:5, 78:17,
79:2
**Raju** [1] - 86:2
**Ramarao's** [2] - 45:25,
47:24
**range** [1] - 44:12
**ranging** [1] - 6:12
**Rao** [1] - 66:25
**rather** [7] - 24:18,
40:3, 44:3, 74:21,
87:4, 87:5, 87:6
**RE** [1] - 1:4
**Re** [1] - 6:15
**reaching** [1] - 32:2
**read** [9] - 34:21,
34:23, 35:8, 35:9,
35:25, 37:19, 50:20,
63:9, 72:20
**readily** [1] - 80:24
**reading** [2] - 35:20,
60:23
**ready** [1] - 60:11
**reality** [3] - 40:10,
40:13, 40:19
**really** [24] - 6:5, 9:3,
9:12, 12:16, 17:4,
17:24, 18:15, 18:18,
19:23, 20:14, 33:8,
35:21, 36:10, 37:24,
38:9, 55:21, 55:24,
58:25, 70:7, 74:16,
78:3, 81:15, 85:10,
86:20
**reason** [4] - 7:2,
26:24, 30:24, 76:4
**reasonable** [11] - 15:1,
16:24, 26:7, 34:6,
34:8, 48:14, 54:12,
58:6, 61:4, 74:16,
74:17

**reasonably** [1] - 58:6
**reasoned** [2] - 18:25,
34:3
**reasons** [2] - 12:19,
51:12
**recalled** [16] - 54:11,
54:14, 54:25, 55:12,
55:14, 55:20, 56:11,
57:8, 57:18, 59:6,
60:9, 60:25, 61:2,
61:11, 63:3, 63:8
**receive** [1] - 5:3
**received** [6] - 10:7,
54:21, 55:11, 55:21,
56:18, 56:19
**recent** [3] - 10:10,
10:12, 69:8
**recently** [4] - 13:4,
47:9, 78:24, 81:4
**recipient** [2] - 7:14,
8:2
**recipients** [1] - 53:23
**recognized** [1] - 74:19
**record** [11] - 4:23,
20:1, 61:6, 68:4,
68:7, 72:13, 79:1,
80:14, 80:20, 83:10,
88:19
**recorded** [1] - 1:24
**rectified** [1] - 78:16,
80:24
**rectify** [3] - 79:4,
79:24, 80:5
**red** [2] - 57:10, 60:4
**redactions** [2] - 8:20,
8:22
**Reddy** [1] - 86:3
**redeposed** [1] - 71:1
**redo** [2] - 67:11, 75:13
**Redondo** [1] - 1:17
**reduce** [1] - 13:2
**reference** [2] - 55:18,
56:17
**referenced** [3] - 55:17,
58:15, 63:7
**referred** [1] - 79:6
**refers** [1] - 45:24
**reflect** [1] - 43:13
**refused** [1] - 70:17
**refusing** [1] - 36:17
**regard** [2] - 5:20, 47:9
**regarded** [1] - 21:20
**regarding** [1] - 25:21
**regardless** [1] - 61:5
**regards** [2] - 7:10, 8:6
**regulatory** [5] - 6:13,
20:17, 56:8, 56:13,
56:23
**rehash** [1] - 72:21
**reiterated** [1] - 51:13

**relate** [2] - 46:1, 86:2
**related** [4] - 21:4,
21:5, 31:11, 32:4
**relates** [2] - 57:5,
57:13
**relating** [2] - 69:2,
86:3
**relatively** [1] - 74:4
**relevance** [2] - 58:22,
59:11
**relevancy** [1] - 31:4
**relevant** [6] - 6:13,
7:24, 27:21, 30:19,
55:22, 58:4
**reliability** [1] - 58:19
**reliance** [1] - 70:3
**reluctant** [1] - 62:16
**remain** [3] - 11:12,
49:16, 86:17
**remaining** [3] - 49:7,
57:22, 82:8
**remains** [2] - 45:10,
45:13
**remember** [2] - 17:1,
47:22
**remind** [1] - 4:20
**REMOTE** [1] - 1:6
**remotely** [1] - 4:1
**repeat** [1] - 5:11
**repeated** [2] - 83:7,
86:19
**repeatedly** [4] - 68:9,
73:1, 84:18, 86:9
**reply** [4] - 67:21,
75:10, 77:20, 85:18
**report** [2] - 20:11,
22:21, 26:5, 27:21,
50:2
**Reporter** [1] - 1:22
**reporter** [1] - 37:17
**Reporter/**
**Transcriber** [1] -
88:21
**reports** [5] - 43:20,
47:2, 71:4, 71:6,
71:8
**represent** [1] - 73:18
**representations** [2] -
72:16, 79:7
**representative** [7] -
54:13, 54:16, 54:24,
55:2, 55:8, 63:6,
63:18
**represented** [2] -
72:13, 77:11
**representing** [2] -
78:21
**reproduced** [1] - 81:3
**request** [14] - 5:25,
6:1, 9:16, 21:8,

