# EXHIBIT D

*In re Valsartan, Losartan, Irbesartan Products Liability Litigation*
Case No. 1:19-md-2875

# <u>Appendix of Unreported Cases</u>

**Case Citation**                                                                      **Tab No**

*Amato v. Subaru of Am., Inc.*,
No. 18-16118, 2021 WL 2154976 (D.N.J. May 27, 2021) ...................................................... 1

*Campbell v. Sedgwick Detert, Moran & Arnold*,
No. CIV. 11-642-ES-SCM, 2013 WL 1314429 (D.N.J. Mar. 28, 2013) ................................. 2

*Corbett v. Remington Arms Co., LLC*,
No. 4:15-CV-00279-BLW, 2016 WL 1755456 (D. Idaho May 2, 2016) ............................... 3

*D'Onofrio v. Borough of Seaside Park*,
No. CIV.A. 09-6220 AET, 2012 WL 5989437 (D.N.J. Nov. 29, 2012) ................................. 4

*Dougan v. Sikorsky Aircraft Corp.*,
2020 WL 5521391 (Conn. Sep. 14, 2020) ............................................................................ 5

*Durbeck v. Suffolk Univ.*,
No. 20-10985, 2021 WL 2582621 (D. Mass. June 23, 2021) ................................................ 6

*Fahy v. Taser Int'l, Inc.*,
No. 4:10-cv-19, 2010 WL 559249 (E.D. Mo. Feb. 10, 2020) ............................................... 7

*Geraczynski v. Nat'l R.R. Passenger Corp.*,
No. 11-6385, 2015 WL 4623466 (D.N.J. July 31, 2015) ...................................................... 8

*Geraczynski v. National R. R. Passenger Corp*,
2013 WL 5934552 (D.N.J. Nov. 1, 2013) ............................................................................. 9

*Gomez v. H&M Int'l Transp., Inc.*,
No. No.: 17–231, 2017 WL 1483306 (D.N.J. Apr. 24, 2017) ............................................. 10

*Heaton v. Mathes*,
2020 WL 1652571 (Tenn. App. April 3, 2020) .................................................................... 11

*Hemmings v. Camping Time RV Centers, LLC*,
2017 WL 4552896 (N.D. Ga. Oct. 11, 2017). ..................................................................... 12

*In re Allergan Biocell Textured Breast Implant Prod. Liab. Litig.*,
No. 2:19-MD-2921-BRM-ESK, 2021 WL 1050910 (D.N.J. Mar. 19, 2021) ....................... 13

*In re FieldTurf Artificial Mktg. & Sales Prac. Litig.*,
No. 17-2779, 2018 WL 4188459 (D.N.J. Aug. 31, 2018) .................................................... 14

*In re Valsartan, Losartan, Irbesartan Products Liability Litigation*
Case No. 1:19-md-2875

*In re Hypodermic Prods. Antitrust Litig.*,
    No. 05-1602, 2007 WL 1959225 (D.N.J. June 29, 2007) .................................................... 15

*In re Liquid Aluminum Sulfate Antitrust Litig.*,
    No. 16-md-2687, 2017 WL 3131977 (D.N.J. July 20, 2017) ................................................ 16

*In re New England Compounding Pharmacy, Inc.*,
    MDL No. 13-02419, 2016 WL 11045600 (D. Mass. Feb. 29, 2016) ..................................... 17

*In re Subaru Battery Drain Prod. Liab. Litig.*,
    No. 1:20-CV-03095-JHR-JS, 2021 WL 1207791 (D.N.J. Mar. 31, 2021) ........................... 18

*In re Thalomid and Revlimid Antitrust Litig.*,
    No. 14-6997, 2015 WL 9589217 (D.N.J. Oct. 29, 2015) ...................................................... 19

*In re Volkswagen Timing Chain Prod. Liab. Litig.*,
    2017 WL 1902160 (D.N.J. May 8, 2017) ............................................................................. 20

*Jepson v. Ticor Title Ins. Co.*,
    No. C06-1723, 2007 WL 2060856 (W.D. Wash. May 1, 2007) ............................................ 21

*King v. Bayer Pharm. Corp.*,
    No. CIV.A. 09-0465, 2009 WL 2135223 (W.D. La. July 13, 2009) ..................................... 22

*Klingenberg v. Vulcan Ladder USA, LLC*,
    No. 15-CV-4012-KEM, 2018 WL 1248007 (N.D. Iowa Mar. 9, 2018) ................................ 23

*Lewis v. GE Healthcare, Inc.*,
    No. 5:19-cv-00490, 2020 WL 1490719 (W.D. La. Mar. 25, 2020) ....................................... 24

*MacMorris v. Wyeth*,
    No. 2:04-CV-596-FTM-29-DNF, 2005 WL 1528626 (M.D. Fla. June 27, 2005) ................ 25

*Majdipour v. Jaguar Land Rover N. Am., LLC*,
    2013 WL 5574626 (D.N.J. Oct. 9, 2013) .............................................................................. 26

*Microbilt Corp. v. Certain Underwriters at Lloyds, London*,
    No. 20-12734, 2021 WL 1214774 (D.N.J. Mar. 31, 2021) ................................................... 27

*Miller v. Lewis Univ.*,
    No. 20-C-5473, 2021 WL 1379488 (N.D. Ill. Apr. 12, 2021) .............................................. 28

*Pecanha v. The Hain Celestial Grp., Inc.*,
    2018 WL 534299 (N.D. Cal. Jan. 24, 2018) ........................................................................ 29

*Rickman v. BMW of N. Am.*,
    No. CV 18-4363(KM)(JBC), 2020 WL 3468250 (D.N.J. June 25, 2020) ............................ 30

*In re Valsartan, Losartan, Irbesartan Products Liability Litigation*
Case No. 1:19-md-2875

*Rolland v. Spark Energy LLC*,
    No. 17-2680, 2019 WL 1903990 (D.N.J. Apr. 29, 2019) ....................................................... 31

*Rosedale & Rosehill Cemetery Ass'n v. Twp. of Reading*,
    -- F. Supp. 3d --, 2020 WL 7768457 (D.N.J. Dec. 30, 2020) ................................................. 32

*Sheet Metal Workers Nat. Health Fund v. Amgen Inc.*,
    No. 07–5295, 2008 WL 3833577 (D.N.J. Aug.13, 2008) ....................................................... 33

*Spring v. Shell Oil Co.*,
    2018 WL1914293 (M.D. La. Apr. 23, 2018) ......................................................................... 34

*Stembridge v. Nat'l Feeds Inc.*, No. 1:11-cv-49,
    2013 WL 5347455 (D. Utah Sept. 23, 2013) ......................................................................... 35

*Transportation Insuance Co. v. Am. Harvest Baking Co., Inc.*,
    2015 WL 9049273 (D.N.J. Dec. 16, 2015) ............................................................................ 36

*Travelers Indem. Co. v. Indus. Paper & Packaging Corp.*,
    No. 3:02-CV-491, 2006 WL 2050686 (E.D. Tenn. July 19, 2006) ........................................ 37

*Xavier v. Philip Morris USA Inc.*,
    No. C 10-02067, 2010 WL 3956860 (N.D. Cal. Oct. 8, 2010) ............................................... 38

TAB 1

*Amato v. Subaru of Am., Inc.*, No. 18-16118, 2021 WL 21549876 (D.N.J. May 27, 2021)

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 7 of 535
PageID: 31954
Amato v. Subaru of America, Inc., Slip Copy (2021)

2021 WL 2154976
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

AMATO, et al Plaintiffs,

v.

SUBARU OF AMERICA, INC., et al Defendants.

Civil Action No. 18-16118
|
Signed 05/27/2021

**Attorneys and Law Firms**

Gary S. Graifman, Kantrowitz, Goldhamer & Graifman, PC, Montvale, NJ, for Plaintiffs.

Neal D. Walters, Ballard Spahr LLP, Casey Gene Watkins, Mt. Laurel, NJ, for Defendants.

**OPINION**

Joseph H. Rodriguez, U.S.D.J.

**\*1** This matter is before the Court on Defendants Subaru of America, Inc. and Subaru Corporation's ("Subaru") Motion to Strike, or in the alternative, for Partial Dismissal of Plaintiffs' Second Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(f). For the reasons stated below, the Court will grant in part and deny in part Subaru's Motion to Strike, and will deny Subaru's Motion to Dismiss.

**I. Factual and Procedural Background**

The Court has recited the facts of this case extensively before [*see* Dkt. 23], and only discusses the facts relevant to the present motion here. This case is a putative class action where Plaintiffs allege that Subaru knowingly withheld information about defective engine pistons or piston ringlands in Impreza WRX and WRX STi vehicles produced between 2009 and 2018. [Dkt. 46-2]. On December 5, 2019, the Court issued an opinion and order on Subaru's motion to dismiss Plaintiffs' original complaint which "trim[med] some of the counts" alleged therein. [Dkt. 46-2 at 9; Dkt. 23, 24].

The parties then conferred about potential claims and parties that Plaintiffs might add in an amended complaint. [Dkt. 43-1 at 8, Dkt. 46-2 at 9]. The parties compromised and

Plaintiffs filed their First Amended Complaint ("FAC") [Dkt. 30], which added claims on behalf of existing Plaintiff Joseph Amato under the Georgia Fair Business Practices Act of 1975, Ga. Code Ann. §§ 10-1-390 et seq. (hereinafter "GFBPA"), and alternatively under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201-1 et seq. (hereinafter "UTPCPL"). [*See* Dkt. 32]. Pursuant to the parties' compromise, Subaru answered the FAC on May 20, 2020 without moving to dismiss it. [Dkt. 34]. On July 2, 2020, Judge Williams issued a scheduling order which stated, in pertinent part, that "[t]he time within which to add named plaintiffs will expire on September 25, 2020. The time within which to seek all other amendments to the pleadings will expire on February 12, 2021." [Dkt. 38].

On September 22, 2020, Plaintiffs indicated to Subaru that they intended to further amend their pleadings and sent a proposed complaint to Subaru for review. [Dkt. 43-1 at 8]. Subaru did not consent to the changes. Plaintiffs filed their Second Amended Complaint ("SAC") on September 25, 2020 without seeking leave to amend their pleadings from the Court. [Dkt. 41]. The SAC asserts new claims under the Michigan Consumer Protection Act, Mich. Comp. Laws §§ 445.901 et seq. ("MCPA"), and for negligent misrepresentation on behalf of a new Plaintiff, Andrew Hinshaw. [Dkt. 41].

Subaru moved strike the SAC or, in the alternative, to partially dismiss the SAC. [Dkt. 43]. Subaru's motion for partial dismissal challenges the claims added in both the FAC and the SAC discussed above. Plaintiffs ask the Court not to strike the SAC and to permit its filing *nunc pro tunc*. [Dkt. 46-2 at 11].

**II. Legal Analysis**

**a. Motion to Strike**

Subaru moves to strike the SAC under Federal Rule of Civil Procedure 12(f) because Plaintiffs did not obtain Subaru's consent or seek leave of the Court before filing the SAC as Federal Rule of Civil Procedure 15(a) requires. [1] [Dkt. 43]. Federal Rule of Civil Procedure 12(f) provides that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f).

**\*2** Plaintiffs argue that their filing was timely and proper because Judge Williams's July 2, 2020 order setting a September 25, 2020 deadline to "add named plaintiffs" and a September 8, 2020 conference call with Judge Williams effectively granted Plaintiffs leave to amend their complaint by that deadline. [Dkt. 46-2 at 10–11]. Alternatively, Plaintiffs admit that they misinterpreted Judge Williams's order and communications and should be permitted to seek the Court's leave to file the SAC *nunc pro tunc* because no prejudice to Subaru will follow. [Dkt. 46-2 at 11].

The Court disagrees with Plaintiffs' view that Judge Williams's July 2, 2020 scheduling order permitted Plaintiffs to amend their pleadings without Subaru's consent or leave from the Court. Nothing in Judge Williams's order suspended Rule 15's requirements or otherwise authorized Plaintiffs to unilaterally add parties to their complaint as they saw fit. The order simply set a deadline for Plaintiffs to add new parties consistent with Rule 15. However, the Court accepts Plaintiffs' representation that their failure to properly move for leave to amend resulted from a misunderstanding on the part of Plaintiffs' counsel. This case is still in its infancy, and permitting amendment at this point is unlikely to prejudice Subaru. Thus, the Court will consider Plaintiffs' request for leave to amend *nunc pro tunc*. *See* Mitchell v. Overman, 103 U.S. 62, 65, 26 L. Ed. 369 (1880) ("A nunc pro tunc order should be granted or refused, as justice may require in view of the circumstances of the particular case.").

### b. Futility of Amendment

Having determined that it will consider Plaintiffs' SAC, the issue now is whether Plaintiff Hinshaw's MCPA and negligent misrepresentation claims as alleged in the SAC are futile. " 'Futility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997) (citations omitted). "In assessing 'futility,' the district court applies the same standard of legal sufficiency as applies under Rule 12(b)(6)." *Id.*

Federal Rule of Civil Procedure 12(b)(6) permits dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A complaint should be dismissed pursuant to Rule 12(b)(6) if the alleged facts, taken as true, fail to state a claim. *Id.* In general, only the allegations in

the complaint, matters of public record, orders, and exhibits attached to the complaint, are taken into consideration when deciding a motion to dismiss under Rule 12(b)(6). *See Chester County Intermediate Unit v. Pa. Blue Shield*, 896 F.2d 808, 812 (3d Cir. 1990). It is not necessary for the plaintiff to plead evidence. *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 446 (3d Cir. 1977). The question before the Court is not whether the plaintiff will ultimately prevail. *Watson v. Abington Twp.*, 478 F.3d 144, 150 (2007). Instead, the Court simply asks whether the plaintiff has articulated "enough facts to state a claim to relief that is plausible on its face." [2] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

**\*3** Further, although "detailed factual allegations" are not necessary, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955 (internal citations omitted). *See also* Iqbal, 556 U.S. at 678, 129 S.Ct. 1937 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Thus, dismissal under Rule 12(b)(6) should be granted unless the plaintiff's factual allegations are "enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955 (internal citations omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'shown'-'that the pleader is entitled to relief.' " *Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937 (quoting Fed. R. Civ. P. 8(a)(2)).

Subaru first argues that Plaintiff Hinshaw's MCPA claim is futile because automobile sales are exempt from the MCPA. [Dkt. 43-1 at 11–12]. While Plaintiffs cite several cases to the contrary,[3] the Court finds that the weight of more recent authority supports Subaru's position. *See Gant v. Ford Motor Co.*, -- F. Supp. 3d --, No. 19-CV-12533, 2021 WL 364250, at \*7 (E.D. Mich. Feb. 3, 2021) (collecting cases); *Matanky v. Gen. Motors LLC*, 370 F. Supp. 3d 772, 799–800 (E.D. Mich. 2019) (citing *Rosenbaum v. Toyota Motor Sales, USA, Inc.*, 2016 WL 9775018, at \*3 (E.D. Mich. Oct. 21, 2016) and

*Jimenez v. Ford Motor Credit Co.*, 2015 WL 9318913, at *7 (Mich. Ct. App. Dec. 22, 2015)). Plaintiff Hinshaw's MCPA claim is therefore futile.

Subaru also argues that Michigan law applies to Plaintiff Hinshaw's negligent misrepresentation claim, and that this claim is futile because Hinshaw fails to plead privity with Subaru and to identify misrepresentations made by Subaru at the time of Hinshaw's purchase. [Dkt. 43-1 at 15–16]. Plaintiffs do not dispute that Michigan law applies to Hinshaw's negligent misrepresentation claim but argue that Michigan law does not require privity, and that they adequately plead negligent misrepresentations. [Dkt. 46-2 at 17–18].

To state a claim for negligent misrepresentation under Michigan law, a plaintiff must allege that he "justifiably relied to his detriment on information prepared without reasonable care by one who owed [the plaintiff] a duty of care." *Johnston v. PHD FITNESS, LLC*, 2018 WL 646683 at *6 (E.D. Mich. Jan. 31, 2018).

As the elements make clear, Plaintiff Hinshaw need not plead privity with Subaru to state a claim for negligent misrepresentation. [4] *See Molecular Tech. Corp. v. Valentine*, 925 F.2d 910, 919 (6th Cir. 1991) ("There is absolutely no fiduciary or privity requirement in order to establish the element of duty under this claim."). Thus, the Court rejects Subaru's argument for dismissal on this ground.

**\*4** Subaru also argues that Plaintiffs fail to "allege that [Subaru] made any representations to [Hinshaw] as part of a sales transaction" because "he purchased his car used from a third-party seller." [Dkt. 43-1 at 16]. In other words, Subaru argues that, because Hinshaw purchased his used vehicle from a third-party seller, Subaru and/or Subaru representatives could not have provided misleading information. In response, Plaintiffs argue that the "misrepresentations relied upon by Hinshaw were set out in his class vehicle's Owner's Manual and Warranty & Maintenance Booklet materials," even if he did not rely on misrepresentations made by Subaru personnel. [Dkt. 46-2 at 18].

With respect to Subaru owner's manuals generally, the SAC alleges that

> [t]he defendants also negligently and recklessly misrepresented information

in the class vehicles' owner's manuals that incorporated incorrect engine maintenance and service recommendations. The proposed class representatives and proposed class members reasonably and justifiably relied upon representations made by the defendants including information in the class vehicles' owner's manual that incorporated incorrect engine inspection and service intervals.

[Am. Compl. ¶¶ 254–55]. The Amended Complaint also alleges that "[t]he Owner's Manual and Warranty & Maintenance Booklet materials accompanying class vehicles do not contain any maintenance or service information for defective class engine pistons or piston ringlands." [Am. Compl. ¶ 10] (emphasis added). According to Plaintiffs, this failure to include ringland maintenance or service information rendered their owner's manuals misleading because their owner's manuals otherwise "have maintenance schedules that extend to 120,000." [Am. Compl. ¶ 10 n.9].

At this stage of the litigation, the Court must accept as true that Plaintiff Hinshaw reviewed the owner's manual for his Subaru vehicle and relied to his detriment on the manual's incomplete representations about "service intervals" for the engine pistons or piston ringlands. *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008) (noting that a district Court "required to accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable" to the plaintiff when deciding a motion to dismiss). Thus, Plaintiffs do plead facts stating that Subaru misrepresented information to Plaintiff Hinshaw even though he did not purchase a vehicle directly from Subaru.

Next, Subaru argues that a "purchaser of a used vehicle from a third party with no relationship to the Subaru Defendants cannot state a claim for negligent misrepresentation." [Dkt. 43-1 at 16]. Subaru cites several out-of-circuit cases, none of which support this proposition. In *Jimenez v. DaimlerChrysler Corp.*, the Fourth Circuit overturned a jury's verdict in favor of the plaintiff on a negligent misrepresentation claim. 269 F.3d 439, 447 (4th Cir. 2001). The Fourth Circuit found that the plaintiff failed to offer any evidence that representations regarding vehicle safety in commercials for the defendant's vehicles were

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 10 of 535
PageID: 31957
Amato v. Subaru of America, Inc., Slip Copy (2021)

false or that plaintiff relied on these representations when purchasing the vehicle. *Id.* The Fourth Circuit did not hold as a matter of law that plaintiffs cannot bring negligent misrepresentation claims against automobile manufacturers. In *Wright v. Kia Motors Am. Inc.*, the district court dismissed the plaintiff's negligent misrepresentation claim for failing to plead a special relationship beyond the common law duty of reasonable care, which Oregon law requires. No. CIV. 06-6212-AA, 2007 WL 316351, at *4–5 (D. Or. Jan. 29, 2007). However, as discussed above, Michigan law does not require any such special relationship.

**\*5** Subaru adds that "[u]sed purchasers are not among the class of persons that the Subaru Defendants could have reasonably foreseen as relying on the accuracy of any representations made in materials or statements put into circulation to address new vehicle purchasers." [Dkt. 43-1 at 16]. Subaru does not cite any controlling authority for this proposition. Moreover, foreseeability is a question of fact for juror consideration under Michigan law. *Composto v. Albrecht*, 328 Mich. App. 496, 503, 938 N.W. 2d 755, 760 (2019), *appeal denied*, 505 Mich. 995, 939 N.W. 2d 258 (2020).

In sum, Plaintiffs have adequately pled a negligent misrepresentation claim for Plaintiff Hinshaw. As a result, this claim is not futile. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1434. However, for the reasons discussed above, Plaintiff Hinshaw's MCPA claim is futile. The Court will permit Plaintiffs to file a second amended complaint that includes Plaintiff Hinshaw's negligent misrepresentation claim only.

### c. Motion to Dismiss

Beyond moving to strike claims alleged for the first time in the SAC, Subaru moves to dismiss Plaintiff Amato's GFBPA and/or UTPCPL claims alleged for the first time in the FAC and realleged in the SAC. [Dkt. 43-1 at 16–20]. Plaintiffs first argue that Subaru should be estopped from challenging Plaintiff Amato's GFBPA and/or UTPCPL claims here because, pursuant to the above-referenced compromise between the parties, Plaintiffs included these claims in the FAC and Subaru answered the FAC without moving to dismiss these claims. [Dkt. 46-2 at 10]. The Court gives this argument little weight as Plaintiffs disregarded this

same compromise when they filed the SAC without Subaru's consent.

Plaintiffs plead Amato's UTPCPL claim as an alternative to his GFBPA if the Court determines that Pennsylvania law applies to Plaintiff Amato rather than Georgia law. Subaru argues that neither the UTPCPL claim nor the GFBPA claim can survive but does not brief the choice-of-law issue underlying Plaintiffs' alternative pleading. Plaintiffs also omit a choice-of-law analysis. Typically, the Court would apply New Jersey's choice-of-law rules to determine whether Georgia or Pennsylvania law would apply to Plaintiff Amato. *See Powell v. Subaru of Am., Inc.*, No. 1:19-CV-19114, 502 F.Supp.3d 856, 2020 WL 6886242, at *10 (D.N.J. Nov. 24, 2020) ("In diversity cases, federal courts apply the forum state's choice of law rules to determine which state's substantive laws are controlling." (citing *Maniscalco v. Brother Int'l (USA) Corp.*, 709 F.3d 202, 206 (3d Cir. 2013))). But because neither party has briefed this choice-of-law issue or explained why one state's statute should apply instead of the other's, the Court declines to decide which state's law applies until the parties fully brief the issue with the benefit of a complete factual record. *See Harper v. LG Elecs. USA, Inc.*, 595 F. Supp. 2d 486, 491 (D.N.J. 2009) (noting that New Jersey choice-of-law analysis is "fact intensive" and deferring its choice-of-law decision at the motion to dismiss stage).

### i. GFPBA

Subaru argues that Plaintiff Amato cannot bring his GFPBA claim on behalf of a class of other Plaintiffs because the GFBPA only permits individual claims. [Dkt. 43-1 at 16–17]. Subaru points to language in the GFBPA which states that " '[a]ny person who suffers injury or damage[ ] as a result of a violation ... of [the Georgia FBPA] as a result of consumer acts or practices in violation of this part ... may bring an action individually, but not in a representative capacity....' " [*Id.*] (quoting Ga. Code Ann. § 10-1-399(a)). Plaintiffs argue that, under the Supreme Court's decision in *Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*, 559 U.S. 393, 398, 130 S.Ct. 1431, 176 L.Ed.2d 311 (2010), Federal Rule of Civil Procedure 23[5] permits Plaintiff Amato to bring his GFPBA claim as a class claim. The Court agrees with Plaintiffs.

**\*6** In *Shady Grove*, a Supreme Court plurality held that Rule 23 permitted the plaintiff in federal court on diversity jurisdiction to bring state-law claims on a class basis even where a state statute barred class actions. 559 U.S. at 416, 130 S.Ct. 1431. The *Shady Grove* Court confronted a New York statute which stated in part that "an action to recover a penalty, or minimum measure of recovery created or imposed by statute may not be maintained as a class action." *See id. at 396, 130 S.Ct. 1431 n.1* (quoting N.Y. Civ. Prac. Law Ann. § 901(b) (West 2006)). This class action bar was not part of a particular statutory regime and did not apply to a specific cause of action, but applied broadly to "penalties" sought under any New York law, federal law, or the law of any other state. *Id. at 432, 130 S.Ct. 1431* (Stevens, J., concurring). The plaintiffs sought to form a class under Federal Rule of Civil Procedure 23, and the lower courts determined that the plaintiffs sought only to recover "penalties." *Id. at 397, 130 S.Ct. 1431*. Thus, the issue before the Supreme Court was whether the plaintiffs could state a class claim in federal court under Rule 23 to recover penalties when the New York statute precluded class actions seeking penalties. *Id. at 398, 130 S.Ct. 1431.*

To resolve this issue, the Supreme Court had to answer two questions: whether the New York statute and Rule 23 conflicted because they both addressed the same procedural issue and, if so, whether Rule 23 exceeded Congress's authority under the Rules Enabling Act.[6] *Id. at 398, 130 S.Ct. 1431*. A Supreme Court majority agreed that Rule 23 conflicted with the New York statute. However, no majority agreed on how to properly resolve the Rules Enabling Act question. Writing for a four-member plurality, Justice Scalia found that Rule 23 did not violate the Rules Enabling Act. *Id. at 407–08, 130 S.Ct. 1431*. Justice Scalia reasoned that courts must focus on the substantive or procedural nature of the *federal rule* at issue, not the substantive or procedural nature of the state law. *Id. at 410, 130 S.Ct. 1431*. Justice Scalia categorically determined that "the validity of a Federal Rule depends entirely upon whether it regulates procedure. If it does, it is authorized by § 2072 and is valid in all jurisdictions, with respect to all claims, regardless of its incidental effect upon state-created rights." *Id.* (citations

omitted). Applying this approach, Justice Scalia concluded that Rule 23 was procedural in nature, did not violate the Rules Enabling Act, preempted the New York statute, and permitted the plaintiffs to bring class claims. *See id. at 415–16, 130 S.Ct. 1431.*

Justice Stevens agreed that Rule 23 and the New York statute conflicted and that Rule 23 did not violate the Rules Enabling Act, but disagreed with the plurality's categorical Rules Enabling Act analysis. According to Justice Stevens, courts must consider the federal rule *and* state law at issue and determine whether the state law—even if it is facially procedural in nature—is so "intertwined with a state right or remedy that it functions to define the scope of the state-created right." *Id. at 423, 130 S.Ct. 1431*. Justice Stevens found that the analysis does "not necessarily turn on whether the state law at issue takes the *form* of what is traditionally described as substantive or procedural. Rather, it turns on whether the state law actually is part of a State's framework of substantive rights or remedies." *Id. at 419, 130 S.Ct. 1431* (emphasis in original) (citations omitted). Justice Stevens reviewed the New York statute's legislative history, its application by New York courts, and its role in New York's statutory regime more broadly. He found that, because the New York statute

**\*7** applies not only to claims based on New York law but also to claims based on federal law or the law of any other State ... [i]t is ... hard to see how § 901(b) could be understood as a rule that, though procedural in form, serves the function of defining New York's rights or remedies.

*Id. at 432*. Thus, Justice Stevens concluded that New York's statute was not "intertwined" with any substantive right and, therefore, that Rule 23 did not "abridge, enlarge, or modify" any substantive state right. *Id. at 436, 130 S.Ct. 1431.*

Courts in this district and elsewhere have disagreed on how to apply *Shady Grove*'s plurality decision to class action

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 12 of 535
PageID: 31959
*Amato v. Subaru of America, Inc.,* Slip Copy (2021)

bars where, as here, the class action bar is part of a specific state statute. Some have adopted Justice Scalia's categorical approach and found that " *Shady Grove* instructs that state consumer protection class action bars do not apply to those claims if brought as a class action under Federal Rule of Civil Procedure 23." *In re Mercedes-Benz Emissions Litig.,* No. CV 16-881 (JLL)(JAD), 2019 WL 413541, at *26 (D.N.J. Feb. 1, 2019), *cert. denied,* No. CV 16-881 (SDW)(JAD), 2019 WL 2591158 (D.N.J. June 25, 2019), *and vacated and remanded,* 797 F. App'x 695 (3d Cir. 2020) (citing *In re Liquid Aluminum Sulfate Antitrust Litig.,* 16-md-2687, 2017 WL 3131977, at *25 (D.N.J. July 20, 2017)); *see also In re Volkswagen Timing Chain Prod. Liab. Litig.,* No. CV 16-2765 (JLL), 2017 WL 1902160, at *24 (D.N.J. May 8, 2017) (citing *In re Hydroxycut Marketing and Sales Practices Litig.,* 299 F.R.D. 648 (S.D. Cal. 2014)). Others have applied Justice Stevens's approach to reach the opposite conclusion, finding that "the specific inclusion of the class action bar within [state] consumer protection statutes ... evinces a desire by the state legislature to limit not only the form of the action but also the remedies available, placing those bars squarely within Justice Stevens' concurrence." *In re Lipitor Antitrust Litig.,* 336 F. Supp. 3d 395, 416 (D.N.J. 2018) (quoting *Delgado v. Ocwen Loan Servicing, LLC,* No. 13-4427, 2017 WL 5201079, at *10, 2017 U.S. Dist. LEXIS 186408 (E.D.N.Y. Nov. 8, 2017)). *See also In re Effexor Antitrust Litig.,* 357 F. Supp. 3d 363, 389 (D.N.J. 2018) (same). Applying Justice Stevens's approach, these courts found that including a class action bar within a state statute creates a substantive right that trumps Rule 23 under the Rules Enabling Act. *See In re Effexor Antitrust Litig.,* 357 F. Supp. 3d at 389–90.

While the Third Circuit has applied *Shady Grove* to class action bars like the one at issue here, it has endorsed Justice Scalia's approach elsewhere. In *Nuveen Municipal Trust ex rel. Nuveen High Yield Municipal Bond Fund v. WithumSmith Brown, P.C.,* the Third Circuit considered, among other things, whether New Jersey's Affidavit of Merit statute (the "AOM statute") [7] could be applied in federal court without voiding Federal Rules of Civil Procedure 8 and 9. 692 F.3d 283, 302–03 (3d Cir. 2012). The Third Circuit interpreted *Shady Grove* to say that courts must focus not "on 'the

substantive or procedural nature or purpose of the affected state law,' but rather [the] 'substantive or procedural nature of the Federal Rule' " when determining whether a federal rule preempts state law. *Id.* at 303 (quoting *Shady Grove,* 559 U.S. at 410, 130 S.Ct. 1431). To be clear, *Nuveen* court did not follow Justice Stevens's approach and analyze the substantive or procedural nature of the AOM statute. *See also Knepper v. Rite Aid Corp.,* 675 F.3d 249, 265 (3d Cir. 2012) (applying *Shady Grove* in a Fair Labor Standards Act case and finding that "[u]nder the [ *Shady Grove*] plurality's view, any supposed substantive purpose underlying § 216(b) is irrelevant, and we need only determine whether Rule 23 'really regulates procedure,' which the Court has already concluded it does."); *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.,* 726 F.3d 403, 409 (3d Cir. 2013), *as amended* (July 11, 2013), as amended (July 22, 2013) (applying Justice Scalia's approach to analyze the relationship between Federal Rule of Civil Procedure 68 and Resources Conservation and Recovery Act).

**\*8** While the *Nuveen* court did not apply *Shady Grove* to Rule 23 or class-action bars contained within state statutes, it implicitly found that district courts should follow Justice Scalia's approach when evaluating potential conflicts between federal rules and state laws more broadly. Taking this approach and focusing only on the procedural or substantive nature of Rule 23, it is clear that " Rule 23, not state law, governs the availability of class action treatment of Plaintiff's claims." *Ambulatory Surgical Ctr. of Somerset v. Allstate Fire Cas. Ins. Co.,* No. CV 16-5378, 2017 WL 5053919, at *2 (D.N.J. Nov. 3, 2017) (quoting *Fitzgerald v. Gann Law Books, Inc.,* 956 F. Supp. 2d 581, 587 (D.N.J 2013)). Thus, assuming for the purposes of this opinion that Georgia law applies to Plaintiff Amato, Plaintiff Amato may bring his GFBPA claim as a class claim.

### ii. UTPCPL

Subaru argues that Plaintiff Amato's UTPCPL claim should be dismissed under Pennsylvania's "economic loss rule." [Dkt. 43-1 at 18–20]. The economic loss rule precludes a plaintiff from recovering purely pecuniary damages for tort claims where the defendant's duty to the plaintiff arises

through a contract. *Dukich v. IKEA US Retail LLC*, No. CV 20-2182, 2021 WL 131284, at *3 (E.D. Pa. Jan. 14, 2021) (quoting *Dittman v. UPMC*, 649 Pa. 496, 196 A.3d 1036, 1038 (Pa. 2018)).

Subaru relies on *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 681 (3d Cir. 2002) to argue that the economic loss rule bars Plaintiff Amato's UTPCPL claim. In *Werwinski*, the Third Circuit predicted that Pennsylvania Supreme Court— which had not yet addressed the issue—would apply the economic loss rule to bar UTPCPL claims. *Werwinski v. Ford Motor Co.*, 286 F.3d at 675. But " '[s]ince *Werwinski* issued, the Pennsylvania courts have spoken. They have held that the economic loss doctrine does not apply to UTPCPL claims.' " *Lovelace v. Nationwide Mut. Ins. Co.*, No. CV 18-2701, 2018 WL 3818911, at *3 (E.D. Pa. Aug. 10, 2018) (quoting *Kantor v. Hiko Energy, LLC*, 100 F. Supp. 3d 421, 427 (E.D. Pa. 2015)). *See also Knight v. Springfield Hyundai*, 2013 PA Super 309, 81 A.3d 940, 952 (2013) ("The claims at issue in this case are statutory claims brought pursuant to the UTPCPL, and do not sound in negligence. Therefore, the economic loss doctrine is inapplicable and does not operate as a bar to Knight's UTPCPL claims."); *Dixon v. Nw. Mut.*, 2016 PA Super 186, 146 A.3d 780, 790 (2016) ("Dixon's UTPCPL claim is not barred by the economic loss doctrine." (citing *Knight*, 81 A.3d at 952)).

After reviewing state and federal court decisions, the Court finds that there is "persuasive evidence" that Pennsylvania law has changed since the Third Circuit decided *Werwinski*, that the *Werwinski* court's prediction about Pennsylvania law was incorrect, and that the Court is not bound to *Werwinski*'s holding. *Lovelace*, 2018 WL 3818911, at *3–*4 (finding a "clear change in law that has proved incorrect the Third Circuit's prediction in *Werwinski*" and permitting UTPCPL claims (citations omitted)); *Catena v. NVR, Inc.*, No. 2:20-CV-00160-MJH, 2020 WL 3412348, at *7 (W.D. Pa. June 22, 2020) ("This Court is persuaded that it should also follow the precedents of *Knight* and *Dixon*. Therefore, the Plaintiffs' UTPCPL claim is not barred by the economic loss or gist of the action doctrine."). Thus, the Court will deny Subaru's motion to dismiss Plaintiff Amato's UTPCPL claim under the economic loss rule.

### III. Conclusion

For the reasons discussed above, the Court will deny Subaru's Motion to Strike as to Plaintiff Hinshaw's negligent misrepresentation claim but grant this motion as to his MCPA claim. The Court will also deny Subaru's Motion to Dismiss Plaintiff Amato's GFBPA and UTPCPL claims. Plaintiffs may file a second amended complaint including Plaintiff Hinshaw's negligent misrepresentation claim. An appropriate order shall follow.

### All Citations

Slip Copy, 2021 WL 2154976

---

### Footnotes

1   Federal Rule of Civil Procedure 15 states that a party seeking to amend its complaint more than twenty-one days after serving the complaint or being served with an answer or "may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2).

2   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955). "Where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937.

3    *In re Gen. Motors A.C. Mktg. and Sales Practices Litig.*, 406 F. Supp. 3d 618 (E.D. Mich. 2019); *State Farm Mut. Auto Ins. Co. v. BMW of N. Am. LLC*, 2009 WL 2447612, at *7 (E.D. Mich. Aug. 7, 2009); *Hoff v. Mercedes-Benz USA, LLC*, 2005 WL 3723201 at *8 (Mich. Cir. Ct. Dec. 30, 2005).

4    Plaintiffs are correct that the case upon which Subaru relies is one link in a chain of Michigan federal court decisions that conflate fraudulent misrepresentation and innocent misrepresentation under Michigan law. Subaru cites *Yaldu v. Bank of Am. Corp.*, 700 F. Supp. 2d 832, 845 (E.D. Mich. 2010), which cites *Sipes v. Kinetra, LLC*, 137 F. Supp. 2d 901, 910 (E.D. Mich. 2001), which cites *M & D, Inc. v. W.B. McConkey*, 231 Mich. App. 22, 25–26, 585 N.W.2d 33, 36–37 (1998). *M & D Inc.* discusses the elements of innocent misrepresentation, *see M & D, Inc.*, 231 Mich. App. at 27–28, 585 N.W.2d 33, and Michigan courts distinguish these two causes of action. *See Unibar Maint. Servs., Inc. v. Saigh*, 283 Mich. App. 609, 621, 769 N.W.2d 911, 919 (2009) (distinguishing between innocent misrepresentation, which requires privity, and negligent misrepresentation, which does not).

5    *Federal Rule of Civil Procedure 23* sets forth the requirements for bringing a class action suit in federal court. *St. Louis Chiropractic v. Fed. Ins. Co.*, No. CIV.A.07-3110( ), 2008 WL 4056225, at *6 (D.N.J. Aug. 26, 2008), *aff'd on other grounds sub nom. St. Louis Park Chiropractic, P.A. v. Fed. Ins. Co.*, 342 F. App'x 809 (3d Cir. 2009).

6    The Rules Enabling Act states, in pertinent part, that

       (a) The Supreme Court shall have the power to prescribe general rules of practice and procedure and rules of evidence for cases in the United States district courts (including proceedings before magistrate judges thereof) and courts of appeals.

       (b) Such rules shall not abridge, enlarge or modify any substantive right. All laws in conflict with such rules shall be of no further force or effect after such rules have taken effect.

       28 U.S.C. § 2072.

7    The AOM statute, N.J. Stat. Ann. §§ 2A:53A–26 et seq., "requires the timely filing of an affidavit of merit attesting to the viability of claims in certain actions against professionals." *Nuveen*, 692 F.3d at 287. Failure to provide the required affidavit can result in a complaint's dismissal for failure to state a cause of action. N.J. Stat. Ann. §§ 2A:53A–29.

---

**End of Document**                                          © 2021 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.    8

TAB 2

*Campbell v. Sedgwick Detert, Moran & Arnold*, No. CIV. 11-642-ES-SCM, 2013
WL 1314429 (D.N.J. Mar. 28, 2013)

KeyCite Yellow Flag - Negative Treatment

Distinguished by   Wyndham Vacation Ownership, Inc. v. Vacation Select
Services & Consulting, LLC,   D.N.J.,   September 1, 2020

2013 WL 1314429
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Wilson J. CAMPBELL, Plaintiff,

v.

SEDGWICK DETERT, MORAN & ARNOLD,
Michael Tanenbaum, James Keale,
Thomas Robertson, et al., Defendants.

Civil No. 11–642–ES–SCM.
|
March 28, 2013.

**Attorneys and Law Firms**

Wilson J. Campbell, U.S. Virgin Islands, Department of
Justice, St. Thomas, VI, pro se.

Joseph D. Guarino, Epstein Becker & Green, PC, Newark,
NJ, for Defendants.

OPINION AND ORDER ON PLAINTIFF'S
MOTIONS FOR LEAVE TO AMEND
AND DEFENDANTS' MOTIONS FOR A
PROTECTIVE ORDER AND SANCTIONS

STEVEN C. MANNION, United States Magistrate Judge.

**I. INTRODUCTION**

*1  Pending before this Court are three motions: A motion
for a protective order [D.E. 53] and motion for sanctions [D.E.
59] filed by defendants James Keale, Thomas Robertson,
Sedgwick Detert, Moran & Arnold (hereafter, "Sedgwick"),
and Michael Tanenbaum (collectively, "Defendants"); and
plaintiff Wilson Campbell's ("Plaintiff") motion for leave
to file an amended complaint [D.E. 65]. Opposition has
been filed with regard to each of the motions. The Court
has considered the parties' submissions pursuant to Federal
Rule of Civil Procedure 78(b), and for the reasons set forth
below the Court grants in part and denies in part Defendants'
motion for a protective order, denies Defendants' motion for

sanctions, and grants in part and denies in part Plaintiff's
motion for leave to file his Amended Complaint.

**II. BACKGROUND**

A detailed history of the events underlying this action can
already be found in Magistrate Judge Waldor's July 2,
2012, Opinion regarding Plaintiff's first motion for leave to
file an amended complaint [D.E. 44]. (See D.E. 60, Judge
Waldor's July 2, 2012, Opinion). Presently, Plaintiff seeks
to make the following amendments to his Complaint: Add
two individuals, Michael McGeehon and David Saunders, as
named defendants; add a breach of contract claim; and clarify
and insert additional factual allegations. Judge Waldor denied
Plaintiff's first motion requesting identical amendments to the
Complaint without prejudice, finding that Plaintiff did not
provide a reason for his delay in seeking to add Saunders
and McGeehon as defendants, did not fully develop his
factual allegations against Saunders, and did not properly
plead a claim for breach of contract. Id. Judge Waldor then
directed Plaintiff to file an appropriate motion to amend
within fourteen days of the entry of the Opinion and Order. Id.

Plaintiff filed the instant motion to amend on July 17, 2012.
Plaintiff alleges that the instant motion to amend addresses
the defects noted in Judge Waldor's July 2, 2012, Opinion,
and satisfies the requirements set forth in the Federal Rules
of Civil Procedure regarding motions to amend the pleadings.
(See D.E. 65, Plaintiff's Brief in Support of Motion to
Amend). Defendants oppose Plaintiff's motion, and argue that
the instant motion is still deficient for all of the reasons set
forth in the July 2, 2012, Opinion. (See D.E. 68, Defendants'
Brief in Opposition to Plaintiff's Motion to Amend).

Discovery in this case has been ongoing since September
of 2011, and has been plagued with various disputes since
then. (See, e.g., Docket Entry Nos. 20, 25, 26, 31, 32, 33,
34). Defendants allege that Plaintiff is using the discovery
process to harass and overburden Defendants, and have filed
the instant motion for a protective order as a result. (See D.E.
53–1, Defendants' Brief in Support of Motion for Protective
Order). Defendants assert that they have already provided
"72 answers to interrogatories, 94 responses to document
requests and 205 responses to requests to admit," but that
Plaintiff has nevertheless served an additional 98 requests,
consisting of interrogatories, document demands, requests
for admissions, and a notice to inspect the premises of
Sedgwick. (See D.E. 58, Defendants' Reply Brief in Support
of Motion for Protective Order, at *2). Defendants allege
that the requested discovery is, inter alia, cumulative, unduly

Campbell v. Sedgwick Detert, Moran & Arnold, Not Reported in F.Supp.2d (2013)

2013 WL 1314429

burdensome, and irrelevant. *Id.* Plaintiff opposes the motion for a protective order, and contends that his discovery requests are relevant and not unduly burdensome or cumulative. (*See* D.E. 55, Plaintiff's Brief in Opposition). Additionally, Plaintiff asserts that discovery in this matter only effectively began on January 9, 2012, when the Court ordered Defendants to produce discovery, and was then stalled in May of 2012 when Defendants filed the instant motion. *Id.* at *2.

**\*2** Finally, Defendants have also filed a motion for sanctions pursuant to Federal Rule of Civil Procedure 16. (*See* D.E. 59, Defendants' Motion for Sanctions). The basis for Defendants' motion is Plaintiff's failure to appear for a court-ordered, inperson hearing on June 15, 2012. (*See* D.E. 59–1, Defendants' Brief in Support of Motion for Sanctions). Plaintiff opposes the motion for sanctions, and asserts that his failure to attend the hearing was the result of his own scheduling mistake and that sanctions are not appropriate. (*See* D.E. 66, Plaintiff's Letter Brief in Opposition).

### III. DISCUSSION

In the interest of clarity, the Court will address each of the pending motions separately.

#### A. Plaintiff's Motion to Amend

Pursuant to Federal Rule of Civil Procedure 15(a)(2), "the court should freely give leave to amend when justice so requires." While leave to amend is typically granted, it is not an absolute right and the decision to amend rests within the sound discretion of the district court. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Courts liberally grant motions to amend if the underlying facts or circumstances relied upon may be a proper subject for relief, granting the amendment would not be unduly prejudicial to the non-moving party, and the movant has not acted with undue delay, bad faith, or dilatory motive. *Id.* An amendment may only be granted if it is not futile, and the opposing party bears the burden of establishing that a proposed amendment should be denied. *Id.*

Plaintiff seeks to amend his Complaint as follows: to add Michael McGeehon, Sedwick's General Counsel, and David Saunders, Sedgwick's Chief of Human Resources, as named defendants; add a claim for breach of contract; and "clarify allegations raised in Plaintiff's Complaint and assert additional factual allegations based on facts uncovered

during discovery." (*See* D.E. 65, Plaintiff's Brief in Support of Motion to Amend, at *2).

First, the Court will address the proposed McGeehon amendment. An amendment is futile if it fails to state a claim upon which relief may be granted or advances a claim that is legally insufficient on its face. *See Great Western Mining & Mineral Co. v. Fox Rothschild LLP,* 615 F.3d 159, 175 (3d Cir.2010) (citing *In re Merck & Co. Sec., Derivative, & ERISA Litig.,* 493 F.3d 400 (3d Cir.2007)). "In assessing futility, the district court applies the same standard of legal sufficiency as applies under Rule 12(b)(6)." *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1434 (3d Cir.1997). Accordingly, an amendment is futile if, accepting all of the facts alleged in the pleading as true, the party has failed to plead enough facts to state a claim to relief that is plausible on its face. *See Duran v. Equifirst Corp.,* Civil No. 09–03856, 2010 WL 918444, at *2 (D.N.J. Mar.12, 2010) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Accordingly, this Court must first consider whether Plaintiff has alleged sufficient facts to conclude that McGeehon provided substantial assistance or encouragement of the employer's conduct alleged to be in violation of the New Jersey Law Against Discrimination ("NJLAD"). *See id.*

**\*3** Here, Plaintiff alleges that McGeehon had knowledge of Plaintiff's August 14, 2008, and September 2008, internal complaints regarding alleged discrimination, and that McGeehon and the named Defendants participated in a plot to retaliate against Plaintiff. (*See* D.E. 65–3, Plaintiff's Proposed Amended Complaint, at ¶¶ 37, 44, 69–86). Plaintiff also alleges that discovery produced in January of 2012 indicates that Defendant Robertson had a privileged discussion with McGeehon and Saunders on February 4, 2009, after Robertson learned of the judicial complaint filed against Plaintiff, and that more than ten emails between McGeehon and Robertson regarding Plaintiff's termination were exchanged on the morning of February 5, 2009, the day that Plaintiff was allegedly forced to resign from Sedgwick. *See id.* at *6–7. The Court notes that in the July 2, 2012, Opinion Judge Waldor, before describing McGeehon's alleged role in the lawsuit, noted that "Plaintiff has alleged several facts that, taken as true, indicate McGeehon played a significant role in Plaintiff's termination." (*See* D.E. 60, July 2, 2012 Opinion, at *11). Judge Waldor concluded her evaluation of futility with regard to the McGeehon amendment by finding that the allegations in the proposed

Campbell v. Sedgwick Detert, Moran & Arnold, Not Reported in F.Supp.2d (2013)

2013 WL 1314429

amended Complaint against McGeehon in his individual capacity, taken as true, "would likely not be futile." *Id.* This Court agrees. Accordingly, the Court finds that the proposed claims against McGeehon in his individual capacity are not futile. *See* *Foman v. Davis,* 371 U.S. at 182.

With regard to the timeliness of the proposed amendment to add McGeehon as a named defendant, the Court notes that Plaintiff appears to have had some knowledge of McGeehon's involvement in Plaintiff's termination at the time the original Complaint was filed. Indeed, Judge Waldor stated in the July 2, 2012, Opinion that Plaintiff must provide some explanation as to why McGeehon could not have been added earlier in this action. (*See* D.E. 60, July 2, 2012, Opinion, at *8).

Plaintiff alleges that his delay in requesting leave to amend the Complaint to add both Saunders and McGeehon stems from his obtaining a privilege log through discovery in January of 2012 that allegedly shows that McGeehon "authored and sent an email on February 4, 2009 entitled 'Associate Termination' to Saunders with a copy to Defendant Tanenbaum, Sedgwick's Chair." (*See* D.E. 65, Plaintiff's Brief in Support of Motion to Amend, at *6). Plaintiff contends that he did not have access to the various e-mails listed on the privilege log that allegedly show McGeehon's and Saunders's involvement in Plaintiff's termination, and that Plaintiff was not aware of said emails when he filed his Complaint in February of 2011. *See id.* at *6–8. Accordingly, Plaintiff argues that he did not know the extent of both McGeehon's and Saunders's involvement in his termination when he filed his initial Complaint, and therefore his instant motion to amend is timely and in good faith. *Id.* at *7.

**\*4** Defendants argue that Plaintiff's delay in seeking leave to amend the Complaint is undue and should accordingly be denied. Specifically, Defendants allege that, by letter dated June 5, 2009, Plaintiff's former counsel contended that Plaintiff participated in a conference call with McGeehon, Sedgwick's general counsel, regarding his resignation from Sedgwick. (*See* D.E. 68, Defendants' Brief in Opposition, at *13). In reply, Plaintiff reiterates that is was not until January of 2012 that he learned that McGeehon had an "active role" in the termination, and was not merely a "mouthpiece," and therefore his delay in seeking leave to amend is not undue. (*See* D.E. 69, Plaintiff's Reply Brief, at *1–2, D.E.).

In light of all of the above, the Court finds that Plaintiff's explanation for his delay in seeking to add McGeehon is

sufficient. *See* *Cureton v. NCAA,* 252 F.3d 267, 273 (3d Cir.2001) (stating that courts, in considering the question of undue delay, "focus on the movant's reasons for not amending sooner"). "The passage of time, without more, does not require that a motion to amend a complaint be denied[ ... ]." *Adams v. Gould, Inc.,* 739 F.2d 858, 868 (3d Cir.1984). Considering that Plaintiff alleges to not have learned of the extent of McGeehon's involvement in discussions regarding his termination until receiving discovery in January of 2009, the Court, in its discretion, does not consider Plaintiff's delay in adding McGeehon as a named defendant to be undue. *See* *Cureton v. NCAA,* 252 F.3d at 273; *Luppino v. Mercedes–Benz USA, LLC,* Civil No. 09–5582, 2012 WL 850743, at *4 (D.N.J. Mar.8, 2012) (granting motion to amend where Plaintiff could have named defendants months earlier). Furthermore, the Court finds that the addition of McGeehon will not cause undue prejudice, as much of the same discovery that has already been produced in this case or is the subject of currently pending discovery disputes should also apply to McGeehon. *See* *Adams v. Gould,* 739 F.2d 858, 868 (3d Cir.2001) (stating that amended claims are not likely to cause prejudice to opposing party where addition of new claims will not require additional, extensive discovery).

Next, the Court will address Plaintiff's request to add Saunders as a named defendant. Plaintiff's Proposed Amended Complaint alleges that Saunders received an email from McGeehon regarding Plaintiff's termination from the Firm. (*See* D.E. 65–3, Proposed Amended Complaint, at *14, ¶ 70). The e-mail was allegedly sent to Saunders on February 4, 2009, one day before Defendant Robertson allegedly informed Plaintiff that he would be fired from the firm if he did not immediately resign. (*See id.; see also* D.E. 65, Plaintiff's Brief in Support of Motion to Amend, at *6). Plaintiff further alleges that on February 5, 2009, the Firm's Human Resources, of which Saunders is Chief, instructed Defendant Robertson to take Plaintiff's building access card. *Id.*

**\*5** Defendants argue that the proposed amendment to add Saunders is futile, and that Plaintiff's motion should accordingly be denied. A pleading is futile if the facts alleged would not allow a court to draw a reasonable inference that the defendant is liable for the alleged misconduct. *See* *Ashcroft v. Iqbal,* 556 U.S. 662, at 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). In the instant matter, Plaintiff seeks to amend his

Complaint to add claims against Saunders in his individual capacity.

After considering the parties' submissions, the Court finds that Plaintiff's Proposed Amended Complaint does not support a claim of individual liability as to Saunders under NJ LAD. Pursuant to N.J.S.A. 10:5–12(e), a plaintiff must allege sufficient facts to conclude that Saunders provided "substantial assistance or encouragement" of the employer's conduct alleged to be in violation of NJ LAD. Here, the Proposed Amended Complaint merely alleges that Saunders received an email entitled "Associate Termination" from McGeehon, participated in discussions with McGeehon and Robertson regarding the judicial complaint filed against Plaintiff, and instructed Defendant Robertson to collect Plaintiff's building access card. Such facts illustrate that Saunders, as Chief of Human Resources, likely had knowledge of Plaintiff's termination and was involved to some degree in finalizing Plaintiff's departure from the firm. The Court finds that these facts do not support the contention that Saunders provided "substantial assistance or encouragement" of the misconduct alleged in the proposed amended Complaint within the meaning of NJ LAD. *See Failla v. City of Passaic,* 146 F.3d 149, 158–59 (3d Cir.1998). Rather, the Court finds that receiving emails regarding the termination of an employee and providing instructions to collect said employee's building access card are consistent with the customary duties and protocols intrinsic to Saunders's role as a human resources director. Accordingly, the Court finds the proposed Amended Complaint to be futile as to the addition of Saunders.

The Court will next turn to Plaintiff's proposed breach of contract amendment. Plaintiff's argument regarding the proposed breach of contact claim revolves around Sedgwick's Employee Assistance Program ("EAP"), a benefit program allegedly available to Sedgwick employees that is designed to assist with personal issues, including legal assistance. (*See* D.E. 65, Plaintiff's Brief in Support of Motion to Amend, at *9–10). Plaintiff claims that when Defendants terminated Plaintiff he was denied benefits to which he was entitled pursuant to the EAP, and as a result incurred damages, including attorney's fees for legal consultations that would have normally been covered by the EAP. *Id.*

Defendants argue that Plaintiff has failed to state a cause of action for breach of contract, as Plaintiff has not explicitly claimed that the parties entered into a contract regarding the EAP. (*See* D.E. 68, Defendants' Brief in Opposition, at *19).

Instead, Defendants assert that Plaintiff has merely alleged that he was afforded certain benefits under the EAP as part of his employment package, and that Sedgwick ceased to provide those benefits to Defendant after Plaintiff's departure from the firm. *Id.* Defendants argue that Plaintiff has not alleged "that Defendants failed to provide him a benefit to which he was entitled while employed by Sedgwick, nor does Plaintiff allege that the Firm agreed to continue to provide him EAP benefits after his separation of employment," and that any obligation Sedgwick may have had to provide Plaintiff with EAP benefits ceased with the termination of his employment at the firm. *Id.* Defendants further argue that Plaintiff has not alleged that any of the individual defendants were a party to any contract or implied contract between himself and Sedgwick. *Id.*

**\*6** A party alleging a breach of contract satisfies its pleading requirement if it alleges: (1) a contract; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party performed its own contractual duties. *Video Pipeline, Inc. v. Buena Vista Home Entertainment, Inc.,* 210 F.Supp.2d 552, at 561 (D.N.J.2002). Here, Plaintiff essentially alleges that: (1) the EAP benefits were part of his employment contract with Sedgwick; (2) Sedgwick breached its obligations to Plaintiff regarding the EAP benefits; (3) Plaintiff suffered damages as a result of Sedgwick's breach; and (4) Plaintiff performed all of his own contractual duties until he was wrongfully terminated. (*See* D.E. 65, Plaintiff's Brief in Support of Motion to Amend, at *9–10). The Court, bearing in mind the liberal approach to pleadings embodied by Rule 15, finds that Plaintiff has sufficiently pled a claim for breach of contract. *See Arthur v. Maersk, Inc.,* 434 F.3d 196, 202 (3d Cir.2006); *Foman v. Davis,* 371 U.S. at 182. Accordingly, Plaintiff's proposed amendment to add a claim for breach of contract is granted as to Defendant Sedgwick.

As to the individually named Defendants, it is well established that a claim for breach of contract cannot be maintained against an individual that is not a party to the underlying contract. *Figueroa v. City of Camden,* 580 F.Supp.2d 390, 408 (D.N.J.2008). Here, Plaintiff has not alleged facts that support the existence of a contract between himself and the individually named Defendants. *See id.* (dismissing common law action for breach of contract where plaintiff firefighter did not allege individual defendant was a party to the contract between city and its firefighters). Accordingly, the proposed breach of contract claim against the individual Defendants

2013 WL 1314429

fails to state a claim upon which relief may be granted and therefore must be denied. *See id.*

Next, the Court will address the factual allegations that Plaintiff seeks to add to his Complaint. Defendants assert that many of the amended factual allegations appear to be immaterial to Plaintiff's claims, redundant, or merely summarize discovery that has been conducted to date. (*See* D.E. 68, Defendants' Brief in Opposition, at *22). Plaintiff counters that the instant motion for leave to file a proposed amended complaint was prompted by new information found in discovery, and essentially argues that the added and amended factual allegations clarify his original pleading. (*See* D.E. 65, Plaintiff's Brief in Support of Motion to Amend). The Court has reviewed Plaintiff's amended factual allegations and does not find the proposed amendments to be at odds with Rule 15. As noted above, leave to amend is freely given when justice so requires, and courts "have shown a strong liberality ... in allowing amendments under Rule 15(a)." *Bechtel v. Robinson,* 886 F.2d 644, 652 (3d Cir.1989) (internal citations omitted); *see also Foman v. Davis,* 371 U.S. at 182. The Court will accordingly grant Plaintiff's motion to amend as to the proposed factual allegations.

**\*7** Finally, the Court will briefly address Defendants' statute of limitations argument with respect to the proposed individually named defendants. Defendants note that NJ LAD is governed by a two year statute of limitations, and argue that since Plaintiff alleges that he was wrongfully terminated on February 5, 2009, the applicable statute of limitations on Plaintiff's retaliation and discrimination claims under NJ LAD expired on February 5, 2011. (*See* D.E. 68, Defendants' Brief in Opposition, at *22–23). Thus, Defendants argue that Plaintiff's proposed NJ LAD claims against McGeehon are barred by the statute of limitations, and are therefore futile unless they relate back to the original complaint in accordance with Federal Rule of Civil Procedure 15(c). *Id.* at 23. Defendants assert that the proposed McGeehon amendment does not relate back to Plaintiff's original Complaint, as the claims against McGeehon do not arise out of the conduct that is set forth in the original pleading. *Id.* at *24.

Three conditions must be met for the successful relation back of an amended complaint that adds new parties: (1) the additional claim arose out of the same conduct as the original pleading; (2) the newly named party received such notice of the institution of the action within 120 days of the complaint so that the party will not be prejudiced in

maintaining a defense on the merits; and (3) the newly named party must have known or should have known within 120 days that, but for a mistake made by the plaintiff concerning the newly named party's identity, the action would have been brought against the newly named party in the initial pleading. *Singletary v. Pennsylvania Dept. of Corrections,* 266 F.3d 186, 189 (3d Cir.2001) (internal quotations and citations omitted). The first condition is met in this action because it is clear that the claims against McGeehon arise out of the same conduct alleged in the original pleading, namely the alleged wrongful termination of Plaintiff. It is also clear that the second condition is met, as McGeehon had both actual notice of the instant lawsuit and sufficient notice of the action under Rule 15(c)(3) by virtue of sharing counsel with the other individually named Sedgwick Defendants. *See Singletary,* 266 F.3d at 196–98. Finally, the third condition for relation back is also met in this matter, as Plaintiff has plausibly argued that he was only learned during discovery that McGeehon may have had an active role in Plaintiff's alleged termination, rather than the role of a mere "mouthpiece." (*See* D.E. 69, Plaintiff's Reply Brief, at *1–2). Accordingly, the Court finds that the McGeehon amendment relates back to the initial filing and is not barred by the statute of limitations. *See Singletary,* 266 F.3d at 196–98.

## B. Defendants' Motion for a Protective Order

Next, the Court will consider Defendants' motion for a protective order. Defendants contend that there exists a good faith need for a protective order regarding Plaintiff's discovery requests, as Plaintiff's requests are voluminous, unduly burdensome, and harassing. (*See* D.E. 53–1, Defendants Brief in Support of Motion, at *6–7). Specifically, Defendants seek a protective order: prohibiting Plaintiff from serving additional discovery; permitting Defendants to not be required to respond to Plaintiff's Third Request for Admissions; permitting Defendants to not be required to respond to Plaintiff's Second Set of Interrogatories to Defendant Sedgwick; permitting Defendants to not be required to respond to Plaintiff's Fourth Request for Admissions; permitting Defendants to not be required to respond to Plaintiff's Third Request for Documents; permitting Defendants to not be required to respond to document requests attached to the notices to depose James Keale, Thomas Robertson, Michael Tanenbaum, Suzanne Horn, David Saunders, and Craig Barnes; and ordering that the depositions of Craig Barnes and David Saunders

2013 WL 1314429

be conducted in California. (*See* D.E. 53–6, Defendants'
Proposed Order).

**\*8** Pursuant to Federal Rule of Civil Procedure 26(b), a
court may order the discovery of any matter relevant to a
party's claims, defenses, or the subject matter involved in the
litigation upon a finding of good cause. Rule 26 is construed
liberally, and relevance is a broader inquiry at the discovery
stage of litigation than at the trial stage. *Tele–Radio Sys. Ltd.
v. DeForest Elecs., Inc.,* 92 F.R.D. 371, 375 (D.N.J.1981)
(citations omitted). While relevant information need not be
admissible at trial, the party seeking discovery must "show
that the information sought is relevant to the subject matter of
the action and may lead to admissible evidence." *Caver v.
City of Trenton,* 192 F.R.D. 154, 159 (D.N.J.2000).

While Rule 26 is generally construed liberally, courts have
authority to limit a party's pursuit of information that would
otherwise be discoverable where the burden of a discovery
request is likely to outweigh the benefits. *See* Fed.R.Civ.P.
26(b)(2) (C); *see also Bayer AG v. Betachem, Inc.,* 173 F.3d
191 (3d Cir.1999). Accordingly, a discovery request may be
denied if the court determines that there exists a likelihood
that the resulting benefits would be outweighed by the burden
or expenses imposed as a consequence of the discovery
after assessing the following factors: (1) the unreasonably
cumulative or duplicative effect of the discovery; (ii) whether
the party seeking discovery has had ample opportunity to
obtain the information by other discovery; and (iii) the
needs of the case, the amount in controversy, the parties'
resources, the importance of the issues at stake in the
action, and the importance of the discovery in resolving
the issues. Fed.R.Civ.P. 26(b)(2)(C). The purpose of this
rule of proportionality is to guard against redundant or
disproportionate discovery by giving the court authority to
reduce the amount of discovery that may be directed to
matters that are otherwise proper subjects of inquiry. *A &
B Ingredients, Inc. v. Hartford Fire Ins. Co.,* 2010 WL 335616,
at \*3 (D.N.J. Jan.29, 2010) (quoting *Bowers v. Nat'l
Collegiate Athletic Assoc.,* No. 97–2600, 2008 LEXIS 14944,
at \*14, 2008 WL 1757929 (D.N.J. Feb. 27, 2008).

Courts have further authority to limit the scope of discovery
through the issuance of a protective order pursuant to Federal
Rule of Civil Procedure 26(c). Pursuant to Rule 26(c), upon a
finding of good cause, the court may issue a protective order
to protect a party or person from annoyance, embarrassment,
oppression, or undue burden or expense. *See Cipollone v.

*Liggett Group, Inc.,* 785 F.2d 1108, 1112, fn. 3 (3d Cir.1986),
*cert. denied,* 486 U.S. 976 (1987). Courts are afforded broad
latitude under Rule 26(c) in tailoring a protective order
to the circumstances of a particular case, and accordingly
may issue an order: forbidding the disclosure of discovery;
specifying terms, including time and place for the disclosure
of discovery; prescribing a discovery method other than the
one selected by the party seeking discovery; and forbidding
inquiry into certain matters, or limiting the scope of disclosure
or discovery to certain matters. *See id.* In seeking a protective
order, a party establishes good cause by demonstrating that
disclosure will cause a clearly defined and serious injury.

*Pansy v. Borough of Stroudsburg,* 23 F.3d 772, 786–87
(3d Cir.1994). However, broad allegations of harm do not
support a showing of good cause, so the alleged injury must
be supported by specific examples and reasons. *Id.*

**\*9** In determining whether good cause exists, courts
must employ a balancing test weighing "the requesting
party's need for information against the injury that might
result if uncontrolled disclosure" is granted. *Id.* at 787
(internal quotations omitted). If the court ultimately finds
that discovery policies require that the materials be disclosed,
the issue then becomes whether they should be disclosed
in a specific way, or whether any limitations of disclosure
should be ordered. *Id.* In making this determination, courts
consider the following factors: (i) whether the information is
being sought for a legitimate purpose or improper purpose;
(ii) whether disclosure will promote fairness and efficiency
among litigants; and (iii) whether a party benefiting from the
order is a public entity, public official or private litigant and
whether the case involves matter of legitimate public interest.
*Id.* at 787–88. The party requesting the protective order bears
the burden of establishing an alleged lack of relevancy or
undue burden. *A & B Ingredients, Inc. v. Hartford Fire Ins.
Co. .,* 2010 WL 335616, at \*4 (D.N.J. Jan.29, 2010).

Defendants assert that good cause exists for the entry
of a protective order because Plaintiff's requests are
"disproportionate to the claims in this matter and will work
a clearly defined and serious injury upon Defendants." (*See*
D.E. 53–1, Defendants' Brief in Support of Motion, at \*11).
Defendants argue that the sheer volume of discovery is unduly
burdensome, harassing, and oppressive given the nature of
the claims in this action. *Id.* In support of their argument
Defendants assert that, despite having already provided over
300 responses to discovery requests by Plaintiff, Plaintiff
has requested an additional 98 requests, most of which are

Campbell v. Sedgwick Detert, Moran & Arnold, Not Reported in F.Supp.2d (2013)

2013 WL 1314429

cumulative and not reasonably calculated to lead to the discovery of admissible evidence. (*See* D.E. 58, Defendants' Reply Brief, at \*2). Defendants argue that Plaintiff's discovery requests relating to the termination of other former Sedgwick attorneys is duplicative and not relevant concerning the circumstances that precipitated Plaintiff's resignation. *Id.* at \*15–17. Defendants further argue that the electronic discovery sought by Plaintiff, namely documents and emails for the period of January 29, 2009 to May 1, 2009 concerning Plaintiff that were received or sent from various Sedgwick employees and persons not employed by Sedgwick but working in Sedgwick's New Jersey office with a Sedgwick email account is burdensome and overly broad in temporal scope since Plaintiff's last day of employment was February 5, 2009. *Id.* at \*17. Likewise, Plaintiff seeks documents and emails sent or received from various Sedgwick employees that reference Plaintiff from as early as January 1, 2007 to the present, and Defendants argue that such requests are also overly broad and burdensome, or have been previously identified by Defendants and listed on their privilege log. *Id.* at \*18. In addition, Defendants note various other discovery requests that they contend are overly broad, irrelevant, or burdensome, such as, *inter alia*, "documents which reflect paid time off for all employees in the Sedgwick New Jersey office from February 2, 2009 to February 6, 2009," and "documents that reflect the gross revenues of Sedgwick from January 1, 2001 to present." *See id.* at \*23–24. Similarly, Defendants argue that Plaintiff's request to inspect the premises of Sedgwick's New Jersey Office for the purpose of "measuring, surveying, videotaping, and photographing his former office and the offices of" various Sedgwick employees is irrelevant and unsupported by any reasonable basis. *Id.* at \*13–14. The Court will address each category of the discovery at issue in turn.

**\*10** First, the Court will consider Plaintiff's Second Set of Interrogatories Directed to the Designated Representative of Defendant Sedgwick. (*See* D.E. 53–4, Defendants' Ex. K to Motion for Protective Order, at \*62–67). Federal Rule of Civil Procedure 33(a)(2) states that "[a]n interrogatory may relate to any matter that may be inquired into under Rule 26(b)," and that an "interrogatory is not objectionable merely because it asks for an opinion or contention that relates to fact or the application of law to fact, but the court may order that the interrogatory need not be answered until designated discovery is complete, or until a pretrial conference or some other time." The Court has reviewed Plaintiff's Second Set of Interrogatories directed to Sedgwick and finds that the interrogatories do not warrant the entry

of a protective order. Plaintiff's interrogatories are, within the liberal meaning of Rule 26, relevant to Plaintiff's claims. However, the Court notes that Interrogatory No. 4 is unlimited in temporal scope, and accordingly orders that the temporal scope of Interrogatory No. 4 be limited to a period of five years from February 5, 2004, to February 5, 2009. (*See* D.E. 53–4, Defendants' Ex. K to Motion for Protective Order, at \*67). If Defendants have previously provided any of the requested information to Plaintiff, or object to a particular interrogatory, Defendants are free to respond accordingly.

Next, the Court will consider Plaintiff's Third and Fourth Requests for Admissions. Federal Rule of Civil Procedure 36 governs requests for admission, and states that "[a] party may serve on any other party a written request to admit, for purposes of the pending action only, the truth of any matters within the scope of Rule 26(b) (1) relating to: (A) facts, the application of law to fact, or opinions about either; and (B) the genuineness of any described documents." Fed.R.Civ.P. 36(a)(1). The Court has reviewed Plaintiff's Third Request for Admissions to Defendants and finds that the requests for admission are within the liberal meaning of discovery embodied by Rule 26 and do not fall outside the scope of requests for admission as defined by Rule 36. (*See* D.E. 53–4, Defendants' Ex. J to Motion for Protective Order, at \*54–60). The Court further notes that Plaintiff's Fourth Request for Admissions requests to admit the genuineness of documents and are appropriately accompanied by copies of the relevant documents in accordance with Fed.R.Civ.P. 36(a)(2). (*See* D.E. 53–5, Defendants' Ex. L to Motion for Protective Order, at \*2–5). Therefore, the Court will deny Defendants' motion for a protective order with respect to Plaintiff's Third and Fourth Requests for Admissions. Again, to the extent that Defendants have previously provided any of the requested information to Plaintiff, or object to a particular request, Defendants are free to respond accordingly.

Next, the Court will consider Plaintiff's Third Document Production Demand to Defendants. (*See* D.E. 53–5, Defendants' Ex. M to Motion for Protective Order, at \*25–29). Any party may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense, and it is well settled that Rule 26 establishes a fairly liberal discovery policy. *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978); Fed.R.Civ.P. 26(b) (1). "As a general rule, discovery is permitted of any information that is relevant or may lead to the discovery of relevant evidence." *Romero v. Allstate Ins. Co.,* 271 F.R.D. 96, 101 (E.D.Pa.2010). Federal Rule of Civil Procedure 34

governs the production of documents and reads, in pertinent part, as follows:

**\*11  (a) In General.** A party may serve on any other party a request within the scope of Rule 26(b):

**(1)** to produce and permit the requesting party or its representative to inspect, copy, test, or sample the following items in the responding party's possession, custody, or control:

**(A)** any designated documents or electronically stored information-including writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations-stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form; or

**(B)** any designated tangible things; or

**(2)** to permit entry onto designated land or other property possessed or controlled by the responding party, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

Here, Plaintiff has made twenty six (26) requests for the production of documents, and has also requested documents in connection with various deposition notices. (*See* D.E. 53–5, Defendants' Ex. M to Motion for Protective Order, at \*25–29). The Court has reviewed Plaintiff's Third Document Production Demand and notes that Plaintiff's requests are reasonably limited in temporal scope, and reasonably calculated to lead to the discovery of admissible evidence. For instance, Request No. 15 seeks "[a]ll documents and e-mails sent by Deborah Lewis from January 1, 2009 to May 1, 2009 that reference Plaintiff." *See id.* at \*27. The Court finds that such requests are relevant to Plaintiff's claims, well within the liberal scope of discovery, and sufficiently designate which documents Plaintiff seeks. *See* Consolidated Rendering Co. v. Vermont, 207 U.S. 541, 543–44, 28 S.Ct. 178, 52 L.Ed. 327 (1908) ("We see no reason why all such books, papers and correspondence which related to the subject of inquiry, and were described with reasonable detail, should not be called for and the company directed to produce them. Otherwise, the State would be compelled to designate each particular paper which it desired, which presupposes an accurate knowledge of which papers, which the tribunal desiring the papers would probably rarely, if ever, have.").

Accordingly, the Court will deny Defendants' motion for a protective order with respect to Plaintiff's Third Document Production Demand. However, the Court notes once again that if Defendants have already provided any of the requested information, or object to a particular demand, Defendants are free to respond accordingly.

With regard to the various document demands attached to Plaintiff's deposition notices, the Court finds that a number of the requests do not appear reasonably calculated to lead to the discovery of admissible evidence and warrant the entry of a protective order. Specifically, the Court finds that Request Nos. 10 and 11 attached to the deposition notice for Suzanne Horn [D.E. 53–5, Ex. R, at \*52]; and Request Nos. 4, 5, and 7 attached to the deposition notice for David Saunders [D.E. 53–5, Ex. S, at \*57] seek financial information from Sedgwick that is irrelevant to Plaintiff's claims. Furthermore, the Court finds that Request No. 6 attached to the deposition notice for David Saunders is unreasonably broad in temporal and geographic scope. *See id.* That particular request seeks "[a]ll documents that reflect the salary of the highest and lowest paid (non-partner) attorney employed by the New Jersey office from January 1, 2001 to present." *Id.* Accordingly, the Court orders that the request be amended so as to only pertain to attorneys that graduated from law school between the years 1998 and 2000, and to the salaries any such attorneys may have had at the time of Plaintiff's termination.

**\*12**  Next, the Court will address Plaintiff's Notice of Inspection. (*See* D.E. 53–5, Defendants' Ex. N to Motion for Protective Order, at \*31–33). Plaintiff seeks to inspect the premises of Sedgwick's New Jersey office for the purpose of "measuring, surveying, videotaping, and photographing his former office and the offices of the following employees of Sedgwick: James Keale; Thomas Robertson; Michael Tanenbaum; Suzanne Horn, Sedgwick's Office Manager; Shari Keiser, Associate; Christopher Kehrli, former Associate; and Kecia Barrett–Callahan." (*See* D.E. 53–1, Defendants' Brief in Support of Motion for Protective Order, at \*13). Defendants argue that Plaintiff has not made any factual allegations that would provide a basis for his Notice of Inspection, and that Plaintiff is seeking the inspection "for the sole reason to harass and annoy Defendants." *Id.* at \*14. Plaintiff argues that he intends to inspect, photograph, and videotape the Sedgwick New Jersey office in order to "aid jurors in their deliberations," by "presenting the jury with photographs showing the location of Plaintiff's office in proximity to several key witnesses," so

as to support his claim that he did not voluntarily resign. (*See* D.E. 55, Plaintiff's Brief in Opposition, at *14). While the Court notes that a liberal approach to discovery is generally favored pursuant to Rule 26, the Court also appreciates Defendants' concerns regarding the potential for harassment and disruption with regard to Plaintiff's Notice of Inspection considering the nature of this case. Accordingly, the Court hereby orders that Plaintiff's inspection of Sedgwick's New Jersey Office be set for a time and date to be determined by Defendants, and that said inspection shall not exceed sixty minutes.

Lastly, the Court will consider the depositions of Craig Barnes, a partner in Sedgwick's Los Angeles office, and David Saunders, Sedgwick's Chief of Human Resources Officer located in San Francisco. (*See* D.E. 53–1, Defendants' Brief in Support of Motion for Protective Order, at *28). Plaintiff noticed the depositions of Craig Barnes and David Saunders and identified Newark, New Jersey as the location of the depositions. *Id.* Neither Barnes nor Saunders is a party to this litigation. *Id.* Defendants argue that Barnes and Saunders would be unduly burdened if they were forced to travel to New Jersey for their depositions, and that Barnes, as a non-party witness, cannot be compelled to travel more than 100 miles from Los Angeles, California pursuant to Federal Rule of Civil Procedure 45(c)(3)(A)(ii). *Id.* at *29.

Rule 30(b)(1) states, in pertinent part, that "a party who wants to depose a person by oral questions must give reasonable written notice to every other party. The notice must state the time and place of the deposition and, if known, the deponent's name and address." Therefore, the default rule is that the examining party "may set the place for the deposition of another party wherever he or she wishes subject to the power of the court to grant a protective order under Rule 26(c) (1)(B) designating a different place." Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, & Richard L. Marcus, *Federal Practice and Procedure* § 2112 (3d ed.2012). Under Rule 30(b)(1), an officer, director, or managing agent of a corporate party may be compelled to give testimony pursuant to a notice of deposition. Accordingly, Rule 30(b)(1) is clear in that "the location designated for the taking of a deposition is solely within the discretion of the court, thereby requiring each application to be considered on its own facts and equities." *Tomingas v. Douglas Aircraft Co.,* 45 F.R.D. 94, 97 (S.D.N.Y.1968) (citing *Branyan v. Koninklijke Luchtvaart Maatschappij,* 13 F.R.D. 425, 429 (S.D.N.Y.1953)).

**\*13** However, the general rule regarding the setting for the location of a corporate party's deposition is that the deposition ordinarily takes place at the corporate party's principal place of business. *See Cadent Ltd. v. 3M Unitek Corp.,* 232 F.R.D. 525, 628 (C.D.Cal.2005) (internal citations omitted). "Notwithstanding the generally recognized rule, courts have often required corporate defendants to produce their officers or agents for depositions at locations other than the corporation's principal place of business where there has been no showing that the defendant will suffer any resulting financial hardship." *South Seas Catamaran, Inc. v. Motor Vessel "Leeway",* 120 F.R.D. 17, 21 fn. 5 (D.N.J.1988). In addition, a number of factors "serve to dissipate the presumption [that a corporate party's deposition should be held at its principal place of business and may persuade the Court to require the deposition to be conducted in the forum district or some other place." *Cadent Ltd. v. 3M Unitek Corp.,* 232 F.R.D. at 628–29. These factors include the "location of counsel for the parties in the forum district, the number of corporate representatives a party is seeking to depose, the likelihood of significant discovery disputes arising which would necessitate resolution by the forum court; whether the persons sought to be deposed often engage in travel for business purposes; and the equities with regard to the nature of the claim and the parties' relationship." *Id.* at 629 (internal citations omitted).

Pursuant to Federal Rule of Civil Procedure 26(c), a court may issue a protective order to regulate the terms, conditions, time or place of discovery. Defendants, as the moving party, bear the burden of showing good cause for the issuance of a protective order. Fed.R.Civ.P. 26(c). Here, Defendants have not provided the Court with any evidence regarding the alleged expense or undue burden associated with holding the depositions of Barnes and Saunders in New Jersey. "Courts have often required corporate defendants to produce their officers or agents for depositions at locations other than the corporation's principal place of business where there has been no showing that the defendant will suffer any resulting financial hardship." *South Seas Catamaran, Inc. v. Motor Vessel "Leeway",* 120 F.R.D. 17, 21 fn. 5 (D.N.J.1988). Furthermore, the Court finds that there are a number of circumstances that weigh against the entry of a protective order ordering that the depositions of Saunders and Barnes be conducted in California. First, both the *pro se* Plaintiff and counsel for the Defendants are located in New Jersey, and it is established that Defendant Sedgwick does business in this district. Also, considering the large number of discovery disputes that have developed thus far

Campbell v. Sedgwick Detert, Moran & Arnold, Not Reported in F.Supp.2d (2013)

2013 WL 1314429

in this litigation, there is a high likelihood that disputes will arise during the depositions that may require resolution by the Court. Therefore, because Defendants have not met their burden of showing good cause for the issuance of a protective order, the Court will deny Defendants' request to order that the depositions of Saunders and Barnes be held in California. Accordingly, the Court, in its discretion and mindful that Rule 1 of the Federal Rules of Civil Procedure states that the Rules "should be construed and administered to secure just, speedy, and inexpensive determination of every action and proceeding," will order that the depositions of Saunders and Barnes be either held via video at Sedgwick's New Jersey Office or at that location, with the expenses to be borne by Defendants.

**\*14** The Court is not persuaded by Defendants' argument that Barnes is not an officer or managing agent within the meaning of Rule 30. The question of whether an individual is a managing agent, and thus subject to a notice of deposition, is answered on a fact-specific basis. *Triple Crown America, Inc. v. Biosynth AG,* Civil No. 96–7476, 1998 WL 227886, at *1–2 (E.D.Pa.1998) (citing *United States v. Afram Lines (USA), Ltd.,* 159 F.R.D. 408, 413 (S.D.N.Y.1994)). Doubts regarding an individual's status as a "managing agent" are resolved in favor of the examining party. *See Founding Church of Scientology v. Webster,* 802 F.2d 1448, 1452 (D.C.Cir.1986); *In re Honda American Motor Co., Inc. Dealership Relations Litigation,* 168 F.R.D. 535, 540–41 (D.Md.1996). The inquiry regarding the identification of a managing agent essentially involves the extent of the individual's decision-making discretion and unsupervised authority, the degree to which his interests converge with those of the corporation, and his general responsibilities, particularly with regard to the matters at issue in the litigation. *Triple Crown America, Inc. v. Biosynth AG,* Civil No. 96–7476, 1998 WL 227886, at *2 (citing *Founding Church of Scientology,* 802 F.2d at 1453; *In re Honda American Motor Co., Inc.* Dealership Relations Litigation, 168 F.R.D. at 540–41). Here, no evidence has been presented regarding any of the aforementioned criteria, but the Court does note that Barnes, as Managing Partner of Sedgwick's Los Angeles Office, likely has interests that align with those of Defendant Sedgwick, and has decision-making discretion and general authority consistent with that of a managing agent. Accordingly, the Court will order that the deposition of

Barnes be conducted at Sedgwick's New Jersey office either in person or via video.

In sum, the Court finds that much of the discovery at issue is reasonably calculated to lead to the discovery of admissible evidence and is proper pursuant to Federal Rule of Civil Procedure 26. Defendants have not shown that good cause exists for the issuance of a protective order as to the entire corpus of discovery noted in their submissions. While Defendants bemoan that they have already answered 72 interrogatories in this matter, Defendants do not assert that Plaintiff has served interrogatories in excess of the pre-trial scheduling order's limit of 25 interrogatories per defendant. (*See* D.E. 16, Pretrial Scheduling Order, at *2, ¶ 6). The Court notes that Defendants have, thus far, answered 23 interrogatories directed to Defendant Keale; 20 interrogatories directed to Defendant Robertson; 22 interrogatories directed to Defendant Tanenbaum; and 17 interrogatories directed to Defendant Sedgwick. (*See* Docket Entry Nos. 53–2, 53–3, Exhibits B–E to Defendants' Motion for Protective Order). Accordingly, the Court finds that Plaintiff has not exceeded the number of interrogatories per defendant allotted to him, and that the additional 5 interrogatories directed to Defendant Sedgwick are proper. As far as the sheer volume of discovery involved in this case, it is the Court's determination that, considering the number of Defendants, the claims involved, and the factual circumstances alleged in Plaintiff's pleadings, the discovery at issue is not disproportionate and the entry of a broad protective order is therefore unwarranted. *See Cipollone,* 785 F.2d 1108; *A & B Ingredients, Inc.,* 2010 WL 335616, at *3.

### C. Defendants' Motion for Sanctions

**\*15** Lastly, the Court will address Defendants' motion for sanctions. Defendants allege that Plaintiff has brought "voluminous, vexatious and predominately irrelevant discovery requests" as part of a strategy of forcing Defendants to incur the maximum attorneys' fees possible, and that, consistent with those claims, Plaintiff has failed to make court ordered appearances on two occasions. (*See* D.E. 59–1, Defendants' Brief in Support of Motion for Sanctions, at *1). In support of the instant motion for sanctions Defendants emphasize Plaintiff's failure to appear for a court-ordered, in-person hearing scheduled for 11:00 a.m. on June 15, 2012. *See id.* Defendants contend that, as a result of Plaintiff's failure to attend the hearing, Defendants unnecessarily incurred legal fees. *Id.* In addition, Defendants note that Plaintiff had

2013 WL 1314429

previously failed to appear for a Court ordered conference scheduled for February 16, 2012, and has since appeared fifteen minutes late for a court-ordered teleconference on July 2, 2012. *Id.*

Plaintiff opposes the motion for sanctions, and asserts that his failure to attend the hearing was the result of his own scheduling mistake. (*See* D.E. 66, Plaintiff's Letter Brief in Opposition). Plaintiff alleges that he "incorrectly noted the hearing time for 1:30 p.m. when the matter was actually scheduled for 11:00 a.m.," and that he entered the courthouse shortly before noon and spend approximately one hour preparing his arguments in the court's library. *Id.* When Plaintiff finally entered the courtroom at approximately 1:00 p.m. the Court had already allowed defense counsel to leave the building on account of Plaintiff's non-appearance, and the Court had moved on to other matters. *Id.* Plaintiff alleges that he continued to sit in the courtroom, mistakenly believing that he was early for the hearing, when he was informed by a Court employee that the hearing was scheduled for 11:00 a.m. and that defense counsel had already left the courthouse. *Id.* at *1–2. At that point Magistrate Judge Waldor returned to the courtroom, and Plaintiff explained his failure to appear for the hearing on the record and apologized for his mistake. *Id.* at *2.

It is established that a district court has the inherent power to sanction parties appearing before it for refusing to comply with its orders. *See, e.g.,* ⚲ *Tracinda Corp. v. DaimlerChrysler AG,* 502 F.3d 212, 242 (3d Cir.2007). This inherent power was recognized by the United States Supreme Court in ⚲ *United States v. Hudson,* 7 Cranch 32, 11 U.S. 32, 3 L.Ed. 259 (1812), where the Court held that "[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution," powers "which cannot be dispensed with in a Court, because they are necessary to the exercise of all others." These powers are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." ⚲ *Link v. Wabash R. Co.,* 370 U.S. 626, 630–631, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962).

**\*16** In addition to the court's inherent authority, Federal Rule of Civil Procedure 16(f) provides that if a party fails to obey a scheduling or pretrial order, or if no appearance is made on behalf of a party at a pretrial conference, a district court, upon motion or the court's own initiative, may issue sanctions. Rule 16 further states that "[i]nstead of or in addition to any other sanction, the court must order the party, its

attorney, or both to pay the reasonable expenses—including attorney's fees—incurred because of any noncompliance with this rule, unless the noncompliance was substantially justified or other circumstances make an ward of expenses unjust." Fed.R.Civ.P. 16(f)(2). Under Rule 16(d), monetary sanctions for noncompliance with Rule 16 pretrial orders are required and appropriate absent a showing that the violation was "substantially justified" or the award of expenses is "unjust" under the circumstances of the case. ⚲ *Tracinda Corp. v. DaimlerChrysler AG,* 502 F.3d 212, 241 (3d Cir.2007). As noted by the Third Circuit in *Tracinda Corp.,* " 'unjust' can be variously defined as 'unfair,' 'unreasonable,' 'inequitable,' or 'harsh,' " and these definitions "invite a consideration of the degree of the sanction in light of the severity of the transgression[ ... ]." *Id.* Thus, whether a party's misconduct is intentional, negligent, or inadvertent is a significant factor in assessing the severity of the transgression at issue. S*ee id.*

Here, the Court, in its discretion, does not find that the misconduct at issue warrants an award of sanctions. Plaintiff's failure to timely attend the June 15, 2012, conference at 11:00 a.m. appears to be the result of Plaintiff's own negligence and not motivated by any improper purpose. After arriving to the courtroom late on June 15, 2012, Plaintiff explained his mistake on the record:

> Your Honor, I apologize for [missing the conference]. It was my understanding that the hearing was going to be held at 1:30. I know we had a conference with Mr. Bruk last —end of last month. And I—I think that I had expressed to the Court earlier, because I have a 7–month– old son, that usually the morning, I can't make it, so I had asked for the conference to be held after lunch. And my apologies to the Court. It was my understanding that it was 1:30. I did not look at the calendar again. I'll honestly admit that, Your Honor. But I believe even when we spoke with Mr. Bruk about two weeks ago, it was the understanding that it was going to be in the afternoon and that there were no

other matters scheduled. That's my recollection.

(*See* D.E. 56, Transcript of June 15, 2012, Proceedings, at *2, ¶¶ 10–22. The Court also recognizes that at the June 15, 2012 proceedings Magistrate Judge Waldor, after expressing her disappointment that Plaintiff forgot to check ECF before the scheduled hearing, noted that Defendants had been given leave to file a motion for sanctions "in a vacuum," before the Court was apprised of Plaintiff's side of the story. *See id.* at *5, ¶¶ 19–24.

 **\*17**  Defendants cite *Grant v. Omni Health Care Sys. of NJ, Inc.,* 2009 WL 3151322 (D.N.J. Sept.24, 2009), and *Miller v. Unum Life Ins. Co. of America,* 2006 U.S. Dist. LEXIS 76079, 2006 WL 3000962 (E.D.Pa. Oct. 19, 2006), in support of the instant motion for sanctions. Both cases may be distinguished from the instant matter. The offending attorney in *Grant* had a long history of misconduct, including, *inter alia,* serving and filing numerous documents late, unprofessional and discourteous conduct, missing deadlines, failing to appear on numerous occasions, and filing motions long after the deadlines set forth in scheduling orders had expired. *See* 2009 WL 3151322, at *1–5. While *Miller* did not feature a pattern of misconduct as egregious as that found in Grant, counsel in that case failed to attend a settlement conference on a date and time selected by counsel for no apparent reason, and in doing so caused opposing counsel to needlessly drive for over four hours from Reading, Pennsylvania to Philadelphia. *See* 2006 U.S. Dist. LEXIS 76079, at *2–3, 2006 WL 3000962.

As noted above, Plaintiff has explained his failure to timely appear at the June 15, 2012, conference, and his failure to appear at said conference has not significantly hindered this litigation. It is this Court's determination that the transgression at issue does not warrant an award of sanctions. However, the Court notes that Plaintiff has unfortunately failed to appear or appeared late for more than one court-ordered conference or hearing, and the Court will not tolerate this behavior developing into an established pattern. While the Court

recognizes that parties may occasionally suffer unexpected trials and tribulations that hinder their ability to make courtordered appearances, the Court also expects that litigants in this Court respect the judicial process and take appropriate care in ensuring that they correctly calendar court-ordered events, and notify the Court and counsel when they will be unavailable. Accordingly, although the Court does not find that sanctions are appropriate at this juncture, continued failure to respect this Court's scheduled conferences and hearings may warrant the imposition of sanctions in the future.

### IV. CONCLUSION

For the foregoing reasons, and good cause shown,

IT IS on this 28th day of March, 2013,

**ORDERED** that Plaintiff's motion to amend his pleading is granted in part and denied in part. The motion as to the proposed McGeehon amendment, the proposed breach of contract amendment, and the proposed amended factual allegations is granted. The Court denies Plaintiff's motion as to the proposed Saunders amendment. Plaintiff shall hereafter modify his proposed Amended Complaint in accordance with this Opinion and file and serve his Amended Complaint within the time provided by the Federal Rules of Civil Procedure; and it is

**FURTHER ORDERED** that Defendants' motion for a protective order is granted in part and denied in part. The discovery requests at issue are hereby modified in accordance with this Opinion. The parties will immediately meet and confer regarding a plan to complete the outstanding discovery and file their joint proposal with the Court within ten days; and it is

 **\*18**  **FURTHER ORDERED** that Defendants' motion for sanctions is denied.

### All Citations

Not Reported in F.Supp.2d, 2013 WL 1314429

---

End of Document

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

TAB 3

*Corbett v. Remington Arms Co., LLC*, No. 4:15-CV-00279-BLW, 2016 WL
1755456 (D. Idaho May 2, 2016)

Corbett v. Remington Arms Company, LLC, Not Reported in Fed. Supp. (2016)

2016 WL 1755456

KeyCite Yellow Flag - Negative Treatment

Declined to Follow by    Glenn v. B & R Plastics, Inc.,    D.Idaho,    July 16, 2018

2016 WL 1755456
Only the Westlaw citation is currently available.
United States District Court, D. Idaho.

Richard CORBETT, Plaintiff,
v.
REMINGTON ARMS COMPANY, LLC, Defendants.

Case No. 4:15-cv-00279-BLW
|
Signed 05/02/2016

**Attorneys and Law Firms**

James D. Ruchti, Joel A. Beck, Ruchti & Beck, Pocatello, ID, Richard A. Ramler, Ramler Law Office, PC, Belgrade, MT, for Plaintiff.

Andrew A. Lothson, Steven E. Danekas, Swanson Martin & Bell, LLP, Chicago, IL, Kirk J. Houston, Tyler J. Anderson, Moffatt Thomas Barrett Rock & Fields, Chtd., Boise, ID, for Defendants.

**MEMORANDUM DECISION AND ORDER**

B. Lynn Winmill, Chief Judge

**INTRODUCTION**

**\*1**  The Court has before it Defendant Remington Arms Company, LLC's Motion to Dismiss (Dkt. 6). The motion is fully briefed and at issue and would not be aided by oral argument. For the reasons explained below, the Court will grant the motion to dismiss, though it will allow Plaintiff Richard Corbett an opportunity to amend.

**FACTS**

In June 2014, Corbett purchased a Remington R51 pistol from a sporting goods stores in Idaho Falls, Idaho. Shortly after he purchased the pistol, Corbett was shot in the abdomen when the gun "unexpectedly and unintentionally discharged without a trigger pull." *Compl.,* Dkt. 1, ¶ 11. Corbett was in the hospital for around a month after the injury, and he has undergone multiple surgeries and other treatment. He says the Remington pistol was defective and alleges three claims: strict products liability, negligence, and breach of warranty.

Remington moves to dismiss the third claim, for breach of warranty. In responding to the motion to dismiss, Corbett did not confine himself to allegations of his complaint. Instead, in an effort to shore up his warranty claim, he submitted an affidavit stating that when he purchased the pistol, he received an owner's manual and a warranty registration card from Remington. Mr. Corbett says he is confident he filled out the warranty card and returned it to Remington. *See Corbett Aff.,* Dkt. 12-1, ¶¶ 9-12.

**STANDARD OF REVIEW**

Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). While a complaint attacked by a Rule 12(b)(6) motion to dismiss "does not need detailed factual allegations," it must set forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.*

The Supreme Court identified two "working principles" that underlie *Twombly* in Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). First, the court need not accept legal conclusions that are couched as factual allegations as true; the trial court "can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Id. Rule 8 does not "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Id. at 678-79. Second, to survive a motion to dismiss, a complaint must state a plausible claim for relief. Id. at 679. "Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.

A dismissal without leave to amend is improper unless it is beyond doubt that the complaint "could not be saved by any amendment." Harris v. Amgen, Inc., 573 F.3d 728, 737 (9th Cir. 2009) (issued 2 months after *Iqbal*). The Ninth

Corbett v. Remington Arms Company, LLC, Not Reported in Fed. Supp. (2016)

2016 WL 1755456

Circuit has held that "in dismissals for failure to state a claim, a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Cook, Perkiss & Liehe, Inc. v. Northern California Collection Service, Inc.,* 911 F.2d 242, 247 (9th Cir. 1990). The issue is not whether plaintiff will prevail but whether he "is entitled to offer evidence to support the claims." *See* *Hydrick v. Hunter,* 466 F.3d 676, 685 (9th Cir. 2006).

## ANALYSIS

### 1. Consideration of the Corbett Affidavit and Related Materials

*\*2 Preliminarily, the Court notes that it will not consider materials outside the pleading in determining whether warranty claim should be dismissed. The Court could consider the materials plaintiff submitted (the affidavit and exhibits) and convert the motion into one for summary judgment. *See* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."); *Hamilton Materials, Inc. v. Dow Chem. Corp.,* 494 F.3d 1203, 1207 (9th Cir. 2007) (trial court, within its discretion, may exclude the extrinsic materials or convert the proceeding to a summary judgment motion.). In this case, however, the Court has determined that the better course is to focus on the complaint as it was originally drafted and filed. The Court will consider the extraneous materials only in determining whether to grant Corbett an opportunity to amend his complaint.

### 2. The Breach of Warranty Claim

In his third claim, Corbett alleges that Remington breached express and implied warranties. He alleges that, because of these breaches, he has suffered "damages, including incidental and consequential damages, ...." *Compl.*, Dkt. 1, ¶ 42. The factual allegations, however, reveal that Corbett is seeking personal injury damages. *See id.* ¶ 11 (alleging that Corbett suffered a serious gunshot wound and that he has undergone multiple surgeries and other treatment as a result of the gunshot injury).

In *Oats v. Nissan Motor Corp.,* 879 P.2d 1095 (Idaho 1994), the Idaho Supreme Court held that a plaintiff may pursue UCC breach of warranty claims for personal injuries only if: (a) the plaintiff is in contractual privity with the manufacturer or seller, or (b) the plaintiff qualifies as a third party beneficiary of the underlying sales contract. *Id.* at 1102 ("UCC breach of warranty actions for personal injuries are available only to a limited group of potential plaintiffs who are either in privity of contract with the manufacturer or seller, or who qualify as third party beneficiaries of the underlying sales contract, as defined in I.C. § 28-2-318."). If plaintiffs do not fit within this limited group, they may pursue their claim for personal injuries under Idaho's product liability action – not the UCC. *Id.* at 1105. As the Idaho Supreme court explained in *Oats,* the plaintiff's "breach of warranty action to recover for personal injuries is essentially a strict liability claim in tort, and it should be governed by the provisions of the ILPRA, ... rather than the provisions of the UCC." *Id.; see also* *Puckett v. Oakfabco, Inc.*, 979 P.2d 1174, 1183 (Idaho 1999) (in a product liability action, "UCC warranties apply only to those in privity of contract with the manufacturer and those who qualify as third party beneficiaries of the underlying sales contract ....").

Corbett's warranty claim, as presently drafted, is foreclosed under *Oats* because he has not alleged any facts demonstrating that he falls within the limited class of plaintiffs identified above – *i.e.*, plaintiffs in contractual privity with the defendant or plaintiffs who are third party beneficiaries of the underlying sales contract.

Regarding privity, Corbett has not alleged that Remington sold or contracted to sell the pistol at issue to anyone other than C-A-L Ranch Store. Privity of contract thus exists between C-A-L Ranch Store and Remington – but not between Mr. Corbett and Remington. And Corbett has not even argued that he qualifies as a third party beneficiary plaintiff. His warranty claims are therefore subject to dismissal under *Oats. Accord* *Wilson v. Amneal Pharms., LLC,* No. 1:13-cv-333-CWD, 2013 WL 6909930, #15 (D. Idaho Dec. 31, 2013) (dismissing breach of express and implied warranty claims in a personal injury action arising from an allegedly defective drug); *Elliott v. Smith & Nephew, Inc.,* No. 1:12-cv-70-EJL-MHW, 2013 WL 1622659 at *8 (D. Idaho Apr. 15, 2013) (dismissing plaintiffs' breach of express and implied warranty claims in a personal injury action arising from an alleged defective medical device).

Corbett v. Remington Arms Company, LLC, Not Reported in Fed. Supp. (2016)
2016 WL 1755456

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 33 of 535
PageID: 31980

**\*3** Corbett advances two related arguments to avoid this difficulty.

First, he says *Oats* is inapplicable because Mr. Oats did not purchase the allegedly defective product in that case – a Nissan automobile – whereas Mr. Corbett did purchase the allegedly defective pistol. Yet nothing in *Oats* suggests that the Idaho Supreme Court would have reached a different holding had Mr. Oats purchased the Nissan himself. Granted, lack of privity was undisputed in that case, so the court did not tackle the issue. But still, the overriding point in *Oats* is that a non-privity breach of warranty action against a manufacturer to recover for personal injuries is governed by Idaho's product liability act – the Uniform Commercial Code. 879 P.2d at 1105. Further, as Remington correctly points out, other Idaho case authority supports the notion that an end consumer, such as Corbett, who buys from a retailer is not in contractual privity with the manufacturer. *See, e.g., Am. W. Enters., Inc. v. CNH, LLC,* 316 P.3d 662, 670 (Idaho 2013) ("It is generally recognized that an authorized dealer is not an agent of a manufacturer absent some quantum of control.").

Corbett next argues that he will be able to establish privity of contract – presumably for both express and implied warranties – by alleging that he filled out a warranty card and returned it directly to Remington. Corbett says such an allegation would definitively establish privity, yet he does not cite a single authority supporting this proposition. *See Response Br.,* Dkt. 12, at 2 (asserting that the "written warranty provides the privity of contract between Plaintiff and Remington ...."). Nor does Corbett explain how the existence of a warranty card would somehow dispense with the basic proposition that contractual privity is linked to the underlying sales contract. *See generally* 1 White & Summers, *Uniform Commercial Code* § 12:2 (6th ed.) (explaining that a plaintiff who purchases a product, but does not buy it directly from the defendant, is not in privity with that defendant). Further, as Remington points out, if Mr. Corbett wishes to allege an express warranty claim, he would need to allege the terms of that warranty. *See In re Sony PS3 "Other OS" Litig.,* 551 Fed. Appx. 916, 919 (9th Cir. 2014) (unpublished decision) (" 'A manufacturer's liability for breach of an express warranty derives from, and is measured by, the terms of that warranty.' A plaintiff must allege 'the exact terms of the warranty.' ") (internal citations omitted).

Under these circumstances, the Court will dismiss Corbett's claim for breach of implied warranty with prejudice. The complaint, as drafted, does not state a claim for breach of implied warranty, and the Court is not convinced that he will be able to allege any facts supporting such a claim. At best, the existence of a warranty registration card might support an *express* warranty claim, but Corbett has not convinced the Court that any such warranty would include implied warranties.

The Court will allow Corbett an opportunity to amend his complaint in his effort to establish a claim for breach of an express warranty based on the existence of the warranty registration card. The Court has some reservations as to whether Corbett will be able to either allege facts showing that he falls within the class of plaintiffs that may pursue such actions, or, alternatively, that privity is not required in such an action. Additionally, it seems unlikely that an express warranty would extend to the personal injury damages plaintiff seeks here. Finally, the Court cannot see any particular advantage plaintiff gains by pursuing a claim for breach of an express warranty when he is already pursuing a strict products liability claim for personal injuries. *See Oats,* 879 P.2d at 1105 ("we fail to see how, in a personal injury product liability action not involving a commercial relationship between the manufacturer and the injured person, Oats's warranty allegations add anything to his other allegations of strict liability and negligence"); *see generally* 1 *White, Summers, & Hillman, Uniform Commercial Code* § 12:4 (6th ed.) (observing that "[p]ersonal-injury plaintiffs in most jurisdictions will thus seek recovery on a theory of strict tort liability under 402A,[1] under the local tort variant of 402A, or under the successor to 402A ...."). Nevertheless, in an abundance of caution, the Court will grant Corbett leave to amend his complaint to allege an express warranty claim.

## ORDER

**\*4** **IT IS ORDERED THAT** Remington's Motion to Dismiss Corbett's third claim for relief is **GRANTED.**

**IT IS FURTHER ORDERED** that Mr. Corbett may file an amended complaint alleging an express warranty claim. **If Mr. Corbett chooses to file an amended complaint, it must be filed within 21 days of this Order.**

2016 WL 1755456

**All Citations**

Not Reported in Fed. Supp., 2016 WL 1755456

# Footnotes

1    *See* Restatement Second, Torts, § 402A, entitled "Special Liability of Seller of Product for Physical Harm to User or Consumer."

---

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

TAB 4

*D'Onofrio v. Borough of Seaside Park*, No. CIV.A. 09-6220 AET, 2012 WL 5989437 (D.N.J. Nov. 29, 2012)

D'Onofrio v. Borough of Seaside Park, Not Reported in F.Supp.2d (2012)

2012 WL 5989437

2012 WL 5989437
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Stephen D'ONOFRIO, Plaintiff,

v.

BOROUGH OF SEASIDE PARK, et al., Defendants.

Civil Action No. 09–6220 (AET).

|

Nov. 29, 2012.

**Attorneys and Law Firms**

Beth Ann Hellriegel White, Kevin P. McCann, Philip Anthony Davolos, Chance & McCann LLC, Bridgeton, NJ, for Plaintiff.

Karen A. McGuinness, Michael J. Vassalotti, Abigail Marie Green, Brown & Connery LLP, Westmont, NJ, for Defendants.

**MEMORANDUM OPINION**

BONGIOVANNI, United States Magistrate Judge.

*\*1*  Currently pending before the Court is Plaintiff Stephen D'Onofrio's ("Plaintiff") motion to amend his Complaint in order to assert claims against Thomas G. Gannon, Esq., as well as the law firm of Hiering Gannon & McKenna ("HGM") [Docket Entry No. 166]. Both the Borough Defendants[1] and Defendant William Schultz ("Mr.Schultz") oppose Plaintiff's motion. The Court has fully reviewed all arguments made in support of and in opposition to Plaintiff's motion. The Court considers Plaintiff's motion without oral argument pursuant to Rule 78. For the reasons set forth more fully below, Plaintiff's motion to amend is GRANTED in part and DENIED in part. Plaintiff's motion is GRANTED to the extent Plaintiff seeks to add factual allegations relevant to their currently pending claims, which may also be relevant to their proposed amendments. Plaintiff's motion is DENIED to the extent Plaintiff seeks to assert allegations against Mr. Gannon or HGM based on Mr. Gannon's role as an alleged policy maker. Further, out of an abundance of caution, the Court holds in abeyance any decision on Plaintiff's motion with respect to the allegations Plaintiff seeks to assert concerning Mr. Gannon's alleged misrepresentations regarding the findings

of the Borough's expert, Clive Samuels & Associates, Inc. ("Clive Samuels"),[2] with respect to the SawMill Café's (the SawMill) sprinkler system.

**I. Background**

The parties and the Court are all familiar with the facts underlying this litigation. As such, they are not restated at length herein. Instead, the Court focuses on the facts relevant Plaintiff's motion to amend.

Plaintiff is the former owner and operator of an establishment located on the boardwalk in the Borough of Seaside Park called the SawMill. In this matter, Plaintiff has sued numerous individuals and entities associated with the Borough of Seaside Park, essentially claiming that these individuals and entities inappropriately engaged in tortious, fraudulent and extortionate conduct that violated Plaintiff's right to control and operate the SawMill. Plaintiff specifically asserts violations of the Equal Protection and Due Process Clauses of the 14th Amendment, the 1st Amendment, 42 U.S.C. § 1983 of the Civil Rights Act; 42 U.S.C. § 1985 of the Civil Rights Act; the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq.; and N.J. S.A. 2C:41–1 et seq. ("New Jersey RICO"), which is the New Jersey statute that prohibits racketeering activity. Many of the allegations raised by Plaintiff in this matter relate to prior, underlying legal disputes between the parties. Plaintiff now seeks to add Mr. Gannon as a defendant for the purposes of Plaintiff's constitutional claims; 42 U.S.C. §§ 1983, 1985; RICO and NJ–RICO. Plaintiff seeks to add HGM as a RICO and NJ–RICO defendant.

The Borough Defendants and Mr. Schultz oppose Plaintiff's motion to amend. While Mr. Schultz argues that Plaintiff's motion has no factual basis and also cites to Plaintiff's elevenmonth delay in bringing the instant motion to amend, the thrust of his opposition focuses on the litigation privilege, which Mr. Schultz argues immunizes Mr. Gannon and HGM from any liability. The Borough Defendants, instead, focus their opposition on Plaintiff's delay in bringing the instant motion-they claim that Plaintiff had the documents that form the basis of his proposed amendments at least eleven months before he filed the pending motion to amend-and on the prejudice that would result if Plaintiff's motion was granted at this time. In this regard, the Borough Defendants argue that granting Plaintiff's motion would be highly prejudicial

2012 WL 5989437

because (1) it would effectively require the disqualification of Mr. Schultz's attorney, Michael J. McKenna, Esq. of HGM; (2) it would require replacement counsel to be obtained for Mr. Schultz, one of the main defendants named in this case, which would not only result in a significant financial burden to the Borough Defendants' insurer, but would also cause a substantial delay in discovery; and (3) the additional delay caused by requiring Mr. Schultz to obtain replacement counsel will impose a hardship on the Borough Defendants as the additional passage of time will result in memories and recollections being further diminished, which, in light of the scope of Plaintiff's allegations, would be exceedingly problematic.

## II. Analysis

### A. Standard of Review

**\*2** Motions to amend the pleadings are governed by Rule 15(a). Pursuant to Rule 15(a)(2), leave to amend the pleadings is generally given freely. *See Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Alvin v. Suzuki,* 227 F.3d 107, 121 (3d Cir.2000). Nevertheless, the Court may deny a motion to amend where there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of the amendment." *Id.* However, where there is an absence of undue delay, bad faith, prejudice or futility, a motion for leave to amend a pleading should be liberally granted. *Long v. Wilson,* 393 F.3d 390, 400 (3d Cir.2004).

In deciding whether to grant leave to amend, "prejudice to the non-moving party is the touchstone for the denial of the amendment." *Bechtel v. Robinson,* 886 F.2d 644, 652 (3d Cir.1989) (quoting *Cornell & Co., Inc. v. Occupational Health and Safety Review Comm'n,* 573 F.2d 820, 823 (3d Cir.1978)). To establish prejudice, the non-moving party must make a showing that allowing the amended pleading would (1) require the non-moving party to expend significant additional resources to conduct discovery and prepare for trial, (2) significantly delay the resolution of the dispute, or (3) prevent a party from bringing a timely action in another jurisdiction. *See Long,* 393 F.3d at 400. Delay alone, however, does not usually justify denying a motion to amend. *See Cureton v. Nat'l Collegiate Athletic Ass'n,* 252 F.3d 267, 273 (3d Cir.2001). Rather, it is only where delay becomes "

'undue,' placing an unwarranted burden on the court, or ... 'prejudicial,' placing an unfair burden on the opposing party" that denial of a motion to amend is appropriate. *Adams v. Gould Inc.,* 739 F.2d 858, 868 (3d Cir.1984).

Further, a proposed amendment is appropriately denied where it is futile. An amendment is futile if it "is frivolous or advances a claim or defense that is legally insufficient on its face." *Harrison Beverage Co. v. Dribeck Imps., Inc.,,* 133 F.R.D. 463, 468 (D.N.J.1990) (Internal quotation marks and citations omitted). In determining whether an amendment is "insufficient on its face," the Court employs the Rule 12(b)(6) motion to dismiss standard. *See Alvin,* 227 F.3d at 121. Under Rule 12(b)(6), a motion to dismiss will be granted if the plaintiff fails to state a claim upon which relief can be granted. The United States Supreme Court set forth the standard for addressing motions to dismiss under Rule 12(b)(6) in *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). According to *Twombly,* "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, ... a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 1964–65 (citations omitted). Instead, "[f]actual allegations must be enough to raise a right to relief above the speculative level ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 1965 (citations omitted).

**\*3** In determining whether a civil complaint sufficiently states a claim for relief, the Court applies a two-part test. First, the Court must separate the factual and legal elements of a claim. While the Court must accept as true "all of the complaint's well-pleaded facts[,]" the Court "may disregard any legal conclusions." *Fowler v. UPMC Shadyside,* 578 F.3d 203, 210–211 (3d Cir.2009) (citing *Iqbal,* 129 S.Ct. at 1949). Second, the Court "must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief." *Id.* at 211 (quoting *Iqbal,* 129 S.Ct. at 1950). Merely alleging an entitlement to relief is insufficient. Instead, the complaint "has to 'show' such an entitlement with its facts." *Id.* A complaint will be dismissed unless it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 39 of 535
PageID: 31986
D'Onofrio v. Borough of Seaside Park, Not Reported in F.Supp.2d (2012)
2012 WL 5989437

that is plausible on its face." *Iqbal,* 129 S .Ct. at 1949 (quoting *Twombly,* 127 S.Ct. at 1955). Moreover, where the complaint contains allegations sounding in fraud or mistake, said allegations must be pled with particularity. Rule 9(b).

## B. Discussion

Here, Plaintiff seeks to amend his Complaint in order to add Mr. Gannon and HGM as defendants to this action. A careful review of Plaintiff's proposed Amended Complaint establishes that Plaintiff seeks to amend 68 paragraphs of his Complaint. In most cases, Plaintiff seeks to add entirely new paragraphs of allegations to his Complaint. Less frequently, Plaintiff seeks to edit the content of existing allegations. Plaintiff's proposed amendments essentially can be categorized into three different groups: (1) allegations concerning Mr. Gannon acting as a policymaker who usurped the authority of the Borough's agencies, officials, entities, officers and employees; (2) allegations concerning alleged misrepresentations Mr. Gannon made regarding the findings of Clive Samuels with respect to the SawMill's sprinkler system; and (3) allegations setting forth additional factual information relevant to Plaintiff's proposed claims against Mr. Gannon and HGM, but also relevant to Plaintiff's originally asserted claims. The Court addresses each of these three categories in turn.

## 1. Allegations Concerning Mr. Gannon Acting as a Policymaker

Through his motion to amend, Plaintiff seeks to add claims against Mr. Gannon based on the fact that he acted as a policymaker for the Borough, usurping the authority of its agencies and officials. Allegations concerning Mr. Gannon's role as policymaker for the Borough include the last sentence of ¶ 45 as well as the allegations asserted in ¶¶ 231–238; 240–242; 537–538; and 557–558 of Plaintiff's proposed Amended Complaint. Because the Court finds that these claims would be futile, the Court denies Plaintiff's request to add the aforementioned allegations.

Plaintiff's assertion that Mr. Gannon was a policymaker for the Borough is not a fact that the Court must accept to be true. Instead, that assertion represents a legal element of Plaintiff's claims, which must be supported by the facts pled in the proposed Amended Complaint. *Fowler,* 578 F.3d at 210– 211 (noting that only well-pleaded facts need be accepted as true, while legal conclusions may be disregarded). As such,

the question facing the Court is whether Plaintiff has alleged sufficient facts to support his claim that Mr. Gannon acted as a policymaker for the town. Without such facts, Plaintiff cannot plausibly seek relief against Mr. Gannon for any claims based on Mr. Gannon's alleged role as policymaker. *See Iqbal,* 129 S.Ct. at 1950 (holding that in order to survive a Rule 12(b)(6) motion to dismiss, complaint must allege facts sufficient to show that plaintiff has plausible claim for relief).

**\*4** Here, in addition to relying on certain allegations pled on "information and belief" (*see e.g.,* ¶¶ 238, 537–538 of Plaintiff's proposed Second Amended Complaint), Plaintiff essentially relies on the same facts set forth in that portion of his motion to compel dedicated to establishing that the Borough Defendants waived the attorney-client privilege over certain categories of documents based on Mr. Gannon assuming the role of *de facto* policymaker as he does in the instant motion to establish that Mr. Gannon was a policymaker for the Borough. The Court, however, already determined that those facts do not support a claim that Mr. Gannon was a *de facto* policymaker for the Borough. While the purposes of both motions differ, the Court's determination regarding whether those facts support a finding of policymaking does not.

For example, in his proposed Amended Complaint, Plaintiff relies on the following documents to establish that Mr. Gannon was a policymaker for the Borough: (1) a June 15, 2007 letter written by Mr. Gannon in partial response to a memorandum authored by Councilman Jablonski; (2) a July 12, 2007 memorandum written by Mr. Gannon regarding potential violations of ABC restrictions and possible zoning violations; (3) a July 20, 2007 letter authored by Mr. Gannon regarding the issuance of a notice of violation based on the July 13–14, 2007 performance by The Gin Blossoms at the SawMill; and (4) an August 14, 2007 letter written by Mr. Gannon concerning ABC liquor license issues related to the SawMill. Contrary to Plaintiff's claims, however, these documents are not "policy setting" documents and do not support Plaintiff's assertion that Mr. Gannon was a *de facto* policymaker for the Borough who usurped the authority of the Borough's agencies and officials. [3] Instead, as explained in detail in the Court's opinion on Plaintiff's motion to compel, these documents simply reflect Mr. Gannon performing his traditional legal functions. (*See* Memorandum Opinion of 11/7/2012 at 54–57; Docket Entry No. 231). As a result, the Court finds that even when the facts asserted by Plaintiff in his proposed Amended Complaint are taken as true, they do not support a finding that Mr. Gannon was a policymaker

for the Borough. Consequently, the Court likewise finds that Plaintiff has failed to plausibly set forth any claims against Mr. Gannon based on his alleged policymaking. Therefore, Plaintiff's proposed amendments in this regard are denied as futile. [4]

### 2. Allegations Concerning Mr. Gannon's Alleged Misrepresentations Regarding the Findings of Clive Samuels

Through his motion, Plaintiff also seeks to add allegations regarding alleged misrepresentations made by Mr. Gannon about the findings of Clive Samuels concerning the SawMill's sprinkler system. These allegations include ¶¶ 45–46; 239; the reference to Mr. Gannon in 411; 421; 424–425; 428; 431; 433–435; 441; 445; 455–458; the reference to Mr. Gannon in 459; 495–496; 504; 523; 551 and 580 of Plaintiff's proposed Amended Complaint.

**\*5** As the parties know, the Court recently rendered a decision in which it in part determined that the crime-fraud exception to the attorney-client privilege applied to the Borough Defendants' communications concerning the parties' underlying dispute over the SawMill's sprinkler system. As a result, the Court directed the Borough Defendants to produce all communications between Mr. Gannon (including all communications to/from his law firm) and any Borough official, construction or otherwise, that relate to the underlying dispute involving the SawMill's sprinkler system. (*See* Memorandum Opinion of 11/7/2012 at 43).

As the parties also know, the Borough Defendants recently filed a motion for reconsideration of the Court's decision concerning the applicability of the crime-fraud exception to the attorney-client privilege. (*See* Docket Entry No. 237). While the Court's decision concerning the applicability of the crime-fraud exception is distinct from Its decision on whether to permit Plaintiff to amend his Complaint in order to assert claims against Mr. Gannon and HGM based on the alleged misrepresentations Mr. Gannon made concerning

Clive Samuels' findings with respect to the SawMill's sprinkler system, the two decisions are related. As a result, the Court shall hold in abeyance Its decision on this aspect of Plaintiff's motion to amend pending the parties' briefing on and the Court's consideration of the Borough Defendants' motion for reconsideration.

### 3. Additional Factual Allegations Relevant to Plaintiff's Original Claims

In his motion to amend, Plaintiff seeks to add several factual allegations, which, while relevant to his proposed claims against Mr. Gannon and HGM, also appear relevant to his originally pled claims. These include ¶¶ 246; 396; 399–406; 408–410; the majority of 411; 412; 413 [5]; the subparagraphs of 414; 419–420; 422–423; 426; 429–430; 438–440; 442; 444; and the change of date in 459. [6] While Plaintiff did not specifically seek permission to amend his Complaint in order to add allegations in further support of his originally pled claims, the Court finds no reason to disallow these amendments. The addition of the above-referenced paragraphs are not futile and do not appear to be the product of bad faith. Further, there is no evidence that the addition of these allegations will unfairly prejudice either the Borough Defendants or Mr. Schultz. As a result, under the liberal standards set forth in Rule 15, the Court shall permit Plaintiff to make the aforementioned amendments.

### III. Conclusion

For the reasons stated above, Plaintiff's motion to amend is GRANTED in part and DENIED in part. In light of the fact that the Court has held in abeyance Its decision on certain aspects of Plaintiff's motion to amend, Plaintiff is directed to refrain from filing an Amended Complaint at this time and to await further instructions by the Court. An appropriate Order follows.

### All Citations

Not Reported in F.Supp.2d, 2012 WL 5989437

### Footnotes

1    The term the "Borough Defendants" refers collectively to: the Borough of Seaside Park; Former Mayor Robert W. Matthies; Mayor Thomas E. Connors; the Seaside Park Borough Council; Susan Maday; Maryanne

Palmisano; John "Jack" Moyse; Benjamin J. Kaiser; Sharon Pratico; Nancy Koury; James Jablonski; Robert Brennan; John Coughlin; Seaside Park Police Department; William A. Beining, III; Edward C. Dickson; Daniel Fitzgerald; Lt. Francis Murphy Larkin; James Leone; Brian McKay; Stephen Shadiack; Brian Jankowski; Seaside Park Municipal Planning Board; Faith Liguori; Kathleen Hughes; Anthony DiCaro; Robert Bellantoni; Seaside Park Municipal Zoning Board; Andrew Sbordone; Martin Wilk, Jr.; Kenneth Deshay; Michael Giuliano; Francis Losey; Michael Tierny; Raymond Sites; Geoffrey N. Schwartz; Seaside Park Code Enforcement Department; James Anderson; Robert Nora; Rejean Laliberte; Gary Swirczynski; Richard Barbarise; and Charles Hollins.

2    While Plaintiff contends that Clive Samuels was a neutral, independent, third-party expert appointed by the New Jersey Superior Court to evaluate the SawMill's sprinkler system, the Court has already determined that Clive Samuels was the Borough Defendants' expert. (*See* Memorandum Opinion of 5/30/12 at 18; Docket Entry No. 195).

3    The Court notes that in reviewing a motion to dismiss, and thus also in determining whether a proposed amendment is futile, "a court may consider the allegations of the complaint, as well as documents attached to or specifically referenced in the complaint, and matters of public record." *Wittorff v. Bank of America, N.A., Civil Action No. 12–4197(SRC) 2012 WL 5867124, *1 (D.N.J. Nov.19, 2012)*

4    Plaintiff's allegations made on "information and belief" do nothing to change this result as Plaintiff's proposed Amended Complaint does not contain sufficient factual information to support the allegations so pled. This is especially true in the context of Plaintiff's claims against Mr. Gannon sounding in fraud as such claims must be pled with particularity.

5    The Court notes that Plaintiff does not indicate that any changes were made to ¶ 413 of the proposed Amended Complaint. However, the Court's review indicates that the date was changed from October 4, 2006 to October 5, 2006. (*See* ¶ 395 Original Verified Complaint).

6    While not noted in Plaintiff's proposed Amended Complaint, the date in ¶ 459 appears to have been changed from July 14, 2007 in ¶ 416 of Plaintiff's Original Verified Complaint to July 17, 2007.

---

**End of Document**      © 2021 Thomson Reuters. No claim to original U.S. Government Works.

TAB 5

*Dougan v. Sikorsky Aircraft Corp.*, 2020 WL 5521391 (Conn.  Sep. 14, 2020)

337 Conn. 27
Supreme Court of Connecticut.

Danny DOUGAN

v.

SIKORSKY AIRCRAFT CORPORATION et al.

(SC 20271)
|
Argued December 18, 2019
|
Officially released September 14, 2020 [**]

**Synopsis**

**Background:** Workers exposed to asbestos while working on manufacturer's cogeneration project brought class action against manufacturer and the project's general contractor, asserting claims for negligence, battery, recklessness, and strict liability for violations of the federal Clean Air Act, as well as seeking compensatory damages, punitive damages, and the establishment of a "court monitoring fund" for payment of medical monitoring of asbestos related diseases. The Superior Court, Hartford County, Ingrid L., Moll, J., 2017 WL 7806431, granted summary judgment for defendants, and workers appealed.

**Holdings:** The Supreme Court, Robinson, C.J., held that:

[1] workers could not recover for medical monitoring in the absence of any expert testimony as to whether any of them suffered from a subcellular change that substantially increased his or her risk of disease; and

[2] summary judgment affidavit of workers' expert was insufficient to overcome summary judgment.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

West Headnotes (17)

**[1]** **Judgment** 🔑 Presumptions and burden of proof

In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. Conn. Practice Book § 17-45.

**[2]** **Judgment** 🔑 Presumptions and burden of proof

The party seeking summary judgment has the burden of showing the absence of any genuine issue of material facts which, under applicable principles of substantive law, entitle him to a judgment as a matter of law. Conn. Practice Book § 17-45.

**[3]** **Judgment** 🔑 Presumptions and burden of proof

The party opposing a motion for summary judgment must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact. Conn. Practice Book § 17-45.

**[4]** **Judgment** 🔑 Absence of issue of fact

A "material fact," for purposes of a summary judgment motion, is a fact which will make a difference in the result of the case. Conn. Practice Book § 17-45.

**[5]** **Appeal and Error** 🔑 Plenary, free, or independent review

The scope of review of the trial court's decision to grant the plaintiff's motion for summary judgment is plenary. Conn. Practice Book § 17-45.

**[6]** **Judgment** 🔑 Presumptions and burden of proof

When documents submitted in support of a motion for summary judgment fail to establish that there is no genuine issue of material fact, the nonmoving party has no obligation to submit

documents establishing the existence of such an issue. Conn. Practice Book § 17-45.

**[7]** **Judgment** 🔑 Presumptions and burden of proof

**Judgment** 🔑 Weight and sufficiency

Once the party moving for summary judgment has met its burden of showing the absence of any genuine issues of material fact which would entitle him to a judgment as a matter of law, the opposing party must present evidence that demonstrates the existence of some disputed factual issue; it is not enough, however, for the opposing party merely to assert the existence of such a disputed issue. Conn. Practice Book § 17-45.

**[8]** **Judgment** 🔑 Weight and sufficiency

Mere assertions of fact are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court on a motion for summary judgment. Conn. Practice Book § 17-45.

**[9]** **Damages** 🔑 Medical treatment and care of person injured

Medical monitoring, either in the form of damages or as a stand-alone cause of action, allows a plaintiff to recover the cost of diagnostic testing for an injury that may occur in the future as a result of a defendant's tortious conduct.

**[10]** **Damages** 🔑 Expenses

Even assuming that Connecticut law recognized a claim for medical monitoring as independent cause of action, workers allegedly exposed to asbestos when working on manufacturers cogeneration project could not recover against manufacturer or project's general manager for medical monitoring in the absence of any expert testimony as to whether any of them suffered from a subcellular change that substantially increased his or her risk of disease, or as to

whether early detection, combined with prompt and effective treatment, would have significantly decreased the risk of death or the severity of the disease, illness or injury, and that such diagnostic medical examinations would have been reasonably and periodically necessary, conformably with the standard of care.

1 Cases that cite this headnote

**[11]** **Judgment** 🔑 Torts

If a plaintiff lacks expert testimony to prove a medical monitoring claim, summary judgment should be granted. Conn. Practice Book § 17-45.

**[12]** **Damages** 🔑 Medical treatment and care of person injured

Requiring each plaintiff bringing a claim for medical monitoring to prove "reasonable necessity" is vital, because if such monitoring is unnecessary, recovery would be unwarranted.

**[13]** **Damages** 🔑 Expenses

It is for the trier of fact to decide, on the basis of competent medical testimony, whether and to what extent the particular plaintiff's exposure to toxic chemicals in a given situation justifies future periodic medical monitoring.

**[14]** **Damages** 🔑 Expenses

Expert testimony limited to generally informing lay jurors about the scientific correlation between asbestos exposure and the onset of asbestos related diseases, is inadequate to support a medical monitoring claim as a matter of law; in the absence of expert testimony demonstrating the necessity of future testing, a fact finder would be unable to accurately conclude whether a plaintiff should recover for medical monitoring.

**[15]** **Damages** 🔑 Medical treatment and care of person injured

**Damages** 👉 **Expenses**

Asbestos exposure alone does not provide a basis for recovery on a claim for medical monitoring, and proof of reasonable necessity, through expert testimony, provides an important check on medical monitoring.

[16]   **Damages** 👉 **Expenses**

Expert testimony as to the likelihood of contracting a disease due to exposure to a toxic substance is not necessary to support a medical monitoring claim.

[17]   **Judgment** 👉 **Torts**

Summary judgment affidavit of workers' expert, offered in opposition to manufacturer's and general contractor's summary judgment motion with regard to workers' medical monitoring claims, was insufficient to establish that there was no genuine issue of material fact as to whether medical monitoring was reasonably necessary for workers who had been exposed to asbestos, because the affidavit did not offer an opinion as to workers, individually or as a group, and therefore, was insufficient to overcome summary judgment.

**Attorneys and Law Firms**

Keith Yagaloff, South Windsor, for the appellants (plaintiffs).

John W. Cerreta, with whom was James H. Rotondo, Hartford, for the appellees (named defendant et al.).

Robinson, C. J., and Palmer, McDonald, D'Auria, Mullins, Kahn and Ecker, Js. [*]

**Opinion**

ROBINSON, C. J.

**\*\*1** **\*28** This appeal requires us to consider the proof necessary to establish a claim for medical monitoring, the availability of which is a question of first impression under Connecticut law. The plaintiffs Philip Badorek, Michael

Daley, William Grem IV, and Fred Ferrara [1] appeal from the judgment of the trial court rendered in favor of the defendants Sikorsky Aircraft **\*29** Corporation (Sikorsky) and Carrier Corporation (Carrier) [2] on their medical monitoring claims, which stemmed from a workplace asbestos exposure at Sikorsky's cogeneration project in Stratford. On appeal, [3] the plaintiffs claim that the trial court improperly granted the defendants' motion for summary judgment because (1) a genuine issue of material fact exists with respect to the issue of physical injury because the plaintiffs each currently suffer from a subclinical injury as a result of asbestos exposure, and (2) Connecticut law permits a cause of action [4] for medical monitoring. We conclude that the trial court properly granted the defendants' motion for summary judgment, albeit on alternative grounds, because, even if we were to recognize a medical monitoring claim in the absence of any physical manifestation of injury under Connecticut law, the plaintiffs nevertheless failed to establish a genuine issue of material fact as to certain elements of the claim, in particular, whether the provision of medical monitoring is reasonably necessary for them. Accordingly, we affirm the judgment of the trial court.

**\*\*2** **\*30** The record reveals the following undisputed relevant facts and procedural history. In September, 2009, Sikorsky began work on a cogeneration project at its manufacturing facilities in Stratford. Sikorsky hired Carrier as the general contractor responsible for the project, which involved building a new cogeneration plant and renovating Sikorsky's existing boiler house. Three of the plaintiffs, Badorek, Daley, and Grem, were employed by B-G Mechanical Contractors, Inc. (B-G Mechanical), one of Carrier's subcontractors on the cogeneration project. B-G Mechanical employees were responsible for removing pipe from Sikorsky's boiler house. As a result, these plaintiffs were present at various times at the site from March, 2010, to July, 2010. The fourth plaintiff, Ferrara, was employed by Tucker Mechanical, Inc., another subcontractor, and was present on site for a period of time in March, 2010. [5]

At some point during the project, some workers began to complain of sore throats. Then, on July 7 or 8, 2010, a B-G Mechanical employee discovered what he believed to be asbestos present in the boiler house. Sikorsky then performed testing that confirmed the presence of asbestos in the boiler house and in an exterior dumpster. As a result, Sikorsky halted the project on or about July 23, 2010, in order to remediate the asbestos. The plaintiffs asserted in their complaint that Sikorsky was aware of the presence of asbestos in the boiler

337 Conn. 27, 2020 WL 5521391

house before work on the project began. In response, Sikorsky admitted that, after performing surveys in 2001 and 2008, asbestos had been discovered in a small amount of pipe insulation in the boiler house basement but averred that the Sikorsky employees in **\*31** charge of the cogeneration project were unaware of this fact.

The named plaintiff, Danny Dougan; see footnote 1 of this opinion; brought a class action complaint in May, 2012, against Sikorsky, Carrier, and URS Corporation AES (URS). [6] The operative complaint, filed on April 1, 2013, includes claims of negligence, battery, recklessness, and strict liability for violations of the federal Clean Air Act, 42 U.S.C. § 7401 et seq., on behalf of Dougan, Grem, Daley, Badorek, and Ferrara individually, as well as "all others similarly situated who were exposed to asbestos while working at the [Sikorsky cogeneration project in Stratford] from the period of approximately March, 2010, to mid-July, 2010, and who are now seeking to pursue remedies for said exposure." The plaintiffs sought compensatory damages, punitive damages, the costs of medical monitoring, and the establishment of a "court monitored fund" for the payment of medical monitoring of asbestos related diseases. [7]

**\*\*3 \*32** In March, 2016, Carrier and Sikorsky moved for summary judgment on all counts of the plaintiffs' complaint. [8] The defendants contended that the plaintiffs had not suffered actual injuries and, instead, sought medical monitoring for a risk of future injury, which they claimed is not a cognizable claim under Connecticut law. Specifically, they argued that (1) the court should not recognize a remedy for medical monitoring based on exposure alone, (2) even under the plaintiffs' theory of recovery, summary judgment is appropriate because Dougan could not prove that his need for medical monitoring resulted from asbestos exposure, and because the other four plaintiffs failed to produce any expert testimony demonstrating their need for medical monitoring, and (3) certain claims failed as a matter of law, specifically, the plaintiffs' claims for battery, strict liability, and punitive damages. The defendants filed numerous exhibits in support of their motion, including excerpts of deposition transcripts of the plaintiffs' two medical experts, M. Saud Anwar and Oyebode Taiwo, and the defendants' medical expert, Barry W. Levine. Levine's deposition testimony discussed his examination of Dougan and the general effects of asbestos exposure, including the long latency period before asbestos related diseases manifest. In their depositions, both Anwar and Taiwo stated that they had not formed any opinions regarding the claims

of Grem, Badorek, Daly, or Ferrara. Additionally, Anwar acknowledged that "a significant percentage of people who are exposed to and inhale asbestos ... never develop clinical symptoms ...."

The plaintiffs filed an objection to the summary judgment motion, contesting the defendants' characterization **\*33** of their knowledge of the presence of asbestos, the current status of the law of medical monitoring, and the public policy reasons against extending liability. Along with their objection, the plaintiffs included an affidavit from Anwar. Anwar's three page affidavit specifically addressed his treatment of Dougan and concluded that Dougan suffered from a "significantly increased risk of contracting a serious disease," and also discussed generally the risks of asbestos, such as the injuries asbestos fibers cause to a person's lungs when inhaled. Additionally, the affidavit stated that "[o]ther individuals who were exposed to asbestos during the demolition work at Sikorsky should be monitored for the early detection and intervention of an asbestos related disease ...." The plaintiffs also submitted other exhibits concerning the presence of asbestos at Sikorsky and the defendants' actions surrounding the incident, but they provided no further expert testimony.

On March 28, 2017, the trial court granted the defendants' motion for summary judgment. See footnote 8 of this opinion. In its memorandum of decision, the trial court reviewed the evidence in the record and determined that no expert had examined or reviewed the medical records of any of the plaintiffs other than Dougan and that all of the plaintiffs admitted that they had not been diagnosed with an asbestos related disease, specifically, "mesothelioma, lung cancer, asbestosis, or pleural effusions." As a result, the trial court determined that the plaintiffs had not presented evidence demonstrating a genuine issue of material fact as to physical injury. The trial court then applied the public policy test outlined in 🔲 *Lawrence* v. *O & G Industries, Inc.*, 319 Conn. 641, 650–51, 126 A.3d 569 (2015), and declined to recognize a cause of action for medical monitoring under Connecticut law that would allow recovery for an increased risk of future injury rather **\*34** than a present injury. Accordingly, the court granted the defendants' motion for summary judgment, vacated the class certification order, and rendered judgment for the defendants on the remaining counts. See footnotes 7 and 8 of this opinion. The trial court later denied the plaintiffs' motion for reargument or reconsideration. This appeal followed. See footnotes 1 and 3 of this opinion.

On appeal, the plaintiffs argue that the trial court incorrectly concluded that medical monitoring claims in the absence of clinical symptoms should not be permitted under Connecticut tort law. The plaintiffs further argue that the trial court incorrectly determined that there was no genuine dispute of material fact as to their injuries because they suffer from subclinical injuries as a result of their asbestos exposure. In response, the defendants counter that the trial court properly declined to create a medical monitoring remedy for asymptomatic plaintiffs exposed to toxic substances in the absence of physical harm. As an alternative ground for affirming the judgment of the trial court, the defendants argue that, even if this court were to recognize medical monitoring as a cause of action, the plaintiffs' claims would still fail because they are not supported by "reliable, scientific evidence ...."[9] We agree with the defendants that, even if we were to recognize a remedy in Connecticut for medical monitoring in the absence of the present manifestation of physical harm, the plaintiffs' claims would still fail as a matter of law because **35** the plaintiffs failed to prove that monitoring was medically necessary.

**\*\*4** **[1]** **[2]** **[3]** **[4]** **[5]** We first set forth the applicable standard of review. "Practice Book [§ 17-49] provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. ... In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. ... The party seeking summary judgment has the burden of showing the absence of any genuine issue [of] material facts which, under applicable principles of substantive law, entitle him to a judgment as a matter of law ... and the party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact. ... A material fact ... [is] a fact which will make a difference in the result of the case. ... Finally, the scope of our review of the trial court's decision to grant the plaintiff's motion for summary judgment is plenary." (Internal quotation marks omitted.) Stuart v. Freiberg, 316 Conn. 809, 820–21, 116 A.3d 1195 (2015).

**[6]** **[7]** **[8]** "When documents submitted in support of a motion for summary judgment fail to establish that there is no genuine issue of material fact, the nonmoving party has no obligation to submit documents establishing the existence of such an issue. ... Once the moving party has met its burden, however, the opposing party must present evidence

that demonstrates the existence of some disputed factual issue. ... It is not enough, however, for the opposing party merely to assert the existence of such a disputed issue. Mere assertions of fact ... are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court under Practice Book [§ 17-45] ...." (Internal quotation marks omitted.) **\*36** State Farm Fire & Casualty Co. v. Tully, 322 Conn. 566, 573, 142 A.3d 1079 (2016).

I

**[9]** We begin our analysis with a review of the medical monitoring claim. Medical monitoring, either in the form of damages or as a stand-alone cause of action; see footnote 4 of this opinion; allows a plaintiff to recover the cost of diagnostic testing for an injury that may occur in the future as a result of a defendant's tortious conduct.[10] See, e.g., Metro-North Commuter Railroad Co. v. Buckley, 521 U.S. 424, 438, 117 S. Ct. 2113, 138 L. Ed. 2d 560 (1997) (defining medical monitoring as "the economic cost of the extra medical checkups that [the plaintiff] expects to incur as a result of his exposure to [toxins]"). Given the nature of the relief provided by medical monitoring and the prevalence of these claims in the world of toxic torts,[11] the central issue in such cases is whether to permit medical monitoring in the absence of some present manifestation of a physical injury. Although medical monitoring is no longer a novel theory of recovery in many states, whether such recovery is permitted in Connecticut is still an open question of law. See Doe v. Stamford, 241 Conn. 692, 699–700 n.8, 699 A.2d 52 (1997) (discussing **\*37** medical monitoring test outlined in In re Paoli Railroad Yard PCB Litigation, 916 F.2d 829, 852 (3d Cir. 1990), cert. denied sub nom. General Electric Co. v. Knight, 499 U.S. 961, 111 S. Ct. 1584, 113 L. Ed. 2d 649 (1991), but noting that neither party requested its adoption in workers' compensation law); see also McCullough v. World Wrestling Entertainment, Inc., 172 F. Supp. 3d 528, 567 (D. Conn. 2016) (discussing how "[f]ew Connecticut courts" have considered viability of stand-alone medical monitoring claims), aff'd in part and appeal dismissed in part sub nom. Haynes v. World Wrestling Entertainment, Inc., United States Court of Appeals, Docket No. 18-3322, 827 Fed.Appx. 3, 2020 WL 5406410 (Con) (2d Cir. 2020). Given that medical monitoring claims present an issue of first impression in

Dougan v. Sikorsky Aircraft Corporation, --- A.3d ---- (2020)

337 Conn. 27, 2020 WL 5521391

Connecticut, we begin with a detailed review of the federal and sister state precedents considering these claims.

**\*\*5** In the 1980s and 1990s, state and federal courts began permitting medical monitoring recovery in toxic exposure cases in the absence of a manifestation of present physical injury, as in the seminal case of *Ayers* v. *Jackson*, 106 N.J. 557, 604–606, 525 A.2d 287 (1987). See, e.g., *In re Paoli Railroad Yard PCB Litigation*, supra, 916 F.2d at 850–52; *Burns* v. *Jaquays Mining Corp.*, 156 Ariz. 375, 380, 752 P.2d 28 (App. 1987), review dismissed, 162 Ariz. 186, 781 P.2d 1373 (1989); *Potter* v. *Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 1007–1009, 863 P.2d 795, 25 Cal. Rptr. 2d 550 (1993); *Hansen* v. *Mountain Fuel Supply Co.*, 858 P.2d 970, 977–78 (Utah 1993). These cases were often supported by the reasoning of an earlier medical monitoring case, *Friends for All Children, Inc.* v. *Lockheed Aircraft Corp.*, 746 F.2d 816, 819, 822, 838 (D.C. Cir. 1984), in which the United States Court of Appeals for the District of Columbia Circuit upheld the creation of a medical monitoring fund for children who suffered from a "neurological development disorder" after a plane crash. [12]

**\*38** Subsequently, in 1997, the United States Supreme Court rejected a medical monitoring cause of action under federal law in *Metro-North Commuter Railroad Co.* v. *Buckley*, supra, 521 U.S. at 444, 117 S.Ct. 2113. In that case, an asymptomatic plaintiff requested lump sum damages under the Federal Employers' Liability Act, 45 U.S.C. § 51 et seq., after he was exposed to asbestos during his duties as a railroad employee. *Id., at 426–27, 117 S. Ct. 2113.* The court considered earlier cases that permitted asymptomatic medical monitoring recovery under state law and noted that those cases imposed certain "integral" restrictions on a plaintiff's case, such as limiting recovery through the establishment of a court administered fund. *Id., at 440–41, 444, 117 S. Ct. 2113.* The court then outlined several policy considerations that weighed against the recognition of this claim, namely, the substantial number of potential plaintiffs who have been exposed to toxic substances, along with the high costs of monitoring. *Id., at 442, 117 S. Ct. 2113.* But, in light of these conflicting policy concerns and the inadequate support in the common law, the court declined to create "a new, full-

blown, tort law cause of action" under the federal statute being considered. *Id., at 443, 117 S. Ct. 2113.*

State appellate courts have been divided in the wake of *Buckley* with respect to whether to permit recovery for medical monitoring in the absence of the manifestation of a physical injury under their states' respective laws. [13] See V. Schwartz & C. Silverman, " **\*39** The Rise of 'Empty Suit' Litigation:™ Where Should Tort Law Draw the Line?," 80 Brook. L. Rev. 599, 620 (2015) (discussing how, after *Buckley*, courts rejected claims for medical monitoring, but, recently, "the pendulum briefly swung back toward permitting medical monitoring claims"); H. Zarov et al., "A Medical Monitoring Claim for Asymptomatic Plaintiffs: Should Illinois Take the Plunge?," 12 DePaul J. Health Care L. 1, 2 (2009) ("[M]ost courts addressing the issue since *Buckley* have rejected claims for medical monitoring absent physical injury. Nevertheless, a few courts have issued post-*Buckley* decisions adopting claims for medical monitoring, while other courts have continued to implement pre-*Buckley* decisions. Thus, although there is a clear trend against the recognition of medical monitoring claims, the debate is far from over.").

**\*\*6** A challenging issue presented by the plaintiffs' claims in this case is determining the nature of the harm, if any, caused by their exposure to asbestos. Past plaintiffs have sought medical monitoring for a variety of **\*40** injuries, ranging from toxins present in their blood [14] to traumatic brain injuries. [15] The plaintiffs in the present case claim that their asbestos exposure caused them to suffer a subclinical injury, which is one that is "not detectable or [that is] producing effects that are not detectable by the usual clinical tests ...." Merriam-Webster's Collegiate Dictionary (11th Ed. 2011) p. 1242; accord Webster's New Complete Medical Dictionary (1995) p. 667. Relying on *Donovan* v. *Philip Morris USA, Inc.*, 455 Mass. 215, 914 N.E.2d 891 (2009), the plaintiffs contend specifically that the trial court incorrectly determined that their subclinical injuries were not actual injuries because, once they were exposed to asbestos at the Sikorsky project, the asbestos fibers entered their lungs and damaged their cells, creating a "preclinical stage of disease."

They ask us to adopt the legal framework from *Donovan* to govern medical monitoring claims arising from subclinical injuries.

In *Donovan*, the Supreme Judicial Court of Massachusetts considered a certified question from a federal district court asking whether "the plaintiffs' suit for medical monitoring, based on subclinical effects of exposure to cigarette smoke and increased risk of lung cancer, state[d] a cognizable claim and/or permit[ted] a remedy under Massachusetts state law ...." (Internal quotation marks omitted.) Id., at 215–16, 914 N.E.2d 891. The plaintiffs, a proposed class of Marlboro cigarette smokers, argued that the defendant had "wrongfully designed, marketed, and sold" its cigarettes and requested a "court-supervised program" for medical monitoring, specifically, of "low-dose computed tomography ... scans of the chest" to screen for lung cancer. Id., at 216–17, 914 N.E.2d 891. The plaintiffs alleged that, because they had used the defendant's *41 defective products, they suffered "objectively observable and identifiable damage to the tissues and structures of their lungs" and, as a result, are at a "substantially increased risk of cancer ...." Id., at 221, 914 N.E.2d 891.

The Massachusetts high court accepted the plaintiffs' theory of harm and recognized a stand-alone medical monitoring cause of action for the plaintiffs' subclinical injuries under Massachusetts law. Id., at 226–27, 914 N.E.2d 891. The court reasoned that, just as a shaken baby would be able to recover expenses for diagnostic testing to determine if she had suffered a brain injury, so, too, should the plaintiffs, as they "have produced sufficient proof of 'impact' ... to safeguard against false claims: they have proffered evidence of physiological changes caused by smoking, and they have proffered expert medical testimony that, because of these physiological changes, they are at a substantially greater risk of cancer due to the negligence of Philip Morris." (Citation omitted.) Id., at 224–25, 914 N.E.2d 891. The court discussed the importance of subcellular changes, stating that such "changes may occur which, in themselves, are not symptoms of any illness or disease, but are warning signs to a trained physician that the patient has developed a condition that indicates a substantial increase in risk of contracting a serious illness or disease and thus the patient will require periodic monitoring." Id., at 225, 914 N.E.2d 891. The court in *Donovan* distinguished the facts of that case from those in "cases that involve exposure to levels of chemicals or radiation known to cause cancer, for which immediate medical monitoring may be medically necessary although no

symptoms or subclinical changes have occurred." (Emphasis omitted.) Id. Because the record in *Donovan* presented evidence of subcellular change indicating an increased risk of cancer, the plaintiffs had adequately demonstrated injury.

**7 The Massachusetts court outlined the following standard for its medical monitoring cause of action, requiring *42 that "each plaintiff" prove that "(1) [t]he defendant's negligence (2) caused (3) the plaintiff to become exposed to a hazardous substance that produced, at least, subcellular changes that substantially increased the risk of serious disease, illness, or injury (4) for which an effective medical test for reliable early detection exists, (5) and early detection, combined with prompt and effective treatment, will significantly decrease the risk of death or the severity of the disease, illness or injury, and (6) such diagnostic medical examinations are reasonably (and periodically) necessary, conformably with the standard of care, and (7) the present value of the reasonable cost of such tests and care, as of the date of the filing of the complaint." Id., at 226, 914 N.E.2d 891. In addition, the court stated that proof of these elements "usually will require competent expert testimony." Id., at 227, 914 N.E.2d 891.

II

[10] Having reviewed the background law governing medical monitoring claims, we now turn to the plaintiffs' claims in the present appeal. We begin by setting forth several assumptions that underlie our analysis. First, we will assume, without deciding, that Connecticut law recognizes a claim for subclinical cellular injury that substantially increased the plaintiffs' risk of cancer and other asbestos related diseases. [16] Second, we also *43 assume, without deciding, that the *Donovan* elements govern proof of a medical monitoring claim. Finally, we assume that the plaintiffs raised a genuine dispute of material fact as to whether they were negligently exposed to asbestos during the Sikorsky project. We nevertheless conclude that the trial court properly granted the defendants' motion for summary judgment because the plaintiffs have not established the existence of a genuine issue of material fact as to certain *Donovan* factors. [17] See, e.g., *44 Stuart v. Freiberg, supra, 316 Conn. at 823, 116 A.3d 1195 ("a plaintiff may properly be called upon at the summary judgment stage to demonstrate that he possesses

sufficient counterevidence to raise a genuine issue of material fact as to any, or even all, of the essential elements of his [claim]").

**8** **[11]** Courts, including the one in *Donovan*, generally require competent expert testimony to prove a medical monitoring claim or remedy. See, e.g., *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 448 (2d Cir. 2013) ("[a]ll of the [previously discussed] states that recognized a medical monitoring cause of action noted that such a claim cannot be established without reliable expert testimony");

*In re Paoli Railroad Yard PCB Litigation*, supra, 916 F.2d at 852 (requiring competent expert testimony to establish medical monitoring cause of action); *Donovan v. Philip Morris USA, Inc.*, supra, 455 Mass. at 227, 914 N.E.2d 891 ("[p]roof of [the *Donovan*] elements usually will require competent expert testimony"); *Ayers v. Jackson*, supra, 106 N.J. at 606, 525 A.2d 287 (requiring "reliable expert testimony" to recover medical surveillance damages); *Hansen v. Mountain Fuel Supply Co.*, supra, 858 P.2d at 979 n.10 ("[p]roof of [the *Donovan*] elements will usually require expert testimony"). As a result, if a plaintiff lacks expert testimony to prove a medical monitoring claim, summary judgment should be granted. See *Bozelko v. Papastavros*, 323 Conn. 275, 282, 147 A.3d 1023 (2016) ("[s]ummary judgment in favor of a defendant is proper when expert testimony is necessary to prove an essential element of the plaintiff's case and **\*45** the plaintiff is unable to produce an expert witness to provide such testimony").

The defendants argue that the plaintiffs "have totally failed to provide expert evidence establishing their need for medical monitoring as a result of asbestos exposure at Sikorsky." The plaintiffs do not dispute that Anwar, their expert witness, has not provided any testimony as to any of them specifically, but they argue that they nevertheless have presented sufficient expert evidence to survive summary judgment. According to the plaintiffs, "the court [in *Donovan*] did not state that the plaintiffs needed to offer expert medical evidence that spoke to the plaintiffs' specific conditions; instead, the court accepted general expert evidence that attested to the undifferentiated effects that cigarette smoking [has] on any smoker, including the plaintiffs." Additionally, the plaintiffs assert only that "expert evidence must be used to generally inform lay jurors about the scientific correlation between asbestos exposure and the onset of asbestos related diseases."

Finally, "the plaintiffs aver that the experts should not form any opinions about the plaintiffs' exposure and their need for medical monitoring or the likelihood of contracting diseases because that function should be reserved [for] the trier of fact."

We disagree with the plaintiffs that the *Donovan* court's acceptance of "general expert advice" assists this inquiry, as that court was considering whether the parties had stated a claim for medical monitoring on a motion to dismiss, not whether the plaintiffs' claims could ultimately survive summary judgment. See *Donovan v. Philip Morris USA, Inc.*, supra, 455 Mass. at 217, 221, 914 N.E.2d 891. Accordingly, we will look to the requirements of other courts reviewing this issue, including those cited with approval in *Donovan*.

The third *Donovan* factor requires a plaintiff to demonstrate that he or she suffers from a subcellular change **\*46** that substantially increases his or her risk of disease. *Id.*, at 226, 914 N.E.2d 891. A Massachusetts federal district court recently considered whether expert testimony sufficiently demonstrated subcellular change on a motion for summary judgment. See *Genereux v. Hardric Laboratories, Inc.*, 950 F. Supp. 2d 329 (D. Mass. 2013), aff'd, 754 F.3d 51 (1st Cir. 2014). The defendant in *Genereux* argued that the plaintiffs would be unable to succeed at trial under *Donovan* because the plaintiffs' expert had "testified that he cannot state, with reasonable medical certainty, that any plaintiff has suffered subcellular change." *Id.*, at 333. The plaintiffs' expert concluded only that "some number of persons will have cellular changes in the blood or lung cells" and "did not state that any specific plaintiff or plaintiffs have suffered beryllium-related subcellular change." (Internal quotation marks omitted.) *Id.*, at 336. The court concluded that "*each plaintiff* must submit sufficient admissible evidence to permit a reasonable fact finder to find that he or she has suffered subcellular change." (Emphasis added.) *Id.*, at 340. Because the plaintiffs had failed to do so, the court rendered summary judgment for the defendant.

*Id.*, at 341; see also *Exxon Mobil Corp. v. Albright*, 433 Md. 303, 385, 71 A.3d 30 ("[W]e conclude that quantifiable, reliable indicia that a defendant's actions have so increased significantly the plaintiff's risk of developing a disease are necessary to recover damages for medical monitoring costs. The indicia may be proven by a medical expert's testimony,

*particularized to a plaintiff,* and demonstrating a reasonable link to toxic exposure." (Emphasis added.)), cert. denied, 571 U.S. 1045, 134 S. Ct. 648, 187 L. Ed. 2d 449 (2013). [18]

**\*9  \*47** The expert affidavit in the present case is ambiguous at best about whether each plaintiff actually suffered subcellular harm that substantially increased his risk of injury. [19] Anwar does aver that "[a]sbestos fibers are readily inhaled into the lungs where the fibers cause changes at [the] cellular level." But the affidavit does not state specifically that Grem, Ferrara, Daley, and Badorek have themselves suffered subcellular change that substantially increased their risk of serious disease, illness, or injury. As a result, it is unclear whether Anwar is concluding that all persons necessarily suffer harmful subcellular change as soon as they are exposed to asbestos, as the plaintiffs in 📙 *Donovan* established with respect to cigarette smoke after the case returned to the federal court or, instead, that one can inhale asbestos and only possibly suffer subcellular change that **\*48** "substantially increase[s] the risk of serious disease, illness, or injury ...." 📙 *Donovan* v. *Philip Morris USA, Inc.,* supra, 455 Mass. at 226, 914 N.E.2d 891; see also 📙 *Donovan* v. *Philip Morris USA, Inc.,* 268 F.R.D. 1, 16 (D. Mass. 2010) ("Indeed, subcellular harm, according to [the] plaintiffs, begins as soon as someone takes a single puff. ... While the extent of the damage and risk may vary among class members, *allegedly twenty pack-years of smoking necessarily causes subcellular harm....* I find their expert affidavits and depositions ... sufficient on this point for class certification purposes." (Citations omitted; emphasis altered; footnote omitted.)). This ambiguity alone does not defeat summary judgment, however, because we construe the evidence in the light most favorable to the nonmoving party, and, therefore, we will read Anwar's conclusions about subcellular harm as applicable to all of the plaintiffs.

Nevertheless, we conclude that the plaintiffs have failed to present sufficient evidence as to certain other factors under 📙 *Donovan,* specifically, that "early detection, combined with prompt and effective treatment, will significantly decrease the risk of death or the severity of the disease, illness or injury," and that "such diagnostic medical examinations are reasonably (and periodically) necessary, conformably with the standard of care ...." 📙 *Donovan* v. *Philip Morris USA, Inc.,* supra, 455 Mass. at 226, 914 N.E.2d 891; see *In re Marine Asbestos Cases,* 265 F.3d 861, 867–68 (9th Cir. 2001) (upholding summary judgment for defendants

because plaintiffs did not "present sufficient evidence to raise a genuine issue of material fact as to the reasonableness and necessity" of medical monitoring, as plaintiffs "submitted no evidence that a single examination would yield any clinical benefit," and their expert affidavit "did not explain how patients would benefit from the single, baseline examination that [the] plaintiffs seek").

**\*49** When discussing the expert testimony requirement in 📙 *Donovan,* the Massachusetts Supreme Judicial Court cited the Utah Supreme Court's decision in 📙 *Hansen* v. *Mountain Fuel Supply Co.,* supra, 858 P.2d at 970. See 📙 *Donovan* v. *Philip Morris USA, Inc.,* supra, 455 Mass. at 227, 914 N.E.2d 891. In 📙 *Hansen,* the Utah Supreme Court reversed the trial court's grant of summary judgment on the plaintiffs' medical monitoring claims and discussed the elements that a plaintiff must prove to establish such a claim. 📙 *Hansen* v. *Mountain Fuel Supply Co.,* supra, at 972, 979. Although the 📙 *Donovan* elements are not identical to those in 📙 *Hansen,* there is significant overlap and, as such, we look to the explanation in 📙 *Hansen* of how to prove medical necessity. [20]

**[12]**  The court in 📙 *Hansen* stated: "It also must be shown that administration of the [medical] test *to a specific plaintiff is medically advisable for that plaintiff.* To illustrate, a monitoring regime might be of theoretical value in detecting and treating a particular illness, but if a reasonable physician would not prescribe it for a particular plaintiff because the benefits of the monitoring would be outweighed by the costs, which may include, among other things, the burdensome frequency of the monitoring procedure, its excessive price, or its risk of harm to the patient, then recovery would not be allowed. ... We emphasize that the advisable medical testing for a *specific plaintiff* must be shown to be 'consistent with contemporary scientific principles' and 'reasonably necessary.' " (Citation omitted; emphasis added.) 📙 *Id.,* at 980; see also 📙 *Ayers* v. *Jackson,* supra, 106 N.J. at 606, 525 A.2d 287 ("we hold that the cost of medical surveillance is a compensable item of damages [when] the proofs demonstrate, through reliable expert testimony predicated **\*50** upon the significance and extent of exposure to chemicals, the toxicity of the chemicals, the seriousness of the diseases for which individuals are at risk, the relative increase in the chance of onset of disease in those exposed, and the value of early diagnosis, that such surveillance

to monitor the effect of exposure to toxic chemicals is *reasonable and necessary*" (emphasis added)); P. Lin, Note, "Opening the Gates to Scientific Evidence in Toxic Exposure Cases: Medical Monitoring and *Daubert*," 17 Rev. Litig. 551, 582 (1998) ("[a]lthough claims for medical monitoring damages do not require proof of specific causation, the plaintiff's burden includes proof of medical necessity, which is similar to proof of specific causation in that it shows that the individual plaintiff can benefit from a program of medical monitoring"). [21] Requiring each plaintiff to prove "reasonable necessity" is vital, as the clinical suitability of medical monitoring must be established because, if such monitoring is unnecessary, recovery would be unwarranted.

**10 [13] [14] [15] [16] The plaintiffs' argument that experts "should not form any opinions about the plaintiffs' exposure and their need for medical monitoring ... because that function should be reserved for the trier of fact" is against the weight of persuasive authority. [22] This is the *51 very purpose of expert testimony in medical monitoring cases. "[I]t is for the trier of fact to decide, *on the basis of competent medical testimony*, whether and to what extent the particular plaintiff's exposure to toxic chemicals in a given situation justifies future periodic medical monitoring." (Emphasis added.) Potter v. Firestone Tire & Rubber Co., supra, 6 Cal. 4th at 1009, 25 Cal.Rptr.2d 550, 863 P.2d 795. Expert testimony limited to "generally inform[ing] lay jurors about the scientific correlation between asbestos exposure and the onset of asbestos related diseases," as the plaintiffs argue, is inadequate proof as a matter of law. In the absence of expert testimony demonstrating the necessity of future testing, a fact finder would be unable to accurately conclude whether a plaintiff should recover for medical monitoring.

As the court in Hansen noted, exposure alone does not provide a basis for recovery, and proof of these elements, through expert testimony, provides an important check on medical monitoring. See Hansen v. Mountain Fuel Supply Co., supra, 858 P.2d at 978, 980; see also In re Paoli Railroad Yard PCB Litigation, 35 F.3d 717, 788 (3d Cir. 1994) (acknowledging necessary limits on medical monitoring claims, such as demonstrating that "a reasonable physician would prescribe for her or him a monitoring regime different [from] the one that would have been prescribed in the absence of that particular exposure" (internal quotation marks omitted)), cert. denied sub *52 nom. General Electric Co. v. Ingram, 513 U.S. 1190, 115 S. Ct. 1253, 131 L. Ed. 2d 134 (1995).

[17] Attached as an exhibit to their motion for summary judgment, the defendants provided an excerpt of Anwar's deposition testimony, in which he stated that he had not formed an opinion as to the plaintiffs. This admission establishes that there is no genuine issue of material fact as to whether medical monitoring is reasonably necessary for the plaintiffs. The plaintiffs attempted to counter the defendants' evidentiary showing with an affidavit from Anwar, but that affidavit does not offer an opinion as to the plaintiffs, individually or as a group. There is only one statement that may reasonably be construed as relevant to the plaintiffs' claims: "Other individuals who were exposed to asbestos during the demolition work at Sikorsky should be monitored for the early detection and intervention of an asbestos related disease, as asbestos inhalation causes a significantly increased risk of contracting a serious disease ...." The only fact that this statement establishes is that persons exposed to asbestos have a significantly higher risk of contracting an asbestos related disease and should be monitored. This statement does not speak to the reasonable need for the medical monitoring of the plaintiffs, and it is insufficient to overcome summary judgment. But see In re Paoli Railroad Yard PCB Litigation, supra, 35 F.3d at 794–95 (concluding that plaintiffs had presented sufficient evidence to overcome summary judgment after experts testified that plaintiffs should receive medical monitoring due to their increased risk); Rhodes v. E.I. du Pont de Nemours & Co., 657 F. Supp. 2d 751, 776 (S.D. W. Va. 2009) (expert opinion stating, inter alia, that "the plaintiffs have a significantly increased risk of disease as a result of their exposure ... and that the increased risk warrants medical monitoring" raised question of material fact as to reasonable necessity), aff'd in part *53 and appeal dismissed in part, 636 F.3d 88 (4th Cir.), cert. denied, 565 U.S. 977, 132 S. Ct. 499, 181 L. Ed. 2d 891 (2011). In addition, the affidavit lacks any statement demonstrating that "early detection, combined with prompt and effective treatment, will significantly decrease the risk of death or the severity of the disease, illness or injury," the fifth element required under Donovan. Donovan v. Philip Morris USA, Inc., supra, 455 Mass. at 226, 914 N.E.2d 891; see In re Marine Asbestos Cases, supra, 265 F.3d at 867 ("the plaintiffs have not shown that a treatment exists for [asbestos related] diseases, or that there is clinical value to administering any such treatment before the onset of symptoms of these diseases").

**11 Even if we were to conclude that Anwar's affidavit was applicable to plaintiffs other than his patient, Dougan,

the portions of the affidavit that could apply to the plaintiffs provide only bare assertions of the legal requirements of medical monitoring without providing the factual foundation supporting those assertions. In several places, the affidavit mirrors the language required to prove a medical monitoring claim in *Redland Soccer Club, Inc.* v. *Dept. of the Army*, 548 Pa. 178, 195–96, 696 A.2d 137 (1997). Specifically, the affidavit states that "[o]ther individuals who were exposed to asbestos ... at Sikorsky should be monitored ... as asbestos inhalation causes a significantly increased risk of contracting a serious disease .... The monitoring regimen would be different from what is normally recommended in the absence of exposure .... [It] is reasonably necessary according to contemporary scientific principles, and the monitoring regimen makes early detection and intervention of an asbestos related disease possible." Although the affidavit does include detailed factual statements, those statements apply only to Dougan, who is no longer a plaintiff. Without additional details supporting the plaintiffs' individual needs **\*54** for medical monitoring, the plaintiffs have not raised a genuine dispute of material fact.

We have repeatedly held that such conclusory statements included in affidavits are insufficient to defeat a motion for summary judgment. See, e.g., *Stuart* v. *Freiberg*, supra, 316 Conn. at 828, 116 A.3d 1195 (discussing how statements in affidavits relied on by plaintiffs "closely replicate portions of the pleadings" and how "these averments are conclusory, and therefore inadequate to defeat a summary judgment

motion"); *Coley* v. *Hartford*, 312 Conn. 150, 166 n.12, 95 A.3d 480 (2014) (concluding that expert's affidavit was conclusory and, therefore, did not demonstrate genuine issue of material fact to defeat summary judgment motion);

*Buell Industries, Inc.* v. *Greater New York Mutual Ins. Co.*, 259 Conn. 527, 557, 791 A.2d 489 (2002) ("[a]lthough an affidavit by an expert may be considered in opposition to a motion for summary judgment, conclusory affidavits, even from expert witnesses, do not provide a basis on which to deny such motions" (internal quotation marks omitted)). Anwar's affidavit does not provide any specific explanation as to why the plaintiffs require medical monitoring because of their asbestos exposure at Sikorsky.

As the expert in this case provided no opinion as to the plaintiffs, and in the absence of any other evidence demonstrating the reasonable necessity of medical monitoring, we conclude that the plaintiffs did not demonstrate a genuine issue of material fact. Accordingly, we conclude that the trial court properly granted summary judgment for the defendants.

The judgment is affirmed.

In this opinion the other justices concurred.

**All Citations**

--- A.3d ----, 337 Conn. 27, 2020 WL 5521391

## Footnotes

\*\*    September 14, 2020, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

\*    The listing of justices reflects their seniority status on this court as of the date of oral argument.

1    The named plaintiff, Danny Dougan, was the fifth plaintiff in the proceedings before the trial court. Dougan died in December, 2017, while his appeal was pending before the Appellate Court. Dougan was initially the only plaintiff to appeal, and, after he died, the defendants moved to dismiss the appeal. The defendants argued that Dougan's claims for medical monitoring were moot and that, because he was the only plaintiff on appeal, the case should be dismissed. Carol Ann Slicer, the executor of Dougan's estate, then filed a motion for leave to substitute herself for Dougan. The Appellate Court granted this motion. Dougan's estate then filed an objection to the motion to dismiss, contending that the claims were not moot and that, because of technical difficulties, the other plaintiffs had not been named in the appeal. The Appellate Court granted the defendants' motion to dismiss Dougan's appeal but also permitted the remaining plaintiffs to file a late

appeal, which is presently before this court. See footnote 3 of this opinion. As a result, we consider only the claims of the four remaining plaintiffs, and all references herein to the plaintiffs collectively are to them.

2      The plaintiffs withdrew their claims against the third defendant, URS Corporation AES, on July 30, 2019, during the pendency of this appeal. See footnote 6 of this opinion.

3      After receiving permission to file a late appeal; see footnote 1 of this opinion; the plaintiffs appealed from the judgment of the trial court to the Appellate Court, and we subsequently transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

4      We note that the trial court considered the plaintiffs' position as a request for a medical monitoring remedy rather than an independent cause of action. On appeal, the plaintiffs request either the recognition of a stand-alone cause of action or a remedy. Although there are some differences between the two approaches, the elements of proof for either approach to medical monitoring are the same. See 1 J. McLaughlin, Class Actions (16th Ed. 2019) § 5:18 ("The distinction between recognizing medical monitoring as an independent cause of action and allowing it solely as a remedial measure has practical consequences. If medical monitoring is not an independent cause of action, then the plaintiff must establish all elements of an independent basis of recovery, and the defendants may assert all available affirmative defenses as against individuals. However, the elements of proof for medical monitoring as a cause of action and as a remedy remain the same and must be established by the plaintiffs." (Footnote omitted.)).

5      The defendants contend that Ferrara was not involved in pipe demolition or removal and that he never entered the basement where the asbestos was found. Viewing the evidence in the light most favorable to the plaintiffs, we accept their argument that this is irrelevant, as asbestos was also found on the main floor of the boiler house and in an exterior dumpster, areas where Ferrara worked.

6      The initial complaint also named A/Z Corporation, Clean Harbors of Connecticut, Inc., and Clean Harbors Environmental Services, Inc., as defendants; the action was later withdrawn as to those parties.

7      The plaintiffs moved for class certification in July, 2013, and requested that the trial court certify a class of approximately forty persons who were allegedly exposed to asbestos during the Sikorsky cogeneration project. The defendants objected and submitted affidavits from two experts, Charles L. Blake, an industrial hygienist, and Mark Metersky, a pulmonologist. Specifically, the defendants argued, inter alia, that the plaintiffs failed to demonstrate that common questions predominate, and, as such, class certification would be inappropriate. The trial court granted in part and denied in part the plaintiffs' request to certify the class in February, 2016. In its memorandum of decision, the trial court concluded that the plaintiffs had not demonstrated sufficient commonality in their claims for medical monitoring due to certain individual inquiries, such as each "class member's current medical condition ...." Nevertheless, the court proceeded to certify the class but excluded certain issues from class treatment, such as a class member's need for medical monitoring. Simultaneously, the court also granted in part and denied in part motions to strike filed by Sikorsky and Carrier, striking the plaintiffs' federal Clean Air Act claims but permitting their other strict liability claims to proceed.

8      Shortly thereafter, URS filed its second motion for summary judgment, asserting largely the same claims as Sikorsky and Carrier. URS had filed its first motion for summary judgment in 2014, but the trial court did not decide this motion before granting URS' second motion for summary judgment on March 28, 2017.

9      The defendants raised this issue as an alternative ground to affirm the trial court's judgment in their preliminary statement of the issues pursuant to Practice Book § 63-4 (a) (1); they also raised this issue before the trial court in their motion for summary judgment. See, e.g., Thomas v. West Haven, 249 Conn. 385, 390–91 n.11, 734 A.2d 535 (1999) (discussing procedural requirements for considering alternative grounds), cert. denied, 528 U.S. 1187, 120 S. Ct. 1239, 146 L. Ed. 2d 99 (2000); Chamerda v. Opie, 185 Conn. App. 627, 645–46, 197 A.3d 982 (same), cert. denied, 330 Conn. 953, 197 A.3d 893 (2018).

10      Medical monitoring differs doctrinally from a claim for enhanced risk. See A. Schwartz, Annot. "Recovery of Damages for Expense of Medical Monitoring To Detect or Prevent Future Disease or Condition," 17 A.L.R.5th 327, 336, § 2 (a) (1994) ("[m]edical monitoring, as this cause of action has come to be known, has been defined as an action seeking to recover the quantifiable costs of periodic future medical examinations to

detect the onset of physical harm ... as distinguished from an enhanced risk claim which seeks compensation for the anticipated harm itself or for increased apprehension of such harm" (internal quotation marks omitted)).

11    See A. Slagel, Note, "Medical Surveillance Damages: A Solution to the Inadequate Compensation of Toxic Tort Victims," 63 Ind. L.J. 849, 852 (1987–1988) ("In a toxic tort case the significant personal injuries often are not detectable simultaneously upon exposure to the toxic substance, but rather are latent. In fact, most toxic injuries do not manifest themselves as clinically detectable ailments until years after exposure occurs." (Footnote omitted.)).

12    See also 🔖 Sadler v. PacifiCare of Nevada, Inc., 130 Nev. 990, 998–99, 340 P.3d 1264 (2014) (explaining that 🔖 Friends for All Children, Inc., was "[o]ne of the earliest cases to consider a medical monitoring claim" and that several courts subsequently relied on its reasoning to "[conclude] that a physical injury is not required in order to recover the costs of medical monitoring"); H. Zarov et al., "A Medical Monitoring Claim for Asymptomatic Plaintiffs: Should Illinois Take the Plunge?," 12 DePaul J. Health Care L. 1, 3 (2009) ("[c]ourts and commentators generally trace the origins of medical monitoring claims to the ... decision [of the District of Columbia Circuit] in 🔖 Friends [f]or All Children, Inc.").

13    For courts rejecting medical monitoring claims in the absence of physical injury after 🔖 Buckley, see 🔖 Hinton ex rel. Hinton v. Monsanto Co., 813 So. 2d 827, 831–32 (Ala. 2001), 🔖 Wood v. Wyeth-Ayerst Laboratories, 82 S.W.3d 849, 857 (Ky. 2002), 🔖 Paz v. Brush Engineered Materials, Inc., 949 So. 2d 1, 5–7 (Miss. 2007), 🔖 Henry v. Dow Chemical Co., 473 Mich. 63, 81, 86, 701 N.W.2d 684 (2005), 🔖 Curl v. American Multimedia, Inc., 187 N.C. App. 649, 657, 654 S.E.2d 76 (2007), 🔖 Lowe v. Philip Morris USA, Inc., 344 Or. 403, 415, 183 P.3d 181 (2008), and Alsteen v. Wauleco, Inc., 335 Wis. 2d 473, 488–91, 802 N.W.2d 212, review denied, 338 Wis. 2d 323, 808 N.W.2d 715 (2011). Cf. 🔖 Caronia v. Philip Morris USA, Inc., 22 N.Y.3d 439, 452, 5 N.E.3d 11, 982 N.Y.S.2d 40 (2013) (requiring evidence of "present physical injury or *damage to property*" (emphasis added)).

For courts allowing a claim for medical monitoring to proceed post 🔖 Buckley, see 🔖 Petito v. A.H. Robins Co., 750 So. 2d 103, 104, 108 (Fla. App. 1999), review denied, 780 So. 2d 912 (2001), and review denied sub nom. Zenith Goldline Pharmaceuticals, Inc. v. Petito, 780 So. 2d 916 (2001), 🚩 Berry v. Chicago, 433 Ill.Dec. 921, 133 N.E.3d 1201, 1209 (Ill. App.), appeal allowed, 433 Ill.Dec. 446, 132 N.E.3d 284 (Ill. 2019), 🔖 Exxon Mobil Corp. v. Albright, 433 Md. 303, 378–80, 71 A.3d 30, cert. denied, 571 U.S. 1045, 134 S. Ct. 648, 187 L. Ed. 2d 449 (2013), 🔖 Donovan v. Philip Morris USA, Inc., 455 Mass. 215, 225–26, 914 N.E.2d 891 (2009), 🔖 Meyer ex rel. Coplin v. Fluor Corp., 220 S.W.3d 712, 717–18 (Mo. 2007), 🔖 Sadler v. PacifiCare of Nevada, 130 Nev. 990, 998–99, 340 P.3d 1264 (2014), and 🔖 Bower v. Westinghouse Electric Corp., 206 W. Va. 133, 140, 522 S.E.2d 424 (1999).

14    See 🔖 Rhodes v. E.I. du Pont de Nemours & Co., 636 F.3d 88, 92 (4th Cir.), cert. denied, 565 U.S. 977, 132 S. Ct. 499, 181 L. Ed. 2d 347 (2011).

15    See McCullough v. World Wrestling Entertainment, Inc., supra, 172 F. Supp. 3d at 535.

16    We note that other courts have rejected similar arguments with respect to whether subclinical injuries are in fact physical injuries as a matter of law. See 🔖 Rhodes v. E.I. du Pont de Nemours & Co., 636 F.3d 88, 95 (4th Cir.) (disagreeing with plaintiffs' argument that exposure to toxin that created "[an] alteration in the structure of [the plaintiffs'] blood is an injury" in negligence cause of action (internal quotation marks omitted)), cert. denied, 565 U.S. 977, 132 S. Ct. 499, 181 L. Ed. 2d 347 (2011); 🔖 June v. Union Carbide Corp., 577 F.3d 1234, 1249 (10th Cir. 2009) ("It is true that a number of courts have recognized [medical monitoring] claims ... premised on subclinical effects of toxic exposure. But, tellingly, these courts *have not*

*reasoned that subclinical injuries from a toxic agent are bodily or physical injuries.*" (Emphasis altered.));

*Parker* v. *Wellman*, 230 Fed. Appx. 878, 881–83 (11th Cir. 2007) (rejecting plaintiffs' theory of subcellular harm as physical injury under Georgia law); *Bell* v. *3M Co.*, 344 F. Supp. 3d 1207, 1216 (D. Colo. 2018) (disagreeing with plaintiffs' theory that "the bioaccumulation of toxins or subclinical damage constitute[s] a present physical injury"); see also J. Grodsky, "Genomics and Toxic Torts: Dismantling the Risk-Injury Divide," 59 Stan. L. Rev. 1671, 1674 (2007) ("Although the case law addressing subcellular damage is limited ... most courts have treated such damage as benign, de minimis, or otherwise legally inconsequential. Courts greatly prefer to draw bright lines between risk and injury, and continue to place the boundary at proof of classic medical symptoms or overt impairment." (Footnote omitted.)). But see *Sullivan* v. *Saint-Gobain Performance Plastics Corp.*, 431 F. Supp. 3d 448, 454–55 (D. Vt. 2019) ("It is more likely that the Vermont Supreme Court will follow the definition of bodily harm developed in [§ 15 of] the Restatement [(Second) of Torts] and apply it to latent injuries caused by chemical exposure. By defining bodily harm to include any alteration to a person's body, the Restatement [(Second) of Torts] includes changes such as abnormal blood serum results showing the presence of an unusual and potentially harmful chemical.").

One Connecticut trial court has held that a very similar theory of liability in an asbestos exposure case raised a question of fact for the jury to decide. See *Bowerman* v. *United Illuminating*, Superior Court, judicial district of New London at Norwich, Docket No. CV-94-0115436-S, 1998 WL 910271 (December 15, 1998) (23 Conn. L. Rptr. 589, 592) ("whether ... the scarring of lung tissue and implantation of asbestos fibers in the lungs constitute a compensable legal harm is an issue of fact if there is evidence showing such conditions to be detrimental and if there is evidence showing the existence of such conditions in the plaintiffs").

17    We note that other federal and state courts have employed a similar analysis, deeming it unnecessary to determine whether to recognize a claim for medical monitoring because the plaintiffs' proof was inadequate to defeat a motion for summary judgment in any event. See *M.G. ex rel. K.G.* v. *A.I. duPont Hospital for Children*, 393 Fed. Appx. 884, 892–93 (3d Cir. 2010) (declining to consider whether Delaware Supreme Court would permit medical monitoring claim because plaintiff could not state such claim); *In re Marine Asbestos Cases*, 265 F.3d 861, 867 (9th Cir. 2001) (upholding grant of summary judgment because, "even if medical monitoring were available under the Jones Act to a seaman who satisfied the *Paoli* factors, the plaintiffs have failed to present sufficient evidence to raise a genuine issue of material fact as to the reasonableness and necessity of the type of medical monitoring that they seek"); *DeStories* v. *Phoenix*, 154 Ariz. 604, 610, 744 P.2d 705 (App. 1987) (upholding grant of summary judgment after concluding that, even if plaintiffs' medical monitoring theory was legally cognizable, plaintiffs' claim would still fail due to lack of evidence); cf. *Philip Morris, Inc.* v. *Angeletti*, 358 Md. 689, 782, 787, 752 A.2d 200 (2000) (declining to consider whether "medical monitoring is a cognizable claim" under Maryland law because medical monitoring class was improperly certified).

18    One federal district court recently rejected a defendant's argument that there must be more individualized expert testimony as to causation. See *Sullivan* v. *Saint-Gobain Performance Plastics Corp.*, 431 F. Supp. 3d 448, 467–70 (D. Vt. 2019). After first predicting that the Vermont Supreme Court would recognize a medical monitoring remedy, the court denied the defendant's motion for summary judgment on the medical monitoring claims of a class of plaintiffs who allegedly had been exposed to perfluorooctanoic acid (PFOA) in their groundwater. *Id., at 452, 469–70*. The defendant argued that the plaintiffs lacked expert evidence demonstrating specific causation, specifically, that "that exposure to PFOA from the [defendant's] facility caused [the plaintiffs to be exposed to] an increased risk of adverse health conditions, as opposed to whether it can do so in general." (Emphasis omitted; internal quotation marks omitted.) *Id., at 467*. The court concluded that, although the plaintiffs' experts had not reviewed the "individual plaintiffs' medical records," summary judgment was inappropriate because "proof of causation must ... be at the population level"; *id.,*

at 467–68; and declined to grant summary judgment against any specific plaintiff because any individual issues could be resolved at the damages phase. Id., at 469–70.

We conclude that Sullivan is distinguishable. First, the class in that case was limited to individuals "who actually demonstrate[d] increased levels of PFOA in their bloodstream," whereas the present case provides no such benchmark. Id., at 462. Second, although the case before us was a class action when the trial court decided the summary judgment motion, the trial court expressly declined to certify the class on the issue of "the nature and extent of [each class member's] present or future need for medical monitoring ...." For these reasons, Sullivan is a case more appropriately decided by common proof, and we are not persuaded that it is applicable or persuasive here.

19    Anwar did examine and treat Dougan as his pulmonary specialist, and, as a result, the affidavit does detail more specifically Dougan's exposure to asbestos and the accompanying harm. Dougan therefore would likely satisfy the subcellular injury requirement under the Donovan standard. But, as Dougan is no longer a party to the case; see footnote 1 of this opinion; we do not consider the affidavit's statements as to Dougan.

20    Medical necessity is demonstrated through the eighth element of Hansen, that the "[medical] test has been prescribed by a qualified physician according to contemporary scientific principles." Hansen v. Mountain Fuel Supply Co., supra, 858 P.2d at 979.

21    We need not address how the reasonable necessity requirement would operate in the context of a class action involving a claim for future medical monitoring. The plaintiffs were not certified as a class with respect to this issue, and the appropriate treatment of class based claims for medical monitoring is not presented in this appeal. See footnote 7 of this opinion. As a result, we conclude that each plaintiff in the present case must establish that medical monitoring is necessary under the Donovan test and leave for another day under what circumstances reasonable necessity may be proven for a class of plaintiffs.

22    The plaintiffs also argue that experts should not opine as to "the [plaintiffs'] likelihood of contracting diseases ...." Certain courts that permit medical monitoring have expressly stated that they do not require a specific assessment or showing of the likelihood of contracting a particular disease in the future. See Merry v. Westinghouse Electric Corp., 684 F. Supp. 847, 851 (M.D. Pa. 1988) (concluding that "the plaintiffs ... proffered sufficient evidence to defeat [the defendant's] summary judgment motion," even though "[t]he [plaintiffs'] experts have not provided, and in fact state they cannot provide, a scientifically sound conclusion as to the precise degree of risk faced by the plaintiffs"); Potter v. Firestone Tire & Rubber Co., supra, 6 Cal. 4th at 1008, 25 Cal.Rptr.2d 550, 863 P.2d 795 (concluding that "recovery of medical monitoring damages should not be dependent upon a showing that a particular cancer or disease is reasonably certain to occur in the future"); Hansen v. Mountain Fuel Supply Co., supra, 858 P.2d at 979 ("[b]ecause the injury in question is the increase in risk that requires one to incur the cost of monitoring, the plaintiff need not prove that he or she has a probability of actually experiencing the toxic consequence of the exposure"). We agree with the plaintiffs that expert testimony on that particular issue is not necessary in this particular context.

---

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

TAB 6

*Durbeck v. Suffolk Univ.*, No. 20-10985, 2021 WL 2582621 (D. Mass. June 23, 2021)

Durbeck v. Suffolk University, --- F.Supp.3d ---- (2021)
2021 WL 2582621

2021 WL 2582621
Only the Westlaw citation is currently available.
United States District Court, D. Massachusetts.

Julia DURBECK, individually and on behalf
of all others similarly situated, Plaintiff,
v.

SUFFOLK UNIVERSITY, Defendant.
Mary Ann Foti and Anna Francesca
Foti, individually and on behalf of all
others similarly situated, Plaintiffs,
v.

Suffolk University, Defendant.

CIVIL ACTION NO. 20-10985-WGY,
CIVIL ACTION NO. 20-11581-WGY,
|
Filed 06/23/2021

**Attorneys and Law Firms**

David Pastor, Pastor Law Office, LLP, Boston, MA, for
Plaintiffs.

Crystal Nix-Hines, Pro Hac Vice, Shon Morgan, Pro Hac
Vice, T. Scott Mills, Pro Hac Vice, Kathleen M. Sullivan,
Quinn Emanuel Urquhart & Sullivan LLP, Los Angeles, CA,
Alexander H. Loomis, Harvey J. Wolkoff, Phillip Allen Syers,
Quinn Emanuel Urquhart & Sullivan LLP, Boston, MA, for
Defendant.

**MEMORANDUM & ORDER**

YOUNG, D.J.

**I. INTRODUCTION**

**\*1** Earlier this year, this Court had occasion to recognize
a few of the consequences of COVID-19 in Massachusetts.
See generally Delaney v. Baker, Civil Action No. 20-11154-
WGY, ---- F.Supp.3d ----, 2021 WL 42340 (D. Mass. Jan.
6, 2021). This matter involves another: defendant Suffolk
University's ("Suffolk") mid-semester transition to an entirely
virtual experience.

In two putative class actions, Julia Durbeck, Mary Ann
Foti, and Anna Francesca Foti (collectively, the "Plaintiffs")
bring breach of contract and unjust enrichment claims against
Suffolk based on its decision to close its campus and transition

to online learning in the wake of COVID-19. Pending before
the Court are Suffolk's motions to dismiss for failure to state
a claim upon which relief can be granted. For the reasons
elucidated below, the motions are DENIED.

**A. Factual Background**

The Plaintiffs allege that Suffolk offers two types of degree
programs: "in-person, hands-on programs" and "fully online
distance-learning programs." Pl.'s Am. Class Action Compl.
& Demand Jury Trial ("Durbeck's Am. Compl.") ¶ 21,
ECF No. 20 (Civil Action No. 20-10985-WGY); First Am.
Class Action Compl. & Demand Jury Trial ("Fotis' Am.
Compl.") ¶ 27, ECF No. 6 (Civil Action No. 20-11581-
WGY). Suffolk allegedly charges more for the in-person
option than for the online option. Durbeck's Am. Compl.
¶ 26; Fotis' Am. Compl. ¶ 31. According to the Plaintiffs,
that is because the in-person option involves more than the
"basic academic instruction" included in the online option.
Durbeck's Am. Compl. ¶ 28; Fotis' Am. Compl. ¶ 12.
Specifically, the Plaintiffs plead that in exchange for the
higher cost of attendance, Suffolk "promised" to provide
benefits and services unique to the in-person option, including
corporeal interactions with faculty, peers, academic and
athletic facilities, affinity and extracurricular groups, and
hands-on experiential opportunities, for the entire spring
2020 semester. Durbeck's Am. Compl. ¶¶ 28-30; Fotis' Am.
Compl. ¶¶ 12, 72. Based on these alleged benefits and
services, the Plaintiffs opted for the in-person experience and
paid fees and a higher tuition just to enroll as undergraduate
students for the spring 2020 semester. Durbeck's Am. Compl.
¶¶ 12, 18, 32-41, 120; Fotis' Am. Compl. ¶¶ 10, 19, 46-50, 68.

The Plaintiffs do not assert that a written contract provided
for these benefits and services. See Durbeck's Am. Compl.
¶ 72; Fotis' Am. Compl. ¶ 25. Instead, the Plaintiffs allege
that "[t]he terms of this contract are as implied or set forth
by [Suffolk] through its website, academic catalogs, student
handbooks, marketing materials and other circulars, bulletins,
and publications." Durbeck's Am. Compl. ¶ 72; Fotis' Am.
Compl. ¶ 26 ("The contractual relationship between Suffolk
and Plaintiffs and Class members is based on various written
materials, including, without limitation, course descriptions,
academic catalogs, student handbooks, account statements,
emails, representations and statements made by Suffolk
through various media, including its website, and other
materials.").

**\*2** Specifically, Durbeck quotes a series of Suffolk's
"publications with respect to non-online classes," which

describe "the on-campus experience, including numerous references to student activities; campus amenities; class size and student/teacher ratios; campus diversity, campus location, and the like." Durbeck's Am. Compl. ¶ 80; see id. ¶¶ 75-110. For their part, the Fotis quote a series of Suffolk's statements with respect to "its on-campus experience," including: "Distinguished [f]aculty provide individual attention to their students in small classes while encouraging open, independent thinking and an appreciation of diverse cultures, perspectives and peoples"; "Students find many opportunities to combine their academic experience with hands-on experience through internships, service learning and a broad range of extracurricular activities"; "Days, night and weekends -- Suffolk students are part of an immersive living and learning experience in the heart of an international city"; "change your perspective and deepen your knowledge as you learn in our classrooms and at the city's top employers. A world of academic possibilities awaits at the College, all just steps away from everything that makes Boston the ideal place to learn and live"; "The Suffolk University campus is located right in the heart of downtown Boston and brings one-of-a-kind city experiences into the classroom"; and "Since 1906, Suffolk University has been woven into Boston's thriving urban landscape, offering a truly immersive environment in which to live, learn and explore. It's the ideal location for Suffolk to provide students with the keys to successful lives and careers; access, opportunity and experience." Fotis' Am. Compl. ¶ 33 (footnotes omitted). The Plaintiffs allege that the implied-in-fact contract also derives from their payment of fees and tuition, Durbeck's Am. Compl. ¶¶ 71, 150; Fotis' Am. Compl. ¶¶ 24, 46, 64, 70, and their registration for and attendance at on-campus classes, Durbeck's Am. Compl. ¶¶ 111-117; Fotis' Am. Compl. ¶¶ 29, 68-69.

In March 2020, approximately halfway through the spring 2020 semester, see Durbeck's Am. Compl. ¶¶ 43-44; Fotis' Am. Compl. ¶ 20, Suffolk asked its students (including those who, like the Plaintiffs, had already paid fees and tuition for the entire spring 2020 semester) not to return to campus after spring break, Durbeck's Am. Compl. ¶ 46; Fotis' Am. Compl. ¶ 34. Suffolk subsequently closed all on-campus facilities, suspended all in-person services and activities, and moved all classes to virtual platforms. Durbeck's Am. Compl. ¶¶ 46-49; Fotis' Am. Compl. ¶¶ 34-36.

Around the same time, Suffolk announced, "Because students will be receiving academic credit and grades for virtual classes and will have access to support and guidance from both faculty and staff, no refunds of tuition will be made." Durbeck's Am. Compl. ¶ 51; Fotis' Am. Compl. ¶ 7. Suffolk has not refunded the Plaintiffs' fees or tuition for the spring 2020 semester. Durbeck's Am. Compl. ¶¶ 51, 54; Fotis' Am. Compl. ¶ 7.

**B. Procedural History**

Durbeck and the Fotis filed the operative complaints on October 1, 2020 and October 23, 2020, respectively. Durbeck's Am. Compl.; Fotis' Am. Compl. Suffolk moved to dismiss these complaints on October 29, 2020 and November 18, 2020, respectively. Def. Suffolk University's Mot. Dismiss, ECF No. 25 (Civil Action No. 20-10985-WGY); Def. Suffolk University's Mot. Dismiss First Am. Compl., ECF No. 16 (Civil Action No. 20-11581-WGY).

The parties have fully briefed both motions. As to Durbeck, Civil Action No. 20-10985-WGY, see generally Def.'s Am. Mem. Law Supp. Its Mot. Dismiss Am. Compl. ("Def.'s Mem. Supp. Mot. Dismiss Durbeck"), ECF No. 29; Pl.'s Mem. Opp'n Def.'s Mot. Dismiss Am. Compl. ("Durbeck's Opp'n"), ECF No. 27; Reply Mem. Supp. Def.'s Mot. Dismiss Am. Class Action Compl. ("Def.'s Reply Supp. Mot. Dismiss Durbeck"), ECF No. 41. As to the Fotis, Civil Action No. 20-11581-WGY, see generally Def.'s Mem. Law Supp. Mot. Dismiss First Am. Compl. ("Def.'s Mem. Supp. Mot. Dismiss Fotis"), ECF No. 17; Pl.'s Opp'n Def.'s Mot. Dismiss ("Fotis' Opp'n"), ECF No. 19; Reply Mem. Supp. Def.'s Mot. Dismiss Consolidated Compl. ("Def.'s Reply Supp. Mot. Dismiss Fotis"), ECF No. 28. The parties later filed notices of supplemental authority.

This Court heard argument on February 2, 2021 and took the matter under advisement. See Elec. Clerk's Notes, ECF No. 49 (Civil Action No. 20-10985-WGY); Elec. Clerk's Notes, ECF No. 35 (Civil Action No. 20-11581-WGY).

**II. ANALYSIS**

To withstand a motion to dismiss, a complaint must "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The complaint must include sufficient factual allegations which, when accepted as true, "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The Court will "draw every reasonable inference" in favor of the plaintiff, Berezin v. Regency Sav. Bank, 234 F.3d 68, 70 (1st Cir. 2000), but it will disregard statements that

2021 WL 2582621

"merely offer legal conclusions couched as fact or threadbare recitals of the elements of a cause of action," Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011) (alterations and quotations omitted).

**\*3** Suffolk moves to dismiss on two grounds. First, Suffolk asserts that the Plaintiffs impermissibly seek to recover for educational malpractice and invade Suffolk's academic freedom. Second, Suffolk argues that the Plaintiffs fail to state a claim for breach of contract or unjust enrichment. This Court is not persuaded by either contention.

### A. Educational Malpractice

Claims for educational malpractice challenge "the sufficiency or quality of education provided by educational intuitions." Zagoria v. N.Y. Univ., 20 Civ. 3610(GBD)(SLC), 2021 WL 1026511, at \*2 (S.D.N.Y. Mar. 17, 2021). Despite "the number of institutions of higher learning in the Commonwealth, Massachusetts' position regarding the viability of educational malpractice claims is unclear."

Moran v. Stonehill Coll., Inc., 2077CV00431, 2021 WL 965754, at \*3 (Mass. Super. Ct. Feb. 16, 2021) (Howe, J.); see Doe v. Town of Framingham, 965 F. Supp. 226, 229-30 (D. Mass. 1997) (O'Toole, J.) (stating that "there is no need to construct what is likely to be a redundant and clumsy common law remedy" for "educational malpractice"). The Plaintiffs concede that educational malpractice claims are not viable in most jurisdictions. Durbeck's Opp'n 6-7. See Ambrose v. N.E. Ass'n of Schs. & Colls., Inc., 252 F.3d 488, 499 (1st Cir. 2001) (applying Maine law) ("[C]ourts consistently have rejected students' claims of 'educational malpractice' against schools."). Hence as "master to decide what law [they] will rely upon," see The Fair v. Kohler Die & Specialty Co., 228 U.S. 22, 25, 33 S.Ct. 410, 57 L.Ed. 716 (1913), the Plaintiffs have chosen not to pursue educational malpractice claims. Durbeck's Am. Compl. ¶ 122 ("This cause of action does not seek to allege 'educational malpractice.' ").

Nevertheless, this Court must ensure that the Plaintiffs' claims are not merely "cloak[ed]" with "creative labeling." See Ambrose, 252 F.3d at 497. However styled, educational malpractice claims raise a multitude of "strong policy arguments that militate against" their adjudication. Id. at 499. "These policy concerns include the lack of a satisfactory standard of care by which to evaluate educators' professional judgments and the patent undesirability of having courts

attempt to assess the efficacy of the operations of academic institutions." Id.

It is axiomatic that "the educational malpractice doctrine does not foreclose all lawsuits by students." Zagoria, 2021 WL 1026511, at \*3; see Grant v. Chapman Univ., No. 30-2020-01146699-CU-BC-CXC, 2021 WL 684581, at \*3 (Cal. Super. Ct. Jan. 22, 2021) (in COVID-19 tuition refund dispute, stating that "just because a claim touches on educational issues does not mean it sounds in 'educational malpractice' "); Smith v. Ohio State Univ., No. 2020-00321JD, 2020 WL 5694024, at \*2 (Ohio Ct. Cl. Sept. 09, 2020) (in COVID-19 tuition refund dispute, stating that "[t]he mere mention of possible consequences to plaintiff's educational or professional future does not render plaintiff's complaint a claim for educational malpractice"); e.g., White v. Fessenden Sch., Civil Action No. 07-10908-JLT, 2007 WL 9798267, at \*3 (D. Mass. July 17, 2007) (Tauro, J.) (rejecting defendant-school's characterization of student's claims as alleging "educational malpractice"). Breach of contract claims, for instance, do not allege educational malpractice where the "essence" of the plaintiff's claims is not "that the institution failed to perform adequately a promised educational service, but rather that it failed to perform that service at all." Ross v. Creighton Univ., 957 F.2d 410, 417 (7th Cir. 1992); see Zagoria, 2021 WL 1026511, at \*3 ("When the essence of the complaint moves beyond the effectiveness of education and into more specific promises for specified services, a student may be able to sue for breach of contract.").

**\*4** Adopting this reasoning, courts across the country have rejected defendant-schools' educational malpractice arguments on motions to dismiss in nearly every COVID-19 tuition refund dispute. The most relevant of these decisions apply Massachusetts law. This Court is aware of eight such decisions.

In six federal actions, Boston College, Boston University, Brandeis University, Harvard College, and Northeastern University advanced educational malpractice arguments which were substantially similar to those presently advanced by Suffolk. Compare Def.'s Mem. Supp. Its Mot. Dismiss Am. Compl. Rules 12(b)(1) & 12(b)(6) 7-9, ECF No. 26, Rodrigues v. Bos. Coll., Civil Action No. 20-11662-RWZ (D. Mass. filed Feb. 1, 2021), and Def.'s Mem. Supp. Def.'s Mot. Dismiss Second Consolidated Class Action Compl. 7-11, ECF No. 56, In re Bos. Univ. COVID-19 Refund Litig., Civil

Action No. 20-10827-RGS (D. Mass. filed Dec. 9, 2020), and Def.'s Mem. Law Supp. Mot. Dismiss Consolidated Class Action Compl. 5-8, ECF No. 22, Omori v. Brandeis Univ., Civil Action No. 20-11021-NMG (D. Mass. filed Nov. 27, 2020), and Def.'s Mem. Supp. Its Mot. Dismiss First Am. Consolidated Compl. 8-10, ECF No. 34, Barkhordar v. President & Fellows of Harvard Coll., Civil Action No. 20-cv-10968-IT (D. Mass. filed Oct. 7, 2020), and Def.'s Mem. Supp. Mot. Dismiss Second Am. Class Action Compl. 25-27, ECF No. 52, Bahrani v. Ne. Univ., Civil Action No. 20-10946-RGS (D. Mass. filed Dec. 9, 2020), and Def.'s Mem. Law Supp. Mot. Dismiss Third Am. Class Action Compl. 24-25, ECF No. 44, Chong v. Ne. Univ., Civil Action No. 20-10844-RGS (D. Mass. filed Oct. 27, 2020), with Def.'s Mem. Supp. Mot. Dismiss Durbeck 5-10, and Def.'s Mem. Supp. Mot. Dismiss Fotis 6-11. Other sessions of this Court rejected these advances. See Rodrigues v. Bos. Coll., Civil Action No. 20-11662-RWZ, 2021 WL 1439784, at *1 (D. Mass. Apr. 15, 2021) (Zobel, J.); In re Bos. Univ. COVID-19 Refund Litig., Civil Action No. 20-10827-RGS, --- F.Supp.3d ----, ---- n.5, 2021 WL 66443, at *2 n.5 (D. Mass. Jan. 7, 2021) (Stearns, J.) ("The court is not convinced that plaintiffs' contract claim is a disguised educational malpractice claim, as [the university] implies. The [complaint] appears to challenge the fact of the switch from in-person to online instruction, not the quality of the online education [the university] provided."); Barkhordar v. President & Fellows of Harvard Coll., Civil Action No. 20-cv-10968-IT, 2021 WL 2535512, at *3 (D. Mass. June 21, 2021) (Talwani, J.) (same); Bahrani v. Ne. Univ., Civil Action No. 20-10946-RGS, 2020 WL 7774292, at *2 n.1 (D. Mass. Dec. 30, 2020) (Stearns, J.) (same); Chong v. Ne. Univ., Civil Action No. 20-10844-RGS, 2020 WL 7338499, at *2 n.1 (D. Mass. Dec. 14, 2020) (Stearns, J.) (same); Omori v. Brandeis Univ., Civil Action No. 20-11021-NMG, 2021 WL 1408115, at *2 (D. Mass. Apr. 13, 2021) (Gorton, J.) ("The complaint challenges neither the substance nor the quality of the specific online courses or curriculum provided by Brandeis. Moreover, plaintiffs do not complain that the online education provided by Brandeis was ineffective, or that they were unable to learn the relevant subject matter or earn academic credits. Instead, plaintiffs seek the reimbursement for services for which they purportedly bargained and paid, i.e. in-person instruction and access to on-campus facilities. Such claims sound in contract, not educational malpractice, and are therefore justiciable." (citations omitted)).

**\*5** In the two other decisions applying Massachusetts law, the Massachusetts Superior Court rejected Stonehill College's and the University of Massachusetts' educational malpractice arguments. See Moran, 2021 WL 965754, at *3 ("Moran does not challenge the judgment or conduct of his son's educators, or Stonehill's right to academic freedom and the discretion to operate its educational programs without unwarranted judicial intervention. He does not challenge the substance of Stonehill's educational programming in a way that implicates First Amendment concerns. In addition, Moran does not challenge the necessity of the closure of Stonehill's campus due to the pandemic. The question raised by the First Amended Complaint is not whether Stonehill was justified in closing its campus, but rather where that risk and financial burden should be contractually allocated."); Holmes v. Univ. of Mass., No. 2084CV01025-B, 2021 WL 1099323, at *2 & n.3 (Mass. Super. Ct. Mar. 8, 2021) (Roach, J.) (agreeing "with the many courts who have considered this question, locally and farther afield, that the sorts of claims pleaded here are not claims for 'educational malpractice,' " and stating that under Massachusetts law, "an implied contract based on different facets of the parties' relationship would not be making new law or wading into the question of how the University teaches its students") (brackets and quotations omitted)).

Setting aside, for a moment, the issue of damages, the Plaintiffs' theory of liability is clear: they allege that Suffolk promised one thing -- an in-person experience for the entire spring 2020 semester -- but delivered another. Durbeck's Am. Compl. ¶¶ 28-30, 51, 54; Fotis' Am. Compl. ¶¶ 7, 24, 37. Thus the "essence" of this action is not that Suffolk "failed to perform adequately a promised educational service" when it delivered a virtual experience, but rather that Suffolk failed to deliver the promised in-person experience entirely in the second half of the spring 2020 semester. See Ross, 957 F.2d at 417; see also Spiegel v. Trs. of Ind. Univ., No. 53C06-2005-CT-000771, 2020 WL 7135320, at *2 (Ind. Cir. Ct. Nov. 19, 2020) (in COVID-19 tuition refund dispute, stating that "[t]he essence of Plaintiff's claims is that he contracted for in-person classes and certain services, which he never received and for which he paid a premium. This does not challenge the quality of the education, but the actual product and service delivered"). This Court concludes, therefore, that the Plaintiffs' claims are not merely "cloak[ed]" with "creative labeling." See Ambrose, 252 F.3d at 497; see also Smith, 2020 WL 5694224, at *2 (in COVID-19 tuition refund

dispute, rejecting defendant-school's educational malpractice argument because "[t]he essence of plaintiff's breach of contract claim is that she contracted for in-person classes and received online classes instead"); Milanov v. Univ. of Mich., No. 20-000056-MK, 2020 WL 7135331, at *3 (Mich. Ct. Cl. July 27, 2020) (in COVID-19 tuition refund dispute, rejecting defendant-school's educational malpractice argument because the plaintiffs alleged "that the university promised one method of instruction, charged tuition and fees commensurate with that method of instruction, yet provided a different (allegedly lesser) method of instruction").

The issue of damages, however, gives this Court pause.

See In re Bos. Univ. COVID-19 Refund Litig., ––– F.Supp.3d at –––– n.5, 2021 WL 66443, at *2 n.5 (in COVID-19 tuition refund dispute, recognizing that "it is possible that the measure of damages for this alleged breach will so inextricably implicate the issue of quality as to render the claim non-actionable"); Bahrani, 2020 WL 7774292, at *2 n.1 (same); Chong, 2020 WL 7338499, at *2 n.1 (same). Suffolk points out that according to the Plaintiffs, the transition to an entirely virtual experience "was not commensurate with in-person instruction," Def.'s Mem. Supp. Mot. Dismiss Durbeck 6 (quoting Durbeck's Am. Compl. ¶ 53), and was "subpar in practically every aspect," Def.'s Mem. Supp. Mot. Dismiss Fotis 7 (quoting Fotis' Am. Compl. ¶ 6). At oral argument, Suffolk contended that the Plaintiffs seek damages equal to the difference between "the fair market value of online learning versus the fair market value of live in-person instruction." Transcript 6, ECF No. 51 (citing Durbeck's Am. Compl. ¶ 128). Taken together, Suffolk asserts, these facts uncloak the Plaintiffs' claims as alleging educational malpractice. Def.'s Reply Supp. Mot. Dismiss Fotis 5 ("By their very nature, these claims require the Court to inject itself into university decision-making as to how to respond to a pandemic and to undertake a qualitative evaluation of Suffolk's educational program to determine whether each remote class offered the same 'value' as its in-person counterpart."). At least two courts have agreed with this argument, though neither applied Massachusetts law.

See Gociman v. Loyola Univ. of Chi., Case No. 20 C 3116, ––– F.Supp.3d ––––, ––––, 2021 WL 243573, at *3 (N.D. Ill. Jan. 25, 2021) (applying Illinois law); Lindner v. Occidental Coll., Case No. CV 20-8481-JFW(RAOx), 2020 WL 7350212, at *7 (C.D. Cal. Dec. 11, 2020) (applying California law). But see McCarthy v. Loyola Marymount Univ., Case No.: 20-cv-04668-SB (JEMx), 2021 WL 268242, at *3 n.2 (C.D. Cal. Jan. 8, 2021) (stating that "the discussion

about the educational malpractice doctrine in [ Lindner v. Occidental College] appears to be dicta").

**\*6** At this stage, the Court is unconvinced. As an initial matter, the calculation of market damages does not necessarily run afoul of the educational malpractice doctrine.

See Bergeron v. Rochester Inst. of Tech., 20-CV-6283 (CJS), 2020 WL 7486682, at *8 & n.7 (W.D.N.Y. Dec. 18, 2020) (in COVID-19 tuition refund dispute, rejecting defendant-school's argument that plaintiffs' "alleged damages would require the Court to speculate about the difference between the subjective value of distance learning and the subjective value of on-campus, in-person instruction," and ruling that the calculation of "the difference in the fair market value of the services and access for which they contracted, and the services and access which they actually received" was a "sufficiently specific" formulation of "market damages" to be proved by objective expert testimony). Furthermore, although factual development might reveal that the Plaintiffs' evidence of damages depends on a qualitative evaluation of Suffolk's educational services, see, e.g., Durbeck's Am. Compl. ¶ 53 (alleging that the educational services delivered were "not commensurate with in-person instruction"); Fotis' Am. Compl. ¶ 6 (alleging that the educational services delivered were "subpar in practically every aspect"), it might reveal instead that the Plaintiffs' evidence of damages depends only on a quantitative calculation of the difference between, for instance, the cost of attending Suffolk's online degree program and the cost of attending Suffolk's in-person degree program, see, e.g., Durbeck's Am. Compl. ¶ 27 (alleging that Suffolk "charged $1,519 per credit hour for its on-campus MBA program, and only $1,171 per identical credit hour online, representing a discount of roughly 23%"); Fotis' Am. Compl. ¶ 21 (alleging that Suffolk charged $1,574 per credit hour for "the majority of traditional masters programs" but $1,213 per credit hour for "all online masters programs"). Using Suffolk's own valuations to calculate damages, if that is indeed the Plaintiffs' tack, might require only basic arithmetic rather than subjective determinations of educational quality.

Against this backdrop, dismissal would be premature.

See Hassan v. Fordham Univ., No. 20-CV-3265 (KMW), 2021 WL 293255, at *3-4 (S.D.N.Y. Jan. 28, 2021) (in COVID-19 tuition refund dispute, rejecting defendant-school's educational malpractice argument because allegations that the benefits and services delivered were "subpar in practically every aspect" and "in no way the equivalent of an in-person education" primarily "impact[ed]

Durbeck v. Suffolk University, --- F.Supp.3d ---- (2021)
2021 WL 2582621

the damages element" rather than "formed the essence of the Complaint" (quotations omitted)); Saroya v. Univ. of the Pac., 503 F.Supp.3d 986, 995 (N.D. Cal. 2020) (similar); Metzner v. Quinnipiac Univ., Case No. 20-cv-00784 (KAD), ─── F.Supp.3d ────, ────, 2021 WL 1146922, at *8 (D. Conn. Mar. 25, 2021) (in COVID-19 tuition refund dispute, stating that "if in the future it becomes manifest that resolving Plaintiffs' claims or assessing their damages will ultimately entail evaluation of whether a course conducted remotely was less valuable than one conducted in person -- and if so, by how much -- the Court will reassess whether it should decline to enter the classroom and determine whether or not the judgments and conduct of professional educators were deficient" (quotations omitted)); Buschauer v. Columbia Coll. Chi., No. 20 C 3394, 2021 WL 1293829, at *4 (N.D. Ill. Apr. 6, 2021) (similar); see also Oyoque v. Depaul Univ., Case No. 20 C 3431, ─── F.Supp.3d ────, ────, 2021 WL 679231, at *2 (N.D. Ill. Feb. 21, 2021) (in COVID-19 tuition refund dispute, recognizing that "[t]o the extent the plaintiffs discuss the difference in value between in-person and online education, that discussion is limited to alleging damages from the defendant's alleged breach of contract, not an allegation that any decreased value constitutes the breach of contract"). The Plaintiffs will have the opportunity to submit evidence of damages before this Court determines whether their claims would violate public policy.

**B. Academic Freedom**

"Academic freedom, though not a specifically enumerated constitutional right, long has been viewed as a special concern of the First Amendment." Regents of the Univ. of Cal. v. Bakke, 438 U.S. 265, 312, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). Universities thus "occupy a special niche in our constitutional tradition" which protects their freedom "to make [their] own judgments as to education...." Grutter v. Bollinger, 539 U.S. 306, 329, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003) (quoting Bakke, 438 U.S. at 312, 98 S.Ct. 2733). The "four essential freedoms" are "to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study." Bakke, 438 U.S. at 312, 98 S.Ct. 2733 (quotations omitted) (quoting Sweezy v. New Hampshire, 354 U.S. 234, 263, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957) (Frankfurter, J., concurring)). Accordingly, "[w]hen judges are asked to review the substance of a genuinely academic decision ... they should show great respect for the faculty's

professional judgment." Regents of the Univ. of Mich. v. Ewing, 474 U.S. 214, 225 & n.11, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985) (quoting Board of Curators of the Univ. of Mo. v. Horowitz, 435 U.S. 78, 96 n.6, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978) (Powell, J., concurring)).

**\*7** Suffolk argues that "[a] judicial determination that remote learning is less effective and less valuable method of instruction than in-person instruction ... would unconstitutionally infringe Suffolk's academic freedom 'to determine what shall be taught and how it shall be taught.' " Def.'s Mem. Supp. Mot. Dismiss Durbeck 10 (quoting Asociación de Educación Privada de P.R., Inc. v. García-Padilla, 490 F.3d 1, 19 (1st Cir. 2007)); Def.'s Mem. Supp. Mot. Dismiss Fotis 10 (same). This argument fails because the Plaintiffs do not seek such a judicial determination. As explicated above, the Plaintiffs seek a judicial determination that remote learning is different from the in-person instruction allegedly promised them, not that the former is "less effective and less valuable" than the latter. See supra Section II.A.

Although public policy counsels against judicial intrusion into certain academic areas, "principles of contract and quasi-contract are not among those areas." Milanov, 2020 WL 7135331, at *3. Thus, "[e]ven with the principle of academic freedom in mind, this Court may review university actions to ensure they comply with enforceable contracts made with students." Burt v. Bd. of Trs. of the Univ. of R.I., C.A. No. 20-191-JJM-LDA, ─── F.Supp.3d ────, ────, 2021 WL 825398, at *4 (D.R.I. Mar. 4, 2021). This Court rules, therefore, that the academic freedom doctrine does not bar the Plaintiffs' claims.[1] See Rhodes v. Embry-Riddle Aeronautical Univ., Inc., Case No. 20-cv-927-Orl-40EJK, ─── F.Supp.3d ────, 2021 WL 140708, at *3 (M.D. Fla. Jan. 14, 2021) ("The focus of this case is simply whether Defendant promised something it later failed to deliver. To answer that question, the Court need not wade into the nuances of educational or public health policy, but rather make an objective assessment of whether Defendant failed to perform on a promise to provide students with in-person instruction and access to campus facilities.").

**C. Breach of Contract**

Suffolk contends that the Plaintiffs fail to state a claim for breach of contract because they have not identified the basis for the alleged contractual right to an in-person experience for the entire spring 2020 semester. Def.'s Mem. Supp. Mot.

Dismiss Durbeck 10-17; Def.'s Mem. Supp. Mot. Dismiss Fotis 11-18. Suffolk further asserts that its Undergraduate Academic Catalog expressly contemplates and "permits the very actions Suffolk took." Def.'s Mem. Supp. Mot. Dismiss Durbeck 16-17; Def.'s Mem. Supp. Mot. Dismiss Fotis 17-18. The Plaintiffs respond that their contractual right to an in-person experience for the entire spring 2020 semester derives from representations in Suffolk's publications, the Plaintiffs' payment of fees and tuition, and their registration for and attendance at on-campus classes prior to the campus closure. Durbeck's Opp'n 10-16; Fotis' Opp'n 9-17. The Plaintiffs also argue that Suffolk's Undergraduate Academic Catalog does not bar their claims. Durbeck's Opp'n 16-18; Fotis' Opp'n 17-18.

### 1. The Plaintiffs State a Claim for Breach of Contract.

**\*8** The central legal question before the Court is whether the Plaintiffs adequately allege the existence of an agreement between the parties for an in-person experience for the entire spring 2020 semester. See Def.'s Mem. Supp. Mot. Dismiss Durbeck 10-17; Def.'s Mem. Supp. Mot. Dismiss Fotis 11-18. The Court answers that question in the affirmative.

"Under Massachusetts law, the elements of a breach of contract claim are that there was an agreement between the parties; the agreement was supported by consideration; the plaintiff was ready, willing, and able to perform his or her part of the contract; the defendant committed a breach of the contract; and the plaintiff suffered harm as a result." Squeri v. Mount Ida Coll., 954 F.3d 56, 71 (1st Cir. 2020) (quotations omitted). "[I]n the absence of an express agreement, a contract implied in fact may be found to exist from the conduct and relations of the parties." Id. (quotations omitted). The plaintiff must "state with substantial certainty the facts showing the existence of the contract and the legal effect thereof." Id. (quotations omitted).

"The student-college relationship is essentially contractual in nature." Mangla v. Brown Univ., 135 F.3d 80, 83 (1st Cir. 1998). "Under Massachusetts law, the promise, offer, or commitment that forms the basis of a valid contract can be derived from statements in handbooks, policy manuals, brochures, catalogs, advertisements, and other promotional materials." Guckenberger v. Bos. Univ., 974 F. Supp. 106, 150 (D. Mass. 1997) (Saris, J.) "Where, as here, a private-

school student or former student sues a school alleging breach of contract, the standard of reasonable expectation applies," under which "courts ask, in interpreting the contractual terms, what meaning the party making the manifestation, the university, should reasonably expect the other party, the student, to give it." Walker v. President & Fellows of Harvard Coll., 840 F.3d 57, 61–62 (1st Cir. 2016) (brackets, citations, and quotations omitted) (applying Massachusetts law); see Rinsky v. Trs. of Bos. Univ., Civil Action No. 10cv10779-NG, 2010 WL 5437289, at \*11 (D. Mass. Dec. 27, 2010) (Gertner, J.) ("The promise must, however, be definite and certain so that the promisor should reasonably foresee that it will induce reliance." (quotations omitted)).

Suffolk's first contention, that the representations in its publications are too "vague" and "generalized" to form an implied-in-fact contract, Def.'s Mem. Supp. Mot. Dismiss Durbeck 12-16; Def.'s Mem. Supp. Mot. Dismiss Fotis 14-17, misses the mark.[2] The implied-in-fact contract alleged here derives not from these representations standing alone, but from these representations viewed in context with the Plaintiffs' payment of fees and tuition, Durbeck's Am. Compl. ¶¶ 71, 150; Fotis' Am. Compl. ¶¶ 24, 46, 64, 70, and the Plaintiffs' registration for and attendance at on-campus classes prior to the campus closure, Durbeck's Am. Compl. ¶¶ 111-117; Fotis' Am. Compl. ¶¶ 29, 68-69. Taken together, these alleged bases are not too vague or generalized to withstand a motion to dismiss. See Rhodes, —— F.Supp.3d at —— n.8, 2021 WL 140708, at \*5 n.8 (in COVID-19 tuition refund dispute, rejecting defendant-school's argument that its representations were "mere puffery"); Doe v. Emory Univ., CIVIL ACTION FILE NO. 20-CV-2002-TWT, 2021 WL 358391, at \*6 (N.D. Ga. Jan. 22, 2021) (in COVID-19 tuition refund dispute, stating that although "promotional statements cannot represent an offer to form an express contract ... these statements can help define the scope of any implied contract," and concluding that when combined with allegations concerning defendant-school's "customary practice and the Plaintiffs' payment of tuition," a plausible implied-in-fact contract had been pled).

**\*9** Suffolk's second suggestion, that the Plaintiffs must "explain[ ] why Suffolk should have reasonably expected its practice of offering in-person instruction would give rise to a reasonable expectation that it would not change its practices in response to the COVID-19 pandemic," Def.'s Reply Supp. Mot. Dismiss Fotis 11, is unpersuasive. The Plaintiffs need only allege, as they have here, that Suffolk should have reasonably foreseen, based upon the "conduct and relations

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 68 of 535
PageID: 32015
*Durbeck v. Suffolk University,* --- F.Supp.3d ---- (2021)

2021 WL 2582621

of the parties," that the Plaintiffs would rely on Suffolk either to continue providing the promised in-person experience or to cease providing the promised in-person experience but refund the fees and tuition paid for that experience. See *Squeri, 954 F.3d at 71* (quotations omitted); *Walker, 840 F.3d at 61–62;* see also *Verlanga v. Univ. of S.F.,* No. CGC-20-584829, 2020 WL 7229855, at *4 (Cal. Super. Ct. Nov. 12, 2020)* (in COVID-19 tuition refund dispute, stating that "[i]t was reasonable for Plaintiffs to expect when they were billed for the Spring semester that they would receive the services, including in-person instruction and lodging in university residence halls, that were allegedly promised to them"). "What becomes of that right or that understanding in the face of a global pandemic is a separate issue, not appropriately resolved" on a motion to dismiss. See *Holmes, 2021 WL 1099323, at *3* (quotations omitted).

Accordingly, drawing all reasonable inferences in their favor, the Plaintiffs state a plausible claim for breach of an implied-in-fact contract for an in-person experience for the entire spring 2020 semester.[3] See *Doe v. Bradley Univ., Case No. 20-1264, 2020 WL 7634159, at *2 (C.D. Ill. Dec. 22, 2020)* (in COVID-19 tuition refund dispute, collecting cases in which courts denied defendant-schools' motions to dismiss breach of contract claims where plaintiffs alleged contracts "for in-person instruction based on university handbooks, catalogs, and brochures"); *Salerno v. Fla. S. Coll., 488 F.Supp.3d 1211, 1217 (M.D. Fla. 2020)* (in COVID-19 tuition refund dispute, denying motion to dismiss because defendant-school's publications and materials "touted its many resources and facilities -- all of which were located on the campus thereby implying in-person participation").

### 2. The Disclaimer Renders any Promise in Suffolk's Online Undergraduate Academic Catalog Illusory.

Suffolk argues that the following language, printed at the top of its online Undergraduate Academic Catalog, authorized it to close all on-campus facilities, suspend all in-person services and activities, move all classes to online platforms, and withhold refunds. Def.'s Mem. Supp. Mot. Dismiss Durbeck 16-17; Def.'s Mem. Supp. Mot. Dismiss Fotis 17-18.

*10 This catalog is not an agreement or contract between the student and

Suffolk University or any other party or parties and should not be regarded as such. The offerings and requirements contained herein are those in effect at the time of publication. The University reserves the right to change, discontinue, or add academic requirements, courses or programs of study at any time. Such changes may be made without notice, although every effort will be made to provide timely notice to students.

Def.'s Mem. Supp. Mot. Dismiss Durbeck, Ex. A, Undergraduate Academic Catalog ("Disclaimer"), ECF No. 29-1; Def.'s Mem. Supp. Mot. Dismiss Fotis, Ex. 1, Undergraduate Academic Catalog, ECF No. 17-1.[4]

This Court disagrees. Here, the Plaintiffs plead an implied-in-fact contract for far more than just the "academic requirements, courses or programs of study" contemplated in the Disclaimer, including corporeal interactions with faculty, peers, academic and athletic facilities, affinity and extracurricular groups, and hands-on experiential opportunities. Durbeck's Am. Compl. ¶¶ 28, 71; Fotis' Am. Compl. ¶¶ 12, 64. See *Ford v. Rensselaer Polytechnic Inst., 20-CV-470, ––– F.Supp.3d ––––, ––––, 2020 WL 7389155, at *6 (N.D.N.Y. Dec. 16, 2020)* (in COVID-19 tuition refund dispute, stating that "what a student expects to receive in exchange for tuition money covers much more territory than simply the right to take classes"). Because "[t]hese allegations clearly extend beyond coursework to the entirety of the educational experience.... [T]he scope of the so-called disclaimer -- if disclaimer it is -- is not broad enough to extinguish Plaintiffs' claims." See *Bergeron, 2020 WL 7486682, at *7;* see also *Hiatt v. Brigham Young Univ., Case No. 20-CV-00100-TS, ––– F.Supp.3d ––––, ––––, 2021 WL 66298, at *3 (D. Utah Jan. 7, 2021)* (in COVID-19 tuition refund dispute, declining to decide on motion to dismiss whether disclaimer in defendant-school's catalog "bars Plaintiff's claims as a matter of law").

The Disclaimer does, however, render any promise in Suffolk's online Undergraduate Academic Catalog illusory. In *Jackson v. Action for Boston Community Development, Inc.,* the Massachusetts Supreme Judicial Court held that a reservation of rights which authorizes a unilateral

modification of a document's terms tends to render any "offer" in the document illusory. See 403 Mass. 8, 14-15, 525 N.E.2d 411 (1988). In Pacella v. Tufts University School of Dental Medicine, this Court "adhere[d] to the teachings of Jackson," ruling that a college was not bound by the terms of a student handbook in part because the college reserved the unilateral right to modify those terms without notice. 66 F. Supp. 2d 234, 241 (D. Mass. 1999). Applying similar reasoning, the United States District Court for the Southern District of New York held that a disclaimer in an academic catalog "may excuse the university from a specific promise that would otherwise be a contractual obligation." Deen v. New Sch. Univ., No. 05 Civ. 7174 KMW, 2007 WL 1032295, at *2 (S.D.N.Y. Mar. 27, 2007) (applying New York law); Keles v. N.Y. Univ., No. 91 CIV. 7457 (SWK), 1994 WL 119525, at *6 (S.D.N.Y. Apr. 6, 1994) (same), aff'd, 54 F.3d 766 (2d Cir. 1995).

**\*11** This Court rules that under Pacella and Jackson, the Disclaimer renders any promise in Suffolk's online Undergraduate Academic Catalog illusory. See Pacella, 66 F. Supp. 2d at 241; Jackson, 403 Mass. at 14-15, 525 N.E.2d 411. This ruling does not, as Suffolk suggests, Def.'s Mem. Supp. Mot. Dismiss Durbeck 16-17; Def.'s Mem. Supp. Mot. Dismiss Fotis 17-18, doom the Plaintiffs' claims. Pacella and Jackson counsel the Court to disregard only the promises allegedly implied in the document where the Disclaimer lies: Suffolk's online Undergraduate Academic Catalog. See Pacella, 66 F. Supp. 2d at 241; Jackson, 403 Mass. at 14-15, 525 N.E.2d 411. These precedents do not counsel the Court to ignore other alleged bases for an implied-in-fact contract. See Pacella, 66 F. Supp. 2d at 241; Jackson, 403 Mass. at 14-15, 525 N.E.2d 411; see also Deen, 2007 WL 1032295, at *3-4 (parsing terms of disclaimer in academic catalog and ruling that it applied to some but not all of defendant-school's implied promises); Gally v. Columbia Univ., 22 F. Supp. 2d 199, 206 n.7 (S.D.N.Y. 1998) (stating that although defendant-school "could disclaim the existence of a specific promise through the use of such a disclaimer, it could not unilaterally disclaim all contractual relations between the parties" (citation omitted)). These other bases, as limned above, are plausibly pled. See supra Section II.C.1.

Suffolk analogizes its Disclaimer to the reservation of rights in Lindner v. Occidental College. Def.'s Reply

Supp. Mot. Dismiss Durbeck 3, 12-13 (citing 2020 WL 7350212 (applying California law)); Def.'s Reply Supp. Mot. Dismiss Fotis 8-9 (same). This analogy is inapposite. The reservation of rights in Lindner expressly authorized the defendant-school "to change fees, modify its services, or change its program should economic conditions or national emergency make it necessary to do so" and specified that "fees, tuition, programs, courses, course content, instructors, and regulations are subject to change without notice." 2020 WL 7350212, at *2 (brackets omitted). Suffolk's analogy overlooks the precise language authorizing the modification of services and costs of attendance as well as the reservation's limited applicability to forces majeures, neither of which is present in Suffolk's Disclaimer. See In re Columbia Tuition Refund Action, No. 20-CV-3208 (JMF), ––– F.Supp.3d ––––, ––––, 2021 WL 790638, at *5 (S.D.N.Y. Feb. 26, 2021) (in COVID-19 tuition refund dispute, stating that disclaimer in defendant-school's university catalog "is significantly narrower in scope" than disclaimer in Lindner and that it "arguably does not cover the change in instructional format from in-person to online"); McCarthy, 2021 WL 268242, at *3 n.2 (in COVID-19 tuition refund dispute, distinguishing "express contract right" in Lindner from language in defendant-school's bulletin authorizing it "to make changes to degree program requirements, academic and administrative policies and regulations, financial charges, and course offerings"); see also Gibson v. Lynn Univ., Inc., 504 F.Supp.3d 1335, 1340 (S.D. Fla. 2020) (in COVID-19 tuition refund dispute, stating that analysis of force majeure clause in defendant-school's policies "is more appropriate at the summary judgment stage" than at the pleading stage).

The reservation of rights in the other decision on which Suffolk primarily relies, a contract dispute under Puerto Rico law, contained similarly precise language authorizing the modification of costs of attendance and "any other regulations affecting students...." See Cuesnongle v. Ramos, 713 F.2d 881, 885 (1st Cir. 1983) ("The University reserves the right to revise or change rules, charges, fees, schedules, courses, requirements for degrees and any other regulations affecting students whenever considered necessary or desirable.").

The Disclaimer's scope and effect thus delineated, Suffolk's motions to dismiss the Plaintiffs' breach of contract claims are DENIED.

#### D. Unjust Enrichment

Suffolk argues that the Plaintiffs fail to state a claim for unjust enrichment as matter of law because the Plaintiffs have an adequate remedy at law (i.e., under their breach of contract theory). Def.'s Mem. Supp. Mot. Dismiss Durbeck 17-18; Def.'s Mem. Supp. Mot. Dismiss Fotis 18-19. Suffolk further contends that the Plaintiffs fail to plead facts sufficient to state a claim for unjust enrichment. Def.'s Mem. Supp. Mot. Dismiss Durbeck 18-20; Def.'s Mem. Supp. Mot. Dismiss Fotis 19-20. The Plaintiffs respond that they do not have an adequate remedy at law (i.e., that their unjust enrichment claims are pled in the alternative to their breach of contract claims), Durbeck's Opp'n 18-19; Fotis' Opp'n 18-19, and that they plead facts sufficient to state a claim for unjust enrichment, Durbeck's Opp'n 19-20; Fotis' Opp'n 20.

#### 1. The Plaintiffs' Unjust Enrichment Claims Are Not Barred as Matter of Law.

**\*12** A plaintiff "with an adequate remedy at law cannot claim unjust enrichment." Tomasella v. Nestlé USA, Inc., 962 F.3d 60, 82 (1st Cir. 2020) (quotations omitted) (applying Massachusetts law). Specifically, "it is the availability of a remedy at law, not the viability of that remedy, that prohibits a claim for unjust enrichment." Id. at 82-83 (brackets and quotations omitted). Nevertheless, because "unjust enrichment serves as an equitable stopgap for occasional inadequacies in contractual remedies at law," Wipro Ltd. v. Analog Devices, Inc., CIVIL ACTION NO. 19-12063-JGD, 2020 WL 7016868, at *7 (D. Mass. May 7, 2020) (Dein, M.J.) (quotations omitted), "it is accepted practice to pursue both theories at the pleading stage," Lass v. Bank of Am., N.A., 695 F.3d 129, 140 (1st Cir. 2012) (applying Massachusetts law); see also Vieira v. First Am. Title Ins. Co., 668 F. Supp. 2d 282, 295 (D. Mass. 2009) (Woodlock, J.) (stating that Federal Rule of Civil Procedure 8(d) "permits Plaintiffs to plead alternative and even inconsistent legal theories, such as breach of contract and unjust enrichment, even if Plaintiffs only can recover under one of these theories"); Little v. Grand Canyon Univ., No. CV-20-00795-PHX-SMB, ––– F.Supp.3d ––––, ––––, 2021 WL 308940, at *4 (D. Ariz. Jan. 29, 2021) (in COVID-19 tuition refund dispute, recognizing that under Federal Rule of Civil Procedure 8(d), "a party may plead an unjust enrichment claim in the alternative even if they are alleging the existence of a contract governing the dispute"); cf. Kishinevsky v. Bd. of Trs. of Metro. State Univ. of Denver, No. 20CV31452, 2020 WL 7087313, at *4 (Colo. Dist. Ct. Nov. 23, 2020) (in COVID-19 tuition refund dispute, observing that a contrary practice would force the plaintiff "to argue against himself at the pleading stage").

Here, although the Plaintiffs plead claims for both breach of contract and unjust enrichment, Durbeck's Am. Compl. ¶¶ 69-171; Fotis' Am. Compl. ¶¶ 62-84, they plead these permissibly in the alternative, Durbeck's Am. Compl. ¶¶ 131, 160; Fotis' Am. Compl. ¶ 78, and Suffolk denies the existence of a contract with the Plaintiffs, Def.'s Mem. Supp. Mot. Dismiss Durbeck 10-17; Def.'s Mem. Supp. Mot. Dismiss Fotis 11-18. The Plaintiffs' unjust enrichment claims therefore are not barred as matter of law. See Lass, 695 F.3d at 140.

#### 2. The Plaintiffs State a Claim for Unjust Enrichment.

To state a claim for unjust enrichment under Massachusetts law, a plaintiff must allege "(1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention by the defendant of the benefit under the circumstances would be inequitable without payment for its value." Tomasella, 962 F.3d at 82 (quotations omitted). Unjustness is "a quality that turns on the reasonable expectations of the parties." Metropolitan Life Ins. Co. v. Cotter, 464 Mass. 623, 644, 984 N.E.2d 835 (2013) (quotations omitted).

Here, the Plaintiffs state a claim for unjust enrichment. First, the Plaintiffs allege that they conferred fees and tuition on Suffolk. Durbeck's Am. Compl. ¶¶ 12, 18, 32-41, 120; Fotis' Am. Compl. ¶¶ 10, 19, 46-50, 68. Second, the Plaintiffs plead that in exchange for the fees and tuition, Suffolk delivered an in-person experience for the first half of the spring 2020 semester but a virtual experience for the second half. Durbeck's Am. Compl. ¶¶ 40, 46-49; Fotis' Am. Compl. ¶¶ 34-37. Finally, the Plaintiffs allege that based on their payment of fees and tuition, it was reasonable to expect an in-person experience for the entire spring 2020 semester, yet Suffolk failed to deliver that experience. Durbeck's Am. Compl. ¶¶ 71, 150; Fotis' Am. Compl. ¶¶ 24, 46, 64, 70.

Although Suffolk contends that it was not unjust to retain the Plaintiffs' fees and tuition because Suffolk continued to provide educational instruction toward a degree, Def.'s Mem. Supp. Mot. Dismiss Durbeck 18-20; Def.'s Mem. Supp. Mot. Dismiss Fotis 19-20, the Court must draw all reasonable inferences in the Plaintiffs' favor, and in so doing it cannot

be said as matter of law that Suffolk's actions were not unjust under the circumstances, see Rosado v. Barry Univ. Inc., 499 F.Supp.3d 1152, 1160 (S.D. Fla. 2020) (in COVID-19 tuition refund dispute, recognizing that although defendant-school "disputes that the retention of the payments was 'unjust,' a motion to dismiss tests the sufficiency of the pleading, not the merits of the case"). "[E]ven if [the Plaintiffs] received a substantial benefit from [their] payments of tuition and fees, it may still be inequitable for [Suffolk] to retain their full value." See Rhodes, ––– F.Supp.3d at ––––, 2021 WL 140708, at *7. Suffolk's motions to dismiss the Plaintiffs' unjust enrichment claims are DENIED. [5]

### III. CONCLUSION

**\*13** For the foregoing reasons, Suffolk's motions to dismiss, ECF No. 25 (Civil Action No. 20-10985-WGY) and ECF No. 16 (Civil Action No. 20-11581-WGY), are DENIED.

### SO ORDERED.

### All Citations

--- F.Supp.3d ----, 2021 WL 2582621

---

## Footnotes

[1]   The Court reiterates that it will accord deference to "genuinely academic decision[s]." See 🔖 Ewing, 474 U.S. at 225, 106 S.Ct. 507. Assuming without deciding that Suffolk's decision to transition to an entirely virtual experience is of that ilk, but see Patel v. Univ. of Vt. & State Agric. Coll., Case No. 20-cv-61, ––– F.Supp.3d ––––, ––––, 2021 WL 1049980, at *5 (D. Vt. Mar. 15, 2021) (stating that defendant-school's decision to shift to online learning was not "made on academic grounds; it was instead an administrative decision made to address the exigencies of the COVID-19 pandemic" (quotations omitted)), the Court leaves for another day its analysis of the effect, if any, of Governor Baker's executive orders regarding COVID-19, see Barkhordar, 2021 WL 2535512, at *1, *6; see also Seslar v. Trs. of Purdue Univ., No. 79D02-2005-PL-000059, 2021 WL 1235493, at *4 (Ind. Super. Ct. Mar. 8, 2021) (in COVID-19 tuition refund dispute, declining to address defendant-school's argument on motion to dismiss "that the Governor's Executive Order made providing in-person instruction impossible").

[2]   Suffolk also points out that the Plaintiffs have not alleged that they "read" Suffolk's publications. Def.'s Mem. Supp. Mot. Dismiss Fotis 16 (citing Elec. Order, ECF No. 48, In re Bos. Univ. COVID-19 Refund Litig., Civil Action No. 20-10827-RGS (D. Mass. Nov. 4, 2020) (Stearns, J.)); Def.'s Reply Supp. Mot. Dismiss Durbeck 11 (same). The Court is not inclined at this early juncture to dismiss the Plaintiffs on this basis.

[3]   The Court recognizes that Durbeck's third count is wholly premised, and the Fotis' first count is partially premised, on the payment of fees. Durbeck's Am. Compl. ¶¶ 144-157; Fotis' Am. Compl. ¶¶ 62-76. The Court further recognizes that in two COVID-19 tuition refund disputes, another session of this Court probed the nature of the fees at issue, allowing a motion to dismiss as to claims based on fees used to " 'support' certain facilities during terms for which those students are enrolled in classes," but denying the motion as to claims based on fees used "to gain admission to any on-campus facility or access to a given resource." See Bahrani, 2020 WL 7774292, at *3; 🔖 Chong, 2020 WL 7338499, at *3-4. In a third COVID-19 tuition refund dispute, that same session denied a motion to dismiss as to all fee-based claims, finding "it significant that the descriptions in this case also refer to specific activities occurring at specific locations...." 🔖 In re Bos. Univ. COVID-19 Refund Litig., ––– F.Supp.3d at ––––, 2021 WL 66443, at *3.

The Massachusetts Superior Court subsequently declined to conduct such a probing inquiry on a motion to dismiss, stating, "While I agree that the 'fee' claims are more muddled, I am not prepared at this time to dismiss claims for fees that 'support' programs, as distinct from fees that provide facility access." Holmes, 2021 WL 1099323, at *3 n.5. This Court likewise declines to dismiss the Plaintiffs' fee-based claims at this stage.

Durbeck v. Suffolk University, --- F.Supp.3d ---- (2021)

2021 WL 2582621

4 The Plaintiffs do not lodge a 📁 Rule 12(d) objection to the Disclaimer, which is, in any event, embodied in a "document[ ] sufficiently referred to in the complaint[s]." See 📁 Squeri, 954 F.3d at 65 (quotations omitted). Durbeck's Am. Compl. ¶¶ 23, 72, 106 (referring to Suffolk's "academic catalogs"); Fotis' Am. Compl. ¶¶ 25-27, 29, 65 (same).

5 The Court recognizes that Durbeck's fourth count is wholly premised, and the Fotis' second count is partially premised, on the payment of fees. Durbeck's Am. Compl. ¶¶ 158-171; Fotis' Am. Compl. ¶¶ 77-84. As explained above, this does not change the Court's conclusion. See supra note 3.

---

**End of Document**         © 2021 Thomson Reuters. No claim to original U.S. Government Works.

TAB 7

*Fahy v. Taser Int'l, Inc.*, No. 4:10-cv-19, 2010 WL 559249 (E.D. Mo. Feb. 10, 2020)

KeyCite Yellow Flag - Negative Treatment

Distinguished by Miravalle v. One World Technologies, Inc., E.D.Mo., August 1, 2018

2010 WL 559249
Only the Westlaw citation is currently available.
United States District Court,
E.D. Missouri,
Eastern Division.

Colin FAHY, Plaintiff,
v.
TASER INTERNATIONAL, INC., et al., Defendants.

No. 4:10CV19 CDP.
|
Feb. 10, 2010.

West KeySummary

1    **Products Liability** ⟜ Distributors and
     Wholesalers

     **Products Liability** ⟜ Weapons and
     Ammunition

     **Removal of Cases** ⟜ Improper or Collusive
     Joinder of Parties

     The manufacturer of a stun gun used by
     police failed to meet its burden to show that
     a distributor, a resident defendant, had been
     fraudulently joined by an injured party in order
     to defeat diversity jurisdiction in a removed
     products liability action. The manufacturer did
     not establish that there was no possibility that
     the injured party would be able to state claims
     against the distributor under Missouri law. The
     manufacturer argued that Missouri's "innocent
     seller" statute precluded the injured party's
     claims against the distributor because they were
     based solely on its status as a seller in the stream
     of commerce. However, the "innocent seller"
     statute did not affect liability at the pleadings
     stage, but rather it established an affirmative
     defense. As an avenue of defense only, the statute
     had no bearing on whether the injured party
     stated a cause of action against the distributor,

which was the relevant inquiry for fraudulent
joinder. V.A.M.S. § 537.762; .

**Attorneys and Law Firms**

William T. Dowd, Alex Lumaghi, Dowd and Dowd, St. Louis,
MO, for Plaintiff.

Timothy J. Maher, Barnes and Thornburg, LLP, South Bend,
IN, Deanne R. Jockish, Baker and Sterchi, L.L.C., St. Louis,
MO, James R. Jarrow, Baker Sterchi Cowden & Rice, LLC,
Kansas City, MO, for Defendants.

### *MEMORANDUM AND ORDER OF REMAND*

CATHERINE D. PERRY, District Judge.

**\*1** Colin Fahy brought this products liability action in state
court after the police electrocuted him with a Taser device.
Fahy's petition names the manufacturer of the device (Taser)
and the licensed dealer who sold it to the police department
(Ed Roehr) as defendants. Taser is a Delaware corporation.
Ed Roehr is a Missouri citizen.[1] Fahy, who is also a Missouri
citizen, seeks compensatory and punitive damages in his five-
count petition. Taser removed the state case to this Court,
claiming Roehr was fraudulently joined so this Court has
diversity jurisdiction over Fahy's claims.[2] I conclude that
there is no fraudulent joinder and complete diversity does not
exist. I will grant Fahy's motion to remand.

### *Additional Background Facts*

According to Fahy's state-court petition, Taser designs and
manufactures the X26 Taser, a "conducted energy device." Ed
Roehr sold the X26 Taser to the St. Louis Metropolitan Police
Department. On December 7, 2007, St. Louis police officers
used the X26 Taser on Fahy, causing him to go into ventricular
fibrillation and cardiac arrest. Fahy brings claims against
both defendants for design defect (Count I), strict liability -
failure to warn (Count II), negligent failure to warn (Count
IV), and negligently supplying a dangerous instrumentality
for supplier's business purposes (Count V). Fahy's petition
also states a separate claim against Taser for negligent design
defect (Count III).

## Discussion

[28 U.S.C. § 1441(b)](#) allows a defendant to remove a civil action from state court to federal court based on diversity jurisdiction only if none of the properly joined defendants are citizens of the state on which the original action was filed. Applied here, I lack jurisdiction over this case if one of the defendants is citizen of Missouri. [28 U.S.C. § 1441(b)](#); *Hurt v. Dow Chem. Co.,* 963 F.2d 1142, 1145 (8th Cir.1992). The defendant, as the party invoking jurisdiction, bears the burden of proving that all prerequisites to jurisdiction are satisfied. *See* *In re Business Men's Assur. Co. of America,* 992 F.2d 181, 183 (8th Cir.1993). Removal statutes are strictly construed, and any doubts about the propriety of removal are resolved in favor of remand. *Transit Cas. Co. v. Certain Underwriters at Lloyd's of London,* 119 F.3d 619, 625 (8th Cir.1997).

Removal will not be defeated, however, by collusive or fraudulent joinder of a resident defendant. *See* *Anderson v. Home Ins. Co.,* 724 F.2d 82, 84 (8th Cir.1983). When a party seeking removal alleges fraudulent joinder, the removing party bears the substantial burden of proving the alleged fraud. *See* *Parnas v. General Motors Corp.,* 879 F.Supp. 91, 92 (E.D.Mo.1995). To establish that a resident defendant has been fraudulently joined, the removing party must show that: (i) there is no possibility the plaintiff would be able to establish a cause of action against the resident defendant in state court; or (ii) there has been outright fraud in the plaintiff's pleadings of jurisdictional facts. *Monroe v. Consolidated Freightways, Inc.,* 654 F.Supp. 661, 662-63 (E.D.Mo.1987). Any contested fact issues must be resolved in favor of the plaintiff. *See* *id.* at 663 (citation omitted).

**\*2** Because Ed Roehr is a citizen of Missouri, this case is not removable under [28 U.S.C. § 1441(b)](#) unless Ed Roehr is fraudulently joined. Here, Taser argues that Ed Roehr's citizenship should be disregarded for removal purposes because Fahy does not have a reasonable basis for asserting claims against the resident defendant in this case. Taser argues that Missouri's "innocent seller" statute, [Mo.Rev.Stat. § 537.762](#), precludes Fahy's claims against Ed Roehr because they are based solely on its status as a seller in the stream of commerce. [3] Fahy's petition alleges that Ed

Roehr transferred the Taser into "the stream of commerce and sold it to the St. Louis Metropolitan Police Department" and then asserts products liability claims against both defendants.

Here, Fahy has stated claims that might impose liability on Ed Roehr under Missouri law. Missouri's "innocent seller" statute, [§ 537.762](#), does not affect a defendant's potential liability to a plaintiff at the pleadings stage, but rather it establishes an affirmative defense. *See* *Dorsey v. Sekisui America Corp.,* 79 F.Supp.2d 1089, 1091 (E.D.Mo.1999). "Under the innocent seller statute, dismissal is proper only where the seller's liability is based solely on its status as a seller in the stream of commerce." *Id.* "Further, an innocent seller may be dismissed only if another defendant, including the manufacturer, is properly before the court and from whom total recovery may be had for plaintiff's claims." *Id.* (internal quotation marks and citation omitted). As Missouri courts have explained. [§ 537.762](#) "does not change the substantive law relating to an innocent seller's liability." *Malone v. Schapun, Inc.,* 965 S.W.2d 177, 182 (Mo.Ct.App.1997). "A seller in the stream of commerce is still subject to liability under the doctrine of strict product liability." *Id.* (citation omitted). As an avenue of defense only, the statute has no bearing on whether Fahy has stated a cause of action against Ed Roehr at the pleadings stage, which is the relevant inquiry for fraudulent joinder. *See* *Dorsey,* 79 F.Supp.2d at 1091.

Moreover the innocent seller defense, even if did apply here, has no effect on the status of parties for jurisdiction purposes. According to the statute, "[n]o order of dismissal under this section shall operate to divest a court of venue or jurisdiction otherwise proper at the time the action was commenced. A defendant dismissed pursuant to this section shall be considered to remain a party to such action only for such purposes." Mo.Rev.Stat. § 537 .762(6). Subsection 7 of the statute provides that "an order of dismissal under this section shall be interlocutory until final disposition of plaintiff's claim by settlement or judgment and may be set aside for good cause shown at anytime prior to such disposition." [Mo.Rev.Stat. § 537.762](#)(7). Under the statute, Ed Roehr would still be considered a party to the case and would remain potentially liable to Fahy under Missouri law even if it were dismissed under [§ 537.762](#)(1). *See* *Dorsey,* 79 F.Supp.2d at 1092; *Pender v. Bell Asbestos Mines, Ltd.,* 46 F.Supp.2d 937, 940 (E.D.Mo.1999). For these reasons, Taser has not established that there is no possibility that Fahy would be able to state claims against Ed Roehr in state court. As a result, Taser has

failed to meet its burden to show that Ed Roehr, a resident defendant, has been fraudulently joined. *See Moeller v. Ford Motor Co.,* 2008 WL 161905 *1, *5–6 (E.D.Mo. Jan.15, 2008). This case was improperly removed to federal court, and I am without jurisdiction to hear the case. *See Hurt,* 963 F.2d at 1146.

**\*3** Accordingly,

**IT IS HEREBY ORDERED** that plaintiff's motion to remand [# 14] is granted, and this action is remanded to the Circuit Court for the City of St. Louis under 28 U.S.C. § 1447(c).

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 559249

## Footnotes

1    A corporation is deemed a citizen of any state in which it is incorporated and the state where it has its principal place of business. *See* 28 U.S.C. § 1332(c)(1). Here, Fahy's petition alleges-and defendants do not dispute-that Ed Roehr is a Missouri corporation with its principal place of business in Missouri.

2    Ed Roehr joins in the removal.

3    "Section 537.762 provides that a defendant, whose liability is based solely on his status as a seller in the stream of commerce, may be dismissed from a product liability claim if another defendant, including the manufacturer, is properly before the court and from whom total recovery may be had for plaintiff's claims."

     *Malone v. Schapun, Inc.,* 965 S.W.2d 177, 181 (Mo.Ct.App.1997) (internal quotation marks and citation omitted).

---

**End of Document**                                              © 2021 Thomson Reuters. No claim to original U.S. Government Works.

TAB 8

*Geraczynski v. Nat'l R.R. Passenger Corp.*, No. 11-6385, 2015 WL 4623466
(D.N.J. July 31, 2015)

KeyCite Blue Flag – Appeal Notification

Appeal Filed by WILLIAM GERACZYNSKI, ET AL v. NATIONAL RAILROAD PASSENGER CO, ET AL, 3rd Cir., September 2, 2015

2015 WL 4623466
Only the Westlaw citation is currently available.
Not For Publication
United States District Court, D. New Jersey.

William GERACZYNSKI and
Christine Geraczynski, Plaintiffs,

v.

NATIONAL RAILROAD PASSENGER
CORPORATION, d/b/a Amtrak, et al., Defendants.

Civil Action No. 11–6385 (SRC).
|
Signed July 31, 2015.

**Attorneys and Law Firms**

Samuel J. Rosenthal, Barish Rosenthal, Philadelphia, PA, for Plaintiffs.

Andrew B. Charkow, Brad M. Gallagher, Landman, Corsi, Ballaine & Ford, Newark, NJ, Glenn Alan Montgomery, Montgomery, Chapin & Fetten, PC, Bridgewater, NJ, Cynthia V. Fitzgerald, Daniel W London, Anthony D. Capasso, London Fischer, LLP, New York, NY, Roseann Primerano, Law Office of Joseph Carolan, Parsippany, NJ, for Defendants.

**OPINION**

CHESLER, District Judge.

**\*1** This matter comes before the Court upon various motions for summary judgment filed by Defendants and one motion to dismiss brought by the Third–Party Defendant. The motions, which concern Defendants' cross-claims for indemnification and a third-party claim for insurance coverage, have all been opposed and fully briefed. The Court has considered the papers filed by the parties in connection with these motions and proceeds to issue its ruling based on the written submissions and without oral argument, as authorized by Federal Rule of Civil Procedure 78.

## I. BACKGROUND

The core of this product liability action concerned allegations of a defectively manufactured chair, which failed and collapsed, resulting in injuries to Plaintiff William Geraczynski in the course of his employment with Defendant Amtrak. In addition to bringing a negligence claim against Amtrak pursuant to the Federal Employers' Liability Act, Geraczynski a New Jersey resident, also sought to hold various companies liable under the New Jersey Product Liability Act, based on their commercial involvement with the allegedly defective chair. Those Defendants are as follows: SAFCO Products Company ("SAFCO") and its parent company Liberty Diversified International (collectively "SAFCO"); and Staples, Inc. and its predecessor company Corporate Express (collectively "Staples"). The background facts out of which this litigation arose have been set forth in this Court's November 1, 2013 Opinion, issued in connection with motions for summary judgment with respect to Plaintiff's product liability claims.

Plaintiff settled his claims against all Defendants, with the product manufacturer, Oasyschair, bearing full responsibility for the settlement. Left unresolved were Defendants' cross-claims against each other for indemnification. Various motions were filed, which the Court held in abeyance at the request of the parties, while they endeavored to mediate their dispute. These efforts were only partially successfully. Amtrak's motion, concerning its cross-claim against Staples for contractual indemnification, is now moot, as its settlement with Staples has extinguished that claim. The Court now proceeds to rule on the remaining motions. They are: (1) Staples' motion for summary judgment on its cross-claims against SAFCO; (2) SAFCO's motion for summary judgment on its cross-claims against Oasyschair; (3) Third–Party Defendant Columbia Casualty Co.'s ("Columbia") motion to dismiss SAFCO's third-party claim for a declaration of insurance coverage; and (4) SAFCO's motion for summary judgment on its declaratory judgment claim for coverage. [1]

## II. DISCUSSION

### A. Staples' Indemnification Cross–Claim Against SAFCO

Staples seeks contractual indemnification from SAFCO for the losses incurred in defending against Plaintiffs' claims as well as losses associated with Amtrak's cross-

Geraczynski v. National R.R. Passenger Corp., Not Reported in F.Supp.3d (2015)

2015 WL 4623466

claim for contractual indemnification. Staples, seller of the allegedly defective chair to ultimate consumer Amtrak, obtained the product from distributor SAFCO. At the time of the wholesale purchase transaction involving the subject chair, Staples and SAFCO were parties to a Vendor Agreement, which applied to all furniture products purchased by Staples from SAFCO from January 1, 2005 to December 31, 2011. The Vendor Agreement contains an indemnification provision, which provides as follows:

**\*2** Vendor [SAFCO] agrees, at Vendor's expense, to promptly indemnify and hold Staples harmless against any and all third party claims, actions, proceedings or investigations (each a "Claim") arising from an actual or alleged breach of any representations, warranties or covenants made by Vendor under this Vendor Agreement. (Spencer Aff., Ex. A: Vendor Agreement, ¶ 19.) Under the Vendor Agreement, SAFCO "represents and warrants to Staples that: (a) all Product is free from defects...." (*Id.*, ¶ 15.)

Amtrak's cross-claims against Staples fall squarely within the Vendor Agreement's obligation on SAFCO to indemnify Staples. There is no dispute that Amtrak is a third party with respect to the Vendor Agreement. Amtrak's cross-claims against Staples asserted that, under its own contract with Staples, Staples was obligated to indemnify it for medical expenses associated with the injuries Plaintiff sustained in the collapse of the allegedly defective chair and for the legal expenses incurred in defending Plaintiff's negligence claims related to the chair failure. Amtrak's cross-claims against Staples were based on Staples's contractual obligation (1) to provide it with products that were "free from defects in design, material and workmanship" and (2) to hold Amtrak harmless from any claims, losses or expenses incurred as a result of Staples' breach of that warranty and/or as result of injuries directly or indirectly caused by products supplied by Staples. In the Vendor Agreement governing the relationship between SAFCO and Staples, SAFCO expressly warranted to Staples that the product was "free from defects" and undertook the obligation to indemnify Staples against claims arising from breach of that representation. Indeed, the warranty made by Staples in the contract covering the sale of the chair to Amtrak essentially mirrors the warranty made by SAFCO in the Vendor Agreement covering SAFCO's sale of the chair to Staples.

SAFCO does not controvert or dispute these material facts concerning the nature of the claims against Staples or the scope of the indemnification provision in the Vendor Agreement. Instead, it attempts to re-cast the dispute as a choice of law issue and in that way avoid enforcement of the Vendor Agreement's indemnification obligation. SAFCO argues that the contractual indemnification claim made by Staples conflicts with the statutory scheme of the New Jersey Product Liability Act, which imposes liability on the product manufacturer, in this case, named party Oasyschair. SAFCO stresses that, as the product distributor, it is an innocent party under the Product Liability Act and should not bear the costs and fees sought by another participant in the product distribution chain, particularly where the indemnity claim, SAFCO argues, has arisen from indemnitee Staples' independent fault under its own agreement with Amtrak. Staples's indemnity claim, however, arises from the alleged breach of an express warranty by SAFCO in the Vendor Agreement, and SAFCO cites no authority to support its argument that the New Jersey Product Liability Act precludes agreements between parties in the chain of distribution to allocate responsibility for losses stemming from product defect. *Cf.* 📄 *Promaulayko v. Johns Manville Sales Corp.,* 116 N.J. 505, 515, 562 A.2d 202 (1989) (holding that while, as a general rule, a party higher up the chain of product distribution should indemnify a party lower in the chain, "parties in a distributive chain may contract for a different allocation of the risk of loss."). SAFCO also invokes the principle that "an indemnitee who has defended against allegations of its independent fault may not recover its defense costs." 📄 *Mantilla v. NC Mall Assoc.,* 167 N.J. 262, 272, 770 A.2d 1144 (2001). The argument fails, however, because that rule is inapposite to this case. As the Court has noted, the warranties made by Staples to Amtrak concerning the subject product are essentially the same as those it received from SAFCO about the product SAFCO provided.

**\*3** There is no genuine issue of material fact concerning SAFCO's obligation to indemnify Staples for losses incurred in connection with Amtrak's cross-claims, and thus summary judgment is warranted as to this portion of the indemnification claim against SAFCO.

Insofar as Staples seeks indemnification against Plaintiffs' claims, summary judgment is also warranted. Plaintiffs' claims sought relief for injuries allegedly caused by the defectively manufactured chair provided by distributor SAFCO to Staples. They therefore implicate SAFCO's warranty in the Vendor's Agreement that the product was not defective. Indemnity is required not only as a matter of contract but also as a matter of common law, which requires a

product distributor to indemnify other distributors further down the chain of distribution, with the ultimate responsibility for losses caused by product defect resting at the top of the chain with the manufacturer. This latter point regarding common law indemnity will be discussed in the section below.

**B. SAFCO's Indemnification Cross–Claim Against Oasyschair**

In is uncontroverted that SAFCO has not adduced evidence of a written contract requiring Oasyschair to indemnify it for losses arising from claims of a defective product. New Jersey courts, however, recognize the common-law right of a downstream distributor or seller to indemnification from an upstream participant in the chain of product distribution.

*Promaulayko v. Johns Manville Sales Corp.,* 116 N.J. 505, 513–15, 562 A.2d 202 (1989). In this lawsuit, Plaintiff's sole theory of product defect maintained that the subject chair had been defectively manufactured. (See November 1, 2013 Op. at 2–3, 9.) SAFCO is a downstream distributor in relation to product manufacturer Oasyschair and as such is entitled to indemnification from Oasyschair on all claims against SAFCO in this lawsuit.

Oasyschair argues that the general rule of indemnity as set forth by the New Jersey Supreme Court in *Promaulayko* does not apply in this situation because Plaintiffs, in their Complaint, had also claimed that SAFCO breached an express warranty. This claim, Oasyschair contends, transforms SAFCO's responsibility from one of passive wrongdoing to one of independent, active fault, thus invalidating SAFCO's claim of entitlement to indemnity. This argument is unavailing. Oasyschair has come forward with no evidence that SAFCO was at fault on any basis other than its role as a conduit in the distribution of the chair indisputably manufactured by Oasyschair. Indeed, the Court had noted in its Opinion granting summary judgment in favor of SAFCO on Plaintiffs' Product Liability Act claims that it refrained from granting summary judgment on the breach of express warranty claim because the request was raised in a reply brief, not because of proof indicating that Plaintiff's claim against SAFCO might be meritorious.

Here, on the cross-motions brought by SAFCO and Oasyschair regarding the latter's duty of indemnification, the record is clear that the claims and cross-claims against SAFCO stem from its distribution of a product placed in the stream of commerce by Oasyschair with an alleged

manufacturing defect. Accordingly, SAFCO's motion for summary judgment on its cross-claim for indemnification from Oasyschair will be granted, and Oasyschair's cross-motion on the claim will be denied.

**C. Insurance Coverage Dispute Between SAFCO and Columbia**

**\*4** Defendant SAFCO filed a Third–Party Complaint against Columbia, asserting a single claim for insurance coverage. SAFCO claims it is entitled to coverage as an additional insured under a commercial general liability policy issued by Columbia to Oasyschair. Columbia has moved to dismiss that claim pursuant to Rule 12(b)(6), arguing that no relief can be granted because the Third–Party Complaint has failed to set forth that SAFCO meets a condition precedent to coverage under the policy's additional insured endorsement. SAFCO opposes the motion, and has filed its own motion seeking summary judgment on the claim, asserting that there are no genuine issues of fact that it is entitled to coverage.

The policy at issue contains an endorsement which modifies the policy in that it provides coverage to vendors for losses relating to "all products insured under this policy." (Lem Cert., Ex. D.) The endorsement does not name any particular vendor but rather identifies an additional insured according to the following terms: "as required by written contract or agreement executed prior to the occurrence." (*Id.*) Columbia has argued that SAFCO cannot meet the requirements for coverage because it has failed to produce a contract between SAFCO and Oasyschair which required Oasyschair to provide insurance coverage and/or name it as an additional insured in any applicable commercial general liability policy.

Columbia's motion to dismiss the claim must be denied. A claim survives a Rule 12(b)(6) motion if the complaint contains "sufficient factual allegations, accepted as true, to 'state a claim for relief that is plausible on its face.' "

*Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly,* 550 U.S. at 556.) The declaratory judgment claim asserted by SAFCO, asserting its entitlement to insurance coverage, alleges a loss falling within the Oasyschair policy and further alleges that SAFCO

Geraczynski v. National R.R. Passenger Corp., Not Reported in F.Supp.3d (2015)

2015 WL 4623466

and its parent company Liberty are additional insureds under the policy per the vendor's endorsement. It also avers that "prior to the date of the incident that is the subject matter of this litigation, SAFCO/LIBERTY entered into an agreement with Oasyschair as a downstream distributor of the chair manufactured by Oasyschair." (Am. Third Party Compl., ¶ 8.) The Third Party Complaint contains a factual allegation, which, taken as true, establishes that SAFCO and Liberty meet the endorsement's terms for coverage as additional insureds. These allegations suffice to state a plausible claim for relief, that is, a declaration that SAFCO is entitled to coverage. Columbia's argument regarding the absence of a contract or agreement in the record goes to SAFCO's ability, or lack thereof, to prove the allegation. Challenges to a claim for lack of evidentiary support fall within the purview of summary judgment under Federal Rule of Civil Procedure 56(a). The Court will accordingly proceed to consider SAFCO's motion for summary judgment on the claim.

**\*5** SAFCO concedes that it has not produced a written contract in which Oasyschair was required to secure insurance coverage for SAFCO for losses and claims related to product defects. It nevertheless argues that it meets the conditions of the vendor's endorsement based on the existence of an agreement, evidenced by the course of dealing between SAFCO and Oasyschair, to name SAFCO as additional insured. Before reaching the question of whether SAFCO has proffered sufficient evidence to demonstrate that a reasonable juror would conclude that there is such an agreement, the Court must address the issue of whether, under the terms of the endorsement, an unwritten agreement can satisfy the requirement for additional insured status. This task is one of contract interpretation.

Columbia submits that the Court should apply the law of the state of New Jersey with regard to matters of insurance contracts, taking the position that New Jersey has the most significant relationship to this case. SAFCO does not disagree, and in fact supports its arguments for summary judgment on the insurance coverage claim with New Jersey caselaw. As the parties agree on the application of New Jersey state law to their insurance coverage dispute, and the substantive law of this state would apply according to the *Erie* doctrine, the Court will examine the claim accordingly.

Facts regarding the applicable insurance policy and the endorsement at issue are not in dispute, and as such the interpretation of vendor's endorsement is a question for the

court to decide as a matter of law. *Am Cas. Co. of Reading, Pa. v. Continisio,* 819 F.Supp. 385, 396 (D.N.J.1993) (citing *Weedo v. Stone–E–Brick, Inc.,* 155 N.J.Super. 474, 479, 382 A.2d 1152 (App.Div.1977), *rev'd on other grounds,* 81 N.J. 233, 405 A.2d 788 (1979)). In construing an insurance contract, a court must "search broadly for the probable common intent of the parties to find a reasonable meaning in keeping with the express general purposes thereof." *Bello v. Hurley Limousines, Inc.,* 249 N.J.Super. 31, 40, 591 A.2d 1356 (App.Div.1991). "If the terms of the contract are susceptible to at least two reasonable alternative interpretations, an ambiguity exists." *Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am.,* 195 N.J. 231, 238, 948 A.2d 1285 (2008). A court may look to extrinsic evidence to resolve the ambiguity. *Id.* It must construe the ambiguous terms so as to apply the interpretation which sustains coverage. *Mazzilli v. Accident & Casualty Ins. Co.,* 35 N.J. 1, 7, 170 A.2d 800 (1961); *see also Sparks v. St. Paul Ins. Co.,* 100 N.J. 325, 336, 495 A.2d 406 (1985) (holding that ambiguities in an insurance contract should be resolved against the insurance company). However, where the contract language is unambiguous, a court should enforce an insurance contract in accordance with its plain language. *Chubb,* 195 N.J. at 238, 948 A.2d 1285. "Indeed, in the absence of an ambiguity, a court should not 'engage in a strained construction to support the imposition of liability' or write a better policy for the insured than the one purchased." *Id.* (quoting *Progressive Cas. Ins. Co. v. Hurley,* 166 N.J. 260, 272–73, 765 A.2d 195 (2001)).

**\*6** The vendor's endorsement at issue here states that, for the endorsement to apply, there must be a "written contract or agreement executed" which requires policyholder Oasyschair to name the vendor in question as an additional insured. SAFCO contends that the endorsement accepts either a "written contract" or "agreement" as sufficient to trigger coverage, and thus the Court should consider the parties' course of dealing to determine whether such an agreement was in place. At the very least, according to SAFCO, the endorsement contains an ambiguity as to whether an agreement must be in writing, and the court should resolve that ambiguity in favor of the insured.

SAFCO's argument implies that the word "written" qualifies only the word "contract" but not "agreement," as a different interpretation would render use of the generally

2015 WL 4623466

interchangeable terms redundant. Citing the Uniform Commercial Code's definition of the word "agreement," SAFCO notes that the terms can be distinct. The UCC, it points out, defines the term as follows: " 'Agreement,' as distinguished from contract, means the bargain of the parties in fact, as found in their language or inferred from other circumstances, including course of performance, course of dealing, or usage of trade." *N.J.S.A.* 12A:1–201(3).

The flaw in SAFCO's argument, however, is that the vendor's endorsement also uses the term "executed" to describe the kind of "written contract or agreement" required to secure additional insured status under the Oasyschair policy with Columbia. The pertinent definitions of "execute" in Black's Law Dictionary state that the term means "to perform or complete (a contract or duty)" or "to make (a legal document) valid by signing; to bring (a legal document) into its final, legally enforceable form." *Black's Law Dictionary* (10th ed.2014). The former meaning would have at best a strained application to the endorsement language, as an agreement between policyholder Oasyschair and any vendor to be named as an additional insured would require no performance, beyond the mere meeting of the minds between the parties that the vendor would, in fact, be covered under the Oasyschair insurance policy. The latter meaning of "execute," signifying the act of formalizing the agreement by signing, is the only one that makes sense in the context of the insurance contract and vendor's endorsement. Thus, contrary to SAFCO's argument, the endorsement language is not susceptible to alternative reasonable meanings, and thus does not call for the Court to consider extraneous evidence to aid in deciphering it. It clearly provides that coverage will be provided to an additional insured where there has been a written or signed manifestation of a commitment by Oasyschair to include the vendor in the policy.

SAFCO bears the burden of proof on its claim against Columbia for insurance coverage, but it has not come forward with a written contract or signed agreement to establish that it is an additional insured. On this record, the Court cannot conclude that no reasonable trier of fact could find in Columbia's favor. In other words, SAFCO has failed to demonstrate that it is entitled to a declaration of insurance coverage as a matter of law.

**\*7** The Court further concludes that even if it were to find the language of the vendor's endorsement ambiguous, and construe it in SAFCO's favor to mean that an unwritten agreement for additional insured coverage would suffice,

SAFCO would not have established that summary judgment on the insurance coverage claim is warranted. SAFCO argues that the course of dealing between Oasyschair and SAFCO establishes that an agreement exists but fails to provide evidence to establish such an implied contract-in-fact. The risk manager for Liberty Diversified, SAFCO's parent company, states in his certification that "on many prior occasions (10 to 15), Oasyschair and/or its carrier, would always step forward and defend and indemnify SAFCO [on product claims]." (Towne Cert. ¶ 11.) This assertion that "Oasyschair and/or its carrier" has indemnified SAFCO in the past does not necessarily indicate that Oasyschair has routinely named SAFCO as an additional insured or that Columbia has routinely provided coverage to SAFCO on product claims pursuant to the vendor's endorsement. SAFCO also relies on the Certificate of Liability Insurance issued by Oasyschair's insurance broker, which pertains to the Columbia commercial general liability policy held by Oasyschair. The certificate states that "SAFCO Products Company is named as an additional insured per broad form vendors endorsement where required by writ [sic] contract or agreement." (SAFCO Mot., Ex. B.) This may constitute relevant evidence on the insurance coverage claim but does not establish SAFCO's entitlement to judgment on the claim as a matter of law. The representation made in the certificate by and large parrots the language of the vendor's endorsement, and as discussed, SAFCO has failed to establish an agreement requiring that SAFCO be named as an additional insured. Moreover, the certificate does not amend or enlarge the coverage provided by the Oasyschair commercial general liability policy issued by Columbia. In fact, it expressly cautions as follows:

> This certificate is issued as a matter of information only and confers no rights upon the certificate holder. This certificate does not affirmatively amend, extend or alter the coverage afforded by the policies below. This certificate of insurance does not constitute a contract between the issuing insurer(s), authorized representative or producer and the certificate holder.

(SAFCO Mot., Ex. B.)

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 85 of 535
PageID: 32032
Geraczynski v. National R.R. Passenger Corp., Not Reported in F.Supp.3d (2015)

2015 WL 4623466

While SAFCO has failed to satisfy the burden for summary judgment on its claim against Columbia, its motion has placed before the Court those parts of the record pertinent to the claim. Upon searching the record, the Court concludes that no reasonable juror could find in SAFCO's favor on the insurance coverage claim, making summary judgment appropriate in favor of Columbia pursuant to Rule 56(f)(1). While notice of a court's intent to grant summary judgment pursuant to this rule is typically required, an exception to this rule applies when there is a fully developed record, a lack of prejudice to the parties, and a decision on a purely legal issue. Gibson v. Mayor & Council of City of Wilmington, 355 F.3d 215, 223–24 (3d Cir.2004). Moreover, the Third Circuit has held a party may be deemed to be on notice of a *sua sponte* summary judgment ruling when "the targeted party had reason to believe the court might reach the issue and received a fair opportunity to put its best foot forward." *Id.* (affirming district court's grant of summary judgment *against* a party that brought a motion for summary judgment, without first giving notice to that party); *see also* Zimmerlink v. Zapotsky, 539 F. App'x 45, 49 (3d Cir.2013) (holding same and quoting *Gibson).* Here, SAFCO has put the merits of the insurance coverage claim squarely before the Court on its motion for summary judgment on a claim on which it bears the burden of proof, and in so doing, has had the opportunity to present all evidence and arguments supporting its claim, that is, "to put its best foot forward." It has had, consistent with the Third Circuit's guidance in *Gibson* and *Zimmerlink,* sufficient notice for this Court to exercise its authority under Rule 56(f)(1) .[2]

**\*8**  Accordingly, SAFCO's motion for summary judgment on the third-party claim against Columbia must be denied, and the Court will grant Columbia summary judgment SAFCO's insurance coverage claim pursuant to Rule 56(f)(1).

### III. CONCLUSION

For the reasons discussed, the pending motions will be adjudicated as follows: Staples' and SAFCO/Liberty's motions for summary judgment on the indemnification cross-claims will be granted, and Oasyschair's cross-motion will be denied. Columbia's motion to dismiss the Third–Party Complaint filed by SAFCO will be denied. SAFCO's motion for summary judgment on its Third–Party Complaint against Columbia will be denied, and summary judgment in favor of Columbia on the insurance coverage claim brought by SAFCO will be granted. Amtrak's motion for summary judgment on its cross-claim against Staples will be dismissed as moot. An appropriate order will be filed.

### All Citations

Not Reported in F.Supp.3d, 2015 WL 4623466

---

### Footnotes

1    Summary judgment is appropriate under Federal Rule of Civil Procedure 56(a) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

2    The Court notes that, in addition, the circumstances presented justify an exception to the notice requirement. For the reasons discussed, there is no surprise or unfairness to SAFCO. Clearly, with discovery long completed, the record is fully developed, and the threshold issue on the insurance coverage claim concerns interpretation of the vendor's endorsement, a purely legal question of contract construction.

---

    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

TAB 9

*Geraczynski v. National R. R. Passenger Corp*, 2013 WL 5934552 (D.N.J. Nov. 1, 2013)

Geraczynski v. National R.R. Passenger Corp., Not Reported in F.Supp.2d (2013)

2013 WL 5934552

2013 WL 5934552
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

William GERACZYNSKI and
Christine Geraczynski, Plaintiffs,

v.

NATIONAL RAILROAD PASSENGER
CORPORATION, d/b/a Amtrak, et al., Defendants.

Civil Action No. 11–6385 (SRC).
|
Nov. 1, 2013.

**Attorneys and Law Firms**

Samuel J. Rosenthal, Barish Rosenthal, Philadelphia, PA, for Plaintiffs.

Andrew B. Charkow, Brad M. Gallagher, Landman, Corsi, Ballaine & Ford, Newark, NJ, Glenn Alan Montgomery, Montgomery, Chapin & Fetten, PC, Bridgewater, NJ, Roseann Primerano, Law Office of Joseph Carolan, Parsippany, NJ, for Defendants.

**OPINION**

CHESLER, District Judge.

**\*1** This matter comes before the Court upon the motion for summary judgment filed by Defendants SAFCO Products Company ("SAFCO"), Liberty Diversified International ("Liberty Diversified"), Staples, Inc. ("Staples") and Corporate Express ("CE") (collectively, the "Moving Defendants"). Opposition to the motion has been filed by Plaintiffs William and Christine Geraczynski and by Defendant Oasyschair Co., Ltd. ("Oasyschair"). The Court has considered the papers filed by the parties and proceeded to issue its ruling based on the written submissions and without oral argument, as authorized by Federal Rule of Civil Procedure 78. For the reasons expressed below, the motion for summary judgment will be granted in part and denied in part.

**I. BACKGROUND**
On April 20, 2011, while attending a job briefing and safety meeting in the course of his employment with Defendant Amtrak, Plaintiff William Geraczynski ("Geraczynski") suffered injuries when the chair in which he was seated collapsed, causing Geraczynski to fall to the floor. The chair was located in the office room trailer at Amtrak's Sunnyside Yard facility in Queens, New York. Geraczynski, a resident of New Jersey, initially filed suit in this Court against Amtrak only, asserting a claim pursuant to the Federal Employers' Liability Act, 45 U.S.C. § 51, but later amended his Complaint to name additional defendants and assert product defect claims under the New Jersey Product Liability Act, N.J. S.A. § 2A:58C–1, et seq., and the common law theories of breach of express warranty and negligence.

The subject chair was a "Nesting Chair" model number 3480 BL manufactured by Defendant Oasyschair. While the parties dispute which entity controlled the design of the chair, the record contains evidence that it was designed by Oasyschair in collaboration with Defendant SAFCO, or at the very least according to input and specifications provided by SAFCO. SAFCO, a wholly owned subsidiary of Defendant Liberty Diversified, was the chair's distributor. SAFCO purchased the Nesting Chair from Oasyschair and sold it to Defendant Staples and/or Corporate Express (a wholly owned subsidiary of Staples), which in turn sold it to Amtrak.

According to Plaintiff's expert, George P. Widas, a professional engineer, the subject chair failed due to a manufacturing defect. Specifically, he stated that the steel reinforcing pin in the lower seat back was not inserted to the proper depth, preventing the chair from tolerating the weight load for which it was designed. In his opinion, had the chair been manufactured properly, with the reinforcing pin inserted according to the design, it would have sustained the force and weight of someone sitting in the chair and leaning back on it. He testified at his deposition:

Q. What about this chair did you find defective or improper?

A. It wasn't manufactured according to the design, which generated excessive stresses under foreseeable loading less than its design tolerance and it failed readily as a loading considerably less than its design tolerance.

**\*2** Q. Can you tell a lay jury, pretend a lay jury is here in front of you. Can you tell them what you are talking about?

A. The chair was designed to be strong enough for somebody to sit in it and exert force to the back of the chair. This chair wasn't built according to that design. It was built

Geraczynski v. National R.R. Passenger Corp., Not Reported in F.Supp.2d (2013)

2013 WL 5934552

very weak and when somebody leaned against the back of it the right way it broke. It was at a very weak level.

Q. Is that the nature of your opinion with respect to the chair?

A. Yes.

\* \* \*

Q. Your allegation is that this chair was assembled incorrectly?

A. Yes. Manufactured, when I said assembled I mean the reinforcing pin was not inserted to a proper depth according to the original design.

Q. So, your belief, if I could put this in layman's terminology, had the pin been inserted deep enough, according to the original design, that would have rendered the chair not defective and okay as far as you are concerned.

Q. Yes.

(Widas Tr. at 117:7–25; 120:9–20.)

The Plaintiff's expert has been clear that it is not his opinion that the subject chair failed due to a design flaw. In fact, he testified at his deposition that "it is designed properly." (*Id* . at 117:5–6.) He confirmed that the only defect he found was the insertion of the reinforcing pin to an improper depth during the manufacture of the chair. He testified as follows:

Q. So, your beef, the bottom line beef, is that the pin was not inserted deep enough. Correct?

A. Yes.

Q. Is that the bottom line?

A. Yes.

Q. How much deeper should it have been inserted to render the unit non-defective?

A. Point six zero inches.

Q. Had it been inserted .60 inches to the plane, it could have rendered it non-defective as far as you are concerned?

A. Yes.

Q. Is that the only defect you found?

A. Yes.

(*Id.* at 122:20–123:8.)

## II. DISCUSSION

### A. Standard of Review

Summary judgment is appropriate under Federal Rule of Civil Procedure 56(a) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.' " *Marino v. Indus. Crating Co.,* 358 F.3d 241, 247 (3d Cir.2004) (quoting *Anderson,* 477 U.S. at 255).

"When the moving party has the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact: it must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *In re Bressman,* 327 F.3d 229, 238 (3d Cir.2003) (quoting *United States v. Four Parcels of Real Property,* 941 F.2d 1428, 1438 (11th Cir.1991)). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325.

**\*3** Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *Jersey Cent. Power & Light Co. v. Lacey Township,* 772 F.2d 1103, 1109 (3d Cir.1985).

Geraczynski v. National R.R. Passenger Corp., Not Reported in F.Supp.2d (2013)

2013 WL 5934552

The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson,* 477 U.S. at 248; *Siegel Transfer, Inc. v. Carrier Express, Inc.,* 54 F.3d 1125, 1130–31 (3d Cir.1995). "[U]nsupported allegations ... and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation,* 912 F.2d 654, 657 (3d Cir.1990). "A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial." *Gleason v. Norwest Mortg., Inc.,* 243 F.3d 130, 138 (3d Cir.2001).

If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, ... there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.,* 972 F.2d 53, 55 (3d Cir.1992) (quoting *Celotex,* 477 U.S. at 322–23).

**B. Analysis**
Plaintiffs seek to hold the Moving Defendants liable for personal injuries caused by the alleged chair defect under the New Jersey Product Liability Act. The Product Liability Act is the "exclusive remedy" for personal injury caused by product defect. *Koruba v. Am. Honda Motor Co.,* 396 N.J.Super. 517, 531, 935 A.2d 787 (App.Div.2007). Its enactment has eliminated the availability of claims for negligence or breach of implied warranty related to product defect, with a carved out exception for claims based on the breach of an express warranty. [1] *Id.; Tirrell v. Navistar Int'l,* 248 N.J.Super. 390, 398, 591 A.2d 643 (App.Div.1991). The method of proof for a claim asserted under the Product Liability Act is essentially the same as "that recognized for strict liability claims." *Tirrell,* 248 N.J.Super. at 398, 591 A.2d 643. In relevant part, the statute provides as follows:

A manufacturer or seller of a product shall be liable in a product liability action only if the claimant proves by a preponderance of the evidence that the product causing the harm was not reasonably fit, suitable or safe for

its intended purpose because it: [a] deviated from the design specifications, formulae, or performance standards of the manufacturer or from otherwise identical units manufactured to the same manufacturing specifications or instructions, or [b] failed to contain adequate warnings or instructions, or [c] was designed in a defective manner. N.J.S.A. § 2A:58C–2.

As the quoted provision reflects, both product manufacturers and product sellers are exposed to liability under the Product Liability Act. The statute, however, provides a mechanism for an "innocent" seller to be relieved of liability if it can demonstrate that it had "no significant responsibility for the alleged product defect and the manufacturer is amenable to service of process and is likely to be able to satisfy any judgment." *Claypotch v. Heller, Inc.,* 360 N.J.Super. 472, 485, 823 A.2d 844 (App.Div.2003). Stated differently, the New Jersey Appellate Division held that a product seller may avail itself of the immunity provided by N.J. S.A. § 2A:58C–9 if it is "truly innocent of responsibility for the alleged defective product" and if the injured party retains a viable claim against the manufacturer. *Id.; see also Bashir v. Home Depot,* No. 08–4745, 2011 WL 3625707, at *3 (D.N.J. Aug.16, 2011) (holding same, in reliance on *Claypotch* ). The relevant provision, invoked by the Moving Defendants as a basis for this summary judgment motion, requires the product seller to "file an affidavit certifying the correct identity of the manufacturer of the product which allegedly caused the injury, death or damage." N.J.S.A. § 2A:58C–9(a). This identification of the product manufacturer will relieve the seller of liability, subject to various conditions set forth in subsection d of the provision. N.J.S.A. § 2A:58C–9(b). Subsection d provides:

**\*4**  A product seller shall be liable if:

(1) The product seller has exercised some significant control over the design, manufacture, packaging or labeling of the product relative to the alleged defect in the product which caused the injury, death or damage; or

(2) The product seller knew or should have known of the defect in the product which caused the injury, death or damage or the plaintiff can affirmatively demonstrate that the product seller was in possession of facts from which a reasonable person would conclude that the product seller had or should have had knowledge of the alleged defect in the product which caused the injury, death or damage; or

(3) The product seller created the defect in the product which caused the injury, death or damage.

N.J.S.A. § 2A:58C–9(d). The burden is on the product seller to prove that the statutory exceptions to immunity do not apply. *Fidelity and Guar. Ins. Underwriters, Inc. v. Omega Flex, Inc.,* —— F.Supp.2d ——, 2013 WL 1299184, at *10 (D.N.J. Mar. 26, 2013); *see also* Bashir, 2011 WL 3625707, at *3 (holding that a product seller must present evidence that the factors in subsection (d) do not apply or point to a "lack of evidence in the record supporting opposite conclusions.").

Defendant SAFCO has demonstrated that it is entitled to summary judgment on Plaintiffs' product liability claim. It complies with the statute by submitting the Affidavit of Pam La Fontaine, SAFCO's Director of Global Sourcing. As required by § N.J.S.A. 2A:58C–9, the affidavit identifies Oasyschair as the product manufacturer. Clearly, Plaintiffs can pursue a viable claim against Oasyschair, as it is in fact a named party actively defending against Plaintiffs' claims in this lawsuit. Moreover, SAFCO has established that it is not the manufacturer of the subject chair, played no role in the manufacture of the chair or in the creation of the alleged defect which caused the chair to collapse, and had no reason or basis to know that the reinforcing pin in the chair's lower back was inserted to an insufficient depth in the manufacturing process. In the affidavit, La Fontaine states that "that area of the chair (the pins in the seats) is completely enclosed and not subject to visual inspection at any time after manufacture." (La Fontaine Aff. at ¶ 21.) She further asserts that "SAFCO had no control of any nature whatsoever regarding the manufacture of the chair, and did not manufacture the chair, nor did they place the metal pins into the plastic seats where the chair allegedly failed." (*Id.* at ¶ 22.)

Neither Plaintiffs nor Oasyschair have come forward with any evidence to dispute these facts. Instead, they attempt to create an issue of fact by pointing to evidence, consisting mostly of emails exchanged between SAFCO and Oasyschair, they contend demonstrate that SAFCO was "deeply involved" with the design, labeling and packaging of the chair. Such evidence, even when viewed in the light most favorable to non-movants Oasyschair and Plaintiffs, fails to create a genuine issue of material fact because, quite simply, the design of the chair is completely immaterial to Plaintiffs' product liability claim. Plaintiffs' expert states unequivocally, in both his deposition testimony as well as the two reports he prepared, that the only defect in the subject chair is a manufacturing defect. Neither the chair's design, nor for

that matter its labeling and packaging, are at issue in this case. Even if it were assumed, for the sake of argument, that Defendant SAFCO had exercised significant control over the design of this product, or at the very least that the evidence proffered by the non-movants pointed to a genuine dispute as to SAFCO's participation in the design, such facts are completely irrelevant.[2] They do not refute SAFCO's satisfactory demonstration that it is "truly innocent of responsibility" for the improper insertion of the reinforcing pin. Indeed, to the contrary, the product was correctly designed, according to Plaintiffs' expert, who opined that had the chair been manufactured in compliance with the design specification regarding the proper depth for the reinforcing pin, it would not have failed. SAFCO, in short has carried its burden of establishing the affirmative defense provided by the Product Liability Act for "innocent sellers."

**\*5** The other Moving Defendants, however, have not made a sufficient demonstration on this motion to avail themselves of innocent seller immunity. While the Court's review of the record strongly suggests that, like SAFCO, Defendants Liberty Diversified, Staples and CE would be entitled to summary judgment for having no involvement in creating the defect at issue, these Defendants have not complied with N.J.S.A. § 2A:58C–9. The statutory immunity provision *requires* a product seller to (1) file an affidavit identifying the product manufacturer; (2) establish that the manufacturer "is amenable to service of process and is likely to be able to satisfy any judgment;" and (3) establish that it had no "significant responsibility" for the alleged defect. Claypotch, 360 N.J.Super. at 485, 823 A.2d 844 (interpreting and applying N.J.S.A. § 2A:58C–9). The only Moving Defendant to file an affidavit and otherwise comply with the statute's innocent seller provision is SAFCO. The Court will accordingly deny the motion for summary judgment on the Product Liability Act claim as to Liberty Diversified, Staples and CE but will do so without prejudice to a renewed motion by these Defendants.

Additionally, insofar as the motion for summary judgment pertains to the claim for breach of an express warranty, it must be denied without prejudice as to all Moving Defendants. While they may be correct that Plaintiffs have no viable claim for breach of express warranty because Plaintiffs did not purchase the subject chair, Moving Defendants raise this argument for the first time in their reply brief. Their moving brief gives no indication that they seek summary judgment on the breach of express warranty claim nor the basis on which they contend that summary judgment is warranted,

Geraczynski v. National R.R. Passenger Corp., Not Reported in F.Supp.2d (2013)

2013 WL 5934552

thus giving the other parties no meaningful opportunity to present a responsive argument. The Court will therefore not consider the Moving Defendants' arguments as to the breach of express warranty claim, without precluding them from properly moving for summary judgment on this claim going forward. *Anspach v. City of Philadelphia,* 503 F.3d 256, 259 n. 1 (3d Cir.2007); *Bayer AG v. Schein Pharma. Inc.,* 129 F.Supp.2d 705, 716 (D.N.J.2001), *aff'd* 301 F.3d 1306 (2002).

## III. CONCLUSION

For the reasons discussed, this motion will be granted in favor of Defendant SAFCO only insofar as it seeks summary judgment on Plaintiffs' claim under the Product Liability Act. Summary judgment will be granted in favor of all Moving Defendants on the negligence claim. The remainder of the Rule 56(a) motion filed by Defendants SAFCO, Liberty Diversified, Staples and CE will be denied without prejudice. An appropriate order will be filed.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 5934552

## Footnotes

1    The Court notes that the Third Amended Complaint asserts negligence claims against each of the Moving Defendants, which have argued in their moving brief that the Product Liability Act is Plaintiffs' subsumes common law actions for negligence. Non-movants Oasyschair and the Plaintiffs do not dispute this point. Accordingly, the Court understands the motion to include a request for summary judgment on the negligence claim. This portion of the motion will be granted, as a negligence claim in a product liability action is clearly not viable. *Koruba,* 396 N.J.Super. at 531, 935 A.2d 787; *Tirrell,* 248 N.J. at 398.

2    For this reason, the Court finds unavailing non-movants' argument that summary judgment must be denied because they need to conduct further discovery, including the deposition of La Fontaine. They have not demonstrated, pursuant to Rule 56(d), that discovery of additional facts regarding SAFCO's involvement with the design or other aspects of bringing the chair to market could negate SAFCO's entitlement to product seller immunity. In other words, Plaintiffs and Oasyschair have not shown that additional facts could give rise to a genuine issue as to SAFCO's involvement in or knowledge of the manufacture of the subject chair.

---

    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**    © 2021 Thomson Reuters. No claim to original U.S. Government Works.    5

TAB 10

*Gomez v. H&M Int'l Transp., Inc.*, No. No.: 17–231, 2017 WL 1483306 (D.N.J. Apr. 24, 2017)

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 95 of 535
PageID: 32042
Gomez v. H&M International Transportation, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 1483306
Only the Westlaw citation is currently available.
**NOT FOR PUBLICATION**
United States District Court, D. New Jersey.

Carmen Rosa GOMEZ, Individually, and
as Administrator Ad Prosequen-dum of the
Estate of Jorge L. Gomez, Deceased, Plaintiff,

v.

H&M INTERNATIONAL
TRANSPORTATION, INC., Defendant.

Civil Action No.: 17–231 (JLL)
|
Signed 04/24/2017

**Attorneys and Law Firms**

Stephen John Liakas, Liakas Law PC, New York, NY,
Plaintiff.

William Edward Marsala, Wilson, Elser, Moskowitz,
Edelman & Dicker, LLP., White Plains, NY, John F.
Karpousis, Freehill, Hogan & Mahar LLP, Jersey City, NJ,
Thomas C. Hart, Ruprecht, Hart, Weeks & Ricciardulli, LLP,
Westfield, NJ, Thaddeus J. Hubert, Iii, Hoagland, Longo,
Moran, Dunst & Doukas, LLP, New Brunswick, NJ, Mark
Samir Hanna, Vincent E. Reilly, Kinney Lisovicz Reilly
& Wolff, PC, Parsippany, NJ, Jeffrey A. Segal, Salmon,
Ricchezza, Singer & Turchi, LLP, Sewell, NJ, Kevin J.
Mcgee, Mcdermott & Mcgee, LLP, Millburn, NJ, William
Paul Cunningham, Daly, Lamastra, Cunningham, Kirmser &
Skinner, Whitehouse Station, NJ, for Defendant.

## OPINION

JOSE L. LINARES, U.S.D.J.

**\*1** This matter comes before the Court by way of Defendant
Hoist Liftruck Manufacturing, Inc.'s ("HLM") motion to
dismiss the Complaint filed by Plaintiff Rosa Gomez. Plaintiff
has opposed this motion. (ECF No. 24No. 24). Defendants
H&M Transport Management ("H&M") and FedEx Freight,
Inc. ("FedEx") have also opposed HLM's motion. (ECF Nos.
26, 27), and HLM has replied to those oppositions (ECF
No. 28No. 28). [1] The Court decides this matter without oral
argument pursuant to Federal Rule of Civil Procedure 78.
The Court has reviewed all papers filed in support of and in
opposition to the pending motion, and for the reasons stated
herein, Defendant HLM's motion to dismiss the Complaint is
granted.

### I. Background

Plaintiff Carmen Rosa Gomez ("Plaintiff") is the surviving
wife of decedent Jorge L. Gomez. (ECF No. 1, "Compl."
¶ 1). This action arises out of an incident that occurred at
the Croxton Intermodal Terminal in Jersey City, New Jersey.
(Id. ¶ 51). Plaintiff alleges that on August 15, 2016, Mr.
Gomez was working at the Terminal "as a lift machine-
operator/switcher." (Id. ¶ 66). On that date, "[Mr. Gomez]
was in the act of transferring intermodal container FDXU
532907 from railcar DTTX 732196(c) on Track E within
Croxton Intermodal Terminal, onto Capacity Jockey Truck
#22645, using Hoist Life Truck—Loaded Container Handler
#28–9347 when the boom of the Hoist Lift Truck—Loaded
Container Handler #28–9347 and the attached intermodal
container FDXU 532907 struck" decedent. (Id. ¶ 76). Plaintiff
alleges that this incident resulted in Mr. Gomez's death. (Id.
¶ 80).

Plaintiff filed the instant action on January 12, 2017, asserting
claims in her own name and on behalf of Mr. Gomez's estate.
Plaintiff asserts claims against a number of Defendants,
each of which appear to be business entities involved in
the commercial railroad industry. (See Compl. ¶¶ 4–12).
Specifically, Plaintiff alleges the following claims: violation
of the Federal Employers' Liability Act (Count I); negligence
(Count II); design defect (Count III), manufacturing defect
(Count IV) and failure to warn (Count V) under the New
Jersey Products Liability Act; wrongful death (Count VI);
a survival action (Count VII); and loss of consortium
(Count VIII). Plaintiff also seek punitive damages against
Defendants. (Count IX).

Defendant HLM filed the pending motion to dismiss on
February 28, 2017. (ECF No. 15No. 15, "HLM Mov. Br.").
Plaintiff, as well as HLM's Co–Defendants, H&M and
FedEx, have each opposed HLM's motion to dismiss. (ECF
No. 24No. 24, "Pl.'s Br."; ECF No. 26No. 26, "H&M
Br."; ECF No. 27No. 27, "FedEx Br."). HLM replied to
these oppositions on March 27, 2017. (ECF No. 28No. 28,
"HLM Reply Br."). This motion is now ripe for the Court's
adjudication.

### II. Legal Standard

Case 1:19-md-02875-RMB-SAK Document 1382-8 Filed 07/12/21 Page 96 of 535
PageID: 32043
Gomez v. H&M International Transportation, Inc., Not Reported in Fed. Supp. (2017)

For a complaint to survive dismissal, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 62, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In determining the sufficiency of a complaint, the Court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008). Additionally, in evaluating a plaintiff's claims, generally "a court looks only to the facts alleged in the complaint and its attachments without reference to other parts of the record." *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir. 1994).

### III. Discussion

#### a. Negligence (Count II)

**\*2** In Count II of the Complaint, Plaintiff asserts a claim of negligence against the following Defendants: H&M, Norfolk Southern Corporation, Consolidated Rail Corporation, Technical Services International, MI–Jack Products, Inc., HLM, FedEx, General Cable Industries, Inc. and PMX Industries, Inc. (Compl. at 17). HLM argues that dismissal of Plaintiff's negligence claim is warranted because same is precluded by Plaintiff's NJPLA claims and because Plaintiff has failed to specifically plead any allegations of negligence as against HLM in particular. (HLM's Mov. Br. at 8; HLM's Reply Br. at 8). The Court agrees that Plaintiff's negligence claim is deficient in both regards.

A plaintiff asserting a claim under the New Jersey Products Liability Act ("NJPLA") foregoes the ability to recover under any other theory of liability as it relates to the defective product. N.J.S.A. 2A:58C–l(b)(3). The language of the PLA makes it clear the Act is the only vehicle a plaintiff may use to recover for a product liability action, expressly providing that: "*any claim* or action for harm caused by a product, *irrespective of the theory underlying the claim*, except actions for harm caused by breach of an express warranty" falls under the ambit of the Act. Id. (emphasis added); *Repola v. Morbark Indus., Inc.*, 934 F.2d 483, 492 (3d Cir. 1991) ("[I]t [is] clear that [the PLA] ... effectively creates an exclusive statutory cause of action for claims falling within its purview."). Furthermore, New Jersey courts have expressly held that "[t]he [PLA] no longer recognizes negligence or

breach of warranty (with the exception of express warranty) as a viable separate claim for 'harm' ... caused by a defective product." *Tirrell v. Navistar Int'l, Inc.*, 248 N.J. Super. 390, 398 (N.J. Super. Ct. App. Div. 1991); *see Reiff v. Convergent Tech.*, 957 F. Supp. 573, 583 (D.N.J. 1997)("Under New Jersey products liability law, negligence and breach of warranty are no longer viable as separate claims for harm caused by a defective product."); *Oquendo v. Bettcher Indus., Inc.*, 939 F. Supp. 357, 361 (D.N.J. 1996)(same).

According to Plaintiff, the "claims for negligence should not be subsumed by Plaintiff's product liability claims as the negligent conduct arises from entirely separate circumstances and is properly pleaded to include other negligent conduct on the part of Defendant, not inherent to the product itself." (Pl.'s Br. at 16). Specifically. Plaintiff argues that the negligence claims pertain to HLM's "maintenance, repair, inspection and modification of the Hoist Lift Truck." (Id.).

Yet, nowhere in the Complaint does Plaintiff assert negligence in the maintenance, repair, inspection or modification of the truck on the part of HLM. Rather, and as HLM notes, Plaintiff alleges negligence as against nine Defendants, but fails to differentiate between the conduct of any of these Defendants. (HLM's Reply Br. at 8). That is, each allegation of negligence is asserted against "the answering Defendant," as opposed to any particular Defendant, and nowhere in the Complaint has Plaintiff identified who "the answering Defendant" is. Not only does this pleading deficiency fail to properly apprise each of the Defendants as to the allegations against them, but it also results in nonsensical pleadings. For example, in subsequent paragraphs of the Complaint, Plaintiff states that "the answering Defendant was the lessee of the Hoist Lift Truck," and that "the answering Defendant was the lessor of the Hoist Lift Truck." (Compl. ¶¶ 111, 112).

The Opposing Parties attempt to cure this fatal pleading deficiency by relying on an attachment to Plaintiff's brief in opposition to the pending motion to dismiss. (Pl.'s Br. at 16; FedEx Br. at 8; H&M Br. at 5). Plaintiff relies upon this document as evidence of HLM's agreement to repair and replace various aspects of the machines, which, according to Plaintiff "allow[s] for a separate claim for negligence to proceed." (Pl.'s Br. at 16). The Court declines to consider this document for the purposes of this motion. "[M]atters extraneous to the pleadings" are not normally considered on a motion to dismiss unless they are "integral to or explicitly relied upon in the complaint." *West Penn Allegheny Health*

*Sys., Inc. v. UPMC*, 627 F.3d 85, 97 (3d Cir. 2010). In this case, the "agreement" now relied upon by the Opposing Parties was not "integral to or explicitly relied upon in the complaint," nor was it attached to that pleading. Plaintiff cannot attempt to amend the pleading through the filing of a newly-identified exhibit. Therefore, the Court declines to consider the implications, if any, of the agreement on Plaintiff's ability to assert a claim for negligence that is sufficient distinct from her NJPLA claims.

**\*3** For all of the above reasons, Defendant HLM's motion to dismiss Plaintiff's negligence claim is granted.

### b. New Jersey Products Liability Act (Counts III, IV, V)

HLM argues that Plaintiff's claims under the NJPLA must be dismissed because the Complaint does not allege the requisite facts to support these claims. (HLM's Mov. Br. at 9–11). The Court agrees.

At the outset, the Court notes that Plaintiff's claims under the NJPLA suffer from the same deficiency as the negligence claim. That is, despite the fact that Plaintiff has brought her three products liability claims against three separate Defendants—Technical Services International, Mi–Jack Products Inc., and HLM—the Complaint fails to plead specific allegations against the separate Defendants. Instead, all allegations are asserted against the unidentified "answering Defendant" or "Defendant." (See Compl. at 27–35). In other words, Plaintiff has failed to put HLM on notice as to which allegations are asserted against HLM as opposed to Technical Services International or Mi–Jack Products, Inc. For this reason alone, counts III, IV and V of Plaintiff's Complaint are subject to dismissal.

In any event, even if Plaintiff had pled allegations as against Defendant HLM specifically, the Complaint would nonetheless fail to state a claim under the NJPLA. The NJPLA provides for liability on the part of the manufacturer or seller of a product upon a showing that the product contained a manufacturing defect or a design defect, or upon a showing of a failure to warn. N.J.S.A. 2A:58C–2.

Here, the Complaint is completely devoid of any factual allegations tending to support a products liability claim. Instead, the Complaint contains conclusory language modeled off the causes of action for design defect, manufacturing defect, and failure to warn. For example, a

plaintiff asserting a claim under the NJPLA "must prove that the product was defective, that the defect could cause injury to a reasonably foreseeable user, and that the defect was the proximate cause of the plaintiff's damages." *London v. Lederle Laboratories, Div. of American Cyanamid Co.*, 290 N.J. Super 318, 326–327 (N.J. Sup. Ct. App. Div. 1996). A product is defective if it is not "reasonably fit, suitable and safe for its intended use or foreseeable purposes." *Id.* (quotations omitted).

Here, Plaintiff summarily alleges that the "Hoist Lift Truck— Loaded Container Handler #28–9347 is defective in its design or formulation in that it is not reasonably fit, suitable or safe for its intended purpose and/or its foreseeable risks exceed the benefits associated with its design and formulation." (Compl. ¶ 204). Plaintiff thereafter offers more conclusory allegations that the product was "defective." However, nowhere does Plaintiff offer any specific factual allegations explaining how the product at issue is or was, in fact, "defective." Instead, Plaintiff's Complaint contains "a formulaic recitation of the elements of a cause of action," which pleading will not stand against a motion to dismiss for failure to state a claim. *Twombly*, 550 U.S. at 555.

### c. Plaintiff's Derivative Claims (Counts VI, VII, VIII, IX)

**\*4** Finally, HLM moves for dismissal as to Plaintiff's claims for wrongful death, survival action, loss of consortium and for punitive damages. Specifically, HLM maintains that because these claims are derivative of the NJPLA and negligence claims, dismissal of those claims is warranted. The Court agrees. That is, in the absence of underlying substantive allegations, Plaintiff's claims for wrongful death, survival action, loss of consortium and for punitive damages cannot stand. *See, e.g., Smith v. Whitaker*, 160 N.J. 221, 233 (1999) (explaining that "a wrongful death action ... is a derivative action arising in favor of beneficiaries named under that act" and that a claim under the "Survival Act preserves to the decedent's estate any personal cause of action that decedent would have had if he or she had survived"); *Finley v. NCR Corp.*, 964 F. Supp. 882, 889 (D.N.J. 1996) ("Loss of consortium is a derivative claim which depends for its sustenance upon a viable tort claim of the spouse.").

### IV. Conclusion

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 98 of 535
PageID: 32045
Gomez v. H&M International Transportation, Inc., Not Reported in Fed. Supp. (2017)

For the reasons stated herein, HLM's motion to dismiss the Complaint is granted. The Court, therefore, dismisses Plaintiff's claims as against HLM, without prejudice to Plaintiff filing an amended pleading that cures the deficiencies identified herein. An appropriate Order accompanies this Opinion.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 1483306

## Footnotes

1    On April 6, 2017, by way of letter to the Court, Defendant General Cable Industries joined in the oppositions filed by Plaintiff, H&M, and FedEx. (ECF No. 29No. 29).

End of Document                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

TAB 11

*Heaton v. Mathes*, 2020 WL 1652571 (Tenn. App. April 3, 2020)

2020 WL 1652571

SEE COURT OF APPEALS RULES 11 AND 12
Court of Appeals of Tennessee,
AT KNOXVILLE.

Charles Huddleston HEATON, Jr., et al.

v.

Catherine L. MATHES et al.

No. E2019-00493-COA-R9-CV
|
January 23, 2020 Session
|
FILED 04/03/2020

**Appeal from the Circuit Court for Knox County, No. 3-526-16, Deborah C. Stevens, Judge**

**Attorneys and Law Firms**

John Knox Walkup and Andrew J. Pulliam, Nashville, Tennessee, for the appellants, Cigna Home Delivery Pharmacy; Tel-Drug, Inc.; Tel-Drug of Pennsylvania, LLC; and David Scott Dessender.

Leslie A. Muse and Grant E. Mitchell, Knoxville, Tennessee, for the appellees, Charles Huddleston Heaton, Jr., and Miki Heaton.

Thomas R. Frierson, II, J., delivered the opinion of the court, in which D. Michael Swiney, C.J., and Richard H. Dinkins, J., joined.

**OPINION**

Thomas R. Frierson, II, J.

**\*1** The plaintiffs filed a health care liability action against a pharmacy and other medical defendants, claiming, *inter alia*, that the defendants failed to provide proper patient counseling and failed to warn of the risks associated with a prescription drug. The pharmacy defendants subsequently filed a motion to dismiss, asserting that the gravamen of the complaint against them was a products liability action rather than a health care liability action. The defendants further asserted that the "seller shield" defense found within the Tennessee Products Liability Act provided them with immunity from liability. The trial court denied the defendants'

motion to dismiss, ruling that the complaint stated a health care liability action rather than a products liability action. The trial court subsequently granted the defendants' motion for permission to seek interlocutory appeal regarding whether the seller shield defense contained within the Tennessee Products Liability Act could be asserted when the plaintiffs' claim is made pursuant to the Tennessee Health Care Liability Act. Following our thorough consideration of the issue, we affirm the trial court's judgment, determining that the seller shield defense found in the Tennessee Products Liability Act is inapplicable to claims made under the Tennessee Health Care Liability Act.

I. Factual and Procedural History

On November 28, 2016, the plaintiffs, Charles Huddleston Heaton, Jr., and Miki Heaton, filed a complaint in the Knox County Circuit Court ("trial court") against Dr. Catherine L. Mathes; Tennessee Center for Internal Medicine; Summit Medical Group, PLLC; Novo-Nordisk, Inc.; Cigna Home Delivery Pharmacy ("CHDP"); Tel-Drug, Inc.; Tel-Drug of Pennsylvania, LLC; and David Scott Dessender. In this complaint, the Heatons alleged that they had been damaged as a result of Mr. Heaton's suffering acute pancreatitis and a subsequent traumatic brain injury caused by Mr. Heaton's use of the prescription medication Victoza and the medical providers' failure to appropriately "prescribe, counsel, provide, utilize, and/or discontinue this medication." More specifically, the Heatons alleged claims of strict liability and simple negligence against Victoza's manufacturer, Novo-Nordisk, Inc., and health care liability claims against the remaining defendants, including Mr. Heaton's physician who prescribed Victoza, Dr. Mathes, and the out-of-state, mail-order pharmacies where Mr. Heaton's prescriptions for Victoza were filled as well as the pharmacist who filled them: CHDP; Tel-Drug, Inc.; Tel-Drug of Pennsylvania, LLC; and pharmacist Dessender (collectively, "the CHDP Defendants").

According to the Heatons, on July 30, 2014, Dr. Mathes prescribed Victoza for Mr. Heaton to treat his diabetes. Subsequently, in the summer of 2015, the Food and Drug Administration issued a Risk Evaluation and Mitigation Strategy ("REMS") for Victoza to warn of the risk of acute pancreatitis with the medication's use. Mr. Heaton asserted that he was not warned of this risk by any of the named defendants.

On September 27, 2015, Mr. Heaton was transported by ambulance to the University of Tennessee Medical Center with a complaint of severe abdominal pain. In November 2015, while traveling for the Thanksgiving holiday, Mr. Heaton was taken to Northridge Medical Center in Commerce, Georgia, where he was diagnosed with and treated for acute pancreatitis, sepsis, and acute respiratory failure. During this hospitalization, Mr. Heaton was allegedly informed that his pancreatitis was likely a result of his use of Victoza.

The Heatons stated in their complaint that on December 30, 2015, Mr. Heaton was taken to the emergency room of Tennova North in Knox County, Tennessee, with complaints of abdominal pain, nausea, and vomiting. Mr. Heaton reportedly had lost approximately thirty pounds, and a gastrostomy tube was inserted during this visit. He remained in the hospital until January 11, 2016, but was later readmitted from January 15 through January 29, 2016, for ongoing treatment of "necrotizing pancreatitis and severe malnutrition." Mr. Heaton was sent to inpatient rehabilitation for approximately four weeks following his discharge from the hospital. Mr. Heaton asserted that after his discharge from inpatient rehabilitation, he remained in a weakened physical state, which resulted in a fall that caused him to suffer a severe traumatic brain injury on April 22, 2016. Mr. Heaton also asserted that he remained disabled as a result of numerous medical complications, all of which were allegedly caused by his use of Victoza.

**\*2** The Heatons averred in their complaint, *inter alia*, that the CHDP Defendants failed to provide any patient counseling to Mr. Heaton related to risks associated with his continued use of Victoza. They further alleged that the CHDP Defendants failed to notify Mr. Heaton of the 2015 REMS warning, which noted the risk of developing acute pancreatitis with Victoza's use and instructed observation of symptoms and discontinuance of Victoza if pancreatitis was suspected. The Heatons asserted that the CHDP Defendants should be held liable under the Tennessee Health Care Liability Act ("THCLA") and that proper pre-suit notice had been sent to all defendants. *See* Tenn. Code Ann. § 29-26-121(a) (Supp. 2019) (requiring written pre-suit notice to each defendant within a one-year statute of limitations and at least sixty days prior to filing the complaint).

On January 13, 2017, the CHDP Defendants filed a motion to dismiss the complaint based on, *inter alia*, the seller shield statute, which is codified at Tennessee Code Annotated §

29-28-106 (2012) of the Tennessee Products Liability Act ("TPLA"). This statutory subsection provides that a products liability action cannot be maintained against a product's seller, other than the manufacturer, except in certain enumerated circumstances. *See* Tenn. Code Ann. § 29-28-106. The CHDP Defendants asserted that this statute shielded pharmacists from liability in the situation alleged in the complaint. The CHDP Defendants argued that the Heatons' complaint mislabeled the alleged claims against the CHDP Defendants as health care liability claims when the gravamen of the complaint against the CHDP Defendants was a products liability claim. The CHDP Defendants further claimed that the TPLA, codified at Tennessee Code Annotated §§ 29-28-101, *et seq.* (2012), applies to failure-to-warn claims against pharmacists as sellers of drugs and, therefore, the claim should be dismissed based upon Tennessee Code Annotated § 29-28-106 because the CHDP Defendants were merely sellers and not the product's manufacturer. Finally, the CHDP Defendants argued that they had no duty to provide warnings to Mr. Heaton other than those provided by the manufacturer and that the complaint therefore did not state a health care liability action against the CHDP Defendants.

On August 27, 2018, the trial court entered an order denying the CHDP Defendants' motion to dismiss. Addressing the interplay between the TPLA and the THCLA, the court determined that the seller shield statute contained within the TPLA would not shield the CHDP Defendants from a THCLA claim. Concerning that issue, the court relied upon the reasoning of a multi-district federal court decision involving a similar question: *In re New England Compounding Pharmacy, Inc. Prods. Liab. Litig.*, No. 13-02419-RWZ, 2014 WL 4322409 (D. Mass. Aug. 29, 2014) ("*New England*"). [1] The trial court explained:

> There are certainly times where it would be more beneficial for one side or the other to proceed under a cause of action as a product liability claim versus a health care liability claim and vice versa. Because of the procedural differences as previously described, there may be situations where one or the other apply but to proceed under both would be unworkable. Absent any particular guidance from the legislation as to the applicability of the product liability defenses that may have been available prior to the passage of the expanded Tennessee Health Care Liability Act, the courts have to examine the gravamen of the complaint.

> In the case at hand, the Plaintiffs allege that the CHDP Defendants are liable for failing to follow the Tennessee Board of Pharmacy Rules; failing to provide patient

counseling; failure to warn and failing to act with due and reasonable care. Complaint at ¶45 and also ¶47-48. Based upon the reasoning set forth in the *New England Compounding Pharmacy* case and the Tennessee precedent regarding pharmacists' duty to warn ... this Court finds that this case should proceed as a health care liability action and the defenses available under the Tennessee Product Liability Act at Tenn. Code Ann. § 29-28-106 are not applicable and therefore the Motion to Dismiss should be DENIED.

**\*3** On September 26, 2018, the CHDP Defendants filed a motion seeking permission for an interlocutory appeal pursuant to Tennessee Rule of Appellate Procedure 9. Following consideration of the Rule 9 factors, the trial court granted the Motion concerning the issue of the interplay between the TPLA and the THCLA and the applicability of a TPLA defense to the Heatons' claims against the CHDP Defendants. The trial court concluded that interlocutory appeal should be granted to enable this Court to address the issue of whether the seller shield defense, codified at Tennessee Code Annotated § 29-28-106, should be applied to bar a claim under the THCLA. This Court likewise granted permission for interlocutory review.

## II. Issue Presented

Pursuant to Tennessee Rule of Appellate Procedure 9, "we are limited on appeal to the question certified by the trial court in its order granting permission to seek an interlocutory appeal and in this Court's order granting the appeal." *In re Bridgestone/Firestone & Ford Motor Co. Litig.*, 286 S.W.3d 898, 902 (Tenn. Ct. App. 2008) (citing Tenn. R. App. P. 9). The trial court's order and this Court's order granting interlocutory appeal present the following issue for our review:

> If the complaint asserts a claim under the Tennessee Health Care Liability Act against the pharmacy/pharmacist defendants (Cigna Defendants), are the pharmacy/pharmacist defendants barred from asserting the "seller shield" defense set forth in the

Tennessee Products Liability Act, Tenn. Code Ann. § 29-28-106?

## III. Standard of Review

Following the grant of an application for interlocutory appeal, "the standard of review is the same standard that would have been applied to the issue(s) in an appeal as of right." *See Peck v. Tanner*, 181 S.W.3d 262, 265 (Tenn. 2005). A trial court's denial of a motion to dismiss is a question of law, which this Court reviews *de novo* with no presumption of correctness.

*See Cannon ex rel. Good v. Reddy*, 428 S.W.3d 795, 799 (Tenn. 2014); *see also Leggett v. Duke Energy Corp.*, 308 S.W.3d 843, 851 (Tenn. 2010). Upon appeal of such an order, "we take all allegations of fact in the plaintiff's complaint as true, and review the lower courts' legal conclusions *de novo* with no presumption of correctness." *Stein v. Davidson Hotel Co.*, 945 S.W.2d 714, 716 (Tenn. 1997).

This appeal also involves the interpretation of state statutes. As our Supreme Court has explained:

> Statutory construction is a question of law that is reviewable on a de novo basis without any presumption of correctness. When dealing with statutory interpretation, well-defined precepts apply. Our primary objective is to carry out legislative intent without broadening or restricting the statute beyond its intended scope. In construing legislative enactments, we presume that every word in a statute has meaning and purpose and should be given full effect if the obvious intention of the General Assembly is not violated by so doing. When a statute is clear, we apply the plain meaning without complicating the task. Our obligation is simply to enforce the written language. It is only when a statute is ambiguous that we may reference the broader statutory scheme, the history of the legislation, or other sources. Further, the language of a statute cannot be considered in a vacuum, but "should be construed, if practicable, so that its component parts are consistent and reasonable." *Marsh v. Henderson*, 221 Tenn. 42, 424 S.W.2d 193, 196 (1968). Any interpretation of the statute that "would render one section of the act repugnant to another" should be avoided. *Tenn. Elec. Power Co. v. City of Chattanooga*, 172 Tenn. 505, 114 S.W.2d 441, 444 (1937). We also must presume that the

General Assembly was aware of any prior enactments at
the time the legislation passed.

**\*4**  *In re Estate of Tanner*, 295 S.W.3d 610, 613-14 (Tenn.
2009)* (other internal citations omitted).

### IV. Interplay Between TPLA and THCLA

The issue on appeal involves the interplay between the TPLA
and the THCLA when health care liability claims are asserted
against a pharmacist and/or pharmacy for failure to warn of
risks associated with a prescription medication. Specifically,
the issue presented questions whether defendant pharmacies
or pharmacists may assert the seller shield defense contained
within the TPLA when the plaintiffs' complaint states a
claim pursuant to the THCLA. We agree with the trial court's
determination that the seller shield defense is inapplicable to
this action.

The "seller shield" is found at Tennessee Code Annotated §
29-28-106 and provides as follows:

No product liability action, as defined in § 29-28-102, shall
be commenced or maintained against any seller, other than
the manufacturer, unless:

(1) The seller exercised substantial control over that
aspect of the design, testing, manufacture, packaging
or labeling of the product that caused the alleged harm
for which recovery of damages is sought;

(2) Altered or modified the product, and the alteration
or modification was a substantial factor in causing the
harm for which recovery of damages is sought;

(3) The seller gave an express warranty as defined by
title 47, chapter 2;

(4) The manufacturer or distributor of the product or part
in question is not subject to service of process in this
state and the long-arm statutes of Tennessee do not
serve as the basis for obtaining service of process; or

(5) The manufacturer has been judicially declared
insolvent.

Tennessee Code Annotated § 29-28-102 (2012) defines a
product liability action as:

[A]ll actions brought for or on account
of personal injury, death or property
damage caused by or resulting from
the manufacture, construction, design,
formula, preparation, assembly,
testing, service, warning, instruction,
marketing, packaging or labeling
of any product. "Product liability
action" includes, but is not limited
to, all actions based upon the
following theories: strict liability in
tort; negligence; breach of warranty,
express or implied; breach of or failure
to discharge a duty to warn or instruct,
whether negligent, or innocent;
misrepresentation, concealment, or
nondisclosure, whether negligent,
or innocent; or under any other
substantive legal theory in tort or
contract whatsoever.

In conjunction with an analysis of the interplay between the
TPLA and the THCLA, some historical context is helpful.
Before the more recent amendments to the THCLA were
enacted, the statute originally spoke in terms of "medical
malpractice" actions, which the statute defined as

an action for damages for personal
injury or death as a result of any
medical malpractice by a health care
provider, whether based upon tort
or contract law. The term shall not
include any action for damages as a
result of negligence of a health care
provider when medical care by such
provider is not involved in such action.

**\*5**  Tenn. Code Ann. § 29-26-102 (1978). *See Burris v. Hosp.
Corp. of Amer.*, 773 S.W.2d 932, 934 (Tenn. Ct. App. 1989).

In *Burris*, a surgeon performed surgery on the patient's lung,
utilizing "Teflon felt" to support the sutures used to close
the lung. *See id.* at 933. Following the patient's death in

1987, allegedly due to complications she suffered as a result of the Teflon felt, the patient's estate filed suit against the hospital, the surgeon, and others. *See id.* The trial court granted summary judgment to the hospital, determining that the three-year statute of repose contained within the Medical Malpractice Act would apply. *See id.*

On appeal in *Burris*, the patient's estate argued that the claim asserted was in the nature of a products liability claim, which was not within the purview of the medical malpractice statutes. *See id.* at 935. This Court disagreed, stating that a claim could fall within the purview of the Medical Malpractice Act even though it "involve[d] the characteristics of a products liability case." *See id.* This Court reasoned that because the act used the inclusive phrase, "whether based upon tort or contract law," and because all civil actions were based in either contract or tort, "any ground" alleged would fall within the purview of the Medical Malpractice Act. *See id.*

More specifically, concerning actions against pharmacists and pharmacies, both the Tennessee Supreme Court and this Court have determined that a pharmacist or pharmacy owes a professional duty of care to a patient to act in compliance with the standard of care required by the pharmacy profession. *See Pittman v. Upjohn Co.*, 890 S.W.2d 425, 434 (Tenn. 1994); *see also Dooley v. Everett*, 805 S.W.2d 380, 385 (Tenn. Ct. App. 1990) ("The pharmacist is a professional who has a duty to his customer to exercise the standard of care required by the pharmacy profession in the same or similar communities as the community in which he practices his profession."). This is, of course, similar to the standard applicable to all medical professionals in malpractice/health care liability actions. *See, e.g., Shipley v. Williams*, 350 S.W.3d 527, 537 (Tenn. 2011) (explaining the standard applicable to medical defendants).

In 2011, the Tennessee Legislature passed the Tennessee Civil Justice Act of 2011, which amended, *inter alia*, Tennessee's Medical Malpractice Act. *See Ellithorpe v. Weismark*, 479 S.W.3d 818, 826 (Tenn. 2015) (citing 2011 Pub. Acts, Ch. 510 § 9 (H.B. 2008)). As our Supreme Court has explained:

> [T]he Tennessee Civil Justice Act of 2011 amended the existing Tennessee Medical Malpractice Act by removing all references to "medical malpractice" from the Tennessee Code and replacing them with "health care liability" or "health care liability action" as applicable. Furthermore, section 29-26-101 was added to the Code which defined

"health care liability action" as "any civil action, including claims against the state or a political subdivision thereof, alleging that a health care provider or providers have caused an injury related to the provision of, or failure to provide, health care services to a person, *regardless of the theory of liability on which the action is based.*" Tenn. Code Ann. 29-26-101(a)(1) (Supp. 2011) (emphasis added). This same section went on to provide that "[a]ny such civil action or claim is subject to the provisions of this part regardless of any other claims, causes of action, or theories of liability alleged in the complaint." *Id.* § 29-26-101(c).

***6** *Id.*

The THCLA defines a "health care provider" as, *inter alia*, a "health care practitioner licensed, authorized, certified, registered, or regulated under any chapter of title 63 or title 68...." Tenn. Code Ann. § 29-26-101 (a)(2)(A) (Supp 2019). Pharmacies and pharmacists are regulated under Title 63, Chapter 10 of the Code. *See* Tenn. Code Ann. § 63-10-201, *et seq.* (2017). As such, pharmacists and pharmacies clearly come within the THCLA's definition of health care providers.

Although Tennessee courts have previously applied malpractice/health care liability law to claims involving pharmacists or pharmacies who failed to warn patients of the risks of particular medications, our research has revealed no Tennessee cases addressing the interplay between the THCLA and the TPLA when there is an allegation that the medication itself was dangerous. The issue of the interplay between the TPLA and THCLA has only been specifically addressed by the Massachusetts federal district court in the *New England* case, both in the 2014 decision and in a subsequent 2016 decision. *See In re New England Compounding Pharmacy, Inc. Prods. Liab. Litig.*, No. 13-02419-RWZ, 2016 WL 11045600 (D. Mass. Feb. 29, 2016) ("*New England II*"). In *New England II*, the federal court ultimately determined that the THCLA would control in that litigation. *See id.* at *1. We note that "[c]ases from other jurisdictions, including federal cases, are always instructive, sometimes persuasive, but never controlling in our decisions." *Summers Hardware & Supply Co., Inc. v. Steele*, 794 S.W.2d 358, 362 (Tenn. Ct. App. 1990).

The *New England II* plaintiffs had asserted a cause of action concerning a product, methylprednisolone acetate ("MPA"), which adversely affected the plaintiffs following their receipt of the contaminated injections of the drug. *See* 2016 WL 11045600, at *1. Because the plaintiffs' injuries in that case resulted from both a product and the provision of health care services (injections), the district court determined that

both the TPLA and the THCLA ostensibly governed. *See id.* However, in *New England II*, the district court determined that the mutually exclusive liability regimes of the TPLA and the THCLA left them in conflict with one another. *See id.* at *2. The district court concluded: "Because the coverage provisions of the two statutes overlap in this instance, their conflicting liability and damages provisions preclude the application of both, and force a choice between them." *Id.* To resolve this conflict, the district court followed Tennessee precedent regarding such conflicts and applied "the more specific statute in lieu of the more general one." *Id.* (citing *Graham v. Caples,* 325 S.W.3d 578, 582 (Tenn. 2010)). Under this approach, the district court concluded that the THCLA was the more specific statute between the two; therefore, the THCLA took precedence and rendered the TPLA inapplicable. *See New England II*, 2016 WL 11045600, at *2.

We determine that the provisions of the TPLA and the THCLA maintain some overlap in coverage when the product involved has a medical use or application. For example, the THCLA governs "any civil action ... alleging that a health care provider or providers have caused an injury related to the provision of, or failure to provide, health care services to a person, regardless of the theory of liability on which the action is based." Tenn. Code Ann. § 29-26-101(a)(1). As the federal district court determined in *New England II*, the terms "any" and "related" contained in Tennessee Code Annotated § 29-26-101(a)(1) emphasize the expansive nature of the THCLA. *See* 2016 WL 11045600, at *1. The *New England II* Court explained that "[a] legislature's use of the word 'any' typically indicates its intent for a statute to have maximal reach." *Id.* (citing United States v. Gonzalez, 520 U.S. 1, 5 (1997)). Similarly, the *New England II* Court explained that the word, "related," "denotes a similar breadth." *See* 2016 WL 11045600, at *1 (citing BLACK'S LAW DICTIONARY (10th ed. 2014)).

 **\*7** We note that our Supreme Court's interpretation of the THCLA supports this approach. *See* Ellithorpe, 479 S.W.3d at 827 (emphasizing that the THCLA applies to "*all* civil actions alleging that a covered health care provider or providers have caused an injury related to the provision of, or failure to provide, health care services"). Likewise, the TPLA also provides expansive coverage governing "all actions brought for or on account of personal injury, death, or property damage caused by or resulting from ... any product ...

under any ... theory in tort or contract whatsoever." *See* Tenn. Code Ann. § 29-28-102(6).

As the *New England II* Court explained:

> The THCLA precludes faultless liability, and requires that plaintiffs prove some dereliction of a professionally acceptable standard of care. Tenn. Code Ann. § 29-26-115(a) (West 2015); *see also* Rye v. Women's Care Center of Memphis, MPLLC, [477] S.W.3d [235, 265-67], 2015 WL 6457768 at *23-24 (Tenn. Oct. 26, 2015). The TPLA, however, embraces strict liability, and requires no showing of fault. Tenn. Code Ann. § 29-28-105(a) (West 2015). Further, the two statutes have incompatible rules for joint tortfeasor liability. The THCLA follows Tennessee's general liability rule that "each defendant will be liable only for the percentage of the damages caused by it," Ridings v. Ralph M. Parsons Co., 914 S.W.2d 79, 83 (Tenn. 1996). The TLPA, however, overrides that rule, and imposes joint and several liability in strict products liability actions. *See* Owens v. Truckstops of Am., 915 S.W.2d 420, 432 (Tenn. 1996) ("[J]oint and several liability ... is essential to the theory of strict products liability.").

*New England II*, 2016 WL 11045600, at *2 (footnote omitted). [2]

In the case at bar, the trial court properly determined that the complaint filed by the plaintiffs was a health care liability action. *See* Ellithorpe, 479 S.W.3d at 827. As the trial court noted in its order granting permission for an interlocutory appeal, "the Cigna Defendants identify the issue [for interlocutory appeal] as 'whether ... Tennessee law allows the seller shield defense ... to be asserted as a defense to claims asserted against a pharmacist under the Health Care Liability Act[.]' " The trial court accordingly determined that the CHDP Defendants had "conceded the applicability of the Health Care Liability Act to this cause of action." As such, the only question that was certified to this Court is "[i]f the complaint asserts a claim under the Tennessee Health Care Liability Act ... are the pharmacy/pharmacist defendants barred from asserting the "seller shield" defense set forth in the Tennessee Products Liability Act, Tenn. Code Ann. § 29-28-106[?]"

Based on the question as it was certified to this Court, we must determine only whether the seller shield defense contained

within the TPLA may be applied to provide immunity for a defendant sued under the THCLA. This question requires that we engage in statutory interpretation relative to the two acts. As our Supreme Court has previously explained:

**\*8** "The most basic principle of statutory construction is to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope." *Owens v. State*, 908 S.W.2d 923, 926 (Tenn. 1995). "The text of the statute is of primary importance." *Mills* [*v. Fulmarque, Inc.*], 360 S.W.3d [362,] 368 [ (Tenn. 2012) ]. "A statute should be read naturally and reasonably, with the presumption that the legislature says what it means and means what it says." *In re Kaliyah S.*, 455 S.W.3d 533, 552 (Tenn. 2015) (citing *BellSouth Telecomms., Inc. v. Greer*, 972 S.W.2d 663, 673 (Tenn. Ct. App. 1997)).

*Moreno v. City of Clarksville*, 479 S.W.3d 795, 804 (Tenn. 2015) (other internal citations omitted). Moreover, Tennessee Code Annotated § 1-3-103 (2014) provides that "[i]f provisions of different titles or chapters of the code appear to contravene each other, the provisions of each title or chapter shall prevail as to all matters and questions growing out of the subject matter of that title or chapter." *See, e.g., Sneed v. City of Red Bank, Tenn.*, 459 S.W.3d 17, 27 (Tenn. 2014) (holding that the more recently enacted Tennessee Human Rights Act was "an independent statutory scheme that create[d] remedies and remove[d] governmental immunity" such that it, rather than the Governmental Tort Liability Act, controlled the adjudication of the plaintiff's age discrimination claim against a municipality).

Based on the trial court's determination and the CHDP Defendants' concession that the claims stated fall under the THCLA, we determine that the seller shield defense contained within the TPLA cannot apply. A natural and reasonable reading of the language of Tennessee Code Annotated § 29-28-106 demonstrates that it only applies to product liability actions. *See Moreno*, 479 S.W.3d at 804 (cautioning against the expansion of a statute beyond its intended scope). Furthermore, the THCLA applies to all health care providers, including pharmacies and pharmacists, without limitation based on any type of product seller immunity. *See, e.g.*, Tenn. Code Ann. § 29-26-101, *et seq.*

The CHDP Defendants' attempts to utilize the TPLA's seller shield defense to immunize themselves from liability for a claim filed pursuant to the THCLA would be akin to an attempt by a defendant in a product liability action to defend on the basis of lack of pre-suit notice, which is a defense only to a claim under the THCLA. Because the complaint states a cause of action pursuant to the THCLA, the provisions of that statute "shall prevail as to all matters and questions growing out of the subject matter of that title or chapter." Tenn. Code Ann. § 1-3-103. As such, the seller shield defense contained within the TPLA is applicable only to product liability actions and cannot be used as a defense to the Heatons' THCLA claims.

## V. Conclusion

For the foregoing reasons, we affirm the trial court's denial of the CHDP Defendants' motion to dismiss. Costs on appeal are taxed to the CHDP Defendants: Cigna Home Delivery Pharmacy; Tel-Drug, Inc.; Tel-Drug of Pennsylvania, LLC; and David Scott Dessender. This matter is remanded to the trial court for further proceedings consistent with this opinion.

**All Citations**

Slip Copy, 2020 WL 1652571, Prod.Liab.Rep. (CCH) P 20,877

## Footnotes

1    In *New England*, certain of the defendants were clinics, hospitals, and other health care providers from Tennessee. Because some defendants in the case were from Tennessee, the Massachusetts District Court analyzed the claims pursuant to Tennessee law.

2    Both parties assert that this Court should be persuaded by *McDonald v. W.-Ward Pharm. Corp.*, No. 2:18-CV-02084-JTF-DKV, 2018 WL 6499353, at \*6 (W.D. Tenn. Oct. 3, 2018), *report and recommendation adopted sub nom. McDonald v. Schriner*, No. 2:18-CV-02084-JTF-DKV, 2019 WL 1040978 (W.D. Tenn. Mar.

5, 2019). We note that in *McDonald*, the federal court similarly determined that a claim against a pharmacy for dispensing medication without warning of risks fell under the THCLA while claims against the medication's manufacturers fell under the TPLA.

---

**End of Document**                              © 2021 Thomson Reuters. No claim to original U.S. Government Works.

---

TAB 12

*Hemmings v. Camping Time RV Centers, LLC*, 2017 WL 4552896 (N.D. Ga. Oct. 11, 2017)

Hemmings v. Camping Time RV Centers, LLC, Not Reported in Fed. Supp. (2017)

2017 WL 4552896, 93 UCC Rep.Serv.2d 1230

2017 WL 4552896
United States District Court,
N.D. Georgia, Atlanta Division.

Charles Clifton HEMMINGS, Plaintiff,

v.

CAMPING TIME RV CENTERS, LLC doing business
as Camping World RV Sales, et al., Defendants.

CIVIL ACTION FILE NO. 1:17-CV-1331-TWT
|
Signed 10/11/2017

**Attorneys and Law Firms**

Thomas Michael Flinn, Office of Thomas Michael Flinn,
Carrollton, GA, for Plaintiff.

Matthew Jordan Grossman, Paul Michael Scott, Brown,
Readdick, Bumgartner, Carter, Strickland and Watkins,
Brunswick, GA, for Defendants.

### OPINION AND ORDER

THOMAS W. THRASH, JR., United States District Judge

*1  This is a breach of warranty action. It is before the
Court on the Defendant Keystone RV Company's Partial
Motion to Dismiss [Doc. 2] and the Defendants Camping
Time RV Centers, LLC and Bank of America, N.A.'s
Motion to Dismiss [Doc. 3]. For the reasons set forth below,
the Defendant Keystone RV Company's Partial Motion to
Dismiss [Doc. 2] is GRANTED in part and DENIED in
part, and the Defendants Camping Time RV Centers, LLC
and Bank of America, N.A.'s Motion to Dismiss [Doc. 3] is
GRANTED in part and DENIED in part.

### I. Background

This case arises out of the purchase of an allegedly defective
RV camper. On March 21, 2016, the Plaintiff Charles Clifton
Hemmings purchased a 2016 Keystone 422 Fuzion Fifth
Wheel RV camper (the "Camper") for over $70,000.[1]
The Camper was manufactured by Defendant Keystone RV
Company ("Keystone") and sold to the Plaintiff by the
Defendant Camping Time RV Centers ("Camping Time").[2]
The Plaintiff and Camping Time signed a binding purchase

contract (the "Sales Agreement"), which contained, among
other things, a disclaimer of warranties and limitation of
remedies.[3]  The Camper came with a "Limited One Year
Warranty" provided by Keystone.[4]  This limited warranty
provided that the Camper would be free from defects in
"materials and workmanship supplied and attributable to
Keystone," and that Keystone would repair or replace in the
event that a defect exists.[5]

Subsequently, the Plaintiff discovered defects with the
Camper, and brought it to the Defendants to make necessary
repairs.[6]  The Plaintiff was told that all repairs would be made
under the warranty.[7]  On July 31, 2016, the Plaintiff returned
to pick up the Camper after this attempted repair. However,
the air conditioning unit still did not function properly.[8]
Camping Time's employees then discovered that there was
a breach in the air conditioning duct.[9]  Camping Time had
never dealt with an issue like this before, and did not know
how to repair it.[10]  Overall, Camping Time attempted repairs,
without success, from July 31, 2016 to September 5, 2016.[11]
The air conditioning defect still remains unrepaired.[12]

The Plaintiff and his wife communicated with various
employees over the course of the attempted repairs.[13]
Camping Time's employees advised the Plaintiff that
Keystone's recommended repair of this defect would be to
cut a hole in the ceiling of the Camper and use duct tape to
tape the air conditioning vents back together. The Plaintiff
found this repair unacceptable, and rejected it.[14]  Camping
Time submitted a request to Keystone to make necessary
repairs, which Keystone allegedly refused to acknowledge.[15]
Keystone advised Camping Time that the appropriate solution
was to cut into the ceiling panel to repair the air conditioning
duct, as it had previously suggested.[16]

*2  On October 14, 2016, the Plaintiff's counsel wrote
Camping Time, Keystone, and Bank of America to advise
them of the problems with the Camper, and demand that
they repurchase the Camper.[17]  The Plaintiff also demanded
that Bank of America refund "all monies paid to date."[18]
Keystone then attempted one more unsuccessful repair, and
returned the Camper to the Plaintiff with the defects still in
place.[19]

WESTLAW  © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Hemmings v. Camping Time RV Centers, LLC, Not Reported in Fed. Supp. (2017)

2017 WL 4552896, 93 UCC Rep.Serv.2d 1230

On February 28, 2017, the Plaintiff filed this suit against the Defendants in state court. The Plaintiff asserts claims for breach of express and implied warranties, revocation of acceptance, rejection of defective tender, violation of the Magnuson-Moss Warranty Act, and violation of the FTC Holder Rule. The Defendants removed to this Court, and now move to dismiss.

## II. Legal Standard

A complaint should be dismissed under Rule 12(b)(6) only where it appears that the facts alleged fail to state a "plausible" claim for relief. [20] A complaint may survive a motion to dismiss for failure to state a claim, however, even if it is "improbable" that a plaintiff would be able to prove those facts; even if the possibility of recovery is extremely "remote and unlikely." [21] In ruling on a motion to dismiss, the court must accept the facts pleaded in the complaint as true and construe them in the light most favorable to the plaintiff. [22] Generally, notice pleading is all that is required for a valid complaint. [23] Under notice pleading, the plaintiff need only give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests. [24]

## III. Discussion

### A. Rejection of Defective Tender and Revocation of Acceptance

#### 1. Keystone

First, Keystone argues that Counts I and II for rejection of defective tender and revocation of acceptance should be dismissed due to lack of privity between it and the Plaintiff. [25] The Plaintiff concedes that he is not asserting these two claims against Keystone. [26] Therefore, Counts I and II are deemed abandoned as to Keystone.

#### 2. Camping Time and Bank of America

Next, Camping Time and Bank of America move to dismiss the Plaintiff's claims for rejection of defective tender and revocation of acceptance. They argue that the Sales Agreement excluded these remedies. [27] The Plaintiff responds that he has stated a valid claim for revocation of acceptance because he has "create[d] a factual question on defects substantially impairing the value" of the Camper, because the limitation of remedies does not apply to failure to comply with the warranties, because the limitation of remedies fails of its essential purpose, and because the limitation on remedies is unconscionable. [28]

**\*3** O.C.G.A. § 11-2-719(1) allows for the modification or limitation of remedies in a contract. It states that a contract may provide for remedies in addition to or in substitution for those provided by the UCC and may also limit or alter the measure of damages recoverable. [29] However, Camping Time's limitation of remedies does not apply to revocation of acceptance. "[R]evocation of acceptance under O.C.G.A. § 11-2-608 is an available remedy even where the seller has attempted to limit its warranties." [30] Therefore, the limitation of remedies does not preclude the Plaintiff from asserting a claim for revocation of acceptance.

Furthermore, even if the parties could exclude revocation of acceptance as an available remedy, Camping Time's limitation of remedies would fail. The ability to modify remedies under the UCC is not without limit. O.C.G.A. § 11-2-719(2) provides that "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this title." [31] A seller such as Camping World cannot disclaim *all* contractual remedies entirely. Instead, there must be some modicum of relief available to a buyer for a breach of a contract.

The Official Comment to [O.C.G.A. § 11-2-719] states: "[I]t is of the very essence of a sales contract that at least minimum adequate remedies be available. If the parties intend to conclude a contract for sale within this Article *they must accept the legal consequence that there be at least a fair quantum of remedy for breach* of the obligations or duties outlined in the contract. Thus any clause purporting to modify or limit the remedial provisions of this Article in an unconscionable manner is subject to deletion and in that event the remedies made available by this Article are applicable as if the stricken clause had never existed." [32]

Thus, a limitation of remedies that leaves a buyer without any recourse against a seller is subject to deletion as being unconscionable.

2017 WL 4552896, 93 UCC Rep.Serv.2d 1230

In Freeman, the court found an automobile lessor's exclusion of remedies to be unconscionable. The lease at issue excluded all remedies except those that the lessee may have had against the manufacturer and dealer.[33] The court found that this limitation of remedies was unconscionable, and allowed the lessee to pursue a revocation of acceptance claim against the lessor.[34] The court noted that O.C.G.A. § 11-2-719 allows parties to substitute remedies and limit damages, but does not allow them to "bar all remedies and avoid all damages."[35] The agreement here left the lessor without any responsibility, despite the fact that it had entered into a contract with the buyer.[36] Thus, the disclaimer was unconscionable, and the lessee could assert a claim of revocation of acceptance.[37]

Similarly, in Esquire Mobile Homes, Inc. v. Arrendale, the purchaser of a mobile home asserted a claim for revocation of acceptance against the seller of the mobile home.[38] The seller argued that it had excluded liability under the purchase agreement, and that the manufacturer, who was now defunct, was the sole source of relief.[39] The court concluded that this exclusion of remedies was unconscionable because, like in Freeman, the seller "took no responsibility for the merchantability and fitness of the mobile home despite [the buyer's] obligation to pay over $66,000."[40] The court once again noted that O.C.G.A. § 11-2-719 allows the parties to "provide substitute remedies and limit damages, not bar all remedies and avoid all damages."[41] Thus, the exclusion of remedies was unconscionable.[42]

 *4 Here, under the facts alleged in the Complaint, Camping Time's limitation of remedies in the Sales Agreement is unconscionable because it eliminates all remedies except for those provided by the manufacturer. The Sales Agreement provided that the manufacturer's warranty constituted the Plaintiff's "exclusive and sole remedy for any problems or defects" and that "any other potentially available remedy, under the Uniform Commercial Code or otherwise, including but not limited to rejection, rescission, or revocation of acceptance, are hereby disclaimed by and unavailable against" Camping Time.[43]

Similar to the dealers in Freeman and Esquire Mobile Homes, Camping Time rejected all contractual responsibility for the performance of the Camper, and provided the Plaintiff with no minimal amount of adequate relief, despite the Plaintiff being obligated to pay over $70,000 under the Sales Agreement. Instead, the Plaintiff's only option under the

Sales Agreement was to pursue a remedy from Keystone, the manufacturer. This exclusion of remedies barred all remedies against Camping Time and allowed Camping Time to avoid all damages. Like in Freeman and Esquire Mobile Homes, this total bar is unconscionable. Consequently, Camping Time's disclaimer is ineffective, and the Plaintiff can assert claims for revocation of acceptance and rejection of defective tender.

Camping Time and Bank of America argue that Freeman and Esquire Mobile Homes are distinguishable because the Plaintiff here still has a meaningful source of relief under the manufacturer's warranty provided by Keystone. However, in Freeman, like in the case at hand, the buyer-lessee was also provided with a manufacturer's warranty, and the manufacturer had even attempted repairs on the car.[44] Nonetheless, the court found that the lessor's total disclaimer of remedies was unconscionable because the lessor accepted no responsibility under the contract.[45] Furthermore, both Freeman and Esquire Mobile Homes focus on the seller's total rejection of contractual responsibility as being unconscionable, not whether other remedies possibly exist.[46] Thus, the inquiry should not focus on whether other remedies may exist with other parties in the supply chain, but instead whether the limitation of remedies allows the seller to avoid all liability under the contract. Therefore, the Plaintiff's claims in Counts I and II should not be dismissed.

### B. Express Warranty

Next, Camping Time and Bank of America move to dismiss the Plaintiff's express warranty claim. They argue that Camping World explicitly disclaimed any express warranty in the Sales Agreement.[47] The Plaintiff responds that Camping Time adopted the Keystone's express warranty by delivering the express warranty to the Plaintiff and assuming performance of the warranty.[48]

In support of his argument, the Plaintiff cites Freeman v. Hubco Leasing, Inc.[49] In Freeman, the plaintiff experienced a number of problems with a new car that he began leasing.[50] The plaintiff sued both the dealer and the lessor after the defects in the car went unrepaired.[51] The dealer argued that it could not be held liable for breach of warranty because it disclaimed all warranties in its agreement with the plaintiff.[52] Despite this disclaimer, the court held that the dealer could be held liable for breach of express warranty,

because it had adopted and transmitted to the plaintiff a manufacturer's warranty. [53]

 **\*5**  However, the warranty in Freeman was both "adopted and transmitted by the dealer." The key fact is that the dealer adopted the warranty and assumed its performance, and not that it merely transmitted it to the plaintiff. [54]  Further, in a New Jersey case that Freeman relied upon in reaching this conclusion, the dealer transmitted the manufacturer's warranty and also agreed "to promptly perform and fulfill all terms and conditions of the owner service policy." [55]  The dealer there explicitly agreed to assume this performance in the sales agreement with the buyer. [56]

Here, in contrast, Camping Time did not adopt the manufacturer's warranty or assume performance of the warranty. In fact, the Sales Agreement explicitly stated that "Dealer does not affirm or adopt any manufacturer warranty(s) available to this Unit or any of its components." [57]  This is in contrast to the dealer in Freeman, which the court emphasized "never disclaimed responsibility for making repairs covered by the manufacturer's warranty, which responsibility is the basis of our holding above." [58]  Thus, a key part of the Freeman court's holding was that the dealer did not disclaim adoption of the manufacturer's warranty. Additionally, Camping Time did not agree to assume performance of the manufacturer's warranty in the Sales Agreement. The facts alleged do not indicate that Camping Time adopted the manufacturer's warranty or assumed the performance of this warranty, as the dealers did in Freeman and Ventura. Therefore, since Camping Time did not adopt the manufacturer's warranty, and made no express warranty of its own, the Plaintiff's claim for breach of express warranty against Camping Time and Bank of America should be dismissed.

### C. Implied Warranty

### 1. Camping Time and Bank of America

Next, Camping Time and Bank of America move to dismiss the Plaintiff's implied warranty claim. They argue that Camping Time effectively disclaimed all warranties in the Sales Agreement. Under Georgia law, "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." [59]  "This warranty protects consumers from defects or

conditions existing at the time of sale." [60]  To recover for breach of the implied warranty of merchantability, a plaintiff must show that there was a defect, that the defect existed at the time of sale, and that the defect made the product unmerchantable. [61]

Camping Time and Bank of America argue that Camping Time effectively disclaimed all warranties, including the implied warranty of merchantability, in the Sales Agreement. [62]  O.C.G.A. § 11-2-316 governs the disclaimer of warranties. It provides that "[s]ubject to subsection (3) of this Code section, to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous." [63]

A term is "conspicuous" if it is "so written, displayed, or presented that a reasonable person against which it is to operate ought to have noticed it." [64]  This includes "[a] heading in capitals equal to or greater in size than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same or lesser size" and "[l]anguage in the body of a record or display in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbols or other marks that call attention to the language." [65]

 **\*6**  The disclaimer here meets these requirements. The Sales Agreement disclaims express and implied warranties in two locations. [66]  In both of these locations, the disclaimer is bolded, underlined, and in capitals. It also specifically mentions the word "merchantability." [67]  Therefore, Camping Time's disclaimer of the implied warranty of merchantability is valid because it meets the requirements of O.C.G.A. § 11-2-316. For these reasons, the Plaintiff's implied warranty claim should be dismissed as to Camping Time and Bank of America.

### 2. Keystone

Next, Keystone argues that the Plaintiff's implied warranty claim against it fails due to lack of privity between it and the Plaintiff. [68]  The Court disagrees. Ordinarily, no implied warranty of merchantability runs from a manufacturer to an

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 115 of 535
PageID: 32062
Hemmings v. Camping Time RV Centers, LLC, Not Reported in Fed. Supp. (2017)
2017 WL 4552896, 93 UCC Rep.Serv.2d 1230

ultimate consumer since no privity of contract exists between them. [69] Since an implied warranty of merchantability arises out of a contract of sale of goods, the warranty can only extend to buyers who are in privity of contract with a seller. [70] Thus, when a consumer purchases a product from a retailer, no implied warranty runs from the manufacturer to the consumer due to this lack of contractual privity. [71]

However, the extension of an express warranty from a manufacturer to the end consumer can establish privity, despite the lack of a contract. For example, the Geogia Court of Appeals has stated that "[w]here an automobile manufacturer, through its authorized dealer, issues to a purchaser of one of its new automobiles from the dealer a warranty as part of the sale, certainly an implied warranty of merchantability is in effect despite the lack of actual privity." [72] Thus, where the manufacturer extends an express warranty to the end consumer, privity is created that satisfies the requirements of the implied warranty of merchantability.

Here, Keystone offered an express warranty to the Plaintiff. [73] This express warranty established the privity necessary for the implied warranty of merchantability to run between the Plaintiff and Keystone. Therefore, the Plaintiff's claim does not fail due to lack of privity.

Nonetheless, a manufacturer can still limit or disclaim this implied warranty, just as a normal seller can under O.C.G.A. § 11-2-316. [74] In its express warranty, Keystone disclaimed all other warranties besides its limited express warranty. It stated that "[t]his warranty is expressly in lieu of all other warranties, express or implied, including any implied warranty of merchantability" and that any implied warranties given by law "shall be limited to and not extend beyond the scope and beyond the duration of the written limited warranty period." [75]

 *7  However, the Magnuson-Moss Warranty Act ("Magnuson-Moss") prevents Keystone from disclaiming implied warranties. Section 2308(a) of Magnuson-Moss prohibits a seller from disclaiming implied warranties if an express warranty is provided. [76] Instead, a seller may only limit the implied warranty to the duration of the written warranty, if reasonable. [77] Any attempt to disclaim implied warranties would be ineffective. [78] Since Keystone provided an express warranty, and since an implied warranty exists under Georgia law, Magnuson-Moss prohibits Keystone from disclaiming this implied warranty. Keystone's attempted disclaimer is ineffective, and the implied warranty still exists for the duration of the express warranty provided by Keystone. Therefore, Keystone's motion to dismiss the implied warranty claim is denied.

### D. Magnuson-Moss Warranty Act

Next, the Plaintiff asserts violations of Magnuson-Moss in Counts V and VI. The Plaintiff alleges that the Defendants breached both a written warranty and the implied warranty of merchantability, which is actionable under Magnuson-Moss. [79] The Defendants move to dismiss these claims. They argue that Magnuson-Moss does not provide an independent cause of action, but instead only provides additional damages for breaches of warranties under state law. [80]

Magnuson-Moss provides consumers with a right of action against a person who fails "to comply with any obligation under ... a written warranty, implied warranty, or service contract." [81] It "does not require manufacturers of consumer goods to provide warranties, rather it creates specific duties and liabilities for the manufacturer that chooses to do so." [82] It also "does not provide an independent cause of action for state law claims, only additional damages for breaches of warranty under state law." [83] Magnuson-Moss only "relates to damages, not liability, and provides for consumers' recovery of costs and attorney's fees in successful actions for breaches of warranty under state law." [84] For this reason, Magnuson-Moss "supplements, rather than supplants state law." [85] It applies the state law of written and implied warranties. [86]

Consequently, the Plaintiff cannot assert an independent cause of action under Magnuson-Moss. Instead, he will only be able to claim additional damages under Magnuson-Moss to the extent that he can allege viable breach of warranty claims under Georgia law. Furthermore, since the Plaintiff has failed to state a claim for breach of express or implied warranty against Camping Time, his claims against Camping Time and Bank of America under Magnuson-Moss should be dismissed. The Plaintiff's claims for additional damages under Magnuson-Moss remain against Keystone, insofar as the Plaintiff can maintain claims for breach of implied and express warranties.

### E. FTC Holder Rule

### 1. Camping Time and Keystone

Camping Time and Keystone argue that Count VII, the Plaintiff's claim under the FTC Holder Rule, should be dismissed because they are not holders of the consumer credit contract.[87] The Plaintiff concedes that he is only asserting claims under the FTC Holder Rule against Bank of America.[88] Therefore, this claim is dismissed as to Keystone and Camping Time.

### 2. Bank of America

**\*8** Next, Bank of America argues that the Plaintiff's FTC Holder Rule claim should be dismissed because it "has all defenses available to Camping World."[89] The Plaintiff responds that "he agrees" that his claims against Bank of America under the Holder Rule are "derivative claims."[90]

The FTC Holder Rule requires that any consumer credit contract for the sale or lease of goods or services contain the following language:

> Any holder of this consumer credit contract is subject to all claims and defenses which the debtor could assert against the seller of goods or services obtained pursuant hereto or with the proceeds hereof. Recovery hereunder by the debtor shall not exceed amounts paid by the debtor hereunder.[91]

However, no private right of action exists under the Holder Rule.[92] Instead, it allows a debtor to assert any claim or defense against a holder of a consumer credit contract that it could assert against the seller.[93]

Thus, the Plaintiff cannot assert an independent cause of action under the Holder Rule against Bank of America. The Holder Rule only allows the Plaintiff to assert claims that he has against Camping Time as derivative claims against Bank of America, since Bank of America is the "holder" of the consumer credit contract. The Plaintiff agrees that "his claims

against Bank of America are derivative claims."[94] Therefore, the Plaintiff's independent claims under the FTC Holder Rule are dismissed.

### F. Exemplary Damages

Finally, the Defendants argue that the Plaintiff's claim for exemplary damages should be dismissed.[95] In Georgia, "[u]nless otherwise provided by law, exemplary damages shall never be allowed in cases arising on contracts."[96] Therefore, exemplary or punitive damages will not be recoverable for the Plaintiff's breach of contract and breach of warranty claims. The Plaintiff concedes that he "is not making any claim for punitive or exemplary damages as against Camping Time," but argues that "should Bank of America NA refuse to honor the FTC Anti Holder Clause contract language, it may be liable for punitive or exemplary damages for violation of the FTC Act or for violation of the Georgia Fair Business Practices Act."[97]

**\*9** However, the Plaintiff cannot recover punitive or exemplary damages under the FTC Holder Rule. The Holder Rule explicitly states that recovery under the rule "shall not exceed amounts paid by the debtor hereunder."[98] A debtor cannot recover more money under this rule than they have paid the holder under the contract. Thus, the Plaintiff's recovery against Bank of America under the Holder Rule, if any, will be limited to the money that he has paid to Bank of America under the contract, and nothing more.[99] Consequently, the Plaintiff's requests for punitive and exemplary damages should be dismissed.

### IV. Conclusion

For the reasons stated above, the Defendant Keystone RV Company's Partial Motion to Dismiss [Doc. 2] is GRANTED in part and DENIED in part, and the Defendants Camping Time RV Centers, LLC and Bank of America, N.A.'s Motion to Dismiss [Doc. 3] is GRANTED in part and DENIED in part.

SO ORDERED, this 11 day of October, 2017.

Hemmings v. Camping Time RV Centers, LLC, Not Reported in Fed. Supp. (2017)

2017 WL 4552896, 93 UCC Rep.Serv.2d 1230

**All Citations**

Not Reported in Fed. Supp., 2017 WL 4552896, 93 UCC
Rep.Serv.2d 1230

## Footnotes

1     Compl. ¶ 4 [Doc. 1-1].
2     Id.
3     Def. Camping Time RV Centers, LLC and Bank of America, N.A.'s Mot. to Dismiss, Ex. A.
4     Def. Camping Time RV Centers, LLC and Bank of America, N.A.'s Mot. to Dismiss, Ex. B.
5     Id.
6     Compl. ¶ 5.
7     Id.
8     Id. ¶ 6.
9     Id. ¶ 7.
10     Id.
11     Id. ¶¶ 5-6.
12     Id. ¶ 7.
13     Id. ¶¶ 8-9.
14     Id. ¶ 8.
15     Id. ¶ 10.
16     Id. ¶ 13B.
17     Id. ¶ 12.
18     Id.
19     Id. ¶ 13.
20     Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009); FED. R. CIV. P. 12(b)(6).
21     Bell Atlantic v. Twombly, 550 U.S. 544, 556 (2007).
22     See Quality Foods de Centro America, S.A. v. Latin American Agribusiness Dev. Corp., S.A., 711 F.2d 989, 994-95 (11th Cir. 1983); see also Sanjuan v. American Bd. of Psychiatry and Neurology, Inc., 40 F.3d 247, 251 (7th Cir. 1994) (noting that at the pleading stage, the plaintiff "receives the benefit of imagination").
23     See Lombard's, Inc. v. Prince Mfg., Inc., 753 F.2d 974, 975 (11th Cir. 1985), cert. denied, 474 U.S. 1082 (1986).
24     See Erickson v. Pardus, 551 U.S. 89, 93 (2007).
25     Def. Keystone RV Company's Mot. to Dismiss, at 3-4.
26     Pl.'s Resp. Br. in Opp'n to Def. Keystone RV Company's Mot. to Dismiss, at 2.
27     Def. Camping Time RV Centers, LLC and Bank of America, N.A.'s Mot. to Dismiss, at 3-4.
28     Pl.'s Resp. Br. in Opp'n to Def. Camping Time RV Centers, LLC and Bank of American, N.A.'s Mot. to Dismiss, at 3-16.
29     O.C.G.A. § 11-2-719(1).
30     Esquire Mobile Homes, Inc. v. Arrendale, 182 Ga. App. 528, 529 (1987); see also Hub Motor Co. v. Zurawski, 157 Ga. App. 850, 851 (1981); Jacobs v. Metro Chrysler-Plymouth, Inc., 125 Ga. App. 462, 467 (1972).
31     O.C.G.A. § 11-2-719(2).

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 118 of 535
PageID: 32065
Hemmings v. Camping Time RV Centers, LLC, Not Reported in Fed. Supp. (2017)
2017 WL 4552896, 93 UCC Rep.Serv.2d 1230

32   Freeman v. Hubco Leasing, Inc., 253 Ga. 698, 705 (1985).

33   Id.

34   Id.

35   Id.

36   Id.

37   Id.

38   Esquire Mobile Homes, Inc. v. Arrendale, 182 Ga. App. 528, 528 (1987).

39   Id. at 529.

40   Id. at 530.

41   Id.

42   Id.

43   Def. Camping Time RV Centers, LLC and Bank of America, N.A.'s Mot. to Dismiss, Ex. A.

44   Freeman v. Hubco Leasing, Inc., 253 Ga. 698, 700 (1985).

45   Id. at 705.

46   See id. at 705;   Esquire Mobile Homes, 182 Ga. App. at 530.

47   Def. Camping Time RV Centers, LLC and Bank of America, N.A.'s Mot. to Dismiss, at 8.

48   Pl.'s Resp. Br. in Opp'n to Def. Camping Time RV Centers and Bank of America, N.A.'s Mot. to Dismiss, at 17-18.

49   253 Ga. 698 (1985).

50   Id. at 699.

51   Id.

52   Id. at 701-02.

53   Id. at 702.

54   Id.

55   Ventura v. Ford Motor Corp., 433 A.2d 801, 807-08 (N.J. Super. Ct. App. Div. 1981).

56   Id. at 807.

57   Def. Camping Time RV Centers, LLC and Bank of America, N.A.'s Mot. to Dismiss, Ex. A.

58   Freeman, 253 Ga. at 702.

59   O.C.G.A. § 11-2-314(1).

60   Dildine v. Town & Country Truck Sales, Inc., 259 Ga. App. 732, 734 (2003).

61   Id.

62   Def. Camping Time RV Centers, LLC and Bank of America, N.A.'s Mot. to Dismiss, at 10.

63   O.C.G.A. § 11-2-316(2).

64   O.C.G.A. § 11-1-201(b)(10).

65   Id.

66   Def. Camping Time RV Centers, LLC and Bank of America, N.A.'s Mot. to Dismiss, Ex. A.

67   Id.

68   Def. Keystone RV Company's Mot. to Dismiss, at 4.

69   Chaffin v. Atlanta Coca Cola Bottling Co., 127 Ga. App. 619 (1972).

70   Id.

71   Id.

72   Lauria v. Ford Motor Co., 169 Ga. App. 203, 205 (1983); see also   Chrysler Corp. v. Wilson Plumbing Co., 132 Ga. App. 435, 437 (1974) (noting that "privity exists" and implied warranties become operative when an automobile manufacturer issues a warranty to the consumer;   Jones v. Cranman's Sporting Goods, 142 Ga. App. 838, 842 (1977) ("The weapon here was 'fully guaranteed' by the distributor to the ultimate consumer. As such it became part of the bargain of sale and thus privity existed.").

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 119 of 535
PageID: 32066

Hemmings v. Camping Time RV Centers, LLC, Not Reported in Fed. Supp. (2017)

2017 WL 4552896, 93 UCC Rep.Serv.2d 1230

73    Compl. ¶¶ 38-39; Def. Keystone RV Company's Mot. to Dismiss, Ex. B.

74    See Chrysler Corp., 132 Ga. App. at 437 ("The manufacturer, therefore, if it desires to exclude the implied warranty arising by operation of law, must meet the requirements of Code s 109A-2-316(2), that is, by a writing expressly referring to merchantability which exclusion of the implied warranty must be conspicuous."); Jones, 142 Ga. App. at 406 ("The Statement fully guaranteeing the rifle failed to limit the warranty made or to exclude any implied warranties.").

75    Def. Camping Time RV Centers, LLC and Bank of America, N.A.'s Mot. to Dismiss, Ex. B.

76    See 15 U.S.C. § 2308(a); see also Global Quest, LLC v. Horizon Yachts, Inc., 849 F.3d 1022, 1031 (11th Cir. 2017).

77    15 U.S.C. § 2308(b).

78    Global Quest, LLC, 849 F.3d at 1031.

79    Compl. ¶¶ 56-65.

80    Def. Camping Time RV Centers, LLC and Bank of America, N.A.'s Mot. to Dismiss, at 11-12; Def. Keystone RV Company's Mot. to Dismiss, at 5-6.

81    15 U.S.C. § 2310(d).

82    Monticello v. Winnebago Indus., Inc., 369 F. Supp. 2d 1350, 1356 (N.D. Ga. 2005).

83    Fedrick v. Mercedes-Benz USA, LLC, 366 F. Supp. 2d 1190, 1200 n.14 (N.D. Ga. 2005); see also Dildine v. Town & Country Truck Sales, Inc., 259 Ga. App. 732, 734 (2003) ("To recover, therefore, Dildine must show that Town & Country breached the implied warranty of merchantability arising under Georgia law.").

84    Sharpe v. General Motors Corp., 198 Ga. App. 313, 314 (1991).

85    Monticello, 369 F. Supp. 2d at 1356.

86    Id.

87    Def. Camping Time RV Centers, LLC and Bank of America, N.A.'s Mot. to Dismiss, at 12-13; Def. Keystone RV Company's Mot. to Dismiss, at 6-7.

88    Pl.'s Resp. Br. in Opp'n to Def. Keystone RV Company's Mot. to Dismiss, at 1.

89    Def. Camping Time RV Centers, LLC and Bank of America, N.A.'s Mot. to Dismiss, at 13.

90    Pl.'s Resp. Br. in Opp'n to Def. Camping Time RV Centers, LLC and Bank of America, N.A.'s Mot. to Dismiss, at 1.

91    16 C.F.R. § 433.2 (2016).

92    Leonard v. The Momentum Grp., Inc., No. 1:14–CV–01074, 2015 WL 11236547, at *4 (N.D. Ga. Dec. 16, 2015).

93    See Diaz v. Paragon Motors of Woodside, Inc., 424 F. Supp. 2d 519, 541 (E.D.N.Y. 2006); see also Simpson v. Anthony Auto Sales, Inc., 32 F. Supp. 2d 405, 410 (W.D. La. 1998) (discussing the "derivative liability" of creditors under the FTC Holder Rule).

94    Pl.'s Resp. Br. in Opp'n to Def. Camping Time RV Centers and Bank of America, N.A.'s Mot. to Dismiss, at 1.

95    Def. Keystone RV Company's Mot. to Dismiss, at 7; Def. Camping Time RV Centers, LLC and Bank of America, N.A.'s Mot. to Dismiss, at 13.

96    O.C.G.A. § 13-6-10; see also Hester Enters., Inc. v. Narvais, 198 Ga. App. 580, 582 (1991) ("Generally, punitive damages are not recoverable for breach of contract, even though the breach may be in bad faith.").

97    Pl.'s Resp. Br. in Opp'n to Def. Keystone RV Company's Mot. to Dismiss, at 2; Pl.'s Resp. Br. in Opp'n to Def. Camping Time RV Centers, LLC and Bank of American, N.A.'s Mot. to Dismiss, at 2. The Plaintiff did not allege a violation of the Georgia Fair Business Practices Act in the Complaint. Therefore, the Court will not address this argument.

98    16 C.F.R. § 433.2.

**Hemmings v. Camping Time RV Centers, LLC, Not Reported in Fed. Supp. (2017)**

2017 WL 4552896, 93 UCC Rep.Serv.2d 1230

99    See *Wait v. Roundtree Mobile, LLC,* No. 15–00285–CG–M, 2015 WL 6964668, at *9 (S.D. Ala. Nov. 10, 2015)* ("To the extent that Plaintiffs are entitled to damages pursuant to a claim under the FTC Holder Rule, the recovery is limited to the amount paid by Plaintiffs on the contract."); *Simpson v. Anthony Auto Sales, Inc.,* 32 F. Supp. 2d 405, 409-10 (W.D. La. 1998)* ("[A] creditor's derivative liability for seller misconduct under the FTC [Holder] rule is limited to the amount paid by the consumer under the credit contract.").

---

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

TAB 13

*In re Allergan Biocell Textured Breast Implant Prod. Liab. Litig.*, No. 2:19-MD-2921-BRM-ESK, 2021 WL 1050910 (D.N.J. Mar. 19, 2021)

KeyCite Yellow Flag - Negative Treatment

Distinguished by   D'Addario v. Johnson & Johnson,   D.N.J.,   March 31, 2021

2021 WL 1050910
Only the Westlaw citation is currently available.
**NOT FOR PUBLICATION**
United States District Court, D. New Jersey.

IN RE: ALLERGAN BIOCELL TEXTURED BREAST
IMPLANT PRODUCTS LIABILITY LITIGATION

Case No. 2:19-md-2921-BRM-ESK
|
MDL No. 2921
|
Filed 03/19/2021

JUDGE EDWARD S. KIEL

OPINION

HON. BRIAN R. MARTINOTTI United States District Judge

**\*1** Before this Court are three motions by Defendants Allergan, Inc. and Allergan USA, Inc. ("Allergan"): (1) Motion to Strike/Dismiss Plaintiffs' Consolidated Class Action Complaint ("CAC") (ECF No. 118) and every other class action complaint filed in a lawsuit that is part of this Multi District Litigation ("MDL") pursuant to Fed. R. Civ. P. 12(b)(6) and 12(f) (ECF No. 171-2); (2) Motion to Dismiss Plaintiffs' complaints on preemption grounds pursuant to Fed. R. Civ. P. 12(b)(6) (ECF No. 171-1); and (3) Motion to Dismiss Plaintiffs' Master Long Form Personal Injury Complaint ("PIC") (ECF No. 119) on non-preemption grounds and every other complaint filed in a lawsuit that is part of this MDL and alleges personal injury damages pursuant to Fed. R. Civ. P. 8(a), 9(b) and 12(b)(6) (ECF No. 171-3). Plaintiffs filed Oppositions to Allergan's Motions. (ECF Nos. 216, 219, 220.) Allergan filed a Notice of Supplemental Authority. (ECF No. 224.) Plaintiffs responded to Allergan's Notice. (ECF No. 225.) Allergan filed Replies in support of its Motions. (ECF Nos. 236, 237, 238.) Allergan filed a second Notice of Supplemental Authority. (ECF No. 246.) Plaintiffs responded to Allergan's second Notice. (ECF No. 250.) Having reviewed the parties' submissions filed in connection with the Motions and having heard oral argument on December 14, 2020 (ECF No. 261), [1] for the reasons set forth below and for good cause having been shown, Allergan's Motion to Strike/Dismiss CAC (ECF No. 171-2), Motion to Dismiss Plaintiffs' complaints on preemption grounds (ECF No. 171-1), and Motion to Dismiss PIC (ECF No. 171-3) are **GRANTED IN PART and DENIED IN PART**.

For the ease of the reader, the Court has included a table of contents:

**TABLE OF CONTENTS**

I. **BACKGROUND** 4

A. Factual Background 4

B. Procedural History 6

II. **LEGAL STANDARD** 9

A. Rule 12(b)(6) 9

B. Rule 12(f) 10

C. Rule 23 11

III. **DECISION** 13

A. Allergan's Motion to Dismiss on Preemption Grounds (ECF No. 171-1) 13

    1. Failure to Warn Claims 17

    2. Plaintiffs' Manufacturing Defect Claims Are Not Preempted 25

    3. Plaintiffs' Negligence *Per Se* Claims Are Not Preempted 29

    4. Plaintiffs' Claims Concerning Investigational Devices Used In An Approved Clinical Trial Are Preempted 30

    5. Plaintiffs' Negligent Failure to Warn Claims Alleging Allergan's Failure to Conduct Post-PMA Clinical Studies Are Preempted 32

    6. Plaintiffs' Implied Warranty Claims Are Not Preempted 33

7. Plaintiffs' Claims for Negligent Misrepresentation, Breach of Express Warranty, and Breach of State Consumer Fraud and Deceptive Trade Practice Statutes Are Not Preempted 35

B. Allergan's Motion to Dismiss on Non-Preemption Grounds (ECF No. 171-3) 37

1. The Court Will Review the PIC with Leniency 39

2. The Court Will Not Scrutinize Whether Plaintiffs Have Sufficiently Alleged Present Injuries in the PIC 41

3. Plaintiffs' Manufacturing Defect Claims Should Not Be Dismissed 42

*2  4. Plaintiffs' Negligence *Per Se* Claims Are Not Viable in Some Jurisdictions 44

5. Plaintiffs' Report-Based Failure to Warn Claims Are Not Viable in Some Jurisdictions 56

6. Plaintiffs' Negligent Misrepresentation Claims 64

7. Plaintiffs Cannot Assert Warranty Claims in Some Jurisdictions 76

8. Summary for Allergan's Motion to Dismiss on Non-Preemption Grounds 94

C. Allergan's Motion to Strike/Dismiss Plaintiffs' Class Allegations (ECF No. 171-2) 95

1. Named Plaintiffs Lack Article III Standing in Some Jurisdictions 98

2. The Class Allegations Meet the Typicality Requirement 101

3. The Rule 23(b)(3) Inquiry Is Premature 103

4. A Rule 23(b)(2) Medical Monitoring Class Is Inapplicable 110

IV. **CONCLUSION** 120

## I. BACKGROUND

### A. Factual Background

Plaintiffs and class members are patients who had Allergan's BIOCELL textured breast implants and tissue expanders[2]

(together, "the BIOCELL implants") implanted into their bodies. (ECF No. 119 at ¶ 1.) Many of the Plaintiffs are breast cancer survivors or women having undergone prophylactic mastectomies, who were implanted with the BIOCELL implants in reconstructive surgery. (*Id.* at ¶ 8.) Plaintiffs allege the BIOCELL implants cause Breast-Implant Associated Anaplastic Large Cell Lymphoma ("BIA-ALCL"), a cancer of the immune system that develops in the area around an implant, often between the implant and the surrounding scar tissue. (*Id.* at ¶¶ 1, 27.) BIA-ALCL frequently presents as a late-onset seroma in the breast, which is an accumulation of fluid between the capsule and the implant, resulting in swelling of the breast. (ECF No. 118 at ¶ 138.) Left untreated, BIA-ALCL can spread through the body and be fatal. (*Id.*) Symptoms of BIA-ALCL can arise even after the implant is removed. (*Id.* at ¶ 139.) Diagnostic procedures for detecting BIA-ALCL include computed tomography scans, magnetic resonance imagings, and fluid sampling. (*Id.* at ¶ 140.) BIA-ALCL is treated with the surgery to remove the implant and the surrounding capsule and tissue, and may require other treatments such as reconstructive surgery, chemotherapy, and radiation. (ECF No. 119 at ¶ 29.) Some of the Plaintiffs have been diagnosed with BIA-ALCL, others have had their implants removed, and others still have BIOCELL implants in their bodies. (*Id.* at ¶ 8.)

This case involves dozens of recalled models of the BIOCELL implants. (*Id.* at ¶ 41.) Many models were sold pursuant to three pre-market approvals ("PMAs") that Allergan received from the United States Food and Drug Administration ("FDA") on May 20, 2000, on November 17, 2006, and on February 20, 2013. (*Id.* at ¶ 53.) Plaintiffs allege these PMAs contained Conditions of Approval, requiring Allergan to (among other things) conduct studies of the devices' safety, report adverse events to the FDA, and revise the labeling to add warnings when necessitated by new safety information. (*Id.* at ¶¶ 59–61.) Other models, including the BIOCELL tissue expanders, were approved through the much less rigorous § 510(k) process. (*Id.* at ¶ 52.) Still others were approved for use in investigative studies under the Investigational Device Exemption ("IDE"). (*Id.* at ¶ 50.)

*3  For over 20 years, Allergan and its predecessor companies marketed and sold the BIOCELL Implants. (ECF No. 118 at ¶¶ 112–37.) To texturize the implant shell, Allergan allegedly employed a "salt loss" manufacturing process. (*Id.* at ¶¶ 13, 167.) The process applies solid particles of cubic salt over the implant shell surface, embedding the particles within. (*Id.*) The implant is then covered with another silicone layer,

which is scrubbed off, and the shell is washed. (*Id.*) Plaintiffs state the FDA-approved manufacturing specifications require all solid particles be scrubbed off and dissolved. (*Id.* at ¶ 168.) Plaintiffs allege Allergan performs the final scrubbing process manually, which leaves solid particles and other residues on the implants' surface. (*Id.* at ¶ 169.) Plaintiffs claim these particles, residues, the implant's increased surface area resulting from the texturizing process, and the chronic friction that occurs between the body's tissues and the implant cause inflammation, increased T-cell activity, malignant T-cell transformation and, ultimately, BIA-ALCL. (*Id.* at ¶ 170.)

Allergan recalled the BIOCELL implants in July 2019 after the FDA found they posed a heightened risk of BIA-ALCL. (*Id.* at ¶¶ 138, 191–92.) Plaintiffs claim Allergan's textured implants increase the risk of BIA-ALCL by 3,000 times. (*Id.* at ¶ 158.) The FDA has concluded "the risk of BIA-ALCL with Allergan BIOCELL textured implants is approximately six times the risk of BIA-ALCL with textured implants from other manufacturers." (*Id.* at ¶ 193.) According to the FDA, 246,831 BIOCELL Implants have been recalled in the United States. (*Id.* at ¶ 386.)

As early as 1997, some women were reported to have developed BIA-ALCL after receiving the BIOCELL Implants. (*Id.* at ¶ 141.) Over the course of the next two decades, the number of reported cases of BIA-ALCL associated with the BIOCELL Implants continued to mount. (*Id.* at ¶¶ 141–45, 149, 154–57.) Through this period, Allergan allegedly concealed the risks of BIA-ALCL by failing to appropriately submit adverse event reports to the FDA or otherwise disclose to the public complete and accurate safety information regarding the BIOCELL Implants. (*Id.* at ¶ 209–20.)

On July 29, 2019, the FDA issued a Class I Recall notice. (*Id.* at ¶ 2.) According to the FDA, the continued distribution of the BIOCELL Implants "would likely cause serious, adverse health consequences and potentially death from BIA-ALCL." (*Id.* at ¶ 193.) Allergan refuses to pay the implants' users for the cost of explant surgeries to remove the implants or for ongoing monitoring and testing for BIA-ALCL. (*Id.* at ¶ 198.)

**B. Procedural History**
This litigation began as a series of actions filed in judicial districts throughout the country. (ECF No. 144 at 1.) By Order dated December 18, 2019, the United States Judicial Panel on Multidistrict Litigation transferred several of those matters to

the District of New Jersey, thereby creating MDL No. 2921. (ECF No. 1.) The Panel has continued to transfer cases since that time, and Plaintiffs have directly filed others, such that this MDL currently consists of more than 562 member cases. (ECF No. 144 at 1–2.)

On May 26, 2020, Liaison Counsel for Plaintiffs and Co-Lead Plaintiffs' Counsel filed the PIC. (ECF No. 119.) The complaint asserts: claims for manufacturing defect, based on strict liability (Count I) and negligence (Count II); claims for failure to warn, based on strict liability (Count IV) and negligence (Count V); claims for general negligence (Count III) and breach of the implied warranty of merchantability (Count VII), primarily based on the aforementioned defects; claims for negligent misrepresentation (Count VI) and breach of express warranty (Count VIII), based on false representations and warranties Allergan allegedly made regarding the safety of the BIOCELL implants. (ECF No. 216 at 29.) The complaint also asserts a claim for survivorship and wrongful death on behalf of representatives of decedents who died after being implanted with the BIOCELL implants (Count XI), loss of consortium on behalf of the spouses of those implanted with the BIOCELL implants (Count XII), and punitive damages (Count XIII). (*Id.* at 29–30.)

**\*4**  On May 26, 2020, certain Plaintiffs filed the CAC. (ECF No. 118.) In addition to certain claims also asserted in the PIC (strict liability and negligent failure to warn, strict liability and negligent manufacturing defect, strict liability and negligent design defect (for non-PMA devices), and breach of implied warranty of merchantability), the CAC asserts claims for medical monitoring (Counts 300–05), violations of state consumer fraud and deceptive trade practices acts (Counts 330–82), unjust enrichment (Counts 383–436), declaratory judgment declaring that releases signed by certain class members are unenforceable (Counts 437–38), and rescission of those releases (Count 439). (ECF No. 216 at 30.) The CAC also seeks equitable relief in the form of a court-ordered medical monitoring program funded by Allergan. (*Id.*)

On August 7, 2020, Allergan filed a Motion to Strike/Dismiss Plaintiffs' CAC and every other class action complaint pursuant to 📙 Fed. R. Civ. P. 12(b)(6) and 12(f) (ECF No. 171-2), Motion to Dismiss Plaintiffs' complaints on preemption grounds pursuant to 📙 Fed. R. Civ. P. 12(b)(6) (ECF No. 171-1), and a Motion to Dismiss Plaintiffs' PIC and every other complaint on non-preemption grounds pursuant to Fed. R. Civ. P. 8(a), 📙 9(b) and 📙 12(b)(6) (ECF No.

In re: Allergan Biocell Textured Breast Implant Products Liability..., Slip Copy (2021)

171-3). On October 7, 2020, Plaintiffs filed an Opposition to Allergan's Motion to Dismiss Plaintiffs' PIC and CAC on preemption grounds. (ECF No. 216.) On October 9, 2020, Plaintiffs filed an Opposition to Allergan's Motion to Strike/ Dismiss Plaintiffs' CAC (ECF No. 219) and an Opposition to Allergan's Motion to Dismiss Plaintiffs' PIC and CAC on non-preemption grounds (ECF No. 220). On October 14, 2020, Allergan filed a Notice of Supplemental Authority. (ECF No. 224.) On October 15, 2020, Plaintiffs responded to Allergan's October 14, 2020 Notice. (ECF No. 225.) On November 8, 2020, Allergan filed a Reply in Support of its Motion to Dismiss Plaintiffs' PIC on non-preemption grounds (ECF No. 236), a Reply in Support of its Motion to Dismiss Plaintiffs' CAC (ECF No. 237), and a Reply in Support of its Motion to Dismiss Plaintiffs' PIC and CAC on non-preemption grounds (ECF No. 238). On November 20, 2020, Allergan filed another Notice of Supplemental Authority. (ECF No. 246.) On November 24, 2020, Plaintiffs responded to Allergan's November 20, 2020 Notice. (ECF No. 250.)

On December 14, 2020, the Court held oral argument on the motions (ECF No. 261) and permitted simultaneous supplemental briefing, which were filed on January 5, 2020 (ECF Nos. 262, 263). On January 27, 2021, Allergan filed a third Notice of Supplemental Authority. (ECF No. 267.) On January 28, 2021, Plaintiffs responded to Allergan's January 27, 2021 Notice. (ECF No. 268.) On February 10, 2021, Allergan filed a fourth Notice of Supplemental Authority. (ECF No. 271.) On February 11, 2021, Plaintiffs responded to Allergan's February 11, 2021 Notice. (ECF No. 273.)

## II. LEGAL STANDARD

### A. Rule 12(b)(6)

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court is "required to accept as true all factual allegations in the complaint and draw all inferences in the facts alleged in the light most favorable to the [plaintiff]." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (citations omitted). However, the plaintiff's "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action." *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)). A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286, 106 S.Ct. 2932 (citations omitted). Instead, assuming the factual allegations in the complaint are true, those "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955 (citing *Papasan*, 478 U.S. at 286, 106 S.Ct. 2932).

**\*5** "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for misconduct alleged." *Id.* This "plausibility standard" requires the complaint allege "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a probability requirement." *Id.* (citing *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955). "Detailed factual allegations" are not required, but "more than an unadorned, the-defendant-harmed-me accusation" must be pled; it must include "further factual enhancement" and not just conclusory statements or a recitation of the elements of a cause of action. *Id.* (citing *Twombly*, 550 U.S. at 555, 557, 127 S.Ct. 1955).

"Determining whether a complaint states a plausible claim for relief [is] ... a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679, 129 S.Ct. 1937. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Id.* (citing Fed. R. Civ. P. 8(a)(2)). However, courts are "not compelled to accept 'unsupported conclusions and unwarranted inferences,' " *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (citing *Schuylkill Energy Res. Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997)), nor "a legal conclusion couched as a factual

In re: Allergan Bioceil Textured Breast Implant Products Liability..., Slip Copy (2021)

allegation." *Papasan*, 478 U.S. at 286, 106 S.Ct. 2932 (citations omitted).

While, as a general rule, the court may not consider anything beyond the four corners of the complaint on a motion to dismiss pursuant to Rule 12(b)(6), the Third Circuit has held that "a court may consider certain narrowly defined types of material without converting the motion to dismiss to a summary judgment motion, including items that are *integral to or explicitly relied upon* in the complaint." *Coulter v. Doerr*, 486 F. App'x 227, 228 (3d Cir. 2012) (citing *In re Rockefeller Ctr. Props. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999)).

### B. Rule 12(f)

A court may, upon motion or *sua sponte*, "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "The purpose of a motion to strike is to simplify the pleadings and save time and expense by excising from a plaintiff's complaint any redundant, immaterial, impertinent, or scandalous matter which will not have any possible bearing on the outcome of the litigation." *Garlanger v. Verbeke*, 223 F. Supp. 2d 596, 609 (D.N.J. 2002) (citations and internal quotations omitted). However, "[b]ecause of the drastic nature of the remedy, ... motions to strike are usually 'viewed with disfavor' and will generally 'be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues.' " *Id.* (citing *Tonka Corp. v. Rose Art Indus., Inc.*, 836 F. Supp. 200, 217 (D.N.J. 1993)); *see also Weske v. Samsung Elecs., Am., Inc.*, 934 F. Supp. 2d 698, 702 (D.N.J. 2013) (explaining that motions to strike are extremely disfavored). "A court possesses considerable discretion in disposing of a motion to strike under Rule 12(f)." *Kim v. Baik*, No. 06-3604, 2007 U.S. Dist. LEXIS 13553, 2007 WL 674715, at *5 (D.N.J. Feb. 27, 2007) (citing *River Rd. Dev. Corp. v. Carlson Corporation-Northeast*, No. 89-7037, 1990 U.S. Dist. LEXIS 6201, 1990 WL 69085, at *2 (E.D. Pa. May 23, 1990)). In short, this is not the time to decide motions *in limine*. The issue to be resolved is whether there is some harm will result from permitting something to be alleged at all—a high bar.

### C. Rule 23

**\*6** "The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores v. Dukes*, 564 U.S. 338, 348, 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011) (citing *Califano v. Yamasaki*, 442 U.S. 682, 700–701, 99 S. Ct. 2545, 61 L. Ed. 2d 176 (1979).). "To invoke this exception, every putative class action must satisfy the four requirements of Rule 23(a) and the requirements of either Rule 23(b)(1), (2), or (3)." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 590 (3d Cir. 2012). A class may be certified pursuant to Rule 23(a) when:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). These four requirements are customarily referred to as: (1) numerosity; (2) commonality; (3) typicality; and (4) adequate representation. *Dukes*, 564 U.S. at 349, 131 S.Ct. 2541. In addition, Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). These requirements are known as "predominance" and "superiority," respectively. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 310 (3d Cir. 2008). Additionally, when certification is sought under Rule 23(b)(3), the Third Circuit has found that a prerequisite to an analysis of the Rule 23(a) requirements is the proposed class "must be currently and readily ascertainable based on objective criteria." *Marcus*, 687 F.3d at 592–93 (citations omitted).

"[T]he requirements set out in Rule 23 are not mere pleading rules." *Hydrogen Peroxide*, 552 F.3d at 316 (citing *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 675–77 (7th Cir. 2001)). "A court may 'delve beyond the pleadings to determine whether the requirements for class certification are satisfied,' " and conduct a "preliminary inquiry into the merits." *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 306 (3d Cir. 2011) (citing *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 167 (3d Cir. 2001)). "The party seeking certification bears the burden of establishing each element of Rule 23 by a preponderance of the evidence." *Marcus*, 687 F.3d at 591 (citing *Hydrogen Peroxide*, 552 F.3d at 307). This requires "actual" not "presumed" conformance with Rule 23's requirements. *Id.* (citing *Hydrogen Peroxide*, 552 F.3d at 326). "Class certification is proper only 'if the trial court is satisfied, after a rigorous analysis, that the prerequisites' of Rule 23 are met." *Hydrogen Peroxide*, 552 F.3d at 309 (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982)).

### III. DECISION

### A. Allergan's Motion to Dismiss on Preemption Grounds (ECF No. 171-1)

Allergan argues Plaintiffs' claims trigger express and implied preemption and are mostly foreclosed by the Medical Device Amendments ("MDA"). (ECF No. 171-1 at 34.) Plaintiffs counter that their claims regarding Allergan's violations of its duties under state law parallel federal requirements and therefore are not preempted. (ECF No. 216 at 31.) The Court will conduct the preemption analysis according to the principles discussed below.

**\*7** "Preemption is an affirmative defense that the defendant has the burden to prove." *Lupian v. Joseph Cory Holdings LLC*, 905 F.3d 127, 130 (3d Cir. 2018) (citing *In re Asbestos Prods. Liab. Litig. (No. VI)*, 822 F.3d 125, 133 n.6 (3d Cir. 2016)). "The question whether a certain state action is pre-empted by federal law is one of congressional intent."

*Gade v. National Solid Wastes Management Ass'n*, 505 U.S. 88, 96, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992) (citing *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 208, 105

S.Ct. 1904, 85 L.Ed.2d 206 (1985)). "Such a determination of congressional intent and of the boundaries and character of a pre-empting congressional enactment is one of federal law."

*International Longshoremen's Ass'n. v. Davis*, 476 U.S. 380, 388, 106 S.Ct. 1904, 90 L.Ed.2d 389 (1986). "The law of the transferee forum applies ... to federal questions, though the Court may give the law of the transferor forum 'close consideration.' " *United States v. Bristol-Myers Squibb Co. (In re Plavix Mktg., Sales Practice & Prods Liab. Litig.)*, 332 F. Supp. 3d 927, 936 (D.N.J. 2017) (citing *In re Nazi Era Cases Against German Defendants Litig.*, 320 F. Supp. 2d 204, 214 (D.N.J. 2004), *aff'd*, 153 F. App'x 819 (3d Cir. 2005)); *see also Becnel v. Anco Insulations, Inc.*, No. 08-84556, 2011 WL 304866 at \*2, 2011 U.S. Dist. LEXIS 9920 at \*7 (E.D. Pa. Jan. 28, 2011) ("[T]he MDL transferee court applies the federal law of the circuit where it sits.") (citations omitted). Accordingly, the Court will primarily apply the federal law from this District and the Third Circuit on the issue of preemption.

The law relating to the field of medical devices presents a unique set of preemption issues. Congress introduced the MDA, 21 U.S.C. § 360c *et seq.*, to the Federal Food, Drug, and Cosmetic Act ("FDCA") to establish a new regulatory regime implemented by the FDA on "various levels of oversight for medical devices, depending on the risks they present." *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 316, 128 S.Ct. 999, 169 L.Ed.2d 892 (2008). "Class I devices pose the least risks, Class II devices are 'more harmful,' and Class III devices pose the greatest risks." *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 765 (3d Cir. 2018) (citing *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 477, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996); 21 U.S.C. § 360c(a)(1)). "Class III devices receive 'the most federal oversight,' and Class I and II devices receive much less." *Id.* (citing *Riegel*, 552 U.S. at 316–17, 128 S.Ct. 999). Before marketing a Class III medical device, the manufacturer must submit a PMA application that the FDA can grant "only after it determines that a device offers a reasonable assurance of safety and effectiveness." *Riegel*, 552 U.S. at 323, 128 S.Ct. 999 (citing 21 U.S.C. § 360e(d)). However, "[a] new device need not undergo premarket approval if the FDA finds it is 'substantially equivalent' to another device exempt from premarket approval." *Id.* (citing 21 U.S.C. § 360c(f)(1) (A)). The FDA "review of devices for substantial equivalence

is known as the § 510(k) process, named after the statutory provision describing the review." *Id.* Class I and Class II devices and most Class III devices are subject to the § 510(k) process. *Id.* at 317, 128 S.Ct. 999; *Shuker*, 885 F.3d at 767.

A state law product liability or tort claim relating to a medical device may be expressly or impliedly preempted by the MDA. The MDA "contains a broad express preemption provision," which:

> [P]roclaims 'no State ... may establish or continue in effect with respect to a device ... any requirement' that 'is different from, or in addition to,' any federal requirement and that relates either 'to the safety or effectiveness of the device' or 'to any other matter' included in a federal requirement applicable to the device.

*Shuker*, 885 F.3d at 767 (citing 21 U.S.C. § 360k(a)). That is to say, "[s]tate requirements are pre-empted under the MDA only to the extent that they are 'different from, or in addition to' the requirements imposed by federal law." *Riegel*, 552 U.S. at 330, 128 S.Ct. 999 (citing 21 U.S.C. § 360k(a)(1)). Therefore, "§ 360k does not prevent a State from providing a damages remedy for claims premised on a violation of FDA regulations; the state duties in such a case 'parallel,' rather than add to, federal requirements." *Id.* The implied preemption issue is explained in *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001), where the Supreme Court "under the auspices of the MDA" foreclosed a state common law fraud-on-the-FDA tort claim. *Sullivan v. Novartis Pharms. Corp.*, 602 F. Supp. 2d 527, 535 (D.N.J. 2009) (citing *Buckman*, 531 U.S. 341, 121 S.Ct. 1012, 148 L.Ed.2d 854). "The FDCA leaves no doubt that it is the Federal Government rather than private litigants who are authorized to file suit for noncompliance with the medical device provisions: 'All such proceedings for the enforcement, or to restrain violations, of this chapter shall be by and in the name of the United States.' " *Buckman*, 531 U.S. at 349 n.4, 121 S.Ct. 1012 (citing 21 U.S.C. § 337(a)).

**\*8** Allergan insists there are four principles that determine whether a state law product liability or tort claim avoids preemption under the MDA. (ECF No. 261 at 9:1–2.) First, if the controlling state law provides something mandatory where the federal law makes it discretionary, then the state law requires something different from or in addition to the federal requirements. *Id.* at 9:7–10. Second, to avoid preemption, a device specific requirement must have been breached and that device specific requirement has to come from the PMA. *Id.* at 9:14–17. Third, to avoid preemption, genuine equivalence is required between the federal regulation and the parallel state law. *Id.* at 10:1–4. Fourth, implied preemption is triggered when the source of the state law duty in fact is in the federal regulations, which are critical to the state law claims. *Id.* at 10:9–13. However, these four principles add nothing to the preemption analysis the Court just discussed.

The first principle merely restates the express preemption inquiry under *Riegel*, which holds "state requirements are pre-empted under the MDA only to the extent that they are 'different from, or in addition to' the requirements imposed by federal law." *Riegel*, 552 U.S. at 330, 128 S.Ct. 999 (citing 21 U.S.C. § 360k(a)(1)).

The second principle refers to the first prong in the two-step framework for the express preemption inquiry under *Riegel*: (1) whether the federal requirements are applicable to the specific device at issue, and (2) if so, whether the controlling state law requires something different from or in addition to the federal one, and relates to the safety and effectiveness of the device. *Id.* at 321–22, 128 S.Ct. 999. But the Court need not consider the first prong here. The BIOCELL implants are approved under one of the three regulatory paths: (1) the PMA, (2) the IDE, and (3) § 510(k). The PMA imposes requirements specific to a Class III device. *Horn v. Thoratec Corp.*, 376 F.3d 163, 171–72 (3d Cir. 2004); *Steele v. Depuy Orthopaedics, Inc.*, 295 F. Supp. 2d 439, 452 (D.N.J. 2003). The IDE is also device-specific. *Gile v. Optical Radiation Corp.*, 22 F.3d 540, 542 (3d Cir. 1994) (citing 21 U.S.C. § 360j(g)(2)(A)) ("Persons seeking an exemption from pre-market approval for a particular medical device (an 'investigational device exemption' or 'IDE') must apply to the FDA for permission to undertake clinical investigations."). Because the PMA and the IDE are device-specific federal requirements, the first prong is met for Plaintiffs' claims concerning PMA/IDE-approved BIOCELL implants, so that the Court need only examine the second prong. As for § 510(k), even though its review process is device-specific, "§ 510(k) does not trigger

preemption." *Soufflas v. Zimmer, Inc.*, 474 F. Supp. 2d 737, 747 (E.D. Pa. 2007) (citing *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 493–94, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996)). As a result, a preemption analysis for Plaintiffs' claims concerning § 510(k)-approved BIOCELL implants is unnecessary. Because either the first prong is inconsequential or no preemption analysis is necessary in analyzing Plaintiffs' claims, the Court need not examine the first prong or apply the two-step framework under *Riegel.*

The third principle also adds nothing new to the express preemption inquiry under *Riegel.* "State and federal requirements are not genuinely equivalent if a manufacturer could be held liable under the state law without having violated the federal law." *Wolicki-Gables v. Arrow Int'l, Inc.*, 634 F.3d 1296, 1300 (11th Cir. 2011) (citing *McMullen v. Medtronic, Inc.*, 421 F.3d 482, 489 (7th Cir. 2005)). In other words, genuine equivalence is found if the controlling state law requires something "different from, or in addition to" the federal requirements.

The fourth principle is essentially restating the implied preemption inquiry under *Buckman*, which prohibits a private enforcement of the FDCA. *Buckman*, 531 U.S. at 349 n.4, 121 S.Ct. 1012 (citing 21 U.S.C. § 337(a)).

In conclusion, Plaintiffs' allegations of Allergan's violations of state law duties, if in parallel with federal requirements and not amounting to a private enforcement of the FDCA, are not preempted.

### 1. Failure to Warn Claims

#### a. Plaintiffs' Label-Based Failure to Warn Claims Are Expressly Preempted

**\*9**  Allergan claims Plaintiffs' attacks on the adequacy of Allergan's FDA-approved labels would require something different from, or in addition to, what the controlling federal regulations mandate, and therefore cannot survive express preemption. (ECF No. 171-1 at 41.) In particular, Allergan argues Plaintiffs' misbranding claims are preempted, as they have the effect of establishing a substantive requirement for a specific device, e.g., a specific labeling requirement, and

are different from, or in addition to, the FDA requirement. (ECF No. 238 at 21–22.) Allergan also states Plaintiffs cannot assert a claim for Allergan's failure to change the label through a Changes Being Effected ("CBE") supplement, because the CBE regulation permits, but does not require, such a change. (ECF No. 171-1 at 53–54.) Allergan maintains any claim that would convert the permissive CBE process into a mandatory submission is expressly preempted, as such a claim is necessarily "different from or in addition to" the FDA's regulatory scheme. (ECF No. 238 at 20.)

Plaintiffs counter their label-based failure to warn claims are not preempted, because they are based on Allergan's violations of parallel state law. (ECF No. 216 at 34.) Plaintiffs contend Allergan has a separate duty under state law to warn consumers of the risk of developing BIA-ALCL by patients with the use of BIOCELL implants. (*Id.* at 34–35.) Plaintiffs suggest such a state law duty parallels with two independent federal law requirements: (1) the PMAs for the BIOCELL implants require Allergan to submit a PMA supplement when unanticipated adverse effects or increases in the incidence of anticipated adverse effects necessitate a labeling modification, including, if permitted, a CBE submission; and (2) the FDCA misbranding provisions require Allergan to update its labeling that is false or misleading. (*Id.* at 35–37.) Plaintiffs insist, when the CBE regulation applies, the PMA requires Allergan to act before the FDA approves the label change. (ECF No. 263 at 7.) The Court disagrees.

"The MDA expressly pre-empts state requirements 'different from, or in addition to, any requirement applicable ... to the device' under federal law." *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 321, 128 S.Ct. 999, 169 L.Ed.2d 892 (2008) (citing 21 U.S.C. § 360k(a)(1)). "[O]nce there is any device-specific requirement (as there always is for Class III devices receiving PMA), then all state law claims are preempted if they differ from or add to any federal requirements applicable to the device." *McLaughlin v. Bayer Corp.*, 172 F. Supp. 3d 804, 814 n.5 (E.D. Pa. 2016). "To the extent that [the plaintiff] asserts a failure to warn claim based only on [the defendant's] failure to comply with FDA regulations, however, such a claim is not expressly preempted." *Mendez v. Shah*, 28 F. Supp. 3d 282, 300 (D.N.J. 2014) (citing *Hughes v. Boston Scientific Corp.*, 631 F.3d 762, 769 (5th Cir. 2011)). That is to say, if Plaintiffs' label-based failure to warn claims differ from or add to *any* requirement in either the PMAs or the FDCA's misbranding provisions, the claims will be expressly preempted.

Here, Plaintiffs allege Allergan failed to comply with requirements in the PMAs for the BIOCELL implants. (ECF No. 216 at 35.) In particular, Plaintiffs claim the CBE regulations direct and require Allergan to update the warnings on the BIOCELL implants, which Allergan allegedly fails to do in violation of the PMAs. (ECF No. 119 at ¶¶ 63–64.) However, as discussed below, the CBE process is not mandatory.

The PMAs require Allergan to submit a PMA supplement for the FDA to review and approve before making any change affecting the safety or effectiveness of the device, unless made through the CBE process. (ECF No. 119 at ¶ 61.) This CBE exception "allows a manufacturer to 'add or strengthen a contraindication, warning, [or] precaution' without pre-approval from the FDA." *Nelson v. Biogen Idec, Inc.*, No. 12-7317, 2018 WL 1960441 at *13, 2018 U.S. Dist. LEXIS 70283 at *37 (D.N.J. April 25, 2018) (citing *Wyeth v. Levine*, 555 U.S. 555, 614, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009)). "Nevertheless, if the manufacturer can show clear evidence that the FDA would not have approved the labeling change, the CBE exception does not apply." *Id.* (citing *Wyeth*, 555 U.S. at 571, 129 S.Ct. 1187). In other words, "[t]he CBE procedure is permissive, not mandatory." *Brooks v. Mentor Worldwide, LLC*, No. 19-2088-KHV, 2019 WL 4628264 at *6, 2019 U.S. Dist. LEXIS 161820 at *13 (D. Kan. Sep. 23, 2019), *aff'd* 985 F.3d 1272 (10th Cir. 2021) (citations omitted); *see also* 21 C.F.R. § 814.39(d)(1) ("After FDA approves a PMA, any change ... to reflect newly acquired information that enhances the safety of the device or the safety in the use of the device *may be* placed into effect by the applicant prior to ... a written FDA order approving the PMA supplement provided that: (i) The PMA supplement and its mailing cover are plainly marked 'Special PMA Supplement - Changes Being Effected.' ").

**\*10** Here, Plaintiffs have not alleged Allergan's failure to comply with any FDA labeling requirement. Though the CBE process allows Allergan to update the label of its implants, Allergan is not obligated to do so, because the CBE process is not mandatory. However, Plaintiffs' label-based failure to warn claims would require Allergan to update warnings on the implants' label. This amounts to a state law duty that differs from or adds to the federal requirements in the PMAs, which triggers express preemption. *See Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1280 (10th Cir. 2021)

(citations omitted) ("And absent a federal requirement that [a medical device manufacturer] do so, federal law expressly preempts any state-law duty requiring a manufacturer to update its labeling."); *In re: Medtronic, Inc., Sprint Fidelis Leads Prods. Liab. Litig.*, 623 F.3d 1200, 1205 (8th Cir. 2010) ("Even if federal law allowed [the defendant] to provide additional warnings, as [the plaintiff] alleged, any state law imposing an additional requirement is preempted by § 360k."); *Heisner v. Genzyme Corp.*, No. 08-C-593, 2010 WL 894054, 2010 U.S. Dist. LEXIS 21339 (N.D. Ill. March 8, 2010) (concluding the MDA preempts all negligence and strict liability claims turning on the defendant's failure to provide supplemental warnings because CBE is not mandatory); *McMullen v. Medtronic, Inc.*, 421 F.3d 482, 489 (7th Cir. 2005) ("Because § 814.39 permits, but does not require, a manufacturer to provide interim supplemental warnings pending approval by the FDA, a common-law duty to provide such a warning imposes an additional obligation."). The PMA requirement that a PMA supplement "be submitted when unanticipated adverse effects, increases in the incidence of anticipated adverse effects, or device failures necessitate a labeling ... modification" (ECF No. 119 at ¶ 61) does not mandate a change of label. Instead, the PMA only requires a submission to the FDA, which, depending on the FDA's decision, may or may not translate into a mandatory label change. Therefore, Plaintiffs cannot allege Allergan's failure to submit a PMA supplement to the FDA as the basis for their label-based failure to warn claims, though this alleged failure may support other theories for a failure to warn claim. Accordingly, the Court concludes Plaintiffs' label-based failure to warn claims are expressly preempted.

### b. Plaintiffs' Report-Based Failure to Warn Claims Are Not Preempted

Allergan argues Plaintiffs' accusation of Allergan's alleged failure to make proper adverse event reports to the FDA is not based on any parallel state law duty, and is therefore expressly preempted. (ECF No. 171-1 at 43.) Allergan maintains Plaintiffs' allegations of Allergan's method of reporting as inadequate is similarly expressly preempted, because there is no state law duty to warn grounded in a method of reporting to the FDA. (*Id.* at 48–49.) Allergan explains the adverse event information that made its way into the MAUDE database accessible by physicians does not correspond to a warning to physicians about any specific report or risk, as it is the FDA that decides whether to exercise its regulatory

prerogative to publish the information in the first place or take some other action. (ECF No. 262 at 11–12.) Allergan also insists Plaintiffs' report-based failure to warn claims are impliedly preempted, because Plaintiffs, as private persons, cannot base their warning claims on the purported breach of a federal duty, and any attempt to recognize such a duty would impermissibly interfere with the federal statutory scheme's requirements. (ECF No. 171-1 at 49–50.)

Plaintiffs argue their report-based failure to warn claims are not preempted, because these state law claims parallel the FDA requirements regarding the reporting of adverse safety information. (ECF No. 216 at 40.) Plaintiffs cite numerous court decisions holding a device manufacturer can violate its state law duty to warn by failing to report adverse safety information to the FDA. (*Id.* at 41–45.) Plaintiffs allege Allergan's improper submission to the FDA of Alternative Summary Reports ("ASRs"), which contain a series of alphanumeric codes (not a narrative description) and are not made publicly available for years, rather than Medical Device Reports ("MDRs"), which contain a full narrative description of the event and are published in the FDA's MAUDE database every month, violates both the state law duty to warn patients or their physicians and the parallel federal requirements. (*Id.* at 51–52.) The Court agrees.

Here, for the preemption inquiry, the Court will not conduct a state-by-state analysis to examine whether Plaintiffs' report-based failure to warn claims are based on a parallel state law duty. The Court determines, and the parties agree, preemption should be examined at the federal level, rather than on a state-by-state basis. (ECF No. 261 12:11–15, 24:13–16); *see also Buquer v. City of Indianapolis*, No. 1:11-cv-00708-SEB-MJD, 2012 WL 830316, at *6, 2012 U.S. Dist. LEXIS 31830, at *16 (S.D. Ind. March 9, 2012) ("[P]reemption can be considered on a national and not a state-by-state basis."). This avoids an across-the-board dismissal of report-based failure to warn claims in all jurisdictions, if some jurisdictions recognize a report-based duty to warn not different from or in addition to federal reporting requirements.

**\*11** "In states that recognize failure to report claims, ... a manufacturer's failure to report adverse events to the FDA can form the basis of a parallel claim that survives preemption." *Nunn v. Mentor Worldwide, LLC*, No. 19-56391, —— Fed.Appx. ——, ——, 2021 WL 406304, 2021 U.S. App. LEXIS 3286 at *3 (9th Cir. Feb. 5, 2021) (citations omitted); *see also Sewell v. Mentor Worldwide, LLC*, —— Fed.Appx. ——, ——, 2021 WL 406623, 2021 U.S. App.

LEXIS 3276, at *4 (9th Cir. Feb. 5, 2021) (same); *Vieira v. Mentor Worldwide, LLC*, No. 19-56394, —— Fed.Appx. ——, ——, 2021 WL 406628 2021 U.S. App. LEXIS 3279 at *3 (9th Cir. Feb. 5, 2021) (same); *Billetts v. Mentor Worldwide, LLC*, —— Fed.Appx. ——, ——, 2021 WL 406313, 2021 U.S. App. LEXIS 3272, at *3–4 (9th Cir. Feb. 5, 2021) (same). Accordingly, the Court declines to dismiss Plaintiffs' report-based failure to warn claims on preemption grounds, and will conduct a state-by-state analysis in Part III.B.5, *infra*, to examine the claims' viability in different jurisdictions. This is consistent with the precedents in the Third Circuit, as discussed below.

The Restatement (Second) of Torts provides "a supplier's duty to warn is discharged by providing information about the product's dangerous propensities to a third person upon whom it can reasonably rely to communicate the information to the ultimate users of the product or those who may be exposed to its hazardous effects." Restatement (Second) of Torts § 388 cmt. n (1965). This Restatement may establish a device manufacturer's traditional state law duty to warn by reporting adverse safety events to the FDA. [3] *Freed v. St. Jude Med.*, Inc., 364 F. Supp. 3d 343, 358–60 (D. Del. 2019); Silver v. Medtronic, Inc., 236 F. Supp. 3d 889, 900 (M.D. Pa. 2017); *Richardson v. Bayer Healthcare Pharm. Inc.*, No. 4:15-cv-00443-BLW, 2016 WL 4546369, at *8 (D. Idaho Aug. 30, 2016); McLaughlin v. Bayer Corp., 172 F. Supp. 3d 804, 838 (E.D. Pa. 2016). The underlying rationale of a report-based failure to warn claim is that the FDA reporting regulations "are related to the manufacturer's duty to provide the [FDA] with information regarding a device's safety and effectiveness, which is then disseminated to the public." *Freed*, 364 F. Supp. 3d at 358 n.13 (citing Hughes v. Boston Scientific Corp., 631 F.3d 762, 770–71 (5th Cir. 2011)). "A manufacturer's failure to provide such information to the FDA is a parallel violation of a state duty ... to provide reasonable and adequate information regarding a product's risks." *Id.* (citing Hughes, 631 F.3d at 770–71). "[T]he FDA may be reasonably relied upon to disclose information regarding medical device failures through the publicly accessible database when provided with that information." Silver, 236 F. Supp. 3d at 900. Accordingly, Plaintiffs' report-based failure to warn claims are not expressly preempted.

For implied preemption, the Court is bound by the Third Circuit's interpretation of the holdings in ⚐ *Buckman.* The application of ⚐ *Buckman* "is often limited to 'fraud-on-the-agency' claims and not extended to claims based on state law tort principles." *Mendez v. Shah*, 28 F. Supp. 3d 282, 291 (D.N.J. 2014) (citing ⚐ *Bausch v. Stryker Corp.*, 630 F.3d 546, 557 (7th Cir. 2010)); *see also Freed*, 364 F. Supp. 3d at 352 (citing ⚐ *Hughes*, 631 F.3d at 775) ("To avoid implied preemption under ⚐ *Buckman*, a claim must assert violation of a state tort duty that also violates some FDA requirement."); *Bull v. St. Jude Med., Inc.*, No. 17-1141, 2018 WL 3397544 at *9, 2018 U.S. Dist. LEXIS 115730 at *27 (E.D. Pa. July 12, 2018) ("State law claims that allege liability based on a common law tort theory and which parallel federal law claims ... are not impliedly preempted under ⚐ *Buckman.*"). A failure to warn claim that "can be established solely by evidence of fraud on the agency is [impliedly] preempted." *Chester v. Boston Sci. Corp.*, No. 16-02421, 2017 WL 751424, at *10, 2017 U.S. Dist. LEXIS 26676, at *27 (D.N.J. Feb. 27, 2017) (citing 🚩 *Cornett v. Johnson & Johnson*, 211 N.J. 362, 48 A.3d 1041, 1056 (N.J. 2012)); *see also* ⚐ *Stout v. Advanced Bionics, LLC*, No. 2:11cv1061, 2013 WL 12133966 at *5, 2013 U.S. Dist. LEXIS 203717 at *13 (W.D. Pa. Sept. 19, 2013) (concluding the plaintiffs' negligence claims based on the device manufacturer's failure to obtain supplemental PMA approval for a change of supplier are "disguised fraud-on-the-FDA claims" and impliedly preempted, because the "approval is an administrative requirement created by the FDA, not a substantive safety requirement of state law"). Here, Plaintiffs' report-based failure to warn claims are based on state law tort principles illustrated in § 388 of the Restatement (Second) of Torts, and not solely based on Allergan's alleged fraud on the FDA. Such an alleged violation of the state law duty to "warn physicians about the risks of [a medical device] based on the failure to fully comply with its federal duty to report all adverse events to the FDA" represents "a traditional state failure to warn theory premised on alleged non-compliance with federal regulations—that it is not impliedly preempted under *Buckman*." *Bull*, 2018 WL 3397544, at *9, 2018 U.S. Dist. LEXIS 115730, at *28.

**\*12** Accordingly, the Court finds Plaintiffs' report-based failure to warn claims are not preempted.

## 2. Plaintiffs' Manufacturing Defect Claims Are Not Preempted

Allergan concedes claims for manufacturing defects, when properly alleged, may not be expressly or impliedly preempted, but contends Plaintiffs' manufacturing defect claims fail for several reasons. (ECF No. 171-1 at 57.) First, Allergan argues Plaintiffs have not alleged its BIOCELL implants deviate from an FDA-approved manufacturing process or attendant FDA-approved device specifications, and therefore must be dismissed. (*Id.* at 60.) Allergan contends the FDA could not have intended these allegedly dangerous particles to be on a medical device. (ECF No. 262 at 15.) Second, Allergan maintains Plaintiffs' allegations, disguised in "manufacturing defect" clothing, are actually aimed at the PMA-approved processes by which all of Allergan's devices are manufactured, and should be preempted as an effort to change what federal regulation commands. (ECF No. 171-1 at 61.) Third, Allergan states the Current Good Manufacturing Practices ("CGMPs"), the quality system requirements ("QSRs"), and FDCA's adulteration provisions are not device-specific, and cannot serve as parallel federal requirements. (ECF No. 262 at 14.) Allergan argues the CGMPs are too vague to create identifiable federal requirements and supply a federal parallel to Plaintiffs' manufacturing defect claims. (ECF No. 238 at 38–39.) In addition, Allergan argues Plaintiffs' adulteration allegations are preempted, because they do not resemble any common law manufacturing defect claim, and exist solely by virtue of the FDA requirements. (ECF No. 171-1 at 65.)

Plaintiffs counter they have alleged manufacturing defects in the BIOCELL implants. (ECF No. 216 at 55.) For example, Plaintiffs allege the debris, including silicone particles, on the implants' surface is not an intended part of the design for the BIOCELL implants. (*Id.*) Plaintiffs suggest the Court should not entertain Allergan's argument that the implants' design may not call for surfaces littered with debris, because Allergan has not produced all the documents from its PMA submissions. (ECF No. 263 at 10 n.6.) Plaintiffs further allege violations of CGMPs by Allergan in the manufacturing process. (ECF No. 216 at 56.) Plaintiffs state their manufacturing defect claims also parallel the FDCA's prohibition on marketing an adulterated device, and therefore are not preempted. (*Id.* at 65.) The Court agrees.

"To the extent that the [manufacturing defect] claim is a hardware failure because the device did not conform to the

standards of other units, and also violated federal regulations and procedures in manufacturing, then it would be parallel claim and would not be preempted." *Mendez v. Shah*, 28 F. Supp. 3d 282, 298–99 (D.N.J. 2014) (citations omitted); *see also Nunn v. Mentor Worldwide, LLC*, No. 19-56391, —— Fed.Appx. ——, ——, 2021 WL 406304, 2021 U.S. App. LEXIS 3286 at *3 (9th Cir. Feb. 5, 2021) (citing *Weber v. Allergan, Inc.*, 940 F.3d 1106, 1112 (9th Cir. 2019)) ("For [Plaintiffs'] manufacturing defect claims to survive express preemption under the MDA, Plaintiffs must allege that Defendants 'deviated from a particular premarket approval or other FDA requirement applicable to the Class III medical device.' "); *Sewell v. Mentor Worldwide, LLC*, —— Fed.App'x ——, ——, 2021 WL 406623, 2021 U.S. App. LEXIS 3276, at *5 (9th Cir. Feb. 5, 2021) (same); *Vieira v. Mentor Worldwide, LLC*, No. 19-56394—— Fed.App'x ——, ——, 2021 WL 406628, 2021 U.S. App. LEXIS 3279 at *4 (9th Cir. Feb. 5, 2021) (same); *Billetts v. Mentor Worldwide, LLC*, —— Fed.Appx. ——, ——, 2021 WL 406310, 2021 U.S. App. LEXIS 3272, at *4–5 (9th Cir. Feb. 5, 2021) (same). "However, if the [defendant's] device was manufactured in compliance with its PMA, then any claim of manufacturing defect would not parallel a federal claim and would be preempted." *Mendez*, 28 F. Supp. 3d at 299 (citing *In re Medtronic, Inc., Sprint Fidelis Leads Products Liability Litigation*, 623 F.3d 1200, 1207 (8th Cir. 2010)). Also, "it would be an injustice to penalize a plaintiff for alleging, through no fault of her own, what turned out to be insufficient facts about the manufacturing process of a device that caused injury," as the manufacturer's agreements with the FDA "that would provide the necessary factual specificity are confidential, and available only to the defendants and the FDA." *Killen v. Spine*, No. 11-1508, 2012 WL 4482371, 2012 U.S. Dist. LEXIS 141639 (W.D. Pa. Aug. 21, 2012) (citations omitted).

**\*13** [I]n this unique set of circumstances, where [the plaintiff] has advanced facts that suggest the existence [of] parallel claims, but does not have access to the confidential information to specifically plead the alleged violation of FDA regulations, fairness compels that some leniency be afforded plaintiff from the stringent *Twombly/Iqbal* pleading standards to allow this claim to proceed.

*Id.* at *24–25. Here, Plaintiffs allege the debris in the BIOCELL implants is not a part of the PMA-approved design for the BIOCELL implants, and therefore constitutes a deviation from the design in violation of the PMAs. (ECF No. 216 at 55.) Therefore, Plaintiffs have advanced facts suggesting plausible manufacturing defects in the BIOCELL implants, and fairness compels some leniency be afforded to Plaintiffs in asserting their manufacturing defect claims. Accordingly, the Court declines to dismiss Plaintiffs' manufacturing defect claims at this stage.

Alternatively, the CGMPs and the FDCA's adulteration provisions could also serve as parallel federal requirements.

"[C]iting to the FDA's Current Good Manufacturing Practices ("CGMP") could present a parallel federal claim." *Mendez v. Shah*, 94 F. Supp. 3d 633, 638 (D.N.J. 2015); *see also Killen*, 2012 WL 4482371, at *8, 2012 U.S. Dist. LEXIS 141639, at *21 (rejecting "the blanket position that CGMPs can never serve as the basis for a parallel claim"). To survive preemption, the plaintiff must identify "what regulations under the CGMPs ... parallel [the plaintiff's] state law claim," *Mendez*, 94 F. Supp. 3d 639, and should not "simply provide a 'laundry list of alleged CGMP violations,' " which is "too general to be capable of enforcement." *Silver v. Medtronic, Inc.*, 236 F. Supp. 3d 889, 897 (M.D. Pa. 2017) (holding the CGMP violations alleged qualify as federal regulations from which a parallel state claim may be made, because the FDA warning letters delineate specific deviations of the defendant's devices from specific CGMPs). Otherwise, "a comparison cannot be made" between the plaintiff's state law claims and relevant federal obligations to determine if the state law "requirements with respect to the device are 'different from, or in addition to,' the federal ones." *Mendez*, 94 F. Supp. 3d at 639. Here, Plaintiffs have alleged Allergan's violations of specific CGMP regulations. (ECF No. 119 at ¶¶ 129–39.) In particular, Plaintiffs allege Allergan "violated state law and parallel federal requirements set forth at 21 C.F.R. § 820.30 by failing to," among other things, "test production units under actual or simulated use conditions." (*Id.* at ¶ 132.) Section 820.30(g), which requires a device manufacturer "to test products under actual or simulated use conditions[,] is specific enough to support a parallel [state law] claim." *Sadler v. Advanced Bionics,*

*Inc.*, 929 F. Supp. 2d 670, 686 (W.D. Ky. 2013) (citing 21 C.F.R. § 820.30(g)). Therefore, Plaintiffs have identified federal parallels for their manufacturing defect claims based on the CGMPs.

The FDCA's adulteration provisions state a medical device is adulterated if "the methods used in, or the facilities or controls used for, its manufacture, packing, storage, or installation are not in conformity with" the CGMP requirements. 21 U.S.C. §§ 351(h), 360j(f). That is to say, adulteration is found if specific CGMP violations are identified. Since Plaintiffs have specified the CGMP regulations that Allergan allegedly violates, Plaintiffs can assert manufacturing defect claims based on Allergan's alleged violation of the FDCA's adulteration provisions.

*See* Silver, 236 F. Supp. 3d at 898–99 (concluding the plaintiff asserts a parallel manufacturing defect claim, because the plaintiff "alleges that [the defendant] breached his Pennsylvania common law duty to exercise reasonable care in manufacturing the Device in failing to ensure that the Device conformed to its own PMA specifications and complied with CGMPs," resulting in an " 'adulterated' device [that] was unreasonably dangerous and caused him harm").

**\*14**  Finally, the Court need not consider implied preemption here, because Allergan does not challenge Plaintiffs' manufacturing defect claims based on implied preemption. Accordingly, with parallel federal requirements in the implants' PMAs, CGMPs, and the FDCA's adulteration provisions, the Court finds Plaintiffs' manufacturing defect claims are not preempted.

### 3. Plaintiffs' Negligence *Per Se* Claims Are Not Preempted

Allergan argues Plaintiffs' negligence *per se* claims, which are based solely on the violation of the FDCA, are improper attempts at private FDCA enforcement and should be impliedly preempted. (ECF No. 171-1 at 65–66.) Plaintiffs maintain state-created causes of action that invoke negligence *per se* based on FDCA violations are not preempted. (ECF No. 216 at 72.) The Court agrees with Plaintiffs and finds negligence *per se* claims are not preempted.

"[T]he doctrine of *per se* liability does not create an independent basis of tort liability but rather establishes, by reference to a statutory scheme, the standard of care

appropriate to the underlying tort." In re Orthopedic Bone Screw Products Liability Litigation, 193 F.3d 781, 791 (3d Cir. 1999) (citing Grove Fresh Distribs., Inc. v. Flavor Fresh Foods, Inc., 720 F. Supp. 714, 716 (N.D. Ill. 1989)). "[T]he FDCA or its accompanying regulations" can be invoked to "establish the standard or duty which defendants allegedly failed to meet." Id. (citing Grove Fresh Distribs., 720 F. Supp. at 716); see also Colacicco v. Apotex, Inc., 432 F. Supp. 2d 514, 554 (E.D. Pa. 2006) ("Here, Plaintiff's negligence *per se* claim is premised on the alleged violation of the FDCA."). "[T]he FDCA does not preempt state common law claims 'such as negligence.' " Polt v. Sandoz, Inc., No. 16-2362, 2017 WL 11507637, 2017 U.S. Dist. LEXIS 228038 (E.D. Pa. July 7, 2017) (citing Orthopedic Bone Screw, 193 F.3d at 792).

Therefore, the FDCA and the FDA regulations may set the basis for Plaintiffs' negligence *per se* claims. Because Plaintiffs' negligence *per se* claims "invoke the statutory violations to prove defendants' liability for a separate underlying tort," instead of "contending the violations themselves form a cause of action," they are not impliedly preempted. Id. at *4 n.1 (citing Orthopedic Bone Screw, 193 F.3d at 791).

### 4. Plaintiffs' Claims Concerning Investigational Devices Used In An Approved Clinical Trial Are Preempted

Allergan argues Plaintiffs' claims concerning its investigational devices (McGhan Textured Breast Implant, Style 153), and post-PMA claims against its reclassified devices (McGhan RTV® Saline-Filled Mammary Implant), are expressly and impliedly preempted. (ECF No. 171-1 at 69–70.) Plaintiffs contend there is no preemption when these investigational devices are used outside an approved clinical trial. (ECF No. 261 at 37:7–9, 38:6–10.) The Court finds Plaintiffs' claims concerning Allergan's investigational devices used in an approved clinical trial are preempted.

As Allergan concedes, whether a device enjoys PMA approval when used for a particular patient governs the availability of preemption. (ECF No. 171 at 73.) Therefore, Plaintiffs' post-PMA claims against Allergan's reclassified devices, which had the PMA approval when used by Plaintiffs, are treated no differently from the claims against the PMA-approved devices as discussed

previously. However, Plaintiffs' claims concerning Allergan's investigational devices, which have not received PMAs, must be analyzed separately.

 **\*15**  "To obtain the data to support an application for premarket approval, a manufacturer may use the device in clinical trials under active FDA supervision pursuant to the FDCA's Investigational Device Exemption ("IDE") provisions and accompanying federal regulations." *Orthopedic Bone Screw*, 193 F.3d at 786 (citing 21 U.S.C. § 360j(g)). The FDA approves an IDE investigation "only upon a determination that the device is sufficiently safe and effective for investigative use on human beings." *Hunsaker v. Surgidev Corp.*, 818 F. Supp. 744, 752 (M.D. Pa. 1992) (citing *Slater v. Optical Radiation Corp.*, 961 F.2d 1330, 1333 (7th Cir. 1992)). "A jury determination that the device is not sufficiently safe and effective would not only be contrary to the experimental purposes of the exemption, but, more important[ly], would directly conflict with the FDA's contrasting judgment." *Gile v. Optical Radiation Corp.*, 22 F.3d 540, 545 (3d Cir. 1994) (citing *id.* at 752–53). "Therefore, state tort law invoked to challenge the safety or effectiveness of a [device] which is part of an FDA investigation is federally preempted." *Id.* (citing *Hunsaker*, 818 F. Supp. at 753). Such "state tort claims run counter to the important public policy, recognized by Congress, of promoting scientific inventions." *Id.* at 546. However, the state law claims concerning investigational devices used outside an approved clinical trial are not preempted under the IDE. *English v. Mentor Corp.*, 67 F.3d 477, 480 (3d Cir. 1995) ("The FDA had initially granted an Investigational Device Exemption to [the defendant], permitting it to test its prosthesis on human subjects; [the plaintiff], however, did not receive a device as part of an IDE test study and thus [the defendant] cannot rely on IDE regulations in support of its argument that [plaintiff's] state tort claims are preempted."), *vacated on other grounds*, 518 U.S. 1030, 116 S.Ct. 2575, 135 L.Ed.2d 1090 (1996); *see also* *Caccia v. Biomet, Inc.*, No. 3:13-CV-73 RLM, 2013 WL 4502211, 2013 U.S. Dist. LEXIS 119124 (N.D. Ind. Aug. 21, 2013) (rejecting the argument that "a manufacturer that obtains IDE status for a device to be used in a controlled investigational setting is, during the time the study is being conducted, exempt from liability for use of that device outside the clinical trial"). Therefore, Plaintiffs'

claims challenging the safety or effectiveness of Allergan's investigational devices used in an approved clinical study are expressly preempted.

### 5. Plaintiffs' Negligent Failure to Warn Claims Alleging Allergan's Failure to Conduct Post-PMA Clinical Studies Are Preempted

Allergan contends Plaintiffs' claims alleging Allergan failed to conduct post-PMA clinical studies are expressly preempted, because there is no state law duty that requires Allergan to undertake the studies. (ECF No. 171-1 at 56.) Allergan maintains such a requirement exists solely by virtue of the FDA's regulatory oversight and Allergan's PMA-based obligations. (*Id.*) Plaintiffs counter they are asserting negligent failure to warn claims for Allergan's alleged violation of FDA regulations and the PMA orders, which require Allergan to conduct post-PMA studies regarding the safety of BIOCELL implants. (ECF No. 216 at 75.) The Court disagrees and finds these claims to be preempted.

The Court is not aware of, and Plaintiffs do not identify, any legal authority suggesting the existence of a parallel state law duty to warn resulting from post-PMA studies. On the contrary, some courts have explicitly rejected such a duty to warn as impliedly preempted. *See, e.g.*, *Nunn v. Mentor Worldwide, LLC*, No. 19-56391, ––– Fed.App'x. –––, 2021 WL 406304, 2021 U.S. App. LEXIS 3286 at \*4 (9th Cir. Feb. 5, 2021) ("[T]o the extent Plaintiffs base their failure to warn claims on [the device manufacturer's] alleged failure to properly conduct the post-approval studies, Plaintiffs' claims are impliedly preempted because Plaintiffs do not identify a parallel state law duty to conduct post-approval studies."); *Sewell v. Mentor Worldwide, LLC*, ––– Fed.App'x. –––, –––, 2021 WL 406623, 2021 U.S. App. LEXIS 3276, at \*4–5 (9th Cir. Feb. 5, 2021) (same); *Vieira v. Mentor Worldwide, LLC*, No. 19-56394, ––– Fed.App'x. –––, –––, 2021 WL 406628, 2021 U.S. App. LEXIS 3279 at \*4 (9th Cir. Feb. 5, 2021) (same); *Billetts v. Mentor Worldwide, LLC*, ––– Fed.App'x. –––, –––, 2021 WL 406313, 2021 U.S. App. LEXIS 3272, at \*4 (9th Cir. Feb. 5, 2021) (same); *Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1281 (10th Cir. 2021) (citations omitted) ("Federal law thus impliedly preempts Plaintiffs' claims based on alleged failures to properly conduct post-approval testing and reporting as attempts to enforce the MDA."); *Ebrahimi v. Mentor Worldwide LLC*, No. 16-7316-DMG (KSx), 2017 WL 4128976, at \*4, 2017 U.S. Dist. LEXIS 153840, at \*12 (C.D. Cal. Sept. 15, 2017)

(citing 📖 *Eidson v. Medtronic, Inc.*, 981 F. Supp. 2d 868, 881 (N.D. Cal. 2013)) ("[T]o the extent [the plaintiff] bases her failure-to-warn claim on [the device manufacturer's] failure to comply with the federal requirement to complete the six post-approval studies, the claim is impliedly preempted."). Therefore, the Court concludes Plaintiffs' negligent failure to warn claims alleging Allergan's failure to conduct post-PMA clinical studies are preempted.

### 6. Plaintiffs' Implied Warranty Claims Are Not Preempted

**\*16**  Allergan argues an implied warranty claim targeting the safety and effectiveness of a PMA-approved medical device is expressly preempted. (ECF No. 171-1 at 36.) Allergan maintains it is following federal law, and therefore any claim premised on alleged faults in the FDA-approved design is expressly preempted. (ECF No. 238 at 43.) Plaintiffs counter their implied warranty claims are not preempted, because they parallel violations of federal law: the BIOCELL implants are not merchantable due to the violations of federal requirements regarding manufacturing and labeling. (ECF No. 216 at 71.) The Court agrees these claims are not preempted.

"State law claims for breach of implied warranty may be preempted to the extent that they impose new or additional requirements on manufacturers beyond the federal regulations governing the medical device at issue." *Freed v. St. Jude Med., Inc.*, 364 F. Supp. 3d 343, 356 (D. Del. 2019) (citations omitted). But a state law claim for breach of implied warranty is "viable," "to the extent [it] seek[s] recovery for conduct that may also have violated the FDCA." *In re Orthopedic Bone Screw Products Liability Litigation*, 193 F.3d 781, 792 (3d Cir. 1999). Here, Plaintiffs' claims are not imposing requirements that are different from, or in addition to, the federal ones. Instead, Plaintiffs claim the BIOCELL implants are not merchantable solely because of Allergan's alleged failure to comply with the FDA regulations and the FDCA's adulteration provisions. (ECF No. 119 at ¶ 240.) Therefore, Plaintiffs' claims are not expressly preempted, because they parallel violations of federal law. *C.f. Freed*, 364 F. Supp. 3d at 356 (dismissing the plaintiff's state law claims for breach of implied warranty as expressly preempted, because the plaintiff does not allege violation of any federal regulations or plead facts setting out the specifics of the breaches at issue); 📖 *Bentzley v. Medtronic, Inc.*, 827 F. Supp. 2d 443, 454 (E.D. Pa. 2011) (finding express preemption of the plaintiff's implied warranty of merchantability claim that asserts the defendant's medical device is "not merchantable for its intended use because of its tendency to infuse the incorrect dosage of insulin," which represents a standard different from, or in addition to, the federal requirements);

📖 *Steele v. Depuy Orthopaedics, Inc.*, 295 F. Supp. 2d 439, 455 (D.N.J. 2003) (concluding the MDA preempts the plaintiff's implied warranty claims, which "impose safety and effectiveness requirements ... that, if successful, would differ from, or impose additional requirements to, those requirements established by the FDA on [the defendant's] device").

The Court need not address the issue of implied preemption, which Allergan does not raise. Accordingly, the Court concludes Plaintiffs' implied warranty claims are not preempted.

### 7. Plaintiffs' Claims for Negligent Misrepresentation, Breach of Express Warranty, and Breach of State Consumer Fraud and Deceptive Trade Practice Statutes Are Not Preempted

Allergan argues, for Plaintiffs' warranty or misrepresentation claims to survive preemption, they must be supported by allegations of Allergan's representations occurring outside the approval process and going beyond what the device's labeling encompasses, which Plaintiffs have not pled. (ECF No. 262 at 15–16.) Allergan stresses Plaintiffs allege no specific statements of Allergan that formed the basis of any purported bargain entered by Plaintiffs or that materially deviated from language approved by the FDA. (*Id.* at 16.) Plaintiffs assert several of their misrepresentation-based claims are not preempted, because Allergan did not argue in its opening brief that these claims were preempted, thereby waiving such preemption arguments. (ECF No. 216 at 68.) The Court agrees the claims are not preempted.

**\*17**  "Absent compelling circumstances not present here, failure to raise an argument in one's opening brief waives it." 📖 *Anspach v. City of Philadelphia*, 503 F.3d 256, 258 n.1 (3d Cir. 2007) (citations omitted); *see also* 📖 *Holk v. Snapple Bev. Corp.*, 575 F.3d 329, 337 n.5 (3d Cir. 2009) ("An issue is waived unless a party raises it in its opening brief."). Preemption arguments are not except from this waiver rule. *See Eagle Sys. v. Asaro-Angelo*, No. 18-11445, 2019 WL 3459088 at \*4, 2019 U.S. Dist. LEXIS 127972 at \*9 (D.N.J.

July 31, 2019). Allergan did not argue in its opening brief that Plaintiffs' claims for negligent misrepresentation, breach of express warranty, and breach of state consumer fraud and deceptive trade practice statutes were preempted, and has not explained why it could not have done so. Therefore, Allergan has waived the preemption arguments against these claims.

Notwithstanding the waiver, these claims are not preempted. As discussed in Part III.B.6.a, *infra*, the PIC has at least sufficiently alleged a misleading promotional YouTube video that Allergan authored concerning the safety features of its Natrelle Breast Implants, which constitutes an off-label representation not approved by the FDA. Therefore, Plaintiffs' claims for negligent misrepresentation, breach of express warranty, and breach of state consumer fraud and deceptive trade practice statutes are supported by adequate factual allegations. To the extent these claims are based on Allergan's statements not approved by the FDA, they are not preempted. *Hart v. Medtronic, Inc.*, No. 1:16-cv-05403, 2017 WL 5951698 at *4, 2017 U.S. Dist. LEXIS 196837 at *14 (D.N.J. Nov. 30, 2017) (citations omitted) ("An express warranty claim is not preempted under the MDA if a Plaintiff can show that Defendants made 'voluntary statements' that were 'not approved by the FDA or mandated by the FDA about the use or effectiveness' of a medical device."); *McLaughlin v. Bayer Corp.*, 172 F. Supp. 3d 804, 827 (E.D. Pa. 2016) (citing *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 330, 128 S.Ct. 999, 169 L.Ed.2d 892 (2008)) ("Plaintiffs can potentially allege cognizable and parallel misrepresentation claims at least insofar as they allege [the defendant] made false or misleading statements ... that were inconsistent with specific statements in approved FDA materials."); *Morton v. Allergan, Inc.*, No. 14-cv-1312, 2015 WL 12839493, 2015 U.S. Dist. LEXIS 188871 (D.N.J. April 2, 2015) (recognizing the plaintiff's claims for negligent misrepresentation and breach of state consumer fraud statute, if adequately pleaded, may satisfy "a narrow exception for a 'parallel' claim, e.g., 'a damages remedy for claims premised on a violation of FDA regulations' " to avoid preemption under the MDA); *Horn v. Thoratec Corp.*, 376 F.3d 163, 168 (3d Cir. 2004) (citing *Michael v. Shiley, Inc.*, 46 F.3d 1316, 1325–31 (3d Cir. 1995)) ("[The plaintiff's] claims for breach of express warranty (based on the [device's] packaging materials) and fraud (based on the manufacturer's advertisements and promotional materials), neither of which were the subject of the FDA's PMA approval, were held not to be preempted."); *Steele v. Depuy Orthopaedics, Inc.*,

295 F. Supp. 2d 439, 456 (D.N.J. 2003) (citing *Michael, 46 F.3d at 1328*) ("[A]ny express warranty claims that are based on representations made by [the device manufacturer] concerning non-FDA approved promotional and advertising materials also are not preempted by the MDA because those claims arise out of a private contractual agreement rather than 'a product of state action.' ").

Finally, both parties agree Plaintiffs' claims concerning Allergan's tissue expanders and implants sold before the 2000 PMA are not preempted. (ECF No. 119 at ¶ 43; ECF No. 171-1 at 22; ECF No. 261 at 37:7–8.) Indeed, Allergan's tissue expanders and pre-PMA implants were sold through the 510(k) process (ECF No. 119 at ¶¶ 5, 43, 46), which does not trigger preemption. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 493–94, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996).

*18 In conclusion, the Court finds the following Plaintiffs' claims are preempted and therefore dismissed: (1) label-based failure to warn claims; (2) claims challenging the safety or effectiveness of Allergan's investigational devices used in an approved clinical trial; and (3) negligent failure to warn claims based on Allergan's alleged failure to conduct post-PMA clinical studies. The above preemptions, however, do not apply to Plaintiffs' claims concerning Allergan's tissue expanders and implants sold before the 2000 PMA, as set forth above and as agreed upon by the parties. (ECF No. 119 at ¶ 43; ECF No. 171-1 at 22; ECF No. 261 at 37:7–8.)

**B. Allergan's Motion to Dismiss on Non-Preemption Grounds (ECF No. 171-3)**

Allergan argues Plaintiffs raise novel state law personal injury claims that have not been authorized by a state statute or adopted by any state's highest court, and this Court should not recognize such claims under the *Erie* doctrine. (ECF No. 171-3 at 10.) Allergan maintains, when confronted with open questions of state law liability, federal courts in this Circuit must opt for the interpretation that restricts liability, rather than expands it, until the state's highest court decides differently. (ECF No. 236 at 6.) However, Allergan concedes the Court need not rely solely on the decisions of a state's highest court in interpreting state laws. (ECF No. 261 at 64:20–21.) Plaintiffs contend the *Erie* doctrine does not mandate the dismissal of all the state claims not recognized by that state's highest court. (ECF No. 220 at 17.) Instead, they assert, if the state's highest court has not spoken, district courts sitting in diversity must predict what the state's highest

court would decide. (*Id.* at 17–18.) The Court agrees the *Erie* doctrine does not mandate dismissal.

"Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law." *Gasperini v. Ctr. for Humanities*, 518 U.S. 415, 427, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996). "A state is not without law save as its highest court has declared it." *West v. AT&T Co.*, 311 U.S. 223, 236, 61 S.Ct. 179, 85 L.Ed. 139 (1940). "There are many rules of decision commonly accepted and acted upon by the bar and inferior courts which are nevertheless laws of the state although the highest court of the state has never passed upon them." *Id.* "In those circumstances a federal court is not free to reject the state rule merely because it has not received the sanction of the highest state court." *Id.* "State law is to be applied in the federal as well as the state courts and it is the duty of the former in every case to ascertain from all the available data what the state law is and apply it." *Id.* at 237, 61 S.Ct. 179. "In predicting how a matter would be decided under state law," a federal court should examine: "(1) what the [State's] Supreme Court has said in related areas; (2) the decisional law of the [State's] intermediate courts; (3) federal appeals and district court cases interpreting state law; and (4) decisions from other jurisdictions that have discussed the issues we face here." *Hughes v. Long*, 242 F.3d 121, 128 (3d Cir. 2001) (citing *Boyanowski v. Capital Area Intermediate Unit*, 215 F.3d 396, 406 (3d Cir. 2000)). "[W]here 'two competing yet sensible interpretations' of state law exist," a federal court "should opt for the interpretation that restricts liability, rather than expands it, until the Supreme Court of [the State] decides differently." *Travelers Indem. Co. v. Dammann & Co.*, 594 F.3d 238, 253 (3d Cir. 2010) (citing *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 680 (3d Cir. 2010)). Therefore, even if a state's highest court has not decided whether a particular state law claim exists, the Court will predict what that state's highest court may decide by looking into other relevant legal authorities.

### 1. The Court Will Review the PIC with Leniency

**\*19**  As a threshold matter, Plaintiffs state Allergan's motion to dismiss on non-preemption grounds is premature at this stage. (ECF No. 220 at 20.) Plaintiffs claim an MDL master

complaint is an administrative tool to assist discovery and allows a court to decide on common issues of fact or law. (*Id.*) Plaintiffs contend a master complaint does not set forth any Plaintiff's specific facts, and does not necessarily include complete recitations of the factual bases and claims a Plaintiff may assert, which makes dismissal of any specific claim alleged in the PIC premature. (*Id.* at 21.) Therefore, Plaintiffs maintain, any ruling on the PIC would have to take the individually filed complaints into account. (*Id.* at 22.) Plaintiffs suggest the decision on matters specific to each Plaintiff and its State should be left for later proceedings. (*Id.*) Allergan insists the Court should narrow Plaintiffs' claims where Plaintiffs have failed to state a claim upon which relief can be granted. (ECF No. 236 at 8.) Allergan asks the Court to apply Rules 8 and 12. (*Id.* at 10.) For the reasons set forth below, the Court will apply some leniency in reviewing the PIC.

In an MDL, "parties may elect to file a master complaint and a corresponding consolidated answer, which supersede prior individual pleadings." *Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 413 n.3, 135 S.Ct. 897, 190 L.Ed.2d 789 (2015). "In such a case, the transferee court may treat the master pleadings as merging the discrete actions for the duration of the MDL pretrial proceedings." *Id.* "No merger occurs, however, when the master complaint is not meant to be a pleading with legal effect but only an administrative summary of the claims brought by all the plaintiffs." *Id.* "When plaintiffs file a master complaint of this variety, each individual complaint retains its separate legal existence." *In re Refrigerant Compressors Antitrust Litig.*, 731 F.3d 586, 590 (6th Cir. 2013). "Where defendants bring a motion to dismiss that raises issues common to all plaintiffs, however, the administrative nature of a Master Complaint does not necessarily preclude 12(b)(6) motion practice." *In re Zimmer Nexgen Knee Implant Prods. Liab. Litig.*, No. 11 C 5468, 2012 WL 3582708, 2012 U.S. Dist. LEXIS 117239 (N.D. Ill. Aug. 16, 2012). "[W]hen the information that may or may not support Plaintiffs' claims is largely within the control of the Defendants," the court may "assess the sufficiency of plaintiffs' claims with substantial leniency." *In re Trasylol Prods. Liab. Litig.*, No. 08-MD-1928-MIDDLEBROOKS, 2009 WL 577726 at \*8, 2009 U.S. Dist. LEXIS 65481 at \*71 (S.D. Fla March 4, 2009).

Here, Plaintiffs consider the PIC as "an administrative method to set forth common facts and potential claims which

individual Plaintiffs ... may assert against Allergan." (ECF No. 119 at 4.) The individual Short Form Complaint to be filed by each Plaintiff will adopt the pleadings in the PIC. Therefore, in this motion to dismiss inquiry, the Court will not afford special leniency in reviewing such "common facts" as presented in the PIC. However, the Court will review, with substantial leniency, the facts that may be specific to each individual Plaintiff or largely within the control of Allergan. In other words, the lack of potentially individualized factual allegations of Plaintiffs, such as causation of individual Plaintiffs' injuries, will not be a ground for dismissal. The Court understands each Plaintiff may allege in its Short Form Complaint facts not mentioned in the PIC.

### 2. The Court Will Not Scrutinize Whether Plaintiffs Have Sufficiently Alleged Present Injuries in the PIC

Allergan contends Plaintiffs not diagnosed with BIA-ALCL do not have a legally cognizable injury to bring this MDL (ECF No. 171-3 at 11), which is formed for the very specific injury of BIA-ALCL (ECF No. 261 at 49:18–24). Allergan claims any alleged injuries without clinical significance are merely potential precursors to a harm that may never be realized (ECF No. 236 at 11). Allergan maintains most states do not recognize tort claims for an "increased risk" or "fear of developing a disease due to exposure" without a currently manifest physical injury. (ECF No. 171-3 at 11–12.) As for medical monitoring, Allergan suggests most states reject it as a relief, and the few states that allow medical monitoring as a relief or a cause of action require the plaintiff to first demonstrate a legally cognizable injury. (Id. at 12.) Plaintiffs claim to have sustained physical injuries even if they are not diagnosed with BIA-ALCL; such injuries include: (1) tissue damage; (2) a collection of fluid built up under the skin (called a "seroma"); (3) unchecked T-cell proliferation; (4) malignant T-cell mutation; and (5) chronic physiologic inflammation. (ECF No. 220 at 25.) Additionally, Plaintiffs claim to have sustained injuries in the diagnostic procedures to detect BIA-ALCL, and the surgeries to remove the BIOCELL implants from their bodies and, in some cases, replace it with a non-defective implant. (Id. at 25–26.) Finally, Plaintiffs seek damages for emotional distress, which includes the fear of cancer. (Id. at 27.)

**\*20**  The Court finds the question of whether present injuries exist is a factual issue specific to each individual Plaintiff, and should not be scrutinized at this stage. Each Plaintiff is entitled to allege its own present injuries, including

the diagnosis of BIA-ALCL, separately in the Short Form Complaint. Accordingly, the Court will not dismiss Plaintiffs' claims, including the requests for the relief of medical monitoring, fear of or increase risk of cancer, based on a failure to allege present injuries in the PIC.

### 3. Plaintiffs' Manufacturing Defect Claims Should Not Be Dismissed

Allergan contends Plaintiffs fail to identify a single manufacturing defect for the manufacturing defect claims, but rather attack the manufacturing process of the BIOCELL implants and allege the textured surface of every device is defective as a result of that process. (ECF No. 171-3 at 14–15.) Allergan relies on *Coba* to argue these claims actually target the design defect of the BIOCELL implants and therefore should be dismissed. (*Id.* at 15 (citing *Coba v. Ford Motor Co.*, 932 F.3d 114, 123–24 (3d Cir. 2019)).) Plaintiffs claim to have described in the PIC that the BIOCELL implants deviate from their intended and approved design specifications. (ECF No. 220 at 29.) The Court agrees.

The alleged manufacturing defects in the BIOCELL implants involve individualized factual issues, as the actual implant used, including its possible defects, is unique to each Plaintiff. Further, the product information of the implants is primarily within the control of Allergan. Therefore, at this stage, the Court will not dismiss Plaintiffs' manufacturing defect claims solely based on an insufficiency of manufacturing defects alleged in the PIC.

Even an exhaustive Rule 12(b)(6) analysis does not warrant dismissal of Plaintiffs' manufacturing defect claims. To sufficiently plead a manufacturing defect claim, Plaintiffs must allege Allergan "deviated from a particular premarket approval or other FDA requirement applicable to the Class III medical device," and "cannot simply demonstrate a defect or a malfunction and rely on *res ipsa loquitur* to suggest only ... that the thing speaks for itself." *Nunn v. Mentor Worldwide, LLC*, No. 19-56391, —— Fed.App'x ——, ——, 2021 WL 406304, 2021 U.S. App. LEXIS 3286 at *4 (9th Cir. Feb. 5, 2021) (citing *Weber v. Allergan, Inc.*, 940 F.3d 1106, 1112 (9th Cir. 2019)); *Sewell v. Mentor Worldwide, LLC*, —— Fed.App'x ——, ——, ——, 2021 WL 406623, 2021 U.S. App. LEXIS 3276, at *5 (9th Cir. Feb. 5, 2021) (same); *Vieira v. Mentor Worldwide, LLC*, No. 19-56394, —— Fed.App'x. ——, 2021 WL 406628, 2021 U.S. App. LEXIS 3279 (9th

Cir. Feb. 5, 2021) (same); *Billetts v. Mentor Worldwide, LLC*, —— Fed.App'x ——, ——, 2021 WL 406313, 2021 U.S. App. LEXIS 3272, at *4–5 (9th Cir. Feb. 5, 2021) (same). Allergan concedes a manufacturing defect is "a deviation from the manufacturer's intended specifications that renders the device unreasonably dangerous." (ECF No. 171-3 at 14–15.) The PIC has alleged exactly that. For example, Plaintiffs allege Allergan's scrubbing process used different brushes and un-validated methods that violated PMA requirements, and resulted in a defectively manufactured surface with particle residues unintended by the product specifications approved by the FDA, causing severe harm to patients. (ECF No. 119 at ¶ 118.) Allergan argues the PMA does not specify a prohibition of the surface particles (ECF No. 261 at 43:8–10), but this does not make the particles a part of the FDA-approved product specifications.

Even if Allergan is correct that Plaintiffs fail to specifically allege a deviation of the implants from their PMA-approved specifications, as discussed in Part III.A.2, *supra*, fairness compels some leniency be afforded to Plaintiffs in asserting their manufacturing defect claims at this stage, because Plaintiffs may not have access to the confidential information to specifically plead Allergan's deviations. Accordingly, the Court declines to dismiss Plaintiffs' manufacturing defect claims based on a potentially inadequate identification of deviations from the PMA-approved specifications.

**\*21**  Finally,  *Coba*  is inapposite here. The defects in *Coba* involved the delamination of a vehicle's fuel tank coatings, "whereby particles of the tank lining would separate from the underlying metal and mix with the vehicle's fuel." *Coba, 932 F.3d at 117.* The delamination was caused by the exposure of the fuel tank coatings to "the acetic and formic acids in fuel," which the coatings could not "tolerate." *Id. at 123.* In other words, in *Coba*, the defects associated with delamination, including the particles of the tank lining, were not a part of the fuel tank in its manufactured form; instead, the defect resulted from the erosions of the fuel tank after it was manufactured, and was caused by an external matter, i.e., the fuel. The *Coba* court decided the fuel tank defect was a design defect. *Id.* But this is different from the alleged defects in the BIOCELL implants, which involve unintended surface particles in the implants' manufactured form.

Accordingly, the Court will not dismiss Plaintiffs' manufacturing defect claims.

### 4. Plaintiffs' Negligence *Per Se* Claims Are Not Viable in Some Jurisdictions

Allergan insists Plaintiffs' negligence *per se* claims fail for multiple independent reasons. (ECF No. 171-3 at 15.) Allergan explains many states do not recognize any negligence *per se* claim, or do not allow a negligence *per se* claim based on alleged FDCA or CGMP violations. (*Id.* at 16–18.) Plaintiffs argue the FDCA can be and is actually recognized as the basis for a negligence *per se* claim. (ECF No. 220 at 36–39.) The Court finds Plaintiffs cannot assert an FDCA/CGMP-based negligence *per se* claim in some jurisdictions.

The following jurisdictions do not allow any negligence *per se* claim or an FDCA/CGMP-based negligence *per se* claim concerning a prescription device:

● Alaska. *Shanks v. Upjohn Co.*, 835 P.2d 1189, 1200–01 (Alaska 1992) (affirming a lower court's decision not to give a negligence *per se* instruction in action against a prescription drug manufacturer, where the negligence *per se* claim is under the misbranding provisions of Alaska's Food, Drug, and Cosmetics Act, because the state statute, using the same languages in FDCA's misbranding provisions, is too vague to define a reasonable standard of care). Though *Shanks* did not conclude that no provision of FDCA/CGMP could form the basis of a negligence *per se* claim, the Court does not discern any legal authority in Alaska that recognizes an FDCA/CGMP-based negligence *per se* claim concerning a prescription device.

● Arkansas. *Central Okla. Pipeline, Inc. v. Hawk Field Services, LLC*, 2012 Ark. 157, 400 S.W.3d 701, 712 (Ark. 2012) (citing *Shannon v. Wilson*, 329 Ark. 143, 947 S.W.2d 349 (Ark. 1997)) ("Under Arkansas law, the violation of a statute is only evidence of negligence and does not constitute negligence *per se*.").

● Colorado. *Liby v. City Park Family*, No. 2011-CV-436, 2012 Colo. Dist. LEXIS 781, at *12 (D. Colo. Feb. 27, 2012) ("[T]he FDCA and its underlying regulations cannot serve as a basis for a negligence *per se* claim."). Plaintiffs argue *Franklin* recognized the viability of FDCA/CGMP-

based negligence *per se* claims. (ECF No. 220-1 at 96 (citing *Franklin v. Medtronic, Inc.*, No. 09-cv-02301-REB-KMT, 2010 WL 2543579, 2010 U.S. Dist. LEXIS 71069 (D. Colo. May 12, 2010)).) The Court does not read such a ruling into *Franklin*. The *Franklin* court found the plaintiff's negligence *per se* claim was preempted, because "the underlying allegations [were] far too conclusory and factually deficient to state a plausible 'parallel' claim," and were only "facially 'premised on a violation of FDA regulations.' " *Franklin*, 2010 WL 2543579, at *10, 2010 U.S. Dist. LEXIS 71069, at *30. But this does not mean, if the plaintiff in *Franklin* sufficiently alleged a violation of FDA regulations, its negligence *per se* claim would surely be viable. The *Franklin* court did not analyze other factors under Colorado law that may preclude FDCA/CGMP-based negligence *per se* claims, such as those considered in *Liby* in rejecting FDCA-based negligence *per se* claims. *Liby*, 2012 Colo. Dist. LEXIS 781, at *5–6.

**\*22** ● Connecticut. *Norman v. Bayer Corp.*, No. 3:16-cv-00253 (JAM), 2016 WL 4007547 at *5, 2016 U.S. Dist. LEXIS 96993 at *14 (D. Conn. July 26, 2016) (citing *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 353, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001)) (concluding the plaintiff's negligence *per se* claim based on "several FDA statutes and regulations ... arise[d] directly and wholly derivatively from the violation of federal law," and "is therefore subject to implied preemption").

● Florida. *McClelland v. Medtronic, Inc.*, 944 F. Supp. 2d 1193, 1200 (M.D. Fla. 2013) (citations omitted) ("As with Plaintiff's claims ... for negligence *per se* and failure to warn, Plaintiff's attempt to recast a claim for violation of the FDCA as a state-law negligence claim is impliedly barred by § 337(a)."); *McClelland v. Medtronic, Inc.*, No. 6:11-CV-1444-Orl-36KRS, 2012 WL 5077401, at *5, 2012 U.S. Dist. LEXIS 152197, at *12–13 (M.D. Fla. 2012) (citations and internal quotations omitted) ("[U]nder Florida law, the violation of a statute can only give rise to civil liability if the statute indicates an intention to create a private cause of action. The FDCA expressly provides that all actions to enforce the Act shall be by and in the name of the United States. This language evidences legislative intent to prohibit a private right of action for a violation of the FDCA. Therefore, Plaintiff cannot assert a negligence *per se* claim based on violations of the FDCA or the FDA's implementing regulations.").

● Georgia. *Green v. Medtronic, Inc.*, No. 1:19-CV-3242-TWT, 2020 U.S. Dist. LEXIS 145524 at *11 (N.D. Ga. May 1, 2020) (citing *Leonard v. Medtronic, Inc.*, No. 1:10-CV-03787-JEC, 2011 U.S. Dist. LEXIS 93176 at *23 (N.D. Ga. Aug. 19, 2011)) ("Nor may a negligence per se claim be premised on breaches of duties created by the FDCA."); *Scoggins v. Floyd Healthcare Mgmt.*, No. 4:14-CV-00274-HLM-WEJ, 2016 U.S. Dist. LEXIS 201663, at *107 (N.D. Ga. June 10, 2016) (citing *Miller v. Chase Home Fin., LLC*, No. 2:10-CV-206-WCO, 2011 WL 10944693 (N.D. Ga. Oct. 6, 2011), *aff'd*, 677 F.3d 1113 (11th Cir. 2012)) ("[A] claim for negligence *per se* [under Georgia law] fails if the statute or regulation establishing the claimed legal duty does not provide a cause of action for damages for its violation."); *Horn v. Boston Sci. Neuromodulation Corp.*, No. CV409-074, 2011 U.S. Dist. LEXIS 102164 at *25 (S.D. Ga. 2011) ("[B]ecause [CGMPs] fail to provide any tangible or concrete standard, this Court agrees that to allow a violation of such a flexible standard to result in liability would, in itself, be imposing a standard 'different from, or in addition to' those imposed by the MDA. 21 U.S.C. § 360k(a)(1). Indeed, any claim based on the QSRs or similarly vague FDA regulations would fail under comparable reasoning.").

● Hawaii. *Sailola v. Mun. Servs. Bureau*, No. 13-00544 HG-RLP, 2014 U.S. Dist. LEXIS 93087 at *23 (D. Haw. July 9, 2014) (citing *Aana v. Pioneer Hi-Bred Intern., Inc.*, 65 F.Supp.2d 1157, 1175 (D. Haw. 2013)) ("Hawaii law does not recognize a negligence *per se* cause of action for violation of a statutory standard.").

● Indiana. *Bayer Corp. v. Leach*, 153 N.E.3d 1168, 1179 (Ind. Ct. App. 2020) (concluding the plaintiff's negligence *per se* claim is impliedly preempted to the extent it is premised "on a standard imported from the Indiana FDCA," which "is specifically designed to parallel federal requirements" in the FDCA); *Cavender v. Medtronic, Inc.*, No. 3:16-CV-232, 2017 U.S. Dist. LEXIS 57376 (N.D. Ind. April 14, 2017) (finding the plaintiff's negligence *per se* claim based on federal regulations "is not a cognizable independent claim and is subsumed by the [Indiana Product Liability Act]").

**\*23** ● Kansas. *Brooks v. Mentor Worldwide, LLC*, No. 19-2088-KHV, 2019 U.S. Dist. LEXIS 161820 (D. Kan. Sept. 23, 2019), *aff'd* 985 F.3d 1272 (10th Cir. 2021) (citations omitted) ("Plaintiffs cannot recover under the theory of negligence *per se* based on violations of the FDCA. In

In re: Allergan Biocell Textured Breast Implant Products Liability..., Slip Copy (2021)

Kansas, negligence *per se* 'is limited to violations of a statute where the legislature intended to create an individual right of action for injury arising out of a statutory violation.' ").

● Kentucky. *Sadler v. Advanced Bionics, Inc.*, 929 F. Supp. 2d 670, 681 (W.D. Ky. 2013) ("Plaintiffs' negligence *per se* claims, which are premised upon violations of federal law, are not cognizable as a matter of Kentucky law and must be dismissed.").

● Louisiana. *King v. Bayer Pharms. Corp.*, No. 09-0465, 2009 U.S. Dist. LEXIS 125802 (W.D. La. June 8, 2009) (citing *Jefferson v. Lead*, 106 F.3d 1245, 1251 (5th Cir. 1997)) ("Plaintiffs' claims against Defendants for strict liability, negligence and negligence *per se* are not viable as independent theories of recovery outside of the [Louisiana Products Liability Act] framework.").

● Maine. *Binette v. Dyer Library Ass'n*, 688 A.2d 898, 904 (Me. 1996) (citations omitted) ("Maine does not recognize the doctrine of negligence *per se.*").

● Maryland. *Webb v. Green Tree Servicing, LLC*, No. ELH-11-2105, 2012 U.S. Dist. LEXIS 79451 at *18 (D. Md. June 7, 2012) ("Maryland does not recognize the negligence *per se* doctrine.").

● Massachusetts. *Amoah v. McKinney*, No. 4:14-40181-TSH, 2016 U.S. Dist. LEXIS 191864, at *45 n.15 (D. Mass. Sept. 2, 2016) (citing *Juliano v. Simpson*, 461 Mass. 527, 962 N.E.2d 175, 179 (Mass. 2012)) ("[A] theory of negligence *per se* ... is not recognized by Massachusetts law.").

● Michigan. *Barnes v. Birds Eye Foods, Inc.*, No. 1:10-cv-541, 2011 U.S. Dist. LEXIS 166587 at *15 (W.D. Mich. Sept. 26, 2011) ("Michigan law does not recognize negligence *per se* as an independent cause of action ...").

● Minnesota. *Kapps v. Biosense Webster, Inc.*, 813 F. Supp. 2d 1128, 1152 (D. Minn. 2011) (citations omitted) ("A negligence-*per-se* claim that is predicated on an alleged violation of the FDCA is, by definition, a claim that would give rise to liability under Minnesota law only because of the FDCA's enactment. Such a claim is preempted under *Buckman.*").

● Nebraska. *Scheele v. Rains*, 292 Neb. 974, 874 N.W.2d 867, 872 (Neb. 2016) (citations omitted) ("[T]he violation of a regulation or statute is not negligence per se, but may be evidence of negligence to be considered with all the other evidence in the case."); *Orduna v. Total Constr. Servs.*, 271 Neb. 557, 713 N.W.2d 471, 479 (Neb. 2006) (citations omitted) ("[T]he violation of a statute is not negligence per se, but is evidence of negligence.").

● Nevada. *Miller v. DePuy Spine, Inc.*, 638 F. Supp. 2d 1226, 1231 (D. Nev. 2009) (citations omitted) ("Congress has stated its intent that the FDCA and regulations thereunder be enforced only by the U.S. Government, ... Nevada law [therefore] would not provide a damages remedy for any violation of FDA regulations," and will "refus[e] to impose negligence *per se* for violation of a statute in absence of legislative intent to impose civil liability.").

● New Hampshire. *Bartlett v. Mut. Pharm. Co.*, 731 F. Supp. 2d 135, 155 (D.N.H. 2010) (citations omitted) (predicting "the New Hampshire Supreme Court would not treat [the defendant's] violation of 21 C.F.R. § 314.80(b)[4] as establishing a *per se* breach of its duty of care, but rather would allow the jury to consider that violation as evidence of such a breach"). Though *Bartlett* did not conclude that no provision of FDCA/CGMP could form the basis of a negligence *per se* claim, the Court does not discern any legal authority in New Hampshire that recognizes an FDCA/CGMP-based negligence *per se* claim concerning a prescription device.

***24** ● New Jersey. *Green v. 712 Broadway, LLC*, No. 17-991, 2018 U.S. Dist. LEXIS 96657 at *18 (D.N.J. June 8, 2018) (citing *Sang Geoul Lee v. Won II Park*, 720 F. App'x 663, 666 (3d Cir. 2017)) ("Under New Jersey law, a claim of negligence *per se* is supported by the violation of a statute or regulation, but only when that statute or regulation serves to impose direct tort liability on the person who offends it.").

● New Mexico. *Rimbert v. Eli Lilly & Co.*, 577 F. Supp. 2d 1174, 1240 (D.N.M. 2008) ("The Court is not certain how it could let proceed a negligence *per se* claim based on the FDCA and its regulations without interpreting and applying in some way the FDA's regulations. Because the Tenth Circuit has indicated that such a private cause of action for violation of the FDCA is foreclosed, [the defendant] is entitled to

summary judgment as a matter of law on [the plaintiff's] negligence *per se* claim.").

● North Carolina. *Hill v. Danek Med., Inc.*, No. 4:96-CV-177-H1, 1998 U.S. Dist. LEXIS 21749 (E.D.N.C. Sept. 9, 1998) ("[T]o the extent that plaintiffs' complaint can be said to present a negligence *per se* claim for violations of the FDCA ... a negligence *per se* claim is nothing but a disguised attempt at private FDCA enforcement, which is precluded by law.").

● North Dakota. *Mehl v. Canadian Pac. Ry.*, 417 F. Supp. 2d 1104, 1118 (D.N.D. 2006) (citing *Kimball v. Landeis*, 652 N.W. 2d 330, 336 (N.D. 2002)) ("North Dakota law does not recognize a claim for negligence *per se*.").

● Rhode Island. *State v. Purdue Pharma L.P.*, No. PC-2018-4555, 2020 R.I. Super. LEXIS 34, at *6 (R.I. Super. May 5, 2020) (citing *Salcone v. Bottomley*, 85 R.I. 264, 129 A.2d 635, 637 (R.I. 1957)) ("Rhode Island does not recognize negligence *per se* as a cause of action.").

● Texas. *Monk v. Wyeth Pharms., Inc.*, No. SA-16-CV-1273-XR, 2017 U.S. Dist. LEXIS 72477 at *23 (W.D. Tex May 11, 2017) ("Texas law likely does not recognize a cause of action for negligence per se based solely on the violation of the FDCA and FDA regulations."); *Hackett v. G.D. Searle & Co.*, 246 F. Supp. 2d 591, 594 (W.D. Tex 2012) (citations omitted) ("[T]he FDCA and FDA regulations do not give rise to a negligence per se cause of action under the standard the Texas Supreme Court established in *Perry v. S.N.*, 973 S.W.2d 301, 41 Tex. Sup. Ct. J. 1162, (Tex. 1998).").

● Utah. *Colosimo v. Gateway Cmty. Church*, 424 P.3d 866, 882 n.82 (Utah 2018) ("So it is only after a statute or ordinance is adopted by the court as the standard of conduct of a reasonable person, thereby imposing a duty recognizable in tort, that a court will then determine whether a violation thereof constitutes prima facie evidence of negligence or negligence per se."); *Gaw v. State*, 798 P.2d 1130, 1135 (Utah Ct. App. 1990) ("The violation of a statute does not necessarily constitute negligence *per se* and may be considered only as evidence of negligence. The violation may be regarded as prima facie evidence of negligence, but is subject to justification or excuse.").

● Washington. *Veridian Credit Union v. Eddie Bauer, LLC*, 295 F. Supp. 3d 1140, 1150 (W.D. Wash. 2017) (citing RCW 5.40.050) ("In Washington, ... the violation of a statute or the breach of a statutory duty is not considered negligence *per se*, but may be considered by the trier of fact only as evidence of negligence.").

**\*25** ● West Virginia. *Mullins v. Ethicon, Inc.*, No. 2:12-cv-02952, 2017 WL 275452, at *2 (S.D. W. Va. Jan. 19, 2017) (citations omitted) ("The plaintiff cannot properly state a negligence *per se* claim under the Food, Drug, and Cosmetics Act."); *Gillingham v. Stephenson*, 209 W.Va. 741, 551 S.E.2d 663, 670 (W. Va. 2001) (citations omitted) ("In West Virginia a 'violation of a statute is prima facie negligence and not negligence per se.' "). Plaintiffs cite *Digitek*, where the court denied the defendant's motion to dismiss the plantiffs' FDCA-based negligence *per se* claim. (ECF No. 220-1 at 132 (citing *In re Digitek Prods. Liab. Litig.*, No. 2:08-md-01968, 2009 WL 2433468, 2009 U.S. Dist. LEXIS 113947 (S.D.W. Va. Aug. 3, 2009)).) But *Digitek* involved an MDL proceeding, where the court did not conduct a state-by-state analysis of the viability of the plaintiffs' claims. *Digitek*, 2009 WL 2433468, at *11–*12, 2009 U.S. Dist. LEXIS 113947, at *111. Therefore, *Digitek* said nothing about whether West Virginia recognized an FDCA/CGMP-based negligence *per se* claim.

The following jurisdictions allow an FDCA/CGMP-based negligence *per se* claim:

● Alabama. *Allen v. Delchamps, Inc.*, 624 So. 2d 1065, 1067–68 (Ala. 1993) (finding the FDCA may "establish a duty or standard of care" for the plaintiff's negligence *per se* claim).

● Arizona. *Conklin v. Medtronic, Inc.*, 244 Ariz. 139, 418 P.3d 912, 920 (Ariz. Ct. App. 2019) (finding certain FDCA provisions and FDA regulations "may be adopted as a standard of conduct to support a negligence per se claim").

● California. *Bird v. Globus Med., Inc.*, No. 19-cv-1024-KJM-CKD, 2020 WL 5366300, at *4, 2020 U.S. Dist. LEXIS 164480, at *16 (E.D. Cal. Sept. 4, 2020) ("Because plaintiffs' negligence per se claim is also based on a state law duty that appears to parallel federal law, it also is not preempted by the MDA."); *Mize v. Mentor Worldwide LLC*, 51 Cal.App.5th 850, 265 Cal. Rptr. 3d 468, 481 (Cal. Ct. App. 2020) (allowing the plaintiff to "pursue her negligence *per se* claim" based on

the defendant device manufacturer's alleged "manufacturing defects and its failure to properly report adverse events to the FDA [that] caused her injuries" in violation of "the MDA and FDA regulations"); *Coleman v. Medtronic, Inc.*, 223 Cal.App.4th 413, 167 Cal. Rptr. 3d 300, 316 (Cal. Ct. App. 2014) (allowing the plaintiff's negligence *per se* claim based on FDCA violations); *Knoppel v. St. Jude Med., Inc.*, No. SACV 13-383 JVS (ANx), 2013 WL 12116393, at *6, 2013 U.S. Dist. LEXIS 201072, at *19 (C.D. Cal. Sept. 24, 2013) (concluding "Plaintiffs have stated a claim for negligence per se," because "to the extent Plaintiffs' negligence per se claim invokes federal statutes in order to articulate a standard of care for medical device manufacturing, it is not impliedly preempted").

● Delaware. *Price v. Blood Bank of Del., Inc.*, 790 A.2d 1203, 1213 (Del. 2002) (ruling the "plaintiff is entitled to a negligence *per se* instruction if he establishes a factual basis for causation" despite "the general language of the FDA protocol" that underlies the plaintiff's negligence *per se* claim).

● District of Columbia. *Iacangelo v. Georgetown Univ.*, 580 F. Supp. 2d 111, 119–20 (D.D.C. 2008) (allowing the plaintiff's negligence *per se* claims based on alleged FDCA violations upon the plaintiff's "demonstrating that the statute creates a reasonable standard of care").

● Illinois. *Sellers v. Boehringer Ingelheim Pharms., Inc.*, 881 F. Supp. 2d 992, 1010 (S.D. Ill. 2012) (holding "the plaintiff has asserted facts sufficient to support a plausible claim for relief under the theory of negligence per se," because "the plaintiff has alleged that, under Illinois common law, [the defendant] owed a duty of care to the plaintiff and that the FDCA provides the definition for the standard of care owed to the plaintiff," and "the fact that there is no private right of action under the FDCA does not warrant dismissal of the plaintiff's negligence per se claims").

**\*26**  ● Mississippi. *Hughes v. Boston Scientific Corp.*, 631 F.3d 762, 772 & n.8 (5th Cir. 2011) (concluding the plaintiff's negligence *per se* claim under Mississippi law based on the defendant's alleged violations of the FDA regulations is not expressly or impliedly preempted)

● Missouri. *Williams v. Bayer Corp.*, 541 S.W.3d 594, 606 (Mo. Ct. App. 2017) (finding the plaintiff's negligence *per se* claim "is grounded on a well-established duty imposed on manufacturers by Missouri state law to warn consumers about the risks of using their product, which [the plaintiff] argues [the defendant] breached by failing to meet the post-premarket approval reporting requirements listed in the MDA and the [defendant's device's] PMA."); *Mattingly v. Medtronic, Inc.*, 486 F. Supp. 2d 964, 969 (E.D. Mo. 2007) (finding the plaintiffs' negligence *per se* claim based on FDA regulations "could parallel similar federal requirements such that the claim could survive a preemption challenge").

● New York. *Henson v. Wright Med. Tech., Inc.*, No. 5:12-CV-805 (FJS/TWD), 2013 WL 1296388, 2013 U.S. Dist. LEXIS 44295 at *16 (N.D.N.Y. March 28, 2013) (citing *Sita v. Danek Med.*, 43 F. Supp. 245, 262 (E.D.N.Y. 1999)) ("[T]he Second Circuit has expressly recognized that a private cause of action for per se negligence arises under New York State law upon violation of the FDCA."); *Lawrence v. Sofamor, S.N.C.*, No. 95-CV-1507, 1999 WL 592689, 1999 U.S. Dist. LEXIS 12228 at *18 (N.D.N.Y. Aug. 2, 1999) (citing *Ezagui v. Dow Chemical Corp.*, 598 F.2d 727, 733 (2d Cir. 1979)) ("Under New York law, a cause of action exists for negligence *per se* when the underlying claim is for misbranding, or otherwise illegally omitting product warnings required by the FDCA; that is, New York recognizes that a violation of a statute or regulation may serve as the basis for negligence *per se*.").

● Oklahoma. *Howard v. Zimmer, Inc.*, 299 P.3d 463, 465 (Okla. 2013) (holding the FDCA does not prohibit Oklahoma from recognizing a claim for negligence *per se* based on a violation of the MDA).

● Oregon. *Santoro v. Endologix Inc.*, No. 3:19-cv-01679-YY, 2020 WL 6295077, 2020 U.S. Dist. LEXIS 200421 at *35 (D. Or. Oct. 6, 2020) (finding "plaintiff has alleged a cognizable claim of negligence *per se*" based on the FDCA concerning the defendant's PMA-approved medical device).

● Pennsylvania. *Polt v. Sandoz, Inc.*, 462 F. Supp. 3d 557, 569 (E.D. Pa. 2020) (citations omitted) ("[A]lthough the FDCA does not create a private cause of action, a violation of the FDCA can form the basis for a negligence *per se* claim.").

● South Carolina. *Fisher v. Pelstring*, 817 F. Supp. 2d 791, 824 (D.S.C. 2011) (allowing a negligence action in which the standard of care is defined by the FDA regulations).

In re: Allergan Biocell Textured Breast Implant Products Liability..., Slip Copy (2021)

● Tennessee. An FDA regulation that imposes specific substantive requirement concerning the safety and effectiveness of a medical device may form the basis of a negligence *per se* claim under Tennessee law. *See Spier v. Coloplast Corp.*, 121 F. Supp. 3d 809, 816 (E.D. Tenn. 2015) (citing *Howard v. Sulzer Orthopedics, Inc.*, 382 F. App'x 436, 441 (6th Cir. 2010)) ("[A] negligence per se claim based on a GMP violation constituted a non-preempted parallel claim."); *Purchase v. Advanced Bionics, LLC*, 896 F. Supp. 2d 694, 698 (W.D. Tenn. 2011) ("If the CGMP regulation in question sets forth a specific and substantive standard of care that is intended to protect others, then it imposes a requirement on the manufacturer. As a result, the violation of that CGMP regulation may support a parallel claim and, incidentally, a negligence per se claim."); *c.f.* *King v. Danek Med.*, 37 S.W.3d 429, 457 (Tenn. Ct. App. 2000) (citing *Talley v. Danek Med., Inc.*, 179 F.3d 154, 161 (4th Cir. 1999)) ("The administrative requirement that a given device be approved by the FDA before being marketed—as opposed to a specific substantive requirement that a device be safe and effective—is only a tool to facilitate administration of the underlying regulatory scheme. Because it lacks any independent substantive content, it does not impose a standard of care, the breach of which could form the basis of a negligence per se claim.").

**\*27** ● Virginia. *Carmine v. Poffenbarger*, 154 F. Supp. 3d 309, 317 (E.D. Va. 2015) (allowing the plaintiff's negligence *per se* claim based on alleged violations of the FDCA); *Orthopedic Equipment Co. v. Eutsler*, 276 F.2d 455, 461 (4th Cir. 1960) ("[A] violation of the Federal Food, Drug, and Cosmetic Act is negligence *per se* in Virginia ....").

● Wisconsin. *Valente v. Sofamor, S.N.C.*, 48 F. Supp. 2d 862, 876 (E.D. Wis. 1999) ("[I]f the plaintiffs could show causation, they could assert negligence *per se* claims against the defendants based on the defendants' alleged violation of FDCA regulations.").

Finally, the Court discerns no relevant legal authority in these states: Idaho, Iowa, Montana, Vermont, and Wyoming. The Court need not consider relevant legal authority in Ohio, because Plaintiffs do not allege a negligence *per se* claim under Ohio law. (*See* ECF No. 119 at ¶¶ 84–86.)

Therefore, Plaintiffs cannot assert negligence *per se* claims based on alleged FDCA/CGMP violations in the following jurisdictions: Alaska, Arkansas, Colorado, Connecticut, Florida, Georgia, Hawaii, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, North Carolina, North Dakota, Rhode Island, Texas, Utah, Vermont, Washington, West Virginia, and Wyoming. These claims shall be dismissed.

### 5. Plaintiffs' Report-Based Failure to Warn Claims Are Not Viable in Some Jurisdictions

Allergan argues Plaintiffs' report-based failure to warn claims should be dismissed, because there is no state law duty to report adverse events to the FDA. (ECF No. 171-3 at 19.) Plaintiffs contend at least 15 states explicitly recognize a state law duty to warn via adverse event reporting, and most of the remaining states are also likely to recognize such a duty. (ECF No. 220 at 43–44.) The Court finds the state law duty to warn by reporting adverse events to the FDA is not recognized in some jurisdictions.

The following jurisdictions allow a failure to warn claim based on a device manufacturer's inadequate reporting to the FDA under state law tort principles:

● California. *Mize v. Mentor Worldwide LLC*, 51 Cal.App.5th 850, 265 Cal. Rptr. 3d 468, 479 (Cal. Ct. App. 2020) (citations omitted) ("A claim based on the failure to warn the FDA of adverse events is not preempted to the extent state tort law recognizes a parallel duty."); *Coleman v. Medtronic, Inc.*, 223 Cal.App.4th 413, 167 Cal. Rptr. 3d 300, 312 (Cal. Ct. App. 2014) ("[T]he duty to warn should not be so narrowly defined as to exclude a requirement to file adverse event reports with the FDA if that is the only available method to warn doctors and consumers.").

● Delaware. *Freed v. St. Jude Med.*, Inc., 364 F. Supp. 3d 343, 358 n.13 (D. Del. 2019).

● Hawaii. *Beavers-Gabriel v. Medtronic, Inc.*, No. 13-00686 JMS-RLP, 2015 WL 143944, at \*12 (D. Haw. Jan. 9, 2015) (citing *Tabieros v. Clark Equip. Co.*, 85 Hawai'i 336, 944 P.2d 1279, 1297–98 (Haw. 1997)) ("Hawaii law imposes a general duty of reasonable care on product manufacturers,

and recognizes a cause of action for failure to warn.... Thus, this duty of care supplies a basis for Plaintiff's strict liability and negligence claims that arises independently of [the defendant's] duty to warn the FDA under federal law.").

**\*28** ● Illinois. *Gravitt v. Mentor Worldwide, LLC*, No. 17 C 5428, 2018 WL 2933609, 2018 U.S. Dist. LEXIS 98198 at \*33 (N.D. Ill. June 12, 2018) (citations omitted) ("[The defendant's] alleged underreporting [its medical device's] tendency to rupture implicates the state law duty of a manufacturer to inform regulators and the public when it has reason to know that a product is riskier than initially believed."); *Laverty v. Smith & Nephew, Inc.*, 197 F. Supp. 3d 1026, 1035 (N.D. Ill. 2016) ("The MDA sets standards for what, when, how, and to whom a manufacturer must report; it does not eviscerate the longstanding state-imposed duty to warn simply by redefining the way medical device manufacturers satisfy that obligation.... Illinois has long recognized negligence and strict liability torts arising out of a failure to warn, placing a duty on a product manufacturer not to communicate directly with an end user, but to engage in 'reasonable conduct for the benefit' of the end user. Here, that reasonable conduct includes fully and correctly complying with FDA disclosure requirements.").

● Indiana. *McAfee v. Medtronic, Inc.*, No. 1:12-CV-417 RLM, 2015 WL 3617755, 2015 U.S. Dist. LEXIS 74101 (N.D. Ind. June 4, 2015) (finding the plaintiff "stated plausible claims for relief" under Indiana state law "based on an alleged failure to warn the FDA" with adverse event reports).

● Idaho. *Richardson v. Bayer Healthcare Pharm. Inc.*, No. 4:15-cv-00443-BLW, 2016 WL 4546369, at \*8 (D. Idaho Aug. 30, 2016) (citation omitted) (holding under Idaho law the manufacturer of a product may have a duty to forewarn a user of the product, which includes warnings and reports to the FDA in the context of Class III medical devices).

● Kentucky. *Waltenburg v. St. Jude Med., Inc.*, 33 F. Supp. 3d 818, 839–40 (W.D. Ky. 2014) (finding to the extent the plaintiffs' failure to warn claim "is based on Defendants' failure to comply with FDA [reporting] regulations, that claim is not preempted by § 360k(a)" or impliedly preempted).

● Louisiana. *Gavin v. Medtronic, Inc.*, No. 12-0851 SECTION: "G"(5), 2013 WL 3791612, 2013 U.S. Dist. LEXIS 101216, at \*44 (E.D. La. July 19, 2013) (ruling the

state law duty to provide adequate warnings and the FDA reporting requirements imposed by 21 C.F.R. § 803.50 are parallel).

● Maryland. *Williams v. Smith & Nephew, Inc.*, 123 F. Supp. 3d 733, 742 (D. Md. 2015) (citations and internal quotations omitted) ("Maryland tort law recognizes that a duty to warn can undergird a negligence case in a product liability action. Moreover, this duty to warn extends beyond the time of sale, and requires the manufacturer to make reasonable efforts to convey an effective warning. And reasonable efforts would, in some circumstances, entail a warning to a third party such as the FDA.").

● Minnesota. *Angeles v. Medtronic, Inc.*, 863 N.W.2d 404, 419 (Minn.App. 2015) ("[The plaintiffs' state law] claim is not expressly or impliedly preempted by federal law to the extent that [the plaintiffs] allege that [the defendant] failed to report adverse events to the FDA.").

● Mississippi. *Hughes v. Boston Scientific Corp.*, 631 F.3d 762, 769 (5th Cir. 2011) (finding under Mississippi law "a failure to warn claim limited to an assertion that the defendant violated a relevant federal statute or regulation is 'parallel' to federal requirements").

● Missouri. *Williams v. Bayer Corp.*, 541 S.W.3d 594, 606 (Mo. Ct. App. 2017) ("[The plaintiff's] claim is not analogous to the 'fraud-on-the-FDA' theory that was rejected in *Buckman* and is instead grounded on a well-established duty imposed on manufacturers by Missouri state law to warn consumers about the risks of using their product, which [the plaintiff] argues [the defendant] breached by failing to meet the post-premarket approval reporting requirements listed in the MDA and the [device's] PMA.").

● Nevada. *Scovil v. Medtronic Inc.*, No. 2:14-CV-00213-APG-VCF, 2015 WL 880614, 2015 U.S. Dist. LEXIS 25708, at \*19 (D. Nev. March 2, 2015) (finding Nevada law contains a parallel requirement that a medical device manufacturer report adverse events to the FDA as required by federal law).

**\*29** ● New York. *Barone v. Bausch & Lomb, Inc.*, No. E2017000711, 2019 N.Y. Misc. LEXIS 6423, 2019 WL 9341358 (N.Y. Sup. Ct., Dec. 6, 2019), *rev'd on other grounds*, 191 A.D.3d 1365, ___ N.Y.S.3d ___ (2021) (allowing a failure to warn claim based on an alleged failure

to comply with the parallel state and federal duty to report adverse events to the FDA concerning an implantable medical device); *A.F. v. Sorin Grp. USA, Inc.*, 346 F. Supp. 3d 534, 544 (S.D.N.Y. 2018) ("[A] manufacturer's duty to take steps that are reasonably necessary to warn the medical community may include warning the FDA as required by the MDA. To the extent Plaintiffs assert a claim for failure to warn the FDA, that claim is not preempted.").

● Pennsylvania. *Silver v. Medtronic, Inc.*, 236 F. Supp. 3d 889, 900 (M.D. Pa. 2017); *McLaughlin v. Bayer Corp.*, 172 F. Supp. 3d 804, 838 (E.D. Pa. 2016).

● Rhode Island. *Hodges v. Brannon*, 707 A.2d 1225, 1228 (R.I. 1998) (affirming the trial court's limiting the evidentiary use of the defendant's negative event reports filed to the FDA "to the duty-to-warn and notice issues").

● Texas. *Schouest v. Medtronic, Inc.*, 13 F. Supp. 3d 692, 706 (S.D. Tex. 2014) (allowing the plaintiff's negligence claim "predicated on [the defendant's] failure to submit adverse-event reports to the FDA after the FDA granted the [defendant's] device premarket approval").

● Vermont. *Halsey v. Smith & Nephew*, No. 5:12-cv-171, 2014 WL 12717702, 2014 U.S. Dist. LEXIS 203484 (D. Vt. Feb. 4, 2014) (citing *Stengel v. Medtronic Inc.*, 704 F.3d 1224, 1227 (9th Cir. 2013); *Hughes v. Boston Scientific Corp.*, 631 F.3d 762, 769–70 (5th Cir. 2011)) (allowing a failure to warn claim parallel to federal requirements such as the FDA's medical device reporting regulations).

● Washington. *O'Neil v. St. Jude Med., Inc.*, No. C13-0661RSL, 2013 WL 6173803, 2013 U.S. Dist. LEXIS 167450 at *11 (W.D. Wash. Nov. 22, 2013) (allowing a failure to warn claim concerning a medical device parallel to the federal obligation to report adverse events to the FDA).

● Wisconsin. *Garross v. Medtronic, Inc.*, 77 F. Supp. 3d 809, 815–16 (E.D. Wis. 2015) (allowing a state common law duty to warn based the defendant's alleged failure to report adverse events to the FDA).

The following jurisdictions explicitly reject a report-based failure to warn claim:

● Arizona. *Conklin v. Medtronic, Inc.*, 245 Ariz. 501, 431 P.3d 571, 578 (Ariz. 2018) ("[O]nly federal law, not state law, imposes a duty on [the defendant] to submit adverse event reports to the FDA.").

● Colorado. *Golden v. Brown*, No. 17CV30568, 2017 WL 4239015, at *2 (Colo. Dist. Ct. Sept. 24, 2017) (citations omitted) ("[T]here is no state law duty identical to the federal requirement that a device manufacturer report adverse events to the FDA.").

● Connecticut. *Norman v. Bayer Corp.*, 3:16-cv-00253 (JAM), 2016 WL 4007547, at *4, 2016 U.S. Dist. LEXIS 96993, at *10 (D. Conn. July 26, 2016) (citations omitted) ("There is no general or background duty under Connecticut law to report risks to a regulatory body.... The failure-to-warn claim arises solely from the MDA's reporting requirements, and therefore is subject to implied preemption.").

● District of Columbia. *Kubicki v. Medtronic, Inc.*, 293 F. Supp. 3d 129, 183 (D.D.C. 2018) ("[T]here is no D.C. common law claim that imposes liability for a manufacturer's failure to report to the FDA adverse incidents concerning an approved medical device.").

● Florida. *Romer v. Corin Group, PLC*, No. 2:18-cv-19-FtM-99MRM, 2018 WL 4281470, at *7, 2018 U.S. Dist. LEXIS 152752, at *19 (M.D. Fla. Sept. 7, 2018) (citing *McClelland v. Medtronic, Inc.*, 944 F. Supp. 2d 1193, 1200–01 (M.D. Fla. 2013)) ("Since Florida does not provide a duty to file such [adverse event] reports with the FDA, plaintiffs' claim is merely an 'attempt to recast a claim for violation of the FDCA as a state-law negligence claim' and is impliedly preempted.").

**\*30** ● Georgia. *Cline v. Advanced Neuromodulation Sys.*, 17 F. Supp. 3d 1275, 1285–87 (N.D. Ga. 2014) (dismissing the plaintiff's negligent failure to warn claim based on the defendant's failure to timely file MDRs partly because the FDA's disclosure of MDRs to the public is not guaranteed).

● Kansas. *Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1281 (10th Cir. 2021) (affirming dismissal of the plaintiffs' failure to warn claim based on the defendant's failure to conduct post-approval reporting of adverse events to the FDA, because the plaintiffs did not identify a parallel duty under Kansas law).

In re: Allergan Bioctll Textured Breast Implant Products Liability... Slip Copy (2021)

● Massachusetts. *Phillips v. Medtronic, Inc.*, No. SUCV2009-05286-A, 2012 WL 3641487 at *10, 2012 Mass. Super. LEXIS 3435 at *28 (Mass. Super. July 10, 2012) (citations omitted) ("[A] parallel claim based on failure to report adverse events, corrections and removals, and failure to submit supplemental reports to the FDA is impliedly preempted because it is premised solely on a duty created by the MDA which did not exist in the common law: the duty to provide information to a regulatory agency to enable it to determine whether to take enforcement action with respect to a device approved through the PMA process.").

● Michigan. *Hill v. Bayer Corp.*, 485 F.Supp.3d 843, 855 (E.D. Mich. 2020) (concluding the plaintiff's "negligent failure-to-warn-FDA claim[ ] [is] impliedly preempted," because the plaintiff "has not alleged any Michigan requirement that a manufacturer report adverse events to the FDA"); *White v. Medtronic, Inc.*, No. 18-11590, 2019 WL 1339613 at *6, 2019 U.S. Dist. LEXIS 49259 at *13 (E.D. Mich. Feb. 20, 2019) ("[T]he federal requirement that manufacturers report adverse events to the FDA has no state law analog, and thus there is no parallel state cause of action.").

● Montana. *Noel v. Bayer Corp.*, 481 F.Supp.3d 1111, 1127 (D. Mont. 2020) ("The claims based on a failure to warn (or report adverse events) to the FDA are impliedly pre-empted because there are no parallel requirements based on Montana law.").

● New Jersey. *D'Addario v. Johnson & Johnson*, No. 19-15627, 2020 WL 3546750, at *4– –*5, 2020 U.S. Dist. LEXIS 116760, at *12 (D.N.J. June 30, 2020) (declining to recognize a separate state law duty to warn the FDA).

● North Carolina. *McNeil-Williams v. DePuy Orthopaedics, Inc.*, No. 5:18-CV-220-FL, 2019 WL 2179217 at *5, 2019 U.S. Dist. LEXIS 84339 at *13 (E.D.N.C. May 20, 2019) (finding North Carolina law "does not recognize an independent state law duty to make adverse event reports to the FDA").

● Ohio. *Aaron v. Medtronic, Inc.*, 209 F. Supp. 3d 994, 1005–06 (S.D. Ohio 2016) ("[T]here is no state-law duty to report adverse events to the FDA [in Ohio].").

● Oregon. *Alton v. Medtronic, Inc.*, 970 F. Supp. 2d 1069, 1089 (D. Or. 2013) ("[T]o the extent the [plaintiff's] claim

was construed as premised on alleged misrepresentations and/or omissions in [the defendant's] mandatory reports to the FDA regarding the risk of adverse outcomes from off-label applications of the [defendant's] device, the claim was clearly impliedly preempted.").

● South Carolina. *Ellis v. Smith & Nephew, Inc.*, No. 6:15-545-TMC, 2016 WL 7319397 at *7, 2016 U.S. Dist. LEXIS 193607 at *19 (D.S.C. Feb. 16, 2016) (declining to recognize a failure to warn claim that is predicated on the defendant's alleged failure to provide required reports to the FDA).

**\*31** ● Tennessee. *Potolicchio v. Medtronic, Inc.*, No. 1:15-cv-122, 2016 WL 3129186 at *4, 2016 U.S. Dist. LEXIS 71723 at *12 (E.D. Tenn. 2016) (citing *Nye v. Bayer Cropscience, Inc.*, 347 S.W.3d 686, 701 (Tenn. 2011)) ("No Tennessee law requires [the defendant] to warn the FDA about adverse events. Tennessee law requires manufacturers to warn physicians, but not the FDA.").

Finally, the Court is unaware of, and counsel has not provided, any relevant legal authority in the following jurisdictions: Alabama, Alaska, Arkansas, Iowa, Maine, Nebraska, New Hampshire, New Mexico, North Dakota, Oklahoma, South Dakota, Utah, Virginia, West Virginia, and Wyoming. Given the split among the jurisdictions as to the viability of a report-based failure to warn claim, the Court will "opt for the interpretation that restricts liability, rather than expands it, until the Supreme Court of [the State] decides differently."

*Travelers Indem. Co. v. Dammann & Co.*, 594 F.3d 238, 253 (3d Cir. 2010) (citing *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 680 (3d Cir. 2010)). Therefore, the Court assumes a report-based failure to warn claim is not allowed in these states.

Accordingly, Plaintiffs' report-based failure to warn claims are dismissed under the laws of Alabama, Alaska, Arkansas, Arizona, Colorado, Connecticut, District of Columbia, Florida, Georgia, Iowa, Kansas, Maine, Massachusetts, Michigan, Montana, Nebraska, New Hampshire, New Jersey, New Mexico, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, South Carolina, South Dakota, Tennessee, Utah, Virginia, West Virginia, and Wyoming.

### 6. Plaintiffs' Negligent Misrepresentation Claims

#### a. Plaintiffs' Negligent Misrepresentations Claims Are Sufficiently Pleaded

Allergan argues Plaintiffs' negligent misrepresentation claims fail to meet the heightened pleading standard under Rule 9. (ECF No. 171-3 at 21.) Plaintiffs counter their negligent misrepresentation claims are sufficiently pleaded even under Rule 9, though Rule 9 should not govern Plaintiffs' negligent misrepresentation claims. (ECF No. 220 at 47–48.) The Court agrees.

Determinations regarding Allergan's alleged negligent misrepresentations will involve evaluation of individualized facts, because each individual Plaintiff may have received from Allergan a distinct set of implant-related information. Additionally, the evidence of such alleged misrepresentations is primarily within the control of Allergan. Therefore, at this stage, the Court will not dismiss Plaintiffs' negligent misrepresentation claims based on an insufficiency of facts alleged in the PIC. Moreover, even applying the the heightened pleading standard under Rule 9, the Court finds Plaintiffs have sufficiently pleaded Allergan's alleged negligent misrepresentations.

"Because pleading rules are procedural in nature, 'the transferee court must apply federal law as interpreted by the court of the district where the transferee court sits.' " *In re Asbestos Prods. Liab. Litig. (No. VI)*, 611 F. App'x 86, 89 (3d Cir. 2015) (citing *Various Plaintiffs v. Various Defendants (Oil Field Cases)*, 673 F. Supp. 2d 358, 362 (E.D. Pa. 2009)). Therefore, the Court will apply the federal law in the Third Circuit in determining the pleading standard applicable to Plaintiffs' negligent representation claims.

**\*32** "[U]nder the Federal Rules, plaintiff's pleading negligent representation without more is sufficient to state a claim." *Manley v. Maran*, No. 02-2504, 2003 U.S. Dist. LEXIS 19696, at \*9 (D.N.J. June 20, 2003). "[T]he defendants' objection that plaintiff had to plead specific facts is misplaced," as the plaintiff only need to satisfy "the liberal pleading requirement of Rule 8 and state[ ] a claim upon which relief can be granted." *Id.* at \*9, 11; *see also Argabright v. Rheem Mfg. Co.*, 201 F. Supp. 3d 578, 604 n.12 (D.N.J. 2016) (citations omitted) ("Where the claims are expressly premised on negligence rather than fraud, Fed. R. Civ. P. 9(b) has been held inapplicable."). However, "where the

plaintiff grounds his claims in allegations of fraud—and the claims thus sound in fraud—the heightened pleading requirements of Rule 9(b) apply." *Gray v. Bayer Corp.*, 2009 WL 1617930 at \*2, 2009 U.S. Dist. LEXIS 48181 at \*5 (D.N.J. June 9, 2009) (citing *In re Suprema Specialties, Inc. Securities Litig.*, 438 F.3d 256, 270 (3d Cir. 2006)). But "[a]bsent a determination that plaintiffs' claims sounded in fraud, or some analysis explaining why Rule 9(b) should apply," applying Rule 9(b) to such claims "constitutes legal error." *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 717 n.20 (3d Cir. 1996).

Assuming Plaintiffs' negligent misrepresentation claims sound in fraud, the Court finds they meet the heightened pleading standard under Rule 9. Plaintiffs have alleged the "essential factual background" of Allergan's alleged misrepresentations of its implants that lack any reference to the BIA-ALCL risk, by describing the "who, what, when, where and how of the events at issue." *Suprema Specialties*, 438 F.3d at 276–77 (citation omitted). For example, the PIC describes Allergan's allegedly misleading promotional YouTube video for its Natrelle Breast Implants. (ECF No. 119 at ¶ 97.) This publicly available online video describes (1) the "greatly improved safety" of breast augmentation, and (2) Allergan's textured and smooth implants, but does not make any distinction between the two types of implants as to the significantly increased risks of contracting BIA-ALCL associated with the textured type. (*Id.*) These descriptions may imply Allergan's textured implants, which include the BIOCELL implants, enjoy a greatly improved safety feature comparable to smooth implants, and, therefore, could plausibly be misrepresentations of the implants' safety features. The bottom of the video displays the following text: "© 2010 Allergan, Inc. ® mark owned by Allergan, Inc."[5] This suggests the video is authored by Allergan and first published in 2010.

#### b. Plaintiffs Cannot Assert Negligent Misrepresentation Claims in Some Jurisdictions

Allergan contends Plaintiffs' negligent misrepresentation claims should be dismissed in the thirteen states that either subsume negligent misrepresentation within the state's product liability statute, or do not recognize negligent

misrepresentation as a separate cause of action. (ECF No. 171-3 at 23.) Plaintiffs point out they do not make any negligent misrepresentation claim in two of the thirteen states, i.e., New Jersey and Indiana, and can assert the claim in the other nine states. (ECF No. 220 at 54.) The Court finds Plaintiffs cannot assert negligent misrepresentation claims in some states.

As explained in Part III.B.6.a, *supra*, the Court need not review the factual sufficiency of Plaintiffs' negligent misrepresentation allegations. Moreover, scrutinizing such factual sufficiency under the potentially varying state laws of negligent misrepresentation would be both cumbersome and unrealistic at this stage, especially when individual Plaintiffs may allege separately in their Short Form Complaints Allergan's misrepresentations to which they each have been exposed. Here, the Court will only examine whether Plaintiffs' negligent misrepresentation claims can be viable as a matter of law. The Court will not examine the controlling laws in New Jersey and Indiana, under whose laws Plaintiffs do not assert any negligent misrepresentation claim.

**\*33** ● Alabama:

Plaintiffs' claims are viable under Alabama law. Allergan suggests Plaintiffs' negligent misrepresentation claims would be considered a product liability action, and may be barred by the learned intermediary doctrine. (ECF No. 236-1 at 240–41.) The Court disagrees. In Alabama, Ala. Code § 6-5-521 "codifies who may bring a 'product liability action,' " including a negligent misrepresentation cause of action, and a plaintiff can assert a negligent misrepresentation claim. *Dalraida Props. v. ElastiKote, LLC*, No. 2:14-cv-1213-MHT-PWG, 2015 WL 4393158, at \*6, 2015 U.S. Dist. LEXIS 92498, at \*16–17 (M.D. Ala. July 15, 2015) (citing Ala. Code § 6-5-521). Also, Plaintiffs' negligent misrepresentation claims are not necessarily precluded by the learned intermediary doctrine. "Under the learned intermediary doctrine, a manufacturer's duty to warn is limited to an obligation to advise the prescribing physician of any potential dangers that may result from the use of its product." *Walls v. Alpharma USPD, Inc.*, 887 So. 2d 881, 883 (Ala. 2004). "[I]f the warning to the learned intermediary is inadequate or misrepresents the risk, the manufacturer remains liable for the injuries sustained by the patient." *Wyeth, Inc. v. Weeks*, 159 So. 3d 649, 673 (Ala. 2014). "The patient must show that the manufacturer failed to warn the physician of a risk not otherwise known to the physician and that the failure to warn was the actual and proximate cause of the patient's injury." *Id.* Here, Plaintiffs allege their physicians were not properly warned of the risks associated with the BIOCELL implants, and the physicians would not have recommended BIOCELL if Allergan provided adequate warnings. (ECF No. 119 at ¶ 204.) Therefore, Plaintiffs' allegations are sufficient under the learned intermediary doctrine.

● Arkansas:

Plaintiffs' claims are not viable under Arkansas law. Allergan argues Arkansas does not recognize negligent misrepresentation as a separate cause of action. (ECF No. 236-1 at 241.) Plaintiffs explain Arkansas recognizes the tort of misrepresentation rather than negligent misrepresentation. (*Id.* at 242.) The Court disagrees. Arkansas "decline[s] to recognize the tort of negligent misrepresentation." *South County v. First W. Loan Co.*, 315 Ark. 722, 871 S.W.2d 325, 326 (Ark. 1994). "Misrepresentation, also commonly referred to as deceit or fraud, has been an intentional tort in Arkansas for well over a century." *Id.* (citations omitted). "Thus, Plaintiffs cannot state a claim of negligent misrepresentation upon which relief may be granted." *Stube v. Pfizer Inc.*, 446 F. Supp. 3d 424, 442 (W.D. Ark. 2020). Plaintiffs claim their factual allegations have sufficiently stated a claim for misrepresentation under Arkansas law. (ECF No. 236-1 at 242.) But this is irrelevant to the viability of Plaintiffs' negligent misrepresentation claims under Arkansas law.

● Florida:

Plaintiffs' claims are viable under Florida law. Florida "recognize[s] a cause of action for negligent misrepresentation." *Moransais v. Heathman*, 744 So. 2d 973, 982 (Fla. 1999) (citing *First Florida Bank, N.A. v. Max Mitchell & Co.*, 558 So. 2d 9 (Fla. 1990)).

**\*34** ● Georgia:

Plaintiffs' claims are viable under Georgia law. Georgia allows a cause of action for negligent misrepresentation, and "adopt[s] the standard for negligent misrepresentation set out in Restatement of Torts 2d, § 552 (1977)." *Neidiger/Tucker/Bruner, Inc. v. Suntrust Bank*, 242 Ga.App. 369, 530 S.E.2d 18, 21 (Ga. Ct. App. 2000) (citing *Robert & Co. Assoc. v. Rhodes-Haverty Partnership*, 250 Ga. 680, 300 S.E.2d 503, 504 (Ga. 1983)).

● Louisiana:

Plaintiffs' claims are not viable under Louisiana law. Allergan argues the Louisiana Product Liability Act ("LPLA") is the exclusive theory of liability for manufacturers for damages caused by their products, and Plaintiffs therefore cannot assert negligent misrepresentation claims. (ECF No. 236-1 at 244.) Plaintiffs maintain their negligent misrepresentation claims could proceed under the LPLA. (*Id.* at 245.) The Court disagrees. "The LPLA establishes the exclusive theory of liability for manufacturers for damages caused by their products." *Baudin v. AstraZeneca Pharms. LP*, 413 F. Supp. 3d 498, 503 (M.D. La. 2019). "The LPLA authorizes four theories of recovery: (1) construction or composition defect; (2) design defect; (3) inadequate warning; or (4) breach of express warranty." *Johnson v. Teva Pharms. USA, Inc.*, No. 2:10 CV 404, 2010 WL 3271934 at *2, 2010 U.S. Dist. LEXIS 84747 at *7 (W.D. La. Aug. 11, 2010) (citing La. Rev. Stat. Ann. § 9:2800.52-54). "A plaintiff may not recover from a manufacturer for damage caused by a product on the basis of any theory not set forth in the LPLA." *Id.* at *7–8 (citing *Jefferson v. Lead Industries, Ass'n., Inc.*, 106 F.3d 1245, 1250–51 (5th Cir. 1997)). A negligent misrepresentation claim is "not cognizable under the LPLA, and must be dismissed." *Lewis v. GE Healthcare, Inc.*, No. 5:19-CV-00490, 2020 WL 1490719 at *4, 2020 U.S. Dist. LEXIS 51999 at *9 (W.D. La. March 25, 2020). Here, Plaintiffs are suing Allergan, a manufacturer, for damages caused by its products. Therefore, the LPLA governs, and does not allow a negligent misrepresentation claim.

● Minnesota:

Plaintiffs' claims are not viable under Minnesota law. Allergan states Plaintiffs fail to plead negligent misrepresentation, because they do not allege pecuniary loss related to a business transaction, and Minnesota limits the negligent misrepresentation claim to damages for pecuniary loss. (ECF No. 236-1 at 245.) Plaintiffs contend Minnesota law does not clearly limit Plaintiffs' claims to pecuniary loss. (*Id.* at 246.) Moreover, Plaintiffs claim to have sustained pecuniary loss related to a business transaction with Allergan: because of Allergan's alleged misrepresentations, Plaintiffs purchased and used implants from Allergan, and incurred pecuniary loss in the form of medical costs and lost wages. (*Id.*) The Court disagrees. In Minnesota,

One who, in the course of his business, profession or employment, or in a transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

**\*35** *Bonhiver v. Graff*, 311 Minn. 111, 248 N.W.2d 291, 298 (Minn. 1976) (citing Restatement, Torts 2d, Tent. Draft No. 12, § 552). "[T]he scope of a negligent misrepresentation claim" is limited "to a commercial or business setting with consequent pecuniary loss," and does not extend to "medical bills." *Forslund v. Stryker Corp.*, No. 09-2134 (JRT/ JJK), 2010 WL 3905854, at *6, 2010 U.S. Dist. LEXIS 104227, at *19–20 (D. Minn. Sept. 30, 2010) (citing *id.*) (dismissing the plaintiff's negligent misrepresentation claim for damages resulting from the defendant's medical implant in the plaintiff's body). Plaintiffs' claims are analogous to that in *Forslund*, and should be dismissed under Minnesota law.

● Mississippi:

Plaintiffs' claims are viable only under the Mississippi Product Liability Act ("MPLA"). Allergan contends Plaintiffs' negligent misrepresentation claims are subsumed by the MPLA and should be dismissed. (ECF No. 236-1 at 247.) The Court finds Plaintiffs' common law negligent misrepresentation claims should be dismissed. "[T]he MPLA applies to 'any action for damages caused by a product.' " *Young v. Bristol-Myers Squibb Co.*, No. 4:16-CV-00108-DMB-JMV, 2017 WL 706320 at *3, 2017 U.S. Dist. LEXIS 24730 at *8 (N.D. Miss. Feb. 22, 2017) (citing Miss. Code Ann. § 11-1-63(a)). "Accordingly, common law claims based on damages caused by a product are subsumed by the MPLA and must be analyzed under the statute." *Id.* (citing *Elliott v. El Paso Corp.*, 181 So.3d 263, 269 (Miss. 2015)); *see also Arnoult v. CL Med. SARL*, No. 1:14-CV-271-

In re: Allergan Bioeell Textured Breast Implant Products Liability..., Slip Copy (2021)

KS-MTP, 2015 WL 5554301 at *4, 2015 U.S. Dist. LEXIS 125843 at *9 (S.D. Miss. Sept. 21, 2015) (citations omitted) ("[T]he MPLA subsumes negligent misrepresentation claims arising from a defective product."); *Little v. Smith & Nephew, Inc.*, No. 1:15-cv-00028-GHD-DAS, 2015 WL 3651769, at *13, 2015 U.S. Dist. LEXIS 75666, at *34 (N.D. Miss. June 11, 2015) (citations omitted) ("Numerous Mississippi district courts have held that the MPLA subsumes common law negligent misrepresentation claims based on a defective product."). "Common law claims for damages caused by a product which seek to impose liability outside the MPLA's framework must be dismissed for failure to state a claim."

*Young*, 2017 WL 706320, at *3, 2017 U.S. Dist. LEXIS 24730, at *8 (citing *Elliott*, 181 So.3d at 269).

Plaintiffs claim they "may pursue negligent misrepresentation claims outside of the MPLA where, as here, defendant made affirmative misrepresentations in addition to and separate from those made on the product's label," such as Allergan's "affirmative misrepresentations in marketing and other non-PMA materials upon which Plaintiffs and Plaintiffs' physicians relied." (ECF No. 236-1 at 247–48 (citing *R.J. Reynolds Tobacco Co. v. King*, 921 So. 2d 268 (Miss. 2005); *Jowers v. BOC Grp., Inc.*, No. 1:08-CV-0036, 2009 WL 995613, 2009 U.S. Dist. LEXIS 53126 (S.D. Miss. Apr. 14, 2009)).) But this argument is contrary to the clear language of the MPLA, which provides:

> The manufacturer, designer or seller of the product shall not be liable if the claimant does not prove by the preponderance of the evidence that at the time the product left the control of the manufacturer, designer or seller:

> (i) 1. The product was defective because it deviated in a material way from the manufacturer's or designer's specifications or from otherwise identical units manufactured to the same manufacturing specifications, or

> 2. The product was defective because it failed to contain adequate warnings or instructions, or

> 3. The product was designed in a defective manner, or

> 4. The product breached an express warranty or *failed to conform to other express factual representations* upon which the claimant justifiably relied in electing to use the product; and

**\*36** (ii) The defective condition rendered the product unreasonably dangerous to the user or consumer; and

(iii) The defective and unreasonably dangerous condition of the product proximately caused the damages for which recovery is sought.

Miss. Code Ann § 11-1-63(a). Therefore, in addition to express warranty, the MPLA covers a manufacturer's "other express factual representations," such as Allergan's alleged off-label affirmative misrepresentations.

Plaintiffs' reliance on *Jowers* and *King* does not change the conclusion. The *Jowers* court found an off-label misrepresentation "[went] beyond any failure to warn, and so [wa]s not simply a 'product liability claim,' and, thus, is not automatically abrogated by the MPLA." *Jowers*, 2009 WL 995613, at *9, 2009 U.S. Dist. LEXIS 53126, at *37. But an off-label misrepresentation, even if not constituting a failure to warn under Miss. Code Ann § 11-1-63(a)(i) 2, falls under "other express factual representations" under § 11-1-63(a)(i) 4. Therefore, interpreting a manufacturer's off-label misrepresentations as going beyond the MPLA's coverage is contrary to the statute's plain language and multiple Mississippi court decisions after *Jowers*, as cited above. Such an inaccurate interpretation of the MPLA is also not supported by the *King* court, which addressed a "singular issue: Does the inherent characteristic defense of Miss. Code. Ann. § 11-1-63(b) ... bar 'any action for damages caused by' manufactured commercial cigarettes regardless of how the plaintiff labels the causes of action in the complaint?" *King*, 921 So. 2d at 270. "§ 11-1-63(b) is commonly referred to as the 'inherent characteristics defense' and is just that." *Id.* at 272. It provides:

> A product is not defective in design or formulation if the harm for which the claimant seeks to recover compensatory damages was caused by an inherent characteristic of the product which is a generic aspect of the product that cannot be eliminated without

In re: Allergan Biocell Textured Breast Implant Products Liability..., Slip Copy (2021)

substantially compromising the product's usefulness or desirability and which is recognized by the ordinary person with the ordinary knowledge common to the community.

Miss. Code Ann § 11-1-63(b). That is to say, the *King* court did not consider the issue of negligent representation, and is therefore inapplicable here. Plaintiffs fail to demonstrate they can pursue negligent misrepresentation claims outside of the MPLA.

Accordingly, the Court dismisses Plaintiffs' common law negligent misrepresentation claims under Mississippi law.

● Ohio:

Plaintiffs' claims are viable under Ohio law. Ohio "recognize[s] the tort of negligent misrepresentation." *Ed Schory & Sons v. Francis*, 75 Ohio St.3d 433, 662 N.E.2d 1074, 1080 (Ohio 1996) (citations omitted).

● Tennessee:

Plaintiffs' claims are viable under Tennessee law. "Tennessee's courts have also recognized the common-law tort of negligent misrepresentation and have adopted the Restatement (Second) of Torts § 552 (1977) as the guiding principle with regard to these claims." *Hodge v. Craig*, 382 S.W.3d 325, 344 (Tenn. 2012) (citations omitted).

● Texas:

Plaintiffs' claims are viable under Texas law. Allergan maintains Plaintiffs' negligent misrepresentation claim is subsumed by a failure to warn claim. (ECF No. 236-1 at 250 (citing *Phares v. Activas-Elizabeth LLC*, 892 F. Supp. 2d 835 (S.D. Tex. 2012)).) The Court disagrees. Texas courts "recognize[ ] a cause of action for negligent misrepresentation where the plaintiff suffered physical harm," even though a plaintiff's negligent misrepresentation claim could be found as "merely a recasting of their failure to warn claim." *Elmazouni v. Mylan, Inc.*, 220 F. Supp. 3d 736, 744 (N.D. Tex. 2016). A negligent misrepresentation may be considered a failure to warn claim when, "[n]o matter how [a plaintiff] casts her claims, [the plaintiff] essentially alleges that [the defendant]

failed to warn her that [the defendant's product] causes [a disease]." *Phares*, 892 F. Supp. 2d at 841. In this situation, if the plaintiff's failure to warn claim is rejected for some reason, then its negligent misrepresentation claim will be rejected for the same reason. *Id.* at 845–46 (dismissing the plaintiff's failure to warn and negligent misrepresentation claims for the same reason, i.e., the defendant owing no legally cognizable duty to the plaintiff); *see also Miles v. Boston Sci. Corp.*, No. H-19-4319, 2020 WL 3871329, at *9, 2020 U.S. Dist. LEXIS 120190 at *26 (S.D. Tex. July 9, 2020) (citations omitted) ("Here, [the plaintiff's] fraud by concealment and negligent misrepresentation claims are premised on her allegation that [the defendant] knowingly omitted material facts about [the defendant's product], or in other words, failed to adequately warn her and her physicians. Since the learned intermediary doctrine applies, her fraud-based and negligent misrepresentation claims fail for the same reasons as her failure to warn claim as discussed above."); *Perez v. Am. Med. Sys.*, 461 F. Supp. 3d 488, 507–08 (W.D. Tex. 2020) ("Plaintiffs' negligent misrepresentation [and] implied warranty ... claims are all grounded in allegations that Defendant provided inadequate warnings .... Therefore, the independent intermediary doctrine applies to these claims.... Plaintiffs cannot demonstrate causation as a matter of law [as required under the doctrine for the failure to warn claim]. Therefore, Defendant is entitled to summary judgment on Plaintiffs' negligent misrepresentation ... as well."). But a plaintiff may still assert a negligent misrepresentation claim independent of a failure to warn claim. *See Hardy v. Zimmer*, No. 2:16-cv-242-JRG, 2017 WL 1551601, 2017 U.S. Dist. LEXIS 65430 (E.D. Tex. April 28, 2017). In conclusion, Plaintiffs may assert a negligent misrepresentation claim not subsumed by a failure to warn claim under Texas law.

**\*37** ● Virginia:

Plaintiffs' claims are not viable under Virginia law. The parties dispute whether Virginia recognizes a negligent misrepresentation claim. (ECF No. 236-1 at 251–52.) Plaintiffs cite *Hansen* to argue negligent misrepresentation is a cognizable claim under Virginia law. (*Id.* at 252 (citing *Hansen v. Stanley Martin Companies, Inc.*, 266 Va. 345, 585 S.E.2d 567, 573 (Va. 2003)).) The Court disagrees. *Hansen* is inapposite here, because the dispute in *Hansen* was governed by Maryland's substantive law. *Hansen*, 585 S.E.2d at 571. Instead, "it is well-established that 'Virginia does not recognize any tort of

In re: Allergan Biocell Textured Breast Implant Products Liability...Slip Copy (2021)

negligent misrepresentation.' " *A.T. Massey Coal Co. v. Rudimex GmbH*, No. 3:05CV190-JRS, 2006 WL 44278 at *6, 2006 U.S. Dist. LEXIS 1882 at *16 (E.D. Va. Jan. 9, 2006) (citing *Bentley v. Legent Corp.*, 849 F. Supp. 429, 434 (E.D. Va. 1994)); *see also Zaklit v. Global Linguist Solutions, LLC*, No. 1:14cv314 (JCC/JFA), 2014 WL 3109804, at *19, 2014 U.S. Dist. LEXIS 92623, at *58 (E.D. Va. July 8, 2014) (citations and internal quotations omitted) ("Virginia does not recognize a general cause of action for negligent misrepresentation."); *Johnson v. Capital Area Permanente Group*, 30 Va. Cir. 107, 109 n.2 (Va. Cir. Ct. 1993) (citations omitted) ("Virginia law does recognize negligent misrepresentation.").

Accordingly, the Court dismisses Plaintiffs' negligence misrepresentation claims under the laws of Arkansas, Louisiana, Minnesota, and Virginia, as well as Mississippi's common law.

### 7. Plaintiffs Cannot Assert Warranty Claims in Some Jurisdictions

Allergan states Plaintiffs' warranty claims fail for several reasons: (1) some states do not allow implied warranty claims in prescription medical device litigations; (2) some states require notice as an element of warranty claims, and Plaintiffs do not plead notice in the PIC; and (3) some states require privity to assert warranty claims, and Plaintiffs lack privity with Allergan. (ECF No. 171-3 at 23.) Plaintiffs rebut Allergan's challenges on the following bases: (1) courts frequently permit warranty claims in cases involving prescription medical devices; (2) before the PIC was filed, Allergan had actual notice of the defects in its BIOCELL implants; (3) to the extent the purpose of a pre-suit notice is to provide an opportunity for the defendant to cure, the notice is not required here, because a cure is impossible for each Plaintiff who is already surgically implanted with Allergan's implant; and (4) Plaintiffs' warranty claims do not require privity because Plaintiffs are alleging personal injury. (ECF No. 220 at 56–60.) The Court finds Plaintiffs' implied warranty claims are not viable in some jurisdictions.

As a threshold matter, the Court will review with substantial leniency the following individualized factual issues, for the reasons explained in Part III.B.1, *supra*. First, a lack of adequate notice by the defendant, even if required for asserting a warranty claim, will not be a ground for dismissal

here. This is because whether Allergan has received adequate notice via its own efforts or from a Plaintiff will involve (1) facts specific to each individual Plaintiff and (2) evidence primarily within Allergan's control. Second, the Court will not scrutinize whether Plaintiffs have sufficiently alleged the defects in the BIOCELL implants. This is because the actual implant used by each individual Plaintiff, including its possible defects, is unique. Third, whether Allergan has directed (mis)representations, warranties or other communications towards Plaintiffs involves individualized factual issues, because each Plaintiff may have engaged in a unique set of contacts with Allergan. Fourth, whether Plaintiffs can establish a third party beneficiary status with respect to the agreement between Allergan and its implant distributors involves individualized factual issues, because it may turn on the interactions between each individual Plaintiff and Allergan. As a result, Plaintiffs' potentially insufficient allegations of notice, defects, Allergan's direct contacts with Plaintiffs, and the third party beneficiary status will not be considered in the motion to dismiss inquiry.

**\*38** However, the Court will examine, under the laws of different jurisdictions: (1) whether warranty claims are allowed in prescription medical device litigations, because this is a purely legal question, and (2) whether privity is required for asserting Plaintiffs' warranty claims, because privity involves a fact common to all Plaintiffs: the BIOCELL implants are prescription medical devices, which suggests Plaintiffs do not purchase the implants directly from Allergan.

In addition, as the following analysis shows, there are often several independent legal theories on which to assert express or implied warranty claims under the law of a given jurisdiction, such as a state's Uniform Commercial Code ("UCC"), product liability statute, common law, and certain exceptions. Plaintiffs, in asserting their warranty claims, do not limit the claims' underlying legal theories. Therefore, as long as Plaintiffs' express or implied claim may be viable under one of the theories recognized in a jurisdiction, the Court will allow that claim to proceed at this stage.

Finally, the viability of an implied warranty of fitness claim is not an issue here, because Plaintiffs do not assert such a claim in the PIC.

● Alabama:

Plaintiffs' claims are viable under Alabama law. The parties dispute whether Alabama law recognizes an implied warranty

of merchantability claim for medical devices. (ECF No. 236-1 at 254.) "In general, Alabama law does not recognize a cause of action for breach of implied warranty of merchantability for inherently dangerous products." *Barnhill v. Teva Pharms. USA, Inc.*, 819 F. Supp. 2d 1254, 1263 (S.D. Ala. 2011). "An implantable Class III medical device ... is an inherently dangerous product." *Grubbs v. Medtronic, Inc.*, No. 2:18-cv-01468-AKK, 2019 WL 3288263 at *4, 2019 U.S. Dist. LEXIS 121216 at *11 (N.D. Ala. July 22, 2019) (citations omitted). However, Alabama allows an implied warranty of merchantability claim based on an alleged failure to "manufacture the Device in accordance with the FDA's requirements," as opposed to "a general allegation that the product contains inherent dangers." *Id.* 2019 WL 3288263, at *4, 2019 U.S. Dist. LEXIS 121216, at *11–12. As discussed in Parts III.A.2 and III.B3, *supra*, Plaintiffs have sufficiently alleged the BIOCELL implants deviate from FDA-approved product specifications, and their implied warranty claims are therefore allowed in Alabama.

● Arizona:

Plaintiffs' claims are viable under Arizona law. The parties dispute whether Arizona law requires privity for an express warranty claim. (ECF No. 236-1 at 255–56.) Plaintiffs cite *Flory* to argue that privity is not required when the defendant's alleged breach of warranty causes physical injury. (*Id.* at 256 (citing *Flory v. Silvercrest Indus.*, 129 Ariz. 574, 633 P.2d 383 (Ariz. 1981)).) The Court disagrees. *Flory* suggested Arizona Revised statutes ("A.R.S.") § 44-2335 might extend a seller's warranties to "personally injured family members and household members and guests" of its buyer. *Flory*, 633 P.2d at 387–88. But § 44-2335 only "eliminates the necessity of horizontal privity as to certain personally injured plaintiffs, but not the necessity of vertical privity, or privity in the chain of distribution," and "does not create warranties on the part of ... remote manufacturers." *Id.* Instead, "the Arizona Supreme Court held that the lack of privity between a purchaser and a manufacturer precluded recovery based on express warranty under the U.C.C.," but "the lack of privity did not preclude the purchaser from bringing a cause of action for breach of express warranty outside the U.C.C." *Plagens v. Nat'l RV Holdings, Inc.*, 328 F. Supp. 2d 1068, 1074 (D. Ariz. 2004) (citing *Flory v. Silvercrest Indus. Inc.*, 129 Ariz. 574, 633 P.2d 383, 387–

89 (Ariz. 1981)); *see also In re Horizon Organic Milk Plus DHA Omega-3 Mktg. & Sales Practice Litig.*, 955 F. Supp. 2d 1311, 1339 (S.D. Fla. 2013) (citations and internal quotations omitted) (finding under Arizona law "a plaintiff may not proceed with a breach of warranty action under the Uniform Commercial Code against a manufacturer not in privity with the plaintiff" but "lack of privity between a manufacturer and retail purchaser does not preclude a claim outside the U.C.C. for breach of express warranty"). Therefore, though privity is required for asserting UCC-based express warranty claims, Plaintiffs may, at minimum, assert non-UCC-based express warranty claims under Arizona law.

**\*39** Moreover, *Hix* rejected the "argument that a patient of an implantable medical product can never be in privity with the manufacturer." *Hix v. Bos. Sci. Corp.*, No. CV-19-00422-PHX-DJH, 2019 WL 6003456 at *6, 2019 U.S. Dist. LEXIS 197384 at *13 (D. Ariz. Nov. 14, 2019). Instead, privity may "exist between the patient and the manufacturer" and "a breach of express warranty could be brought[,] if the plaintiff was capable of pleading sufficient facts to show that the manufacturer made representations specifically to the plaintiff, rather than just plaintiff's physicians." *Id.* at *14 (citing *Martin v. Medtronic*, Inc., 63 F. Supp. 3d 1050, 1061 (D. Ariz. 2014)). Because the Court will not scrutinize Allergan's representations made to an individual Plaintiff at this stage, Plaintiffs' express warranty claims under Arizona law, whether or not based on UCC, will not be dismissed for a lack of privity.

● California:

Plaintiffs' claims are viable under California law. The parties dispute whether privity of contract is required for Plaintiffs' implied and express warranty claims under California law. (ECF No. 236-1 at 258–60.) "[P]rivity of contract is required in an action for breach of either express or implied warranty." *Blanco v. Baxter Healthcare Corp.*, 158 Cal.App.4th 1039, 70 Cal. Rptr. 3d 566, 582 (Cal. Ct. App. 2008) (citations omitted). However, California courts have not concluded "a patient of an implantable medical product can never be in privity with the manufacturer," and have only held "privity does not exist between the patient and the manufacturer if the patient did not rely on the manufacturer's judgment but did rely on the physician's skill and judgment." *Zetz v. Bos. Sci. Corp.*, 398 F. Supp. 3d 700, 711 (E.D. Cal. 2019); *see also Fundin v. Chi. Pneumatic Tool Co.*, 152 Cal.App.3d 951, 199 Cal. Rptr. 789, 793–94 (Cal. Ct.

App. 1984) (citing *Burr v. Sherwin Williams Co.*, 42 Cal.2d 682, 268 P.2d 1041, 1049 (Cal. 1954)) ("[W]hen a consumer relies on representations made by a manufacturer in labels or advertising material, recovery is allowable on the theory of express warranty without a showing of privity.");

*c.f.* *Blanco*, 70 Cal. Rptr. 3d at 582 (concluding the plaintiff patient cannot sue the defendant medical device manufacturer for breach of implied warranties, because "there is no evidence [the plaintiff] relied on [the defendant's] judgment that the [device] was appropriate for her"). Because the Court declines to scrutinize whether the PIC contains sufficient allegations of Allergan's misrepresentations made to an individual Plaintiff, the Court will not dismiss Plaintiffs' warranty claims under California law for a lack of privity.

● Florida:

Plaintiffs' claims are viable under Florida law. The parties dispute the privity requirement. (ECF No. 236-1 at 262–63.) "Pursuant to Florida law, the plaintiff must be in privity of contract to recover under theories of breach of express or implied warranties." *Cubbage v. Novartis Pharms. Corp.*, No. 5:16-cv-129-Oc-30PRL, 2016 WL 3595747 at *7, 2016 U.S. Dist. LEXIS 86753 at *20 (M.D. Fla. July 5, 2016) (citations omitted). "Most often, privity does not exist between manufacturers and patients when the medication is only available by prescription." *Dimieri v. Medicis Pharms. Corp.*, No. 2:14-cv-176-FtM-38DNF, 2014 WL 3417364, at *6, 2014 U.S. Dist. LEXIS 95409, at *15 (M.D. Fla. July 14, 2014) (citations omitted). But a plaintiff may meet a "relaxed" privity standard if it "relied on the safety claims in those advertisements" of the defendant manufacturer purposely targeting patients like the plaintiff. *Humleker v. Boston Sci. Corp.*, No. 6:19-cv-121-Orl-31EJK, 2019 WL 6465059, at *2, 2019 U.S. Dist. LEXIS 207077, at *5 (M.D. Fla. Dec. 2, 2019); *c.f. Dimieri*, 2014 WL 3417364, at *6, 2014 U.S. Dist. LEXIS 95409, at *15–16 (concluding "Plaintiff fails to allege the existence of privity between himself and Defendant" because "Plaintiff does not assert the existence of any direct contact between Defendant and Plaintiff when the physician prescribed" the medicine). Here, the Court will not scrutinize Plaintiffs' direct contacts with Allergan, and therefore will not dismiss Plaintiffs' warranty claims under Florida law for a lack of privity.

*\*40* ● Georgia:

Plaintiffs' claims are viable under Georgia law. The parties dispute the privity requirement. (ECF No. 236-1 at 264–65.) "Georgia law still generally precludes the ultimate consumer from recovering on any express or implied warranty when the manufacturer sells the product to the original consumer, e.g. a retailer." *Lee v. Mylan Inc.*, 806 F. Supp. 2d 1320, 1325–26 (M.D. Ga. 2011) "However, Georgia courts recognize an exception to this general rule." *Id.* at 1326. "If the manufacturer expressly warrants to the ultimate consumer that the product will perform in a certain way or that it meets particular standards, privity with that ultimate consumer is deemed to exist." *Id.* (citations omitted); *see also Hemmings v. Camping Time RV Ctrs., LLC*, No. 1:17-CV-1331-TWT, 2017 WL 4552896, 2017 U.S. Dist. LEXIS 168417 (N.D. Ga. 2017) ("[W]here the manufacturer extends an express warranty to the end consumer, privity is created that satisfies the requirements of the implied warranty of merchantability."). Here, the Court will not scrutinize whether Plaintiffs have sufficiently alleged an express warranty from Allergan, and therefore will not dismiss Plaintiffs' warranty claims under Georgia law for a lack of privity.

● Idaho:

Plaintiffs' claims are viable under Idaho law. The parties dispute the privity requirement. (ECF No. 236-1 at 265–66.) Plaintiffs argue their warranty claims do not require privity when they are brought under the Idaho Products Liability Reform Act ("IPLRA") rather than UCC. (*Id.* at 266 (citing *Glenn v. B & R Plastics, Inc.*, 326 F. Supp. 3d 1044, 1063–64 (D. Idaho 2018)).) The Court disagrees. The *Glenn* court ruled the Idaho Supreme Court had concluded in *Oats* that plaintiffs lacking privity with the manufacturer or seller may pursue their claims for personal injuries based on breach of warranty under the IPLRA rather than the UCC." *Glenn*, 326 F. Supp. 3d at 1064 (citing *Oats v. Nissan Motor Corp.*, 126 Idaho 162, 879 P.2d 1095, 1105 (Idaho 1994)).

But this is an inaccurate reading of *Oats*, which did not explicitly recognize a non-privity breach of warranty action under the IPLRA; *Oats* only allowed the plaintiff, who initially brought a non-privity breach of warranty action, to proceed under the IPLRA with a strict liability claim.

*Oats*, 879 P.2d at 1105 ("[W]hen a plaintiff brings a non-privity breach of warranty action against a manufacturer or seller to recover for personal injuries allegedly sustained as a result of a defective product, that action is one for strict liability in tort, governed by the provisions of the IPLRA.").

Instead, "Idaho does not recognize a breach of warranty claim in personal injury products liability actions which do not involve a contractual relationship between the manufacturer and the injured person." *Elliott v. Smith & Nephew*, No. 1:12-CV-0070-EJL-MHW, 2013 WL 1622659 at \*8, 2013 U.S. Dist. LEXIS 59072 at \*26 (D. Idaho April 15, 2013) (citing *Oats*, 879 P.2d at 1105).

However, privity is not always necessary for a UCC-based warranty claim under Idaho law. "[A] plaintiff may pursue UCC breach of warranty claims for personal injuries only if: (a) the plaintiff is in contractual privity with the manufacturer or seller, or (b) the plaintiff qualifies as a third party beneficiary of the underlying sales contract." *Corbett v. Remington Arms Co., LLC*, No. 4:15-cv-00279-BLW, 2016 WL 1755456 at \*2, 2016 U.S. Dist. LEXIS 58967 at \*5 (D. Idaho May 2, 2016) (citing *Oats*, 879 P.2d at 1102). Moreover, for express warranty claims, certain direct contacts between the patient and the manufacturer may meet the privity requirement. *See id.* 2016 WL 1755456, at \*3, 2016 U.S. Dist. LEXIS 58967, at \*9 ("At best, the existence of a warranty registration card [the plaintiff filled and sent directly to the defendant] might support an express warranty claim, but [the plaintiff] has not convinced the Court that any such warranty would include implied warranties."). Therefore, Plaintiffs may proceed with UCC-based warranty claims and non-UCC-based express warranty claims, as the Court will not scrutinize whether Plaintiffs have sufficiently alleged a third party beneficiary status or direct contacts with Allergan in the PIC.

  \*41  ● Indiana:

Plaintiffs' claims are viable under Indiana law. The parties dispute the privity requirement. (ECF No. 236-1 at 268.) The Indiana Product Liability Act ("IPLA") "ha[s] codified the entire field of products liability" under Indiana law. *Weigle v. SPX Corp.*, 729 F.3d 724, 737 (7th Cir. 2013); *see also Gardner v. Tristar Sporting Arms*, No. 1:09-cv-0671-TWP-WGH, 2010 WL 3724190 at \*2, 2010 U.S. LEXIS 97188 at \*6 (S.D. Ind. Sept. 15, 2010) (citations omitted) ("[T]he IPLA has effectively supplanted products liability common law claims."). "A product can be defective within the meaning of the IPLA because of a manufacturing flaw, a defective design or a failure to warn of the dangers while using the product." *Campbell Hausfeld/Scott Fetzer Co. v. Johnson*, 109 N.E.3d 953, 956 (Ind. 2018). "Thus, the IPLA

governs the strict liability and negligence claims." *Ind. Farm Bureau Ins. v. Amazon*, No. 1:19-cv-01568-JRS-TAB, 2020 WL 6400808 at \*2, 2020 U.S. Dist. LEXIS 204081 at \*4 (S.D. Ind. Oct. 30, 2020) (citations omitted). "[B]reach of implied warranty" and "breach of express warranty" claims are not "recognized under the IPLA." *Bradburn v. Bard, Inc.*, No. 3:19-cv-925-PPS-MGG, 2020 WL 3065024 at \*3, 2020 U.S. Dist. LEXIS 101201 at \*8 (N.D. Ind. June 9, 2020) (citing Ind. Code § 34-20-1-1). Therefore, Plaintiffs cannot pursue warranty claims under the IPLA.

However, warranty claims can be asserted under Indiana's UCC and independent from the IPLA. *Atkinson v. P & G-Clairol, Inc.*, 813 F. Supp. 2d 1021, 1025 (N.D. Ind. 2011) ("The fact that the Supreme Court of Indiana has established that different damages are available under tort and contract law for a defective product bolsters the argument that a defective product can give rise to claims under both the IPLA and the UCC."); *Cincinnati Ins. Cos. v. Hamilton Beach/Proctor-Silex, Inc.*, No. 4:05 cv 49, 2006 WL 299064, 2006 U.S. Dist. LEXIS 9807 at \*8 (N.D. Ind. Feb. 7, 2006) (citations omitted) ("[C]laims under the IPLA are independent from breach of warranty claims alleged under Indiana's adoption of the Uniform Commercial Code."); *Hunt v. Unknown Chem. Mfr. No. One*, No. IP 02-389-C-M/S, 2003 WL 23101798, 2003 U.S. Dist. LEXIS 20138 at \*34 (S.D. Ind. Nov. 5, 2003) (citing *Hitachi Const. Mach. Co., Ltd. v. Amax Coal Co.*, 737 N.E.2d 460 (Ind. App. 2000)) ("[T]he IPLA did not vitiate contract actions under the Uniform Commercial Code"). But the IPLA bars implied warranty claims sounding in tort. *McClellon v. Thermo King Corp.*, No. 1:11-cv-01337-SEB-MJD, 2013 U.S. Dist. LEXIS 174996, at \*10–11 (S.D. Ind. Dec. 13, 2013) (citations omitted) ("[A] breach of implied warranty claim duplicates an IPLA strict liability claim and should not be pursued as a separate count."); *1st Call Home Health, LLC v. Porter*, No. 18A05-1110-PL-528, 2012 Ind. App. Unpub. LEXIS 261, at \*7 (Ind. Ct. App. March 2, 2012) ("The IPLA effectively supplants the common-law breach of implied warranty in tort claim."). To conclude, "[t]ort-based implied warranty claims are subsumed under the IPLA, but contract-based implied warranty claims are not." *Ind. Farm*, 2020 U.S. Dist. LEXIS 204081, at \*7 (citations omitted).

  \*42  Here, Plaintiffs allege Allergan "impliedly warranted to Plaintiff that the defective implants were of merchantable quality and safe for their ordinary and intended use in the human body as breast implants and tissue expanders." (ECF

No. 119 at ¶ 232.) "This is enough for a contract-based claim of breach of implied warranty." *Constructora Mi Casita S De RL De CV v. NIBCO Inc.*, No. 3:16-CV-565-PPS-MGG, 2017 WL 3438182, 2017 U.S. Dist. LEXIS 126649 at *16 (N.D. Ind. Aug. 9, 2017) (citations omitted) (noting the plaintiff has pleaded the defendant "impliedly warranted to Plaintiff that [the defendant's products] were of merchantable quality and fit for the use for which they were intended"). As for privity, "Indiana law does not require vertical privity between a consumer and a manufacturer as a condition to a claim by the consumer against the manufacturer for breach of the manufacturer's implied warranty of merchantability."

*Hyundai Motor Am., Inc. v. Goodin*, 822 N.E.2d 947, 959 (Ind. 2005). Therefore, Plaintiffs may pursue UCC-based implied warranty claims against Allergan.

In contrast, express warranty claims, even if asserted for the recovery of physical harm, "are not subsumed by the IPLA, particularly in light of the legislative inaction as to the relationship between the UCC and the IPLA." *Bayer Corp. v. Leach*, 153 N.E.3d 1168, 1190 (Ind. Ct. App. 2020) (citing

*DePuy, Inc. v. Farmer*, 847 N.E.2d 160, 168 (Ind. 2006)). Also, "vertical privity is not required to pursue a claim based on those alleged express warranties." *Id.* at 1191. "[A] remote purchaser was 'not precluded from suing a manufacturer because of lack of privity of contract, where the manufacturer allegedly made express warranties' directly to the remote purchaser." *Id.* (citing *Prairie Production, Inc. v. Agchem Division-Pennwalt Corp.*, 514 N.E.2d 1299, 1302 (Ind. Ct. App. 1987)). Because the Court declines to scrutinize whether Plaintiffs sufficiently allege direct contacts with Allergan in the PIC, the Court will not dismiss at this stage Plaintiffs' express warranty claims for lack of privity.

In conclusion, under Indiana law, Plaintiffs may assert express warranty claims and UCC-based implied warranty of merchantability claims.

● Kentucky:

Plaintiffs' claims are viable under Kentucky law. The parties dispute the privity requirement. (ECF No. 236-1 at 269.) "Under Kentucky law, privity of contract is an essential element of a claim for breach of an implied warranty."

*Estate of Demoss v. Eli Lilly & Co.*, 234 F. Supp. 3d 873, 882 (W.D. Ky. 2017) (citations omitted). "[P]rivity of contract does not extend beyond the buyer-seller setting, and an intervening purchaser destroys privity." *Id.* (citations

omitted). However, "an actual and direct promise for the benefit of a third party will be sufficient to create privity between the promisor and the third party beneficiary."

*Louisville Gas & Elec. Co. v. Continental Field Systems, Inc.*, 420 F. Supp. 2d 764, 770 (W.D. Ky. 2005) (citations omitted). Here, whether an individual Plaintiff may establish a third-party beneficiary status will not be scrutinized at this stage, meaning Plaintiffs may proceed with an implied warranty claim. As for asserting an express warranty claim, a contractual privity is not necessary, because privity exists "when the manufacturer made express warranties directly to the intended consumer of the product." *Huff v. Howmedica Osteonics*, No. 5:14-CV-00134-TBR, 2014 WL 4918807, 2014 U.S. Dist. LEXIS 137735 at *8 (W.D. Ky. Sept. 29, 2014) (citations omitted). Here, whether Allergan extended express warranties to an individual Plaintiff will not be scrutinized at this stage, meaning Plaintiffs may proceed with an express warranty claim. As a result, the Court declines to dismiss Plaintiffs' warranty claims under Kentucky law for a lack of privity.

● Michigan:

Plaintiffs' claims are viable under Michigan law. The parties dispute whether implied warranty claims are barred in prescription medical product litigation. (ECF No. 236-1 at 269–70.) The Court finds Michigan allows an implied warranty claim asserted against medical products, including medical devices. *See Davis v. C.R. Bard, Inc.*, No. 11-12556, 2012 WL 6082933, 2012 U.S. Dist. LEXIS 172925 at *31 (E.D. Mich. Dec. 6, 2012) (denying the defendant's motion for summary judgement on the plaintiff's implied warranty claim against the defendant's medical device); *Walker v. Johnson & Johnson Vision Prods.*, 217 Mich.App. 705, 552 N.W.2d 679, 682 (Minn. Ct. App. 1996) (rejecting "the view that § 360k(a) provides blanket preemption of all state law claims against manufacturers of Class III medical devices," including the plaintiff's breach of implied warranty claim); *Smith v. E.R. Squibb & Sons*, Inc., 405 Mich. 79, 273 N.W.2d 476, 480 (Mich. 1979) (conceding, in a drug product liability case, implied warranty and negligence may be independent causes of action).

**\*43** Further, the parties dispute whether privity is required for breach of express warranty claims. (ECF No. 236-1 at 269–71.) Contractual privity is required for a UCC-based express warranty claim. *Tice v. Zimmer Holdings, Inc.*, No.

1:15-cv-134, 2015 WL 4392985, 2015 U.S. Dist. LEXIS 91738 at *17 (W.D. Mich. July 15, 2015). "[A]n express warranty running from a remote manufacturer to a consumer does not create the requisite contractual privity." *Chiasson v. Winnebago Indus.*, No. 01-CV-74809, 2002 WL 32828652, 2002 U.S. Dist. LEXIS 27462 at *28 (E.D. Mich. May 16, 2002) (citing 🏳 *Meridian Mutual Ins. Co. v. Kellman*, 197 F.3d 1178, 1181 (6th Cir. 1999)). "However, an intended third-party beneficiary is in privity of contact with the original parties for purposes of an express warranty." *Montgomery v. Kraft Foods Global, Inc.*, No. 1:12-CV-00149, 2012 WL 6084167, 2012 U.S. Dist. LEXIS 173035 at *37 (W.D. Mich. Dec. 6, 2012) (citing Mich. Comp. Laws § 600.1405(1)). Here, the Court will not scrutinize whether Plaintiffs may establish an intended third-party beneficiary status, meaning Plaintiffs may proceed with a UCC-based express warranty claim. Moreover, "under Michigan law, the privity requirement of the Michigan UCC is inapplicable to a products liability action based on express warranty."

🏳 *Bouverette v. Westinghouse Elec. Corp.*, 245 Mich.App. 391, 628 N.W.2d 86, 92 (Mich. Ct. App. 2001) (citing 🏳 *Reid v. Volkswagen of America, Inc.*, 512 F.2d 1294, 1297 (6th Cir. 1975)). Therefore, Plaintiffs may proceed with express warranty claims, whether or not based on UCC, at this stage under Michigan law.

● Nevada:

Plaintiffs' claims are viable under Nevada law. The parties dispute whether, for an implied warranty of merchantability claim, contractual privity between the buyer and seller is required. (ECF No. 236-1 at 273–74.) The Court finds that a split exists among Nevada courts as to whether contractual privity is required for a personally injured user to assert an implied warranty of merchantability claim against the manufactuer of the medical device allegedly causing the injury. While some courts answered in the affirmative, *see Claridge v. I-Flow Corp.*, No. 2:18-cv-01654-GMN-BNW, 2019 WL 4139433, 2019 U.S. Dist. LEXIS 148935, at *8 (D. Nev. Aug. 30, 2019); *Finnerty v. Howmedica Osteonics Corp.*, No. 2:14-cv-00114-GMN-GWF, 2016 WL 4744130, 2016 U.S. Dist. LEXIS 123071 *21 (D. Nev. Sept. 12, 2016); *Phillips v. C.R. Bard, Inc.*, No. 3:12-cv-00344-RCJ-WGC, 2014 U.S. Dist. LEXIS 174506, at *24–25 (D. Nev. Dec. 16, 2014), others answered in the negative, *see Reed v. Arthrex, Inc.*, No. 3:17-cv-00337-LRH-WGC, 2017 WL 4560140, 2017 U.S. Dist. LEXIS 168247 (D. Nev. Oct. 11, 2017); 🏳 *Forest v. Vitek, Inc.*, 884 F. Supp. 378, 382 (D. Nev. 1993). Even assuming

privity is required for an implied warranty of merchantability claim and Plaintiffs lack such privity, Plaintiffs may still pursue this claim under a third party beneficiary theory. *Copper Sands Homeowners Ass'n v. Copper Sands Realty, LLC*, No. 2:10-cv-00510-GMN-GWF, 2012 WL 1044311, at *3, 2012 U.S. Dist. LEXIS 42370, at *11–12 (D. Nev. March 27, 2012) ("[The defendant] argues that [the plaintiffs'] claim for Breach of Implied Warranty fails because there is no privity of contract between the parties. However, because the Court finds that [the plaintiffs] are a third party beneficiary to the contract this argument fails."); *c.f. Neal-Lomax v. Las Vegas Metro. Police Dep't*, No. 2:05-CV-1464-PMP-PAL, 2006 WL 2022989 at *8, 2006 U.S. Dist. LEXIS 49692 at *22 (D. Nev. July 17, 2006) (rejecting the implied warranty claim as a matter of law because the victim, "not a named or intended third party beneficiary of the contract between [the defendant police department] and [the defendant Taser manufacturer]," "was not in privity with" the defendant Taser manufacturer).

● New York:

Plaintiffs' claims are viable under New York law. The parties dispute whether privity is required for implied warranty claims. (ECF No. 236-1 at 277.) "There is no requirement of privity for [an implied] warranty claim so long as the plaintiff's claim is one for personal injury." *Mahoney v. Endo Health Solutions, Inc.*, No. 15cv9841(DLC), 2016 WL 3951185 at *5, 2016 U.S. Dist. LEXIS 94732 at *12 (S.D.N.Y. July 20, 2016); *see also* 🏳 *Bristol Vill., Inc. v. Louisiana-Pacific Corp.*, 916 F. Supp. 2d 357, 363 (W.D.N.Y. 2013) (citations omitted) ("[U]nder New York law, 'a claim based upon a breach of an implied warranty requires a showing of privity between the manufacturer and the plaintiff when there is no claim for personal injuries.' "). Because Plaintiffs are suing Allergan for their personal injuries, they need not allege privity for their implied warranty claims under New York law.

*44  ● Ohio:

Plaintiffs' claims are viable under Ohio law. The parties dispute whether the Ohio Product Liability Act ("OPLA") abrogates any common law warranty claims, and whether privity is required for Plaintiffs' implied warranty of merchantability claims. (ECF No. 236-1 at 278–79.) "Ohio product liability law was consolidated under the OPLA,

🏳 Ohio Revised Code section 2307.71 through 🏳 section 2307.80, and applies to any recovery of compensatory

or putative damages based on a product liability claim."

*Mitchell v. Proctor & Gamble*, No. 2:09-CV-426, 2010 WL 728222, 2010 U.S. Dist. LEXIS 17956 at *5 (S.D. Ohio Mar. 1, 2010) (citing Ohio Rev. Code § 2307.72(A), (B)). An express warranty claim, but not an implied warranty claim, may be asserted under the OPLA. *Everhart v. Tm Claims Serv.*, No. 2:09-cv-267, 2009 WL 10679479, 2009 U.S. Dist. LEXIS 147751 (S.D. Ohio Oct. 8, 2009). "[A]ll common law claims arising from damages in connection with product liability claims are abrogated by the OPLA."

*Stratford v. SmithKline Beecham Corp.*, No. 2:07-CV-639, 2008 WL 2491965, 2008 U.S. Dist. LEXIS 84826 at *12 (S.D. Ohio June 17, 2008) (citing Ohio Rev. Code § 2307.71(B)). Therefore, Plaintiffs cannot pursue tort-based common law warranty claims and OPLA-based implied warranty claims, though OPLA-based express warranty claims are viable.

However, "Plaintiffs' warranty claims are separately cognizable under contract law and Ohio Revised Code § 1302.26 et seq." (Ohio's UCC), even if the plaintiffs are also "asserting tort claims sounding in product liability." *Miles v. Raymond Corp.*, 612 F. Supp. 2d 913, 924 (N.D. Ohio 2009). "[T]o sustain a contract-based breach of implied warranty claim, the parties must be in privity." *Caterpillar Fin. Servs. Corp. v. Harold Tatman & Son's, Enters.*, 50 N.E.3d 955, 962 (Ohio Ct. App. 2015). But "when the manufacturer is so involved in the sales transaction that the distributor merely becomes the agent of the manufacturer, then the manufacturer and the ultimate consumer are in privity of contract." *Bobb Forest Prods., Inc. v. Morbark Indus. Inc.*, 151 Ohio App.3d 63, 783 N.E.2d 560, 576 (Ohio Ct. App. 2002) (citations omitted). "A consumer may also have privity of contract with the manufacturer if that consumer is an intended third-party beneficiary to a contract." *Id.* at 84 (citations omitted). Whether a Plaintiff can establish an intended third-party beneficiary status or prove the distributor for the BIOCELL implants to be an agent of Allergan will depend on facts specific to that individual Plaintiff, which the Court declines to scrutinize at this stage. As a result, Plaintiffs' UCC-based implied warranty claims are viable under Ohio law.

● Pennsylvania:

Plaintiffs' implied warranty of merchantability claims are not viable under Pennsylvania law. The parties dispute whether implied warranty claims are barred in prescription medical product litigations. (ECF No. 236-1 at 280–81.) In Pennsylvania, there is "a split in authority on the applicability of breach of implied warranty of merchantability claims based on defects in the manufacture of medical devices."

*Terrell v. Davol, Inc.*, No. 13-5074, 2014 U.S. Dist. LEXIS 103695 at *22 (E.D. Pa. July 30, 2014). The *Terrell* court refused to recognize "the breach of an implied warranty of merchantability claim [wa]s a viable cause of action under Pennsylvania law" based on defects in prescription medical devices. *Id.* at *23–24. This is in line with some Pennsylvania cases that reject all implied warranty claims in prescription medical device cases. *See Pasqual v. I-Flow Corp.*, No. 13-003571, 2013 Pa. Dist. & Cnty. Dec. LEXIS 15739, at *34 (Allegheny Com. Pl. Oct. 15, 2013) ("Pennsylvania does not recognize implied warranty claims in prescription medical device cases."); *Schiff v. Hurwitz*, No. 12cv0264, 2012 U.S. Dist. LEXIS 70039 at *16 (W.D. Pa. May 18, 2012) ("Breach of implied warranty is inapplicable to prescription medical devices in Pennsylvania."). But other Pennsylvania cases "recognize a claim for breach of the implied warranty of merchantability where it is based on a manufacturing defect" of a prescription medical device. *Dougherty v. C.R. Bard, Inc*, No. 11-6048, 2012 U.S. Dist. LEXIS 100374, 2012 WL 2940727, at *7 (E.D. Pa. July 18, 2012); *see also Smith v. Howmedica Osteonics Corp.*, 251 F. Supp. 3d 844, 855 (E.D. Pa. 2017) (denying the defendant's motion to dismiss "insofar as breach of the implied warranty of merchantability claim asserts a manufacturing defect" in a medical device). With such an unclarity, the Court will "opt for the interpretations that restrict liability," *Travelers Indem. Co. v. Dammann & Co.*, 594 F.3d 238, 253 (3d Cir. 2010), and therefore finds Plaintiffs' implied warranty claims not viable in Pennsylvania.

**\*45** ● Tennessee:

Plaintiffs' claims are viable under Tennessee law. The parties dispute the privity requirement. (ECF No. 236-1 at 282–83.) Allergan argues, even if an exception to the privity requirement exists, Plaintiffs not diagnosed with BIA-ALCL cannot assert warranty claims because they do not suffer current injuries. (*Id.* at 283.) The Court disagrees. First, "[t]he Tennessee General Assembly abolished the requirement of privity on April 10, 1972." *Travelers Indem. Co. v. Indus. Paper & Packaging Corp.*, No. 3:02-CV-491, 2006 U.S. Dist. LEXIS 49318 at *29 (E.D. Tenn. July 19, 2006). "The legislation enacted provides that in all cases of action

for personal injury or property damage brought on account of ... breach of warranty, privity shall not be a requirement to maintain said action." *Id.* (citing T.C.A. § 29-34-104]). Second, as explained in Part III.B.2, *supra*, the Court declines to determine, at this stage, whether Plaintiffs have alleged any legally cognizable injuries, and therefore, will not dismiss Plaintiffs' claims on that basis.

● Washington:

Plaintiffs' claims are viable under Washington law. The parties dispute the privity requirement for implied warranty claims. (ECF No. 236-1 at 284–85.) Plaintiffs contend privity is met when the buyer is an intended third party beneficiary of the manufacturer's warranties to a third party. (*Id.* at 284.) The Court agrees. Privity is "required for a breach of an implied warranty claim" under Washington law. *Thongchoom v. Graco*, 117 Wash.App. 299, 71 P.3d 214, 219 (Wash. Ct. App. 2003) (citing *Baughn v. Honda Motor Co.*, 107 Wash.2d 127, 727 P.2d 655, 669 (Wash. 1986)). However, there is a third party beneficiary exception to the privity requirement: for a remote purchaser, "implied warranties are enforceable if the manufacturer was involved in the transaction, knew the purchaser's identity and purpose, communicated with the purchaser, or delivered the good." *Johnson v. Metro-Goldwyn-Mayer Studios Inc.*, No. C17-541 RSM, 2017 U.S. Dist. LEXIS 122810 at *15 (W.D. Wash. Aug. 3, 2017) (citing *Touchet Valley Grain Growers, Inc. v. Opp & Seibold Gen. Constr., Inc.*, 119 Wash.2d 334, 831 P.2d 724, 730 (Wash. 1992) (en banc)). At this stage, the Court will not scrutinize whether Plaintiffs may establish a third party beneficiary status. Therefore, Plaintiffs may pursue their implied warranty claims under a third party beneficiary theory.

● Wisconsin:

Plaintiffs' claims are not viable under Wisconsin law. The parties dispute the privity requirement. (ECF No. 236-1 at 285–86.) Notwithstanding the privity requirement, "[t]he Wisconsin Supreme Court has held that 'it is inappropriate to bring an action for breach of warranty where a tort remedy is sought' because 'a breach of warranty theory is encumbered with the ancient baggage of contract actions.' " *Karnes v. C. R. Bard, Inc.*, No. 18-cv-931-wmc, 2019 U.S. Dist. LEXIS 65115, at *20 (W.D. Wis. April 16, 2019) (citing *Austin v. Ford Motor Co.*, 86 Wis.2d 628, 273 N.W.2d 233, 240 (Wis. 1979)). The *Austin* court "established that strict liability in tort

actions precludes breach of warranty claims for physically injured users of unreasonably dangerous defective products." *Id.* at *22 (citing *Crosby v. Premier Marine, Inc.*, No. 01 C 50286, 2002 WL 596373, at *1 (N.D. Ill. Apr. 15, 2002)). Here, Plaintiffs have asserted a number of strict liability tort claims. (ECF No. 119 at 73, 89, 116.) Therefore, the Court dismisses Plaintiffs' warranty claims, so that "the interest of justice and the adjudication of claims will be expedited." *Karnes*, 2019 U.S. Dist. LEXIS 65115, at *21 (citing *Austin*, 273 N.W.2d at 240, 86 Wis.2d 628).

**\*46** In conclusion, the following warranty claims are dismissed: implied warranty of merchantability claims under Pennsylvania law and warranty claims under Wisconsin law.

### 8. Summary for Allergan's Motion to Dismiss on Non-Preemption Grounds

In summary, the Court dismisses: (1) FDCA/CGMP-based negligence *per se* claims under the laws of Alaska, Arkansas, Colorado, Connecticut, Florida, Georgia, Hawaii, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, North Carolina, North Dakota, Rhode Island, Texas, Utah, Vermont, Washington, West Virginia, and Wyoming; (2) report-based failure to warn claims under the laws of Alabama, Alaska, Arkansas, Arizona, Colorado, Connecticut, District of Columbia, Florida, Georgia, Iowa, Kansas, Maine, Massachusetts, Michigan, Montana, Nebraska, New Hampshire, New Jersey, New Mexico, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, South Carolina, South Dakota, Tennessee, Utah, Virginia, West Virginia, and Wyoming; (3) negligence misrepresentation claims under the laws of Arkansas, Louisiana, Minnesota, and Virginia, as well as common law negligence misrepresentation claims under Mississippi law; and (4) the following warranty claims: implied warranty of merchantability claims under Pennsylvania law and warranty claims under Wisconsin law.

### C. Allergan's Motion to Strike/Dismiss Plaintiffs' Class Allegations (ECF No. 171-2)
Allergan challenges Plaintiffs' class allegations asserted for the following three classes, purportedly nationwide in scope:

> A "medical monitoring" class comprised of all persons who were implanted with Allergan's textured breast

implant devices, but have not yet been diagnosed with BIA-ALCL;

112 separate subclasses—two for every U.S. State and Territory—consisting of the exact same putative members as the nationwide class; and

A "release subclass" comprised of persons who signed an optional release of liability as part of their individual warranty claims leading to the explant of their breast implant devices.

(ECF No. 171-2 at 10.)

Plaintiffs argue Allergan's Motion to Strike/Dismiss the CAC is premature and a rare remedy: because the issue of whether Plaintiffs can satisfy Rule 23 is a fact-intensive question, class certification decisions should be made following discovery. (ECF No. 219 at 13.) Allergan contends striking class allegations at the pleadings stage is not rare. (ECF No. 237 at 11 n.1.) Allergan insists courts can strike class allegations whose impropriety is evident from the face of the complaint. (*Id.* at 11.) The Court finds not all the class allegations in the CAC should be stricken/dismissed at this stage.

"Class certification is proper only 'if the trial court is satisfied, after a rigorous analysis, that the prerequisites of' Rule 23 are met.' " *In re Hydrogen Peroxide Antitrust Litigation*, 552 F.3d 305, 309 (3d Cir. 2008) (citations omitted). "The court may 'delve beyond the pleadings to determine whether the requirements for class certification are satisfied.' " *Id.* at 316 (citations omitted). "The majority of courts have found that a Rule 12(b)(6) dismissal of class allegations is appropriate, even when the plaintiff has not yet filed a motion for conditional class certification." *Horowitz v. AT&T Inc.*, No. 3:17-cv-4827, 2018 U.S. Dist. LEXIS 69191, at *51 (D.N.J. April 25, 2018) (citations omitted). But in this District, "dismissal of class allegations at [the pleading] stage should be done rarely and that the better course is to deny such motion because the shape and form of a class action evolves only through the process of discovery." *Id.*; *see also Luppino v. Mercedes-Benz USA, LLC*, No. 09-CV-5582, 2013 U.S. Dist. LEXIS 161689, 2013 WL 6047556, at *3 (D.N.J. Nov. 12, 2013) (citation omitted) ("Generally courts do not consider whether a proposed class meets the Fed. R. Civ. P. 23 class requirements until after plaintiffs move

for class certification."). "A defendant may move to strike class action allegations prior to discovery in those rare cases where the complaint itself demonstrates that the requirements for maintaining a class action cannot be met." *Clark v. McDonald's Corp.*, 213 F.R.D. 198, 205 n.3 (D.N.J. 2003) (citations omitted); *see also McPeak v. S-L Distrib. Co.*, No. 12-348, 2014 U.S. Dist. LEXIS 123728, at *9 (D.N.J. Sept. 5, 2014) (citations omitted) ("It is only when no amount of discovery or time will allow for plaintiffs to resolve deficiencies in class definitions under Rule 23, that a motion to strike class allegations should be granted."). "[T]he usual practice favoring pre-certification discovery derives from the fundamental premise of Fed. R. Civ. P. 12, which is that claims, including class claims, should not be dismissed on the pleadings 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Ehrhart v. Synthes (USA)*, No. 07-01237, 2007 U.S. Dist. LEXIS 94760 at *12 (D.N.J. Dec. 21, 2007) (citing *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)).

**\*47** Accordingly, the Court will dismiss Plaintiffs' class allegations only if, on its face, the CAC demonstrates the Rule 23 requirements cannot be met even after discovery. In particular, the Court will not consider the potential factual differences among individual Plaintiffs, which could otherwise defeat class certification. For example, in arguing Plaintiffs cannot satisfy the typicality requirement, Allergan refers to a failure of representation by device: the implants used by the class representatives may not be typical of the whole class, because not every type of the BIOCELL Implants has been implanted in the class representatives. (ECF No. 171-2 at 22, 24.) At this stage, the Court will not entertain this alleged failure of representation, which involves factual differences in the actual implant used by individual Plaintiffs, because such "differences among plaintiffs[ ] may be defeated by common proof developed in discovery." *Landsman & Funk PC v. Skinder-Strauss Assocs.*, 640 F.3d 72, 94 (3d Cir. 2011) (citing *Gene & Gene LLC v. BioPay LLC*, 541 F.3d 318, 327–28 (5th Cir. 2008)); *see also Horowitz*, 2018 U.S. Dist. LEXIS 69191, at *51–52 (declining to dismiss class pleadings under Rule 12(b)(6) in an age discrimination case, even though the plaintiffs "do not allege that they and all putative collective members were employed by the same [defendant's] entity, worked in the same department, performed similar work, or had similar circumstances of

employment," because the plaintiffs "have at least alleged they and the potential opt-ins have been injured by a single policy, the 2020 Scheme, which targeted workers over the age of 40").

### 1. Named Plaintiffs Lack Article III Standing in Some Jurisdictions

Allergan argues the named Plaintiffs lack the standing to serve as class representatives for the subclasses from jurisdictions where the named Plaintiffs are not citizens. (ECF No. 237 at 17.) Plaintiffs contend a plaintiff living in one state can have the standing as a class representative for the state law claims of class members in other states. (ECF No. 219 at 27.) The Court disagrees.

"[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348–49, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011) (citations omitted). "[C]lass representatives must meet Article III standing requirements the moment a complaint is filed."

*Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 367 (3d Cir. 2015) (citing *Lewis v. Casey*, 518 U.S. 343, 358, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996)). "[N]amed plaintiffs lack standing to assert claims under the laws of the states in which they do not reside or in which they suffered no injury." *In re Ductile Iron Pipe Fittings ("DIPF") Indirect Purchaser Antitrust Litig.*, No. 12-169, 2013 U.S. Dist. LEXIS 142466 at *35 (D.N.J. Oct. 2, 2013); *see also Cooper v. Medimetriks Pharms., Inc.*, No. 18-11987, 2019 U.S. Dist. LEXIS 50265 (D.N.J. March 25, 2019) (citing *McGuire v. BMW of N. LLC*, No. 13-7356, 2014 U.S. Dist. LEXIS 77009, 2014 WL 2566132, at *6 (D.N.J. June 6, 2014)) ("Cooper is the only named plaintiff in this Action. Cooper is not a New Jersey resident (she is a resident of Ohio) and Cooper did not suffer any alleged injuries in New Jersey (she was allegedly injured in Ohio), and thus Cooper is barred from proceeding as a class representative for the [New Jersey state] claims."); *Lauren v. PNC Bank, N.A.*, 296 F.R.D. 389, 391 (W.D. Pa. 2014) ("[The plaintiff] suffered an alleged injury exclusively under Ohio law. Therefore, she does not have standing to assert unjust enrichment claims under the law(s) of any other state."); *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 157–58 (E.D. Pa. 2009) (finding the named plaintiffs have no standing to bring claims under the laws of states where no named

plaintiff is located and where no member of a named plaintiff purchased the defendant's accused product).

However, prior to the class certification stage, it is premature to examine the named plaintiffs' "standing to pursue claims on behalf of absent class members of the nationwide class ... in states other than those in which they were injured," because such an inquiry "is one of predominance" and "only arises if the Court certifies the nationwide class." *In re FieldTurf Artificial Turf Mktg. & Sales Practices Litig.*, No. 3:17-md-2779, 2018 U.S. Dist. LEXIS 149379, at *28 (D.N.J. Aug. 31, 2018) (citations omitted). After all, "class discovery will unveil the various members of the currently unknown class," which will enable the court to determine whether all the state law claims have "a proper representative who resides in the subject states and if those claims may proceed, even if the named [plaintiffs'] claims become moot." *In re Liquid Aluminum Sulfate Antitrust Litig.*, No. 16-md-2687, 2017 U.S. Dist. LEXIS 115294, at *84 (D.N.J. July 20, 2017)

(citing *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 403, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980)). In contrast, when it comes to state-specific (sub)classes, the court may "dismiss the state subclasses of which no Plaintiff is a member" at the pleading stage. *FieldTurf*, 2018 U.S. Dist. LEXIS 149379, at *29; *see also In re: Niaspan Antitrust Litig.*, No. 13-MD-2460, 2015 U.S. Dist. LEXIS 164021, at *8–9 (E.D. Pa. Dec. 8, 2015) (citations and internal quotations omitted) (concluding at the pleading stage that the named plaintiffs "lack standing to bring claims on behalf of" the state-specific classes when the named "plaintiffs have not alleged that any one named plaintiff either resides in or made purchases and/or reimbursements of [the accused product] in those states").

**\*48** Plaintiffs cite *Ramirez* to argue the named Plaintiffs can represent absent class members in other states. (ECF No. 219 at 28 (citing *Ramirez v. STi Prepaid LLC*, 644 F. Supp. 2d 496, 504–06 (D.N.J. 2009).) Indeed, the *Ramirez* court held "once threshold individual standing by the class representative is met, a proper party to raise a particular issue is before the court, and there remains no further separate class standing requirement in the constitutional sense." *Ramirez*, 644 F. Supp. 2d at 504–05 (citing *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 306–07 (3d Cir. 1998)). However, both *Ramirez* and *Prudential* involved a nationwide

class. *Id.* at 498; *Prudential*, 148 F.3d at 289. Therefore, the two cases are inapplicable, because the issue here is the named Plaintiffs' standing as representatives for certain state-specific subclasses.

Accordingly, the Court finds the named Plaintiffs do not have the standing as class representatives to assert claims for the state-specific subclasses of which they are not members. The named Plaintiffs are citizens of 39 different states. (*See* ECF No. 118 at ¶¶ 22–84.) Therefore, the Court dismisses the claims of the following subclasses of which no named Plaintiff is a member: Alaska, American Samoa, Arkansas, District of Columbia, Guam, Hawaii, Indiana, Kansas, Maryland, Mississippi, Nebraska, New Hampshire, North Dakota, Northern Mariana Islands, Puerto Rico, U.S. Virgin Islands, and Vermont. Plaintiffs may later reappoint class representatives or reformulate (sub)classes to cure the above deficiencies.

### 2. The Class Allegations Meet the Typicality Requirement

Allergan argues Plaintiffs cannot satisfy the typicality requirement under Rule 23(a). (ECF No. 171-2 at 21.) Allergan points out the 63 named Plaintiffs are citizens of 39 different states, which leads to a failure of representation by jurisdiction: (1) 32 subclasses are not represented by any named Plaintiff; (2) some dual subclasses for each jurisdiction lack or share a representative; (3) an unknown number of unidentified named Plaintiffs purport to represent the claims of a jurisdiction of which they are not citizens. (*Id.*) Plaintiffs insist they meet the typicality requirement: even though they live in different states, their claims all stem from the same course of conduct by Allergan, i.e., the manufacture and sale of the BIOCELL Implants, and all Plaintiffs share the same interests in obtaining reliefs in the form of medical monitoring and repayment of economic losses resulting from Allergan's recall. (ECF No. 219 at 25.) The Court agrees.

A defendant's challenge of typicality may be "premature" and "not appropriate" at the pleading stage, because "[d]ismissal of class claims prior to discovery and a motion to certify the class by plaintiff is the exception rather than the rule." *Durso v. Samsung Elecs. Am., Inc.*, No. 2:12-cv-05352, 2013 U.S. Dist. LEXIS 160596, at *35 (D.N.J. Nov. 6, 2013) (citations omitted). Further, the following analysis shows Plaintiffs meet the typicality requirement.

"The Third Circuit has 'set a low threshold for satisfying' the typicality requirement holding that 'if the claims of the named plaintiffs and class members involve the same conduct by the defendant, typicality is established.' " *In re Remeron End-Payor Antitrust Litig.*, No. 04-5126, 2005 U.S. Dist. LEXIS 27011, at *24 (D.N.J. Sept. 13, 2005) (citing *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 183–84 (3d Cir. 2001)). "[C]lass members need not 'share identical claims' " to satisfy the typicality requirement. *In re NFL Players Concussion Injury Litig.*, 821 F.3d 410, 428 (3d Cir. 2016) (citing *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994)). "The typicality requirement is designed to align the interests of the class and the class representatives so that the latter will work to benefit the entire class through the pursuit of their own goals." *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 141 (3d Cir. 1998) (citing *Baby Neal v. Casey*, 43 F.3d 48, 57 (3d Cir. 1994)). The court need not "consider the variations among the laws of the 50 states" in the typicality inquiry. *Prudential*, 148 F.3d at 311 (affirming the district court's finding of typicality, despite the defendant's challenge that the district court's typicality analysis was inadequate for not having considered the variations among the laws of the 50 states); *see also In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 529, 531–32 (3d Cir. 2004) (affirming the district court's finding of typicality based on the same alleged wrongful conduct of the defendant and the same general legal theories underlying the plaintiffs' claims, while addressing variance of the substantive laws of the fifty states only in the commonality and predominance analysis); *In re Sch. Asbestos Litig.*, 789 F.2d 996, 1010 (3d Cir. 1986) (considering the variances in products liability law among different states only in the Rule 23(b)(3) analysis).

**\*49** Here, the claims asserted by the named Plaintiffs and putative class members stem from the same course of conducts of Allergan. The named Plaintiffs and putative class members share an aligned interest in seeking damages from Allergan. The Court need not consider the variances among controlling state laws for the typicality inquiry. Therefore, Plaintiffs meet the typicality requirement.

### 3. The 🔖 Rule 23(b)(3) Inquiry Is Premature

#### a. The Court Declines to Dismiss Plaintiffs' Class Allegations on Predominance Grounds

Allergan argues the nationwide medical monitoring classes cannot meet 🔖 Rule 23(b)(3)'s predominance requirement, because: (1) medical monitoring and product liability laws differ widely between the states; and (2) the liability and causation inquiries are highly individualized and not susceptible to class-wide proof. (ECF No. 171-2 at 28–29.) Allergan contends Plaintiffs' claims for consumer fraud and unjust enrichment cannot meet the predominance requirement, because (1) the relevant factual inquiry is inherently individual, such as Plaintiffs' reliance on Allergan's representation or omission (*id.* at 40), and (2) consumer protection statutes and unjust enrichment claims vary widely between states (ECF No. 237 at 39). Allergan also claims to have an array of affirmative defenses that will require individualized findings of fact, and are not susceptible to common proof. (ECF No. 171-2 at 42–43.) Finally, Allergan maintains the legal and factual questions surrounding the validity of each class member's Release constitute individualized inquiries, making it impossible for Plaintiffs to meet the predominance requirement. (*Id.* at 44.)

Plaintiffs claim they will establish at the class certification stage that any material differences among state laws can be handled through commonly used case management tools, for example, by grouping similar state laws or through subclassing. (ECF No. 219 at 30.) Plaintiffs argue Allergan's concerns regarding any factual issues among class members are speculative before discovery. (*Id.* at 31.) As for the consumer fraud and unjust enrichment claims, Plaintiffs point out the reliance requirement has been relaxed under most state laws. (*Id.* at 33.) Plaintiffs contend Allergan's potential affirmative defenses do not provide a basis to strike the class allegations, because (1) discovery is necessary to determine whether and how the affirmative defenses affect class treatment, and (2) affirmative defenses in themselves do not preclude class certification. (*Id.* at 34–36.) Finally, Plaintiffs allege the Court need not decide prior to discovery whether challenging the releases through the mechanism of a class action would be impermissible, because (1) the release is a form document, so that the challenges likely do not entail consumer-specific evidence, and (2) relevant extrinsic evidence unlikely involves meaningful variation among the

vast majority of class members. (*Id.* at 37–38.) The Court agrees.

"[A]t the motion to strike stage, the burden on plaintiffs is less than at the certification stage." *In re Ry. Indus. Emple. No-Poach Antitrust Litig.*, 395 F. Supp. 3d 464, 514 (W.D. Pa. 2019). "The court must determine only whether plaintiffs satisfied their burden to set forth factual allegations to advance a prima facie showing of predominance or that at least it is likely that discovery will reveal evidence" so that critical elements of Plaintiffs' claims "may be proven on a class-wide basis." *Id.* Courts in this Circuit have declined to conduct a predominance inquiry upon a defendant's motion to strike/dismiss a plaintiff's class allegations, recognizing the dismissal of class claims before discovery and a class certification motion "is the exception rather than the rule." *Luppino v. Mercedes-Benz USA, LLC*, No. 09-CV-5582, 2013 U.S. Dist. LEXIS 161689, at *20 (D.N.J. Nov. 12, 2013); *Durso v. Samsung Elecs. Am., Inc.*, No. 2:12-cv-05352, 2013 U.S. Dist. LEXIS 160596, at *35 (D.N.J. Nov. 6, 2013); *see also Derrick v. Glen Mills Sch.*, No. 19-1541, 2019 U.S. Dist. LEXIS 220610 (E.D. Pa. Dec. 19, 2019) ("Without the benefit of at least some limited discovery, ... any determination regarding predominance would be premature."); 🔖 *Goldman v. RadioShack Corp.*, No. 2:03-CV-0032, 2003 U.S. Dist. LEXIS 7611 at *2 (E.D. Pa. April 16, 2003) (postponing "class certification because further discovery is needed regarding the predominance test of 🔖 FED. R. CIV. P. 23(b)(3)"); *Seiffert v. Green*, No. 81-1956, 1988 U.S. Dist. LEXIS 1375 at *3 (E.D. Pa. Jan. 13, 1988) (granting a motion for class certification while noting "[i]f discovery reveals such extensive individualized proof that common issues of law or fact no longer predominate, class action treatment may no longer be appropriate"); *c.f. Sanders v. Johnson & Johnson, Inc.*, No. 03-2663, 2006 U.S. Dist. LEXIS 35881, at *33–34 (D.N.J. May 31, 2006) (striking class allegations at the pleading stage, based on variances in the applicable state laws and individual factual circumstances, when the plaintiff also filed a cross-motion for partial class certification, so that "the Court does not need to address whether [the defendants'] motion [to strike] was timely or premature"). After all, "[i]t is not this Court's place to predict what evidence may be found and which theory (or theories) Plaintiffs may pursue. *Buck v. Am. Gen. Life Ins. Co.*, No. 17-13278, 2018 U.S. Dist. LEXIS 186890 at *25 (D.N.J. Oct. 31, 2018) (dismissing the defendant's motion to strike class allegations on predominance grounds). Courts in other circuits have also suggested a pre-discovery

predominance inquiry is premature. *See Amaraut v. Sprint/ United Mgmt. Co.*, No. 3:19-cv-411-WQH-AHG, 2020 U.S. Dist. LEXIS 7558 (S.D. Cal. Jan. 14, 2020) (holding the plaintiffs seeking pre-certification discovery need not "make a prima facie showing that Rule 23 class action requirements are satisfied or to show that discovery is likely to produce substantiation of the class allegations"); *Choi v. Kimberly-Clark Worldwide, Inc.*, No. SA CV 19-0468-DOC (ADSx), 2019 U.S. Dist. LEXIS 175623, at *16 (C.D. Cal. Aug. 28, 2019) (concluding the defendant's argument that variances in state law will defeat the predominance of a nationwide class is premature and "Plaintiff should be afforded the opportunity to conduct discovery and determine whether a narrower class than the definition proposed in the Complaint is appropriate"); *Smith v. Pizza Hut, Inc.*, No. 09-cv-01632-CMA-BNB, 2011 WL 2791331, 2011 U.S. Dist. LEXIS 76793 at *16 (D. Colo. July 14, 2011) (citations omitted) ("[T]he predominance of individual questions is only relevant at the post-discovery stage of the collective action certification."); *Chenensky v. New York Life Ins. Co.*, No. 07 Civ. 11504, 2011 U.S. Dist. LEXIS 48199, at *10–11 (S.D.N.Y. April 27, 2011) (declining to consider the predominance requirement before class discovery, because any conclusion will be "based on assumptions of fact rather than on findings of fact" and the plaintiffs may redraw "class boundaries that obviate the need for individual proof" after discovery).

**\*50** Therefore, the Court finds a predominance inquiry is premature at this stage. First, as previously explained, the Court will not scrutinize the factual differences among individual class members at this stage, and will not dismiss class allegations because of such potential differences. Second, the variances of controlling state laws do not necessarily defeat predominance. Without discovery, the Court is unable to examine how these state laws will apply to the facts of Plaintiffs, so as to determine whether "questions of law or fact common to the members of the class predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Discovery may also help Plaintiffs reformulate their (sub)classes, and group the varying state laws, if feasible, into a few categories in light of the facts revealed in discovery. Third, Plaintiffs have made a prima facie showing of predominance. Plaintiffs refer to a series of common factual and legal issues arising out of Allergan's conducts, which, after discovery, may provide answers applicable to all named Plaintiffs and other class members. (ECF No. 219 at 28–29.) Plaintiffs also point

out the remedies sought by the class, i.e., a class-wide medical monitoring program and recovery for economic losses, will not present individualized issues that predominate over common ones. (*Id.* at 29.) These showings cut against striking/dismissing Plaintiffs' class allegations. *C.f. Lafferty v. Sherwin-Williams Co.*, No. 1:17-06321, 2018 U.S. Dist. LEXIS 141549, at *13–14 (D.N.J. Aug. 21, 2018) (finding individualized factual issues predominate common issues at the pleading stage in a toxic exposure tort case, where "individual fact finding is essential to determine whether one of these hazardous substances impacted" the plaintiffs, some of whom "have never been exposed to hazardous substances").

Finally, Allergan relies on *Almond* to argue that the variations in state law could be a basis to strike class allegations. (ECF No. 246 at 3.) Indeed, the *Almond* court, at the pleading stage of a prescription drug product liability litigation, concluded a nationwide class that sought the medical monitoring relief could not meet Rule 23(b)(3)'s predominance requirement, because "a fault line divides class members whom state law permits to seek relief through a no-injury medical monitoring claim, and those whom state law prohibits" asserting no-injury medical monitoring claims. *Almond v. Janssen Pharms., Inc.*, No. 20-2183, 337 F.R.D. 90, 2020 U.S. Dist. LEXIS 207900 at *22 (E.D. Pa. Nov. 6, 2020). However, the Court notes the nationwide class in *Almond* could be divided into two subclasses: one subclass for the jurisdictions that permit a no-injury medical monitoring claim, and the other subclass for those that prohibit such a claim. It is within a district court's sound discretion, after performing a balancing analysis of costs and benefits, to allow or refuse the creation of subclasses under Rule 23(c). *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 271 (3d Cir. 2009); *In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 202 (3d Cir. 2005). A district court may formulate subclasses "independently of any proposals made by the parties." *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 494 (3d Cir. 2015) (citing Tobias Barrington Wolff, *Discretion in Class Certification*, 162 U. Pa. L. Rev. 1897, 1898 (2014)). Here, the Court is not in a position to question whether it was within the *Almond* court's discretion not to consider the above possible subclasses. But the Court could exercise its discretion here to grant Plaintiffs the opportunity of discovery, so that they may reformulate subclasses, if necessary, in light of the facts revealed in the discovery. The Court will then examine whether Plaintiffs' proposed subclasses or other arrangements meet the predominance requirement.

Accordingly, at this stage, the Court declines to dismiss Plaintiffs' class allegations on predominance grounds.

### b. The Court Declines to Dismiss Plaintiffs' Class Allegations on Superiority Grounds

Allergan argues the analysis of the four superiority factors under Rule 23(b)(3) shows a class action would not be superior to other available methods. (ECF No. 171-2 at 47.) First, Allergan states Plaintiffs have indicated a clear intent to control their own individual cases, as the Plaintiffs' Steering Committee to date has refused to adopt the PIC for any of the individual cases in this MDL, even though the Committee is the counsel of record in roughly 75% of those individual cases. (*Id.* at 48.) Second, Allergan claims it is hard to prove Plaintiffs' proposed class action is superior to, and therefore should supplant, the pending MDL that achieves many of the same efficiencies that Rule 23 is supposed to foster. (*Id.* at 50.) Third, Allergan points out the great multitude of claims under the varying laws of 56 jurisdictions make the proposed class action unmanageable: the difficulty of formulating jury instructions and conducting individualized factual inquires under these different state laws will be substantial. (*Id.* at 50–52.) Plaintiffs counter a single class action trial adjudicated with common proof is more efficient than multiple individual trials based on the same common evidence. (ECF No. 219 at 39–40.) Plaintiffs explain individual Plaintiffs have agreed to file Short Form Complaints according to the Case Management Order No. 17, which should not suggest an intent to control their own individual cases. (*Id.* at 40 n.12.) Plaintiffs state Allergan's superiority argument is a premature factual argument that will hinge on the full discovery record. (ECF No. 263 at 19.) Plaintiffs point out individual and class action cases frequently proceed together in product liability MDLs, and do not conflict with each other, because class members are always free to opt out of a class action or file individual actions. (*Id.*) The Court agrees.

**\*51** Under Rule 23(b)(3), courts must take a "close look" at whether a class action is "superior to other available methods for the fair and efficient adjudication of the controversy." *Amchem Prods. v. Windsor*, 521 U.S. 591, 615, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (citing Fed. R. Civ P. 23(b)(3)). Rule 23(b)(3) provides a list of

factors pertinent to a court's the predominance and superiority analysis:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions;

> (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum;

> (D) the difficulties likely to be encountered in the management of a class action.

Fed. R. Civ P. 23(b)(3). "The superiority requirement asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 316 (3d Cir. 1998) (citations and internal quotations omitted). Before discovery, however, "there is insufficient information to conduct an informed balancing assessment." *Kantor v. Hiko Energy, LLC*, 100 F. Supp. 3d 421, 431 (E.D. Pa. 2015). "Erring in favor of the class action proceeding in this instance," a court may "decline to strike the class allegations" on superiority grounds. *Id.* (citing *Kahan v. Rosenstiel*, 424 F.2d 161, 169 (3d Cir. 1970)) "Many courts have determined that discovery is helpful and relevant in determining whether to certify a class and especially in evaluating the class certification factor of superiority." *Santiago v. Apothaker Scian, P.C.*, No. 2:16-CV-1432, 2017 WL 1552324, at \*2, 2017 U.S. Dist. LEXIS 64760, at \*5 (D.N.J. April 27, 2017) (citations omitted).

The Court finds a superiority inquiry is premature at this stage. First, without discovery, the Court is unable to examine whether applying the varying state laws to the facts here will render a class action unmanageable and undesirable. The discovery will also help Plaintiffs formulate subclasses or group the controlling state laws into limited categories that may make their proposed class action more manageable and desirable. Second, the failure of the Plaintiffs' Steering Committee to adopt the PIC is irrelevant here. After all, individual Plaintiffs, when filing their Short Form Complaints, will adopt the PIC. The Court discerns no reason why the Plaintiffs' Steering Committee should

adopt the PIC. Third, "[t]he superior nature of the class action is closely related to the predominance requirement because 'only where predominance exists do the economies of scale justify aggregating claims in a class action.' " *In re Microcrystalline Cellulose Antitrust Litig.*, 218 F.R.D. 79, 93 (E.D. Pa. 2003) (citing *In re Mercedes-Benz Antitrust Litig.*, 213 F.R.D. 180, 186 (D.N.J. 2003)). Since the Court finds a predominance inquiry is premature, the superiority determination should also be postponed. Accordingly, the Court declines to dismiss Plaintiffs' class allegations on superiority grounds.

### 4. A Rule 23(b)(2) Medical Monitoring Class Is Inapplicable

Allergan argues Plaintiffs cannot invoke Rule 23(b)(2) for their proposed class action, because (1) all the reliefs they request, including those for medical monitoring, consumer fraud, and unjust enrichment, are in essence economic damages, and (2) their proposed classes lack cohesiveness. (ECF No. 171-2 at 55–57.) Plaintiffs counter it is premature at this stage to decide whether they can establish a Rule 23(b)(2) medical monitoring class, because discovery will help them formulate a medical monitoring program for Allergan to fund and implement. (ECF No. 219 at 40–41.) Plaintiffs contend Allergan blurs the line between Rule 23(b)(3) and (b)(2) classes by arguing the Rule 23(b)(2) certification is improper for lacking cohesiveness. (*Id.* at 41.) The Court finds a Rule 23(b)(2) class is inapplicable here.

**\*52** Rule 23(b)(2) class actions are limited to those seeking "injunctive relief or corresponding declaratory relief [that] is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). " Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011). Apart from the medical monitoring program, Plaintiffs do not request other injunctive or declaratory reliefs in the CAC. Therefore, as for the Rule 23(b)(2) inquiry, the Court will only consider the appropriateness of a Rule 23(b)(2) medical monitoring class.

As the following analysis shows, Plaintiffs not diagnosed with BIA-ALCL may not recover the medical monitoring relief under the laws of some jurisdictions. Though Plaintiffs not diagnosed with BIA-ALCL claim to have sustained physical injuries in the form of certain subclinical changes (ECF No. 220 at 25), these subclinical changes are not legally recognizable injuries in some jurisdictions. If such jurisdictions require a present injury in requesting the medical monitoring relief, then Plaintiffs not diagnosed with BIA-ALCL may not request the medical monitoring relief in these jurisdictions.

The following jurisdictions explicitly refuse to consider subclinical changes as legally recognizable physical injuries:

● Alabama. *Lindsey v. 3M Co.*, No. 5:15-cv-01750-AKK, 2020 WL 1479170 at \*2, 2020 U.S. Dist. LEXIS 52159 at \*5 (N.D. Ala. March 26, 2020) ("Alabama law requires that plaintiffs currently have a disease as a result of exposure in order to recover in tort.").

● Arizona. *Burns v. Jaquays Mining Corp.*, 156 Ariz. 375, 752 P.2d 28, 30 (Ariz. Ct. App. 1987) ("[S]ubclinical injury resulting from exposure to asbestos is insufficient to constitute the actual loss or damage to a plaintiff's interest required to sustain a cause of action under generally applicable principles of tort law.").

● Delaware. *In re Asbestos Litig.*, No. 87C-09-24, 1994 WL 721763 at \*3, 1994 Del. Super. LEXIS 693 at \*9 (Del. Super. June 14, 1994) ("[A]symptomatic pleural thickening, which results only in scarring of the lungs without any physical impairment or illness, is not an actual loss and therefore should not be considered a compensable injury.").

● Georgia. *Parker v. Brush Wellman, Inc.*, 230 F. App'x 878, 882 (11th Cir. 2007) (citing *Boyd v. Orkin Exterminating Co., Inc.*, 191 Ga. App. 38, 381 S.E.2d 295, 298 (Ga. Ct. App. 1989), *overruled on other grounds, Hanna v. McWilliams*, 213 Ga. App. 648, 446 S.E.2d 741 (Ga. Ct. App. 1994)) (In the leading Georgia case dealing with exposure to a toxic substance, the Court of Appeals indicated that a personal injury plaintiff must present evidence of 'actual disease, pain or impairment of some kind.' ").

● Hawaii. *In re Hawaii Fed. Asbestos Cases*, 734 F. Supp. 1563, 1567 (D. Haw. 1990) ("[T]he mere presence of asbestos fibers, pleural thickening or pleural plaques in the lung unaccompanied by an objectively verifiable functional impairment is not enough" to "show a compensable harm by adducing objective testimony of a functional impairment due to asbestos exposure.").

● Indiana. *Ott v. AlliedSignal, Inc.*, 827 N.E.2d 1144, 1156 (Ind. Ct. App. 2005) ("[S]ubclinical injuries or other physiological changes resulting from exposure to asbestos are insufficient to support a cause of action until symptoms emerge or until the disease can be diagnosed without resort to extraordinary procedures.").

● Iowa. *Pickrell v. Sorin Grp. USA*, Inc., 293 F. Supp. 3d 865, 868 (S.D. Iowa 2018) (finding the plaintiff suffered no injury because she was asymptomatic).

**\*53**  ● Kentucky. *Luttrell v. Cooper Indus.*, 60 F. Supp. 2d 629, 630–32 (E.D. Ky. 1998) (stating the plaintiff's "personal injury claim for cancer had not accrued at the time of the earlier lawsuit" where "the plaintiffs offered evidence that they suffered cellular damage that had yet to be manifested as physical injuries").

● Maine. *Bernier v. Raymark Industries, Inc.*, 516 A.2d 534, 543 (Me. 1986) (citations omitted) ("[S]ubclinical injury ... is 'insufficient to constitute the actual loss or damage to a plaintiff's interest required to sustain a cause of action under generally applicable principles of tort law.' ").

● Maryland. *Exxon Mobil Corp. v. Albright*, 433 Md. 303, 386, 71 A.3d 30 (Md. 2013) (citations omitted) ("In the context of physical injuries sustained as a result of exposure to toxic substances, subcellular change produced by exposure to toxic chemicals—without manifested symptoms of a disease or actual impairment—is not a compensable 'injury' under Maryland law.").

● Mississippi. *Harris v. Brush Wellman, Inc.*, No. 1:04cv598HSO-RHW, 2007 WL 5960181, at \*10 n.14, 2007 U.S. Dist. LEXIS 81970, at \*38–39 n.16 (S.D. Miss. Oct. 30, 2007) (citing *Paz v. Brush Engineered Materials, Inc.*, 949 So. 2d 1 (Miss. 2007)) ("[T]he Mississippi Supreme Court determined that plaintiffs did not demonstrate an actionable

injury despite allegations of subclinical, subcellular, and cellular injury.").

● Missouri. *Laswell v. Brown*, 683 F.2d 261, 269 (8th Cir. 1982) (declining to recognize the exposure "to an unusually high risk of disease in genetically passed cellular damage" as a cognizable injury under Missouri law).

● New Jersey. *Caterinicchio v. Pittsburgh Corning Corp.*, 127 N.J. 428, 605 A.2d 1092, 1096 (N.J. 1992) ("[T]he presence of pleural thickening may not, alone, mandate a jury finding of compensable injury for an otherwise healthy plaintiff."); *Schweitzer v. Consolidated Rail Corp. (Conrail)*, 758 F.2d 936, 942 (3d Cir. 1985) ("[S]ubclinical injury resulting from exposure to asbestos is insufficient to constitute the actual loss or damage to a plaintiff's interest required to sustain a cause of action under generally applicable principles of tort law.").

● New York. *Caronia v. Philip Morris USA, Inc.*, 22 N.Y.3d 439, 982 N.Y.S.2d 40, 5 N.E.3d 11, 18 (N.Y. 2013) ("[I]t is speculative, at best, whether asymptomatic plaintiffs will ever contract a disease; allowing them to recover medical monitoring costs without first establishing physical injury would lead to the inequitable diversion of money away from those who have actually sustained an injury as a result of the exposure.").

● North Carolina. *Dennis v. Bayer Healthcare Pharms. Inc.*, No. 3:18-CV-00491-KDB-DCK, 2020 WL 534307, 2020 U.S. Dist. LEXIS 18180 (W.D.N.C. Feb. 3, 2020) (citations omitted) ("In cases involving disease, North Carolina courts have held that a cause of action does not accrue until the disease is diagnosed.").

● Ohio. *Ackison v. Anchor Packing Co.*, 120 Ohio St.3d 228, 897 N.E.2d 1118, 1125–26 (Ohio 2018) (declining to find asymptomatic pleural thickening sufficient to establish a compensable injury for asbestos exposure).

● Pennsylvania. *Zieber v. Bogert*, 565 Pa. 376, 382, 773 A.2d 758 (E.D. Pa. 2001) (finding asymptomatic asbestos-related pleural thickening is not a compensable injury); *Schweitzer v. Consolidated Rail Corp. (Conrail)*, 758 F.2d 936, 942 (3d Cir. 1985) ("[S]ubclinical injury resulting from exposure to asbestos is insufficient to constitute the actual loss

or damage to a plaintiff's interest required to sustain a cause of action under generally applicable principles of tort law.").

**\*54** ● Virginia. *Contreras v. Thor Norfolk Hotel, L.L.C.*, 292 F. Supp. 2d 798, 802 (E.D. Va. 2003) ("[U]ntil Plaintiff is diagnosed with an asbestos-related disease, he has no cause of action stemming from a physical injury.").

● Texas. *McManaway v. KBR, Inc.*, No. H-10-1044, 2015 U.S. Dist. LEXIS 190297, at \*56 (S.D. Tex. Jan. 23, 2015) (ruling the plaintiffs cannot recover for their asymptomatic genetic transformation injuries); *Ford Motor Co. v. Miller*, 260 S.W.3d 515, 518 (Tex. App. 2008) (citing RESTATEMENT (SECOND) OF TORTS § 7 cmt. b (1965)) ("[A] mere physical change that is not detrimental does not constitute a harm.").

● West Virginia. *Ball v. Joy Mfg. Co.*, 755 F. Supp. 1344, 1371 (S.D.W. Va. 1990) (concluding the plaintiffs, who were exposed to toxic chemicals but not yet diagnosed with a related disease, "may not recover such [medical monitoring] costs here because they have not suffered an actionable injury under the law of West Virginia").

● Wisconsin. *Peter v. Sprinkmann Sons Corp.*, 360 Wis.2d 411, 860 N.W.2d 308, 313 (Wis. Ct. App. 2015) ("[The plaintiff] did not have any legally cognizable claim for injuries before April 29, 1994, because [the plaintiff] was not diagnosed with mesothelioma until 2012."); *Alsteen v. Wauleco, Inc.*, 335 Wis.2d 473, 802 N.W.2d 212, 217–18 (Wis. Ct. App. 2011) ("[A]symptomatic plaintiffs who are merely exposed to toxic chemicals do not suffer a corresponding physical injury.").

The following jurisdictions do not allow a medical monitoring relief without a present physical injury:

● Alabama. *Hinton v. Monsanto Co.*, 813 So. 2d 827, 829 (Ala. 2001) (rejecting the plaintiff's contention that he could recover for "medical monitoring" without a "manifest, present injury").

● Delaware. *In re Asbestos Litig.*, No. 87C-09-24, 1994 WL 16805917 at \*1, 1994 Del. Super. LEXIS 685 at \*4 (Del. Super. Ct. Aug. 5, 1994) (citing *Mergenthaler v. Asbestos Corp. of America*, 480 A.2d 647, 651 (Del. 1984)) ("Because the Court has determined that plaintiffs do not have

a compensable physical injury, plaintiffs may not recover for the expenses of medical surveillance.").

● District of Columbia. *Witherspoon v. Philip Morris, Inc.*, 964 F. Supp. 455, 467 (D.D.C. 1997) (citing *Burton v. R.J. Reynolds*, 884 F. Supp. 1515, 1523 (D. Kan. 1995)) ("Whether a cause of action or a part of damages requested, medical monitoring requires that the plaintiff have a present injury and a reasonable fear that the present injury could lead to the future occurrence of disease.").

● Georgia. *Parker v. Brush Wellman, Inc.*, 377 F. Supp. 2d 1290, 1302 (N.D. Ga. 2005) ("This Court does not read Georgia law as permitting the establishment of a medical monitoring fund with respect to persons who have not endured a cognizable tort injury.").

● Iowa. *Pickrell v. Sorin Grp. USA*, Inc., 293 F. Supp. 3d 865, 868 (S.D. Iowa 2018) ("[T]he Iowa Supreme Court, if confronted with the opportunity to recognize a medical monitoring cause of action, would either decline to do so or would require an actual injury.").

● Kentucky. *Wood v. Wyeth-Ayerst Labs.*, 82 S.W.3d 849, 857 (Ky. 2002) ("rejecting prospective medical monitoring claims (in the absence of present injury)").

● Louisiana. *Burmaster v. Plaquemines Parish Gov't*, 982 So. 2d 795, 806 (La. 2008) (citing *Bourgeois v. A.P. Green Indus., Inc.*, 783 So. 2d 1251, 1255 (La. 2001)) ("[T]he Louisiana Legislature amended *La. Civ. Code art. 2315* to eliminate medical monitoring as a compensable item of damage, unless the plaintiff has manifested physical or mental injury or disease.").

**\*55** ● Michigan. *Henry v. Dow Chem. Co.*, 473 Mich. 63, 701 N.W.2d 684, 692–93 (Mich 2005) (holding a medical monitoring claim "does not exist in Michigan" and "our common law requires a present injury in addition to economic loss incurred as a result of that injury").

● Minnesota. *Palmer v. 3M Co.*, No. C2-04-6309, 2007 Minn. Dist. LEXIS 162, at \*46 (Minn. Dist. Ct. June 19, 2007) ("Minnesota law does not recognize an independent tort of medical monitoring."); *Thompson v. Am. Tobacco Co.*, 189

In re: Allergan Biocell Textured Breast Implant Products Liability..., Slip Copy (2021)

F.R.D. 544, 555 (D. Minn. 1999) (citations omitted) ("[E]ach Plaintiff seeking participation in a medical monitoring program must establish injury;" "an increased risk of disease due to 'mere exposure to a toxic substance' by itself is not a sufficient injury under Minnesota law.").

● Mississippi. *Paz v. Brush Engineered Materials, Inc.*, 949 So. 2d 1, 9 (Miss. 2007) (declining to recognize "a medical monitoring cause of action without a showing of physical injury").

● New York. *Caronia v. Philip Morris USA, Inc.*, 22 N.Y.3d 439, 982 N.Y.S.2d 40, 5 N.E.3d 11, 18 (N.Y. 2013) ("[P]olicy reasons set forth above militate against a judicially-created independent cause of action for medical monitoring. Allowance of such a claim, absent any evidence of present physical injury or damage to property, would constitute a significant deviation from our tort jurisprudence.").

● North Carolina. *Curl v. Am. Multimedia, Inc.*, 187 N.C.App. 649, 654 S.E.2d 76, 81 (N.C. Ct. App. 2007) (electing not to create a new cause of action of medical monitoring for the plaintiffs that are not diagnosed with an illness).

● North Dakota. *Mehl v. Canadian Pac. Ry.*, 227 F.R.D. 505, 518 (D.N.D. 2005) ("Given these basic principles of North Dakota tort law, a plaintiff would be required to demonstrate a legally cognizable injury to recover any type of damages in a newly recognized tort, including a medical monitoring claim.").

● Oklahoma. *Taylor v. Michelin N. Am., Inc.*, No. 14-CV-293-JED-FHM, 2018 WL 1569495 at *7, 2018 U.S. Dist. LEXIS 54405 at *23 (N.D. Okla. March 30, 2018) (dismissing the plaintiffs' medical monitoring class allegations because "the plaintiffs have not yet presented evidence of physical injuries attributable to contaminants from the plant"); *Reece v. AES Corp.*, No. CIV-12-0457-JH, 2014 WL 61242 at *7, 2014 U.S. Dist. LEXIS 2236 at *31 (E.D. Okla. Jan. 8, 2014) ("Plaintiffs concede that Oklahoma law does not allow a remedy for medical monitoring in the absence of an existing disease or physical injury.").

● Oregon. *Hamilton v. Silven, Schmeits & Vaughan*, No. 2:09-cv-1094-SI, 2013 WL 2318809 at *8, 2013 U.S. Dist. LEXIS 74352 at *27 (D. Or. May 28, 2013) (citing *Lowe*

*v. Philip Morris USA, Inc.*, 344 Or. 403, 183 P.3d 181, 186 (Or. 2008)) ("Medical monitoring damages are not recoverable in Oregon without some present symptoms.");

*Lowe*, 183 P.3d at 187 ("[N]egligent conduct that results only in a significantly increased risk of future injury that requires medical monitoring does not give rise to a claim for negligence.").

● Tennessee. *Bostick v. St. Jude Med., Inc.*, No. 03-2636 BV, 2004 WL 3313614 at *14, 2004 U.S. Dist. LEXIS 29997 at *45 (W.D. Tenn. Aug. 17, 2004) (citations omitted) ("Tennessee requires present injury for medical monitoring claims.").

● Texas. *Norwood v. Raytheon Co.*, 414 F. Supp. 2d 659, 665 (W.D. Tex. 2006) ("[T]he Texas Supreme Court appears likely to reject medical monitoring claims ... in the absence of a present physical injury.").

**\*56** ● Washington. *Duncan v. Northwest Airlines, Inc.*, 203 F.R.D. 601, 606–07 (W.D. Wash. 2001) (concluding a stand-alone medical monitoring cause of action "is contrary to Washington law, which is grounded in actual present injury and limits recovery for enhanced risk").

● West Virginia. *Ball v. Joy Mfg. Co.*, 755 F. Supp. 1344, 1371 (S.D.W. Va. 1990) (concluding the plaintiffs, who were exposed to toxic chemicals but not yet diagnosed with a related disease, "may not recover such [medical monitoring] costs here because they have not suffered an actionable injury under the law of West Virginia").

● Wisconsin. *Alsteen v. Wauleco, Inc.*, 335 Wis.2d 473, 802 N.W.2d 212, 218–19 (Wis. Ct. App. 2011) (citations omitted) ("[D]efining the need for medical monitoring as an 'injury' does nothing more than attach a specific item of damages to what is actually a claim for increased risk of future harm. Yet, Wisconsin tort law does not compensate for increased risk of future harm; actual, present injury is required.").

As a result, in the jurisdictions that (1) reject subclinical changes as physical injuries and (2) require physical injuries be shown for recovering the medical monitoring relief, the Plaintiffs not diagnosed with BIA-ALCL cannot request the medical monitoring relief. Whether Plaintiffs' other alleged injuries, such as those relating to diagnostic procedures and removal surgeries, are legally cognizable is irrelevant,

because they are not the types of injuries that give rise to the need of medical monitoring. As a result, the Plaintiffs not diagnosed with BIA-ALCL cannot obtain a medical monitoring relief, at least, under the laws of Alabama, Delaware, Georgia, Iowa, Kentucky, Mississippi, New York, North Carolina, Texas, West Virginia, and Wisconsin.

In other words, a nationwide 🔖 Rule 23(b)(2) class action for medical monitoring will not provide any relief to some Plaintiffs. The Court needs no individualized factual inquiries or discovery to reach this conclusion, because Plaintiffs concede only 16.7% of Plaintiffs are diagnosed with BIA-ALCL (ECF No. 263-1 at 1), and refer to class members not diagnosed with BIA-ALCL in every state-specific subclass (ECF No. 118 at ¶¶ 270–382). Because the proposed medical monitoring class "includes class members from states that expressly prohibit no-injury medical monitoring claims, the declaratory relief Plaintiff[s] seek[ ] could never be 'appropriate respecting the class as whole.' " *Almond v. Janssen Pharms., Inc.*, 337 F.R.D. 90, 100 (E.D. Pa. 2020). "Accordingly, the nationwide class cannot satisfy 🔖 Rule 23(b)(2)." *Id.* (citations omitted). Plaintiffs may later reformulate medical monitoring (sub)classes to cure the above deficiencies.

In sum, the Court dismisses Plaintiffs' class allegations asserted for (1) the following subclasses: Alaska, American Samoa, Arkansas, District of Columbia, Guam, Hawaii, Indiana, Kansas, Maryland, Mississippi, Nebraska, New Hampshire, North Dakota, Northern Mariana Islands, Puerto Rico, U.S. Virgin Islands, and Vermont; and (2) a nationwide 🔖 Rule 23(b)(2) medical monitoring class.

## IV. CONCLUSION

For the reasons set forth above, Allergan's Motion to Strike/Dismiss CAC (ECF No. 171-2), Motion to Dismiss Plaintiffs' complaints on preemption grounds (ECF No. 171-1), and Motion to Dismiss PIC (ECF No. 171-3) are **GRANTED IN PART and DENIED IN PART** as follows: The Court dismisses with prejudice all Plaintiffs' claims to the extent they are based on the alleged defects in Allergan's investigational devices used in an approved clinical trial, other than Allergan's tissue expanders and implants sold

before the 2000 PMA. In addition, the Court dismisses with prejudice Plaintiffs' claims for: negligence *per se* (Count III) to the extent the claims are asserted under the laws of Alaska, Arkansas, Colorado, Connecticut, Florida, Georgia, Hawaii, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, North Carolina, North Dakota, Rhode Island, Texas, Utah, Vermont, Washington, West Virginia, and Wyoming; strict liability (Count IV) and negligent failure to warn (Count V) to the extent they are based on Allergan's alleged failure to (1) warn on its label the risk of developing BIA-ALCL and (2) conduct post-PMA clinical studies, for the BIOCELL implants, other than Allergan's tissue expanders and implants sold before the 2000 PMA; strict liability (Count IV) and negligent failure to warn (Count V) to the extent they are based on Allergan's alleged failure to adequately report safety information to the FDA under the laws of Alabama, Alaska, Arkansas, Arizona, Colorado, Connecticut, District of Columbia, Florida, Georgia, Iowa, Kansas, Maine, Massachusetts, Michigan, Montana, Nebraska, New Hampshire, New Jersey, New Mexico, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, South Carolina, South Dakota, Tennessee, Utah, Virginia, West Virginia, and Wyoming; negligent representation (Count VI) the extent they are asserted under the laws of Arkansas, Louisiana, Minnesota, and Virginia, as well as Mississippi common law; implied warranty of merchantability (Count VII) to the extent they are asserted under Pennsylvania law and Wisconsin law; and express warranty (Count VIII) to the extent they are asserted under Wisconsin law. Also, the Court strikes/dismisses without prejudice Plaintiffs' class allegations for (1) the a nationwide 🔖 Rule 23(b)(2) medical monitoring class; and (2) the PMA and non-PMA Device State Subclasses the extent of the subclasses for Alaska, American Samoa, Arkansas, District of Columbia, Guam, Hawaii, Indiana, Kansas, Maryland, Mississippi, Nebraska, New Hampshire, North Dakota, Northern Mariana Islands, Puerto Rico, U.S. Virgin Islands, and Vermont. The motions to dismiss are denied as to the remaining claims.

**All Citations**

Slip Copy, 2021 WL 1050910

In re: Allergan Biocell Textured Breast Implant Products Liability - Slip Copy (2021)

## Footnotes

1    Following oral argument, the Court permit simultaneous supplemental briefing, which was filed by Plaintiffs and Allergan on January 5, 2021. (ECF Nos. 262, 263.)

2    A tissue expander is an empty breast implant gradually filled with saline until the breast tissue expands to the desired size. A second surgery is performed to remove the tissue expander and insert a permanent breast implant. (ECF No. 119 at ¶ 4.)

3    The Court is not holding the Restatement establishes a duty to warn for every state. Here, the Restatement only provides a theory that allows a state failure to warn claim to survive express preemption. It is up to each State to decide whether to adopt the Restatement as the basis for a state law duty to warn.

4    The FDA regulation for postmarketing reporting of adverse drug experiences

5    Dra Panama, *Natrelle Breast Implants - Picking the Right Implants for Your Body and the Surgery Process.*, YouTube (Sept. 23, 2013), https://www.youtube.com/watch?v=vu-0W8vSNrU.

---

**End of Document**                                             © 2021 Thomson Reuters. No claim to original U.S. Government Works.

TAB 14

*In re FieldTurf Artificial Mktg. & Sales Prac. Litig.,* No. 17-2779, 2018 WL
4188459 (D.N.J. Aug. 31, 2018)

In re FieldTurf Artificial Turf Marketing and Sales Practices..., Not Reported in Fed....
2018 WL 4188459, 96 UCC Rep.Serv.2d 790

2018 WL 4188459
**NOT FOR PUBLICATION**
United States District Court, D. New Jersey.

IN RE: FIELDTURF ARTIFICIAL
TURF MARKETING AND SALES
PRACTICES LITIGATION

Civil Action No. 3:17-md-2779 (MAS) (TJB)
|
Signed 08/31/2018

**MEMORANDUM OPINION**

Michael A. Shipp, United States District Judge

 **\*1** This matter comes before the Court upon Defendants FieldTurf USA Inc., FieldTurf, Inc., FieldTurf Tarkett SAS, and Tarkett Inc.'s (collectively, "FieldTurf") motion to dismiss certain claims in the Consolidated Amended Class Action Complaint ("Complaint") filed in this multidistrict litigation.[1] (ECF No. 91.) Plaintiffs: (i) Borough of Carteret ("Carteret"), State Operated School District of the City of Newark ("Newark"), and County of Hudson ("Hudson") (collectively, "NJ Plaintiffs"); (ii) City of Fremont ("Fremont") and Santa Ynez Valley Union High School District ("Santa Ynez") (collectively, "CA Plaintiffs"); (Hi) Levittown Union Free School District ("Levittown" or "NY Plaintiff"); and Neshannock Township School District ("Neshannock" or "PA Plaintiff") (collectively, "Plaintiffs") filed opposition (ECF No. 100) and FieldTurf replied (ECF No. 112). The Court has carefully considered the parties' submissions and decides this matter without oral argument pursuant to Local Civil Rule 78.1. For the reasons set forth below, FieldTurf's motion to dismiss is granted in part and denied in part.

**I. Background**[2]

Plaintiffs are school districts, a county, a borough, and a city that purchased defective FieldTurf Duraspine fields.[3] (Compl. ¶¶ 23-30.) All allege that they:

> **\*2** decided to buy the Duraspine Turf Field based in part on FieldTurf's representations that the field had superior materials and design such that it had greater durability and resistance to wear, matting, and UV than competing products and a useful lifespan of more than 10 years.... At the time of purchase, Plaintiff[s] did not know that the field was composed of defective and inferior materials that did not [comport with FieldTurf's] represent[ations]. Plaintiff[s] would not have purchased the Duraspine Turf Field, or would have paid less for it, had [they] known that the fields were defective and did not have the qualities and lifespan represented. Plaintiff[s] ha[ve] suffered a concrete injury as a direct and proximate result of Defendants' misconduct ....

*Id.*)

**A. FieldTurf's Product**

An alternative to natural grass, artificial turf fields are designed for year-round use, in a variety of weather conditions, and for long periods of time. (Compl. ¶ 44.) Artificial turf does not require recovery time between events or the same maintenance as natural grass. (*Id.*) It consists of a minimum of three components: "(1) plastic grass blades, which are manufactured from plastic 'fiber' or 'yarn' and bundled into individual 'tufts'; (2) a backing material to which the tufts are attached; and (3) an adhesive used to secure the tufts to the backing." (*Id.* ¶ 45.) Artificial soil called "infill" may also be used, and when assembled, may be referred to as a " 'turf system." (*Id.*) Design and performance involve "sophisticated engineering" and "specialized knowledge" not possessed by the average consumer, and, accordingly, purchasers rely on the sellers for information about the quality and performance and cannot determine when a field is deteriorating prematurely. (*Id.* ¶ 48.)

FieldTurf "markets, manufactures, sells, and installs" these fields across the United States and is particularly known for its "infilled" fields. (*Id.* ¶¶ 49-50.) It also controls installation and ensures the fields are installed in a uniform fashion. (*Id.* ¶ 52.) In September 2005, FieldTurf entered into an agreement with Mattex Leisure Industries ("Mattex") to

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 178 of 535
PageID: 32125
In re FieldTurf Artificial Turf Marketing and Sales Practices..., Not Reported in Fed....
2018 WL 4188459, 96 UCC Rep.Serv.2d 790

obtain fiber for its fields that had a "monofilament design" with a central "spine." (*Id.* ¶¶ 55-56.) FieldTurf named this fiber "Duraspine" and planned to sell Duraspine Turf fields at higher prices, as this turf was more durable and long-lasting. (*Id.* ¶ 57.)

### B. FieldTurf's Claims and Sales

FieldTurf launched a uniform marketing campaign to disseminate the message in a consistent manner and to promote sales. (*Id.* ¶ 60.) Components of the campaign included trade publications (*id.* ¶ 63), flyers (*id.* ¶¶ 64, 65), and materials given to every prospective customer (*id.* ¶ 68), and a standard sales pitch (*id.* ¶¶ 69-71).[4] Advertising and marketing materials featured clients like NFL teams and claimed Duraspine Turf fields were "the best fields money could buy." (*Id.* ¶ 60-61.) A 2006 trade publication quoted then-CEO John Gilman ("Gilman") as saying his company's "breakthrough in technology" would "change the industry" and "double the expected useful life" of an artificial turf field. (*Id.* ¶ 63.) He stated that the fibers used in Duraspine Turf were "stronger," "wear more slowly," and were more resistant to "environmental agents." ( *Id.*) As a result, Gilman said the Duraspine Turf fields' lifespan was "longer than the 10 years" already expected from current products. ( *Id.*) Similarly, in a marketing document, featured in a national marketing campaign and distributed to all potential customers, "10 Reasons Why FieldTurf and Its MonoGrass System Should be Selected," FieldTurf stated that testing reflected that Duraspine Turf would last longer than FieldTurf's current product, which had an eight to ten-year life. (*Id.* ¶¶ 66, 68.) The document also stated that such durability was a "fact" and the field could be amortized on a "10+ year basis." (*Id.* ¶ 67.) A standard marketing pitch claimed that the Duraspine Turf "would virtually eliminate" the maintenance of natural grass and could be used year-round, lasting longer than any other product on the market. (*Id.* ¶ 69.) It claimed "FieldTurf has nothing to hide" and its comments were "[n]o marketing spin." (*Id.* ¶ 70.) Finally, FieldTurf claimed its fields were cheaper over the long term and sometimes save customers up to $1 million. (*Id.* ¶ 71.)

**\*3** Although promising customers that they would probably never need to rely on a warranty, FieldTurf also provided customers with an eight-year express warranty[5] for the Duraspine Turf after contracting for purchase. (*Id.* ¶ 87.)

As a result, customers were induced by FieldTurf' representations, paid a premium price, and sales of the Duraspine Turf fields nearly doubled in a few years. (*Id.* ¶¶ 73, 77.) Plaintiffs were no exception, as FieldTurf made specific representations about the Duraspine Turfs quality, design, materials, durability, and lifespan, and Plaintiffs relied upon these statements in their purchase. (*Id.* ¶¶ 79-84, 86.) The fields were the most expensive in the industry. (*Id.* ¶ 75.) From late 2005 to 2012, FieldTurf sold a minimum of 1,450 of these Duraspine Turf fields for an average of $300,000 to $500,000 each, resulting in revenues of over half a billion dollars. (*Id.* ¶ 59.)

### C. FieldTuiT's Knowledge

#### 1. Prior to Market Launch

FieldTurf knew that the Duraspine Turf was defective, unfit for its ordinary use and that its representations about Duraspine's durability and lifespan were false, as reflected by its testing and the testing performed by others. (*Id.* ¶ 100.) In early 2004, FieldTurf began to suspect that testing performed by Mattex was insufficient to determine the fiber's durability, and as a result, FieldTurf began to conduct its own testing. (*Id.* ¶ 92.) FieldTurf, however, performed the test using non-standard equipment knowing that the equipment would render inaccurate results. ( *Id.*) By early 2005, FieldTurf's tests showed that the fiber "fibrillated" in one-third of the expected lifespan and FieldTurf contacted Mattex to ask about its material and methods. (*Id.* ¶ 93.) In addition, a representative from Bonar Yarns, another FieldTurf supplier, reported in a 2005 e-mail message that the Duraspine showed "poor results in the Lisport test!" (*Id.* ¶ 94.) This test is the standard industry test used by FIFA, soccer's international governing body. ( *Id.*) Gilman was concerned, and in an e-mail message, questioned whether the company "erred in our over exuberance in the adoption of the monofilament yarns, specifically the Mattex yarns?" (*Id.* ¶ 95.) FieldTurf's director of manufacturing, Derek Bearden, ran more tests and acknowledged on multiple occasions that the "finger coating" method employed to attach the fiber to the backing was not dependable and secure. (*Id.* ¶¶ 95, 96, 98.) In July 2005, FieldTurf's primary West Coast installer stated that FieldTurf should not carry out its Fall 2005 launch because it had "no idea whether it [Duraspine Turf] will work" and should not "rush a product to market and have it fail." (*Id.* ¶ 97.) Finally, in mid-2005, tests at a France facility revealed that the five

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 179 of 535
PageID: 32126
In re FieldTurf Artificial Turf Marketing and Sales Practices..., Not Reported in Fed....
2018 WL 4188459, 96 UCC Rep.Serv.2d 790

tested samples "deteriorated 40-80%" after simulating five to six years of use. (*Id.* ¶¶ 33, 99.)

## 2. During the Period Sold

**\*4** "[T]hroughout the time it sold and installed Duraspine Turf fields, FieldTurf repeatedly confirmed its awareness that Duraspine Turf was defective, lacked necessary strength, durability, and resistance and did not have the lifespan FieldTurf claimed." (*Id.* ¶ 102.) For example: (i) its operations director informed the CEO and others in 2006 that Duraspine fields installed in 2005 were already prematurely degrading (*id.* ¶ 103); and in January 2006, an employee in France observed that a field installed nine months prior was failing (*id.* ¶ 105). As a result, in December 2006, Gilman wrote to Mattex, stating, "We are seeing fields showing splitting under a year of play and have already had to replace one full-sized field due to yarn failure after only a few months of installation!" (*Id.* ¶ 106 (emphasis in original).) " [W]e know with heavy use, the fiber is coming apart." ( *Id.* (emphasis in original).) In 2007, Ken Gilman, who is Gilman's son and was then a FieldTurf executive, stated in an e-mail message to the then-interim CEO that:

> [Duraspine] is nowhere near as robust or resilient as we initially thought and probably will not last that much longer than a high quality slit-film yarn .... In all likelihood in years 5 and 6 these Duraspine Turf fields will be matted down and fibrillating pretty heavily.... Our marketing claims and sales pitches need to reflect this reality.

(*Id.* ¶ 109.) He also stated the FieldTurf was promoting useless maintenance equipment which would not revitalize a field. (*Id.* ¶ 111.) When FieldTurf's counsel noted that the e-mail message was discoverable and could be used in litigation, Ken Gilman asked an IT representative whether the e-mail message could be "zapped off," the IT consultant answered in the negative and stated "[l]egally, it is not possible ... You would be asking me ... to commit a possible crime." (*Id.* ¶¶ 112-13.) Ken Gilman continued to try and convince FieldTurf to revise the representations in its sales and marketing representations. (*Id.* ¶¶ 114, 116, 117, 119.)

Notably, one e-mail message, included as a screenshot in the Complaint, stated, among other things:

> As you know[,] our sales and marketing guys continually make claims that we can't possibly meet in the real world. This opens us up to tons of exposure from a legal standpoint.... On the marketing side[,] the claims made regarding the Duraspine ... are ridiculous. Everyday[,] we are putting stuff out there that can't and won't live up to the marketing spin. We have to control this somehow!!!"

(*Id.* ¶ 114.) FieldTurf did not alter its sales and marketing claims, remove the product from the market, or inform customers of their misrepresentations. (*Id.* ¶ 120.) Ken Gilman was fired in 2008, and FieldTurf signed another exclusive supply agreement with TenCate, Mattex's successor, in or around July 2018. (*Id.* ¶¶ 120, 179.)

## 3. FieldTurf's "Finger-Coating" Method

During the manufacturing process, fibers are sown or "tufted" into a backing material in rows so that cleans can penetrate the infill material instead of the fiber. (*Id.* ¶ 122.) The manufacturer subsequently applies polyurethane to secure the fibers and prevent "tuft bind" issues. Tuft bind problems occur when the coating does not effectively lock fibers in place and they come loose from the backing. (*Id.* ¶ 123.) Tuft bind failures result in fibers laying on top of the field like mowed grass. (*Id.* ¶ 124.) Derek Bearden. then-Vice President of Manufacturing, recommended coating the whole backing with polyurethane; however, FieldTurf utilized a "finger coating" method in which it applied polyurethane to the back of each row of fibers only. (*Id.* ¶¶ 125-26.) The remaining backing material between the rows was left uncoated. ( *Id.*) Significant tuft bind failures resulted and FieldTurf received multiple complaints. (*Id.* ¶¶ 127-28.) Bearden told management that a full coating would "immediately make a significant difference." ( *Id.*) Nevertheless, FieldTurf did not alter its process and instead manipulated test results to conceal the defect. (*Id.* ¶¶ 129-30.) John Rodgers, FieldTurf's Senior Research and Development Project Manager, stated

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 180 of 535
PageID: 32127

In re FieldTurf Artificial Turf Marketing and Sales Practices..., Not Reported in Fed....
2018 WL 4188459, 96 UCC Rep.Serv.2d 790

that to obtain passing scores on "tuft bind pull force" tests, the company disregarded the lowest five of twenty pulls. (*Id.* ¶ 130.) Finally, Revolution Turf, FieldTurf's product that launched in 2012, at minimum, suffers from the same attachment defects of Duraspine described above. (*Id.* ¶¶ 131-32.)

### 4. FieldTurf's Infill and Safety Testing

**\*5** FieldTurf marketing materials and sales presentations represented that FieldTurf used "ten pounds of infill per square foot" in installations but actually used much less, as reflected in FieldTurf's instructions to installers. (*Id.* ¶ 134.) A FieldTurf internal report stated that the "low infill phenomenon is real" (*id.* ¶ 135) *and the issue decreased durability, safety, and performance (*id.* ¶ 136). The lower amount of infill increased the rate by which the fields deteriorated because fibers would not remain upright and instead laid over, exposing them to more wear. (*Id.* ¶ 137.) The end result was a "harder, sub-par" surface and not a premium product as represented. (*Id.* ¶ 138.) This practice continues today. (*Id.* ¶ 139.) In connection with this issue, FieldTurf cited to studies comparing turf to natural grass, studies it falsely represented to be "independent" but were actually funded by FieldTurf. (*Id.* ¶¶ 140-43.)

### D. Consumer Complaints and FieldTurf's Response

While defects in the Duraspine Turf were not immediately apparent to customers, in 2009 and 2010, FieldTurf began receiving a distressing amount of complaints uniformly stating that the fiber on the fields was "fading, splitting, thinning and ultimately disintegrating within two to three years of installation." (*Id.* ¶¶ 144-45.) Plaintiffs, including, for example, Levittown, Newark, and Fremont, suffered similar problems, with a Newark football coach noting "You grab it and it rips. It rips like grass." (*Id.* ¶ 146.) FieldTurf, in response, conducted a "systematic campaign" to deceive purchasers and avoid warranties by: failing to inform customers that FieldTurf knew the fields were defective; failing to tell customers when FieldTurf representatives detected field failure; downplaying field failures observed by customers; and trying to persuade customers against enforcing their warranties. (*Id.* ¶ 147.) Notably, FieldTurf instructed its sales and marketing teams to handle customer complaints—the same people who misled customers into buying the defective product. (*Id.*)

First, FieldTurf would deny the existence of a defect in the fields, many of which FieldTurf itself claimed were defective in its litigation against the manufacturer, discussed below, and describe problems "as an anomaly or normal wear and tear, or claim that the issues would improve over time." (*Id.* ¶¶ 149, 153.) Then, FieldTurf would delay action, advise customers to monitor the fields, and conduct an inspection six to eight months later. (*Id.* ¶ 150.) FieldTurf would repeat this cycle until the expiration of warranty periods. (*Id.*) For those customers that demanded action, FieldTurf invented "FiberGuard," a clear coat of paint used on the fields; however, FieldTurf knew that the FiberGuard was ineffective. (*Id.* ¶ 151.) Additionally, FieldTurf accelerated applications on fields in high UV areas with one to two years remaining on their warranty periods, so that defect claims would fall outside the warranty period. (*Id.* ¶ 152.) When FieldTurf replaced a field, however, it provided more of the same defective product. (*Id.* ¶ 154.) If a customer refused to accept a replacement, FieldTurf offered either the customer an "upgrade" for an additional charge that was actually just the existing Duraspine Turf or Revolution Turf, which was still defective. (*Id.* ¶ 155.) Plaintiffs and others were subject to all of these tactics. (*Id.* ¶¶ 157-77.)

For example, in April 2013, Carteret reached out to FieldTurf about premature wear and spoke to two FieldTurf representatives, Perry DiPiazza and Andrew Schwartz, to report a warranty claim. (*Id.* ¶ 157.) The two stated that they need to conduct an inspection, which was performed five months later. (*Id.*) Over a year passed before Carteret received additional information, and only after Carteret only received a response after it sent October 2014 correspondence requesting an update. (*Id.* ¶ 158.) Almost two years after Carteret's first call to FieldTurf, DiPiazza e-mailed Carteret apologizing and promising to ease concerns; however, Carteret subsequently sent FieldTurf three letters between October 2015 and May 2016 and no further inspection was conducted. (*Id.* ¶¶ 159-60.) In June 2016, FieldTurf finally expressed "personal apologies" through its representative. (*Id.*) FieldTurf's delay tactic appeared to be an effort to allow the warranty period to expire. (*Id.* ¶ 161.) Several months after FieldTurf's apology, FieldTurf e-mailed Carteret three proposals "that would require it to pay thousands of dollars in repair and replacement costs." (*Id.*)

### E. FieldTurf's Lawsuit Against TenCate and the NJ Advance Media Investigation

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 181 of 535
In re FieldTurf Artificial Turf Marketing and Sales Practices..., Not Reported in Fed....
PageID: 32128
2018 WL 4188459, 96 UCC Rep.Serv.2d 790

**\*6** On March 1, 2011, FieldTurf sued TenCate, Mattex's successor and supplier of the fiber used in the Duraspine Fields sold to Plaintiffs and the putative class members. (*Id.* ¶ 179.) To bring its case, FieldTurf admitted that the fiber used was "inferior" and "defective" in its design and composition. (*Id.* ¶ 180.) According to FieldTurf, the representations TenCate/Mattex made about the nature of the fiber were false and misleading—and essentially identical to the representations made by FieldTurf itself. ( *Id.*) FieldTurf admitted that: (i) the fiber was cheap, defective, less durable, and lacked sufficient UV stabilizers; (ii) the defects were due to the inferior materials Mattex/Tencate used; and (iii) the manufacturing process diminished the fiber's quality. (*Id.* ¶ 181.) FieldTurf's experts opined that: (i) scientific testing demonstrated that the fiber showed signs of premature physical and chemical degradation and had insufficient amounts of UV protection; and (ii) the general deterioration confirmed that the fiber was defective. (*Id.* ¶¶ 182-83.) Finally, "FieldTurf's CEO, Erie Daliere, testified that FieldTurf continued to sell, install, and profit from Duraspine Turf fields despite knowing they were defective." (*Id.* ¶ 184.)

NJ Advance Media conducted an exhaustive six-month investigation of these events, reviewing 5,000 pages of production from forty document requests, interviewing coaches, officials, and current FieldTurf employees, and inspecting fifty fields in New Jersey. (*Id.* ¶ 186.) It also enlisted the University of Michigan's Breaker Space Lab to test Duraspine Turf fibers from three fields in New Jersey. ( *Id.*) In December 2016, NJ Advance Media published its results. ( *Id.*) Testing confirmed that the turf's tensile strength failed to meet both industry and FieldTurf's own standards. [6] (*Id.* ¶ 187.) The investigation concluded:

- FieldTurf knew its Duraspine Turf fields were defective. For most of the time they sold the fields, which cost at least $300,000 to $500,000 each, executives were aware the turf was deteriorating faster than expected and might not last a decade or more as promised.

- They misled their customers. Despite candid, internal email discussions about their overblown sales pitches, executives never changed their marketing campaign for Duraspine Turf fields.

- They have and continue to keep quiet about their lies. From the time fields began to fail in 2006 until today, executives have never told most customers about

Duraspine Turf's problems or how to identify signs it was prematurely falling apart.

- FieldTurf officials slow-footed warranty claims and told customers the deterioration was normal, or that their fields needed more maintenance, or the problems would get better. Further, to this day, in testimony before governmental bodies, and in publicly released statements. FieldTurf continues to publicly deny there was a widespread defect with its Duraspine Turf products.

(*Id.* ¶ 188.)

## II. **Legal Standard** [7]

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting 🚩 *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) ). On a motion to dismiss for failure to state a claim, the "defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).

**\*7** A district court conducts a three-part analysis when considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). *See Malleus v. George*, 641 F.3d 560. 563 (3d Cir. 2011). "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.' " *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ). Second, the court must "[review] the complaint to strike conclusory allegations[.]" *Id.* The court must accept as true all of the plaintiff's well-pleaded factual allegations and "construe the complaint in the light most favorable to the plaintiff[.]" *Fowler v. UPMC Shadyside*, 578 F.3d 203. 210 (3d Cir. 2009) (citation omitted). In doing so, however, the court is free to ignore legal conclusions or factually unsupported accusations that merely state "the-defendant-unlawfully-harmed-me." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (citing *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955). Finally, the court must determine whether "the facts alleged in the complaint are sufficient to

show that the plaintiff has a 'plausible claim for relief.' "
*Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937). A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 210 (quoting *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937).

Finally, some of Plaintiffs' claims allege fraud, and those claims are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 301 n.9 (3d Cir. 2011); *Frederico v. Home Depot*, 507 F.3d 188, 202-03 (3d Cir. 2007).

## III. Discussion

### A. Claims Under Statutes of Forty-Three Jurisdictions Where There is No Named Plaintiff

"[A] class representative *must be part of the class* and 'possess the same interest and suffer the same injury' as the class members." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 131 S.Ct. 2541, 2550, 180 L.Ed.2d 374 (2011) (quoting *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977) ) (emphasis added); *see also* *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349. 360 (3d Cir. 2013) ("It is axiomatic that the lead plaintiff must fit the class definition"). The Court acknowledges disagreement among the courts regarding whether, prior to class certification, named plaintiffs must demonstrate that they have standing to assert all claims in the class action complaint "or whether it is sufficient to establish standing for a single claim because a court will determine if the named plaintiffs have standing to represent the unnamed class members seeking redress under the balance of asserted claims during the class certification process[.]" *McGuire v. BMW of N. Am., LLC*, No. 13-7356, 2014 WL 2566132, at *5 (D.N.J. June 6, 2014) (quoting *In Re Magnesium Oxide Antitrust Litig.*, No. 10-5943, 2011 WL 5008090, at *8 (D.N.J. Oct. 20, 2011) ).

Here, Plaintiffs bring claims for fraud, fraudulent concealment, fraud in the inducement. and unjust enrichment/ quasicontract (Compl. ¶¶ 219-64) on behalf of themselves and a nationwide class of:

> [a]ll persons or entities in the United States and its territories who purchased one or more Duraspine Turf fields for their own use and not for resale. Excluded from the Class are FieldTurf, or its affiliates, subsidiaries, agents, board members, directors, officers, and/or employees. Also excluded from the Class are authorized Duraspine Turf field installers.

(Comp. ¶ 191.)

In addition, Plaintiffs seek to bring claims for breach of express warranty, breach of implied warranties, and breach of various consumer protection laws and to represent state classes defined as: "[a]ll persons or entities who purchased one or more Duraspine Turf fields for their own use and not for resale within [a specific state] or who purchased one or more Duraspine Turf fields for their own use and not for resale and reside in [a specific state]." (*Id.* ¶ 192.)

FieldTurf argues that Plaintiffs lack standing to bring claims under the laws of states in which they do not reside, no fields are located, and no injuries are alleged to have occurred. (FT's Moving Br. 11-13.) Plaintiffs counter that they undisputedly possess Article III standing and that FieldTurf actually challenges whether Plaintiffs can represent absent class members—a question to be addressed in the Rule 23 class certification analysis, not on a motion to dismiss. (Pls.' Opp'n Br. 7-11.) Further, Plaintiffs note that FieldTurf clearly sold its products throughout the country and if Plaintiffs here can recover on their claims, many customers in other states can also recover under similar laws. (*Id.* at 7.) On reply, FieldTurf notes that the state classes are defined as "[a]ll persons or entities who purchased one or more Duraspine Turf fields ... within [the State] or who purchased one or more Duraspine Turf fields ... and reside in [the State]" and Plaintiffs are not members of the forty-three state classes at issue and, therefore, those classes can never be certified. (FieldTurf's Reply Br. ("FT's Reply Br.") 1-2, ECF No. 112). FieldTurf asserts that the case law Plaintiffs offer in opposition is inapplicable, because those cases involve plaintiffs that purport to represent and *be a member* of a single class involving claims under many states' laws. (*Id.* at 3.)

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 183 of 535
PageID: 32130

In re FieldTurf Artificial Turf Marketing and Sales Practices..., Not Reported in Fed....
2018 WL 4188459, 96 UCC Rep.Serv.2d 790

**\*8** The Court defers consideration of standing to pursue claims on behalf of absent class members of the nationwide class and deems the inquiry premature and more appropriate for the class certification analysis. The Court agrees with the rationale of one contingent of courts, that "the fact that the named Plaintiffs may not have individual standing to allege violations of consumer protection laws in states other than those in which they [were injured] is immaterial." because "[t]he issue ... is one of predominance[—]whether questions of law or fact common to class members predominate over any questions affecting only individual members." *Ramirez v. STI Prepaid LLC*, 644 F.Supp.2d 496, 505 (D.N.J. Mar. 18, 2009) (citing Fed. R. Civ. P. 23 (b) (3) ); *In re Liquid Aluminum Sulfate Antitrust Litig*, No. 16-md-2687, 2017 WL 3131977, at \*28, 2017 U.S. Dist. LEXIS 115294, at \*83-84 (D.N.J. July 20. 2017). Here, the question of whether Plaintiffs have standing to bring claims for violations of laws of other states only arises if the Court certifies the nationwide class. Accordingly, FieldTurf's motion to dismiss claims brought on behalf of the nationwide class is denied on this ground.

From the face of the Complaint, however, the named plaintiffs cannot represent any putative state subclasses of which they are not a member. Additionally, FieldTurf is correct in its assessment that the case law Plaintiffs offer involves plaintiffs that purport to represent and *be a member* of a single class involving claims under many states' laws. Accordingly, FieldTurf's motion to dismiss the state subclasses of which no Plaintiff is a member (*i.e.*, other than the New York, New Jersey, Pennsylvania, and California subclasses) is granted without prejudice and Plaintiffs are granted leave to amend.

## B. Consumer Protection Claims

FieldTurf asserts that the NJ Plaintiffs, NY Plaintiff, and CA Plaintiffs do not adequately allege state consumer fraud claims because they are insufficiently pled or barred by the statute of limitations. (FT's Moving Br. 13.) The Court will examine each, in turn.

### 1. NJ Plaintiffs' Claims Under the New Jersey Consumer Fraud Act ("NJCFA")

To state a claim under the NJCFA, a plaintiff must allege three elements: (1) the defendant's unlawful conduct;[8] (2) the plaintiff's ascertainable loss; and (3) a causal relationship between the two. *Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co.*, 192 N.J. 372, 389, 929 A.2d 1076 (N.J. 2007); *Frederico v. Home Depot*, 507 F.3d 188, 202 (3d Cir. 2007). There are three general categories of unlawful conduct: affirmative acts, knowing omissions, and violation of regulations promulgated under N.J. Stat. Ann. § 56:8-2, 56:8-4. *Harnish v. Widener Univ. Sch. of Law*, 931 F.Supp.2d 641, 648 (D.N.J. 2013) (citing *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 647 A.2d 454, 462 (N.J. 1994) ). Finally, when bringing an NJCFA claim, plaintiffs must meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b). *Castro v. Sovran Self Storage, Inc.*, 114 F.Supp.3d 204. 219 n.12 (D.N.J. 2015); Fed. R. Civ. P. 9(b). "To satisfy this standard, the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Frederico*, 507 F.3d at 200 (citing *Lum v. Bank of Am.*, 361 F.3d 217, 223-34 (3d Cir. 2004) ).

### a. Applicability of the NJCFA

First, FieldTurf argues that the NJ Plaintiffs cannot invoke the protections of the NJCFA because they are not "consumers" and the purchased fields are not "merchandise." (FT's Moving Br. 14.) FieldTurf states that the NJCFA does not apply to "transactions involving sophisticated institutional buyers of products that are not sold to the general public and are subject to individualized specifications and negotiations' " and the fields at issue here are worth hundreds of thousands of dollars and sold to a small group of sophisticated customers. (FT's Moving Br. 14-15.) Despite Plaintiffs' assertion that the Court's analysis turns on whether the fields were sold to the public at large, FieldTurf asserts that the Complaint fails to make this allegation and instead alleges that specialized products were sold to "municipalities, school districts, universities, and athletic organizations." (FT's Reply Br. 112 (quoting Compl. ¶ 259).) Plaintiffs in opposition assert that: (i) the NJCFA is broadly construed and protective; (ii) the NJCFA can apply to expensive products purchased by knowledgeable buyers; and (in) the proper inquiry for the Court is whether a product at issue was sold to the public at large. (Pls.' Opp'n Br. 12-14.)

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 184 of 535
PageID: 32131
In re FieldTurf Artificial Turf Marketing and Sales Practices..., Not Reported in Fed....
2018 WL 4188459, 96 UCC Rep.Serv.2d 790

**\*9** The Court finds that FieldTurf has not carried its burden to demonstrate that based on the Complaint's allegations, the NJCFA does not apply to the sale of the fields. In support of its argument, FieldTurf cites cases involving products that, based on the facts as pled, appear unlike the fields at issue. (*See* FT's Moving Br. 14-15 (citing *Boc Grp. v. Lummus Crest,* 251 N.J.Super. 271, 597 A.2d 1109, 1109-10 (N.J. Super. Ct. Law Div. 1990)* (case regarding "the design, engineering and operation of a plant in Texas intended to manufacture needle coke, which is used to produce graphite electrodes"); *Khan v. Conventus Inter-Ins. Exch,* 440 N.J.Super. 372, 113 A.3d 803, 806 (N.J. Super. Ct. Law Div. 2013)* (medical malpractice insurance); *Centrum Fin. Servs., Inc. v. Chicago Title Ins. Co.,* No. 09-3300, 2010 WL 936201, at \*4 (D.N.J. Mar. 12, 2010)* (title insurance policy); *Princeton Healthcare Sys. v. Netsmart N.Y., Inc.,* 422 N.J.Super. 467, 29 A.3d 361, 365 (N.J. Super. Ct. App. Div. 2011)* ("complex computer system"). Here, the NJ Plaintiffs are public entities—a school district, borough, and county (Compl. ¶¶ 23, 25, 29)—and there is an inherently public undertone to these transactions. Plaintiffs allege that "[b]ecause so many of these consumers were public and/or taxpayer funded entities, FieldTurf's wrongful acts directly impacted the public interest in honest dealings with such consumers and in ensuring that public funds and taxpayer dollars are not wasted on defective, inferior, fraudulent goods." (*Id.* ¶ 178; *see also id.* ¶ 138 (alleging the fields were "far from the 'premium' product FieldTurf marketed ... and. in many instances, taxpayers, paid for.").) Accordingly, the Court declines to bar the NJ Plaintiffs' NJCFA claims on this basis and as a matter of law at this stage of the proceedings. The Court, therefore, denies FieldTurf's motion to dismiss the NJ Plaintiffs' NJCFA claims on this ground.

### b. "Ascertainable Loss"

Second, FieldTurf claims that the NJ Plaintiffs have not alleged an "ascertainable loss." (FT's Moving Br. 16.) FieldTurf asserts that an alleged defect covered by an express warranty cannot constitute an ascertainable loss under the NJCFA and instead, a plaintiff must seek redress under the warranty. (*Id.* at 16-17.) According to FieldTurf, Plaintiffs fail to allege any defect that is not covered by FieldTurf's warranty. (*Id.* at 17.) Plaintiffs, however, assert that a written warranty does not bar the Finding of ascertainable loss under the NJCFA. (Pls.' Opp'n Br. 16.) Plaintiffs assert that an ascertainable loss is simply receiving less than what was

promised, which was the case here where the fields did not conform to FieldTurf's representations. (*Id.*) Further, Plaintiffs contend that a breach of warranty claim does not preclude an NJCFA claim if it is brought in the alternative, when the warranty is allegedly ineffective. (*Id.*) FieldTurf, on reply, asserts that Plaintiffs cite authority standing for the proposition that an NJCFA claim can only arise where the alleged breach of warranty is unconscionable and the NJ Plaintiffs' allegations that FieldTurf unreasonably delayed responding to warranty claims or denied a claim does not rise to unconscionability. (FT's Reply Br. 5-6.)

Generally, an ascertainable loss under the NJCFA: (i) "is one that is quantifiable or measurable, not hypothetical or illusory." *Annecharico v. Raymour & Flanigan,* No. 16-1652, 2016 WL 7015615, at \*7 (D.N.J. Nov. 30, 2016)* (internal quotation marks and citations omitted) (citing *D'Agostino v. Maldonado,* 216 N.J. 168, 78 A.3d 527, 537 (N.J. 2013)* ); and (ii) "occurs when a consumer receives less than what was promised." *Dzielak v. Whirlpool Corp.,* 26 F.Supp.3d 304, 335 (D.N.J. 2014)* (quotations omitted) (citing *Union Ink Co., Inc. v. AT&T Corp.,* 352 N.J.Super. 617, 801 A.2d 361, 379 (N.J. Super. Ct. App. Div. 2002)* ).

Here, the Court finds that FieldTurf has failed to carry its burden to demonstrate that Plaintiffs failed to allege ascertainable loss. FieldTurf relies heavily on an unreported case from this district, *Glass v. BMW of North Am., LLC,* 2011 WL 6887721,* which interpreted a Supreme Court of New Jersey decision, *Thiedemann v. Mercedes-Benz USA, LLC,* 183 N.J. 234, 872 A.2d 783 (N.J. 2005).* *Thiedemann* states that "defects that arise and are addressed by warranty, *at no cost to the consumer,* do not provide the predicate 'loss' that the [NJ]CFA expressly requires[.]" *Id. at 794* (emphasis added). The *Thiedemann* plaintiffs' "problems caused by the defective sensors did not result in any out-of-pocket monetary loss[, a]ll repairs were performed by defendant under warranty, at no cost to [plaintiffs], and the loaner vehicles were provided during periods when [their] car was being repaired." *Id.* Moreover, the New Jersey Supreme Court has described *Thiedemann* using language suggesting that cost to the consumer is a factor in the determination of ascertainable loss. *Bosland v. Warnock Dodge, Inc.,* 197 N.J. 543, 964 A.2d 741, 750 (N.J. 2009)*

In re FieldTurf Artificial Turf Marketing and Sales Practices..., Not Reported in Fed....
2018 WL 4188459, 96 UCC Rep.Serv.2d 790

(citing *Thiedemann*, 872 A.2d at 794) ) ("We have held that a consumer who had repairs to a vehicle performed under warranty at no cost did not sustain such a loss.")

**\*10** In this case, each of the NJ Plaintiffs alleges it spent thousands of dollars in connection with repair and/or replacement of its fields. (Compl. ¶¶ 161, 163, 169.) Finally, Plaintiffs assert their warranty claims in the alternative. (Compl. 81 n.9.) Accordingly, for the purpose of this motion, the Court finds Plaintiffs' allegations of ascertainable loss sufficient. *See Miller v. Chrysler Grp. LLC*, No. 12-760, 2014 WL 12617598, at \*7, 2014 U.S. Dist. LEXIS 90314, at \*21-22 (quoting *Thiedemann*, 872 A.2d at 792) (noting that the New Jersey Supreme Court has held that "either out-of-pocket loss or a demonstration of loss in value will suffice" to create an issue of fact related to ascertainable loss and finding allegations sufficient to withstand a motion to dismiss).

### c. Hudson's NJCFA Claim

Finally, FieldTurf alleges that Hudson has not sufficiently alleged: (i) "unlawful conduct" pursuant to Rule 9(b) and, instead, asserts " 'generic and conclusory boilerplate allegations" without mention of the date, time or place of the misrepresentation or the persons involved (FT's Moving Br. 17-18, FT's Reply Br. 6); and (ii) a causal connection between a misrepresentation and the alleged loss, as misrepresentations made to the public and not to a plaintiff re insufficient (FT's Moving Br. 18-19, FT's Reply Br. 6). Plaintiffs contend that FieldTurf is sufficiently on notice of the unlawful conduct at issue because it sued TenCate regarding defects, its experts testified to such defects, and FieldTurf's executives knew that the company was misleading customers and, consequently, that FieldTurf was exposed to fraud claims. (Pls.' Opp'n Br. 17.) Plaintiffs assert that they have identified the who, what and when of the fraud: FieldTurf, its multitude of misrepresentations and omissions about the Duraspine Turf, and the date of Hudson's purchase of the fields. (*Id.* at 18.) Plaintiffs further claim that Hudson has adequately alleged that it would not have purchased or would have paid a lower price for the fields had it known the truth about the product. (*Id.*)

To satisfy Rule 9(b), "a plaintiff must plead or allege the date, time and place of the alleged fraud *or otherwise inject precision or some measure of substantiation into a* fraud allegation." *Frederico*, 507 F.3d at 200 (emphasis added). The Court declines to "require specificity just for specificity's sake" and finds that, given the highly unusual nature of the facts of this case, which, as pled in the Complaint, involve FieldTurf's own lawsuit against its manufacturer and an extensive media investigation. FieldTurf is sufficiently on notice of the misconduct alleged. *Smajlaj v. Campbell Soup Co.*, 782 F.Supp.2d 84, 104 (D.N.J. 2011). Here, Plaintiffs allege that Hudson made its purchases based partially " 'on FieldTurf's representations to the market throughout the 2007-2009 period that the fields had superior materials and design such that they had greater durability and resistance to wear, matting, and UV than competing products and a useful lifespan of more than 10 years." (Compl. ¶ 86.) Additionally, "Mr. DiPiazza served as FieldTurf's representative to Hudson in the sales process and thereafter." (*Id.*) Read in conjunction with the numerous allegations in the Complaint that detail FieldTurf's national marketing campaign (*see generally id.* ¶¶ 60-71), the Court finds that Hudson has adequately alleged a misrepresentation.

Finally, the Court finds that Hudson has adequately alleged causation. *See, e.g., Ramirez v. STi Prepaid LLC*, 644 F.Supp.2d 496, 501 (D.N.J. 2009) (finding adequate allegations that plaintiffs would not have purchased the items at issue if truth was disclosed). Plaintiffs allege that Hudson based its decision to purchase the fields "in part on FieldTurf's representations that the fields had superior materials and design such that they had greater durability and resistance to wear, matting, and UV than competing products and a useful lifespan of more than 10 years" and "claimed comparative cost savings of Duraspine Turf fields." (Compl. ¶ 25.) Plaintiffs further allege that at the time of purchase, Hudson did not know the fields did not live up to these representations and Hudson would not have purchased the Duraspine Turf fields, or would have paid less for them, had it known that the fields were defective and did not have the qualities and lifespan represented. (*Id.*) The Court finds that Hudson has adequately raised its fraud allegation here, and FieldTurf's motion to dismiss on this ground is denied.

### 2. Levittown's Claims for Consumer Protection and False Advertising Under New York General Business Law Sections 349 and 350

In re FieldTurf Artificial Turf Marketing and Sales Practices..., Not Reported in Fed....
2018 WL 4188459, 96 UCC Rep.Serv.2d 790

*11 New York General Business Law § 349 and § 350 prohibit "deceptive acts or practices" and "false advertising" in the conduct of any business, trade or commerce or in the furnishing of any service in New York state. *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 124 (2d Cir. 2017) (quoting N.Y. Gen. Bus. Law § 349(a) ); *4 K & D Corp. v. Concierge Auctions, LLC, 2* F.Supp.3d 525, 547 (S.D.N.Y. 2014) (quoting N.Y. Gen. Bus. Law § 350). "To successfully assert a claim under either section, 'a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice.' " *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015) (quoting *Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, 944 N.Y.S.2d 452, 967 N.E.2d 675, 675 (N.Y. 2012) ) (internal quotation marks omitted).

### a. Statute of Limitations

FieldTurf asserts that: (i) even if plaintiffs allege fraud, a three-year statute of limitations applies and began to run on the date of the alleged injury, which can be no later than the 2008 sale of allegedly defective goods (FT's Moving Br. 20; FT's Reply Br. 7); and (ii) Levittown has not pled allegations sufficient to toll the limitations period based on equitable estoppel because (a) merely pleading that a defendant failed to disclose the wrong is insufficient (FT's Moving Br. 20-21) and (b) Levittown does not and cannot allege due diligence in pursuing its suit or FieldTurf's acts that prevented it from filing suit (FT's Reply Br. 8). In opposition, Plaintiffs assert that Levittown's claims are timely because: (i) a six-year statute of limitations applies to fraud claims (Pls.' Opp'n Br. 19); (ii) Levittown's claims accrued in 2016 when the fields failed because a claim premised on misrepresentations regarding future performance does not accrue until such performance fails (*id.* at 20); and (iii) FieldTurf's active concealment before and after the sale tolled the limitations period because Levittown was induced by fraud, misrepresentations or deception to refrain from timely filing an action (*id.* at 21).

### i. Accrual of the Claims

A statute of limitations defense may "be raised by a motion under Rule 12(b)(6). but only if 'the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations.' " *Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir. 2002) (quoting *Hanna v. U.S. Veterans' Admin. Hosp.*, 514 F.2d 1092, 1094 (3d Cir. 1975) ). "If the bar is not apparent on the face of the complaint, then it may not afford the basis for a dismissal of the complaint under Rule 12(b)(6)." *Id.* (quoting *Bethel v. Jendoco Constr. Corp.*, 570 F.2d 1168, 1174 (3d Cir. 1978) ). Here, the Court finds that based on the facts pled and briefing provided, Plaintiffs present at least a colorable argument based on the language of a New York Court of Appeals decision that Levittown's injury could have occurred in 2016 when it determined its fields needed to be replaced. *See Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 944 N.Y.S.2d 732, 967 N.E.2d 1177, 1185 (N.Y. 2012) (quoting *Gaidon v. Guardian Life Ins. Co. of Am.*, 96 N.Y.2d 201, 211, 727 N.Y.S.2d 30, 750 N.E.2d 1078 (N.Y. 2001) ). The Court acknowledges that FieldTurf provided case law from New York federal district courts in support of its contention; however, because Plaintiffs' argument is at least plausibly valid, the Court finds that FieldTurf has not carried its burden to demonstrate that Levittown's claim is barred as a matter of law, as "the bar is not apparent on the face of the complaint." *Robinson*, 313 F.3d at 135.

### ii. Equitable Estoppel

*12 Equitable estoppel prevents a defendant from asserting a statute of limitations defense " 'where it is the defendant's affirmative wrongdoing ... which produced the long delay between the accrual of the cause of action and the institution of the legal proceeding.' " *Putter v. N. Shore Univ. Hosp.*, 7 N.Y.3d 548, 825 N.Y.S.2d 435, 858 N.E.2d 1140, 1142 (N.Y. 2006) (quoting *Zumpano v. Quinn*, 6 N.Y.3d 666, 816 N.Y.S.2d 703, 849 N.E.2d 926. 929 (N.Y. 2006). "A plaintiff seeking to apply the doctrine of equitable estoppel must 'establish that subsequent and specific actions by defendants somehow kept [it] from timely bringing suit.' " *Id.* "Equitable estoppel is appropriate where the plaintiff is prevented from filing an action within the applicable statute of limitations due to his or her reasonable reliance on deception, fraud or misrepresentations by the defendant." *Id.* Here, in light of the significant facts pled that allege an overarching "deny-and-delay" scheme (*see generally* Compl. ¶¶ 146-78),

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 187 of 535
PageID: 32134
In re FieldTurf Artificial Turf Marketing and Sales Practices..., Not Reported in Fed....
2018 WL 4188459, 96 UCC Rep.Serv.2d 790

the Court declines to find that Levittown has failed to plead specific misrepresentations made that prevented it from filing suit and is entitled to some discovery on this issue. Further consideration of this issue may be appropriately requested at a later stage of the proceedings.

### b. Sufficiency of the Pleadings

FieldTurf asserts that because it sold the fields to only business entities, both § 349 and § 350 do not apply unless plaintiffs show that the same activity was also directed at non-business consumers. (FT's Moving Br. 21.) FieldTurf characterizes its sale to Levittown as a "private transaction" without "ramifications for the public at large." (FT's Reply Br. 8.) According to FieldTurf, to allege consumer-oriented conduct, Plaintiffs must state that the deceptive acts are standardized and not rooted in a private dispute with individualized allegations. (Id.) FieldTurf: (i) characterizes Levittown as a sophisticated entity; and (ii) claims that Levittown does not allege that individual consumers were harmed, that it was treated similar to FieldTurf's nonbusiness customers, or that the public interest is implicated here. (FT's Moving Br. 22; FT's Reply Br. 8.)

Plaintiffs claim that their allegations as to Levittown are sufficient because the critical question is whether the matter affects the public interest in New York, and a municipality can bring a claim under the statutes at issue. (Pls.' Opp'n Br. 22.) Further, even if Levittown was a "business entity." Plaintiffs argue that a business entity may sue if the deceptive practices possibly affected similarly situated customers or the public interest; pleading a widespread or standardized practice is not required. (Id. at 23.)

For similar reasons as stated in Section III.B.1.a., the Court finds that FieldTurf has not met its burden to show that Levittown, on these facts, is a business entity for the purposes of § 349 and § 350, and accordingly, Levittown may not be required to plead the additional facts FieldTurf claims are necessary. FieldTurf asserts that Levittown: (i) is a school district serving five regions and multiple schools; (ii) purchased its fields for two high schools; (iii) alleged that the cost to replace the fields would be $2 million; and (iv) the parties engaged in a formal bidding process. (FT's Moving Br. 22.) These facts, allowing all favorable inferences to the Plaintiffs, actually make Levittown appear to be different than a business.

Moreover, even if Levittown is considered to be a business, while "courts have stated consistently that unique private transactions between sophisticated business parties do not give rise to liability under the statute[,]" a business may bring a claim under the statute "if it is harmed by consumer-oriented conduct." *Spirit Locker, Inc. v. EVO Direct, LLC,* 696 F.Supp.2d 296, 301-02 (E.D.N.Y. 2010). Courts have construed the term "consumer-oriented conduct" liberally.

*New York v. Feldman,* 210 F.Supp.2d 294, 301 (S.D.N.Y. 2002). "A defendant engages in 'consumer-oriented' activity if his actions cause any 'consumer injury or harm to the public interest.' " *Id.* (quoting *Securitron Magnalock Corp. v. Schnabolk,* 65 F.3d 256, 264 (2d Cir. 1995) ). "The 'critical question,' then, 'is whether the matter affects the public interest in New York, not whether the suit is brought by a consumer ....' " *Id.* (quoting *Schnabolk,* 65 F.3d at 264) (alterations in original). Accordingly, at this stage, because Plaintiffs have plausibly alleged that Levittown is different from a business entity and that the matter affects the public interest (*see* Compl. ¶ 26 ("Levittown ... is a school district ..."); ¶ 138 (alleging the fields were "far From the 'premium' product FieldTurf marketed ... and. in many instances, taxpayers, paid for."); ¶ 146a (describing effects on games and practices); ¶ 178 (alleging that "many of those consumers were public and/or taxpayer funded entities" and "FieldTurf's wrongful acts directly impacted the public interest in honest dealing with such consumer and in ensuring that public funds and taxpayer dollars are not wasted on defective, inferior, and fraudulent goods.") ), the Court declines to dismiss Levittown's claims pursuant to § 349 and § 350 at this time.

### 3. CA Plaintiffs' False Advertising Claims and Unlawful, Unfair, or Fraudulent Business Acts Claims

#### a. Statute of Limitations

**\*13** FieldTurf asserts that the CA Plaintiffs' false advertising claims are subject to a three-year statute of limitations that runs from the dates the fields were purchased in 2006, 2007, and 2011. (FT's Moving Br. 23.) Specifically, FieldTurf claims that Santa Ynez and Fremont alleged discovery in 2011, and Santa Ynez was told about FieldTurf's pending litigation during that same year, and had knowledge of enough facts to have filed a claim. (FT's Reply Br. 9.) The CA

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 188 of 535
PageID: 32135
In re FieldTurf Artificial Turf Marketing and Sales Practices..., Not Reported in Fed....

2018 WL 4188459, 96 UCC Rep.Serv.2d 790

Plaintiffs did not, according to FieldTurf, toll the statute of limitations because they failed to allege required facts regarding the time and manner of discovery of the problem and their inability to uncover the issue, despite due diligence, before the date of discovery. (FT's Moving Br. 23-24.) As to the unfair competition law claims, FieldTurf asserts that a four-year statute of limitations governs and began to run on the date the cause of action accrued, which was on the dates of purchase, not on the dates of discovery. (*Id.* at 24-25.)

Plaintiffs, in opposition, assert that either the discovery rule or fraudulent concealment tolls the statute of limitations for all the CA Plaintiffs' claims. (Pls.' Opp'n Br. 24.) As an initial matter, Plaintiffs note that FieldTurf acknowledges that the discovery rule applies to Plaintiffs' false advertising claims and the CA Plaintiffs' Unfair Competition Law claims can be equitably tolled by the discovery rule as well, as FieldTurf relies on a case that is no longer good law. (*Id.* at 24-25.) Second, Plaintiffs argue that the discovery rule operates here because "as a result of FieldTurf's continuing course of lies," Plaintiffs did not realize that the breakdown in their fields were due to known defects until 2016. ( *Id.*) Third, Plaintiffs argue they have pled fraudulent concealment because they pled when and the circumstances under which the fraud was discovered, and that the CA Plaintiffs were not at fault for their failure to discover the fraud or had no knowledge of the facts. (*Id.* at 26.) Finally, Plaintiffs argue that FieldTurf is estopped from asserting a statute of limitations defense as a result of misrepresentations and concealment before and after the sale. (*Id.* at 27.)

### i. Discovery Rule

"In California, the discovery rule postpones accrual of a claim until the plaintiff discovers, or has reason to discover, the cause of action." *Plumlee v. Pfizer, Inc.*, No. 13-414, 2014 WL 695024, at *8 (N.D. Cal. Feb. 21, 2014) (quoting *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1024 (9th Cir. 2008) ) (internal quotations omitted). "A plaintiff whose complaint shows on its face that his claim would be barred without the benefit of the discovery rule must specifically plead facts to show (1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence." *Id.* (quoting *E-Fob, Inc. v. Accountants, Inc. Servs.*, 153 Cal. App. 4th 1308, 1319, 64 Cal.Rptr.3d 9 (Cal. Ct. App. 2007) ) (internal quotations

and citation omitted); *see also* *Clemens*, 534 F.3d at 1024 (quoting *Bedolla v. Logan & Frazier*, 52 Cal. App. 3d 118, 129, 125 Cal.Rptr. 59 (Cal. Ct. App. 1975) ) ("A plaintiff must affirmatively excuse his failure to discover the fraud ... by showing that he was not negligent in failing to make the discovery sooner and that he had no actual or presumptive knowledge of facts sufficient to put him on inquiry.").

Here, the parties agree that the discovery rule applies to False Advertising Law claims but disagree as to whether it also applies to Unfair Competition Law claims. The Court finds that Plaintiffs have raised sufficient argument that the California Supreme Court applies the discovery rule to the Unfair Competition Law and the case that FieldTurf relies upon has been characterized by other California courts as incorrect. *See* *Plumlee*, 2014 WL 695024, at *8 (citing *Yumid v. Smart Balance, Inc.*, 733 F.Supp.2d 1117, 1131 (C.D. Cal. 2010) and *Aryeh v. Canon Bus. Solutions, Inc.*, 55 Cal. 4th 1185, 1196, 151 Cal.Rptr.3d 827, 292 P.3d 871 (Cal. 2013) ). FieldTurf fails to adequately rebut this argument on reply, merely stating that Plaintiffs have not cited a case where the statute of limitations is tolled by the discovery rule. (FT's Reply Br. 9.) The Court finds that FieldTurf has not carried its burden to demonstrate that the discovery rule does not apply.

**\*14** Viewing the facts pled most favorably to Plaintiffs, the Court finds that the application of the discovery rule has been adequately pled. Plaintiffs allege the time and manner of discovery. (*See, e.g.*, Compl. ¶ 206 ("Indeed, it took NJ Advance Media six months of in-depth investigation, analyzing 5,000 pages of production from 40 document requests, interviewing dozens of coaches, officials, and current and former FieldTurf employees, examining 50 fields in New Jersey, and commissioning the services of an independent testing laboratory, the University of Michigan's Breaker Space Lab. to test turf fibers from three different Duraspine Turf fields in New Jersey to even begin to uncover the breadth of FieldTurf's fraudulent scheme."); ¶ 209 ("Plaintiffs and Class members had no realistic ability to discover the omissions or fraudulent nature of the misrepresentations until at least December 2016, when NJ Advance Media published the results of its investigation.").)

Plaintiffs also allege that the CA Plaintiffs could not have discovered the facts earlier, despite reasonable diligence. (*See, e.g., id.* ¶ 203 ("Plaintiff[s] and class members had no way of knowing about the defects in Duraspine Turf

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 189 of 535
PageID: 32136
In re FieldTurf Artificial Turf Marketing and Sales Practices..., Not Reported in Fed....
2018 WL 4188459, 96 UCC Rep.Serv.2d 790

and the other information concealed by FieldTurf. FieldTurf systematically lied to Plaintiff[s] and Class Members concerning the qualities of Duraspine Turf. When problems were discovered, FieldTurf claimed there was no defect, and provided other reasons for the rapid deterioration in FieldTurf's products, like poor maintenance. In addition, FieldTurf advised Plaintiff[s] and Class Members that over time, the problems they were experiencing, would diminish."); ¶¶ 164, 170-73, 201-10.) Fremont alleges that despite contacting FieldTurf regarding a field's condition in March 2011 and having FieldTurf representatives inspect the field, FieldTurf " 'denied that the field deterioration was unusual or excessive" and "instead advised Fremont that the field was in normal condition and had enough remaining blades, assuring Fremont that the loss of fiber" was "normal wear and tear." (*Id.* ¶ 164.) Santa Ynez alleges that it knew of its first-installed field's problems and the "pending litigation with the manufacturer of the earlier version of Duraspine used on [its then-]current field;" however, it also alleges that FieldTurf replaced that field in 2012 and represented that the replacement was an improved version that did not suffer from the same issues, when, in fact, the problems remained. (*Id.* ¶¶ 170-73.)

### ii. Fraudulent Concealment & Equitable Estoppel

A plaintiff may toll the statute of limitations under the doctrine of fraudulent concealment by alleging a defendant's "affirmative deceptive conduct," not merely "nondisclosure."

*Yumul v. Smart Balance, Inc.*, 733 F.Supp.2d 1117, 1131 (C.D. Cal. 2010); *see also hauler v.* *Anoufrieva*, 642 F.Supp.2d 1060, 1100 (C.D. Cal. 2008) ("A plaintiff alleging fraudulent concealment must establish that his failure to have notice of his claim was the result of the affirmative conduct by the defendant.") (citation omitted). As to equitable estoppel, " 'four elements must be present in order to apply the doctrine ...: (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury.' " *Honeywell v. Workers' Comp. Appeals Bd.*, 35 Cal. 4th 24, 37, 24 Cal.Rptr.3d 179, 105 P.3d 544 (Cal. 2005) (quoting *City of Long Beach v. Mansell*, 3 Cal. 3d 462, 489, 91 Cal.Rptr. 23, 476 P.2d 423 (Cal. 1970) ).

For similar reasons as discussed above in the section regarding the discovery rule, Plaintiffs have pled fraudulent concealment and equitable estoppel here. (*See, e.g.*, Compl. ¶¶ 164, 170-73, 211, 212 ("FieldTurf knowingly manufactured, marketed, sold, and installed Duraspine Turf fields well after it knew, or had reason to know, the fields were defective in their composition, design, engineering, and installation, and yet FieldTurf never amended or updated its marketing, promotional, or sales material used universally by FieldTurf and provided to Plaintiffs and Class members."), 213-14.)

### b. Santa Ynez's Claim for False Advertising

**\*15** California's false advertising law

> makes it "unlawful for any person.... corporation ..., or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services ... or to induce the public to enter into any obligation relating thereto, to make or disseminate ... before the public in this state, ... in any newspaper or other publication ... or in any other manner or means whatsoever ... any statement, concerning that real or personal property or those services ... which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading ...."

*Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 950, 119 Cal.Rptr.2d 296, 45 P.3d 243 (Cal. 2002) (quoting Cal. Bus. & Prof. Code § 17500).

FieldTurf argues that Santa Ynez cannot bring a claim for false advertising because it does not allege that it viewed any advertising or marketing materials. (FT's Moving Br. 25.) Plaintiffs, in opposition, assert that a plaintiffs actual reliance on a misrepresentation can be inferred, so all that must be alleged is that a misrepresentation was made and that but for the misrepresentation, a plaintiff would not have made a purchase. (Pls.' Opp'n Br. 28.) Here, Plaintiffs allege misrepresentations made to Santa Ynez by a FieldTurf representative. (Compl. ¶ 81 ("Likewise, in the Fall of 2005, FieldTurf's Regional Sales Representative, Tim Coury, told Santa Ynez's Athletic Director, Ken Fredrickson, that the Duraspine Turf product had a useful life of 10+ years, and would last beyond the eight year warranty period, discussed below.").) The Complaint, however, also alleges that "[t]he

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 190 of 535
PageID: 32137

In re FieldTurf Artificial Turf Marketing and Sales Practices..., Not Reported in Fed....
2018 WL 4188459, 96 UCC Rep.Serv.2d 790

'10 Reasons Why' document was part of a national marketing campaign *distributed to all potential customers*. FieldTurf specifically intended for customers to rely on the information in the document, as well as information in its other sales and marketing materials." (*Id.* ¶ 68) (emphasis added). Construing the Complaint on a motion to dismiss and on these unique facts, the Court finds that Santa Ynez has sufficiently pled a claim for false advertising and declines to dismiss the claim.

### C. New Jersey, New York, and Pennsylvania Fraudulent Concealment, Fraud, and Fraud in the Inducement Claims

FieldTurf argues that the NJ, NY, and PA Plaintiffs have failed to adequately allege a duty to disclose under state common law. requiring dismissal of the fraudulent concealment claims, as well as the fraud and fraud in the inducement claims to the extent that they are premised on an omission. (FT's Moving Br. 26, 28.) FieldTurf asserts that Plaintiffs failed to allege the type of relationship between the parties that would create a duty of disclosure. ( *Id.* at 27, 24 Cal.Rptr.3d 179, 105 P.3d 544.)

### 1. New Jersey

Under New Jersey law, "where a claim for fraud is based on silence or concealment, New Jersey courts will not imply a duty to disclose, *unless such disclosure is necessary to make a previous statement true* or the parties share a 'special relationship.' " *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1185 (3d Cir. 1993) (citing *Berman v. Gurwics*, 189 N.J.Super. 89, 458 A.2d 1311, 1313 (N.J. Super. Ct. Chan. Div. 1981) ) (emphasis added). FieldTurf argues that: (i) Plaintiffs have not alleged any facts suggesting a special relationship exists (FT's Moving Br. 28); and (ii) in opposition, Plaintiffs admit that they base their claims on affirmative misrepresentations which, unlike partial disclosures, do not result in a duty to disclose (FT's Reply Br. 11-12). Plaintiffs assert that New Jersey law imposes a duty to disclose when such disclosure is required to make an earlier statement true. (Pls.' Opp'n Br. 30-31.)

**\*16** The Court finds that FieldTurf has not carried its burden to show that there is no duty to disclose on these facts. The Court does not agree with FieldTurf's conclusion that Plaintiffs conceded that their claims rest solely on misrepresentations. In addition to highlighting various alleged misrepresentations, Plaintiffs' opposition points to allegations that Plaintiffs claim to be omissions. (Pls.' Opp'n Br. 29 (citing Compl. ¶ 120 ("FieldTurf did not revise its sales and marketing claims, let alone pull the Duraspine Turf products from the market or tell any customers that the fields 'cannot possibly technically' meet FieldTurf's claims ...."), ¶ 234 ("Defendants fraudulently concealed and suppressed material facts regarding the defective Duraspine Turf fields. Despite advertising these products as having a 10-plus-year lifespan, Defendant knew when it marketed, sold, and installed the fields that Duraspine Turf fields were inferior in composition and design and did not have the superior qualities of UV and wear resistance and fiber memory Defendants represented, nor the lifespan Defendants claimed. Defendants failed to disclose these facts to consumers at the time they marketed, sold, and installed the fields.").) FieldTurf cites to a case from the District of New Jersey on reply that, according to FieldTurf, implicitly holds that a manufacturer's statement that cars would be defect-free constitutes an affirmative misrepresentation, not a partial disclosure, and does not create a duty to disclose. (*See id.* 11-12.) On a motion to dismiss under these distinguishable, unique facts in the present matter, the Court declines to adopt FieldTurf's position at this time.

### 2. New York and Pennsylvania

In the context of a fraudulent concealment claim under New York law, "the duty to disclose arises where a party, with a duty to be complete, has made only a partial or ambiguous statement, or 'where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.' " *TVT Records v. Island Def Jam Music Grp.*, 412 F.3d 82, 91 (2d Cir. 2005) (quoting *Brass v. Am. Film Tech., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993) ). Under Pennsylvania law, "[a]bsent a duty to speak or disclose, the concealment of certain facts cannot constitute fraud." *Protica, Inc. v. iSatori Techs., LLC*, No. 11-1105, 2012 WL 1071223, at \*5 (E.D. Pa. Mar. 29, 2012) (citing *WP 851 Assocs., L.P. v. Wachovia Bank, N.A.*, No. 07-2374, 2008 WL 114992, at \*6 (E.D. Pa. Jan. 11, 2008). "[A] duty to disclose does not typically arise unless there is a confidential or fiduciary relationship between the parties.' " *Id.* Such a confidential or fiduciary relationship arises in certain situations, such as:

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 191 of 535
PageID: 32138

In re FieldTurf Artificial Turf Marketing and Sales Practices..., Not Reported in Fed....
2018 WL 4188459, 96 UCC Rep.Serv.2d 790

where there is an agreement between the parties; as a result of one party's reliance on the other's representations, *if one party is the only source of information to the other party or the problems are not discoverable by other reasonable means; when disclosure is necessary to prevent an ambiguous or partial statement from being misleading*; where subsequently acquired knowledge makes a previous representation false; or *where the undisclosed fact is basic to the transaction*.

*Bucci v. Wachovia Bank, N.A.*, 591 F.Supp.2d 773, 783 (E.D. Pa. 2008) (emphasis added) (citation omitted). " 'The duty to speak does not arise where 'both the plaintiff and defendant were sophisticated business entities, entrusted with equal knowledge of the facts.' " *Id.* (quoting *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 612 (3d Cir. 1995) ).

As to Levittown, FieldTurf argues that Levittown: (i) has not alleged any facts to support the existence of a duty, merely the legal conclusion that FieldTurf was under a duty to disclose the nature of the Duraspine fields (FT's Moving Br. 29); and (ii) failed to plead a partial or ambiguous statement or that FieldTurf withheld the essence of the transaction (FT's Reply Br. 12). As to Neshannock, FieldTurf asserts that no allegations suggest a fiduciary, fiduciary-like, or confidential relationship. (FT's Moving Br. 30.) Plaintiffs argue that the Complaint contains ample allegations of FieldTurf's calculated misleading conduct, despite knowing that its representations were false, and "[h]aving spoken (indeed, lied), FieldTurf had a duty to tell the whole truth." (Pls.' Opp'n Br. 32-33.) Plaintiffs reiterate that they are largely towns and schools that relied on FieldTurf 's knowledge regarding the specifications of the Duraspine Turf. Here, the Court finds that both Levittown and Neshannock have alleged an independent duty.

The Court finds that, as to Levittown, Plaintiffs adequately alleged that FieldTurf made partial or ambiguous statements and that FieldTurf possesses "superior knowledge" and

knows that Levittown acted on the basis of mistaken knowledge. (*See, e.g.*, Compl. ¶ 48 (" 'The design and performance of an artificial turf field involves sophisticated engineering and specialized knowledge beyond the ken of the average consumer, be it a school, a recreation department, or an individual small business owner. As a result, purchasers (including Plaintiffs and the Class members here) necessarily rely on the sellers of the fields (including FieldTurf) for complete and accurate information on the quality and expected performance of the fields. Similarly, the average purchaser does not possess the expertise to pick up on signs that a field is degrading prematurely."); ¶ 149 ("Step one in the process was to deny to the existence of any known defect. FieldTurf abused its discretion under the warranties and, relying on its industry expertise, took advantage of Plaintiffs and Class members' inability to detect field failures.").) For similar reasons, the Court finds that Plaintiffs have adequately alleged a duty with respect to Neshannock.

### 3. Hudson's and Neshannock's Fraud Claims

**\*17** As to Hudson, FieldTurf argues that a misrepresentation has not been adequately pled because: (i) there are no allegations that Hudson actually possessed, read or saw marketing or advertising materials; and (ii) relies on conclusory allegations and bases its fraud claim on FieldTurf's "representations to the market" from 2007 to 2009, which is insufficient under Rule 9. (FT's Moving Br. 31-32.) Plaintiffs contend that FieldTurf requests specificity for its own sake and that general allegations of reliance are sufficient. (Pls' Opp'n Br. 33-34.) Based on the reasoning set forth in Section III.B.1.c. denying dismissal of Hudson's NJCFA claim, the Court declines to dismiss Hudson's fraud claim on this ground.

As to Neshannock, FieldTurf argues that the "gist of the action" doctrine bars Neshannock's fraud claims because its breach of contract claim is premised on the same allegations. (FT's Moving Br. 32-33.) The Complaint alleges that in 2015, Neshannock observed deterioration of the field, complained to FieldTurf, FieldTurf repaired the field, and the same issues arose weeks later. (*Id.* at 34, 24 Cal.Rptr.3d 179, 105 P.3d 544.) According to FieldTurf, this claim is grounded in the warranty claim. (*Id.*) Plaintiffs assert that a plaintiff may plead both tort and contract claims, the existence of a contract does not per se bar tort claims, especially here, where Plaintiffs' warranty claims are brought in the alternative

and Plaintiffs assert fraud claims challenging the underlying contracts and warranties. (Pls.' Opp'n Br. 35.)

The gist of the action doctrine "ensure[s] that a party does not bring a tort claim for what is, in actuality, a claim for a breach of contract." *Bruno v. Erie Ins. Co.*, 630 Pa. 79, 99, 106 A.3d 48 (Pa. 2014). The "critical determinative factor in determining whether a claim is a tort or breach of contract claim is 'the nature of the duty alleged to have been breached." *Id. at 112, 106 A.3d 48* (internal quotations and citation omitted). The Court, however, finds that because Neshannock's warranty claims are pled in the alternative, and Plaintiffs specifically brought such claims " 'without waiver of Plaintiffs' claims that any warranty or contract cannot be enforced by the Defendants" (Comp. 81-82 n.9), at the motion to dismiss stage, Neshannock's fraud claims may proceed.

*See, e.g.,* *Mill Run Assocs. v. Locke Prop. Co.*, 282 F.Supp.2d 278, 291-91 (E.D. Pa. 2003) (denying motion to dismiss fraud in the inducement claim where a counterclaim "contains both contract and tort claims, which are pleaded in the alternative[,] [which] is permissible under Federal Rule of Civil Procedure Rule 8(e)."); *see also Turuvekere v. ContinuServe, LLC*, No. 12-5158, 2012 WL 5961957, at *4 (E.D. Pa. Nov. 28, 2012) (quoting *Weber Display & Packaging v. Providence Wash. Ins. Co.*, No. 02-7792, 2003 WL 329141, at *4 (E.D. Pa. Feb. 10, 2013) ) (" 'Courts have cautioned against deciding whether the gist of an action is in contract or tort at the motion to dismiss stage of a proceeding.' ").

## D. Warranty Claims

### 1. NJ Plaintiffs' Claims for Breach of Implied Warranty

FieldTurf argues that the NJ Plaintiffs' claims for breach of the implied warranty of merchantability and fitness for a particular purpose are untimely and inadequately pled. (FT's Moving Br. 35.) FieldTurf asserts that the four-year statute of limitations in New Jersey's Uniform Commercial Code governs the transaction, and the claims accrued on the delivery of the fields. (*Id. at 35, 24 Cal.Rptr.3d 179, 105 P.3d 544.*) The latest an NJ Plaintiff purchased a field was more than six years before Plaintiffs asserted their claims. Additionally, the NJ Plaintiffs, according to FieldTurf, have not pled that they were unable to use the fields for the purpose for which they were purchased, *i.e.*, playing sports. (*Id. at*

36-37, 24 Cal.Rptr.3d 179, 105 P.3d 544.) FieldTurf further claims that Plaintiffs have not pled fraudulent concealment and have not pled that they exercised due diligence in uncovering information that would have permitted them to file suit. (FT's Reply Br. 14.) In opposition, Plaintiffs assert that they have adequately pled equitable tolling of the statute of limitations based on FieldTurf's fraudulent concealment and "deny-and-delay" scheme. (Pls.' Opp'n Br. 35-36.)

### a. Fraudulent Concealment

**\*18** To plead fraudulent concealment that tolls the statute of limitations, a plaintiff must allege " '(1) wrongful concealment by the party raising the statute of limitations defense, resulting in (2) plaintiff's failure to discover the operative facts forming the basis of his cause of action during the limitations period (3) despite the exercise of due diligence.' " *In re Volkswagen Timing Chain Prod Liab. Litig.*, No. 16-2765, 2017 WL 1902160, at *14 (D.N.J. May 8, 2017) (quoting *Dewey v. Volkswagen AG*, 558 F.Supp.2d 505, 523 (D.N.J. 2008) ). The Court finds that each of these elements is adequately pled here. (*See, e.g., id.* ¶ 203 ("Plaintiff[s] and class members had no way of knowing about the defects in Duraspine Turf and the other information concealed by FieldTurf. FieldTurf systematically lied to Plaintiff and Class Members concerning the qualities of Duraspine Turf. When problems were discovered. FieldTurf claimed there was no defect, and provided other reasons for the rapid deterioration in FieldTurf's products, like poor maintenance. In addition, FieldTurf advised Plaintiff and Class Members that over time, the problems they were experiencing, would diminish."); ¶¶ 157-61 (describing three years of delay tactics FieldTurf employed in its dealings with Carteret); ¶¶ 162-63 (describing that Hudson reached out to FieldTurf stating it was "stunned at how rapidly the Fibers had deteriorated" and that "[t]he turf in some areas were worn right down to the fabric backing," but received no response); ¶ 146b (stating that "'[o]n information and belief, from the date of installation through 2016. more than Fifty repairs were required on Newark's Shabazz Field alone"); ¶ 168 (alleging that on August 5, 2015, FieldTurf denied warranty coverage for any future repairs to Newark's Shabazz High and Schools Stadium fields" because sufficient maintenance had not been performed, as Newark had not hired a specific vendor to perform the maintenance); *see also* ¶¶ 201-10.) *See, e.g., In re Volkswagen*, 2017 WL 1902160, at *4 (holding that similar allegations adequately pled fraudulent concealment).

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 193 of 535
PageID: 32140

In re FieldTurf Artificial Turf Marketing and Sales Practices..., Not Reported in Fed....

2018 WL 4188459, 96 UCC Rep.Serv.2d 790

### b. Sufficiency of the Pleadings

"Pursuant to the implied warranty of merchantability, a merchant warrants that goods sold are fit for the ordinary purposes for which the goods are used." *In re Ford Motor Co. E-350 Van Prods. Liab. Litig.*, No. 03-4558, 2008 WL 4126264, at *19 (D.N.J. Sept. 3, 2008) (citing N.J.S.A. § 12A:2-314). FieldTurf claims that the ordinary purpose for which the fields were used was playing sports; however, the NJ Plaintiffs assert that their purpose was more significant. (Pls.' Opp'n Br. 39.)

The Court finds that FieldTurf has not carried its burden to demonstrate that the NJ Plaintiffs have failed to plead claims for breach of the implied warranty. The Court agrees with Plaintiffs that based on the facts pled, Plaintiffs have adequately alleged that the fields failed to serve their ordinary purpose. First, Plaintiffs allege that the fields failed to meet industry standards and deteriorated prematurely. (*See, e.g.*, Compl. ¶ 94 ("In the Spring of 2005, FieldTurf learned of more evidence confirming major problems with the fiber's durability. Bonar Yarns, another FieldTurf supplier, reported that the fiber showed 'poor results' on a standard industry test called the Lisport test, used by FIFA (the world-wide governing body for soccer)."); ¶ 187 ("The Breaker Space Lab tests confirmed the tensile strength of the turf to be well below industry standards, and FieldTurf's own standards."); *see also* ¶¶ 16-20, 145-46, 167-70, 189).) Second, Plaintiffs alleged that they were promised fields not simply for playing sports, but with "endurance, good aesthetics, and low maintenance." (Pls.' Opp'n Br. 39; *see, e.g.*, Compl. ¶ 61 ("In its advertising and marketing of Duraspine Turf fields. FieldTurf showcased high-profile clients (such as NFL teams) and touted its Duraspine Turf fields as being the best fields money could buy."); ¶ 62 ("In 2006, FieldTurf's then-CEO John Gilman claimed in a trade publication that, among other things, his company's 'breakthrough in technology' would 'change the industry,' as Duraspine Turf 'will double the expected useful life' of an artificial turf field."); *see also* ¶¶ 79-80, 86.) Finally, Plaintiffs alleged that the fields failed to meet the expectations. (*See, e.g., id.* ¶¶ 146a, 161, 163, 169.)

### 2. Levittown's Claims for Breach of the Express and Implied Warranty

FieldTurf asserts that Levittown's claims for breach of the express and implied warranty are time barred, as the four-year statute of limitations prescribed by the Uniform Commercial Code began to run from the date of delivery of the fields. (FT's Moving Br. 37.) FieldTurf characterizes the written warranty at issue as a repair and replace warranty, not a warranty of future performance that guarantees a product will function for a certain period. (*Id.* at 37-39, 24 Cal.Rptr.3d 179, 105 P.3d 544.) Plaintiffs assert that, similar to the NJ Plaintiffs, they have properly pled Levittown's fraudulent concealment, resulting in equitable tolling of the statute of limitations. (Pls.' Opp'n Br. 35-36.) Further, Plaintiffs argue that they alleged that FieldTurf made warranties of future performance outside of the written warranty, including that the fields had a lifespan of ten or more years and those claims accrue when the breach was discovered. (*Id.* at 37, 24 Cal.Rptr.3d 179, 105 P.3d 544.) On reply, FieldTurf asserts that where an express written warranty exists, evidence of additional oral warranties is not permitted, and the cases Plaintiffs cite are distinguishable because they involve situations without a written warranty at all. (FT's Reply Br. 15.)

**\*19** As stated in Section III.B.2.a.ii. above, the Court finds that Levittown has pled sufficient facts to establish equitable tolling of the statute of limitations. Additionally, at this juncture, the Court declines to bar Levittown from bringing an express warranty claim based on an alleged future performance warranty created by FieldTurf's oral misrepresentations, as Plaintiffs assert fraud claims challenging the underlying warranties and have asserted warranty claims in the alternative.

### 3. Neshannock's Claims for Breach of Express and Implied Warranties

"Under Pennsylvania law, '[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.' " *Morello v. Kenco Toyota Lift*, 142 F.Supp.3d 378, 387 (E.D. Pa. 2015) (quoting 13 Pa.C.S.A. § 2312(a)(1) ).

FieldTurf asserts that Neshannock fails to allege any of the elements required to state a claim for a breach of FieldTurf's warranty. (FT's Moving Br. 39.) According to FieldTurf, Neshannock only alleges that it complained about

In re FieldTurf Artificial Turf Marketing and Sales Practices..., Not Reported in Fed....
2018 WL 4188459, 96 UCC Rep.Serv.2d 790

the condition of the field, FieldTurf groomed the turf, and the problems reoccurred; however, it does not allege it notified FieldTurf of the problem or that FieldTurf rejected a warranty claim or declined to fix or replace the field. (*Id.* at 40, 24 Cal.Rptr.3d 179, 105 P.3d 544.) FieldTurf further contends that Plaintiffs merely cite to general allegations (in support of their arguments regarding both express and implied warranties), but none relate to Neshannock's fields. (FT's Reply Br. 16.) In opposition, Plaintiffs assert that this claim is based on statements FieldTurf made in its marketing and sales campaign. (Pls.' Opp'n Br. 39.)

Pursuant to FieldTurf's characterization of the elements required to state a claim—asserting that a plaintiff must plead a warranty, reliance, breach, proximate cause and damages (FT's Moving Br. 39 (citing *Yurcic v. Purdue Pharma, L.P.,* 343 F.Supp.2d 386, 394, (M.D. Pa. 2004)), the Court finds that Plaintiffs have sufficiently done so. Plaintiffs allege a warranty (*see, e.g.,* Compl. ¶ 84 ("FieldTurf also represented in its marketing materials given to Neshannock in or around Spring 2008 that the expected useful life of Duraspine Turf was 10+ years, which was supported by '10 Year Cost Analysis FieldTurf v. Natural Grass' marketing brochure provided to Neshannock, and that Duraspine Turf had durability and longevity superior to its competitors' turf products.")); reliance (*see, e.g., id.* ¶ 28 (Neshannock "decided to buy the Duraspine Turf Field based in part on FieldTurf's representations that the field had superior materials and design such that it had greater durability and resistance to wear, matting, and UV than competing products and a useful lifespan of more than 10 years. These representations, along with the claimed comparative cost savings of the Duraspine Turf Field, were among the primary reasons Plaintiff[s] chose the Duraspine Turf Field.")); breach (*see, e.g., id.* ¶¶ 28, 60-71, 167); causation (*see, e.g., id.* ¶ 28) and damages (*see, e.g., id.* ¶ 167).

Section 2314 provides that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." 13 Pa. Cons. Stat. § 2314(a). To be "merchantable," goods must "have an inherent soundness which makes them suitable for the purpose for which they are designed, ... be free from significant defects,... perform in the way that goods of that kind should perform, and ... be of reasonable quality within expected variations and for the ordinary purpose for which they are used." *Gall v. Allegheny Cty. Health Dep't,* 521 Pa. 68, 555 A.2d 786, 789-90 (Pa. 1989).

**\*20** "The UCC implies a warranty of fitness for a particular purpose when 'the seller at the time of contracting has reason to know: (1) any particular purpose for which the goods are required; and (2) that the buyer is relying on the skill or judgment of the seller to select or furnish suitable goods.' " *Visual Commims., Inc. v. Konica Minolta Bus. Solutions U.S.A., Inc.,* 611 F.Supp.2d 465, 470-71 (quoting 13 Pa. Cons. Stat. Ann. § 2315). "A 'particular purpose' differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business[.]" *Id.* (quoting *Gall.* 555 A.2d at 790).

As to the implied warranty claims, FieldTurf contends that allegations that part of Neshannock's fields were wearing down seven and a half years after installation is not sufficient and there are no allegations that the field was not fit for the purpose for which it intended. (FT's Moving Br. 41.) Conversely, Plaintiffs assert that they have alleged the fields' intended use was for "outdoor, year-round ... extensive athletic and other activities" and were failing earlier than other artificial turf products; therefore, Plaintiffs have alleged that the defective fields cannot be merchantable or fit for their ordinary purpose. (Pls.' Opp'n Br. 40-41.) For similar reasons as stated in <u>Section III.D.1.b.</u>, the Court finds that FieldTurf has not carried its burden to demonstrate that Neshannock has failed to state a claim for a breach of the implied warranties under Pennsylvania law.

### 4. CA Plaintiffs' Claims for
### Breach of the Implied Warranty

FieldTurf argues that the CA Plaintiffs' claims For breach of the implied warranty are untimely because the four-year statute of limitations began to run when the fields were delivered. (FT's Moving Br. 41.) Plaintiffs counter that these warranty claims are timely because: (i) a cause of action accrues on delivery of conforming goods, and here, the fields were never conforming; (ii) the statute of limitations was tolled during the eight-year express warranty period because a breach of future performance warranty occurs when performance fails; and (ii) fraudulent concealment and the discovery rule toll the statute of limitations. (Pls.' Opp'n Br. 41.) On reply, FieldTurf notes that: (i) the CA Plaintiffs did not allege that they took issue with the fields on delivery; therefore, the fields are conforming goods for the purposes of the statute; and (ii) the majority of California courts

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 195 of 535
PageID: 32142

In re FieldTurf Artificial Turf Marketing and Sales Practices..., Not Reported in Fed....
2018 WL 4188459, 96 UCC Rep.Serv.2d 790

reject Plaintiffs' argument regarding tolling of the statute of limitations. (FT's Reply Br. 16-17.)

As an initial matter, the Court agrees with FieldTurf that Plaintiffs have provided no support for their contention that the goods are "nonconforming" simply because they were allegedly defective on delivery. The Court is unpersuaded by this argument. Next, the Court recognizes that multiple California courts decline to apply the future performance exception to implied warranty claims.[9] Nevertheless, based on similar reasoning as discussed in Section III.B.3.a.ii., the Court finds that the CA Plaintiffs have adequately alleged that fraudulent concealment and the discovery rule apply here to toll the statute of limitations.

### 5. Unjust Enrichment Claims

**\*21** FieldTurf argues for dismissal of Plaintiffs' unjust enrichment claims, declaring that Plaintiffs cannot assert unjust enrichment claims when valid contracts exist on this issue. (FT's Moving Br. 42.) In other words, alleging

breach of the express warranty allegedly precludes an unjust enrichment claim. (*Id.* at 42-43, 78 S.Ct. 99.) Plaintiffs, in opposition, state that the unjust enrichment and warranty claims are pled in the alternative because FieldTurf's behavior may cause the warranties to be unenforceable. (Pls.' Opp'n Br. 42.) Accordingly, Plaintiffs state that it is premature to determine which claim survives. (*Id.*) The Court agrees with Plaintiffs and finds that the two types of claims at issue were adequately pled in the alternative, and the Court will not rule as to which survives on a motion to dismiss. (*See* Compl. ¶ 256.)

### IV. Conclusion

For the reasons set forth above, FieldTurf's motion to dismiss is granted in part and denied in part. An Order consistent with this Memorandum Opinion will be entered.

### All Citations

Not Reported in Fed. Supp., 2018 WL 4188459, 96 UCC Rep.Serv.2d 790

## Footnotes

1    This multidistrict litigation is currently composed of the following member cases, listed with the districts where the actions were originally filed or removed: *Santa Ynez Valley Union High School District v. Fieldturf, USA, Inc., et al.*, No. 17-3947 (C.D. Cal.); *Lake Tahoe Unified School District v. Fieldturf, USA, Inc., et al.*, No. 17-4035 (E.D. Cal.); *The Paw, Inc. v. FieldTurf USA, Inc., et al.*, No. 17-4030 (D. Minn.); *Borough of Carteret, el al. v. FieldTurf USA, Inc., et al.*, No. 16-09252 (D.N.J.); *Gentile v. FieldTurf USA, Inc., et al.*, No. 17-173 (D.N.J.); *New Castle School District v. FieldTurf USA, Inc. et al.*, No. 17-13065 (W.D. Pa.); *Ranney School v. FieldTurf USA Inc., et al.*, No. 17-3414 (D.N.J.); *Lakeview Day Camp v. FieldTurf USA Inc.*, No. 17-3301 (D.N.J.); *Neshannock Township School District v. FieldTurf USA, Inc., et al.*, No. 17-4391 (W.D. Pa.); *Chaffey Joint High School District, et al. v. FieldTurf USA, Inc. et al.*, No. 17-4516 (C.D. Cal.); *Pajaro Unified School District (PVUSD) v. FieldTurf USA, Inc. et al.*, No. 17-4438 (N.D. Cal.); *Cherokee Central Schools v. FieldTurf USA, Inc. et al.*, No. 17-4405 (W.D.N.C.); *Brownsville Independent School District v. FieldTurf USA, Inc. et al.*, No. 17-4406 (S.D. Tex.); *Chaffey Joint Union High School District v. FieldTurf USA, Inc. et al.*, No. 17-4516 (C.D. Cal.); *City of Fremont v. FieldTurf USA, Inc. et al.*, No. 17-7714 (N.D. Cal.); *County of Hudson v. FieldTurf USA, Inc. et al.*, No. 17-1628 (D.N.J.); and *Borough of Little Ferry v. FieldTurf USA Inc. et al.*, No. 18-9740 (D.N.J.). On March 16, 2018, the Township of Medford voluntarily dismissed its case without prejudice. (ECF No. 99.)

2    For the purposes of this motion to dismiss, the Court accepts as true and summarizes the facts alleged in the Complaint. *See* *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).

3    Carteret purchased six fields: four contracted for in September 2006 and installed in 2008; one contracted for in January 2007 and installed in May 2007; and one contracted for in 2010 and installed in 2011. (Compl.

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 196 of 535
PageID: 32143

In re FieldTurf Artificial Turf Marketing and Sales Practices..., Not Reported in Fed....
2018 WL 4188459, 96 UCC Rep.Serv.2d 790

¶ 23.) Fremont purchased two fields, one in each of 2007 and 2011. (*Id.* ¶ 24.) Hudson purchased five fields: one contracted for in 2007 and installed between 2007 and 2009; two contracted for in 2007 and installed between 2007 and 2008; and two fields contracted for in 2009 and installed between 2009 and 2010. (*Id.* ¶ 25.) Levittown purchased two fields in 2008. (*Id.* ¶ 26.) Neshannock purchased a field in 2008. (*Id.* ¶ 28.) Newark purchased four fields between late 2006 and 2010. (*Id.* ¶ 29.) Santa Ynez purchased one field in 2006. (*Id.* ¶ 30.)

4    Included in the Complaint are various screenshots of marketing materials. (Compl. at 22. 23. 25, 27.)

5    The warranty stated:

> FieldTurf USA warrants that if [Duraspine Turf] proves to be defective in material or workmanship, resulting in premature wear, during normal and ordinary use of the Product for sporting activities set out below or for any other uses for which FieldTurf gives written authorization, within 8 years from the date of completion of installation. FieldTurf will, at FieldTurf' option, either repair or replace the affected area without charge, to the extent required to meet the warranty period (but no cash refunds will be made).

(Compl. ¶ 88.)

6    "[N]ew fibers should withstand at least 3.6 lbs. of force and lose no more than 50% of tensile strength after eight years, *i.e.*, 1.8 lbs. of force. The lab tested fibers collected from low-traffic areas of three Duraspine Turf fields installed in New Jersey in 2008. All three samples showed tensile strength well below 1.8 lbs. of force." (*Id.* ¶ 187.)

7    In its moving brief, FieldTurf discussed choice of law issues and asserted that: (i) the procedural law of the transferee district, the District of New Jersey, applies; and (ii) applying the choice of law rules in the states in which the actions were originally filed—here, New Jersey, Pennsylvania, and California—Plaintiffs' claims are substantively assessed under the laws of each of their home states. (FieldTurf's Moving Br. ("FT's Moving Br.") 10-11, ECF No. 91-1.) Plaintiffs do not argue to the contrary in their opposition. (*See generally* Pls.' Opp'n Br., ECF No. 100.) The Court agrees with FieldTurf's analysis and, accordingly, applies New Jersey law to the NJ Plaintiffs' claims, New York law to Levittown's claims, Pennsylvania law to Neshannock's claims, and California law to the CA Plaintiffs' claims.

8    The NJCFA defines " 'unlawful practice" as:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise[.]

N.J.S.A. § 56:8-2. "Merchandise" is a broad term that includes "goods." "commodities." and "services of anything offered." N.J.S.A. § 56:8-(c).

9    The future performance exception of the California Commercial Code provides:

> A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

Cal. Com. Code § 2725(2). The California Court of Appeal has held that this exception "must be narrowly construed" and "applies only when the seller has *expressly agreed* to warrant its product for a specific and defined period of time." *Cardinal Health 301, Inc. v. Tyco Elecs. Corp.*, 169 Cal.App.4th 116, 87 Cal.Rptr.3d 5, 16 (Cal. Ct. App. 2008) (emphasis in original). "[B]ecause an implied warranty is one that arises by operation of law rather than by an express agreement of the parties, courts have consistently held [that] it is not a warranty that explicitly extends to future performance of the goods." *Philips v. Ford Motor Co.*, No. 14-2989, 2016 U.S. Dist. LEXIS 58954, at *MI (N.D. Cal. 2016) (quoting *Cardinal Health 301, Inc.*, 87 Cal.Rptr.3d at 19-20).

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

TAB 15

*In re Hypodermic Prods. Antitrust Litig.*, No. 05-1602, 2007 WL 1959225 (D.N.J. June 29, 2007)

In Re Hypodermic Products Antitrust Litigation, Not Reported in F.Supp.2d (2007)

2007 WL 1959225

KeyCite Yellow Flag - Negative Treatment

Declined to Follow by   In re Packaged Ice Antitrust Litigation,   E.D.Mich.,
March 11, 2011

2007 WL 1959225
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

In re HYPODERMIC PRODUCTS
ANTITRUST LITIGATION
This Document Relates To:
Jabo's Pharmacy, Inc.
v.
Becton Dickinson & Co., Civil
Action No.: 05–CV–5892,
and
Drug Mart Tallman, Inc.
v.
Becton Dickinson & Co., Civil
Action No. 06–CV–0174.

MDL NO. 1730.
|
Master Docket No. 05–CV–1602 (JLL/CCC).
|
June 29, 2007.

**Attorneys and Law Firms**

Gordon Ball, Ball & Scott, Knoxville, TN, James V. Bashian,
Law Office of James V. Bashian, PC, Fairfield, NJ, Joel M.
Silverstein, Stern & Kilcullen, Roseland, NJ, for Plaintiff.

R. Dale Grimes, Bass, Berry & Sims, PLC, Nashville, TN,
Deborah A. Silodor, Gregory B. Reilly, Lowenstein Sandler,
PC, Roseland, NJ, for Defendant.

*OPINION*

LINARES, District Judge.

 **\*1**  This matter comes before the Court on the motion
of Defendant, Becton Dickinson & Company, to dismiss
Plaintiffs'[1] Consolidated Class Action Complaint,[2] pursuant
to  Federal Rule of Civil Procedure 12(b)(6). For the

reasons set forth in this Opinion, Defendant's motion is
DENIED.[3]

*BACKGROUND*[4]

This matter arises from actions brought by healthcare
providers and distributors in the pharmaceutical and medical
device industry, against Defendant, a medical device
manufacturer, which allegedly controls a dominant share of
the relevant market for the hypodermic products at issue
in this case. The Judicial Panel on Multidistrict Litigation
has transferred several related actions to this Court for
consolidated pretrial proceedings, pursuant to  28 U.S.C. §
1407.[5]

**I. Historical Facts**

Plaintiffs are pharmacies in Tennessee and New York
which purchased various disposable hypodermic products
manufactured by Becton through a distributor or wholesaler.
(Compl., ¶¶ 1, 13–14). Becton, a New Jersey corporation
founded in 1897, is a large healthcare product manufacturer,
which has been the dominant manufacturer of syringes and
other disposable hypodermic products in the United States for
decades. (*Id.,* ¶¶ 3, 15, 46). "By the 1950s, Becton had become
the leading U.S. hypodermic syringe manufacturer." (*Id.,* ¶
46). The disposable hypodermic products at issue include
relevant markets for: (1) disposable syringes and associated
needles, (2) disposable blood collection tubes, (3) disposable
blood collection tube holders, and (4) intravenous ("IV")
catheter devices and their associated needles. (*Id.,* ¶ 2).
Said products are referred to collectively in the Complaint
as "Disposable Hypodermic Products." (*Id.*). Disposable
Hypodermic Products come in safety and non-safety forms.
(*Id.,* ¶ 48). The relevant geographic market for each of the
Disposable Hypodermic Products is the entire United States.
(*Id.,* ¶¶ 27, 34, 39, 44).

By way of background, the Complaint explains that, at all
relevant times, Plaintiffs purchased Disposable Hypodermic
Products from Becton through authorized distributors who
do not set the prices for those products. (*Id.,* ¶ 49). In
particular, the Complaint explains that a pharmacy negotiates
a price for Disposable Hypodermic Products with Defendant,
either directly or through a Group Purchasing Organization
(hereinafter "GPO"). (*Id.,* ¶ 50). The authorized dealer then
takes possession of Defendant's products and holds them

in inventory until the pharmacy becomes in need of said products, at which time the authorized dealer delivers same. (*Id.*). The pharmacy then pays the authorized dealer the price it had negotiated with Becton, as well as a delivery or administrative fee. (*Id.*). The authorized dealer then pays Defendant the amount it collected from the pharmacy, which was "the amount already agreed to between Becton and the [pharmacy] under applicable GPO agreements or otherwise directly with Becton." (*Id.*).

**\*2** The Complaint goes on to allege that "as a result of this purchasing process, there is effectively only one sale: the [pharmacy] purchases Becton Disposable Hypodermic Products at prices negotiated with Becton and then receives these Products from authorized distributors." (*Id.*). Because authorized distributors have no control over the pricing of Becton's products, they, therefore, act solely as a distribution agent, "temporarily holding inventory and then delivering the product purchased" by the pharmacy. (*Id.,* ¶ 51). Thus, the only price which the authorized distributors negotiate with Becton and/or the healthcare provider is the amount of the delivery and/or administrative fee associated with same. (*Id.*). "The fixed percentage the authorized distributor charges for distribution services is the same no matter the price the Class Member negotiates and then pays Becton, and the price a Class Member pays for Becton Disposable Hypodermic Products will be the same from all authorized distributors." (*Id.*). The Complaint also explains that upon information and belief, Becton sells a portion of its Disposable Hypodermic Products to wholesalers, who then resell these products to indirect class members. (*Id.,* ¶ 55).

## II. Becton's Alleged Anti–Competitive Conduct

Beginning in the early 1980s, rival manufacturers began posing a threat to Becton's dominance in the Disposable Hypodermic Products markets. (*Id.,* ¶ 47). As a result, Becton began engaging in certain anti-competitive and illegal practices, which served to foreclose competition in the relevant markets by suppressing competition from current competitors and/or product innovators, such as Terumo and Retractable (*Id.,* ¶ 6).

The specific anti-competitive practices set forth in the Complaint include: (1) Becton's imposition of market share purchase requirements on persons purchasing Disposable Hypodermic Products, (2) Becton's bundling of its goods for exclusionary and predatory purposes, (3) Becton's exclusionary contracts with certain GPOs, and (4) Becton's bundling of its goods with the goods of other manufacturers

for exclusionary purposes. (*Id.,* ¶ 4). Such practices were specifically designed to "eliminate or lessen competition and unlawfully acquire and maintain monopoly and/or market power" in the four relevant markets mentioned above, namely: (1) disposable syringes and their associated needles, (2) disposable blood collection tubes, (3) disposable blood collection tube holders, and (4) IV catheters and their associated needles. (*Id.,* ¶ 2). Erecting such artificial barriers in the form of anti-competitive conduct has "discouraged potential rivals from even attempting to invest the resources necessary to challenge Becton's dominance in the markets for Disposable Hypodermic Products ." (*Id.,* ¶ 47). Moreover, the Complaint alleges that there are no pro-competitive efficiencies created through such predatory and exclusionary conduct. (*Id.,* ¶ 70).

### A. *Market Share Purchase Requirements and Bundling*

**\*3** The Complaint also alleges that Becton uses exclusionary contracts in order to "bundle together for sale different types of products to protect and exploit its market power." (*Id.,* ¶ 64). For example, Becton responded to bid requests from GPOs, by offering proposals to sell its Disposable Hypodermic Products along with unrelated products, thereby providing substantial financial incentives to customers which agreed to purchase all of the products included in the bundle. (*Id.*).

Pursuant to one such purchasing program, in order "to receive the purported benefit" of the bundle, "purchasers had to agree to fill at least 95% of their Disposable Hypodermic Product needs from Becton." (*Id.,* ¶ 65). On the other hand, customers who purchased less than Becton's suggested "compliance" levels of their Disposable Hypodermic Products needs from Becton were penalized by (1) having to pay higher prices for Disposable Hypodermic Products, (2) losing certain post-purchase rebates, and (3) having to re-pay past rebates received by Becton. (*Id.*).

Becton has also offered certain customers "conversion" bonuses and rebates, which served as an additional incentive to accept the bundle of Becton products. (*Id.,* ¶ 66). One such conversion program offered customers with one month's worth of Disposable Hypodermic Products as an inducement to choose Becton as their "primary" Disposable Hypodermic Product supplier. (*Id.*). Under this program, customers became eligible for certain "premium" discounts on Becton products only if they agreed to use a "minimum of three of four Becton Dickinson safety product categories that include needles and syringes, IV catheters, surgical

2007 WL 1959225

blades and blood collection." (*Id.*). Because many of Becton's competitors in the Disposable Hypodermic Product markets are smaller companies which sell much fewer products, "these competitors cannot profitably match Becton's structured offers across product lines (because the combined discounts on all of the products in Becton's bundle is in many cases greater than the entire price of a single product made by another manufacturer)." (*Id.*, ¶ 67). As a result of such "deliberately designed" programs, a substantial portion of the Disposable Hypodermic Product markets has been foreclosed. (*Id.*, ¶ 68).

### B. *Exclusionary Contracts*

Finally, the Complaint alleges that anywhere between 68% to 98% of hospitals in this country currently belong to at least one GPO, which serves as a negotiating agent for healthcare providers. (*Id.*, ¶ 56). GPOs were originally designed as a way for hospitals to save money by pooling their purchasing power in order to negotiate lower prices for medical products and/or goods. (*Id.*, ¶ 57). Prior to 1986, any payments made by manufacturers to a GPO were considered an illegal "kickback," which violated the Social Security Act's "anti-kickback" provisions. (*Id.*). However, Congress amended the Social Security Act's "anti-kickback" provisions in 1986 to create certain limited exceptions for amounts paid by vendors to a GPO. (*Id.*). Thus, according to the Complaint, in order to influence GPOs, such as Premier, Becton has rewarded them not only with substantial cash payments, but also with high administrative fees, and equity positions. (*Id.*, ¶ 58).

 **\*4** Becton also secured "commitment contracts" with certain GPOs—including Novation and Premier—which essentially required that they deal exclusively with Becton for all their Hypodermic Product needs. (*Id.*, ¶¶ 59–61). For example, in 1998, one such GPO, Premier, awarded Becton with a 7.5 year "sole-source" contract. (*Id.*, ¶ 59). Similarly, in 1999, Becton awarded another GPO, Novation, with a $1 million payment —in addition to certain administrative fees—for a 4–year "sole-source" contract, whereby "Becton would be the only vendor approved by Novation to sell Disposable Hypodermic Products to Novation members." (*Id.*). Such commitment or "sole-source" contracts were implemented to prevent healthcare providers from buying Disposable Hypodermic Products made by other manufacturers. (*Id.*, ¶ 60). In fact, "[i]f a Class member desired to purchase Disposable Hypodermic Products from a manufacturer that was not the chosen sole-source contractor for the GPO, the Class member risked losing numerous financial incentives." (*Id.*).

Finally, Plaintiffs allege that Becton used exclusionary practices to unfairly and unlawfully limit competition from competing manufacturers of Disposable Hypodermic Products. (*Id.*, ¶ 71). For example, the Complaint alleges that in response to a growing threat to its monopoly power in the Disposable Hypodermic Product markets by a Japanese corporation by the name of Terumo, Becton engaged in a program called "Block Terumo" in the late 1980s, "which entailed the use of an aggressive strategy that included the bundled pricing and contracting strategies described above and other similar exclusionary and predatory tactics." (*Id.*, ¶ 72). Similar strategies were utilized by Becton to limit competition from another competitor—Retractable Technologies—in the late 1990s. (*Id.*, ¶¶ 73–74).

### III. Market Effects of Becton's Alleged Anti–Competitive Conduct

The Complaint alleges that the combined market effect of the foregoing anti-competitive actions have resulted in foreclosed competition and, thus, higher prices for all purchasers of Becton's Disposable Hypodermic Products. (*Id.*, ¶ 69). Thus, according to the Complaint, Becton's customers have paid more than they would have paid in the absence of such unlawful conduct, "contrary to Becton's representations that hospitals and other customers who purchased Becton's bundle would receive a financial benefit." (*Id.*, ¶¶ 69, 77). Thus, not only were healthcare providers deprived of the opportunity to purchase competing Disposable Hypodermic Products, but they were also forced to pay Becton artificially inflated prices for same. (*Id.*, ¶ 77).

### IV. The Consolidated Class Action Complaint

In light of the foregoing, Plaintiffs brought this action, pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, to recover treble damages, equitable relief, and reasonable attorneys' fees for Defendant's alleged violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2, as well as Section 3 of the Clayton Act, 15 U.S.C. § 14. Plaintiffs filed the instant class action complaint on May 10, 2006, pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3), on their behalf, and as representatives of the following class (hereinafter referred to as the "Class"):

In Re Hypodermic Products Antitrust Litigation, Not Reported in F.Supp.2d (2007)

2007 WL 1959225

*5 All persons in the United States who purchased Disposable Hypodermic Products manufactured by Becton through Becton's authorized distributors, at any time during the period 1988 through the present (the "Class Period"). The Class excludes Becton, Becton's parents, subsidiaries and affiliates, as well as Becton's authorized distributors.

(Compl., ¶ 16). In the alternative, or in addition, Plaintiffs seek to bring this action on their own behalf and as representatives of the following class of persons and entities (hereinafter referred to as the "Indirect Class"):

All persons in Alabama, Arizona, California, District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin (the "Class Jurisdictions"), who purchased Disposable Hypodermic Products manufactured by Becton through a distributor or wholesaler at any time during the period 1988 through the present (the "Class Period"). The Class excludes Becton, Becton's parents, subsidiaries and affiliates, and all distributors or wholesalers.

(Id., ¶ 17).

Count One of the Complaint alleges unreasonable restraint of trade, in violation of Section 1 of the Sherman Act and Section 3 of the Clayton Act. Count Two of the Complaint alleges monopoly maintenance, in violation of Section 2 of the Sherman Act, and Count Three alleges

attempted monopolization also in violation of Section 2 of the Sherman Act. Count Four alleges state antitrust law violations, brought only by the Indirect Class. Count Five alleges unjust enrichment, brought by the Indirect Class members in Arizona, District of Columbia, Florida, Hawaii, Iowa, Maine, Massachusetts, Montana, Nebraska, South Dakota, Tennessee, Utah, and Vermont. Count Six alleges also alleges unjust enrichment, brought by the Indirect Class members in Alabama, California, Michigan, Minnesota, Mississippi, Nevada, New Mexico, New York, North Carolina, North Dakota, West Virginia, and Wisconsin.

Defendant Becton now moves to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

## LEGAL STANDARD

The applicable inquiry under Federal Rule of Civil Procedure 12(b)(6) is well-settled. Courts must accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party. [6] See Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), abrogated on other grounds by Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); Allegheny Gen. Hosp. v. Philip Morris, Inc., 228 F.3d 429, 434–35 (3d Cir.2000). However, courts are not required to credit bald assertions or legal conclusions improperly alleged in the complaint. See In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1429 (3d Cir.1997). Similarly, legal conclusions draped in the guise of factual allegations may not benefit from the presumption of truthfulness. See In re Nice Sys., Ltd. Sec. Litig., 135 F.Supp.2d 551, 565 (D.N.J.2001).

*6 "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do. Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." Bell Atl. Corp. v. Twombly, —— U.S. ——, ——, 127 S.Ct.

1955, 1959, —— L.Ed.2d ——, —— (2007).[7] Ultimately, however, the question is not whether plaintiffs will prevail at trial, but whether they should be given an opportunity to offer evidence in support of their claims. *Scheuer,* 416 U.S. at 236.

Additionally, the Third Circuit has explained that antitrust complaints, in particular, should be liberally construed. *Commonwealth of Pa. ex rel. Zimmerman v. PepsiCo, Inc.,* 836 F.2d 173, 179 (3d Cir.1988). Although there is no heightened pleading standard in antitrust cases,[8] antitrust complaints are not exempt from the Federal Rules of Civil Procedure. *See, e.g., Zimmerman,* 836 F.2d at 179–80. In this vein, the Third Circuit has indicated that the pleading standard for "Section 1 claims is the short and concise statement standard of Rule 8(a)."[9] *Lum v. Bank of Am.,* 361 F.3d 217, 228 (3d Cir.2004) (distinguishing the "short and concise statement" standard of Rule 8(a), generally applicable to antitrust claims, from the heightened "particularity" standard of Rule 9(b), applicable to antitrust claims sounding in fraud). In assessing the Rule 8(a) pleading standard in the context of antitrust cases, the United States Supreme Court has explained that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," it must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.,* 127 S.Ct. at 1964, 1974.[10] With this framework in mind, the Court turns now to the issues raised by Defendant in support of the instant motion.

### DISCUSSION

Becton argues that the Complaint should be dismissed for failure to state claims upon which relief can be granted based on the following: (1) Plaintiffs have not adequately alleged the essential elements or necessary facts of any of its federal antitrust claims, (2) Plaintiffs have not adequately alleged the essential elements of any state-law antitrust claims, (3) Plaintiffs lack standing to assert the Clayton Act claim, (4) Plaintiffs lack standing to assert certain state law claims, and (5) certain state claims fail as a matter of law.

### I. Federal Antitrust Claims

#### A. Elements of Claims

Defendant argues that Plaintiffs have failed to allege any of the required elements of an antitrust claim. (Def. Br. at 12). In particular, Defendant claims that the Complaint is deficient in alleging (1) a relevant market, (2) anti-competitive effects, (3) antitrust injury, (4) standing, and (5) unlawful "exclusive dealing" or "exclusionary conduct." Because Defendant has presented the Court with such global pleading arguments, which allegedly relate to Counts One, Two *and* Three, it is not entirely clear to the Court which arguments relate to which claims, and therefore, the specific basis on which Defendant believes that Plaintiffs have failed to plead particular elements of any claim. As a result, the Court will begin its analysis by assessing, generally, whether the Complaint alleges the requisite elements of the federal antitrust claims,[11] and will then turn to Defendant's broader pleading arguments, keeping in mind that antitrust complaints are liberally construed in this Circuit. *See PepsiCo, Inc.,* 836 F.2d at 179.

### *Count One*

**\*7** Count One of the Complaint alleges unreasonable restraint of trade, in violation of Section 1 of the Sherman Act and Section 3 of the Clayton Act. Section 1 of the Sherman Act provides that:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

15 U.S.C. § 1.

The Third Circuit has explained that there are four essential elements of a § 1 violation:

> (1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted action was illegal; and (4) that the plaintiff was injured as a proximate result of the concerted action.

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 124 F.3d 430, 442 (3d Cir.1997). Moreover, "[b]ecause § 1 of the Sherman Act 'does not prohibit [all] unreasonable restraints of trade ... but only restraints effected by a contract, combination, or conspiracy,' '[t]he crucial question' is whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement, tacit or express.' " *Bell Atl. Corp.,* 127 S.Ct. at 1964. As a result, "stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Id.* at 1965.

Section 3 of the Clayton Act, in turn, provides that:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods ... or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods ... of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

15 U.S.C. § 14. *See Town Sound and Custom Tops, Inc. v. Chrysler Motors Corp.,* 959 F.2d 468, 473 n. 2 (3d Cir.1992) (explaining that Section 3 of the Clayton Act was technically written to "cover exclusive dealing contracts (contracts requiring the purchaser not to deal in the goods of a competitor of the seller) but Congress also intended to cover tying arrangements.").

Recovery under Section 3 of the Clayton Act generally requires: (1) an "exclusive dealing" arrangement, and (2) "the probable effect of the exclusion must be to substantially lessen competition in the market." *Barr Labs., Inc. v. Abbott Labs.,* No. 87–4764, 1989 WL 60320, *4 (D.N.J. June 1, 1989) (citing *Tampa Elec. Co. v. Nashville Coal Co.,* 365 U.S. 320, 327, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961)).

**\*8** Here, the Complaint alleges that Becton entered into anti-competitive arrangements with GPOs, such as Premier, whereby it would pay the GPOs "millions of dollars in cash payments," as well as "equity positions," with the expectation and/or understanding that said GPOs would then "favor Becton's products, regardless of price, over those of Becton's competitors." (Compl., ¶ 58). The Complaint cites to an article from February 1997, which states that as a result of a recent deal between Becton and Premier, whereby Premier would "receive a portion of administrative fees in the form of warrants to buy Becton stock. If Becton Dickinson's fortunes rise, buoyed in part by Premier purchases, so will the value of the stock held by Premier." (*Id.*).

The Complaint also alleges that Becton entered into agreements with GPOs, certain hospitals and other customers which included "bundled financial incentives" and "exclusive dealing commitments ." (Compl., ¶ 81). For example, during 1999, it is alleged that Becton provided Novation, another GPO, with a \$1 million payment, on top of the 3% administrative fees, in exchange for a four-year "sole-source contract under which Becton would be the only vendor approved by Novation to sell Disposable Hypodermic Products to Novation members." (*Id.,* ¶ 59).[12] The Complaint further alleges that the object of such an arrangement was to prevent Class members from purchasing Disposable Hypodermic Products made

In Re Hypodermic Products Antitrust Litigation, Not Reported in F.Supp.2d (2007)
2007 WL 1959225

by other manufacturers, because "[i]f a Class member desired to purchase Disposable Hypodermic Products from a manufacturer that was not the chosen sole-source contractor for the GPO, the Class member risked losing numerous financial incentives." (*Id.,* ¶ 60). Accordingly, such arrangements served to significantly "impede and prevent competing Disposable Hypodermic Product manufacturers from selling significant (if any) Disposable Hypodermic Products to healthcare providers that used those GPOs." (*Id.,* ¶ 61).

Moreover, a plaintiff must allege facts establishing an "antitrust injury." *See* 🔖 *Schuykill Energy Res., Inc. v. Pa. Power & Light,* 113 F.3d 405, 413, 417 (3d Cir.1997) (recognizing that the existence of antitrust injury is not typically resolved through motions to dismiss). In this regard, the Complaint alleges that Plaintiffs were injured by Becton's exclusionary practices, including its "sole-source" arrangements with certain GPOs, to the extent that they were forced to pay higher prices for Disposable Hypodermic Products than they would have paid in the absence of such practices and/or arrangements. (Compl., ¶¶ 62, 84, 92, 98).

### Count Two

Count Two of the Complaint alleges monopoly maintenance in violation of 🔖 Section 2 of the Sherman Act. 🔖 Section 2 of the Sherman Act provides that:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

**\*9** 🔖 15 U.S.C. § 2.

The Third Circuit has indicated that a 🔖 § 2 violation generally consists of two elements: "(1) possession of monopoly power [in the relevant product market] and (2) '... maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.' " 🔖 *United States v. Dentsply Int'l,* 399 F.3d 181, 186 (3d Cir.2005) (citing 🔖 *Eastman Kodak Co. v. Image Technical Servs., Inc .,* 504 U.S. 451, 480, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992)). The Complaint alleges that Becton possesses monopoly power in the Disposable Syringe and Blood Collection Tube and Blood Collection Tube Holder markets, in the United States. (Compl., ¶ 86). The Complaint also alleges that in order to maintain such monopoly power, "Becton has willfully and unlawfully used exclusionary and predatory conduct, including but not limited to, bundled pricing with the intent to foreclose competition, and exclusionary agreements." (*Id.,* ¶ 88). The Complaint likewise alleges that Becton's monopoly power in the Disposable Syringe, Blood Collection Tube and Blood Collection Tube Holder markets is not the result of "superior product offerings, good faith business acumen, or historical accident." (*Id.,* ¶¶ 90). Rather, it is the result of certain "deliberately designed" programs and/or arrangements with GPOs and healthcare providers, including but not limited to, commitment contracts, bundling contracts, and conversion bonuses. (*Id.,* ¶¶ 58, 59, 65–68). [13]

### Count Three

Count Three of the Complaint alleges attempted monopolization, in violation of 🔖 Section 2 of the Sherman Act. "To state a claim for attempted monopolization, a plaintiff must allege '(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.' " 🔖 *Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.,* 113 F.3d 405, 413 (3d Cir.1997) (citation omitted). The Complaint alleges that, "to the extent that Becton does not possess monopoly power in the Disposable Syringe, Blood Collection Tube and/or Blood Collection Tube Holder markets in the United States, it has unlawfully attempted to monopolize the markets for Disposable Syringes, Blood Collection

2007 WL 1959225

Tubes and/or Blood Collection Tubes." (Compl., ¶ 94). In particular, the Complaint alleges that Becton engaged in exclusionary and predatory conduct, including bundled pricing and exclusionary agreements, with the "specific intent" of achieving its goal of obtaining a monopoly in the foregoing markets. (*Id.,* ¶¶ 95, 96). For example, the Complaint explains that Becton engaged in a program called "Block Terumo," as a result of "the growing threat" posed by the price reductions of a competitor, Terumo. (*Id.,* ¶ 72). The Complaint goes on to allege that, as a result of the implementation of the "exclusionary and predatory sales tactics" (i.e., the "Block Terumo" program) "Terumo's market share in the United States for the Disposable Hypodermic Products went from approximately 12% to approximately 1%." (*Id.*). By 1992, "Terumo announced that it would no longer focus on selling hypodermic products to hospitals in the United States," thus illustrating that "there is a dangerous probability that if left unchecked, Becton will achieve its goals of obtaining monopoly power in said markets. (*Id.,* ¶¶ 72, 97). [14]

**B. Generally**

*Relevant Market*

**\*10** Turning now to Defendant's arguments, Defendant claims that Plaintiffs have failed to set forth the requisite relevant market. (Def. Br. at 12). In particular, Defendant claims that (1) Plaintiffs improperly combine "safety and conventional products without any allegations of the reasonable interchangeability and cross-elasticity of demand," and (2) Plaintiffs' definition of the "IV" catheter market," which includes winged IV catheters does not allege whether these products "can be interchanged, used to perform the same clinical functions or substituted for each other in medical practice." (*Id.* at 13).

The Third Circuit has explained that Plaintiffs have the burden of defining the relevant market, and that the "outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 124 F.3d 430, 436 (3d Cir.1997) (internal citations omitted). In *Queen City Pizza,* the Court went on to explain that:

> Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted.

*Id.*

The Complaint alleges four relevant product markets: (1) disposable syringes and associated needles, (2) disposable blood collection tubes, (3) disposable blood collection tube holders, and (4) intravenous catheter devices and their associated needles. (Compl., ¶ 2). The Complaint likewise alleges that there is no product "that can reasonably be substituted for" any of the products comprising the relevant product markets. (*Id.,* ¶¶ 28, 33, 38, 43). Defendant is correct in noting that the Complaint alleges that each of the four products at issue come in safety and non-safety forms. (*Id.,* ¶¶ 26, 37, 48). To the extent that Defendant urges the Court to conclude, based on the foregoing allegations, (1) that the two versions of each product, therefore, comprise separate product markets, and (2) that "folding these two separate markets into one general market creates an implausible product market," [15] the Court determines that any such determination would be improper at this juncture. [16] *See, e.g.,*

*Fineman v. Armstrong World Indus., Inc.,* 980 F.2d 171, 199 (3d Cir.1992) ("the determination of a relevant product market or submarket ("market") is a highly factual one best allocated to the trier of fact."); *Weiss v. York Hosp.,* 745 F.2d 786, 825 (3d Cir.1984) ( "Market definition is a question of fact.").

Defendant also makes the cursory argument that Plaintiffs' definition of the "IV catheter market," which includes winged IV catheters does not allege whether these products "can be interchanged, used to perform the same clinical functions or substituted for each other in medical practice," without citing to the relevant portion of the Complaint which

2007 WL 1959225

allegedly defines the "IV catheter market" as such. (Def. Br. at 13). Although the Complaint does allege that Becton *manufactures* IV Catheters "including Winged IV Catheters," the Complaint does not expressly allege that the "Winged IV Catheters" necessarily fall within the relevant product market of "IV Catheters and their Associated Needles." (Compl., ¶¶ 42, 43). Moreover, the Complaint *does* allege that "[a] relevant product market exists for the sale of IV Catheters and their associated needles and the market segments thereunder," and that *"no product ... can be substituted for IV Catheters and their associated needles to fill this medical need."* (*Id.,* ¶ 43) (emphasis added).

### Anti–Competitive Effects

**\*11** Defendant claims that the Complaint "contains no particularized allegations about competition in any specific market. Plaintiffs never once identify any specific product as the subject of an exclusive contract or a bundled discount. Nor do they ever allege that any specific contract or agreement impacted any specific product market or any specific competitor within that market." (Def. Br. at 15). Additionally, Defendant argues that the Complaint "is silent about the competitive dynamics or prices in any specific product market. Nor does the ... Complaint allege what specific competitors (or would-be competitors) participated in, and were supposedly excluded from, which of the specific product markets." (*Id.* at 16). However, Defendant cites to no legal authority indicating that such particularized allegations are a pleading requirement.[17] To the contrary, the Supreme Court has reiterated that "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atlantic Corp.,* 127 S.Ct. at 1964 (quoting *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).[18] The Court recognizes that the Third Circuit has applied a heightened pleading standard in antitrust cases sounding in fraud. *See, e.g., Lum,* 361 F.3d at 228 (distinguishing the "short and concise statement" standard of Rule 8(a), generally applicable to antitrust claims, from the heightened "particularity" standard of Rule 9(b), applicable to antitrust claims sounding in fraud). However, Defendant does not suggest that the antitrust claims alleged in the Complaint sound in fraud.[19] Therefore, the Court sees

no reason why it should apply the more rigorous pleading standard contemplated by Defendant to the case at hand.[20]

In any event, the Complaint does provide examples of the types of exclusionary practices allegedly utilized by Becton, and the purported effects of same. For example, the Complaint alleges that from 1998 through 1999, Becton engaged in securing commitment or "sole-source" contracts with certain GPOs, including Premier and Novation, which required that they deal exclusively with Becton for any hypodermic product needs, in return for a substantial monetary payment. (*Id.,* ¶ 59). The Complaint also alleges that pursuant to Becton's purchasing programs, unrelated products from different product lines were "bundled" together for sale to hospitals and other healthcare providers whereby in order "to receive the purported benefit offered under the bundle, purchasers had to agree to fill at least 95% of their Disposable Hypodermic Product needs from Becton." (*Id.,* ¶¶ 64, 65). As an additional incentive, Plaintiffs also allege that Becton offered "conversion" programs. The Complaint goes on to list two examples of such programs, one of which provided a particular Class member with the ability to purchase Becton products at a premium discount only if it agreed to utilize a "minimum of three of four Becton Dickinson safety product categories that include needles and syringes, IV catheters, surgical blades and blood collection." (*Id.,* ¶ 66).

**\*12** In addressing the anti-competitive effects of such programs, the Complaint alleges the following:

> Many of Becton's competitors in the Disposable Hypodermic Product markets are smaller, specialized companies that sell fewer products, and in some instances only a single product. As a result, these competitors cannot profitably match Becton's structured offers across product lines (because the combined discounts on all of the products in Becton's bundle is in many cases greater than the entire price of a single product made by another manufacturer). In certain cases, even if the competitor offered substantial discounts on Disposable Hypodermic Products (or indeed gave them away for free), it could not 'replace' all the discounts and rebates

In Re Hypodermic Products Antitrust Litigation, Not Reported in F.Supp.2d (2007)
2007 WL 1959225

that the buyer would 'lose' as a penalty for rejecting Becton's bundle.

(*Id.,* ¶ 67). For instance, the Complaint alleges that beginning in the 1970s, one particular competitor, Terumo, "which manufactures certain disposable medical products, including disposable syringes and associated needles"—one of the relevant product markets at issue—began gaining approximately 12% of the United States market for various hypodermic products. (Compl., ¶ 71). However, by 1992—as a direct result of certain exclusionary initiatives undertaken by Becton—Terumo's market share dropped to approximately 1%, and it ultimately ceased focusing on selling any hypodermic products to hospitals in the United States. (*Id.,* ¶ 72). This, the Complaint alleges, demonstrates that Becton's actions effectively foreclosed competition in the relevant product markets, forcing Plaintiffs to pay higher prices for Disposable Hypodermic Products than they would have paid in the absence of Becton's exclusionary practices. (*Id.,* ¶¶ 67, 68, 69).

The Court finds such allegations of anti-competitive conduct set forth in the Complaint to be in sharp contrast with the allegations found to be insufficient in *Bell Atl. Corp.,* 127 S.Ct. at 1962–63.[21] In particular, the complaint at issue in *Bell Atl. Corp.* sought to demonstrate anticompetitive agreements based on parallel conduct through *inference. Id.* at 1962. To the contrary, the instant Complaint sets forth allegations of specific anti-competitive agreements—between Becton and certain GPOs, and between Becton and certain manufacturers—which the Court deems as providing Defendant with adequate notice of the particular grounds upon which Plaintiffs' claims rest, particularly given the fact that Plaintiffs have not yet had the benefit of discovery.[22]

*See, e.g., Hosp. Bldg. Co. v. Trs. of Rex Hosp.,* 425 U.S. 738, 746–747, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976) (explaining that "in antitrust cases, where 'the proof is largely in the hands of the alleged conspirators,' dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly") (quotation omitted).

### *Antitrust Injury*

Defendant argues that Plaintiffs cannot state a claim because the "vague" allegations of antitrust injury set forth in the Complaint lack the requisite specificity. (Def. Br. at 25–26).

Defendant also argues that "[s]ince a plaintiff ordinarily must be a participant in the relevant market to suffer antitrust injury, MedStar cannot state a claim without alleging the specific market in which it buys or sells products." (*Id.* at 26).

**\*13** In support of its argument that the allegations of antitrust injury contained in the Complaint are overly vague, Defendant presents the following hypothetical questions for the Court's consideration—"Plaintiffs claim that they 'incurred overcharges' for some unspecified products. What were those products? In what markets are plaintiffs consumers?" (Def. Br. at 16). Even assuming, *arguendo,* that the Complaint does not specifically answer those questions, once again, Defendant cites to no legal authority indicating that antitrust injury must be plead with such specificity,[23] or that the antitrust injury alleged by Plaintiffs is somehow implausible. The Complaint alleges that "[b]y unlawfully excluding and impairing competition [in the four relevant product markets], Becton's conduct has caused Plaintiffs and the other Class members to pay more for Disposable Hypodermic Products than they otherwise would have paid absent Becton's illegal, exclusionary conduct." (Compl., ¶ 62). Defendant has given the Court no specific basis on which to find such a pleading of antitrust injury to be insufficient.[24]

In the alternative, Defendant cites to *Schuylkill Energy Res., Inc. v. Pa. Power & Light,* 113 F.3d 405, 415 (3d Cir.1997), for the proposition that "[a] plaintiff who is neither a competitor nor a consumer in the relevant market does not suffer antitrust injury." (Def. Br. at 16). To the extent that Defendant moves to dismiss the Complaint on such a basis, any such request is denied. The United States Supreme Court has recognized that an antitrust injury can be suffered by a plaintiff, even if the plaintiff "was not a competitor of the conspirators, [where] the injury she suffered was inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market." *Blue Shield of Va. v. McCready,* 457 U.S. 465, 484, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982)). There, the Court went on to explain that "[i]n light of the conspiracy here alleged we think that McCready's injury 'flows from that which makes defendants' acts unlawful' within the meaning of *Brunswick,* and falls squarely within the area of congressional concern." *Id.*

The Third Circuit has likewise found that a terminal operator plaintiff lacked standing to assert antitrust injury in the soda ash market—in which it was neither a consumer nor a competitor—because the plaintiff had "made no showing

In Re Hypodermic Products Antitrust Litigation, Not Reported in F.Supp.2d (2007)

2007 WL 1959225

of a connection between the alleged international soda ash conspiracy and the level of competition within the terminalling market." *Int'l Raw Materials, Ltd.,* 978 F.2d at 1327–29. There, the Court explained "[b]ecause IRM is neither a competitor nor a consumer in the relevant market, it must allege a significant causal connection between the alleged soda ash conspiracy and the alleged anticompetitive effects in the terminalling market such that the harm to the terminalling market can be said to be 'inextricably intertwined' with the alleged soda ash cartel." *Id.* at 1327 (quoting *McCready,* 457 U.S. at 484). *See also Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.,* 995 F.2d 425, 429 (3d Cir.1993) ("The second *[Brunswick]* requirement is generally met if the plaintiff is a 'competitor [ ]or a consumer in the relevant market.' Alternatively, this requirement is fulfilled if there exists a 'significant causal connection' such that the harm to the plaintiff can be said to be 'inextricably intertwined' with the antitrust conspiracy.") (quoting *McCready,* 457 U.S. at 484). Thus, neither the Supreme Court nor the Third Circuit has foreclosed a finding of antitrust injury simply because the plaintiff was not a participant in the relevant market.[25] As a result, to the extent that Defendant moves to dismiss the Complaint on the basis that Plaintiffs cannot suffer antitrust injury in a relevant market in which it is not a participant, Defendant's motion is denied.[26]

### Standing

**\*14** Defendant also makes the argument that Plaintiffs lack standing under Section 3 of the Clayton Act because "neither Drug Mart nor Jabo has alleged that they are parties to any contract with Becton, exclusionary or otherwise, prohibiting them from buying products from Becton's competitors." (Def. Br. at 19).

Pursuant to this Court's March 23, 2007 Order, all parties were advised that the issue of Clayton Act standing would by addressed by way of separate motion. *See* CM/ECF Docket Entry Nos. 144, 146. As a result, the Court will not address the issues raised regarding same herein.[27]

### Exclusive Dealing Allegations

Defendant makes the global argument that the "heart of plaintiffs' monopolization, attempted monopolization and restraint of trade claims are the allegations of Becton's alleged 'exclusionary' contracts, 'predatory sales tactics' and 'bundling' practices. There are many paragraphs and pages making vague allegations about how Becton sought to 'unfairly restrain and limit competition' in the non-existent 'Disposable Hypodermic Products' market, but there are no specific allegations about what specific contracts, with what specific parties, affected competition in which specific market." (Def Br. at 14). The crux of Defendant's argument is that, "plaintiffs allege no facts about which contracts are exclusive, which products they relate to, or who the parties are that are involved in those contracts." (*Id.* at 15).

The Complaint alleges that "Becton used 'commitment contracts' ... [which] essentially required GPO members to deal exclusively with Becton for its Hypodermic Product needs." (Compl., ¶ 59). The Complaint goes on to provide two examples of such "commitment contracts," (1) "in or around 1998 Premier awarded Becton a 7.5 year sole-source contract," and (2) "[i]n or around 1999, Becton provided another GPO, Novation, a $1 million payment (in addition to the 3% administrative fees that it pays Novation) for a 4–year sole-source contract under which Becton would be the only vendor approved by Novation to sell Disposable Hypodermic Products to Novation members." (*Id.*). Moreover, the Complaint alleges that "[i]f a Class member desired to purchase Disposable Hypodermic Products from a manufacturer that was not the chosen sole-source contractor for the GPO, the Class member risked losing numerous financial incentives," as a result, a "substantial portion of the markets for Disposable Hypodermic Products have been foreclosed." (*Id.,* ¶¶ 60, 68).

In light of the foregoing allegations, the Court finds that Defendant's argument that "there are no specific allegations about what specific contracts, with what specific parties, affected competition in which specific market" to be unpersuasive.[28] See, e.g., *Bell Atl. Corp.,* 127 S.Ct. at 1965 ("Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.").

### II. Indirect Purchaser Claims

**A. Generally**

**\*15** In the alternative, Plaintiffs assert indirect purchaser claims under the laws of the District of Columbia and twenty-five other jurisdictions. Defendant moves to dismiss such "indirect" purchaser claims on the same basis on which it argues that Plaintiffs' federal antitrust claims are deficient. (Def. Br. at 22). As discussed above, Plaintiffs' claims will not be dismissed on these grounds.

Defendant also claims that "[t]here is an additional, and independent, reason for dismissing plaintiffs' 'indirect' purchaser claims under state law: the Complaint fails to allege what portion, if any, of Becton's alleged 'overcharge' was passed on to them." (Def. Br. at 22). In particular, Defendant argues that, as indirect purchasers, Plaintiffs must prove that Becton charged monopoly prices and that Becton's "overcharge" was passed on to Plaintiffs.

As a preliminary matter, the Court notes that Defendant cites to no legal authority indicating that Plaintiffs must plead the *amount* of "overcharge" which was passed on to them. Furthermore, although Defendant claims that "an indirect purchaser must allege and prove: (1) that a 'direct' purchaser (*e.g.,* a wholesaler) was overcharged by Becton, (2) that the direct purchaser then passed on the overcharge, or some portion of it, to the 'indirect' purchaser, and (3) that the indirect purchaser did not turn around and pass on all of the overcharge to its customers," [29] the cases relied upon by Defendant in support of same—which are not binding on this Court, and none of which were decided at the motion to dismiss stage—do not dictate that the foregoing factors are a pleading requirement. [30] Therefore, the Court concludes that Defendant has not met its burden in demonstrating that Plaintiffs' indirect purchaser claims should be dismissed on such a basis at this time.

**B. Standing** [31]

Defendant makes the argument that Count IV of the Complaint (asserting various state antitrust law violations) should be dismissed because the named plaintiffs lack standing to bring claims in those states in which the named plaintiffs do not reside or engage in business. (Def. Br. at 24, 27). In particular, Defendant argues that Plaintiffs cannot acquire standing by asserting claims on behalf of "un-named, un-identified absent class members." [32] (*Id.* at 25). The Court has considered Defendant's argument in this regard, but, for

the reasons that follow, declines to rule on the issue prior to addressing the issue of class certification. [33]

The Supreme Court has explained that "[w]hile an Article III court ordinarily must be sure of its own jurisdiction before getting to the merits, a Rule 23 question should be treated first because class certification issues are 'logically antecedent' to Article III concerns...." *Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 816, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999). Here, Defendant's argument that Plaintiffs do not enjoy standing to raise state antitrust claims in jurisdictions in which they do not reside or do business is an issue that would not arise unless class certification is granted. To be clear, the state antitrust claims alleged in Count IV of the Complaint are brought "*only* by the Indirect Class." See Compl. at 24 (emphasis added). It follows that if the Court determines that Plaintiffs' Indirect Class should not be certified, then Defendant's concerns regarding the state antitrust claims—brought "*only* by the Indirect Class"—may prove to be moot. *Id.* Therefore, in accordance with *Ortiz,* [34] the Court will defer its consideration of this argument until after class certification issues have been resolved. *See, e.g.,* In re K–Dur Antitrust Litig., 338 F.Supp.2d at 544 (declining to address defendant's argument that plaintiffs lack Article III standing to assert claims in jurisdictions in which plaintiffs do not allege to have been purchasers prior to determining class certification); *Clark v. McDonald's Corp.,* 213 F.R.D. 198, 205 (2003) (declining to address defendant's argument that plaintiff has no standing to assert claims on behalf of class members regarding restaurants in states that plaintiff, himself, has not visited, and reasoning that such an issue "would not arise but for Clark's capacity as a putative class representative."); *In re Buspirone Patent Litig.,* 185 F.Supp.2d 363, 377 (S.D.N.Y.2002) (deferring on issue of Article III standing on a motion to dismiss, and explaining that "it is appropriate to decide class certification before resolving alleged Article III challenges of the present kind."). As such, to the extent that Defendant moves to dismiss Plaintiffs' state antitrust claims on such a basis, Defendant's motion is denied, without prejudice.

**C. Unjust Enrichment Claims**

**\*16** Plaintiffs assert claims for unjust enrichment under the laws of the District of Columbia and twenty-five other jurisdictions. (Compl. at 27–28). Generally, "in order to state a claim for unjust enrichment, a plaintiff must allege (1)

at plaintiff's expense, (2) defendant received benefit, (3) under circumstances that would make it unjust for defendant to retain benefit without paying for it." *In re K–Dur Antitrust Litig.,* 338 F.Supp.2d at 544 (citing Restatement of Restitution § 1 (1937)). Here, the Complaint alleges that "[a]s a result of Becton's anticompetitive scheme alleged herein, Plaintiffs and the Class members paid too much for Becton Disposable Hypodermic Products. The payment of these 'overcharges' represents an unjust benefit Plaintiffs and Class members conferred upon Becton. Becton was unjustly enriched by these illegal overcharges and equity requires disgorgement to prevent Becton from benefitting from its illegal acts." (Compl., ¶¶ 108, 112).

Defendant moves to dismiss Plaintiffs' claims for unjust enrichment on the basis that such claims are redundant to the extent that they are "based on the same alleged facts and same alleged damages as their antitrust claims: that they 'paid too much' for Becton products and that the 'overcharge' was an 'unjust benefit' plaintiffs conferred on Becton." (Def. Br. at 36). While Defendant may ultimately be correct, Plaintiffs are permitted to plead alternative theories of recovery. *See, e.g., In re K–Dur Antitrust Litig.,* 338 F.Supp.2d at 544 (denying motion to dismiss claims of unjust enrichment on the basis that equitable remedies such as unjust enrichment should not be granted where there exists an adequate remedy at law, and noting that plaintiffs "are clearly permitted to plead alternative theories of recovery."); *United States v. Kensington Hosp.,* 760 F.Supp. 1120, 1135 (E.D.Pa.1991) (recognizing that under Pennsylvania law an underlying contract precludes a claim of unjust enrichment, but allowing both claims to proceed, and explaining that the "Federal rules allow pleading in the alternative."). Therefore, the Court finds that it would be premature to dismiss Plaintiffs' unjust enrichment claims on such a basis at this stage of the litigation.

To the extent that Defendant moves to dismiss Plaintiffs' claims of unjust enrichment on the basis that certain individual states impose additional requirements, such as privity and exhaustion of remedies, the Court likewise determines that it is premature to consider these requirements on a state by state basis, at this time. Because neither the "Indirect Class," nor the "D.C. Indirect Class" has yet to be certified, the Court will not predict which state law(s) would be applicable in the event that said Classes are certified, "particularly given the fact that the anticipated complexity of a choice-of-law analysis may itself be a factor in determining the certifiability of the class." *In re K–Dur Antitrust Litig.,* 338 F.Supp.2d at 541. Therefore, Defendant's motion to dismiss Plaintiffs' unjust enrichment claims is denied, without prejudice.

### D. State Antitrust Claims

**\*17** Finally, Defendant argues that certain state antitrust claims asserted by Plaintiffs are deficient for various reasons, including, but not limited to (1) Plaintiffs' inability to pursue claims under state antitrust laws which regulate only *intrastate* commerce, and (2) Plaintiffs' inability to meet particular pleading and/or procedural requirements set forth by certain states. For the same reasons why the Court deems it inappropriate to determine under which state laws Plaintiffs have viable unjust enrichment claims, the Court likewise determines that it would be inefficient to assess (1) which state antitrust laws would be applicable, and (2) the viability of Plaintiffs' state antitrust claims under such laws, *prior* to a determination on the issue of class certification. [35] Accordingly, to the extent that Defendant moves to dismiss Plaintiffs' state antitrust claims on such a basis, Defendant's motion is denied, without prejudice.

### CONCLUSION

For the reasons stated herein, the Court denies Defendant's motion to dismiss the Consolidated Class Action Complaint. An appropriate Order accompanies this Opinion.

### All Citations

Not Reported in F.Supp.2d, 2007 WL 1959225

### Footnotes

2007 WL 1959225

1    For purposes of the instant motion, Plaintiffs include Jabo's Pharmacy, Inc. and Drug Mart Tallman, Inc. (hereinafter collectively "Plaintiffs").

2    The operative complaint is the Consolidated Class Action Complaint, filed on May 10, 2006, hereinafter referred to as "Complaint." In the instant Opinion, the Court addresses *only* Defendant's motion to dismiss the Complaint filed by Jabo's Pharmacy, Inc. and Drug Mart Tallman, Inc. Defendant has filed separate motions to dismiss the complaints of other parties to this multidistrict litigation, which have been decided by the Court by way of separate opinions.

3    The Court decides this matter without oral argument. Fed.R.Civ.P. 78. Jurisdiction is premised on 28 U.S.C. §§ 1331, 1337, and  15 U.S.C. § 15(a).

4    For purposes of the instant motion to dismiss, the Court accepts Plaintiffs' factual allegations as true, and relies only on the Complaint. *See, e.g.,*  *Lum v. Bank of Am.,* 361 F.3d 217, 222 n. 3 (3d Cir.2004) ("In deciding motions to dismiss pursuant to  Rule 12(b)(6), courts generally consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim.").

5    Defendant has also moved to dismiss (1) the Second Consolidated Amended Class Action Complaint filed by Louisiana Wholesale Drug Company, Inc., Rochester Drug Co–Operative, Inc., JM Smith d/b/a Smith Drug Company, Dik Drug Company, American Sales Company, Inc., Park Surgical Co. Inc. and SAJ Distributors, Inc., and (2) the Class Action Amended Complaint filed by Medstar Health, Inc., Medstar–Georgetown Medical Center, Inc., Washington Hospital Center Corporation and National Rehabilitation Hospital, Inc. As previously indicated, the foregoing motions will not be addressed herein.

6    In doing so, a court may look only to the facts alleged in the complaint and any accompanying attachments, and may not look at the record. See *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1251, 1261 (3d Cir.1994).

7    In so holding, the United States Supreme Court rejected the language previously used by the Court in *Conley v. Gibson,* providing that "[i]n appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). *See*  *Bell Atl. Corp.,* 127 S.Ct. at 1964, 1974 (holding that the *Conley* "no set of facts" language "has earned its retirement" and "is best forgotten.").

8    *See, e.g.,*  *In re K–Dur Antitrust Litig.,* 338 F.Supp.2d 517 (D.N.J.2004);  *In re Mercedes–Benz Anti–Trust Litig.,* 157 F.Supp.2d 355, 359 (D.N.J.2001).

9    Federal Rule of Civil Procedure 8(a) provides that "[a] pleading which sets forth a claim for relief ... shall contain ... a short and plain statement of the claim showing that the pleader is entitled to relief."

10    See also  *Associated Gen. Contractors of Cal., Inc. v. Carpenters,* 459 U.S. 519, 528 n. 17, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) (stating that "a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed.").

11    In doing so, the Court is cognizant of the fact that "a formulaic recitation of a cause of action's elements" alone will not sustain Plaintiffs' obligation to provide the grounds of their entitlement to relief.  *Bell Atl. Corp.,* 127 S.Ct. at 1959.

12    Given the foregoing allegations, the Court finds "plausible grounds to infer an agreement" between Defendant and certain GPOs and/or manufactures.  *Bell Atl. Corp.,* 127 S.Ct. at 1965. *See generally*  *Elder–Beerman Stores Corp. v. Federated Dept. Stores, Inc.,* 459 F.2d 138, 146 (6th Cir.1972) ("The granting of exclusive selling rights or acceptance of such exclusive selling rights, acts which are not prohibited by law unless there is a resulting foreclosure of market alternatives cannot, without proof of such foreclosure, form the basis for a jury verdict that the defendants had entered into a conspiracy to restrain trade.").

13    *See, e.g.,* 📑 *SmithKline Corp. v. Eli Lilly & Co.,* 575 F.2d 1056, 1065 (3d Cir.1978) (finding that "the act of willful acquisition and maintenance of monopoly power was brought about by linking products on which Lilly faced no competition Keflin and Keflex with a competitive product, Kefzol. The result was to sell all three products on a non-competitive basis in what would have otherwise been a competitive market for Ancef and Kefzol. The effect of the Revised CSP was to force SmithKline to pay rebates on one product, Ancef, equal to rebates paid by Lilly based on volume sales of three products.").

14    *See generally* 📑 *Schuylkill Energy Res., Inc.,* 113 F.3d at 415 ("Thus, SER must allege that PP & L unlawfully acquired monopoly power or had a dangerous probability of unlawfully achieving monopoly power in its service area. To do this, SER must allege that PP & L in some way acted to exclude SER as a competitor in the delivery of electricity to customers in PP & L's service area .").

15    In particular, Defendant argues that "as a matter of federal law, safety and conventional devices are not interchangeable" and thus cannot be part of the same relevant market. (Def. Br. at 8). Even if Defendant is ultimately correct, the Court declines to engage in any such analysis at this time. *See, e.g., Ansell, Inc. v. Schmid Labs., Inc.,* 757 F.Supp. 467 (D.N.J.1991) (defining relevant product market after multi-day hearing, including expert testimony).

16    Moreover, Defendant's reliance on 📑 *E. & G. Gabriel v. Gabriel Bros., Inc.,*—a case which is not binding on this Court and distinguishable on a number of levels—is misplaced. No. 93–0894, 1994 WL 369147, at *3 (S.D.N.Y. July 13, 1994) (finding plaintiff's proposed market, comprised of "products as varied as household hardwares and children's sleepwear," to be implausible, and reasoning that "[h]ammers are obviously not reasonable substitutes for children's pajamas, they are not used for similar purposes, nor will the price of hammers affect the price of pajamas.").

17    Throughout its papers, Defendant relies on a number of cases, which are not binding on this Court, for the proposition that Plaintiffs' have failed to plead with the requisite "particularity" or "specificity." The Court has reviewed these decisions and finds that such cases do not warrant dismissal of Plaintiffs' claims on such a basis at this time. *See, e.g.,* 📑 *JM Computer Servs., Inc. v. Schlumberger Techs., Inc.,* 1996 WL 241607, at *4 (N.D.Cal. May 3, 1996) (granting defendant's motion to dismiss a 📑 § 2 claim where plaintiff (1) failed to "identify the specific products or services in product markets for which Plaintiff claims there is no price elasticity," (2) failed to "identify an agreement with a specific person or entity," and (3) "does not identify the parts, services, or contracts involved in the alleged exclusive dealing").

      Defendant also relies heavily on the Third Circuit's decision in 📑 *Garshman v. Universal Res. Holding Inc.,* 824 F.2d 223, 230–31 (3d Cir.1987). The Court has reviewed the *Garshman* decision and finds that the deficiencies alleged by Defendant in this case do not rise to the level of those contemplated by the Third Circuit in *Garshman,* where the complaint, itself, failed to allege *any* "adverse effect on competition in any relevant market." 📑 *Id.* at 231 (stating that "[t]he allegation of unspecified contracts with unnamed other entities to achieve unidentified anticompetitive effects does not meet the minimum standards for pleading a conspiracy in violation of the Sherman Act.").

18    While the Supreme Court indicated that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions," for the reasons stated herein, the Court finds that Plaintiffs have met this burden. 📑 *Bell Atl. Corp.,* 127 S.Ct. at 1959.

19    *See also In re Ins. Brokerage Antitrust Litig.,* No. 04–5184, 2007 WL 1100449, at *8 (D.N.J. April 5, 2007) (utilizing heightened pleading standard of 📑 Federal Rule of Civil Procedure 9(b) where the plaintiffs' antitrust conspiracy claims were predicated on fraud).

20    Defendant reasserts this argument repeatedly throughout its papers. For purposes of efficiency, the Court will not revisit this issue herein.

21    In *Bell Atl. Corp.,* the plaintiffs alleged that the Incumbent Local Exchange Carriers "have entered into a contract, combination or conspiracy to prevent competitive entry in their respective local telephone and/

or high speed internet services markets and have agreed not to compete with one another and otherwise allocated customers and markets to one another." *Id.* at 1963.

22   The Court recognizes that "[t]he allegation of unspecified contracts with unnamed other entities to achieve unidentified anticompetitive effects does not meet the minimum standards for pleading a conspiracy in violation of the Sherman Act." *Garshman v. Universal Res. Holding Inc.,* 824 F.2d 223, 230–31 (3d Cir.1987). Nevertheless, the Court does not find that the deficiencies alleged by Defendant in this case rise to the level of those contemplated by the Third Circuit in *Garshman,* where the complaint, itself, failed to allege *any* "adverse effect on competition in any relevant market." *Id.* at 231.

23   *See, e.g.,* *Bell Atl. Corp.,* 127 S.Ct. at 1960, 1964 ("A complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," only "enough facts to state a claim to relief that is plausible on its face.").

24   *See generally* *Harrison Aire, Inc. v. Aerostar Intern., Inc.,* 423 F.3d 374, 385 (3d Cir.2005) ("Here, Harrison Aire is a consumer of balloon fabric, and it claims antitrust injury in the form of business losses caused by high fabric prices, which in turn allegedly were caused by Raven/Aerostar's exclusionary conduct in the relevant fabric market. This type of injury-prohibitively high consumer prices resulting from allegedly monopolistic behavior-is the type the antitrust laws are designed to redress.").

25   Because Defendant does not argue that Plaintiffs' alleged injuries are not "inextricably intertwined" with Defendant's alleged actions in the relevant markets, the Court need not consider same.

26   Defendant also makes the related argument that Plaintiffs lack antitrust standing *generally* because they "have not alleged the facts that would give *them* standing to complain—*e.g.,* that they actually buy conventional IV catheters, that the conduct alleged actually affected the price of conventional IV catheters, or that plaintiffs actually were injured by that conduct." (Def. Br. at 17, 20) (emphasis in original). To the extent that the Court should construe such an argument as based on the theory that Plaintiffs cannot suffer antitrust injury in a relevant market in which it is not a participant, such an argument is, therefore, rejected.

27   To the extent that Defendant argues that Plaintiffs lack antitrust standing *generally* based on the theory that Plaintiffs have not alleged that they are direct purchasers of the Disposable Hypodermic Products at issue, the Court will, therefore, defer its consideration of this argument. See Def. Br. at 17, 20 (arguing that Plaintiffs lack standing because they "have not alleged the facts that would *them* standing to complain—*e.g.,* that they actually buy conventional IV catheters, that the conduct alleged actually affected the price of conventional IV catheters, or that plaintiffs actually were injured by that conduct.") (emphasis in original).

28   Furthermore, the Court has reviewed the unpublished decisions cited to by Defendant and finds that the types of deficiencies alleged by Defendant in this case do not rise to the level of the deficiencies found by the respective courts in those cases. *See, e.g.,* *McPherson's, Ltd. v. Never Dull, Inc.,* 1990 WL 238812, *4 (D.N.J.1990) (dismissing antitrust claims where the complaint contained merely a "boilerplate allegation of price discrimination without providing supporting facts."); *JM Computer Servs., Inc. v. Schlumberger Techs., Inc.,* 1996 WL 241607, at *4 (N.D.Cal. May 3, 1996) (granting defendant's motion to dismiss a § 2 claim where plaintiff (1) failed to "identify the specific products or services in product markets for which Plaintiff claims there is no price elasticity," (2) failed to "identify an agreement with a specific person or entity," and (3) "does not identify the parts, services, or contracts involved in the alleged exclusive dealing").

29   *See* Silidor Decl., Ex. 4 at 23.

30   See *In re Methionine Antitrust Litig.,* 204 F.R.D. 161, 164 (N.D.Cal.2001); *A & M Supply Co. v. Microsoft Corp.,* 252 Mich.App. 580, 654 N.W.2d 572, 575 (Mich.Ct.App.2002); *Melnick v. Microsoft Corp.,* No. 99–709, 2001 WL 1012261, at *6 (Me.Super.Ct. Aug. 24, 2001).

Moreover, to the extent that Defendant cites to *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), for the proposition that "[a]n indirect purchaser plaintiff must prove that Becton charged monopoly prices and that all or some of Becton's 'overcharge' was passed through the distribution chain

In Re Hypodermic Products Antitrust Litigation, Not Reported in F.Supp.2d (2007)

2007 WL 1959225

from the first purchaser to the indirect purchaser plaintiff" (Def. Br. at 23), Defendant fails to indicate how Plaintiffs' ultimate burden of proof is relevant at this stage of the litigation. *See, e.g.,* 🚩 *Scheuer,* 416 U.S. at 236 (explaining that, in conducting a 12(b)(6) analysis, the question is not whether plaintiffs will ultimately prevail in a trial on the merits, but whether they should be given an opportunity to offer evidence in support of their claims).

31    L. Civ. R. 7.2(b) imposes a 15 page limit for reply briefs when using a 14–point Times New Roman font, as was done in this case. Moreover, L. Civ. R. 7.2(b) specifically provides that "[b]riefs of greater length will only be accepted if special permission of the Judge or Magistrate Judge is obtained prior to submission of the brief." Defendant's reply brief totals 15 pages. However, Defendant's reply brief also refers the Court to pages 8–14 of the reply brief it submitted in connection with its motion to dismiss the Second Consolidated Amended Class Action Complaint filed by Louisiana Wholesale Drug Company, Inc., Rochester Drug Co–Operative, Inc., JM Smith d/b/a Smith Drug Company, Dik Drug Company, American Sales Company, Inc., Park Surgical Co. Inc. and SAJ Distributors, Inc. See Def. Reply Br. at 2. Not only does this put Defendant well over the allotted 15 page limit, but such cross-referencing is both confusing and frustrating to the Court, and should therefore be avoided in all future filings. In any event, Defendant does not indicate that it sought, or was given, permission, to file an over-length reply brief in this instance. As a result, to the extent that pages 8–14 of the reply brief submitted in connection with Defendant's motion to dismiss the Second Consolidated Amended Class Action Complaint filed by Louisiana Wholesale Drug Company, Inc., Rochester Drug Co–Operative, Inc., JM Smith d/b/a Smith Drug Company, Dik Drug Company, American Sales Company, Inc., Park Surgical Co. Inc. and SAJ Distributors, Inc. raise arguments not raised herein, the Court will not consider such arguments in connection with the instant motion to dismiss.

32    The Court notes that the cases cited to by Defendant in support of this argument are either not binding on this Court, or were decided before 🏷️ *Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999). See Def. Br. at 25.

33    Magistrate Judge Ronald J. Hedges' March 28, 2007 Order indicates that motions for class certification will be forthcoming. *See* CM/ECF Docket Entry No. 146.

34    The Court is unpersuaded by Defendant's contention that the *Ortiz* "logically antecedent" exception does not apply to the circumstances at hand. 🏷️ 527 U.S. 815, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999). (Def. Reply Br. at 3). As previously indicated, the state antitrust claims alleged in Count IV of the Complaint are brought "*only* by the Indirect Class." See Compl. at 24 (emphasis added). Should the Court decide not to certify the Indirect Class, then Defendant's concerns regarding claims "brought *only* by the Indirect Class" may be moot. *Id.*

35    *See, e.g.,* 🏷️ *In re K–Dur Antitrust Litig.,* 338 F.Supp.2d at 542 (declining to address similar arguments regarding the deficiency of plaintiffs' state antitrust claims, and explaining that it would be "inefficient to determine under which state laws the Indirect Purchasers have viable claims before first deciding the class certification and choice of law issues.").

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

TAB 16

*In re Liquid Aluminum Sulfate Antitrust Litig.*, No. 16-md-2687, 2017 WL
3131977 (D.N.J. July 20, 2017)

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 218 of 535
PageID: 32165
In re Liquid Aluminum Sulfate Antitrust Litigation, Not Reported in Fed. Supp. (2017)
2017 WL 3131977

KeyCite Yellow Flag - Negative Treatment

Disagreed With by    In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litigation,    E.D.N.Y.,    November 13, 2018

2017 WL 3131977
Only the Westlaw citation is currently available.

**NOT FOR PUBLICATION**

United States District Court, D. New Jersey.

IN RE LIQUID ALUMINUM
SULFATE ANTITRUST LITIGATION

Civil Action No.: 16-md-2687 (JLL)
|
Signed 07/20/2017

**OPINION**

JOSE L. LINARES, Chief Judge

*1  This matter comes before the Court by way of several Motions to Dismiss on behalf of Defendants in this multi-district litigation. Plaintiffs in this action bring claims against Defendants in connection with Defendants' alleged conspiracy to fix the price of liquid aluminum sulfate ("Alum"). For the sake of brevity, this Opinion will address all the pending Motions which seek dismissal of four Complaints: 1) DPP Compl.; 2) IPP Compl.; 3) Shreveport Compl.; 4) Florida Shreveport. The various claims alleged by the plaintiffs will be expounded upon at length in this Opinion. In response to these claims, Defendant GEO Specialty Chemicals, Inc. ("GEO"), Defendant General Chemical LLC, and all of Defendant General Chemical's Chemtrade entities (collectively referred to as "GCC") argue that the claims against them must be dismissed because that they cannot be held liable for any damages that accrued prior to the effective date of their respective Bankruptcy discharge orders. (ECF Nos. 244-1, 255-1, 298, 299-1, 304-1, 366-1, 372). Defendants Ghazey and Sundbeck submitted a Motion to Dismiss for lack of general and specific personal jurisdiction pursuant to    Rule 12(b)(2) of the Federal Rules of Civil Procedure. (ECF Nos. 308, 310). Defendants Southern Ionics Inc. ("Southern"), USALCO, Ghazey, Sundbeck, and Kemira also filed a Motion to Dismiss on the ground that all claims against them are time barred by the relevant statute of limitations. (ECF Nos. 249, 250, 308, 310, 311). Defendants jointly argue that the IPP Complaint

fails to properly assert both Article III and Antitrust standing to bring this action. (ECF No. 306-1 at 4-16). Defendants Southern and USALCO also move to dismiss the DPP Complaint under    Rule 12(b)(6) of the Federal Rules of Civil Procedure. (ECF Nos. 249; 250-1). Defendants GEO, C&S Chemicals ("C&S"), and C&S Chemicals of Georgia ("C&S Georgia") move to dismiss the Florida Complaint pursuant to    Federal Rule of Civil Procedure 12(b)(6). (ECF Nos. 368, 369). Defendants also filed a Joint Motion to Dismiss IPP's state-law claims for alleged deficiencies in IPP Compl. (ECF No. 306). The Court decides this matter without oral argument pursuant to    Rule 78 of the Federal Rules of Civil Procedure. For the reasons set forth below, the Court denies all Defendants' Motions to Dismiss. [1]

**I. BACKGROUND** [2]

**A. The Parties**

**a. Direct Purchaser Plaintiffs ("DPP")**

*2  Plaintiff Central Arkansas Water ("CAW") is a business entity operating in the State of Arkansas with its principal place of business in Little Rock. (DPP Compl. ¶ 8). CAW operates a consolidated water system, which was created under the Consolidated Waterworks Authorization Act, Act 982 of the 83 rd General Assembly of the State of Arkansas. (DPP Compl. ¶ 8). Next, Plaintiff City of Charlotte, North Carolina ("Charlotte") is a municipal corporation chartered by the State of North Carolina. (DPP Compl. ¶ 9). Also a municipal corporation is the City and County of Denver, Colorado ("Denver"). (DPP Compl. ¶ 10).

Next, Plaintiff Flambeau River Papers, LLC ("Flambeau") is a Wisconsin limited liability company located in Park Falls, Wisconsin. (DPP Compl. ¶ 11). The following Plaintiff is the City of Greensboro, North Carolina ("Greensboro"), which is a municipal corporation with its principal place of business in Greensboro, North Carolina. (DPP Compl. ¶ 12). Further, Plaintiff Mobile Area Water and Sewer System ("Mobile") is a municipal authority with its principle place of business in Mobile, Alabama. (DPP Compl. ¶ 13). The next Plaintiff is the City of Rochester ("Rochester"), which is a municipal corporation located in the State of Minnesota. (DPP Compl. ¶ 14).

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 219 of 535
PageID: 32166
In re Liquid Aluminum Sulfate Antitrust Litigation, Not Reported in Fed. Supp. (2017)
2017 WL 3131977

The following parties are entities that are collectively referred to as the "SUEZ Entites" herein. (DPP Compl. ¶ 15). Plaintiff SUEZ Water Environmental Services, Inc. is a Delaware corporation with its principal place of business in Paramus, New Jersey. (DPP Compl. ¶ 15). Plaintiff SUEZ Water New Jersey, Inc. is a New Jersey corporation with its principal place of business in Paramus, New Jersey. (DPP Compl. ¶ 15). Plaintiff SUEZ Water Princeton Meadows Inc. is also a New Jersey corporation with its principal place of business in Plainsboro, New Jersey. (DPP Compl. ¶ 15). Next, Plaintiff SUEZ Water New York, Inc. is a New York corporation with its principal place of business in West Nyack, New York. (DPP Compl. ¶ 15). The last SUEZ Entity is Plaintiff SUEZ Water Pennsylvania Inc., a Pennsylvania corporation with its principal place of business in Harrisburg, Pennsylvania. (DPP Compl. ¶ 15).

Further, Plaintiff City of Sacramento is a municipal corporation with its principal place of business in Sacramento, California. (DPP Compl. ¶ 16). The next two Plaintiffs are both municipal corporations collectively referred to as "Texarkana Plaintiffs" herein. (DPP Compl. ¶ 17). The first is Plaintiff City of Texarkana, Arkansas chartered by the State of Arkansas. (DPP Compl. ¶ 17). The second is Plaintiff City of Texarkana Texas chartered by the State of Texas. (DPP Compl. ¶ 17). The two cities jointly own and operate the two aforementioned municipal corporations, creating an unincorporated entity that manages and operates the cities' integrated water and sewer systems. (DPP Compl. ¶ 17). All of DPPs allege that they directly purchased Alum from one or more of Defendants. [3]

### b. Indirect Purchaser Plaintiffs ("IPP")

The first IPP is Plaintiff City of Homestead, Florida ("Homestead"), which is a Florida municipality located in Miami Dade County, Florida. (IPP Compl. ¶ 19). The other IPP is Plaintiff City of Creston Water Works Department ("Creston") which is located in Union County, Iowa. (IPP Compl. ¶ 20).

### c. Additional Plaintiffs

Also before the Court are two additional complaints filed by Plaintiff Shreveport and Plaintiff Florida. (*See generally* Shreveport Compl; Fl. Compl.). Plaintiff Shreveport is a municipal corporation located in the State of Louisiana and operates "the City's water supply reservoir, its water treatment plants, its water storage tanks, its water distribution systems, its wastewater sewer systems and treatment plants, and its outfall systems[.]" (Shreveport Compl. ¶ 9). Plaintiff Florida includes the State of Florida, the Attorney General of Florida, and the Department of Legal Affairs of Florida, and bring this action "on behalf of one or more individual consumers, municipalities, and governmental entities in Florida[.]" (Fl. Compl. ¶ 12-14).

### d. Corporate Defendants

**\*3** During the class period, Defendant General Chemical LLC was a limited liability company duly formed under the laws of Delaware and had its principal place of business in Parsippany, New Jersey. (DPP Compl. ¶ 20). Also operating out of the same office in Parsippany, New Jersey was Defendant General Chemical Corporation, a Delaware corporation. (DPP Compl. ¶ 21). Defendant General Chemical Performance Products LLC was a Delaware limited liability company that operated out of the same Parsippany, New Jersey office. (DPP Compl. ¶ 22). All three of these aforementioned Defendants were part of a holding company, Defendant GenTek, Inc., a Delaware corporation. (DPP Compl. ¶ 23; IPP Compl. ¶ 24). [4] Also located at this same Parsippany, New Jersey office is Defendant Chemtrade Chemicals Corporation, a Delaware corporation. (DPP Compl. ¶ 27). Two additional Delaware limited liability companies occupy that same office: Defendants Chemtrade Chemicals US LLC and Chemtrade Solutions LLC. (DPP Compl. ¶¶ 28-29). Defendant Chemtrade Logistics, Inc. is a publicly traded Canadian corporation, with its principal place of business in Parsippany, New Jersey. [5] (Shreveport Compl. ¶ 15). The final Chemtrade entity named in this action is a Canadian company, Defendant Chemtrade Logistics Income Fund. (IPP Compl. ¶ 25). [6] Defendant Chemtrade acquired Defendant GenChem, its entire business, and all of Defendant GenChem's subsidiaries on January 23, 2014. (Shreveport Compl. ¶ 11).

The next corporate Defendant is GEO, which is a private corporation located in Ambler, Pennsylvania. (DPP Compl. ¶ 30). Defendant Southern is a Mississippi corporation located in Baton Rouge, Louisiana. (DPP Compl. ¶ 32). [7] Additionally, Defendant C&S Chemicals, Inc. ("C&S") is a Pennsylvania corporation with its principal place of business located in Marietta, Georgia. (DPP Compl. ¶ 33). Further,

2017 WL 3131977

Defendant C&S Georgia is a Delaware corporation also located in Marietta, Georgia. (Fl. Compl. ¶ 27).[8] Also, Defendant USALCO, LLC ("USALCO") is a Maryland limited liability company and is located in Baltimore, Maryland. (DPP Compl. ¶ 34).[9] The final corporate defendant is Defendant Kemira Chemicals, Inc. ("Kemira"), which is a duly formed corporation under Georgia law and is located in Atlanta, Georgia. (IPP Compl. ¶ 37).[10]

### e. Individual Defendants [11]

Defendant Frank A. Reichl is a New Jersey resident who previously worked for Defendant GenChem. (DPP Compl. ¶ 35). From 1993 to 2005 Reich was the General Manager of Water Treatment at Defendant GenChem. (DPP Compl. ¶ 35). He was also the Vice President of Sales and Marketing from 2006 through 2010, when he was ultimately terminated. (DPP Compl. ¶ 35). Also a New Jersey resident, Defendant Vincent J. Opalewski served as Defendant GenChem's General Manager of Sulfur Products from 1999 through 2005. (DPP Compl. ¶ 36). Defendant Opalewski was then the Vice President of Sale and Marketing from 2005 to 2006, Vice President and General Manager from 2006 through 2009, and, finally, President from 2009 to 2011. (DPP Compl. ¶ 36). Additionally, Defendant Brian Steppig, an Arkansas resident, was the National Sales Manager for Defendant GEO from 1997 to 2006. (DPP Compl. ¶ 38). Thereafter, Defendant Steppig served as Defendant GEO's Director of Sales and Marketing from 2006 until "at least 2011." (DPP Compl. ¶ 38).

New Jersey resident Alex Avraamides served as Director of Sales and Marketing for Defendant GenChem from 1994 to 2005.[12] (DPP Compl. ¶ 37). Thereafter, Defendant Avraamides served as Defendant GEO's Senior Vice President and General Manager from 2005 to 2010. (DPP Compl. ¶ 37). Defendant Avraamides returned to Defendant GenChem in 2010 and served as Vice President of Sales and Marketing until 2011. (DPP Compl. ¶ 37). Further, Defendant Amita Gupta "is a resident of the United States," who served as Director of Sales and Marketing for Water Treatment Chemicals from 2008 until 2012 at Defendant GenChem. (DPP Compl. ¶ 39).[13]

**\*4** Defendant Kenneth A. Ghazey is a resident of the Commonwealth of Massachusetts, who, from 2005 to present, has served as Defendant GEO's President and Chief

Executive Officer.[14] (IPP Compl. ¶ 45). He has also served on Defendant GEO's Board of Directors. (IPP Compl. ¶ 45). Finally, Defendant Milton Sundbeck is a resident of Mississippi and "has been the President and Chief Executive Officer of [Defendant Southern] during the entire Class Period."[15] (IPP Compl. ¶ 46).

### B. Liquid Aluminum Sulfate

Alum is a chemical compound that is used to treat water by removing impurities and other substances.[16] (DPP Compl. ¶ 53). It is used as a coagulant in the early stages of the water filtration process. (DPP Compl. ¶ 54). As a coagulant, its positively charged molecules attract any suspended particles which are later removed through sediment or filtration. (DPP Compl. ¶ 54). "Alum is one of the most established chemicals utilized in water and wastewater treatment[,]" and its use has risen due to stringent water purity regulations. (DPP Compl. ¶ 55). Municipalities and private water companies purchase Alum to use it in the treatment of potable water and wastewater. (DPP Compl. ¶ 56).

These entities usually purchase Alum "though a publicly advertised bidding process, and municipal contracts for Alum are typically one year in duration with options to renew for a certain period of time." (DPP Compl. ¶ 56). These bids are kept confidential from both the bidders and the general public. (IPP Compl. ¶ 62). "Thus, bidders are not privy to the content of their competitors' bids any sooner than the general public." (IPP Compl. ¶ 62). "Many municipalities also require that bidders execute and submit an affidavit of non-collusion with their bid to certify that the bidder has not divulged or discussed their bid with any other bidders." (IPP Compl. ¶ 63).

Paper mills also use Alum for drainage enhancement and "to set rosins (a sizing agent used in the manufacturing process)." (DPP Compl. ¶ 57). Specifically, Alum is used to adjust the pH level during the production process, "with higher pH levels requiring higher quantities of Alum." (DPP Compl. ¶ 57). Its most common paper product usage is in the production of "fine paper." (DPP Compl. ¶ 57). The paper industry consumed approximately 43% of the nation's Alum and usually purchase same by issuing requests for price to manufacturers and purchasing Alum pursuant to supply contracts. (DPP Compl. ¶¶ 58-59). Municipal, private water, and wastewater entities consume approximately 41% of the nation's Alum. (DPP Compl. ¶ 59).

2017 WL 3131977

## C. Allegations of Collusion

While the crux of the four complaints are nearly identical, *i.e.* that Defendants colluded to fix the price of Alum and/ or allocate customers thereby restraining free trade, each complaint is nuanced in how the various groups of Plaintiffs were impacted by the conduct in question. Accordingly, the Court discusses the allegations of each complaint separately herein.

### a. DPP's Allegations

According to DPP, the Alum market is inherently susceptible to collusion. (DPP Compl.¶¶ 60). Specifically, DPP point to four factors that render the market susceptible, with those being the following: "(1) industry concentration and consolidation; (2) a standardized product for which competition was principally on the basis of price; (3) the lack of available economic substitutes; and (4) stable demand." (DPP Compl. ¶ 60). "The Alum industry experienced significant consolidation in the period leading up to and including 1997." (DPP Compl. ¶ 62). In support of this contention, DPP point to Defendant GenChem's acquisition of three competitor chemical companies' Alum businesses (DPP Compl. ¶ 62). Those companies acquired were Rhone, Poulech (February 1993), Courtney Industries (July 1994), and Cytec Industries (December 1996). (DPP Compl. ¶ 62). Defendant GenChem also participated in the consolidation of the industry when, in June 1997, it acquired a Georgia-based company that produced sulfuric acid, Alum, and oleum. (DPP Compl. ¶ 63). "The concentration of the Alum industry is also enhanced by agreements among Defendants to distribute one another's products." (DPP Compl. ¶ 64). These agreements include "swaps, trades, and selling and distribution agreements." (DPP Compl. ¶ 64). The concentration and consolidation of the Alum industry, DPP conclude, renders the industry susceptible to collusion. (DPP Compl. ¶ 64).

**\*5** DPP also allege that Alum is a commodity because its "market participants compete principally based on the price rather than other attributes such as product quality." (DPP Compl. ¶ 65). This characteristic, DPP assert, makes it easier for collusion to occur because "price is more often objectively measurable and observable than non-price factors." (DPP Compl. ¶ 65). DPP further allege that "the bidding process by which suppliers compete to provide [A]lum to a municipality demonstrates that [A]lum is interchangeable across supplies

and that competition is primarily based on price." (DPP Compl. ¶ 66). Furthermore, DPP point to the fact that there is a lack of substitutes for Alum in the two subject industries (water treatment and paper production) to support their assertion that the Alum market is highly susceptible to collusion. (DPP Compl. ¶¶ 67-68).

The Alum market has a consistent demand and is generally stable. (DPP Compl. ¶ 69). This, DPP aver, incentivizes collusion in order "to avoid market share or price competition with competitors." (DPP Compl. ¶ 69). "During the relevant time period, the Alum market was mature and stable. Demand for Alum grew at approximately 1% to 3% percent [*sic*] per year[,]" with the water treatment industry's demand being pegged to the relevant population growth. (DPP Compl. ¶ 70). Growth in the industry was stunted by the fact that the water treatment facilities were not operating at maximum capacity, thereby rendering "no capacity-related reason for any Defendant not to compete for Alum business during the Class Period." (DPP Compl. ¶ 71).

Against this backdrop, DPP claim Defendants engaged in bid rigging and illegal market allocation. (DPP Compl. at 18-29). Prior to the alleged conspiracy, "there was a 'price war' between [Defendant] GenChem and [Defendant] GEO in which each company bid aggressively for the accounts of the other company." (DPP Compl. ¶ 72). Defendant GEO's guilty plea evidences that the "war" concluded in 1997 when the companies "agreed to 'stay away' from each other's 'historical' customers by not pursuing the business of those customers, and to engage in related bid-rigging." (DPP Compl. ¶ 73). The agreement was arrived at when Defendant Avraamides, Defendant Reichl, and Defendant GenChem's CEO, Denny Grandle, met and agreed to stop fighting for each other's customers. (DPP Compl. ¶ 73). Other entities then began joining the alleged conspiracy, such as Defendant Southern. (DPP Compl. ¶ 73). Executives at Defendant Southern and Defendant GEO communicated that there should be a " 'peace in the valley' in order to 'not bring down market price' because Defendants agreed that it would be 'better business for everyone to work together instead of competing and ruining the market price.' " (DPP Compl. ¶ 73).

DPP point to several other communications to bolster their conspiracy allegations. (DPP Compl. ¶ 74). On March 31, 2003, Defendant GenChem circulated an internal marketing strategy memorandum which outlined its "strategy for its nominal competitor, [Defendant] USALCO" and stated

2017 WL 3131977

"[c]ontinue to work in conjunction at Akron, OH, and Western Michigan accounts." (DPP Compl. ¶ 74(a)). In March 2006, Defendant GEO's "internal business review concluded that both [Defendant GenChem] and Defendant Southern were '[r]emaining non-aggressive consistently favoring price increases over share gain strategy.' " (DPP Compl. ¶ 74(b)). Also, in September 2008, an executive from Defendant GenChem arranged a meeting with Defendant Gupta, Defendant Steppig, and Mr. Scot Lang from Defendant GEO. (DPP Compl. ¶ 74(c)). This "getting to know you meeting" was "designed to introduce [Defendant] Gupta to senior staff of [Defendant GenChem's] friendly 'competitor' [Defendant] GEO, and to discuss market and supply agreements." (DPP Compl. ¶ 74(c)). DPP assert that "Defendants took a number of actions in support of this overarching conspiracy ... [that] included regular communications with each other in private, including discussions of specific bids and accounts." (DPP Compl. ¶ 75).

 *6  Executives from the corporate Defendants regularly "communicated with each other" via telephone, email, and in person. (DPP Compl. ¶ 76). During said communications, Defendants discussed their market allocation plans, as well as certain customer accounts that "were off-limits to the other companies and how to handle the bidding process as it related to those accounts." (DPP Compl. ¶ 76). One example centers around when Defendant Gupta became the Director of Marketing for Alum at Defendant GenChem in April 2008. (DPP Compl. ¶ 77). "On May 28, 2008, [Defendant] Gupta exchanged contact information via email with [Defendant] Steppig," and "promised to get 'back to [him] with the other info we discussed,' and later called [Defendant] Steppig on his mobile phone." (Id.). Another example is Defendant Opalewski's January 14, 2010 email to Defendant Sundbeck, where Defendant Opalewski wrote "[w]ith regard to dinner, happy to include the entire team or keep it to you and me. If we do get everyone together, would still like to slip away at some point to discuss the larger issue we touched on." (DPP Compl. ¶ 78). Trade associations also allowed frequent face-to-face interaction at various meetings and events. (DPP Compl. ¶ 79).

DPP recount numerous specific instances of bid coordination throughout their complaint. (DPP Compl. ¶¶ 81-104). In 2005, Defendant GenChem and Defendant GEO conspired to coordinate bids for the paper mill of Potlatch-McGehee, Arkansas when Defendant Avraamides asked Defendant GenChem "what price [Defendant] GEO should bid for the Potlatch-McGehee account." (DPP Compl. ¶¶ 82-83).

Defendant "Avraamides instructed ... [Defendant] Steppig to bid $198.73 so that [Defendant] GEO would not take the account from [Defendant] GenChem." (DPP Compl. ¶ 83). In 2006, Defendants GenChem and GEO conspired when Defendant "Avraamides spoke with an employee [at Defendant] GenChem." (DPP Compl. ¶¶ 84-85). Defendant "Avraamides instructed [Defendant] GenChem to bid above $260 per ton for [the municipality of] Columbiana[, Alabama's] Alum business, so that [Defendant] GEO would win the business." (DPP Compl. ¶ 85).

Also in 2006, Defendant GenChem and Defendant GEO swapped their historical accounts at MeadWestvaco paper mill and the municipality of Fayetteville, North Carolina by coordinating bids. (DPP Compl. ¶ 86). Defendant GenChem had historically serviced the MeadWestvaco paper mill until 2006, when it sought a new supplier. (DPP Compl. ¶ 87). Either Defendant Opalewski or Defendant Reichl told Defendant Avraamides about the issue. (DPP Compl. ¶ 87). Fedison of Defendant GEO sent an email on April 11, 2006 to Defendant Avraamides which "identified Fayetteville as a location where [Defendant] GenChem would be more freight logical than [Defendant] GEO and could 'take a dent out of our swap imbalance.' " (DPP Compl. ¶ 87). DPP asserts that absent Defendants' decision to engage in the swap, Defendant GEO would not have been an aggressive bidder on Defendant GenChem's historical account. (DPP Compl. ¶ 88). DPP Compl. contains at least six more recitations of similar situations, but the sum and substance of each situation is the same. Defendants used the bidding process to control the allocation of customers, or to control the price of Alum on the open market. (DPP Compl. ¶ 90-104).

Additionally, DPP assert that Defendants were enjoying "*supra*-competitive profit margins during this time period, not counting freight charges. Thus, the sellers of Alum had the ability to submit bids at considerably lower prices than they did and still make a profit." (DPP Compl. ¶ 105). This was one of the reasons Defendants chose to engage in the alleged conspiracy. (DPP Compl. ¶ 105). A large portion of Alum's price is comprised of its shipping cost. (DPP Compl. ¶ 106). Industry standard dictates that Alum suppliers include the cost of shipping in the quoted price. (DPP Compl. ¶ 106). Accordingly, a "freight logical" supplier has an inherent economic advantage. [17] However, throughout the Class Period, various "non-freight-logical suppliers consistently submitted winning bids to the same customer." (DPP Compl. ¶ 107). No reasonable economic explanation could be offered for the pattern of illogical

bidding other than the alleged conspiracy, DPP claim. (DPP Compl. ¶ 107).

 **\*7** One instance of the anomalous bidding is when Defendant GEO, which had a treatment plant in Baltimore, Maryland, but almost never bid for business in the Mid-Atlantic region, despite being one of the closes Alum producers in the area. (DPP Compl. ¶ 108). Another example is how Defendant Southern had a water treatment plant in Williamsport, Maryland, but never competitively bid in the Mid-Atlantic region. (DPP Compl. ¶ 108). A third example is how Defendant GenChem won a bid that was 205 miles away from its closest treatment facility, despite the fact that Defendants GEO, C&S, and Southern all had plants located at 90, 97, and 131 miles away, respectively. (DPP Compl. ¶ 109(a)). Additionally, Defendant USALCO won a bid that was 246 miles away when Defendant GenChem had a plant only 84 miles away. (DPP Compl. ¶ 109(b)). Defendant GenChem also bid illogically higher on this account as well. (DPP Compl. ¶ 109(b)).

Defendants also took efforts to police the actions of their alleged co-conspirators. (DPP Compl. ¶ 110). For example, a lower bid made to one of Defendants' historical clients would prompt a complaint that would result in withdrawal of the lower bid. (DPP Compl. ¶ 110). One example occurred in 2009, when Defendant GenChem submitted a lower bid to a client historically supplied by Defendant GEO. (DPP Compl. ¶ 110). Defendant Steppig called Defendant Gupta to complain she was not being consistent with the parties' agreements. (DPP Compl. ¶ 110). Thereafter, Defendant GenChem withdrew its bid. (DPP Compl. ¶ 110).

The alleged collusion by Defendants caused the price of Alum to increase. (DPP Compl. ¶ 112). Defendants specifically told consumers that the price was increasing due to the increases in cost of raw materials and other manufacturing costs. (DPP Compl. ¶ 113). Defendant GenChem told one customer that there was an "emerging alumna crisis and its impact on raw material costs. In a nut shell, alumna is short globally and producers are accelerating price increase at unprecedented levels." (DPP Compl. ¶ 113). However, the reality, according to DPP, was that Defendants' actions were the cause of the increased prices of Alum. (DPP Compl. ¶ 114).

Defendants are also alleged to have fraudulently concealed the conspiracy from DPP. (DPP Compl. ¶ 122). The alleged misrepresentations were presented in the form of "non-collusion affidavits" used during the bidding procedure, and

other representations made during bid submissions. (Id.) (quotations in original). The alleged collusion itself, DPP argue, was self-concealing as the submission of fake or altered bids led to the appearance of competition. (Id.). DPP did not, and could not, discover the existence of the conspiracy until Defendant Reichl pled guilty and his file was made public. (DPP Compl. ¶ 123). Defendants also allegedly lied about the reason for the increased prices, citing to increased manufacturing costs, when in reality it was their joint decision to collectively increase the price of Alum. (DPP Compl. ¶ 127). For these reasons, DPP brought the single count DPP Compl. for Violation of Section 1 of the Sherman Act, 📘 15 U.S.C. § 1. (DPP Compl. ¶¶ 132-140).

## b. IPP's Allegations

With the exception of naming a few different Defendants, IPP Compl. nearly mirrors DPP Compl. (IPP Compl. ¶¶ 1-49). IPP agree with DPP as to what Alum is and its primary commercial purposes. (IPP Compl. ¶¶ 50-55). Moreover, IPP agree with DPP's allegations regarding the Alum industry's susceptibility to collusion given the nature of the product, the way bids are made, and the fact that Alum is a commodity. (IPP Compl. ¶¶ 56-77). Further, IPP agree with DPP that Defendants had an incentive to conspire, that the conspiracy started at the 1997 meeting between Defendants GenChem and GEO, and as to the general description as to how the conspiracy was carried out. (IPP Compl. ¶¶ 84-89).

IPP also outline additional meetings and discussions between Defendants regarding the alleged conspiracy. (IPP Compl. ¶¶ 90-92). In one instance, Defendant Avraamides met with Defendant GEO "at a restaurant in New Orleans to reconfirm their agreement to conspire." (IPP Compl. ¶ 92(a)). Another instance occurred in 2005, when Defendants GenChem and GEO met in Chicago, Illinois, and the very next day Defendant GenChem met with USALCO in Schaumberg, Illinois to discuss the alleged conspiracy. (IPP Compl. ¶ 92(b)). A third example occurred in 2008, when Defendant Gupta and another executive from Defendant GenChem met with Defendant Steppig and another executive from Defendant GEO at a "get to know you meeting" that was designed to introduce Defendant Gupta to Defendant GEO as a "friendly 'competitor' " and to further discuss the alleged conspiracy. (IPP Compl. ¶ 92(d)).

 **\*8** IPP also adds that several individual Defendants have pled guilty or have been indicted for their participation in the

2017 WL 3131977

alleged conspiracy, which, they claim further bolsters the fact that a conspiracy did in fact exist. (IPP Compl. ¶¶ 78-83). Defendant Reichl pled guilty on October 27, 2015, where he admitted that he "did knowingly and intentionally conspire and agree with others not to compete for each other's historical business by rigging bids, allocating customers and fixing the price for [Alum]." (IPP Compl. ¶ 80)(quoting *United States v. Reichl*, Cr. No. 15-554 (D.N.J. Oct. 27, 2015))(Linares, J.). Defendant GEO also has pled guilty in connection with the scheme. (IPP Compl. ¶ 81). Moreover, Defendants Opalewski and Steppig have both been indicted in connection with the alleged conspiracy. (IPP Compl. ¶ 82).

Moreover, documents show that the alleged conspiracy was furthered in ways other than simply through in-person meetings. (IPP Compl. ¶ 93). In 2005, Defendant Sundbeck called Defendant Avraamides "to ensure that the conspiracy was maintained and that their companies 'not bring down market price.' " (IPP Compl. ¶ 94). "[T]elephone call logs [also] reveal that [Defendant] GEO's Steppig and Defendant GenChem's Gupta communicated very frequently with each other by telephone between 2009-2011." (IPP Compl. ¶ 96).

According to IPP, internal documents further bolster the fact that the alleged conspiracy took place. (IPP Compl. ¶¶ 97(a)-(f)). Defendant GenChem's documents show a business strategy for dealing with competitors, including Defendant USALCO, and how said competitors were "not to gain market share from them but to 'work together' or 'work in conjunction' in order to 'protect market stability and maintain market pricing.' " (IPP Compl. ¶ 97(a)). "A March 31, 2003 [Defendant] GenChem internal marketing strategy memorandum stated [Defendant] GenChem's strategy for its supposed competitor, [Defendant] USALCO, as follows: 'Continue to work in conjunction at Akron, OH and Western Michigan accounts.' " (IPP Compl. ¶ 97(b)). "An internal [Defendant] GEO memo written by [Defendant] Steppig in 2005 reveals that [Defendant] Opalewski and [Defendant] GenChem agreed to 'stay away intentionally' from [Defendant] USALCO's customers." (IPP Compl. ¶ 97(c)). These are just a few of the internal documents IPP rely on. (IPP Compl. ¶¶ 97(d)-(f)).

Additionally, Defendants used a "code word" to conceal the alleged conspiracy. (IPP Compl. ¶ 98). "One such frequently used code phrase to describe the cooperation among the supposed competitors was 'peace in the valley.' " (IPP Compl. ¶ 98). Defendant Sundbeck used "peace in the valley" when he called Defendant Avraamides in November 2005,

"to indicate that [Defendant Southern] wanted to maintain 'peace in the valley and not bring down the market price.' " (IPP Compl. ¶ 99)(internal quotations omitted). "As another example, on December 20, 2005, [Defendant] Ghazey sent [Defendant] Avraamides (both at [Defendant] GEO) an email about their strategic plans, which stated: '[L]ook forward to ... having some 'peace in the valley.' " (IPP Compl. ¶ 100) (internal quotations omitted). A third example occurred "in April 2005, [when Defendant] Kemira's Product Manager, John Cowan, had expressed concerns in an internal email chain to [Defendant] Kemira's Vice President of Sales & Logistics Bill Wowchuk and others at [Defendant] Kemira about the fact that [Defendant] GenChem might try to bid on [Defendant] Kemira's St. Louis, Missouri account. Two months later, in a July 20, 2005 email, Bill Wowchuk wrote the following to John Cowan: 'John this [Gulf Coast Water Authority bid] and [a] St. Louis [Missouri bid] will test our theory whether there will be peace in the valley.' " (IPP Compl. ¶ 102)(internal quotations omitted).

**\*9** IPP also recount at least nineteen different specific instances of alleged bid rigging and customer allocation.[18] (IPP Compl. ¶¶ 104-165). One example of bid rigging occurred in 2005, when Defendants C&S and GenChem rigged bids in Rochester, Minnesota. (IPP Compl. ¶ 105). Specifically, Defendant GenChem won a one-year supply contract for the City of Rochester. (IPP Compl. ¶ 106). Despite having the winning bid, in 2006, Defendant GenChem withdrew the winning bid "leaving [Defendant] C&S as the winning bidder for the 2006 calendar year." (IPP Compl. ¶ 107). Another example of the conspiracy occurred in 2006, when Defendants GEO and Southern "met to coordinate and allocate customers." (IPP Compl. ¶ 115). "In an email exchange dates April 30, 2006, [Defendants] Avraamides and Ghazey ... corresponded via [Defendant] Ghazey's personal email account about a request for pricing to customer Akzo Nobel." (IPP Compl. ¶ 116). In response, Defendant Avraamides wrote "[a]s you know, I have been holding off to assess if we are experiencing any competitive threat from [Defendant Southern] on our Mead-Westvaco quotation. So far, it does not appear as though we have a threat ... [Defendant] Sundbeck—[Defendant] Southern, welcomed a meeting and proposed May 15th in Houston." (Id.)(internal quotations omitted). One final example happened in 2009, when Defendants GenChem and C&S coordinated bids to Dekalb County, Georgia. (IPP Compl. ¶ 120). Specifically, Defendant GenChem's Larry McShane indicated he was interested in the aforementioned account, "which previously had been awarded to RGM of

In re Liquid Aluminum Sulfate Antitrust Litigation, Not Reported in Fed. Supp. (2017)
2017 WL 3131977

Georgia." (IPP Compl. ¶ 121). "After learning that RGM of Georgia was selling to fellow conspirator [Defendant] C&S, McShane emailed [Defendant] Gupta: 'RGM of GA turned out to be [Defendant] C&S (Austell) so I assume we don't want to take it.' " (IPP Compl. ¶ 122). These are just a few of the nineteen examples contained in IPP Compl.

"Defendants also allocated customer accounts concerning other sulfate-based water treatment chemicals ... in order to maintain their agreement to allocate customers." (IPP Compl. ¶ 166). One example happened in 2009, when Defendant Reichl told Defendant Opalewski, "[t]he $480 [Defendant GenChem] bid last year [for the Clayton, Georgia ferric sulfate account against Kemira] was a throw away price[,]" and further explained that Defendant GenChem took the account in 2009 because Defendant Kemira "took a few accounts from us and this one made sense for [Defendant GenChem] to have." (IPP Compl. ¶ 167)(internal quotations omitted). Another example of customer allocation for other sulfate-based water treatment chemical products took place in 2010. (IPP Compl. ¶ 168). Defendant Reichl noted, when discussing a bid for ferric sulfate to Denton, Texas, "Bid opened yesterday. We lost. Was in plan." (IPP Compl. ¶ 168) (internal quotations omitted).

Furthermore, "purchasers of Alum received bids that made no economic sense." (IPP Compl. ¶ 169). "In March 2005, [Defendant] USALCO entered into a three-year contract with Grand Rapids, Michigan, at a price of $149.52 per ton. The only other two bidders were [Defendants] GenChem and C&S, which submitted bids of $186.94 and $232," respectively. (IPP Compl. ¶ 169(a)). The next example happened "[i]n October 2008, [when Defendant] GenChem won a bid for Fayetteville, Arkansas at a price of $184.20 per ton. The second-lowest bidder was [Defendant] C&S, with a bid of $247.60 per ton." (IPP Compl. ¶ 169(b)). A third example of the nonsensical bidding took place "[i]n May 2009, [when Defendant] GenChem received a contract with Milwaukee, Wisconsin, at a price of $429 per ton. The only other bidder, [Defendant] USALCO, submitted a bid of $562 per ton." (IPP Compl. ¶ 169(c)). The final example offered by IPP occurred "[i]n June 2010, [when Defendant] GenChem received a contract to supply Pensacola, Florida, at a price of $212.93 per ton. While the second-lowest bidder, a small regional producer named Southern States, submitted a bid of $219 per ton, the other larger national Alum producers, [Defendants] GEO and C&S, bid prices which were an astounding 117.7% and 162% higher than [Defendant GenChem's winning bid." (IPP Compl. ¶

169(d)). These actions, IPP aver, were "designed to, and did, result in artificially inflated and *supra*-competitive prices to wholesalers, distributors, and resellers." (IPP Compl. ¶ 170).

IPP claim that Defendants' conduct restrained or eliminated competition in the Alum market. (IPP Compl. ¶ 182). For this reason, IPP allege that they were forced to pay a significantly higher price than if Defendants had not engaged in the alleged conspiracy. (IPP Compl. ¶¶ 183-84). Against this backdrop, IPP filed IPP Compl., asserting three causes of actions containing multiple sub-claims based on the laws of each IPP's home state. [19] Count I is for "Violation of State Antitrust Statutes," and asserts claims under the laws of the following states: 1) Arizona; 2) California; 3) District of Columbia; 4) Hawaii; 5) Illinois; 6) Iowa; 7) Kansas; 8) Maine; 9) Michigan; 10) Minnesota; 11) Mississippi; 12) Nebraska; 13) Nevada; 14) New Hampshire; 15) New Mexico; 16) New York; 17) North Carolina; 18) North Dakota; 19) Oregon; 20) Puerto Rico; 21) Rhode Island; 22) South Dakota; 23) Tennessee; 24) Utah; 25) Vermont; 26) West Virginia; and 27) Wisconsin. (IPP Compl.¶¶ 191-96(aa)). Count II is for alleged violations of the following states' consumer protection and unfair and deceptive trade practices statutes: 1) Alabama; 2) Arkansas; 3) California; 4) Colorado; 5) District of Columbia; 6) Florida; 7) Massachusetts; 8) Nebraska; 9) New Hampshire; 10) New Mexico; 11) New York; 12) North Carolina; 13) Oregon; 14) Rhode Island; 15) South Carolina; and 16) Vermont. Finally, Count III is for unjust enrichment and disgorgement of profits under the laws of the following states: 1) Alabama; 2) Arizona; 3) Arkansas; 4) California; 5) Colorado; 6) District of Columbia; 7) Florida; 8) Hawaii; 9) Illinois; 10) Iowa; 11) Kansas; 12) Maine; 13) Massachusetts; 14) Michigan; 15) Minnesota; 16) Mississippi; 17) Nebraska; 18) Nevada; 19) New Hampshire; 20) New Mexico; 21) New York; 22) North Carolina; 23) North Dakota; 24) Oregon; 25) Puerto Rico; 26) Rhode Island; 27) South Carolina; 28) South Dakota; 29) Tennessee; 30) Utah; 31) Vermont; 32) West Virginia; and 33) Wisconsin. (IPP Compl.¶¶ 267-43).

### c. Plaintiff Shreveport

**\*10** Plaintiff Shreveport brings a separate action on behalf of itself only. (*See generally* Shreveport Compl.). The allegations therein regarding the conspiracy and customer allocations are identical to those in DPP Compl. and IPP Compl. (Shreveport Compl.¶¶ 1-87). Accordingly, the Court will not belabor the point by restating same herein and

2017 WL 3131977

incorporates the above background. Plaintiff Shreveport claims that the alleged conspiracy caused the price of Alum to artificially rise, thereby causing it to spend more money per ton of Alum, to Defendants' benefit at its detriment. (Shreveport Compl.¶¶ 74-77). Accordingly, Plaintiff Shreveport brought an action asserting claims for Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Violation of Louisiana Monopolies Act, La. Rev. Stat § 51:122. (Shreveport Compl. ¶¶ 88-99).

### d. Plaintiff Florida

Similarly, Plaintiff Florida's complaint recites a nearly identical history of the Alum market as well as the alleged conspiracy. (Fl. Compl. ¶¶ 1-105). According to Plaintiff Florida, the conspiracy caused it damages because the inflated prices and increased costs were passed-through to consumers of the State of Florida, including various municipal entities and individuals. (Fl. Compl ¶ 106). Accordingly, Plaintiff Florida filed a three count complaint seeking to recover money damages stemming from the alleged collusion. Count I is for Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. (Fl. Compl. ¶¶ 125-32). Count II is Violation of the Florida Antitrust Act, Section 542.21 of the Florida Statutes. (Fl. Compl. ¶¶ 133-42). Finally, Count III is for Violation of the Florida Deceptive and Unfair Trade Practices Act. (Fl. Compl. ¶¶ 143-52).

### D. Defendants GenChem and GEO's Bankruptcies

This action presents an additional factual wrinkle; both Defendants GenChem and GEO previously filed for, and have since emerged from, Bankruptcy protection. (IPP Compl. ¶¶ 21-24, 31-33, Shreveport Compl. ¶¶ 13, 20). Defendant GenChem filed a voluntary Chapter 11 petition for Bankruptcy in the United States Bankruptcy Court for the District of Delaware. (Shreveport Compl. ¶¶ 13(a)). Said Bankruptcy petition included all the relevant subsidiaries discussed above. (Shreveport Compl. ¶ 13(a)). Defendant GenChem emerged from Bankruptcy on October 7, 2003, and its debts were discharged under a plan of reorganization. (Shreveport Compl. ¶ 13(a)). It is alleged that "[a]fter its discharge from bankruptcy, [Defendants] GenTek and General Chemical reaffirmed their participation in the conspiracy, in part by continuing to engage in the [above described] conduct ... with respect to Alum." (Shreveport Compl. ¶ 13(b)).

Defendant GEO also filed a voluntary Chapter 11 Bankruptcy petition in the United States Bankruptcy Court for the District of New Jersey on March 18, 2004. (Shreveport Compl. ¶ 20(a)). "Effective December 20, 2004, [Defendant] GEO was discharged from bankruptcy under a plan of reorganization." (Id.). It is alleged that "[a]fter its discharge from bankruptcy, [Defendant GEO] reaffirmed its participation in the conspiracy, in part by continuing to engage in the [above described] conduct ... with respect to the sale of Alum." (Shreveport Compl. ¶ 20(b)). All Plaintiffs alleged that Defendants GenChem and GEO's conduct after their discharge from bankruptcy render them jointly and severally liable for any damages that may have accrued since the beginning of the alleged conspiracy. (*See, e.g.*, Shreveport Compl. ¶¶ 12(b)-(c)).

## II. LEGAL STANDARD

To withstand a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

*11 To determine the sufficiency of a complaint under *Twombly* and *Iqbal* in the Third Circuit, the court must take three steps: first, the court must take note of the elements a plaintiff must plead to state a claim; second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth; finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief. *See* *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (citations omitted). "In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 227 of 535
PageID: 32174

In re Liquid Aluminum Sulfate Antitrust Litigation, Not Reported in Fed. Supp. (2017)

2017 WL 3131977

are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

## III. ANALYSIS

The Court recognizes three general categories of arguments advanced by Defendants in support of dismissal of the aforementioned complaints. First, Defendants GenChem and GEO argue that their Bankruptcy discharge orders preclude any Plaintiff from recovering damages for their actions prior to the discharge order. In other words, Defendants GenChem and GEO assert they are not liable for any pre-discharge conduct; only for any alleged post-discharge collusion. The next argument advanced by all Defendants is that each of the complaints fail to state a claim upon which relief may be granted. Finally, the third category is a miscellaneous category, which includes personal jurisdiction and standing arguments. For purposes of clarity, the Court discusses each category separately as it relates to the various Defendants.

### A. Bankruptcy

Defendant GEO and GCC Defendants all assert the same argument. (*See* ECF Nos. 244-1, 251-1, 298, 299-1, 304-1, 366-1, 372). Specifically, those Defendants assert that they cannot be held liable for any damages that accrued prior to the effective date of their respective Bankruptcy discharge orders. (Id.). This argument relies primarily on Third Circuit law regarding how to determine whether a specific claim has been discharged. In *In re Grossman's, Inc.*, 607 F.3d 114, 122 (3d Cir. 2010), the Third Circuit announced a two-part test regarding how to make said determination. Specifically, this Court must ascertain 1) whether the claim arose prior to the confirmation of the reorganization plan, and, if so, 2) whether Due Process has been afforded to the claimant such that it is "fair" to discharge his or her claim. *In re Grossman's*, 607 F.3d at 127.

Primarily, the Court is cognizant that GCC Defendants and Defendant GEO both assert that civil antitrust claims are dischargeable in Bankruptcy, relying on 11 U.S.C. § 1141(d)(1)(A) and *In re Grossman's, supra.* No Plaintiff opposes this position, and the Court agrees that the antitrust claims are potentially dischargeable. However, for the reasons set forth below, the Court finds that these specific antitrust claims against Defendant GEO and GCC Defendants are not subject to the discharge orders and, therefore, said Defendants

may be liable for antitrust damages that accrued prior to the dates of the discharge orders.

As noted, for claims to be barred by the discharge order under *Grossman's* this Court must find that Plaintiffs' claims accrued prior to the confirmation of Defendants' reorganization plans and that Plaintiffs were afforded due process. *Grossman's*, 607 F.3d at 127. There is no dispute that Plaintiffs' claims accrued prior to the 2003 and 2004 discharge orders since the alleged conspiracy must have started by 1997. Hence, the first prong is met. Thus, the only question for the Court to resolve is whether Plaintiffs were afforded Due Process in connection with said claims and the two Bankruptcy proceedings.

**\*12** The Bankruptcy Code broadly defines the term claim as "a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101 (5)(A). Congress broadly coined this definition to assure that debtors received a fresh start by "maximizing the scope of a discharge." *Grossman's, supra* at 122 (quotations omitted). As discussed, a claim has been construed to include civil antitrust claims when such claims are based on pre-discharge conduct. *See In re Penn. Cent. Transp. Co.*, 771 F.2d 762, 766-67 (3d Cir. 1985).

However, in order for a discharge order to bar a claim, the claimant must have been provided with ample notice consistent with Due Process. *Grossman's, supra* at 122. The method for how a creditor is provided notice depends on whether the creditor was known or unknown to the debtor. *Chemetron Corp. v. Jones*, 72 F.3d 341, 345 (3d Cir. 1995). This determination is made from the perspective of the debtor. *Chemetron*, 72 F.3d at 345. If the creditor is known to the debtor, then the debtor must give actual notice of the Bankruptcy proceedings to the creditor. *Id.* However, if the creditor is unknown to the debtor then notice by publication satisfies due process and serves as adequate notice. *Id.* at 345-46. Hence, the Court must ascertain whether Plaintiffs were known to Defendant GEO and GCC Defendants at the time of the Bankruptcy filings.

The Court disagrees with Movants that Plaintiffs' various complaints make allegations that would require this Court to consider Plaintiffs unknown creditors. Indeed, Plaintiffs have

2017 WL 3131977

pled that any of the victims of the alleged conspiracies would be the purchasers of Alum. (DPP Compl. ¶ 5). Said differently, Defendants knew that Plaintiffs were creditors since Plaintiffs make up the Alum market Defendants allegedly conspired to monopolize. (Id.). Defendants had a duty to make a reasonable and diligent inquiry regarding all possible known creditors and not merely rely on their books and records. *See, e.g., In re XO Commc'ns, Inc.*, 301 B.R. 782, 793-94 (Bankr. S.D.N.Y. 1995)("Reasonable diligence in fettering out known creditors will, of course, vary in different contexts ... A debtor is obligated ... to undertake more than a cursory review of its records and files to ascertain its known creditors. *Known creditors are defined as creditors that a debtor* knew of, *or should have known of*, when service notice of the bar date.") (emphasis added).

As discussed, Defendant Reichl has already pled guilty to his participation in the alleged conspiracy. (DPP Compl. ¶¶ 7, 35). Moreover, Defendants Steppig and Opalewski have both been indicted for their alleged participation in the alleged conspiracy. (*See* Cr. No. 16-65). Indeed, Plaintiffs have sufficiently pled that Defendant GEO and GCC Defendants were aware of their alleged conspiracy, took overt steps to keep the conspiracy a secret, and failed to provide all Plaintiffs with sufficient notice regarding their Bankruptcies consistent with due process. (DPP Compl. 4-6; IPP Compl. 24-31; Shreveport Compl. 26-29; Fl. Compl. 14-26). Hence, the Court is satisfied that Plaintiffs have all shown, at this juncture, that Defendants knew or should have known that Plaintiffs were known creditors. Because Plaintiffs fall under the definition of known creditors under the Code, they were entitled to actual notice. All Plaintiffs have sufficiently pled that not a single one of them was ever apprised of the two Bankruptcy proceedings. Thus, the Court concludes that the discharge orders will not bar Plaintiffs' ability to recover damages prior to the effective date of said orders from Defendant GEO and GCC Defendants.

**\*13** Moreover, even if this Court were to conclude that due process was satisfied, which it does not, Defendant GEO and GCC Defendants' alleged post-discharge conduct subjects them to joint and several liability for the entirety of the alleged conspiracy. This is because a party is jointly and severally liable for all the damages caused from the inception of the conspiracy until its conclusion. *In re K-Dur Antitrust Litig.* 338 F. Supp. 2d 517, 538-39)("Although Plaintiffs' complaints allege that [defendant] joined the conspiracy ... after it was formed, a co-conspirator is liable for all acts committed in furtherance of a conspiracy, regardless of when it entered the conspiracy.")(citing *Lefco v. United States*, 74 F.2d 66, 68-69 (3d Cir. 1934)). A party who withdraws from a conspiracy and later rejoins it remains jointly and severally liable for all of the conspirators' conduct. *See Hyde v. United States*, 225 U.S. 347, 370-72 (1912).

Both Bankruptcy Defendants allegedly continued to be involved in the conspiracy during the Bankruptcy periods and thereafter. For example, in 2006 GCC Defendants allegedly won an account that historically belonged to Defendant GEO. Thereafter, top executives at both companies agreed to let Defendant GEO take one of GCC Defendants' accounts of the same size to "mak[e] the playing field even again." (DPP Compl. ¶ 111). Another example took place in 2009 when GCC Defendants submitted a low bid for an account held by a distributor that Defendant GEO supplied, but said bid was withdrawn when Defendant Steppig complained to Defendant Gupta. (DPP Compl. ¶ 110). The various Defendants also continued to have private meetings and conference calls far after the Bankruptcies were over. (DPP Compl. ¶¶ 76-80).

Accordingly, even if the Bankruptcies precluded recovery of damages for pre-discharge conduct, the Bankruptcy Defendants' post-discharge conduct renders them jointly and severally liable for the entire conspiracy. This is because the Defendants continued to allegedly participate in the conspiracy. By doing so Defendant GEO and GCC Defendants subjected themselves to potential liability for the entire length of the conspiracy and for any and all damages supposedly caused by their co-conspirators. Thus, Defendant GEO and GCC Defendants' Motions to Partially Dismiss based on their Bankruptcies (ECF Nos. 244, 251) are hereby denied.

### B. Personal Jurisdiction

Defendants Ghazey and Sundbeck argue that this Court is without personal jurisdiction and accordingly must be dismissed from this action. [20] (ECF Nos. 308, 310, respectively). The arguments advanced by both of these Defendants are identical. They argue that this Court lacks general and specific personal jurisdiction over them since they do not reside in the State of New Jersey and have no minimum contacts with the forum state. (Id.; id.). The Court rejects these Defendant-specific personal jurisdiction arguments.

Once a defendant files a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), the "plaintiff must prove by affidavits or other competent evidence that jurisdiction is proper." *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009) (internal citations omitted). Where, as here, the district court does not hold an evidentiary hearing, a plaintiff need only establish a "*prima facie* case of personal jurisdiction and the plaintiff is entitled to have its allegations taken as true and all factual disputes drawn in its favor." *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004)(emphasis added). Additionally, "[i]f the contents of the plaintiff's complaint conflict with the defendant's affidavits, the district court must construe all reasonable inferences that can be drawn from the papers in the plaintiff's favor." *Haffen v. Butler Specialties, Inc.*, 2011 WL 831933 at *2 (D.N.J. Mar. 3, 2011) (quoting 4 Wright & Miller, Federal Practice and Procedure: Civil 3d § 1067.6 (3d ed. 2002)). The plaintiff, however, retains "the burden of demonstrating that the defendants' contacts with the forum state are sufficient to give the court *in personam* jurisdiction." *Mesalic v. Fiberfloat Corp.*, 897 F.2d 696, 699 (3d Cir. 1990)(emphasis added). "These contacts must be shown 'with reasonable particularity.' " *Wellness Publ'g v. Barefoot*, 128 Fed.Appx. 266, 268 (3d Cir. 2005) (quoting *Mellon Bank v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992)).

**\*14** "A federal court sitting in New Jersey has jurisdiction over parties to the extent provided under New Jersey state law." *Miller Yacht Sales, Inc.*, 384 F.3d at 96. "New Jersey's long-arm statute provides for jurisdiction coextensive with the due process requirements of the United States Constitution." *Id.* (citing N.J. Ct. R. 4:4-4(c)). A district court sitting in New Jersey may therefore exercise personal jurisdiction over a non-resident defendant if the defendant has "certain minimum contacts with [New Jersey] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *Henry Heide, Inc. v. WRH Prods. Co., Inc.*, 766 F.2d 105, 108 (3d Cir. 1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

"Minimum contacts can be analyzed in the context of general jurisdiction or specific jurisdiction." *Metcalfe*, 566 F.3d at 334. "General jurisdiction results from, among other things, 'systematic and continuous' contact between a non-resident defendant and the forum state." *Spuglio v. Cabaret Lounge*, 344 Fed.Appx. 724, 725 (3d Cir. 2009) (quoting *Int'l Shoe*, 326 U.S. at 320). "Specific jurisdiction over a defendant exists when that defendant has 'purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities.' " *Miller Yacht Sales*, 384 F.3d at 96 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).

### i. General Jurisdiction

" '[G]eneral jurisdiction exists when a defendant has maintained systematic and continuous contacts with the forum state.' This is a fact-specific inquiry, and the 'nonresident's contacts to the forum must be continuous and substantial' to support the exercise of general jurisdiction." *Arpaio v. Dupre*, 527 Fed.Appx. 108, 113 (3d Cir. 2013) (internal citations omitted). In recent years, the United States Supreme Court has offered guidance on the level of "continuous and substantial" contacts that might justify the exercise of general or "all purpose" jurisdiction.

In *Goodyear Dunlop Tires Operations S.A. v. Brown* the Court addressed a situation in which the foreign subsidiaries of an American corporation challenged a North Carolina court's exercise of personal jurisdiction over them. 131 S. Ct. 2846 (2011). A unanimous Court discussed the parameters of general jurisdiction, writing that, "[f]or an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation it is an equivalent place, one in which the corporation is fairly regarded as at home." *Id.* at 2853-54. The Court reiterated the principle that "[a] corporation's 'continuous activity of some sorts within a state' ... 'is not enough to support the demand that the corporation be amenable to suits unrelated to that activity.' " *Id.* at 2856 (quoting *Int'l Shoe Co.*, 326 U.S. at 318). The Court further noted that neither regular purchases of goods from a state nor the sales of goods to a state were sufficient, in themselves, to subject an entity to general jurisdiction on claims unrelated to the sales/purchases. *Id.* at 2856-57 (citing *Helicopteros Nacionales De Colombia v. Hall*, 466 U.S. 408, 418 (1984)). As the defendant subsidiaries in *Goodyear* had only "attenuated" contacts with the state (*i.e.*, their products were sold into the state via

In re Liquid Aluminum Sulfate Antitrust Litigation, Not Reported in Fed. Supp. (2017)

2017 WL 3131977

intermediaries)[21] and were "in no sense at home in North Carolina," the Court found that the subsidiaries were not subject to general jurisdiction in North Carolina. *Id.* at 2857.

**\*15** The Supreme Court confirmed the narrow applicability of the general jurisdiction doctrine in *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014). In *Daimler*, the Court rejected a formulation of the doctrine that would "approve the exercise of general jurisdiction in every State in which a corporation 'engages in a substantial, continuous, and systematic course of business,' " characterizing that broad definition as "unacceptably grasping." *Id.* at 749 (internal citation omitted). The Court observed that "the inquiry under *Goodyear* is not whether a foreign corporation's in-forum contacts can be said to be in some sense 'continuous and systematic,' it is whether that corporation's 'affiliations with the State are so 'continuous and systematic' as to render it essentially at home in the forum State.' " *Id.* at 761 (quoting *Goodyear*, 131 S. Ct. at 2851). The Court also clarified that "the general jurisdiction inquiry does not 'focus solely on the magnitude of the defendant's in-state contacts.' General jurisdiction instead calls for an appraisal of a corporation's activities in their entirety, nationwide and worldwide. A corporation that operates in many places can scarcely be deemed at home in all of them. Otherwise 'at home' would be synonymous with 'doing business' tests framed before specific jurisdiction evolved in the United States." *Id.* at 762, n. 20. The Court ultimately found that there was "no basis to subject Daimler to general jurisdiction in California, for Daimler's slim contacts with the State hardly render it at home there." *Id.* at 760, 761-62.

Here, Defendants assert that they are not subject to general jurisdiction because they do not reside in New Jersey nor maintain continuous and systemic contacts with New Jersey for general jurisdiction. (ECF Nos. 308, 310). While IPP do not concede this argument completely, they acknowledge that their complaint relies on specific jurisdiction. (*See* ECF No. 337 ("IPP Opp. Br.") at n. 43). Accordingly, this Court concludes that Defendants Ghazey and Sundbeck are not subject to general jurisdiction for the alleged wrongdoings.

### ii. Specific Jurisdiction

"Specific jurisdiction is established when a non-resident defendant has 'purposefully directed' his activities at a resident of the forum and the injury arises from or is related to those activities." *Gen. Elec. Co. v. Deutz AG*, 270 F.3d 144, 150 (3d Cir. 2001) (quoting *Burger King*, 471 U.S. at 472). In other words, specific jurisdiction exists where the "cause of action arises out of [t]he defendant's forum-related activities, such that the defendant should reasonably anticipate being haled into court in that forum." *Abel v. Kirbaran*, 267 Fed.Appx. 106, 108 (3d Cir. 2008) (internal citations and quotations omitted).

Three elements must be met to establish specific jurisdiction. *HS Real Co., LLC v. Sher*, 526 Fed.Appx. 203, 206 (3d Cir. 2013). First, the defendant must have purposefully availed itself of the privilege of conducting activities within the forum. *Id.* Second, "plaintiffs' claims must arise out of or relate to at least one of the contacts with the forum." *Id.* (internal citations and quotations omitted). Third, the exercise of jurisdiction must comport with traditional notions of fair play and substantial justice. *O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 317 (3d Cir. 2007).

Because the existence of specific jurisdiction depends on a link between the defendant's activity and the resulting harm, a specific jurisdiction analysis is necessarily claim specific. *Remick v. Manfredy*, 238 F.3d 248, 255 (3d Cir. 2001) ("Such a determination is claim specific because a conclusion that the District Court has personal jurisdiction over one of the defendants as to a particular claim asserted by [plaintiff] does not necessarily mean that it has personal jurisdiction over that same defendant as to [plaintiff]'s other claims.").

Here, both Defendants Sundbeck and Ghazey are subject to specific personal jurisdiction in this Court. This is because both allegedly communicated with Defendant Avraamides, who was located in New Jersey, to discuss the supposed conspiracy. Specifically, IPP allege that Defendant Ghazey emailed Defendant Avraamides discussing a strategic plan, where he used the code phrase "peace in the valley." (IPP Compl. ¶ 100). In another email, Defendant Avraamides wanted to confirm "peace in the valley." (IPP Compl. ¶ 101) (internal quotations omitted).

**\*16** Defendant Sundbeck also called Defendant Avraamides to note that his company wanted " 'peace in the valley' and not to bring down the market price." (IPP Compl. ¶ 99)(internal quotations omitted). IPP point to various

Case 1:19-md-02875-RMB-SAK     Document 1382-8     Filed 07/12/21     Page 231 of 535
PageID: 32178

In re Liquid Aluminum Sulfate Antitrust Litigation, Not Reported in Fed. Supp. (2017)

2017 WL 3131977

documentary evidence supporting said communications. (*See* IPP Opp. Br. at n. 45). IPP Compl. even details a conversation between Defendant Ghazey and Defendant Avraamides where they discussed a meeting with Defendant Sundbeck. (IPP Compl. ¶ 116). That paragraph specifically discussed how Defendant Southern would not be a competitive threat because Defendant Sundbeck welcomed a meeting with Defendant Ghazey and his company. (Id.).

Such communications have been found by this District, as well as the Third Circuit, to be sufficient to confer specific personal jurisdiction. In *Eaton Corp. v. Maslym Holding Co.*, 929 F. Supp. 792, 797 & n. 8 (D.N.J. 1996) the Hon. Maryanne Trump Barry found that communications with a New Jersey defendant was sufficient to confer specific personal jurisdiction. Additionally, the Third Circuit has held phone calls into the forum state regarding the subject matter of the litigation were sufficient to establish the minimum contacts for the District to assert personal jurisdiction over a defendant. *See Grand Entm. Grp., Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476, 482-83 (3d Cir. 1993).

Hence, this Court is satisfied that both Defendants Ghazey and Sundbeck's alleged conduct are sufficient for this Court to assert personal jurisdiction over them. Both Defendants engaged in communications with a resident of New Jersey with the intention and purpose of allegedly furthering the conspiracy. The claims here, at least in part, arise out of said conduct. Thus, IPP Compl. contains enough allegations to support the assertion of personal jurisdiction in this District.

Moreover, even if personal jurisdiction did not exist, which this Court explicitly disagrees with, the MDL standing order would lead to an identical result. This is because the MDL statute explicitly carves out venue and *in personam* jurisdiction restrictions when actions are transferred pursuant to said statute. 28 U.S.C. § 1707. The Judicial Panel on Multidistrict Litigation has explicitly rejected due process challenges to case transfers under *28 U.S.C. § 1407*, and the Second Circuit has noted that the MDL statute authorized national personal jurisdiction when cases are transferred under said statute. *See In re Sugar Industry Antitrust Litig.*, 399 F. Supp. 1397, 1400 (J.P.M.D.L. 1975); *In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 145, 163 (2d Cir. 1987). Accordingly, if this Court were to rule that Defendants Ghazey and Sundbeck must be sued in their forum states, the result would be the same. In other words, these individual Defendants will be required to defend this action in the

District of New Jersey regardless of where the action is initiated because of the current MDL standing order regarding Alum related lawsuits. Accordingly, this Court will not dismiss IPP Compl. against Defendants Ghazey or Sundbeck for lack of personal jurisdiction.

**C. Choice of Law**

New Jersey's choice of law principles are applicable to this matter since federal courts with diversity jurisdiction must apply the choice of law principles of the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941). However, the Court need not address any choice of law arguments at this juncture, since choice of law analysis has routinely been found to be premature at the motion to dismiss phase of a class action lawsuit, especially when certain discovery is needed to further develop the facts that will be used in the choice of law analysis. *See, e.g., Prudential Ins. Co. of Am. v. Goldman, Sachs & Co.*, 2013 WL 1431680, at *5 (D.N.J. Apr. 9, 2013) (finding choice of law analysis at motion to dismiss premature); *In re Samsung DLP Television Class Action Litig.*, No. 07-cv-2141, 2009 WL 3584352, at *3 (D.N.J. Oct. 27, 2009) (same); *In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46, 55 (D.N.J. 2009) (same); *see also Arcand v. Brother Int'l Corp.*, 673 F. Supp. 2d 282, 295 (D.N.J. 2009) (finding that New Jersey's most significant relationship test requires a fact-sensitive analysis that cannot be performed on a record that consists solely of a complaint and motion to dismiss); *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 541 (D.N.J. 2004) (finding that a choice of law analysis is premature at the motion to dismiss phase). Accordingly, this Court will not engage in a choice of law analysis at this point in the action.

**\*17** Further, the various Defendants fail to explain how any of the various Plaintiffs' common law claims conflict with the laws of their home states. Rather, Defendants simply conclude that a conflict exists and therefore, the subject Complaints must be dismissed. Yet, as noted above, the most significant relationship test is a fact-sensitive inquiry. Accordingly, the Court declines to engage in a choice of law analysis at this juncture, and Defendants' Motions to Dismiss based on same are hereby denied.

**D. Statute of Limitations and Fraudulent Concealment**

2017 WL 3131977

Defendants Southern, USALCO, Ghazey, Sundbeck, and Kemira all assert that the respective claims against them are time barred by the relevant statute of limitations. (ECF Nos. 249, 250, 308, 310, 311). According to Defendant Southern, the statute of limitations bars DPP's Sherman Act claims. (ECF No. 249 at 13, 29-27). Defendant USALCO makes similar arguments against DPP Compl., arguing that DPP failed to plead fraudulent concealment thereby barring said claims under the statute of limitations. (ECF No. 250 at 18-24). Defendant Ghazey, relying on arguments advanced in the Defendants' Joint Motion to Dismiss (ECF No. 303, 308), avers that all claims asserted against him are barred by the relevant statutes of limitations. (ECF No. 303, 308). Indeed, Defendants jointly advance statute of limitations arguments regarding various claims, including unjust enrichment and state-specific statutory claims. (ECF No. 308). Defendant Sundbeck adopts Defendant Ghazey's statute of limitations arguments. (ECF No. 310). Finally, Defendant Kemira adopts the statute of limitations arguments advanced by the Joint Motion to Dismiss (ECF No. 311).

The Court is not persuaded by any of the above arguments regarding the statutes of limitations. This is because IPP, as well as all other Plaintiffs, have sufficiently pled fraudulent concealment.[22] For fraudulent concealment to toll the statute of limitations, a plaintiff must plead "(1) wrongful concealment by the party raising the statute of limitations defense, resulting in (2) plaintiff's failure to discover the operative facts forming the basis of his cause of action during the limitations period (3) despite the exercise of due diligence." *Dewey v. Volkswagen AG*, 558 F. Supp. 2d 505, 523 (D.N.J. 2008).

Here, the Court is satisfied that all Plaintiffs have sufficiently pled fraudulent concealment and meet the above standard. DPP allege Defendants collectively engaged in fraudulent concealment when they made false representations to DPP, and members of the DPP Class, that Defendants were not engaged in any collusion. (DPP Compl. ¶ 122). "These [allegedly] false representations took many forms, including 'non-collusion affidavits' and representations made in connection with Defendants' bid submissions." (DPP Compl. ¶ 122). DPP also allege that the conspiracy itself was inherently "self-concealing" since the bids "were submitted through the operation of the conspiracy [to give] the appearance of competition, when, in fact, none existed." (DPP Compl. ¶ 122). Due to this alleged concealment, DPP allege they had no actual nor constructive knowledge. (DPP Compl. ¶ 122). DPP further allege that they was no way for them

to learn of the purported conspiracy through any sort of reasonable diligence, and only became aware of same when Defendant Reichl's plea agreement was filed and made public. (DPP Compl. ¶ 123). According to DPP, "Defendants engaged in a secret conspiracy that did not reveal facts that would put [DPP or the DPP Class] on inquiry notice that there was [an alleged] conspiracy to fix prices for Alum[,] ... [and that] Defendants routinely met and had private conversations" to discuss how they could further the alleged conspiracy. (DPP Compl. ¶ 124).

**\*18** DPP claim Defendants engaged in fraudulent concealment by affirmatively, but falsely, representing to DPP that their bids for Alum business were free from collusion or that there was any form of illegal coordination. (DPP Compl. ¶ 125). Once again, DPP point to the "non-collusion affidavits" signed by Defendants in connection with their bids and say that those affidavits alone made affirmative false representations. (Id.). In other instances, where such affidavits were not required, Defendants allegedly made affirmative false misrepresentations that the bid did not involve any other person or entity, nor were they in agreement with any third-party. (DPP Compl. ¶ 126). Additionally, DPP allege that Defendants falsely asserted that the reason for the increased price of Alum "was attributable *entirely* to higher raw material and energy costs." (DPP Compl. ¶ 127)(emphasis added). Moreover, Defendants allegedly further concealed the supposed conspiracy by assuring that very few written communications regarding same were in existence. (DPP Compl. ¶ 128). This secrecy, DPP allege, assured that DPP would never have any actual or constructive knowledge of the conspiracy. (DPP Compl. ¶¶ 129-30). IPP, Plaintiff Shreveport, and Plaintiff Florida all make nearly identical allegations of fraudulent concealment. (IPP Compl. ¶¶ 185-90; Shreveport Compl. ¶¶ 78-87; Fl. Compl. ¶¶ 107-24).

Here, the Court is satisfied that all Plaintiffs have sufficiently pled fraudulent concealment, and, accordingly, the statute of limitations defense is insufficient at the Motion to Dismiss phase.[23] To be clear, this Court is not concluding that Defendants did in fact fraudulently conceal the alleged conspiracy, but rather, it is merely satisfied that Plaintiffs have sufficiently pled same. Because Plaintiffs have successfully pled fraudulent concealment, the statute of limitations may be equitably tolled. Accordingly, the Court finds that it is inappropriate to dismiss the claims at this stage in the litigations. Defendants may renew this argument at a later point, should discovery lead them to a different conclusion.

Case 1:19-md-02875-RMB-SAK     Document 1382-8     Filed 07/12/21     Page 233 of 535
PageID: 32180

In re Liquid Aluminum Sulfate Antitrust Litigation, Not Reported in Fed. Supp. (2017)

2017 WL 3131977

### E. Article III Standing

Defendants jointly argue that IPP lack standing to bring this action. (ECF No. 306-1 at 416). Defendants specifically argue that IPP lack both Article III standing as well as Antitrust standing. (Id.). For the following reasons, the Court rejects both arguments.

### i. IPP Have Article III Standing

Article III standing requires Plaintiffs to allege: 1) an injury in fact; 2) causation; and 3) redressability. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). The purpose of the standing requirement is to assure that the "party seeking relief has 'alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination' of difficult constitutional questions before it.' " *Flast v. Cohen*, 392 U.S. 83, 99 (1968). Class action plaintiffs are not excused from the above Article III standing requirement. *See McGuire v. BMW N. Am.*, 2014 WL 2566132, *5 (D.N.J. June 6, 2014)*(Linares, J.) Defendants do not challenge that IPP have pled both causation and redressability with regard to these claims, nor do they assert that Plaintiffs have insufficiently pled any of the three claims. (*See* ECF No. 306-1 at 5-7). Rather, Defendants focus their argument strictly on injury in fact and residency of the named IPP. (Id.).

This Court is unpersuaded by either argument. Indeed, IPP Compl. is replete with claims of damages, such that it can be said IPP have a personal stake in the outcome of the litigation. Without belaboring the point by reciting all of IPP's allegations stated above, IPP have pled that they indirectly purchased Alum "through intermediary distributors, resellers, retailers, wholesales, and chemical supply companies." (IPP Compl. ¶ 3). According to IPP, Alum is sold directly to DPP who then sell smaller quantities to IPP. (IPP Compl. ¶ 4).

**\*19** As noted above, IPP Compl. contains sufficient allegations to outline the scheme that Defendants allegedly engaged in. (*See e.g.* IPP Compl. ¶¶ 5-11, 78-173). Those allegations discuss when, how, and even why Defendants allegedly chose to conspire with each other, with the ultimate purpose being to inflate the price of Alum and assure that each Defendant increased their respective profits. Based on these allegations, IPP allege competition for Alum was restrained, thereby increasing the price of Alum, which caused IPP to pay more for the product. (IPP Compl. ¶¶ 182-83). IPP specifically allege that the "inflated and supra-competitive prices" for Alum caused them to sustain a concrete injury in increased costs which they would not have been subjected to "in the absence of Defendants' [allegedly] illegal conduct, combination or conspiracy." (IPP Compl. ¶¶ 183-84). To say that IPP have not pled an injury is simply nonsensical. Accordingly, the Court rejects Defendants' argument that IPP lack Article III standing for failing to plead an injury.

The Court also rejects Defendants' argument that the named IPP Plaintiffs lack standing to bring state law claims under the laws of a state in which they do not reside. (ECF No. 306-1 at 5). As IPP correctly note, the United States Supreme Court has made it clear that District Courts should defer addressing standing questions concerning putative class members who are not named until after class certification when certification of the class is "logically antecedent" to the issue of standing.

*See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 612 (1997). It is true that class certification here is "logically antecedent" to the issue of standing. This is because class discovery will unveil the various members of the currently unknown class. Indeed, this Court has previously ruled on a nearly identical issue and declined to rule on standing until the Court addresses class certification. *See In re Hypodermic Prods. Antitrust Litig.*, MDL No. 1730, 2007 WL 1959225, *15 (D.N.J. June 29, 2007)*(Linares, J.) (quoting *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 816 (1999)); *see also Warma Witter Kreisler, Inc. v. Samsung Electronics Am., Inc.*, Civ. No. 08-5380, 2009 WL 4730187 (D.N.J. Dec. 3, 2009)(Linares, J.) (citations omitted). Upon such revelation, the Court will be able to ascertain whether each of the 33 state-based claims has a proper representative who resides in the subject states and if those claims may proceed, even if the named IPP Plaintiffs' claims become moot. *See U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 413 (1980). Hence, dismissal at this juncture would be inappropriate.

### ii. IPP Have Antitrust Standing

Defendants also jointly argue that IPP Compl. should be dismissed since IPP do not have Antitrust standing. (ECF No. 306-1 at 7-16). More specifically, Defendants aver that each IPP has failed to allege sufficient facts to support standing

2017 WL 3131977

under the various state antitrust statutes. (Id.). In making this argument, Defendants rely heavily on *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983)(hereinafter "*AGC*"). According to IPP, adopting this argument would be a resurrection of the United States Supreme Court's decision in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), which denied indirect purchasers a right to pursue federal antitrust actions. (ECF No. 337 at 46-47). IPP further note that the Supreme Court clearly has permitted states to reject *Illinois Brick* by way of state legislation and still permit indirect purchasers the right to sue under their state's antitrust laws. (Id.).

Indeed, the Supreme Court has directly addressed whether states may reject the *Illinois Brick* doctrine in *California v. ARC America Corp.*, 490 U.S. 93 (1989). *ARC* involved an antitrust action brought by the States of Alabama, Arizona, California, and Minnesota on behalf of themselves and classes of all governmental entities within each state. *ARC*, 490 U.S. at 98. The plaintiffs in *ARC* alleged that defendants therein partook in a nationwide conspiracy to fix the price of cement. *Id.* Additionally, similar to this case, some of the plaintiffs were indirect purchasers and alleged violations of their own states' antitrust laws. *Id.* "The District Court certified the actions as class actions and established a number of plaintiff classes. Between July 1979 and October 1981, several major defendants settled with the various classes, resulting in a settlement fund in excess of $32 million. The settlements left distribution of the fund for later resolution, subject to approval of the District Court." *Id.* at 98-99.

**\*20** The indirect purchasers sought payment approval from the settlement fund for their state law based claims. *Id.* at 99. The direct purchaser plaintiffs objected. *ARC, supra* at 99. The District Court "refused to allow the claims against the fund pursuant to state indirect purchaser statutes," relying on *Illinois Brick, supra. Id.* The Ninth Circuit affirmed and the indirect purchasers' petition for *certiorari* was granted. *Id.* The Supreme Court clarified that the complaints in the matter sought relief under both federal and state antitrust statutes. *Id.* at 100.

The Court recited the history and purpose of pre-emption and concluded that *Illinois Brick* did not preclude the indirect purchasers from maintaining antitrust claims pursuant to their state antitrust statutes. *Id.* at 100-06. According to the Court,

state antitrust laws "are consistent with the broad purposes of the federal antitrust laws: deterring anticompetitive conduct and ensuring the compensation of victims of that conduct." *Id.* at 102 (citing *Illinois Brick, supra* at 746; *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 485-86 (1977)). The Court further noted that *Illinois Brick* dealt strictly with "what was the proper construction of § 4 of the Clayton Act." *Id.* at 103 (citations omitted). Hence, the Supreme Court concluded that "nothing in *Illinois Brick* suggests that it would be contrary to congressional purposes for States to allow indirect purchasers to recover under their own antitrust laws." *Id.*

*ARC*'s holding remains valid law and directly addresses the issue herein. IPP's antitrust claims are all based on various state antitrust statutes. (IPP Compl. ¶¶ 191-96(aa)). Those claims contain state-specific allegations that Defendants participated in a conspiracy designed to inflate the price of Alum and allocate customers in contravention of each state's specific antitrust statute. (Id.). When these allegations are read in conjunction with IPP's allegations regarding the conspiracy itself, it is apparent that IPP have properly alleged that the conspiracy caused them to sustain damages in the form of purchasing overpriced Alum from one or more direct purchasers. IPP are correct that "Defendants will have ample opportunity to challenge whether IPP can *prove* that the [alleged] collusive overcharges were passed on to and paid for by the class at the summary judgment stage, or at trial." (ECF No. 337 at 51). At the pleadings stage this Court must accept IPP Compl. as true. Thus, as noted above, the Court is satisfied that IPP have pled facts sufficient to support antitrust standing under each of the state-specific antitrust statutes. Accordingly, Defendants' Motion to Dismiss based on lack of antitrust standing is hereby denied.

### F. Sufficiency of the Allegations

Both corporate and individual Defendants assert that the claims asserted against each are insufficiently pled. For purposes clarity, the Court will analyze each of the four subject complaints separately below.

### i. DPP Compl. [24]

**\*21** Defendants Southern and USALCO move to dismiss DPP's single claim of violation of Section 1 of the Sherman Act asserting that DPP have not sufficiently pled a *prima*

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 235 of 535
PageID: 32182

In re Liquid Aluminum Sulfate Antitrust Litigation, Not Reported in Fed. Supp. (2017)

2017 WL 3131977

*facie* cause of action under the statute. (ECF Nos. 249; 250-1). Section 1 of the Sherman Act provides that:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $ 100,000,000 if a corporation, or, if any other person, $ 1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

15 U.S.C. § 1. The Third Circuit has explained that there are four essential elements of a § 1 violation:

> (1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted action was illegal; and (4) that the plaintiff was injured as a proximate result of the concerted action.

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 442 (3d Cir. 1997). Moreover, "[b]ecause § 1 of the Sherman Act 'does not prohibit [all] unreasonable restraints of trade ... but only restraints effected by a contract, combination, or conspiracy,' '[t]he crucial question' is whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement, tacit or express.' " *Twombly*, 550 U.S. at 553. As a result, "stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Id.* at 556.

In this matter, the Court finds that DPP have sufficiently pled their claim under the Sherman Act. DPP Compl. is laden with ample facts to support each and every element laid out by the Third Circuit in *Queen City Pizza*. DPP provide a robust explanation of Alum and the Alum industry. (DPP Compl. ¶¶ 53-71). Therein, DPP explain that the Alum market is susceptible to collusion due to the fact that it is highly concentrated and has experienced heavy consolidation. (DPP Compl. ¶¶ 61-64). Furthermore, DPP allege that there is no practical substitute for Alum, thereby restricting DPP's ability to avoid the supposedly inflated prices and requiring them to continue purchasing Alum from Defendants. (DPP Compl. ¶¶ 67-68).

Thereafter, DPP explain that Defendants, acting in concert, colluded to fix the price of Alum and allocate customers. (DPP Compl. ¶¶ 72-121). Some specific examples of collusion include various in-person meetings Defendants attended where the alleged conspiracy was discussed and plans for the furtherance of the alleged conspiracy were made. (DPP Compl. ¶¶ 76-80). DPP also include allegations of specific bid rigging instances which produced an anticompetitive market for Alum. (DPP Compl. ¶¶ 81-121). DPP also allege that Defendants' conduct was illegal as it violated Section 1 of The Sherman Act. (DPP Compl. ¶¶ 132-40). Finally, DPP have sufficiently alleged that they have been harmed by the Defendants' concerted effort to price fix Alum as they were forced to pay more for an item they needed to operate their businesses and/or municipalities. (DPP Compl. ¶¶ 135-38). Accordingly, DPP have pled all the requisite elements necessary to assert a *prima facie* cause of action for violation of Section 1 of the Sherman Act. Therefore, Defendants' Motions to Dismiss DPP Compl. is denied.

### ii. Shreveport Compl.

**\*22** As discussed, Shreveport Compl. contains two claims. The first is for violation of Section 1 of The Sherman Act and the second is for violation of Louisiana's Monopolies Act under La. Rev. Stat. § 51:122. (*See generally* Shreveport Compl.). Only GCC Defendants and Defendant GEO have moved to dismiss Shreveport Compl., and those Motions are based on those Defendants' Bankruptcies, which this Court addressed in III.A, *supra*. Since no other Defendant attacks

In re Liquid Aluminum Sulfate Antitrust Litigation, Not Reported in Fed. Supp. (2017)

2017 WL 3131977

the sufficiency of the allegations contained in Shreveport Compl. under 🔖 Rule 12(b)(6) the action shall proceed in due course.

### iii. Fl. Compl.

Plaintiff Florida's Compl. asserts the following causes of action: 1) Violation of Section 1 of The Sherman Act; 2) Violation of the Florida Antitrust Act; and 3) Violation of the Florida Deceptive and Unfair Trade Practices Act. (*See generally* Fl. Compl.). Both GCC Defendants and Defendant GEO moved to dismiss Fl. Compl. based on their respective Bankruptcies, which the Court addresses in III.A, *supra*. Additionally, Defendants GEO, C&S, and C&S Georgia also attack the sufficiency of the allegations within Fl. Compl. (*See* ECF Nos. 368, 369). C&S Defendants argue that Plaintiff Florida has failed to properly allege a *prima facie* claim under Section 1 of the Sherman Act, Florida's Antitrust Act, and Florida's Deceptive and Unfair Trade Practices Act. (ECF No. 368). Meanwhile, Defendant GEO argues that both the Federal and State Antitrust claims must be dismissed because Plaintiff Florida cannot recover damages on behalf of private businesses or entities, and because Plaintiff Florida allegedly cannot seek civil penalties under the Florida Antitrust Act. (ECF No. 369). Additionally, Defendant GEO avers that Plaintiff Florida has failed to plead a *prima facie* cause of action pursuant to the Florida Deceptive and Unfair Trade Practices Act. (Id.).

First, the Court rejects any arguments that Plaintiff Florida has insufficiently pled a claim under Section 1 of The Sherman Act. As with DPP Compl., Fl. Compl. contains more than sufficient allegations regarding the conspiracy and the Movants involvement in same. Just as with all the subject Complaints, Plaintiff Florida provides an explanation of Alum and the Alum market. (FL. Compl. ¶¶ 30-57). Plaintiff Florida then outlines Defendants' allegedly competitive conduct. (Fl. Compl. ¶¶ 58-103). Therein, Plaintiff Florida makes direct allegations regarding Movants.

Specifically, Plaintiff Florida alleges that Defendant GEO and C&S Defendants "conspired to circumvent competitive bidding and independent pricing and to raise [Alum] prices by submitting artificially inflated bids in Florida and elsewhere." (Fl. Compl. ¶ 58). Plaintiff Florida also alleges that "[e]xecutives from [Defendants] C&S Chemicals ... and GEO communicated with their competitors by telephone, email, or at meetings on at least hundreds of occasions.

These executives included [*Defendant*] GEO executive Brian Steppig ... and [*Defendant*] C&S Chemicals executive Rob Chandler." (Fl. Compl. ¶ 61)(emphasis added). Fl. Compl. then goes on to detail Defendant GEO's alleged conspiracy related acts performed in concert with GCC Defendants. (Fl. Compl. ¶¶ 62-69). Additionally, Plaintiff Florida describes C&S Defendants alleged efforts to further the conspiracy performed in concert with GCC Defendants. (Fl. Compl. ¶¶ 70-103).

All of the aforementioned allegations are detailed accounts of Movants involvement in the alleged conspiracy. For example, as to Defendant GEO, Plaintiff Florida alleges that Defendant GEO and GCC Defendants "agreed to allocate the liquid aluminum sulfate account of a pulp and paper manufacturer in Florida to [Defendant] GEO from 2004 to 2011, resulting in inflated revenues to [Defendant] GEO of approximately $2.9 million." (Fl. Compl. ¶ 67). As to C&S Defendants, Plaintiff Florida discusses how in late 2008 Defendant "Gupta assessed the competitive state of [GCC Defendants'] plants, including its plant in Tampa, Florida. [Defendant Gupta] indicated that [C&S Defendants] knew better than to compete with [GCC Defendants], and that [GCC Defendants] could therefore extract substantial price increases from its customers." (Fl. Compl. ¶ 74).

**\*23** Accordingly, the Court is satisfied that Plaintiff Florida has sufficiently pled a *prima facie* cause of action for violation of Section 1 of The Sherman Act. Fl. Compl. contains more than sufficient allegations that Movants acted in concert to fix and raise the price of Alum. Moreover, Fl. Compl. contains sufficient allegations that Movants achieved said result and that their alleged conspiracy was illegal. Finally, Fl. Compl. contains ample allegations regarding the damages Plaintiff Florida sustained, mainly in the form of paying for Alum at an artificially inflated price.

The Court is also satisfied that Plaintiff Florida has sufficiently pled a *prima facie* claim under the Florida Antitrust Act. Florida's Antitrust Act is analogous to The Sherman Act and is to be analyzed under the same set of rules and case law as federal antitrust laws. *See* Fla. Stat. §§ 542.16; 542.18; 542.32. Florida courts have held that courts should review Motions to Dismiss claims under the Florida Antitrust Act consistent with *Twombly, supra. See MYD Marine Distrib., Inc. v. Int'l Paint Ltd.*, 76 So. 3d 42, 47 n.4 (Fla. 4th DCA 2011); *see also St. Petersberg Yacht Charters, Inc. v. Morgan Yacht, Inc.*, 457 So. 2d 1028, 1032 (Fla. 2d DCA 1984)("the Florida legislature, has, in effect, adopted as

In re Liquid Aluminum Sulfate Antitrust Litigation, Not Reported in Fed. Supp. (2017)

2017 WL 3131977

the law of Florida the body of antitrust law developed by the federal courts under the Sherman Act violations."). Hence, consistent with the finding that Plaintiff Florida sufficiently pled a *prima facie* cause of action under The Sherman Act against Movants, this Court finds that Plaintiff Florida has also pled a *prima facie* claim under the Florida Antitrust Act. Thus, at this juncture, this claim may not be dismissed.

Additionally, the Court finds that Plaintiff Florida has sufficiently pled its claim under the Florida Deceptive and Unfair Trade Practices Act. The parties agree that Florida's Deceptive and Unfair Trade Practices Act prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fl. Stat. § 501.204(1). "To prevail on a [Florida Deceptive and Unfair Trade Practices Act] claim, a plaintiff must establish: (1) a deceptive or unfair practice; (2) causation; and (3) damages." *Dimattina Holdings, LLC v. Steri-Clean, Inc.*, 195 F. Supp. 3d 1285, 1291 (S.D. Fla. 2016). "A plaintiff can demonstrate a deceptive or unfair practice by showing either: (1) a representation, omission, or practice likely to mislead the consumer; or (2) violation of any law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition or unfair practices." *Dimattina Holdings*, 195 F. Supp. 3d at 1291. When analyzing whether a claim may lie under the Florida Deceptive and Unfair Trade Practices Act, Courts are guided by federal antitrust laws. *See* Fla. Stat. § 501.204; *see also* *Mack v. Bristol-Meyer Squibb Co.*, 673 So. 2d 100, 104 (Fla. 1st DCA 1996)("a court should consider whether the [Fair Trade Commission] and federal courts deem such conduct to be an unfair method of competition or an unconscionable, unfair or deceptive act or practice under ... the [Fair Trade Commission] Act" when attempting to analyze whether certain conduct violates the Florida Deceptive and Unfair Trade Practices Act). The *Mack* court found that "it is well established that collusive price-fixing constitutes a violation of section 5(a)(1) of the Fair Trade Commission Act." *Mack*, 673 So. 2d at 104.

Here, Plaintiff Florida has indeed sufficiently pled a claim under the Florida Deceptive and Unfair Trade Practices Act. This is because it has pled deceptive or unfair conduct on the part of Defendants. Specifically, Plaintiff Florida properly plead violations of both The Sherman Act and the Florida Antitrust Act. Consistent with the holding in *Mack*, both of these alleged violations constitute deceptive or unfair conduct, and, accordingly, Plaintiff Florida have met the first element of the claim. Additionally, Fl. Compl. also contains

sufficient allegations regarding the damages Plaintiff Florida sustained as a result of Defendants' alleged conduct. (Fl. Compl. ¶ 106, 143-53). Hence, Plaintiff Florida has pled all three elements necessary to assert a claim under Florida's Deceptive and Unfair Trade Practices Act, and this Court will not dismiss same.

**\*24** Finally, the Court is not persuaded by Defendant GEO's argument that Plaintiff Florida cannot recover damages on behalf of private entities or businesses, or the argument that Plaintiff is not entitled to seek civil penalties under the Florida Antitrust Act. First, Florida law provides the following:

> No action under [section 524.21(4) or s. 542.23 shall be commenced by the Attorney General against any person, who, at the time is a defendant in a suit filed by the United States for violation or alleged violation of the federal antitrust laws involving substantially the same subject matter and seeking the same relief.

Fla. Stat. § 524.21(4). Thus, this action would be precluded if: 1) Defendant GEO was a defendant in an action brought by the United States Government at the time Fl. Compl. was filed; 2) Plaintiff Florida sought the same relief in Fl. Compl. that the United States Government sought in the action it brought against Defendant GEO; and 3) both actions involved substantially the same subject matter. *Id.*

Here, that is simply not the case. As Plaintiff Florida correctly notes, Defendant GEO was not currently involved in any litigation with the United States at the time Fl. Compl. was filed. This is because Defendant GEO pled guilty to violations of The Sherman Act on June 16, 2016 and the action was terminated on June 21, 2016. (*See* Crim. No. 16-290). Meanwhile, Fl. Compl. was filed in January of 2017. Hence, no concurrent actions were pending against Defendant GEO that involved the United States at the time Plaintiff Florida brought its claim for violation of the Florida Antitrust Act. Moreover, the prior action between Defendant GEO and the United States was a criminal matter, where the Government sought criminal sanctions for Defendant GEO's conduct. Here, however, Plaintiff Florida seeks to recover civil damages. Accordingly, the type of relief sought in both actions are not "substantially the same." Therefore, Plaintiff

2017 WL 3131977

Florida is not barred from seeking civil penalties under the Florida Antitrust Act.

Finally, Defendant GEO is correct that Plaintiff Florida may not attempt to recover damages on behalf of private entities or businesses. *See* Fla. Stat. § 542.22(2). Plaintiff Florida concedes this point, but notes that it does not attempt to recover such damages. (ECF No. 373 at 30). Rather, the damages and various forms of injunctive relief sought in Fl. Compl. are on behalf of the State of Florida and its municipalities. (Fl. Compl. ¶¶ 126, 130-32, 134-35, 139-40, 142, 153(e)). Therefore, dismissal based on this argument is inappropriate as it is inapplicable to the claims asserted, and relief sought, by Plaintiff Fl.

### iv. IPP Compl.

Aside from attacking IPP's antitrust claim under The Sherman Act, Defendants jointly move to dismiss IPP's state-law-based claims for "Violations of State Consumer Protection and Unfair and Deceptive Trade Practices Statutes" as well as IPP's state-law-based "Unjust Enrichment and Disgorgement of Profits" claims. (ECF No. 306). The Joint Motion to Dismiss advances different arguments for each state-law-based claim. (Id.).

#### 1. State-Law-Based Statutory Antitrust and Consumer Protection Claims

First, Defendants argue that Plaintiffs have not alleged a sufficient nexus between the purported antitrust conduct and certain states to satisfy those states' statutory requirements. [25] According to Defendants, the allegations are conclusory and fail to meet the requisite showing of a nexus between Defendants' alleged conduct and the forum state. (ECF No. 306-1 at 16-20). However, this Court agrees with IPP that pleading intrastate conduct and allegations of nationwide price-fixing satisfies the nexus requirement for asserting claims under state antitrust and/or consumer fraud statutes.

*See* *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 407-08 (S.D.N.Y. 2011)(finding the nexus requirement satisfied when defendants' conduct was "in a continuous and uninterrupted flow of intrastate and interstate commerce."). Indeed, courts throughout the nation have found that pleading intrastate and interest commerce does in fact satisfy the nexus requirement for state-based statutory claims. [26]

**\*25** The Court is satisfied that IPP have properly pled sufficient facts relating to interstate commerce such that they overcome Defendants' "nexus to the state" argument. IPP allege that the conspiracy took place across the United States and thereby implicates the statutory law of the seventeen states Defendants seek dismissal of. (IPP Compl. ¶¶ 2-11, 78-83, 117-19, 177). Moreover, IPP include allegations that show that Defendants' alleged conduct impacted IPP in their home states, which happen to also be the state-based claims Defendants seek to have dismissed. (*See, e.g.*, IPP Compl. ¶¶ 105-07, 117-19, 126-41). Accordingly, Defendant's "nexus to the state" argument fails, and this Court will not dismiss those statutory claims.

Defendants next argue that IPP's claims under the Illinois Antitrust Act, Alabama Deceptive Trade Practices Act, and South Carolina Unfair Trade Practices Act must be dismissed because, under those statutes, these claims may not be maintained as class actions. (ECF No. 306 at 20-21, 29-30). However, Defendants' argument fails to appreciate United States Supreme Court precedent. Specifically, Defendants' argument does not acknowledge *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010). There, the Supreme Court held that, despite the fact that a state statute prohibits certain matters from proceeding as class action, such a bar does not apply to federal law suits.

*Shady Grove*, 559 U.S. at 398. The Court's ruling relied on Rule 23 of the Federal Rules of Civil Procedure, holding that Rule 23 did not "abridge, enlarge or modify" any substantive right under the statute. *Id.* at 398. Thus, while the subject statutes may prohibit the Illinois, Alabama, and South Carolina statutory claims from proceeding as class actions, such a bar is inapplicable to this action. Accordingly, the Court rejects Defendants' argument regarding same.

Next, Defendants argue that IPP may not maintain a claim under the Arkansas Deceptive Trade Practices Act because the statute does not list "price-fixing" as an actionable claim under the statute. (ECF No. 306-1 at 21)(citing Ark. Code Ann. §§ 4-88-101, *et seq.*). However, Defendants' argument does not take into account that the Arkansas Deceptive Trade Practices Act explicitly states that the "deceptive and unconscionable trade practices listed [therein] are in addition to and do not limit the types of unfair trade practices actionable at common law or under other statutes

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 239 of 535
PageID: 32186
In re Liquid Aluminum Sulfate Antitrust Litigation, Not Reported in Fed. Supp. (2017)
2017 WL 3131977

of" Arkansas. 🚩 Ark. Code Ann. § 4-88-107(b). Hence, the mere fact that "price-fixing" is not enumerated in the Arkansas Deceptive Trade Practices Act does not render such a claim non-actionable under same. *See* 📑 *Baptist Health v. Murphy*, 226 S.W.3d 800, 811 (Ark. 2006)(affirming the Circuit Court's finding that the "Arkansas Deceptive Trade Practices Act ... *makes illegal any trade practice which is unconscionable, which includes conduct violative of* public policy *or statute*.")(internal citations and quotations omitted) (emphasis added).

Defendants' reliance on 📑 *Depriest v. Astrazeneca Pharms., L.P.*, 2008 WL 3243562 (Ark. Cir. Ct. Jul. 31, 2008), *aff'd,* 📑 351 S.W.3d 168 (Ark. 2009) is misplaced for two reasons. First, that case related to fraudulent marketing and not price-fixing. *See* 📑 *Depriest,* 2008 WL 3243562, *1-2. Moreover, to the extent the "price-fixing" claim was raised in *Depriest,* that claim relied on a different provision of the Arkansas Code, Ark. Code Ann. § 4-75-309, which does in fact prohibit a private right of action. *Id.* at 6. IPP's price-fixing claim, however, relies on 📑 Ark. Code Ann. § 4-88-101. Hence, *Depriest* is inapplicable to this case, and Defendants' argument fails as it pertains to the Arkansas Deceptive Trade Practices Act.

 **\*26** The following argument advanced by Defendants is that IPP may not sustain a claim under the Colorado Consumer Protection Act because, Defendants aver, Plaintiffs have not suffered "injury in fact to a legally protected interest." (ECF No. 306-1 at 22). The parties agree that the standard for asserting a claim under the Colorado Consumer Protection Act has been clearly stated in 📑 *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 146-47 (Colo. 2003). There, Supreme Court of Colorado held that a plaintiff asserting a claim under the Colorado Consumer Protection Act must allege the following elements: 1) the defendant engaged in an unfair or deceptive trade practice; 2) in the course of its business; 3) significantly impacting the public as actual or potential customers; 4) the plaintiff suffered an injury in fact to a legally protected interest; and 5) the practice caused the injury. 📑 *Rhino,* 62 P.3d at 146-47.

The Court is satisfied that IPP Compl. meets the above standard and that IPP have stated a *prima facie* claim under the Colorado Consumer Protection Act. As discussed in detail herein, IPP have made allegations regarding Defendants'

supposed illegal conduct and the purported conspiracy. Moreover, IPP have alleged that Defendants' unfair trade practices were in the form of price-fixing and customer allocation and that the conduct occurred during the course of Defendants' business. (IPP Compl. ¶¶ 197-200). Finally, IPP Compl. contains sufficient allegations that IPP suffered injury as "end use purchasers" of Alum as a result of Defendants' purported illegal conspiracy. (IPP Compl. ¶¶ 213-16). Accordingly, IPP have met the above standard and their claim under the Colorado Consumer Protection Act cannot be dismissed at the Motion to Dismiss phase.

Defendants further argue IPP cannot maintain a claim under the District of Columbia Consumer Protection Procedures Act because IPP are not "consumers" as defined by the Act. This argument relies on Defendants' assertion that District of Columbia courts have held that a consumer is a person "who receives or demands goods or services that are primarily for personal, household, or family use." 📑 *Shaw v. Marriott Int'l, Inc.*, 605 F.3d 1039, 1043 (D.C. Cir. 2010). However, this argument does not take into account the D.C. Appellate Court's holding that if "the purchaser is not engaged in the regular business or purchasing this type of goods or service and reselling it, then the transaction will usually fall within the Act." *Adam A. Weschler & Son, Inc. v. Klank*, 531 A.2d 1003, 1005 (D.C. Ct. App. 1989). While this Court is not absolutely certain that IPP will be able to prevail on their District of Columbia Consumer Protection Procedures Act, as they ultimately may be found to not be consumers, that is not the task at hand. IPP Compl., read as true, sufficiently states a claim to proceed. IPP allege that they purchased Alum, that the purchased Alum was not for resale, and that Defendants conspired to fix the price of Alum in order to cause consumers, including IPP, to pay higher prices. (IPP Compl. ¶¶ 19-20, 174, 197-200, 217-20). These allegations are sufficient to survive Defendants' Motion to Dismiss.

Additionally, Defendants argue that IPP's Florida Deceptive and Unfair Trade Practices Claim must be dismissed because it fails to meet the heightened pleading standard of 📑 Fed. R. Civ. P. 9(b). (ECF No. 306-1 at 24). This argument relies mainly on 📑 *Wrestlerunion, LLC v. Live Nation Television Holdings, Inc.*, 2008 WL 3048859, *3 (M.D. Fla. Aug. 4, 2009). However, reliance on *Wrestlerunion* is misplaced as that matter was a contract case with allegations of fraudulent inducement, which implicated 📑 Rule 9(b). *See generally Wrestlerunion.* As a matter of fact, Florida Courts have held

that the heightened pleading requirements of Rule 9(b) are not applicable to claims under the Florida Deceptive and Unfair Trade Practices Act. *See, e.g., Galstaldi v. Sunvest Cmtys. USA, LLC*, 637 F. Supp. 2d 1045, 1058 (S.D. Fla. 2009)(refusing to apply Rule 9(b) to claims under the Florida Deceptive and Unfair Trade Practices Act). Here, the Court is satisfied that IPP have made allegations that Defendants' conduct was deceptive, which caused IPP to pay more for Alum in the State of Florida, to their detriment. (IPP Compl. ¶¶ 169(d), 177, 221-23). Hence, the Court denies Defendants' Motion to Dismiss IPP's claim under the Florida Deceptive and Unfair Trade Practices Act.

**\*27** As to the Hawaii Antitrust Claim, Defendants jointly assert that the claim must fail because the Hawaii Attorney General has the first right of refusal. (ECF No. 306-1 at 25). Defendants rely on Haw. Rev. Stat §§ 480-2, 480-13.3, which states that private actions under Hawaii's Antitrust statute is only permitted after notice is given to the State's Attorney General. While IPP do not seem to wholly agree with this notion, since they do argue that Hawaii's pre-suit notice requirements are inapplicable to federal actions, they do note that they have served pre-suit notice on the Hawaii Attorney General on May 24, 2016. (ECF No. 337 at 79). Therefore, the Hawaii Antitrust statutory requirements have been met and the claim is sustained at this juncture.

Next, Defendants assert that IPP's claim under the New Mexico Unfair Trade Practices Act fails because IPP do not allege an "unconscionable act," which is required by the statute. (ECF No. 306-1 at 25-26). The parties agree that an "unconscionable act" under the statute requires allegations of "a gross disparity between the value received ... and the price paid." *In re Aftermarket Filters Antitrust Litig.*, 2009 WL 3754041, \*9 (N.D. Ill. 2009)("Federal courts have generally permitted claims under the New Mexico Unfair Practices Act in price fixing cases if the plaintiff alleges a gross disparity between the price paid for the product and the value received."); *see also In re Domestic Drywall Antitrust Litig.*, MDL No. 13-2437, 2016 WL 3769680, \*10 (E.D. Pa. Jul 13, 2016). IPP have done just that by alleging "[t]here was a *gross disparity* between the price that [IPP] paid for [Alum] and the value of [Alum] received." (IPP Compl. ¶ 199). In fact, IPP make explicit allegations of "gross disparity" directly in the sub-count where they assert their claim under the New Mexico Unfair Practices Act. (*See* IPP Compl. ¶¶ 238, 240). These allegations, along with allegations of *supra*-competitive prices (*see* IPP Compl. ¶¶ 2, 9, 148, 170, 182-83,

191, 240), are more than sufficient to overcome a Motion to Dismiss. Accordingly, the Court will not dismiss IPP's New Mexico Unfair Practices Act claim.

The next argument advanced by Defendants is that IPP do not have a claim under the Oregon Unfair Trade Practices Act because the statute "does not provide a cause of action for antitrust claims" and does not apply to indirect purchasers. (ECF No. 306-1 at 26-27)(citing Or. Rev. Stat. §§ 646.607-08, 646.725). The parties agree that there are no cases discussing whether indirect purchasers may maintain a price-fixing claim under the Oregon Unfair Practices Act. (ECF No. 306-1 at 26-27 *cf.* ECF No. 337 at 81). However, this Court agrees with IPP's assessment that the Act is to be liberally construed in order to maximize protection of consumers. *See CollegeNet, Inc. v. Embard.Com, Inc.*, 230 F. Supp. 2d 1167, 1173 (D. Ore. 2001). Additionally, the Act is designed to prevent "false or misleading representations of fact" relating to the consumer's cost for goods. Or. Rev. Stat. § 646.608(s).

IPP Compl. contains such allegations, such as the allegation that "raw material cost increases were cited as" as the reason Alum's price was increasing (IPP Compl. ¶ 71); a statement IPP assert was utterly false. IPP also allege that at least one Defendant starkly increased its price for Alum and misrepresented that the increase was due to "worldwide competition and fuel and energy cost used to manufacture and transport" Alum. (IPP Compl. ¶ 119). Finally, IPP allege that Defendants took active steps to prevent their customers from learning about their purported misrepresentations and false statements. (IPP Compl. ¶ 189). The Court believes that these allegations are sufficient to sustain a claim under the Oregon Unfair Trade Practices Act.

**\*28** Defendants further argue that IPP may not maintain a claim under the Rhode Island Unfair Trade Practices and Consumer Protection Act because this claim is a "repackaging" of IPP's antitrust claim. (ECF No. 28-29). This argument relies on two premises. First, Defendants rely on prior arguments that IPP do not have standing to bring an antitrust claim under Rhode Island law. (Id. at 28). However, the Court has disposed of this argument in Section III.E.i, *supra*, and need not readdress same herein.

Next, Defendants argue that IPP's Rhode Island Unfair Trade Practices and Consumer Protection Act claim is merely one for price-fixing, which, Defendants assert, is not actionable

2017 WL 3131977

under said Act. (Id. at 28-29)(citing R.I. Gen Laws § 3-13-1.1, *et seq.*). The following factors have been used to ascertain whether a plaintiff has successfully asserted a claim of "unfairness" under the Rhode Island Unfair Trade Practices and Consumer Protection Act:

(1) whether the practice affronts public policy, as delineated by the common law, statutes, and other established concept[s] of unfairness;

(2) whether it is immoral, unethical, oppressive, or unscrupulous; [and]

(3) whether it causes substantial injury to consumers.

*In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 586 (M.D. Pa. 2009)(internal citations and quotation marks omitted). The Court went on to find that "[t]hese factors encompass price-fixing injuries, and consumers subject to collusive pricing possess a cognizable claim under the [Rhode Island Unfair Trade Practices and Consumer Protection Act.]" *Id.* Additionally, other courts throughout the nation have permitted price-fixing claims to proceed under the subject Act. *See, e.g., In re Refrigerant Compressors Antitrust Litig.*, 2013 WL 1431756, *16 (E.D. Mich. 2013); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1129-30 (N.D. Cal 2008). Additionally, the case Defendants rely on, *In re Dynamic Random Access Memory ("DRAM")*, 516 F. Supp. 2d 1072, 116 (N.D. Cal. 2007) initially did not sustain the price-fixing claim under the Act. However, after plaintiffs therein amended their complaint to allege violations of statutory prohibitions on price-fixing and unscrupulous conduct by defendants to cause injury to consumers in Rhode Island, the Court allowed the claim to proceed. *See In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 536 F. Supp. 2d 1129, 1145 (N.D. Cal. 2008).

Here, as discussed in detail above, IPP have alleged a statutory violation; specifically, IPP allege a violation of The Sherman Act. (IPP Compl. ¶¶ 191-96). That claim alleges Defendants engaged in a conspiracy to illegally fix the price of Alum and improperly allocate customers among themselves. (Id.). IPP further allege that Defendants' purportedly illegal and unscrupulous conduct caused consumers in the State of Rhode Island to be injured as they were forced to pay a higher price of Alum. (IPP Compl. ¶¶ 255-58). Accordingly, IPP have properly pled a claim

under the Rhode Island Unfair Trade Practices and Consumer Protection Act, and the Court will not dismiss the claim at this point in the litigation.

Finally, Defendants assert that IPP may not maintain a claim under the Utah Antitrust Act because IPP are not citizens of Utah. (ECF No. 306-1 at 30)(citing Utah Code Ann. 1953 § 76-10-3101, *et seq.*). IPP agree that under the Utah Antitrust Act, indirect purchasers may recover damages for antitrust violations only if they are citizens or residents of Utah. (ECF No. 337 at 67)(citing Utah Code Ann. 1953 § 76-10-3109(1)(a)). However, IPP correctly note that IPP Compl. "asserts claims under Utah Law on behalf of class members who are citizens or residents of Utah and made purchases in Utah." (ECF No. 337 at 67)(citing IPP Compl. ¶¶ 174). Indeed, allegations that "members of the putative class presumably include Utah citizens and residents" are sufficient to overcome a motion to dismiss indirect purchasers claims under the Utah Antitrust Act when said allegations assert that said "members of the putative classes made purchases in Utah." *In re Asacol Antitrust Litig.*, 2016 WL 4083333, *13 (D. Mass. July 20, 2016). Accordingly, IPP have asserted a *prima facie* claim under the Utah Antitrust Act, and the Court will not dismiss said claim at this juncture.

### 2. State-Law-Based Unjust Enrichment and Disgorgement of Profit Claims

**\*29** Defendants advance three arguments in favor of dismissing IPP's unjust enrichment claims. First, Defendants argue that IPP's unjust enrichment claims must fail because said claims are merely a "repackaging" of IPP's antitrust claims. (ECF No. 306-1 at 32-34) This argument fails at the motion to dismiss phase because a plaintiff is entitled to plead causes of action in the alternative. (*See* ECF No. 337 at 85-86). Pursuant to Rule 8(d)(2) of the Federal Rules of Civil Procedure, a party "may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient." Fed. R. Civ. P. 8(d)(2); *see also Verizon N.J., Inc. v. Ntegrity Telecontent Servs., Inc.*, 219 F. Supp. 2d 616, 635 (D.N.J. 2002). Therefore, Defendants' argument that IPP's unjust enrichment claims are duplicative fails.

Next, Defendants assert that IPP do not plead the essential elements for unjust enrichment claims. (ECF No. 306-1 at 31-32). To assert a *prima facie* cause of action for

unjust enrichment a plaintiff must allege that: "(1) at plaintiff's expense (2) defendant received a benefit (3) under circumstances that would make it unjust for defendant to retain the benefit without paying for it." *In re K-Dur*, 338 F. Supp. 2d 517, 544 (D.N.J. 2004)(citing Restatement of Restitution § 1 (1937)); *see also VRG Corp. v. GKN Realty Corp.*, 135 N.J. 539, 554 (N.J. Sup. Ct. 1994)(stating that a plaintiff seeking to assert a claim for unjust enrichment must establish that "defendant received a benefit[,] and that retention of that benefit without payment would be unjust[,] ... [and plaintiff] expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights."). [27]

Here, IPP Compl. contains all the requisite elements to assert an unjust enrichment claim. IPP allege that at their expense, Defendants gained a benefit. (*See, e.g.*, IPP Compl. ¶¶ 269-77). Therein, IPP Allege that they have conferred an economic benefit to Defendants, by way of profits to Defendants, and that those profits came at the expense of IPP. (IPP Compl. ¶ 270). IPP further allege that it would be futile for them to seek a remedy from any party with whom Defendants had privity of contract with. (IPP Compl. ¶ 271). Moreover, IPP allege that the economic benefit Defendants obtained was derived from their artificially inflated Alum prices and that said benefit was rightfully IPP's. (IPP Compl. ¶¶ 273-74). The Court finds that these generalized allegations, along with the state-specific unjust enrichment allegations (IPP Compl. ¶¶ 278-413), are sufficient to maintain a *prima facie* cause of action for unjust enrichment and declines to dismiss same.

Finally, Defendants assert that IPP have failed to plead the state-specific elements for each state-law-based unjust enrichment claim. (ECF No. 306-1 at 31-32). However, the Court is not persuaded by this argument. Defendants, without citation of law, argue that IPP have failed to reference and/or plead state-specific elements for their unjust enrichment claims. (Id.). Yet, a thorough review of IPP Compl. leads to a different conclusion. IPP dedicate nearly 20 pages to their unjust enrichment claims, where they make different allegations for each and every state. (*See* IPP Compl. 58-79).

**\*30** For example, IPP's Alabama unjust enrichment claim asserts that Defendants earned an economic benefit by charging monopolistic and artificially inflated prices for Alum, that said benefits to Defendants rightfully belonged to IPP, and that Defendants' benefit was earned to IPP's detriment. (IPP Compl. ¶¶ 278-80). Meanwhile, for IPP's Arizona unjust enrichment claim IPP allege that "Defendants derived [an economic benefit by] charging monopolistic and artificially inflated prices for" Alum, that said financial benefits belonged to IPP who paid the artificially inflated and anticompetitive prices to their detriment. (IPP Compl. ¶¶ 281-82). While these allegations may seem identical, IPP continue to make additional allegations in support of their Arizona unjust enrichment claim. Indeed, IPP then allege that they "have been impoverished by the overcharges for" Alum and that "Defendants' enrichment and [IPP's] impoverishment are connected," and that IPP "have no remedy at law." (IPP Compl. ¶¶ 283-85). Additionally, IPP allege that Defendants' enrichment occurred "because of Defendants' illegal activities was without legally cognizable justification" and that "[t]o the extent legal remedies do not sufficiently accomplish disgorgement of Defendants' [alleged] illegal profits from the sale of [Alum] to indirect purchasers in Arizona, Defendants should be ordered to make restitution for the benefit of Arizona indirect purchasers because it would be unjust and inequitable to allow Defendants to retain the benefit of their sales of [Alum] at illegally inflated prices." (IPP Compl. ¶ 286).

When comparing these two claims, the Court is satisfied that IPP did not merely repeat the same allegations for the Alabama and Arizona unjust enrichment claims. The same remains true with the balance of IPP's unjust enrichment claims. (IPP Compl. ¶¶ 290-413). Each of the various unjust enrichment claims contain specific allegations that pertain to that state's law. Hence, the Court will not dismiss the unjust enrichment claims for lack of specificity or vagueness.

## CONCLUSION

For the aforementioned reasons, Defendants' Motions to Dismiss (ECF Nos. 244-1, 249, 250, 255-1, 298, 299-1, 304-1, 306-1, 308, 310, 311, 366-1, 368, 369, 372) Plaintiffs' Complaints are hereby denied. An appropriate Order accompanies this Opinion.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 3131977

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 243 of 535
PageID: 32190
In re Liquid Aluminum Sulfate Antitrust Litigation, Not Reported in Fed. Supp. (2017)
2017 WL 3131977

## Footnotes

1    The Court notes that Defendant C&S withdrew its Motion to Dismiss DPP Compl. on June 6, 2017 (ECF No.
     248) by submitting a request to withdraw same. (ECF No. 394). Additionally, Defendant C&S withdrew its
     Motion to Dismiss IPP Compl. on June 19, 2017 (ECF No. 309) by filing a withdrawal request. (ECF No. 398).

2    This background is derived from DPP's Consolidated Amended Complaint (ECF No. 220 ("DPP Compl.")),
     Indirect Purchaser Plaintiff's ("IPP") Consolidated Class Action Complaint (ECF No. 242 ("IPP Compl.")), The
     City of Shreveport's ("Shreveport") Complaint (ECF No. 1 on Civ. No. 16-4679 ("Shreveport Compl.")), and
     the State of Florida's ("Florida") Complaint (ECF No. 1 on Civ. No. 17-384 ("Fl. Compl.")), all of which the

     Court must accept as true at this stage of the proceedings. See Alston v. Countrywide Fin. Corp., 585
     F.3d 753, 758 (3d Cir. 2009). For purposes of brevity, the Court will cite to DPP Compl., so long as the
     allegations therein are consistent with any of the parallel complaints.

3    A full discussion regarding Alum and the alleged conduct that is the subject matter of this action is contained
     herein, infra.

4    These Defendants shall collectively be referred to as "GenChem Defendants."

5    Defendant Chemtrade Logistics, Inc. is only the subject of Shreveport Compl.

6    The GenChem Defendants and all of the Chemtrade entities shall collectively be referred to as "GCC
     Defendants."

7    Defendant Southern is only the subject of DPP Compl. and IPP Compl.

8    Defendant C&S Georgia is only the subject of Fl. Compl.

9    Defendant USALCO is only the subject of DPP Compl. and IPP Compl.

10   Defendant Kemira is only the subject of IPP Compl.

11   Plaintiff Florida has not asserted any claims against any individual Defendants. See generally Fl. Compl.

12   Defendant Avraamides is only the subject of DPP Compl. and IPP Compl.

13   Defendant Gupta is only the subject of DPP Compl. and IPP Compl.

14   Defendant Ghazey is only the subject of IPP Compl.

15   Defendant Sundbeck is only the subject of IPP Compl.

16   Alum's chemical proper chemical name is $Al_2(SO_4)_3$.

17   Freight logical simply means the supplier that is closest to the customer, who thereby will have a lower bid
     due to the decreased cost of shipping. (DPP Compl. ¶ 106).

18   For purposes of brevity, the Court will discuss a sample of these allegations. However, as noted in n. 1, supra,
     the Court accepts each instance as true for purposes of these motion.

19   The Court is cognizant that the District of Columbia and the Commonwealth of Puerto Rico are not states.
     However, the Court will refer to both as "states" for purposes of consistency throughout this discussion.

20   The Court notes that both Defendants Ghazey and Sundbeck advance additional arguments in support of
     dismissal, which shall be addressed infra.

21   The Goodyear Court also specified that while the "[f]low of a manufacturer's products into the forum ... may
     bolster an affiliation germane to specific jurisdiction ... ties serving to bolster the exercise of specific jurisdiction
     do not warrant a determination that, based on those ties, the forum has general jurisdiction over a defendant."
     Id. at 2855 (emphases in original).

22   The Court notes that IPP are correct in their argument that Puerto Rico law does acknowledge that
     fraudulent concealment tolls a statute of limitations. See Rivera-Ramos v. Roman, 156 F.3d 276, 282 (1st Cir.
     1998)("Puerto Rico law would toll the statute of limitations if-because of active or fraudulent concealment-a
     reasonable person would not have been able to discovery the basis for the lawsuit.")

23   Defendants also jointly assert a statute of limitations argument in favor of dismissing IPP's antitrust claim
     under Puerto Rico law. (ECF No. 306-1 at 27-28). Consistent with the analysis set forth in this subsection, the
     Court concludes that IPP's allegations of fraudulent concealment are sufficient to toll the statute of limitations.

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 244 of 535
PageID: 32191

In re Liquid Aluminum Sulfate Antitrust Litigation, Not Reported in Fed. Supp. (2017)

2017 WL 3131977

(IPP Compl. 185-90) Thus, the Court incorporates its reasoning herein to IPP's antitrust claim under Puerto Rico law.

24    The Court notes that on June 6, 2017, Defendant C&S filed a Motion to Withdraw its Motion to Dismiss DPP Compl. (ECF No. 394). Said Motion was granted by the Court on June 7, 2017. (ECF No. 397). Accordingly, DPP's claims against Defendant C&S shall proceed. The Court also notes that GCC Defendants and Defendant GEO have not moved to dismiss DPP Compl. for insufficiency of the allegations, but rather only based on their previously discussed bankruptcies. *See supra* at III.A; *see also* ECF Nos. 244-1, 251-1. Finally, the Court notes that no individual Defendant has moved to dismiss DPP Compl. Thus, only Corporate Defendants Southern and USALCO are presently moving to dismiss DPP Compl.

25    This argument pertains to the following statutes: 1) California Unfair Competition Law; 2) District of Columbia Antitrust Act; 3) Kansas Restraint of Trade Act; 4) Massachusetts Consumer Protection Act; 5) Mississippi Antitrust Act; 6) Nebraska Junkin Act; 7) Nebraska Consumer Protection Act; 8) Nevada Unfair Trade Practices Act; 9) New Hampshire Consumer Protection Act; 10) New York Donnelly Act; 11) New York Deceptive Trade Practices Act; 12) North Carolina Unfair and Deceptive Trade Practices Act; 13) North Dakota Uniform State Antitrust Act; 14) South Dakota Antitrust Law; 15) Tennessee Trade Practices Act; 16) Vermont Consumer Fraud Act; and 17) West Virginia Antitrust Act. (ECF No. 306-1 at 16-17).

26    *See* *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 253 (D. Conn. 2015)(finding intrastate requirements satisfied by alleging interstate antitrust conduct in Mississippi, New York, Tennessee, and the District of Columbia); *In re Solodyn Antitrust Litig.*, 2015 WL 5458570, 16 (D. Mass. Sept. 19, 2016)( finding intrastate requirements satisfied by alleging interstate antitrust conduct in the District of Columbia, Massachusetts, Mississippi, Nevada, New York, New Hampshire, Oregon, and West Virgina); *In re Suboxone Antitrust Litig.*, 64 F. Supp. 3d 665, 698-99 (E.D. Pa. 2014)(finding intrastate requirements satisfied by alleging interstate antitrust conduct in the District of Columbia, Kansas, North Carolina, North Dakota, South Dakota, Tennessee, and West Virginia); *In re Auto. Parts Antitrust Litig.*, 50 F. Supp. 3d 869, 888-901 (E.D. Mich. 2014)(finding that indirect purchasers' claims under Nebraska's antitrust and Vermont's consumer fraud laws were sufficient since indirect purchasers alleged a price-fixing conspiracy which eliminated competition); *In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524, 540-41 (E.D. Pa. 2010)(holding that allegations that defendant therein sold a significant amount of the subject product in North Carolina satisfied the interstate requirement).

27    The Court notes that there are no material differences between jurisdictions regarding the law of unjust enrichment. Accordingly, the Court's analysis is the same under New Jersey law. *See* *Tele Aid*, 257 F.R.D. at 58 ("While there are minor variations in the elements of unjust enrichment under the laws of the various states, those differences are not material and do not create an actual conflict.").

---

**End of Document**                                  © 2021 Thomson Reuters. No claim to original U.S. Government Works.

TAB 17

*In re New England Compounding Pharmacy, Inc.*, MDL No. 13-02419, 2016 WL
11045600 (D. Mass. Feb. 29, 2016)

2016 WL 11045600
Only the Westlaw citation is currently available.
United States District Court, D. Massachusetts.

IN RE: NEW ENGLAND
COMPOUNDING PHARMACY, INC.
PRODUCTS LIABILITY LITIGATION
This Order Applies to Actions Naming St.
Thomas Outpatient Neurological Center, LLC

MDL NO. 13-02419-RWZ
|
Signed 02/29/2016

OPINION AND ORDER

RYA W. ZOBEL, UNITED STATES DISTRICT JUDGE

**\*1** With bellwether trials approaching, both the Plaintiffs' Steering Committee ("PSC") and the Tennessee Defendants [1] seek to define the scope of the Tennessee Cases. Each side has moved for summary judgment on the applicability of the Tennessee Products Liability Act ("TPLA"), Tenn. Code Ann. §§ 29-28-101 et seq. (West 2015): the PSC argues that St. Thomas qualifies as a "seller" under that statute, while the Tennessee Defendants contend that the Tennessee Health Care Liability Act ("THCLA"), Tenn. Code Ann. §§ 29-26-101 et seq. (West 2015), precludes application of the TPLA. For the reasons discussed below, the Tennessee Defendants' motion is allowed, and the PSC's motion is denied.

**I. Background**

Briefly, [2] the Tennessee Cases stem from the injection of contaminated methylprednisolone acetate ("MPA") manufactured and sold to St. Thomas by NECC. These contaminated MPA injections caused many patients who received them to develop fungal meningitis; in Tennessee, the disease has caused illness in 153 persons and the death of sixteen more.

In their Master Complaint, the PSC asserted claims against the Tennessee Defendants under both the TLPA and the THCLA. The Tennessee Defendants moved to dismiss both sets of claims. See Docket # 1360. Ruling on the TLPA claims, I held only that "plaintiffs have adequately stated claims for relief

under the TPLA.... [g]iven the lack of controlling authority to the contrary," and declined to dismiss them. Docket # 1360 at 30. Now both the PSC and the Tennessee Defendants test the TLPA claims through summary judgment.

**II. Standard**

Summary judgment shall issue absent a "genuine dispute as to any material fact." Fed. R. Civ. P. 56. To defeat a motion for summary judgment, its opponent must "demonstrate that a trialworthy issue exists." Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 19 (1st Cir. 2003).

**III. Discussion**

The parties dispute two issues: first, whether the THCLA renders the TLPA inapplicable to St. Thomas; and second, if the THCLA does not preclude the TLPA, whether the TLPA applies to St. Thomas on the facts before the court.

Turning first to the antecedent question, the two statutes have partially overlapping coverage, and this overlap creates the possibility of conflict between them. The THCLA governs "any civil action ... related to ... the provision of health care services." Tenn. Code Ann. § 29-26-101(a)(1). Two terms in this coverage provision—"any" and "related"— emphasize its expansiveness. A legislature's use of the word "any" typically indicates its intent for a statute to have maximal reach. See, e.g., United States v. Gonzales, 520 U.S. 1, 5 (1997) ("Read naturally, the word 'any' has an expansive meaning...."). "Related" denotes a similar breadth, with Black's defining the term as "[c]onnected in some way." Related, Black's Law Dictionary (10th ed. 2014); see also Morales v. Trans World Airlines, Inc., 504 U.S. 374, 383 (1992) ("The ordinary meaning of ['relating to'] is a broad one...."). The conjunction of the two terms thus means that the THCLA encompasses all civil actions with some connection to "the provision of health care services," Tenn. Code Ann. § 29-26-101(a)(1), a conclusion recently reinforced by the Tennessee Supreme Court. See Ellithorpe v. Weismark, —— S.W.3d ——, 2015 WL 5853873 at *7 (Tenn. Oct. 8, 2015) (THCLA applies to "all civil actions" alleging injuries related to the provision of health care services).

**\*2** The TPLA has similar breadth. It reaches "all actions brought for or on account of personal injury, death, or property damage caused by or resulting from ... any product.... under any ... theory in tort or contract whatsoever." Tenn.

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 248 of 535
PageID: 32195
In re New England Compounding Pharmacy, Inc. Products..., Not Reported in Fed....
2016 WL 11045600

Code Ann. § 29-28-102(6) (West 2015). This language evinces the Tennessee legislature's intent that the TLPA apply broadly, a conclusion shared by other courts that have examined this issue. See, e.g., Greene v. Brown & Williamson Tobacco Corp., 72 F. Supp. 2d 882, 886–87 (W.D. Tenn. 1999).

Here, the plaintiffs have asserted a cause of action concerning a product—MPA—that adversely affected them as the result of receiving health care services—MPA injections. Both statutes thus ostensibly control, but their mutually exclusive liability regimes leave them in conflict. The THCLA precludes faultless liability, and requires that plaintiffs prove some dereliction of a professionally acceptable standard of care. Tenn. Code Ann. § 29-26-115(a) (West 2015); see also

Rye v. Women's Care Center of Memphis, MPLLC, ––– S.W.3d ––––, 2015 WL 6457768 at *23–24 (Tenn. Oct. 26, 2015). The TPLA, however, embraces strict liability, and requires no showing of fault. Tenn. Code Ann. § 29-28-105(a) (West 2015). Further, the two statutes have incompatible rules for joint tortfeasor liability. The THCLA follows Tennessee's general liability rule that "each defendant will be liable only for the percentage of the damages caused by it," Ridings v. Ralph M. Parsons Co., 914 S.W.2d 79, 83 (Tenn. 1996). The TLPA, however, overrides that rule, and imposes joint and several liability in strict products liability actions. See Owens v. Truckstops of Am., 915 S.W.2d 420, 432 (Tenn. 1996) ("[J]oint and several liability ... is essential to the theory of strict products liability.").

Under the plain meaning of their coverage provisions, both the THCLA and the TLPA could apply here, as the plaintiffs' allegations concern both a defective product and the provision of health care services. Because the coverage provisions of the two statutes overlap in this instance, their conflicting liability and damages provisions preclude the application of both, and force a choice between them. When faced with such conflicts, Tennessee courts apply the more specific statute in lieu of the more general one. Graham v. Caples, 325 S.W.3d 578, 582 (Tenn. 2010). The parties agree that between the TLPA and the THCLA, the THCLA is the more specific statute, and the plaintiffs do not dispute that the THCLA applies in these cases. [3] The THCLA therefore takes precedence, rendering the TLPA inapplicable in these cases.

Because the TLPA cannot apply here, I need not and do not address the question of whether it applies to St. Thomas.

### IV. Conclusion

The PSC's Motion for Partial Summary Judgment (Docket # 2300) is DENIED, and the Tennessee Defendants' Motion for Partial Summary Judgment (Docket # 2462) is ALLOWED.

### All Citations

Not Reported in Fed. Supp., 2016 WL 11045600

---

### Footnotes

1    This opinion adopts the shorthand used in Docket # 2309: "NECC" refers to New England Compounding Pharmacy, Inc., d/b/a New England Compounding Center; and "Clinic-Related Defendants" refers to clinics, hospitals, and healthcare professionals who procured contaminated NECC products and administered them to patients. "Tennessee Defendants" refers to Clinic-Related Defendants located in Tennessee: Saint Thomas Outpatient Neurosurgical Center, LLC ("St. Thomas"); Howell Allen Clinic, P.C.; John Culclasure, MD; Debra Schamberg, RN, CNOR; and Vaughan Allen, MD. Cases naming the Tennessee Defendants are referred to as the "Tennessee Cases."

2    Previous opinions set forth in detail the circumstances giving rise to this multidistrict litigation. See, e.g., In re New England Compounding Pharm., Ind. Prods. Liability Litig., 496 B.R. 256, 260–263 (D. Mass. 2013).

3    Further, any argument that the THCLA does not apply would be unavailing. As discussed above, the THCLA applies to "any civil action ... related to ... the provision of health care services." Tenn. Code Ann. § 29-26-101(a)(1) (West 2015). Plaintiffs' allegations concern the injection of contaminated MPA as a part

**In re New England Compounding Pharmacy, Inc. Products..., Not Reported in Fed....**

2016 WL 11045600

of pain-treatment services performed by medical professionals, and therefore plainly relate to the provision of health care services.

---

**End of Document**                                           © 2021 Thomson Reuters. No claim to original U.S. Government Works.

TAB 18

*In re Subaru Battery Drain Prod. Liab. Litig.*, No. 1:20-CV-03095-JHR-JS, 2021
WL 1207791 (D.N.J. Mar. 31, 2021)

2021 WL 1207791
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

IN RE SUBARU BATTERY DRAIN
PRODUCTS LIABILITY LITIGATION

Civil Action No. 1:20-cv-03095-JHR-JS
|
Signed 03/31/2021

**Opinion**

Joseph H. Rodriguez, USDJ

**\*1** This matter comes before the Court on the Motion to Dismiss or for a More Definite Statement filed by Defendants Subaru of America, Inc. ("SOA") and Subaru Corporation ("SBR") (collectively "Defendants") [Dkt. 34] in the above-referenced case, and the opposition thereto filed by Plaintiffs Amy Burd, Walter Gill, David Hansel, Glen McCartney, Roger Baladi, Tamara O'Shaughnessy, Anthony Franke, Matthew Miller, Steven Stone, Howard Bulgatz, Mary Beck, David Davis, and Colin George (collectively "Plaintiffs") individually and on behalf of all others similarly situated (the "Class"). [Dkt. 38]. The Court has reached the following conclusions:

1. Defendants' motion to preclude Plaintiffs from seeking remedies for Subaru Forester and 2020 Subaru Legacy vehicles for lack of standing is GRANTED;

2. Defendants' motion to dismiss all of Plaintiffs' express warranty claims against SBR (Counts II–IV) is GRANTED;

3. Defendants' motion to dismiss all of Plaintiffs' express warranty claims (Counts II-IV) for improperly alleging a design defect is DENIED;

4. Defendants' motion to dismiss Plaintiffs Gill and George's common-law express warranty claims for failure to present their vehicles for repair is hereby GRANTED (Count II);

5. Defendants' motion to dismiss Plaintiffs Burd, Baladi, Miller and Stone's common-law express warranty claims (Count II) for inadequate opportunity to repair is GRANTED;

6. Defendants' motion to dismiss Plaintiffs Hansel, O'Shaughnessy, and Davis's common-law express warranty claims (Count II) for failure to allege continued defects is GRANTED;

7. Defendants' motion to dismiss common-law express warranty claims (Count II) for lack of pre-suit notice is DENIED as to Plaintiffs Beck (Michigan) and Davis (Texas), and GRANTED as to Plaintiff Bulgatz (Illinois);

8. Defendants' motion to dismiss common-law implied warranty claims (Count I) for lack of privity is DENIED as to California Plaintiffs Franke and Miller, Florida Plaintiff Stone, New York Plaintiffs Baladi, McCartney, and O'Shaughnessy, and GRANTED as to Illinois Plaintiff Bulgatz;

9. Defendants' motion to dismiss common-law implied warranty claims (Count I) as untimely is DENIED as to Plaintiff George and GRANTED as to Plaintiff Franke;

10. Defendants' motion to dismiss Plaintiffs' Magnuson-Moss Warranty Act (Count III) claims for lack of standing is GRANTED;

11. Defendants' motion to dismiss express warranty claims under the Song-Beverly Act (Count IV) is GRANTED as to Plaintiff Miller, and DENIED as to Plaintiff Franke;

12. Defendants' motion to dismiss Plaintiff Miller's implied warranty claim under the Song-Beverly Act (Count V) as untimely is DENIED;

13. Defendants' motion to dismiss Plaintiffs' common-law and statutory fraud claims is GRANTED to the extent Plaintiffs have alleged affirmative fraudulent misrepresentations;

14. Defendants' motion to dismiss Plaintiffs' statutory fraud and fraudulent concealment claims for lack of knowledge is DENIED;

15. Defendants' motion to Dismiss Plaintiffs' fraud claims as to SBR for lack of duty is GRANTED as to Plaintiffs' New Jersey Consumer Fraud Act (Count VI), Illinois Consumer Fraud and Deceptive Business Practices Act (Count X), and common-law fraudulent concealment under New Jersey, Illinois, Michigan, and Florida law (Count XV), but is otherwise DENIED;

**\*2**  16. Defendants' motion to dismiss claims under Sections 349 and 350 of the New York General Business Law (Counts XII and XIII) for failure to plead deceptive practices in New York is DENIED as to Plaintiffs Baladi and O'Shaughnessy, but GRANTED as to Plaintiff McCartney;

17. Defendants' motion to dismiss claims under Section 350 of the New York General Business Law (Count XIII) as to Plaintiffs Baladi and O'Shaughnessy is DENIED;

18. Defendants' motion to dismiss Plaintiff Bulgatz's Illinois Consumer Fraud and Deceptive Business Practices Act claim (Count X) for "unfair" conduct is GRANTED;

19. Plaintiff Beck's Michigan Consumer Protection Act claim (Count XI) is DISMISSED;

20. Defendants' motion to limit remedies available to Plaintiffs Miller and Franke under the California Unfair Competition Law (Count VIII) to restitution and injunctive relief is GRANTED;

21. Defendants' motion to dismiss Plaintiffs' California Unfair Competition Law claims (Count VIII) for failing to plead traceability is DENIED;

22. Defendants' motion to dismiss Plaintiff Franke's claim under the California Consumers Legal Remedies Act (Count VI) as untimely is GRANTED;

23. Defendants' motion to dismiss Plaintiffs Franke and Miller's claims for equitable relief under the California Unfair Competition Law (Count VIII) and the California Consumers Legal Remedies Act (Count VI) as duplicative of legal remedies is GRANTED as to Count VI and denied as to Count VIII;

24. Defendants' motion to dismiss the fraudulent concealment claims (Count XV) of New Jersey, California, Florida, and Illinois plaintiffs is GRANTED;

25. Defendants' motion to dismiss Plaintiff Davis's (Texas) fraudulent concealment claim (Count XV) is GRANTED;

26. Defendants' motion to dismiss Plaintiffs' claim for unjust enrichment (Count XVI) is GRANTED;

27. Defendants' motion to preclude Plaintiffs from enjoining Defendants from falsely advertising their vehicles is GRANTED;

28. Defendants' motion to dismiss for failure to satisfy Federal Rule of Civil Procedure 8(a)(2) is DENIED; and

29. Defendants' motion for a more definite statement is DENIED.

**I. Background**

Defendant Subaru Corporation is a Japanese corporation with a principal place of business in Tokyo, Japan that is engaged in the business of designing and manufacturing Subaru automobiles worldwide. [Consol. Compl., Dkt. 18 at ¶ 23].[1] Defendant Subaru of America, Inc. ("SOA") is a wholly owned subsidiary of Subaru Corporation with a principal place of business in Camden, New Jersey. [Id. ¶ 24]. SOA "distributes, advertises, markets, sells, warrants, and services Subaru vehicles in the United States." [Id.].

As described in detail below Plaintiffs are thirteen individuals who purchased Subaru vehicles between 2015 and 2019. [Id. ¶¶ 10–22, 30 40, 47, 54, 60, 68, 75, 82, 89, 97, 109, 115]. Plaintiffs bring this putative class action "individually and on behalf of all current and former owners and lessees of the following model year ("MY") Subaru vehicles: MY 2015-2020 Outback, MY 2015-2020 Forester, MY 2015-2020 Legacy, MY 2015-2020 WRX, and MY 2019-2020 Ascent (the "Class Vehicles")." Plaintiffs allege that the Class Vehicles suffer from a common defect which causes the vehicles' batteries to drain quickly and which renders their vehicles inoperable. [Id. ¶¶ 123–36]. Each of the Subaru vehicles at issue here contains the same electrical system called a Controller Area Network ("CAN"), through which the vehicles' "components like electronic units, microcontrollers, devices, sensors and actuators communicate..." [Id. ¶¶ 125, 127, 130]. "When the vehicle is in use, the CAN system in the Class Vehicles relies on electrical current so that the vehicle can be operated as intended. When the vehicle is not being operated, the CAN system should enter a sleep mode in which it stops drawing significant electrical current." [Id. ¶ 133]. However, the CANs in the class vehicles do not enter sleep mode when the vehicle turns off, resulting in "parasitic battery drain." [Id. ¶¶ 124, 134]. Causes of this parasitic battery drain include "software errors." [Id. ¶ 134]. The Court will refer to this defect as the "Battery Defect."

**\*3** Due to the nature of the Battery Defect, Plaintiffs claim that replacing batteries in the Class Vehicles does not ensure that users can operate their cars. [*Id.* ¶ 143]. Plaintiffs also allege that "[v]ehicle batteries are not designed to be continually drained down to low volumes of power.... The Defect therefore makes it necessary to replace the battery in Class Vehicles far more often than is typical with other, non-defective vehicles. [*Id* ¶ 170]. Owners must replace their batteries frequently as a result.

SOA provided a New Vehicle Limited Warranty (the "Limited Warranty") for each class vehicle that lasts for three years or 36,000 miles. [*Id.* ¶ 140; *see also* Dkt. 34-2 at 7]. The Limited Warranty covers "any repairs needed to correct defects in material or workmanship reported during the applicable warranty period and which occur under normal use." [*Id.*]. The Limited Warranty provides that covered defects "will be repaired without charge" by authorized Subaru retailers. [Dkt. 34-2 at 10]. The Limited Warranty further states that

> THESE WARRANTIES AND THE EMISSION RELATED WARRANTIES APPEARING ELSEWHERE IN THIS BOOKLET ARE THE ONLY EXPRESS WARRANTIES BY SOA ON THE VEHICLE AND ON GENUINE SUBARU OPTIONAL ACCESSORIES INSTALLED ON THE VEHICLE PRIOR TO DELIVERY.THESE WARRANTIES ARE LIMITED IN DURATION TO THE TIME PERIOD OF THE WRITTEN WARRANTIES. THESE WARRANTIES ARE IN LIEU OF ALL OTHER OBLIGATIONS, LIABILITIES OR WARRANTIES, WHETHER EXPRESS OR IMPLIED. ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE END AT THE SAME TIME COVERAGE ON THE PARTICULAR COMPONENT ENDS. SOA, its Distributors, and

> Authorized SUBARU Retailers do not authorize any person to assume for any of them any obligations or liabilities greater than or different from those set forth in these warranties. Some states do not allow limitations on how long an implied warranty lasts, so the above limitations may not apply. These warranties give you specific legal rights and you may also have other rights under state law.

[*Id.* (capitalization and emphasis in the original)].

The Limited Warranty contains an "Authorized Genuine Subaru Replacement Battery Warranty" (the "Battery Warranty") which states

> Authorized Genuine Subaru Replacement Batteries are warranted by the 30-month/unlimited mileage Authorized Genuine Subaru Replacement Battery Warranty or the balance of the Basic New Vehicle Limited Warranty, whichever is longer. During the 30-month Authorized Genuine Subaru Replacement Battery Warranty period, or the balance of the Basic New Vehicle Limited Warranty period, coverage includes reimbursement for testing and replacement labor costs provided the battery was installed by an authorized Subaru retailer. In addition, if the vehicle cannot be driven due to a defect covered by this warranty, the cost of towing to the nearest authorized Subaru retailer is covered. Authorized Genuine Subaru Replacement Batteries that fail after the 30-month Authorized Genuine Subaru Replacement Battery Warranty period or the Basic New Vehicle Limited Warranty has expired are eligible for prorated warranty coverage for a limited period of 85 months. Reimbursement for testing,

replacement labor or towing is not covered. Prorating begins on the date the battery was originally installed.

[Consol. Compl. ¶ 141]. The Limited Warranty requires that "[a]ny and all repairs must be performed by an Authorized SUBARU Retailer located in the United States." [Dkt. 34-2 at 7]. According to Plaintiffs, when they took their vehicles for repairs under the Limited Warranty and Battery Warranty, Subaru either refused to fix the vehicles or simply replaced the batteries. [Consol. Compl. ¶ 143].

**\*4** Plaintiffs allege that Defendants were aware of the Battery Defect as early as 2014, but did not disclose the defect to its customers and actively concealed the defect as they continued to sell vehicles with the Battery Defect. [Id. ¶¶ 165–66]. Plaintiffs allege that Defendants gained knowledge of the Battery defect through various sources, including "internal pre-release testing data, consumer complaints to Subaru and its dealers, Subaru's testing in response to the complaints and in connection with service bulletins, warranty data from its dealers, replacement parts sales data from its internal databases, and reimbursement claims paid to Subaru dealers for work performed in response to warranty claims." [Id. ¶ 146]. Plaintiffs refer specifically to several Technical Service Bulletins ("TSB") which Subaru issued as early as June 2014 which discuss technical problems including rapid battery drain in some Subaru vehicles. [Id. ¶¶ 153–59]. Plaintiffs also point to several consumer complaints posted on the National Highway Traffic Safety Administration ("NHTSA") website, Subaru owner message boards, and social media websites. [Id. ¶ 162]. Plaintiff claims that, despite its knowledge of the defects, Subaru marketed its vehicles as "safe and reliable." [Id. ¶ 166]. Plaintiffs also claim that neither the Class Vehicles' Monroney stickers [2] nor Subaru sales representatives disclosed the Battery Defect before Plaintiffs purchased their Class Vehicles. Plaintiffs all claim that they would not have purchased their Class Vehicles if they knew of the Battery Defect.

Plaintiffs filed a consolidated class action complaint alleging sixteen causes of action, some of which apply to the entire class and some of which apply to certain sub-classes. The following chart summarizes the claims and the applicable Plaintiffs:

| Count | Cause of Action | On Behalf Of |
|---|---|---|
| I | Breach of Implied Warranty of Merchantability | Nationwide Class or State Subclasses |
| II | Breach of Express Warranty | Nationwide Class or State Subclasses |
| III | Violation of the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. §§ 2301–12 | Nationwide Class |
| IV | Violation of the Song-Bervely Consumer Warranty Act (Express Warranty), Cal. Civ. Code § 1790-1795.8 | California Subclass |
| V | Violation of the Song-Bervely Consumer Warranty Act (Implied Warranty), Cal. Civ. Code § 1790-1795.8 | California Subclass |
| VI | Violations of New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 et seq. ("NJCFA") | New Jersey Subclass |
| VII | Violations of California Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750-1785 | California Subclass |

| VIII | Violations of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200-17210 | California Subclass |
| IX | Violations of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 et seq. ("FDUTPA") | Florida Subclass |
| X | Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. § 505/1 et seq. ("ICFA") | Illinois Subclass |
| XI | Violations of the Michigan Consumer Protection Act, Mich. Comp. Laws § 445.901, et seq. ("MCPA") | Michigan Subclass |
| XII | Violations of the New York General Business Law N.Y. Gen. Bus. Law § 349 ("NYGBL § 349") | New York Subclass |
| XIII | Violations of the New York General Business Law, N.Y. Gen. Bus. Law § 350 ("NYGBL § 350") | New York Subclass |
| XIV | Violations of the Washington Consumer Protection Act, Wash. Rev. Code § 19.86.010 et seq. ("WCPA") | Washington Subclass |
| XV | Fraudulent Concealment | State Subclasses |
| XVI | Unjust Enrichment | State Subclasses |

[Consol. Compl. ¶¶ 191–380].

### a. Plaintiff-Specific Allegations

This Section outlines the factual allegations pled for each individual class Plaintiff. The following table summarizes the most pertinent facts:

Tabular or graphical material not displayable at this time.

### i. Plaintiff Amy Burd

Plaintiff Amy Burd, a New Jersey Resident, purchased a 2017 Subaru Outback on or around August 23, 2013 from Freehold Subaru in Freehold, New Jersey. [Consol. Compl. ¶ 30]. Before purchasing the vehicle, Plaintiff Burd reviewed Subaru advertisements and the vehicle's Monroney sticker, and spoke to sales representatives, none of which disclosed the Battery Defect. [*Id.* ¶ 31]. In October or November 2018, Plaintiff Burd brought her vehicle to World Nissan after her car failed to start numerous times, and that dealership replaced the battery. [*Id.* ¶¶ 33–34]. Plaintiff Burd purchased a portable booster to jumpstart her car for approximately $65. [*Id.* ¶ 35]. On September 23, 2019, Plaintiff Burd brought her Subaru to Open Road Subaru, which replaced her car's battery and stated that "the quality of the battery is a known issue." [*Id.* ¶ 36]. The battery continued to fail and Plaintiff Burd purchased a third-party battery at her own expense. [*Id.* ¶ 38].

### ii. Plaintiff Walter Gill

Plaintiff Walter Gill, a citizen and resident of New Jersey, purchased a new 2017 Subaru Outback from Haldeman Subaru, an authorized Subaru dealership located in Trenton, New Jersey on or around January 2017. [*Id.* ¶ 40]. Mr. Gill also purchased a seven-year extended warranty. [*Id.* ¶ 42].

In re Subaru Battery Drain Products Liability Litigation, Slip Copy (2021)

Before purchasing the vehicle, Plaintiff Gill reviewed Subaru advertisements and the vehicle's Monroney sticker, and spoke to sales representatives, none of which disclosed the Battery Defect. [*Id.* ¶ 41]. Within eight months of his purchase, Plaintiff Gill's car battery began to fail, and failed at least four times by March 2020. [*Id.* ¶ 43–44].

### iii. Plaintiff David Hansel

On or around June 19, 2019, Plaintiff David Hansel, a citizen and resident of New Jersey, purchased a 2019 Subaru Outback from Haldeman Subaru, an authorized Subaru dealership located in Trenton, New Jersey. [*Id.* ¶ 47]. Before purchasing the vehicle, Plaintiff Hansel reviewed Subaru advertisements and the vehicle's Monroney sticker and spoke to sales representatives, none of which disclosed the Battery Defect. [*Id.* ¶ 48]. Around February 2020 and with approximately 9,000 miles on the vehicle, Mr. Hansel's battery failed, and he brought his vehicle to Haldeman Subaru which replaced his battery. [*Id.* ¶ 49]. Plaintiff purchased jumper cables at his own expense in case of future battery failure. [*Id.* ¶ 50]. In May 2020, his car's battery died again and the vehicle would not start. On June 1, 2020, Mr. Hansel took his vehicle to Flemington Subaru, which tested the battery and performed an "ECM update" to "help with battery health." [*Id.* ¶ 51].

### iv. Plaintiff Glen McCartney

**\*5** On or about July 28, 2016, Plaintiff Glen McCartney, a citizen and resident of New York, purchased a new 2016 Subaru Outback from Ramsey Subaru, an authorized Subaru dealership located in Ramsey, New Jersey. [*Id.* ¶ 54]. Before purchasing the vehicle, Plaintiff McCartney reviewed the vehicle's Monroney sticker and spoke to sales representatives, which did not disclose the Battery Defect. [*Id.* ¶ 55]. In 2019 with approximately 35,000 miles on the odometer, his vehicle's battery failed, and he brought his vehicle to Ramsey Subaru, an authorized Subaru dealership, for service. [*Id.* ¶ 56]. Ramsey Subaru tested the battery and declined to replace it, so Mr. McCartney purchased a replacement battery at his own expense. [*Id.* ¶ 56–57].

### v. Plaintiff Roger Baladi

In April 2018 Plaintiff Roger Baladi, a citizen and resident of New York purchased a new 2018 Subaru Outback from Milea

Subaru, an authorized Subaru dealership in Bronx, New York. [*Id.* ¶ 60]. Before purchasing the vehicle, Plaintiff Baladi reviewed Subaru advertisements and the vehicle's Monroney sticker, and spoke to sales representatives, none of which disclosed the Battery Defect. [*Id.* ¶ 61]. Beginning in October 2018, Mr. Baladi's car battery began to fail, and he purchased jumper cables and a jump starter at his own expense. [*Id.* ¶ 63]. On or Around March 13, 2019, Mr. Baladi brought his vehicle to Koeppel Subaru, an authorized Subaru dealership in Queens, New York, for service. Koeppel Subaru replaced the battery. [*Id.* ¶ 64]. Plaintiff's car battery failed several times after this repair. [*Id.* ¶ 65].

### vi. Plaintiff Tamara O'Shaughnessy

On or around August 12, 2019, Plaintiff Tamara O'Shaughnessy, a citizen and resident of New York, purchased a new 2019 Subaru Outback from Van Bortel Subaru of Rochester, an authorized Subaru dealership in Rochester, New York. [*Id.* ¶ 68]. Before purchasing the vehicle, Plaintiff O'Shaughnessy reviewed Subaru advertisements and the vehicle's Monroney sticker, and spoke to sales representatives, none of which disclosed the Battery Defect. [*Id.* ¶ 69]. In or about October 2019, with approximately 1,000 miles on the odometer, Plaintiff O'Shaughnessy's car battery failed. [*Id.* ¶ 70]. On or around April 24, 2020, she returned to Van Bortel Subaru where the battery failed to start and the dealership replaced the battery. [*Id.* ¶ 71]. Plaintiff purchased a portable jump starter at her own expense to use when her battery dies. [*Id.* ¶ 72].

### vii. Plaintiff Anthony Franke

In February 2015, Plaintiff Anthony Franke, a citizen and resident of California, purchased a new 2015 Subaru WRX from Subaru of El Cajon, an authorized Subaru dealership located in El Cajon, California. [*Id.* ¶ 75]. Before purchasing the vehicle, Plaintiff Franke reviewed Subaru advertisements and the vehicle's Monroney sticker, and spoke to sales representatives, none of which disclosed the Battery Defect. [*Id.* ¶ 76]. Beginning around March 2015, Mr. Franke's battery failed and failed to start on at least four occasions. [*Id.* ¶ 77]. Mr. Franke took his Class Vehicle to Subaru of El Cajon for assistance, but the dealership refused to replace the battery. [*Id.* ¶ 78]. Mr. Franke claims that he "prefers the features and aesthetics of Subaru vehicles to other vehicles" and would like to purchase Subaru vehicles in the future, but "he will

not do so unless Subaru takes sufficient steps to cure the defect and ensure the accuracy of its representations about its vehicles." [*Id.* ¶ 81].

### viii. Plaintiff Matthew Miller

On or about July 21, 2018 Plaintiff Matthew Miller, a citizen and resident of California, purchased a new 2017 Subaru Outback from Ocean Subaru, an authorized Subaru dealership in Fullerton, California. [*Id.* ¶ 82]. Before purchasing the vehicle, Plaintiff Miller reviewed Subaru advertisements and the vehicle's Monroney sticker, and spoke to sales representatives, none of which disclosed the Battery Defect. [*Id.* ¶ 83]. In or about January 2020, with about 15,000 miles on the odometer, the battery in Plaintiff Miller's vehicle failed. [*Id.* ¶ 84]. Mr. Miller's battery died three more times, and he brought his vehicle to a Subaru dealership in March 2020, where the vehicle's battery was replaced. [*Id.* ¶ 85]. Plaintiff Miller's battery failed again six more times between March 2020 and May 2020. [*Id.*]. Mr. Miller claims that he "prefers the features and aesthetics of Subaru vehicles to other vehicles" and would like to purchase Subaru vehicles in the future, but "he will not do so unless Subaru takes sufficient steps to cure the defect and ensure the accuracy of its representations about its vehicles." [*Id.* ¶ 88].

### ix. Plaintiff Steven Stone

 **\*6** On or around September 15, 2016 Plaintiff Steven Stone, a citizen and resident of Florida, purchased a new 2017 Subaru Outback from Ocala Subaru Volvo, an authorized Subaru dealership located in Ocala, Florida. [*Id.* ¶ 89]. Before purchasing the vehicle, Plaintiff Stone reviewed Subaru advertisements and the vehicle's Monroney sticker, and spoke to sales representatives, none of which disclosed the Battery Defect. [*Id.* ¶ 90]. In or about May 2017, with approximately 9,000 miles on the odometer, Plaintiff's battery failed and his vehicle was towed to Ocala Subaru. The dealership replaced Mr. Stone's battery. [*Id.* ¶ 91]. Around June 2018, his vehicle's battery failed again and he paid to replace it. [*Id.* ¶ 92]. Around October 2019, his vehicle's battery died again. AAA jump-started his vehicle, but the battery failed again the next day. Mr. Stone's vehicle was towed locally for repair and he paid to have another new battery installed. [*Id.* ¶ 93]. Even after this third battery replacement, his vehicle's battery continued to fail. [*Id.* ¶ 94].

### x. Plaintiff Howard Bulgatz

On or around August 31, 2018, Plaintiff Howard Bulgatz, a citizen and resident of Illinois, leased a new 2019 Subaru Legacy from Napleton Subaru, an authorized Subaru dealership in Arlington Heights, Illinois. [*Id.* ¶ 97]. Before purchasing the vehicle, Plaintiff Bulgatz reviewed Subaru advertisements and the vehicle's Monroney sticker, and spoke to sales representatives, none of which disclosed the Battery Defect. [*Id.* ¶ 98]. Beginning around October 2018, the battery in Plaintiff Bulgatz's vehicle failed approximately three times. After the third failure, Mr. Bulgatz brought his vehicle to the Napleton dealership for repair, but the dealership declined to replace the battery, and the battery failed again thereafter. [*Id.* ¶ 99].

### xi. Plaintiff Mary Beck

On or about December 14, 2019, Plaintiff Mary Beck, a citizen and resident of Michigan, purchased a new 2020 Subaru Outback from Glassman Automotive Group, an authorized Subaru dealership in Southfield, Michigan. [*Id.* ¶ 102]. Before purchasing her vehicle, Plaintiff Beck reviewed the vehicle's Monroney sticker and spoke to sales representatives, neither of which disclosed the Battery Defect. [*Id.* ¶ 103]. In or about April 2020, with approximately 4,500 miles on the odometer, the battery in Plaintiff Beck's Class Vehicle began to fail and she had to jump start it several times. Ms. Beck brought her vehicle to Glassman Automotive, but the dealership declined to replace the battery. [*Id.* ¶ 105]. Plaintiff Beck then purchased a replacement battery with a larger capacity. [*Id.* ¶ 106].

### xii. Plaintiff David Davis

On or around August 20, 2018, Plaintiff David Davis, a citizen and resident of Texas, purchased a new 2019 Subaru Ascent from Austin Subaru, an authorized Subaru dealership in Austin, Texas. [*Id.* ¶ 109]. Before purchasing the vehicle, Plaintiff Davis reviewed Subaru advertisements and the vehicle's Monroney sticker, and spoke to sales representatives, none of which disclosed the Battery Defect. [*Id.* ¶ 110]. On or about April 2020, with approximately 20,000 miles on the odometer, Mr. Davis's battery failed and he had his vehicle towed to Austin Subaru. Austin Subaru

inspected Plaintiff Davis's vehicle and replaced the battery. [*Id.* ¶ 112].

### xiii. Plaintiff Colin George

On or about January 23, 2016, Plaintiff Colin George, a citizen and resident of Washington, purchased a new 2016 Subaru Outback from Carter Subaru, an authorized Subaru dealership in Seattle, Washington. [*Id.* ¶ 115]. Before purchasing the vehicle, Plaintiff George reviewed Subaru marketing materials and the vehicle's Monroney sticker, and spoke to sales representatives, none of which disclosed the Battery Defect. [*Id.* ¶ 116]. Beginning in or about January 2019, with approximately 33,000 miles on the odometer, Plaintiff George's battery began to fail. [*Id.* ¶ 117]. Plaintiff has had his battery replaced twice. [*Id.* ¶ 119]. Mr. George purchased a AAA membership and a jump starter due to the Battery Defect. [*Id.* ¶ 120].

## II. Analysis

### a. Standing

**\*7** In this case, the named Plaintiffs seek to recover for Battery Defects in various Subaru vehicle models, including 2015–2020 Subaru Foresters and the 2020 Subaru Legacy. [Consol. Compl. ¶ 1]. However, none of the named Plaintiffs have owned or leased a Subaru Forester of any year, or a 2020 Subaru Legacy. Defendants argue that Plaintiffs lack standing to assert claims based on these vehicles which Plaintiffs have not leased or owned. [Dkt. 34-1 at 17].

The Constitution limits the subject matter jurisdiction of federal courts to "cases" and "controversies." *See* U.S. Art. III § 2. To establish Article III standing, a plaintiff must plead specific facts to show "an 'injury in fact' or an 'invasion of a legally protected interest that is concrete and particularized,' ... a 'causal connection between the injury and the conduct complained of,' and 'a likelihood that the injury will be redressed by a favorable decision.' " *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 633 (3d Cir. 2017) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61, 112 S. Ct. 2130, 2136, 119 L. Ed. 2d 351 (1992)); *Anjelino v. N.Y. Times Co.*, 200 F.3d 73, 88 (3d Cir. 2000). In a class action context, the plaintiff must still "show that she has personally been injured; indeed, the class plaintiff cannot rely on 'injuries suffered by other,

unidentified members of the class.' " *Lieberson v. Johnson & Johnson Consumer Cos.*, 865 F. Supp. 2d 529, 537 (D.N.J. 2011) (quoting *Lewis v. Casey*, 518 U.S. 343, 357, 116 S. Ct. 2174, 135 L. Ed. 2d 606 (1996)).

In *Sauer v. Subaru of America, Inc.*, this Court recently noted that courts in this district are divided as to "whether 'a class plaintiff who brings a claim for a product within a line of products' has standing to assert claims for those other related products." *Sauer v. Subaru of Am., Inc.*, No. CV 18-14933, 2020 WL 1527779, at \*3 (D.N.J. Mar. 31, 2020) (quoting *Cox v. Chrysler Grp., LLC*, No. CV 14-7573, 2015 WL 5771400, at \*15 (D.N.J. Sept. 30, 2015)). In one line of cases, "courts have dismissed the remaining claims concerning the rest of the product line, holding that named plaintiffs lack standing for claims relating to products they did not purchase." *Id.* (quoting *Cox, 2015 WL 5771400*, at \*15). *See also Cox, 2015 WL 5771400*, at \*15 (citing *Lieherson*, 865 F. Supp. 2d at 537; *Green v. Green Mountain Coffee Roasters, Inc.*, 279 F.R.D. 275, 280 (D.N.J.2011); *Hemy v. Perdue Farms, Inc.*, No. 11–888, 2011 WL 6002463, at \*11 (D.N.J. Nov. 30, 2011)). In a second line of cases, courts "have refused to dismiss claims for products that the named plaintiffs did not buy themselves." *Sauer*, 2020 WL 1527779, at \*3 (citing *Haas v. Pittsburgh Nat. Bank*, 526 F.2d 1083, 1088 (3d Cir. 1975)). Courts in this second line of cases apply a three-part test to determine whether class plaintiffs have standing to assert claims for products they do not own: (1) whether the basis for the claims is the same; (2) whether the products are closely related; and (3) whether the defendants are the same. *Cox, 2015 WL 5771400*, at \*15.

In *Sauer*, this Court declined to decide which standard applied because Plaintiffs had not pled facts to establish standing under the three-factor test even if that standard applied. *Sauer*, 2020 WL 1527779, at \*3. Here, Plaintiffs allege that this second line of cases applies, that they have satisfied the three-part test, and that they have standing to assert claims for vehicles which they have not leased or purchased. [Dkt. 38 at 19–20]. Defendants urge the Court to follow the first line of cases and to dismiss for lack of standing. [Dkt. 34-1 at 17–18].

**\*8** The Court here agrees with Defendants' position and the first line of cases discussed above. There is no dispute

In re Subaru Battery Drain Products Liability Litigation, Slip Copy (2021)

that the named Plaintiffs have not suffered an injury due to defects in Subaru Foresters of any year or the 2020 Subaru Legacy because no Plaintiff has purchased or leased one of these vehicles. Standing for an individual plaintiff "cannot be predicated on an injury which the plaintiff has not suffered." *In re Franklin Mut. Funds Fee Litig.*, 388 F. Supp. 2d 451, 461 (D.N.J. 2005), *as amended* (Sept. 22, 2005) (citing *Allee v. Medrano*, 416 U.S. 802, 828–29, 94 S. Ct. 2191, 40 L.Ed.2d 566 (1974)). And as the Supreme Court, courts in this district, and courts elsewhere have acknowledged, "[t]hat a suit may be a class action ... adds nothing to the question of standing...." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547, 194 L. Ed. 2d 635 (2016), *as revised* (May 24, 2016) (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 40, n. 20, 96 S. Ct. 1917, 48 L.Ed.2d 450 (1976)); *Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244, 252 (4th Cir.), *cert. denied*, 141 S. Ct. 373, 208 L. Ed. 2d 96 (2020) ("The strictures of Article III standing are no less important in the context of class actions.... In a class action, we analyze standing based on the allegations of personal injury made by the named plaintiffs.") (citations omitted); *In re SuperValu, Inc.*, 870 F.3d 763, 768 (8th Cir. 2017) ("The requirements for standing do not change in the class action context."); *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 152 (E.D. Pa. 2009) ("[E]ach claim must be analyzed separately, and a claim cannot be asserted on behalf of a class unless at least one plaintiff has suffered the injury that gives rise to that claim."). *See also Green*, 279 F.R.D. at 280 (dismissing claims as to unpurchased products because the "standing inquiry does not change in the context of a putative class action") (citations and quotations omitted); *Lieberson*, 865 F. Supp. 2d at 537 (same). The Court therefore finds that Plaintiffs do not have standing to bring claims for Subaru Foresters of any year or the 2020 Subaru Legacy, and dismisses Plaintiffs' Consolidated Complaint as to claims for these vehicles.

### b. Motion to Dismiss for Failure to State a Claim

Federal Rule of Civil Procedure 12(b)(6) permits dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A complaint should be dismissed pursuant to Rule 12(b)(6) if the alleged facts, taken as true, fail to state a claim. *Id.* In general, only the allegations in the complaint, matters of public record, orders, and exhibits attached to the complaint, are taken into consideration when deciding a motion to dismiss under Rule 12(b)(6).[1] *See Chester County Intermediate Unit v. Pa. Blue Shield*, 896 F.2d 808, 812 (3d Cir. 1990). It is not necessary for the plaintiff to plead evidence. *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 446 (3d Cir. 1977). The question before the Court is not whether the plaintiff will ultimately prevail. *Watson v. Abington Twp.*, 478 F.3d 144, 150 (2007). Instead, the Court simply asks whether the plaintiff has articulated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

"A claim has facial plausibility[2] when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "Where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

The Court need not accept " 'unsupported conclusions and unwarranted inferences,' " *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (citation omitted), however, and "[l]egal conclusions made in the guise of factual allegations ... are given no presumption of truthfulness." *Wyeth v. Ranbaxy Labs., Ltd.*, 448 F. Supp. 2d 607, 609 (D.N.J. 2006) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see also Kanter v. Barella*, 489 F.3d 170, 177 (3d Cir. 2007) (quoting *Evancho v. Fisher*, 423 F.3d 347, 351 (3d Cir. 2005) ("[A] court need not credit either 'bald assertions' or 'legal conclusions' in a complaint when deciding a motion to dismiss."). *Accord Iqbal*, 556 U.S. at 678–80 (finding that pleadings that are no more than conclusions are not entitled to the assumption of truth).

**\*9** Further, although "detailed factual allegations" are not necessary, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Twombly*, 550 U.S. at 555 (internal citations omitted). *See also Iqbal*, 556 U.S. at 678

("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

Thus, a motion to dismiss should be granted unless the plaintiff's factual allegations are "enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 556 (internal citations omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'shown'-'that the pleader is entitled to relief.' " *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

### i. Plaintiffs' Concessions

In their Response, Plaintiffs concede that their Consolidated Complaint fails to state the following claims against Defendants: (1) Plaintiffs Gill and George's common-law express warranty claims; (2) Plaintiff Miller's implied warranty claim under the Song-Beverly Act; (3) Plaintiff Beck's claim under the Michigan Consumer Protection Act; (4) express warranty claims against SBR. [Dkt. 38 at 17 n.1, 38 n.7]. These claims are therefore dismissed.

### ii. Choice of Law

Defendants argue that individual Plaintiffs who do not reside in New Jersey should not be permitted to sue Defendants under New Jersey Law. [Dkt. 34-1 at 18]. This argument applies to Plaintiffs' common-law express and implied warranty claims (Counts I and II) for which Plaintiffs seek to recover individually and on a class-wide basis. Defendants argue that the Court should engage in a choice-of-law analysis to determine that those Plaintiffs can only bring claims under the laws of their respective home states. [Dkt. 34-1 at 19–22]. Plaintiffs argue that such a choice-of-law analysis would be premature at the pleading stage. [Dkt. 38 at 23].

"[C]ourts in this Circuit have sometimes determined that the choice of law analysis in a putative class action can be done at the motion to dismiss stage." *Snyder v. Farnam Cos., Inc.*, 792 F. Supp. 2d 712, 718 (D.N.J. 2011) (collecting cases). When performing a choice-of-law analysis, the Court applies choice-of-law rules of the forum state, which is New Jersey in this case. *Barbey v. Unisys Corp.*, 256 Fed. Appx. 532,

533 (3rd Cir. 2007). Under New Jersey rules, the "choice of law analysis must be undertaken on an issue-by-issue basis." *Harper v. LG Elecs. USA, Inc.*, 595 F. Supp. 2d 486, 490 (D.N.J. 2009) (citing *Rowev v. Hoffman-La Roche, Inc.*, 917 A.2d 767, 771 (N.J.2007)). Therefore, the Court will analyze each claim separately to determine whether a choice-of-law analysis is proper, and if so, determine which state's law applies to each claim.

### iii. Common Law Express Warranty Claims (Count II)

Plaintiffs allege that Defendants[3] breached express warranties contained in the Limited Warranty, which applies to "any repairs needed to correct defects in material or workmanship reported" within three years of purchase or 36,000 miles. [Consol. Compl. at ¶¶ 140, 203–33]. Defendants argue that because the Limited Warranty applies only to defective "material or workmanship," it does not apply to the complained-of Battery Defect which is, at bottom, a design defect. [Dkt. 34-1 at 23]. Defendants also argue that New Jersey warranty law conflicts with the laws of certain Plaintiffs' home states, and home-state law should govern those Plaintiffs' express warranty claims. Thus, the Court will first conduct a choice-of-law analysis to determine whether a conflict exists and, if so, which state's law should apply to each Plaintiff's express warranty claim.

#### 1. Choice of Law for Express Warranty Claims

**\*10** The Court must first apply New Jersey's choice of law rules to determine whether there is an actual conflict between New Jersey law and the laws of the other relevant jurisdictions. *Powell v. Subaru of Am., Inc.*, No. 1:19-CV-19114, 2020 WL 6886242, at \*10–11 (D.N.J. Nov. 24, 2020). Defendants point to several potential conflicts. First, they argue that the laws of Texas, Illinois, and Michigan "require formal pre-suit notification to a remote seller, and failure to do so requires dismissal of the claims." [Dkt. 34-1 at 19 (citing cases)]. Accordingly, Defendants argue that local law applies to Plaintiffs Davis, Bulgatz, and Beck, respectively. [*See id.*]. Defendants are correct that New Jersey law does not require pre-suit notice, but that Texas, Illinois, and Michigan law do require pre-suit notice. *See Powell*, 2020 WL 6886242, at \*11 (citing cases and comparing New Jersey law with Texas and Michigan law with respect to pre-

suit notice*); *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 492, 675 N.E.2d 584, 589 (1996) ("[I]n general, buyers such as the instant plaintiffs must directly notify the seller of the troublesome nature of the transaction or be barred from recovering for a breach of warranty (citing 810 ILCS 5/1–201(26) (West 1994))) *accord Parrott v. Fam. Dollar, Inc.*, No. 17 C 222, 2019 WL 4573222, at *2 (N.D. Ill. Sept. 20, 2019). Because this issue of pre-suit notice may dispose of Plaintiffs Davis, Bulgatz, and Becks' claims, "there is an actual conflict between the relevant laws of [Illinois,] Texas and Michigan on one hand and New Jersey on the other." *Powell*, 2020 WL 6886242, at *11.

Step two of New Jersey's choice of law analysis requires the Court to "determine which jurisdiction has the 'most significant relationship to the claim.' " *Amato v. Subaru of Am., Inc.*, No. CV 18-16118, 2019 WL 6607148, at *12 (D.N.J. Dec. 5, 2019) (citing *Skeen v. BMW of N. Am., LLC*, No. 2:13-CV-1531-WHW-CLW, 2014 WL 283628, at *12 (D.N.J. Jan. 24, 2014)). New Jersey Courts turn to § 188 and § 6 of the Restatement (Second) of Conflict of Laws to determine which state has the "most significant relationship" to the claims. *Powell*, 2020 WL 6886242, at *10–11. Section 188 applies to contract claims like Plaintiffs' warranty claims and advises courts to consider factors including "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil [sic], residence, nationality, place of incorporation and place of business of the parties." *Beth Schiffer Fine Photographic Arts, Inc. v. Colex Imaging, Inc.*, No. CIV. 10-05321, 2012 WL 924380, at *11 (D.N.J. Mar. 19, 2012) (citing Restatement (Second) Conflict of Laws § 188(2)). "With limited exception, the Restatement also provides that '[i]f the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied.' " *Powell*, 2020 WL 6886242, at *11 (quoting *Amato*, 2019 WL 6607148, at *12). Section 6 provides general principles to consider in all conflict-of-law analyses: "(1) the interests of interstate comity; (2) the interests of the parties; (3) the interests underlying the field of [ ] law; (4) the interests of judicial administration; and (5) the competing interests of the states." *P.V. v. Camp Jaycee*, 197 N.J. 132, 962 A.2d 453, 463 (2008).

Applying these factors, the Court finds that warranty laws of Illinois, Michigan, and Texas apply to the express warranty claims of Plaintiffs Bulgatz, Beck, and Davis, respectively.

Section 188 factors weigh in favor of applying Plaintiffs' home-state law because Plaintiffs leased or purchased their Class Vehicles from Subaru dealerships located in their home states. Presumably, Plaintiffs negotiated and signed sales contracts in the states where they purchased their Class Vehicles and drove their vehicles in their home states. After experiencing battery failures, these Plaintiffs returned their Class Vehicles to the same dealerships in their home states for repair under their respective Limited Warranties. Outside of their contractual relationship with SOA, which has its principal place of business in Camden, New Jersey, the Plaintiffs have no relevant connections to New Jersey. Courts have found that, under facts such as these, the law of a Plaintiffs' home state has the most significant relationship to the Plaintiffs' warranty claims. *Powell*, 2020 WL 6886242, at *11 (citing *Maniscalco v. Brother Int'l (USA) Corp.*, 709 F.3d 202, 209 (3d Cir. 2013)); *Amato*, 2019 WL 6607148, at *12–13.

**\*11** Section 6 factors also favor applying non-New Jersey law to these Plaintiffs' express warranty claims. Under circumstances such as these, "the interests of interstate comity [under § 6] favor applying the law of the individual claimant's own state. Applying New Jersey law to every potential out-of-state claimant would frustrate the policies of each claimant's state." *Maniscalco*, 709 F.3d at 209. Further, "[e]ach plaintiff's home state has an interest in protecting its consumers from in-state injuries caused by foreign corporations and in delineating the scope of recovery for its citizens under its own laws." *In re Ford Motor Co. Ignition Switch Prod. Liab. Litig.*, 174 F.R.D. 332, 348 (D.N.J. 1997). Thus, under the facts and circumstances of this case, the warranty laws of Illinois, Michigan, and Texas apply to the express warranty claims of Plaintiffs Bulgatz, Beck, and Davis respectively.

Defendants also argue that Florida, Michigan, and New York warranty laws require Plaintiffs to plead "reliance on the warranty at the time of purchase," and that "California requires proof of reliance when the plaintiff and defendant are not in privity of contract." [Dkt. 34-1 at 20]. Because New Jersey does not require reliance, Defendants argue that a conflict exists.

The Court has already found that Michigan law will apply to Michigan Plaintiff Beck's express warranty claim. Defendants are right that New Jersey law does not require reliance but New York law does. *Compare Snyder v. Farnam Companies,*

*Inc.*, 792 F. Supp. 2d 712, 721 (D.N.J. 2011) (New Jersey law) with *Avola v. Louisiana-Pac. Corp.*, 991 F. Supp. 2d 381, 391 (E.D.N.Y. 2013) (citing 📑 *CBS Inc. v. Ziff–Davis Publ'g Co.*, 75 N.Y.2d 496, 502–504, 554 N.Y.S.2d 449, 553 N.E.2d 997 (1990)) (New York law). While there is some disagreement, Florida law appears not to require reliance where, as here, the dispute concerns an express written warranty as opposed to an express warranty by mere affirmation or promise. *See Aprigliano v. Am. Honda Motor Co.*, 979 F. Supp. 2d 1331, 1340–41 (S.D. Fla. 2013); *see also* 📑 *S. Broad. Grp., LLC v. Gem Broad., Inc.*, 145 F. Supp. 2d 1316, 1321 (M.D. Fla. 2001), *aff'd sub nom. S. Broad. v. GEM Broad.*, 49 F. App'x 288 (11th Cir. 2002) ("The Florida Supreme Court has not yet decided whether proof of reliance is required to recover for breach of an express written warranty" and discussing widespread confusion about when reliance is required under Florida warranty law). Further, courts in this district have comprehensively compared California's breach of express warranty law with New Jersey's to find that no conflict exists with respect to reliance, even without privity of contract. 📑 *Majdipour v. Jaguar Land Rover N. Am., LLC*, No. 2:12-CV-07849 WHW, 2013 WL 5574426, at *11–13 (D.N.J. Oct. 9, 2013). Thus, for the purposes of deciding this choice-of-law issue, the only state whose law is inconsistent with New Jersey's is New York.

Inquiry into New York Plaintiffs' reliance, however, is too fact-intensive to conduct a choice-of-law analysis at this time. *See Powell*, 2020 WL 6886242, at *15 ("[T]he Court is unable to determine whether Plaintiffs would be able to put forth sufficient evidence of reliance, and therefore whether this difference between the relevant states' laws would have an impact on the success of Plaintiffs' warranty claims.").

In sum, and for the purposes of deciding Defendants' Motion to Dismiss, the Court will apply New Jersey law to the express warranty claims of all Plaintiffs except the Illinois, Michigan, and Texas Plaintiffs. The Court will now turn to Defendants' substantive express warranty arguments.

### 2. Whether the Limited Warranty Covers the Battery Defect

As stated above, Defendants argue that Plaintiffs' express warranty claims should be dismissed because the complained-of Battery Defect is, at bottom, a design defect, and the Limited Warranty only applies to defective materials or

workmanship. A warranty covering " 'defect[s] in ... materials or workmanship[ ]' unambiguously excludes 'design defects.' " *Amato*, 2019 WL 6607148, at *5 (quoting 📑 *Coba v. Ford Motor Co.*, 932 F.3d 114, 121 (3d Cir. 2019)). In *Coba*, the Third Circuit explained the differences among defects in material, workmanship, and design:

> ***12*** [D]efects in "workmanship" and "materials" are flaws pertaining to the construction or manufacture of a product, while defects in "design" are shortcomings that arise in the plans for a product's creation. More specifically, a "materials" defect is a failing in the quality of the actual substances used to make a product; a "workmanship" defect is a deficiency in the execution of a product's assembly or construction; and a "design" defect is a flaw inherent in the product's intended operation and construction ...

📑 *Coba*, 932 F.3d at 121.

Plaintiffs allege that they have sufficiently pled facts showing that the class vehicle defect is a workmanship defect which the Limited Warranty covers. Plaintiffs describe in detail the CAN system that is common among all class vehicles and that allegedly malfunctions to cause parasitic battery drain. [Consol. Compl., Dkt. 18 at ¶¶ 123–133]. When describing the Battery Defect itself, Plaintiffs allege the following:

> The Class Vehicles contain a manufacturing defect (including software errors) that results in the CAN system not entering the necessary sleep mode when the vehicle is turned off. As a result, the CAN system draws significant "dark current" (parasitic battery draw)

even when the vehicle is turned off and not being operated.

[*Id.* at ¶ 134]. The Court cannot accept the conclusory allegation that the underlying problem is a "manufacturing defect" as fact. *Iqbal*, 556 U.S. at 678. And according to Plaintiffs' pleadings, the alleged parasitic drain is the result of the alleged defect, not the defect itself. Thus, Plaintiffs have pled one fact regarding the alleged defect itself: that "software errors" cause the complained-of parasitic battery drain. [Consol. Compl., Dkt. 18 at ¶ 134].

Construing these allegations in favor of Plaintiffs, as the Court must at this stage, the Court cannot decide as a matter of law that these "software errors" result from a design defect rather than an error in implementing an otherwise functional design. *See* *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (noting that at the motion to dismiss stage, a court is "required to accept as true all of the allegations in the complaint and all reasonable inferences that can be drawn therefrom."). *See also* *Alin v. Am. Honda Motor Co.*, No. CIV A 08-4825, 2010 WL 1372308, at *6 (D.N.J. Mar. 31, 2010) (noting that, before discovery, "the distinction between defect in design and defect in materials or workmanship is a matter of semantics."). Plaintiffs do not allege that software was programmed according its design. *Cf.* *Cooper v. Samsung Elecs. Am., Inc.*, 374 Fed. Appx. 250, 253–254 (3d Cir. 2010) (dismissing breach of warranty claim because the plaintiff "agree[d] his TV was manufactured as designed."). Discovery is therefore necessary to determine the nature of the underlying software defect. *See Morris v. BMW of N. Am., LLC*, No. CIV.A. 13-4980 JLL, 2014 WL 793550, at *10–11 (D.N.J. Feb. 26, 2014) (denying motion to dismiss based on defective software in car's navigation system).

Defendants' arguments to the contrary are unavailing. Defendants cite *Sauer v. Subaru of America, Inc.* for the proposition that claims related to software design defects were not covered by SOA's warranties. [Dkt. 34-1 at 24 (citing *Sauer*, 2020 WL 1527779, at *6)]. But in *Sauer*, Plaintiffs explicitly pled that the engine defects at issue were design defects, and sought to recover under a warranty that covered "material or workmanship." *Sauer*, 2020 WL 1527779, at *6 ("Taking Plaintiff's allegations as true in this case, the Complaint explicitly pleads the engine defect at the time of sale is a design defect"). As required, the Court in that case

construed Plaintiff's allegations as true and found that the plaintiff failed to plead breach of the warranty at issue. *Id.* The Court did not find that alleged engine defects constituted a design defect as a matter of law.

 *13  Defendants also argue that Plaintiffs' claims should be dismissed because they have deliberately "refus[ed] to call the alleged battery defect a design defect." [Dkt. 34-1 at 25]. Whatever Plaintiffs' intentions, it is no less plausible at this stage of the litigation that the "software error" that caused parasitic battery drain resulted from manufacturing errors than design errors.

In sum, the Court finds that Plaintiffs have plausibly alleged that the Battery Defect is a manufacturing defect, and denies Defendant's motion to the extent it seeks dismissal on this issue.

### 3. Failure of Express Warranty Claims Due to Lack of Opportunity to Repair

Defendants argue that Plaintiffs Gill, George, Burd, Baladi, Miller, and Stone cannot recover under the Limited Warranty because they did not provide Defendants adequate opportunity to repair their Class Vehicles. [Dkt. 34-1 at 26]. As mentioned above, Plaintiffs have conceded this issue with respect to Plaintiffs Gill and George. However, Plaintiffs argue that Defendants had ample opportunity to repair the other Plaintiffs' vehicles. [Dkt. 38 at 32–33].

For the purposes of this motion, New Jersey law applies to the express warranty claims of Plaintiffs Burd, Baladi, Miller and Stone. [4] Under New Jersey law, parties may "expressly agree" to exclusive remedies for breach of contract. *Cox*, 2015 WL 5771400, at *6 (citing N.J.S.A. 12A:2–719(1) (b)). "But even when parties expressly agree to an exclusive remedy provision, [other remedies may be available] '[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose.' " *Id.* (quoting N.J.S.A. 12A:2–719(2)). Where a warranty contains an exclusive remedy provision, the warranty

> may limit the seller's obligation to repair or replace the defective equipment. In these types of cases —where the seller has limited

the warranty to the repair or replacement of a defective part or product—before the exclusive remedy is considered to have failed its essential purpose, the seller must be given an opportunity to repair or replace the product.

*BOC Grp., Inc. v. Chevron Chem. Co.*, LLC, 359 N.J. Super. 135, 147, 819 A.2d 431, 438 (App. Div. 2003 (citations and quotations omitted).

In this case, Plaintiffs agreed to the Limited Warranty which "limit[s] the seller's obligation to repair or replace the defective equipment." *BOC Grp., Inc.*, 359 N.J. Super. at 147, 819 A.2d at 438. The Limited Warranty states that "**THESE WARRANTIES AND THE EMISSION RELATED WARRANTIES APPEARING ELSEWHERE IN THIS BOOKLET ARE THE ONLY EXPRESS WARRANTIES BY SOA ON THE VEHICLE,**" and "**THESE WARRANTIES ARE IN LIEU OF ALL OTHER OBLIGATIONS, LIABILITIES OR WARRANTIES, WHETHER EXPRESS OR IMPLIED.**" [Dkt. 34-2 at 10] (capitalization and emphasis in the original). The Limited Warranty further states that "[u]nder these warranties, parts that malfunction or fail during the warranty period as a result of a manufacturing defect will be repaired without charge." [*Id.*]. And, as discussed above, Plaintiffs have plausibly alleged a defect covered by the Limited Warranty.

**\*14** Thus, the issue is whether the Warranty has failed as to its essential purpose. Courts have recognized two circumstances where a warranty fails for its essential purpose: (1) where a plaintiff gives the defendant "the opportunity to repair the defect but [is] refused service under the Warranty;" and (2) where " 'after numerous attempts to repair,' the product does not operate free of defects." *Cox*, 2015 WL 5771400, at \*7 (quoting *BOC Grp., Inc.*, 359 N.J. Super. at 148, 819 A.2d at 438).

Plaintiffs Burd, Baladi, Miller, and Stone do not meet these pleading requirements. These Plaintiffs allege that they brought their Class Vehicles to Subaru dealerships for repair, but do not allege that the dealership denied them service.

Instead, they allege that they received new batteries under the Limited Warranty, but only one time. [*See* Consol. Compl. ¶¶ 30–39; 60–67; 82–96]. New Jersey courts permit remedies outside of the warranty only "after numerous attempts" at repairing the complained-of defect. *BOC Grp., Inc.*, 359 N.J. Super. at 148, 819 A.2d at 438. By its plain meaning, "numerous" means more than once. Merriam-Webster, *Numerous* ("consisting of great numbers of units or individuals; many"), https://www.merriam-webster.com/dictionary/numerous. [5] Plaintiff Burd alleges that she brought her vehicle to a Nissan dealership for repair, but does not allege any facts connecting this dealership to Defendants. [Consol. Compl. ¶ 34]. Further, the Limited Warranty requires authorized Subaru retailers to service Subaru vehicles. [Dkt. 34-2 at 10]. Thus, Plaintiff Burd gave Defendants only one opportunity to repair her vehicle under the Limited Warranty. Because Plaintiffs Burd, Baladi, Miller, and Stone only gave Defendants one attempt to repair their vehicles, they did not provide Defendants adequate opportunity to remedy the alleged Battery Defect as the Limited Warranty requires. Their common-law express warranty claims are therefore dismissed.

Defendants also argue that Plaintiffs Hansel (New Jersey), O'Shaughnessy (New York), and Davis's (Texas) express warranty claims must be dismissed because they fail to allege that Defendants' repairs under the Limited Warranty were unsuccessful. [Dkt. 34-1 at 27–28]. Plaintiffs respond that, "[i]n lieu of repairing or replacing the actual defective part(s) that cause the parasitic battery drain, the dealers provided ineffective service, such as replacing the battery." [Dkt. 38 at 33].

The Court agrees with Defendants' reading of the facts as pled in the Consolidated Complaint. Plaintiffs Hansel, O'Shaughnessy, and Davis do not allege that they continued to experience defects after Defendants serviced their vehicles. [*See* Consol. Compl. ¶¶ 47–53; 68–74; 109–114]. Plaintiffs argue that Defendants' repair efforts are beside the point because "replacing one defective part with another equally defective part would render [the warranty] meaningless." [Dkt. 38 at 34] (quoting *Coba*, 2013 WL 244687, at \*6). The problem, however, is that Plaintiffs do not plead facts to show that the replacement parts were "equally defective" for Plaintiffs Hansel, O'Shaughnessy, or Davis. [6] In other words, Plaintiffs have not alleged that the repair services offered under the Limited Warranty failed to cure these Plaintiffs' mechanical issues. [7] This omission is fatal

because pleading failure of a warranty's essential purpose requires Plaintiffs to allege that "the product does not operate free of defects" even after Defendants attempted to repair their vehicles. *Cox*, 2015 WL 5771400, at *7 (quoting *BOC Grp., Inc.*, 359 N.J. Super. at 148, 819 A.2d at 438). The Court therefore dismisses the express warranty claims of Plaintiffs Hansel, O'Shaughnessy, and Davis.

### 4. Pre-Suit Notice for Illinois and Michigan Plaintiffs [8]

*15 As decided above, the Court will apply the law of Illinois and Michigan to Plaintiffs residing in those states to determine whether their claims should be dismissed for failure to allege pre-suit notice. To meet this requirement, Plaintiffs must "demonstrate more than simply general knowledge of an issue with the product line on the part of the defendant — instead, they must allege that the defendant had 'actual knowledge of the alleged breach of the particular products purchased by the named plaintiffs in this lawsuit.' " *Powell*, 2020 WL 6886242, at *15 (discussing notice requirement under Illinois and Michigan law); *McKay v. Novartis Pharm. Corp.*, 934 F. Supp. 2d 898, 913 (W.D. Tex. 2013), aff'd, 751 F.3d 694 (5th Cir. 2014) ("[T]he notice must have alerted Novartis to a particular buyer/end user, namely McKay, who was having problems with its products.").

While Plaintiffs dispute the notice requirement entirely, they also argue that they have satisfied each state's notice requirement. Plaintiffs first argue that they have satisfied pre-suit notice requirements because "[o]n April 27, 2020, Plaintiff Davis sent a letter to Subaru on behalf of himself and all similarly situated individuals residing in Texas who purchased 2016–2020 Subaru Outbacks [and] 2019–2020 Subaru Ascents' regarding parasitic drain in the vehicles batteries." [Dkt. 38 at 34 n.11 (quotations omitted)]. Plaintiffs also state that on June 15, 2020, Plaintiff Miller of California

> sent a pre-suit notice on behalf of himself and a 'class of persons who purchased or leased a 2015-2019 Subaru Outback, 2015-2019 Forester, 2015-2019 Legacy, 2015-2019 WRX, or 2019-2020 Ascent' concerning the Battery Drain Defect. Mr. Miller explained the Battery Drain Defect and noted Subaru had breached express and implied warranties of merchantability with respect to Class Vehicles.

[*Id.*]. The Court finds that the letters would provide sufficiently specific notice for Plaintiffs Davis and Miller.

But neither party has argued that California law requires pre-suit notice, and the Court has already dismissed Plaintiff Davis's express warranty claim. Further, because the law requires notice as to "particular end users," the products they purchased, and the specific defect, the Court finds that these letters do not provide adequate notice for other Plaintiffs' express warranty claims. *McKay*, 934 F. Supp. 2d at 913.

Plaintiffs further argue that they satisfied pre-suit notice requirements because "presenting a vehicle to an authorized dealer for repair, as Plaintiffs did, also constitutes notice." [Dkt. 38 at 34]. Under Michigan law, a single repair attempt is sufficient to create a question of fact as to whether Plaintiffs have satisfied their pre-suit notice requirements. *Gregorio v. Ford Motor Co.*, No. 20-11310, 2021 WL 778913, at *11 (E.D. Mich. Mar. 1, 2021) (citing *Francis v. Gen. Motors, LLC*, No. 19-11044, 2020 WL 7042935, at *12 (E.D. Mich. Nov. 30, 2020)). Because Michigan Plaintiff Beck alleges that she brought her Class Vehicle to a dealership for service, Plaintiffs' complaint survives the pre-suit notice requirement as to its Michigan Plaintiff Beck. Illinois courts, however, have found repair attempts insufficient to satisfy Illinois's pre-suit requirement. *See Darne v. Ford Motor Co.*, No. 13 CV 03594, 2017 WL 3836586, at *9 (N.D. Ill. Sept. 1, 2017).

Finally, Plaintiffs argue that Plaintiff-specific notice was not required because Defendants already knew of the Battery Defect in Plaintiffs' Class vehicles. However, "the Illinois Supreme Court has expressly rejected this theory of notice, and this Court is bound by its decision." *O'Connor v. Ford Motor Co.*, 477 F. Supp. 3d 705, 715 (N.D. Ill. 2020) (citing *In re Emerald Casino, Inc.*, 867 F.3d 743, 765 (7th Cir. 2017) and *Connick v. Suzuki Motor Co., Ltd.*, 174 Ill.2d 482, 221 Ill. Dec. 389, 675 N.E.2d 584, 589 (1996)). Thus, Plaintiffs have failed to adequately plead pre-suit notice under Illinois law.

*16 In sum, the Court rejects Defendant's pre-suit notice arguments as to Michigan Plaintiff Beck, but grants Defendants' Motion to Dismiss as to Illinois Plaintiff (Bulgatz) on this issue.

### iv. Breach of Implied Warranty (Count I)

Count I of the Consolidated Complaint alleges that Defendants breached their implied warranty of

merchantability by selling vehicles that were not fit for their ordinary uses. [Dkt. 18 at ¶¶ 191–202]. At the outset, Defendants argue that New Jersey's implied warranty law conflicts with the implied warranty law of several other states. Thus, the Court will first determine which states' laws apply to Plaintiffs' breach of implied warranty claims.

### 1. Choice of Law

Defendants argue that the laws of California, Florida, New York, and Illinois "require plaintiffs asserting implied warranty claims to be in direct vertical privity with the defendant," but that New Jersey law has no privity requirement. [Dkt. 34-1 at 19 (citing cases)]. Defendants argue that the law of those states should therefore govern their resident Plaintiffs' implied warranty claims.

To determine whether to apply New Jersey law or the law of each Plaintiff's home state, the court must first determine whether this issue of privity is outcome determinative and, therefore, whether New Jersey law conflicts with the laws of California, Florida, New York, and Illinois. *Powell*, 2020 WL 6886242, at *10. Under New Jersey law, "the buyer need not establish privity with the remote supplier to maintain an action for breach of express or implied warranties." *Amato*, 2019 WL 6607148, at *11 (quoting *Spring Motors Distributors, Inc. v. Ford Motor Co.*, 489 A.2d 660, 663 (N.J. 1985)). California, Florida, New York, and Illinois all require privity of contract. *In re Volkswagen Timing Chain Prod. Liab. Litig.*, No. CV 16-2765 (JLL), 2017 WL 1902160, at *16 (D.N.J. May 8, 2017) (citing *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 983-85 (N.D. Cal. 2014) (California law) and *Sanchez-Knutson v. Ford Motor Co.*, 52 F. Supp. 3d 1223, 1233–34 (S.D. Fla. 2014) (Florida law)). New York and Illinois law also require privity. *See id.* ("[N]o implied warranty will extend from a manufacturer to a remote purchaser not in privity with the manufacturer where only economic loss and not personal injury is alleged." (quoting *Lexow & Jenkins, P.C. v. Hertz Commercial Leasing Corp.*, 504 N.Y.S.2d 192, 193-94 (N.Y. App. Div. 1986)) (New York law); *Frank's Maint. & Eng'g, Inc. v. C. A. Roberts Co.*, 86 Ill. App. 3d 980, 992–93, 408 N.E.2d 403, 412 (1980) (Illinois law). Therefore, a conflict exists between New Jersey law and the law of California, Florida, Illinois and New York. *Amato*, 2019 WL 6607148, at *11 (finding

that privity requirements establish a conflict with New Jersey law).

Next, the Court must determine which state has the most significant relationship to claims of the California, Florida, Illinois, and New York Plaintiffs. *Amato*, 2019 WL 6607148, at *12 (quoting *Skeen*, 2014 WL 283628, at *3). The Court has already determined that the state-interest analysis favors application of Illinois law with respect to express warranties, and finds that the analysis here mirrors the express warranty analysis. The state-interests analysis is no different for the California, Florida, and New York Plaintiffs, except Plaintiff McCartney. Although Plaintiff McCartney resides in New York, he purchased his vehicle in New Jersey. [Consol. Compl. ¶ 54]. Thus, the Court cannot determine at this time which state has the strongest relationship to Plaintiff McCartney's claim, and New Jersey law will apply for the purposes of this motion to dismiss. *See Powell*, 2020 WL 6886242, at *12 (deferring determination of applicable law where Plaintiff resided in one state and purchased his vehicle in another).

**\*17** In sum, conflicts exist between New Jersey law and the law of California, Florida, Illinois, and New York with respect to privity, and the Court will apply local law to the implied warranty claims of all Plaintiffs from these states, except Plaintiff McCartney. Defendants' motion to dismiss Plaintiff McCartney's claim for lack of privity under New York law is therefore denied.

### 2. Dismissal for Lack of Privity

Defendants argue that the implied warranty claims of Plaintiffs Miller and Franke (California), Stone (Florida), Baladi and O'Shaughnessy (New York), and Bulgatz (Illinois) should be dismissed because they failed to adequately plead privity as their respective state laws require. [Dkt. 34-1 at 29]. Plaintiffs argue that these states permit exceptions to the privity requirement "when a plaintiff is the intended beneficiary of implied warranties in agreements linking a retailer and a manufacturer, and therefore lack of privity does not bar plaintiffs' implied warranty claims." [Dkt. 38 at 28–29 (quoting *Roberts v. Electrolux Home Prod., Inc.*, No. CV 12-1644 CAS, 2013 WL 7753579, at *10 (C.D. Cal. Mar. 4, 2013))].

California and Florida "have exceptions to the vertical privity requirement when, as is the case here, the consumer, rather than the dealer, is the ultimate user." *In re Volkswagen Timing Chain Prod. Liab. Litig.*, 2017 WL 1902160, at *16 (citing *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d at 983-85 (California law) and *Sanchez-Knutson*, 52 F. Supp. 3d at 1233–34 (Florida law)). These exceptions apply here because Plaintiffs are the "ultimate users" of Defendants' vehicles, and Defendants' motion to dismiss these claims is therefore denied.

Under Illinois law, however, such an exception only applies "where there is a direct relationship between the manufacturer and the seller or where ... the manufacturer knew the identity, purpose and requirements of the dealer's customer and manufactured or delivered the goods specifically to meet those requirements." *Frank's Maint. & Eng'g, Inc.*, 86 Ill. App. 3d at 992–93, 408 N.E.2d 412. Plaintiffs argue that such a direct relationship exists because Defendants "marketed the Class Vehicles to Plaintiffs as reliable and functional" and that "Subaru was aware that Plaintiffs and consumers require safe and reliable transportation." [Dkt. 38 at 27–28]. However, these general marketing efforts are insufficient to establish such a "direct relationship" with the specific Illinois Plaintiff here. *See In re VTech Data Breach Litig.*, No. 15 CV 10889, 2018 WL 1863953, at *5 (N.D. Ill. Apr. 18, 2018) (rejecting argument that advertising is sufficient to establish a "direct relationship" and dismissing implied warranty claim for lack of privity). Illinois Plaintiff Bulgatz's implied warranty claim is therefore dismissed.

With respect to New York law, courts have found that the privity analysis is too fact intensive to resolve at the motion to dismiss stage where Plaintiffs plead a third-party beneficiary relationship. *Argabright v. Rheem Mfg. Co.*, 258 F. Supp. 3d 470, 487 (D.N.J. 2017) ("The Court finds that the issue of privity between the Defendants and the seller of Romeo's automobile involves issues of fact not appropriate for resolution at the motion to dismiss stage. Defendants may renew this argument on a motion for summary judgment if they choose." (quoting *Dewey v. Volkswagen AG*, 558 F.Supp.2d 505, 524 n.17 (D.N.J. 2008))). Because Plaintiffs have alleged that they are "third-party beneficiaries of contracts between Subaru and its dealers, and specifically Subaru's implied warranties," the Court will deny Defendants' motion as to Plaintiffs Baladi and O'Shaughnessy's implied warranty claims.

### 3. Timeliness of Plaintiff Franke and George's Implied Warranty Claims

**\*18** Defendants also argue that California and Washington four-year statutes of limitations bar Plaintiffs Franke and George's implied warranty claims (Count I) and MMWA claims (Count III) because Plaintiffs Franke and George did not bring their claims within four years of purchasing their Class Vehicles. [Dkt. 38-1 at 29]. Plaintiffs argue that their implied warranty claims should be tolled and are timely because they pled that Defendants deliberately concealed the Battery Defect. [Dkt. 38 at 29].

As discussed below, the Court will dismiss Plaintiffs' MMWA claims on other grounds, and therefore declines to address this timeliness argument. As decided above, the Court will apply California law to Plaintiff Franke's implied warranty claim, under which a four-year statute of limitations applies. Cal. Com. Code § 2725. The Court also notes that Defendants have not argued that New Jersey law conflicts with Washington law as to the statute of limitations for implied warranty claims. Nor could they: both states also impose a four-year statute of limitations on implied warranty claims. *See Argabright*, F. Supp. 3d at 484 (citing N.J.S.A. § 12A:2–725(1); Rev. Code Wash. (ARCW) § 62A.2-725(1). Under New Jersey law, equitable tolling applies to implied warranties " 'where defendant's fraudulent conduct results in a plaintiff's lack of knowledge of a cause of action'; the essence of equitable tolling 'is not whether [the p]laintiff was in possession of all the information necessary to prevail on [her] claims, but whether plaintiff had enough information to commence a lawsuit.' " *Argabright*, 258 F. Supp. 3d at 485 (quoting *Jackson v. Eddy's LI RV Ctr.*, 845 F. Supp. 2d 523, 533 (E.D.N.Y. 2012)) (alterations in the original). California applies an analogous standard. *See Rosal v. First Fed. Bank of California*, 671 F. Supp. 2d 1111, 1123 (N.D. Cal. 2009) ("Equitable tolling may be applied if, despite all due diligence, a plaintiff is unable to obtain vital information bearing on the existence of his claim." (quoting *Santa Maria v. Pacific Bell*, 202 F.3d 1170, 1178 (9th Cir. 2000))). Thus, " 'the statute of limitations will be tolled if the plaintiff pleads, with particularity, the following three elements: (1) wrongful concealment by the defendant, (2) which prevented the plaintiff's discovery of the nature of the claim within the limitations period, and (3) due diligence in pursuing discovery

of the claim.' " *Id.* (quoting *Statistical Phone Philly v. NYNEX Corp.*, 116 F. Supp. 2d 468, 482 (S.D.N.Y. 2000)).

With respect to Plaintiff George, Plaintiffs explicitly pled elements (1) and (2), and allege that he did not begin to experience problems with his car until January 2019. [Consol. Compl. ¶¶ 117, 178, 301]. Accepting Plaintiffs' representations as true, it is plausible to infer that that he could not have discovered the defect sooner, even if he exercised due diligence.

Plaintiff Franke claims that he purchased his Class Vehicle in February 2015 and experienced battery failures as early as March 2015. [Consol. Compl. ¶ 76]. The Amended Complaint further states that Franke returned his car to the dealership after the fourth battery failure, but that the dealership refused to replace the battery. [*Id.* at 77–78]. The Amended Complaint does not identify dates for these subsequent failures or Franke's trip to the dealership. Plaintiffs argue that Franke's claim should be tolled because he "began suffering battery problems soon after his purchase, acted diligently by bringing in his Class Vehicle to a Subaru dealership, which refused repair and never informed him of a defect." [Dkt. 38 at 50].

 **\*19** The Court finds that Plaintiff Franke has not set forth facts to justify equitable tolling. The Consolidated Complaint and Plaintiffs' own arguments show that Plaintiff Franke immediately and repeatedly suffered battery failures as early as March 2015, and was refused service by a Subaru dealership. The Consolidated Complaint does not specify that any of these failures or his visit to the dealership occurred within the statute of limitations. Thus, according to the Consolidated Complaint, Franke had the same "vital information bearing on the existence of his claim" in 2015 as he did when this lawsuit was filed in 2020. *Rosal*, 671 F. Supp. 2d at 1123. Plaintiffs' argument that the statute of limitations should be tolled because the dealership "never informed [Franke] of a defect" is futile considering Plaintiffs' claims in this lawsuit. None of the Plaintiffs have alleged that Defendants or Subaru retailers "informed" them of the Battery defect, and yet, Plaintiffs initiated this lawsuit. Without the benefit of equitable tolling, Plaintiff Franke's implied warranty claim does not meet the four-year statute of limitations and is therefore dismissed.

In sum, the Consolidated Complaint adequately pleads facts to show that Plaintiff George is entitled to equitable tolling on his implied warranty claim, but fails to do so for Plaintiff

Franke's implied warranty claim. Accordingly, Defendants' motion to dismiss implied warranty claims as untimely is granted as to Plaintiff Franke, but denied as to Plaintiff George.

### v. Magnuson-Moss Warranty Act Claims, 15 U.S.C. § 2310(d)(1) ("MMWA") (Count III)

Defendants move to dismiss Plaintiff's MMWA claims on two grounds. First, they argue that the Court lacks subject-matter jurisdiction over the MMWA claims because Plaintiffs failed to name one hundred plaintiffs in the complaint as the statute expressly requires. [Dkt. 34-1 at 30]. Second, Defendants argue that, even if the Court finds that it has jurisdiction, the MMWA claims are meritless for the same reasons as Plaintiffs' warranty claims. The Court agrees that it lacks jurisdiction over Plaintiffs' MMWA claims and declines to review Defendants' argument as to the merits of Plaintiffs' MMWA claims.

Under 15 U.S.C. § 2310(d)(1), the MMWA vests jurisdiction "(A) in any court of competent jurisdiction in any State or the District of Columbia; or (B) in an appropriate district court of the United States, subject to paragraph (3) of this subsection." Paragraph (3) requires plaintiffs to satisfy three elements: (1) the amount in controversy for each plaintiff exceeds $25; (2) the total amount in controversy exceeds $50,000; and (3) "the number of named plaintiffs is at least 100." 15 U.S.C. § 2310(d)(1)(B).

The parties offer competing interpretations of the MMWA's jurisdictional provisions. Defendants argue that, because there are fewer than 100 named plaintiffs in this case, Plaintiffs cannot meet element (3) and therefore failed to plead jurisdiction. [Dkt. 34-1 at 30]. Plaintiffs argue that the Court may nevertheless exercise jurisdiction over their MMWA claims because 15 U.S.C. § 2310(d)(1)(A) permits MMWA cases in "any court of competent jurisdiction," and because the court already has jurisdiction over the case under the Class Action Fairness Act ("CAFA"). [Dkt. 38 at 35–36].

The parties' dispute reflects a disagreement in this district as to whether courts may exercise jurisdiction over MMWA claims where, as here, a complaint fails to name 100 plaintiffs but where the court otherwise has jurisdiction to hear the case. *Compare, e.g., Powell*, 2020 WL 6886242, at *18 (finding no jurisdiction under the MMWA) *with Payne v. Fujifilm U.S.A., Inc.*, No. CIV.A. 07-385 (JAG), 2007 WL

4591281, at *6 (D.N.J. Dec. 28, 2007) (finding jurisdiction under the MMWA). In finding a lack of jurisdiction in *Powell*, Judge Hillman held that plaintiffs "may not use CAFA as a means to evade the explicit jurisdictional requirements of the MMWA." *Powell*, 2020 WL 6886242, at *19. Judge Hillman noted that finding jurisdiction despite a plaintiff's "failure to satisfy the plain-language requirement of at least one hundred named plaintiffs would have the effect of overriding a part of the MMWA" without Congress's authorization or intent. *Id.* (quoting *Floyd v. American Honda Motor Co., Inc.*, 966 F.3d 1027, 1035 (9th Cir. 2020)). Judge Hillman also interpreted the statute to find that 15 U.S.C. § 2310(d)(1)(A) applies only to cases brought in state courts. *Id.* at *18. *See also* 15 U.S.C. § 2310(d)(1)(A) (permitting suit in "any court of competent jurisdiction in any State or the District of Columbia.").

**\*20** Having reviewed the conflicting case law in this district and elsewhere, the Court agrees with Judge Hillman's reasoning and conclusion in *Powell*, which mirrors the Ninth Circuit's opinion in *Floyd*. 966 F.3d at 1035. The Court therefore finds that it lacks jurisdiction over Plaintiffs' MMWA claims and will grant Defendants' motion to dismiss these claims. The Court will not consider Defendants' alternative MMWA arguments.

### vi. Song Beverly Act, Cal. Civ. Code § 1790-1795.8 (Deering) ("SBA") (Counts IV and V)

Plaintiffs claim that Plaintiffs Franke and Miller are entitled to relief for Defendants' violations of the SBA's express (Count IV) and implied (Count V) warranty protections. Defendants challenge these claims in three ways. First, Defendants argue that the SBA's damages provisions conflict with damages available to Plaintiffs under New Jersey law. [Dkt. 34-1 at 19–20]. Second, Defendants argue that Plaintiffs Miller and Franke's express warranty claims under the SBA fail as a matter of law. [*Id.* at 33–34]. Finally, Defendants argue that Plaintiff Miller's SBA claim is untimely. [*Id.* at 34].

### 1. Choice of Law

Defendants argue that New Jersey law, which only permits actual damages plus consequential damages for express warranty claims, conflicts with the SBA, which permits "actual damages and, for willful violations, a civil penalty

of up to two times actual damages." [Dkt. 34-1 at 19–20 (comparing N.J.S.A. 12A:2-714 with Cal. Civ. Code § 1794(b), (c) (Deering))]. Defendants also point out that "Song-Beverly ... allows recovery of costs and expenses, including attorneys' fees, unlike New Jersey. [*Id.* (citing Cal. Civ. Code § 1794(d) (Deering))]. However, Defendants do not argue for a choice-of-law analysis that would require the Court to apply New Jersey law to Plaintiffs' SBA claims. In fact, they seem to argue the opposite. [*See id.* at 20 "Plaintiffs' home states have the most significant relationship."]. Moreover, Defendants have not offered any authority to show that New Jersey law can or should override damages which a California statute makes available to California plaintiffs. Defendants' claims regarding these differences in statutory remedies will not affect the Court's analysis of Plaintiffs' SBA claims.

### 2. SBA Express Warranty Claims (Count IV)

Defendants argue that Plaintiffs Miller and Franke's SBA claims fail as a matter of law because Plaintiffs have failed to plead facts necessary to state an express-warranty SBA claim.

In order to state a claim for breach of express warranty under the SBA, a plaintiff must show "(1) the product had a defect or nonconformity covered by the express warranty; (2) the product was presented to an authorized representative of the manufacturer for repair; and (3) the manufacturer or its representative did not repair the defect or nonconformity after a reasonable number of repairs." *Gonzalez v. Ford Motor Co.*, No. CV 19-652 PA (ASX), 2019 WL 1364976, at *5 (C.D. Cal. Mar. 22, 2019) (quoting *Arteaga v. Carmax Auto Superstores W. Coast, Inc.*, No. CV-14-1888 RSWL (CWx), 2014 WL 3505527, at *3 (C.D. Cal. July 11, 2014). Defendants argue that Plaintiffs Miller and Franke fail to meet element (1) because the Limited Warranty does not cover the complained-of defect for the same reasons discussed above. [Dkt. 34-1 at 34]. Defendants also argue that Defendant Miller fails element (3) because he only presented his car for repair once before filing this lawsuit. [*Id.*].

**\*21** As noted above, Plaintiffs concede that Plaintiff Miller cannot sustain his Song-Beverly Act claim. [Dkt. 38 at 17 n.1]. Plaintiff Franke meets element (1) because, as discussed above, he adequately pleads a defect which the Limited Warranty covers. The Court therefore denies Defendants' motion to dismiss Plaintiff Franke's SBA claim.

### 3. SBA Implied Warranty Claims (Count V)

Defendants allege that Plaintiff Miller's breach of implied warranty claim under the SBA fails because his alleged breach did not occur within one year of when he purchased his car, and the statute imposes a one-year warranty period. [Dkt. 34-1 at 34] (citing 📄 Cal. Civ. Code § 1791.1(c) ("[I]n no event shall such implied warranty have a duration of less than 60 days nor more than one year following the sale of new consumer goods to a retail buyer.")). However, the California Court of Appeals has held that this one-year-from-purchase period does not apply to products with latent defects.

📄 *Mexia v. Rinker Boat Co.*, 174 Cal. App. 4th 1297, 95 Cal. Rptr. 3d 285, 295 (2009). *See also* 📄 *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1222 (9th Cir. 2015) (adopting *Mexia*'s holding). This latent-defect exception applies in this case because Plaintiffs have alleged that the Battery Defect is a latent defect. [Consol. Compl. ¶ 300]. While the Court agrees with Defendants that the statute does not contain a carveout for latent defects, [Dkt. 39 at 9–10], the Court is bound by the decision of intermediate state appellate courts. *PSM Holding Corp. v. Nat'l Farm Fin. Corp.*, 884 F.3d 812, 828 (9th Cir. 2018). Thus, Defendants' motion is denied with respect to Defendant Miller's breach of implied warranty claim under the SBA.

### vii. Fraud and Consumer Protection Claims

Plaintiffs have alleged fraud and/or unfair business practices under seven state consumer-protection statutes: the New Jersey Consumer Fraud Act N.J. Stat. Ann. § 56:8-1 et seq. ("NJCFA") (Count VI); the California Consumers Legal Remedies Act 📄 Cal. Civ. Code §§ 1750–🚩 1785 ("CLRA") (Count VII); California Unfair Competition Law 📄 Cal. Bus. & Prof. Code §§ 17200–17210 ("UCL") (Count VIII); the Florida Deceptive and Unfair Trade Practices Act Fla. Stat. § 501.201 et seq. ("FDUTPA") (Count IX); Illinois Consumer Fraud and Deceptive Business Practices Act 815 Ill. Comp. Stat. § 505/1 et seq. ("ICFA") (Count X); the Michigan Consumer Protection Act 📄 Mich. Comp. Laws § 445.901, et seq. ("MCPA") (Count XI);[9] and 📄 New York General Business Law §§ 349, 350 ("NYGBL"). Plaintiffs also allege common law fraudulent concealment (Count XV). These claims generally assert that Defendants knew of the Battery Defect but concealed information about the Battery Defect despite having a duty to disclose this information. [*See e.g.*, Consol. Compl. ¶¶ 266–68]. Plaintiffs all claim that they spoke to Subaru representatives and reviewed the Class Vehicles' Monroney stickers before purchasing their Class Vehicles. Some claim that they also reviewed Subaru advertisements and marketing materials before purchasing their vehicles. According to Plaintiffs, none of these sources of information disclosed the battery defect.

Defendants challenge Plaintiffs fraud claims—collectively and individually—on numerous grounds. The Court will discuss each of Defendants' arguments in the order Defendant has presented them.

### 1. The Sufficiency of Plaintiffs' Pleadings Under 📄 Federal Rule of Civil Procedure 9(b)

**\*22** Defendants first argue that 📄 Federal Rule of Civil Procedure 9(b)'s heightened pleading standard applies to Plaintiffs' statutory fraud and common-law fraudulent concealment claims. [Dkt. 34-1 at 35]. Defendants are correct to the extent that their challenge applies only to statutory claims that sound in fraud or deception.[10] 📄 *Naporano Iron & Metal Co. v. Am. Crane Corp.*, 79 F. Supp. 2d 494, 510–11 (D.N.J. 1999) (NJCFA); 📄 *Dzielak v. Whirlpool Corp.*, 26 F. Supp. 3d 304, 336 (D.N.J. 2014) (CLRA); *Sauer*, 2020 WL 1527779, at *8 (UCL); *Morano v. BMW of N. Am., LLC*, 928 F. Supp. 2d 826, 833 (D.N.J. 2013) (citing *Blair v. Wachovia Mortg. Corp.*, 11–cv–566–OC–37, 📄 2012 WL 868878 (M.D. Fla. Mar. 14, 2012)) (FDUTPA); 📄 *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736–37 (7th Cir. 2014) (citing 📄 *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 446–47 (7th Cir. 2011)) (ICFA); 📄 *Weske v. Samsung Elecs., Am.*, Inc., 934 F. Supp. 2d 698, 703 (D.N.J. 2013) (fraudulent concealment).

📄 Rule 9(b) requires Plaintiffs alleging fraud claims to plead the "circumstances" of the alleged fraud with specificity sufficient to "place defendants on notice of the precise misconduct with which they are charged." 🚩 *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984). To that end, "[a]lthough the rule states that [m]alice, intent, knowledge, and other conditions of a person's

mind may be alleged generally, and does not require the plaintiff to plead every material detail of the fraud, the plaintiff must use alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Argabright*, 201 F. Supp. 3d at 590–91 (quoting

*In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002) (internal quotations and citations omitted)). " 'Plaintiffs must accompany their legal theory with factual allegations that make their theoretically viable claim plausible.' " *Powell*, 2020 WL 6886242, at *20 (quoting

*In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d at 216).

As a preliminary matter, Defendants argue that Plaintiffs have failed to satisfy Rule 9(b) because their pleadings improperly lump-together SOA and SBR without specifying which entity committed which fraudulent conduct. [Dkt. 34-1 at 35]. Generally, "[w]hen multiple defendants are involved, the complaint must plead with particularity by specifying the allegations of fraud applying to each defendant." *MDNet, Inc. v. Pharmacia Corp.*, 147 F. App'x 239, 245 (3d Cir. 2005) (citing *Cinalli v. Kane*, 191 F. Supp. 2d 601, 609 (E.D. Pa. 2002)). However, because this case involves " 'an alleged fraudulent concealment perpetrated by sophisticated corporate entities that are related to each other, [Plaintiff] need not distinguish the specific roles that each entity played in the fraudulent concealment in order to meet the Rule 9(b) standard." *Ponzio v. Mercedes-Benz USA, LLC*, 447 F. Supp. 3d 194, 226 (D.N.J. 2020) (quoting *Gray v. BMW of N. Am., LLC*, 2014 WL 4723161, at *2 (D.N.J. Sept. 23, 2014)).

*23 Defendants next argue—and Plaintiffs concede—that Defendants did not make actionable affirmative fraudulent misrepresentations to Plaintiffs. [Dkt. 34-1 at 36; Dkt. 38 at 39]. [11] Plaintiffs clarify that they argue only that Defendants fraudulently omitted or concealed known information about the Battery Defect. [Dkt. 38 at 38]. On that point, Defendants argue primarily—and categorically, without analyzing the elements of each statutory claim—that Plaintiffs' fraudulent concealment claims should be dismissed because the Consolidated Complaint fails to allege facts showing that Defendants knew of the Battery Defect. [Dkt. 34-1 at 38]. [12]

Naturally, Plaintiffs disagree. As evidence of Defendants' knowledge, Plaintiffs cite to several Technical Support

Bulletins ("TSB") which Subaru filed with the National Highway Traffic Safety Administration ("NHTSA") between June 2014 and October 2019 which addressed battery-life issues for various models and years of Subaru vehicles. [Consol Compl. ¶¶ 153–59]. Plaintiffs also point to "consumer complaints submitted to NHTSA and Subaru, internal pre-release testing data, warranty data from its dealers, replacement-parts sales data, ... reimbursement claims paid to Subaru dealers for work performed in response to warranty claims," and consumer posts to third-party websites such as the NHTSA website and Facebook. [Dkt. 38 at 43; Consol. Compl. ¶¶ 146–51; 161–62].

Taken together and construed in favor of Plaintiffs, the facts and evidence which Plaintiffs cite in the Consolidated Complaint permit a plausible inference that Defendants knew of the Battery Defect when they sold vehicles to Plaintiffs. Several of the TSBs address battery failures in Subaru vehicles, and others address programming errors related to battery failures. For example, the June 9, 2014 TSB addresses "Parasitic Battery Draw" for "All Models" of Subaru vehicles. [Consol. Compl. ¶ 153]. Several 2017 TSBs concern computer programming to address "potential battery discharge (dead battery) after repeated periods of short trip driving." [Consol Compl ¶ 156–58]. Even though the 2017 TSBs do not all involve vehicles of the same year and model as the Class Vehicles, Plaintiffs have alleged that the defective CAN system "has been implemented in all Subaru models." [Consol. Compl. ¶ 219]. Assuming that this claim is true, Subaru's knowledge of software-related battery problems in non-Class Vehicles could show that Defendants knew that the same problems affected Class Vehicles that contained the same CAN system. Construed in favor of Defendants, these TSBs suggest that Defendants were aware of a battery-related defect across Subaru vehicles of numerous models and years which electronic reprogramming could alleviate.

*24 Defendants argue that any TSBs which post-date Plaintiffs' Class Vehicle purchases cannot show that Defendants had pre-sale knowledge of the Battery Defect. [Dkt. 34-1 at 40]. However, the earliest TSB which Plaintiffs cite was issued in June 2014, before any Class Plaintiffs purchased their Class Vehicles. Moreover, most of the cited TSBs were issued within one to two years of the earliest Class Vehicle purchases and therefore "permit plausible inferences that [Defendants] were aware of the defect at the time they sold the vehicles." *Falco v. Nissan N. Am. Inc.*, No. CV 13-00686 DDP MANX, 2013 WL 5575065, at *6 (C.D. Cal.

Oct. 10, 2013); [*compare* Dkt. 34-1 at 14 (listing purchase dates of Class Vehicles) *with* Dkt. 38 at 40–41 (listing TSB publication dates)].

The facts pled also support a finding that Defendants learned of the Battery Defect through warranty claims. Plaintiffs state that they sought replacement batteries while their Class Vehicles were under warranty. [*E.g.* ¶ 91]. Further, some customer complaints to NHTSA "specifically state that the [battery] issues were reported to Subaru by way of warranty claims." [13] *Powell, 2020 WL 6886242, at *22*. [*See* Consol. Compl. at 52–52]. The Consolidated Complaint explains that Subaru's Quality Assurance Division would have gained knowledge of the Battery Defect through these warranty claims. [14] The Consolidated Complaint also explains that Subaru dealership service centers provide "detailed documentation ... for repairs made pursuant to warranties." [*Id.* ¶ 150]. [15] Construed in favor of Plaintiffs, these customer complaints suggest that Defendants would have learned of battery-related issues when customers sought repairs under their warranties. *See id.* [16]

Defendants further argue that, to the extent TSB's do provide evidence of Defendants' knowledge of the Battery Defect, Defendants did not "conceal" this information because they filed the information publicly with the NHTSA. [*Id.* at 41]. This might be a compelling argument if Defendants established that the state laws and consumer fraud statutes at issue here imposed on Plaintiffs some duty to research or investigate their Class Vehicles before purchasing them, and that such an investigation would have included a review of TSBs filed with NHTSA. [17] But because Defendants have not established such a duty, the Court rejects this argument.

 **\*25** Next, Defendants argue on several grounds that SBR specifically cannot be held liable for fraud. [Dkt. 34-1 at 41]. First, Defendants argue that the Complaint fails to establish that SBR was responsible for any of the alleged misrepresentations. But the Consolidated Complaint alleges that SBR and SOA "jointly develop sales and marketing materials" and "jointly design, determine the substance of, and affix to Subaru vehicles" the Monroney stickers. [Consol. Compl. ¶¶ 28–29]. Relatedly, Defendants claim that "SBR does not sell, distribute, market, warrant, or service Subaru vehicles in the United States." [Dkt. 34-1 at 41]. This is a factual dispute that the Court cannot resolve at this juncture. Defendants also argue that SBR cannot be liable for omissions from Monroney stickers because "the categories

of information to be included on that label are prescribed by law and do not include information about potential vehicle defects." [Dkt. 34-1 at 42 (citing 15 U.S.C. § 1232)]. Defendants offer no authority for their claim that 15 U.S.C. § 1232 exclusively lists the information that an automobile manufacturer may include on its vehicles' Monroney stickers.

Finally, Defendants argue that Plaintiffs have not established that SBR owed a duty to disclose information regarding the Battery Defect. [18] [Dkt. 34-1 at 41]. Plaintiffs allege throughout their Consolidated Complaint that SBR had a duty to disclose information concerning the Battery Defect due to its superior knowledge of the Battery Defect through the sources discussed above. [*See, e.g.*, Consol. Compl. ¶¶ 146, 180]. And, as discussed above, the Consolidated Complaint plausibly alleges that SBR knew of the Battery Defect and participated in creating marketing materials and Monroney stickers for the Class Vehicles. However, not all states recognize a duty to disclose based merely on superior knowledge in an arm's-length transaction at common law or for statutory fraud claims. Indeed, courts interpreting fraud claims under New Jersey, Michigan, Illinois, and Florida common law, and under the NJCFA and ICFA, have not recognized such a duty. *See New Jersey Econ. Dev. Auth. v. Pavonia Rest., Inc.,* 319 N.J. Super. 435, 446, 725 A.2d 1133, 1139 (App. Div. 1998) ("[A] party has no duty to disclose information to another party in a business transaction unless a fiduciary relationship exists between them, unless the transaction itself is fiduciary in nature, or unless one party 'expressly reposes a trust and confidence in the other.' " (quoting *Berman v. Gurwicz,* 189 N.J. Super. 89, 93, 458 A.2d 1311 (Ch. Div. 1981))) (New Jersey common law); *Mickens v. Ford Motor Co.,* 900 F. Supp. 2d 427, 441 (D.N.J. 2012) (citing *Arcand v. Brother Int'l Corp.,* 673 F. Supp. 2d 282, 296 (D.N.J. 2009)) (NJCFA); *Flynn v. FCA US LLC,* 327 F.R.D. 206, 218 (S.D. Ill. 2018) (ICFA and Illinois common law) (same*); Matanky v. Gen. Motors LLC,* 370 F. Supp. 3d 772, 794 (E.D. Mich. 2019) ("[A] legal duty to make a disclosure will arise ... when inquiries are made by the plaintiff, to which the defendant makes incomplete replies that are truthful in themselves but omit material information." (quoting *MacDonald v. Thomas M. Cooley Law Sch.,* 880 F. Supp.2d 785, 798-99 (W.D. Mich. 2012), *aff'd,* 724 F.3d 654, 666 (6th Cir. 2013))) (Michigan common law) [19] ; *Taylor v. Am. Honda Motor Co.,* 555 F. Supp. 59, 64 (M.D. Fla. 1982) ("[A]llegations

of superior actual knowledge are not sufficient to state a claim of fraudulent concealment.") (Florida common law).

*Cf.* Ponzio, 447 F. Supp. 3d at 246 (quoting *Falco v. Nissan N. Am. Inc.*, 96 F. Supp. 3d 1053, 1063 (C.D. Cal. 2015) (acknowledging duty based on superior knowledge under the UCL); *Falk v. Gen. Motors Corp.*, 496 F. Supp. 2d 1088, 1096 (N.D. Cal. 2007) (citing *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 337, 60 Cal. Rptr. 2d 539 (1997)) (CLRA); *Cardenas v. Toyota Motor Corp.*, 418 F. Supp. 3d 1090, 1105 (S.D. Fla. 2019) (FDUTPA); *Herron v. Best Buy Co. Inc.*, 924 F. Supp. 2d 1161, 1175 (E.D. Cal. 2013) (California common law); *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993) (New York common law); *Short v. Hyundai Motor Co.*, 444 F. Supp. 3d 1267, 1280 (W.D. Wash. 2020) (Washington common law). [20] Plaintiffs have not argued that any other duty attaches to SBR's statutory fraud, omission, or deception claims, or Plaintiffs' common-law fraudulent concealment claim. [21] Plaintiffs' NJCFA and ICFA claims, and common-law fraud claims under New Jersey, Michigan, Illinois, and Florida law against against SBR are therefore dismissed.

### 2. New York General Business Law §§ 349, 350 ("NYGBL") (Counts XII and XIII)

**\*26** Defendants argue that Plaintiffs' New York statutory false advertising claims must fail because Plaintiffs have failed to allege that any deceptive conduct occurred in New York. [Dkt. 34-1 at 43–44]. "The New York Court of Appeals in *Goshen v. Mutual Life Insurance Company of New York* appears to have interpreted the limiting phrase 'in this state' in sections 349(a) and 350 [of NYGBL] to require that 'the transaction in which the consumer is deceived ... occur in New York.' " *Devane v. L'Oreal USA, Inc.*, No. 19 CIV. 4362 (GBD), 2020 WL 5518484, at \*6 (S.D.N.Y. Sept. 14, 2020) (quoting *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 122 (2d Cir. 2013) and *Goshen v. Mutual Life Ins. Co. of N.Y.*, 774 N.E.2d 1190, 1195 (N.Y. 2002)). As Plaintiffs point out, they have alleged that Plaintiffs Baladi and O'Shaughnessy purchased their Class Vehicles in New York, where the alleged omissions occurred. [Consol. Compl. at ¶¶ 60, 68, 347]. Although Plaintiff McCartney is a New York resident, he purchased his Class Vehicle in New Jersey, and does not

allege that any deceptive conduct occurred in New York. [*See* Compl. ¶ 55]. The Court therefore rejects Defendants' argument as applied to Plaintiffs Baladi and O'Shaughnessy, but grants Defendants' motion as to Plaintiff McCartney.

Defendants also argue that Plaintiffs Baladi and O'Shaughnessy's claims under § 350 of the NYGBL fail because these Plaintiffs failed to allege that they relied on Defendants' misleading advertisements. [Dkt. 34-1 at 42–43]. However, "[t]he New York Court of Appeals has squarely held ... that '[j]ustifiable reliance by the plaintiff is not an element of [a] statutory claim' brought pursuant to Section 349 or 350." *Bassaw v. United Indus. Corp.*, 482 F. Supp. 3d 80, 88 (S.D.N.Y. 2020) (citing *Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, 944 N.Y.S.2d 452, 967 N.E.2d 675 (N.Y. 2012)). *See also Devane v. L'Oreal USA, Inc.*, No. 19 CIV. 4362 (GBD), 2020 WL 5518484, at \*3 (S.D.N.Y. Sept. 14, 2020) (listing elements of § 350 claim without mention of reliance); *Lugones v. Pete & Gerry's Organic, LLC*, 440 F. Supp. 3d 226, 239 (S.D.N.Y. 2020) (same). Defendants' motion on this claim is therefore denied.

### 3. Plaintiff Bulgatz's Claim Under the Illinois Consumer Fraud and Deceptive Business Practices Act Claim, 815 Ill. Comp. Stat. § 505/1 et seq. ("ICFA") (Count X)

Plaintiff Bulgatz's ICFA claim alleges that Defendants' conduct was both "unfair and deceptive." [Consol. Compl. ¶¶ 323–24]. Defendants argue that Plaintiff Bulgatz's "unfair" practices claim cannot survive because Plaintiff Bulgatz improperly relies on the same factual predicates to state both his "unfair practices" and "deceptive conduct" theories of liability. [Dkt. 34-1 at 44]. Plaintiffs counter that Bulgatz's complaint should survive because they have specifically alleged in the Consolidated Complaint that Defendants' conduct is both deceptive and unfair. [Dkt. 38 at 37–38]. But Plaintiffs rely entirely on claims that Defendants misled them by failing to disclose material information. The problem then "is not that the alleged conduct is not unfair; it is that the alleged unfair conduct completely overlaps with the deceptive conduct." *In re VTech Data Breach Litig.*, No. 15 CV 10889, 2018 WL 1863953, at \*7 (N.D. Ill. Apr. 18, 2018). "Simply adding language of 'unfairness' instead of 'misrepresentation' does not alter the fact that [plaintiffs'] allegations are entirely grounded in fraud under the ICFA." *Id.* (quoting *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761

F.3d 732, 737 (7th Cir. 2014)). Thus, Plaintiff Bulgatz's ICFA claim is dismissed to the extent it alleges unfair conduct.

### 4. Plaintiff Beck's Claim Under the Michigan Consumer Protection Act, Mich. Comp. Laws § 445.901, et seq. ("MCPA") (Count XI)

Defendants argue that Plaintiff Beck's claim under the MCPA should be dismissed because automotive sales are exempt from the MCPA. [Dkt. 34-1 at 44]. As mentioned above, Plaintiffs concede Defendants' position. [Dkt. 38 at 17 n.1]. Plaintiffs' MCPA claim is therefore dismissed.

### 5. Restitution for Plaintiffs Miller and Franke Under the California Unfair Competition Law Cal. Bus. & Prof. Code §§ 17200–17210 ("UCL") (Count VIII)

**\*27** Defendants raise three arguments against Plaintiffs Miller and Franke's UCL claims. First, Defendants argue that the only remedies available to Plaintiffs Miller and Franke under the UCL are restitution or injunctive relief. [Dkt. 34-1 at 45]. Second, Defendants argue that Plaintiffs cannot recover restitution under the UCL because Plaintiffs purchased their cars from third-party dealerships and, therefore, that Defendants did not obtain "money or property" from Plaintiffs. [*Id.*]. Third, Defendants argue that, even if Plaintiffs could recover from Defendants, Plaintiffs failed to plead facts showing that Plaintiffs' payments to the third-party dealerships are traceable to defendants. [*Id.*]. Plaintiffs do not dispute that they may only obtain restitution and injunctive relief under the UCL. However, they contend that the UCL does not require them to allege direct payment to Defendants, and that they have adequately pled that the monies payed to third-party vendors are traceable to Defendants. [Dkt. 38 at 32].

"The UCL only provides for restitution or injunctive relief." *Cabebe v. Nissan of N. Am., Inc.*, No. 18-CV-00144-WHO, 2018 WL 5617732, at *5 (N.D. Cal. Oct. 26, 2018) (citing *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144 (2003)); *accord Saitsky v. DirecTV, Inc.*, No. CV 08-7918 AHM (CWX), 2009 WL 10670629, at *2 (C.D. Cal. Sept. 22, 2009) ("Remedies for private individuals bringing suit under the UCL are limited to restitution and injunctive relief." (citing *Madrid v. Perot Systems Corp.*, 130 Cal.

App. 4th 440, 452 (2005))). Courts have reached "divergent conclusions" as to whether plaintiffs can seek restitution from a manufacturer defendant where plaintiffs purchased a car from a third-party dealer. *Cabebe*, 2018 WL 5617732, at *5 (citing *Asghari v. Volkswagen Grp. of Am.*, Inc., 42 F. Supp. 3d 1306, 1324 (C.D. Cal. 2013) and *Aberin v. Am. Honda Motor Co.*, 2018 WL 1473085, at *8 (N.D. Cal. March 26, 2018)). Courts in this District have found previously that the UCL permits plaintiffs to seek restitution from remote manufacturers, *see Powell*, 2020 WL 6886242, at *28, and the weight of authority supports that same conclusion here. *See Cabebe*, No. 18-CV-00144-WHO, 2018 WL 5617732, at *5 (discussing cases).

The Court agrees with Defendants that, to survive a motion to dismiss, plaintiffs suing a remote manufacturer must plead facts showing that payments to third-party distributors are traceable to the manufacturer defendants. *In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d 1098, 1105 (N.D. Cal. 2007). ("[T]he Court concludes that as long as Indirect Purchaser Plaintiffs are ultimately able to prove traceability, California law authorizes this Court to award them restitution under the UCL."). However, the Court finds that Plaintiffs' have adequately pled traceability because they claim that Defendants profited from the sale of defective cars. [Consol. Compl. at ¶¶ 377–78]. *See Powell*, 2020 WL 6886242, at *28 (denying motion to dismiss after finding that similar pleadings satisfied the traceability requirement).

The Court therefore grants Defendants' motion to limit remedies available under the UCL to injunctive relief and restitution, but denies Defendants' motion to the extent it asserts that Plaintiffs failed to plead traceability.

### 6. Timeliness of Plaintiff Franke's Claim Under the California Consumers Legal Remedies Act Cal. Civ. Code §§ 1750–1785 ("CLRA") (Count VII)

Defendants next argue that Plaintiff Franke's CLRA claim is untimely because he filed his complaint more than three years after he purchased his car. [Dkt. 34-1 at 46]. Plaintiffs do not dispute that a three-year statute of limitations applies to CLRA claims under Cal. Civ. Code § 1783, but argue that the limitations clock starts when a latent defect is discovered under the delayed discovery rule. [Dkt. 38 at 50]. In reply,

Defendants argue that Plaintiffs failed to plead facts necessary to toll the statute of limitations. [Dkt. 39 at 10 n.2].

"The delayed discovery rule tolls the statute of limitations on CLRA claims.... To invoke the delayed discovery rule, a plaintiff must plead facts that show (1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence." *Asghari*, 42 F. Supp. 3d at 1320 (citations and quotations omitted).

**\*28** For the same reasons discussed above with respect to Franke's implied warranty claim, the Court finds that Plaintiffs have failed to plead facts showing that Franke's CLRA claim was timely. Plaintiff Franke's CLRA claim is therefore dismissed.

### 7. Plaintiffs Franke and Miller's CLRA and UCL Claims for Equitable Relief (Counts VII and VIII)

Next, Defendants argue that Plaintiffs Franke [22] and Miller's CLRA and UCL claims for equitable relief should be dismissed because they have adequate remedies at law. [Dkt. 34-1 at 46]. Plaintiffs argue that these statutory and legal claims are not mutually exclusive, at least at the pleading stage. [Dkt. 38 at 48–49]. Alternatively, Plaintiffs argue that their legal claims are not sufficient to "address Subaru's ongoing violations." [*Id.*].

In general, " '[t]here is no right to equitable relief or an equitable remedy when there is an adequate remedy at law." *Huu Nguyen v. Nissan N. Am., Inc.*, No. 16-CV-05591-LHK, 2017 WL 1330602, at \*4 (N.D. Cal. Apr. 11, 2017) (*Duttweiler v. Triumph Motorcycles (Am.) Ltd.*, 2015 WL 4941780, at \*8 (N.D. Cal. Aug. 19, 2015)). However, both the UCL and CLRA state that the statutory remedies provided therein are "cumulative" to other legal remedies. [23] Because of this tension, there was until recently a "split of authority in the California district courts on the question of whether plaintiffs should be barred from pleading claims for equitable relief under the UCL and CLRA if they have alleged a claim that would provide an adequate remedy at law." *Luong v. Subaru of Am., Inc.*, No. 17-CV-03160-YGR, 2018 WL 2047646, at \*7 (N.D. Cal. May 2, 2018) (citations and quotations omitted).

The Ninth Circuit resolved this split in *Sonner v. Supreme Nutrition Corp.*, the 971 F.3d 834, 844 (9th Cir. 2020). It held that, despite the UCL's and CLRA's cumulative remedies language, "traditional principles governing equitable remedies in federal courts, including the requisite inadequacy of legal remedies, apply when a party requests restitution under the UCL and CLRA in a diversity action." *Id.* [24] Plaintiffs argue that *Sonner* is distinguishable because that case involved an amended complaint filed in the late stages of litigation. [Dkt. 38 at 49]. However, courts applying *Sonner* have rejected this same argument when dismissing complaints for cumulative pleading. *See, e.g.*, *Shay v. Apple Inc.*, No. 20CV1629-GPC(BLM), 2021 WL 75690, at \*9 (S.D. Cal. Jan. 8, 2021). Plaintiffs also argue that the Court should not apply *Sonner* because it contradicts the Ninth Circuit's ruling in *Moore v. Mars Petcare US, Inc.* 966 F.3d 1007, 1021 (9th Cir. 2020). But *Moore* only held that the UCL and CLRA are cumulative with one another, not with separate legal remedies. *Id.* ("The UCL, FAL and CLRA explicitly provide that remedies under each act are cumulative to each other."). Thus, Plaintiffs cannot seek equitable remedies under the UCL and CLRA that are cumulative to their legal remedies.

**\*29** The question now is whether Plaintiffs have pled that they lack an adequate remedy at law. *Huu Nguyen*, 2017 WL 1330602, at \*4. [25] Under the UCL, Plaintiffs seek several forms of equitable relief, including an order "to enjoin Subaru from continuing its unlawful, unfair, and fraudulent acts or practices." [*e.g.* Consol. Compl. ¶ 299]. These "fraudulent acts or practices" include "repairing defective parts with more defective parts and otherwise failing to adequately remedy;" and "[r]efusing to repair or replace the Class Vehicles when the known Defect manifested outside the warranty period," among others [*Id.* ¶ 297.c,d]. Plaintiffs argue that Defendants must be enjoined from their current repair practices "because the battery itself is not the root cause of the failures. Therefore, an injunction is required to prevent further harm, including by protecting the owners of Class Vehicles from post-judgment battery failures." [Dkt. 38 at 48].

"It goes without saying that an injunction is an equitable remedy." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311 (1982). The requested injunction, among other equitable remedies that Plaintiffs request, is distinct from the legal damages that Plaintiffs seek elsewhere, and the Court finds that Plaintiffs have adequately alleged that legal remedies are

inadequate. Defendants' motion is therefore denied on this issue, and Plaintiffs may seek equitable remedies under the UCL.

Under the CLRA, Plaintiffs "seek injunctive relief for Subaru's violation of the CLRA." [Consol. Compl. ¶ 289]. The Complaint alleges that Defendants' CRLA violations result entirely from deceptive statements and "partial representations" made to Plaintiffs before they purchased their class vehicles. [*Id.* ¶¶ 282, 283]. Plaintiffs have not explained how injunctive relief would cure their CLRA injury as pled, or alleged facts showing that legal remedies are inadequate. As discussed below, and to the extent that Plaintiffs seek to enjoin Defendants from falsely advertising their vehicles to Plaintiffs or other future customers, Plaintiffs lack standing to obtain this relief. Plaintiffs have therefore failed to plead that they are entitled to injunctive relief under the CLRA. Defendants' motion to dismiss Plaintiffs' CLRA claim for equitable remedies is therefore dismissed.

### 8. Economic Loss Rule (Count XV)

Defendants argue that the economic loss rule bars the fraudulent concealment claims raised by New Jersey, California, Florida, and Illinois Plaintiffs under the laws of their respective states. [Dkt. 38-1 at 47]. Plaintiffs argue "fraudulent inducement is a well-established exception to the economic loss rule" and that this exception applies to their fraudulent concealment claims. [Dkt. 38 at 51–52].

New Jersey, California, Florida, and Illinois all recognize the economic loss rule, which generally holds that "purely economic losses are not recoverable in tort." *Ponzio*, 447 F. Supp. 3d at 236 (quoting *NuCal Foods, Inc. v. Quality Egg LLC*, 918 F. Supp. 2d 1023, 1028 (E.D. Cal. 2013)). The economic loss rule "preclude[s] plaintiffs from recovering under fraud and other intentional tort theories of liability where the tort claims are based on the same facts as the breach of contract claims." *Id.* (citing *WeBoost Media S.R.L. v. LookSmart Ltd.*, No. C 13-5304, 2014 WL 2621465, at *5 (N.D. Cal. June 12, 2014)) (discussing California law).

*See also id.* at 238 (quoting *Benkle v. Ford Motor Co.*, No. SACV161569, 2017 WL 9486154, at *9 (C.D. Cal. Dec. 22, 2017) (Florida law); *Bracco Diagnostics, Inc. v. Bergen Brunswig Drug Co.*, 226 F. Supp. 2d 557, 562 (D.N.J. 2002) (New Jersey law); *In re Rust-Oleum*

*Restore Mktg., Sales Practices & Prod. Liab. Litig.*, 155 F. Supp. 3d 772, 824 (N.D. Ill. 2016) (Illinois law). Each of these states recognizes an exception to the economic loss rule for affirmative fraudulent misrepresentations, but declines to apply the exception to claims of fraudulent concealment or omission such as those advanced here. *See Ponzio*, 447 F. Supp. 3d 236–37 (noting "[t]o benefit from the [fraud exception under California law], the tortious claim must allege an affirmative misrepresentation distinct from the contract breach, and the claim must allege damages beyond what the contract breach caused." (quoting *Marshall v. Galvanoni*, No. 217CV00820KJMCKD, 2017 WL 5177764, at *6 (E.D. Cal. Nov. 8, 2017))); *In re Takata Airbag Prod. Liab. Litig.*, 193 F. Supp. 3d 1324, 1339 (S.D. Fla. 2016) (dismissing fraudulent concealment claims under the economic loss rule); *Moorman Mfg. Co. v. Nat'l Tank Co.*, 91 Ill. 2d 69, 88, 435 N.E.2d 443, 452 (1982) ("This court has held that economic loss is recoverable where one intentionally makes false representations."); *Red Hawk Fire & Sec., LLC v. Siemens Indus. Inc.*, 449 F. Supp. 3d 449, 465 (D.N.J. 2020) (noting that the fraud exception to the economic loss rule applies to fraud in the inducement).

**\*30** Plaintiffs also do not argue that their fraud claims rely on facts distinct from their contract claims. *Ponzio*, 447 F. Supp. 3d at 236. And, as stated above, Plaintiffs insist that they only allege fraudulent concealment in this case. [Dkt. 38 at 39]. Thus, the New Jersey, California, Florida, and Illinois Plaintiffs' fraudulent concealment claims are dismissed under the economic loss rule.

### 9. Plaintiff Davis's Fraudulent Concealment under Texas Law (Count XV)

Defendants argue that Plaintiff Davis's claim for fraudulent concealment should be dismissed because Texas law does not recognize an independent cause of action for fraudulent concealment. [Dkt. 34-1 at 48]. Plaintiffs respond that Defendants' argument relies on a misreading of Texas law. [Dkt. 38 at 52]. [26]

Based on the Court's review of Texas law, the weight of authority considers fraudulent concealment to be a tolling provision, and courts regularly dismiss fraudulent concealment claims pled as independent causes of action. *See, e.g., Buraimoh v. BMW of N. Am.*, LLC, No. 1:20-CV-0019-RP, 2020 WL 7711823, at *6 (W.D. Tex. Dec. 29,

2020) (citing *ExxonMobil Corp. v. Lazy R Ranch, LP*, 511 S.W.3d 538, 544 n.21 (Tex. 2017); *Sweezey v. C.R. Bard Inc.*, No. 3:19-CV-2172-S, 2020 WL 1237394, at *1 (N.D. Tex. Mar. 12, 2020)) (citing cases). Plaintiffs' Texas fraudulent concealment claim is therefore dismissed.

### viii. Unjust Enrichment (Count XVI)

Defendants argue on several grounds that Plaintiffs' unjust enrichment claims must be dismissed. Among their arguments, Defendants claim that Plaintiffs did not have a direct relationship with Defendants because they purchased their Class Vehicles from third-party dealerships and, therefore, that Plaintiffs did not confer a benefit upon defendants. [Dkt. 34-1 at 49]. Plaintiffs respond that they have pled "unjust enrichment as an alternative route to recovery." [Dkt. 38 at 52]. Plaintiffs also argue that Defendants' argument fails because Defendants dispute that the Limited Warranty covers the Battery Defect, creating a "bona fide dispute" over Plaintiffs' breach of warranty claim. [*Id.*].

Courts in this district have previously found that " 'the majority of cases concerning claims similar to the ones asserted here—fraud and breach of warranty claims against a product manufacturer—a plaintiff may not maintain an unjust enrichment claim against the manufacturer if he did not purchase the product directly from the manufacturer." *Powell*, 2020 WL 6886242, at *29 (quoting *Defilippo v. Whirlpool Corp.*, No. 18-12523, 2019 WL 4127162, at *14 (D.N.J. Aug. 30, 2019)). *See also Schechter v. Hyundai Motor America*, No. 18-13634 (FLW), 2019 WL 3416902, at *11 (D.N.J. July 29, 2019) (citing cases). Courts summarily dismiss unjust enrichment claims where, as here, plaintiffs allege that they purchased products from third-party distributors. *See Powell*, 2020 WL 6886242, at *29.

**\*31** Plaintiffs rely on *Kuzian v. Electrolux Home Products, Inc.* to argue that the parties' "bona fide dispute" regarding the Limited Warranty "precludes dismissal of Plaintiffs' unjust enrichment claims." 937 F. Supp. 2d 599, 618 (D.N.J. 2013). However, Judge Hillman applied New York law when deciding *Kuzian*, and more recently reached the opposite conclusion when applying New Jersey law. *Powell*, 2020 WL 6886242, at *29 (dismissing unjust enrichment claim where defendant argued that the complained-of defect was a design defect not covered by warranty).

Thus, the Court will grant Defendants' motion to dismiss Plaintiffs' unjust enrichment claims and declines to review Defendants' alternative arguments on this issue.

### ix. Plaintiffs' Standing to Obtain
### Injunctive Relief as to False Advertising

As remedies for several of their statutory consumer-protection claims, Plaintiffs seek an order "enjoining Subaru from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint." [Consol. Compl. ¶¶ 305, 315, 343, 352, 363]. Defendants argue that, to the extent Plaintiffs seek to enjoin Defendants from falsely advertising their vehicles, Plaintiffs lack standing to do so. [Dkt. 34-1 at 51]. Plaintiffs respond that they have standing because, as pled in the Consolidated Complaint, several of the named Plaintiffs "are current Subaru customers, prefer the features and aesthetics of Subaru vehicles, and are thus reasonably likely to purchase another Subaru in the future." [Dkt. 38 at 55].

A plaintiff does not have standing to bring a claim unless she can "establish that she is 'likely to suffer future injury' from the defendant's conduct." *In re Johnson & Johnson Talcum Powder Prod. Mktg., Sales Practices & Liab. Litig.*, 903 F.3d 278, 292 (3d Cir. 2018) (quoting *McNair v. Synapse Group Inc.*, 672 F.3d 213, 223 (3d Cir. 2012). "[T]he threat [of injury] must be actual and imminent, not conjectural or hypothetical." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493, 129 S. Ct. 1142, 173 L.Ed.2d 1 (2009). "The Supreme Court has repeatedly reiterated that the threatened injury must be certainly impending to constitute injury in fact, and that allegations of possible future injury are not sufficient." *Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 465 (S.D.N.Y. 2020) (quoting *Am. Civil Liberties Union v. Clapper*, 785 F.3d 787, 800 (2d Cir. 2015)).

Plaintiffs maintain that they have pled that they are likely to suffer repeat injuries in the future due to their preferences for Subaru vehicles, which is sufficient to confer standing at the pleading stage. To support their argument, Plaintiffs cite *Davidson v. Kimberly-Clark Corp.*, where the Ninth Circuit explicitly held

that a previously deceived consumer may have standing to seek an injunction against false advertising or labeling, even though the consumer now knows or suspects that the advertising was false at the time of the original purchase, because the consumer may suffer an actual and imminent, not conjectural or hypothetical threat of future harm.

889 F.3d 956, 969 (9th Cir. 2018) (quoting *Summers* 555 U.S. at 493). However, the Third Circuit and other courts have squarely rejected *Davidson*'s reasoning and conclusion, finding the threat of injury that repeat customers "might suffer as a result of the company's advertising practices [to be] 'wholly conjectural.' " *In re Johnson & Johnson Talcum Powder Prod. Mktg., Sales Practices & Liab. Litig.*, 903 F.3d at 292 (quoting *McNair v. Synapse Group Inc.*, 672 F.3d 213, 223 (3d Cir. 2012)); *accord Lisowski v. Henry Thayer Co., Inc.*, No. CV 19-1339, 2020 WL 6743258, at *5 (W.D. Pa. Nov. 17, 2020); *Hesse*, 463 F. Supp. 3d at 465 ("Yet the injury alleged by Plaintiffs in this case is *hypothetical—if* they choose to purchase Godiva's products in the future, *then* they *may* be harmed. The conditionality of this alleged injury removes it from the harms that Article III authorizes federal courts to remedy.") (emphasis in original). In other words, the Third Circuit bluntly rejected "stop me before I buy again" standing arguments such as Plaintiffs' argument here. *In*

*re Johnson & Johnson Talcum Powder Prod. Mktg., Sales Practices & Liab. Litig.*, 903 F.3d at 293.

**\*32** The Court will therefore grant Defendants' motion on this issue, and dismiss Plaintiffs' requests to enjoin Defendants from engaging in false advertising.

### x. Dismissal for Failure to Specify Applicable Defendant or, Alternatively, Request for More Definite Statement

Finally, Defendants argue that Plaintiffs' Consolidated Complaint fails to specify which Defendant—SBR or SOA —engaged in which wrongful conduct. [Dkt. 34-1 at 51– 52]. Defendants argue that, due to this failure, Plaintiffs have failed to satisfy Federal Rule of Civil Procedure 8(a)(2), which warrants dismissal or a more definite statement under Federal Rule of Civil Procedure 12(e). [*Id.*]. The Court has already found that Plaintiffs stated their fraud claims—which are held to a heightened pleading standard—with enough specificity to notify both SBR and SOA of the claims pending against them. The Court does not find that the Consolidated Complaint is so vague as to the other claims alleged that it is "unintelligible" and therefore declines to exercise its discretion to order a more definite statement. *MK Strategies, LLC v. Ann Taylor Stores Corp.*, 567 F. Supp. 2d 729, 736 (D.N.J. 2008).

### III. Conclusion

For the reasons stated above, Defendants' Motion to Dismiss and for a More Definite Statement is granted in part and denied in part. An appropriate order will follow.

### All Citations

Slip Copy, 2021 WL 1207791

### Footnotes

1    The operative complaint is Plaintiffs' Consolidated Class Action Complaint. [Dkt. 18].

2    Defendants, like all automobile manufacturers, are required to affix "Monroney stickers" to every vehicle under the Automobile Information Disclosure Act of 1958, 15 U.S.C. § 1231 *et seq.*

1    "Although a district court may not consider matters extraneous to the pleadings, a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment." *U.S. Express Lines, Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002) (internal

quotation marks and citations omitted) (emphasis deleted). *Accord* 🚩 *Lum v. Bank of Am.*, 361 F.3d 217, 221 n.3 (3d Cir. 2004) (citations omitted).

2    This plausibility standard requires more than a mere possibility that unlawful conduct has occurred. "When a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.*

3    As noted above, Plaintiffs have conceded that their express warranty claims extend only to SOA, and that the express warranty claims against SBR should be dismissed.

4    The Court has already determined that no conflict exists between New Jersey law and Florida law (Stone) as to express warranty claims, and that it will apply New Jersey law to New York Plaintiffs' express warranty claims (Baladi). Neither party has argued that non-New Jersey law should apply to express warranty claims of Plaintiff Burd (New Jersey) or Plaintiff Miller (California).

5    Plaintiffs argue that "[i]f Subaru's position were adopted, a plaintiff would never have a ripe claim for breach of express warranty because every time a failure occurred after a failed repair attempt, it would trigger an obligation to go back to the dealer." [Dkt. 38 at 33]. The Court does not believe that such an infinite regression will follow by concluding that "numerous" means "more than once."

6    The Court acknowledges that it determined that Texas law will apply to Plaintiff Davis's express warranty claim. However, the Court's analysis and conclusion here is consistent with Texas law. *See* 📙 *Orthoflex, Inc. v. ThermoTek, Inc.*, No. 3:10-CV-2618-D, 2013 WL 4045206, at *7 (N.D. Tex. Aug. 9, 2013) ("A limitation of remedies fails of its essential purpose when a warrantor fails to correct the defect within a reasonable time or after multiple attempts." (citing *Mostek Corp. v. Chemetron Corp.*, 642 S.W.2d 20, 27 (Tex. App. 1982)); *cf.* 📙 *Mercedes-Benz of N. Am., Inc. v. Dickenson*, 720 S.W.2d 844, 854 (Tex. App. 1986) (finding that plaintiff adequately pled failure of essential purpose where plaintiff "alleged that after having returned the car for repairs at least seven times, Mercedes' authorized dealer was unable to repair the car's defective transmissions, squealing brakes, rattles in the dashboard, and low gas mileage.").

7    Plaintiffs' failure to plead facts showing that Defendants' repair efforts failed points to a more fundamental problem. Specifically, it suggests that Plaintiffs Hansel, O'Shaughnessy, and Davis did not suffer the same defects as the other Plaintiffs for whom repair efforts were futile.

8    Defendants also argue that Texas Plaintiff Davis's express warranty claim fails for lack of pre-suit notice. The Court has determined above that his claim fails for failure to plead continuing defect.

9    As mentioned above, Plaintiffs have asked the court to dismiss the Michigan Plaintiff Beck's MCPA claim.

10    The Court notes that Plaintiffs have alleged unfair and unlawful conduct as well as fraudulent conduct under the UCL [Consol. Compl. ¶¶ 292–295]; unfair and deceptive conduct under the CLRA [Consol Compl. ¶ 280; and unfair conduct under the FDUTPA [Consol. Compl. ¶ 311]. 📙 Rule 9(b)'s heightened pleading standard does not apply to these claims. *See* 📙 *Morano v. BMW of N. Am.*, LLC, 928 F. Supp. 2d 826, 833 (D.N.J. 2013) ("It follows, then, that '[t]he requirements of 📙 Rule 9(b) do not apply' merely because a claim is brought under FDUTPA." (citing 📙 *Guerrero v. Target Corp.*, 889 F. Supp.2d 1348 (S.D. Fla. 2012)).

11    Plaintiffs argue that "Subaru's argument wrongly assumes that Plaintiffs base their consumer fraud claims on affirmative misrepresentations. Plaintiffs bring omissions-based claims arising from Subaru's failure to disclose material information that would have made its partial representations about the Vehicles not misleading." [Dkt. 38 at 39]. This argument is at odds with some the legal claims alleged in the Consolidated Complaint. [*See, e.g.*, Consol. Compl. ¶ 279.a ("Subaru represented that the Class Vehicles have characteristics, uses, or benefits that they do not have.")]. Nevertheless, based on Plaintiffs' representation, the Court grants Defendants' motion to dismiss as it applies to all fraud claims based on affirmative misrepresentations.

12    Plaintiffs do not dispute that knowledge is a common element of state consumer protection statutes for omission, concealment, or deception, or for common-law fraudulent concealment. *See, e.g.*, *CDK Glob., LLC v. Tulley Auto. Grp., Inc.*, No. CV153103KMJBC, 2020 WL 5743072, at *17 (D.N.J. Sept. 25, 2020)

("The NJCFA requires a plaintiff to prove three elements: (1) unlawful conduct by the defendant; (2) an ascertainable loss by the plaintiff; and (3) a causal connection between the defendant's unlawful conduct and the plaintiff's ascertainable loss... Under the NJCFA, 'unlawful conduct' falls within three general categories: affirmative acts, knowing omissions, and violation of regulations promulgated under N.J. Stat. Ann. §§ 56:8-2, 56:8-4.") (citations and quotations omitted).

13    Plaintiffs allege that Defendants "actively monitor[ ]" the NHTSA website and other third-party websites for customer complaints. [Consol. Compl. ¶ 162].

14    "Subaru's Quality Assurance Division ... collects and analyzes data from dealership service centers, parts sales reports, warranty claim data, and technical reports from Subaru engineers who examine vehicles brought in for warranty repairs." [Consol. Compl. ¶ 149].

15    This explanation of how Subaru gained knowledge of the Battery Defect distinguishes this case from *Gotthelf v. Toyota Motor Sales, U.S.A., Inc.*, upon which Defendants rely to argue that Plaintiffs' pleadings are insufficient. [Dkt. 34-1 at 38–39]. *Cf. Gotthelf v. Toyota Motor Sales, U.S.A., Inc.*, 525 F. App'x 94, 104 (3d Cir. 2013) (finding that the plaintiff inadequately pled knowledge because he failed to "provide any facts relating to the alleged books of knowledge, internal testing, or dealership repair orders.").

16    To be sure, other courts in this district have found that similar evidence suffices to show that defendants had knowledge of vehicle defects for fraudulent omission claims at the pleading stage. *See Powell*, 2020 WL 6886242, at *22 (collecting cases).

17    *Cf. Darne v. Ford Motor Co.*, No. 13 C 03594, 2015 WL 9259455, at *11 (N.D. Ill. Dec. 18, 2015) ("That Ford publicly issued a number of TSBs related to the 6.4L engine is incompatible with allegations that it attempted to conceal these facts. Moreover, Ford had no duty to disclose information about any alleged defects in the engine because consumers, like Darne, could have discovered that information with the exercise of reasonable diligence. Darne states that, 'unless the consumer is knowledgeable about the NHTSA database," he or she never sees or hears of the TSBs Ford issued. **Although the NCUDTPA does not require a consumer to be 'knowledgeable,' it does require a consumer to use reasonable diligence to investigate before imposing a duty on the seller to affirmatively disclose a defect**.") (emphasis added).

18    Defendants have argued lack of duty only as to SBR.

19    The Court will discuss Michigan Plaintiff's MCPA claim separately below.

20    The Court will discuss Plaintiffs' fraudulent concealment claim under Texas common law separately below.

21    The Consolidated Complaint claims that Defendants also owed a duty to Plaintiffs based on partial disclosure of information. [Consol. Compl. ¶ 34-1 ¶¶ 268, 323, 370]. However, Plaintiffs have not identified specific statements or representations which Defendants made that were mere "partial disclosures." To the extent that Plaintiffs rely on marketing materials generally touting the "quality, durability and reliability" of Subaru vehicles [*e.g.*, Consol. Compl. ¶ 166], such advertising "amounts to 'mere' puffery [and] is not actionable because no reasonable consumer relies on puffery." *Ponzio*, 447 F. Supp. 3d at 234 (quoting *In re Toshiba America HD DVD Marketing and Sales Practices Litigation*, 2009 WL 2940081, at *10 (D.N.J. 2009)).

22    As discussed above, Plaintiff Franke's CLRA claim is dismissed as untimely.

23    *See* Cal. Bus. & Prof. Code § 17205 (West) (UCL) ("Unless otherwise expressly provided, the remedies or penalties provided by this chapter are cumulative to each other and to the remedies or penalties available under all other laws of this state."); Cal. Civ. Code § 1752 (West) (CLRA) ("The provisions of this title are not exclusive. The remedies provided herein for violation of any section of this title or for conduct proscribed by any section of this title shall be in addition to any other procedures or remedies for any violation or conduct provided for in any other law.").

24    Because CAFA vests federal courts with diversity jurisdiction, *Serrano v. 180 Connect, Inc.*, 478 F.3d 1018, 1020–21 (9th Cir. 2007), and this Court has jurisdiction through CAFA, *Sonner*'s reasoning and holding apply here.

In re Subaru Battery Drain Products Liability Litigation, Slip Copy (2021)

25    The cases upon which Plaintiffs rely do not support their argument. *See, e.g.,* 🏷️ *Aberin v. Am. Honda Motor Co., Inc.*, No. 16-CV-04384-JST, 2018 WL 1473085, at *9 (N.D. Cal. Mar. 26, 2018) (a pre-*Sonner* case finding only that Plaintiffs could allege legal claims and equitable claims under the UCL and CLRA, and making no determination as to the sufficiency of legal remedies).

26    The cases Plaintiffs upon which Plaintiffs rely do not support their argument. *See Ibe v. Jones,* 836 F.3d 516, 525-26 (5th Cir. 2016) (upholding dismissal of fraudulent concealment and negligent misrepresentation claims under economic loss rule); *N. Texas Opportunity Fund L.P. v. Hammerman & Gainer Int'l, Inc.*, 107 F. Supp. 3d 620, 636 (N.D. Tex. 2015) ("The discovery rule affords protection in only limited instances, applying in (1) cases of fraudulent concealment....").

---

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

TAB 19

*In re Thalomid and Revlimid Antitrust Litig.*, No. 14-6997, 2015 WL 9589217
(D.N.J. Oct. 29, 2015)

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 285 of 535
PageID: 32232

In re Thalomid and Revlimid Antitrust Litigation, Not Reported in Fed. Supp. (2015)

2015 WL 9589217

2015 WL 9589217
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

IN RE THALOMID AND REVLIMID
ANTITRUST LITIGATION.

Civil No.: 14–6997 (KSH) (CLW)
|
Signed October 29, 2015

**Attorneys and Law Firms**

Frank Rocco Schirripa, John Anthony Blyth, Hach Rose Schirripa & Cheverie, New York, NY, for Plaintiff.

Gavin J. Rooney, Joseph Aldo Fischetti, Nicole Denise Bearce, Lowenstein Sandler, Roseland, NJ, for Defendant.

*Opinion*

Katharine S. Hayden, U.S.D.J.

**I. *Introduction***

**\*1** International Union of Brick Layers and Allied Craft Workers Local 1 Health Fund ("IUB"), individually and on behalf of all others similarly situated, sued Celgene Corporation ("Celgene") for alleged violations of federal antitrust laws and state antitrust and consumer laws. (D.E. 1 (14–6997) ("IUB Compl.").) The City of Providence ("Providence") filed a complaint against Celgene that raised similar allegations and claims. (D.E. 1 (15–1605) ("Providence Compl.").) Both complaints were consolidated under docket number 14–6997. (D.E. 32 (146997); D.E. 5 (15–1605).) [1]

The motion practice in this case developed as follows. Celgene moved to dismiss IUB's complaint under Fed.R.Civ.P. 12(b)(6) on February 3, 2015, and IUB filed its opposition on March 17, 2015. (D.E. 20 (14–6997); D.E. 29 (14–6997).) Eight days later, on March 25, a stipulation and order was entered consolidating IUB's and Providence's lawsuits, and the parties agreed that Celgene's motion to dismiss IUB's complaint would apply to the common issues in Providence's complaint and that Celgene would file a second motion to dismiss that complaint's unique state law claims. (D.E. 32 (14–6997); D.E. 5 (15–1605).) Before filing

the motion to dismiss Providence's complaint, Celgene filed a reply to IUB's opposition on March 30, 2015. (D.E. 31 (14–6997).) It then filed the motion to dismiss the unique state law claims in Providence's complaint on April 20, 2015 (D.E. 35 (14–6997)), and Providence filed its opposition on May 4, 2015, joining the arguments raised by IUB in its opposition that applied to their federal claims, while addressing Celgene's reasons for dismissal of its individual state law claims. (D.E. 40 (146997).) Celgene filed its reply brief to Providence's opposition on May 11, 2015. (D.E. 41 (146997).) Together, Celgene's motions seek dismissal of the entirety of plaintiffs' complaints.

Celgene, a branded manufacturer, identifies Thalomid and Revlimid as two of its most well-known products. Their generic names are thalidomide and lenalidomide. The former has a history – it was developed originally as a sleeping pill for pregnant women, was discovered to cause serious birth defect and other side effects, and was banned for decades. Because of this, when Celgene developed thalidomide as a treatment for a form of leprosy, the FDA required restricted distribution programs before granting approval to the distribution of Thalomid and Revlimid (the latter having been developed to treat different disorders but considered to pose similar threats). Celgene has amassed what it describes as a significant portfolio of unexpired patents which cover Thalomid and Revlimid as medicines and also their delivery without the risk of fetal exposure.

IUB, which maintains its principal place of business in Wallingford, Connecticut, purchased Thalomid and Revlimid for its members in Massachusetts and Nebraska, or partially reimbursed members who purchased the drugs. Providence, a municipal corporation, is a "self-insured health and welfare benefit plan" located in Providence, Rhode Island, that purchased and/or provided reimbursement for Thalomid and Revlimid on behalf of "its active and retired public employees and their dependents who reside in Florida, Kansas, Massachusetts, New Jersey, North Carolina, and Pennsylvania." Central to plaintiffs' theory of their lawsuit as indirect purchasers of these drugs is Celgene's dominance over the market for thalidomide and lenalidomide, and how/if generic manufacturers will enter the market. As such, the Hatch–Waxman Act and the Food and Drug Administration ("FDA") regulations that govern the approval of pioneer and generic drugs are critical to this litigation.

**\*2** Plaintiffs contend that Celgene fraudulently obtained patents covering its distribution methods, and that then

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 286 of 535
PageID: 32233

In re Thalomid and Revlimid Antitrust Litigation, Not Reported in Fed. Supp. (2015)

2015 WL 9589217

Celgene manipulated the FDA regulatory scheme and Hatch–Waxman Act to prevent or delay generic manufacturers from obtaining FDA approval for generic versions of Thalomid and Revlimid by bringing sham infringement lawsuits. They contend further that Celgene withheld samples of thalidomide and lenalidomide from generic manufacturers (but not from researchers) to foil their efforts to gain FDA approval for generics. According to plaintiffs, Celgene's only purpose for the foregoing conduct was to maintain its monopoly over the market for thalidomide based drugs in order to continue to charge consumers supracompetitive prices. Plaintiffs' federal and state antitrust claims and unfair competition and unjust enrichment claims against Celgene are brought on behalf of indirect purchasers in several states, the District of Columbia, and Puerto Rico who paid or provided reimbursement for those drugs, other than for re-sale since November 7, 2010. (IUB Compl., ¶ 7; Providence Compl., ¶ 8.)

In deciding Celgene's motion to dismiss, the Court addresses the arguments raised in Celgene's moving briefs (D.E. 20–1 (“Celgene Br.”); D.E. 35–1); IUB's and Providence's opposition briefs (D.E 29; D.E 40); and Celgene's replies to plaintiffs' respective opposition briefs. (D.E. 31; D.E. 41.)

## II. Background

The facts taken from the plaintiffs' complaints are assumed as true, and are construed in favor of plaintiffs for purposes of Celgene's motions. *Phillips v. Cnty. of Allegheny,* 51 F.3d 224, 231 (3d Cir.2008).

### A. Overview of FDA Regulations

#### 1. Development of Pioneer and Generic Drugs

The parties largely agree about what statutory and regulatory law applies, and how it works. Pharmaceutical manufacturers seeking to market a pioneer drug must obtain the Food and Drug Administration's (“FDA”) approval by filing a New Drug Application (“NDA”). 21 U.S.C. § 355(a). The NDA must include information pertaining to the proposed drug's safety and effectiveness, along with the patents that cover it. § 355(b)(1). For each patent, the NDA must list:

> the patent number and the expiration date of any patent which claims the drug for which the applicant submitted

the [NDA] or which claims a method of using such drug and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug.

*Id.; see also* 21 C.F.R. § 314.53(b). The manufacturer is required to list these patents in the “Approved Drug Products and Therapeutic Equivalence Evaluations,” known as the Orange Book, which is published by the FDA. The manufacturer must also list any patent it obtains subsequently that covers the drug, and do so within 30 days after the patent is issued. 21 U.S.C. § 355(b)(1), (c)(2); 21 C.F.R. § 314.53(c)(2)(ii). The plaintiffs assert that because the FDA's limited resources prevent it from verifying the patent information, the agency relies on the representations submitted by the manufacturers. (IUB Compl., ¶ 24; Providence Compl., ¶ 23.)

The development and approval of generic drugs was the focus of the Hatch–Waxman Act, 21 U.S.C. § 355, which aims to “(1) induc[e] pioneering research and development of new drugs and (2) enabl[e] competitors to bring low-cost, generic copies of those drugs to market.” *Andrx Pharm., Inc. v. Biovail Corp.,* 276 F.3d 1368, 1371 (Fed.Cir.2002). Instead of an NDA, a manufacturer seeking approval of a generic version of a pioneer drug may file an Abbreviated New Drug Application (“ANDA”) demonstrating that its generic version is the “bioequivalent” of the approved, pioneer drug. 21 U.S.C. § 355(j). The ANDA applicant is not required to conduct its own tests to prove a drug's efficacy and safety and may rely on the pioneer manufacturer's research and data. § 355(j)(2)(A)(iv). The ANDA needs to establish that the generic drug contains the same active ingredient or ingredients, dosage form, route of administration, and strength as the pioneer drug, and that the generic drug is absorbed to the same extent and at the same rate. § 355(j)(2), (j)(8)(B).

**\*3** The ANDA applicant must submit a certification for each patent covering the pioneer drug listed in the Orange Book that makes one of the following representations: (1) that no patent information was filed with the FDA covering

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 287 of 535
PageID: 32234

In re Thalomid and Revlimid Antitrust Litigation, Not Reported in Fed. Supp. (2015)
2015 WL 9589217

the pioneer drug; (2) that the listed patent expired; (3) that the patent will expire on a certain date and that the ANDA's approval should be delayed until then; or (4) that the patent "is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted."

§ 355(j)(2)(B)(vii). The fourth representation is often referred to as a Paragraph IV Certification. *See Janssen Pharmaceutica, N.V. v. Apotex, Inc.,* 540 F.3d 1353, 1356 (Fed.Cir.2008).

The ANDA applicant must notify the patent holder (frequently the pioneer manufacturer) when filing a Paragraph IV Certification. 21 U.S.C. § 355(j)(2)(B). Two contingencies affect an ANDA for which a Paragraph IV Certification is filed:

> (1) whether the pioneer drug company brings an infringement action within 45 days of learning of the Paragraph IV ANDA filing, and (2) whether the company seeking approval was the first one to file an ANDA containing a Paragraph IV certification to the listed patent.

*Janssen,* 540 F.3d at 1356. If the brand name manufacturer does not sue within 45 days, the FDA may grant final approval to the ANDA after all other requirements are satisfied. 21 U.S.C. § 355(j)(5)(B)(iii). But if an infringement action is instituted within that 45–day period, approval is stayed for 30 months or until resolution of the lawsuit. *Id.* In this regard, the mere act of filing a Paragraph IV Certification constitutes patent infringement allowing the patent holder to immediately file suit against the ANDA applicant. 21 U.S.C. § 271(e)(2)(A).

The Hatch–Waxman Act provides a 180 day period of exclusivity to the first generic manufacturer to file a Paragraph IV Certification once its generic drug is approved. *Janssen,* 540 F.3d at 1356; *see also* 21 U.S.C. § 355(j)(5)(B)(iv). That 180–day period begins to run from the date the generic drug is first marketed. § 355(j)(5)(B)(iv)(I). An ANDA applicant that fails to market the drug upon the expiration of certain time frames forfeits that exclusivity period. § 355(j)(5)(D)(i)(I).

### 2. *FDA Citizen Petitions*

A private entity may file a citizen petition requesting, among other things, that the FDA issue, amend, or revoke a regulation, or that the agency take or refrain from any administrative action. 21 C.F.R. § 10.30(b). The citizen petition must contain "the factual and legal grounds on which the petitioner relies." *Id.* Citizen petitions are sometimes filed in response to an ANDA, but the FDA cannot delay the application's approval unless it determines "that delay is necessary to protect the public health." 21 U.S.C. § 355(q)(A)(ii).

### B. *Celgene's Development of Thalomid and Revlimid*

After the worldwide ban of thalidomide was lifted in 1998, Celgene obtained FDA approval to market and distribute it under the brand name Thalomid to treat erythema nodosum leprosum, a form of leprosy. (IUB Compl., ¶¶ 66–67.) In 2005, Celgene received approval to manufacture and market Revlimid, or lenalidomide, a "thalomid analogue." (*Id.* ¶ 69; Providence Compl., ¶ 109.)

The FDA conditioned its approval on Celgene's developing restricted distribution programs for the two drugs. (Providence Compl. ¶ 4.) In 1998, Celgene devised and implemented a program known as S.T.E.P.S., the acronym for the System for Thalidomide Education and Prescribing Safety. (IUB Compl., ¶ 67.) In 2010, S.T.E.P.S. was replaced by REMS, Risk Evaluation and Mitigation Strategies. (Providence Compl., ¶ 4.) All thalidomide and lenalidomide distributors, pharmacists, and recipient patients are required to enroll in the REMS program as a condition of obtaining Thalomid or Revlimid. (*Id.* ¶ 4.)

**\*4** Celgene acquired six patents covering the procedures for the approved distribution of Thalomid and Revlimid: Patent No. 6,045,501 ("the '501 Patent"); Patent No. 6,315,720 ("the '720 Patent"); Patent No. 6,561,976 ("the '976 Patent"); Patent No. 6,561,977 ("the '977 Patent"); Patent No. 6,755,784 ("the '784 Patent"); and Patent No. 8,513,886 ("the '886 Patent") (collectively "the Distribution Patents"). (Providence Compl., ¶ 108.) In 1998, when the FDA approved Thalomid, Celgene had listed only the '501

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 288 of 535
PageID: 32235
In re Thalidomide and Revlimid Antitrust Litigation, Not Reported in Fed. Supp. (2015)
2015 WL 9589217

Patent in the Orange Book. (*Id.* ¶ 110.) Celgene added the other patents under Thalomid as they were obtained: the

🚩 '720 Patent in 2001; the '976 Patent and '977 Patent in 2003; and the '784 Patent in 2004. (*Id.* ¶¶ 108, 110.) Celgene listed the same patents under Revlimid when the FDA approved it in 2005. (*Id.* ¶ 110.) In 2012, Celgene added the '886 Patent to the Orange Book listings for both Thalomid and Revlimid. (*Id.* ¶¶ 108, 110.) The Distribution Patents, according to plaintiffs, generally claim "the use of registries to register patients, prescribers, and pharmacies when the patient is using a particular drug that should not be exposed to a fetus or contraindicated individual"; periodic testing of patients for risks related to the drug; patient counseling about those risks; limitations on the amount of drug dispensed; and/or prescribing or dispensing the drug to patients after determining the risks are acceptable. (*Id.* ¶ 110; IUB Compl., ¶ 123.)

### C. *Celgene's Monopoly Power in the Relevant Markets and its Anti–Competitive Conduct.*

Plaintiffs assert that Celgene had monopoly power over the markets for the drugs in question, and gained and maintained its monopoly power by anti-competitive conduct that successfully suppressed the entry of generic thalidomide and lenalidomide products into the market. According to plaintiffs, Celgene "possessed and exercised monopoly power over the markets for Thalomid and Revlimid, because it had the power to raise and/or maintain the price of Thalomid and Revlimid at supracompetitive levels without losing substantial sales." (Providence Compl., ¶ 269.) Plaintiffs recite a "dramatic increase" in the revenue Celgene derives from sales of the drugs, which have amounted to $20.9 billion in revenue since 2006. (IUB Compl., ¶ 3.) In the first quarter of 2014 alone, Celgene recorded $3.6 billion in revenue from Revlimid sales and $164 million from Thalomid sales. (Providence Compl., ¶ 5; IUB Compl., ¶ 3.) When it was first approved, Thalomid cost approximately $6 per capsule and now it costs between $212 and $357. (IUB Compl., ¶ 3.) Celgene charges $500 per capsule of Revlimid. (*Id.*)

Celgene's "overarching anti-competitive scheme" consisted of using its REMS programs as a pretext to deny generic manufacturers access to samples of Thalomid and Revlimid necessary to complete bioequivalency testing; fraudulently obtaining various patents, including the distribution method patents; engaging in sham litigation and, in certain cases, entering into confidential settlements that may have included an anti-competitive reverse payment; and filing baseless

citizen petitions with the FDA. (Providence Compl. ¶ 260.) This conduct was undertaken to prevent and delay the sale of generic thalidomide and lenalidomide products "by suppressing the ability of generic manufacturers to compete through the most efficient means of competition available under the applicable statutory and regulatory construct, including the Hatch–Waxman Act." (*Id.*)

### 1. *Celgene Restricts the Supply of* *Thalidomide* and *Lenalidomide*

Plaintiffs assert that Celgene actively sought to prevent generic drug manufacturers from obtaining samples of thalidomide and lenalidomide containing the active pharmaceutical ingredient ("API") essential for bioequivalency studies and validation testing that ANDAs require. (IUB Compl., ¶¶ 70, 80; Providence Compl., ¶ 61.) They contend that Celgene used the S.T.E.P.S. and REMS programs as a pretext to deny generic manufacturers access to the samples and that it also attempted to limit the availability of samples from other potential thalidomide API suppliers.

 **\*5**  According to the allegations, two drug manufacturers, Mylan Pharmaceuticals and Lannett Company, sought to develop and market generic versions of Thalomid, and Dr. Reddy's Laboratory wanted to develop a generic alternative to Revlimid. (*Id.* ¶¶ 88, 99, 118; Providence Comp., ¶¶ 73, 81.) The three companies asked Celgene for samples to use in their bioequivalence studies. (IUB Compl., ¶¶ 93, 99, 118.) Plaintiffs claim that Celgene refused, claiming that providing samples would violate its S.T.E.P.S. distribution program. (*Id.* ¶¶ 93, 110, 119–121.) This was contrary to FDA communications with the generic manufacturers, which they forwarded to Celgene, and which stated that the agency would not take action if Celgene provided the samples. (*Id.* ¶¶ 90, 93, 105, 110.)

Faced with Celgene's refusal, Lannett sought an injunction, and plaintiffs allege that Celgene settled in 2011 on confidential terms. (*Id.* ¶ 95–96.) Mylan sued Celgene in this district in April 2014 after it refused to provide Revlimid samples. (*Id.* ¶ 112.) Celgene unsuccessfully moved to dismiss. (Providence Compl., ¶ 99.) Dr. Reddy's filed a citizen petition with the FDA in June 2009, asserting that Celgene improperly denied it access to Revlimid samples for bioequivalency testing. (IUB Compl., ¶ 120.) The complaints do not indicate how that effort fared.

2015 WL 9589217

According to IUB's complaint, Barr Laboratories ("Barr") successfully obtained the thalidomide API in 2004 from Seratec S.A.R.L. ("Seratec"), a French company. (*Id.* ¶¶ 81, 82.) After Barr completed its bioequivalency testing, it needed a Drug Master File ("DMF") reference letter from Seratec to include with its ANDA submissions. (*Id.* ¶ 82.) Seratec refused Barr's request. (*Id.* ¶ 83.) Plaintiffs claim there was an "exclusive thalidomide supply arrangement" between Celgene and Seratec that Celgene had demanded so as "to interfere with potential generic competitors' ability to market a generic version of Thalomid." (*Id.*) Barr had to find an alternative supplier and repeat its bioequivalency testing, which delayed its ANDA filing until December 2006. (*Id.* ¶ 84; Providence Compl., ¶ 72.) Plaintiffs assert that Barr's application would have been submitted "years earlier," and a lower-priced generic version of Thalomid would have been available for purchase, had Celgene not interfered. (*Id.* ¶ 85; Providence Compl., ¶ 72.)

According to plaintiffs, despite its practice of denying generic manufacturers access to samples, Celgene has supplied samples to several research institutions when requested without raising S.T.E.P.S. or the REMS programs as a bar. (*Id.* ¶¶ 76, 77.)

### 2. *Celgene's Fraudulently Obtained Patents*

Plaintiffs allege that Celgene fraudulently obtained the Distribution Patents covering S.T.E.P.S. and REMS in order to extend its monopoly power over the thalidomide and lenalidomide markets, and engaged in sham enforcement litigation. (Providence Compl., ¶¶ 107, 175.) They claim that when it applied for its Distribution Patents, Celgene withheld "information known to be material to patentability with the intent to deceive" the United States Patent and Trademark Office ("USPTO") regarding prior art that it knew about. (IUB Compl., ¶¶ 129–33.) And plaintiffs take the position that Celgene listed the Distribution Patents in the Orange Book solely to discourage thalidomide and lenalidomide ANDA filings. (*Id.* ¶ 127.)

The prior art consists of ten "[p]rocedures for safe distribution and use of dangerous drugs," which may be grouped into three categories: pharmaceutical distribution programs and packaging, publications, and meetings. From the allegations, it appears that all relate to the methods that were instituted in connection with distributing Clozaril, Clozapine, and Accutane safely, and how this might apply to thalidomide.

**\*6** *Pharmaceutical Distribution Programs and Packaging*

1. Clozaril Patient Monitoring Service ("CPMS");

2. Accutane Pregnancy Prevention Program ("PPP");

3. Accutane PPP Package ("PPP Package"), a patient and prescriber information packet for Accutane released in 1994.

*Publications*

4. Honigfeld, "Effects of the Clozapine National Registry System on Incidence of Deaths Related to Agranulocytosis," *Psychiatric Services* 47(1): 52–56 (1996) ("Honigfeld I");

5. Honigfeld, *et al.,* "Reducing Clozapine–Related Morbidity and Mortality: 5 Years of Experience With the Clozaril National Registry," *J. Clin. Psychiatry* 59 suppl. 3: 3–7 (1998) ("Honigfeld II");

6. "Guide to the Clozaril Patient Monitoring Service," ("the Guide"), which was published in 1997, and described the details of CPMS;

7. Zeldis, *et al.,* "Steps: A Comprehensive Program for Controlling and Monitoring Access to Thalidomide," *Clinical Therapeutics* 21(2): 319–30 (1999) ("the Zeldis Article").

*Meetings*

8. CDC Meeting—a Centers for Disease Control ("CDC") public meeting titled "Preventing Birth Defects Due to Thalidomide Exposure" and its corresponding transcript from March 26, 1997 ("CDC Transcript");

9. CDER Meeting—a public meeting held by the Center for Drug Evaluation and Research of the FDA on September 4 and 5, 1997;

10. NIH Meeting—a public workshop held on September 9 and 10, 1997, by the National Institutes of Health ("NIH"), FDA, and CDC entitled "Thalidomide: Potential Benefits and Risks Open Scientific Workshop."

(*Id.* ¶ 131.)

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 290 of 535
PageID: 32237

In re Thalomid and Revlimid Antitrust Litigation, Not Reported in Fed. Supp. (2015)
2015 WL 9589217

Plaintiffs contend that Bruce Williams, a Celgene employee and the named inventor of the Distribution Patents, and Dr. Jerome Zeldis, then-president of medical affairs at Celgene, attended the CDC Meeting in March 1997 at which CPMS and PPP were discussed as foundations for developing similar distribution methods and controls for thalidomide. (*Id.* ¶¶ 160, 161.) And they go on to assert that later that same year, Williams gave presentations at both the CDER meeting and NIH meeting regarding the creation of a distribution and control program for thalidomide that was a corollary to CPMS and PPP. (*Id.* ¶¶ 174, 175, 179, 180.) Plaintiffs also assert that Williams, along with other Celgene employees, authored and published the Zeldis Article in 1999, which describes S.T.E.P.S. and acknowledges that the program was based on CPMS and PPP. (*Id.* ¶¶ 165–67.) According to plaintiffs, the Zeldis Article cites to Honigfeld I and II in its discussion of CPMS. (*Id.* ¶ 168.)

Plaintiffs allege that nine of the ten examples they cite are prior art to all of the Distribution Patents. The exception is the Zeldis Article, which they assert is prior art to all except the '501 Patent and '976 Patent. (IUB Compl., ¶¶ 140, 143, 146, 149, 153, 156, 162, 164, 176, 181, 183.) They contend that Celgene omitted all prior art material to the '501, '720, '976, '977, and '784 Patents' applications. (*Id.* ¶¶ 184–191.) As to the '886 Patent, plaintiffs maintain that Celgene disclosed eight references of prior art and only omitted the PPP Package and CDC transcript from its application. (*Id.* ¶ 197.). Plaintiffs charge that Celgene willfully and fraudulently withheld the prior art from the USPTO (IUB Compl., ¶¶ 190, 191, 208, 209), and as a consequence the Distribution Patents are invalid and unenforceable. Over all, plaintiffs allege that Celgene's sole purpose in listing these patents in the Orange Book was to invoke the benefits of the 30–month stay in 21 U.S.C. § 355(j)(5)(B)(iii) should an ANDA be filed. (*Id.* ¶¶ 192, 194, 204.)

### 3. *Sham Litigation and Citizen Petition*

**\*7** Plaintiffs further contend that Celgene engaged in "sham litigation" to enforce the Distribution Patents (IUB Compl., ¶¶ 211, 213, 226–29, 238; Providence Compl., ¶¶ 195, 210), and that Celgene filed a sham citizen petition in 2007 in response to Barr's 2006 ANDA, urging the FDA to withhold approval. (IUB Compl., ¶¶ 212, 216, 220–22.) Factually, plaintiffs point to Celgene's 2007 lawsuit against Barr after it filed its

Paragraph IV Certification, which triggered the 30–month stay of FDA approval for Barr's thalidomide ANDA. (*Id.* ¶¶ 213–15.) On May 26, 2010, not long after the stay expired, Celgene and Barr[2] reached a confidential settlement. (*Id.* ¶ 126.) These events "had the anti-competitive effect of keeping generic alternatives to Thalomid off the market." (*Id.*)

Plaintiffs allege that the settlements with Barr and Lannett are "reverse payment patent settlements," also known as pay-for-delay agreements.[3] (*Id.* ¶¶ 217, 239.) They maintain that Celgene paid the manufacturers either to delay or to postpone their entrance into the thalidomide or lenalidomide markets. (*Id.* ¶ 217, 218, 242; Providence Compl., ¶ 240.)

Celgene filed a patent infringement suit against Natco, whose Paragraph IV Certification was directed against the earliest five Distribution Patents, along with Patent No. 5,635,517 ("the '517 Patent"), Patent No. 6,281,230 ("the '230 Patent"), Patent No. 6,555,554 ("the '554 Patent"), Patent No. 7,119,106 ("the '106 Patent"), and the Patent No. 7,465,800 ("the '800 Patent"), which, according to plaintiffs, covered Revlimid's chemical composition. (*Id.* ¶¶ 225, 226.) While the lawsuit was pending, Celgene listed two more patents in the Orange Book covering Revlimid. (*Id.* ¶¶ 229, 230.) Natco filed a second Paragraph IV Certification on March 14, 2013, claiming those patents were also invalid, unenforceable, or not infringed by Natco's generic lenalidomide. (*Id.* ¶ 231.) Almost three years after it instituted the patent infringement suit against Natco, Celgene listed two other patents in the Orange Book under Revlimid: Patent No. 8,404,717 ("the '717 Patent") and Patent No. 8,431,509 ("the '598 Patent"). (*Id.* ¶ 232–33.) Through a series of amended complaints in its lawsuit against Natco, Celgene has, according to plaintiffs, pursued its goal of delaying generic entry into the Revlimid market. (*Id.* ¶ 238.)

### D. *Celgene's Overall Anti–Competitive Scheme*
Plaintiffs allege that Celgene engaged in an anti-competitive scheme to "block[ ] and delay[ ] generic Thalomid and Revlimid competition, disrupt[ ] the normal channels, and the statutory and regulatory mechanisms, by which generic competition takes place ..., and exclude[ ] would-be generic competitors from the most efficient means of distributing their products." (*Id.* ¶ 243.) Were it not for Celgene's anti-competitive conduct, plaintiffs claim that generic versions of Thalomid and Revlimid would have entered the market, thus "driving down the cost" of thalidomide and lenalidomide products and increasing consumer choice. (Providence

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 291 of 535
PageID: 32238

In re Thalidomid and Revlimid Antitrust Litigation, Not Reported in Fed. Supp. (2015)

2015 WL 9589217

Compl., ¶¶ 243, 244.) They assert that "[t]he enormous cost savings" that generic drugs would afford consumers "outweigh" any justification that Celgene could offer and that any reasons it does put forth are pretextual. (IUB Compl., ¶ 248.) Plaintiffs conclude that Celgene did not maintain its monopoly power through "meritorious competition" but did so through unlawful, willful exclusionary conduct violating federal and state laws. (Providence Compl., ¶ 247.)

### E. *Procedural History*

**\*8**  IUB filed its five-count class action complaint against Celgene on November 7, 2014, on behalf of:

> All persons or entities who purchased and/or paid for some or all of the purchase price for thalidomide or lenalidomide in any form, in the United States, and its territories for consumption by themselves, their families, or their members employees, insureds, participants, or beneficiaries at any time during the period of November 7, 2010 through and until the anticompetitive effects of [Celgene's] unlawful conduct cease.

(IUB Compl., ¶ 252.) Providence filed its five-count class action complaint on March 3, 2015, on behalf of a similarly defined class. (Providence Compl., ¶ 250.) IUB and Providence, in counts 1 and 2 of their complaints, allege that Celgene's scheme constituted unlawful monopolization and attempted monopolization under state law. (IUB Compl., ¶¶ 282–99; Providence Compl., ¶¶ 279– 92.) IUB asserts that Celgene violated 27 state laws in count 1 and 30 in count 2 (IUB Compl., ¶¶ 289, 295), and Providence relies on 25 state laws in count 1 [4] and count 2. [5] (Providence Compl., ¶¶ 286, 292.) Count 3 of both complaints contends that Celgene engaged in unfair and deceptive trade practices under state law. [6] (IUB Compl., ¶¶ 296–99; Providence Compl., ¶¶ 293–96.) Plaintiffs, in their respective fourth counts, request injunctive relief under the Clayton Act, 15 U.S.C. § 26, ordering Celgene to cease its alleged anti-competitive activities, asserting that they contravene Section 2 of the Sherman Antitrust Act ("the Sherman Act"), 15 U.S.C. § 2. [7] (IUB Compl., ¶¶ 300–02; Providence Compl., ¶¶

297–99.) The last claim contends that Celgene was unjustly enriched by its anti-competitive and unlawful acts in the form of the economic benefit conferred on it by plaintiffs and their prospective class when they purchased and/or provided reimbursement for the cost of Thalomid and/or Revlimid. [8] (IUB Compl., ¶¶ 303–15; Providence Compl., ¶¶ 300–12.)

### III. *Discussion*

### A. *Standard of Review*

**\*9**  "Detailed factual allegations" are not required for a plaintiff to survive a motion to dismiss, but there must be more in the complaint than "the-defendant-unlawfully-harmed-me accusation[s]" and legal conclusions. *Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).* The plaintiff must set forth " 'sufficient factual matter' to show that a claim is facially plausible" so as to permit " 'the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' " *Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir.2009)* (quoting *Iqbal, 556 U.S. at 678*).

### B. *Sherman Act Claims – Plaintiffs' Fourth Counts*

Celgene first challenges the fourth counts in plaintiffs' complaints, which bring claims under Section 2 of the Sherman Act and seek injunctive relief pursuant Section 16 of the Clayton Act. Section 2 of the Sherman Act makes it unlawful for any person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 2. Injunctive relief is available to prevent "against threatened loss or damage by a violation of the antitrust laws" pursuant to the Clayton Act. § 26. To state a plausible claim for relief under Section 2 of the Sherman Act, the plaintiff must show that the defendant (1) possessed "monopoly power in the relevant market" and (2) willfully acquired or maintained that power "as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Broadcom Corp. v. Qualcomm Inc., 501 F.3d 297, 307 (3d Cir.2007)* (quoting *United States v. Grinnell Corp., 384 U.S. 563 570–71 (1966)*) (internal quotation marks omitted).

### 1. *Antitrust Causation and Injury*

Case 1:19-md-02875-RMB-SAK   Document 1382-8   Filed 07/12/21   Page 292 of 535
PageID: 32239

In re Thalomid and Revlimid Antitrust Litigation, Not Reported in Fed. Supp. (2015)

2015 WL 9589217

Celgene contends that plaintiffs lack antitrust standing, having failed to show antitrust causation or injury. The requirements of antitrust injury and standing, although mutually exclusive, often overlap. *See Animal Sci. Prods., Inc. v. Chin Minmetals Corp.,* 34 F.Supp.3d 465, 492 (D.N.J.2014) (McNulty, J.). To satisfy the requirements of injury, a plaintiff must show "(1) 'injury of the type the antitrust laws were intended to prevent,' and (2) injury that 'flows from that which makes the defendants' acts unlawful.' " *Int'l Raw Materials, Ltd. v. Stauffer Chem. Co.,* 978 F.3d 1318, 1328 (3d Cir.1992) (quoting *Brunswick Corp. v. Pueblo Bowl–O Mat, Inc.,* 429 U.S. 477, 489 (1977)). And while an injury may be "causally related to an antitrust violation," it will not constitute antitrust injury "unless it is attributable to an anti-competitive aspect of the practice under scrutiny." *Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 334 (1990). Celgene's argument rests on two premises. First, it maintains that plaintiffs fail to plead causation and injury because the *Noerr Pennington* Doctrine immunizes it from antitrust liability for asserting its patents covering Thalomid and Revlimid against generic drug manufacturers.[9] Second, Celgene argues that its numerous patents covering Thalomid and Revlimid ("the Non–Distribution Patents") operate as an independent bar to market entry for generic versions of those drugs. Celgene therefore concludes that "[n]o generic manufacturer could have brought generic versions of Revlimid and Thalomid to market in any event, for the wholly independent reason that, as a matter of law Celgene can assert (and has asserted) patents in its portfolio that [plaintiffs do] not, and could not legitimately, challenge as having been fraudulently procured or sham asserted." (Celgene Br. at 2–3.)

### a. The Noerr Pennington Doctrine

**\*10** Celgene contends that its conduct in asserting its patents is immune from antitrust liability under the *Noerr Pennington* Doctrine. Plaintiffs counter by asserting that Celgene engaged in sham litigation and obtained the Distribution Patents by committing fraud on the USPTO, stripping it of any immunity it could claim under *Noerr Pennington*.

"Whether conduct in procuring or enforcing a patent is sufficient to strip a patentee of its immunity from the antitrust laws" is resolved applying Federal Circuit law, while Third Circuit law applies "to issues involving other elements of antitrust law." *Nobelpharma AB v. Implant*

*Innovations, Inc.,* 141 F.3d 1059, 1068 (Fed.Cir.1998). The *Noerr Pennington* Doctrine stands for the proposition that "the Sherman Act does not prohibit ... persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly." *Noerr,* 365 U.S. at 136; *accord Pennington,* 381 U.S. at 670. This includes the use of "state and federal agencies to advocate their causes and points of view respecting resolution of their business and economic interests vis-à-vis their competitors." *Cal. Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 511 (1972). The Doctrine's goal seeks to avoid invasions on "the First Amendment right to petition," *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,* 508 U.S. 49, 56 (1993) (hereinafter "*PRE* "), even it is for "an improper purpose or motive," such as to destroy competition. *A.D. Bedell Wholesale Co, Inc. v. Philip Morris Inc.,* 263 F.3d 239, 250 (3d Cir.2001).

The Supreme Court has carved out two exceptions to *Noerr Pennington* immunity. The first, which relates solely to patents, is based on *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.,* 382 U.S. 172 (1965). A plaintiff raising a *Walker Process* claim alleges that the defendant is "bringing a suit to enforce a patent with knowledge that the patent is invalid or not infringed, and the litigation is conducted for anti-competitive purposes." *C.R. Bard, Inc. v. MS Sys., Inc.,* 157 F.3d 1340, 1368 (Fed.Cir.1998). *Noerr Pennington* immunity does not attach, and a defendant is liable under antitrust laws, when it procures a patent "by knowing and willful fraud" and "enforced the patent with knowledge of the fraudulent manner in which it was obtained." *Ritz Camera & Image, LLC v. SanDisk Corp.,* 700 F.3d 503, 506 (Fed.Cir.2012); *see also Walker Process,* 382 U.S. at 179 (Harlan, J., concurring). The additional elements of a Section 2 claim, such as monopoly power, must also be shown. *See Hydril Co. LP v. Grant Prideco LP,* 474 F.3d 1344, 1349 (Fed.Cir.2007) (stating that the other elements of a claim under Section 2 of the Sherman Act must be present when an antitrust violation is premised on a fraudulently obtained patent).

The second exception applies to "petitions and lawsuits that are a 'mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships

Case 1:19-md-02875-RMB-SAK   Document 1382-8   Filed 07/12/21   Page 293 of 535
PageID: 32240

In re Thalomid and Revlimid Antitrust Litigation, Not Reported in Fed. Supp. (2015)

2015 WL 9589217

of a competitor.' " *Cheminor Drugs, Ltd. v. Ethyl Corp.,* 168 F.3d 119, 122 (3d Cir.1999) (quoting *Noerr,* 365 U.S. at 144). In identifying sham litigation, a court must first assess whether the lawsuit is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *PRE,* 508 U.S. at 60. If so, the inquiry then turns to "whether the baseless lawsuit conceals an attempt to interfere directly with the business relationships of a competitor through the use of the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon." *Id.* at 60–61 (citations and internal quotation marks omitted).

**\*11** A patent owner can be stripped of antitrust immunity under either exception. The sham litigation exception precludes a patent holder from *Noerr Pennington* immunity if the suit is "based on a theory of infringement or validity that is objectively baseless," in that no reasonable person would believe that the patent was infringed or valid, and if it is "subjectively brought in bad faith." *Nobelpharma,* 141 F.3d at 1072. "[I]f a suit is not objectively baseless, an antitrust defendant's subjective motivation is immaterial," and the sham litigation exception does not apply. *Id.* For a *Walker Process* claim, in contrast, the mindset of the patent holder in enforcing a patent is irrelevant because, once it is shown that a patent was knowingly and willfully procured by fraud, the patent owner may not hide under shelter of *Noerr Pennington* irrespective of its reasons for bringing suit. *See Dippin' Dots, Inc. v. Mosey,* 476 F.3d 1337, 1346 (Fed.Cir.2007) ("A party who asserts such a fraudulently obtained patent may be subject to an antitrust claim.").

### i. *Walker Process* Claim

Celgene argues that plaintiffs' allegations fall short of the heightened pleading standard of *Fed.R.Civ.P. 9(b),* which applies to *Walker Process* claims. "*Rule 9(b)* requires identification of the specific who, what, when, where, and how of the material misrepresentation or omission committed before the [US]PTO." *Exergen Corp. v. Wal–Mart Stores, Inc.,* 575 F.3d 1312, 1327 (Fed.Cir.2009). A plaintiff alleging that a patent was procured through fraud under *Walker Process* must show:

(1) a false representation or deliberate omission of a fact material to patentability, (2) made with the intent to deceive the patent examiner, (3) on which the examiner justifiably relied in granting the patent, and (4) but for which misrepresentation or deliberate omission the patent would not have been granted.

*C.R. Bard,* 157 F.3d at 1364. But "[a] mere failure to cite a reference to the [USPTO] will not suffice" as a willful omission because "the applicant could have a good-faith belief that disclosure was not necessary, or simply have forgotten to make the disclosure." *Dippin' Dots,* 476 F.3d at 1347 (citation and internal quotation marks omitted). "There must be evidence of intent separable from the simple fact of the omission." *Id.*

A patent applicant has a duty of candor to the USPTO, which includes disclosing all prior art, 37 C.F.R. § 1.56(a), and "[a] patent is invalid for anticipation if a single prior art reference discloses each and every limitation of the claimed invention." *Schering Corp. v. Geneva Pharm.,* 339 F.3d 1373, 1377 (Fed.Cir.2003). Among the classes of prior art, the one relevant to the present matter is that which precludes the issuing of a patent when "the claimed invention was patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention." 35 U.S.C. § 102(a)(1).

Plaintiffs allege that Celgene fraudulently procured the six Distribution Patents, the earliest of which was obtained on April 4, 2000, by knowingly omitting ten references of anticipatory prior art material to their patentability. (IUB Compl., ¶ 135.) Celgene argues these allegations fail to meet the heightened pleading standard of *Fed.R.Civ.P. 9(b)* because they do not explain how the prior art "materially differ[s] from, and/or was not cumulative of, the prior art" it disclosed to the USPTO while prosecuting the Distribution Patents. Celgene also contends that the pleadings are insufficient to show fraud on the USPTO because plaintiffs failed to explain how the references of prior art "are materially

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 294 of 535
PageID: 32241

In re Thalomid and Revlimid Antitrust Litigation, Not Reported in Fed. Supp. (2015)

2015 WL 9589217

similar to, and/or anticipatory of," any of the Distribution Patents' claims.

According to plaintiffs, Celgene employees attended the CDER Meeting and NIH Meeting, easily raising the inference that Celgene was aware of those two references of prior art at all times before procuring the earliest Distribution Patent. (IUB Compl., ¶¶ 171, 172, 179, 180.) And plaintiffs assert that Williams, a named inventor of the Distribution Patents, gave presentations at both meetings about developing a restricted distribution program for thalidomide, extrapolating the methods used for Accutane and Clozaril. (*Id.* ¶¶ 174, 175, 179, 180.) Williams's knowledge of the Accutane and Clozaril programs raises the inference that he, and in turn Celgene, was aware of CPMS, PPP, and the PPP Package. This knowledge is further shown by the assertions that Williams and Zeldis were at the CDC Meeting during which PPP and CPMS were discussed. (*Id.* ¶¶ 159–61.) Plaintiffs also claim that the Zeldis Article, which Williams and other Celgene employees authored, cites to Honigfeld I and II, implying a knowledge of those two references of alleged prior art. (*Id.* ¶¶ 165–168.) Last, Celgene included the Guide as prior art in the '886 Patent's application. (*Id.* ¶ 197.)

**\*12** Plaintiffs note that Celgene included eight of the ten references of prior art in the 2010 application for the '886 Patent, the latest of the Distribution Patents. (IUB Compl, ¶¶ 197–98.) This raises the inference that Celgene believed those eight references of prior art were material to the '886 Patent's application and the others as well. Plaintiffs therefore plausibly allege that Celgene willfully omitted the prior art from the prior applications with the intent to deceive the USPTO. The issuance of the patents demonstrates justifiable reliance by the USPTO. *See Unitherm Food Sys., Inc. v. Swift–Eckrich, Inc.,* 375 F.3d 1341, 1361 (Fed.Cir.2004) (finding that the USPTO justifiably relied on a patent application's omission because it issued the patent), *rev'd on other grounds,* 546 U.S. 394 (2006). Plaintiffs' allegations, taken as true, sufficiently allege, under the heightened pleading standard of Fed.R.Civ.P. 9(b), that Celgene obtained the Distribution Patents by committing fraud on the USPTO.[10]

Plaintiffs assert that Celgene sought to enforce the Distribution Patents in infringement suits brought against Barr and Natco in response to Paragraph IV Certifications they filed. (IUB Compl., ¶¶ 213, 214, 226, 229.) The litigation is not in dispute and the complaints sufficiently allege facts

that support plaintiffs' theory that Celgene mounted the lawsuits to enforce illegally obtained patents, satisfying the second prong of a *Walker Process* claim. Celgene's motion to dismiss plaintiffs' Sherman Act claim on *Noerr Pennington* immunity grounds is denied.

### ii. *Sham Litigation*

A plaintiff contending that a defendant engaged in sham litigation must plead facts that show the lawsuit was "(1) 'objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits' (the objective element), and (2) motivated by a desire 'to interfere *directly* with the business relationships of a competitor' (the subjective element)." *Tyco Healthcare Grp. LP v. Mutual Pharm. Co., Inc.,* 762 F.3d 1338, 1343 (Fed.Cir.2014) (quoting *PRE,* 508 U.S. at 60–61).

Litigation is objectively baseless if it is brought without probable cause. *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.,* 682 F.3d 1003, 1007 (Fed.Cir.2012). But, "[n]either the bringing of an unsuccessful lawsuit to enforce patent rights, nor the effort to enforce a patent that falls to invalidity, subjects the suit to antitrust liability," *C.R. Bard,* 157 F.3d at 1369, and "evidence of anticompetitive intent or purpose" alone will not transform an objectively reasonable lawsuit into a sham." *PRE,* 508 U.S. at 59. It must be shown "that plaintiff's case [had] no objective foundation, and the plaintiff must actually know this." *iLOR, LLC v. Google, Inc.,* 631 F.3d 1372, 1377 (Fed.Cir.2011).

Plaintiffs argue that several of their allegations allow the Court to infer that Celgene's patent infringement suits were objectively baseless, which include those asserting Celgene obtained the Distribution Patents by fraud and that it entered into reverse payment agreements with Barr and Lannett because the settlements evince Celgene's knowledge that the Distribution Patents were unenforceable. Plaintiffs' factual allegations showing that Celgene procured the Distribution Patents by committing fraud plausibly show that the patent infringement suits were objectively baseless because a reasonable litigant would know that a lawsuit to enforce invalid patents is without probable cause. *See C.R. Bard,* 157 F.3d at 1368 ("Conduct prohibited under antitrust laws

Case 1:19-md-02875-RMB-SAK   Document 1382-8   Filed 07/12/21   Page 295 of 535
PageID: 32242

In re Thalomid and Revlimid Antitrust Litigation, Not Reported in Fed. Supp. (2015)

2015 WL 9589217

includes bringing suit to enforce a patent with knowledge that the patent is invalid or not infringed, and the litigation is conducted for anticompetitive purposes."); 📖 *Abbott Labs. v. Teva Pharm. USA, Inc.,* 432 F.Supp.2d 408, 428 (D.Del.2006) (finding that plaintiffs sufficiently alleged that the defendant's patent infringement suits were objectively baseless because it knew that the patents were unenforceable).

**\*13**  Plaintiffs argue they pleaded other facts that plausibly support that Celgene engaged in sham litigation—specifically that it entered into settlements with Barr and Lannett that were pay-for-delay agreements. They allege Celgene paid the two manufacturers either to delay or not to market their generic versions of thalidomide until a certain event or point in time. (IUB Compl., ¶¶ 213, 214, 217.) According to plaintiffs, Celgene also "may have agreed to sell Thalomid to Lannett under the terms of the settlement, because Lannett announced in late 2014 that its bioequivalence studies were going well, and it expected to submit an ANDA" in January 2014. (*Id.* ¶ 240.)

The Supreme Court recently addressed such pay-for-delay, or reverse payment agreements in *Actavis,* holding that under certain circumstances, such arrangements may violate the Sherman Act. *Actavis,* 133 S.Ct. 2237. Essentially, the Court found that for a reverse payment to raise possible antitrust implications and cast doubt on a patent's validity: (1) there must be a "reverse payment"; (2) that is "large and unjustified"; (3) that the payor is "unable to explain and to justify." *Id.*

The Court recognizes that plaintiffs do not allege facts going to the amount of any "reverse payment" to Barr and Lannett. What remains troubling is Celgene's insistence, in its reply to plaintiffs' arguments on this point, that because of its large portfolio of patents covering Thalomid and Revlimid, competitors could not enter the market. This pushes aside the fact that the complaints here arise out of the particular nature of Hatch–Waxman. The plaintiffs allege that by various means that directly had an impact on the requirements for ANDAs, Celgene carefully blocked or delayed generic manufacturers' entry into the market over which it had monopoly power. At this stage of the litigation, the Court is reluctant to dismiss claims of sham litigation when plaintiffs' theory is clearly enunciated in the complaints and the facts in support connect the litigation to delay to the injury complained of.

The Court also finds that in context, the filing of the citizen petition may be seen as consistent with efforts to block entry into the thalidomide and lenalidomide markets. It is not determinative of the plausibility of the facts pled that the FDA did not take action on the citizen petition, as Celgene argues. Plaintiffs are asserting that Celgene's litigation is causally connected to its overall anti-competitive scheme whereby it first blocked its competitors' access to its drugs by refusing to providing samples for bioequivalency testing, and then sued the same competitors after they were able to obtain sufficient samples to conduct testing and file ANDAs.

**b. *The Non–Distribution Patents***

Celgene's second standing argument rests on the "almost three-dozen" patents that it owns, which cover Thalomid and Revlimid and are not challenged here as invalid ("the Non–Distribution Patents"). Even if its enforcement of the Distribution Patents were anti-competitive, Celgene argues, it could prevent generic drug manufacturers from entering the thalidomide and lenalidomide markets by raising the Non–Distribution Patents in an infringement action. In its moving brief, Celgene asserts that the Non–Distribution Patents "explain[s] the absence of generic competition of Revlimid and Thalomid," and therefore, plaintiffs fail to allege antitrust injury and causation because their payment of supracompetitive prices is not solely attributable to its alleged anti-competitive conduct. (Celgene Br. at 16.)

As plaintiffs note in their opposition, this argument would essentially require them to discredit all possible intervening causes of an injury in their complaint to demonstrate standing. But the law does not demand that plaintiffs "allege all alternative theories of causation to survive a motion to dismiss.... Plaintiffs are simply required to allege facts showing that they suffered the type of injury or harm the antitrust laws were intended to prevent, and that their injury flows from [Celgene's] anti-competitive conduct." 📖 *In re K–Dur Antitrust Litig.,* 338 F.Supp.2d 517, 535 (D.N.J.2004) (Greenaway, J.) (hereinafter "*K–Dur (2004)*"); *see also* 📖 *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 114 n.9 (1969) ("[A] plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable [antitrust] injury...."). Therefore, at this stage of the litigation, whether Celgene owned other patents by which it could lawfully exclude

2015 WL 9589217

generic competition from the thalidomide and lenalidomide markets is not the point. [11]

**\*14** These complaints allege how Celgene manipulated the FDA regulatory scheme, particularly the Hatch–Waxman Act, to "block[ ] and delay[ ] generic Thalomid and Revlimid competition." (IUB Compl., ¶ 243.) Plaintiffs assert facts supporting their claims of anticompetitive conduct: that Celgene engaged in sham litigation, and that it used its restricted distribution programs as a pretext to withhold samples for bioequivalency testing in order to prevent generic competitors from entering the thalidomide and lenalidomide markets (IUB Compl., ¶ 243, 246.), which is the type of conduct antitrust laws were aimed to prevent because it "impairs the opportunity of rivals" without "further[ing] competition on the merits." Broadcom Corp., 501 F.3d at 308. And plaintiffs allege this conduct resulted in them paying supracompetitive prices for Thalomid and Revlimid due to the lack of generic competition in thalidomide and lenalidomide markets–a quintessential antitrust injury. See Brantley v. NBC Universal, Inc., 675 F.3d 1192, 1202 n.11 (9th Cir.2012) (noting that reduced consumer choice and increased price constitute antitrust injury when caused by anti-competitive practices). The Court therefore finds that plaintiffs' factual allegations sufficiently plead antitrust injury and causation.

### 2. Celgene's Refusal to Deal

Celgene challenges the sufficiency of plaintiffs' allegations founded on its refusal to provide Thalomid and Revlimid samples to generic drug manufacturers for bioequivalency testing. It contends that, in order to state a Section 2 Sherman Act claim based on a refusal to deal, the plaintiff must show that the defendant terminated a prior course of dealing with a competitor and that it had no legitimate business justification for doing so. Implicit in plaintiffs' arguments is that a prior course of dealing is not a necessary element of a refusal-to-deal claim.

"As a general rule, businesses are free to choose the parties with whom they will deal...." Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc., 555 U.S. 438, 448 (2009); see also King Drug, 791 F.3d at 409 n.32. Requiring a business to cooperate with competitors "is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive

for the monopolist, rival, or both" to innovate. Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 407–08 (2004). "Courts are ill suited 'to act as central planners, identifying the proper price, quantity, and other terms of dealing.' " Linkline, 555 U.S. at 452 (quoting Trinko, 504 U.S. at 408). And of most concern is that forced cooperation and negotiation between competitors may facilitate "the supreme evil of antitrust: collusion." Trinko, 540 U.S. at 408.

"The high value ... placed on the right to refuse to deal with other firms does not mean the right is unqualified," however. Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 601 (1985). A business may freely choose with whom to deal except where its motivation is to obtain or maintain a monopoly. United States v. Colgate & Co., 250 U.S. 300, 307 (1919). However, a Sherman Act violation for a refusal to deal "is near the outer boundary of § 2." Trinko, 540 U.S. at 409.

The parties dispute the validity of this claim based on competing interpretations of the Supreme Court's decision in *Aspen Skiing,* specifically whether, under that decision, the termination of a prior course of dealing between the defendant and a competitor is a necessary element of a Section 2 refusal-to-deal claim. In *Aspen Skiing,* the defendant, Ski Co., the owner of three of four ski areas in Aspen, Colorado, ceased cooperating with the owner of the fourth, Highlands, in selling a multi-mountain six-day pass for use at any of the four ski areas. Ski Co. replaced it with a six-day pass that was limited to its three ski mountains, and would only agree to reinstate the four-mountain pass if Highlands accepted a fixed percentage of the revenue, allocating Highlands far less than what it had been getting. Highlands responded by marketing its own four-mountain pass, but Ski Co. refused to sell Highlands passes to its three ski areas, even at retail value. Highlands' market share for downhill skiing in Aspen tumbled after Ski Co. unilaterally terminated the four-mountain ski pass program.

**\*15** The Supreme Court found these facts sufficient to conclude that Ski Co.'s refusal to deal violated the Sherman Act as being motivated by anti-competitive goals. The Supreme Court noted that the inquiry should be limited not just to the effect of Ski Co.'s conduct on its competitor, Highlands, but also on consumers, and "whether it has

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 297 of 535
PageID: 32244

In re Thalomid and Revlimid Antitrust Litigation, Not Reported in Fed. Supp. (2015)

2015 WL 9589217

impaired competition in an unnecessarily restrictive way."
*Aspen Skiing,* 472 U.S. at 605. It found that "[i]f a firm has been attempting to exclude rivals on some basis other than efficiency, it is fair to characterize its behavior as predatory." *Id.* The Court determined that the elimination of the four-area ticket adversely affected consumer choice as well as having a negative impact on Highlands' ability to compete. *Id.* at 606–08. Moreover, the Court reasoned that Ski Co.'s justifications for refusing to deal with Highlands were pretextual. *Id.* at 608–09. Ski Co. offered no efficiency justifications and an argument that it was too difficult to monitor skier mountain usage under the four-mountain pass was without merit because that had been done successfully in the past. *Id.* at 608–09. Ski Co. also claimed that Highlands' ski area's quality was inferior, and the Court dismissed that argument as pretextual because the four-area pass allowed the skiers to choose based on quality. *Id.* at 610.

The Court concluded that the evidence "support[ed] an inference that the monopolist made a deliberate effort to discourage its customers from doing business with its smaller rival" and that "Ski Co. was not motivated by efficiency concerns and ... was willing to sacrifice short-run benefits and consumer goodwill in exchange for the perceived long-run impact on its smaller rival." *Id.* at 610–11. Thus, the Court looked at all the facts surrounding Ski Co.'s refusal to deal with Highlands as circumstantial evidence to support the inference that it acted with anticompetitive intent because, as the Court noted earlier in its opinion, "no monopolist monopolizes unconscious of what he is doing." *Id.* at 602 (citation and internal quotation marks omitted).

The reasoning behind *Aspen Skiing* was revisited by the Supreme Court in *Trinko* where the plaintiffs alleged that the defendant, Verizon, violated Section 2 of the Sherman Act by refusing to provide its competitors with access to its communication network, conduct for which the government had penalized Verizon under the Telecommunications Act of 1996. The Court rejected the plaintiffs' claim, declining to extend *Aspen Skiing* to Verizon's conduct. *Trinko,* 540 U.S. at 409. The Court noted that in *Aspen Skiing* it found significant that Ski Co.'s "unilateral termination of a voluntary (*and thus presumably profitable* ) course of dealing suggested a willingness to forsake short-term profits to achieve an anti-competitive end, and also that the defendant's unwillingness

to renew the ticket *even if compensated at retail price* revealed a distinctly anticompetitive bent." *Id.* Verizon's prior conduct, unlike Ski Co.'s, "shed[ ] no light upon the motivation of its refusal to deal upon whether it[ ] ... [was] prompted not by competitive zeal but by *anticompetitive malice.*" *Id.* (emphasis added).

Celgene reads *Aspen Skiing* and *Trinko* too narrowly. The termination of the dealing between Ski Co. and Highlands was used as circumstantial evidence of Ski Co.'s demonstrated anti-competitive motivation, along with its lack of legitimate business justifications for doing so.

Both decisions indicate that motivation is central. The Court agrees with the plaintiffs that at this point it is too soon to measure motivation on Celgene's part. The facts asserted are that Celgene provided samples to researchers who were not seeking to enter the market, but not to competitors, who were. Plaintiffs specify that Mylan and Lannett gave Celgene letters from the FDA that stated that the agency would not take action should Celgene provide samples to them. Celgene continued to refuse to deal. This raises a plausible inference that Celgene's reliance on its distribution programs is pretextual. [12]

**\*16** Celgene offers the additional justification that "certain states ... purport to hold branded manufacturers ... liable for the injuries caused by generic copies of their drugs," relying on several cases where courts have held a brand name manufacturer liable for injuries caused by generic manufacturer's drug. (Celgene Br. at 35.) As plaintiffs argue in their opposition, Celgene overstates the basis on which liability is extended to a brand name manufacturer.

Those states holding brand name manufacturers liable do so on a failure-to-warn theory. *See, e.g., Kellogg v. Wyeth,* 762 F.Supp.2d 694, 708–09 (D.Vt.2010); *Conte v. Wyeth, Inc.,* 85 Cal.Rptr.3d 299, 318 (Cal.Ct.App.2008). These decisions rely on the laws regulating a generic drug's labeling, which require it to use the identical labeling that was approved for the brand name drug. 21 U.S.C. § 355(j)(2)(A)(v). These courts held that a brand name manufacturer owes a duty to a consumer injured by a generic manufacturer's drug when a risk of that drug is not adequately disclosed on the its labeling because the generic drug must use the same labeling as the brand name drug. *Kellogg,* 762 F.Supp.2d at 708–09. A brand name manufacturer would not be liable for defects

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 298 of 535
PageID: 32245

In re Thalomid and Revlimid Antitrust Litigation, Not Reported in Fed. Supp. (2015)

2015 WL 9589217

in the generic drug's formulation or manufacture. *Conte, 85 Cal.Rptr.3d at 317 n. 16.* In fact, a failure-to-warn claim relies on the fact that the brand name and generic drugs are bioequivalents, having the same formulation. *See id. at 307.* The possibility that Celgene could be liable for a generic drug's harm is therefore not a legitimate justification that would support its refusal to supply generic manufacturers with samples of Thalomid and Revlimid.

Plaintiffs' allegations plausibly show that Celgene lacked a legitimate business justification for withholding samples of its drugs.

### 3. Celgene's Overall Anti–Competitive Scheme

Celgene moves to dismiss plaintiffs' fourth count in its entirety by arguing that plaintiffs fail to state claim under Section 2 of the Sherman Act because each individual act that they allege to be part of its overall anti-competitive scheme is not itself an antitrust violation. This argument, however, takes too narrow a view of what a plaintiff must plead to state claim under Section 2.

A court must look at allegations about a defendant's anti-competitive conduct as a whole, *LePage's, Inc. v. 3M, 324 F.3d 141, 162 (3d Cir.2003),* and its legal analysis must not "tightly compartmentaliz[e] the various factual components" of a plaintiff's allegations, "wiping the slate clean after scrutiny of each." *Cont'l Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699 (1962); see also Abbott Labs., 432 F.Supp.2d at 428.* A court assessing the anti-competitive effect of a defendant's overall scheme must consider "the increase in the defendant's market share, the effects of foreclosure on the market, benefits to customers and the defendant, and the extent to which customers felt they were precluded from dealing with other manufacturers." *LePage's, 324 F.3d at 162.*

Plaintiffs plausibly assert that Celgene procured the Distribution Patents by committing fraud on the USPTO and then sued potential generic competitors for infringement of those invalid patents such that its conduct is not protected by the *Noerr Pennington* Doctrine. Plaintiffs also adequately claim that Celgene manipulated the Hatch–Waxman Act by listing the Distribution Patents in the Orange Book and

by filing infringement lawsuits to prevent or delay the approval of any ANDAs filed by generic competitors. As IUB characterizes the allegations in its opposition brief, Celgene "first block[ed] competitors' access to its drug for bioequivalence testing, and then su[ed] those same competitors when they managed to obtain the drug and file an ANDA." (D.E. 29 at 23.) These allegations allow the Court to infer that Celgene willfully sought to maintain its monopoly in violation of Section 2 of the Sherman Act in order to charge supracompetitive prices, not through business acumen or a superior product, but through a concerted effort to deny potential generic competitors access to the market.

**\*17** For the above reasons, Celgene's motion to dismiss count 4 of plaintiffs' complaints is denied.

### C. State Law Claims – Count 1, Count 2, Count 3, and Count 5

Celgene requests the dismissal of plaintiffs' state law claims in their respective first, second, third, and fifth counts and raises four arguments that are equally applicable to both IUB's and Providence's complaints. Celgene first contends that plaintiffs lack Article III standing to assert claims on behalf of putative class members under the laws of states in which they have not alleged a personal injury. It also maintains that, pursuant to New Jersey choice-of-law rules, plaintiffs may only bring claims under the laws of Connecticut and Rhode Island and that all other state law claims must be dismissed. Celgene's third argument asserts that plaintiffs' state law claims are preempted by federal patent law because they rely on its alleged inequitable conduct before the USPTO. It focuses its final assertion on plaintiffs' unjust enrichment claims in their fifth counts, arguing that those claims rest on the same allegations as their state antitrust claims and that unjust enrichment claims cannot be used as an end-run around state antitrust laws. Celgene further contends the individualized nature of the harm inherent in unjust enrichment claims precludes class certification.

### 1. Article III Standing for State Law Claims

Celgene argues that plaintiffs lack Article III standing to assert claims on behalf of putative class members under the laws of states in which they either have not alleged an injury or do not reside. Constitutional standing, under Article III, requires a plaintiff to show: (1) it suffered an injury-in-fact, that is "concrete and particularized" and "actual or

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 299 of 535
PageID: 32246
In re Thalomid and Revlimid Antitrust Litigation, Not Reported in Fed. Supp. (2015)

2015 WL 9589217

imminent," and not merely "conjectural or hypothetical"; (2) that the defendant's complained of conduct caused that injury; and (3) that it is likely, "as opposed to merely speculative," a favorable decision by the court will redress the injury. *Winer Family Trust v. Queen,* 503 F.3d 319, 325 (3d Cir.2007). "[N]amed plaintiffs who represent a class 'must allege and show that they have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.' " *Lewis v. Casey,* 518 U.S. 343, 357 (1996) (quoting *Simon v. E. Ky. Welfare Rights Org.,* 426 U.S. 26, 40 n.20 (1976)). "Once threshold individual standing by the class representative is met, a proper party to raise a particular issue is before the court, and there remains no further separate class standing requirement in the constitutional sense." *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions,* 148 F.3d 283, 306–07 (3d Cir.1998) (citation and internal quotation marks omitted) (hereinafter "*In re Prudential* "). Celgene contends IUB has standing in only three states, Connecticut, Massachusetts, and Nebraska, and that Providence has standing in five, Rhode Island, Kansas, Massachusetts, New Jersey, North Carolina, and Pennsylvania.

Plaintiffs respond that Celgene conflates Article III standing with class certification issues under *Fed.R.Civ.P. 23,* and that for Article III standing purposes it is sufficient to show they have suffered a personal injury. They note Celgene concedes they satisfactorily alleged injury in certain states, and argue that whether they can raise claims on behalf of absent class members under the laws of states where they did not suffer an injury is a question appropriate for the class certification stage, which must follow the resolution of any Article III standing questions.

**\*18** The Third Circuit recently addressed the last point in *Neale v. Volvo Cars of North America,* 794 F.3d 353, 360 (2015), finding that "considerations under *Rule 23* are themselves procedural rules, and thus rarely can be antecedent to the question of whether a federal court has jurisdiction to hear a claim at all," and so an Article III standing inquiry is a necessary prerequisite to *Fed.R.Civ.P. 23* considerations. The court reasoned that delaying the standing analysis until after class certification could result in an advisory opinion—an act of "ultra vires." *Id.* at 361 (internal quotation marks

omitted) (quoting *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 102 (1998)).

IUB, which is located in Connecticut, alleges to have paid and/or reimbursed its members for the price of Thalomid and Revlimid in Massachusetts and Nebraska. (IUB Compl., ¶ 12.) Providence is based in Rhode Island, and it claims it paid or reimbursed its members for the price of the two brand name drugs in Florida, Kansas, Massachusetts, New Jersey, North Carolina, and Pennsylvania. (Providence Compl., ¶ 14.) Celgene, for purposes of its motions to dismiss, accepts that plaintiffs allege injuries in those states. The Court finds that the factual allegations discussed above support plaintiffs' standing to pursue state law claims because they show that Celgene's anti-competitive conduct caused their claimed injury in paying supracompetitive prices by unlawfully excluding generic competition. Further, plaintiffs seek damages for their state law claims, so a favorable decision will redress their injury. Plaintiffs therefore possess Article III standing to pursue their state law claims in those particular states.

The fact that plaintiffs have Article III standing, however, does not resolve the question of whether they can pursue state law claims on behalf of putative class members under the laws of states where they do not allege they suffered a personal injury. Celgene and plaintiffs point to cases that arrived at differing conclusions regarding this issue, but this authority offers little by way of legal analysis for their conclusions; the courts are either dismissing those state law claims or finding it premature to decide the issue. The Supreme Court, recently provided guidance in *Lexmark International, Inc. v. Static Control Components, Inc.,* 134 S.Ct. 1377, 1386 (2014) (citation and internal quotation marks omitted), where it stated that the limitation of a court's "power to resolve Cases or Controversies" flows from Article III, which sets out, along with the separation-of-powers principle, the "irreducible constitutional minimum of standing." Once the three-part test of (1) injury, (2) causation, and (3) redressability is satisfied, the Court emphasized that "a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Id.* (citation and internal quotation marks omitted). The Court differentiated the zone-of-interests test, which it found was unrelated to standing and strictly a matter of statutory construction. *Id.* at 1387. That test "requires [a court] to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim."

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 300 of 535
PageID: 32247

In re Thalomid and Revlimid Antitrust Litigation, Not Reported in Fed. Supp. (2015)

2015 WL 9589217

*Id.* Unlike the question of Article III standing, the zone-of-interest test does not concern a court's subject matter jurisdiction–its "power" to hear the case, but whether the plaintiff states a claim–a merits question. *See id.* at 1387 n.3, 1387 n.4; *see also Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Dist. Comm'n,* 768 F.3d 183, 201 (2d Cir.2014) (elaborating that the zone-of-interests test does not involve a court's jurisdiction to hear a case or controversy under Article III).

**\*19** Celgene's attack on plaintiffs' standing to pursue state law claims on behalf of absent class members is not an Article III jurisdictional issue under *Lexmark.* Celgene argues that plaintiffs must allege an in-state injury, but Article III's injury-in-fact requirement "has nothing to do with the text of the statute relied upon." *Steel Co.,* 523 U.S. at 97 n.2; *see also Lexmark,* 134 S.Ct. at 1386. Celgene's attempt "[t]o inject the condition that [p]laintiffs must satisfy certain elements of the state antitrust claims into a constitutional standing analysis ... result[s] in an impermissible out-of-the-box merits inquiry." *Processed Egg,* 851 F.Supp.2d 867, 886 (E.D.Pa.2012); *see also Nesbit v. Gears Unlimited, Inc.,* 347 F.3d 72, 80 (3d Cir.2003) ("The [Supreme] Court also criticized the implications of treating the validity of a cause of action as jurisdictional.").

In this opinion the Court has determined that there is a live case or controversy sufficient to invoke its subject matter jurisdiction under Article III. Plaintiffs correctly conclude that whether they may pursue these claims is better left for the class certification stage because "the issue now [becomes] one of compliance with the provisions of Rule 23, not one of Article III standing." *In re Prudential,* 148 F.3d at 307 (alteration in original) (citation and internal quotation marks omitted); *see also Sosna v. Iowa,* 419 U.S. 393, 403 (1975) (noting that, once Article III standing is established, the focus shifts to whether the plaintiff will adequately represent the interests of the proposed class under Fed.R.Civ.P. 23(a)). Celgene's motion to dismiss all of plaintiffs' claims under the laws of states in which they do not allege a personal injury in their first, second, third, and fifth counts is denied.

**2.** *Choice of Law*

Celgene also argues that all of plaintiffs' state law claims in their first, second, third, and fifth counts must be dismissed because New Jersey choice of law rules require the Court to apply Connecticut law to all of IUB's claims, which Celgene contends bars indirect purchasers, like IUB, from pursuing antitrust damages claims and prohibits IUB from raising unfair competition or unjust enrichment claims on the same facts as a way to plead around this prohibition. It makes a similar argument regarding Providence's claims. Plaintiffs contend that it is premature at the motion-to-dismiss stage to engage in a choice-of-law analysis before class certification.

A court's determination about "whether a choice-of-law issue is ripe or premature should be made on a case-by-case basis depending on the facts presented." *Montich v. Miele USA, Inc.,* 849 F.Supp.2d 439, 445 (D.N.J.2012) (Wolfson, J.) While a court may resolve a choice-of-law question on a motion to dismiss, *see Cooper v. Samsung Elecs. Am., Inc.,* 374 F. App'x 250, 255 (3d Cir.2010), it should defer engaging in such an analysis if the facts are, as of yet, under developed to decide the issue. *See K–Dur 2004,* 338 F.Supp.2d at 541 (declining to decide which state laws would apply because the class of plaintiffs had yet to be certified); *see also In re Flonase Antitrust Litig.,* 692 F.Supp.2d 524, 534 (E.D.Pa.2010) ("[C]hoice-of-law issues may be determined at or after class certification."). A court should exercise caution prior to class certification when asked to resolve choice-of-law questions "in a nationwide class action where an array of factors beyond the residence of the class members must be considered, including ... the location of the parties and the purchased items." *Sullivan v. DB Investments, Inc.,* 667 F.3d 273, 309 (3d Cir.2011).

Celgene's argument that the Court should conduct a choice-of-law analysis is undermined by the fact that many of the cases it relies on were decisions made on motions for summary judgment. *See In re K–Dur Antitrust Litig.,* No. 01–1652, 2008 WL 2660783, at \*1–2 (D.N.J. Mar. 19, 2008) (Orlofsky, Special Master) (hereinafter "*K–Dur (2008)*"); *In re Rezulin Prods. Liability Litig.,* 392 F.Supp.2d 597, 606 (S.D.N.Y.2005); *Am. Rockwool, Inc. v. Owens–Corning Fiberglas Corp.,* 640 F.Supp. 1411, 1418 (E.D.N.C.1986). In fact, the court in *K–Dur (2008)* had previously refused to undertake a choice-of-law analysis, finding it to be premature

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 301 of 535
PageID: 32248

In re Thalomid and Revlimid Antitrust Litigation, Not Reported in Fed. Supp. (2015)

2015 WL 9589217

on a motion to dismiss. See *K–Dur (2004),* 338 F.Supp.2d at 541.

**\*20** Based on the above, the Court will defer its decision regarding the validity of any claims under particular state laws until the facts are further developed about the residence of putative class members or the state where they purchased or reimbursed their members for the price of Thalomid and Revlimid, and where the absent class members suffered an injury. The Court also does not address Celgene's motions to dismiss specific claims in plaintiffs' first, second, third, and fifth counts because it "is unwilling to predict which state law(s) would be applicable in the event the class is certified." *K–Dur (2004),* 338 F.Supp.2d at 541.

For the foregoing reasons, Celgene's motion to dismiss individual state law claims in the complaints is denied.

### 3. *Federal Preemption*

Celgene's also contends that all of plaintiffs' state law claims are preempted by federal patent law because they primarily rely on the allegations that it obtained the Distribution Patents through inequitable conduct on the USPTO. Plaintiffs maintain that their state law claims are not preempted by federal patent law because they rely on more than Celgene's alleged misconduct before the USPTO and also contain the element of bad faith misconduct in the market place.

"Federal Circuit law governs whether federal patent law preempts a state law claim," *Ultra–Precision Mfg., Ltd. v. Ford Motor Co.,* 411 F.3d 1369, 1376 (Fed.Cir.2005), and it preempts any state law causes of action that are based on nothing more than misconduct before the USPTO. *See Semiconductor Energy Lab., Ltd. v. Samsung Elecs. Co., Ltd.,* 204 F.3d 1368, 1382 (Fed.Cir.2008). But a state law claim is not preempted "even if it requires the state court to adjudicate a question of federal patent law," so long as it contains additional elements not part of a federal patent cause of action. *Dow Chem. Co. v. Exxon Corp.,* 139 F.3d 1470, 1473 (Fed.Cir.1998). These additional elements, as plaintiffs note, often include allegations regarding bad faith conduct in the marketplace committed by the patentee. *See Zenith Elecs. Corp. v. Exzec, Inc.,* 182 F.3d 1340, 1355 (Fed.Cir.1999) (finding that a state-law tortious interference claim was not preempted by federal patent law because

the plaintiff must show the defendant acted in bad faith). For example, in *Dow* the court found that the plaintiffs' interference with contractual relations cause of action was not preempted by federal patent law because, although the tort claim relied, in part, on inequitable conduct before the USPTO, "but rather was premised upon bad faith misconduct in the marketplace." *Dow,* 139 F.3d at 1477

Plaintiffs' claims, while alleging that Celgene committed fraud before the USPTO, are also premised on bad faith misconduct in the thalidomide and lenalidomide markets. They assert that Celgene obtained the Distribution Patents through fraud, enforced those patents knowing they were invalid, and manipulated the FDA regulations, all to foreclose generic competition so it could continue to charge supracompetitive prices for Thalomid and Revlimid. These allegations go beyond just claiming fraud on the USPTO and, rather, focus on Celgene's acts in the marketplace and form the foundation of all of plaintiffs' state law claims. The Court therefore agrees with plaintiffs that their state law claims are not preempted by federal patent law because they go beyond Celgene's alleged misconduct before the USPTO by claiming Celgene's acts also involved marketplace misconduct and denies Celgene's motion to dismiss plaintiffs' state law claims as preempted.

### 4. *Count 5—Unjust Enrichment*

**\*21** Celgene contends that plaintiffs' unjust enrichment claims rely entirely on their allegations that Celgene violated antitrust laws and that a plaintiff cannot bring a corresponding unjust enrichment claim as a means to avoid a state's antitrust law's bar against damages claims by indirect purchasers. Celgene also maintains that the type of harm alleged when bringing an unjust enrichment claim is too individualized to permit class certification. Plaintiffs' primary opposition is that it is premature to decide these issues prior to class certification.

Plaintiffs may plead alternative theories of recovery in their complaints, and it is too soon now, prior to discovery, to make the determination that plaintiffs' unjust enrichment claims are brought to evade a state's rule about the litigation rights of indirect purchasers. *See In re Hypodermic Prods. Antitrust Litig.,* No. 05–1602, 2007 WL 1599225, at \*16 (D.N.J.2007)*Hypodermic Prods. Antitrust Litig.,* No. 05–1602, 2007 WL 1599225, at \*16 (D.N.J.2007) (Linares, J.) (declining to dismiss unjust enrichment claims when the

Case 1:19-md-02875-RMB-SAK   Document 1382-8   Filed 07/12/21   Page 302 of 535
PageID: 32249

In re Thalomid and Revlimid Antitrust Litigation, Not Reported in Fed. Supp. (2015)

2015 WL 9589217

defendant argued they were redundant of plaintiffs' antitrust claims because it was premature to do so). And whether the individualized nature of the harm will preclude class certification is a question of predominance better left for class certification for when a more developed factual and legal record is before the Court so that it may conduct the "rigorous analysis" Fed.R.Civ.P. 23 requires. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 309 (3d Cir.2008). The Court therefore denies Celgene's motion to dismiss unjust enrichment claims.

**IV.** *Conclusion*

For the foregoing reasons, Celgene's motion to dismiss all counts in plaintiffs' complaints is denied. An appropriate order will be entered.

**All Citations**

Not Reported in Fed. Supp., 2015 WL 9589217

---

## Footnotes

1      The Court will refer to IUB and Providence collectively as plaintiffs.

2      Plaintiffs appear to indicate that following the settlement agreement Barr was purchased by Teva, but because the allegations are unclear in this regard, the Court will continue to refer to this entity as Barr.

3      In a reverse payment settlement, "Company A sues Company B for patent infringement. The two companies settle under terms that require (1) Company B, the claimed infringer, not to produce the patented product until the patent's term expires, and (2) Company A, the patentee, to pay B many millions of dollars." *F.T.C. v. Actavis, Inc.*, 133 S.Ct. 2223, 2227 (2013).

4      In count 1, both IUB and Providence allege Celgene's conduct violated the laws of Arizona, California, the District of Columbia, Florida, Illinois, Iowa, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, North Dakota, Oregon, Puerto Rico, South Dakota, Utah, Vermont, West Virginia, and Wisconsin. (IUB Compl., ¶ 289; Providence Compl., ¶ 286.) IUB also relies on the antitrust laws of Hawaii, Massachusetts, Missouri, and Tennessee. (IUB Compl., ¶ 289.) Providence claims that Celgene's acts also violated the antitrust laws of Kansas and Rhode Island. (Providence Compl., ¶ 286.)

5      As for count 2, both IUB and Providence rely on the same states' antitrust laws that they relied on in count 1, and IUB adds New York's statute. (IUB Compl., ¶ 289; Providence Compl., ¶ 292.)

6      IUB and Providence both rely on the laws of Arizona, Arkansas, California, the District of Columbia, Florida, Kansas, Idaho, Michigan, Minnesota, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, South Dakota, Utah, and Virginia in count 3. (IUB Compl., ¶ 299; Providence Compl., ¶ 296.) IUB additionally brings claims in count 3 pursuant to Illinois, Maine, Massachusetts, Tennessee, and West Virginia statutes. (IUB Compl., ¶ 299.)

7      Plaintiffs limit their request to injunctive relief for Celgene's alleged violations of the Sherman Act recognizing the Supreme Court's ruling in *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 747 (1977) that indirect purchasers may not obtain monetary relief for federal antitrust violations.

8      The plaintiffs bring their unjust enrichment claims "under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana." (IUB Compl., ¶ 311; Providence Compl., ¶ 308.)

9      The *Noerr Pennington* Doctrine derives its name from the Supreme Court's decisions in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) and *United Mine Workers of America v. Pennington*, 381 U.S. 657 (1965), on which it is based.

10     The Court notes that Celgene neglected to provide the Distribution Patents' applications or prosecution history, further buttressing the plausibility of plaintiffs' allegations. *See Hydril*, 474 F.3d at 1349 (finding

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 303 of 535
PageID: 32250
In re Thalomid and Revlimid Antitrust Litigation, Not Reported in Fed. Supp. (2015)
2015 WL 9589217

that, in the absence of the patent applications or prosecution history, that plaintiffs' allegations were sufficient to plead a claim of *Walker Process* fraud).

11    Celgene also argues that the Court may use Fed.R.Evid. 201(b) to take judicial notice of the Non–Distribution Patents and their validity based on their listings in the Orange Book. Fed.R.Evid. 201(b) permits a court to take judicial notice of an adjudicative fact "that is not subject to dispute because it is (1) generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." The Court may take judicial notice of the fact that Celgene's

Non–Distribution Patents are listed in the Orange Book as a matter of public record, *see* *Schmidt v. Skolas,* 770 F.3d 241, 249 (3d Cir.2014), but cannot deem the listings as proof of their validity when the FDA admits that it does not review the patent information submitted as part of an NDA. *See King Drug Co. of Florence,*

*Inc. v. Smithkline Beecham Corp.,* 792 F.3d 388, 395 (3d Cir.2015); *see also* *aaiPharma Inc. v. Thompson,* 296 F.3d 227, 237 (4th Cir.2002) ("[The FDA] explain[s] that it lacks both the resources and the expertise to police the correctness of Orange Book listings."). Furthermore, patents "should not be irrebuttably presumed valid" because of "the public interest support[ing] judicial testing and elimination of weak patents." *King Drug,* 792 F.3d at 398 (alteration in original) (citation and internal quotation marks omitted).

12    Both parties brought to the Court's attention a recent decision in which a court dismissed a plaintiff's refusal-to-deal claim when a drug manufacturer cited a restricted distribution program as the reason for its refusal to sell the plaintiff drug samples for bioequivalency testing. *Natco Pharma Ltd. v. Gilead Scis., Inc.,* 2015 WL 5718398, at *6 (D.Minn. Sept. 29, 2015). The primary difference between the present matter and that matter, however, is that the plaintiff never alleged that the FDA informed the defendant that its restricted distribution program could not be relied on in denying potential generic manufacturers access to samples.

---

End of Document                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

TAB 20

*In re Volkswagen Timing Chain Prod. Liab. Litig.*, 2017 WL 1902160 (D.N.J. May 8, 2017)

2017 WL 1902160, 92 UCC Rep.Serv.2d 754

KeyCite Yellow Flag - Negative Treatment

Declined to Follow by    In re Takata Airbag Products Liability Litigation,
S.D.Fla.,   June 1, 2020

2017 WL 1902160
**NOT FOR PUBLICATION**
United States District Court, D. New Jersey.

IN RE VOLKSWAGEN TIMING CHAIN
PRODUCT LIABILITY LITIGATION

Civil Action No.: 16-2765 (JLL)
|
Signed 05/08/2017

**OPINION**

JOSE L. LINARES, UNITED STATES DISTRICT JUDGE

**\*1** This matter comes before the Court by way of Defendant Volkswagen Group of America, Inc.'s Motion to Dismiss Plaintiffs First Amended Complaint (ECF No. 6 ("Compl.")) and Compel Arbitration pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (ECF No. 36). Plaintiffs have collectively submitted an opposition (ECF No. 40), which Defendant has replied to (ECF No. 42). The Court decides this matter without oral argument pursuant to Rule 78 of the Federal Rules of Civil Procedure. For the reasons set forth below, the Court grants in part and denies in part Defendant's Motion to Dismiss.

## I. BACKGROUND [1]

### A. The Parties

Plaintiff David Zimand is a citizen and resident of the State of New Jersey, who leased and later purchased a 2009 Volksagen ("VW") Jetta Wolfsburg Edition equipped with a 2.0L TSI [2] engine from a VW and Audi authorized dealer, Jack Daniels Motors Inc., in Fairlawn, New Jersey. (Compl. ¶ 18). Additionally, Plaintiff Chris Drake, who is also a citizen and resident of New Jersey, purchased a 2010 VW GTI equipped with a 2.0L TSI engine from an authorized VW dealer. (Compl. ¶ 26).

Also, Plaintiff Jay Melman, who is a citizen and resident of the State of New York, purchased a 2010 VW Tiguan equipped with a 2.0L TSI engine in New York. (Compl. ¶ 24). Additionally, Plaintiff Hamza Deib, another citizen and resident of New York, purchased a 2010 Audi A4 equipped with a 2.0L TFSI [3] engine. (Compl. ¶ 46). Plaintiff Rosario Panepinto, who is also a New York citizen and resident, purchased a 2009 VW Jetta equipped with a 2.0L TSI engine from an authorized VW dealer. (Compl. ¶ 48).

Next, Plaintiff Anoushirvan Nadiri is a citizen and resident of the State of California, who purchased a new 2011 VW GTI equipped with 2.0L TSI engine from an authorized VW dealer. (Compl. ¶ 27). Additionally, Plaintiffs Jennifer Piumarta and William R. Swihart, who are also California citizens and residents, purchased a certified pre-owned 2010 Audi A3 equipped with a 2.0L TFSI engine and a 2009 Audi A4 Avant equipped with a 2.0L TSI engine, respectively, from authorized Audi dealers. (Compl. ¶¶ 28, 29). Furthermore, California citizen and resident Plaintiff Umar Ellahie "entered into a contract for a 2010 Volkswagen CC from Sunnyvale Volkswagen in Sunnyvale, California." (Compl. ¶ 62).

Furthermore, Plaintiff Dawn Stanton Blanchard, who is a Florida citizen and resident, leased a 2011 VW CC equipped with a 2.0L TSI engine from an authorized VW dealer, South Motors Volkswagen, in Miami, Florida. (Compl. ¶ 32). In addition, Plaintiffs Luis F. Lopez and Shimelesse Mekbeb, who are also citizens and residents of Florida, purchased a 2009 A4 Quattro equipped with a 2.0L TFSI engine and a 2009 VW Jetta equipped with a 2.0L TSI engine, respectively. (Compl. ¶¶ 36, 37). Also, Florida citizens and residents Plaintiffs Allison Fleck and William Fleck leased and then purchased a 2012 Volkswagen EOS from Volkswagen of Freehold in Freehold, New Jersey. (Compl. ¶ 65).

**\*2** Further, Plaintiff Rafael Serbia, a citizen and resident of the State of Connecticut, purchased a new 2011 VW GTI equipped with a 2.0L TSI engine from an authorized VW dealer. (Compl. ¶ 31). Another citizen and resident of Connecticut, Plaintiff Karl Molwitz purchased a pre-owned 2009 Volkswagen Tiguan from Danbury Volkswagen in Danbury, Connecticut. (Compl. ¶ 56). Moreover, Plaintiff Allan Gaudet, who is also a citizen and resident of Connecticut, "entered into a contract for a 2011 Volkswagen GTI from Crowley Volkswagen in Plainville, Connecticut." (Compl. ¶ 59).

Illinois citizen and resident Plaintiff Erika Sensnovispurchased a certified pre-owned 2011 Tiguan equipped with a 2.0L TSI engine from an authorized VW

In re Volkswagen Timing Chain Product Liability Litigation, Not Reported in Fed. Supp....
2017 WL 1902160, 92 UCC Rep.Serv.2d 754

dealer. (Compl. ¶ 39). Plaintiff Katrina Calihan, also a citizen and resident of Illinois, purchased a certified pre-owned 2010 Tiguan equipped with a 2.0L TSI engine from an authorized VW dealer. (Compl. ¶ 40).

Next, Plaintiff John Schaffranek, a citizen and resident of the Commonwealth of Pennsylvania, purchased a 2010 VW CC. (Compl. ¶ 53). Also a citizen and resident of Pennsylvania, Plaintiff Jeffery Pipe purchased a new 2009 Audi A4 equipped with a 2.0L TFSI engine from an authorized Audi dealer. (Compl. ¶ 51).

Moreover, Plaintiff Dena Stockalper is a citizen and resident of the State of Arkansas, who purchased a 2012 VW EOS Lux equipped with a 2.0L TSI EA888 engine in Springdale, Arkansas. (Compl. ¶ 22). Next, Plaintiff Hannah LeMoine, who is a citizen and resident of the State of Colorado, purchased a 2010 Audi A3 equipped with a 2.0L TSI engine. (Compl. ¶ 30). Plaintiff Robby Smith, a citizen and resident of the State of Georgia, purchased a certified pre-owned 2010 Audi A4 equipped with a 2.0L TFSI engine from an authorized Audi dealer. (Compl. ¶ 38). Additionally, Plaintiff Garrett Johnson, who is a citizen and resident of Indiana, purchased a 2009 Audi A4 equipped with a 2.0L TFSI engine. (Compl. ¶ 41).

Furthermore, citizen and resident of the State of Kansas, Plaintiff Neel Mody purchased a new 2012 VW Tiguan equipped with a 2.0L TSI engine from an authorized VW dealer. (Compl. ¶ 42). Plaintiff Debra Ann Haggerty, who is a citizen and resident of the State of Michigan, purchased a new 2012 VW CC equipped with a 2.0L TSI engine from an authorized VW dealer. (Compl. ¶ 43). In addition, Plaintiff David Zhao, a citizen and resident of the State of Minnesota, purchased a new 2012 Audi Q5 equipped with a 2.0L TFSI engine from an authorized Audi dealer. (Compl. ¶ 44). Additionally, Plaintiff Suzanne Noyes, a citizen and resident of the State of New Hampshire, purchased a 2012 VW Tiguan equipped with a 2.0L TSI engine. (Compl. ¶ 45).

Next, Plaintiff Jason Hosier is a citizen and resident of the State of Maryland, who purchased a 2010 VW Tiguan equipped with a 2.0L TSI engine from an authorized VW dealer. (Compl. ¶ 47). Additionally, citizen and resident of the State of North Carolina, Plaintiff Debra J. Oles purchased a 2008 VW Passat equipped with a 2.0L TSI engine from an authorized VW dealer. (Compl. ¶ 49). Plaintiff James I. Scott, IV, a citizen and resident of the State of Ohio, purchased a 2011 VW GTI equipped with a 2.0L TSI engine from an

authorized VW dealer. (Compl. ¶ 50). Additionally, Plaintiff Michael A. Borchino, who is a citizen and resident of the State of South Carolina, purchased a new 2012 VW CC equipped with a 2.0L TSI engine from an authorized VW dealer. (Compl. ¶ 52).

Moreover, Plaintiff Pamela K. Kane, a citizen and resident of the State of Texas, purchased a new 2010 Audi A4 equipped with a 2.0L TFSI engine from an authorized Audi dealer. (Compl. ¶ 54). Additionally, citizen and resident of the State of Washington, Plaintiff Zachariah Gossman purchased a 2009 Audi A4 equipped with a 2.0L TFSI engine. (Compl. ¶ 55). Next, Plaintiff Bartosz Zielezinski, who is a citizen and resident of the State of Nevada, purchased a 2012 Audi A5 from AutoNation Volkswagen in Las Vegas, Nevada. (Compl. ¶ 67).

**\*3** Finally, Defendant Volkswagen Aktiengesellschaft ("VWAG") is a German corporation that designs, develops, manufactures, and sells automobiles. (Compl. ¶ 73). VWAG is the parent corporation of Defendants Volkswagen Group of America, Inc. ("VW America") and Audi Aktiengesellschaft ("Audi AG"). (Compl. ¶ 73). Defendant VW America is a New Jersey corporation that acts in the furtherance of the interests of VWAG, which includes the advertising, marketing, and sale of VWAG and VW America (collectively referred to as "VW") automobiles nationwide. (Compl. ¶ 74). Defendant Audi AG is a German corporation that designs, develops, manufactures, and sells luxury automobiles under the Audi brand name. (Compl. ¶ 75). Audi AG is the parent corporation of Audi of America, Inc. ("Audi America"), which is a Delaware corporation that, *inter alia*, advertises, markets, and sells Audi AG and Audi America (collectively referred to as "Audi") automobiles nationwide. (Compl. ¶ 76).

**B. Procedural History**

Plaintiff initially brought this putative class action on May 16, 2016. (ECF No. 1). Thereafter, Plaintiffs filed their "First Consolidated Class Action Complaint" on August 22, 2016, (ECF No. 6), which, as noted above, is currently the operative complaint. Plaintiffs bring this class action against Defendants individually, and on behalf of all persons similarly situated in the United States who purchased, own, owned, lease, or leased a 2008 through 2013 model year 2.0L TSI or 2.0L TFSI VW or Audi vehicle containing the allegedly defective Timing Chain System[4] (the "Class Vehicles"). (*See generally* Compl.). On December 12, 2016, Defendant

Case 1:19-md-02875-RMB-SAK Document 1382-8 Filed 07/12/21 Page 308 of 535 PageID: 32255

In re Volkswagen Timing Chain Product Liability Litigation, Not Reported in Fed. Supp....

2017 WL 1902160, 92 UCC Rep.Serv.2d 754

VW America filed the instant motion to dismiss and compel arbitration of the claims. (ECF No. 36).

### C. Timing Chain Systems

Each Plaintiff either leased or purchased a Class Vehicle manufactured and/or sold by Defendants. (Compl. ¶¶ 79, 80). The Class Vehicles are equipped with 2.0L TSI or 2.0L TFSI EA888 four-cylinder turbocharged gasoline engines, which contain the allegedly defective Timing Chain System. (Compl. ¶ 81, 89).

### a. Engine Mechanics and Components

A "combustion" is required in order for a conventional four-stroke internal combustion engine to function. (Compl. ¶ 87). First, the engine's intake valves open in order to allow fuel and air to enter into the piston combustion chamber. (Compl. ¶¶ 88, 91). The valves then close so that the "rising piston can compress the air and fuel right below the spark plug," which then results in a combustion that drives the piston down. (Compl. ¶ 91). This combustion produces byproducts that must be removed in order for further combustion to occur. (Compl. ¶ 87). Thus, the exhaust valves open so that the "rising piston can expel the combusted air and fuel mixture" resulting from the combustion. (Compl. ¶ 91).

Crucial to the proper operation of the engine is the synchronization of the piston movements with the opening and closing of the intake and exhaust valves. (Compl. ¶¶ 87, 92). Therefore, a timing chain is added to physically connect the crankshaft, which is connected to the pistons, to the camshaft, which opens and closes the valves. (Compl. ¶ 88). If the timing chain system fails, then "synchronization is lost and the four-stroke cycle will be disrupted," which may result in power loss or engine failure. (Compl. ¶ 92).

### b. The Class Vehicles

Here, the 2.0L TSI and 2.0L TFSI both use a double overhead camshaft ("DOHC") configuration with two camshafts connected to the crankshaft by a timing chain. (Compl. ¶ 89). This engine is specifically an interference engine, such that the intake or exhaust valves, when fully open, extend into the area in which the piston travels. (Compl. ¶ 89). Therefore, a stretched, broken, or dislocated timing chain could severely distort the camshaft timing, which could cause the pistons

to collide into the valves, leading to damaged pistons and/or valves. (Compl. ¶ 89). This could cause substantial engine failure, which is expensive to repair or replace. (Compl. ¶ 89).

### D. The Defective Timing Chain System

### a. The Chain Tensioner

**\*4** Plaintiffs claim that the source of the defect in the Timing Chain System is the Hydraulic Tensioner, Camshaft Chain Drive (the "Chain Tensioner"), which keeps the timing chain in proper tension—which is crucial in preventing "jumps"—through oil pressure. (Compl. ¶¶ 96, 97). Since oil pressure is only available when the vehicle is turned on with the engine running, there is little to no oil pressure when the vehicle is turned off or is starting up. (Compl. ¶ 97). Thus, the Chain Tensioner uses a mechanical mechanism during the latter in order to keep the chain tight. (Compl. ¶ 97). This mechanism requires several key components: a steel retainer clip, a piston retainer pin, a ratchet pawl, and piston teeth. (Compl. ¶ 98). According to Plaintiffs, the failure of the ratchet pawl caused the loss of tension on the timing chain, which then allowed the timing chain to "jump a tooth" during start up, causing the bending of intake valves and subsequent engine failure. (Compl. ¶ 99).

Ordinarily, when the engine is running, there is an internal spring that augments oil pressure in order to push a piston against a timing chain tensioning rail, which presses against the timing chain and maintains its tension. (Compl. ¶ 97). When the engine is off and there is no oil pressure to push the piston out, a ratchet pawl is used to prevent the piston from collapsing inward. (Compl. ¶ 100). The piston incorporates ratchet teeth and a retaining clip in order to hold a detached pawl above the piston. (Compl. ¶ 100). If the pawl teeth are broken or worn, or if the retaining clip fails to hold the pawl in position, then the piston will not hold the proper tension on the chain when oil pressure is low. (Compl. ¶ 100). This low tension can cause the chain to "jump a tooth," which may subsequently cause the camshaft to be out of sync with the crankshaft and pistons. (Compl. ¶ 100).

### E. Defendants' Knowledge and Omissions

Plaintiffs claim Defendants knew or should have known of the defect in the Timing Chain Systems and "fraudulently, intentionally, negligently and/or recklessly concealed [the defect] from Plaintiffs and members of the Classes...." (Compl. ¶ 106).

### a. Knowledge

First, Defendants released several technical service bulletins ("TSB") from 2010 to 2012 regarding the timing chain issues with the Class Vehicles. (Compl. ¶¶ 111–122). They specifically described noise coming from the timing chains, difficulty starting engines, and possible damage to the camshaft. (Compl. ¶¶ 112–119). In 2012, a TSB stated that the "[t]iming chain tension may be incorrect due to [the] tensioner," causing skips in the timing chain. (Compl. ¶ 116). At this time, dealers were instructed to repair the Timing Chain System when customers complained of rattling noises after the engine started, issues with the engine not starting, or the "check engine" light being on. (Compl. ¶ 117). Such TSBs were not available publicly and were not disclosed to owners or lessees. (Compl. ¶ 121).

Second, consumer complaints were made to the National Highway Traffic Safety Administration ("NHTSA") regarding failures of the Chain Tensioner that were causing problems with the Timing Chain System. (Compl. ¶¶ 123–125). Several of the consumers experienced sudden and complete engine failure. (Compl. ¶ 125). Plaintiffs assert that Defendants have a duty to identify potential defects in their vehicles, and that the monitoring of NHTSA complaints falls within this duty. (Compl. ¶ 123).

Third, Defendants significantly redesigned the Chain Tensioner in 2012. (Compl. ¶¶ 126–127). Specifically, the ratchet pawl of the earlier Chain Tensioner was accessible from outside the part, and needed an external steel retainer clip to keep its position. (Compl. ¶ 127). The "Redesigned Tensioner" no longer needed the external retainer clip because the grooved tensioner piston and internal clip were placed inside the structure. (Compl. ¶ 127). This change is significant because the earlier Chain Tensioner utilized a sintered metal (type of metal forged by being heated beyond its melting point such that its particles formed a molecular bond), which is weaker than other forged metal. (Compl. ¶¶ 128–129). The sintered metal pawl could no longer function properly after approximately 50,000 miles because its teeth would significantly erode. (Compl. ¶ 129).

**\*5** Additionally, Defendants redesigned the timing chain incorporated by the Timing Chain System. (Compl. ¶ 130). Specifically, the earlier timing chain had "alternating rows of link plate thickness," which may have allowed the chain to stretch, subsequently affecting the Timing Chain System. (Compl. ¶ 130).

Plaintiffs further assert that even if Defendants did not have actual knowledge, they should have at least been put on notice of the Timing Chain System defects following the number of replacement components and revisions. (Compl. ¶ 153). Additionally, Plaintiffs allege that predecessor models of the Class Vehicles used identical Timing Chain System components that were also experiencing premature failure. (Compl. ¶ 153).

### b. Omissions

Not only do Plaintiffs assert that Defendants had knowledge of the Timing Chain System defect, but they also assert that Defendants intentionally concealed this defect from Plaintiffs and other Class Vehicle purchasers and/or lessees. (Compl. ¶ 151).

First, Plaintiffs' omission claims are based on Defendants' representations in the USA Warranty and Maintenance schedules provided with the Class Vehicles that the Timing Chain System is "intended and reasonably expected to last for the useful life of the engine and at least 120,000 miles without the need for repair or replacement." (Compl. ¶ 94). Specifically, several of Defendants' maintenance schedules do not require maintenance of the Timing Chain System within 120,000 to 135,000 miles. (Compl. ¶ 94; *see* Compl. at Exhibits A, B, E, G). Thus, Plaintiffs allege that Defendants set forth incorrect maintenance recommendations in its Class Vehicle owner manuals and concealed these inaccuracies from Class Vehicle owners and/or lessees. (Compl. ¶¶ 143, 158–161, 181).

Next, Plaintiffs allege that Defendants deceived Plaintiffs and other Class Vehicle purchasers and/or lessees by failing to disclose material information regarding the Timing Chain System defects and the impact this would have on future repairs, costs, and reliability. (Compl. ¶ 189). Further, Plaintiffs allege that Defendants concealed their knowledge during the express warranty period in order to shift the costs of repair and replacement to Plaintiffs once the period expired. (Compl. ¶ 151): Even when several of Plaintiffs' Class Vehicles showed signs of premature failure—that only Defendants could identify or know of—within the express warranty period, Defendants did not disclose the existence of the defect. (Compl.¶¶ 139, 141). The express warranty

In re Volkswagen Timing Chain Product Liability Litigation, Not Reported in Fed. Supp....
2017 WL 1902160, 92 UCC Rep.Serv.2d 754

included "bumper to bumper coverage for 3 years or 36,000 miles, whichever occur[red] first," and "a Powertrain Limited Warranty for '5 years or 60,000 miles whichever occur[red] first.' " (Compl. ¶ 9). Moreover, Plaintiffs allege Defendants continued to sell the Class Vehicles containing the defect and refused to fully compensate Plaintiffs who experienced Timing Chain System failures after the expiration of the express warranty. (Compl. ¶ 138). Thus, Plaintiffs assert that they were deprived of the "right to have such defective part replaced for free under the warranty." (Compl. ¶ 189).

Plaintiffs further allege that these material omissions concerning the defective Timing Chain System protected Defendants' corporate profits since Plaintiffs and other members of the putative class would not have purchased the vehicles or would have purchased them at a lower price had they been aware of the defects. (Compl. ¶¶ 192, 193).

## II. LEGAL STANDARD

**\*6** To withstand a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

To determine the sufficiency of a complaint under *Twombly* and *Iqbal* in the Third Circuit, the court must take three steps: first, the court must take note of the elements a plaintiff must plead to state a claim; second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth; finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief. *See Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (citations omitted). "In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the

complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

## III. ANALYSIS

Based on the aforementioned allegations, Plaintiffs brought the within suit seeking to recover damages for the following causes of action, individually and on behalf of the putative class: Count I—Fraud; Count II—Breach of Contract; [5] Count III—Negligent Misrepresentation; Count IV—Breach of Express Warranty; Count V—Breach of Implied Warranty; Count VI—Violation of the Magnuson-Moss Warranty Act; Count VII—Unjust Enrichment. (*See* Compl. at 74–91).

Additionally, each group of Plaintiffs from the various different States have brought putative sub-class actions asserting the following violations of State consumer fraud and/or consumer protection laws: Count VIII—Violation of the New Jersey Consumer Fraud Act; Count IX—Violation of the Arkansas Deceptive Trade Practice Act; Count X—Violation of California's Unfair Competition Law; Count XI —Violation of the California Consumer Legal Remedies Act; Count XII—Violation of the Colorado Consumer Protection Act; Count XIII—Violation of the Connecticut Unfair Trade Practices Act; Count XIV—Violation of the Connecticut Product Liability Act; Count XV—Violation of the Florida Deceptive and Unfair Trade Practices Act; Count XVI— Violation of the Georgia Uniform Deceptive Trade Practices Act; Count XVII—Violation of the Georgia Fair Business Practices Act of 1975; Count XVIII—Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act; Count XIX—Violation of the Indiana Deceptive Consumer Sales Act; Count XX—Violation of the Kansas Consumer Protection Act; Count XXI—Violation of the Maryland Consumer Protection Act; Count XXII—Violations of the Michigan Consumer Protection Act; Count XXIII— Violation of the Minnesota Prevention of Consumer Fraud Act; Count XXIV—Violation of the Minnesota Uniform Deceptive Trade Practices Act; Count XXV—Violation of Minnesota's "Private Attorney General Statute"; Count XXVI —Violation of the Nevada Deceptive Trade Practices Act; Count XXVII—Violation of the New Hampshire Consumer Protection Act; Count XXVIII—Violations of the New York Consumer Protection Act; Count XXIX—Violation of the North Carolina Unfair and Deceptive Trade Practices

2017 WL 1902160, 92 UCC Rep.Serv.2d 754

Act; Count XXX—Violation of the Ohio Consumer Sales Practices Act; Count XXXI—Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law; Count XXXII—Violation of the South Carolina Consumer Unfair Trade Practices Act; Count XXXIII—Violation of the Texas Deceptive Trade Practices-Consumer Protection Act; Count XXXIV—Violation of the Washington Consumer Protection Act. (*See* Compl. at 92–198). The Court discusses each claim separately.

### A. Breach of Contract

**\*7** As noted above (*see* n.5, *supra*), Plaintiffs have collectively abandoned their breach of contract claim. (Pl. Opp. Br. at 41). Accordingly, this claim is hereby dismissed.

### B. Motion to Dismiss and Compel Arbitration

Generally, an agreement to arbitrate a dispute "is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to to submit." *E.M. Diagnostic Sys., Inc. v. Local 169, Intl Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America*, 812 F.2d 91, 94 (3d Cir. 1987)(quoting *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)). The Federal Arbitration Act ("FAA"), applies to arbitration clauses contained in contracts involving matters of interstate commerce. *See* 9 U.S.C. § 2; *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). When a party, whose claims are subject to the FAA, refuses to arbitrate same the district court must decipher whether the claims are arbitrable. *Medtronic Ave, Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44, 54 (3d Cir. 2001)(citing *AT&T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 649 (1986)). "In the absence of any express provision excluding a particular grievance from arbitration, ... only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." *AT&T Technologies*, 475 U.S. at 654 (quotations omitted); *see Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 (3d Cir. 1980)("Before a party to a lawsuit can be ordered to arbitrate and thus be deprived of a day in court, there should be an express, unequivocal agreement to that effect.").

"Federal policy favors arbitration and thus a court resolves doubts about the scope of an arbitration agreement in favor of arbitration." *Medtronic*, 247 F.3d at 55 (citing *Moses H. Cone*, 460 U.S. at 24-25); *Zimmerman*, 783 F. Supp. at 868. The presumption in favor of arbitration guides district courts to refrain from denying a motion to compel arbitration absent certainty that the claims do not fall within the scope of an arbitration clause. *See Medtronic*, 247 F.3d at 55; *Mutual Ben. Life Ins., Co., v. Zimmerman*, 783 F. Supp. 853, 869 (D.N.J. 1992)("There is a presumption of arbitrability in the sense that an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.")(internal citations and quotations omitted). However, "[i]f there is doubt as to whether such an agreement [to arbitrate] exists, the matter, upon a proper and timely demand, should be submitted to a jury." *Par-Knit*, 636 F.2d at 54. In considering a motion to compel arbitration, a court must engage in a two-step analysis: *it must determine first whether there is a valid agreement to arbitrate* and, if so, *whether the specific dispute falls within the scope of said agreement. See Century Indem. Co. v. Certain Underwriters at Lloyd's*, 584 F.3d 513, 523 (3d Cir. 2009)(emphasis added); *Salvadori v. Option One Mtg. Corp.*, 420 F. Supp. 2d 349, 356 (D.N.J. 2006).

**\*8** The Court here finds that, contrary to Defendant VW America's assertion, no agreement to arbitrate exists between the parties. Defendant argues that arbitration must be compelled because the various Plaintiffs entered into purchase and/or lease agreements contained an arbitration clause. (ECF No. 36-1 ("Def. Mov. Br.") at 7-11). Those purchase and/or lease agreements contained the following language:

**"ARBITRATION PROVISION**

**"PLEASE REVIEW-IMPORTANT-AFFECTS YOUR LEGAL RIGHTS**

**"1. EITHER YOU OR WE MAY CHOOSE TO HAVE ANY DISPUTE BETWEEN US DECIDED BY ARBITRATION AND NOT IN COURT OR BY JURY TRIAL.**

**"2. IF A DISPUTE IS ARBITRATED, YOU WILL GIVE UP YOUR RIGHT TO**

2017 WL 1902160, 92 UCC Rep.Serv.2d 754

PARTICIPATE AS A CLASS REPRESENTATIVE
OR CLASS MEMBER ON ANY CLASS
CLAIM YOU MAY HAVE AGAINST US
INCLUDING ANY RIGHT TO CLASS
ARBITRATION OR ANY CONSOLIDATION
OF INDIVIDUAL ARBITRATIONS...."

((Def. Mov. Br. at 7)(quotations and bold in original); *see also* Exhibits A-I annexed to Def. Mov. Br.) This clause, according to Defendant, requires the Court to dismiss the action and compel arbitration consistent with the above law.

However, as Plaintiffs have explained, and as Defendant concedes, Defendant VW America was not a party to these purchase and/or lease agreements. (*See* ECF No. 40 ("Pl. Opp. Br.") at 8-11; ECF No. 42 ("Def. Rep. Br.") at 1-3). Rather, those agreements were entered into by Plaintiffs and the various dealerships from which they purchased and/or leased their vehicles from. (Def. Mov. Br. at 7). Accordingly, Defendant VW America never entered into any agreement with Plaintiffs to arbitrate.

Basic contract law requires parties to be in privity with each other in order for them to enforce the terms of a contract. *See Black's Law Dictionary* (10th ed. 2014), *available at* Westlaw BLACKS (defining privity of contract as "The relationship between the parties to a contract, allowing them to sue each other but preventing a third party from doing so."). Since the parties never personally entered into an agreement with each other, no privity of contract between Plaintiffs and Defendant can be established. The parties concede this point. (*See* Def. Mov. Br. at 10, 31, 37; Pl. Opp. Br. at 9). Hence, without privity of contract between the parties, Defendant VW America cannot enforce the arbitration clause contained within the purchase and/or lease agreements signed by Plaintiffs and the various dealerships. Thus, in accordance with *Century Indem. Co., supra*, there is no valid agreement between the parties that this Court can enforce, and the Motion to Compel Arbitration must be denied.

Defendant VW America also attempts to rely on the doctrine of equitable estoppel in support of its Motion to Compel Arbitration. (*See* Def. Mov. Br. at 12). "[I]n certain situations, a non-signatory to an arbitration agreement may compel a signatory to arbitrate." *EPIX Holdings Corp. v. Marsh & McLennan Cos.*, 410 N.J. Super. 453, 982 A.2d 1194, 1200 (N.J. Super. Ct. App. Div. 2009); *see also E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 195 (3d Cir. 2001)

(noting situations in which non-signatories may be bound by an arbitration clause). The *EPIX* Court noted that "the combination of the requisite nexus of the claim to the contract *together with the integral relationship* between the non-signatory and the other contracting party [is] ... a sufficient basis to invoke estoppel." 982 A.2d at 1202 (emphasis in original).

**\*9** Courts have permitted "non-signatory third party beneficiaries to compel arbitration against signatories of arbitration agreements." *E.I. DuPont, supra* at 195 (citation omitted). For example, the Third Circuit has "bound a signatory to arbitrate with a non-signatory at the non[-]signatory's insistence *because of the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the non[-]signatory's obligations and duties in the contract* ... and [the fact that] the claims were intimately founded in and intertwined with the underlying contract obligations." *E.I. DuPont*, 269 F.3d at 199-200 (internal quotations omitted; alteration in original) (emphasis added). "The distinction between signatories and non-signatories is important to ensure that short of piercing the corporate veil, a court does not ignore the corporate form of a non-signatory based solely on the interrelatedness of the claims alleged." *Id.* at 202.

Here, the doctrine of equitable estoppel does not assist Defendant VW America's assertions that arbitration must be compelled. This is because Defendant VW America can point to no allegations that there was a "close relationship" between the parties. Rather, the allegations in the Complaint indicate the complete opposite. Plaintiffs each purchased and/or leased their vehicle from an authorized car dealership. At the time Plaintiffs acquired their vehicles, they entered into a purchase and/or lease agreement between themselves *and the dealership*. A member of each dealership presented this document. The agreements only contained the dealership's name and the various Plaintiffs' names. Accordingly, there was no relationship, let alone a close one, that supports the application of equitable estoppel in this action. Thus, the Motion to Compel Arbitration must be denied.

### C. Plaintiffs' Complaint Does Not Need to be Dismissed for "Lumping"

Defendant also briefly argues that Plaintiffs' entire complaint should be dismissed for "combin[ing] separate named defendant entities under the name 'Defendants[.]' " (Def.

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 313 of 535
PageID: 32260

In re Volkswagen Timing Chain Product Liability Litigation, Not Reported in Fed. Supp....
2017 WL 1902160, 92 UCC Rep.Serv.2d 754

Mov. Br. at 17). Accordingly, Defendant VW America believes the Complaint should be dismissed for failing to meet the pleading standards set forth under Rules 8 and 9(b) of the Federal Rules of Civil Procedure. (Id.). However, this argument is not persuasive. While Plaintiffs do use the term "Defendants" throughout the Complaint, they also make particularized allegations against each Defendant, including Defendant VW America, separately.

Specifically, as to Defendant VW America, Plaintiffs allege that it is headquartered in the United States and "engages in ... the advertising, marketing and sale of VW automobiles nationwide." (Compl. ¶ 74). Plaintiffs clearly distinguish Defendant VW America form Defendant Audi America by stating that Defendant Audi America is also headquartered in the United States and engages in nearly identical activities that Defendant VW America engages in. (Compl. ¶ 76). The Complaint also explains that both Defendants VW America and Audi America are authorized agents, representatives, servants, employees and/or alter egos of the German parent companies. (Compl. ¶ 77).

The allegations against each entity are clear, and, as Plaintiffs explain, "to the extent Plaintiffs assert common allegations as to [Defendants collectively]," it is because the entities are intertwined through a complex corporate structure. (Pl. Opp. Br. at 18). Plaintiffs cannot be expected to know the exact corporate structure and degree of each Defendant's involvement, at this stage in the litigation and prior to discovery. See Weske v. Samsung Elecs., Am., Inc., 934 F. Supp. 2d 698, 708 (D.N.J. 2013)(holding that Courts should employ a relaxed pleading standard when "specific information is in the exclusive control of the defendant") (citing Craftmatic Sec. Litig v. Kraftsow, 890 F.2d 628, 645 (3d Cir. 1989)).

*10 Moreover, this Court is satisfied that, with the limited information in Plaintiffs' possession, Plaintiffs have made specific allegations as to Defendant VW America. For example, Plaintiff Molowitz asserts his vehicle was impacted by the timing chain issue, that he contacted Defendant VW America regarding same, and that Defendant VW America denied his request for repairs. (Compl. ¶ 58). Plaintiffs also allege that Defendant VW America "acted as [an] authorized agent[ ], representative[ ], servant[ ], [and/or] employee[ ]" of its German parent company, and that Defendant VW America performed activities of "advertising, warranties, warranty repairs, dissemination of technical information and

monitoring the performance of [its] vehicles." (Compl. ¶ 77). Additionally, Plaintiffs make specific allegations regarding Defendant VW America's knowledge of the supposedly faulty timing chain because Defendant "VW America was monitoring warranty claims and Class Vehicle performance in the United States." (Compl. ¶ 136). Moreover, "[c]ertain Plaintiffs were informed by representatives of [Defendant] VW America that" it would not repair the faulty timing chain system because the "failure occurred outside of the express warranty period." (Compl. ¶ 137). Plaintiffs further allege that "Defendants' [collective] knowledge of Class Vehicle defects was derived from warranty claims, claims supervisors, customer complaints and monitoring ofperformance of Class Vehicles by [Defendant] VW America quality assurance employees." (Compl. ¶ 153)(emphasis added). Finally, Plaintiffs have alleged that "Defendant (and particularly the sales and marketing executives at [Defendant] VW America) advertised and otherwise created the reasonable expectation (including but not limited to scheduled class engine maintenance recommendations) that Class Vehicles would last over 120,000 miles or ten years before experiencing Timing Chain System failure." (Compl. ¶ 157)(emphasis added).

The Court finds that these allegations are specific to, and targeted at, Defendant VW America. Thus, while Plaintiffs use the generic term of "Defendants" in their Complaint, they also make particularized allegations regarding Defendant VW America's conduct sufficient to satisfy Rules 8 and 9(b) of the Federal Rules of Civil Procedure. Hence, Defendant VW America's Motion to Dismiss based on "lumping" is hereby denied.

### D. Dismissal for Failure to "Plead Which State's Law Applies" as to Plaintiff's Common Law Counts is Unwarranted

Defendant avers that Plaintiffs' common law claims for fraud, breach of contract,[6] negligent misrepresentation, and unjust enrichment must be dismissed since Plaintiffs have not identified the applicable law for each claim, thereby rendering them "vague." (Def. Mov. Br at 15). Defendant also argues that each Plaintiffs home state has the "most significant relationship," and, according to New Jersey law, each state's laws governing common law claims must be applied to each group of Plaintiffs, based on the state where they reside. (Def. Mov. Br. at 16-17). Indeed, New Jersey's choice of law principles are applicable to this matter since federal courts with diversity jurisdiction must apply the choice of law

principles of the forum state. *See* *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941). However, the Court need not address the choice of law arguments at this juncture.

As Plaintiff correctly notes, the choice of law analysis has routinely been found to be premature at the motion to dismiss phase of a class action law suit, especially when certain discovery is needed to further develop the facts that will be used in the choice of law analysis. *See, e.g.,* *Prudential Ins. Co. of Am. v. Goldman, Sachs & Co.*, No. 12-cv-6590, 2013 WL 1431680, at *5 (D.N.J. Apr. 9, 2013) (choice of law analysis at motion to dismiss premature); *In re Samsung DLP Television Class Action Litig.*, No. 07-cv-2141, 2009 WL 3584352, at *3 (D.N.J. Oct. 27, 2009) (same); *In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46, 55 (D.N.J. 2009) (same); *see also* *Arcand v. Brother Int'l Corp.*, 673 F. Supp. 2d 282, 295 (D.N.J. 2009) (finding that New Jersey's most significant relationship test" requires a fact-sensitive analysis that cannot be performed on a record that consists solely of a complaint and motion to dismiss); *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 541 (D.N.J. 2004) (finding that a choice of law analysis is premature at the motion to dismiss phase).

Further, Defendant has failed to explain how Plaintiffs' common law claims conflict among their home states. Rather, Defendant simply concludes that a conflict exists and therefore the Complaint must be dismissed. Yet, as discussed, the most significant relationship test is a fact-sensitive inquiry. Accordingly, the Court declines to engage in a choice of law analysis at this juncture and Defendant VW America's Motion to Dismiss based on same is hereby denied.

### E. Plaintiffs Have Sufficiently Pled *prima facie* Claims for Breach of Express Warranty

**\*11** Defendant VW America advances five separate arguments as to why Plaintiffs' breach of express warranty claims must be dismissed. First, Defendant VW America argues that no claim can lie for repairs to, or failures of, the Timing Chain System beyond the express warranty period contained in Defendant's New Vehicle Limited Warranty ("NVLW"). (Def. Mov. Br. at 18). Second, Defendant asserts that both the time and mileage terms of the NVLWs were not unconscionable. (Def. Mov. Br. at 19). Third, Defendant avers that the NLVWs do not cover design defects, which,

it claims, is the gravamen of Plaintiffs' claims. (Def. Mov. Br. at 22). Fourth, Defendant claims that Plaintiffs have not pled sufficient facts showing they complied with the NLVWs' notice requirements. (Def. Mov. Br. at 23). Finally, Defendant asserts that four Plaintiffs' express warranty claims are barred by the statute of limitations; specifically those Plaintiffs from Connecticut, New York, Ohio, and Texas. (Def. Mov. Br. at 27). For the following reasons, the Court is unpersuaded by any of these arguments and concludes that Plaintiffs have included sufficient allegations to withstand a motion to dismiss.

First, the Court is satisfied that Plaintiffs have pled sufficient facts to allege that the NVLWs were unconscionable, and therefore the time and mileage limitations argument advanced by Defendant is premature. Indeed, as Plaintiffs note, "[o]ne way Plaintiffs may avoid [the] durational limits of Defendant's warranty is by alleging facts sufficient to show that the warranty is unconscionable." (Pl. Opp. Br. at 21) (citing *Skeen v. BMW of N. Am., LLC*, 2014 WL 283628 *12 (D.N.J. Jan 24, 2014))(compiling cases). The *Skeen* matter is quite similar to this action. There, the Plaintiffs brought a putative class action against BMW asserting that certain MINI Cooper vehicles suffered from "a latent defect in a part of the engine known as the 'timing chain tensioner' which causes the part to fail prematurely." *Skeen, supra* at 1. Those vehicles were subject to "an express warranty of 48 months or 50,000 miles, whichever came first." *Id.* at 1. Plaintiffs there alleged that the warranty period was "not fatal to their warranty claims because Defendants [therein] knew the defects would manifest and manipulated the warranty term to make sure it did not happen until after the warranty term expired." *Id.* at 1.

BMW moved to dismiss the various claims, including the breach of warranty claim asserting that the malfunction occurred after the warranty period expired, and therefore no claim could stand. *Id.* at 1, 4. The Court denied the motion regarding the warranty claim. *Id.* at 4, 15-16. According to the Court, Plaintiffs had sufficiently pled both substantive and procedural unconscionability. *Id.* Specifically, the Court noted that Plaintiffs were in a significantly weaker bargaining position than the manufacturer because the "preprinted" warranty left the purchasers with no meaningful choice in setting the terms of said warranty," and therefore satisfied the procedural unconscionability requirement. *Id.* at 43 (citing *Delta Funding Corp. v. Harris*, 189 N.J. 28, 55 (N.J. Sup. Ct. 2006))(Zazzali, J., concurring in part and dissenting

in part)). Moreover, the Court concluded that substantive unconscionability was also sufficiently pled because plaintiffs alleged that defendant knew the timing chain tensioner would fail and the warranty was manipulated in such a manner so that defendant could avoid paying for it. *Id.* at 41-42. Thus, the Court was satisfied that plaintiffs met the unconscionability pleading standard.

This Court is also satisfied that Plaintiffs have pled both substantive and procedural unconscionability. Substantive unconscionability occurs when "the term is 'excessively disproportionate,' involving an exchange of obligations so one-sided as to shock the court's conscience." *Skeen, supra* at 12. "[P]rocedural unconscionability focuses on the circumstances of the negotiation that produced the contested term," and typically is present when a party has "no meaningful choice" in negotiating the term due to "a gross disparity in bargaining power." *Id.* (quoting *Henderson v. Volvo Cars of North America, LLC*, 2010 WL 2925913, *9 n.6 (D.N.J. Jul. 21, 2010)).

 **\*12** Here, both forms of unconscionability have been pled. Just as in *Skeen*, Plaintiffs have pled that Defendant was well aware of the defect in their vehicles' Timing Chain Systems. (Compl. ¶¶ 2, 5, 11, 110, 256). Plaintiffs further pled that said defect manifests during and/or shortly after the warranty period, but prior to the end of the Class vehicles' useful lives. (Compl. ¶¶ 5, 33, 94, 110, 139-41, 144, 150, 248). Moreover, Plaintiffs allege that Defendant had superior knowledge regarding said defect. (Compl. ¶¶ 11, 107, 110, 122). Additionally, Plaintiffs have pled that they had no meaningful choice in determining the temporal and/or mileage limits of the NLVWs. (Compl. ¶ 162). Finally, Plaintiffs allege that the NLVWs were drafted by Defendant, without any input, let alone meaningful input, from Plaintiffs, that there was a gross disparity in bargaining power in favor of Defendant, the terms of the NLVWs unreasonably favored Defendant, and Defendant was aware of the defect at the time of sale. (Compl. ¶¶ 162-, 165-72, 256).

Based on the above, Plaintiffs have sufficiently pled that the express warranties were unconscionable. It is important to note that this Court is not declaring the NLVWs unconscionable at this time. Rather, at the Motion to Dismiss stage, the Court is merely satisfied that Plaintiffs have alleged sufficient facts to support the assertion that the NLVWs are unconscionable. Should Plaintiffs be able to, through discovery, elicit sufficient evidence to support the

allegations the NLVWs' limitations may not be applicable, and Defendant's defense of this claim based on said limitations would not be viable. Accordingly, and since this is a fact sensitive inquiry, dismissal at this time is inappropriate.

Defendant's next argument in support of dismissal of the express warranty claims is that the NLVWs "cover only repairs to correct 'a manufacturer's defect in material and workmanship.' " (Def. Mov. Br. at 22). In essence, Defendant asserts that the Timing Chain System defect is a "design defect" and therefore is not covered by the NLVWs. (Id.). For this reason, Defendant argues that the express warranty claims must be dismissed.

The Court is not persuaded by this argument either. Courts within this district have refused to apply a distinction between a defect in design and a defect in materials or workmanship at the pleadings stage of litigation. *See Alin v. Am. Honda Motor Co.*, 2010 WL 1372308, at *6 (D.N.J. Mar. 31, 2010)(Hayden, J.)(holding that "where the distinction between defect in design and defect in materials or workmanship is a matter of semantics, and sufficient facts are alleged to assert both, the defendant's characterization of the nature of the claim pre-discovery should not control whether the complaint survives."); *see also Cox v. Chrysler Grp., LLC*, 2015 WL 5771400, at *6 (D.N.J. Sept. 30, 2015)(same). This Court agrees with the *Alin* and *Cox* opinions. Indeed, Plaintiffs' Complaint contains sufficient factual allegations to assert a breach of the warranty, regardless of whether the defect is in design or in manufacturing and workmanship. (Compl. ¶¶ 94-100, 108, 126-29, 201, 251-53).

Moreover, even if the NLVWs only cover design defects, Plaintiffs' allegations specifically point to defects in the materials and/or the workmanship. The Complaint describes how various materials within the Timing Chain System break and/or fail, and how that failure leads to the motor failing in general. (Compl. ¶¶ 94-100). Plaintiffs also make allegations regarding how the material used in the ratchet pawl sintered metal is defective and fails over time. (Compl. ¶¶ 126-29). These allegations were designed to point to specific materials and/or workmanship that contained defects known to Defendant, which by its own admissions and arguments, would be covered by the NLVWs. Accordingly, the Court is satisfied that Plaintiffs have sufficiently pled claims for breach of the NLVWs.

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 316 of 535
PageID: 32263

In re Volkswagen Timing Chain Product Liability Litigation, Not Reported in Fed. Supp....

2017 WL 1902160, 92 UCC Rep.Serv.2d 754

Additionally, Defendant argues that Plaintiffs failed to comply with the notice requirements of the NLVWs, warranting dismissal of their express warranty claims. (Def. Mov. Br. at 23). Defendant asserts that the States of Arkansas, California, Colorado, Connecticut, Florida, Georgia, Illinois, Indiana, Maryland, Michigan, Minnesota, Nevada, New Hampshire, New Jersey, New York, North Carolina, Ohio, South Carolina, Texas, and Washington, and the Commonwealth of Pennsylvania, all have pre-suit notice requirements for breach of warranty claims. (Id.). Defendant avers that not a single Plaintiff has complied with said pre-suit notice requirements, and therefore the claims must be dismissed. (Id. at 23-24).

*13 However, this argument also fails. Defendant's reliance on the Uniform Commercial Code ("UCC") § 2-607 is misplaced. That provision requires a buyer of a product that allegedly breaches an express warranty to provide the *seller* of a product with notice within a reasonable time after the breach is discovered or when the buyer should have discovered said breach. *See* UCC § 2-607(3)(a). However, Defendant here is not the direct seller of the vehicles, but rather the remote manufacturer and/or seller.

Pre-suit notice is not required when the action is brought against a remote manufacturer and/or seller. *See* Strzakowlski v. Gen. Motors Corp., 2005 WL 2001912, *3 (D.N.J. Aug. 16, 2005). There, the Court explained that it "has previously predicted that the New Jersey Supreme Court would not require notice under section 2-607(3)(a) in a case against a *remote manufacturer who was not the immediate seller of a defective product*." *Strzakowlski, supra* at *3 (emphasis added). The Court further held that even if notice was required, notice would be satisfied merely by filing the Complaint. *Id.* at *3. Additionally, Plaintiffs need not give a remote manufacturer and/or seller pre-suit notice in California, Florida, Georgia, Michigan, New Jersey, New York, Ohio, Pennsylvania, and Washington. *See* In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices & Prods. Liab. Litig., 754 F. Supp. 2d 1145, 1180 (C.D. Cal. 2010)(under California law, pre-suit notice excused with respect to remote manufacturer with whom consumer did not deal); *Strzakowlski v. Gen. Motors Corp.*, 2005 WL 2001912, *3 (D.N.J. Aug. 16, 2005)(New Jersey does not require notice to remote manufacturer and, if it did, filing complaint would satisfy notice); In re MyFord Touch Consumer Litig., 46 F. Supp. 3d 936, 975-979 (N.D. Cal 2014)(surveying states: in Florida, notice

not required to manufacturer; in Ohio and Pennsylvania, the filing of a complaint satisfies notice); *In re Bridgestone/ Firestone, Inc. Tires Prods. Liab. Litig.*, 155 F. Supp. 2d 1069, 1109-1110 (S.D. Ind. 2001)(surveying cases: in Pennsylvania, Michigan, New York, and Georgia, the filing of a complaint satisfies notice requirement); *Cats v. Monaco RV, LLC*, 2016 WL 5253204, at *4 (W.D. Wash. Sept. 22, 2016)(the State of Washington does not require notice to remote sellers, and, if required, taking vehicle to dealer for repair satisfied notice). As for Illinois, Indiana, and Minnesota, the notice requirement is satisfied when, as alleged here, the manufacturer is aware of the defect with the goods. *See* In re Rust-Oleum Restore Mktg., Sales Practices & Prods. Liab. Litig., 155 F. Supp. 3d 772, 799-800 (N.D. Ill. 2016) (Ill. law); *Anderson v. Gulf Stream Coach, Inc.*, 662 F.3d 775, 781-82 (7th Cir. 2011) (Ind. law); *Church of the Nativity of Our Lord v. Watpro, Inc.*, 491 N.W.2d 1, 5 (Minn. 1992). Accordingly, the Court concludes that Plaintiffs, in certain circumstances, were not required to provide Defendant with any pre-suit notice, and, in cases where pre-suit notice was required, Plaintiffs satisfied said requirement by simply filing their Complaint. Hence, dismissal on this ground is also unwarranted.

Finally, Defendant argues that a four-year statute of limitations bars any express warranty claims by Plaintiffs from Connecticut, New York, Ohio, and Texas. (Def. Mov. Br. at 27; Def. Rep. Br. at 28-29). Defendant cites to Conn. Gen. Stat. § 42a-2-725(1)-(2); N.Y. U.C.C. Law § 2-725; Ohio Rev. Code § 1302.98; Tex. Bus & Com. Code Ann. § 2.725 in support of this contention. (Def. Mov. Br. at 27). Those statutes impose a four-year statute of limitations for repair and replace warranties, such as the NLVWs. None of these statutes of limitations have a discovery rule. *See* Conn. Gen. Stat. § 42a-2-725(1)-(2); N.Y. U.C.C. Law § 2-725; Ohio Rev. Code § 1302.98; Tex. Bus & Com. Code Ann. § 2.725.

*14 Resolving this argument would require the Court to engage in a choice of law analysis. However, as noted above, this Court will not engage in a choice of law analysis at this juncture. Yet, this does not preclude the Court from rendering a determination, since Plaintiffs have properly alleged grounds for equitable tolling of the statute of limitations. *See* In re Ford Motor Co. E-350 Van Prods. Liab. Litig. (No. II), 2008 WL 4126264, at *17 (D.N.J. Sept. 2, 2008); *Simpson v. Widger*, 311 N.J. Super. 379, 391 (N.J.

In re Volkswagen Timing Chain Product Liability Litigation, Not Reported in Fed. Supp....
2017 WL 1902160, 92 UCC Rep.Serv.2d 754

Super. Ct. App. Div. 1998))("[T]he presence of fraud may toll the running of the statute" for breach of warranty claims).

For fraudulent concealment to toll the statute of limitations a plaintiff must plead "(1) wrongful concealment by the party raising the statute of limitations defense, resulting in (2) plaintiffs failure to discover the operative facts forming the basis of his cause of action during the limitations period (3) despite the exercise of due diligence." Dewey v. Volkswagen AG, 558 F. Supp. 2d 505, 523 (D.N.J. 2008).

The Court is satisfied that Plaintiffs have met all three elements of the above standard. Specifically, Plaintiffs allege that "Defendant[ ] wrongfully and intentionally concealed a defect in the [Timing Chain System] of the Class Vehicles, which can fail at any time." (Compl. ¶ 2). Plaintiffs further allege that Defendant had knowledge of this defect, and, despite this knowledge, Defendant has "never disclosed to Plaintiffs and members of the Classes that the defect exists or that drivers and/or occupants of the Class Vehicles [were] at risk." (Compl. ¶ 5). Additionally, Plaintiffs assert that the Timing Chain System failed far before its useful life expired. (Id.). Accordingly, Plaintiffs allege that Defendant has "wrongfully and intentionally transferred the cost of repair or replacement of the Timing Chain System to Plaintiffs and members of the Classes by fraudulently concealing the existence of the defect, which Defendant [knew would] typically occur after the expiration of the [NLVWs]." (Id.). Moreover, Plaintiffs assert and allege that despite their due diligence, they were incapable of ascertaining the defect, partly due to Defendant's alleged fraudulent concealment. (Compl. ¶¶ 10-12, 14, 106-10, 144-60, 195-202).

While this Court is not concluding that Defendant did in fact fraudulently conceal the defect in the Timing Chain System, it is satisfied that Plaintiffs have sufficiently pled same. Since Plaintiffs have successfully pled fraudulent concealment, the statute of limitations may be equitably tolled. Accordingly, the Court finds that it is inappropriate to dismiss the express warranty claims at this juncture. Defendant may renew this argument at a later point, should discovery tend to indicate that no fraudulent concealment occurred.

### F. Plaintiffs Have Successfully Pled a *prima facie* Cause of Action for a Breach of the Implied Warranty of Merchantability

Similarly, Defendant argues that Plaintiffs' claims for breach of the implied warranty of merchantability must be dismissed for the following reasons: 1) the implied warranties expired prior to the manifestation of the defect and the Class Vehicles are merchantable; 2) "[m]any of Plaintiffs [i]mplied [w]arranty [c]laims [m]ust [b]e [d]ismissed [b]ecause [p]laintiffs [a]re [n]ot in [p]rivity with Defendant[ ];" 3) Plaintiffs did not comply with the pre-suit notice requirements; and 4) certain Plaintiffs are barred by the statute of limitations. (Def. Mov. Br. at 29-36). For the reasons below, the Court disagrees with said arguments and denies Defendant's Motion to Dismiss Plaintiffs' breach of the implied warranty of merchantability claims.

**\*15** Summarily, the Court disposes of arguments three and four, regarding the pre-suit notice and statute of limitations, relatively. This is because the arguments advanced in support of both the pre-suit notice requirements and the statute of limitations are identical to those advanced by Defendant in support of dismissal of the express warranty claims. (Def. Mov. Br. at 34-35, *cf.* Def. Mov. Br. 23-25, 27-29). Accordingly, the above analysis, *supra* at 26-30, is applicable to these arguments. Hence, these arguments are not persuasive and no further analysis is necessary herein.

The implied warranty of merchantability is designed "to protect buyers from loss where the goods purchased are below commercial standards." Altronics of Bethlehem, Inc. v. Repco, Inc., 957 F.2d 1102, 1105 (3d Cir. 1992)(citing Vlases v. Montgomery Ward & Co., 377 F.2d 846, 849 (3d Cir. 1967)). "In order to be merchantable, goods must be 'fit for the ordinary purposes for which such goods are used.' " *Id.* (citation omitted). "[T]o establish a breach of this warranty, a plaintiff must show, among other things, that the product at issue was defective." *Am. Atelier, Inc. v. Materials, Inc.*, 2017 U.S. App. LEXIS 851, *3, 2017 WL 203371 (3d Cir. Jan. 18, 2017)(citing *Altronics, supra* at 1105). "In the context of a car, this warranty is satisfied when the vehicle provides safe and reliable transportation." Greene v. BMW of North Am., 2013 WL 5287314, *2 (D.N.J. Sept. 17, 2013).

Here, despite Defendant's assertion that the Class Vehicles were merchantable, Plaintiffs have successfully pled a *prima facie* claim for breach of the implied warranty of merchantability. The Complaint contains more than sufficient factual allegations regarding the failure of the Timing Chain System, which led to failure of the vehicle in general. For example, Plaintiffs allege that when the Timing Chain System's tensioner failed the timing of the motor's valves was no longer in sync causing various internal components to bend and/or break. (Compl.¶¶ 3, 4, 34, 92). The bending

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 318 of 535
PageID: 32265
In re Volkswagen Timing Chain Product Liability Litigation, Not Reported in Fed. Supp....
2017 WL 1902160, 92 UCC Rep.Serv.2d 754

and/or breaking of said components causes the motor to cease operation. (Id.). When the motor ceased working, the vehicle no longer performed its ordinary commercial purpose of driving. (Id.). Hence, Plaintiffs have sufficiently pled that the vehicles were not merchantable.

Moreover, the latency in manifestation is insufficient to support dismissal at this juncture of this litigation. It is true that implied warranties do not extend beyond the time, or other limitations, of a good's express warranty. *See, e.g.,* *Glass v. BMW of N. Am.*, 2011 U.S. Dist. LEXIS 149199, *49, 2011 WL 6887721 (D.N.J. Dec. 29, 2011); *Suddreth v. Mercedes-Benz, LLC*, 2011 U.S. Dist. LEXIS 126237, *12-13, 2011 WL 5240965 (D.N.J. Oct. 31, 2011). According to Defendant, the breach of the implied warranty of merchantability claim must be dismissed because the defect manifested itself after the NLVWs expired. However, as this Court explained above, Plaintiffs have sufficiently pled unconscionability of the NLVWs, which may result in the inapplicability of the NLVWs' time and mileage limitations. If said limitations are inapplicable, the express warranty claims may still be viable. If the express warranty claims are viable due to the unconscionability of the limitation terms, then the implied warranty claims would remain viable as well, since the prior limitations relied on by Defendant no longer bind Plaintiffs. Accordingly, dismissal of the implied warranty claims pursuant to this argument is also inappropriate.

Finally, Defendant argues that Plaintiffs from California, Connecticut, Florida, Georgia, Illinois, New York, North Carolina, Ohio, and Washington cannot maintain an implied warranty claim because they are not in "vertical privity" with Defendant. (Def. Mov. Br. at 31-34). Indeed, those states require the parties to be in vertical privity with each other in order for a breach of implied warranty claim to lie. *See* *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1023 (9th Cir. 2008); *TD Props., LLC, v. VP Bldgs., Inc.*, 602 F. Supp. 2d 351, 362 (D. Conn. 2009); *Speier-Roche v. Volkswagen Grp. of Am., Inc.*, 2014 U.S. Dist. LEXIS 59991, *21-22, 2014 WL 1745050 (S.D. Fla. Apr. 30, 2014); *Monticello v. Winnebago Indus.*, 369 F. Supp. 2d 1350, 1361 (N.D. Ga. 2005); *Ibarolla v. Nutrex Research, Inc.*, 2012 U.S. Dist. LEXIS 155721, *22, 2012 WL 5381236 (N.D. Ill. Oct. 31, 2012); *In re Scotts EZ Seed Litig.*, 2013 U.S. Dist. LEXIS 73808, *24-25, 2013 WL 2303727 (S.D.N.Y. May 22, 2013); *Kelly v. Ga.-Pac. LLC*, 671 F. Supp.

2d 785, 769 (E.D.N.C. 2009); *Curl v. Volkswagen of Am., Inc.*, 114 Ohio St. 3d 266, 269 (Ohio 2007); *Baughn v. Honda Motor Co.*, 107 Wash.2d 127, 151 (Wash. 1986). [7]

**\*16** However, each of these states provides various exceptions to the vertical privity requirement; the so-called third-party beneficiary exception. [8] California, North Carolina, Florida and Washington all have exceptions to the vertical privity requirement when, as is the case here, the consumer, rather than the dealer, is the ultimate user. *See* *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 983-85 (N.D. Cal. 2014)(acknowledging the third-party beneficiary exception under California and North Carolina law); *Keegan v. Am. Honda Motor Co.*, 838 F. Supp. 2d 929, 947-48 (C.D. Cal. 2012)(stating that in California the purchaser of a vehicle may maintain implied warranty claim against manufacturer when vehicle is purchased from authorized dealership); *Sanchez-Knutson v. Ford Motor Co.*, 52 F. Supp. 3d 1223, 1233-34 (S.D. Fla. 2014)(acknowledging the third-party beneficiary exception under Florida law); *In re MyFord Touch Consumer Litig.*, 2015 WL 5118308, *7 (N.D. Cal. Aug. 31, 2015)(acknowledging the third-party beneficiary exception under Washington law). In Georgia, the vertical privity requirement is satisfied when the manufacturer provides an express warranty, as is the case with Defendant's NLVWs. *See* *Lee v. Mylan, Inc.*, 806 F. Supp. 2d 1320, 1326 (M.D. Ga. 2011). Finally, and similar to Georgia, Illinois' vertical privity requirement is satisfied if the manufacturer provides a written warranty that satisfies the Magnuson-Moss Warranty Act, as, once again, is the case with Defendant's NLVWs. *See* *Rothe v. Maloney Cadillac, Inc.*, 518 N.E.2d 1028, 1030-31 (Ill. 1988); *Szajna v. Gen. Motors Corp.*, 503 N.E.2d 760, 770 (Ill. 1986).

Accordingly, while a party may generally be required to be in vertical privity with its adversary to assert a breach of implied warranty claim in California, Connecticut, Florida, Georgia, Illinois, New York, North Carolina, Ohio, and Washington, Plaintiffs herein are not required to meet said requirement. This is because Plaintiffs from California, North Carolina, Florida and Washington are exempt from said requirement as they were the true consumers of the product, not the dealer. Moreover, those Plaintiffs from Georgia and Illinois are also exempt from the vertical privity requirement since Defendant provided express warranties to Plaintiffs hailing from these

2017 WL 1902160, 92 UCC Rep.Serv.2d 754

states, which absolves Plaintiffs from the vertical privity requirement in those states. Therefore, dismissal of the breach of the implied warranty of merchantability is inappropriate.

### G. Plaintiffs Have Pled a Claim Under the Magnuson-Moss Warranty Act

Defendant does not attack the sufficiency of Plaintiffs' Magnuson-Moss Warranty Act ("MMWA") claim. Rather, Defendant's sole argument in support of dismiss of Plaintiffs' MMWA is premised on its anticipated dismissal of Plaintiffs' express and implied warranty claims. (Def. Mov. Br. at 36). Indeed, a prerequisite to a MMWA claim is adequately pleading a breach of warranty claim. See *Cooper v. Samsung Elecs. Am., Inc.*, 2008 U.S. Dist. LEXIS 75810, *18-19, 2008 WL 4513924 (D.N.J. Sep. 30, 2008). Here, since the Court has determined that Plaintiffs have asserted viable breach of warranty claims, both express and implied, Plaintiffs satisfy the pleading requirement to assert an MMWA claim. Accordingly, the Court will not dismiss Plaintiffs' MMWA claims.

### H. Plaintiffs Have Article III Standing to Bring Common Law Fraud, Statutory Fraud, and Negligent Misrepresentation Claims

According to Defendant, Plaintiffs lack Article III standing to assert claims for common law fraud, statutory fraud, and negligent misrepresentation. (Def. Mov. Br. at 39). Article III standing requires Plaintiffs to allege: 1) an injury in fact; 2) causation; and 3) redressability. See *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Defendant does not challenge that Plaintiffs have pled both an injury in fact and redressability with regards to these claims, nor does it assert that Plaintiffs have insufficiently pled any of the three claims. (See Def. Mov. Br. at 39-41). Rather, Defendant focuses its argument strictly on causation and asserts that these causes of action must be dismissed because Plaintiffs' alleged injuries cannot be "traced" to Defendant. (Id.)(citing *Toll Bros., Inc. v. Twsp. of Readington*, 555 F.3d 131, 142 (3d Cir. 2009)).

 **\*17** The Court is satisfied that Plaintiffs have more than sufficiently pled causation. Plaintiffs point to Defendant's knowledge of the defects in the Timing Chain System and allege that it concealed same. (See, e.g., Compl. ¶¶ 2, 5, 11). As a matter of fact, Plaintiffs allege Defendant acknowledged the issue in their TSBs. (See, e.g., Compl. ¶¶ 2, 111-25). The concealment of this information, Plaintiffs assert, was fraudulent, negligent and the sole reason they

suffered damages in the form of a malfunctioning vehicle and the costs associated with repairing same, as well as higher operation costs due to the inefficiency of the motor. (See, e.g., Compl. ¶¶ 105, 108, 145, 149, 150-58). Hence, the Complaint contains ample allegations of the injury Plaintiffs suffered, and, more importantly, Defendant's role in causing said injury. Therefore, the Court holds that Plaintiffs have Article III standing to bring this action.

### I. Plaintiffs Have Pled Their Common Law Fraud Claims with Particularity

Next, Defendant asserts that, while the 22 different states laws implicated in this action all have different common law fraud pleading standards, they all require that fraud be pled with particularity, and argues that Plaintiffs have failed to meet this heightened pleading standard. (Def. Mov. Br. at 41-42). In making this argument, Defendants advance the following sub-arguments: 1) Plaintiffs failed to plead an actionable misrepresentation; 2) Plaintiffs failed to plead any omission Defendant was under a duty to disclose (based on varying state laws); 3) Plaintiffs cannot maintain a fraud claim because their vehicles outlasted the time and mileage durations in the NLVWs; and 4) certain claims by Plaintiffs are barred by the economic loss doctrine. (Def. Mov. Br at 42-59). For the reasons below, the Court is not persuaded by any of these arguments.

First, the Court disposes of arguments three and four above. Argument three relies on the expiration of the NLVWs. (Def. Mov. Br. at 57). For that argument to succeed, this Court would need to conclude that the time and mileage limitations set forth in the NLVWs are applicable to these Plaintiffs. This is because of the fact that, generally speaking, permitting common law fraud claims beyond the scope of the express warranty would effectively extend the express warranty. See, e.g., *Duffy v. Samsung Elecs. Am., Inc.*, 2007 U.S. Dist. LEXIS 14792, *22-23, 2007 WL 703197 (D.N.J. Mar. 2, 2007); *Noble v. Porsche Cars N. Am., Inc.*, 694 F. Supp. 2d 333, 337-38 (D.N.J. 2010); *Nobile v. Ford Motor Co.*, 2011 U.S. Dist. LEXIS 26766, *15-16, 2011 WL 900119 (D.N.J. Mar. 14, 2011). However, while the Court has not reached the complete opposite conclusion (i.e. that the limitations are not applicable to Plaintiffs), this Court has concluded that Plaintiffs have sufficiently pled that said limitations are potentially unconscionable. Since the Court has reached such a conclusion, the applicability of the NLVWs' limitations remains unknown.

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 320 of 535
PageID: 32267

In re Volkswagen Timing Chain Product Liability Litigation, Not Reported in Fed. Supp....
2017 WL 1902160, 92 UCC Rep.Serv.2d 754

As noted above, should Plaintiffs succeed at proving the alleged unconscionability of the NLVWs' limitations, the warranty period may not be applicable to Plaintiffs. If the limitations are not applicable to Plaintiffs, then their common law fraud claims would no longer be bound to the time and mileage limitations contained therein. Accordingly, the Court will not dismiss said claims based on the time and mileage limitations contained in the NLVWs.

Additionally, the Court will not dismiss the claims pursuant to the economic loss doctrine. Under that doctrine, a plaintiff who is dissatisfied with a product must bring a breach of contract or warranty claim. *See* E. River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 871-72 (1986). Florida, Michigan, New Hampshire, New Jersey, North Carolina, Ohio, Pennsylvania, and South Carolina all extend the economic loss doctrine to fraud based claims, such as those advanced by Plaintiffs here. *See* Burns v. Winnebago Indus., Inc., 2013 U.S. Dist. LEXIS 116377, *9, 2013 WL 4437246 (M.D. Fla. Aug. 16, 2013); Murphy v. P&G, 695 F. Supp. 2d 600, 602 (E.D. Mich. 2010); In re Elk Cross Timbers Decking Mktg., Sales Practices & Prods. Liab. Litig., 2015 U.S. Dist. LEXIS 144790, *73-74, 2015 WL 6467730 (D.N.J. Oct. 26, 2015) (Linares, J.)(applying New Hampshire law); Park v. Inovio Pharms., Inc., 2016 U.S. Dist. LEXIS 24993, *4-6, 2016 WL 796890 (D.N.J. Mar. 1, 2016); Orlando v. Novurania of Am., Inc., 162 F. Supp. 2d 220, 225-26 (S.D.N.Y. 2001); Malone v. Tamko Roofing Prods., 2013 U.S. Dist. LEXIS 145530, *6, 2013 WL 5561628 (W.D.N.C. Oct. 8, 2013); Galoski v. Stanley Black & Decker, Inc., 2015 U.S. Dist. LEXIS 114663, *19-21, 2015 WL 5093443 (N.D. Ohio Aug. 28, 2015); Sabol v. Ford Motor Co., 2015 U.S. Dist. LEXIS 92341, *17, 2015 WL 4378504 (E.D. Pa. July 16, 2015); Sapp v. Ford Motor Co., 687 S.E.2d 47, 49 (S.C. 2009).

**\*18** However, each of these states also have exceptions to the general rule that permit all of Plaintiffs' claims to proceed. New York law does not apply the economic loss doctrine to "claims of misrepresentation and fraud." In re Caterpillar, Inc., C13 & C15 Engine Prods. Liab. Litig., 2015 WL 4591236, *35 (D.N.J. Jul. 29, 2015)(citing Weisblum v. Prophase Labs, Inc., 2015 WL 738112, *12 (S.D.N.Y. Feb. 20, 2015)). New Jersey, Florida, North Carolina, Pennsylvania, New Hampshire, and South Carolina

law also do not apply the economic loss doctrine to fraud based claims when a plaintiff alleges fraudulent inducement or that the defendant violated an extrinsic duty. *See* Smith v. Citimortgage, Inc., 2015 WL 12734793, *7 (D.N.J. Dec. 22, 2015)(Linares, J.)(under New Jersey law, "fraud [based] claims that are extrinsic to the underlying contract, such as for fraudulent inducement, are not" barred by economic loss doctrine); In re MyFord Touch Consumer Litig., 46 F. Supp. 3d 936, 965-67 (N.D. Cal. 2014)(holding that the economic loss doctrine does not bar fraudulent inducement claims under Florida or North Carolina law); Stein v. Fenestra Am., L.L.C., 2010 WL 816346, *4 (E.D. Pa. Mar. 9, 2010)(finding that the economic loss doctrine does not apply under Pennsylvania law where the fraud is "extraneous to the contract"); Wyle v. Lees, 162 N.H. 406, 411 (N.H. 2011)(holding that the economic loss doctrine does not apply to fraudulent inducement); Simons v. Wal-Mart Stores E., L.P., 2013 WL 393998, *5 (D.S.C. Jan. 31, 2013)("The economic loss rule does not bar tort claims where a defendant voluntarily assumes a duty to use due care over and above the duty required by the contract."). Similarly, Michigan and Ohio's economic loss doctrine does not bar fraud claims by consumers who are not in contractual privity with the defendant. *See* Republic Ins. Co. v. Broan Mfg. Co., Inc., 960 F. Supp. 1247, 1249 (E.D. Mich. 1997) (Michigan's economic loss doctrine "has no application outside the commercial realm."); Blackward v. Simplex Prods. Div., 2001 WL 1255924, *3 (Mich. Ct. App. Oct. 19, 2001) ("The economic loss doctrine as adopted in Michigan clearly distinguishes between transactions involving the sale of goods for commercial purposes, where there are economic expectations attached to the purchases, and those involving the sale of defective products which result in losses traditionally remedied by resort to tort law."); Weske v. Samsung Elecs., Am., Inc., 934 F. Supp. 2d 698, 706 (D.N.J. 2013)(find that the economic loss doctrine does not bar negligence claims under Ohio law for claims brought by consumer not in privity with manufacturer); In re MyFord Touch Consumer Litig., 46 F. Supp. 3d 936, 968 (N.D. Cal. 2014) (same).

Here, Plaintiffs' common law fraud claims fall into each their home state's exception to the economic loss doctrine. Plaintiffs' fraud claims are simply exempt from New York's economic loss doctrine. As for the Ohio and Michigan Plaintiffs, their claims also survive since, as established above, the parties were never in privity with

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 321 of 535
PageID: 32268

In re Volkswagen Timing Chain Product Liability Litigation, Not Reported in Fed. Supp....
2017 WL 1902160, 92 UCC Rep.Serv.2d 754

each other. Finally, the New Jersey, Florida, North Carolina, Pennsylvania, New Hampshire, and South Carolina Plaintiffs' fraud claims also survive because they have adequately pled fraud claims based on fraudulent inducement.

Additionally, Plaintiffs have pled actionable misrepresentation. Defendant asserts that "Plaintiffs never allege that Defendants actually made any affirmative misrepresentations that Plaintiffs relied upon regarding the timing chain system or the useful life of the vehicles in the Warranty Manuals or elsewhere." (Def. Mov. Br. at 43). This is simply not true, as Plaintiffs have done exactly this. Specifically, Plaintiffs allege that Defendant's sale and marketing departments advertised and otherwise misrepresented to Plaintiffs that the Class Vehicles would last over 120,000 miles or ten years without needing to service the Timing Chain System. (Compl. ¶¶ 8, 142-43, 156-57). These misrepresentations were made in the NLVWs and Maintenance schedules. (Compl. ¶¶ 83, 94). Plaintiffs further allege that Defendant misrepresented that the NLVWs would cover all defects occurring within the mileage limitations despite the fact that they knew it intended to deny coverage for anything that it deemed a "design defect," without actually ever defining that term. (Compl. ¶¶ 9-10). Additionally, Plaintiffs assert that Defendants misrepresented that the NLVWs would cover all engine parts while knowing that the Timing Chain System would likely fail outside the warranty period and refused to cover same during the warranty period. (Comp. ¶¶ 135-37). Finally, Plaintiffs allege "Defendants misrepresented the that the Timing Chain System failures were the result of other conditions not covered under [the NLVWs]." (Pl. Opp. Br. at 52)(citing Compl. ¶ 149).

These alleged misrepresentations, which, at this point in the litigation the Court must accept as true, were not simply puffery, but actual misstatements of fact. *See* Castle Inc. v. Pennzoil Co., 987 F.2d 939, 946 (3d Cir. 1993). Accordingly, Plaintiffs have successfully pled actionable misrepresentations to support their common law fraud claims.

**\*19** Lastly, Defendant asserts Plaintiffs have failed to plead any omission of information that it had a duty to disclose. (Def. Mov. Br. at 46). According to Defendant, New Jersey, Georgia, Illinois, and South Carolina laws create a duty to disclose only if there is a fiduciary or other special relationship between the parties. (Id.)(citing N. J. Econ. Dev. Auth. v. Pavonia Rest., Inc., 319 N.J. Super. 435, 446 (N.J. Super. Ct. App. Div. 1998); Lilliston v. Regions Bank,

653 S.E.2d 306, 309 (Ga. Ct. App. 2007); Greenberger v. GEICO General Ins. Co., 631 F.3d 392, 401 (7th Cir. 2011) (applying Illinois law); Pitts v. Jackson Nat'l Life Ins. Co., 574 S.E.2d 502, 510 (S.C. Ct. App. 2002)). Defendant further argues that in Arkansas, "plaintiffs and defendants must be in either a fiduciary relationship or in contractual privity for a duty to disclose to attach." (Id.)(citing Perez v. Volkswagen Grp. of Am., 2013 U.S. Dist. LEXIS 54845, *29-30, 2013 WL 1661434 (W.D. Ark. Apr. 17, 2013)). Ohio and Texas laws are similar and also only impose a duty to disclose when there is a fiduciary or special relationship, or when a defendant makes a misleading partial disclosure. *See* Gator Dev. Corp. v. VHH, Ltd., 2009-Ohio-1802, ¶ 28 (Ohio Ct. App. Apr. 17, 2009); Yoon v. Yoo, 2016 U.S. Dist. LEXIS 129268, *8, 2016 WL 4801314 (N.D. Tex. Feb. 24, 2016). Defendant further asserts that arm's-length transactions between a manufacturer and consumer does not give rise to such a relationship and therefore no duty to disclose existed here. (Def. Mov. Br. at 47)(citing Stevenson v. Mazda Motor of Am., Inc., 2015 U.S. Dist. LEXIS 70945, *27, 2015 WL 3487756 (D.N.J. June 2, 2015); Coba v. Ford Motor Co., 2013 U.S. Dist. LEXIS 8366, *37, 2013 WL 244687 (D.N.J. Jan. 22, 2013)). Hence, Defendant concludes that since there is no fiduciary or other special relationship, and, with regards to the Ohio and Texas Plaintiffs, no partial disclosures were made, it had no duty to disclose and the common law fraud claims must be dismissed. (Def. Mov. Br. at 47-49).

However, as Defendant acknowledges (*see* Def. Mov. Br. at 49-55), "the laws of the majority of [Plaintiffs'] home states recognize a duty to disclose where the defendant possesses exclusive or superior knowledge or actively conceals the omitted information."[9] (Pl. Mov. Br. at 46-47 (citing Def. Mov. Br. at 49)); *see also* Song Fi, Inc. v. Google, Inc., 2016 U.S. Dist. LEXIS 45547, *22, 2016 WL 1298999 (N.D. Cal. Apr. 4, 2016); Mallon Oil Co. v. Bowen/Edwards Assocs., Inc., 965 P.2d 105, 111 (Colo. 1998); Bac Home Loans Serv. v. Farina, 2010 Conn. Super. LEXIS 4929, *1-2 (Conn. Super. Ct. June 2, 2010); Mukamal v. GE Capital Corp. (In re Palm Beach Fin. Partners, L.P.), 517 B.R. 310, 335 (Bankr. S.D. Fla. 2013); Fifth Third Bank v. Double Tree Lake Estates, LLC, 2013 U.S. Dist. LEXIS 20234, *21-22 (N.D. Ind. Feb. 12, 2013); Kestrel Holdings I, L.L.C. v. Learjet Inc., 316 F. Supp. 2d 1071, 1078 (D. Kan. 2004); Dean v. Beckley, 2010 U.S. Dist. LEXIS 105007,

In re Volkswagen Timing Chain Product Liability Litigation, Not Reported in Fed. Supp....
2017 WL 1902160, 92 UCC Rep.Serv.2d 754

*16, 2010 WL 3928650 (D. Md. Oct. 1, 2010); *Glidden Co. v. Jandernoa*, 5 F. Supp. 2d 541, 551, 553 (W.D. Mich. 1998); *Graphic Commc'ns.* *Local 1B Health & Welfare Fund "A" v. CVS Caremark Corp.*, 850 N.W.2d 682, 695 (Minn. 2014); *Heldenbrand v. Multipoint Wireless, LLC*, 2012 U.S. Dist. LEXIS 150634, *13-14, 2012 WL 5198479 (D. Nev. Oct. 18, 2012); *King v. Philip Morris, Inc.*, 2000 N.H. Super. LEXIS 5, *26, 2000 WL 34016322 (N.H. Super. Ct. 2000); *Remington Rand Corp. v. Amsterdam-Rotterdam Bank*, N.V., 68 F.3d 1478, 1483-84 (2d Cir. 1995) (applying New York law); *McKee v. James, 2013 NCBC 38*, ¶ 51 (N.C. Super. Ct. 2013); *Gaines v. Krawczyk*, 354 F. Supp. 2d 573, 586 (W.D. Pa. 2004); *White v. Zhou Pei*, 452 S.W.3d 527, 537-38 (Tex. App. 2014); *Lovell v. P.F. Chang's China Bistro, Inc.*, 2015 U.S. Dist. LEXIS 112101, *17-18, 2015 WL 4940371 (W.D. Wash. Mar. 27, 2015) (citation omitted).

Here, Plaintiffs from New York, California, Colorado, Connecticut, Florida, Indiana, Kansas, Michigan, Minnesota, New Hampshire, Maryland, North Carolina, Pennsylvania, Washington and Nevada have all sufficiently pled Defendant's superior knowledge with regards to the defect in the Timing Chain System. Specifically, Plaintiffs point to various pre-production testing, design failure mode analysis, early consumer complaints, warranty data gathered from the various dealerships, consumer complaints to the NHTSA, and Defendant's testing performed in response to consumer complaints in support of the fact that Defendant had superior, and potentially exclusive, knowledge regarding the defect. (Compl. ¶ 107). Plaintiffs have also alleged the presence of various TSBs and Defendant's decision to redesign the Timing Chain System as further proof of its superior knowledge. (Compl. ¶¶ 112-30). Plaintiffs further contend that Defendant took steps in order to conceal the defect in order to shift the cost of repair to Plaintiffs. (Compl. ¶¶ 2, 5, 10, 11-12, 14, 106-07, 110, 121, 144, 146, 149, 151-52, 156-57, 160-61, 189, 191, 193). Indeed, these allegations are sufficient to impose a duty to disclose on Defendant. *See, e.g., Majdipour v. Jaguar Land Rover N. Am., LLC*, 2013 WL 5574626, *17 (D.N.J. Oct. 9, 2013); *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 960 (N.D. Cal. 2014); *Feldman v. Mercedes-Benz USA, LLC*, 2012 WL 6596830, *11 (D.N.J. Dec. 18, 2012). Accordingly, the Court concludes that the New York, California, Colorado, Connecticut, Florida, Indiana, Kansas, Michigan, Minnesota, New Hampshire,

Maryland, North Carolina, Pennsylvania, Washington and Nevada Plaintiffs have sufficiently pled a duty to disclose and the Court will not dismiss their common law fraud claims.

**20** The Court comes to the same conclusion as to the Georgia, Illinois, Ohio, South Carolina, and Texas Plaintiffs. In those jurisdictions, Defendant owed a duty to disclose safety defects. *See, e.g., McCabe v. Daimler AG*, 948 F. Supp. 2d 1347, 1368-70 (N.D. Ga. 2013) (imposing a duty to disclose where "safety defects with gasoline tanks ... could not have been discovered through the exercise of ordinary prudence and caution [by plaintiffs]" and allowing the fraud by omission claims under Georgia and Texas law to proceed); *In re Takata Airbags Prods. Liability Litig.*, No. 15-md-2599, slip op. at 13-14 (S.D. Fla. Sept. 21, 2016) ("South Carolina law does not always require a fiduciary relationship for a duty to disclose to exist") (citing *Fisher v. Pelstring*, 817 F. Supp. 2d 791, 823 (D.S.C. 2011)); *In re Takata Airbags Prods. Liability Litig.*, No. 15-md-2599, slip op. at 11, 15, 21-22 & 31 (S.D. Fla. Oct. 14, 2016) (permitting fraudulent concealment claims to proceed under Ohio, Georgia and Illinois law based on duty to disclose safety defects). Plaintiffs here have specifically pled that the defect in the Timing Chain System created safety concerns, and, despite Defendant's knowledge of the defect and the safety concerns associated with same, Defendant chose not to disclose the defect to Plaintiffs. (Compl. ¶¶ 4, 10). Hence, Defendant had a duty to disclose the safety defect under Georgia, Illinois, Ohio, South Carolina, and Texas law and Plaintiffs claims pursuant to this theory of liability will not be dismissed.

Finally, New Jersey law imposes a duty to disclose when a defendant has made a partial disclosure. *See Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1185 (3d Cir. 1993) ("where a claim for fraud is based on silence or concealment, New Jersey courts will not imply a duty to disclose, unless such disclosure is necessary to make a previous statement true"). Here, Plaintiffs have made allegations with respect to Defendant's partial disclosures regarding the Class Vehicles. Plaintiffs rely on the maintenance schedules which, *inter alia*, identify engine parts and components that require routine maintenance and/or replacement at certain points throughout the lifespan of the vehicle. (Compl. at Exs. A, B). According to Plaintiffs' Complaint, "Defendant represents in the maintenance schedules that the timing belt, which performs the same function as the Timing Chain System, will need service after a certain time but makes no representation that the Timing Chain System will need maintenance." (Pl.

2017 WL 1902160, 92 UCC Rep.Serv.2d 754

Opp. Br. at 51 (citing Compl. ¶ 83)). Accordingly, Plaintiffs have pled that Defendant made partial disclosure regarding the Class Vehicles. Since Defendant allegedly made said partial disclosures, it had a duty to fully disclose any and all information regarding the Timing Chain System to Plaintiffs under New Jersey law. Hence, Plaintiffs have pled a viable claim for common law fraud based on Defendant's duty to disclose under New Jersey law, and dismissal would be inappropriate.

### J. Plaintiffs Have Successfully Pled Claims for Negligent Misrepresentation

First, the parties agree the Arkansas does not recognize negligent misrepresentation claims. (Def. Mov. Br. at 59; Pl. Opp. Br. at n.41). Accordingly, Plaintiffs claim for negligent misrepresentation under Arkansas is hereby dismissed.

Defendant argues that the rest of the negligent misrepresentation claims must be dismissed for three reasons: 1) certain states do not permit a negligent misrepresentation claim to lie absent an express, false statement, and therefore cannot be based on an omission; 2) certain states permit omission claims, but only when there is a special relationship;[10] and 3) aside from Kansas and Texas, the economic loss doctrine bars suit for economic damages based on tort theories. These arguments are unconvincing.

First, negligent misrepresentation may be actionable in New York and Michigan even when the claim is based on an omission. See Williams v. Polgar, 215 N.W.2d 149 (Mich. 1974)(permitting a negligent misrepresentation claim against an abstracter when he or she omits a recorded deed in a title abstract after failing to conduct a reasonable investigation); Gomez-Jimenez v. N.Y. Law Sch., 103 A.D.3d 13, 17-18 (N.Y. App. Div. 2012)("To state a cause of action for fraudulent misrepresentation, a plaintiff must allege a misrepresentation or a material omission of fact"). Hence, the New York and Michigan Plaintiffs may have an actionable claim under the relevant laws of their forum states and dismissing the claim, at this juncture, would not be proper.

*21 Defendant's argument that the negligent misrepresentation claims must be dismissed because there is no special relationship between the parties is equally unpersuasive. This is because, as discussed above, claims based on affirmative misrepresentations and omissions by a vehicle manufacturer may lie when the manufacturer has exclusive or superior knowledge regarding the defect or if

the defect relates to a safety concern. The Court has already concluded that, for purposes of this motion, Defendant, at the very least, had superior knowledge regarding the defect and that the defect here potentially implicates safety concerns. Accordingly, at this point in the litigation, Plaintiffs' claims for negligent misrepresentation by Defendant is sufficient as no special relationship is necessary.

Finally, the economic loss doctrine does not bar Plaintiffs' negligent misrepresentation claims. First, as Plaintiffs note, Defendant concedes that this argument is inapplicable to the Kansas and Texas Plaintiffs, and therefore dismissal of those claims pursuant to this argument is not warranted.[11] Moreover, the remainder of the jurisdictions all have exceptions to the economic loss doctrine. Specifically, those states allow claims to proceed when the tort claim is based on conduct that is either independent of a contract or where there is a risk of personal injury. See, e.g., United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd., 210 F.3d 1207, 1227 (10th Cir. 2000) (discussing Colorado law and the applicability of the economic loss doctrine); HTP, Ltd. v. Lineas Aereas Costarricenses, S.A., 685 So. 2d 1238, 1239 (Fla. 1996); Ulbrich v. Groth, 310 Conn. 375, 406 (Conn. 2013); U.S. Bank, N.A. v. Integrity Land Title Corp., 929 N.E.2d 742, 746 (Ind. 2010); Holloman v. D.R. Horton, Inc., 241 Ga. App. 141, 147-48 (Ga. Ct. App. 1999); In re Chi. Flood Litig., 680 N.E.2d 265, 274-75 (Ill. 1997); Lloyd v. Gen. Motors Corp., 916 A.2d 257, 265-66 (Md. Ct. App. 2007); 80 S. Eighth St. Ltd. P'ship v. Carey-Canada, Inc., 486 N.W.2d 393, 399 (Minn. 1992); Phillips v. Dignified Transition Sols., 2014 WL 4294972, *7 (D. Nev. Aug. 28, 2014); Johnson v. Capital Offset Co., 2013 WL 5406613, *3 (D.N.H. Sept. 25, 2013); Silicon Knights, Inc. v. Epic Games, Inc., 2011 WL 1134453, *6, n.7 (E.D.N.C. Jan. 25, 2011); Nat'l Mulch & Seed, Inc. v. Rexius Forest By-Prods. Inc., 2007 WL 894833, *6 (S.D. Ohio Mar. 22, 2007); Brand Mktg. Grp. LLC v. Intertek Testing Servs., N.A., Inc., 801 F.3d 347, 354 (3d Cir. 2015) (applying Pennsylvania economic loss doctrine); Jackson v. City of Seattle, 244 P.3d 425, 431 (Wash. Ct. App. 2010); Robinson Helicopter Co. v. Dana Corp., 102 P.3d 268, 273 (Cal. 2004). Plaintiffs' negligent misrepresentation claim is independent of any contractual claim. (Compl. ¶ 4; see also n.5 supra). Plaintiffs have also alleged that potential for personal injury in connection with

In re Volkswagen Timing Chain Product Liability Litigation, Not Reported in Fed. Supp....

2017 WL 1902160, 92 UCC Rep.Serv.2d 754

the allegedly defective Timing Chain System. (Compl. ¶ 4). For these reasons, as well as those set forth in Subsection I *supra*, the Court will not dismiss Plaintiffs' negligent misrepresentations claims as being barred by the economic loss doctrine.

### K. Plaintiffs' Have Sufficiently Pled Claims for Unjust Enrichment

Defendant argues that Plaintiffs' unjust enrichment claim should be dismissed because they have an adequate remedy at law. (Def. Mov. Br. at 61)(citing *In re Ford Tailgate Litig*, 2014 U.S. Dist. LEXIS 119769, *12–17, n.3, 2014 WL 3899545 (N.D. Cal. Aug. 8, 2014)). Essentially, Defendant asks this Court to dismiss the unjust enrichment claims because Plaintiffs have asserted other viable, legal remedies.

(Def. Mov. Br. at 62)(citing 🚩 *Ebner v. Fresh, Inc.*, 2016 U.S. App. LEXIS 4875, *17-18, 2016 WL 1056088 (9th Cir. Mar. 17, 2016))(additional citations omitted). This argument is meritless.

**\*22** To assert a *prima facie* cause of action for unjust enrichment a plaintiff must allege that: "(1) at plaintiffs expense (2) defendant received a benefit (3) under circumstances that would make it unjust for defendant to retain the benefit without paying for it." *In re K-Dur*, 338 F. Supp. 2d 517, 544 (D.N.J. 2004)(citing *Restatement of Restitution* § 1 (1937)); *see also* *VRG Corp. v. GKN Realty Corp.*, 135 N.J. 539, 554 (N.J. Sup. Ct. 1994)(stating that a plaintiff seeking to assert a claim for unjust enrichment must establish that "defendant received a benefit[,] and that retention of that benefit without payment would be unjust[,] ... [and plaintiff] expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights."). [12]

Plaintiffs here have sufficiently pled claims for unjust enrichment. Indeed, they claim that Defendant received a benefit at Plaintiffs' expense. Specifically, they allege that Defendant benefited, at Plaintiffs' expense, when they sold Plaintiffs a vehicle that would not operate properly until the end its purported usual lifespan. (Compl. ¶¶ 1, 2, 5, 9-10). Said differently, Plaintiffs allege that they received a vehicle that was inferior to the vehicle they thought they were purchasing, yet the price they paid was the price for a supposedly better functioning vehicle they thought they were

purchasing. Hence, Plaintiffs have pled that Defendant has been unjustly enriched at their expense.

This claim is pled in the alternate to the other claims in the Complaint. (Pl. Opp. Br. at 63). Pursuant to Rule 8(d)(2) of the Federal Rules of Civil Procedure, a party "may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient." Fed. R. Civ. P. 8(d)(2); *see also* *Verizon N.J., Inc. v. Ntegrity Telecontent Servs., inc.*, 219 F. Supp. 2d 616, 635 (D.N.J. 2002). Therefore, Defendant's argument that Plaintiffs' unjust enrichment claims are duplicative fails. For these reasons, the Court concludes that Plaintiffs have pled an alternate *prima facie* causes of action for unjust enrichment, and therefore does not dismiss said claims.

### L. Plaintiffs' Have Sufficient Pled Their Statutory Consumer Fraud Claims

As noted above, Plaintiffs have all brought consumer protection claims pursuant to each Plaintiff's local state laws. According to Defendant, the state law consumer protection claims must be dismissed for the following reasons: 1) all of the claims fail to satisfy Fed. R. Civ. P. 9(b) as they lack particularity; 2) eighteen of the state law claims must be dismissed because they fail to allege practices that are likely to deceive ordinary customers; 3) the Arkansas and New York claims must be dismissed because they fail to plead any injury other than diminution of the value of the vehicles; 4) the Georgia and Indiana claims must be dismissed because those states do not recognize omission based claims; 5) Colorado, Georgia, and South Carolina laws do not recognize classwide claims for damages under their consumer protection statutes; 6) Georgia, California and Minnesota's consumer protection statutes do not allow for monetary damages, only equitable relief; 7) the economic loss doctrine bars the Michigan, New Jersey, North Carolina, and Pennsylvania Plaintiffs' claims; 8) the Connecticut claims must be dismissed because Connecticut's Products Liability Act subsumes all other claims; 9) the New Jersey and California claims must be dismissed because those states will not permit a claim when a component has outlasted its warranty period; 10) the Ohio claim must be dismissed because Defendant was not placed on sufficient notice that its conduct was deceptive or unconscionable; and 11) the Connecticut and New York claims are time barred. (Def. Mov. Br. at 64-79). The Court disagrees with each of these

In re Volkswagen Timing Chain Product Liability Litigation, Not Reported in Fed. Supp....
2017 WL 1902160, 92 UCC Rep.Serv.2d 754

arguments, except for the argument addressing the Ohio claims.

**\*23** First, with regards to the Ohio Consumer Sales Protection Act, Defendant argues that the claim must be dismissed as it was not sufficiently on notice that its conducts was deceptive or otherwise unconscionable as defined by the Act. *See* Ohio Rev. Code § 1345.09(B). Plaintiffs bringing claims under this act "must demonstrate that either (1) the alleged violation is an act or practice that was declares to be deceptive or unconscionable by a rule adopted by the Attorney General before the consumer transaction on which the action is based, or (2) the alleged violation is an act or practice that was determined by a court to violate the [Act] and the court's decision was available for inspection before the transaction took place." *In Re Porsche Cars N. Am., Inc. Plastic Coolant Tubes Prods. Liab. Litig.*, 880 F. Supp. 2d 801, 868 (S.D. Ohio 2012). The Ohio Plaintiffs seemingly concede that they failed to sufficiently plead their claim under the Ohio Consumer Sales Protection Act, and offer to re-plead same. (Pl. Opp. Br. at 72, n.55). Accordingly, the Court dismisses the Ohio Plaintiffs' claims under the Ohio Consumer Sales Protection Act, without prejudice, and with leave to file an amended claim.

Additionally, the Court finds that Defendant is correct that each and every one of the various Plaintiffs' statutory fraud and/or violations of consumer protection laws all sound in fraud and therefore are subject to the heightened pleading standards of Fed. R. Civ. P. 9(b). The Court further finds that Plaintiffs have pled *prima facie* claims of statutory fraud and/or violations of consumer protection laws in accordance with each of their home state laws sufficient to satisfy Rule 9(b). Defendant's entire argument relies on its assertion that Plaintiffs have supposedly failed to plead a misrepresentation by Defendant or that Plaintiffs did not plead facts to support a duty to disclose. The Court disagrees with both of these notions.

As to the duty to disclose, the Court has addressed this argument, *supra*, and has concluded that Plaintiffs' complaint contains sufficient factual allegations to support a duty to disclose claim. Accordingly, the Court adopts the above logic and conclusion. As to the particularity, the Court has discussed, in great detail, how Plaintiffs' Complaint is replete with allegations of both overt misrepresentations and active concealment with respect to the alleged defect in the Timing Chain System. Indeed, Plaintiffs make very specific allegations about how they were supposedly misled about the defective Timing Chain System, along with misrepresentations by Defendant regarding the warranties, the useful life of the vehicle and its engine components, as well as the necessary maintenance and repairs associated with the Class Vehicles. (Compl. ¶¶ 8, 9-10, 94, 135-37, 143, 149, 157, 189-94). These allegations sufficiently place Defendant on notice regarding the specific misconduct that Plaintiffs' assert was fraudulent and deceptive in connection with the statutory fraud and/or violation of consumer protection laws. *See Gotthelf v. Toyota Motor Sales, U.S.A., Inc.*, 2012 WL 1574301, \*15-18 (D.N.J. May 3, 2012)(Linares, J.), *aff'd*, 525 Fed.Appx. 94 (3d Cir. 2013)(recognizing that the purpose of the heightened Rule 9(b) pleading standards in connection with fraud based claims is to assure a defendant is provided with notice of the "precise misconduct with which [it is] charged."). Here, the Court is satisfied that the Complaint contains sufficient allegations regarding the statutory fraud and/or consumer protection claims and meets the heightened pleading standard under Rule 9(b).

Additionally, as noted above, the economic loss doctrine does not bar Plaintiffs' fraud based claims. Those exceptions to the doctrine's applicability extend to statutory fraud and/or consumer protection claims as well. *See, e.g., In re Ford Motor Co. E-350 Van Prods. Liab. Litig. (No. II)*, 2008 WL 4126264, \*29 (D.N.J. Sept. 2, 2008)(compiling cases that refused to dismiss New Jersey Consumer Fraud Act claims pursuant to the economic loss doctrine); *Kantor v. Hiko Energy, LLC*, 100 F. Supp. 3d 421, 429 (E.D. Pa. 2015)(holding that the economic loss rule does not bar a Pennsylvania consumer fraud claim); *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 967 (N.D. Cal. 2014)(applying North Carolina law and holding that "the consumer protection statute here gives rise to a duty independent of the contract and therefore should not be barred by the economic loss rule"); *Safeco Ins. Co. of Am. v. CPI Plastics Grp., Ltd.*, 625 F. Supp. 2d 508, 520 (E.D. Mich. 2008)(finding that Michigan's economic loss doctrine does not apply to consumer transactions). Accordingly, based on this Court's analysis above, as well as the relevant case law, the Court concludes that the economic loss doctrine does not bar the Michigan, New Jersey, North Carolina, and Pennsylvania Plaintiffs' statutory fraud and/or violation of consumer protection law claims.

In re Volkswagen Timing Chain Product Liability Litigation, Not Reported in Fed. Supp....
2017 WL 1902160, 92 UCC Rep.Serv.2d 754

*24 Defendant's argument that the Colorado, Georgia, and South Carolina Plaintiffs' claims must be dismissed because those states do not recognize classwide claims for damages is unpersuasive for two reasons. First, as the parties are aware, the application before the Court is to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6). Defendant does not attack the sufficiency of the class allegations in the Complaint, but rather directs its argument as to whether the action could proceed as a class action in general. Hence, Defendant does not address the sufficiency or insufficiency of the claims it seeks to dismiss.

Moreover, the Supreme Court has addressed this issue and has held that matters may proceed as putative class actions, regardless of whether state statutes prohibit such claims, so long as the application of Fed. R. Civ. P. 23 does not "abridge, enlarge or modify any substantive right." *Shady Grove Othopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 407 (2010)(quoting 28 U.S.C. § 2072(b)). Circuit Courts applying *Shady Grove* have also held that class actions may proceed despite state statutes prohibiting such actions. *See, e.g., In re Hydroxycut Marketing and Sales Practices Litig.*, 299 F.R.D. 648 (S.D. Cal. 2014)(permitting claims under Georgia, South Carolina and other state consumer protection statutes to proceed as class action under Rule 23 where state statutes do not allow class actions); *see also Lisk v. Lumber One Wood Preserving, LLC*, 792 1331 (11th Cir. 2015)(same application for Alabama consumer protection statutes). Hence, the claim may proceed as a class action and any attacks as to whether class certification is appropriate can be raised at the class certification phase.

Defendant also argues that Plaintiffs from Arkansas, California, Colorado, Connecticut, Florida, Georgia, Illinois, Indiana, Maryland, Michigan, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Texas and Washington cannot maintain their claims under the relevant state statutes, because all of those statutes either require a plaintiff to plead subjective reasonable reliance on the alleged deceptive acts or "determine whether a particular practice is deceptive according to its objective tendency to deceive reasonable, ordinary, or average customers." (Def. Mov. Br. at 68)(quotations omitted). Plaintiffs do not disagree with this standard. In support of this argument, Defendant relies on its prior arguments that "Plaintiffs have failed adequately to [*sic*] the existence of, let alone reliance on, misrepresentations,

omissions or other deceptive acts by" Defendant. (Def. Mov. Br. at 69).

However, as the Court explained above, Plaintiffs Complaint sufficiently pleads reliance on Defendant's alleged misrepresentations and/or omissions. This is apparent based on Defendant's alleged superior and/or exclusive knowledge of the defective Timing Chain System as well as the allegations that Defendant actively concealed same from Plaintiffs, and those similarly situated. (Compl. ¶¶ 11, 106-07, 110, 122, 143, 151, 158-61, 181). Plaintiffs further contend that these alleged misrepresentations and/or omissions would mislead purchasers, including Plaintiffs, regarding the useful life of the vehicle, the anticipated cost of repair, and the overall value and quality of the Class Vehicles. (Compl. ¶¶ 156-57, 168-, 193). Thus, for these reasons, as well as those detailed above, the Court is satisfied that Plaintiffs have sufficiently pled that they reasonably relied on Defendant's alleged misrepresentations and/or omissions, and therefore their claims will not be dismissed for this reason.

*25 As to the Arkansas and New York Plaintiffs, Defendant avers that these claims must be dismissed because those Plaintiffs fail to plead any damages other than a diminution of the value of their vehicles. (Def. Mov. Br. at 70). The Court disagrees. Defendant cites to case law from both jurisdictions, yet said law does not support its contention. While the Court in *Wallis v. Ford Motor Company*, 208 S.W.3d 153, 161 (Ark. 2005) did dismiss the claim there, the dismissal was because Plaintiff did not plead any "actual damage or injury," and simply pled an abstract diminution in value. The Arkansas Court noted that "actual damage or injury is sustained when the product has *actually malfunctioned or the defect has manifested itself.*" *Id.* Here, Plaintiffs from Arkansas, as well as the rest of Plaintiffs, have sufficiently pled that the malfunction has already either manifested itself in their vehicles and/or that the vehicles have already malfunctioned. (Compl. ¶ 248). Thus, the Court concludes that the Arkansas Plaintiffs have sufficiently pled their claims under the Arkansas Deceptive Trade Practices Act and the Court declines to dismiss same at this juncture.

Similarly, New York's consumer protection laws are implicated when a "plaintiff [alleges] that a deceptive practice caused him to pay more than the good or service he actually received was worth." *Servedio v. State Farms Ins. Co.*, 889 F. Supp. 2d 450, 453 (E.D.N.Y. 2012), *aff'd*, 531 Fed.Appx. 110 (2d Cir. 2013). The *Servedio* Court held that such allegations "maybe able to satisfy the injury requirement" under New

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 327 of 535
PageID: 32274

In re Volkswagen Timing Chain Product Liability Litigation, Not Reported in Fed. Supp....
2017 WL 1902160, 92 UCC Rep.Serv.2d 754

York law. *Id.* New York Courts have also explained that where a consumer pays an inflated price due to deceptive conduct on behalf of a defendant that "plaintiff might have a claim for the higher price the consumer paid for the product as a result of the misrepresentation." *Small v. Lorillard Tobacco Co., Inc.*, 94 N.Y.2d 43, 56 n.5 (1999). Here, the New York Plaintiffs have sufficiently pled that, based on Defendant's alleged misrepresentations and/or omissions, they were caused to overpay for the supposedly defective Class Vehicles which are purportedly worth less than a defect-free vehicle. (Compl. ¶¶ 15, 183-84, 192-93). Thus, the Court will not dismiss the Arkansas and New York claims based on this argument.

Defendant argues that the Georgia and Indiana claims must be dismissed because those jurisdictions do not recognize omission based claims. (Def. Mov. Br. at 71). This assertion is correct, to the degree that both jurisdictions do not permit statutory consumer fraud claims to proceed merely on allegations of omissions. *See Energy Four, Inc. v. Dornier Med. Systems, Inc.*, 765 F. Supp. 724, 731 (N.D. Ga. 1991)(absent an affirmative representation that is "misleading, partially incorrect, or untrue," the "mere failure to disclose is not actionable."); *Lawson v. Hale*, 902 N.E.2d 267, 274 (Ind. Ct. App. 2009)("Indiana Code section 24-5-0.5-3(a) ... does not apply to nondisclosures."). The Georgia and Indiana Plaintiffs concede the assertion that omission based claims cannot lie in these jurisdictions, but note that they have made allegations of affirmative misrepresentations, which satisfy the pleading requirements of both jurisdictions. (Pl. Opp. Br. at 71-72). Indeed, as detailed above, Plaintiffs' Complaint contains numerous allegations of affirmative misrepresentations. (Compl. ¶¶ 9, 10, 12, 135-37, 143, 149, 156, 157, 362). Those allegations, for example, include affirmative misrepresentations regarding the coverage afforded by the NLVWs, and the useful life of the vehicle. (Compl. ¶¶ 94, 135-37). Thus, the Court is satisfied that the Georgia and Indiana Plaintiffs have pled *prima facie* claims under each their forum state's consumer protection laws.

Defendant further asserts that the California, Georgia, and Minnesota Plaintiffs' consumer fraud claims must be dismissed because those statutes allow for injunctive relief, and those Plaintiffs cannot seek injunctive relief when they have an adequate remedy at law. (Def. Mov. Br. at 72). This argument fails for numerous reasons. First, the Court has explained that Plaintiffs may plead causes of actions in the alternate under Rule 8(d)(2) of the Federal Rules of Civil Procedure. Accordingly, at the very least, these Plaintiffs may sustain these claims in the alternate. Moreover, while these Plaintiffs may ultimately be foreclosed from recovering under these statutes due to the injunctive nature of the relief, that does not necessarily preclude an award of injunctive relief for currently unascertained members of the putative class who may later be identified through discovery. For these reasons, the Court declines to dismiss the California, Georgia, and Minnesota Plaintiffs' statutory consumer fraud claims at this juncture.

**\*26** As to the Connecticut Plaintiffs, Defendant argues that Connecticut's Products Liability Act subsumes any and all other claims stemming from the allegedly defective product. (Def. Mov. Br. at 75)(citing Conn. Gen. Stat. § 52-572m-q). Yet, despite Defendant's assertion that this provision forecloses *all* claims stemming from a defective product, the Connecticut Supreme Court has created exceptions to said blanket rule. *See Gerrity v. R.J. Reynolds Tobacco Co.*, 818 A.2d 769 (Conn. 2003). In *Gerrity*, the Connecticut Supreme Court found that a plaintiff may sustain both a Connecticut Products Liability Act claim along with a Connecticut Unfair Trade Practices Act claim if the Unfair Trade Practices Claim is based on financial injury caused by the allegedly defective product. *Gerrity*, 818 A.2d at 775-76. Here, Plaintiffs have pled financial injury in the form of exacerbated costs of maintenance and repair, as well as increased ownership costs due to inefficiency. (Compl. ¶¶ 151, 189). The Court is satisfied that, at this juncture, Plaintiffs have pled a financial injury and therefore may maintain both a Products Liability claim, as well an Unfair Trade Practices Act, under Connecticut law.

Finally, the Court disagrees with Defendant's assertion that the New York, Connecticut, and Ohio statutory consumer fraud claims are time barred. (Def. Mov. Br. at 78-79). The statute of limitations under both New York and Connecticut law for consumer fraud claims is three years. *See Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1184-85 (N.Y. 2013); Conn. Gen. Stat. § 42-110g. In Ohio, the statute of limitations for such claims is two years. *See Ohio Re. Code. Ann.* § 1345.10(c). All three of these statutes of limitations begin running when the "violation" first occurs. *See Indep. Ins. Serv. Corp. v. Hartford Life Ins. Co.*, 472 F. Supp.2d 183, 190 (D. Conn. 2007)(the "limitation period for [Connecticut Unfair Trade Practices Act] is triggered upon the occurrence of the alleged violation"); *Ohio Rev. Code Ann.* § 1345.10

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 328 of 535
PageID: 32275

In re Volkswagen Timing Chain Product Liability Litigation, Not Reported in Fed. Supp....
2017 WL 1902160, 92 UCC Rep.Serv.2d 754

(an action may not be brought "more than two years after the occurrence of the violation"); *Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1184 (N.Y. 2012) (there must be "successful deception of plaintiffs within three years of the time the action was brought"). Defendant contends that the statute of limitations began each of the Plaintiffs from these forum states purchased their vehicles.

However, as Plaintiffs correctly note, post-sale deceptive conduct is actionable in all three of the venues. *See Marshall v. Hyundai Motor America*, 51 F. Supp. 3d 451 (S.D.N.Y. 2014)(finding that the plaintiff's consumer fraud claims under New York's General Business Law was not time barred due to "post-sale" fraud, specifically, defendant's "fail[ure] to disclose information about the defects in the brake system through adequate warnings or adequate recall notices"); *CSL Silicones Inc. v. Midsun Grp. Inc.*, 170 F. Supp. 3d 304, 312 (D. Conn. 2016) (finding that a "[Connecticut Unfair Trade Practices Act] claim can accrue separately for each discrete illegal act that forms the basis of a [Connecticut Unfair Trade Practices Act] claim"). Here, Plaintiffs Complaint contains sufficient factual allegations regarding Defendant's supposed ongoing deception and

failure to disclose the defect despite having knowledge of same. (Compl. ¶¶ 136, 168-69, 181). Dismissal, without affording Plaintiffs the opportunity to conduct discovery regarding this issue, would be inappropriate. Thus, the Court concludes that Plaintiffs have sufficiently pled these claims at this juncture and declines to dismiss them.

## CONCLUSION

For the aforementioned reasons, Defendant's Motion to Dismiss Plaintiffs' Amended Complaint is hereby granted in part and denied in part. The Court hereby dismisses Count II (Breach of Contract),[13] Count III (Negligent Misrepresentation) *only as to the Arkansas Plaintiffs*,[14] and Count XXX (Violation of the Ohio Sales Practices Act) as to the Ohio Sub-Class.[15] The remainder of Defendant's Motion to Dismiss is hereby denied.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 1902160, 92 UCC Rep.Serv.2d 754

## Footnotes

1    This background is derived from Plaintiffs' First Consolidated Amended Class Action Complaint (ECF No. 6 ("Compl.")), which the Court must accept as true at this stage of the proceedings. *See Alston v. Countrywide Fin. Corp.*, 585 F.3d 753, 758 (3d Cir. 2009).

2    A full description of the TSI engine is contained herein, *infra*.

3    A full description of the TFSI engine is contained herein, *infra*.

4    A full discussion regarding timing chains and the alleged defect that is the subject matter of this action is contained herein, *infra*.

5    Plaintiffs have since abandoned their Breach of Contract Claim. (Pl. Opp. Br. at 41).

6    As discussed in n. 5, *supra*, this claim has been abandoned by Plaintiffs.

7    The Court notes that Defendant is incorrect in its assertion that both Michigan and Nevada law require vertical privity for breach of implied warranty claims. *See Montgomery v. Kraft Foods Glob., Inc.*, 822 F.3d 304, 309 (6th Cir. 2016)(Mich. law); *Pack v. Damon Corp.*, 434 F.3d 810, 818-20 (6th Cir. 2006)(Mich. law); *Hiles Co. v. Johnston Pump of Pasadena, Cal.*, 560 P.2d 154, 157 (Nev. 1977)("[W]e believe that lack of privity between the buyer and manufacturer does not preclude an action against the manufacturer for the recovery of economic losses caused by breach of warranties.").

8    The Court notes that Defendant did not address Plaintiffs' exception arguments in its reply brief. (*See generally* Def. Rep. Br.).

**In re Volkswagen Timing Chain Product Liability Litigation, Not Reported in Fed. Supp....**
2017 WL 1902160, 92 UCC Rep.Serv.2d 754

9     Specifically, this is applicable to Plaintiffs from New York, California, Colorado, Connecticut, Florida, Indiana, Kansas, Michigan, Minnesota, New Hampshire, Maryland, North Carolina, Pennsylvania, Washington and Nevada.

10    Defendant relies on its pervious arguments regarding the lack of a special relationship.

11    The Court notes that Defendant did not advance any argument with regards to Colorado's application of the economic loss doctrine to these claims.

12    The Court notes that there are no material differences between jurisdictions regarding the law of unjust enrichment. Accordingly, the Court analysis same under New Jersey law. *See*  *Tele Aid,* 257 F.R.D. at 58 ("While there are minor variations in the elements of unjust enrichment under the laws of the various states, those differences are not material and do not create an actual conflict.").

13    This Count was voluntarily withdrawn by Plaintiffs.

14    Dismissal of the negligent misrepresentation claims by the Arkansas Plaintiffs was conceded to.

15    The Ohio Plaintiffs shall be permitted to submit an amended pleading addressing the deficiencies set forth herein.

---

**End of Document**          © 2021 Thomson Reuters. No claim to original U.S. Government Works.

TAB 21

*Jepson v. Ticor Title Ins. Co.*, No. C06-1723, 2007 WL 2060856 (W.D. Wash. May 1, 2007)

Jepson v. Ticor Title Ins. Co., Not Reported in F.Supp.2d (2007)

KeyCite Yellow Flag - Negative Treatment

Distinguished by  Gilmore v. First American Title Ins. Co.,   E.D.Mich., September 11, 2009

2007 WL 2060856
Only the Westlaw citation is currently available.
United States District Court, W.D. Washington, at Seattle.

Jeremy JEPSON, on behalf of himself and a class of all others similarly situated, Plaintiff,

v.

TICOR TITLE INSURANCE COMPANY, a foreign corporation, Defendant.

No. C06-1723-JCC.
|
May 1, 2007.

**Attorneys and Law Firms**

Benjamin Schwartzman, Williams & Works, Bainbridge Is, WA, William M. Sweetnam, Freed & Weiss, Chicago, IL, for Plaintiff.

Alina A. McLauchlan, Kimberly Williams Osenbaugh, Thomas E. Kelly, Jr., Kirkpatrick & Lockhart Preston Gates Ellis, Seattle, WA, for Defendant.

ORDER

JOHN C. COUGHENOUR, United States District Judge.

**I. INTRODUCTION**

 *1  This matter comes before the Court on Defendant's Motion to Dismiss Plaintiff's Claims for (1) Violations of Arizona, Idaho, Oregon and New Mexico Law; (2) Violations of Washington Revised Code § 48.29.140; (3) Breach of Contract; and (4) Breach of the Duty of Good Faith and Fair Dealing. (Dkt. No. 6.) Having considered the parties' relevant submissions on the matter and determined that oral argument is unnecessary, the Court rules as follows.

**II. BACKGROUND AND FACTS** [1]
Plaintiff refinanced the mortgage on his home in 2005. (Compl.¶ 30.) His lender (who is not a party to this action) required that he purchase a "lender's" title insurance policy

for his mortgage. (Id.) Generally speaking, title insurance indemnifies the insured against losses associated with defects in the title. As the name implies, the "lender's" policy is an insurance policy in which the lender-not the home buyer-is the beneficiary.

Plaintiff filed the instant lawsuit alleging that he was overcharged for the title insurance policy. Plaintiff personally alleges various contract-related causes of action stemming from an alleged implied contract between the parties (specifically: breach of contact, conversion, unjust enrichment, and breach of the duty of good faith) and that Defendant violated Washington's Insurance Rate Filing Statute, Wash. Rev.Code § 48.29.140, and Washington's Consumer Protection Act (CPA), Wash. Rev.Code §§ 19.86.010-.920. Additionally, Plaintiff purports to represent a class of individuals who suffered similar injuries under the laws of Washington, Idaho, Oregon, New Mexico, and Arizona. (Compl.¶ 17.)

**III. ARTICLE III STANDING**
Defendant argues that Plaintiff lacks standing to assert claims on behalf of residents in other states because he, as Named Plaintiff, has suffered no injury under those laws. Plaintiff does not contest that he personally lacks standing to sue under the laws of the other states, but instead argues that the Court should address the standing issue after class certification, at which point any standing defects will be cured. Defendant argues that the standing question must be addressed now.

While "[o]rdinarily ... any ... Article III court must be sure of its own jurisdiction before getting to the merits," exceptions may be made in class actions where the class certification issues are "logically antecedent" to Article III concerns.  Ortiz v. Fibreboard Corp., 527 U.S. 815, 831, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999) (analyzing the issue of class certification prior to standing in the context of a mandatory global settlement class). The class-certification question is logically antecedent to Article III standing where the standing concerns "would not exist but for the class-action certification."  Amchem Products, Inc. v. Windsor, 521 U.S. 591, 612, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (internal quotations and alterations omitted). In this case, the class-certification issue is logically antecedent because there is no question that the proposed class would have standing to assert non-Washington claims if it were certified. In such cases, "it is possible for ... common issues to predominate and for class certification to be an appropriate mechanism for handling the

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 333 of 535
PageID: 32280
Jepson v. Ticor Title Ins. Co., Not Reported in F.Supp.2d (2002)

dispute." *In re Buspirone Patent Litigation,* 185 F.Supp.2d 363, 377 (S.D.N.Y.2002) (holding that class certification was logically antecedent under *Ortiz* in a class action involving similar claims under a number of different states' laws); *See also In re Relafen Antitrust Litig. .,* 221 F.R.D. 260, 269 (D.Mass.2004); *but see In re Terazosin Hydrochloride Antitrust Litig.;* 160 F.Supp.2d 1365, 1371 (S.D.Fla.2001). It is thus "appropriate to decide class certification before resolving alleged Article III challenges of the present kind." *In re Buspirone Patent Litig.,* 185 F.Supp.2d at 377 (citing *Ortiz,* 527 U.S. at 831).

**\*2** The Ninth Circuit's opinion in *Easter v. American West Financial,* 381 F.3d 948, 962 (9th Cir.2004), is consistent with this result. In *Easter,* the Ninth Circuit held that the named plaintiffs lacked standing to sue certain defendants because they could not trace their injuries to them, even though these defendants had behaved similarly to others who had caused traceable injuries to the named plaintiffs. *Easter v. Am. W. Fin.,* 381 F.3d 948, 956, 962 (9th Cir.2004). In contrast, the Named Plaintiff in this action alleges an injury from this very Defendant and merely purports to represent a class of those similarly injured by this Defendant under analogous laws in other states. Addressing class certification prior to standing in such circumstances is clearly warranted. *See Ortiz,* 527 U.S. at 831. While *Easter* indicates that there is no per se rule that class certification must be considered before standing issues, it does not-and cannot-stand for the proposition that standing always must be considered first. *See id.* [2]

### IV. SUMMARY JUDGMENT

#### A. Standard of Review

*Rule 56 of the Federal Rules of Civil Procedure* states that a party is entitled to summary judgment in its favor "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed.R.Civ.P. 56(c).* In determining whether an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-50, 106 S.Ct. 2505, 91 L.Ed.2d 202

(1986); *Bagdadi v. Nazar,* 84 F.3d 1194, 1197 (9th Cir.1996). A genuine issue of material fact exists where there is sufficient evidence for a reasonable factfinder to find for the nonmoving party. *Anderson,* 477 U.S. at 248. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. The moving party bears the burden of showing that there is no evidence which supports an element essential to the nonmovant's claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant has met this burden, the nonmoving party then must show that there is in fact a genuine issue for trial. *Anderson,* 477 U.S. at 250.

#### B. The § 48.29.140 Claim

Defendant argues that there is no private right of action under Title 48 of the Washington Revised Code and therefore Plaintiff cannot sue under § 48.29.140. The Court agrees.

Washington law is very clear that "[i]n creating the insurance regulatory scheme, the Legislature and the insurance commissioner did not intend to provide protection or remedies for individual interests; they only intended to create a mechanism for regulating the insurance industry." *Pain Diagnostics and Rehabilitation Assoc., P.S. v. Brockman,* 97 Wash.App. 691, 988 P.2d 972, 976 (Wash.Ct.App.1999) (internal citations omitted). "Instead, private causes of action for violations of the insurance statutes and regulations must be brought under the CPA." *Id.* Plaintiff's attempt to manufacture an implied private right of action under § 48.29.140 has no merit in light of this clear precedent.

#### C. The Contract-Based Claims

**\*3** Both parties agree that there was no express contract between Plaintiff and Defendant. (Pl.'s Opp'n 14; Def.'s Reply 6.) The only issue is whether there was an implied contract between the parties.

"Contracts implied in fact are express contracts which arise from the facts and subsequently show a mutual consent and an intention to contract with the other party." *Lynch v. Deaconess Med. Ctr.,* 113 Wash.2d 162, 776 P.2d 681, 683 (Wash.1989) "Like an express contract, *it grows out of the intentions of the parties to the transaction, and there must be*

*a meeting of the minds."* *Trane Co. v. Randolph Plumbing & Heating,* 44 Wash.App. 438, 722 P.2d 1325, 1328-29 (Wash.Ct.App.1986) (emphasis in original, internal citations and quotations omitted).

Defendant argues that there is no implied contract because Plaintiff and Defendant never interacted at all; rather, Defendant only interacted with the lender. (Def.'s Reply 6 ("Jepson instead admits in his Complaint that he interacted exclusively with the lending institution that provided his refinance, never with Ticor. *See* Compl. ¶ 2.").) However, reading the relevant section of Plaintiff's Complaint, the Court does not agree that Plaintiff has made such an admission. (*See* Compl. ¶ 2.) Indeed, Plaintiff specifically alleges "Mr. Jepson consequently *paid to defendant Ticor* a premium for the purchase of a title insurance policy written for $359,650 of coverage" (Compl. ¶ 30 (emphasis added)), which seems to indicate that there was a direct interaction between Plaintiff and Defendant that could, depending on the precise circumstances, demonstrate mutual consent to contract between the parties. *See* *Randleman v. Fidelity Nat. Title Ins. Co.,* 465 F.Supp.2d 812, 818-21 (N.D.Ohio 2006) (denying a title insurance company's motion for summary judgment where a home buyer sufficiently alleged facts from which a reasonable jury could find an implied contract). At this stage, the Court takes the facts in the light most favorable to Plaintiff.[3] Accordingly, the Court finds that Defendant has not met its burden at summary judgment in demonstrating that there is no genuine issue of material fact regarding the existence of a potential implied contract between the parties. Its motion for summary judgment on the contract-related claims is therefore denied.

## V. CONCLUSION

For the foregoing reasons, Defendant's Motion is GRANTED IN PART AND DENIED IN PART. Plaintiff's Claim under § 48.29.140 is hereby DISMISSED. The other claims remain in this action.

SO ORDERED.

## All Citations

Not Reported in F.Supp.2d, 2007 WL 2060856

## Footnotes

[1]    The Court notes Defendant's evidentiary objections regarding the Washington Insurance Commission report (Def.'s Reply 8 (Dkt. No. 9)), and assures the parties that it has considered only admissible evidence for purposes of this order.

[2]    Defendant's conclusory assertion that *Easter* limited *Ortiz* to only those circumstances involving "a mandatory global settlement class" is unpersuasive. *Ortiz* indicated that such sequencing is appropriate when the class certification is logically antecedent to Article III standing issues. The global settlement class at issue in that case was but one instance of such a situation. Defendant provides no reason why it would be the only one.

[3]    Plaintiff is incorrect, however, in stating that the Court must accept his allegation regarding the existence of an implied contract merely because he alleges that there is one. (*See* Pl.'s Opp'n 14.) While the Court must accept Plaintiff's well-plead *factual* allegations as true for summary judgment purposes, it is not bound by Plaintiff's assertions of law. It is only the factual assertions regarding the parties' interactions surrounding the purchase of the title insurance policy that prevents the Court from entering summary judgment on this issue.

End of Document    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

TAB 22

*King v. Bayer Pharm. Corp.*, No. CIV.A. 09-0465, 2009 WL 2135223 (W.D. La. July 13, 2009)

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 337 of 535
PageID: 32284
King v. Bayer Pharmaceuticals Corp., Not Reported in F.Supp.2d (2009)
2009 WL 2135223

2009 WL 2135223
Only the Westlaw citation is currently available.
United States District Court, W.D. Louisiana,
Monroe Division.

Diann KING and Mike King
v.
BAYER PHARMACEUTICALS
CORPORATION, et al.

Civil Action No. 09–0465.
|
July 13, 2009.

West KeySummary

1    Products Liability  🔑 Design
     Products Liability  🔑 Warnings or
     Instructions
     Products Liability  🔑 Drugs in General

A patient stated a claim under the
Louisiana Products Liability Act (LPLA) against
pharmaceutical companies. The patient alleged
that the prescription drug ciprofloxacin was
defective and unreasonably dangerous, both in
design and in inadequate warning. The patient
also alleged that the companies manufactured,
assembled, tested, promoted, and sold the drug.
The patient contended that she suffered injuries
to her feet and ankles as a proximate cause of
the unreasonably dangerous conditions of the
drug. Additionally, the patient alleged that the
defective design of the drug created a foreseeable
risk which exceeded the benefits associated with
the drug's design or formulation. 🚩 LSA–R.S.
9:2800.54.

**Attorneys and Law Firms**

Brian E. Crawford, Crawford & Joyce, Monroe, LA, for
Plaintiffs.

Michael J. Wasicko, Thomas J. Cullen, Jr., Goodell Devries
et al., Baltimore, MD, John F. Olinde, Peter J. Rotolo, III,
Chaffe McCall et al., Terry Christovich Gay, Christovich &
Kearney, Arthur B. Keppel, Charles A. Fitzpatrick, Rawle
& Henderson, Philadelphia, PA, New Orleans, LA, David
Stanley, Kevin G. Lohman, Reed Smith, Los Angeles, CA,
for Defendants.

## JUDGMENT

ROBERT G. JAMES, District Judge.

**\*1**  The Report and Recommendation [Doc. No. 41] of
the Magistrate Judge having been considered, no objections
thereto having been filed, and finding that same is supported
by the law and the record in this matter,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED
that the motions to dismiss [Doc. Nos. 21 & 23]
filed by Defendants Bayer Healthcare Pharmaceuticals,
Inc. ("Bayer") and Schering Corporation ("Schering") are
GRANTED IN PART, and Plaintiffs' claims against Bayer and
Schering for punitive damages, attorney's fees, and all other
claims not arising under the Louisiana Products Liability Act
("LPLA") are DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that the motions to dismiss are
otherwise DENIED.

IT IS FURTHER ORDERED, ADJUDGED, AND
DECREED that Plaintiffs' claims against Apotex Inc. for
punitive damages, attorney's fees, and all other claims not
arising under the LPLA are *sua sponte* DISMISSED WITH
PREJUDICE.

### *REPORT AND RECOMMENDATION*

KAREN L. HAYES, United States Magistrate Judge.

Before the court are two motions to dismiss [doc # 21 &
23] pursuant to 📄 Federal Rule of Civil Procedure 12(b)
(6) filed by Defendants, Bayer Healthcare Pharmaceuticals,
Inc. ("Bayer") and Schering Corporation ("Schering"). The
district court referred the motions to the undersigned
magistrate judge for report and recommendation pursuant
to 📄 28 U.S.C. § 636(b)(1)(B). For the reasons assigned

2009 WL 2135223

below, it is recommended that Defendants' motions to dismiss be GRANTED IN PART, insofar as they seek dismissal of plaintiffs' punitive damages claim and all other claims not arising under the Louisiana Products Liability Act. It is further recommended that the motions to dismiss otherwise be DENIED. In addition, because the same reasoning applies to the claims against the non-moving defendant, Apotex Incorporated, it is recommended that the court dismiss with prejudice Plaintiffs' punitive damage claims and all other claims not arising under the LPLA as to Apotex Incorporated as well.

### BACKGROUND

On March 23, 2009, Plaintiffs, Diann and Mike King, filed the above-captioned suit against Bayer Pharmaceuticals Corporation, Bayer Health Care, LLC, Schering–Plough Corporation, and Apotex Corporation, for damages allegedly sustained as a result of Plaintiff Diann King's using the prescription drug ciprofloxacin, most commonly know by its trade name, Cipro. (Compl.¶¶ 12, 16). King states that "Defendants, [1] by themselves, or by the use of others, did manufacture, create, design, assemble, test, label, sterilize, package, promote, supply, market, sell, advertise, and otherwise distribute in interstate commerce, the prescription drug Cipro." Id. at ¶ 18. King was prescribed Cipro on numerous occasions beginning on or about March 14, 2005 and continuing until May 2008. Id. at ¶ 12. [2] King contends that as a result of her Cipro use, she suffered injuries to both feet and ankles, including a fracture, ligament tears and chronic calcific insertional Achilles tendonitis ("tendonitis") of her right foot and ankle, which have required two surgeries to date. (Compl.¶¶ 14–16).

**\*2** Plaintiffs allege that the Defendants "intentionally, wantonly, fraudulently, recklessly, negligently, grossly negligently, and/or carelessly failed to ascertain and report the existence, nature and extent of the risks of tendon rupture, damage and/or injury associated with Cipro ... and failed to comply with FDA specifications and requirements in the design, manufacturing, and distribution." (Compl.¶¶ 28–29). The complaint sets forth the following counts: (I) negligence; (II) negligent misrepresentation; (III) strict products liability-failure to warn; (IV) strict products liability-defective product; (V) strict products liability-pursuant to Restatement Second of Torts 402a (1965); (VI) breach of express warranty; (VII) breach of implied warranties; (VIII) unjust enrichment; (IX) battery; and (X) loss of consortium. (Compl.¶¶ 30–78).

Plaintiffs seek restitution, compensatory damages, permitted statutory damages, punitive damages, an award of pre-judgment and post-judgment interest, attorney's fees and court costs, as well as any further relief deemed fit. (Compl., Prayer for Relief).

On May 11, 2009, Bayer Healthcare Pharmaceuticals, Inc., along with Schering Corporation, filed the instant Motions to Dismiss Non–LPLA Claims for Failure to state a claim for which relief can be granted. The Defendants contend that the Louisiana Products Liability Act ("LPLA"), Louisiana Revised Statutes Annotated § 9:2800.51 (1988), et seq., serves as Plaintiffs' exclusive remedy against a manufacturer, and that Plaintiffs have not properly alleged any claims under the LPLA; therefore, Defendants argue that Plaintiffs' claims for negligence and negligence per se (Count I), negligent misrepresentation (Count II), strict products liability, including but not limited to strict products liability pursuant to Restatement Second of Torts 402a (1965) (Counts III–V), breach of implied warranties (Count VII), unjust enrichment (Count VIII), battery (Count IX), and Plaintiffs' request for punitive/exemplary damages are outside the permissible scope of the LPLA and should be dismissed. On May 26, 2009, Plaintiffs filed a memorandum in opposition to the motion to dismiss. [doc # 30]. Defendants filed a reply brief on June 4, 2009. [doc # 37].

### 12(b)(6) STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a dismissal is permitted where the claimant fails "to state a claim upon which relief can be granted." If the complaint "lacks an allegation regarding a required element necessary to obtain relief," a dismissal is proper. Borskey v. Meditronics, Inc., No. 94–2302, 1998 WL 122602, at 3 (E.D.La. March 18, 1998) (quoting Blackburn v. City of Marshall, 42 F.3d 925, 931 (5th Cir.1995)).

In evaluating a motion to dismiss, "the District Court must take the factual allegations of the complaint as true and resolve any ambiguities or doubts regarding the sufficiency of the claim in favor of the plaintiff." Fernandez–Montes v. Allied Pilots Ass'n, 987 F.2d 278, 284 (5th Cir.1993). The factual allegations of the complaint "must be enough to raise a right to relief above the speculative level." In re Southern Scrap Material Co., LLC, 541 F.3d 584, 587 (5th Cir.2008)

(quoting 📘 *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Because this court must construe the facts of the complaint to be true, even if doubtful, the plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face," but not necessarily probable. *Id* . "The standard 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary claims or elements." *Id.*[3]

## ANALYSIS

**\*3** Defendants contend that Plaintiffs' claims for negligence, negligent misrepresentation, strict products liability-failure to warn, strict products liability-defective product, strict products liability-pursuant to Restatement Second of Torts 402a (1965), breach of implied warranties, unjust enrichment; and battery are barred pursuant to the Louisiana Products liability Act, which serves to establish the exclusive theories of recovery under products liability. Defendants are correct in their assertions regarding Plaintiffs' non-LPLA claims; however, Plaintiffs' complaint does contain sufficient factual allegations to support valid claims under the Louisiana Products Liability Act.

### a) *LPLA Exclusivity*

Under Louisiana law, the Louisiana Products Liability Act ("LPLA"), Louisiana Revised Statute § 9:2800.51, *et seq.,* provides "the exclusive theories of liability for manufacturers for damage caused by their products. A claimant may not recover from a manufacturer for damage caused by a product on the basis of any theory of liability that is not set forth in [the LPLA]." 📘 La.Rev.Stat. Ann. § 9:2800.52 (1988); *see also,* 📘 *Jefferson v. Lead,* 106 F.3d 1245, 1251 (5th Cir.1997).[4]

Although Plaintiffs argue that their claims fall under the LPLA, Plaintiffs also argue that their negligence, negligence per se, and strict liability claims are viable pursuant to the Federal Food, Drug & Cosmetic Act ("FDCA"), 21 U.S.C.A. § 301, *et seq.* Plaintiffs contend that "a Louisiana State Court should respect Louisiana law, unless there is some federal impediment to application of that law contained in federal legislation." (Opp. Memo. pgs 3–4) (citing 📘 *Brodtmann v. Duke,* 708 So.2d 447 (La.App. 4th Cir.1998)).[5] Plaintiffs argue that, where federal law may apply, the LPLA would supplement their available claims under the FDCA. *Id.* at

pg 4. However, under the *Erie* Doctrine, Louisiana law is appropriate in this situation on the grounds that a federal court sitting in diversity applies state substantive law and federal procedural law. 📘 *Gasperini v. Ctr. for Humanities, Inc.,* 518 U.S. 415, 427, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996); *see also,* 📘 *In re Vioxx Prods. Liab. Litig .,* 478 F.Supp.2d 897, 906 (E.D.La.2007) (applied substantive law of plaintiff's home state in defective drug product case).

Plaintiffs contend that the FDCA allows claims for negligence, negligence per se, strict liability and other theories; however, the court in *Doucet, et al v. Danek Medical, Inc., et al,* held that 'Louisiana does not recognize any claim for violations of FDA regulations. The only remedies available to plaintiffs in this case are provided in the LPLA." *Doucet, et al v. Danek Medical, Inc., et al,* No. 96–2439, 1999 WL 1129648 (W.D.La. June 28, 1999), 1999 U.S. Dist. LEXIS 18889. In another Western District of Louisiana case, *McNeely, et al. v. Danek Medical, Inc., et al.,* No. 94–0655, 1999 WL 1117108 (W.D.La. July 8, 1999), 1999 U.S. Dist. LEXIS 18815, plaintiffs argued that the FDCA preempted the LPLA and allowed them to pursue claims outside of the LPLA. However, the court rejected this argument stating "it is clear that Plaintiff's only recourse ... is to proceed under the LPLA ... Under the LPLA, only four exclusive theories of liability are available to plaintiffs." (Defs.' Reply Mem. pg 3) (*quoting McNeely v. Daneck Medical, Inc.,* No. 94–0655.) The undersigned agrees with the reasoning of these decisions.

**\*4** Accordingly, pursuant to the LPLA, Plaintiffs' claims against Defendants for strict liability, negligence and negligence per se are not viable as independent theories of recovery outside of the LPLA framework. *Jefferson, supra.* The LPLA's exclusivity provision further precludes Plaintiffs' claims for unjust enrichment,[6] breach of implied warranty,[7] and negligent misrepresentation.[8]

### b) *Sufficiency of the LPLA Allegations*

Although Bayer and Schering contend that Plaintiffs have failed to state any viable claims, the factual allegations in Plaintiffs' complaint are sufficient to state claims under the LPLA. To hold a manufacturer liable under the LPLA, a plaintiff must establish: "damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity." 📕 La. R.S. 9:2800.54 A.

The product is unreasonably dangerous if, and only if, the product is: (1) unreasonably dangerous in construction, (2) unreasonably dangerous in design, (3) unreasonably dangerous due to an inadequate warning, or (4) unreasonably dangerous because it does not conform to an express warranty.

La. R.S. 9:2800.54 B. In other words, to state a cause of action under the LPLA, Plaintiff must allege:

1. that the defendant is a manufacturer of the product;

2. that the claimant's damage was proximately caused by a characteristic of the product;

3. that the characteristic made the product unreasonably dangerous in one of the four ways provided in the statute; and

4. That the claimant's damage arose from a reasonably anticipated use of the product by the claimant or someone else.

*Jefferson,* 106 F.3d at 1251.

Here, Plaintiffs specifically allege that Cipro is defective and unreasonably dangerous in design as well as unreasonably dangerous due to an inadequate warning and non-conformance to an express warranty. (Compl.¶¶ 26, 28). Plaintiffs further allege that Defendants "did manufacture, create, design, assemble, test, label, sterilize, package, promote, supply, market, sell, advertise, and otherwise distribute in interstate commerce, the prescription drug Cipro." (Compl.¶ 18). Plaintiffs state that Diann King was prescribed Cipro on numerous occasions and that she used the drug in a reasonably foreseeable manner. *Id.* at ¶ 12. Plaintiffs also contend that they suffered damages as a proximate cause of the unreasonably dangerous conditions of Cipro.

Plaintiffs elaborate by stating that the Defendants failed to provide "proper warnings regarding possible tendon rupture, damage and/or injury associated with the use of Cipro in that the warnings given did not accurately reflect the symptoms, scope or severity of such injuries and health risk." *Id.* at ¶ 45. Plaintiffs further allege that they learned of Cipro's defects via the news media, which stated that the drug had been identified by the Federal Drug Administration as carrying a potential risk for tendon ruptures and related foot injuries. *Id.* at ¶ 17. Plaintiffs also contend that Defendants failed to perform adequate testing and failed to effectively warn users, pharmacists and physicians. *Id.* at ¶¶ 45–46. The complaint continues by alleging defective design, "in that when [Cipro]

left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation, ... [Cipro] was more dangerous than an ordinary consumer would expect, and more dangerous than other similar medications." *Id.* at ¶ 51. Plaintiffs also allege that if proper testing had been completed on the medication, the serious problems would have been revealed prior to its placement in the market; thus, inadequate warnings contribute to Defendants' fault because "they knew or should have known that [Cipro] created a risk of tendon rupture, damage, and/or injury and related conditions and diseases," and even after placing Cipro on the market, the Defendants' failed to provide adequate warnings to users or consumers and continued to promote the medication. *Id.* Plaintiffs continue by alleging that Cipro is unreasonably dangerous, and that at all times, a safer alternative medication existed. *Id.* at ¶¶ 55–56.

*5 Finally, Plaintiffs also allege Cipro is unreasonably dangerous because it does not conform to the express warranty that "Cipro was safe and effective as clinically tested and was of merchantable quality and fit for the use for which the drug was intended." *Id .* at ¶ 63.

Clearly, Plaintiffs' complaint contains the requisite factual allegations to state a claim under the LPLA. Moreover, the factual allegations support claims under the LPLA, even though Plaintiffs' complaint used titles for their claims that fell outside the LPLA. *See, Rathborne v. Rathborne, 683 F.2d 914, 917 (5th Cir.1982)* ("complaint need not correctly categorize the legal theories giving rise to the claims; it must merely allege facts upon which relief can be granted.") (citation omitted). Thus, although some of plaintiffs' claims are barred by the LPLA, plaintiffs' products liability allegations surpass mere speculation and "raise a reasonable expectation that discovery will reveal evidence of the necessary claims or elements." *In re Southern Scrap Material Co., LLC, supra.*

### c) *Punitive Damages and Attorney's Fees*

In their complaint, Plaintiffs assert the right to recover punitive damages and attorney's fees. Under Louisiana law, however, exemplary or punitive damages are not recoverable unless expressly provided for by statute. *Albert v. Farm Bureau Ins., Inc.,* 940 So.2d 620, 622 (La.2006) (citation omitted). [9] Plaintiffs fail to allege either of the two specific circumstances where exemplary damages are allowed under

Louisiana law. *See,* La. Civ.Code Arts. 2315.4 and 2315.7. Plaintiffs' claims for punitive damages should be dismissed.

Similarly, Louisiana law does not allow recovery of attorneys fees except where authorized by statute or contract. *See* La.Code Civ. Proc. Ann. art 1920; *See also, Kinsinger v. Taco Tico, Inc.,* 861 So.2d 669, 671–672 (La.App. 5th Cir.2003); *Smith v. Shirley,* 815 So.2d 980,989 (La.App. 3d Cir.2002). No statute or contract authorizes the recovery of attorney's fees in this case; therefore, dismissal of Plaintiffs' claims for attorney's fees is also warranted on this basis.

#### d) *Apotex Incorporated*

Although Defendant Apotex Incorporated failed to file a similar motion to dismiss, it is recommended that any and all claims against it not arising under the Louisiana Products Liability Act be dismissed as well. The court possesses the inherent authority to dismiss the action *sua sponte,* without motion by a defendant. *McCullough v. Lynaugh,* 835 F.2d 1126, 1127 (5th Cir.1988) (citing *Link v. Wabash R.R. Co.,* 370 U.S. 626, 630–31, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962));

*See also, Spann v. Woods,* 66 F.3d 322, 1995 WL 534901 (5th Cir.1995) (the district court sua sponte dismissed claims under 12(b)(6) although the defendants never filed a motion to dismiss, nor did they plead failure to state a claim in their answer). The Fifth Circuit has held that a "district court may dismiss an action on its own motion under Rule 12(b)(6) 'as long as the procedure employed is fair.' "); *McCoy v. Wade,* 2007 WL 1098738, *1 (W.D.La. Mar.12, 2007) (the report and recommendation itself provides adequate notice to the parties) (citing *Magourik v. Phillips,* 144 F.3d 348, 359 (5th Cir.1998)).

**\*6** For the reasons set forth above,

**IT IS RECOMMENDED** that the motions to dismiss pursuant to Fed .R.Civ.P. 12(b)(6) [doc. # 21 & 23] filed by defendants, Bayer Healthcare Pharmaceuticals, Inc.

and Schering Corporation, be **GRANTED IN PART,** and that judgment be entered in favor of Bayer and Schering **DISMISSING WITH PREJUDICE** Plaintiffs' punitive damages and attorney's fees claims and all other claims not arising under the Louisiana Products Liability Act. **IT IS FURTHER RECOMMENDED** that the motions to dismiss otherwise be **DENIED.**

For the same reasons, **IT IS RECOMMENDED** that judgment be entered in favor of Apotex Incorporated **DISMISSING WITH PREJUDICE** Plaintiffs' punitive damages and attorney's fees claims and all other claims not arising under the LPLA.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and FRCP Rule 72(b), the parties have **ten (10) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objection within **ten (10) business days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED–TO PROPOSED FACTUAL AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 2135223

## Footnotes

1    Plaintiffs originally named Bayer Pharmaceuticals Corporation and Bayer Health Care, LLC; as defendants; however, these entities were the incorrect parties; therefore, on April 22, 2009, Plaintiff filed an Amended Complaint replacing Bayer Pharmaceuticals Corporation and Bayer Health Care, LLC, with the proper

defendant, Bayer Healthcare Pharmaceuticals, Inc., along with the remaining Defendants, Schering Corporation (incorrectly named Schering–Plough Corporation) and Apotex Corporation. (Am. Compl. ¶ 2 [doc. # 11] ). On June 3, 2009, Plaintiffs filed a Second Amended Complaint to correctly identify Apotex Corporation as Apotex Incorporated. (Second Am. Compl. ¶ 5 [doc # 35–1] ).

2   Plaintiff was prescribed Cipro on an "as needed" basis to treat kidney stones and urinary tract infections.

3   Plaintiffs' opposition relies on these contentions as well as the Fifth Circuit's decision in *Rios v. City of Del Rio,* 44 F.3d 417, 420–421 (5th Cir.2006), stating "the complaint must contain either direct allegations on every material point to sustain a recovery or contain allegations from which an inference fairly may be drawn that evidence on these material points will be introduced at trial."

4   Defendants cited numerous cases where the courts rejected theories of recovery that are not enumerated in the LPLA. *See, Lege v. Wal–Mart Louisiana, LLC, et al.,* (W.D.La. Mar. 2, 2009) (dismissing fraud, negligence, false misrepresentations, intent to deceive and gross negligence as outside the LPLA); *Derise v. Origin Medsystems, Inc.,* No. 05–712 (W.D.La. Jan. 24, 2006) (dismissing negligence, failure to properly and adequately test, failure to properly and accurately market, label, package and/ or advertise claims as outside the LPLA); *Bell v. Bayer Corp., et al.,* No. 01–2018, (W.D.La. Sept. 22, 2004) (dismissing claims for negligence, fraud and misrepresentation); *Robinson v. Bayer Corp., et al.,* No. 01–2217 (W.D.La. Dec. 20, 2004) (dismissing negligence, fraud, and misrepresentation claims, pursuant to LPLA); *Barrette v. Dow Agrosciences, L.L.C.,* No. 02–1677, 2002 WL 31365598, at *4 (E.D.La. Oct.18, 2002) (dismissing plaintiff's claims of negligence, strict liability, redhibition, breach of implied warranty, and fraud and misrepresentation).

5   Although Plaintiffs' opposition relies on *Brodtmann,* in that case, the LPLA was applied as a supplement to general maritime law, which is a much more narrow area of law than products liability. Additionally, Plaintiffs rely on *Lavergne v. America's Pizza Co.,* 838 So.2d 845 (La.App. 3d Cir.2003), where the court upheld a claim for negligence against a manufacturer; however, the manufacturer was also the employer of an employee who was found negligent; thus, the manufacturer was held vicariously liable in its capacity as an employer, not as a manufacturer.

6   *See, Hilton v. Atlas Roofing Corp.,* 2006 U.S. Dist. LEXIS 30284, 2006 WL 1581239 (E.D.La. May 17, 2006) (dismissing unjust enrichment claim as precluded by the LPLA).

7   Assuming that Louisiana recognizes a breach of implied warranty claim separate and apart from a redhibition claim. *See, Dawson Farms, LLC v. BASF Corp.,* 2008 U.S. Dist. LEXIS 39826, *7, 2008 WL 2222214 n2 (W.D.La. May 16, 2008).

8   *See, Jefferson,* 106 F.3d at 1251 (dismissing claims for negligence, fraud by misrepresentation, market share liability, breach of implied warranty of fitness, and civil conspiracy); *Grenier v. Medical Eng'g Corp.,* 99 F.Supp.2d 759, 763 (W.D.La.2000) (dismissing claims for strict liability, negligence, breach of warranty of fitness for a particular purpose, breach of implied warranty; misrepresentation/fraud; fraud by concealment; false advertising; negligent infliction of emotional distress; and fear of future product failure), *affirmed,* 243 F.3d 200 (5th Cir .La.2001); and *Ingram v. Bayer Corp.,* 2002 U.S. Dist. LEXIS 10402, 2002 WL 1163613 (E.D.La. May 29, 2002) (dismissing claims for negligence, gross negligence, strict liability, fraud, misrepresentation, concealment, conspiracy, suppression and willful, wanton and reckless conduct)

9   Under Louisiana's Conflict of Laws provisions, the issue of damages (including punitive damages) in a products liability case is governed by the law of Louisiana when, (1) the injury was sustained in Louisiana by a person domiciled or residing in Louisiana; or (2) when the product was acquired in Louisiana and caused injury in Louisiana or injured someone domiciled in this state. La. Civ.Code Art. 3545.

---

**End of Document**                                      © 2021 Thomson Reuters. No claim to original U.S. Government Works.

TAB 23

*Klingenberg v. Vulcan Ladder USA, LLC*, No. 15-CV-4012-KEM, 2018 WL
1248007 (N.D. Iowa Mar. 9, 2018)

2018 WL 1248007, 95 UCC Rep.Serv.2d 300

2018 WL 1248007
United States District Court,
N.D. Iowa, Western Division.

Jeffrey KLINGENBERG and
Jennifer Klingenberg, Plaintiffs,

v.

VULCAN LADDER USA, LLC; and G.P.
International Company, Defendants.

No. 15-CV-4012-KEM
|
Signed 03/09/2018

**Attorneys and Law Firms**

David W. Stamp, Eashaan Vajpeyi, Ball, Kirk & Holm, PC, Waterloo, IA, Janece Valentine, Valentine Law Office, PC, Fort Dodge, IA, for Plaintiffs.

Gregory M. Lederer, Megan Rett Merritt, Lederer Weston Craig PLC, Cedar Rapids, IA, Mark E. Parsky, Paul V. Kaulas, McVey & Parsky LLC, Chicago, IL, for Defendants.

**ORDER**

Kelly K.E. Mahoney, United States Magistrate Judge

*Table of Contents*

*1  *I. BACKGROUND*...——

*II. JUDGMENT AS A MATTER OF LAW*...——
*A. Fournier's Expert Testimony*...——

*B. Statute of Limitations*...——

*C. Sufficiency of the Evidence for Breach of Express Warranty*...——

*D. Inconsistency of the Jury Verdict*...——

*III. NEW TRIAL*...——

*IV. INTEREST AND COSTS*...——

*V. CONCLUSION*...——

This case involves claims brought under Iowa law by Plaintiffs Jeffrey and Jennifer Klingenberg[1] after Jeffrey fell from a ladder in February 2013 and suffered serious injuries. After a four-day trial, the jury returned a verdict in favor of Defendants, Vulcan Ladder USA, LLC (Vulcan) and G.P. International Company (GP International), on the design-defect claim, but in favor of the Klingenbergs on the breach-of-express-warranty claim. The jury awarded the Klingenbergs more than $2.4 million in damages. Defendants now move for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) or, alternatively, for a new trial under Federal Rule of Civil Procedure 59(a)(1)(A). They argue that the Klingenbergs' expert should not have been allowed to testify, that the statute of limitations bars the Klingenbergs' claims against GP International, that no evidence supports the verdict, and that the jury's verdict is inconsistent. They also argue that the great weight of the evidence demonstrates no breach of warranty occurred. I **deny** the motion for judgment as a matter of law and Defendants' alternative request for a new trial (Doc. 128).

**I. BACKGROUND**

On February 22, 2013, while working as a home inspector, Jeffrey fell as he attempted to move from the roof of a house onto a Vulcan-branded ladder, and he suffered serious injuries. He had purchased the ladder from a Menards store in September 2011.

The Klingenbergs initiated this lawsuit on January 26, 2015, by filing a complaint in state court against Vulcan. Doc. 1-2. They alleged, among other things, that Vulcan breached an express warranty based on the ladder's label that its working weight limit was 300 pounds and that Vulcan defectively designed the ladder. *Id.* Vulcan removed the case to federal court on February 26, 2015. Doc. 1. In a disclosure statement filed in accordance with the Local Rules on March 18, 2015, Vulcan stated that GP International, a Chinese corporation, was Vulcan's parent company. Doc. 5.

After conducting some discovery, the Klingenbergs moved on July 24, 2015—the deadline to add parties—for leave to file an amended complaint adding GP International and GP International Co., LLC (GP LLC) as defendants. Docs. 7, 9. The Klingenbergs asserted that they were still not sure of the relationship between the parties and what role the additional defendants had in designing, manufacturing, and distributing the ladder. *Id.* The court granted the motion on August 11,

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 346 of 535
PageID: 32293
Klingenberg v. Vulcan Ladder USA, LLC, Not Reported in Fed. Supp. (2018)
2018 WL 1248007, 95 UCC Rep.Serv.2d 300

2015, and that same day, the Klingenbergs filed an amended complaint setting forth the same claims but adding the two additional defendants. Docs. 10, 11. Vulcan and GP LLC quickly filed answers to the amended complaint (represented by the same attorneys), but the Klingenbergs were unable to serve GP International, and counsel for Vulcan declined to accept service on GP International's behalf. Docs. 14-17, 74 ¶ 12.

**\*2** The case proceeded without GP International. Vulcan and GP LLC filed a *Daubert* motion to exclude the testimony of the Klingenbergs' expert witness, Stephen Fournier. Doc. 26. Vulcan and GP LLC also filed a motion for summary judgment, largely based on the assumption that the Klingenbergs' expert testimony would be excluded. Doc. 25. The court [2] granted summary judgment to Vulcan and GP LLC on the Klingenbergs' manufacturing-defect claim but denied the *Daubert* motion and allowed the rest of the Klingenbergs' claims to proceed. Doc. 39.

On May 30, 2017, having exhausted the requirements for service under the Hague Convention to no avail, the Klingenbergs moved for default judgment against GP International. Doc. 56. Two weeks later, the motion became moot when the attorneys for Vulcan and GP LLC entered their appearance on GP International's behalf and filed GP International's answer. Docs. 57-59, 63. GP International's answer set forth the same boilerplate affirmative defenses that had been in Vulcan's and GP LLC's answers, including a statute-of-limitations defense, and added a defense based on lack of personal jurisdiction. *See* Docs. 4, 14, 17, 58. GP International also filed a disclosure statement as required by the Local Rules, stating that no entities were related to it as a parent, subsidiary, or otherwise and that no other entities had a direct or indirect pecuniary interest in the outcome of the case. Doc. 61. GP LLC filed the same disclosure statement, as did Vulcan, amending (without explanation) its earlier disclosure statement that had represented GP International was its parent company. Docs. 60, 62. The court allowed the Klingenbergs to conduct additional discovery in the form of depositions to try to discern the relationship between the three defendants. Docs. 74, 83. After the additional discovery, the parties agreed to the dismissal of GP LLC as a defendant and to stipulate that the ladder was designed and distributed by Vulcan and manufactured and sold by GP International. Docs. 99, 107, 113 at 18. They also agreed not to use the additional discovery at trial. Doc. 99.

The court held a final pretrial conference on September 11, 2017 (before the additional discovery had been conducted). Doc. 92. The parties discussed with the court the foreseeable issues for trial, and the court entered a final pretrial order. Defendants made no mention of a potential statute-of-limitations defense, and this defense was not included as a potential issue for trial in the final pretrial order (even though the final pretrial order does note "Defendants will argue at the close of Plaintiffs' case[-]in[-]chief that ... [GP International] should be dismissed" based on a lack of evidence that it designed and distributed the ladder). Docs. 93, 102.

The parties submitted joint proposed jury instructions. Doc. 86. They requested the model Iowa instructions for design-defect claims and breach-of-express-warranty claims. *Id.* Defendants also proposed the following instruction related to the alternative-design element of the design-defect claim:

> [T]he Court has instructed you to consider "the technological feasibility" of the alternative design. This is also known as "state of the art." Whether or not a reasonable alternative design existed must be tested by what was technologically available at the time of sale, as opposed to what has developed since that time.

**\*3** The Defendants contend that the rail bracing design of the ... ladder was, at the time of sale, state of the art. You have received evidence regarding the [American National Standards Institute (ANSI) ] A14.2 Standard and [Occupational Safety and Health Administration (OSHA) ] 1926.1053 Regulation. Those standards and regulations required this ladder to withstand a thousand pound load when fully extended at 75° in the "straight" configuration when a single locking pin (or "J" hook) is engaged. The evidence in this case is uncontroverted that this model of Vulcan ladders met the ANSI testing requirements.

You may consider such evidence in determining whether or not the [ladder] rail bracing design met the state of the art.

Doc. 86 at 12. The Klingenbergs objected that this instruction was based on a withdrawn model Iowa instruction that now stated under " *Wright v. Brooke Group, Ltd.*, 652 N.W.2d 159 (Iowa 2002)[,] ... 'State of the Art' [is] an element of plaintiff's proof in product liability cases, but remains an affirmative defense under Iowa Code section 668.12." Doc. 86 at 12.

The court submitted proposed jury instructions on September 15, 2017, and included instructions only on the design-defect

claim because both sides' model verdict forms contained only that claim. Docs. 88, 89, 94-1. Neither did the court include Defendants' proposed state-of-the-art instruction. Doc. 94-1. The court instructed the parties to file any objections to the jury instructions by 5:00 p.m. on September 20, 2017, or the objection would be deemed waived. Doc. 94. The Klingenbergs objected, requesting instructions on additional claims. Doc. 96. Defendants filed no response. The court filed revised proposed jury instructions on September 21, 2017, which included instructions on breach of express warranty, and ordered the parties to respond by 5:00 p.m. the next day. Docs. 98, 98-1. The court further stated that "[a] party may not object to any portion of these instructions that remains unchanged from the [previous] version" and that "[a]ny objection not included in a party's response will be deemed to be waived." Doc. 98. By email, counsel for Defendants requested additional time to object (Doc. 148 at 1), which the court allowed. When Defendants filed their response to the jury instructions, they had no objections to the instructions on breach of express warranty. Doc. 103. During the pretrial conference on the first day of trial, the court presented the parties with the final jury instructions and inquired into whether any changes needed to be made. Trial Tr. vol. 1, 4-6.[3] Again, Defendants made no objection to the breach-of-express-warranty instructions. *Id.* The final jury instruction on breach of express warranty included the following elements (as it had throughout the revision process):

*First*, the Defendants sold the Vulcan ladder and expressly warranted that the working weight load of the ladder was 300 pounds and that it could be used in different positions under the 300-pound working weight.

• An express warranty is any promise by a seller about a product that naturally or ordinarily leads the buyer to purchase the product.

• For a promise to be an express warranty, no particular form of words have to be used, nor do the terms "warrant" or "guarantee" have to be used, nor does the seller have to intend to make a warranty. The warranty must relate to a fact and not an opinion about the quality or condition of the product sold. An expression of opinion or belief only, a statement of value, or mere words of praise do not create a warranty.

*Second*, the Plaintiffs made the purchase relying on the express warranty.

*\*4* • The fact that a buyer may, to some extent, rely upon his or her own judgment in purchasing goods does not prevent him or her from also relying upon an express warranty made by the seller.

*Third*, the Vulcan ladder did not conform to the express warranty.

• A product does not conform to an express warranty when defects are substantial and sufficiently serious so that the product fails to materially comply with the express warranty. It is not enough if the defects are small, minor, or insignificant.

*Fourth*, the breach of the express warranty was a cause of the Plaintiffs' damage.

*Fifth*, the amount of damage.

Docs. 98-1 at 16, 113 at 16; *see also* Doc. 11 at 6; Doc. 86; Iowa Model Civil Jury Instructions 1100.1-1100.4 (2017).

Neither party objected to the verdict form until the second day of trial, when the Klingenbergs objected that the jury should not consider whether Vulcan breached an express warranty separately from whether GP International breached an express warranty; the Klingenbergs argued the jury should consider the Defendants' liability together, so that either Vulcan and GP International were both liable, or both were not. Trial Tr. vol. 2, 334-337. Defendants resisted. *Id.* That night, the parties submitted briefing on the issue by email, and Defendants argued that "[i]t does not matter if a[n] [ ] entity is the seller or the distributor; what matters is who ... convey[ed] ... the warranty." Doc. 148 at 2-7. Defendants suggested that the evidence on this issue was different between Vulcan and GP International and argued that the verdict form should therefore require the jury to evaluate their liability separately for the breach-of-express-warranty claim. The parties discussed the issue further at the pretrial conference the next day, where Defendants again argued any entity that communicated the warranty would be liable. Trial Tr. vol. 3, 342-346. Defendants argued that the sticker containing the warranty "[j]ust says Vulcan" and that the ladder contained no reference to GP International. *Id.* at 344. Ultimately, the court expressed no views on the merits of this issue, finding that the Klingenbergs should have raised their objection to the verdict form earlier and that it was waived. Trial Tr. vol. 4, 489-92.

Case 1:19-md-02875-RMB-SAK   Document 1382-8   Filed 07/12/21   Page 348 of 535
PageID: 32295
Klingenberg v. Vulcan Ladder USA, LLC, Not Reported in Fed. Supp. (2018)
2018 WL 1248007, 95 UCC Rep.Serv.2d 300

During trial, the Klingenbergs presented testimony from Jeffrey and Fournier (the expert) regarding liability, as well as several witnesses who testified as to damages. They also presented the ladder itself, which had a Vulcan label, but did not offer any evidence distinguishing Vulcan from GP International, apart from the stipulation as to each Defendants' role in designing, manufacturing, and selling the ladder. After the Klingenbergs rested, Defendants moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a), and they renewed their motion at the close of all evidence. Trial Tr. vol. 3, 399-422, 471-72. In the motion, for the first time since GP International filed its answer, GP International argued that the statute of limitations barred any claims against it. *Id.* at 399, 404-18. GP International argued that because it did not have notice of the lawsuit within 90 days of the filing of the original complaint, the amended complaint did not relate back. *Id.* at 406-07. The Klingenbergs objected to this argument as forfeited, arguing that if they had known GP International intended to raise a statute-of-limitations defense, they would have presented evidence on the relationship between GP International and Vulcan to prove that GP International had notice of the lawsuit (including the additional discovery that the parties had agreed to exclude). *Id.* at 407-09.[4] GP International responded that because it raised the defense in its answer, it was entitled not to mention it again "[f]or strategic purposes" until the Klingenbergs rested. *Id.* at 409-10. GP International and Vulcan also renewed the argument that Fournier should not have been allowed to testify as an expert and that if his testimony was excluded, the Klingenbergs could not establish causation for either the design-defect or breach-of-express-warranty claims. *Id.* at 399-04, 418-20; Trial Tr. vol. 4, 493-97. As part of that argument, Defendants contended no breach of warranty occurred because Fournier conceded that the ladder met the standards set forth by ANSI. Trial Tr. vol. 3, 402:20-403:1; Trial Tr. vol. 4, 494-95. The court denied the part of the Rule 50(a) motion that rested on the inadmissibility of Fournier's testimony and reserved ruling on the statute-of-limitations issue until after trial. Trial Tr. vol. 3, 420-21; Trial Tr. vol. 4, 549-50.

**\*5** Defendants did not specifically move for a directed verdict in favor of Vulcan on the breach-of-express-warranty claim based on a lack of evidence that Vulcan sold the ladder. Neither did they move for a directed verdict in favor of GP International on this issue. This, despite Defendants' representation at the final pretrial conference (memorialized in the final pretrial order) that "[b]ecause the only evidence adduced will be that Vulcan is the

designer and distributor, Defendants will argue at the close of Plaintiffs' case[-]in[-]chief that GP International ... should be dismissed."[5] Doc. 102. And in Defendants' briefing on the verdict-form issue (submitted by email on the evening of the second day of trial), they represented that they would "argue at the close of evidence that ... Plaintiffs have not adduced evidence on" the issue of who conveyed or communicated the warranty. Doc. 148 at 5-7. They did not make such motion. The court addressed the issue somewhat in ruling on the verdict-form issue, however, which was decided in Defendants' favor, allowing them to argue during their closing argument (which they ultimately did not do) that the entities should be considered separately (which they ultimately did not do). Trial Tr. vol. 4, 489-92; *see also id.* at 496-97.

After a four-day trial, the case was submitted to the jury. The jury found against both Vulcan and GP International on the breach-of-express-warranty claim and awarded the Klingenbergs more than $2.4 million in damages: $262,000 in past medical expenses, $500,000 in future medical expenses, $72,000 in loss of past earnings, $600,000 in loss of future earning capacity, $200,000 in past loss of full body function, $200,000 in future loss of full body function, $200,000 in past pain and suffering, $200,000 in future pain and suffering, $100,000 in past loss of consortium, and $100,000 in future loss of consortium. Doc. 115. The jury found in favor of Defendants and against the Klingenbergs on the design-defect claim, however. *Id.*

The clerk entered judgment on the jury verdict on September 29, 2017. Doc. 119. The Klingenbergs filed a bill of costs, and Defendants moved for a stay of execution of judgment. Docs. 122, 124. The court granted the motion to stay in part, imposing a temporary stay that would be lifted on November 6, 2017, unless Defendants had filed a supersedeas bond. Doc. 127. The court ordered that "[u]pon the filing by Defendants ... of a supersedeas bond in the amount of $2,434,000, execution of the judgment shall be stayed until this court has resolved Defendants ... post-trial motions." *Id.* No bond was ever filed.

Defendants now move for judgment as a matter of law or alternatively, for a new trial. Doc. 128. They argue that testimony from Fournier, the Klingenberg's expert, should not have been admitted; that the statute of limitations bars the express-warranty claim against GP International; that the express-warranty claim fails because no evidence establishes that ANSI standards were violated; that only sellers can be liable for breach of express warranty under

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 349 of 535
PageID: 32296
Klingenberg v. Vulcan Ladder USA, LLC, Not Reported in Fed. Supp. (2018)
2018 WL 1248007, 95 UCC Rep.Serv.2d 300

Iowa law, and no evidence establishes Vulcan sold the ladder; that the Klingenbergs' damages are limited because they did not purchase the ladder directly from Defendants; and that the jury's finding for Defendants on the design-defect claim precludes a finding against them on the express-warranty claim. [6] The court heard argument on the motion on January 5, 2018. Doc. 147. At the hearing, Plaintiffs made a conditional motion requesting that if Defendants' motion were denied, the court direct execution of the judgment effective immediately, including interest and costs. They argued that the fourteen-day grace period provided for in Federal Rule of Civil Procedure 62(a) has already been exhausted. I agree,

*see, e.g.,* Anastos v. M.J.D.M. Truck Rentals, Inc., 521 F.2d 1301, 1302-04 (7th Cir. 1975), and note that the stay I imposed expired months ago (Doc. 127).

## II. JUDGMENT AS A MATTER OF LAW

**\*6** During trial, after the plaintiffs rest, the defendants may move for judgment as a matter of law under Federal Rule of Civil Procedure 50(a). After trial, "the movant may file a renewed motion for judgment as a matter of law" under Rule 50(b). A court may grant judgment as a matter of law on a claim when "a reasonable jury would not have a legally sufficient evidentiary basis to find for" the plaintiff. Fed. R. Civ. P. 50(a)(1), (b). In evaluating whether a sufficient evidentiary basis exists to support the jury's verdict, the court considers "the evidence in the light most favorable to the verdict, giving the non-moving party the benefit of all reasonable inferences." Emmenegger v. Bull Moose Tube Co., 324 F.3d 616, 619 (8th Cir. 2003). The court "do[es] not judge the credibility of witnesses or weigh the evidence." *Id.* Judgment as a matter of law is proper when only "[a] mere scintilla of evidence" or "no proof beyond speculation ... support[s] the verdict." Larson ex rel. Larson v. Miller, 76 F.3d 1446, 1452 (8th Cir. 1996) (en banc) (quoting City of Omaha Emps. Betterment Ass'n v. City of Omaha, 883 F.2d 650, 651-52 (8th Cir. 1989)).

### A. Fournier's Expert Testimony

As they have throughout this case, Defendants focus their argument on Plaintiffs' expert testimony from Fournier. Defendants argue that Fournier should not have been allowed to testify as an expert under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and that without

this expert testimony, insufficient evidence exists to support the jury's verdict. Defendants offer no new arguments based on the trial testimony [7] for excluding Fournier's testimony, instead reasserting that Fournier is unqualified and that he performed no testing or calculations to support his opinion. Judge Bennett previously addressed these arguments when ruling on Defendants' motion to exclude Fournier's testimony (and criticized Defendants for "failing to acknowledge ... that [Fournier] has extensive experience as a forensic engineer, that he has investigated over 1,000 construction-related incidents, that over 175 of those incidents involved ladders, and ... that he has been qualified as an expert 20 times in prior ladder cases"—all facts which Defendants have once again failed to mention). Docs. 26, 34, 39. I see no reason to address Defendants' arguments in depth. Although Fournier has never designed a ladder, he has twenty years of experience working construction sites as a civil engineer, in which he handled ladders regularly and ensured that the construction activity met safety standards; and he has investigated around 200 accidents involving ladders in connection with other litigation. Trial Tr. vol. 2, 214-223; Doc. 31-2 at 5-6; Doc. 117-30 at 1-11. The court did not err in finding Fournier qualified to offer expert testimony. *See* Baxter v. Robinette Co., No. 5:04CV00222 JLH, 2005 WL 5988679, at \*5 (E.D. Ark. Nov. 29, 2005) ("Rule 702 ... contains no requirement that an expert have designed or have worked with a specific piece of machinery before opining whether the machine was defective. Rule 702 does require that an expert demonstrate qualifications in his particular field.").

**\*7** Neither did the court err in finding Fournier's opinion reliable. Fournier based his opinion on general engineering principles; his experience; information from Jeffrey about the accident; and examinations of the accident ladder, design specifications for the accident ladder, [8] competitors' ladders, and photos of the accident scene. Trial Tr vol. 2, 226-27, 239-40, 242; Doc. 26-2 at 51, 54. Testing or calculations are not a necessary prerequisite to the admission of expert testimony, as Defendants contend. *See* McRunnel v. Batco Mfg., 917 F. Supp. 2d 946, 953 (D. Minn. 2013) (finding expert testimony reliable when "the proposed alternative design exists in the marketplace and [the expert] based his opinion on published engineering standards" after noting that "[t]he Court will not exclude [the expert's] testimony simply because he has never tested his alternative design or subjected his design to peer review"); Johnson v. Zimmer, Inc., No. CIV. 02-1328 JTNFLN, 2004 WL 742038, at \*4-5 (D. Minn. Mar. 31, 2004) (denying *Daubert* motion when expert

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 350 of 535
PageID: 32297

Klingenberg v. Vulcan Ladder USA, LLC, Not Reported in Fed. Supp. (2018)
2018 WL 1248007, 95 UCC Rep.Serv.2d 300

based his opinion "on basic scientific theory and generally accepted and well-documented studies" without conducting independent testing or submitting his theory to peer review); *Thomson v. Gummiwerk Kraiburg Elastik Beteiligungs GmbH & Co.*, No. C02-11 LRR, 2003 WL 22697174, at *2-3, *5 (N.D. Iowa Nov. 13, 2003) (in design-defect case, finding expert's opinion sufficiently reliable when it was based on knowledge acquired from training and experience, personal inspection of the defective machine, documents supplied by counsel, conversations with plaintiff, and review of a sketch of the machine); *see also Manuel v. MDOW Ins. Co.*, 791 F.3d 838, 846 (8th Cir. 2015) (expert testimony on the origin of a fire may be based on "observations at the scene and ... experience investigating fires"); 📙 *Smith v. BMW N. Am., Inc.*, 308 F.3d 913, 919-20 (8th Cir. 2002) (district court erred in excluding doctor's opinions about the cause of plaintiff's injuries and whether air bags would have reduced those injuries when doctor "applied his medical knowledge and his experience to the physical evidence" and "based his opinion on his knowledge of the basic operation of air bags and his knowledge of how injuries of the type sustained by [plaintiff] occur and can be prevented").

The cases relied on by Defendants are distinguishable. In 📙 *Peitzmeier v. Hennessy Industries, Inc.*, 97 F.3d 293, 297-98 (8th Cir. 1996), the Eighth Circuit held the district court did not abuse its discretion by excluding expert testimony of a design defect and alternative design when the expert had "[n]o factual basis ... that his design changes [we]re feasible," as he had conducted no testing and relied only on rough sketches that had not been made into prototypes. Here, however, the design changes proposed by Fournier are clearly feasible as they have been implemented in competitors' ladders. *See* 📙 *Young v. Pollock Eng'g Grp., Inc.*, 428 F.3d 786, 790 (8th Cir. 2005) (holding that "the experts did not need to conduct a detailed feasibility study" when the defendant had installed the experts' proposed alternative design and used it successfully). Defendants also rely on 📙 *Alevromagiros v. Hechinger Co.*, 993 F.2d 417, 421-22 (4th Cir. 1993), which does not address the admissibility of expert testimony (and analyzes the evidence needed to prove a design-defect claim under Virginia law, not Iowa law). Defendants cite no authority demonstrating that the admission of Fournier's testimony was an abuse of discretion. The court finds no error in allowing the jury to weigh the qualifications and reliability of Fournier and his methodology.

### B. Statute of Limitations

Because the Klingenbergs amended their complaint to add GP International as a defendant after the statute of limitations had expired, GP International argues that the claims against it are time-barred. The Klingenbergs argue that GP International waived its statute-of-limitations defense by failing to raise it at the final pretrial conference for inclusion in the final pretrial order and that, in any event, the claims against GP International relate back to the filing of the original (timely) complaint.

Due to the Klingenbergs' inability to effect service on it, GP International did not file its answer and enter the case as a defendant until June 13, 2017, after the deadline for filing dispositive motions had already passed. Docs. 7, 45, 57-59. In its answer, GP International raised nine affirmative defenses, all of which had also been raised by Vulcan and GP LLC, including a statute-of-limitations defense. Doc. 58. At the final pretrial conference, the parties discussed the potential legal issues to be decided at trial and made no mention of a statute-of-limitations defense. The final pretrial order [9] identified the issues for trial and did include a statute-of-limitations issue: the only issues raised by GP International relate to jury instructions, motions in limine, and its intent to move for a directed verdict based on a lack of evidence that GP International designed or distributed the ladder. Doc. 102. But at trial, after the Klingenbergs rested, GP International moved for a directed verdict on a different basis, raising its statute-of-limitations defense for the first time since filing its answer. Trial Tr. vol. 3, 399-422. GP International argued that no evidence established it had notice of the lawsuit within 90 days of the filing of the original complaint, so the amended complaint did not relate back to the original complaint, and thus, the claims against GP International were time-barred. *Id.* at 406-07. When the Klingenbergs protested that they would have presented evidence on notice had they realized it was an issue, GP International responded that it made a strategic decision not to "broadcast" its statute-of-limitations defense until after the Klingenbergs had rested precisely to prevent the Klingenbergs from presenting such evidence. *Id.* at 407-10.

**\*8** This type of gamesmanship is not permitted by the Federal Rules of Civil Procedure. The purpose of the final pretrial conference is to "promot[e] efficiency and conserve[e] judicial resources by identifying the real issues prior to trial, thereby saving time and expense for everyone." 📙 *Friedman & Friedman, Ltd. v. Tim McCandless, Inc.*, 606 F.3d 494, 498 (8th Cir. 2010) (quoting Fed. R. Civ. P. 16

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 351 of 535
PageID: 32298
Klingenberg v. Vulcan Ladder USA, LLC, Not Reported in Fed. Supp. (2018)
2018 WL 1248007, 95 UCC Rep.Serv.2d 300

advisory committee's note to 1983 amendment). As such, "[a]ttorneys at a pre-trial conference must make a full and fair disclosure of their views as to what the real issues of the trial will be." *Gorlikowski v. Tolbert*, 52 F.3d 1439, 1444 (7th Cir. 1995) (alteration in original) (quoting *Erff v. Marktton Indus., Inc.*, 781 F.2d 613, 617 (7th Cir. 1986)). And because "the final pretrial order supersedes the pleadings," 📙 *Friedman & Friedman*, 606 F.3d at 498, as a general rule, an affirmative defense omitted from the final pretrial order is forfeited (just as it would be if the defendant failed to plead the affirmative defense in its answer), *see* 📙 *Youren v. Tintic Sch. Dist.*, 343 F.3d 1296, 1304-05 (10th Cir. 2003); *see also* 📙 *Am. Simmental Ass'n v. Coregis Ins. Co.*, 282 F.3d 582, 588-89 (8th Cir. 2002) (recognizing that the "district court [may] refuse[ ] to allow a party to advance new theories following the entry of a [final] pretrial order" (citing *Anderson v. Genuine Parts Co.*, 128 F.3d 1267, 1271 (8th Cir. 1997))). Thus, GP International forfeited its statute-of-limitations defense by failing to raise it for inclusion in the final pretrial order. *See* 📙 *Youren*, 343 F.3d at 1304-05 (defendants waived statute-of-limitations defense by failing to "identify the statute of limitations issue in the pretrial order" as a contested issue of law, despite raising the defense in their answer); 🚩 *Sidak v. Pinnacle Telemarketing Ltd.*, 182 F. Supp. 2d 873, 880 n.9 (D. Neb. 2002) ("Although [the defendant] generally pleaded a statute of limitations defense in its answer, the defense was not preserved in the final pretrial conference order. I therefore treat it as waived."), *disapproved of on other grounds by* 📙 *Hassler v. Alegent Health*, 198 F. Supp. 2d 1108 (D. Neb. 2002). [10] A finding of forfeiture is especially appropriate here because the Klingenbergs would have likely presented evidence of the relationship between Vulcan and GP International at trial had they realized that when GP International received notice of the lawsuit was a disputed issue. *See Mannarino v. Morgan Twp.*, 64 Fed.Appx. 844, 847 (3d Cir. 2003) ("Because the statute of limitations argument was not identified in the Pretrial Order, plaintiffs did not have a meaningful opportunity to address its merits at trial"); *see also* Trial Tr. vol. 3, 406-07 (GP International conceded the statute-of-limitations would not bar the Klingenbergs' claims if it had notice of the lawsuit within the time for effecting service of the original complaint under Federal Rule of Civil Procedure 4). I decline to address the merits of Defendants' statute-of-limitations defense.

## C. Sufficiency of the Evidence for Breach of Express Warranty

Defendants argue that because no evidence establishes that ANSI standards were violated, the evidence is insufficient to support a breach-of-express-warranty claim. Specifically, they argue the ladder's label warranted only "that the ladder met ANSI A14.2" standards, and as all the evidence establishes the ladder met those standards, no breach occurred. Doc. 136 at 6-7. The Klingenbergs do not dispute that the ladder met ANSI standards. *See* Doc. 141 at 3-5. Rather, the Klingenbergs argue that the Defendants warranted that the ladder would hold 300 pounds irrespective of whether it met ANSI standards and that this warranty was breached when the ladder "collapsed with less than 300 pounds on it." Doc. 141 at 4-5.

Iowa has adopted the Uniform Commercial Code (U.C.C.), which defines an express warranty as an "affirmation of fact or promise ... which relates to the goods" or "[a]ny description of the goods"; "formal words such as 'warrant' or 'guarantee' are not necessary." Iowa Code § 554.2313. The jury found that the Defendants "expressly warranted that the working weight load of the ladder was 300 pounds and that it could be used in different positions under the 300-pound working weight." Doc. 113 at 16. This warranty was based on the accident ladder's label, which read:

> Type IA Extra heavy-duty
> Industrial Rating
> Working Load: 300 [pounds]

Doc. 117-32 at 100. Lower on the label (after the model number, address of Vulcan, and date and place of manufacture), the label stated:

> MANUFACTURED TO
> OSHA
> ANSI A 14.2
> SPECIFICATIONS

Doc. 117-32 at 101-102. Under ANSI A14.2, an articulated ladder rated "Extra Heavy Duty—Type IA" must satisfy certain tests demonstrating a working load of 300 pounds. Doc. 117-32 at 40. Thus, Defendants suggest that the warranty created by the words, "Working Load: 300 pounds," must be read in context: immediately preceding the working-load language, the label refers to the ladder's ANSI rating ("Type

Klingenberg v. Vulcan Ladder USA, LLC, Not Reported in Fed. Supp. (2018)

2018 WL 1248007, 95 UCC Rep.Serv.2d 300

IA"), which requires the ladder meet tests prescribed by ANSI showing a working load of 300 pounds, and further below, the label explicitly cites the ANSI standard imposing the 300-pound working load for Type IA ladders. [11] Defendants argue the evidence establishes the label warranted only that the ladder complied with ANSI working-load standards to hold 300 pounds.

**\*9** Although the issue is close, the jury could find that the label warranted "that the working weight load of the ladder was 300 pounds," regardless of whether the ladder satisfied the ANSI working-load tests. The label explicitly stated, "Working Load: 300 pounds." If Defendants wished to convey only that the ladder satisfied the ANSI working-load standards, they could have omitted the "300 pounds" language and stated only that the ladder was rated "Type IA Extra heavy-duty" and manufactured to ANSI A14.2 specifications. *Cf. Thomas v. Genie Indus., Inc., No. 07-1447, 2008 WL 4366067, at \*5 (W.D. La. Sept. 22, 2008)* (suggesting that if evidence established "which ANSI requirements were not met and how this caused [plaintiff's] damages," defendant would have breached "its warranty ... that all ANSI requirements were met"). [12] The label did expressly warrant that the ladder was manufactured to meet ANSI A14.2 ("manufactured to OSHA ANSI A14.2 specifications"), but the label went further by specifically stating "[w]orking load: 300 [pounds.]" Doc. 117-32 at 101; *see* Doc. 117-32 at 60 (ANSI standards require the ladder's label to state the ladder's "[t]ype and duty rating" and "ANSI standard compliance," but not its working load). [13] Although Plaintiffs' expert, Fournier, testified that the language on the ladder's label meant that the ladder's design satisfied a number of ANSI safety tests for "various load applications," he also opined that the label demonstrated "the ladder's designed for a person weighing 300 pounds to be able to use the ladder in a safe manner." Trial Tr. vol. 2, 228. [14]

There is sufficient evidence to establish that this warranty was breached. Jeffrey testified that he weighed "close to 250" pounds when he purchased the ladder, which is why he chose a ladder with packaging saying it could hold 300 pounds. Trial Tr. vol. 1, 179. He testified that as he was moving from the roof of a house to the ladder (with one foot on the ladder and one foot off), the ladder "jar[red]," causing him to fall. Trial Tr. vol. 1, 148, 193. Fournier testified that the outer rail of the ladder became deformed (which would have been prevented by a retaining strap) such that it could no longer sustain its normal load, causing the outer rail to move

and in turn causing Jeffrey's fall. Trial Tr. vol. 2, 235-36. Although Fournier acknowledged on cross-examination that the ladder satisfied ANSI standards, [15] he explained that ANSI standards impose minimum safety standards and that "additional testing and additional performance activities ... should be conducted on ladders ... to make sure ... they are safe." *Id.* at 270. Fournier also testified that a product can still be defective, despite meeting ANSI standards, [16] and that no ANSI standard applies to test the particular defect involved in this case. *Id.* at 249-50. The jury could reasonably find, based on this evidence, that the Defendants breached their express warranty that the ladder would hold 300 pounds.

**\*10** Defendants rely on *Kolarik v. Cory International Corp., 721 N.W.2d 159, 161, 164 (Iowa 2006),* in which the Iowa Supreme Court [17] affirmed the grant of summary judgment to defendants on plaintiff's express-warranty claim. In that case, the plaintiff fractured his tooth when he bit down on an olive pit, and he argued that "the words 'minced pimento stuffed,' contained on the label of the jar of olives, constituted an express warranty that the olives had been pitted." *Id.* at 161, 163. The vice president of quality control for the olive company agreed that olives must be pitted to be stuffed, but he testified in his deposition that the machines did not always pit every olive because of their varying shapes and that there was no practical method of inspection. *Id.* at 163-64. The court noted his "statements concerning the inevitability of some pits ... being in the product w[ere] corroborated by plaintiff's own assertion that United States Department of Agriculture standards for pitted olives allow 1.3 pits or pit parts per one hundred olives." *Id.* at 164. The court held that this evidence was insufficient to establish that a breach of express warranty occurred. *Id.* The court noted that, as a rule, "all descriptions by merchants must be read against the applicable trade usages with the general rules as to merchantability resolving any doubts." *Id.* at 164 (quoting U.C.C. § 2-313 cmt. 7). [18] The court reasoned that "it [wa]s unrealistic to impart to the description 'minced pimento stuffed' the meaning that defendants are guaranteeing that the olives in the jar are entirely free of pits or pit fragments," and "it [wa]s much more realistic to interpret the description as only warranting that the particular jar of olives contain[ed] pimento-stuffed, green olives that would pass as merchantable without objection in the trade." *Id.* Because no evidence established "that the contents of the jar, taken as a whole, did not live up to this

2018 WL 1248007, 95 UCC Rep.Serv.2d 300

warranty," the plaintiff's breach-of-express-warranty claim failed. *Id.* [19]

Although a close call, I find *Kolarik* distinguishable. The court in *Kolarik* emphasized that the product met standards of merchantability, [20] and the product at issue did not involve a defect of the magnitude here (a pit in a pitted olive as compared to a ladder that collapsed under weight it was supposed to hold). Evidence in *Kolarik* established that there was no way to ensure olives were completely pit-free, but here, Fournier testified that additional testing should have been performed (although he did not specify what type of testing would have uncovered the defect). Further, although the Iowa Supreme Court did not seem to rely on this fact, I note the label in *Kolarik* did not warrant "pitted" olives, but rather, warranted "pimento stuffed" olives (which gave rise to an inference that the olives were pitted). The label here specifically stated "working load: 300 [pounds]" and therefore (unlike in *Kolarik*) "it is [not] unrealistic to impart" to those words the meaning described in Instruction No. 11 —that "the working weight of the ladder was 300 pounds and that it could be used in different positions under the 300-pound working weight." That the ladder conformed to ANSI standards does not preclude the Klingenbergs' breach-of-express-warranty claim, and this conclusion is unaffected by *Kolarik.* [21]

**\*11** Defendants' remaining arguments regarding the sufficiency of the evidence for breach of express warranty are likewise unsuccessful. Defendants argue that Vulcan, the designer and distributor of the ladder, cannot be held liable for breach of express warranty under Iowa law, as no evidence establishes that Vulcan sold the ladder. They also argue that because Jeffrey purchased the ladder from Menards, and not directly from Defendants, he is not in privity with Defendants and therefore cannot recover consequential damages. The Klingenbergs respond that Defendants waived these arguments by failing to raise them in their pre-verdict Rule 50(a) motion. Additionally, the Klingenbergs argue Defendants waived the consequential-damages argument by failing to object to the jury instructions on damages.

A post-trial Rule 50(b) motion "may not advance additional grounds that were not raised in the pre-verdict motion." *Walsh v. Nat'l Computer Sys., Inc.*, 332 F.3d 1150, 1158 (8th Cir. 2003) (quoting *Rockport Pharm., Inc. v. Digital Simplistics, Inc.*, 53 F.3d 195, 197 (8th Cir. 1995)). For a ground to be considered raised by a pre-verdict Rule 50(a)

motion, the motion must "specify the judgment sought and the law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(2). "[T]echnical precision is not necessary in stating grounds for the motion so long as the ... court is aware of the movant's position." *Walsh*, 332 F.3d at 1158 (alteration in original) (quoting *Rockport Pharm.*, 53 F.3d at 197-98). "[T]he purpose of requiring the moving party to articulate the ground on which [judgment as a matter of law] is sought 'is to give the other party an opportunity to cure the defects in proof that might otherwise preclude him from taking the case to the jury.' " *Id.* (first alteration in original) (quoting *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 286 (2d Cir. 1998)). "If colloquy between counsel and the trial court fleshes out the motion, it may provide the opposing party with the requisite notice." *Id.*

Here, prior to the close of Plaintiffs' case, in connection with an issue related to the verdict form, Defendants argued that only the party that communicated or conveyed the warranty was liable, and they represented that they intended to move for a directed verdict on this point (although they never did). They elaborated that the sticker containing the warranty "just says Vulcan" and that the ladder contained no reference to GP International, suggesting that GP International could not be liable for breach of express warranty, because no evidence established it conveyed or communicated the warranty. Now, however, Defendants argue that only sellers may be liable for breach of express warranty (a position they explicitly disclaimed in their briefing on the verdict-form issue) and that Vulcan (as opposed to GP International) cannot be liable for breach of express warranty because no evidence established Vulcan sold the ladder.

I am inclined to agree with the Klingenbergs that Defendants have waived this argument by failing to raise it in their Rule 50(a) motion, especially because the argument that they did make on this point during trial (before Plaintiffs rested) is directly at odds with their current argument. They did, however, at least mention this issue during trial: I addressed the issue briefly, and the Klingenbergs were on notice of the need to present evidence on the first element of the breach-of-express-warranty claim. The same cannot be said for Defendants' argument that the Klingenbergs' damages are limited because they were not in privity with Defendants. To my knowledge, this argument was not raised at any point in the proceedings. Moreover, Defendants did not object to the jury instructions on damages, which instructed the jury to award consequential damages. Doc. 113. I find that

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 354 of 535
PageID: 32301
Klingenberg v. Vulcan Ladder USA, LLC, Not Reported in Fed. Supp. (2018)
2018 WL 1248007, 95 UCC Rep.Serv.2d 300

Defendants have forfeited the argument that the Klingenbergs' damages are limited to direct, economic damages. *See, e.g.,*

🔖 *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 733 (7th Cir. 2004) (holding defendant waived argument that plaintiff could not recover presumed or punitive damages based on plaintiff's failure to prove actual malice, because defendant "fail[ed] to propose a jury instruction requiring a predicate finding of actual malice for general damages or to object to the court's instruction on that ground").

**\*12** Nevertheless, because I believe the outcome is the same whether or not I address the merits of Defendants' arguments, I will briefly do so. First, Defendants argue that Vulcan—the designer and distributor of the Vulcan-branded ladder—cannot be liable for breach of express warranty because no evidence establishes Vulcan sold the ladder. Defendants do not cite any caselaw in support of their position that only sellers can be liable for breach of express warranty under Iowa law, relying instead on a provision of Iowa's adoption of the U.C.C., which defines how "[e]xpress warranties by the seller are created." Iowa Code § 554.2313. The comments to that section of the U.C.C. provide that "[a]lthough this section is limited in its scope and direct purpose to warranties made by the seller to the buyer ..., the warranty sections of this Article are not designed in any way to disturb those lines of case law growth which have recognized that warranties need not be confined either to sales contracts or to the direct parties to such a contract." U.C.C. § 2-313 cmt. 2. The provision relied upon by Vulcan does not stand for the proposition that only sellers can be liable for breach of express warranty—indeed, Iowa case law recognizes that non-sellers may be liable for breach of express warranty in certain instances. *See, e.g.,* 🔶 *Midland Forge, Inc. v. Letts Indus., Inc.*, 395 F. Supp. 506, 511 (N.D. Iowa 1975) ("Express warranties can be made by distributing advertising literature which contains factual representations relied upon by the ultimate purchaser, even though the latter is not in privity with the manufacturer who made the statements."); 🔖 *Dailey v. Holiday Distrib. Corp.*, 151 N.W.2d 477, 483 (Iowa 1967) (suggesting that a manufacturer could be liable for breach of express warranty when "evidence disclos[ed] an[ ] express warranty was ... advanced, made or given to plaintiffs by defendant manufacturer"; or when the seller made an express warranty and "acted as agent for" the manufacturer). Here, Vulcan designed the ladder; Vulcan distributed the ladder; and the ladder, which contained a warranty on a label bearing Vulcan's name, ended up at a retail store, where it was purchased by Jeffrey. Defendants cite no authority, and I have

found none, holding that a defendant such as Vulcan cannot be liable for breach of express warranty causing personal injury under Iowa law.

Defendants also argue that because the ladder was purchased from a Menards store, rather than directly from them, no privity exists between the parties, and the Klingenbergs are barred from recovering consequential damages—specifically, those damages related to medical expenses, lost earnings, loss of body function, pain and suffering, and loss of consortium. Under the U.C.C. as adopted by Iowa, "[a] seller's warranty whether express or implied extends to any person who may reasonably be expected to use, consume or be affected by the goods and who is injured by breach of the warranty." Iowa Code § 554.2318. This is one of three alternatives contained in the U.C.C., all of which are designed to "give certain beneficiaries the benefit of the same warranty which the buyer received in the contract of sale, thereby freeing any such beneficiaries from any technical rules as to 'privity.' " U.C.C. § 2-318 & cmt. 2. The first alternative in the U.C.C. seeks to "include[ ] as beneficiaries within its provisions the family, household and guests of the purchaser"; under the second alternative (which is the version adopted by Iowa), "the seller's warranties, given to his buyer who resells, extend to other persons in the distributive chain"; and the third version "goes further, ... extending the rule beyond injuries to the person." U.C.C. § 2-3138 cmt. 3. Thus, Iowa Code section 554.2318 abolishes privity as a defense when a defective product causes "personal injury or property damage"—as opposed to merely causing "economic loss," in which case Iowa courts "only allow the buyer to bring a claim under an express warranty for direct economic losses against a remote seller and warranty claims for consequential economic losses against the seller in privity with them." *Des Moines Flying Serv., Inc. v. Aerial Servs. Inc.*, 880 N.W.2d 212, 222 (Iowa 2016); *see also* 🔖 *Nationwide Agribusiness Ins. Co. v. SMA Elevator Constr. Inc.*, 816 F. Supp. 2d 631, 683 (N.D. Iowa 2011) ("Section 554.2318 does not extend its warranty protection to third party beneficiaries who have suffered only economic loss, because the term 'injured' has been interpreted by [the Iowa Supreme Court] to include only '*physical harm* to the plaintiff or his property.' " (quoting 🔖 *Nebraska Innkeepers, Inc. v. Pittsburgh–Des Moines Corp.*, 345 N.W.2d 124, 129 (Iowa 1984))). Defendants conflate consequential damages with consequential economic damages, relying on cases involving only economic loss, not damages resulting from personal injury. *See* 🔖 *Nationwide Agribusiness Ins.*, 816 F. Supp. 2d at 637-38, 685 (defendants sought to recover "

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 355 of 535
PageID: 32302
Klingenberg v. Vulcan Ladder USA, LLC, Not Reported in Fed. Supp. (2018)
2018 WL 1248007, 95 UCC Rep.Serv.2d 300

'consequential economic loss damages,' " not personal injury damages); *Tomka v. Hoechst Celanese Corp.*, 528 N.W.2d 103, 105, 107-08 (Iowa 1995) (defendant sought to recover lost profits and loss of good will for damages to cattle he did not own, which are "consequential economic loss damages");

*Beyond the Garden Gate, Inc. v. Northstar Freeze-Dry Mfg., Inc.*, 526 N.W.2d 305, 310 (Iowa 1995) (plaintiff could recover the difference between what it paid for the machine and what it sold it for under its breach-of-express-warranty theory against a nonprivity seller, but it could not recover "consequential economic loss damages," including "repair bills, ... lost training profits, and lost business profits"); *see also* *Kolarik*, 721 N.W.2d at 163 (a plaintiff who bit into an olive and *chipped his tooth* "falls within th[e] extended class of beneficiaries" protected by Iowa Code section 554.2318). Because this is a personal-injury case, and the evidence establishes that the Klingenbergs suffered damages beyond economic loss, lack of privity between the Klingenbergs and Defendants does not preclude a breach-of-express-warranty claim nor limit the Klingenbergs' damages.

### D. Inconsistency of the Jury Verdict

**\*13**  Defendants argue that "[t]he jury's verdict of 'no design defect' precludes a verdict of breach of express warranty under Iowa law." Defendants rely on *Wright v. Brooke Group Ltd.*, 652 N.W.2d 159, 181-82 (Iowa 2002), which held that "personal injury plaintiffs are permitted to seek recovery under tort and warranty theories that in essence allege the same wrongful acts," but a claim for breach of the implied warranty of merchantability requires the same "proof of a product defect" as a tort claim. Defendants argue that just as with implied-warranty-of-merchantability claims, breach-of-express-warranty claims require proof of product defect in tort.

The jury instructions on the breach-of-express-warranty claim required the jury to find that Defendants warranted that "the working weight load of the ladder was 300 pounds" and that "the Vulcan ladder did not conform to" that warranty because of "substantial and sufficiently serious" defects. Doc. 113 at 16. The instructions on breach of express warranty did not specifically include a requirement that the jury find a reasonable alternative design existed at the time of the sale of the ladder, as the design-defect instructions did. Doc. 113 at 14. The jury was troubled by the alternative-design element, as evidenced by the jury question asking whether the exemplar ladders from different brands using an alternative

design were "new models" or whether they existed in 2011. Doc. 114.

The parties requested the Iowa model instructions on breach of express warranty and on design defect. Defendants made no objections to the jury instructions before or during trial, despite multiple opportunities. They did not raise the possibility of an inconsistent verdict. Nor did Defendants argue that the jury's verdict was inconsistent at any point before the jury's discharge—indeed, this issue is raised for the first time in the current briefing.

First, courts "evaluate whether verdicts are consistent in light of how the jury was instructed, not retrospective arguments about what the law is (which are really just late arguments about how the jury should have been instructed)." *S.E.C. v. Quan*, 817 F.3d 583, 589-90 (8th Cir. 2016). Here, it seems likely that the jury credited the testimony of Fournier and Jeffrey and found the ladder defective but did not find that the Klingenbergs had proved the existence of a reasonable alternative design at the time of the ladder's manufacture. Thus, the jury's finding for Defendants on the design-defect claim and against them on the express-warranty claim can be reconciled based on the required elements for each as listed in the instructions.

Even if the jury verdict was inconsistent, however, "[i]t is well established, at least in [the Eighth Circuit], that a party waives any objection to an inconsistent verdict if she fails to object to the inconsistency before the jury is discharged." *Williams v. KETV Television, Inc.*, 26 F.3d 1439, 1443 (8th Cir. 1994). The purpose of this rule is " 'to allow the original jury to eliminate any inconsistencies without the need to present the evidence to a new jury' and to 'prevent[ ] a dissatisfied party from misusing procedural rules and obtaining a new trial for an asserted inconsistent verdict.' " *Yazdianpour v. Safeblood Techs., Inc.*, 779 F.3d 530, 538-39 (8th Cir. 2015) (alteration in original) (quoting *Lockard v. Mo. Pac. R.R. Co.*, 894 F.2d 299, 304 (8th Cir. 1990)). The Eighth Circuit has declined to excuse the failure to object to an inconsistent verdict before the jury's discharge when defendants "waited more than a month to raise their objection" and did not raise the issue of an inconsistent verdict at any point during the trial. *See id.* at 538 & n.4; *cf.* *Quan*, 817 F.3d at 588 (suggesting that the forfeiture rule may not apply when a defendant "pointed out an alleged inconsistency, but did not formally request relief"). Defendants have forfeited their argument that the jury's finding for them on the design-defect claim

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 356 of 535
PageID: 32303

Klingenberg v. Vulcan Ladder USA, LLC, Not Reported in Fed. Supp. (2018)
2018 WL 1248007, 95 UCC Rep.Serv.2d 300

is inconsistent with its finding against them on the express-warranty claim.

### III. NEW TRIAL

**\*14** "A motion for new trial based on sufficiency of the evidence should be granted only if the verdict is against the weight of the evidence." *S.M. v. Lincoln County*, 874 F.3d 581, 589 (8th Cir. 2017); *see also* Fed. R. Civ. P. 59(a)(1)(A). "[T]he district court 'can rely on its own reading of the evidence—it can "weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict." ' " *Lincoln Composites, Inc. v. Firetrace USA, LLC*, 825 F.3d 453, 459 (8th Cir. 2016) (quoting *White v. Pence*, 961 F.2d 776, 780 (8th Cir. 1992)). This test has sometimes been phrased as against the "clear weight" of the evidence, or "great weight," or "overwhelming weight," but " '[r]egardless of the rhetoric used[,] the true standard for granting a new trial is simply ... whether a miscarriage of justice has occurred.' " *White*, 961 F.2d at 780 (quoting *Fireman's Fund Ins. Co. v. Aalco Wrecking Co.*, 466 F.2d 179, 187 (8th Cir. 1972)).

As discussed above, Jeffrey testified that he fell when the ladder moved, and Fournier testified that the ladder's outer rail bent due to a lack of a retaining strap, and the ladder could no longer bear loads normally. The jury could credit Fournier's testimony over Defendants' expert and find the deformed outer rail caused the ladder to be unable to hold loads of 300 pounds, as warranted. The weight of the evidence does not support a finding otherwise—this case came down to which expert the jury believed, and merely because the jury credited Fournier's testimony over Defendants' expert does not mean that a miscarriage of justice has resulted. *See Keeper v. King*, 130 F.3d 1309, 1315 (8th Cir. 1997).

### IV. INTEREST AND COSTS

The Klingenbergs orally moved at the hearing for judgment to be amended to include interest and costs. They are entitled to costs as requested (Doc. 124) under Federal Rule of Civil Procedure 54(d)(1). They are also entitled to postjudgment interest on the entire award (including the amount awarded by the jury, costs, and any prejudgment interest) under 28 U.S.C. § 1961. *See also Sociedad Espanola de Electromedicina y Calidad, S.A. v. Blue Ridge X-Ray Co.*, 226 F. Supp. 3d 520, 537 (W.D.N.C. 2016).

"The award of prejudgment interest in a diversity action is determined by the law of the state in which the action arose." *California & Hawaiian Sugar Co. v. Kan. City Terminal Warehouse Co.*, 788 F.2d 1331, 1333 (8th Cir. 1986). Although the Klingenbergs did not specifically request prejudgment interest, "[t]he Iowa Supreme Court has stated that '[t]he award of [prejudgment] interest is mandatory and should be awarded even when interest has not been requested.' " *Purina Mills, L.L.C. v. Less*, 295 F. Supp. 2d 1017, 1048 (N.D. Iowa 2003) (quoting *Hughes v. Burlington N. R.R. Co.*, 545 N.W.2d 318, 321 (Iowa 1996)). Generally, prejudgment interest on tort judgments involving personal injury is governed by Iowa Code section 668.13, which authorizes prejudgment interest for past damages (but not future damages) that "accrue[s] from the date of the commencement of the action." Iowa Code § 668.13(1), (4); *see also Waterloo Sav. Bank v. Austin ex rel. Austin*, 494 N.W.2d 715, 717 (Iowa 1993). In other words, "section 668.13 ... provides for interest on damages sustained prior to trial from the date of the commencement of the action." *Gosch v. Juelfs*, 701 N.W.2d 90, 92 (Iowa 2005).[22] Accordingly, the Klingenbergs are entitled to prejudgment interest on $834,000 (the damages for past medical expenses, loss of past earnings, past loss of full body function, past pain and suffering, and past loss of consortium) from January 26, 2015, until the entry of the final amended judgment. *See Schulte v. Feterl Mfg. Co.*, No. C92-4038, 1993 WL 13015647, at \*9 (N.D. Iowa Aug. 30, 1993) (awarding prejudgment interest under Iowa law "on plaintiff's award for past pain and suffering, past medical expenses, and past disability and disfigurement only").

### V. CONCLUSION

**\*15** The jury had a legally sufficient evidentiary basis to find for the Klingenbergs on their express-warranty claim, and the verdict is not against the great weight of the evidence. I therefore **deny** Defendants' renewed motion for judgment as a matter of law and their alternative request for a new trial (Doc. 128).

The Clerk of Court is directed to enter an amended final judgment in the amount totaling $2,434,000 (as set forth in the original judgment filed at Docket No. 119), plus costs; prejudgment interest on $834,000 from January 26, 2016, to

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 357 of 535
PageID: 32304

Klingenberg v. Vulcan Ladder USA, LLC, Not Reported in Fed. Supp. (2018)
2018 WL 1248007, 95 UCC Rep.Serv.2d 300

the date of entry of final judgment at the rate provided in Iowa Code section 668.13(3); and postjudgment interest on the entire award (including prejudgment interest and costs) at the rate provided in 28 U.S.C. § 1961(a).

**IT IS SO ORDERED** this 9th day of March, 2018.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1248007, 95 UCC Rep.Serv.2d 300

## Footnotes

1   I refer to the Klingenbergs individually by their first names to avoid confusion.

2   The Honorable Mark W. Bennett, United States District Judge for the Northern District of Iowa. Judge Bennett presided over the case until the parties consented to the exercise of jurisdiction by a United States magistrate judge in August 2017. Doc. 67.

3   The trial transcript is filed at Docs. 130-133.

4   Later in the day, after the jury had been excused, the Klingenbergs submitted a short written resistance on the statute-of-limitations issue by email. Doc. 148 at 8-10.

5   This issue was included in the original final pretrial order, when the parties had not yet entered into the stipulation regarding who designed, manufactured, sold, and distributed the ladder, and it remained as an issue in the amended final pretrial order, which included the stipulation. *See* Docs. 93, 102.

6   Defendants raise the inconsistency of the jury's verdict as a basis for judgment as a matter of law, but I believe a finding in their favor would more appropriately result in a new trial. As I do not find their argument meritorious, however, I need not address what relief is warranted.

7   I am concerned by what seems to be an inconsistency between Fournier's expert report and his testimony. His expert report provides that flange and web bending on the ladder placed "stresses on the locking pin" and that "[w]hen the locking pin failed, the ladder moved unexpectedly" and caused Jeffrey's fall. Doc. 26-2 at 54-55. It later states that "[w]ithout the strap ..., the ladder became deformed and one of the locking pins failed." *Id.* at 56. At trial, however, when asked about the "the significance of the broken locking pin," Fournier testified "[n]one really in this instance other than the fact that it, due to the location of the break, more than likely happened ... during the incident as opposed to being a cause of the incident." Trial Tr. vol. 2, 233. Defendants did not point out this apparent discrepancy at any point during trial, including on cross-examination, and they do not argue it as a basis for excluding Fournier's testimony now. I thus decline to address the issue. (I also note that I allowed, over Defendants' objection, Plaintiffs to use a demonstrative aid of an animation illustrating the accident because I found it consistent with the opinion depicted by Fournier's expert report, and although Defendants re-raised the objection after Fournier testified, they did not point to any discrepancy between his testimony and his expert report. Trial Tr. vol. 1, 9-12, 120; Trial Tr. vol. 2, 254.)

8   It does not seem that he examined an undamaged Vulcan ladder before forming his opinion.

9   The parties were required to submit a proposed final pretrial order. Doc. 73 at 2; Local Rule 16A(b). The trial management orders contained instructions that the section for "Evidentiary and Other Legal Issues" in the proposed final pretrial order should include "whether recovery is barred as a matter of law by a particular defense." Docs. 8 at 18, 45 at 19, 73 at 21-22.

10  GP International relies on Coons v. Industrial Knife Co., 620 F.3d 38, 41 (1st Cir. 2010), which held that a party need not raise a statute-of-limitations defense by filing a dispositive motion before trial. Coons did not address a party's failure to raise a statute-of-limitations defense in a final pretrial order and is thus inapplicable.

11  I further note at summary judgment, the Klingenbergs argued that the ladder's label "expressly warranted that the ladder had an 'Industrial Rating Working Load' of '300 [pounds],' " suggesting that "Industrial Rating" and "Working Load" should be read together. Doc. 39 at 5.

Klingenberg v. Vulcan Ladder USA, LLC, Not Reported in Fed. Supp. (2018)

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 358 of 535
PageID: 32305

2018 WL 1248007, 95 UCC Rep.Serv.2d 300

12  At least two cases have recognized that the working load on a ladder's label may form an express warranty, although those cases did not address whether the claim would succeed in the absence of proof that ANSI standards had been violated. *See Picken v. Louisville Ladder, Inc.*, No. 11-13044, 2013 WL 3896570, at *1-2 (E.D. Mich. July 29, 2013) (holding that "Plaintiff has provided sufficient evidence to support his express warranty claim" based on unchallenged facts that plaintiff purchased the type IA ladder relying on "weight limit stated on the ladder" that it was "rated to support 300 pounds"); *Solorio v. Louisville Ladder, Inc.*, No. CV-06-0285-EFS, 2008 WL 11336763, at *4 (E.D. Wash. Mar. 7, 2008) ("The Court concludes it is undisputed that the ladder contained a label stating that the ladder could hold up to 300 pounds. It is a question for the jury whether the label constitutes either an 'affirmation of fact or promise' or a 'description of the goods.' ").

13  The ladder's type is "[t]he designation that identifies the working load" (here, IA). Doc. 117-32 at 11, 18, 20. The ladder's duty rating—defined as "[t]he combination of factors, including, but not limited to, ladder types and design features, which imply service capability"—is "extra heavy duty." *Id.* The ladder's type and duty rating is not 300 pounds (although that is the working load required of type IA ladders rated extra heavy duty). *Id.* at 12, 18, 20.

14  In response to counsel's question asking the meaning of the label saying, "type [I]A extra heavy duty industrial rating working load, 300 pounds," Fournier responded:

[T]he ladder's designed for a person weighing 300 pounds to be able to use the ladder in a safe manner and ... with that there are a number of tests that in order to comply with ANSI standards and OSHA standards you need a substantial factor of safety to be able to do that.... And they have tests that they have for various load applications.

Trial Tr. vol 2., 228.

15  Fournier testified on direct examination that after the accident, the ladder did not meet ANSI standards because the outer rail was permanently deformed and thus would "no longer [be] able to sustain the loads that it would normally," but I do not think this is sufficient to establish that the ladder failed to meet ANSI standards before the accident in the face of his explicit acknowledgement on cross-examination. Trial Tr. vol. 2, 232.

16  Under Iowa law, whether a product conforms to industry standards bears on the issue whether a product is defective, but is not dispositive (and does not satisfy the state-of-the-art defense, which "refers to what feasibly could have been done"). *Specht v. Kubota Tractor Corp.*, No. 16-CV-1012-LRR, 2017 WL 2884532, at *4 (N.D. Iowa July 6, 2017) (quoting 📄 *Falada v. Trinity Indus., Inc.*, 642 N.W.2d 247, 250 (Iowa 2002)).

17  In a diversity action involving claims brought under Iowa state law, the court is "bound by the decisions of the [Iowa] Supreme Court regarding issues of substantive state law." *Bockelman v. MCI Worldcom, Inc.*, 403 F.3d 528, 531 (8th Cir. 2005).

18  Stated another way, "[e]xpress warranties ... must be read in terms of their significance in the ... trade and relative to what would normally pass in the trade without objection under the contract description." *Kolarik*, 721 N.W. at 164 (quoting 📄 *Fargo Mach. & Tool Co. v. Kearney & Trecker Corp.*, 428 F. Supp. 364, 373 (E.D. Mich. 1977)).

19  The court allowed the plaintiff's negligence claim to proceed, however, holding that "the purchaser of pimento-stuffed olives may reasonably anticipate that the olive pits have been removed" and that "[c]onsistent with this expectation, a seller must exercise reasonable care to assure that this expectation is realized." *Kolarik*, 771 N.W.2d at 166.

20  I note (discussed further below) that the jury rejected the Klingenbergs' design-defect claim, which requires the same proof as an implied warranty of merchantability claim. *See* 📄 *Wright*, 652 N.W.2d at 181-82.

21  The court recognizes that Defendants have consistently argued that they cannot be liable because the ladder meets the ANSI standard. But throughout these proceedings, including at trial, their argument seemed based on the (erroneous) premise that a ladder that meets ANSI standards cannot be defective under Iowa law. Their current argument about what the ladder did (and did not) warrant based on the ANSI standards may not have been sufficiently raised by their Rule 50(a) motion, nor at any other point during trial (e.g., they did

not object to Instruction No. 11). As I find there is sufficient evidence to support a breach-of-express-warranty claim under Iowa law, however, I do not address the issue.

22    Prejudgment interest may accrue earlier if allowed under the common law, ⚑ *Gosch*, 701 N.W.2d at 92, but prior to the enactment of section 668.13, "[c]laims for [nonfatal] personal injuries were ordinarily denied prejudgment interest," *Balster v. State*, 360 N.W.2d 788, 790 n.2 (Iowa 1985)

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

TAB 24

*Lewis v. GE Healthcare, Inc.*, No. 5:19-cv-00490, 2020 WL 1490719 (W.D. La. Mar. 25, 2020)

2020 WL 1490719
Only the Westlaw citation is currently available.
United States District Court, W.D. Louisiana,
Shreveport Division.

Rickey LEWIS

v.

GE HEALTHCARE, INC., et al.

CASE NO. 5:19-CV-00490
|
Signed 03/25/2020

**Attorneys and Law Firms**

Amanda Lynn Washington, Daniel Julian McGlynn, McGlynn Glisson & Mouton, Baton Rouge, LA, William B. Curtis, Pro Hac Vice, Curtis Law Group, Dallas, TX, for Rickey Lewis.

Michael D. Fisse, Daigle Fisse & Kessenich, Covington, LA, Jeremy A. Moseley, Pro Hac Vice, Michael L. O'Donnell, Pro Hac Vice, Wheeler Trigg & O'Donnell, Denver, CO, for GE Healthcare Inc., General Electric Co.

Isaac H. Ryan, Deutsch Kerrigan & Stiles, New Orleans, LA, for McKesson Corp.

## RULING

TERRY A. DOUGHTY, UNITED STATES DISTRICT JUDGE

**\*1** Before the Court is a Motion to Dismiss for Failure to State a Claim Pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Motion to Dismiss") [Doc. No. 11] filed by Defendants General Electric Company and GE Healthcare, Inc. (collectively, "GEHC"). For reasons explained below, the motion is GRANTED IN PART and DENIED IN PART.

## Background

On April 17, 2019, Plaintiff Rickey Lewis, a resident of Minden, Louisiana, filed the above-captioned lawsuit against Defendants General Electric Company; GE Healthcare, Inc.; GE Healthcare AS; and McKesson, for injuries he sustained following receipt of intravenous injections of Omniscan, a

gadolinium-based contrast agent ("GBCA") manufactured by GEHC and distributed by McKesson. [Doc. No. 1, Compl. ¶¶ 1–15]. According to Lewis, he received the Omniscan injections in connection with several magnetic resonance imaging ("MRI") scans and soon after developed Gadolinium Deposition Disease ("GDD"), a disease that occurs in patients who have received a GBCA, with symptoms consistent with the toxic effects of retained gadolinium. *Id.*, ¶¶ 19-20. Lewis's alleged symptoms included, "but were not limited to ... burning sensation; clouded mentation; confusion; weakness; fatigue; difficult and painful movement; inflammation; muscle cramps; numbness; tingling sensation; aching joints; lumps and rashes on the body." *Id.*, ¶ 19.

Lewis alleged that the Omniscan he received was manufactured by the "Defendants," which he defined as *all* the defendants in the suit. *Id.*, ¶¶ 12, 24. Lewis further alleged that, for years, Defendants knew, or should have known of the toxic effects of Omniscan on patients with normal or near-normal kidney function, yet they failed to warn healthcare providers and consumers of the risks associated with GBCAs. *Id.* ¶¶ 25-31. Lewis claims that he would not have received a GBCA, and would not have been afflicted with GDD, had he and/or his healthcare provider been warned of the risks. *Id.* ¶ 32.

Lewis's complaint asserted the following causes of action: (1) strict liability–failure to warn; (2) negligence; (3) negligent misrepresentation; (4) negligence per se; (5) breach of express warranty; (6) breach of implied warranty; (7) fraudulent misrepresentation and concealment; and (8) civil battery. *Id.*, ¶¶ 58-133. He seeks recovery for compensatory and punitive damages, plus attorney's fees and costs.

On May 29, 2019, McKesson filed a Motion to Dismiss [Doc. No. 6], contending that (1) Lewis's allegations are conclusory and fail to meet the requisite pleading standard; (2) Lewis's claims premised on failure to warn are barred by federal preemption; and (3) Lewis failed to plead his causes of action for negligent misrepresentation and fraudulent misrepresentation/concealment with particularity under Fed. R. Civ. P. 9(b). Lewis filed his opposition to McKesson's Motion to Dismiss on June 28, 2019. [Doc. No. 16]. McKesson filed a reply brief on July 16, 2019. [Doc. No. 26]. On March 13, 2020, the Court issued a Ruling [Doc. No. 28] and Judgment [Doc. No. 29] granting in part and denying in part McKesson's Motion to Dismiss. The motion was granted as to Lewis's claims for strict liability: failure to warn, negligence, negligent misrepresentation,

negligence per se, breach of express warranty, fraudulent misrepresentation/concealment, and civil battery, and these claims were dismissed with prejudice. The motion was otherwise denied.

**\*2** On June 21, 2019, GEHC filed the instant Motion to Dismiss. [Doc. No. 11]. GEHC argues that (1) none of Plaintiff's causes of action are permissible outside of the Louisiana Products Liability Act ("LPLA"), which otherwise provides the exclusive remedy against a manufacturer for damages caused by its product; and (2) even if Plaintiff's claims were asserted under the LPLA, the allegations remain conclusory and fail to meet the requisite pleading standard.

Lewis filed his opposition to GEHC's Motion to Dismiss on July 3, 2019. [Doc. No. 19]. GEHC filed a reply on July 10, 2019. [Doc. No. 22]. Thus, the matter is ripe.

### Standard of Review

The Federal Rules of Civil Procedure sanction dismissal where the plaintiff fails "to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). A pleading states a claim for relief when, *inter alia*, it contains a "short and plain statement ... showing that the pleader is entitled to relief ..." Fed. R. Civ .P. 8(a)(2).

To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955 (2007)). A claim is facially plausible when it contains sufficient factual content for the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.Plausibility* does not equate to *possibility* or *probability*; it lies somewhere in between. *SeeIqbal, supra*. Plausibility simply calls for enough factual allegations to raise a reasonable expectation that discovery will reveal evidence to support the elements of the claim. *See Twombly*, 550 U.S. at 556, 127 S.Ct. at 1965.

Assessing whether a complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal, supra* (citation omitted). A well-pleaded complaint may proceed even if it strikes the court that actual proof

of the asserted facts is improbable, and that recovery is unlikely. *Twombly, supra*. Furthermore, "[t]he notice pleading requirements of Federal Rule of Civil Procedure 8 and case law do not require an inordinate amount of detail or precision." *Gilbert v. Outback Steakhouse of Florida Inc.*, 295 Fed. Appx. 710, 713 (5th Cir. Oct. 10, 2008) (unpubl.) (citations and internal quotation marks omitted). "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007) (quoting *Bell Atl.*, 127 S. Ct. at 1958). The complaint need not even "correctly specify the legal theory" giving rise to the claim for relief. *Gilbert, supra*. [1] Although the court must accept as true all factual allegations set forth in the complaint, the same presumption does not extend to legal conclusions. *Iqbal, supra*. A pleading comprised of "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" does not satisfy Rule 8. *Id.* In addition, a court is compelled to dismiss an otherwise well-pleaded claim if it is premised upon an invalid legal theory. *Neitzke v. Williams*, 490 U.S. 319, 109 S.Ct. 1827 (1989).

**\*3** When considering a motion to dismiss, courts generally are limited to the complaint and its proper attachments. *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (citation omitted). However, courts may rely upon "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice" – including public records. *Dorsey, supra*; *Norris v. Hearst Trust*, 500 F.3d 454, 461 n9 (5th Cir. 2007) (citation omitted) (proper to take judicial notice of matters of public record). Furthermore, "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-499 (5th Cir. 2000) (citations and internal quotation marks omitted).

### Choice of Law

"[F]ederal courts sitting in diversity apply state substantive law and federal procedural law." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996); *see Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). This Court applies

the choice of law rules of the forum state—Louisiana—to determine which state's law governs. *PHI, Inc. v. Rolls-Royce Corp.*, No. CIV.A. 08-1406, 2010 WL 883794, at *5 (W.D. La. Mar. 9, 2010) (citing *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Louisiana's choice of law rules are codified in Book IV of the Louisiana Civil Code. Article 3545 provides:

> [d]elictual and quasi-delictual liability for injury caused by a product, as well as damages, whether compensatory, special, or punitive, are governed by the law of this state: (1) when the injury was sustained in this state by a person domiciled or residing in this state; or (2) when the product was manufactured, produced, or acquired in this state and caused the injury either in this state or in another state to a person domiciled in this state.

In this products liability suit, Lewis alleged that he paid for and was injected with Omniscan in Louisiana. [Doc. No. 1, Compl. ¶ 17]. He suffered injury and was treated for Gadolinium Deposition Disease in Louisiana. *Id.* Therefore, because he is a Louisiana domiciliary *Id.*, ¶ 16, who sustained injuries in Louisiana, his claims are governed by Louisiana law.[2]

To determine Louisiana law, "courts must begin every legal analysis by examining primary sources of law: the State's Constitution, codes, and statutes. Jurisprudence, even when it rises to the level of *jurisprudence constante,* is a secondary law source in Louisiana." *Ayala v. Enerco Grp., Inc.*, 569 F. App'x 241, 246 (5th Cir. 2014) (citation omitted). Thus, this Court must look first to the LPLA, and only secondarily to judicial decisions (i.e., decisions of the Louisiana Supreme Court). *Id.*; *see also Moore v. State Farm Fire & Casualty Co.*, 556 F.3d 264, 269 (5th Cir. 2009) (citation omitted).

## LPLA

**I. Exclusivity**

Under Louisiana law, the LPLA "establishes the exclusive theories of liability for manufacturers for damage caused by their products," and a "claimant may not recover from a manufacturer for damage caused by a product on the basis of any theory of liability that is not set forth in" the LPLA. La. R.S. 9:2800.52.[3]

**\*4** Courts routinely dismiss claims against manufacturers that do not arise under the LPLA. *See e.g., Jefferson v. Lead Indus. Ass'n, Inc.*, 106 F.3d 1245, 1251 (5th Cir. 1997) (affirming dismissal of plaintiff's claims for negligence, fraudulent misrepresentation, breach of implied warranty, market share liability, and civil conspiracy); *Guillot v. Aventis Pasteur, Inc.*, No. 02-3373, 2013 WL 4508003, at *3 n.5 (E.D. La. Aug. 22, 2013) (finding that tort claim for civil battery is "not available against [the] manufacturer defendants due to the LPLA's exclusivity provision"). *King v. Bayer Pharm. Corp.*, No. 09-0465, 2009 WL 2135223, at *4 (W.D. La. July 13, 2009) ("Plaintiffs' claims against Defendants for strict liability, negligence and negligence per se are not viable as independent theories of recovery outside of the LPLA framework. The LPLA's exclusivity provision further precludes Plaintiffs' claim[ ] for ... negligent misrepresentation.") (internal citations omitted). *Grenier v. Med. Eng'g Corp.*, 99 F. Supp. 2d 759, 763 (W.D. La. 2000) (dismissing plaintiff's claims for, *inter alia*, negligence, breach of implied warranty, fraudulent misrepresentation, and fraud by concealment).

Lewis "does not contest that any cause of action which does not arise under the LPLA is inappropriate, including its [sic] request for punitive damages and attorney's fees." [Doc. No. 19, p. 6]. Accordingly, because Lewis's strict liability (insofar as he endeavors to assert a freestanding claim for such independent of the LPLA), negligence, negligent misrepresentation, breach of implied warranty,[4] fraudulent misrepresentation and concealment, and civil battery claims are not cognizable under the LPLA, and must be dismissed.

Further, Lewis asserted his negligence per se claim pursuant to federal law, for Food & Drug Administration ("FDA") and Federal Food, Drug & Cosmetic Act ("FDCA") violations. (Compl. ¶¶ 92-102) (citing 21 C.F.R. §§ 201.57, 201.80, 201.128; 21 U.S.C. §§ 331, 352). However, "Louisiana does not recognize any claim for violations of FDA [or FDCA] regulations. The only remedies available to plaintiff[ ] in this case are provided in the LPLA." *King, 2009*

WL 2135223, at *3 (quoting *Doucet v. Danek Med., Inc.*, No. 96-2439, 1999 WL 1129648, at *1 n.4 (W.D. La. June 28, 1999)). Therefore, Lewis's negligence per se claim also should be dismissed.

## II. Sufficiency of the LPLA Allegations

Under the LPLA, a manufacturer is liable to a claimant for damage proximately caused by a product only if the product is unreasonably dangerous. La. R.S. 9:2800.54(A). A product is unreasonably dangerous "if and only if" it is unreasonably dangerous (1) in construction or composition; (2) in design; (3) because of inadequate warning; or (4) because it does not conform to an express warranty. La. R.S. 9:2800.54(B).

In his complaint, Lewis endeavored to assert claims for failure to warn and for breach of express warranty. [Doc. No. 1, Compl. ¶¶ 58-61, 103-111]. In his opposition brief, however, he also advanced a claim for unreasonably dangerous design. [Doc. No. 19, pp. 10–11]. GEHC contends that these claims fail because Lewis did not explicitly assert a claim under the LPLA. It is manifest, however, that a complaint need not "correctly specify the legal theory giving rise to the claim for relief." *Gilbert, supra*. Further, "[c]ourts must focus on the substance of the relief sought and the allegations pleaded, not on the label used." *Gearlds, supra*. Because failure to warn, breach of express warranty, and unreasonably dangerous design are cognizable under the LPLA, the Court will proceed to determine whether Lewis alleged sufficient facts to support these claims. *See* *King*, 2009 WL 2135223, at *5 (complaint contained "the requisite factual allegations to state a claim under the LPLA" even though plaintiffs failed to correctly categorize their claims).

**\*5** To state a cause of action under the LPLA, a plaintiff must allege:

1. that the defendant is a manufacturer of the product;

2. that the claimant's damage was proximately caused by a characteristic of the product;

3. that the characteristic made the product unreasonably dangerous in one of the four ways provided in the statute; and

4. that the claimant's damage arose from a reasonably anticipated use of the product by the claimant or someone else.

*Jefferson*, 106 F.3d at 1251.

Here, Lewis alleged: (1) GEHC manufactured the product at issue—Omniscan; (2) his injuries were foreseeable because studies demonstrated that the weak protective layer coating Omniscan failed to prevent gadolinium, a highly toxic heavy metal, from coming in contact with human tissue; and (3) his damage arose from a normal use of the product —intravenous injection of the product in conjunction with an MRI. [Doc. No. 1, Compl. ¶¶ 2–3, 7, 21-27, 30, 33, 36-37, 139; *see generally* Compl.]. Thus, to survive dismissal, Lewis also must allege facts to show that the product is unreasonably dangerous because of an inadequate warning, failure to conform to an express warranty, or a defective design. *See* La. R.S. 9:2800.54.

### A. Failure to Warn

"A claim premised on a failure to warn requires that the plaintiff prove that the device's inadequate warning rendered the device 'unreasonably dangerous.'" *Perez v. Michael Weinig, Inc.*, No. CIV.A. 304CV0448, 2005 WL 1630018, at *6 (W.D. La. July 7, 2005). Under the LPLA, a product is unreasonably dangerous "if, at the time the product left its manufacturer's control, the product possessed a characteristic that may cause damage and the manufacturer failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product." La. R.S. 9:2800.57(A). Therefore, to maintain a failure to warn claim, "a plaintiff must demonstrate that the product in question has a potentially damage-causing characteristic and that the manufacturer failed to use reasonable care to provide an adequate warning about this characteristic." *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 264 (5th Cir. 2002).

Lewis contends that during the years GEHC manufactured and sold Omniscan, there have been "numerous case reports, studies, assessments, papers, peer-reviewed literature, and other clinical data that have described and/or demonstrated GDD in connection with the use of GBCAs." [Doc. No. 1, Compl. ¶ 25]. Beginning in 1988, studies demonstrated that gadolinium was breaking free of bonds in linear GBCAs, in part due to its weak protective layer. *Id.* ¶ 37. Further, since 1991, studies indicated that gadolinium retention was occurring in people with normal renal function. *Id.* ¶ 54. The first major study that showed deposits of gadolinium in

2020 WL 1490719

human tissue in patients with renal failure appeared in 1998 and in patients with normal renal function in 2004. *Id.* ¶ 38.

Lewis alleged that linear GBCAs, including Omniscan, have a potentially damage-causing characteristic, a weak protective layer, which has caused "debilitating symptoms" in patients with normal renal function. *Id.* ¶¶ 44, 46. He alleged that GEHC knew for years that Omniscan "did not have very stable bonds," "could come apart easily causing significant toxicity in humans," and posed a risk to people with normal renal function. *Id.* ¶¶ 43, 54. Nevertheless, according to Lewis, GEHC failed to warn consumers and healthcare providers, including Lewis's own healthcare providers, of gadolinium retention on the labels of its products. Further, in 2012, GEHC corrected its label to warn of gadolinium retention in people with kidney disease or acute kidney injury, but not in people with normal renal function. *Id.* ¶¶ 29, 55. GEHC issued a new label warning of gadolinium retention in patients with normal kidney function only in May 2018. *Id.* ¶ 53.

**\*6** Based on these allegations, the Court reasonably can infer that GEHC failed to provide an adequate warning of the risks associated with the use of Omniscan. *See* Iqbal, 556 U.S. at 678. Accordingly, Lewis sufficiently has pleaded an inadequate warning claim under the LPLA against GEHC, and GEHC's motion should be denied as to this claim. *See* Rayford v. Karl Storz Endoscopy Am., Inc., No. 15-2835, 2016 WL 4398513, at \*6 (W.D. La. June 22, 2016) (finding the allegations in plaintiff's complaint created a reasonable inference that defendants "failed to provide an adequate warning of the dangers associated with the use of their product").

### B. Breach of Express Warranty

The LPLA provides that,

> [a] product is unreasonably dangerous when it does not conform to an express warranty made at any time by the manufacturer about the product if the express warranty has induced the claimant or another person or entity to use the product and the claimant's damage was proximately

caused because the express warranty was untrue.

La. R.S. § 9:2800.58.

In his complaint, Lewis noted that the weak protective layers of GBCAs were "not considered to be a problem as long as the contrast agent was excreted out of the body according to the claimed drug's half-life," but the "delayed elimination phase of the GBCAs," which allowed toxic gadolinium to be released into the body, was later discovered. (Compl. ¶ 39). Lewis contends that as of the date of his injections, GEHC knew "Omniscan was not completely eliminated from the body, even in patients with normal renal function," yet included the "specific and unequivocal" assertion in the Pharmacokinetics section of the Omniscan label that " 'Gadolinium is eliminated' from the body." *Id.,* ¶¶ 107-108. Lewis also claims that members of the medical community relied on GEHC's representations in prescribing Omniscan, and he sustained damages as a result. *Id.,* ¶¶ 110-111. Had GEHC warned plaintiff and/or his healthcare providers about the true risks associated with Omniscan, Lewis would not have been administered a GBCA, and would not have been afflicted with GDD. *Id.,* ¶ 32.

In support of the Motion to Dismiss, GEHC identified and referenced the operative Omniscan label that was in effect for the period from December 2010 through April 26, 2018. [5] The label stated that

> Gadodiamide is eliminated primarily in the urine with 95.4 ± 5.5% (mean ± SD) of the administered dose eliminated by 24 hours. The renal and plasma clearance rates of gadodiamide are nearly identical (1.7 and 1.8 mL/min/kg, respectively), and are similar to that of substances excreted primarily by glomerular filtration.

Nothing else in the label discusses the elimination of gadodiamide. Consequently, contrary to plaintiff's allegations, GEHC never represented that *100* percent of the Omniscan would be eliminated from the body. Where, as here, there is a conflict between the allegations in the complaint and

the exhibits referenced in the complaint, the latter controls.

*U.S. ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 377 (5th Cir. 2004) (citation omitted).

In his opposition brief, Lewis further noted that GEHC represented that "Omniscan does not cross the intact blood-brain barrier," when, in fact, it can cross the blood-brain barrier. [Doc. No. 19, p. 11 (citing Compl., ¶ 75) ]. Moreover, the foregoing statement *does* appear in the Omniscan label. [6] Although Lewis included the blood-brain barrier misrepresentation in the section of his complaint on negligent misrepresentation, it may be considered for purposes of his breach of express warranty claim.

**\*7** On review, the undersigned finds that while not particularly fulsome, Lewis' allegations suffice to support a breach of express warranty claim. *See Rayford*, 2016 WL 4398513, at \*7 (noting that *Twombly* "does not require the plaintiff to set forth such precise, detailed allegations with respect to the breach of express warranty claim," but merely requires enough "to raise a right to relief above the speculative level"). Accordingly, GEHC's motion should be denied as to Lewis's LPLA express warranty claim.

### C. *Unreasonably Dangerous Design*

To maintain a design defect claim, a plaintiff must demonstrate "[t]here existed an alternative design for the product that was capable of preventing the claimant's damage" and "[t]he likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design." La. R.S. 9:2800.56.

In response to GEHC's motion, Lewis noted that he pleaded "that an alternative design for Omniscan existed and was capable of preventing Plaintiff's damages" to support a claim under the LPLA for an unreasonably dangerous design. [Doc. No. 19 at p. 11 (citing Compl. ¶¶ 30–33, 47(b)) ]. However, the cited portions [7] of the complaint do not identify an alternative design for Omniscan. Therefore, Lewis does not state a cause of action for an unreasonably dangerous design.

Insofar as Lewis intended to seek leave to amend his complaint to redress his insufficient allegations, he has not included a proposed pleading with his request. Accordingly, the issue is not properly before the Court. [8]

### III. Causation and Other Arguments

GEHC also contends that "the FDA and scientific community have found no evidence of any adverse health effects in patients with normal kidney function from any trace amounts of a GBCA that may be retained in the body ..." [Doc. No. 11-1, pp. 1-2]. In his Complaint, however, Lewis pointed to studies that highlighted the toxic effects of gadolinium retention. *See* [Doc. No. 1, Compl. ¶¶ 36-46].

GEHC further faults Lewis for his failure to plead when he received Omniscan, the reason he received Omniscan, when he developed his symptoms, and whether or when he was diagnosed with GDD by a medical professional. These issues, however, constitute topics for discovery, not Rule 8 pleading requirements, which mandates only fair notice of the claim(s) and the grounds upon which it rests. At this stage in the proceedings, the Court only must determine whether Lewis's claims meet the minimal threshold of plausibility. Under this standard, the undersigned finds that Lewis sufficiently has pleaded that Omniscan is unreasonably dangerous because of inadequate warning and/or because it does not conform to an express warranty and that this proximately caused his injury. GEHC's additional arguments implicate the merits of Lewis's claims and remain premature at this stage of the proceedings. Whether Lewis ultimately will be able to offer sufficient proof to support his claims is more appropriate in the context of a motion for summary judgment or a trial on the merits.

### Conclusion

**\*8** For the foregoing reasons, GEHC's Motion to Dismiss is GRANTED IN PART and DENIED IN PART. The motion is GRANTED, and Lewis' non-LPLA claims for strict liability: failure to warn, negligence, negligent misrepresentation, negligence per se, breach of implied warranty, fraudulent misrepresentation/ concealment, civil battery, plus his defective design claim under the LPLA, and his request for punitive damages and attorney's fees, are DISMISSED WITH PREJUDICE. The Motion to Dismiss is otherwise DENIED.

### All Citations

Slip Copy, 2020 WL 1490719

2020 WL 1490719

# Footnotes

1    "Courts must focus on the substance of the relief sought and the allegations pleaded, not on the label used." *Gearlds v. Entergy Servs., Inc.*, 709 F.3d 448, 452 (5th Cir. 2013) (citations omitted).

2    In addition, no party contests that the substantive issues raised by the Motion to Dismiss are governed by Louisiana law. *See In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 206 (5th Cir. 2007) (deferring to the parties' agreement that Louisiana substantive law controlled); *Jefferson v. Lead Indus. Ass'n*, 106 F.3d 1245, 1250 (5th Cir. La. 1997) (applied Louisiana law where no party disputed that Louisiana law governed).

3    The LPLA defines manufacturer as "a person or entity who is in the business of manufacturing a product for placement into trade or commerce." La. R.S. § 9:2800.53. Lewis alleged, and GEHC does not dispute, that GEHC manufactures, markets, and sells Omniscan, *see* [Doc. No. 1, Compl. ¶¶ 5, 7]. Therefore, GEHC meets the definition of a manufacturer.

4    Under Louisiana law, "breach of implied warranty or redhibition is not available as a theory of recovery for personal injury ..." *Jefferson, supra.* Although Lewis alleged economic loss associated with his breach of implied warranty claim, he did not advance a redhibition claim in response to GEHC motion, and, in fact, conceded that all non-LPLA claims were inappropriate. The Court will rule accordingly.

5    *See* https://www.accessdata.fda.gov/drugsatfda_docs/label/2010/020123s037lbl.pdf (last visited on Mar. 24, 2020). The court may take judicial notice of publicly available FDA documents that are matters of public record. *See Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011).

6    *See* https://www.accessdata.fda.gov/drugsatfda_docs/label/2010/020123s037lbl.pdf (last visited on Mar. 24, 2020).

7    There does not appear to be a 47(b).

8    Ordinarily, the Court should afford Plaintiff the opportunity to amend his complaint to state a claim for relief. However, because the instant motion disposes of fewer than all claims and parties, it is not a final judgment and remains subject to revision at any time before conclusion of the case. Fed. R. Civ. P. 54(b). Therefore, if, and when Lewis uncovers facts sufficient to support a viable design defect claim against GEHC, then he may seek leave to amend his Complaint to assert the claim. It goes without saying, however, that Lewis may not dither in his efforts.

---

**End of Document**                                © 2021 Thomson Reuters. No claim to original U.S. Government Works.

TAB 25

*MacMorris v. Wyeth*, No. 2:04-CV-596-FTM-29-DNF, 2005 WL 1528626 (M.D. Fla. June 27, 2005)

KeyCite Yellow Flag - Negative Treatment
Distinguished by  Virgilio v. Ryland Group, Inc.,  11th Cir.(Fla.),   May 18, 2012

2005 WL 1528626
Only the Westlaw citation is currently available.
United States District Court,
M.D. Florida.

Rosemary MACMORRIS, individually and
and as personal representative of the estate
of Clifford Macmorris, deceased, Plaintiff,
v.
WYETH, INC. f/k/a American Home Products
Corporation a/k/a Wyeth Company, Wyeth-
Ayerst Laboratories Company, Wyeth
Pharmaceuticals, Inc., Upsher-Smith Laboratories,
Inc., Sandoz Gmbh, Sandoz, Inc., fka Geneva
Pharmaceuticals, Inc., Eon Labs, Inc., f/k/a
Eon Labs Manufacturing, Inc., Alphapharm Pty
Limited, Par Pharmaceutical, Inc ., Defendants.

No. 2:04CV596FTM-29DNF.
|
June 27, 2005.

**Attorneys and Law Firms**

David Hughes Harris, Kenneth G. Gilman, Gilman and
Pastor, LLP, Naples, FL, for Plaintiff.

Ace J. Blackburn, Jr., Cooney, Mattson, Lance, Blackburn,
Richards, & O'connor, P.A., Ft. Lauderdale, FL, Matthew J.
Moore, Shook, Hardy & Bacon, L.L.P., Ronald Edward Bush,
William B. Bowles, Jr., Bush Graziano & Rice, P.A., Tampa,
FL, for Defendants.

*OPINION AND ORDER*

STEELE, J.

**\*1** This matter comes before the Court on motions to dismiss
the Second Amended Complaint filed separately by eight of
the nine defendants. [1] (Docs.# 28-29, 31, 36-37). [2] Plaintiff
filed her Opposition to Defendants' Motions to Dismiss (Doc.
# 41) on March 9, 2005.

I.

In deciding a Rule 12(b)(6) motion to dismiss, the Court
must accept all factual allegations in a complaint as true
and take them in the light most favorable to the plaintiff.
Christopher v. Harbury, 536 U.S. 403, 406, 122 S.Ct.
2179, 153 L.Ed.2d 413 (2002); Hill v. White, 321 F.3d
1334, 1335 (11th Cir.2003). A complaint should not be
dismissed unless it appears beyond doubt that plaintiff can
prove no set of facts that would entitle them to relief.
Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2
L.Ed.2d 80 (1957) (footnote omitted); Marsh v. Butler
County, Ala., 268 F.3d 1014, 1022 (11th Cir.2001)(en banc).
To satisfy the pleading requirements of Fed.R.Civ.P. 8, a
complaint must simply give the defendant fair notice of
what the plaintiff's claims are and the grounds upon which
they rest. Swierkiewicz v. Sorema N .A., 534 U.S. 506,
512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). The Court must
limit its consideration to well-pleaded factual allegations,
documents central to or referenced in the complaint, and
matters judicially noticed. La Grasta v. First Union
Secs., Inc., 358 F.3d 840, 845 (11th Cir.2004). Dismissal
is warranted however if, assuming the truth of the factual
allegations of the plaintiff's complaint, there is a dispositive
legal issue which precludes relief. Neitzke v. Williams,
490 U.S. 319, 326, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989);
Brown v. Crawford County, Ga. ., 960 F.2d 1002, 1009-10
(11th Cir.1992). The Court need not accept unsupported
conclusions of law or of mixed law and fact in a complaint.
Marsh, 268 F.3d at 1036 n. 16.

Additionally, a party may not incorporate all allegations of
each count in every successive count. Magluta v. Samples,
256 F.3d 1282, 1284 (11th Cir.2001); Cramer v. State of
Fla., 117 F.3d 1258, 1263 (11th Cir.1997). Here, each count
of the Second Amended Complaint incorporates all paragraphs
in all the previous counts. Accordingly, except for Count I,
the Second Amended Complaint is a shotgun pleading. The
Court will discuss below whether the counts are otherwise
also subject to dismissal.

## II.

In her Second Amended Complaint, plaintiff Rosemary MacMorris, individually and as personal representative of the estate of Clifford MacMorris, the deceased, contends that defendants' failure to warn of the dangers of and/or the defective design of Amiodarone[3] caused his death. Specifically, plaintiff asserts that Mr. MacMorris suffered injury and death as a result of his consumption of Amiodarone which was manufactured and/or distributed by defendants. (Doc. # 27, p. 6). According to plaintiff, defendants failed to provide adequate warnings and/or manufactured and distributed a drug which was defective and in an unreasonably dangerous condition. (*Id.,* p. 37).

The Federal Drug Administration approved Amiodarone for marketing to the public as a drug of last resort for patients who suffer from recurrent life-threatening ventricular fibrillation and ventricular tachycardia, and only when those conditions would not respond to other available antiarrhythmic drugs and therapies. Plaintiff contends that defendants "embarked on a course of conduct the purpose of which was to increase Amiodarone sales as an initial, first-line antiarrhythmic medication, for which Amiodarone has never received FDA approval." (*Id.,* pp. 7-8).

**\*2** Plaintiff alleges that, in reliance on the express warranty indicating Amiodarone was a safe drug, her husband purchased and ingested Amiodarone, which was manufactured or distributed by each defendant. This express warranty can be found in the direct-to-consumer advertisements. Plaintiff states that defendants did not provide an adequate warning of the negative effects of the use of Amiodarone despite having knowledge of the dangers. As a result of consuming Amiodarone, Mr. MacMorris suffered "pulmonary fibrosis secondary to Amiodarone toxicity, excruciating pain and injuries, agonizing aches, mental anguish, loss of enjoyment of life and life's pleasures, and ultimately, death." (Doc. # 27, p. 30).

The eleven-count Second Amended Complaint (Doc. # 27) alleges the following causes of action under Florida law[4] as to various defendants: (1) wrongful death, negligence; (2) wrongful death, strict products liability; (3) wrongful death, breach of express warranty; (4) wrongful death, fraud; (5) unjust enrichment; (6) outrage (intentional infliction of emotional distress); (7)-(11) alternative claims under the

Florida Survival Statute, FLA. STAT. § 46.021; (12) loss of consortium claim under the Survival Statute.

Defendants contend that the Second Amended Complaint should be dismissed because (1) off-label marketing of prescription drugs by a manufacturer is not unlawful; (2) plaintiff is barred by the learned intermediary doctrine from bringing the negligence, strict liability, and fraud claims against them (Counts I, II, and IV), (3) the counts fail to state any claim under Florida law for a breach of express warranty, unjust enrichment, or intentional infliction of emotional distress (Counts III, V, and VI); and (4) the deficiencies in Counts I-VI which are equally applicable to the alternative claims under the Survival Statute. Defendants do not address plaintiff's loss of consortium claim (Count XII).

## III.

### A. "Off-Label" Marketing
Defendants argue that those portions of the Second Amended Complaint which refer to "off-label" marketing of Amiodarone should be dismissed or stricken because "off-label" marketing of prescription drugs by a manufacturer is not illegal. The Second Amended Complaint specifically alleges the contrary, and the federal regulation and case law supports plaintiff's legal position. Therefore, this ground for dismissal will be denied.

### B. Learned Intermediary Doctrine (Counts I, II, and IV)
Defendants argue that Counts I, II, and IV must be dismissed to the extent they allege a duty to provide warnings or other information directly to a consumer. Defendants assert that under Florida's learned intermediary doctrine the manufacturer's duty to warn runs only to the physician, not directly to the patient.

Under Florida law, a manufacturer's duty to warn of drug hazards runs to the physician, not directly to the patient, and therefore a manufacturer of prescription drugs or products discharges its duty to warn by providing the physician with information about risks associated with those products. *Christopher v. Cutter Labs.,* 53 F.3d 1184, 1192 (11th Cir.1995), citing *Felix v. Hoffmann-LaRoche, Inc.,* 540 So.2d 102, 105 (Fla.1989). The learned intermediary doctrine is a corollary to this rule, and provides that the failure of the manufacturer to provide a physician with an adequate warning of the risks associated with a prescription product is

MacMorris v. Wyeth, Inc., Not Reported in F.Supp.2d (2005)
2005 WL 1528626

not the proximate cause of a patient's injury if the prescribing physician had independent knowledge of the risk that the adequate warning should have communicated. *Christopher,* 53 F.3d at 1192. In other words, the causal link between a patient's injury and the alleged failure to warn is broken when the prescribing physician had "substantially the same" knowledge as an adequate warning from the manufacturer should have communicated to him. *Christopher,* 53 F.3d at 1192; *Tatum v. Schering Corp.,* 795 F.2d 925, 928 (11th Cir.1986).

**\*3** The learned intermediary doctrine is a fact-intensive affirmative defense which cannot be resolved in this case pursuant to a motion to dismiss. Defendants also seek to dismiss these counts because the duty to warn runs to the physician and not the patient. The duty is to the physician, not the patient, because "the prescribing physician, acting as a 'learned intermediary' between the manufacturer and the consumer, weighs the potential benefits against the dangers in deciding whether to recommend the drug to meet the patients needs." *Felix,* 540 So.2d at 104. The Second Amended Complaint alleges that the manufacturers marketed Amiodarone to consumers, and defendants have not cited any case which requires dismissal under this circumstance. Therefore, this ground for dismissal will be denied.

C. Inadequate Testing and Investigation
Defendants seek dismissal of Counts I and II to the extent they are premised upon the failure to perform adequate testing and investigation, which does not provide an independent cause of action. Plaintiff agrees with this legal principle, but states these allegations were not raised as a separate and independent cause of action. Therefore, the motion to dismiss or strike will be denied as to these allegations.

D. Count III-Breach of Express Warranty
Defendants contend that there can be no claim for breach of express warranty without privity between Mr. MacMorris and the defendants, and plaintiff made no allegations that Mr. MacMorris purchased Amiodarone directly from any of the defendants. Plaintiff counters that, at least under some factual circumstances, Florida law recognizes a viable claim for breach of express warranty when the consumer purchased the product from a third party.

The general rule requires privity in order to state an express warranty claim. *See Intergraph Corp. v. Stearman,* 555 So.2d 1282, 1283 (Fla. 2d DCA 1990) ("Privity is required in order to recover damages from the seller of a product for breach of express or implied warranties."); *see also Spolski Gen. Contractor, Inc. v. Jett-Aire Corp. Aviation Mgmt. of Cent. Fla., Inc.,* 637 So.2d 968, 970 (Fla. 5th DCA 1994) (manufacturer of floor paint could not be held liable to general contractor for breach of express warranties, where there was no sale from manufacturer to contractor, no privity between them, no contract between them, no reliance by contractor on any warrant, and no warranty was given to contractor). Other cases have held, however, that some factual circumstances satisfy the privity requirement even in the absence of a purchase directly from the manufacturer. *New Nautical Coatings, Inc. v. Scoggin,* 731 So.2d 145, 147 (Fla. 4th DCA 1999) (finding privity when the paint manufacturer's representative was heavily involved in the transaction where the third-party paint shop provided the services to the plaintiff); *see also ISK Biotech Corp. v. Douberly,* 640 So.2d 85 (Fla. 1st DCA 1994) (finding privity where manufacturer's representative informed the third-party fungicide seller that the seller could assure the plaintiff that the subject fungicide would not destroy the plaintiff's crop); *Cedars of Lebanon Hosp. Corp. v. European X-Ray Distribs. of Am., Inc.,* 444 So.2d 1068, 1072 n. 4 (privity existed where manufacturer's representative made express warranty through the direct contacts with the ultimate purchaser/consumer who bought the product from the third party distributor). At the motion to dismiss stage the Court cannot determine that privity will fail in this case. The motions will be denied as to Count III.

E. Count V-Unjust Enrichment
**\*4** Defendants argue the claim for unjust enrichment should be dismissed because plaintiff failed to make any allegations that Mr. MacMorris obtained the Amiodarone directly from them. Plaintiff responds that privity is not a necessary element for an unjust enrichment claim, and that courts recognize this claim even where consumers did not deal directly with the manufacturer who was unjustly enriched.

Under Florida law, "[t]he elements of a cause of action for unjust enrichment are: (1) the Plaintiff has conferred a benefit on the Defendant; (2) the Defendant has knowledge of the benefit; (3) the Defendant has accepted or retained the benefit conferred; and (4) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying fair value." *Media Servs. Group, Inc. v. Bay*

MacMorris v. Wyeth, Inc., Not Reported in F.Supp.2d (2005)

2005 WL 1528626

*Cities Communications, Inc.,* 237 F.3d 1326, 1330-31 (11th Cir.2001); citing *Swindell v. Crowson,* 712 So.2d 1162, 1163 (Fla. 2d DCA 1998); *see also Shands Teaching Hosp. and Clinics, Inc. v. Beech Street Corp.,* 899 So.2d 1222, 1227 (Fla. 1st DCA 2005). Plaintiff is correct that indirect purchasers have been allowed to bring an unjust enrichment claim against a manufacturer. Plaintiff alleges that a benefit was conferred on defendants (Doc. # 27, pp. 44-45), and at this stage of the proceedings the Court cannot say that the count cannot be sustained. The motions will be denied as to Count V.

F. Count VI-Intentional Infliction of Emotional Distress
Defendants contend that this count is insufficient because plaintiff failed to adequately plead the element of intent, which requires that the misconduct was directed specifically at her or the decedent. Plaintiff asserts that she has sufficiently pleaded the allegations for Count VI in paragraphs 39-122 and 184-187 in the Second Amended Complaint, and that defendants confuse the elements of negligent infliction of emotional distress with the elements of intentional infliction of emotional distress.

To state a claim for intentional infliction of emotional distress under Florida law, the plaintiff must allege: (1) deliberate or reckless infliction of mental suffering; (2) by outrageous conduct; (3) which conduct must have caused the suffering; and (4) the suffering must have been severe. *Hart v. United States,* 894 F.2d 1539, 1548 (11th Cir.1990); citing *Metropolitan Life Ins. Co. v. McCarson,* 467 So.2d 277, 278 (Fla.1985) (adopting definition laid out in Restatement (Second) of Torts § 46). In Florida, conduct is intentional "[w]here the actor knows that [severe] distress is certain, or substantially certain to result from his conduct." *Hart,* 894 F.2d at 1548; quoting *Ford Motor Credit Co. v. Sheehan,* 373 So.2d 956, 958 (Fla. 1st DCA 1979) (debt collector seeking to repossess plaintiff's car called his mother and told her the caller needed to get in touch with plaintiff because plaintiff's children had been in a serious automobile accident in another state). Viewing the facts pleaded in the Second Amended Complaint in the light most favorable to plaintiff, and drawing all inferences in plaintiff's favor, the Court concludes that the count is adequately plead. The motions will be denied as to Count VI.

G. Survival Statute Claims (Counts VII-XI)

*5 Defendants argue that, to the extent that plaintiff asserts the same claims under under the Florida Survival Statute, FLA. STAT. § 46.021 (Counts VII-XI), the defenses applicable to Counts I-VI are equally applicable to Counts VII-XI. Since the Court has not sustained the arguments as to Counts I to VI, this argument is without merit.

IV.

To remedy the shotgun pleading, the Court will modify the following paragraphs of the Second Amended Complaint:

1. The words "the preceding" will be stricken in Paragraph 148 and "1 through 131" will be added to the sentence, so that it reads: "Plaintiffs incorporate and reallege herein the allegations contained in paragraphs 1 through 131."

2. The words "the preceding" will be stricken in Paragraph 156 and "1 through 131" will be added to the sentence, so that it reads: "Plaintiffs incorporate and reallege herein the allegations contained in paragraphs 1 through 131."

3. The words "the preceding" will be stricken in Paragraph 164 and "1 through 131" will be added to the sentence, so that it reads: "Plaintiffs incorporate and reallege herein the allegations contained in paragraphs 1 through 131."

4. The words "the preceding" will be stricken in Paragraph 178 and "1 through 131" will be added to the sentence, so that it reads: "Plaintiffs incorporate and reallege herein the allegations contained in paragraphs 1 through 131."

5. The words "the preceding" will be stricken in Paragraph 183 and "1 through 131" will be added to the sentence, so that it reads: "Plaintiffs incorporate and reallege herein the allegations contained in paragraphs 1 through 131."

6. The words "the preceding" will be stricken in Paragraph 188 and "1 through 131" will be added to the sentence, so that it reads: "Plaintiffs incorporate and reallege herein the allegations contained in paragraphs 1 through 131."

Additionally, plaintiff has attempted to embed a Count Twelve, loss of consortium, in the portion of the Second Amended Complaint labeled Counts Seven through Eleven. The Court finds this improper, and the purported Count Twelve will be dismissed.

MacMorris v. Wyeth, Inc., Not Reported in F.Supp.2d (2005)

2005 WL 1528626

Accordingly, it is now

ORDERED:

1. Defendants' Motions to Dismiss the Second Amended Complaint (Doc. # 28-29, 31, 36-17) are DENIED.

2. The Second Amended Complaint is amended as set forth above.

3. The purported Count Twelve is dismissed without prejudice.

DONE AND ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 1528626

## Footnotes

1    It does not appear that defendant Alphapharm Pty Limited ("Alphapharm") has been served yet. Consequently, Alphapharm has not responded to the Second Amended Complaint. For purposes of this Order, the Court will omit any discussion of the allegations in the Second Amended Complaint as they pertain to Alphapharm.

2    Defendant Par Pharmaceuticals, Inc. filed a Motion to Dismiss the Second Amended Complaint (Doc. # 29) that is virtually identical to the 12(b)(6) motion (Doc. # 28), which defendants Wyeth, Inc., Wyeth-Ayerst Laboratories Company, and Wyeth Pharmaceuticals, Inc. (collectively referred to as "Wyeth") filed on January 24, 2005. Additionally, the other defendants filed motions adopting and incorporating the arguments set forth in their co-defendants Par Pharmaceuticals, Inc.'s and Wyeth's 12(b)(6) motions. (Docs.# 31, 36-37). In short, all the defendants make the same arguments and invoke the same defenses against plaintiff's allegations in the Second Amended Complaint.

3    The drug Amiodarone is also known under the names Cordarone®, which is manufactured and sold by defendant Wyeth, and Pacerone®, which is manufactured and sold by defendant Upsher-Smith Laboratories, Inc. The Court will refer to the subject drug as Amiodarone from hereon.

4    A federal court sitting in diversity jurisdiction applies the substantive law of the forum state unless federal constitutional or statutory law compels a contrary result. *Technical Coating Applicators, Inc. v. United States Fid. & Guar. Co.,* 157 F.3d 843, 844 (11th Cir.1998). Both parties agree that Florida law applies to this case.

---

**End of Document**                                   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

TAB 26

*Majdipour v. Jaguar Land Rover N. Am., LLC*, 2013 WL 5574626 (D.N.J. Oct. 9, 2013)

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 378 of 535
PageID: 32325
Majdipour v. Jaguar Land Rover North America, LLC, Not Reported in F.Supp.2d (2013)
2013 WL 5574626

KeyCite Yellow Flag - Negative Treatment

Distinguished by  Hall v. General Motors, LLC,  E.D.Mich.,  March 18, 2020

2013 WL 5574626
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Simon MAJDIPOUR and Pamela Austin,
individually and on behalf of a class of
similarly situated individuals, Plaintiffs,

v.

JAGUAR LAND ROVER NORTH
AMERICA, LLC and Jaguar Land
Rover Automotive, Plc, Defendants.

Civ. No. 2:12–cv–07849 (WHW).
|
Oct. 9, 2013.

OPINION

WALLS, Senior District Judge.

**\*1** Defendant Jaguar Land Rover North America, LLC ("Land Rover") moves for dismissal of Plaintiffs' First Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b). Under Federal Rule of Civil Procedure 78(b), this motion is decided without oral argument. The motion to dismiss is granted in part and denied in part.

FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs Simon Majdipour and Pamela Austin bring this action individually and on behalf of putative classes of similarly situated individuals against Land Rover and Jaguar Land Rover Automotive, PLC for various causes of action related to an alleged defect in the electronic air suspension system in Range Rover sport utility vehicles for the 2003 through 2006 model years (the "Subject Vehicles").[1] ECF No. 14, First Am. Compl. ¶¶ 1–8.

Plaintiffs are California citizens who each purchased a certified pre-owned ("CPO") 2006 Range Rover from a Land Rover authorized dealer in California—Land Rover Encino. *Id.* ¶¶ 19, 45, 52. Land Rover is a limited liability company with its headquarters and principal place of business in Mahwah, New Jersey. *Id.* ¶ 20.

Plaintiffs allege that Land Rover sold Subject Vehicles containing a suspension defect (the "Defect"), which "causes the suspension system's rubber air bellows ... to develop leaks, releasing air pressure and losing their ability to properly hold the vehicle's weight," resulting in "a serious safety hazard, including the sudden loss of suspension on one side of the vehicle (rendering it lopsided while it is in motion), a loss of handling and the consequent inability to steer the vehicle in a straight line ." *Id.* ¶ 27. The Defect has also resulted in "the vehicles suddenly dropping while being driven, sitting unevenly and leaning to one side, and/or suddenly losing the ability to travel in a straight line." *Id.* ¶ 30.

Plaintiffs' individual allegations are similar. Plaintiff Austin purchased her CPO 2006 Range Rover in February 2008, and Plaintiff Majdipour purchased his vehicle in October 2009. *Id.* ¶¶ 46, 52. Both Plaintiffs "considered Land Rover marketing materials concerning the subject vehicle, including Land Rover television commercials which failed to disclose ... the alleged Defect." *Id.* ¶¶ 46, 53. Austin also reviewed "Land Rover's website and Range Rover brochures." *Id.* ¶ 53. Both Plaintiffs spoke with Land Rover Encino employees before purchasing their vehicles. *Id.* ¶¶ 46, 53. Majdipour was informed that his vehicle had "passed Land Rover's comprehensive 140–poi nt inspection and was certified to be in good condition." *Id.* ¶ 46. Austin also received and reviewed the 140–point checklist. *Id.* ¶ 53. Neither the employees with whom Plaintiffs spoke nor the 140–point certification warned of the alleged Defect. *Id.* ¶¶ 46, 54.

When Plaintiffs purchased their vehicles, Land Rover provided a CPO Limited Warranty for the earlier of 6 years or 75,000 miles—measured from the original in-service date and zero miles. *Id.* ¶ 79–80, Ex. B, pg. 5. This warranty supplements Land Rover's 4 year/50,000 mile express warranty for new vehicles. *Id.* ¶ 80. The CPO Limited Warranty provides:

> **\*2** Land Rover North America, Inc., through its authorized retailers, will repair, replace or reimburse the

> policy holder for the reasonable cost
> to repair or replace any of the
> parts covered, if required due to a
> mechanical breakdown or failure....
> MECHANICAL BREAKDOWN OR
> FAILURE is defined as the inability
> of any covered part(s) to perform the
> function(s) for which it (they) was
> (were) designed due to defects in
> material or workmanship.

*Id.* ¶ 80, Ex. B, pg. 5. The CPO Limited Warranty also explains that "[t]here is a $100 deductible per repair visit, for which the customer is responsible." First Am. Compl. Ex. B, pg. 5.

Each Plaintiff alleges two manifestations of the Defect. Plaintiff Majdipour first encountered a problem on November 17, 2010 with approximately 47,986 miles on the odometer, when his vehicle "suddenly dropped to one side while being driven, and suspension warning lights illuminated on the dashboard." First Am. Compl. ¶ 47. An authorized Land Rover dealer concluded there was a " 'leak at right front air spring,' " which the dealer replaced under the CPO Limited Warranty in addition to making other suspension-related repairs. *Id.* ¶ 48. Maj di pour paid the $100 deductible. *Id.* Majdi pour further asserts that he was never told during the repair visit "that this was a known systemic defect in the [Subject] Vehicles that may manifest again," and he alleges that "the dealer failed to repair all the defective air suspension parts at this repair visit." *Id.*

Majdipour's second experience occurred on April 6, 2012 with approximately 65,783 miles on the odometer, when his vehicle "suddenly and without warning dropped to one side while being driven, thereby rendering it immobile and inoperable." *Id.* ¶ 49. Madjipour alleges that his wife was informed by a Land Rover dealer that the alleged Defect was not covered under warranty. *Id.* ¶ 50. An independent mechanic "found the left air spring leaking and failing to hold pressure," *id.,* and a different mechanic charged Majdipour $1,409.45 to "replace[ ] both defective front air springs with aftermarket components," *id.* ¶ 51.

Plaintiff Austin first "visited Land Rover Encino complaining that her suspension had dropped" on November 26, 2011 with approximately 57,633 miles on her vehicle's odometer. *Id.* ¶ 56. The dealer "verified [her] concern and replaced

the 'leaking [ ] right front spring,' " charging Austin the deductible. *Id.* Austin alleges that the dealer "failed to repair or replace other defective air suspension parts." *Id.* Austin's second visit to Land Rover Encino came on December 14, 2011 with approximately 58,046 miles on her vehicle's odometer because "her suspension fault message was on." *Id.* ¶ 57. The dealer found that the "left front spring was leaking" and replaced it, again charging Austin a deductible. *Id.* Austin asserts that she was not informed during either visit that "this was a known systemic defect in the [Subject] Vehicles that may manifest again." *Id.*

**\*3** Plaintiffs draw on their individual experiences and seek to represent two classes: (1) a "Nationwide Class" consisting of "[a]ll persons or entities in the United States who are current or former owners and/or lessees of a [Subject] Vehicle," and (2) a "California Sub–Class" comprised of "[a]ll persons or entities in California who are current or former owners and/or lessees of a [Subject] Vehicle." *Id.* ¶ 59. To support their claims, Plaintiffs rely on "complaints to the National Highway Traffic Safety Administration ('NHTSA') and on the internet," in order to assert that "an extraordinary number of purchasers and lessees of the [Subject] Vehicles have experienced problems with the electronic air suspension as a result of the Defect." *Id.* ¶ 31. According to Plaintiffs, these complaints "reveal that the Defect is widespread and dangerous and that it manifests without warning." *Id.*

Plaintiffs allege that Land Rover had exclusive and superior knowledge of the Defect and has been aware of it since 2003, yet failed to disclose its existence to Plaintiffs or other purchasers of Subject Vehicles or to repair the Defect. *Id.* ¶ 29. Plaintiffs assert this placed them and others at risk and forced them to pay the costs of necessary repairs, which Plaintiffs claim can total up to $2,500. *Id.* ¶¶ 29, 32, 37.

Plaintiffs support these contentions in three ways. First, Plaintiffs set forth seven "examples of consumer safety complaints on the internet or to NHTSA that have been posted on [NHTSA's] website concerning the Defect...." *Id.* ¶ 33. Second, Plaintiffs allege, based on information and belief:

> Land Rover knew about the
> Defect through sources not available
> to consumers, including pre-
> release testing data, early consumer
> complaints about the Defect to Land
> Rover and their dealers, testing

2013 WL 5574626

conducted in response to those complaints, high failure rates and replacement parts sales data contained in [Land Rover's] warranty databases, as well as high reimbursement claims paid to Land Rover dealers who directly reported to Land Rover consumers' high failure rates and seeking assistance for repairs, among other sources of aggregate information about the problem.

*Id.* ¶ 36.

Third, Plaintiffs allege that in August 2006, "Land Rover quietly acknowledged the existence of the Defect to only their dealers in a Technical Service Bulletin ('TSB')." *Id.* ¶ 4. The TSB applied to vehicles through model year 2004 and explained that although "[n]o obvious system leaks may be found," vehicles "may develop hairline cracks in the rubber material of the front air spring." *Id.* Ex. A, pg. 1. The TSB called for a "leak" test and a replacement with "upgraded spring material." *Id.* Although Plaintiffs acknowledge that the TSB only applied to vehicles through model year 2004, they allege that the vehicles for the remaining model years suffered from the same Defect. First Am. Compl. ¶ 5. In addition, Plaintiffs allege that the "upgraded spring materials" also contained the Defect, and that Land Rover called for this "temporary fix to prolong the amount of time that will elapse before the [Subject] Vehicles again experience the Defect ... thus helping to ensure that the Defect occurs outside the express warranty period...." *Id.* ¶ 6.

**\*4** Plaintiffs also allege that Land Rover has "actively concealed the existence and nature of the [D]efect from Plaintiffs and members of the proposed class at the time of purchase, lease or repair and thereafter." *Id.* ¶ 40. Plaintiffs contend that "Land Rover has failed to disclose or actively concealed" the Defect "at and after the time of purchase, lease or repair." *Id.* They also claim that Land Rover failed to disclose or actively concealed "that the [Subject] Vehicles and their electronic air suspension were defective," and that they "were not fit for their intended purposes ... despite the fact that Land Rover learned of such defects through alarming failure rates, customer complaints, as well as through other internal sources, as early as 2003." *Id.*

In short, Plaintiffs declare that "Land Rover has caused Plaintiffs and Members of the [Proposed] Class to expend money at their dealerships to repair or replace the [Subject] Vehicles' electronic air suspension components, despite Defendants' knowledge of the defect." *Id.* ¶ 41.

From these factual assertions, Plaintiffs bring eight causes of action: (1) violation of the New Jersey Consumer Fraud Act ("NJCFA"); (2) breach of express warranty; (3) common law fraud; (4) breach of the duty of good faith and fair dealing; (5) unjust enrichment; (6) breach of the implied warranty of merchantability under California's Song–Beverly Act (on behalf of the California Sub–Class only); (7) violation of California's Consumer Legal Remedies Act ("CLRA") (on behalf of the California Sub–Class only); and (8) violation of sections of the California Business & Professional Code, commonly referred to as the Unfair Competition Law ("UCL") (on behalf of the California Sub–Class only).

Defendant Land Rover moves to dismiss the First Amended Complaint in its entirety pursuant to 🔖 Federal Rules of Civil Procedure 12(b) (6) and 🔖 9(b). ECF No. 17, Mem. of Law in Support of Def. Jaguar Land Rover N. Am., LLC's Mot. to Dismiss Pls.' Am. Compl. ("Def.'s Mem.") pg. 7. Land Rover argues that counts three, seven, and eight fail to meet 🔖 Rule 9(b)'s pleading standards applicable to fraud-based claims and insufficiently allege that Land Rover owed Plaintiffs a duty to disclose. *Id.* at 1–2, 13, 17. Land Rover also contends that Plaintiffs have failed to state a claim on counts two, four, five, and six. *Id.* at 2, 27, 32, 35, 38–40. In addition, the parties dispute whether New Jersey or California law applies to several causes of action, and Land Rover argues that a choice of law determination should result in the dismissal of count one. *Id.* at 1, 7–13.

## STANDARD OF REVIEW

On a motion to dismiss for failure to state a claim upon which relief can be granted, 🔖 Fed.R.Civ.P. 12(b)(6), the court is required to "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."

🔖 *Broadcom Corp. v. Qualcomm Inc.,* 501 F.3d 297, 306 (3d Cir.2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a

claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal quotation marks and citations omitted). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

**\*5** "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (citations omitted). Thus, "a district court weighing a motion to dismiss asks 'not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.' " *Id.* at 563 n. 8 (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).

In evaluating the plaintiffs' claims, the court may consider the allegations of the complaint, as well as documents attached to or specifically referenced in the complaint. *See Sentinel Trust Co. v. Universal Bonding Ins. Co.,* 316 F.3d 213, 216 (3d Ci r.2003); *Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1357 at 299 (2d ed.1990).* "A 'document integral to or explicitly relied on in the complaint' may be considered 'without converting the motion [to dismiss] into one for summary judgment.' " *Mele v. Fed. Reserve Bank of N. Y.,* 359 F.3d 251, 255 n. 5 (3d Ci r.2004) (citing *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir.1997)).

*Federal Rule of Civil Procedure 9(b)* requires that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake": The plaintiff must "state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which it is charged." *Frederico v. Home Depot,* 507 F.3d 188, 200 (3d Cir.2007); *see also Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3d Ci r.1984) (explaining that the purpose of the rule is to "place the defendants on notice of the precise misconduct with which [they are] charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior"). "To satisfy this heightened standard, the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure

of substantiation into a fraud allegation." *Freder ico,* 507 F.3d at 200.

Normally, "*Rule 9(b)* requires, at a minimum, that plaintiffs support their allegations ... with all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where and how of the events at issue." *In re Suprema Specialties, Inc. Sec. Litig.,* 438 F.3d 256, 276–77 (3d Cir.2006) (citations and quotation marks omitted). "Courts should, however, apply the rule with some flexibility and should not require plaintiffs to plead issues that may have been concealed by the defendants." *Rolo v. City Investing Co. Liquidating Trust,* 155 F.3d 644, 658 (3d Cir.1998) (citation omitted). Moreover, "[m]alice, intent, knowledge and other conditions of a person's mind may be alleged generally." *Fed.R.Civ.P. 9(b).*

## DISCUSSION

**\*6** Defendant Land Rover's Motion to Dismiss and Plaintiffs' opposition require this Court to proceed in several steps. First, the Court decides the choice of law issues raised by the parties, including the implications of those decisions for the remaining issues before the Court. Next, the Court addresses the sufficiency of Plaintiffs' allegations with respect to their fraud-based claims. Finally, the Court address the sufficiency of Plaintiffs' remaining pleadings.

## Choice of Law

A federal court applies the choice of law rules of its forum state—here, New Jersey—to determine which law controls in cases under its diversity jurisdiction. *Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Maniscalco v. Brother Int'l (USA) Corp.,* 709 F.3d 202, 206 (3d Ci r.2013). "New Jersey has adopted the 'most significant relationship' test set forth in the Restatement (Second) of Conflict of Laws. This is a two-part test." *Maniscalco,* 709 F.3d at 206 (citing *P.V. ex rel. T.V. v. Camp Jaycee,* 197 N.J. 132, 142–43, 962 A.2d 453 (2008)). "[T]he first step is to determine whether an actual conflict exists. That is done by examining the substance of

2013 WL 5574626

the potentially applicable laws to determine whether 'there is a distinction' between them." *Camp Jaycee,* 197 N.J. at 143, 962 A.2d 453 (quoting *Lebegern v. Forman,* 471 F.3d 424, 430 (3d Cir.2006) (further citation omitted)). "If there is not an actual conflict, the inquiry is over and, because New Jersey would apply its own law in such a case, a federal court sitting in diversity must do the same." *Lebegern,* 471 F.3d at 428. "If, however, an actual conflict is found to exist, the inquiry proceeds to the second step." *Cooper v. Samsung Elecs. Am., Inc.,* 374 F. App'x 250, 254 (3d Cir.2010).

"Under the second part of the inquiry, the court must determine which jurisdiction has the 'most significant relationship' to the claim." *Maniscalco,* 709 F.3d at 207 (quoting *Camp Jaycee,* 197 N.J. at 144, 962 A.2d 453). To make that determination, courts look to the Second Restatement, which "provides specific guidance for resolving particular types of cases." *Camp Jaycee,* 197 N.J. at 140, 962 A.2d 453; *see also Montich v. Miele USA, Inc.,* 849 F.Supp.2d 439, 446 (D.N.J.2012) (court "must weigh the factors set forth in the Restatement section that corresponds to Plaintiff's cause of action"). "The Second Restatement assessment takes place on an issue-by-issue basis. It is qualitative, not quantitative." *Camp Jaycee,* 197 N.J. at 143, 962 A.2d 453 (citations omitted). "[I]n balancing the relevant elements of the most significant relationship test," courts should "apply the law of the state that has the strongest connection to the case." *Id.* at 155, 962 A.2d 453.

In this case, there are several choice of law issues. First, the Court addresses Defendant Land Rover's argument that "the consumer fraud laws of California, not New Jersey, apply here," and therefore Plaintiffs' claim under count one for a violation of the NJCFA should be dismissed. Def.'s Mem. at 7–8. Second, the Court resolves the parties' dispute over which law—that of New Jersey or California—applies to Plaintiffs' claim for breach of express warranty. As explained later, the law that applies to this claim will also necessarily apply to Plaintiffs' claim for breach of the duty of good faith and fair dealing. Third, although not briefed by the parties, the Court addresses the remaining choice of law issues, which relate to Plaintiffs' allegations of common law fraud and unjust enrichment.

### 1. The New Jersey Consumer Fraud Act

**\*7** Land Rover argues that count one, alleging a violation of the NJCFA, should be dismissed because the consumer fraud laws of California and New Jersey conflict, a choice of law analysis is necessary and appropriate at this time, and California's consumer fraud laws, and not those of New Jersey, should apply. Def.'s Mem. at 7–13. Plaintiffs disagree. They respond that a choice of law analysis is "premature at this early stage of litigation," that Land Rover has failed to demonstrate that the NJCFA conflicts with California's consumer protection laws, and that if the Court does conduct the choice of law inquiry and finds a conflict, New Jersey has the "most significant relationship" to this case. ECF No. 18, Pls.' Mem. of Law in Opp'n to Def. Jaguar Land Rover N. Am., LLC's Mot. to Dismiss Pls.' Am. Compl.("Pls.' Opp'n") pgs. 6–12. Plaintiffs argue that the Court should uphold the NJCFA claim. *Id .*

For the reasons that follow, the Court finds that the NJCFA and California's consumer protection laws do conflict, that conducting the choice of law analysis is appropriate at this time, and that California's consumer protection laws should apply because it has the most significant relationship to this case. As a result, the Court grants Land Rover's motion to dismiss count one.

### a. The NJCFA and California's Consumer Protection Laws Conflict

The first step in the choice of law inquiry is to determine whether the "substance of the potentially applicable laws" conflict. *Camp Jaycee,* 197 N.J. at 143, 962 A.2d 453. Plaintiffs do not dispute Land Rover's assertion that the potentially applicable laws are the NJCFA and California's CLRA and UCL. Def.'s Mem. at 8. The Court finds that these laws clearly conflict.

The NJCFA, N.J. Stat. Ann. § 56:8–2 (West 2013), requires Plaintiffs to prove three elements: "1) unlawful conduct by defendant; 2) an ascertainable loss by plaintiff; and 3) a causal relationship between the unlawful conduct and the ascertainable loss ." *Bosland v. Warnock Dodge, Inc.,* 197 N.J. 543, 557, 964 A.2d 741 (2009). The law "does not require proof that a consumer has actually relied on a prohibited act in order to recover." *Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co., Inc.,* 192 N.J. 372, 391, 929 A.2d 1076 (2007). "In place of the

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 383 of 535
PageID: 32330
Majidpour v. Jaguar Land Rover North America, LLC, Not Reported in F.Supp.2d (2013)
2013 WL 5574626

traditional reliance element of fraud and misrepresentation," the act "require[s] that plaintiffs demonstrate that they have sustained an ascertainable loss." *Id.*

By contrast, both the UCL and CL RA require a showing of reliance: "[A] plaintiff must plead and prove actual reliance to satisfy the standing requirement of section 17204 [of the UCL]," *In re Tobacco II Cases,* 46 Cal.4th 298, 93 Cal.Rptr.3d 559, 207 P.3d 20, 40 (Cal.2009), and "actual reliance must be established for an award of damages under the CL RA," *Cohen v. DIRECTV, Inc.,* 178 Cal.App.4th 966, 101 Cal.Rptr.3d 37, 47–48 (Cal.Ct.App.2009). Therefore, the "substance" of the laws conflict, *Camp Jaycee,* 197 N.J. at 143, 962 A.2d 453, and the Court must proceed to the second step of the analysis.

*See also* *Feldman v. MercedesBenz USA, LLC,* No. 2:11–cv–00984 (WJM), 2012 WL 6596830, at *6 (D.N.J. Dec. 18, 2012) ("Courts in this District have recognized that the NJCFA materially conflicts with the consumer protection statutes of California, the CLRA and UCL.").

**b. A Choice of Law Analysis is Appropriate at this Time and California has the "Most Significant Relationship" to this Case**

**\*8** Under the second step of the analysis, the Court looks to the applicable section of the Second Restatement to determine which state has the "most significant relationship" to this case with respect to the consumer fraud allegations. *Maniscalco,* 709 F.3d at 207; *Camp Jaycee,* 197 N.J. at 140, 962 A.2d 453. "Where a fraud or misrepresentation claim has been alleged, the court looks to the factors found in § 148 of the Restatement (Second) of Conflict of Laws." *Maniscalco,* 709 F.3d at 207. Subsection (2) is applicable because "the plaintiff[s'] action[s] in reliance took place in whole or in part in a state other than where the false representations" are alleged to have been made. Restatement (Second) of Conflict of Laws § 148(2) (1971); *see* *Maniscalco,* 709 F.3d at 207–08. Under this subsection, the Court considers the following factors:

> (a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,

> (b) the place where the plaintiff received the representations,

> (c) the place where the defendant made the representations,

> (d) the domici l[e], residence, nationality, place of incorporation and place of business of the parties,

> (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and

> (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

Restatement (Second) of Conflict of Laws § 148(2). "The relative importance of each of the factors in a given case 'should be determined in light of the choice-of-law principles stated in § 6 [of the Restatement].' " *Maniscalco,* 709 F.3d at 207 (quoting Restatement (Second) of Conflict of Laws § 148 cmt. e). Those principles are "(1) the interests of interstate comity; (2) the interests of the parties; (3) the interests underlying the field of tort l aw; (4) the interests of judicial administration; and (5) the competing interests of the states." *Camp Jaycee,* 197 N.J. at 147, 962 A.2d 453 (internal citation and quotation marks omitted).

As an initial matter, Plaintiffs argue that this inquiry "requires the court to engage in a factsensitive analysis that cannot be undertaken on a record consisting solely of a complaint and motion to dismiss." Pls.' Opp'n at 7. In support, they cite statements by other courts in this district stating that, in the context of those cases, the factual record was not developed enough to make the choice of law determination. *See id.* In response, Land Rover acknowledges that "some cases defer a choice-of-law analysis where a relevant factual deficit exists," but contends that postponing the inquiry is inappropriate "when no additional facts are needed for the analysis." ECF No. 24, Reply Mem. of Law in Support of Def. Jaguar Land Rover N. Am., LLC's Mot. to Dismiss Pls.' Am. Compl. ("Def.'s Reply") pg. 1. Land Rover argues that this case falls into the latter category. *Id.*

**\*9** Land Rover is correct. Plaintiffs have failed to show how further development of the record would affect the choice of law analysis. Specifically, they have failed to demonstrate even the possibility that additional information concerning any of the six factors in section 148 might impact the Court's inquiry. *See* *Montich,* 849 F.Supp.2d at 447–48 ("Plaintiff's Complaint provides all necessary facts for the

Restatement analysis. Indeed, Plaintiff's conclusory position that the Court cannot engage in a choice-of-law analysis is belied by her inability to indicate what other facts are necessary to decide this issue."); *see also* *Cooper,* 374 F. App'x at 255 n. 5 (rejecting similar argument "that the District Court erred in resolving the choice-of-law determination as to his statutory consumer fraud act claim at the motion to dismiss stage").

Plaintiffs argue for postponing a choice of law analysis because more facts are needed regarding Restatement section 148 factor (c), "the place where the defendant made the representations." § 148(2)(c). They point to a portion of the Third Circuit's opinion in *Maniscalco* in which the court distinguished an earlier district court opinion, *In re Mercedes–Benz Tele Aid Contract Litig.,* 257 F.R.D. 46 (D.N.J.2009). The Third Circuit explained that in *Tele Aid,* "the court was bound at the motion to dismiss stage to accept as fact that the defendant's marketing team was solely responsible for any alleged misrepresentations and omissions, and that all of the misconduct took place in New Jersey." *Maniscalco,* 709 F.3d at 211. Therefore, in *Tele Aid,* factor (c) pointed toward New Jersey law. In *Maniscalco,* however, discovery had revealed that the representations were actually made in Japan, and not New Jersey, and therefore factor (c) did not weigh in favor of New Jersey law. *Id.*

*Maniscalco* does not help Plaintiffs. Plaintiffs argue that New Jersey law should apply. Pls.' Opp'n at 8–12. Discovery might confirm that New Jersey was "the place where the defendant made the representations." Restatement § 148(2) (c). Or, as in *Maniscalco,* discovery might show that the alleged representations were made elsewhere, thus weakening the connection to New Jersey. As explained more fully later, even accepting that factor (c) weighs in favor of New Jersey l aw, this Court finds that the balance of factors weighs clearly in favor of applying California consumer fraud law. The Court agrees with Land Rover that discovery is unnecessary because "[w]hether it confirmed Plaintiffs' allegations or disproved them, their home state's law would still apply." Def.'s Reply at 2.

Turning to the section 148(2) factors, the parties do not appear to dispute the result of analyzing each individual factor. Rather, they differ over the weight to assign the factors in light of the relevant precedent and the principles in section 6 of the Restatement. Factors (a), (b), and (e) —the place where Plaintiffs acted in reliance, where they received the representations, and where the subject of the transactions were located—clearly point to California, where both Plaintiffs allege they purchased their vehicles after reviewing marketing material and interacting with Land Rover employees. First Am. Compl. ¶¶ 45–46, 52–53. Factor (c)—where defendant made the representations—weighs in favor of New Jersey because the Court must accept as true Plaintiffs' allegation that "New Jersey is where the conduct causing injury to the Plaintiffs ... occurred and from where it emanated." *Id.* ¶ 17. Factor (d)—the domicile, residence, nationality, place of incorporation and place of business of the parties—does not weigh strongly in favor of either state, as Plaintiffs are citizens of California and Land Rover is headquartered in New Jersey. *Id.* ¶¶ 19–20. It may weigh slightly in favor of California. *See* *Maniscalco,* 709 F.3d at 208 (emphasizing comment i to section 148, which states "[t]he domicil, residence and place of business of the plaintiff are more important than are similar contacts on the part of the defendant" because "financial loss will usually be of greatest concern to the state with which the person suffering the loss has the closest relationship"). Finally, factor (f) "is inapplicable since there is no contract performance required by Plaintiff[s]." *Montich,* 849 F.Supp.2d at 448. In sum, three factors clearly favor application of California law, one favors New Jersey law, one does not weigh heavily in either direction, and one is inapplicable.

**\*10** Land Rover argues that it is "legally insufficient" for factor (c) alone to result in the application of New Jersey law, Def.'s Reply at 2, and that "the Third Circuit has [so] held," Def.'s Mem. at 10. That is an overstatement. While the Third Circuit in *Maniscalco* did hold that, in that case, "this single factor—factor (c)—d[id] not warrant applying New Jersey law," 709 F.3d at 209, it did not lay down a blanket rule. The Third Circuit voiced skepticism at the rationale of the *Tele Aid* court, which had found that New Jersey's "interest in deterring misconduct by corporations headquartered within its borders" justified the application of New Jersey law. *Maniscalco,* 709 F.3d at 210. The court, however, stopped short of explicitly rejecting such an approach. *See id.* ("But even were we to find the reasoning of the *Tele Aid* court persuasive, the case before us is distinguishable."). It might, therefore, be possible to envision a case in which the *Tele Aid* approach is appropriate.

This is not that case. In *Maniscalco,* the Third Circuit emphasized that "[n]othing else about the relationship between the parties, other than the fortuitous location of

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 385 of 535
PageID: 32332
*Majidipour v. Jaguar Land Rover North America, LLC*, Not Reported in F.Supp.2d (2013)

2013 WL 5574626

[defendant's] headquarters, took place in the state of New Jersey." *709 F.3d at 208*. Rather, plaintiff's "home state, in which he received and relied on [defendant's] alleged fraud, ha[d] the 'most significant relationship' to his consumer fraud claim." *Id.* at 209. Here, Plaintiffs' only allegations related to New Jersey arise out of the fact that Land Rover is headquartered there. *See* First Am. Compl. ¶ 17 ("Land Rover NA's marketing and advertising efforts, warranty and goodwill policies and procedures, and maintenance schedules and recommendations were all likely created in and orchestrated from the location of Land Rover NA's present headquarters in New Jersey."). Plaintiffs have not alleged any other connection with the state, other than this "fortuitous location" of Land Rover's headquarters. *Maniscalco*, 709 F.3d at 208. As a result, Plaintiffs have failed to distinguish this case from *Maniscalco* and other similar cases in this jurisdiction. *See also Cooper*, 374 F. App'x at 255 ("The transaction in question bears no relationship to New Jersey other than the location of Samsung's headquarters. Cooper's claim bears the most significant relationship with Arizona, the state in which the television was marketed, purchased, and used.").

The Court also rejects Plaintiffs' invitation to apply New Jersey law by relying on the principles in section 6 of the Restatement or on the *Tele Aid* court's public policy rationale. Pls.' Opp'n at 9–12. Under similar circumstances, the *Maniscalco* court found that "[a]pplying Section 6 of the Restatement" in fact "bolsters the conclusion" that the law of Plaintiffs' home state should apply. *709 F.3d at 209; see also id.* at 209–10 (analyzing each principle). As for the *Tele Aid* decision, the Third Circuit commented, "New Jersey's deterrent interest might well be served by actions involving in-state plaintiffs or actions involving additional contacts within New Jersey without opening the floodgates to nation-wide consumer fraud class actions brought by out-of-state plaintiffs involving transactions with no connection to New Jersey other than the location of the defendant's headquarters." *Id.* at 210.

 **\*11** The Court finds that application of the factors in section 148(2) of the Restatement results in the clear choice of California's UCL and CLRA, which are already pled in counts seven and eight. Land Rover's motion to dismiss count one alleging a violation of the NJCFA is granted.

## 2. Breach of Express Warranty

Land Rover argues that there is a conflict between the express warranty laws of New Jersey and California, and that under the applicable section of the Restatement, this Court should find that California law applies to Plaintiffs' breach of express warranty claim. Def.'s Mem. at 26–27. Plaintiffs counter that a choice of law analysis is premature and that Land Rover "fails to meet its burden to demonstrate that New Jersey and California warranty laws conflict." Pls.' Opp'n at 30. As such, Plaintiffs ask the Court to apply New Jersey l aw. *Id.* at 31. Because the Court concludes that Land Rover has not demonstrated a conflict in the express warranty laws of New Jersey and California, New Jersey law applies to Plaintiffs' breach of express warranty claim. This conclusion also means that New Jersey law applies to Plaintiffs' claim for breach of the duty of good faith and fair dealing.

As an initial matter, Land Rover's citation to an opinion of another court of this district for the proposition that "courts have held that an actual conflict exists between the laws of New Jersey and California governing contract claims," Def.'s Mem. at 26 (quoting *Feldman v. Mercedes–Benz USA, LLC*, No. 2:11–cv–00984 (WJM), 2012 WL 6596830, at *7 (D.N.J. Dec. 18, 2012)), is insufficient to meet its burden. It is possible that the "substance," *Camp Jaycee*, 197 N.J. at 143, 962 A.2d 453, of some contract laws will conflict between different states while others will not. As example, the laws on express warranty might conflict while the laws on implied warranty do not. That is why "[t]he Second Restatement assessment takes place on an issue-by-issue basis." *Id.* Land Rover does better on reply, arguing that California law on breach of express warranty requires an allegation of reasonable reliance on the terms of the warranty, whereas there is no requirement of reliance under New Jersey law. Def.'s Reply at 10. The Court finds, however, that Land Rover has failed to demonstrate a conflict.

In New Jersey, "[a]s a rule, no proof of the buyer's reliance on the warranty is necessary other than that the seller's statements were of a kind which naturally would induce the purchase. The warranty need not be the sole inducement." *Elias v. Ungar's Food Products, Inc.*, 252 F.R.D. 233, 239 (D.N.J.2008) (citation omitted). Rather, to state an express warranty claim in New Jersey, Plaintiffs must establish an "affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain." N.J. Stat. Ann. § 12A:2–313 (West 2013).

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 386 of 535
PageID: 32333
Majdipour v. Jaguar Land Rover North America, LLC, Not Reported in F.Supp.2d (2013)

2013 WL 5574626

"[A] promise is presumed to be a 'part of the basis of the bargain' under New Jersey law 'once the buyer has become aware of the affirmation of fact or promise....' " *Liberty LincolnMercury, Inc. v. Ford Motor Co.,* 171 F.3d 818, 825 (3d Ci r.1999) (quoting 🚩 *Cipollone v. Liggett Group, Inc.,* 893 F.2d 541, 568 (3d Cir.1990), *overruled on other grounds,* 📄 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992)). In determining whether the "basis of the bargain" requirement is met, "the focus is not on any particular language at a particular point in time but whether the seller's actions or language when viewed in light of his relationship with the buyer were fairly regarded as part of the contract to purchase the good." *Id.* A defendant may rebut the presumption by showing "clear affirmative proof ... that the buyer knew that the affirmation of fact or promise was untrue." 🚩 *Cipollone,* 893 F.2d at 568.

**\*12** In California, the statutory language is identical, and also requires that there be an "affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain." Cal. Com.Code § 2313 (West 2013). However, the case law raises some question as to whether a stronger form of reliance—different from the "basis of the bargain" requirement under New Jersey law—is required.

The matter appeared to be resolved by California state courts. The California Supreme Court has observed: "The basis of the bargain requirement represents a significant change in the law of warranties. Whereas plaintiffs in the past have had to prove their reliance upon specific promises made by the seller ... the Uniform Commercial Code requires no such proof." 📄 *Hauter v. Zogarts,* 14 Cal.3d 104, 120 Cal.Rptr. 681, 534 P.2d 377, 383 (Cal.1975) (citation omitted). The California Courts of Appeal have expanded upon that comment. In *Keith v. Buchanan,* the court explained:

> The change of the language in section 2313 of the California Uniform Commercial Code modifies both the degree of reliance and the burden of proof in express warranties under the code. The representation need only be part of the basis of the bargain, or merely a factor or consideration inducing the buyer to enter into the bargain. A warranty statement made

by a seller is presumptively part of the basis of the bargain, and the burden is on the seller to prove that the resulting bargain does not rest at all on the representation.

📄 173 Cal.App.3d 13, 220 Cal.Rptr. 392, 398 (Cal.Ct.App.1985). This description of the law closely mirrors the express warranty law of New Jersey. More recently, in *Weinstat v. Dentsply Int'l, Inc.,* the Court of Appeal stated, "[B]reach of express warranty arises in the context of contract formation in which reliance plays no role." 📄 180 Cal.App.4th 1213, 103 Cal.Rptr.3d 614, 625 (Cal.Ct.App.2010). In addition, the court found "persuasive[ ]" a description of the "basis of the bargain" requirement as relating "to the essence of the contract." *Id.* (quoting 📄 *Autzen v. John C. Taylor Lbr. Sales, Inc.,* 280 Or. 783, 572 P.2d 1322, 1326 (Or.1977) (emphasis removed)). *Keith* and *Weinstat'* s description of California's express warranty law does not conflict with the express warranty law of New Jersey.

However, some federal district courts in California have read these cases narrowly. In 📄 *Coleman v. Boston Scientific Corp.,* No. 1:10–cv–01968–OWW, 2011 WL 3813173, at \*4–5 (E.D.Cal. Aug.29, 2011), the court distinguished *Keith* and *Weinstat* on the basis that in both cases there was privity of contract between the buyer and seller, concluding, "[n]either *Weinstat* nor *Keith* supports Plaintiff's erroneous contention that reliance is not required where privity is absent." The court also found the "invocation of California Commercial Code section 2313 ... unavailing, as it does not alter the requirement that reliance (or some other substitute for privity) is required for an express warranty claim against a non-selling manufacturer of a product." *Id. See also* 📄 *Keegan v. Am. Honda Motor Co., Inc.,* 284 F.R.D. 504, 546 (C.D.Cal.2012) ("[I]n the absence of privity, California law requires a showing that a plaintiff relied on an alleged omission or misrepresentation.").

**\*13** These courts appear to draw on developments in the law concerning whether *privity* is necessary in express warranty cases. There is a "general rule ... that privity of contract is required in an action for breach of either express or implied warranty and that there is no privity between the original seller and a subsequent purchaser who is in no way a

party to the original sale." *Burr v. Sherwin Williams Co.,* 42 Cal.2d 682, 268 P.2d 1041, 1048 (Cal.1954). There are "[s]ome particularized exceptions to the rule," such as "when the plaintiff *relies on* written labels or advertisements of a manufacturer." *Clemens v. DaimlerChrysler Corp.,* 534 F.3d 1017, 1023 (9th Cir.2008) (emphasis added). The courts reason, therefore, that *either* privity or reliance is required to state a claim for breach of express warranty. If that were so, the laws of California and New Jersey would conflict, since neither privity nor reliance is required in New Jersey. *See Elias,* 252 F.R.D. at 239; *Alloway v. Gen. Marine Indus., L.P.,* 149 N.J. 620, 642, 695 A.2d 264 (1997) ("Under the U.C.C. as construed by this Court, moreover, the absence of privity no longer bars a buyer from reaching through the chain of distribution to the manufacturer.").

While there is logic to this argument, it finds no support in the opinions of the California state courts. Neither *Keith* nor *Weinstat* purport to limit their statements to situations in which there is privity. Rather, they refer to what the California Supreme Court called the "significant change in the law of warranties," *Hauter,* 120 Cal.Rptr. 681, 534 P.2d at 383, resulting from California's adoption of the Uniform Commercial Code. *See Weinstat,* 103 Cal.Rptr.3d at 626 ("Pre–Uniform Commercial Code law governing express warranties required the purchaser to prove reliance on specific promises made by the seller.... The Uniform Commercial Code, however, does not require such proof." (citation omitted)); *Keith,* 220 Cal.Rptr. at 397 ("Under former provisions of law, a purchaser was required to prove that he or she acted in reliance upon representations made by the seller. California Uniform Commercial Code section 2313 indicates only that the seller's statements must become 'part of the basis of the bargain.' " (citations omitted)).

The Court finds that Land Rover has not established that California law requires a showing of reliance in a breach of express warranty claim, and so Land Rover has failed to demonstrate that the express warranty laws of New Jersey and California conflict. The Court will apply New Jersey law to Plaintiffs' breach of express warranty claim.

In addition, because a claim for breach of the duty of good faith and fair dealing may not "arise absent an express or implied contract," *Wade v. Kessler Inst.,* 172 N.J. 327, 345, 798 A.2d 1251 (2002), the law of the state governing the express contract must also govern that claim. Because the Court finds New Jersey law applies to the express warranty claim, New Jersey law also applies to their claim for breach of the duty of good faith and fair dealing.

### 3. Remaining Issues

**\*14** Although not briefed by either party, there are also choice of law considerations with respect to Plaintiffs' two remaining causes of action relating to the putative Nationwide Class: common law fraud and unjust enrichment.

The elements of common law fraud are the same in New Jersey and California. *Compare Robinson Helicopter Co., Inc. v. Dana Corp.,* 34 Cal.4th 979, 22 Cal.Rptr.3d 352, 102 P.3d 268, 274 (Cal.2004) ("The elements of fraud are: (1) a misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage."), *with Gennari v. Weichert Co. Realtors,* 148 N.J. 582, 610, 691 A.2d 350 (1997) ( "The five elements of common-law fraud are: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages."). The Court will therefore apply New Jersey law to Plaintiffs' cause of action for common law fraud.

As for Plaintiffs' cause of action for unjust enrichment, there is some uncertainty over whether there is a conflict between California and New Jersey law on this issue. *See Montich v. Miele USA, Inc.,* 849 F.Supp.2d 439, 459–61 (D.N.J.2012) (surveying case law to conclude "a conflict may exist between New Jersey's and California's application of the law of unjust enrichment," but declining to decide the issue absent briefing by the parties). However, the Court finds it unnecessary to engage in this choice of law inquiry because, as explained below, Plaintiffs' cause of action for unjust enrichment must be dismissed under the law of either state.

Finally, the Court notes that because counts six, seven, and eight are brought individually and on behalf of only the putative California Sub–Class under specific California statutory provisions, they raise no choice of law issues.

### Plaintiffs' Fraud–Based Claims

Land Rover argues that Plaintiffs' claims in counts three, seven, and eight for common law fraud, violation of the CLRA, and violation of the UCL should be dismissed for failure to satisfy the pleading requirements of Federal Rule of Civil Procedure 9(b). Def.'s Mem. at 13–16. Land Rover also contends that dismissal is warranted because Plaintiffs have failed to adequately allege that Land Rover owed them a duty to disclose the existence of the alleged Defect. *Id.* at 17–25. Nonetheless, the Court finds that Plaintiffs' allegations meet the heightened pleading requirements of Rule 9(b) and that Plaintiffs have adequately alleged that Land Rover owed them a duty to disclose based on allegations that Land Rover had exclusive knowledge of the Defect.

### 1. Federal Rule of Civil Procedure 9(b)

Land Rover argues that Plaintiffs' fraud-based claims lack the particularity required by Federal Rule of Civil Procedure 9(b). Def .'s Mem. at 13–16. In particular, Land Rover suggests that Plaintiffs must identify specific samples of representations on which they relied which did not contain the allegedly omitted information. *Id.* at 13–14 (citing *Eisen v. Porsche Cars N. Am ., Inc.,* No. CV 11–9405(CAS), 2012 WL 841019, at *3 (C.D.Cal. Feb.22, 2012)). Land Rover also contends that Plaintiffs have failed to sufficiently specify the "where" and "when," *In re Suprema Specialties, Inc. Sec. Litig.,* 438 F.3d 256, 276–77 (3d Cir.2006), of the allegedly omitted information. Def.'s Mem. at 15–16; Def.'s Reply at 4 ("[T]hey attempt to skirt the 'when' and 'where' requirements of Rule 9(b)...."). The Court disagrees and finds that Plaintiffs' allegations satisfy Rule 9(b).

**\*15** As several courts have noted, Rule 9(b)'s "heightened standard is somewhat relaxed in a case based on a fraudulent omission," rather than one based on misrepresentation. *Montich v. Miele USA, Inc.,* 849 F.Supp.2d 439, 451 (D.N.J.2012); *see also Feldman v. Mercedes–Benz USA, LLC,* No. 2:11–CV–00984 (WJM), 2012 WL 6596830, at *10 (D.N.J. Dec.18, 2012) ("[P]laintiffs pleading a fraud by omission claim are not required to plead fraud as precisely as they would for a false representation claim.") This is because "a plaintiff in a fraud by omission

suit will not be able to specify the time, place, and specific content of an omission as precisely as would a plaintiff in a false representation claim." *Falk v. Gen. Motors Corp.,* 496 F.Supp.2d 1088, 1098–99 (N.D.Cal.2007). Land Rover does not quarrel with these statements, but argues that Plaintiffs have failed to meet even this "relaxed" standard because "[l]ess specificity does not mean *no* specificity." Def .'s Mem. at 16; Def.'s Reply at 4. Luckily for Plaintiffs, their allegations rise far above the level of "no specificity."

Plaintiffs have alleged "the who, what, when, where and how of the events at issue." *Suprema Specialties,* 438 F.3d at 276–77. They allege the "who"—Land Rover, and the "what" and "how"—failing to disclose and actively concealing the Defect which "causes the suspension system's rubber air bellows ... to develop leaks, releasing air pressure and losing their ability to properly hold the vehicle's weight," resulting in "a serious safety hazard, including the sudden loss of suspension on one side of the vehicle (rendering it lopsided while it is in motion), a loss of handling and the consequent inability to steer the vehicle in a straight line." First Am. Compl. ¶ 27. They also allege the "when" and "where." Plaintiff Austin purchased her CPO 2006 Range Rover in February 2008, and Plaintiff Maj di pour purchased his vehicle in October 2009 at Land Rover Encino. *Id.* ¶¶ 46, 52. Each Plaintiff spoke with Land Rover employees and allegedly relied on Land Rover's CPO 140–poi nt checklist, but none of the representations made to them warned of the Defect. *Id.* ¶¶ 46, 53–54. The Plaintiffs also allege specific occasions on which they took their vehicles to Land Rover authorized dealers for repair, and that the dealers failed to disclose "that this was a known systemic defect in the [Subject] Vehicles that may manifest again." *Id.* ¶¶ 48, 57. Plaintiffs have certainly satisfied the requirement that they "inject precision or some measure of substantiation into [the] fraud allegation," by providing "sufficient particularity to place the defendant on notice of the precise misconduct with which it is charged." *Frederico v. Home Depot,* 507 F.3d 188, 200 (3d Cir.2007).

Land Rover places particular emphasis upon its reading of the Ninth Circuit case *Kearns v. Ford Motor Co.,* 567 F.3d 1120 (9th Cir.2009), for its contention that Plaintiffs must provide samples of the representations or advertisements on which they relied. Def.'s Mem. at 13–14. But as Plaintiffs rightly point out, *Kearns* involved misrepresentations, not alleged fraudulent omissions. Pls.'

Opp'n at 27. *See Kearns,* 567 F.3d at 1125 ("Kearns alleges that Ford's marketing materials and representations led him to believe that CPO vehicles were inspected by specially trained technicians and that the CPO inspections were more rigorous and therefore more safe."). To be sure, *Kearns* also summarily dismissed, with little discussion, Plaintiff's non-disclosure claims, *id.* at 1127, but the discussion and standard on which Land Rover relies dealt specifically with the claims for affirmative misrepresentations. Moreover, even were *Kearns* an applicable precedent, Plaintiffs' pleading would be sufficient. The *Kearns* plaintiff "failed to specify which sales material he relied upon in making his decision to buy a CPO vehicle." *Id.* at 1126. Here, Plaintiffs have specifically referred to the CPO 140–point checklist and discussions with Land Rover employees, all of which allegedly failed to disclose the defect. First A m. Compl. ¶¶ 46, 53–54. [2]

**\*16** Finally, Land Rover argues that Plaintiffs' allegations concerning the remaining Subject Vehicles (i.e., those in the putative classes) fail to meet Rule 9(b)'s particularity requirement because they "ignore time and place entirely" or "imply that all times and places are relevant." Def.'s Mem. at 15. However, in circumstances such as these, where Plaintiffs allege that there was a failure to disclose a particular Defect in various advertisements and representations throughout a relevant time period, their allegations suffice where they allege their individual experiences in detail and also allege the omitted information that should have been disclosed in those advertisements and representations. *See Lynch v. Tropicana Products, Inc.,* No. 2:11–CV–07382 (DMC), 2013 WL 2645050, at \*5 (D.N.J. June 12, 2013) ("Plaintiffs assert that the alleged misrepresentations appeared on the labels, packaging, and advertisements for Tropicana's orange juice throughout the Class Period. Therefore, the 'where' requirement may be satisfied by the misrepresentations allegedly contained on Tropicana's labels or packages; there need not be strict identification of one particular store location where it is alleged that the labeling and packaging in question was sold in thousands of locations throughout the country."); *Gutierrez v. TD Bank,* No. 11–5533(JLL), 2012 WL 272807, at \*7 (D.N.J. Jan. 2, 2012) ("Plaintiffs need only state with particularity the who, what, when and where of the false misrepresentations or omissions made by Defendants based on their familiarity with said misrepresentations as experienced by them in the mortgage transactions....").

The Court finds that Plaintiffs' allegations satisfy the requirements of Federal Rule of Civil Procedure 9(b).

### 2. Allegations of Land Rover's Duty to Disclose

Land Rover also challenges Plaintiffs' fraud-based claim by arguing that Plaintiffs have failed to adequately allege that Land Rover owed them a duty to disclose the existence of the Defect. Def .'s Mem. at 17. Under both the CLRA and UCL, "a manufacturer is not liable for a fraudulent omission concerning a latent defect ... unless the omission is 'contrary to a representation actually made by the defendant, or an omission of a fact the defendant was obliged to disclose.' " *Wilson v. Hewlett–Packard Co.,* 668 F.3d 1136, 1141 (9th Cir.2012) (quoting *Daugherty v. Am. Honda Motor Co., Inc.,* 144 Cal.App.4th 824, 51 Cal.Rptr.3d 118, 126 (Cal.Ct.App.2006); *see also Baba v. Hewlett–Packard Co.,* No. C 09–05946 RS, 2010 WL 2486353, at \*3 (N.D.Cal. June 16, 2010) ("A duty to disclose under UCL requires the same showing as a duty to disclose under CLRA."). A duty to disclose can arise in four ways: "(1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts." *LiMandri v. Judkins,* 52 Cal.App.4th 326, 60 Cal.Rptr.2d 539, 543 (Cal.Ct.App.1997). Plaintiffs have not alleged a fiduciary relationship. Land Rover challenges the adequacy of their allegations with respect to the remaining possi b l ities. [3]

**\*17** The Court finds that Plaintiffs' allegations concerning Land Rover's exclusive knowledge contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal quotation marks and citations omitted). Plaintiffs allege that Range Rovers for the 2003 through 2006 model years contain a Defect that Land Rover has known about since 2003. First Am. Compl ¶¶ 1, 36. They also allege that "the Defect cannot be detected until after it manifests," and therefore "Plaintiffs and other members of the proposed class were not reasonably able to discover the problem...." *Id.* ¶ 23. To support this allegation, Plaintiffs rely on complaints to the N H STA and on the i nternet, the TSB issued by Land Rover, and a long list of "internal sources of aggregate information about the problem" that were "not available to consumers." *Id.* ¶¶ 4–5, 33, 36.

As an initial matter, the Court agrees with Land Rover that the "undated, anonymous comments" from the NHSTA and internet, Def.'s Mem. at 21, do nothing to bolster Plaintiffs' allegations. That is because "plaintiffs must sufficiently allege that a defendant was aware of a defect at the time of sale to survive a motion to dismiss," *Wilson,* 668 F.3d at 1145, and "[n]one of those postings or complaints ... include any dates, and therefore shed no light on when [Land Rover] knew of the alleged defects." *Baba,* 2010 WL 2486353, at * 5. Plaintiffs also fail to allege that Land Rover ever read these comments or that they were forwarded *to* Land Rover.

This is not fatal to Plaintiffs' claim, as the Court finds that Plaintiffs' remaining allegations, taken together, adequately plead Land Rover's exclusive knowledge. Plaintiffs' allegations concerning "pre-release testing data, early consumer complaints about the Defect to Land Rover and their dealers, testing conducted in response to those complaints, high failure rates and replacement parts sales data contained in [Land Rover's] warranty databases, as well as high reimbursement claims paid to Land Rover dealers," First Am. Compl. ¶ 36, are similar to allegations found sufficient in analogous cases. *See Feldman v. Mercedes–Benz USA, LLC,* N o. 2:11–CV–00984 (WJM), 2012 WL 6596830, at *11 (D.N.J. Dec. 18, 2012) (finding sufficient allegations that "Defendants had exclusive knowledge of material facts not known to Plaintiffs, through pre-release testing data, early consumer complaints about the A IS Defect ... testing conducted in response to those complaints, warranty and post-warranty claims, replacement part sales data, aggregate data from Mercedes dealers, and from other internal sources" (quotation marks omitted)); *Ehrlich v. BMW of N. Am., LLC,* 801 F.Supp.2d 908, 918–19 (C.D.Cal.2010) ("pre-release testing data, early consumer complaints to BMW and dealers, testing done in response to complaints, replacement part sales data, aggregate data from BMW dealers, and other internal sources"); *Falk v. Gen. Motors Corp.,* 496 F.Supp.2d 1088, 1096–97 (N.D.Cal.2007) (" '[o]nly GM had access to the aggregate data from its dealers[,] only GM had access to pre-release testing data[, and] only GM had access to the numerous complaints from its customers' ").

**\*18** These allegations are not concl usory. Land Rover does not deny that it engages in the types of testing alleged or maintains the other types of aggregate data asserted. Plaintiffs

have no way of knowing what these data showed, but have adequately alleged that they showed a Defect and gave Land Rover exclusive knowledge of it. Moreover, Plaintiffs support their contention by submitting the TSB, issued by Land Rover, which warned that vehicles "may develop hairline cracks in the rubber material of the front air spring." First Am. Compl. Ex. A, pg. 1. The TSB supports Plaintiffs allegations that Land Rover engaged in testing or otherwise learned of the Defect through internal sources: Land Rover issued an internal bulletin advising dealers on how to repair the very Defect Plaintiffs complain of. The TSB makes Plaintiffs' allegation that Land Rover had "internal sources of aggregate information about the problem" that were "not available to consumers," First Am. Compl. ¶ 36, entirely plausible.

Land Rover challenges Plaintiffs' reliance on the TSB in two ways. It argues that the TSB, by its terms, only applies to vehicles through model year 2004, and therefore does nothing to support Plaintiffs' claims with respect to their model year 2006 Range Rovers. Def.'s Reply at 7, 8. Plaintiffs, however, allege that all vehicles for model years 2003 through 2006 contain the same Defect. First Am. Compl. ¶ 5. Moreover, the TSB not only supports Plaintiffs' allegations concerning the existence of the Defect, it also supports Plaintiffs' allegations that Land Rover engaged in internal testing and otherwise maintained internal sources of aggregate information about the problem. *Id.* ¶ 36.

Land Rover also argues that "courts in this District have repeatedly refused to view TSBs as evidence of a defect or consumer fraud," Def.'s Mem. at 20, because it "may discourage manufacturers from responding to customers in the first place," *id.* (quoting *Chan v. Daimler AG,* No. 11–5391, 2012 WL 5827448, at *7 (D.N.J. Nov.9, 2012) (citation omitted). This argument is off mark. The Court, at this stage, is not making findings as to whether the TSB should be considered as evidence or an admission of liability in evaluating the claim on the merits. Rather, the question is whether the TSB, together with the allegations of "internal sources of aggregate information about the problem," First Am. Compl. ¶ 36, support a claim that is "plausible on its face." *Iqbal,* 556 U.S. at 678. Even if there is a public policy rationale for excluding TSBs as evidence of a defect or an admission of liability, the Court will not now stretch that rationale to raise the bar that Plaintiffs must meet at the pleading stage, especially when they allege that the information showing the Defendant's exclusive knowledge is within the Defendant's exclusive control.

The Court denies Land Rover's motion to dismiss counts three, seven, and eight.


**Plaintiffs' Remaining Claims**

**\*19** Land Rover moves to dismiss Plaintiffs' remaining claims for breach of express warranty, breach of the duty of good faith and fair dealing, breach of the implied warranty of merchantability, and unjust enrichment.


**1. Breach of Express Warranty**

Land Rover argues that Plaintiffs have not alleged a breach of the CPO Limited Warranty and their claim in count two should be dismissed. Def.'s Mem. at 27–29. Plaintiffs respond that "Land Rover ... breached the [warranty] with respect to both Plaintiffs by failing to repair and/or replace Plaintiffs' air suspension systems while the vehicles were still covered under the CPO warranty." Pls.' Opp'n at 31. Plaintiffs argue that on each of their initial visits, the dealer breached the warranty by only partially repairing the suspension system, "after which the defect recurred." *Id.* The Court finds that Plaintiffs have failed to allege a breach of express warranty.

The CPO Limited Warranty required Land Rover to "repair, replace or reimburse" covered parts "if required due to a mechanical breakdown or failure." First Am. Compl. Ex. B at 5. According to Plaintiffs' First Amended Complaint, this is precisely what occurred. Plaintiff Majdipour's first incident involved his right front air spring, which a dealer replaced under warranty. First. Am. Compl. ¶¶ 47–48. Plaintiff Austin's first incident involved her right front spring, and her second incident involved the left front spring. *Id.* ¶¶ 56–57. Both of these problems were replaced by the dealer under warranty. *Id.*

As for Plaintiff Majdipour's second incident, in which he was allegedly informed that his repairs would not be covered under warranty, Land Rover is correct that he has not alleged that the incident occurred *during* the term of the warranty —the earlier of 6 years/75,000 miles from the original in-service date. While Majdipour does allege that there were 65,783 miles on the odometer, *id.* ¶ 49, he does not allege that April 6, 2012—the date of the incident—was within 6 years from the original in service date for his 2006 Range Rover. *See Moulton v. LG Electronics USA, Inc.,* CIV.A. 11–4073 JLL, 2012 WL 3598760 (D.N.J. Aug.21, 2012) ("In the Third

Circuit, an express warranty does not cover repairs made after the applicable time has elapsed.").

Plaintiffs' suggestion that the repairs were incomplete because Land Rover did not replace parts of the suspension system that had not yet broken down runs against the express terms of the warranty. The Court agrees with Land Rover that the express warranty "does not require Land Rover to predict parts' possible future failures or replace parts prophylactically." Def.'s Reply at 11. *See Herbstman v. Eastman Kodak Co.,* 68 N.J. 1, 12, 342 A.2d 181 (1975) ( "We do not agree ... that Kodak's express 'warranty' was that the camera would be free of mechanical defects. Rather, the language used contemplated that such defects might occur and, if so, Kodak would repair them.").

**\*20** The Court also finds Plaintiffs' claims that the terms of the express warranty were unconscionable to be without merit. There is nothing substantively unconscionable about a 6 year/75,000 mile warranty per se. *See Nelson v. Nissan N. Am., Inc.,* 894 F.Supp.2d 558, 565–66 (D.N.J.2012). The allegations that Land Rover knew that the Defect might manifest after the express warranty term do not implicate the consciability of that term. The Second Circuit has persuasively explained the reason this is so:

> All parts will wear out sooner or later and thus have a limited effective life. Manufacturers always have knowledge regarding the effective life of particular parts and the likelihood of their failing within a particular period of time. Such knowledge is easily demonstrated by the fact that manufacturers must predict rates of failure of particular parts in order to price warranties and thus can always be said to "know" that many parts will fail after the warranty period has expired. A rule that would make failure of a part actionable based on such "knowledge" would render meaningless time/mileage limitations in warranty coverage.

*Abraham v. Volkswagen of Am., Inc.,* 795 F.2d 238, 250 (2d Cir.1986); *see also* *Nelson,* 894 F.Supp.2d at 566 ("Nissan's alleged knowledge of a transmission defect is an insufficient basis on which to find the warranty limit unconscionable."); *Alban v. BMW of N. Am.,* No. CIV. 09–5398(DRD), 2011 WL 900114, at *9 (D.N.J. Mar.15, 2011) ("[A]llegations that BMW knew that the sound insulation in his vehicle would fail after the expiration of the warranty agreement do not indicate that the time and mileage limitation clause was unconscionable.").

The Court also rejects Plaintiffs' claim that the warranty was procedurally unconscionable because they had "no meaningful choice" in determining the time limits and because a "gross disparity in bargaining power existed." First Am. Compl. ¶ 87. First, the clear weight of authority has rejected this argument. *See* *Smith v. Ford Motor Co.,* 462 F. App'x 660, 663–64 (9th Ci r.2011) ( "Smith was presented with a meaningful choice, not just the option of purchasing a different vehicle from a different manufacturer, but also the option of purchasing a different warranty with an extended durational limit from Ford."); *Alban,* 2011 WL 900114, at * 9 ("Alban's bare-bones allegations that he 'had no meaningful choice in determining' the time and mileage limitation, and that 'a gross disparity in bargaining power existed between' him and BMW, are 'no more than conclusions [that] are not entitled to the assumption of truth.' " (quoting *Iqbal,* 556 U.S. at 679)). Second, Plaintiffs' own allegations make it clear that there was a choice— Plaintiff Austin chose to purchase an additional warranty for 8 years/96,000 miles. First Am. Compl. ¶ 80 n. 6.

Because Plaintiffs have failed to allege a breach of the CPO Limited Warranty, the Court grants Land Rover's motion to dismiss count two.

### 2. Breach of the Duty of Good Faith and Fair Dealing

**\*21** Land Rover moves to dismiss Plaintiffs' claim in count four for a breach of the duty of good faith and fair dealing. With respect to New Jersey law,[4] Land Rover argues that Plaintiffs have failed to allege facts showing bad faith and that the claim also fails because the "allegations of supposed bad faith are precisely those alleging breach of warranty." Def.'s Reply at 14. The Court finds that Plaintiffs have sufficiently alleged a breach of the duty of good faith and fair dealing under New Jersey l aw.

"A covenant of good faith and fair dealing is implied in every contract in New Jersey." *Wilson v. Amerada Hess Corp.,* 168 N.J. 236, 244, 773 A.2d 1121 (2001). "Although the implied covenant of good faith and fair dealing cannot override an express term in a contract, a party's performance under a contract may breach that implied covenant even though that performance does not violate a pertinent express term." *Id.* "Good faith entails adherence to community standards of decency, fairness or reasonableness ... and requires a party to refrain from destroying or injuring the right of the other party to receive its contractual benefits. A plaintiff must also prove the defendant's bad motive or intention." *Iliadis v. Wal–Mart Stores, Inc.,* 191 N.J. 88, 109–10, 922 A.2d 710 (2007) (citations and quotation marks omitted). "[T]he breach of the implied covenant arises when the other party has acted consistent with the contract's literal terms, but has done so in such a manner so as to have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Wade v. Kessler Inst.,* 172 N.J. 327, 345, 798 A.2d 1251 (2002) (citation and quotation marks omitted).

The Court has already concluded that Plaintiffs have failed to allege a violation of the express terms of the contract —the CPO Limited Warranty. However, Plaintiffs have adequately alleged a violation of the duty of good faith and fair dealing such that the Court will allow that claim to go forward. Plaintiffs allege that during their repair visits, Land Rover dealers failed to alert them to the fact that the suspension system was defective, and only repaired the parts that had actually broken down, despite Land Rover's alleged knowledge that other parts of the suspension system were defective and would break down in the future. First. Am. Compl. ¶¶ 47–48, 56–57, 82, 95. While Land Rover is correct that "[n]o *contractual* responsibilities obligate Land Rover to notify Plaintiffs of any alleged defect," Def.'s Mem. at 37, New Jersey's implied covenant of good faith and fair dealing may impose such an obligation. Plaintiffs have alleged that this action by Land Rover injured their "right ... to receive the fruits of the contract." *Wade,* 172 N.J. at 345, 798 A.2d 1251. And though the Court is mindful that a "plaintiff must also prove the defendant's bad motive or intention," *Iliadis,* 191 N.J. at 110, 922 A.2d 710, "at the pleading stage all that is required is an allegation of bad faith," *Alin v. Am. Honda Motor Co., Inc.,* No. CIV A 08–4825(KSH), 2010

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 393 of 535
PageID#: 32340
Majdipour v. Jaguar Land Rover North America, LLC, Not Reported in F.Supp.2d (2013)

2013 WL 5574626

WL 1372308, at * 11 (D.N.J. Mar.31, 2010). *See Seidenberg v. Summit Bank,* 348 N.J.Super. 243, 263, 791 A.2d 1068 (App.Div.2002) ("[T]he presence of bad faith is to be found in the eye of the beholder or, more to the point, in the eye of the trier of fact.").

**\*22**  The Court finds Plaintiffs' allegations sufficient to allow this claim to proceed. *See Alin,* 2010 WL 1372308, at *12 (finding sufficient allegations that "Honda unfairly exercised its discretion in not performing under the warranty by deciding not to notify Alin of the defects in the A/C system and by not covering the repair costs"). Land Rover's motion to dismiss count four is denied.

### 3. Breach of the Implied Warranty of Merchantability

Land Rover argues that "Plaintiffs' implied warranties expired before the events forming the basis of their claims occurred." Def .'s Mem. at 32. Land Rover relies on the Song–Beverly Act, under which Plaintiffs bring their claim in count six, which provides: "The duration of the implied warranty of merchantability ... with respect to used consumer goods sold in this state, ... in no event shall" be "less than 30 days nor more than three months following the sale of used consumer goods to a retail buyer." Cal. Civ.Code § 1795.5(c) (West 2013). As both Plaintiffs allegedly experienced the Defect more than three months following the purchase of their vehicles, Land Rover argues they have failed to state a claim for breach of implied warranty. Def.'s Mem. at 32– 33. Plaintiffs respond that the durational limits of the statute do not apply where a latent defect that existed at the time of sale manifests after those limits expire. Pls.' Opp'n at 33. The Court agrees with Plaintiffs and denies Land Rover's motion to dismiss count six.

In *Mexia v. Rinker Boat Co., Inc.,* 174 Cal.App.4th 1297, 95 Cal.Rptr.3d 285, 290–91 (Cal.Ct.App.2009), the California Court of Appeal held that "[t]he implied warranty of merchantability may be breached by a latent defect undiscoverable at the time of sale." The court explained that "[u]ndisclosed latent defects ... are the very evil that the implied warranty of merchantability was designed to remedy," *id. at 291* (citation omitted), and stressed the "distinction between unmerchantabi l ity caused by a latent defect and the subsequent discovery of the defect," *id. at 293.* "I n the case of a latent defect, a product is rendered unmerchantable, and the warranty of merchantability is breached, by the existence of the unseen defect, not by its subsequent discovery." *Id. at 291.* As for the suggestion "that latent defects must be discovered and reported to the seller within the specified time," the court concluded it "has no support in the text of the statute." *Id. at 295.*

Land Rover, faced with this authority, argues that the Court should disregard it. Relying principally on discussions in a handful of federal district court opinions, Land Rover asserts that "*Mexia* enjoys the limelight as a case 'contrary to established California case law with respect to the duration of the implied warranty of merchantability.' " Def.'s Mem. at 33 (quoting *Marchante v. Sony Corp. of Am.,* 801 F.Supp.2d 1013, 1022 (S.D.Cal.2011) (citation omitted)). Land Rover contends *Mexia* should not be followed because it " 'renders meaningless any durational limits on implied warranties,' as '[e]very defect that arises could conceivably be tied to an imperfection existing during the implied warranty period.' " *Id. at 34,* 95 Cal.Rptr.3d 285 (quoting *Marchante,* 801 F.Supp.2d at 1022).

**\*23**  The Court declines Land Rover's invitation to ignore *Mexia.* "A n intermediate appellate state court's decision 'is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.' " *Boyanowski v. Capital Area Intermediate Unit,* 215 F.3d 396, 406 (3d Cir.2000) (quoting *West v. American Telephone & Tel. Co.,* 311 U.S. 223, 237, 61 S.Ct. 179, 85 L.Ed. 139 (1940)). *Mexia* is a thoroughly reasoned, published opinion by a California Court of Appeal that is less than five years old. The court took into account the statutory history, its language, and its purpose in reaching its decision. It ultimately concluded that applying the durational limits to latent defects that existed at the time of sale and manifest after those limits expire is "unsupported by the text of the statute, legal authority, or sound policy." *Mexia,* 95 Cal.Rptr.3d at 296–97. The skepticism of a few federal district courts concerning the wisdom of that decision are not, in this Court's view, "persuasive data that the highest court of the state would decide otherwise." *Boyanowski,* 215 F.3d at 406 (citation omitted). *See also Ehrlich v. BMW of N. Am., LLC,* 801 F.Supp.2d 908, 924 (C.D.Cal.2010) ("The Court will follow *Mexia* ... to find that Plaintiff can pursue his Song– Beverly Act claim. *Mexia* directly addressed and rejected the precise argument BMW makes here, holding that, so long as a

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.     16

latent defect existed within the one-year period, its subsequent discovery beyond that time did not defeat an implied warranty claim.").

Land Rover also argues that, even if *Mexia* is applicable, it only applies to "defects that render the product unmerchantable from the outset." Def.'s Mem. at 34 (quoting 📌 *Marchante,* 801 F.Supp.2d at 1021). To be sure, some courts have appeared to read this limitation into *Mexia'* s holding. *See, e.g.,* 📌 *Ortega v. Toyota Motor Sales, U.S.A., Inc.,* 422 F. App'x 599, 601 (9th Cir.2011) ("[T] he court suggested that to ultimately prevail, Mexi a still needed to demonstrate a defect existed at the time of sale."). Land Rover is incorrect, however, in its suggestion that Plaintiffs must allege that their vehicles "failed to *work properly* from the outset." Def.'s Mem. at 34 (emphasis added). In making this argument, Land Rover makes the very mistake the *Mexia* court warned against: It "ignores the distinction between unmerchantabi l ity caused by a latent defect and the subsequent discovery of the defect" when it manifests. 📌 *Mexia,* 95 Cal.Rptr.3d at 293. Plaintiffs have adequately alleged that the vehicles were unmerchantable *at the time of sale* because they contained the alleged Defect. *See* First Am. Compl. ¶ 1. This Defect was also allegedly undiscoverable until it manifested; it was latent. *Id.* ¶¶ 23–24. It follows that the three month durational limitation does not bar the claim, and the motion to dismiss count six is denied.

### 4. Unjust Enrichment

**\*24** Land Rover argues that Plaintiffs' cause of action in count five for unjust enrichment must be dismissed under both California and New Jersey law. It asserts that there is no cause of action for unjust enrichment in California, and that New Jersey law does not permit a cause of action for unjust enrichment when the claim sounds in fraud. Def.'s Mem. at 38, 40; Def.'s Reply at 15.[5] The Court agrees with Land Rover and grants its motion to dismiss count five.

It is well-settled that "[t]here is no cause of action in California for unjust enrichment." 📌 *Durell v. Sharp Healthcare,* 183 Cal.App.4th 1350, 108 Cal.Rptr.3d 682, 699 (Cal.Ct.App.2010) (citation and quotation marks omitted). "Rather, it is a general principle underlying various doctrines and remedies, including quasi-contract." 📌 *Jogani v. Superior Court,* 165 Cal.App.4th 901, 81 Cal.Rptr.3d 503, 511 (Cal.Ct.App.2008) (citation omitted). *See also Bosinger*

*v. Belden CDT, Inc.,* 358 F. App'x 812, 815 (9th Cir.2009) ("In California there is no cause of action for unjust enrichment; it is a general principle, underlying various legal doctrines and remedies, rather than a remedy itself." (citation and quotation marks omitted)). A party may sometimes elect to *recover* based on unjust enrichment, but it is not a "freestanding cause of action." 📌 *Munoz v. MacMillan,* 195 Cal.App.4th 648, 124 Cal.Rptr.3d 664, 675 (Cal.Ct.App.2011).

In New Jersey, "[u] nj ust enrichment is of course a familiar basis for imposition of liability in the law of contracts." 📌 *Castro v. NYT Television,* 370 N.J.Super. 282, 299, 851 A.2d 88 (App.Div.2004). However, "New Jersey does *not* recognize unjust enrichment as an independent tort cause of action." *Warma Witter Kreisler, Inc. v. Samsung Electronics Am., Inc.,* No. CIV. 08–5380(JLL), 2009 WL 4730187, at \*7 (D.N.J. Dec.3, 2009). This is because "the role of unjust enrichment in the law of torts is limited for the most part to its use as a justification for other torts such as fraud or conversion." 📌 *Castro,* 370 N.J.Super. at 299, 851 A.2d 88. *See also* 📌 *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.,* 171 F.3d 912, 936–37 (3d Ci r.1999) ("I n the tort setting, an unjust enrichment claim is essentially another way of stating a traditional tort claim (i.e., if defendant is permitted to keep the benefit of his tortious conduct, he will be unjustly enriched)."). In this matter, Plaintiffs' cause of action for unjust enrichment unquestionably relies on a tort theory sounding in fraud. *See* First Am. Compl. ¶¶ 98, 99, 100 ("As a direct and proximate result of Defendants' failure to disclose known defects and material misrepresentations ..."). This cause of action for unjust enrichment is not permitted in New Jersey.

*See* 📌 *Pappalardo v. Combat Sports, Inc.,* No. CIV.A. 11–1320(MLC), 2011 WL 6756949, at \*12 (D.N.J. Dec.23, 2011) (dismissing unjust enrichment claim because it was "presented as a tort-based theory of recovery").

Land Rover's motion to dismiss count five is granted.

### CONCLUSION

**\*25** Land Rover's motion to dismiss is granted in part and denied in part. An appropriate Order follows.

**Majdipour v. Jaguar Land Rover North America, LLC, Not Reported in F.Supp.2d (2013)**

2013 WL 5574626

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 5574626

## Footnotes

1    Although Plaintiffs label these "Class Vehicles," no class has been certified at this point.

2    The Court has reviewed the remaining district court cases relied on by Land Rover and finds them either inapplicable or clearly distinguishable.

3    Land Rover does not challenge that the existence of the Defect would be a "material fact." Def.'s Reply at 6 ("Land Rover has not raised the issue of materiality.").

4    Much of Land Rover's argument pertains to California law, but the Court has concluded that New Jersey law applies to this claim.

5    Land Rover also makes an argument, which Plaintiffs dispute, based on a lack of privity between the parties, Def.'s Mem. at 38–9. The Court finds it unnecessary to resolve this issue.

---

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

TAB 27

*Microbilt Corp. v. Certain Underwriters at Lloyds, London*, No. 20-12734, 20021 WL 1214774 (D.N.J. Mar. 31, 2021)

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 398 of 535
                                          PageID: 32345
Microbilt Corporation v. Certain Underwriters at Lloyds, Slip Copy (2021)
2021 WL 1214774

2021 WL 1214774
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

MICROBILT CORPORATION, Plaintiffs,

v.

CERTAIN UNDERWRITERS AT LLOYDS, London
and CFC Underwriting Limited, Defendants.

Civil Action No. 20-12734 (FLW)(ZNQ)
|
Signed 03/31/2021

**Attorneys and Law Firms**

Robert D. Chesler, Anderson Kill & Olick, P.C., Newark, NJ,
for Plaintiff.

Daniel Pickett, Kennedys CMK LLP, Basking Ridge, NJ, for
Defendants.

**MEMORANDUM OPINION AND ORDER**

Zahid N. Quraishi, United States Magistrate Judge

**\*1** This matter comes before the Court upon Plaintiff
Microbilt Corporation's ("Plaintiff") Motion for Leave to
File an Amended Complaint (the "Motion"). (Mot., ECF
No. 13.) Defendants Certain Underwriters at Lloyds, London
("Underwriters") and CFC Underwriting Limited ("CFC")
(collectively as, "Defendants") opposed, (Defs.' Opp'n, ECF
No. 14), and Plaintiff replied, (Pl.'s Reply, ECF No. 17). The
Court has carefully considered the arguments and decides
the matter without oral argument pursuant to Federal Rule of
Civil Procedure 78 and Local Civil Rule 78.1. For the reasons
set forth herein, Plaintiff's Motion is granted.

**I. BACKGROUND**

Plaintiff commenced this action against Defendants on
September 15, 2020. (Compl., ECF No. 1). Plaintiff alleges
that it purchased a management liability insurance policy
for the period of November 7, 2017 to November 7, 2018
(the "Policy"). (Mot. at 4.) The Policy was underwritten
by Underwriters and it was effected through CFC. (*Id.*)
In 2018, Plaintiff submitted notice of claims to CFC. (*Id.*)
Defendants accepted coverage for the claims, but allegedly
failed to timely pay Plaintiff for its insured losses. (*Id.*)
Plaintiff contends that as of September 15, 2020, Defendants

had not fully paid Plaintiff, which led to Plaintiff filing the
instant action. (*Id.*) On September 24, 2020, Defendants paid
Plaintiff up to the limits of the Policy, but Plaintiff alleges that
Defendants did not pay for the extra-contractual damages that
Plaintiff suffered as a result of Defendants' delay in making
the payment. (*Id.* at 5.) Plaintiff alleges that Defendants
are liable for breach of contract for failing to timely comply
with their contractual obligations under the Policy. (*Id.* at 3.)
Plaintiff also alleges that Defendants breached the implied
covenant of good faith and fair dealing as a result of "their
unreasonable delay and reckless disregard to pay defense fees
owed to [Plaintiff]." (*Id.*)

Defendants filed a motion to dismiss on October 21, 2020,
seeking to dismiss Count I for breach of contract against
Underwriters and all counts against CFC. (Mot. to Dismiss,
ECF No. 9.) In their motion to dismiss, Defendants argue that
Plaintiff cannot bring any claims against CFC because CFC
is not a party to the insurance policy. (*See id.*) In light of that
assertion, Plaintiff seeks "leave to file an amended complaint
to assert additional claims against CFC as Underwriters'
agent or claims handler." (*Id.* at 5.) Specifically, in the
original complaint, Plaintiff alleges that Defendants were the
insurance companies that issued the Policy. Now, because of
Defendants' argument that CFC is not a party to the insurance
policy, Plaintiff seeks leave to amend. (*Id.* at 6-7.) In sum,
Plaintiff seeks to: (1) add a count for breach of contract in
the alternative against CFC as Underwriters' agent or claims
handler, for its failure to timely process Plaintiff's insured
claims and for failure to make prompt payment of undisputed
amounts to Plaintiff pursuant to the Policy; and (2) add a
negligence claim against CFC for failing to act with the duty
of care owed to Plaintiff in processing the insured claims.
(Reply at 1; Proposed Amend. Compl. at 8-9.)

**II. LEGAL STANDARD**

**\*2** Rule 15(a)(2) authorizes a party to amend its pleadings
"only with the opposing party's written consent or the court's
leave." Rule 15(a)(2) further instructs that "[t]he court should
freely give leave when justice so requires." Fed. R. Civ. P.
15(a)(2). Though within the discretion of the Court,

> [i]n the absence of any apparent or
> declared reason—such as undue delay,
> bad faith or dilatory motive on the
> part of the movant, repeated failure
> to cure deficiencies by amendments

Microbilt Corporation v. Certain Underwriters at Lloyds, Slip Copy (2021)

2021 WL 1214774

previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."

*Foman v. Davis*, 371 U.S. 178, 182 (1962).

"Futility 'means that the complaint, as amended, would fail to state a claim upon which relief could be granted.' " *Great Western Mining & Mineral Co. v. Fox Rothschild, LLP*, 615 F.3d 159, 175 (3d Cir. 2010) (citing *In re Merck & Co. Sec., Derivative, & ERISA Litig.*, 493 F.3d 393, 400 (3d Cir. 2007). "The standard for assessing futility is the 'same standard of legal sufficiency as applies under Federal Rule of Civil Procedure 12(b)(6),' " meaning that all pleaded allegations are taken as true and viewed in a light most favorable to plaintiff. *Id.* (citing *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000); *Winer Family Trust v. Queen*, 503 F.3d 319, 330-31 (3d Cir. 2007). "[D]elay alone does not justify denying a motion to amend." *Allegheny Plant Servs., Inc. v. Carolina Cas. Ins. Co.*, No. 14-4265, 2017 WL 772905, at *4 (D.N.J. Feb. 27, 2017). "[P]rejudice to the non-moving party is the touchstone for the denial of an amendment." *Phillips v. Borough of Keyport*, 179 F.R.D. 140, 144 (D.N.J. 1998) (quoting *Cornell & Co. v. Occupational Safety & Health Review Comm'n*, 573 F.2d 820, 823 (3d Cir.1978)) (alteration in original). The Third Circuit has contemplated that the standard for denial of amendment is high, stating "[g]enerally, Rule 15 motions should be granted." *United States ex rel. Customs Fraud Investigations, LLC. V. Victaulic Co.*, 839 F. 3d 242, 249 (3d Cir. 2016).

### III. DISCUSSION

There is no dispute before the Court as to whether Plaintiff's proposed amended complaint will cause any undue delay or undue prejudice against Defendants. Thus, the Court turns to whether Plaintiff's proposed amended complaint is futile. In determining whether a proposed amendment is futile, the Court "applies the same standard of legal sufficiency as applies under Rule 12(b)(6)." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997) (citations omitted). An amended complaint is futile if, as amended, it "would fail to state a claim upon which relief could be granted." *Id.* The Court "determines futility by taking all pleaded allegations as true and viewing them in the light most favorable to [the moving party]." *Great W. Mining & Mineral Co.*, 615 F.3d at 175. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

Defendants argue that Counts I, III, and IV of the proposed amended complaint are futile. (Defs.' Opp'n at 6-12.) Specifically, Defendants argue that Plaintiff's proposed amended complaint is futile because: (1) the breach of contract claims asserted against all Defendants (Count I)[1] and the breach of contract claim asserted against CFC (Count III) fail to state a claim upon which relief may be granted; and (2) Plaintiff's claim against CFC for negligence (Count IV) is not actionable under New Jersey law. (*Id.*)

**\*3** First, the Court turns to whether Plaintiff's claim for breach of Contract against CFC is futile. Defendants argue that CFC cannot be liable for breach of contract because CFC is not a party to the insurance policy contract. (*See* Defs.' Opp'n at 8-11.) Plaintiff argues that the decision of the New Jersey Supreme Court in *Pickett v. Lloyds*, 621 A.2d 445 (1993) holds otherwise, as the policyholder in that case recovered consequential damages from the insurance company, Underwriters, and its agent, Peerless, for their breach of the insurance policy and bad faith, and the court upheld the jury's allocation of 60% of the liability to Peerless. (Pl.'s Reply at 5.) Plaintiff contends that pursuant to *Pickett v. Lloyds*, although CFC was not a party to the Policy, "CFC may have liability as Underwriters' agent and should still be liable for its failure to act in accordance with the duty of care owed to [Plaintiff] and its failure to exercise good faith and reasonable skill in handling the insured claims." (Mot. at 7-8.) Plaintiff alleges that the proposed amended complaint alleges that CFC's conduct contributed to or caused Plaintiff's damages and therefore, CFC is potentially liable to Plaintiff in contract for its bad faith. (*Id.* at 5.)

The Court agrees with Plaintiff. In *Pickett v. Lloyds*, the New Jersey Supreme Court held that Peerless, the insurance company's agent, was liable to the insured in contract for lack of good faith and fair dealing outside of its agency relationship with Lloyd's for its role in the claims handling delay that caused consequential damages to the policyholder.

*Pickett*, 621 A.2d at 450. The court found that Peerless' conduct contributed to the delay that led to the consequential damage. *Id.* at 458. Similarly, here, in its proposed amended complaint, Plaintiff alleges that CFC's conduct contributed to or caused Plaintiff's damages. The *Pickett* case shows that although an agent such as CFC may not have been a party to the contract, it can still be liable for breach of contract and/or tort. The New Jersey Supreme Court held that "although the allegation of an agent's breach of duty of care carries tort overtones, the contractual relationship between the insured and insurer dominates not only the relationship between them, but also that between the insured and the agent." (*Id.* at 452.) The court further held that "agents of an insurance company are obligated to exercise good faith and reasonable skill in advising insureds." (*Id.* at 450.) Accordingly, Plaintiff's breach of contract claim against CFC is not futile.

Next, the Court turns to Plaintiff's negligence claim against CFC. Defendants argue that a claim of negligence against CFC is not actionable under New Jersey law. (Defs.' Opp'n at 11.) Defendants contend that "simple negligence... is insufficient to impose liability against the agent of an insurance company." (*Id.*) Plaintiff argues that the New Jersey Supreme Court in *Pickett* "did not rule out the possibility of an independent tort action for bad faith." (Pl.'s Reply at 8.)

In *Picket*, the court held that "clearly cases may arise in which the insurance company's conduct in response to an insured's claim for payment constitutes an independent tort." *Picket*, 621 A.2d at 455. Although Defendants cite to *Miglicio v. HCM Claim Mgmt. Corp., 288 N.J. Super. 331, 346, 672 A.2d 266, 274 (1995),* and *Nuzzo v. Horvath,* A-5323-08T1, 2011 WL 3795035 (N.J. Super. Ct. App. Div. Aug. 29, 2011) to support their argument, neither of those cases hold that a claim of negligence against an insurance company's agent is never actionable under New Jersey law. Accordingly, Plaintiff's negligence claim against CFC is not futile.

### IV. CONCLUSION & ORDER

For the reasons stated above, and for other good cause shown,

**IT IS** on this 31st day of March, 2021 **ORDERED** that:

1. Plaintiff's Motion to Amend the Complaint (ECF No. 13) is hereby **GRANTED**.

2. Plaintiff shall file the Amended Complaint within seven (7) days of the entry of this Order.

**All Citations**

Slip Copy, 2021 WL 1214774

---

## Footnotes

1    In their opposition brief, Defendants argue that Plaintiff should not be granted leave to amend Count I for breach of contract against Defendants and that Count I should be dismissed because Plaintiff has failed to state a claim upon which relief may be granted. (Defs.' Opp'n at 6.) However, Plaintiff does not seek leave to amend Count I of the complaint. Therefore, Defendant's argument is improperly raised here. Whether Count I states a claim upon which relief may be granted will be determined in the pending motion to dismiss. (ECF No. 9.) Being that Plaintiff is seeking to add Count III and Count IV, the Court will focus on whether those two amendments are futile.

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

TAB 28

*Miller v. Lewis Univ.*, No. 20-C-5473, 2021 WL 1379488 (N.D. Ill. Apr. 12, 2021)

2021 WL 1379488
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Brianna MILLER, on behalf of herself
and all others similarly situated, Plaintiff,
v.
LEWIS UNIVERSITY, Defendant.

Case No. 20 C 5473
|
Filed 04/11/2021
|
Corrected 04/12/2021

**Attorneys and Law Firms**

Jason P. Sultzer, The Sultzer Law Group, Poughkeepsie, NY, Edward W. Ciolko, Gary F. Lynch, Carlson Lynch, LLP, Pittsburgh, PA, Kathleen Patricia Lally, Katrina Carroll, Carlson Lynch, LLP, Chicago, IL, Michael Alexander Tompkins, Pro Hac Vice, Leeds Brown Law, P.C., Carle Place, NY, for Plaintiff.

Ashley N. Higginson, Pro Hac Vice, Miller Canfield, PLC, Lansing, MI, Robert Thomas Zielinski, Miller, Canfield. Paddock and Stone PLC, Chicago, IL, for Defendant.

## CORRECTED MEMORANDUM
## OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

**\*1** Pursuant to Federal Rule of Civil Procedure 12(b)(6), Lewis University has moved to dismiss Brianna Miller's first amended complaint. Miller—on behalf of herself and others—has sued Lewis alleging breach of contract (Count 1) and unjust enrichment (Count 2). She claims the University entered into a contract with her to provide, among other things, in-person classes and on-campus services. In Miller's view, she fulfilled her obligations under the contract by paying tuition. She claims Lewis breached the contract when, in response to the COVID-19 pandemic, it transitioned to remote instruction.

Though the Court is sympathetic to all who have been aggrieved by the pandemic, not all grievances are redressable

by courts of law. As explained below, Miller has failed to state a claim upon which relief may be granted, so the Court grants Lewis's motion.

### Background

Lewis is a private Catholic university located in Romeoville, Illinois. It educates approximately 6,400 undergraduate and graduate students. Lewis—in normal times—offers both a traditional, in-person student experience as well as an online learning experience. Miller was a traditional student at Lewis. She began in fall 2016 and graduated in spring 2020.

During the spring 2020 semester, as the country began confronting the COVID-19 pandemic, Lewis made several changes to its academic program. On March 12, 2020, the University announced that "[a]ll courses originally scheduled to be face-to-face will be delayed by one week, resuming in a fully online format on Monday, March 23." Am. Compl. ¶ 4. At the time, Lewis had not decided whether face-to-face learning would resume. But, on March 19, 2020, the University determined that the remainder of the 2020 school year (spring and summer terms) would be "delivered through online only learning methods." *Id.* ¶ 4. Lewis also told students that "residence halls would remain closed through the conclusion of the summer terms." *Id.*

Miller does not take direct issue with the University's elimination of in-person learning. *See id.* ¶ 8. Instead, she challenges Lewis's decision to "retain monies paid by [her and those she wishes to represent] when [Lewis] failed to provide [ ] in-person and on-campus classes and services." *Id.* For the spring 2020 semester, Miller paid approximately $16,860 in tuition and mandatory fees. She has not been given a partial refund for the value of the in-person classes that were moved online, nor has she received a partial refund for the mandatory fees she paid despite Lewis's discontinuation of on-campus services. Miller asserts that Lewis's failure to provide an in-person education and on-campus services, while also retaining the full amount of her tuition and fees, constitutes a breach of contract and unjust enrichment.

Central to her breach-of-contract claim is Miller's allegation that she entered into a contract with Lewis under which, in exchange for tuition and fees, Lewis "would provide in-person and on-campus educational services, experiences, opportunities, and other related services." *Id.* ¶¶ 35, 70. According to Miller, the terms of this contract are set forth in

various "marketing materials, advertisements, publications, and other documents from [Lewis], including but not limited to the Lewis University Course Schedule." *Id.* ¶ 70.

 **\*2**  With regard to her unjust enrichment claim, Miller claims that she paid tuition and fees "with the expressed understanding that such costs included the in-person classes, services, opportunities, and experiences that Defendant had previously marketed, promoted, or made available prior to COVID-19." *Id.* ¶ 84. In her view, by retaining the full amount of tuition and fees even after failing to provide the benefits that Miller and her classmates expected, the school was unjustly enriched at her and others' expense.

Miller seeks compensatory damages, disgorgement, equitable relief, and other forms of relief.

## Discussion

To survive a motion to dismiss for failure to state a claim, the complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009) (internal quotation marks omitted). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *McCauley v. City of Chicago*, 671 F.3d 611, 615 (7th Cir. 2011) (internal quotation marks omitted).

When ruling on a motion to dismiss, the court must construe "all well-pleaded allegations of the complaint as true and view them in the light most favorable to the plaintiff." *Appert v. Morgan Stanley Dean Witter, Inc.*, 673 F.3d 609, 622 (7th Cir. 2012) (alterations accepted) (internal quotation marks omitted). But "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

### A. Educational malpractice

Lewis contends in its motion that Miller's breach-of-contract claim is really an educational malpractice claim, which is not cognizable under Illinois law. *See Waugh v. Morgan Stanley & Co.*, 2012 IL App (1st) 102653, ¶¶

28–44, 359 Ill.Dec. 219, 966 N.E.2d 540, 549–54 ("If a claim raises questions about the reasonableness of an educator's conduct in providing educational services, or if a claim requires an analysis of the quality of education, it is a claim for educational malpractice" and "the tort of educational malpractice is not recognized in Illinois.") The Court disagrees.

In this context, to state a viable claim for breach of contract —and therefore avoid a claim sounding in educational malpractice—"the plaintiff must do more than simply allege that the education was not good enough." *See Ross v. Creighton Univ.*, 957 F.2d 410, 417 (7th Cir. 1992). Rather, the plaintiff must allege that the educational institution "failed to perform [a promised educational] service at all." *Id.* Miller has done that here. She alleges that she was promised an in-person learning experience, paid for it, did not receive it, and should recover damages as a result. In other words, Miller has put forward a fairly straightforward breach-of-contract claim.

Lewis contends that Miller must be alleging a difference in the quality between the in-person education she wishes she had received and the online education she received, or else her claim could not stand. But just because Miller argues that an online education does not have the same value as an in-person education does not mean that she is challenging the quality of the education she received. Instead, to the extent she discusses the difference in "market value" between in-person and online education, "that discussion is limited to alleging damages from the defendant's alleged breach of contract, not an allegation that any decreased value *constitutes* the breach of contract." *See Oyoque v. DePaul Univ.*, No. 20 C 3431, ---- F.Supp.3d ----, ----, 2021 WL 679231, at \*2 (N.D. Ill. Feb. 21, 2021) (Kennelly, J.). This is markedly different from claiming educational malpractice. *See Waugh*, 2012 IL App (1st) 102653, ¶ 29, 359 Ill.Dec. 219, 966 N.E.2d at 549 (listing the three "broad categories of educational malpractice claims: '(1) the student alleges that the school negligently failed to provide him with adequate skills; (2) the student alleges that the school negligently diagnosed or failed to diagnose his learning or mental disabilities; or (3) the student alleges that the school negligently supervised his training.' ").

 **\*3**  To summarize, Miller's breach-of-contract claim does not sound in educational malpractice because her complaint does not challenge the adequacy of the education she received, and the resolution of her claim would not require "second-

guessing the professional judgment of the University faculty on academic matters." *See* *Ross*, 957 F.2d at 417.

## B. Breach of contract (Count 1)

Next, the Court considers whether Miller has stated a claim for breach of contract. In Illinois, a plaintiff claiming breach of contract must allege: "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages." *Sevugan v. Direct Energy Servs., LLC*, 931 F.3d 610, 614 (7th Cir. 2019) (internal quotation marks omitted).

As discussed above, in the educational context plaintiffs "must do more than simply allege that the education was not good enough. Instead, [plaintiffs] must point to an identifiable contractual promise that the [educational institution] failed to honor." *Ross*, 957 F.2d at 416–17; *see also Charleston v. Bd. of Trs. of Univ. of Illinois at Chicago*, 741 F.3d 769, 773 (7th Cir. 2013) ("[T]he student's complaint must be specific about the source of [the] ... contract, the exact promises the university made to the student, and the promises the student made in return."). "The catalogues, bulletins, circulars, and regulations of the institution made available to the matriculant may become a part of the contract." *Bissessur v. Indiana Univ. Bd. of Trs.*, 581 F.3d 599, 602 (7th Cir. 2009) (internal quotation marks omitted); *see also DiPerna v. Chicago Sch. of Prof'l Psychology*, 893 F.3d 1001, 1006–07 (7th Cir. 2018) ("In Illinois, 'a college or university and its students have a contractual relationship, and the terms of the contract are generally set forth in the school's catalogs and bulletins.' ").

### 1. Materials expressing intention, hope, or desire

Though Lewis concedes that the parties have an "inherently contractual" relationship, it argues that Miller has not sufficiently alleged that the University made a promise to provide in-person classes. The Court agrees. In her complaint, Miller cites to various "marketing materials, advertisements, and other documents" that "highlighted" Lewis's "in-person educational opportunities, experiences, and services." *See* Am. Compl. ¶¶ 19, 24, 70, 71. But "promotional materials"— i.e., marketing materials or advertisements—"are not among the terms of the contract between universities and their students." *See Galligan v. Adtalem Glob. Educ. Inc.*, No. 17 C 6310, 2019 WL 423356, at *6 (N.D. Ill. Feb. 4, 2019)

(citing *DiPerna*, 893 F.3d at 1006–07); *see also Bissessur*, 581 F.3d at 602.

Miller cites to portions of Lewis's website to claim that the it "actively markets [its] on-campus experience and opportunities as a benefit to students." *See* Am. Compl. ¶¶ 21–22 (statements describing, for example, Lewis's "active campus with opportunities for personal development" and "impressive academic facilities."). These are clearly promotional materials and cannot become part of the contract between Miller and Lewis. But even if that weren't true, and promotional materials could be considered, advertising a "safe and welcoming campus," "an inviting community .... [w]ith more than 100 clubs and organizations," and " 'well-equipped classrooms,' " Am. Compl. ¶ 21, is not the same making a "definite" and "concrete promise," *see also Galligan*, 2019 WL 423356, at *7 (internal quotation marks omitted). Instead, the vast majority of Miller's cites to the Lewis website involve "puffing" statements, "meaning they were not concrete promises that could comprise part of a contract between student and university." *See id.* at *6; *see also id.* at *4 (" 'Puffing denotes the exaggerations reasonably expected of a seller as to the degree of quality of his or her product, the truth or falsity of which cannot be precisely determined.' ")

**\*4** Next, Miller points to the executive summary of Lewis's strategic plan, which she says is distinct from promotional materials. But strategic plans are not among the documents that may be considered as part of the contracts between students and educational institutions. *See Bissessur*, 581 F.3d at 602 ("The 'catalogues, bulletins, circulars, and regulations of the institution made available to the matriculant may become a part of the contract.' "). In any event, the executive summary contains no concrete statements committing the University to definite actions. *See* Am. Compl. ¶ 21. Instead it is filled with "expression[s] of intention, hope or desire" and cannot be a part of Lewis's contract with its students. *See Galligan*, 2019 WL 423356, at *7 (internal quotation marks omitted). For example, the fact that Lewis intends to "advance transformative life experiences; experiential learning opportunities and a campus setting that creates a distinctive and relevant student experience" is of no consequence here. *See Strategic Plan 2017–2022: Executive Summary*, Lewis University, https://www.lewisu.edu/welcome/strategic-plan.htm.[1] That

intention is an unenforceable aspiration, not an enforceable promise that Miller or any other student can enforce against Lewis in a court of law. *See* 📄 *Galligan*, 2019 WL 423356, at *7 (finding an institution's commitment to ensuring that "qualified students with disabilities are afforded reasonable accommodations" was definite enough to make it a "concrete promise rather than an 'unenforceable expression' ").

Miller's reliance on Lewis's statements about its Air Traffic Control certificate program, College of Aviation, Science and Technology, College of Business, and College of Education and Social Science does nothing to advance her claim. Miller does not allege that she was enrolled in any of these programs, but even if she was, one need only look at the statements as published to know that these too were promotional materials. Even if these promotional materials could be considered, the marketing of "classroom instruction," "laboratory simulations," "hands-on learning," and "state-of-the-art facilities," *see* Am. Compl. ¶ 23, without more, is not the same as making a "definite" and "concrete promise" to provide an in-person education. *See* 📄 *Galligan*, 2019 WL 423356, at *7.

### 2. Lewis's spring 2020 course schedule

Miller also cites to Lewis's spring 2020 course schedule to support her breach-of-contract claim. As part of the recurring course registration process, Lewis publishes the upcoming term's course schedule, which lists the courses being offered along with associated fees, as well as various policies. For each class in the schedule there is a notation explaining which instructional method will be used to teach the course. For spring 2020, course instructional methods included traditional, "face-to-face" learning, online learning, blended learning (a mixture of face-to-face learning and online), and multi-option courses (students could move between face-to-face and online). *See* Am. Compl. ¶ 31. Miller was enrolled in traditional courses before the pandemic forced the University to change plans.

Miller argues that the course schedule contains a promise for an in-person education because when students enrolled in classes, they were invited to select courses that used a specific instructional method including traditional (face-to-face) learning. But the spring 2020 schedule contained an important reservation: though "[t]he information contained in th[e] schedule was accurate on October 22, 2019 ... [it was] subject to change without notice." Def.'s Ex. A-3 at

ECF p. 42.[2] Moreover, Lewis reserved "the right to cancel any course ... and to make any schedule changes required including change of class time, location or instructor." *Id.* In light of this reservation, Lewis claims that the course schedule cannot contain any enforceable promises. Lewis also argues that the notations regarding instructional method are not enough to form a contractual promise.

**\*5** The Court agrees with Lewis. The notations are "hardly sufficient to form a binding contract" as they cannot be confused with definite and concrete promises. *See* 📄 *Gociman v. Loyola Univ. of Chicago*, No. 20 C 3116, ––– F.Supp.3d ––––, ––––, 2021 WL 243573, at *4 (N.D. Ill. Jan. 25, 2021) (holding that parentheticals in a course catalog were not promises that courses for which students registered would be delivered on-campus). Without more, these notations are informative rather than promissory and Miller cannot transform such statements into a binding contract.[3] *See* 📄 *Abrams v. Illinois Coll. of Podiatric Med.*, 77 Ill. App. 3d 471, 477, 32 Ill.Dec. 680, 395 N.E.2d 1061, 1065 (1979) (holding that a particular provision of the institution's student handbook was not a promise but rather an "unenforceable expression of intention, hope or desire" because "it was not communicated to the plaintiff in such a way as to invite the payment of tuition in reliance" and therefore "plaintiff did not have the power to transform [it] into a binding contractual obligation.").

Miller's attempt to read into the course schedule a promise to provide an in-person education is further undermined by the fact that it is "plainly inconsistent with the document itself."

*See* 📄 *Gociman*, ––– F.Supp.3d at ––––, 2021 WL 243573, at *4. This is true mainly because Miller cannot sidestep the schedule's unambiguous reservation permitting Lewis to "make any schedule changes required *including* change of class time, location or instructor." Def.'s Ex. A-3 at ECF p. 42 (emphasis added). Though Miller argues that the University didn't reserve the right to change the instructional method specifically, it didn't need to. The word "including," of course, typically denotes a non-exhaustive list, i.e. a part of the whole rather than the entirety. *See* Bryan A. Garner, *Garner's Modern English Usage* 500 (4th ed. 2016). The only way one can read the reservation to *explicitly exclude* the instructional method is by changing "including" to "involving," "limited to," "consists of," or something similar. But that is not what the schedule says.

Miller also asserts—without any support—that even if the reservation permitted Lewis to change the course schedule and manner of instruction, it did not allow Lewis to do so after courses began. But there is nothing in language of the reservation to support such a limitation. And the cases Miller relies on for this argument are inapplicable, as they involve courts applying different law under different circumstances.

*See* *Saroya v. Univ. of the Pac.*, 503 F.Supp.3d 986, 996 (N.D. Cal. 2020) (applying California law to "look to the reasonable expectation of the student at the time of contracting"); *Verlanga v. Univ. of San Francisco*, No. CGC-20-584829, 2020 WL 7229855, at *2 (Cal. Super. Ct. Nov. 12, 2020) ("The Court likewise denies USF's request for judicial notice of its catalog, including the refund policy and the university's reservation of rights to modify its regulations and programs.")

Finally, Miller argues that even if the Court does not agree with her interpretation of the reservation, it is subject to two reasonable interpretations and therefore may not be resolved on a motion to dismiss. *See* *Drennan v. Indiana Harbor Belt R. Co.*, No. 99 C 3371, 2001 WL 883659, at *4 (N.D. Ill. Aug. 6, 2001) ("If the relevant terms are susceptible to more than one reasonable interpretation, then the contract is ambiguous and the interpretation of the terms is a question of fact which cannot be resolved on a motion to dismiss."). The Court disagrees. There is nothing the least bit ambiguous about the language of the reservation allowing Lewis to make unilateral changes.

**\*6** In sum, none of the materials Miller has identified is appropriately understood to constitute a binding contractual promise by the University to provide in-person educational services, experiences, or opportunities. As a result, count 1 fails to state a claim. [4]

## C. Unjust enrichment (Count 2)

Lastly, the Court will address Miller's unjust enrichment claim. Under Illinois law, a plaintiff states a claim for unjust enrichment when she alleges that the "defendant has unjustly retained a benefit to the plaintiff's detriment and the defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *See* *Blythe Holdings, Inc. v. DeAngelis*, 750 F.3d 653, 658 (7th Cir. 2014) (alterations accepted) (internal quotation marks omitted). "Because it is an equitable remedy, unjust enrichment is only

available when there is no adequate remedy at law." *Guinn v. Hoskins Chevrolet*, 361 Ill. App. 3d 575, 604, 296 Ill.Dec. 930, 836 N.E.2d 681, 704 (2005) (internal quotation marks omitted). Accordingly, the remedy of unjust enrichment is unavailable "where there is a specific contract that governs the relationship of the parties." *Id.* (alterations accepted) (internal quotation marks omitted).

Miller argues that her claim should survive because, although she alleges the existence of a contract, her claim for unjust enrichment is pleaded in the alternative. Generally, Illinois law permits a party at the pleading stage to plead claims in the alternative, including pleading an unjust enrichment claim as an alternative to a breach-of-contract claim. *See* *id.* However, "when the unjust enrichment claim is premised on a failure to fulfill contractual terms—which is the case here—this general rule does not apply, and dismissal of the unjust enrichment claim is appropriate." *Oyoque*, ---- F.Supp.3d at ----, 2021 WL 679231, at *5; *see also* *id.* (citing cases). Because, Miller alleges the existence of a contract and Lewis does not dispute that there is one, the Court must dismiss Count 2. *See* *Team Impressions, Inc. v. Chromas Techs. Canada, Inc.*, No. 02 C 5325, 2003 WL 355647, at *4 (N.D. Ill. Feb. 18, 2003) (St. Eve, J.) (plaintiff's alternative unjust enrichment claim dismissed because it was premised on the defendant's failure to fulfill the terms of an express contract).

### Conclusion

For the reasons stated above, the Court grants defendant's motion to dismiss [docket no. 28]. Unless Miller submits by April 26, 2021 a proposed amended complaint stating a viable claim over which this Court has jurisdiction, the Court will enter judgment in favor of the University. The case is set for a telephone status hearing on May 5, 2021 at 9:15 a.m. to set any necessary schedules for further proceedings, using call-in number 888-684-8852, access code 746-1053. Counsel should wait for the case to be called before announcing themselves.

### All Citations

--- F.Supp.3d ----, 2021 WL 1379488

## Footnotes

1    Though she quotes only a few words of the executive summary in the body of her complaint, Miller also cited the web address for the full executive summary. *See* Am. Compl. ¶ 21.

2    Though Miller did not allege the course schedule reservation in her complaint it is "well settled that in deciding a 🔖 Rule 12(b)(6) motion, a court may consider 'documents attached to a motion to dismiss ... if they are referred to in the plaintiff's complaint and are central to his claim.' " *See* 🔖 *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012). Because Miller incorporated the course schedule by reference in the complaint, the court may consider that document, which Lewis attached to its motion to dismiss.

3    Miller also argues that the University created a specific contract term by custom. *See* 🔖 *Ross*, 957 F.2d at 417 ("[C]ustom and usages can also become specific terms by implication."). This argument is unavailing as evidence of "[c]ustom and usage may only be relied upon to interpret an agreement if the practice was 'so well known, uniform, long-established and generally acquiesced in as to induce the belief that the parties contracted with reference to it.' " *Gray v. Mundelein Coll.*, 296 Ill. App. 3d 795, 805, 231 Ill.Dec. 260, 695 N.E.2d 1379, 1386 (1998). Because the notations are not promises, evidence of custom and usage are not necessary to interpret their meaning.

4    Lewis provided additional arguments for dismissal of the breach-of-contract claim, including that the University's tuition agreement precludes a finding of breach of contract and that Miller failed to allege that the University's decision to transition to remote learning was arbitrary, capricious, or in bad faith. Because the Court has dismissed this claim on other grounds, it need not consider these additional arguments.

---

**End of Document**                                         © 2021 Thomson Reuters. No claim to original U.S. Government Works.

TAB 29

*Pecanha v. The Hain Celestial Grp., Inc.*,2018 WL 534299 (N.D. Cal. Jan. 24, 2018)

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 411 of 535
PageID: 32358
Pecanha v. The Hain Celestial Group, Inc., Not Reported in Fed. Supp. (2018)
2018 WL 534299

KeyCite Yellow Flag - Negative Treatment
Distinguished by    In re HomeAdvisor, Inc. Litigation,    D.Colo.,
September 29, 2020

2018 WL 534299
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

Makinde PECANHA, et al., Plaintiffs,

v.

THE HAIN CELESTIAL
GROUP, INC., et al., Defendants.

Case No. 17-cv-04517-EMC
|
Signed 01/24/2018

**Attorneys and Law Firms**

Joel Dashiell Smith, Lawrence Timothy Fisher, Bursor &
Fisher, P.A., Walnut Creek, CA, Reuben D. Nathan, Nathan
& Associates, APC, San Diego, CA, for Plaintiffs.

Kenneth Kiyul Lee, Alexander Michael Smith, Jenner &
Block LLP, Los Angeles, CA, Dean N. Panos, Jenner and
Block LLP, Chicago, IL, for Defendants.

**ORDER DENYING DEFENDANTS'
MOTION TO DISMISS OR STAY**

Docket No. 29

EDWARD M. CHEN, United States District Judge

*1 Plaintiffs Makinde Pecanha and Shaun Ray Bell have
filed a class action against Defendants The Hain Celestial
Group, Inc. ("Hain") and JĀSÖN Natural Products, Inc.
("JNP"), asserting claims for, *inter alia*, false advertising and
breach of warranty based on Defendants' marketing of their
JĀSÖN deodorant products as "Naturally Fresh" and "Pure
Natural" when in fact they contain synthetic ingredients.
Defendants have moved to dismiss the first amended class
action complaint ("FAC") or, alternatively, to stay based
on primary jurisdiction of the FDA. Having considered the
parties' briefs and accompanying submissions, as well as
the oral argument of counsel, the Court hereby **DENIES**
Defendants' motion.

**I. FACTUAL & PROCEDURAL BACKGROUND**

In their FAC, Plaintiffs allege as follows.

Hain is a company that focuses on food and personal care
products. One of its brands is the JĀSÖN® brand, which
covers personal care products. *See* FAC ¶ 2. Hain, along
with JNP, promote the JĀSÖN® brand "as a leader in natural
cosmetics." FAC ¶ 2.

At issue in the instant case are JĀSÖN® deodorant products.
The front packaging for the deodorant products use one
or more of the following labels: "Naturally Fresh," "Pure
Natural Deodorant," "Pure Natural Deodorant Stick," and/
or "Natural Pioneer Since 1959." FAC ¶ 5. Although
the labels use the term "natural" in some form, the
deodorant products actually use synthetic ingredients—
namely, tocopheryl acetate, glycerin, and ethylhexylglycerin.

- "Tocopherol acetate is a synthetic, inert ingredient
  which is used pre- and post-harvest as an ingredient in
  pesticide formulations applied to growing crops or to
  raw agricultural commodities after harvest." FAC ¶ 7.

- "Glycerin is a factory-produced texturizer that is created
  by a complex process, used as a filler and thickening
  agent." FAC ¶ 7.

- "Ethylhexylglycerin is a synthetic conditioning agent and
  preservative." FAC ¶ 7.

Based on, *inter alia*, the above allegations, Plaintiffs have
asserted the following causes of action:

(1) Violation of the California Consumer Legal Remedies
Act ("CLRA"). *See* Cal. Civ. Code § 1750 *et seq.*

(2) Violation of California Business & Professions Code
§ 17200.

(3) Violation of California Business & Professions Code
§ 17500.

(4) Breach of express warranty.

(5) Unjust enrichment.

(6) Fraud.

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 412 of 535
PageID: 32359

Pecanha v. The Hain Celestial Group, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 534299

## II. DISCUSSION

A. Legal Standard

The bulk of Defendants' motion is a motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b).

To survive a [12(b)(6) ] motion to dismiss for failure to state a claim after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), [a plaintiff's] factual allegations [in the complaint] "must ... suggest that the claim has at least a plausible chance of success." In other words, [the] complaint "must allege 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' "

.... [The Ninth Circuit has] settled on a two-step process for evaluating pleadings:

**\*2** First, to be entitled to the presumption of truth, allegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively. Second, the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation.

*Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1134-35 (9th Cir. 2014).

Notably,

[t]he plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent" with a defendant's liability, it "stops short of the line between possibility and plausibility 'of entitlement to relief.' "

*Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937.

As for Rule 9(b), it provides that, "[i]n alleging fraud ..., a party must state with particularity the circumstances constituting fraud," although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). The Ninth Circuit has explained that this means that

the circumstances constituting the alleged fraud "be 'specific enough to give defendants notice of the particular misconduct ... so that they can defend against the charge and not just deny that they have done anything wrong.' " Averments of fraud must be accompanied by "the who, what, when, where, and how" of the misconduct charged. "[A] plaintiff must set forth more than the neutral facts necessary to identify the transaction. The plaintiff must set forth what is false or misleading about a statement, and why it is false."

*Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003).

B. Fraud-Based Claims—Use of the Term "Natural"

Plaintiffs' fraud-based claims are predicated on Defendants' use of the term "natural" on the labeling for the deodorant products. Plaintiffs charge Defendants with using the term "natural" in the following ways: "Naturally Fresh," "Pure Natural Deodorant," "Pure Natural Deodorant Stick," and/or "Natural Pioneer Since 1959." FAC ¶ 5. According to Plaintiffs, these phrases are misleading because the deodorant products actually contain synthetic ingredients. In response, Defendants argue that the phrases are not misleading because they do not make claims of "*all* natural" or "*100%* natural." (Defendants apparently concede that a label of "all natural" or "100% natural" would be misleading if the product bearing the label contained synthetic ingredients.) Defendants also argue that the phrases used on the label for the deodorant must be viewed in context—not only the front of the label (which further states that the deodorant contains no aluminum, parabens, phthalates, or propylene glycol) but also the back (which displays the ingredient list).

As the Court acknowledged at the hearing, it is a close question as to which party has the better argument. Indeed, the parties have cited district court opinions that go both ways, and those opinions are not always reconcilable or easily distinguishable. *Compare, e.g., In re 100% Grated Parmesan Cheese Mktg. & Sales Practices Litig.*, No. 16 C 5802, 275 F.Supp.3d 910, 2017 WL 3642076 (N.D. Ill. Aug. 24, 2017); *Kelly v. Cape Cod Potato Chip Co.*, 81 F.Supp.3d 754 (W.D. Mo. 2015); *Pelayo v. Nestle USA*,

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 413 of 535
PageID: 32360
Pecanha v. The Hain Celestial Group, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 534299

*Inc.*, 989 F.Supp.2d 973 (C.D. Cal. 2013) [1]; *with Segedie v. Hain Celestial Grp., Inc.*, No. 14-cv-5029 (NSR), 2015 WL 2168374, at *11, 2015 U.S. Dist. LEXIS 60739, at *29 (S.D.N.Y. May 7, 2015); *Jou v. Kimberly-Clark Corp.*, No. C-13-03075 JSC, 2013 WL 6491158, 2013 U.S. Dist. LEXIS 173216 (N.D. Cal. Dec. 10, 2013); *Campen v. Frito-Lay N. Am., Inc.*, No. 12-1586 SC, 2013 WL 1320468, at *13, 2013 U.S. Dist. LEXIS 47126, at *35-36 (N.D. Cal. Apr. 1, 2013).

**\*3** The Court, however, must begin with the Ninth Circuit's directive that "whether a business practice is deceptive will usually be a question of fact not appropriate for decision on" a motion to dismiss. *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008). Indeed, the Ninth Circuit has characterized it as a "rare situation" where "granting a motion to dismiss is appropriate." *Id.* at 939. Thus, in the instant case, unless the Court can say, as a matter of law, that no reasonable consumer could be deceived by Defendants' use of the term "natural," then Defendants' motion should be denied.

In the instant case, Plaintiffs charge Defendants with using the term "natural" in the following ways: "Naturally Fresh," "Pure Natural Deodorant," "Pure Natural Deodorant Stick," and/or "Natural Pioneer Since 1959." FAC ¶ 5. While, arguably, no reasonable consumer would infer that the deodorant products are "all natural" based solely on the phrase "Natural Pioneer Since 1959," it appears that phrase was used in conjunction with one of the other phrases —"Naturally Fresh" and "Pure Natural"—*see, e.g.*, FAC ¶ 24, which are most problematic. For example, although Defendants contend that "Pure Natural" differs from "100% natural," the phrase "Pure Natural" may be tantamount to, or at least could reasonably be understood to mean, "all natural" or "100% natural." Notably, "pure" is defined by Merriam-Webster as, *inter alia*, "unmixed with any other matter," "free from dust, dirt, or taint," "free from what vitiates, weakens, or pollutes," and "containing nothing that does not properly belong." https://www.merriam-webster.com/dictionary/pure?utm_campaign=sd&utm_medium=serp&utm_source=jsonld (last visited January 22, 2017). The distinction between "Pure Natural" and "100% natural" is not as sharp as Defendants contend.

In *Jou v. Kimberly-Clark Corp.*, No. C-13-03075 JSC, 2013 WL 6491158, 2013 U.S. Dist. LEXIS 173216 (N.D. Cal. Dec. 10, 2013), Judge Corley found that a similar phrase

—"pure and natural"—used to describe diapers [2] "could plausibly deceive a reasonable consumer. The packaging prominently displays the term 'pure & natural,' which could lead a reasonable consumer to believe that that the product is free of non-natural ingredients when it actually contains polypropylene and sodium polyacrylate." *Id.* at *22 (also noting that "the front of the packaging is adorned with a green banner and images of leaves" which "reinforces the reasonable consumer's belief that the diapers are entirely natural"). Judge Corley also underscored that a "recent case in this District ... analyzed the phrases '100% Natural,' 'All Natural,' and [even plain] 'Natural' interchangeably in denying the defendant' motion to dismiss. At no point in the analysis was the absence of '100%' or 'All' from the term 'Natural' significant in determining the deceptiveness of the 'Natural' representation on the packaging of a granola bar that included synthetic ingredients." *Id.* at *25; *see also Segedie*, 2015 WL 2168374, *at *11*, 2015 U.S. Dist. LEXIS 60739, at *29 (stating that "[i]t is not unreasonable as a matter of law to expect that a product labeled 'natural' or 'all natural' contains only natural ingredients." Judge Corley acknowledged that "the use of 'all' in 'all natural' may make the inference even more plausible than the inference arising from the use of just 'natural,' the use of 'natural' still provides the plausible inference required to defeat a Rule 12(b)(6) motion." *Jou*, 2013 WL 6491158, at *7, 2013 U.S. Dist. LEXIS 173216, at *27 (emphasis omitted); *see also id.* at *29 (adding that "[w]hether a reasonable consumer would agree with Plaintiffs ('natural' means no non-natural ingredients) or with Defendant ('natural' means at least one natural ingredient among other, possibly non-natural ingredients) or with neither is not a question that can be resolved on a Rule 12(b)(6) motion").

**\*4** Defendants protest that the use of the term "natural" on the deodorant products cannot be viewed in a vacuum; rather, the term must be taken in context, in particular, other information on the front of the label. Defendants highlight that the front of the label also displays prominently the following phrase: "NO ALUMINUM, PARABENS, PHTHALATES, OR PROPYLENE GLYCOL." According to Defendants, "[w]hen viewed 'as a whole,' the reference to 'natural' or 'naturally' refers to the fact that there is 'no aluminum, parabens, phthalates, or propylene glycol' in the deodorants," Mot. at 1, not that the deodorant product is 100% natural in all respects. The problem for Defendants is that, while a reasonable consumer might plausibly so interpret the label, that does not mean that a reasonable consumer could not have

a different interpretation. For instance, it is plausible that a reasonable consumer could view the "no aluminum" language as a *reinforcement or illustrative* of the term "natural"—*i.e.*, "natural" means, in particular, that there is no aluminum, parabens, phthalates, or propylene glycol in the product. That would not preclude an assumption that, in addition to these four prominent substances, there are no other non-natural ingredients. *Cf.* 🚩 *Anderson v. Hain Celestial Grp., Inc.,* 87 F.Supp.3d 1226, 1237 (N.D. Cal. 2015) (Davila, J.) (in response to defendant's argument that "other information on the Sunflower Dream Drink's label clarifies that the 'All Natural' statement refers only to the sunflower seeds used to manufacture the product and does not refer to the naturalness of the product as a whole," stating that "[i]t cannot be confidently said, looking only at the label, that use of the word 'natural' in other less prominent locations renders 'it impossible for the plaintiff to prove that a reasonable consumer was likely to be deceived' by the 'All Natural' statement placed conspicuously on the front of the product, independent of any reference to sunflower seeds").

Defendants contend that, at the very least, there is ambiguity because of the "no aluminum" language and, once there is ambiguity, it is, in essence, the duty of the consumer to look at the ingredient list on the back of the label to clarify any ambiguity. [3] As an initial matter, it is not clear that that is the law, at least in the Ninth Circuit. No Ninth Circuit case holds such, including but not limited to 📙 *Freeman v. Time, Inc.,* 68 F.3d 285, 290 (9th Cir. 1995) (in a case involving language used in a sweepstake promotion (*i.e.*, no ingredient lists were involved), rejecting plaintiff's argument that a certain inference could be made from the language because of the "context of the entire document"; "[a]ny ambiguity that [the plaintiff] would read into any particular statement is dispelled by the promotion as a whole"); 📙 *Williams,* 552 F.3d at 939-40 (rejecting the argument that "reasonable consumers should be expected to look beyond misleading representations on the front of the box to discover the truth from the ingredient list in small print on the side of the box"; "reasonable consumers expect that the ingredient list contains more detailed information about the product that confirms other representations on the packaging"); and 📙 *Ebner v. Fresh, Inc.,* 838 F.3d 958, 966 (9th Cir. 2016) (characterizing 📙 *Williams* as "stand[ing] for the proposition that if the defendant commits an act of deception, the presence of fine print revealing the truth is insufficient to dispel that deception").

While some district court opinions may be read to support Defendants' position, *see* 📙 *100% Grated Parmesan Cheese, 275 F.Supp.3d at ——,* 2017 WL 3642076, at *6 (distinguishing 📙 *Williams* because, there, "the allegedly deceptive term 'Fruit Juice' on the front of the package was an affirmatively false impression; there was no ambiguity");

📙 *Workman v. Plum,* 141 F.Supp.3d 1032, 1035 (N.D. Cal. 2015) (Alsup, J.) (holding that no reasonable consumer would "view pictures on the packaging of a puree pouch or box of fruit bars and assume that the size of the items pictured directly correlated with their predominance in the blend"; then adding—in what appears to be dicta—"any potential ambiguity could be resolved by the back panel of the products, which listed all ingredients in order of predominance, as required by the FDA"), those cases are not binding authorities. Moreover, there is authority to the contrary. *See, e.g.,* 📙 *Campen,* 2013 WL 1320468, at *13, 2013 U.S. Dist. LEXIS 47126, at *35-36 (stating that "a reasonable consumer *could* interpret a bag of chips claiming to have been 'Made with ALL NATURAL Ingredients' to consist exclusively of natural ingredients, contrary to the reality described in the nutrition box [and], [e]ven though the nutrition box could resolve any ambiguity, the Court cannot conclude *as a matter of law, in the context of a* 📙 *Rule 12(b) (6) motion,* that no reasonable consumer would be deceived by the "Made with ALL NATURAL Ingredients" labels") (emphasis added).

**\*5** Finally, even crediting Defendants' ambiguity argument, Defendants still would not prevail at this juncture of the proceedings because, as Plaintiffs point out, it is not readily apparent that the ingredient list would be helpful—*i.e.*, it is not clear that a reasonable consumer would be able to determine whether the ingredients on the ingredient list were natural or synthetic. The ingredient list provided by Defendants lists many chemicals but a chemical is not necessarily synthetic. Hence, the inclusion of an ingredient list does not warrant, at this 12(b)(6) juncture, judgment as a matter of law.

The Court thus denies Defendants' motion to dismiss the fraud-based claims.

C. Primary Jurisdiction Doctrine

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 415 of 535 PageID: 32362
Pecanha v. The Hain Celestial Group, Inc., Not Reported in Fed. Supp. (2018)
2018 WL 534299

With respect to the fraud-based claims, Defendants argue that, if the Court is not inclined to dismiss, then it should at the very least stay the claims (and presumably the entire case since it is largely predicated on the fraud claims) based on the primary jurisdiction doctrine. More specifically, Defendants argue that the Court should stay the case to see what further guidance is given by the FDA with respect to the term "natural." According to Defendants, there is "ongoing FDA regulatory review of the meaning of the word natural," Mot. at 12, based on the FDA's November 2015 request for comments "on the use of the term 'natural' in the labeling of human food products, including foods that are genetically engineered or contain ingredients produced through the use of genetic engineering." Defs.' RJN, Ex. 8 (FDA notification of request for comments). Defendants admit that this case involves the personal care/cosmetics industry and not the food industry, but argue that "many of the ingredients challenged in 'all natural' food cases are also used in personal care products"—*e.g.*, glycerin. Mot. at 14.

"Primary jurisdiction is a prudential doctrine that permits courts to determine 'that an otherwise cognizable claim implicates technical and policy questions that should be addressed in the first instance by the agency with regulatory authority over the relevant industry rather than by the judicial branch.' " *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 760 (9th Cir. 2015). "Not every case that implicates the expertise of federal agencies warrants invocation of primary jurisdiction. Rather, the doctrine is reserved for a 'limited set of circumstances' that 'requires resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency.' " *Id.* A court has discretion as to whether to stay a case based on the primary jurisdiction doctrine.

> [C]ourts in considering the issue have traditionally employed such factors as (1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory authority that (4) requires expertise or uniformity in administration.

*Syntek Semiconductor Co. v. Microchip Tech. Inc.*, 307 F.3d 775, 781 (9th Cir. 2002).

According to Defendants, the above factors weigh in favor of a stay in the instant case, particularly as the Ninth Circuit just "last year directed a district court to stay a case alleging that Chobani deceptively and unlawfully labels its yogurt as 'natural' in violation of FDA regulations 'until such time as the [FDA] completes its proceedings' on the use of the term 'natural' in food labeling." Mot. at 13 (quoting *Kane v. Chobani, LLC*, 645 Fed. Appx. 593, 594 (9th Cir. 2016)[4]).

**\*6** In assessing Defendants' argument on primary jurisdiction, the Court begins with the Ninth Circuit's *Astiana* decision. There, the Ninth Circuit acknowledged that "defining what is 'natural' for cosmetics labeling is both an area within the FDA's expertise and a question not yet addressed by the agency." *Astiana*, 783 F.3d at 760. However, the court went on to say that a court must "consider whether invoking primary jurisdiction would needlessly delay the resolution of the claims"; " 'efficiency' is the 'deciding factor' in whether to invoke primary jurisdiction." *Id.* The court continued:

> Common sense tells us that even when agency expertise would be helpful, a court should not invoke primary jurisdiction when the agency is aware of but has expressed no interest in the subject matter of the litigation. Similarly, primary jurisdiction is not required when a referral to the agency would significantly postpone a ruling that a court is otherwise competent to make.

*Id.* at 761.

In *Astiana*, the Ninth Circuit found that Judge Hamilton "did not err in invoking primary jurisdiction" because "[d]etermining what chemical compounds may be advertised as natural on cosmetic product labels is 'a particularly complicated issue that Congress has committed to' " the FDA"

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 416 of 535
PageID: 32363
Pecanha v. The Hain Celestial Group, Inc., Not Reported in Fed. Supp. (2018)
2018 WL 534299

and it was not unreasonable to think that new guidance would be forthcoming based on the debate over the use of the term "natural" in food labeling. *See* 🔖 *id.* But the Ninth Circuit held that Judge Hamilton should have stayed the case, not dismissed it, and then directed Judge Hamilton, on remand, to

> consider whether events during the pendency of [the] appeal—including [the plaintiff's] informal letter [asking for agency guidance on the use of the term 'natural' in the personal care industry], the FDA's website publication of a Small Business Fact Sheet regarding cosmetics labeling, and the FDA's response to the other courts—affect the need for further proceedings at the FDA or demonstrate that another referral to the agency would be futile.

🔖 *Id.* at 762.

On remand, Judge Hamilton noted that the FDA had responded to the plaintiff's informal letter, stating that "it would not take any action on the 'natural' definition without going through a notice-and-comment process." *Astiana v. Hain Celestial Grp., Inc.*, No. 11-cv-6342-PJH, 2015 WL 13333579, at *1, 2015 U.S. Dist. LEXIS 138496, at *3 (N.D. Cal. Oct. 9, 2015). The letter also stated that the agency's " 'resources are fully occupied with health and safety matters, so proceedings to define 'natural' do not fit within our current health and safety priorities' " and so " 'we respectfully decline to make a determination regarding the term "natural" in cosmetic labeling at this time.' " *Id.* at *3-4. Based on the FDA's letter, Judge Hamilton held that the agency was aware of but expressed no interest in the subject matter of the litigation and thus denied the defendant's motion to stay based on the need for a FDA referral. Judge Hamilton did ultimately stay proceedings but on nonprimary jurisdiction grounds.

Based on the *Astiana* proceedings, at least one district court has declined to grant a stay where a defendant has invoked the primary jurisdiction doctrine with respect to the use of the word "natural" in the personal care/cosmetics (as opposed to food) industry. More specifically, in *Brenner v. Proctor & Gamble Co.*, No. SACV 16-1093-JLS (JCGx),

2016 WL 8192946, 2016 U.S. Dist. LEXIS 187303 (C.D. Cal. Oct. 20, 2016), the court held that, "at this point, a stay under the primary jurisdiction doctrine would be improper because the FDA is aware of the controversy surrounding 'natural'-branded cosmetics but has chosen not to prioritize the issuance of any definition of the term," and so "holding this case in abeyance indefinitely would not serve the efficiency principle underling the primary jurisdiction doctrine." *Id.* at *22-23. The court added that the FDA's November 2015 request for comments on the use of the term natural in the food industry "does not suggest that the agency will also take immediate action to define the proper scope of 'natural' claims relating to cosmetics"— indeed, "Defendant has not provided a single case where a district court in this Circuit stayed a case relating to a 'natural' label on a cosmetic under the primary jurisdiction doctrine pending the outcome of these FDA proceedings." *Id.* at *23-24 (emphasis omitted). Other district courts have ruled similarly. *See, e.g.*, *Gasser v. Kiss My Face, LLC*, No. 17-cv-01675-JSC, 2017 WL 4773426, at *10, 2017 U.S. Dist. LEXIS 175273, at *30 (N.D. Cal. Oct. 23, 2017) (noting "there is no pending proceeding or date in sight, and no evidence that a definition for 'natural' is being contemplated for cosmetics"); 🔖 *Segedie,* 2015 WL 2168374, *at *13, 2015 U.S. Dist. LEXIS 60739, at *35 (stating that the primary jurisdiction doctrine does not "bar the Natural Claims"; "reject[ing] Defendant's assertion that the FDA will imminently regulate the term 'natural' " as "[t]he FDA has declined to adopt formal rulemaking to define 'natural' despite repeated applications by various stakeholders");

🔖 *Goldemberg v. Johnson & Johnson Consumer Cos.*, 8 F.Supp.3d 467, 477 (S.D.N.Y. 2014) (noting that "the FDA has not begun to promulgate a rule concerning the term 'natural' in cosmetics" and "recently declined to make such a determination"; this "weighs against applying the primary jurisdiction doctrine, especially considering that decisions from various district and appellate courts regularly conflict"); *Fagan v. Neutrogena Corp.*, No. 5:13-cv-01316-SVW-OP, 2014 WL 92255, at *1, 2014 U.S. Dist. LEXIS 2795, at *3 (C.D. Cal. Jan. 8, 2014) (holding that "Plaintiffs' claims are not barred by the doctrine of primary jurisdiction" based on allegation that "FDA has affirmed that 'proceedings to define the term "natural" [in the context of cosmetics] do not fit within [its] current health and safety priorities' ").

**\*7** Defendants point to no specific FDA action reasonably anticipated in the near future which warrants delaying this

case. The Court therefore declines to stay proceedings based on the primary jurisdiction doctrine.

#### D. All Claims Asserted Against Hain

Defendants contend that, even if the Court rejects their arguments above, dismissal of all claims against Hain is warranted because it simply the parent company of JNP and Plaintiffs have failed to allege any specific wrongdoing by Hain itself.

The Court does not agree. Plaintiffs have alleged enough to overcome the 12(b)(6) challenge. They have alleged that Hain itself—and not just JNP—manufactured, sold, and marketed the deodorant products at issue, *see* FAC ¶ 17 (alleging that "Defendants produce, market and distribute various consumer skin care and hygiene products in retail stores across the United States," including the deodorant products at issue); FAC ¶ 21 ("alleging that the JĀSÖN® brand is manufactured and marketed by Defendants"), and there appears to be a good faith basis for this allegation, as Plaintiffs explain in their opposition brief. For example, Exhibit 9 of Plaintiffs' Request for Judicial Notice is Hain's 10-K filed with the SEC. On page 5, Hain notes that it has "acquired numerous companies and brands since our formation" and "[o]ur business strategy is to integrate our brands under one management team within each operating segment and employ uniform marketing, sales and distribution programs when attainable." Pls.' RJN, Ex. 9 (10-K at 5). From this statement, it is a reasonable inference that Hain has a role in the marketing of the JĀSÖN® brand products, including how they are marketed as "natural."

#### E. Fraud-Based Claims—Economic Injury

As to the fraud-based claims, Defendants also make a Rule 9(b) argument. According to Defendants, based on Rule 9(b), Plaintiffs must plead with "with particularity that they suffered economic injury in reliance on the alleged misrepresentations"—*i.e.*, that they paid a price premium for the deodorant products because they are "natural." Mot. at 16. Defendants continue:

> [W]hile Plaintiffs' FAC now alleges the approximate amount they paid for the JĀSÖN deodorant products, they have not alleged any of the other factual predicates for this theory, including the *identity* or the *cost*

of comparable deodorant products (which would establish the benchmark price relative to which JĀSÖN allegedly charged a price premium) or the *size* of the price premium they allegedly paid.

Mot. at 17 (emphasis added).

The problem for Defendants is that they have failed to cite any authority to support the proposition that this is the level of specificity required by Rule 9(b)—*i.e.*, that Plaintiffs' allegation that they paid a premium for "natural" products is not enough.

Rule 9(b) serves three purposes: (1) to provide defendants with adequate notice to allow them to defend the charge and deter plaintiffs from the filing of complaints "as a pretext for the discovery of unknown wrongs"; (2) to protect those whose reputation would be harmed as a result of being subject to fraud charges; and (3) to "prohibit [ ] plaintiff[s] from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis."

**\*8** *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009). Defendants have failed to explain how the level of specificity they demand serves any of the above purposes.

#### F. Warranty Claim

Defendants argue next that the warranty claim should be dismissed because (1) the FAC does not describe the exact terms of the warranty and (2) no warranty could have been breached because the ingredient list on the deodorant products discloses what ingredients are in the products. The first argument has no merit. Clearly, the alleged warranty is that the deodorant products were "natural." And Defendants clearly recognize that this is the alleged warranty given the argument that they present in (2). As for that second argument, it is essentially derivative of the argument made above in connection with the fraud-based claims—*i.e.*, that no reasonable consumer could be deceived by the use of the term "natural." Consistent with the above, whether there was a breach of the warranty—*i.e.*, that the deodorant products are "all natural"—is a question of fact that cannot be resolved at the 12(b)(6) phase.

G. Claim for Unjust Enrichment

Defendants challenge the unjust enrichment claim on the same basis as they contested the fraud-based claims—*i.e.*, "no reasonable consumer would be deceived." Mot. at 18. As discussed above, this is a question of fact that cannot be resolved at the 12(b)(6) phase.

H. Nationwide Class

Finally, Defendants argue that, because Plaintiffs are citizens of California only, they cannot represent a *nationwide* class but at best only a *statewide* class. Defendants argue that the Court should decide this issue now, as a part of the motion-to-dismiss proceedings, and not wait until class certification. In support of this argument, Defendants cite *In re Carrier IQ, Inc. Consumer Priv. Litig.*, 78 F.Supp.3d 1051 (N.D. Cal. Jan. 2015). There, the Court acknowledged that "it has the discretion to defer questions of [a plaintiff's] standing until *after* class certification." *Id.* at 1074 (emphasis added). The Court, however, declined to exercise that discretion and opted, as a matter of case management, to require the plaintiffs to present *now* a named class member who possessed individual standing to assert each state law's claims against the defendants. *See id.* The Court's reason for taking this approach included the fact that "[t]he number of consumers from 35 other states in which state law claims are asserted is vast relative to the claims to which the named Plaintiffs [13 different states] have standing." *Id.* The Court thus had reservations about subjecting the defendants to the expense and burden of nationwide discovery. And given the breadth of the asserted class, there was a meaningful risk that the requirements for class certification under Federal Rule of Civil Procedure 23 might not be met or that subclasses would have to be created. Thus, the Court concluded that it was best to address the issue now rather than wait for class certification. *See id.*

After *Carrier IQ* was decided, the Ninth Circuit issued its decision in *Melendres v. Arpaio*, 784 F.3d 1254 (9th Cir. 2015). In *Melendres*, the defendants argued that the named plaintiffs did not have standing to represent the claims of unnamed class members who were stopped, detained, searched *outside* of a saturation patrol effort. The Ninth Circuit stated that the defendants' argument improperly conflated standing with class certification. Admittedly,

**\*9** when courts have found a disjuncture between the claims of named plaintiffs and those of absent class members, they have not always classified the disjuncture consistently, some referring to it as an issue of standing, and others as an issue of class certification. Nor is the distinction always easy to discern. Even the Supreme Court has apparently applied both approaches inconsistently.

*Id.* at 1261. The Ninth Circuit, however, concluded that the issue was better addressed as part of class certification. *See id.* at 1262 ("adopt[ing] the class certification approach"). "Under the class certification approach, ... 'any issues regarding the relationship between the class representative and the passive class members—such as dissimilarity in injuries suffered—are relevant only to class certification, not to standing.' " *Id.* at 1262. (Ultimately, the court held that, "[u]nder the class certification approach, or the standing approach for that matter, the named plaintiffs in this case ... are adequate representatives because the named plaintiffs' claims do not 'implicate a significantly different set of concerns' than the unnamed plaintiffs' claims." *Id.* at 1263.)

Defendants argue that *Melendres* is distinguishable because the case involved a dissimilarity in injuries suffered (*i.e.*, comparing the named plaintiffs with the unnamed putative class members); in contrast, this case involves named plaintiffs who cannot bring legal claims pursuant to state laws for states where they do not reside. While this is a distinction between *Melendres* and the instant case, the distinction is not material for purposes of taking the class certification approach.

III. CONCLUSION

For the foregoing reasons, the Court denies Defendants' motion to dismiss or stay.

This order disposes of Docket No. 29.

**IT IS SO ORDERED**.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 534299

## Footnotes

1    *But see* 🚩 *Tsan v. Seventh Generation, Inc.*, No. 15-cv-00205-JST, 2015 WL 6694104, at *5, 2015 U.S. Dist.
     LEXIS 149042, at *14 (N.D. Cal. Nov. 3, 2015) (stating that "*Pelayo*'s reasoning has been heavily criticized
     by other courts").

2    At the hearing, Defendants noted that 🚩 *Jou* also involved baby wipes. However, "pure and natural" was
     used to describe the diapers only. The baby wipes were described as "Natural Care." *See* 🚩 *Jou,* 2013 WL
     6491158, at *1, 2013 U.S. Dist. LEXIS 173216, at *1-3.

3    Apparently, the synthetic ingredients identified by Plaintiffs in their complaint all appear on the ingredient lists
     for the deodorant products.

4    🚩 *Kane* involved the use of the term "evaporated cane juice" (and not just "natural"). With respect to
     "evaporated cane juice," the Ninth Circuit noted that, "in July 2015, the FDA represented that it expects to
     issue final guidance on the term ... by the end of 2016." 🚩 *Kane,* 645 Fed. Appx. at 594. Because of "the
     ongoing FDA proceedings regarding the terms 'natural' *and* 'evaporated cane juice,' " the Ninth Circuit held
     that a stay was appropriate. 🚩 *Id.* (emphasis added).

---

**End of Document**                                            © 2021 Thomson Reuters. No claim to original U.S. Government Works.

TAB 30

*Rickman v. BMW of N. Am.*, No. CV 18-4363(KM)(JBC), 2020 WL 3468250
(D.N.J. June 25, 2020)

2020 WL 3468250
United States District Court, D. New Jersey.

Garner RICKMAN, Ziwen Li, Gary Reising, Jacob
Biggins, Tom Hoffman, Alexander Vandamme,
Seth Davis, Charles Chapman, Charles Rogers, Ion
Nicolescu, Werner Rogmans, Erica Olson, Algredo
Arias, Jesse White, Razmir Avic, Rickey Evans,
Mark Messina, Lukas Wildner, Miguel Fragoso,
Mark Smith, William Berbaum, Kyle Kern, Eric
Stenglein, Carlos Buendia, Tahani Ibrahim, John
Saviano, Gene Quint, Brian Hembling, Irving
Cohen, Christine Griffith, Tarrah Pee, Darshan
Patel, Brian Beckner, Joshua Hu, Jeffrey Price,
Dean Werner, Eric Sanchez, Charles Campbell,
Angela Hughes, James Turner, Ellis Goldfrit, Chad
Maccanelli, and Salomon Campos, individually and
on behalf of all others similarly situated, Plaintiffs,
v.
BMW OF NORTH AMERICA, Bayerische Motoren
Werke Aktiengesellschaft (BMW A.G.), Robert
Bosch GmbH, and Robert Bosch LLC, Defendants.

Civ. No. 18-4363(KM) (JBC)
|
Signed 06/25/2020

**Attorneys and Law Firms**

Christopher A. Seeger, Seeger Weiss LLP, Ridgefield Park,
NJ, Mark M. Makhail, Michael Andrew Innes, Caroline
F. Bartlett, James E. Cecchi, Carella Byrne Cecchi Olstein
Brody & Agnello, P.C., Roseland, NJ, Scott A. George,
Seeger Weiss, LLP, Newark, NJ, for Plaintiffs.

Kevin M. Mcdonough, Latham & Watkins LLP, Jeffrey A.
Rosenthal, Cleary Gottlieb Steen & Hamilton LLP, New York,
NY, Amy Danielle Luria, Michael D. Critchley, Critchley,
Kinum & DeNoia, LLC, Roseland, NJ, for Defendants.

**OPINION**

KEVIN MCNULTY, U.S.D.J.:

 **\*1** The named plaintiffs in this case represent a putative
class of car buyers who each allegedly own a BMW X5
or BMW 335D vehicle. On behalf of the class, the named

plaintiffs sued BMW of North America ("BMW USA");
Bayerische Motoren Werke Aktiengesellschaft ("BMW AG")
(together, "BMW"); Robert Bosch GmbH; and Robert Bosch
LLC (together, "Bosch") for their alleged roles in the clean-
diesel emissions scandal. Plaintiffs' first amended complaint
("1AC", DE 65) [1] asserts one count under the federal RICO
statute and seventy-eight counts under the laws of various
states.

Now before the Court are the motions to dismiss, pursuant
to Fed. R. Civ. P. 12(b)(6), of defendants BMW USA
(DE 68) and Robert Bosch LLC (DE 69). For the following
reasons, the motions are **GRANTED** in part and **DENIED**
in part. Plaintiffs have failed to allege standing to bring a
claim under the federal Racketeer Influenced and Corrupt
Organizations Act ("RICO"), 18 U.S.C. § 1962. Because
amendment would appear to be futile, the portion of the
complaint that purports to state a claim for RICO relief
(Count 1) is **DISMISSED**. Because federal-court jurisdiction
is unaffected by that dismissal, Plaintiffs may continue to
prosecute their state-law claims (Counts 2–79).

**I. BACKGROUND** [2]
Familiarity with this matter is presumed; I write for the parties
and do not repeat the factual background described in my
June 27, 2019 opinion (DE 59), which dismissed the original
consolidated class action complaint. Instead, I will briefly
summarize the new allegations contained in the first amended
complaint.

**A. New Allegations, Generally**
The linchpin issue that doomed the consolidated class action
complaint (DE 26) was the lack of "a straightforward
allegation that an identified plaintiff bought a car which. when
tested or analyzed, turned out to contain a defeat device." (DE
59 at 2). Instead, the consolidated class action complaint
relied on a single X5 vehicle that "seem[ed] to be proffered as
an exemplar." (DE 59 at 2). The first amended complaint also
does not allege facts to establish that any named plaintiff's
car contained a defeat device. It is true that the new pleadings
contain more robust allegations concerning the testing and
analysis of five "clean diesel" and one gasoline vehicle. (1AC
¶ 163). Still, no plaintiff claims to have owned any of the
tested vehicles; instead, Plaintiffs' theory is that each vehicle
is representative of the entire line of cars. (1AC ¶¶ 3 &73).

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 423 of 535
PageID: 32370
Rickman v. BMW of North America, Slip Copy (2020)
2020 WL 3468250, RICO Bus.Disp.Guide 13,355

Plaintiffs emphasize that when a car manufacturer like BMW seeks regulatory approval for a new vehicle, the manufacturers submit to the EPA a single vehicle to stand in for the entire model line. (1AC ¶¶ 3 & 173). The theory is that each subject vehicle is materially and fundamentally identical to every other vehicle in the fleet, and therefore is properly the subject of the clean diesel testing fraud allegations. That theory is the foundation upon which the first amended complaint seeks to cure the deficiencies of the previously dismissed consolidated class action complaint. To that end, Plaintiffs note that after the class action complaint was dismissed, their experts performed tests using the portable emission measurement system ("PEMS") and a chassis dynamometer on several additional vehicles—although, again, none in particular is alleged to have belonged to any named plaintiff.

**\*2** The tested vehicles consisted of two 2012 BMW X5s, one 2011 BMW X5, two 2011 BMW 335ds, and a gasoline-powered 2012 X5.[3] (1AC ¶¶ 163 & 169–252). The first amended complaint also includes new information about the vehicles that were tested, including allegations that their mileage was close to the certification standard, that they had been properly maintained, and that none had any emission-system faults. (1AC ¶¶ 169, 171 & 172).

Plaintiffs maintain that the first amended complaint sets forth detailed, particularized allegations of:

(1) tests of five diesel vehicles (1AC ¶¶ 3, 20, 125–28 & 169–252);

(2) PEMS testing (1AC ¶¶ 2, 3, 4, 5, 17, 163 & 186–252);

(3) chassis dynamometer testing (1AC ¶¶ 17 & 174–85);

(4) with the test results showing use of defeat devices (1AC ¶¶ 18–24 & 174–252);

(5) the operation of the defeat devices (1AC ¶¶ 25 & 253–66); and

(6) Defendants' manipulation of the EDC17 system (1AC ¶¶ 25, 80, 84, 85, 203, 204, 253–66 & 269–308).

Plaintiffs have also submitted to the Court scientific literature, reports, and testing accounts from independent entities that purport to show that most "clean diesel" vehicles emit far more pollution on the road than in laboratory tests. (1AC ¶¶ 322–32). The first amended complaint also vouches for the reliability of the PEMS testing system.[4] (1AC ¶¶ 4 & 152–68).

Plaintiffs allege that their scientific evidence confirms the superior accuracy of PEMS testing as compared with chassis dynamometer testing.[5] The first amended complaint focuses on the weaknesses inherent in chassis dynamometer testing. These weaknesses of chassis dynamometer testing include that (1) during testing, the front wheels move but do not turn, which does not happen in real-world driving conditions; (2) on a two-wheel drive vehicle, the driven wheels are moving but the non-driven wheels are not; and (3) on a vehicle equipped with GPS, the vehicle's wheels move while the GPS position does not change. (1AC ¶ 166). According to Plaintiffs, an engine can be designed to detect that it is being tested on a chassis dynamometer, but the same is not true as to PEMS testing. Thus, according to Plaintiffs, "PEMS is not only accurate for detection and quantification of defeat devices, it is essential." (1AC ¶ 166).

Plaintiffs subjected all five subject vehicles to laboratory and real-world testing. The vehicles were first tested on a chassis dynamometer, adhering to federal test protocols in a CFR-compliant laboratory. (1AC ¶¶ 125–28 & 174). In this laboratory testing environment, the five vehicles all met or approached emissions standards. (1AC ¶¶ 180–85). During on-road PEMS testing, however, the vehicles did not meet the standard. The first amended complaint alleges that the defeat device drove the vehicles' on-road NOx emissions dramatically higher. Specifically, under city driving conditions, the vehicles' emissions were 1.4 to 7.5 times the standard and at, times, 9 to 73 times the standard. (1AC ¶¶ 19 & 192). Under highway-driving conditions, all but one diesel vehicle exceeded the standards. The 2012 X5, for example, exceeded the standard by a multiple of 3.4. (1AC¶ 195). The gasoline-powered BMW X5, by contrast, had an average NOx emission rate below the emissions standard in both chassis dynamometer and PEMS testing. (1AC ¶ 192).

**\*3** Plaintiffs also claim that the first amended complaint adequately alleges the use of a temperature defeat device, embodied in software programming. (1AC ¶ 197) The temperatures in vehicle test-certification cycles must be between 68°F and 86°F, but the first amended complaint details how emissions controls are turned down or off in temperatures outside that range. (1AC ¶¶ 196–210). According to Plaintiffs, PEMS testing revealed the use of a

temperature defeat device, yielding emissions as high as 526 mg/mile. (1AC ¶¶ 196–200).

The first amended complaint also alleges that the subject vehicles can reduce NOx to meet emissions standards so long as the effectiveness of the emissions-control system is not otherwise reduced, such as by instruction from the EDC17. (1AC ¶¶ 213 & 214). It also contains allegations that describe how the emissions systems were disabled. (1AC ¶¶ 215–19). Specifically, by isolating and testing laboratory-like conditions during PEMS testing, Plaintiffs' experts concluded that the subject vehicles are able to detect the certification test cycle and adjust the emissions performance when the EDC17 "knows" the test cycle is not being run. (1AC ¶ 218).

Moreover, the first amended complaint alleges that Plaintiffs' PEMS tests showed increased emissions during cold-start and hot-start conditions, and that the tested vehicles did not pass PEMS testing during the passive regeneration phase that removes diesel particulate matter.[6] (1AC ¶¶ 21–24, 220–28, 241 & 304).

All of these new allegations taken together, Plaintiffs assert, cure the deficiencies identified in the consolidated class action complaint.

### B. New Allegations Directed at Bosch

The first amended complaint also contains revised allegations regarding Bosch's participation in the scheme. According to Plaintiffs, Bosch in 2006 introduced the EDC17 as the "brain of diesel injection" that "controls every parameter that is important for effective, low-emission combustion," because it wanted to enter the lucrative diesel market. (1AC ¶ 269). The EDC17 is a proprietary system over which Bosch exerts complete control to prevent its clients from changing the software without Bosch's participation. (1AC ¶¶ 258 & 271–73).

Plaintiffs allege that Bosch's control over the software allowed BMW to reduce or turn off emissions controls when the vehicle sensed it was not in a testing environment. (1AC ¶¶ 6 & 260). Moreover, Bosch actively marketed clean diesel technology throughout the United States. (DE ¶¶ 25 & 289–94). Plaintiffs allege that Bosch participated in the fraudulent scheme by manufacturing, installing, testing, modifying, and supplying the EDC17, which operated as a defeat device and turned off or turned down emissions controls in the BMW vehicles. (1AC ¶ 373). Bosch also allegedly concealed the

defeat devices in U.S. documentation and in communications with U.S. regulators. (1AC ¶ 373). Almost all manufacturers to whom Bosch sold the EDC17 are now known to have used defeat devices and to have misled consumers. Bosch was involved in the Volkswagen scandal, actively working to conceal manipulation in the software that it programmed in a collaborative scheme with Volkswagen. (1AC ¶¶ 83–84 & 267–83).

### C. Procedural History

**\*4** On June 27, 2019, I filed an opinion (DE 59) and order (DE 60), dismissing without prejudice the consolidated class action complaint (DE 26). As discussed in that opinion, the dismissal rested on Plaintiffs' failure to allege Article III standing, and was entered without prejudice to the filing of an amended complaint. On September 20, 2019, Plaintiffs filed the first amended complaint. (DE 65). BMW and Bosch again moved to dismiss. (DE 68 & 69). BMW's motion to dismiss is accompanied by a request for judicial notice and seventeen exhibits, which consist primarily of news articles discussing BMW's role (or lack thereof) in the clean diesel emissions scandal. (DE 68-3 through 68-20).

### II. DISCUSSION AND ANALYSIS

This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 to the extent that Plaintiffs' claims arise under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962. The Court has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367.

Alternatively, this Court has ordinary diversity jurisdiction because Plaintiffs and Defendants reside in different states and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332(a). This Court also has original diversity jurisdiction over this lawsuit pursuant to the pursuant to the Class Action Fairness Act of 2005. 28 U.S.C. § 1332(d). Plaintiffs and Defendants are citizens of different states; there are more than one-hundred members of the class; the aggregate amount in controversy exceeds $5 million; and class members reside across the United States.

### A. Standard of Review

Federal courts are courts of limited jurisdiction which are confined to the adjudication of "cases" or "controversies" as

Rickman v. BMW of North America, Slip Copy (2020)

2020 WL 3468250, RICO Bus.Disp.Guide 13,355

permitted by Article III of the Constitution. *See* U.S. Const.,
Art. III, § 2. The case-or-controversy requirement requires
that a plaintiff possess constitutional standing. *See* *Taliaferro v.
Darby Twp. Zoning Bd.*, 458 F.3d 181, 188 (3d Cir. 2006). For
a plaintiff to have constitutional standing, the following three
elements must be present: "the plaintiff must have (1) suffered
an injury in fact, (2) that is fairly traceable to the challenged
conduct of the defendant, and (3) that is likely to be redressed
by a favorable judicial decision." *Spokeo, Inc. v. Robbins*,
136 S. Ct. 1540, 1547 (2016); *In re Nickelodeon Consumer
Privacy Litig.*, 827 F.3d 262, 272 (3d Cir. 2016). "The
plaintiff, as the party invoking federal jurisdiction, bears the
burden of establishing these elements." *Spokeo*, 136 S. Ct.
1540, 1547. "Absent Article III standing, a federal court does
not have subject matter jurisdiction to address a plaintiff's
claims, and they must be dismissed." *Taliaferro*, 458 F.3d
181, 188. Consequently, a motion to dismiss for lack of
standing is properly brought under Federal Rule of Civil
Procedure 12(b)(1). *Constitution Party of Pa. v. Aichele*,
757 F.3d 347, 357 (3d Cir. 2014); *In re Schering Plough
Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235,
243 (3d Cir. 2012).

Federal Rule of Civil Procedure 12(b)(1) governs
jurisdictional challenges to a complaint. These may be either
facial or factual attacks. *See* 2 Moore's Federal Practice
§ 12.30[4] (3d ed. 2007); *Davis v. Wells Fargo*, 824 F.3d
333, 346 (3d Cir. 2016). A facial challenge asserts that the
complaint does not allege sufficient grounds to establish
subject matter jurisdiction. *Lincoln Ben. Life Co. v. AEI
Life, LLC*, 800 F.3d 99, 105 (3d Cir. 2015); *Iwanowa
v. Ford Motor Co.*, 67 F. Supp. 2d 424, 438 (D.N.J. 1999).
"In reviewing a facial attack, the court must only consider
the allegations of the complaint and documents referenced
therein and attached thereto, in the light most favorable to
the plaintiff." *Lincoln Ben. Life*, 800 F.3d at 105 (citing
*Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176
(3d Cir. 2000)). As to a facial jurisdictional attack, then, the
standard is similar to the one that applies to an ordinary
motion to dismiss under Federal Rule of Civil Procedure
12(b)(6). [7]

**\*5** Federal Rule of Civil Procedure 12(b)(6) provides for
the dismissal of a complaint, in whole or in part, if it fails to
state a claim upon which relief can be granted. The defendant,
as the moving party, bears the burden of showing that no
claim has been stated. *Animal Science Products, Inc. v. China
Minmetals Corp.*, 654 F.3d 462, 469 n. 9 (3d Cir. 2011). For
the purposes of a motion to dismiss, the facts alleged in the
complaint are accepted as true and all reasonable inferences
are drawn in favor of the plaintiff. *N.J. Carpenters & the
Trustees Thereof v. Tishman Constr. Corp. of N.J.*, 760 F.3d
297, 302 (3d Cir. 2014).

Federal Rule of Civil Procedure 8(a) does not require that a
complaint contain detailed factual allegations. Nevertheless,
"a plaintiff's obligation to provide the 'grounds' of his
'entitlement to relief' requires more than labels and
conclusions, and a formulaic recitation of the elements of a
cause of action will not do." *Bell Atl. Corp. v. Twombly*,
550 U.S. 544, 555 (2007). Thus, the complaint's factual
allegations must be sufficient to raise a plaintiff's right to
relief above a speculative level, so that a claim is "plausible
on its face." *Id.* at 570; *see also* *W. Run Student Hous.
Assocs., LLC v. Huntington Nat'l Bank*, 712 F.3d 165, 169
(3d Cir. 2013). That facial-plausibility standard is met "when
the plaintiff pleads factual content that allows the court to
draw the reasonable inference that the defendant is liable
for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S.
662, 678 (2009) (citing *Twombly*, 550 U.S. 544, 556).
While "[t]he plausibility standard is not akin to a 'probability
requirement' ... it asks for more than a sheer possibility."
*Iqbal*, 556 U.S. 662, 678.

With respect to allegations of fraud, "a party must state with
particularity the circumstances constituting fraud," although
"intent, knowledge, and other conditions of a person's mind
may be alleged generally." *Fed. R. Civ. P. 9(b)*; *see also*
*U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries,
LLC*, 812 F.3d 294, 307 (3d Cir. 2016) ("A plaintiff alleging
fraud must therefore support its allegations 'with all of the
essential factual background that would accompany the first
paragraph of any newspaper story—that is, the who, what,
when, where and how of the events at issue.' " (quoting *In
re Rockefeller Ctr. Props., Inc. Securities Litig.*, 311 F.3d 198,
217 (3d Cir. 2002))). In doing so, "a party must plead [its]
claim with enough particularity to place defendants on notice

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 426 of 535
PageID: 32373
Rickman v. BMW of North America, Slip Copy (2020)
2020 WL 3468250, RICO Bus.Disp.Guide 13,355

of the precise misconduct with which they are charged."

🔖 *United States ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497, 502 (3d Cir. 2017) (internal quotation and citation omitted).

## B. Article III Standing

In this Court's opinion dismissing the consolidated class action complaint (DE 26), I determined, for two reasons, that Plaintiffs' reliance on the test results of single vehicle was insufficient to establish standing:

> I find inadequate the allegation that the Plaintiffs' vehicles contain a defeat device for two primary reasons. First, it depends on testing of a single vehicle which revealed discrepancies between laboratory and on-road emissions results, from which plaintiffs somewhat speculatively infer that the vehicle contained a defeat device. Second, it relies on a further inference that the tested vehicle is a valid exemplar—*i.e.*, that because it contained a defeat device, then the Plaintiffs' vehicles, too, must have contained such a device.

**\*6** (DE 59 at 16). Now, in the first amended complaint, Plaintiffs return to this Court having tested what they allege are five exemplar vehicles. (1AC). And again, BMW and Bosch challenge the sufficiency of the pleadings and assert that Plaintiffs have not established standing to bring their claims. (DE 68 & 69).

BMW broadly attacks the sufficiency of Plaintiffs' allegations. Specifically, BMW alleges that the first amended complaint does not allege an injury in fact because (1) none of Plaintiffs' vehicles were tested (DE 68-1 at 21–22); (2) the first amended complaint does not allege corroborating facts (DE 68-1 at 22–24); and (3) the first amended complaint does not identify a defeat device (DE 68-1 at 24–25). BMW also notes that some tested vehicle arguably passed PEMS testing. (DE 68-1 at 25–28). Finally, BMW insists that there is no injury fairly traceable to BMW's conduct. (DE 68-1 at 31–34).

Bosch generally adopts these arguments that, adding only that any overpayment by Plaintiffs would have been to BMW—

not Bosch—and that Bosch had no control over the subject vehicles. (DE 69-1 at 5–6).

Defendants contend that Plaintiffs still lack standing because they have not alleged that any tested vehicle belonged to any plaintiff. However, Plaintiffs have alleged that the five tested vehicles represent, and are substantially identical to, those owned by Plaintiffs and which are the subject of Defendants' alleged scheme. The purpose of Rule 8(a) is to give a defendant "fair notice" of the claim against him and her, and the allegations here do just that. The allegations contained in the first amended complaint are sufficient to permit a plausible inference that BMW's vehicles, including those purchased by Plaintiffs, contained defeat devices.

Defendants also note that Plaintiffs do not allege specifics as to the driving history or maintenance record of the tested vehicles. This deficiency, they conclude, dooms Plaintiffs case, presumably under the theory that some intervening event could have caused the heightened emissions in Plaintiffs' vehicles. While some such intervening cause may favor Defendants' position at a later point in the proceeding, for now, Plaintiffs' allegations regarding ownership of specific BMW models is sufficient to notify Defendants which of its cars are alleged to contain defeat devices. Rule 8(a) requires no more than that. In any event, the first amended complaint alleges the mileage of each vehicle, that each was screened to ensure it been properly maintained, and that each was free of potential emission-control defects.

Defendants make too much of this Court's earlier observation that the Plaintiffs' lack of corroborating evidence of a defeat device did not move their allegations "across the line from conceivable to plausible." *See* 🔖 *Twombly*, 550 U.S. at 570:

> Plaintiffs have not (by analogy to the plaintiffs in *Mercedes I* or *Counts*) cited independent entities that have levied defeat-device accusations against BMW for the particular engines at issue. Rather, Plaintiffs allege more generally that "[i]n Europe, watchdog groups, NGOs, and government agencies have cited virtually every manufacturer, including BMW, for violating the lower European emissions standards." There is no allegation that pinpoints any particular European governmental agency's citation of BMW with respect to its diesel cars in general, or the Subject Vehicles in particular. Rather, Plaintiffs allege (1) that a non-profit organization called Transportation and Environment accused many diesel vehicles of employing defeat devices, including certain

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 427 of 535
PageID: 32374
Rickman v. BMW of North America, Slip Copy (2020)
2020 WL 3468250, RICO Bus.Disp.Guide 13,355

BMW models and engines, but did not cite the Subject Vehicles at issue here; and (2) that a group called the International Council on Clean Transportation ("ICCT") released a report analyzing the real world versus lab testing emissions of many manufacturers' vehicles and found a different BMW model (not any of the Subject Vehicles) to have polluted above the European standard. Plaintiffs do not allege that these different BMW models have the same engines or use the same deceptive technology as the Subject Vehicles.

**\*7** ...

The allegations here fall short of those in *Mercedes*. Plaintiffs have not alleged that any governmental organization has accused BMW of evading regulators with defeat devices in their diesel cars, Plaintiffs also have not alleged that the Defendants admitted any wrongdoing. These corroborating allegations were essential to the *Mercedes I* court's finding that the plaintiffs' testing sufficed to make the defeat device inference plausible.

Ultimately, without sufficient corroborating allegations, I am persuaded to dismiss the Complaint because the Plaintiffs have presented little beyond emissions test results for a single vehicle—one used 2012 X5.

(DE 59 at 20–21). A closer reading of that opinion reveals that I did not view independent corroborating evidence as a necessary condition that Plaintiffs needed to allege to withstand a Rule 12(b) motion. Rather, the opinion states that in the absence of adequate testing (which Plaintiffs had failed alleged in the consolidated class action complaint), such evidence *might* suffice to burnish the one-vehicle sample size enough to state a claim for relief. To be sure, Defendants have submitted a trove of news articles that emphasize the BMW was never implicated in the clean diesel scandal like many of its competitors. (*See* DE 68-4 through -20). However, the lack of a governmental investigation does not, by itself, demonstrate the absence of a defeat device or, by extension, deprive Plaintiffs of Article III standing.

The first amended complaint also adequately alleges an injury fairly traceable to Defendants' conduct. Plaintiffs allege that Defendants misled them by advertising and failing to disclose material information, that they were exposed to these misrepresentations or nondisclosures, that but for Defendants' conduct they would not have bought the vehicles or would have paid less for them, and that all Plaintiffs overpaid for their vehicles. Each plaintiff has also pled reliance on misrepresentations and omissions, has alleged BMW's and Bosch's conduct in that enterprise, and claimed that he or she paid an artificially high market price because of Defendants' false advertisements and conduct. Taken together, these specific allegations demonstrate that Plaintiffs' alleged injuries are fairly and directly traceable to the conduct of BMW and Bosch.

Accordingly, I find that the first amended complaint has cured the deficiencies of the consolidated class action complaint with respect to the threshold issue of Article III standing.

### C. Federal Law Claim (RICO)

Plaintiffs allege that Defendants' conduct violates the federal RICO statute. *See* 18 U.S.C. § 1962(c)–(d); *see also* 18 U.S.C. § 1964 (granting civil remedies for RICO violation). The RICO enterprise is alleged to be one by which the BMW and Bosch defendants coordinated their operations through the design, manufacture, distribution, testing process, and sale of the subject vehicles.

Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which effect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c)); *see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 362–63 (3d Cir. 2010). Section 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

To establish a claim under section 1962(c), a plaintiff must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 482–83 (1985); *see also District 1199P Health & Welfare Plan v. Janssen, L.P.*, 784 F.Supp.2d 508, 518–19 (D.N.J. 2011) (citation omitted).

**\*8** The term "enterprise" for RICO purposes is exceedingly broad. *See Boyle v. United States*, 556 U.S. 938, 944 (2009). It includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *Ins. Brokerage*, 618 F.3d at 362–63 (citing 18

U.S.C. § 1961(4)). With respect to the pattern of racketeering activity, the statute "requires at least two acts of racketeering activity within a ten-year period," which may include federal mail fraud under 🔖 18 U.S.C. § 1341 or federal wire fraud under 🔖 18 U.S.C. § 1343. *Id.* (citations omitted). In addition, "the plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." *Sedima, 473 U.S. at 496.*

The racketeering predicate acts alleged here are mail fraud, 🔖 18 U.S.C. § 1341, and wire fraud, 🔖 18 U.S.C. § 1343. Both statutes provide that "[w]hoever, having devised a scheme or artifice to defraud ... for the purpose of executing such scheme or artifice" either (a) "places in any post office or authorized depository for mail matter, any matter or thing," or (b) "transmits or causes to be transmitted by means of wire ... in interstate or foreign commerce" virtually any sort of material shall be guilty of an offense. *See* 🔖 18 U.S.C. §§ 1341 & 🔖 1343.

In addition to the requirements described above, a successful RICO plaintiff must also demonstrate standing to bring a RICO claim in the first place. This is not the minimal jurisdictional showing of Article III standing, but a judge-made limitation. One absolute bar to RICO standing is the so-called "indirect purchaser rule." The Supreme Court developed the indirect purchaser rule in the antitrust context, when it held that Clayton Act plaintiffs may not demonstrate injury by providing evidence only of indirect purchases. 🔖 *Ill. Brick Co. v. Illinois*, 431 U.S. 720, 737 (1977).

It must be acknowledged that the rule is somewhat arbitrary and policy-based; after all, if Smith is overcharged for an item and resells the item to Jones, then Jones, too, may be overcharged as a result. The *Illinois Brick* Court warned, however, that allowing Jones or other indirect purchasers down the line to recover under such a theory would "transform treble-damages actions into massive multiparty litigations involving many levels of distribution and including large classes of ultimate consumers remote from the defendant." 🔖 *Id.* at 739. Moreover, the indirect purchaser rule prevents defendants from being exposed to "multiple liability" should both indirect and direct purchasers in a distribution chain be permitted to assert claims arising out of

a single overcharge. 🔖 *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 851 (3d Cir. 1996).

Because 🔖 18 U.S.C. § 1964(c), RICO's private cause of action, was modeled on the Clayton Act, "antitrust standing principles apply equally to allegations of RICO violations." 🔖 *McCarthy, 80 F.3d at 855; see also* 🔖 *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 270–74 (1992). In *Holmes*, the Court explicitly held that federal jurisprudence interpreting antitrust principles governs RICO claims, because Congress modeled RICO's civil action provision on a substantially similar provision in the Clayton Act:

> The key to better interpretation lies in some statutory history. We have repeatedly observed, *see* 🔖 *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 150-51, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987) ... that Congress modeled 🔖 § 1964(c) ... [of RICO after] the federal antitrust laws, § 4 of the Clayton Act ...

> In 🔖 *Associated General Contractors* [*v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983)] ... we discussed how Congress enacted § 4 in 1914 with language borrowed from § 7 of the Sherman Act, passed 24 years earlier. Before 1914, lower federal courts had read § 7 to incorporate common-law principles of proximate causation ... and as we reasoned, as many lower federal courts had done before us ... that congressional use of the § 7 language in § 4 presumably carried the intention to adopt "the judicial gloss that avoided a simple literal interpretation." ... Thus, we held that a plaintiff's right to sue under § 4 required a showing that the defendant's violation not only was a "but for" cause of his injury[ ] but was the proximate cause as well.

> **\*9** The reasoning applies just as readily to 🔖 § 1964(c) [of RICO]. We may fairly credit the 91st Congress, which enacted RICO, with knowing the interpretation federal courts had given the words earlier Congresses had used first in § 7 of the Sherman Act, and later in the Clayton Act's § 4.... It used the same words, and we can only assume it intended them to have the same meaning that courts had already given them.

🔖 *Holmes, 503 U.S. at 267–68.*

Here, none of the subject vehicles were acquired directly from BMW (or Bosch, for that matter). (1AC ¶¶ 31–70). Instead, the Plaintiffs allege that they acquired their vehicles from a dealer, from a private party, or at auction. In fact, very few of the subject vehicles were acquired from an authorized BMW dealer at all; most seem to have been acquired on the secondary market. [8] The Third Circuit and courts in this District have repeatedly held that such indirect purchasers lack standing to assert RICO claims. *See, e.g.,*

*McCarthy*, 80 F.3d at 854 (plaintiffs were not direct purchasers of allegedly overpriced photocopies and therefore lacked antitrust and RICO standing); *Minnesota by Ellison v. Sanofi-Aventis U.S. LLC*, No. 18-14999, 2020 WL 2394155 at *8–9 (D.N.J. Mar. 31, 2020) (plaintiffs lacked RICO standing because none purchased insulin directly from defendants);

*MSP Recovery Claims, Series, LLC v. Sanofi Aventis U.S. LLC*, No. 18-2211, 2019 WL 1418129 at *16 (D.N.J. Mar. 29, 2019) (heightened coinsurance payments and fraudulent benchmark prices of insulin did not bestow RICO standing because plaintiffs failed to allege they directly purchased insulin from defendants); *In re Insulin Pricing Litig.*, No. 17-699, 2019 WL 643709 at (D.N.J. Feb. 15, 2019) (allegation that benchmark prices "directly" affected price paid by consumers did not overcome indirect purchaser bar to RICO standing; indirect purchaser rule applies even when alleged improper price inflation is passed along on a "dollar for dollar basis"). Under the law within this Circuit, then, Plaintiffs do not have standing to pursue their RICO claims against BMW and Bosch, because each plaintiff is an indirect purchaser of his or her vehicle. [9]

In response, Plaintiffs argue that Defendants are attempting "to graft a privity requirement into RICO by means of an indirect purchaser theory," (DE 73 at 8), and that both *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008), and *In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.*, 804 F.3d 633 (3d Cir. 2015), carved out exceptions to the indirect purchaser rule in RICO cases. (DE 73 at 8–10).

First, there is no question of "grafting" anything. The Third Circuit has clearly and directly held that "only the purchaser immediately downstream from the alleged [RICO violator]" possesses standing to pursue an action. *McCarthy*, 80 F.3d at 848. If this be privity, make the most of it.

**\*10** Second, Plaintiffs' reliance on *Bridge* and *Avandia* conflates the standing and causation issues under RICO. Those are distinct issues which require discrete analyses. Thus, Plaintiffs' claim would still fail for lack of RICO standing even if *Bridge* and *Avandia* controlled the issue of causation.

*Bridge* at least addresses standing, but it does not undercut the indirect purchaser rule as it applies to Plaintiffs' RICO claims. In *Bridge*, the Court held that a plaintiff who is injured "by reason of" a pattern of mail fraud may have RICO standing "even if he [or she] has not relied on any misrepresentations." 553 U.S. at 649–50. The *Bridge* plaintiff, however, was not an indirect purchaser; the case does not support any argument for RICO standing on behalf of plaintiffs multiple levels down the consumer chain.

In *Avandia*, the Third Circuit explained that "if there is a sufficiently direct relationship between the defendant's wrongful conduct and the plaintiffs' injury, ... a RICO plaintiff who did not directly rely on a defendant's misrepresentation can still establish *proximate causation*." (DE 73 at 9 (quoting 804 F.3d at 643) (emphasis added)). Apart from the fact that *Avandia* speaks to reliance and causation, not standing, the case presents numerous factual differences. The *Avandia* plaintiffs were third-party payors who included the drug Avandia in their formulary decisions at favorable rates, relying on material misrepresentations made by the defendant manufacturer. *Avandia*, 804 F.3d at 636. By contrast, Plaintiffs here allege that their damages stem from inflated prices paid by car dealers and original owners before Plaintiffs purchased the vehicles from those intermediaries.

Critically, the *Avandia* plaintiffs did not seek a remedy for payments made to third parties based on misrepresentations made by a manufacturer. Instead, the claim there concerned the defendants' failure to disclose known health risks of various drugs ultimately included in their formularies:

> The conduct that allegedly caused plaintiffs' injuries is the same conduct forming the basis of the RICO scheme alleged in the complaint—the misrepresentation of the heart-related risks of taking Avandia that caused [third-party payors] and [pharmacy benefit managers] to place Avandia in

the formulary. The injury alleged by the [third-party payors] is an economic injury independent of any physical injury suffered by Avandia users. *And, as far as we can tell, prescribing physicians did not suffer RICO injury from [the] marketing of Avandia.*

*Avandia*, 804 F.3d at 644 (emphasis added). *Avandia* suggests by analogy, that if there was a RICO injury in our case, it was the car dealer—not any Plaintiff—who suffered it.

Each Plaintiff here is an indirect purchaser and therefore lacks standing to maintain a RICO claim against Defendants. Accordingly, Plaintiffs' RICO claim (Count 1) is **DISMISSED**.

### D. State Law Claims

Plaintiffs also bring common-law and statutory claims under the laws of various states. Counts 2 through 53 allege fraudulent concealment and violations of the consumer-protection laws of the twenty-four states in which at least one named plaintiff resides. Counts 54 through 79 concern the statutory consumer-protection laws of the remaining twenty-six states.

Plaintiffs' common-law claims proceed on a fraudulent-concealment theory:

 **\*11** BMW understood that a consumer deciding between a gas BMW and a diesel BMW had to have a reason to pay more for a diesel. For this reason BMW made numerous statements about lower emissions, the environment, and fuel economy that omitted material. BMW made these statements because it understood that information about lower emissions, fuel economy, and performance were material to potential consumers of diesel vehicles. The misrepresentations and omissions common to all state law claims can be summarized as follows:

The vehicles "met emissions standards in all states." [false];

"BMW Efficient Dynamics Means Less Emissions"; [false and misleading];

Its engines "protect the environment every day." [misleading];

Its engines turned nitric oxides "into environmentally friendly compatible nitrogen and water vapor." [false and misleading];

Its engines offered "increased power with decreased fuel consumption and emissions." [misleading as in many circumstances with emissions manipulation there is no decrease in emissions.];

BMW claimed its SCR catalyst ensured effective reduction of NOx, in part by urea dosing (¶ 123) [false as SCR efficiency was manipulated to allow increased emissions];

BMW claimed its polluting vehicles generated "less emissions" [misleading as this is true only in certain circumstances and emissions are not less than a comparable BMW gas model].

"Exemplary fuel economy" [false and misleading as fuel economy is decreased during active regeneration, and any fuel economy advantage only occurs when the emissions system is manipulated].

"Consistent distribution of AdBlue ... is ensured by the SCR mixer [false as the SCR mixer is programmed to reduce admissions control].

(1AC ¶ 400).

Plaintiffs allege that both BMW and Bosch were required to disclose concealed facts:

> (1) [T]hey each made or were complicit in statements that were misleading for failure to disclose material facts; (2) Defendants knew the omitted facts were material to consumers which is why they made or were complicit in statements made about emissions, the environment and fuel economy; (3) Defendants were in a superior position and had exclusive knowledge of the true facts; and (4) these omissions related to the core function of a diesel vehicle. As to exclusive knowledge defendants had contractual agreements requiring strict confidentiality as to

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 431 of 535
PageID: 32378
Rickman v. BMW of North America, Slip Copy (2020)
2020 WL 3468250, RICO Bus.Disp.Guide 13,355

the software programming used to manipulate emissions performance.

(1AC ¶ 401).

Defendants argue that this Court should dismiss Plaintiffs' consumer-protection and fraudulent-concealment claims. BMW and Bosch claim that Plaintiffs have failed plead facts showing (1) standing to bring claims in states in which they do not reside (DE 68-1 at 42–43; DE 69-1 at 19); and (2) the requirements of Rule 9(b) (DE 68-1 at 45–47; DE 69-1 at 19). Bosch also alleges that Plaintiffs have not properly alleged a duty to disclose. (DE 69-1 at 19–21).

**1. State-Law Standing Issues**

Essentially, Defendants' first argument is that Counts 54–79—the claims relating to the consumer-protection statutes of the states in which no named plaintiff resides—should be dismissed because the named plaintiffs, as nonresidents of those states, lack standing to bring those claims. A more prudent approach would be to defer consideration of this argument until the certification stage. To the extent the proposed class is not certified, or is limited, many of these issues might be rendered moot. I here follow the lead of other cases that have declined to address similar issues in advance of class certification. *See, e.g.*, *Sheet Metal Workers Nat. Health Fund v. Amgen Inc.,* No. 07–5295, 2008 WL 3833577 at *9 (D.N.J. Aug.13, 2008)* (declining to address argument that plaintiff lacks standing to bring claims under laws of states in which plaintiff failed to allege an injury and explaining that "because class certification creates the jurisdictional issue, the Court must treat the statutory standing issue before it deals with Article III standing, as instructed by *Ortiz*") (citing *Ortiz v. Fibreboard Corp.,* 527 U.S. 815 (1999)); *In Re Hypodermic Prods. Antitrust Litig.,* No. 05-1602, 2007 WL 1959225 at *15 (D.N.J. June 29, 2007)* (deferring consideration of argument that "Plaintiffs do not enjoy standing to raise state antitrust claims in jurisdictions in which they do not reside" until after class certification issues have been resolved); *Clark v. McDonald's Corp.,* 213 F.R.D. 198, 204 (D.N.J.2003)* (considering it appropriate to decide class certification before resolving Article III standing challenges where defendant had argued that "Clark does not enjoy standing to assert claims on behalf of class members

regarding restaurants that Clark has not visited, or in states Clark has not visited").

**2. Fraudulent Concealment and Rule 9(b)**

*12 Defendants also seek dismissal of the common-law claims. The parties are less than specific about which states' common law applies, and do not point to any relevant distinctions between the laws of those states. I therefore default to the New Jersey law of fraudulent concealment, which has five essential elements: (1) a material misrepresentation or omission of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity or knowing the omission to be material; (3) intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages. *Gennari v. Weichert Co. Realtors,* 148 N.J. 582, 610 (1997); *Delaney v. Am. Express Co.,* No. 06-5134, 2007 WL 1420766 at *5 (D.N.J. May 11, 2007).

Rule 9(b)'s specificity requirement applies to fraudulent concealment claims. *GKE Enters., LLC v. Ford Motor Credit Co. LLC USA,* No. 09-4656, 2010 WL 2179094 at *4 (D.N.J. May 26, 2010).* Fraud-by-omission claims, however, are by their nature less susceptible of precise formulation than affirmative misrepresentation claims. [10] *See Feldman v. Mercedes Benz USA,* No. 11-984, 2012 WL 6596830 at *10 (D.N.J. Dec. 18, 2012).* A fraud-by-omission claim is sufficient so long as it places "the defendant on notice of the precise misconduct with which it is charged," *Montich v. Miele USA, Inc.,* 849 F. Supp. 2d 439, 443 (D.N.J. 2012) (quoting *Frederico v. Home Depot,* 507 F.3d 188, 200 (3d Cir. 2007)).

BMW [11] contends that Plaintiffs have failed to specify the who, what, when, where, and how of the allegedly fraudulent scheme, as required by Rule 9(b). (DE 68-1 at 46). Here, however, BMW mistakenly focuses on the alleged affirmative misrepresentations to the exclusion of the claimed omissions. For example, BMW argues that "[r]ather than allege conduct specifically and separately as to each BMW entity, the FAC refers to supposed misrepresentations and omissions by 'BMW' or the 'Defendants,' which is insufficient under Rule 9(b)" and that "the FAC fails to identify with

specificity the statements on which named Plaintiffs relied, when those statements were made, or who made them." (DE 68-1 at 46). BMW's argument asks too much of Rule 9(b), which imposes a less specific pleading standard on fraudulent omissions than it does on affirmatively fraudulent statements. The "who, what, when, where and how" is not so strictly required here, because Plaintiffs cite BMW's affirmative statements primarily to establish the context for what BMW should *also* have said to ensure that those statements did not mislead. Moreover, the first amended complaint does not engage in impermissible group pleading, because it distinctly pleads the roles that that BMW and Bosch allegedly played in carrying out the scheme. Plaintiffs cite numerous specific examples of how each defendant furthered the allegedly fraudulent conduct. (1AC ¶ 379).

Plaintiffs' allegations of misrepresentations, and particularly those involving omissions, have sufficiently notified BMW and Bosch of the precise misconduct with which they are charged: "Each Plaintiff alleges exposure to the materially deficient messaging because each 'selected and ultimately purchased [his or her vehicle], in part, because of the diesel system, as represented through advertisements and representations made by BMW,' including 'advertisements on BMW's website and representations from the dealership touting the efficiency, fuel economy, and power and performance of the engine.' " (DE 73 at 45–46).

 **\*13** Moreover, Plaintiffs allege that Defendants designed the defect device to provide the perception of reduced emissions while avoiding the cost of reduced emissions. These allegations are sufficient to permit an inference of fraudulent intent, and they meet the specificity requirements of Rule 9(b). Similar allegations have been found in other automotive-defect cases, both within and without this district, to satisfy Rule 9(b). See *Counts v. Gen. Motors, LLC*, 237 F. Supp. 3d 572, 599 (E.D. Mich. 2017) (plaintiffs sufficiently alleged that GM "actively concealed and had exclusive knowledge of the alleged 'defeat device' "); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 349 F. Supp. 3d 881, 915 (N.D. Cal. 2018) (finding that fraudulent omissions claims survived, because plaintiffs identified "the specifics of what VW failed to disclose: (1) that 'the Clean Diesel engine systems were not EPA-compliant,' and (2) that the class vehicles 'used software that caused the vehicles to operate in low-emission test mode during emissions testing' "); *Feldman*, 2012 WL 6596830 at *10 (holding that plaintiffs adequately stated a

claim of fraud by omission where they "allege[d] specific facts showing Defendants' knowledge and concealment of the alleged defect").

This Court will not dismiss Plaintiffs' state-law fraudulent-concealment claims for failure to meet the standards of Rule 9(b).

### 3. Bosch's Duty to Disclose

Concerning Bosch, Plaintiffs' allegations of fraudulent concealment rest on a theory of fraud by omission. (1AC ¶¶ 414–15). Under New Jersey law, "courts will not imply a duty to disclose, unless such disclosure is necessary to make a previous statement true or the parties share a 'special relationship.' " *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1185 (3d Cir. 1993). The categories of relationships that give rise to a duty to disclose are: "(1) fiduciary relationships, such as principal and agent, client and attorney, or beneficiary and trustee; (2) relationships where one party expressly reposes trust in another party, or else from the circumstances, such trust necessarily is implied; and (3) relationships involving transactions so intrinsically fiduciary that a degree of trust and confidence is required to protect the parties." *Id.*

Plaintiffs also draw attention to a similar case which held that where an omission makes the representation misleading —that is, where "Plaintiffs allege active concealment of the truth"—then Plaintiffs "need not establish a duty to disclose." (DE 72 at 7 n.12):

Defendants contend that a number of states—namely, Massachusetts, Maryland, Maine, New Jersey, Nevada, Oregon, Pennsylvania, South Carolina, and Tennessee— recognize a fraudulent concealment claim only where there is a fiduciary relationship between the plaintiff and defendant. *See* FCA/VM Mot. at 54. Defendants are incorrect. Although Defendants do cite some authority to support their position,

[T]here is substantial authority [that] a fiduciary relationship is not the only time a duty to disclose arises; also, an affirmative act of concealment by the defendant effectively negates the duty-to-disclose requirement (*i.e.*, there is a difference between silence, where a duty to disclose is required, and active concealment, where there is no such requirement). In this regard, Plaintiffs do not claim

that Defendants were simply silent but rather that they took affirmative steps to conceal the defeat devices—including not identifying them for the EPA and CARB.... A duty to disclose thus may obtain in a variety of circumstances or indeed, may not even be required in some situations[.]

...

*See* U. Jersey Bank v. Kensey, 306 N.J. Super. 540, 704 A.2d 38, 45 (1997) (indicating agreement with Restatement (Second) of Torts that there is a duty "to disclose to another 'facts basic to the transaction, if he knows that the other is about to enter into it under a mistake ... and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts' ").

**\*14** In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig., 295 F. Supp. 3d 927, 1009 (N.D. Cal. 2018).

Here, Plaintiffs do not assert that they fall into one of the special relationship categories with Bosch. The focus of the inquiry is only whether a duty to disclose existed to prevent a previous statement from being misleading.

Bosch claims that "Plaintiffs fail to allege facts to show that Bosch LLC owed a duty of disclosure to Plaintiffs," (DE 69-1 at 19–20), and that "[a]s far as Plaintiffs were concerned, Bosch LLC was 'a complete stranger' that 'dealt with [Plaintiffs] only through impersonal [and indirect] market transactions.' " (DE 69-1 at 21 (quoting Chiarella v. United States, 445 U.S. 222, 232–33 (1980)). Nevertheless, Plaintiffs' allegations here suffice to show that Bosch had a duty to Plaintiffs to disclose the falsity of its statements. Bosch is alleged to have knowingly participated in designing the fraudulent emissions system (1AC ¶¶ 268–78); developed coded language about the defeat device and concealing the defeat device (1AC ¶¶ 279–80); and actively and knowingly deceived U.S. regulators about its diesel technology for the benefit of all affected vehicles (1AC ¶¶ 281–83). These allegations are sufficient to establish an obligation by Bosch to correct the record. *See* In re Volkswagen Timing Chain Prod. Liab. Litig., No. 16-2765, 2017 WL 1902160 at \*20 (D.N.J. May 8, 2017) (finding that the plaintiffs pled a partial disclosure after which the defendant had a duty to disclose "any and all information regarding the Timing Chain System"

to plaintiffs, where the plaintiffs alleged that the defendant "represent[ed] in the maintenance schedules that the timing belt, which performs the same function as the Timing Chain System, will need service after a certain time but makes no representation that the Timing Chain System will need maintenance"); Strawn v. Canuso, 271 N.J. Super. 88, 104 (App. Div. 1994) (establishing a duty on buyers and brokers of real estate to disclose the existence of off-site conditions that were unknown to the buyer but that were known or should have been known to the seller and that would reasonably and foreseeably affect the value or desirability of the property), *aff'd,* 140 N.J. 43 (1995).

In *Strawn*, the New Jersey Supreme Court adopted the Restatement (Second) of Torts which imposes a "duty upon a party to disclose to another 'facts basic to the transaction, if he knows that the other is about to enter into it under a mistake ... and the other, because of the relationship between them, the customs of the trade[,] or other objective circumstances, would reasonably expect a disclosure of those facts,' " where the nondisclosure of those facts amounts to taking advantage of a plaintiff's ignorance, such that it would be "shocking to the ethical sense of the community, and [would be] so extreme and unfair, as to amount to a form of swindling.' " U. Jersey Bank, 306 N.J. Super. at 554 (citations omitted). Bosch's active concealment of the existence of the defeat device amounts to such a situation. *Cf.* Chrysler-Dodge-Jeep, 295 F. Supp. 3d at 1009 (finding that allegations of defendants' active concealment of the defeat devices was sufficient to establish a duty to disclose under); Counts, 237 F. Supp. 3d at 600 (noting that defendant's alleged active concealment of the defeat device was sufficient to establish a duty to disclose). Accordingly, Plaintiffs' claims of fraudulent concealment by Bosch will not be dismissed on this basis.

### 4. Statutory Consumer-Fraud Issues

#### i. New Jersey's Consumer Fraud Act (Count 32)

**\*15** Defendants allege that the New Jersey Consumer Fraud Act requires plaintiffs to plead "ascertainable loss." That element, Defendants say, "require[s] plaintiffs to specify the price paid for the product and the price of comparable products to adequately state a claim." (DE 68-1 at 48 (quoting

*In re Riddell Concussion Reduction Litig.*, 77 F. Supp. 3d 422, 439 (D.N.J. 2015)); *see also* N.J. Stat. Ann. § 56:8-2).

Defendants are correct that a claim under the New Jersey Consumer Fraud Act requires an allegation of ascertainable loss. *See Riddell*, 77 F. Supp. 3d at 436–37. The plaintiff need not, however, plead ascertainable loss with pinpoint specificity. *See Maniscalco v. Brother Int'l Corp. (USA)*, 627 F.Supp.2d 494, 503 (D.N.J.2009) (citing *Perkins v. DaimlerChrysler Corp.*, 383 N.J. Super. 99, 111 (App. Div. 2006)) ("Here, plaintiff alleged in her complaint that she suffered an ascertainable loss. She did not allege the nature of that loss, nor was she so required at that stage. Defendant's motion to dismiss, unlike the summary judgment procedure, did not require, in order to avoid dismissal, that the plaintiff provide evidential material to rebut defendant's contention that she had not sustained ascertainable loss ...."); *Lamont v. OPTA Corp.*, 2006 WL 1669019 (N.J. Super. Ct. App. Div. 2006) ("There is nothing ... that requires the pleading of an ascertainable loss element of a Consumer Fraud Act cause of action with any special specificity ...."). Even in opposition to a motion for summary judgment, "[a]n estimate of damages, calculated within a reasonable degree of certainty will suffice to demonstrate an ascertainable loss." *Thiedemann v. Mercedes-Benz USA, LLC*, 183 N.J. 234, 249 (2005) (internal quotation and citation omitted). At the motion to dismiss stage, alleging a diminution in value due to the defect is sufficient. *See Maniscalco*, 627 F.Supp.2d at 503 (finding that conclusory statement about the replacement cost of a defective machine was an adequate allegation of ascertainable loss); *Strzakowski v. GMC*, No. 04-4740, 2005 WL 2001912 at *6–7 (D.N.J. Aug. 16, 2005) (alleging diminution in value satisfies the CFA's loss requirement); *cf. Perkins*,383 N.J. Super. at 110–11

Here, each New Jersey plaintiff alleges the actual price paid for the car and the amount of the price premium allegedly attributable to the fraud. The first amended complaint also alleges that these calculations are "based on analysis of other emissions cases." (1AC ¶ 319). The plaintiff need not adduce his evidence at this, the pleading stage. These allegations satisfy the ascertainable loss element of the New Jersey Consumer Fraud Act.

#### ii. Mississippi's Consumer Protection Act (Count 28)

Defendants argue that the Mississippi Consumer Protection Act claim must be dismissed for failure to comply with Mississippi's requirement of participation in settlement programs before filing suit. *See* Miss. Code Ann. § 75-24-15(2). [12]

The legal question boils down to one of federalism. A matter may proceed as a federal class action, regardless of a state procedural bar, so long as the application of Rule 23 does not "abridge, enlarge or modify any substantive right." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 407 (2010) (quoting Rules Enabling Act, 28 U.S.C. § 2072(b)). Courts applying *Shady Grove* have gone so far as to hold that a federal class action may proceed on state-law claims despite state statutes prohibiting class action treatment.

*See, e.g.*, *In re Hydroxycut Marketing and Sales Practices Litig.*, 299 F.R.D. 648 (S.D. Cal. 2014) (permitting claims under state consumer-protection statutes to proceed as class action under Rule 23 even where state statutes do not allow class actions); *see also Lisk v. Lumber One Wood Preserving, LLC*, 792 1331 (11th Cir. 2015) (same application).

**\*16** Under the Supreme Court's decision in *Shady Grove*, state rules, even if procedural in form, may control in federal court when they are "part of a State's framework of substantive rights or remedies." 559 U.S. at 419 (Stevens, J., concurring). There is no consensus among the federal cases as to whether pre-suit notice or settlement requirements are "substantive" or "procedural." Some have applied such provisions, reasoning that failure to do so "would encourage forum shopping and the inequitable administration of laws."

*In re Effexor Antitrust Litig.*, 357 F. Supp. 3d 363, 387–88 (D.N.J. 2018) (quoting *In re Asacol Antitrust Litig.*, No. 15-12730, 2016 WL 4083333 at *15 (D. Mass. July 20, 2016)); *see also In re Insulin Pricing Litigation*, No. 17-699, 2020 WL 831552 at 9 (D.N.J Feb. 20, 2020) (dismissing claim for failure to comply with Mississippi's pre-suit dispute resolution requirement); *In re Lipitor Antitrust Litigation*, 336 F.Supp.3d 395, 415–17 (D.N.J. 2018) ("In sum, the Court finds that the ... notice provisions ... are applicable here and Plaintiffs failed to comply."); *In re Chocolate Confectionary Antitrust Litig.*, 749 F.Supp.2d 224,

Rickman v. BMW of North America, Slip Copy (2020)
2020 WL 3468250, RICO Bus.Disp.Guide 13,355

232 (M.D. Pa. 2010) (finding failure to comply with Hawaii notice requirement "warrants dismissal"). Others have treated such provisions as procedural, *i.e.*, not sufficiently a part of the relevant states' framework of substantive rights or remedies to be controlling. *See In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 355 F.Supp.3d 145, 156 (E.D.N.Y. 2018)* ("Hawaii's law regulates only when private plaintiffs can litigate the case. It does not alter the substantive elements of plaintiffs' claims."); *In re Propranolol*, 249 F.Supp.3d at 728 n.24 (dismissal not required for failure to comply with Hawaii's procedural notice rule); *In re Broiler Chicken Antitrust Litig.*, 290 F.Supp.3d 772, 817 (N.D. Ill. 2017) (declining to dismiss Arizona antitrust claim notwithstanding late notice to attorney general); *In re Aggrenox Antitrust Litig.*, 94 F.Supp.3d 224, 254 (D. Conn. 2015) (declining to dismiss based on the plaintiffs' failure to plead compliance with the notice requirements of the Hawaii antitrust statute); *In re Aftermarket Filters Antitrust Litig.*, No. 08-4883, 2009 WL 3754041 at *6 (N.D. Ill. Nov. 5, 2009) (finding Hawaii antitrust "statute does not provide for dismissal of the action for failure to comply [with the pre-suit notice requirement], and that dismissal is inconsistent with the remedial purposes of the statute").

Whether Rule 23 would abridge a substantive right, however, is an issue that need not be faced until the certification stage. The elements of a cause of action are set forth. The motion to dismiss the Mississippi claim is, at least for now, denied.

### iii. Alaska's Unfair Trade Practices and Consumer Protection Act (Count 54)

The first amended complaint pleads violations of the Alaska Unfair Trade Practices and Consumer Protection Act, Alaska Stat. Ann. § 45.50.471 *et seq.*, "for notice purposes only." (1AC ¶ 1181). Defendants argue that because the complaint does not identify an Alaska plaintiff, the putative class does not have standing to bring this claim. (DE 68-1 at 49). Defendants have a point, but for the reasons discussed *supra*, the issue of standing to bring claims on behalf of unnamed plaintiffs, some of them potentially from Alaska, is more appropriately resolved at the certification stage.

### iv. West Virginia's Consumer Credit and Protection Act (Count 78)

Likewise, the first amended complaint pleads violations of the West Virginia Consumer Credit and Protection Act, W. Va. Code § 46A-1-101 *et seq.*, "for notice purposes only." (1AC ¶ 1379). Again, I will defer consideration until the certification stage.

### v. Iowa's Private Right of Action for Consumer Frauds Act (Count 61)

Defendants argue that the Iowa Private Right of Action for Consumer Frauds Act, Iowa Code § 714H.1 *et seq.*, requires that class actions under that act secure pre-clearance from the attorney general. (DE 68-1 at 50). Plaintiffs have not alleged such preclearance. Whether Rule 23 would abridge a substantive right, *see Shady Grove*, 559 U.S. at 407, is an issue that need not be faced until the certification stage. At least for now, the motion to dismiss the Iowa claim is denied.

### vi. Georgia's Uniform Deceptive Trade Practices Act (Count 13)

The Georgia Uniform Deceptive Trade Practices Act does not authorize private damages lawsuits. *See Ga. Code Ann. § 10-1-373.* This lawsuit, however, is about injunctive relief at least as much as it is about damages. The first amended complaint sufficiently alleges that, for Rule 12(b)(6) purposes, the subject vehicles need to be fixed and that Plaintiffs' injuries can be redressed, at least in part, by a recall or a replacement. The motion to dismiss the Georgia UDTPA claim is therefore denied.

### vii. Minnesota's Deceptive Trade Practices Act (Count 26)

**\*17** Similarly, the Minnesota Deceptive Trade Practices Act does not permit private damages lawsuits. *See* Minn. Stat. Ann. § 325d.45. The motion to dismiss the Minnesota DTPA claim is denied. *See* subsection vi, immediately preceding.

#### viii. Kentucky's Consumer Protection Act (Count 19)

Defendants point out that the Kentucky Consumer Protection Act, contains a privity requirement. *See* Ky. Rev. Stat. Ann. § 367.220(1). However, courts applying this statute have recognized an exception to the privity requirement when breach of an express warranty is alleged:

> To maintain a private action under Kentucky's Consumer Protection Act, a plaintiff must generally be in privity of contract with the defendant. *Naiser* [*v. Unilever U.S., Inc.*], 975 F.Supp.2d [727,] 743 [ [2013] ] (citing *Ky. Laborers Dist. Council Health & Welfare Trust Fund v. Hill & Knowlton, Inc.*, 24 F.Supp.2d 755, 772–73 (W.D.Ky.1998) (noting that the KCPA "requires that privity of contract exist between the parties[ ]")). The statute typically cited for the KCPA's privity requirement states:
>
> > *Action for recovery of money or property; when action may be brought*—(1) Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property .. may bring an action ....
>
> K.R.S. § 367.220(1). Kentucky courts have held that this language "plainly contemplates an action by a purchaser against his immediate seller." *Skilcraft Sheetmetal, Inc. v. Ky. Mach., Inc.*, 836 S.W.2d 907, 909 (Ky. App. 1992). *As noted in Naiser, however, there is an exception to the privity requirement when express representations are alleged.*

...

> According to the Court in *Naiser,* since the plaintiffs had sufficiently alleged that the manufacturer made valid express warranties for Plaintiffs' benefit, ... [t]he plaintiffs were permitted to maintain a KCPA claim despite the absence of a direct buyer-seller relationship.
>
> *Bosch v. Bayer Healthcare Pharm., Inc.*, 13 F. Supp. 3d 730, 750 (W.D. Ky. 2014) (emphasis added); *see also Skilcraft*, 836 S.W.2d at 909 (a subsequent purchaser could not "maintain an action against a seller with whom he did not deal *or who made no warranty for the benefit of the subsequent purchaser*") (emphasis added).

Here, Plaintiffs have alleged that Defendants made an express warranty with regard to the subject vehicles. That allegation is sufficient to overcome the privity requirement, and the motion to dismiss the Kentucky CPA claim is denied.

### III. CONCLUSION

For the foregoing reasons, the motions of BMW USA (DE 68) and Robert Bosch LLC (DE 69) are **GRANTED** in part and **DENIED** in part. Count 1 of the first amended complaint (1AC) is **DISMISSED**. The dismissal is with prejudice because it appears that further amendment would be futile.

A separate order will issue.

### All Citations

Slip Copy, 2020 WL 3468250, RICO Bus.Disp.Guide 13,355

---

#### Footnotes

1    "DE —" refers to the docket entry in this case.

2    For purposes of this motion, the facts alleged in the first amended complaint, not yet tested by any fact finder, are assumed to be true.

3    Plaintiffs allege that for all material purposes, the tested models represent all makes and model years of the vehicles at issue here. (1AC ¶¶ 2, 3 & 172). All models at issue share a common diesel engine. (1AC ¶¶ 101–15).

4    European vehicle-emissions regulators use PEMS to test real-world driving conditions. (1AC ¶ 154). The EPA and the California Air Resources Board ("CARB") also use PEMS testing for their heavy-duty in-use

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 437 of 535
PageID: 32384
Rickman v. BMW of North America, Slip Copy (2020)
2020 WL 3468250, RICO Bus.Disp.Guide 13,355

compliance program to measure emissions against the not-to-exceed standards. The EPA and the CARB widely use PEMS to evaluate vehicles for defeat devices. (1AC ¶ 154).

5    One study concluded that because PEMS testing is designed for—and is conducted on the road in actual driving—it is in certain respects *more accurate* than chassis dynamometer testing. (DE ¶ 160).

6    Active regenerations should theoretically occur infrequently because of the increase in emissions and fuel economy impacts. (1AC ¶ 22). But expert testing reveals active regeneration far in excess of the permissible frequency, which is above the permissible certification frequency for all the tested diesel models. (1AC ¶¶ 21–24, 221 & 247–50).

7    A factual attack, on the other hand, permits the Court to consider evidence extrinsic to the pleadings.
     *Lincoln Ben. Life,* 800 F.3d at 105; *Gould Elecs. Inc. v. United States,* 220 F.3d 169, 178 (3d Cir. 2000), *holding modified on other grounds by Simon v. United States,* 341 F.3d 193 (3d Cir. 2003).

8    Perhaps more appropriately stated, the vast majority of the subject vehicles were acquired on the *tertiary* market, because, for RICO purposes, car dealerships themselves are already considered a secondary market.

9    Practically speaking, of course, applying the indirect purchaser rule to car buyers forecloses all consumer RICO claims against car manufacturers, because state laws generally prohibit manufacturers' direct sales of automobiles. A RICO remedy would thus seem to be confined to car dealers, and there are no dealers (at least *qua* dealers) among the plaintiff class. So far as our research has disclosed, there is no automobile exception to the indirect purchaser rule.

10   We need not tarry over the paradoxes inherent in a requirement of stating the precise time, place, location, and manner in which something did not occur.

11   Bosch fully adopts BMW's argument on this point. (DE 69-1 at 19).

12   Defendants do not address—apart from the arguments that have already been discussed, *supra*—the sufficiency of the factual allegations.

---

**End of Document**    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

TAB 31

*Rolland v. Spark Energy LLC*, No. 17-2680, 2019 WL 1903990 (D.N.J. Apr. 29, 2019)

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 440 of 535
PageID: 32387

Rolland v. Spark Energy, LLC, Not Reported in Fed. Supp. (2019)

2019 WL 1903990

2019 WL 1903990
Only the Westlaw citation is currently available.
**NOT FOR PUBLICATION**
United States District Court, D. New Jersey.

Janet ROLLAND, Plaintiff,
v.
SPARK ENERGY, LLC, Defendant.

Civil Action No. 17-2680 (MAS) (LHG)
|
Signed 04/29/2019

**Attorneys and Law Firms**

Matthew Ross Mendelsohn, Mazie Slater Katz & Freeman LLC, Roseland, NJ, for Plaintiff.

Ezra Dodd Church, Morgan Lewis & Bockius LLP, Philadelphia, PA, for Defendant.

**MEMORANDUM OPINION**

Michael A. Shipp, United States District Judge

**\*1** This matter comes before the Court on Defendant Spark Energy, LLC's ("Defendant") Third Motion to Dismiss and Motion to Strike Class Allegations. (ECF No. 54.) Plaintiff Janet Rolland ("Plaintiff") filed a Second Amended Complaint ("SAC") on August 17, 2018. (ECF No. 48.) Plaintiff opposed Defendant's Motion (ECF No. 59), and Defendant replied (ECF No. 67).[1] The Court has carefully considered the parties' submissions and decides the matter without oral argument pursuant to Local Civil Rule 78.1. For the reasons set forth below, the Court grants in part and denies in part Defendant's Motion.

**I. Background**[2]
The parties are familiar with the matter's factual history, and therefore, the Court only repeats those facts necessary to resolve the instant motion. Plaintiff enrolled in Defendant's electricity services from February 25, 2012 to December 24, 2014. (SAC ¶¶ 7, 24.) Defendant offered a twelve-month low, fixed-rate for new customers. (*Id.* ¶¶ 2, 17.) After twelve billing cycles, Defendant placed Plaintiff on a month-to-month variable rate plan ("Variable Rate Plan"). (*Id.* ¶ 17.) Defendant notified Plaintiff before the last billing cycle that

her initial fixed-rate services were ending and she would be automatically enrolled in the Variable Rate Plan if she did not terminate her service. (*Id.* ¶ 20.) Plaintiff did not respond and was automatically enrolled into the Variable Rate Plan. (*Id.*) The price of the Variable Rate Plan was higher than the initial fixed rate. (*Id.* ¶¶ 17-31.) According to Plaintiff, the variable rare jumped 108% from the introductory fixed rate at the end of the first billing cycle, and Defendant's prices were 93% to 114% higher than competitors' rates. (*Id.* ¶ 24.)

Defendant moves to dismiss Count One of Plaintiff's SAC. (*Id.* ¶¶ 54-66.) Plaintiff filed two previous complaints (ECF Nos. 30, 48) after this Court granted Defendant's Motions to Dismiss without prejudice (ECF Nos. 28, 44). The Court denied Defendant's original Motion to Dismiss Plaintiff's breach of contract and breach of implied covenant of good faith and fair dealing claims. (First Mot. to Dismiss, ECF No. 28.) The Court, however, granted Defendant's Motion to Dismiss Plaintiff's New Jersey Consumer Fraud Act ("NJCFA") claim, finding Plaintiff did not satisfy Federal Rule of Civil Procedure [3] 9(b)'s pleading standards as to the NJCFA. (Dec. 7, 2017 Hr'g Tr. 6:7-12, ECF No. 34.)

Specifically, the Court cited to *Melville v. Spark Energy, Inc.*, No. 15-8706, 2016 WL 6775635 (D.N.J. Nov. 15, 2016), and *Vitale v. U.S. Gas & Electric, Inc.*, No. 14-4464, 2016 WL 1060807 (D.N.J. Mar. 16, 2016), as setting the appropriate pleading standard, and provided Plaintiff leave to file an amended complaint. (*Id.* at 5:23-6:12.)

**\*2** Plaintiff subsequently filed an Amended Complaint. (ECF No. 30.) Defendant moved to dismiss, arguing Plaintiff failed to satisfactorily plead an NJCFA claim. (Second Mot. to Dismiss 8-13, ECF No. 37.) In its July 11, 2018 Memorandum Opinion, the Court granted Defendant's motion, finding Plaintiff again failed to provide sufficiently detailed allegations to plead an NJCFA claim. (July 11, 2018 Mem. Op. 6, ECF No. 43.) The Court further reiterated its prior determination that *Melville* and *Vitale* set forth the proper NJCFA pleading standard, and found Plaintiff's Amended Complaint failed to "allege that Plaintiff purchased electricity through Defendant based on any specific representation(s), or that price was considered by *Plaintiff when* purchasing from Defendant." (*Id.* at 5-6.) The Court granted Plaintiff one final opportunity to cure the deficiencies in her Amended Complaint. (*Id.* at 7.)

Plaintiff subsequently filed the SAC. (*See generally* SAC.) Currently before the Court is Defendant's third Motion to

Rolland v. Spark Energy, LLC, Not Reported in Fed.Supp. (2019)

2019 WL 1903990

Dismiss Plaintiff's NJCFA claim. (*See* Def.'s Moving Br., ECF No. 54-1.) Defendant moves to dismiss with prejudice Plaintiff's NJCFA claim, and further moves to dismiss or strike Plaintiff's nationwide class allegations. (*Id.*)

## II. Legal Standard

When analyzing a Rule 12(b)(6) motion, the district court conducts a three-part analysis. First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009). Second, the court must accept as true all of a plaintiff's well-pleaded factual allegations and construe the complaint in the light most favorable to the plaintiff. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). The court, however, must disregard any conclusory allegations proffered in the complaint. *Id.* at 210-11. Finally, the court must determine whether the "facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief." *Id.* at 211 (quoting *Iqbal*, 556 U.S. at 679). "[W]here the well-pleaded facts do not permit the court to infer more than mere possibility of misconduct," the claim is insufficient. *Iqbal*, 556 U.S. at 679.

Where a plaintiff pleads fraud, however, the plaintiff "must meet a heightened pleading standard under [ Rule] 9(b)." *Zuniga v. Am. Home Mortg.*, No. 14-2973, 2016 WL 6647932, at *2 (D.N.J. Nov. 8, 2016). The NJCFA is subject to the heightened standard of Rule 9(b). *Smajlaj v. Campbell Soup Co.*, 782 F. Supp. 2d 84, 98 (D.N.J. 2011) (citing *F.D.I.C. v. Bathgate*, 27 F.3d 850, 876-77 (3d Cir, 1994) ). "In alleging fraud ..., a party must state with particularity the circumstances constituting fraud ...." Fed. R. Civ. P. 9(b). "A plaintiff alleging fraud must therefore support its allegations 'with all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where and how of the events at issue.' " *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016) (quoting *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002) ). "To satisfy this standard, the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision

or some measure of substantiation into a fraud allegation." *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007). The purpose of Rule 9(b) is "to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of ... fraudulent behavior." *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984).

A plaintiff seeking a claim under the NJCFA must present evidence of: (1) unlawful conduct; (2) an ascertainable loss by the plaintiff; and (3) a causal relationship between the unlawful conduct and the ascertainable loss. *Melville*, 2016 WL 6775635, at *2 (citing *Int'l Union of Operating Eng'gs Local No. 68 Welfare Fund v. Merck & Co., Inc.*, 929 A.2d 1076, 1086 (N.J. 2007) ); *see also* N.J.S.A. 56:8-19. Unlawful conduct includes, "any unconscionable commercial practice, deception, fraud, false pretense, false promise, [or] misrepresentation ... in connection with the sale or advertisement of any merchandise or real estate...." N.J.S.A. 56:8-2. A plaintiff must allege "substantial aggravating circumstances" to state a valid NJCFA claim. *Neuss v. Rubi Rose, LLC*, No. 16-2339, 2017 WL 2367056, at *7 (D.N.J. May 31, 2017) (citation omitted).

*3 Finally, under Rule 12(b)(1), a party may move to dismiss a complaint for lack of subject matter jurisdiction. Because federal courts are courts of limited jurisdiction, the party seeking to invoke the court's jurisdiction bears the burden of proving the existence of subject matter jurisdiction. *See* *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

## III. Analysis

### A. Plaintiffs NJCFA Claim

Defendant asserts that Plaintiff's SAC does not address the inadequacies from the prior dismissed complaints. (Def.'s Moving Br. 4.) Defendant contends Plaintiff failed to plead the third element of an NJCFA claim—a causal nexus between her injury and Defendant's allegedly unlawful conduct. (*Id.* at 8 citing *Arcand v. Bro. Int'l Corp.*, 673 F. Supp. 2d 282, 303 (D.N.J. 2009) ).) Specifically, Defendant contends, "Plaintiff fails to state that she ... read, reviewed, looked at, or relied on the Terms of Service or the Renewal Notice. Instead, Plaintiff pleads she merely 'received' or

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 442 of 535
PageID: 32389

Rolland v. Spark Energy, LLC, Not Reported in Fed.Supp. (2019)
2019 WL 1903990

was 'provided' those documents ...." (*Id.* at 9 (emphasis removed).)

Defendant also argues Plaintiff again failed to allege that she considered price when she purchased services from Defendant, and instead, continues to "resort only to the considerations of a 'reasonable consumer'—an attempt the Court specifically rejected." (*Id.* at 10 (citing July 11, 2018 Mem. Op. 6 ("Plaintiffs Amended Complaint does not allege that Plaintiff purchased electricity from Defendant based on any specific representation(s), or that price was considered by *Plaintiff* when purchasing from Defendant.") ).) Thus, Defendant contends that although "Plaintiff speculates about what the platitudinal 'reasonable consumer' would think and do. she does not state facts—let alone particularized facts—of a representation that caused *her* to roll over to a [V]ariable [R]ate [Plan] and to stay there." (*Id.* at 11.)

Moreover, Defendant contends Plaintiff failed to allege any misrepresentation or omission on behalf of Defendant. (*Id.* at 12.) Rather, Defendant argues "Plaintiff simply points to additional language in the Terms and Conditions that an administrative fee would not be included in the fixed rate —an allegation that has nothing to do with her variable-rate allegations." (*Id.* at 13.) Defendant disputes Plaintiff's statement that Defendant's use of the terms "competitively priced" amounts to a misrepresentation of the Variable Rate Plan. (*Id.* at 14.) Instead, Defendant alleges this phrase is merely "puffery," which this Court has previously found as not actionable under the NJCFA. (*Id.* (citing *Urbino v. Ambit Energy Holdings, LLC*, No. 14-5184, 2015 WL 4510201, at \*5 n.7 (D.N.J. July 24, 2015) ("[C]laims of 'substantial savings,' 'low, competitive rates,' 'exceptional value,' and 'great savings' are not factual assertions. As such, they are not actionable under the [NJ]CFA.") ).)

Finally, Defendant contends Plaintiff has not pled substantial aggravating circumstances sufficient to constitute consumer fraud under the NJCFA. (*Id.* at 15.) *See Hassler v. Sovereign. Bank*, 374 F. App'x 341, 344 (3d Cir. 2010) (quoting *Turf Lawnmower Repair, Inc. v. Bergen Record Corp.*, 655 A.2d 417, 429 (N.J. 1995) ("To constitute consumer fraud ... the business practice in question must be 'misleading' and stand outside the norm of reasonable business practice in that it will victimize the average consumer ....") ); *see also Suber v. Chrysler Corp.*, 104 F.3d 578, 587 (3d Cir. 1997) (differentiating between mere breach of contract or warranty and an NJCFA violation). Thus, Defendant contends, "No

basis exists to morph the breach of contract claim ... into a treble-damages [NJ]CFA claim." (*Id.* at 16.)

**\*4** This Court previously identified *Melville* and *Vitale* as providing the appropriate NJCFA pleading standard. (July 11, 2018 Mem. Op. 5 (citing *Melville*, 2016 WL 6775635; *Vitale*, 2016 WL 1060807).) In *Melville*, the plaintiff took the agreement into consideration when he read and reviewed the terms. *Melville*, 2016 WL 6775635, at \*1. The *Melville* court also stated that "as with common law and equitable fraud, an NJCFA violation must be pled with particularity" and held that the plaintiff satisfied the Rule 9(b) standard because the plaintiff attached the agreement and referenced a specific encounter between the defendant and the plaintiff. *Id.* at \*4.

In *Vitale*, the plaintiffs claimed the defendant told them, and provided them with documentation, that stated the rates were "competitive" when the plaintiffs switched to the defendant's services. *Vitale*, 2016 WL 1060807, at \*1. Further, the plaintiffs directly quoted the standardized telephone sales pitch that induced them to switch electricity providers. *Id.* at \*3. There, the court held the plaintiffs satisfied the NJCFA pleading requirements because the plaintiffs demonstrated the specific misleading statements that they considered, which induced them to switch to the defendant's services. *Id.*

In the instant matter, Plaintiff again fails to allege that she considered any of Defendant's representations when she purchased Defendant's electricity services. "To properly plead a causal nexus, a plaintiff cannot rely on legal conclusions that fail to allege when statements were made or when the plaintiff[ ] [was] exposed to the statements." *Torres-Hernandez v. CVT Prepaid Sols., Inc.*, No. 08-1057, 2008 WL 5381227, at \*7 (D.N.J. Dec. 17, 2008) (citation omitted). Here, although Plaintiff attached the Terms of Service and Renewal Notice to her SAC, Plaintiff did not plead any facts demonstrating that she saw, read, heard, or in any way took those documents into consideration. (*See* SAC, Ex. 1; SAC, Ex. 2.) In fact, Plaintiff merely alleges that she "received" Defendant's Renewal Notice, and Defendant "provided her" its Terms of Service. (SAC ¶¶ 18, 20.) Therefore, Plaintiff failed to establish the Terms of Service and Renewal Notice were material to her decision making, but instead, pleads pursuant to a reasonable consumer, which the Court has already rejected. (*See* July 11, 2018 Op. 5-6 (collecting cases); *see also id.* at 6.) *See also Mladenov v. Wegmans Food*

Case 1:19-md-02875-RMB-SAK   Document 1382-8   Filed 07/12/21   Page 443 of 535
PageID: 32390

Rolland v. Spark Energy, LLC, Not Reported in Fed.Supp. (2019)

2019 WL 1903990

*Mkts., Inc.*, 124 F. Supp. 3d 360, 377 (D.N.J. 2015) (finding the plaintiffs failed to plead an NJCFA claim with sufficient particularity because, among other things, the "[p]laintiffs [did] not specify any instance in which they even saw [the d]efendant's advertisements"); *Berman v. ADT LLC*, No. 12-7705, 2015 WL 4496517, at *5 (D.N.J. July 22, 2015) (finding the plaintiffs failed to successfully plead an NJCFA claim because the record lacked evidence that the defendants' representations were "material to [the plaintiffs'] decision-making").

The Court is also not persuaded by Plaintiff's assertion that Defendant's use of the phrase "competitively priced offers" in the Renewal Notice constitutes a misrepresentation. (SAC, Ex. 2.) This Court has previously determined, "claims of 'substantial savings,' 'low, competitive rates,' 'exceptional value,' and 'great savings' are not factual assertions, As such, [those phrases] are not actionable under the [ NJ]CFA." *Urbino*, 2015 WL 4510201, at *5 n.7 (citation omitted); *see also* Glass v. BMW of N. Am., No. 10-5259, 2011 WL 6887721, at *6 (D.N.J. Dec. 29, 2011) (citation omitted) ("Advertising that amounts to mere puffery is not actionable because no reasonable consumer relies on puffery. The distinguishing characteristics of puffery are vague, highly subjective claims, as opposed to specific, detailed factual assertions."); *Berman*, 2015 WL 4496517, at *5 (alteration in original) (internal quotation marks and citation omitted) ("[I]dle comments or mere puffery are not material because reasonable consumers do not rely on puffery."). Here, Defendant's assertion that its rates were competitively priced falls squarely into the category of puffery. Nonetheless, as stated previously, Plaintiff failed to plead that she read or considered the Renewal Notice, and therefore, has not demonstrated that she even took the phrase "competitively priced" into consideration. [4]

**B. Plaintiff's Multistate Class Allegations**

**\*5** Defendant next argues the SAC fails to support a multistate class. Specifically, Defendant moves to dismiss Plaintiff's class allegations pursuant to Rules 12(b)(1), 12(b)(6), or 23(d)(1)(D). (Def.'s Moving Br. 17-21.)

Plaintiff's class definition does not include a geographic limitation, *i.e.* New Jersey, but rather, Plaintiff brings the suit "on behalf of a class of consumers who purchased electricity on a variable rate from Defendant from April 19, 2011, to present." (SAC ¶ 6.) Plaintiff further provides that Defendant "has thousands of customers in New Jersey and elsewhere," and operates in "New Jersey and other states." (SAC ¶ 8.) Although the Court recognizes Plaintiff's nationwide class allegations are limited, Plaintiff's allegations are sufficiently broad to encompass a class outside of the State of New Jersey.

Moreover, the Court is not inclined to dismiss or strike Plaintiff's class allegations at the motion to dismiss stage, and finds this issue better suited for the class certification stage. [5] *See Rubi Rose, LLC*, 2017 WL 2367056, at *10 ("[S]trik[ing] ... class allegations at [the motion to dismiss] stage would be premature, and the Court's consideration of this issue is better suited for the class certification stage."); *see also* Durso v. Samsung Elecs. Am., Inc., No. 12-5352, 2013 WL 5947005, at *13 (D.N.J. Nov. 6, 2013) (citation omitted) ("Dismissal of class claims prior to discovery and a motion to certify the class by plaintiff is the exception rather than the rule."); Fishman v. Gen. Elec. Co., No. 12-585, 2013 WL 1845615, at *6 (D.N.J. Apr. 30, 2013) (explaining that a motion to strike under Rule 12(f), rather than a motion to dismiss under Rule 12(b)(6), is the "proper procedural mechanism" for disputing nationwide class allegations, and finding the defendant's motion premature at the motion to dismiss stage); *cf.* Bell v. Cheswick Generating Station, No. 12-929, 2015 WL 401443, at *5-7 (W.D. Pa. Jan. 28, 2015) (reviewing the defendant's motion brought pursuant to Rules 12(b) and 23(c)(1)(A) as a motion to strike class allegations). The Court, accordingly, denies Defendant's motion to dismiss or strike Plaintiff's nationwide class allegations. [6]

## IV. Conclusion

For the reasons set forth above, the Court dismisses with prejudice Plaintiff's NJCFA claim. The Court denies Defendant's Motion to Strike Plaintiff's nationwide class. The Court will enter an Order consistent with this Memorandum Opinion.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 1903990

## Footnotes

1    The Court permitted Plaintiff and Defendant to submit a sur-reply and sur-sur-reply, respectively, but reserved on its decision as to whether it would consider the arguments advanced in that correspondence. (ECF Nos. 68, 69, 70, 71, 72, 73.) The Court hereby grants Plaintiffs and Defendant's Motions to submit a sur-reply and sur-sur-reply. (ECF Nos. 71, 72.) Further, the Court acknowledges receipt of the notices of supplemental authority (ECF Nos. 77, 79), and the responses thereto (ECF Nos. 78, 80).

2    For purposes of the instant motion, the Court accepts all well-pled factual allegations in the Complaint as true. *See* *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).

3    Unless otherwise noted, all references to "Rules" hereinafter refer to Federal Rules of Civil Procedure.

4    Plaintiff's arguments regarding the Administrative Fee lack merit as the Terms of Service provides that fixed rate plan customers will not pay an administrative fee, and Plaintiff does not allege that she paid an administrative fee during the time she was enrolled in the fixed rate plan. (SAC, Ex. 1; *see also* SAC ¶ 39 (stating Plaintiff began paying an administrative fee after switching to the Variable Rate Plan).)

5    The Court acknowledges that "[c]ourts are divided on the question of the appropriate standard of review for pre-discovery motions to strike class allegations ...." *Bell v. Cheswick Generating Station*, No. 12-929, 2015 WL 401443, at *3 (W.D. Pa. Jan. 28, 2015) (collecting cases). Here, the Court finds Defendant's motion premature, and therefore, does not reach the issue.

6    The Court further finds Defendant's standing argument unpersuasive. *See, e.g.*, *Langan v. Johnson & Johnson Consumer Cos.*, 897 F.3d 88, 96 (2d Cir. 2018) ("[W]hether a plaintiff can bring a class action under the state laws of multiple states is a question of predominance under Rule 23(b)(3), not a question of standing ....").

---

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

TAB 32

*Rosedale & Rosehill Cemetery Ass'n v. Twp. of Reading*, -- F. Supp. 3d --, 2020
WL 7768457 (D.N.J. Dec. 30, 2020)

2020 WL 7768457
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

ROSEDALE AND ROSEHILL
CEMETERY ASSOCIATION, Plaintiff,

v.

TOWNSHIP OF READING, et al., Defendants,
State of New Jersey, Intervenor.

Civil Action No.:19-16428 (FLW)
|
Signed 12/30/2020

**Synopsis**
**Background:** Non-profit cemetery company brought action
against township, alleging that company applied to township
to open cemetery, that township denied application pursuant
to its authority under the New Jersey Cemetery Act,
and that under Due Process Clause, certain provisions of
Act were unconstitutional on their faces and as applied.
Following removal, company moved for summary judgment
and township cross-moved for summary judgment.

**Holdings:** The District Court, Freda L. Wolfson, Chief Judge,
held that:

[1] failure of company's complaint to use term "due process"
did not foreclose Due Process Clause as source of company's
claim that Act was void for vagueness;

[2] subsection of Act providing that "cemetery shall not
be established or enlarged in any municipality without first
obtaining the consent of the municipality by resolution" could
not be read to incorporate words of limitation expressed in
different subsection;

[3] subsection did not borrow limiting principles from
New Jersey's Municipal Land Use Law (MLUL) to restrain
municipality's exercise of discretion;

[4] subsection was facially void for vagueness under Due
Process Clause;

[5] subsection was not severable from remainder of statute;
and

[6] remanding to New Jersey Cemetery Board was not proper
remedy.

Motion granted; cross-motion denied.

**Procedural Posture(s):** Motion for Summary Judgment.

West Headnotes (34)

**[1]**   **Federal Civil Procedure** 🔑 In general;
injury or interest

**Federal Civil Procedure** 🔑 Causation;
redressability

To establish Article III standing, a plaintiff needs
to demonstrate injury in fact, causation, and
redressability. U.S. Const. art. 3, § 2, cl. 1.

**[2]**   **Federal Civil Procedure** 🔑 In general;
injury or interest

Where a plaintiff challenges multiple provisions
in a statute, it must meet the Article III standing
requirements for each provision. U.S. Const. art.
3, § 2, cl. 1.

**[3]**   **Constitutional Law** 🔑 Certainty and
definiteness; vagueness

The "vagueness doctrine," which provides that
a statute violates the Due Process Clause of
the Fourteenth Amendment if its prohibitions
are not clearly defined, addresses at least two
connected but discrete due-process concerns:
first, that regulated parties should know what is
required of them so they may act accordingly;
second, precision and guidance are necessary
so that those enforcing the law do not act in
an arbitrary or discriminatory way. U.S. Const.
Amend. 14.

**[4]**   **Constitutional Law** 🔑 Certainty and
definiteness; vagueness

If a state or federal statute, or local ordinance,
fails to give a person of ordinary intelligence
fair notice of what is prohibited or required, then

Rosedale and Rosehill Cemetery Association v. Township..., --- F.Supp.3d ---- (2020)

2020 WL 7768457

it is void for vagueness under the Due Process Clause. U.S. Const. Amend. 14.

**[5]**    **Constitutional Law** 🔑 Certainty and definiteness; vagueness

If a state or federal statute is so standardless that it authorizes or encourages seriously discriminatory enforcement or arbitrary decision-making, then it is void for vagueness under the Due Process Clause. U.S. Const. Amend. 14.

**[6]**    **Constitutional Law** 🔑 Particular claims

Failure of non-profit cemetery company's complaint to use term "due process" when alleging that New Jersey Cemetery Act failed to circumscribe in any meaningful way township's discretion to approve or deny application to open cemetery did not foreclose Due Process Clause as source of company's claim that Act was void for vagueness, where vagueness was undeniably limn of company's claim, and vagueness quintessentially underlaid due process, and thus facts as alleged allowed due-process analysis, regardless of provision in Constitution to which company traced the wrong.

U.S. Const. Amend. 14; 🚩 N.J. Stat. Ann. § 45:27-25(a).

**[7]**    **Federal Civil Procedure** 🔑 Claim for relief in general

A complaint is not intended to be exhaustive, need not name every source of law under which a plaintiff may be harmed, and will not be penalized for failing to invoke magic legal words.

**[8]**    **Federal Civil Procedure** 🔑 Claim for relief in general

A complaint need only limn the claim; details of both fact and law come later, in other documents.

**[9]**    **Constitutional Law** 🔑 Certainty and definiteness; vagueness

A vague law fails under the Due Process Clause because it does not provide the customary protection of fair notice to those who must follow it, leaving the line between what is lawful and unlawful left to conjecture, and because it enables enforcement officials to shape the law's contours as they see fit; this invites arbitrary power while keeping people in the dark about what the law demands, and permits governments to condemn all that they personally disapprove and for no better reason than that they disapprove it. U.S. Const. Amend. 14.

**[10]**    **Constitutional Law** 🔑 Encroachment on Legislature

Because New Jersey courts view delegations of legislative authority with a liberal eye, they will not intervene unless the legislative decision is palpably arbitrary.

**[11]**    **States** 🔑 Powers Reserved to States

A state legislature's choice to delegate its power, as well as the extent of the delegation, is not a federal matter, and the legality of those decisions is a question for the state itself.

**[12]**    **Cemeteries** 🔑 Power to establish and regulate

Under New Jersey law, the state legislature plainly has the power to delegate to municipalities the authority to approve the establishment or expansion of cemeteries.

**[13]**    **Constitutional Law** 🔑 Due Process

By its terms, the Fourteenth Amendment subjects state actions to the Due Process Clause, regardless of whether they are permissible exercises of state power under state law; that is the very purpose of the Amendment. U.S. Const. Amend. 14.

**[14]**    **Constitutional Law**  🔗  Economic rights and regulation

**Constitutional Law**  🔗  Trade or Business

Under the Due Process Clause, economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action, and because the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process. U.S. Const. Amend. 14.

**[15]**    **Constitutional Law**  🔗  Trade or Business

In the field of regulatory statutes governing business activities, where the acts limited are in a narrow category, greater leeway is allowed under due-process vagueness analysis. U.S. Const. Amend. 14.

**[16]**    **Cemeteries**  🔗  Statutory and municipal regulations

**Constitutional Law**  🔗  Funeral directors, cemeteries, and related occupations

Subsection of New Jersey Cemetery Act providing that "cemetery shall not be established or enlarged in any municipality without first obtaining the consent of the municipality by resolution" could not be read to incorporate words of limitation expressed in different subsection concerning "public need for additional cemetery lands[,]" for purposes of non-profit cemetery company's facial challenge alleging that Act was void for vagueness under Due Process Clause, where first subsection did not reference second subsection's limiting principles, and second subsection explicitly mentioned other provisions of Act but did not reference first subsection. U.S. Const. Amend. 14; 🚩 N.J. Stat. Ann. §§ 45:27-25(a), 45:27-25(d).

**[17]**    **Constitutional Law**  🔗  Facial invalidity

A facial challenge seeks to invalidate a statute itself, rather than its application to a particular party under a particular set of facts.

**[18]**    **Constitutional Law**  🔗  Facial invalidity

A facial challenge to a statute is the most difficult challenge to mount successfully, because the plaintiff must establish that no set of circumstances exists under which the statute would be valid; in other words, the plaintiff must show that the statute is unconstitutional in all of its applications.

**[19]**    **Injunction**  🔗  On ground of invalidity

**Statutes**  🔗  Effect of Partial Invalidity; Severability

The remedy for a successful facial challenge to a statute is to strike down the unconstitutional law or provision, whereas for an as-applied challenge the remedy is an injunction against enforcement as to that plaintiff only.

**[20]**    **Constitutional Law**  🔗  Statutes in general

As to the starting point for a vagueness challenge to a statute, the court must look to the law as a whole to determine whether a person of ordinary intelligence may be able to ascertain the meaning of the challenged terms.

**[21]**    **Constitutional Law**  🔗  Certainty and definiteness; vagueness

Some ambiguities will not render a statute impermissibly vague, in violation of the Due Process Clause. U.S. Const. Amend. 14.

**[22]**    **Cemeteries**  🔗  Statutory and municipal regulations

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 450 of 535
Rosedale and Rosehill Cemetery Association v. Township..., --- F.Supp.3d ---- (2020)
PageID: 32397

2020 WL 7768457

**Constitutional Law**  ☛ Funeral directors, cemeteries, and related occupations

Subsection of New Jersey Cemetery Act providing that "cemetery shall not be established or enlarged in any municipality without first obtaining the consent of the municipality by resolution" did not borrow limiting principles from New Jersey's Municipal Land Use Law (MLUL) to restrain municipality's exercise of discretion, for purposes of non-profit cemetery company's facial challenge alleging that Act was void for vagueness under Due Process Clause, where MLUL was land-use statute which restricted municipality's zoning authority but was silent as to exercise of other municipal powers, MLUL's limiting principles were not referenced in Cemetery Act, and even if MLUL standards applied, land company sought to establish as cemetery was properly zoned for cemetery use when company purchased it. U.S. Const. Amend. 14; N.J. Stat. Ann. §§ 40:55D-1, 🚩 45:27-25(a).

[23]   **Zoning and Planning**  ☛ Conformity to enabling statute

Under New Jersey law, municipalities must exercise their authority to develop land in strict conformity with the Municipal Land Use Law (MLUL). N.J. Stat. Ann. § 40:55D-1.

[24]   **Zoning and Planning**  ☛ Conformity to enabling statute

New Jersey's Municipal Land Use Law (MLUL) is a land-use statute, which restricts a municipality's zoning authority—i.e., what sort of development should happen where, and how townships should draw their zoning ordinances in the first instance. N.J. Stat. Ann. § 40:55D-1.

[25]   **Cemeteries**  ☛ Statutory and municipal regulations

**Constitutional Law**  ☛ Funeral directors, cemeteries, and related occupations

Subsection of New Jersey Cemetery Act providing that "cemetery shall not be established or enlarged in any municipality without first obtaining the consent of the municipality by resolution" was facially void for vagueness under Due Process Clause, where subsection did not provide statutory definition of consent, narrow contexts in which consent could or could not be granted, or provide any signal whatsoever as to circumstances under which municipality would approve new cemetery apart from waiver, nor did subsection incorporate by reference, or by implication, common industry word that applicants could use to better understand what was required in order to secure consent. U.S. Const. Amend. 14; 🚩 N.J. Stat. Ann. § 45:27-25(a).

[26]   **Statutes**  ☛ Property

Subsection of New Jersey Cemetery Act which was facially void for vagueness under Due Process Clause, specifically, subsection providing that "cemetery shall not be established or enlarged in any municipality without first obtaining the consent of the municipality by resolution[,]" was not severable from remainder of statute, where severing subsection would result in substantial narrowing of circumstances in which municipalities could consent to new cemeteries despite legislature's repeated and consistent efforts over course of 150 years to broaden consent power to cover all new cemeteries, and thus severing subsection would defeat principal legislative objective of statute as a whole. U.S. Const. Amend. 14; 🚩 N.J. Stat. Ann. § 45:27-25(a).

[27]   **Federal Courts**  ☛ State constitutions, statutes, regulations, and ordinances

Whether a state statute is severable is a question of state law.

[28]   **Statutes**  ☛ Effect of Partial Invalidity; Severability

New Jersey courts determining whether a statute is severable ascertain legislative intent by asking whether the objectionable feature of the statute can be exercised without substantial impairment of the principal object of the statute.

**[29]    Statutes**  🔑  **Effect of Partial Invalidity; Severability**

Under New Jersey law, severance of an invalid portion of a statute is warranted where there is such a manifest independence of the parts as to clearly indicate a legislative intention that the constitutional insufficiency of the one part would not render the remainder inoperative, such as when the remaining portion of the statute forms a complete act within itself.

**[30]    Statutes**  🔑  **Effect of Partial Invalidity; Severability**

Under New Jersey law, judicial surgery to sever an invalid portion of a law depends, at all times, on whether the Legislature would have wanted the statute to survive without the unconstitutional provision.

**[31]    Statutes**  🔑  **Effect of Partial Invalidity; Severability**

Under New Jersey law concerning severance of unconstitutional statutory provisions, it is not enough that the act be severable in fact; its severability in the event of partial invalidity must also have been within the legislative intention.

**[32]    Cemeteries**  🔑  **Power to establish and regulate**

Under the New Jersey Cemetery Act, which preempts the field of cemetery regulation, municipalities have little power to legislate existing cemeteries, but the residuum of power they retain on the act is to exclude new cemeteries within their boundaries. 🚩 **N.J. Stat. Ann. § 45:27-25 et seq.**

**[33]    Statutes**  🔑  **Effect of severability clause**

The presence or absence of a severability clause in a state statute is not dispositive in determining whether an unconstitutional provision is severable.

**[34]    Cemeteries**  🔑  **Statutory and municipal regulations**

**Civil Rights**  🔑  **Judgment and relief in general**

Remanding to New Jersey Cemetery Board to correct subsection of New Jersey Cemetery Act that was facially void for vagueness under Due Process Clause, specifically, subsection providing that "cemetery shall not be established or enlarged in any municipality without first obtaining the consent of the municipality by resolution[,]" was not proper remedy; it was not clear that United States District Court had authority to remand to Cemetery Board with order compelling further rulemaking, as issue was not Court's power to intervene to remedy subsection, but nature and degree of requested intervention, which raised sensitive federalism concerns, and in any event, Cemetery Board likely lacked power to make rules regarding definition of consent. **U.S. Const. Amend. 14**;

**N.J. Stat. Ann. §§ 45:27-4(a)**, 🚩 **45:27-25(a).**

**West Codenotes**

**Held Unconstitutional**

🚩 **N.J. Stat. Ann. § 45:27-25(a)**

**Held Unconstitutional as Not Severable**

🚩 **N.J. Stat. Ann. §§ 45:27-25(b), 45:27-25(c),** 🚩 **45:27-25(d), 45:27-25(e)**

**Attorneys and Law Firms**

**Megan Knowlton Balne**, **Richard Milan Hluchan**, Hyland Levine LLP, Marlton, NJ, **Robert Richard Stanicki**, Mackevich, Burke & Stanicki, Clark, NJ, for Plaintiff.

Rosedale and Rosehill Cemetery Association v. Township..., --- F.Supp.3d ---- (2020)
2020 WL 7768457

Richard P. Cushing, Gebhardt & Kiefer, PC, Clinton, NJ, for
Defendants.

Wendy Leggett Faulk, Office of the Attorney General State of
New Jersey, Newark, NJ, for Intervenor.

Gurbir S. Grewal, Trenton, NJ, pro se.

## OPINION

WOLFSON, Chief Judge:

**\*1**  This matter concerns the constitutionality of the New
Jersey Cemetery Act ("the Cemetery Act"), which, *inter
alia*, empowers municipalities to consent to new cemeteries
within their borders. *See* 🚩 N.J.S.A. § 45:27-25, *et seq.*
Rosedale and Rosehill Cemetery Association ("Plaintiff"
or "Rosedale"), a non-profit cemetery company, applied to
the Township of Readington and its Township Committee
(collectively, "Defendants" or "the Township") to open a
cemetery. After extensive negotiations with the Planning
Board, and four days of hearings over the course of a year,
the Township denied Rosedale's application pursuant to its
authority under 🚩 N.J.S.A. § 45:27-25(a).

Presently before the Court are the parties' Motions for
Partial Summary Judgment on Counts Three through Five.
Rosedale contends that two provisions of the Cemetery Act,
🚩 N.J.S.A. § 45:27-25(a) and 🚩 N.J.S.A. § 45:27-25(d),
violate the Due Process Clause, *see* U.S. CONST. AMEND.
XIV, because they give the Township unfettered discretion
to establish cemeteries. In its cross-motion, the Township
contends that these provisions are a permissible delegation of
state legislative power and that it properly denied Rosedale's
application. The State of New Jersey has intervened to
defend the constitutionality of the Cemetery Act on similar
grounds as the Township. For the following reasons, I
**GRANT** Rosedale's partial summary judgment motion and
**DENY** the Township's cross-motion as follows: subsection
(a) of 🚩 N.J.S.A. § 45:27-25 of the Cemetery Act is
unconstitutionally vague under the Due Process Clause
of Fourteenth Amendment, and because subsection (a)
cannot be severed from the rest of the provisions of 🚩 §
45:27-25 (b)-(d), the entire 🚩 N.J.S.A. § 45:27-25 is declared
unconstitutional. However, this Order shall be stayed for a

period of 30 days before taking effect, to provide the New
Jersey Legislature an opportunity to amend the statute.

## I. BACKGROUND AND PROCEDURAL HISTORY

Rosedale has operated a large cemetery in Linden, New
Jersey, for over a century. *See* Pl. Br., Ex. 5 (Hearing
Transcript), at 9:6-12; Pl. SUMF, ¶ 4. Anticipating that it
would soon run out of interment space, Rosedale sought to
open a new cemetery nearby. *See* Pl. SUMF, ¶ 5. After a
lengthy search for a suitable location, it contracted to purchase
180 acres in Readington Township in 2015 ("Block 12"). *Id.*
¶¶ 6-7. Among other factors, Block 12 was already zoned
for cemetery use. *Id.* ¶¶ 12-13. Beginning on February 9,
2017, Rosedale dedicated several months to negotiating a site
application with the Township's Planning Board. *Id.* ¶¶ 8,
10-13. Despite Rosedale's investment of time and resources
in this process, [1] and despite seemingly having no obligation
to wait, on September 17, 2017, the Board declined to hear
Rosedale's final plan until the Township consented to the
cemetery. *Id.* ¶ 13; Pl. Br., Ex. 9 (Letter from Planning
Board Secretary). Rosedale submitted a request for consent
on February 20, 2018, *see* Pl. SUMF, ¶ 14, and the Township
held public hearings on May 21, 2018, September 17, 2018,
October 15, 2018, and May 6, 2019. *Id.* ¶ 15; Pl. Br., Exs. 3-6
(Hearing Transcripts).

### A. The Hearings
**\*2**  During the hearings, Rosedale primarily contested the
constitutionality of 🚩 N.J.S.A. §§ 45:27-25(a) and (d). *See*
Pl. Br., Ex. 3 (Hearing Transcript), at 9:24-13:23; Ex. 6
(Hearing Transcript), at 87:16-88:19. The statute provides in
full:

a. A cemetery shall not be established or enlarged in any
municipality without first obtaining the consent of the
municipality by resolution.

b. No more than five cemeteries may be established in any
one municipality, and not more than 3% of the area of any
municipality shall be devoted to cemetery purposes.

c. A cemetery shall not be established or expanded to
exceed 250 acres at any one location.

d. The governing body of a municipality, by resolution,
may waive the limitations of subsection b. or c. of this
section if it finds that there is a public need for additional

cemetery lands and that it is in the public interest to waive them.

e. A cemetery company shall not dedicate additional land to cemetery purposes without board approval.

🚩 N.J.S.A. § 45:27-25. Specifically, Rosedale argued that subsection (a), the consent provision, is unconstitutional because it fails to "specify[ ] any standards for such consent," Pl. Br., at 7, and that subsection (d), the waiver provision, likewise lacks a "sufficiently definite standard." *Id.*

Further, Rosedale argued that it did not need a waiver under subsection (d) because, based on its narrow reading of the Cemetery Act, there are not five cemeteries in the Township—and even if it did need a waiver, "there was a local and regional public need for an additional cemetery." *See* Pl. SUMF, ¶¶ 17-18, 21, 23. Rosedale presented expert testimony to this end, which showed that two cemeteries in the Township conduced just "one burial per month" even though "approximately 109 residents" died annually, *see* Pl. Br., Ex. 5 (Hearing Transcript), at 40:25-41:19; Ex. 15 (Newell Cemetery Report); Ex. 16 (Rural Hills Cemetery Report), no new cemeteries had opened in the region in decades, *id.*, Ex. 5 (Hearing Transcript), at 31:16-19, and its proposed cemetery was "designed to serve a wide range of interment-related needs, including burial in a memorial park, indoor and outdoor niches, indoor crypts, mausoleums, a veterans area, a scattering garden, and green burial options." [2] *Id.*; Ex. 10 (Site Plan).

Rosedale also made extensive concessions to the Township over the course of the hearings. *See id.*, Ex. 3 (Hearing Transcript), at 22:13-23, 35:2-22. For example, Rosedale agreed to limit the size of the burial area to 38 acres in perpetuity; establish a designated burial area for veterans, the only one within 50 miles; screen all upright headstones from public view with buffers and setbacks; provide 73 acres to the Township for public space; implement a grass-mowing program to protect bird habitats; not to use herbicides, pesticides, or fertilizers in its operation; not to build a crematorium; and restore rather than raze preexisting buildings to preserve the agricultural character of the property. *Id.*, Ex. 3 (Hearing Transcript), at 20:19-20, 37:8-14, 56:2-23; Ex. 5 (Hearing Transcript), at 38:22-39:2; Ex. 10 (Site Plan); Ex. 14 (Letter Requesting Consent). In all, Rosedale estimated that it would perform three to four burials per day on Block 12 and 50,000 over the lifetime of the

cemetery. *See* Pl. Br., Ex. 5 (Hearing Transcript), at 26:14-16, 65:22-66:18.

*B. The Township's Decision*

**\*3** On May 6, 2019, in its final hearing, the Township denied Rosedale's application. One Commissioner suggested that "if this were an application from a church ... [it] would be a different story," *see* Pl. SUMF, ¶ 27; Pl. Br., Ex. 6 (Hearing Transcript), at 119:18-21, a sentiment with which the Mayor, who sits on the Committee, seemed to agree. *Id.* ¶ 28; Pl. Br., Ex. 6 (Hearing Transcript), at 120:16-22, 121:16-24. Others indicated a preference for farmland and a desire to avoid "ever-increasing traffic," raised concerns about "commercial business enterprise[s]" such as Rosedale even though Rosedale is a non-profit, yet objected to recouping "no tax benefit" at the same time, and argued that a cemetery is an inappropriate land use despite the fact that the Township's zoning ordinance allowed such a use at the time. *See, e.g.*, SUMF, ¶ 27; Ex. 6 (Hearing Transcript), at 119:3-25, 120:7-8, 121:13-15, 122:8-14, 122:21-23. In a subsequent action —adopted on September 4, 2019, after Rosedale filed suit in state court—the Township asserted that 🚩 N.J.S.A. §§ 45:27-25(a) and (d) are constitutional on their face and as applied to Rosedale, there are twenty-one cemeteries in Readington because the Cemetery Act broadly defines "cemetery," thus triggering subsection (d), and Rosedale is not entitled to a waiver because it "failed to demonstrate that ... [another] cemetery would satisfy a public need or be in the public interest." *See* Def. Br., Ex. 7A (Resolution Denying Rosedale's Application). The Resolution ultimately denied "Plaintiff's request for consent to establish a cemetery within its borders pursuant to 🚩 N.J.S.A. 45:27-25(a) and [ ] Plaintiff's request for a waiver pursuant to 🚩 N.J.S.A. 45:27-25(d)." *See id.*; Def. SUMF, ¶ 12.

*C. The Parties' Present Dispute*

Rosedale sued the Township in the Superior Court of New Jersey, Law Division, Hunterdon County, on June 19, 2019. *See* Compl., ¶ 44. The Township removed the matter to federal court on August 7, 2019. *See* 📄 28 U.S.C. §§ 1334, 📄 1441. Rosedale then filed an eighteen-count supplemental Complaint on October 31, 2019. Because the parties agreed to litigate Plaintiff's claims in a bifurcated manner, their present motions concern only the validity of two provisions in the Cemetery Act: 🚩 N.J.S.A. § 45:27-25(a) and 🚩 N.J.S.A.

2020 WL 7768457

§ 45:27-25(d). Count Three asserts that ⚑ N.J.S.A. § 45:27-25(a) is both unconstitutional on its face and as applied, *see* Compl., ¶¶ 60-63, while Count Four asserts the same with respect to ⚑ N.J.S.A. § 45:27-25(d). *Id.* ¶¶ 65-67. Count Four further asserts that, even if subsection (d) is constitutional, the Township improperly denied Rosedale's waiver. *Id.* Additionally, Count Five asserts that Rosedale does not need a waiver under subsection (d) because of the way the Cemetery Act defines the word "cemetery." The parties agree to hold litigating all remaining claims pending the outcome of the motions here. [3] *See* Def. Br., Ex. 7G (Joint Scheduling Order).

### D. The Parties' Present Motions

Rosedale argues in its summary judgment motion that ⚑ N.J.S.A. § 45:27-25(a) is unconstitutional because "it provides no standard whatsoever" to guide the Township's decision whether to consent to a new cemetery, thereby violating due process. Pl. Br., at 1. Rosedale also argues that, based on a narrow reading of the Cemetery Act, only cemeteries with a Certificate of Authority from the State— not "*every* area containing human remains," such as religious cemeteries, churchyards, and historic family gravesites— properly count toward the five-cemetery limit in ⚑ N.J.S.A. § 45:27-25(b), and "any attempt [by the Township] to identify qualifying cemeteries must exclude ... [these burial grounds]." *Id.* at 2. So construed, there are two—not over twenty—cemeteries in Readington, *id.*, which "eliminate[s] the need for a waiver." *Id.* Finally, even if there are more than five cemeteries in Readington, subsection (d)'s waiver provision, like subsection (a), "fails to provide a sufficiently clear municipal decision-making standard in the manner due process requires." *Id.* at 3. Thus, Rosedale concludes, it is "free of the obligation to obtain the 'consent' of the Township's governing body ... and ... to pursue its application for site plan approval" with the Planning Board. *Id.* at 1-2.

**\*4** The Township challenges each of these points in its cross-motion. First, because the legislature has the authority under state law to delegate the consent power to municipalities, there is no due process issue. The State of New Jersey advances a similar argument. *See* St. Br., at 14-17. Assuming due process applies, "although subsection (a) does not provide explicit standards for municipal consent, it is constitutional when read in conjunction with the remaining provisions," namely, "a 'public need' standard [from subsection (d)] is

implied in subsection (a)." [4] Def. Br., at 4-5. And even if subsection (a) is unconstitutionally vague, rather than strike it down, the Court should order the Cemetery Board to issue regulations with a more detailed standard, postpone the effective date of the decision to give the legislature time to modify the statute, or sever it from the remainder of ⚑ N.J.S.A. § 45:27-25. *Id.* at 5. Second, the Township argues that the Cemetery Act "applies to all" places containing human remains, not merely to "cemeteries with certificates of authority" from the State, such that there are many more than five in Readington, and Rosedale needs a waiver. [5] Def. Br., at 3; Pl. Br., at 8. Third, the "public interest" requirement in the waiver provision is a "constitutionally sufficient" standard for exercising discretion under subsection (d), which Rosedale has not met in this case. *Id.* at 4.

### E. The Scope of This Opinion

**[1]** **[2]** Before proceeding to discuss the substance of the parties' motions, I note that this Opinion only addresses the constitutionality of ⚑ N.J.S.A. § 45:27-25(a) in Count Three. [6] Although Plaintiff argues in passing that it also brings an as-applied vagueness challenge, *see* Pl. Br., at 1 ("[Subsection (a)] is therefore void both on its face and as applied."), and the Township responds that such a challenge must fail because there is insufficient evidence of discriminatory enforcement, *see* 📗 *United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010) ("An as-applied attack ... does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right."), I decline to decide that issue, because I find subsection (a) to be facially unconstitutional. [7] Further, because I find that subsection (a) is not severable from ⚑ N.J.S.A. § 45:27-25 on the whole, which dooms the remaining provisions in that statute, I need not decide whether subsection (d) is a standardless delegation of power or whether the Cemetery Act narrowly defines the word "cemetery" such that Rosedale does not need a waiver at all.

### II. LEGAL STANDARD

**\*5** Under Federal Rule of Civil Procedure 56(a), summary judgment shall be granted if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* A dispute is "genuine" when "a reasonable jury could return a

verdict for the nonmoving party" based on the evidence in the record. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute is "material" when it "might affect the outcome of the suit under the governing law." *Id.* In deciding a summary judgment motion, the court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## III. DISCUSSION

A. *The Constitutionality of the Municipal Consent Provision in Subsection (a)*

The gravamen of Plaintiff's constitutional challenge is that a standardless delegation by a legislature to a municipality—such as the one in N.J.S.A. § 45:27-25(a)—violates the Fourteenth Amendment's Due Process Clause. *See* Pl. Br., at 11-23. In particular, because subsection (a) does not define the circumstances under which Defendants may withhold consent, or otherwise provide guidelines as to their exercise of discretion, the provision is void for vagueness. *See id.* at 11-12 ("On its face ... [subsection (a)] supplies no standard or principle."). Defendants disagree, contending, first, that I should not decide this case under due process, a position the State advances in even stronger terms. *See* St. Br., at 14-17. Assuming due process applies, Defendants contend that the vagueness doctrine does not invalidate subsection (a) because it is a civil provision, which is entitled to a greater degree of imprecision. *See* Def. Reply Br., at 7. Finally, Defendants argue that the context of the statute, mainly subsection (d), implies a standard in any event. The State adds that subsection (a) borrows a standard from the Municipal Land Use Law to restrain the Township's discretion, and that it is nevertheless constitutional because "for more than 100 years" it has not been "challenged." *See* St. Br., at 15.

**[3]** The Fourteenth Amendment provides that no state "shall ... deprive any person of life, liberty, or property, without due process of law." U.S. CONST. AMEND. XIV. The Supreme Court has invoked the Due Process Clause to void a statute if it is excessively vague, *i.e.*, "its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). The vagueness doctrine "addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253, 132 S.Ct. 2307, 183 L.Ed.2d 234 (2012); *see also Grayned*, 408 U.S. at 108-09, 92 S.Ct. 2294 (stating that vague laws "offend several important values" including "fair notice" and "explicit standards for those who apply them," which are the "basic principle of due process").

**[4]** **[5]** Hence, if a state or federal statute, or local ordinance, fails to give "a person of ordinary intelligence fair notice" of what is prohibited or required, then it is void for vagueness. *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162, 167, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972) (invalidating a local vagrancy ordinance on its face in part because it was "so all-inclusive and generalized" as to enable "men to be caught, ... although not chargeable with any particular offense"); *see also United States v. Harriss*, 347 U.S. 612, 617, 74 S.Ct. 808, 98 L.Ed. 989 (1954) (describing "[t]he constitutional requirement of definiteness" in the context of fair notice); *Holder v. Humanitarian Law Project*, 561 U.S. 1, 20-22, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010) (analyzing the "fair notice" prong of the vagueness doctrine in an as-applied challenge to a federal statute). The same is true if the statute is "so standardless that it authorizes or encourages seriously discriminatory enforcement" or arbitrary decision-making. *Skilling v. United States*, 561 U.S. 358, 416, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010) (analyzing the "arbitrariness" prong of the vagueness doctrine in a facial challenge to a federal statute) (quotations omitted); *Papachristou*, 405 U.S. at 168-170, 92 S.Ct. 839 (invalidating the local ordinance in part because it gave officials "unfettered discretion"); *see also United States v. Williams*, 553 U.S. 285, 304, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008) (explaining the vagueness doctrine in the context of due process); *Sessions v. Dimaya*, ––– U.S. ––––, 138 S. Ct. 1204, 1216, 200 L.Ed.2d 549 (2018) (stressing that the purpose of the vagueness doctrine is due process, and invalidating a federal statute on its face for "produc[ing] more unpredictability and arbitrariness than the Due Process Clause tolerates").

i. New Jersey's Non-Delegation
Doctrine and Federal Due Process

**\*6**  **[6]**  **[7]**  **[8]** As a preliminary matter, Defendants argue that I should decide the constitutionality of subsection (a) under New Jersey's non-delegation doctrine because Plaintiff's Complaint fails to specifically plead due process. *See* Def. Reply Br., at 5-7. I reject this argument. Consistent with longstanding notice-pleading rules, a complaint is not intended to be exhaustive, need not name every source of law under which a plaintiff may be harmed, and will not be penalized for failing to invoke magic legal words. *See Weston v. Pennsylvania*, 251 F.3d 420, 429 (3d Cir. 2001) ("Complaints need not plead law or match facts to every element of a legal theory.") (quotations omitted). Instead, it need only "limn[ ] the claim; details of both fact and law come later, in other documents." *Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir. 1992); *N.A.A.C.P. v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 292 (7th Cir. 1992) ("A complaint should limn the grievance and demand relief. It need not identify the law on which the claim rests."); *see also Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11, 135 S.Ct. 346, 190 L.Ed.2d 309 (2014) ("Federal pleading rules call for 'a short and plain statement of the claim showing that the pleader is entitled to relief,' ... [T]hey do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted.") (quoting Fed. R. Civ. P. 8(a)(2)).

Plaintiff states in Count Three that subsection (a) fails to circumscribe the Township's discretion in any meaningful way and that the legislature must prescribe standards to govern the power it delegates, or else it impermissibly confers "unfettered discretion." *See* Compl., ¶¶ 60-63. Although the Complaint does not use the term "due process" here, the absence of those words does not foreclose that clause as the source of Plaintiff's constitutional claim. *See Bartholet*, 953 F.2d at 1078 ("Instead of asking whether the complaint points to the appropriate statute, a court should ask whether relief is possible under any set of facts that could be established consistent with the allegations."). Vagueness is undeniably the "limn" of Count Three, and vagueness quintessentially underlies due process; thus, the facts here allow a due process analysis, regardless of the provision in the constitution to which Plaintiff traces the wrong.

In asking this Court to pass on Plaintiff's vagueness claim without addressing due process, Defendants ignore their inherent relationship, whether it be civil or criminal, which the Supreme Court has "repeatedly pointed out in [its] decisions." *Cramp v. Board of Public Instruction of Orange County, Fla.*, 368 U.S. 278, 279, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961); *Lanzetta v. State of New Jersey*, 306 U.S. 451, 453, 59 S.Ct. 618, 83 L.Ed. 888 (1939) ("No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes."); *see also Connally v. General Constr. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926) (explaining that "sufficiently explicit" statutory terms "is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law"); *Jordan v. De George*, 341 U.S. 223, 231-32, 71 S.Ct. 703, 95 L.Ed. 886 (1951) ("Despite the fact that this is not a criminal statute, we shall nevertheless examine the application of the vagueness doctrine to this case."); *Kolender v. Lawson*, 461 U.S. 352, 357-58, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983); *Giaccio v. Pennsylvania*, 382 U.S. 399, 402, 86 S.Ct. 518, 15 L.Ed.2d 447 (1966); *Coates v. City of Cincinnati*, 402 U.S. 611, 613-14, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971); *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497-98, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982); *Papachristou*, 405 U.S. at 162, 170-71, 92 S.Ct. 839; *Humanitarian Law Project*, 561 U.S. at 20, 130 S.Ct. 2705; *Skilling*, 561 U.S. at 412-13, 130 S.Ct. 2896; *Fox*, 567 U.S. at 253, 132 S.Ct. 2307; *Williams*, 553 U.S. at 304, 128 S.Ct. 1830; *Dimaya*, 138 S. Ct. at 1212-1216; *Grayned*, 408 U.S. at 108-109, 92 S.Ct. 2294 (collecting cases).

The vagueness doctrine has *always* been "an outgrowth ... of the Due Process clause." *Williams*, 553 U.S. at 304, 128 S.Ct. 1830. For example, the earliest reported federal vagueness case, *The Enterprise*, 8 F. Cas. 732 (C.C.D.N.Y. 1810), spoke unmistakably in terms of fair notice: if "ignorance [of what the law requires] be the consequence of an ambiguous or obscure phraseology, some indulgence is due to it." *Id.* at 734. In *United States v. Sharp*, 27 F. Cas. 1041 (C.C.D. Pa. 1815), decided just a few years later, the court emphasized both fair notice and arbitrariness: "all

men, subject to their penalties, ... [must] know what acts it is their duty to avoid," and there is a "natural repugnance, to selecting from this mass of definitions, one, which may fix a crime ... when, by making a different selection, it would be no crime at all." *Id.* at 1043. Early state cases took a similar tack. *See, e.g., McConvill v. Mayor and Aldermen of Jersey City*, 39 N.J.L. 38, 42 (1876) (explaining that laws "ought to be expressed in such a manner as that [their] meaning may be unambiguous, and in such language as may be readily understood by those upon whom [they are] to operate"). And in a series of cases from the turn of the twentieth century, the Supreme Court invalidated various laws as "contravening the due process clause of the Fifth Amendment ... because [they] required that the transactions named should conform to a rule or standard which was so vague and indefinite that no one could know what it was." *A.B. Small Co. v. American Sugar Refining Co.*, 267 U.S. 233, 238-39, 45 S.Ct. 295, 69 L.Ed. 589 (1925); *United States v. Cohen Grocery Co.*, 255 U.S. 81, 90-92, 41 S.Ct. 298, 65 L.Ed. 516 (1921) (collecting cases); *Weeds Inc. v. United States*, 255 U. S. 109, 112, 41 S.Ct. 306, 65 L.Ed. 537 (1921); *cf. Int'l Harvester Co. of America v. Com. of Kentucky*, 234 U.S. 216, 221-22, 34 S.Ct. 853, 58 L.Ed. 1284 (1914) (considering whether a "law as construed offers no standard of conduct that it is possible to know," and whether "a combination invited by the law is required to guess at its peril what its product would have sold for," and holding that it does not because it merely "throws upon men the risk of rightly estimating a matter of degree").

 **\*7** Defendants seem to advocate for Justice Thomas' minority position in *Dimaya* that, if the vagueness doctrine has any roots in the Constitution at all, it is in the separation of powers. *See Dimaya*, 138 S. Ct. at 1248 (Thomas, J., dissenting) ("[P]erhaps the vagueness doctrine is really a way to enforce the separation of powers—specifically, the doctrine of nondelegation."); *id.* at 1224 (Gorsuch, J., concurring) ("[N]ow again today Justice Thomas has questioned whether our vagueness doctrine can fairly claim roots in the Constitution as originally understood."). It is clear why Defendants would take such a position. In Justice Thomas' view, a federal court could not rely on the principles of fair notice or arbitrariness embodied in the Due Process Clause to invalidate a state law or local ordinance—rather, only on the state's non-delegation doctrine—because separation of powers is a federal issue.

 **[9]** Yet, the Supreme Court has rejected this distinction. A vague law fails because it does not provide the customary protection of fair notice to those who must follow it, *see Connally*, 269 U.S. at 391, 46 S.Ct. 126, leaving the "line between what is lawful and unlawful ... left to conjecture," *id.* at 393, 46 S.Ct. 126, and because it enables enforcement officials to "shap[e]" the law's "contours" as they see fit. *Dimaya*, 138 S. Ct. at 1228 (Gorsuch, J., concurring). This "invite[s] arbitrary power" while keeping "people in the dark about what the law demands," *id.* at 1223-24, and permits governments to "condem[n] all that [they] personally disapprove and for no better reason than that [they] disapprove it." *Jordan*, 341 U.S. at 242, 71 S.Ct. 703 (Jackson, J., dissenting). Regardless of whether Plaintiff expressly pleads the Due Process Clause in its Complaint, then, I reject Defendants' position that Plaintiff's vagueness claim does not support such a challenge.

 **[10]** Defendants next cite various cases concerning the permissibility of legislative delegations under state law, drawing the conclusion that "a federal due process claim is not proper in this context" and that the division of power among the branches of state government is up to the states. *See* Def. Reply Br., at 6-7. The State of New Jersey makes a similar argument, starting from the premise that "[t]he exercise of legislative judgment [to delegate a state power] is not subject to judicial superintendence unless it is plainly beyond the realm of the police power or palpably unreasonable." St. Br., at 15. This is entirely uncontroversial. In New Jersey, "[i]t is well-established that within limits the legislature may delegate its authority." *Mount Laurel Twp. v. Dep't of Public Advocate*, 83 N.J. 522, 532, 416 A.2d 886 (1980). Because New Jersey courts view delegations "with a liberal eye," *Montgomery Nat'l Bank v. Clarke*, 703 F. Supp. 1161, 1168 (D.N.J. 1989), *aff'd*, 882 F.2d 87 (3d Cir. 1989), they will not "intervene unless the legislative decision is palpably arbitrary." *Shelton College v. State Bd. of Educ.*, 48 N.J. 501, 518, 226 A.2d 612 (N.J. 1967).

 **[11]** **[12]** It is also well-established that a state legislature's choice to delegate its power, as well as the extent of the delegation, is not a federal matter. The legality of those decisions is a "question for the state itself." *Highland Farms Dairy v. Agnew*, 300 U.S. 608, 612, 57 S.Ct. 549, 81 L.Ed. 835 (1937) (rejecting the argument that a state law delegating the power to regulate prices was unlawful under the Constitution); *see also Women's Health Services,*

*Inc. v. Maher*, 514 F. Supp. 265, 271-72 (D. Conn. 1981) ("This Court must adhere to the *Highland Farms Dairy* principle that the broad scope or vague boundaries of a state legislature's definition of [delegated] powers are not of federal constitutional concern."). As such, the state legislature plainly has the power to delegate to municipalities the authority to approve the establishment or expansion of cemeteries. *See, e.g.*, *Kozenik v. Montgomery Twp.*, 24 N.J. 154, 167, 131 A.2d 1 (1957) ("[T]he zoning statute delegates legislative power to local government. The judiciary of course can exercise that power directly .... We may act only if the presumption in favor of the ordinance is overcome by a clear showing that it is arbitrary or unreasonable."); *State v. State Board of Health*, 67 N.J.L. 463, 51 A. 456 (1902) (holding that the Health Board acted properly in hearing an appeal to a municipal decision under subsection (a)). In fact, the Cemetery Act preempts the field of cemetery regulation. *See Trinity Cemetery Ass'n, Inc. v. Twp. of Wall*, 325 N.J. Super. 292, 295, 739 A.2d 409 (App. Div. 1999).

**\*8** However, Plaintiff does not challenge this premise, nor base its Complaint on a narrow reading of the State's delegation doctrine. In other words, Plaintiff does not argue that the Township lacks the power to consent altogether, or that the legislature lacked the authority to pass the consent law in the first instance. Plaintiff readily concedes that "the State may delegate to municipalities the power to approve or reject" new cemeteries within town borders. Pl. Reply Br., at 3 (emphasis removed). Plaintiff instead challenges the substance of the delegation: whether the Cemetery Act conferring the consent power also contains "sufficient standards to guide" the Township's deliberations, limit its discretion, and "apprise the public of the bases on which new cemeteries will be approved or rejected." *Id.* Defendants and the State fail to substantively respond to Plaintiff's claim in this regard.

**[13]** Defendants and the State also draw an erroneous conclusion from their premise: because this case involves a permissible delegation under state law, it cannot involve a due process violation under federal law. The State goes so far as to assert that "[t]he Legislature ... need not impose standards upon a discretionary power long understood to be reserved to municipalities." St. Br., at 12 (citing *Trinity Cemetery Ass'n v. Twp. of Wall*, 170 N.J. 39, 53-54, 784 A.2d 52 (2001) (Zazzali, J., concurring)). By its terms, however, the Fourteenth Amendment subjects state actions to the Due Process Clause, regardless of whether they are

permissible exercises of state power under state law. U.S. CONST. AMEND. XIV; *see also* *Papachristou*, 405 U.S. 156, 92 S.Ct. 839 (rejecting a local vagrancy ordinance on due process grounds). That is the very purpose of the Amendment.

*See* *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 59, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) ("[T]he Fourteenth Amendment, by expanding federal power at the expense of state power, had fundamentally altered the balance of state and federal power struck by the Constitution."); *City of Boerne v. Flores*, 521 U.S. 507, 524, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) ("As enacted, the Fourteenth Amendment confers substantive rights against the States which, like the provisions of the Bill of Rights, are self-executing.").

Citing *Montgomery*, 703 F. Supp. 1161, Defendants advance the same flawed position. *See* Def. Reply Br., at 5-8. To the contrary, that case, which involved the New Jersey Banking Commissioner's authority to waive a statutory prohibition on new branches in small towns "if he decides that the establishment of such banks is in the public interest," N.J.S.A. § 17:9-A-19K, cuts the other way. The plaintiff in *Montgomery* alleged that the "public interest" standard was void for vagueness. 703 F. Supp. at 1165. Eliding the distinction between a challenge to a delegation of state power itself and a challenge to the standards governing the *exercise of* the delegated power, the district court held that the plaintiff's vagueness claim was "outside the scope of ... the fourteenth amendment." *Id.* at 1167. Although the Third Circuit rejected the plaintiff's claim on appeal, it fully reviewed the merits of the due process argument under longstanding federal precedent governing that issue, a clear rejection of the district court's legal conclusion that the Due Process Clause was inapplicable. *Montgomery*, 882 F.2d at 89-91.

The State seems to recognize what Defendants do not, maintaining that municipalities may not "exercise their authority ... in ways which conflict with provisions of the federal or state constitutions." N.J. Br. at 11. They even cite to *West Point Island Civic Ass'n v. Twp. Comm. of Dover*, 54 N.J. 339, 255 A.2d 237 (1969), for the proposition that "the discretionary activity of municipal governing bodies in this state has traditionally been subject to close judicial scrutiny in order to prevent arbitrary and unreasonable action." *Id.* at 346, 255 A.2d 237. Plainly, then, an impermissible delegation of a state power, which is a matter of state law, is not the same as a permissible delegation of state power with impermissibly

vague standards for its exercise, which is a matter of federal due process, as here. And the lawfulness of a delegation, alone, cannot save a statute from a federal or a state due process challenge. [8] Defendants and the State misconstrue the scope of the vagueness doctrine, which "does not forbid the legislature from acting toward any end it wishes, but only requires it to act with enough clarity that reasonable people can know what is required of them and [officials] can apply the law consistent with their limited office." *Dimaya*, 138 S. Ct. at 1223 (Gorsuch, J., concurring).

**\*9** I therefore proceed to analyze Plaintiff's vagueness claim under the Due Process Clause, while recognizing that the consent provision in the Cemetery Act is a permissible delegation of state power.

ii. The Standard When Reviewing A Statute for Vagueness

Defendants next challenge the standard of review under the vagueness doctrine. Specifically, they argue that subsection (a) is not unconstitutionally vague because courts require less precision in civil statutes than criminal ones. *See* Def. Br., at 12-14; Def. Reply Br., at 7. Defendants are correct that the Supreme Court has sometimes "expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Hoffman*, 455 U.S. at 499, 102 S.Ct. 1186. But the "happenstance" that a law is civil rather than criminal is by no means "dispositive," *Dimaya*, 138 S. Ct. at 1223 (Gorsuch, J., concurring), and the conceptual foundation of that distinction is increasingly in doubt. *Id.* at 1223-31.

As a basic proposition, a vague civil law can invite an arbitrary exercise of power, leave citizens in the dark as to how to arrange their affairs, and discriminate on an ad hoc basis no less than a vague criminal law. *See, e.g.*, ALEXANDER BICKEL, THE LEAST DANGEROUS BRANCH 151 (1962) ("[A] loosely worded statute allows latitude for 'discontrol, irrationality, and irregularity,' for erratic, prejudiced, discriminatory, or overreaching ... exercises of authority.") (citations omitted). As a matter of history, the vagueness doctrine has never exclusively operated on criminal laws. *See* *Giaccio*, 382 U.S. at 402, 86 S.Ct. 518 (stating that due process protections against vague laws are "not to be avoided by the simple label a State chooses

to fasten upon its conduct or its statute"); *De George*, 341 U.S. at 231-32, 71 S.Ct. 703 ("Despite the fact that this is not a criminal statute, we shall nevertheless examine the application of the vagueness doctrine to this case."); *A.B. Small Co.*, 267 U.S. at 239, 45 S.Ct. 295 ("The defendant attempts to distinguish [prior vagueness] cases because they were criminal prosecutions. But that is not an adequate distinction."); *Int'l Harvester Co.*, 234 U.S. at 221-22, 34 S.Ct. 853 (applying the vagueness doctrine to a civil fine for a combination in restraint of trade); *Montgomery*, 882 F.2d at 89 (applying the vagueness doctrine to a civil banking regulation); *see also* *Drake v. Drake*, 15 N.C. 110, 115 (1833) ("[I]f the terms in which [a law] is couched be so vague as to convey no definite meaning to those whose duty it is to execute it, either ministerially or judicially, it is necessarily inoperative."); *Commonwealth v. Bank of Pennsylvania*, 3 Watts & Serg. 173, 177 (Pa. 1842) ("We have seldom, if ever, found the language of legislation so devoid of certainty as in the proviso [regulating voting shares for certain stockholders of the Bank of Pennsylvania] before us."); *Goldington v. Bassingburn*, Y.B. Trin. 3 Edw. II, f. 27b (1310) (explaining, in the civil context, that it was "the law of the land" that "no one [could] be taken by surprise" by having to "answer in court for what [one] has not been warned to answer"). Indeed, from the 1920s on, the Supreme Court itself has forcefully applied the vagueness doctrine in civil actions. *See, e.g.*, *A.B. Small Co.*, 267 U.S. at 239, 45 S.Ct. 295 ("The ground or principle of [the vagueness doctrine is] not such as to be applicable only to criminal prosecutions .... but the exaction of obedience to a rule or standard which was so vague and indefinite as to really be no rule or standard at all."); *Cohen*, 255 U.S. at 92, 41 S.Ct. 298 (collecting cases).

**\*10** And "if the severity of the consequence counts" when determining the standard of review for vagueness, *Dimaya*, 138 S. Ct. at 1229 (Gorsuch, J., concurring), then it is hard to see how civil statutes with restrictions that can result in severe consequences, perhaps even more so than some criminal statutes, should require lesser due process protections. *Id.* at 1229-30 (listing examples). For these reasons, I reject Defendants' contention that the civil nature of subsection (a) is, by itself, grounds for dismissing Plaintiff's due process claim.

[14]   [15]   Still, it is widely accepted that "economic regulation is subject to a less strict vagueness test because its

subject matter is often more narrow, [ ] because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action," and because "the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process."

*Hoffman*, 455 U.S. at 498, 102 S.Ct. 1186 (citations omitted). Another reason for a less stringent standard when reviewing economic regulations for vagueness is that they often confer benefits rather than impose burdens, *i.e.*, involve regulatory beneficiaries not regulatory objects. Hence, "[i]n the field of regulatory statutes governing business activities, where the acts limited are in a narrow category, greater leeway is allowed." *Papachristou*, 405 U.S. at 162, 92 S.Ct. 839;

*see also* *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 340, 72 S.Ct. 329, 96 L.Ed. 367 (1952) (holding that, as to a statute criminalizing the use of certain routes when transporting explosives, "no more than a reasonable degree of certainty [as to the prohibited conduct] can be demanded"); *United States v. National Dairy Products Corp.*, 372 U.S. 29, 32, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963) ("[S]tatutes [criminalizing selling goods at unreasonably low prices] are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language."); *United States v. Petrillo*, 332 U.S. 1, 8, 67 S.Ct. 1538, 91 L.Ed. 1877 (1947) ("The language here challenged conveys sufficiently definite warning as to the proscribed conduct [limiting the number of employees a business needs] when measured by common understanding and practices. The Constitution requires no more.").

Consistent with this principle, courts in the Third Circuit have applied a less stringent standard of review to zoning and zoning-adjacent business regulations, such as the present one. In *Adhi Parasakthi Charitable v. Twp. of W. Pikeland*, 721 F. Supp. 2d 361 (E.D. Pa. 2010), for example, the court rejected a vagueness challenge to a zoning ordinance because the ordinance "set[ ] forth the considerations for the Zoning Board in determining whether to grant a conditional-use application" and made clear that "conditional use must be granted not only before construction, but also before certain uses are made of the property," which put the plaintiff on notice and rendered his due process argument without "much force." *Id.* at 377, 380 n.4. Likewise, in *CMR D.N. Corp. v. City of Philadelphia*, 829 F. Supp. 2d 290

(E.D.Pa.2011), *aff'd*, 703 F.3d 612 (3d Cir. 2013), the court upheld a local zoning ordinance against a vagueness challenge because "it would be impossible for [such an ordinance] to identify specifically each and every permitted use" that is "appropriate for the density, character, ... and surrounding community," a phrase in the regulation which itself sufficiently limited the zoning board's discretion. *Id.* at 298 n.9, 299. The Third Circuit has therefore held that, "to find an economic civil statute void for vagueness, it must be so vague as to be no standard or rule at all." *CMR D.N. Corp.*, 703 F.3d at 632 (quotations omitted).

**\*11** Taking these bodies of law into consideration, I will evaluate "the degree of imprecision" in subsection (a) based on whether it provides Plaintiff with fair notice and contains some standard to guide the Township's consent, keeping in mind that, as an economic regulation, a degree of flexibility is permitted.

### iii. Applying the Vagueness Standard to Subsection (a)

**[16]** Plaintiff argues that subsection (a) is a standardless delegation of power, *see* Pl. Br., at 13-21, while Defendants respond that subsection (d) provides the adequate standard. *See* Def. Br., at 4-5. The State adds that subsection (a) borrows a standard from the Municipal Land Use Law and that the passage of time renders it constitutional in any event. *See* St. Br., at 15-16.

**[17]** **[18]** **[19]** As discussed, *supra*, Plaintiff brings a facial challenge to subsection (a). *See, e.g.*, Pl. Br., at 12 n.3 ("In all circumstances, [the provisions] delegate arbitrary, standardless decision-making authority to municipal officials."). This type of challenge seeks to invalidate a statute itself, rather than its application to a particular party under a particular set of facts. It is "the most difficult challenge to mount successfully," *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), because Plaintiff "must establish that no set of circumstances exists under which the Act would be valid." *Id.*; *see also* *United States v. Mitchell*, 652 F.3d 387, 405 (3d Cir. 2011). In other words, Plaintiff must show that the statute "is unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008). The remedy for a successful facial challenge is to strike down the

unconstitutional law or provision, whereas for an as-applied challenge the remedy is an injunction against enforcement as to that plaintiff only. *See* CMR D.N. Corp., 703 F.3d at 624.

**[20]** **[21]** As to the starting point for a facial attack, I must "look to the law as a whole to determine whether a person of ordinary intelligence may be able to ascertain the meaning of the challenged terms." *Id.* at 631; *see also* Grayned, 408 U.S. at 110, 92 S.Ct. 2294. And "some ambiguities" will not "render [the statute] impermissibly vague." Hoffman, 455 U.S. at 502, 102 S.Ct. 1186 (upholding an ordinance that did "contain ambiguities"). But Defendants' conclusion that subsection (a) incorporates the "public need" or "public interest" standard from subsection (d), and as such is constitutional, falls short for two basic reasons. First, subsection (d) explicitly mentions subsections (b) and (c), but omits any mention of subsection (a), despite multiple revisions over the last 50 years. This raises the inference that subsection (d) intends to exclude, and hence not operate on or restrict, subsection (a). *See, e.g.,* N.L.R.B. v. SW General Inc., --- U.S. ----, 137 S. Ct. 929, 940, 197 L.Ed.2d 263 (2017) (explaining that a negative implication can be drawn where "the circumstances support a sensible inference that the term left out must have been meant to be excluded," as here); Marx v. General Revenue Corp., 568 U.S. 371, 381, 133 S.Ct. 1166, 185 L.Ed.2d 242 (2013) ("The force of any negative implication [ ] depends on context."); Barnhart v. Peabody Coal Co., 537 U.S. 149, 168, 123 S.Ct. 748, 154 L.Ed.2d 653 (2003) (explaining that a negative implication can be drawn when "it is fair to suppose [a legislature] considered the unnamed possibility and meant to say no to it"); United States v. Vonn, 535 U.S. 55, 65, 122 S.Ct. 1043, 152 L.Ed.2d 90 (2002) (explaining that a negative implication can be overcome by "contrary indications that adopting a particular rule or statute was probably not meant to signal any exclusion"). In other words, because "[t]here is a basic difference between filling a gap left by [the legislature's] silence and rewriting rules that [the legislature] has affirmatively and specifically enacted," Mobil Oil Corp. v. Higginbotham, 436 U.S. 618, 625, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978), subsection (d) cannot be read to limit the scope of the consent power in subsection (a).

**\*12** Second, because the text of subsection (a) does not contain a reference to the limiting principles in subsection

(d), or any other limiting principles for that matter, it cannot be read to incorporate the words of limitation expressed in subsection (d). A municipality acting under its subsection (a) authority may clearly contemplate a far wider range of considerations than "public interest" or "public necessity"—so much so that Plaintiff argues it is unconstitutional. *See infra.* Defendants' interpretation would nevertheless "have [me] read an absent word into the statute," Lamie v. United States Trustee, 540 U.S. 526, 538, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004), resulting "not [in] a construction of [the] statute, but, in effect, a[ ] [narrowing] of it by the court, so that what was omitted [in subsection (a)] ... may be included." Iselin v. United States, 270 U.S. 245, 251, 46 S.Ct. 248, 70 L.Ed. 566 (1926). In view of the unambiguous text of the provision, I am unwilling to "soften the import" of the New Jersey Legislature's "chosen words" by borrowing limitations from subsection (d), Lamie, 540 U.S. at 538, 124 S.Ct. 1023, or otherwise "supply[ing] omissions." Nichols v. United States, --- U.S. ----, 136 S. Ct. 1113, 1118, 194 L.Ed.2d 324 (2016) (further citation omitted). Simply, "it is not within [the courts'] power to ... narrow state laws" in the manner requested by Defendants. Grayned, 408 U.S. at 110, 92 S.Ct. 2294; *see also* United States v. Thirty-seven (37) Photographs, 402 U.S. 363, 369, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971) (explaining that "it is for Congress, not this Court, to rewrite the statute"); Freedman v. Maryland, 380 U.S. 51, 58, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965) (declining to rewrite Maryland's statute); Teitel Film Corp. v. Cusack, 390 U.S. 139, 141, 88 S.Ct. 754, 19 L.Ed.2d 966 (1968) (same, but with Chicago's ordinance). I thus reject Defendants' invitation to "add an extra clause" to subsection (a). *Id.*

**[22]** **[23]** **[24]** For similar reasons, I reject the State's argument that subsection (a) borrows a provision from the Municipal Land Use Law ("the MLUL"), *see* N.J.S.A. § 40:55D-1, to restrain Defendants' exercise of discretion. The MLUL "guide[s] the appropriate use or development of all lands in this State in a manner that will promote public health, safety, morals, and welfare of their inhabitants." St. Br., at 11. Municipalities "must exercise their authority in strict conformity with [it]." *Id.* (citing Riggs v. Twp. of Long Beach, 109 N.J. 601, 611, 538 A.2d 808 (1988) (stating that every zoning ordinance "must advance one of the purposes of the [MLUL]")). Even so, the MLUL is a land *use* statute, which restricts a municipality's *zoning* authority—*i.e.*, what

sort of development should happen where, and how townships should "draw[ ]" their zoning ordinances in the first instance.

🔖 *Lusardi v. Curtis Point Prop. Owners Ass'n*, 86 N.J. 217, 226-27, 430 A.2d 881 (1981) ("One standard contained in the [MLUL] is that municipalities should encourage uses that are appropriate to particular locations."). Importantly, it is silent as to the exercise of other municipal powers, such as the consent power here. The State arguably concedes this point by noting that "a governing body's decision [under the Cemetery Act] is not a zoning decision *per se*." *See* St. Br., at 18.

Second, the MLUL standard cited by the State does not appear anywhere in the thirty-eight provisions of the Cemetery Act, much less the provisions of 🚩 N.J.S.A. § 45:27-25, in particular. There is no basis for the Court to read this statute into subsection (a), absent any indication of legislative intent to do so. *See* 🔖 *Vonn*, 535 U.S. at 65, 122 S.Ct. 1043. Third, applying the standards in the MLUL, Block 12 *was* properly zoned for cemetery use when Plaintiff purchased it. If the MLUL were also the guidepost for determining whether a municipality should consent to an applicant's proposed cemetery, as here, then Plaintiff would need to do little else to make the case for its cemetery than point to the Township's zoning ordinance. The zoning inquiry and the consent inquiry could be coextensive in such a case, despite clear legislative intent that they operate with a different scope and under a different set of considerations. The State appears to admit this as well, arguing that "zoning considerations favor considerably into [a municipality's] determination [under the Cemetery Act]." *See* St. Br., at 18. Notwithstanding these problems, an unrelated regulatory regime does little to satisfy the basic requirement of fair notice. Even in the context of an economic regulation such as subsection (a), one cannot expect Plaintiff to scour unrelated legal codes for guidance.

**\*13** **[25]** Because I reject Defendants' contention that subsection (d) provides sufficient context for subsection (a), as well as the State's argument that subsection (a) can fairly be read in the context of the MLUL, the constitutionality of the consent provision must stand or fall on its own terms. I am persuaded that it falls as a delegation without a standard. First, subsection (a) does not provide a statutory definition of consent, narrow the contexts in which consent may or may not granted, or provide any signal whatsoever as to the circumstances under which the Township will approve a new cemetery apart from a waiver. In this sense, subsection (a) does not give applicants in Plaintiff's position, "at the outset," any idea of what they must do or not do, or include

or not include, in their applications, *see* 🔖 *Fox*, 567 U.S. at 254, 132 S.Ct. 2307, which is a far cry from cases in which *somewhat* vague ordinances were not found to be *unconstitutionally* vague. For instance, in 🔖 *CMR D.N. Corp.*, 829 F. Supp. 2d 290, *aff'd*, 🔖 703 F.3d 612, the court rejected the plaintiff's due process challenge to an ordinance requiring that its development plan be "appropriate in scale, density, character, and use for the surrounding community," holding that the ordinance "contains standards and uses which are appropriately delineated in commonplace terms and categories ... references specific legislative findings that further clarify those standards, .... [and in detail] sets forth eight findings that address the purpose of the overlay area ... including maintaining the City's vision, encouraging a variety of uses, and driving economic growth." 🔖 *Id.* at 297 & n.6, 301 & n.21, 302-03.

Or, in 🔖 *Adhi*, 721 F. Supp. 2d 361, the court rejected the plaintiff's due process challenge because the ordinance "sets forth the considerations for the Zoning Board in determining whether to grant a conditional-use application," with "some of these factors [addressing] whether the proposed use meets the criteria of a conditional use or Defendant's general zoning requirements (such as subsections a, b, c, d, k, l, and m) and others [relating] to a consideration of whether the conditional use will have an impact on the surrounding area not normally expected from such a use (such as subsections f, g, i, and j)." 🔖 *Id.* at 375-76 & n.4 (holding that the ordinance was void for vagueness under the First Amendment but not the Due Process Clause). "The list include[d] fifteen factors." 🔖 *Id.* at 376.

Likewise, in 🔖 *Hotel and Restaurant Employees and Bartenders Intern. Union Local 54 v. Read*, 832 F.2d 263 (3d Cir. 1987), the Third Circuit rejected a vagueness challenge to a provision of the New Jersey Casino Control Act disqualifying registrants who associate with career offenders because "the legislature, in articulating the policies underlying the act and in drafting an objective test into [the provision], has given sufficient direction to those who will enforce [it]." 🔖 *Id.* at 268-69. And in 🔖 *Hoffman*, 455 U.S. at 498, 102 S.Ct. 1186, the Supreme Court rejected the plaintiff's vagueness challenge to an ordinance requiring a business to obtain a license if it sells items "designed or marketed for use with illegal cannabis or drugs," holding that "[a] business

person of ordinary intelligence would understand that this term refers to the design of the manufacturer, not the intent of the retailer or customer," and that it is "sufficiently clear that items which are principally used for nondrug purposes, such as ordinary pipes, are not 'designed for use' with illegal drugs." *Id.* at 491, 503-04, 102 S.Ct. 1186.

Other circuits have reached similar conclusions on laws with substantially more substance than subsection (a). In *Mayes v. City of Dallas*, 747 F.2d 323 (5th Cir. 1984), the Fifth Circuit held that an ordinance requiring new buildings to "harmonize" with the "overall character" of a district, or with certain "surrounding structures," did not fail to set forth "objective, articulated standards sufficient to prevent the arbitrary exercise of government power." *Id.* at 324-25. Similarly, in *Henry v. Jefferson Cnty. Planning Comm'n*, 215 F.3d 1318 (4th Cir. June 9, 2000) (table opinion), the Fourth Circuit held that an ordinance requiring projects to be "compatible" with and to "preserve the rural character of the ... agricultural community" was not unconstitutionally vague, explaining that the term "compatible" had only one logical meaning and that the provisions of the ordinance, plus its stated legislative purpose, provided builders with "sufficient notice and warning as to what requirements [they] must meet in order to obtain" a permit. *Id.* at *4-5; *see also Terson Co., Inc. v. Bakery Drivers and Salesmen Local 194*, 739 F.2d 118, 121 (3d Cir. 1984) (rejecting a vagueness challenge to a provision of the Multiemployer Pension Plan Amendments Act governing withdrawals because it incorporates "reasonable 'actuarial assumptions and methods' ").

 *14 These laws all share what the consent provision here plainly lacks: *some* standard for guiding the exercise of discretion. *Accord Trade West Management Ass'n, Inc. v. Hughey*, 780 F.2d 221, 236 (3d Cir. 1985) (calling the plaintiff's vagueness challenge to a provision of the New Jersey Solid Waste Management Act of 1970, *see N.J.S.A.* 13:1E-1, *et seq.*, requiring waste collectors to register with the Department of Environmental Protection and setting forth twenty-three criteria for disqualification, *see N.J.S.A.* § 13:1E-133(e), "substantial," though declining to decide that issue); *Holmes v. New York City Housing Authority*, 398 F.2d 262, 265 (2d Cir. 1968) (stating, in the context of a vagueness challenge to the eligibility requirements for public housing tenants, that "due process requires that selections

among applicants be made in accordance with 'ascertainable standards,' " and "[i]t hardly need be said that the existence of an absolute and uncontrolled discretion in an agency of government vested with the administration of a vast program, such as public housing, would be an intolerable invitation to abuse").

Neither does subsection (a) incorporate by reference, or by implication, a common industry word that applicants in Plaintiff's position could use to better understand what is required in order to secure consent, or under what conditions the Township might withhold it. The State arguably proves this point by claiming that, under New Jersey law, "the word consent 'implies a voluntary action, not statutory compulsion,' " St. Br., at 12 (quoting *West Point Island*, 54 N.J. at 345-46, 255 A.2d 237), which, of course, suggests no standard whatsoever. This, too, is different from cases in which courts have found statutes to be vague but not unconstitutionally so. *See Williams*, 553 U.S. at 306-07, 128 S.Ct. 1830 (explaining that the common legal meaning of *mens rea* terms such as "knowledge, belief and intent" in part renders the statute permissible); *Civil Service Commission v. Letter Carriers*, 413 U.S. 548, 575, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973) (rejecting a vagueness challenge to the Hatch Act because its scope had been narrowed and defined through "longstanding interpretations" of which ordinary people would be aware); *Dailey v. City of Philadelphia*, 417 F. Supp. 3d 597, 618 (E.D. Pa. 2019) (explaining that the term "malfeasance" in the city's retirement code is not unconstitutionally vague because "people of common intelligence" would not "guess as [to] its meaning and differ as to its application" in the context of using a government credit-card for personal benefit); *Doylestown Elec. Supply Co. v. Maryland Cas. Ins. Co.*, 942 F. Supp. 1018, 1021 (E.D. Pa. 1996) (rejecting a vagueness challenge to the term "bad faith" because "Pennsylvania jurisprudence provides sufficient guidance" to enforcement officials); *see also Weeds*, 255 U.S. at 112, 41 S.Ct. 306 ("In the absence of a statutory definition of, or method of determining, standard prices ... the natural standard ... is ... the standard of fair market value .... So construed, I regard this provision as clearly constitutional."). Here, on the other hand, no amount of research—of other laws, administrative process, Cemetery Board regulations, past Township decisions, or the surrounding provisions in N.J.S.A. § 47:25-1, *et seq.*—could adequately inform how Plaintiff should understand the meaning of "consent."

Subsection (a) further fails because Plaintiff does know whether, as a rule, there *are* certain facts or conditions it could present in an application to obtain the Township's consent. Such "indeterminacy" and "unpredictability" as to what "must be proved" to establish a new cemetery cannot pass constitutional muster. 🔖 *Williams,* 553 U.S. at 306, 128 S.Ct. 1830 ("What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is."); 🔖 *Fox,* 567 U.S. at 253, 132 S.Ct. 2307 ("[A] regulation is not vague because it may at times be difficult to prove an incriminating fact but rather because it is unclear as to what fact must be proved."). Instead, the Township's approval turns on "wholly subjective judgments," 🔖 *Williams,* 553 U.S. at 306, 128 S.Ct. 1830, such that the Committee may "condem[n] all that [they] personally disapprove and for no better reason than that [they] disapprove it." 🔖 *Jordan,* 341 U.S. at 242, 71 S.Ct. 703 (Jackson, J., dissenting).

**\*15** In short, the municipal consent provision "is vague, not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all." 🔖 *Coates,* 402 U.S. at 614, 91 S.Ct. 1686; 🔖 *Williams,* 553 U.S. at 306, 128 S.Ct. 1830. The concern, here, is the provision's lack of limiting principles: it places no boundaries on the Township's power to grant or withhold consent and, to that extent, vests the Township with unfettered discretion. As subsection (a) stands, whether the Township approves a cemetery application hinges on the whims of the Committee members. With little effort, I can formulate dozens of arbitrary and/or improper reasons why the Township might reject a new cemetery—from the name of an applicant's business or a disagreement with a separate zoning ordinance to cronyism, economic protectionism, ethnic or racial bias, or a preference for a particular religion. The very facts of this case, assuming they are true, provide an example of the unfettered discretion the statute confers: one town Commissioner suggested that, if Plaintiff had proposed a religious cemetery, "this would be a different story," *see* Pl. SUMF, ¶ 27; Pl. Br., Ex. 6 (Hearing Transcript), at 119:1-8-120:1, while the Mayor allegedly stated that the local zoning ordinances contemplated "small church cemeteries" because "Readington's population is ... majority Catholic." [9] *Id.* Ex. 6 (Hearing Transcript), at 120:16-121:24. The Township is not constrained by

subsection (a) in any manner, leaving Plaintiff guessing as to what facts might win approval and the Township free to invent them.

Due process requires more. The Township must make decisions based on some ascertainable standard, not just for any reason or no reason. In turn, applicants in Plaintiff's position must have fair notice *of* the standard. *See* 🔖 *Connally,* 269 U.S. at 391, 46 S.Ct. 126. As Justice Gorsuch wrote in 🔖 *Dimaya*:

> The implacable fact is that this isn't your everyday ambiguous statute. It leaves the people to guess about what the law demands—and leaves [the Township] to make it up. You cannot discern answers to any of the questions this law begets by resorting to the traditional canons of statutory interpretation. No amount of staring at the statute's text, structure, or history will yield a clue. Nor does the statute call for the application of some preexisting body of law familiar to the judicial power. The statute doesn't even ask for application of common experience. Choice, pure and raw, is required. Will, not judgment, dictates the result.

🔖 138 S. Ct. at 1232 (Gorsuch, J., concurring). Or, as the Supreme Court wrote in 🔖 *Cohen Grocery Co.*:

> Observe that the section forbids no specific or definite act. It confines the subject-matter of the [consent] which it authorizes to no element essentially inhering in the transaction as to which it provides. It leaves open, therefore, the widest conceivable inquiry, the scope of which no one can foresee and the result of which no one can foreshadow or adequately guard against. In fact, ... to attempt to

enforce the section would be the exact equivalent of an effort to carry out a statute which in terms merely penalized and punished all acts ... when unjust and unreasonable in the estimation of the [Township].

255 U.S. at 91, 41 S.Ct. 298.

Finally, Plaintiff relies on *Yick v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), to support its claim that subsection (a) violates the Due Process Clause. Although Defendants point out that the holding in *Yick* concerned the plaintiff's as-applied challenge, much of the Supreme Court's reasoning focused on facial infirmities in the statute. [10] That reasoning is highly persuasive, [11] and Defendants have not suggested any basis for rejecting it, so I find it worthwhile to discuss at length. The *Yick* plaintiff challenged San Francisco's ordinance making it illegal to conduct a laundry business without the approval of the board of supervisors, a consent provision virtually identical to the one at issue in this case. Specifically, the San Francisco ordinance made it:

unlawful ... for any person or persons to establish, maintain, or carry on a laundry, within the corporate limits of the city and county of San Francisco, *without having first obtained the consent of the board of supervisors*, except the same be located in a building constructed either of brick or stone.

*16 *Id.* at 357, 6 S.Ct. 1064 (emphasis added).

*17 In striking down the ordinance, the Supreme Court emphasized its standardless character, again much like the ordinance here, writing that it "does not prescribe a rule and conditions, for the regulation of the use of property for laundry purposes, to which all similarly situated may conform." *Id.* at 368, 6 S.Ct. 1064. The Court also emphasized the arbitrary character of the ordinance: it "divides ... merely by an arbitrary line, on one side of which

are those who are permitted to pursue their industry by the mere will and consent of the supervisors, and on the other those from whom that consent is withheld, at their mere will and pleasure." *Id.* The Court concluded with a statement that applies with equal force to this case: "[T]he very idea that one man may be compelled to hold his life, or the means of living, or any material right essential to the enjoyment of life, at the mere will of another, seems to be intolerable in any country where freedom prevails." *Id.* at 370, 6 S.Ct. 1064;

*see also* *State of Washington ex rel. Seattle Title Trust Co. v. Roberge*, 278 U.S. 116, 122, 49 S.Ct. 50, 73 L.Ed. 210 (1928) (citing *Yick* for the proposition "[t]he delegation of power [to adjacent landowners to consent to the construction of new homes] is repugnant to the due process clause of the Fourteenth Amendment because "[t]here is no provision for review under the ordinance[,] the failure to give consent is final," and landowners "are free to withhold consent for selfish reasons or arbitrarily and may subject [builders] to their will or caprice").

As in *Yick*, the Township's consent power over new cemeteries is so "naked ... that, if an applicant for such consent, being in every way a competent and qualified person, and having complied with every reasonable condition demanded by any public interest," should fail "to obtain the requisite consent ... to the prosecution of his business," 118 U.S. at 366, 6 S.Ct. 1064, and challenge that decision, a reviewing court (or state regulatory body) could not begin to discern whether the Township acted properly, because subsection (a) provides no commands, obligations, contingencies, or criteria against which one might judge the Township's decision. Rather, "it would be a sufficient answer for [the Township] to say that the law had conferred upon them authority to withhold their assent, without reason and without responsibility," *id.*, an unconstitutional delegation which "acknowledges neither guidance nor restraint." *Id.* at 367, 6 S.Ct. 1064.

Further proving this point, Plaintiff here went to great lengths to make concessions to the Township, including by agreeing to dedicate nearly half of its acreage to public use and to limit its burial area to 38 acres in perpetuity. *See* Pl. Br., Ex. 14 (Letter Requesting Consent). Still, heeding the Township's demands did not cure Plaintiff's doubts as to what facts must be proved under subsection (a) nor ultimately produce the Township's consent, leaving this Court with the distinct

impression that there was nothing Plaintiff could have done to win over the Township. *Cf. Letter Carriers,* 413 U.S. at 580, 93 S.Ct. 2880 (upholding a vague statute in part because there was a "procedure by which an employee in doubt about the validity of a proposed course of conduct may seek and obtain advice from the Commission and thereby remove any doubt there may be as to the meaning of the law").

Despite its standardless delegation of power, Defendants and the State make one last argument that subsection (a) is constitutional: it has been on the books for almost 150 years seemingly without issue. *See* State Br., at 15-16; Def. Reply Br., at 6-7. There is some merit to this argument. For example, the Supreme Court has held in the Establishment Clause context that "familiarity itself can become a reason for preservation," *American Legion v. American Humanist Ass'n,* ––– U.S. ––––, 139 S. Ct. 2067, 2084, 204 L.Ed.2d 452 (2019) (plurality), and "[t]he passage of time gives rise to a strong presumption of constitutionality." *Id.* at 2085; *Town of Greece, N.Y. v. Galloway,* 572 U.S. 565, 576, 134 S.Ct. 1811, 188 L.Ed.2d 835 (2014) (finding it persuasive that Congress has opened its sessions with a prayer for more than 200 years and that many state legislatures do so); *Marsh v. Chambers,* 463 U.S. 783, 792, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983) ("In light of the unambiguous and unbroken history of more than 200 years, there can be no doubt that the practice of opening legislative sessions with a prayer has become part of the fabric of our society."). History may generate a similar presumption in the Second Amendment context. *See District of Columbia v. Heller,* 554 U.S. 570, 627 n.26, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008) (observing several "longstanding" gun regulations, which are "presumptively lawful").

**\*18** However, these cases "must not be understood as permitting a practice that would amount to a constitutional violation if not for its historical foundation." *Town of Greece,* 572 U.S. at 576, 134 S.Ct. 1811. They merely "teach[ ] that [some constitutional provisions, such as the Establishment Clause] must be interpreted 'by reference to historical practices and understandings.' " *Id.* (quoting *County of Allegheny v. American Civil Liberties Union Greater Pittsburgh Chapter,* 492 U.S. 573, 670, 109 S.Ct. 3086, 106 L.Ed.2d 472 (Kennedy, J., concurring in judgment in part and dissenting in part)). Hence, "[s]tanding alone,

historical patterns cannot justify contemporary violations of constitutional guarantees," *Marsh,* 463 U.S. at 790, 103 S.Ct. 3330, but merely provide evidence that a particular practice was never, in fact, unconstitutional. Stated differently: "what matters ... isn't [a practice's age *per se*] but its compliance with ageless principles," such as those expressed in the Constitution. *American Legion,* 139 S. Ct. at 2102 (Gorsuch, J., concurring in the judgment). Turning to the case at bar, because subsection (a) plainly violates the Due Process Clause, the mere fact that it has operated for a long time cannot save it, and I reject any implication that "the longer the violation the less violative it becomes." *Gonzales v. North Tp. of Lake County, Ind.,* 4 F.3d 1412, 1422 (7th Cir. 1993) (dismissing "this sort of bootstrapping argument as a defense" and finding no "other case that [has] adopted this reasoning").

In sum, because the Township has unfettered discretion to withhold its consent under subsection (a), which leaves applicants such as Plaintiff in the dark as to what a successful application for a new cemetery requires, it is void for vagueness under the Due Process Clause.

*B. Remedies*

i. Severability

**[26]** I turn now to the remedy. Defendants first argue that, if subsection (a) is unconstitutional, then I should sever it from the remainder of N.J.S.A. § 45:27-25, because "the invalidation of the consent requirement in subsection (a) would have no impact upon the continued functioning of the waiver provision in subsection (d)." *See* Def. Br., at 30-32. For support, Defendants cite *State v. Lanza,* 27 N.J. 516, 143 A.2d 571 (1958), *cert denied,* 358 U.S. 333, 79 S.Ct. 351, 3 L.Ed.2d 350 (1959), where the New Jersey Supreme Court held that the provisions in a state law should be deemed severable "unless the two are so intimately connected and mutually dependent as reasonably to sustain the hypothesis that the Legislature would not have adopted the one without the other." *Id.* at 528, 143 A.2d 571.

On the other hand, Plaintiff contends "that subsection (a) is the threshold requirement set forth in N.J.S.A. 45:27-25," the absence of which would change the scope and purpose of the entire act. *See* Pl. Reply Br., at 11. Specifically, "if

subsection (a) were removed, the remaining subsections ... would be left untethered to any underlying requirement," rendering the statute "even more vague and constitutionally infirm than its present state." *Id.* at 11-12. Plaintiff cites

*Chamber of Commerce v. State*, 89 N.J. 131, 445 A.2d 353 (1982), for support, where the New Jersey Supreme Court cautioned that, "[a]lthough judicial surgery can be practiced in constitutional adjudications, the occasion for its application is not easy to identify." *Id.* at 152, 445 A.2d 353.

[27] Whether a state statute is severable is a question of state law. *See Leavitt v. Jane L.*, 518 U.S. 137, 139, 116 S.Ct. 2068, 135 L.Ed.2d 443 (1996) (per curiam) ("Severability [of a state statute] is of course a matter of state law."); *New Jersey Retail Merchants Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 396 (3d Cir. 2012). The touchstone is legislative intent.

*Affiliated Distillers Brands Corp. v. Sills*, 60 N.J. 342, 346, 289 A.2d 257 (1972); *Washington Nat'l Ins. Co. v. Board of Review of N.J. Unemployment Compensation Commission*, 1. N.J. 545, 556, 64 A.2d 443 (N.J. 1949) ("Severability is a question of intent."); *see also Hooper v. Bernalillo County Assessor*, 472 U.S. 612, 624, 105 S.Ct. 2862, 86 L.Ed.2d 487 (1985) ("It is for the [state] courts to decide, as a matter of state law, whether the state legislature would have enacted the statute without the invalid portion.").

[28] [29] [30] New Jersey courts ascertain legislative intent by asking "whether the objectionable feature of the statute can be exercised without substantial impairment of the principal object of the statute." *Affiliated Distillers*, 60 N.J. at 345, 289 A.2d 257 (quotations omitted). Severance is warranted where there is "such a manifest independence of the parts as to clearly indicate a legislative intention that the constitutional insufficiency of the one part would not render the remainder inoperative," *id.* at 346, 289 A.2d 257, such as when "the remaining portion [of the statute] forms a complete act within itself." *Inganamort v. Borough of Fort Lee*, 72 N.J. 412, 423, 371 A.2d 34 (1977). Still, "judicial surgery" depends, at all times, on "whether the Legislature would have wanted the statute to survive" without the unconstitutional provision. *Chamber of Commerce*, 89 N.J. at 151-52, 445 A.2d 353.

*19 [31] Defendants argue that subsection (a) is a "freestanding provision" which "would have absolutely no impact upon the operation of the waiver provision" in subsection (d) if it were stricken. Def. Br., at 31. Although subsection (d) might be unaffected by severing subsection (a), since it waives the limitation on the number and size of cemeteries imposed by subsections (b) and (c), I must nonetheless examine severance in light of the overall objective of the statute. As such, "[i]t is not enough that the act be severable in fact; its severability in the event of partial invalidity must also have been within the legislative intention." *Lanza*, 27 N.J. at 527, 143 A.2d 571. Contrary to Defendants' contention, the result of severance here would not be "slightly less comprehensive legislation." *New Jersey State Chamber of Commerce v. Hughey*, 774 F.2d 587, 597 (3d Cir. 1985) ("[W]here one aspect of a broad regulatory scheme is struck down, the New Jersey Courts are likely to hold that legislative intent is better served by severing the invalid provision ..., than by striking down the entire statute, which would result in no regulation at all.").

Far from a minimal change to the design of N.J.S.A. § 45:27-25, severing subsection (a) would result in a substantial narrowing of the circumstances in which municipalities may consent to new cemeteries despite the legislature's repeated and consistent efforts over the course of 150 years to *broaden* the consent power to cover *all* new cemeteries. *See infra.* To make such a change to the statute would border on a "usurpation of the legislative power." *Washington Nat'l*, 1 N.J. at 556, 64 A.2d 443.

In determining whether severing subsection (a) would defeat the principal legislative objective of N.J.S.A. § 45:27-25 as a whole, it is critical to understand the relationship between subsections (d) and (a). Under subsection (d), a municipality may grant consent to a new cemetery even if the limitations in subsections (b) and (c) apply, *i.e.*, there are more than five cemeteries in a municipality, three percent of municipal land is dedicated to cemeteries, *or* a proposed cemetery is more than 250 acres. *See* N.J.S.A. §§ 45:27-25(b)-(c). Historically, municipalities lacked the power to consent in these circumstances, and thus new cemeteries generally could not open, until the legislature enacted the waiver provision some 100 years after the consent provision in subsection (a) first appeared. *See infra.* Subsection (a), on the other hand, empowers municipalities to grant or withhold consent even if subsections (b) and (c) do not trigger subsection (d), *i.e.*, there are fewer than five cemeteries in town, less than three percent of town land is dedicated to cemeteries, *and* the proposed cemetery is smaller than 250 acres.

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 468 of 535
PageID: 32415
Rosedale and Rosehill Cemetery Association v. Township..., --- F.Supp.3d ---- (2020)
2020 WL 7768457

**[32]** When subsection (a) is read in conjunction with subsection (d), it becomes clear that a municipality must *affirmatively authorize* any new cemetery within its borders. *See, e.g., Burke v. Gunther*, 27 Backes 565, 567, 128 N.J. Eq. 565, 17 A.2d 481 (Ct. of Chancery 1941) ("This consent is what is commonly referred to as the license or franchise for the cemetery."). In this sense, subsection (a) demonstrates a clear legislative intent to always give municipalities a say over new cemeteries, regardless of how many cemeteries currently exist, how big they are, or any other factor. Indeed, under the Cemetery Act, which preempts the field of cemetery regulation, "municipalities have little power to legislate existing cemeteries," *Trinity*, 325 N.J. Super. at 296, 739 A.2d 409, but "[t]he residuum of power [they] retain[ ] on the act is to exclude new cemeteries ... within their boundaries." *Id.* at 295, 739 A.2d 409. In addition, subsection (a) demonstrates a clear legislative intent to give municipalities the *final* say over whether a new cemetery may open. While the original consent provision included a procedure under which an applicant could appeal a municipality's decision to the State Board of Health, *see* L. 1885, p. 166, § 6, and citizens could also appeal to the Health Board a decision they found objectionable, in 1971 the legislature amended the statute to remove the appeal procedure entirely, leaving municipal decisions unreviewable. *See* N.J. Rev. Stat. 8A:6-5 (1971).

**[33]** Even more compelling, if subsection (a) were severed, and the conditions in (b) and (c) did not trigger subsection (d), N.J.S.A. § 45:27-25 would not apply at all. In these cases, municipalities would lose their consent power altogether and town zoning committees or planning boards would be newly empowered to decide, in the end, whether new cemeteries may open—despite a longstanding signal from the legislature that municipalities should have the last word all of the time. *See, e.g., Borough of West Long Branch v. Home Building & Realty Co. of Long Branch*, 99 N.J. Eq. 738, 743, 133 A. 758 (Ct. of Chancery 1926) ("[I]f it is the intention of the defendant to locate a new cemetery ... then it would be necessary for the defendant to obtain the consent and approval of the governing body."). Although subsection (a) is just one provision among thirty-eight in the Cemetery Act, severing it from the remainder of the provisions in N.J.S.A. § 45:27-25 frustrates the core legislative plan of that part of the statute—comprehensive municipal consent—such that this Court must invalidate N.J.S.A. § 45:27-25

"as a unitary whole." [12] *Lanza*, 27 N.J. at 527, 143 A.2d 571. Because consent in all circumstances is the "dominant aim" of the statute, *Railroad Retirement Board v. Alton R. Co.*, 295 U.S. 330, 362, 55 S.Ct. 758, 79 L.Ed. 1468 (1935), unless N.J.S.A. § 45:27-25 operates in its entirety, it will be wholly ineffective in achieving the legislature's statutory design. [13]

***20** The enactment and legislative history, which are relevant in New Jersey when construing a statute, confirm the centrality of subsection (a) to N.J.S.A. § 45:27-25. *See Cedar Park Cemetery v. Hayes*, 132 N.J. Super. 572, 576, 334 A.2d 386 (App. Div. Feb. 28, 1975) (interpreting the Cemetery Act "in the light of its legislative history"); *New Jersey Pharmaceutical Ass'n v. Furman*, 33 N.J. 121, 130, 162 A.2d 839 (1960) ("Courts may, of course, freely refer to legislative history and contemporaneous construction for whatever aid they may furnish in ascertaining the true intent of the legislation.").

New Jersey has regulated cemeteries for 170 years, beginning in 1851, with the Rural Cemetery Act, which required cemetery associations to incorporate. *See* An Act Authorizing the Incorporation of Rural Cemetery Associations, L. 1851, p. 254, §§ 1, 4; *Cedar Park*, 132 N.J. Super. at 576, 334 A.2d 386 ("Since 1875, the New Jersey Legislature has recognized the need to regulate places of interment."). The legislature amended the Act in 1875, to permit cemeteries up to 75 acres. *See* L. 1875, p. 67, § 4. A few years later, in 1883, it limited the number of cemeteries to three in any one township. *See* L. 1883, c. 135, § 2. The consent provision appeared around this time, in 1885. *See* L. 1885, p. 166, § 6 ("[I]t shall not be lawful to locate any new cemetery or burying ground ... in this state without the consent and approval of the municipal authorities ...."). The legislature amended these provisions in 1929, 1937, 1971, and 2003. In 1929, it raised the limit on the number of cemeteries to five. *See* L. 1929, c. 20. And in 1971, it removed a mechanism from the consent provision under which parties could appeal a municipality's decision to grant or withhold consent. *See* N.J. Rev. Stat. 8A:6-5 (1971). On the other hand, the legislature did not enact the waiver provision until 1971, almost 100 years later. *See* L. 1971, c. 333.

This history has three major implications. First, before 1971, municipalities could not authorize new cemeteries as long as the conditions in subsections (b)-(c) were present.

The initial waiver provision *expanded* the consent power to these circumstances, indicating legislative permission to exercise discretion even if many cemeteries already existed. Second, under the original version of subsection (d) passed in 1971, a municipality could authorize a new cemetery despite subsections (b)-(c) only if "the capacity of an existing cemetery [was] exhausted, so that no further interment spaces can be purchased." *Id.* The legislature then *relaxed* this standard in 1973, *i.e.*, expanded the consent power again, to permit waivers if there is a public need, which governs the provision today. *See* L. 1973, c. 219, § 24. So construed, the legislature has never contemplated, much less passed, a provision narrowing the situations in which a municipality may consent to a new cemetery, as severance would do here, but rather has repeatedly acted to *enlarge* the consent power and *facilitate* the exercise of municipal discretion in new factual scenarios. Third, for over 150 years, subsections (a)-(c) have operated together while subsection (d) is of relatively recent vintage and could not be intended as the only consent-conferring provision in 🚩 N.J.S.A. § 45:27-25.

Relatedly, because subsection (a) and (d) are different in scope and objective, Defendants' argument that all cemetery applicants could proceed through subsection (d)—assuming the statute could be read to permit such an expansive interpretation of the waiver provision, which is doubtful—must fail. Through the consent provision in subsection (a), the legislature intended to give municipalities the power to contemplate a wide range of considerations in deciding whether to grant to deny a new cemetery—so much so that it is unconstitutionally vague, but that is nevertheless the intent. On the contrary, through subsection (d), the legislature intended municipalities to consent in more limited factual scenarios: when the "public necessity" or "public interest" warrants it. Had the legislature wanted all cemetery applicants to seek approval under subsection (d), then it could have eliminated subsection (a) in 1971 or 1973. Alternatively, had it wanted all applicants to proceed through subsection (a), then it could have eliminated subsections (b)-(c) rather than enacting a waiver provision. It chose to take neither of these actions, instead adding subsection (d), which applies under a narrower set of circumstances. To channel all cemetery applications through subsection (d)'s more restrictive consent power would defy legislative intent, not to mention rewrite the statute.

**\*21**  I therefore find that subsection (a) is not severable from the other provisions in 🚩 N.J.S.A. § 45:27-25, and as such, subsections (b)-(d) are invalid.

### ii. Other Remedies

**[34]**  Defendants further suggest that I remand this matter to the New Jersey Cemetery Board to add detail to the statute. I decline to take that course of action. First, it is not clear that I have the authority to remand to the Cemetery Board with an order compelling further rulemaking. The issue is not the Court's power to intervene to remedy subsection (a), but the nature and degree of the requested intervention, which raises sensitive federalism concerns. By ordering rulemaking from a subdivision of state government and a delegee of state legislative power, I might infringe on a core state operation and deprive the legislature of its oversight responsibility, undermining principles of judicial restraint and comity in the process. It would be imprudent to entangle this Court with state-level rulemaking and whatever ongoing monitoring or periodic reporting that entails.

In any event, the Cemetery Board likely lacks the power to make rules regarding the definition of consent. N.J.S.A. § 45:27-4(a) contains the Cemetery Board's primary grant of power: "[it] shall administer the provisions of this act and shall have general supervision and regulation of, and jurisdiction and control over, all cemetery companies and their property, property rights, equipment and facilities." *Id.* I read this provision as empowering the Board to set processes and procedures, not to impose substantive limitations on the discretion that the statute vests in municipalities. I also read it as empowering the Board to bind or penalize cemetery companies, which are the primary regulatory objects of the Act,[14] not other government actors. N.J.S.A. § 45:27-38 confirms this interpretation because that provision empowers the Board to institute actions in the name of the State for violations of its rules, most of which concern cemetery companies. Similarly, although N.J.S.A. § 45:27-4(b) gives the Board the seemingly broad authority "to carry out the purposes of [the Cemetery Act]," the very terms of subsection (a) indicate that its purpose is to give municipalities unrestrained (and, as it turns out, unconstitutional) latitude to reject new cemeteries. Limiting their leeway by rulemaking would undermine rather than carry out that purpose.

*C. Subsections (b)-(d)*

Finally, the parties dispute whether subsection (d), like subsection (a), is void for vagueness, and whether the Cemetery Act narrowly defines the word "cemetery" such that Rosedale does not need a waiver, *i.e.*, whether the limitation on the number of cemeteries in subsection (b) triggers the waiver provision. Although I do not decide these issues today, I remark that the parties' positions demonstrate that imprecision pervades N.J.S.A. § 45:27-25.

The first of these arguments is that subsection (d) contains insufficient limiting principles to guide municipal discretion. *See* Pl. Br., at 24 ("Much like the consent requirement in subsection (a), there is nothing in the statute that supplies a standard to guide the governing body's decision [under subsection (d)]."). Defendants posit that standards similar to those in subsection (d), "[w]hile broad," have long been upheld by state and federal courts. *See* Opp. Br., at 25 (collecting cases). Subsection (d) provides that:

> **\*22** The governing body of a municipality, by resolution, may waive the limitations of subsection b. or c. of this section if it finds that there is a public need for additional cemetery lands and that it is in the public interest to waive them.

N.J.S.A. § 45:27-25(d). Defendants' argument here has merit, as limited by the discussion below. *See, e.g.,* *Montgomery Nat'l Bank v. Clarke*, 882 F.2d 87, 90 (3d Cir. 1989) ("In the sphere of economic regulation, the Supreme Court has frequently upheld statutes that require administrative agencies to make determinations based upon standards such as the public interest."); *see also* *FCC v. RCA Communications, Inc.*, 346 U.S. 86, 90, 73 S.Ct. 998, 97 L.Ed. 1470 (1953) (upholding a "public interest, convenience, or necessity" standard governing the grant of radio licenses); *Lichter v. United States*, 334 U.S. 742, 786, 68 S.Ct. 1294, 92 L.Ed. 1694 (1948) (collecting cases upholding statutes prohibiting "excessive profits," providing for "just and reasonable rates," proscribing "unfair methods of competition," and requiring "fair and reasonable rent"). Still, New Jersey courts have observed, public interest "is a broad concept. The constitutional sufficiency of terms of such sweep may not be judged in a vacuum. The context

must be considered." *Elizabeth Federal Savings & Loan Association v. Howell*, 30 N.J. 190, 194, 152 A.2d 359 (1959) (per curium). As I have found, the context of N.J.S.A. § 45:27-25 is exceedingly vague.

More to the point, Plaintiff argues that subsection (d) is unconstitutional because it is "silent" as to whether a municipality should consider the local or the regional interest in determining whether to grant a waiver to a proposed cemetery. *See* Pl. Br., at 24-25 (concluding that public interest must be viewed regionally). Defendants argue that public interest must be viewed locally rather than regionally because "1) Plaintiff is seeking to establish a cemetery within Readington Township and the Township Committee is concerned with the interests of the Township and its residents, and 2) the Township Committee does not have the ability to accurately evaluate public need/interest beyond its borders, and 3) there is no legal authority saying that 'public need' and 'public interest' [in subsection (d)] must be viewed regionally." Def. Br., at 8, 23-25; Def. Reply Br., at 2-3.

Surprisingly, the State agrees with Plaintiff, arguing that municipalities acting pursuant to subsection (d) "must consider the welfare of all of the State's citizens, not just the interests of the inhabitants in the particular locality." *See* St. Br., at 18 (quoting *Howell Properties, Inc. v. Twp. of Brick*, 347 N.J. Super. 573, 581, 791 A.2d 228 (App. Div. Feb. 13, 2002)). The State then cites to *Duffcon Concrete Products, Inc. v. Cresskill*, 1 N.J. 509, 64 A.2d 347 (1949), for the proposition that "the most appropriate use of any particular property depends not only on all the conditions, physical, economic and social, prevailing within the municipality and its needs, present and reasonably prospective, but also on the nature of the entire region in which the municipality is located." *Id.* at 513, 64 A.2d 347. The State also points to the Township's municipal code, which seeks to "ensure that the development of Readington Township does not conflict with ... the general welfare of ... the state as a whole," § 148-3(c), and "provide sufficient space for a variety of ... uses ... both public and private ... in order to meet the needs of all New Jersey citizens[.]" § 148-3(f).

**\*23** While I express no opinion on the ultimate merits of this argument, the disagreement between the State and the Township reveals the potential flaws in applying subsection (d). The very reason for requiring standards in a delegation is to ensure that the delegee understands the scope of its power, the ways in which that power should be exercised,

**Rosedale and Rosehill Cemetery Association v. Township..., --- F.Supp.3d ---- (2020)**

2020 WL 7768457

and the criteria relevant to its decisions. Here, although the State has delegated the waiver power to the Township with some standards, the Township and the State diverge sharply as to what those standards command, *i.e.*, whether the local or regional interest should predominate. That disagreement does much to prove Plaintiff's point: subsection (d) may not guide the Township's exercise of discretion in a manner consistent with legislative intent.

The second of these arguments is whether the definition of the word "cemetery" in the Cemetery Act triggers the limitation in 📙 N.J.S.A. § 45:27-25(b), such that Plaintiff requires a waiver. Subsection (b) provides that:

> No more than five cemeteries may be established in any one municipality, and not more than 3% of the area of any municipality shall be devoted to cemetery purposes.

*Id.*

The parties' dispute centers on the definition of "cemetery." The Cemetery Act defines "cemetery" as "any land or place used or dedicated for use for burial of human remains or disposition of cremated human remains." 📙 N.J.S.A. § 45:27-2. Plaintiff argues that this "quite capacious" definition nevertheless refers only to cemeteries with a Certificate of Authority from the State, *i.e.*, cemetery *companies, see* Pl. Reply Br., at 12-18, based on "ample contextual evidence." *See* Pl. Br., at 34 n.12. Specifically, Plaintiff points to (1) a provision of 📙 N.J.S.A. § 45:27-2 stating that the statutory definition of "cemetery" does not apply if "context indicates otherwise," (2) the New Jersey Supreme Court decision in *Feuchtbaum v. Mayor and Twp. Committee of Woodbridge*, 12 N.J. Misc. 541, 172 A. 910 (1934), which, Plaintiff argues, holds that the Cemetery Act applies only to cemeteries organized under the statute, (3) an Attorney General Opinion from 1940 construing a prior version of the Cemetery Act narrowly, *see* N.J. Atty. Gen. Op. 125 (1940); Pl. Br., Ex. 7, and (4) "basic principles of statutory construction" which "weigh heavily against the Township's all-encompassing definition." *See* Pl. Br., at 37-46.

Defendants respond that, based on a "plain" and "straightforward" reading of the text in the Act, "cemetery"

broadly includes any plot of land containing human remains. [15] *See* Def. Reply Br., at 2-3; Def. Br., at 20-22. The State calls both approaches "absurd." *See* St. Br., at 24. It contends that the definition of "cemetery" includes cemeteries that are operated by religious organizations and that restrict burials to members of that faith, *i.e.*, not just cemetery *companies* with a Certificate of Authority, as Plaintiff advocates, but excludes "privately-owned lands where remains have been buried," as advanced by Defendants. *Id.* at 20-25. For support, the State focuses on a 1973 amendment to the Cemetery Act, then § 8A:6-1.1, which included a provision applying the consent provision in subsection (a), the 250-acre limitation in subsection (b), and the five-cemetery limitation in subsection (b) to cemetery companies, religious corporations, and religious societies. *See* L. 1973, c. 219, § 25 (effective Sept. 10, 1973). From this, the State infers that the legislature "intended that cemeteries operated by cemetery companies and those operated by religious corporations be counted *together* for the purposes of determining the number of cemeteries within a single municipality." *See* St. Br., at 22.

**\*24** Without deciding the scope of the word "cemetery," I again stress that the parties' disagreement indicates a problematic degree of imprecision in 📙 N.J.S.A. § 45:27-25. For example, when the legislature reenacted the Cemetery Act in 2003 as part of an ongoing effort to modernize its code, it removed § 8A:6-1 altogether, even though the recodification commission recommended retaining it. *See* Def. Br., Ex. 8 (Table of Dispositions), at 31; St. Br., at 23. However, the commission commented that the substantive revisions to the Act, which the legislature adopted, were "broadened to reflect § 8A:6-1.1" all the same. *See* Def. Br., Ex. 8 (Table of Dispositions), at 19. The legislature then expressly repealed § 8A:6-1.1 in 2005. *See* L. 2005, c. 324. This convoluted enactment history, among other things, casts doubt on the meaning of "cemetery," despite its seemingly broad definition in 📙 N.J.S.A. § 45:27-2, leaving the Court—and apparently all three parties in this case—unsure as to when the five-cemetery limitation in subsection (b) is triggered and the circumstances under which the waiver provision in subsection (d) applies.

## IV. CONCLUSION

Because 🚩 N.J.S.A. § 45:27-25(a) is a standardless delegation of state power, it violates the Due Process Clause of the United States Constitution, and because it is not severable from subsections (b)-(d), 🚩 N.J.S.A. § 45:27-25

is unconstitutional in its entirety. I stay my decision for a period of thirty days to give the New Jersey Legislature the opportunity to enact a new version of N.J.S.A. § 45:27-25, should it wish to do so, *see Freeman v. Fischer*, No. 03-03140, 2012 WL 10205071, at *1 (D.N.J. Apr. 24, 2012), at which time it would be well-advised to clarify the uncertainties in the statute raised by the parties and the Court in this Opinion.

Plaintiff's Motion for Summary Judgment is **GRANTED** and Defendants' cross-motion is **DENIED**.

**All Citations**

--- F.Supp.3d ----, 2020 WL 7768457

## Footnotes

1    For example, Rosedale integrated a twenty-one page comment from a Planning Board engineer into its proposed design for Block 12.

2    Rosedale presented other expert testimony in support of its application, including from a landscape architect, professional engineer, environmental specialist, traffic engineer, and hydrogeologist. *See* Pl. SUMF, ¶ 16. A nearby property owner opposed Rosedale's application and cross-examined its witnesses, but otherwise no parties objected. *See generally* Pl. Br., Exs. 3-6 (Hearing Transcripts).

3    Counts One, Two, Six, and Seven assert that the Township's decision to withhold consent was also arbitrary, capricious, and an abuse of discretion. *See* Compl., ¶¶ 53-54, 58, 69-71, 73-74. Rosedale then asserts various state and federal constitutional claims, including a violation of the First Amendment, *id.* ¶¶ 79-81 (Count Eight); New Jersey's Establishment Clause, *id.* ¶¶ 83-84 (Count Nine); procedural due process for denying a fully conforming conditional use application, *id.* ¶¶ 86-87 (Count Ten), hearing outside research and testimony, *id.* ¶ 89 (Count Eleven), and abusing the hearing procedures, *id.* ¶ 93 (Count Thirteen); and a taking. *Id.* ¶ 91 (Count Twelve). Further, Rosedale asserts various claims based on the Township's Resolution, including a violation of the New Jersey Open Public Meeting Act, *id.* ¶¶ 94-102 (Count Fourteenth), issuing a resolution without jurisdiction, *id.* ¶¶ 104-09 (Count Fifteen), and *ultra vires* acts. *Id.* ¶¶ 111-26 (Count Sixteen). Finally, Rosedale asserts violations of the New Jersey Civil Rights Act, *id.* ¶¶ 128-32 (Count Seventeen), and the Federal Civil Rights Act. *Id.* ¶¶ 134-38 (Count Eighteen).

4    The State adds that subsection (a) is constitutional because a provision in New Jersey's Municipal Land Use Law supplies a standard restricting the Township's exercise of discretion, and because subsection (a) has existed for many years seemingly without challenge. *See* St. Br., at 10-12, 15-16.

5    The State splits the difference on this point, arguing that the definition includes cemeteries that are operated by religious organizations and that restrict burials to members of that faith, but does not include "privately-owned lands where remains have been buried." *See* St. Br., at 22-25.

6    Although the parties do not dispute whether Plaintiff has standing to challenge subsection (a), I must address that issue *sua sponte* because it affects the Court's subject matter jurisdiction under Article III. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006) ("We have an obligation to assure ourselves of litigants' standing under Article III."). To establish standing, a plaintiff needs to demonstrate injury in fact, causation, and redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Friends of Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 180-81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). Where a plaintiff challenges multiple provisions in a statute, as here, it must meet the standing requirements for each provision. *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 230-31, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990); *Comité de Apoyo a los Trabajadores Agrícolas v. Perez*, 148 F. Supp. 3d 361, 370-71 (D.N.J. 2015). Because Defendants' Resolution clearly denies Plaintiff's application under subsection (a) as well as (d), *see* Def.

SUMF, ¶ 12; Def. Br., Ex. 7A (Resolution Denying Rosedale's Application), I find that Plaintiff has standing to challenge subsection (a).

7    That said, assuming Rosedale's allegations are true, this strikes me as a classic case in which discriminatory application proves, in part, facial infirmities. *See infra* (discussion of *Yick v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886)). For example, at the final hearing on Rosedale's proposed cemetery, a Commissioner allegedly stated that, "[i]f this were an application from a church and congregants and family members and community members were running out of space, this would be a different story." *See* Pl. SUMF, ¶ 27; Pl. Br., Ex. 6 (Hearing Transcript), at 119:1-8-120:1. Similarly, the Mayor allegedly made the following comment: "Readington's population is, you could say, surprisingly or alarmingly or whatever, majority Catholic. And most of the people who – most of – certainly the local funeral homes, both of them really, deal largely with people who die in Readington and are buried in Catholic cemeteries in the area .... I think, and maybe this is the wrong thing to say, ... I don't think this was the vision that [local zoning ordinances had] for a cemetery. I think they were talking about small church cemeteries, not a gigantic cemetery run by an out-of-town corporation that really has no connection to Readington." *See* Pl. Br., Ex. 6 (Hearing Transcript), at 120:16-121:24. Although Defendants argue that these comments were merely "in artfully [sic] stated," Def. Br., at 16, to the extent that they are true, there is merit to Rosedale's as-applied challenge to N.J.S.A. § 45:27-25(a).

8    New Jersey courts have long enforced due process on this basis. *See, e.g.,* *Weiner v. Borough of Stratford,* 15 N.J. 295, 298-300, 104 A.2d 659 (1954) (holding that "the municipality has a broad grant of police powers to enact ordinances not prohibited by or inconsistent with the Federal or State Constitutions or other statutes," and explaining the difference between the existence of a municipal power and the existence of standards governing the exercise of that power); *Twp. of Raritan v. Hubb Motors, Inc.,* 26 N.J. Super. 409, 410, 98 A.2d 326 (App. Div. June 29, 1953) ("[The] power of a municipality is always subject to the provision that the ordinance must not be unreasonable, arbitrary or discriminatory, and must lay down a standard or norm for the guidance of the authority."); *Group Health Ins. of N.J. v. Howell,* 40 N.J. 436, 447, 193 A.2d 103 (1963) ("[T]he statute sets forth no standards or safeguards to protect against unfairness, arbitrariness, or favoritism, and is therefore void for lack of due process."); *Abelson's, Inc. v. New Jersey State Board of Optometrists,* 5 N.J. 412, 424, 75 A.2d 867 (1950) ("The conduct thus inhibited is not that which in law and in fact is of a character likely to 'deceive or defraud the public,' words of definite and certain meaning, but that which 'in the opinion of the board' is of that character. This subjective test of conduct meriting disapproving action is so vague, indefinite, and uncertain as to render the provision void for want of due process."); *Cammarata v. Essex County Park Comm'n,* 26 N.J. 404, 410, 140 A.2d 397 (1958) (holding that a delegation of state legislative power will survive scrutiny under the New Jersey Constitution only if it is " 'hemmed in by standards sufficiently definite to guide its exercise' ").

9    Two weeks later, in a Committee meeting regarding a proposed ordinance to eliminate cemeteries as a conditional use altogether, the Mayor allegedly reiterated her position that a church cemetery would have been approved in Plaintiff's case. *See* Pl. Br., Ex. 7 (Meeting Transcript), at 3:18-4:8. The Mayor also allegedly stated that, under the new zoning rules, if "a new house of worship ... wanted to have a cemetery, they could always go to the zoning board." *Id.* at 4:4-8.

10    The Supreme Court passed on the facial challenge in *Yick*, not because one could not be sustained, but because "the facts shown establish an administration directed so exclusively against a particular class of persons as to warrant and require the conclusion that ... they are applied by the public authorities charged with their administration, and thus representing the state itself, with a mind so unequal and oppressive as to amount to a practical denial by the state of that equal protection of the laws." 118 U.S. at 373, 6 S.Ct. 1064.

11    Similar reasoning is found in a number of state cases, albeit older ones, concerning municipal consent provisions, some regulating cemeteries, which I also find persuasive. *See, e.g., Finn v. Mun. Council of City of*

*Clifton,* 136 N.J.L. 34, 36-37, 53 A.2d 790 (Ct. Errors & Appeals 1947) (invalidating an ordinance "prohibit[ing] gasoline service stations in business districts 'unless permission is first obtained from the Municipal Council of the City of Clifton' " because that standard "does not lay down a sufficient norm or standard for the guidance of the Municipal Council upon which the granting or refusal of the requested permit may depend"); *Bultman Mortuary Service v. City of New Orleans,* 174 La. 360, 365, 140 So. 503 (1932) (invalidating an ordinance that prohibited new "[m]ortuary establishments except when granted upon the expressed permission of the commission council" because that "places it within the power of the council to grant or withhold permits ... according to its whim and fancy"); *Park Hill Development Co. v. City of Evansville,* 190 Ind. 432, 130 N.E. 645 (1921) (invalidating an ordinance prohibiting a new cemetery in the city "until a plat of said cemetery has been first filed with and approved by the board of public works of said city and the common council of said city" because that "confer[red] upon certain city officers the arbitrary power to approve or disapprove an offered plat of a cemetery for any reason they might choose, or upon a mere whim, without a reason, and to take different action with regard to different plats under like circumstances"); *Los Angeles Cty. v. Hollywood Cemetery Ass'n,* 57 P. 153, 124 Cal. 344, 349-50 (1899) (invalidating on state constitutional grounds an ordinance making it "unlawful to locate or establish, extend or enlarge, any cemetery, graveyard, burying ground, or crematory, within the limits of the county of Los Angeles, without the permission of the board of supervisors first had and obtained"); *City of Baltimore v. Radecke,* 49 Md. 217, 230 (Md. Ct. App. 1878) ("[T]here is nothing in the ordinance [giving the mayor the power to shut down a steam engine business] to guide or control his action. It lays down no rules by which its impartial execution can be secured, or partiality and oppression prevented .... and, when we remember that this action of non-action may proceed from enmity or prejudice, from partisan zeal or animosity, from favoritism and other improper influences and motives easy of concealment, and difficult to be detected and exposed, it becomes unnecessary to suggest or comment upon the injustice capable of being wrought under cover of such a power, for that becomes apparent to every one who gives to the subject a moment's consideration.").

12    Legislative intent can also be gleaned from N.J.S.A. § 45:27-25's title, "Consent of municipality for establishment, enlargement of cemetery," which implies that every cemetery must go through the consent process, not merely cemeteries that are otherwise prohibited by subsections (b) and (c). *See, e.g., FTC v. Mandel Bros., Inc.,* 359 U.S. 385, 388-89, 79 S.Ct. 818, 3 L.Ed.2d 893 (1959) ("The Title of the act ... is ... a useful aid."); *Maguire v. Commissioner of Internal Revenue,* 313 U.S. 1, 9, 61 S.Ct. 789, 85 L.Ed. 1149 (1941) ("While the title of an act will not limit the plain meaning of its text, it may be of aid in resolving an ambiguity.") (internal citations omitted).

13    It is worth mentioning that none of the current Cemetery Act's thirty-eight provisions contains a severability clause. Of course, "[t]he presence or absence of a [state] severability clause in a statute is not dispositive." *Trade Waste,* 780 F.2d at 231. And a New Jersey statute of general application provides that, "[i]f any title, subtitle, chapter, article or section of the Revised Statutes, or of any statute or any provision thereof, shall be declared to be unconstitutional, invalid or inoperative, in whole or in part, by a court of competent jurisdiction, such title, subtitle, chapter, article, section or provision shall, to the extent that it is not unconstitutional, invalid or inoperative, be enforced and effectuated and no such determination shall be deemed to invalidate or make ineffectual the remaining titles, subtitles, chapters, articles, sections or provisions." N.J.S.A. § 1:1-10. Even so, on the facts "in each case it is necessary to determine whether, assuming one section of a statute is invalid, the legislature nevertheless would have enacted the remaining parts," *Trade Waste,* 780 F.2d at 231, and "there may be circumstances which compel a court to conclude that the [New Jersey] Legislature would not have enacted the statute without the inclusion of the objectionable part" despite the presence of a general savings clause. *Group Health,* 40 N.J. at 455, 193 A.2d 103.

14    For example, the Act regulates the organization of cemetery companies, the duties of their governing bodies, the land they may acquire or own, the rights of plot owners as against them, and related cemetery salesmen.

15  Defendants' interpretation of "cemetery" includes religious cemeteries as well as secular ones. A religious group seeking to establish a new cemetery in Readington must therefore obtain a waiver in the normal course under subsection (d) because, based on Defendants' definition, Readington contains over twenty cemeteries, far exceeding the five-cemetery limit imposed by subsection (b). *See* Def. SUMF, ¶ 19. Despite this, the Mayor stated in a subsequent hearing repealing the conditional-use zoning rule for cemeteries that religious groups can apparently seek approval for new cemeteries from the Planning Board directly. *See supra*, note 9. The Mayor's remark may evince an animus toward non-religious cemeteries, which is the basis of Plaintiff's remaining claims.

---

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

TAB 33

*Sheet Metal Workers Nat. Health Fund v. Amgen Inc.*, No. 07–5295, 2008 WL
3833577 (D.N.J. Aug.13, 2008)

2009-1 Trade Cases P 76,556

KeyCite Yellow Flag - Negative Treatment

Declined to Follow by  Dragoslavic v. Ace Hardware Corporation,
E.D.Tex.,  August 16, 2017

2008 WL 3833577

NOT FOR PUBLICATION

United States District Court, D. New Jersey.

SHEET METAL WORKERS NATIONAL

HEALTH FUND, individually and on behalf

of all others similarly situated, Plaintiff,

v.

AMGEN INC. and Amgen USA, Inc., Defendants.

Civil Action No. 07–5295 (SRC).

|

Aug. 13, 2008.

**Attorneys and Law Firms**

David J. Cohen, Saltz Mongeluzzi Barrett & Bendesky,
Philadelphia, PA, for Plaintiff.

Michael R. Griffinger, Michael F. Quinn, Guy V. Amoresano,
Jennifer A. Hradil, Gibbons, PC, Newark, NJ, for Defendants.

**OPINION**

CHESLER, District Judge.

 **\*1**  This matter comes before the Court upon the motion to
dismiss filed by Defendants Amgen Inc. and Amgen USA,
Inc. [docket item # 27] (The Defendants will be referred
to collectively as "Amgen".) Plaintiff Sheet Metal Workers
National Health Fund ("Plaintiff" or "SMW") opposes the
motion. The Court has considered the papers submitted by
the parties, and pursuant to Federal Rule of Civil Procedure
78, rules on the motion without oral argument. For the
reasons discussed below, the Court grants Amgen's motion in
part, dismissing SMW's claim for injunctive relief under the
Clayton Act and for a declaratory judgment without prejudice.
Certain of the state antitrust claims will be also dismissed
without prejudice for failure to state a claim upon which
relief may be granted. The motion to dismiss the remainder
of the claims, pled under various state laws will be denied as
premature.

## I. RELEVANT FACTS

This putative class action involves an alleged tying
arrangement and pricing scheme implemented by Amgen
allegedly in violation of federal and state antitrust law. The
Court has subject matter jurisdiction over this case pursuant
to the diversity jurisdiction requirements of the Class Action
Fairness Act of 2005,  28 U.S.C. § 1332(d)(2)(A). The
lawsuit also supports federal question jurisdiction under 28
U.S.C. §§ 1331 and 1337 and 15 U.S.C. § 15(a) by virtue
of Plaintiff's claim for injunctive relief under the Clayton Act,
15 U.S.C. § 26, for alleged violations of the Sherman Act,
15 U.S.C. § § 1– 2. The following summary of the facts
is based on the Complaint, and the Court assumes their truth
for purposes of this motion.

This lawsuit involves Amgen's sale to oncology clinics of
two kinds of drugs-red blood cell growth factor ("RBCGF")
and white blood cell growth factor ("WBCGF"). [1] Amgen
manufactures and sells a RBCGF drug known as Aranesp,
which is approved by the Food and Drug Administration
("FDA") to treat chemotherapy-induced anemia, a red
blood cell deficiency. Aranesp competes with only one
other RBCGF drug for chemotherapy-induced anemia. The
competitor RBCGF drug is manufactured by Ortho Biotech
Products, L.P. ("Ortho") and sold under the brand name
Procrit. Amgen also manufactures and sells WBCGF drugs,
branded as Neupogen and Neulasta, which command a 98%
market share of WBCGF drug sales to oncology clinics. [2]
Because many cancer patients undergoing chemotherapy
develop anemia and/or the white blood cell deficiency
neutropenia, most oncology clinics need to purchase both
RBCGF drugs and WBCGF drugs.

SMW alleges that Amgen has sought to eliminate competition
for sales of RBCGF drugs to oncology clinics by
implementing a pricing scheme that bundles sales of
Aranesp, Amgen's RBCGF drug, with sales of its WBCGF
drugs, on which Amgen has an undisputed monopoly, in
a way that penalizes oncology clinics for purchasing
the competing RBCGF drug Procrit. The bundled pricing
scheme, implemented in spring 2004, offered substantial
rebates to oncology clinics if a clinic met certain dollar
volume requirements in their combined purchases of Amgen's
RBCGF and WBCGF drugs. Amgen offered these rebates
in its Amgen Portfolio Contract ("APC"). Under the APC
pricing, each clinic was given dollar volume usage targets

2009-1 Trade Cases P 76,556

that, once reached, allowed the clinic to earn a specified level of rebate. The greater the purchases of Amgen products, the greater the rebate earned.

**\*2** The Complaint does not allege that Amgen will sell its WBCGF products on the condition that the oncology clinics also buy its RBCGF product Aranesp. The tying arrangement described by the Complaint is based on the discounts a clinic would receive if certain volumes of the products were purchased in a bundle, as described above. SMW claims that Amgen's pricing scheme structured the bundled discounts in a way that forced the purchase of Aranesp. One, Amgen capped the amount of WBCGF drugs that could be considered for purposes of reaching the dollar volume targets or higher rebate levels. Two, Amgen required minimum dollar volume requirements for Aranesp in order to earn the rebates. In the latest iteration of the pricing scheme described in the Complaint, namely the October 2005 APC, clinics were required to purchase at least 65% of their RBCGF volume from Amgen to gain access to the lowest rebate level. [3] Amgen's increase of Aranesp purchase requirements to reach the same rebate levels previously offered for lower purchase volumes and decrease of rebates offered on the WBCGF drug Neulasta forced oncology clinics to purchase all or substantially all of their RBCGF drugs from Amgen. The coercive effect of the pricing scheme was magnified by the economics of treating Medicare patients, who form approximately 40% of the patient population in oncology clinics. Because the federal government reimburses clinics for drugs they purchase and administer to Medicare patients under a formula based on a drug's average selling price, a clinic that does not avail itself of all rebates may pay the manufacturer more for a drug than it will receive in reimbursement from the government. Thus, foregoing the bundled discount—which requires the purchase of Aranesp—would result in significant losses on an oncology clinic's administration of WBCGF drugs, which are practically speaking only available from Amgen.

SMW charges that Amgen's pricing scheme will ultimately harm competition and raise prices paid by end payers, such as SMW. By coercing clinics to buy less Procrit and more Aranesp, the APC pricing scheme has resulted in loss of market share by Ortho for RBCGF sales to oncology clinics. According to the Complaint, "Amgen's current efforts to leverage its monopoly in the WBCGF drug market by penalizing oncology clinics that do not buy substantial amounts of Aranesp, coupled with the Medicare reimbursement regime, preclude Ortho from

competing over the long-term in the RBCGF oncology clinic market." (Compl., ¶ 53.) The Complaint alleges that as a result of the pricing scheme, Ortho's share of RBCGF sales to oncology clinics had dropped to 34% of that market.

SMW, a multi-employer welfare fund, claims injury in this scheme as a third-party payer. SMW reimburses oncology clinics for their purchases of Aranesp used to treat the fund's insureds. The Complaint alleges: "Amgen's pricing schemes have caused and will continue to cause anti-competitive effects in the relevant product markets.... Amgen's coercive bundling programs have caused public and private health care insurers, including third-party payer members of the Class, to reimburse clinics for their Aranesp purchases at rates that are higher than would have prevailed in 'head to head' competition." (*Id.,* ¶¶ 64–65.)

**\*3** SMW alleges, in sum, that Amgen has illegally tied the purchase of its RBCGF drug Aranesp to the purchase of its WBCGF drugs by virtue of the "massive rebates" offered on the combined purchases and Amgen's monopolist market power in the sale of WBCGF drugs. The tying arrangement "has substantially foreclosed and will continue to substantially foreclose Ortho from competing with Amgen for the sale of RBCGF drugs to oncology clinics based on the efficacy of its product and the price of its product on a stand-alone basis." (*Id.,* ¶ 113.) In addition to its anti-competitive effect, Amgen's practices have increased the cost to consumers in the oncology clinic market, and according to SMW, will continue to do so unless enjoined. (*Id.,* ¶ 115.)

The Complaint asserts causes of action under federal and state law. The first count pleads for injunctive relief under § 16 of the Clayton Act, 15 U.S.C. § 26, premised on Amgen's alleged antitrust conduct, in violation of the Sherman Act, 15 U.S.C. §§ 1– 2. [4] It also seeks a declaratory judgment that Amgen has violated Section 2 of the Sherman Act. The second and third count plead, respectively, unlawful tying in violation of California's antitrust statute, Bus. & Prof.Code § 16700, *et seq.,* and violation of California's Unfair Competition Law, Bus. & Prof.Code § 17200, *et seq.* (Amgen is a Delaware corporation with its principal place of business in California.) Finally, the fourth count asserts an alternative claim for relief. It states that "to the extent the Court rules that California's antitrust law does not apply nationwide," SMW seeks damages under the antitrust statutes of 27 different states.

2009-1 Trade Cases P 76,556

## II. STANDARD OF REVIEW

Amgen's principal basis for seeking dismissal of the Complaint in its entirety is SMW's lack of antitrust standing for failure to allege an injury in fact. While such grounds implicate constitutional standing principles and therefore the Court's subject matter jurisdiction, the Court reviews the motion according to the standards applicable to Rule 12(b)(6) instead of Rule 12(b)(1). First, the Third Circuit jurisprudence on antitrust standing has generally considered this issue in the context of reviewing a motion to dismiss pursuant to Rule 12(b)(6). *Maio v. Aetna, Inc.,* 221 F.3d 472, 482 n. 7 (3d Cir.2000). Second, the parties have treated the motion under the rubric of Rule 12(b)(6), and thus there is no prejudice to SMW in the Court treating it as such. *Id.*

A motion to dismiss under Federal Rule of Civil Procedure 12(b) (6) may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds that plaintiff has failed to set forth fair notice of what the claim is and the grounds upon which it rests. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, ——, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007) (citing *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In *Bell Atlantic v. Twombly,* an antitrust case alleging conspiracy in violation of the Sherman Act, the Supreme Court addressed the standard for evaluating the legal sufficiency of a pleading attacked on a Rule 12(b)(6) motion. It held that while a complaint need not contain "detailed factual allegations," it must plead "enough facts to state a claim to relief that is plausible on its face." *Id.* at 1964. [5] Federal Rule of Civil Procedure 8, which sets forth a notice pleading standard, requires that "something beyond the mere possibility of loss causation" be alleged. *Id.* at 1966 (citing *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 347, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005)).

**\*4** In evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court may consider only the complaint, exhibits attached to the complaint, matters of public record, and undisputedly authentic documents if the complainant's claims are based upon those documents. *See Pension Benefit Guar. Corp. v. White Consol. Indus.,* 998 F.2d 1192, 1196 (3d Cir.1993). The issue before the Court "is not whether plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence in support of the claims."

*Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1420 (3d Cir.1997) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).

## III. FEDERAL CLAIMS

### A. Injunctive Relief Under The Clayton Act

Amgen takes the position that the Complaint must be dismissed because it is bereft of facts alleging that SMW has suffered or is threatened with injury-in-fact. Without injury-in-fact, a plaintiff lacks statutory standing under the federal antitrust law. *Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 334, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990); *City of Pittsburgh v. West Penn Power Co.,* 147 F.3d 256, 268 (3d Cir.1998). The Third Circuit has observed that standing, which is a threshold question in any action, takes on particular significance in context of antitrust laws "where a balance must be struck between encouraging private actions and deterring legitimate competitive activity through overly vigorous enforcement." *City of Pittsburgh,* 147 F.3d at 264; *see also* Phillip Areeda, *Antitrust Violations Without Damage Recoveries,* 89 Harv. L.Rev. 1127, 1127 (1976) ("the desire to encourage private enforcement and to penalize antitrust violations is no excuse for awarding damages that are non-existent"). The question of whether a plaintiff has suffered an antitrust injury must be decided first. *City of Pittsburgh,* 147 F.3d at 265.

In this case, SMW pleads for an injunction under the Clayton Act against Amgen's allegedly anti-competitive tying arrangement. Section 16 of the Clayton Act provides for injunctive relief against *"threatened"* loss or damage by a violation of the antitrust laws." 15 U.S.C. § 26 (emphasis added). This standard is slightly different from the statutory standard for recovering damages for an antitrust violations. While a plaintiff seeking to recover damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, must establish that it actually sustained injury-in-fact, a plaintiff seeking injunctive relief must show "a significant threat of injury" from the antitrust violation to establish standing. *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 126, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986). The Supreme Court has held that although there are differences between Section 4 and Section 16 in the cognizable injury for which they provide a remedy, under both sections a plaintiff "must still allege an injury of

the type the antitrust laws were designed to prevent." *Id. at 111.*

**\*5** The parties take differing views on how the law defines antitrust injury in disputes involving an allegedly illegal tying arrangement. The matter is complicated by the fact that the law in this area is unsettled, and the issue has not been addressed by the Third Circuit Court of Appeals or by any district court within the Third Circuit. [6] The tension lies between recognizing antitrust injury when, as a result of the tying, a buyer has paid above-market prices for the tied product (the "tied product" approach) and recognizing injury when the buyer pays more for both the tied and tying products in a bundle than their combined market value would command (the "package" approach). X Phillip E. Areeda, et al., *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1769a, at 410 (2d ed.2000) [hereinafter, *Antitrust Law*]; compare *Kaiser Aluminum & Chem. Sales v. Avondale Shipyards,* 677 F.2d 1045, 1054 (5th Cir.1982), *cert. denied,* 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983) (holding that "in a tying arrangement, 'the ordinary measure of damages would be the difference between the price actually paid for the tied product and the price at which the product could have been obtained on the open market' ") (quoting *Pogue v. Int'l Indus., Inc.,* 524 F.2d 342, 344 (6th Cir.1975) *with Kypta v. McDonald's Corp.,* 671 F.2d 1282, 1285 (11th Cir.), *cert. denied,* 459 U.S. 857, 103 S.Ct. 127, 74 L.Ed.2d 109 (1982) (holding that "injury resulting from a tie-in must be shown by establishing that payments for both the tied and tying products exceeded their combined fair market value"). While it did not resolve the question of which approach it would hold accurately captures antitrust injury, the Second Circuit Court of Appeals offered a concise explanation of the two basic methods for assessing harm in tying cases:

> One method is the "tied product" approach, as referred to by the district court. Under this measure, the damages awarded reflect the difference between the price actually paid for the tied product and the price for which the item could have been purchased on the open market. The second approach is the so-called "package" measure, which would award damages only to the extent that the plaintiff overpaid for the combination of the tied and tying products.

*In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 142–43 (2d Cir.2001), *cert. denied, Visa U.S.A. Inc. v.*

*Wal–Mart Stores, Inc.,* 536 U.S. 917, 122 S.Ct. 2382, 153 L.Ed.2d 201 (2002) (citations omitted).

The Complaint before this Court states that SMW has been injured as follows:

> Amgen's coercive bundling programs have caused public and private health care insurers, including third-party payer members of the Class, to reimburse clinics for their Aranesp purchases at rates that are higher than would have prevailed in "head-to-head" competition.

(Compl., ¶ 65.) Re-stated, SMW alleges that, because of the illegal tie, it has paid above-market prices for the tied product, Aranesp. The Complaint does not allege that SMW has paid more for the package of Aranesp (the tied product) and WBCGF (the tying product) than it would have paid for them combined at market value. Thus, whether our jurisprudence would identify antitrust injury according to the tied product approach or, instead, according to the package approach is crucial to the question of SMW's standing to pursue its federal antitrust claim.

**\*6** The Court has reviewed the caselaw of jurisdictions that have addressed antitrust injury in tying cases. Guided, in part, by the discussion on the subject in Areeda's treatise *Antitrust Law,* the Court finds the rationale of the package approach to be sound and follows those courts which have adopted that approach. [7] Areeda explains that in most tying arrangements, a premium price on the tied product will be accompanied by a reduction in price on the tying product. *Antitrust Law* ¶ 1769c at 413. Comparing the value of only the tied product bundled and unbundled would not, therefore, give an accurate account of whether the buyer in fact sustained economic harm. *Id.; see also Kypta,* 671 F.2d at 1285. Indeed, Areeda's opinion on the error of the tied product approach is blunt; he states that those courts that have measured damages based on an overcharge for the tied product alone are "quite wrong." *Antitrust Law* ¶ 1769c at 413. Holding that "injury resulting from a tie-in must be shown by establishing that payments for both the tied and tying products exceeded their combined fair market value," *Kypta,* 671 F.2d at 1285, the Eleventh Circuit Court of Appeals reasoned:

2009-1 Trade Cases P 76,556

A determination of the value of the tied products alone would not indicate whether the plaintiff indeed suffered any net economic harm, since a lower price might conceivably have been exacted by the franchisor for the tying product. Unless the fair market value of both the tied and tying products are determined and an overcharge in the complete price found, no injury can be claimed; suit, then, would be foreclosed. *Id.* Indeed, the alternative approach to tying damages not only fails to capture the incidence of economic harm but may also have the unintended result of going beyond making the plaintiff whole and placing it in a better position than it would have been in absent the allegedly unlawful antitrust activity. In a case decided after *Visa Check,* the District Court for the Southern District of New York rejected the tied product approach, reasoning that such a measure of damages could result in a windfall to the plaintiff because it fails to take into account whether any increase in the price of the tied product was offset or even exceeded by a reduction in the price of the tying product. *Freeland,* 238 F.R.D. at 150 (citing *Visa Check,* 280 F.3d at 155 (Jacobs, J., dissenting)).

Because SMW has not pled Amgen's tying arrangement has caused it to face a significant threat of paying more for Aranesp and WBCGF as a bundle than it would pay for the products individually absent the tie, SMW has failed to allege injury that may be redressed by its federal antitrust claims. That the package approach to identifying whether antitrust injury has been sustained is the correct view is not merely theoretical in this case. The facts alleged bear out the rationale for the package measure of damages. SMW alleges that the Amgen products were tied by a pricing scheme that made discounts on the tying product, Amgen's WBCGF, available only on the condition that an oncology clinic purchase certain volumes of the tied product, Aranesp. The relevant fact of injury must be the amount paid for the bundle, not merely for the Aranesp alone. The very nature of the tie at issue revolves around the tied goods' price interdependence, which is the underpinning of the package approach.

**\*7** No relief may be granted under the Clayton Act because SMW has failed to plead an injury cognizable under the federal statute. "While the amount of damages need not be precise, the fact of damage, consisting of net economic loss suffered by the plaintiff, ... [is] the gravamen of a tie-in action." *Kypta,* 671 F.2d at 1285 (citing Areeda, 89 Harv. L.Rev. at 1127–28). Without making a plausible allegation of threatened antitrust injury, SMW lacks statutory standing to seek an injunction under the Clayton Act against Amgen's

allegedly unlawful tying and monopolization. Dismissal of SMW's Clayton Act claim is warranted under 12(b)(6). [8]

The Court notes that it will order a dismissal without prejudice. SMW should and will be given the opportunity to re-plead its claim for relief under the Clayton Act alleging it has faced a significant threat of injury-in-fact as discussed by this Opinion.

### B. Request For Declaratory Judgment

Count One of the Complaint also pleads for this Court to issue declaratory judgment that Amgen's conduct, as described in the Complaint, violates Section 2 of the Sherman Act. SMW claims that through the allegedly illegal tying arrangement, Amgen has monopolized or attempted to monopolize the oncology clinic market for RBCGF. The declaratory judgment claim will also be dismissed for failure to state a claim upon which relief may be granted.

The Declaratory Judgment Act provides that a Court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The express language of the declaratory judgment statute and fundamental principles of standing under Article III of the Constitution limit this power to actions which present a case or controversy. *Cutaiar v. Marshall,* 590 F.2d 523, 527 (3d Cir.1979). "The statute creates a remedy only; it does not create a basis of jurisdiction, and does not authorize the rendering of advisory opinions." *Id.* The Supreme Court has held that the question of whether declaratory judgment is appropriate is "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy any reality to warrant the issuance of a declaratory judgment." *Golden v. Zwickler,* 394 U.S. 103, 108, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969) (quoting *Maryland Cas. Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941)). Because SMW seeks a declaration that Amgen has violated Section 2 of the Sherman Act, deciding whether SMW's claim for a declaratory judgment can survive this motion to dismiss requires an evaluation of whether the Complaint states a justiciable controversy involving that antitrust violation.

2009-1 Trade Cases P 76,556

Section 2 of the Sherman Act encompasses three separate offenses: monopolization, attempt to monopolize and conspiracy to monopolize. 15 U.S.C. § 2; *Carlo C. Gelardi Corp. v. Miller Brewing Co.,* 421 F.Supp. 237, 244 (D.N.J.1976). It is a penal provision, providing that any person who has committed one of the three listed acts "shall be deemed guilty of a felony." 15 U.S.C. § 2. A private litigant's right to assert a civil suit for a violation of Section 2 of the Sherman Act is grounded in the Clayton Act. *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 486 n. 10, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); *Handicomp, Inc. v. United States Golf Ass'n.,* No. 99–5372, 2000 WL 426245, at *2 n. 2 (3d Cir. Mar.22, 2000), *cert. denied,* 531 U.S. 928, 121 S.Ct. 307, 148 L.Ed.2d 246 (2000). The Clayton Act, as discussed, requires that the plaintiff have sustained an antitrust injury as a matter of standing. *Atlantic Richfield Co.,* 495 U.S. at 334. For the reasons set forth in Section III.A., the Court has found that SMW has failed to plead injury-in-fact.

*8  A justiciable case or controversy requires the existence of injury-in-fact. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). A failure to plead injury-in-fact therefore leaves SMW's claim for a declaratory judgment without a fundamental underpinning of that claim—an actual controversy between the parties.

Thus, Count One of the Complaint, requesting both injunctive relief under the Clayton Act and a declaratory judgment, will be dismissed without prejudice in its entirety.

## IV. STATE ANTITRUST CLAIMS

Amgen also seeks the dismissal Counts Two through Four of the Complaint. Counts Two and Three plead for relief under the laws of California, Amgen's principal place of business. [9]  In the event the Court finds that California law would not apply to the nationwide class, Count Four pleads for relief under the antitrust laws of 27 other jurisdictions as well. [10]  Amgen argues that aside from being flawed for failing to plead injury-in-fact, the state antitrust claims also fail because SMW has failed to allege that it made a reimbursement to an oncology clinic for the Amgen products in each state under whose laws it seeks to recover and therefore lacks standing. Amgen also argues, alternatively, that apart from this infirmity, the state antitrust claims fail to

state a claim upon which relief can be granted because (1) several of the states do not recognize antitrust damages claims brought by indirect purchasers; (2) SMW's injury-assuming one were pled-would be too remote to be cognizable in states whose antitrust statutes permit indirect purchasers to recover damages; and (3) several of the states limit the applicability of their antitrust statute to conduct that is predominantly intrastate in scope. The Court will address each of these arguments in turn.

### A. Standing To Bring Claims Under Laws of States Where No Injury Claimed

Amgen argues that, even if the state antitrust claims were cognizable—and as discussed below, it maintains that they are not—SMW lacks standing to pursue them because it has not asserted that it reimbursed oncology clinics, i.e., sustained an alleged injury, in each of the states under the laws of which it seeks relief. Amgen takes the position that this deficiency in the Complaint violates a basic principle of standing: the named plaintiffs must have been personally injured. *Lewis v. Casey,* 518 U.S. 343, 347, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996).

Assuming, arguendo, that the harm claimed in the Complaint is a cognizable antitrust injury, SMW alleges that it was injured, but it does not specify that it actually made reimbursements in each of the states whose antitrust law the Complaint invokes. This omission presents a problem of standing. "[T]he fact that 'a suit may be a class action ... adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.' " *Gratz v. Bollinger,* 539 U.S. 244, 289, 123 S.Ct. 2411, 156 L.Ed.2d 257 (2003) (quoting *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 40 n. 20, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)). Amgen argues that where there is no allegation of antitrust injury having occurred in a particular state, the class action plaintiff lacks standing to pursue a claim under that state's laws and the claim must be dismissed. *See In re Terazosin Hydrochloride Antitrust Litig.,* 160 F.Supp.2d 1365, 1370–71 (S.D.Fla.2002) (dismissing certain state law antitrust claims on a Rule 12(b) motion because no named end-payer plaintiff alleged that it suffered antitrust injury in those states). In other words, Amgen takes the position that

2009-1 Trade Cases P 76,556

SMW cannot maintain a state antitrust claim on behalf of the putative class based on the assumption that, theoretically, some un-named member of the class reimbursed an oncology clinic for its Aranesp purchase in that state.

**\*9** Amgen's argument for dismissal of the state law claims for lack of standing fails because it is premature. Although in *Terazosin,* the Southern District of Florida dismissed certain state law antitrust claims for lack of Article III standing before it decided whether the class should be certified, Supreme Court precedent on the correct order of addressing these issues is to the contrary. Granted, it is axiomatic that the existence of a justiciable case or controversy is a fundamental requirement for jurisdiction to attach under Article III of the Constitution. The Supreme Court, however, has held that where class certification is "logically antecedent to Article III concerns," class certification should be decided before reaching the question of Article III standing. *Ortiz v. Fibreboard,* 527 U.S. 815, 831, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999). The *Ortiz* rule applies to this case. The issue of whether SMW, the class action plaintiff, could pursue various state law antitrust claims on behalf of the putative class would not exist but for the fact that SMW has filed these claims on behalf of a class. *Id.; see also Amcham Prods., Inc. v. Windsor,* 521 U.S. 591, 612, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (stating that "logically antecedent" issues are those that would not exist but for the certification). The question is not whether SMW itself has sustained personal injury; clearly, it has alleged that in reimbursing oncology clinics, it bore overcharges due to Amgen's tying arrangement. *See In re Relafen Antitrust Litig.,* 221 F.R.D. 260, 268 (D.Mass.2004) (noting distinction between situations in which *Ortiz* rule applies because standing issues arise solely due to class certification and those in which Article III standing must be decided first because the putative representative's injury is in doubt) (citing *Rivera v. Wyeth–Ayerst Labs.,* 283 F.3d 315, 319 & n. 6 (5th Cir.2002) and *Payton v. County of Kane,* 308 F.3d 673, 680–82 (7th Cir.2002)). Instead, the question of Article III standing to bring each state antitrust claim arises precisely because SMW seeks to prosecute the state claims on behalf of a class, whose members would have suffered an injury in the states whose antitrust statutes are asserted in the Complaint. If the Court decides that class certification is not warranted, then Amgen's challenge to SMW's ability to pursue certain state law claims may be moot. *In re Hypodermic Prods. Antitrust Litig.,* No. 05–1602, 2007 U.S. Dist. LEXIS 47438, at \*57, 2007 WL 1959225 (D.N.J.

June 29, 2007). Thus, because class certification creates the jurisdictional issue, the Court must treat the statutory standing issue before it deals with Article III standing, as instructed by *Ortiz. Ortiz,* 527 U.S. 815 at 831, 119 S.Ct. 2295, 144 L.Ed.2d 715; *In re Hypodermic Prods. Antitrust Litig.,* 2007 U.S. Dist. LEXIS 47438, at \*57–58, 2007 WL 1959225.

Amgen's motion to dismiss the state antitrust claims pertaining to the indirect purchaser states (that is, all the state claims except those asserted under the antitrust statutes of Florida, Louisiana, Massachusetts and New Jersey) for lack of jurisdiction, based on the absence of a justiciable controversy, will be denied without prejudice as premature.

## B. Whether State Law Antitrust Claims State A Claim Upon Which Relief May Be Granted

### 1. *States That Do Not Recognize Damages Claims By Indirect Purchasers*

**\*10** SMW does not allege that it is a direct purchaser of Amgen's RBCGF and WBCGF products. It describes itself and the class members it claims to represent as a third-party payers, which reimburse oncology clinics for their purchases from Amgen. Under federal antitrust law, only a direct purchaser may bring a claim for damages sustained as a result of an antitrust violation. *Ill. Brick Co. v. Illinois,* 431 U.S. 720, 728–29, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). Though SMW does not assert a claim for damages under the Clayton Act, the Complaint does plead for monetary relief for the state antitrust law violations it claims Amgen committed. The Court references the federal law on standing as a backdrop to Amgen's arguments about SMW's standing to pursue state law antitrust claims.

Florida, Massachusetts and New Jersey follow the *Illinois Brick* rule. *Mack v. Bristol–Myers Squibb Co.,* 673 So.2d 100, 103 (Fla.Dist.Ct.App.1996); *Ciardi v. Hoffmann–LaRoche, Ltd.,* 436 Mass. 53, 58, 762 N.E.2d 303 (2002); *Wilson v. Gen. Motors Corp.,* 190 N.J. 336, 339, 921 A.2d 414 (2007). The law is in those states that an indirect purchaser cannot sue for damages under their antitrust statutes. SMW's argument that Florida and Massachusetts courts have held that indirect purchasers do have standing to sue under their states' consumer protection statutes is inapposite, because SMW has not pled claims under those statutes. With respect to relief under the New Jersey statute,

2009-1 Trade Cases P 76,556

SMW argues that injunctive relief may be available; however, the Court does not read the Complaint to make a demand for this remedy. [11]

The Complaint's claims under the antitrust statutes of Florida, Massachusetts and New Jersey should be dismissed. Neither SMW, an indirect purchaser, nor the putative class of other third-party payers it purports to represent, can obtain the relief sought under those statutes. SMW will be given leave to amend the Complaint, however, to assert claims presently absent from the pleading. The Court makes no determination at this time whether those claims would be viable or survive subsequent motions to dismiss.

Amgen also moves for dismissal of the claim under Louisiana's antitrust statute. Louisiana courts have not settled the question of whether, in applying Louisiana's antitrust statute, they would follow *Illinois Brick* or, instead, recognize the standing of indirect purchasers to sue for damages. *Free v. Abbott Labs.,* 176 F.3d 298, 299 (5th Cir.1999), *aff'd,* 529 U.S. 333, 120 S.Ct. 1578, 146 L.Ed.2d 306 (2000). The Fifth Circuit Court of Appeals, however, predicted that Louisiana would follow the *Illinois Brick* rule. Affirming the district court's dismissal of the indirect purchaser plaintiffs' state antitrust claims, the Fifth Circuit held "[i]n our best judgment, the Louisiana courts would follow the federal indirect purchaser rule and deny standing to the appellants." *Id.* Guided by the Fifth Circuit's prediction in *Free,* this Court holds that SMW's claim under Louisiana's antitrust statute must be dismissed for failure to state a claim under which SMW, or any other indirect purchaser, may obtain monetary relief.

### 2. *States That Permit Indirect Purchaser Recovery of Damages*

**\*11** According to Amgen's brief, the remainder of the state jurisdictions invoked in the Complaint do recognize antitrust damages claims made by indirect purchasers. Amgen concedes that, in states with *Illinois Brick* repealer statutes, indirect purchasers may have standing to pursue antitrust damages claims but maintains that their ability to pursue such claims is limited by the remoteness of the injury. (States that do not follow the *Illinois Brick* rule will be referred to as "indirect purchaser" states.) It argues that any purported link between SMW's alleged injury-reimbursement of oncology clinic purchases of Aranesp-and Amgen's pricing scheme is too attenuated to confer standing on SMW.

Amgen relies on *Associated General Contractors of California v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). There the Supreme Court held that merely having suffered a cognizable antitrust injury would not necessarily entitle a party to maintain an antitrust suit. *Id.* at 535. It instructed that whether recovery may be had requires an evaluation of the relationship between the harm and the alleged wrongdoing, with reference to several factors. *Id.* at 535–37. One relevant factor is the directness or indirectness of the claimed injury. *Id.* at 540. Amgen takes the position that the amount at which SMW reimbursed oncology clinics was affected by too many intervening factors to have a sufficiently traceable or direct link to the alleged wrongdoing to be subject to antitrust remedy.

The Court need not, and will not, consider Amgen's recitation of the various facts surrounding how an oncology clinic purchases RBCGF and WBCGF, how reimbursement by end-payors may be determined and the various steps in between the bundled sale and payment by a third-party payor. (*See* Def. Br. at 16–17.) These facts, on which Amgen bases its remoteness argument, are not pled in the Complaint, making the remoteness argument wholly unsuited to a Rule 12 motion to dismiss. [12] The Complaint makes allegations about how the government reimburses clinics for drugs administered to Medicare patients. (Compl.¶¶ 48–49.) Amgen's citation to these paragraphs does not yield the conclusion that the overcharges borne by SMW and the other end-payors it claims to represent are the product of a system of purchasing and reimbursement so complex that it defeats any standing SMW may have to seek antitrust damages in indirect purchaser states.

Instead, a construction of the facts of the Complaint in the light most favorable to SMW compels the opposite conclusion. Caselaw dealing with indirect purchaser standing under the Clayton Act is instructive. Under federal antitrust law, *Illinois Brick* does not bar indirect purchasers from obtaining injunctive relief. *In re Warfarin Sodium Antitrust Litig.,* 214 F.3d 395, 399–400 (3d Cir.2000). In *Warfarin Sodium,* the Court considered the question of standing by a class of consumers of Coumadin, the brand name of a blood-thinning drug prescribed for the prevention and treatment of blood clots, to sue for injunctive relief under section 16 of the Clayton Act. *Id.* at 397. The Court held

2009-1 Trade Cases P 76,556

that the district court had incorrectly cited and relied on facts outside the complaint in concluding that there was not a significant nexus between the alleged injury and the defendant's anti-competitive conduct. *Id.* at 398. These extrinsic facts included the existence of health insurance and third-party payor arrangements and their effect on whether the consumer class had in fact sustained any overcharge. *Id.* The Third Circuit held that the district court should have accepted as true what the complaint alleged—"that the class members paid inflated prices for Coumadin because DuPont [the defendant] thwarted the generic's market entry." *Id.* Analyzing the consumer class's antitrust standing based on that allegation, the Third Circuit held that the district court's refusal to recognize the consumers' standing was "contrary to our jurisprudence." *Id.* at 401. The Court rejected the defendant's remoteness argument, reasoning:

> **\*12** Regardless of the existence of various links of middlemen, if there were no ultimate consumer of Coumadin, prices charged for the drug by DuPont to distributors, pharmacies, etc., would be irrelevant. The excess amount paid by Coumadin users not only is "inextricably intertwined" with the injury DuPont aimed to inflict, the overcharge was the aim of DuPont's preclusive conduct. It is difficult to imagine a more formidable demonstration of antitrust injury.

*Id.*

Guided by this analysis, the Court holds that based on the facts pled in the Complaint, it appears that SMW's allegations of harm are not so remote from the complained-of wrongdoing that the claims under the indirect purchaser states' statutes must be dismissed. Specifically, the Complaint avers: "Amgen's pricing schemes have caused and will continue to cause anti-competitive effects in the relevant product markets.... Amgen's coercive bundling programs have caused public and private health care insurers, including third-party payor members of the Class, to reimburse clinics for their Aranesp purchases at rates that are higher than would have prevailed in 'head to head' competition." (Compl., ¶¶ 64–65.) The Court recognizes that SMW identifies itself in the Complaint as a third-party payer. This alone, however, does

not necessarily imply that, due to different ways that a clinic may purchase and administer RBCGF drugs and WBCGF drugs, that a patient may pay the clinic for his particular mix of purchases and the various formula that may apply to reimbursements by third-party payors, SMW's injury is too remote from the pricing scheme to be cognizable. These facts, argued by Amgen, are neither pled by the Complaint nor can they be inferred from the pleading. Amgen's remoteness argument is, simply put, premature, and if at all, appropriate for consideration on a motion for summary judgment.

Thus, Amgen's motion to dismiss the antitrust claims for recovery under the laws of the indirect purchaser states will be denied.

### 3. States That Limit Antitrust Statutes To Predominantly Intrastate Conduct

Amgen also challenges SMW's ability to proceed with its claims under the antitrust statutes of the states of Louisiana, Massachusetts, Michigan, Tennessee, West Virginia and Wisconsin on the grounds that the antitrust statutes of these states cannot provide relief for the wrongdoing alleged in the Complaint. These states' antitrust laws, Amgen contends, apply only if the anti-competitive activity at issue occurred predominantly within the state. SMW, however, complains of nationwide injuries on behalf of a putative nationwide class. Amgen argues that the Complaint contains no "allegations of any conduct or injury in the states in question, much less predominantly intrastate conduct." (Reply Br. at 14.)

The Court has reviewed the relevant provisions of the statutes of the above-mentioned states (with the exception of Louisiana and Massachusetts, because the Court has already determined that those claims must be dismissed as precluded by SMW's indirect purchaser status). The antitrust statutes of Michigan, Tennessee, West Virginia and Wisconsin, are unquestionably directed toward intrastate commerce. *See*

🔖 *Peoples Savs. Bank v. Stoddard,* 359 Mich. 297, 102 N.W.2d 777, 796 (Mich.1960) (holding state antitrust statute is not preempted by federal law and that a state has the authority to enforce its own antitrust statute where the effect of the anticompetitive conduct is primarily intrastate);

🔖 *In re New Motor Vehicles Canadian Export Antitrust Litig.,* 350 F.Supp.2d 160, 172 (D.Me.2004) (holding that Tennessee Court of Appeals rejected requirement that conduct "predominantly" affect intrastate commerce, instead concluding that Tennessee's antitrust statute "applies to illegal conduct that *substantially* affects commerce within

2009-1 Trade Cases P 76,556

this state") (quoting *Sherwood v. Microsoft Corp.,* No. M2000–01850–COA–R9CV, 2003 WL 21780975, at *21 (Tenn.Ct.App.2003) (emphasis in quotation); W.Va.Code § 37–18–3 ("[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in this State [West Virginia] shall be unlawful"); *Meyers v. Bayer AG,* 303 Wis.2d 295, 735 N.W.2d 448, 464 (Wis.2007) (noting that Wisconsin Supreme Court has held that state's antitrust statute applicable if "the conduct complained of 'substantially affects' the people of Wisconsin and has impacts in this state, even if the illegal activity resulting in those impacts occurred predominantly or exclusively outside this state") (citing *Olstad v. Microsoft Corp.,* 284 Wis.2d 224, 700 N.W.2d 139, 158 (Wis.2005)). Amgen contends that the claims under these state antitrust statutes must fail because these laws "apply only to conduct that is predominantly interstate." (Reply Br. at 14.) The Court has not been presented with any authority that states that relief under these laws is exclusive of any applicable federal relief for the interstate reach of the activity. *See, e.g.,* *In re Intel Corp. Microprocessor Antitrust Litig.,* 496 F.Supp.2d 404, (D.Del.2007) (denying motion to dismiss claim under West Virginia antitrust statute in a nationwide class action suit also involving claims under federal law and statutes of other states). In other words, based on the minimal briefing on the subject, the Court does not interpret the statutes to be inapplicable where the anticompetitive conduct may have both interstate effects and, as concerns the particular state in question, intrastate impact. Whether the factual allegations of the Complaint, which presently lacks any state-specific allegations, may support a viable claim under these statutes is a separate question, and one which the Court will not address at this time.

**\*13** Thus, Amgen's motion to dismiss the state antitrust claims under the laws of Michigan, Tennessee, West Virginia and Wisconsin will be denied without prejudice.

4. *Substantive Sufficiency of State Claims*
Finally, in the interest of completeness, the Court notes that Amgen alternatively argues that even if the Court were to find that SMW has standing to pursue the antitrust claims pled in the Complaint, they must be dismissed for failure to

state a claim upon which relief may be granted. The Court, of course, need not evaluate whether the Complaint avers facts on which tying and monopolization claims under the Sherman Act could be predicated. For the reasons discussed above, SMW's federal antitrust claims will be dismissed without prejudice for failure to plead injury-in-fact. Amgen, however, clarifies that, even though it relies primarily on federal caselaw regarding standing and the elements of tying and monopolization claims, its motion challenges the sufficiency of the state antitrust claims as well.

The Court will not reach the question of whether the surviving state antitrust claims, i.e., those relating to the indirect purchaser states, assert a claim upon which relief may be granted. The papers submitted by the parties on the instant motion provide only a cursory discussion of the substantive requirements of the state claims. The Court simply could not make an informed decision based on this briefing. The Court will entertain a separate motion to dispose of the state claims supported by adequate briefing.

**V. CONCLUSION**
For the foregoing reasons, this Court will dismiss Plaintiff's federal claims, for relief under the Clayton Act and for a declaratory judgment, without prejudice. The Court will also dismiss Plaintiff's claims under the state antitrust laws of Massachusetts, Florida, Louisiana and New Jersey, because those states do not permit indirect purchasers to seek damages. To the extent Amgen's motion seeks a dismissal of the other state antitrust claims pled in the Complaint, specifically those under the indirect purchaser states' antitrust statutes, the motion will be denied without prejudice. Finally, with respect to the claim under California's Unfair Competition Law, the motion will be denied without prejudice.

Plaintiff will be given leave to amend the Complaint to cure the Complaint's deficiencies, consistent with this Opinion. An appropriate form of order will be filed together with this Opinion.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 3833577, 2009-1 Trade Cases P 76,556

2009-1 Trade Cases P 76,556

## Footnotes

1    RBCGF drugs treat severe anemia, which is most commonly seen in patients (1) with chronic kidney disease pre-dialysis or while undergoing dialysis, (2) undergoing chemotherapy, or (3) undergoing zidovudine treatment for HIV. WBCGF drugs treat neutropenia, a white blood cell deficiency and common side-effect of chemotherapy.

2    The only other WBCGF drug sold is Leukine, distributed by Berlex Laboratories. Ortho does not sell a WBCGF drug.

3    The threshold for Aranesp was set at dollar amounts equal to 65% of a clinic's prior RBCGF drug purchases.

4    The Complaint alleges two kinds of antitrust activity: (1) unlawful tying, in violation of _Section 1_ of the Sherman Act, and (2) monopolization of the RBCGF oncology clinic market, in violation of _Section 2_ of the Sherman Act. _See_ Compl., ¶¶ 96–100.

5    In contrast, the standard articulated in _Conley_ was that the "complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." _Conley, 355 U.S. at 45–46._ The Supreme Court abrogated the _Conley_ "no set of facts" standard in _Bell Atlantic. Bell Atlantic Corp., 127 S.Ct. at 1969._

6    The Eastern District of Pennsylvania followed the leading case for one of the two competing approaches— the "package" approach—in rejecting the defendant's argument that summary judgment should be granted because there was insufficient proof of antitrust injury. _Pennsylvania v. Milk Indus. Mgmt. Corp., 812 F.Supp. 500, 508 (E.D.Pa.1992)_ (citing _Kypta v. McDonald's Corp., 671 F.2d 1282, 1285 (11th Cir.), cert. denied, 459 U.S. 857, 103 S.Ct. 127, 74 L.Ed.2d 109 (1982)_). In that case, however, the antitrust suit was not based on illegal tying, but rather on a conspiracy to restrain trade by submitting rigged bids for a school district's milk contracts.

7    The Courts of Appeals of the Fifth, Seventh, Ninth and Eleventh Circuits have defined antitrust injury according to the package approach. _United Farmers Agents Ass'n. v. Farmers Ins. Exch., 89 F.3d 233, 237 (5th Cir.1996); Will v. Comprehensive Accounting Corp., 776 F.2d 665, 672–73 (7th Cir.1985); Siegel v. Chicken Delight, Inc., 448 F.2d 43, 52 (9th Cir.), cert. denied, 405 U .S. 955 (1972); Midwestern Waffles, Inc. v. Waffle House, Inc., 734 F.2d 705 718–19 (11th Cir.1984); see also L. Knife & Son, Inc. v. Banfi Prod. Corp., 118 F.R.D. 269, 271 (D.Mass.1987)_ (applying package approach to calculation of damages in ruling on discovery dispute); _Freeland v. AT & T Corp., 238 F.R.D. 130, 149–50 (S.D.N.Y.2006)_ (applying package approach to identify antitrust injury-in-fact in denying motion for class certification).

8    Amgen correctly points out that injury-in-fact is also a requirement of Article III standing under the United States Constitution, and its absence would deprive this Court of subject matter jurisdiction. The Court, however, notes that its determination that SMW lacks statutory standing to pursue a claim for injunctive relief under the Clayton Act does not deprive this Court of subject matter jurisdiction over the entire action, which is also properly before this Court by virtue of class action diversity jurisdiction. _See_ 28 U.S.C. 1332(d). The Complaint asserts claims under the antitrust statutes of 28 different states, and the matter of statutory standing under those statutes has not been briefed. Based on the papers submitted on this motion, it is not clear to this Court whether those various jurisdictions would define antitrust injury in the same way federal law does, in particular because the federal jurisprudence on what constitutes antitrust injury in a tying arrangement is not settled. Moreover, as discussed in Section IV.A, class certification must be decided before the Court reaches the question of SMW's Article III standing with regard to the state claims. The Court finds that it would be premature to make a determination on SMW's standing to pursue various state antitrust claims based on lack of injury-in-fact, particularly where the parties have not had the opportunity to brief the law of each state adequately.

2009-1 Trade Cases P 76,556

9     Count Three, for violation of California's unfair business practices statute, does not concern antitrust law, as do all other claims in the Complaint. The Court's discussion of the legal sufficiency of the federal and state antitrust claims is not applicable to the claim asserted in Count Three. The Court, however, will not deal with that claim in a separate section of this Opinion. Though Amgen moves to dismiss the Complaint in its entirety, its argument regarding the insufficiency of the California unfair business practices claim appears only in a short footnote. The Court is not in a position, based on this briefing, to make a well-informed decision on whether Count Three states a claim upon which relief may be granted. Therefore, to the extent this motion seeks to seeks to dismiss Count Three, it will be denied without prejudice.

10    These jurisdictions are: Alabama, Alaska, Arizona, District of Columbia, Florida, Hawaii, Iowa, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Jersey, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia and Wisconsin.

11    The Complaint does not expressly request injunctive relief under the state statutes. Following an assertion that Amgen's conduct has violated the statutes, the Complaint state its "Prayer for Relief," asking for "damages ... and such other relief as this Court may deem just and proper."

12    Though urged by Amgen, the Court declines to take judicial notice of facts alleged by SMW in a lawsuit pending in California.

---

**End of Document**          © 2021 Thomson Reuters. No claim to original U.S. Government Works.

TAB 34

*Spring v. Shell Oil Co.*, 2018 WL1914293 (M.D. La. Apr. 23, 2018)

2018 WL 1914293
Only the Westlaw citation is currently available.
United States District Court, M.D. Louisiana.

Charles SPRING

v.

SHELL OIL COMPANY, et al.

CV. NO. 17-1754-JWD-RLB
|
Signed 04/23/2018

**Attorneys and Law Firms**

Jeremiah Sprague, Timothy J. Falcon, Falcon Law Firm, Marrero, LA, for Charles Spring.

Deborah Kuchler, Janika D. Polk, Joshua James Doguet, Mark Edward Best, Michele Hale DeShazo, Skylar Barbosa Rudin, Kristyn L. Lambert, Kuchler Polk Weiner, LLC, Michael R. Phillips, Brett Patrick Fenasci, Shannon S. Cobb, Kean Miller LLP, New Orleans, LA, for Shell Oil Company, et al.

<u>**RULING AND ORDER**</u>

JOHN W. deGRAVELLES, JUDGE

**I. THE PLAINTIFF'S ALLEGATIONS**

**\*1** In this case, Plaintiff Charles Spring sues "Oil Company Defendants" Shell Oil Company; Shell Offshore Inc.; SWEPI, LP; and Chevron USA, Inc. (Doc. 1-1 at 1).

This case concerns radioactive scale "co-produced during oil and gas production" that adheres to pipe and other oil production equipment. (*Id.* at 2). When the scale within a pipe builds up enough to slow the flow of oil or gas, oil companies like Defendants send the pipe to a facility to be de-scaled. (*Id.* at 2-3).

Between 1973 and 1983, Plaintiff worked for Shield Coat, Inc., at the French Jordan and Shield Coat Facility ("FJSC facility") in Houma, Louisiana, which performs pipe descaling work. (*Id.* at 2). Plaintiff worked with pipe containing scale, and the FJSC facility's pipe cleaning process pulverized the scale and caused it to become airborne, exposing Plaintiff to dangerous levels of radiation. (*Id.*). The pipe and scale were never marked or otherwise identified as

radioactive. (*Id.* at 3). Defendants owned some of the pipes submitted to the FJSC facility, and Defendants' employees were often present to observe the de-scaling of the pipe. (*Id.* at 2-3).

In February 2017, a "lump" was discovered on Plaintiff's thyroid gland, and Plaintiff claims that the lump was caused by radiation exposure. (*Id.* at 5). Plaintiff also claims that he has an increased risk of cancer and "fear of cancer" and that he has "breathing problems." (*Id.* at 4-5).

Plaintiff alleges, *inter alia*, that Defendants are "strictly liable for all damages caused by [scale], having *garde* of the contaminated pipe and although the pipe may have been temporarily in the control of the pipe cleaning yard, the pipe at all times remained under the custody, control, direction, [and] supervision of [Defendants] and [Defendants] controlled what cleaning processes were to be administered to [Defendants'] pipes and controlled its movement and storage." (*Id.* at 4). Plaintiff's prayer for compensatory damages includes a request for the costs associated with medical monitoring. (*Id.* at 5).

**II. DEFENDANTS' MOTION**

The Motion before the Court seeks to partially dismiss this action under Federal Rule of Civil Procedure 12(b)(6). ("Motion," Doc. 12; *see also* Doc. 15 (Chevron's request to adopt portions of Motion), Doc. 17 (Order granting request) ). Defendants argue that Plaintiff has failed to state a strict liability claim, as he has not plausibly alleged that: (1) the pipe was defective in and of itself, rather than made dangerous by the temporary presence of a foreign substance; (2) any defect caused Plaintiff's injury, as it was not the presence of scale but the cleaning process used at the FJSC facility that pulverized and aerosolized the scale; and (3) at the time when the pipe was cleaned it was in Defendants' garde, rather than in the garde of a pipe cleaning contractor or Shield Coat. (Doc. 12-1 at 5-9).

Defendants also oppose Plaintiff's request for damages for medical monitoring. (*Id.* at 9). They maintain that such damages are available only when a disease is presently "manifest," and Plaintiff has made only vague and unclear allegations concerning specific medical conditions from which he suffers or his future prognosis. (*Id.* at 9-10). Defendants also argue that Plaintiff has failed to address factors necessary to support a request for medical monitoring damages, including whether an available and adequate

2018 WL 1914293

monitoring procedure exists; whether the procedure is reasonably necessary; whether the procedure has been prescribed by a qualified physician; the public's level of risk of contracting any particular disease; Plaintiff's comparative risk; and whether there is some demonstrated clinical value of early detection. (*Id.* at 10).

**\*2** Shell Offshore and SWEPI further claim that they were incorporated and formed in December 1981 and October 1983, respectively, and they cannot be sued for any acts or omissions prior to those dates. (*Id.* at 4-5).

Plaintiff does not oppose Shell Offshore and SWEPI's request to dismiss claims against them arising prior to when they were incorporated and formed. (Doc. 22 at 1-2). Otherwise, Plaintiff opposes the Motion, arguing that he has stated a strict liability claim and claim for medical monitoring under the liberal pleadings standards of Rule 12(b)(6). (*Id.* at 2-5). In reply, Defendants generally contend that Plaintiff's factual allegations in support of his claims are vague and conclusory and are therefore not entitled to a presumption of truth. (Doc. 23 at 1-3).

### III. GENERAL STANDARDS

In *Johnson v. City of Shelby, Miss.,* —— U.S. ——, 135 S.Ct. 346, 190 L.Ed.2d 309 (2014), the Supreme Court analyzed the standards applicable to motions under Rule 12(b)(6), explaining that "[f]ederal pleading rules call for a 'short and plain statement of the claim showing that the pleader is entitled to relief,' Fed. R. Civ. P. 8(a)(2); they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." 135 S.Ct. at 346–47 (citation omitted).

Interpreting Rule 8(a), the Fifth Circuit has explained:

> The complaint (1) on its face (2) must contain enough factual matter (taken as true) (3) to raise a reasonable hope or expectation (4) that discovery will reveal relevant evidence of each element of a claim. "Asking for [such] plausible grounds to infer [the element of a claim] *does not impose a probability requirement* at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal [that the elements of the claim existed]."

*Lormand v. U.S. Unwired, Inc.,* 565 F.3d 228, 257 (5th Cir. 2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (emphasis added in *Lormand* ) ).

Applying the above case law, the Western District of Louisiana has stated:

> Therefore, while the court is not to give the "assumption of truth" to conclusions, factual allegations remain so entitled. Once those factual allegations are identified, drawing on the court's judicial experience and common sense, the analysis is whether those facts, which need not be detailed or specific, allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." [ *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) ]; *Twombly,* [550] U.S. at 556, 127 S.Ct. at 1965. This analysis is not substantively different from that set forth in *Lormand, supra,* nor does this jurisprudence foreclose the option that discovery must be undertaken in order to raise relevant information to support an element of the claim. The standard, under the specific language of Fed. R. Civ. P. 8(a)(2), remains that the defendant be given adequate notice of the claim and the grounds upon which it is based. The standard is met by the "reasonable inference" the court must make that, with or without discovery, the facts set forth a plausible claim for relief under a particular theory of law provided that there is a "reasonable expectation" that "discovery will reveal relevant evidence of each element of the claim." *Lormand,* 565 F.3d at 257; *Twombly,* [550] U.S. at 556, 127 S.Ct. at 1965.

**\*3** *Diamond Servs. Corp. v. Oceanografia, S.A. De C.V.,* 2011 WL 938785, at \*3 (W.D. La. Feb. 9, 2011) (citation omitted).

More recently, in *Thompson v. City of Waco, Tex.,* 764 F.3d 500 (5th Cir. 2014), the Fifth Circuit summarized the standard for a Rule 12(b)(6) motion:

> We accept all well-pleaded facts as true and view all facts in the light most favorable to the plaintiff ... To

Spring v. Shell Oil Company, Not Reported in Fed. Supp. (2018)

2018 WL 1914293

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 494 of 535
PageID: 32441

survive dismissal, a plaintiff must plead enough facts to state a claim for relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Our task, then, is to determine whether the plaintiff state a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success.

*Id.* at 502–03 (citations and internal quotations omitted).

### IV. ANALYSIS

The parties agree that Plaintiff's claims against Shell Offshore and SWEPI arising prior to their incorporation and formation dates should be dismissed, and the Court accepts this agreement and dismisses these claims. The Court now turns to the contested issues.

#### a. Strict Liability

The Louisiana Supreme Court discussed strict liability claims in the following excerpt:

Under Louisiana law, liability for injuries sustained by one as the result of a defective condition of a thing is based on legal fault, i.e., strict liability. *See* La. Civ.Code art. 2317. Louisiana's codal provision for legal fault is found in La. Civ.Code art. 2317 which provides: We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody....

In an action asserting liability under La. Civ.Code art. 2317 before 1996, the plaintiff bore the burden of proving three elements: (1) that the thing which caused the damages was in the care, custody, and control (garde) of the defendant; (2) that the thing had a vice, ruin, or defect that presented an unreasonable risk of harm; and (3) that the vice, ruin, or defect was the cause-in-fact of the plaintiff's damages.

La. Civ. Code art. 2317; *Sistler v. Liberty Mutual Ins.*

*Co.*, 558 So.2d 1106 (La. 1990); *Loescher v. Parr*, 324 So.2d 441 (La. 1975). To recover, plaintiff bears the burden of proving these elements in the affirmative, and the failure on any one is fatal to the case.

*Dupree v. City of New Orleans*, 1999-3651 (La. 8/31/00), 765 So.2d 1002, 1007–08 (formatting altered, footnotes omitted); *see also* 12 La. Civ. L. Treatise, Tort Law § 1:18 (2d ed.) (1996 revisions to article 2317 added scienter requirements, "changing the requirement for liability under the article from strict liability to negligence").

Not every imperfection or irregularity creates an unreasonable risk of injury, and the fact that an accident occurred because of a vice or defect does not elevate the condition of the thing to that of an "unreasonably dangerous defect." *Dupree*, 765 So.2d at 1012-13. In determining whether a thing presents an unreasonable risk of harm, courts consider: "(1) the claims and interests of the parties; (2) the probability of the risk occurring; (3) the gravity of the consequences; (4) the burden of adequate precautions; (5) individual and societal rights and obligations; and (6) the social utility involved." *Id.* at 1012. Notably, a defect must be "an imperfection or deficiency which inheres with relative permanence in a thing as one of its qualities." *Scarabin v. Shell Pipe Line Corp.*, 1992 WL 176111, at *1 (E.D. La. July 9, 1992) (citing *Toussant v. Guice*, 414 So.2d 850, 852 (La. App. 4th Cir. 1982); *Schexnaider v. State Farm Ins.*, 541 So.2d 223 (La. App. 4th Cir. 1989) ).

**\*4** The person who has custody or garde of a thing "is he who has the legal duty to prevent its vice or defect from harming another," and a thing can be in more than one entity's custody or garde at the same time. *Dupree*, 765 So.2d at 1009. In evaluating whether a thing is in a defendant's custody or garde, Louisiana courts consider principally "whether the person bears such a relationship as to have the right of direction and control over the thing[,] and ... what, if any, kind of benefit the person derives from the thing." *Id.*

In *Robertson v. Chevron USA, Inc.*, the Eastern District of Louisiana analyzed claims similar to those presented here:

Under either the pre-1996 or post-1996 causes of action for strict liability, a defendant is liable for only things in its custody that have a "ruin, vice, or defect." The Oil Company Defendants and the Pipe Contractor Defendants

argue the alleged scale is not an imperfection inherent in the pipe itself sufficient to trigger strict liability. The Defendants contend they cannot be held strictly liable because the contaminated pipe scale on the oilfield pipes is merely a temporary condition and thus not a "defect" sufficient to trigger strict liability.

The Court disagrees. The radiation at issue in this case is absorbed into the pipe, which Plaintiffs assert renders the pipe permanently defective. Thus, the radioactive quality of the pipes containing NORM is not a mere temporary hazard that would preclude the applicability of strict liability.

Defendants also argue Plaintiffs fail to allege the vice or defect in the pipes was the cause-in-fact of their injuries. Instead, Defendants argue, Plaintiffs allege their injuries were caused by pipe-cleaning operations conducted on the property. Defendants contend Plaintiffs' claim of strict liability should be dismissed because it was the pipe-cleaning operations—not any inherent defect in the pipes—that caused their injuries.

Plaintiffs' petition alleges the "scale on the pipe delivered to the Property was contaminated with ... TERM, and other hazardous ... compounds that are known to pose a serious health risk to humans." Plaintiffs also allege the radioactive material "will remain in the properties of the Petitioners, and continue[ ] to emit harmful radiation, damaging Petitioner's [sic] properties and causing ... health problems." Plaintiffs further allege "[a]s a result of their long-term exposures ... the Petitioners are at risk for contracting diseases, including cancers and forms of leukemia." Finally, Plaintiffs allege the "acts and/or omissions of the [Defendants] are a substantial contributing cause of the Petitioners' injuries and damages." The Court finds this sufficient to allege the pipe scale caused Plaintiffs' physical injuries and property damage.

Defendants further argue Plaintiffs failed to allege that any Oil Company Defendant had *garde* of the pipe when the alleged harm occurred. Conoco argues it cannot be held strictly liable because "several entities, including the Pipe Contractors, accepted the pipe and asserted custody and control ("garde") over it." [...]

In this case, Plaintiffs allege "the Oil Companies delivered to the Pipe Contractors at the Property used oil field pipe that was to be cleaned and inspected" and "[a]t all relevant times, the Oil Companies retained ownership of the pipe, and retained the right to supervise and control the

Pipe Contractors' cleaning work." Plaintiffs further allege the "scale on the pipe delivered [to the Pipe Contractor Defendants] ... was contaminated with [TERM]." Because Plaintiffs allege the Oil Company Defendants "retained ownership of the pipe" and the Pipe Contractor Defendants had care, custody, or control of the pipes, the Court finds the Plaintiffs allege sufficient facts to establish the Oil Company Defendants and Pipe Contractor Defendants had custody or control of the pipes for the purposes of strict liability. Accordingly, Plaintiffs state a claim for strict liability under Louisiana Civil Code article 2317 as to claims arising before 1996.

**\*5** *Robertson v. Chevron USA, Inc.*, 2017 WL 679406, at \*4-5 (E.D. La. Feb. 21, 2017).

For many of the same reasons set forth in *Robertson*, Plaintiff has adequately alleged a strict liability claim. Defendants contend that scale is a foreign substance present only temporarily and not inherent in Defendants' pipes. (Doc. 12-1 at 5-6). However, Plaintiff has claimed that scale adheres to pipes and is present until the pipes are industrially descaled. (Doc. 1-1 at 2-3). At this early stage, Plaintiff has adequately alleged that scale is a condition that inheres with *relative* permanence in Defendants' pipes. *See Scarabin*, 1992 WL 176111, at \*1; *see also Coleman v. H.C. Price Co.*, 2014 WL 4354443, at \*6 (E.D. La. Sept. 2, 2014) (rejecting argument that radioactive contamination of pipe was "merely a temporary condition").

Defendant's argument concerning causation is similarly unavailing. The Petition for Damages appears to allow that the cleaning of the pipes was an additional or alternative cause-in-fact of Plaintiff's injuries, but it also reasonably permits the conclusion that the "vice, ruin, or defect" complained of was a cause-in-fact of Plaintiff's injuries. *Robertson*, 2017 WL 679406, at \*5. Similarly, although the Petition appears to allow that other entities may have had garde over contaminated pipe, it also reasonably permits the conclusion that Defendants retained rights of "direction and control" over the pipe (and the cleaning process) at relevant times. *Id.*; *see* Dupree, 765 So.2d at 1009 (object can be in garde of two entities at the same time).

For the foregoing reasons, Defendants' request to dismiss Plaintiff's strict liability claim is denied.

Spring v. Shell Oil Company, Not Reported in Fed. Supp. (2018)

2018 WL 1914293

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 496 of 535
PageID: 32443

### b. Medical Monitoring

The Eastern District of Louisiana has summarized the standards applicable to medical monitoring claims:

In *Bourgeois I*, the Louisiana Supreme Court held that medical monitoring costs are compensable damages under Louisiana Civil Code article 2315, provided that the plaintiff satisfies seven criteria. *Bourgeois v. A.P. Green Indus., Inc.*, 716 So.2d 355, 360 (La. 1998) ("*Bourgeois I*"). These criteria are: (1) a significant exposure to a proven hazardous substance; (2) as a proximate result of this exposure, plaintiff suffers a significant increased risk of contracting a serious latent disease; (3) plaintiff's risk of contracting a serious latent disease is greater than (a) the risk of contracting the same disease had he or she not been exposed and (b) the chances of members of the public at large of developing the disease; (4) a monitoring procedure exists that makes the early detection of the disease possible; (5) the monitoring procedure has been prescribed by a qualified physician and is reasonably necessary according to contemporary scientific principles; (6) the prescribed monitoring regime is different from that typically recommended in the absence of exposure; and (7) there is some demonstrated clinical value in the early detection and diagnosis of the disease. *Bourgeois I*, 716 So.2d at 360–61.

**\*6** In the wake of this decision, the Louisiana Legislature, through Act 989 of 1999, amended article 2315 to exclude future medical monitoring from the statute's definition of compensable damages. *La. Civ. Code. art. 2315(B)* ("Damages do not include costs for future medical treatment, services, surveillance, or procedures of any kind unless such treatment, services, surveillance, or procedures are directly related to a manifest physical or mental injury or disease."); *see also Bonnette v. Conoco, Inc.*, 837 So.2d 1219, 1230, n.6 (La. 2003) (explaining that "the amendment effectively eliminated medical monitoring as a compensable item of damage in the absence of a manifest physical or mental injury or disease."). The amended version of the statute became effective on July 9, 1999.

Then, in *Bourgeois II*, the Louisiana Supreme Court held that Act 989 could not apply retroactively to divest a cause of action that accrued before the effective date of the Act. *Bourgeois v. A.P. Green Indus., Inc.*, 783 So.2d 1251, 1260 (La. 2001) ("*Bourgeois II*"). Accordingly, to state a claim for medical monitoring damages following the amendment to article 2315 and the Louisiana Supreme Court's decision in *Bourgeois II*, a plaintiff must either (1) satisfy Louisiana Civil Code article 2315(B) which requires that the monitoring relate to a manifest physical or mental injury or disease; or (2) demonstrate that the seven factors forming the *Bourgeois I* test converged before July 9, 1999. *See* La. Civ. Code. art. 2315(B); *Crooks v. Metro. Life Ins. Co.*, 785 So.2d 810, 812 ("[F]or the Bourgeois II holding to apply, the seven factors forming the Bourgeois I test must have converged prior to July 9, 1999.").

*Hill v. Exxon Mobil Corp.*, 2012 WL 359322, at *2 (E.D. La. Feb. 2, 2012) (Vance, J.) (continuing on to grant motion to dismiss for failure to address *Bourgeois I* factors and failing to allege a "manifest injury or disease").

Here, Plaintiff's Petition does not meaningfully address the *Bourgeois I* factors or whether they "converged" before July 9, 1999. The relevant questions, therefore, are (1) whether Plaintiff has alleged a "manifest physical ... injury or disease"; and (2) if he has done so, whether he must also expressly address the *Bourgeois I* factors at the pleading stage.

Neither party has provided the Court with a clear definition of "manifest physical ... injury or disease" to use in interpreting article 2315, but, especially given the relatively light burden faced by Plaintiff at this stage, the Court believes that Plaintiff's allegations, while not lengthy or very detailed, suffice. *See* DISEASE, Black's Law Dictionary (10th ed. 2014) ("A deviation from the healthy and normal functioning of the body ...; any disorder; any depraved condition").

The next question is the extent to which Plaintiff must address the *Bourgeois I* factors at the pleading stage. Having pled a manifest physical injury or disease, it is unclear whether he must do so at all. Some of the Louisiana Supreme Court's statements in *Bourgeois I* were phrased broadly. *See, e.g.*, *Bourgeois I*, 716 So.2d at 360 ("[W]e are persuaded that

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 497 of 535
PageID: 32444
Spring v. Shell Oil Company, Not Reported in Fed. Supp. (2018)
2018 WL 1914293

the reasonable cost of medical monitoring is a compensable item of damage under Civil Code article 2315, provided that a plaintiff satisfies the following criteria[.]"). Also, it appears that Louisiana juries are still instructed to apply the Bourgeois I factors in a "limited number of cases" following the partial abrogation of Bourgeois I. 18 La. Civ. L. Treatise, Civil Jury Instructions § 18:19 (3d ed.)

However, in laying out the Bourgeois I factors, the court, of course, had no opportunity to consider the interplay between these factors and the limiting language of the subsequent amendment to article 2315 passed in response to Bourgeois I. Moreover, the "narrow issue" in Bourgeois I was whether "asymptomatic plaintiffs," who had had significant occupational exposure to asbestos and were required to bear the expense of periodic medical examinations to monitor the effects of that exposure, had suffered damage under article 2315. Id. at 357. The Louisiana Supreme Court addressed the (ultimately "unwarranted") fear that, "without an identifiable physical injury upon which to moor a claim for medical expenses, an atmosphere of unlimited and unpredictable liability [would] ensue." Id. at 358. The court also discussed other cases in which states had authorized recovery for medical monitoring "in the absence of physical injury." Id. at 359-60. The court ultimately held that "a plaintiff who can demonstrate a need for medical monitoring has suffered damage in the form of the costs required to pay for this care." Id. at 361. Therefore, the scope of Bourgeois I, and the extent to which article 2315 should supplement or supplant it, is ambiguous. Subsequent cases are similarly vague, although many seem to suggest that the article 2315 test is independent of the Bourgeois I factors. See In re FEMA Trailer Formaldehyde Prod. Liab. Litig., 2008 WL 5217594, at *18-*20 (E.D. La. Dec. 12, 2008) (plaintiffs alleged that they had suffered physical injuries from formaldehyde exposure but did not describe them, arguing that the issue could not be properly litigated on motion to dismiss; court did not discuss Bourgeois I factors in finding that plaintiffs' allegations of manifest injury were sufficient to support medical monitoring claim); Royal v. Exxon Mobil Corp., 2012

WL 380305, at *1 (E.D. La. Feb. 6, 2012) (in case alleging exposure to radioactive scale, "[t]he fact that [the plaintiff] may have been exposed to radiation [was] not, in and of itself, sufficient [to support medical monitoring award]"(emphasis added) ); Hill, 2012 WL 359322, at *2 (stating that plaintiff's claims failed under "either the current article 2315 test or the Bourgeois I test" (emphasis added) ).

*7 Relatedly, a medical monitoring claim will likely ultimately require proof of several of the facts underlying the Bourgeois I factors. See, e.g., Woods v. Reynolds Indus. Contractors, Inc., 2010 WL 1286438, at *4 (W.D. La. Mar. 30, 2010) (no support for medical monitoring award following trial where, although plaintiff suffered "occasional nosebleeds" after exposure to asbestos, physician had not found any "causal connection" between the nosebleeds and the exposure, plaintiff had not been "diagnosed with any asbestos related disease," and physician had recommended "nothing more than regular physical examinations"). However, this says little about how specifically they must be pled at the outset of a case to satisfy Rule 12(b)(6), particularly where Plaintiff alleges, if imprecisely, some manifest physical injury. See In re FEMA Trailer Formaldehyde Prod. Liab. Litig., 2008 WL 5217594, at *20; see also Diamond Servs. Corp., 2011 WL 938785, at *3 (facts permitting the court to draw "reasonable inference" of liability need not be "detailed or specific," and the relevant standards permit that discovery may be necessary to support an element of a claim). Under these standards, the Court cannot conclude that Defendants have shown that they are entitled to dismissal of Plaintiff's medical monitoring claim. Defendants' request is therefore denied.

## V. CONCLUSION

For the foregoing reasons, the Motion (Doc. 12) is GRANTED, upon the parties' agreement, with respect to Plaintiff's claims against Shell Offshore and SWEPI that predate these entities' incorporation and formation. The Motion is DENIED in all other respects.

## All Citations

Not Reported in Fed. Supp., 2018 WL 1914293

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

TAB 35

*Stembridge v. Nat'l Feeds Inc.*, No. 1:11-cv-49, 2013 WL 5347455 (D. Utah Sept. 23, 2013)

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 501 of 535
PageID: 32448
Stembridge v. National Feeds Inc., Not Reported in F.Supp.2d (2013)
2013 WL 5347455, 81 UCC Rep.Serv.2d 795

2013 WL 5347455
United States District Court,
D. Utah, Northern Division.

Kolby STEMBRIDGE, et al., Plaintiffs,

v.

NATIONAL FEEDS INC., et al., Defendants.

No. 1:11CV49DAK.
|
Sept. 23, 2013.

**Attorneys and Law Firms**

D. Williams Ronnow, J. Craig Smith, Megan E. Garrett, Earl J. Peck, Smith Hartvigsen PLLC, Salt Lake City, UT, for Plaintiffs.

Joseph E. Minnock, Allison S. Fletcher, Morgan Minnock Rice & James, Philip D. Dracht, W. Cullen Battle, Fabian & Clendenin, Salt Lake City, UT, Hans A. Mitchell, Carey Perkins LLP, Boise, ID, for Defendants.

## MEMORANDUM DECISION AND ORDER

DALE A. KIMBALL, District Judge.

**\*1** This matter is before the court on Defendant Rangen Inc.'s Motion for Summary Judgment and Motion to Exclude Expert Testimony. Defendant National Feeds Inc. joined in Rangen's motions. After the motions were fully briefed, on September 11, 2013, the court held a hearing on the motions. At the hearing, Plaintiffs were represented by D. Williams Ronnow and Megan E. Garrett, Rangen was represented by Hans A. Mitchell, and National Feeds was represented by Allison S. Fletcher. The court heard oral argument from counsel for Plaintiffs and Rangen and then took the motion under advisement. The court has carefully considered all pleadings, memoranda, and other materials submitted by the parties. The court has further considered the law and facts relevant to the motion. Now being fully advised, the court enters the following Memorandum Decision and Order.

### *BACKGROUND*

The Stembridges are three generations of family mink ranchers in Peoa, Utah. The Stembridges each ran separate herds on the ranch, but used common sheds and equipment to care for the mink. The Stembridges are each members of the Fur Breeders Agricultural Cooperative ("Co-op"), which is an organization of fur breeders that provides various services to its members, including feed, vaccinations, and veterinary services. Over 100 mink ranches are part of the Co-op.

The Stembridges feed their mink a base diet that is comprised of wet feed purchased and received through the Co-op. The Co-op supplied feed is intended to be a complete feed that will allow mink to be raised without additional feeds or supplements.

In 2010, however, the Stembridges ordered Reproduction Crumlets and Lactation Crumlets from National Feeds, Inc. National Feeds markets its crumlets as supplemental feeds to be added to a base wet feed diet. To fulfill the Stembridges' order, National Feeds used Rangen, a toll miller, to manufacture and then ship the feed. Rangen and National Feeds have a contract, whereby Rangen manufactures product for National and distributes that product directly to National Feeds' customers.

The Stembridges incorporated the Reproduction Crumlet into their minks' diet beginning in March 2010, and increased the percentage of crumlet until the diet reached twenty percent crumlets and eighty percent wet feed. After feeding the Reproduction Crumlet and beginning to feed the Lactation Crumlet, the Stembridges noticed that many of the mink had no kits and those that did have kits had small litter sizes. The Stembridges also began to notice that many of the breeding females appeared to be blind and the kits were sluggish, partially paralyzed, had crusty eyes and noses, were greasy and skinny, did not "fur out," and were otherwise unhealthy. After the kits were weaned and vaccinated, they began dying. For three to four weeks, the Stembridges lost large numbers of mink daily, totaling approximately 45% of their expected kit crop.

The Stembridges took several of their mink for examination at diagnostic laboratories, including the Utah Veterinary Diagnostic Laboratory ("UVDL"). They learned that the mink presented physical changes showing that they suffered from vitamin E deficiency. Because the Stembridges suspected that the problem was caused by the feed, the Stembridges tested their remaining Reproduction Crumlet. One test showed that the vitamin E in the crumlet was less than guaranteed on the label, while another showed that the fat levels did not meet the label guarantee. The Stembridges later had the Lactation

Stembridge v. National Feeds Inc., Not Reported in F.Supp.2d (2013)
2013 WL 5347455, 81 UCC Rep.Serv.2d 795

Crumlet tested and the test showed that it contained ionophore monensin. The parties dispute whether minks can tolerate monensin.

*2 The Stembridges expert, Dr. Hildebrandt, concluded that the Reproduction Crumlet reduced the overall level of fat in the minks' diet, prevented the mink from accumulating sufficient bodily stores of vitamin E, and predisposed the mink to suffer a vitamin E deficiency in the event their immune systems were challenged. Dr. Hildebrandt further opined that the Lactation Crumlet with monensin caused oxidative stress reaction in the mink and accelerated the minks' depletion of already low levels of vitamin E. The reduced levels of vitamin E allegedly caused the mink to suffer immunosuppression and vitamin E deficiency, which eventually resulted in the minks' death through secondary infections and kidney damage.

The parties dispute whether Rangen followed National Feeds' formula and directions for the crumlets. The Stembridges allege that the Lactation Crumlets contained monensin, which is not one of the ingredients identified on the label, and the Reproduction Crumlets failed to meet National Feeds' requirements for vitamin E and fat.

The parties also dispute whether Rangen sells mink feed. Rangen contends that, as a miller, it does not sell mink feed. The Stembridges, however, allege that under the contract between Rangen and National, Rangen sells mink feed to National. Rangen further alleges that it did not sell the mink feed at issue in this case. The Stembridges ordered the feed from National, and Rangen manufactured and delivered the feed to the Stembridges according to Rangen's contract with National. The Stembridges, therefore, assert that the payment Rangen received from National for the Stembridges' order was based on Rangen's sale of the product to National under the contract.

Furthermore, the parties dispute whether Rangen's packing slips accompanying the crumlets that were shipped to the Stembridges provide any warranty to the Stembridges. The packing slips stated: "We warrant that seeds, feeds and plants we sell will conform to the label description as required under state and federal laws." Rangen contends that the warranty does not apply to the Stembridges because Rangen did not sell the crumlets in this case. Rangen claims that National sold the crumlets to the Stembridges and Rangen only manufactured the crumlet and shipped it to the Stembridges. Therefore, Rangen asserts that it did not sell the crumlet to anyone

and the warranty does not apply. However, the Stembridges argue that by manufacturing and shipping the product under the terms of Rangen's contract with National, and receiving payment from National for doing so, Rangen sold the crumlet to National. Therefore, the warranty should apply.

## DISCUSSION

### Rangen's Motion to Exclude Expert Testimony

Rangen moves for an order excluding the testimony of Dr. Hugh Hildebrandt, D.V.M., the Stembridges' veterinarian expert, and Douglas Fizzell, the Stembridges' damages expert under Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). The Tenth Circuit has recognized the trial court has broad discretion in fulfilling its "gatekeeping role" of reviewing and determining admissibility of proffered expert testimony under Rule 702 and Daubert. United States v. Velarde, 214 F.3d 1204, 1209 (10th Cir.2000).

### A. Dr. Hildebrandt

*3 Rangen argues that Dr. Hildebrandt does not have the required expertise in nutrition because it requires expertise in the formulation of diets to meet the nutritional needs of the animals consuming those diets. In his first report, Dr. Hildebrandt mistakenly calculated the vitamin E levels. When he submitted a supplemental report, with the calculation corrected, he did not explain why he had done it wrong in the first report. This error, however, does not demonstrate that Dr. Hildebrandt is unqualified. Rather, it shows that Dr. Hildebrandt made a mistake that was later corrected. The court is unaware of any requirement that an expert explain why he made a mistake. Dr. Hildebrandt has a Doctor of Veterinary Medicine from the University of Wisconsin at Madison and has had a private veterinary practice for 23 years in which he routinely treats mink in ranch settings. During Dr. Hildebrandt's many years of veterinary practice he has had extensive experience with the nutritional and dietary needs of the animals he treats. The court finds no basis for excluding Dr. Hildebrandt's testimony with respect to nutritional issues. If Rangen believes that specific opinions lack merit, it can address its contentions on cross examination.

Rangen also claims that Dr. Hildebrandt's opinions should be excluded because he ignores contrary evidence. Again,

this argument is not a basis for excluding his testimony altogether. Rangen can question Dr. Hildebrandt as to the contrary evidence on cross examination.

Rangen's further disputes Dr. Hildebrandt's theory as to the causation of harm to the minks as lacking factual and scientific support. During Dr. Hildebrandt's practice as a veterinarian he has assisted clients with identifying various toxins and herd exposure to toxic substances and has been involved in clinical studies involving the adverse effects of toxins in different animals. His education, skill, and extensive veterinary clinical experience with mink qualify him as an expert entitled to provide opinion testimony. His opinions are within his realm of expertise and based on scientific principles and facts. Rangen's criticisms of Dr. Hildebrandt's opinions pertain only to discrete portions of his report and do not affect his analysis as a whole. Rangen's contentions go to the weight to be afforded Dr. Hidebrandt's theory, not the admissibility of it. The court, therefore, finds no basis for Rangen's motion.

### B. Fizzell

Rangen also seeks to exclude the damages opinions of Douglas Fizzell. Mr. Fizzell does not dispute that Rangen's damages expert's calculations are inaccurate, rather he disputes that they are the proper measure of Plaintiff's damages. Mr. Fizzell suggests that the calculation does not take into account that the Stembridges retain kits to grow the size of their herd, may pelt out breeders to reduce the size of their herd, or sell live animals as breeders to other ranchers. However, Rangen claims that this information does not apply to Plaintiffs, or is taken into account by Rangen's expert. Therefore, Rangen argues that Mr. Fizzell's method is not valid and his testimony should be excluded.

**\*4** The court agrees with the Stembridges that Rangen's challenge to Mr. Fizzell's opinion essentially requests the court to adopt Rangen's theory of the case and then exclude Fizzell's opinion because it contradicts Rangen's position. The dispute as to reproduction rates is a question for the jury. Fizzell's opinion is supported by evidence and is properly admissible. Accordingly, Rangen's Motion to Exclude Expert Testimony is denied.

### *Rangen's Motion For Summary Judgment*

As an initial matter, the parties both raise the issue of whether Utah or Idaho law should apply because the Stembridges are located in Utah but Rangen is located in Idaho. Utah and Idaho law does not significantly differ with respect to all of the claims except the negligent misrepresentation claim. However, to the extent that there is a conflict between Utah and Idaho law, under the "most significant relationship" approach, the court concludes that Utah has the most significant relationship to the dispute and Utah law governs.

### I. Breach of Warranty Claims

Rangen argues that no express or implied warranties arose in this case because it did not sell a product to anyone. Rangen contends that it provided a tolling service but did not sell a product. Under Rangen and National Feeds' Fur Feed Production Agreement, National compensated Rangen per ton for toll manufacturing. Rangen procured its own ingredients and materials for production of the goods and sent National monthly invoices for payment as to finished products shipped, which also included current ingredient costs. National was required to send Rangen a check within 14 days of the invoices that included both manufacturing compensation and ingredient reimbursement. The parties further agreed that delivery charges for goods delivered to customers were to be based on actual delivery charges. Therefore, although Rangen claims that it did not sell the crumlets to National, National paid it for manufacturing, ingredients, and shipping.

The preamble of the Fur Feed Production Agreement further states: "Whereas, Rangen desires to produce certain mink and fox feeds (Goods) **for sale** in the United States;" and "Whereas, National is willing, subject to the terms and conditions hereof, to disclose the formulae for the purpose of **selling** to customers in the United States." Although it is undisputed in this case that Rangen did not sell the crumlets directly to the Stembridges, it is not clear under the Fur Feed Production Agreement that Rangen was not selling the crumlets to National. The crumlets contained a National Feeds label and it appears that National Feeds entered the contract for sale with customers, but Rangen processed such quantities of feed as customers requested, acquired the ingredients for the feed, produced the feed according to National's formula, agreed to maintain the standard and quality of goods required by National, and shipped the feed to specific customers.

### A. Express Warranties

Stembridge v. National Feeds Inc., Not Reported in F.Supp.2d (2013)
2013 WL 5347455, 81 UCC Rep.Serv.2d 795

*5 Under Utah law "a consumer can recover for breach of an express warranty despite a lack of privity." *State of Utah v. GAF Corporation*, 760 P.2d 310, 315 (Utah 1988). In *GAF*, the court recognized that manufacturers can be held responsible for a variety of express warranties. *Id.* " 'It would be unjust to recognize a rule that would permit manufacturers of goods to create a demand for their products by representing that they possess qualities which they, in fact, do not possess, and then, because there is no privity of contract existing between the consumer and the manufacturer, deny the customer the right to recover if damages result from the absence of those qualities, when such absence is not readily noticeable.' " *Id.* (quoting *Baxter v. Ford Motor Co.*, 12 P.2d 409, 412 (Wash.1932)).

The Stembridges argue that Rangen expressly warranted that the crumlets would conform to its label description as required under state and federal law. The Stembridges, directly and as a third-party beneficiary, benefit from Rangen's express warranty that the crumlets would conform to the label descriptions. Affirmations of fact or promise, description of the goods, and samples or models that are made part of the basis of the bargain can create express warranties. Utah Code Ann. § 70A–2–313(1)(a)–(c). Rangen's documents acknowledge that the feed it produces is sold. Under Utah law, the Stembridges are allowed to recover upon the warranty both as expressed users of the crumlet Rangen manufactured for National and as third-party beneficiaries to the contract between National and Rangen.

The Utah Uniform Commercial Code imputes privity to the Stembridges under these circumstances. The scope of Rangen's express warranty is not limited solely to the immediate buyer and seller; rather, it "extends to any person who may reasonably be expected to use, consume or be affected by the goods and who is injured by breach of the warranty." Utah Code Ann. § 70A–2–318. "Any beneficiary of a warranty may bring a direct action for breach of warranty against the seller whose warranty extends to him." U.C.C. § 2–318. The Stembridges, as the ultimate purchasers and users of the crumlet, benefit from these warranties.

In this case, the Stembridges are expressly contemplated third-party beneficiaries to Rangen and National Feeds' contract as Rangen specifically made the feed to fulfill the Stembridges' order. National communicated the Stembridges' order of crumlets to Rangen. Rangen fulfilled the order and shipped the feed to the Stembridges. As a result, Rangen should have reasonably expected the Stembridges to use the feed and the express warranty extends to the Stembridges as third party beneficiaries.

Both Idaho and Utah law requires that a "commercial feed ... offered for sale or sold or otherwise distributed in this state ... shall have ... a label bearing" statutorily required information. Idaho Code Ann. § 25–2705(1) (2012); Utah Code Ann. § 4–12–5; Utah Admin. Code R68–2–4 (2013). These provisions require the label to set forth the minimum percentage of crude fat and quantity of vitamin E. The label must also list the common or usual name of each ingredient used in the manufacture of the feed. If the "composition or quality falls below or differs from that which it is purported or is represented to possess by its labeling," a commercial feed is considered adulterated. Idaho Code Ann. § 25–2707(8); Utah Code Ann. § 4–12–2(1)(b).

*6 In this case, the Stembridges have put forth sufficient evidence that the Lactation and Reproduction Crumlets did not conform to their label description as expressly warranted by Rangen and as required by state law to survive summary judgment. There is evidence that the Reproduction Crumlets were lower than the label stated for Vitamin E and crude fat, and that the Lactation Crumlets contained monensin, which is recognized as a drug by the FDA, 21 C.F.R. § 558.4, and the label did not list it as an ingredient.

### B. Implied Warranties of Merchantability & Fitness for Particular Purpose

Under both Utah and Idaho law, implied warranties of merchantability and fitness for a particular purpose exist pursuant to statute. Idaho Code § 28–2–314 to –315; Utah Code Ann. § 70A–2–314 to –315. Rangen argues that it did not sell the Stembridges any feed and no statutory implied warranty arose between Rangen and the Stembridges.

However, Rangen's implied warranty of merchantability to National Feeds extends to the Stembridges as a matter of law and as third-party beneficiaries. *See* Utah Code Ann. § 70A–2–104(1); § 70A–2–318. "A seller's warranty whether express or implied extends to any person who may reasonably be expected to use, consume or be affected by the goods and who is injured by breach of the warranty. *Id.* § 70A–2–318. The implied warranty of merchantability is "implied in a contract for [the sale of goods] if the seller is a merchant with respect to goods of that kind." Utah Code Ann. § 70A–2–314(1). As discussed above with respect to an express warranty, it would be unjust to recognize a rule that would permit manufacturers of goods to represent that goods possess qualities they do

2013 WL 5347455, 81 UCC Rep.Serv.2d 795

not possess, and then deny the customer to recover damages because there is no privity of contract existing between the consumer and the manufacturer.

To be merchantable, goods must, at a minimum, satisfy certain criteria, including that they "pass without objection in the trade under the contract description; be "of fair average quality within the description"; be "fit for the ordinary purposes for which such such goods are used"; "run, within the variations permitted by the agreement, of even kind, quality, or quantity within each unit and among all units involved"; be "adequately contained, packaged and labeled as the agreement may require"; and "conform to the promises or affirmations of fact made on the container or label." Utah Code Ann. § 70A–2–314(2)(a)–(f). The Stembridges have submitted evidence that Rangen's crumlets breached these implied warranties of merchantability because the Reproduction Crumlets did not contain the fat and vitamin E described on the label and the Lactation Crumlets were adulterated by the addition of monensin with no listing of such on the label. This evidence is sufficient to survive summary judgment on the implied warranty claim.

## II. Strict Product Liability, Negligence, and Negligent Misrepresentation Claims

### A. Causation

*7  Regardless of the theory, Rangen contends that the Stembridges cannot show that the feed caused their losses because the Stembridges' expert, Dr. Hildebrandt, provides opinions that lack both factual and scientific bases. Dr. Hildebrandt's expert reports detail his theory for determining that the Reproduction Crumlets and Lactation Crumlets caused the Stembridges' losses. Contrary to Rangen's position, the court does not believe this is a case where the expert testimony can be found to be wholly inadmissible. As discussed above, Rangen's criticisms relate to the weight to be accorded to, and not the admissibility of, Dr. Hildebrandt's opinions.

The disputed question of causation is a question of fact that cannot be resolved by the court based on the record before it. Summary judgment on a negligence claim can only be granted in the clearest of circumstances. "It is only when the facts are undisputed and but one reasonable conclusion can be drawn therefrom" that proximate cause can become a question of law. Apache Tank lines v. Cheney, 706 P.2d 614, 615 (Utah 1985). "[W]hen there is doubt about the matter, it should

be resolved in favor of permitting the party to go to trial." Rees v. Albertson's, Inc., 587 P.2d 130, 133 (Utah 1978).

Rangen seeks to impose a higher burden of proof than is required by Utah law. The Stembridges need not prove causation with the level of precision advocated by Rangen and can instead prove causation circumstantially. In Alder v. Bayer Corp., the court held that causation was an issue for the jury when there were "allegations of daily exposure during the period in which symptoms developed to substances documented as causative agents for the specific harm alleged." 2002 UT 115, ¶ 75. Where the plaintiffs show that the symptoms experienced are documented in connection with exposure to the chemical at issue, "[a]ny argument that their illnesses stem from other causes creates an issue of triable fact." Id. at ¶ 84.

Causation has been found to be a jury questions in less compelling circumstances. Rangen has not proffered an alternative explanation of the Stembridges' losses. Rather, it criticizes the Stembridges' theory of causation pointing to conflicting test results and an absence in Dr. Hildebrandt's reports of analysis regarding vitamin E depletion rates and minks' Vitamin E requirements. Rangen's critique, however, goes to the weight of the Stembridges' evidence and does not show either an absence of a genuine dispute of material fact or that Rangen is entitled to judgment as a matter of law. The court cannot place an emphasis on tests that are favorable to Rangen when the standard for summary judgment requires the court to view the evidence in a light favorable to the nonmoving party. In fact, the court cannot weigh disputed facts and evidence on summary judgment.

Moreover, regardless of Dr. Hildebrandt's opinions, the Stembridges have otherwise provided sufficient and adequate evidence of causation to create genuine disputes of material fact as to the cause of the Stembridges' losses. The Stembridges have submitted evidence that the only farmers that experienced losses comparable to the Stembridges also fed National Feeds' crumlet to their mink. Medical and laboratory evidence exists that allow the jury to conclude that the losses were caused by the crumlets. Rangen's expert admitted that monensin is toxic to mink and other evidence from his deposition is available regarding the causes and symptoms of Vitamin E deficiency and ionophore toxicity. This evidence, combined with the timing of the losses and the Stembridges' physical observations, is sufficient to allow a jury to determine causation even without Dr. Hildebrandt's

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 506 of 535
PageID: 32453
Stembridge v. National Feeds Inc., Not Reported in F.Supp.2d (2013)
2013 WL 5347455, 81 UCC Rep.Serv.2d 795

opinion. Accordingly, Rangen is not entitled to summary judgment as to causation.

### B. Negligence Per Se

**\*8** Furthermore, Rangen's alleged violation of federal and state feed laws can be determined to be prima facie evidence of negligence and provides evidence sufficient to withstand Rangen's motion for summary judgment on the Stembridges' negligence claim. "As a general rule, violation of a standard of safety set by statute or ordinance is prima facie evidence of negligence." *Hall v. Warren,* 632 P.2d 848, 850 (Utah 1981). "Prima facie evidence is 'that quantum of evidence that suffices for proof of a particular fact until the fact is contradicted by other evidence." *Child v. Gonda,* 972 P.2d 425, 432 (Utah 1998).

Rangen's alleged violation of commercial feed law could be considered negligence per se. "Negligence per se, which usually results from the violation of a statute, is defined as 'conduct, whether of action or omission, which may be declared and treated as negligence without any argument or proof as to the particular surrounding circumstances." *Child,* 972 P.2d at 432. A statutory provision may be adopted as the standard of conduct for a reasonable person if the statute's purpose, in whole or in part, is: "(a) to protect a class of persons which includes the one whose interest is invaded, and (b) to protect the particular interest which is invaded, and (c) to protect the particular interest against the kind of harm which has resulted, and (d) to protect that interest against the particular hazard from which the harm results." *Rollins v. Peterson,* 813 P.2d 1156, 1163 (Utah 1991). Before a statute can be said to impose a tort duty, the statute's purpose must be to protect a class of persons of which the plaintiffs are members and to protect against the type of harm experienced. *See* id. at 1163–64.

The commercial feed statutes are intended to protect against the particular kind of harm and the particular hazard that the Stembridges allege caused their minks deaths. *See White v. Rose,* 241 F.2d 94 (10th Cir.1957) (reviewing Colorado commercial feed law and concluding that plaintiff's loss of cattle after feeding adulterated feed was "the very kind [of injury] that the statute was intended to prevent."). The Stembridges, as the ultimate recipients of the crumlets, are within the class of persons whose interest is to be protected by the statutes. The statutes expressly proscribe the distribution of adulterated feed. The failure of the feed to meet the

label guarantees and to identify all of the ingredients and drugs exacerbated the minks propensity to become vitamin E deficient and immunosuppressed by having inadequate vitamin E available to protect against the monensin. Under these circumstances, there is a question of fact as to whether Rangen's alleged failure to comply with the commercial feed statutes was negligence per se.

### C. Negligent Misrepresentation

Rangen claims that the Stembridges have no cause of action for negligent misrepresentation under Utah law. Under Utah law, the party from whom recovery is sought must actually misrepresent a material fact. *Jardine v. Brunswick,* 423 P.2d 659, 663 (1967). In this case, however, Rangen contends that it made no representations to the Stembridges because none of the Stembridges ever spoke to anyone at Rangen. To the extent that the Stembridges claim that Rangen made representations on the shipping documents, Rangen argues that the shipping documents do not provide a warranty because Rangen did not sell the feed. Moreover, Rangen argues that it applied National Feeds' label so the label cannot be considered a representation by Rangen.

**\*9** The Stembridges have submitted evidence that the Reproduction Crumlets and Lactation Crumlets did not conform to their label description as required by state and federal law. This failure can constitute a negligent misrepresentation. Utah law provides that "a party injured by reasonable reliance upon a second party's careless or negligent misrepresentation of a material fact may recover damages resulting from that injury" if "the second party had a pecuniary interest in the transaction, was in a superior position to know the material facts, and should have reasonably foreseen that the injured party was likely to rely upon the fact." *Price–Orem Inc. Co. v. Rollins, Brown and Gunnell, Inc.,* 713 P.2d 55, 59 (Utah 1986). "Privity of contract is not a necessary prerequisite to liability." *Id.*

In this case, Rangen knew that the Lactation and Reproduction Crumlets were being manufactured for the Stembridges and could have reasonably foreseen that the Stembridges would rely on Rangen's representation that the crumlets would conform to their label descriptions. Whether Rangen authored the labels with which it failed to comply is irrelevant to the analysis. Rangen stated that its feed would comply with the label and it agreed to such with National Feeds. Rangen did not need to make the label to have the duty. It made the feed and put the label on the feed. Therefore, state

and federal law required it to comply with the obligations to make sure the feed was properly labeled.

In addition, Rangen asserts that, to the extent that the Stembridges claim that the label on the feed presented a representation, the Stembridges cannot show how the feed caused harm to the mink. As discussed above, there is a question of fact as to the causation issue. Moreover, the Stembridges assert that if the labels had been correct, they would have acted differently. Accordingly, the court concludes that there is no basis for granting Rangen summary judgment on the Stembridges' negligent misrepresentation claim.

### D. Strict Product Liability Claims

In addition to causation, a plaintiff seeking to recover under a theory of strict product liability must also show that the product was unreasonably dangerous at the time it left Rangen's facilities. *Niemela v. Imperial Manufacturing, Inc.,* 263 P.3d 1191, 1195 (Utah Ct.App.2011). Rangen contends that the Stembridges do not have sufficient evidence to meet this standard. However, the Stembridges claim that the feed was defective because of rancidity, low fact, and borderline vitamin E in the Reproduction Crumlets and monensin in the Lactation Crumlets. The Stembridges argue that the Reproduction Crumlet and Lactation Crumlet were unreasonably dangerous because of their design, manufacturing, and Rangen's failure to provide adequate warnings regarding the use of the crumlets. *Niemela,* 2011 UT App. 333, ¶ 8.

" '[U]nreasonably dangerous' means that the product was dangerous to an extent beyond which would be contemplated by the ordinary and prudent buyer, consumer, or user of that product in that community considering the product's characteristics, propensities, risks, dangers, and uses together with any actual knowledge, training, or experience possessed by that particular buyer, user, or consumer." Utah Code Ann. § 78B–6–702. The Stembridges argue that the manufacturing defects in the crumlets caused them to be unreasonably dangerous because an ordinary and prudent mink rancher would not expect supplemental crumlet, which is marketed as a complete feed, to cause vitamin E deficiency, immunosuppression, death, and diminished production. An ordinary mink rancher would not assume that the Reproduction Crumlet had insufficient levels of vitamin

E and fat or that the Lactation Crumlet contained monensin, which is not approved for use in mink, potentially toxic, and can cause the mink to deplete their available vitamin E. In response, Rangen takes issue with the test results relied upon by the Stembridges and the theory that the monensin levels of the Lactation Crumlets were high enough to cause toxicity. These disputes, however, raise questions of fact to be determined at trial by a jury. They do not provide a basis for summary judgment.

**\*10** The Stembridges also assert that the crumlets were also unreasonably dangerous because Rangen failed to provide adequate warnings. "Where a manufacturer knows or should know of a risk associated with its product, the absence or inadequacy of warnings renders that product 'unreasonably dangerous,' subjecting the manufacturer to strict liability." *House v. Armour of Am., Inc.,* 929 P.2d 340, 343 (Utah 1996). The Stembridges contend that Rangen should have undertaken quality control testing and that with such testing Rangen should have known that the crumlets did not meet the label guarantees and were adulterated with monensin. The only language on the Reproduction Crumlet that could be construed as a warning was a statement suggesting that the mink could lose too much weight. The Lactation Crumlet failed to contain a warning that the product contained monensin and failed to identify it as an ingredient.

Under Utah law, the Stembridges are entitled to a presumption that they would have heeded an adequate warning. The Stembridges assert that had they been adequately warned, they would not have fed their mink the crumlets or they would have taken other precautions. Therefore, the court concludes that Rangen is not entitled to summary judgment on the Stembridges' strict product liability claim.

### CONCLUSION

Based on the above reasoning, Defendant Rangen's Motion to Exclude Expert Testimony is DENIED and Defendant Rangen's Motion for Summary Judgment is DENIED.

### All Citations

Not Reported in F.Supp.2d, 2013 WL 5347455, 81 UCC Rep.Serv.2d 795

---

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

TAB 36

*Transportation Insurance Co. v. Am. Harvest Baking Co., Inc.*, 2015 WL 9049273
(D.N.J. Dec. 16, 2015)

2015 WL 9049273
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

TRANSPORTATION INSUANCE COMPANY,
Plaintiff and Counterclaim Defendant,
v.
AMERICAN HARVEST BAKING
COMPANY, INC., Defendant, Counterclaim
Plaintiff, and Third Party Plaintiff,
v.
Cna Financial Corporation, Loews Corporation, and
Continental Casualty Corp., Third Party Defendants.

Civ. No. 15-663 (NLH/AMD)
|
Signed 12/16/2015

**Attorneys and Law Firms**

Bressler, Amery & Ross, P.C., By: Samuel J. Thomas, Esq., 325 Columbia Turnpike, Florham Park, New Jersey 07932, Counsel for Plaintiff and Counterclaim Defendant Transportation Insurance Company and Third Party Defendant Continental Casualty Corporation

Elenius, Frost & Walsh, By: Edward Delsesky, Esq., 1249 South River Road, Suite 300A, Cranbury, New Jersey 08512, Counsel for Third Party Defendant CNA Financial Corporation

Lightman & Manochi, By: Gary P. Lightman, Esq., Glenn A. Manochi, Esq., W. Lyle Stamps, Esq., 1520 Locust Street, 12th Floor, Philadelphia, Pennsylvania 19102, Counsel for Defendant, Counterclaim Plaintiff, and Third Party Plaintiff American Harvest Baking Company, Inc.

**OPINION**

HILLMAN, United States District Judge

**\*1** This contract dispute began as an action for recovery of unpaid premiums by insurer Transportation Insurance Company ("TIC") against American Harvest Baking Company, Inc. ("AHBC"). AHBC proceeded to counterclaim against TIC and make a third party complaint against CNA Financial Corporation ("CNAF"), Loews Corporation ("Loews"), and Continental Casualty Corporation ("CCC")

(collectively, the "Third Party Defendants") alleging a conspiracy to defraud amongst TIC and the Third Party Defendants (collectively, the "Counterclaim/Third Party Defendants"). This matter comes before the Court on TIC and CCC's Motion to Dismiss for Failure to State a Claim ("TIC's Motion" or "TIC Mot.") [Dkt. No. 23], CNAF's Motion to Dismiss for Lack of Personal Jurisdiction ("CNAF's Motion" or "CNAF Mot.") [Dkt. No. 29]; and CNAF's Motion for Joinder in TIC and CCC's Motion ("CNAF's Joinder Mot.") [Dkt. No. 31]. For the reasons that follow, CNAF's Motion will be **DENIED WITHOUT PREJUDICE**, TIC's Motion will be **GRANTED-IN-PART**, and CNAF's Joinder will be **DISMISSED**.

**I. BACKGROUND**

The following facts are admitted by AHBC in its Answer [1] or otherwise alleged in the Counterclaim and Third Party Complaint. AHBC was issued an insurance policy in 2013 and 2014 by an entity AHBC believed to be "CNA." "CNA" offered a low premium amount on its insurance policy, and AHBC decided to select "CNA" as its insurance provider for worker's compensation insurance. The insurance policy was subsequently issued to AHBC by TIC. Premiums paid by AHBC were billed by and paid to "CNA."

Some time after signing for both the 2013 and 2014 policies, audits were performed on AHBC's policies. The audits reclassified certain employees, which resulted in a determination that AHBC owed additional premiums under the policies in the amount of $88,053.02. Invoices for the additional premiums were sent by "CNA." AHBC made an initial payment of $977.15 toward this, but then ceased making any additional payments as AHBC does not believe it owes TIC the additional $87,075.87. [2] TIC filed suit in this Court against AHBC to recover what it believes are additional monies owed to TIC.

AHBC then counterclaimed against TIC and filed a third party complaint against CCC, CNAF, and Loews, alleging, among other counts, a conspiracy to defraud amongst all four entities. The instant motions followed. During the pendency of these motions, AHBC voluntarily dismissed the Third Party Complaint against Loews. (June 9, 2015 Notice [Dkt. No. 35].)

**II. JURISDICTION**

Transportation Insurance Company v. American Harvest., Not Reported in Fed....

2015 WL 9049273

The original case as filed by TIC, an Illinois company with principal place of business in Illinois, against AHBC, a Delaware corporation [3] with principal place of business in New Jersey, was properly brought under this Court's diversity jurisdiction pursuant to 28 U.S.C. § 1332. This Court has jurisdiction over AHBC's Counterclaim and Third Party Complaint pursuant to 28 U.S.C. § 1367.

## III. MOTIONS TO DISMISS

**\*2** This Court will turn first to CNAF's Motion regarding lack of personal jurisdiction, and then TIC's Motion regarding failure to adequately plead and failure to state a claim.

### A. MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

CNAF moves to dismiss the Third Party Complaint against it, arguing that this Court does not have personal jurisdiction over CNAF, a Delaware corporation with principal place of business in Illinois. This Court finds the arguments persuasive that personal jurisdiction may not exist, but also finds that AHBC has presented sufficient evidence to permit them to pursue limited jurisdictional discovery. Accordingly, this Court will deny CNAF's motion without prejudice to permit AHBC to undertake the limited jurisdictional discovery for the reasons that follow here.

### 1. LEGAL STANDARD

AHBC, as third-party plaintiff in the action against CNAF, bears the burden of demonstrating the facts that establish personal jurisdiction, and in deciding a motion brought under Rule 12(b)(2) the Court "must accept all of the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff." *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002) (citations omitted). Once a defendant raises a jurisdictional defense, the plaintiff must prove the jurisdictional facts by affidavits or other competent evidence. *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009) (citing *Dayhoff Inc. v. H.J. Heinz Co.*, 86 F.3d 1287, 1302 (3d Cir. 1996)). "[A]t no point may a plaintiff rely on the bare pleadings alone in order to withstand a defendant's Rule 12(b)(2) motion to dismiss for lack of in personam jurisdiction." *Patterson ex rel. Patterson v. F.B.I.*, 893 F.3d 595, 603–04 (3d Cir. 1990) (quoting *Time Share*

*Vacation Club v. Atl. Resorts, Ltd.*, 735 F.3d 61, 67 n.9 (3d Cir. 1984)). Thus a court must look beyond the pleadings and consider the affidavits and other proofs submitted by the parties. Accordingly, facts recited in this section that come from outside the pleadings are inappropriate to be considered *infra* in any discussion of the sufficiency of the pleadings.

Personal jurisdiction over a defendant in federal court is established when the defendant "is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located." Fed. R. Civ. P. 4(k)(1)(A); *see also Daimler AG v. Bauman*, 134 S. Ct. 746, 753 (2014). Accordingly, "[a] federal court sitting in New Jersey has jurisdiction over parties to the extent provided under New Jersey state law." *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 86 (3d Cir. 2004). New Jersey "permits the exercise of personal jurisdiction to the fullest limits of due process." *IMO Industries, Inc. v. Kiekert AG*, 155 F.3d 254, 259 (3d Cir. 1998); *see also* N.J. Ct. R. 4:4–4(b)(1). "Due process requirements are satisfied when in personam jurisdiction is asserted over a nonresident corporate defendant that has certain minimum contacts with the forum such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)) (internal quotation marks and alterations omitted).

**\*3** Personal jurisdiction may be asserted in one of two ways —general jurisdiction or specific jurisdiction. As the Supreme Court has explained:

> A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so "continuous and systematic" as to render them essentially at home in the forum State. Specific jurisdiction, on the other hand, depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and

is therefore subject to the State's regulation.

*Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011) (citations and internal quotations omitted). The Supreme Court has also recognized that as its jurisprudence "has increasingly trained on the relationship among 'the defendant, the forum, and the litigation,' i.e., specific jurisdiction, general jurisdiction has come to occupy a less dominant place in the contemporary scheme." *Daimler*, 134 S. Ct. at 758 (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)) (footnotes omitted). This Court will analyze both bases of jurisdiction in turn.

## 2. GENERAL JURISDICTION

AHBC alleges that this Court has general jurisdiction over CNAF based on the fact that TIC and CCC, which are subsidiaries of CNAF, are subject to the general jurisdiction of this Court and are alter egos of CNAF. (AHBC Opp. at 20–24.)[4] The Supreme Court in *Daimler* rejected using an agency theory for general jurisdiction, but the Court appears to have left intact the alter ego theory for general jurisdiction when dealing with parents and subsidiaries. *See* *Daimler*, 134 S. Ct. at 759 (noting the use of the alter ego theory by several Courts of Appeals without opining on its validity). The Third Circuit has not yet had occasion to opine on this issue,[5] but the Second and Ninth Circuits have, concluding that the alter ego theory as a basis for general jurisdiction survived the decision in *Daimler*. *See* *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1071 (9th Cir. 2015) ("The alter ego test is designed to determine whether the parent and subsidiary are not really separate entities, such that one entity's contacts with the forum state can be fairly attributed to the other.") (internal quotations omitted); *Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221, 225–26 (2d Cir. 2014) (assuming contacts can be imputed and then finding no general jurisdiction). This Court agrees and will apply the alter ego test in this matter.

**\*4** The alter ego theory is a derivation of the "piercing the corporate veil," and the alter ego test for personal jurisdiction is less stringent than the one for liability. *In re Enterprise Rent-A-Car Wage & Hour Emp't Practices Litig.*, 735 F. Supp.

2d 277, 319 (W.D. Pa. 2010) (citing *Stuart v. Spademan*, 772 F.2d 1185, 1198 n.12 (5th Cir. 1985)). The determination of jurisdiction over a nonresident parent corporation by means of the acts of the subsidiary is a matter of state law.

*Alexander v. CIGNA Corp.*, 991 F. Supp. 427, 443 n.25 (D.N.J. 1998). "In New Jersey, a subsidiary will be deemed to be the alter ego or 'mere instrumentality' of its parent if 'the parent so dominated the subsidiary that it had no separate existence but was merely a conduit for the parent.'" *Seltzer v. I.C. Optics, Ltd.*, 339 F. Supp. 2d 601, 610 (D.N.J. 2004) (quoting *State, Dep't of Envtl. Prot. v. Ventron Corp.*, 94 N.J. 473, 500–01 (N.J. 1983)).

"Whether the exercise of jurisdiction over a parent corporation is proper under the alter-ego theory depends upon the details of the unique relationship between the parent corporation and its subsidiary. The parent-subsidiary relationship itself is not sufficient to establish in personam jurisdiction over the parent entity." *In re Enterprise*, 735 F. Supp. 2d at 317–18 (citation omitted); *see also* *Lucas v. Gulf & W. Indus., Inc.*, 666 F.2d 800, 805–06 (3d Cir. 1981) (remarking on factors relevant for jurisdictional analysis between a parent and a subsidiary), *abrogated on other grounds*, *EF Operating Corp. v. Am. Bldgs.*, 993 F.2d 1046 (3d Cir. 1993); *Carfagno v. Ace, Ltd.*, Civ. No. 04-6184 (JBS), 2005 WL 1523530, at *6 (D.N.J. June 28, 2005) (same). A court "should examine all relevant factors that relate to the intimacy of the relationship between the parent and subsidiary to assess whether the contacts of the subsidiary with a particular state should be imputed to the parent." *Arch v. Am. Tobacco Co., Inc.*, 984 F. Supp. 830, 837 (E.D. Pa. 1997). In New Jersey, the factors to consider include "(1) whether the subsidiary is doing business in the forum that would otherwise be performed by the parent; (2) whether there is common ownership of the parent and a subsidiary; (3) whether there is financial dependency; and (4) whether the parent interferes with the subsidiary's personnel, disregards the corporate formalities, and/or controls the subsidiary's marketing and operational policies." *Dewey v. Volkswagen AG*, 558 F. Supp. 2d 505, 513 (D.N.J. 2008) (citations omitted).[6]

AHBC's primary argument is toward the second and fourth factors regarding common ownership, disregard of corporate formalities, and control of the subsidiary's marketing policies. AHBC argues the fact that "CNA [Financial]'s officers and

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 513 of 535
PageID: 32460
Transportation Insurance Company v. American Harvest, Not Reported in Fed....
2015 WL 9049273

directors overlap 100% [with TIC and CCC], even if they do hold 'separate' meetings and keep 'separate books.'" (AHBC Opp. at 22 (citing Lehman Decl. ¶¶ 18–19).) This ignores the "well established principle of corporate law that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership." *United States v. Bestfoods*, 524 U.S. 1, 69 (1998) (internal quotations and alterations omitted). The declaration submitted by CNAF makes clear that each of the corporate entities involved here maintains its own corporate records and holds its meetings separately from the others. (Lehman Decl. ¶¶ 18–20.)

**\*5** Construing disputed facts in favor of AHBC, the third-party plaintiff, as this Court must do, it seems that this may not actually be the case. The terms of use for CNAF's website—as submitted by CNAF—appear to conflate CCC and CNAF, stating "Continental Casualty Company ('CNA', 'we', 'our', 'us') provides this Web site and the materials located at and under the domain name cna.com (collectively, this 'Site') and any CNA services available on this Site ... to you, the user ...." (Ex. A to Lehman Decl.) Similarly, CNAF does appear to control the subsidiary's marketing policies, when disputed facts are construed in favor of AHBC. CNAF, TIC, and CCC all use the common "CNA" mark. (Lehman Decl. ¶ 4.) Despite this, as other courts have reasoned, "[p]romotional statements made on a public website do not precisely convey the operative corporate structure." *LaSalle Nat'l Bank v. Vitro, SA*, 85 F. Supp. 2d 857, 865 (N.D. Ill. 2000). Also in favor of AHBC's position is the fact that the single payment it did make toward the additional premiums was debited by an entity only called "CNA" and not "Travelers Insurance Company" or anything similar. (*See* Ex. A to Roseman Aff.)

However, the full weight of the evidence present does not support a finding that CNAF "so dominates" either CCC or TIC in such a manner that the subsidiaries are "mere conduits" for CNAF. With respect to the first factor to be considered, CNAF could not perform the functions of TIC or CCC. CNAF as the parent company is purely a holding company, does not engage in any insurance activities itself, and is not licensed to issue policies in this forum, or any other forum. (Lehman Decl. ¶¶ 6–13.) As other courts have noted, a "holding company could simply hold another type of subsidiary." *In re Enterprise*, 735 F. Supp. 2d at 324 (quoting *Action Mfg. Co., Inc. v. Simon Wrecking Co.*, 375 F. Supp. 2d 411, 422 (E.D. Pa. 2011)). As to the third factor, no evidence has been submitted regarding financial dependency of either TIC or

CCC on CNAF. Further, regarding parent control over the subsidiary's operational policies, CNAF has explained that CNAF does not hire anyone involved with the underwriting or premium auditing that TIC or CCC engage in, and that CNAF is not involved in the decision even as to which subsidiary will issue the insurance policy. (Lehman Decl. ¶ 9.) Additionally, at least one other court in this circuit, when analyzing multiple factors in a similar situation involving a holding company, has concluded that in "an ordinary holding company/subsidiary relationship, not one of undue domination and control," there is no alter ego relationship. *Arch*, 984 F. Supp. at 837–38. This Court agrees with that conclusion, based on the facts and affidavits presented, with all disputed facts construed in favor of AHBC. There is no undue domination and control here, and thus neither TIC nor CCC is functioning as an alter ego of CNAF. Accordingly, this court does not have general jurisdiction over CNAF.

### 3. SPECIFIC JURISDICTION

AHBC's arguments for why this court has specific jurisdiction over CNAF all appear to stem from the same alter ego argument, which this Court has already rejected as a theory for general jurisdiction. "The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant 'focuses on the relationship among the defendant, the forum, and the litigation.'" *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984)). "For a State to exercise jurisdiction consistent with due process, the defendant's suit related conduct must create a substantial connection with the forum State." *Id.* The contacts must be created by CNAF itself, not a third party, and the contacts must be with New Jersey itself, and not merely with one entity who resides here in New Jersey. *Id.* at 1122.

AHBC explains that it sought a quote from "CNA," submitted information to "CNA," and decided to obtain a "CNA insurance policy." (AHBC Opp. at 25; Rosenberg Aff. (Ex. A to AHBC Opp.) ¶¶ 5–9.) The argument relies in large part on the insurance policy cover stating "Your Workers Compensation and Employers Liability Policy from CNA" and speaking to Ms. Connie Monroe, allegedly a CNA collections agent. (AHBC Opp. at 25–26; Rosenberg Aff. ¶¶ 11–13.) AHBC even explains it was "surprised" to have been sued by TIC rather than any company named "CNA." (AHBC Opp. at 26; Rosenberg Aff. ¶ 15.)

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 514 of 535
PageID: 32461
Transportation Insurance Company v. American Harvest,... Not Reported in Fed....
2015 WL 9049273

**\*6** When the policy documents themselves are reviewed, the policy issuer is clear. The cover page does indeed state "Your Workers Compensation and Employers Liability Policy from CNA" in large print, but in normal sized print also states, "the company designated on the Information Page has caused this policy to be signed." (Ex. A to Rosenberg Aff.) Turning to the Information Page of the policies issued to AHBC, both state plainly at the top, "Coverage is Provided By NCCI Carrier Code No: 12408, *Transportation Insurance Co.*" (Ex. C & D to CNAF Reply (emphasis added).) While the "CNA" mark is used on the cover, this is insufficient to overcome the plain language of the policy, clearly indicating TIC as the insurance provider, and not any company with "CNA" in the name.

AHBC was required to prove jurisdiction by bringing forth affidavits or other competent evidence, *Metcalfe, 566 F.3d at 330*, and AHBC's submissions fail to overcome the issues presented in the affidavits and exhibits presented by CNAF. CNAF, by its own affidavit, has no employees, agents, or representatives that act on its behalf regarding insurance products. (Lehman Decl. ¶¶ 8–9.) AHBC has provided no evidence to controvert that assertion aside from its own misunderstanding of who issued its policy. Further, AHBC has provided no evidence to satisfy either of the two requirements for "a substantial connect with the forum State" as explained in the Supreme Court's recent *Walden* decision —contacts that are (1) created by CNAF and (2) directed toward New Jersey. AHBC's own misconceptions as to their own insurance policy are not sufficient reasons for this foreign corporation to be haled into a New Jersey court. Accordingly, this Court also does not have a specific jurisdiction basis for personal jurisdiction over CNAF.

### 4. JURISDICTIONAL DISCOVERY

In the absence of finding jurisdiction based on the affidavits presented, AHBC requests leave for jurisdictional discovery to "uncover evidence of additional activities conducted by CNA[F] such that CNA[F] should be subjected to general jurisdiction in New Jersey." (AHBC Opp. at 20 n.2.) "[C]ourts are to assist the plaintiff by allowing jurisdictional discovery unless the plaintiff's claim is 'clearly frivolous.'" *Toys "R" Us, Inc. v. Step Two, S.A.,* 318 F.3d 446, 456 (3d Cir. 2003) (citing *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n,* 107 F.3d 1026, 1042 (3d Cir. 1997)). "If a plaintiff presents factual allegations that suggest with reasonable particularity

the possible existence of the requisite contacts between the party and the forum state, the plaintiff's right to conduct jurisdictional discovery should be sustained." *Id.* (quoting *Mellon Bank (E.) PSFS, Nat'l Ass'n v. Farino,* 960 F.2d 1217, 1223 (3d Cir. 1992)) (internal quotations omitted).

This case is a close call, as this Court has found that one of the issues may tip slightly in AHBC's favor. Accordingly, AHBC has not presented a "clearly frivolous" claim of jurisdiction. AHBC will be permitted to pursue discovery only for the limited purpose of discovering information germane to satisfying the factors as delineated in *Dewey*. This Court will exert personal jurisdiction over CNAF to the extent necessary to require it to provide this limited jurisdictional discovery. The period for this discovery shall be thirty (30) days from the entry of this opinion and accompanying order. Within seven (7) days, AHBC may file a supplemental brief to demonstrate jurisdiction, and CNAF's supplemental opposition will be due seven (7) days thereafter. If AHBC does not file a supplemental brief within the specified time, CNAF may make an application to renew its motion to dismiss for lack of personal jurisdiction, based on AHBC's failure to supplement.

### B. MOTION TO DISMISS FOR FAILURE TO ADEQUATELY PLEAD OR FAILURE TO STATE CLAIM

**\*7** All of the Counterclaim/Third Party Defendants move this Court to dismiss AHBC's Counterclaim and Third Party Complaint. As an initial matter, TIC's Motion was joined by CNAF in a filing styled as a "Motion for Joinder." (CNAF Joinder Mot. at 1.) As this is not actually a Motion for Joinder under Federal Rules of Civil Procedure 19 or 20, but rather a motion to join in the arguments being made by TIC and CCC, CNAF's Joinder Motion will be dismissed. The Court agrees with the Counterclaim/Third Party Defendants and will dismiss the complaint for failure to comply with the heightened pleading standards of Rule 9(b) and grant AHBC leave to file an amended Counterclaim and Third Party Complaint.

### 1. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides that a court may dismiss a complaint "for failure to state a claim upon which relief can be granted." In order to survive a

Transportation Insurance Company v. American Harvest..., Not Reported in Fed....
2015 WL 9049273

motion to dismiss, a complaint must allege facts that make a right to relief more than speculative. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also* Fed. R. Civ. P. 8(a)(2).

While a court must accept all allegations in the complaint as true, viewing them in the light most favorable to the non-moving party, *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008), a court is not required to accept sweeping legal conclusions cast as factual allegations. *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997). The complaint must state sufficient facts to show that the legal allegations are not simply possible, but plausible. *Phillips*, 515 F.3d at 234. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

All four counts of AHBC's Counterclaim and Third Party Complaint sound in fraud, which also implicates Federal Rule of Civil Procedure 9(b). Rule 9(b) imposes a heightened pleading standard on fraud-based claims, and provides that "[i]n alleging fraud or mistake, a party *must state with particularity* the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b) (emphasis added). The standard of Rule 9(b) is independent of the standard applicable to Rule 12(b)(6) motions. *Cal. Pub. Emp.'s Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 144 (3d Cir. 2004). "Although Rule 9(b) falls short of requiring every material detail of the fraud, such as date, location, and time, plaintiffs must use alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Id.* (quoting *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002)) (internal quotation marks omitted). This requirement is intended to "place the defendant on notice of the precise misconduct with which it is charged." *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (internal quotations omitted). The result is that plaintiffs may not benefit from the inferences they may get under a traditional Rule 12(b)(6) analysis if they cannot comply

with the heightened pleading requirements of Rule 9(b). *Cal. Pub.*, 394 F.3d at 145, 156.

Courts are required to be "sensitive to situations in which sophisticated defrauders may successfully conceal the details of their fraud" and relax the rigid requirements of Rule 9(b). *In re Rockefeller*, 311 F.3d at 216 (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417 (3d Cir. 1997)). "Nevertheless, even when the defendant retains control over the flow of information, 'boilerplate and conclusory allegations will not suffice. Plaintiffs must accompany their legal theory with factual allegations that make their theoretically viable claim plausible.'" *Id.* (quoting *In re Burlington*, 114 F.3d at 1418).

## 2. PLEADING FRAUD UNDER RULE 9(B)

**\*8** The Counterclaim/Third Party Defendants seek dismissal of the Answer and Counterclaim and the Third Party Complaint (collectively, the "Counterclaim")[7] in its entirety as a "shotgun pleading" with improper allegations of fraud made without the specificity required by Rule 9(b). The entire Counterclaim refers to actions undertaken by the "Counterclaim/Third Party Defendants" without stating which of the four named entities—of which only three now remain[8]—committed which acts of wrongful conduct. Throughout the "Factual Background" section, the "Preliminary Statement," and in each of the four counts of the Counterclaim, the conduct of the Counterclaim/Third Party Defendants parties is generally grouped together.

The only allegations in the entire pleading that provides any specificity for which entity engaged in any conduct are directed toward "CNA,"[9] alleging: (1) CNA never intended to issue an insurance policy to AHBC, instead causing TIC to issue the policy; (2) all of AHBC's negotiations and communications were with CNA; (3) payments were made to and bills were sent by CNA; and (4) "AHBC was induced to purchase the workers compensation policy from CNA because the initial premium it was quoted was a very competitive premium." (Counterclaim ¶¶ 69, 71–73.) AHBC also alleges that it never interacted with TIC. (Counterclaim ¶ 70.) It is on these few paragraphs that AHBC stakes its entire claim that it has plead sufficient facts to satisfy its pleading

obligations of factual particularity under Rule 8 generally and Rule 9(b) more specifically as to claims of fraud. (*See* AHBC Opp. at 8.)

Courts in this district have held that pleadings that fail to explain who has committed what actions are impermissibly vague and fail to comport with the pleading standards set out by the Supreme Court in *Twombly*. *See, e.g.*, *K.J. & T.J. ex rel. K.J., Jr. v. Greater Egg Harbor Reg'l High Sch. Dist. Bd. of Educ.*, Civ. No. 14-145 (RBK/JS), 2015 WL 5039460, at *6 (D.N.J. Aug. 26, 2015); *Japhet v. Francis E. Parker Mem'l Home, Inc.*, Civ. No. 14-01206 (SRC), 2014 WL 3809173, at *2–3 (D.N.J. July 31, 2014); *Falat v. Cnty. of Hunterdon*, Civ. No. 12-6804 (SRC), 2013 WL 1163751, at *3 (D.N.J. Mar. 19, 2013). In *K.J.* the court dismissed the complaints as "impermissibly vague" due to being over 100 pages and containing allegations against seventeen individual defendants. *K.J.*, 2015 WL 5039460, at *6. Similarly, the court in *Falat* dismissed a 57-page complaint against sixteen defendants for being "impermissibly vague." *Falat*, 2013 WL 1163751, at *3. However, a lengthy complaint and excessive number of defendants are not requirements for this type of impermissible vagueness. In *Japhet*, the court dismissed a complaint where the plaintiff "seem[ed] to confuse her bald legal conclusions and threadbare allegations against 'Defendants' generally with factually alleging misconduct sufficient to plausibly give rise to [the movant's] liability specifically." *Japhet*, 2014 WL 3809173, at *2. The court found "it [was] impossible for this Court to read the Complaint and have any idea what [the movant] did to get named in this lawsuit, let alone what she did that would make her plausibly liable for the misconduct alleged." *Id.* (internal quotations omitted).

**\*9** AHBC's Counterclaim is not a lengthy complaint against an excessive number of defendants as in *K.J.* and *Falat*, but neither is it completely devoid of facts as in *Japhet*. That being said, this Court can only deduce from the Counterclaim that AHBC is complaining of misconduct on the part of TIC and CNAF. The Counterclaim contains absolutely no mention of CCC aside from the required recitation of CCC's state of incorporation and principal place of business. (*See* Counterclaim ¶ 65.) CCC is only mentioned in passing in the "Preliminary Statement" with its actions never separately delineated from those of "CNA" or TIC, and never mentioned in the "Factual Background"

of the Counterclaim. The closest the Counterclaim comes to naming specific conduct of CCC is in legal conclusions that CCC acted in an unlawful conspiracy with every other Counterclaim/Third Party Defendant without any support. (*See* Counterclaim, Prelim. Statement ¶¶ 1–4.) Thus, it is impossible to determine what conduct CCC engaged in that would make CCC plausibly liable for the misconduct alleged.

On these grounds, the motion will be granted with respect to CCC. However, the "shotgun pleading" theory is insufficient to dismiss the Counterclaim against TIC and CNAF. ABHC's failure to sufficiently plead fraud under Rule 9(b), on the other hand, does provide sufficient grounds to dismiss the Counterclaim against all of the Counterclaim/Third Party Defendants.

AHBC seeks to avail itself of the modified Rule 9(b) standard available in certain instances when the answering party is a corporation. (AHBC Opp. at 4–5, 8.) However, this modified standard is only appropriate when the plaintiff —or counterclaimant/third party plaintiff as here—can show "that the requisite factual information is peculiarly within the defendant's knowledge or control." *In re Rockefeller*, 311 F.3d at 216 (citing *In re Burlington*, 114 F.3d at 1418). Here, AHBC in its Counterclaim fails to allege that there is any factual information it does not have, aside from prefacing many allegations with the phrase "AHBC believes and thus avers," which is merely a reordered version of pleading "on information and belief." In the context of Rule 9(b), a party is permitted to "allege, on information and belief, the specific facts which give rise to the necessary inference of fraud if the information lies within the *defendant's exclusive possession and control*, and [the party has] made *diligent efforts to obtain* such information." *In re Am. Travellers Corp. Sec. Litig.*, 806 F. Supp. 547, 554 (E.D. Pa. 1992) (citing *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 285 (3d Cir. 1991)) (emphases added). The Counterclaim is devoid of any such allegations on behalf of AHBC. Even where "AHBC believes and thus avers," there is neither an assertion that the information is within the Counterclaim/Third Party Defendants' *exclusive* possession and control, nor any detailing of how AHBC made *diligent efforts* to obtain any missing information it would need to plead fraud under Rule 9(b).

Only in AHBC's Opposition does AHBC begin to explain what information it is missing in order to plead fraud

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 517 of 535
PageID: 32464

Transportation Insurance Company v. American Harvest..., Not Reported in Fed....

2015 WL 9049273

with specificity. (AHBC Opp. at 10.) However, it is well settled that a complaint may not be amended in briefs filed in opposition to a motion for failure to state a claim. *Frederico*, 507 F.3d at 201–02. Accordingly, the factual arguments made in AHBC's Opposition regarding this issue must be disregarded. Even if this Court could consider this, AHBC still fails to explain what diligent efforts it has undertaken to attempt to obtain the information in anticipation of filing its Counterclaim. Accordingly, the modified Rule 9(b) standard is inappropriate here. However, even applying the relaxed standard under Rule 9(b), the Counterclaim still fails to adequately plead fraud with particularity as required.

As explained *supra*, Rule 9(b) is a standard separate and apart from Rule 12(b)(6), and provides an independent basis for dismissal of a complaint. Even a relaxed standard requires "injecting precision and some measure of substantiation" into allegations of fraud. *Cal. Pub.*, 294 F.3d at 144. AHBC has failed to do this. As an example, AHBC alleges without any factual support that "AHBC suspects and believes and thus avers that in over 90% of the 'audits' conducted by Counterclaim/Third Party Defendants, the result was a premium increase over the initial, artificially low premium quoted to consumers (such as AHBC), to induce them to purchase in the first instance." (Counterclaim ¶ 81.) Nowhere in the Counterclaim does AHBC offer any "substantiation" of this allegation, despite it being an essential part of its allegations regarding fraud.

*10  The heightened pleading standards of Rule 9(b) have been said to require a plaintiff to identify the "who, what, where, when, and how" of the fraud. *See In re Burlington*, 114 F.3d at 1422. Reading AHBC's Counterclaim, their allegations of misconduct seem to condense down to two major issues: (1) the initial offer of the policy and (2) the eventual audits of the policy. AHBC does not identify who offered it the policy, who at any of the various entities it has sued performed the audit, or who contacted AHBC regarding the increased premiums following the audit. Accordingly, AHBC also fails to demonstrate the "who" in the alleged fraud. AHBC further alleges that the information regarding its employees did not change between the time the policy was signed for and the time of the audits, but provides no information regarding what AHBC told its insurance broker about its employees, or what was actually wrong with

the audits. (*See* Counterclaim ¶ 77.) Thus, AHBC fails to demonstrate the "what" element of fraud.

The "where," "when," and "how" elements of fraud can be plausibly inferred from the Counterclaim. The "where" is generally at the corporate offices of the Counterclaim/ Third Party Defendants, the "when" is in 2014 when the audits were performed, and the "how" is by offering a low initial insurance cost, and subsequently performing an audit that raised the price significantly. But three out of five is insufficient. Therefore, the Court will grant the motion to dismiss for failure to plead with specificity under Rule 9(b). The remainder of the arguments under Rule 12(b)(6) and the specifics of how each individual count fails under Rule 9(b) need not be addressed.

## C. DISMISSAL WITH LEAVE TO AMEND IS APPROPRIATE HERE

Having determined that the Counterclaim fails plead fraud with particularity under Rule 9(b), it will be dismissed without prejudice, and AHBC will be granted leave to file an amended Counterclaim and Third Party Complaint. *See In re Burlington*, 114 F.3d at 1435 ("Ordinarily where a complaint is dismissed on Rule 9(b) 'failure to plead with particularity' grounds alone, leave to amend is granted."). Due to the fact that this Court will also grant jurisdictional discovery to AHBC for a period to conclude within thirty (30) days of this opinion and accompanying order, AHBC must file its amended Counterclaim and Third Party Complaint within sixty (60) days of this opinion and accompanying order. If no amendment is timely filed, TIC, CCC, and CNAF may make an application for dismissal based on AHBC's failure to amend. *See Phillips*, 515 F.3d at 234.

## IV. CONCLUSION

For the foregoing reasons, CNAF's Motion to Dismiss for Lack of Personal Jurisdiction will be denied without prejudice, TIC's Motion to Dismiss for Failure to Sufficiently Plead or State a Claim will be granted-in-part as failing to sufficiently plead fraud under Rule 9(b), and CNAF's Motion for Joinder will be dismissed.

Jurisdictional discovery is permitted to determine whether TIC or CCC is an alter ego of CNAF according to the factors

Case 1:19-md-02875-RMB-SAK    Document 1382-8    Filed 07/12/21    Page 518 of 535
PageID: 32465
Transportation Insuance Company v. American Harvest..., Not Reported in Fed....
2015 WL 9049273

as explained in *Dewey v. Volkswagen AG*, 558 F. Supp. 2d 505, 513 (D.N.J. 2008). The period for this discovery is 30 days. Within 7 days thereafter, the parties may file supplemental briefs on the issue of personal jurisdiction. If no supplemental briefs are filed, CNAF may make an appropriate application to this Court.

The Counterclaim and Third Party Complaint are dismissed without prejudice, and AHBC is given leave to file an amended Counterclaim and Third Party Complaint

within sixty (60) days. If no amended pleading is filed, the Counterclaim/Third Party Defendants may make an appropriate application to this Court.

An appropriate order accompanies this opinion.

**All Citations**

Not Reported in Fed. Supp., 2015 WL 9049273

## Footnotes

1    The admissions of AHBC in its Answer to TIC's Complaint are incorporated by reference in the Counterclaim. (Counterclaim ¶ 61.)

2    AHBC does not deny that it does owe the money; it denies that it owes any money to TIC as opposed to "CNA." (*See* Answer ¶¶ 16, 18.)

3    The Complaint alleges that AHBC is a New Jersey corporation. (Compl. [Dkt. No. 1] ¶ 2.) AHBC's Answer indicates that it is a Delaware corporation. (Answer ¶ 2.) This does not affect this Court's analysis of its diversity jurisdiction, but to the extent it is relevant, AHBC's response will control here.

4    CNAF is admitted by AHBC to be a Delaware corporation with a principal place of business in Illinois. (Answer and Counterclaim ¶ 64.) Therefore, no general jurisdiction in New Jersey exists based on the "paradigm bases" for the exercise of general jurisdiction for a corporation. *See Daimler*, 134 S. Ct. at 760 (2014).

5    The only Third Circuit opinion to address the effect of *Daimler* and the issues of general jurisdiction over a foreign corporation has been vacated upon order of the Circuit to hear the case in front of the en banc court.

    *See Chavez v. Dole Food Co., Inc.*, 796 F.3d 261, 269–70 (3d Cir. 2015), *vacated pending reh'g en banc*. Regardless, the panel decision in *Chavez* was not directly applicable to the issue of corporate alter ego as a basis for general jurisdiction.

6    AHBC directs this Court to the ten-factor test used in the Eastern District of Pennsylvania, as explained in *Simeone ex rel. Simeone v. Bombardier-Rotax GmbH*, 360 F. Supp. 2d 665, 675 (E.D. Pa. 2005). While potentially instructive, to the knowledge of this Court, this ten-factor test has never been cited to by a court in New Jersey, and primarily cited by courts in Pennsylvania. The test from *Dewey* is far more appropriate, being grounded in New Jersey state law.

7    As the Third Party Complaint [Dkt. No. 9] solely incorporates by reference allegations contained within the Answer and Counterclaim [Dkt. No. 8] and contains no independent allegations, for simplicity the documents will be referred to jointly as "the Counterclaim" and citations will be to the Answer and Counterclaim [Dkt. No. 8].

8    AHBC voluntarily dismissed its claims against Loews. (*See* June 9, 2015 Notice [Dkt. No. 35].)

9    Presumably, "CNA" in the Counterclaim refers to CNA Financial Corporation. The confusion between "CNA" as a service mark and "CNA Financial Corporation" as a juridical entity is addressed in the discussions regarding personal jurisdiction, *supra*, and something AHBC would do well to address in an amended pleading.

**End of Document**                                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

TAB 37

*Travelers Indem. Co. v. Indus. Paper & Packaging Corp.*, No. 3:02-CV-491, 2006
WL 2050686 (E.D. Tenn. July 19, 2006)

Travelers Indemnity Co. v. Industrial Paper & Packaging Corp., Not Reported in...
2006 WL 2050686, 60 UCC Rep.Serv.2d 307

KeyCite Yellow Flag - Negative Treatment
Disagreed With by   Nye v. Bayer Cropscience, Inc.,   Tenn.,   June 7, 2011

2006 WL 2050686
United States District Court, E.D. Tennessee,
Knoxville Division.

TRAVELERS INDEMNITY COMPANY, as subrogee
of Smoky Mountain Laser and IDM, Inc., Plaintiff,
v.

INDUSTRIAL PAPER & PACKAGING
CORP., et al., Defendants.

Civil Action No. 3:02–CV–491.
|
July 19, 2006.

**Attorneys and Law Firms**

Clint J. Woodfin, Spicer, Flynn & Rudstrom, Knoxville,
TN, Elizabeth J. Herre, Samuel S. Woodhouse, Cozen &
O'Connor, Atlanta, GA, for Plaintiff.

Charles G. Taylor, III, McDonald, Levy & Taylor, Knoxville,
TN, Charles B. Lewis, Richard W. Krieg, Summer H. Stevens,
Lewis, King, Krieg, Waldrop & Catron, P.C., Knoxville, TN,
for Defendants.

*MEMORANDUM AND OPINION*

THOMAS W. PHILLIPS, District Judge.

**\*1** Plaintiff [1] has filed the instant action alleging that an
accumulation of defective and/or unreasonably dangerous
diffusion fluid caused or contributed to a building fire. Five
motions for summary judgment [Doc. 70, Doc. 82, Doc. 84,
Doc. 88, and Doc. 92] have been filed by defendants. The
plaintiff has opposed these motions by filing responses. For
the reasons that follow, defendants' motions for summary
judgment are **GRANTED in part** and **DENIED in part**.

### I. *Summary of the Facts*
As the law requires, all disputed facts and inferences are
resolved most favorably for the plaintiff. Furthermore, the
Court merely provides an abridged summary of facts for the
purposes of this opinion.

The fire that is subject of this lawsuit occurred on September
11, 1999, and damaged Q–Zar Amusement Center located
at 716 Parkway, Gatlinburg, Tennessee. This was an arcade
business owned by Smoky Mountain Laser and IDM, Inc.
("Smoky Mountain"). The amusement complex was a two-
story building. The first floor contained a concession area,
video machines, and a laser instruction room. The second
floor contained a laser arena that consisted of a maze of
walkways to target centers. The fire is alleged to have
originated in a 15–ton HVAC unit and to have spread through
the unit's duct system due to an accumulation of diffusion
fluid in the HVAC system. It appears that diffusion fluid was
used in the fogging machines for the laser tag operations.

Plaintiff filed suit against the diffusion fluid manufacturers
and/or sellers, Industrial Paper & Packaging Corp ("Industrial
Paper"), [2] Venture Tech, Inc. ("Venture Tech"), Citgo
Petroleum Corporation ("Citgo"), and Reel EFX, Inc. ("Reel
EFX"), based upon products liability, breach of warranty, and
negligence. Plaintiff also filed suit against Ronald Ogle and
Ogle's Repair Company ("Ogle and Ogle's Repair") based on
negligence. Specifically, plaintiff's allegations against Ogle
and Ogle's Repair are based upon the fact that Ogle serviced
the HVAC system on September 3, 1999, eight days before
the fire, and that the defendants failed to warn of or remove
the accumulation of diffusion fluid in the HVAC system.

The fire caused $736,343.66 in damages. This figure includes
$413,243.81 for the building, $198,432.85 for the content,
and $124,667.00 for lost profits.

### II. *Law Applicable to Rule 56 of the Federal Rules of Civil Procedure*

Rule 56 of the Federal Rules of Civil Procedure provides that
summary judgment will be granted by a court only when there
is no genuine issue of material fact and the moving party is
entitled to judgment as a matter of law. The burden is on
the moving party to conclusively show that no genuine issue
of material fact exists. A court must view the facts and all
inferences to be drawn therefrom in the light most favorable
to the non-moving party. *Matsushita Elec. Indus. Co., v.
Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Morris v. Crete
Carrier Corp.,* 105 F.3d 279, 280–81 (6th Cir.1997); *60 Ivy
Street Corp. v. Alexander,* 822 F.2d 1432, 1435 (6th Cir.1987).

**\*2** Once the moving party presents evidence sufficient to
support a motion under Rule 56 of the Federal Rules of Civil
Procedure, the nonmoving party is not entitled to a trial simply

*Travelers Indemnity Co. v. Industrial Paper & Packaging Corp., Not Reported in...*
2006 WL 2050686, 60 UCC Rep.Serv.2d 307

on the basis of allegations. The non-moving party is required to come forward with some significant probative evidence, which makes it necessary to resolve the factual dispute at trial.

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). The moving party is entitled to summary judgment if the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof.

*Celotex,* 477 U.S. at 323; *Collyer v. Darling,* 98 F.3d 220 (6th Cir.1996).

### III. *Motion for Summary Judgment and applicable law*

#### A. Industrial Paper

Before May of 1994, Industrial Paper's salesman, Roger Bowles ("Bowles"), was given a sample of diffusion fluid used at the Q–Zar Amusement Center. Taking this sample to Venture Tech, Bowles found a substitute to market to Smoky Mountain. Smoky Mountain then began purchasing diffusion fluid from Industrial Paper. Thereafter, the fire occurred on September 11, 1999.

In reference to facts to support its summary judgment motion, Industrial Paper asserts that the product provided by Industrial Paper was the same as the sample taken from Q–Zar. Further, Industrial Paper states that the product was never opened nor altered when in Industrial Paper's possession and that Industrial Paper never made any representations regarding the product. Additionally, Industrial Paper claims that plaintiff's expert has not determined that there was anything wrong with the product; has not determined that there were any differences between the subject diffusion fluid and other diffusion fluids; and indicated that Smoky Mountain had a responsibility to keep the diffusion fluid from accumulating in the HVAC system.

Based upon these facts, Industrial Paper argues summary judgment in its favor on the following grounds: (1) the product is not defective nor unreasonably dangerous; (2) Industrial Paper had no duty to warn; and (3) Industrial Paper is not liable based upon the sealed container doctrine (moreover, the exception to the sealed container doctrine, breach of warranty, does not apply in the instant matter). In response, the plaintiff has opposed Industrial Paper's grounds for summary judgment, as well as asserted that Industrial Paper is an apparent manufacturer.

1. Defective and/or Unreasonably Dangerous Product; Duty to Warn; and Causation

It is fundamental to any products liability action that there must be evidence that the product in question was defective or unreasonably dangerous. Under Tennessee law, "[a] manufacturer or seller of a product shall not be liable for any injury to a person or property caused by a product unless the product is determined to be in a defective condition or unreasonably dangerous at the time it left the control of the manufacturer or seller." T.C.A. § 29–28–105(a). There are statutory definitions for "defective condition" of products and "unreasonably dangerous" products. "Defective condition" means a condition of a product that renders it unsafe for normal or anticipatable handling and consumption. T.C.A. § 29–28–102(2). "Unreasonably dangerous" means that a product is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics, or that the product because of its dangerous condition would not be put on the market by a reasonably prudent manufacturer or seller, assuming that the manufacturer or seller knew of its dangerous condition." T.C.A. § 29–28–102(8).

**\*3** The unreasonable dangerousness of a product as well as a lack of warnings about a dangerous product that can serve the basis for a manufacturer's liability, are usually jury questions. *Harwell v. American Medical Sys.,* 803 F.Supp. 1287, 1297 (M.D.Tenn.1992). It is normally a question for the jury's determination as to whether the product is in a defective condition or is unreasonably dangerous to the user. *Id.* The Court acknowledges that "the product itself need not be shown to be of defective manufacture. It can be perfectly made, but is rendered unreasonably dangerous by the manufacturer by failure in its duty to warn of non-apparent dangers known or that should be known by the manufacturer." *Goode v. Tamko Asphalt Products, Inc.,* 1988 WL 99985 \*3 (Tenn.Ct.App. June 26, 1988), *rev'd,* 783 S.W.2d 184 (Tenn.1990) (reversed on grounds of insufficiency of the evidence). Indeed, Tennessee law requires manufacturers to warn of hidden and unknown dangers in their products. *Shoemake v. Omiquip Inernational, Inc.,* 152 S.W .3d 567, 574–75 (Tenn.Ct.App.2004). In other words, "[r]elevant to the determination of whether a product is defective and/or unreasonably dangerous is the presence or absence of a statement accompanying the product which in

Travelers Indemnity Co. v. Industrial Paper & Packaging Corp., Not Reported in...

2006 WL 2050686, 60 UCC Rep.Serv.2d 307

some way informs the user of the danger. This statement must be calculated to bring home to a reasonably prudent user of the product the nature and extent of the danger involved in using the product." *Harwell,* 803 F.Supp. at 1297 (internal citations omitted).

The plaintiff has essentially alleged that the diffusion fluid was unreasonably dangerous due to inherent dangers in the product that are not open and/or obvious and that would not be expected from an unsophisticated consumer, necessitating appropriate warnings. The plaintiff has produced sufficient proof such that a jury could find that the accumulation of diffusion fluid in the HVAC system caused and/or contributed to the fire. [3] While the plaintiff's expert did not allude to a manufacture defect, it is undisputed that the warning provided by Venture Tech stated that the product was "non-flammable." [4] The warnings of dangers must be sufficient in identifying the dangers posed by a product. *Harwell,* 803 F.Supp. at 1297. Thus, a reasonable juror could find that the warning provided by Venture Tech was inadequate, creating an unreasonably dangerous product. [5] However, the summary judgment analysis as to Industrial Paper does not end here.

2. Sealed Container Doctrine

According to Tennessee law, the seller of a product normally cannot be sued under products liability if the seller acquired and later sold the product in a "sealed container" and/or when the product is acquired and sold by the seller under circumstances in which the seller is afforded no reasonable opportunity to inspect the product, which would or should in the exercise of reasonable care, reveal the existence of the defective condition. T.C.A. § 29–28–106(a). As a caveat, however, the doctrine does not apply to a valid breach of warranty action, expressed or implied. T.C.A. § 29–28–106(a) (1); *see also Wesson v. Woodworks, Inc.,* 1999 WL 188288 *5 (Tenn.Ct.App. Apr. 6, 1999). As to implied warranty of fitness for a particular purpose, the buyer must prove (1) that the seller was aware that the buyer had a particular purpose for which the goods were required; (2) that the seller knew that the buyer was relying on the seller's skill or judgment to provide the buyer with goods that were fit for that particular purpose; and (3) that the buyer must have actually relied on the seller's skill or judgment. T.C.A. § 47–2–315; *see also Lee's Home Center, Inc. v. Morris,* 2006 WL 1716797 * 4 (Tenn.Ct.App. June 21, 2006). [6]

*4 Based upon the facts presented to the Court, the diffusion fluid was purchased by Industrial Paper from Venture Tech in sealed drums. The drums were then temporarily delivered to Industrial Paper's warehouse where they were never opened or modified. Later, when the drums were taken by Industrial Paper to Smoky Mountain's facility, they arrived in the same condition as when Industrial Paper had acquired them.

In response the defendant's motion, the plaintiff states that Industrial Paper is confusing its failure to inspect the product with not having an opportunity to inspect the product. Additionally, plaintiff argues that a company, such as Industrial Paper, should not be insulated from liability by simply "sticking its head in the sand." However, plaintiff has not offered any support for these contentions, and the Court is unable to find supportive authority for these novel arguments. In light of the facts presented to the Court, plaintiff's strict liability and negligence claims are barred as a matter of law by the sealed container doctrine.

The Court, however, is not persuaded that plaintiff's breach of warranty claim is likewise barred. When finding a product suitable for the needs of Smoky Mountain, Industrial Paper's salesman, Bowles, stated that he was "familiar with the reason that Q–Zar wanted the fluid." Further, Bowles "told [Venture Tech] what they did with it, which was they put it in a fogger and they fogged the inside of the building so it would make it more difficult to play a laser tag game." Since Industrial Paper was well aware of the use and purpose of the diffusion fluid, a reasonable juror could conclude that the plaintiff was relying upon Industrial Paper's skill or judgment to provide goods fit for the particular purpose and that plaintiff indeed relied upon Industrial Paper's skill or judgment. Accordingly, plaintiff's breach of warranty claim survives summary judgment.

3. Apparent Manufacturer

As an additional argument in opposition to defendant's motion for summary judgment, plaintiff asserts that Industrial Paper is an apparent manufacturer. The apparent manufacturer doctrine states that one who puts out as his own product a chattel by another is subject to the same liability as though he were the manufacturer. *Restatement 2d of Torts,* § 400 (1964). "Hold out" (or "puts out") usually involves either a defendant's labeling or affixing to the product its own name or putting forth advertising identifying the defendant as the maker of the product. *Herbel v. Sherman Equipment,* 92

Travelers Indemnity Co. v. Industrial Paper & Packaging Corp., Not Reported in...
2006 WL 2050686, 60 UCC Rep.Serv.2d 307

Ill.2d 368, 372, 65 Ill.Dec. 888, 891, 442 N.E.2d 199, 202 (1982) (citations omitted).

In the instant matter, however, the plaintiff has not put forth sufficient evidence that Industrial Paper represented the diffusion fluid as its own product. There is no evidence that Industrial Paper either labeled or advertised the product as its own nor are there other sufficient indications that Industrial Paper was leading its customers and the general public to believe that it actually manufactured the diffusion fluid. Accordingly, based upon the facts before the Court, Industrial Paper is not an apparent manufacturer.

*B. Venture Tech*

**\*5** Venture Tech filed its motion for summary judgment on the following theories: (1) Venture Tech is not liable to plaintiff by operation of the "sealed container" doctrine; (2) no evidence exists to support plaintiff's theory of causation; and (3) plaintiff's claims against Venture Tech are barred by the three year statute of limitations on property claims and the four year statute of limitations on warranty claims. As previously mentioned, the Court has found that the plaintiff has put forth sufficient evidence to support its theory of causation, i.e. that the diffusion fluid is defective and/or unreasonably dangerous and that the product caused or contributed to the fire at Q–Zar Amusement Center. [7] Therefore, only the remaining two arguments are considered.

*1. Statue of Limitations*

As mentioned above, the fire occurred on September 11, 1999, and the plaintiff filed its complaint on September 5, 2002. Initially, the plaintiff only filed suit against Industrial Paper, JCL Management, Inc., Ogle and Ogle's Repair, John Doe Company, and Kel–San, Inc. [8] However, upon Industrial Paper's filing of its amended answer naming Venture Tech, plaintiff filed suit against Venture Tech pursuant to T.C.A. § 20–1–119 on March 30, 2004.

T.C.A. § 20–1–119 provides in relevant part as follows:

20–1–119. Comparative fault—Joinder of third party defendants.—

(a) In civil actions, where comparative fault is or becomes an issue, if a defendant named in an original complaint initiating a suit filed within the applicable statue of limitations, or named in an amended complaint filed within the applicable statue of limitations, alleges in an answer

or amended answer to the original or amended complaint that a person not a party to the suit caused or contributed to the injury or damage for which the plaintiff seeks recovery, and if the plaintiff's cause or causes of action against such person would be barred by any applicable statute of limitations but for the operation of this section, the plaintiff may, within ninety (90) days of filing of the first answer or first amended answer alleging such person's fault, either:

(1) Amend the complaint to add such person as a defendant pursuant to Rule 15 of the Tennessee Rules of Civil Procedure and cause process to be issued for that person; or

(2) Institute a separate action against that person by filing a summons and compliant ...

(b) A cause of action brought within ninety (90) days pursuant to subsection (a) shall not be barred by any statue of limitations ....

Venture Tech disputes the application of the statute to the instant matter. Essentially, Venture Tech argues that it was identified as a potential tortfeasor to plaintiff before being formally named in Industrial Paper's amended answer and that, since plaintiff did not timely instigate proceedings against Venture Tech upon discovery, plaintiff is barred from bringing Venture Tech into the suit. Specifically, Venture Tech argues that the plaintiff was apprised of Venture Tech's involvement in the matter as earlier as September 21, 1999 when it received a facsimile allegedly indicating that Venture Tech was the supplier or manufacturer of the diffusion fluid. [9] Further, Venture Tech claims that Bowles, the former sales associate of Industrial Paper, informed plaintiff that Venture Tech was the supplier of diffusion fluid in his April 28, 2003 deposition. [10] Defendant asserts that since plaintiff did not sue Venture Tech at either of the two instances, plaintiff is barred from filing suit against Venture Tech by the statute of limitations, [11] as well as T.C.A. § 20–1–119.

**\*6** In response, plaintiff asserts that the facsimile did not place the plaintiff on notice that Venture Tech may have been the manufacturer of the diffusion fluid. Rather, plaintiff argues that the MSDS merely shows from where the document was faxed. Plaintiff claims that it does not explain or identify Venture Tech as the manufacturer of the diffusion fluid. [12] Further, in regard to Bowles' deposition, plaintiff states since the statute of limitations had passed, it is irrelevant whether the plaintiff knew or should have known that Venture Tech sold diffusion fluid in that T.C.A. § 20–1–

Travelers Indemnity Co. v. Industrial Paper & Packaging Corp., Not Reported in...
2006 WL 2050686, 60 UCC Rep.Serv.2d 307

119 requires the identified tortfeasor to be named in an answer or amended answer. Plaintiff states that once this was done, plaintiff appropriately filed a lawsuit against Venture Tech within ninety (90) days.

Initially, the Court notes that the discovery doctrine does not apply in this particular situation. The Court acknowledges that Venture Tech did not argue the discovery doctrine; however, case law cited by Venture Tech discusses the legal argument. The rule applies only in cases where the plaintiff does not discover, and reasonably could not be expected to discover, that the plaintiff had a *right of action,* rather than who the proper parties to an action may be. *See* 📑 *Potts v. Celotex Corp.,* 796 S.W.2d 678, 680–81 (Tenn.1990). "It is immaterial that the [plaintiff] had not identified the defendant as the party who allegedly wronged [it]." *IFC Nonwovens, Inc. v. Owens–Corning Fiberglass Corp.,* 1 F.3d 1241, 1993 WL 272445, *3 (6th Cir. July 19,1993); *see also Schultz v. Carter,* 2005 WL 1668287, *2–3 (E.D.Tenn. July 18, 2005). Indeed, once a party is put on notice that components of a product may be responsible for an injury, the statute of limitations begins to run regardless of whether the exact identities of the defendants are known. *Id.*

Turning to the statute, T.C.A. § 20–1–119 allows a plaintiff ninety days in which to assert a claim against an alleged comparative tortfeasor if two conditions are met. 📑 *Towns v. Sunbeam Oster Co.,* 50 S.W.3d 446, 452–53 (Tenn.App.2001); *Kizziah v. Fire Management Systems,* 2006 WL 218026, *7 (E.D.Tenn. Jan. 27, 2006). First, a defendant must name the comparative tortfeasor as one who caused or contributed to the injury or damage of which the plaintiff seeks recovery. *Id.* Second, the comparative tortfeasor must be a non-party to the suit. *Id.* The statute makes no reference to the plaintiff's diligence in discovering the identity of the potentially liable parties. *Id.*

However, Venture Tech asserts that the plaintiff had knowledge that a third party, Venture Tech, may have been at fault for the complained injuries long before the amended answer; therefore, T.C.A. § 20–1–119 is inapplicable. In support of its argument, defendant cites a Sixth Circuit decision, 📑 *Whittlesey v. Cole,* 142 F.3d 340 (6th Cir.1998). [13] Defendant's reliance on *Whittlesey* is misplaced in that subsequent to the *Whittlesey* decision, T.C.A. § 20–1–119 was analyzed by the Tennessee Supreme Court in *Towns v. Sunbeam Oster Co. Inc.*

*7 In *Townes,* the Tennessee Supreme Court initially articulated the following in reference to federal and state law application:

> State law must be applied in diversity cases filed in federal court that do not involve a federal question. The federal courts must look to the law of the state as declared by its highest court when they decide questions of state law. In the absence of an authoritative pronouncement by the state's highest court, the federal courts may either certify the state law question to the state's highest court for an authoritative interpretation, or ascertain and apply the state law as they understand it from the available sources.

📑 *Townes,* 50 S.W.3d at 452 (internal citations omitted). Then, the Tennessee Supreme Court stated its authoritative pronouncement holding that since T.C.A. § 20–1–119 makes no reference to the plaintiff's diligence in discovering the identity of potentially liable parties, the plaintiff's knowledge of the existence of other persons who might be liable for the plaintiff's injuries is irrelevant. 📑 *Id.* at 452–53. Further, the Tennessee Supreme Court concluded that T.C.A. § 20–1–119 is remedial and should be construed liberally to enable plaintiffs to have their claims adjudicated on the merits. 📑 *Id.* at 451.

In light of the above, this Court must hold that any knowledge of other non-parties who may have potential liability for a plaintiff's injuries is immaterial in the application of T.C.A. § 20–1–119. Further, the plaintiff has met the requirements of T.C.A. § 20–1–119. First, Venture Tech was named by defendant Industrial Paper in its amended answer as one who caused or contributed to the injury or damages for which the plaintiff seeks recovery. Second, Venture Tech was not a party to the lawsuit. Finally, plaintiff filed its actions against parties, including Venture Tech, within the ninety days allowed to add comparative tortfeasors. Accordingly, plaintiff's claim is not barred by the statute of limitations.

Travelers Indemnity Co. v. Industrial Paper & Packaging Corp., Not Reported in...

2006 WL 2050686, 60 UCC Rep.Serv.2d 307

### 2. Sealed Container

As in the situation involving Industrial Paper, Venture Tech asserts that it cannot be held liable for plaintiff's damages under the sealed container doctrine, and the plaintiff responds that Venture Tech held itself out to be the apparent manufacturer of the diffusion fluid. However, the facts are slightly different. Venture Tech's name and information is stated on the MSDS that accompanied the product and that was provided to the plaintiff.

As mentioned above, the apparent manufacturer doctrine states that one who puts out as his own product a chattel by another is subject to the same liability as though he were the manufacturer. *Restatement 2d of Torts,* § 400 (1964). According to *Prosser, Law of Torts,* 3rd Ed., § 96, one who labels a product with his own name or otherwise represents it to be his own is to be treated on the same basis as if he had manufactured it, and so is liable for any negligence on the part of the actual maker. In *Bogart,* the Court found that a "purchaser of an article ought to be able to rely upon the labeling of a product to identify the manufacturer; and in the absence of the name of the real manufacturer, the marketer named on the product ought to be conclusively presumed to be the manufacturer." *Bogart v. STP Corporation,* 1985 WL 301940 *3 (Tenn.Cir.Ct. Oct. 2, 1985). In the concurring opinion, Justices Samuel L. Lewis and William C. Koch held that "a seller of a product packaged under its own trade name cannot take advantage of the 'sealed container' defense when it [is] involved in any way in the production of the product." *Id.* at *6. The *Bogart* concurrence goes on to cite *Walker v. Decora, Inc.,* 225 Tenn. 504, 471 S.W.2d 778 (Tenn.1971) [14] in which the Tennessee Supreme Court held that a company labeling a product with its own trade name or otherwise represented the product to be its own, treated the defendant company as the manufacturer, and held the defendant company strictly liable for damages resulting from the product. Lastly, the *Bogart* concurring opinion articulates that the rationale for imposing liability on the apparent manufacturer was a species of estoppel. *Id.* at 7. "[T]he vendor, through its labeling or advertising of a product, caused the public to believe that it was the manufacturer and to buy the product in reliance on the vendor's reputation and care in making it, was held to have assumed the obligations of a manufacturer and to be estopped to deny its identity as the manufacturer." *Herbel,* 92 Ill.2d at 371, 65 Ill.Dec. at 890, 442 N.E.2d at 201 (citations omitted). The loss caused by an unsafe product should be borne by those who create the risk of harm by marketing and distribution of unsafe products, those who derive economic benefit from placing them in the stream of commerce, and those who are in a position to eliminate the unsafe character of the product and prevent the loss. *Id.,* 92 Ill.2d at 378–79, 65 Ill.Dec. at 894, and 442 N.E.2d at 205.

**\*8** In analysis, the Court notes that Venture Tech asserts that the diffusion fluid was manufactured by Citgo in its answer. While Citgo provides the product with a different MSDS referencing the manufacturer as Lyondell Lubricants, Venture Tech provided a different MSDS to the plaintiff through Industrial Paper, with the name "Venture Tech Corporation" and that the product was "manufactured for Industrial Paper & Packaging Corp." [15] No other companies are listed on the MSDS. Industrial Paper's salesman, Bowles, testified that the plaintiff received the MSDS with the 55 gallon drum of diffusion fluid. Specifically, Bowles states that "on the drum it had the label and the Material Safety Data Sheet attached." Although the Court acknowledges that the application of the apparent manufacture doctrine is tenuous, there is sufficient evidence of an issue of fact as to whether Venture Tech held itself out as the manufacturer.

### 3. Breach of Implied Warranty and Privity

Venture Tech argues that its breach of warranty claim is barred for lack of privity and because the product was not defective and/or unreasonably dangerous to the consumer at the time of sale. The Tennessee General Assembly abolished the requirement of privity on April 10, 1972. The legislation enacted provides that in all cases of action for personal injury or property damage brought on account of negligence, strict liability, or breach of warranty, privity shall not be a requirement to maintain said action. *See* T.C.A. § 29–34–104; *Wheeler v. John Deer Co.,* 1987 WL 18896 *2 (Tenn.Ct.App. Oct. 27, 1987); *Commercial Truck & Trailer Sales, Inc. v. McCampbell,* 580 S.W.2d 765, 772 (Tenn.1979). Accordingly, defendant's argument fails.

### C. Citgo

Citgo has filed its motion for summary judgment asserting that there is no evidence that the product was defective or unreasonably dangerous; the product's warning was adequate; the plaintiff cannot show that Citgo breached an implied warranty of fitness for a particular purpose; and that Citgo was not negligent in its actions. Particular to the facts of plaintiff's claim against Citgo is that Citgo provided its own MSDS, which discussed the flammable nature of the product.

Travelers Indemnity Co. v. Industrial Paper & Packaging Corp., Not Reported in...
2006 WL 2050686, 60 UCC Rep.Serv.2d 307

Further, Citgo passed these warnings along to its customers. However, as previously discussed, Venture Tech's MSDS was provided to the plaintiff instead of Citgo's MSDS. While the Court has previously addressed the alleged defective and/or unreasonably dangerous nature of the product and the duty to warn against dangers of the product in reference to Venture Tech's MSDS, [16] the Court below addresses Citgo's duty to warn end users. Further, the Court analyzes plaintiff's claim of breach of implied warranty of fitness for a particular purpose and plaintiff's claim of negligence.

1. MSDS Provided by Citgo

The record reflects that Citgo did provide a MSDS to its customers, which includes vendors who resold the product to end-users. On approximately seven pages of the MSDS, Citgo cautions that the product may be a fire hazard and/or that a user should be careful with heat or flame. Citgo acknowledges that its MSDS did not make its way to the plaintiff but asserts that it took all proper steps to distribute its warnings about the product. [17] Although Citgo asserts that a duty to warn is discharged when a defendant delivers product warnings to a customer, this is not a legal conclusion. The determination as to whether the supplier's duty has been reasonably discharged may come within the function of the trier of fact.

**\*9** The Restatement (Second) of Torts § 388, Comment n (1965) suggests a balancing of four factors to determine if the warning given to the middleman is reasonably certain to reach those in the field: (1) the risk of the injury; (2) the seriousness of the harm which might result; (3) the practicability and expense of placing a warning directly on the product; and (4) the reliability of the middleman as a conduit of the warning. See also Whitehead v. Dycho Company, Inc., 775 S.W.2d 593, 597–598 (Tenn.1989). In light of these considerations, the Court finds that a jury may determine that the risk of injury and seriousness of harm are substantial factors, considering that the product was used in a children/adult entertainment center. Moreover, Citgo was aware that this product was at least "Slightly Combustible!" and that the product in mist or spray form may be flammable, indicating that Citgo was aware of the risk and seriousness of harm that could result. Also, Citgo could have placed the MSDS information directly upon the product's surface to ensure that the middlemen passed on the warnings. See Shoemake., 152 S.W.3d at 575; Whitehead, 775 S.W.2d at 598 (warning labels concerning dangers of naphtha were placed upon the 55 gallon drums when they were delivered to Magnavox);

Byrd v. Brush Wellman, Inc., 753 F.Supp. 1403, 1405–06 (E.D.Tenn.1990) (besides other methods of conveying information of the dangers of beryllium, defendant placed warning labels on the outside of the product). Citgo's delivery of MSDS information, an automation system and delivery of the MSDS upon a request practice, is clearly less likely to ensure that the warning will be passed on to end customers. Lastly, a jury may find that Citgo's function as a bulk supplier leaves them little opportunity to investigate whether the middleman actually passes on the proper warnings, and therefore, greater precautions should have been taken on the front end by Citgo. The Court concludes that a jury must determine whether Citgo's duty to warn was discharged when it delivered warnings to a middleman.

2. Implied Warranty of Fitness for a Particular Purpose and Negligence

Citgo states that there is no evidence indicating that Citgo knew of the purpose for which the product was sold to the ultimate user. As mentioned above, T.C.A. § 47–2–315 states that where the seller has any reason to know any particular purpose for which the goods are required and the buyer is relying on the seller's skill or judgment to furnish suitable goods, there is an implied warranty that the goods shall be fit for such purpose. In short, the Court finds that a reasonable juror could determine that Citgo knew that its product could be used in a smoke machine in view of Citgo's MSDS indicating that the diffusion fluid could be used in a mist or vapor form. Additionally, in light of the above, plaintiff has produced sufficient evidence of negligence on part of Citgo.

In summation, plaintiff's claims against Citgo contain issues of fact for the jury to determine.

D. Reel EFX

**\*10** Venture Tech asserted fault against Reel EFX in its answer filed on September 10, 2004. In particular, Venture Tech asserted that it was not the manufacturer of the diffusion fluid and that Industrial Paper may have sold diffusion fluid to plaintiff manufactured by Kel–San, Inc., Reel EFX, MDG Fog Generators, or others. However, Industrial Paper does not assert Reel EFX as a potential comparative tortfeasor. In fact, Industrial Paper's former salesman, Bowles, states that he only bought the product through Venture Tech.

Reel EFX filed its motion for summary judgment upon three grounds: (1) plaintiff's claims are barred by the statute of

**Travelers Indemnity Co. v. Industrial Paper & Packaging Corp., Not Reported in...**
2006 WL 2050686, 60 UCC Rep.Serv.2d 307

limitations, and T.C.A. § 20–1–119 is not applicable in the instant matter; (2) the plaintiff has not produced evidence that the product was defective and/or unreasonably dangerous; and (3) the plaintiff has not produced sufficient proof that Reel EFX supplied fluid to any of the parties in the lawsuit. Since the Court has previously addressed the first and second [18] arguments finding that summary judgment is not warranted upon the facts presented, the Court only considers the third argument.

In order to survive summary judgment, it is essential that the plaintiff prove that the product manufactured and sold by Reel EFX and/or the warnings proximately caused the injuries plaintiff alleges to have sustained. *Barnes v. The Kerr Corporation,* 418 F.3d 583, 589 (6th Cir.2005). "A fundamental principle of traditional product liability law is that the plaintiff must prove that the defendant supplied the product which caused the injury." *Rodrigues v. General Electric Corp.,* 204 F.Supp.2d 975, 976 (E.D.Tex.2001) (citations omitted). After a plaintiff has been given a reasonable opportunity to substantiate its claims, summary judgment may be entered if the plaintiff has failed to establish an essential element of his case, which it will bear the burden of proof at trial. *Celotex,* 477 U.S. 321–35; *see also Bryant v. Tri–County Elec. Membership Corp.,* 844 F.Supp. 347 (W.D.Ky.1994) (holding that when the most favorable view of the evidence leads to the unavoidable conclusion that a plaintiff cannot identify the movant as a manufacturer, summary judgment is appropriate).

In the instant matter, Reel EFX was named in the action by another party. Reel EFX searched the invoice records and financial data related to its sales of diffusion fluid and other products to the present. Based upon the investigation, Reel EFX asserts that it did not sell any diffusion fluid to any of the parties named in the lawsuit, nor did it sell any diffusion fluid to any person or business in the state of Tennessee. Specifically, Reel EFX states that its only commercial transaction in Tennessee from 1995 to the present was a sale for parts in 2002 to Armstrong Photography for banded lights. Moreover, plaintiff is unable to show that Reel EFX sold diffusion fluid to any party to the lawsuit related to the fire that occurred at Smoky Mountain. The Court finds that simply relying upon Venture Tech's assertion of fault against Reel EFX without further proof is not enough. Accordingly, plaintiff's claims against Reel EFX are dismissed.

### E. Ogle and Ogle's Repair

**\*11** Viewing the facts favorably to the plaintiff, defendants were contacted by the plaintiff with a complaint of a general air conditioning unit problem. Shortly thereafter, Ogle and Ogle's Repair arrived at Smoky Mountain, inspected the unit, and determined that the compressor needed to be replaced. On September 3, 1999, eight days before the fire, Ogle and Ogle's Repair replaced of one of three compressors contained in the HVAC condenser unit. After the fire, fire investigator/ plaintiff's expert Fowler interviewed Ogle. Ogle related to Fowler that every time he worked on the units, the interior was saturated with an oily film. Ogle said that he would clean and wipe some of the film from the units every time he was called to do any type of repair on the air conditioners. For the 4 or 5 years prior to the fire, Ogle stated that he and Robert Montgomery (one of the owners of plaintiff's center) talked about the units getting old and that replacements were needed. In the instant action, plaintiff claims that Ogle and Ogle's Repair were negligent in that Ogle failed to warn Smoky Mountain that the diffusion fluid was present in the HVAC system and/or negligent in failing to remove the diffusion fluid from the system. In response, Ogle and Ogle's Repair filed a motion for summary judgment specifically claiming that the plaintiff cannot prove breach of a duty and that any alleged breach of duty did not proximately cause the fire. Again, since the Court has already held that the plaintiff produced sufficient evidence of causation, the Court will only consider defendants' arguments concerning duty and breach of duty.

"A claim of negligence requires proof of the following elements: (1) duty of care owed by a defendant to a plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of duty; (3) injury or loss; (4) cause in fact; and (5) proximate, or legal cause." *See McCall v. Wilder,* 913 S.W.2d 150, 153 (Tenn.1995) (citations omitted). "Properly defined, duty is the legal obligation owed by the defendant to plaintiff to conform to a reasonable person standard of care for the protection against unreasonable risks of harm." *Id.* (citations omitted). Once it is determined that a defendant owes plaintiff a legal obligation to conform to a reasonable person standard of conduct, i.e. the duty, the question is whether the defendant failed to exercise reasonable care under the circumstances. *Id.*

Ogle and Ogle's Repair previously filed a motion for summary judgment on essentially the same grounds it asserts in the subject motion. Additional discovery has been conducted

regarding the facts of the case since the Court's order denying summary judgment. Nevertheless, the Court again finds disputed issues of material facts, which, if resolved in the plaintiff's favor, could support a jury verdict for the plaintiff. The parties assert conflicting evidence regarding the service call and the condition of the HVAC unit prior to the fire. Whether the plaintiff can show that defendants were negligent should decided by a jury after the plaintiff has had an opportunity to put on his proof.

### VI. *CONCLUSION*

*\*12* For the reasons hereinabove set forth, defendants' motions for summary judgment [Doc. 70, Doc. 82, Doc. 84, Doc. 88, and Doc. 92] are **GRANTED in part** and **DENIED in part.** Defendant Reel EFX's motion for summary judgment

is **GRANTED in its entirety,** and Reel EFX is dismissed as a defendant in this case. Defendant Industrial Paper's motion for summary judgment as to plaintiff's strict liability and negligence claims are **GRANTED,** but Industrial Paper's motion as to plaintiff's breach of warranty claim is **DENIED.** Further, the remaining motions for summary judgment filed by defendants, Venture Tech, Citgo, and Ogle and Ogle's Repair, are **DENIED in their entirety.** The remaining parties will prepare the case for trial.

### IT IS SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2006 WL 2050686, 60 UCC Rep.Serv.2d 307

---

## Footnotes

1    For the purposes of this memorandum and opinion, the term "plaintiff" shall refer to the arcade and its operators, as well as Travelers Indemnity Company.

2    JCL Management, Inc. is a company affiliated with Industrial Paper. The Court collectively refers to JCL Management, Inc. and Industrial Paper as "Industrial Paper."

3    Plaintiff's proof includes expert testimony from fire investigator, Rodney Fowler, and chemist, Dr. Andrew Armstrong. The Court has previously denied a motion in limine to exclude testimony of plaintiff's proffered expert witness Rodney L. Fowler.

4    Industrial Paper has argued that the dangers of the product, i.e. flammability was apparent to the ordinary consumer. While a seller or manufacturer are not liable for failure to warn of obvious dangers associated with a product, *Permerton v. American Distilled Spirits Co.,* 664 S.W.2d 690, 692–93 (Tenn.1984), the Court finds that a reasonable juror could determine that the warning provided by Venture Tech was non-obvious and inadequate, creating an unreasonably dangerous product.

5    In its argument, Industrial Paper states that the negligence of others in allowing the diffusion fluid to accumulate actually caused the fire. The Court notes defendant's assertion of the comparative fault doctrine and finds that the issue is within the province of jury determination.

6    Since the plaintiff has not put forth any evidence that Industrial Paper expressly warranted the goods fit for a particular purpose, the Court only focuses on an implied warranty analysis.

7    The Court has fully analyzed Industrial Paper's arguments regarding causation and inadequate proof that the diffusion fluid was defective and/or unreasonably dangerous and found that these arguments are either unpersuasive and/or involve questions of fact.

8    Kel–San, Inc. has since been voluntary dismissed from the case.

9    Plaintiff received the subject fascimile within the statute of limitations period.

10   Plaintiff received this information outside the statute of limitations period.

11   In Tennessee, property tort actions must be brought prior to the expiration of three years from the date of accrual, and a breach of warranty action must be brought within four years of the date the product was accepted by the purchaser. T.C.A. § 28–3–105; T.C.A. § 28–3–105(2).

Case 1:19-md-02875-RMB-SAK   Document 1382-8   Filed 07/12/21   Page 530 of 535
PageID: 32477
Travelers Indemnity Co. v. Industrial Paper & Packaging Corp., Not Reported in...
2006 WL 2050686, 60 UCC Rep.Serv.2d 307

12    This statement may appear to be contradictory to the plaintiff's assertions that Venture Tech is an apparent
      manufacturer. However, the contentions are not altogether antonymous. Further, it is the jury function to sort
      such facts.

13    In *Whittlesey,* the plaintiff allegedly died on May 29, 1993 as a result of medical malpractice during treatment
      at a Naval Hospital. *Whittlesey,* 142 F.3d at 341. The survivor filed an administrative claim under the
      Federal Tort Claim Act against the Department of the Navy and two doctors. *Id.* at 342. On July 7, 1994,
      the Navy learned and informed the plaintiff that the doctors were not employed by the government, but rather
      were civilian doctors employed by a private company, PHP Healthcare Corporation. *Id.* The Navy then denied
      the claim on February 17, 1995. *Id* . However, the plaintiff did not file her cause of action against the Navy,
      the two doctors, and PHP Healthcare Corporation until July 7, 1995. *Id.* The Navy filed its answer denying
      liability reiterating that the doctors were employed by a private company. *Id.* The Court considered both
      the discovery doctrine and T.C.A. § 20–1–119 and then found that the plaintiff had knowledge or at least
      sufficient knowledge to engage in an investigation of his claim, which would have included a determination of
      the treating physician. The Court felt that this knowledge was acquired long before the Navy's answer (long
      before the complaint was filed), and granted summary judgment. *Id.* at 343–45.

14    The *Walker* decision predates the enactment of Tennessee Products Liability Act of 1978 [T.C.A. § 29–28–
      101 *et seq.*]. The product liability legislation contains certain provisions that have direct bearing upon the
      circumstances under which the "sealed container" defense can be invoked. However, the legislative history/
      debates make it evident that the General Assembly did not intend to modify the *Walker* decision. *Bogart,*
      WL 301940 at *8–9.

15    While the plaintiff refers to this MSDS as being attached to the deposition of Roger L. Bowles, Exhibit D,
      plaintiff fails to provide same. However, plaintiff provides the MSDS in response to the motion for summary
      judgment filed by Ogle and Ogle's Repair. Furthermore, the exact same MSDS delivered to the plaintiff was
      provided by Venture Tech, as well as Citgo.

16    In its memorandum of law, Citgo immersed in argument voicing opposition to plaintiff expert Armstrong's
      reliability and qualifications relating to adequacy of warnings. The proper procedure to oppose or dispute
      the testimony of an expert is by filing a motion in limine to exclude expert testimony (motion for a *Daubert*
      hearing) in accordance with the scheduling order.
      In any event, Dr. Armstrong merely asserts that "non-flammable" does not properly address the true fire
      hazards and misleads the reader to conclude that the material will not burn. In particular, Armstrong criticized
      the use of "nonflammable" to describe the diffusion fluid given that the diffusion fluid is combustible and
      will burn once it is heated to a temperature above its flash point and that once above the flash point, the
      diffusion fluid will produce sufficient vapors to sustain an open flame. Moreover, Armstrong stated that the
      auto-ignite temperature of the diffusion fluid ranges from 415°F to 500 °F. Dr. Armstrong deals with MSDS's
      on a regular basis. He reviews, analyzes, and uses the information provided on the MSDS as a regular part of
      his consulting work. In the Court's opinion, Dr. Armstrong's testimony is therefore admissible. Any arguments
      regarding Dr. Armstrong's lack of drafting, testing, etc. of warning will be proper areas for cross examination.
      Likewise, Citgo's argument that Dr. Armstrong has not prepared any alternative warnings may be addressed
      through cross examination.

17    Citgo asserts that the process of sending MSDS's to customers was almost completely automated and that
      each customer received the current version of the MSDS for any product it purchased, as well as any updates
      that were issued. Further, Citgo states that its MSDS's for any product were sent free of charge at a customer's
      request.

18    The Court acknowledges that Reel EFX's motion for summary judgment based upon the statute of limitations
      and application of T.C.A. § 20–1–119 involves additional facts. Nevertheless, the Court finds that the plaintiff
      lawfully brought Reel EFX into the litigation.

---

End of Document                                        © 2021 Thomson Reuters. No claim to original U.S. Government Works.

TAB 38

*Xavier v. Philip Morris USA Inc.*, No. C 10-02067, 2010 WL 3956860 (N.D. Cal. Oct. 8, 2010)

Xavier v. Philip Morris USA Inc., Not Reported in F.Supp.2d (2010)
2010 WL 3956860, Prod.Liab.Rep. (CCH) P 18,498

2010 WL 3956860

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. California.

Burt XAVIER and James Franklin,
individually and on behalf of themselves
and all others similarly situated, Plaintiffs,

v.

PHILIP MORRIS USA INC., a
Virginia corporation, Defendant.

No. C 10–02067 WHA.
|
Oct. 8, 2010.

**Attorneys and Law Firms**

Charles S. Siegel, Waters & Kraus LLP, Dallas, TX, Ingrid M. Evans, Sundeep Ravindra Patel, Waters & Kraus, LLP, San Francisco, CA, Steven J. Phillips, Victoria E. Phillips, Levy Phillips and Konigsberg, LLP, New York, NY, for Plaintiffs.

Tammy Beth Webb, Ina Doung–May Chang, Michael Kevin Underhill, Shook Hardy & Bacon L.L.P., San Francisco, CA, Gary R. Long, John K. Sherk, III, Shook Hardy & Bacon LLP, Kansas City, MO, Gregory P. Stone, Munger Tolles & Olson LLP, Los Angeles, CA, for Defendant.

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS AND VACATING HEARING**

WILLIAM ALSUP, District Judge.

**INTRODUCTION**

**\*1**  In this putative class action seeking medical monitoring for heavy smokers, defendant Philip Morris USA, Inc. moves to dismiss two of the six claims asserted against it in the complaint. For the reasons set forth below, defendant's motion to dismiss is **GRANTED.**

**STATEMENT**

Lead plaintiffs Burt Xavier and James Franklin seek to represent a statewide class of asymptomatic Marlboro smokers (and recent quitters) over fifty years of age with at least a twenty-pack-year habit. A twenty-pack-year smoking history is a pack a day for twenty years, or two packs a day for ten years, and so on—at least 146,000 individual cigarettes.

This case differs from the typical tobacco action because plaintiffs do not seek compensatory or punitive damages for personal injury or wrongful death. Instead, they want medical monitoring for healthy smokers. The medical monitoring sought is Low Dose CT scanning of the chest. According to plaintiffs, this scan is a new, largely unavailable technology that is safer than x-rays and far better at detecting the early stage of lung cancer. Early diagnosis dramatically improves survival odds.

This case differs from the typical medical monitoring action because plaintiffs do not seek money to pay for screening. Instead, they want Philip Morris to supply the chest scans themselves in a court-supervised program. Defendant would have to provide outreach, information, ongoing testing, notice of results, record keeping, and administration.

Plaintiffs contend that Philip Morris acted wrongfully because its Marlboro cigarettes deliver excessive carcinogens. Plaintiffs also contend that Philip Morris ignored feasible alternative designs. They allege, *inter alia,* that Philip Morris marketed "light" cigarettes despite knowing that its customers would unconsciously compensate with deeper inhalation in a way that testing machines would not; that it briefly marketed a genuinely low-tar cigarette only to establish credibility for later imposters; that its tobacco blend needlessly contained the dangerous Burley variety.

The complaint alleges six claims: (1) violation of the California Unfair Competition Law, Cal. Bus. & Prof.Code § 17200; (2) violation of the Consumers Legal Remedies Act, Cal. Civ.Code § 1750; (3) breach of implied warranty, Cal. Com.Code § 2314; (4) strict liability design defect; (5) negligent design and testing; and (6) medical monitoring. Defendant moves to dismiss the first and last.

**ANALYSIS**

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged in the complaint. *See*

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.    1

*Xavier v. Philip Morris USA Inc., Not Reported in F.Supp.2d (2010)*
2010 WL 3956860, Prod.Liab.Rep. (CCH) P 18,498

*Parks Sch. of Bus. v. Symington,* 51 F.3d 1480, 1484 (9th Cir.1995). Dismissal under Rule 12(b)(6) "can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.,* 901 F.2d 696, 699 (9th Cir.1990). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft v. Iqbal,* ––– U.S. ––––, ––––, 129 S.Ct. 1937, 1950, 173 L.Ed.2d 868 (2009). A claim must be plausible on its face—conclusory legal allegations and speculative inferences do not suffice. *Ibid.*

### 1. CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200.

**\*2** California Section 17200 covers "any unlawful, unfair or fraudulent business act or practice." Persons authorized to bring claims under this code section are those who "ha[ve] suffered injury in fact and ha[ve] lost money or property as a result of the unfair competition" (§ 17204). The Act provides equitable means to "prevent" unfair competition and "restore" money or property acquired through unfair competition (§ 17203).

Defendant moves to dismiss the Section 17200 claim because plaintiffs have not pled loss of money or property and thus lack standing. Plaintiffs do not object to dismissal provided it is without prejudice, in case purported class members pay out-of-pocket for chest scans before this case is decided. Defendant replies that even those with potential for standing cannot state a claim because Section 17203 does not authorize nonrestitutionary relief.

Plaintiffs have failed to plead their Section 17200 claim sufficiently under *Iqbal.* Plaintiffs have not pointed to any economic loss. Further, the remedial recovery power of Section 17203 is limited to restitutionary disgorgement of money obtained from violations of Section 17200 to the victims of such violations. *See Kraus v. Trinity Mgmt. Servs., Inc.,* 23 Cal.4th 116, 126–27, 96 Cal.Rptr.2d 485, 999 P.2d 718 (2000). Pre-judgment, out-of-pocket expenditures for chest scans would be ineligible for restitution because the recipients of the monies would be third-party medical providers, not the defendant. Defendant's motion to dismiss this claim is **GRANTED.**

If plaintiffs choose to amend and plead this claim again, they must answer several questions. With respect to standing, plaintiffs must address whether the need for medical monitoring or some other loss represents lost "money or property" as required by Section 17204. With respect to remedies, the relief sought must be relief available. As to the "restore" prong of Section 17203, plaintiffs must identify how what they are seeking is restitution. As to the "prevent" prong, plaintiffs must address whether requiring defendant to provide medical monitoring is a mandatory injunction within the ambit of Section 17203.

### 2. MEDICAL MONITORING.

A plaintiff seeking medical monitoring in California must show "that the need for future monitoring is a reasonably certain consequence of the plaintiff's toxic exposure and that the recommended monitoring is reasonable." *Potter v. Firestone Tire & Rubber Co.,* 6 Cal.4th 965, 974, 25 Cal.Rptr.2d 550, 863 P.2d 795 (1993). Necessity and reasonableness of monitoring must be shown through "reliable medical expert testimony"; five enumerated factors are relevant. *Id.* at 1009. *Potter* dispensed with the traditional tort requirement that a plaintiff show a present physical injury. Nor must a plaintiff prove emotional distress from fear of cancer or a threat of a future injury that is more likely than not to occur. The need for medical testing, necessitated by exposure to toxins, is a detriment; the cost of anticipated medical care, reasonably certain to be required, is recoverable damage. *Id.* at 1005, 25 Cal.Rptr.2d 550, 863 P.2d 795.

**\*3** A claim for medical monitoring can succeed in California where the same claim would fail categorically elsewhere. *See Paz v. Brush Engineered Materials, Inc.,* 949 So.2d 1 (Miss.2007) (answering certified question, holding that Mississippi law does not recognize a medical monitoring action absent physical injury). Where the parties in the present case disagree is whether plaintiffs can plead a stand-alone claim of medical monitoring—a discrete tort—or whether plaintiffs must instead seek medical monitoring as a remedy for an existing tort.

The California Supreme Court has answered this question. "Recognition that a defendant's conduct has created the need for future medical monitoring does not create a new tort. It is simply a compensable item of damage when liability is established under traditional tort theories of recovery." *Potter,* 6 Cal.4th at 1007, 25 Cal.Rptr.2d 550, 863 P.2d

Xavier v. Philip Morris USA Inc., Not Reported in F.Supp.2d (2010)
2010 WL 3956860, Prod.Liab.Rep. (CCH) P 18,498

795. The California Supreme Court has since reemphasized that medical monitoring is "not a separate tort." *Lockheed Martin Corp. v. Superior Court,* 29 Cal.4th 1096, 1105, 131 Cal.Rptr.2d 1, 63 P.3d 913 (2003).

Decisions from other jurisdictions demonstrate that the creation of a discrete tort goes further than California's approach. In *Bower v. Westinghouse Electric Corporation,* 206 W.Va. 133, 522 S.E.2d 424, 431 (W.Va.1999), for example, the Supreme Court of Appeals of West Virginia considered the question, approved the rationale behind *Potter,* and then explicitly created a "claim for recovery of future medical monitoring costs" and "define[d] the elements necessary to sustain such a claim."

Plaintiffs deal with the "not a separate tort" language by arguing that because the plaintiffs in *Potter* and *Lockheed Martin* sought money for monitoring, not monitoring itself—a *legal* remedy—the narrower question of whether a purely *equitable* claim for medical monitoring could stand alone has never been squarely presented in California. Plaintiffs ask for a prediction that the California Supreme Court would approve a purely equitable stand-alone medical monitoring claim because of that Court's general enthusiasm for medical monitoring and the specific, targeted nature of the monitoring here sought. Such a prediction would allow their claim to survive in federal court.

Plaintiffs ask too much. With *Potter,* California joined the minority of jurisdictions endorsing recovery in tort without present physical injury. That was the controversial step that now allows the plaintiffs' other claims in the present case to proceed. The means the California Supreme Court adopted to achieve this end—recognition of a cognizable detriment and remedy—was a relatively minor aspect of its decision. True, the Court did not rule out equitable medical monitoring as a stand-alone claim. But there is no indication that it was the legal nature of the lawsuit in *Potter* that prevented the Court from characterizing its decision as one creating a new tort. Likewise, there is no indication that the Court would adopt plaintiffs' preferred approach if given

the opportunity now. If "not a separate tort" is dictum, it is exceedingly persuasive dictum. Principles of comity and federalism prevent overwriting the means adopted in *Potter* as if that decision was a blank slate.

**\*4** Plaintiffs request that they be allowed to plead the medical monitoring tort again as part of the class certification motion practice. Plaintiffs maintain that a purely equitable action will help them overcome affirmative defenses, time bars, and the maze of Rule 23. That may be true. But given that *Potter* did not create a new tort, it *a fortiori* did not create a new plaintiff-friendly super tort.

Plaintiffs assert medical monitoring as a stand-alone claim against defendant. In California, medical monitoring is a remedy which must rely upon underlying claims. It does not stand alone. It is not cognizable as required by *Balistreri.* Defendant's motion to dismiss the medical monitoring claim is **GRANTED.** The claim is dismissed without leave to amend.

## CONCLUSION

For the reasons above, defendant's motion to dismiss is **GRANTED.** The hearing set for October 14, 2010, is **VACATED.** Plaintiffs may move for leave to amend the dismissed Unfair Competition Law claim by **OCTOBER 27, 2010.** Any such motion should be accompanied by a proposed pleading and the motion should explain why the foregoing problems are overcome by the proposed pleading. Plaintiffs must plead their best case. Failing such a motion, the inadequately pled claim will be dismissed without further leave to amend.

**IT IS SO ORDERED.**

## All Citations

Not Reported in F.Supp.2d, 2010 WL 3956860, Prod.Liab.Rep. (CCH) P 18,498

**End of Document**                                         © 2021 Thomson Reuters. No claim to original U.S. Government Works.