# EXHIBIT C

Confidential Information - Subject to Protective Order

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEW JERSEY
 2                     CAMDEN VICINAGE
 3

    ****************************
 4

    IN RE:  VALSARTAN, LOSARTAN,   MDL No. 2875
 5  AND IRBESARTAN PRODUCTS
    LIABILITY LITIGATION           Civil No.
 6                                 19-2875
    ****************************   (RBK/JS)
 7

    THIS DOCUMENT APPLIES TO ALL   HON ROBERT B.
 8  CASES                          KUGLER
 9  ****************************
10           - CONFIDENTIAL INFORMATION -
             SUBJECT TO PROTECTIVE ORDER
11
12
13           Remote Videotaped via Zoom
14  Deposition of MIN LI, Ph.D., commencing at 7:03
15  a.m. China Standard Time, on the 20th of
16  April, 2021, before Maureen O'Connor Pollard,
17  Registered Diplomate Reporter, Realtime
18  Systems Administrator, Certified Shorthand
19  Reporter.
20
21                      - - -
22
              GOLKOW LITIGATION SERVICES
23        877.370.3377 ph | 917.591.5672 fax
                  deps@golkow.com
24
```

1	notice, let's go to the -- actually, you have
2	it in front of you, right?
3	        A.      Yeah.
4	        Q.      On the second-to-last page of
5	the deposition notice, there was a request
6	for your most recent resume/curriculum vitae
7	and your LinkedIn profile.
8	        A.      Uh-huh.  I already provided it.
9	        Q.      And those are the most recent
10	versions of both?
11	        A.      Yes.
12	        Q.      This also asked for
13	the complete production of any relevant
14	custodial documents for you, "including those
15	maintained on personal computers or
16	electronic devices, to the extent not
17	produced prior."
18	                Are you producing any documents
19	in connection with the deposition at this
20	time?
21	        A.      No.
22	        Q.      You started working with ZHP in
23	2014, right?
24	        A.      Yes.  September of 2014, yes.

1    Q.    Were you given any sort of a
2    computer at that time to do your work for
3    ZHP?
4    A.    Yes.
5    Q.    What type of computer were you
6    given when you started?
7    A.    Originally it's a ThinkPad,
8    Lenovo ThinkPad, but that computer broke
9    down.  Now I have a Microsoft, like what,
10   ProBook.
11   Q.    You said you were given a
12   Lenovo ThinkPad when you started, and then it
13   broke.  When did it break?
14   A.    When did it break.  That's a
15   very good question.  It broke during --
16   actually during a trip.  I don't remember
17   exactly.
18         When did it break.  Probably
19   somewhere between 2017 to 2018, but, you
20   know, I don't have an accurate, you know,
21   recollection exactly, like, which year.
22   Q.    When your computer broke, did
23   you notify your company that you needed a new
24   computer?

```
 1      A.    Oh, yeah, mm-hmm.
 2      Q.    Who did you notify?
 3      A.    IT.
 4      Q.    And they got you a new
 5   computer?
 6      A.    Yes.
 7      Q.    There would be a record within
 8   the company of you asking for a new computer
 9   and getting that computer.  I assume
10   something like that gets documented, right?
11      A.    Oh, sure, sure, uh-uh.
12      Q.    So if we need to know when your
13   computer broke and when you got your new
14   computer, the company should be able to
15   provide that information, right?
16      A.    Yeah.  If I ask, they should be
17   able to provide, yes.
18            MR. SLATER:  Counsel is going
19      to ask me to send an e-mail or
20      something after the deposition to
21      confirm the request, but that's going
22      to be another one of the things we're
23      going to request.
24            MR. GALLAGHER:  Please put it
```

Confidential Information - Subject to Protective Order

1           in writing, and we'll take it under
2           advisement.
3      BY MR. SLATER:
4           Q.    When you said the computer
5      broke on a trip, what happened to the
6      computer?
7           A.    It just could not start, so I
8      think eventually it turns out to be, you
9      know, a hard drive failure.
10          Q.    What happened to the data that
11     was on the computer?
12          A.    I would say, according to the
13     IT guys -- well, quite a few documents
14     actually became permanently damaged, but the
15     majority of them was able to be restored,
16     yeah.
17          Q.    You said documents were
18     permanently damaged?
19          A.    Some of the documents, yeah,
20     because of the hardware, you know, failure.
21          Q.    What types of documents were
22     permanently damaged?
23          A.    Well, it's -- you know, there's
24     different kinds.

Confidential Information - Subject to Protective Order

1   Q.   Well, tell me, please, which
2  ones?
3   A.   Like some of those, like,
4  research papers, you know, some of those
5  research, you know, you know, investigation
6  report. And even, you know, some personal,
7  you know, like pictures.
8   Q.   Was your computer backed up
9  periodically?
10   A.   What do you mean, "backed up"?
11  Like backed up to, like, an external drive?
12   Q.   I mean backed up so that the
13  data was held in a separate location so that
14  if your computer stopped working, the data
15  wouldn't be lost.
16   A.   I -- you know, I didn't do
17  that.
18   Q.   Is there any protocol in your
19  company to back up computers periodically?
20   A.   Well, for important documents,
21  you know, you know, the company have archive,
22  so I don't need to, you know, you know, to
23  archive like, you know, by myself.
24   Q.   How about your e-mails? Were

