# EXHIBIT D

```
               IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW JERSEY
                         CAMDEN VICINAGE
                            -   -   -

    IN RE:  VALSARTAN,          :   MDL NO. 2875
    LOSARTAN, AND               :
    IRBESARTAN PRODUCTS         :   CIVIL NO.
    LIABILITY LITIGATION        :   19-2875
                                :   (RBK/JS)
    _____:
                                :
    THIS DOCUMENT APPLIES       :   HON. ROBERT
    TO ALL CASES                :   B. KUGLER
           - CONFIDENTIAL INFORMATION -
             SUBJECT TO PROTECTIVE ORDER

                            -   -   -

                       April 5, 2021
                            -   -   -


            Videotaped remote deposition of
    ERIC GU, Ph.D., taken pursuant to notice,
    was held via Zoom Videoconference,
    beginning at 7:02 a.m., China Standard
    Time, on the above date, before Michelle
    L. Gray, a Registered Professional
    Reporter, Certified Shorthand Reporter,
    Certified Realtime Reporter, and Notary
    Public.


                            -   -   -


              GOLKOW LITIGATION SERVICES
          877.370.3377 ph | 917.591.5672 fax
                     deps@golkow.com
```

1  last about three hours or so.
2      Q.   Did any of your meetings
3  with your attorneys to prepare for this
4  deposition last more than three hours?
5      A.   Let me think.  More than
6  three hours?  No, I don't recall.
7      Q.   What if any documents did
8  you review in preparation for the
9  deposition?
10     A.   You know, I wasn't with the
11 company until 2014, so I, you know, find
12 all those documents, research report and
13 risk assessment and those documents
14 relate to my -- to my -- you know, to my
15 job.
16     Q.   Okay.  You said a research
17 report.  Which research report?
18     A.   The process, you know,
19 developed back in 2011 or so.
20     Q.   Are you talking about the
21 process development research report from
22 SynCores?
23     A.   Yes, you are right.
24     Q.   When you said risk

1  these type of document.
2        Q.   You said SOPs and what else?
3        A.   I reviewed many documents.
4  User log, there's reports, SOPs, and 483
5  document, and those documents.  That's
6  pretty much it.
7             MR. SLATER:  Cheryll, I
8        don't know what exhibit we're on,
9        but maybe you can say it when you
10       put it up.  But let's put up the
11       deposition notice, please.
12            MS. CALDERON:  Sure.  It's
13       223, is the next exhibit.
14            (Document marked for
15       identification as Exhibit
16       ZHP-223.)
17 BY MR. SLATER:
18       Q.   All right.  Have you seen
19 this document?
20       A.   Let's see.  No.  No.
21       Q.   Did you search for any
22 documents that may be produced to us
23 tonight as part of your deposition?
24       A.   Search what document?

```
 1         Q.    Any of your personal
 2   documents that may relate to this case,
 3   did you search to see if you had any that
 4   had not been previously collected so they
 5   can be provided tonight?
 6         A.    As far as I understand, all
 7   the document has been provided to you.
 8         Q.    Yeah, my question is this:
 9   In connection with this deposition, did
10   you search to see if any relevant
11   documents to this litigation had not
12   previously been produced so they could be
13   produced to us in connection with the
14   deposition.
15         A.    That's a good question.  How
16   would I know?  Okay.  I don't know.  What
17   are you talking about?
18         Q.    Did you make any effort to
19   identify documents that were not
20   previously produced to us as part of this
21   litigation?
22         A.    The answer is no.
23         Q.    Do you keep handwritten
24   notes in connection with your work?
```

1  one.  Yeah, any given time, I had one
2  computers.
3        Q.   Did you say that your
4  computer broke or did you say it was
5  stolen or both?  I thought you said --
6        A.   I recall I lost, let's say,
7  one computer when I travel.  One computer
8  was broken down and it crashed.
9        Q.   When did you lose a computer
10 when you traveled?
11       A.   That's a good question.
12 Let's see.  Let me try and remember that.
13 That was maybe in 2016 or so when I
14 travel from San Francisco back to
15 Shanghai.  I lost my computer one time,
16 yeah.
17       Q.   When was that?
18       A.   I just left on the airplane.
19 And I find out, you know, I didn't have
20 my computer.  I call the airline.  They
21 said they didn't find it, so...
22       Q.   When?
23       A.   I don't remember exactly the
24 time.  I thought maybe it was 2016 time

