**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

————————————————————

IN RE:  VALSARTAN PRODUCTS
LIABILITY LITIGATION

————————————————————

CIVIL ACTION NUMBER:

19-md-02875-RBK-KMW

MOTION TO COMPEL VIA
REMOTE ZOOM VIDEOCONFERENCE
SEALED TRANSCRIPT

Mitchell H. Cohen Building & U.S. Courthouse
4th & Cooper Streets
Camden, New Jersey  08101
September 10, 2021
Commencing at 3:00 p.m.

B E F O R E:          THE HONORABLE THOMAS I. VANASKIE (RET.)
                     SPECIAL MASTER

A P P E A R A N C E S:

    MAZIE SLATER KATZ & FREEMAN, LLC
    BY:  ADAM M. SLATER, ESQUIRE
    103 Eisenhower Parkway
    Roseland, New Jersey  07068
    For the Plaintiffs

    KIRTLAND & PACKARD LLP
    BY:  BEHRAM V. PAREKH, ESQUIRE
    1638 South Pacific Coast Highway
    Redondo Beach, California  90277
    For the Plaintiffs

    FARR LAW FIRM
    BY:  GEORGE T. WILLIAMSON, ESQUIRE
    99 Nesbit Street
    Punta Gorda, Florida  33950
    For the Plaintiffs

            Camille Pedano, Official Court Reporter
                  camillepedano@gmail.com
                      609-774-1494
    Proceedings recorded by mechanical stenography; transcript
            produced by computer-aided transcription.

**A P P E A R A N C E S (Continued):**

        DUANE MORRIS LLP
        BY:  SETH A. GOLDBERG, ESQUIRE
        BY:  JESSICA PRISELAC, ESQUIRE
        30 South 17th Street
        Philadelphia, Pennsylvania  19103
        For the Defendants, Prinston Pharmaceuticals,
        Solco Healthcare U.S. LLC, and
        Zhejiang Huahai Pharmaceuticals Ltd.


        CIPRIANI & WERNER, P.C.
        BY:  JESSICA M. HEINZ, ESQUIRE
        450 Sentry Parkway
        Blue Bell, Pennsylvania  19422
        For the Defendants, Aurolife Pharma LLC
        and Aurobindo Pharma USA, Inc.


**ALSO PRESENT:**

        LORETTA SMITH, ESQUIRE
        Judicial Law Clerk to The Honorable Robert B. Kugler

        Larry MacStravic, Courtroom Deputy

*United States District Court*
*District of New Jersey*

1   (PROCEEDINGS held via remote Zoom videoconference before The

2   Honorable Thomas I. Vanaskie, (Ret.), Special Master, at 3:00

3   p.m.)

4           JUDGE VANASKIE:  We will proceed.  You know the drill.

5   Please mute your mic if you're not speaking.  And don't put

6   yourselves on hold if you're participating only by phone and

7   then try to come back.

8           MR. SLATER:  Unless there's good music in the

9   background.

10          JUDGE VANASKIE:  There never is.

11      All right.  So we have the plaintiffs' motion to compel.

12  I have a question, and it's a question that is a little bit --

13  I looked but I have to ask this questions:  Was a reply brief

14  filed?

15          MR. SLATER:  No, Your Honor.  There was some follow up

16  in our agenda letter for the last conference but that was it.

17          JUDGE VANASKIE:  I wanted to make sure I did not miss

18  anything.

19          MR. SLATER:  Well, if you missed it, then I missed it,

20  which would be interesting.

21          JUDGE VANASKIE:  Yes.  All right.  I think the best

22  way to proceed today is to go over some matters item by item.

23  And I don't necessarily want to say there's anything

24  significant to the order that I'm going to proceed in and I

25  want to make sure that we hit all of the items that are there.

1      Now, I thought I understood from the briefs that ZHP was

2  going to make additional production of document retention

3  policies.  Did I misunderstand that or is that in the works?

4  What's going on there?

5      MS. PRISELAC:  Hello, Your Honor.

6      Yes.  We have made an additional production that

7  includes the document retention policies that plaintiffs cited

8  in their brief.  It's a little bit like a needle in the

9  haystack process trying to find the additional ones.  I spoke

10  to my colleagues today.  They think by the end of next week

11  everything else will be produced that we have.

12      Just so Your Honor understands, you know, initially, the

13  document retention policies that we produced were ones that

14  were related to specific SOP's that were also ordered produced,

15  so what we're doing is going back and finding something that's

16  even broader so that we can just end this dispute.

17      JUDGE VANASKIE:  Okay.  All right.

18      Mr. Slater?

19      MR. SLATER:  It sounds like we should wait until the

20  end of next week to see what we get.

21      JUDGE VANASKIE:  Okay, very well.  That's what we

22  shall do.

23      Now, one of the big issues here deals with production of

24  litigation hold letters or hold notices.

25      I'm struggling to find their -- what do you have in

1  terms of evidence that there has been a failure to follow

2  litigation holds?

3        MR. SLATER:  Your Honor, a couple of things that I

4  think are recent examples here.

5        Number one, we have Jinsheng Lin, who obviously wrote an

6  important email and was involved in some important work who we

7  know did not get a litigation hold letter, and we've provided

8  Your Honor some charts in our brief which I hope are helpful

9  showing us that despite Dr. Lin being employed by ZHP starting

10  in July 2012, and despite the date of the email that we've all

11  talked about quite a bit in July 2017, the first date of any

12  document they produced as his custodial file is January 13,

13  2018.  And that's obviously very concerning.

14        And just to anticipate a question that may come, defense

15  counsel had previously confirmed that if a document had

16  previously been produced, it wouldn't be produced again.  But

17  as Your Honor knows, duplicate custodian fields were not

18  populated so there's no way to know if a document was in a

19  custodian's file if that custodian is not listed as a duplicate

20  custodian.

21        So Jinsheng Lin is a good example.  I think that Baohua

22  Chen and the rest of these witnesses are good examples because

23  what you can see is a pervasive pattern of documents being

24  produced with the first date produced for any of the custodial

25  file being in 2018, mostly later in 2013 or in some cases later

1    in 2018 -- if I said 2013, I misspoke, 2018.  So we have a

2    pattern that on its face indicates that there should be more

3    documents than there are not.

4         I'll give you another example.  The ESI protocol

5    required that any smartphone that was used at all for business,

6    whether it was company issued or not is not the issue in the

7    ESI protocol, needed to be collected, swept and have the

8    responsive ESI provided, and we've provided Your Honor

9    testimony from multiple witnesses who said nobody ever asked

10   for their smartphones and that they did from time to time use

11   their smartphones for work.  So that's another example of

12   something that we know is a violation and we know that we

13   didn't get any of those documents because it was just that they

14   were never collected, their smartphones.

15            JUDGE VANASKIE:  Right.

16            MR. SLATER:  So, you know, so the lack of litigation

17   holds to most multiple people, we know the smartphones weren't

18   looked at, and on its face, the documents that were produced

19   are in such small numbers and for a time period that starts so

20   late that on its face it raises very serious questions.  And we

21   obviously don't have to prove spoliation.  I think we have to

22   make a prima facie showing that things were not saved that

23   should have been or haven't been produced or can't be found

24   that should be.

25            So I think when you put that together, it creates a

1    picture that I think under these circumstances would require

2    the Court, at the very least, to take the first step of looking

3    at the holds *in camera* to determine whether, in Your Honor's

4    judgment, there is something in there that is probative to

5    what's been happening here.  For example, what did the

6    litigation holds tell people to save or not save?  We just

7    don't have that information.  And, again, the fact that we know

8    that the litigation holds did not go to people that turned out

9    to be relevant creates very serious concerns and we would like

10   to be able to see what the litigation holds told people to do

11   at which periods of time because they could have evolved.  So

12   we don't know.

13         So, again, a halfway point might be, if Your Honor has

14   any questions, for Your Honor to look at the lit holds and

15   determine whether you think they should be produced, which is

16   something we would certainly agree with.

17         JUDGE VANASKIE:  All right.  Ms. Priselac?  You're

18   actually muted now.

19         MS. PRISELAC:  My apologies, Your Honor.

20         JUDGE VANASKIE:  That's okay.

21         MS. PRISELAC:  So I think you asked the precisely

22   correct question, which is, what evidence is there of

23   spoliation, and Mr. Slater has listed for you zero.

24         And I'll start with his first point, which is that there

25   were a certain number of documents that they believed had low

1    hit counts for the custodians.  They commented in their

2    briefing that they thought there might be a problem with the

3    metadata rather than having a meet and confer with us about

4    whether there was a problem with the metadata.  And so we went

5    back and, as we said in our brief, we asked our vendor to see

6    if there were some issues with the metadata.

7        Now, Your Honor, if you go back, you know, we've

8    produced over 370,000 documents.  And if I could go back to

9    about this point last year, and I am glad Mr. Parekh is on the

10   phone today, you know, technical issues like a metadata

11   overlay, especially in a case here where we have a company in

12   China, we have a company in the U.S., we have two subsidiaries

13   in China, getting all this documentation together, the metadata

14   right, de-duplicating everything, which, by the way, isn't just

15   what the defendants wanted, it was what the plaintiffs wanted

16   because it helps them do their review, but in any event,

17   metadata and these overlays in terms of duplicate custodians

18   gets very complicated because the ZHP parties are four -- or,

19   excuse me, four different companies.  We also have two

20   subsidiaries that have productions.

21       So what we did is we went back, we corrected the

22   metadata, we produced a new overlay.  And if Your Honor's

23   interested in seeing, we do have an updated chart that shows

24   that after we produced the metadata overlay, the numbers did go

25   up, including for Mr. Chen and Mr. Lin.  And not that the

1    actual number of documents was higher, Your Honor, it's that

2    the metadata to do an easy count of the documents was

3    corrected.

4        Now, if they had just searched for their names or their

5    email addresses in the production, they certainly could have

6    gotten these same counts.  But we understand the ESI protocol

7    is there for a reason so we corrected the metadata.  And if you

8    want to see that chart, Your Honor, I'm happy to share my

9    screen.

10        JUDGE VANASKIE:  Yes, I would like to see that,

11   please.

12        MS. PRISELAC:  I think I might be disabled, Your

13   Honor.

14        THE COURT:  Larry, are you on?  Do we need to enable

15   Ms. Priselac to share screen?  Larry, are you there?  He must

16   have stepped away.  Okay.

17        MS. PRISELAC:  Your Honor, I don't want to hold this

18   up.  I'm happy to produce it to you and to the plaintiffs after

19   the hearing.  But what I will say is that, you know, Mr. Chen's

20   number of documents did go up to over 600 documents and his

21   earliest document now that the duplicate custodian overlay has

22   been produced dates to 2010.  So this idea that we're only

23   getting information from 2018 is just not true.

24        Also accounted for now in this metadata overlay is the

25   document they specifically referenced in their motion, which is

1    ZHP 02490581, and that document now has the correct metadata

2    overlay.

3         So, again, Your Honor, first of all, this isn't an issue

4    of these documents weren't previously produced; it's that the

5    metadata was not complete.  And so we're saying, yes, that's

6    true, and, you know, that was our mistake, but it's been

7    corrected now.  And what the metadata shows and what they could

8    have done by doing a simple search of the actual documents

9    rather than the metadata is that there are documents way before

10   2010, including from Mr. Chen, that were produced months ago.

11   That's one point, Your Honor.

12        The other is that in terms of Jinsheng Lin and his

13   documents, the updated count shows that about a thousand

14   documents were produced for Mr. Lin, and if you look at

15   Exhibits 14, 15 and 16 of the plaintiffs' motion, you'll see

16   that they even have Mr. Lin's handwritten notebooks about this

17   Irbesartan Improvement Project.  And so the idea that somehow

18   Mr. Lin's documents have been lost or spoliated, there's just

19   absolutely no evidence of that.

20        And I think, Your Honor, one of the things we have to

21   remember is that ZHP approved this process that's at issue for

22   making valsartan in 2011, and then that process was submitted

23   to the FDA in 2013.  So the idea that, you know, Mr. Lin --

24   excuse me, Jinsheng Lin, who was not involved in that process

25   of developing these methods, should have more than a thousand

1    documents is just -- it doesn't jive with the facts.  Because

2    what's been testified to, including by Dr. Gu, is that a lot of

3    this process for the method of making valsartan was done by

4    Shanghai SynCores.  And so it wasn't even done at ZHP, and

5    that's why Shanghai SynCores was a custodian who was collected

6    from.

7         So, in short, Your Honor, what CEMAT and Mr. Lin do

8    today in 2021 are very different from what Mr. Lin did back in

9    2010 or 2011 or 2012 because CEMAT didn't exist at ZHP until

10   2014.  And by 2014, Your Honor, the method for making valsartan

11   had not already been developed, it had been submitted by the

12   FDA and approved.  To the FDA.  I'm sorry.

13        And then, Your Honor, finally, you know, I think you

14   made a good point about evidence of spoliation because in *Major

15   Tours*, which is what the plaintiffs have relied on here, Judge

16   Schneider found evidence of spoliation because two of the

17   witnesses, corporate designees, made it very clear in their

18   testimony they did not adhere to the legal holds.  None of our

19   witnesses have testified to that.

20        JUDGE VANASKIE:  Can you respond to the suggestion

21   from Mr. Slater that I conduct an *in camera* review of the

22   litigation hold letters?

23        MS. PRISELAC:  Sure, Your Honor -- I'm sorry if you're

24   getting a little feedback.  Okay.

25        You know, we have no problem on one level with the

1  actual content of our letters.  And, in fact, we've even

2  disclosed who they went to and on what days, which is in

3  Exhibit 29 in the plaintiffs' motion.

4      The problem we have, Your Honor, is that a process like

5  that should not occur unless there's a finding of -- at least

6  preliminarily of spoliation.  And the problem here is, you

7  know, knowing the history of this case and of the plaintiffs, I

8  can see that the next moment here is, well, Your Honor already

9  found evidence of spoliation, if that's what we take -- if

10 that's the route we go down.

11     JUDGE VANASKIE:  Could I ask you to now share your

12 screen so I could look at those charts.

13     MS. PRISELAC:  Yes.

14     JUDGE VANASKIE:  I'm informed that you have that

15 ability now.

16     MS. PRISELAC:  Okay, great.

17     JUDGE VANASKIE:  When I look at it, will I be able to

18 compare it against the chart that was in plaintiff's brief?

19     MS. PRISELAC:  Yes, Your Honor, I believe that you

20 should now.

21     If you see, Your Honor, we have what plaintiffs had

22 originally had in their brief on the left and ours on the

23 right.  And I did want to highlight for Your Honor, because we

24 had communicated this to plaintiffs but I don't think it was

25 obvious in the briefing, that Wangwei Chen and Peng Liu were

1  two custodians who left ZHP before the litigation and before

2  the discovery of NDMA in valsartan.  So their electronic files

3  were not -- their electronic email files, that is, were not

4  kept.  Anything they did though in a lab notebook or that was

5  on a shared server was produced.

6          JUDGE VANASKIE:  Okay.  Thank you.

7      Mr. Slater, what would I be looking for in the

8  litigation hold letters in an *in camera* review?

9          MR. SLATER:  I think that Your Honor would be looking

10  for is what were people told to do, what were they told to

11  preserve, why they were told to preserve it, and how they were

12  told to preserve it.  And I'll circle back on, I think this

13  might be helpful, talking about Dr. Lin.  Dr. Lin, obviously in

14  that email that we've talked about quite a bit, in a

15  matter-of-fact way says there's NDMA in valsartan, and it's

16  caused by the quenching process, very a matter of fact.  There

17  is not one document that was produced yet in this litigation by

18  ZHP showing where that knowledge came from, showing anything

19  about that.  It just pops out, out of nowhere, and we have no

20  other information about it.  That, on its face, creates serious

21  questions and what we need to see is what were they telling

22  people at what time period -- time point so that we can figure

23  out, A, what should Dr. Lin have been told, for example, using

24  him as an example, and at what point in time, because we don't

25  even know at this point, I don't think, if or when he got a

1   litigation hold.  It certainly wasn't in 2018 or 2019.

2        And I will parenthetically say counsel just represented

3   that there were two people who left the company before the

4   litigation or the discovery of NDMA in valsartan.  I don't know

5   when they left the company, but, obviously, we have a document

6   that shows that there was knowledge of the NDMA in valsartan in

7   July 2017, so I don't know if they left before that email.

8   And, again, there's an open question of when was this known

9   before that because it's -- it's hard to imagine that somebody

10  could make a matter of fact statement like that out of the blue

11  without having some prior knowledge and a reason for saying it.

12       So, again, we're -- and that's really the nature of any

13  of these issues that the plaintiffs have both arms tied behind

14  their back, to a large extent, because we don't know what we

15  don't know, but I think that's what you would see and determine

16  whether there's something probative about it.  It may be that

17  you look at these letters and say, there's nothing here that's

18  going to add anything to these questions.

19       And not that I want to bog down on this but counsel's

20  talking about what the overlay file shows and how the document

21  counts apparently increased.  This is not what I'm being told.

22  I'm literally emailing with people on my team as we're doing

23  this argument, and we're not seeing updated counts, according

24  to what I'm told, and we're going to have to -- we're going to

25  have to go through it and we're going to have to see if we

1    agree.  Because I'm literally emailing with Mr. Parekh and Mr.

2    Geddis and other people on my team while we're talking and

3    that's not the information that we're seeing.

4         So, you know, when did Jinsheng -- coming back to it,

5    what was Jinsheng Lin told to do, for example, when and if he

6    ever did get a litigation hold letter?  What was Baohua Chen

7    told to preserve?

8         The document count that we have as of when we filed our

9    papers is incredibly small and incredibly suspicious, from our

10   perspective.  Even 600 documents, if they're right, which we

11   have to see -- we don't know in whatever time period, I haven't

12   seen that.  I'm being told by people they don't see that on my

13   team.  Even with 600 documents, take that -- take that as

14   Gospel for the purpose of this argument, that's still a

15   woefully small number of documents for the chairman of the

16   company who was involved with this -- the oversight of this

17   process throughout.

18        So, that's what I think you would find.  And, again, I

19   don't know what the litigation hold letter says so I can't tell

20   you that there may -- there may be other things in there.  I'm

21   just trying to make sure that we have all the information we

22   need as we go through this process because we're -- we're

23   convinced based on the circumstantial evidence and the hard

24   evidence of what that email said in 2017 that there has to be

25   more documents and they have to be significant and we just

1    don't have them.

2          And that's the best we can say at this point because we

3    just don't have other smoking guns.  We have one, and we have

4    very low document counts and documents beginning very late in

5    the process, based on the information that we had when we filed

6    these papers and that I'm told remain accurate but maybe

7    there'll have to be a meet and confer, I don't know.

8          JUDGE VANASKIE:  Ms. Priselac?

9          MS. PRISELAC:  Sure, Your Honor.

10         So first to address the Baohua Chen issue, I think Your

11   Honor is more than familiar with the many declarations and

12   other things we submitted to the effect that Mr. Chen actually

13   had zero involvement in the development of valsartan and, you

14   know, the process by which the zinc chloride process came about

15   and in marketing or anything that really relates to this -- to

16   what would have been a responsive document.  And we've all --

17   you know, it was not his practice to use email.

18         And so at the end of the day, the fact that there are

19   only around 600 documents from his custodial file is completely

20   consistent with what we've been saying about Mr. Chen's role in

21   the key issues of this case, which are the zinc chloride

22   process and the development thereof, you know, back in 2011,

23   2012 and 2013 and 2014.

24         So putting that aside though, Your Honor, I'm glad that

25   Mr. Slater brought up this Jinsheng Lin email, because if you

1    look at this list, a lot of the people with lower document

2    counts are people that were added as part of the supplemental

3    production as additional custodians.  And the reason they were

4    additional custodians and not original custodians is because

5    they didn't have anything to do with the process of developing

6    valsartan.  We voluntarily agreed to add them as custodians in

7    order to put this issue to bed and for no other reason.  And

8    the documents show that they weren't involved in those

9    processes back in 2011, 2012, and that time period, in

10   developing valsartan.

11        What they do show is that they were involved in

12   different experiments, some of them at CEMAT, that the

13   plaintiffs wanted additional information about, most of which

14   involve valsartan -- excuse me, irbesartan, and we've given

15   them those documents.  But these -- these additional custodians

16   weren't on the original list for a reason.

17        Your Honor, my colleagues at Duane Morris spent hours

18   with the plaintiffs in multiple meet and confers, including

19   having Jun Du, the CEO and vice president, and the vice

20   chairman of ZHP, have an eight-hour, basically, interview about

21   all of these aspects and who was involved.  And so these are --

22   the fact that some of these people have low document counts

23   should come as a surprise to no one because they were not

24   original custodians for a reason.

25        And then secondly, with the Jinsheng Lin email, the

1    reality is, and I will share my screen in a moment, the email

2    he's talking about was about this Irbesartan Improvement

3    Project, and now they have all of those documents.  And the

4    statement he's made I'm very glad he brought up because if we

5    look at the actual email and its attachment, and I will share

6    my screen again, Your Honor --

7              JUDGE VANASKIE:  All right.

8              MR. SLATER:  Your Honor, one question procedurally, if

9    we're going to do this, it would seem that maybe if documents

10   are going to be shared that they should be identified as

11   exhibits and circulated to counsel after these hearings.  I

12   just realized that as we're talking because I think we should

13   have a record of what's shown and we may have to come back to

14   these documents on future hearings.

15             JUDGE VANASKIE:  You are correct to request that.  And

16   so let's start with the document that was shown to me first,

17   and that was the updated numbers comparing them with the

18   information that I have I think at Page 3 of the plaintiffs'

19   brief.  We'll call that Hearing Exhibit A.  We'll use letter

20   designations here if that's all right with everybody.  And so

21   we'll mark that Hearing Exhibit A and I'll ask that it be

22   produced in hard copy as well.

23             (HEARING EXHIBIT A WAS MARKED FOR IDENTIFICATION.)

24             MR. SLATER:  Thank you, Your Honor.

25             MS. PRISELAC:  Thank you, Your Honor.

```
 1          JUDGE VANASKIE:  All right.  And now did you want to

 2   share your screen, Ms. Priselac?

 3          MS. PRISELAC:  Yes, Your Honor, thank you.

 4       So, Your Honor, looking at what the plaintiffs have

 5   previously marked, excuse me, ZHP 296, which is the Jinsheng

 6   Lin email as they refer to it -- I'm sorry, I keep moving it --

 7   you'll see that, you know, first of all, it's titled, you

 8   know -- it's basically an investigation into irbesartan and

 9   it's sent in 2017 and you'll see the attachment is marked

10   Valsartan Impurity K.

11       Now, Impurity K, Your Honor, in these APIs there's a

12   list of impurities that are called known impurities.  And

13   they're lettered sequentially A, B, C, D, all the way through

14   up to and including K.  So Valsartan Impurity K was an impurity

15   that was known to any maker of valsartan and to the FDA.  And

16   what Jinsheng Lin -- and so when Mr. Slater says where could he

17   have come up with this idea that there might be a nitrosamine

18   in valsartan, and he acts as though he doesn't really -- he has

19   no idea what this attachment says or what the email says.

20       Well, actually, what Mr. Lin says in his email is that

21   he's attached a patent from a company called Zheijiang Second

22   Pharma, which, to clarify, Your Honor, has nothing to do with

23   Zhejiang Huahai.  Zhejiang is like a province in China, so it's

24   like calling something New York --

25          JUDGE VANASKIE:  Okay.
```

```
 1          MS. PRISELAC:  -- and not related to Zheijiang Huahai

 2   whatsoever.

 3          And so what does that patent say that could have, you

 4   know, resulted in Mr. Lin saying this?

 5          Well, the patent you'll see here, it was published in

 6   2014; and if you look, Your Honor, what Zheijiang Second Pharma

 7   here goes into and what Dr. Gu -- excuse me, Dr. Lin testified

 8   to at -- well, Mr. Slater questioned him --

 9          MR. SLATER:  I didn't depose Mr. Lin, Dr. Lin.

10          MS. PRISELAC:  I'm sorry.  Dr. Li, I apologize, Dr.

11   Min Li, who was asked about this patent extensively by Mr.

12   Slater, what Dr. Li explained is that, you know, Impurity K was

13   a known impurity and that this was a patent that Zhejiang

14   Second Pharma filed with respect to Impurity K, but that this

15   was not something that Zhejiang Huahai, you know, agreed with,

16   and he certainly didn't agree with in his testimony that Mr.

17   Slater elicited from him.

18          So, basically, Your Honor, what this patent puts into

19   this possibility that there might be some type of nitroso

20   reaction related to Impurity K, but that has nothing to do with

21   some kind of widespread conspiracy at Zheijiang Huahai that

22   there was NDMA in valsartan.  And it's really important here,

23   Your Honor, that none of this -- this patent doesn't say

24   anything about NDMA.  It talks about nitroso compounds

25   generally.
```

1          So what I want to just clarify here is this email

2    doesn't say what Mr. Slater keeps saying it says.  I mean,

3    every time we're in front of you he makes it sound as though

4    it's this long colloquy about everybody knows at ZHP that

5    there's NDMA in valsartan.  That's not what the email says.

6    And when he asks you, we need to understand where this idea

7    came from, it came from the attachment.  It's pretty obvious.

8    And so when they sit there and say we have no idea how he could

9    have come up with this, it's pretty -- it's there for them in

10   the attachment in black and white.

11         So why we wanted to have this confidential hearing

12   today, Your Honor, is so we could walk through the actual

13   document and this patent with you so that you could see that

14   this is not something that came out of nowhere.  It was in the

15   attached patent of a company that has nothing to do with ZHP.

16         JUDGE VANASKIE:  Now, for the record, what you had

17   shown to me appear to be slides where information has been --

18   on which information has been transposed, not the actual

19   documents.  Is that accurate?

20         MS. PRISELAC:  Yes, Your Honor, because I believe the

21   actual documents were submitted to you by Mr. Slater multiple

22   times.  But I will -- I will happily resubmit them when I

23   submit the slides.

24         JUDGE VANASKIE:  And can we mark those slides as

25   Exhibit B-1 through whatever you got to.

1          MS. PRISELAC:  Yes.

2          JUDGE VANASKIE:  Okay.

3          (HEARING EXHIBITS B-1 THROUGH B-5 WERE MARKED FOR

4     IDENTIFICATION.)

5          JUDGE VANASKIE:  All right.  Mr. Slater, any response?

6          MR. SLATER:  Yes, absolutely.

7     It's a little frustrating because what you just saw,

8     Your Honor, was a, unfortunately, a very misleading Power Point

9     and summary of that document, which you obviously have heard us

10    go through many times and you've seen the testimony from Min

11    Li.  So what counsel just did is said, first of all, she's

12    showing you the actual document.  I wrote it down and put

13    quotes around it.  It's not the actual document.  What it is is

14    a very, very carefully rigged-up set of Power Point slides to

15    misrepresent the part that matters.

16         So the part that matters the most is the part that was

17    not shown to you, where Dr. Lin is saying we found an impurity

18    that looks just like or similar to the NDMA that is in

19    valsartan and which is created by the sodium nitrite quenching.

20    That's the sentence that matters.  It's not the sentence you

21    were shown.

22         Later in the email he pointed out the patent from this

23    other Chinese manufacturer and said, they had figured out that

24    the sodium azide quenching can create this nitrosamine.  So

25    people are catching on to this, so leaders of the company, and

1    I'm paraphrasing, it's pretty close though, beware and be

2    careful.  He also said this was going to be potentially a

3    massive cGMP problem.

4         But coming back to it, what counsel didn't show you is

5    the one sentence that's most important.  Why was that and why

6    was it represented that the email was talking only about the

7    patent?  I don't know, it's distressing.  And if you want to,

8    Your Honor, we could hold a whole hearing on this.  We can walk

9    through the document and we can do whatever we need to do

10   because I'm really, really taken aback and surprised at what

11   just happened.

12        The email was not focused on the patent.  The patent was

13   used to illustrate that other companies out there were aware of

14   this problem so we better watch ourselves because we already

15   have this problem in our valsartan.  And that's what it is and

16   I stand by that.  And if you need us to, we can pull up the Min

17   Li testimony where I asked him questions about what the

18   document said and he confirmed the language, but you've seen

19   it, many times.  So that kind of just took me aback.  I'm a

20   little bit surprised at what was just presented to the Court.

21        What else can I tell you about what was just said by

22   counsel?  Counsel said it was not Mr. Chen's practice to use

23   email.  That's -- okay, well, that makes Maggie Kong that much

24   more important and probably whoever was in Maggie Kong's

25   position in the prior years, if she was handling his emails for

1    him.  It shows you why it's so much more important to get those

2    documents.

3         Number two, the Jun Du meeting you heard about, Your

4    Honor, I'm telling you this because things were being thrown at

5    you that you weren't the Special Master at the time, it

6    predated you.

7         JUDGE VANASKIE:  Right.

8         MR. SLATER:  We had to get a court order from Judge

9    Schneider who sat in the room with us across the hall from his

10   chambers and he forced Jun Du to be brought to talk to us

11   informally to give us information on corporate organization so

12   we could figure out what was going on and learn about the

13   company and learn some terminology.  So that's how that

14   happened.  This was no offer by ZHP; it was Court ordered.

15        For some reason counsel seems to think that Jinsheng Lin

16   not being listed as a custodian initially is somehow favorable

17   to ZHP.  That's a massive violation by them not disclosing his

18   existence to us and, as you know, we only learned about him and

19   his involvement by accident.  Because, talking now, bringing

20   this back to the issues that are before Your Honor today, that

21   email is not in Jinsheng Lin's custodial file, the person who

22   wrote it, it's not in anybody else's custodial file for anybody

23   else that received it except one person, Min Li, and as you

24   know, we don't have the electronic version, we have a copy of

25   it that was then copied onto another computer and it says the

1   date created was in June of 2018 when that was really the date

2   it was copied, which is why we think we got it.  That's why we

3   think it slipped through, because the metadata gave it the

4   wrong created date so it post-dated what we believe they were

5   holding back.

6        So the idea that Dr. Lin not being listed as a custodian

7   is somehow on us or is somehow exculpatory, he should have been

8   listed right up front because they had an obligation to do

9   their searches and talk to the company and to find out, and

10  they should have found out about this document.  Again, we

11  don't believe they even knew the document had been produced, we

12  believe it was accidentally produced for the reasons we've

13  explained.

14       So I hope that -- I tried to compartmentalize a little

15  of what I just heard because I think that when you hear these

16  explanations and then you hear, similar to the other day, you

17  know, this was hard, these people are in China, we had to

18  collect all these things, that's why they're still giving us

19  documents now and still trying to correct overlay files that

20  was all supposed to be taken care of over a year ago, that's,

21  again, a distressing fact.

22       But to the issue before the Court, Your Honor, the fact

23  that Jinsheng Lin, and this is one example I gave you, says in

24  July 2017 there's NDMA in valsartan, and accurately states the

25  root cause, it's due to the sodium nitrite quenching to get rid

1    of the azide, I mean, he literally sets forth not just that

2    there's NDMA there but why it's there, the root cause that was

3    admitted to the FDA when this came out, so it's hard to imagine

4    that he just came up with that that day.  And there is not one

5    document within the company anywhere else documenting that

6    before that moment.  Very hard to imagine.  And I don't think

7    anybody would believe that that's the state of affairs.

8            So, again, I think that I tried to come up with a

9    halfway point, which would be, if we're just talking about,

10   we've gone into a bunch of other areas, but the lit holds --

11           JUDGE VANASKIE:  Right.

12           MR. SLATER:  -- I think there's no harm in it being

13   produced to Your Honor.  If Your Honor looks at it and says,

14   look, there's nothing here that's going to be of any use or

15   relevance, you know, we'll abide by that, of course.

16           JUDGE VANASKIE:  All right.  Ms. Priselac?

17           MS. PRISELAC:  Thank you, Your Honor.  Just a few

18   things.

19           I find it interesting that Mr. Slater can, you know, go

20   on huge diatribes, impugn my client, using his own words, not

21   Dr. Lin's words.  He has paraphrased this -- whatever he wants

22   this email to say in every hearing, it suits his purposes.  He

23   never actually shows you the actual words.  So the fact that

24   he's taken aback that I'm showing you the actual written words

25   I think speaks volumes because the written words actually

1  disprove all of his paraphrasing over all of these months,

2  which is why we wanted this hearing.  So that's the first

3  thing.  And we made that clear, by the way, when we asked for

4  this hearing, that we were going to walk through it.  So the

5  fact that he's surprised and he's not ready to put his side up,

6  that's neither here nor there.

7        The second thing, he keeps saying, we should have been

8  told about Dr. Lin's involvement.  Involvement in what?

9  Involvement in the Irbesartan Improvement Project?  Well, first

10 of all, you have the head of the Irbesartan Improvement Project

11 as a custodian, his name is Dr. Min Li, you have him as a

12 custodian.  And why would the Irbesartan Improvement Project be

13 related -- have put this on anyone's radar?  It wouldn't.  This

14 is a case about valsartan.  Point blank, Dr. Lin was not

15 involved in the creation of the process by which valsartan is

16 made.  People who were, were named custodians.  So this idea

17 that he should have been named, he only should have been named

18 because Mr. Slater now thinks the Irbesartan Improvement

19 Project is important.

20        Now, in order to put this all to bed, we agreed to make

21 him a custodian and produce these documents but the idea that

22 he should have been disclosed in the first place has no factual

23 basis.

