# EXHIBIT 14

Case 1:19-md-02875-RMB-SAK   Document 1703-16   Filed 11/01/21   Page 2 of 12
                                              PageID: 36389
Chester Valley Coach Works, Inc. v. Fisher-Price, Inc., Not Reported in F.Supp.2d (2001)
Prod.Liab.Rep. (CCH) P 16,185

KeyCite Yellow Flag - Negative Treatment
Distinguished by Westley v. Ecolab, Inc., E.D.Pa., May 12, 2004

2001 WL 1160012
United States District Court, E.D. Pennsylvania.

CHESTER VALLEY COACH WORKS, et al.
v.
FISHER–PRICE, INC.

No. CIV. A. 99 CV 4197.
|
Aug. 29, 2001.

MEMORANDUM AND ORDER

SURRICK, J.

*1 This is a products liability case arising from a fire that completely destroyed Plaintiffs' place of business on July 16, 1998. Presently before the court is Defendant's Motion for Summary Judgment. Resolution of the Motion is dependant upon a determination of the admissibility of the testimony of Plaintiffs' expert concerning the origin of the fire and whether a Bigfoot Power Wheels designed and distributed by Defendant caused the fire. Upon consideration of the Motion, Plaintiffs' Response thereto, Defendant's Reply thereto, and the evidentiary record including the testimony of Plaintiffs' origin and causation expert, Paul M. Kaczmarczik, at a *Daubert* hearing on June 14, 2001, and for the reasons set forth below, Paul M. Kaczmarczik's expert testimony is excluded and Defendant's Motion for Summary Judgment is GRANTED as to all of Plaintiffs' causes of action.

BACKGROUND

In the early morning hours of July 16, 1998, a fire started at Plaintiffs' place of business, completely destroying the building and all personal and business property therein. The building was located in Spring City, Pennsylvania. Plaintiff Chester Valley Coach Works ("CVCW") leased the building from its owner, Gregory Roberts, and occupied the northern two thirds of the building. CVCW sub-leased the southern third of the building to a non-party, Continental Paving. A wall divided the northern CVCW side of the building from the southern Continental Paving side.

CVCW was in the business of restoring automobiles as well as doing conversions of "monster trucks" and motor homes. CVCW was managed by Greg Peck who is not a party to this suit. Plaintiff Jack Brady operated a business called KSR Motorsports out of the same location occupied by CVCW.[1] Evidently, CVCW and Brady had agreed that profits earned by either CVCW or KSR Motorsports would be divided equally between the two businesses. Plaintiff Richard Blackburne was a customer of CVCW and/or KSR.

Before the fire, Brady had purchased two "Bigfoot" model Power Wheels products (referred to herein as "Bigfoot # 1 and # 2") designed and distributed by Defendant Fisher–Price, Inc.[2] Plaintiffs contend that one Bigfoot (designated Bigfoot # 2) caused the fire when it spontaneously ignited due to a design defect in its electrical system. As a result, Plaintiffs filed the instant suit alleging causes of action in negligence, strict liability and breach of warranty.

Plaintiffs and Defendant dispute the origin and cause of the fire. Defendant relies on the reports of four independent fire investigators, all of whom concluded that the fire began in the southern (Continental Paving) side of the building on the south side of the dividing wall.[3] Plaintiffs contend that the fire originated just to the north of the dividing wall (in the CVCW section of the building), underneath a mezzanine (the "Mezzanine Area"). They further contend that it was caused by one of the Bigfoot vehicles. These vehicles were located in the Mezzanine Area near the dividing wall. In making this argument, Plaintiffs rely exclusively on the expert opinion provided by their sole liability expert, Paul M. Kaczmarczik. ("Kaczmarczik").

*2 Defendant has filed this Motion for Summary Judgment the gravamen of which is that Kaczmarczik's testimony must be excluded pursuant to Rule 702 of the Federal Rules of Evidence as unreliable under the standards set forth by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Because Kaczmarczik is Plaintiffs' sole expert witness as to the origin and cause of the fire, Defendant's Motion argues that once Kaczmarczik's opinions are excluded, Plaintiffs will be unable to offer any proof that the Bigfoot was the cause of the fire. With no such evidence, Defendant contends that there is no genuine issue of material

Case 1:19-md-02875-RMB-SAK   Document 1703-16   Filed 11/01/21   Page 3 of 12
PageID: 36390
Chester Valley Coach Works, Inc. v. Fisher-Price, Inc., Not Reported in F.Supp.2d (2001)
Prod.Liab.Rep. (CCH) P 16,185

fact as to origin and cause and that it is entitled to summary judgment.[4]

Kaczmarczik produced an expert report, a copy of which was reviewed by the Court as an attachment to Defendant's Motion for Summary Judgment. In addition, the Court held a *Daubert* hearing on June 14, 2001, at which Kaczmarczik testified. The hearing focused on whether Kaczmarczik's expert opinion is supported by valid and reliable methodology, as required by *Daubert* and *Kumho Tire.*

ANALYSIS

I. *Rule 702 and Daubert*

The admissibility of expert testimony turns on whether the expert is qualified and whether the testimony meets the requirements of Rule 702 of the Federal Rules of Evidence. See Daubert, 509 U.S. at 589. According to the *Daubert* Court, a district court judge has a "gatekeeping role" in which:

> [T]he trial judge must determine at the outset ... whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand and determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether the reasoning or methodology properly can be applied to the facts in issue.

