No *Shepard's* Signal™
As of: November 1, 2021 5:41 PM Z

# Sakolsky v. Genie Indus.

United States District Court for the District of New Jersey

August 18, 2021, Decided; August 18, 2021, Filed

Civil Action No.: 15-6893 (ES) (MAH)

**Reporter**
2021 U.S. Dist. LEXIS 155821 *; 2021 WL 3661398

MICHAEL SAKOLSKY, Plaintiff, v. GENIE INDUSTRIES, Defendant.

**Notice:** NOT FOR PUBLICATION

## Core Terms

alternative design, outriggers, lift, defeat, testing, user, reliable, elevated, platform, manufactured, installed, first report, machine, switch, designs, hazard, removing, electrical, factors, summary judgment, interlock, warn, summary judgment motion, motion to exclude, opinion testimony, expert testimony, opinion evidence, design defect, design-defect, eliminated

**Counsel: [*1]** For MICHAEL SAKOLSKY, Plaintiff: ADAM L. ROTHENBERG, LEAD ATTORNEY, LEVINSON AXELROD, Edison, NJ.

For GENIE INDUSTRIES, Defendant: KENNETH R. MEYER, LEAD ATTORNEY, McCARTER & ENGLISH LLP, NEWARK, NJ; RYAN A. RICHMAN, LEAD ATTORNEY, MCCARTER & ENGLISH, newark, nj.

**Judges:** Esther Salas, United States Distric Judge.

**Opinion by:** Esther Salas

## Opinion

**SALAS, DISTRICT JUDGE**

Plaintiff Michael Sakolsky asserts two claims against Defendant Genie Industries ("Genie"): design defect and failure to warn, under the New Jersey Product Liability Act ("NJPLA"), N.J.S.A. § 2A:58C-1 et seq. Both claims arise from when a Genie-manufactured aerial lift toppled over while Sakolsky was in the platform and elevated about 20 feet. In support of his design-defect claim, Sakolsky offers the expert opinion of Russ Rasnic, P.E., who prepared two reports offering two alternative designs to Genie's aerial lift. Genie moves to exclude Rasnic's opinions as inadmissible under Fed. R. Evid. 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). (D.E. No. 64). Genie also moves to exclude additional opinion evidence offered by Rasnic as procedurally improper. (D.E. No. 67). Finally, Genie moves for summary judgment, arguing that, whether or not Rasnic's opinions are admissible, there is no genuine dispute of material fact and Genie is entitled to judgment as a matter of law. (D.E. **[*2]** No. 61). The Court has considered the parties' submissions and decides these motions without oral argument. *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). For the following reasons, Genie's motion to exclude Rasnic's opinions is **GRANTED**, its motion to exclude additional opinion evidence is **DENIED as moot**, and its motion for summary judgment is **GRANTED**.

## I. BACKGROUND

Unless noted otherwise, the following facts and procedural history are not in dispute.[1]

### A. The AWP-30S

Genie manufactures and designs aerial lifts, and one such lift is the AWP-30S. (Genie's SUMF ¶¶ 1 & 3). The AWP-30S can lift a user 30 feet in the air. (*Id.* ¶ 3). When the lift is not being operated, it can sit on four wheels, which makes it easily mobile and, thereby, more commercially attractive. (*Id.* ¶¶ 5-6 & 8). However, both parties agree that the AWP-30S "should never be

---

[1] The Court pulls these facts primarily from (i) the paragraphs in Genie's Statement of Undisputed Material Facts, to which Sakolsky admitted (D.E. No. 61-2 ("Genie's SUMF"); and (ii) the paragraphs in Sakolsky's Supplemental Statement of Undisputed Material Facts, to which Genie admitted (D.E. No. 62-1 ("Sakolsky's SUMF")).

moved with a worker elevated in the platform." (*Id.* ¶ 16). Such use is dangerous. And to prevent such use, Genie manufactured the lift so that the user must install four outriggers at the bottom of the lift before operating it. (*Id.* ¶¶ 7, 15 & 17-18). The outriggers are crucial safety devices because they increase the lift's footprint and—together with a leveling jack, which is placed at **[*3]** the end of each outrigger and adjusts down to press against the floor—ensures the lift remains stable while elevated. (*Id.* ¶¶ 11-14). Without those pieces in place, the lift can easily tip over when elevated due to its mobility. (*Id.* ¶ 14).

Genie warns users not to operate the lift without first installing and using the outriggers and leveling jacks. (*Id.* ¶¶ 21-28). For example, the lift has a warning label, located on the storage compartment of the outriggers, that reads: "Tip-over hazard. Do not operate unless all four outriggers are properly installed and adjusted." (D.E. No. 61-34, Ex. G, GENIE 000481). The lift also displays a label that reads: "Tip-over hazard. Attempting to move the machine with the platform raised will tip the machine over and cause death or serious injury." (D.E. No. 61-40, Ex. G, GENIE 000501). This label is located at eye-level of where the lift's ground operator is ordinarily stationed. (Genie's SUMF ¶ 23).

