# EXHIBIT A

Confidential Information - Subject to Protective Order

1       IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF NEW JERSEY
2                      -  -  -
3     IN RE:  VALSARTAN,      :  MDL NO. 2875
      LOSARTAN, AND          :
4     IRBESARTAN PRODUCTS     :  HON. ROBERT
      LIABILITY LITIGATION    :  B. KUGLER
5     _____ :
                                :
6     THIS DOCUMENT APPLIES    :
      TO ALL CASES            :
7
            - CONFIDENTIAL INFORMATION -
8           SUBJECT TO PROTECTIVE ORDER
9                      -  -  -
10             September 16, 2021
11                     -  -  -
12
13          Videotaped remote deposition of
      MICHAEL B. BOTTORFF, Pharm.D., taken
14    pursuant to notice, was held via Zoom
      Videoconference, beginning at 9:04 a.m.,
15    EST, on the above date, before Michelle
      L. Gray, a Registered Professional
16    Reporter, Certified Shorthand Reporter,
      Certified Realtime Reporter, and Notary
17    Public.
18
                       -  -  -
19
20          GOLKOW LITIGATION SERVICES
         877.370.3377 ph | 917.591.5672 fax
21             deps@golkow.com
22
23
24

Confidential - Information Subject to Protective Order

```
 1    ZOOM APPEARANCES:
 2
 3    HOLLIS LAW FIRM, PA
      BY:  BRETT VAUGHN, ESQ.
 4         IRIS SIMPSON, ESQ.
      8101 College Boulevard, Suite 260
 5    Overland Park, Kansas 66210
      (913) 385-5400
 6    brett@hollislawfirm.com
      Iris@hollislawfirm.com
 7    Representing the Plaintiffs
 8
      LEVIN PAPANTONIO RAFFERTY PROCTOR
 9    BUCHANAN, O'BRIEN, BARR, MOUGEY, PA
      BY:  DANIEL NIGH, ESQ.
10    316 South Baylen Street
      Suite 600
11    Pensacola, Florida 32502
      (888) 435-7001
12    dnigh@levinlaw.com
      Representing the Plaintiffs
13
14    DALIMONTE RUEB STOLLER
      BY:  BEHRAM V. PAREKH, ESQ.
15    515 S. Figueroa Street
      Suite 1550
16    Los Angeles, California 90071
      (213) 348-7277
17    Behram.parekh@drlawllp.com
      Representing the Plaintiffs
18
19    MARTIN HARDING & MAZZOTTI, LLP
      BY:  ROSEMARIE RIDDELL BOGDAN, ESQ.
20    1 Wall Street
      Albany, New York 12205
21    (800) LAW-1010
      Rosemarie.bogdan@1800law1010.com
22    Representing the Plaintiffs
23
24
```

Confidential - Information Subject to Protective Order

```
 1   ZOOM APPEARANCES:  (Cont'd.)
 2
     KANNER & WHITELEY, LLC
 3   BY:  LAYNE HILTON, ESQ.
     701 Camp Street
 4   New Orleans, Louisiana 70130
     (504) 524-5777
 5   l.hilton@kanner-law.com
     Representing the Plaintiffs
 6
 7   GREENBERG TRAURIG, LLP
     BY:  SARA K. THOMPSON, ESQ.
 8        VICTORIA DAVIS LOCKARD, ESQ.
     Terminus 200
 9   3333 Piedmont Road NE
     Suite 2500
10   Atlanta, Georgia 30305
     (678) 553-2312
11   Thompsons@gtlaw.com
     Lockardv@gtlaw.com
12
              - and -
13
     GREENBERG TRAURIG, LLP
14   BY:  STEPHEN T. FOWLER, ESQ.
     2101 L Street NW
15   Washington, D.C. 20037
     (202) 530-8587
16   Fowlerst@gtlaw.com
17            - and -
18   GREENBERG TRAURIG, LLP
     BY:  KENNETH DZIKOWSKI, ESQ.
19   500 Campus Drive, Suite 400
     Florham Park, New Jersey 07932
20   (973) 360-7900
     Dzikowskik@gtlaw.com
21   Representing the Defendants, Teva
     Pharmaceutical Industries, Ltd., Teva
22   Pharmaceuticals USA, Inc., Actavis LLC,
     and Actavis Pharma, Inc.
23
24
```

Confidential Information - Subject to Protective Order

```
 1   ZOOM APPEARANCES:  (Cont'd.)
 2
     WALSH PIZZI O'REILLY FALANGA LLP
 3   BY:  LIZA M. WALSH, ESQ.
     Three Gateway Center
 4   100 Mulberry Street
     15th Floor
 5   Newark, New Jersey 07102
     (973) 757-1017
 6   Lwalsh@walsh.law
     Representing the Defendants, Teva
 7   Pharmaceutical Industries, Ltd., Teva
     Pharmaceuticals USA, Inc., Actavis LLC,
 8   and Actavis Pharma, Inc.
 9
     DUANE MORRIS, LLP
10   BY:  COLEEN W. HILL, ESQ.
     30 South 17th Street
11   Philadelphia, PA 19103
     (215) 979-1164
12   cwhill@duanemorris.com
13         - and -
14   DUANE MORRIS, LLP
     BY:  ROBERT KUM, ESQ.
15   865 South Figueroa Street
     Suite 3100
16   Los Angeles, California 90017
     (213) 689-7424
17   Rkum@duanemorris.com
     Representing the Defendants, Zhejiang
18   Huahai Pharmaceutical Co, Ltd., Prinston
     Pharmaceutical Inc., Huahai U.S., Inc.,
19   and Solco Healthcare US, LLC
20
     BARNES & THORNBURG, LLP
21   BY:  KARA KAPKE, ESQ.
     11 S. Meridian Street
22   Indianapolis, Indiana 46204
     (317) 231-6491
23   Kara.kapke@btlaw.com
     Representing CVS Pharmacy, Inc., and Rite
24   Aid Corporation
```

Confidential Information - Subject to Protective Order

```
 1   ZOOM APPEARANCES:  (Cont'd.)

 2

     HINSHAW & CULBERTSON, LLP
 3   BY:  GEOFFREY M. COAN, ESQ.
     53 State Street, 27th Floor
 4   Boston, Massachusetts  02109
     (617) 213-7047
 5   Gcoan@hinshawlaw.com
     Representing the Defendant, ScieGen
 6   Pharmaceuticals, Inc.

 7

     PIETRAGALLO GORDON ALFANO BOSICK &
 8   RASPANTI, LLP
     BY:  JASON M. REEFER, ESQ.
 9   One Oxford Centre, 38th Floor
     Pittsburgh, Pennsylvania 15219
10   (412) 263-1840
     JMR@pietragallo.com
11   Representing the Defendant, Mylan
     Pharmaceuticals, Inc.

12

13   CIPRIANI & WERNER, P.C.
     BY:  JESSICA HEINZ, ESQ.
14   450 Sentry Parkway, Suite 200
     Blue Bell, Pennsylvania 19422
15   (610) 567-0700
     jheinz@c-wlaw.com
16   Representing the Defendants, Aurobindo
     Pharma, USA, Inc., and
17   Aurolife Pharma, LLC

18

     FALKENBERG IVES, LLP
19   BY:  KIRSTEN B. IVES, ESQ.
     230 W. Monroe Street, Suite 2220
20   Chicago, IL 60606
     (312) 566.4808
21   KBI@falkenbergives.com
     Representing the Defendant, Humana

22

23

24
```

Confidential Information - Subject to Protective Order

```
 1   ZOOM APPEARANCES:   (Cont'd.)
 2

     HILL WALLACK, LLP
 3   BY: NAKUL Y. SHAH, ESQ.
     21 Roszel Road
 4   Princeton, New Jersey 08543
     (609) 734-6358
 5   Nshah@hillwallack.com
     Representing the Defendants, Hetero, USA,
 6   Inc., Hetero Labs
 7

 8   VIDEOTAPE TECHNICIAN:
     Judy Diaz
 9

10   LITIGATION TECHNICIAN:
     Tyler Crotty
11

12   ALSO PRESENT:
13   Lauren Massey - Paralegal
     (Levin Papantonio)
14

15   Melisha Valenzuela - Paralegal
     (Hollis Firm)
16

     Bradley Matta, Esq.
17   Elana Williams, Esq.
     (Mylan - Viatris)
18

19

20

21

22

23

24
```

Confidential Information Subject to Protective Order

```
 1                   -   -   -

 2                I N D E X

 3                   -   -   -

 4

    Testimony of:

 5

            MICHAEL B. BOTTORFF, Pharm.D.

 6

 7   By Mr. Vaughn                    11, 370

 8   By Ms. Thompson                      356

 9

10

11

12                   -   -   -

13              E X H I B I T S

14                   -   -   -

15

16   NO.             DESCRIPTION               PAGE

17   Bottorff-1      Expert Report         19
                     (Bottorff)
18                   8/2/21

19   Bottorff-2      List of Materials     44
                     Considered
20

     Bottorff-3      Curriculum Vitae      105
21                   (Bottorff)

22   Bottorff-4      WHO, Molecular        228
                     And Cellular Aspects
23                   Of Carcinogen Screening
                     Tests

24
```

Confidential Information Subject to Protective Order

```
 1                          -   -   -
 2          E X H I B I T S  (Cont'd.)
 3                          -   -   -
 4
 5    NO.              DESCRIPTION              PAGE
 6    Bottorff-5      M7(R1) Assessment         277
                      and Control of DNA
 7                    Reactive...
                      Guidance for Industry
 8
      Bottorff-6      Control of               285
 9                    Nitrosamine Impurities
                      In Human Drugs
10                    Guidance for Industry
11    Bottorff-7      N-Nitrosodimethylamine
                      Concise International
12                    Chemical Assessment
                      Document 38              307
13
      Bottorff-8      Effects of DNA          323
14                    Polymerase Kappa and
                      Mismatch Repair
15                    (Nohmi)
16
17
18
19
20
21
22
23
24
```

Confidential Information - Subject to Protective Order

```
 1                    -   -   -

 2           DEPOSITION SUPPORT INDEX

 3                    -   -   -

 4

 5   Direction to Witness Not to Answer

 6   PAGE    LINE
     None.

 7

 8   Request for Production of Documents

 9   PAGE    LINE
     None.

10

11   Stipulations

12   PAGE    LINE
     None.

13

14   Questions Marked

15   PAGE    LINE
     None.

16

17

18

19

20

21

22

23

24
```

Confidential Information - Subject to Protective Order

1                    -   -   -

2             THE VIDEOGRAPHER:  We are

3        now on the record.  My name is

4        Judy Diaz.  I'm a legal

5        videographer for Golkow Litigation

6        Services.

7             Today's date is

8        September 16, 2021, and the time

9        is 9:04 a.m.

10            This remote video deposition

11       is being held in the matter of

12       Valsartan, Losartan, and

13       Irbesartan Products Liability

14       Litigation MDL for the United

15       States District Court District of

16       New Jersey.

17            The deponent is Dr. Michael

18       Bottorff.

19            All parties to this

20       deposition are appearing remotely

21       and have agreed to the witness

22       being sworn in remotely.

23            All counsel will be noted on

24       the stenographic record.

Confidential Information Subject to Protective Order

1           The court reporter is

2       Michelle Gray and will now swear

3       in the witness.

4                   -  -  -

5       ... MICHAEL B. BOTTORFF, Pharm.D.,

6    having been first duly sworn, was

7    examined and testified as follows:

8                   -  -  -

9                 EXAMINATION

10                  -  -  -

11   BY MR. VAUGHN:

12       Q.    Doctor, can you introduce

13   yourself for the jury?

14       A.    Yes.  Michael Bottorff.

15       Q.    And am I saying it right,

16   Bottorff?

17       A.    That's good.

18       Q.    All right.  I'll try my best

19   not to butcher that.

20       A.    No problem.

21       Q.    Have you ever had your

22   deposition taken before?

23       A.    I'm sorry.  The question?

24       Q.    Have you previously had your

Confidential Information - Subject to Protective Order

```
 1   deposition taken in any matter?
 2          A.    Yes, I have.
 3          Q.    Was that a yes?
 4          A.    Yes.
 5          Q.    And what litigations were
 6   those?
 7          A.    There was an amiodarone
 8   litigation that I think we've disclosed.
 9   That's the only one that's been in the
10   last maybe four or five years.  Prior to
11   that I did some depositions in Niaspan
12   patent law.  And then a couple of
13   personal injury depositions probably back
14   in the 1990s.
15          Q.    Okay.  There's only -- was
16   the first one a drug case that you were
17   an expert in?
18          A.    In the '90s, yes.
19          Q.    And were you on the
20   plaintiffs' or the defense side?
21          A.    Defense.
22          Q.    And have you ever had your
23   deposition taken via Zoom before?
24          A.    No.
```

Confidential Information Subject to Protective Order

1    Q.    If you have any problems

2  hearing me just let me know.  Okay?

3    A.    I will.

4    Q.    All right.  And then for the

5  court reporter's sake, let's try our best

6  not to talk over each other and give, you

7  know, the defense attorney time to make

8  her objections, if she has any.  Is that

9  fair?

10    A.    Yes.

11    Q.    And do you understand that

12  if there are objections, those are just

13  between the defense attorney and myself

14  and they shouldn't influence your answers

15  in any way?

16    A.    I understand.

17    Q.    And you're an expert for the

18  defense in this litigation, correct?

19    A.    Correct.

20    Q.    And as an expert, you're

21  aware that I'm allowed to ask you

22  hypothetical questions, right?

23    A.    Yes.

24    Q.    And if you don't understand

Confidential Information Subject to Protective Order

1    my questions, you'll let me know, right?

2         A.    I will.

3         Q.    Okay.  So I want to explore

4    just some of your opinions first and the

5    basis for those opinions.  And so, kind

6    of reading through here, I guess my first

7    question is, Dr. Bottorff, is it your

8    opinion that generic valsartan

9    contaminated with NDMA or NDEA has the

10   same monetary value as generic valsartan

11   without NDMA or NDEA?

12              MS. THOMPSON:  Objection.

13        Form.  Compound.

14              THE WITNESS:  So the

15        question, as I understand it, is

16        the same monetary value?

17   BY MR. VAUGHN:

18        Q.    Correct.

19        A.    I believe it would be.

20        Q.    And what's the basis for

21   your opinion on that?

22        A.    Because I don't see how it

23   substantially changed the effectiveness

24   of the drug.

Confidential Information - Subject to Protective Order

1          Q.     And what do you mean by the
2    effectiveness of the drug?
3          A.     Its ability to do what it
4    was intended to do, which was control
5    heart failure, hypertension post-MI.
6          Q.     And is it your opinion that
7    the levels of NDMA in generic valsartan
8    are unable to increase a person's risk of
9    developing cancer?
10              MS. THOMPSON:  Objection.
11         Form.
12              THE WITNESS:  I don't think
13         I'd characterize my opinion as
14         being unable.  I don't think I
15         used those terms anywhere.
16    BY MR. VAUGHN:
17         Q.     What is your opinion as to
18    if the levels of NDMA contained in
19    generic valsartan can increase the
20    levels -- increase the risk of someone
21    developing cancer?
22              MS. THOMPSON:  Objection.
23         Form.
24              THE WITNESS:  We don't have

Confidential Information Subject to Protective Order

1              the answer to that because we

2              don't have adequate data in humans

3              to make that determination.

4    BY MR. VAUGHN:

5              Q.    If the levels of NDMA in

6    generic valsartan did increase the risk

7    of someone developing cancer, would you

8    agree that it would reduce the monetary

9    value of that medication?

10             MS. THOMPSON:  Objection.

11             Form.  He wasn't designated on

12             issues of monetary value.  So

13             I'm --

14             MR. VAUGHN:  He just said --

15             he just told me that he had an

16             opinion on it, so I'm exploring

17             that opinion.

18             THE WITNESS:  Yeah, I don't

19             really -- it wasn't any of the

20             focus that I used in my

21             evaluation.

22             So I haven't really

23             expressed any kind of opinion on

24             monetary, other than I don't think

Confidential - Information Subject to Protective Order

1          it would have altered its

2          effectiveness and not necessarily

3          another step of whatever that

4          monetary value would be.

5    BY MR. VAUGHN:

6          Q.    Okay.  So you do not plan to

7    tell the jury that the monetary value of

8    valsartan contaminated with NDMA is

9    unchanged?

10          A.    I have no plans on talking

11    about monetary value.

12          Q.    Okay.  Do you think it's

13    acceptable for a patient to take generic

14    valsartan at the highest levels of

15    contamination of NDMA that we've seen?

16               MS. THOMPSON:  Objection.

17          Form.

18               THE WITNESS:  Well, again,

19          I'm not sure exactly what you're

20          asking.

21               What I have formed an

22          opinion on and provided in my

23          report is that I don't believe

24          there's any -- any risk associated

Confidential Information - Subject to Protective Order

1    with the amount of NDMA that's in

2    any of the valsartan products that

3    I evaluated.

4  BY MR. VAUGHN:

5    Q.    And what amount of NDMA

6  would be necessary in valsartan to

7  increase the risk of someone developing

8  cancer?

9    A.    In humans, we don't have

10  that answer.  We're having to completely

11  rely on animal data to make any kind of

12  extrapolation along those lines at all.

13    And I think we've seen in

14  the literature multiple people express

15  concerns about extrapolating animal data

16  to human data.

17    I did in my report try to

18  do, based on the available data with all

19  those known limitations, suggest that the

20  amount of what I'm going to call

21  impurities of NDMA in any of the

22  valsartan products seems well below what

23  in the animal studies might be expected

24  to cause any cancer.

Confidential Information Subject to Protective Order

1    Q.    And so do you not have an

2  opinion as to how much NDMA it would take

3  to increase the risk of someone

4  developing cancer?

5              MS. THOMPSON:  Objection.

6        Form.  And again, this is not what

7        he was designated on.

8              THE WITNESS:  Yeah, I don't

9        think that's what any focus on my

10        report was on.

11              MR. VAUGHN:  Tyler, can you

12        pull up his expert report for me.

13              TRIAL TECH:  Sure.  Give me

14        one second.

15              (Document marked for

16        identification as Exhibit

17        Bottorff-1.)

18              MS. THOMPSON:  We're giving

19        him a hard copy of his report as

20        well.

21              MR. VAUGHN:  Sounds good.

22              Tyler, can we go to Page 63

23        of this report.

24              TRIAL TECH:  Sure.  And this

Confidential Information - Subject to Protective Order

1          will be Exhibit 1.

2                    MR. VAUGHN:  Yeah.  Thank

3          you for that.

4                    TRIAL TECH:  No problem.

5          You said Page 63?

6                    MR. VAUGHN:  Yeah.

7     BY MR. VAUGHN:

8          Q.    And Dr. Bottorff, let me

9     know when you're there.

10         A.    I am.  I'm there now.

11         Q.    Can you read looks like

12    Opinion VII..?

13                Can you read it out loud?

14    I'm sorry.

15         A.    Yes, I will.

16                "The scientific literature

17    and evidence, which I have reviewed

18    extensively, do not support that the

19    valsartan products during the time period

20    at issue carried an independent risk of

21    cancer, nor that there is any increased

22    risk of cancer associated with the

23    valsartan containing the NDMA/NDEA

24    impurity as compared to valsartan with a

Confidential Information - Subject to Protective Order

1   zero level of NDMA or NDEA."

2        Q.    Okay.  Would you agree with

3   me that you're giving an opinion that the

4   levels of NDMA do not increase the risk

5   of a patient's cancer?

6        A.    Yes.  But I thought your

7   question was, how much would it take to

8   cause cancer.  And I didn't have a good

9   answer to that.

10            MS. THOMPSON:  I was trying

11        to get an objection in there.

12            THE WITNESS:  Oh, sorry.

13            MR. VAUGHN:  So reminder to

14        give me a pause.

15            I was objecting to the form

16        of the last question.

17            THE WITNESS:  Sorry.

18   BY MR. VAUGHN:

19        Q.    Doctor, is it your opinion

20   that no level of NDMA would cause cancer

21   in a human?

22            MS. THOMPSON:  Objection.

23        Form.

24            THE WITNESS:  I don't know

Confidential Information - Subject to Protective Order

```
 1              the answer to that.  We don't have
 2              any data on what it would take to
 3              cause cancer in humans with drugs
 4              that haven't been -- or compounds
 5              that haven't been studied in
 6              humans.
 7    BY MR. VAUGHN:
 8         Q.    If you do not know the level
 9    that would -- of NDMA that it would take
10    to cause cancer, how can you give an
11    opinion that the levels of NDMA in
12    valsartan cannot increase the risk of
13    someone developing cancer?
14              MS. THOMPSON:  Objection.
15              Form.
16              THE WITNESS:  Again, as I
17              said before, we're having to
18              extrapolate the animal data with
19              all those known limitations.
20              And so, this statement was
21              based on how much NDMA did not
22              seem to cause cancer in animals.
23              And that was in many cases
24              way above the amount that's in any
```

Confidential Information - Subject to Protective Order

1            of these valsartan products.

2                    So again, accepting those

3            limitations, that's where this

4            conclusion comes from.

5    BY MR. VAUGHN:

6            Q.    So you're not able to tell

7    our jury at what point -- at what level

8    NDMA in valsartan would increase the risk

9    of someone developing cancer?

10           A.    Yeah.  I don't think there's

11   anybody who can do that.

12           Q.    What is the highest level of

13   NDMA that you're aware of in generic

14   valsartan?

15           A.    I can look at my report,

16   which I think --

17           Q.    Take your time.

18           A.    No problem.  Just scanning

19   through the NDMA amounts on Page 6, 7,

20   and 8 of my report, the highest amount, I

21   think, was just over 20 micrograms.

22           Q.    So is it safe -- I'm sorry.

23           A.    I was just going to add, in

24   a valsartan 320-milligram tablet.

Confidential Information Subject to Protective Order

1    Q.    I appreciate that.

2          And so the opinions in your

3    expert report only apply to a daily NDMA

4    exposure level of 20 micrograms or lower?

5          MS. THOMPSON:  Objection to

6          form.

7          THE WITNESS:  Sorry.  I'm

8          not -- that's not exactly what I

9          say in my report.

10   BY MR. VAUGHN:

11   Q.    What is it -- how did I

12   mischaracterize it?

13   A.    If we go to Page 32 and 33,

14   which is where I make that extrapolation

15   from -- this is one study, for example,

16   by Ito that there was an animal dose that

17   did not produce cancers, and

18   extrapolating that in kilogram to the

19   human exposure, if you use the same

20   milligram per kilogram calculation,

21   again, with all those limitations, then

22   the amount that was not cancer causing in

23   this study were anywhere from

24   approximately 300 to over 20,000 times

Confidential Information Subject to Protective Order

1    the amount that's in any of the valsartan

2    products.

3         Q.    We'll get more into that in

4    a little bit.  But in forming your expert

5    opinions, the highest level of NDMA that

6    you were aware of in valsartan was

7    20 micrograms, correct?

8         A.    Correct.

9              MR. VAUGHN:  Can we go to --

10        back to Page 6 real quick, Tyler.

11   BY MR. VAUGHN:

12        Q.    All right.  On that second

13   paragraph, Doctor, you note that there's

14   levels as high as 120 parts per million.

15   Where did that information come from?

16        A.    I'm assuming that it's a

17   part per million conversion from these

18   data, from the FDA's laboratory analysis.

19        Q.    Where did you find that data

20   though?  Where did you find the 120 parts

21   per million?  Are you the one that did

22   that calculation?

23        A.    No.  I wouldn't have done

24   the calculation.

Confidential Information Subject to Protective Order

1       Q.     So where did you find that

2    information?  I don't see a citation.  So

3    I'm just wondering where this came from?

4       A.     I don't recall exactly.

5       Q.     What did you say ppm stands

6    for?

7       A.     Parts per million.

8       Q.     Okay.  And you would expect

9    that that part per million, if you

10   actually do the math to figure out how

11   many micrograms that could be in a pill

12   of valsartan, would be no more than

13   20 micrograms, right?

14      A.     If this range is

15   representative of what the FDA's analysis

16   is, then that would be correct.

17      Q.     But you're not sure where

18   this range even comes from?

19            MS. THOMPSON:  Objection to

20        form.

21            THE WITNESS:  No.

22            Sorry.

23            My best guess at this point

24        in time is that those are the

Confidential Information - Subject to Protective Order

1          ranges that were also in the FDA's

2          testing, but I don't recall it

3          exactly at this point.

4   BY MR. VAUGHN:

5          Q.    Okay.  Doctor, are you aware

6   how to convert parts per million into

7   micrograms or nanograms in a pill?

8          A.    Yes, it's based on the

9   milligram strength of the tablet that

10  that's calculated.

11         Q.    And how many nanograms --

12  are you aware of how many nanograms are

13  in a milligram?

14         A.    Yes.

15         Q.    How many?

16         A.    A milligram has a thousand

17  micrograms, which also has a thousand

18  nanograms per microgram.  So that would

19  be about a million.

20         Q.    It would be one million?

21         A.    Yes.

22         Q.    And so for every milligram

23  of valsartan, there would be 120

24  nanograms of NDMA; is that correct?

Confidential - Information - Subject to Protective Order

1         A.    I think that's the correct

2    calculation.

3              MR. VAUGHN:  Tyler, can you

4         pull a calculator up for us.

5    BY MR. VAUGHN:

6         Q.    All right.  And how --

7    before we do this, 20 micrograms, how

8    many nanograms would that be?

9         A.    20,000.

10        Q.    20,000.  Okay.  So let's

11   take the 120 -- let me see if I can --

12   there we go.  120 was the parts per

13   million.  Oh, didn't want that to happen.

14             120.

15             And what's the largest dose

16   of valsartan?

17        A.    320 milligrams.

18        Q.    One second.

19             120 times -- did you say 320

20   was the largest?

21        A.    Correct.

22             MR. VAUGHN:  Hey, Tyler, can

23        you try and control this?  It's

24        not working for me.

Confidential Information - Subject to Protective Order

1          TRIAL TECH:  Yeah, I think

2     you just need to clear -- do it

3     120.

4          MR. VAUGHN:  Times 320.

5          TRIAL TECH:  Where is --

6     okay, now it's clear.  120 times

7     320.

8          There you go.

9  BY MR. VAUGHN:

10     Q.    That's 38,400 nanograms,

11  correct, Doctor?

12     A.    Yes.

13     Q.    And how many micrograms

14  would that be?

15     A.    38.4.

16     Q.    And would you agree with me

17  that's approximately twice as high as any

18  of the levels the FDA identified?

19          MS. THOMPSON:  Objection.

20     Form.

21          THE WITNESS:  Yeah, so I'm

22     guessing that was ZHP's own

23     analysis and not the FDA's

24     analysis where that separate range

Confidential Information - Subject to Protective Order

1    of 120 came from.

2    BY MR. VAUGHN:

3          Q.    Did you review ZHP's

4    analysis?

5          A.    I think it's -- I think it's

6    in my reliance documents.

7          Q.    Okay.  Do you remember any

8    levels higher than 120 parts per million

9    in ZHP's analysis?

10          A.    I do not.

11                If you -- if I can just

12    expand a little bit.  If I recall, ZHP's

13    analysis was based on the parts per

14    million of their API, which would be the

15    small amount of milligrams of the active

16    ingredient.

17                So I don't know if that

18    changes the calculation or not.

19          Q.    Can you explain to me what

20    API is?

21          A.    The active ingredient.

22          Q.    And what's the active

23    ingredient in valsartan?

24          A.    Valsartan.

Confidential Information - Subject to Protective Order

1    Q.    Okay.  And the final pill,

2  what is it made up of besides valsartan

3  and sometimes NDMA and NDEA?

4          MS. THOMPSON:  Objection to

5          form.

6          THE WITNESS:  Off the top of

7          my head, I don't know that

8          exactly.  But I can tell you,

9          having been trained in pharmacy,

10         that it will have all kinds of

11         binders and other excipients and

12         lubricants so it flows through

13         machines when they make the

14         tablets and that kind of thing.

15 BY MR. VAUGHN:

16    Q.    So a 320-milligram valsartan

17  pill will have 320 milligrams of

18  valsartan in it, correct?

19    A.    Correct.

20    Q.    But will the total pill be

21  more than 320 milligrams because it has

22  other constituents in it?

23    A.    It would have to be.

24    Q.    Okay.  And so if ZHP's parts

Confidential Information Subject to Protective Order

1    per million is on the API of valsartan,

2    how does that make a difference now when

3    we're going to the final pill if there's

4    still 320 milligrams in there?

5        A.    It's part of the same part

6    per million calculation.  But I don't

7    know how that changes when the API gets

8    incorporated in -- into the tablet.

9        Q.    Okay.  But the final tablet

10   would be more than 320 milligrams, right?

11       A.    Right.

12       Q.    Do you have any idea, like,

13   as a pharmacist, on average, what

14   percentage of a pill is filler?

15       A.    I haven't looked at that

16   kind of calculation in, gosh, years,

17   because it's never really been called

18   into question or needed to be known.

19       Q.    And so, in forming your

20   opinions in this litigation, you didn't

21   consider the amount of filler in

22   valsartan, correct?

23           MS. THOMPSON:  Objection to

24       form.

Confidential Information Subject to Protective Order

```
1              THE WITNESS:  Correct.

2              Sorry.

3              I did not.

4    BY MR. VAUGHN:

5         Q.    If someone were to test a

6    pill, the parts per million would be

7    lower than if they tested the API,

8    correct?

9         A.    You know, at this point I'm

10   not sure, because if it's based on the

11   320 milligrams of active ingredient,

12   seems like the calculation would still be

13   the same.

14        Q.    Well, let's say a pill is

15   640 milligrams but only half of that is

16   valsartan, would that not half the parts

17   per million of the NDMA in the pill?

18              MS. THOMPSON:  Objection to

19        form.

20              THE WITNESS:  If you based

21        it on the weight of the actual

22        pill instead of based on the

23        active ingredient.

24   BY MR. VAUGHN:
```

Confidential Information - Subject to Protective Order

1     Q.    And if you didn't know the

2  percentages of what the filler were, what

3  would you -- how could you base it on

4  anything but the entire pill's weight?

5     A.    Well, I think the issue at

6  hand was the part per million of the

7  valsartan and not the ppm based on any of

8  the excipients or anything else.

9     Q.    So would you agree with me

10 that it would be more appropriate to use

11 the ppm of the API than the final

12 product?

13    A.    I would agree with that.

14          MR. VAUGHN:  Tyler, can we

15      go back to --

16          Can you guys all hear me?

17      It says my connection is unstable

18      right now.

19          Okay.  Tyler can we go back

20      to Page 6 of this expert report.

21          Zoom out a little bit.

22 BY MR. VAUGHN:

23    Q.    You note here, the fourth

24 column on the right, midpoint --

Confidential Information Subject to Protective Order

1          MR. VAUGHN:  And if we go to

2      the next page, Tyler.

3  BY MR. VAUGHN:

4      Q.    It looks like you calculated

5  the midpoint of the contamination; is

6  that correct?

7          MS. THOMPSON:  Objection to

8      form.

9          THE WITNESS:  Correct.

10  BY MR. VAUGHN:

11      Q.    Why did you calculate the

12  midpoint?

13      A.    It was an attempt to try to

14  represent that it would be unlikely over

15  the three to four or whatever years of

16  exposure at the time that these

17  impurities were known to be in valsartan

18  tablets that someone would take the exact

19  same lot for the entire period of time

20  that they were on that particular dose of

21  valsartan.

22          And so they would have, even

23  within the same manufacturer, probable

24  exposure to a different lot that had a

Confidential Information - Subject to Protective Order

1  different amount and/or be switched over,

2  depending on what the pharmacy was

3  carrying at the time, to another product

4  that had a different amount.

5           So it was really just to try

6  to give an idea.  You have the lowest

7  amount that could be found, which in many

8  cases was below the lower limits of

9  detection, and the highest amount that

10 was found in one of the products.

11          But the reality is that an

12 exposure value might actually be

13 something that's more of a midpoint.

14      Q.    Do you know how the FDA came

15 to these results?

16      A.    In terms of the analytical

17 process?

18      Q.    Yeah.  I mean, were they

19 testing the whole pill or were they

20 testing the API?

21      A.    I think they could only have

22 been testing the full pill.

23      Q.    And have you seen any

24 evidence that the FDA considered how much

Confidential Information - Subject to Protective Order

1   filler is in the pill?

2        A.    I've not seen that anywhere.

3        Q.    A midpoint isn't the same as

4   the average, correct?

5        A.    Correct.  Which is why I did

6   not put the average in there, is you

7   don't have the raw data to be able to

8   accurately calculate an average.

9        Q.    Did the defense attorneys

10  not provide you the raw data?

11            MS. THOMPSON:  Objection.

12        Form.

13            THE WITNESS:  No.  I went

14        off this, which was the FDA's

15        report.  And if you don't have

16        each individual result for each

17        individual tablet, and you just

18        have an upper and lower limit of

19        the range, you can't guesstimate

20        how many that was involving to be

21        able to calculate statistically an

22        average.

23  BY MR. VAUGHN:

24        Q.    Did you not ask defense

Confidential Information Subject to Protective Order

1  counsel to provide you all the levels of

2  the internal testing?

3            MS. THOMPSON:  Objection.

4       Form.

5            THE WITNESS:  I did not.

6  BY MR. VAUGHN:

7       Q.    Why?

8       A.    I had no reason to.

9       Q.    I'm sorry.  You didn't

10  consider any of the internal testing in

11  forming your opinions?

12            MS. THOMPSON:  Objection.

13       Form.

14            THE WITNESS:  No.  That is

15       in my report.  It is what I

16       considered for the amounts

17       contained in the valsartan

18       products.

19  BY MR. VAUGHN:

20       Q.    What if the internal testing

21  shows much higher levels than this?

22            MS. THOMPSON:  Objection.

23       Form.

24            THE WITNESS:  I don't have

Confidential Information - Subject to Protective Order

1        that data, so I don't know.

2  BY MR. VAUGHN:

3        Q.    So your opinions won't apply

4  to it if the -- to the levels if they

5  were higher than what's in the FDA's?

6        A.    It would depend how much

7  higher.  And I'd have to see them.

8        Q.    How much higher?

9        A.    I don't know.  I'd have to

10  see it.

11        Q.    You said it depends on how

12  much higher.  At what point does it

13  matter?

14              MS. THOMPSON:  Objection.

15        Form.

16              THE WITNESS:  Again, I'd

17        have to see them and then be able

18        to make that determination.

19  BY MR. VAUGHN:

20        Q.    Is there any level that

21  you're going to say is unacceptable?

22              MS. THOMPSON:  Objection

23        form.

24              THE WITNESS:  I believe

Confidential Information Subject to Protective Order

1    you've asked that, and my answer

2    was I don't think there is a level

3    that I can say is going to be

4    related to cancer in humans,

5    because we don't know that.  We

6    don't have that data.

7  BY MR. VAUGHN:

8         Q.    So it's irrelevant to you

9  how much NDMA is in valsartan?

10            MS. THOMPSON:  Objection.

11        Form.  Mischaracterizes testimony.

12            THE WITNESS:  Yeah, I don't

13        think I ever used the word

14        "irrelevant."

15  BY MR. VAUGHN:

16        Q.    Is there any point when you

17  would be concerned on the level of NDMA

18  in valsartan?

19            MS. THOMPSON:  Objection.

20        Form.

21            THE WITNESS:  Yeah, I don't

22        really know what you're trying to

23        get me to say or what you're

24        really asking.

Confidential Information Subject to Protective Order

1           I'm concerned with the

2      amounts that I know, based on the

3      FDA's analysis, were in valsartan

4      tablets, and then comparing that

5      to the animal data, which is all

6      we have, to see if I believe that

7      this exceeded the metabolic

8      capacity -- and this is from a

9      pure pharmacokinetic drug

10     metabolism standpoint -- that has

11     been associated in animal studies

12     with not causing cancer.

13          So I wasn't looking to try

14     to establish an amount that would

15     cause cancer.  So I don't have an

16     opinion on that.

17 BY MR. VAUGHN:

18     Q.    You weren't trying to figure

19 out how much NDMA it would take to cause

20 cancer in humans?

21     A.    No.  I was not.

22     Q.    Okay.  And in forming your

23 opinions, you assumed that the FDA's

24 analysis is actually the highest levels

Confidential - Information Subject to Protective Order

1   of NDMA engineered in valsartan, correct?

2           MS. THOMPSON:  Objection.

3       Form.

4           THE WITNESS:  I did not

5       assume that.

6   BY MR. VAUGHN:

7       Q.   So you think that there

8   might be actually higher levels than the

9   FDA is aware of?

10          MS. THOMPSON:  Objection to

11      form.

12          THE WITNESS:  I don't know.

13      This is what I had to go off of,

14      based on the FDA's published data.

15  BY MR. VAUGHN:

16      Q.   So why is that not assuming

17  the highest levels?  You didn't even ask

18  for the internal data.

19      A.   I wasn't assuming anything.

20  I was evaluating what I had access to.

21      Q.   Doctor, were you initially

22  retained for this litigation by Teva?

23      A.   No one from Teva has ever

24  contacted me.

Confidential Information - Subject to Protective Order

1        Q.    Were you initially retained

2   for this litigation for every defendant

3   or a specific defendant?

4        A.    I think when I was

5   originally retained, the word Teva may

6   have been mentioned in some of those

7   early communications.  But since then

8   there's never been any contact directly

9   with Teva at all.

10       Q.    Okay.  So you do think you

11  might have initially been retained by

12  Teva?

13       A.    No.  I didn't say that.

14             I've only been retained by

15  GT.  And they may have mentioned that

16  Teva was one of the defendants in some of

17  the earlier communication.  But since

18  then, I understand that there are other

19  defendants in this as well.

20       Q.    When were you initially

21  retained for this litigation?

22       A.    It was either right at the

23  end of 2020 or the very early part of

24  2021.

Confidential Information Subject to Protective Order

1          Q.    And approximately when did

2    you become aware of all the other

3    defendants?

4          A.    I -- I don't have a date for

5    that.  Probably sometime in the spring.

6                MR. VAUGHN:  Okay.  Tyler,

7          can we go to -- I think it's

8          Exhibit B on my files.  It's -- or

9          exhibit -- one second.  Yeah,

10         Exhibit B of his expert report.

11               And then can we go to

12         Page 10.

13               (Document marked for

14         identification as Exhibit

15         Bottorff-2.)

16   BY MR. VAUGHN:

17         Q.    All right.  We'll see down

18   here some Teva Bates numbers.

19               MR. VAUGHN:  And then,

20         Tyler, can we go to the next page.

21   BY MR. VAUGHN:

22         Q.    And then a bunch more Teva

23   Bates numbers.

24               MR. VAUGHN:  Next page,

Confidential Information Subject to Protective Order

```
1         Tyler.

2    BY MR. VAUGHN:

3         Q.    A bunch more Teva.

4              MR. VAUGHN:  Next page.

5    BY MR. VAUGHN:

6         Q.    A bunch more Teva.

7              MR. VAUGHN:  Next page.

8    BY MR. VAUGHN:

9         Q.    All Teva again.

10             MR. VAUGHN:  Next page.

11   BY MR. VAUGHN:

12        Q.    And then there's two other

13   Bates numbers here.  There's HLL.  Do you

14   know what the HLL Bates numbers denote,

15   Doctor?

16        A.    Is that on this screen that

17   I'm looking at?

18        Q.    Yeah.  The top right-hand

19   corner.  It's the only ones that didn't

20   have a Teva Bates number.  I didn't know

21   if you knew what company's documents

22   those two are.

23             MS. THOMPSON:  Objection.

24        Form.
```

Confidential Information Subject to Protective Order

1          THE WITNESS:  I -- I assume

2     they're associated with what's on

3     the left hand column.

4  BY MR. VAUGHN:

5     Q.   Okay.  So did you only

6  review internal documents of Teva in this

7  litigation?

8          MR. VAUGHN:  Is that my

9     internet or his that's messing up?

10     He's frozen on my screen.

11          THE VIDEOGRAPHER:  He looks

12     frozen on my screen.

13          THE WITNESS:  Oh, well.

14          THE VIDEOGRAPHER:  Oh, yeah,

15     he's back.

16  BY MR. VAUGHN:

17     Q.   Okay.  I'm sorry, Doctor.  I

18  missed whatever your answer was.

19     A.   I didn't yet because you

20  said I was frozen so --

21     Q.   Okay.

22     A.   -- I didn't think you could

23  hear me either.

24     Q.   I appreciate it.

Confidential Information Subject to Protective Order

1       A.     In looking at these

2   documents, my recollection back then, I

3   think the first round of materials that

4   were provided to me were probably Teva

5   materials.

6       Q.     Were any of those internal

7   testing by Teva?

8       A.     They may have been.  I don't

9   recall specifically.

10      Q.     You didn't review any other

11  documents of any other defendant besides

12  Teva, did you?

13      A.     No, I don't believe so.

14      Q.     Why did you only review Teva

15  documents?

16      A.     The question that I was

17  specifically addressing didn't seem to be

18  as important to be looking at internal

19  documents for every single defendant as

20  opposed to evaluating the literature for

21  NDMA, NDEA metabolism and distribution.

22      Q.     Well, then why did you

23  review Teva documents?

24             MS. THOMPSON:  Objection.

1              Form.

2                     THE WITNESS:  They were sent

3              to me early on.  And when I

4              receive documents, I reviewed

5              them.

6      BY MR. VAUGHN:

7              Q.    Are these the documents that

8      you requested, or they just picked out

9      documents and sent to you?

10                    MS. THOMPSON:  Objection to

11             form.

12                    THE WITNESS:  I didn't

13             request them, so they were somehow

14             selected and sent to me.

15                    MR. VAUGHN:  We can take

16             down the exhibit.  I'm done with

17             that for now.

18     BY MR. VAUGHN:

19             Q.    Doctor, what degrees do you

20     hold?

21             A.    I hold a bachelor's degree

22     from Georgia Tech, and PharmD degree from

23     the University of Kentucky.

24             Q.    You're a pharmacist?

Confidential Information Subject to Protective Order

1        A.      Yes.

2        Q.      When you're filling a

3   medication for someone, what do you call

4   that person that you're filling the

5   medication for?  For instance, are they

6   your client, a customer, a patient?

7        A.      Well, they would be a

8   patient in my reference.  But that's not

9   been what my career has been, is filling

10  prescriptions, that type of pharmacist.

11       Q.      Have you ever filled a

12  prescription?

13       A.      Yes.

14       Q.      When was the last time that

15  you did that?

16       A.      Probably the summer of 1982.

17       Q.      If you're not filling

18  prescriptions, what is it that you do for

19  work?

20       A.      My career has always been in

21  academic pharmacy.  So certainly teaching

22  has been part of that.  But as part of

23  that, I had a clinical practice where I

24  rounded with an interdisciplinary

Confidential Information Subject to Protective Order

1    cardiology team on inpatients at academic

2    medical centers for 35 years.

3         Q.    What do you currently do for

4    work?

5         A.    What I thought was going to

6    be a semi-state of retirement has turned

7    out to be almost full-time, because I'm

8    continuing to teach for my most recent

9    academic appointment at Manchester

10   University in Fort Wayne, Indiana.  And

11   certainly Covid has allowed a lot of

12   online teaching to be done, so I didn't

13   have to be in Indiana all the time to do

14   that.

15             And then I -- the position

16   that I was in prior to that was in

17   Knoxville at South College.  And I'm now

18   chair of their independent research

19   committee.

20             And then most recently I've

21   been added to the adjunct faculty the

22   University of Cincinnati where I used to

23   teach for 20 years to be involved in

24   their online Masters in pharmacogenomics

Confidential Information Subject to Protective Order

1    program.

2         Q.    At Manchester University,

3    are you a professor or an adjunct

4    professor?

5         A.    As of last August, I am

6    adjunct.  And I was professor for five

7    years prior to that.

8         Q.    What is an adjunct

9    professor?  What's the difference of that

10   and a professor?

11        A.    A pay cut basically.

12              You know, going to some more

13   of what would be called a part-time

14   status.  Still paid, but part-time

15   status.

16        Q.    Okay.  How many hours a week

17   are you -- do you devote to the adjunct

18   professor?

19        A.    For Manchester, probably 15.

20   For University of Cincinnati probably

21   five to ten depending on when things are

22   being done that are -- or what I'm being

23   expected to do.

24        Q.    How many students do you

Confidential Information Subject to Protective Order

1  currently teach?

2      A.    There are roughly 65 in each

3  class of the four years of pharmacy

4  students at Manchester.  And the online

5  genomics program has just started at

6  Cincinnati, so it is a smaller program.

7  I think it has like eight to ten.

8      Q.    Okay.  What is

9  pharmacogenomics?  Can you explain that?

10     A.    Yeah.  It's the study of the

11 interaction between genetic alterations

12 in drug metabolism or response and the

13 drugs that are being given to patients.

14           So it is a component of sort

15 of a common buzzword these days called

16 personalized medicine.

17     Q.    And so is the focus on it

18 specifically pharmacological drugs, not

19 carcinogens?

20     A.    All drugs.

21     Q.    Are there drugs that are

22 carcinogens?

23     A.    Yes.

24     Q.    Such as?

Confidential Information Subject to Protective Order

1        A.     Immunosuppressant drugs for

2    transplant patients have the ability to

3    induce cancers by blocking cancer sort of

4    surveillance systems.

5        Q.     How do they block cancer

6    surveillance systems?

7        A.     They're immunosuppressants.

8    And as part of the immune system is a

9    component of it that suppresses cancer

10   cells.

11       Q.     So would you agree with me

12   that an immunosuppressant increases the

13   risk of one developing cancer?

14       A.     Yep.  That's been reported.

15            MS. THOMPSON:  Sorry, we

16       have a loud air conditioner.

17       Hopefully it will turn off soon.

18            MR. VAUGHN:  I can't hear it

19       actually.

20            MS. THOMPSON:  It's loud in

21       here.

22            MR. VAUGHN:  Can we go back

23       to the expert report, Tyler.

24       Page 3.

Confidential Information Subject to Protective Order

1    BY MR. VAUGHN:

2         Q.    All right.  You note during

3    your career that you have served on

4    advisory boards and national speaking

5    bureaus for several pharmaceutical

6    companies that make sartans, including

7    Merck -- should that be losartan?

8         A.    Yeah.

9         Q.    And Bristol-Myers Squibb,

10   irbesartan, and Novartis, valsartan.

11   Were those paid positions?

12        A.    Yes.  Being on speakers

13   bureaus, you're asked to give

14   presentations and be paid for those when

15   you go.

16        Q.    Approximately in what years

17   were you paid by these pharmaceutical

18   companies?

19        A.    Merck was the first sartan

20   company on the market.  So that would

21   have been maybe in the mid to late '90s,

22   irbesartan sort of in the late '90s, and

23   valsartan, late '90s early 2000.  But I

24   haven't been on the speaker bureaus for

Confidential Information Subject to Protective Order

1    over 20 years.

2         Q.    Have you done work for

3    pharmaceutical companies within the last

4    20 years?

5         A.    What do you mean by work?

6         Q.    Have you been paid by

7    pharmaceutical companies in the last

8    20 years outside of litigation?

9         A.    A little bit.  You know, if

10   you keep up with what's happened in

11   pharma and speaker bureaus, there's

12   really been a pretty strict federal limit

13   on what they used to do.

14              So I am on a couple speaker

15   bureaus now, But for neither one of those

16   companies have I given a talk in the last

17   18 months because they shut those down

18   for Covid.

19         Q.    Are there any other

20   pharmaceutical companies that make

21   sartans that you have been paid by

22   previously, besides the ones listed here?

23         A.    No.

24         Q.    How many types of sartans

Confidential Information Subject to Protective Order

1    are there?

2          A.    Structural differences or in

3    that whole category of sartans, how many

4    of them?

5          Q.    In the category of sartans.

6          A.    I think there's eight or

7    nine.

8          Q.    Can you name off the ones

9    that you recall?

10         A.    Oh, there's these three.

11   There's eprosartan.  I'd have to look at

12   a list.  These are by far the more common

13   used though.

14         Q.    The eight or nine types of

15   sartans, how many have been found to have

16   lots that are contaminated with NDMA or

17   NDEA?

18              MS. THOMPSON:  Objection.

19        Form.

20              THE WITNESS:  To my

21        knowledge, these three.  So I've

22        not really looked into the other

23        ones.

24   BY MR. VAUGHN:

Confidential Information Subject to Protective Order

1    Q.    And so would you agree that

2    there are numerous sartans that are not

3    contaminated with NDMA or NDEA?

4    A.    I don't know about numerous,

5    but I think there's some.

6    Q.    Do you think there's more

7    than there are that are contaminated?

8         MS. THOMPSON:  Objection to

9         form.

10        THE WITNESS:  I don't have a

11        breakdown because I haven't looked

12        at the other ones that much.

13   BY MR. VAUGHN:

14   Q.    Okay.  So there's eight or

15   nine types of sartans, and at least three

16   of them that you're aware of are

17   contaminated with a carcinogen, correct?

18        MS. THOMPSON:  Objection to

19        form.

20        THE WITNESS:  Correct.

21   BY MR. VAUGHN:

22   Q.    And you didn't consider the

23   other sartans in forming your opinions in

24   this litigation, correct?

Confidential Information Subject to Protective Order

1      A.     Correct.  I did not.

2      Q.     And so the whole

3  risk/benefit analysis thing that you're

4  talking about in your report, you didn't

5  consider the fact that there's sartans on

6  the market that aren't contaminated with

7  a carcinogen?

8           MS. THOMPSON:  Objection to

9      form.

10          THE WITNESS:  No.  I would

11     say that's part of my

12     consideration, is that there were

13     potential alternatives for these

14     three.

15  BY MR. VAUGHN:

16     Q.     How many pharmaceutical

17  companies make sartans?

18     A.     I guess now that many of

19  them are generic, there could be as many

20  as two dozen.  I don't know for sure.

21     Q.     How many pharmaceutical

22  companies make valsartan?

23     A.     I don't have an exact

24  number.  I would say maybe as many as

1   ten.

2          Q.    Can you list off the name of

3   all the defendants in this litigation?

4                MS. THOMPSON:   Objection.

5          Form.

6   BY MR. VAUGHN:

7          Q.    Sorry.   Let me rephrase

8   that.

9                Can you list off all of the

10  defendants who manufacture valsartan?

11         A.    Well, I don't know if it's

12  the same as what I used, which is the

13  FDA's list of valsartan products

14  containing the NDMA or NDEA.   But I could

15  read those off if that's what you would

16  like.

17         Q.    No.   That's okay.   But your

18  opinion is that it doesn't matter the

19  manufacturer, none of the levels of NDMA

20  in valsartan are going to increase

21  someone's risk of cancer?

22                MS. THOMPSON:   Objection.

23         Form.

24                THE WITNESS:   Could you ask

Confidential Information Subject to Protective Order

1        that again?  I want to be sure I

2        answer it right.

3   BY MR. VAUGHN:

4        Q.    Is it your opinion that it

5   doesn't matter who the manufacturer is of

6   the generic valsartan that contains

7   levels of NDMA; it's not going to

8   increase someone's risk of cancer?

9            MS. THOMPSON:  Objection.

10        Form.

11            THE WITNESS:  The

12        manufacturer played no role in any

13        of my analyses.  It was only the

14        amount of NDMA or NDEA that

15        factored into my analyses.

16   BY MR. VAUGHN:

17        Q.    But you -- so the amount of

18   NDMA did factor into your analysis, but

19   you're not sure if you're aware of the

20   highest levels, correct?

21        A.    I'm sure that no one knows

22   what the highest levels would be.

23        Q.    Would you want to know if

24   there are levels higher than you're

Confidential Information Subject to Protective Order

1    aware -- than you are aware of in your

2    report?

3                    MS. THOMPSON:  Objection to

4            form.

5                    THE WITNESS:  I suppose.  If

6            I had that, I could redo my

7            calculations and my opinions.  But

8            this is what I worked off of.

9    BY MR. VAUGHN:

10        Q.    If defense counsel was aware

11   of levels higher than what you worked off

12   of, do you think that they would have

13   given you that information?

14                   MS. THOMPSON:  Objection.

15           Form.  Calls for speculation.

16                   THE WITNESS:  I have no

17           idea.

18   BY MR. VAUGHN:

19        Q.    Would you have expected them

20   to give you that information?

21                   MS. THOMPSON:  Same

22           objection.

23                   THE WITNESS:  I guess so.

24   BY MR. VAUGHN:

Confidential Information Subject to Protective Order

1          Q.     Is there a brand name of

2     valsartan?

3          A.     Diovan.

4          Q.     Can you say that again?  The

5     audio broke -- cut out.

6          A.     I'm sorry.  The originator

7     was --

8          Q.     I'm not -- you're frozen and

9     no audio.

10         A.     Hmm.

11         Q.     Oh, you're back.

12         A.     Okay.  The originator was

13    Diovan with Novartis.

14         Q.     Is that still on the market?

15         A.     I think so.

16         Q.     And are you aware if the

17    brand name Diovan has NDMA or NDEA in it?

18              MS. THOMPSON:  Objection.

19         Form.

20              THE WITNESS:  I'm not aware

21         specifically.

22    BY MR. VAUGHN:

23         Q.     And so you're not aware if

24    it's ever had it in it?

Confidential Information Subject to Protective Order

1      A.     I am not.  And I know a lot

2  of times what the originators do when the

3  drug goes generic, is they either stop it

4  totally or they actually get generic drug

5  from somebody else and make their own

6  generic.  And I don't know specifically

7  if they've done that or not.

8      Q.     You haven't looked into that

9  in this litigation, did you?

10     A.     I did not.

11     Q.     So you have no idea if the

12  brand name has always been completely

13  clean of carcinogens?

14          MS. THOMPSON:  Objection.

15      Form.

16          THE WITNESS:  I -- I don't

17      know that anybody knows that.

18  BY MR. VAUGHN:

19     Q.     Do you know if the

20  manufacturing process is different?

21     A.     I didn't look into that.  So

22  I don't.

23     Q.     So as a nurse I have an

24  ethical obligation -- had an ethical

Confidential - Information Subject to Protective Order

1    obligation to patients.  And, you know, a

2    doctor has an patient relationship, and

3    that carries certain ethical obligations.

4                    Are there similar type

5    ethical obligations a pharmacist has to

6    the person whose medication they are

7    filling?

8                    MS. KAPKE:  This is Kara

9            Kapke.  Object to form.

10                   MR. VAUGHN:  Are you all --

11           I'm sorry.

12                   Are all the defense

13           attorneys going to be objecting or

14           just one of them?

15                   MS. THOMPSON:  She, I

16           believe, represents a retailer

17           who's not part of the manufacturer

18           group.  So --

19                   MR. VAUGHN:  Okay.  I

20           appreciate the clarification.

21    BY MR. VAUGHN:

22           Q.    So, Doctor, do pharmacists

23    have any type of ethical obligations to

24    the person whose medication they are

Confidential Information Subject to Protective Order

1    filling?

2        A.    Every professional has an

3    ethical obligation.

4        Q.    Can you go over -- go ahead.

5        A.    It's part of the definition

6    of being a professional.

7        Q.    Can you go through some of

8    those ethical obligations with me that a

9    pharmacist would have to a person who's

10   filling their medication?

11              MS. KAPKE:  Object to form.

12              MS. THOMPSON:  Same

13         objection.

14              THE WITNESS:  Following the

15         laws, you know, being honest,

16         accurate.  I'm not sure what

17         you're getting at.

18   BY MR. VAUGHN:

19       Q.    Is informed consent part of

20   the relationship a pharmacist has with a

21   patient?

22              MS. THOMPSON:  Objection.

23         Form.

24              THE WITNESS:  In my

Confidential Information Subject to Protective Order

1          professional career, informed

2          consent is a document in a

3          clinical trial that a patient

4          signs that they understand and

5          have been aware of the risks and

6          the benefits of being involved in

7          that clinical trial.

8               So I don't -- I don't see

9          informed consent in what my daily

10         practice was, in that term.

11    BY MR. VAUGHN:

12         Q.    Is that because you don't

13    actually fill medications for patients?

14         A.    I wouldn't say it's for that

15    reason.  That's just not how informed

16    consent is used.

17         Q.    Do you not discuss informed

18    consent at all with your pharmacy

19    students?

20         A.    In courses where I've taught

21    the process of conducting clinical trials

22    I have.

23         Q.    If a pharmacist is aware

24    that one medication contains a carcinogen

Confidential Information - Subject to Protective Order

1  and another version of that same

2  medication does not contain a carcinogen,

3  should they warn the patient about that?

4                  MS. KAPKE:  Object to form.

5                  THE WITNESS:  I mean, again,

6          in your hypothetical, you're

7          supposing that they know this.

8          And so if someone were to ask me

9          or you in your former practice --

10         you said you were a nurse?

11  BY MR. VAUGHN:

12         Q.    Correct.

13         A.    In your hypothetical that

14  you had two compounds, one that was a

15  known carcinogen, which is not what we're

16  talking about here, and one that was, and

17  one that wasn't, you know, would you go

18  ahead and give them the one that was?  I

19  mean, I don't think anybody would answer

20  that they would do that.

21         Q.    What about probable

22  carcinogen?

23                  MS. THOMPSON:  Objection to

24         form.

Confidential Information Subject to Protective Order

```
1              THE WITNESS:  You know, I
2         don't -- I don't know that that
3         changes.
4              I think I would have to look
5         at the data to see if I agreed
6         with it.
7    BY MR. VAUGHN:
8         Q.    What if a top cancer
9    researcher is the one that thinks that
10   the levels are high enough to increase
11   someone's risk of cancer?
12             Would you as a pharmacist
13   defer to a top cancer researcher?
14             MS. THOMPSON:  Objection.
15        Form.
16             THE WITNESS:  Again, I
17        haven't practiced in a drug store
18        setting in over probably 35 years.
19        So I don't know how that
20        information, if it were available,
21        would actually reach the
22        individual everyday practicing
23        pharmacist.
24   BY MR. VAUGHN:
```

Confidential Information Subject to Protective Order

1          Q.    So you don't know if there's

2     a computer system that, like, notifies

3     the pharmacist, hey, this drug has a

4     carcinogen in it?

5                    MS. KAPKE:  Object to form.

6                    THE WITNESS:  Sorry.  I'm

7          pretty sure that's not the case.

8     BY MR. VAUGHN:

9          Q.    Okay.  If you were aware of

10    literature that said the amount of a

11    carcinogen in a medication would increase

12    the risk of someone developing cancer,

13    would you let the patient know that?

14                   MS. KAPKE:  Object to form.

15                   MS. THOMPSON:  Same

16         objection.

17                   THE WITNESS:  Well, it's not

18         done at that level where that

19         responsibility is put in the hands

20         of an individual practicing

21         pharmacist.

22                   Those decisions get made at

23         corporate levels or at regulatory

24         levels, not at the -- not at the

Confidential Information - Subject to Protective Order

1          level of an individual practicing

2          pharmacist.

3     BY MR. VAUGHN:

4          Q.    What do you mean by

5     corporate level?

6          A.    Well --

7               MS. KAPKE:  Sorry, Doctor.

8          This is Kara Kapke again.  I'm

9          just going to interpose an

10          objection to this entire line of

11          questioning.  This witness has

12          been designated on general

13          causation issues, not liability

14          issues.

15               And there's been an

16          agreement that the experts at this

17          stage of the litigation are only

18          testifying and will only be

19          questioned about liability

20          issues -- or only about causation

21          issues, and they will not be asked

22          about for -- designated on

23          liability issues.

24               And so I think this entire

Confidential Information Subject to Protective Order

1          line of questioning is improper

2          and in violation of the agreement

3          that has been made and -- among

4          the plaintiff and defendants.

5               MR. VAUGHN:  I note your

6          objection.  And just for the

7          record I'm trying to fully explore

8          the opinions that are within his

9          expert report.

10               Tyler, can we go back to his

11          expert report, I guess.  Let's go

12          to Page 21.

13               MS. THOMPSON:  And on that

14          line, I mean, if you're going to

15          talk about specific items in his

16          report, that's fine.  But I don't

17          think anything about the ethical

18          obligations of a dispensing

19          pharmacist is in the report.

20               MR. VAUGHN:  That's fine.

21      BY MR. VAUGHN:

22          Q.    Here in the bottom of that

23      first paragraph, you note the risks --

24      you need to balance the risks and

Confidential Information - Subject to Protective Order

1    benefits, that being the cornerstone --

2              MR. VAUGHN:  Sorry, one

3         above that, Tyler.  Yeah, the very

4         last sentence there.

5    BY MR. VAUGHN:

6         Q.    "The balance of risk/benefit

7    is the cornerstone of therapeutic

8    decisionmaking."

9              That sounded a whole lot

10   like -- to me like informed consent.

11             Does that not sound like

12   informed consent to you, Doctor?

13             MS. THOMPSON:  Objection.

14        Form.

15             THE WITNESS:  No.  As I said

16        before, informed consent is -- in

17        my professional experience, has

18        been used in the context of

19        enrolling a patient in a clinical

20        trial where there's a consent form

21        that they're asked -- that has to

22        be approved by an investigational

23        review board.

24             And that's -- I'm not sure

Confidential Information Subject to Protective Order

1          that we're using the same

2          terminology on what informed

3          consent is.

4    BY MR. VAUGHN:

5          Q.    Okay.  And so that informed

6    consent that you're talking about in a

7    clinical trial, what all does it have to

8    disclose?

9          A.    The procedures of the study,

10   the amount that they're being reimbursed

11   for participating in the trial, the

12   nature of the drug, whether it's

13   experimental or not, those kind of

14   things.

15         Q.    What does that have to --

16   this says decisionmaking, though, in your

17   opinion.  What does what you just said

18   have to do with decisionmaking?

19         A.    It doesn't.  That's why I

20   was saying the use of the term "informed

21   consent" is not what this is.

22         Q.    Okay.  So you don't think

23   that a patient needs to be aware of all

24   risks and all benefits in order to obtain

Confidential Information Subject to Protective Order

1   informed consent?

2             MS. KAPKE:  Object to form.

3             MS. THOMPSON:  Object to

4        form.

5             THE WITNESS:  Again,

6        therapeutic decisionmaking is

7        different from informed consent.

8        So I think that you're using it in

9        a context that it's not typically

10       used in.

11  BY MR. VAUGHN:

12       Q.   Okay.  So for therapeutic

13  decisionmaking when we're talking about

14  the risk and the benefit, would one of

15  the risks be what the level of NDMA is in

16  a pill?

17       A.   I think you would have to

18  assess that risk and decide if there was

19  one or not.

20       Q.   What other risk -- when

21  taking valsartan, besides how much of a

22  carcinogen in it, what are the other

23  risks that would go into this therapeutic

24  decisionmaking?

Confidential Information Subject to Protective Order

1        A.    Well, first let me -- let me

2   say that using the term "carcinogen"

3   is -- it's a probable carcinogen in

4   humans.  We don't have the data that it's

5   a for sure carcinogen.

6             Drugs have all kinds of

7   risks, particularly sartans.

8   Hyperkalemia, hypotension, renal

9   dysfunction.  So the -- a rare case of

10  angioedema.

11            Those are the kind of risks

12  that you typically consider when you're

13  talking about therapeutic decisionmaking.

14       Q.    Of those potential

15  complications that you just listed, would

16  you consider any of those or the

17  development of cancer to be a bigger risk

18  to the patient?

19            MS. THOMPSON:  Objection.

20       Form.

21            THE WITNESS:  Well, if the

22       question is, is cancer worse than

23       hyperkalemia, then I would say

24       yes, it is.

Confidential Information Subject to Protective Order

1    BY MR. VAUGHN:

2         Q.    And so would it not be very

3    important to know the levels of a

4    potential carcinogen in a medication and

5    evaluating the risk/benefit of that

6    medication?

7              MS. THOMPSON:  Objection.

8              MS. KAPKE:  Object to form.

9              THE WITNESS:  Yeah, again, I

10        think we're getting back into this

11        liability issue that is not what I

12        was considering.

13             I was looking at the

14        metabolism and distribution of

15        NDMA and NDEA.

16             And by putting this comment

17        in my statement or in my report,

18        it was more to remind people that

19        when the risk is unknown, which is

20        what I consider it to be, unknown

21        in humans, you also have to

22        remember stopping drugs in

23        patients is not without risk as

24        well.

Confidential Information Subject to Protective Order

1           And that's been clearly

2      identified in all of the FDA

3      reports that I've seen.

4  BY MR. VAUGHN:

5           Q.    Doctor, why are there no

6  studies of NDMA in humans?

7           A.    Why are there no studies?

8           Q.    Yeah.

9           A.    I'm not sure.

10          Q.    Would it be ethical to give

11 humans NDMA and study what happens?

12               MS. THOMPSON:  Objection.

13      Form.  Outside the scope.

14               THE WITNESS:  I think it

15      depends on the amount.

16 BY MR. VAUGHN:

17          Q.    So you think the regulatory

18 agencies would approve a study on a

19 probable carcinogen in humans?

20               MS. THOMPSON:  Objection to

21      form.  Outside the scope.

22               THE WITNESS:  Yeah, I don't

23      know.  I think it would depend on

24      the amount, but I don't know.

Confidential Information Subject to Protective Order

1    BY MR. VAUGHN:

2         Q.    Okay.  So in forming your

3    opinions, you did not consider any human

4    data regarding NDMA exposure, correct?

5         A.    That is not correct.

6         Q.    I thought you said that

7    there wasn't any.

8         A.    I think what I said is that

9    there were no data in humans showing that

10   it was a carcinogen.  Or --

11        Q.    What's -- go ahead.

12        A.    I'm sorry.  Or proving that

13   it was a carcinogen.

14        Q.    Okay.  What studies did you

15   look at in humans then that you are

16   opining didn't show it can cause cancer?

17   Because I didn't see that in your expert

18   report.

19        A.    Let's go to Pages 48 through

20   end of 55, 56.

21             I did review the

22   epidemiology studies that have been done.

23        Q.    Okay.

24        A.    Either environmental or

Confidential Information - Subject to Protective Order

1  dietary.

2          And let me be clear about

3  what my reason for putting that in my

4  report was.

5          I wasn't attempting to

6  individually critique or support any one

7  of these studies.

8          The purpose of putting them

9  in my report is that I saw some plaintiff

10  experts that looked at these same data

11  and were pretty confident in stating that

12  this proves that NDMA causes cancer.

13          And I look at the same

14  data -- and again, without getting into

15  discussion of odds ratios and confidence

16  limits, I didn't see a consistency in

17  these data that led me to the same

18  conclusion.

19          And so I thought it was

20  worth putting in my report that two

21  people or more looking at these same data

22  might not necessarily draw the exact same

23  conclusion.

24          Q.    Would you agree that these

Confidential Information Subject to Protective Order

1    studies in humans at least identify what

2    organs NDMA could impact, if it went

3    systemically?

4              MS. THOMPSON:  Objection.

5         Form.

6              THE WITNESS:  I don't think

7         so.  Because I don't think this

8         proves anything.

9    BY MR. VAUGHN:

10        Q.    Why?

11        A.    Because of their

12   inconsistency, some of their limitations

13   that, again, that others have commented

14   on.  You know, if this proved that it was

15   definitely a human causing cancer

16   substance, then it would have had a

17   different level of designation in the

18   IARC.

19        Q.    When you say prove, what

20   level of evidence is that?  Is that like

21   more likely than not, like 51 percent,

22   75 percent?  Do you have to get to

23   100 percent to get to prove?

24        A.    I don't know.  I don't have

Confidential Information Subject to Protective Order

1    an opinion on that level.

2                My comment more is that

3    there's inconsistency in the data.  And

4    so I don't know what that cut point ought

5    to be.

6         Q.    So is it your opinion that

7    every single study must say that NDMA

8    causes cancer in order to prove that it

9    causes cancer?

10               MS. THOMPSON:  Objection.

11          Form.  Mischaracterizes.

12               THE WITNESS:  Yeah, that's

13          not what I'm saying.

14               What I'm saying is these

15          data look inconsistent enough to

16          me that I would not be willing to

17          draw the conclusion that we have

18          proof that NDMA causes cancer in

19          humans based on these epidemiology

20          trials and their limitations and

21          their inconsistencies.

22               MR. VAUGHN:  We've been

23          going for a little over an hour.

24          Now is a decent time for a break

Confidential Information Subject to Protective Order

```
 1           if you guys want to take one.
 2                MS. THOMPSON:  That's fine
 3           with us.
 4                MR. VAUGHN:  All right.
 5           Want to do --
 6                THE VIDEOGRAPHER:  The time
 7           right now is 10:06 a.m.  We're off
 8           the record.
 9                (Short break.)
10                THE VIDEOGRAPHER:  The time
11           right now is 10:20 a.m.  We're
12           back on the record.
13      BY MR. VAUGHN:
14           Q.    Doctor, do you have any
15      programs open on your computer except for
16      Zoom?
17           A.    No.
18           Q.    And you'll keep it that way
19      for the whole deposition?
20           A.    Yes.
21           Q.    Great.  A second ago you
22      said human studies did not prove that
23      NDMA causes cancer in humans.  Doctor, do
24      you agree, though, that at least some of
```

Confidential - Information Subject to Protective Order

1   the studies in humans where they gave

2   them NDMA or where they were exposed to

3   NDMA, that they found an association

4   between increasing levels of NDMA and

5   increasing rates of cancer?

6               MS. THOMPSON:  Objection.

7        Form.

8               THE WITNESS:  Yes, some of

9        those studies did show a

10        statistical association.

11   BY MR. VAUGHN:

12        Q.    And was that cancer that

13   they found an association with NDMA, was

14   that specific to a certain organ?

15        A.    No.

16        Q.    What organs do you recall

17   being associated with NDMA being able to

18   incite cancer?

19               MS. THOMPSON:  Objection.

20        Form.

21               THE WITNESS:  Well, again,

22        the association was in differing

23        studies, different organs.  They

24        looked at almost anything that you

Confidential Information Subject to Protective Order

1      can imagine.  So it's sort of all

2      over the board.

3  BY MR. VAUGHN:

4      Q.    There's a lot of organs that

5  NDMA is associated with causing cancer in

6  these studies?

7      A.    There were many different

8  organs, yes.  Again, I would add that it

9  wasn't necessarily within an individual

10  organ that it was always consistent that

11  it did show the association.

12      Q.    Doctor, your audio cut out

13  again.

14      A.    I'm sorry.  What I was

15  adding was that in many cases when you

16  looked at a specific organ, for example,

17  you might find inconsistent results that

18  one study would find an association and

19  another study would not.

20      Q.    Doctor, how many hours did

21  you spend in coming to your opinions

22  within your expert report?

23      A.    I'd have to look at the two

24  invoices that I have sent.  I'm guessing

Confidential Information Subject to Protective Order

1    somewhere around 100 to 120, something

2    like that.

3                    MR. VAUGHN:  Tyler, can we

4           go back to Exhibit B of his expert

5           report.

6                    And can we go to the next

7           page.

8    BY MR. VAUGHN:

9           Q.    Doctor, can you read off the

10   names of all plaintiff expert reports

11   that you reviewed?

12          A.    Not off the top of my head,

13   but I certainly did review these that you

14   see on my list.

15                   MS. THOMPSON:  Here is the

16          same thing in hardcopy.  Sorry.

17          It might be easier to read.

18                   THE WITNESS:  Yeah, so the

19          ones that you see here, are the

20          ones that I did look at.

21   BY MR. VAUGHN:

22          Q.    Can you go ahead and read

23   those off for me, aloud?

24          A.    Etminan, Panigrahy, Hecht,

Confidential Information Subject to Protective Order

1    Lagana, Madigan.

2          Q.    And then at the top of that

3    it says with exhibits.  What does that

4    mean?  Does that mean like their CV and

5    their materials considered?

6          A.    CVs, not thoroughly, but

7    just to get an idea of what their

8    background was and where -- what

9    institutions they were in.

10          And in reading the report,

11    if there was a material that I thought

12    was germane to what I was doing, that I

13    might have looked at those too.

14          Q.    Did you consider the

15    experts' CV when you were critiquing

16    their opinions?

17          A.    In terms of their background

18    or their institution they were in, or

19    what part of the CV?

20          Q.    Any part of the CV?

21          A.    No.  No that was not apart

22    of my critique is what their CV would

23    have been.

24          Q.    I'm not saying critiquing

Confidential Information Subject to Protective Order

1    their CV.  I'm saying when you were

2    critiquing their opinions, did you

3    consider what their specialty and

4    background was?

5         A.    I mean, yes, I would have

6    considered it.  I don't think it played

7    any role in what my critique was though.

8         Q.    Okay.  Did you review the

9    literature that each plaintiff expert

10   relied on?

11        A.    Not all.

12        Q.    Approximately how much of it

13   did you review?

14        A.    I think it might have

15   depended on who it was, but I relied

16   mostly on their report and not on the

17   materials that they used to derive their

18   report.

19             So 20 percent, if I felt it

20   was germane to what I was interested in.

21        Q.    But you didn't consider all

22   of the citations that plaintiffs' experts

23   used to support their opinions?

24             MS. THOMPSON:  Objection.

Confidential Information Subject to Protective Order

1      Form.

2           THE WITNESS:  No, I did not.

3  BY MR. VAUGHN:

4      Q.    Was there one expert report

5  that you focused on more than the others?

6           MS. THOMPSON:  Objection.

7      Form.

8           THE WITNESS:  No, not

9      really.  I sort of gave them equal

10     weight and time relative to how

11     big they were and how detailed

12     they were.

13 BY MR. VAUGHN:

14     Q.    Do you recall which one was

15 the largest expert report?

16     A.    Not exactly.  My best

17 recollection was Panigrahy, but I can't

18 swear to that.

19     Q.    Do you recall approximately

20 how many pieces of literature

21 Dr. Panigrahy relied on?

22     A.    I don't recall at all.

23     Q.    So you don't know if it was

24 100, 200, 500 articles?

Confidential Information Subject to Protective Order

1      A.      I do not.

2      Q.      If you reviewed the article

3    that a plaintiffs expert relied on, would

4    that appear on your materials considered

5    list?

6              MS. THOMPSON:  Objection.

7         Form.

8              THE WITNESS:  If it was

9         included in the exhibits, which is

10        what this says is my reliance

11        document, then I would have had

12        it.

13   BY MR. VAUGHN:

14        Q.      Well, if the exhibit just

15   gave the names of the studies and didn't

16   actually have the study itself there, did

17   you go and find that study to look at?

18        A.      If there was a study I had

19   interest in, I wouldn't have had any

20   assessment on it based on just reading

21   the title of the study.  I would have

22   pulled the study if I felt like I needed

23   to look in.

24        Q.      And then would that -- would

Confidential Information Subject to Protective Order

1    you have then included that on your

2    materials considered list in the area

3    that lists all the different studies that

4    you reviewed?

5          A.    Not always.

6          Q.    Why not?

7          A.    If it ended up not being

8    something that was used to form my

9    opinions, then I didn't feel it was

10   relevant to put in my reliance list.

11         Q.    And so you didn't even

12   critique the literature that plaintiffs'

13   experts relied on?  It just wasn't

14   relevant to you?

15               MS. THOMPSON:  Objection to

16         form.  Mischaracterizes.

17               THE WITNESS:  Yeah, I didn't

18         say it was irrelevant.

19               When I looked at them, I

20         would have decided if it was

21         relevant or irrelevant to what I

22         was doing.

23   BY MR. VAUGHN:

24         Q.    Okay.  How many deposition

Confidential Information Subject to Protective Order

1    transcripts with exhibits did you review

2    in forming your opinions?

3            A.    The ones that are listed

4    here.

5            Q.    And were each of those

6    transcripts several hundred pages?

7            A.    Yes.

8            Q.    Who is this Daniel Barreto?

9    I don't know if I'm saying the names

10   right.

11           A.    I have to look at my notes.

12   He might have been a Teva employee.

13           Q.    Do you know what any of

14   these depositions you reviewed -- can you

15   tell me who any of them are or who they

16   work for?

17           A.    The one that I remember the

18   most because it -- was Nudelman.  I know

19   he was a Teva employee involved in sort

20   of risk assessment or something like

21   that.

22           Q.    Why did you -- why were

23   these the transcripts you decided to

24   review out of all the depositions that

Confidential - Information Subject to Protective Order

1    have been taken in this litigation?

2         A.    These were the ones that I

3    received from counsel.

4         Q.    So counsel determined what

5    you reviewed?

6              MS. THOMPSON:  Objection.

7         Form.  Mischaracterizes.

8              THE WITNESS:  No.  Counsel

9         does not determine what I review.

10   BY MR. VAUGHN:

11        Q.    Did you ask to review

12   certain depositions of people in certain

13   positions?

14        A.    No.

15             MR. VAUGHN:  All right.  Can

16        we scroll down a little bit,

17        Tyler, on this regulatory guidance

18        and documents.

19   BY MR. VAUGHN:

20        Q.    I note there's over 40

21   regulatory guidances and documents on

22   your materials considered.  How did you

23   come into possession of all of these

24   regulatory guidelines?

Confidential Information Subject to Protective Order

1        A.     Where are we now?

2        Q.     Bottom of the page.  So it

3    starts -- bottom of Page 1, and I think

4    it goes to -- two, three -- yeah, till

5    Page 3 is your regulatory guidance

6    documents.

7        A.     I'd say some of them came

8    from counsel as part of what were called

9    my initial documents for consideration.

10   And some of them were documents that I

11   already had because in the nature of my

12   normal day-to-day job responsibilities,

13   as I try to keep track of what's going on

14   with the drugs that I have an interest

15   in.

16            So particularly, the FDA

17   documents, most of those I had already.

18       Q.     So you reviewed all these

19   guidance documents, correct?

20       A.     Yes.

21       Q.     Did you have -- did you have

22   any disagreements with any of these

23   guidance documents?

24       A.     I mean, how many did you say

Confidential Information Subject to Protective Order

1   there were?

2          Q.    About 40.

3          A.    Yeah, I can't recall

4   specifically if I would have had an

5   agreement within one or, you know, out of

6   all the things it would have been in all

7   the -- each of the individual 40

8   documents.  So I don't recall that

9   specifically.

10         Q.    If you disagreed with the

11  regulatory guideline, would that be not

12  significant?

13              MS. THOMPSON:  Object to

14         form.

15              THE WITNESS:  I don't know

16         what significant would mean.

17  BY MR. VAUGHN:

18         Q.    I mean, would you not note

19  it in your expert report if you disagreed

20  with one of the regulatory guidance

21  documents?

22         A.    Only, I suspect -- because I

23  don't recall doing it.  But only if I

24  suspect it would have altered one of my

Confidential Information Subject to Protective Order

1    opinions.

2          Q.    Do you know if any of these

3    regulatory guidance documents lay out the

4    methodology in which you -- and how you

5    convert animal exposure to NDMA to human

6    exposure?

7                MS. THOMPSON:  Objection.

8          Form.

9                THE WITNESS:  There may have

10         been areas that touched on that in

11         some of these documents.  But I

12         don't recall specifically which

13         ones and where.

14   BY MR. VAUGHN:

15         Q.    Would you agree that would

16   be important for your methodology to

17   follow what is laid out in the regulatory

18   guidelines?

19               MS. THOMPSON:  Objection.

20         Form.

21               THE WITNESS:  In terms of

22         forming my opinion on the

23         distribution and metabolism of

24         NDMA and NDEA?

Confidential Information Subject to Protective Order

1    BY MR. VAUGHN:

2         Q.    On the equivalent dose for a

3    human based on what an animal got.

4         A.    Well, that question

5    specifically has been addressed, not just

6    in regulatory documents, but in many,

7    many, many of the articles that I

8    reviewed in the animal studies.

9              And I don't recall ever

10   seeing a single one that did not list

11   that as a limitation in expanding animal

12   data to humans in this regard.

13        Q.    Did you give more weight to

14   an article or to a regulatory guidance?

15        A.    I guess I don't look at it

16   in those terms, to say one is better than

17   the other or stronger than the other.

18             I would say that in general,

19   regulatory documents look at a variety of

20   clinical and/or animal situation or data

21   as opposed to one single study.

22             So in a pure volume

23   standpoint, there would probably be more

24   data reviewed in a regulatory document.

Confidential Information - Subject to Protective Order

1    But that's not always the case.

2         Q.    If the regulatory document

3    laid out a different methodology than

4    some random study, which would you use?

5              MS. THOMPSON:  Objection.

6         Form.

7              THE WITNESS:  Which would I

8         use to do what with?

9    BY MR. VAUGHN:

10        Q.    To convert the dose of NDMA

11   given to an animal, to the equivalent

12   dose needed to give a human.

13        A.    Well, again, I'm not sure

14   exactly what you're asking.  So maybe you

15   can rephrase it, and I'll try to do a

16   better job of answering.

17        Q.    No.  It was a bad question.

18   You're okay.  We'll get to it here in a

19   little bit.

20        A.    Okay.

21        Q.    Did you conduct your own

22   literature review in forming your

23   opinions?

24        A.    Yes.

Confidential Information Subject to Protective Order

1    Q.    Can you explain your

2  methodology on your literature review to

3  me?

4    A.    Yeah.  I'd be happy to.

5          Original communications

6  between counsel and myself, I was asked

7  to evaluate the metabolism and

8  distribution of NDMA and NDEA.  And then

9  with a focus of -- in regards to the

10  amount that had been identified in the

11  valsartan tablets.

12          And so after my original

13  review of documents that were provided in

14  those initial files, one of those was

15  also the pleadings from plaintiffs.

16          And even before I did my

17  literature search, I went through those

18  and tried to identify areas that were

19  within my area of expertise, like

20  bioequivalence, drug metabolism, and

21  those types of things.  So I sort of knew

22  what direction I was wanting to head.

23          And then I went to PubMed

24  and started looking at articles relative

Confidential Information Subject to Protective Order

1    to NDMA and NDEA and metabolism,

2    dose-response, drug distribution.

3                And then, in addition, I

4    looked at valsartan as well, just because

5    there seemed to be issues about whether

6    there was potential overlapping

7    metabolism between valsartan and the

8    impurity.

9                So I included valsartan,

10   which pretty well characterized it, so it

11   didn't take too long anything that I

12   needed to find out about valsartan.

13               MR. VAUGHN:  Tyler, can we

14        go to the next page of this

15        reliance list, or materials

16        considered.  One more page.

17        Sorry.

18   BY MR. VAUGHN:

19        Q.   At the bottom -- yeah, so

20   literature and standards down here.  I

21   note that you have approximately 100,

22   117 pieces of literature on here.  Were

23   you saying earlier that there's even more

24   literature than this that you reviewed,

Confidential Information - Subject to Protective Order

1    you just didn't include it on your

2    materials considered?

3         A.    Yeah.   I think there's more.

4    Sometimes I would look at an article that

5    I thought was relevant.   And then one of

6    my additional things that I do, instead

7    of just relying on my PubMed returns, is

8    I look at the references that are in that

9    article.

10           And sometimes you find one

11   that you might not have found through a

12   PubMed search.   And I decide whether that

13   adds additional information or is

14   supportive or -- so, yeah, there's other

15   articles beyond these that, in the course

16   of the last four or five months, that I

17   looked at as well.

18        Q.    I mean, if you had to

19   estimate, how many more?   Like twice as

20   many, another dozen?

21           MS. THOMPSON:   Objection.

22        Form.

23           THE WITNESS:   I really can't

24        give you a number.   It could be

Confidential Information - Subject to Protective Order

1          between 25 and 75.  I don't really

2          recall.

3   BY MR. VAUGHN:

4          Q.    So less than 200 articles in

5   total you reviewed then?

6          A.    Maybe.  It could be more

7   than that.

8          Q.    So you reviewed five expert

9   reports with the exhibits, eight

10  deposition transcripts with exhibits,

11  over 40 regulatory documents, and

12  approximately 200 pieces of literature

13  and 100 or so internal documents, and you

14  did all of that in 100 to 120 hours; is

15  that correct?

16         A.    That is correct.

17         Q.    Doctor, is this litigation

18  the first time that you ever researched

19  the carcinogenicity and potency of a

20  probable human carcinogen?

21              MS. THOMPSON:  Objection.

22         Form.

23              THE WITNESS:  Probably the

24         first time to this level of

1          research.  But the concepts here

2          are essentially the same for any

3          new drug or any grant that I

4          submitted, where you have to be

5          thorough in your approach to

6          evaluating the literature,

7          selecting that, that you think is

8          relevant to what your question is

9          that you're trying to answer.

10              And so I -- it's maybe the

11         second time that I've looked at

12         what would be a potential

13         carcinogenic response to a drug.

14         But it's not any different from

15         what I've done for the last

16         35 years.

17    BY MR. VAUGHN:

18         Q.    I know you don't believe

19    NDMA or NDEA to be human carcinogens.

20    But would you agree with me that they are

21    animal carcinogens?

22              MS. THOMPSON:  Objection.

23         Form.

24              THE WITNESS:  Yes.  There

1       are numerous, numerous studies

2       showing carcinogenicity in

3       animals.

4   BY MR. VAUGHN:

5       Q.    Are you aware of any animal

6   that NDMA is not a carcinogen in?

7       A.    I didn't approach it looking

8   for one that escaped that.  So I don't

9   know.  I'm not aware of any, I don't

10  know.

11      Q.    So you didn't consider if

12  every mammal ever tested with NDMA was

13  found to -- scratch that.  Let me re-ask

14  the question.

15          So you didn't consider if

16  every animal is susceptible to cancer

17  formation when exposed to NDMA?

18      A.    There's no opinion in my

19  report that was based on that, so no.

20      Q.    Is a human an animal?

21      A.    Yes.

22      Q.    I'm sorry.  For the jury.

23          So if every animal -- ever

24  mammal tested with NDMA was found to

1    increase their risk of cancer, would that

2    not be relevant to your opinion on if

3    NDMA is a human carcinogen also?

4              MS. THOMPSON:  Objection.

5         Form.

6              THE WITNESS:  No.  And

7         again, I don't differ from the --

8         from the IARC's designation that

9         this is a probable human

10        carcinogen.  I don't disagree with

11        that assessment.

12             And as I said before, with

13        the availability and the

14        limitations of the epidemiology

15        studies that have been done, those

16        were available to IARC and they

17        still didn't change that

18        designation from probable.

19             So the number of animal

20        species that had cancer responses

21        to various, and I might add super

22        high doses relative to what we are

23        talking about with NDMA, that

24        didn't change anything for me.

Confidential Information - Subject to Protective Order

BY MR. VAUGHN:

Q.   So at least in regards to animals, NDMA and NDEA are the most potent carcinogens that you've ever investigated, correct?

MS. THOMPSON:  Objection. Form.

THE WITNESS:  I mean, possibly, yes.

MR. VAUGHN:  Tyler, can we go to Exhibit A of his expert report now.

I think this will be Exhibit 3 Tyler.

TRIAL TECH:  Exhibit 3. Yes.

(Document marked for identification as Exhibit Bottorff-3.)

MR. VAUGHN:  Thank you.  Can we go to Page 11 of the PDF. Perfect.

BY MR. VAUGHN:

Q.   Doctor.  It looks like

Confidential Information - Subject to Protective Order

1   you've been involved in many journals.

2   What does it mean to be an editor of a

3   journal?

4        A.    When researchers write

5   articles to be considered for

6   publication, they first go to an editor.

7   And the editor makes a preliminary

8   decision about whether it's worthy or not

9   of publication.

10          And if they believe it is

11  and within the scope of what that journal

12  focuses on, then they will send it out to

13  individual reviewers to provide specific

14  comments on all of the methodology and

15  conclusions and statistics and so forth.

16          So the editor level is sort

17  of one step above the individual journal

18  article referees or reviewers.

19       Q.    How do you become either a

20  referee or an editor on a journal?

21       A.    Usually those journals will

22  call me.  Often it's a journal that I've

23  published in several times already.  And

24  based on your expertise and experience,

1    they will invite you to be an editor.  So

2    it's a selection, not something that you

3    volunteer for.

4         Q.    So being an editor on a

5    journal is kind of a way of -- you've

6    been recognized as one of the leaders in

7    that area.  Is that fair to say?

8         A.    Very fair to say, correct.

9         Q.    Have you ever worked --

10   sorry.

11              Have you ever been an editor

12   or reviewer or referee for a journal that

13   has a focus on cancer?

14        A.    No.  My focus has been

15   cardiovascular drugs, but again,

16   everything within the realm of those

17   drugs involving their pharmacology,

18   pharmacokinetics, pharmacodynamics,

19   safety, efficacy.

20        Q.    So, you know, sometimes

21   people publish in journals that's a

22   little outside of the scope of what their

23   article is on.  Have you ever been

24   involved in the peer review process of an

Confidential Information - Subject to Protective Order

1    article on cancer, that was submitted for

2    publication?

3           A.    Gosh, you know, some of

4    these were 25 to 30 years ago, so I don't

5    recall.  I know it wouldn't have been a

6    major area of the articles that I would

7    have been asked to review.  But it's

8    possible there was something there.  And

9    I didn't -- that I just don't recall.

10                MR. VAUGHN:  Tyler, can we

11          go to Page 3 of this document, PDF

12          Page 3.

13   BY MR. VAUGHN:

14          Q.    I see there's like 141

15   invited presentations that you listed.

16          A.    Is that all?

17          Q.    Right.  Can you explain to

18   me what invited presentations are?

19          A.    Anywhere from -- yeah,

20   because those are followed by scientific

21   presentations.  So I've done about maybe

22   1,500 internationally and nationally.

23                I break them down into two

24   types.  One would be if a professional

Confidential Information - Subject to Protective Order

1    society, a local organization, a

2    pharmacist, physicians, nurses would ask

3    me to give a presentation, that would be

4    an invited presentation in that setting.

5              The other ones that are more

6    scientific are typically either

7    professional societies or places like

8    hospitals to do grand rounds and those

9    types of things.

10        Q.    Of all these invited

11   presentations, of the 141 listed, do any

12   of them relate to the carcinogenicity of

13   a substance?

14             MS. THOMPSON:  Object to

15        form.

16             THE WITNESS:  No, they all

17        relate to the safety, efficacy,

18        therapeutic decisionmaking, if you

19        will, of cardiovascular drugs in

20        general.

21   BY MR. VAUGHN:

22        Q.    You're noting the different

23   types of people -- or organizations that

24   would invite you to give these

Confidential Information - Subject to Protective Order

1  presentations.  Would any of them be

2  pharmaceutical companies?

3       A.    No, I wouldn't have listed

4  those.  And they usually don't invite

5  someone like me to just come in and give

6  a presentation.  I have done, in

7  40 years, maybe three or four of those.

8  But that's not a usual thing that

9  happens.

10      Q.    Have you ever given a

11  presentation on behalf of a

12  pharmaceutical company?

13      A.    Yes.  And that gets back to

14  the speaker bureau question that we had

15  earlier this morning.

16      Q.    And they pay you for those

17  presentations?

18      A.    Correct.  And these

19  professionals societies, when they invite

20  you, they pay you as well.

21      Q.    But, again, some of the

22  presentations that you've given, you were

23  hired by a pharmaceutical company, but

24  you weren't presenting to the

Confidential Information - Subject to Protective Order

1  pharmaceutical company, correct?

2       A.    Correct.  I was presenting

3  to other healthcare professionals.

4       Q.    Do you disclose to them when

5  you are presenting, that you're hired to

6  present to them by the pharmaceutical

7  company?

8       A.    Yes.  That's required.

9       Q.    And then under the

10 scientific presentations that you were

11 also talking about, do any of them relate

12 to the carcinogenicity of a substance?

13      A.    No.  I don't believe so.

14 They're all related again to the complete

15 profile and safety and efficacy and the

16 therapeutic application of any

17 cardiovascular drug that I had an

18 interest in.

19           MR. VAUGHN:  Tyler, can we

20      go to PDF Page 10.

21 BY MR. VAUGHN:

22      Q.    You list numerous awards

23 spanning several decades.  Do any of the

24 awards have anything to do with cancer

Confidential Information - Subject to Protective Order

1    research?

2         A.    No.  I don't do cancer

3    research.

4         Q.    Why don't you do cancer

5    research?

6         A.    My focus is on

7    pharmacokinetics, pharmacodynamics, drug

8    metabolism, drug interactions with

9    cardiovascular drugs.  And if cancer was

10   part of that, then that's part of that.

11   But --

12        Q.    So in general, would you be

13   relying in your professional field on

14   someone who has a focus in cancer

15   research?

16             MS. THOMPSON:  Objection.

17        Form.

18             THE WITNESS:  Would I be

19        relying on -- I'm sorry.  I'm not

20        sure I understand the question.

21   BY MR. VAUGHN:

22        Q.    I guess -- so you said that

23   you don't really research carcinogenicity

24   of substances.

Confidential Information - Subject to Protective Order

1           If you needed to know the

2    carcinogenicity of a substance in your

3    daily practice, where would you get that

4    information, would you defer -- would you

5    get it from an expert in the field?

6                     MS. THOMPSON:  Objection.

7           Form.  Mischaracterizes.

8                     THE WITNESS:  Yeah, I'm not

9           sure under what circumstances that

10          might be.  But yeah, I could --

11          oncology people were part of the

12          academic medical centers where I

13          was.  So I could always have

14          access to them.

15   BY MR. VAUGHN:

16          Q.   All right.  You would agree

17   that the oncologists at the places that

18   you've worked at would be more qualified

19   to give an opinion on the carcinogenicity

20   of a substance than you?

21                     MS. THOMPSON:  Objection.

22          Form.

23                     THE WITNESS:  Not if it came

24          to the area of drug metabolism and

Confidential Information - Subject to Protective Order

1          pharmacokinetics.

2                    They would refer to me.

3     BY MR. VAUGHN:

4          Q.     What about dose-response?

5          A.     Pretty much the same thing

6     in the context of how a drug is

7     metabolized.

8          Q.     Would you consult with them?

9                    MS. THOMPSON:  Objection.

10          Form.

11                    THE WITNESS:  If necessary.

12                    MR. VAUGHN:  All right.  Can

13          we go to PDF Page 12 now, Tyler.

14     BY MR. VAUGHN:

15          Q.     Again, you have lots of

16     committees that you've been on in your

17     career.

18                    Do any of them, of these

19     committees, have a focus on cancer?

20          A.     Again, I'm not trying to

21     recall every single committee that I've

22     been on, but I have been on, and chaired

23     institutional review boards where

24     cancer-related studies were part of the

Confidential Information - Subject to Protective Order

1    submission.  So I have interacted in

2    that -- in that regard.

3           Q.    Do you recall any of those

4    cancer related studies that you just

5    referenced?

6           A.    Not off the top of my head,

7    no.

8           Q.    A long time ago?

9           A.    I mean, in the range of 10

10   to 20 years ago, yes.

11          Q.    Has the field of

12   pharmacology evolved in the last ten

13   years?

14              MS. THOMPSON:  Objection.

15         Form.

16              THE WITNESS:  Quite a bit.

17   BY MR. VAUGHN:

18          Q.    What about cancer or our

19   knowledge on carcinogens?

20          A.    It looks like it has, based

21   on some of the documents that I reviewed

22   for this.

23              MR. VAUGHN:  And, Tyler, can

24         we go to PDF Page 14, please.

Confidential Information - Subject to Protective Order

1    BY MR. VAUGHN:

2         Q.    It looks like you have been

3    37 grants or contracts.  What is a grant

4    or a contract?

5         A.    A grant is typically

6    something you submit to a funding agency.

7    And they review and approve for funding.

8              A contract is more a

9    negotiation with a funding agency,

10   specifically for something that you want

11   to do.  And you're not necessarily in

12   competition for other people like you

13   would be for a grant.

14        Q.    Are you doing animal studies

15   here or just all different types of

16   studies?

17        A.    Majority is human

18   pharmacokinetics, pharmacodynamics, and

19   drug interactions.

20              I have done animal studies.

21   I'm not sure I got funded for any of

22   those.  But I have worked in a fair

23   number of animal studies.

24        Q.    What experience do you have

Confidential Information - Subject to Protective Order

1    with animal studies?

2           A.    My earliest one is at the

3    University of Kentucky as a resident.

4    One of my projects was looking at drug

5    distribution based on obesity using a rat

6    model.  These are called Zucker rats.

7                 I was mostly just helping

8    out in the lab and looking at the

9    techniques.  So I never became an author

10   on the paper.  But I have done that in

11   animals.

12                I've also done a dog study

13   looking at isolated cardiac myocytes in

14   the lab.  And I've done some did

15   defibrillation threshold studies in pigs,

16   which I do have publications on.

17          Q.    Have you ever done any

18   carcinogenicity studies in animals?

19          A.    No.

20          Q.    In your opinion, what animal

21   or animals are most similar to a human in

22   how they are going to respond to a drug?

23          A.    It depends.  And -- you

24   know, when you're looking at a specific

Confidential Information - Subject to Protective Order

1    drug metabolism, then what it appears --

2    and this popped up in many of the studies

3    that I looked at for my report -- that

4    the rat is actually the animal that seems

5    the most similar to humans for drug

6    metabolism based on a standardized weight

7    of the liver in the rat, versus the liver

8    of a human, and not quite so much so in

9    the other animal models of drug

10   metabolism.

11        Q.    So are you telling our jury

12   that humans are more similar to rats than

13   they are to monkeys?

14            MS. THOMPSON:  Objection to

15        form.

16            THE WITNESS:  In terms of

17        opposing thumbs, I think we're

18        closer to monkeys.  But in terms

19        of drug metabolism, sometimes

20        we're closer to rats.

21   BY MR. VAUGHN:

22        Q.    What about our DNA?  What

23   percentage of our DNA do we share with

24   monkeys?  Do you know?

Confidential Information - Subject to Protective Order

1          MS. THOMPSON:  Objection.

2     Scope.

3          THE WITNESS:  I think it's

4     probably in the 90 percent.

5     Something like that.

6  BY MR. VAUGHN:

7     Q.    What percent of DNA do we

8  share with rats?

9     A.    It's probably in the

10 88 percent.  So it's not as far off as

11 you would think.

12    Q.    But we're more similar, DNA,

13 at least wise, to a monkey than a rat,

14 correct?

15         MS. THOMPSON:  Objection.

16    Form.

17         MR. VAUGHN:  I appreciate if

18    you quit laughing, Counsel.

19         MS. THOMPSON:  Sorry.  This

20    is a really funny line of

21    questioning.

22         THE WITNESS:  Again, I think

23    it depends on what you are talking

24    about.  And for this litigation,

Confidential Information Subject to Protective Order

1        for the question that I was asked

2        to address, it just turns out that

3        drug metabolism of NDMA is more

4        closely related in the rat than it

5        would be in any of the other

6        species.

7             And that's not getting into

8        the oncology part of it.  It's

9        just getting into the drug

10       metabolism part.  And that's the

11       part where I focus.

12   BY MR. VAUGHN:

13       Q.    Are there any oral human

14   studies of NDMA exposure?

15       A.    Other than the epidemiology

16   ones that we've mentioned already?

17       Q.    Mm-hmm.

18       A.    I do believe there was a

19   ranitidine study that looked at urinary

20   NDMA.  I didn't focus on it for this

21   particular question that I was asked to

22   address.  But I think there is at least

23   one that I can vaguely recall seeing.

24       Q.    And did it look into the

1    metabolism of NDMA in the human body?

2         A.    Not that I recall.  But

3    again I didn't -- it's been a while since

4    I saw that one.  So I haven't considered

5    it recently.

6         Q.    What are you basing your

7    opinion on that humans metabolize NDMA

8    the same -- most similarly to rats of any

9    animal?

10        A.    Numerous mentions of that in

11   the articles that I considered for this.

12   And I'm trying to recall.  I probably

13   have in my note when it happened.  If we

14   want to take the time to do that, I can

15   recall one specifically.

16             But my recollection is I saw

17   that as many as four or five times

18   mentioned.

19        Q.    Did you look to see how they

20   came to their opinion on that?

21        A.    Again, in the absence of

22   pharmacokinetic studies in humans, it was

23   more based on either rat 2E1, which is

24   the major metabolizing enzyme in question

Confidential Information - Subject to Protective Order

1    here for NDMA, and NDEA for that matter.

2    That was one area that was discussed.

3              And then another area was

4    the volume that you can isolate of P450

5    per gram of liver in the rat is similar

6    if not close to identical to what you see

7    with that same calculation in the human.

8         Q.    Is P450 an important --

9    strike that question.

10             What organs in the human

11   body have P450?

12        A.    Many.  But in almost every

13   study that I've ever seen, the majority,

14   by an overwhelming majority is the liver.

15   You do have, depending on the enzyme,

16   some in the gut wall, like the upper

17   small intestine, the kidney, the lungs.

18             There are a variety of other

19   organs that have been identified to have

20   it.  But on a rank order, it's liver far

21   and away number one, gut wall number two.

22        Q.    And so would you agree with

23   me that an organ or tissue must contain

24   P450 in order for NDMA to be able to

Confidential Information - Subject to Protective Order

1    incite cancer in that organ?

2          A.    Yes.   And that's been

3    written about in numerous of the studies

4    that I reviewed.

5          Q.    And so you would also agree

6    that organs with P450, if exposed to

7    NDMA, could be susceptible to cancer

8    formation?

9          A.    Depending on the dose.   And

10   then depending on the amount of P450 in

11   that organ, because they don't all have

12   the same amount.

13              So if you give the same dose

14   to two different organs and have one

15   organ that has ten times the P450 of the

16   other, and then it would produce a

17   different amount of carcinogen at that

18   point.

19              So it is relying on both the

20   dose, the amount of P450, and technically

21   in the way in which the drug is

22   administered as well.

23         Q.    But you're unable to tell me

24   how much of a dose of NDMA is needed in a

Confidential Information - Subject to Protective Order

1    human, right?

2                   MS. THOMPSON:   Object to

3          form.

4                   THE WITNESS:   No one has

5          that data.

6                   Sorry.

7    BY MR. VAUGHN:

8          Q.    These grants and contracts

9    that you received, are any of them from

10   pharmaceutical manufacturers?

11         A.    Some of them are.   Yes.

12         Q.    What's the most recent grant

13   or contract that you received, do you

14   recall, or do you know?

15         A.    I can tell you looking here.

16                2013, which is around the

17   time that I started switching my

18   responsibilities from primarily a

19   researcher clinician, educator, faculty

20   member to picking up more administrative

21   responsibilities.

22         Q.    You are no longer conducting

23   research, correct?

24                MS. THOMPSON:   Objection.

Confidential Information - Subject to Protective Order

1    Form.

2             THE WITNESS:  Not in the way

3        in which would be reflected in

4        terms of doing, you know, a grant

5        submission or something like that.

6             But again, you know,

7        researching drugs, their

8        pharmacology, that's almost a

9        daily thing for me for 40 years.

10            MR. VAUGHN:  And, Tyler, if

11       we can go to PDF Page 15.

12   BY MR. VAUGHN:

13       Q.    So your publications start

14   there.  And it looks like you have about

15   50 publications listed.  Do any of your

16   publications focus on cancer?

17       A.    No, none of my publications

18   focused on cancer.  But you can see that

19   they are heavily involved in drug

20   metabolism, drug pharmacokinetics, drug

21   pharmacodynamics.

22            MR. VAUGHN:  And, Tyler, can

23       you go to 19.

24

Confidential Information - Subject to Protective Order

BY MR. VAUGHN:

Q.    At the bottom you list original research.  What do you mean by original research?

A.    I try to break down publications by either books or book chapters that I've authored compared to review articles, you know, which are sort of an overview of a particular drug or drug topic.

But then original research are the actual studies that I conducted, most of the time in collaboration with others, and then have those published.

Q.    And of your original research, any of it relate to cancer?

A.    No.  Again, it's all on pretty much a drug pharmacokinetics, drug metabolism, drug interactions, and pharmacodynamics.

Q.    All right.  So, Doctor, I don't see anywhere within your CV anything on cancer.

Can you explain to our jury

1    why you believe that you are qualified to

2    provide an opinion as to the potency of a

3    carcinogen?

4                    MS. THOMPSON:  Objection.

5            Form.

6                    THE WITNESS:  Again, I don't

7            think that I'm claiming anything

8            involving potency in the way in

9            which I think of that term from a

10           pharmacodynamic standpoint.

11                   But again, the question that

12           I was asked to review was how was

13           NDMA and NDEA metabolized and

14           where would they go and what would

15           happened to them at these doses.

16                   And, you know, without

17           sounding flippant, metabolism of

18           compounds evolved long before we

19           put drugs in capsules and tablets.

20                   So whether the chemical is

21           NDMA and is going through

22           cytochrome P450, whether it's a

23           cardiovascular drug or

24           noncardiovascular drug, it's going

Confidential Information - Subject to Protective Order

1    through cytochrome P450.

2         Those principles are

3    identical, and in fact were

4    originally for ingested compounds,

5    long before we made capsules and

6    tablets.

7         So P450 has been around for

8    way longer than valsartan for

9    instance.

10   BY MR. VAUGHN:

11        Q.   What is your definition of

12   potency?

13        A.   Potency would typically be a

14   dose-response curve where you give

15   multiple doses and then characterize the

16   dose-response curve of two different

17   substances.  And if there is a shift to

18   the left or to the right, then one of

19   those would be considered more potent

20   than the other.

21             That's how potency is

22   defined in drug pharmacology.

23        Q.   As a pharmacist, do you

24   think you are more qualified than a

Confidential Information Subject to Protective Order

1    cancer research specialist to opine on

2    the potency of a carcinogen?

3            MS. KAPKE:  Object to form.

4            MS. THOMPSON:  Objection.

5        Form.

6            THE WITNESS:  As a

7        pharmacist, what I'm probably more

8        qualified than anyone that I've

9        read depositions or expert reports

10       on, is to comment on drug

11       metabolism and drug distribution,

12       and a dose-response relationship

13       to that pharmacokinetic

14       distribution.

15   BY MR. VAUGHN:

16       Q.   When that substance is a

17   potential carcinogen, you still think

18   that you're more qualified than a cancer

19   research specialist?

20           MS. THOMPSON:  Objection.

21       Form.

22           THE WITNESS:  In the context

23       of what I focused on about drug

24       metabolism, absolutely.

Confidential Information - Subject to Protective Order

1    BY MR. VAUGHN:

2         Q.    Did you do research to see

3    if, you know, any of the properties of

4    NDMA would change the way it's

5    metabolized in comparison to a

6    pharmaceutical drug?

7              MS. THOMPSON:  Objection.

8         Form.

9              THE WITNESS:  Yes, I did

10        actually.

11             And again, many of my

12        research and publications has

13        centered on not just drug

14        metabolism, but routes of drug

15        metabolism as a way of predicting

16        drug interactions.

17             And the number one cause of

18        a drug interaction is having two

19        co-administered compounds that

20        compete for the same metabolic

21        pathway.

22             And so one of my areas of

23        review was to describe how

24        valsartan is distributed and

1          metabolized, eliminated.  And the

2          same for NDMA and NDEA.  And I

3          think clearly demonstrated in my

4          report, that there's no overlap at

5          all, so there would be no

6          expectation of any -- having any

7          effect on each other because of

8          not sharing routes of elimination.

9     BY MR. VAUGHN:

10         Q.    When you were determining

11    the levels that were -- of NDMA that were

12    given to animals, and you were trying to

13    opine what level would be needed for a

14    human to be equivalent, did you base that

15    in part off of the weight of the human?

16              MS. THOMPSON:  Objection.

17         Form.

18              THE WITNESS:  I mean, we can

19         look at that section in my report.

20         But the way in which I tried to

21         do, with all its limitations, the

22         extrapolation of the animal data,

23         particularly rats, because I think

24         they are the closest approximation

Confidential Information - Subject to Protective Order

1       to humans, into human dose

2       equivalence, then that was done on

3       a milligram-per-kilogram basis.

4               So yes, it incorporated the

5       weight differential between the

6       two species, if you will, humans

7       and animals.

8   BY MR. VAUGHN:

9       Q.    As a pharmacist and, you

10  know, the medications that you deal with,

11  is that how you convert every medication?

12  You do it the same way?

13      A.    Convert from what to what?

14              MS. KAPKE:  Object to form.

15  BY MR. VAUGHN:

16      Q.    From an animal to a human?

17      A.    Sometimes.  I think it

18  depends on what's been done.  And

19  sometimes they use body surface area.

20  But the usual way it's done is on a

21  milligram-per-kilogram basis.

22      Q.    Usual way, but not always,

23  right?

24      A.    Usual way but not always.

Confidential Information - Subject to Protective Order

1          Q.    Is there any -- is there any

2    medication you're aware of or substance

3    where scaling for weight is

4    inappropriate?

5                MS. THOMPSON:  Objection.

6          Form.

7                THE WITNESS:  Off the top of

8          my head, I can't say.  I suspect

9          that it could be there.  But I

10         can't say.  I don't know off the

11         top of my head.

12   BY MR. VAUGHN:

13         Q.    What factors would make it

14   inappropriate to scale based on weight?

15               MS. THOMPSON:  Objection.

16         Form.

17               THE WITNESS:  Well, not

18         having seen that done very much, I

19         don't have -- I don't have an

20         opinion on what that would be.

21   BY MR. VAUGHN:

22         Q.    And so you didn't consider

23   what factors might make scaling for

24   weight when converting NDMA from an

Confidential Information - Subject to Protective Order

1  animal to a human, you didn't consider

2  what factors might make that

3  inappropriate?

4      A.    If I had ever seen in the

5  articles that I did review any allusion

6  to that, then I would have considered it.

7  But I didn't see it anywhere.

8      Q.    You didn't see it anywhere.

9  But you would have considered though if

10  you did see it?

11      A.    I would have always

12  considered it if I saw it.

13      Q.    And would it have been in

14  your report then if you saw that?

15      A.    Yes.

16          MR. VAUGHN:  Counsel, right

17      now is another really good time

18      for a break.  I know we're about

19      an hour.

20          (Whereupon a discussion was

21      held off the record.)

22          THE VIDEOGRAPHER:  The time

23      right now is 11:11 a.m.  We are

24      off the record.

Confidential Information - Subject to Protective Order

1              (Short break.)

2              THE VIDEOGRAPHER:  The time

3         right now is 11:26 a.m.  We're

4         back on the record.

5              MR. VAUGHN:  All right.

6         Tyler, can you pull the expert

7         report back up for us.  And let's

8         go to Page 63 again.

9    BY MR. VAUGHN:

10            Q.    Doctor, can you read that

11   opinion of yours at the bottom, VIII?

12            A.    Yes.

13            "It is my opinion that no

14   scientific professional could credibly

15   claim to a reasonable degree of

16   scientific certainty that plaintiffs'

17   cancer was caused by their treatment with

18   any valsartan product contain trace

19   levels of NDMA and NDEA impurities during

20   the time period in question."

21            Q.    Doctor, what do you consider

22   trace levels?

23            A.    The amounts that I consider

24   to be trace in these valsartan products.

Confidential Information - Subject to Protective Order

1    Q.    And that was 20 micrograms

2  or less, correct?

3    A.    Correct.

4    Q.    And you say any valsartan

5  product.  How could you give that opinion

6  when you haven't even reviewed all of the

7  testing data?

8         MS. THOMPSON:  Objection.

9    Form.

10         THE WITNESS:  Any valsartan

11    product that I evaluated.

12  BY MR. VAUGHN:

13    Q.    Okay.  So again, just less

14  than the 20 micrograms is what your

15  opinion is limited to?

16         MS. THOMPSON:  Objection.

17    Form.

18         THE WITNESS:  Not really.

19  BY MR. VAUGHN:

20    Q.    So would it be more accurate

21  to say that any valsartan product that

22  the FDA reviewed?

23         MS. THOMPSON:  Objection.

24    Form.

Confidential Information - Subject to Protective Order

1                THE WITNESS:  No.  What I

2         used to draw that conclusion in my

3         report were the levels of exposure

4         to NDMA and NDEA in the animal

5         studies that provided

6         dose-response relationships that

7         appeared to confine, number one,

8         doses of NDMA that would not leave

9         the liver due to first-pass

10         metabolism, and that also did not

11         appear to cause cancer in

12         predominately rats because they're

13         the best model for this.

14   BY MR. VAUGHN:

15         Q.    You're aware -- if you were

16   aware that the NDMA or NDEA levels in

17   generic valsartan were higher than what

18   the FDA was aware of, is that something

19   that you would have considered in forming

20   your opinions?

21                MS. THOMPSON:  Objection.

22         Form.

23                THE WITNESS:  If we go back

24         to the ZHP, for instance, comment

Confidential Information - Subject to Protective Order

1          that was earlier in my report of

2          120 parts per million.

3    BY MR. VAUGHN:

4          Q.    Mm-hmm.

5          A.    That would correspond to

6    only about twice as much as what the

7    highest amount was in any of the products

8    that I evaluated.

9               And if you look at my tables

10   on 35, 36, 37, 38, 39, we're still

11   talking about hundreds to thousands times

12   more that was shown to be safe in animals

13   than the amount even in that 120 parts

14   per billion -- or million that we talked

15   about.

16         Q.    What if the levels were go

17   even higher than 120 parts per million?

18         A.    I don't have that

19   information, so I don't know what that

20   would look like or how much that would

21   be.  It's not enough information for me

22   to make an opinion on.

23         Q.    Defense counsel would have

24   needed to provide that information to you

Confidential Information - Subject to Protective Order

1    for you to provide an opinion on it,

2    right?

3                    MS. THOMPSON:  Objection.

4           Form.

5                    THE WITNESS:  Or the FDA or

6           anybody else.

7    BY MR. VAUGHN:

8           Q.    So in this opinion, when you

9    say no scientific professional could

10   credibly claim, what do you mean by that?

11                   Is that more than just

12   disagreeing with the other side.  Are you

13   drawing into question their integrity in

14   making their opinions?

15                   MS. THOMPSON:  Objection.

16          Form.

17                   THE WITNESS:  No, I didn't

18          draw this conclusion based on

19          their opinions.

20                   I drew that conclusion based

21          on my research into NDMA

22          metabolism and the dose-response

23          relationship that this seemed to

24          be far below that was associated

Confidential Information - Subject to Protective Order

1        with any cancer in the hundreds to

2        thousands times lower.

3    BY MR. VAUGHN:

4        Q.    Would you consider some of

5    the plaintiffs' experts to be scientific

6    professionals?

7        A.    Within their field, yes.

8        Q.    And did any of them make the

9    claim to a reasonable degree of

10   scientific certainty that a plaintiff's

11   cancer could have been caused by their

12   treatment with valsartan containing NDMA

13   or NDEA?

14       A.    I believe they made those

15   claims.  I'm not sure they had access to

16   the data that I've provided and whether

17   that would have changed their opinions or

18   not.

19       Q.    And do you think that you

20   reviewed all of the data that they

21   reviewed?

22       A.    Much of the same.

23       Q.    And so this -- this opinion

24   is not directed to any specific

Confidential Information - Subject to Protective Order

1  plaintiffs' expert?

2       A.    No, it is not.

3       Q.    And it's not directed at any

4  of them, correct?

5       A.    Correct.

6       Q.    Did you review

7  Dr. Panigrahy's CV?  You said that you

8  did, correct?

9       A.    I probably scanned it to

10  see, you know, what his background and

11  training was and what his interests were

12  and what his current position was.

13       Q.    Can you tell our jury what

14  you recall about Dr. Panigrahy's

15  credentials?

16       A.    The details of that, I don't

17  have off the top of my head.  I'd have to

18  look at my materials.

19       Q.    So you don't recall that

20  Dr. Panigrahy was a medical -- is -- was

21  a medical doctor and completed a surgical

22  residency?

23       A.    If I looked at it I would

24  recall that.

Confidential Information - Subject to Protective Order

1      Q.    Do you recall if

2  Dr. Panigrahy has taught both surgery and

3  pathology at Harvard?

4      A.    If that's what he did, I

5  would have recalled it if I saw it.

6      Q.    All right.  Do you recall

7  that Dr. Panigrahy has devoted almost his

8  entire career to studying cancer?

9      A.    That rings a bell, yes.

10      Q.    Do you recall that

11  Dr. Panigrahy has been an editor on

12  journals such as Carcinogenesis,

13  Neoplasia, Cancer Research, Clinical

14  Cancer Research and Nature Reviews

15  Cancer?

16      A.    Not those details, I don't

17  recall.

18      Q.    All the journals that I just

19  listed, they all deal with cancer,

20  correct?

21      A.    I don't remember each one of

22  them.  But I heard cancer a few times.

23  So I'm guessing that's the case.

24      Q.    Does Carcinogenesis, does

Confidential Information - Subject to Protective Order

1    that relate to cancer?

2           A.    Yes.

3           Q.    What about Neoplasia?

4           A.    Yes.

5           Q.    Cancer Research?

6           A.    Yes.

7           Q.    Clinical Cancer Research?

8           A.    Yes.

9           Q.    And Nature Reviews Cancer?

10          A.    Yes.

11          Q.    And previously you testified

12   that being an editor on a journal

13   signifies that you were a higher level or

14   respected individual in that field,

15   correct?

16          A.    I think I --

17                MS. THOMPSON:   Objection to

18          form.

19                THE WITNESS:   Sorry.

20                I think I used the word

21          "recognized."

22   BY MR. VAUGHN:

23          Q.    Okay.  So would you agree

24   with me that Dr. Panigrahy -- or

Confidential Information - Subject to Protective Order

1    Panigrahy is a recognized leader in the

2    field of cancer?

3              MS. THOMPSON:   Objection.

4         Form.

5              THE WITNESS:   He seems to

6         be.

7    BY MR. VAUGHN:

8         Q.    Are you familiar with the

9    NIH?

10        A.    Yes.

11        Q.    Can you tell our jury what

12   the NIH is?

13        A.    It's a research arm of the

14   federal government that conducts some of

15   its own research and then funds external

16   researchers who apply for grants.

17        Q.    Have you ever received

18   funding from the National Institute of

19   Health?

20        A.    I applied twice and did

21   not -- I got approved, but my priority

22   score wasn't high enough to receive the

23   dollars.

24        Q.    So they just don't hand that

Confidential Information - Subject to Protective Order

1    out to anybody, those grants, do they?

2         A.    No.

3         Q.    Are you aware -- are you

4    familiar with National Cancer Institute?

5         A.    That's one of the branches

6    of the National Institutes of Health.

7         Q.    That was going to be my next

8    question.  Thank you.

9              And have ever received -- I

10   guess you have not received funding from

11   the National Cancer Institute either,

12   because that's part of the National

13   Institute of Health?

14        A.    That's correct.  I have

15   received no NIH funding of any of their

16   branches.

17        Q.    Do you recall that

18   Dr. Panigrahy has received funding both

19   from the National Institute of Health and

20   the National Cancer Institute to study

21   cancer in -- on numerous occasions?

22             MS. THOMPSON:  Object to

23        form.

24             THE WITNESS:  I don't

Confidential Information - Subject to Protective Order

1           recall -- sorry.

2                I don't recall those

3           details, but if they are in his

4           CV, I'm sure he did.

5    BY MR. VAUGHN:

6           Q.    So you don't recall that the

7    first time that he received funding was

8    back in 1998 for advanced training in

9    surgical oncology with a focus in

10   laboratory research?

11               MS. THOMPSON:  Objection.

12          Form.

13               THE WITNESS:  I do not

14          recall that specifically.

15   BY MR. VAUGHN:

16          Q.    And do you recall if the

17   National Institutes of Health and the

18   National Cancer Institute is still

19   funding Dr. Panigrahy to research cancer

20   to this very day?

21               MS. THOMPSON:  Objection.

22          Form.

23               THE WITNESS:  I do not

24          recall that detail.

Confidential Information - Subject to Protective Order

1    BY MR. VAUGHN:

2         Q.    Do you think the National

3    Institute of Health and the National

4    Cancer Institute would still be funding

5    Dr. Panigrahy's cancer research if they

6    questioned his credibility?

7              MS. THOMPSON:  Objection.

8         Form.

9              THE WITNESS:  They probably

10        would not fund someone whose

11        credibility that they questioned

12        based on the research that they

13        submitted for review.

14   BY MR. VAUGHN:

15        Q.    Are you aware that

16   Dr. Panigrahy, one of the top cancer

17   researchers in the world, spent around

18   1,400 hours researching and drafting his

19   opinions in this case?

20             MS. THOMPSON:  Objection.

21        Form.

22             THE WITNESS:  I don't have

23        access to that information.  So I

24        could not have been aware of that.

Confidential Information - Subject to Protective Order

1    BY MR. VAUGHN:

2         Q.    And you spent approximately

3    100 to 120 hours, right?

4              MS. THOMPSON:  Objection.

5         Form.

6              THE WITNESS:  So far, yes.

7    BY MR. VAUGHN:

8         Q.    Would that be about

9    10 percent of the time that Dr. Panigrahy

10   spent?

11             MS. THOMPSON:  Objection.

12        Form.

13             THE WITNESS:  That's how

14        that would be calculated, yes.

15   BY MR. VAUGHN:

16        Q.    Doctor, are you familiar

17   with the term bioavailability?

18        A.    Yes.

19        Q.    Can you explain to the jury

20   what bioavailability means?

21        A.    Bioavailability is the

22   assessment of what percent of a drug

23   that's taken actually reaches what we

24   would call the systemic circulation,

Confidential Information - Subject to Protective Order

1   which means you can measure it in the

2   bloodstream.

3          Q.     When the substance is taken

4   orally, what primarily impacts the

5   substance's bioavailability?

6          A.     Well, it's a multi-step

7   process.  And so the first step in that

8   is the actual release of the compound

9   from, let's say the pill or tablet that

10  was taken.  And there are a lot of

11  examples of pills that don't completely

12  release constituents.

13               But once they are, they are

14  typically absorbed in the small

15  intestine.  And there is a round,

16  potentially, depending on the product, of

17  drug metabolism that occurs across the

18  small intestine.

19               And once absorbed there, it

20  goes directly into the liver where it

21  sees another round of potential

22  metabolism.  And only after exceeding

23  those steps, would it then show up in the

24  bloodstream to measure its

1  bioavailability.

2          Then that would be expressed

3  as a percentage of the dose of that

4  particular drug or chemical that you

5  gave.

6      Q.   Give me one -- I'm reading

7  the realtime.  My internet cut out a

8  little bit, so I missed part of your

9  answer.  So just give me one second.

10         You said that a lot of drugs

11 don't release their constituents.  Can

12 you explain that further to me?

13     A.   Yeah.  It just depends on

14 the drug.  It's been noted with a lot of

15 sustained-release drugs, for instance,

16 that they release the drug so slowly that

17 sometimes the product gets past the site

18 of absorption before all the drug in it

19 gets released.  And, therefore, you don't

20 get as good as bioavailability as you

21 might expect you would get.

22     Q.   Valsartan, would all of the

23 NDMA be released or would some of that

24 pass with the valsartan as it's being

Confidential Information - Subject to Protective Order

1    excreted?

2              MS. THOMPSON:  Objection to

3         form.

4              THE WITNESS:  My suspicion

5         is that it would be released from

6         the dosage form, yes.

7    BY MR. VAUGHN:

8         Q.    Your suspicion -- what do

9    you base your suspicion on?

10        A.    Well, that dosage form is

11   the type that usually is pretty much

12   completely dissolved into its individual

13   components before or by the time it

14   reaches the upper part of the small

15   intestine.

16        Q.    So this process that you've

17   been talking about of what impacts the

18   bioavailability of a drug that is orally

19   ingested, is that known as first-pass

20   metabolism?

21        A.    Well, not necessarily.  You

22   can give an injectable into the muscle

23   and measure bioavailability.  And that

24   would not be going through first pass.

Confidential Information - Subject to Protective Order

1                    So first pass is more

2       pertinent to oral administration.

3            Q.    That's what my question was,

4       is with oral administration, it's known

5       as first pass?

6            A.    Yes.

7            Q.    And the organs you said that

8       were primarily involved, which is

9       stomach, small intestine, liver?

10           A.    Not so much the stomach.

11      Small intestine and liver.

12           Q.    Okay.  And you would never

13      expect to see NDMA in the blood of a

14      human, correct, because you believe that

15      the liver should be able to handle all of

16      it?

17           A.    Well, let me -- let me

18      qualify that by saying that at the

19      amounts that were found in the -- of NDMA

20      and NDEA in the valsartan tablets, I

21      would not expect that to reach the

22      systemic circulation at all based upon

23      first-pass metabolism.

24           Q.    If someone were to find it

Confidential Information - Subject to Protective Order

1   in the blood, that means it got past the

2   liver, right?

3          A.    I think that would be, if

4   the dose was high enough, possible.

5          Q.    Well, regardless of the

6   dose, if it was found in the blood, that

7   means it got past the liver, right?

8              MS. THOMPSON:  Objection.

9          Form.

10             THE WITNESS:  Not

11         necessarily.  It could have gotten

12         there from another source.

13  BY MR. VAUGHN:

14         Q.    Such as?

15         A.    There's known endogenous

16  production of NDMA.  So that's possible.

17  It could have been an environmental

18  exposure that led to NDMA that you found.

19         Q.    What about if someone orally

20  ingests NDMA, and after orally ingesting

21  it, the levels of NDMA in their blood go

22  up?

23             MS. THOMPSON:  Objection to

24         form.

Confidential Information - Subject to Protective Order

1           THE WITNESS:  Then that

2      would imply to me that the dose is

3      far exceeding the doses that we

4      are talking about here.

5  BY MR. VAUGHN:

6      Q.    Sorry.  My internet is

7  really bad here.  You said that would

8  imply to you that the dose is far

9  exceeding the doses that we were talking

10  about here.

11           Again, regardless of dose

12  though, you could -- if you saw that,

13  it's getting past the liver, correct?

14      A.    Yeah.  But that wouldn't be

15  regardless of dose.  It would be as a

16  result of the dose.

17      Q.    And if we saw it in the

18  blood, that would mean that dose is

19  sufficient to get past the liver,

20  correct?

21      A.    Correct.

22      Q.    And would you also agree

23  then once it's in the blood, there are

24  many more organs in which the NDMA could

Confidential Information - Subject to Protective Order

1   potentially impact?

2       A.    There are multiple organs

3   that receive blood flow, if that were the

4   scenario, that would receive NDMA.

5       Q.    And those tissues or organs

6   would be at risk for cancer formation,

7   correct?

8       A.    Not necessarily.

9       Q.    Why not?

10       A.    Depends on the amount.  It

11   depends on that organ's ability to remove

12   potential mutagens.  And then it would

13   also depend on that organ's volume of the

14   specific enzyme that's involved in

15   creating the potential mutagen from NDMA.

16   And that specific P450 is called 2E1.

17   I'm sorry.

18       Q.    No, I'm sorry.  I didn't

19   mean to interrupt you.

20       A.    It's all right.

21            And 2E1 has different

22   amounts in different organs.  So there

23   are a lot of factors in play that would

24   have to be considered in that

Confidential Information - Subject to Protective Order

1    hypothetical.

2         Q.    You used the word "mutagen."

3    What is a mutagen?

4         A.    A drug that alters DNA

5    structure.

6         Q.    And is NDMA a mutagen?

7         A.    Yes.

8         Q.    And earlier I believe you

9    testified that human DNA is most similar

10   to a monkey's DNA, correct?

11        A.    It most likely is.  I

12   haven't looked at that information in a

13   long time.

14        Q.    Of all the pharmaceutical

15   medications that you've worked with, how

16   many of them are also mutagens?

17        A.    Gosh.  I couldn't tell you

18   off the top of my head.  Someone would

19   have had to have done a study

20   specifically looking for that.

21             Most of that work is done

22   when a drug is being developed in animal

23   studies before preclinical development,

24   and in most of those cases if there was

Confidential Information - Subject to Protective Order

1    even a suspicion of that, it might not

2    have continued in the drug development

3    process.  So I don't really have a good

4    number for you.

5         Q.    Why would that -- why would

6    that be?  Why, if there was a suspicion

7    that something was a mutagen, the drug

8    process would not continue?

9         A.    Well, there's a variety of

10   reasons that a drug would be killed in

11   the preclinical process.  In mutagenicity

12   studies, teratogenicity studies,

13   inability to get it stable in a dosage

14   form, a dependency on a specific P450

15   pathway that has a bunch of known drug

16   interactions.

17              I mean, the list is almost

18   endless.  And the way that companies do

19   this, is they have maybe as many as 20 or

20   30 similar chemically related drug

21   candidates.  And they do a variety of

22   those kind of studies on all those, and

23   what looks like the best to go forward

24   with are the ones that actually end up

Confidential Information Subject to Protective Order

1    making it in human trials.

2         Q.    And so when a medication is

3    found to be a mutagen, it makes more

4    sense to kill the drug development

5    process than potentially kill a human,

6    right?

7         A.    It depends on what the drug

8    is being developed for.

9         Q.    And in which situation do

10   you think it would be okay to keep going

11   and give it to a human?

12              MS. KAPKE:  Object to form.

13              MS. THOMPSON:  Objection to

14        form.

15              THE WITNESS:  I don't have a

16        lot of details of that part of the

17        drug development process.

18              So it also depends on what

19        disease it is they're trying to

20        treat and whether that's a risk

21        worth taking.

22              Those are -- those are

23        decisions made at the drug company

24        level looking at a variety of

Confidential Information - Subject to Protective Order

1        factors.

2    BY MR. VAUGHN:

3        Q.    Can you name a disease for

4    me that would be worse than cancer?

5            MS. THOMPSON:  Objection.

6        Form.

7            THE WITNESS:  I mean, there

8        are -- I don't know.  There are

9        some that I'm sure somebody can

10       say is worse than cancer.  It

11       depends on what type of cancer

12       we're talking about.  So I don't

13       have a strong opinion on that at

14       all.

15   BY MR. VAUGHN:

16       Q.    What type of cancer do you

17   think is the worst kind of cancer?

18           MS. KAPKE:  Object to form.

19           MS. THOMPSON:  Form.

20           THE WITNESS:  The fatal

21       ones, I guess.  I don't have a --

22   BY MR. VAUGHN:

23       Q.    So can you name one drug

24   that you've worked with that is a

Confidential Information - Subject to Protective Order

1    mutagen?

2            MS. THOMPSON:  Objection.

3        Form.

4            THE WITNESS:  What do you

5        mean by "worked with"?

6    BY MR. VAUGHN:

7        Q.    Studied?

8        A.    Did my own independent

9    research on?  Or as part of my 40 years

10   of evaluating drugs and drug safety and

11   pharmacokinetics and drug metabolism, any

12   drug within that realm that could have

13   turned out to be a mutagen?

14       Q.    Yeah, in any way.  Can you

15   name drugs that you've worked with in

16   some way that are mutagens?

17       A.    Actos, I think, is the one

18   that comes off the top of my head.

19       Q.    What did Actos cause?

20           MS. THOMPSON:  Objection.

21       Form.

22           THE WITNESS:  I believe it

23       was bladder cancer.

24   BY MR. VAUGHN:

Confidential Information - Subject to Protective Order

1        Q.    And was the mechanism there
2   because it was a mutagen?  Is that what
3   was resulting in the bladder cancer?
4        A.    I assume so.  I didn't get
5   into the details of the mechanisms of
6   mutagenicity or carcinogenicity.  The
7   mechanisms of that are not what I do.
8        Q.    Did you consider the
9   mechanisms of mutagenicity when forming
10  your opinions in this case?
11       A.    Yes and no.  I mean mostly
12  what I focused on was metabolism,
13  distribution, and drug dose-response.
14       Q.    Do you know if mutagenicity
15  has any impact on drug dose-response?
16            MS. THOMPSON:  Objection.
17       Form.
18            THE WITNESS:  Well,
19       mutagenicity would be a drug dose
20       response, or could be.
21  BY MR. VAUGHN:
22       Q.    Do you know if mutagenicity
23  has any impact on how you should be
24  scaling from an animal to a human?

Confidential Information - Subject to Protective Order

1         MS. THOMPSON:  Objection.

2    Form.

3         THE WITNESS:  Well again, we

4    have all the limitations of

5    scaling from animals to humans.

6    And for me to form the opinions

7    that I did, I looked at the amount

8    of NDMA, NDEA in valsartan

9    products, the amounts that did not

10   seem to be carcinogenic, in what I

11   considered to be the best animal

12   model which is the rat model.

13        And so my opinions were

14   formed based on that relationship

15   between a drug dose that did not

16   appear to cause either -- at least

17   carcinogenicity, and in some cases

18   mutagenicity, and compared that to

19   the levels of valsartan-containing

20   products.

21        So did I consider

22   mutagenicity as part of my

23   evaluation?  Yes, I did.

24   BY MR. VAUGHN:

Confidential Information - Subject to Protective Order

1    Q.    How --

2    A.    In response to the drug or

3    chemical.

4    Q.    How does mutagenicity impact

5    interspecies scaling, if at all?

6         MS. THOMPSON:  Objection.

7    Form.

8         THE WITNESS:  Well, I don't

9    think -- again, it's not the

10   mutagenicity that impacts the

11   interspecies scaling.

12        Interspecies scaling is

13   always going to be an

14   extrapolation that has its

15   limitations.

16        In every one of articles you

17   read, in at least the last

18   paragraph or two, it always says

19   we're unsure what it means in

20   humans.

21        And so we are unsure about

22   that.  And so it's hard to say how

23   that impacts scaling because it's

24   not -- it's an inherent problem

Confidential Information - Subject to Protective Order

1          with doing the scaling to begin

2          with.

3     BY MR. VAUGHN:

4          Q.    Earlier, when we went

5     through your CV and the literature

6     review, you described to me the

7     methodology in which you found that

8     literature.

9               Did you seek out any

10    literature on if mutagenicity would

11    impact interspecies scaling?

12         A.    I don't even know that

13    that's the question that I was looking

14    at.

15              What I can say is that some

16    of the dose-response studies,

17    particularly in rats by some of the

18    trials, studies in rats that I relied on,

19    they used mutagenicity as the

20    dose-response marker.

21         Q.    Did you review any

22    literature on mutagenicity as it is

23    related to interspecies scaling?

24              MS. THOMPSON:  Objection.

Confidential Information - Subject to Protective Order

1          Form.

2                  THE WITNESS:  Again, I'm not

3          even sure what that question is.

4          So I have a hard time answering

5          it.

6                  So I did say that I

7          considered mutagenicity in making

8          an opinion or forming an opinion

9          about dose-response relationships

10         with rats relative to the amount

11         of NDMA, NDEA that are found in

12         the valsartan products.

13                 So I made those

14         extrapolations, understanding all

15         of the limitations quoted by

16         almost every author in the study

17         that I looked at.

18    BY MR. VAUGHN:

19         Q.   Would you have scaled it the

20    same way regardless of if the substance

21    was a mutagen?

22                 MS. THOMPSON:  Objection.

23         Form.

24    BY MR. VAUGHN:

Confidential Information - Subject to Protective Order

1        Q.    Sorry, would you have scaled

2   from the animal studies with NDMA to

3   humans the same way regardless if the

4   substance was a mutagen?

5              MS. THOMPSON:  Objection.

6        Form.

7              THE WITNESS:  I mean, that's

8         just one of the dose responses

9         that you would -- that you would

10        try and extrapolate.  So I'm not

11        even sure that I really understand

12        the question.

13   BY MR. VAUGHN:

14        Q.    Okay.  If NDMA was not a

15   mutagen, would your methodology have been

16   the exact same?

17        A.    In terms of evaluating the

18   literature for drug distribution and

19   metabolism, yes.

20        Q.    And dose-response and

21   interspecies scaling?

22        A.    And it would have been a

23   different response.

24        Q.    I want to focus on the

Confidential Information - Subject to Protective Order

1    interspecies scaling.

2          A.    Okay.  What do you mean by

3    that?

4          Q.    Okay.  When you take it from

5    an animal -- let's say an animal weighs

6    one kilogram, okay?

7          A.    Mm-hmm.

8          Q.    And only one nanogram, let's

9    say, for that animal can cause cancer,

10   that 1 kg animal.  How would you then --

11   using your methodology, how would you

12   determine how much would be needed to

13   give a human to cause cancer?

14              MS. THOMPSON:  Objection to

15         form.

16              THE WITNESS:  I didn't

17         evaluate it in those terms that

18         you're asking the question.

19   BY MR. VAUGHN:

20         Q.    Explain to me again then how

21   you did your analysis on these animal

22   studies to come to these conclusions that

23   the valsartan contained so much more NDMA

24   than the animal studies?

Confidential Information Subject to Protective Order

```
 1              MS. THOMPSON:  Objection.
 2         Form.
 3              THE WITNESS:  It's actually
 4         the other way around.
 5              The animal study doses, that
 6         were often not related to any
 7         cancer whatsoever, so mutagenicity
 8         doesn't play a role in that
 9         setting, I was able to find doses
10         that did not produce any mutagenic
11         or carcinogenic effect, and those
12         are the values that I used to make
13         my species extrapolation from --
14         from the rats to the humans.
15              So I was using the absence
16         of mutagenicity and
17         carcinogenicity, not the
18         production of it.
19    BY MR. VAUGHN:
20         Q.   Are you saying most of the
21    animal studies regarding NDMA did not
22    cause cancer?
23              MS. THOMPSON:  Objection.
24         Form.
```

Confidential Information - Subject to Protective Order

1          THE WITNESS:  No.  This gets

2     back to my whole premise and focus

3     in this review and report, is the

4     dose.

5          And obviously, and we talked

6     about this earlier this morning,

7     you know, if you give enough NDMA

8     and NDEA to many of the animal

9     species that we talked about, you

10    can induce cancer.  And that's not

11    the question that I was

12    addressing.

13          I was addressing, is there a

14    dose below which it doesn't appear

15    to, and how does that relate to

16    what's in valsartan.

17          MR. VAUGHN:  Tyler, can we

18    go back to his expert report.

19    Let's go to Page 21.

20 BY MR. VAUGHN:

21    Q.    Under valsartan

22 pharmacokinetics, can you read the first

23 two sentences aloud for me?

24          A.    "After oral administration

Confidential Information - Subject to Protective Order

1    in humans, valsartan is absorbed into the

2    body primarily in the small intestine,

3    below the level of the stomach and

4    reaches peak plasma concentrations

5    between two and four hours.

6                   "The amount of a given dose

7    that reaches the systemic circulation,

8    which means beyond the liver, is

9    expressed by the term of absolute

10   bioavailability and this ranges from 10

11   to 35 percent, averaging 25 percent."

12        Q.    Is there any difference

13   between absolute bioavailability and

14   bioavailability, the terms?

15        A.    Yes, in a way.  They're just

16   adding a descriptor of absolute because

17   they have something when they did this

18   study to compare it to.

19                   Let's say you gave a dose

20   of -- I don't know -- any drug and you

21   measured it in blood, then you can claim

22   that it has bioavailability.  But what

23   you really have to do to calculate

24   absolute bioavailability is compare that

Confidential Information - Subject to Protective Order

1   back to the intravenously given dose of

2   the same drug.  And then the number that

3   you're calculating is absolute.

4        Q.    And this absolute

5   bioavailability of valsartan is 10 to

6   35 percent.  That's in humans, right?

7        A.    Correct.

8        Q.    Why is the bioavailability

9   of valsartan 350 percent higher in some

10  humans compared to others?

11              MS. THOMPSON:  Objection.

12        Form.

13              THE WITNESS:  Because of its

14        variability, do you mean?

15  BY MR. VAUGHN:

16        Q.    Well, I mean, this range of

17  ten percent to 35 percent.  35 percent is

18  like 350 times higher than 10 percent,

19  right?

20        A.    Yeah.

21        Q.    Why is there such a wide

22  range on the bioavailability in humans?

23        A.    For many drugs you would

24  find the same thing, so I don't consider

Confidential Information - Subject to Protective Order

1    that to be abnormal at all.  That's just

2    what drug variability is.

3         Q.    That's expected, right,

4    there's going to be variability between

5    humans?

6         A.    Yes.  What we call

7    interindividual variability.  But that

8    will be unique to whatever drug we happen

9    to be talking about.

10        Q.    But typically there's

11   variability among humans, correct,

12   regardless of the substance?

13        A.    There will always be some.

14   In some cases it's more than this, and in

15   some cases it's less than this in terms

16   of the variability.

17        Q.    In terms of percent

18   bioavailability of valsartan, which

19   animal is the most similar to humans?

20             MS. THOMPSON:  Objection.

21        Form.

22             THE WITNESS:  I do not know.

23        Because we have human data, we

24        don't have to worry about it.  And

1              so I don't know which model.  I

2         assume if I were to go back and

3         look at the basic preclinical

4         studies, that probably someone in

5         Novartis or contracted by Novartis

6         did 25 to 30 years ago, that I

7         could probably find that.  But --

8         and so I know it's out there.  I

9         just haven't looked at it.

10   BY MR. VAUGHN:

11         Q.    Do you agree that knowing a

12   medication's bioavailability is critical

13   in determining the dose necessary for a

14   specific outcome?

15              MS. THOMPSON:  Objection to

16         form.

17              THE WITNESS:  Well, the way

18         that question is asked, you know,

19         could go a lot of different

20         answers.

21              You know, if only 5 percent

22         of something is absorbed, but you

23         give a high enough dose to get the

24         effect, then it's the effect you

Confidential Information - Subject to Protective Order

1          care about, and not whether it was

2          5 percent and whether you liked

3          the number 5 percent or not.

4    BY MR. VAUGHN:

5          Q.    This 10 to 35 percent

6    bioavailability in your report, that's

7    specific to valsartan, right?  That

8    doesn't have anything to do with the

9    bioavailability of NDMA or NDEA, correct?

10          A.    Nothing to do with that at

11   all.  They -- they're not attached to

12   each other.  One doesn't carry the other.

13   So they're managed and handled

14   independently.

15          Q.    Can you identify in your

16   report where you specified the

17   bioavailability of NDMA in humans?

18          A.    I think in my report -- if

19   you give me a minute to look at it.  Is

20   that all right?

21          Q.    Absolutely.  Take all the

22   time you need.

23          A.    You're talking about NDMA or

24   NDEA?

Confidential Information - Subject to Protective Order

1    Q.    Yes, sir.

2    A.    Yeah, I don't find where I

3    specifically listed a specific

4    bioavailability number.  And the reason

5    probably for that is that it depends on

6    the dose because, unlike valsartan, this

7    is a highly subjective drug to first-pass

8    metabolism.  And so as the dose goes up,

9    the bioavailability changes.

10           So it's not as fixed a

11    number as the valsartan bioavailability

12    would be.

13    Q.    If there were studies in

14    which they were giving below -- scratch

15    that.

16           If there were studies in

17    which they were giving NDMA below what

18    would saturate the liver, would that

19    allow you to determine its

20    bioavailability?

21    A.    Well, actually what you

22    would determine in that setting by

23    measuring something downstream from the

24    liver, you would measure zero, which

1   would mean it was essentially zero

2   bioavailability because it wouldn't get

3   into the systemic circulation, despite

4   being absorbed.

5        Q.    So it's your opinion the

6   liver must be fully saturated before it

7   can get past the liver?

8        A.    Absolutely.

9        Q.    Is that with every animal?

10       A.    That's with everybody with a

11  liver.

12       Q.    And then -- so once it's

13  saturated, is every amount of the dose

14  going to be going past the liver?

15       A.    Yes.  Depends again on the

16  compound, the drug, and how else it might

17  be metabolized.  But when it leaves the

18  liver, it goes into the venous

19  circulation.

20       Q.    And so can you explain to me

21  again how you determine the

22  bioavailability of a substance?

23       A.    The most pure way, if you

24  will -- excuse me -- is to give an oral

Confidential Information - Subject to Protective Order

1  dose and an IV dose and compare how much

2  you measure in the bloodstream using

3  something called the area under the curve

4  or the AUC.

5       Q.    And did you see any studies

6  like that on any animal?

7       A.    I did.

8       Q.    What animals?

9       A.    Predominately rats.  But a

10 few other species.  I think I saw a

11 monkey study and a pig study and a dog

12 study.  Actually two dog studies, maybe.

13      Q.    And do you recall what the

14 bioavailability of NDMA is in rats?

15      A.    It was less than 10 percent

16 at doses below, say, around .1 milligram

17 per kilogram given orally.  So in the

18 range of 6 to 8 percent.

19      Q.    What about monkey?  Do you

20 recall what the bioavailability of NDMA

21 is in a monkey?

22      A.    I think the study I saw was

23 it was higher.  Maybe as much as 80 or

24 90 percent.

Confidential Information - Subject to Protective Order

1      Q.    80 or 90 percent?

2      A.    That's my recollection.

3      Q.    So you're saying in monkeys,

4  80 to 90 percent of the NDMA you give

5  them is going to get past the liver?

6              MS. THOMPSON:  Objection.

7         Form.

8              THE WITNESS:  In the dose

9         that they gave in that monkey

10        study.  That's going to get

11        back -- gets back to the heart of

12        what my whole premise here is, is

13        that bioavailability for a

14        high-clearance drug like NDMA is

15        based on the dose you give.

16             And I'm fairly certain in

17        the monkey study that it gave at

18        least a milligram per kilogram,

19        which is way above what I'm

20        contending is the liver's capacity

21        to completely metabolize NDMA and

22        spare downstream organs.

23  BY MR. VAUGHN:

24        Q.    What about pigs?  Do you

Confidential Information - Subject to Protective Order

1  recall the bioavailability of NDMA in

2  pigs?

3       A.    Yeah.  I think that study

4  was around -- oh, I'm going to say

5  45 percent, something like that.

6       Q.    And then do you recall the

7  bioavailability of NDMA in dogs?

8       A.    I think it was somewhat

9  similar to the pigs.  Maybe in that 40 to

10  50, 60 percent range.

11       Q.    And so pigs, dogs, monkeys,

12  the bioavailability of NDMA is hundreds

13  of times higher than in rats, correct?

14       A.    When you give a thousand

15  times higher dose, yes.

16       Q.    But it's your opinion that

17  humans are most similar to rats in their

18  bioavailability of NDMA?

19       A.    That is my contention.  And

20  there's literature to support that.

21       Q.    Is there literature that

22  goes against that?

23            MS. THOMPSON:  Objection.

24       Form.

Confidential Information - Subject to Protective Order

1          THE WITNESS:  Again, you
2     have to be very specific about the
3     doses given.
4          And the other animal species
5     that you're talking about, the
6     doses given were a thousand or
7     more times higher than the doses
8     that I'm talking about in the rat
9     studies that have been shown to be
10    completely metabolized in the
11    liver.
12         MR. VAUGHN:  Give me just
13    one second.
14         THE WITNESS:  And I should
15    add, while you're looking,
16    there's -- it's a little more
17    complicated than that.
18         When you look at these kinds
19    of bioavailability studies, not
20    only is the dose important to
21    determine what you're going to
22    call bioavailability, the two
23    other things that are important to
24    look at, one is interspecies

Confidential Information - Subject to Protective Order

1    differences in the amount of the

2    cytochrome P450 enzyme that we're

3    talking about here, which is 2E1.

4        And so for a species to have

5    less than a rat, let's say, then

6    even the same dose would give a

7    higher bioavailability because

8    they have less metabolizing

9    capacity by having less 2E1.  And

10   beagles, swine, and monkey

11   primates are all known to have

12   less 2E1 than rats.

13       So that factors into that

14   higher bioavailability.

15       And then to go even a little

16   bit deeper, and this gets into the

17   understanding of how you calculate

18   or use AUCs to calculate

19   bioavailability, is there's an

20   assumption that you make.  And all

21   of these articles we're referring

22   to identify that assumption.

23       And they clearly identify in

24   their own self-criticism of their

Confidential Information - Subject to Protective Order

1       study, is it makes the assumption

2       that when you give a drug IV, it's

3       metabolized nowhere but in the

4       liver because you're comparing the

5       oral dose that goes straight

6       through the liver with the IV

7       dose.

8            And the more there is

9       extrahepatic metabolism of the

10      drug, the more the overestimate is

11      of the bioavailability.

12           So using those

13      bioavailability numbers in animals

14      that have less 2E1 that made

15      invalid assumptions about the

16      calculations of bioavailability to

17      begin with, and then thirdly give

18      a thousandfold or higher dose than

19      what the liver can handle at

20      smaller doses, then I evaluated

21      those studies, but because I

22      didn't think they were germane to

23      the doses of NDMA that we're

24      talking about here, they didn't

Confidential Information - Subject to Protective Order

1     alter my opinions in my report.

2  BY MR. VAUGHN:

3     Q.    Part of the reasons those

4  doses were not -- or you do not consider

5  similar to the amounts given to humans is

6  because humans weigh more than those

7  animals, correct?

8     A.    No.  You can do it on a

9  milligram per kilogram.

10         The three other species

11 studies we're talking about, beagles,

12 pig, and monkey, some of them gave both 1

13 and 5-milligram-per-kilogram oral doses.

14 And if you do that on a scale of what's

15 in valsartan containing NDMA, we are

16 talking thousands and thousands times

17 higher doses.

18         And I think it might have

19 been the monkey study that only gave one

20 milligram per kilogram.  They didn't do

21 the five as well.

22         So there are a lot -- there

23 are a lot of reasons why those trials did

24 not alter my conclusions, because they

Confidential Information - Subject to Protective Order

1    weren't relevant to the doses that we are

2    talking about, and they weren't as close

3    a species for 2E1 metabolism.

4         Q.    And you're saying humans are

5    more similar to rats than monkeys?

6              MS. THOMPSON:  Objection to

7         form.

8              THE WITNESS:  In 2E1

9         metabolism.

10   BY MR. VAUGHN:

11        Q.    Doctor, we got through that

12   section a little quicker than I had

13   anticipated.

14             MR. VAUGHN:  I think it's a

15        little after noon your guys' time.

16        If you want to take a lunch break

17        now, I think that would be --

18        that's okay with me.

19             MS. THOMPSON:  That's fine

20        with me.

21             THE WITNESS:  Yeah, that's

22        fine.

23             MR. VAUGHN:  How long do you

24        guys want to take?  We can go off

Confidential Information - Subject to Protective Order

1       the record.

2              THE VIDEOGRAPHER:  The time

3       now is 12:16 p.m.  We're off the

4       record.

5              (Whereupon a luncheon recess

6       was taken.)

7              THE VIDEOGRAPHER:  The time

8       right now is 1:07 p.m.  We're back

9       on the record.

10   BY MR. VAUGHN:

11         Q.    Doctor, you testified

12   earlier that NDMA is a probable human

13   carcinogen.  Can you define for the jury

14   the word "probable"?

15         A.    Again, I take that

16   definition from the IARC definition of a

17   known carcinogen in animals, but

18   insufficient data to call it a known

19   carcinogen in humans.

20         Q.    Do you not have a definition

21   for the word "probable"?

22              MS. THOMPSON:  Objection.

23         Form.

24              THE WITNESS:  No, I don't.

Confidential Information - Subject to Protective Order

 1   BY MR. VAUGHN:

 2        Q.    Would you say that probable

 3   is the same as more likely than not or a

 4   higher level of proof?

 5             MS. THOMPSON:  Objection to

 6        form.

 7             THE WITNESS:  Yeah, I don't

 8        have an opinion on that.

 9   BY MR. VAUGHN:

10        Q.    Do you think probable is

11   possibly less than more likely than not?

12             MS. THOMPSON:  Objection to

13        form.

14             THE WITNESS:  I don't have

15        an opinion on that.

16   BY MR. VAUGHN:

17        Q.    Does the bioavailability of

18   valsartan decrease as you decrease the

19   dose of valsartan?

20             MS. THOMPSON:  Objection.

21        Form.

22             THE WITNESS:  Not that I'm

23        aware of.

24             I don't recall seeing

Confidential Information - Subject to Protective Order

1        anything in the -- in the

2        pharmacokinetic valsartan studies

3        that indicated that.  So it's

4        probably of a similar amount

5        across its usual oral dosage

6        range.

7   BY MR. VAUGHN:

8        Q.    Is that typical of most

9   drugs?

10       A.    It depends.  It depends on

11  their clearance and how they're

12  metabolized and what their dose range is.

13       Q.    So why would valsartan --

14  because do you have to saturate it

15  before -- beforehand, the liver, before

16  it can get systemic?

17            MS. THOMPSON:  Objection.

18       Form.

19            THE WITNESS:  Well, unless

20       you're giving a drug orally with

21       the intent of treating the colon,

22       which is like what happens with

23       some drugs for ulcerative colitis

24       and Crohn's disease, then orally

```
1            administered drugs that are

2            supposed to have an effect

3            somewhere other than the colon or

4            the liver, then you have to give

5            it at a dose that will get to

6            those sites of action.

7                 But I wouldn't characterize

8            the metabolism as having been

9            saturated at the doses that we

10           give for valsartan.

11   BY MR. VAUGHN:

12           Q.    If valsartan is not

13   saturated in the liver then why is some

14   of the valsartan getting past the liver?

15                MS. THOMPSON:  Objection.

16           Form.

17                THE WITNESS:  In this case

18           it's a slowly metabolized drug.

19           So it just takes a while to

20           metabolize.  So some drug is going

21           on into the bloodstream while the

22           other part that's still in the

23           liver is waiting to be

24           metabolized.
```

Confidential Information - Subject to Protective Order

1            So, I mean, you could call

2       that a form of saturation if you

3       want.  But it's -- it's not really

4       a form of saturation.  It's a rate

5       of metabolism in this case.

6   BY MR. VAUGHN:

7       Q.    And so I'm clear, the

8   valsartan does not have to saturate the

9   liver to get past the liver, correct?

10           MS. THOMPSON:  Objection.

11       Form.

12           THE WITNESS:  I don't

13       believe I've ever seen that

14       described as being a saturable

15       metabolism step.

16   BY MR. VAUGHN:

17       Q.    Why with NDMA do you believe

18   that it must fully saturate the liver for

19   any amount of NDMA to get past the liver?

20           MS. THOMPSON:  Objection.

21       Form.

22           THE WITNESS:  Because its

23       rate of metabolism is different.

24       It's a faster rate.

Confidential Information - Subject to Protective Order

1    BY MR. VAUGHN:

2         Q.    What's the rate of

3    metabolism of NDMA?

4         A.    I don't know that number off

5    the top of my head.

6         Q.    What's the rate of

7    metabolism for valsartan?

8         A.    I also don't know the number

9    off the top of my hand -- my head.

10              My point is that using the

11   term "saturation" to define what does or

12   does not get into the liver past the

13   bloodstream, it's more complicated than

14   that.  It's based on rate of metabolism

15   and the amount given as well.

16        Q.    How can you have the opinion

17   that NDMA is metabolized faster than

18   valsartan when you do not know the rate

19   of metabolism of either valsartan or

20   NDMA?

21              MS. THOMPSON:  Objection.

22         Form.

23              THE WITNESS:  Just its

24         clearance.  Clearance.

Confidential Information - Subject to Protective Order

1    BY MR. VAUGHN:

2         Q.    Can you explain that a

3    little more?

4         A.    Well, there's two types of

5    clearance.  There's high clearance and

6    low clearance.  And it depends on the

7    kind of drug and which one is going to be

8    more dependent on the intrinsic clearance

9    of the liver versus hepatic blood flow

10   itself.

11              And those ratios are all

12   different for different drugs.

13        Q.    Are you aware of any

14   substances that can inhibit P450?

15        A.    Yes.  I'm aware of many.

16        Q.    Can you list off the ones

17   that you're aware of?

18        A.    Amiodarone, cimetidine,

19   azole antifungals, erythromycin,

20   clarithromycin, many of the HIV drugs.

21   The list goes on and on.

22        Q.    So taking substances that

23   inhibit P450 increase the likelihood that

24   NDMA is going to get past the liver in a

Confidential Information - Subject to Protective Order

1   human?

2           MS. THOMPSON:  Objection.

3       Form.

4           THE WITNESS:  Again, it

5       would depend on what the inhibitor

6       inhibits.

7           Some of these drugs I

8       mentioned only block P450-3A4 and

9       they don't touch 2E1, which is the

10      major P450 we're talking about

11      here.  And in looking at my 2E1

12      metabolism, there are no listed

13      inhibitors for 2E1.

14  BY MR. VAUGHN:

15      Q.    None?

16      A.    None.

17      Q.    What about alcohol?

18      A.    Alcohol.  You asked me about

19  drugs.  And so I didn't list alcohol as a

20  drug.

21      Q.    I apologize.  So alcohol

22  could though?

23      A.    Alcohol has been shown to

24  block 2E1.

Confidential Information - Subject to Protective Order

1    Q.    So it would be a bad idea to

2    be drinking alcohol if you were taking

3    valsartan contaminated with NDMA,

4    correct?

5    A.    Actually, I should --

6         MS. THOMPSON:  Objection to

7    form.

8         THE WITNESS:  Sorry.

9         Let me clarify.  I think

10   it's the alcohol that blocks 2A6

11   and not 2E1.

12   BY MR. VAUGHN:

13   Q.    And what are you basing that

14   on?

15   A.    The data.

16   Q.    Are you aware of any other

17   substances -- doesn't have to be drugs --

18   any other substances that would inhibit

19   2E1?

20   A.    I am not.

21   Q.    What data are you relying on

22   to say that alcohol does not inhibit 2E1?

23   A.    The fact that there isn't

24   any.

Confidential Information - Subject to Protective Order

1    Q.    So you're not aware of any?

2    A.    I'm not aware of any.

3    Q.    So you did not -- sorry.

4    A.    I'm aware though of the

5    alcohol and the 2A6.

6    Q.    If there is literature out

7    there on various substances that can

8    inhibit 2E1, you did not consider those

9    in forming your opinions in this case,

10   correct?

11            MS. THOMPSON:  Objection.

12            THE WITNESS:  I did not see

13       any.

14            Sorry.

15            MS. THOMPSON:  You got to

16       let me object.

17            Objection to form.

18            Go ahead.

19            THE WITNESS:  I did not see

20       any.

21   BY MR. VAUGHN:

22   Q.    And so, therefore, you did

23   not consider it, correct?

24   A.    Correct.

Confidential Information Subject to Protective Order

1    Q.    Doctor, do you disagree with

2    the plaintiffs' experts that there is a

3    linear dose-response with NDMA or NDEA

4    and cancer with no dose threshold,

5    correct?

6             MS. KAPKE:  Object to form.

7             MR. VAUGHN:  Let me re-ask

8         that one.

9    BY MR. VAUGHN:

10    Q.    Doctor, are you aware if

11    sedatives can impact 2E1 or inhibit 2E1?

12             MS. THOMPSON:  Object to

13         form.

14             THE WITNESS:  I don't recall

15         specifically seeing that.  If I

16         did, my recollection was that it

17         was one of the older sedatives

18         that we don't use anymore.  But

19         I -- I don't have that off the top

20         of my head.

21    BY MR. VAUGHN:

22    Q.    So you do think that there

23    are some substances that can inhibit 2E1?

24    A.    Maybe.

Confidential Information Subject to Protective Order

1    Q.    Maybe.   What about

2    phytochemicals?

3    A.    I'm not sure what you're

4    referring to.

5    Q.    Chemical compounds produced

6    by plants.  Are you aware of any

7    compounds that plants could produce that

8    could inhibit 2E1?

9    A.    If there is, I didn't look

10   at that or I didn't consider it.

11   Q.    Okay.  Doctor, plaintiffs'

12   experts have opined that NDMA and cancer

13   have a linear dose-response with no dose

14   threshold.  You disagree with that

15   opinion, correct?

16            MS. KAPKE:  Object to form.

17            THE WITNESS:  I disagree

18         with the latter part of that

19         conclusion about no dose

20         threshold, because that's not

21         consistent with the data that I've

22         included in my report.

23   BY MR. VAUGHN:

24   Q.    Okay.  Have you seen any

1    evidence or literature suggesting that

2    there is a no-dose threshold?

3         A.    Yes.  I refer in my

4    report -- excuse me.  The Ito study.

5         Q.    You said Ito?

6         A.    I-T-O.

7         Q.    Okay.  Ito.  Gotcha.

8         A.    There was a noneffective

9    level of carcinogenesis at .1 milligrams

10   per kilogram by the oral route.

11        Q.    Is that the only thing that

12   you're basing your opinion off of?

13        A.    No.

14        Q.    What else?

15        A.    One of the Peto studies on

16   Page 34.  The apparent increase in liver

17   cancer was only seen in doses above

18   .3 parts per million, equating to

19   15 micrograms per kilogram per day.

20        Q.    So you actually relied on

21   Peto to say there is no dose-response --

22   or there is no -- I'm sorry, there is no

23   dose threshold?

24             MS. THOMPSON:  Objection to

Confidential Information - Subject to Protective Order

1          form.

2                 THE WITNESS:  I'm relying on

3          that particular Peto study.  And

4          this is in -- this is in comparing

5          against his rate of nontreated

6          rats who also developed liver

7          cancer.

8                 So evidence of higher doses,

9          yes, but not at the dose different

10          from what was seen in the

11          background noise of his rat

12          population.

13     BY MR. VAUGHN:

14          Q.    Do you know if Peto believes

15     there is a no-dose threshold?

16          A.    I may --

17                MS. THOMPSON:  Object to the

18          form.  Sorry.

19                THE WITNESS:  Yeah, I may

20          have mentioned it in my report

21          that he uses terms about the

22          likely shapes of dose-response.

23          And that's on Page 36 in my

24          report.

Confidential Information - Subject to Protective Order

1          "In Peto's conclusion is the
2      comment, 'General arguments about
3      the likely shapes of dose-response
4      relationships make it probable,
5      even at lower doses where direct
6      observation is impractical, that
7      this linear relationship may
8      remain approximately true for
9      Colworth rats, if not for
10     humans.'"
11          And so he's not sure at the
12     low doses if there's enough
13     evidence to solidly state that
14     there is a linear relationship.
15  BY MR. VAUGHN:
16     Q.    He's not 100 percent sure,
17  but he thinks it's probable, correct?
18     A.    He think it's possible,
19  probable.  I'm just saying that the
20  people who do those studies are not
21  100 percent convinced at the low doses.
22     Q.    They are not 100 percent.
23  But they think it's probable, correct?
24          MS. THOMPSON:  Objection to

1          form.

2                    THE WITNESS:  That's not the

3          word he used.  He said

4          "approximately true."  So he

5          didn't use the word "probable."

6          That was your word.

7   BY MR. VAUGHN:

8          Q.    Approximately true.  Oh.

9   Would you at least think that's more

10  likely than not?

11         A.    I do not know what he meant

12  by that.

13         Q.    Okay.

14         A.    And what it does mean is

15  that he can draw through the numbers and

16  call it a straight line, but that doesn't

17  mean that it actually describes what

18  happens at low doses like we're talking

19  about because he didn't do enough animals

20  and you don't see enough cancer at those

21  doses to have reliability.

22                    And one of his areas of

23  statistical analysis in that study

24  involved something called his Z value.

1    And I go onto describe on

2    the next page, in his methodology, the Z

3    value, if it's between -- between the

4    numbers two and three, then judgment as

5    to how likely it is that treatment really

6    did cause the disease of interest becomes

7    more difficult.

8    And so he's unclear as well,

9    because in the ones that we are talking

10    about at these doses we're talking about

11    were in that range of uncertainty with

12    that Z value between two and three.

13    Q.    Again, when you say he's not

14    sure, do you mean that, you know, he's --

15    what was the word you used, approximately

16    true?

17    A.    That was his previous

18    statement.

19    Q.    So you rely on Peto to say

20    that there is a threshold, but you

21    disagree with Peto's analysis of his own

22    studies?

23    A.    I do not -- sorry.

24    MS. THOMPSON:  Objection to

Confidential Information - Subject to Protective Order

1          form.

2                    THE WITNESS:  I do not

3          disagree.  That's not what I said.

4                    I said he is unsure at those

5          low doses.  And I am agreeing with

6          him at those low doses about the

7          uncertainty of a linear

8          relationship at doses that low.

9     BY MR. VAUGHN:

10         Q.    Do you agree with him that

11    it's approximately true?

12         A.    I agree that he can draw a

13    line through them and then claim that's

14    approximately true.

15                   And I would just like to add

16    that this is an era at the time where

17    everyone pretty much already believed

18    that it was linear.  And so to me, he was

19    trying to not accept that it might not

20    be.

21                   And I think there are other

22    experts in this field who might argue

23    that we have more modern data that

24    dispute a low range linearity

Confidential Information - Subject to Protective Order

1    relationship.

2         Q.    Approximately what year was

3    Peto's study going on?

4         A.    1991 for this one.  So

5    30 years ago.

6         Q.    If you didn't know what Peto

7    meant by approximately true, wouldn't you

8    want to see what he meant by that

9    wording?

10              MS. THOMPSON:  Objection.

11         Form.

12              THE WITNESS:  I think if he

13         was able to give more detail on

14         what he meant, he would have put

15         it in his paper.  So I'm only

16         going on what he put on his paper.

17    BY MR. VAUGHN:

18         Q.    Have you not reviewed any of

19    Peto's other papers where he says that

20    there's likely no threshold for NDMA?

21         A.    I have read his other

22    papers.

23         Q.    And do you recall him saying

24    that it is likely there is no threshold

Confidential Information - Subject to Protective Order

1  for NDMA?

2            MS. THOMPSON:  Objection.

3       Form.

4            THE WITNESS:  I recall him

5       saying that.  But that's not what

6       this study data shows.

7  BY MR. VAUGHN:

8       Q.    And so are you disagreeing

9  with Peto that it is likely there is no

10 threshold for NDMA?

11           MS. THOMPSON:  Objection.

12      Form.

13           THE WITNESS:  Again, I'm

14      disagreeing that the data show

15      that.  We're talking now about his

16      interpretation of his data at an

17      era where linearity was the

18      accepted, and which we now know is

19      not necessarily the case.

20 BY MR. VAUGHN:

21      Q.    Can you explain to the jury

22 what a linear dose-response means?

23      A.    In this case it means that

24 you can identify with dose increases

Confidential Information - Subject to Protective Order

1  across a broad enough dose range that you

2  see an increase in the effect.  And that

3  effect could be a positive effect or it

4  could be a negative effect.

5            And I think all of the

6  papers in this realm that talk about low

7  doses, that the effect rates are so small

8  that you start losing your reliability of

9  that linear relationship.

10           The Brantom study, which is

11 the next one at the bottom of Page 37, in

12 Brantom's introductory remarks he

13 considers the possibility that at very

14 low levels of exposure there is no

15 effect.

16           And he did essentially a

17 similar study to what Peto did.

18      Q.    He considers the

19 possibility.  Is that what you said?

20      A.    That's a quote in my -- in

21 my report from what he says in the

22 introductory components to his thesis

23 project.

24      Q.    So he thinks there's some

Confidential Information - Subject to Protective Order

1    possibility that there might not be a

2    threshold?

3                    MS. THOMPSON:  Objection.

4            Form.

5                    THE WITNESS:  That's what he

6            says.

7    BY MR. VAUGHN:

8            Q.    But you're convinced there

9    is a threshold?

10                   MS. THOMPSON:  Objection.

11           Form.

12                   THE WITNESS:  I believe

13           there is a threshold, yes.

14   BY MR. VAUGHN:

15           Q.    And so is it your opinion

16   that you can consume a certain amount of

17   NDMA per day and not be at any increased

18   risk of developing cancer, but once you

19   pass some threshold, then boom, you can

20   start developing cancer?

21                   MS. THOMPSON:  Objection.

22           Form.

23                   THE WITNESS:  That would

24           mischaracterize what I've written

Confidential Information Subject to Protective Order

1    in my report.

2  BY MR. VAUGHN:

3          Q.    How did I mischaracterize

4  it?

5          A.    I have identified a level

6  below which, number one, there does not

7  appear to be proof of a cancer effect,

8  again, in rat studies.  And that I

9  further go on to say that's consistent

10 with first-pass metabolism at low doses

11 of this kind of compound, and that these

12 reported no cancer rates are hundreds to

13 thousands of times higher than the amount

14 of NDMA found in any of the valsartan

15 products.

16         Q.    Based on your methodology,

17 correct?

18         A.    Based on what's in the

19 literature.

20         Q.    Okay.  But, I mean, the dose

21 comparison, you're the one that did that

22 calculation, right?

23         A.    I did.  But I didn't create

24 the noncancer dose that I'm reporting

1    from these studies like Ito.

2        Q.    But to take the animal dose

3    to get the human dose, you're the one

4    that did that math, right?

5        A.    Yes.

6        Q.    All right.  And we'll get to

7    your methodology on that later.

8            In your opinion, what is the

9    threshold level of NDMA that is needed to

10   increase a human's risk of getting

11   cancer?

12           MS. THOMPSON:  Objection.

13       Form.  Asked and answered.

14           THE WITNESS:  I do not know

15       that dose.  As I've said

16       previously, I'm able to identify

17       what appears to be a dose below

18       which you don't see cancer.  I

19       don't have the ability to identify

20       above which, because at these low

21       dose exposure levels that seem

22       they don't cause cancer or that do

23       not cause cancer in animal

24       studies, often the next dose is

Confidential Information - Subject to Protective Order

1      100 or a thousand times.

2              So there may be something in

3      between.  I don't know where that

4      is.

5              So I'm only talking about

6      the no effect dose.  I'm not

7      trying to describe or define the

8      effect dose.

9   BY MR. VAUGHN:

10      Q.    Is this mysterious threshold

11   for NDMA in humans, is it the exact same

12   for every person?

13              MS. THOMPSON:  Objection.

14      Form.

15              THE WITNESS:  Since I don't

16      know what it is, I can't answer

17      that.

18   BY MR. VAUGHN:

19      Q.    Is it your opinion that once

20   that threshold is crossed, the

21   dose-response then would be linear from

22   then on?

23              MS. THOMPSON:  Objection.

24      Form.

Confidential Information - Subject to Protective Order

1           THE WITNESS:  That's not

2     what I said.

3           What I said is the amount of

4     NDMA in any valsartan product is

5     hundreds to thousand times below

6     doses that are no cancer related

7     in the rat studies.

8  BY MR. VAUGHN:

9     Q.    I'm sorry.  I wasn't clear

10 in my question probably.

11          Valsartan aside.  If you're

12 giving a human NDMA, once you pass

13 whatever that threshold is, is the

14 dose-response going to be linear?

15    A.    We don't know that in

16 humans.  I have no idea.  There's never

17 been a --

18    Q.    Is there a chance that it

19 becomes exponential at some point, it

20 kind of goes straight up?

21    A.    I have no idea.

22          MS. THOMPSON:  Objection.

23 BY MR. VAUGHN:

24    Q.    What -- how do you define

Confidential Information - Subject to Protective Order

1  whether you have a linear dose-response?

2  What does the word "linear" in the

3  dose-response mean?

4      A.    It depends on what the

5  response is.

6      Q.    Can you explain that to me,

7  what you mean?

8      A.    Well, which response are we

9  talking about?

10      Q.    Well, let's talk about NDMA

11  and its ability to increase the risk of

12  cancer.  So what is a linear

13  dose-response mean in that context?

14      A.    In that context it's defined

15  a couple of different ways.

16          Pegg defined it by looking

17  at the formation of adducts.

18          Peto defined it by the

19  formation of tumors so there are

20  different ways of defining that.

21      Q.    But the linear part of it,

22  what does that mean?  Does that mean,

23  like, it's proportional to the amount

24  that you increase the dose to increase

Confidential Information - Subject to Protective Order

1    risk of cancer?  Is that what's going on

2    with linear?

3            A.    Again, the use of the term

4    linear means as the dose goes up, it

5    looks like the occurrence goes up, which

6    may or may not necessarily be

7    characterized as a dead straight line.

8    They just sort of observe that there's

9    more when they sort of plot it over time.

10           Q.    Is there a reason that

11   throughout your entire expert report you

12   never mention that NDMA is genotoxic?

13               MS. THOMPSON:  Objection.

14           Form.

15               THE WITNESS:  There's no

16           reason that I didn't mention it.

17           It was not what I was focused on

18           in my report.

19   BY MR. VAUGHN:

20           Q.    Do you know if NDMA is

21   genotoxin?

22               MS. THOMPSON:  Objection.

23           Form.

24               THE WITNESS:  We know it is

1          in animals.

2     BY MR. VAUGHN:

3          Q.    Do you know if a substance

4     being a genotoxin impacts its dose

5     threshold?

6               MS. THOMPSON:  Objection.

7          Form.

8               THE WITNESS:  I don't even

9          understand the question.  So I'm

10         not sure how to answer it.

11    BY MR. VAUGHN:

12         Q.    Okay.  So you didn't

13    consider the fact that NDMA is a

14    genotoxin when coming to your opinions

15    that there is a threshold for NDMA

16    exposure before it's going to increase

17    the risk of cancer, correct?

18         A.    Well, not correct, because

19    that's not what I testified.

20              I'm not defining, again, the

21    threshold at which genotoxicity occurs.

22    That wasn't the focus of my report.

23         Q.    There's -- I think you kind

24    of misconstrued things.  I don't think

1    there's a threshold for genotoxicity.

2    NDMA is just a genotoxin, period,

3    correct?

4         A.    Yes, it's a genotoxin.

5         Q.    At any amount given, right?

6         A.    Well, I don't know about

7    that.  That sort of gets out of my area

8    of testimony, because there are

9    oncologists and toxicologists that that's

10   more within their realm.

11             I'm more looking at more

12   dose-response relationships at what

13   appear to be safe levels of NDMA and how

14   that compares to the amount of NDMA found

15   in valsartan products.

16        Q.    And so you would defer to an

17   oncologist or a toxicologist on if the

18   genotoxicity of a substance would impact

19   it's dose threshold?

20             MS. THOMPSON:  Objection.

21             THE WITNESS:  Not

22        necessarily, but again, I don't

23        know that I understand what that

24        question was asking.

Confidential Information - Subject to Protective Order

1  BY MR. VAUGHN:

2        Q.    Do you know or have you seen

3  any literature that says that you should

4  calculate the dose-response or the

5  threshold differently if the substance is

6  a genotoxin?

7              MS. THOMPSON:  Objection.

8        Form.

9              THE WITNESS:  Characterizing

10       dose-response relationships has

11       nothing to do with whether a

12       chemical or a drug is genotoxic or

13       not.

14  BY MR. VAUGHN:

15       Q.    What about dose threshold?

16       A.    Again, depends on the

17  response.  But there are many drugs where

18  you calculate a dose threshold that has

19  nothing to do with genotoxicity.

20       Q.    There are many drugs that

21  you can calculate -- sorry, scratch that.

22             Can you name one genotoxin

23  that has a threshold level needed to --

24  scratch that again.  I'm sorry.

Confidential Information - Subject to Protective Order

1          Can you name one genotoxin

2     that has a dose threshold?

3          MS. THOMPSON:  Objection.

4     Form.

5          THE WITNESS:  A dose

6     threshold for what?

7     BY MR. VAUGHN:

8     Q.    Before it can cause cancer.

9     A.    No.  I mean, that's what I

10    previously testified is that I'm not here

11    today to try to define the genotoxic dose

12    threshold that starts causing

13    genotoxicity.  That's not the nature of

14    my report.

15    Q.    Then how can you say that

16    there is a dose threshold for NDMA?

17    A.    And I'll say again, it's the

18    dose from the studies that was shown to

19    not be genotoxic.

20    Q.    And so that's all that you

21    base your opinion on, correct?

22    A.    That is what I'm basing my

23    opinion on.

24    Q.    Thank you.  Can you define

Confidential Information - Subject to Protective Order

1    genotoxic to the jury for me?

2              MS. THOMPSON:  Objection.

3         Form.

4              THE WITNESS:  I don't think

5         that's my role to do that.

6              Again, I'm focusing on drug

7         metabolism.  I think there are

8         others who have spent time on

9         toxicity, genotoxicity,

10        mutagenicity.  They're better

11        equipped to do that than I am.  So

12        it's not my role.

13   BY MR. VAUGHN:

14        Q.    And you would defer to them,

15   correct?

16        A.    In the definition of

17   genotoxicity, yes, I would.

18        Q.    And that's the only aspect

19   that you would defer to them on, is just

20   the definition?

21              MS. THOMPSON:  Objection.

22        Form.

23              THE WITNESS:  I never said

24        it was the only aspect I would

Confidential Information - Subject to Protective Order

1           refer to them on.  I said that
2           specific question is one that I
3           think it's -- I would defer to
4           them.
5    BY MR. VAUGHN:
6           Q.    Do you know if a genotoxin
7    can permanently alter a person's DNA?
8                 MS. THOMPSON:  Objection.
9           Form.
10                THE WITNESS:  I have no
11          opinion on that.
12   BY MR. VAUGHN:
13          Q.    So you have no definition of
14   genotoxicity?
15                MS. THOMPSON:  Objection.
16          Form.
17                THE WITNESS:  I do not.
18   BY MR. VAUGHN:
19          Q.    And I assume you probably
20   have no opinion if it does permanently
21   mutate someone's DNA, if that can be
22   passed to every generation thereafter?
23                MS. THOMPSON:  Objection.
24          Form.

Confidential Information - Subject to Protective Order

1         THE WITNESS:  I do not have

2    an opinion on that.

3    BY MR. VAUGHN:

4         Q.    Let's go to Page 26 of your

5    expert report.  The first paragraph at

6    the bottom, if you can read us the first

7    sentence that starts with, "The alpha."

8         A.    "The alpha-hydroxylation

9    pathway produces the methyldiazonium ion,

10   which binds with a segment of DNA to

11   produce a primary mutagenic and

12   carcinogenic substance

13   O6-methyl-guanine."

14        Q.    Can you explain what that

15   means to the jury?

16        A.    Well, to me, what it means

17   particularly if you put it in the context

18   of the following sentence, is that the

19   key step in producing the potential

20   mutagenic carcinogenic substance is

21   forming the alpha-hydroxylated metabolite

22   of NDMA, which is 2E1-mediated.

23        Q.    Is it okay if we refer to

24   this as O6 going forward?

Confidential Information - Subject to Protective Order

1          A.     Sure.

2          Q.     It's a lot to say.   Thank

3   you.   And so you would agree that O6 is a

4   carcinogen, correct?

5                 MS. THOMPSON:   Objection.

6          Form.

7                 THE WITNESS:   That is the

8          known carcinogen, correct.

9   BY MR. VAUGHN:

10          Q.     And so O6 is not a probable

11   human carcinogen.   O6 is a known human

12   carcinogen, correct?

13                 MS. THOMPSON:   Objection to

14          form.

15                 THE WITNESS:   Incorrect.   We

16          do not know the known carcinogenic

17          effect of NDMA or its downstream

18          metabolites.

19   BY MR. VAUGHN:

20          Q.     Why did -- in your report,

21   do you note that O6 is a carcinogenic

22   substance?

23          A.     Because it caused cancer in

24   animals.

Confidential Information - Subject to Protective Order

1          Q.    Oh, so you're talking about

2    animals.  You are not talking about

3    humans?

4          A.    Yes.

5          Q.    You think O6 is unlikely to

6    cause cancer in humans?

7                MS. THOMPSON:  Objection.

8          Form.

9                THE WITNESS:  I never said

10          that.  I think that's, again, a

11          better question for toxicology

12          oncology.  The amounts, the

13          mechanism, the inherent protective

14          mechanisms.  That's not the nature

15          of my testimony.

16    BY MR. VAUGHN:

17          Q.    The amount, you would defer

18    to a toxicologist or an oncologist, is

19    what you just testified to, correct?

20                MS. THOMPSON:  Objection to

21          form.

22                THE WITNESS:  The amount

23          that would make it a carcinogen in

24          animals, yes.

Confidential Information - Subject to Protective Order

BY MR. VAUGHN:

Q.    And in humans?

A.    I don't have to defer to
anybody on that one because it's never
been studied, so it's not known.

Q.    Okay.  But at least in
animals, you would defer to an oncologist
or toxicologist on how much of a dose is
necessary to induce cancer, correct?

MS. THOMPSON:  Objection.
Form.

THE WITNESS:  Correct.  As
I've stated before, it was not the
intent of my report to define that
threshold.

My point was to find the
threshold below which there
doesn't appear to be a cancer
risk.

BY MR. VAUGHN:

Q.    Okay.  So would you also
defer to a cancer researcher on what dose
would cause cancer or could increase the
risk of cancer?

Confidential Information Subject to Protective Order

1          MS. THOMPSON:  Objection.

2     Form.

3          THE WITNESS:  That's what I

4     said, yes.

5 BY MR. VAUGHN:

6     Q.    All right.  She objected.

7 Let me ask it again so it's really clear.

8          In regards to the dose

9 necessary for NDMA to increase the risk

10 of cancer, you would defer to a cancer

11 researcher, correct?

12          MS. THOMPSON:  Objection.

13     Form.

14          THE WITNESS:  It's not the

15     nature of my testimony.

16 BY MR. VAUGHN:

17     Q.    And so you would defer to a

18 cancer researcher, correct?

19     A.    Potentially.  Could be

20 toxicologist.  Could be somebody else.

21 But it's not the nature of my testimony.

22     Q.    Let's go to Page 33 of your

23 report now.

24          So towards the bottom of

Confidential Information - Subject to Protective Order

1  this page, you opine that the liver may

2  have a carcinogenic surveillance system

3  that removes O6 from DNA prior to

4  carcinogenesis.

5            Is this opinion based on the

6  Pegg paper that you cited above?

7       A.    Pegg refers to it in his

8  paper.  There are many others that I came

9  across that refer to that too.  And the

10  surveillance system is my own sort of

11  selection of a descriptor.

12       Q.    Do you find Pegg to be

13  reliable?

14       A.    Yes.

15       Q.    Your opinion regarding the

16  surveillance system being able to remove

17  O6 from DNA prior to carcinogenesis, is

18  that opinion specific to the liver?

19       A.    In the context of what my

20  report is, I'm referring to the liver's

21  ability to protect itself against

22  potential carcinogens from NDMA, again

23  depending on the dose.

24            My understanding, although

Confidential Information - Subject to Protective Order

1  it's not my area, is that that

2  surveillance system is essentially in all

3  tissues, in all cells.

4       Q.    And so you agree that this

5  surveillance system opinion is really not

6  in your wheelhouse, correct?

7            MS. THOMPSON:  Objection.

8       Form.

9            THE WITNESS:  It's in my

10      wheelhouse in the context of how I

11      used it.  I'm not trying to

12      quantify it.

13           I find it from a

14      pharmacologic sense interesting

15      that the lower dose NDMA, because

16      of first-pass metabolism and

17      clearance, 2E1 produces the

18      potential carcinogen in the very

19      organ that has the best probable

20      capacity to remove it.

21 BY MR. VAUGHN:

22      Q.    And so if NDMA were to have

23 a high bioavailability in humans and was

24 able to get past the liver, the liver's

Confidential Information - Subject to Protective Order

1    carcinogenic surveillance system wouldn't

2    have any impact on the O6 formations in

3    other organs or tissues, correct?

4              MS. THOMPSON:  Objection.

5         Form.

6              THE WITNESS:  Again, that's

7         a hypothetical.  That's not what

8         I'm dealing with because we're not

9         giving those kinds of doses to

10        humans.

11   BY MR. VAUGHN:

12        Q.    You are an expert in this

13   litigation, so I can ask you a

14   hypotheticals.

15             And I'm saying

16   hypothetically, if it were to get past

17   the liver, the liver surveillance system

18   wouldn't have any impact on those O6

19   formations in other tissues and organs,

20   correct?

21             MS. THOMPSON:  Objection.

22        Form.

23             THE WITNESS:  Yeah, if you

24        were to give some massive

Confidential Information - Subject to Protective Order

1          overdose, then I guess, in theory,

2          in your hypothetical, you could

3          bypass the liver.

4     BY MR. VAUGHN:

5          Q.    But you don't know what dose

6     that is, correct?

7          A.    I do not.

8          Q.    Okay.  Are you aware --

9     sorry.

10          Are you aware of any factors

11     that can inhibit or increase the

12     metabolism of NDMA in the liver?

13          MS. THOMPSON:  Objection.

14          Form.

15          THE WITNESS:  The only one

16          that I looked at, because of my

17          interest in pharmacogenomics, is

18          to see if there is any 2E1 related

19          polymorphisms.  And those have not

20          been identified.  So no.

21     BY MR. VAUGHN:

22          Q.    And so in coming to your

23     opinions in this case, you did not

24     consider any factors that could inhibit

Confidential Information Subject to Protective Order

1    or increase the metabolism of NDMA in the

2    liver?

3                    MS. THOMPSON:   Objection.

4                    THE WITNESS:   In the

5            research that I did, if I came

6            across it, then I would have

7            commented on it.  So it wasn't

8            that I didn't consider it.  I

9            would have looked for it in the

10           articles that I was looking at.

11   BY MR. VAUGHN:

12           Q.    And you didn't comment

13   anywhere in your expert report on it, did

14   you?

15           A.    I did not.

16           Q.    Did you actually read the

17   Pegg paper?

18           A.    I did.

19                    MR. VAUGHN:  Hey, Tyler, can

20           you pull up the 1980 Pegg paper

21           for us.

22                    (Document marked for

23           identification as Exhibit

24           Bottorff-4.)

Confidential Information - Subject to Protective Order

 1             MR. VAUGHN:  Go to PDF Page

 2         15.

 3  BY MR. VAUGHN:

 4         Q.    All right.  And that second

 5  sentence, can you read that aloud for the

 6  jury, please, where it starts, "For

 7  example."

 8         A.     "For example, when the

 9  ability of the liver to metabolize NDMA

10  is impaired by feeding a

11  protein-deficient diet, a greater

12  fraction of the carcinogen may become

13  available for reaction with other

14  organs."

15         Q.    Why did you not mention that

16  in your expert report?

17             MS. THOMPSON:  Objection.

18         Form.

19             THE WITNESS:  I have no

20         reason for that.  But again, the

21         impact of that would have to also

22         depend on the dose.

23             And so, I didn't consider it

24         as having an impact on the doses

Confidential Information - Subject to Protective Order

1            that we're talking about.

2     BY MR. VAUGHN:

3            Q.    Why didn't you mention that

4     in your expert report?  I thought you

5     said you would have addressed it?

6                  MS. THOMPSON:  Objection.

7            Form.

8                  THE WITNESS:  Because I

9            didn't think it would have an

10           impact at the amount of doses that

11           we are talking about.

12    BY MR. VAUGHN:

13           Q.    Well, that's not the answer

14    that you gave me a second ago, is it?

15                 MS. THOMPSON:  Objection.

16           Form.

17    BY MR. VAUGHN:

18           Q.    Go ahead and read the next

19    sentence.  Starts also.  "Also since

20    uptake."

21                 Can you read that for the

22    jury?

23                 MS. THOMPSON:  Can he answer

24           the question that you had earlier

Confidential Information - Subject to Protective Order

1        before we --

2              MR. VAUGHN:  I'm sorry.  I

3        thought he -- yeah, absolutely.

4              MS. THOMPSON:  Okay.  We may

5        need the court reporter to read it

6        back.  But I think you asked an

7        question and then he didn't

8        answer --

9              MR. VAUGHN:  I can ask it

10       again.

11   BY MR. VAUGHN:

12       Q.    That was not the answer that

13   you gave earlier, was it?

14             MS. THOMPSON:  Objection.

15       Form.

16             Go ahead.

17             THE WITNESS:  And I think I

18       said that if it would have

19       impacted my opinions, I would have

20       included it.  And so it didn't

21       impact my opinion.

22   BY MR. VAUGHN:

23       Q.    I thought you said if you

24   would have read it in the literature you

Confidential Information - Subject to Protective Order

1    would have addressed it in your expert

2    report.

3                   MS. THOMPSON:  Objection to

4           form.  Mischaracterizes.

5                   THE WITNESS:  If it would

6           have impacted my opinion.

7    BY MR. VAUGHN:

8           Q.    And again, you haven't

9    reviewed all the internal testing on the

10   levels of NDMA in valsartan, have you?

11                  MS. THOMPSON:  Objection.

12          Form.

13                  THE WITNESS:  No, I haven't.

14   BY MR. VAUGHN:

15          Q.    Okay.  I'm going to now ask

16   you if you can read that next sentence

17   that starts with "Also, since uptake."

18          A.    "Also, since uptake of NDMA

19   is more rapid from the small intestine

20   than from the stomach, agents that retard

21   gastric emptying might be expected to

22   slow the rate of absorption."

23          Q.    What does "retard gastric

24   emptying" mean?

Confidential Information - Subject to Protective Order

1    A.    Slow gastric emptying into

2  the site of absorption.

3    Q.    Okay.  Can you read the next

4  sentence for me?

5    A.    "Agrelo have recently

6  published data which show that the

7  presence of fat retards the rate of

8  uptake and the metabolism of oral doses

9  of NDMA."

10    Q.    And you --

11    A.    And he -- I'm sorry.

12        Then he goes on to say that

13  that might actually increase its

14  metabolism by the liver, not enhance its

15  ability to escape the liver.

16    Q.    And you didn't mention that

17  in your report either, did you?

18        MS. THOMPSON:  Objection.

19     Form.

20        THE WITNESS:  No.  Again,

21     these aren't things that I

22     considered.  He was being thorough

23     in looking at potentials.

24        But most of these would have

Confidential Information - Subject to Protective Order

1           effects, based on my knowledge of

2           these issues with other drugs that

3           would not be -- that would not

4           alter my opinion about NDMA in the

5           doses that we are talking about.

6    BY MR. VAUGHN:

7           Q.    Do you know if a person's

8    liver would metabolize NDMA with the same

9    efficiency if the person took their

10   valsartan with just water versus taking

11   their valsartan with food or drinks other

12   than water?

13              MS. THOMPSON:  Objection.

14        Form.

15              THE WITNESS:  I'm sorry,

16        effect their absorption of what?

17   BY MR. VAUGHN:

18          Q.    Do you know if a person's

19   liver would metabolize NDMA at the same

20   efficiency regardless if the patient took

21   the valsartan with water or if they took

22   it with food or if they took it with a

23   drink other than water?

24              MS. THOMPSON:  Object to

Confidential Information - Subject to Protective Order

1          form.

2                    THE WITNESS:   We -- sorry.

3          We don't know that.

4    BY MR. VAUGHN:

5          Q.    We don't -- who is we?

6          A.    We, us, all of us.   Nobody

7    knows that answer.

8          Q.    Are you speaking for the

9    plaintiffs' experts as well?

10         A.    Well, let me rephrase my

11   answer then.

12                There are no data in humans

13   that address that question that you

14   asked.

15         Q.    What about animals?

16         A.    I mean, you could talk about

17   what he says here.   I don't think they

18   have a substantial effect at the doses

19   we're talking about.

20         Q.    What do you base that on?

21         A.    Just that these doses are so

22   small and generally these sort of

23   theoreticals don't have that much of an

24   impact.

Confidential Information - Subject to Protective Order

1    Q.    And again, these doses that

2  are so small, you're not even aware of

3  the highest doses, are you?

4                MS. THOMPSON:  Objection.

5           Form.  Asked and answered.

6                THE WITNESS:  I'm aware of

7           the highest doses that I had

8           access to.

9  BY MR. VAUGHN:

10    Q.    Do you know if vitamins can

11  impact the carcinogenicity of NDMA or

12  NDEA in animals or humans?

13                MS. THOMPSON:  Objection to

14           form.

15                THE WITNESS:  I have not

16           looked at that.

17  BY MR. VAUGHN:

18    Q.    Being a vegetarian, would

19  that have any impact on how efficiently

20  someone's liver can metabolize NDMA?

21                MS. THOMPSON:  Objection to

22           form.

23                THE WITNESS:  I have no

24           opinion on that.

Confidential Information - Subject to Protective Order

1    BY MR. VAUGHN:

2         Q.    Same thing with a high-fat

3    diet.  You have no opinion on that if

4    it's going to impact the rate of

5    metabolism of NDMA in a human liver?

6         A.    I have no -- no opinion.

7         Q.    Same with alcohol, no

8    opinion on if that's going to impact the

9    metabolism of NDMA in a human?

10        A.    Correct.

11        Q.    So is your opinion regarding

12   NDMA in valsartan, how it's going to be

13   metabolized, based on the assumption that

14   nothing else can impact the metabolism?

15              MS. THOMPSON:  Objection.

16         Form.

17              THE WITNESS:  Let me put it

18         back into perspective that as my

19         approach.

20              Again, in the doses that do

21         not appear to be carcinogenic in

22         animals, which is hovering around

23         .1 milligrams per kilogram or

24         lower, that that threshold, which

1        is not the carcinogenic threshold,

2        it's the non-carcinogenic

3        threshold, is in the range of 350

4        to 21,000 times higher than the

5        valsartan I evaluated as having

6        contained those amounts of NDMA.

7            And so, if gastric emptying

8        or taking a glass of water versus

9        a glass of milk, there's never

10       been any bioavailability study

11       with any drug under any of those

12       conditions that has changed

13       absorption by 350 times or, you

14       know, 22,000 times.

15           So these issues that

16       might -- in Pegg's paper where I

17       think he was being thorough in all

18       the data he analyzed, in my

19       opinion, having read this, it had

20       no impact on my conclusion.

21           So I didn't put it in the

22       paper for that reason.

23   BY MR. VAUGHN:

24       Q.    Your paper is not as

Confidential Information - Subject to Protective Order

1    thorough as Pegg's?

2              MS. THOMPSON:  Is that a

3         question or a statement?

4              MR. VAUGHN:  It's a

5         question.

6              MS. THOMPSON:  Objection.

7         Form.

8              THE WITNESS:  My paper is

9         focused on what I focused on.  His

10        paper focused on other things.

11   BY MR. VAUGHN:

12        Q.    In your opinion, is

13   100 percent of NDMA absorbed and makes

14   its way to the liver?

15             MS. THOMPSON:  Objection.

16        Form.

17             THE WITNESS:  Do you mean

18        given orally?

19   BY MR. VAUGHN:

20        Q.    Correct.

21        A.    Because inhaled --

22        Q.    No, I understand.  I

23   appreciate your clarification.  I'll

24   re-ask the question.

Confidential Information Subject to Protective Order

1          Is it your opinion that when

2   NDMA is ingested orally, that 100 percent

3   of it makes its way to the liver?

4          A.    Yes.  I think there are

5   bioavailability studies in animals that

6   show that.

7          Q.    So none of it is going to be

8   excreted through the feces or make it

9   down that tract?

10          A.    No.  I think the study I

11   saw, the absorption was 90-something

12   percent.

13          Q.    Does the stomach have P450

14   in it?

15          A.    It does.  The only two

16   enzymes that I've seen in the stomach are

17   like 2J2 and 2S4, or something.

18          So very, very, very uncommon

19   P450s, but not the ones we are talking

20   about.

21          Q.    What about in the

22   intestines, large intestine, small

23   intestine?  Do they have P450-2E1?

24          A.    Actually, they do not.  The

Confidential Information - Subject to Protective Order

1    small intestine does not have 2E1.

2         Q.    A second ago, did you say

3    that you saw a study that said 90 percent

4    was absorbed?

5         A.    I believe that's the one

6    that I saw where they gave administration

7    through a feeding tube into the stomach

8    and then also down into the intestine.

9         Q.    So that's not 100 percent.

10   Where's that other ten percent going?

11              MS. THOMPSON:  Objection.

12        Form.

13              THE WITNESS:  They just

14        couldn't measure it anymore from

15        drawing back from the tube.

16   BY MR. VAUGHN:

17        Q.    Is there a chance that some

18   of it would be excreted to the feces?

19        A.    It hasn't been described.

20        Q.    Do you know if the rectum

21   has P450-2E1?

22        A.    I believe it does not.  My

23   understanding is that as you go further

24   down from the small intestine towards the

Confidential Information - Subject to Protective Order

1  larger intestine, that there's this

2  decline in all the P450s.  And I have

3  never seen anything that identified 2E1

4  being in the colon or rectum.

5      Q.    Does the entire GI tract

6  have P450 in it?

7          MS. THOMPSON:  Objection.

8      Form.

9          THE WITNESS:  Some have

10     P450, and some do not.

11 BY MR. VAUGHN:

12     Q.    The study in which you were

13 saying 90 percent, what animal was that

14 in?  Do you recall?

15     A.    Pretty sure it was in rats.

16     Q.    And was that an oral dose?

17     A.    Yes.  They put like a

18 feeding tube down and then administered

19 the NDMA through the feeding tube.  And

20 then sampled back out of the feeding tube

21 over time to see how the drug was

22 absorbed.

23     Q.    How does pulling it back out

24 let you know if it made it to the liver?

Confidential Information - Subject to Protective Order

1          MS. THOMPSON:  Objection.

2     Form.

3          THE WITNESS:  There are

4     other studies showing that it goes

5     to the liver once it's absorbed in

6     the small intestine.

7          MR. VAUGHN:  Can we go to

8     Page 19 -- actually, before we do

9     that, stay here.

10          Can we go to the bottom of

11     the summary of -- on this page,

12     yeah.

13 BY MR. VAUGHN:

14     Q.    Then can you read the

15 sentence that starts with, "The greatest

16 capacity," and read that sentence and the

17 one afterward.

18     A.    Yeah, I can see fine on

19 mine.

20          "The greatest capacity to

21 metabolize these nitrosamines to

22 alkylating agents is found in the liver,

23 but other organs including the esophagus,

24 lung and kidney are also capable of

Confidential Information - Subject to Protective Order

1    activation."

2           Q.    And the next sentence as

3    well, please.

4           A.    "These organs may be more

5    susceptible to alkylation than the liver

6    because they have a lesser ability to

7    catalyze the removal of the

8    O6-alkyl-guanine from their DNA."

9           Q.    Do you agree with that?

10          A.    Particularly if you go on to

11   the next sentence, because I want to put

12   it in the proper context.

13               "However, orally

14   administered doses of NDMA and the NDMA

15   formed by nitrosation reactions" --

16               THE WITNESS:  Can you keep

17          scrolling for me, please.

18               MS. THOMPSON:  I don't have

19          control of the documents.

20               THE WITNESS:  Oh, I'm sorry.

21               -- "within the GI tract are

22          rapidly absorbed from the upper

23          part of the small intestine and

24          carried to the liver in the portal

Confidential Information - Subject to Protective Order

1           blood supply.  When small doses

2           are given in this way, the

3           capacity of the liver to

4           metabolize the carcinogen is

5           sufficient that the nitrosamines

6           effectively cleared in a

7           first-pass effect, leaving very

8           little to interact with other

9           organs."

10               So to read those couple

11          sentences that you had me start

12          with, I think it was only fair to

13          put it into the context of the

14          rest of Pegg's comments.

15   BY MR. VAUGHN:

16          Q.   No, actually.  I'm really

17   glad that you did.  At the end of that,

18   it said "very little is left to interact

19   with other organs."

20               You agree with that, right?

21   It's not that it's none left.  It's just

22   not as much, right?

23          A.   No, not right.  It depends

24   on the dose.

Confidential Information - Subject to Protective Order

1        Q.    And here it says "when small

2   doses are given."  Would you agree with

3   that?  Small doses, you're still going to

4   get a little bit that goes to the other

5   organs?

6        A.    Depends on --

7             MS. THOMPSON:  Objection to

8        form.

9             Sorry.

10            THE WITNESS:  Sorry.

11            It depends on how small the

12       dose.

13  BY MR. VAUGHN:

14       Q.    Do you have any idea what

15  Pegg meant when he said small dose here?

16       A.    No, he didn't define it in

17  this set.

18       Q.    And we don't know if his

19  definition of small dose is the same as

20  your definition of a trace amount?

21       A.    I don't.

22       Q.    All right.  Can we go back

23  to your expert report, and go to Page 19

24  now.

Confidential Information - Subject to Protective Order

1           Can you read out loud the

2    first full sentence on this page?  It

3    starts at the end of Line 117.

4               MS. THOMPSON:  Line 117?

5               MR. VAUGHN:  I messed up on

6          that.  317.

7               It starts with the word

8          "only."  Sorry about that.

9               MS. THOMPSON:  Here, if it's

10         easier to read.

11              THE WITNESS:  I've go it.

12              "Only when the dose exceeds

13         first-pass metabolism capacity

14         will unchanged drug or compound be

15         systemically available for

16         distribution through the

17         bloodstream, leaving the liver and

18         being delivered to other tissues

19         and organs."

20   BY MR. VAUGHN:

21         Q.    And so is it your opinion

22   that if a human orally ingests NDMA, that

23   it would only be detectable in the blood

24   if it was exceeding the first-pass

Confidential Information - Subject to Protective Order

1    metabolism capacity of the liver?

2         A.    Correct.

3         Q.    Do you agree that if NDMA

4    reaches the bloodstream, that it has the

5    potential to cause cancer in numerous

6    organs and tissues?

7              MS. THOMPSON:  Objection.

8         Form.

9              THE WITNESS:  Again, I think

10        we've talked about this a few

11        times.

12              It depends on the amount,

13        how much gets past the liver.  And

14        the ability of that organ to

15        generate -- or to have the 2E1.

16              So it's dependent on a lot

17        of things.

18   BY MR. VAUGHN:

19        Q.    And again, you've stated

20   several times that you're not here to

21   talk about what dose is necessary.

22              So dose aside, if you're

23   getting into the bloodstream there's more

24   organs and tissues at risk, correct?

Confidential Information - Subject to Protective Order

1          MS. THOMPSON:  Object to

2     form.

3          THE WITNESS:  There's --

4     there's more organs and tissue

5     that can receive the drug.  I

6     don't know what that risk is

7     because it depends on the amount.

8  BY MR. VAUGHN:

9     Q.    I mean, the risk of it would

10 be getting cancer.  Are you saying that

11 you don't know how likely they are to get

12 cancer?

13    A.    Yes.

14         MS. THOMPSON:  Object to

15    form.

16         THE WITNESS:  I can't

17    quantify without having a dose

18    to -- or an amount that gets to

19    the organ or knowing which organ

20    and how much 2E1 it has and how

21    much of a removal system that it

22    has.

23         Those are -- those are all

24    things that would impact the

Confidential Information - Subject to Protective Order

1          conclusion you were drawing.

2     BY MR. VAUGHN:

3          Q.    Are you aware if some people

4     are exposed to NDMA in their diet?

5          A.    I am aware of that.

6          Q.    Do you know what the average

7     amount of NDMA that -- scratch that.  One

8     second.

9               Do you know what the average

10    amount of NDMA an American is exposed to

11    in their diet every day?

12              MS. THOMPSON:  Objection to

13         form.

14              THE WITNESS:  I recall

15         having seen it.

16              My recollection is that it

17         might be like a few hundred

18         nanograms or up to maybe a tenth

19         of a microgram or something like

20         that.

21    BY MR. VAUGHN:

22         Q.    It's kind of impossible to

23    not be exposed to NDMA at all as a human,

24    correct?

Confidential Information - Subject to Protective Order

1      A.    I would say that the sources

2  of NDMA that I've read about that are in

3  dietary substances, some or many of them

4  are part of the normal American diet,

5  yes.

6      Q.    Is it your opinion that NDMA

7  in the diet can't cause cancer in humans?

8           MS. THOMPSON:  Objection to

9      form.

10          THE WITNESS:  It is my

11     opinion that looking at the

12     dietary studies that have been

13     done, I don't believe they

14     reliably and consistently show

15     that they have caused cancer

16     through dietary studies.

17  BY MR. VAUGHN:

18     Q.    But they do show an

19  association, correct?

20          MS. THOMPSON:  Objection to

21     form.

22          THE WITNESS:  Sorry.  An

23     association, yes.

24  BY MR. VAUGHN:

Confidential Information - Subject to Protective Order

1    Q.    I want to ask you again your

2    opinion.  Can the amount of NDMA in the

3    diet increase the risk of cancer in

4    humans?

5              MS. THOMPSON:  Objection to

6         form.

7              THE WITNESS:  And I'm saying

8         that hasn't been demonstrated.  If

9         it had been, it would have a

10        different IARC classification than

11        it does.

12   BY MR. VAUGHN:

13   Q.    You're saying the amount of

14   NDMA in the diet probably could increase

15   the risk of cancer in humans?

16   A.    No, I'm not saying that.

17   I'm saying there's no data that it does

18   increase cancer in humans.

19   Q.    There's no data at all?

20   A.    There are no data that prove

21   that NDMA in the diet causes cancer in

22   humans.

23   Q.    And so prove.  Again, like,

24   you're putting this at 100 percent

Confidential Information - Subject to Protective Order

1    standard, right?

2              MS. THOMPSON:  Objection.

3         Form.

4              THE WITNESS:  I don't

5         believe it's been proven.  The

6         preponderance of the data are

7         conflicting to me.

8    BY MR. VAUGHN:

9         Q.    Does it lean more one way or

10   the other?

11             MS. THOMPSON:  Objection to

12        form.

13             THE WITNESS:  Not in any

14        type of reliable conclusion that

15        I've been able to make, no.

16   BY MR. VAUGHN:

17        Q.    So I'm okay to start eating

18   a lot of bacon with my whiskey again?

19   It's not going to increase my risk of

20   cancer?

21             MS. THOMPSON:  Objection to

22        form.

23   BY MR. VAUGHN:

24        Q.    I'd like to be able to do

Confidential Information - Subject to Protective Order

1    that again.  That's -- I really like

2    bacon.

3          A.    On your grilled hamburger,

4    yes.

5                MR. VAUGHN:  Do you want to

6          take a break real quick.  Is that

7          okay?

8                MS. THOMPSON:  Sure.

9                THE VIDEOGRAPHER:  The time

10         right now is 2:07 p.m.  We're off

11         the record.

12               (Short break.)

13               THE VIDEOGRAPHER:  The time

14         right now is 2:23 p.m.  We're back

15         on the record.

16   BY MR. VAUGHN:

17         Q.    Doctor, if a human is able

18   to exceed their body's repair mechanisms

19   just through NDMA in their diet, then

20   wouldn't any additional amount of NDMA

21   further increase their risk of cancer?

22               MS. THOMPSON:  Objection.

23         Form.

24               THE WITNESS:  Again, I

Confidential Information - Subject to Protective Order

1    suspect that's theoretically

2    possible, but --

3    BY MR. VAUGHN:

4        Q.    What do you mean theoretical

5    possible?

6        A.    Well they would have to --

7    well, number one, there's no proof in

8    humans that dietary NDMA causes cancer.

9            And so it's operating from

10   the assumption that it does, and so it

11   makes it hard for me to accept that

12   hypothetical.

13       Q.    If an animal is able to

14   exceed their body's repair mechanisms

15   just through the NDMA in their diet, then

16   wouldn't any additional amount of NDMA

17   further increase that animal's risk of

18   cancer?

19           MS. THOMPSON:  Objection.

20       Form.

21           THE WITNESS:  So again, the

22       basis for that question was that

23       dietary NDMA is causing cancer in

24       animals?

Confidential Information - Subject to Protective Order

1  BY MR. VAUGHN:

2      Q.   Yeah.  If/then.  It's a

3  hypothetical?

4      A.   I mean, same thing, it would

5  have to be enough to cause cancer to

6  begin with.

7      Q.   And, again, hypothetical.

8  If that was enough, then any additional

9  amount of NDMA would further increase the

10 risk of cancer, correct?

11          MS. THOMPSON:  Objection.

12      Form.

13          THE WITNESS:  Well, I

14      believe the dose studies that have

15      given enough to cause cancer sort

16      of prove that that's possible.

17 BY MR. VAUGHN:

18      Q.   Thank you, Doctor.  Now, a

19 second ago you said the average amount

20 diet would have a few hundred nanograms

21 of NDMA in it a day.  But what about a

22 single meal?  Do you know how much that

23 on average would have?

24          MS. THOMPSON:  Objection to

Confidential Information - Subject to Protective Order

1           form.   Scope.

2                   THE WITNESS:   I don't.

3    BY MR. VAUGHN:

4           Q.    Less than a few hundred

5    nanograms, though, right?

6                   MS. THOMPSON:   Objection.

7           Form.   Scope.

8                   THE WITNESS:   I mean, I

9           guess it depends on the meal

10          relative to the other meals of the

11          day.   I mean, I don't know.

12                  MR. VAUGHN:   Tyler, can we

13          pull Pegg back up again, the 1980

14          Pegg study.   Let's go to Page 15

15          again.

16   BY MR. VAUGHN:

17          Q.    Doctor, that second

18   paragraph that starts with the word

19   "finally," can you read that aloud for

20   the jury?

21          A.    "Finally, it has been

22   reported that NDMA and NDEA were present

23   in human peripheral blood samples and

24   that the amounts increased after a meal.

Confidential Information - Subject to Protective Order

1  Calculations of total daily exposures

2  have been made on the basis of these

3  figures but without knowledge of the

4  clearance rate these calculations may be

5  seriously in error and may underestimate

6  total exposure."

7        Q.    And so this is saying just

8  one meal is able to clear the liver and

9  get into the bloodstream, the NDMA; is

10 that correct?

11              MS. THOMPSON:  Objection.

12        Form.

13              THE WITNESS:  Again, I'd

14        have to look at those studies to

15        see if just that one-sentence

16        summary would be an accurate

17        representation.

18 BY MR. VAUGHN:

19        Q.    Did you not look at those

20 two studies when you were forming the

21 basis of your opinions?

22        A.    No, I did not.

23        Q.    And so if this is true, that

24 a meal can -- levels of NDMA in a meal

Confidential Information - Subject to Protective Order

1  can exceed what the liver can handle and

2  make it into the bloodstream, then if

3  someone took valsartan with NDMA in it,

4  that would also be able to make it into

5  the bloodstream, correct?

6              MS. THOMPSON:  Objection.

7         Form.

8              THE WITNESS:  Again, I can't

9         draw that same conclusion without

10        looking at those studies.

11  BY MR. VAUGHN:

12        Q.    And you didn't look at those

13  studies, so you can't really opine on

14  what impact dietary NDMA is going to have

15  on the NDMA that's in valsartan, correct?

16             MS. THOMPSON:  Objection.

17        Form.

18             THE WITNESS:  No, I haven't

19        looked at these studies.  So I

20        can't tell you what impact they

21        would have on my opinions.

22  BY MR. VAUGHN:

23        Q.    What were the levels that

24  you were aware of, of NDMA in valsartan?

Confidential Information Subject to Protective Order

1    Was it 20,000 nanograms and they were

2    able to show 38,000 nanograms?  Is that

3    what it says?

4          A.    Yes.

5          Q.    All right.  And you said

6    that the average diet would have a few

7    hundred nanograms.  But yet one meal is

8    able to bypass the liver and the NDMA get

9    into the bloodstream?

10         A.    I don't know that.  I

11   haven't read these studies.  They weren't

12   what I looked at in looking at NDMA

13   metabolism.

14         Q.    If just a couple hundred

15   nanograms can bypass the liver, then, I

16   mean, tens of thousands of nanograms of

17   NDMA would definitely bypass the liver,

18   correct?

19              MS. THOMPSON:  Objection to

20        form.

21              THE WITNESS:  I can't answer

22        that without looking at these

23        studies.

24   BY MR. VAUGHN:

Confidential Information - Subject to Protective Order

1        Q.    It's a hypothetical.  It's

2   an if/then.  If a few hundred was able to

3   bypass, then definitely tens of

4   thousands, correct?

5              MS. THOMPSON:  Objection to

6        form.

7              THE WITNESS:  Well, again,

8        you're asking me to accept the

9        "if."  And I have to look at these

10       studies before I would accept

11       that.

12  BY MR. VAUGHN:

13       Q.    Because you didn't review

14  all the literature before you formed your

15  opinions in this case or before this

16  deposition, right?

17             MS. THOMPSON:  Objection.

18       Form.

19             THE WITNESS:  I was not

20       focused on dietary NDMA.

21  BY MR. VAUGHN:

22       Q.    Are you going to review

23  these studies after this deposition?

24       A.    I could.

Confidential Information - Subject to Protective Order

1    Q.    And if you change your

2  opinions, are you going to notify us?

3    A.    If I change my opinions, I

4  would notify you.

5         MS. THOMPSON:  You will

6      notify us, and we will notify.

7         THE WITNESS:  Well.

8  BY MR. VAUGHN:

9    Q.    Doctor, can you explain how

10  you did your dosage conversions around

11  animal to human?

12    A.    I just used milligrams per

13  kilogram.  And the average typically used

14  weight for a human is 70 kilograms.

15    Q.    Based on what authority did

16  you decide that the -- scratch that one

17  second.

18         The average typically used

19  weight for a human is 70 kilograms.  What

20  did you base that off of?

21    A.    That's been a historical

22  number that you can find in the

23  literature for literally decades.

24    Q.    So it's not like a standard

Confidential Information - Subject to Protective Order

1    of practice in pharmacy and stuff that

2    you would use 70 kg for a human?

3              MS. KAPKE:  Object to form.

4              THE WITNESS:  Sorry.  Not

5         any more standard to pharmacy than

6         it is to any of the other health

7         professions.

8    BY MR. VAUGHN:

9         Q.    Including oncology?

10        A.    Including oncology,

11   including cardiology, nephrology.  That's

12   been in the literature as sort of a

13   standard for a long time, probably longer

14   than what would be accurate today.  I

15   think the number today would probably be

16   even bigger.

17        Q.    It's important to have that

18   number be accurate, correct?

19        A.    In a comparative basis, not

20   necessarily.  But you know, it's ballpark

21   enough to make the point.

22        Q.    And so you don't know -- you

23   said that cancer research oncologists,

24   they all use 70 kg, right?

Confidential Information Subject to Protective Order

1          MS. THOMPSON:  Object to

2     form.

3          THE WITNESS:  I didn't say

4     that.  I said it's been accepted

5     by all branches of the medical and

6     pharmacy and nursing communities

7     when people are sort of talking

8     about what the average human

9     weight is.  And that's been around

10    for decades.

11  BY MR. VAUGHN:

12       Q.    Did you do any research to

13  make sure that that's the weight that's

14  used when you're dealing with a

15  carcinogen?

16          MS. THOMPSON:  Objection.

17     Form.

18          THE WITNESS:  No, I did not.

19  BY MR. VAUGHN:

20       Q.    You just assumed that you

21  would use the same weight?

22          MS. THOMPSON:  Objection.

23     Form.

24          THE WITNESS:  Again, it's

1    for a relative basis.

2         If I were to use 10

3    kilograms less or 10 kilograms

4    more, or 20 kilograms more, it

5    wouldn't change my opinions.

6    BY MR. VAUGHN:

7         Q.    Isn't it your opinion that

8    the levels of NDMA present in generic

9    valsartan don't increase the risk of

10   cancer for anyone taking it?

11              MS. THOMPSON:  Objection.

12         Form.

13              THE WITNESS:  Could you

14         rephrase that again for me,

15         please?

16   BY MR. VAUGHN:

17         Q.    Yeah.

18              Is it your opinion that the

19   levels of NDMA that were present in

20   generic valsartan did not pose an

21   increased risk of cancer formation for

22   anyone that took the drug?

23         A.    Yes.  That's in my report.

24         Q.    If your opinion is on anyone

1    that took the drug, why are you using

2    average human weight?

3            A.    For comparative purposes.  I

4    guess I could have used, if I had them,

5    the weights of all the people who took

6    the drug.  But I didn't have that.

7            Q.    I mean, wouldn't

8    approximately half of humans weigh less

9    than the actual weight of a human?

10           A.    Yes.

11           Q.    If you were so confident in

12   your opinions that the levels of NDMA in

13   valsartan can't cause or increase the

14   risk of human cancer, why didn't you just

15   go with the lowest weight value.  Why did

16   you use average?

17               MS. THOMPSON:  Objection.

18           Form.

19               THE WITNESS:  I don't know

20           what the lowest weight would have

21           been.  But had I picked, you know,

22           60 kilograms or 20 or -- I don't

23           know what you mean, because I

24           don't know what that number is.

Confidential Information - Subject to Protective Order

1    BY MR. VAUGHN:

2         Q.    Well, it significantly

3    impacts your calculation, does it not?

4              MS. THOMPSON:   Objection.

5         Form.

6              THE WITNESS:   No.   It really

7         doesn't.   If you look at my table,

8         you know, where I use the 70-kilo,

9         and get 7,000 milligrams, as what

10        appeared to be a non-cancerous

11        dose based on a .1 milligram per

12        kilogram in rat studies, whether

13        that number is 6,000 or in the

14        case of someone who's larger,

15        whether that number is 15,000, it

16        doesn't change my opinions.

17   BY MR. VAUGHN:

18        Q.    All right.   Based on your

19   methodology, if 1 nanogram of NDMA was

20   able to induce cancer in an animal that

21   weighed one kilogram, then based on your

22   calculations, it would take 70 nanograms

23   to induce cancer in a human; is that

24   correct?

Confidential Information Subject to Protective Order

1    A.    Well, I never calculated

2    that.

3         Q.    Well, I know you didn't do

4    this calculation.  But the way you're

5    doing your conversion -- and so I'm not

6    trying to represent that one nanogram

7    causes cancer in animals.  I'm just using

8    these numbers for simplicity's sake

9    because I want to understand your

10   methodology and how you came to these

11   numbers.

12        Does that make sense?

13        A.    Yeah, we can just use the

14   numbers and use them.  We don't have to

15   use something other than the numbers.

16        Q.    Well, I need the math to be

17   a lot easier, is why I'm doing it this

18   way.

19        A.    Okay.  This is pretty easy.

20        Q.    So you're just taking

21   whatever the nanograms per kilogram are

22   and you're timesing them by 70, correct?

23        A.    And they're actually

24   micrograms and/or milligrams, and not in

Confidential Information - Subject to Protective Order

1    the nanogram range.

2           Q.    Would you be more

3    comfortable if I gave my hypothetical in

4    micrograms instead of nanograms?  Would

5    that make it easier for you?

6           A.    Well, like I said, we can

7    just use the numbers.  They're not that

8    complicated.  .1 --

9           Q.    I'm allowed to ask you

10   hypotheticals.  And if I use basic

11   numbers it's a lot easier for the jury to

12   understand what your methodology is.

13              So if 1 microgram of NDMA

14   was able to induce cancer in an animal

15   that weighed 1 kilogram, based on your

16   calculations, it would take 70 micrograms

17   to induce cancer in a human; is that

18   correct?

19              MS. THOMPSON:  Objection.

20        Form.

21              THE WITNESS:  Again, if that

22        were the case, which isn't the

23        case.

24   BY MR. VAUGHN:

Confidential Information - Subject to Protective Order

1      Q.     But the way I did my math

2   was how you did your methodology,

3   correct?

4      A.     Well, multiplying by 70,

5   yes.

6      Q.     Okay.  And so for every kg,

7   you added 100 percent of that base dose,

8   correct?

9      A.     For a dose that did not

10  cause cancer in rats, that in a few

11  studies was fairly consistent

12  around .1 milligrams per kilogram, I

13  extrapolated that to the average weight

14  of a human adult, which is 70 kilograms.

15  So 70 times the .1 gave 7 milligrams,

16  which is 7,000 micrograms.

17     Q.     Thank you, Doctor.

18            And so, if an animal weighs

19  70 times as much as another animal, based

20  on your methodology, it's going to take

21  70 times the amount of NDMA to have the

22  same impact on that animal, correct?

23            MS. THOMPSON:  Objection.

24      Form.

Confidential Information - Subject to Protective Order

1          THE WITNESS:  I don't think

2      that's what I'm saying here.

3  BY MR. VAUGHN:

4      Q.    Can you explain to me what

5  you're saying then?

6      A.    Well, you again, reverted

7  from the dose I said that doesn't cause

8  cancer to a dose that does cause cancer,

9  and I'm not claiming to know what that

10 is.

11     Q.    Okay.  Let's set aside

12 causing cancer.  One nanogram per

13 kilogram would be the same as 70

14 nanograms for 70 kilograms.

15         That's what your math came

16 out to be, right?

17     A.    Correct.  That's the math.

18     Q.    Okay.  And is that known as

19 linear extrapolation?

20         MS. THOMPSON:  Objection to

21     form.

22         THE WITNESS:  I don't know

23     if that's the term that's used.

24     But that would describe it

1    accurately, I think.

2  BY MR. VAUGHN:

3    Q.    So it's like a one to one

4  ratio, right?  Like, for every kg, you

5  add one part of the base, right?

6    A.    Yeah.  As long as it's

7  reported in kilograms.

8    Q.    And what was your basis that

9  that one-to-one ratio was appropriate to

10  use for NDMA?

11    A.    It's just the best that we

12  have.  We don't have any other method of

13  conversion based on some other

14  physiologic factor.  It's how the animals

15  were dosed.  They were dosed in

16  milligrams per kilogram.

17    Q.    But you have no basis for

18  why that's appropriate to extrapolate

19  them to humans based on weight?

20    A.    Well, as I've already said,

21  we are not sure that extrapolating these

22  animal data to humans is accurate and the

23  right thing to do to begin with.

24        So we have some missing

Confidential Information - Subject to Protective Order

1    parts.  We've got the milligram per

2    kilogram dose in the animals, what dose

3    didn't cause cancer, we have the weight,

4    the average weight of a human adult, and

5    then we have how much microgram

6    quantities were in the valsartan product.

7              So there's that missing link

8    connection that is an assumption that is

9    being made.

10         Q.    Okay.  Let's set humans

11    aside then.

12              If two different animal

13    species, each weighed one kilogram, you

14    would expect the exact same amount of

15    NDMA to be necessary to induce cancer in

16    those animals, correct?

17         A.    No.

18         Q.    Why?

19         A.    Different amounts of 2E1.

20         Q.    Does a rat and a mouse have

21    different amounts of 2E1?

22         A.    I believe they do.  I know

23    for sure a rat and a dog do and a rat and

24    a monkey does and a rat and a pig does.

Confidential Information - Subject to Protective Order

1    Q.    But you don't know if a rat

2    and a mouse have different amounts?

3    A.    I don't recall seeing that.

4    And the reason I do know about the

5    monkeys and the pigs and the beagle dogs,

6    is because there were studies that I

7    reviewed that were in that area.

8    Q.    And so you didn't consider

9    the amount of 2E1 in mice when forming

10   your opinions in this case?

11   A.    No, I did not.

12   Q.    Based on what you just said

13   about the 2E1, assuming that they have

14   comparable amounts of 2E1.  An animal

15   that weighs, let's say, 12 times as much

16   as another animal, you would expect it to

17   take 12 times the amount of NDMA to have

18   the same impact, correct?

19   A.    Well, I'm saying the dose

20   would be.  I am not saying what the

21   impact would be.  There's other parts to

22   the question about causing cancer.  And

23   it has to do with the amount of 2E1 in

24   the different organs and what the dose is

Confidential Information - Subject to Protective Order

1    and whether you exceed first-pass

2    metabolism, and do you give it IV or PO.

3              There's all these moving

4    parts to the puzzle to even get close to

5    having an apples-to-apples kind of

6    comparison.

7         Q.    Well, assuming that you're

8    giving it the same route, you know,

9    giving it orally for each of them.

10        A.    Right.  But again, they have

11   different amounts of 2E1.

12        Q.    I said assuming that they

13   had comparable amounts of 2E1.  I mean,

14   you're assuming that human and rats have

15   comparable amounts, right?

16        A.    Well, that's been

17   demonstrated.  And I can't say it across

18   all species.

19        Q.    You don't know if mice have

20   anything similar?

21        A.    I just didn't look at that,

22   no.

23        Q.    You listed, "2018 M7(R1)

24   Assessment and Control of DNA" --

Confidential Information - Subject to Protective Order

1  reactivity -- "Reactive Impurities in

2  Pharmaceuticals to Limit Potential

3  Carcinogenic Risk:  A Guidance For the

4  Industry."

5          Did you read that entire

6  document?

7          A.    I did.

8          Q.    And did you consider the

9  2018 guidance for the industry in forming

10  your opinions?

11          A.    I considered them.  But they

12  didn't have an impact on my opinions.

13          Q.    Do you recall disagreeing

14  with anything from the 2018 guidance for

15  industry?

16          A.    It doesn't mean that I

17  disagreed with them.  It just means that

18  they didn't have an impact on the

19  conclusions that I drew based on NDMA

20  metabolism relative to the amounts of

21  NDMA found in the valsartan products.

22          Q.    But what I was asking is do

23  you recall disagreeing with anything in

24  the guidance?

Confidential Information - Subject to Protective Order

1          A.    I don't recall being in any
2    position to disagree with it.  I just was
3    familiar with it.
4          Q.    And would you follow a
5    guidance document like that?
6                MS. THOMPSON:  Objection.
7          Form.
8                THE WITNESS:  I read the
9          guidance document.  I don't know
10         what you mean by follow.
11               MR. VAUGHN:  Tyler, you can
12         go ahead and pull that up for me.
13         The 2018 M7(R1).
14               (Document marked for
15         identification as Exhibit
16         Bottorff-5.)
17   BY MR. VAUGHN:
18         Q.    Guidance for industry.
19   Who's the industry that this is supposed
20   to guide?
21         A.    Pharmaceutical industry.
22         Q.    That's who you represent,
23   correct?
24         A.    Correct.

1    Q.    And at the bottom here, what

2    agencies are responsible for this

3    guidance document?

4    A.    HHS, FDA, the CDER, CBER,

5    which are branches of the FDA.

6    Q.    So the U.S. Department of

7    Health And and Human Services, the Food &

8    Drug Administration, the Center for Drug

9    Evaluation & Research, and the Center For

10   Biologic Evaluation & Research; is that

11   correct?

12   A.    Yes.  Just to clarify, CDER

13   and CBER are branches of the FDA, and the

14   FDA is a branch of the Health & Human

15   Services.

16   Q.    Okay.  So this guidance

17   document is basically put out by the U.S.

18   Department of Health & Human Services?

19   A.    Under the auspices of the

20   FDA, and it's two specific branches that

21   did the work.

22   Q.    And what year was this put

23   out?

24   A.    2018.

Confidential Information Subject to Protective Order

1    Q.    And when did the industry --

2    or not the industry.  Scratch that.

3             When did the FDA

4    approximately learn about the valsartan

5    contamination with NDMA?

6             MS. THOMPSON:  Objection.

7        Form.

8             THE WITNESS:  I think it was

9        in July of 2018 that they

10       announced.  I can't remember the

11       exact date.  But it was in 2018.

12            MR. VAUGHN:  Go to Page 39,

13       Tyler.  Actually, one second.  One

14       second.  Page 24.  Can you go back

15       two pages actually, Tyler, for me.

16       I'm sorry.  I got my PDF stuff

17       wrong.  That works.  All right.

18       Got it.  Sorry.  I'm having a hard

19       time seeing it.  Go -- no, no.

20   BY MR. VAUGHN:

21       Q.    Do you see here what kg body

22   weight they are using?

23       A.    50.

24       Q.    And you used 70, correct?

Confidential Information - Subject to Protective Order

1    A.    Correct.

2          MS. THOMPSON:  I think I'm

3    in the wrong document.  Is this in

4    the shared file?

5          MR. VAUGHN:  I mean, it's in

6    his materials considered that you

7    gave us.

8          MS. THOMPSON:  I understand.

9    I'm just trying to make sure that

10   I'm pulling up the right one

11   because the last exhibit that I

12   have in here is Exhibit 5, which

13   looks like it's the guidance

14   document.

15         MR. VAUGHN:  The first page

16   says "Guidance for Industry.

17   M7(R1)."  It's March 2018.

18   BY MR. VAUGHN:

19   Q.    So would you agree with me,

20   Doctor, when the FDA is doing their

21   calculations on carcinogens, they use a

22   50 kg weight, not 70 kg rate?

23         MS. THOMPSON:  Objection to

24   form.

Confidential Information - Subject to Protective Order

1          THE WITNESS:  They did use

2     50.

3 BY MR. VAUGHN:

4     Q.    And do you know if they

5 always use 50 when it's a carcinogen?

6     A.    I do not know that.  I think

7 they -- I don't know if it's here or

8 somewhere else that they explained their

9 use of the 50 kilos, so they would be in

10 their calculations on the

11 ultra-conservative side.

12     Q.    And why would they want to

13 be on the more conservative side?

14     A.    Because they're a regulatory

15 agency.  I don't know.

16     Q.    Do you think it might have

17 anything to do with not wanting people to

18 get cancer?

19          MS. THOMPSON:  Object to

20     form.

21          THE WITNESS:  I'm sure they

22     don't want people to get cancer.

23 BY MR. VAUGHN:

24     Q.    And so setting that lower kg

Confidential Information - Subject to Protective Order

1    rate gives them a little bit more

2    assurance, right?

3                MS. THOMPSON:  Objection.

4         Form.

5                THE WITNESS:  Not

6         necessarily, but that's what they

7         chose to do.

8    BY MR. VAUGHN:

9         Q.    What do you mean not

10   necessarily?  Isn't timesing something by

11   50 going to result in a lower number than

12   timesing something by 70?

13               MS. THOMPSON:  Objection to

14        form.

15               THE WITNESS:  Every time.

16               MR. VAUGHN:  All right.

17        Sorry.  I got off.  I don't know

18        where I was at.

19   BY MR. VAUGHN:

20        Q.    Doctor, you also listed the

21   FDA's February 2021 "Control of

22   Nitrosamine Impurities in Human Drugs:

23   Guidance For Industry" on your list of

24   your materials considered.

Confidential Information Subject to Protective Order

1              Do you recall reading that

2    document?

3          A.     I do.

4          Q.     And did you read that entire

5    document?

6          A.     I probably scanned that one

7    in case there was something different

8    than what I had seen before.  I don't --

9    I don't remember specifically if I read

10   the entire word for word.

11         Q.     You don't recall if FDA's

12   guidance document lays out a different

13   methodology than the one that you used in

14   forming your opinions?

15         A.     Well, I believe the document

16   that you just have up there now used a

17   different methodology than I used.

18         Q.     And why did you decide to

19   use a different methodology than the FDA?

20         A.     They have a different focus.

21         Q.     Is their focus more on

22   patient health and your focus is more on

23   defending a pharmaceutical company?

24              MS. THOMPSON:  Objection.

Confidential Information - Subject to Protective Order

1        Form.

2                THE WITNESS:  Well, my focus

3        was on the science behind looking

4        at a non-cancerous dose as opposed

5        to trying to extrapolate something

6        over 70 years in a 50-kilogram

7        person, which I think is their

8        more regulatory approach.  I tried

9        to look at the science and

10        conclude what was available.

11   BY MR. VAUGHN:

12        Q.    You didn't even look into

13   like, mutagenicity and stuff, did you?

14                MS. THOMPSON:  Object to

15        form.

16                THE WITNESS:  I'm not sure

17        what you're asking.

18   BY MR. VAUGHN:

19        Q.    That's fine.  We'll get into

20   it more.

21                MR. VAUGHN:  Tyler, can you

22        pull up the 2021 guidance for

23        industry.

24                And what exhibit number is

Confidential Information - Subject to Protective Order

1          this going to be, Tyler?  I'm

2          sorry.  Is it five?

3                  TRIAL TECH:  This is going

4          to be six.

5                  MR. VAUGHN:  Six.  Thank

6          you.

7                  (Document marked for

8          identification as Exhibit

9          Bottorff-6.)

10   BY MR. VAUGHN:

11          Q.    I'm trying to stay organized

12   as we go.  Can we go to -- this is what I

13   want to go to 24.

14                  MR. VAUGHN:  Can we go to 24

15          now, Tyler.  Sorry about that.

16   BY MR. VAUGHN:

17          Q.    All right.  If we go --

18                  MR. VAUGHN:  Sorry.  You

19          were at the page I wanted.

20                  TRIAL TECH:  Okay.  I was

21          going to say, it doesn't look like

22          there's a Page 24.  But this is

23          the last one.

24                  MR. VAUGHN:  The last one.

Confidential Information Subject to Protective Order

1          That's what I meant.  Of the

2          document, Page 24 -- or of the

3          PDF.

4   BY MR. VAUGHN:

5          Q.    All right.  And, Doctor, if

6   we go to Line 39.  Do you see where the

7   FDA in this 2021 guidance to the industry

8   is still recommending that 50 kg be

9   utilized when doing conversions to

10  humans?

11          Doctor?

12          MR. REEFER:  Excuse me,

13      Brett.  Can you hear me?

14          MR. VAUGHN:  I can.  Can you

15      guys not hear me?

16          MR. REEFER:  We're having

17      some technical difficulties in the

18      room.  I apologize for

19      interjecting.  This is Jason from

20      the Pietragallo firm.

21          MR. VAUGHN:  No problem.

22      You guys -- is it fixed now?

23          MS. THOMPSON:  No.  We're on

24      this computer only.  So I'm trying

Confidential Information Subject to Protective Order

1          to shut down and redo my

2          connection since I control the

3          mic.

4               THE VIDEOGRAPHER:  Should we

5          go off the record?

6               MR. VAUGHN:  Go off the

7          record.  Yeah.

8               THE VIDEOGRAPHER:  The time

9          right now is 2:52 p.m.  We're off

10          the record.

11               (Short break.)

12               THE VIDEOGRAPHER:  The time

13          right now is 2:57 p.m.  We're back

14          on the record.

15     BY MR. VAUGHN:

16          Q.    Doctor, is the amount of

17     P450-2E1 going to impact how much NDMA it

18     takes to kill an animal?

19          A.    Not necessarily.

20          Q.    What do you mean by not

21     necessarily?

22          A.    Well, you can give a massive

23     IV dose that goes -- that totally

24     disrupts liver function and causes

Confidential Information – Subject to Protective Order

1   massive bleeding which has been done and

2   that has nothing to do with 2E1.

3        Q.    Line 39, I don't know if we

4   got the question in before you guys

5   disconnected earlier.  The FDA here in

6   2021 is still recommending to use 50 kg

7   as the body weight, correct?

8            MS. THOMPSON:  Objection.

9        Form.

10           THE WITNESS:  I don't think

11       they are recommending that I or

12       anyone else use 50 kilograms.

13       It's what they did in their

14       calculation.

15  BY MR. VAUGHN:

16       Q.    And they're still doing that

17  calculation in 2021 with 50 kilograms,

18  correct?

19       A.    Correct.

20       Q.    And so, on that example we

21  gave earlier, that one nanogram per

22  kilogram for human, with your

23  methodology, you would come out at 70

24  nanograms.  Based on the FDA's

Confidential Information Subject to Protective Order

1  methodology, it would be 50-nanograms,

2  correct?

3        A.    Yeah.  And we can apply that

4  to my calculations where the .1 milligram

5  per kilogram dose that doesn't appear to

6  cause cancer in rats, we can multiply it

7  by 50 and I get 5,000 milligrams instead

8  of 7,000 milligrams.  And that wouldn't

9  change my conclusions at all.

10       Q.    Down at the -- towards the

11  bottom, Line 52.  It's talking about TD50

12  values.  Do you know what a TD50 value

13  is?

14       A.    I do.

15       Q.    Can you explain to the jury

16  what a TD50 value?

17       A.    It's the dose given to the

18  animal that you've decided to give it to

19  that kills half of the animals.  It's

20  sort of like the lethal 50 dose.

21  Actually it's -- in this case, it's the

22  tumor dose.  It gives half the animals

23  tumors.

24       Q.    The amount that's needed per

Confidential Information - Subject to Protective Order

1    kg is half as much for a rat as it is for

2    a mouse, isn't it?

3         A.    Yes.

4         Q.    And you don't know if that's

5    because of P450-2E1 or if it's because as

6    you increase weight it's not proportional

7    of the dose that you need to give the

8    animal, correct?

9              MS. THOMPSON:  Objection.

10        Form.

11             THE WITNESS:  It's correct

12        that I don't know what the reason

13        for that is.  It could be that

14        the -- that the rat are more

15        resistant to getting tumors than

16        the mice.

17             I mean, there is a number of

18        reasons why that might be the

19        case.

20   BY MR. VAUGHN:

21        Q.    You never investigated what

22   that reason is in forming your opinions,

23   did you?

24        A.    I did not.

Confidential Information - Subject to Protective Order

1          Q.    And if the reason is because

2    it's not a linear relationship when you

3    increase weight to dose, then that would

4    significantly impact your opinions,

5    wouldn't it?

6                    MS. THOMPSON:  Objection.

7          Form.

8                    THE WITNESS:  No.  In fact,

9          the FDA used the milligram per

10          kilogram in their calculations.  I

11          mean, so they're comfortable using

12          milligrams per kilogram.

13    BY MR. VAUGHN:

14          Q.    The FDA did in this example.

15    But what I'm saying is if the rat is

16    increasing in weight, but only needs half

17    as much per kilogram, then that's more

18    like a 50 percent ratio, right, as

19    opposed to the 100 percent ratio?

20                    MS. THOMPSON:  Objection to

21          form.

22                    THE WITNESS:  This means

23          that it takes less drug by about

24          half in the rat versus the mouse

Confidential Information - Subject to Protective Order

1          to cause a tumor in half of them.

2   BY MR. VAUGHN:

3          Q.     And if that held true as the

4   weight kept going up all the way to a

5   human and we use the FDA's 50 kg, then

6   that would only be -- half of 50 is 25,

7   right?  So you'd multiply it by 25

8   instead, if this held true for humans,

9   correct?

10         A.     Again, we're not applying

11  the mouse data to the humans.

12         Q.     You're not applying the

13  mouse data to the human?

14         A.     And nor did any of the other

15  studies that I looked at.

16         Q.     And you didn't consider the

17  mouse data?

18                MS. THOMPSON:  Objection to

19         form.

20                THE WITNESS:  I did not.

21         Sorry.

22  BY MR. VAUGHN:

23         Q.     I don't know if -- did you

24  answer that?  I don't see it on -- oh,

Confidential Information - Subject to Protective Order

1   there it is.  My internet is now

2   unstable.  Are you able to hear me?

3          A.    I think I said correct.

4          Q.    You did.  I guess my

5   internet was having -- was going a little

6   slow there.

7                So there is a citation for

8   this, isn't there?  Citation Number 3.

9   And what is that citation?

10         A.    In the document?

11         Q.    Yeah.

12         A.    It's this carcinogenicity

13  potency database for NDMA.

14         Q.    And who published that

15  database?

16         A.    I'm not sure publishes it.

17  But this is a reference to the National

18  Library of Medicine collection of those

19  databases.

20         Q.    Is that what the NLM part of

21  that -- and then it has a ".NIH"; is

22  that -- what's the NIH part there?

23         A.    I guess that's indicating

24  that the National Library of Medicine is

Confidential Information - Subject to Protective Order

1    part of the NIH.

2         Q.    And that's the National

3    Institute of Health, correct?

4         A.    Correct.

5         Q.    And that's what we were

6    talking about earlier, the National

7    Institute of Health that continues to

8    fund Dr. Panigrahy -- sorry.  Scratch

9    that.

10             That's the same National

11   Institute of Health that we talked about

12   earlier that continues to fund

13   Dr. Panigrahy's cancer research, correct?

14        A.    Correct.

15             MS. THOMPSON:  Object to

16        form.

17   BY MR. VAUGHN:

18        Q.    It's a hard name sometimes.

19             Doctor, do you know what the

20   average rate -- I can't talk anymore.

21             Doctor, do you know what the

22   average weight of a rat was that was

23   studied with NDMA?

24        A.    I looked at that, because in

Confidential Information - Subject to Protective Order

1    some cases it wasn't so clear what that

2    number was.   And in other cases it was

3    more clear.

4              Most of these rats were in

5    the 300, 350, 400, 450 range, depending

6    on their age and whether they were male

7    or female.

8         Q.    And the mice, did you

9    calculate their average weight too?

10        A.    I did not.

11        Q.    You didn't calculate their

12   weight at .025 kg?

13        A.    I did not.

14             MR. VAUGHN:  Go to his

15        expert report.  Go to Page 44.

16   BY MR. VAUGHN:

17        Q.    On Line 728, where you note

18   the rough estimate of 25 grams or 0.025

19   kg for the mice, what did you base that

20   off of?  Or do you not recall putting

21   that into your expert report?

22        A.    No, I recall.  This was one

23   of the mice studies that I looked at, and

24   I don't believe in the paper they

Confidential Information - Subject to Protective Order

1    actually reported the weights.

2            So to do my calculation, I

3    had to go to the laboratory animal place

4    where you go buy them and look at that

5    specific strain and then look at the

6    weights that they give.

7            Q.    Did you not look at any

8    other NDMA studies in mice to see what

9    weights they were in those studies?

10           A.    No.  I don't recall any

11   other one.

12           Q.    Why didn't -- why didn't you

13   do that?

14           A.    As I did my search and

15   started looking for articles that had

16   some kind of dose-response relationship

17   that would indicate a non-cancerous dose,

18   the vast majority of that data were in

19   rats.  And so I used predominately rat

20   data.

21           Q.    Did you give more weight to

22   the rat data just because more studies

23   have been done in rats?

24           A.    No.  As I said earlier, I

Confidential Information - Subject to Protective Order

1  gave more weight because many of these

2  researchers talk about how the rat liver

3  metabolism is the closest to human liver

4  metabolism, which is why I think there's

5  way more rat studies in this area than

6  there is any other species.

7         Q.    So you wouldn't exclude any

8  animal data just because it wasn't a rat,

9  right?

10        A.    It depends on the data are

11 and what they found and how they got it.

12        Q.    So, like, if the data showed

13 that it increased the risk of cancer for

14 another animal, you wouldn't discount

15 that animal just because it wasn't a rat,

16 right?

17        A.    No, I wouldn't discount

18 that.  But again, I was looking for doses

19 that didn't cause cancer, not doses that

20 did.  And many of these are on the doses

21 given to cause cancer.

22        Q.    But you wouldn't exclude an

23 animal just because it wasn't a rat?

24        A.    I wouldn't exclude looking

Confidential Information Subject to Protective Order

1    at the study.  But I might exclude

2    pharmacokinetic data or something else

3    that is less applicable to what my

4    question was.

5         Q.    What about just not

6    mentioning it in your study, like the

7    animal.  Like, you only focus on the rat

8    when the study looked at rats and another

9    animal?

10        A.    I think it was appropriate

11   to focus on the rat because that's the

12   animal that best approximates metabolism,

13   which is what the focus of my report was.

14        Q.    Right.  You don't even know

15   what the metabolism is in a mouse.  So

16   how do you know that the rat is the

17   closest to a human?

18             MS. THOMPSON:  Objection.

19        Form.

20             THE WITNESS:  Because of all

21        the studies that I looked at.

22   BY MR. VAUGHN:

23        Q.    What's a hamster?  How close

24   is that to a human?

```
 1              MS. THOMPSON:  Objection.

 2        Form.

 3              THE WITNESS:  I don't know

 4        for sure.  I know studies have

 5        been done.  But not that many.

 6              MR. VAUGHN:  Can we go to

 7        Page 46 of your expert report now.

 8        And can we go to Line 766.

 9  BY MR. VAUGHN:

10        Q.    And can you read the

11  sentence for the jury that starts with

12  "rats"?

13        A.    "Rats and hamsters were

14  studied, but given the preponderance of

15  rat studies, only the rat data are shown

16  here."

17        Q.    Is this consistent with what

18  you just testified to?

19        A.    Yes.

20        Q.    How?

21        A.    That the preponderance of

22  evidence comes from rat data.

23        Q.    And so you discounted the

24  hamster data because it wasn't a rat,
```

Confidential Information - Subject to Protective Order

1    right?

2              MS. THOMPSON:  Objection.

3         Form.

4              THE WITNESS:  I did not

5         include it because the rats are

6         the closest and I wanted to look

7         at as many rat studies as I could.

8    BY MR. VAUGHN:

9         Q.    And again, how can you say

10   that rats are closer to humans than

11   hamsters if you don't know what hamsters'

12   metabolism is like?

13        A.    When the researchers in my

14   research say rats are closest, I believe

15   them.

16        Q.    So you would defer to

17   someone else on that, correct?

18              MS. THOMPSON:  Objection.

19        Form.

20              THE WITNESS:  For the people

21        who do animal studies in this

22        area, yes, I would.

23   BY MR. VAUGHN:

24        Q.    So, like, a cancer

Confidential Information - Subject to Protective Order

1    researcher that focuses on animal

2    studies, you would defer to that cancer

3    researcher, correct?

4         A.    I would refer to the study,

5    regardless of who the researcher was.

6         Q.    Defer?

7         A.    I would defer to their

8    conclusion that they chose that animal

9    for a reason.

10         Q.    And so if a cancer

11    researcher with a specialty in animal

12    studies says that some other animal

13    besides a rat is closest to a human in

14    how they metabolize NDMA, you would defer

15    to that cancer researcher, correct?

16              MS. THOMPSON:  Objection to

17         form.

18              THE WITNESS:  I would look

19         at that, yes.

20    BY MR. VAUGHN:

21         Q.    Would you defer to them?

22              MS. THOMPSON:  Objection.

23         Form.

24              THE WITNESS:  Again, if it's

1              one study, no.  If it's, as in

2              this case, dozens and dozens of

3              studies that said that about the

4              rat, then I would defer to the rat

5              studies.

6       BY MR. VAUGHN:

7              Q.    But again, you don't know

8       about how other animals compare to humans

9       when it comes to their metabolism of

10      NDMA, correct?

11             A.    Well, that's not true.  I

12      have looked at that.

13             Q.    Okay.  Hamsters, did you

14      look at hamsters?

15             A.    I read the study.  But I

16      don't recall the hamster data.

17             Q.    Okay.  But -- sorry?

18             A.    That's okay.

19                   As I previously testified, I

20      did look at the swine data.  I did look

21      at the beagle data.  I did look at the

22      monkey data.

23             Q.    But not the hamster or the

24      mouse?

Confidential Information - Subject to Protective Order

1     A.    Well, I did report on a
2 mouse study.  I just didn't report on a
3 hamster study.
4     Q.    But you didn't look into
5 either a mouse or a hamster as it relates
6 to metabolism of NDMA, correct?
7     A.    I did one mouse study.  We
8 just looked at it.
9     Q.    But that had to do with how
10 the mouse metabolizes NDMA?
11     A.    I think it had to do with
12 alcohol and the effects of NDMA.
13     Q.    And what impact does alcohol
14 have on NDMA?
15     A.    Go back to the study --
16 which one was it?  Will someone refresh
17 my memory where it was.
18             MS. THOMPSON:  Page 44.
19             THE WITNESS:  Page --
20             MS. THOMPSON:  44.
21             THE WITNESS:  44?
22             Oh, the Gricute.
23 BY MR. VAUGHN:
24     Q.    Where in that paragraph that

Confidential Information Subject to Protective Order

1  you're talking about on Page 44 that you

2  discuss the metabolism of NDMA in mice?

3        A.    I don't.  I'd have to pull

4  the study to see why I only put this

5  amount of data in.  But it was trying to

6  get at what was the dose that was being

7  studied.

8            And again, my focus for this

9  report was to try to find studies that

10 gave doses that did not produce cancer.

11           And they gave such a large

12 dose, that it didn't give me evidence

13 with which to reach my conclusions.

14      Q.    So in forming your opinions,

15 you only considered data or studies that

16 did not cause cancer, you didn't consider

17 the ones that did cause cancer, correct?

18           MS. THOMPSON:  Objection.

19        Form.

20           THE WITNESS:  Untrue,

21        because many of these studies also

22        caused cancer.  But what I was

23        interested in is if they had dose

24        regimens small enough to allow me

Confidential Information - Subject to Protective Order

1       to evaluate a noncancer-causing

2       dose and what that dose was and

3       how it correlated to the amount of

4       NDMA in the valsartan products.

5   BY MR. VAUGHN:

6       Q.   Did you try and look for any

7   literature on low doses causing cancer in

8   animals?

9           MS. THOMPSON:  Objection.

10      Form.

11          THE WITNESS:  I think, in a

12      way that's what I just said, is I

13      looked for studies that had enough

14      of a low dose of the dosage range

15      on the low end, to have a low

16      enough dose to not cause cancer,

17      if that existed.  And if it didn't

18      exist, it didn't.  But it did.

19  BY MR. VAUGHN:

20      Q.   Were you only looking for

21  ones where it did not cause cancer?

22          MS. THOMPSON:  Objection.

23      Form.

24          THE WITNESS:  If there were

Confidential Information Subject to Protective Order

1         low dose studies that did cause

2         cancer, I looked at them and I

3         included them.  But I was focusing

4         on low dose studies that had an

5         arm that didn't cause cancer so I

6         could try to find how that low

7         dose noncancer-causing dose

8         related to NDMA in valsartan.

9    BY MR. VAUGHN:

10        Q.    So any low dose studies that

11   did cause cancer would be contained in

12   the body of your expert report, correct?

13        A.    Well --

14        Q.    Let me rephrase that.  So

15   any low dose studies that did cause

16   cancer that you relied on in forming your

17   opinions in this case would be contained

18   in the body of your expert report,

19   correct?

20        A.    I believe so, yes.

21        Q.    I see a 1978 document from

22   the WHO on nitrosamines on your materials

23   considered list.

24              What is the WHO?

Confidential Information - Subject to Protective Order

1        A.    The World Health

2   Organization.

3        Q.    Is that a reputable

4   organization?

5        A.    Yes.

6        Q.    Is that an authoritative

7   organization?

8        A.    Yes.

9             MR. VAUGHN:  Tyler, do you

10       mind pulling the -- yeah, 2002

11       WHO.

12            (Document Marked for

13       identification as Exhibit

14       Bottorff-7.)

15   BY MR. VAUGHN:

16       Q.    Did you review anything

17   after the 1978 one?  I don't see this

18   2002 one on your materials considered.

19       A.    I have one that's dated

20   2002.  So I have looked at this.

21       Q.    Oh, good.  Is it included on

22   your materials considered?

23       A.    I don't know.  But I

24   actually looked at this, I don't know, a

Confidential Information Subject to Protective Order

1    couple days ago.  So I know I've seen it.

2           Q.    Did you consider it when

3    forming your opinions in this case?

4           A.    We're looking for it.  I

5    don't know.

6           Q.    All right.  2002 is a lot

7    more recent been 1978, isn't it?

8           A.    Yes.

9           Q.    A lot has changed, you know,

10   from 1978 to 2002 in science.  Wouldn't

11   you agree?

12               MS. THOMPSON:  I'm giving

13         him the list of materials

14         considered.

15   BY MR. VAUGHN:

16         Q.    I could have missed it.  So

17   please double-check and let me know if

18   you included that on your materials

19   considered.

20         A.    Yeah, I have the article.  I

21   know I looked at it.  I just don't see it

22   at this point on the materials

23   considered.

24         Q.    Do you recall anything in

Confidential Information Subject to Protective Order

1    this document that is counter to your

2    methodology?

3           A.    Not that I recall.

4           Q.    Would you want your

5    methodology to be counter to what the WHO

6    recommends?

7                 MS. THOMPSON:  Objection.

8           Form.

9                 THE WITNESS:  It depends on

10          what they're recommending.  So I

11          don't know -- I don't know how to

12          answer that.

13   BY MR. VAUGHN:

14          Q.    It's fine.  I'll be a little

15   more specific for you.

16                MR. VAUGHN:  Tyler, do you

17          mind taking us to PDF Page 27.  I

18          think it's 23 on the bottom of the

19          document though.

20   BY MR. VAUGHN:

21          Q.    I guess before we do that,

22   this n-nitroso -- how do you say that?

23          A.    N-nitrosodimethylamine.

24          Q.    What is that?

Confidential Information - Subject to Protective Order

1          A.     That's NDMA.

2          Q.     So this document is specific

3    to NDMA?

4          A.     Yeah.  And I did find this

5    in my -- in my documents that I reviewed.

6          Q.     It's on your materials

7    considered list?

8          A.     Very top of Page 5.

9          Q.     Okay.  See, I do -- oh, but

10   WHO is further in there.  That's why I

11   missed it.  Thank you for pointing that

12   out.

13         A.     No problem.  I know I had

14   seen it.

15         Q.     Appreciate it.

16                MR. VAUGHN:  So yeah, now,

17         can we go to Page 27 of the PDF,

18         Tyler.

19   BY MR. VAUGHN:

20         Q.     And then under dose-response

21   analysis, can you read that entire second

22   paragraph for the jury, Doctor?

23         A.     "Scaling for variations in

24   the ratios of surface area to body weight

Confidential Information - Subject to Protective Order

1   between rodent species and humans was not

2   considered appropriate for the measures

3   of exposure response developed on the

4   basis of experimental data in animals,

5   since it's highly probable that the

6   carcinogenicity of NDMA is mediated

7   primarily through the generation of an

8   active metabolite."

9        Q.    What do you understand that

10  to mean?

11       A.    That means that they chose

12  not to use body surface area, which you

13  use body weight when you calculate body

14  surface area.  So they're saying they

15  chose not to use body surface area.

16       Q.    So they didn't scale between

17  species to humans?

18       A.    Not using body surface area.

19       Q.    How did they recommend

20  scaling?

21       A.    Well, this doesn't say what

22  they recommended for that.

23       Q.    And what's the reason they

24  are saying not to scale based on surface

Confidential Information - Subject to Protective Order

1    area to body weight?

2         A.    Again, I'm not sure how they

3    derived their reason.  But the reason

4    they list is mediation through the active

5    metabolite generation.

6         Q.    And what active metabolite

7    is that?

8         A.    The methyldiazonium ion

9    mediated by 2E1, which we previously

10   talked about the rat model being a good

11   approximation of humans for that.

12        Q.    Were you aware that you

13   shouldn't be using surface area to body

14   weight conversions with NDMA?

15        A.    I don't recall specifically

16   that comment.  But in all these studies,

17   they've used body weight.  So that's

18   almost like saying that it's the accepted

19   way to do that, instead of body surface

20   area.

21        Q.    Your opinion is it's almost

22   like saying it's accepted to do it the

23   way you did?

24        A.    I would say that if I did it

Confidential Information - Subject to Protective Order

1  using body surface area, I would have

2  been wrong in their opinion.

3       Q.    This active metabolite, is

4  that a genotoxin?

5       A.    That is the genotoxin.

6       Q.    So is it because it is a

7  genotoxin they're saying not to do the

8  scaling?

9            MS. THOMPSON:  Objection to

10       form.

11            THE WITNESS:  Not to my

12       knowledge.

13  BY MR. VAUGHN:

14       Q.    It says "since it's

15  highly probable".  Isn't "since" kind of

16  like "because", this is the reason we're

17  telling you not to do it?

18            MS. THOMPSON:  Object to the

19       form.

20            THE WITNESS:  I think so.

21       But it's -- I think you could

22       argue it's metabolism, not the

23       genotoxicity that makes that

24       statement.

Confidential Information - Subject to Protective Order

1   BY MR. VAUGHN:

2        Q.    What do you derive that from

3   in this paragraph?

4        A.    Because they don't say we

5   recommend this because it's a genotoxin.

6   They recommend it because of the active

7   metabolite pathway.

8        Q.    If it was recommended

9   because it was a genotoxin, would that

10  change the way you did your methodology?

11             MS. THOMPSON:  Objection.

12        Form.

13             THE WITNESS:  Yeah,

14        possibly.  But that's not what

15        they are saying.

16  BY MR. VAUGHN:

17        Q.    Okay.  And you've never

18  worked with a genotoxin prior to this

19  litigation, correct?

20             MS. THOMPSON:  Objection.

21        Form sorry.

22             THE WITNESS:  Sorry.  What

23        do you mean by work?

24  BY MR. VAUGHN:

Confidential Information - Subject to Protective Order

```
1        Q.     Did you not testify earlier
2   that you have not had experience with
3   genotoxins prior to this litigation?
4        A.     I don't think that's exactly
5   how I worded it because I think you did
6   use the word "work with," and I wanted
7   you to define it.
8        Q.     And I said, you know,
9   anything.  I tossed some examples and I
10  said in any way.  And you said no.  I
11  mean, can you think of one now?
12       A.     No, I said that I had looked
13  at Actos and its genotoxicity.  And that
14  I've taken care of hundreds of patients
15  who were cardiac transplant patients that
16  were on immunosuppressive drugs that have
17  the potential to be genotoxic.  So it's
18  not a foreign concept to me at all.
19       Q.     How much immunosuppression
20  is necessary to be genotoxic?
21       A.     I'm not sure.  It's not how
22  those drugs are dosed.  The
23  immunosuppressive is dosed to prevent the
24  more problem at hand, which is the organ
```

Confidential Information - Subject to Protective Order

1    transplant.  So they're not dosed based

2    on their genotoxic potential.  It's an

3    unwanted side effect if it were to occur.

4        Q.    Are you aware if NDMA is an

5    immunosuppressant?

6        A.    I'm not aware of that.  I

7    focused on its metabolism.

8        Q.    And so you didn't consider

9    if NDMA was an immunosuppressant when

10   forming your opinions?

11       A.    No.  I did not consider

12   that.

13       Q.    Right.  Immunosuppressant

14   itself can cause cancer, correct?

15            MS. THOMPSON:  Object to

16       form.

17            THE WITNESS:  I mean, I

18       think that's a blanket yes/no

19       statement, and I think it's

20       probably a lot more complicated

21       than that.

22   BY MR. VAUGHN:

23       Q.    But you didn't evaluate any

24   other things that you would need to in

Confidential Information - Subject to Protective Order

```
 1    forming your opinions, right?
 2              MS. THOMPSON:  Objection.
 3         Form.
 4              THE WITNESS:  I didn't
 5         evaluate immunosuppression as part
 6         of my opinions.
 7    BY MR. VAUGHN:
 8         Q.   You didn't even consider
 9    immunosuppression, did you?
10              MS. THOMPSON:  Objection to
11         form.  Asked and answered.
12              THE WITNESS:  I did not.
13         Metabolism is what I focused on.
14              MR. VAUGHN:  How long have
15         we been going in this section?
16              Have we been on the record a
17         little bit.
18              THE VIDEOGRAPHER:
19         28 minutes.
20              MR. VAUGHN:  Oh, yeah, we
21         had that break earlier.
22              Do you need a break, Doctor,
23         or are you good.
24              THE WITNESS:  I'm good.
```

Confidential Information - Subject to Protective Order

1          MR. VAUGHN:  Anyone else?

2          MS. THOMPSON:  No.

3          MR. VAUGHN:  All right.

4     Tyler, if we can go back to his

5     expert report.  And let's look at

6     Page 57 this time.

7  BY MR. VAUGHN:

8     Q.    Doctor, can you read aloud

9  the first two sentences of this page?

10    A.    "Notably, in Dr. Panigrahy's

11  report on Page 31, he states that only a

12  single dose of NDMA is required to cause

13  and initiate cancer in multiple animal

14  species; however, Dr. Panigrahy did not

15  cite any literature in support of this

16  assertion.  Based on my experience and my

17  review of the literature, I do not agree

18  with Dr. Panigrahy's blanket assertion."

19    Q.    Dr. Panigrahy, that's the

20  cancer researcher that we've been talking

21  a lot about that the NIH funds, right?

22    A.    Right.

23    Q.    And you don't agree with him

24  that a single dose of NDMA is capable of

Confidential Information - Subject to Protective Order

1    inducing cancer, correct?

2         A.    I think what I'm stating

3    here is I don't agree with that statement

4    without having a reference to it.

5         Q.    And did you review all the

6    literature at the end of Dr. Panigrahy's

7    expert report?

8              MS. THOMPSON:  Objection.

9         Form.

10             THE WITNESS:  I didn't read

11        every single article that he

12        referenced.

13   BY MR. VAUGHN:

14        Q.    So you didn't come across

15   any of the literature that supported his

16   opinion -- or that would support his

17   opinion that only one dose of NDMA can

18   cause cancer?

19        A.    No.  And I did it -- I

20   commented on it in the context that

21   follows those two sentences.

22             And it's that, if the dose

23   is low enough, which was again, the focus

24   of my contentions, that a single dose

Confidential Information - Subject to Protective Order

1    would be almost entirely metabolized by

2    the liver.

3              So I think it would be

4    better to put it into the context of what

5    I was referring to.

6         Q.    Just to be clear, you did

7    not review all the literature that Dr.

8    Panigrahy did, correct?

9         A.    Correct.

10             MR. VAUGHN:  Can we go to

11   Page 26 of his expert report now.

12   BY MR. VAUGHN:

13        Q.    Can you read that last

14   sentence that goes onto the next page.

15   It starts with, "A key step."

16        A.    This is my report, right?

17        Q.    Correct.  This is your

18   report?

19        A.    "A key step in this

20   metabolic activation to a potential

21   carcinogen is the hydroxylation of

22   NDMA/NDEA by cytochrome P450 pathways.

23   2E1 is almost exclusively for NDMA, and

24   both 2E1 and 2A6 are used for NDEA."

Confidential Information - Subject to Protective Order

1    Q.    And you have a citation

2    there, don't you?

3    A.    Yes.

4         MR. VAUGHN:  And can we

5         scroll down to see what that

6         citation is.

7    BY MR. VAUGHN:

8    Q.    You found these authors of

9    this article to be credible, correct?

10   A.    Correct.

11   Q.    And experienced in the field

12   of nitrosamines?

13   A.    I didn't look at each author

14   or even the first author's complete

15   publication list to see how many papers

16   they've written in that area.  I've just

17   focused on what this one said.

18   Q.    But the more papers they

19   wrote on it, probably the more

20   authoritative they are?

21   A.    Potentially, yes.

22        MR. VAUGHN:  Tyler, can we

23        go back now to Exhibit B, his

24        materials relied on.  Let's go to

Confidential Information - Subject to Protective Order

1          PDF Page 9.  It's Page 8 on the

2          bottom of the document.

3   BY MR. VAUGHN:

4          Q.     Doctor, if you look up about

5   five rows, you'll see this Kushida.

6   That's the article that you were citing

7   to a second ago in your expert report,

8   right?

9          A.     Yes.

10         Q.     Do you see the -- oh, I

11  think it's about the sixth, the

12  next-to-last name, T.  -- I don't know

13  how you say that.  Nohmi?

14         A.     Mm-hmm.  I see it.

15         Q.     Do you recall if you

16  reviewed any other articles by this T.

17  Nohmi?

18         A.     I don't think I did.  I

19  don't recall that.

20         Q.     Do you recall seeing other

21  papers by this T. Nohmi in Dr.

22  Panigrahy's expert report?

23         A.     I may have seen that.  But I

24  didn't read those.

Confidential Information Subject to Protective Order

1      Q.    Okay.  Well, let's have a

2  look at those.

3           MR. VAUGHN:  Tyler, will you

4      pull up the Nohmi 2020 for us.

5           (Document marked for

6      identification as Exhibit

7      Bottorff-8.)

8  BY MR. VAUGHN:

9      Q.    This first one that we were

10  looking at that you cited to is back in

11  2000.  And this one now is in 2020.  So

12  this -- Nohmi has at least been, you

13  know, involved in researching

14  nitrosamines for 20 years.  Would you

15  agree with that?

16      A.    I don't know what happened

17  in between.  So there's a 20-year time

18  period between these two papers.

19      Q.    He was studying nitrosamines

20  20 years ago, and he's still studying

21  nitrosamines though in 2020, right?

22           MS. THOMPSON:  Object to

23      form.

24           THE WITNESS:  That, I agree.

Confidential Information - Subject to Protective Order

1    BY MR. VAUGHN:

2           Q.    Right.

3           A.    That, I agree.  I just don't

4    know what happened in between.

5           Q.    You don't know if he's

6    published additional papers in between

7    2000 and 2020, like in 2018, right?

8           A.    Right.  I did not look at

9    that.

10             MR. VAUGHN:  Okay.  Then if

11             we can go down about two-thirds of

12             the way under that first paragraph

13             under introduction.  And there's a

14             sentence starting with "In

15             General."

16    BY MR. VAUGHN:

17          Q.    Doctor, can you read that

18    sentence aloud for the jury?

19          A.     "In general, genotoxic

20    carcinogens are regulated under the

21    policy that they have no thresholds or a

22    safe dose."

23          Q.    And then how many citations

24    are listed after that?

Confidential Information - Subject to Protective Order

1          A.      Three.

2          Q.      Do you know what ICH stands

3     for?

4          A.      Yeah.  I think it's a cancer

5     harmonization group or something like

6     that.  International cancer harmonization

7     or something.

8          Q.      And they are saying

9     genotoxic carcinogens are regulated under

10    the policy they have no threshold or safe

11    dose.  You weren't aware of that when you

12    were forming your opinions, were you?

13              MS. THOMPSON:  Objection.

14         Form.

15              THE WITNESS:  I was aware

16         that there are people who think

17         from a regulatory standpoint that

18         way.

19    BY MR. VAUGHN:

20         Q.      Why would regulators take

21    that stance?

22              MS. THOMPSON:  Objection.

23         Form.

24              THE WITNESS:  I'm not a

Confidential Information Subject to Protective Order

1    regulator.  I don't know.

2  BY MR. VAUGHN:

3        Q.    But you agree that a

4  genotoxin can alter a person's DNA,

5  correct?

6              MS. THOMPSON:  Objection.

7        Form.

8              THE WITNESS:  I agree that

9        that's the definition of a

10        genotoxin.

11  BY MR. VAUGHN:

12        Q.    But you don't know if that

13  has any impact on if there should be a

14  safe threshold, do you?

15        A.    Well, on that fact alone,

16  no, I don't think that's necessarily I

17  would agree with that.

18        Q.    Go ahead and read the next

19  sentence for us.

20        A.    "This is based on the

21  assumption that even one molecule of

22  genotoxic chemicals may induce a mutation

23  that may cause cancer."

24        Q.    And then there's a couple

Confidential Information - Subject to Protective Order

1    citations there as well, correct?

2         A.    Correct.

3         Q.    Did you happen to read

4    through of those citations either?

5         A.    I did not.  They were not

6    the focus in my report.

7         Q.    I thought the focus of your

8    report was to see how little or how much

9    NDMA you can -- a human can -- scratch

10   that.

11            I thought the purpose of

12   your opinion was to figure out how much

13   NDMA a person can consume and not get

14   cancer, right?

15            MS. THOMPSON:  Objection to

16        form.

17            THE WITNESS:  Well, again,

18        there are words in here about

19        regulatory policy.  I didn't

20        evaluate regulatory policy.

21            There are words in here

22        about assumption.  I didn't

23        operate on assumptions.

24            I looked at the data.  And

1          found that there were doses that

2          did not cause cancer.

3     BY MR. VAUGHN:

4          Q.     And you're not trying to

5     give any regulatory opinions in this

6     litigation, correct?

7          A.     Correct.

8               MS. THOMPSON:  Objection to

9          form.

10              THE WITNESS:  Sorry.

11              MS. THOMPSON:  It's okay.

12              THE WITNESS:  Correct.

13    BY MR. VAUGHN:

14         Q.     The assumption is that one

15    molecule of a genotoxic chemical may

16    induce a mutation that may cause cancer.

17    This sentence though, what does that

18    actually have to do with regulatory?

19              MS. THOMPSON:  Objection.

20         Form.

21              Where are you reading that

22         from?

23              THE WITNESS:  The second

24         sentence.

Confidential Information - Subject to Protective Order

1    BY MR. VAUGHN:

2         Q.    Thank you, Doctor.

3         A.    Again, the first sentence is

4    regulatory policy that I said I was not

5    going to give any opinions on.

6              The second sentence I said

7    made an assumption and then gave two

8    references.

9              And so for example,

10   Panigrahy's report references this

11   article.  And this article only refers to

12   an assumption.

13             So what I don't know is if

14   this assumption is referring to papers

15   that also said assumption as opposed to

16   data proving it.  So I can't really tell

17   you if this is just somebody repeating

18   assumption and assumption and assumption

19   and keep referring to it without having

20   any evidence or proof.  They may have it.

21   I just can't tell from this.

22        Q.    Because you haven't read

23   this and you haven't read any of the

24   citations, have you?

Confidential Information - Subject to Protective Order

1    A.    No.  But now I have read

2  Panigrahy's reference or citation for

3  that, and there's no data here to support

4  that contention.

5    Q.    I thought earlier -- I

6  thought your expert report you said you

7  did not have anything to support that

8  opinion?

9          MS. THOMPSON:  Objection to

10      form.

11          THE WITNESS:  I said he

12      didn't cite anything to form that

13      opinion.

14  BY MR. VAUGHN:

15    Q.    So do you think this is the

16  only article that he based that opinion

17  on?

18    A.    I do not know that.  I know

19  that this article has no data with which

20  to make that conclusion that he made.

21    Q.    But you haven't tried to

22  seek out any additional data regarding

23  genotoxic chemicals and their ability to

24  mutate someone's DNA and cause cancer

Confidential Information - Subject to Protective Order

1    even with just one molecule, have you?

2         A.    I haven't looked for that.

3    Although I have found animal data with

4    way more than one molecule being given

5    that did not produce cancer over the

6    entire lifetime of rats which corresponds

7    to anywhere between 70 and 90 years of

8    exposure in humans.

9         Q.    And because you didn't look

10   for any literature on this, you cannot

11   base any of your opinions on the

12   literature that says this, right?  You

13   didn't -- scratch that.

14             Because you didn't look for

15   any literature on genotoxic chemicals,

16   you also did not consider any of that

17   literature in forming your opinions in

18   this case; is that correct?

19             MS. THOMPSON:  Objection.

20        Form.

21             THE WITNESS:  These opinions

22        were not germane to the focus of

23        my report.

24   BY MR. VAUGHN:

Confidential Information - Subject to Protective Order

1          Q.    And explain to me again what

2     the focus of your report was?

3              MS. THOMPSON:  Objection.

4          Asked and answered.

5              THE WITNESS:  The metabolism

6          of NDMA and NDEA and in relation

7          to the amounts that were found in

8          valsartan, and in relation to

9          that, was there evidence based on

10         metabolism that there would be a

11         risk of cancer that I could

12         identify based on the animal data.

13    BY MR. VAUGHN:

14         Q.    Doctor, can you tell the

15    jury how many molecules of NDMA are in

16    one nanogram?

17              MS. THOMPSON:  Objection.

18         Form.

19              THE WITNESS:  Let's see.

20         Can we do micrograms

21         instead?

22    BY MR. VAUGHN:

23         Q.    Sure.

24         A.    And the reason I say that is

Confidential Information - Subject to Protective Order

1    this gets back to what are called molar

2    calculations, which use the molecular

3    weight of the compound in question, which

4    in the case of NDMA is -- the molecular

5    weight is 74.  That's the weight of the

6    carbons an the oxygen and the nitrogens

7    and the hydrogens.

8              And they add up to 74.  So a

9    microgram divided by 74 would be whatever

10   that ratio is in micromolar, and a mole

11   has Avoadra's number, 6.03 times ten to

12   the 23rd molecules.

13             So we can do that math if

14   you want.

15        Q.    How about this?  What's

16   larger, a nanogram or a molecule?

17             MS. THOMPSON:  Objection.

18             THE WITNESS:  A nanogram.

19   BY MR. VAUGHN:

20        Q.    So there are multiple

21   molecules of NDMA in every nanogram of

22   NDMA?

23        A.    Right.  And so I'm doubting

24   that there's any way that you could prove

Confidential Information - Subject to Protective Order

1    that one molecule could cause cancer

2    because there's no way to give one

3    molecule.

4         Q.    You're saying they just

5    can't prove it, so you discount it?

6         A.    And that's why this is an

7    assumption that I think is being passed

8    on from person to person.

9              And in your nursing career,

10   you may have heard of something called

11   chart lore where someone has heart

12   failure, because someone else in a note

13   said they had heart failure, and you

14   can't find any evidence of an ejection

15   fraction or heart failure meds or

16   anything to substantiate what we call

17   chart lore.

18             You can't give one molecule

19   of anything.  We just don't do that.

20   There's no way to do it.  So this is an

21   assumption that I think is being passed

22   on.

23        Q.    An assumption based on the

24   fact that it's genotoxin and can alter

1    someone's DNA, right?

2              MS. THOMPSON:  Objection.

3              THE WITNESS:  At some dose.

4        But there's no way to prove it

5        happened at one molecule.

6    BY MR. VAUGHN:

7        Q.    Would you say there's 100

8    molecules in a nanogram?  A thousand?

9    How much do you think there approximately

10   would be?

11       A.    It's based on the molecular

12   weight of the substance that you're

13   talking about.

14       Q.    It would be more than 100?

15       A.    Yeah, because we're talking

16   6.02 times ten to the 23rd for a

17   micromole.  So that's a lot of molecules.

18       Q.    Can you -- we'll go ahead

19   and do it in micrograms.

20             Can you give me an estimate

21   of how many of those molecules would be

22   in a microgram or a nanogram, either one?

23       A.    Yeah.  That's my estimate.

24   It's -- it's something like times ten to

Confidential Information - Subject to Protective Order

1    the 20th or something like that.

2          Q.    Per, is that microgram or

3    nanogram?

4          A.    Per microgram.

5          Q.    And what's ten to the 20th

6    for the jury?

7          A.    Quadrillion billions or

8    something.  I don't know what the exact

9    is.

10         Q.    So per microgram, there's

11   you said quadrillion billions?

12         A.    Oh, I don't know the exact

13   number.  It's got 20 zeros in front of

14   the decimal point.

15         Q.    20 zeros.  And then you are

16   aware of NDMA levels in valsartan that

17   are 40 micrograms.  So you're saying

18   billions and billions and billions of

19   molecules of a genotoxic substance, you

20   don't think has the potential to cause

21   cancer, correct?

22         A.    At the doses that we're --

23               MS. THOMPSON:  Objection.

24         Form.

Confidential Information - Subject to Protective Order

1              THE WITNESS:  At the doses

2         that we're talking about that have

3         been demonstrated in the best

4         approximator we have, which is the

5         rat, that there is no cancer that

6         formed in billions times those

7         billions.

8    BY MR. VAUGHN:

9         Q.    Just one nanogram, would

10   that be like trillions of molecules of

11   NDMA?

12        A.    I'd have to do the math.  I

13   couldn't assign a number to it unless I

14   did the math.  But we're talking about a

15   lot.

16        Q.    So these researchers have a

17   focus in carcinogens and NDMA.  They

18   think one molecule of it can induce

19   cancer.  And you, a pharmacist, thinks

20   that trillions of molecules of NDMA won't

21   even increase the risk of someone getting

22   cancer; is that correct?

23              MS. THOMPSON:  Object to

24        form.

Confidential Information - Subject to Protective Order

1    MS. KAPKE:  Object to form.

2    THE WITNESS:  What is

3    correct is that there have been no

4    data showing cancer in humans.  So

5    we have to start there.

6    And just secondly, we have

7    millions and billions of molecules

8    being given to rats that don't

9    cause cancer.

10    And the NDMA in valsartan is

11    way less than that.

12    So that is what it is.

13    BY MR. VAUGHN:

14    Q.    So the only evidence that's

15    going to be good enough for you is if we

16    give humans a bunch of NDMA and see what

17    happens?  That's the only way that you're

18    going to say that it could be a

19    carcinogen in humans?

20    MS. THOMPSON:  Objection to

21    form.  Asked and answered.

22    THE WITNESS:  It's not the

23    focus of my report.

24    The focus of my report is

Confidential Information Subject to Protective Order

1       whether the amount in valsartan

2       that we know, whether that

3       achieves some likelihood of

4       causing cancer based on the best

5       data we have, which are animal rat

6       data.

7              And so I concluded what I

8       did based on that.

9   BY MR. VAUGHN:

10      Q.    Are you aware of the widely

11  understood principle that animal studies

12  may simply be underpowered to pick up the

13  cancer risk at very low levels?

14             MS. THOMPSON:  Objection.

15      Form.

16             THE WITNESS:  I am aware of

17      any study can be limited by the

18      lack of something showing up at

19      low doses.  And that's what we

20      have.  That's the data that we

21      have.

22  BY MR. VAUGHN:

23      Q.    And are you aware that Peto

24  previously stated that too?

Confidential Information - Subject to Protective Order

1        A.     That Peto stated that we

2   have data showing that low doses won't

3   cause cancer?

4        Q.     No, that Peto says that

5   animal studies were underpowered;

6   therefore, they wouldn't be able to

7   detect low doses increasing the risk of

8   cancer, which is why they extrapolate all

9   the way down to a no dose threshold.

10             Are you aware if Peto said

11   that?

12             MS. THOMPSON:  Objection to

13        form.

14             THE WITNESS:  I am aware of

15        Peto's study.  I referenced it.  I

16        referenced the concerns that he

17        also expressed about the accuracy

18        of the no threshold concept.

19   BY MR. VAUGHN:

20        Q.     You said you are aware of

21   Peto study.

22             Is it your belief that Peto

23   has only done one study on NDMA?

24        A.     I never said that.  I was

Confidential Information - Subject to Protective Order

 1    referring to the one that I referred to

 2    where he gave a low enough dose that we

 3    could see there was no association with

 4    cancers.

 5         Q.    Have you read all of Peto's

 6    studies on NDMA?

 7         A.    I'd have to look at my

 8    reference list.  I think I've read at

 9    least one or two others.

10              This was by far the largest.

11    So the reason he did a 4,000-rat study

12    was to address those concerns about not

13    having enough power to detect cancers at

14    low doses.  So he improved his power by

15    doing what I thought was the largest rat

16    study, although it turns out that REMS

17    was almost the same size.

18         Q.    I'm going to ask you one of

19    the questions again because I don't think

20    I got a clear answer.

21              One second.  You said that

22    you're aware of the Peto study.  And you

23    referenced it.

24              My question was, were you

1    aware that Peto said that he believed the

2    animal studies were underpowered and,

3    therefore, were not able to detect the

4    increased risk of cancer at low doses of

5    NDMA?

6                    MS. THOMPSON:  Objection.

7          Form.

8                    THE WITNESS:  And in that

9          paper, was it in his introduction

10         or in his conclusions?

11   BY MR. VAUGHN:

12         Q.    You don't recall where it

13   was?

14                   MS. THOMPSON:  Objection.

15         Form.

16                   THE WITNESS:  I don't.  We

17         could look it up.  My suspicion is

18         that it's in his introduction to

19         explain why he chose to do a study

20         in 4,000 rats, is to address that

21         concern.

22   BY MR. VAUGHN:

23         Q.    That's your suspicion, but

24   you don't know, do you?

Confidential Information - Subject to Protective Order

1          A.     No.  We can call it up.  We
2     can look at it.  I would actually love to
3     do that.
4          Q.     We might do that in front of
5     the jury instead.
6                    MR. VAUGHN:  Can we go back
7          to that Nohmi 2020 article,
8          please.
9                    Can we zoom out a little
10         bit.
11    BY MR. VAUGHN:
12         Q.     Can you read out loud,
13    Doctor, the next sentence starting with
14    "accordingly."
15         A.     "Accordingly, genotoxic
16    carcinogens are strictly regulated and
17    not allowed to be used as food additives,
18    pesticides, or veterinary drugs."
19         Q.     So genotoxic carcinogens
20    aren't even allowed in veterinary drugs
21    or pesticides, but it's your opinion that
22    it's okay for them to be in human
23    medications; is that correct?
24                    MS. THOMPSON:  Objection.

Confidential Information - Subject to Protective Order

1          Form.  Calls for speculation.

2                    THE WITNESS:  Again, at

3          doses low enough that don't appear

4          to increase the risk for cancer,

5          which is what I found, that is

6          reporting the science, not making

7          a regulatory statement, which is

8          not what I'm attempting to do.

9    BY MR. VAUGHN:

10         Q.    Okay.  Pesticides, it's not

11   like low amounts of NDMA are allowed in

12   pesticides.  No NDMA is allowed to be in

13   a pesticide, right?

14                   MS. THOMPSON:  Objection.

15         Form.  Scope.

16                   THE WITNESS:  I mean that's

17         what it says, yes.

18   BY MR. VAUGHN:

19         Q.    And same for drugs that you

20   give to animals, it's not like you can

21   give a little bit.  You can't give any at

22   all, right?

23                   MS. THOMPSON:  Objection.

24         Form.  Scope.

Confidential Information Subject to Protective Order

```
 1                THE WITNESS:  Again --
 2         sorry.
 3                This is a regulatory
 4         perspective.  That's not the
 5         approach I took.
 6  BY MR. VAUGHN:
 7         Q.   Which one -- which approach
 8  would be safer for the public health,
 9  your approach or this approach?
10                MS. THOMPSON:  Objection.
11         Form.  Scope.
12                THE WITNESS:  Again, you --
13         you are making the assumption that
14         one molecule causes cancer which
15         is an unsubstantiated claim.
16                So the reality is that we
17         have to look at what did happen,
18         not at what could or should or
19         might happen in the future.
20                But I was looking at the
21         reality of what did happen.  And
22         did I feel that this put patients
23         at risk for developing cancer at
24         the amount in the valsartan
```

Confidential Information - Subject to Protective Order

1          products.

2                  And based on the best

3          available data that I have access

4          to, the answer is no, I don't

5          think it put people at excess

6          risk.

7   BY MR. VAUGHN:

8          Q.    Again, you don't know all

9   the levels that were in valsartan,

10  because you never even asked defense

11  attorneys to provide it to you, did you?

12                 MS. THOMPSON:  Objection.

13         Form.  Asked and answered.

14                 THE WITNESS:  I didn't ask

15         attorneys for that.  I took it

16         from the FDA's website which was

17         publicly available to all of us.

18  BY MR. VAUGHN:

19         Q.    Okay.  I mean, I guess,

20  would you expect that a manufacturer of a

21  pharmaceutical product would disclose all

22  of their testing data to the FDA?

23                 MS. THOMPSON:  Objection.

24         Form.

Confidential Information - Subject to Protective Order

1            THE WITNESS:  They may have.

2       But the FDA didn't make it

3       available to me.

4            And even if we go back, I

5       think at the very beginning of

6       this morning, when you talked

7       about the 120 parts per billion,

8       let's call that the highest level.

9       It doesn't change the opinions in

10      my report anyway.

11 BY MR. VAUGHN:

12      Q.    Did you just say parts per

13 billion?  Did you mean parts per million?

14      A.    If I said billion, I meant

15 million.

16            Sorry.  The 120 parts per

17 million, which I think we calculated as

18 being just under 40 micrograms, like 38

19 something.

20            And so we're talking about,

21 instead of the calculations that I did on

22 20 micrograms, that 120 parts per

23 million, let's call it 40 micrograms.

24 And so instead of the amount in the

Confidential Information - Subject to Protective Order

1    valsartan products that I calculated

2    being anywhere from 350 to 22,000 times,

3    you know, it's still 150 to 11,000 times.

4    So it doesn't change my opinions at all.

5         Q.    The fact that you

6    underestimated the amount of NDMA in a

7    pill, the fact that you overestimated the

8    weight of the average human, the fact

9    that you did a one-to-one ratio when you

10   scaled it for kg, all of those things

11   together you don't think really impact

12   your opinion?

13              MS. THOMPSON:  Objection to

14        form.  Mischaracterizes his

15        testimony.

16              THE WITNESS:  No.  And just

17        making some assumptions that I

18        don't necessarily have to agree

19        with.

20              There's not a patient in

21        this country on valsartan for

22        hypertension at the usual age that

23        those people are that weigh

24        50 kilograms.

Confidential Information - Subject to Protective Order

1    BY MR. VAUGHN:

2         Q.    In the United States, right?

3         A.    Is there one somewhere?

4    Yeah, probably.

5         Q.    I mean, I guess Americans

6    are heavier on average than people in

7    other countries, aren't we?

8         A.    Yeah, that's true.

9         Q.    So --

10        A.    Again, we're not talking

11   about healthy 17-years-olds.  We're

12   talking about potentially unhealthy 50-,

13   60-, 70-year olds, who again aren't going

14   to be taking the drug for 70 years.  At

15   most they could have been taking it for

16   four years.

17        Q.    So if a company is making

18   valsartan and some of their product they

19   know has a lot of NDMA in it and some of

20   their product has just a little bit of

21   NDMA in it, do you think it would be more

22   appropriate for them to be sending that

23   high level of NDMA to Americans because,

24   you know, Americans weigh more than other

Confidential Information Subject to Protective Order

1   people do in other countries on average?

2            MS. THOMPSON:  Objection.

3        Form.  Foundation.  Calls for

4        speculation.

5            THE WITNESS:  I don't think

6        I ever said that.  But I don't

7        think anyone would be doing that

8        anyway.

9   BY MR. VAUGHN:

10       Q.    Why?

11       A.    Why would they?  I can't

12  come up with a reason why they would.  So

13  I don't have a why.

14       Q.    It would be very unethical

15  if they were doing that, wouldn't it?

16           MS. THOMPSON:  Objection.

17       Form.  Scope.

18           THE WITNESS:  If someone

19       were to do something unethical, it

20       would be unethical.

21  BY MR. VAUGHN:

22       Q.    I mean, if a company was

23  intentionally sending the higher level of

24  NDMA product to the United States instead

Confidential Information - Subject to Protective Order

1    of other countries, that would be

2    unethical to do, right?

3                    MS. THOMPSON:  Objection.

4            Form.  Asked and answered.  Scope.

5            I mean, this is so far afield from

6            his opinions in his report, I

7            don't know what we're doing here.

8    BY MR. VAUGHN:

9            Q.    You going to answer the

10   question, Doctor?

11           A.    Yes, I can answer.

12                    I can't understand how that

13   would ever happen.  So I don't have an

14   opinion on something that would never

15   happen.

16           Q.    I agree with you, it's

17   completely inconceivable someone would do

18   something like that.

19                    Do you agree that a

20   responsible pharmaceutical company would

21   disclose all of their testing data and

22   all of the levels of NDMA that they were

23   aware of in valsartan to the FDA?

24                    MS. THOMPSON:  Objection to

Confidential Information - Subject to Protective Order

1          form.

2                    MS. KAPKE:  Object to form.

3                    MS. THOMPSON:  I'm going to

4          re-raise the issue that was raised

5          earlier, that that is a general

6          liability opinion.  That's not

7          about causation.  That's not what

8          we're here to discuss.

9                    MR. VAUGHN:  Well, I mean,

10         the FDA has done some calculations

11         and stuff based on the data that

12         they're aware of.  And this expert

13         has relied on what the FDA was

14         aware of.

15                   So I think it is applicable.

16    BY MR. VAUGHN:

17         Q.    You would expect a

18    responsible company to disclose all the

19    data that they are aware of to the FDA,

20    right?

21                   MS. THOMPSON:  Same

22         objection.

23                   THE WITNESS:  I'm assuming

24         they did.  So I don't know what

Confidential Information - Subject to Protective Order

1    happened there.  It wasn't

2    anything that I looked at or

3    relied upon.

4         MR. VAUGHN:  Great.  Let's

5    take a break.

6         THE VIDEOGRAPHER:  The time

7    right now is 3:55 p.m.  We're off

8    the record.

9         (Short break.)

10        THE VIDEOGRAPHER:  The time

11   right now is 4:06 p.m.  We're back

12   on the record.

13   BY MR. VAUGHN:

14        Q.   Doctor, can you hear me?  It

15   says my connection is unstable.  I think

16   it's good now.

17        A.   I hear you now.

18        MS. THOMPSON:  We hear you.

19   BY MR. VAUGHN:

20        Q.   All right.  Doctor, are you

21   aware -- strike that.  Just going to talk

22   clearly.

23        Doctor, are you aware of how

24   the FDA selected the valsartan pills that

Confidential Information - Subject to Protective Order

1    it tested for NDMA?

2         A.    No, I'm not, actually.  I

3    got the table that I included in my

4    report off of the FDA's published

5    website.

6         Q.    And so you're not aware if

7    the companies sent the valsartan pills to

8    the FDA to test, correct?

9         A.    I do not know that.

10        Q.    And, therefore, you don't

11   know if those companies cherry-picked the

12   valsartan pills that they decided to send

13   to the FDA, correct?

14        A.    I do not know that.

15             MR. VAUGHN:  Thank you very

16        much for your time today, Doctor.

17        I have no further questions,

18        subject to direct.

19             THE WITNESS:  Okay.  All

20        right.  Thank you, Mr. Vaughn.

21             MS. THOMPSON:  We are going

22        to have some questions.  And I

23        wasn't expecting you to do that.

24        So give me a second to pull those

Confidential Information - Subject to Protective Order

1       up.

2               THE VIDEOGRAPHER:  Are we

3       going off the record?

4               MR. VAUGHN:  I'm fine with

5       staying on.

6               MS. THOMPSON:  If you don't

7       mind, I'd really like to go off

8       for just two minutes just to make

9       sure that I have all my questions.

10              MR. VAUGHN:  As long as it's

11      just a couple minutes.

12              MS. THOMPSON:  Real brief.

13              THE VIDEOGRAPHER:  The time

14      right now is 4:07 p.m.  We're off

15      the record.

16              (Short break.)

17              THE VIDEOGRAPHER:  The time

18      right now is 4:10 p.m.  We're back

19      on the record.

20              MS. THOMPSON:  Just a few

21      questions.  Hopefully this will be

22      quick.

23                  -   -   -

24              EXAMINATION

Confidential Information - Subject to Protective Order

```
 1                    -  -  -

 2   BY MS. THOMPSON:

 3        Q.    Dr. Bottorff, as a doctor of

 4   pharmacy are you able to and have you

 5   prescribed drugs to patients?

 6        A.    In the context of physically

 7   writing the prescription, I have done

 8   that.

 9              Usually I've done it in an

10   environment where a physician at some

11   point would need to come behind and

12   co-sign it instead of independent

13   prescriptive authority, although there

14   are some pharmacists in some states who

15   have that ability.  So yeah, I've

16   initiated, with co-signature, thousands

17   of drug therapies.

18        Q.    And has that included

19   prescribing anti-hypertensives like

20   valsartan or other ARB drugs?

21        A.    Valsartan, many of the other

22   ARBs, and not just for hypertension, but

23   also for heart failure.

24        Q.    And you didn't study
```

Confidential Information - Subject to Protective Order

1    valsartan and the other ARBs for their

2    metabolism or their pharmacokinetics for

3    the first time for this case, right?

4         A.    No.  No.  Those are drugs

5    that on a regular basis, when they come

6    out, I look at their pharmacokinetics,

7    their pharmacodynamics, their side effect

8    profile.  Because when you have more than

9    one drug in the category, then you need

10   to evaluate in what situation would I use

11   this one versus that one, what's the

12   strength of their outcome data, as much

13   clinical information on those drugs as I

14   can get.

15            And it's not just in my own

16   interest.  I get asked questions about

17   those issues with these drugs from

18   physicians, from patients and from

19   students when I teach.

20        Q.    We had some questions

21   earlier, and I just want to give you an

22   opportunity to explain it cleanly in a

23   way that a layperson -- and I am a

24   layperson -- can understand.

Confidential Information - Subject to Protective Order

1          What is first-pass

2   metabolism?

3          A.    Every drug that we give

4   orally that is absorbed towards the

5   liver, across the small intestine,

6   undergoes what we would call first-pass

7   metabolism.

8              And for some drugs that

9   clearance is pretty low, for some drugs

10  it's intermediate, and for some drugs

11  that clearance rate is really high.

12             And so the amount of drug

13  that gets through the liver, then into

14  the hepatic vein, which then enters the

15  circulation through the heart, the lungs,

16  back to the liver, to other organs, is

17  only occurring if drugs are given at a

18  dose that exceeds whatever that

19  first-pass metabolism capability is for

20  that particular drug.

21       Q.    So did you have to determine

22  a first-pass metabolism capability for

23  valsartan and NDMA?

24             MR. VAUGHN:   Object to form.

Confidential Information - Subject to Protective Order

1    THE WITNESS:  Sorry.  For --

2    for valsartan, that's what's

3    reported in the package label and

4    plenty of studies showing --

5    that's when we talked about its

6    bioavailability being between,

7    what was it, 10 and 35 percent.

8    That's the percent of the

9    drug that gets through the liver

10   and does its systemic effects,

11   because that's a drug that you

12   want to work on the heart, in the

13   kidney, on the blood vessels.

14   Can you repeat the question

15   real quick?

16   BY MS. THOMPSON:

17   Q.    I was asking about, did you

18   have to determine the first-pass

19   metabolism of both valsartan and then

20   NDMA --

21   A.    Yeah, it's easier for

22   valsartan because it's supposed to get

23   through the liver and do its

24   pharmacologic effect so you can measure

Confidential Information Subject to Protective Order

1  the bloodstream to assess

2  bioavailability.

3           For NDMA, that assessment is

4  not as exact a science, except for a

5  couple small rat studies that looked at

6  it, because you don't want it to get into

7  the systemic circulation.

8           So -- and the dose is low

9  enough that you get first complete

10  first-pass metabolism, you couldn't

11  measure it in the bloodstream.

12     Q.    And before valsartan that

13  contains NDMA or NDEA gets to the liver,

14  does it get metabolized anywhere else or

15  exposed to any organs prior to the liver?

16     A.    No.  And some drugs do.

17  There is a fairly robust round of

18  cytochrome P450 in the small intestine.

19  So many drugs are first metabolized

20  there, and then into the mesenteric blood

21  system directly into the liver.

22           But in looking at this

23  issue, particularly at 2E1, there is no

24  2E1 in the small intestine.  So there is

Confidential Information - Subject to Protective Order

1    no pre-systemic metabolism before it gets

2    to the liver.  So all of it occurs in the

3    liver.

4         Q.    And so, how do we know that

5    the only metabolism that would occur

6    would be in the liver and not prior to

7    that?

8              MR. VAUGHN:  Object to form.

9              THE WITNESS:  Because there

10        is no metabolism ability present

11        until you get to the liver.

12   BY MS. THOMPSON:

13        Q.    Does first-pass metabolism

14   apply to both NDMA and NDEA?

15        A.    Yes, it does.

16        Q.    And you also used a term

17   earlier today that I'm going to again

18   make you explain to me like a layperson.

19             Liver saturation, can you

20   please explain that?

21        A.    Again, this sort of gets at

22   the issue of first-pass metabolism and at

23   what point do you reach the ability of

24   the liver to completely clear the dose of

Confidential Information - Subject to Protective Order

1    that drug.

2              And saturation is a good

3    term.  Some people liken it to, like, how

4    much water can a sponge hold.  And when

5    you've reached the point where the sponge

6    can hold no more water, the water gets

7    past the sponge to wherever it would go

8    after that.

9              So that's a way of thinking

10   of a saturation point.  It's your ability

11   to measure it beyond the liver.

12        Q.    Were you able to determine a

13   liver saturation level for NDMA or NDEA?

14        A.    Not in the context of what

15   the actual dose would be based on blood

16   levels past the liver because it has such

17   a short half-life it's really difficult

18   to do.

19              So the surrogate for

20   measuring post-liver blood level

21   penetration, if you will, was whether

22   there was any either adducts or cancers

23   that occurred past that.  So that's where

24   I came up with that

Confidential Information - Subject to Protective Order

1   .1-milligram-per-kilogram sort of dose

2   that, if it does get through the liver,

3   it doesn't appear to cause any downstream

4   cancer.  So it must be in small enough

5   amounts that it can't do that.

6          Q.    Does NDMA or NDEA accumulate

7   in the liver if it is ingested every day?

8          A.    That's a good question.  In

9   a pharmacokinetic sense, drug metabolism

10  sense, for a drug to accumulate --

11  remembering that the liver's job is to

12  metabolize.  And if you can't measure any

13  downstream, it's because the drug has

14  been completely metabolized in the liver,

15  so no drug level accumulation would occur

16  as long as you weren't exceeding that

17  capacity on a daily basis.

18              So in the doses that we are

19  talking about, there would be no drug

20  level accumulation.

21          Q.    If valsartan makes it

22  through the liver and circulates into the

23  bloodstream and provides therapeutic

24  effect, how can you say that NDMA or NDEA

Confidential Information Subject to Protective Order

1   in it doesn't make it to that point?

2         A.    We touched briefly on this.

3   I don't know how well I explained it.

4   But when a tablet of valsartan is

5   dissolved in the stomach and the upper

6   small intestine and then is absorbed, the

7   way I like to explain it, is that they

8   then go their merry way.

9              They are no longer

10  chemically connected.  They have their

11  own separate and independent routes of

12  metabolism and elimination.  And so

13  valsartan does what it does, and NDMA and

14  NDEA does what it does.

15        Q.    And --

16        A.    And those mechanisms do not

17  overlap at all.

18        Q.    Is evaluating whether,

19  where, and how a drug is metabolized part

20  and parcel of pharmacokinetics?

21        A.    Absolutely.  I give examples

22  in my report of drugs whose doses are

23  dramatically different, or in some cases

24  aren't even given at all because

1    first-pass metabolism is so efficient

2    that the drug would be ineffective.

3             And a real classic example

4    of that is lidocaine.  We don't use it

5    that much anymore for arrhythmias.  But

6    when it was attempted to be given orally,

7    first-pass metabolism was so extensive

8    you've got no clinical effect from

9    lidocaine.  Only if you gave it

10   intravenously.

11            So measurable kinetics,

12   clearance, half-life, first-pass

13   metabolism, that's all dependent on the

14   route of administration.

15       Q.    And in your -- I hesitate to

16   put a number on there -- almost 40-year

17   career, have you done this type of

18   evaluation of whether, how, and where

19   drugs are metabolized in the body in your

20   ordinary course of your professional

21   experience?

22            MR. VAUGHN:  Object to form.

23            THE WITNESS:  I'm sorry.

24       Hundreds of times.  There were how

1           many drugs in the cardiovascular

2           arena on the market when I

3           graduated compared to how many are

4           in the arena now in that 40 years,

5           how many more.

6                It's like hundreds and

7           hundreds more, and I do that for

8           every one of these drugs.

9     BY MS. THOMPSON:

10         Q.    So the analysis that you've

11    done here to formulate your opinions, is

12    it consistent with what you've done in

13    your professional practice?

14         A.    It is a process for any drug

15    that I go through.  What's its dose, how

16    effective, what are its side effects,

17    what's its toxicity, what are the data,

18    what are the type of data.  In many cases

19    I look at the animal studies in addition

20    to the human studies when they are

21    conducted.

22         Q.    And you were asked earlier

23    about your kind of ultimate opinion that

24    the presence of NDMA in valsartan, based

Confidential Information Subject to Protective Order

1    on all of these factors, does not

2    increase the risk of cancer in downstream

3    organs.  Do you recall that?

4            A.    Yes.

5            Q.    Okay.  How do you know that?

6                  MR. VAUGHN:  Object to form.

7                  THE WITNESS:  It's my best

8            clinical judgment based on an

9            evaluation of the trials that have

10           a dose that did not cause cancer

11           in the most close animal model for

12           NDMA metabolism, which is the rat.

13           I identified a dose that below

14           which would not cause tumors.

15                 And then in the multiple

16           tables that I provided, I compared

17           that to the milligram-per-kilogram

18           dose in the valsartan products

19           versus extrapolating to humans.

20           And it was hundreds and hundreds,

21           and even thousands and in some

22           cases tens of thousands of times

23           more.

24                 So if we add that evidence,

Confidential Information Subject to Protective Order

1          which is the best we'll have,

2          we're not going to have any

3          better.

4               If that's the evidence that

5          we have of a dose and it doesn't

6          cause cancer --

7               (Brief interruption.)

8    BY MS. THOMPSON:

9          Q.    Sorry, Doctor.  If you want

10   to kind of go back and --

11         A.    Poor child.

12              So again, using the animal

13   data, which is the best we have to

14   extrapolate into humans, a noncancerous

15   dose of NDMA which was about

16   .1 milligrams per kilogram -- and that

17   was fairly consistent across three or

18   four studies, at least that I looked at.

19   And you expressed that in a human dose

20   based on body weight, which is the best

21   way that we have to do it.

22              Then you get

23   valsartan-containing products, even if

24   you accept the 120 parts per million that

Confidential Information - Subject to Protective Order

1    we talked about, there are still hundreds

2    to tens of thousands times more than what

3    doesn't cause cancer in a rat.

4         Q.    I have one more question, at

5    least for now.  We'll see if we have

6    anything further based on what you just

7    said.  I hate to end on this note.

8              In preparing for this, did

9    you find a citation in your report that

10   you need to correct?

11        A.    Thank you for bringing that

12   up.

13             When I went through some of

14   the epidemiology studies and constructed

15   my tables showing what I thought -- well,

16   what is the inconsistency in the data on

17   the association between NDMA proposed in

18   dietary and/or environmental exposures,

19   there were two studies by an author named

20   Straif.

21             And in my tables I reference

22   Straif and his data.  But the citation I

23   quote is his other study and not the one

24   that actually has the data that I have in

Confidential Information - Subject to Protective Order

1    there.  So I just need to switch the

2    citation to the article that has those

3    data.

4              The data are accurate,

5    they're what I wanted to have in the

6    report, but his reference is the other

7    one that I read of his, not the one that

8    has these data.

9              MS. THOMPSON:  And we'll

10         provide an updated version with

11         the correct citation for the other

12         Straif article.  I don't know if

13         anybody else has anything else

14         that they wanted to cover.

15              MR. VAUGHN:  I'll be quick

16         then.

17                   -   -   -

18              EXAMINATION

19                   -   -   -

20    BY MR. VAUGHN:

21         Q.    Doctor, when did you realize

22    that your report had citation errors?

23         A.    Yesterday afternoon.  It has

24    a citation error.

Confidential Information Subject to Protective Order

1    Q.    And how did that come to

2  your attention?

3    A.    In just going through the

4  report and looking at some of where the

5  data came from.  I think it actually it

6  was one of counsel that picked it up.

7    Q.    Did you meet with counsel

8  prior to this deposition?

9    A.    Yes.

10    Q.    For how many hours?

11    A.    Maybe six hours yesterday.

12    Q.    Was yesterday the only day?

13    A.    It's the only day that we

14  met in person.

15    Q.    How many days did you meet

16  not in person or did you -- sorry not

17  meet.  Strike that.

18         Did you also consult or prep

19  with attorneys by remote meetings?

20    A.    There was a remote meeting

21  on Monday that just lasted a couple

22  hours.

23    Q.    Are those the only two

24  meetings that you had in preparation for

Confidential Information - Subject to Protective Order

1    your deposition?

2           A.    Yes.

3           Q.    I believe, just a few

4    minutes ago, you testified that NDMA is

5    not exposed to any organs prior to the

6    liver.  Is that what you meant to say?

7           A.    That is not what I said.

8           Q.    Okay.  So if the transcript

9    says that -- sorry.

10          A.    Yeah, let me clarify.

11                It's not exposed to an organ

12   with metabolic capability prior to

13   getting to the liver.

14          Q.    In your opinion, correct?

15          A.    Yes, in my opinion.

16          Q.    But there are several organs

17   that it touches prior to getting to the

18   liver?

19          A.    Not in a metabolizing

20   capacity.

21          Q.    But you would agree that it

22   at least touches several organs prior to

23   getting to the liver, correct?

24          A.    It passes through the

Confidential Information - Subject to Protective Order

1    esophagus in a solid pill form, which is

2    not where absorption would occur.

3              And then its dissolution to

4    be able to be absorbed occurs in the

5    stomach where there is no 2E1.  And then

6    it's absorbed across the small intestine,

7    which also does not have 2E1.  So the

8    first time it's in a form that can be

9    metabolized by 2E1 is when it gets to the

10   liver.

11       Q.    When a substance is absorbed

12   through the small intestine, does

13   100 percent of it go to the liver or does

14   some of that blood bypass the liver?

15             MS. THOMPSON:  Objection to

16        form.

17             THE WITNESS:  Yeah, the

18        mesenteric system drains it all

19        into the liver.  It's the

20        evolution of that defense

21        mechanism.  That's what it's there

22        for.

23   BY MR. VAUGHN:

24       Q.    The evolution, what do you

Confidential Information - Subject to Protective Order

1    mean evolution of that defense mechanism?

2        A.    Our evolution of the liver

3    doing what it does and the cytochrome

4    P450 system and other metabolizing

5    pathways that are not, you know, at hand

6    here, those evolved as a way of

7    detoxifying things that we ingested.

8             So the evolution of our

9    alimentary system and our drug

10   metabolizing system is the way it is to

11   be a detoxifying system.

12       Q.    So is it your opinion that

13   because humans have been exposed to

14   environmental nitrosamines throughout

15   history, that humans have evolved to be

16   able to not get cancer from NDMA?

17            MS. THOMPSON:  Objection.

18       Form.

19            THE WITNESS:  Yeah, it's a

20       good line of thinking, but many of

21       these P450s evolved in response to

22       exposures that may have been other

23       toxins of other types that had

24       nothing to do with NDMA.

Confidential Information - Subject to Protective Order

1              But because they're there

2        and now we are exposed to NDMA, we

3        have the capacity to metabolize.

4   BY MR. VAUGHN:

5        Q.    So --

6        A.    Some of these enzymes are

7   not so super specific that they evolve

8   only to handle one potential toxin.

9        Q.    And is P450 one of those

10  that handles numerous toxins?

11       A.    Yeah.  There are like 250,

12  300 individually specific cytochrome P450

13  isozymes.

14       Q.    Why haven't humans evolved

15  to just not be able to get cancer at all?

16            MS. THOMPSON:  Objection.

17       Scope.

18            THE WITNESS:  That is beyond

19       my ability to understand and

20       answer.

21  BY MR. VAUGHN:

22       Q.    But you're able to give an

23  opinion that we've evolved to be able to

24  handle NDMA?

1        MS. THOMPSON:  Objection.

2     Form.  Mischaracterizes.

3        THE WITNESS:  We have

4     evolved with the ability to

5     detoxify orally ingested

6     substances.

7        And I should add, it's a

8     little more complicated than I'm

9     portraying.

10       Many of the cytochrome P450s

11    are involved in endogenous

12    steroid, hormone, and cholesterol

13    metabolism.  So some of them have

14    multiple jobs.

15 BY MR. VAUGHN:

16    Q.    Do you have an opinion on

17 what animal a human evolved from?

18       MS. THOMPSON:  Object to

19    form.

20       THE WITNESS:  The -- I mean,

21    I'm pretty sure we evolved from

22    primates, from nonhuman primates.

23 BY MR. VAUGHN:

24    Q.    But you think we metabolize

Confidential Information - Subject to Protective Order

1    NDMA more like a rat than a nonhuman

2    primate?

3                    MS. THOMPSON:  Objection.

4          Asked and answered.

5                    THE WITNESS:  I think that

6          because that's what scientists

7          have said.

8    BY MR. VAUGHN:

9          Q.    Does that really make sense,

10   if we evolved from a nonhuman primate,

11   that we're going to metabolize it more

12   like a rat?

13                   MS. THOMPSON:  Objection.

14         Asked and answered.

15                   THE WITNESS:  You know, why,

16         I don't know that I have an answer

17         for.  It is just what it is.  And

18         so I observed it, reported on it.

19   BY MR. VAUGHN:

20         Q.    You noted lidocaine earlier.

21   Is Lidocaine a genotoxic carcinogen?

22                   MS. THOMPSON:  Objection.

23         Form.

24                   THE WITNESS:  I don't think

Confidential Information - Subject to Protective Order

1           so.  It's just an example of a

2           drug that has a very high

3           first-pass metabolism, and so

4           giving it orally will never

5           produce any post-liver effect.  So

6           it's a good example in that

7           regard.

8    BY MR. VAUGHN:

9           Q.    But the only genotoxic

10   carcinogen that you have experience with

11   is Actos, correct?

12               MS. THOMPSON:  Objection.

13          Form.  Mischaracterizes testimony.

14               THE WITNESS:  No.  I also

15          mentioned the immunosuppressive

16          drugs for heart transplant

17          patients.  But that's pretty much

18          the extent.

19   BY MR. VAUGHN:

20          Q.    Those are genotoxins?

21               MS. THOMPSON:  Objection.

22          Form.

23               THE WITNESS:  I'm not sure

24          their mechanism of cancer

Confidential Information - Subject to Protective Order

1    production is genotoxic.  But they

2    are carcinogenic.

3  BY MR. VAUGHN:

4        Q.    Okay.  So the only genotoxic

5  carcinogen that you have experience with

6  is Actos?

7            MS. THOMPSON:  Objection.

8        Form.

9            THE WITNESS:  In -- in that

10       specific genotoxic sense, yes.

11  BY MR. VAUGHN:

12       Q.    Doctor, is every carcinogen

13  also a genotoxin?

14           MS. THOMPSON:  Objection.

15       Form.

16           THE WITNESS:  I don't think

17       so.  But -- yeah, I don't think

18       so.

19  BY MR. VAUGHN:

20       Q.    Were you an expert in the

21  Actos litigation at all?

22       A.    No.  That was just out of my

23  interest in -- when that report came out

24  about the potential association with

Confidential Information - Subject to Protective Order

1  bladder cancer in the normal part of what

2  I do, is I look at the data and where it

3  came from, and how solid it is, and what

4  type of data.  And Actos was one of those

5  drugs that a lot of my heart patients

6  were on.

7       Q.    And so you wanted to

8  investigate it because you cared about,

9  you know, if your patients got cancer or

10 not, right?

11           MS. THOMPSON:  Objection.

12      Form.

13           THE WITNESS:  I investigated

14      it to evaluate the quality of the

15      data to make a determination in

16      that regard.

17 BY MR. VAUGHN:

18      Q.    And in your opinion does

19 Actos actually incite bladder cancer or

20 increase the risk of bladder cancer?

21           MS. THOMPSON:  Objection.

22      Form.  Scope.

23           THE WITNESS:  Certainly not

24      anything that I put into my

Confidential Information - Subject to Protective Order

1           report.  But my understanding is

2           that there was some inconsistency

3           in that data, so I don't think it

4           was very clear.

5    BY MR. VAUGHN:

6           Q.    Did you keep all of your

7    patients on Actos?

8                 MS. THOMPSON:  Objection.

9           Form.

10                THE WITNESS:  To the best of

11          my knowledge, yes.

12   BY MR. VAUGHN:

13          Q.    Do you know if any of them

14   got bladder cancer?

15                MS. THOMPSON:  Objection.

16          Form.  Scope.

17                THE WITNESS:  To the best of

18          my knowledge, no.

19   BY MR. VAUGHN:

20          Q.    Are you aware of studies

21   that have shown that gastric and

22   colorectal tissues are more efficient at

23   metabolizing NDMA in humans than in

24   animals?

Confidential Information - Subject to Protective Order

1          MS. THOMPSON:  Objection.

2     Form.

3          THE WITNESS:  I have not

4     seen that data.  It didn't come up

5     in my research.

6  BY MR. VAUGHN:

7     Q.    Is it easier to measure the

8  bioavailability of valsartan in

9  comparison to NDMA?

10    A.    It's easier in the concept

11 that we can do that in humans and that

12 we've not done that with NDMA in humans.

13    Q.    Didn't you say earlier it's

14 not well studied in humans?

15         MS. THOMPSON:  Objection.

16 BY MR. VAUGHN:

17    Q.    Or it's not studied at all,

18 I guess, is what you're saying?

19    A.    Yeah, there are no

20 pharmacokinetic studies on NDMA in

21 humans.  Maybe the one that was in

22 ranitidine that we mentioned earlier

23 today.

24    Q.    So would you agree you don't

Confidential Information - Subject to Protective Order

1    know actually how much NDMA gets into the

2    bloodstream?

3                    MS. THOMPSON:  Objection.

4            Form.

5                    THE WITNESS:  Because we

6            don't measure -- number one, we

7            don't know in humans.  And because

8            we don't measure it in the animal

9            studies, I use the surrogates,

10           whether that was a development of

11           tumor or adducts.

12   BY MR. VAUGHN:

13           Q.    But you agree that you do

14   not know how much would make it into the

15   bloodstream in a human, correct?

16                   MS. THOMPSON:  Objection.

17           Form.  Asked and answered.

18                   THE WITNESS:  It depends on

19           the dose.

20   BY MR. VAUGHN:

21           Q.    At the doses that we are

22   discussing -- that your expert report

23   covers, do you know how much NDMA gets

24   into the bloodstream of a human?

Confidential Information - Subject to Protective Order

1          MS. THOMPSON:  Objection.

2     Form.  Asked and answered.

3          THE WITNESS:  In a

4     quantitative amount in the rat

5     studies, no.

6          But not enough at the

7     .1-milligram-per-kilogram dose or

8     below to induce downstream cancer.

9  BY MR. VAUGHN:

10     Q.    My question is more simple

11  than that.  Just strictly in humans, you

12  do not know how much NDMA would get into

13  their bloodstream after they consumed

14  valsartan contaminated with NDMA,

15  correct?

16          MS. THOMPSON:  Objection.

17     Form.  Asked and answered.

18          THE WITNESS:  We do not have

19     those data in humans.  And so

20     we're relying on the best

21     surrogate we have, which is the

22     animal models, particularly the

23     rat.

24  BY MR. VAUGHN:

Confidential Information Subject to Protective Order

 1          Q.    And so you would agree that

 2    you do not know how much NDMA would get

 3    into the human bloodstream, correct?

 4                MS. THOMPSON:  Objection.

 5          Form.  Asked and answered.

 6                THE WITNESS:  Correct.  We

 7          do not have those human data.

 8    BY MR. VAUGHN:

 9          Q.    And because you don't have

10    the data, you can't know, correct?

11                MS. THOMPSON:  Objection.

12          Form.  Asked and answered.

13                THE WITNESS:  I do not know.

14                MR. VAUGHN:  I have no

15          further questions.

16                MS. THOMPSON:  One second.

17          I think we're done.  Sorry.

18                MR. VAUGHN:  Not a problem,

19          Sara.

20                MS. THOMPSON:  Okay.  Can we

21          go off.

22                MR. VAUGHN:  Yeah.

23                THE VIDEOGRAPHER:  The time

24          right now is 4:38 p.m.  We're off

Confidential Information - Subject to Protective Order

1        the record.

2               * * * * * * * *

3               (Excused.

4               (Deposition concluded at

5        approximately 4:38 p.m. eastern

6        time.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Confidential Information - Subject to Protective Order

1

2                        CERTIFICATE

3

4

5            I HEREBY CERTIFY that the
   witness was duly sworn by me and that the
6  deposition is a true record of the
   testimony given by the witness.
7
             It was requested before
8  completion of the deposition that the
   witness, MICHAEL B. BOTTORFF, Pharm.D.,
9  have the opportunity to read and sign the
   deposition transcript.
10

11

12      *Michelle L. Gray*_____
        MICHELLE L. GRAY,
13      A Registered Professional
        Reporter, Certified Shorthand
14      Reporter, Certified Realtime
        Reporter and Notary Public
15      Dated:  September 20, 2021
16

17

18            (The foregoing certification
19  of this transcript does not apply to any
20  reproduction of the same by any means,
21  unless under the direct control and/or
22  supervision of the certifying reporter.)
23

24

Confidential Information - Subject to Protective Order

1              INSTRUCTIONS TO WITNESS

2

3              Please read your deposition

4    over carefully and make any necessary

5    corrections.  You should state the reason

6    in the appropriate space on the errata

7    sheet for any corrections that are made.

8              After doing so, please sign

9    the errata sheet and date it.

10             You are signing same subject

11   to the changes you have noted on the

12   errata sheet, which will be attached to

13   your deposition.

14             It is imperative that you

15   return the original errata sheet to the

16   deposing attorney within thirty (30) days

17   of receipt of the deposition transcript

18   by you.  If you fail to do so, the

19   deposition transcript may be deemed to be

20   accurate and may be used in court.

21

22

23

24

Confidential Information - Subject to Protective Order

```
1                   –   –   –   –   –   –

                  E R R A T A

2                   –   –   –   –   –   –

3

4    PAGE   LINE   CHANGE

5    _____  _____  _____

6           REASON:  _____

7    _____  _____  _____

8           REASON:  _____

9    _____  _____  _____

10          REASON:  _____

11   _____  _____  _____

12          REASON:  _____

13   _____  _____  _____

14          REASON:  _____

15   _____  _____  _____

16          REASON:  _____

17   _____  _____  _____

18          REASON:  _____

19   _____  _____  _____

20          REASON:  _____

21   _____  _____  _____

22          REASON:  _____

23   _____  _____  _____

24          REASON:  _____
```

Confidential Information - Subject to Protective Order

1

2          ACKNOWLEDGMENT OF DEPONENT

3

4          I,_____, do

5    hereby certify that I have read the

6    foregoing pages, 1 - 391, and that the

7    same is a correct transcription of the

8    answers given by me to the questions

9    therein propounded, except for the

10   corrections or changes in form or

11   substance, if any, noted in the attached

12   Errata Sheet.

13

14

15   _____

16    MICHAEL B. BOTTORFF, Pharm.D.    DATE

17

18

19   Subscribed and sworn
     to before me this

20   _____ day of _____, 20_____.

21   My commission expires:_____

22

     _____

23   Notary Public

24

Confidential Information - Subject to Protective Order

```
 1                    LAWYER'S NOTES

 2    PAGE   LINE

 3    _____  _____   _____

 4    _____  _____   _____

 5    _____  _____   _____

 6    _____  _____   _____

 7    _____  _____   _____

 8    _____  _____   _____

 9    _____  _____   _____

10    _____  _____   _____

11    _____  _____   _____

12    _____  _____   _____

13    _____  _____   _____

14    _____  _____   _____

15    _____  _____   _____

16    _____  _____   _____

17    _____  _____   _____

18    _____  _____   _____

19    _____  _____   _____

20    _____  _____   _____

21    _____  _____   _____

22    _____  _____   _____

23    _____  _____   _____

24    _____  _____   _____
```