# EXHIBIT G

Case 1:19-md-02875-RMB-SAK    Document 1712-9    Filed 11/01/21    Page 2 of 16 PageID: 39537
Player v. Motiva Enterprises LLC, Not Reported in F.Supp.2d (2006)
2006 WL 166452

2006 WL 166452
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Jeff PLAYER, et al., Plaintiffs,
v.
MOTIVA ENTERPRISES LLC, a successor in interest to Star Enterprises, Defendant.

No. Civ. 02–3216(RBK).
|
Jan. 20, 2006.

**Attorneys and Law Firms**

Keith A. McKenna, McKenna, Mulcahy & McKenna, Montclair, NJ, for Plaintiffs.

Jeffrey W. Moryan, Connell Foley LLP, Roseland, NJ, for Defendant.

OPINION

KUGLER, United States District Judge:

*1 This matter comes before the Court upon motions by Defendant Motiva Enterprises, LLC, ("Defendant" or "Motiva") for summary judgment of the claims of Plaintiffs Jeff Player, et al. ("Plaintiffs"), and to exclude Plaintiffs' experts Michael Gochfeld, M.D., Ph.D. ("Gochfeld"), R. Brian Ellwood, Ph.D. ("Ellwood"), Bruce M. Gallo ("Gallo"), and Daniel McDonald ("McDonald"). For the reasons set forth below, Defendant's motions will be granted in part and denied in part.

I. Background [1]

This environmental contamination suit is brought by the current and former owners of twenty-seven parcels of residential property located in the Spring Hollow Subdivision in Gloucester Township, New Jersey.[2] Plaintiffs allege that emissions from Defendant's nearby Texaco gasoline service station contaminated their property and the Kirkwood Cohansey Aquifer, the underground water source for their potable wells.

Contamination of the aquifer was first detected on April 5, 2000, when significant concentrations of the gasoline-related compound methyl tertiary butyl ether ("MTBE") was discovered in a drinking fountain at Camden County Community College. New Jersey Consumers Water Company ("Consumers"), the entity responsible for providing water to the college, conducted sampling of some of its wells and discovered significant amounts of gasoline-related compounds in municipal supply well number 8 ("CW–8"). Consumers took the well offline on April 10.

While investigating the contamination, the New Jersey Department of Environmental Protection ("NJDEP") detected a discharge of volatile organic compounds ("VOCs") from Defendant's service station, located at 585 Berlin Cross Keys Road ("Motiva site" or "contamination site").[3] The NJDEP issued a Field Directive on April 12, 2000, requiring Motiva to investigate the source and extent of the discharge, to implement an interim treatment system, and to submit a remedial action work plan to the NJDEP. Defendant installed an interim recovery system and twenty-five monitoring and recovery wells between April and June 2000.

The NJDEP issued a second directive on May 5, 2000, ordering Defendant to cease gasoline retail operations and provide treatment or an alternate source of water to replace CW–8. Defendant replaced the interim system with a permanent ground water recovery and treatment system in June 2000, and installed forty-one additional monitoring wells from June 2000 to present. As further required by the NJDEP, Defendant regularly sampled potable wells located on approximately forty residential properties in the vicinity of the Motiva site. Defendant detected small amounts of MTBE in thirteen of the residential wells it sampled.[4]

Per the NJDEP directive, Motiva submitted a Remedial Investigation Work Plan/Remedial Investigation report on July 2000 and a Remedial Action Workplan ("RAW") on November 14, 2000. In its RAW, Defendant requested permission to cease sampling of the residential wells, contending that the MTBE detected in those wells could not have come from the Motiva site since the wells are located upgradient[5] or sidegradient from the site, and no emissions were detected in most of the monitoring wells between the Motiva site and the potable wells.[6] Motiva also claimed that recent literature indicated that traces of MTBE in groundwater could likely result from "non-point sources." (March 2001 Directive at 2.)

Case 1:19-md-02875-RMB-SAK   Document 1712-9   Filed 11/01/21   Page 3 of 16 PageID: 39538
Player v. Motiva Enterprises LLC, Not Reported in F.Supp.2d (2006)
2006 WL 166452

*2 Plaintiffs' expert, R. Brian Ellwood, Ph.D ("Ellwood"), submitted a response to the RAW on January 17, 2001. In his report, Ellwood notes that as of January 17, 2001, "[c]ontrol of contamination at depth beneath the site, control of offsite contamination, and possibly control of contamination at the northern site boundary, has not been established." (Preliminary Report Sicklerville Road Groundwater Contamination ("Ellwood Report"), McKenna Cert. in Opp. to Def.'s Mot. Summ. J., filed Oct. 12, 2005 ("McKenna Cert."), Ex. F, at 2.) Ellwood also offered possible theories to demonstrate the plausibility of Defendant's responsibility for the MTBE in spite of Motiva's arguments to the contrary.

The NJDEP ultimately rejected Defendant's request to cease sampling of the residential wells in its March 2001 Directive on the basis that "there is insufficient evidence for Equiva to conclude that the MTBE detected in the 13 potable wells in the area did not originate from the Cross Keys Texaco site" and "that regardless of the source of the MTBE in these wells, which is obviously debatable, ongoing sampling of these wells is required *primarily due to their proximity to the site.*" (March 2001 Directive at 2) (emphasis in original).

Also in the March 2001 Directive, the NJDEP approved a Classification Exemption Area ("CEA") for the site that excluded all but 1/10 of an acre of 583 Berlin Cross Keys Road (the Wallace Property). The CEA establishes the boundaries of a ground water plume where VOCs exceed the GWQS.[7]

Through summer 2004, the NJDEP regularly reduced the testing requirements. By August 18, 2003, the NJDEP required only:

> annual sampling of the wells at 4, 7, 11, 13 and 14 Donna Marie Court; 2, 4, 6, and 8 Latham Way; 12 and 20 Spring Hollow Drive, and; 937 and 948 Sicklerville Road. For all the sampling events of the aforementioned potable wells conducted April 2002, the Department notes that all wells continue to exhibit no gasoline related contamination in excess of the Department's Drinking Water Quality Standards.

(NJDEP Directive, Aug. 18, 2003, McKenna Cert., Ex. D.)

The NJDEP approved shut down of the recovery and treatment system on April 30, 2004. (NJDEP Correspondence, Aug. 9, 2004, Mairo Cert., Ex. S., at 2.) Finally, on August 9, 2004, the NJDEP determined that "Defendant's Remedial Action Progress Reports "meet the conditions of the March 21, 2001 Remedial Action Workplan (RAW) approval. Shell Oil Products U.S. (Shell OPUS) is, therefore, in compliance with N.J.A.C. 7:14B–6." (Aug. 9, 2004, NJDEP Correspondence, Mairo Cert., Ex. S., at 1.)

