# EXHIBIT C

# New Jersey Law Journal

VOL. CXCIII - NO.12 - INDEX 866   SEPTEMBER 12, 2008   ESTABLISHED 1878

**Exhibit 17**

# Personal Injury

## Beware of the Literature

### Investigation of adversary's treatises is now required

**By Bruce Stern**

Ever since the New Jersey Supreme Court liberalized and modernized the use of learned treatises, the use of medical literature to support one's theories or to cross-examine an adversary's experts has proven helpful. [N.J.R.E. 803(c)(18); *Jacober v. Saint Peter's Medical Center*, 128 N.J. 475 (1992).]

While this liberalization was a welcomed change to the stifling old rule, which in reality prevented the use of learned treatises, new issues regarding the validity of medical research mandates that the trial attorney now research not only one's opponent's experts, but investigate the authors of those learned treatises which will be relied upon by one's adversary.

Prior to 1992, one could only utilize a learned treatise during cross-examination, if and only if, the defense expert acknowledged that the learned treatise was authoritative. Should the expert fail or refuse to acknowledge such authoritativeness, the attorney was precluded from using the learned treatise to cross-examine that expert. In 1992, the New Jersey Supreme Court in *Jacober*, adopted the Federal Rule of Evidence regarding the introduction and use of learned treatises. Shortly thereafter, the "*Jacober* rule" was codified and became a part of New Jersey's Rules of Evidence, 803 (c) (18). That rule states:

> To the extent called to the attention of an expert witness upon cross-examination or relied upon by the expert in direct examination, statements contained in published treatises, periodicals or pamphlets on a subject of history, medicine or other science or art, established as a reliable authority by testimony or by judicial notice. If admitted, the statements may not be received as exhibits but may be read into evidence or, if graphics, shown to the jury.

Since the rule change, use of learned treatises has become a customary part of trials. However, can we really trust what is published in these journals? What are the biases that these published authors bring to any specific issue? Who or what was the funding source(s) behind the research?

For quite some time, the medical and scientific community has been concerned about the relationships between authors and researchers and the pharmaceutical community. DeAngelis, C.D. and Fontanarosa, P.B. "Impugning the Integrity of Medical Science — The Adverse Affects of Industry Influence." *JAMA*. 2008; 299 (15): 1833-1835. This has lead many scientific journals such as *JAMA* and *The New England Journal of Medicine*, as well as others to establish stringent disclosure requirements to enhance the integrity of medical publications.

However, a recent study in the April 21st issue of *JAMA* highlights that the deception nevertheless continues. "Clinical trial manuscripts related to Rofecoxib were authored by sponsor employees but often attributed first authorship to academically affiliated investigators who did not always disclose industry financial support. Review manuscripts were often prepared by unacknowledged authors and subsequently attributed authorship to academically affiliated investigators who often did not disclose industry financial support." [Ross, J.S., Hill, K.P., Egilman, D.S., and Krumholz, H.M. "Guest Authorship and Ghostwriting in Publications Related to Rofecox: A Case Study of Industry Documents From Rofecoxib Litigation." *JAMA*. 2008; 299 (15): 1800-1812.] Citing from other sources, the authors noted, "Ghostwriting was demonstrated in 13 percent of researched articles, 10 percent of review articles, 6 percent of editorials and 11 percent of Cochrin reviews; other research has found similar rates."

Ghostwriting and financial support by industry is not limited to the pharmaceutical industry. Recent financial disclosures in litigation disclose that such practices exist in the field of forensic neuropsychology.

The Center for Public Integrity just

---

*Stern is a Shareholder and member of the Personal Injury Group of Stark & Stark in Lawrenceville.*

Reprinted with permission from the September 12, 2008, edition of the *New Jersey Law Journal*. © 2008 ALM Properties, Inc. All rights reserved. Further duplication without permission is prohibited. For information, call 973.854.2923 or Elissa.Peterson@incisivemedia.com. ALM is now Incisive Media, www.incisivemedia.com

released a shocking story disclosing that Paul Lees-Haley, Ph.D. and other researchers were paid millions of dollars by the welding industry which has been embattled in litigation over whether welding fumes contain manganese, a toxic metal that specialists suggest cause Parkinsonism. According to the Center, lawsuits against the welding industry have been ongoing since the 1970s. The welding products industry has consistently argued that there were no reliable scientific data to prove that welding fumes cause the Parkinson-like syndrome known as Parkinsonism.