22:13, 24:20, 25:20,
29:1, 36:15, 37:15,
38:8, 41:25, 50:19,
51:9
**requested** [6] - 16:2,
16:24, 44:11, 47:8,
47:10, 47:23
**requesting** [4] - 35:11,
46:15, 51:4
**requests** [9] - 19:7,
19:12, 19:14, 21:3,
21:7, 28:9, 44:3,
46:2, 84:8
**require** [3] - 48:10,
63:20, 70:1
**required** [3] - 22:25,
40:17, 60:4
**requiring** [1] - 70:24
**rescheduled** [1] -
86:15
**researching** [1] -
30:21
**reserve** [1] - 82:14
**reserved** [1] - 87:19
**resolve** [5] - 9:1, 9:4,
12:25, 41:6, 80:6
**resolved** [3] - 13:6,
41:21, 78:13
**resort** [3] - 74:20,
74:21, 74:22
**resources** [3] - 75:1,
76:7, 81:13
**respect** [19] - 5:7,
5:11, 5:24, 28:17,
46:10, 46:14, 48:24,
50:3, 60:7, 62:18,
63:24, 65:12, 71:17,
77:1, 78:16, 79:17,
80:7, 85:15, 87:13
**respond** [7] - 27:18,
40:14, 40:24, 44:3,
46:6, 70:11, 83:3
**responded** [1] - 51:16
**responding** [1] -
11:22
**response** [11] - 8:13,
43:18, 51:7, 54:20,
61:17, 68:10, 68:17,
70:14, 72:7, 84:23,
85:14
**responsibilities** [1] -
31:8
**responsibility** [1] -
31:13
**responsive** [4] - 31:9,
43:16, 44:5, 79:15
**responsiveness** [2] -
17:20, 23:2
**rest** [4] - 9:16, 12:16,
73:25, 83:22

**restricted** [2] - 73:6,
73:7
**result** [3] - 21:3,
84:13, 84:21
**resume** [1] - 78:9
**retain** [2] - 63:8, 64:8
**retained** [8] - 52:19,
53:6, 53:15, 57:18,
58:16, 61:15, 62:23,
63:3
**retake** [1] - 65:22
**retaken** [2] - 66:9,
82:16
**retrospect** [1] - 78:13
**returned** [2] - 61:3,
62:4
**review** [17] - 7:7, 8:17,
9:18, 10:16, 16:4,
16:5, 17:18, 24:7,
24:10, 24:13, 24:18,
32:25, 34:16, 35:1,
49:23, 71:7, 76:9
**reviewed** [2] - 23:1,
32:16, 43:22
**reviewing** [1] - 76:21
**reviews** [1] - 17:20
**revision** [1] - 17:14
**revisions** [1] - 17:15
**rhetoric** [1] - 86:21
**rid** [2] - 64:9, 64:10
**Riddell** [1] - 6:15
**rights** [2] - 17:16,
17:22
**rings** [1] - 77:22
**ripe** [1] - 51:8
**rise** [2] - 67:17, 69:15
**rises** [1] - 67:18
**RMR** [1] - 88:21
**Road** [2] - 2:13, 2:23
**Robert** [1] - 3:2
**robust** [1] - 6:2
**roll** [2] - 69:12, 69:13
**rolling** [7] - 24:24,
25:14, 47:11, 47:15,
47:20, 48:6, 48:15
**Roseland** [1] - 1:14
**Roszel** [1] - 2:23
**roughly** [2] - 6:6, 68:3
**round** [2] - 9:8, 28:9
**RPR** [1] - 88:21
**Rule** [3] - 69:17,
74:12, 84:8
**ruled** [1] - 53:22
**Rules** [1] - 70:21
**ruling** [2] - 42:11,
82:14
**rulings** [2] - 27:14,
40:17