```
 1   any of your e-mails lost when your computer
 2   broke?
 3        A.    No.  E-mail, you know, it's
 4   always there, e-mail, you know, because it's
 5   always in the server.
 6              That's, you know, that's what
 7   the IT -- you know, at least, you know, it
 8   will be preserved according to the company
 9   policy, you know, for as long as the company
10   policy, you know, you know, would allow.
11        Q.    What does the company policy
12   require?
13        A.    I don't have the specifics.
14        Q.    You've been there since 2014.
15   Is it your understanding that all the e-mails
16   you've sent or received have been backed up
17   or held on a server?
18        A.    As I said, yeah, I mean, as
19   long as, you know, you know, the company, you
20   know, policy says, you know, how long it will
21   keep, you know, in company server, it will be
22   there.  You know, so that regardless, you
23   know, my personal computer's failure, it will
24   be there.
```

Confidential Information - Subject to Protective Order

1    Q.    Has there ever been a time
2    since your computer broke where you realized
3    that a document or any data was lost and you
4    couldn't retrieve it, couldn't find it?
5    A.    No.  I always be able to
6    retrieve, you know, from either my e-mail or
7    from, you know, you know, company's archive,
8    or from my colleagues, you know.
9    Q.    The ThinkPad, is that a desktop
10   or is that a laptop or something else?
11   A.    Laptop.  Nobody use desktop
12   anymore, as far as I know, I mean, you know,
13   for personal use.
14   Q.    Well, in your work at ZHP, have
15   you had a desktop computer in addition to the
16   laptop?
17   A.    No.
18   Q.    Never had a desktop computer?
19   A.    I think it's totally obsolete
20   for the purpose, you know, you know, people
21   doing office work.  I mean, at least for me,
22   I mean.
23   Q.    I'd like to be a little more
24   precise on the timing of when your computer

1    A.    No.

2    Q.    Do you know if either of your
3    computers was taken into the control of
4    either IT or your lawyers to be searched in
5    order to pull off documents in connection
6    with this litigation?

7    A.    My Microsoft ProBook, yes, was
8    taken into, yeah, that purpose, yes.

9    Q.    When?

10   A.    They have gone through, yeah,
11   my personal ProBook, yes.

12   Q.    When?

13   A.    I think sometime last year.
14   Again, you know, I have so many things
15   ongoing, you know, I don't remember exactly.
16   Yeah.  It should be sometime last year.

17   Q.    Sometime in 2020?

18   A.    It looks like.  But again, you
19   know, like I said, I need to, you know, find
20   out.  If you really wanted that exactly date,
21   I think -- you know, or exactly period, I can
22   find out for you.

23   Q.    Well, I want your best
24   recollection right now.  We may request that

1   also.  But what's your best recollection,
2   that your computer was taken in order to take
3   documents off it for this litigation in 2020?
4       A.    Yeah, I think it should be
5   sometime last year.
6       Q.    Who was it that did that?  Who
7   approached you?
8       A.    Who approached me.
9             Again, this whole activity from
10  Huahai or ZHP's perspective, it was
11  coordinated, again, by Maggie Kong.
12      Q.    So if Maggie Kong keeps good
13  records, she probably knows when everybody
14  was first told about their depositions and
15  when people were told to bring their
16  computers in to be swept?
17            MR. GALLAGHER:  Sorry.  I'm
18        going to object to the extent you're
19        asking for information that would
20        constitute attorney/client privileged
21        information.
22            MR. SLATER:  How would that be
23        privileged?  I'm asking this witness
24        about another person he works with,

1      Q.     On the screen is Exhibit 293.
2   Do you recognize that document?
3      A.     Oh, yeah.
4      Q.     What is it?
5      A.     Right now it's just, you know,
6   the starting of the summary of my LinkedIn
7   page.
8             MR. SLATER:  All right.
9        Cheryll, can you scroll down to where
10       it talks about -- right there.
11       Perfect.  No.  A little more up.  Yes,
12       perfect.
13     Q.     Your LinkedIn page says that
14  you established something called CEMAT,
15  C-E-M-A-T.
16     A.     Yes, CEMAT.
17     Q.     What is that?
18     A.     Basically, it's just like --
19  you know, in the sense that I rebuilt my, you
20  know, research team at Huahai.
21            You know, the mission is pretty
22  much the same, you know, you know, in terms
23  of, you know, supporting those issues related
24  to pharmaceutical impurities, and those are