1  frame.
2      Q.   Was the information on that
3  computer backed up somewhere so that the
4  data or information on the computer was
5  not lost?
6      A.   The computer, you know, was,
7  you know, backed up from time to time.
8  But I'm not sure 100 percent, maybe lost
9  some data.
10     Q.   Was there ever a point where
11 you lost the computer where you realized
12 something that you needed couldn't be
13 found because it was on that computer?
14     A.   I didn't think so, because
15 it didn't impact my work.
16     Q.   You said another computer --
17 well, let me ask you this.
18          The computer that you lost
19 when you were traveling, was that a
20 laptop?
21     A.   Laptop.
22     Q.   What type of laptop?
23     A.   Gee, that was -- I remember,
24 what was that?  That was -- I think it

```
 1            Q.    Was that provided to you
 2   by -- well, rephrase.
 3            Who provided that computer
 4   to you?
 5            A.    The company computer.
 6            Q.    Which company provided that
 7   to you?
 8            A.    ZHP.
 9            Q.    Do you consider yourself to
10   work for ZHP?
11            A.    Yes.  And I work for
12   SynCores, but ZHP is the majority holder
13   of SynCores.
14            MR. SLATER:  Cheryll, let's
15        go to Exhibit A of the deposition
16        notice, please.
17   BY MR. SLATER:
18            Q.    Have you seen that page or
19   those lists of topics before right now?
20            A.    Could you expand a little
21   bit, please?
22            Q.    Have you ever seen that
23   document in front of you, Exhibit A
24   listing 30(b)(6) topics?  Have you seen
```

```
 1   that before?
 2              MR. BALL:  I think he asked
 3       if she can expand it, Adam.
 4              MR. SLATER:  Oh, expand it.
 5       I thought he said if I could
 6       explain it.
 7              MR. BALL:  No, expand it.
 8              MR. SLATER:  Are you able to
 9       make it bigger, Cheryll?  Great.
10   BY MR. SLATER:
11       Q.    Does that help you, sir?
12       A.    Yes, that help.  Yes, I saw
13   these two items.  Yes, I saw this from
14   somewhere, maybe talking to my counsel
15   sometimes, yeah.
16       Q.    So I'll just ask again.
17   This page, Exhibit A, have you seen the
18   page before?
19       A.    Yes.
20       Q.    And did you review the
21   topics listed and prepare yourself to
22   testify on those topics?
23       A.    Yes, exactly.
24              MR. SLATER:  Let's go to the
```

```
 1          A.    Yeah.
 2          Q.    Is it -- rephrase.
 3                Is this CV accurate?
 4          A.    Yes.
 5          Q.    Let's go to the section
 6   under professional experience.  It says
 7   Shanghai SynCores Technology Inc.
 8   Limited, February 2014 to the present.
 9          A.    Mm-hmm.
10          Q.    Is that accurate?
11          A.    Yes.
12          Q.    This says your title is
13   general manager.  Is that your current
14   title?
15          A.    Hold on -- okay.  It's the
16   same.
17          Q.    This has your title as
18   general manager.  Is that correct?
19          A.    Correct.
20          Q.    And is your current title
21   general manager?
22          A.    Yes.
23          Q.    Have you held any other
24   titles at Shanghai SynCores?
```

1    A.    No, that's the only title I
2 have.  In China we call it general
3 manager, but manager as president of the
4 company.  So basically, I think that's
5 the same.
6    Q.    Are you the president of the
7 company?
8    A.    Yes.
9    Q.    Have you been the president
10 of Shanghai SynCores since February 2014?
11    A.    Yes.
12    Q.    When was the first time that
13 you ever had any involvement with
14 valsartan?
15    A.    The first time was -- let me
16 think.  The first time I was involved in
17 the valsartan, you know, project, that
18 was -- that was -- that was after 2018,
19 June, okay, when we -- you know, when we
20 had a notice.  About July time frame, I
21 got a notice from the ZHP.
22    Q.    Well, let's be clear.  When
23 was the first time that you had
24 involvement with valsartan.  Was it in

Confidential Information - Subject to Protective Order

1    A.    Yeah, based on our knowledge
2  at that time, you know, if there was a
3  suspected genotoxic impurity in the
4  process, we will do the analysis.
5       Q.    When ZHP -- well, rephrase.
6            Was SynCores involved in the
7  development of the manufacturing process
8  for valsartan with sodium nitrite
9  quenching?
10      A.    In the lab scale, yes.
11      Q.    With regard to the valsartan
12 sodium nitrite quenching process, was
13 SynCores and ZHP responsible to perform a
14 genotoxic impurity analysis?
15           MR. BALL:  Objection.
16      Compound.
17           THE WITNESS:  When you know,
18      you will do the analysis.  If you
19      don't know okay, you will not.
20 BY MR. SLATER:
21      Q.    I'm sorry.  I didn't
22 understand the answer.  If maybe -- can
23 just say that again?
24      A.    Let me say it.  Okay.  When