24        And the third thing, Your Honor, is, and this is really

25 important, and I would really love to hear from Mr. Slater,

1    they keep saying that we somehow, this metadata issue -- he

2    throws around metadata and overlays and should have been

3    produced and it slipped through, I still have no idea what this

4    theory is.

5        What really happened is we have an incredibly

6    comprehensive, very, very in-depth document collection review

7    process that we have gone to great lengths to produce every

8    document.  So I actually want to know, instead of these kind of

9    vague conspiracies about metadata and slipping through, what

10   exactly is he accusing us of?  Because I can't really combat

11   that unless he really says what he thinks happened.

12           MR. SLATER:  Okay.  And I will -- Ms. Priselac asked

13   me to do this.  This is an email to me, I got it here in my

14   handy smartphone, my iPhone, the phrasing that matters which

15   counsel says, again, just doubled down and said, well, we

16   showed you what it said, the part that matters the most for

17   this argument is where it says, the email by Dr. Lin, "It is

18   very likely," talking about this impurity they found in

19   irbesartan, "It is very likely that it is an N-nitroso

20   compound.  It is similar to the N-nitrosodimethylamine," that's

21   NDMA, "that occurs in valsartan when quenched with sodium

22   nitrite" -- I'll start over just to make sure it's clean.

23           JUDGE VANASKIE:  Okay.

24           MR. SLATER:  He says:  "It is very likely that it is

25   an N-nitroso compound and it is similar to the

1  N-nitrosodimethylamine that occurs in valsartan when quenched

2  with sodium nitrate and its structure is very toxic."  That's

3  the words.  Those are the words we're talking about.  This is

4  somebody, in 2017, clearly stating the root cause for the NDMA

5  in the valsartan and recognizing that it is in the valsartan.

6  That's -- I don't care if this is the context of the balloon

7  project to build a better balloon; it's the statement that's

8  made about their knowledge about this impurity in valsartan,

9  exactly the impurity and exactly the root cause that has now

10  been established unequivocally that's how it was caused.

11      So, again, I don't know why counsel doubled down on

12  that, it doesn't make any sense to me, and there's no way out

13  of that language.  Again, counsel has never showed you the

14  language I just read to Your Honor today.

15      So where did that come from?  Why did Jinsheng Lin not

16  get a litigation hold?  Whatever counsel wants to say, there is

17  no doubt that that person should have been listed as a

18  custodian so that we would have had that person up front.  And

19  how are they going to explain the fact that they didn't list

20  anybody, including Jinsheng Lin, as a duplicate custodian on

21  the document we got from Min Li's custodial file?  It's because

22  it was never intended to be produced to us, and that's an issue

23  we're going to come to in a few moments in the context of

24  Baohua Chen, which is, counsel stated in -- it's Exhibit 3 to

25  our documents, July 22, 2021, email, that they didn't reproduce

```
 1   documents that had previously been produced, that's fine but
 2   you're supposed to and you are required by the ESI protocol to
 3   list all the other recipients and anybody else that sent it,
 4   anyone else that's on it, as duplicate custodians which was not
 5   done.
 6        So you look at that and that, from our perspective,
 7   evidences a systematic effort to hide documents and the fact
 8   that this one document slipped through and nothing else on that
 9   is seen, nothing about why they knew this, it's been produced,
10   creates, I think, a very strong inference of somebody on behalf
11   of ZHP making sure that documents were not getting to us,
12   whether -- and I'm not guessing at who it was.  We know that
13   the review of documents initially is done by law firms in
14   China, it's my understanding.  They review everything, they
15   work with the witnesses, they work with the custodians, they
16   look for privilege, they look for state secret, they're working
17   with the documents, my understanding is, before Duane Morris
18   gets them, I assume.  That could be corrected.  That would be a
19   benefit to Duane Morris because it potentially would push the
20   responsibility for this to the law firms in China.
21        This is a very troubling area.  Thank goodness this
22   document slipped through and we're trying to get to the bottom
23   of it to push that timeline as far back as we can to when they
24   knew, as I just read from Dr. Lin's email, that there is NDMA
25   in valsartan and it occurs when it's quenched with sodium
```

1   nitrate because they knew it because he said it clearly.

2        MS. PRISELAC:  Your Honor, may I respond?

3        JUDGE VANASKIE:  Yes, you may.

4        MS. PRISELAC:  Thank you.

5        You know, stepping aside from Mr. Slater's unsupported

6   accusations about law firms in China and, you know, Duane

7   Morris and our client, I just want to highlight that I just

8   asked Mr. Slater to break down this theory of his about

9   metadata slipping through, you know, in their brief there were

10  allusions to a broken laptop and how this was all part of some

11  conspiracy in very vague terms that I didn't understand when I

12  read the brief and I still didn't hear an explanation that made

13  any sense whatsoever from Mr. Slater.  Again, it's just these

14  vague generalizations that are actually not supported by the

15  facts.  And, Your Honor, when we do submit these slides to you,

16  I'm more than happy to submit all of ZHP 296 and all of ZHP 297

17  because you're going to see, it's a long document with one

18  sentence and a one sentence that directly relates to the

19  attached patent.  And I'll leave it at that because right now

20  we're not here to argue about the merits; we're here on a

21  motion to compel.  And the reality is, Mr. Slater has

22  absolutely zero evidence of spoliation.

23       What he does have, actually, is an incredible amount of

24  data that we produced to him to show the lengths, even before

25  this litigation, that Dr. Min Li went through to save the old

1   laptop data and put it on his new laptop and all of that has

2   been produced.  So this idea that there's some conspiracy to

3   withhold documents just has no basis in fact.  And so if we're

4   going to start implying spoliation on that kind of conjecture,

5   that's a very dangerous road to head down, Your Honor.

6           MR. SLATER:  Your Honor --

7           JUDGE VANASKIE:  Let me ask a question of Ms.

8   Priselac, please.

9        Don't you find it a little concerning that this -- and I

10  realize it must be a lengthy document, and I haven't read it,

11  but don't you find it a little concerning that this email

12  didn't appear in any other of the custodians' productions even

13  though they were recipients of it?

14          MS. PRISELAC:  So, Your Honor, Mr. Slater did ask some

15  of the other custodians that he deposed about this, and, you

16  know, I can take -- I can only take them by their testimony,

17  which is to say, if it didn't really relate to them or

18  something that they were supposed to keep, they didn't keep it;

19  they deleted it.

20       Now, I will tell you, Your Honor, even though the actual

21  email doesn't exist, and I believe that on one of our hearings

22  they admitted to this, all of these lab notebooks and the

23  contemporaneous data in terms of how they work as scientists,

24  which is these handwritten notes with printouts scanned and

25  kept in hard-copy files, some of which were actually attached

 1    to the plaintiffs' motion, that's how they work as scientists.

 2    They are keeping these hard-copy lab notebooks with some

 3    electronic data printed out and put in the notebook and that's

 4    their system.  Because, Your Honor, quite frankly, when the FDA

 5    comes, they have to show all of their hard-copy backups and

 6    systems.  You know, they're not doing email searches.  So their

 7    focus in terms of document retention is that.

 8            And, you know, even though this email was not kept by

 9    all of these custodians, the underlying data about the actual

10    -- about the actual project itself and these tests were given

11    -- was kept, was given to the plaintiffs, and they have it.

12            JUDGE VANASKIE:  How would you be prejudiced, you,

13    talking in terms of ZHP, if I was to order production of the

14    litigation hold letters?

15            MS. PRISELAC:  Well, Your Honor, I mean, under the law

16    it means that you have found a preliminary finding of

17    spoliation, and I think that's incredibly prejudicial to our

18    client.

19            MR. SLATER:  I don't want to interrupt.  I'm sorry.

20            JUDGE VANASKIE:  Now, I did think I heard you say that

21    others who may have received that email didn't view it as

22    important and deleted it.  I guess that would have all occurred

23    prior to litigation.

24            MS. PRISELAC:  Right, Your Honor, because that email's

25    dated in 2017.

```
 1          JUDGE VANASKIE:  Right.

 2          MR. SLATER:  Okay.

 3          JUDGE VANASKIE:  All right.

 4          MR. SLATER:  Counsel has just represented some things

 5   which are very interesting and they're revelatory, to some

 6   extent.

 7          First of all, counsel's saying that these documents --

 8   I'll start with the last comment -- were deleted long before

 9   the litigation.  I don't know that.  I don't know if counsel

10   knows that.  In fact, counsel just represented that the email

11   was not kept by the custodians, other than Min Li, that they

12   all deleted it.  No one's ever told us that, that they all

13   deleted it?  We were told they didn't -- they weren't producing

14   it because it had already been produced from Min Li but they

15   didn't list the duplicate custodians.  So that's very telling.

16          Counsel also said the actual email no longer exists.

17   They have a centralized server, if I recall correctly.  How

18   does the actual email no longer exist?  I mean, this is very

19   disturbing.  And, again, I -- I didn't take every deposition.

20   I watched Ms. Hilton depose Jucai Ge, Jucai Ge, J-U-C-A-I and

21   then G-E, is the last name, the head of quality, the person who

22   would have been responsible to be up in arms over this because

23   Dr. Lin said this is a very serious cGMP situation.  She

24   actually recalled the email but felt that, oh, this is for

25   other people to follow up on that are more -- that can figure
```

1  out if this poses a risk, so I didn't do anything because

2  nobody said do anything about it, when literally the email from

3  this Ph.D. expert that works for the company said this is a big

4  cGMP risk for us.  So she was -- my recollection is she is the

5  only witness who actually admitted to remembering the email.

6  But, of course, it wasn't in her custodial file, she wasn't

7  listed as a duplicate custodian, but Your Honor just saw the

8  Power Point, there were like 11 or 12 recipients, I believe,

9  ten to 12 recipients.  So this isn't just an offhand document.

10  This is the document that goes to the heart of the case.

11       And, again, counsel keeps doubling down and now saying

12  why should we be worried that everybody deleted this email.

13  Why should we be worried that the author of it wasn't given the

14  litigation hold letter?  Why should we -- here's the question

15  for counsel which I would be interested, because I was asked

16  some questions, and I'm doing this rhetorically, because I

17  don't think it's appropriate for me to ask directly to counsel,

18  but what did Dr. Lin mean when he said there's NDMA in

19  valsartan when quenched with sodium nitrate?  What is the

20  explanation from counsel for why Dr. Lin, almost a year before

21  the disclosure to the rest of the world, knew that there was

22  NDMA and knew exactly how it was being caused?  It's a big

23  question.  I'm curious the answer.  Because there is no answer

24  other than he knew it because they figured it out and they knew

25  it.  And it was his job to know that.  That was his specific

1    job is to understand chemical reactions and to understand

2    impurities.  He was the head of that department that looked

3    into impurities.  So he was doing what he was supposed to do.

4         JUDGE VANASKIE:  All right.  Ms. Priselac?

5         MS. PRISELAC:  May I respond because -- I wish we had

6    a realtime because the number of things that just aren't true

7    and things I didn't say are myriad.  Okay.

8         So, first of all, Your Honor is an expert in electronic

9    discovery.  Mr. Slater deposed many of these people and asked

10   them why it wasn't in their file.  And so I'm not testifying or

11   representing anything new here.  They all said if it wasn't in

12   my file, it must mean I deleted it.  They didn't say they had a

13   recollection of it.  That was the testimony.

14        Secondly, this idea -- and, you know, I would really

15   like -- I would really love it, Adam, if you could just

16   maintain a little composure when I'm trying to speak.

17        But the reality is these people have all been deposed

18   and they basically said, if it's not there, I don't know why,

19   maybe I deleted it.  What I'm telling you, Your Honor, is that

20   we went back to check their custodial files, I never have

21   represented, ever, and none of my colleagues have, that this

22   was a duplicate custodian issue.  We have never said that.

23   We've never said, oh, it should have been in a duplicate

24   custodian.  I've never said that; none of my colleagues have

25   ever said that.  What we did say is that we would go and look

1    for all this additional information that they requested.

2        And when he's talking about Jucai Ge remembering this

3    email and not doing anything about it, the part he's talking

4    about that talks about cGMP is related to irbesartan cGMPs for

5    this improvement project, and it's related to a process that

6    wasn't even in place yet.  So the fact that Ms. Ge didn't think

7    it was important for her to keep, it's because she's in charge

8    of cGMPs of -- of cGMPs of processes that are actually in

9    place, not potential Irbesartan Improvement Projects.  So this

10   idea that somehow Ms. Ge should have been worried about the

11   cGMPs of a process that's not even being used at Huahai doesn't

12   make any sense.  And to say that Dr. Lin is in charge of all

13   impurities for all of Huahai, I don't know where that kind

14   of -- that kind of language comes from and I don't even know

15   what that means, to be frank, in terms of the scientific basis

16   for that.

17       When we're talking about what documents do exist, the

18   documents that do exist are myriad related to this project,

19   including contemporaneous handwritten lab experiments, and

20   they've all been given to Mr. Slater.  So the idea that there

21   was some kind of effort to spoliate, when they've been given

22   all of that information, just makes absolutely no sense to me.

23   And that includes handwritten data from 2017 that is

24   contemporaneous with the actual project.  And you haven't heard

25   Mr. Slater say he doesn't have that, because he does.

```
 1          JUDGE VANASKIE:  All right.  We're going to have to
 2   move on.
 3          My concern right now is I'm not sure what production of
 4   the litigation hold letters would accomplish.  I'm very
 5   concerned about the circumstances surrounding this particular
 6   email, and I know, Ms. Priselac, that you have come up with
 7   explanations for why it exists only, apparently, in one
 8   instance and not in somebody's custodial file, but it is
 9   troubling.  But I'm going to come back to you, Mr. Slater, and
10   say, what purpose is served by production of the litigation
11   hold letters?  I know I've asked you that question before but
12   I'm trying to get a better understanding.
13          MR. SLATER:  We, again, we don't obviously know what
14   the letter said but I think it'd be helpful for us, for
15   example, to see the description of what the issues are -- the
16   description of the issues, to see what people were told to do,
17   and what to preserve and what not to preserve, so we could at
18   least understand what the company's understanding was of what
19   the reason was to preserve these documents and what people were
20   told to do with them.
21          Again, I don't know what the language in the litigation
22   hold is so I don't know if there's something that would be
23   incredibly helpful, but it would certainly let us understand
24   what the company did at each point in time to fulfill its legal
25   obligation to preserve relevant documents and information,
```

1  because now we're being told people were deleting emails.  We

2  don't know when they deleted them.  We're being told these

3  documents don't exist but don't worry about it any -- they

4  don't exist anymore but don't worry.  We're being told we

5  should be happy that a document no longer exists in its

6  electronic form because somebody copied it from one computer

7  onto a laptop.  None of these things give us any comfort.

8         So I don't have a great answer for Your Honor, and I'm

9  happy to admit that because it is what it is, but I think that

10  if you look at the litigation hold letters, we don't know

11  what's in there but, normally, they explain what should be

12  preserved, how it should be preserved, and why it should be

13  preserved.  So that could shed a lot of light in terms of what

14  the company was telling its employees.  And it may be that

15  you'll read those litigation hold letters and it will be clear

16  that what people were told to do was completely inadequate and

17  not in compliance with the legal obligation to preserve

18  documents in anticipation of litigation.

19         And remember, as counsel said, we don't know what that

20  trigger date is yet because that's a fact-sensitive inquiry

21  that's not being made.

22         JUDGE VANASKIE:  Right.

23         MR. SLATER:  But we have a strong argument, I think,

24  that when they knew there was NDMA in these pills and they knew

25  why it was being created that that would trigger their

1  obligation.  And, again, we believe that a tremendous number of

2  documents and information has just not been provided to us

3  because of how damaging it would be.

4      JUDGE VANASKIE:  Ms. Priselac, maybe you can

5  illuminate the question of the storage of emails at ZHP.  What

6  I'm having trouble understanding is why this particular -- and

7  I know we're focused on one email right now but it is a

8  significant one -- why it would not have existed in electronic

9  format.

10     MS. PRISELAC:  Sure, Your Honor.

11     And I, unfortunately, was not involved in the original

12  discussions that happened when Jun Du and my colleagues were

13  negotiating the ESI, but I have talked to them and been through

14  all of their notes, and what I understood is it was extensively

15  discussed where are ZHP systems and there is not a centralized

16  ZHP server.  ZHP's email server is run by a third party.  It

17  doesn't have massive archives and that type of thing.

18     Now, so, basically, Your Honor, if an email was saved,

19  it gets saved to like the personal laptop or the personal

20  desktop, and so all -- a lot of these documents that are so old

21  in terms of email were things that people downloaded from the

22  server and kept on their laptops.  And so, like, for example,

23  ZHP can't go back to some archive from 2015 of all the emails.

24  That's not how their system is set up.  So they basically are

25  using a third party and downloading their emails to their

1    system.

2         Now, in terms of -- you know, I want to make something

3    clear, though, because Mr. Slater just misstated a lot of

4    information, including the fact that this wasn't an electronic

5    document.  This was an electronic document found on Min Li's

6    computer.  So the idea that this was not an electronic

7    document, it was found through electronic purposes, it's an

8    electronic document on his laptop.  And the fact that it was

9    produced and found, you know, and given to the plaintiffs shows

10   how transparent and how thorough ZHP's collection and

11   production is, including by looking through the old files of an

12   old laptop that was damaged, and it still got to the plaintiff.

13   So this idea that this email shows spoliation, it actual shows

14   the exact opposite.

15        And I will also say, Your Honor, this cover email about

16   a project that has detailed information in hard copy and

17   electronic copy that has been given to the plaintiffs, and the

18   fact that this one cover email, you know, isn't part -- is only

19   part with Dr. Li's production, the reality is that doesn't show

20   spoliation either because the actual project documents

21   themselves have all been produced to the plaintiffs and they do

22   exist.  So the fact that they, quote, unquote, only got this

23   cover email from Dr. Li, it's wholly unremarkable given that in

24   terms of their actual work, they're all working through lab

25   notebooks and reports and that type of system, all of which the

1    plaintiffs now have.

2         JUDGE VANASKIE:  Is it the case, Ms. Priselac, that

3    the documents would be reviewed by lawyers in China before you

4    all get to see them, Blank Rome gets to see them -- or not

5    Blank Rome, Duane Morris?

6         MS. PRISELAC:  Sure.  So, Your Honor, I'll try to walk

7    this line here of attorney-client and work-product privilege,

8    but I think it's no secret at this point that you know because

9    you're now an expert in the Chinese state secrets law, that

10   before anything comes to our -- to the United States, it has to

11   be cleared for state secrets by a Chinese attorney.  So, yes,

12   in that sense, everything has to be looked at by a Chinese

13   attorney first.

14        JUDGE VANASKIE:  Thanks.  All right.

15        MR. SLATER:  Your Honor, I don't want to delay

16   anything.  This will take ten seconds.

17        I just want to note for the record, it was questioned as

18   to how I or why I thought Dr. Lin was responsible for

19   impurities?  In a document produced by the company regarding

20   CEMAT, that's all caps, C-E-M-A-T, it says -- this is, I

21   believe, a Power Point presentation about that CEMAT unit --

22   says, "Jinsheng Lin specializes in genotoxic impurities for

23   CEMAT, the special teams of high-level scientists charged with

24   maintaining quality at ZHP."  So that's where I came up with

25   it, their own document.  This is exactly what he's supposed to

1    do is to identify impurities like NDMA.  That's his job.

2            MS. PRISELAC:  Your Honor, just to clarify, though,

3    and I think we put this in our brief, that level of -- that

4    kind of processing and coming up with knew APIs and optimizing

5    processes for APIs, that work is done at the beginning of the

6    process before the DMF is submitted to the FDA.  So in this

7    case, Dr. Lin was not involved in that process nor was CEMAT.

8    It didn't exist when all of that happened.  CEMAT existed 2014

9    and after when Dr. Li came to ZHP.  All of this information,

10   all of the process and the risk assessments and coming up with

11   the zinc chloride process, that happened before 2011 and it was

12   finalized and submitted to the FDA in -- double-checking right

13   here -- December of -- I don't want to give you the wrong date

14   -- December of 2013.  So that's before CEMAT even existed.

15           This idea that Dr. Lin should have been, you know, put

16   on a list because he would have been in charge of valsartan API

17   impurities is just not true.  And also, the head of CEMAT, Dr.

18   Min Li, who is actually the head of CEMAT, was deposed and his

19   files were produced, which is why Mr. Slater has the email

20   we're talking about today.

21           JUDGE VANASKIE:  All right.  Thank you.

22           I don't want to make a finding of spoliation, I don't

23   think there's a sufficient evidentiary foundation for that at

24   this time.  On the other hand, there seems to be enough to

25   proceed further with this inquiry.  And so I would like to get

1    the litigation hold letters for *in camera* review.  I'm not

2    making a finding that plaintiffs have made even a preliminary

3    showing of spoliation.  The *Colorel* case, which I use in my law

4    school class, is one I'm familiar with, and I don't think that

5    you've gotten to that level.  But that involved producing the

6    litigation hold letters to the other side, not for *in camera*

7    review.  And I think that there's enough uncertainty here to

8    say I want to see what the litigation hold letter said in terms

9    of providing -- and, you know, I'm going to ask for an

10   explanation as to the individuals that were identified in the

11   plaintiffs' brief that did not receive litigation hold notices.

12   There were five or six individuals, as I recall.  I thought it

13   would be revealed to me by the chart, which is Exhibit 29, but

14   it's not revealed to me by looking at the chart.  But I would

15   like to find out why were they not included in the universe of

16   individuals that received the litigation hold letters.

17        Now, we've been going for over an hour, and I know we

18   haven't made a whole lot of progress yet, we've made some.  I'm

19   going to direct that the litigation hold letters be produced

20   for *in camera* review.  And I'll ask you, Ms. Priselac, how soon

21   can that be done?

22        MS. PRISELAC:  Just because it takes our vendor a

23   little time -- well, actually, Your Honor, since it's just

24   going to you, I guess they don't have to be Bates labeled.  So

25   I can get them to you -- can I get them to you Wednesday next

1    week?

2            JUDGE VANASKIE:  Sure, that's really prompt.

3            MS. PRISELAC:  We take -- I want to assure you, Your

4    Honor, they do exist and we took our duty to write them

5    seriously, so we do have access to them.

6            JUDGE VANASKIE:  Okay, very well.

7        Now, I don't know if you heard but my dog says he needs

8    a break.  So we're going to take a ten-minute recess at this

9    time.  Thank you.

10           MS. PRISELAC:  Thank you.

11           MR. SLATER:  Thank you, Your Honor.

12           (Brief recess taken at 4:10 p.m.)

13           JUDGE VANASKIE:  All right.  Let's go to the next big

14   issue for me, and that is the Maggie Kong files, that is the

15   production issue there.

16       I understand that when you did a search for hits, and

17   correct me if I'm wrong on this, using the search terms, you

18   came up with 37,579 documents.  Is that the total universe in

19   her custodial file?

20           MS. PRISELAC:  That was with the search term hits,

21   Your Honor; but I will tell you that the responsiveness rate

22   from the Court-ordered search term hits is incredibly low.

23           JUDGE VANASKIE:  Okay.  That's encouraging.

24           MS. PRISELAC:  So that's not unsurprising, given the

25   breadth of the search terms.

1          JUDGE VANASKIE:  Also, of that 37,579 documents,

2     16,339 hit on privilege-related terms, as I understand it.

3          MS. PRISELAC:  That's right.

4          JUDGE VANASKIE:  So 43 percent are likely to be

5     privileged.

6          MS. PRISELAC:  Correct.

7          JUDGE VANASKIE:  And then from what you just said, as

8     I understand it, then you did a responsiveness review?

9          MS. PRISELAC:  I will clarify that, Your Honor.

10          I just meant the overall responsiveness rate for the

11     entire litigation using those search terms is low.  We have not

12     done -- I mean, our point of doing this collection then

13     applying the search terms was right to avoid the cost of having

14     to do a review because it is quite expensive, especially given

15     the state secret issues.

16          JUDGE VANASKIE:  But you're asking that no further

17     production from Maggie Kong's file be ordered on

18     proportionality grounds?

19          MS. PRISELAC:  Correct, Your Honor.

20          In particular, Your Honor, I don't think that the

21     plaintiffs have articulated what fact or what issue, and they

22     do point to meeting -- meeting minutes or meeting Outlook

23     invites that they want, but the testimony has shown, and we've

24     cited it in our briefs, so I won't go through it, you know,

25     it's not the standard practice at ZHP to use Outlook

1  invitations and the type, and they do have already quite a few

2  -- several meeting minutes from various departments.  And what

3  I've not heard yet from the plaintiffs is what they hope to get

4  from Ms. Kong's files that they don't already have that is

5  actually relevant to the litigation.

6          JUDGE VANASKIE:  All right.  Well, let's hear from Mr.

7  Slater on that point then.

8          MR. SLATER:  Thank you, Your Honor.

9          What do we hope to get from Maggie Kong's files is any

10 documents that are responsive and were hit by the search terms.

11 And we've just been told multiple times, and it's in the

12 briefing, that everything goes through Maggie Kong.  The

13 explanation for Baohua Chen's facially, very troubling, very

14 low document count is, well, everything goes through Maggie

15 Kong.

16         Now, she did start in late 2017 so we'll have to put a

17 pin in what we're going to do about the prior period of time

18 and who was getting the emails that he should have been -- who

19 was getting the emails instead of Baohua Chen before that.  But

20 she was his conduit to the world.  Everything went through her,

21 she was interacting with other executives.

22         For example, Min Li said, all these meetings that took

23 place, when this came out through Novartis, in early June 2018

24 and Baohua Chen was conducting meetings, we were told there's

25 no emails about it, there's no paper calendars about it, just

1    Maggie Kong would come down the hall and tell everybody, well,

2    this is -- you know, we're having a meeting now.  And that's

3    pretty -- I think a pretty accurate paraphrase of what the

4    testimony was, as strange as it sounds.

5         So she's obviously somebody who's working very closely

6    with very relevant witnesses, she's the conduit for Baohua

7    Chen, we should get her production.  We should see what's

8    there.  And I don't think that anything that we've heard

9    creates a serious proportionality issue which would outweigh

10   the need for these documents, especially as we're meandering

11   towards the deposition of Baohua Chen, being told there's

12   several hundred documents for him, but because everything goes

13   through Maggie Kong but we're not going to see the documents

14   she has, it would be, I think, very unfair.  And if counsel --

15   if counsel wants to say they have to do a state secret review,

16   maybe they'll luck out like they did with Baohua Chen, which

17   I'm putting to the side for a second, where after we were told

18   for so long that he's going to have this big state secret

19   problem, and then it turned out there were zero documents that

20   were identified as state secret documents, we'll see, maybe

21   we'll -- maybe with Maggie Kong maybe there'll be none also, we

22   don't know, but it is what it is.  There is certainly a

23   substantial number of documents that are potentially very

24   important and she was the conduit for Baohua Chen when all this

25   was breaking to the world.

 1            JUDGE VANASKIE:  All right.  Ms. Priselac?

 2            MS. PRISELAC:  Sure, Your Honor.  I'll take those

 3   issues in turn.

 4       First, because it really had nothing to do with Maggie

 5   Kong but I think it's important to correct the record.  When we

 6   talked about Baohua Chen having a tremendous amount of

 7   documents subject to the state secret laws, the issue is not

 8   that all of those documents or any would be responsive to

 9   plaintiffs' document request; the only point we were making is

10   that as a government official, he would have in his possession

11   quite a few state secret materials which requires a level of

12   review and a specialized reviewer who knows that law in China

13   to go through them.  That was the burden we were talking about

14   with Baohua Chen.  So this idea that the fact that he doesn't

15   have any additional responsive documents that were subject to

16   the state secret law is neither here nor there.

17       The second thing is, Your Honor, Mr. Slater just

18   explained why the evidence to date shows why Maggie Kong should

19   not be -- her file should not be ordered reviewed and produced.

20   All of the witnesses have said they don't use the kind of

21   electronic invite.  She comes and gathers them up.  Nobody has

22   stated otherwise.  So the evidence is telling you that there

23   aren't any kind of meeting coordination emails.  The testimony

24   says that and Mr. Slater admits it.  So if that's what they're

25   looking for coordinating these meetings, it doesn't exist.

1      And, finally, Your Honor, I said that it wasn't -- I
2  said that it wasn't Mr. Chen's practice to use email.  I didn't
3  say that everything for him goes through Ms. Kong.  That's
4  never been represented.  She's certainly his chief of staff and
5  certainly is organizing his meetings.  I don't think I've ever
6  stated, and if I did, I did not intend to, that every email for
7  him goes through her.  What I said is it's not his practice to
8  use email.

9           JUDGE VANASKIE:  Okay.

10          MS. PRISELAC:  And I will just also make it clear
11  here.  You know, Your Honor, 2017 is when she started, but the
12  reality is that this litigation started not long after she
13  arrived.  So it's really not shocking that a lot of these
14  search terms hit on her file.  But what are the real issues
15  here, Your Honor, especially from 2017 on?

16          From 2017 and later, the real issues are, you know, when
17  Novartis, you know, found NDMA in valsartan API, what the
18  company did, talking to the FDA.  You've heard not one thing
19  from Mr. Slater about documents that are deficient from that
20  time period, not one thing, because they're not.  They're
21  extraordinarily robust already.

22          JUDGE VANASKIE:  All right.  Quick rebuttal, a brief
23  rebuttal, Mr. Slater.

24          MR. SLATER:  Sure.  Sure.  This is the person who was
25  the chief of staff for the chairman of the company, was

1  interacting with high-level executives across the company, all

2  of whom that were involved in this process were interacting

3  with her, we would expect her emails and her documents and

4  maybe her handwritten notes and her handwritten calendars will

5  refer to what Mr. Chen said or Mr. Chen did or who else visited

6  with him, when they took place, that's the calendar part.  But

7  there's -- we expect substantive information that will be in

8  her communications and her documents because of the role she

9  played and because if Mr. Chen's practice was not to use email,

10  she was doing it on his behalf, and that is in the papers.

11        JUDGE VANASKIE:  What I haven't heard yet is that

12  there has been any review of Ms. Kong's files, of Ms. Kong's

13  emails, of Ms. Kong's handwritten notes, et cetera.  Has

14  anything been done in that regard?

15        MS. PRISELAC:  No, Your Honor, because when we made

16  this argument initially, you know, what we were arguing, it was

17  disproportionate and part of that is because of the costs that

18  we would incur by doing that.  But, you know, the issue here is

19  in terms of the proportionality issue, we've gone round and

20  round with the plaintiffs.  I mean, we've already expended a

21  huge amount of resources.  To go back now and do this, when,

22  you know, Mr. Slater still has yet to articulate a reason

23  why -- notice he has not talked about any claim, any -- you

24  know, they have millions of pages of documents.  By the way,

25  Maggie Kong is on a lot of them.  So, you know, if there was

1    something specific, based on what they know Maggie Kong -- what

2    is in the production about Maggie Kong, that they wanted to

3    follow up on, you know, maybe they could meet their burden.

4    But as we sit here today, they haven't.  And they should if --

5    I mean, there are plenty of documents they already have that

6    Maggie Kong is on.  I haven't heard one thing specific about

7    why they need us to review even more of them.

8              JUDGE VANASKIE:  Well, what could be done in terms of

9    an electronic review of Maggie Kong's files to make it more

10   efficient and expedite the review?

11             MS. PRISELAC:  Well, Your Honor, I will be very frank

12   with you that the plaintiffs have put on us a very onerous set

13   of search terms but that we have followed the ESI protocol to

14   the T, so what they demand is incredibly time intensive and I

15   cannot think of a way that would actually expedite it at all.

16             JUDGE VANASKIE:  Is there a different set of search

17   terms that could be run against the Maggie Kong custodial file

18   that could be more precise in what plaintiffs are looking for

19   and wouldn't require a review of thousands of documents?

20             MR. SLATER:  Your Honor, the application of the search

21   terms, I -- when counsel suggests that the plaintiffs are

22   requiring the defendants to adhere, again, by way of history,

23   the search terms were agreed to by the parties.

24             JUDGE VANASKIE:  I understand.

25             MR. SLATER:  There's nothing onerous about applying

1    the search -- counsel seems -- look, if I'm forgetting that

2    they disputed a few of the search terms, and then Judge

3    Schneider ruled on them, there's an order that encompasses the

4    search terms, I believe, and I believe they were agreed to.

5          Anyway, the point being, the search terms are applied,

6    as Your Honor knows, electronically. It doesn't take a long

7    time to apply 400 search terms, a hundred search terms or five;

8    either way, it's a computer function. So the time-consuming

9    part is when counsel says they have to review for privilege,

10   and that's their choice. They can also have a -- they have

11   clawback rights, so they could also produce documents and have

12   the right to clawback if they want to do this quickly and save

13   time or money, but that should not be placed on us in terms of

14   being deprived of her custodial documents that are hit by the

15   search terms and are responsive. We should really have access

16   to this. There is nothing onerous about it, there is nothing

17   difficult about it, and we're going to be deposing the person

18   that she worked hand-in-hand with who we've been told doesn't

19   use email very much, so she's the person the emails were going

20   through. Again, we think it would be very prejudicial to not

21   see her custodial file when we're going to be deposing Mr. Chen

22   at some point.