*Id.* at 592–93. Defendant has not objected to Kaczmarczik's qualifications. The question, therefore, is whether Kaczmarczik's testimony is supported by valid and reliable methodology.

In the Third Circuit, when analyzing expert testimony under *Daubert* and *Kumho Tire,* a district court must consider the following factors: "(1) whether a method consists of a testable hypothesis; (2) whether the method has been subjected to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to the methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put." Oddi v. Ford Motor Co., 234 F.3d 136, 145 (3d Cir.2000) (citations omitted). The Court of Appeals for the Third Circuit has further explained that "admissibility thus depends in part upon 'the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case.' " Id. at 145 (quoting In re Paoli Railroad Yard PCB Litigation, 35 F.3d 717, 743 (3d Cir.1994)). This standard, however:

> *3 is not intended ... to be applied in a manner that requires the plaintiffs 'to prove their case twice—they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of the evidence that their opinions are reliable.' This is a very important distinction. The test of admissibility is not whether a particular scientific opinion has the best foundation or whether it is demonstrably correct. Rather, the test is whether the 'particular opinion is based on valid reasoning and reliable methodology.'

*Id.* (citing Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 806 (3d Cir.1997)).

Originally decided in the context of an expert offering testimony regarding scientific knowledge, *Daubert* has been extended to "any technical or other specialized knowledge," see Kumho Tire, 526 U.S. at 141, an extension that clearly covers the type of testimony at issue here. With these standards in mind, we conclude that Kaczmarczik's proposed testimony is not supported by valid and reliable methodology and must be excluded.

II. *Kaczmarczik's Testimony Regarding Fire Origin*

a) NFPA 921

Throughout his deposition testimony and his *Daubert* hearing testimony, Kaczmarczik indicated that his conclusions as to fire origin and causation are not based on any testing, experimentation, or generally accepted texts, treatises, or other writings. Rather, Kaczmarczik's findings and conclusions are based primarily upon his "experience and education." The only authority that Kaczmarczik has referred to as providing support for his conclusions is *NFPA 921,*

*Guide to Fire and Explosion Investigations* ("NFPA 921"). This reference came only after preparing his report, after his deposition and after the filing of the instant motion.[5]

NFPA 921 is a guide to fire investigations developed by the National Fire Protection Association to "assist in improving the fire investigation process and the quality of information on fires resulting from the investigative process." Kaczmarczik acknowledges that NFPA 921 is *the authoritative comprehensive guide* to accepted procedures and techniques for fire investigations. The very first substantive chapter of NFPA 921 is entitled "Basic Methodologies" and reads, in relevant part, as follows:[6]

> 2–1 Nature of Fire Investigations.... The compilation of factual data, as well as an analysis of those facts, should be accomplished objectively and truthfully. The basic methodology of the fire investigation should rely on the use of a systematic approach and attention to all relevant details. the use of a systematic approach often will uncover new factual data for analysis, which may require previous conclusions to be reevaluated. With a few exceptions, the proper methodology for a fire or explosion investigation is to first determine and establish the origin(s), then investigate the cause: What circumstances, conditions, or agencies caused the ignition source, fuel, and oxidant to come together?
>
> **\*4** 2–2 Systematic Approach. The systematic approach recommended is that of the scientific method, which is used in physical sciences. This method provides for the organizational and analytical process so desirable and necessary in a successful fire investigation.
>
> 2–3 Relating Fire Investigation to the Scientific Method.... The scientific method is applied using the following six steps.
>
> 2–3.1 Recognize the Need. First, one should determine that a problem exists....
>
> 2–3.2 Define the Problem. Having determined that a problem exists, the investigator or analyst should define in what manner the problem can be solved. In this case, a proper origin and cause investigation should be conducted. This is done by an examination of the scene and by a combination of other data collection methods, such as the review of previously conducted investigations of the incident, the interviewing of witnesses or other knowledgeable persons, and the results of scientific testing.
>
> 2–3.3 Collect Data. Facts about the fire incident are now collected. This is done by observation, experiment, or other direct data gathering means. This is called empirical data because it is based on observation or experience and is capable of being verified.
>
> 2–3.4 Analyze the Data (Inductive Reasoning). All of the collected and observed information is analyzed by inductive reasoning. This is the process in which the total body of empirical data collected is carefully examined in the light of the investigator's knowledge, training, and experience. Subjective or speculative information cannot be included in the analysis, only facts that can be clearly proven by observation or experiment.
>
> 2–3.5 Develop a Hypothesis. Based on the data analysis, the investigator should now produce a hypothesis or group of hypotheses to explain the origin and cause of the fire .... This hypothesis should be based solely on the empirical data that the investigator has collected.
>
> 2–3.6 Test the Hypothesis (Deductive Reasoning). All other reasonable origins and causes should be eliminated. The investigator does not have a truly provable hypothesis unless it can stand the test of careful and serious challenge. This is done by the principle of deductive reasoning, in which the investigator compares his or her hypothesis to all known facts. If the hypothesis cannot withstand an examination by deductive reasoning, it should be discarded as not provable and a new hypothesis tested. This may include the collection of new data or the reanalysis of existing data. this process needs to be continued until all feasible hypotheses have been tested. Otherwise the fire cause should be listed as "undetermined."
>
> 2–3.6.1 Presumption of Cause. Until data have been collected, no specific hypothesis can be reasonably formed or treated. All fires, however, should be approached by the investigator without presumption.
>
> 2–4 Basic Method of a Fire Investigation. Using the scientific method ... should involve the following five major steps from inception through final analysis.
>
> **\*5** 2–4.1 Receiving the Assignment. The investigator should be notified of the incident, what his or her role will be, and what he or she is to accomplish....