Without all four outriggers properly installed, an electromechanical interlock system prevents the platform from elevating. (*Id.* ¶ 17). However, and crucial to this case, that interlock system does not prevent the operator from removing the outriggers **[*4]** *after the platform is elevated*. (Sakolsky's SUMF ¶ 3; Genie's SUMF ¶¶ 20 & 57).[2] To do so, a user need only elevate the lift and then remove the outriggers as he or she would if the lift was lowered—that is, by raising the leveling jack and removing a spring loaded plunger to pull the outriggers from the base. A user might be inclined to do so to save on the time it takes to lower the lift to move it between locations. (*See* Genie's SUMF ¶ 77). While mobility may not be safe, it might be efficient.

The inventor of this interlock system, Rick Curtin, testified there is no benefit to designing a system that prevented a user from removing the outriggers while the lift was elevated. He said, "if the intent is to remove the outriggers, adding a system on top of the system we already have will not prevent them from removing the outriggers." (D.E. No. 61-4, Ex. A., at 65:21-25). He also said he was not aware "of any system that exists that would prevent a person from removing an outrigger." (*Id.* at 66:2-3). And if there was such a system, Curtin testified, the lift would not be any safer because a user could simply raise the leveling jack if he or she was intent on defeating the system. (*Id.* **[*5]** at 66:11-20).

## B. The Accident

Michael Sakolsky and Charles Griffin were welders and set builders for Kadan Productions. (Genie's SUMF ¶¶ 47-48). On February 24, 2014, Serge Hunkins, the owner of Kadan, instructed them to put up a fence in Kadan's warehouse. (*Id.* ¶ 48). To do so, they needed to tie a cable to one of the warehouse's rafters, drop it down to hold up the fence, and then attach it to the rafters on the other side. (*Id.* ¶ 54). In doing so, they used an AWP-30S, which was manufactured by Genie on March 27, 2006. (*Id.* ¶¶ 49-50). That AWP-30S utilized the interlock system described above.

Because the AWP-30S could not fit in the location where the fence was being erected, Griffin removed the outriggers while Sakolsky was elevated 20 feet in the air in the platform. (*Id.* ¶¶ 56-57). Griffin then pushed Sakolsky to various locations where he needed to attach a cable. (*Id.* ¶ 57). They succeeded under this system for a little over ten minutes, until the AWP-30S tipped over, while Sakolsky was still in the platform, causing Sakolsky significant injuries. (*Id.* ¶¶ 59, 61 & 72).

## C. Procedural Background

On August 21, 2015, Sakolsky filed suit against Genie in the Superior Court of New Jersey, **[*6]** Law Division of Middlesex County. (D.E. No. 1, Notice of Removal ¶ 1). On September 16, 2015, Genie removed this action to

---

[2] Sakolsky's SUMF says, "Nothing in the design of the product as sold prevents anyone working with the machine from removing the outriggers when the machine is elevated." (Sakolsky's SUMF ¶ 3). Genie denies this fact, noting that its design incorporates warning labels. (D.E. No. 63-1, Genie's Response to Sakolsky's SUMF ¶ 3). However, Genie does not dispute that its interlock system does not prevent the lift's operator from removing the outriggers after the platform is elevated. And Genie effectively concedes that fact. (Genie's SUMF ¶ 20 ("Removing the outriggers with an individual in the platform while it is elevated requires an individual to intentionally defeat an obvious and necessary safety system."), ¶ 57 ("To fit into that area, after Plaintiff was elevated in the platform of the AWP-30s, Mr. Griffin intentionally removed, with Plaintiff's knowledge and agreement, all four outriggers and then pushed the AWP-30s approximately 25 to 30 feet with Plaintiff elevated in the platform, about 20 feet above the concrete floor, to the location where the cable was being attached.").

federal court. (*Id.*). Sakolsky asserts two claims against Genie under the NJPLA for design defect and failure to warn. (*Id.*, Ex. A). In support of his design-defect claim, Sakolsky produced two reports prepared by Russ Rasnic, P.E., who put forward two alternative designs to the AWP-30S's interlock system that he claims are safer, technically feasible, and practical.

### D. The First Report

In his first report, Rasnic opined that the AWP-30S was defective because it did not have a mechanism to prevent users from removing the outriggers while the lift was elevated. (D.E. Nos. 61-98-61-105, Ex. BB ("First Report") at 3). Rasnic explained that, "[a]ccording to the Accident Prevention Manual by the National Safety Council and other peer-reviewed publications, the following priority list must be followed with any product design" to guard against any possible hazard:

> *Priority One*: Eliminate the hazard.
>
> *Priority Two*: Neutralize the hazard with guards, automatic-stop devices, or other protective safety devices.
>
> *Priority Three*: Warn users of the hazard.
>
> *Priority Four*: Modify behavior **[*7]** by designing operational procedures and employee training programs.
>
> *Priority Five*: Provide protective equipment and clothing.

(*Id.* at 10-11). Rasnic believed the AWP-30S was defective because Genie opted for Priorities Three and Four, rather than Priority One, which he says was available:

> In the case of this type of personnel lift, the **highest design** priority of **eliminating the hazard** was available. A simple, electrical interlocking circuit could have been designed (quite similar in fact, to the one already included on the machine), which would have **prevented removal of the outriggers unless the platform was completely lowered to the ground**. This would have **eliminated the hazard** of the machine being maneuvered with the platform in the raised position and in combination with the outriggers removed, and **would have prevented this accident**.