B. The Residential Properties

Plaintiffs own twenty-seven respective residential properties near Defendant's gasoline station.[8] Twenty-six of the twenty-seven properties-all but 583 Berlin Cross Keys Road ("the Wallace property")-contain potable wells located in the Kirkwood Cohansey Aquifer. Because Plaintiffs' properties are north/northeast of the contamination site, (Undisputed Facts ¶ 38), they are considered upgradient or sidegradient of the contamination site, depending on whether CW–8 is pumping.[9]

*3 Consistent with the requirements of the NJDEP directives, Defendant tested the Plaintiffs' residential wells for six gasoline-related compounds: benzene, toluene, ethylbenzene, xylenes, MTBE, and TBA. No testing detected any gasoline-related compound on eighteen of the properties.[10] Detection of compounds on the remaining eight properties was as follows:

- A single detection of 0.79 ppb toluene and ten detections of MTBE (highest at 15.5 ppb) at 4 Latham Way,

  - Three detections of MTBE (highest at 0.76 ppb) at 14 Donna Marie Court,

  - Three detections of MTBE (highest at 1.4 ppb) at 6 Latham Way,

  - A single detection of 1.4 ppb toluene at 850 Sicklerville Road,

- A single detection of 0.4 ppb MTBE at 4 Donna Marie Court,
- A single detection of 0.3 ppb MTBE at 12 Donna Marie Court,
- A single detection of 1.2 ppb MTBE at 8 Latham Way, and
- A single detection of 0.3 ppb MTBE at 20 Spring Hollow Road.

The GWQS for toluene is 1,000 ppb and the GWQS for MTBE is 70 ppb. No gasoline-related compound was detected on any Plaintiff's property after April 2001. According to the Certification of Julian Davies, a Project Manager for EnviroTrac, Ltd., an environmental consulting firm retained by Defendant to remediate the Motiva site, the NJDEP never restricted the consumption of water from Plaintiffs' potable wells, and never required Defendant to treat the water, provide Plaintiffs with an alternate source of water, or collect soil samples from the residential properties.[11] (Julian Davies Cert., Mairo Cert., Ex. R, at 2.)

Since the fact of the contamination became known, several Plaintiffs have sold their property. Maria and John Wallace sold 583 Berlin Cross Keys Road for $350,000.00 in September 2001, Plaintiffs Thomas and Tina Stankiewicz sold 9 Spring Hollow Drive in July 2002 for $143,000.00, Barbara Tanner sold 17 Spring Hollow Drive for $134,000.000 in February 2002, Daniel and Maria Rodriguez sold 18 Spring Hollow Drive for $138,000.00 in July 2003, David Lodi sold 5 Donna Marie Court for $104,000.00 in September 2001, 13 Donna Marie Court was sold for $109,900.00 in July 2000, and 19 Spring Hollow Drive was sold for $133,900.00 in May 2001.

Defendant filed motions for summary judgment and to exclude experts on June 24, 2005, after requesting and receiving permission from this Court to extend by one week the date for the filing of dispositive and *in limine* motions. Briefs in opposition were due July 22, 2005, however, Plaintiffs instead filed an untimely request for an extension on August 2, 2005, and a second request on September 6, 2005, moving the deadline to September 30, 2005. On October 5, 2005, Plaintiffs filed another untimely request for an extension, and ultimately did not submit a complete Opposition until October 14, 2005. Nevertheless, because a district court should not grant a motion for summary judgment without examining the merits, *Stackhouse v. Mazurkiewicz*, 951 F.2d 29, 30 (3d Cir.1991) (citing *Anchorage Assoc. v. Virgin Islands Bd. of Tax Rev.*, 922 F.2d 168 (3d Cir.1990)), this Court will exercise its discretion to consider Plaintiffs' Opposition, even though it is untimely. Local Civ. R. 7.1(d)(5).

II. Standard

*4 Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 330, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could find for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment. *Celotex*, 477 U.S. at 330. The moving party may satisfy this burden by either (1) submitting affirmative evidence that negates an essential element of the nonmoving party's claim; or (2) demonstrating to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's case. *Id.* at 331.

Once the moving party satisfies this initial burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). To do so, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Serbin*, 96 F.3d at 69 n. 2 (quoting *Celotex*, 477 U.S. at 322); *Heffron v. Adamar of N.J., Inc.*, 270 F.Supp.2d 562, 568–69 (D.N.J.2003). "If the non-movant's evidence on any essential element of the claims asserted is merely 'colorable' or is 'not significantly probative,' the court must enter summary judgment in favor of the moving party."

*Heffron,* 270 F.Supp.2d at 69 (citing *Anderson,* 477 U.S. at 249–50).

III. Motion to Exclude Expert Daniel McDonald
Defendant moves to exclude the testimony of Plaintiffs' expert Daniel McDonald ("McDonald") on the grounds that he is unqualified and his report is unreliable.[12] Admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).[13] In the Third Circuit, the admissibility of expert testimony is contingent on the "qualifications" of the expert and the "reliability" of his methodology. *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717 (3d Cir.1994) (interpreting *Daubert* ); *see also Oddi v. Ford Motor Co.,* 234 F.3d 136, 145 (3d Cir.2000).

A. *In Limine* Hearing
In certain instances, courts are obligated to provide *in limine* hearings before applying *Daubert* to exclude expert testimony. *Padillas v. Stork–Gamco, Inc.,* 186 F.3d 412 (3d Cir.1999). A hearing is required, for example, where the court excludes an expert's conclusions on the grounds that they are "insufficiently explained and the reasons and foundations for them inadequately and perhaps confusingly explicated." *Id.* In other words, where a report is "conclusory and did not adequately explain the basis for [the expert's] opinion or the methodology employed in reaching his conclusions," the "plaintiff needs an 'opportunity to be heard' on the critical issues of scientific reliability and validity." *Oddi,* 234 F.3d 136, 152 (3d Cir.2000) (holding that the district court did not err "in granting summary judgment here without an *in limine* hearing") (quoting *Padillas,* 186 F.3d at 417). Where the evidentiary record is substantial, however, or the court has before it the information necessary to determine that the expert lacks "good grounds" for his conclusions, an *in limine* hearing may be unnecessary. *Id.* at 153.

*5 The evidence before this Court clearly establishes the process by which McDonald "arrived at his conclusions," *Oddi,* 234 F.3d at 152, and McDonald's report and deposition details the methodology underlying his determinations. As discussed below, this Court will exclude McDonald's testimony on the grounds that his analysis and methodology are baseless and inconclusive, not because his report is insufficiently explained. Additionally, Defendant's motion for summary judgment alerted Plaintiffs to the *Daubert* challenge, yet Plaintiffs neither requested a hearing nor offered any affidavit or evidence in support of McDonald. Accordingly, an *in limine* hearing is unnecessary.

B. Qualifications
The Third Circuit instructs courts to "liberally" evaluate an expert's qualifications. *Oddi v. Ford Motor Co.,* 234 F.3d 136, 145 (3d Cir.2000). In particular, the Circuit has "eschewed overly rigorous requirements of expertise and [has] been satisfied with more generalized qualifications." *In re Paoli,* 35 F.3d at 741 (citing *Hammond v. International Harvester Co.,* 691 F.2d 646, 652–53 (3d Cir.1982) and *Knight v. Otis Elevator Co.,* 596 F.2d 84, 87–88 (3d Cir.1979)). This liberal treatment extends to the expert's substantive qualifications as well as his formal qualifications. *Id.*

Nevertheless, the Third Circuit has "also set a floor with respect to an expert witness's qualifications." *Elcock v. Kmart Corp.,* 233 F.3d 734, 742 (3d Cir.2000). To demonstrate when an expert would not be qualified under Rule 702, the *Elcock* Court offered the pre-*Daubert* case, *Aloe Coal Co. v. Clark Equip. Co.,* 816 F.2d 110 (3d Cir.1987), which held a tractor salesperson unqualified to testify as an expert about the cause of a tractor fire. *Elcock,* 233 F.3d at 742 (citing *Aloe Coal,* 816 F.2d 110).