Recently, in December 2007, district Judge Kathleen O'Malley, who has been handling hundreds of these cases, ordered both sides to fully disclose payments made by any of the parties to researchers. Court documents obtained by the Center for Public Integrity demonstrate that, "The welding companies pay more than $12.5 million to 25 organizations and 33 researchers, virtually all of whom have published papers dismissing the connection between welding fumes and workers' ailments. Most of the money, $11 million, was spent after the litigation achieved critical mass in 2003; attorneys for the welders, meanwhile, spent about half a million."

The documents also reveal that John Fryzek, who works for Maryland's International Epidemiology Institute — known for its "industry-commissioned studies" — was paid $971,000 from welding defendants while Paul Lees-Haley was paid $860,000; C. Warren Olanow, M.D., a Manhattan neurologist who "published at least a dozen articles cited by defense experts," received almost $2.9 million. The Parkinson Institute in California received nearly $3.4 million to conduct a four-year study.

These revelations about Dr. Paul Lees-Haley, a noted defense neuropsychologist who often serves as a forensic expert witness in traumatic brain injury cases, confirms the fears and opinions of Erin Bigler, Ph.D., an internationally-renowned neuropsychologist who has been severely critical of defense forensic neuropsychologists and the effect that they are having on clinical neuropsychology. In an article published in the *Archives of Clinical Neuropsychology,* entitled "A Motion to Exclude and the "Fixed" Versus "Flexible" Battery in "Forensic" Neuropsychology: Challenges to the Practice of Neuropsychology," Dr. Bigler exposed the sham positions being taken by defense forensic neuropsychologists in TBI litigation. Criticizing the reliance on defense-oriented articles published in the Archives, Dr. Bigler notes, "If taken at face value, [reliance on these articles] would have excluded all of the so-called flexible neuropsychological tests, approaches and comprehensive additional norms — including age, education and demographically adjusted norms." Further acceptance of this literature "also ignores all the clinical practice methods used by neuropsychologist involving interview, observation, clinical inference, neuropsychological screening measures and testing of mental status."

Finally, Dr. Bigler raised serious concerns about the amount of financial incentive paid by defense insurance carriers and corporate defendants to defense forensic neuropsychologists to help evade responsibility and accountability for injuries that these defendants cause.

In the January issue of *Brain Injury Professional*, the official publication of the North America Brain Injury Society, Dr. Bigler, in an open letter to the editor, writes what he calls "the extravagant income, unreasonable and improper charges being made in neuropsychological evaluations done in the name of forensic neuropsychology in cases of individuals with acquired brain injury." Dr. Bigler called for a public forum to set guidelines and standards for reasonable compensation within forensic neuropsychology. Dr. Bigler stated that these guidelines are "desperately needed because what is occurring, has the potential to undermine the entire process of neuropsychological assessment and consultation in the evaluation of patients with acquired brain injury." Dr. Bigler believes that it is undermining some of the research in traumatic brain injury as it relates to neuropsychological outcome and is having a damaging effect on patients with brain injury.

Revelations about how much money defense experts and researchers such as Paul Lees-Haley have and are being paid by defense insurance companies and corporate defendants, make one realize that one cannot accept the findings in published research on their face. It is necessary that trial lawyers begin to investigate the biases and financial remuneration that is paid to many of these researchers. In preparing to confront literature which will be used at trial, the trial attorney should investigate the author of the article or journal piece and the editor of the journal, as well as those doctors who make up the editorial board. Are they true scientific researchers or is a great deal of their work forensic? If the latter, do they testify for both plaintiffs or defendants or do they have a bias for one side versus the other? These are all avenues which need to be explored in order to appreciate the politics and the "agenda" of the various people involved in an article's publication. Unfortunately, the fact that an article has been published in a peer reviewed journal does not mean that it is authoritative. ■