**S**

**sailed** [1] - 71:5
**sample** [4] - 54:14,
54:17, 54:24, 55:2
**samples** [20] - 52:19,
52:20, 53:15, 54:9,
55:8, 57:18, 58:15,
58:16, 59:2, 61:15,
61:17, 61:18, 61:19,
61:23, 62:1, 62:12,
62:23, 63:6, 63:14,
63:18
**sanction** [11] - 69:17,
69:19, 70:23, 70:24,
73:7, 74:20, 81:22,
82:1, 82:19, 87:17,
87:18
**sanctions** [13] - 64:22,
65:25, 69:16, 71:10,
73:4, 73:11, 74:11,
74:20, 74:24, 74:25,
82:15, 82:22, 83:23
**sat** [1] - 84:8
**satisfied** [1] - 55:4
**saw** [1] - 87:9
**scanned** [1] - 15:19
**scanning** [1] - 17:17
**scenario** [1] - 24:11
**schedule** [8] - 24:3,
24:11, 39:19, 39:21,
75:18, 86:17, 87:4
**scheduled** [1] - 6:23
**scheduling** [4] - 84:3,
86:10, 86:11, 86:12
**Schneider** [10] -
50:21, 53:21, 54:5,
54:9, 54:23, 55:3,
55:7, 55:16, 63:7
**Schneider's** [2] - 6:14,
51:6
**scope** [4] - 50:9,
60:18, 60:21, 78:19
**screen** [1] - 4:22
**search** [7] - 15:23,
16:2, 21:22, 24:6,
31:10, 77:3, 84:13
**second** [2] - 57:4,
85:9
**seconds** [1] - 19:18
**secret** [1] - 17:14
**Section** [1] - 41:18
**see** [21] - 4:5, 4:6,
4:16, 8:20, 9:2, 9:15,
15:14, 18:18, 24:24,
28:15, 35:10, 45:2,
49:23, 59:11, 64:6,
67:24, 69:3, 69:8,
69:11, 84:25, 88:6
**seeing** [1] - 64:1
**seek** [1] - 74:25

**seeking** [3] - 74:11,
74:21, 86:10
**seem** [3] - 40:2, 63:17,
67:17
**self** [3] - 15:11, 15:12,
16:15
**self-collection** [3] -
15:11, 15:12, 16:15
**selling** [1] - 30:20
**send** [4] - 56:9, 71:11,
77:23, 77:24
**sender** [4] - 7:13,
7:18, 8:1, 53:24
**sends** [1] - 73:14
**sense** [4] - 18:22,
29:15, 31:14, 40:2
**sent** [8] - 14:21, 16:25,
51:11, 53:24, 56:10,
59:6, 78:4, 85:20
**sentence** [1] - 36:7
**sentiments** [1] - 54:10
**Sentry** [1] - 2:17
**separate** [1] - 56:14
**September** [1] - 19:8
**sequester** [1] - 60:15
**sequestered** [2] -
52:16, 60:21
**sequestration** [1] -
52:18
**serious** [2] - 22:14,
76:12
**seriously** [2] - 19:15,
76:13
**serves** [1] - 67:14
**service** [1] - 77:25
**set** [14] - 13:24, 16:4,
16:5, 19:7, 23:1,
24:9, 43:24, 45:14,
46:23, 46:25, 50:22,
66:6, 83:8
**several** [4] - 7:22,
47:7, 51:18, 87:10
**severe** [2] - 81:21,
81:25
**Shah** [9] - 43:2, 43:6,
45:21, 46:6, 47:5,
47:14, 48:5, 48:17
**SHAH** [5] - 2:23, 43:4,
46:10, 48:8, 48:21
**shah** [1] - 43:21
**shame** [1] - 60:23
**Shanghai** [1] - 24:6
**shared** [1] - 79:10
**sheet** [3] - 36:1, 36:2,
37:16
**sheets** [2] - 34:15,
34:17
**shelf** [2] - 58:18, 60:3
**shift** [1] - 66:18
**ship** [1] - 71:5