```
 1    the most challenging, you know, issues, as I
 2    put there, yeah, the most challenging
 3    technical issues.
 4           Q.    When I ask what CEMAT is, is it
 5    a laboratory or a separate office, or is
 6    it -- let me ask this question.
 7                 In terms of what CEMAT is, is
 8    it part of ZHP?
 9           A.    Yes.
10           Q.    Where is it located?
11           A.    It's located in headquarter of
12    ZHP, E Linghai, Zhejiang Province, China.
13           Q.    Which facility?
14           A.    Which facility.  It's in
15    Xunqiao facility, yeah, Xunqiao site.
16           Q.    Why was it necessary for you to
17    establish CEMAT?
18           A.    Why it's necessary?
19           Q.    Let me ask the question very
20    specifically.
21                 What was the specific need --
22    well, rephrase.
23                 What was the specific reason
24    why CEMAT was established?
```

1          A.     Well, there's multiple
2     purposes.  You know, one, just to present to,
3     you know, our colleagues, you know, and
4     sometimes, you know, present to, you know, to
5     my boss, you know, during the, like,
6     quarterly meetings, you know, particularly in
7     the early days.
8               You know, you need to, you
9     know, you need to show, you know, right, what
10    you can achieve.
11              MR. SLATER:  I'm sorry.  Let's
12         go to the page after the cover page,
13         please?  Perfect.
14         Q.    Looking at the Mission of
15    CEMAT, it says, "To solve the most
16    challenging technical problems encountered
17    from research and development to scale up and
18    manufacture of drug substances and finished
19    products, particularly those related to
20    process impurities, degradation products, and
21    solid state and polymorphism."
22              Do you see that?
23         A.    Mm-hmm, sure.
24         Q.    When this -- rephrase.

1              Process impurities would
2     include, for example, the NDMA created
3     by the zinc chloride process; that's a
4     process impurity, correct?
5          A.    Retrospectively, yes.
6          Q.    And the creation of NDMA and
7  NDEA in the TEA process with sodium nitrite
8  quenching, those would be process impurities,
9  correct?
10         A.    Right.
11         Q.    And in both those -- rephrase.
12              After both those manufacturing
13  processes -- well, rephrase.
14              For the zinc chloride process,
15  the root cause of the creation of NDMA was
16  that the dimethylformamide was decomposing to
17  create dimethylamine, which then reacted
18  during the process with nitrous acid to
19  create NDMA, correct?
20              MR. GALLAGHER:  Objection.
21        Vague, and foundation.
22  BY MR. SLATER:
23         Q.    That's the root cause, correct?
24         A.    Yeah, that's the root cause

Confidential Information - Subject to Protective Order

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF NEW JERSEY
 2                     CAMDEN VICINAGE
 3

    ***************************
 4

    IN RE:  VALSARTAN, LOSARTAN,   MDL No. 2875
 5  AND IRBESARTAN PRODUCTS
    LIABILITY LITIGATION           Civil No.
 6                                 19-2875
    ***************************   (RBK/JS)
 7

    THIS DOCUMENT APPLIES TO ALL   HON ROBERT B.
 8  CASES                          KUGLER
 9  ***************************
10            - CONFIDENTIAL INFORMATION -
              SUBJECT TO PROTECTIVE ORDER
11
12
13            Continued Remote Videotaped via
14  Zoom Deposition of MIN LI, Ph.D., commencing at
15  7:08 a.m. China Standard Time, on the 22nd of
16  April, 2021, before Maureen O'Connor Pollard,
17  Registered Diplomate Reporter, Realtime
18  Systems Administrator, Certified Shorthand
19  Reporter.
20
21                     - - -
22
             GOLKOW LITIGATION SERVICES
23       877.370.3377 ph | 917.591.5672 fax
                  deps@golkow.com
24
```

```
 1                MR. GALLAGHER:  Objection.
 2                Go ahead.
 3         A.     I don't recall, okay?
 4    BY MR. SLATER:
 5         Q.     So a roomful of people meeting
 6    with the chairman of the company about a
 7    situation that's the top priority of the
 8    company multiple times, in all those meetings
 9    you never took notes, Mr. Chen never took
10    notes, and you never saw anyone else take
11    notes.
12                That's your best recollection,
13    is that what you're testifying?
14                MR. GALLAGHER:  Objection.
15          Argumentative, asked and answered,
16          vague, and compound.
17         A.     That's not what exactly what I
18    told you.  Okay.  What I can tell you is
19    Mr. Chen, he didn't take notes, okay?  And I
20    didn't take note.  Who else, I don't
21    remember, okay?
22    BY MR. SLATER:
23         Q.     Were there ever agendas
24    circulated for these meetings; for example,
```

1  by e-mail?

2     A.    I don't know.  I don't
3  remember.

4     Q.    When these meetings were
5  scheduled, were e-mails sent out or any sort
6  of calendar sent out so everybody would know
7  the date and time and place of the meetings?

8     A.    I don't remember.  I mean, but
9  one thing is, you know, usually, okay, I can
10 tell you my -- you know, like for Mr. -- you
11 know, for meetings with Mr. Chen, usually,
12 you know, his, you know, secretary, you know,
13 would make phone calls.

14           And one of the reason probably
15 was he was quite busy, so we just -- you
16 know, a lot of times we just stand by.  And
17 so once he had time, his secretary would
18 call, call us, you know, to go to meeting
19 rooms, you know, with him.

20    Q.    Who was his secretary?  What's
21 her name?

22    A.    There is a --

23    Q.    Who is Mr. Chen's secretary?

24    A.    There are a group, you know, of