23          JUDGE VANASKIE: All right. Ms. Priselac?

24          MS. PRISELAC: Your Honor, I'm sorry, but I'm having a

25   really hard time believing Mr. Slater can possibly forget the

1  months and months of motion practice and the fights that have

2  occurred about these search terms.  It's actually shocking.  It

3  went through rounds and rounds of briefing.  I mean, we have

4  shown time and again to Judge Schneider incredibly low

5  responsiveness rate that these search terms have and they have

6  been an issue from day one.  So the idea that they were agreed

7  upon on any way is just untrue.

8       Secondly, the responsiveness rate, and, Your Honor, if

9  you would like additional briefing on this, I'd be happy to do

10  it, shows what an incredible burden and how disproportionate

11  the request is here.  I mean, it's going to require us to have

12  a review of 37,000 documents if they don't narrow those search

13  terms.  37,000 documents, privileged or not privileged, is a

14  huge amount of documents when we've already spent millions of

15  dollars doing this.  And I've yet to hear from Mr. Slater why

16  he needs these.  He already has a lot of documents from Maggie

17  Kong.  If he thinks something's missing in there, tell me what

18  it is.

19       JUDGE VANASKIE:  Well, it's a little bit hard to

20  identify what you think is missing.

21       MS. PRISELAC:  Well --

22       JUDGE VANASKIE:  I guess he's given us some

23  indication.  You know, you don't see documentation concerning

24  scheduling meetings and things of that nature.  We do know from

25  the evidence that has been presented thus far that there were

 1  meetings, but it would be helpful, I would imagine, to know,

 2  were they all the meetings, when were the meetings, where were

 3  the meetings, who was invited to the meetings, things that you

 4  would expect would occur electronically, but apparently they

 5  don't have that.  Now, correct me, I can see you're ready to

 6  answer.

 7         MS. PRISELAC:  Well, yes, Your Honor, because I do

 8  think Mr. Slater admitted this and we've cited all the

 9  testimony in our briefs where, you know, let's be really clear,

10  this wasn't an issue that these witnesses know about, right,

11  Maggie Kong's custodial file.  They're just asking a long

12  litany of things about how things work at ZHP and every single

13  one of them said, you know, this is not a by email set up a

14  meeting thing generally.  It's just, you know, everybody, all

15  hands on deck, especially a lot of them are in close proximity,

16  that's what the testimony shows, that's what we've cited in our

17  brief.  So the reality is all of the evidence to date shows

18  that that doesn't occur at ZHP.

19         Now, if -- you know, if it did, this wouldn't be as big

20  of an issue, and, quite frankly, he would probably already have

21  all of this information because if we look at the types of

22  meetings we're talking about, and what the defendants'

23  corporate witnesses testified to, those people's custodial

24  files have already been collected and produced.

25         JUDGE VANASKIE:  Help me out on this once again.  The

1    37,000 documents we're talking about, that's her entire

2    custodial file?

3         MS. PRISELAC:  So the 37,000 documents that are search

4    term hits, Your Honor, because the way we do search term hits

5    --

6         JUDGE VANASKIE:  Search term hits.

7         MS. PRISELAC:  Let me be clear, too, Your Honor, I

8    don't want to give the impression that 37,000 documents are a

9    hit for one of these.  It's inclusive of families, right,

10   because that's how you have to do a review.

11        JUDGE VANASKIE:  Okay.

12        MS. PRISELAC:  So even though they didn't hit on all

13   37,000, we would have to review all 37,000.

14        MR. SLATER:  Your Honor, it's interesting, counsel

15   hasn't reviewed the documents.  And I think the representation

16   is, I'm taking that as, no lawyer in the U.S. or China or

17   anywhere else has actually looked at her custodial file at all.

18   Okay?  I find that hard to imagine but okay.  Yet counsel's

19   making representations about what may or may not be in there

20   and guessing at it when the documents are in her possession and

21   control.  So I think that that's -- it's very concerning for

22   counsel to make these arguments having not looked at the

23   documents.

24        Thirty-seven thousand documents with search term hits,

25   let's go beyond this because, again, counsel wants to focus --

1    and I think that when these meetings took place and who

2    attended are very important, but what about what was being

3    said?  For example, emails, Chairman Chen wants you to do this,

4    Chairman Chen says to do this, attachments, documents being

5    sent around, her being copied on other documents.  We need to

6    see this.  She is literally his right hand and his mouthpiece

7    to the company and is interacting with people within the

8    company, and the fact that there's 37,000 documents with search

9    term hits, that just tells us how important it is for us to see

10   those documents because it's a significant amount.

11        MS. PRISELAC:  Your Honor, may I clarify a technical

12   issue?

13        JUDGE VANASKIE:  Sure.

14        MS. PRISELAC:  Okay.  So I think you probably remember

15   way back when we were talking about getting these lap -- these

16   air-gapped laptops because there's state secret information on

17   them.

18        JUDGE VANASKIE:  Yes.

19        MS. PRISELAC:  So one thing we can do with these

20   laptops is use kind of the data from the database to try to

21   de-duplicate, try to thread, try to cut that number down; but

22   because these documents are -- Mr. Chen and Ms. Kong's files,

23   because of the state secret issues and his position, are kind

24   of, at this point, unconnected to the Internet and unconnected

25   to the larger database.  We can't do a complete, like,

1    custodial -- how do I say it?  We can't do like a -- do a

2    complete de-duplication at this point, right, which is why all

3    37,000 have to be reviewed.  So it's very possible that once

4    they're reviewed and exported and cleared to the U.S. there

5    would be some duplicates.  So I don't want to give the

6    misimpression that some of these documents might already be in

7    the custodial file of others because they might.  Because the

8    reality is, Your Honor, there are 83 custodian -- oh, actually,

9    I think we're up to 92 ZHP custodians.  And the people Mr.

10   Slater is talking about rounding up for meetings are all

11   already custodians.  So I don't want to give the misimpression

12   that these might not be in other people's, they might.  But

13   because of the way our review has to happen, it would require

14   us to look at all 37,000 before we could export it to a

15   database to take out the duplicates and threading.

16          JUDGE VANASKIE:  Anything else on this issue, Mr.

17   Slater?

18          MR. SLATER:  Counsel said we might have some of the

19   documents.  We need the documents, Your Honor.  I don't -- I

20   can't imagine how it would be fair for us to have to depose

21   Baohua Chen without having her custodial file, in light of what

22   her role was and the fact that she's the conduit.

23          And I'll say one last thing.  Counsel just said that the

24   plaintiffs know everybody that attended the meetings.  No, we

25   don't.  We know who we deposed and if they said they were at a

1   meeting or not.  It would be very interesting if the documents

2   from Maggie Kong show that other people in the company actually

3   had an important role and we were never told about them; or

4   maybe there's documents in her custodial file that should have

5   been produced by other custodians and we didn't get them.  We

6   already have a history of that.

7        So I really don't have much more to say other than I

8   think we've established the strong relevance of this witness

9   and her importance to preparing for the Chen deposition.

10       JUDGE VANASKIE:  All I have right now is a number

11  count.  I can infer from that the burden of review, but I also

12  know that Ms. Kong is in a very central position here in terms

13  of being the chief of staff, if you will, of Mr. Chen.  And it

14  wouldn't be surprising that she would have documents of

15  interest.

16       I think you're going to have to review those documents.

17  I think it would be an error on my part to say, well, you were

18  told it's 37,000 documents, it will be a substantial

19  undertaking, but given the fact that Mr. Chen didn't use email

20  and you'd expect then that he would rely upon his chief of

21  staff as his go-between in communications suggests to me that

22  it should be reviewed.  I would want a better evidentiary

23  foundation to say that the review need not be undertaken.  All

24  I have right now is, as I said, a hit count.

25       I would encourage counsel to see, because of the

1    different role that Ms. Kong plays, that perhaps not all search

2    terms need to be run or that there is a narrowing search terms

3    -- I shouldn't say narrowing search terms -- a way to narrow or

4    limit the search in a way that still captures the important

5    documents that doesn't require review of 37,000 documents, but

6    absent that, I think you're going to have to review them.

7             And so I will order that, that that review be

8    undertaken.

9             MS. PRISELAC:  Your Honor, this is probably a good

10   time to -- and we have to -- I want to be as transparent as

11   possible because we did brief this for Judge Kugler earlier

12   this week.  There is a new law in China called the Data

13   Security Law whereby -- you've probably seen about it in the

14   *Wall Street Journal* and a lot of places, where the Chinese

15   government's latest position is that essentially that documents

16   cannot be left out of the country without -- cannot be allowed

17   out of the country without relevant government approval if it's

18   going -- if the purpose to do so is to be used in a foreign

19   litigation.  Obviously that's created a lot of issues for not

20   just our clients but everyone operating in China.  You know,

21   unfortunately, we seemed to be put as a little bit of a pawn in

22   what is going on in kind of the broader landscape of U.S./China

23   relations.

24             I have been told by our vendor -- because, obviously,

25   our vendor is FTI, very well respected in the U.S. and in

1    China, that, essentially, they don't even want to take the

2    liability at this point of continuing producing documents as a

3    vendor.

4         We're hoping that this is, obviously, not really tenable

5    for any court, right, in the United States that has a Chinese

6    litigant in the long-term.  There were a lot of debates about

7    this law and, you know, there was a lot of hope it would not

8    actually go into force.  My understanding from our Chinese

9    counsel is it did go into force September 1, and everyone's

10   been scrambling since then, including, you know, lawyers and

11   vendors, a lot of eDiscovery vendors.

12        Right now our vendor has put a stop on all export

13   because of the law.  They're working very hard, our clients and

14   I know our vendor's counsel, to try to figure out what the --

15   what branch of the Chinese government needs to give you

16   permission to resume the export of documents.  But I just want

17   to be very transparent with you that right now we're in a

18   really odd position that, quite frankly, in my career, Your

19   Honor, I've never faced, to be kind of caught up in something

20   much more geopolitical in nature, let's put it.

21             JUDGE VANASKIE:  All right.

22             MR. SLATER:  Your Honor, my view on that is, I think

23   that we ask for the Court to enter whatever orders Your Honor

24   is comfortable entering and then, you know, ZHP can take

25   whatever position they're going to take based on what they

 1    think the law says, and then I think we go from there.

 2         I don't -- I'm not a politician but if a country passes

 3    a law that basically prevents every company within its borders

 4    to export out the documents that would be needed to support

 5    litigation in the United States, I would think it's going to

 6    bleed into a bunch of other issues; but the consequences for

 7    them as a litigation matter would be a subsequent issue to

 8    address later.

 9         JUDGE VANASKIE:  Yes, I think it's not an issue for me

10    to decide.  At this point I will enter, after I get the

11    transcript, an order that directs the production of Maggie

12    Kong's file, subject to withholding for privilege.  I

13    understand this might be one of those issues that has to be

14    adjudicated.

15         I am disappointed -- I'm glad you were transparent, Ms.

16    Priselac, but maybe we should have started out with this issue

17    instead of having it coming up after I've made a decision.  Of

18    course, if I made the other decision, it would be moot.

19         MS. PRISELAC:  I didn't want to beat my own argument,

20    Your Honor, but I was fully intending on -- well, we've already

21    raised it in a brief with Judge Kugler and I was actually

22    hoping by today maybe we would have more -- or even while I'm

23    sitting here, a little more clarity about what our vendor

24    intends to do but I just don't.

25         And I just want to make it clear that this is not --

1    this is not what my client wants, I don't think it's what any

2    vendor wants, and I think that there are a lot of people, not

3    just my client, trying to figure out how they're going to

4    respond to this.

5            JUDGE VANASKIE:  All right.  Very well.  We'll issue

6    an order.  We understand that it may be something that is

7    superseded by the change in the law.  I'm trying to get to my

8    next point here.  I understand that it may be superseded by the

9    change in the law in China, but we'll go ahead and issue our

10   order and then you certainly will have the right to raise

11   whatever issues you have in terms of there being some

12   supervening, superseded change that precludes production.

13           Now, the next issue I was going to take up had to deal

14   with, maybe we've already covered it, the TC201729 issue that

15   is at Page 9 of the plaintiffs' brief, the heading on that

16   argument is "No new documents with the Search Term TC201729

17   have been produced," and the claim that the production there is

18   deficient.

19           Mr. Slater, did you want to add anything to what you've

20   already said in your brief?

21            MR. SLATER:  Yes.  I just want to make it very brief

22   so that our argument is clear.

23           All that was produced was a single draft of this report,

24   a hard copy that was produced as a .pdf when the document was

25   clearly created on a computer.  So that's number one.  So,

1    again, we have this issue.  Because we want the metadata, we

2    want the notes, we want to see who made comments, we want to

3    see if there were edits made, we want to see all drafts, not

4    just one, because obviously there could be different versions

5    that different custodians or different people within the

6    company edited.  So that's what we want.  We want any and all

7    drafts of that report in native, with the metadata intact,

8    because it was supposed to be produced per the ESI protocol,

9    and then we'll go from there.  That's the specific information

10   that we need.  And Your Honor's obviously already ordered

11   production of the report, so we're just asking that we get the

12   report in an ESI-compliant form and that we get all versions of

13   the report, whether draft or final.

14            JUDGE VANASKIE:  All right.  Ms. Priselac?

15            MS. PRISELAC:  Sure, Your Honor.

16       I'm just very confused because not in the briefing or

17   anywhere does Mr. Slater say any document is not in

18   ESI-compliant form.  So if he wants to expand on that, I'd like

19   to know so I can counter it.

20            MR. SLATER:  It was a document that was prepared on a

21   computer and we weren't provided it in the form that it was on

22   the computer.  Instead it was printed, turned into a hard copy,

23   then .pdf'd and then produced to us.

24            MS. PRISELAC:  What document are you talking about?

25            MR. SLATER:  The draft report that was produced, the

1  single draft report that was produced that we're talking about

2  here.

3      MS. PRISELAC:  I don't know what you're talking about.

4      MR. SLATER:  The subject -- the subject that we were

5  discussing is the irbesartan draft report, irbesartan report,

6  and that's the TC201729, correct?

7      MS. PRISELAC:  I will say this, Your Honor.

8      MR. SLATER:  I'm not sure what the disconnect is.

9      MS. PRISELAC:  I don't -- everything we've produced

10  has all of the relevant metadata, including like hard -- I will

11  say that all even the hard-copy documents go through a process

12  by which someone has to enter manually, right, where, like,

13  what room they've collected from, what person they've collected

14  from.  So all the documents for this report, all of the search

15  term hits, all of the metadata have been produced.  If there's

16  some specific document number that he thinks is missing

17  metadata, again, Your Honor, this is the kind of thing I would

18  hope they would just bring to our attention in a

19  meet-and-confer situation rather than in a brief.  We've

20  produced everything is all -- there's nothing more I could say.

21      JUDGE VANASKIE:  All right.  And that's a perfectly

22  acceptable response.

23      Mr. Slater, I think the onus is on you to identify, by

24  Bates number or some other way, the document to which you're

25  referring so that it can be verified that it's produced without

1    metadata and that drafts haven't been produced and go from

2    there.  But I -- go ahead, Mr. Slater.

3           MR. SLATER:  I'm trying to understand what the

4    disconnect is here.  Your Honor ordered the irbesartan -- I'm

5    going to call it the irbesartan report to be produced.  What we

6    got was a single draft report that was printed and then .pdf'd

7    and then produced to us.  That's not what the ESI protocol says

8    they're supposed to do.  They're supposed to produce it in the

9    format that it existed on the computer.  So we want it produced

10   in the format it was supposed to be; and if there are other

11   drafts as well, we would like them.  If counsel says that's the

12   only draft, there's not much more we can do.  But we just want

13   it produced in the manner which was required, that's all.

14          MS. PRISELAC:  Your Honor, I still don't know which

15   document he's specifically referring to.  And I'm happy to look

16   at the metadata but we did follow Your Honor's order, even not

17   just electronic data, we went back and got hard-copy data in

18   file rooms in China over many days and at great expense, Your

19   Honor.  So I don't know what else we could possibly do.

20          JUDGE VANASKIE:  Mr. Slater, let me ask this question:

21   The document that you're talking about, I take it that document

22   was not made an exhibit to the brief?

23          MR. SLATER:  I don't believe so.  It's in Chinese.

24          JUDGE VANASKIE:  Okay.

25          MR. SLATER:  But it's -- as we laid out on Page 9 of

1    our brief, Your Honor ordered that we be produced the documents

2    related to that code TC201729.  As Your Honor knows, this goes

3    back to the evaluation that we were talking about with Jinsheng

4    Lin before.  And what we got -- because remember the report

5    couldn't be located.  We found it in some spreadsheet cell that

6    referred to it and it took a long time.  Finally, counsel said,

7    oh, we produced the report.  That's the report, it's the one

8    that exists, but it was a draft, it's a single draft and it was

9    not produced in the format it's supposed to be.  It's not

10   supposed to be printed and then .pdf'd and then produced to us.

11   It's supposed to be produced to us in the form it was residing

12   on their computer system as it was.

13        So if they want to say there's no other drafts and

14   there's no other documents related to that, there is not much I

15   can say to that.  But with regard to the document we got, we

16   would like it to be produced compliant with the protocol.

17        MS. PRISELAC:  Again, Your Honor, it's very hard for

18   me to do this in a vacuum.  This is why we have meet and

19   confers.  So I am just representing to Your Honor that I had --

20   when this brief was filed, we went back to make sure every

21   single reference to this number had been produced.  And,

22   actually, I think we found like two additional documents that

23   were maybe duplicates, and we even gave those to the plaintiff.

24   So I just am out of -- there's nothing else I can give.

25        JUDGE VANASKIE:  The only thing I can suggest on this,

1    Mr. Slater, is that you provide some identification of the

2    document in question by, I'm using Bates numbers, I assume it

3    has a Bates number associated with it, so that Ms. Priselac can

4    look it up and then --

5              MR. SLATER:  Let me look.  I may have that, Your

6    Honor.  I'm sorry, Your Honor, I may have it, because I'm

7    looking now at our brief and we actually listed three

8    exhibits --

9              JUDGE VANASKIE:  Yes.

10             MR. SLATER:  -- 14, 15 and 16, and I'm just going to

11   see -- it's Exhibit 14, Your Honor.

12             JUDGE VANASKIE:  All right.

13             MR. SLATER:  I just got an email from somebody much

14   smarter than I.  So the document we're talking about is Exhibit

15   14.

16             MS. PRISELAC:  So, Your Honor, I believe Exhibit 14 is

17   a document -- is like a hard-copy document.  So the reason it

18   was scanned is because that's our protocol for when things are

19   kept in a file room, and I don't know how else you would

20   produce it to the plaintiffs unless you gave them the actual

21   piece of paper.

22             MR. SLATER:  Well, it had to have been produced on a

23   computer.  You're not saying someone handwrote this document.

24   So if someone didn't handwrite it, it was created on a --

25             MS. PRISELAC:  Well, one of the documents is

1    handwritten.

2          MR. SLATER:  Let me finish, please.

3          It had to have been created on a computer, unless the

4    representation -- this is a template.  This is a computer

5    template.  Look at the headers.  This is a computer-generated

6    document.  It should have been produced to us in the form on

7    which it was generated and maintained on the computer, not

8    printed, .pdf'd, and produced to us.  That's what the ESI

9    protocol required.

10          MS. PRISELAC:  Again, Your Honor, maybe I misstated.

11    I thought -- there is a handwritten report in there so I

12    thought that's what he was referring to.  Again, I'm happy to

13    look at whatever number he's talking about and look at the

14    metadata.

15          JUDGE VANASKIE:  Take a look at Exhibit 14.  I'm

16    looking at it now, and it's clear to me it would have been

17    produced on a computer.  And so there should be an ability to

18    produce it with the required metadata, et cetera.

19          MS. PRISELAC:  Yes, Your Honor, I believe that it was

20    but I will certainly double-check.

21          JUDGE VANASKIE:  All right.  Mr. Slater, you're saying

22    it was not?

23          MR. SLATER:  No, it was not.  It was printed, .pdf'd,

24    and then produced to us.

25          JUDGE VANASKIE:  Okay.  All right.  So I'll ask Ms.

1    Priselac to go back and take a look at this and see if you can

2    find out what happened and find out if the document, as it was

3    created, exists in electronic format with metadata, et cetera.

4            MS. PRISELAC:  Sure, Your Honor.

5            JUDGE VANASKIE:  Thank you.

6            MR. SLATER:  Thank you.

7            MS. PRISELAC:  Let me make sure, Exhibit 14, right?

8            MR. SLATER:  Yes.

9            JUDGE VANASKIE:  Exhibit 14.

10           MS. PRISELAC:  Thank you, Your Honor.

11           JUDGE VANASKIE:  All right.  And it is Bates labeled

12   so you'll find it there, too.

13           MS. PRISELAC:  Thank you.

14           JUDGE VANASKIE:  All right.  The next issue I have is

15   at the bottom of Page 9, and the heading is, "ZHP has not

16   produced documents allowing plaintiffs to determine whether it

17   has properly produced all of Min Li's and Hong Gu's documents

18   from broken devices as well as personal ones used for

19   ZHP-related business".

20           Mr. Slater?

21           MR. SLATER:  I'll tell you where we're focused now for

22   this at this point.

23           The ESI protocol required any smartphone that was used

24   at all for company business, even if it was one email, one

25   text, whatever it was, to have been -- to have that information

1   produced to us.  The testimony, as we laid out, we gave you

2   deposition excerpts from multiple witnesses, all said that

3   their phones, their smartphones were not collected and we've

4   established that there were witnesses that said they used their

5   phones, but they were not even collected and reviewed.  So what

6   we're asking is for the ESI protocol to be complied with, for

7   all of the custodians' smartphones to be collected, reviewed,

8   and for us to get the responsive ESI from those smartphones.

9           JUDGE VANASKIE:  All right.  Ms. Priselac?

10          MS. PRISELAC:  So, Your Honor, there's a couple

11   things.  The first thing, and I think we've briefed this

12   extensively, and I'd love to hear Mr. Slater read what he

13   thinks in the ESI protocol requires us to do what he just said

14   because there's absolutely no requirement of that whatsoever.

15          And, Your Honor, the reality is, in November of 2020,

16   when our production was complete, there is quite a few ways

17   that the plaintiffs could have figured out if we had given

18   people personal data through very -- Mr. Parekh is on the

19   phone, I'm sure he's well aware, there's numerous technical

20   ways you could figure out if people have or haven't produced

21   cell phone data.  So they've known this for quite some time

22   because it wasn't a requirement.

23          And the reality is the one time when we even discussed

24   personal emails and things of that sort with the plaintiffs,

25   and Mr. Parekh was on the line, and so was I, they asked for a

1  whole set of personal emails, including Jun Du and others, in

2  response -- after we had made our initial production.  And we

3  voluntarily agreed to produce Mr. Du's personal email.  But

4  what we were very clear about is that, you know, the burden for

5  collecting personal data of an individual who resides in China,

6  who is a Chinese citizen, is very different.  And the first

7  thing they would have to do was try to serve Hague service on

8  that individual because we don't represent them in their

9  personal capacity and the law is very different.  And that's --

10  and in January that whole issue was dropped.

11       So the idea that now, in September, this has become an

12  issue, when it could have been brought to the Court almost a

13  year ago when they had the vast majority of our production, and

14  they know that we have not done this and there was no basis to

15  order it, and, quite frankly, Your Honor, my client has no

16  control over these people's personal devices and would have

17  absolutely no way to compel them to produce this information.

18       And so I will just start with, Your Honor, that it's

19  very disturbing to me that Mr. Slater is mischaracterizing the

20  protocol to begin with because it just doesn't say that.

21            JUDGE VANASKIE:  All right.  Mr. Slater?

22            MR. SLATER:  Yes.  As quoted in our brief on Page 10,

23  the ESI protocol, and I believe it's on Page 2 of the ESI

24  protocol itself, required the production of all, quote, apps

25  (data from smartphone applications) used in the normal course

1    of business.  So if they used -- Section 1A on Page 2 of the

2    ESI protocol, if a smartphone was used for any business, then

3    we were supposed to get the data that was in those apps that

4    was used to communicate on those smartphones.  That's the ESI

5    protocol.  All this Hague production, Hague service, subpoenas,

6    those are invalid objections.  This has already been ordered by

7    the Court to be done for every single custodian.

8            MS. PRISELAC:  Your Honor, it's absolutely not what

9    the ESI order says.  And Your Honor, you know, can look -- Your

10   Honor can read it.  What he's just cited is a definition of

11   what ESI could potentially encompass generally.  What we've

12   cited in our brief, which is at Page 2 of the order, and it

13   says, "This list is neither exhaustive nor does it represent

14   that such ESI exists within the party's data sources or that it

15   will be produced."  It's very clear that this is -- and then it

16   goes on to say that, "What the parties will do will meet and

17   confer regarding any disputes related to relevancy,

18   proportionality or production issues for submission to the

19   Court."

20           So it's really clear here, and what we did do, Your

21   Honor, is to have a meet and confer about potentially producing

22   these personal devices and we told them it's not possible, and

23   under Chinese law our client can't even make that happen.  So

24   the idea that this was in the court order is just not true.

25           JUDGE VANASKIE:  All right.  Mr. Slater, is there any

1  brief rebuttal?

2       MR. SLATER:  No, I don't think so.  I think in light

3  of the time, I think I've said what I need to say.  I think the

4  protocol clearly covers it.

5       JUDGE VANASKIE:  I'll take a look again at the

6  protocol --

7       MR. SLATER:  Thank you.

8       JUDGE VANASKIE:  -- and make a determination on this

9  issue.  If it's in the protocol, I'll order production; if it's

10 not in the protocol, I won't, recognizing, acknowledging that

11 there may be issues under Chinese law.

12      And I would ask counsel, I know you've cited to the new

13 law in a brief to Judge Kugler, I have not reviewed it, but I

14 would like to get a citation to that law from counsel so that I

15 can have a better understanding of the issue.

16      The next issue I have, and maybe the last issue, but

17 I'll give you certainly an opportunity to tell me there's --

18 maybe there's two issues here.

19      MS. PRISELAC:  Your Honor, I'm sorry, can we go back

20 to that.  If that is, you know -- we are liaison counsel.  I

21 want to make something clear.  You know, if this -- if Your

22 Honor's going to interpret the order that way, I do think that

23 we need to bring in all of the defendants who might have a

24 position because, Your Honor, this is not -- this is not how

25 anybody intended this ESI protocol to be interpreted; and the

1    idea that, you know, this much later it would suddenly mean

2    that would have an incredible affect not just on my client but

3    on every defendant in this litigation because that was

4    absolutely not the intent.  I think it's very clear from the

5    plain reading of the order, but if that's how it's going to be

6    interpreted, I don't want to be in a position here where

7    something happens in here without the other defendants being

8    able to weigh in, if that was the way you were so inclined to

9    order.  It's that --

10           JUDGE VANASKIE:  So I won't issue an order on it yet

11   without giving other parties the opportunity to be heard on the

12   issue.  I think that's prudent.

13           MR. SLATER:  Your Honor, one thing, because I didn't

14   want to interrupt when counsel was talking, we filed our brief

15   on -- awhile ago, I don't have the signature date but it was

16   our initial brief, and the relief that we were asking for was

17   spelled out.  So I don't understand how counsel can show up at

18   argument and say, well, now we want to ask for further briefing

19   on an issue that was fully briefed and we asked for this

20   relief -- I don't remember when this brief was filed, it was

21   weeks and weeks and weeks ago.

22           JUDGE VANASKIE:  July 23rd.

23           MR. SLATER:  Yes.  So for counsel to show up now in

24   September and say, almost two months later, say, well, now we

25   want to let other people brief it, all counsel saw this.  It

1   was available to all counsel.  I would ask that Your Honor not

2   provide further time for briefing or intervention.  We've asked

3   for this relief against ZHP.  If someone asked for this relief

4   against another defendant later, that would be a -- then they

5   can address that issue.  We're only seeking this against ZHP at

6   this time.

7          MS. PRISELAC:  Well, and I am glad Mr. Slater said

8   that because I think that goes exactly to my point, Your Honor.

9   The reality is Mr. Slater is continuously trying to harass ZHP

10  with disproportionate requests.  Your Honor, I understand that

11  -- I mean, but it is -- this is -- I think that one of the

12  reasons the larger defense group did not weigh in is because

13  the ESI order -- this is so far from what anyone intended, it

14  would be a complete shock to the rest of the defendants if this

15  was ordered.  I mean, that's how far -- I, quite frankly,

16  thought that once I cited this, Mr. Slater would drop it.  I

17  mean, this is -- this is -- I mean, Mr. Parekh's on the phone,

18  he can weigh in.  This issue was brought up in January and it

19  was dropped.

20         JUDGE VANASKIE:  All right.  Mr. Parekh, you're on the

21  spot now.  Are you there?

22         MR. PAREKH:  I am, Your Honor.  Unfortunately, I'm in

23  a place where I can't have the video on, but I apologize.

24         The discussion in January was primarily actually with

25  Ms. Hilton, although I was on the phone in the discussion.  The

1    discussion revolved around specific email, personal email, and

2    how to get the personal emails, including ones used by Jun Du.

3    There was a compromise reached on those specific emails at

4    issue, and I believe the Gmail from Jun Du was being produced.

5    I don't have those details offhand.  It was not a more general

6    issue with Fulcrum data and it was not discussed in the Fulcrum

7    data context at all.  It was discussed solely in the form of

8    the use of personal email addresses.

9         JUDGE VANASKIE:  All right.  Thank you for that.  And

10    I know there would be a dispute on that.

11         What I am going to do is to take a look at the protocol.

12    If the protocol, in my judgment, requires that cell phones be

13    reviewed and data from the cell phones produced, I'll order it.

14         You know, to me it would be surprising that that

15    significant source of data would be outside the scope of the

16    ESI protocol, but I will take a look at it.

17         MS. PRISELAC:  Well, Your Honor, if I could weigh in,

18    because the ESI protocol was negotiated and I was part of that,

19    one of the reasons it was not in there is because of the number

20    of foreign entities, not just our client but a lot of the

21    defendants are foreign entities where, you know, the companies

22    don't have that power, right, the law is different in the U.S.

23    And so to put that in an ESI protocol that applied to everyone

24    was not something people could agree to.  We would have never

25    agreed to it.  This was an agreed-upon protocol.  And we did

1  raise these issues so that if they got to the point where they

2  said, all right, well, we need the cell phone data from China,

3  then we would have that discussion and fight.  It was not --

4  that's why it's not in there because it's not just our client,

5  it's people all over the world.  European countries have an

6  even stricter data privacy law.  So I'll just leave it at that,

7  Your Honor.

8         JUDGE VANASKIE:  All right.  Thank you.

9         The next issue I have starts at Page 11 of the

10  plaintiffs' brief, and it is ZHP has not produced the emails,

11  meeting minutes, and calendar invites related to meetings Min

12  Li attended with Mr. Chen.

13         And where does that stand?  Where does that issue stand,

14  Mr. Slater?

15         MR. SLATER:  Your Honor, as to the Min Li issue, we're

16  going to accept what the production is at this time.

17         JUDGE VANASKIE:  Okay.

18         MR. SLATER:  We don't think we have to push that any

19  further.  We still have some concerns but I think in light of

20  all the other -- the gravity of the other issues, it's not

21  worth pursuing.  And the same with Min Li.  Although I don't

22  think any documents were produced, I assume counsel is saying

23  no such documents exist, because the two documents counsel

24  pointed to in their brief related only to Min Li, I believe.

25  But we're not going to pursue -- we're dropping this issue

1  based on counsel's representation that they've produced

2  everything that's responsive within this scope of this issue.

3          JUDGE VANASKIE:  And what about the issue that ZHP has

4  not produced documents related to Min Li's meeting with

5  multinational companies?

6          MR. SLATER:  That's what I'm talking about.  That is

7  the entire topic.

8          JUDGE VANASKIE:  Okay.

9          MR. SLATER:  We're concerned about what we were

10  provided but we're trying to, believe it or not, not push every

11  issue.

12          JUDGE VANASKIE:  Okay.  And the last issue I have is

13  the production with respect to nitrosamine testing.  Anything

14  else on that?

15          MR. SLATER:  I think it's very straightforward.  The

16  order of May 11 ordered the production of all the testing, not

17  just a chart collecting some information, the purported results

18  of the testing, but to the extent that testing was done, there

19  should be underlying documentation.  And there was never any

20  order by the Court limiting production to USDMF, meaning

21  US-grade valsartan.  In fact, that issue's been litigated,

22  we've prevailed on that.  Judge Schneider's orders were very

23  clear that we get all the testing from the facilities that

24  manufactured valsartan and sold it in the U.S.  So that's --

25  that's a distinction that's already been rejected by the Court

1   long ago.

2           JUDGE VANASKIE:  Thank you.

3       Ms. Priselac?

4       MS. PRISELAC:  Right, Mr. Slater just said, "and sold

5   in the U.S."  And so, yes, he's right, only sold in the U.S.,

6   he just stated it.  And so they have everything that was sold

7   in the U.S.