2–4.3 Conducting the Investigation. The investigator should conduct an examination of the scene, if it is available, and collect data necessary to the analysis....

2–4.4 Collecting and Preserving Evidence. Valuable physical evidence should be recognized, properly collected, and preserved for further testing and evaluation or courtroom presentation.

2–4.5 Analyzing the Incident. All collected and available data should be analyzed using principles of the scientific method.... Conclusions should be drawn according to the principles expressed in this guide.

2–5 Reporting Procedure. * * *

If Kaczmarczik had followed this universally recognized standard methodology in arriving at his origin and cause conclusions, we would have little trouble admitting his testimony. However, Kaczmarczik's testimony demonstrates that far from following this methodology, Kaczmarczik deviated from it repeatedly and significantly.

Kaczmarczik's first deviation comes from the very first section of NFPA 921's "Basic Methodology" chapter, § 2–1, which states that "[w]ith a few exceptions, the proper methodology for a fire or explosion investigation is to first determine and establish the origin(s), then investigate the cause." [7] Kaczmarczik took the exact opposite approach. Kaczmarczik admitted at the *Daubert* hearing that "in timing," he first investigated Bigfoot # 1 and # 2 as a possible cause and only then proceeded to investigate the origins of the fire.

Kaczmarczik testified that when Plaintiffs first contacted him, his assignment was to look at the remains of Bigfoot # 1 and # 2 and determine whether they could have started a fire. He examined them visually, performed x-ray analysis on them, and downloaded information from the internet related to the Bigfoot product recall that Fisher–Price had instituted a few months after the fire. Based on this examination and the recall data and *before he began any investigation into the fire's origin,* Kaczmarczik concluded that a Bigfoot could have caused the fire.

Kaczmarczik admitted at the *Daubert* hearing that he approached his investigation of the fire's origin with the hypothesis that Bigfoot # 2 could have caused the fire. [8] It is exactly this type of "putting the cart before the horse" that NFPA 921 forbids. Section 2–3.6.1 of NFPA 921's "Basic Methodology" chapter states that "[u]ntil data have been collected, no specific hypothesis can be reasonably formed or treated. All fires, however, should be approached by the investigator *without presumption*." (emphasis added). It is not difficult to understand the wisdom of this required methodology. An investigator who goes into a fire investigation with preconceived notions of what he expects to find is much more likely to find it than is an investigator who goes in with an open mind. Indeed, the evidence in this record suggests that all of the independent investigators investigated the origin of the fire before looking for causes within that origin. Only Kaczmarczik, who had a preconceived notion of what the cause might be, located the fire's origin in the northern part of the building where the Bigfoot vehicles had been.

*6 When Kaczmarczik finally began his investigation of the fire's origin, he immediately violated NFPA 921's first principle of fire origin investigation. NFPA 921 § 2–4.3 clearly states that a fire investigator should examine the fire scene if it is available. Kaczmarczik never made any such independent examination. Though he initially insisted that he had not been "fully retained" until after the Plaintiffs had cleaned up the scene, he ultimately conceded under cross-examination that he had, in fact, commenced his investigation weeks before the scene was cleaned up. [9]

During cross-examination, Kaczmarczik testified that it is "absolutely preferable," and part of a "reliable methodology" to personally inspect the fire scene. NFPA 921 § 6–2.7 states that an investigator "should promptly determine the identity of the individual, authority, or entity that has possession or control of the scene. Right of access and means of access should be established ." Kaczmarczik also testified that if a fire investigator's client does not want the investigator to examine the fire scene, the investigator should inform the client that such an examination is an important part of a fire investigation. Nevertheless, despite the fact that he was employed by Plaintiff, who had possession and control of the scene, Kaczmarczik never attempted to gain access to the scene.

Kaczmarczik's failure to inspect the fire scene has compromised the reliability of several of his findings that were integral to his overall conclusions. For example, Kaczmarczik's report bases its origin conclusion on five factors. One of these is "burn patterns." According to Kaczmarczik, one of the principal reasons that an investigator

inspects the fire scene is to obtain burn pattern evidence. According to NFPA 921, the analysis of burn patterns is a "major objective" of any fire investigation. Without the benefit of an independent inspection of the scene, Kaczmarczik concluded that burn patterns on 1) the "gable" wall at the south end of the building, and 2) a metal "footing" along the divider wall suggest that the fire began in the Mezzanine Area.