(*Id.* at 25-26 (emphasis added)). "The addition of an outrigger interlock system," Rasnic went on, "would have eliminated the tip-over hazard associated with the removal of outriggers while the platform was in the elevated position and would have negated the impact of not heeding applicable warnings located on the machine." (*Id.* at 32). The system he designed **[*8]** would use an electrical interlocking circuit that would lock the outriggers into place as they are installed into the lift and would keep them from being removed unless the platform is lowered. (*Id.* at 25-26). He installed this system on an exemplar model of the AWP-30S. (*Id.* at 26).

In reaching his conclusion, Rasnic acknowledged that the AWP-30S complied with stability standards published by the American National Standards Institute ("ANSI") and authored by the Security Industry Association ("SIA"). (*Id.* at 21). But it met those standards, Rasnic explained, only "with these outriggers in place." (*Id.*). Rasnic also listed seven instances, dating back to 1994, where a user suffered from a fall for similar reasons as Sakolsky. (*Id.* at 23). Rasnic explained that there were likely more accidents, but that he was aware of only so few because he received the accident history from Genie and because manufacturers are rarely made aware of accidents. (*Id.*).

Two things bear mentioning here. First, Rasnic's report does not indicate the possibility that his own design could be defeated and, if so, the likelihood it would be defeated by a typical user. Notwithstanding, at his deposition, Rasnic suggested **[*9]** those considerations were central to his design. Rasnic admitted that any safety mechanism could be defeated by a person intent on doing so. (D.E. No. 64-39, Ex. M ("Rasnic Dep."), at 177:22-24 ("[I]f you try hard enough you certainly can defeat any safety system. There's no doubt about that.")). But "[w]hat you want to do," Rasnic explained, "is to make it as non-defeatable as possible, and a true defeat is when you intentionally work around the safety systems that are designed to prevent things from happening." (*Id.* at 177:24-178:3). His design, he went on, "t[ook] away the convenience of being able to disable a safety system so that disabling it would take more time than actually using it right[, so] then you eliminate the impetus to defeat that safety system." (*Id.* at 178:25-179:4). In other words, Rasnic's alternative design supposedly eliminated the hazard by removing the incentive to defeat the safety mechanism.

Second, Rasnic did not conduct any testing on the first alternative design. During his deposition, the following colloquy occurred:

Q. Did you [conduct] any reliability testing on this design . . .?

A. I did not. That wasn't appropriate for a concept or a prototype. Just **[*10]** to verify design would be functional.

Q. Did you do anything to assess potential component failure on that design?

A. No.

Q. Did you do anything to evaluate potential forms of misuse?

A. To a degree I did.

Q. What did you do in that regard?

A. Well, that was part of arriving at the final design.

Q. Is there anything you did in that regard that's not captured in your report?

A. No.

(*Id.* at 157:25-158:16). Nothing in the First Report mentions Rasnic's evaluation of potential forms of misuse.

These two considerations bear mentioning because Genie's own experts installed Rasnic's first alternative design onto an AWP-30S and came up with at least four ways to defeat the system, allowing a user to remove the outriggers while the lift is elevated. (D.E. No. 64-5, Ex. C ("Evulich Report"), at 18). Rasnic did not dispute that (*see* Rasnic's Dep. at 171:4-5), and Genie's experts did so by using tools that are common to any warehouse (Evulich Report at 18). The Court need not outline each way they defeated the first alternative design, but to provide just one example, and as reported by Barris J. Evulich, P.E., they used duct tape to disengage the limit switch while the platform was elevated, allowing them **[*11]** to remove the outriggers. (*Id.*). Nothing in Rasnic's First Report accounts for that possibility.

### E. The Second Report

In the Second Report, Rasnic explained that, while his first alternative design may intentionally be defeated by someone intent on doing so, the AWP-30S, *as designed*, does not require any sort of intentional defeat for a user to be able to remove the outriggers while the lift is elevated. (D.E. Nos. 61-106-110, Ex. CC ("Second Report"), at 2, 5 & 15-16). Indeed,

> The same method used to remove the outriggers when the machine is lowered can be employed to remove them while the platform is raised, by simply pulling out on the spring loaded plunger. This does not represent a defeat of the system, but merely a use of the designed method to release the outriggers. Genie did not incorporate any means to inhibit this from happening.

(*Id.* at 5). Thus, when Griffin removed the outriggers while Sakolsky was elevated in the lift, Griffin did not defeat the lift but rather used the machine as it was "designed to function" and merely "ignor[ed] . . . warnings and instructions." (*Id.* at 15). Moreover, defeating the first alternative design, Rasnic explained, does not make his design less **[*12]** safe than the AWP-30S; rather, it would "provide at least the same level of protection that Genie designed into the machine." (*Id.* at 7).

And "[w]hile no system is totally immune to defeat, . . . steps can be taken to increase this difficulty for most of the typical user population." (*Id.* at 9). One such step, according to Rasnic, is to implement his second alternative design, which consists of installing a coded proximity switch to sense when the platform is in the down position. (*Id.*). When the platform is down, and when the outriggers are installed, the switch will lock the outriggers in place. (*Id.* at 9 & 15). This type of switch was introduced by Allen Bradley in 2012, and Rasnic installed the Allen Bradley version to an exemplar of the AWP-30S. (*Id.* at 9). The methods used by Genie's experts to defeat the first alternative design would not defeat this second alternative design, according to Rasnic. (*Id.* at 10). Finally, Rasnic acknowledged that his second alternative design could be defeated, but said the person doing so would have to possess "electrical design knowledge, in which case the[ person] would be redesigning the machine as [his or her] own." (*Id.* at 16).