In *Elcock* itself, the Court determined with "misgivings" that the district court had not abused its discretion by concluding that a psychologist with experience in obtaining employment for disabled individuals was qualified to testify to the possibility for vocational rehabilitation of the injured plaintiff. However, the Court acknowledged that it also would have upheld a decision to exclude the expert since "he seems most qualified to testify on a micro-level regarding the ability of a disabled individual to return to a specific job; he does not appear particularly qualified to testify on the macro-level regarding the number of jobs in the national or local economy that the disabled individual is able to perform."[14] *Elcock,* 233 F.3d at 744. Taken together, *Elcock* and *Aloe Coal* indicate that where a proposed expert's area of experience is

adjacent to, but not actually encompassing, the subject matter of his testimony, he may be deemed unqualified.

McDonald has worked as a licensed appraiser in New Jersey for approximately twenty-two years. Defendant argues that McDonald is nevertheless unqualified to testify to the diminution in value of Plaintiffs' properties because McDonald has no experience in appraising contaminated property. Defendant notes that McDonald has never appraised property allegedly contaminated by emissions from a gasoline station and has never acted as an expert in a situation involving contamination of the groundwater or allegations of a leaking underground storage tank. (Daniel McDonald Dep. ("McDonald Dep."), Mairo Cert. in Supp. Def.'s Mot. to Exclude Plaintiffs' Expert Daniel McDonald, Ex. C, at 23–24.) Defendant also points out that McDonald did not entirely understand the Ellwood and Gallo reports upon which he relied, including the charts indicating the presence and degree of contaminating agents on the property. (McDonald Dep. at 55–56.)

*6 This case lies squarely between *Aloe Coal* and *Elcock*. Although McDonald is an experienced appraiser, no evidence indicates that he has any experience appraising contaminated properties or is qualified to value the effects of stigma on property values. Just as a psychologist experienced in assisting individuals to find work may be unqualified to testify about the general availability of jobs in the economy, an individual able to appraise an uncontaminated property may have no grounds for appreciating the devaluation of the same property under unique conditions of contamination or stigma. Because nothing in McDonald's experience indicates knowledge or expertise in issues of contamination, he is unqualified to testify to the loss of value to Plaintiffs' properties arising from the alleged contamination.

C. Reliability

Because expert testimony has the potential to bear considerable weight with a jury, the district court functions as a gatekeeper responsible for assuring "that the scientific methodology upon which the expert opinion is founded is reliable" and that "the expert's conclusion is based on good grounds." *In re Paoli*, 35 F.3d at 732–33. To ascertain "reliability," the court must examine a number of factors, both those established in *Daubert* and those previously enumerated by the Third Circuit in *United States v. Downing*, 753 F.2d 1224 (3d Cir.1985). *Oddi*, 234 F.3d 145 (citing *Paoli II*, 35 F.3d at 742). In particular, the court must consider:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subjected to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Paoli II*, 35 F.3d at 742 n. 8; *see also Elcock*, 233 F.3d at 746 (noting that "each factor need not be applied in every case"). The party wishing to introduce the testimony bears the burden of establishing "by a preponderance of the evidence that their opinions are reliable." *Paoli*, 35 F.3d at 744.

Of course, an expert's opinion need not be "perfect," and judges may not substitute their opinions for those of an expert. *Paoli*, 35 F.3d at 744; *see also Crowley v. Chait*, 322 F.Supp.2d 530, 536 (D.N.J.2004). However, courts also need not admit mere conclusions or "opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F.Supp.2d 584, 608 (D.N.J.2002) (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 145–46, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)).

*7 Mere assumptions, without causal evidence or methodological analysis may be inadmissible. *In re TMI Litig.*, 193 F.3d 613, 667–68 (3d Cir.1999). Conclusions based only on the expert's experience, *Oddi*, 234 F.3d at 140–41, and testimony founded on methods that are not

generally accepted or lack testable hypotheses may also fail to surmount the *Daubert* standard, *Elcock,* 233 F.3d at 746. Furthermore, conclusions based on analogies that are too dissimilar to the subject of the testimony may also merit exclusion. *General Elec.,* 522 U.S. at 144 (rejecting expert testimony that plaintiff's cancer was due to exposure to PCBs when the testimony was based on animal studies of infant mice that had developed cancer after exposure to PCBs).

In response to Defendant's motion to exclude McDonald's testimony, Plaintiffs argue that "Mr. McDonald's opinions are based upon credible facts, NJDEP records, the reports of Plaintiffs' liability experts and individual appraisal reports prepared for each residential property." (Pl.s' Opp. Def.'s Mot. Summ. J. ("Opp."), filed Oct. 12, 2005, at 30.) However, McDonald testified in his deposition that he relied only on the Gallo and Ellwood Reports, and he specifically testifies that he did *not* "review any correspondence from the NJDEP related to this site." (McDonald Dep. at 15.) [15]

In spite of Plaintiffs' arguments to the contrary, this Court cannot avoid the conclusion that McDonald's methodology is entirely unreliable. In his report, McDonald determines that the value of Plaintiffs' properties with no evidence of contamination should be discounted 35% percent and property with onsite contamination should be discounted by 66%. (McDonald Report ("McDonald Report"), Mairo Cert. in Support of Def.'s Mot. Exclude Pl.s' Expert Daniel McDonald, Ex. B., at 31, 33.) McDonald reached the 35% and 66% figures without discussing, or even recognizing, the extent to which the property was actually contaminated. As demonstrated by his ignorance of the "ND"/Not Detected signifier in the Gallo and Ellwood Reports, McDonald did not know how to read the charts denoting the levels of contamination. (McDonald Dep. at 56.) Nor had McDonald ever conducted any physical inspection of or visit to the properties prior to writing the report. [16] (McDonald Dep. at 15–16.)

Furthermore, to quantify the stigma attached to Plaintiffs' properties, McDonald relies upon a highly misleading analogy with a site of profoundly contaminated residential properties in Dover Township. (McDonald Report at 27.) Specifically, McDonald compares Plaintiffs' properties with "an area of Dover Township that had ground water contamination from Union Carbide and ... Ciba Geigy that resulted in what was commonly known as a cancer cluster among children," meaning "an inordinate number of children with cancer." (McDonald Dep. at 158–59.) McDonald selected the Dover site not because of its comparability, but because McDonald "didn't know of any other cases that, where the data was as readily available." (McDonald Dep. at 159.)

*8 Employing the Dover analogy, McDonald determined that the property in the Dover site is in the final stages of recovery and continues to suffer a stigma loss of 13%. Because McDonald considered Plaintiffs' properties in the early stages of recovery, McDonald determined that they must bear a stigma discount of at least two or three times that of the Dover site, resulting in a discount of 35%. [17] However, the severity of the contamination and resulting illness among Dover residents undercuts any grounds for comparison with Plaintiffs' properties where there were few detections of contaminants and no reported physiological effects.

The methodology employed to reach the 66% figure is equally unreliable. To assess the value of properties with some evidence of contamination, McDonald sent an email to thirteen financial lenders to determine whether they would "lend on a property that has known contamination, or the stigma of contamination, to the ground water." (McDonald Report at 32.) Of the thirteen lenders, six replied. One of those refused to comment, and one said that it would loan given certain circumstances. The other four lenders stated that they would not lend on a property that is contaminated, but the content of their brief responses suggested that they understood the email hypothetical to denote property that was actually contaminated and out of compliance with state requirements. [18]

From the results of the email test, McDonald concludes that there would be no buyers other than those who could pay cash. [19] McDonald then assessed the discount in value given cash-only buyers, extrapolating from this a discount of 66%. (McDonald Report at 33.) However, the reliability of the 66% figure is entirely invalidated by the overemphasis placed on the four responses to the email hypothetical, the misleading implication in the email hypothetical, suggesting a much greater contamination of the property than actually present, and the unclear calculations and assumptions underlying McDonald's arrival at 66%.