**short** [2] - 49:17, 60:8
**shortly** [1] - 6:23
**shot** [1] - 18:8
**show** [5] - 25:8, 57:14, 58:10, 68:12, 70:20
**showing** [7] - 28:5, 51:5, 58:12, 59:16, 64:2, 81:15, 85:7
**shown** [1] - 86:7
**shows** [5] - 9:8, 30:11, 66:1, 75:11
**side** [7] - 12:21, 19:22, 21:2, 37:3, 41:9, 83:13
**sides** [1] - 35:6
**sign** [5] - 34:22, 34:25, 35:6, 35:9, 37:13
**signed** [1] - 35:19
**significance** [1] - 59:22
**significant** [2] - 20:15, 75:1
**signing** [3] - 35:15, 37:3, 38:23
**silent** [1] - 22:23
**similar** [2] - 54:9, 66:1
**simple** [1] - 6:5
**simplistic** [1] - 21:21
**simply** [2] - 57:11, 73:13
**single** [3] - 54:11, 65:23, 66:13
**sit** [1] - 19:13
**site** [3] - 15:13, 16:7, 24:3
**sitting** [3] - 60:10, 60:11, 61:2
**situation** [1] - 69:17
**situations** [1] - 65:25
**size** [2] - 53:17, 78:19
**Slater** [22] - 4:6, 4:16, 16:19, 16:20, 20:22, 21:2, 21:10, 21:12, 25:3, 25:23, 27:17, 28:8, 28:25, 30:3, 32:11, 33:7, 35:7, 35:16, 36:22, 39:20, 41:21, 41:22
**SLATER** [28] - 1:13, 1:13, 4:17, 16:19, 16:21, 18:15, 19:18, 19:21, 23:3, 25:24, 27:16, 27:18, 28:23, 29:2, 29:6, 29:9, 32:12, 33:8, 33:14, 33:25, 35:17, 37:14, 38:15, 39:5, 39:22, 42:3, 42:6, 88:10
**Slater's** [1] - 36:17
**slightly** [1] - 46:4

**small** [3] - 24:14, 32:3, 43:13
**smaller** [1] - 13:20
**SMITH** [1] - 3:2
**so..** [1] - 38:3
**Solco** [1] - 2:10
**solely** [2] - 8:9, 8:12
**someone** [1] - 36:6
**sometime** [1] - 33:23
**soon** [2] - 32:1
**sooner** [1] - 9:11
**sorry** [6] - 10:10, 11:3, 30:5, 63:23, 66:25, 73:5
**sort** [10] - 17:17, 26:15, 44:13, 44:21, 47:1, 47:11, 49:3, 49:20, 57:25, 77:22
**sorts** [1] - 55:23
**sought** [2] - 38:10, 87:17
**sound** [2] - 26:3, 54:12
**sounds** [1] - 18:16
**sources** [2] - 59:9, 84:12
**South** [2] - 1:17, 2:9
**speaking** [7] - 4:5, 4:8, 4:21, 4:23, 34:15, 84:16
**speaks** [1] - 45:22
**SPECIAL** [1] - 1:10
**Special** [3] - 4:2, 5:6, 14:18
**specific** [10] - 20:2, 21:5, 43:10, 44:1, 44:18, 44:21, 46:11, 47:12, 48:13, 63:2
**specifically** [5] - 8:4, 47:8, 71:18, 76:9, 84:20
**speed** [1] - 74:10
**spend** [1] - 76:6
**spent** [3] - 22:15, 40:4, 76:21
**spill** [1] - 73:24
**spoliating** [1] - 81:21
**spoliation** [11] - 26:22, 27:4, 56:1, 56:23, 57:11, 57:25, 58:1, 58:2, 58:10, 61:25, 81:24
**spring** [1] - 19:13
**spun** [1] - 79:25
**stability** [1] - 58:18
**staff** [1] - 29:6
**stage** [1] - 17:3
**stance** [1] - 20:5
**stand** [2] - 5:24, 50:3
**standard** [5] - 26:21,