8           And so here's the issue we're having, Your Honor, is

9   that here we are, they're not saying that they haven't been

10  able to do anything that they would need to do to prove their

11  case without these other testing.  The reality is we're through

12  expert discovery almost, they have all the U.S. data, that's

13  not what the order says.  I won't go through it ad nauseam with

14  you, Your Honor, because our briefing is very clear.  But the

15  order says that in terms of the testing documents, the parties

16  were to meet and confer and come up with a workable set of

17  documents.  We've attached to our brief the letter between my

18  -- the email between my colleague and Mr. Parekh where my

19  colleague makes it clear that all of the nitrosamine testing

20  records have been produced.  That has been -- those documents

21  were produced since last year in August.  The fact that this

22  only came up recently shows that this is -- they have zero

23  interest in actually looking at these documents or using them

24  for a purpose, they just see that there's a bunch of documents

25  that would cost a lot of -- cost us a lot of money to produce.

1   And to be clear, Your Honor, this is a set of documents that

2   would cost millions of dollars to produce, millions.  These are

3   in hard copy.  Per the ESI protocol they have to be manually

4   entered, a set of very long metadata that is manually entered

5   by a person.  This is all stuff that has never, ever been sold

6   in the United States.  It's not even things that the FDA

7   wanted.  What use could the plaintiffs possibly have for them

8   that are proportional to the needs of this case?

9        And what is really troubling to me, Your Honor, is, you

10  know, they insisted that they had to have the underlying test

11  results, right, for everything that went to the U.S., and we

12  did that, and it cost us millions of dollars to do all of that

13  because it's paper, and it's intensive, and it has to be

14  scanned, and then the metadata has to be manually entered.  And

15  they've had that since last summer, and by my conversations

16  with the plaintiffs in the meet and confer, they never even

17  looked at it.  Even though it's clearly marked nitrosamine

18  testing records, even though they insisted on having it last

19  summer and we spent a huge amount of time and resources to get

20  it to them quickly, because Judge Schneider allowed them to

21  prioritize certain discovery and we abided by that.  So to come

22  now a year later saying, oh, wait, we want everything else, we

23  can only infer it's purely for harassment.  And I don't use

24  that word lightly, Your Honor, but this is beyond -- I mean,

25  they have been on notice of what we produced in terms of these

1   testing records for a year.  You know, when Mr. Ferretti sent

2   that email to Mr. Parekh, there is no email they'll show you

3   where Mr. Parekh says, no, you're missing this, we need all of

4   the entire world, it's crucial to our case, because that was

5   the agreement.  They knew exactly what they were getting and

6   they got it.  And so to bring this up now is incredibly

7   prejudicial to my client and Mr. Slater has yet to articulate a

8   reason he needs it.

9            JUDGE VANASKIE:  All right.

10           MR. SLATER:  Your Honor --

11           JUDGE VANASKIE:  Brief rebuttal, Mr. Slater.

12           MR. SLATER:  Yes, sure.  Your Honor, you already

13  ordered this.  You already ordered it because during the

14  depositions we saw in the document a representation that 7,000

15  batches had been tested, and we didn't just bring this up now.

16  Your Honor entered the order in May, which means our briefing

17  predated it, the issue was being discussed for weeks and weeks

18  before that, in the context of the depositions when we met and

19  conferred with the defense and said, hey, where are these 7,000

20  batches of testing, we don't see it.  And we went back and

21  forth and we've never been produced it, and counsel

22  acknowledges they haven't given that to us.  So I'm not going

23  to go back and reargue the merits because Your Honor's already

24  ordered this.  So we just ask that they be ordered to comply

25  with your order from May 11 please.

```
 1          MS. PRISELAC:  Your Honor --

 2          MR. PAREKH:  Your Honor, this is Behram --

 3          JUDGE VANASKIE:  Hold on, hold on, Ms. Priselac.  I'll

 4   hear from Mr. Parekh.

 5          MR. PAREKH:  Your Honor, the email which Ms. Priselac

 6   refers to, there seems to be a disconnect in what she is

 7   talking about and what we're asking for.

 8          The email that she's referring to refers to the actual

 9   manufacturing batch records and the testing done during that

10   manufacturing process.  What we're asking for is the testing

11   done of nitrosamine contamination of batches that were tested

12   by ZHP.  Those are two completely separate things.  The testing

13   that was done during the manufacturing process and the batch

14   records that are referred to in the emails, the white, blue and

15   yellow text, have nothing to do with the post-recall testing

16   done by ZHP of batches of DMF regardless of where it went.  And

17   Judge Schneider's order was clear that it didn't matter where

18   the batches went to, the issue was where were they

19   manufactured.  And if they were manufactured in a facility that

20   went -- that also manufactured batches that went to the U.S.,

21   those tests of nitrosamine in those batches were required to be

22   produced.  So we are talking about two separate issues here.

23          JUDGE VANASKIE:  All right.  Ms. Priselac?

24          MS. PRISELAC:  Thank you, Your Honor.

25          You know, there is a discussion of the batch testing
```

1    records in that email, but that email is very clear.  Mr.

2    Parekh asks Mr. Ferretti, do you have -- "Have you produced" --

3    and this is September 13th, 2020, a year ago, "Have you already

4    produced a hundred percent of the retrospective testing results

5    chromatography or is it still being produced?  I can't remember

6    what you told me."  Mr. Ferretti says, "It's already been

7    produced."  He gives him the specific production volume and he

8    explains that there was a correction and so that there had to

9    be a little bit of an overlay, which is why it was late,

10   because, you know, Your Honor, Judge Schneider did produce it

11   -- order that it be produced earlier, these records, and they

12   were produced.

13        So to say now, a year later, oh, that's not what we

14   wanted, I mean, it really belies what they're attempting to do

15   here, Your Honor.  Because the reality is, first Mr. Slater

16   says, oh, Judge Schneider ordered it, then his argument is that

17   you ordered it.

18        If we want to go back to the meet and confer that

19   happened more recently, I was extraordinarily clear, and I'm

20   happy to go back to my emails and notes, if we're going to make

21   that argument, that my client was not going to produce

22   thousands of documents, additional documents, at a cost of, you

23   know, potentially billions of dollars.  I said what I would do

24   is go back to my client to see if they had a more detailed

25   summary rather than the underlying raw data.  Under no

 1    circumstances did you order or did I agree to do that.

 2         And the order he's referring to, Your Honor, was the

 3    order you initially entered that was based upon the parties'

 4    agreement.  And so if that's the order he's talking about, he

 5    well knows that ZHP and I never agreed to that, Your Honor.

 6         JUDGE VANASKIE:  All right.  And you're referring to

 7    Exhibit P, that's the email exchange with Mr. Ferretti?

 8         MS. PRISELAC:  That's right, Your Honor.  And I'm also

 9    referring to, let me get it out --

10         JUDGE VANASKIE:  What order are you referring to?  I'm

11    looking at things now as we're talking.

12         MS. PRISELAC:  Well, I would love to know what order

13    -- I mean, Mr. Slater says that there's an order we violated.

14         JUDGE VANASKIE:  May 11 he said.

15         MS. PRISELAC:  That order, you remember, Your Honor,

16    was the one that you entered after we had said we had come to a

17    number of agreements in our status report.

18         JUDGE VANASKIE:  What I'm looking at right now is

19    Special Master Order 20.

20         MR. SLATER:  Your Honor, actually, I think I may have

21    misspoken.  I believe that it's ECF Document 1233 --

22         JUDGE VANASKIE:  Okay.

23         MR. SLATER:  -- which is -- oh, actually, no, it

24    should be that document.  That is that document.

25         JUDGE VANASKIE:  I just want to make sure we're all on

1    the same page.

2        I'm looking at Paragraph 7 of that order, Special Master

3    Order 20, which required the ZHP defendants to produce any

4    additional responsive and nonprivileged documents relating to

5    the -- related to the March 12, 2018, testing investigation of

6    Valsartan APA Batch Number, and then there is a batch number,

7    as well as any additional responsive and nonprivileged

8    documents relating to the batch testing referenced in Prinston

9    0075797.  Are we on the same page?

10        MR. SLATER:  That's the chart.  Yes, we are, Your

11   Honor, and that's the chart that's transposed on Page 11 of our

12   brief.

13        JUDGE VANASKIE:  Okay.

14        MS. PRISELAC:  Right.  Your Honor, and that was by

15   agreement, that order, and what we had agreed to do was go back

16   and look for additional underlying data for that chart, right,

17   because it's a summary chart and we said, look, this is a lot

18   of OUS, outside of U.S., product, but -- and to produce kind of

19   the raw underlying data for that chart would be extraordinarily

20   expensive.  But if there -- if there is some kind of Excel

21   spreadsheet or something that's less cost prohibitive that

22   gives you this data, you know, we'll produce it, but I don't

23   know if it exists, I need to talk to my client.  And then I

24   talked to them and they went back to their testing people to

25   see if there was something that wasn't all of the underlying

1    data that costs millions of dollars to produce and that was

2    something more akin to like a more detailed spreadsheet.  The

3    problem is that doesn't exist.  If they want that data, Your

4    Honor, it has to be produced in this form that's incredibly

5    expensive.  And so when we talk about responsive data, our

6    position is that it wasn't responsive because it was not within

7    the Judge's order, and what we agreed to was to produce the

8    U.S. testing data.

9        MR. SLATER:  I'm at a loss, Your Honor.  It's in the

10    order and we've already gone through this.  Judge Schneider's

11    Macro Orders said we're entitled to discovery from the

12    facilities that manufactured valsartan that was sold in the

13    U.S., okay?  I'm not only asking -- and I never said only the

14    results relating to the valsartan actually sold in the U.S.

15    Judge Schneider was very clear, it's the full facility

16    regardless of where it went.  And this was agreed to.  You have

17    this chart, you can see it.

18        They say in their Deviation Investigation Report, and

19    that's where this is transposed from, I believe, this chart,

20    that there were 7,000 batches tested.  We need those results.

21        MS. PRISELAC:  Why?

22        MR. SLATER:  We want to see what the levels were.

23        MS. PRISELAC:  Your Honor, putting apart the fact that

24    if that is what Judge Schneider --

25        MR. SLATER:  I'll tell you.  I'll answer that.

1    Counsel asked a question.

2            JUDGE VANASKIE:  Hold on, hold on.

3            MR. SLATER:  I'll tell you.  For example, let's --

4    what if the levels are much higher?  Their experts are making

5    certain assumptions in their reports, and presumably in the

6    testimony we're going to get, as to what the levels of

7    contamination were.  They didn't limit it just to the U.S.

8    They talked about the contamination and they rely on European

9    constitutes, European epidemiologic studies of contaminated

10   valsartan being taken in Europe, and they're relying on those

11   studies.  So we certainly should have the right to see all of

12   the test results, the actual results, not just what was

13   compiled into a chart, and look into that and see whether or

14   not it's accurate and potentially use that later; because,

15   again, their experts are not just relying on data from the

16   U.S., they're relying on a lot of European studies.  In fact,

17   two out of the three epidemiologic studies on actual valsartan

18   users were based on European usage, Germany and in Northern

19   Europe, I believe in the Netherlands, the Potagard study.

20           MS. PRISELAC:  Well, Your Honor, there are no European

21   people -- there are no European citizens that are plaintiffs in

22   this action.  So it's more than appropriate for an expert to

23   use a study from a different country without producing things,

24   you know, underlying test results that are related to consumers

25   -- products consumers took in a different country.  I mean,

1   those two -- they're completely unrelated to one another, and

2   the fact that Mr. Slater could come up with that is -- I still

3   don't understand what the relevance would be, even after that

4   explanation.  To have a European study have anything to do with

5   European consumers is just unrelated to this case.

6        And the reality is, Your Honor, they do have information

7   about the levels, the chart shows it.  I mean why you would

8   need the underlying documentation of every graph, especially

9   from what I can tell, they haven't even -- let me just make

10  this point, Your Honor.  Of all of the underlying data, testing

11  data, they insisted they needed for the USDMF-grade valsartan,

12  they haven't used any of it.  So they insisted they needed all

13  of this raw data because it's so important to the case, it's

14  not cited in one of their expert reports, it's not cited

15  anywhere because they didn't use it, they didn't look at it.  I

16  know that they didn't look at it because when I had a meet and

17  confer and told them where these documents were, they were

18  surprised.  So this is clearly just a last-ditch attempt to try

19  to get us to increase our litigation expenses astronomically.

20       And I'll be really clear, Your Honor, if this was -- if

21  we had not come to this agreement and made it very clear with

22  Mr. Parekh, we would have gone to Judge Schneider and made a

23  motion for a protective order because my client, the amount of

24  expense involved here is so beyond what is proportional to this

25  case, especially when you're talking about underlying raw data

1    of API testing that -- for other countries when the plaintiffs

2    have just admitted they already have the summary data.

3            JUDGE VANASKIE:  I guess what I'm having trouble

4    understanding, Ms. Priselac, is that Paragraph 7 of Special

5    Master Order 20 did direct you to produce any additional

6    responsive and nonprivileged documents relating to the batch

7    testing referenced in this chart, and I don't recall anybody

8    objecting to the terms of that order.

9            MS. PRISELAC:  Well, let me make something clear, Your

10   Honor.

11           Number one, our position is that it's not responsive.

12   That order was entered, and I'm happy to go back, Your Honor,

13   and get all of the correspondence, that order was entered by

14   agreement because we had a meet and confer about what we would

15   and wouldn't produce.  And what I made very clear is that under

16   no circumstances would my client spend millions of dollars at

17   this point in the litigation to produce underlying hard-copy

18   documents of testing for products that never were sold in the

19   U.S.  I would have never made that agreement.  And what we did

20   agree to go back is to see if there were somehow additional

21   documents that included outside of U.S. testing that were maybe

22   withheld because they weren't responsive that were a summary

23   that could satisfy the plaintiffs.  That kind of summary

24   doesn't exist or else we would have produced it.

25           The only way to do this is to go back and scan a huge

1    amount of hard-copy data that I made very clear to Mr. Slater

2    and his colleagues my client would not agree to do.

3            JUDGE VANASKIE:  All right.

4            MR. SLATER:  Your Honor, I'll just bring one thing to

5    your attention that you can take a look at.

6        If you look at Judge Schneider's Macro Order November

7    25, 2019, it's Document 303, Paragraph 4 says, "Defendants

8    shall produce all documents reflecting the presence of any

9    nitrosamine in any sartan product.  This includes not only

10   valsartan, but also losartan, irbesartan, olmesartan and

11   candesartan," which not only is relevant to this but harkening

12   back to the irbesartan report, that also is encompassed by this

13   order, because that's what this says, "any nitrosamine in any

14   sartan," so that irbesartan report was clearly relevant because

15   it was a report about nitrosamines in a sartan.  And Paragraph

16   8 also says that, "Plaintiffs are entitled to discovery

17   regarding any tests that could identify any presence of

18   nitrosamine contamination," and it goes on, that's Paragraph 8.

19       So I just offer that to Your Honor because when counsel

20   says it's not responsive, it's not within the scope of this

21   case, Judge Schneider's Macro Order was very clear and was very

22   expansive.

23           JUDGE VANASKIE:  All right.

24           MS. PRISELAC:  The part about the Macro Order I do

25   want to emphasize, though, Your Honor, and you'll see it, is

1    that it also orders the parties to meet and confer about the

2    scope of the testing records, which is what we did.  And if

3    they would have insisted that these records be produced, we

4    would have moved for a protective order.  We have to be able to

5    meet and confer on these issues, Your Honor, because, I'm sure

6    you understand, a company of this size has huge amounts of

7    testing data.  To say it all has to be produced would have been

8    completely impossible and certainly not economically feasible.

9         And Mr. Slater is, you know, talking about irbesartan,

10   losartan, candesartan, we absolutely have produced all of the

11   responsive documents in that order, which is why you do have

12   some irbesartan documents; but what you don't have, and why you

13   don't hear Mr. Slater saying we need all of the underlying

14   nitrosamine documentation for candesartan, losartan,

15   irbesartan, is because that's not what that paragraph means and

16   he knows it.  Otherwise, he would have all of that data or be

17   moving to compel that and he's not.

18        JUDGE VANASKIE:  All right.  Very well.  I'm going to

19   have to study this particular issue.  I won't issue an order at

20   this time.

21        And at my peril and at your peril, too, I'll ask, is

22   there anything else we need to discuss today?

23        MS. PRISELAC:  I just had a housekeeping issue, Your

24   Honor.

25        JUDGE VANASKIE:  All right.

```
 1          MS. PRISELAC:  So how would you -- how would you like
 2   me to submit the slides to you?  Because, obviously, they do
 3   have some restricted confidential information.
 4          JUDGE VANASKIE:  Well, I think you could send it to me
 5   as a password-protected encrypted file by email to my Stevens
 6   and Lee address.
 7          MS. PRISELAC:  Sure.  I guess what I meant, I mean,
 8   obviously, I think we've sent you restricted confidential
 9   without a password before; but I mean in terms of making it --
10   it sounded like you wanted to make it part of the record.
11   Should I send you kind of a redacted portion also?
12          JUDGE VANASKIE:  Yes, you can do that.  I wasn't
13   intending to attach it to the transcript, if that's what you
14   mean.
15          MS. PRISELAC:  Yes.  Okay.
16          MR. SLATER:  Your Honor, there was one other issue
17   which has to do with Baohua Chen productions.  And, certainly,
18   you, at your peril, asked if there was any other issues; at my
19   peril, I say yes.
20          JUDGE VANASKIE:  Okay.
21          MR. SLATER:  I don't do that lightly.  I'm texting my
22   certain people right now telling them I'm going to be not
23   making dinner, but this is important and I understand I have to
24   do this.  So I'll try to keep this to the point with Baohua
25   Chen.
```

1          ZHP has confirmed that they withheld documents that they

2     say were produced through other custodians' productions but

3     he's not listed as a duplicate custodian in that metadata

4     field, so we would ask that those documents that were withheld

5     be produced.

6               JUDGE VANASKIE:  All right.

7               MR. SLATER:  That's number one.

8               JUDGE VANASKIE:  Let's hear from Ms. Priselac on

9     number one before we get to number two.

10              MS. PRISELAC:  I'm sorry, were there two?  I thought

11    there was just one.

12          I guess I'm just confused what Mr. Slater means.

13              MR. SLATER:  What I'm saying --

14              MS. PRISELAC:  Yeah, I don't --

15              MR. SLATER:  Okay, that's fine.

16              MS. PRISELAC:  We have produced all of Mr. Chen's

17    documents that are responsive.  We produced an overlay file to

18    make it clear what documents where he was also a duplicate

19    custodian, but I don't know what else he would like us to

20    produce.

21              MR. SLATER:  What we would like is the documents that

22    were in Baohua Chen's custodial collection that were deemed

23    relevant and responsive that were not produced to us because

24    ZHP says they were produced through other custodians' custodial

25    productions, but since he is not listed as a duplicate

1    custodian, there's no way for us to know that.  So we need the

2    documents --

3          MS. PRISELAC:  There are no such documents.

4          MR. SLATER:  I believe that that's what -- that's our

5    understanding.  In fact, I'm looking at Ms. Priselac's email of

6    July 22nd, which is Exhibit 3 to our papers, in part says, and

7    this was an email to myself, "Accordingly, it should be no" --

8    "it should come as no surprise that documents that were

9    previously produced have not been produced again in duplicate

10   form."

11         We understand that, but since the metadata doesn't list

12   him as a duplicate custodian on those other productions, we

13   have no way to know those documents were in his custodial.

14   And, in fact, I'm not even sure if that would have even existed

15   at the time because he wasn't a custodian when a lot of those

16   custodial files were collected most likely.  So we need the

17   documents because we need to know what documents were in his

18   file and without listing him as a duplicate custodian in

19   someone's custodial production, we have no way to link him to

20   the document.

21         MS. PRISELAC:  So, Your Honor, I would love if Mr.

22   Parekh could weigh in because I know that he's an expert in

23   these issues but, you know, the overlay -- the overlay we've

24   provided, and I think we talked about extensively at the

25   beginning, corrects that issue.  So there's nothing really I

1    can really do other than that.

2        Maybe I'm -- we're talking cross-purposes here, but the

3    overlay now has all of the duplicate custodian information

4    corrected.  So I don't know what else I could possibly do.

5        MR. SLATER:  I think we're going to have to meet and

6    confer on the overlay file, Your Honor.

7        JUDGE VANASKIE:  Okay.

8        MR. SLATER:  Because I've been emailing with my team

9    and I think there's going to have to be a discussion between

10   our team and ZHP's team and make sure we're all on the same

11   page, and maybe some of these issues can be resolved by going

12   through how things were loaded or how things appear in the

13   metadata, it doesn't seem clear to us, but I think it's

14   reasonable for us to talk to the defense on this issue.

15       JUDGE VANASKIE:  I agree.  And I would direct that you

16   meet and confer on this particular issue.

17       MR. SLATER:  The rest of the issues with Baohua Chen,

18   I don't know that there's really much Your Honor can do at this

19   point other than perhaps what you've done before, because, I

20   mean, look, for example, at the small number of documents, it's

21   a concern.  We also have a concern because you recall many

22   times we were told, well, there's going to be a lot of state

23   secret documents that are going to be -- we're going to have to

24   grapple with.  They hit on over 4,000 documents that -- with

25   the search terms, we got either 300 or 600, and there was no

```
 1   state secret log.  All the sudden there was not one state

 2   secret document.

 3        I realize you're going to say, well, how do I know what

 4   -- how do I doubt that there's something there?  I don't know.

 5   All we want to make sure is that belts and suspenders because

 6   it just seems very contrary to what we were told for months and

 7   it's a little bit -- you know, it leaves us at a little bit of

 8   a loss on our end when there was no state secret issue with

 9   Baohua Chen.

10        JUDGE VANASKIE:  Well, I don't know that there's

11   anything that I can do right now on that particular issue.

12        MR. SLATER:  Understood.

13        JUDGE VANASKIE:  All right.

14        MR. SLATER:  Understood.  I just wanted to raise it.

15        There's one other issue, Your Honor, that I think I just

16   want to say this, and we don't have to discuss it further, but,

17   the plaintiffs have a very serious issue with sealing these

18   hearings and with ZHP continuing to assert confidentiality as

19   to documents.  Again, it's not an issue we have to address now

20   but it's something I want to foreshadow that we believe at some

21   point very soon ZHP's going to need to file a formal motion if

22   they want to keep sealing hearings, and we really want to get

23   to the bottom of what's going on here.

24        For example, that document that they're going to send to

25   you as restricted confidential, there's nothing in it that
```

1    justifies confidentiality from our perspective.  In fact, I

2    think Your Honor has ruled on very similar information and

3    ordered it produced.

4        So I just wanted to say this because we're very

5    uncomfortable with sealing these hearings and sealing so many

6    documents.  Thank you.

7        JUDGE VANASKIE:  All right.  Ms. Priselac, did you

8    want to respond?

9        MS. PRISELAC:  Well, Your Honor, you know, especially

10   today, you know, we get sometimes in this position and, you

11   know, unfortunately for us, we had to sit through weeks and

12   weeks of Mr. Slater mischaracterizing a document and not really

13   being able to defend ourselves by putting things up and walking

14   through like we did today.  And so without this level of

15   confidentiality, something like that would never be possible

16   because, you know, the Irbesartan Improvement Project, you

17   know, in and of itself, certain people could read that title

18   and understand exactly how, you know, ZHP was trying to attempt

19   to improve a process of making API for irbesartan.  And so I

20   think that for us, you know, we really felt hamstrung on

21   walking through this kind of delicate thing with Your Honor

22   and, you know, really were disadvantaged by having to just

23   listen to misinterpretations of this document rather than just

24   being able to look at it.  And so that's why we felt like that

25   this was the more appropriate venue so that Your Honor could

1    actually see the document and we appreciate this opportunity.

2         JUDGE VANASKIE:  Well, thank you for that.  I am

3    concerned, I'll tell you, I don't have proceedings sealed

4    lightly.  Certainly in my prior role, I took the fact that this

5    is a judicial proceeding, it should be open, very seriously and

6    we will be sensitive to that going forward.  That's all I can

7    say right now.

8         We went much longer than I thought we would today, but

9    that happens sometimes, and we'll conclude for today.  I'm not

10   going to ask is there anything else.

11        And I'll thank Camille very much for her -- I'm

12   struggling for the right word -- resilience and stamina,

13   stamina, and we will conclude for today.

14             (Off-the-record discussion.)

15        JUDGE VANASKIE:  We had a discussion off the record

16   about sealing the transcript from today's arguments, from

17   today's proceeding.  We should follow the rules that govern

18   sealing of transcripts.  What I expect that to mean, and you

19   can correct me if I'm wrong, if I'm misstating the rules in New

20   Jersey, in New Jersey Federal Court, but I expect that a draft

21   of the transcript will be provided to counsel and counsel will

22   have an opportunity to designate those portions that they

23   believe should be sealed, and to the extent that a

24   determination must be made by me with respect to what gets

25   sealed, I'll make that determination.

1          We've heard from Mr. Slater that he does not believe

2    that any part of this needs to be sealed, and Ms. Priselac, I

3    understand, will have to review the transcript to identify

4    those parts that she considers need the protection of a sealing

5    order.

6          MS. PRISELAC:  Thank you, Your Honor.

7          JUDGE VANASKIE:  All right.  Thank you.

8          MR. SLATER:  Have a nice, pleasant weekend, everybody.

9          JUDGE VANASKIE:  You, too.  Thank you all very much.

10   Thank you.  Bye-bye.

11          (The proceedings concluded at 5:45 p.m.)

12          - - - - - - - - - - - - - - - -

13

14          I certify that the foregoing is a correct transcript

15   from the record of proceedings in the above-entitled matter.

16

17   */S/ Camille Pedano, CCR, RMR, CRR, CRC, RPR*
     *Court Reporter/Transcriber*

18

19   *September 13, 2021*
         *Date*

20

21

22

23

24

25

## /

/S [1] - 100:17

## 0

**0075797** [1] - 86:9
**02490581** [1] - 10:1
**07068** [1] - 1:14
**08101** [1] - 1:8

## 1

**1** [1] - 61:9
**10** [2] - 1:9, 72:22
**103** [1] - 1:14
**11** [6] - 35:8, 78:9, 79:16, 82:25, 85:14, 86:11
**12** [3] - 35:8, 35:9, 86:5
**1233** [1] - 85:21
**13** [2] - 5:12, 100:19
**13th** [1] - 84:3
**14** [8] - 10:15, 68:10, 68:11, 68:15, 68:16, 69:15, 70:7, 70:9
**15** [2] - 10:15, 68:10
**16** [2] - 10:15, 68:10
**16,339** [1] - 46:2
**1638** [1] - 1:17
**17th** [1] - 2:3
**19-md-02875-RBK-KMW** [1] - 1:4
**19103** [1] - 2:4
**19422** [1] - 2:8
**1A** [1] - 73:1

## 2

**2** [3] - 72:23, 73:1, 73:12
**20** [3] - 85:19, 86:3, 90:5
**2010** [3] - 9:22, 10:10, 11:9
**2011** [5] - 10:22, 11:9, 16:22, 17:9, 43:11
**2012** [4] - 5:10, 11:9, 16:23, 17:9
**2013** [5] - 5:25, 6:1, 10:23, 16:23, 43:14
**2014** [5] - 11:10, 16:23, 20:6, 43:8
**2015** [1] - 40:23
**2017** [12] - 5:11, 14:7, 15:24, 19:9, 25:24, 29:4, 33:25, 37:23, 47:16, 50:11, 50:15, 50:16
**2018** [9] - 5:13, 5:25, 6:1, 9:23, 14:1, 25:1,

47:23, 86:5
**2019** [2] - 14:1, 91:7
**2020** [2] - 71:15, 84:3
**2021** [4] - 1:9, 11:8, 29:25, 100:19
**22** [1] - 29:25
**22nd** [1] - 95:6
**23rd** [1] - 75:22
**25** [1] - 91:7
**29** [2] - 12:3, 44:13
**296** [2] - 19:5, 31:16
**297** [1] - 31:16

## 3

**3** [3] - 18:18, 29:24, 95:6
**30** [1] - 2:3
**300** [1] - 96:25
**303** [1] - 91:7
**33950** [1] - 1:20
**37,000** [12] - 54:12, 54:13, 56:1, 56:3, 56:8, 56:13, 57:8, 58:3, 58:14, 59:18, 60:5
**37,579** [2] - 45:18, 46:1
**370,000** [1] - 8:8
**3:00** [2] - 1:9, 3:2

## 4

**4** [1] - 91:7
**4,000** [1] - 96:24
**400** [1] - 53:7
**43** [1] - 46:4
**450** [1] - 2:8
**4:10** [1] - 45:12
**4th** [1] - 1:8

## 5

**5:45** [1] - 100:11

## 6

**600** [5] - 9:20, 15:10, 15:13, 16:19, 96:25
**609-774-1494** [1] - 1:24

## 7

**7** [2] - 86:2, 90:4
**7,000** [3] - 82:14, 82:19, 87:20

## 8

**8** [2] - 91:16, 91:18
**83** [1] - 58:8

## 9

**9** [3] - 63:15, 66:25, 70:15
**90277** [1] - 1:17
**92** [1] - 58:9
**99** [1] - 1:20

## A

**aback** [3] - 23:10, 23:19, 26:24
**abide** [1] - 26:15
**abided** [1] - 81:21
**ability** [2] - 12:15, 69:17
**able** [7] - 7:10, 12:17, 75:8, 80:10, 92:4, 98:13, 98:24
**above-entitled** [1] - 100:15
**absent** [1] - 60:6
**absolutely** [9] - 10:19, 22:6, 31:22, 37:22, 71:14, 72:17, 73:8, 75:4, 92:10
**accept** [1] - 78:16
**acceptable** [1] - 65:22
**access** [2] - 45:5, 53:15
**accident** [1] - 24:19
**accidentally** [1] - 25:12
**accomplish** [1] - 38:4
**according** [1] - 14:23
**Accordingly** [1] - 95:7
**accounted** [1] - 9:24
**accurate** [4] - 16:6, 21:19, 48:3, 88:14
**accurately** [1] - 25:24
**accusations** [1] - 31:6
**accusing** [1] - 28:10
**acknowledges** [1] - 82:22
**acknowledging** [1] - 74:10
**ACTION** [1] - 1:3
**action** [1] - 88:22
**acts** [1] - 19:18
**actual** [24] - 9:1, 10:8, 12:1, 18:5, 21:12, 21:18, 21:21, 22:12, 22:13, 26:23, 26:24, 32:20, 33:9, 33:10, 34:16, 34:18, 37:24, 41:13, 41:20, 41:24, 68:20, 83:8, 88:12, 88:17
**ad** [1] - 80:13
**ADAM** [1] - 1:13
**Adam** [1] - 36:15

**add** [3] - 14:18, 17:6, 63:19
**added** [1] - 17:2
**additional** [17] - 4:2, 4:6, 4:9, 17:3, 17:4, 17:13, 17:15, 37:1, 49:15, 54:9, 67:22, 84:22, 86:4, 86:7, 86:16, 90:5, 90:20
**address** [5] - 16:10, 62:8, 76:5, 93:6, 97:19
**addresses** [2] - 9:5, 77:8
**adhere** [2] - 11:18, 52:22
**adjudicated** [1] - 62:14
**admit** [1] - 39:9
**admits** [1] - 49:24
**admitted** [5] - 26:3, 32:22, 35:5, 55:8, 90:2
**affairs** [1] - 26:7
**affect** [1] - 75:2
**agenda** [1] - 3:16
**ago** [7] - 10:10, 25:20, 72:13, 75:15, 75:21, 80:1, 84:3
**agree** [8] - 7:16, 15:1, 20:16, 77:24, 85:1, 90:20, 91:2, 96:15
**agreed** [13] - 17:6, 20:15, 27:20, 52:23, 53:4, 54:6, 72:3, 77:25, 85:5, 86:15, 87:7, 87:16
**agreed-upon** [1] - 77:25
**agreement** [6] - 82:5, 85:4, 86:15, 89:21, 90:14, 90:19
**agreements** [1] - 85:17
**ahead** [2] - 63:9, 66:2
**aided** [1] - 1:25
**air** [1] - 57:16
**air-gapped** [1] - 57:16
**akin** [1] - 87:2
**allowed** [2] - 60:16, 81:20
**allowing** [1] - 70:16
**allusions** [1] - 31:10
**almost** [4] - 35:20, 72:12, 75:24, 80:12
**ALSO** [1] - 2:11
**amount** [8] - 31:23, 49:6, 51:21, 54:14, 57:10, 81:19, 89:23, 91:1