Trooper Barton, one of the independent investigators, concluded that the fire started at a point near the southern end of the building. He based this conclusion, in part, on the burn patterns he observed on the southern "gable" wall. Kaczmarczik read Trooper Barton's fire investigation report and concluded in his own report that Barton was wrong in that the burn patterns on the gable wall did not suggest a fire origin near the southern end of the building. Kaczmarczik based this conclusion on his observation, gleaned from deposition testimony, that the gable wall had separated from the rest of the building and fallen intact. "If the massive ridge beam was first consumed at the very southern end," Kaczmarczik's report opines, "the gable wall would have been *partially* or entirely *consumed.*" (emphasis added). However, Barton based his conclusion, in part, on the presence of a "large hole" in the gable wall through which, Barton opined, the flames had burned completely. Kaczmarczik was not aware of the hole (which represents at least a partial consumption of the gable wall) because he never personally inspected the fire scene or even looked at close-up pictures of the gable wall. In fact, it appears that Kaczmarczik first became aware of the hole when it was pointed out to him on cross-examination by defense counsel at the *Daubert* Hearing.

**\*7** As for the metal footing, Richard O'Brien, another of the independent fire investigators, opined that had the fire originated north of the dividing wall and progressed to the south, the metal footing at the base of the dividing wall would have been completely destroyed by the fire. Because the metal footing was not completely destroyed by the fire, O'Brien concluded that the fire must have originated to the south of the dividing wall. Kaczmarczik disputes O'Brien's conclusions and argues that the metal footing need not be completely destroyed to support a fire origin north of the dividing wall. Kaczmarczik's conclusions about the state of the metal footing were reached without the benefit of a personal inspection of the fire scene or a review of close-up photographs of the damage to the metal footing.[10] Kaczmarczik admits that he has never seen an adequate representation of the extent of the damage to the metal footing and that his observations would be significantly more reliable had he made a personal inspection of the fire scene.

Another important part of any fire investigation is evaluation of the accounts of the first witnesses to the fire. Section 11–1 of NFPA 921 indicates that "observations reported by persons who witnessed the fire" are important information to be considered in a fire origin analysis. Kaczmarczik testified that accounts of the first witnesses to a fire can contain valuable information and that evaluation of their *first-hand* accounts is part of the standard methodology applied in any fire origin investigation. However, Kaczmarczik did not review available deposition transcripts of either Jennifer Lahr or Jon Burry, the first eye-witnesses to the fire.[11]

Kaczmarczik failed to comply even with the central tenet of the Basic Methodologies chapter that a fire investigator follow a "systematic approach" utilizing the "scientific method." NFPA 921 § 2–3, quoted *supra,* and the subsections that follow set forth this requirement and the order of six steps to be followed in applying the scientific method. Kaczmarczik did not follow this sequence of steps. First and foremost, he developed the hypothesis that Bigfoot # 2 might have caused the fire (step 5) before he collected or analyzed the data (steps 3 and 4) regarding fire origin or other potential causes. Furthermore, Kaczmarczik never tested his hypothesis that Bigfoot # 2 started the fire by obtaining an exemplar and attempting to ignite it according to his theory of product defect. In addition, NFPA 921 notes that testing the hypothesis (step 6) includes eliminating "all other reasonable origins and causes." Kaczmarczik's elimination of other possible origins through burn pattern evidence on the gable wall and metal divider is, as discussed above, rendered unreliable by his failure to personally inspect the scene or even examine detailed photographs of the burn pattern evidence in those areas. Surprisingly, Kaczmarczik never considered, nor was he even aware of, several other possible causes of the fire.

**\*8** It is clear to us that the methodologies Kaczmarczik used in his fire investigation deviate frequently and significantly from those required by the Basic Methodologies chapter of NFPA 921, the authoritative guide for fire investigations. These deviations have left us with serious doubts as to the reliability of the methodologies that Kaczmarczik did follow and the conclusions that he reached. However, as hereinafter demonstrated, we need not rely solely on these deviations to exclude Kaczmarczik's testimony.

b) Kaczmarczik's Report

In addition to our doubts about the reliability of his general fire investigation methodologies, Kaczmarczik's expert report demonstrates that each specific observation he relies upon to form his origin conclusions is subject to significant question. Kaczmarczik's Report sets forth five factors that support his conclusion that the fire originated in the Mezzanine Area:

1) Alarm readings from an intrusion alarm system covering the building on the night of the fire;

2) "Clean burn" evidence;

3) "Spalling" evidence;

4) Observed fire progression; and

5) Burn patterns

The first of these factors, alarm readings, refers to an intrusion alarm system that covered the building before the fire. As the fire began, it set off an initial intrusion alarm specific to a given area in the building. As the fire progressed into different areas, different area intrusion alarms were triggered. Kaczmarczik concluded that the order in which the alarms were triggered suggested a fire beginning in the Mezzanine Area, and progressing south, through the dividing wall and into the southern part of the building. However, Kaczmarczik never pointed to any testing, experimentation or treatise that supported this conclusion. Nor did Kaczmarczik perform any independent investigation of the alarm system or the data that the alarm system company receives.[12] Kaczmarczik's theory that the intrusion alarm progression supports his conclusions as to fire origin appears to be an *ipse dixit* (because I say so). It has not been tested or subjected to peer review,[13] nor did Plaintiffs provide the Court with information as to the known or potential rate of error, or whether the technique Kaczmarczik utilized in applying alarm progression analysis to fire origin investigation is generally accepted.[14]

The second and third factors on which Kaczmarczik bases his origin conclusion are "clean burn" and "spalling." Kaczmarczik's analysis of these factors in his report is relevant only indirectly, by way of attempting to disprove the origin conclusions of two of the independent investigators who place the fire's origin at two points south of the dividing wall. Kaczmarczik has pointed to particular sections of NFPA 921 that support his conclusions that evidence of "clean burn" and/or "spalling" in a given location are not necessarily indicators of fire origin. Defense counsel did not challenge these assertions at the *Daubert* hearing, and we are prepared to take them at face value. Nevertheless, while these factors may reflect reliable methodology, they go only to challenge the origin conclusions of two of the four independent investigators and do not assist in reaching the conclusion that the fire started in the Mezzanine Area. Kaczmarczik conceded as much during his *Daubert* testimony.