Like the first **[*13]** alternative design, there are two things worth mentioning here about the second alternative design. First, Rasnic did not conduct "serial reliability testing" on his second alternative design. (Rasnic Dep. at 117:7-8). Instead, he installed the Allen Bradley switch on "one outrigger" and, he testified, "made sure that it did what I wanted it to do and it did[,] so that was how I tested it." (*Id.* at 115:15-18). He operated the lift with his second alternative design, he admitted, only about a "half a dozen" times. (*Id.* at 117:5). Second, the Allen Bradley switch he used in testing his second alternative design was introduced in 2012—after Genie designed the AWP-30S in 2006—because that was the "quickest" switch he could find. (*Id.* at 183:2-9). However, in Rasnic's Second Report, he said similar "types of sensors have been around for decades as well," and that he "has personally designed

systems utilizing them as far back as the late 1980s." (Second Report at 11).

These considerations bear mentioning because, like the first alternative design, Genie's experts found ways to defeat the second alternative design. Though this time, they used more sophisticated means, as documented in Evulich's **[*14]** rebuttal report—by, for example, cutting cables, removing an "actuator," and placing magnets near an actuator. (D.E. No. 64-63, Ex. T, at 5-6). Evulich also reported that the Allen Bradley switch introduced additional power to the AWP-30S, and that the design failed multiple times as a result. (*Id.* at 9). Evulich asserts:

> It is a critical, unacceptable design flaw by Mr. Rasnic to subject electrical components to conditions greater than they are rated for by the manufacturer. In this case, a switch rated at 200 mA subjected to amperages (current) to almost two-and-one-half (2-1/2) times its manufacturer's rating under certain circumstances and configurations. Nowhere in his supplemental report does Mr. Rasnic mention testing let alone consider what would happen if a lift was being operated while the on-board battery charger was plugged in. As I have previously stated, unlike Mr. Rasnic, Genie and all manufactures that I know test their products and designs before going into production [and] would not market a product with such a critical design flaw [such] as subjecting the coded proximity switch to such extreme currents during normal operation. This renders Mr. Rasnic's "design" potentially **[*15]** unsafe and unreasonably dangerous.

(*Id.* at 10).

## F. Affidavit

In opposition to Genie's motion for summary judgment, Sakolsky submitted an affidavit of Rasnic. (D.E. No. 62-2, Ex. A ("Rasnic Aff.")). Pertinent here, Rasnic explained that "[a]ll engineers who design equipment that is to be utilized by human beings must necessarily be knowledgeable in human factors, since integral to the design process is the analysis of the utility of the product and how human beings will interact with the product." (*Id.* ¶ 5). And through his experience as an engineer in the industry, he "gained [his] human factors knowledge." (*Id.*). Rasnic also explained that, while his second alternative design could be defeated, he designed only a concept, not a final, assembly-line-ready machine; and one could mitigate the risk it would be defeated "by refining the design prior to production (such as adding covers, changing locations to hide the switch, etc.)." (*Id.* ¶ 16). And defeating the second alternative design "would require an intentional decision by a user to study the physical and electrical components and then figure out how to physically modify the manufacturer's design[] in safety devices." (*Id.*). "[T]he **[*16]** user would have to make a conscious decision to study the mechanical aspects and electrical circuitry of the machine, secure tools and devices to purposely disable these devices and possess the requisite knowledge to be able to successfully negate the safety devices," and doing so, again, would require "technical expertise." (*Id.* ¶ 22). Moreover, Rasnic explained that, "[w]hile the coded proximity sensor chosen for the 2nd concept prototype was indeed developed in 2012," other similar coded proximity sensors have been around since the 1980s. (*Id.* ¶ 19). In addition, Rasnic blames the second alternative design's electrical failures on Genie's experts' missteps in replicating the design and testing it. (*Id.* ¶ 20). And a final design, as opposed to his concept, according to Rasnic, would address any such electrical failures. (*Id.*). Finally, Rasnic says any issues concerning the lack of reliability testing are no matter because "[r]eliability testing is performed once the final design concept is established, not during the prototyping phase." (*Id.* ¶ 21). And none of the parts he put into his second design were new—indeed, their reliability has "been proved over decades of successful use." **[*17]** (*Id.*).

## II. DISCUSSION

Genie moves (i) to exclude Rasnic's affidavit as procedurally improper (D.E. No. 67); (ii) to exclude Rasnic's opinions under *Fed. R. Evid. 702* and *Daubert, 509 U.S. 579 (D.E. No. 64)*; and (iii) for summary judgment. (D.E. No. 61). Because neither of the latter two motions turns on considering Rasnic's affidavit, the motion to exclude the affidavit is denied as moot.