Ultimately, McDonald's report does not fulfil any of the reliability factors. His method is untestable and arbitrary, without a generally accepted, established, or peer reviewed methodology, and his evaluation was conducted without any

real standards. Because McDonald is unqualified and his evaluation is unreliable, Defendant's motion *in limine* to exclude his testimony will be granted.

IV. Plaintiffs' Claims

A. Negligence and Gross Negligence

To surmount a motion for summary judgment of a negligence claim, Plaintiffs must provide evidence such that a reasonable jury could find "breach of a duty of care and actual damages sustained as a proximate cause of the breach." *Muise v. GPU, Inc.,* 371 N.J.Super. 13, 35, 851 A.2d 799 (App.Div.2004) (citing *Weinberg v. Dinger,* 106 N.J. 469, 484, 524 A.2d 366 (1987)); *Nappe v. Anschelewitz, Barr, Ansell & Bonello,* 97 N.J. 37, 45, 477 A.2d 1224 (1984) ("[T]he plaintiff must show a breach of duty and resulting damage to prevail in a negligence action."). Motiva argues that Plaintiffs have failed to establish damages and causation and requests summary judgment of Plaintiffs' gross negligence claim on the same basis.[20]

*9 The absence of an injury will preclude a negligence claim, even where a clear breach of duty is present. *Rocci v. MacDonald–Cartier,* 323 N.J.Super. 18, 24–25, 731 A.2d 1205 (App.Div.1999) (affirming summary judgment for insufficient evidence of damages in defamation case and noting that "a plaintiff must present proof of a material question of fact as to both liability and damages") (citing *Norwood Easthill Assoc. v. Norwood Easthill Watch,* 222 N.J.Super. 378, 384, 536 A.2d 1317 (App.Div.1988) (affirming summary judgment of malicious interference claim on basis that "plaintiff has suffered no injury or damage")). At the summary judgment stage, Plaintiffs must provide actual evidence of injury and cannot simply rely upon "unsubstantiated allegations." *Trap Rock Indus., Inc. v. Local 825,* 982 F.2d 884, 890 (3d Cir.1992) (reversing district court's denial of summary judgment). Just as "a residential customer not in residence during a power loss, or a commercial customer whose store was closed, might have no damages except the inconvenience of resetting clocks," *Muise,* 371 N.J.Super. at 49, 851 A.2d 799, the release of contaminants into the groundwater aquifer does not itself generate damages, unless Plaintiffs can show that they suffered harm.

Plaintiffs concede that they "have not presented and will not present claims for the present manifested bodily injury." (Undisputed Facts ¶ 67.) However, they argue that they have adequately established damages for medical monitoring and property damage. They do not address their claim for emotional distress.[21]

1. Medical Monitoring

Damages for medical monitoring are appropriate where a plaintiff exhibits no physical injury, but nevertheless requires medical testing as a proximate result of a defendant's negligent conduct. *Ayers v. Jackson Twp.,* 106 N.J. 557, 600, 525 A.2d 287 (1987). The risk of injury need not be quantified to merit medical surveillance damages; however, the plaintiff must establish that the risk of serious disease is "significant." *Id.* at 599–600, 525 A.2d 287; *Campo v. Tama,* 133 N.J. 123, 131, 627 A.2d 135 (1993) (awarding medical monitoring damages to a plaintiff with a "fifty- to seventy-five-percent chance of suffering a recurrence of cancer" due to the delay resulting from defendant doctor's malpractice). In the case of toxic exposure, "medical-surveillance damages may be awarded only if a plaintiff reasonably shows that medical surveillance is required because the exposure caused a distinctive increased risk of future injury." *Theer v. Philip Carey Co.,* 133 N.J. 610, 627, 628 A.2d 724 (1993). Such damages are "not available for plaintiffs who have not experienced direct and hence discrete exposure to a toxic substance and who have not suffered an injury or condition resulting from that exposure." *Id.* at 628, 628 A.2d 724.

Low level contamination, "that is, contamination below the minimum level set by DEP for water remediation," typically is insufficient to establish injurious toxic exposure. *Muralo Co., Inc. v. Employers Ins. of Wausau,* 334 N.J.Super. 282, 290–291, 759 A.2d 348 (App.Div.2000) ("[S]ince it is clear that no untreated groundwater is ever entirely pure, we are satisfied that DEP standards are the most reliable guide for determining whether contamination causing damage ... has occurred."). Here, contaminants have been detected in only eight of Plaintiffs' wells, and no detection has been even close to the GWQS. The NJDEP never restricted Plaintiffs' use of water from their potable wells, nor required Defendant to treat Plaintiffs' wells or to provide Plaintiffs with an alternate water source.

*10 Plaintiffs rely on the testimony of Dr. Michael Gochfeld, Ph.D. ("Gochfeld"), to establish the significant health risks

Case 1:19-md-02875-RMB-SAK   Document 1712-9   Filed 11/01/21   Page 9 of 16 PageID: 39544
Player v. Motiva Enterprises LLC, Not Reported in F.Supp.2d (2006)
2006 WL 166452

and necessity of medical surveillance following from the alleged contamination of Plaintiffs' property. However, nothing in Gochfeld's report concludes that the individual Plaintiffs themselves require medical monitoring under the circumstances. Rather, Gochfeld's report creates a medical monitoring program for a hypothetical target population without taking into consideration the actual exposure of any plaintiff.[22] (Gochfeld Dep. at 26–29.) Gochfeld prepared his report under the assumption that "there were known or actual or potential exposure to a variety of constituents of gasoline." (Gochfeld Dep. at 12.) He states in deposition that he had "no specific factual knowledge of the actual exposures in this case," and he confirms that he has never examined the individual Plaintiffs. (Gochfeld Dep. at 10, 29.)

Gochfeld himself notes that "[w]hether a person exposed to MTBE requires medical monitoring depends in large measure on the level of exposure and the time over which it occurred" and notes that "clearly people that are exposed to MTBE casually would not require one." (Gochfeld Dep. at 24.) Furthermore, Gochfeld stated that he "probably would not" recommend medical monitoring for the minor and often single detections of MTBE on Plaintiffs' properties.[23] (Gochfeld Dep. at 46–50.) Consequently, Gochfeld's report does not establish that Plaintiffs require medical monitoring.

Plaintiffs also appear to argue that their wells may have been more contaminated prior to the initiation of Defendant's testing in July 2000. (Opp. at 20.) However, Plaintiffs provide no evidence suggesting that such exposure actually occurred or that any exposure prior to July 2000 was more than minimal. Plaintiffs also argue for the first time in their Opposition that they may have ingested water from contaminated sources besides the potable wells on their property. (Opp. at 20.) However, Plaintiffs offer no evidence that any Plaintiff actually consumed water from CW–8. Without any evidence supporting their theories, Plaintiffs cannot establish a claim for medical monitoring sufficient to survive summary judgment.

Because Plaintiffs have provided no evidence of a "distinctive increased risk of future injury" from the exposure, Plaintiffs are not entitled to damages for medical monitoring.