27:6, 27:7, 37:24, 74:16
**stands** [1] - 16:11
**STANOCH** [9] - 2:2, 50:11, 50:14, 52:7, 52:13, 59:25, 61:14, 61:22, 62:11
**Stanoch** [8] - 50:12, 50:13, 52:3, 53:11, 58:24, 59:24, 61:10, 64:1
**start** [3] - 26:15, 68:8, 69:12, 74:4, 75:3
**started** [4] - 4:4, 4:15, 19:7, 69:13
**starting** [2] - 31:23, 85:15
**state** [2] - 17:14, 79:20
**statement** [9] - 34:25, 35:6, 35:8, 37:10, 39:1, 44:4, 45:15, 54:10, 70:15
**statements** [3] - 79:18, 79:21, 83:5
**STATES** [1] - 1:1
**States** [3] - 20:8, 30:13, 72:12
**statistics** [1] - 85:25
**status** [1] - 50:2
**STATUS** [1] - 1:5
**stay** [3] - 34:16, 34:18, 36:18
**stenography** [1] - 1:24
**step** [2] - 15:8, 61:6
**still** [11] - 47:4, 50:15, 51:19, 52:7, 52:16, 52:19, 58:16, 60:18, 61:15, 81:7, 81:10
**stipulate** [1] - 37:22
**stipulation** [2] - 35:15, 35:19
**stop** [2] - 22:6, 37:19
**stopping** [1] - 60:8
**straight** [1] - 65:19
**straightforward** [1] - 53:16
**strategically** [1] - 83:21
**streamlined** [1] - 17:25
**Street** [2] - 2:3, 2:9
**Streets** [1] - 1:8
**strength** [1] - 38:3
**strengthen** [2] - 62:8, 62:9
**strengthens** [1] - 64:10
**strike** [2] - 4:13, 5:12
**striking** [1] - 74:12

**students** [1] - 79:11
**subject** [4] - 44:9, 44:10, 49:2, 49:12
**submission** [3] - 53:20, 56:17, 58:8
**submit** [1] - 49:16, 75:9, 78:14, 79:16, 80:15, 80:21, 81:14, 82:1, 82:12, 82:22, 87:1
**submitted** [4] - 9:25, 67:20, 72:21, 75:10
**subset** [1] - 46:4
**substance** [1] - 86:22
**substantial** [2] - 25:13, 53:11
**substantive** [1] - 29:10
**succinct** [1] - 50:16
**sudden** [1] - 85:2
**sufficient** [4] - 27:3, 51:5, 63:6, 85:6
**suggest** [3] - 47:6, 60:14, 64:9
**suggested** [3] - 18:2, 65:17, 65:22
**suggesting** [1] - 12:11
**suggestion** [6] - 49:14, 49:15, 49:21, 51:24, 59:18, 66:3
**Suite** [3] - 1:20, 2:6, 2:13
**Sunday** [2] - 10:13, 14:4
**supplement** [1] - 79:25
**supplemental** [5] - 21:20, 75:6, 75:18, 80:25, 86:14
**supports** [1] - 73:9
**suppose** [1] - 28:25
**supposed** [2] - 20:15, 46:24
**suppression** [1] - 58:5
**Supreme** [1] - 40:17
**surmountable** [1] - 45:5
**surprised** [1] - 24:19
**swallow** [1] - 20:14
**swelled** [1] - 10:23
**sympathetic** [1] - 21:23
**system** [1] - 30:13

---

**T**

**tapes** [1] - 85:24
**tasked** [1] - 49:3
**team** [4] - 42:9, 49:3, 77:6, 77:11
**technical** [2] - 22:22,

41:20
**telephone** [1] - 30:9
**template** [1] - 17:8
**ten** [1] - 38:16
**ten-day** [1] - 38:16
**tends** [1] - 43:12
**terabyte** [2] - 78:4, 87:14
**term** [1] - 21:21
**terminology** [1] - 17:17
**terms** [24] - 5:10, 10:20, 15:23, 16:3, 16:25, 20:6, 20:22, 21:22, 22:19, 22:25, 24:7, 28:15, 30:19, 31:3, 31:10, 32:9, 33:5, 39:1, 47:2, 50:2, 62:7, 63:22, 66:8, 77:3
**territory** [1] - 11:10
**test** [6] - 52:24, 53:5, 60:5, 61:12, 64:2
**testified** [3] - 30:8, 30:14, 51:1
**testify** [2] - 51:2, 60:21
**testimony** [5] - 26:2, 37:18, 38:3, 57:13, 62:25
**testing** [7] - 58:16, 58:19, 59:2, 59:5, 59:7, 59:8
**Teva** [23] - 2:14, 2:14, 50:8, 50:22, 51:16, 51:19, 52:17, 53:25, 55:8, 55:10, 55:11, 56:4, 59:23, 60:4, 60:9, 60:10, 60:14, 60:24, 61:7, 61:22, 63:23, 63:24, 64:13
**Teva's** [3] - 50:9, 51:2, 55:24
**THE** [2] - 1:1, 1:10
**themselves** [1] - 8:3
**then-pending** [1] - 51:15
**theory** [1] - 21:10
**therefore** [1] - 82:19
**they've** [12] - 16:2, 21:4, 47:7, 52:17, 54:21, 58:11, 58:15, 59:12, 65:24, 75:14, 75:21, 81:1
**thinks** [3] - 22:24, 41:22, 48:5
**Third** [1] - 74:18
**third** [1] - 57:13
**THOMAS** [2] - 1:11, 2:5