**amounts** [1] - 92:6
**answer** [1] - 35:23, 39:8, 55:6, 87:25
**anticipate** [1] - 5:14
**anticipation** [1] - 39:18
**anyway** [1] - 53:5
**APA** [1] - 86:6
**apart** [1] - 87:23
**API** [4] - 43:16, 50:17, 90:1, 98:19
**APIs** [3] - 19:11, 43:4, 43:5
**apologies** [1] - 7:19
**apologize** [2] - 20:10, 76:23
**appear** [3] - 21:17, 32:12, 96:12
**application** [1] - 52:20
**applications** [1] - 72:25
**applied** [2] - 53:5, 77:23
**apply** [1] - 53:7
**applying** [2] - 46:13, 52:25
**appreciate** [1] - 99:1
**appropriate** [3] - 35:17, 88:22, 98:25
**approval** [1] - 60:17
**approved** [2] - 10:21, 11:12
**apps** [2] - 72:24, 73:3
**archive** [1] - 40:23
**archives** [1] - 40:17
**area** [1] - 30:21
**areas** [1] - 26:10
**argue** [1] - 31:20
**arguing** [1] - 51:16
**argument** [11] - 14:23, 15:14, 28:17, 39:23, 51:16, 62:19, 63:16, 63:22, 75:18, 84:16, 84:21
**arguments** [2] - 56:22, 99:16
**arms** [2] - 14:13, 34:22
**arrived** [1] - 50:13
**articulate** [1] - 51:22, 82:7
**articulated** [1] - 46:21
**aside** [2] - 16:24, 31:5
**aspects** [1] - 17:21
**assert** [1] - 97:18
**assessments** [1] - 43:10
**associated** [1] - 68:3
**assume** [3] - 30:18, 68:2, 78:22
**assumptions** [1] -

88:5
**assure** [1] - 45:3
**astronomically** [1] - 89:19
**attach** [1] - 93:13
**attached** [5] - 19:21, 21:15, 31:19, 32:25, 80:17
**attachment** [5] - 18:5, 19:9, 19:19, 21:7, 21:10
**attachments** [1] - 57:4
**attempt** [2] - 89:18, 98:18
**attempting** [1] - 84:14
**attended** [3] - 57:2, 58:24, 78:12
**attention** [2] - 65:18, 91:5
**attorney** [3] - 42:7, 42:11, 42:13
**attorney-client** [1] - 42:7
**August** [1] - 80:21
**Aurobindo** [1] - 2:9
**Aurolife** [1] - 2:9
**author** [1] - 35:13
**available** [1] - 76:1
**avoid** [1] - 46:13
**aware** [2] - 23:13, 71:19
**awhile** [1] - 75:15
**azide** [2] - 22:24, 26:1

## B

**B-1** [2] - 21:25, 22:3
**B-3** [1] - 22:3
**background** [1] - 3:9
**backups** [1] - 33:5
**balloon** [2] - 29:6, 29:7
**Baohua** [19] - 5:21, 15:6, 16:10, 29:24, 47:13, 47:19, 47:24, 48:6, 48:11, 48:16, 48:24, 49:6, 49:14, 58:21, 93:17, 93:24, 94:22, 96:17, 97:9
**based** [7] - 15:23, 16:5, 52:1, 61:25, 79:1, 85:3, 88:18
**basis** [4] - 27:23, 32:3, 37:15, 72:14
**Batch** [1] - 86:6
**batch** [6] - 83:9, 83:13, 83:25, 86:6, 86:8, 90:6
**batches** [8] - 82:15, 82:20, 83:11, 83:16, 83:18, 83:20, 83:21,

87:20
**Bates** [5] - 44:24, 65:24, 68:2, 68:3, 70:11
**Beach** [1] - 1:17
**beat** [1] - 62:19
**become** [1] - 72:11
**bed** [2] - 17:7, 27:20
**begin** [1] - 72:20
**beginning** [3] - 16:4, 43:5, 95:25
**behalf** [2] - 30:10, 51:10
**behind** [1] - 14:13
**BEHRAM** [1] - 1:16
**Behram** [1] - 83:2
**belies** [1] - 84:14
**Bell** [1] - 2:8
**belts** [1] - 97:5
**benefit** [1] - 30:19
**best** [2] - 3:21, 16:2
**better** [5] - 23:14, 29:7, 38:12, 59:22, 74:15
**between** [4] - 59:21, 80:17, 80:18, 96:9
**beware** [1] - 23:1
**beyond** [3] - 56:25, 81:24, 89:24
**big** [6] - 4:23, 35:3, 35:22, 45:13, 48:18, 55:19
**billions** [1] - 84:23
**bit** [10] - 3:12, 4:8, 5:11, 13:14, 23:20, 54:19, 60:21, 84:9, 97:7
**black** [1] - 21:10
**blank** [1] - 27:14
**Blank** [2] - 42:4, 42:5
**bleed** [1] - 62:6
**Blue** [1] - 2:8
**blue** [2] - 14:10, 83:14
**bog** [1] - 14:19
**borders** [1] - 62:3
**bottom** [3] - 30:22, 70:15, 97:23
**branch** [1] - 61:15
**breadth** [1] - 45:25
**break** [2] - 31:8, 45:8
**breaking** [1] - 48:25
**Brief** [1] - 45:12
**brief** [36] - 3:13, 4:8, 5:8, 8:5, 12:18, 12:22, 18:19, 31:9, 31:12, 43:3, 44:11, 50:22, 55:17, 60:11, 62:21, 63:15, 63:20, 63:21, 65:19, 66:22, 67:1, 67:20, 68:7,

72:22, 73:12, 74:1, 74:13, 75:14, 75:16, 75:20, 75:25, 78:10, 78:24, 80:17, 82:11, 86:12
**briefed** [2] - 71:11, 75:19
**briefing** [10] - 8:2, 12:25, 47:12, 54:3, 54:9, 64:16, 75:18, 76:2, 80:14, 82:16
**briefs** [3] - 4:1, 46:24, 55:9
**bring** [5] - 65:18, 74:23, 82:6, 82:15, 91:4
**bringing** [1] - 24:19
**broader** [2] - 4:16, 60:22
**broken** [2] - 31:10, 70:18
**brought** [5] - 16:25, 18:4, 24:10, 72:12, 76:18
**build** [1] - 29:7
**Building** [1] - 1:7
**bunch** [3] - 26:10, 62:6, 80:24
**burden** [5] - 49:13, 52:3, 54:10, 59:11, 72:4
**business** [4] - 6:5, 70:24, 73:1, 73:2
**business"** [1] - 70:19
**BY** [6] - 1:13, 1:16, 1:19, 2:2, 2:3, 2:7
**bye** [2] - 100:10
**bye-bye** [1] - 100:10

## C

**calendar** [2] - 51:6, 78:11
**calendars** [2] - 47:25, 51:4
**California** [1] - 1:17
**Camden** [1] - 1:8
**camera** [6] - 7:3, 11:21, 13:8, 44:1, 44:6, 44:20
**Camille** [3] - 1:23, 99:11, 100:17
**camillepedano@ gmail.com** [1] - 1:23
**candesartan** [3] - 91:11, 92:10, 92:14
**cannot** [3] - 52:15, 60:16
**capacity** [1] - 72:9
**caps** [1] - 42:20
**captures** [1] - 60:4

**care** [2] - 25:20, 29:6
**career** [1] - 61:18
**careful** [1] - 23:2
**carefully** [1] - 22:14
**case** [15] - 8:11, 12:7, 16:21, 27:14, 35:10, 42:2, 43:7, 44:3, 80:11, 81:8, 82:4, 89:5, 89:13, 89:25, 91:21
**cases** [1] - 5:25
**catching** [1] - 22:25
**caught** [1] - 61:19
**caused** [3] - 13:16, 29:10, 35:22
**CCR** [1] - 100:17
**cell** [7] - 67:5, 71:21, 77:12, 77:13, 78:2
**CEMAT** [12] - 11:7, 11:9, 17:12, 42:20, 42:21, 42:23, 43:7, 43:8, 43:14, 43:17, 43:18
**central** [1] - 59:12
**centralized** [2] - 34:17, 40:15
**CEO** [1] - 17:19
**certain** [5] - 7:25, 81:21, 88:5, 93:22, 98:17
**certainly** [15] - 7:16, 9:5, 14:1, 20:16, 38:23, 48:22, 50:4, 50:5, 63:10, 69:20, 74:17, 88:11, 92:8, 93:17, 99:4
**certify** [1] - 100:14
**cetera** [3] - 51:13, 69:18, 70:3
**cGMP** [4] - 23:3, 34:23, 35:4, 37:4
**cGMPs** [4] - 37:4, 37:8, 37:11
**Chairman** [2] - 57:3, 57:4
**chairman** [3] - 15:15, 17:20, 50:25
**chambers** [1] - 24:10
**change** [3] - 63:7, 63:9, 63:12
**charge** [3] - 37:7, 37:12, 43:16
**charged** [1] - 42:23
**chart** [16] - 8:23, 9:8, 12:18, 44:13, 44:14, 79:17, 86:10, 86:11, 86:16, 86:17, 86:19, 87:17, 87:19, 88:13, 89:7, 90:7
**charts** [2] - 5:8, 12:12

**check** [2] - 36:20, 69:20
**checking** [1] - 43:12
**chemical** [1] - 36:1
**Chen** [31] - 5:22, 8:25, 10:10, 12:25, 15:6, 16:10, 16:12, 29:24, 47:19, 47:24, 48:7, 48:11, 48:16, 48:24, 49:6, 49:14, 51:5, 53:21, 57:3, 57:4, 57:22, 58:21, 59:9, 59:13, 59:19, 78:12, 93:17, 93:25, 96:17, 97:9
**Chen's** [8] - 9:19, 16:20, 23:22, 47:13, 50:2, 51:9, 94:16, 94:22
**chief** [4] - 50:4, 50:25, 59:13, 59:20
**China** [17] - 8:12, 8:13, 19:23, 25:17, 30:14, 30:20, 31:6, 42:3, 49:12, 56:16, 60:12, 60:20, 61:1, 63:9, 66:18, 72:5, 78:2
**Chinese** [12] - 22:23, 42:9, 42:11, 42:12, 60:14, 61:5, 61:8, 61:15, 66:23, 72:6, 73:23, 74:11
**chloride** [3] - 16:14, 16:21, 43:11
**choice** [1] - 53:10
**chromatography** [1] - 84:5
**CIPRIANI** [1] - 2:7
**circle** [1] - 13:12
**circulated** [1] - 18:11
**circumstances** [4] - 7:1, 38:5, 85:1, 90:16
**circumstantial** [1] - 15:23
**citation** [1] - 74:14
**cited** [10] - 4:7, 46:24, 55:8, 55:16, 73:10, 73:12, 74:12, 76:16, 89:14
**citizen** [1] - 72:6
**citizens** [1] - 88:21
**CIVIL** [1] - 1:3
**claim** [2] - 51:23, 63:17
**clarify** [5] - 19:22, 21:1, 43:2, 46:9, 57:11
**clarity** [1] - 62:23
**class** [1] - 44:4

clawback [2] - 53:11, 53:12
clean [1] - 28:22
clear [31] - 11:17, 27:3, 39:15, 41:3, 50:10, 55:9, 56:7, 62:25, 63:22, 69:16, 72:4, 73:15, 73:20, 74:21, 75:4, 79:23, 80:14, 80:19, 81:1, 83:17, 84:1, 84:19, 87:15, 89:20, 89:21, 90:9, 90:15, 91:1, 91:21, 94:18, 96:13
cleared [2] - 42:11, 58:4
clearly [7] - 29:4, 31:1, 63:25, 74:4, 81:17, 89:18, 91:14
Clerk [1] - 2:12
client [18] - 26:20, 31:7, 33:18, 42:7, 63:1, 63:3, 72:15, 73:23, 75:2, 77:20, 78:4, 82:7, 84:21, 84:24, 86:23, 89:23, 90:16, 91:2
clients [2] - 60:20, 61:13
close [2] - 23:1, 55:15
closely [1] - 48:5
Coast [1] - 1:17
code [1] - 67:2
Cohen [1] - 1:7
colleague [2] - 80:18, 80:19
colleagues [6] - 4:10, 17:17, 36:21, 36:24, 40:12, 91:2
collect [1] - 25:18
collected [10] - 6:7, 6:14, 11:5, 55:24, 65:13, 71:3, 71:5, 71:7, 95:16
collecting [2] - 72:5, 79:17
collection [4] - 28:6, 41:10, 46:12, 94:22
colloquy [1] - 21:4
Colorel [1] - 44:3
combat [1] - 28:10
comfort [1] - 39:7
comfortable [1] - 61:24
coming [5] - 15:4, 23:4, 43:4, 43:10, 62:17
Commencing [1] - 1:9
comment [1] - 34:8
commented [1] - 8:1

comments [1] - 64:2
communicate [1] - 73:4
communicated [1] - 12:24
communications [2] - 51:8, 59:21
companies [4] - 8:19, 23:13, 77:21, 79:5
company [26] - 6:6, 8:11, 8:12, 14:3, 14:5, 15:16, 19:21, 21:15, 22:25, 24:13, 25:9, 26:5, 35:3, 38:24, 39:14, 42:19, 50:18, 50:25, 51:1, 57:7, 57:8, 59:2, 62:3, 64:6, 70:24, 92:6
company's [1] - 38:18
compare [1] - 12:18
comparing [1] - 18:17
compartmentalize [1] - 25:14
COMPEL [1] - 1:5
compel [4] - 3:11, 31:21, 72:17, 92:17
compiled [1] - 88:13
complete [5] - 10:5, 57:25, 58:2, 71:16, 76:14
completely [5] - 16:19, 39:16, 83:12, 89:1, 92:8
compliance [1] - 39:17
compliant [3] - 64:12, 64:18, 67:16
complicated [1] - 8:18
complied [1] - 71:6
comply [1] - 82:24
composure [1] - 36:16
compound [2] - 28:20, 28:25
compounds [1] - 20:24
comprehensive [1] - 28:6
compromise [1] - 77:3
computer [1] - 1:25, 24:25, 39:6, 41:6, 53:8, 63:25, 64:21, 64:22, 66:9, 67:12, 68:23, 69:3, 69:4, 69:5, 69:7, 69:17
computer-aided [1] - 1:25
computer-generated [1] - 69:5
concern [3] - 38:3,

96:21
concerned [3] - 38:5, 79:9, 99:3
concerning [5] - 5:13, 32:9, 32:11, 54:23, 56:21
concerns [2] - 7:9, 78:19
conclude [2] - 99:9, 99:13
concluded [1] - 100:11
conduct [1] - 11:21
conducting [1] - 47:24
conduit [4] - 47:20, 48:6, 48:24, 58:22
confer [14] - 8:3, 16:7, 65:19, 73:17, 73:21, 80:16, 81:16, 84:18, 89:17, 90:14, 92:1, 92:5, 96:6, 96:16
conference [1] - 3:16
conferred [1] - 82:19
confers [2] - 17:18, 67:19
confidential [4] - 21:11, 93:3, 93:8, 97:25
confidentiality [3] - 97:18, 98:1, 98:15
confirmed [3] - 5:15, 23:18, 94:1
confused [2] - 64:16, 94:12
conjecture [1] - 32:4
consequences [1] - 62:6
considers [1] - 100:4
consistent [1] - 16:20
conspiracies [1] - 28:9
conspiracy [3] - 20:21, 31:11, 32:2
constitutes [1] - 88:9
consumers [3] - 88:24, 88:25, 89:5
consuming [1] - 53:8
contaminated [1] - 88:9
contamination [4] - 83:11, 88:7, 88:8, 91:18
contemporaneous [3] - 32:23, 37:19, 37:24
content [1] - 12:1
context [4] - 29:6, 29:23, 77:7, 82:18
Continued [1] - 2:1
continuing [2] - 61:2, 97:18

continuously [1] - 76:9
contrary [1] - 97:6
control [2] - 56:21, 72:16
conversations [1] - 81:15
convinced [1] - 15:23
Cooper [1] - 1:8
coordinating [1] - 49:25
coordination [1] - 49:23
copied [4] - 24:25, 25:2, 39:6, 57:5
copy [15] - 18:22, 24:24, 32:25, 33:2, 33:5, 41:16, 41:17, 63:24, 64:22, 65:11, 66:17, 68:17, 81:3, 90:17, 91:1
corporate [3] - 11:17, 24:11, 55:23
correct [12] - 7:22, 10:1, 18:15, 25:19, 45:17, 46:6, 46:19, 49:5, 55:5, 65:6, 99:19, 100:14
corrected [6] - 8:21, 9:3, 9:7, 10:7, 30:18, 96:4
correction [1] - 84:8
correctly [1] - 34:17
corrects [1] - 95:25
correspondence [1] - 90:13
cost [7] - 46:13, 80:25, 81:2, 81:12, 84:22, 86:21
costs [2] - 51:17, 87:1
counsel [52] - 5:15, 14:2, 18:11, 22:11, 23:4, 23:22, 24:15, 28:15, 29:11, 29:13, 29:16, 29:24, 34:4, 34:9, 34:10, 34:16, 35:11, 35:15, 35:17, 35:20, 39:19, 48:14, 48:15, 52:21, 53:1, 53:9, 56:14, 56:22, 56:25, 58:18, 58:23, 59:25, 61:9, 61:14, 66:11, 67:6, 74:12, 74:14, 74:20, 75:14, 75:17, 75:23, 75:25, 76:1, 78:22, 78:23, 82:21, 88:1, 91:19, 99:21
counsel's [4] - 14:19, 34:7, 56:18, 79:1

count [6] - 9:2, 10:13, 15:8, 47:14, 59:11, 59:24
counter [1] - 64:19
countries [2] - 78:5, 90:1
country [5] - 60:16, 60:17, 62:2, 88:23, 88:25
counts [7] - 8:1, 9:6, 14:21, 14:23, 16:4, 17:2, 17:22
couple [2] - 5:3, 71:10
course [4] - 26:15, 35:6, 62:18, 72:25
court [2] - 24:8, 61:5, 73:24
Court [14] - 1:23, 7:2, 23:20, 24:14, 25:22, 45:22, 61:23, 72:12, 73:7, 73:19, 79:20, 79:25, 99:20, 100:17
COURT [2] - 1:1, 9:14
Court-ordered [1] - 45:22
Courthouse [1] - 1:7
Courtroom [1] - 2:13
cover [3] - 41:15, 41:18, 41:23
covered [1] - 63:14
covers [1] - 74:4
CRC [1] - 100:17
create [1] - 22:24
created [9] - 22:19, 25:1, 25:4, 39:25, 60:19, 63:25, 68:24, 69:3, 70:3
creates [5] - 6:25, 7:9, 13:20, 30:10, 48:9
creation [1] - 27:15
cross [1] - 96:2
cross-purposes [1] - 96:2
CRR [1] - 100:17
crucial [1] - 82:4
curious [1] - 35:23
custodial [26] - 5:12, 5:24, 16:19, 24:21, 24:22, 29:21, 35:6, 36:20, 38:8, 45:19, 52:17, 53:14, 53:21, 55:11, 55:23, 56:2, 56:17, 58:1, 58:7, 58:21, 59:4, 94:22, 94:24, 95:13, 95:16, 95:19
custodian [24] - 5:17, 5:19, 5:20, 9:21, 11:5, 24:16, 25:6, 27:11, 27:12, 27:21,

29:18, 29:20, 35:7, 36:22, 36:24, 58:8, 73:7, 94:3, 94:19, 95:1, 95:12, 95:15, 95:18, 96:3
**custodian's** [1] - 5:19
**custodians** [20] - 8:1, 8:17, 13:1, 17:3, 17:4, 17:6, 17:15, 17:24, 27:16, 30:4, 30:15, 32:15, 33:9, 34:11, 34:15, 58:9, 58:11, 59:5, 64:5
**custodians'** [4] - 32:12, 71:7, 94:2, 94:24
**cut** [1] - 57:21

## D

**damaged** [1] - 41:12
**damaging** [1] - 40:3
**dangerous** [1] - 32:5
**Data** [1] - 60:12
**data** [39] - 31:24, 32:1, 32:23, 33:3, 33:9, 37:23, 57:20, 66:17, 71:18, 71:21, 72:5, 72:25, 73:3, 73:14, 77:6, 77:7, 77:13, 77:15, 78:2, 78:6, 80:12, 84:25, 86:16, 86:19, 86:22, 87:1, 87:3, 87:5, 87:8, 88:15, 89:10, 89:11, 89:13, 89:25, 90:2, 91:1, 92:7, 92:16
**database** [3] - 57:20, 57:25, 58:15
**Date** [1] - 100:19
**date** [11] - 5:10, 5:11, 5:24, 25:1, 25:4, 39:20, 43:13, 49:18, 55:17, 75:15
**dated** [2] - 25:4, 33:25
**dates** [1] - 9:22
**days** [2] - 12:2, 66:18
**de** [3] - 8:14, 57:21, 58:2
**de-duplicate** [1] - 57:21
**de-duplicating** [1] - 8:14
**de-duplication** [1] - 58:2
**deal** [1] - 63:13
**deals** [1] - 4:23
**debates** [1] - 61:6
**December** [2] - 43:13, 43:14
**decide** [1] - 62:10

**decision** [2] - 62:17, 62:18
**deck** [1] - 55:15
**declarations** [1] - 16:11
**deemed** [1] - 94:22
**defend** [1] - 98:13
**defendant** [2] - 75:3, 76:4
**defendants** [7] - 8:15, 52:22, 74:23, 75:7, 76:14, 77:21, 86:3
**Defendants** [3] - 2:4, 2:9, 91:7
**defendants'** [1] - 55:22
**defense** [4] - 5:14, 76:12, 82:19, 96:14
**deficient** [2] - 50:19, 63:18
**definition** [1] - 73:10
**delay** [1] - 42:15
**deleted** [9] - 32:19, 33:22, 34:8, 34:12, 34:13, 35:12, 36:12, 36:19, 39:2
**deleting** [1] - 39:1
**delicate** [1] - 98:21
**demand** [1] - 52:14
**department** [1] - 36:2
**departments** [1] - 47:2
**depose** [3] - 20:9, 34:20, 58:20
**deposed** [5] - 32:15, 36:9, 36:17, 43:18, 58:25
**deposing** [2] - 53:17, 53:21
**deposition** [4] - 34:19, 48:11, 59:9, 71:2
**depositions** [2] - 82:14, 82:18
**deprived** [1] - 53:14
**depth** [1] - 28:6
**Deputy** [1] - 2:13
**description** [2] - 38:15, 38:16
**designate** [1] - 99:22
**designations** [1] - 18:20
**designees** [1] - 11:17
**desktop** [1] - 40:20
**despite** [2] - 5:9, 5:10
**detailed** [3] - 41:16, 84:24, 87:2
**details** [1] - 77:5
**determination** [3] - 74:8, 99:24, 99:25
**determine** [4] - 7:3, 7:15, 14:15, 70:16

**developed** [1] - 11:11
**developing** [3] - 10:25, 17:5, 17:10
**development** [2] - 16:13, 16:22
**Deviation** [1] - 87:18
**devices** [3] - 70:18, 72:16, 73:22
**diatribes** [1] - 26:20
**different** [13] - 8:19, 11:8, 17:12, 52:16, 60:1, 64:4, 64:5, 72:6, 72:9, 77:22, 88:23, 88:25
**difficult** [1] - 53:17
**dinner** [1] - 93:23
**direct** [3] - 44:19, 90:5, 96:15
**directly** [2] - 31:18, 35:17
**directs** [1] - 62:11
**disabled** [1] - 9:12
**disadvantaged** [1] - 98:22
**disappointed** [1] - 62:15
**disclosed** [2] - 12:2, 27:22
**disclosing** [1] - 24:17
**disclosure** [1] - 35:21
**disconnect** [2] - 65:8, 66:4, 83:6
**discovery** [7] - 13:2, 14:4, 36:9, 80:12, 81:21, 87:11, 91:16
**discuss** [2] - 92:22, 97:16
**discussed** [5] - 40:15, 71:23, 77:6, 77:7, 82:17
**discussing** [1] - 65:5
**discussion** [8] - 76:24, 76:25, 77:1, 78:3, 83:25, 96:9, 99:14, 99:15
**discussions** [1] - 40:12
**disproportionate** [3] - 51:17, 54:10, 76:10
**disprove** [1] - 27:1
**dispute** [2] - 4:16, 77:10
**disputed** [1] - 53:2
**disputes** [1] - 73:17
**distinction** [1] - 79:25
**distressing** [2] - 23:7, 25:21
**DISTRICT** [2] - 1:1, 1:1
**disturbing** [1] - 34:19,

72:19
**ditch** [1] - 89:18
**DMF** [2] - 43:6, 83:16
**Document** [2] - 85:21, 91:7
**document** [72] - 4:2, 4:7, 4:13, 5:12, 5:15, 5:18, 9:21, 9:25, 10:1, 13:17, 14:5, 14:20, 15:8, 16:4, 16:16, 17:1, 17:22, 18:16, 21:13, 22:9, 22:12, 22:13, 23:9, 23:18, 25:10, 25:11, 26:5, 28:6, 28:8, 29:21, 30:8, 30:22, 31:17, 32:10, 33:7, 35:9, 35:10, 39:5, 41:5, 41:7, 41:8, 42:19, 42:25, 47:14, 49:9, 63:24, 64:17, 64:20, 64:24, 65:16, 65:24, 66:15, 66:21, 67:15, 68:2, 68:14, 68:17, 68:23, 69:6, 70:2, 82:14, 85:24, 95:20, 97:2, 97:24, 98:12, 98:23, 99:1
**documentation** [5] - 8:13, 54:23, 79:19, 89:8, 92:14
**documenting** [1] - 26:5
**documents** [147] - 5:23, 6:3, 6:13, 6:18, 7:25, 8:8, 9:1, 9:2, 9:20, 10:4, 10:8, 10:9, 10:13, 10:14, 10:18, 11:1, 15:10, 15:13, 15:15, 15:25, 16:4, 16:19, 17:8, 17:15, 18:3, 18:9, 18:14, 21:19, 21:21, 24:2, 25:19, 27:21, 29:25, 30:1, 30:7, 30:11, 30:13, 30:17, 32:3, 34:7, 37:17, 37:18, 38:19, 38:25, 39:3, 39:18, 40:2, 40:20, 41:20, 42:3, 45:18, 46:1, 47:10, 48:10, 48:12, 48:13, 48:19, 48:20, 48:23, 49:7, 49:8, 49:15, 50:19, 51:3, 51:8, 51:24, 52:5, 52:19, 53:11, 53:14, 54:12, 54:13, 54:14, 54:16, 56:1, 56:3, 56:8, 56:15, 56:20, 56:23, 56:24, 57:4, 57:5,

57:8, 57:10, 57:22, 58:6, 58:19, 59:1, 59:4, 59:14, 59:16, 59:18, 60:5, 60:15, 61:2, 61:16, 62:4, 63:16, 65:11, 65:14, 67:1, 67:14, 67:22, 68:25, 70:16, 70:17, 78:22, 78:23, 79:4, 80:15, 80:17, 80:20, 80:23, 80:24, 81:1, 84:22, 86:4, 86:8, 89:17, 90:6, 90:18, 90:21, 91:8, 92:11, 92:12, 94:1, 94:4, 94:17, 94:18, 94:21, 95:2, 95:3, 95:8, 95:13, 95:17, 96:20, 96:23, 96:24, 97:19, 98:6
**dog** [1] - 45:7
**dollars** [6] - 54:15, 81:2, 81:12, 84:23, 87:1, 90:16
**done** [18] - 10:8, 11:3, 11:4, 30:5, 30:13, 43:5, 44:21, 46:12, 51:14, 52:8, 72:14, 73:7, 79:18, 83:9, 83:11, 83:13, 83:16, 96:19
**double** [2] - 43:12, 69:20
**double-check** [1] - 69:20
**double-checking** [1] - 43:12
**doubled** [2] - 28:15, 29:11
**doubling** [1] - 35:11
**doubt** [2] - 29:17, 97:4
**down** [10] - 12:10, 14:19, 22:12, 28:15, 29:11, 31:8, 32:5, 35:11, 48:1, 57:21
**downloaded** [1] - 40:21
**downloading** [1] - 40:25
**Dr** [31] - 5:9, 11:2, 13:13, 13:23, 20:7, 20:9, 20:10, 20:12, 22:17, 25:6, 26:21, 27:8, 27:11, 27:14, 28:17, 30:24, 31:25, 34:23, 35:18, 35:20, 37:12, 41:19, 41:23, 42:18, 43:7, 43:9, 43:15, 43:17
**draft** [10] - 63:23,

64:13, 64:25, 65:1,
65:5, 66:6, 66:12,
67:8, 99:20
**drafts** [5] - 64:3, 64:7,
66:1, 66:11, 67:13
**drill** [1] - 3:4
**drop** [1] - 76:16
**dropped** [2] - 72:10,
76:19
**dropping** [1] - 78:25
**Du** [7] - 17:19, 24:3,
24:10, 40:12, 72:1,
77:2, 77:4
**Du's** [1] - 72:3
**Duane** [5] - 17:17,
30:17, 30:19, 31:6,
42:5
**DUANE** [1] - 2:2
**due** [1] - 25:25
**duplicate** [18] - 5:17,
5:19, 8:17, 9:21,
29:20, 30:4, 34:15,
35:7, 36:22, 36:23,
57:21, 94:3, 94:18,
94:25, 95:9, 95:12,
95:18, 96:3
**duplicates** [3] - 58:5,
58:15, 67:23
**duplicating** [1] - 8:14
**duplication** [1] - 58:2
**during** [3] - 82:13,
83:9, 83:13
**duty** [1] - 45:4

### E

**earliest** [1] - 9:21
**early** [1] - 47:23
**easy** [1] - 9:2
**ECF** [1] - 85:21
**economically** [1] -
92:8
**eDiscovery** [1] - 61:11
**edited** [1] - 64:6
**edits** [1] - 64:3
**effect** [1] - 16:12
**efficient** [1] - 52:10
**effort** [2] - 30:7, 37:21
**eight** [1] - 17:20
**eight-hour** [1] - 17:20
**Eisenhower** [1] - 1:14
**either** [3] - 41:20,
53:8, 96:25
**electronic** [17] - 13:2,
13:3, 24:24, 33:3,
36:8, 39:6, 40:8,
41:4, 41:5, 41:6,
41:7, 41:8, 41:17,
49:21, 52:9, 66:17,
70:3
**electronically** [2] -

53:6, 55:4
**elicited** [1] - 20:17
**email** [74] - 5:6, 5:10,
9:5, 13:3, 13:14,
14:7, 15:24, 16:17,
16:25, 17:25, 18:1,
18:5, 19:6, 19:19,
19:20, 21:1, 21:5,
22:22, 23:6, 23:12,
23:23, 24:21, 26:22,
28:13, 28:17, 29:25,
30:24, 32:11, 32:21,
33:6, 33:8, 33:21,
34:10, 34:16, 34:18,
34:24, 35:2, 35:5,
35:12, 37:3, 38:6,
40:7, 40:16, 40:18,
40:21, 41:13, 41:15,
41:18, 41:23, 43:19,
50:2, 50:6, 50:8,
51:9, 53:19, 55:13,
59:19, 68:13, 70:24,
72:3, 77:1, 77:8,
80:18, 82:2, 83:5,
83:8, 84:1, 85:7,
93:5, 95:5, 95:7
**email's** [1] - 33:24
**emailing** [3] - 14:22,
15:1, 96:8
**emails** [20] - 23:25,
39:1, 40:5, 40:23,
40:25, 47:18, 47:19,
47:25, 49:23, 51:3,
51:13, 53:19, 57:3,
71:24, 72:1, 77:2,
77:3, 78:10, 83:14,
84:20
**emphasize** [1] - 91:25
**employed** [1] - 5:9
**employees** [1] - 39:14
**enable** [1] - 9:14
**encompass** [1] -
73:11
**encompassed** [1] -
91:12
**encompasses** [1] -
53:3
**encourage** [1] - 59:25
**encouraging** [1] -
45:23
**encrypted** [1] - 93:5
**end** [5] - 4:10, 4:16,
4:20, 16:18, 97:8
**enter** [3] - 61:23,
62:10, 65:12
**entered** [8] - 81:4,
81:14, 82:16, 85:3,
85:16, 90:12, 90:13
**entering** [1] - 61:24
**entire** [4] - 46:11,

56:1, 79:7, 82:4
**entities** [2] - 77:20,
77:21
**entitled** [3] - 87:11,
91:16, 100:15
**epidemiologic** [2] -
88:9, 88:17
**error** [1] - 59:17
**ESI** [29] - 6:4, 6:7, 6:8,
9:6, 30:2, 40:13,
52:13, 64:8, 64:12,
64:18, 66:7, 69:8,
70:23, 71:6, 71:8,
71:13, 72:23, 73:2,
73:4, 73:9, 73:11,
73:14, 74:25, 76:13,
77:16, 77:18, 77:23,
81:3
**ESI-compliant** [2] -
64:12, 64:18
**especially** [8] - 8:11,
46:14, 48:10, 50:15,
55:15, 89:8, 89:25,
98:9
**ESQUIRE** [7] - 1:13,
1:16, 1:19, 2:2, 2:3,
2:7, 2:12
**essentially** [2] - 60:15,
61:1
**established** [3] -
29:10, 59:8, 71:4
**et** [3] - 51:13, 69:18,
70:3
**Europe** [2] - 88:10,
88:19
**European** [9] - 78:5,
88:8, 88:9, 88:16,
88:18, 88:20, 88:21,
89:4, 89:5
**evaluation** [1] - 91:22
**event** [1] - 8:16
**evidence** [13] - 5:1,
7:22, 10:19, 11:14,
11:16, 12:9, 15:23,
15:24, 31:22, 49:18,
49:22, 54:25, 55:17
**evidences** [1] - 30:7
**evidentiary** [2] -
43:23, 59:22
**evolved** [1] - 7:11
**exact** [1] - 41:14
**exactly** [8] - 28:10,
29:9, 35:22, 42:25,
76:8, 82:5, 98:18
**example** [15] - 5:21,
6:4, 6:11, 7:5, 13:23,
13:24, 15:5, 25:23,
38:15, 40:22, 47:22,
57:3, 88:3, 96:20,
97:24