*9 The fourth factor Kaczmarczik relies upon in reaching his fire origin conclusion is observed fire progression in the building. Kaczmarczik reviewed the original transcript of Fire Marshal Gallagher's deposition and based his origin conclusion, in part, on Gallagher's testimony regarding observed fire progression. That transcript stated that when Gallagher first arrived at the fire scene, he observed the fire concentrated primarily on the northern CVCW side and moving from the north, towards the southern Continental Paving side of the building. This "observed progression" supports Kaczmarczik's fire origin theory and Kaczmarczik testified at his deposition that Gallagher's observations were "of primary importance" to him in arriving at his ultimate origin conclusion. However, shortly after his deposition Gallagher filed an errata sheet correcting his testimony to read that he first saw the fire concentrated in the *southern* part of the building, progressing northward *towards the CVCW portion* of the building. When confronted with Gallagher's correction at his own deposition, Kaczmarczik admitted that he would have to "rethink" his conclusions. At the *Daubert* hearing, Kaczmarczik maintained that the correction did not change his conclusions as to fire origin. Nevertheless, he admitted that Gallagher's testimony, which no longer supports Kaczmarczik's conclusions, forms the entirety of the "observations" for Kaczmarczik's "fire progression" factor.

The last factor upon which Kaczmarczik based his origin conclusion is "burn patterns." These consist of burn pattern observations in two places: 1) the "gable" wall at the south end of the building, and 2) damage to a metal "footing" along the divider wall. As discussed above, we have concluded that both of these "burn pattern" observations are open to serious question.

Based on the forgoing, we are satisfied that Kaczmarczik's conclusions as to fire origin are unreliable under the *Daubert* standards and must be excluded.[15]

III. *Kaczmarczik's Testimony Regarding Cause*

Case 1:19-md-02875-RMB-SAK   Document 1703-16   Filed 11/01/21   Page 8 of 12
                                          PageID: 36395
Chester Valley Coach Works, Inc. v. Fisher-Price, Inc., Not Reported in F.Supp.2d (2001)
Prod.Liab.Rep. (CCH) P 16,185

Having pinpointed the fire's origin in the Mezzanine Area, Kaczmarczik's report proceeds to identify Bigfoot # 2 as the cause. He bases this conclusion on the following three factors:

1) That the Bigfoot model Power Wheels had a design defect in its electrical system capable of causing a Bigfoot to ignite into flames even when parked and turned off;

2) That Bigfoot # 1 and # 2 were the only items in the Mezzanine Area capable of producing the fire; and

3) Physical and X–Ray examination of Bigfoot # 2 revealing that the fault in the electrical system did, indeed, trigger the fire through the melting of a copper conductor.

An examination of each of these factors reveals significant failures in Kaczmarczik's methodology.

According to Kaczmarczik's report:

> A high resistance short circuit between the batteries and the switch [in a Bigfoot] would create a constant current drain through the inadequately designed and manufactured plug and receptacle. The thermal energy, produced through Joule heating, would degrade the integrity of the components and, over time, create a direct short circuit and cause these components and the stored vehicle to ignite.

 *10  Kaczmarczik's theory appears to be based on his own experience and education, as well as two additional factors. First, Kaczmarczik noted the deposition testimony of Plaintiff Jack Brady. Brady testified that one Bigfoot was significantly faster than the other when equally charged and that the slower Bigfoot required more frequent charging. Based on this testimony, Kaczmarczik concluded that the slower Bigfoot had a fault in its electrical system. Regardless of the validity of this conclusion, the Court is unaware of how Kaczmarczik reached it. Kaczmarczik did not rely on any testing, experimentation or generally accepted texts or treatises to support it. Instead, his conclusion drawn from Brady's observations rests, by his own admission, solely on his experience and education. Second, Kaczmarczik bases his conclusion that a design defect existed in the Bigfoot electrical system on a report from the United States Consumer Product Safety Commission ("CPSC") of a voluntary recall of the Bigfoot model Power Wheels product by Fisher–Price. The report states that "CPSC and Fisher–Price have received approximately 700 reports of electrical components failing and overheating while the cars and trucks were being ridden, charged, parked or stored. About 150 fires have been reported." Kaczmarczik concludes from this report that the Bigfoot vehicles had a design defect capable of causing them to ignite while parked, absent misuse. However, Kaczmarczik admitted that the CPSC report does not specifically mention a single reported incident of a fire while a Bigfoot was parked and that he is unaware of a single fire occurring in such conditions.