### A. *Rule 702* and *Daubert*

#### (i) Legal Standard

"Under the Federal Rules of Evidence, a trial judge acts as a 'gatekeeper' to ensure that 'any and all expert testimony or evidence is not only relevant, but also reliable.'" *Pineda v. Ford Motor Co., 520 F.3d 237, 243*

Case 1:19-md-02875-RMB-SAK   Document 1711-30   Filed 11/01/21   Page 6 of 10 PageID: 38926

Page 6 of 10
2021 U.S. Dist. LEXIS 155821, *17

*(3d Cir. 2008)* (quoting *Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 806 (3d Cir. 1997)*). However, this gatekeeping function is a "flexible" one, *Daubert, 509 U.S. at 594*, and "*Rule 702*, which governs the admissibility of expert testimony, has a liberal policy of admissibility," *Kannankeril, 128 F.3d at 806*. "*Rule 702* has three major requirements: (1) the proffered witness must be an expert, i.e., must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact." *Pineda, 520 F.3d at 244*.

Genie does not dispute that Rasnic is a qualified expert. Nor does it seriously dispute that Rasnic's opinions, *if reliable*, would assist the trier of fact. Instead, Genie argues Rasnic's opinions fail the second requirement— i.e., **[*18]** are not about matters requiring scientific, technical or specialized knowledge—because Rasnic's opinions are unreliable. (D.E. No. 64-1 ("Mov. Br. to Exclude") at 30-40).

The second requirement mandates that "an expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable." *Pineda, 520 F.3d at 244* (citing *Kannankeril, 128 F.3d at 806*). "While a litigant has to make more than a prima facie showing that his expert's methodology is reliable," an opinion that is reliable does not necessarily need to be correct. *Id. at 247* (quoting *In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 744 (3d Cir. 1994)*). "[T]he standard for determining reliability 'is not that high.'" *In re TMI Litig., 193 F.3d 613, 665 (3d Cir. 1999)*, *as amended*, *199 F.3d 158 (3d Cir. 2000)* (quoting *In re Paoli, 35 F.3d at 745*). An "expert's conclusion" is reliable if it "is based on good grounds (the methods and principles of science)." *Paoli, 35 F.3d at 732*. The focus here is on the expert's methodology, and there are several non-exhaustive factors a court may consider in determining whether an expert's opinion is reliable. *Pineda, 520 F.3d at 247-48* (citing *In re Paoli, 35 F.3d at 742 n.8*). The "reliability factors . . . may not apply with equal force in every setting." *Florio v. Ryobi Techs., Inc., No. 17-5518, 2020 U.S. Dist. LEXIS 160324, 2020 WL 5234924, at *5 (D.N.J. Sept. 2, 2020)*. In design-defect cases, courts in this district have considered:

> (1) federal design and performance standards, (2) standards established by independent standards organizations, (3) relevant literature, **[*19]** (4) evidence of industry practice, (5) product design and accident history, (6) illustrative charts and diagrams, (7) data from scientific testing, (8) the feasibility of any suggested modification, and (9) the risk-utility of any suggested modification.

*Id.* It bears emphasis, however, that these factors are non-exhaustive.

**(ii) Analysis**

To start, there are several factors favorable to the reliability of Rasnic's testimony. First, he tailored his opinion to independent industry standards and relevant literature—more specifically, the Accident Prevention Manual published by the National Safety Council. (*See* First Report at 10-11). Those standards, Rasnic said, establish a list of five priorities, with Priority One being the most important and Priority Five being the least. (*Id.*). Rasnic found the AWP-30S defective because Genie opted for Priorities Three and Four even though Priority One was available. (*Id.* at 25). According to Rasnic, rather than eliminate the hazard (Priority One), Genie warned users not to move the lift while elevated (Priority Three) and sought to modify behavior by providing user instructions (Priority Four). (*Id.* at 32). Genie could have instead, Rasnic said, opted **[*20]** for Priority One by implementing, for example, one of his alternative designs. (*Id.* at 25-26; *see* Second Report at 9). The AWP-30S is defective, Rasnic said, because Genie failed to do so. Second, Rasnic acknowledged that the AWP-30S met stability standards published by ANSI and authored by SIA. (First Report at 21). But that did not change his conclusion, he explained, because the AWP-30S met those standards only when the outriggers were installed. (*Id.*). Third, Rasnic considered AWP-30S's accident history, noting that there are so few reported accidents (seven, since 1994) because manufacturers are rarely made aware of accidents. (*Id.* at 23).

However, several other factors overcome those identified above, because whether Rasnic's opinion is reliable turns not on his understanding of the hierarchy of engineering priorities, or his explanation of other industry standards, or his explanation of the accident history. Instead, it most crucially turns on whether he has "good grounds" to conclude Priority One (or even Prior Two) was available to Genie. Indeed, under New Jersey law, while several factors are relevant to whether a design is defective, "the issue upon which most claims will **[*21]** turn is the proof by plaintiff of a 'reasonable alternative design . . . the omission . . . [of which] renders the product not reasonably safe.'" *Cavanaugh v. Skil Corp., 164 N.J. 1, 751 A.2d 518, 522 (N.J. 2000)*

Case 1:19-md-02875-RMB-SAK   Document 1711-30   Filed 11/01/21   Page 7 of 10
PageID: 38927

Page 7 of 10
2021 U.S. Dist. LEXIS 155821, *21

(quoting *Green v. General Motors Corp., 709 A.2d 205, 210, 310 N.J. Super. 507 (N.J. App. Div. 1998)*). "Plaintiffs," such as Sakolsky, "who assert that the product could have been designed more safely must prove under a risk-utility analysis the existence of an alternative design that is both practical and feasible." *Lewis v. Am. Cyanamid Co., 155 N.J. 544, 715 A.2d 967, 980 (N.J. 1998)*. Thus, the issue here is whether the methodologies Rasnic used to create his designs are reliable. For several reasons, they are not.