2. Property Damage

Defendant requests summary judgment of Plaintiffs' claims of property damage on the grounds that the contamination caused no actual damage to Plaintiffs' properties.[24] Instead of claiming that their property was physically harmed, Plaintiffs contend that the news of the contamination stigmatized their property, reducing its value in the minds of potential buyers.

In support of their claim for stigma damages, Plaintiffs offer the expert testimony of Daniel McDonald. However, as discussed previously, McDonald's testimony must be excluded as unreliable. Plaintiffs also argue that the testimony of individual Plaintiffs establishes a stigma discount to their property:

> *11 Plaintiff Marie Wallace has submitted sworn Interrogatory statements documenting a $150,000.00 loss on the sale of her property. See Exhibit 0 to McKenna Certification. Other Plaintiffs have similarly provided certified answers to Interrogatories and Deposition testimony as to the loss in value through sales transactions, which occurred from the discharge. See Exhibit N–R to the McKenna Certification.

(Opp. at 20–21.)

This evidence fails to establish an injury. Exhibits N–R consist of contracts for sale and unexecuted contracts for sale of three of Plaintiffs' properties, including the Wallace property, leaving it to the Court's imagination to ascertain how these contracts demonstrate a loss in value. Wallace's testimony also fails to establish a stigma injury to the property.

Specifically, Wallace claims that she received a verbal offer for her asking price of $500,000.00 from a man named "Amin," whose last name she cannot recall. (Marie Wallace Dep., McKenna Cert., Ex. 0, M.) Wallace claims that he reneged from the agreement after she told him about the release, however, the alleged offeror never gave Wallace the offer in writing and she has no evidence of the offer or "Amin's" motive for withdrawing, aside from her own testimony. Consequently, even construing this evidence in the light most favorable to Plaintiffs, no reasonable jury could find that Plaintiffs' properties were stigmatized on the basis of this evidence alone.

3. Emotional Distress

Defendant also moves for summary judgment of Plaintiffs' claim for emotional distress. Plaintiffs do not respond to this argument in their Opposition, and Defendant is entitled to summary judgment of Plaintiffs' emotional distress claim for Plaintiffs' failure to present evidence of significant distress or physical injury.

A claim for emotional distress cannot succeed absent evidence of physical injury or "severe and substantial" emotional distress, even where a person has a reasonable concern of an enhanced risk of future disease. *Ironbound Health Rights Advisory Com'n v. Diamond Shamrock Chem. Co.,* 243 N.J.Super. 170, 174–75, 578 A.2d 1248 (App.Div.1990) (noting that "[i]n the absence of physical injury, damages are allowed where the resultant emotional distress is severe and substantial" and listing cases). Without some physical injury, mere exposure to toxic chemicals does not give rise to a claim for emotional distress damages. *Id.* (holding plaintiffs unable to sustain emotional distress claim for exposure to chemicals manufactured at plant near their residences); *see also Mauro v. Raymark Indus., Inc.,* 116 N.J. 126, 137, 561 A.2d 257 (1989); *Troum v. Newark Beth Israel Med. Ctr.,* 338 N.J.Super. 1, 17, 768 A.2d 177 (App.Div.2001). Because Plaintiffs provided no evidence of significant emotional distress or physical injury, Defendant's motion for summary judgment will be granted.

B. Trespass

Defendant moves for summary judgment of Plaintiffs' claim for trespass. Plaintiffs argue that Defendant's "intentional refusal" to remove the contamination from their property and failure to install remediation equipment amounts to an intentional trespass.[25] (Opp. at 25.)

*12 The Restatement (Second) of Torts defines intentional trespass as:

> One who intentionally and without a consensual or other privilege
>
> (a) enters land in possession of another or any part thereof or causes a thing or third person so to do, or
>
> (b) remains thereon, or
>
> (c) permits to remain thereon a thing which the actor or his predecessor in legal interest brought thereon in the manner stated in §§ 160 and 161, is liable as a trespasser to the other irrespective of whether harm is thereby caused to any of his legally protected interests.

Rest. (2d) Torts § 158.

As Defendant argues, New Jersey has moved away from "such common law claims as trespass and nuisance" in environmental pollution cases. *Mayor and Council of Borough of Rockaway v. Klockner & Klockner,* 811 F.Supp. 1039, 1053 (D.N.J.1993); *Kenney v. Scientific, Inc.,* 204 N.J.Super. 228, 256, 497 A.2d 1310 (1985) ("There is no need for us ... to torture old remedies to fit factual patterns not contemplated when those remedies were fashioned."). Regardless of the continuing viability of trespass claims in the environmental context, however, Plaintiffs have failed to come forward with any evidence supporting their claim and cannot survive summary judgment.

Plaintiffs note that they are "not arguing that Defendants intentionally caused the contamination of their property," but rather are claiming that "defendants have repeatedly refused to perform the horizontal and vertical delineation of the soil and groundwater contamination in the area of the residential properties." (Opp. at 25.) However, no evidence suggests that such measures were necessary to remove contaminants from Plaintiffs' properties. Rather, the record indicates that Defendant consistently complied with NJDEP requirements, including the installation and maintenance of a groundwater recovery system to rehabilitate the aquifer, and the NJDEP never required Defendant to install any sort of remediation equipment on any of the residences. Given that there has been no detection of a gasoline-related contaminant in any Plaintiff's potable well since April 2001, the argument that Defendant permitted contamination to remain on Plaintiffs' properties lacks any viable evidentiary foundation. Defendant's motion for summary judgment of Plaintiffs' trespass claim will be granted.

C. Strict Liability

Plaintiffs originally claimed a cause of action for strict liability under the theory that the handling, storage, or use of gasoline constitutes an abnormally dangerous activity. However, Plaintiffs voluntarily dismissed this claim in their Opposition. (Pl.'s Opp. at 3.) Accordingly, the Court will not address the merits of Plaintiffs' strict liability claim.

D. Environmental Statutes

1. New Jersey Environmental Rights Act

Plaintiffs allege a right to recover under the New Jersey Environmental Rights Act ("ERA"), N.J.S.A. 2A:35A–1 *et seq.* Defendant requests summary judgment on the grounds that Plaintiffs have not satisfied the ERA's notice provision, N.J.S.A. 2A:35A–11, and that an ERA claim is not actionable where the NJDEP has acted to institute and oversee remediation of the contamination.

*13 Section 4(a) of the ERA, permits "any person" to "maintain an action in a court of competent jurisdiction against any other person to enforce, or to restrain the violation of, any statute, regulation or ordinance which is designed to prevent or minimize pollution, impairment or destruction of the environment." N.J.S.A. 2A:35A–4(a). Although the ERA itself does not create substantive rights, it confers standing on private persons to enforce other environmental statutes, including the New Jersey Spill Compensation and Control Act ("Spill Act"). *Rockaway*, 811 F.Supp. at 1054; *Allied Corp. v. Frola*, 701 F.Supp. 1084, 1091 (D.N.J.1988).

The NJDEP is "entrusted initially with the right to determine the primary course of action to be taken." *Howell Township v. Waste Disposal, Inc.*, 207 N.J.Super. 80, 95, 504 A.2d 19 (App.Div.1986) ("In order to be effective, [the NJDEP] must normally be free to determine what solution will best resolve a problem on a state or regional basis given its expertise and ability to view those problems and solutions broadly."). Consequently, the right of private parties to sue under the EPA is "an alternative to inaction by the government which retains primary prosecutorial responsibility." *Superior Air Prod. Co. v. NL Indus., Inc.*, 216 N.J.Super. 46, 58, 522 A.2d 1025 (App.Div.1987); *Rockaway*, 811 F.Supp. at 1054 ("[T]he primary goal of the ERA is to limit lawsuits by private litigants to those instances where the government has not acted.").