**Thomas** [1] - 4:2
**thorough** [2] - 7:16, 8:16
**thousand** [2] - 6:7, 15:22
**thread** [2] - 17:11, 17:12
**threading's** [1] - 17:12
**threatened** [1] - 83:23
**three** [10] - 9:9, 44:5, 46:16, 47:5, 53:6, 57:25, 58:13, 62:1, 66:25, 85:19
**threw** [1] - 38:21
**throughout** [5] - 11:14, 15:16, 20:17, 21:16, 22:18
**thrown** [1] - 10:20
**tie** [1] - 44:17
**timeframe** [3] - 15:25, 32:3, 49:15
**timeline** [6] - 14:6, 16:6, 16:12, 23:25, 67:25, 68:1
**timely** [2] - 77:2, 82:18
**timing** [3] - 5:5, 14:19, 24:15
**today** [20] - 5:1, 5:4, 5:13, 6:8, 29:3, 31:23, 38:8, 42:11, 46:3, 48:16, 60:2, 60:25, 61:5, 75:21, 76:10, 76:24, 79:5, 81:6, 84:16, 88:5
**together** [3] - 49:23, 70:20, 84:24
**ton** [1] - 66:15
**tons** [3] - 50:24, 60:17, 61:12
**took** [3] - 37:18, 73:20, 87:12
**topics** [1] - 63:1
**topmost** [2] - 7:18, 11:14
**Torrent** [1] - 64:14
**total** [1] - 34:11
**totally** [3] - 21:1, 21:8, 24:21
**touch** [1] - 15:15
**Tours** [1] - 51:6
**towards** [1] - 66:19
**track** [2] - 65:15, 79:1
**transcript** [10] - 1:24, 4:24, 35:1, 37:17, 37:19, 38:1, 55:16, 63:9, 88:6, 88:18
**transcription** [1] - 1:25
**transcripts** [1] - 36:4
**transfer** [4] - 77:15,

77:18, 78:6, 87:13
**translating** [1] - 35:2
**translation** [1] - 35:3
**transparent** [1] - 22:16
**transpire** [1] - 87:9
**transpires** [1] - 73:16
**TRAURIG** [1] - 2:12
**tried** [1] - 7:15
**triple** [1] - 35:3
**trouble** [3] - 32:6, 43:17, 64:1
**troubled** [1] - 87:15
**troubles** [1] - 77:14
**troubling** [2] - 87:11, 87:21
**true** [5] - 20:23, 32:8, 55:13, 58:23, 80:2
**Trumper** [2] - 56:12, 56:18
**trust** [2] - 84:1, 84:2
**try** [12] - 8:25, 11:8, 12:25, 15:13, 16:12, 24:23, 37:22, 50:15, 60:1, 79:4, 80:6, 81:16
**trying** [14] - 9:3, 14:4, 19:15, 29:2, 29:4, 37:14, 38:25, 40:25, 43:18, 48:3, 52:7, 52:11, 52:21, 53:18
**turned** [1] - 77:12
**twice** [2] - 66:5, 84:4
**two** [31] - 7:9, 9:8, 14:20, 22:3, 22:9, 23:15, 23:17, 24:13, 24:16, 28:4, 40:18, 47:6, 47:11, 48:5, 48:8, 48:16, 51:10, 66:2, 66:24, 70:18, 75:13, 76:17, 76:20, 84:11, 84:12, 84:22, 85:2, 85:16
**two-week** [1] - 47:11
**type** [5] - 21:7, 35:5, 35:15, 69:17, 73:15