**examples** [2] - 5:4,
5:22
**Excel** [1] - 86:20
**except** [1] - 24:23
**excerpts** [1] - 71:2
**exchange** [1] - 85:7
**exculpatory** [1] - 25:7
**excuse** [5] - 8:19,
10:24, 17:14, 19:5,
20:7
**executives** [2] - 47:21,
51:1
**exhaustive** [1] - 73:13
**EXHIBIT** [1] - 18:23
**exhibit** [1] - 66:22
**Exhibit** [14] - 12:3,
18:19, 18:21, 21:25,
29:24, 44:13, 68:11,
68:14, 68:16, 69:15,
70:7, 70:9, 85:7,
95:6
**EXHIBITS** [1] - 22:3
**Exhibits** [1] - 10:15
**exhibits** [2] - 18:11,
68:8
**exist** [14] - 11:9,
32:21, 34:18, 37:17,
37:18, 39:3, 39:4,
41:22, 43:8, 45:4,
49:25, 78:23, 87:3,
90:24
**existed** [5] - 40:8,
43:8, 43:14, 66:9,
95:14
**existence** [1] - 24:18
**exists** [7] - 34:16,
38:7, 39:5, 67:8,
70:3, 73:14, 86:23
**expand** [1] - 64:18
**expansive** [1] - 91:22
**expect** [6] - 51:3, 51:7,
55:4, 59:20, 99:18,
99:20
**expedite** [2] - 52:10,
52:15
**expended** [1] - 51:20
**expense** [2] - 66:18,
89:24
**expenses** [1] - 89:19
**expensive** [3] - 46:14,
86:20, 87:5
**experiments** [2] -
17:12, 37:19
**expert** [7] - 35:3, 36:8,
42:9, 80:12, 88:22,
89:14, 95:22
**experts** [2] - 88:4,
88:15
**explain** [2] - 29:19,
39:11

**explained** [3] - 20:12,
25:13, 49:18
**explains** [1] - 84:8
**explanation** [5] -
31:12, 35:20, 44:10,
47:13, 89:4
**explanations** [2] -
25:16, 38:7
**export** [4] - 58:14,
61:12, 61:16, 62:4
**exported** [1] - 58:4
**extensively** [4] -
20:11, 40:14, 71:12,
95:24
**extent** [4] - 14:14,
34:6, 79:18, 99:23
**extraordinarily** [3] -
50:21, 84:19, 86:19

### F

**face** [4] - 6:2, 6:18,
6:20, 13:20
**faced** [1] - 61:19
**facially** [1] - 47:13
**facie** [1] - 6:22
**facilities** [2] - 79:23,
87:12
**facility** [2] - 83:19,
87:15
**fact** [35] - 7:7, 12:1,
13:15, 13:16, 14:10,
16:18, 17:22, 25:21,
25:22, 26:23, 27:5,
29:19, 30:7, 32:3,
34:10, 37:6, 39:20,
41:4, 41:8, 41:18,
41:22, 46:21, 49:14,
57:8, 58:22, 59:19,
79:21, 80:21, 87:23,
88:16, 89:2, 95:5,
95:14, 98:1, 99:4
**fact-sensitive** [1] -
39:20
**facts** [2] - 11:1, 31:15
**factual** [1] - 27:22
**failure** [1] - 5:1
**fair** [1] - 58:20
**familiar** [2] - 16:11,
44:4
**families** [1] - 56:9
**far** [4] - 30:23, 54:25,
76:13, 76:15
**FARR** [1] - 1:19
**favorable** [1] - 24:16
**FDA** [10] - 10:23,
11:12, 19:15, 26:3,
33:4, 43:6, 43:12,
50:18, 81:6
**feasible** [1] - 92:8
**Federal** [1] - 99:20

**feedback** [1] - 11:24
**felt** [3] - 34:24, 98:20, 98:24
**Ferretti** [4] - 82:1, 84:2, 84:6, 85:7
**few** [6] - 26:17, 29:23, 47:1, 49:11, 53:2, 71:16
**field** [1] - 94:4
**fields** [1] - 5:17
**fight** [1] - 78:3
**fights** [1] - 54:1
**figure** [6] - 13:22, 24:12, 34:25, 61:14, 63:3, 71:20
**figured** [3] - 22:23, 35:24, 71:17
**file** [32] - 5:12, 5:19, 5:25, 14:20, 16:19, 24:21, 24:22, 29:21, 35:6, 36:10, 36:12, 38:8, 45:19, 46:17, 49:19, 50:14, 52:17, 53:21, 55:11, 56:2, 56:17, 58:7, 58:21, 59:4, 62:12, 66:18, 68:19, 93:5, 94:17, 95:18, 96:6, 97:21
**filed** [7] - 3:14, 15:8, 16:5, 20:14, 67:20, 75:14, 75:20
**files** [15] - 13:2, 13:3, 25:19, 32:25, 36:20, 41:11, 43:19, 45:14, 47:4, 47:9, 51:12, 52:9, 55:24, 57:22, 95:16
**final** [1] - 64:13
**finalized** [1] - 43:12
**finally** [3] - 11:13, 50:1, 67:6
**fine** [2] - 30:1, 94:15
**finish** [1] - 69:2
**FIRM** [1] - 1:19
**firms** [3] - 30:13, 30:20, 31:6
**first** [19] - 5:11, 5:24, 7:2, 7:24, 10:3, 16:10, 18:16, 19:7, 22:11, 27:2, 27:9, 27:22, 34:7, 36:8, 42:13, 49:4, 71:11, 72:6, 84:15
**five** [2] - 44:12, 53:7
**Florida** [1] - 1:20
**focus** [2] - 33:7, 56:25
**focused** [3] - 23:12, 40:7, 70:21
**follow** [6] - 3:15, 5:1, 34:25, 52:3, 66:16,

99:17
**followed** [1] - 52:13
**FOR** [3] - 1:1, 18:23, 22:3
**force** [2] - 61:8, 61:9
**forced** [1] - 24:10
**foregoing** [1] - 100:14
**foreign** [3] - 60:18, 77:20, 77:21
**foreshadow** [1] - 97:20
**forget** [1] - 53:25
**forgetting** [1] - 53:1
**form** [9] - 39:6, 64:12, 64:18, 64:21, 67:11, 69:6, 77:7, 87:4, 95:10
**formal** [1] - 97:21
**format** [5] - 40:9, 66:9, 66:10, 67:9, 70:3
**forth** [2] - 26:1, 82:21
**forward** [1] - 99:6
**foundation** [2] - 43:23, 59:23
**four** [2] - 8:18, 8:19
**frank** [2] - 37:15, 52:11
**frankly** [5] - 33:4, 55:20, 61:18, 72:15, 76:15
**FREEMAN** [1] - 1:13
**front** [3] - 21:3, 25:8, 29:18
**frustrating** [1] - 22:7
**FTI** [1] - 60:25
**Fulcrum** [2] - 77:6
**fulfill** [1] - 38:24
**full** [1] - 87:15
**fully** [2] - 62:20, 75:19
**function** [1] - 53:8
**future** [1] - 18:14

---

## G

**gapped** [1] - 57:16
**gathers** [1] - 49:21
**Ge** [5] - 34:20, 37:2, 37:6, 37:10
**GE** [1] - 34:21
**Geddis** [1] - 15:2
**general** [1] - 77:5
**generalizations** [1] - 31:14
**generally** [3] - 20:25, 55:14, 73:11
**generated** [2] - 69:5, 69:7
**genotoxic** [1] - 42:22
**geopolitical** [1] - 61:20
**GEORGE** [1] - 1:19

**Germany** [1] - 88:18
**given** [15] - 17:14, 33:10, 33:11, 35:13, 37:20, 37:21, 41:9, 41:17, 41:23, 45:24, 46:14, 54:22, 59:19, 71:17, 82:22
**glad** [5] - 8:9, 16:24, 18:4, 62:15, 76:7
**Gmail** [1] - 77:4
**go-between** [1] - 59:21
**GOLDBERG** [1] - 2:2
**goodness** [1] - 30:21
**Gorda** [1] - 1:20
**Gospel** [1] - 15:14
**govern** [1] - 99:17
**government** [3] - 49:10, 60:17, 61:15
**government's** [1] - 60:15
**grade** [2] - 79:21, 89:11
**graph** [1] - 89:8
**grapple** [1] - 96:24
**gravity** [1] - 78:20
**great** [4] - 12:16, 28:7, 39:8, 66:18
**grounds** [1] - 46:18
**group** [1] - 76:12
**Gu** [2] - 11:2, 20:7
**Gu's** [1] - 70:17
**guess** [6] - 33:22, 44:24, 54:22, 90:3, 93:7, 94:12
**guessing** [2] - 30:12, 56:20
**guns** [1] - 16:3

---

## H

**Hague** [3] - 72:7, 73:5
**halfway** [2] - 7:13, 26:9
**hall** [2] - 24:9, 48:1
**hamstrung** [1] - 98:20
**hand** [4] - 43:24, 53:18, 57:6
**hand-in-hand** [1] - 53:18
**handling** [1] - 23:25
**hands** [1] - 55:15
**handwrite** [1] - 68:24
**handwritten** [9] - 10:16, 32:24, 37:19, 37:23, 51:4, 51:13, 69:1, 69:11
**handwrote** [1] - 68:23
**handy** [1] - 28:14
**happily** [1] - 21:22
**happy** [10] - 9:8, 9:18,

31:16, 39:5, 39:9, 54:9, 66:15, 69:12, 84:20, 90:12
**harass** [1] - 76:9
**harassment** [1] - 81:23
**hard** [24] - 14:9, 15:23, 18:22, 25:17, 26:3, 26:6, 32:25, 33:2, 33:5, 41:16, 53:25, 54:19, 56:18, 61:13, 63:24, 64:22, 65:10, 65:11, 66:17, 67:17, 68:17, 81:3, 90:17, 91:1
**hard-copy** [8] - 32:25, 33:2, 33:5, 65:11, 66:17, 68:17, 90:17, 91:1
**harkening** [1] - 91:11
**harm** [1] - 26:12
**haystack** [1] - 4:9
**head** [6] - 27:10, 32:5, 34:21, 36:2, 43:17, 43:18
**headers** [1] - 69:5
**heading** [2] - 63:15, 70:15
**Healthcare** [1] - 2:5
**hear** [10] - 25:15, 25:16, 27:25, 31:12, 47:6, 54:15, 71:12, 83:4, 92:13, 94:8
**heard** [13] - 22:9, 24:3, 25:15, 33:20, 37:24, 45:7, 47:3, 48:8, 50:18, 51:11, 52:6, 75:11, 100:1
**hearing** [6] - 9:19, 21:11, 23:8, 26:22, 27:2, 27:4
**Hearing** [2] - 18:19, 18:21
**HEARING** [2] - 18:23, 22:3
**hearings** [6] - 18:11, 18:14, 32:21, 97:18, 97:22, 98:5
**heart** [1] - 35:10
**HEINZ** [1] - 2:7
**held** [1] - 3:1
**hello** [1] - 4:5
**help** [1] - 55:25
**helpful** [5] - 5:8, 13:13, 38:14, 38:23, 55:1
**helps** [1] - 8:16
**hide** [1] - 30:7
**high** [2] - 42:23, 51:1
**high-level** [2] - 42:23,

51:1
**higher** [2] - 9:1, 88:4
**highlight** [2] - 12:23, 31:7
**Highway** [1] - 1:17
**Hilton** [2] - 34:20, 76:25
**history** [3] - 12:7, 52:22, 59:6
**hit** [10] - 3:25, 8:1, 46:2, 47:10, 50:14, 53:14, 56:9, 56:12, 59:24, 96:24
**hits** [9] - 45:16, 45:20, 45:22, 56:4, 56:6, 56:24, 57:9, 65:15
**hold** [29] - 3:6, 4:24, 5:7, 9:17, 11:22, 13:8, 14:1, 15:6, 15:19, 23:8, 29:16, 33:14, 35:14, 38:4, 38:11, 38:22, 39:10, 39:15, 44:1, 44:6, 44:8, 44:11, 44:16, 44:19, 83:3, 88:2
**holding** [1] - 25:5
**holds** [9] - 5:2, 6:17, 7:3, 7:6, 7:8, 7:10, 7:14, 11:18, 26:10
**Hong** [1] - 70:17
**Honor** [186] - 3:15, 4:5, 4:12, 5:3, 5:8, 5:17, 6:8, 7:13, 7:14, 7:19, 8:7, 9:1, 9:8, 9:13, 9:17, 10:3, 10:11, 10:20, 11:7, 11:10, 11:13, 11:23, 12:4, 12:8, 12:19, 12:21, 12:23, 13:9, 16:9, 16:11, 16:24, 17:17, 18:6, 18:8, 18:24, 18:25, 19:3, 19:4, 19:11, 19:22, 20:6, 20:18, 20:23, 21:12, 21:20, 22:8, 23:8, 24:4, 24:20, 25:22, 26:13, 26:17, 27:24, 29:14, 31:2, 31:15, 32:5, 32:6, 32:14, 32:20, 33:4, 33:15, 33:24, 35:7, 36:8, 36:19, 39:8, 40:10, 40:18, 41:15, 42:6, 42:15, 43:2, 44:23, 45:4, 45:11, 45:21, 46:9, 46:19, 46:20, 47:8, 49:2, 49:17, 50:1, 50:11, 50:15, 51:15, 52:11, 52:20, 53:6, 53:24,

54:8, 55:7, 56:4,
56:7, 56:14, 57:11,
58:8, 58:19, 60:9,
61:19, 61:22, 61:23,
62:20, 64:15, 65:7,
65:17, 66:4, 66:14,
66:19, 67:1, 67:2,
67:17, 67:19, 68:6,
68:11, 68:16, 69:10,
69:19, 70:4, 70:10,
71:10, 71:15, 72:15,
72:18, 73:8, 73:9,
73:10, 73:21, 74:19,
74:24, 75:13, 76:1,
76:8, 76:10, 76:22,
77:17, 78:7, 78:15,
80:8, 80:14, 81:1,
81:9, 81:24, 82:10,
82:12, 82:16, 83:1,
83:2, 83:5, 83:24,
84:10, 84:15, 85:2,
85:5, 85:8, 85:15,
85:20, 86:11, 86:14,
87:4, 87:9, 87:23,
88:20, 89:6, 89:10,
89:20, 90:10, 90:12,
91:4, 91:19, 91:25,
92:5, 92:24, 93:16,
95:21, 96:6, 96:18,
97:15, 98:2, 98:9,
98:21, 98:25, 100:6
**Honor's** [6] - 7:3, 8:22,
64:10, 66:16, 74:22,
82:23
**Honorable** [2] - 2:12,
3:2
**HONORABLE** [1] -
1:10
**hope** [6] - 5:8, 25:14,
47:3, 47:9, 61:7,
65:18
**hoping** [2] - 61:4,
62:22
**hour** [2] - 17:20, 44:17
**hours** [1] - 17:17
**housekeeping** [1] -
92:23
**Huahai** [7] - 2:5,
19:23, 20:1, 20:15,
20:21, 37:11, 37:13
**huge** [6] - 26:20,
51:21, 54:14, 81:19,
90:25, 92:6
**hundred** [3] - 48:12,
53:7, 84:4

## I

**idea** [23] - 9:22, 10:17,
10:23, 19:17, 19:19,
21:6, 21:8, 25:6,

27:16, 27:21, 28:3,
32:2, 36:14, 37:10,
37:20, 41:6, 41:13,
43:15, 49:14, 54:6,
72:11, 73:24, 75:1
**identification** [1] -
68:1
**IDENTIFICATION** [2] -
18:23, 22:4
**identified** [3] - 18:10,
44:10, 48:20
**identify** [5] - 43:1,
54:20, 65:23, 91:17,
100:3
**illuminate** [1] - 40:5
**illustrate** [1] - 23:13
**imagine** [6] - 14:9,
26:3, 26:6, 55:1,
56:18, 58:20
**implying** [1] - 32:4
**importance** [1] - 59:9
**important** [18] - 5:6,
20:22, 23:5, 23:24,
24:1, 27:19, 27:25,
33:22, 37:7, 48:24,
49:5, 57:2, 57:9,
59:3, 60:4, 89:13,
93:23
**impossible** [1] - 92:8
**impression** [1] - 56:8
**improve** [1] - 98:19
**Improvement** [8] -
10:17, 18:2, 27:9,
27:10, 27:12, 27:18,
37:9, 98:16
**improvement** [1] -
37:5
**impugn** [1] - 26:20
**impurities** [9] - 19:12,
36:2, 36:3, 37:13,
42:19, 42:22, 43:1,
43:17
**impurity** [6] - 19:14,
20:13, 22:17, 28:18,
29:8, 29:9
**Impurity** [6] - 19:10,
19:11, 19:14, 20:12,
20:14, 20:20
**IN** [1] - 1:4
**in-depth** [1] - 28:6
**inadequate** [1] - 39:16
**Inc** [1] - 2:9
**inclined** [1] - 75:8
**included** [2] - 44:15,
90:21
**includes** [3] - 4:7,
37:23, 91:9
**including** [13] - 8:25,
10:10, 11:2, 17:18,
19:14, 29:20, 37:19,

41:4, 41:11, 61:10,
65:10, 72:1, 77:2
**inclusive** [1] - 56:9
**increase** [1] - 89:19
**increased** [1] - 14:21
**incredible** [3] - 31:23,
54:10, 75:2
**incredibly** [10] - 15:9,
28:5, 33:17, 38:23,
45:22, 52:14, 54:4,
82:6, 87:4
**incur** [1] - 51:18
**indicates** [1] - 6:2
**indication** [1] - 54:23
**individual** [2] - 72:5,
72:8
**individuals** [3] -
44:10, 44:12, 44:16
**infer** [2] - 59:11, 81:23
**inference** [1] - 30:10
**informally** [1] - 24:11
**information** [29] - 7:7,
9:23, 13:20, 15:3,
15:21, 16:5, 17:13,
18:18, 21:17, 21:18,
24:11, 37:1, 37:22,
38:25, 40:2, 41:4,
41:16, 43:9, 51:7,
55:21, 57:16, 64:9,
70:25, 72:17, 79:17,
89:6, 93:3, 96:3,
98:2
**informed** [1] - 12:14
**initial** [2] - 72:2, 75:16
**inquiry** [1] - 39:20,
43:25
**insisted** [5] - 81:10,
81:18, 89:11, 89:12,
92:3
**instance** [1] - 38:8
**instead** [4] - 28:8,
47:19, 62:17, 64:22
**intact** [1] - 64:7
**intend** [1] - 50:6
**intended** [3] - 29:22,
74:25, 76:13
**intending** [2] - 62:20,
93:13
**intends** [1] - 62:24
**intensive** [2] - 52:14,
81:13
**intent** [1] - 75:4
**interacting** [4] - 47:21,
51:1, 51:2, 57:7
**interest** [2] - 59:15,
80:23
**interested** [2] - 8:23,
35:15
**interesting** [5] - 3:20,
26:19, 34:5, 56:14,

59:1
**Internet** [1] - 57:24
**interpret** [1] - 74:22
**interpreted** [2] -
74:25, 75:6
**interrupt** [2] - 33:19,
75:14
**intervention** [1] - 76:2
**interview** [1] - 17:20
**invalid** [1] - 73:6
**Investigation** [1] -
87:18
**investigation** [2] -
19:8, 86:5
**invitations** [1] - 47:1
**invite** [1] - 49:21
**invited** [1] - 55:3
**invites** [2] - 46:23,
78:11
**involve** [1] - 17:14
**involved** [12] - 5:6,
10:24, 15:16, 17:8,
17:11, 17:21, 27:15,
40:11, 43:7, 44:5,
51:2, 89:24
**involvement** [5] -
16:13, 24:19, 27:8,
27:9
**iPhone** [1] - 28:14
**Irbesartan** [8] - 10:17,
18:2, 27:9, 27:10,
27:12, 27:18, 37:9,
98:16
**irbesartan** [15] -
17:14, 19:8, 28:19,
37:4, 65:5, 66:4,
66:5, 91:10, 91:12,
91:14, 92:9, 92:12,
92:15, 98:19
**issue** [66] - 6:6, 10:3,
10:21, 16:10, 17:7,
25:22, 28:1, 29:22,
36:22, 45:14, 45:15,
46:21, 48:9, 49:7,
51:18, 51:19, 54:6,
55:10, 55:20, 57:12,
58:16, 62:7, 62:9,
62:16, 63:5, 63:9,
63:13, 63:14, 64:1,
70:14, 72:10, 72:12,
74:9, 74:15, 74:16,
75:10, 75:12, 75:19,
76:5, 76:18, 77:4,
77:6, 78:9, 78:13,
78:15, 78:25, 79:2,
79:3, 79:11, 79:12,
80:8, 82:17, 83:18,
92:19, 92:23, 93:16,
95:25, 96:14, 96:16,
97:8, 97:11, 97:15,

97:17, 97:19
**issue's** [1] - 79:21
**issued** [1] - 6:6
**issues** [28] - 4:23, 8:6,
8:10, 14:13, 16:21,
24:20, 38:15, 38:16,
46:15, 49:3, 50:14,
50:16, 57:23, 60:19,
62:6, 62:13, 63:11,
73:18, 74:11, 74:18,
78:1, 78:20, 82:22,
92:5, 93:18, 95:23,
96:11, 96:17
**it'd** [1] - 38:14
**item** [2] - 3:22
**items** [1] - 3:25
**itself** [3] - 33:10,
72:24, 98:17

## J

**January** [4] - 5:12,
72:10, 76:18, 76:24
**JERSEY** [1] - 1:1
**Jersey** [4] - 1:8, 1:14,
99:20
**JESSICA** [2] - 2:3, 2:7
**Jinsheng** [17] - 5:5,
5:21, 10:12, 10:24,
15:4, 15:5, 16:25,
17:25, 19:5, 19:16,
24:15, 24:21, 25:23,
29:15, 29:20, 42:22,
67:3
**jive** [1] - 11:1
**job** [3] - 35:25, 36:1,
43:1
**Journal** [1] - 60:14
**Jucai** [3] - 34:20, 37:2
**JUCAI** [1] - 34:20
**Judge** [18] - 11:15,
24:8, 53:2, 54:4,
60:11, 62:21, 74:13,
79:22, 81:20, 83:17,
84:10, 84:16, 87:10,
87:15, 87:24, 89:22,
91:6, 91:21
**JUDGE** [130] - 3:4,
3:10, 3:17, 3:21,
4:17, 4:21, 6:15,
7:17, 7:20, 9:10,
11:20, 12:11, 12:14,
12:17, 13:6, 16:8,
18:7, 18:15, 19:1,
19:25, 21:16, 21:24,
22:2, 22:5, 24:7,
26:11, 26:16, 28:23,
31:3, 32:7, 33:12,
33:20, 34:1, 34:3,
36:4, 38:1, 39:22,
40:4, 42:2, 42:14,

43:21, 45:2, 45:6,
45:13, 45:23, 46:1,
46:4, 46:7, 46:16,
47:6, 49:1, 50:9,
50:22, 51:11, 52:8,
52:16, 52:24, 53:23,
54:19, 54:22, 55:25,
56:6, 56:11, 57:13,
57:18, 58:16, 59:10,
61:21, 62:9, 63:5,
64:14, 65:21, 66:20,
66:24, 67:25, 68:9,
68:12, 69:15, 69:21,
69:25, 70:5, 70:9,
70:11, 70:14, 71:9,
72:21, 73:25, 74:5,
74:8, 75:10, 75:22,
76:20, 77:9, 78:8,
78:17, 79:3, 79:8,
79:12, 80:2, 82:9,
82:11, 83:3, 83:23,
85:6, 85:10, 85:14,
85:18, 85:22, 85:25,
86:13, 88:2, 90:3,
91:3, 91:23, 92:18,
92:25, 93:4, 93:12,
93:20, 94:6, 94:8,
96:7, 96:15, 97:10,
97:13, 98:7, 99:2,
99:15, 100:7, 100:9
**Judge's** [1] - 87:7
**judgment** [2] - 7:4,
77:12
**judicial** [1] - 99:5
**Judicial** [1] - 2:12
**July** [7] - 5:10, 5:11,
14:7, 25:24, 29:25,
75:22, 95:6
**Jun** [7] - 17:19, 24:3,
24:10, 40:12, 72:1,
77:2, 77:4
**June** [2] - 25:1, 47:23
**justifies** [1] - 98:1

**K**

**KATZ** [1] - 1:13
**keep** [7] - 19:6, 28:1,
32:18, 37:7, 93:24,
97:22
**keeping** [1] - 33:2
**keeps** [3] - 21:2, 27:7,
35:11
**kept** [7] - 13:4, 32:25,
33:8, 33:11, 34:11,
40:22, 68:19
**key** [1] - 16:21
**kind** [20] - 20:21,
23:19, 28:8, 32:4,
37:13, 37:14, 37:21,
43:4, 49:20, 49:23,

31:6, 33:15, 42:9,
44:3, 49:12, 49:16,
60:12, 61:7, 61:13,
62:1, 62:3, 63:7,
63:9, 72:9, 73:23,
74:11, 74:13, 74:14,
77:22, 78:6
**LAW** [1] - 1:19
**Law** [2] - 2:12, 60:13
**laws** [1] - 49:7
**lawyer** [1] - 56:16
**lawyers** [2] - 42:3,
61:10
**leaders** [1] - 22:25
**learn** [2] - 24:12,
24:13
**learned** [1] - 24:18
**least** [3] - 7:2, 12:5,
38:18
**leave** [2] - 31:19, 78:6
**leaves** [1] - 97:7
**Lee** [1] - 93:6
**left** [6] - 12:22, 13:1,
14:3, 14:5, 14:7,
60:16
**legal** [3] - 11:18,
38:24, 39:17
**lengths** [2] - 28:7,
31:24
**lengthy** [1] - 32:10
**less** [1] - 86:21
**letter** [9] - 3:16, 5:7,
15:6, 15:19, 18:19,
35:14, 38:14, 44:8,
80:17
**lettered** [1] - 19:13
**letters** [14] - 4:24,
11:22, 12:1, 13:8,
14:17, 33:14, 38:4,
38:11, 39:10, 39:15,
44:1, 44:6, 44:16,
44:19
**level** [7] - 11:25,
42:23, 43:3, 44:5,
49:11, 51:1, 98:14
**levels** [4] - 87:22,
88:4, 88:6, 89:7
**Li** [18] - 20:10, 20:11,
20:12, 22:11, 23:17,
24:23, 27:11, 31:25,
34:11, 34:14, 41:23,
43:9, 43:18, 47:22,
78:12, 78:15, 78:21,
78:24
**Li's** [5] - 29:21, 41:5,
41:19, 70:17, 79:4
**liability** [1] - 61:2
**LIABILITY** [1] - 1:4
**liaison** [1] - 74:20
**light** [4] - 39:13,

58:21, 74:2, 78:19
**lightly** [3] - 81:24,
93:21, 99:4
**likely** [5] - 28:18,
28:19, 28:24, 46:4,
95:16
**limit** [2] - 60:4, 88:7
**limiting** [1] - 79:20
**Lin** [39] - 5:5, 5:9,
5:21, 8:25, 10:12,
10:14, 10:23, 10:24,
11:7, 11:8, 13:13,
13:23, 15:5, 16:25,
17:25, 19:6, 19:16,
20:4, 20:7, 20:9,
22:17, 24:15, 25:6,
25:23, 27:14, 28:17,
29:15, 29:20, 34:23,
35:18, 35:20, 37:12,
42:18, 42:22, 43:7,
43:15, 67:4
**lin** [1] - 19:20
**Lin's** [6] - 10:16,
10:18, 24:21, 26:21,
27:8, 30:24
**line** [2] - 42:7, 71:25
**link** [1] - 95:19
**list** [9] - 17:1, 17:16,
19:12, 29:19, 30:3,
34:15, 43:16, 73:13,
95:11
**listed** [10] - 5:19, 7:23,
24:16, 25:6, 25:8,
29:17, 35:7, 68:7,
94:3, 94:25
**listen** [1] - 98:23
**listing** [1] - 95:18
**lit** [2] - 7:14, 26:10
**litany** [1] - 55:12
**literally** [5] - 14:22,
15:1, 26:1, 35:2,
57:6
**litigant** [1] - 61:6
**litigated** [1] - 79:21
**litigation** [42] - 4:24,
5:2, 5:7, 6:16, 7:6,
7:8, 7:10, 11:22,
13:1, 13:8, 13:17,
14:1, 14:4, 15:6,
15:19, 29:16, 33:25,
33:14, 33:23, 34:9,
35:14, 38:4, 38:10,
38:21, 39:10, 39:15,
39:18, 44:1, 44:6,
44:8, 44:11, 44:16,
44:19, 46:11, 47:5,
50:12, 60:19, 62:5,
62:7, 75:3, 89:19,
90:17
**LITIGATION** [1] - 1:4

**Liu** [1] - 12:25
**LLC** [3] - 1:13, 2:5, 2:9
**LLP** [2] - 1:16, 2:2
**loaded** [1] - 96:12
**located** [1] - 67:5
**log** [1] - 97:1
**long-term** [1] - 61:6
**look** [38] - 7:14, 10:14,
12:12, 12:17, 14:17,
17:1, 18:5, 20:6,
26:14, 30:6, 30:16,
36:25, 39:10, 53:1,
55:21, 58:14, 66:15,
68:4, 68:5, 69:5,
69:13, 69:15, 70:1,
73:9, 74:5, 77:11,
77:16, 86:16, 86:17,
88:13, 89:15, 89:16,
91:5, 91:6, 96:20,
98:24
**looked** [7] - 3:13,
6:18, 36:2, 42:12,
56:17, 56:22, 81:17
**looking** [15] - 7:2,
13:7, 13:9, 19:4,
41:11, 44:14, 49:25,
52:18, 68:7, 69:16,
80:23, 85:11, 85:18,
86:2, 95:5
**looks** [2] - 22:18,
26:13
**LORETTA** [1] - 2:12
**losartan** [3] - 91:10,
92:10, 92:14
**loss** [2] - 87:9, 97:8
**lost** [1] - 10:18
**love** [5] - 27:25, 36:15,
71:12, 85:12, 95:21
**low** [7] - 7:25, 16:4,
17:22, 45:22, 46:11,
47:14, 54:4
**lower** [1] - 17:1
**Ltd** [1] - 2:5
**luck** [1] - 48:16

**M**

**Macro** [4] - 87:11,
91:6, 91:21, 91:24
**MacStravic** [1] - 2:13
**Maggie** [22] - 23:23,
23:24, 45:14, 46:17,
47:9, 47:12, 47:14,
48:1, 48:13, 48:21,
49:4, 49:18, 51:25,
52:1, 52:2, 52:6,
52:9, 52:17, 54:16,
55:11, 59:2, 62:11
**maintain** [1] - 36:16
**maintained** [1] - 69:7
**maintaining** [1] -

57:20, 57:23, 60:22,
61:19, 65:17, 86:18,
86:20, 90:23, 93:11,
98:21
**KIRTLAND** [1] - 1:16
**knowing** [1] - 12:7
**knowledge** [4] -
13:18, 14:6, 14:11,
29:8
**known** [5] - 14:8,
19:12, 19:15, 20:13,
71:21
**knows** [8] - 5:17, 21:4,
34:10, 49:12, 53:6,
67:2, 85:5, 92:16
**Kong** [19] - 23:23,
45:14, 47:12, 47:15,
48:1, 48:13, 48:21,
49:5, 49:18, 50:3,
51:25, 52:1, 52:2,
52:6, 52:17, 54:17,
59:2, 59:12, 60:1
**Kong's** [1] - 23:24,
46:17, 47:4, 47:9,
51:12, 51:13, 52:9,
55:11, 57:22, 62:12
**Kugler** [4] - 2:12,
60:11, 62:21, 74:13

**L**

**lab** [5] - 13:4, 32:22,
33:2, 37:19, 41:24
**labeled** [2] - 44:24,
70:11
**lack** [1] - 6:16
**laid** [2] - 66:25, 71:1
**landscape** [1] - 60:22
**language** [5] - 23:18,
29:13, 29:14, 37:14,
38:21
**lap** [1] - 57:15
**laptop** [7] - 31:10,
32:1, 39:7, 40:19,
41:8, 41:12
**laptops** [3] - 40:22,
57:16, 57:20
**large** [1] - 14:14
**larger** [1] - 57:25,
76:12
**Larry** [2] - 9:14, 9:15
**larry** [1] - 2:13
**last** [11] - 3:16, 8:9,
34:8, 34:21, 58:23,
74:16, 79:12, 80:21,
81:15, 81:18, 89:18
**last-ditch** [1] - 89:18
**late** [4] - 6:20, 16:4,
47:16, 84:9
**latest** [1] - 60:15
**law** [22] - 30:13, 30:20,