The CPSC report, the recall and the fact that Fisher–Price did modify the Bigfoot electrical system upon recall does suggest the existence of some sort of design defect. It does not, without more, prove that the design defect was sufficient to cause a Bigfoot to ignite when parked and turned off. Kaczmarczik never tested his theory using an exemplar nor did he make an inquiry to determine whether any such testing had ever been done.

Having concluded that the Bigfoot vehicles could have caused the fire, Kaczmarczik then declares, without explanation, that there were no other items in his designated area of origin that could be the cause. This appears to follow NFPA 921's requirement that "[a]ll other reasonable origins and causes should be eliminated," *see* NFPA 921 § 2–3.6. However, it is clear that Kaczmarczik did not follow generally accepted methodology in reaching this conclusion.

Although he admitted at the *Daubert* hearing that a lawn tractor, a hanging lamp, and approximately five automobiles undergoing repair were located in the Mezzanine Area, Kaczmarczik did not investigate any of these items as possible causes. He ruled them out based solely on his experience and education. With respect to the hanging lamp, which was plugged in to a power outlet, Kaczmarczik conceded that he did not know who had manufactured it, what it was made of or precisely where it was hanging nor did he conduct an inspection of its remains. More troubling is the fact that Kaczmarczik did not know that a motorized mini-bike and lawn-mower were in the Mezzanine Area until advised by defense counsel *at the Daubert hearing*. When so advised, Kaczmarczik admitted that he could not "one hundred percent" rule those items out as a potential cause.

**\*11** Finally, having identified the Bigfoot vehicles as the only possible cause in the Mezzanine Area, Kaczmarczik's report concludes that the Bigfoot design defect did indeed cause Bigfoot # 2 to ignite by melting a copper conductor. Again, Kaczmarczik never tested this theory on an exemplar nor does he point the Court to generally accepted texts or treatises or experiments conducted by others in support of his finding. [16] Instead, his conclusion is based on two observations.

With regard to the first observation, Kaczmarczik testified that he placed the remains of Bigfoot # 1 and # 2 side by side with the front of the vehicles farthest from the observer. He then observed that the fire destruction was greatest in the adjacent front corners of the vehicles. He concluded that this observation was consistent with a fire starting in the area of Bigfoot # 2 where the alleged design defect existed. At the *Daubert* hearing, Kaczmarczik demonstrated this on two pictures of the Bigfoot remains as they existed when he examined them. He identified the missing material on the adjacent front portions as the areas of "greatest destruction" referred to in his report. However, defense counsel then showed Kaczmarczik a picture of one Bigfoot taken at the scene shortly after the fire. After examining the picture at some length, Kaczmarczik admitted that the missing portion of that Bigfoot was, in fact, present in the photograph taken at the fire scene. For obvious reasons, we conclude that this portion of Kaczmarczik's report lacks reliable support. Indeed, it further illustrates how Kaczmarczik's failure to personally inspect the fire scene severely compromised his ability to reach reliable conclusions.

With regard to the second observation, Kaczmarczik's report notes that both visual observation and radiography reveal an electrical fault in Bigfoot # 2, which Kaczmarczik concludes, melted and separated the "# 14 AWG stranded copper conductor." He then opines that the melted copper conductor would have caused the surrounding plastic on the Bigfoot to ignite, which would have been sufficient to cause the overall building fire.

Once again, Kaczmarczik did not use an exemplar to test his theory nor does he point to any such tests performed by others, any literature indicating such a fault progression, or any other generally accepted texts or treatises to support his conclusion. Rather, his conclusion is based solely on his experience and education. Crucial to Kaczmarczik's theory is the fact that the melting temperature of copper is approximately 1,980 degrees Fahrenheit, which building fires rarely reach for any sustained period of time. Thus, Kaczmarczik concludes, the melting copper must have caused the building fire as opposed to the other way around.

Kaczmarczik's report completely ignores the phenomenon known as "alloying." This phenomenon is specifically discussed in NFPA 921. It occurs when, during a fire, a metal with a relatively low melting point may drip onto other metals, such as copper, that do not normally melt in fires. This can cause a metal like copper to melt at a lower-than-normal temperature. Kaczmarczik admitted that he was aware when he submitted his report that others had found through testing that alloying did indeed occur. He further admitted that based on the results of these tests, he could not rule out the possibility that the copper conductor in Bigfoot # 2 had been melted by the building fire.

IV. *Conclusions*

**\*12** Based on the foregoing, we are compelled to conclude that Kaczmarczik's expert opinions must be excluded under *Daubert.* Several cases in this Circuit support our conclusion. In *Oddi v. Ford Motor Co., supra,* the Court of Appeals for the Third Circuit affirmed a district court's exclusion of expert testimony as to the cause of an automobile accident based upon *Daubert.* There, the plaintiff was severely injured when the truck he was driving collided with a guardrail. The plaintiff sued the manufacturer of the vehicle with plaintiff's expert opining that a design defect in the vehicle caused his injuries. In affirming the district court's findings, the Court of Appeals placed great emphasis on the fact that plaintiff's expert never tested his theory on causation nor did he perform any separate tests or experimentation to support his conclusions. The Court of Appeals further stated:

> Essentially [the expert's] opinion ... is based on nothing more than his training and years of experience as an engineer. Although there may be some circumstances where one's training and experience will provide an adequate foundation to admit an opinion and furnish the necessary reliability to allow a jury to consider it, this is not such a case.... [The expert's] *ipse dixit* does not withstand *Daubert's* scrutiny.