First, as Genie points out, Rasnic has offered contradictory opinions, particularly with respect to the first alternative design. (Mov. Br. to Exclude at 33). "Rasnic's first proposed alternative design," Genie argues, "is directly contrary, and therefore inherently unreliable, to his opinion that the AWP-30[S] is defective." (*Id.*). Indeed, in his First Report, he concluded that the AWP-30S was defective because Genie could have used something like his first alternative design to "*eliminate[]* the hazard of the machine being maneuvered with the platform in the raised position." (First Report at 25-26 (emphasis added)). But as Genie points out, Rasnic later conceded that any design, including **[*22]** his own, can be defeated. (Mov. Br. to Exclude at 30 (citing Rasnic Dep. at 177:21-24)). While Rasnic clarified his position—that he merely sought to create a design that was "as non-defeatable as possible" (*id.* at 177:24-178:3)—this risk-reduction hypothesis only raises a question: How does the first alternative design reduce the risk of defeat? His First Report does not answer it, so Genie could not respond to it. Moreover, the answer apparently rests on an assessment of human behavior—i.e., an understanding of the typical user population, and a corresponding cost/benefit analysis that the typical user might make before engaging in a dangerous activity. His First Report does not offer that assessment. He offered it in his Second Report. (Second Report at 9 & 16). But his Second Report does not offer his competency to opine on human behavior, and Genie contests whether he is even competent to testify on such matters. (D.E. No. 66, Reply at 13-14). He submitted those qualifications very late in this litigation, when Sakolsky responded to Genie's motion for summary judgment, leaving Genie with hardly any ability to respond. (Rasnic Aff. ¶ 5).

The above shows that the significance of **[*23]** Rasnic's designs has been a moving target, making it difficult to follow and indicating he does not have good grounds supporting his opinion. See *In re Bausch & Lomb, Inc. Contact Lens Sol. Prods. Liab. Litig., No. 06-77777, 2009 U.S. Dist. LEXIS 83849, 2009 WL 2750462, at *13 (D.S.C. Aug. 26, 2009)* ("Dr. Cohen's changing opinions, and willingness to abandon or qualify her opinions when faced with further facts, undermines the reliability of her opinions."); *Haller v. AstraZeneca Pharms. LP, 598 F. Supp. 2d 1271, 1296 (M.D. Fla. 2009)* (excluding expert opinion described as "a veritable moving target" as unreliable); *Magistrini v. One Hour Martinizing Dry Cleaning, 180 F. Supp. 2d 584, 594 (D.N.J. 2002)* (considering "whether the expert's proposed testimony grows naturally and directly out of research the expert has conducted independent of the litigation" (citing *Daubert v. Merrell Dow Pharms., Inc., 43 F.3d 1311, 1317 (9th Cir. 1995)*)). Indeed, Rasnic started by saying Genie could have eliminated the risk and then shifted to saying that Genie could have reduced the risk. And he offered his competency to opine on the latter very late in the litigation. Because the Court must be assured that his "research comports with the dictates of good science," *Daubert, 43 F.3d at 1317*, it is entirely appropriate to consider whether he "is being as careful as he would in his professional work outside of the litigation context." *Magistrini, 180 F. Supp. 2d at 594-95* (citing *Sheehan v. Daily Racing Form, Inc., 104 F.3d 940, 942 (7th Cir. 1997)*); *see Fed. R. Evid. R. 702* advisory committee's notes. The shifting quality of Rasnic's work suggests he does not have "good grounds" for his opinion. In other words, it suggests he did **[*24]** not follow the dictates of good science.

Second, not only did Rasnic fail to explain his designs' significance for some time, but he continues to leave unanswered gaps. As Genie points out, "[a] court may conclude, after viewing an expert's conclusions in light of the evidence on which he relies and the methodology employed, that 'there is simply too great an analytical gap between the data and the opinion proffered.'" (Mov. Br. to Exclude at 29-30 (quoting *Yarchak v. Trek Bicycle Corp., 208 F. Supp. 2d 470, 495 (D.N.J. 2002)* (quoting *Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997)*)). As noted, Rasnic's First Report contains no analysis of human behavior and is, therefore, unacceptable. See *Edison Wetlands Ass'n, Inc. v. Akzo Nobel Chem., Inc., No. 08-0419, 2009 U.S. Dist. LEXIS 119281, 2009 WL 5206280, at *2 (D.N.J. Dec. 22, 2009)* ("Courts need not admit bare conclusions or mere assumptions proffered under the guise of expert opinions." (cleaned up)); *Zeller v. J.C. Penney Co., No. 05-2546, 2008 U.S. Dist. LEXIS 25993, 2008 WL 906350, at *4 (D.N.J. Mar. 31, 2008)* (same). Rasnic's Second Report does not offer his competency to opine on human behavior. Nor does his Second Report specify the typical user population, much

less their training and experience in using machines with electrical components. His affidavit neglects that type of analysis, too. The Court cannot assume, without evidentiary support, that the typical user population of the AWP-30S is not aware of the lift's electrical components or is unable to defeat the design as Genie's experts [*25] did. There is "simply too great an analytical gap between" Rasnic's opinion and the facts he presented supporting it. Gen. Elec. Co., 522 U.S. at 146. The Court need not accept reasoning by "*ipse dixit*." Id. Even in response to Genie's experts, Rasnic failed to button up his analysis.