A private ERA suit may be permitted even in the absence of complete government inaction if the NJDEP has "failed in its mission ... failed or neglected to act in the best interest of the citizenry or has arbitrarily, capriciously or unreasonably acted." *Howell*, 207 N.J.Super. at 96, 504 A.2d 19; *Morris County Transfer Station, Inc. v. Frank's Sanitation Serv., Inc.*, 260 N.J.Super. 570, 578, 617 A.2d 291 (App.Div.1992) (permitting private ERA action where the NJDEP would not address violation for three years and had taken no enforcement actions against contaminating defendant who continued operating its illegal facility two months after receiving a violation notice). Where NJDEP "action subsequently proves sufficient to protect the environment," however, NJDEP "action under the Spill Act is preemptive of private rights under ERA." *Superior Air Prod.*, 216 N.J.Super. at 61, 522 A.2d 1025. The permissibility of private action must be evaluated on a case-by-case basis. *Id.*

Here the record indicates consistent and pervasive NJDEP oversight of the remediation process, requiring Defendant to regularly test Plaintiffs' wells and institute interim and permanent groundwater recovery systems. Plaintiffs have not claimed that the NJDEP failed to act or acted unreasonably, and there are no grounds for finding NJDEP inaction sufficient to permit a private ERA suit. Furthermore, as discussed below, Plaintiffs failed to give the NJDEP the requisite notice of their private suit. Accordingly, Defendant's motion for summary judgment of Plaintiffs' ERA claim will be granted.

2. Notice

*14 Before a private party may commence an action under the ERA, the party must "at least 30 days prior to the commencement thereof, direct a written notice of such intention by certified mail, to the Attorney General, the Department of Environmental Protection, the governing body of the municipality in which the alleged conduct has, or is likely to occur, and to the intended defendant." N.J.S.A. 2A:35A–11. The notice provision is intended to give the government an adequate opportunity to intervene in the litigation and to allow the NJDEP:

> to exercise value judgments in individual cases, e.g., whether it will join in that litigation or enforcement proceeding, whether other actions it may have taken already with respect to the particular problem or offender would render the litigation subject to collateral estoppel or res judicata principles, whether its expertise would assist the court, whether broad State interests would be sacrificed unduly to

Case 1:19-md-02875-RMB-SAK   Document 1712-9   Filed 11/01/21   Page 12 of 16
PageID: 39547
Player v. Motiva Enterprises LLC, Not Reported in F.Supp.2d (2006)
2006 WL 166452

regional or personal interests by the instigators of that litigation, etc.

*Howell,* 504 A.2d at 95; *Morris County,* 260 N.J.Super. at 578, 617 A.2d 291 (quoting *Howell* for same).

Because Plaintiffs did not provide the required thirty day notice to the NJDEP or the Attorney General, they are barred from further pursuing their claim under the ERA. Plaintiffs argue that Defendant is judicially estopped from claiming lack of notice for failure to raise this issue at an earlier stage in the case. Plaintiffs analogize the ERA requirement to that of an affidavit of merit, required in certain cases to avoid "unmeritorious and frivolous malpractice lawsuits at an early stage of litigation." *Knorr v. Smeal,* 178 N.J. 169, 197–98, 836 A.2d 794 (2003) (holding judicially estopped defendant's request for summary judgment for plaintiff's failure to file affidavit of merit) (citing *Palanque v. Lambert–Woolley,* 168 N.J. 398, 404, 774 A.2d 501, 505 (2001)); *Ferreira v. Rancocas Orthopedic Assoc.,* 178 N.J. 144, 836 A.2d 779, (2003) (same).

Defendant argues that the ERA notice requirement is more analogous to the notice of intent in the Resource Conservation and Recovery Act (RCRA), which the Supreme Court held to be a jurisdictional prerequisite to suit in *Hallstrom v. Tillamook County,* 493 U.S. 20, 31, 110 S.Ct. 304, 107 L.Ed.2d 237 (1989) ("[C]ompliance with the 60-day notice provision is a mandatory, not optional, condition precedent for suit."); *Public Interest Research Group of N.J., Inc. v. Windall,* 51 F.3d 1179, 1189 (3d Cir.1995) (holding notice provision jurisdictional in context of Clean Water Act ("CWA")); *Hawksbill Sea Turtle v. Federal Emergency Mgmt. Agency,* 126 F.3d 461, 471 (3d Cir.1997) (holding notice provision jurisdictional in context of Endangered Species Act ("ESA")).

However, the language of the notice requirement in RCRA is not entirely analogous to that of the ERA. RCRA states, under the heading of "Actions prohibited" that "No action may be commenced ... prior to 60 days after the plaintiff has given notice of the violation to" the Administrator, the state and the alleged violator. 42 U.S.C.A. § 6972. The ERA lacks the "no action may be commenced" language of the RCRA, CWA, and ESA, and states only that notice must be sent "at least 30 days prior to the commencement" of suit. Consequently, the argument that the plain language of the statute creates a jurisdictional bar is not as strong in the context of the ERA.

*15 Nevertheless, because the purpose of the notice provision is to provide the Attorney General and NJDEP with notice of the suit and opportunity to intervene, *Howell,* 504 A.2d at 95, and not merely to protect defendants, as in the case of the affidavit of merit, Defendant is not judicially estopped from raising Plaintiffs' lack of compliance with the notice provision and is entitled to summary judgment of Plaintiffs' ERA claim.

E. Spill Act Claim

In their complaint, Plaintiffs assert a private right of action under the Spill Act, N.J.S.A. 58:10–23.11 *et seq.*[26] As amended in 1991, the Spill Act authorizes a private cause of action for individuals to recover costs for environmental damage to their property. *Housing Auth. of City of New Brunswick v. Suydam Inv., L.L.C.,* 177 N.J. 2, 18, 826 A.2d 673 (2003). Actions under the Spill Act are limited to clean up and removal costs, *Bahrle v. Exxon Corp.,* 145 N.J. 144, 155, 678 A.2d 225 (1996), defined as:

> all direct costs associated with a discharge, and those indirect costs that may be imposed by the department pursuant to section 1 of P.L.2002, c. 37 associated with a discharge, incurred by the State or its political subdivisions or their agents or any person with written approval from the department in the: (1) removal or attempted removal of hazardous substances, or (2) taking of reasonable measures to prevent or mitigate damage to the public health, safety, or welfare, including, but not limited to, public and private property.

N.J.S.A. 58:10–23.11b(d). The Act does not authorize "damages arising from emotional distress, enhanced risk of disease, loss of enjoyment of property, and other economic and financial harm." *Bahrle,* 145 N.J. at 155, 678 A.2d 225. Plaintiffs maintain that the investigation conducted by Ellwood was a reimbursable clean up and removal cost under the Spill Act. As Plaintiffs suggest, because "a discharge cannot be addressed until the contaminants are defined and the extent of the discharge determined," certain forms of investigative costs are implicitly included in the Act. *Metex Corp. v. Federal Ins. Co.,* 290 N.J.Super. 95, 115, 675 A.2d 220 (App.Div.1996).