**U**

**U.S** [12] - 1:7, 2:10, 65:20, 68:14, 68:23, 68:24, 72:8, 76:17, 77:1, 77:7, 84:4
**ultimately** [2] - 54:4, 77:21
**unable** [2] - 26:6, 48:16
**unavailable** [1] - 45:16
**unaware** [1] - 56:15
**uncomfortable** [1] -

38:12
**under** [11] - 12:6, 23:18, 25:1, 26:20, 27:25, 34:20, 40:17, 51:5, 65:25, 74:12, 87:16
**underscores** [1] - 73:4
**understood** [2] - 13:23, 39:10
**unequivocal** [1] - 20:6
**unexpired** [1] - 60:6
**unfair** [1] - 19:16
**unfortunate** [1] - 36:16
**unfortunately** [2] - 6:21, 78:24
**unheard** [1] - 76:3
**unique** [1] - 71:16
**Unit** [2] - 43:21
**United** [3] - 20:8, 30:13, 72:12
**UNITED** [1] - 1:1
**unless** [4] - 4:21, 6:15, 12:14, 41:20
**unprecedented** [2] - 71:16, 82:6
**unpunished** [1] - 80:2
**unreasonable** [2] - 23:22, 37:15
**unredacted** [1] - 42:8
**unsupported** [1] - 86:22
**unusual** [1] - 86:6
**unwarranted** [1] - 81:23
**up** [24] - 4:12, 5:13, 10:7, 10:9, 27:10, 29:3, 36:21, 39:24, 40:25, 41:24, 44:23, 47:13, 49:9, 51:11, 51:13, 53:12, 66:22, 74:10, 80:6, 81:10, 83:22, 84:9
**up-to-date** [1] - 10:7
**upcoming** [2] - 20:19, 40:20
**update** [2] - 10:13, 16:10
**updated** [4] - 7:21, 10:5, 13:25, 67:21
**updates** [1] - 19:2, 22:5
**urgency** [1] - 40:24
**USA** [2] - 2:14, 2:21
**uses** [1] - 30:12
**usual** [1] - 4:9

**V**

**Valsartan** [1] - 20:7
**VALSARTAN** [1] - 1:4

**valsartan** [9] - 21:6, 30:20, 30:21, 32:1, 32:2, 50:23, 60:10
**value** [1] - 31:5
**Vanaskie** [1] - 4:2
**VANASKIE** [116] - 1:11, 4:4, 4:10, 4:15, 4:18, 5:21, 5:24, 6:18, 9:5, 9:20, 10:1, 10:3, 10:11, 10:19, 11:1, 11:23, 12:21, 13:7, 14:1, 14:9, 14:11, 14:14, 15:4, 16:17, 16:20, 19:4, 19:20, 21:18, 22:12, 23:5, 23:9, 25:2, 25:8, 25:12, 25:17, 25:19, 26:16, 27:15, 27:17, 28:13, 28:25, 29:5, 29:8, 29:20, 31:14, 32:5, 32:9, 32:14, 33:7, 34:8, 34:14, 35:10, 35:16, 36:23, 37:1, 38:21, 39:8, 39:11, 39:16, 40:8, 40:23, 41:12, 41:14, 42:5, 42:12, 42:15, 42:17, 42:22, 43:1, 43:5, 43:8, 44:7, 45:1, 45:6, 45:10, 45:18, 46:9, 46:19, 47:14, 48:14, 48:23, 49:19, 50:1, 50:7, 50:13, 52:2, 52:9, 53:8, 59:24, 61:9, 61:20, 62:6, 62:16, 63:20, 64:20, 65:3, 65:5, 66:8, 67:12, 69:19, 70:2, 70:23, 71:15, 72:15, 73:6, 74:1, 77:8, 77:14, 80:8, 80:11, 82:13, 83:1, 85:11, 87:8, 88:4, 88:13
**variety** [1] - 64:8
**various** [2] - 15:16, 54:22
**vast** [3] - 19:12, 71:21, 71:24
**vastly** [1] - 80:19
**vendor** [10] - 14:7, 15:12, 16:6, 19:6, 21:14, 24:1, 44:17, 46:18, 48:11, 86:1
**vendor's** [2] - 44:15, 45:2
**Venkata's** [1] - 46:2
**versions** [1] - 15:23
**versus** [1] - 61:3
**via** [2] - 4:1, 49:16