42:24

**Major** [1] - 11:14

**majority** [1] - 72:13

**maker** [1] - 19:15

**manner** [1] - 66:13

**manually** [4] - 65:12, 81:3, 81:4, 81:14

**manufactured** [5] - 79:24, 83:19, 83:20, 87:12

**manufacturer** [1] - 22:23

**manufacturing** [3] - 83:9, 83:10, 83:13

**March** [1] - 86:5

**mark** [2] - 18:21, 21:24

**MARKED** [2] - 18:23, 22:3

**marked** [3] - 19:5, 19:9, 81:17

**marketing** [1] - 16:15

**massive** [3] - 23:3, 24:17, 40:17

**Master** [5] - 3:2, 24:5, 85:19, 86:2, 90:5

**MASTER** [1] - 1:11

**materials** [1] - 49:11

**matter** [6] - 13:15, 13:16, 14:10, 62:7, 83:17, 100:15

**matter-of-fact** [1] - 13:15

**matters** [6] - 3:22, 22:15, 22:16, 22:20, 28:14, 28:16

**MAZIE** [1] - 1:13

**mean** [26] - 21:2, 26:1, 33:15, 34:18, 35:18, 36:12, 46:12, 51:20, 52:5, 54:3, 54:11, 75:1, 76:11, 76:15, 76:17, 81:24, 84:14, 85:13, 88:25, 89:7, 93:7, 93:9, 93:14, 96:20, 99:18

**meandering** [1] - 48:10

**meaning** [1] - 79:20

**means** [5] - 33:16, 37:15, 82:16, 92:15, 94:12

**meant** [2] - 46:10, 93:7

**mechanical** [1] - 1:24

**meet** [17] - 8:3, 16:7, 17:18, 52:3, 65:19, 67:18, 73:16, 73:21, 80:16, 81:16, 84:18, 89:16, 90:14, 92:1, 92:5, 96:5, 96:16

**meet-and-confer** [1] - 65:19

**meeting** [11] - 24:3, 46:22, 47:2, 48:2, 49:23, 55:14, 59:1, 78:11, 79:4

**meetings** [15] - 47:22, 47:24, 49:25, 50:5, 54:24, 55:1, 55:2, 55:3, 55:22, 57:1, 58:10, 58:24, 78:11

**merits** [2] - 31:20, 82:23

**met** [1] - 82:18

**metadata** [35] - 8:3, 8:4, 8:6, 8:10, 8:13, 8:17, 8:22, 8:24, 9:2, 9:7, 9:24, 10:1, 10:5, 10:7, 10:9, 25:3, 28:1, 28:2, 28:9, 31:9, 64:1, 64:7, 65:10, 65:15, 65:17, 66:1, 66:16, 69:14, 69:18, 70:3, 81:4, 81:14, 94:3, 95:11, 96:13

**method** [2] - 11:3, 11:10

**methods** [1] - 10:25

**mic** [1] - 3:5

**might** [13] - 7:13, 8:2, 9:12, 13:13, 19:17, 20:19, 58:6, 58:7, 58:12, 58:18, 62:13, 74:23

**millions** [7] - 51:24, 54:14, 81:2, 81:12, 87:1, 90:16

**Min** [18] - 20:11, 22:10, 23:16, 24:23, 27:11, 29:21, 31:25, 34:11, 34:14, 41:5, 43:18, 47:22, 70:17, 78:11, 78:15, 78:21, 78:24, 79:4

**minute** [1] - 45:8

**minutes** [3] - 46:22, 47:2, 78:11

**mischaracterizing** [2] - 72:19, 98:12

**misimpression** [2] - 58:6, 58:11

**misinterpretations** [1] - 98:23

**misleading** [1] - 22:8

**misrepresent** [1] - 22:15

**miss** [1] - 3:17

**missed** [2] - 3:19

**missing** [4] - 54:17,

54:20, 65:16, 82:3

**misspoke** [1] - 6:1

**misspoken** [1] - 85:21

**misstated** [2] - 41:3, 69:10

**misstating** [1] - 99:19

**mistake** [1] - 10:6

**misunderstand** [1] - 4:3

**Mitchell** [1] - 1:7

**moment** [3] - 12:8, 18:1, 26:6

**moments** [1] - 29:23

**money** [2] - 53:13, 80:25

**months** [6] - 10:10, 27:1, 54:1, 75:24, 97:6

**moot** [1] - 62:18

**Morris** [5] - 17:17, 30:17, 30:19, 31:7, 42:5

**MORRIS** [1] - 2:2

**most** [6] - 6:17, 17:13, 22:16, 23:5, 28:16, 95:16

**mostly** [1] - 5:25

**MOTION** [1] - 1:5

**motion** [9] - 3:11, 9:25, 10:15, 12:3, 31:21, 33:1, 54:1, 89:23, 97:21

**mouthpiece** [1] - 57:6

**move** [1] - 38:2

**moved** [1] - 92:4

**moving** [2] - 19:6, 92:17

**MR** [83] - 3:8, 3:15, 3:19, 4:19, 5:3, 6:16, 13:9, 18:8, 18:24, 20:9, 22:6, 24:8, 26:12, 28:12, 28:24, 32:6, 33:19, 34:2, 34:4, 38:13, 39:23, 42:15, 45:11, 47:8, 50:24, 52:20, 52:25, 56:14, 58:18, 61:22, 63:21, 64:20, 64:25, 65:4, 65:8, 66:3, 66:23, 66:25, 68:5, 68:10, 68:13, 68:22, 69:2, 69:23, 70:6, 70:8, 70:21, 72:22, 74:2, 74:7, 75:13, 75:23, 76:22, 78:15, 78:18, 79:6, 79:9, 79:15, 82:10, 82:12, 83:2, 83:5, 85:20, 85:23, 86:10, 87:9, 87:22, 87:25, 88:3,

91:4, 93:16, 93:21, 94:7, 94:13, 94:15, 94:21, 95:4, 96:5, 96:8, 96:17, 97:12, 97:14, 100:8

**MS** [93] - 4:5, 7:19, 7:21, 9:12, 9:17, 11:23, 12:13, 12:16, 12:19, 16:9, 18:25, 19:3, 20:1, 20:10, 21:20, 22:1, 26:17, 31:2, 31:4, 32:14, 33:15, 33:24, 36:5, 40:10, 42:6, 43:2, 44:22, 45:3, 45:10, 45:20, 45:24, 46:3, 46:6, 46:9, 46:19, 49:2, 50:10, 51:15, 52:11, 53:24, 54:21, 55:7, 56:3, 56:7, 56:12, 57:11, 57:14, 57:19, 60:9, 62:19, 64:15, 64:24, 65:3, 65:7, 65:9, 66:14, 67:17, 68:16, 68:25, 69:10, 69:19, 70:4, 70:7, 70:10, 70:13, 71:10, 73:8, 74:19, 76:7, 77:17, 80:4, 83:1, 83:24, 85:8, 85:12, 85:15, 86:14, 87:21, 87:23, 88:20, 90:9, 91:24, 92:23, 93:1, 93:7, 93:15, 94:10, 94:14, 94:16, 95:3, 95:21, 98:9, 100:6

**multinational** [1] - 79:5

**multiple** [6] - 6:9, 6:17, 17:18, 21:21, 47:11, 71:2

**music** [1] - 3:8

**must** [4] - 9:15, 32:10, 36:12, 99:24

**mute** [1] - 3:5

**muted** [1] - 7:18

**myriad** [2] - 36:7, 37:18

### N

**N-nitroso** [2] - 28:19, 28:25

**N-nitrosodimethylamine** [2] - 28:20, 29:1

**name** [2] - 27:11, 34:21

**named** [3] - 27:16, 27:17

**names** [1] - 9:4

**narrow** [2] - 54:12, 60:3

**narrowing** [2] - 60:2, 60:3

**native** [1] - 64:7

**nature** [3] - 14:12, 54:24, 61:20

**nauseam** [1] - 80:13

**NDMA** [18] - 13:2, 13:15, 14:4, 14:6, 20:22, 20:24, 21:5, 22:18, 25:24, 26:2, 28:21, 29:4, 30:24, 35:18, 35:22, 39:24, 43:1, 50:17

**necessarily** [1] - 3:23

**need** [28] - 9:14, 13:21, 15:22, 21:6, 23:9, 23:16, 48:10, 52:7, 57:5, 58:19, 59:23, 60:2, 64:10, 74:3, 74:23, 78:2, 80:10, 82:3, 86:23, 87:20, 89:8, 92:13, 92:22, 95:1, 95:16, 95:17, 97:21, 100:4

**needed** [4] - 6:7, 62:4, 89:11, 89:12

**needle** [1] - 4:8

**needs** [6] - 45:7, 54:16, 61:15, 81:8, 82:8, 100:2

**negotiated** [1] - 77:18

**negotiating** [1] - 40:13

**Nesbit** [1] - 1:20

**Netherlands** [1] - 88:19

**never** [22] - 3:10, 6:14, 26:23, 29:13, 29:22, 36:20, 36:22, 36:23, 36:24, 50:4, 59:3, 61:19, 77:24, 79:19, 81:5, 81:16, 82:21, 85:5, 87:13, 90:18, 90:19, 98:15

**NEW** [1] - 1:1

**New** [5] - 1:8, 1:14, 19:24, 99:19, 99:20

**next** [10] - 4:10, 4:20, 12:8, 44:25, 45:13, 63:8, 63:13, 70:14, 74:16, 78:9

**nice** [1] - 100:8

**nitrate** [3] - 29:2, 31:1, 35:19

**nitrite** [3] - 22:19,

25:25, 28:22
**nitrosamine** [11] -
19:17, 22:24, 79:13,
80:19, 81:17, 83:11,
83:21, 91:9, 91:13,
91:18, 92:14
**nitrosamines** [1] -
91:15
**nitroso** [4] - 20:19,
20:24, 28:19, 28:25
**nitrosodimethylamin**
**e** [2] - 28:20, 29:1
**nobody** [3] - 6:9, 35:2,
49:21
**none** [6] - 11:18,
20:23, 36:21, 36:24,
39:7, 48:21
**nonprivileged** [3] -
86:4, 86:7, 90:6
**normal** [1] - 72:25
**normally** [1] - 39:11
**Northern** [1] - 88:18
**note** [1] - 42:17
**notebook** [2] - 13:4,
33:3
**notebooks** [4] - 10:16,
32:22, 33:2, 41:25
**notes** [6] - 32:24,
40:14, 51:4, 51:13,
64:2, 84:20
**nothing** [16] - 14:17,
19:22, 20:20, 21:15,
26:14, 30:8, 30:9,
49:4, 52:25, 53:16,
65:20, 67:24, 83:15,
95:25, 97:25
**notice** [2] - 51:23,
81:25
**notices** [2] - 4:24,
44:11
**Novartis** [2] - 47:23,
50:17
**November** [2] - 71:15,
91:6
**nowhere** [2] - 13:19,
21:14
**number** [25] - 5:5,
7:25, 9:1, 9:20,
15:15, 24:3, 36:6,
40:1, 48:23, 57:21,
59:10, 63:25, 65:16,
65:24, 67:21, 68:3,
69:13, 77:19, 85:17,
86:6, 90:11, 94:7,
94:9, 96:20
**NUMBER** [1] - 1:3
**Number** [1] - 86:6
**numbers** [4] - 6:19,
8:24, 18:17, 68:2
**numerous** [1] - 71:19

**O**

**objecting** [1] - 90:8
**objections** [1] - 73:6
**obligation** [4] - 25:8,
38:25, 39:17, 40:1
**obvious** [2] - 12:25,
21:7
**obviously** [15] - 5:5,
5:13, 6:21, 13:13,
14:5, 22:9, 38:13,
48:5, 60:19, 60:24,
61:4, 64:4, 64:10,
93:2, 93:8
**occur** [3] - 12:5, 55:4,
55:18
**occurred** [2] - 33:22,
54:2
**occurs** [3] - 28:21,
29:1, 30:25
**odd** [1] - 61:18
**OF** [1] - 1:1
**off-the-record** [1] -
99:14
**offer** [2] - 24:14, 91:19
**offhand** [1] - 35:9,
77:5
**official** [1] - 49:10
**Official** [1] - 1:23
**old** [4] - 31:25, 40:20,
41:11, 41:12
**olmesartan** [1] - 91:10
**once** [3] - 55:25, 58:3,
76:16
**one** [53] - 4:23, 5:5,
10:11, 10:20, 11:25,
13:17, 16:3, 17:23,
18:8, 23:5, 24:23,
25:23, 26:4, 30:8,
31:17, 31:18, 32:21,
38:7, 39:6, 40:7,
40:8, 41:18, 44:4,
50:18, 50:20, 52:6,
54:6, 55:13, 56:9,
57:19, 58:23, 62:13,
63:25, 64:4, 67:7,
68:25, 70:24, 71:23,
75:13, 76:11, 77:19,
85:16, 89:1, 89:14,
90:11, 91:4, 93:16,
94:7, 94:9, 94:11,
97:1, 97:15
**one's** [1] - 34:12
**onerous** [3] - 52:12,
52:25, 53:16
**ones** [4] - 4:9, 4:13,
70:18, 77:2
**onus** [1] - 65:23
**open** [2] - 14:8, 99:5
**operating** [1] - 60:20
**opportunity** [4] -
74:17, 75:11, 99:1,
99:22
**opposite** [1] - 41:14
**optimizing** [1] - 43:4
**Order** [6] - 85:19,
86:3, 90:5, 91:6,
91:21, 91:24
**order** [51] - 3:24, 17:7,
24:8, 27:20, 33:13,
53:3, 60:7, 62:11,
63:6, 63:10, 66:16,
72:15, 73:9, 73:12,
73:24, 74:9, 74:22,
75:5, 75:9, 75:10,
76:13, 77:13, 79:16,
79:20, 80:13, 80:15,
82:16, 82:25, 83:17,
84:11, 85:1, 85:2,
85:3, 85:4, 85:10,
85:12, 85:13, 85:15,
86:2, 86:15, 87:7,
87:10, 89:23, 90:8,
90:12, 90:13, 91:13,
92:4, 92:11, 92:19,
100:5
**ordered** [18] - 4:14,
24:14, 45:22, 46:17,
49:19, 64:10, 66:4,
67:1, 73:6, 76:15,
79:16, 82:13, 82:24,
84:16, 84:17, 98:3
**Orders** [1] - 87:11
**orders** [3] - 61:23,
79:22, 92:1
**organization** [1] -
24:11
**organizing** [1] - 50:5
**original** [4] - 17:4,
17:16, 17:24, 40:11
**originally** [1] - 12:22
**otherwise** [2] - 49:22,
92:16
**ourselves** [2] - 23:14,
98:13
**OUS** [1] - 86:18
**Outlook** [2] - 46:22,
46:25
**outside** [3] - 77:15,
86:18, 90:21
**outweigh** [1] - 48:9
**overall** [1] - 46:10
**overlay** [14] - 8:11,
8:22, 8:24, 9:21,
9:24, 10:2, 14:20,
25:19, 84:9, 94:17,
95:23, 96:3, 96:6
**overlays** [2] - 8:17,
28:2
**oversight** [1] - 15:16
**own** [3] - 26:20, 42:25,

62:19

**P**

**P.C** [1] - 2:7
**p.m** [4] - 1:9, 3:3,
45:12, 100:11
**Pacific** [1] - 1:17
**PACKARD** [1] - 1:16
**Page** [10] - 18:18,
63:15, 66:25, 70:15,
72:22, 72:23, 73:1,
73:12, 78:9, 86:11
**page** [3] - 86:1, 86:9,
96:11
**pages** [1] - 51:24
**paper** [3] - 47:25,
68:21, 81:13
**papers** [4] - 15:9,
16:6, 51:10, 95:6
**Paragraph** [5] - 86:2,
90:4, 91:7, 91:15,
91:18
**paragraph** [1] - 92:15
**paraphrase** [1] - 48:3
**paraphrased** [1] -
26:21
**paraphrasing** [2] -
23:1, 27:1
**PAREKH** [4] - 1:16,
76:22, 83:2, 83:5
**Parekh** [12] - 8:9, 15:1,
71:18, 71:25, 76:20,
80:18, 82:2, 82:3,
83:4, 84:2, 89:22,
95:22
**Parekh's** [1] - 76:17
**parenthetically** [1] -
14:2
**Parkway** [2] - 1:14,
2:8
**part** [18] - 17:2, 22:15,
22:16, 28:16, 31:10,
37:3, 41:18, 41:19,
51:6, 51:17, 53:9,
59:17, 77:18, 91:24,
93:10, 95:6, 100:2
**participating** [1] - 3:6
**particular** [6] - 38:5,
40:6, 46:20, 92:19,
96:16, 97:11
**parties** [6] - 8:18,
52:23, 73:16, 75:11,
80:15, 92:1
**parties'** [1] - 85:3
**parts** [1] - 100:4
**party** [2] - 40:16,
40:25
**party's** [1] - 73:14
**passes** [1] - 62:2
**password** [2] - 93:5,

93:9
**password-protected**
[1] - 93:5
**patent** [14] - 19:21,
20:3, 20:5, 20:11,
20:13, 20:18, 20:23,
21:13, 21:15, 22:22,
23:7, 23:12, 31:19
**pattern** [2] - 5:23, 6:2
**pawn** [1] - 60:21
**pdf** [1] - 63:24
**pdf'd** [5] - 64:23, 66:6,
67:10, 69:8, 69:23
**Pedano** [2] - 1:23,
100:17
**Peng** [1] - 12:25
**Pennsylvania** [2] -
2:4, 2:8
**people** [38] - 6:17, 7:6,
7:8, 7:10, 13:10,
13:22, 14:3, 14:22,
15:2, 15:12, 17:1,
17:2, 17:22, 22:25,
25:17, 27:16, 34:25,
36:9, 36:17, 38:16,
38:19, 39:1, 39:16,
40:21, 57:7, 58:9,
59:2, 63:2, 64:5,
71:18, 71:20, 75:25,
77:24, 78:5, 86:24,
88:21, 93:22, 98:17
**people's** [3] - 55:23,
58:12, 72:16
**per** [2] - 64:8, 81:3
**percent** [2] - 46:4,
84:4
**perfectly** [1] - 65:21
**perhaps** [2] - 60:1,
96:19
**peril** [4] - 92:21,
93:18, 93:19
**period** [6] - 6:19,
13:22, 15:11, 17:9,
47:17, 50:20
**periods** [1] - 7:11
**permission** [1] - 61:16
**person** [10] - 24:21,
24:23, 29:17, 29:18,
34:21, 50:24, 53:17,
53:19, 65:13, 81:5
**personal** [14] - 40:19,
70:18, 71:18, 71:24,
72:1, 72:3, 72:5,
72:9, 72:16, 73:22,
77:1, 77:2, 77:8
**perspective** [3] -
15:10, 30:6, 98:1
**pervasive** [1] - 5:23
**Ph.D** [1] - 35:3
**Pharma** [5] - 2:9, 2:9,

19:22, 20:6, 20:14
**Pharmaceuticals** [2] -
2:4, 2:5
**Philadelphia** [1] - 2:4
**phone** [7] - 3:6, 8:10,
71:19, 71:21, 76:17,
76:25, 78:2
**phones** [4] - 71:3,
71:5, 77:12, 77:13
**phrasing** [1] - 28:14
**picture** [1] - 7:1
**piece** [1] - 68:21
**pills** [1] - 39:24
**pin** [1] - 47:17
**place** [7] - 27:22, 37:6,
37:9, 47:23, 51:6,
57:1, 76:23
**placed** [1] - 53:13
**places** [1] - 60:14
**plain** [1] - 75:5
**plaintiff** [2] - 41:12,
67:23
**plaintiff's** [1] - 12:18
**plaintiffs** [34] - 4:7,
8:15, 9:18, 11:15,
12:7, 12:21, 12:24,
14:13, 17:13, 17:18,
19:4, 33:11, 41:9,
41:17, 41:21, 42:1,
44:2, 46:21, 47:3,
51:20, 52:12, 52:18,
52:21, 58:24, 68:20,
70:16, 71:17, 71:24,
81:7, 81:16, 88:21,
90:1, 90:23, 97:17
**Plaintiffs** [4] - 1:15,
1:18, 1:21, 91:16
**plaintiffs'** [9] - 3:11,
10:15, 12:3, 18:18,
33:1, 44:11, 49:9,
63:15, 78:10
**played** [1] - 51:9
**plays** [1] - 60:1
**pleasant** [1] - 100:8
**plenty** [1] - 52:5
**point** [32] - 7:13, 7:24,
8:9, 10:11, 11:14,
13:22, 13:24, 13:25,
16:2, 26:9, 27:14,
38:24, 42:8, 46:12,
46:22, 47:7, 49:9,
53:5, 53:22, 57:24,
58:2, 61:2, 62:10,
63:8, 70:22, 76:8,
78:1, 89:10, 90:17,
93:24, 96:19, 97:21
**Point** [4] - 22:8, 22:14,
35:8, 42:21
**pointed** [2] - 22:22,
78:24

**policies** [3] - 4:3, 4:7,
4:13
**politician** [1] - 62:2
**pops** [1] - 13:19
**populated** [1] - 5:18
**portion** [1] - 93:11
**portions** [1] - 99:22
**poses** [1] - 35:1
**position** [11] - 23:25,
57:23, 59:12, 60:15,
61:18, 61:25, 74:24,
75:6, 87:6, 90:11,
98:10
**possession** [2] -
49:10, 56:20
**possibility** [1] - 20:19
**possible** [4] - 58:3,
60:11, 73:22, 98:15
**possibly** [4] - 53:25,
66:19, 81:7, 96:4
**post** [2] - 25:4, 83:15
**post-dated** [1] - 25:4
**post-recall** [1] - 83:15
**Potagard** [1] - 88:19
**potential** [1] - 37:9
**potentially** [7] - 23:2,
30:19, 48:23, 73:11,
73:21, 84:23, 88:14
**Power** [4] - 22:8,
22:14, 35:8, 42:21
**power** [1] - 77:22
**practice** [7] - 16:17,
23:22, 46:25, 50:2,
50:7, 51:9, 54:1
**precise** [1] - 52:18
**precisely** [1] - 7:21
**precludes** [1] - 63:12
**predated** [2] - 24:6,
82:17
**prejudiced** [1] - 33:12
**prejudicial** [3] - 33:17,
53:20, 82:7
**preliminarily** [1] - 12:6
**preliminary** [2] -
33:16, 44:2
**prepared** [1] - 64:20
**preparing** [1] - 59:9
**presence** [2] - 91:8,
91:17
**PRESENT** [1] - 2:11
**presentation** [1] -
42:21
**presented** [2] - 23:20,
54:25
**preserve** [9] - 13:11,
13:12, 15:7, 38:17,
38:19, 38:25, 39:17
**preserved** [3] - 39:12,
39:13
**president** [1] - 17:19

**presumably** [1] - 88:5
**pretty** [5] - 21:7, 21:9,
23:1, 48:3
**prevailed** [1] - 79:22
**prevents** [1] - 62:3
**previously** [6] - 5:15,
5:16, 10:4, 19:5,
30:1, 95:9
**prima** [1] - 6:22
**primarily** [1] - 76:24
**Prinston** [2] - 2:4,
86:8
**printed** [6] - 33:3,
64:22, 66:6, 67:10,
69:8, 69:23
**printouts** [1] - 32:24
**prioritize** [1] - 81:21
**Priselac** [27] - 7:17,
9:15, 16:8, 19:2,
26:16, 28:12, 32:8,
36:4, 38:6, 40:4,
42:2, 44:20, 49:1,
53:23, 62:16, 64:14,
68:3, 70:1, 71:9,
80:3, 83:3, 83:5,
83:23, 90:4, 94:8,
98:7, 100:2
**PRISELAC** [94] - 2:3,
4:5, 7:19, 7:21, 9:12,
9:17, 11:23, 12:13,
12:16, 12:19, 16:9,
18:25, 19:3, 20:1,
20:10, 21:20, 22:1,
26:17, 31:2, 31:4,
32:14, 33:15, 33:24,
36:5, 40:10, 42:6,
43:2, 44:22, 45:3,
45:10, 45:20, 45:24,
46:3, 46:6, 46:9,
46:19, 49:2, 50:10,
51:15, 52:11, 53:24,
54:21, 55:7, 56:3,
56:7, 56:12, 57:11,
57:14, 57:19, 60:9,
62:19, 64:15, 64:24,
65:3, 65:7, 65:9,
66:14, 67:17, 68:16,
68:25, 69:10, 69:19,
70:4, 70:7, 70:10,
70:13, 71:10, 73:8,
74:19, 76:7, 77:17,
80:4, 83:1, 83:24,
85:8, 85:12, 85:15,
86:14, 87:21, 87:23,
88:20, 90:9, 91:24,
92:23, 93:1, 93:7,
93:15, 94:10, 94:14,
94:16, 95:3, 95:21,
98:9, 100:6
**Priselac's** [1] - 95:5

**privacy** [1] - 78:6
**privilege** [5] - 30:16,
42:7, 46:2, 53:9,
62:12
**privilege-related** [1] -
46:2
**privileged** [3] - 46:5,
54:13
**probative** [2] - 7:4,
14:16
**problem** [10] - 8:2,
8:4, 11:25, 12:4,
12:6, 23:3, 23:14,
23:15, 48:19, 87:3
**procedurally** [1] -
18:8
**proceed** [4] - 3:4,
3:22, 3:24, 43:25
**proceeding** [2] - 99:5,
99:17
**Proceedings** [1] -
1:24
**PROCEEDINGS** [1] -
3:1
**proceedings** [3] -
99:3, 100:11, 100:15
**process** [27] - 4:9,
10:21, 10:22, 10:24,
11:3, 12:4, 13:16,
15:17, 15:22, 16:5,
16:14, 16:22, 17:5,
27:15, 28:7, 37:5,
37:11, 43:6, 43:7,
43:10, 43:11, 51:2,
65:11, 83:10, 83:13,
98:19
**processes** [3] - 17:9,
37:8, 43:5
**processing** [1] - 43:4
**produce** [23] - 9:18,
27:21, 28:7, 53:11,
66:8, 68:20, 69:18,
72:3, 72:17, 80:25,
81:2, 84:10, 84:21,
86:3, 86:18, 86:22,
87:1, 87:7, 90:5,
90:15, 90:17, 91:8,
94:20
**produced** [104] - 1:25,
4:11, 4:13, 4:14,
5:12, 5:16, 5:24,
6:18, 6:23, 7:15, 8:8,
8:22, 8:24, 9:22,
10:4, 10:10, 10:14,
13:5, 13:17, 18:22,
25:11, 25:12, 26:13,
28:3, 29:22, 30:1,
30:9, 31:24, 32:2,
34:14, 41:9, 41:21,
42:19, 43:19, 44:19,

49:19, 55:24, 59:5,
63:17, 63:23, 63:24,
64:8, 64:23, 64:25,
65:1, 65:9, 65:15,
65:20, 65:25, 66:1,
66:5, 66:7, 66:9,
66:13, 67:1, 67:7,
67:9, 67:10, 67:11,
67:16, 67:21, 68:22,
69:6, 69:8, 69:17,
69:24, 70:16, 70:17,
71:1, 71:20, 73:15,
77:4, 77:13, 78:10,
78:22, 79:1, 79:4,
80:20, 80:21, 81:25,
82:21, 83:22, 84:2,
84:4, 84:5, 84:7,
84:11, 84:12, 87:4,
90:24, 92:3, 92:7,
92:10, 94:2, 94:5,
94:16, 94:17, 94:23,
94:24, 95:9, 98:3
**producing** [5] - 34:13,
44:5, 61:2, 73:21,
88:23
**product** [3] - 42:7,
86:18, 91:9
**production** [31] - 4:2,
4:6, 4:23, 9:5, 17:3,
33:13, 38:3, 38:10,
41:11, 41:19, 45:15,
46:17, 48:7, 52:2,
62:11, 63:12, 63:17,
64:11, 71:16, 72:2,
72:13, 72:24, 73:5,
73:18, 74:9, 78:16,
79:13, 79:16, 79:20,
94:7, 95:19
**productions** [6] -
8:20, 32:12, 93:17,
94:2, 94:25, 95:12
**PRODUCTS** [1] - 1:4
**products** [2] - 88:25,
90:18
**progress** [1] - 44:18
**prohibitive** [1] - 86:21
**Project** [7] - 10:17,
18:3, 27:9, 27:10,
27:12, 27:19, 98:16
**project** [7] - 29:7,
33:10, 37:5, 37:18,
37:24, 41:16, 41:20
**Projects** [1] - 37:9
**prompt** [1] - 45:2
**properly** [1] - 70:17
**proportional** [2] -
81:8, 89:24
**proportionality** [4] -
46:18, 48:9, 51:19,
73:18

**protected** [1] - 93:5
**protection** [1] - 100:4
**protective** [2] - 89:23, 92:4
**protocol** [30] - 6:4, 6:7, 9:6, 30:2, 52:13, 64:8, 66:7, 67:16, 68:18, 69:9, 70:23, 71:6, 71:13, 72:20, 72:23, 72:24, 73:2, 73:5, 74:4, 74:6, 74:9, 74:10, 74:25, 77:11, 77:12, 77:16, 77:18, 77:23, 77:25, 81:3
**prove** [2] - 6:21, 80:10
**provide** [2] - 68:1, 76:2
**provided** [8] - 5:7, 6:8, 40:2, 64:21, 79:10, 95:24, 99:21
**providing** [1] - 44:9
**province** [1] - 19:23
**proximity** [1] - 55:15
**prudent** [1] - 75:12
**published** [1] - 20:5
**pull** [1] - 23:16
**Punta** [1] - 1:20
**purely** [1] - 81:23
**purported** [1] - 79:17
**purpose** [4] - 15:14, 38:10, 60:18, 80:24
**purposes** [3] - 26:22, 41:7, 96:2
**pursue** [1] - 78:25
**pursuing** [1] - 78:21
**push** [4] - 30:19, 30:23, 78:18, 79:10
**put** [17] - 3:5, 6:25, 17:7, 22:12, 27:5, 27:13, 27:20, 32:1, 33:3, 43:3, 43:15, 47:16, 52:12, 60:21, 61:12, 61:20, 77:23
**puts** [1] - 20:18
**putting** [4] - 16:24, 48:17, 87:23, 98:13

### Q

**quality** [2] - 34:21, 42:24
**quenched** [4] - 28:21, 29:1, 30:25, 35:19
**quenching** [4] - 13:16, 22:19, 22:24, 25:25
**questioned** [2] - 20:8, 42:17
**questions** [7] - 3:13, 6:20, 7:14, 13:21, 14:18, 23:17, 35:16

**quick** [1] - 50:22
**quickly** [2] - 53:12, 81:20
**quite** [12] - 5:11, 13:14, 33:4, 46:14, 47:1, 49:11, 55:20, 61:18, 71:16, 71:21, 72:15, 76:15
**quote** [2] - 41:22, 72:24
**quoted** [1] - 72:22
**quotes** [1] - 22:13

### R

**radar** [1] - 27:13
**raise** [3] - 63:10, 78:1, 97:14
**raised** [1] - 62:21
**raises** [1] - 6:20
**rate** [4] - 45:21, 46:10, 54:5, 54:8
**rather** [5] - 8:3, 10:9, 65:19, 84:25, 98:23
**raw** [4] - 84:25, 86:19, 89:13, 89:25
**RE** [1] - 1:4
**reached** [1] - 77:3
**reaction** [1] - 20:20
**reactions** [1] - 36:1
**read** [8] - 29:14, 30:24, 31:12, 32:10, 39:15, 71:12, 73:10, 98:17
**reading** [1] - 75:5
**ready** [2] - 27:5, 55:5
**real** [2] - 50:14, 50:16
**reality** [13] - 18:1, 31:21, 36:17, 41:19, 50:12, 55:17, 58:8, 71:15, 71:23, 76:9, 80:11, 84:15, 89:6
**realize** [2] - 32:10, 97:3
**realized** [1] - 18:12
**really** [35] - 14:12, 16:15, 19:18, 20:22, 23:10, 25:1, 27:24, 27:25, 28:5, 28:10, 28:11, 32:17, 36:14, 36:15, 45:2, 49:4, 50:13, 53:15, 53:25, 55:9, 59:7, 61:4, 61:18, 73:20, 81:9, 84:14, 89:20, 95:25, 96:1, 96:18, 97:22, 98:12, 98:20, 98:22
**realtime** [1] - 36:6
**reargue** [1] - 82:23
**reason** [11] - 9:7, 14:11, 17:3, 17:7,