*Oddi,* 234 F.3d at 158. As has been explored at great length above, Kaczmarczik, like the expert in *Oddi,* did not test his theories in any way and does not support his conclusions through generally accepted principles or methodologies. Rather, his testimony is simply *"ipse dixit* [and] does not withstand *Daubert's* scrutiny."

The case of *Booth v. Black & Decker,* 2001 **WL** 366631 (E.D.Pa., Apr. 12, 2001)(Reed, J.), provides an even closer analogy. In *Booth,* the court granted summary judgment to the defendant on plaintiff's negligence, design defect, and breach of warranty claims stemming from a house fire allegedly caused by a Black & Decker toaster oven. The court granted summary judgment only after concluding that the plaintiff's causation expert's testimony must be excluded pursuant to *Daubert.* In doing so, the court noted:

> [The expert] asserted that his method of investigating the cause of the fire was a standard method applied by others in the field, but he produced no persuasive, objective evidence that his method was subject to peer review, had a known or potential rate of error, could be measured against existing standards, or was generally accepted, as required by Rule 702, *Daubert, Kumho Tire,* and *Oddi....* [The expert] claimed, only at the prompting of defense counsel, that he followed the general methodology of fire investigation established by the National Fire Protection Association ... NFPA 921.... Given NFPA 921's comprehensive and detailed treatment of fire investigations, it appears that NFPA 921 might have contained a methodology upon which [the expert] could have relied, but he failed to state that he applied any specific methodology contained in NFPA 921.... Furthermore, [the expert] pointed to nothing in that document that provided a methodology for investigating the hypothesized cause of the fire in this case.

**\*13** *Id.* at *3. Here, as in *Booth,* Kaczmarczik's purported reliance on NFPA 921 is obviously unavailing. The absence of any generally accepted methodology in support of his conclusions requires that Kaczmarczik's testimony be excluded.

V. *Summary Judgment*

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, a court must view facts and inferences in the light most favorable to the party opposing the motion. *Siegel Transfer, Inc. v. Carrier Express, Inc.,* 54 F.3d 1125, 1127 (3d Cir.1995). In a motion for summary judgment, the moving party bears the burden of proving that no genuine issue of material fact is in dispute. See *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585 n. 10, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Once the moving party has carried its initial burden, the non-moving party may not rest upon the mere allegations or denials of the moving party's pleadings, but must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

Plaintiffs in this case have alleged three causes of action: strict liability under the Restatement (Second) of Torts § 402A, negligence, and breach of warranty. Plaintiffs seek to hold Defendant liable for the fire and to recover compensatory damages for all real and personal property damaged or destroyed in the fire. In order to succeed, Plaintiffs must prove that Defendant's Bigfoot vehicles caused the fire. Kaczmarczik is Plaintiffs' only liability expert witness.[17] Without his expert testimony, Plaintiffs lack sufficient evidence to establish the cause of the fire. There being no genuine issue of material fact on the issue of causation, we will grant summary judgment in favor of Defendant Fisher–Price, Inc., and against Plaintiffs Chester Valley Coach Works, Inc., d/b/a Trix Trucks; Jack Brady, individually and d/b/a KSR Motorsports; and Richard Blackburne.

Case 1:19-md-02875-RMB-SAK   Document 1703-16   Filed 11/01/21   Page 11 of 12
                                       PageID: 36398
Chester Valley Coach Works, Inc. v. Fisher-Price, Inc., Not Reported in F.Supp.2d (2001)
Prod.Liab.Rep. (CCH) P 16,185

An appropriate Order follows:

### ORDER

AND NOW, this 29th day of August, 2001, upon consideration of Defendant's Motion for Summary Judgment, Plaintiff's Response thereto, Defendant's Reply thereto, testimony given at the *Daubert* Hearing on June 14, 2001, and the remaining evidentiary record, it is ORDERED that:

  1. The Testimony of Paul M. Kaczmarczik is excluded.

  2. Defendant's Motion for Summary Judgment is GRANTED.

  3. JUDGMENT is hereby ENTERED in favor of Defendant, Fisher–Price, Inc., and against Plaintiffs Chester Valley Coach Works, Inc., d/b/a Trix Trucks; Jack Brady, individually and d/b/a KSR Motorsports; and Richard Blackburne, on all of Plaintiffs' causes of action.