Third, as Genie points out, Rasnic did not sufficiently test either of his designs. (Mov. Br. to Exclude at 35 & 38). "[A]n expert must have 'good grounds' for his opinion, and in the case of alternative designs, testing is crucial." Ortiz v. Yale Materials Handling Corp., No. 03-3657, 2005 U.S. Dist. LEXIS 18424, 2005 WL 2044923, at *6 (D.N.J. Aug. 24, 2005) (citing Dhillon v. Crown Controls Corp. 269 F.3d 865, 870 (7th Cir. 2001)); *see also* Oddi v. Ford Motor Co., 234 F.3d 136, 156 (3d Cir. 2000) ("The Supreme Court has explicitly instructed, '[o]rdinarily, a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested.'" (quoting Daubert, 509 U.S. at 595)); In re Paoli, 35 F.3d at 764 ("We think that the district court essentially, and properly, read Dr. DiGregorio's testimony as showing that his opinion that PCBs caused plaintiffs' illnesses was only a hypothesis which he had yet to attempt to verify or disprove by subjecting it to the rigors of scientific testing."); Jones v. Synthesis USA Sales, LLC, No. 08-2060, 2010 U.S. Dist. LEXIS 85744, 2010 WL 3311840, at *8 (D.N.J. Aug. 19, 2010) (excluding opinion testimony because the expert failed to subject his alternative design to any testing).

At his deposition, Rasnic conceded [*26] that he did not test the first alternative design *at all*. (Rasnic Dep. at 157:25-158:16). He also admitted that he did not conduct "serial reliability testing" on his second alternative design. (*Id.* at 117:7-8). Instead, he installed the Allen Bradley switch and operated the lift about a "half a dozen" times to make sure it did as he desired. (*Id.* at 115:15-18 & 117:5). His Second Report does not memorialize those "tests," leaving the Court unable to judge whether he used reliable methods. It is notable, too, that Rasnic conducted no testing on either design (with a typical user or other person) to support his risk-reduction hypothesis. Finally, he did not use materials available to Genie when it introduced the AWP-30S in 2006. Instead, Rasnic installed an Allen Bradley switch that was manufactured in 2012. (Second Report at 9). Under New Jersey law, "[i]n a design-defect case, the critical time for measuring the state of technological knowledge imputed to a manufacturer is the time of manufacture." See Lewis, 715 A.2d at 982 (citations omitted); Jurado v. W. Gear Works, 131 N.J. 375, 619 A.2d 1312, 1317 (N.J. 1993) (explaining that the design defect must exist "when the product left the hands of the defendant"). Genie is thus correct that "[t]he 'testing' done by [] Rasnic [*27] is crucially deficient to support the practicality or feasibility of his second proposal." (Mov. Br. to Exclude at 38). Rasnic saying his design works—without testing it, memorializing those tests, and using components that were available to Genie at the time of manufacture—is insufficient. See Florio, 2020 U.S. Dist. LEXIS 160324, 2020 WL 5234924, at *6 (excluding opinion evidence where plaintiffs sought "to present 'expert' design testimony from someone who ha[d] never implemented his own recommended features or even operated the supposedly defective product"); cf. Gen. Elec. Co., 522 U.S. at 146 ("But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").[3]

Sakolsky argues that Rasnic's failure to test his designs "simply raise[s] issues for cross[-]examination." (Opp. Br. to Exclude at 35 (citing Dalton v. McCourt Elec. LLC, 112 F. Supp. 3d 320, 329 (E.D. Pa. 2015)). But Sakolsky does not and cannot deny that Rasnic's lack of testing bears on the reliability of his designs, and the case cited by Sakolsky confirms this conclusion. See Dalton, 112 F. Supp. 3d at 329 (noting that testing "may have rendered the opinion 'more' reliable"). In combination with the other factors discussed above and below, Rasnic's failure to test his designs is [*28] troubling.

Fourth, Genie's experts underscore the importance of Rasnic performing a complete analysis. As noted, a court should consider whether the expert "is being as careful as he would in his professional work outside of the litigation context." Magistrini, 180 F. Supp. 2d at 594-95. For example, failing to "make any adjustment for variables" or to account for other important

---

[3] Rasnic's response that similar devices were available in 2006 is likewise no answer because it does no more than suggest that the second alternative design was "merely theoretically possible." Cavanaugh, 751 A.2d at 521.

considerations "indicates a failure to exercise the degree of care that [an expert] would use in his [field]." *Sheehan, 104 F.3d at 942*. Genie's experts came up with several ways to defeat both designs, and they report that the second design malfunctioned after several uses.[4] Rasnic did not consider the possibility of defeat in his First Report, and he offered an incomplete analysis of that possibility in his Second Report. Moreover, he did not perform appropriate testing on either design to indicate whether his design is practical or feasible. Much less did he test for the likelihood of defeat by a typical user or other person.