However, for a private party to obtain reimbursement under the Act, the party must have obtained "written approval from the department," for example, in a memorandum of agreement, prior to incurring the cost. N.J.S.A. 58:10-23.11b(d); *Id.* Such approval permits the NJDEP to "review and approve or disapprove its investigation to date, its proposed remedial action, and its report of the implementation of its action." *Id.; see also Interfaith Cmty Org. v. Honeywell Intern., Inc.,* 263 F.Supp.2d 796, 867 (D.N.J.2003) (concluding "that such costs were approved by and/or incurred at the direction of NJDEP and thus are recoverable under the Spill Act."). Because Plaintiffs have not obtained NJDEP approval for any cost incurred, including the Ellwood report, Defendant is entitled to summary judgment of Plaintiffs' Spill Act Claim.

*16 The accompanying Order shall enter today.

*Elcock,* 233 F.3d at 741.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 166452

## Footnotes

1  The following facts are taken from Defendant's statement of undisputed material facts, filed June 24, 2005, ("Undisputed Facts") and Plaintiffs' counterstatement of undisputed facts, filed Oct. 14, 2005, ("Counterstatement Facts"). Plaintiffs did not provide a separate statement of undisputed facts.
   Although Plaintiffs dispute the majority of Defendant's statements of fact, Plaintiffs' counterstatements typically provide additional facts without setting forth any conflicting evidence. Where no actual disputes are presented, Defendant's statements will be treated as undisputed. *See e.g., Tofano v. Reidel,* 61 F.Supp.2d 289, 292 n. 1 (D.N.J.1999) (citing Fed.R.Civ.P. 56(e)) ("This court will ... not consider assertions without evidential support as creating genuine issues of disputed fact."); *Talbot v. United States,* 2005 WL 2917463, *2 (D.N.J.2005) (noting that where the nonmoving party does not submit facts in opposition, "it is entirely appropriate for this court to treat all facts properly supported by the movant to be uncontroverted") (quoting *Allebach v. Sherrer,* No. 04-287, 2005 U.S. Dist. LEXIS 15626, at *5 (D.N.J.2005)).
   More generally, Plaintiffs' brief suffers from numerous typographical errors and a dearth of citations to page numbers in the record. This "alone warrants exclusion of the evidence." *See Orr v. Bank of America, NT & SA,* 285 F.3d 764, 774-75 (9th Cir.2002) (holding that party's failure to cite page and line numbers when referencing the deposition merits exclusion of evidence); *Huey v. UPS, Inc.,* 165 F.3d 1084, 1085 (7th Cir.1999) ( "[J]udges need not paw over the files without assistance from the parties."); *Nissho-Iwai Am. Corp. v. Kline,* 845 F.2d 1300, 1307 (5th Cir.1988) (parties must designate specific facts and their location in the record).
2  Among the original litigants to the suit were also former plaintiffs Michael and Susan Kammerhoff and Norma Simmons. The Kammerhoff plaintiffs were voluntarily dismissed, and plaintiff Norma Simmons died on August 26, 2000.
3  VOCs generally associated with gasoline discharge include MTBE, benzene, toluene, ethylbenzene, xylene (collectively "BTEX"), and tertiary butyl alcohol ("TBA"). The NJDEP has issued a Ground Water Quality Standard ("GWQS") for each of these VOCs, also known as "gasoline-related compounds." MTBE, for example, has a GWQS of 70 parts per billion ("ppb").
4  Although Motiva detected MTBE in thirteen residential wells, not all of these wells are owned by Plaintiffs to this litigation. Of the twenty-seven parcels of property at issue in this suit, only eight of the properties contain wells that ever tested positive for any gasoline-related compound.
5  The direction of water's flow in an aquifer is described as "downgradient," and the direction against the current is "upgradient."


6   In particular, testing revealed emissions in monitoring wells 6–Shallow ("MW–6S") and 7–Deep ("MW–7D"), which lie between the Motiva site and the residential properties. However, the majority of upgradient monitoring wells did not test positive for gasoline-related contaminants. (NJDEP Directive, March 21, 2001 ("March 2001 Directive"), Mairo Cert. in Supp. Def.'s Mot. Summ. J., filed June 24, 2005 ("Mairo Cert."), Ex. O, at 4.)

7   Plaintiffs dispute Defendant's characterization of the CEA, (Counterstatement Facts ¶ 31), on the basis that Defendant proposed the CEA prior to conducting an actual delineation of the plume and that "the Plaintiffs' residential wells could only had [sic] been included in the CEA, if Defendant intended to supply a permanent public water supply to Plaintiffs' properties." While Plaintiffs' contention with the CEA is not entirely clear, Plaintiffs have not provided any evidence indicating that the NJDEP improperly approved the CEA or that the CEA was an inaccurate representation of the boundaries of contaminants in excess of the GWQS.

8   Plaintiffs' properties are: 850 Sicklerville Road; 565, 569, 581, and 583 Berlin–Cross Keys Road; 6, 9, 10, 12, 13, 14, 1, 16, 17, 18, 20 Spring Hollow; 2, 4, 6, and 8 Latham Way; 3, 4, 5, 7, 12, 14, and 15 Donna Marie Court.

9   CW–8 is located approximately 1,000 feet downgradient of the contamination site. (March 2001 Directive at 2.) While active, CW–8 pumps approximately 500 gallons per minute and causes the groundwater to flow southwest. (Ellwood Report at 2.) When CW–8 is not pumping, the groundwater flow is more westerly. (Ellwood Report at 2.)

10   Plaintiff disputes these facts on the basis that:
> The Defendant has no data for any portable [sic] water supply of the Plaintiffs prior to July 2000. The Defendant never performed any delineation of the groundwater plume in the areas of the residential properties despite having actual knowledge of such contamination in MW–6, MW–7 and MW–12. See Gallo Certification and Exhibits C, D and E.

(Counterstatement Facts ¶¶ 46–48.) However, because Defendant makes no averment of the presence or absence of contamination prior to July 2000, Defendant's statements are not actually in dispute. Plaintiffs provide no fact indicating an inaccuracy in Defendant's statements regarding the testing of Plaintiffs' wells. Consequently, there is no actual dispute regarding the presence or amount of *detected* gasoline-related compounds.

11   Plaintiffs dispute these statements by citing to Exhibit F of the McKenna certification; however, Exhibit F is the Ellwood report and therefore is not indicative of the NJDEP requirements. Plaintiffs nowhere cite to a statement by the NJDEP requiring Defendant to treat their water or provide them with an alternate water source, and therefore this fact is undisputed.

12   Because this Court will grant Defendant's motion for summary judgment, it will not reach the merits of Defendant's motions to exclude experts Gochfeld, Ellwood, and Gallo.

13   After *Daubert*, Rule 702 was amended to encompass the *Daubert* analysis:
> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. While *Daubert* itself addressed only the admissibility of scientific evidence, the Court has since noted that courts' gatekeeping obligations extend to all expert testimony. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 151, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

14   The Court noted that it had "misgivings" about the expert's qualifications in spite of:
> (1) [the expert's] general training in "assessing" individuals, which he received while earning his Ph.D. in psychology; (2) his experience, twenty years previous, helping drug addicts reenter the workforce; (3) his experience primarily in the last two years dealing with the Virgin Islands Division of Workers' Compensation, which he had advised regarding the ability of approximately fifty to sixty-five disabled employees to return to their previous jobs; (4) his past experience as an expert witness making lost earning capacity assessments;

Case 1:19-md-02875-RMB-SAK   Document 1712-9   Filed 11/01/21   Page 15 of 16 PageID: 39550
Player v. Motiva Enterprises LLC, Not Reported in F.Supp.2d (2006)
2006 WL 166452

(5) his attendance at two seminars regarding vocational rehabilitation, and his stated familiarity with the literature in the area; (6) his membership in two vocational rehabilitation organizations, both of which place no restrictions on membership; and (7) the fact that when [the expert] was in school, a degree in vocational rehabilitation therapy was not available, but that he received similar training nonetheless.