**VIA** [1] - 1:6
**VICTORIA** [1] - 2:12
**videoconference** [1] - 4:1
**VIDEOCONFERENCE** [1] - 1:6
**view** [1] - 46:21
**viewed** [1] - 26:20
**visible** [1] - 44:15
**voice** [1] - 14:18
**volume** [5] - 15:18, 16:13, 24:10, 32:18, 78:3
**volumes** [1] - 33:1
**voluntarily** [3] - 7:7, 19:12, 21:11

**W**

**Wachtel** [4] - 67:12, 70:2, 80:18, 81:14
**wait** [4] - 4:10, 4:14, 9:12, 28:14
**waiting** [1] - 73:19
**wall** [2] - 47:2, 49:20
**WALLACK** [1] - 2:22
**wants** [5] - 18:23, 34:16, 44:23, 47:5, 62:22
**warehouse** [2] - 60:10, 61:3, 62:3
**warning** [1] - 51:21
**warrant** [2] - 27:4, 63:17
**warranted** [2] - 65:25, 82:2
**weeds** [1] - 44:13
**week** [19] - 10:8, 14:18, 16:7, 16:8, 16:10, 23:8, 24:2, 24:4, 24:5, 24:7, 46:12, 46:24, 47:11, 49:10, 49:13, 50:2, 55:10, 53:9, 83:10
**week's** [3] - 23:2, 23:5, 23:22
**weekly** [2] - 19:2, 22:4
**weeks** [19] - 14:20, 20:19, 22:3, 22:10, 23:15, 23:17, 24:13, 24:17, 40:21, 46:16, 47:5, 47:6, 47:7, 48:6, 48:8, 48:16, 74:7, 75:15, 84:18
**weeks'** [1] - 23:22
**weigh** [2] - 31:4, 41:22
**WERNER** [1] - 21:16
**whack** [1] - 85:4
**whack-a-mole** [1] - 85:4
**white** [1] - 20:22

*WHITELEY* [1] - 2:2
*whole* [2] - 19:7, 85:5
*willful* [2] - 69:9, 70:13
*willing* [6] - 7:1, 9:19, 12:23, 21:10, 32:20, 86:17
*wiped* [2] - 70:18, 84:23
*wise* [1] - 54:12
*wish* [2] - 6:25, 80:25
*withheld* [8] - 7:6, 7:9, 10:18, 11:15, 11:21, 13:16, 49:5, 72:8
*withhold* [1] - 60:13
*withholding* [4] - 8:14, 11:12, 49:7, 58:5
*witness* [15] - 27:25, 37:4, 37:10, 51:1, 52:17, 56:4, 60:21, 61:16, 67:3, 70:25, 71:3, 75:24, 76:2, 81:22
*witnesses* [15] - 28:4, 30:14, 34:16, 35:20, 39:6, 39:9, 66:20, 69:22, 80:25, 81:3, 82:17, 82:24, 85:16, 87:4
*word* [1] - 55:16
*words* [2] - 44:11, 45:24
*world* [2] - 20:17, 84:12
*worse* [1] - 47:18
*wrap* [2] - 41:24, 49:9
*written* [3] - 20:12, 72:10, 87:25
*wrote* [2] - 37:19, 43:21

**Y**

*year* [1] - 77:4
*years* [8] - 27:23, 31:24, 31:25, 33:15, 33:17, 53:7, 58:14, 62:1
*yesterday* [12] - 5:2, 6:22, 7:3, 13:5, 44:10, 46:3, 49:2, 49:6, 49:10, 71:23, 75:10, 83:14
*yourself* [1] - 4:22

**Z**

*zero* [1] - 76:1
*Zhejiang* [1] - 2:11
*ZHP* [24] - 5:4, 14:15, 14:24, 15:6, 16:24, 18:2, 20:5, 20:7, 20:16, 22:19, 25:20, 29:12, 30:12, 34:16, 35:11, 35:12, 35:20, 38:6, 38:22, 39:17, 40:6, 41:9, 41:15, 42:15
*ZHP's* [7] - 19:23, 20:8, 25:21, 29:22, 31:1, 38:20, 73:20
*zones* [1] - 40:19
*ZOOM* [1] - 1:6
*Zoom* [1] - 4:1