17:16, 17:24, 24:15, 38:19, 51:22, 68:17, 82:8
**reasonable** [1] - 96:14
**reasons** [3] - 25:12, 76:12, 77:19
**rebuttal** [4] - 50:22, 50:23, 74:1, 82:11
**recalled** [1] - 34:24
**receive** [1] - 44:11
**received** [3] - 24:23, 33:21, 44:16
**recent** [1] - 5:4
**recently** [2] - 80:22, 84:19
**recess** [2] - 45:8, 45:12
**recipients** [4] - 30:3, 32:13, 35:8, 35:9
**recognizing** [2] - 29:5, 74:10
**recollection** [2] - 35:4, 36:13
**record** [8] - 18:13, 21:16, 42:17, 49:5, 93:10, 99:14, 99:15, 100:15
**recorded** [1] - 1:24
**records** [9] - 80:20, 81:18, 82:1, 83:9, 83:14, 84:1, 84:11, 92:2, 92:3
**redacted** [1] - 93:11
**Redondo** [1] - 1:17
**refer** [2] - 19:6, 51:5
**reference** [1] - 67:21
**referenced** [3] - 9:25, 86:8, 90:7
**referred** [2] - 67:6, 83:14
**referring** [8] - 65:25, 66:15, 69:12, 83:8, 85:2, 85:6, 85:9, 85:10
**refers** [2] - 83:6, 83:8
**reflecting** [1] - 91:8
**regard** [2] - 51:14, 67:15
**regarding** [3] - 42:19, 73:17, 91:17
**regardless** [2] - 83:16, 87:16
**rejected** [1] - 79:25
**relate** [1] - 32:17
**related** [17] - 4:14, 20:1, 20:20, 27:13, 37:4, 37:5, 37:18, 46:2, 67:2, 67:14, 70:19, 73:17, 78:11, 78:24, 79:4, 86:5,

88:24
**relates** [2] - 16:15, 31:18
**relating** [4] - 86:4, 86:8, 87:14, 90:6
**relations** [1] - 60:23
**relevance** [2] - 26:15, 59:8, 89:3
**relevancy** [1] - 73:17
**relevant** [9] - 7:9, 38:25, 47:5, 48:6, 60:17, 65:10, 91:11, 91:14, 94:23
**relied** [1] - 11:15
**relief** [4] - 75:16, 75:20, 76:3
**rely** [2] - 59:20, 88:8
**relying** [3] - 88:10, 88:15, 88:16
**remain** [1] - 16:6
**remember** [7] - 10:21, 39:19, 57:14, 67:4, 75:20, 84:5, 85:15
**remembering** [2] - 35:5, 37:2
**remote** [1] - 3:1
**REMOTE** [1] - 1:6
**reply** [1] - 3:13
**report** [20] - 63:23, 64:7, 64:11, 64:12, 64:13, 64:25, 65:1, 65:5, 65:14, 66:5, 66:6, 67:4, 67:7, 69:11, 85:17, 91:12, 91:14, 91:15
**Report** [1] - 87:18
**Reporter** [1] - 1:23
**Reporter/ Transcriber** [1] - 100:17
**reports** [3] - 41:25, 88:5, 89:14
**represent** [2] - 72:8, 73:13
**representation** [4] - 56:15, 69:4, 79:1, 82:14
**representations** [1] - 56:19
**represented** [6] - 14:2, 23:6, 34:4, 34:10, 36:21, 50:4
**representing** [2] - 36:11, 67:19
**reproduce** [1] - 29:25
**request** [3] - 18:15, 49:9, 54:11
**requested** [1] - 37:1
**requests** [1] - 76:10
**require** [5] - 7:1,

52:19, 54:11, 58:13, 60:5
**required** [9] - 6:5, 30:2, 66:13, 69:9, 69:18, 70:23, 72:24, 83:21, 86:3
**requirement** [2] - 71:14, 71:22
**requires** [3] - 49:11, 71:13, 77:12
**requiring** [1] - 52:22
**resides** [1] - 72:5
**residing** [1] - 67:11
**resilience** [1] - 99:12
**resolved** [1] - 96:11
**resources** [2] - 51:21, 81:19
**respect** [3] - 20:14, 79:13, 99:24
**respected** [1] - 60:25
**respond** [5] - 11:20, 31:2, 36:5, 63:4, 98:8
**response** [3] - 22:5, 65:22, 72:2
**responsibility** [1] - 30:20
**responsible** [2] - 34:22, 42:18
**responsive** [6] - 6:8, 16:16, 47:10, 49:8, 49:15, 53:15, 71:8, 79:2, 86:4, 86:7, 87:5, 87:6, 90:6, 90:11, 90:22, 91:20, 92:11, 94:17, 94:23
**responsiveness** [5] - 45:21, 46:8, 46:10, 54:5, 54:8
**rest** [4] - 5:22, 35:21, 76:14, 96:17
**restricted** [3] - 93:3, 93:8, 97:25
**resubmit** [1] - 21:22
**resulted** [1] - 20:4
**results** [8] - 79:17, 81:11, 84:4, 87:14, 87:20, 88:12, 88:24
**resume** [1] - 61:16
**Ret** [1] - 3:2
**RET** [1] - 1:10
**retention** [4] - 4:2, 4:7, 4:13, 33:7
**retrospective** [1] - 84:4
**revealed** [2] - 44:13, 44:14
**revelatory** [1] - 34:5
**review** [30] - 8:16, 11:21, 13:8, 28:6,

30:13, 30:14, 44:1,
44:7, 44:20, 46:8,
46:14, 48:15, 49:12,
51:12, 52:7, 52:9,
52:10, 52:19, 53:9,
54:12, 56:10, 56:13,
58:13, 59:11, 59:16,
59:23, 60:5, 60:6,
60:7, 100:3
**reviewed** [10] - 42:3,
49:19, 56:15, 58:3,
58:4, 59:22, 71:5,
71:7, 74:13, 77:13
**reviewer** [1] - 49:12
**revolved** [1] - 77:1
**rhetorically** [1] - 35:16
**rid** [1] - 25:25
**rigged** [1] - 22:14
**rigged-up** [1] - 22:14
**rights** [1] - 53:11
**risk** [3] - 35:1, 35:4,
43:10
**RMR** [1] - 100:17
**road** [1] - 32:5
**Robert** [1] - 2:12
**robust** [1] - 50:21
**role** [6] - 16:20, 51:8,
58:22, 59:3, 60:1,
99:4
**Rome** [2] - 42:4, 42:5
**room** [3] - 24:9, 65:13,
68:19
**rooms** [1] - 66:18
**root** [4] - 25:25, 26:2,
29:4, 29:9
**Roseland** [1] - 1:14
**round** [2] - 51:19,
51:20
**rounding** [1] - 58:10
**rounds** [2] - 54:3
**route** [1] - 12:10
**RPR** [1] - 100:17
**ruled** [2] - 53:3, 98:2
**rules** [2] - 99:17,
99:19
**run** [3] - 40:16, 52:17,
60:2

## S

**sartan** [3] - 91:9,
91:14, 91:15
**sat** [1] - 24:9
**satisfy** [1] - 90:23
**save** [4] - 7:6, 31:25,
53:12
**saved** [3] - 6:22,
40:18, 40:19
**saw** [4] - 22:7, 35:7,
75:25, 82:14
**scan** [1] - 90:25

**scanned** [3] - 32:24,
68:18, 81:14
**scheduling** [1] - 54:24
**Schneider** [10] -
11:16, 24:9, 53:3,
54:4, 81:20, 84:10,
84:16, 87:15, 87:24,
89:22
**Schneider's** [5] -
79:22, 83:17, 87:10,
91:6, 91:21
**school** [1] - 44:4
**scientific** [1] - 37:15
**scientists** [3] - 32:23,
33:1, 42:23
**scope** [4] - 77:15,
79:2, 91:20, 92:2
**scrambling** [1] - 61:10
**screen** [6] - 9:9, 9:15,
12:12, 18:1, 18:6,
19:2
**SEALED** [1] - 1:6
**sealed** [4] - 99:3,
99:23, 99:25, 100:2
**sealing** [7] - 97:17,
97:22, 98:5, 99:16,
99:18, 100:4
**Search** [1] - 63:16
**search** [35] - 10:8,
45:16, 45:17, 45:20,
45:22, 45:25, 46:11,
46:13, 47:10, 50:14,
52:13, 52:16, 52:20,
52:23, 53:1, 53:2,
53:4, 53:5, 53:7,
53:15, 54:2, 54:5,
54:12, 56:3, 56:4,
56:6, 56:24, 57:8,
60:1, 60:2, 60:3,
60:4, 65:14, 96:25
**searched** [1] - 9:4
**searches** [2] - 25:9,
33:6
**second** [3] - 27:7,
48:17, 49:17
**Second** [3] - 19:21,
20:6, 20:14
**secondly** [3] - 17:25,
36:14, 54:8
**seconds** [1] - 42:16
**secret** [15] - 30:16,
42:8, 46:15, 48:15,
48:18, 48:20, 49:7,
49:11, 49:16, 57:16,
57:23, 96:23, 97:1,
97:2, 97:8
**secrets** [2] - 42:9,
42:11
**Section** [1] - 73:1
**Security** [1] - 60:13

**see** [49] - 4:20, 5:23,
7:10, 8:5, 9:8, 9:10,
10:15, 12:8, 12:21,
13:21, 14:15, 14:25,
15:11, 15:12, 19:7,
19:9, 20:5, 21:13,
31:17, 38:15, 38:16,
42:4, 44:8, 48:7,
48:13, 48:20, 53:21,
54:23, 55:5, 57:6,
57:9, 59:25, 64:2,
64:3, 68:11, 70:1,
80:24, 82:20, 84:24,
86:25, 87:17, 87:22,
88:11, 88:13, 90:20,
91:25, 99:1
**seeing** [3] - 8:23,
14:23, 15:3
**seeking** [1] - 76:5
**seem** [2] - 18:9, 96:13
**send** [3] - 93:4, 93:11,
97:24
**sense** [5] - 29:12,
31:13, 37:12, 37:22,
42:12
**sensitive** [1] - 39:20,
99:6
**sent** [5] - 19:9, 30:3,
57:5, 82:1, 93:8
**sentence** [5] - 22:20,
23:5, 31:18
**Sentry** [1] - 2:8
**separate** [2] - 83:12,
83:22
**September** [6] - 1:9,
61:9, 72:11, 75:24,
84:3, 100:19
**sequentially** [1] -
19:13
**serious** [6] - 6:20, 7:9,
13:20, 34:23, 48:9,
97:17
**seriously** [2] - 45:5,
99:5
**serve** [1] - 72:7
**served** [1] - 38:10
**server** [5] - 13:5,
34:17, 40:16, 40:22
**service** [2] - 72:7, 73:5
**set** [9] - 22:14, 40:24,
52:12, 52:16, 55:13,
72:1, 80:16, 81:1,
81:4
**SETH** [1] - 2:2
**sets** [1] - 26:1
**seven** [1] - 56:24
**several** [2] - 47:2,
48:12
**shall** [2] - 4:22, 91:8
**Shanghai** [2] - 11:4,

11:5
**share** [6] - 9:8, 9:15,
12:11, 18:1, 18:5,
19:2
**shared** [2] - 13:5,
18:10
**shed** [1] - 39:13
**shock** [1] - 76:14
**shocking** [2] - 50:13,
54:2
**short** [1] - 11:7
**show** [10] - 17:8,
17:11, 23:4, 31:24,
33:5, 41:19, 59:2,
75:17, 75:23, 82:2
**showed** [2] - 28:16,
29:13
**showing** [7] - 5:9,
6:22, 13:18, 22:12,
26:24, 44:3
**shown** [7] - 18:13,
18:16, 21:17, 22:17,
22:21, 46:23, 54:4
**shows** [16] - 8:23,
10:7, 10:13, 14:6,
14:20, 24:1, 26:23,
41:9, 41:13, 49:18,
54:10, 55:16, 55:17,
80:22, 89:7
**side** [3] - 27:5, 44:6,
48:17
**signature** [1] - 75:15
**significant** [5] - 3:24,
15:25, 40:8, 57:10,
77:15
**similar** [5] - 22:18,
25:16, 28:20, 28:25,
98:2
**simple** [1] - 10:8
**single** [7] - 55:12,
63:23, 65:1, 66:6,
67:8, 67:21, 73:7
**sit** [3] - 21:8, 52:4,
98:11
**sitting** [1] - 62:23
**situation** [2] - 34:23,
65:19
**six** [1] - 44:12
**size** [1] - 92:6
**SLATER** [82] - 1:13,
1:13, 3:8, 3:15, 3:19,
4:19, 5:3, 6:16, 13:9,
18:8, 18:24, 20:9,
22:6, 24:8, 26:12,
28:12, 28:24, 32:6,
33:19, 34:2, 34:4,
38:13, 39:23, 42:15,
45:11, 47:8, 50:24,
52:20, 52:25, 56:14,
58:18, 61:22, 63:21,

64:20, 64:25, 65:4,
65:8, 66:3, 66:23,
66:25, 68:5, 68:10,
68:13, 68:22, 69:2,
69:23, 70:6, 70:8,
70:21, 72:22, 74:2,
74:7, 75:13, 75:23,
78:15, 78:18, 79:6,
79:9, 79:15, 82:10,
82:12, 85:20, 85:23,
86:10, 87:9, 87:22,
87:25, 88:3, 91:4,
93:16, 93:21, 94:7,
94:13, 94:15, 94:21,
95:4, 96:5, 96:8,
96:17, 97:12, 97:14,
100:8
**Slater** [64] - 4:18, 7:23,
11:21, 13:7, 16:25,
19:16, 20:8, 20:12,
20:17, 21:2, 21:21,
22:5, 26:19, 27:18,
27:25, 31:8, 31:13,
31:21, 32:14, 36:9,
37:20, 37:25, 38:9,
41:3, 43:19, 47:7,
49:17, 49:24, 50:19,
50:23, 51:22, 53:25,
54:15, 55:8, 58:10,
58:17, 63:19, 64:17,
65:23, 66:2, 66:20,
68:1, 69:21, 70:20,
71:12, 72:19, 72:21,
73:25, 76:7, 76:9,
76:16, 78:14, 80:4,
82:7, 82:11, 84:15,
85:13, 89:2, 91:1,
92:9, 92:13, 94:12,
98:12, 100:1
**Slater's** [1] - 31:5
**slides** [6] - 21:17,
21:23, 21:24, 22:14,
31:15, 93:2
**slipped** [1] - 25:3,
28:3, 30:8, 30:22
**slipping** [2] - 28:9,
31:9
**small** [4] - 6:19, 15:9,
15:15, 96:20
**smarter** [1] - 68:14
**smartphone** [5] - 6:5,
28:14, 70:23, 72:25,
73:2
**smartphones** [8] -
6:10, 6:11, 6:14,
6:17, 71:3, 71:7,
71:8, 73:4
**SMITH** [1] - 2:12
**smoking** [1] - 16:3
**sodium** [7] - 22:19,

22:24, 25:25, 28:21, 29:2, 30:25, 35:19
**Solco** [1] - 2:5
**sold** [8] - 79:24, 80:4, 80:5, 80:6, 81:5, 87:12, 87:14, 90:18
**solely** [1] - 77:7
**someone** [4] - 65:12, 68:23, 68:24, 76:3
**something's** [1] - 54:17
**sometimes** [2] - 98:10, 99:9
**soon** [2] - 44:20, 97:21
**SOP's** [1] - 4:14
**sorry** [9] - 11:12, 11:23, 19:6, 20:10, 33:19, 53:24, 68:6, 74:19, 94:10
**sort** [1] - 71:24
**sound** [1] - 21:3
**sounded** [1] - 93:10
**sounds** [2] - 4:19, 48:4
**source** [1] - 77:15
**sources** [1] - 73:14
**South** [2] - 1:17, 2:3
**speaking** [1] - 3:5
**speaks** [1] - 26:25
**special** [1] - 42:23
**SPECIAL** [1] - 1:11
**Special** [5] - 3:2, 24:5, 85:19, 86:2, 90:4
**specialized** [1] - 49:12
**specializes** [1] - 42:22
**specific** [9] - 4:14, 35:25, 52:1, 52:6, 64:9, 65:16, 77:1, 77:3, 84:7
**specifically** [2] - 9:25, 66:15
**spelled** [1] - 75:17
**spend** [1] - 90:16
**spent** [3] - 17:17, 54:14, 81:19
**spoliate** [1] - 37:21
**spoliated** [1] - 10:18
**spoliation** [13] - 6:21, 7:23, 11:14, 11:16, 12:6, 12:9, 31:22, 32:4, 33:17, 41:13, 41:20, 43:22, 44:3
**spot** [1] - 76:21
**spreadsheet** [3] - 67:5, 86:21, 87:2
**staff** [4] - 50:4, 50:25, 59:13, 59:17
**stamina** [2] - 99:12, 99:13

**stand** [3] - 23:16, 78:13
**standard** [1] - 46:25
**start** [7] - 7:24, 18:16, 28:22, 32:4, 34:8, 47:16, 72:18
**started** [3] - 50:11, 50:12, 62:16
**starting** [1] - 5:9
**starts** [2] - 6:19, 78:9
**state** [17] - 26:7, 30:16, 42:9, 42:11, 46:15, 48:15, 48:18, 48:20, 49:7, 49:11, 49:16, 57:16, 57:23, 96:22, 97:1, 97:8
**statement** [3] - 14:10, 18:4, 29:7
**States** [4] - 42:10, 61:5, 62:5, 81:6
**STATES** [1] - 1:1
**states** [1] - 25:24
**stating** [1] - 29:4
**status** [1] - 85:17
**stenography** [1] - 1:24
**step** [1] - 7:2
**stepped** [1] - 9:16
**stepping** [1] - 31:5
**Stevens** [1] - 93:5
**still** [12] - 15:14, 25:18, 25:19, 28:3, 31:12, 41:12, 51:22, 60:4, 66:14, 78:19, 84:5, 89:2
**stop** [1] - 61:12
**storage** [1] - 40:5
**straightforward** [1] - 79:15
**strange** [1] - 48:4
**Street** [3] - 1:20, 2:3, 60:14
**Streets** [1] - 1:8
**stricter** [1] - 78:6
**strong** [3] - 30:10, 39:23, 59:8
**structure** [1] - 29:2
**struggling** [2] - 4:25, 99:12
**studies** [4] - 88:9, 88:11, 88:16, 88:17
**study** [4] - 88:19, 88:23, 89:4, 92:19
**stuff** [1] - 81:5
**subject** [5] - 49:7, 49:15, 62:12, 65:4
**submission** [1] - 73:18
**submit** [4] - 21:23, 31:15, 31:16, 93:2

**submitted** [6] - 10:22, 11:11, 16:12, 21:21, 43:6, 43:12
**subpoenas** [1] - 73:5
**subsequent** [1] - 62:7
**subsidiaries** [2] - 8:12, 8:20
**substantial** [2] - 48:23, 59:18
**substantive** [1] - 51:7
**sudden** [1] - 97:1
**suddenly** [1] - 75:1
**sufficient** [1] - 43:23
**suggest** [1] - 67:25
**suggestion** [1] - 11:20
**suggests** [2] - 52:21, 59:21
**suits** [1] - 26:22
**summary** [6] - 22:9, 84:25, 86:17, 90:2, 90:22, 90:23
**summer** [2] - 81:15, 81:19
**superseded** [3] - 63:7, 63:8, 63:12
**supervening** [1] - 63:12
**supplemental** [1] - 17:2
**support** [1] - 62:4
**supported** [1] - 31:14
**supposed** [13] - 25:20, 30:2, 32:18, 36:3, 42:25, 64:8, 66:8, 66:10, 67:9, 67:10, 67:11, 73:3
**surprise** [2] - 17:23, 95:8
**surprised** [4] - 23:10, 23:20, 27:5, 89:18
**surprising** [2] - 59:14, 77:14
**surrounding** [1] - 38:5
**suspenders** [1] - 97:5
**suspicious** [1] - 15:9
**swept** [1] - 6:7
**SynCores** [2] - 11:4, 11:5
**system** [5] - 33:4, 40:24, 41:1, 41:25, 67:12
**systematic** [1] - 30:7
**systems** [2] - 33:6, 40:15

_____

**T**

**talks** [2] - 20:24, 37:4
**TC201729** [4] - 63:14, 63:16, 65:6, 67:2
**team** [6] - 14:22, 15:2,

15:13, 96:8, 96:10
**teams** [1] - 42:23
**technical** [3] - 8:10, 57:11, 71:19
**template** [2] - 69:4, 69:5
**ten** [3] - 35:9, 42:16, 45:8
**ten-minute** [1] - 45:8
**tenable** [1] - 61:4
**term** [9] - 45:20, 45:22, 56:4, 56:6, 56:24, 57:9, 61:6, 65:15
**Term** [1] - 63:16
**terminology** [1] - 24:13
**terms** [46] - 5:1, 8:17, 10:12, 31:11, 32:23, 33:7, 33:13, 37:15, 39:13, 40:21, 41:2, 41:24, 44:8, 45:17, 45:25, 46:2, 46:11, 46:13, 47:10, 50:14, 51:19, 52:8, 52:13, 52:17, 52:21, 52:23, 53:2, 53:4, 53:5, 53:7, 53:13, 53:15, 54:2, 54:5, 54:13, 59:12, 60:2, 60:3, 63:11, 80:15, 81:25, 90:8, 93:9, 96:25
**test** [3] - 81:10, 88:12, 88:24
**tested** [3] - 82:15, 83:11, 87:20
**testified** [4] - 11:2, 11:19, 20:7, 55:23
**testifying** [1] - 36:10
**testimony** [14] - 6:9, 11:18, 20:16, 22:10, 23:17, 32:16, 36:13, 46:23, 48:4, 49:23, 55:9, 55:16, 71:1, 88:6
**testing** [28] - 79:13, 79:16, 79:18, 79:23, 80:11, 80:15, 80:19, 81:18, 82:1, 82:20, 83:9, 83:10, 83:12, 83:15, 83:25, 84:4, 86:5, 86:8, 86:24, 87:8, 89:10, 90:1, 90:7, 90:18, 90:21, 92:2, 92:7
**tests** [3] - 33:10, 83:21, 91:17
**text** [2] - 70:25, 83:15
**texting** [1] - 93:21
**THE** [3] - 1:1, 1:10,

9:14
**themselves** [1] - 41:21
**theory** [2] - 28:4, 31:8
**there'll** [2] - 16:7, 48:21
**thereof** [1] - 16:22
**they've** [7] - 37:20, 37:21, 65:13, 71:21, 79:1, 81:15
**thinks** [5] - 27:18, 28:11, 54:17, 65:16, 71:13
**third** [3] - 27:24, 40:16, 40:25
**thirty** [1] - 56:24
**thirty-seven** [1] - 56:24
**Thomas** [1] - 3:2
**THOMAS** [1] - 1:10
**thorough** [1] - 41:10
**thousand** [3] - 10:13, 10:25, 56:24
**thousands** [2] - 52:19, 84:22
**thread** [1] - 57:21
**threading** [1] - 58:15
**three** [2] - 68:7, 88:17
**THROUGH** [1] - 22:3
**throughout** [1] - 15:17
**thrown** [1] - 24:4
**throws** [1] - 28:2
**tied** [1] - 14:13
**time-consuming** [1] - 53:8
**timeline** [1] - 30:23
**title** [1] - 98:17
**titled** [1] - 19:7
**TO** [1] - 1:5
**today** [16] - 3:22, 4:10, 8:10, 11:8, 21:12, 24:20, 29:14, 43:20, 52:4, 62:22, 92:22, 98:10, 98:14, 99:8, 99:9, 99:13
**today's** [2] - 99:16, 99:17
**together** [2] - 6:25, 8:13
**took** [8] - 23:19, 45:4, 47:22, 51:6, 57:1, 67:6, 88:25, 99:4
**topic** [1] - 79:7
**total** [1] - 45:18
**Tours** [1] - 11:15
**towards** [1] - 48:11
**toxic** [1] - 29:2
**transcript** [7] - 1:24, 62:11, 93:13, 99:16, 99:21, 100:3, 100:14
**TRANSCRIPT** [1] - 1:6

transcription [1] - 1:25
transcripts [1] - 99:18
transparent [4] - 41:10, 60:10, 61:17, 62:15
transposed [3] - 21:18, 86:11, 87:19
tremendous [2] - 40:1, 49:6
tried [2] - 25:14, 26:8
trigger [2] - 39:20, 39:25
trouble [2] - 40:6, 90:3
troubling [4] - 30:21, 38:9, 47:13, 81:9
true [5] - 9:23, 10:6, 36:6, 43:17, 73:24
try [9] - 3:7, 42:6, 57:20, 57:21, 61:14, 72:7, 89:18, 93:24
trying [12] - 4:9, 15:21, 25:19, 30:22, 36:16, 38:12, 63:3, 63:7, 66:3, 76:9, 79:10, 98:18
turn [1] - 49:3
turned [2] - 7:8, 48:19, 64:22
two [16] - 8:12, 8:19, 11:16, 13:1, 14:3, 24:3, 67:22, 74:18, 75:24, 78:23, 83:12, 83:22, 88:17, 89:1, 94:9, 94:10
type [4] - 20:19, 40:17, 41:25, 47:1
types [1] - 55:21

U

U.S [22] - 1:7, 2:5, 8:12, 56:16, 58:4, 60:25, 77:22, 79:24, 80:5, 80:7, 80:12, 81:11, 83:20, 86:18, 87:8, 87:13, 87:14, 88:7, 88:16, 90:19, 90:21
U.S./China [1] - 60:22
uncertainty [1] - 44:7
uncomfortable [1] - 98:5
unconnected [2] - 57:24
under [6] - 7:1, 33:15, 73:23, 74:11, 84:25, 90:15
underlying [13] - 33:9, 79:19, 81:10, 84:25, 86:16, 86:19, 86:25,

88:24, 89:8, 89:10, 89:25, 90:17, 92:13
understood [4] - 4:1, 40:14, 97:12, 97:14
undertaken [2] - 59:23, 60:8
undertaking [1] - 59:19
unequivocally [1] - 29:10
unfair [1] - 48:14
unfortunately [5] - 22:8, 40:11, 60:21, 76:22, 98:11
unit [1] - 42:21
UNITED [1] - 1:1
United [4] - 42:10, 61:5, 62:5, 81:6
universe [2] - 44:15, 45:18
unless [5] - 3:8, 12:5, 28:11, 68:20, 69:3
unquote [1] - 41:22
unrelated [2] - 89:1, 89:5
unremarkable [1] - 41:23
unsupported [1] - 31:5
unsurprising [1] - 45:24
untrue [1] - 54:7
up [42] - 3:15, 8:25, 9:18, 9:20, 16:25, 18:4, 19:14, 19:17, 21:9, 22:14, 23:16, 25:8, 26:4, 26:8, 27:5, 29:18, 34:22, 34:25, 38:6, 40:24, 42:24, 43:4, 43:10, 45:18, 49:21, 52:3, 55:13, 58:9, 58:10, 61:19, 62:17, 63:13, 68:4, 75:17, 75:23, 76:18, 80:16, 80:22, 82:6, 82:15, 89:2, 98:13
updated [4] - 8:23, 10:13, 14:23, 18:17
US [1] - 79:21
US-grade [1] - 79:21
USA [1] - 2:9
usage [1] - 88:18
USDMF [2] - 79:20, 89:11
USDMF-grade [1] - 89:11
users [1] - 88:18

V

vacuum [1] - 67:18
vague [3] - 28:9, 31:11, 31:14
VALSARTAN [1] - 1:4
Valsartan [3] - 19:10, 19:14, 86:6
valsartan [37] - 10:22, 11:3, 11:10, 13:2, 13:15, 14:4, 14:6, 16:13, 17:6, 17:10, 17:14, 19:15, 19:18, 20:22, 21:5, 22:19, 23:15, 25:24, 27:14, 27:15, 28:21, 29:1, 29:5, 29:8, 30:25, 35:19, 43:16, 50:17, 79:21, 79:24, 87:12, 87:14, 88:10, 88:17, 89:11, 91:10
Vanaskie [1] - 3:2
VANASKIE [131] - 1:10, 3:4, 3:10, 3:17, 3:21, 4:17, 4:21, 6:15, 7:17, 7:20, 9:10, 11:20, 12:11, 12:14, 12:17, 13:6, 16:8, 18:7, 18:15, 19:1, 19:25, 21:16, 21:24, 22:2, 22:5, 24:7, 26:11, 26:16, 28:23, 31:3, 32:7, 33:12, 33:20, 34:1, 34:3, 36:4, 38:1, 39:22, 40:4, 42:2, 42:14, 43:21, 45:2, 45:6, 45:13, 45:23, 46:1, 46:4, 46:7, 46:16, 47:6, 49:1, 50:9, 50:22, 51:11, 52:8, 52:16, 52:24, 53:23, 54:19, 54:22, 55:25, 56:6, 56:11, 57:13, 57:18, 58:16, 59:10, 61:21, 62:9, 63:5, 64:14, 65:21, 66:20, 66:24, 67:25, 68:9, 68:12, 69:15, 69:21, 69:25, 70:5, 70:9, 70:11, 70:14, 71:9, 72:21, 73:25, 74:5, 74:8, 75:10, 75:22, 76:20, 77:9, 78:8, 78:17, 79:3, 79:8, 79:12, 80:2, 82:9, 82:11, 83:3, 83:23, 85:6, 85:10, 85:14, 85:18, 85:22, 85:25, 86:13, 88:2, 90:3, 91:3, 91:23,

92:18, 92:25, 93:4, 93:12, 93:20, 94:6, 94:8, 96:7, 96:15, 97:10, 97:13, 98:7, 99:2, 99:15, 100:7, 100:9
various [1] - 47:2
vast [1] - 72:13
vendor [8] - 8:5, 44:22, 60:24, 60:25, 61:3, 61:12, 62:23, 63:2
vendor's [1] - 61:14
vendors [2] - 61:11
venue [1] - 98:25
verified [1] - 64:24
version [1] - 24:24
versions [2] - 64:4, 64:12
via [2] - 3:1
VIA [1] - 1:5
vice [2] - 17:19
video [1] - 76:23
videoconference [1] - 3:1
VIDEOCONFERENCE [1] - 1:6
view [2] - 33:21, 61:22
violated [1] - 85:13
violation [2] - 6:12, 24:17
visited [1] - 51:5
volume [1] - 84:7
volumes [1] - 26:25
voluntarily [2] - 17:6, 72:3

W

wait [2] - 4:19, 81:22
walk [4] - 21:12, 23:8, 27:4, 42:6
walking [2] - 98:13, 98:21
Wall [1] - 60:14
Wangwei [1] - 12:25
wants [8] - 26:21, 29:16, 48:15, 56:25, 57:3, 63:1, 63:2, 64:18
WAS [1] - 18:23
watch [1] - 23:14
watched [1] - 34:20
ways [2] - 71:16, 71:20
Wednesday [1] - 44:25
week [4] - 4:10, 4:20, 45:1, 60:12
weekend [1] - 100:8
weeks [7] - 75:21,

82:17, 98:11, 98:12
weigh [5] - 75:8, 76:12, 76:18, 77:17, 95:22
WERE [1] - 22:3
WERNER [1] - 2:7
whatsoever [3] - 20:2, 31:13, 71:14
whereby [1] - 60:13
white [2] - 21:10, 83:14
whole [4] - 23:8, 44:18, 72:1, 72:10
wholly [1] - 41:23
widespread [1] - 20:21
WILLIAMSON [1] - 1:19
wish [1] - 36:5
withheld [3] - 90:22, 94:1, 94:4
withhold [1] - 32:3
withholding [1] - 62:12
witness [2] - 35:5, 59:8
witnesses [11] - 5:22, 6:9, 11:17, 11:19, 30:15, 48:6, 49:20, 55:10, 55:23, 71:2, 71:4
woefully [1] - 15:15
word [2] - 81:24, 99:12
words [7] - 26:20, 26:21, 26:23, 26:24, 26:25, 29:3
work-product [1] - 42:7
workable [1] - 80:16
works [2] - 4:3, 35:3
world [5] - 35:21, 47:20, 48:25, 78:5, 82:4
worried [3] - 35:12, 35:13, 37:10
worry [2] - 39:3, 39:4
worth [1] - 78:21
write [1] - 45:4
written [2] - 26:24, 26:25
wrote [3] - 5:5, 22:12, 24:22

Y

year [9] - 8:9, 25:20, 35:20, 72:13, 80:21, 81:22, 82:1, 84:3, 84:13
years [1] - 23:25

**yellow** [1] - 83:15
**York** [1] - 19:24
**yourselves** [1] - 3:6

## Z

**zero** [5] - 7:23, 16:13, 31:22, 48:19, 80:22
**Zheijiang** [4] - 19:21, 20:1, 20:6, 20:21
**Zhejiang** [5] - 2:5, 19:23, 20:13, 20:15
**ZHP** [45] - 4:1, 5:9, 8:18, 10:1, 10:21, 11:4, 11:9, 13:1, 13:18, 17:20, 19:5, 21:4, 21:15, 24:14, 24:17, 30:11, 31:16, 33:13, 40:5, 40:15, 40:16, 40:23, 42:24, 43:9, 46:25, 55:12, 55:18, 58:9, 61:24, 70:15, 70:19, 76:3, 76:5, 76:9, 78:10, 79:3, 83:12, 83:16, 85:5, 86:3, 94:1, 94:24, 97:18, 98:18
**ZHP's** [4] - 40:16, 41:10, 96:10, 97:21
**ZHP-related** [1] - 70:19
**zinc** [3] - 16:14, 16:21, 43:11
**ZOOM** [1] - 1:6
**Zoom** [1] - 3:1