**All Citations**

Not Reported in F.Supp.2d, 2001 WL 1160012, Prod.Liab.Rep. (CCH) P 16,185

### Footnotes

| | |
|---|---|
| 1 | Jack Brady ran KSR as a sole proprietorship. He is therefore suing in his individual capacity and on behalf of KSR. |
| 2 | The Bigfoot is a battery-powered toy vehicle for children 3–7 years old and weighing up to 65 pounds. |
| 3 | These independent fire investigators are Trooper Thomas Barton, Assistant Fire Marshall for the Pennsylvania State Police Fire Investigation Unit; Brian M. Gallagher, Assistant Fire Marshall for Chester County; Bruce W. Crowly, P.E., of BC Engineering Services, Inc.; and Richard O'Brien, of Crawford and Company, an independent adjustor company. In the interest of fairness, it should be noted that although all of these independent cause and origin investigators reported that the fire originated on the southern side of the dividing wall, they do not agree on precisely where on the southern side of the dividing wall the fire originated or what caused the fire. |
| 4 | In addition to its contentions regarding preclusion of Kaczmarczik's expert testimony, Defendant's Motion for Summary Judgment also argues a) that summary judgment is appropriate as a sanction for Plaintiffs' alleged spoliation of the fire scene, and b) that, in the alternative, partial summary judgment is appropriate as to certain aspects of damages. Because we have granted summary judgment based on the exclusion of Plaintiffs' expert liability witness, we need not reach these alternative grounds. |
| 5 | Interestingly, at his deposition, Kaczmarczik denied basing his conclusions on NFPA 921. After Defendant filed its Motion for Summary Judgment seeking exclusion of Kaczmarczik's testimony and pointing out its lack of methodological support, Kaczmarczik for the first time claimed that his report is based on NFPA 921. Kaczmarczik testified at the *Daubert* hearing that while he may not have specifically referred to NFPA 921 while conducting his investigation of the fire or writing his report, he is familiar with NFPA 921 and its principles guide all of his investigations. We note that *Daubert* does not require that an expert physically refer to a treatise such as NFPA 921 when its fundamental concepts are intimately familiar to the expert and thus an intuitive part of his basic methodology. This does not, however, relieve the expert from *Daubert*'s requirement that he demonstrate that he actually applied these methodological principles to his investigation and that they support his conclusions. This, Kaczmarczik has failed to do. |
| 6 | All references herein to NFPA 921 refer to the 1998 edition of that text. The 2001 edition of NFPA 921, which supercedes the 1998 edition, was issued on January 13, 2001, and became effective on February 9, 2001, approximately six weeks *before* the date of Kaczmarczik' expert report. Kaczmarczik testified at the *Daubert* hearing that he has never seen the 2001 edition. |

7   NFPA 921 § 11–1 goes on to state that "if the origin of a fire cannot be determined, the cause cannot be determined."

8   Kaczmarczik testified under cross-examination that he began his fire origin investigation with the hypothesis that Bigfoot # 2 could have caused the fire. Only after counsel for the Defendant pointed out NFPA 921's proscription against approaching origin investigations with a presumption of possible cause did Kaczmarczik change his tune and insist that he did not approach his origin investigation with any such hypothesis.

9   The record reflects that the real reason Kaczmarczik never inspected the fire scene is that Plaintiffs would not pay him to do so.

10  NFPA § 7–1 indicates that where a physical inspection of the fire scene is not possible, "the thorough fire investigation" includes "evaluating the prior documentation of the scene." In addition, NFPA 921 § 2–1, the very first section of the "Basic Methodology" chapter states that "[t]he basic methodology of the fire investigation should rely on ... attention to all relevant details." It is clear to us that Kaczmarczik's evaluation of the prior documentation was selective at best, if not simply careless.

11  He did review the depositions of the independent fire investigators, some of which paraphrased Lahr and Burry's accounts. Kaczmarczik conceded, however, that first-hand accounts are preferable to second-hand accounts. Section 2–3.2 of NFPA 921's Basic Methodology chapter states that a fire investigation should include "interviewing of witnesses."

12  Kaczmarczik got all of his fire alarm progression data from a review of the deposition of Mr. Ladd, the President of the company that installed, maintains and monitors the intrusion alarm system.

13  Kaczmarczik has never published in the area of fire investigation or origin and cause determination.

14  Casting further doubt on the validity of Kaczmarczik's analysis, Mr. Ladd testified at his deposition that, in his opinion, the observed progression of alarm triggers in the building does not support Kaczmarczik's conclusions as to fire origin. Mindful of the fact that *Daubert* does not require exclusion of an expert's testimony simply because the expert's conclusions may not be correct in all respects, we do not assign Mr. Ladd's testimony great weight in this context. Nevertheless, it is troubling in light of the fact that Kaczmarczik admitted both at his deposition and at the *Daubert* hearing that Mr. Ladd is more knowledgeable regarding the data his company receives.

15  NFPA 921 § 11–1 states that "if the origin of a fire cannot be determined, the cause cannot be determined." Therefore, it seems to us that our conclusion that Kaczmarczik's origin testimony is not admissible under *Daubert* is sufficient to exclude his causation opinion. Out of an abundance of caution, however, we proceed to an independent analysis of that opinion.

16  Kaczmarczik's failure to test exemplars of the Bigfoot also violates NFPA 921. Section 18–4.5 states that "[t]o more fully understand an appliance, to test its operation, or to explore failure mechanisms, the investigator may need to obtain an exact duplicate (i.e., an exemplar)." Section 18.4.6 goes on to state that "[e]xemplar appliances can be operated and tested to establish the validity of the proposed ignition scenario. If the ignition scenario requires the failure or malfunction of one or more appliance components, this can also be tested for validity on the exemplar."

17  Plaintiffs' liability witness list includes Kaczmarczik, Plaintiff Jack Brady, Plaintiff Richard Blackburn, Gregory Peck, and "Representatives of the United States Consumer Products Safety Commission." None of these witnesses, other than Kaczmarczik can testify as to the origin or the cause of the fire.

---

**End of Document**  © 2021 Thomson Reuters. No claim to original U.S. Government Works.