Fifth, Rasnic's answer to the above concerns creates a stronger case for excluding his testimony. He need not, he said, test his designs or provide a complete analysis of them because they are merely prototypes that would be production ready after **[*29]** Genie (or another manufacturer) conducted the necessary testing and analysis. (Rasnic Aff. ¶ 21; *see also id.* ¶ 19; Rasnic Dep. at 157:25-158:16). Sakolsky repeats this argument in various contexts. (Opp. Br. to Exclude at 31, 33-34 & 35-37). That is no answer. An alternative design must be more than "merely theoretically possible." *Cavanaugh, 751 A.2d at 521*; *Simmons v. Ford Motor Co., 132 F. App'x 950, 953 (3d Cir. 2005)* (affirming district court's exclusion of expert who offered an "alternative [that] was nothing more than a sketch without a mock-up or testing of the design").[5] In addition, Rasnic's concession confirms he was not as careful as he would have been outside the litigation context.

---

[4] This factor is not to suggest Rasnic's conclusion is incorrect. Indeed, Rasnic vigorously disputes Genie's experts' contentions. Instead, this factor underscores the importance of Rasnic performing a complete analysis, one that included (i) considering of the possibility of defeat by the typical user population and (ii) testing his designs for defeat, practicability, and feasibility.

[5] It is worth noting that Rasnic indicated in his deposition that, in certifying his opinions to a reasonable degree of engineering certainty, he defined "certainty" as "not just speculation." (Rasnic Dep. at 164:13-22). As Genie points out, there is significant space between "certainty" and "not just speculation," making it unclear what level of confidence Rasnic assigned to his conclusion. (Genie Mov. Br. to Exclude at 32). Although "there is nothing magical about the phrase, to a reasonable degree of scientific certainty," *see United States v. Mornan, 413 F.3d 372, 381 (3d Cir. 2005)* (internal quotation marks and citation omitted), it is entirely appropriate to consider Rasnic's definition of certainty in combination with his failure to offer a complete analysis.

Consequently, for the above stated reasons, Rasnic's opinions are unreliable and therefore inadmissible.

## B. Summary Judgment

Because Rasnic's testimony is excluded, Genie is entitled to summary judgment. Under New Jersey law, "a plaintiff is required to provide expert testimony" to support a design-defect claim "where the allegedly defective product involves a complex instrumentality." *Lauder v. Teaneck Volunteer Ambulance Corps, 368 N.J. Super. 320, 845 A.2d 1271, 1277 (N.J. Super. Ct. App. Div. 2004)*. The AWP-30S is clearly a complex instrumentality. *See Ortiz, 2005 U.S. Dist. LEXIS 18424, 2005 WL 2044923, at *11* ("The instrumentality at issue in this case, a forklift, is a complicated piece of equipment that consists of many intricate mechanical parts."). **[*30]** Having produced no other expert, Sakolsky cannot proceed to trial. *See Oddi, 234 F.3d at 159* ("Inasmuch as Oddi's 'defect expert' does not survive *Daubert* scrutiny, the district court properly granted summary judgment to Ford and Grumman on Oddi's negligent failure to test claim."); *Florio, 2020 U.S. Dist. LEXIS 160324, 2020 WL 5234924, at *9* ("Inasmuch as Plaintiffs 'defect expert' does not survive Daubert scrutiny, Defendants are entitled to summary judgment on Plaintiffs' defective design claim." (cleaned up)); *Milanowicz v. The Raymond Corp., 148 F. Supp. 2d 525, 541-42 (D.N.J. 2001)* ("As Plaintiffs have put forward no other evidence to support their design defect and failure to warn claims, the Court concludes that summary judgment is appropriate."). Similarly, Genie is entitled to summary judgment on Sakolsky's failure-to-warn claim. Sakolsky has not produced an expert suggesting Genie's warning labels were insufficient, and he, in fact, concedes he abandoned this claim. (Genie's SUMF ¶ 74).

## III. CONCLUSION

Based on the foregoing, Genie's motion to exclude Rasnic's opinions (D.E. No. 64) is **GRANTED**. Genie's motion to preclude additional opinion evidence offered by Rasnic as procedurally improper (D.E. No. 67) is **DENIED as moot**. Finally, Genie's motion for summary judgment (D.E. No. 61) is **GRANTED**. An appropriate Order accompanies **[*31]** this Opinion.

Date: August 18, 2021

/s/ Esther Salas

Ronald B Orlando

Case 1:19-md-02875-RMB-SAK   Document 1711-30   Filed 11/01/21   Page 10 of 10
PageID: 38930
2021 U.S. Dist. LEXIS 155821, *31

Page 10 of 10

Esther Salas, U.S.D.J.

**ORDER**

**SALAS, DISTRICT JUDGE**

This matter comes before the Court by way Defendant Genie Industries' ("Genie") motions for summary judgment (D.E. No. 61), to exclude opinion testimony (D.E. No. 64), and to exclude additional opinion testimony (D.E. No. 67). For the reasons set forth in the Court's corresponding Opinion,

IT IS on this 18th day of August 2021,

**ORDERED** that Genie's motions for summary judgment (D.E. No. 61) and to exclude opinion testimony (D.E. No. 64) are **GRANTED**; and it is further

**ORDERED** that Genie's motion to exclude additional opinion testimony (D.E. No. 67) is **DENIED as moot**.

*/s/ Esther Salas*

**Esther Salas, U.S.D.J.**

---

**End of Document**