15   Plaintiffs also argue that "Defendant does not attack the methodology, standard or factual basis for the opinions," (Opp. at 31), however, it is quite clear from Defendant's motion that the reliability of McDonald's methodology is hotly disputed.

16   McDonald also appeared unaware of the fact that Plaintiffs' properties are served by potable wells, even though the potable wells contain the evidence of contamination.

> Q: Do you know whether or not the plaintiffs' properties have potable wells?
> A: It's my understanding that they are hooked to a public water system.
> Q: If each of the properties did in fact have a potable well, would that be a factor that you were consider relevant in your analysis?
> Mr. McKenna: You may want to review the documents that you referenced in your report to assist you in this area. Just separate the Ellwood and Gallo reports. I'm going to go to the men's room.
> (Whereupon, a recess is taken.)
> Mr. Mairo: I am going to object that Mr. McKenna was basically coaching the witness.
> Back on the record.
> A: Your question about whether or not each of these houses were, was, had their own private well on site-
> Q: Uh-huh?
> A: -it's my understanding that each house is served by wells within and around the neighborhood and that Consumer, Consumers Water Company owns those wells and supplies that water to the homes.

(McDonald Dep. at 36.)

17   McDonald reaches the 35% devaluation figure with the following methodology:

> The subject properties are in the early stages of monitoring, and clean up of the ground water contamination. The properties from Dover Twp. are beyond the clean up stage and into the final stage of recovery, yet they still show a 13% loss in value as compared to similar properties outside of the contaminated area. The subject area is in stage D of recovery, which is the beginning of the remediation process. Based on the acceptance of the Detrimental Condition Model as a viable process for valuing Detrimental Conditions to Real Estate, by the appraisal community and the Subcommittee on Housing and Community Opportunity of the House Committee on Financial Services, it would be logical to assume that the discount to the properties which are the subject of this report, would be 2 to 3 times that of properties in the final stage of recovery. In this case a discount of 35% would be considered reasonable.

(McDonald Report at 31.)

18   Interbay Funding, for example, qualified their statement that they would not lend by noting, "The property would have to be completely cleaned up. They would have to file all necessary documents to the state of NJ and we would require something from the state telling us the property is cleaned up." (McDonald Report at 32.) From this, McDonald concluded that Interbay Funding would not lend on properties such as Plaintiffs', without considering that none of Plaintiffs' properties were contaminated in excess of state standards.

19   In evaluating this data, McDonald states:

> The lenders that did respond have overwhelmingly stated that they would not approve the loan at all, or they would require substantial conditions to the loan. In the case of the subject properties, it can be assumed that a purchaser with private financing or cash would be the only potential buyer of houses in this area.

(McDonald Report at 32.)

20   Because the Court now finds that there is no evidence of any actual injury arising from Defendant's negligence, this Court will not address Defendant's causation argument.

21   Plaintiff argues that Defendant's motion for summary judgment of its negligence claim should be denied on the basis of the doctrine of *res ipsa loquitur*. However, *res ipsa loquitur* acts only to "permit[ ] an inference of defendant's negligence" (i.e., that defendant acted in an unreasonable manner) under particular

Case 1:19-md-02875-RMB-SAK    Document 1712-9    Filed 11/01/21    Page 16 of 16
PageID: 39551
Player v. Motiva Enterprises LLC, Not Reported in F.Supp.2d (2006)
2006 WL 166452

circumstances. *Jerista v. Murray,* 185 N.J. 175, 192, 883 A.2d 350 (2005). The doctrine does not establish either causation or the presence of damages. *See e.g., Bahrle v. Exxon Corp.,* 279 N.J.Super. 5, 35, 652 A.2d 178 (App.Div.1995) (holding *res ipsa* doctrine inapplicable where "there was a factual dispute as to whether the contamination was a result of plaintiffs' own voluntary acts or neglect"). Accordingly, because Defendant is contesting only causation and damages, the *res ipsa* doctrine does not apply.

22   Gochfeld testifies in his deposition that he created his report without any specific information about the Plaintiffs:

> Q: So, for example, in determining the percentage of the target population that was in high exposure category, that wasn't based on the ground water, your review of the ground water tables that were attached to Mr. Gallo's report?
> A: It was not.
> Q: That was based purely on just an assumption of yours?
> A: It was an assumption based on experience with previous programs or programs that are currently underway in our communities.
> Q: Having no specific factual knowledge of the actual exposures in this case?
> A: That's correct, these are hypotheticals.

(Gochfeld Dep. at 28–29.)

23   Gochfeld also states that he would not even recommend medical monitoring for the one property with by far the highest detection of MTBE (13.8 ppb at 4 Latham Way) "on this data alone" because "[i]t is possible that a person living there would only be drinking bottled water, would not be in the house very much." (Gochfeld Dep. at 50.)

24   Defendant argues further that New Jersey law does not permit Plaintiffs to recover for stigma damages in the absence of some physical harm to their property. Because Plaintiffs have provided no evidence of any stigma to their property, the Court will not reach Defendant's alternative argument.

25   It is unclear whether Plaintiffs allege negligent trespass since they discuss only the Restatement (Second) of Torts § 158, Intentional Trespass, in their Opposition. Unlike intentional trespass, negligent or reckless trespass requires evidence of "harm to the land, to the possessor, or to a thing or a third person." Rest. Torts 2d § 165; *see also Burke v. Briggs,* 239 N.J.Super. 269, 271, 571 A.2d 296 (App.Div.1990) (citing Rest.2d Torts § 158 with approval for another premise); *Karpiak v. Russo,* 450 Pa.Super. 471, 481, 676 A.2d 270 (Pa.Super.1996) (affirming dismissal of trespass claim for entry of dust onto property since the "evidence failed to establish that the dust caused appellants harm"). As discussed previously, Plaintiffs have not provided any evidence of injury to their persons or property. Consequently, to the extent that Plaintiffs are claiming negligent trespass, Defendant is entitled to summary judgment.

26   It is unclear whether Plaintiffs also raise a claim for cleanup and removal costs from the Spill Compensation Fund under N.J.S.A. 58:10–23.11g(a). (Opp. at 12–13.) However, the appropriate procedure to obtain compensation under the Fund is by filing a claim with the administrator of the Fund, "not later than one year after the date of discovery of damage. The administrator shall prescribe appropriate forms and procedures for such claims." N.J.S.A. 58:10–23.11k. In the event "a party, including a potentially responsible party ... contests the amount or validity of" a claim for reimbursement from the Spill Fund, "the dispute is referred to an arbitrator whose decision may be appealed to the Appellate Division," and the arbitrator's decision will be final unless it was "arbitrary, capricious, or unreasonable." *Lacey Municipal Util. Auth. v. New Jersey Dept. of Envir. Prot., Envir. Claims Admin.,* 369 N.J.Super. 261, 273, 848 A.2d 843 (App.Div.2004). Accordingly, this is an improper forum for a Spill Compensation Fund claim.

---

**End of Document**    © 2021 Thomson Reuters. No claim to original U.S. Government Works.