# EXHIBIT F

Case 1:19-md-02875-RMB-SAK    Document 1713-8    Filed 11/01/21    Page 2 of 322
PageID: 39686
Case 1:03-cv-17000-KMO    Document 1862-4    Filed 08/07/2006    Page 1 of 321

Page 1

**Exhibit 5**

IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

----------------------------X

3

IN RE:                          :

MDL DOCKET NO. 1535             :   Case No. 1:03 CV 17000

WELDING ROD PRODUCTS            :   Judge Kathleen O'Malley

LIABILITY LITIGATION            :

----------------------------X

Videotaped deposition of JON PETER FRYZEK, Ph.D.

Baltimore, Maryland

Tuesday, February 8, 2005

9:15 a.m.

Job No.:  22-50687

Pages:  1 - 321

Reported by:  Beatriz D. Fefel, RPR

Page 2

1              Videotaped deposition of JON PETER FRYZEK

2      held at the law offices of:

3

4              McCARTER & ENGLISH, L.L.P.

5              300 East Lombard Street

6              Suite 1000

7              Baltimore, Maryland 21202

8              (410) 659-8500

9

10

11              Pursuant to agreement, before Beatriz D.

12      Fefel, Registered Professional Reporter and Notary

13      Public of the State of Maryland.

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1                      A P P E A R A N C E S

2

3         ON BEHALF OF THE PLAINTIFFS:

4              JIM CROSBY, ESQUIRE

5              CROSBY SAND

6              6404 Hillcrest Park Court

7              Mobile, Alabama   36695

8              (251) 476-3000

9

10        ON BEHALF OF THE DEFENDANT GENERAL ELECTRIC

11        COMPANY:

12             NATHAN A. SCHACHTMAN, ESQUIRE

13             ERIKA J. DOHERTY, ESQUIRE

14             McCARTER & ENGLISH, L.L.P.

15             1735 Market Street

16             Mellon Bank Center, Suite 700

17             Philadelphia, Pennsylvania   19103-7501

18             (215) 979-3800

19   AND

20             LUTHER L. HAJEK, ESQUIRE

21             SPRIGGS & HOLLINGSWORTH

22             1350 I Street, Northwest

23             Washington, D.C.   20005

24             (202) 898-5800

25

Page 4

1       A P P E A R A N C E S   (C O N T I N U E D)

2

3       ON BEHALF OF THE DEFENDANT MABSCOTT SUPPLY:

4           MATTHEW A. KELLY, ESQUIRE

5           CAMPBELL, WOODS, BAGLEY, EMERSON, McNEER &

6           HERNDON, P.L.L.C.

7           517 Ninth Street

8           Suite 1000

9           Huntington, West Virginia  25719-1835

10          (304) 529-2391

11

12      ON BEHALF OF THE DEFENDANT SELECT ARC:

13          RICHARD M. EDMONSON, ESQUIRE

14          ARMSTRONG ALLEN

15          4450 Old Canton Road

16          Highland Bluff North, Suite 210

17          Jackson, Mississippi  39211

18          (601) 713-1192

19

20

21

22

23

24

25

EX 5-004

Page 5

1        A P P E A R A N C E S    ( C O N T I N U E D )

2

3    ON BEHALF OF THE DEFENDANTS ILLINOIS TOOL WORKS,

4    INC., AND MILLER ELECTRIC MANUFACTURING COMPANY:

5        HUBERT O. THOMPSON, ESQUIRE

6        BROTHERS & THOMPSON, P.C.

7        100 West Monroe Street

8        Suite 1700

9        Chicago, Illinois  60603

10       (312) 372-2090

11

12   ON BEHALF OF THE DEFENDANT METROPOLITAN LIFE

13   INSURANCE:

14       JOSE RAMON GONZALEZ-MAGAZ, ESQUIRE

15       STEPTOE & JOHNSON, L.L.P.

16       1330 Connecticut Avenue, Northwest

17       Washington, D.C.  20036-1795

18       (202) 429-8110

19

20   ALSO PRESENT:  Adam Lemnah, Videographer

21

22

23

24

25

Page 6

CONTENTS

1

2    EXAMINATION OF JON PETER FRYZEK, Ph.D.                    PAGE:

3        By Mr. Crosby                                              8

         EXHIBITS
4
              (Attached to the transcript.)
5
                                                                PAGE:
6    PLAINTIFF'S DEPOSITION EXHIBITS:

7    1    Invoice statements                                       50

8    2    Partial list of Fryzek publications                      85

9    3    Danish questionnaire                                    119

10   4    7/20/04 Swedish study proposal                          156

11   5    Danish study proposal                                   159

12   6    Research Agreement                                      172

13   7    Letter to Brandt-Rauf; reviewer

14       comments and responses                                  191

15   8    Final paper                                             218

16   9    Hansen paper                                            222

17   10   Lung Cancer Mortality in Stainless Steel

18       and Mild Steel Workers                                   270

19   11   Fryzek Declaration                                      277

20

21

22

23

24

25

EX 5-006

Page 7

P R O C E E D I N G S

1
2          THE VIDEOGRAPHER:  Here begins Tape No. 1 in
3   the deposition of John P. Fryzek, Ph.D., In Re:   MDL
4   Docket No. 1535, Welding Rod Products Liability
5   Litigation, in the United States District Court for
6   the Northern District of Ohio, Eastern Division, Case
7   No. 1:03 CV, 17000.  Today's date is February 8th,
8   2005, the time is 9:15 a.m.  The video operator today
9   is Adam Lemnah of LegaLink Biloxi.  This video
10  deposition is taking place at the office of McCarter &
11  English, 300 East Lombard Street, Suite 1000,
12  Baltimore, Maryland, 21202, and was noticed by Jim
13  Crosby, counsel for the Plaintiffs.
14          Will the counsel please identify themselves
15  and state whom they represent?
16          MR. CROSBY:  I'm Jim Crosby.  I represent
17  the Plaintiffs.
18          MR. THOMPSON:  Hubert Thompson.  I represent
19  Illinois Tool Works and Miller Electric.
20          GONZALEZ-MAGAZ:  Jose Ramon Gonzalez-Magaz
21  of the law firm of Steptoe & Johnson on behalf of
22  Metropolitan Life Insurance Company.
23          MR. KELLY:  Matthew Kelly on behalf of
24  Mabscott Supply Company.
25          MR. HAJEK:  Luke Hajek of Spriggs &

Page 8

1    Hollingsworth on behalf of General Electric.

2              MR. EDMONSON:  Richard Edmonson on behalf of

3    Select Arc.

4              MS. DOHERTY:  Erika Doherty on behalf of

5    British Oxygen and other companies.

6              MR. SCHACHTMAN:  Nathan Schachtman, McCarter

7    & English, also on behalf of British Oxygen, Lincoln

8    Electric, and other companies.

9              THE VIDEOGRAPHER:  The court reporter today

10   is Bea Fefel of LegaLink Biloxi.  Will the reporter

11   please swear the witness?

12                         -----------

13              JON PETER FRYZEK, Ph.D.

14        having been duly sworn, testified as follows:

15              THE VIDEOGRAPHER:  Please begin.

16        EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

17   BY MR. CROSBY:

18        Q    Would you state your name, please, for the

19   record?

20        A    My name is John Peter Fryzek.

21        Q    And where do you live?

22        A    I live in Gaithersburg, Maryland.

23        Q    And what do you do?

24        A    I'm a research scientist.

25        Q    Are you employed?

Page 9

1       A       Pardon me?

2       Q       Are you employed?

3       A       Yes.

4       Q       Where are you employed?

5       A       I'm employed through the International

6    Epidemiology Institute in Rockville, Maryland, and

7    Vanderbilt University in Nashville, Tennessee.

8               MR. SCHACHTMAN:  Can we just stop for a

9    moment, Mr. Crosby?  And I'm just going to address the

10   people on the phone.

11              If people come on and drop off, we're going

12   to drop you off.  It's very distracting to the witness

13   and the examiner and everyone else in the room, and so

14   if you're here and you want to listen, you're welcome

15   to listen, otherwise we're just going to disconnect.

16   BY MR. CROSBY:

17      Q       Have you ever given a deposition before?

18      A       Never.

19      Q       Have you ever testified in court before?

20      A       No.

21      Q       Okay.  Has anybody explained to you how

22   depositions proceed generally?

23      A       Yes.

24      Q       Okay.  Let me give you sort of my version,

25   and if I say anything that disagrees with what you

Page 10

1    understand, let me know because I want to be sure we

2    start off on the same page.  Okay?

3         A    Okay.

4         Q    I represent Plaintiffs and I am here to take

5    your deposition by asking you questions.  And I then

6    want you to answer the questions to the best of your

7    ability under oath.  Do you remember being sworn?

8         A    I remember.

9         Q    All right.  If I ask you a question and you

10   don't understand the question or any part of it,

11   please let me know.  All right?

12        A    Umh-humh.

13        Q    Another thing that's important is that

14   although we have this videographer here who will do an

15   excellent job, is for you to please answer audibly

16   yes, if your answer is in the affirmative, and audibly

17   no, if your answer is in the negative, because

18   umh-humh and hunh-unh can sometimes get misunderstood

19   by this lady who is also an excellent person that

20   writes what we say down.  But to avoid any problem

21   with that, I'd ask that you answer audibly and not

22   shake or nod your head, but to give a clear yes or no

23   when the answer suits that.  All right, sir?

24        A    Yes.

25        Q    Now, if I ask you a question and you do not

EX 5-010

Page 11

1   understand that question or any part of it, please let
2   me know for an important reason.  If you answer the
3   question it's going to be taken that you understood it
4   and you answered it to the best of your ability under
5   oath.  All right, sir?
6        A    Yes.
7        Q    Did I say anything there that disagrees with
8   anything that you understood as to how things would
9   proceed?
10       A    You did not say anything that disagrees with
11  what I understand.
12       Q    All right.  Another point that I want to
13  emphasize with you that is this is sort of an open-
14  book test.  In other words, I want to know what you
15  know, and I'm not trying to get you to tell me
16  something you don't know, but if there is a document
17  or some information from some source that you need in
18  order to answer to the best of your ability under
19  oath, please let me know.  All right, sir?
20       A    Yes.
21       Q    Have you given video conferences before?
22       A    No, I've never given a video.
23       Q    Okay.  Have you ever done any sort of
24  rehearsed for video conferences or presentations for
25  video or television programs or anything like that?

Page 12

1       A    No, I haven't.

2       Q    All right.  So this will be your first

3    occasion in front of a camera other than a, maybe home

4    videos or something like that?

5       A    Yes.

6       Q    I know that they sometimes make me feel

7    uncomfortable.  If it's giving you a problem with

8    focusing and giving answers, please let me know.

9       A    Okay.

10       Q    Because it's important that we get your best

11    answer under oath.

12       A    (Nodding.)

13       Q    You also have a right, if you wish, when

14    this is over with, this lady will type up what

15    everybody in here says whenever we're on the record

16    and put it in a neat little booklet, and you can read

17    what she has typed up and check that to see that she

18    has typed up what you best recall having said, and if

19    you see something there that looks like either she

20    misunderstood or you misspoke, you can make a note in

21    the back on an errata sheet to make any adjustment.

22           Is that something you want to do?  Or you

23    have a right to waive it.

24       A    That's something I want to do.

25       Q    All right, sir.

EX 5-012

Page 13

1           Are you on any kind of medication?

2      A    Yes.

3      Q    Okay.  Is it any kind of medication that

4  will in any way impact your ability to understand the

5  questions that I'm asking?

6      A    No, it won't.

7      Q    Will it in any way impact your ability to

8  recall whatever you may need to recall in order to

9  respond?

10     A    No, it won't.

11     Q    Will it impact your ability to speak?

12     A    No.

13     Q    So insofar as -- and tell me if I'm wrong.

14  That's another thing.  Anytime I'm asking you

15  questions and I've got something wrong, just say, you

16  know, Jim, you've misunderstood or you got it wrong.

17  But as I understand it, you're clear-headed and feel

18  fully competent to understand and answer questions

19  under oath.

20     A    Yes.

21     Q    Okay.  You've been identified as an expert

22  witness that may be called in some cases involving

23  welding rod litigation.  Have you ever been retained

24  as an expert with the potential of being a witness in

25  any litigation?

Page 14

1       A    No.

2       Q    Did you have any involvement as a consultant

3   in any litigation where you would not be called as an

4   expert?

5       A    Yes.

6       Q    And without at this point revealing

7   particulars as to whom, what litigation have you been

8   involved in?

9       A    You mean in terms of areas of litigation,

10  or --

11      Q    Yes, sir.

12      A    One case was around the Superfund site, and

13  then on another case about dioxin.

14      Q    Is that while you were employed at IEI?

15      A    One was at IEI, the dioxin case was.

16      Q    And where were you on the Superfund event?

17      A    University of Michigan.

18      Q    Which side had retained you in the Superfund

19  event?

20      A    I think it was the defense.

21      Q    And what about in the dioxin?

22      A    Defense.

23      Q    Did you have any role with respect to breast

24  implant litigation?

25      A    No, none at all.

Page 15

1    Q    Did IEI?

2    A    II does, yes.

3    Q    You call it IE, or EI, or what?  So we'll be

4    on the same page.

5    A    IEI.

6    Q    Okay.  And is IEI a Maryland corporation?

7    A    Yes.

8    Q    Is it a for-profit corporation?

9    A    Yes, it is.

10    Q    Are you a shareholder?

11    A    No.

12    Q    Who are the shareholders, do you know?

13    A    I don't know.

14    Q    Who are the principals?

15    A    Doctor William Blot, B-L-O-T, and Joseph

16    McLaughlin.

17    Q    When were you first retained in this

18    litigation?

19    A    I began working on the study of welders last

20    January, but in terms of being retained to testify it

21    was, I think, December, November/December of last

22    year.

23    Q    So back in -- let me make sure I understand.

24    A    Umh-humh.

25    Q    January of '04, about a year ago?

Page 16

```
 1        A     Yeah.

 2        Q     You began some research with respect to

 3   welding?

 4        A     Right.

 5        Q     And later of last year, November or

 6   December, you were retained as an expert?

 7        A     Right.

 8        Q     When did you first have any discussions with

 9   any lawyers that represent Defendants in the welding

10   litigation?

11        A     I think the first time was last, it was

12   either July or August, after we completed the study.

13        Q     And when did you first have any discussions,

14   if ever, with anybody connected with the welding rod

15   industry?

16        A     Other than lawyers?

17        Q     Yes.

18        A     I've never discussed anything with anyone

19   other than lawyers.

20        Q     Okay.  What about any of the other personnel

21   at IEI, when were they first approached by the welding

22   rod manufacturers or their lawyers about consulting?

23        A     I'm not exactly sure of the date.  I know on

24   the proposal that we wrote there was a date on that.

25   But prior to that time I don't know.
```

Page 17

1    Q    So the proposal for the, shall we call it

2  the Danish study?

3    A    Yes.

4    Q    As far as you know, was that the first

5  contact between anyone with IEI and anyone with the

6  welding manufacturing industry?

7    A    To my knowledge, yes.

8    Q    Okay.  So you're not saying that there

9  wasn't contact before that, that's just the only part

10  you know about?

11    A    I'm saying, yeah, I don't know about other

12  contacts.

13    Q    So, for example, Mr. Blot -- or is he a

14  doctor?

15    A    Doctor Blot, yes.

16    Q    Is he a medical doctor, or a Ph.D.?

17    A    Ph.D.

18    Q    And Doctor McLaughlin, is he a medical

19  doctor, or a Ph.D.?

20    A    Ph.D.

21    Q    Do you know if either of them at any time

22  had any discussions with any welding rod manufacturers

23  or lawyers prior to the date of the proposal in 2004?

24    A    No.  The first time I heard about it was

25  with the proposal.

Page 18

1    Q    Right.  I understand that's when you first

2  heard about it, but you don't know if Doctor Blot or

3  Doctor McLaughlin had other discussions?

4    A    I have no idea.

5    Q    And you don't know whether or not -- is

6  Doctor Garabrant with IEI?

7    A    He's affiliated, but he's, he's not housed

8  there.  I don't think -- we don't even fund him.  He's

9  not housed at IEI.  We don't fund him.

10    Q    By you don't fund him, what does that mean?

11    A    He doesn't take any salary from us.

12    Q    Okay.  But is he on your website?

13    A    Yeah.  I think, yeah, I think he is.

14    Q    So of the people that are on your website --

15    A    Umh-humh.

16    Q    -- which ones are funded by IEI?

17    A    There's Doctor Blot; Doctor McLaughlin;

18  Doctor Boice, John Boice; Doctor Robert Tarone;

19  myself; Lisa Signorello, Doctor Lisa Signorello;

20  Ms. Binni Chadda; Mark Steinwandevl; Sarah Cohen; Mike

21  Mumma.

22    Q    How do you spell his last name?

23    A    M-U-M-M-A.  That's it, that's it.

24    Q    Are any of those folks medical doctors?

25    A    No.

Page 19

1       Q       And which ones have post undergraduate

2   degrees, either master's or Ph.D.?

3       A       All of them except for Mark Steinwandevl.

4       Q       And what's his level?

5       A       Bachelor's.

6       Q       Is it a BS?

7       A       Yes.

8       Q       And Doctor Blot, is his a Ph.D., or an

9   S.C.D.?

10      A       Ph.D.

11      Q       Doctor McLaughlin?

12      A       Ph.D.

13      Q       Boice?

14      A       Boice, S.C.D.   Tarone is Ph.D.   I'm a Ph.D.

15  And Signorello is an S.C.D.

16      Q       How many people are there -- if you know, in

17  your reasonable judgment, if you have one.   Please

18  don't guess.

19      A       Okay.

20      Q       How many people are there affiliated with

21  IEI who are, as you put it, unfunded?

22      A       To my knowledge, I can think of three at

23  this time.

24      Q       Okay.   And who are they?

25      A       Doctor Garabrant, Mr. Marano, and Doctor

Page 20

1    Robert Weiss.

2        Q    Who is Doctor Weiss?

3        A    I believe he is a psychiatrist.  I may have

4    his name incorrect.

5        Q    Okay.  The unfunded individuals, what is

6    their role with IEI?

7        A    We collaborate with them on some projects.

8        Q    What does that mean?

9        A    Sometimes if we have a proposal to do

10   something and they can bring some expertise to the

11   project, we include them on the proposal.

12       Q    What does Doctor -- I mean, excuse me, Don

13   Marano do?

14       A    He's an industrial hygienist.

15       Q    Did he work on the Danish study?

16       A    No.

17       Q    Did he propose any work on the Swedish

18   study?

19       A    No.

20       Q    Doctor Robert McLaugh -- is he a doctor, I

21   think you said?

22       A    I think so, yeah.

23       Q    What is his area?

24       A    I'm not sure.

25       Q    And Doctor Garabrant?

Page 21

1    A    Yeah.

2    Q    What's his area?

3    A    Occupational medicine.

4    Q    Is he an M.D. and a Ph.D., or an M.D.?

5    A    M.D.

6    Q    So is he a certified epidemiologist, or is

7    he an occupational medical doctor who at times engages

8    in some areas of epidemiology?

9        MR. SCHACHTMAN:  Objection to the form.

10    A    It's my understanding he does both.  He's an

11    occupational medicine physician and that he sees

12    patients and he also conducts epidemiological studies.

13    Q    Okay.  Is he in any epidemiological

14    societies of which you are aware?

15    A    I'm not aware of what societies he's in.

16    Q    How long have you known him?

17    A    Since 1992, '93.

18    Q    And what were the circumstances under which

19    you all met?

20    A    I was his student for my Ph.D.

21    Q    At the University of Michigan?

22    A    Yes.

23    Q    Did anyone else at IEI while you were a

24    student there have any affiliation with the University

25    of Michigan?

Page 22

```
 1      A    No.

 2      Q    I'm going by memory so I can really be wrong

 3 now.

 4      A    Okay.

 5      Q    Where did you get your Ph.D.?

 6      A    Michigan.

 7      Q    And did you write a dissertation?  Did they

 8 call it a dissertation there?

 9      A    Yes.

10      Q    And who was your faculty mentor or guide for

11 that, if anybody?

12      A    Yeah.  I had a committee, and the professors

13 on the committee, Doctor David Garabrant and Doctor

14 Sioban Harlow, were the chairs.  Doctor David

15 Schottenfeld and Doctor Richard Severson and Doctor

16 Brenda Gillespie.

17      Q    Prior to the date of the proposal for the

18 study done for the welding industry, the Danish study,

19 had you and Doctor Garabrant discussed welding

20 matters?

21      A    No.

22      Q    With whom, if anybody, had you had any

23 discussions about health effects of welding prior to

24 the welding proposal --

25      A    No one.
```

EX 5-022

Page 23

1    Q     -- or the Danish study?

2    A     No one.

3    Q     Assuming that the proposal was in mid-2004,

4  and we'll get to it in a minute, but assume that it

5  was -- well --

6    A     It was probably 2003.

7    Q     2003?

8    A     Umh-humh.

9    Q     August 2003.

10   A     Okay.

11   Q     Is that what triggered you looking into

12 welding, was the proposal had been made and accepted?

13   A     Yeah, I was instructed to monitor the

14 project.

15   Q     Okay.  Who instructed you to do that?

16   A     Doctor Bill Blot, my supervisor.

17   Q     By monitoring the project, what do you mean?

18   A     Going to Denmark and interacting with our

19 collaborators and establishing study design and

20 analysis, and things like that.

21   Q     So was it your job to make sure it was

22 right, done right as well as it could be?

23   A     Along with the other collaborators on the

24 project.

25   Q     Who had overall responsibility for assuring

EX 5-023

Page 24

1   that the Danish study for the welding industry was

2   done correctly top to bottom?

3        A    Doctor Jorgen Olsen.

4        Q    And who is that?

5        A    He's the head of the Danish Department of

6   Epidemiology at the Danish Cancer Institute in

7   Copenhagen, Denmark.

8        Q    And does he have any affiliation or

9   associations with any industry?

10       A    No.

11       Q    How long has he had that position?

12       A    I have no idea.

13       Q    Were you subject to his oversight?

14       A    Absolutely, yes.

15       Q    So was everybody subject to his oversight?

16       A    Yes.

17       Q    And where does he reside or work?

18       A    Copenhagen, Denmark.

19       Q    And is he the person that would have all of

20  the data that relates to the study?

21       A    Yes.  All of the data is in Copenhagen.

22       Q    Has any of the data ever been transferred or

23  transmitted by any means to the U. S.?

24       A    No.

25       Q    Did you have access to any of the data?

EX 5-024

Page 25

1      A      While I was in Copenhagen I had access to

2  the data.

3      Q      All of it?

4      A      All of it.  Actually, not all of it.  Some

5  of it was summary data.

6      Q      Okay.  Who had the underlying data?

7      A      Our Danish collaborators.

8      Q      Did you ever have any access to the

9  underlying data?

10     A      That's a difficult question to answer.  By

11  underlying data, I'm going to say the hospitalization

12  records, and I did not have access to those.

13     Q      Okay.  Did you have any access to the

14  databases and information housed in databases

15  maintained by the various registries?

16     A      I, I saw the databases, but I did not

17  manipulate them.

18     Q      So you were unable or not allowed to

19  manipulate the databases?

20     A      No, I -- it -- we had the analyst in Denmark

21  who was familiar with the databases who did the

22  manipulation.

23     Q      And who was that?

24     A      Her name is Andrea Bouts.

25     Q      And whose oversight was she subject to?

EX 5-025

Page 26

1       A    Doctor Jorgen Olsen.

2       Q    Did you have any authority or right to see

3   what she was doing and how she manipulated the data

4   and to verify the accuracy of it?

5       A    I -- I'm sorry.  I don't understand the

6   question.

7       Q    Okay.  As I understand it, you got summary

8   reports?

9       A    Correct.

10      Q    And as I understand it -- I've forgotten her

11  last name.  Andrea, was it?

12      A    Bouts.

13      Q    Bouts?

14      A    Yeah.

15      Q    Manipulated the data, and maybe I'm wrong,

16  and from that I assume she generated the summary

17  reports?

18      A    It was, it was actually a more complex

19  process than that.

20      Q    Okay.

21      A    The original databases are housed in the

22  Danish National Board of Health and Welfare, which is

23  a governmental organization.

24      Q    How many databases are there?

25      A    They have -- I'm not sure.  All of the --

Page 27

1   Denmark is a nationalized medical care system and any

2   type -- anytime you have contact with the medical

3   system, that information is put in a database.

4       Q    Okay.  So are we talking tens of databases,

5   or hundreds of databases, or thousands of databases?

6       A    Probably hundreds.  But I'm not, I'm not

7   certain, certain of the number.

8       Q    Okay.  So Danish citizens whenever they have

9   any kind of medical treatment --

10      A    Umh-humh.

11      Q    -- is it entered into one of these databases

12  or registries?

13      A    Right, yes.

14      Q    Would that include hospitalizations?

15      A    Yes.

16      Q    And emergency room visits?

17      A    Yes.

18      Q    And clinics?

19      A    Yes.

20      Q    Are there any private clinics for private

21  physicians where a regular Danish person can just go

22  see their doctor?

23      A    It's my understanding there is for plastic

24  surgeons.

25      Q    Okay.  And is that in a registry?

EX 5-027

Page 28

1      A      That is not -- it's not in the governmental

2    registry.

3      Q      So other than --

4      A      I'm sorry.  If they go to the public clinics

5    for plastic surgery, then it is in the registry.

6      Q      Are there any other private clinics in the

7    Danish medical system that you're aware of other than

8    those relating to plastic surgery?

9      A      Not that I'm aware of.

10     Q      Have you done anything to ascertain whether

11   there are?

12     A      I, I -- my collaborators there tell me there

13   is not, so I trusted their knowledge.

14     Q      Are any of them medical doctors?

15     A      Yes.

16     Q      Were any of them neurologists?

17     A      I'm not sure what their field of expertise

18   is.

19     Q      So with respect to the Danish study for the

20   welding industry, as I understand it, we don't know if

21   there was anybody who was a trained neurologist

22   involved in it?

23     A      That's correct.

24     Q      Have you had any training in neurology?

25     A      No.

EX 5-028

1     Q    Okay.  How about movement disorders?

2     A    No.

3     Q    Do you have a personal diagnostic criteria

4 that you use with respect to determining whether or

5 not a person has Parkinson's disease?

6     A    No.

7     Q    How about Parkinsonism?

8     A    No.

9     Q    How about manganesium?

10    A    No.

11    Q    Had you ever had an occasion to witness

12 people being examined for a diagnosis of movement

13 disorders?

14    A    No.

15    Q    Did you have any occasion to see or discuss

16 with any of the people that were the subject of this

17 Danish study that were diagnosed with any sort of

18 movement disorder?

19    A    No.

20    Q    Did you see any of the people that were

21 involved in that study?

22    A    No.  It was a retrospective study.

23    Q    And as I understand it, you didn't have

24 access to their identity to find out who they were

25 anyway, correct?

EX 5-029

1      A      Correct.

2      Q      So, then, if someone wanted to do -- or if

3  you had wanted to do an independent verification on a

4  random sample basis as to whether or not a living

5  member of the group really did have Parkinsonism or a

6  movement disorder, you would not have been able to do

7  that; am I correct?

8      A      There was a verification of Parkinson's

9  disease in the study.  The Danes did go through a

10  process where they verified the diagnosis of

11  Parkinson's disease.

12      Q      Did they do that by seeing people, or did

13  they do that by looking at records?

14      A      They looked at records.

15      Q      Did anybody look at people?

16      A      To my knowledge, no.

17      Q      And if you had wanted to look at people, you

18  were not allowed access to the information to

19  undertake that verification; is that correct?

20      A      Yes, that's correct.

21      Q      Was there anything to preclude the Danes

22  from doing an independent verification by looking at

23  the records, ascertaining the person's identity, and

24  then following up that person?

25      A      I don't know.

1    Q    Is there a separate registry for

2  psychological disorders?

3    A    For psych -- I, I'm not sure.  There might

4  be.

5    Q    Was there -- would it be -- excuse me.  If

6  there is such a registry for psych -- let's call it

7  psychiatric disorders, too, was there one for that?

8    A    If there is, I have not used it.

9    Q    If there is, would it maintain records of

10  neuropsychological disorders or diagnoses, or do you

11  know?

12    A    I have no idea.

13    Q    Are you familiar with whether or not there

14  are studies that indicate that Parkinsonism or

15  Parkinson's disease manifest neuropsychological

16  symptoms and signs?

17    A    I'm not aware of those studies.

18    Q    When was your first meeting with the lawyers

19  that represent the welding industry?

20    A    I think it was last July, July 2004.

21    Q    And who was there?

22    A    Oh, to be honest, I can't recall all their

23  names.

24    Q    All right.

25    A    There was a lot of them.

EX 5-031

Page 32

1      Q      Which ones can you recall?

2      A      Mr. Schachtman was there, Ralph Davies.

3  That's all I recall.

4      Q      About how many of them were there?

5      A      Maybe eight.

6      Q      Oh, shoot.  That's a small group for them.

7      A      Yeah.  However bigger our conference room

8  was.

9             MR. SCHACHTMAN:   Small by Plaintiff's

10 standards, too.

11     Q      What about -- do you have any notes or

12 records of that?

13     A      No.

14     Q      Do you know if anybody kept any Minutes of

15 it?

16     A      Not to my knowledge.

17     Q      And what all was discussed?

18     A      The study had been completed at that time

19 and we gave them an overview of what the study said.

20     Q      And who is we?

21     A      Myself and Doctor Blot.

22     Q      And what did you all tell them?

23     A      The study results.

24     Q      And how did you all put it at that point?

25     A      I don't understand.

Page 33

1    Q    Well, when you told them what the results

2    were, what were your words insofar as you recall?

3    A    I don't recall my exact words.

4    Q    They don't have to be exact, just your best

5    recollection of what you recall having said when you

6    summarized the study.

7    A    You know, I don't recall my exact words.

8    I'm sure I talked about the results as they're in the

9    tables in the paper.

10    Q    At that point had it been accepted for

11    publication?

12    A    At that point it had not.

13    Q    At that point had it been submitted to

14    publication?

15    A    No, it hadn't, it had not.

16    Q    Did you distribute copies of the report?

17    A    Among the collaborators on the project we

18    did.

19    Q    Okay.  What about at the presentation --

20    A    No.

21    Q    -- to the lawyers?

22    A    No.

23    Q    Where was that presentation?

24    A    In our offices.

25    Q    Was it done by slide, or Power Point, or

EX 5-033

Page 34

1    what?

2        A    No.

3        Q    How was it done?

4        A    Verbally.

5        Q    So you explained a table without any kind of

6    visual aid?

7        A    We had a piece of paper that we showed them

8    what the results were.

9        Q    Did you put it on an overhead?

10       A    No.

11       Q    Okay.  Do you have a copy of the piece of

12   paper that you showed them?

13       A    I, I don't think so.

14       Q    Where would that have gone?

15       A    Into the table in the paper.  The numbers

16   have not changed in the tables since that time.

17       Q    Have your tables changed?

18       A    No.

19       Q    And this is a pre-submission table?

20       A    Yes.

21       Q    How many times did you present this paper

22   for publication?

23       A    Once.

24       Q    And to whom?

25       A    You mean by journal?

Page 35

1    Q    Yes, sir.

2    A    To the Journal of Occupational Environmental

3    Medicine.

4    Q    You didn't submit it to any other journal?

5    A    No.

6    Q    And did you get reviewer comments?

7    A    Yes.

8    Q    Did it bring about changes?

9    A    Minor changes.

10   Q    But it did bring about changes?

11   A    Yes.

12   Q    Do you have a copy of the pre-change

13   article?

14   A    No.

15   Q    So you don't have a copy of the original

16   submission?

17   A    I'm sure the journal does, but we don't.

18   Q    Do you have any problem with us getting a

19   copy of it?

20   A    No.

21   Q    I understand you cannot recall what you

22   said. Do you remember what Mr. Blot -- Doctor Blot

23   said?

24   A    At what time?

25   Q    At the meeting in -- around July of 2004

Page 36

1    with the lawyers.

2        A    I, I don't know specifically.  I don't

3    remember specifics of that meeting.

4        Q    So I just want to be sure I'm understanding

5    what you're saying.

6        A    Yeah.

7        Q    Well, let me back up.

8            Have you ever had a meeting with eight

9    lawyers before?

10       A    No.

11       Q    Had you ever had a meeting where you

12   presented the findings of results of a study to

13   lawyers who represent the people who funded the study?

14       A    No.

15       Q    And as I understand what you're telling me,

16   is that that presentation, which was about six months

17   ago --

18       A    Umh-humh.

19       Q    -- you don't remember the gist of what you

20   said or what Mr. -- Doctor Blot said?

21       A    As I explained previously, we, we discussed

22   what was in the tables.

23       Q    And that's all you can remember that you did

24   with a room full of lawyers about a study with

25   preliminary results --

EX 5-036

1      A     Right.

2      Q     -- is that correct?

3      A     It was a short meeting.

4      Q     How short?

5      A     Maybe an hour, maybe.

6      Q     Did they have any questions?

7      A     No, not that I recall.

8      Q     Or any comments?

9      A     I can't remember specific comments.  They

10   may have said some comments.

11     Q     Anything that related to the nature of the

12   study, either how it was conducted, what the contents

13   of what you all had said about the study?

14     A     No.

15     Q     Okay.  So you were in a room with eight

16   lawyers for an hour?

17     A     Umh-humh.

18     Q     And you don't recall any of them asking a

19   question?

20     A     I don't.

21     Q     And you don't recall any of them having

22   comments about a study that you all made --

23     A     I don't recall specific comments.

24     Q     Do you recall any general comments, or the

25   gist of any comments?

Page 38

1    A    Other than they were -- that the study was a

2  good study.

3    Q    They thought it was a good study?

4    A    I did, too.

5    Q    I see.  Did you design the study?

6    A    The study was designed by Doctor Blot.

7    Q    Did you have any input in the design of the

8  study?

9    A    Not in the design, no.

10   Q    Did you have any input with respect to the

11  study at all other than oversight?

12   A    Yes, I did.

13   Q    And what was that?

14   A    I designed the statistical analyses and I

15  also wrote the original drafts.

16   Q    How many drafts were there?

17   A    I don't recall.

18   Q    Do you still have those on your computer?

19   A    No.

20   Q    Does IEI still have them?

21   A    No.

22   Q    Do any of your Danish collaborators or any

23  collaborators have them?

24   A    I don't know.  They may have.

25   Q    Do you have any problem with us having

EX 5-038

Page 39

1    copies of those?

2        A    If they exist.  Our policy is not to keep

3    drafts.

4            MR. CROSBY:  I would renew my request for

5    that sort of information, please.

6            MR. SCHACHTMAN:  I'll take it under

7    advisement.

8            MR. CROSBY:  As well as for the initial

9    submission to the journal.

10           MR. SCHACHTMAN:  I don't mean to interrupt

11   you, Mr. Crosby.

12           MR. CROSBY:  That's okay.

13           MR. SCHACHTMAN:  But you do have -- I think

14   I provided to you the reviewer comments and the

15   proposed changes in response to the reviewer comments.

16   That probably defines the entire universe of changes

17   between the submitted draft and the accepted draft.

18           MR. CROSBY:  I appreciate your assistance

19   there, and I do have that, but unlike some folks, I

20   wasn't in the meeting in July, and so that may be my

21   only way to find out.

22   BY MR. CROSBY:

23       Q    And how long was it after the meeting that

24   the proposed publication was submitted?

25       A    Oh, I think it was first submitted in

EX 5-039

Page 40

1    August, late August or early September.

2        Q    Is there a reason that you presented the

3    results to the group of lawyers before you submitted

4    it for publication?

5        A    No.

6        Q    Is that your usual practice, to submit a

7    paper to a funder or partial funder prior to

8    submitting for publication?

9            MR. SCHACHTMAN:    Objection --

10       A    No.

11           MR. SCHACHTMAN:    -- to the form.

12       Q    What is your usual practice?

13       A    As we state in our proposal and in our

14   contracts, that we publish results no matter what they

15   are.

16       Q    I understand that.  But -- and what is your

17   usual practice with respect to whether or not you do a

18   presentation about a study before you submit for

19   publication?

20       A    Our usual practice is to give the funder the

21   final copy of the paper.

22       Q    That is, as accepted --

23       A    Right.

24       Q    -- by the publisher?

25       A    Right.

1    Q    So normally you would submit the paper, have

2    it accepted by a publisher, go through the review

3    process, make the changes, then when it is finally

4    accepted by the publisher and you have the galley

5    proofs of what will be published, that is what you

6    then submit --

7    A    No.

8    Q    -- to --

9    A    Typically we give them the first draft, the

10    first, you know, the first submission to the journal.

11    Q    Okay.  So then the process would normally

12    be, instead of in this case, you would have had it

13    accepted by the publisher, first draft in July, and

14    then maybe in August you would have met with the

15    funders?

16    A    Right.  We haven't given the funders the

17    final paper yet.

18    Q    Okay.  What is it that we have?

19    A    You have what's been accepted by the

20    journal.

21    Q    Okay.  And the final paper would be what --

22    are there changes that may occur between the paper as

23    accepted and what's published?

24    A    Yeah.  There may be some superficial

25    changes, and the gallies may have the tables

Page 42

1    misaligned or something like that.

2        Q    But normally speaking, as I understand it,

3    you would first have, for example, what we now have --

4        A    Umh-humh.

5        Q    -- before you presented it to the funders?

6        A    We -- what we would do is we would take our,

7    our final paper, submit it to the funders along with

8    our final bill.  And they don't have the final bill

9    yet, I don't think.

10       Q    We'll mark this a little later.

11       A    Okay.

12       Q    I just want to understand if that is what

13   you would call the final paper.

14       A    Let me make sure I --

15            (Witness reviewing document.)

16       A    Is this part isn't (indicating).  Just the

17   first part is.

18       Q    All right.

19       A    Yeah, Page 25.

20       Q    So until we get to the Protective Order --

21       A    Umh-humh.

22       Q    -- that's the final paper?

23       A    Right.

24       Q    And as I understand it, normally that is

25   what would be presented to a funder?

EX 5-042

Page 43

1    A    I -- I'm not saying that we would not talk

2    to the funder through the process, but we would submit

3    the final paper along with our final payment -- or

4    final invoice.

5    Q    And as final paper, and I'm -- I don't mean

6    to be splitting frog's hairs here, but I'm trying to

7    be sure I understand what's a final paper.

8    A    Umh-humh.

9    Q    Because you just indicated, I thought, that

10    you had not yet submitted the final paper to the

11    welding industry.

12    A    Right.

13    Q    Okay.  So then what is this?

14    A    That's the final paper.  But I don't know

15    why Doctor Blot hasn't submitted it yet.

16    Q    Well, do you know how the welding industry

17    may have gotten copies of it?

18    A    We gave it to them.

19    Q    Okay.  Who gave it to them?

20    A    IEI, either Doctor Blot or myself.

21    Q    Then what do you mean by saying you don't

22    know why Doctor Blot hasn't given it to them?

23    A    I'm sorry.  What I'm saying is that our --

24    we are talking about our normal process.

25    Q    Yes, sir.



Page 44

1      A    And as part of our normal process, our

2 invoicing process, we submit the last invoice along

3 with the final paper.  This is the final paper that

4 you have.  Because of this Protective Order in this

5 litigation, you wanted a copy of what the final paper

6 would look like in the journal, so we supplied this.

7      Q    All right.  So normally speaking, a funder

8 would get a copy of the final paper at what point?

9      A    On the conclusion of the study.

10     Q    Is the study concluded?

11     A    Absolutely.

12     Q    And when was it concluded?

13     A    When we did the final changes on this paper,

14 which I think was October.

15     Q    Okay.  So let me try to get the sequence

16 right.

17     A    Umh-humh.

18     Q    And excuse my inability to understand.

19        Would you normally give a copy of the final

20 paper to a funder only after you had made the final

21 changes as required by the publisher?

22     A    You know, I -- it varies by project, because

23 some projects they don't want the paper, they just

24 want a report.  And it varies by project.

25     Q    One other point I forgot to tell you, if

1  there's a point at which you would like to take a

2  break for any reason, just let us know.

3      A     Okay.

4      MR. CROSBY:  Do you all have a break

5  schedule that you --

6      MR. SCHACHTMAN:  No.  I just figured we'd go

7  about ninety minutes or so and give the reporter a

8  chance to put her fingers in ice.

9  BY MR. CROSBY:

10     Q     What all did you review, if anything, prior

11  to commencing the study that the industry funded on

12  welding?

13     A     I reviewed some prior studies on welding and

14  Parkinson's disease.

15     Q     Do you recall which ones?

16     A     The ones that are mentioned in the paper.

17     Q     And you read those before you began the

18  study?

19     A     Yes.  Before my involvement in the study.

20     Q     Was that before Doctor Blot put you in

21  charge, or after he had put you in charge?

22     A     After he did.

23     Q     Any meetings with defense counsel after July

24  2004?

25     A     I, I think I met with Mr. Schachtman in -- I

Page 46

1    think our first meeting was in November.

2         Q    Of '04?

3         A    Yeah.

4         Q    And what was the nature of that visit?

5         A    To discuss this litigation.

6         Q    Do you recall what you all discussed other

7    than just this litigation?

8         A    I wrote a Declaration for the court that we

9    discussed.

10        Q    Do you recall what he had to say, if

11   anything, about it?

12        A    Yes, some things.

13        Q    Who prepared the first draft of the

14   Declaration?

15        A    I did.

16        Q    And then were there any other drafts?

17        A    Yes.

18        Q    Who all was involved in that process?

19        A    In the process of preparing the drafts?

20        Q    Yes, sir.

21        A    Myself, Doctor Blot, Doctor McLaughlin,

22   Mr. Schachtman.  And I think that's it.

23        Q    What was Doctor Blot's role with respect to

24   the draft?

25        A    Editing.

1      Q      Do you have copies of any of those drafts?

2      A      No.

3      Q      Do you know if Doctor Blot does?

4      A      No, because he gave his copy back to me.

5      Q      And what did you do with it?

6      A      I made the changes he suggested and threw it

7  away.

8      Q      Okay.  Do you remember the nature of his

9  suggestions and changes?

10     A      No, I don't.

11     Q      What about Doctor McLaughlin, what role did

12  he play?

13     A      The same as Doctor Blot, editing.

14     Q      And do you have a copy of the draft where he

15  had his comments?

16     A      No.

17     Q      Do you recall what areas he had comments and

18  changes?

19     A      Probably more grammatical.

20     Q      Why would you think that Doctor Blot would

21  be dealing with substance and Doctor McLaughlin would

22  be dealing with language?

23     A      He's a stickler for that.

24     Q      And what about Mr. Schachtman, what was his

25  role?

Page 48

1      A      He reviewed what I wrote and offered some

2   suggestions.

3      Q      Do you recall what his suggestions were?

4      A      Not specifically.

5      Q      Do you recall generally?

6      A      About the wording of some of the comments.

7      Q      Do you recall what, wording about what

8   comments?

9      A      I don't recall specifically what comments,

10  no.

11     Q      Do you recall any general comments about his

12  suggestions?

13     A      No, other than he liked what I had written.

14     Q      He did.  Had you ever given a declaration

15  for a court before?

16     A      No.

17     Q      Did you find the process interesting?

18     A      Not particularly.

19     Q      Did you find it unique?

20     A      No.

21     Q      What did you find it to be similar to in

22  your experience?

23     A      Probably similar to writing a scientific

24  abstract.

25     Q      And when you get the reviewer's comments

Page 49

1   back you make changes or don't make changes in a

2   scientific abstract, right?

3        A    If you don't make changes you have to

4   justify why not.

5        Q    Did Doctor Blot or Doctor McLaughlin expect

6   you to do that with them with respect to their

7   suggestions?

8        A    Their suggestions weren't substantial enough

9   to warrant big changes in the Declaration.

10        Q    What about Mr. Schachtman's?

11        A    The same.

12        Q    But you don't recall what they were?

13        A    Not specifically, no.

14        Q    Do you recall how much time you spent doing

15   that?

16        A    I, I billed him for the time, so you have a

17   copy of my bill.

18        Q    Do I have a copy of all of your bills --

19        A    Yeah.

20        Q    -- relating to this?

21        A    To these, yeah.

22        Q    What is your normal hourly billing rate?

23        A    It's IEI's billing rate.  I don't collect

24   the monies myself.  So I think they charged me at four

25   hundred dollars an hour.

Page 50

1      MR. CROSBY:  Let me show you what I will

2  mark as Exhibit 1, please.  Would you hand me some of

3  those?

4      THE WITNESS:  These (indicating)?

5      MR. CROSBY:  Yes.

6      (Deposition Exhibit No. 1 was marked for

7  identification and was attached to the transcript.)

8  BY MR. CROSBY:

9      Q    That's a copy of -- excuse me.

10      MR. CROSBY:  Do you want a copy?

11      MR. SCHACHTMAN:  Oh, thank you.

12      MR. CROSBY:  Sure.

13  BY MR. CROSBY:

14      Q    -- invoices or statements that I've

15  received.  Could you tell me which one of those, if

16  any, relates to your preparation of the Declaration?

17      A    Yeah.  The first one, the one on the top.

18  January 10th, 2005.

19      Q    So it's twenty-one hours?

20      A    Correct, yes.

21      Q    What does Doctor McLaughlin bill at?

22      A    I have no idea.

23      Q    How about Doctor Blot?

24      A    No idea.

25      Q    If you'll look at the second page, please,

1     sir.

2          A     Umh-humh (complying).

3          Q     It's a statement for fifty-seven thousand,

4     nine hundred and forty dollars?

5          A     Umh-humh.

6          Q     Dated September 29, 2003?

7          A     Yes.

8          Q     At what point were you in the study there?

9          A     Oh, I think probably it was December or

10    January, December of 2003, January of 2004, around

11    that time.

12         Q     But I'm looking at a bill for September

13    2003.

14         A     Right.

15         Q     So does that mean that the roughly fifty-

16    eight thousand dollars was an initial payment before

17    anything had been undertaken?

18         A     Oh, no.  There is a huge undertaking by the

19    Danes to assemble the data, actually, first approved,

20    to get approval for using the data, and then to

21    assemble the underlying hospitalization data.

22         Q     Had IEI undertaken anything at this point?

23         A     Other than initial meetings, no.

24         Q     Does IEI generate any itemized bill for the

25    work done, or do they just send the bill for roughly

Page 52

1    fifty-eight thousand dollars?

2        A    I'm not in charge of billing, so I don't

3    know.

4        Q    I understand you're not in charge of it.

5    But you don't have any understanding as to whether or

6    not an IEI bill submits the amount of time spent by

7    IEI personnel or others, or copies of receipts for

8    monies expended, or invoices from third parties for

9    services rendered or items provided?

10       A    I have no knowledge of that at all.

11       Q    How long have you been working there?

12       A    Since '97, 1997.

13       Q    Do you all have any kind of production or

14   billing goals at IEI?

15       A    No, not that I'm aware of.

16       Q    So if you go to work at IEI -- what's your

17   normal workday?

18       A    It varies from day to day.

19       Q    Is there a time you're expected to be at

20   work?

21       A    Yes.

22       Q    What time?

23       A    Between eight and nine in the morning.

24       Q    Is there a time you're expected to be at the

25   office or to be engaged in work during the day?

EX 5-052

1     A     Between then and six, five, six p.m.

2     Q     Okay.  And I take it there are many days

3 where you work many more hours than that?

4     A     Correct, yes.

5     Q     Do you keep a timesheet?

6     A     We do keep a timesheet for our NIH funding.

7     Q     How about for matters such as the welding

8 industry study?

9     A     No.

10     Q     So how did you know that you spent twenty-

11 one hours doing the Declaration?

12     A     This was for the litigation, that we did

13 keep track of.  But for the actual study, we don't.

14     Q     Okay.  So did you do a time --

15     A     Because it's an hourly rate.

16     Q     Because what's an hourly rate?

17     A     The work on the Declaration was.

18     Q     Okay.  Well, wasn't the work for the study

19 projected on an hourly basis?

20     A     Not to my knowledge.  I think in the

21 proposal he put some hourly estimates.

22     Q     And who is he?

23     A     Doctor Blot.

24     Q     What's your best judgment as to how many

25 hours you spent working on the welding industry study

EX 5-053

Page 54

1    in Denmark?

2        A    Well, when we did the initial analysis and

3    paper writing, I was there for a week.  So probably

4    fifty or sixty hours that week.

5        Q    All right.

6        A    Before and after that, I'm not sure.

7        Q    How about overall, how many hours do you

8    feel like you put into the study that were, you know,

9    legitimate --

10       A    Umh-humh.

11       Q    -- billable work hours?

12       A    I don't think I could give you a number.

13       Q    Okay.  How about how many did Doctor Blot

14   put in?

15       A    I don't know.

16       Q    Do you know how many hours anybody at IEI

17   put in?

18       A    No.

19       Q    How about how much time anybody involved in

20   the study in Denmark put in?

21       A    No.

22       Q    With the NIH work, do they circulate a draft

23   of your compiled timesheets for that grant to be

24   submitted for you to approve?

25            MR. SCHACHTMAN:  Objection to the form.

Page 55

1      A      I'm not sure what you're asking.

2      Q      Well, you indicated, I thought, and maybe I

3  misunderstood it, that you kept time with respect to

4  NIH matters.

5      A      Yes.

6      Q      Does that go back to NIH for their review?

7      A      You know, I'm not sure.  I'm not sure.

8      Q      And is it your understanding that in

9  addition to the round numbers, two hundred and eighty

10  thousand dollars that has been billed, that there is

11  yet another statement that's due to the welding

12  industry for this study?

13      A      I think according to the proposal, there is.

14      Q      Have you read any other expert's

15  declarations in the welding litigation?

16      A      Yes.

17      Q      Did you read any of them before you wrote

18  yours?

19      A      No.  No, I didn't.

20      Q      All right.  Who all's have you read?

21      A      I read Doctor Wells' and Doctor Louis'.

22              And you're asking me before I wrote my

23  Declaration?

24      Q      Yes, sir.

25      A      Yeah.  I think that's it.

Page 56

1    Q    Okay.  So --

2    A    I'm trying to recall exactly when I read

3    them and when I wrote my Declaration.  It was all

4    around the same time.

5    Q    All right.  Did anybody give you any

6    guidance as to what was to be contained in your

7    Declaration?

8    A    No.

9    Q    So --

10    A    It was my understanding that I would write

11    about -- that I was going to discuss the study that I

12    did.

13    Q    And what is your understanding as to why you

14    were going to be called as an expert witness in this

15    case?

16    A    Because the study wasn't in the public

17    domain yet, it hadn't been published in the

18    literature, and in case there were questions about

19    that, that they wanted to use me as an expert witness.

20    Q    Is it your understanding, or do you intend

21    to offer any testimony concerning studies published by

22    any other person or entity with respect to health

23    effects of welding?

24    A    I'm going to only discuss my study.

25    Q    Have you formed any opinions with respect to

STATE-WIDE REPORTERS (800) 372-3376

1   any studies other than yours concerning health effects

2   of welding fumes?

3        A    I have not, no.

4             MR. CROSBY:  All right.  So he's limiting

5   himself to just his study?

6             MR. SCHACHTMAN:  As are we.

7             MR. CROSBY:  All right.  If you want, we

8   could take that break now.

9             MR. SCHACHTMAN:  Absolutely.

10            MR. CROSBY:  Great.

11            THE VIDEOGRAPHER:  We are going off the

12  video record.  The time is 10:20 a.m.

13            (A short recess was taken.)

14            THE VIDEOGRAPHER:  We are back on the video

15  record.  The time is 10:39 a.m.

16  BY MR. CROSBY:

17       Q    All right.  We're back on the record.  Still

18  under oath, all right?

19       A    Okay.

20       Q    All right.  Now, after reading Doctor Wells'

21  and Doctor Louis' Declarations sometime around --

22  before or after you did your Declaration, have you

23  read anybody else's declarations?

24       A    I read David Garabrant's Declaration a

25  couple weeks ago.

Page 58

1      Q    Did you form any impressions or opinions

2   concerning what he stated in his Declaration?

3      A    Yes, I -- it's a difficult question.

4      Q    Okay.

5      A    Yes, I had thoughts about his. . .

6      Q    Do you plan on expressing any of those

7   thoughts with respect to his Declaration in any

8   subsequent declaration or in any testimony?

9      A    No.

10          MR. CROSBY:  Is that correct, are you all

11   going to elicit anything?

12          MR. SCHACHTMAN:  I'm not going to ask him

13   for those opinions, so if I do, they'll be

14   nonresponsive answers.

15          MR. CROSBY:  All right.

16   BY MR. CROSBY:

17      Q    With respect to any other declarations,

18   besides Doctor Wells, Doctor Louis and Doctor

19   Garabrant, have you read any?

20      A    Not for this case, for this litigation.

21      Q    Okay.  Have you read any for any other

22   litigation?

23      A    I have.

24      Q    And what litigation is that?

25      A    I think I -- back when I, I looked at the

EX 5-058

Page 59

1    litigation I worked on in the Nineties, I think I, I

2    read some affidavits then.  But I can't recall

3    exactly.

4         Q    Okay.  Would that have been the Superfund?

5         A    Superfund, yeah.  I think I did.

6         Q    Have you read any briefs that have been

7    filed in this case?

8         A    No.

9         Q    Have you ever read a legal brief before?

10        A    I have not, no.

11        Q    How about any deposition transcripts?

12        A    Yeah.

13        Q    Okay.

14        A    I have.  Yes, I have.

15        Q    Okay.  Whose deposition transcripts have you

16   read?

17        A    Doctor Wells', Doctor Louis'.

18        Q    How about Doctor Garabrant's?

19        A    Yes, I did read his as well.

20        Q    Anybody else's?

21        A    Not for this litigation.

22        Q    Okay.  What litigation have you read

23   deposition transcripts before?

24        A    Probably the past litigation I worked on for

25   the Superfund sites.

Page 60

1      Q      How about trial transcripts, have you read

2    any trial transcripts?

3      A      No.

4      Q      Speaking of trials, this is a question that

5    we lawyers have to ask, and it's not meant to do

6    anything other than just do what lawyers have to do,

7    somewhat like what doctors have to do when you go into

8    a hospital, and some of it's not fun.

9             Have you ever been convicted of a crime?

10     A      No.

11     Q      Have you ever been charged with a crime?

12     A      No.

13     Q      What else have you read with respect to

14   preparing for your Declaration or this deposition

15   other than the transcripts that we discussed, the

16   Declarations we discussed, and the articles that are

17   referenced in your Declaration and in your paper?

18     A      Nothing else.

19     Q      With respect to the papers that you read

20   dealing with welding fumes and health aspects --

21     A      Umh-humh.

22     Q      -- did you do any power analysis of any of

23   those?

24     A      Of the studies?

25     Q      Yes.

EX 5-060

Page 61

1      A     No.

2      Q     Did you ever do any power analysis with

3 respect to the Danish study you did for the welding

4 industry?

5      A     No.

6      Q     Did you do a pre-study power analysis with

7 respect to that study?

8      A     No.

9      Q     Did Doctor Blot?

10     A     No, he did not.

11     Q     Did anybody do one?

12     A     No.

13     Q     Has anybody done a post-study power analysis

14 of the Danish study you all did for the welding

15 industry?

16     A     There was no need to.  We had the study

17 results.

18     Q     I understand your opinion on that.

19     A     Umh-humh.

20     Q     But what I'm asking is whether or not you

21 did it.

22     A     It was not done, no.

23     Q     Okay.  Do you know if anyone has done that?

24     A     I know Doctor -- I think Doctor Louis wrote

25 about a power calculation he did.  It was either

EX 5-061

Page 62

1    Doctor Louis or Doctor Wells.

2         Q    Since the Declaration in November when you

3    spent approximately twenty-one hours, how many hours,

4    if any, have you spent involved in welding research or

5    endeavors for anybody?

6              MR. SCHACHTMAN:  Objection to the form.

7         A    I'm not sure what you mean by welding

8    research.

9         Q    Have you done anything pertaining to health

10   aspects of welding fume exposure since your

11   Declaration was finished?

12        A    Yes.

13        Q    Okay.  What is that?

14        A    We've designed a study for Sweden, to look

15   at welders in Sweden.

16        Q    What about with respect to litigation?

17        A    I'm not sure what you're asking.

18        Q    All right.  Have you spent any time

19   reviewing anything for which you're going to charge

20   somebody with respect to the litigation since you

21   finished your Declaration?

22        A    I've not reviewed anything for money since I

23   finished my Declaration.

24        Q    Okay.  Have you reviewed anything relating

25   to health aspects of welding fume exposure since your

Page 63

1    Declaration for any purpose, other than for the

2    Swedish study?

3        A    Yeah, nothing other than the declarations

4    and the depositions that we discussed earlier.

5        Q    Okay.  And how much time since you finished

6    your Declaration have you spent either doing research

7    or reviewing literature or transcripts or declarations

8    relating to this litigation since you finished your

9    Declaration?

10              MR. SCHACHTMAN:  Objection to form.

11       A    I'm not sure of the exact number of hours,

12    but -- I'm not sure of the exact number of hours.

13       Q    Since your --

14       A    But some.

15       Q    Okay.  Have you written it on a timesheet

16    somewhere?

17       A    Yeah.

18       Q    Okay.  And do you still have those

19    timesheets?

20       A    It's -- it would be an email that I would

21    send to Doctor Blot.

22       Q    Have you met with anyone in preparation for

23    this deposition today?

24       A    Yes.

25       Q    And who all was that?

EX 5-063

Page 64

1    A    Mr. Schachtman and Erika Doherty.

2    Q    And when did you all meet?

3    A    It was last Thursday.

4    Q    And where were you?

5    A    Here.

6    Q    And how long did you all meet?

7    A    It was about four hours, four or five hours.

8    Q    Okay.  And what all did you all discuss?

9    A    The deposition.

10    Q    What aspects of it?

11    A    How to dress, how to -- you know, what the

12    deposition would entail, those type of issues.

13    Q    Did you discuss your study?

14    A    A little bit, yes.

15    Q    What aspects of the study did you all

16    discuss?

17    A    Just, just the basic, you know, what I would

18    say about the study.

19    Q    And what did you say that you would say?

20    A    That it was an excellent study.

21    Q    And is that your own humble opinion?

22    A    Absolutely.

23    Q    And what else, if anything, did you discuss

24    about the study?

25    A    We also looked at other depositions and read

EX 5-064

Page 65

1    through what other people had written about the study.

2         Q    Okay.  Which ones did you all read through

3    about the study, what depositions?

4         A    Doctor Louis' and Doctor Wells'.

5         Q    Okay.  And did you go over their

6    Declarations as well?

7         A    I think I just looked at the depositions.

8         Q    And what were the comments by the lawyers or

9    your comments about Doctor Wells' statements

10   concerning your study?

11        A    I'm not sure what you're asking.

12        Q    Maybe I misunderstood.  Did you all discuss

13   Doctor Wells' deposition and comments he made

14   concerning your study?

15        A    Yes.

16        Q    Okay.  What comments of Doctor Wells did you

17   all discuss?

18        A    The comments that pertained to me.

19        Q    Okay.  And what were they?  What did he --

20   what was the gist of his comments about --

21        A    Doctor Wells?

22        Q    Yes.

23        A    I can't recall them off the top of my head.

24   You have them in the deposition.

25             MR. SCHACHTMAN:  Let me just -- if I may.

EX 5 065

1           MR. CROSBY:  Sure.

2           MR. SCHACHTMAN:  I don't think much turns on

3    it, but Doctor Wells has not testified, and I think

4    the witness is referring to the Declaration that he

5    reviewed, and I think he's just confused what a

6    declaration is and what a deposition is.

7           MR. CROSBY:  Okay.  Thank you.

8    BY MR. CROSBY:

9      Q     Have you -- does that help refresh your

10   recollection?

11     A     Absolutely.

12     Q     All right.  Now, do you recall the substance

13   of what Doctor Wells said about your study?

14     A     I remember him saying that it was a very

15   good cohort study.

16     Q     And that was in his Declaration?

17     A     Yes.

18     Q     And do you recall what Doctor Louis said?

19     A     Not specifically, no.

20     Q     Do you recall anything that Doctor Wells

21   said about your study that you disagreed with?

22     A     I think I disagreed with all of his

23   comments.

24     Q     Okay.  And what about Doctor Louis, was

25   there anything that he said about your study with

Page 67

1    which you disagreed?

2         A    Yes, there was.

3         Q    And what all did you disagree with about

4    what Doctor Louis said?

5         A    Some of his specific comments about my

6    study.

7         Q    How many declarations of Doctor Louis have

8    you read?

9         A    To my knowledge, just one.

10        Q    And how many declarations of Doctor Wells

11   have you read?

12        A    One.

13        Q    And what about Doctor Garabrant?

14        A    I guess I'm confused about what --

15   deposition and declaration, so. . .

16        Q    A deposition --

17        A    I know I read his deposition.

18        Q    Okay.  A deposition is typed up on a piece

19   of paper and they double space everything and it

20   usually says Q for a question and a question's typed

21   out, and then they'll be skipping down, have an A, and

22   then it will have an answer for what somebody said.

23   So it's a question and answer process, reads like a

24   script.

25        A    Yeah.  I think I read both Doctor

Page 68

1    Garabrant's Declaration and deposition.

2        Q    Okay.  And was there anything that Doctor

3    Garabrant said about your study with which you

4    disagreed?

5        A    No.

6        Q    Is there anything that he said that you

7    agreed with?

8        A    Yes.

9        Q    Do you recall what it is that you agreed

10    with?

11        A    His -- the specifics I don't, unless you

12    read them to me.

13            MR. CROSBY:  Okay.  I'd renew the request

14    for the information relating to billing, please.

15        Q    Do you have any notes of any conversations

16    with any of the counsel that you've met with?

17        A    No.

18        Q    How about any correspondence or emails,

19    anything like that?

20        A    I have emails that pertain to where the

21    deposition would be held and things like this.

22        Q    Anything dealing with health aspects of

23    welding fumes, or studies or declarations relating to

24    health aspects of welding fumes?

25        A    Yes.

Page 69

1    Q    Emails?

2    A    Yeah.

3    Q    Okay.  From counsel?

4    A    Yeah.

5    Q    And do you know where those are?

6    A    Yeah, I have them.

7    MR. CROSBY:  Okay.  I'll renew the request

8    for those, please.

9    MR. SCHACHTMAN:  Let me just say that I know

10   that Messrs. Harber and Barrett had an agreement

11   reached about drafts, and if the emails he's talking

12   about — and I don't really know which ones he is —

13   relate to drafts, then I think it's covered by the

14   agreement.

15   MR. CROSBY:  I'm not trying to do anything

16   that is, you know, contrary to whatever agreements

17   that our respective folks have made, but if there's

18   something that I'm entitled to have —

19   MR. SCHACHTMAN:  I understand.

20   MR. CROSBY:  — I'm just asking for it.

21   MR. SCHACHTMAN:  And so we'll take it under

22   advisement, and I will seek counsel from Harber and

23   you'll seek counsel from Mr. Barrett.

24   BY MR. CROSBY:

25   Q    Are you currently working on any kind of

1    supplemental report?

2       A    No.

3       Q    Have you been asked to prepare one --

4       A    No.

5       Q    -- or consider one?

6       A    No.

7       Q    Is there -- do you have a desire to submit

8    one after having read what Doctor Wells and Doctor

9    Louis had to say?

10      A    No.

11      Q    Has anyone discussed with you doing any

12   study relating to health aspects of welding fumes

13   other than your Swedish study?

14      A    No.

15      Q    Are you familiar with any other studies

16   being conducted by any other researchers with respect

17   to health aspects of welding fumes?

18      A    Other than what's been published in the

19   literature, no, no ongoing studies.

20      Q    Have you sought funding for any studies

21   relating to welding fumes or health aspects of welding

22   fumes from any source other than manufacturers of

23   welding rods?

24      A    No.

25      Q    Have you -- are you aware of anyone

Page 71

1    submitting proposals for grants to NIH or any other

2    governmental agency or institution with respect to

3    conducting a study on health aspects of welding fumes?

4         A    I'm not aware.

5         Q    Do you agree or disagree with this

6    statement:  There is no current scientific

7    justification and no past scientific justification for

8    expensive and time-consuming analytic studies of

9    Parkinson's disease and welding?

10        A    Would you repeat?

11        Q    Yes, sir.  There is no current scientific

12    justification and no past scientific justification for

13    expensive and time-consuming analytic studies of

14    Parkinson's disease and welding?

15        A    It has a lot of qualifiers in it.

16             MR. SCHACHTMAN:  Is there a time when that

17    statement was made?  There's a temporality aspect to

18    it.

19        Q    Let's assume it was made within the last two

20    years.

21        A    Would you repeat it one more time, please?

22        Q    Yes, sir.

23        A    Umh-humh.

24        Q    There is no current scientific justification

25    and no past scientific justification for expensive and

Page 72

1    time-consuming analytic studies of Parkinson's disease

2    and welding.

3                MR. SCHACHTMAN:  Objection to the form.

4        A    I believe there's justification to study

5    Parkinson's disease among welders, yes.

6        Q    So do you agree that there is current

7    scientific justification for expensive and time-

8    consuming analytic studies of Parkinson's disease and

9    welding?

10       A    I don't know.

11       Q    Do you agree that there was past scientific

12   justification for expensive and time-consuming

13   analytic studies of Parkinson's disease and welding?

14       A    I, I believe there is justification for

15   studying Parkinson's disease and welding, yes.

16       Q    Why do you believe that?

17       A    There were some case reports that I read

18   about in the literature.

19       Q    All right.

20       A    And I think it would be important to verify

21   that in a more rigorous analytical method.

22       Q    You know, lawyers sometimes ponder having a

23   dream case.

24       A    Umh-humh.

25       Q    And I'm wondering -- are you an

Page 73

1    epidemiologist, or a biostatistician?

2        A    Epidemiologist.

3        Q    And I was wondering, do epidemiologists

4    sometimes ponder having the dream epidemiological

5    study?  What would you do to design the perfect

6    epidemiological study if you could do it?

7        A    It would be a cohort study.

8        Q    Okay.  Now, was your Danish study for the

9    welding industry, did it meet your standard for the

10   dream study?

11       A    I think it's the best study to date.

12       Q    Okay.

13       A    It's a very powerful study.

14       Q    If you could tell me, please, sir -- well,

15   did you calculate the power?

16       A    I did not calculate the power, no.

17       Q    Could you tell me, please, with respect to

18   going forward --

19       A    Umh-humh.

20       Q    -- and just disregard your Swedish proposal.

21   Let's assume that I come to you and say I want you to

22   design from scratch the best study that could be done

23   to answer the question are people that are exposed to

24   welding fumes at an increased risk for Parkinson's

25   disease, Parkinsonism, neurological problems, movement

Page 74

```
1    disorders.
2         A     Umh-humh.
3         Q     Okay?
4         A     (Nodding.)
5         Q     What would be your first step after I said
6    money is no object, besides smiling like you just did?
7         A     The first step would definitely be to
8    identify welders.
9         Q     Okay.  How do you mean that?
10        A     Identify people who had worked in welding.
11        Q     Okay.  And I want to do that in the United
12   States.
13        A     You do?
14        Q     If I want to do that in the United States,
15   how do we do it?
16        A     I don't know.
17        Q     Okay.  But you would go about -- how big a
18   group would you need?
19        A     In order to see an effect?
20        Q     Yes.
21        A     I don't know.
22        Q     If you did the study in any other country,
23   do you know how big a population you would need in
24   order to see whether or not there was any meaningful
25   effect that was statistically significant?
```

Page 75

```
 1      A      Yeah, I don't think anyone could answer

 2   that.

 3      Q      Okay.  Why is that?

 4      A      Because there are no disease registries or

 5   background rates of Parkinson's disease.

 6      Q      Where, in the world, or --

 7      A      To my knowledge, in large populations in

 8   Denmark we didn't have any background rates of

 9   Parkinson's disease, so there was no way to calculate

10   power.

11      Q      Do you have a general understanding or

12   appreciation as to what is generally accepted as the

13   background incidence of Parkinson's disease in human

14   beings in the United States?

15      A      I have no knowledge of that.

16      MR. SCHACHTMAN:  Objection to the form.

17      A      I have no knowledge of that.

18      Q      Okay.  Is that something that you looked

19   into before you -- well, is that something you've

20   looked into?

21      A      Yes.

22      Q      Okay.  And you found nothing that indicates

23   what the incidence is?

24      A      There are a few studies that show incidences

25   in some areas, but nothing for Denmark.  There's no,
```

Page 76

1    there's no disease registry of Parkinson's disease or

2    anything like that where we could estimate power from.

3         Q    What about in the United States?

4         A    Not to my knowledge, there's no nationalized

5    registries of Parkinson's disease.

6         Q    Are there some generally-accepted numbers as

7    to what the incidence of Parkinsonism is amongst the

8    population of human beings in the United States?

9         A    I, I don't know.  I have no idea.

10        Q    Is there any generally-accepted incidence

11   rate for the occurrence of Parkinsonism or Parkinson's

12   disease in Denmark?

13        A    No, there's not.  That was, was the beauty

14   of using the hospitalization, that way we could get a

15   background rate in the general population of what

16   Parkinson's disease was, looking at the disease

17   frequency of Parkinson's.

18        Q    Of Parkinson's disease, for hospitalization

19   of Parkinson's --

20        A    Correct.

21        Q    -- disease?

22        A    Yeah.

23        Q    But not necessarily finding out what the

24   incidence of Parkinson's disease actually is?

25        A    Well, that is an instance of Parkinson's

Page 77

1  disease.  That's an unbiased incidence among the

2  background population and among the welders.  So that

3  way we were, you know, we were comparing like to like.

4      Q    In some respects, perhaps, but we'll get to

5  all of that in a minute.

6          MR. SCHACHTMAN:  Objection to form.

7      Q    But what I'm asking you is your incidence

8  rate is hospitalizations in Denmark, correct?

9      A    Correct, umh-humh.

10     Q    It is not occurrences in Denmark?

11     A    It is occurrences of Parkinson's in Denmark.

12     Q    It's not all occurrences of Parkinson's

13  disease in Denmark, is it?

14     A    It's hospitalizations for Parkinson's

15  disease.

16     Q    And so it's limited to that?

17     A    Correct.

18     Q    Now, in the United States do we have any

19  sort of data that would yield that kind of

20  information, or could yield that kind of information?

21     A    To my own knowledge, no, not at all.

22     Q    So then we're back to designing the dream

23  study.

24     A    Umh-humh.

25     Q    How would you design the study to ascertain

Page 78

1  whether or not there is an increased incidence or risk

2  of Parkinsonism in the United States?

3       A     Umh-humh.  As I said, first I'd assemble a

4  group of welders.

5       Q     How big a group?

6       A     As large as I could possibly find.

7       Q     Well, is a dozen enough?

8       A     I don't think so.  It depends on the

9  magnitude of the risk you're expecting to find.

10       Q     And what would be the magnitude of the risk,

11  if you have an opinion, that you would expect to find?

12       A     You'd have to look in the literature and see

13  what other people have reported.

14       Q     And so do you have an opinion or a view on

15  that?

16       A     I don't.

17       Q     Would you do a power calculation before you

18  undertook the study?

19       A     If the data was available to do a power

20  calculation, I would.

21       Q     Was the data available in Denmark?

22       A     No.

23       Q     Is the data available in Sweden?

24       A     No.

25       Q     Do you know of any country where the data is

1    available?

2        A    No.

3        Q    Do you know of any geographical area,

4    country, county, state, any geographical area where --

5        A    I don't know of any registries of

6    Parkinson's disease where you could estimate an

7    incidence rate.

8        Q    So does that mean that you won't be able to

9    do, or one would not be able to do the perfect

10   epidemiological study with respect to Parkinson's

11   disease or Parkinsonism and welding fume exposure?

12       A    Well, you could do a power calculation now

13   because we know the background of hospitalization

14   rates of Parkinson's in Denmark.  So the

15   hospitalizations of Parkinson's disease, we have that

16   background right now.  We have an estimate of that.

17   And you could -- you know, if you had a similar

18   country or similar cohort, you could, you could use

19   that rate.

20       Q    And that would be a suitable rate, in your

21   opinion, with respect to hospitalization for

22   Parkinson's disease?

23       A    Right, if that was the outcome you were

24   studying.

25       Q    Are you familiar with any studies that

Page 80

1    address the incidence by which Parkinson's disease is

2    not found by means of review of hospital and medical

3    records?

4        A    No.

5        Q    If there were medical and scientific

6    literature published that indicated that in the area

7    of forty percent of Parkinson's disease patients are

8    not hospitalized and not captured by either hospital

9    records or medical records, would that alter your

10   opinion with respect to the reliability of medical

11   records for use in such a study in the United States?

12       A    If you were looking at hospitalizations of

13   Parkinson's disease, that wouldn't alter it at all,

14   because it would be unbiased between welders and the

15   comparison population and the background population,

16   and as long as you didn't ascertain your outcome

17   differently between welders and the other -- your

18   comparison group, then there's no concern.

19       Q    So that presupposes, as I understand it, by

20   epidemiologists that everybody's alike, if you're a

21   welder and you have Parkinson's disease and you don't

22   go to the doctor and you don't get hospitalized, then

23   you're going to behave just like the people who are

24   nonwelders who have Parkinson's disease and are not

25   hospitalized?

1       A       I'm sorry.  Can you repeat, please?

2       Q       Isn't that a lot like --

3       A       It's a long --

4       Q       The basic premise is that we all behave the
5   same, whether you've got a welder and have Parkinson's
6   disease or a nonwelder and have Parkinson's disease?

7       A       Right.

8       Q       Has that been verified?

9       A       I have no knowledge of that.

10      Q       Okay.  So that's an assumption?

11      A       Right, that Parkinson's disease is similar.

12      Q       And that people that have it behave
13  similarly whether they're welders or not?

14      A       In terms of hospitalizations, yes.

15      Q       Other than the income from performing the
16  study for the manufacturers in the Danish report, have
17  you or IEI received any other funding or monies from
18  the welding industry?

19      A       No.  I'm sorry, other than my preparation
20  for the deposition.

21      Q       Yeah.  What we've talked about?

22      A       Yeah.

23      Q       Has anyone else at IEI published any study
24  or report in the medical and scientific literature
25  dealing with welding fume exposure and Parkinson's

EX 5-081

Page 82

1    disease or Parkinsonism or movement disorders?

2        A    Not to my knowledge, no.

3        Q    How about has anybody at IEI other than the

4    study that is there now waiting to be published, have

5    they published anything dealing with maganesism?

6        A    No.

7        Q    In the year 2004, approximately what

8    percentage of your time was spent in consulting in

9    litigation?

10       A    2004.  I had a little bit in January of

11   2004, and that was the only time.  I'm sorry, except

12   for the November/December work I did for this.  So

13   it's sporadic.  It's not constant month to month.

14       Q    What about IEI, what percentage of IEI's

15   efforts and endeavors are related to consulting in

16   litigation?

17       A    I have no idea.

18       Q    Are you aware of other people who are

19   employed with or by or affiliated with IEI who provide

20   services as expert consultants and witnesses?

21       A    Yes, other people at IEI do.

22       Q    Okay.  Who is it?

23       A    Pardon me?

24       Q    Who else does that?

25       A    Doctor Blot and Doctor McLaughlin, I

1    believe.

2        Q    Okay.  And are they involved in doing that

3    in welding at all other than in assisting you in --

4        A    No.

5        Q    What areas are they experts to testify or

6    consult?

7        A    I have no idea.

8        Q    Do you know what percentage of their time is

9    spent in those endeavors?

10       A    No.

11       Q    Do you know what percentage of the research

12   that is conducted by IEI is funded in whole or in part

13   by industry?

14       A    I don't know.

15       Q    Of the papers that you authored or

16   co-authored last year --

17       A    Umh-humh.

18       Q    -- papers, reports, whether published or

19   not --

20       A    Umh-humh.

21       Q    -- what percentage of those were funded in

22   whole or in part by industry?

23       A    By industry?  I have no idea.  I would have

24   to look through my CV and tell you the numbers.

25       Q    Okay.  Would looking through the CV give the

1    source of the funding, or just you would look at it,

2    see it, and that would help you recall?

3        A    That would help me recall.  But at the end

4    of each article we acknowledge who the funders were.

5        Q    That's as to published.  Are all of your

6    studies published?

7        A    In the last year they've been, yes.

8        Q    How many papers did you publish in 2004?

9        A    I don't know.  I'm not sure of the exact

10   number.  Ten?

11       Q    How many paper -- excuse me.  How many hours

12   do you work a year?

13       A    Total?  I don't know.

14       Q    What's your average week?

15       A    Probably fifty, sixty.

16       Q    How many weeks vacation do you get?

17       A    We're allowed, I think it's three or four.

18   Three weeks, twenty-one days.

19       Q    Are you paid a flat salary?

20       A    Yes.

21       Q    Is there any potential for bonus?

22       A    Sometimes.

23       Q    And what's the basis for any bonus?

24       A    I have no idea.

25       Q    Have you ever gotten a bonus?

1       A       Yes.

2       Q       Did you get a bonus for last year?

3       A       I got a small bonus, yes.

4       Q       And they didn't tell you why you got it?

5       A       Because they appreciated my work.

6       Q       This is Pages 7 through 12, which is the

7   list; I've just given you the ones that start with

8   2004, at Item No. 36.

9       A       Okay.

10      Q       And if you wish, you can simply give us the

11  number.

12              (Deposition Exhibit No. 2 was marked for

13  identification and was attached to the transcript.)

14      A       Could you repeat exactly what you're asking

15  me to look for, then?

16  BY MR. CROSBY:

17      Q       I'm looking for the articles from 2004,

18  since, as I understand it, they were all published.

19      A       Umh-humh.

20      Q       And for you to tell me which ones of those,

21  No. 36 through 53, which I think may now catch some of

22  2005.

23      A       Yeah.

24      Q       If it does, please let me know.

25      A       Some of them are just submitted or in press,

Page 86

1   so they're not -- they're 2004.  It's only through 40,

2   2004.

3           MR. SCHACHTMAN:  He certainly had a more

4   productive year than I did.

5           THE VIDEOGRAPHER:  I'm sorry.  What exhibit

6   number is this.

7           MR. CROSBY:  2.  I'm sorry.

8           THE VIDEOGRAPHER:  That's quite all right.

9   BY MR. CROSBY:

10      Q    Was No. 36 funded in whole or in part by any

11  industry source?

12      A    This specific paper, no.

13      Q    Were there other papers that were funded in

14  whole or in part by industry that yielded the data

15  that permitted this paper to publish?

16      A    I believe so, yeah.

17      Q    Okay.  What about No. 37?

18      A    No.

19      Q    Was there data that was yielded from a

20  previously-funded study from industry that allowed

21  this paper to print?

22      A    Not on this specific topic, no.

23      Q    Was it from a related topic?

24      A    Yes.

25      Q    So would you agree that in whole or in part

Page 87

1    this paper comes about with respect to funding that

2    was provided by industry?

3                MR. SCHACHTMAN:  Objection; form.

4        A    In a small part.

5        Q    Okay.  And No. 38?

6        A    Again, it's similar to 37.  Some of the

7    original work from this data set was through industry

8    funding.  But this specific paper, no.

9        Q    Who funded this study, then?

10       A    38?

11       Q    Yes, sir.

12       A    I believe -- I would be guessing.

13       Q    Okay.  Please don't guess.

14       A    Okay.

15       Q    No. 39?

16       A    39 was part of the same funding as 38, I'm

17   sure.

18       Q    So that, in part, relates back to funding

19   from breast implant?

20       A    Yeah.

21       Q    And were you all funded by the breast

22   implant manufacturers?

23       A    I'm not sure who, who it was specifically

24   funded by.

25       Q    Whether it was their lawyers or them

EX 5-087

Page 88

1    directly or what?

2        A    I don't know.  It was, it was prior to my

3    joining IEI.

4        Q    And you came there in '97?

5        A    Yeah.

6        Q    Were you recruited, or did you come to them?

7        A    I came to them, yeah.

8        Q    How did you hear of them?

9        A    How did I hear of IEI?

10       Q    Yes, sir.

11       A    I knew Doctor Blot.  He's a famous guy and I

12   wanted to work with him.

13       Q    Where is he famous from?

14       A    NCI.

15       Q    The National Cancer Institute?

16       A    Yeah.

17       Q    What's his relationship to NIH?

18       A    He worked there for many years.  He retired

19   from there.

20       Q    All right.  No. 40?

21       A    Umh-humh.

22       Q    Was that funded in whole or in part by

23   industry?

24       A    In part, yeah.  The original underlying

25   data, but, again, not this specific paper, no.

EX 5-088

Case 1:19-md-02875-RMB-SAK     Document 1713-8     Filed 11/01/21     Page 90 of 322
PageID: 39774
Case 1:03-cv-17000-KMO     Document 1862-4     Filed 08/07/2006     Page 89 of 321

Page 89

```
 1          Q      Okay.  And No. 41?

 2          A      41, I don't believe was any type of funding.

 3   I think that was a -- we used in-house funds for that.

 4          Q      And No. 42?

 5          A      Yeah, 42 is from industry.

 6          Q      Was that a hundred percent?

 7          A      Yes, yeah.

 8          Q      No. 43?

 9          A      43 is a variety of sources, but part is,

10   part is from industry.

11          Q      And No. 44?

12          A      44 was industry, yeah.

13          Q      No. 45?

14          A      45 is part of the papers coming from a

15   similar data set as 43.

16          Q      No. 46?

17          A      That was, again, in-house funding, so no

18   industry.

19          Q      What is the in-house impetus for the renal

20   research?

21          A      Oh.  We were just interested.  That was a

22   topic area that Doctor McLaughlin was studying when he

23   was at NCI, so he was just interested in continuing

24   that work.

25          Q      So he's another NCI grad?
```

Page 90

1    A    Yup.  So is Doctor Boice and Doctor Tarone.

2    Q    Did you have any affiliation with NCI?

3    A    No.

4    Q    No. 47?

5    A    This, this was, you know, in part, again,

6    from industry.

7    Q    No. 48?

8    A    48 and 47 are the same, from the same

9    database.

10   Q    And No. 49?

11   A    49's from that database as well.

12   Q    And that's got some industry funding, or is

13   it a hundred percent industry funded?

14   A    No, some, some, very -- some of the

15   underlying data was sponsored by industry.

16   Q    No. 50?

17   A    That was an NIH grant.

18   Q    What were the results of that one, do you

19   recall?

20   A    Yeah.

21   Q    What was it?

22   A    People that were heavier are more likely to

23   have pancreatic cancer.

24   Q    How much heavier have you got to be?

25   A    Well, that's a good question.  This study,

Page 91

1    it linked weight retrospectively, and so we didn't try

2    to quantify weight because people lie about their past

3    weight.

4         Q    So how does it help us?

5         A    Pardon me?

6         Q    How does it help us to know it?

7         A    It's just -- actually, in the paper today

8    there was a story of obesity and this underlying

9    biosyndrome, they're calling it.  I don't remember the

10   exact words, but increased risk for a variety of

11   health diseases, yeah.

12        Q    Okay.  And No. 51?

13        A    51 was part of -- I think some of the

14   underlying data to a similar cohort was from industry.

15        Q    And No. 52?

16        A    That was NIH funding.

17        Q    And No. 53?

18        A    NIH funding.

19        Q    No. 1, of the Reviews, Case Reports?

20        A    Yeah.  Was that was done in '97.

21        Q    Okay.  Let me move down to 20 -- which is

22   No. 4, picks up with 2004.

23        A    2004?

24        Q    Right.

25        A    Let's see.  That is a -- oh, that's an

Case 1:19-md-02875-RMB-SAK    Document 1713-8    Filed 11/01/21    Page 93 of 322
PageID: 39777
Case 1:03-cv-17000-KMO    Document 1862-4    Filed 08/07/2006    Page 92 of 321

Page 92

1    editorial, and that was sponsored by industry.

2        Q    And No. 5?

3        A    I'm sorry.  No, I'm sorry, I was misreading.

4        Q    Okay.  That's all right.

5        A    Yeah.  No. 4 in part, you know, some of the

6    data we based this on was by industry.

7        Q    All right.

8        A    But No. 5 was a study we had done for

9    industry, yeah.

10       Q    And No. 6?

11       A    No. 6 was a response to No. 4.

12       Q    So was the data used in expressing that in

13   part provided by industry funding?

14       A    It's, it's difficult.  It's more of an

15   editorial, and I would say what we based our editorial

16   on was our analysis.  We did the data that -- the

17   underlying data came from, and it came -- we collected

18   through monies from industry.

19       Q    Books and chapters.  Here you are with

20   Doctor Garabrant.

21       A    Umh-humh.

22       Q    The Epidemiology of Pancreatic Cancer.  Was

23   that funded, the data that you used for writing that

24   derived in whole or in part funding by industry?

25       A    No.  That was an NCI grant.

Page 93

1    Q    If we go to the back of Page 12, we can

2    start with 2004 again.  Cosmetic and Reconstructive

3    Breast Implants?

4    A    Umh-humh.

5    Q    In 2004?

6    A    Some -- again, some of the underlying data

7    to assemble that data was sponsored by industry.

8    Q    And then No. 23?

9    A    That is a small grant that we got from IEI

10    in discretionary monies.

11    Q    No. 24?

12    A    24, I'm not sure where their funding came

13    from.  It's sponsored by Kaiser.  I know that there's

14    some grant process, they got the monies through that.

15    Q    And No. 25?

16    A    Again, some of the underlying data, to

17    assemble the data was sponsored by industry.

18    Q    Okay.  Now, with respect to the ones that we

19    started with, No. 41 through 53 --

20    A    Umh-humh.

21    Q    -- how many of those found an increased risk

22    associated with the use of or exposure to the item

23    that you were researching?

24    A    41 to 53?

25    Q    Yeah.  Those are the ones we just went over.

Page 94

1       MR. SCHACHTMAN:  Objection to the form.

2    A    Okay.

3       MR. CROSBY:  Well, we can do them one at a

4    time if you want to.

5       MR. SCHACHTMAN:  No, no.  The problem is

6    that I'm not sure they all necessarily involve

7    exposures.  Some of them are anthropomorphic measures

8    or other kinds of --

9    A    Some are just descriptive studies as well,

10   they're just describing the population.

11   Q    Then we'll do them one at a time.

12   A    Perfect.

13   Q    Okay.  No. 41.

14   A    Umh-humh.

15   Q    Did that do an assessment as to whether or

16   not there's an increased risk?

17   A    Actually, the hypothesis was that statins

18   would protect you from cancer.

19   Q    Okay.  And what did you find?

20   A    There's -- I think he found a small -- I

21   can't recall exactly, but I think he small a small

22   protective effect.

23   Q    Okay.  So statin is good for you insofar as

24   cancer goes?

25   A    They should put it in water.

Page 95

1    Q    Okay.  And Parkinson's disease, we'll get to

2    that --

3    A    Okay.

4    Q    -- in a little bit.

5         No. 43?

6    A    Umh-humh.  This was, this was just a

7    descriptive paper of the type of complications that

8    you'd find after plastic surgery.

9    Q    Okay.  So it didn't assess whether or not

10   breast implants cause an increased risk of illness or

11   disease or anything?

12   A    No.  We were looking at complications that

13   were associated with the surgeries.

14   Q    No. 44.  Is working in the movie business

15   being assessed for whether or not there's a health

16   risk?

17   A    Yes.  And we did find a health risk, yes.

18   Q    And what health risk was it?

19   A    We found an association with AIDS and

20   suicide.

21   Q    Is that work-related?

22   A    We hypothesize that it's not.

23   Q    And then No.45, the Reconstructive Breast

24   Implantation --

25   A    Yes.

EX 5-095

1    Q    -- After Mastectomy?

2    A    Here she's, she's -- it's a descriptive

3    paper; again, she's just describing the outcomes.

4    Q    No. 46.

5    A    Umh-humh.

6    Q    What is that result?

7    A    In this paper we didn't find an association

8    between antihypertensive medication and renal cell

9    carcinoma.

10    Q    Okay.  So then the antihypertensive

11    medication is okay insofar as kidney cancer goes,

12    according to this study?

13    A    According to this study, yeah.

14    Q    No. 47?

15    A    47, he describes some occupational exposures

16    that may increase your risk of chronic renal failure.

17    Q    And did that include the industry that

18    funded the study?

19    A    No.

20    Q    No. 48.  Anthropometric Measures and Risk of

21    Chronic Renal Failure?

22    A    Umh-humh.

23    Q    What was the result there?

24    A    She did find that people who are -- had

25    higher BMIs were more likely to develop chronic renal

Page 97

1    failure.

2         Q    And was the industry that funded this in

3    part a place where one could have an increased BMI?

4         A    No.

5              MR. SCHACHTMAN:  It wasn't McDonald's.

6         Q    No. 49.

7         A    Umh-humh.

8         Q    The Course of Renal Failure:  Results of a

9    Nationwide Cohort Study.

10        A    Right.  This is just a descriptive paper.

11        Q    Is that an assigned risk?

12        A    No.  We were looking at demographic

13    characteristics such as age and sex and things like

14    that, and looking to see who were more likely to get a

15    kidney transplant or die, and the rates of disease in

16    the different groups.

17        Q    Did it in any way conclude whether or not

18    the person that, or entity that funded in part the

19    study was contributing to the potential for renal

20    failure?

21        A    No.

22        Q    Pancreatic Cancer in Residents in

23    Southeastern Michigan?

24        A    Umh-humh.

25        Q    Was there an increased incidence there of

EX 5-097

Page 98

1    pancreatic cancer?  Was that one of the purposes of

2    that study?

3         A    The purpose of the study was to look at risk

4    factors that may be associated with pancreatic cancer.

5         Q    Okay.  Did you determine any risk factors?

6         A    This paper saw an association with body mass

7    index.

8         Q    Okay.  Nothing that relates it to any kind

9    of industrial exposure?

10        A    No, we didn't look at industry exposures

11   here.

12        Q    No. 51?

13        A    Umh-humh.

14        Q    The Psychological and Social Characteristics

15   of Danish Women with Cosmetic Breast Implants?

16        A    Umh-humh.

17        Q    Psychosomatics.  Does it find that people

18   who had breast implants were suffering from somatoform

19   disorders?

20        A    We just -- again, we just described

21   characteristics of the patients.

22        Q    Did you make any attribution as to whether

23   or not these people have an increased incidence of

24   somatoform disorders as a result of their breast

25   implants?

Page 99

1        A       It was just a descriptive paper.  We didn't

2  have a comparison population.

3        Q       Okay.  Seriom -- Serum DDE and Risk of

4  Pancreas Cancer?

5        A       Umh-humh.

6        Q       Was there an association?

7        A       Yes.

8        Q       Where does one find serum DDE?

9        A       Everywhere, in your food, in the

10 environment, in water.

11       Q       Does --

12       A       Everyone's been exposed to it.

13       Q       It's ubiquitous?

14       A       Absolutely.

15       Q       Is it a manmade ubiquitous chemical?

16       A       Yes.

17       Q       Is it one with which we could do without if

18 we wished to remove it?

19       A       I would say no.

20       Q       And then No. 53, Use of Non-Aspirin NSAIDS

21 and Risk of Lung Cancer.

22       A       Umh-humh.

23       Q       What did that?

24       A       The goal of that study was -- is through an

25 NCI-sponsored study to see if NSAIDS can protect you

EX 5-099

Page 100

1    against lung cancer.

2         Q    And what did you find?

3         A    The study, I think -- I believe I found no

4    protection.  I, I can't recall exact specifics.

5         Q    And speaking of lung cancer, in a cohort of

6    American males who don't smoke, the relative risk is

7    one.  What is the relative risk of a population of

8    American men who do smoke?

9         A    I don't know exactly what that risk would

10   be.

11        Q    What excess incidence or what fold risk or

12   percentage of increased risk do you expect to see of

13   lung cancer in human beings that smoke over human

14   beings that don't?

15        A    I don't know.

16        Q    What about over the general population?

17        A    The excess risk?

18        Q    Yes, sir.

19        A    It's not something I've studied.

20        Q    Okay.  What about -- so you wouldn't have a

21   view one way or the other with respect to one-pack-a-

22   day or two-pack-a-day smokers over the general

23   population in the U. S.?

24        A    Right.

25        Q    What about in Denmark?

EX 5-100

1      A    In, in our paper we, we looked at the
2  prevalence of smoking among the welders and among the
3  general population, and found them both to be around
4  fifty percent, fifty-three percent.

5      Q    Half of them smoked?

6      A    Yes.

7      Q    Now, then, did you study what the incidence
8  of lung cancer was in Denmark with respect to
9  nonsmokers as opposed to smokers?

10     A    I did not study that, no.

11     Q    Are you familiar with whether or not the
12 data in Denmark are consistent with the data in the
13 U. S.?

14     A    I, I -- I'm not sure what the data in the
15 U. S. is or Denmark, so it's not something I've
16 studied.

17     Q    Have you ever heard that the risk of
18 smoking -- or smoking increases your risk of
19 contracting lung cancer by at least five- and usually
20 tenfold?

21          MR. SCHACHTMAN:  Objection to form.

22     A    I have not heard those exact words.

23     Q    Anything similar to it?

24     A    Yes.

25     Q    What have you heard that's similar to that?

Page 102

1    A    Smoking increases your risk of lung cancer.

2    Q    But by how much you don't know?

3    A    No.

4    THE VIDEOGRAPHER:  Gentlemen, I'm sorry.

5    We're going to have to change the tape.

6    Here ends Tape No. 1 in the deposition of

7    John P. Fryzek, Ph.D.  We are going off the record.

8    The time is 11:33 a.m.

9    (Discussion off the record.)

10    THE VIDEOGRAPHER:  Here begins Tape No. 2 in

11    the deposition of John P. Fryzek, Ph.D.  We are back

12    on the record.  The time is 11:40 a.m.

13    BY MR. CROSBY:

14    Q    Doctor, you still doing all right?

15    A    I'm fine.

16    Q    Okay.  When did Doctor Blot leave NIH?  Or

17    was he NCI, or NIH, or both?

18    A    It's -- NCI is a branch of NIH.

19    Q    Okay.

20    A    I think he left in '94, but I'm not sure.

21    Q    And when did Doctor McLaughlin leave?

22    A    At the same time.  They left to form IEI.

23    Q    To form the business?

24    A    Yeah.  And Doctor Blot retired.

25    Q    Did Doctor McLaughlin retire?

EX 5-102

Page 103

1    A    No.

2    Q    Have you ever heard of a

3    neuroepidemiologist?

4    A    I don't know any.

5    Q    Have you ever heard of the term?

6    A    No.

7    Q    Your affiliation with Vanderbilt, I want to

8    talk about that a little bit.  All right?

9    A    Okay.

10    Q    What is your responsibility with Vanderbilt?

11    A    Currently it's just working on grants.

12    Q    And what does that mean?

13    A    Managing grants or the research that's going

14    on around grants, writing reports -- or not reports,

15    but scientific articles, things like that.

16    Q    Are you paid by Vanderbilt?

17    A    Yes.

18    Q    Okay.  What is your salary from Vanderbilt?

19    A    I don't wish to disclose that.

20    Q    Does that salary come directly to you?

21    A    Yes.

22    Q    Are any of the papers that you've published

23    that are on your CV included in what's funded through

24    Vanderbilt?

25    A    Yes.

EX 5-103

Page 104

1    Q    Were any of the ones that we just went

2    through for the year 2004?

3    A    Yes.

4    Q    Which ones were those?

5    A    Actually, I don't think 2004, but the ones

6    that have been submitted.

7    Q    Okay.  All of them?

8    A    No.

9    Q    Okay.  What department are you affiliated

10   with?

11   A    Medicine, Department of Medicine.

12   Q    And what do you do?  Do you teach?

13   A    Not at this time.

14   Q    Did you used to teach?

15   A    I used to teach, yes.

16   Q    At Vanderbilt?

17   A    No.

18   Q    Okay.  How long have you been affiliated

19   with Vanderbilt?

20   A    I think it's been two years.

21   Q    And is there a term limit on how long you

22   will be affiliated with them?

23   A    Not to my understanding.

24   Q    Do you have any kind of employment contract

25   or agreement with them?

Page 105

1      A    I, I don't have anything that I've signed,

2    no.

3      Q    Okay.  Have they submitted something to you

4    to sign?

5      A    I can't recall.

6      Q    Do you have an employment contract with IEI?

7      A    In terms of a formal signature, no.

8      Q    Do you have anything that provides you with

9    your job description and duties and

10   responsibilities --

11     A    No, I don't.

12     Q    -- with IEI?

13     A    No.

14     Q    Do you have any kind of written

15   understanding with them?

16     A    Nothing written, no.

17     Q    Do you have any kind of oral understanding

18   with them?

19     A    Yes.

20     Q    What is your oral understanding with them?

21     A    With --

22     Q    IEI?

23     A    -- IEI?  That I would work as a researcher.

24     Q    Okay.  Does it involve what you would get

25   paid as a salary?

Page 106

1    A    My salary, I would be paid for doing

2  research, yes.

3    Q    And what is your salary with IEI?

4    A    I don't wish to disclose that.

5    Q    I understand that.  Are you refusing to?

6    A    I would not like to.

7    Q    I know.  There are a lot of things that we

8  don't like to do.

9    A    I don't feel I need to.

10    Q    I don't like to strip down in a hospital,

11  but sometimes I have to.

12    A    Umh-humh.

13    Q    So are you refusing to do that?

14    A    Yes.

15    Q    Okay.  And are you refusing to disclose your

16  income from Vanderbilt?

17    A    Yes.

18    Q    And what about any other source of income?

19    A    Yes.

20    Q    Do you have any other sources of income?

21    A    Personally, no.

22    Q    Is there a means by which you would have a

23  source of income that is not personal?

24    A    My wife works as well.

25    Q    Oh, all right.  She might consider that her

Page 107

1    income?

2        A    She does.

3            MR. SCHACHTMAN:  The State of Maryland might

4    consider it their both.

5        Q    Is your position with IEI a full-time

6    position?

7        A    Yes.

8        Q    And --

9        A    It's a combination with IEI/Vanderbilt.

10       Q    How does that work now?

11       A    A percentage is IEI, a percentage is

12   Vanderbilt.  So a percentage of my salary comes from

13   IEI and a percentage comes from Vanderbilt.

14       Q    So are you a joint project between IEI and

15   Vanderbilt?

16       A    I don't understand joint project.

17       Q    Well, I don't understand what the

18   relationship is.  Does IEI have an agreement with

19   Vanderbilt?

20       A    An agreement in?

21       Q    In any way.

22       A    Part of my salary comes from IEI, so I have

23   a percentage appointment at Vanderbilt.

24       Q    Well, do Vanderbilt and IEI get together on

25   how much you're going to get paid?

Page 108

1    A    That simplifies it.  It depends on what

2   research is funded and what projects I'm working on,

3   that determines how much I get from Vanderbilt.

4        Q    How about just explaining it to me, keeping

5   in mind that I have trouble understanding a lot of

6   stuff here.  But how about trying to explain it to me,

7   and I will try to understand the nature of the

8   relationship between IEI and Vanderbilt and you and

9   IEI and Vanderbilt.

10       A    Okay.  I have some projects that I work on

11  strictly for IEI and some projects that I work on

12  strictly for Vanderbilt, and the percentage of time

13  that I work on each of those projects dictates my pay

14  from those two sources.

15       Q    With respect to the welding study --

16       A    Umh-humh.

17       Q    -- was any of that Vanderbilt related?

18       A    No.

19       Q    With respect to studies that are part IEI

20  and part Vanderbilt, how do you keep up with how much

21  you've spent doing for IEI and how much you've spent

22  doing for Vanderbilt?

23       A    I -- I've -- my -- personally, we don't

24  divide studies like that, it's either an IEI study or

25  a Vanderbilt study.  So. . .

Page 109

```
1        Q     What percentage of your time is Vanderbilt
2   related?
3        A     At this time I think it's -- it changes
4   depending on what point in the projects we're at.  So,
5   you know, if they need more help or if they need
6   analytical work or things like that, then I spend more
7   time there and I get paid more for that.  So I believe
8   it might be twenty percent now, I think.
9        Q     Do they pay you an hourly fee?
10       A     No.
11       Q     How is the compensation reached?
12       A     It's -- you know, they have a base fee and
13  then they have a percentage of that.  It's a monthly
14  payment.
15       Q     Is there any kind of formal understanding
16  between IEI and Vanderbilt with respect to your duties
17  and responsibilities with either place?
18       A     Other -- for Vanderbilt, my duties are
19  specified in the grants they write.  So if I'm on a
20  grant it tells specifically what my duties are for
21  that grant.
22       Q     And does IEI approve whether or not you can
23  undertake that?
24       A     Approve -- approve, yes, I would say
25  approve.
```

Page 110

1    Q    So if IE -- let's put it this way and just

2    clarify me if I'm wrong.

3    A    Umh-humh.

4    Q    You work for both IEI and Vanderbilt?

5    A    Umh-humh.

6    Q    And you do independent work -- or work

7    independently of each on studies that you're doing for

8    one or the other?

9    A    Right.

10    Q    But if IEI needs John Fryzek to do

11    something --

12    A    Umh-humh.

13    Q    -- and what Vanderbilt is proposing that you

14    do is going to conflict with it, IEI has first call?

15    A    Oh, I have no idea.  That -- that's not been

16    the case.

17    Q    Do you submit to Mr. Blot or anybody -- or

18    Doctor Blot or anybody at IEI what the proposal is for

19    you to do at Vanderbilt?

20    A    No.  I've written into proposals that other

21    people have written.

22    Q    Well, what is your understanding that will

23    make sure that you don't wind up spending all your

24    time doing Vanderbilt work while IEI is paying you?

25    A    The work is allocated in a manner that that

Page 111

1    won't happen.  You know, if, if I feel like I'm

2    spending too much time on one project I can go to them

3    and tell them.

4        Q    And is that association with Vanderbilt

5    throughout IEI, or are you the only one that has that

6    deal?

7        A    Some people at IEI are affiliated with

8    Vanderbilt and some people are not.

9        Q    Which ones are affiliated with Vanderbilt?

10       A    Doctor Blot, Doctor McLaughlin, Doctor

11   Boice, Doctor Tarone, I believe, and Doctor

12   Signorello.

13       Q    And do all of you all have that same

14   arrangement insofar as IEI compensation and Vanderbilt

15   compensation?

16       A    I don't know about their compensation, only

17   my own.

18       Q    Are those studies that are Vanderbilt

19   studies the NIH grant studies?

20       A    Most of them, yes.

21       Q    Are any of them studies funded by industry?

22       A    No.

23       Q    Who's head of the medical school at

24   Vanderbilt?

25       A    I have no idea.

Page 112

1    Q    Do any of the IEI personnel that are
2    affiliated with Vanderbilt teach at Vanderbilt?
3    A    IEI did offer a course last summer at
4    Vanderbilt, yes.
5    Q    And what was the name of the course?
6    A    Let me see if I can recall.  It was
7    Biomarkers in Epidemiology.  I don't remember the
8    exact name of the course.
9    Q    Are any members of IEI regular members of
10   the faculty that offered normal courses taught at
11   Vanderbilt?
12   A    I don't know.  But it's my understanding
13   that eventually we will teach courses at Vanderbilt,
14   that is the direction.
15   Q    Do you all have any other affiliation with
16   any other university or college or teaching
17   institution similar to that that you have with
18   Vanderbilt?
19   A    I don't, no.
20   Q    Are you aware of anyone at IEI that does?
21   A    I'm not aware.
22   Q    Do you all talk to each other up there?
23   A    We try.
24   Q    The papers that you're doing for Vanderbilt,
25   do they get proofed or reviewed by IEI personnel?

Page 113

```
1      A     If the IEI personnel are working on the

2   project.

3      Q     Have you ever had a paper that you did

4   for -- that's Vanderbilt affiliated that did not have

5   someone else from IEI on it?

6      A     I don't think so.

7      Q     Is it Doctor Blot or Doctor McLaughlin who

8   usually co-author on them?

9      A     Doctor Blot, yes.

10      Q     Have you ever applied to be a professor or

11   instructor at Vanderbilt or any other teaching

12   institution?

13      A     I, I was assistant professor at University

14   of Nebraska Medical Center.

15      Q     And when was that?

16      A     1996.

17      Q     Since then, have you applied for any

18   position as an instructor or teacher or professor at

19   any other institution?

20      A     No.

21      Q     I don't know if I asked this.  Did you ever

22   attend any medical school?

23      A     No.

24      Q     Did you apply?

25      A     No.
```

Page 114

1    Q    Have you ever been to any Parkinson's

2    disease or movement disorder clinic in the United

3    States or Denmark?

4    A    No.

5    Q    Do you have an opinion whether or not

6    Parkinson's disease or Parkinson's syndrome is a

7    treatable condition?

8    A    I have no opinion.

9    Q    How often do you go to Vanderbilt?

10    A    Not very often.

11    Q    What's not often to you?  As an

12    epidemiologist, you know it's all relative.

13    A    Absolutely.  Maybe once a year.  But as I

14    stated, my understanding is that will change.

15    Q    What is the expected change?

16    A    I will start offering coursework at

17    Vanderbilt.

18    Q    You will?

19    A    That's my understanding.

20    Q    Well, have you applied for the position?

21    A    It's not a new position.  It's part of the

22    duties that we've already. . .

23    Q    Well, did somebody else cut this deal and

24    they're just letting you know that that's what you're

25    expected to do?

Page 115

1       A    No.

2       Q    Okay.  So how did it come about?

3       A    It -- it's my understand -- I don't have

4  firsthand knowledge of this.  It's my understanding

5  that eventually coursework in epidemiology will be

6  offered at Vanderbilt and that potentially we will be

7  involved in teaching that.

8       Q    And who gave you that understanding?

9       A    Doctor Blot.

10      Q    Okay.  And when is that supposed to be

11 implemented?

12      A    I don't know.

13      Q    Does anyone at IEI currently serve as an

14 instructor, teacher, professor, or any position of, I

15 guess, instruction at any university, college, medical

16 school, or teaching facility?

17      A    I know that Doctor Boice, Doctor Blot and

18 Doctor McLaughlin all have -- I think even Doctor

19 Tarone have adjunct appointments at various

20 universities.

21      Q    Well, does IEI have a school?

22      A    No.

23      Q    You all don't have a teaching facility where

24 you all teach people?

25      A    No.  It's very similar to the NCI or NIH,

Page 116

1    it's a research organization.

2        Q    Okay.  But NCI and NIH are not for-profit.

3    IEI is for-profit, isn't it?

4        A    Right.  But you asked me about teaching.

5        Q    Right.  But -- so what I'm trying to figure

6    out is this.  When I look at IEI it often refers to

7    you as, for example, faculty.

8        A    Umh-humh.

9        Q    Whose idea was it that employees of IEI

10   would be called faculty?

11       A    I have no idea.  That was not my decision.

12       Q    Do you know why they chose that term?

13       A    No.

14       Q    When you introduce yourself to colleagues or

15   you're introduced to colleagues in Denmark, are you

16   introduced as a faculty member of IEI?

17       A    No.

18       Q    But you hold yourselves out at IEI as being

19   faculty members, right?

20            MR. SCHACHTMAN:  Objection to form.

21       A    I don't.

22       Q    It's on the website.

23       A    I, I have no control over what's on the

24   website.  Sorry.

25       Q    Is that something you'd rather not be there?

Page 117

1          MR. SCHACHTMAN:  Objection.

2     A    I have no feelings one way or the other.  It

3 does not bother me.

4     Q    Does IEI have a mission statement?

5     A    Nothing that they've printed and given to

6 me.

7     Q    Have they given you one orally?

8     A    No.

9     Q    When an article says that it is, quote,

10 funded, closed quote, by IEI, what does that mean?

11    A    I don't know unless you tell me the article

12 and in what context.

13    Q    Okay.  So the phrase funded by IEI can mean

14 different things --

15    A    Absolutely.

16    Q    -- depending on the context?

17    A    Yes.

18    Q    What other -- well, have we gone over the

19 different industries, or all the different industries

20 that IEI currently receives funding for research on?

21    A    I don't believe so.

22    Q    Okay.  Which ones are there that we haven't?

23    A    Let's see.  We've done work for Boeing,

24 Lockheed Martin.  I said the National Institutes of

25 Health.  The government of Sweden.  Deluxe Studios.

EX 5-117

Page 118

1     The government of France.  And I think that's all I

2     can recall right now.

3          Q     The data that deals with this study, what's

4     been provided to me, in essence, is — and if I leave

5     something out, let me know, I don't think I will — is

6     a letter to the editor of the journal.

7          A     Umh-humh.

8          Q     With your comments concerning suggestions

9     and changes with an attached draft.

10         A     (Nodding.)

11         Q     Your proposal to the industry.

12         A     Umh-humh.

13         Q     Your agreement with your Danish cohort.

14         A     Yes.

15         Q     Your -- or colleagues, I suppose, although

16    they'd be a cohort too, wouldn't they?

17         A     I guess, yes.

18         Q     Okay.  So -- I think that's all that I have.

19    Is that all that you have?

20         A     That's all.

21               MR. SCHACHTMAN:  Mr. Crosby, I believe that

22    I sent to you --

23               MR. CROSBY:  That's what I can't remember.

24               MR. SCHACHTMAN:  -- the questionnaire.

25               MR. CROSBY:  Yes.  You know, that is great.

Page 119

1    I'm glad you brought that up.

2            MR. SCHACHTMAN:  In Danish.

3            MR. CROSBY:  Yes.  Well, I was going to ask

4    you.  Let me show you No. 3.

5            (Deposition Exhibit No. 3 was marked for

6    identification and was attached to the transcript.)

7    BY MR. CROSBY:

8        Q    I've marked that as Plaintiff's Exhibit No.

9    3.

10       A    Okay.

11       Q    Could you tell us what that is, please?

12       A    This is the questionnaire that was

13   administered to the welders in 1985 or '86.

14       Q    Is that in -- what language is that in?  I

15   don't, I don't doubt my colleague.  I just --

16       A    It's in Danish.

17       Q    It's in Danish?

18       A    Yeah.

19       Q    He might speak it for all I know.  Do you?

20       A    No.

21       Q    You do not?

22       A    I can say hello.

23       Q    What is hello in Danish?

24       A    Goddag.

25       Q    Sounds like good night, doesn't it?

Page 120

1       A     Good day.

2       Q     So do you have a translation of this?

3       A     I don't.  To my knowledge, there's no

4  translation to this questionnaire.

5       Q     And you're not able to translate it?

6       A     Right.

7             MR. SCHACHTMAN:  Ya is yes and nej is no.

8       Q     So did you undertake any effort to ascertain

9  the quality of the information sought by the

10 questionnaire other than what's in the article that's

11 published?

12      A     Yeah.  That was done by the researchers in

13 '86.

14      Q     Okay.  Was there --

15      A     Doctor Hansen.

16      Q     Was there any effort in your paper before or

17 during to do any follow-up with respect to another

18 questionnaire?

19      A     No.

20      Q     So your reliance on the response to the

21 questionnaire in '86, as reflected in the '86 study,

22 is what you relied on with respect to the information

23 that came from the questionnaire in your Danish welder

24 study for industry?

25      A     Right.

EX 5-120

Page 121

1    Q    The data that was used that's in the

2    registries, how does one go about, if one wants to,

3    accessing that data that you had access to to assess

4    the content of the data?

5    A    Umh-humh.  First, I personally didn't have

6    access to the data.

7    Q    Right.

8    A    Our Danish colleagues did.

9    Q    Umh-humh.

10    A    The first thing you would do would be to

11    write an application to the Danish government, a part

12    of the government that's called the National Board of

13    Health and Welfare, and you go through an approval

14    process to use the data.

15    Q    Okay.  So the approval process is to use the

16    paper -- use the data but not access it?

17    A    Right.

18    Q    Okay.  Who is the person that controls the

19    registry?

20    A    I have no idea.  It's a government official.

21    Q    So help me out here.  If what I wanted to do

22    was have someone competent to do it look at the

23    underlying data to be sure that nobody missed anything

24    when it came to the compilation and preparing the

25    summaries, the only - and tell me if I'm wrong - the

Page 122

1    person that I designate couldn't have hands-on access

2    unless the person I designate is whom?

3        A    First, you couldn't have access because

4    you're not Danish.

5        Q    Right.

6        A    So you need a Dane.

7        Q    Okay.  There's nothing like a Dane.

8        A    Yes.

9        Q    So we've got to get someone who is Danish.

10   And is there a particular group of Danes that has

11   access to it?

12       A    Yeah.  The employees at the National Board

13   of Health and Welfare.

14       Q    And are they able to share any of the

15   information that they get?

16       A    If, if you have approvals.

17       Q    Okay.  And can they share the underlying

18   data?  Could they give me a, for example, a run of all

19   six thousand people, in round numbers, that were in

20   your study and give me all of their, their individual

21   and respective ages and all their information about

22   their hospitalizations without their names?

23       A    The data cannot leave the country.

24       Q    I understand that.  Whoever is going to do

25   this goes over there and --

Page 123

1    A    Umh-humh.

2    Q    -- camps out at that place.  If they wanted

3    to, could they --

4    A    The people could give you that, yeah.

5    Q    So that's something you could have had

6    access to?

7    A    We did have access to it.

8    Q    Okay.  But as I understood it, you didn't,

9    you didn't personally oversee that data?

10    A    Right.  When I say we, I mean myself and the

11    colleagues on the paper.

12    Q    And by the colleagues on the paper you mean

13    the Danish groups?

14    A    Right.

15    Q    Okay.  Did they undertake any independent

16    verification or random sampling of the data summaries

17    to ascertain that the data summaries correctly

18    reflected the underlying data?

19    A    Yeah, that's a good question.  I know they

20    do go through a verification process.  I'm not sure

21    exactly what that entails, but I know that's part of

22    their protocol.

23    Q    Did you oversee that?

24    A    I did not, no.

25    Q    Aren't you the lead author on this?

Page 124

1      A      Absolutely, yeah.

2      Q      Okay.  So you don't know what the process

3  is, but you feel comfortable that there is a process?

4      A      Umh-humh.

5      Q      And that process, do you know whether or not

6  it was actually undertaken?

7      A      Yes.

8      Q      Who did it?

9      A      I don't know.

10      Q      So how do you know --

11      A      My Danish colleagues did it.

12      Q      How do you know that they did it?

13      A      Because they're our collaborators and I

14  trust their word.

15      Q      So they told you they did it?

16      A      Umh-humh.

17      Q      And how did they tell you they did it?

18      A      Verbally.

19      Q      No.  I mean, what did they tell you they did

20  in order to do it?  Did they explain to you the

21  process --

22      A      No.

23      Q      -- of verification?

24      A      No, no.

25      Q      So you don't know what they did?

Page 125

1      A      Right.

2      Q      You just trust them?

3      A      Absolutely, yeah.

4      Q      So if I want to have somebody undertake that

5   same process, then I would retain a Dane?

6      A      Umh-humh.

7      Q      And --

8      A      First you apply to the Board.

9      Q      Well, the Dane would get the permission,

10  wouldn't he?

11     A      Right.  Well, maybe.

12     Q      Okay.  Well, the Dane applies -- well,

13  they've got a big problem over there, right?  Isn't

14  that one of their big problems, they're worried about

15  all this data they've got and whether or not who can

16  access it and how they can access it?

17     A      I don't understand.

18     Q      Isn't that a concern of the Danish people,

19  that their public -- that their lives will become

20  public?

21     A      I don't know.

22     Q      You're not aware of the studies and the

23  articles written by the people in Denmark who are

24  worried about all these registries and the potential

25  for abuse?

EX 5-125

Page 126

1    A    I, I -- personally I don't know.

2    Q    Okay.  So I get a Dane who's qualified and

3    competent, that person applies; if he gets or she gets

4    approval, then he or she can then go do whatever

5    verification process you understand and believe that

6    your colleagues did?

7    A    Yes.

8    Q    How long does that process take?  I'm

9    talking about the approval process.

10   A    Oh, I don't know.  One to two -- one to

11   three months maybe.

12   Q    What about the summaries, were you able to

13   take those with you?

14   A    I took the tables with me that are in the

15   paper.

16   Q    The three tables in the paper?

17   A    Yeah.

18   Q    But what about the summaries you used to put

19   the tables together?

20   A    No.  I didn't take those, no.

21   Q    Okay.  How much --

22   A    I looked at those when I was in Denmark,

23   yeah.

24   Q    Are they able to leave?

25   A    I don't know.  I believe not.

Page 127

1    Q    How much more extensive were the data that
2    you looked at as opposed to the data reflected in the
3    tables?

4    A    The data that I looked at personally were
5    the data in the tables.

6    Q    Okay.  So --

7    A    I didn't look at any other data besides what
8    was in the tables personally.

9    Q    All right.  So then as far as it goes --
10   again, tell me if I'm wrong -- when I'm looking at your
11   Tables 1, 2 and 3 in the paper that has been provided,
12   I'm looking at the very same data that you looked at?

13   A    Absolutely, yeah.

14   Q    You saw nothing more than I saw?

15   A    Right.

16   Q    And from those data you constructed that
17   paper?

18   A    Yes.

19   Q    Do you know Doctor Goldman?

20   A    No.

21   Q    Do you know Doctor Tanner?

22   A    No.

23   Q    Do you know of any agreement between IEI or
24   you and the welding industry other than what is
25   reflected in the proposal that was drawn up between

Page 128

1      IEI and the welding industry?

2           A    No.

3           Q    Well, other than being -- you being a

4      witness?

5           A    Right.

6           Q    And is any of that written down?

7           A    No.

8           Q    Are you familiar with something called the

9      Franklin Report?

10          A    No.

11          Q    The study that you did for the welding

12     people in the welding industry in -- what was it, in

13     2004 pretty much, right?

14          A    Yes, yeah.

15          Q    Were those data pretty much available in

16     1986?  I mean, other than obviously the birth hadn't

17     been there until '86, but the same data available?

18          A    I'm not sure when the data were available.

19          Q    Well, if we look at Doctor Hansen's study,

20     which was '96 --

21          A    Umh-humh.

22          Q    -- does it indicate how long the data had

23     been available?

24          A    I don't recall.

25          Q    I think when we were off the record you

1    indicated that the Danish people have been keeping

2    records about everybody's health since -- when was it?

3         A    Oh, not everyone's health.  Everyone's

4    marriages and births.

5         Q    Okay.  When did they start the registries,

6    do you know?

7         A    The registries for health?

8         Q    Yes, sir.

9         A    The hospitalization registry started in

10   1977.

11        Q    Okay.  So from -- in 1986, could there have

12   been basically about a ten-year study?

13        A    On?

14        Q    Hospitalizations.

15        A    Yes.

16        Q    Okay.  And by 1990, roughly a fifteen-year

17   study?

18        A    Umh-humh.

19        Q    '95 -- or '97, a twenty-year study?

20        A    Right.

21        Q    Do you know of anybody that ever undertook

22   to do that?

23        A    No.

24        Q    Do you know why they didn't?

25        A    No, I have no idea.

Page 130

1      Q      There were case reports in existence in '86,

2   were there not, of --

3      A      I'm not sure of the dates of the reports.

4      Q      If there were, would that be an indication

5   that such a study would have merit?

6             MR. SCHACHTMAN:  Objection; incomplete

7   hypothetical.

8      A      I'm not sure what the reports were.

9      Q      If they showed that people who were exposed

10  to welding fumes were suffering from movement

11  disorders who were welders, would that indicate that

12  such a study would have --

13            MR. SCHACHTMAN:  Objection to form.

14     Q      -- purpose?

15            MR. SCHACHTMAN:  Same objection.

16     A      I don't believe that case reports always

17  justify a study.

18            MR. SCHACHTMAN:  Want a take a lunch break?

19            MR. CROSBY:  Yeah, why don't we do that.  If

20  that suits everybody, we can break now and I can

21  organize.

22            THE VIDEOGRAPHER:  We are going off the

23  video record.  The time is 12:14 p.m.

24            (A luncheon recess was taken at 12:14 until

25  1:17 p.m.)

Page 131

1          THE VIDEOGRAPHER:  We are back on the video

2    record.  The time is 1:17 p.m.

3    BY MR. CROSBY:

4          Q    Doctor, did you have a good lunch?

5          A    Yes.

6          Q    Did you have an opportunity to -- or did you

7    take the opportunity to check on increased risk of

8    lung cancer from cigarette smoking during lunch?

9          A    It didn't occur to me to check for that.

10         Q    Okay.  Let's go back to the --

11              MR. SCHACHTMAN:  There was no smoking at

12   lunch.

13         Q    Let's go back to the dream study that I

14   talked about earlier on.

15         A    Umh-humh.

16         Q    What would be your outline generally,

17   without just giving any numbers or anything, generally

18   what would be an ideal epidemiological study to

19   ascertain increased risk, if any, of -- to any disease

20   from any substance where the occurrence rate in the

21   general population is, say, two or three per hundred

22   thousand?

23              MR. SCHACHTMAN:  Objection to the form.  You

24   can answer.

25         A    The ideal study for any disease is a

Page 132

1    randomized controlled trial.

2        Q    And how would you do that when it comes to

3    something like welding?

4        A    You could randomly assign people exposure to

5    welding fumes or not, and follow them over time to see

6    if they develop Parkinson's disease.

7        Q    I mean, that's using humans as guinea pigs.

8        A    That's my dream study.

9            MR. SCHACHTMAN:  Objection to form.

10       Q    I see.

11       A    If you really want to know the answer to the

12   question.

13       Q    Aside from doing that, what is the way that

14   we could -- or you could ascertain whether or not

15   welding fumes increases the risk of Parkinson's

16   disease in welders or Parkinson's -- let's try to get

17   some terms straight.

18       A    Okay.

19       Q    I think we've been saying the same thing all

20   along, but I don't know.  When I've been saying

21   Parkinson's disease, have you been restricting it in

22   your mind to just idiopathic Parkinson's disease, or

23   do you include the panoply of Parkinson's syndrome?

24       A    In my mind it's only Parkinson's disease.

25       Q    Okay.  And what about Parkinsonism, what

Page 133

1    does that mean to you?

2        A    That's a different disease.

3        Q    Okay.  Would you do the study differently

4    for Parkinson's disease than Parkinsonism?

5        A    No.

6        Q    Okay.  So would the questions that I've

7    asked that have just utilized the term Parkinson's

8    disease in your answers include Parkinsonism?

9        A    I would study any disease, the best design

10   would be a randomized control trial.

11       Q    In the Danish study were you studying

12   Parkinsonism, Parkinson's disease, or movement

13   disorder?

14       A    If you look at Table 2 it tells you all the

15   diseases we looked at.  The main focus was Parkinson's

16   disease.

17       Q    Okay.

18       A    But we look the at some other

19   neurodegenerative diseases.

20       Q    So what would be your study for finding

21   whether or not there is an increased risk for

22   welding -- or, excuse me, for Parkinsonism or

23   neurological deficits for Parkinson's disease from

24   welding fumes?

25       A    The next best state of design, if you

Page 134

1     couldn't do a randomized controlled study, would be a

2     cohort study.

3          Q     And how would you fashion that study?

4          A     I'd identify a group of welders, ascertain

5     their exposure status, and then follow them over time,

6     see who developed Parkinson's disease.  You can either

7     do it with only welders or you could use a similar

8     group of people not working in welding that have

9     similar characteristics.

10         Q     If you just used a group of welders for your

11    cohort, would you call that a cohort?

12         A     Yeah.

13         Q     Would you compare it with anything?

14         A     You could compare it with -- you know, if

15    you had industrial hygiene measures you could either

16    look at people who are higher exposed to lower exposed

17    based on however you had those exposure measurements.

18         Q     Would you compare it to another population?

19         A     You could do that if you had -- if you were

20    able to ascertain Parkinson's disease in a similar

21    manner in both populations, that would be fair.

22         Q     Is there a way to do that in the United

23    States in any geographical area of which you are

24    familiar?

25         A     I don't know.

EX 5 / 134                    EX 5-134

Page 135

1    Q    Is that anything that you've explored?

2    A    To do it in the U. S.?

3    Q    Yes, sir.

4    A    No.

5    Q    Has anyone asked you to explore that?

6    A    No.

7    Q    You have a Swedish proposal?

8    A    Yeah.

9    Q    Was that -- well, whose idea was that?

10    A    Doctor Blot's.

11    Q    Is there a reason that he suggested doing

12    the Swedish proposal?

13    A    I don't know his reasons for it.

14    Q    Do you think it's a good idea?

15    A    Sure.

16    Q    Do you think it will provide helpful data in

17    assessing an increased risk or not of Parkinsonism or

18    movement disorders amongst welders?

19    A    Yeah.  It's always good to confirm your

20    hypothesis in other populations.

21    Q    In your ideal or dream study, would you have

22    a control group?

23    A    In my ideal study with unlimited resources,

24    yeah.

25    Q    And how big would it be?

Page 136

1      A    It would depend on the rate of diseases in

2  the populations.

3      Q    Assume, again, that it's approximately three

4  per hundred thousand per year.

5      A    I can't do those calculations without

6  looking at the -- you know, a formula and having my

7  calculator.  So that would be difficult for me to, to

8  do.

9          MR. SCHACHTMAN:  Doctor Fryzek, can I ask

10  you to keep your voice up?

11          THE WITNESS:  Okay.

12  BY MR. CROSBY:

13      Q    Would you want the population to be the same

14  size as the exposed population?

15      A    Again, it would depend on the rates of the

16  disease and other characteristics.

17      Q    At what rate would you want it to be the

18  same size and at what rate would you not care if it

19  is?

20      A    That's something I would have to calculate.

21      Q    How would you ascertain exposure levels?

22      A    Exposure levels to?

23      Q    The welding fumes.  I thought one of the

24  things was quantify the exposure over time.

25      A    Yeah.  One thing you could do is what we did

Page 137

1    in our paper, is look at duration of welding, how many

2    years they, they worked as a welder.  You would assume

3    that people who worked longer would have higher

4    exposure, cumulative exposure.

5         Q    And did your study include anyone who ever

6    welded?

7         A    It included people who welded, yeah.  That

8    were welding in a company, employed as a welder,

9    absolutely.

10        Q    For any period of time?

11        A    I'm not sure of the minimum period of time

12   that they were employed as a welder.

13        Q    Would that be of significance?

14        A    Typically, if you want to look at, you know,

15   levels of exposure, you would need to know that

16   information.

17        Q    And if you wanted to assess whether a given

18   population in a particular occupation was at an

19   increased risk for contracting a disease from exposure

20   in that occupation, wouldn't it also be important to

21   know for how long the person was exposed?

22        A    Yeah.

23        Q    So if someone is caught in a cohort as

24   having been classified as a welder at any one given

25   time, regardless of how long, if it happened to be a

Page 138

1    very short period of time, that could have an impact

2    on the results, could it not?

3         A    It may or may.  It depends if there's an

4    association with the duration of exposure.  But -- but

5    in our study we actually did that and found that

6    people who worked longest, twenty years or more, I

7    think it was twenty years or more, had no -- their

8    risk was not statistically significantly different

9    than people who worked a short period of time.

10        Q    The risk of hospitalization?

11        A    For Parkinson's disease.

12        Q    Right.  So what I'm trying to get to is if

13   you have, of a cohort of six thousand people --

14        A    Umh-humh.

15        Q    -- for ease, let's say one thousand of them

16   were only welders for a month --

17        A    Umh-humh.

18        Q    -- that one thousand people, if it's a time-

19   dose relationship, would greatly dilute the effect,

20   would they not?

21        A    If that's the case.  But that wasn't the

22   case in our study, that people who worked longest had

23   the greatest risk.

24        Q    I understand you want to talk about your

25   study and you want to defend it.

Page 139

1        A      Yeah.

2        Q      But I'm not talking about your study right

3     now.

4        A      Okay.

5        Q      Okay?

6               MR. SCHACHTMAN:  Objection to form.

7        Q      So normally speaking, if you have a

8     population of six thousand people and one thousand of

9     them were engaged in the occupation for a very brief

10    period of time but still classified in the cohort as

11    in the occupation, and if it's a time-dose response or

12    relationship, that would dilute the result, would it

13    not?

14               MR. SCHACHTMAN:  Objection to form.

15       A      I don't know.

16       Q      It could --

17       A      I'm speculating.

18       Q      It could, though, couldn't it?

19               MR. SCHACHTMAN:  Objection to form.

20       A      It may.

21       Q      What steps did you all take to verify the

22    duration that someone welded?

23       A      It was ascertained from the questionnaire

24    data.

25       Q      How would you do that in your study if you

Page 140

1    were designing one?

2        A    If it was a prospective study, which I

3    prefer to do, you would know when they first were

4    employed as a welder.

5        Q    Okay.  And if it was a retrospective study,

6    how would you go about ascertaining it?

7        A    It depends on what type of information you

8    have.

9        Q    You know they're a welder.

10        A    You would have to have identified that

11    through some mechanism.

12        Q    Yes, sir.  And so how would you then

13    identify for how long each person was a welder?

14        A    It would depend on the information that you

15    had about the person.

16        Q    All you know is it's a human being that's a

17    welder.

18        A    Umh-humh.  If it was a yes/no, then you

19    wouldn't be able to do it.

20        Q    How would you -- after you had the yes or

21    no, what steps would you take to find out?

22        A    You're asking me to speculate, or --

23        Q    Assume you had a database that gave you the

24    data on six thousand people that said they were

25    welders and you wanted to know how long they were

Page 141

1    welders, how would you go about finding out?

2        A    There's a number of ways you could it.  You

3    could ask them.

4        Q    Right.

5        A    You could look at employment records.

6        Q    Okay.

7        A    You could look at tax records.

8        Q    Okay.  Was that done in Denmark?

9        A    Yes.

10       Q    What was done?

11       A    We asked them and we looked at employment

12   records.

13       Q    Okay.  When did you ask them?

14       A    I didn't ask them personally, our Danish

15   colleagues did.

16       Q    I'm sorry.  Who did?

17       A    Danish colleagues.

18       Q    When did they ask them?

19       A    They had information in 1986.

20       Q    Okay.  So they used the questionnaire?

21       A    Right.

22       Q    Would you use a questionnaire?

23       A    I, I would use whatever method I could.

24       Q    Would a questionnaire be one of the methods?

25       A    Yes, yeah.

Case 1:03-cv-17000-KMO    Document 1862-4    Filed 08/07/2006    Page 142 of 321

Page 142

1    Q    All right.

2    A    Sure.

3    Q    Exhibit 1, I believe -- no, what is it?

4    A    3.

5    Q    Exhibit 3?

6    A    Yeah.

7    Q    Is that the one you would use?

8    A    For my dream study, or for --

9    Q    Yes, sir.

10   A    I would use a similar questionnaire.

11   Q    You would.  What all does that ask?

12   A    Specifically, I don't know.

13   Q    But you would use it?

14   A    I, I would use it to get the similar type of

15   information.

16       Q    But you don't know what information it

17   seeks, do you?

18       A    I know that it tells you duration of

19   welding, how many years you worked as a welder, when

20   you started working as a welder.

21       Q    That's what you understand from reading the

22   study?

23       A    That's what I understand from my Danish

24   colleagues.

25       Q    I see.  So you -- a questionnaire in your

EX 5-142

Case 1:19-md-02875-RMB-SAK    Document 1713-8    Filed 11/01/21    Page 144 of 322
PageID: 39828
Case 1:03-cv-17000-KMO    Document 1862-4    Filed 08/07/2006    Page 143 of 321

Page 143

1    book is a valid way to follow up, just to follow up

2    and find out whether or not somebody was a welder and

3    for how long?

4         A    It's one of the ways that you could do it.

5         Q    Okay.  Was that done when you undertook the

6    study that was published, or is to be published that

7    you were hired by the welding industry to do?

8         A    Yeah, a questionnaire was used.

9         Q    No.  Did you use one?

10        A    Myself personally?

11        Q    Yes.

12        A    I did not.

13        Q    Did you or your colleagues that were

14   involved in writing the paper in the year 2004 use a

15   questionnaire?

16        A    Yes, they did.

17        Q    Which one?

18        A    This one.  Exhibit No. 3.

19        Q    Was that provided to them?

20        A    I'm sorry?

21             MR. SCHACHTMAN:  Objection to form.

22        Q    Were the answers to the questionnaires given

23   to them?

24             MR. SCHACHTMAN:  Objection to form.

25        A    I don't understand your question.  I'm

Page 144

1    sorry.

2        Q      As I read the paper --

3        A      Umh-humh.

4        Q      -- you all did not resubmit questionnaires

5    to people, did you?

6        A      We did not.

7        Q      Okay.  So did you and your colleagues use

8    questionnaires?

9        A      Yes.

10        Q      Where did you get them from?

11        A      From the 1986 questionnaire.

12        Q      So did you have copies of the 1986

13    questionnaires?

14        A      Oh.  Me -- no, I did not.

15        Q      Did your colleagues?

16        A      They did not have copies of the

17    questionnaires.

18        Q      So how did you use them?

19        A      They had the text files that were coded from

20    the questionnaires.

21        Q      And where did they get those?

22        A      They own that data.

23        Q      Who is they that own that data?

24        A      Our Danish colleagues.

25        Q      What are their names?

Page 145

1       A      Doctor -- Doctor Bonde, I think B-O-N-D-E, I

2   think it's Jens Peter.   The original data is owned by

3   Doctor Hansen who collected it.

4       Q      Is that data available?

5       A      In Denmark it is.

6       Q      Does one have to go through the same process

7   to get that data?

8       A      Absolutely, yeah.

9       Q      So is it controlled by the Danish

10  government?

11      A      It's controlled by the Danish Cancer

12  Institute.

13      Q      And Mr. J-E-N-S Peter B-O-N-D-E --

14      A      Yeah.

15      Q      -- has that data?

16      A      I believe so.

17      Q      But do you know?

18      A      I don't know for a fact.

19      Q      Okay.  Did you oversee anyone doing any work

20  with respect to those data?

21      A      I discussed with our Danish colleagues the

22  analyses.

23      Q      Did you oversee how anyone used that data?

24      A      Yes.

25      Q      Whom did you watch and what were they doing?

Case 1:19-md-02875-RMB-SAK    Document 1713-8    Filed 11/01/21    Page 147 of 322
PageID: 39831
Case 1:03-cv-17000-KMO    Document 1862-4    Filed 08/07/2006    Page 146 of 321

Page 146

1    A    I watched the statistician do the analysis.

2    Q    How did they do it?

3    A    On a computer.

4    Q    Did you take any random sample at any time

5    of any of the work performed by statisticians to

6    ascertain that they were accurately doing their work?

7    A    The data was replicated by one of our

8    biostatisticians as well.  I mean, the data analysis.

9    Q    Which one?

10   A    Miss Cohen.

11   Q    And Miss Cohen is an IEI person?

12   A    Yes.

13   Q    Did you oversee her work personally?

14   A    As -- yes.

15   Q    So you watched her do it?

16   A    I didn't watch her do it.

17   Q    Okay.

18   A    But I saw the results of her work.

19   Q    You saw her results?

20   A    Yeah.

21   Q    Did you see what steps she took to

22   replicate?

23   A    No.

24   Q    Do you know what steps the first group took

25   to generate their reports?

EX 5 / 146                    EX 5-146

Page 147

1       A     No.  In general I do, but the specific

2    steps, I don't know.

3       Q     Why not?

4       A     Because that was their duties, or that was

5    their job on the project.

6       Q     Is Miss Cohen in a position to tell us

7    whether or not she looked -- did she look at the

8    underlying data?

9       A     No.

10      Q     So she did not have Doctor Hansen's

11    underlying data?

12      A     No.  We're -- the underlying -- by

13    underlying data I mean the hospitalization data,

14    that's the underlying Parkinson's's data.

15      Q     Then let's use the underlying computerized

16    data from Doctor Hansen.

17      A     Yes.

18      Q     Did she have that?

19      A     She looked at that when she was in

20    Copenhagen, yes.

21      Q     Did she manipulate it, or just look at it?

22      A     She manipulated it.

23      Q     Okay.  Did she manipulate it under anyone's

24    supervision?

25      A     Pardon me?

Page 148

1      Q      Did she manipulate it while under anyone's
2   supervision?
3      A      Under my supervision and Doctor Olsen's
4   supervision, yes.
5      Q      What was the nature of your supervision?
6      A      I discussed with her the type of analyses I
7   wanted to see from the data.
8      Q      Okay.  And did she provide the type of
9   analysis you wanted?
10     A      She performed the statistical maneuvers that
11   I asked her to.
12     Q      And did you do anything to verify that her
13   statistical maneuvers were done properly?
14     A      I did not, but my Danish colleagues did as
15   well.
16     Q      And who was your Danish colleague that did?
17     A      Miss Bouts, Andrea Bouts.
18     Q      How you did she go about doing it?
19     A      She ran the statistical tests independently
20   of Miss Cohen and got the same results.
21     Q      Using the same formulas?
22     A      I'm not sure exactly what her programming
23   entailed.
24     Q      Did any American have access to any of the
25   underlying hospitalization data?

Page 149

1    A    No.

2    Q    What Danish people had access to the
3  underlying hospitalization data?

4    A    The people at the National Board of Health
5  and Welfare.  And I'm not a hundred percent sure but I
6  think that they gave summary data to the Cancer
7  Institute so that we could calculate rates.

8    Q    In your dream study with respect to welding
9  rods, would you study different types of welding rods?

10    A    If I believed that there was a health effect
11  associated with it, the welding rods.

12    Q    Would you study different types of metals
13  that were being welded with different types of rods?

14    A    Again, if I believed there were health
15  effects.

16    Q    Were you of the opinion that mild steel and
17  stainless steel welding was the only welding that
18  potentially posed a health risk?

19    A    I had no thoughts on what type of welding.

20    Q    Was that Doctor Blot's call as to what
21  welding --

22    A    We used all the data that was available to
23  us, and those were the data that were available to us,
24  mild and stainless steel welders.

25    Q    Do you know what the diagnostic criteria for

Page 150

1    the various disease categories in your Danish study

2    was utilized in Denmark during the times at --

3    understudied by you and your colleagues Parkinson's

4    disease?

5         A    I don't, but the neurologist that treated

6    the patients did.

7         Q    Okay.  So let me back up.

8              Did you undertake any examination or

9    interview anybody to ascertain the diagnostic criteria

10   utilized by Danish physicians during the periods that

11   your cohort was followed by you in those records?

12        A    I did not.

13        Q    Okay.  Is there a separate neurological

14   registry in Denmark?

15        A    No.

16        Q    Do you know whether or not everyone who gets

17   hospitalized in Denmark is seen by a neurologist?

18        A    I don't know.

19        Q    So am I correct in my understanding that of

20   your cohort of six thousand people, as far as we know

21   it may well be that none of them saw a neurologist?

22        A    That's incorrect.

23             MR. SCHACHTMAN:  Objection to form.

24        Q    I'm sorry?

25        A    That's incorrect.

Page 151

1    Q    And how do we know that that's incorrect?

2    A    We verified the diagnosis of Parkinson's

3  disease, we discussed that in the paper, and in order

4  to verify it they went through medical records and

5  either had a neurologist write down Parkinson's

6  disease in the medical records and also medication to

7  treat Parkinson's disease.

8    Q    So it's your understanding that your random

9  sample of -- was it eighty records?

10    A    I can't recall the exact number.

11    Q    Well, and you didn't do that, did you?

12    A    Right.

13    Q    That was the Danish colleagues --

14    A    Right.

15    Q    -- that did that?

16         Now, you're saying that they verified that a

17  neurologist had seen each of those patients at the

18  time of diagnosis?

19    A    At the time of hospitalization.

20    Q    At the time of hospitalization they verified

21  that each of those had been seen by a neurologist?

22    A    That -- through the medical records, yes.

23    Q    Okay.  And then what, that was independently

24  assessed by a neurologist on your team to verify that

25  that diagnosis was accurate?

Page 152

```
 1      A    No.
 2      Q    Who was it that undertook to verify the
 3  accuracy or inaccuracy of the Parkinson's disease
 4  diagnosis in the random sample?
 5      A    I'm not sure.  It was someone under the
 6  direction of Doctor Olsen, who was on the paper.  I'm
 7  sorry, Doctor Hansen, Johnni Hansen.
 8      Q    Is Johnni Hansen, J-O-H-N-N-I, related to
 9  the Doctor Klaus Hansen?
10      A    I have no idea.
11      Q    How long did you all work together?
12      A    I don't know who Doctor Klaus Hansen is.
13      Q    You don't?
14      A    No.
15      Q    Okay.  Did you work with Johnni Hansen?
16      A    Yes.
17      Q    And where is he from?
18      A    Copenhagen.
19           MR. SCHACHTMAN:  Hansen's a little bit like
20  Kim in Korea.  Hansen in Denmark is a little bit like
21  Kim in Korea.
22      Q    Do you know the ICD diagnostic criteria for
23  Parkinson's disease, or maganesism or Parkinsonism, or
24  any of the disease categories in your study?
25           MR. SCHACHTMAN:  Objection to form; assumes
```

Page 153

1    facts not in evidence.

2        A    Could you repeat the question?

3        Q    Do you know what the ICD codes are?

4        A    I think we report them in the paper.

5        Q    Right.  But are you familiar with them?

6        A    I can't tell you them from memory.

7        Q    No.  But are you familiar with them?

8        A    I'm familiar in that we put them in the

9    paper.

10        Q    Are you familiar with the diagnostic

11    criteria set forth by the ICD codes for Parkinson's

12    disease, for example?

13            MR. SCHACHTMAN:  Objection; foundation.

14        A    I'm sorry.  I'm not sure what you're asking.

15        Q    Your paper says that the patients were coded

16    as having Parkinson's disease based on ICD 8 through

17    10, I believe, correct?

18        A    Yes.

19        Q    Do you know what's contained in the ICD 8,

20    for example, with respect to a description of

21    Parkinson's disease?

22            MR. SCHACHTMAN:  Objection; foundation.

23        A    I, I can look in the ICD code book for 8, 9

24    and 10, and look up Parkinson's disease and determine

25    what the code is.

Page 154

1    Q    Okay.  Everybody in this room could do that.

2    A    Correct.

3    Q    Okay.  But do you know whether or not the

4    ICD code also has criteria for what someone should

5    manifest in the way of symptoms as to whether or not

6    they may fit under one particular ICD code in any of

7    those editions as opposed to under a different ICD

8    code?

9    A    That I don't know.

10         MR. SCHACHTMAN:  Objection to foundation.

11   A    No.

12   Q    Okay.  Prior to you undertaking your role --

13   and yours was in January of 2004, right?

14   A    Yeah.

15   Q    -- were you aware of any epidemiological

16   studies that showed an increased incidence of

17   Parkinsonism or Parkinson's disease in people exposed

18   to welding fumes?

19   A    Not prior to 2004.

20   Q    Did you become aware of any between January

21   2004 and the publication of your article?

22   A    Yes, through the ones I looked up on Pub

23   Med.

24   Q    Do you recall which ones revealed that?

25   A    I think I discussed them in my paper, so I

Page 155

1    can't recall off the top of my head.

2         Q    Do you make a distinction between -- what is

3    the distinction -- excuse me, I think you already told

4    me you did.  What is the distinction you make between

5    Parkinsonism and Parkinson's disease?

6         A    The only distinction I make is through the

7    ICD codes that we used to define our outcomes in the

8    paper.

9         Q    All right.  So did you have to, or did any

10   of the people involved in writing your paper have to

11   make any kind of independent assessment that someone

12   fit one or the other of the ICD codes other than the

13   random sample?

14        A    Yeah.  No one on the paper looked to see

15   if -- looked for the ICD criteria in the welders or in

16   the general population.

17        Q    When it came to the random sample, who was

18   it of your colleagues that undertook to diagnose and

19   classify the ICD code that a patient would have based

20   on the review in the random sample of the medical

21   records?

22        A    No one on my study did a diagnosis.  It was

23   only a verification of the diagnosis.

24        Q    Okay.  So if I'm understanding what you just

25   said, the random sample was not undertaken to be sure

Page 156

1    that someone was correctly diagnosed, the random

2    sample was undertaken to see if the record really said

3    Parkinson's disease?

4        A    That there is a verification of Parkinson's

5    disease in the record, yes.

6        Q    All right.  Was it restricted to primary

7    diagnosis?

8        A    For our study it was, yes.

9        Q    Was it restricted to that for purposes of a

10    random sample?

11        A    Yes.

12        Q    Are you familiar with the reference

13    sample -- or, excuse me, the Reference Manual on

14    Scientific Evidence?

15        A    No.

16            MR. CROSBY:  Let me show you what we will --

17    or I will mark for us as Exhibit 4.

18            THE WITNESS:  4 is next.

19            (Deposition Exhibit No. 4 was marked for

20    identification and was attached to the transcript.)

21    BY MR. CROSBY:

22        Q    Could you tell me what that is, please, sir?

23        A    This appears to be a proposal for the

24    Swedish study.

25        Q    Has that study been approved?

Page 157

1      A      It's going through that process right now.

2      Q      So has it been approved?

3      A      It's going -- I don't -- no, it has not been

4   approved.  It's. . .

5      Q      Did you help draft this proposal?

6      A      No.

7      Q      Who drafted the proposal?

8      A      Doctor Blot.

9      Q      When did he draft -- that proposal was July

10   20th, 2004?

11     A      That's what it says, yeah.

12     Q      Do you know to whom he presented it?

13     A      No, I don't.

14     Q      But you do know it's under consideration?

15     A      Right.

16     Q      Do you know if he's presented it to welding

17   manufacturers or NIH or --

18     A      I'm sorry.  By under some consideration, I

19   mean that the Swedes are going through the process to

20   get approval for the data.

21     Q      All right.  And do you know whether or not

22   you have -- it's been submitted by -- to anyone for

23   approval for funding?

24     A      It's my understanding that it's been funded.

25     Q      Okay.  Who is funding it?

Page 158

1     A     The same group that's funded the Danish

2  study.

3     Q     Who is that group?

4     A     I can't recall what they title themselves,

5  consumables of welding products.

6     Q     Combustibles?

7     A     Yeah.

8     Q     Do you all at IEI represent, or ever do any

9  work with labor unions?

10    A     I don't know.

11    Q     Have you?

12    A     I have not, no.

13    Q     Have you all ever undertook to explore risk

14 or causation of disease in a population of workers on

15 behalf of the workers?

16    A     Yes.

17    Q     Which ones?

18    A     Boeing.

19    Q     And what was the extent --

20    A     I guess that was funded by the automotive

21 union.

22    Q     Okay.  And what was the name -- what was

23 that study involving?

24    A     It's currently ongoing, of people who

25 developed rocket test engines.

Page 159

1      Q     And is it funded by them in whole or in

2    part?

3      A     I think -- I'm not exactly clear who the

4    funding actually comes from, but I, I know they're

5    part of the -- I think they did fund part of it.

6      Q     They either may be funding or they're

7    providing the cohort?

8      A     No, they're not providing the cohort.  The

9    cohort is all the employees of Boeing.

10     Q     Okay.  Is Boeing funding part of it?

11     A     I believe so.

12           (Deposition Exhibit No. 5 was marked for

13    identification and was attached to the transcript.)

14           MR. CROSBY:  Let me show you what I will

15    mark as No. 5.  I don't know why some of these are

16    thicker than others.

17           MR. THOMPSON:  This is 5?

18           MR. CROSBY:  That's 5.  I apologize to you

19    all for not having enough copies, but I didn't know

20    how many were going to be here, either.

21    BY MR. CROSBY:

22     Q     Could you tell me what this is, please?

23     A     It appears to be the proposal that -- for

24    the Danish study.

25     Q     Have you seen it before?

Page 160

1      A      Yes.

2      Q      When was the first time that you saw it?

3      A      I think that -- when you asked us to produce

4  it.

5      Q      Okay.  So prior to undertaking the study in

6  January and throughout the time that the study was

7  being performed, you didn't look at this proposal?

8      A      No.  It was in Doctor Blot's office.

9      Q      Okay.  Was there a protocol for this study?

10     A      Other than what's written in the proposal,

11  no.  The proposal is the protocol.

12     Q      So how did you know what to do?

13     A      Actually, it pretty much lays out step by

14  step what we're going to do under the methods section.

15     Q      Yes, sir.  But I understood you didn't have

16  this until after the study was finished.

17     A      Excuse me?

18     Q      I understood that you did not have Exhibit 5

19  until after the study was finished.

20     A      No.  What this -- this is telling the

21  methodology used to assemble the cohort and to link it

22  to the registries and things like that.  So that was

23  all done prior to my joining.

24          MR. SCHACHTMAN:  Mr. Crosby's asking you

25  about your last answer in which you said you hadn't

Page 161

1    seen this before you started.

2                THE WITNESS:  Right.

3                MR. SCHACHTMAN:  You only saw it recently.

4    Then he asked you how you did the study without

5    knowing this information, that's the question.

6        A    Okay.  This was for the, for the Danes to

7    follow, and they had completed the -- most of the

8    steps in here except for the analysis prior to my

9    joining the project.

10   BY MR. CROSBY:

11       Q    All right.  So can you walk me through the

12   process?

13       A    Umh-humh.

14       Q    At some point, I take it, either Doctor Blot

15   was approached or he had a vision of doing a study?

16       A    Umh-humh.

17       Q    And from there to the time that you got

18   involved, what took place?

19       A    Approvals to use the Danish data, some data

20   processing, and by that I mean a reassembling of the

21   questionnaire data and getting -- collecting the data

22   or applying it and assembling the data for Parkinson's

23   disease and other neurological conditions, and then

24   creating the background rates.

25       Q    Okay.  Who did all of that?

Page 162

1    A    The Danes.

2    Q    Was Doctor Blot involved in that?

3    A    Other than the initial discussions, no.

4    Q    Okay.  Were you involved in that?

5    A    No.

6    Q    Have you undertaken any steps for

7  verification of what was done by the Danes up until

8  the time that you came onboard other than them telling

9  you that this is what we did and we did it right?

10    A    I personally did not do that, no.

11    Q    Okay.  Did any American do that?

12    A    No.

13    Q    Do you know if there are any drafts of this

14  proposal?

15    A    I, I have no idea.  I have no knowledge at

16  all.

17    Q    Do you have any real awareness of what's

18  contained in the proposal?

19    A    I've read it through, yeah.

20    Q    Okay.  When was the first time you read it

21  through?

22    A    I'm not sure.  Probably -- within the last

23  six months.

24    Q    Okay.  So this proposal didn't have anything

25  to do with the way you did the study, did it?

Page 163

1      A     The study was -- used standard

2   epidemiological methods, and I was able to do that.

3      Q     Right.  So this proposal didn't have

4   anything to do with how you did the study?

5            MR. SCHACHTMAN:  Objection to form.

6      Q     This proposal didn't guide you in any way?

7      A     Everything that is in this proposal was

8   done, yes.

9      Q     That's not my question, Doctor.  And I'm

10  sorry that I'm inartful.

11           Did you rely on this proposal in any way,

12  shape, or form in performing what you did with respect

13  to the Danish study for the welding manufacturers?

14     A     I did not read this proposal and then do the

15  study.

16     Q     Okay.  So did you rely on it in any way,

17  shape, or form?

18     A     I personally did not.

19     Q     Okay.  Did anybody at IEI involved in it, in

20  the study rely on this proposal in any way, shape, or

21  form other than Doctor Blot?

22     A     I, I believe Doctor Blot did.

23     Q     And is he the only one as far as you know?

24     A     Yes.

25     Q     I notice that in this proposal there is

Page 164

```
 1    mention of a number of Danish hospital discharge
 2    registries and other registries that can be linked
 3    together.
 4         A    Umh-humh.
 5         Q    Do you know whether or not any of that was
 6    linked other than the discharge registry and the
 7    discharge diagnosis?  And, excuse me, there's one
 8    other one, I think, the emergency outpatient registry.
 9         A    I'm sorry.  I don't -- I don't see where
10    you're reading the other registries.
11         Q    Let me just ask you this.
12              What registries, if any, are you familiar
13    with being linked or utilized in the study?
14         A    The hospital discharge registry.
15         Q    Yes.
16         A    The mortality registry.
17         Q    Umh-humh.
18         A    And the immigration registry.  And I think
19    that's all that I'm aware of.
20         Q    Does the hospitalization registry include
21    emergency room or outpatient?
22         A    Yes.
23         Q    Okay.  Would that include clinics?
24         A    Yes, it would.
25         Q    Does it mean that -- and I don't know how
```

Case 1:19-md-02875-RMB-SAK   Document 1713-8   Filed 11/01/21   Page 166 of 322
PageID: 39850
Case 1:03-cv-17000-KMO   Document 1862-4   Filed 08/07/2006   Page 165 of 321

Page 165

```
1     Danes practice medicine?
2         A     No.
3         Q     But if I'm a Danish citizen and need to go
4     to see my doctor --
5         A     Right.
6         Q     -- who is a neurologist, and I go see my
7     neurologist doctor, is he captured in this system?
8         A     Yes.
9         Q     From day one, or from 1996?
10        A     It depends --
11              MR. SCHACHTMAN:  Objection to form.
12              THE WITNESS:  I'm sorry.
13        A     -- if you were hospitalized or not.
14        Q     Assume I'm not hospitalized.
15        A     Then it would be captured in 1996.
16        Q     Okay.  So any person whose visits to a
17    neurologist in Denmark prior to 1996 that did not
18    result in hospitalization is not captured?
19        A     Right.  In this registry, that's correct.
20        Q     Now, post 1996, are you saying that anyone
21    who went to any doctor anywhere in Denmark for any
22    purpose other than plastic surgery is captured by this
23    system?
24        A     Yes.
25        Q     And as I understand it, the -- and by this
```

Page 166

1    system, I mean the hospitalization system.

2        A    Umh-humh.

3        Q    And as I understand it, when someone goes in

4    there is a diagnoses and there are up to twenty

5    different diagnoses?

6            MR. SCHACHTMAN:    Objection.

7        A    There can be.

8        Q    Up to twenty?

9            MR. SCHACHTMAN:    Objection.

10       A    That's my understanding.

11       Q    Okay.  Which one of the twenty did you all

12   use?

13       A    We used the first diagnoses, because it's

14   impossible to calculate comparison rates if you try to

15   use all twenty diagnoses.

16       Q    Okay.  So is it the diagnosis at time of

17   presentation of the patient at the hospital or the

18   emergency room, or is it the primary diagnosis at the

19   time that the person is discharged, or do you know?

20       A    I don't know.

21       Q    All right.  So if you'll look at No. -- Page

22   3, is a list of various diseases or conditions with

23   ICD codes.  Was there any consideration given, or do

24   you know if there was any consideration given to using

25   IDC -- excuse me, ICD occupation codes?

Page 167

1          MR. SCHACHTMAN:  Objection to form;

2     foundation.

3          Q    Or occupation disease codes?

4          A    I'm --

5          MR. SCHACHTMAN:  Same objection.

6          A    I'm not aware of what those codes are.

7          Q    Okay.  And as I understand the way the data

8     were likely done, if someone had a diagnosis, any of

9     these diagnoses that carry any of these ICD numbers,

10    they were theoretically picked up by the

11    hospitalization registry system?

12         A    If they had one of these diagnoses in the

13    hospital discharge registry, yes, we picked them up.

14         Q    And that's done by just key punching -- or

15    key punching's a thing of the past.

16         A    By --

17         Q    By computerized manipulation?

18         A    Yes.

19         Q    Right under that it says:  In addition to

20    the hospital discharge and outpatient registries, a

21    psychiatric registry has been in place since 1953.

22    Linkage to this registry will also be explored.

23         A    Umh-humh.

24         Q    Did you have any involvement in the

25    exploration of that?

Page 168

1      A    No.

2      Q    Do you have any understanding as to whether

3  or not such a registry exists?

4      A    I understand that that registry does exist,

5  yes.

6      Q    Do you understand why it was determined not

7  to link?

8      A    I, I don't have any knowledge at all on

9  that.

10      Q    Did you all calculate SDRs?

11      A    No.

12      Q    The bottom paragraph on Page 3 --

13      A    Oh, I'm sorry.  We call them standardized

14  hospitalization rates.  In here we're calling them

15  disease ratios.  It's the same calculation.

16      Q    Would it be performed in a similar manner to

17  an SMR for that type study?

18      A    An SMR would deal with mortality.

19      Q    Right.

20      A    But it would be performed in a similar

21  manner, yeah.

22      Q    And did you calculate to a ninety-five

23  percent confidence interval?

24      A    Yes.

25      Q    Did Doctor Blot go to Denmark?

Page 169

| | | |
|---|---|---|
| 1 | A | Doctor Blot has been to Denmark, yes. |
| 2 | Q | Did he go for this? |
| 3 | A | No. |
| 4 | Q | Did you go to Denmark for this? |
| 5 | A | Yes. |
| 6 | Q | Did Ms. Lipwid -- did Miss Lipworth, or |
| 7 | | Mr. Lipworth, Lauren Lipworth? |
| 8 | A | Miss. |
| 9 | Q | Miss? |
| 10 | A | Doctor. |
| 11 | Q | Doctor? |
| 12 | A | Doctor, yes. |
| 13 | | She did not, no.  She was pregnant. |
| 14 | Q | Did anyone with IEI other than you go to |
| 15 | | Denmark? |
| 16 | A | Yeah.  Miss Cohen. |
| 17 | Q | And how many times did you all go? |
| 18 | A | We went once.  For this specific study, |
| 19 | | once. |
| 20 | Q | Yes, sir.  Do you know Jens P. Bonde's |
| 21 | | maiden name? |
| 22 | A | He's -- |
| 23 | Q | It's a her -- a him? |
| 24 | A | A him, yeah. |
| 25 | Q | I don't know -- these names baffle me, I'm |

1   sorry.  They probably think I've got a strange name

2   and they would. . .

3            MR. SCHACHTMAN:  Crosby's not a Danish name?

4            MR. CROSBY:  That's what I'm going to have

5   to look up.

6            MR. SCHACHTMAN:  You could probably trace

7   the linage back five or six centuries.

8            MR. CROSBY:  Absolutely.

9   BY MR. CROSBY:

10       Q    Do you know who made the decision not to

11  link to the psychiatric registry?

12       A    No, I don't.

13       Q    Do you know why it was decided not to?

14       A    No.

15       Q    Looking at Page 6, it has fixed cost at two

16  hundred and eighty-nine thousand, seven hundred

17  dollars.

18       A    Umh-humh.

19       Q    And I thought we added up the numbers this

20  morning and we were right at two hundred and eighty

21  thousand dollars.

22       A    I don't recall now.  I'll trust you.

23       Q    Is there going to be a supplemental -- has

24  it gone up?

25       A    No.  My understanding was that -- maybe it

Page 171

1   did -- when was the last bill submitted?  I'm not

2   sure.

3        Q    I think you have them (indicating).  It's

4   Exhibit 1.

5        A    You know, I don't know, because I'm not in

6   charge of submitting the bills, so -- let's see.  It

7   looks like his last one was July, so I think there's

8   one more payment.

9        Q    And it says here that there's a discounted

10  rate of three hundred and fifty dollars per hour for

11  Doctor Blot, two-fifty for you, and two-fifty for

12  Doctor Lipworth.

13       A    Okay.

14       Q    Do you have an understanding as to why that

15  was done?

16       A    I have no idea.

17       Q    And you discontinued your favorable rate?

18       A    For?

19       Q    For purposes of doing your testimony and

20  doing declarations and doing work for the litigation.

21       A    I'm not in charge of billing, so I don't

22  know --

23       Q    Okay.

24       A    -- what the rates are.

25       Q    I understood that you were charging four

Page 172

1    hundred dollars an hour.

2        A    Right.

3        Q    Okay. Well, here it was two-fifty.

4        A    This is a different activity.

5        Q    Okay. So writing a report is two hundred --

6    writing a scientific paper is two hundred and fifty

7    dollars an hour and a declaration's four hundred an

8    hour?

9        A    I have no idea.

10        Q    And on that last page it says Danish Cancer

11    Society-slash -- is that Ar/hous?

12        A    Ar/hoose.

13        Q    Aarhus University --

14        A    Yeah.

15        Q    -- a hundred and forty-nine thousand

16    dollars?

17        A    Yeah.

18        Q    Is that being paid directly by you all, do

19    you know?

20        A    I'm not in charge of billing. I don't know

21    how those bills are being processed.

22            (Deposition Exhibit No. 6 was marked for

23    identification and was attached to the transcript.)

24    BY MR. CROSBY:

25        Q    I'll show you what I'll mark as Plaintiff's

Page 173

1    Exhibit 6, which is entitled a Research Agreement.

2    Have you seen that previously?

3         A    I'm sorry.  What was the question?

4         Q    My question to you is have you seen Exhibit

5    6 previously?

6         A    No.

7         Q    Were you aware that there was a written

8    agreement between IEI and the Institute of Cancer

9    Epidemiology/Danish Cancer Society?

10        A    I assume there was.

11        Q    Is the Danish Cancer Society like the

12   American Cancer Society, a private society?

13        A    Absolutely.

14        Q    I'm sorry?

15        A    I think so.

16        Q    Okay.  So it's not like the National Cancer

17   Institute, this is like a private organization?

18        A    No.  It's -- I don't quite understand

19   exactly.  It's affiliated with the government, but it

20   also has a not-for-profit section as well it funds

21   from.  But I'm not -- I can't speak to exactly. . .

22        Q    Well, is the director of the Danish Cancer

23   Society a governmental employee, or is he an employee

24   of the Cancer Society, or do you know?

25        A    I don't know.  I don't know.

Page 174

1      Q      And the Institute of Cancer and

2   Epidemiology, what that is?  Is that a part --

3      A      Yes.

4      Q      -- of the Danish Cancer Institute?

5      A      That's a part of it.

6      Q      Do you know if that's the privately funded

7   part, or the publicly funded part?

8      A      I think those distinctions are more at an

9   overall level.  I mean, they all -- there's not a

10  private and a public funded part.

11           MR. SCHACHTMAN:  It's a socialist country.

12     Q      And Joseph K. McLaughlin is the President of

13  IEI?

14     A      Yes.

15     Q      What's Doctor Blot's title?

16     A      CEO.

17     Q      Was there a separate agreement with Aarhus,

18  or is that something that was undertaken with the

19  Danish Cancer Society?

20     A      I have no idea.

21     Q      Have you had a chance just to look this

22  over?  And do you notice that according to this

23  agreement IEI is going to pay directly to the

24  Institute of Cancer Epidemiology/Danish Cancer

25  Society?

Page 175

1    A    Okay.

2    Q    Do you know why that would be done?

3    A    Why IEI is paying directly to the Danish

4    Cancer Society?

5    Q    Yes, as opposed to the funders.

6    A    Oh, I have no idea.

7    Q    Looking at Section 3, Schedule and Payments.

8    Do you notice that IEI is to pay the Institute of

9    Cancer Epidemiology/Danish Cancer Society a hundred

10    and twenty-five thousand dollars for doing their work?

11    A    I see that on Page 2, yeah.

12    Q    Do you have an understanding as to what

13    happened, or where the other twenty-four thousand

14    dollars went that was designated to go to IEI and

15    Aarhus for performing their work as opposed to the

16    hundred and twenty-five thousand going to the Danish

17    Cancer Society?

18    A    I have no idea.

19    Q    Did the Danish Cancer Society undertake to

20    do the things that are set forth in this Research

21    Agreement?

22    A    They signed the Research Agreement, yes.

23    Q    I understand they signed it.  But did they

24    do the work, or do you know?

25    A    They did -- I haven't read this through, but

Page 176

1    I assume that they've done the work mentioned in here.

2        Q    Well, there's an Attachment A, the research

3    protocol.  Is that the same research protocol that was

4    presented to the funders?

5        A    It appears to be.

6        Q    Do you notice that the diseases in the

7    proposal to the Cancer Society is less extensive than

8    the list of diseases in the proposal to the funders?

9        A    Okay.

10       Q    Do you understand why that was changed?

11       A    No.

12       Q    But otherwise is the proposal -- or the

13   research protocol, Attachment A on Exhibit 6, does it

14   set forth the information contained on Exhibit 5 for

15   the research proposal?

16       A    It appears to be.

17       Q    Does seeing the difference on Page -- of

18   Exhibit 6 and Exhibit 5 with respect to disease

19   classifications that were to be reviewed have any

20   impact on your views with respect to the study --

21       A    No.

22       Q    -- or the proposals?

23       A    Not at all.

24       Q    Why is that?

25       A    The study's what it is.  We looked at the

Page 177

1  diseases that are mentioned in the study.

2      Q     But do you have any idea as to why some of

3  them were taken out?

4          MR. SCHACHTMAN:  Objection to form.

5      A     I, I have no idea.

6      Q     If more diseases were included, could it

7  change your results?

8      A     I think --

9          MR. SCHACHTMAN:  Objection to form.

10     A     -- we included more diseases in the paper.

11     Q     Have you seen any documentation reflecting

12  any changes or modifications to the protocol and

13  proposal between IEI and the Danish Cancer Society?

14     A     No.

15     Q     Now, after you got onboard in January of

16  '04, right?

17     A     Umh-humh.

18     Q     How long was it before you went to Denmark?

19     A     I think I went to Denmark in January and

20  then in March.

21     Q     Okay.  And what did you do before you went

22  to Denmark with respect to preparation for working on

23  this project?

24     A     I read through the background literature.

25     Q     And is that all reflected in the article?

Page 178

1      A      Yeah.

2      Q      Did you form any opinions?

3      A      I wanted to see what the research questions

4   were.   And so, yeah.

5      Q      Okay.   And what were the research questions?

6      A      To see if there were any health effects of

7   working in welding.

8      Q      All right.   And did you have a preliminary

9   view as to what -- whether or not there were health

10  effects --

11     A      Not at all.

12     Q      -- from working in welding?

13     A      No.

14     Q      So to you, based on what you read prior to

15  January of 2004, or up until the time you left for

16  Denmark sometime in January 2004, it was an unanswered

17  question?

18     A      Correct.

19     Q      Had you seen any studies that had indicated

20  there was no effect?

21     A      I had looked at all the studies mentioned in

22  my paper.   I think some had an effect and some did

23  not.

24     Q      So another study is certainly called for

25  under those circumstances?

Page 179

1              MR. SCHACHTMAN:   Objection to form.

2       Q     Do you agree?

3              MR. SCHACHTMAN:   Objection.

4       A     I mean, I would like to do as many studies

5    as I could, of course.

6       Q     Well, did you think the question had been

7    answered?

8              MR. SCHACHTMAN:   Objection to form.

9       A     I, I think that the question has been

10   answered that there is no excess risk of

11   hospitalization for Parkinson's disease in Danish

12   welders.

13      Q     I understand that.  But did you think that

14   in January of 2004, that the question as to whether or

15   not there was an increased risk for Parkinson's

16   disease or movement disorders as a result of exposure

17   to welding fumes had been answered?

18      A     No.

19      Q     After you went -- what did you do when you

20   were in Denmark in January?

21      A     I go to Denmark every two months.

22      Q     Why do you go every two months?

23      A     I have a variety of projects that I'm

24   involved in.

25      Q     So in January of 2004 -- I wasn't talking

Page 180

1    about this January.  I said January of 2000 --

2         A    I said this January as well.

3         Q    Do you have relatives there?

4         A    I, I do, but not -- none that are known to

5    me.

6         Q    We may have something in common.

7              Let me ask you, then, in January of 2004,

8    when you went over --

9              MR. SCHACHTMAN:  You could be related.

10        Q    -- for this study --

11             MR. CROSBY:  Maybe.

12        Q    When you went over for this study in January

13   of 2004, what did you do on this study during that

14   visit?

15        A    I had meetings with the other researchers,

16   our Danish colleagues, to see the progress of

17   assembling -- the data assembly for both the

18   questionnaire and the hospitalization rates.

19        Q    And did you ask them about whether or not

20   there were other registries that you would -- that

21   they would recommend that you might access with

22   respect to this population?

23        A    I didn't ask them, no.

24        Q    Did you pick the cohort?

25        A    No.  The cohort was picked -- it was an

EX 5-180

Page 181

1    established cohort from 1986.

2        Q    Well, I understand that.  There are lots of

3    established cohorts out there, right?

4        A    Right.

5        Q    Who picked it?

6        A    I assume the Danes did.  We weren't aware of

7    the cohort prior to, prior to then.

8        Q    Well, Doctor -- did Doctor Blot have it in

9    his proposal?

10       A    Yes.

11       Q    So did he get it from the Danes?

12       A    I, I assume so.  I'm not sure.

13       Q    So then do you know who picked it?

14       A    I don't.

15       Q    Did you review any tables or data in your

16   January '04 visit?

17       A    There were no tables or data to review.

18       Q    In January of '04?

19       A    Right, right.

20       Q    Was there anything in writing for you to

21   review?

22       A    No.

23       Q    Was there anything on a computer screen for

24   you to review?

25       A    No.

Page 182

1   Q   Was there anything in any form, including

2   hologram, for you to review?

3   A   No.

4   Q   So what, did you all just talk?

5   A   Absolutely.

6   Q   Did they have suggestions about how to make

7   the study better?

8   A   No.  The talk was in terms of timelines and

9   what needed to be -- what, what -- how far along they

10  were in assembling the data and getting it ready for

11  analysis.  So it was more procedure issues and

12  practical issues.

13  Q   Did you have any telephone calls from

14  anybody with the welding industry asking you about the

15  status and the progress and timelines as you were

16  working on this study?

17  A   No.  I didn't meet anyone from any of the

18  lawyers until after the study was completed.

19  Q   Right.  But did any of them call you up?

20  A   No, no.  I had no contact at all.

21  Q   Who would they have been in touch with?

22  A   I have no idea.

23  Q   Well, was Doctor Blot the primary contact

24  for this study with respect to the client?

25  A   Yes, he was.  As he is for all of our

Page 183

1    clients, I think.

2                    (Comments off the record.)

3                    MR. THOMPSON:  Doctor Fryzek, if you could

4    keep your voice up a little bit.

5                    MR. SCHACHTMAN:  In order to keep it a

6    little cooler in here, I turned the thermostat down

7    and so now the HVAC is pumping cold air and it's got

8    that noise to deal with.

9                    MR. CROSBY:  Do you need any fresh water, or

10   are you all right?

11                   THE WITNESS:  I'm fine.

12   BY MR. CROSBY:

13        Q    Okay.  After you left Denmark -- have we

14   covered what you did in Denmark in January of '04?

15        A    Yeah.

16        Q    When was the next time that you had any

17   information on this particular study?

18        A    The -- when the Danes had assembled the data

19   they called me and said it was ready to start working

20   on the analysis, so then I went.

21        Q    And when was that?

22        A    March.

23        Q    And who was it that called you?

24        A    Johnni Hansen.

25        Q    And did he give you any preliminary

Page 184

1    indication as to what the data were showing?

2        A    No.  He hadn't even looked at the data yet.

3        Q    So you went back over in March of '04?

4        A    Yeah.

5        Q    What did you do when you were there in March

6    of '04?

7        A    I worked on a variety of projects for this

8    project.  I set up the, what you call dummy tables.

9    It's kind of the Table 1, look at the characteristics

10    and type of analyses that you want to see.

11        Q    Did you see any data in March of '04?

12        A    At the conclusion of my trip, I did.  And in

13    terms of data, I meant the summary data that are in

14    the table.

15        Q    So in March of '04 you were able to get the

16    information that's reflected on Tables 1, 2 and 3?

17        A    Yes, yeah.  We completed those analysis

18    during that time.

19        Q    So you all were crunching numbers?

20        A    That's exactly true.

21        Q    But somebody else really was doing the

22    numbers crunching, you were getting the results?

23        A    Yeah.

24        Q    Did you provide any formulas or any

25    information as to how they needed to crunch the

Page 185

1    numbers, or is that all programmed and it just sort of

2    gets crunched?

3        A    That's standardized techniques, yeah.

4        Q    Which ones did you all use?

5        A    Pardon me?

6        Q    Which standardized techniques did you use?

7        A    The standardized techniques for cohort

8    studies described in Breslow & Day.

9        Q    And are there programs that run those?

10       A    Yes.

11       Q    And which programs did you use?

12       A    It's a computerized analysis system that's

13   called SAS.

14       Q    And is there a particular program within SAS

15   that was used, or do you know?

16       A    I don't know.

17       Q    Do you know which edition or version?

18       A    No.  Whatever the dates have on their

19   computers.

20       Q    Did anybody do any sampling or checking of

21   that, the system or the programs to make sure that

22   they were properly and validly operated?

23       A    Yeah.  We replicated all the analysis

24   independently.  The Danes did the analysis and we did

25   the analysis as well.

Page 186

1    Q    Using the same computers?

2    A    Not the same computers.  The same

3    statistical software.

4    Q    Okay.  Was it their computers?

5    A    Yes.

6    Q    On their system?

7    A    Yes.

8    Q    So you used their data, their software and

9    their hardware?

10   A    Yes.

11   Q    After March of 2004, what did you do on the

12   study?

13   A    I worked on the paper, writing the paper.

14   Q    When did you do your first draft?

15   A    Actually, I had a first draft done by the

16   end of March.

17   Q    And what did you do with it?

18   A    I distributed it to the coauthors.

19   Q    All of them?

20   A    Yes.

21   Q    Did they give you comments back?

22   A    They gave me comments back, yes.

23   Q    How did they give you comments back?

24   A    They faxed.  They wrote on the paper and

25   faxed it back to me.

Page 187

1    Q    Nobody just emailed it to you?

2    A    No.

3    Q    You didn't use like Adobe Comment?

4    A    I don't know what that is.

5    Q    Or Word?

6    A    No.  They faxed.

7    Q    Okay.  Do you have those?

8    A    No.

9    Q    Did you do another draft?

10   A    Yes.

11   Q    And where is that?

12   A    That draft was sent out to the colleagues as

13   well.

14   Q    Okay.  Did you get comments back?

15   A    Yes.

16   Q    Do you have any of those?

17   A    No.

18   Q    The first set of comments from your

19   colleagues, do you recall what the nature of the

20   comments were?

21   A    It was more in the structure of the paper,

22   not really the substance of the paper.

23   Q    And what was it that they wanted to modify

24   about the structure?

25   A    They put in the -- they had done the

Page 188

1  verification analysis, the verification of Parkinson's

2  disease, and so they added that in.  Doctor Bonde had

3  some information on exposure levels of welders, and he

4  put that in as well.  You'll find both of those in the

5  discussion.

6      Q    Doctor Bonde's welding exposure levels that

7  he had, that's not the same population of people, is

8  it?

9      A    I have no idea.

10      Q    So we don't know that his exposure level has

11  any relevance to your findings?

12      A    That I don't know.

13      Q    And then the hospitalization, that's the

14  random sampling?

15      A    Yes.

16      Q    That was on the first go-round?

17      A    I'm sorry?

18      Q    That was on the first go-round of comments

19  by co-authors?

20      A    I think so.

21      Q    Okay.  On the second -- when did you have

22  the second draft ready?

23      A    Probably the end of summer.  The problem was

24  we had -- the second go-round we sent out around May,

25  and then in Denmark they had this wonderful system

Page 189

1    where they go on holiday for the summer.  So when

2    people returned from holiday, we got the rest of the

3    comments back.

4        Q    All right.  Did anybody suggest that there

5    be some power calculations?

6        A    That's not typically done, to my knowledge,

7    after a study's been completed.

8        Q    I understand.  But did anybody suggest it?

9        A    No.

10       Q    Did you, or did anyone before the study

11   began in January suggest that there be some sort of

12   power calculation with respect to the study?

13       A    It was an impossible thing to do because we

14   didn't have the background rates of Parkinson's

15   disease in the population of Denmark.

16       Q    Do you know of any European countries for

17   which there has -- there is such data?

18       A    I don't know.

19       Q    Or are such data?

20       A    I don't know.

21       Q    What were the comments on the second round?

22       A    I'm trying to recall.  I think they were

23   more just grammatical and, and just some minor wording

24   changes.  I can't recall exactly what they were.

25       Q    And those comments are gone?

1     A   Yeah.

2     Q   Did anybody ever do anything about arriving

3 at a P factor with respect to this study?

4     MR. SCHACHTMAN:  Objection to form.

5     A   I'm not sure what a P factor is.

6     Q   As in like P greater than zero-point-oh-

7 five.

8     MR. SCHACHTMAN:  A P value?

9     Q   P value, P factor.  I'm sorry.

10    A   We -- I'm not sure what you're asking.  I'm

11 sorry.

12    Q   Is there one for this study?

13    A   Every number in the table has a P value

14 associated with it.  That's, that's included -- that's

15 in the confidence interval of the measurements.

16    Q   Is that your range?

17    A   Pardon me?

18    Q   Is that the range?

19    MR. SCHACHTMAN:  Objection to form.

20    A   The range of?

21    Q   Your CI.

22    A   Right.

23    Q   Can one ascertain a P value from that?

24    A   One can look at a level of significance from

25 the confidence level.

Page 191

1      Q    Can one ascertain a P value for that?

2      A    You can determine if P is less than or

3  greater than point-zero-five, yes.

4      Q    Did anybody do that?

5      A    It is understood.

6      Q    What is understood?

7      A    The significance level.

8      Q    What is it?  That it's less than zero-point-

9  five --

10      A    It depends --

11      Q    Or, excuse me, zero-point-zero-five?

12      A    It depends what the levels of confidence

13  interval are.

14          MR. CROSBY:  Okay.  Let's look at what I'll

15  mark as Plaintiff's 7.

16          (Deposition Exhibit No. 7 was marked for

17  identification and was attached to the transcript.)

18  BY MR. CROSBY:

19      Q    What is a -- yeah, I gave you the right one.

20  What is a P value?

21      A    P value is a probability level.

22      Q    And a probability level indicating what?

23      A    If, if an association that you find in a

24  study is due to chance or not.

25      Q    Is a P value something that one takes into

Page 192

1  account when doing a study and ascertaining whether or

2  not there is a chance to replicate the study and that

3  something will happen just by chance?

4       A    Not if you're a graduate of University of

5  Michigan.  We believe in confidence intervals, not P

6  values.

7       Q    Does anybody believe in P values?

8       A    It's, it's not often reported.  Confidence

9  interval is a much better measure.  It gives you an

10  idea of, of chance, or P value, as well as the range

11  of a possible effect.

12       Q    Did you all provide a P value for this study

13  at any point?

14       A    Every measure of association has a P value

15  associated with it, yeah.

16       Q    Did you ever type in the paper anywhere a P

17  value?

18       A    Yeah.  On Page -- on Table 3, there's the P

19  values.  You're going to see P value equals.

20       Q    Okay.  Is this P equals zero-point-zero-

21  seven?

22       A    You'll have to show me.

23            (Mr. Crosby exhibiting.)

24       A    Yes.  P equals zero-point-zero-seven, yes.

25       Q    Is that a P value for the tailed study, the

Page 193

1    one-tailed study?  You've got -- it's the last page

2    on --

3        A    That is the P value for the one-tailed

4    categorical trend.

5            MR. SCHACHTMAN:  I'm sorry.  Mr. Crosby,

6    which table are you on?

7            MR. CROSBY:  Page 25 --

8            THE WITNESS:  Page 25.

9            MR. CROSBY:  -- which is Table 3.

10   BY MR. CROSBY:

11       Q    Is there a P value for any other aspect of

12   the study?

13       A    Again, the confidence intervals have

14   incorporated the value of, of chance in the measure.

15       Q    Yes, sir.  But do you provide a P value for

16   any of the other data, other than by means of

17   confidence value -- confidence interval?

18       A    No.

19       Q    Now, then, what is Fast Track publication?

20       A    They publish interesting articles quicker.

21       Q    And would it generally be an article that

22   deals with public health and safety?

23       A    It's, it's the editor's discretion.

24       Q    What was the date of your original

25   submission for this publication?

Page 194

1    A    I'm not sure of the exact date.  It was
2  September something.  It maybe was the end of August.
3  It was somewhere around there.
4    Q    Of '04?
5    A    Yeah.
6    Q    Looking at Plaintiff's 7, this is a letter
7  to Paul Brandt-Rauf, I guess.  I don't know.
8    A    Right.
9    Q    I don't want to mess his name up.  He's just
10  right down the street in Towson, Maryland.
11    A    Actually, he's in New York, I think.  This
12  is his editorial assistant who is in Towson.
13    Q    Okay.
14    A    Yeah.
15    Q    But it's addressed to him there?
16    A    Right.  That's, that's the address of the
17  journal.
18    Q    Did you ask for Fast Track publication of
19  this?
20    A    Yes.
21    Q    Whose idea was it that you ask for Fast
22  Track publication?
23    A    I think it was mine.
24    Q    Did you run that by Doctor Blot?
25    A    Yes, of course.  Yeah, Doctor --

Page 195

1      Q      Did he -- I'm sorry.

2      A      Yes.

3      Q      Another point.  If I interrupt you, I don't

4   mean to and let me know, because I want you to finish

5   your answer.  Okay?

6      A      Umh-humh.

7      Q      Do you know whether or not the funders

8   wanted this fast-tracked?

9      A      I don't know.

10     Q      What's the date that this was submitted?

11     A      I'm not sure.  It was in the fall.

12     Q      Okay.  But Plaintiff's Exhibit 7, the letter

13  transmitting it, has no date, or am I missing it?

14     A      Yeah, I don't see a date as well.

15     Q      This statement here, quote, it is -- this is

16  the next-to-the-last sentence in the first paragraph:

17  It is estimated that there are over five hundred

18  thousand welders in the United States, so that

19  evaluation of possible adverse effects from manganese

20  or other exposures among welders seems critical.

21     A      Yes.

22     Q      Are those your words?

23     A      Yes.

24     Q      Would that have been true ten years ago?

25     A      I don't know.

1     Q     Twenty years ago?

2     A     I don't know.

3     Q     Then your next is:  However, to date there

4  are limited scientific data addressing this important

5  health issue.  Are those your words?

6     A     Yes.

7     Q     And do you estimate that there are over five

8  hundred thousand welders in the U. S. alone?

9     A     Actually, Science Magazine does.

10    Q     Okay.  And you don't have the version that

11  prompted the comments that follow on the next page of

12  Exhibit 7; am I correct?

13    A     I don't believe I do, no.

14          MR. CROSBY:  Okay.  Do you want to change

15  now?

16          THE VIDEOGRAPHER:  Sure.

17          MR. CROSBY:  Okay.

18          MR. SCHACHTMAN:  Five-minute stretch, or --

19          MR. CROSBY:  He just gave me a note that he

20  needs to change the tape.

21          THE VIDEOGRAPHER:  Here ends Tape No. 2 in

22  the deposition of John P. Fryzek, Ph.D.  We are going

23  off the record.  The time is 2:42 p.m.

24          (A short recess was taken.)

25          THE VIDEOGRAPHER:  Here begins Tape No. 3 in

EX 5-196

Page 197

1   the deposition of John P. Fryzek, Ph.D.  We are back

2   on the record.  The time is 2:56 p.m.

3   BY MR. CROSBY:

4        Q    Could you tell us what Plaintiff's Exhibit 7

5   is, please?

6        A    I'm sorry?

7        Q    Could you tell us what Plaintiff's Exhibit 7

8   is, please?

9        A    If I could have it.

10       Q    I thought I gave it to you.

11       A    I'm sorry.  We were using it over here.

12            This is the letter we wrote to the editor of

13  the journal where we submitted our paper, as well as

14  the reviewer comments to our paper and our responses

15  to those comments, and then the final version of the

16  paper.

17       Q    Do you agree that generally papers can have

18  strengths and weaknesses?

19       A    Yes.

20       Q    Do weaknesses in a paper generally bias to

21  the null?

22            MR. SCHACHTMAN:  Objection to form.

23       A    I have no idea.

24       Q    You don't have any opinion one way or the

25  other as to whether or not whenever there's a weak

Page 198

1    aspect of a paper, whether or not that tends to create

2    a bias toward the null?  Not an intended bias.

3         A     Umh-humh.

4         Q     It just tends to drift it down to no risk as

5    opposed to drift it up to a risk.

6         A     A weakness could push it in either

7    direction, a bias towards or away from the null.

8         Q     With respect to Page 2 of Exhibit 7 --

9         A     Okay.

10        Q     -- the comment is:  What about other types

11   of welding besides mild and stainless steel?

12        A     Okay.  You're looking at No. 1.

13        Q     No. 1, yes, sir.

14        A     Okay.

15        Q     Who wrote these responses?

16        A     I did.

17        Q     Did you delegate any portion of responding

18   to this paper to anybody else?

19        A     No.

20        Q     Did anybody assist you with responding to

21   this paper?

22        A     Doctor -- I'm sure Doctor Blot commented on

23   my responses.

24        Q     So you would have made your responses,

25   submitted them to Doctor Blot, he may have had

Page 199

1    comments, and you would have gotten those back and

2    incorporated them into whatever you sent in?

3        A    Right.

4        Q    Do you recall whether or not he did that?

5        A    I don't recall his exact comments, but I'm

6    sure he did that.

7        Q    And your response is:  Information on other

8    types of welders was not available as this study was

9    based on a previous cohort study of mild and stainless

10   steel welders.  Is that a limitation of the study?

11       A    No, I don't believe so.

12       Q    Did one of your peers indicate that it was?

13       A    I don't -- no.

14       Q    You don't know, or you disagree that --

15       A    I disagree that he says that.

16       Q    Did he suggest that you consider looking at

17   other types of welding?

18       A    Yes.

19       Q    And did you explain that the reason you're

20   not is because your cohort was picked?

21       A    I'm explaining that the reason was -- that

22   we did not was because they were not available in the

23   cohort that we studied.

24       Q    Right.  It was not that it was not necessary

25   to do, it was that you could not given the parameters

Page 200

1    of your cohort?

2         A     Correct, yes.

3         Q     So is that a weakness, that you could not do

4    the study that this reviewer was indicating he thought

5    you should explore?

6              MR. SCHACHTMAN:   Objection; foundation.

7         A     Yeah, that's not a weakness, no.

8         Q     Okay.  Did you have any weaknesses in that

9    study?

10        A     Yeah, I believe we did.

11        Q     In Paragraph -- excuse me, Methods, No. 1:

12   There needs to be a reference with respect to this --

13   a statement because prior studies have shown.  And the

14   response was:  We included a reference from a review

15   article.  Do you know which article that was?

16        A     If you'll allow me to look at paper, I'll

17   tell you.

18        Q     Oh, yeah.  Like I said, this is open-book.

19        A     Okay.

20              (Witness reviewing document.)

21        A     It looks like it's Reference 25 of the

22   paper, and if you look at the reference list, it's --

23   the author is Quick.

24        Q     And that is dealing with smoking, nicotine,

25   and Parkinson's disease?

1      A      Yes.

2      Q      And No. 2 question is -- do you know who any

3   of the reviewers were, by the way?

4      A      No.  It's blinded.

5      Q      Are any people at IEI on this journal?

6      A      I am.

7      Q      Do you know the peers?

8      A      Pardon me?

9      Q      Do you know the people that review it?

10     A      Reviewed -- no, no.

11     Q      Not this particular one, but in general do

12  you know who is on the committee?  Do you all call it

13  a review committee?

14     A      No.  Typically what they do is they find

15  people who are expertise in some field and then ask

16  them to review.  So there's not a committee that they

17  oversee.

18     Q      It's not a set group that makes up those who

19  get sent papers on a rotational basis at random?

20     A      I'm not -- all journals do it differently.

21  I'm not sure.

22     Q      Okay.  And No. 2 says:  I'm concerned about

23  the statistical analysis of each effect, age, time,

24  duration, smoking, is analyzed separately.

25           MR. SCHACHTMAN:  Excuse me.  It says "since

Page 202

1    each effect."

2          MR. CROSBY:  Yes, thank you.

3      Q    I would be surprised if each one of those

4    was independent from the other, especially age and

5    smoking.  Was there any effect to -- effort to combine

6    the effects and interactions into one model so that

7    each effect is adjusted for the others?  And the

8    response was -- what did you say in the response, can

9    you tell us?

10     A    Due to the small number of cases of PD in

11   each category, simultaneous adjustment for any

12   evaluations of interactions between age, time,

13   duration and smoking was problematic, with limited

14   power interpretation of such models.  No changes made.

15   And the editor agreed with us and accepted that

16   comment.

17     Q    I understand.  If the paper's published,

18   that means they accepted it?

19     A    Absolutely.

20     Q    They may not like it, but they accepted it,

21   right?

22          MR. SCHACHTMAN:  Objection; foundation.

23     A    I don't know.

24     Q    You don't know?

25     A    Yeah.

Page 203

1    Q    So let me ask you this.  Was that a

2  weakness, the small number?

3    A    I don't know if I would call it a weakness.

4  It was a limitation.

5    Q    A limitation?

6    A    Yeah.

7    Q    Do limitations bias toward the null?

8    A    Not to my knowledge.

9    Q    Generally, is that an accepted premise in

10  epidemiology, that limitations in a study bias toward

11  the null?

12         MR. SCHACHTMAN:  Objection to foundation.

13    A    Not to my knowledge, no.

14    Q    Now, when it says with limited power, what

15  do you mean by that?

16    A    That the number of Parkinson's disease in

17  each category was small.

18    Q    So is that different from a power

19  calculation?

20    A    It's -- yes.

21    Q    Did you undertake a power calculation post

22  study to determine how limited the power was, or is?

23    A    No.

24    Q    Is there a reason not to?

25    A    Yeah.  You can look at the range of the

Page 204

1    confidence intervals see how -- confidence intervals

2    in the estimates.

3        Q    Then the part under Results, where it says

4    No. 1, Page 9.

5        A    Umh-humh.

6        Q    Quote:  Sixty-nine of the cases, ellipsis,

7    closed quote, I would like to see the results from the

8    last sentence, age at onset, put into either a new

9    table or one of the existing tables.

10       A    Umh-humh.

11       Q    Paren, Table 2, question mark, paren closed.

12   In the text I would also be interested in seeing the

13   exact, quote, P value, closed quote, rather than,

14   paren, P is greater than zero-point-one-zero, closed

15   paren, period.

16       A    Umh-humh.

17       Q    Is that what the reviewer wrote?

18       A    Yes.

19       Q    So was there a P value in this paper when it

20   was submitted at this point?

21       A    Yes, it appears so.

22       Q    Did you calculate it?

23       A    I did not calculate it personally, no.

24       Q    Do you know who did?

25       A    Probably Miss Cohen.

1       Q       Okay.  Did you agree with it?

2       A       With?

3       Q       Her P value.

4       A       I accepted her P value.

5       Q       Did you do anything to check it?

6       A       No.

7       Q       So the P value is greater than zero-point-

8       one-zero?

9       A       That's what it says, yes.

10      Q       And is that in the paper?

11      A       In the current paper?

12      Q       Yes.

13      A       No.

14      Q       Did you take it out?

15      A       Yes.  The reviewer asked us to.

16      Q       Well, actually, what -- does it say in the

17      text:  I would also be interested in seeing the exact

18      P value?

19      A       Umh-humh.

20      Q       And that's in quote, right?

21      A       Yes.

22      Q       Rather than P is greater than zero-point-

23      one-zero?

24      A       Yeah.  We actually offered him more

25      information than that by providing the confidence

1    interval around the ages.  So we did more than we were

2    asked.

3         Q    In your opinion?

4              MR. SCHACHTMAN:  Objection.

5         Q    For those of us who like to see P values --

6         A    Right.

7         Q    -- it would be nice to see one, wouldn't it?

8              MR. SCHACHTMAN:  Objection; foundation.

9         Q    I understand you may not think it's any

10   good, but there are just some of us that like them,

11   we're old fashioned.  Is there a reason that you

12   wouldn't?

13        A    Because providing the confidence interval

14   offers more information than a P value.

15        Q    Is a P value of greater than zero-point-one

16   of any significance as opposed to a P value of zero-

17   point-oh-five?

18             MR. SCHACHTMAN:  Objection; competence.

19        A    I'm not sure what you're asking.

20        Q    What is the goal for a P value when someone

21   is performing a study?

22        A    The goal for the P value is to determine if

23   your association may be due to chance or not.

24        Q    And do you want your P value low, or high?

25        A    It depends what you're looking at.  I mean,

1    it depends on the study.  It is what it is.

2         Q    Does it give you any clue as to how strong

3    the study is or how much the chance is that this could

4    be a chance finding as opposed to a repeatable

5    finding?

6         A    Not as much as the confidence interval.

7         Q    I understand that.  But does it give you

8    one?

9         A    It gives you an idea, yes.

10        Q    And what's the idea that it gives you when

11   it's greater than point-one-zero?

12        A    There's no difference, no association.

13        Q    Does it indicate that you have a higher

14   chance of this occurring by chance, if it's at, say,

15   zero-point-one-zero as opposed to zero-point-oh-five?

16             MR. SCHACHTMAN:  Objection.

17        A    I'm sorry.  Could you repeat?

18             MR. CROSBY:  Could you read that back,

19   please.

20             (Question was read by the Reporter.)

21             MR. SCHACHTMAN:  Same objection.

22        A    Both of those P values would say that

23   there's a high likelihood of it occurring by chance.

24   BY MR. CROSBY:

25        Q    How high is the likelihood with a P value of

Page 208

1    zero-point-one-zero?

2        A    Zero-point-one-zero, it's ninety percent.

3        Q    Ninety percent likelihood that it could just
4    be by chance?

5        A    Yeah.

6        Q    And if it's, say, zero-point-zero-five?

7        A    Greater than zero-point-zero-five?

8        Q    Right, if it's greater than.  Is it still
9    the same thing?

10        A    Yeah.  It means that it's likely that
11    you're -- that it's due to chance.

12        Q    What if it's equal to zero-point-one-zero?

13        A    Well, we -- I'm sorry?

14        Q    The P value is equal to or less than.

15        A    Those are two different questions.  Sorry.

16        Q    Fine.  What if it's equal to zero-point-one-
17    zero, the P value?

18        A    Right.  It says that your results could be
19    due -- are likely due to chance.

20        Q    And if it says that the P value is less than
21    zero-point-one-zero, what does that indicate?

22            MR. SCHACHTMAN:  Objection to form.

23        A    Typically you say if the P value is less
24    than point-zero-five, then you say it's not likely due
25    to chance.

Page 209

1    Q    Right.  And your P value is twenty times

2   that, correct?

3    A    Right.  For, for this analysis on age.

4    Q    I understand.

5         Did you have P factors for any -- P values

6   for any other tables besides the age and the one-tail?

7    A    Again, the confidence interval incorporates

8   the probability level.

9    Q    Yes, sir.  Look, I understand you like

10  confidence intervals.

11   A    Yeah.

12   Q    And I understand that they're in the paper.

13   A    Right.

14   Q    What I'm trying to find out is what may have

15  been in the paper before --

16   A    Oh, we --

17   Q    -- but it's not there now.

18   A    No.

19   Q    And I'd like to find out.

20   A    No, that's, that's a different question.  I

21  would not write a paper such as this with only P

22  values.

23   Q    But you could write it with both, right?

24   A    I could.  But the confidence interval tells

25  you what -- gives you an idea if there's any

Page 210

1    association or not.

2         Q    And you did with respect to the one-tail

3    aspect?

4         A    Trend?  That was a trend, yeah.

5         Q    Did you provide a P value?

6         A    We provided a P value for the trend test,

7    yes.

8         Q    Did you provide a P value at one time on

9    age?

10        A    We did.  Yes, we did.

11        Q    Now, smoking, did you do an analysis in this

12   study to ascertain whether the original cohort had any

13   findings that tended to be at odds with general trends

14   and observations of diseases in this group overall?

15        A    The goal of this study was to look at

16   neurodegenerative diseases.

17        Q    I understand.  But you have a cohort of

18   convenience here.

19        A    Umh-humh.

20        Q    So I'm trying to see if when you looked at

21   this convenient cohort that had already been gathered

22   together by someone else --

23        A    Umh-humh.

24        Q    -- did you look at the data dealing with

25   that cohort to see if there was anything in the cohort

Page 211

1    that would raise some flags that perhaps there's

2    something going on here that makes me want to look at

3    this cohort a little bit closer?  Did you do that?

4         A    I'm sorry.  I'm not sure what you're asking.

5         Q    Did you look at the original published study

6    dealing with this cohort?

7         A    Yes.

8         Q    Did you look at the data generated by that

9    study?

10        A    Yes.

11        Q    Did you look at the data in that study to

12   see if there was anything unusual about disease

13   incidence or disease ratios or risk or anything about

14   what's going on in this population of six thousand

15   people in Denmark that looks a little bit unusual

16   compared to what your experience is as an

17   epidemiologist to what's going on in human beings all

18   over the world, or even in Denmark?

19        A    Yeah, that's a very broad question.  I —— we

20   had the Hansen paper which looked at lung cancer.

21        Q    Okay.  Is that Klaus Hansen?

22        A    That's —— his first name is —— I think so.

23   I think it's Klaus.  I'm not sure.  I can ——

24        Q    And you don't know if he's related to Johnni

25   Hansen?

Page 212

```
 1       A    I, I have no idea.  Hansen is a very common

 2   last name.

 3       Q    Okay.  So you had the Hansen paper?

 4       A    Yes.

 5       Q    And you had the data, even?  You all had

 6   access to the underlying data?

 7       A    Yeah.

 8       Q    So if you had seen something in the paper

 9   that made you wonder whether or not there was

10   something unusual in this group about disease, you had

11   somebody at your disposal who had at their disposal

12   the underlying records to see if there was something

13   happening?

14            MR. SCHACHTMAN:  Objection to form and

15   foundation.

16       A    The only disease information we had for this

17   cohort was the Parkinson's disease and the other

18   neurodegenerative diseases that we mention in the

19   paper.

20       Q    You had smoking information, didn't you?

21       A    But that's not a disease.

22       Q    Diseases from smoking is, right?

23       A    I, I didn't have information on diseases

24   from smoking.

25       Q    Did the underlying paper have that
```

Case 1:19-md-02875-RMB-SAK    Document 1713-8    Filed 11/01/21    Page 214 of 322
PageID: 39898
Case 1:03-cv-17000-KMO    Document 1862-4    Filed 08/07/2006    Page 213 of 321

Page 213

1    information?

2         A    The underlying paper had information on lung

3    cancer.

4         Q    And that was a study about lung cancer in

5    welders, right?

6         A    Right.

7         Q    Did you look at the lung cancer rate in

8    those welders in that first study?

9         A    Yes.

10        Q    Did you find it to be consistent with the

11   lung cancer rate for the general population of

12   Denmark?

13        A    I, I didn't do that comparison.

14        Q    If you had done that comparison and it

15   seemed to be out of kilter, would you have done

16   anything to address it in your study?

17             MR. SCHACHTMAN:  Objection to form,

18   foundation.

19        A    I'm not sure what I would do.

20        Q    Is the author, Doctor Klaus Hansen, still

21   alive?

22        A    Yes.

23        Q    Did you have any discussions with him?

24        A    No.  I've never met him.

25        Q    And as I understand it, he and his co-author

Page 214

1   or authors, I can't remember, created this cohort, did

2   they not?

3        A    Right.

4        Q    And they created this cohort to do a study

5   of lung cancer?

6        A    Yes.

7        Q    Prior to the submission, or the original

8   submission to the journal, did you all, or had you all

9   ascertained the number of person years reflected in

10  Table 3?

11       A    Prior to the submission -- I'm sorry?

12  Refresh me again.  I'm sorry.

13       Q    Prior to the initial submission to the

14  journal --

15       A    Umh-humh.

16       Q    -- had you all calculated the number of

17  person years as reflected on Table 3?

18       A    All the person years were calculated prior

19  to submission to the journal, yes.

20       Q    Okay.  Is there a reason that they had to be

21  added after submission, initial submission?

22       A    Not my knowledge.

23       Q    Well, if you look at tables, under the

24  portion that says Table and it says No. 1, Table 3.

25       A    I'm sorry.  Where are you looking?  Under

Page 215

1    the reviewer comments?

2         Q    Yes, sir.

3         A    Okay.  The reviewer asked us to add the

4    person years in the table.

5         Q    Okay.  So does that indicate to you that

6    person years had not been placed in that table at

7    initial submission?

8         A    Right.

9         Q    So did you have to calculate person years

10   after initial submission?

11        A    No.  They were already calculated.  We just

12   had to put them in the table.

13        Q    Is there a reason you did not put them in

14   for the initial submission?

15        A    No, no reason.

16        Q    Is there a reason this reviewer wanted them

17   in, that you know of?

18        A    Not that I know of.

19        Q    Is there an advantage to having it in there?

20        A    Other than looking at -- giving more

21   description of the different populations.

22        Q    In the portion above in the discussion, once

23   again dealing with smoking and PD, did you just

24   address smoking and PD, or did you address smoking and

25   Parkinsonism in your one-tailed study?

Page 216

1     A     The analyses are just for PD.

2     Q     I'm sorry?

3     A     The analyses are just for PD.

4     Q     Did you look at the other neurological

5   disorders to see if there was any protective, or

6   protection afforded for those?

7     A     No.

8     Q     Did anybody else write any other part of the

9   initial draft of this paper?  Did you delegate it at

10  all?

11    A     No.

12    Q     So when you first saw the three tables which

13  are -- did it have person years in the tables that you

14  first saw?

15    A     I don't recall.

16    Q     Were there data in those three tables that

17  are not in the three that we have here?

18    A     No, there was no additional data.

19    Q     And you don't have those original tables?

20    A     No.

21    Q     Does anybody?

22    A     I don't think so.

23          MR. CROSBY:  I will mark this subject to the

24  understanding that we can put the sealed cover sheet

25  on it and make sure that we're complying by whatever

Page 217

1     rules we need to.

2          MR. SCHACHTMAN:  Right.  I think we should

3     let the reporter know that the exhibit Mr. Crosby is

4     about to mark is subject to a Protective Order and is

5     certainly available to all the parties and their

6     counsel subject to the terms of the Protective Order,

7     but that this deposition should not be generally

8     available other than to the parties and their counsel.

9     I should say the, the deposition and its exhibits.

10    And I guess that would be true of the videography.

11          MR. CROSBY:  For the record, I will mark it

12    as Exhibit 8, and the copies that I will distribute

13    has the Protective Order attached for anyone that's

14    not familiar with it.

15          THE WITNESS:  I'd just like to say that

16    Exhibit 7 also has the paper on it.

17          MR. SCHACHTMAN:  Right.

18          MR. CROSBY:  And what we might want to do is

19    detach it from 7 so we don't have to keep up with but

20    one, since all I questioned him on Exhibit 7 was the

21    reviewer comments.

22          MR. SCHACHTMAN:  And the submission, the

23    transmittal letter.

24          MR. CROSBY:  Is that agreeable with

25    everybody, that we on No. 7 remove the study so that

Page 218

1    it's just -- Exhibit 7 is just the letter to journal

2    along with the reviewer comments?  And Exhibit 8 will

3    be the paper in process.

4              (Deposition Exhibit No. 8 was marked for

5    identification and was attached to the transcript.)

6    BY MR. CROSBY:

7         Q    Is this paper published yet?

8         A    It will be out in May.

9         Q    Does that mean it got Fast Track, or didn't

10   get it?

11        A    It did not.

12        Q    Do they let you know if something makes Fast

13   Track or not?

14        A    They send you the proofs.

15        Q    I'll ask you to please identify Exhibit 8,

16   please?  Can you identify Exhibit 8 for us, please?

17        A    Oh, I'm sorry.  This is the paper we wrote

18   based on the welder study, the cohort study of

19   Parkinson's disease and other neurodegenerative

20   disorders in Danish welders.

21        Q    You were identified as lead author, am I

22   correct, on the first page of that document?

23        A    Yes.

24        Q    Did anybody write any portion of this paper

25   other than you, other than editorial and comments that

Page 219

1    we've discussed?

2         A    Yes.

3         Q    Who?

4         A    Jens Peter Bonde wrote part.  Jorgen Olsen

5    wrote part.  And I think the rest were mainly

6    editorial.

7         Q    Okay.  What part did -- is it --

8         A    I think Johnni Hansen wrote part as well.

9    Sorry.

10        Q    And what part did Johnni Hansen write?

11        A    One of the problems I have is usually they

12   combined their comments together on one draft and sent

13   it back to me that way.  So it's difficult for me to

14   identify exactly who commented on what part.

15        Q    No, I wasn't asking about commenting.  I was

16   asking if anyone wrote any portion of the paper other

17   than commenting.

18        A    Right.  Well, they would include their

19   written portions in their comments.  So, for example,

20   like the part on, on the validity study of Parkinson's

21   disease, they wrote that on the draft and they sent

22   that back to me.

23        Q    So that entire segment dealing with the

24   validity study of the random sample was handwritten on

25   a draft and faxed?

Page 220

1      A    It was faxed back, yeah.  I can't remember

2   if it was typed in the fax, or written.

3      Q    What other parts did -- and who was in

4   charge of writing that, do you know?

5      A    I, I assumed it was Johnni Hansen because he

6   was the one that was involved in that activity.  But I

7   can't say for sure.

8      Q    But was he the person in charge of that

9   study for the Danish group?

10     A    And part of that segment of the study, yeah.

11     Q    Okay.  What about -- what did Doctor Bonde

12  write?

13     A    He wrote -- let me look for a minute.

14          (Witness reviewing document.)

15     A    He wrote about the levels of exposure to

16  metal fumes and welders on Page 14.  And, also, I

17  think Doctor Olsen wrote the conclusion, or at least

18  the final sentence.

19          (Mr. Edmonson left the deposition.)

20     Q    The exposure portion is the portion that

21  deals with some studies or analysis done of welding

22  fumes in Denmark?

23     A    Yes.

24     Q    But as I understand it, we don't know if any

25  of those studies overlapped with any of the people in

Page 221

1    your cohort; am I correct?

2        A    Correct.

3        Q    Why did Doctor Olsen write the final

4    sentence?

5        A    I think he wrote the final conclusion.

6        Q    Did you sign off on it?

7        A    Yeah.

8        Q    Did everybody?

9        A    All the authors did, yes.

10       Q    So this is a real group consensus work?

11       A    Absolutely.

12       Q    Did they all feel as strongly about it as

13   you did?

14       A    In terms of that it's a good study, yes.

15       Q    I noticed in looking at your paper as

16   against Doctor Hansen's paper, that your numbers of

17   the population do not always overlap precisely with

18   his numbers in his paper.

19       A    Umh-humh.

20       Q    Is there a reason for that?

21       A    Yeah.  Some of the people had died in the

22   cohort after he had published it, so the numbers are

23   slightly different.

24       Q    Is that the only reason?

25       A    They may have immigrated out of the country

1    as well.

2        Q    Did you all look at the same years in

3    population as he did?

4        A    We used the same cohort as he did.

5        Q    And did you use the same period of time that

6    he did?

7        A    No.  Our time was longer.

8        Q    Okay.  What was his time frame, do you

9    recall?

10       A    I don't recall without looking at the paper.

11           MR. CROSBY:  Let me mark as Plaintiff's

12   Exhibit 9, Cancer Incidence Among Mild Steel and

13   Stainless Steel Welders and Other Metal Workers by

14   Klaus Hansen and Jens Lauritsen and A. -- how do they

15   pronounce that?

16           THE WITNESS:  I don't know.

17           MR. CROSBY:  Skytthe, I suppose, with

18   apologies to --

19           MR. SCHACHTMAN:  The Dutch population, yeah.

20           MR. THOMPSON:  What exhibit number is that?

21           MR. CROSBY:  It's No. 9.  I thought I had

22   more copies, but. . .

23           -----------

24           (Deposition Exhibit No. 9 was marked for

25   identification and was attached to the transcript.)

Page 223

1    BY MR. CROSBY:

2         Q    Is that the Hansen paper cited in your

3    paper?

4         A    Yes.

5         Q    And does this paper tell us what years were

6    under study by him?

7         A    Yes, it does.

8         Q    Okay.  And what years was it?

9         A    Let me look real quick here.

10              (Witness reviewing document.)

11         A    We looked at the time period from 1964 to

12    1985.

13         Q    And what period did you look at?

14         A    1964 to, I believe -- let me look at my

15    paper quickly.

16         Q    Sure.

17         A    I think we had dated it through '92 -- I'm

18    sorry.  Through 2002.

19         Q    And what years did you look at?

20         A    The cohort was identified in 1964, so we had

21    workers back to the Sixties.  But we ascertained the

22    outcome from 1977 to 2002.

23         Q    And what did Doctor Hansen use to ascertain

24    outcome?

25         A    The Danish cancer registry.

Page 224

1    Q    And did he use what years?

2    A    I think he started in '6 -- hold on just --

3    1964 to '85.

4    Q    And is the only reason for someone being

5    excluded from your study being that they died?

6    A    Or they are lost to follow-up and that they

7    immigrated out, and I think those were the only

8    reasons.

9    Q    So the only two -- are the only two reasons

10   for lost follow-up that they immigrated out or died?

11   A    Umh-humh.

12   Q    And did you do, or did anyone do any

13   analysis of the data to determine whether or not

14   anyone who was included in your cohort should be

15   excluded for any reason other than that?

16   A    There were no other exclusionary criteria.

17   Q    Looking at your Statement of Clinical

18   Significance.

19   A    Okay.

20   Q    The last sentence there says that it offers

21   assurances that men in mild and stainless steel

22   welding do not have increased hospitalizations for PD

23   or other neurodegenerative disorders.

24   A    Yes.

25   Q    Was that also your conclusion?

Page 225

1    A    That was my conclusion, yes.

2    Q    Are you familiar with any studies by

3  Schoenberg or Gutman or others relating to the

4  incidence of hospitalization for Parkinson's disease?

5         MR. SCHACHTMAN:  Objection; foundation.

6    A    The only studies I know of are the ones I

7  quoted in the article.

8    Q    Okay.  If there is a potential for

9  underreporting of an incident, can it affect the

10  results of a study?

11    A    It depends if, if it was done differently

12  for different groups in the study.  But in our study

13  the reporting was done similarly for the welders and

14  for the background population.

15    Q    Do you have any information as to whether or

16  not persons with Parkinsonism tend to be hospitalized

17  more frequently as they age with that condition?

18    A    Parkinsonism?

19    Q    Or Parkinson's disease.

20    A    I don't have that information about Denmark.

21    Q    Do you have that information about the

22  United States?

23    A    No.

24    Q    So do you have any information as to whether

25  or not a person diagnosed with Parkinson's disease or

Page 226

1    a Parkinsonism or Parkinson's syndrome/disorder is

2    more likely to be hospitalized as they get older than

3    when they first contract the symptoms or the

4    condition?

5         A    I don't have any information.

6         Q    Did that have any impact on your study?

7         A    It could have impact on the study.

8         Q    What impact could that have?

9         A    Little, if, if it was done similarly among

10   all the groups in the study.

11        Q    But what impact could it be?

12        A    If, if the outcome is hospitalizations for

13   Parkinson's disease, it would have no impact.

14        Q    Would it tend to trend toward later

15   increased numbers of Parkinson's disease because as

16   people get older they go to the hospital for it?

17        A    I don't know.

18        Q    Do you know when it was first generally

19   known or publicized that welding rods contained

20   manganesism?

21             MR. SCHACHTMAN:   Objection to form.

22        Q    Excuse me.   First publicized that welding

23   rods contained manganese?

24        A    I don't know when it was first publicized.

25        Q    Do you know in Denmark when it was first

Page 227

1    publicized to the medical community that welding rods

2    contained manganese?

3        A    I do not.

4        Q    Do you know if it is yet?

5        A    I have no idea.

6        Q    Are you familiar with the term threshold

7    limit value?

8        A    No.

9        Q    Or permissible exposure limit?

10       A    Yes, yes.

11       Q    What is a permissible exposure limit?

12       A    It's the maximum -- to my knowledge, it's

13   the maximum level of exposure to a certain substance

14   that's allowable.

15       Q    And do you know what the permissible

16   exposure limit was in Denmark between 1977 to 2002 for

17   welding fumes?

18       A    I have no idea.

19       Q    Or for manganese oxide?

20       A    I have no idea.

21       Q    Do you know what it is in the U. S.?

22       A    No.

23       Q    Could it have an impact on your studies with

24   respect to the incidence of disease in Denmark versus

25   the incidence of disease in the United States if the

Page 228

1    threshold limit value or permissible exposure limit is

2    higher in Denmark -- excuse me, is lower in Denmark

3    than in the U. S.?

4          MR. SCHACHTMAN:  Objection; form,

5    foundation.

6      A    I think first you'd have to make the

7    assumption that there's an association with welding

8    fumes and a disease effect.

9      Q    Yes.  But if one is trying to ascertain

10   whether there is an association --

11     A    Umh-humh.

12     Q    -- and if one is studying a population where

13   the exposure limit in one country is threefold less

14   than it is in the other country, wouldn't that tend to

15   indicate that perhaps the exposure level the country

16   with the lower value would have a different result

17   than the one with the higher value?

18          MR. SCHACHTMAN:  Objection; form and

19   foundation.

20     A    I -- I'm not sure how that would -- how

21   individuals in those countries would be exposed.

22     Q    I understand.  And you're not for your

23   study, are you?

24     A    Pardon?

25     Q    And you don't know that for your study?

Page 229

1    A    Right.

2    Q    But if the general population of welders is

3  exposed to three times as much welding fumes, or are

4  permitted to be being exposed to three times as much

5  welding fumes as the welders in Denmark, would that

6  indicate to you that the welders here are exposed to

7  greater amounts of welding fumes?

8         MR. SCHACHTMAN:  Objection to form and

9  foundation.

10    A    Yeah, I don't have any information on the

11  exposure levels of individuals.

12    Q    Your study, as I understand it from Page 5,

13  excludes all shipyards, correct?

14    A    Yes.

15    Q    That was not a welding-related exclusion,

16  was it?

17    A    I don't understand what you're asking.

18    Q    You didn't exclude welders from shipyards

19  because you were studying Parkinsonism?  I misspoke,

20  I'm sorry.

21    A    That was the original study design when they

22  were trying to study lung cancer.  They excluded them

23  because they didn't want people exposed to asbestos in

24  their study and they were concerned that that would be

25  a confounding effect of any association with lung

1    cancer.

2        Q    If you had selected a cohort or had your

3    druthers, would you include shipyard welders?

4        A    I, I would try to include as many people as

5    I could.  I'd want to get the largest cohort I could

6    find.

7        Q    Is it a limitation on your study that it

8    does not include shipyard workers -- or welders?

9    Excuse me?

10       A    Yeah, I don't, I don't know if I would call

11   it a limitation.  It's just you -- I mean, we -- the

12   study, the original study was designed to look at

13   welding fumes and the health effects of welding fumes,

14   so people in the study are exposed.  And we're able to

15   get information on levels of exposure by duration of

16   work, and when we looked at duration of work we didn't

17   find any effect.  So I, you know, I'm not sure.

18       Q    Have you ever been to a shipyard where

19   welders are welding?

20       A    I have not, no.

21       Q    Have you ever been into any of these

22   factories or plants that were the subject of this

23   study to see where welders were welding?

24       A    No.

25       Q    Do you know what any of these factories or

Page 231

1   plants do or did?

2        A    No, I don't.

3        Q    So do you have any understanding or

4   appreciation whatsoever as to whether or not the

5   people engaged in whatever welding activities they

6   were engaged in in Denmark is remotely resembling what

7   welders do in shipyards, let's say, in the United

8   States?

9        A    I have no knowledge one way or the other.

10       Q    Okay.  Do you have any idea as to whether or

11  not these welders in your study have anything similar

12  in their exposure to welding fumes as, say, welders in

13  the construction trades in the United States?

14       A    No, I don't know.

15       Q    So we don't know what they're welding in

16  your study, do we?

17       A    Correct.

18       Q    And we don't know under what circumstances

19  or conditions, do we?

20       A    Right.

21       Q    We do know it's in factories?

22       A    Right.

23       Q    And factories generally have superior

24  ventilation and industrial hygiene facilities to other

25  places, do they not?

Page 232

1          MR. SCHACHTMAN:  Objection to form and

2     foundation.

3          A    I don't know that.  I didn't visit the

4     factories.

5          Q    Would you agree with me that, generally

6     speaking, the Danes are considered to be and have been

7     more aware of occupational health effects than the

8     U. S.?

9          MR. SCHACHTMAN:  Objection; foundation.

10         A    I, I don't know.  One of the beauties of

11    this study, we had information on welders back in the

12    Sixties and Seventies when, when those conditions

13    were -- when the, when the levels were higher of

14    welding fumes in the factories and things like that.

15         Q    And those would be the older welders, right?

16         A    Yeah.

17         Q    And did they smoke more?

18         A    They smoked the same as the general

19    population.

20         Q    But did the older welders smoke more than

21    the younger welders?

22         A    That I don't know.

23         Q    Is that information you sought to ascertain

24    for the one-tailed study?

25         A    We looked at smoking overall in the

Page 233

1    population.

2        Q    Did you attempt to ascertain whether the

3    older guys smoked more than the younger guys?

4        A    I'm not sure why we would do that.

5        Q    I understand you might not know why you'd do

6    it, but did you?

7        A    No, we did not.

8        Q    Okay.  Now, in your study, as I understand

9    it, you had seventy-four companies that remained

10   representing sixty percent of all the stainless steel

11   welders in Denmark; am I right?

12       A    Yes.

13       Q    You eliminated all the companies with less

14   than five stainless steel workers, right, welders?

15       A    Mind you, I didn't do any of this.  This was

16   data already collected by Hansen.

17       Q    Right.

18       A    So the Hansen study did these things, yes.

19       Q    All right.  And do you have any

20   understanding based on your experiences as to whether

21   or not smaller shops have higher intensity of exposure

22   to welding fumes than big facilities?

23       A    I don't know if that's true or not in

24   Denmark.

25       Q    Okay.  What effort, if any, did you

Page 234

1    undertake when you were doing this study in 1986 --

2    excuse me, in 19 -- no, you're not, you're in 2004.

3    He was in '96.  I'm sorry.

4        A    Yeah.

5        Q    -- when you were undertaking the study in

6    2004 to ascertain where the other forty percent of the

7    stainless steel welders in Denmark were?

8        A    No.

9        Q    Would that have been one of those things

10   that would have been closer to the dream study?

11       A    The study was based on an established

12   cohort, so we used the information that was already

13   available.

14       Q    This is the cohort of convenience?

15       A    This is -- this is the Hansen cohort.

16       Q    Right.  But it was convenient, right?  There

17   it was.

18       A    It was convenient for us, not for him.  It

19   was a lot of work for him.

20       Q    I understand.  And you all chose not to

21   build on it?

22       A    Correct.

23       Q    Do you know whether or not the other forty

24   percent were shipyard workers?

25       A    I don't know who they were.

Page 235

1    Q    Do you know why there was a decision to

2    include mild stainless steel as opposed to just all

3    stainless steel?

4    A    I don't know why.

5         MR. SCHACHTMAN:  Excuse me.  Did you say

6    mild stainless steel?

7         MR. CROSBY:  I'm sorry, yes, I think I did.

8    Mild steelworkers, I'm sorry.  Thanks.

9         MR. SCHACHTMAN:  We're all getting a little

10   tired.

11        MR. CROSBY:  Yes, and I'm. . .

12   BY MR. CROSBY:

13   Q    Now, let me ask you this.  When it comes to

14   your efforts to ascertain job description, what all

15   did you do?

16   A    We used the questionnaire information.

17   Q    And the questionnaire information, did it

18   supplement, or did it supplant the National

19   Supplementary Pension Fund Data?

20   A    Yeah, the National Supplementary Pension

21   Fund was used to tell -- my understanding of the

22   Hansen study, was used to identify companies where

23   welding was performed, and then they were able to

24   determine welding departments, and from those they

25   administered questionnaires, and from the

Page 236

1    questionnaires they identified welders.

2        Q    Did you use any of the data from any

3    governmental agency to assist in ascertaining that a

4    person was correctly identified as a welder?

5        A    The Hansen study did.

6        Q    Did you all?

7        A    No.

8        Q    So did the Hansen study use both the

9    questionnaire and governmental registries?

10       A    Yes.

11       Q    And did the Hansen study make any

12   determinations or offer any observations with respect

13   to how comfortable they were with respect to the

14   classification of those who were known as welders?

15            MR. SCHACHTMAN:  Objection to form.

16       A    Would you please repeat the question?

17       Q    In the Hansen paper --

18       A    Umh-humh.

19       Q    -- did they make any comments or

20   observations with respect to their comfort level that

21   welders were properly identified as to occupation?

22       A    I -- I'm not sure what the Hansen paper

23   commented on that.

24       Q    Have you read the Hansen paper previously?

25       A    I've read it previously, yes.

Page 237

1      Q      Have you read any Hansen paper relating to

2   this cohort other than the one that is marked as

3   Exhibit 9?

4      A      No, I haven't.

5      Q      What weaknesses or limitations are there in

6   your study?

7      A      I would say one limitation is that we don't

8   have information on welding after 1986, that's when

9   the welding information ended.  But we did have enough

10  information to classify people as welders.

11            Another -- I don't know if it's a

12  limitation, but we used -- using the hospitalization

13  rates of Parkinson's disease, you know, we couldn't

14  look at mild forms of Parkinson's.  But that didn't

15  bias the study because we were able to look at

16  hospitalization rates for both welders and the

17  background population.  So everyone -- disease was

18  ascertained similarly for everyone in the study.

19     Q      Any other weaknesses or limitations?

20     A      There was some more information, specific

21  information on welding, but the number of people with

22  Parkinson's disease was too small to really look at,

23  look at that information.

24     Q      Could you elaborate on that a little bit?

25  I'm not sure I'm following --

Page 238

1      A     Yeah.  Let me --

2      Q     -- what you're saying there, I'm sorry.

3      A     Do you mind if I look in the paper?

4      Q     Oh, no.  Listen, this is really an open-book

5  test.  I want to know --

6      A     Right.

7      Q     -- what you do know.

8      A     Umh-humh.

9      Q     And I want to know your opinions.  I guess

10 what I do at times when I try to sort of go back to

11 some of my questions is I'm trying to get answers to

12 my questions as well, but I really do want to know

13 what you know.

14     A     Okay.

15     Q     And how you know it and what your opinions

16 are.

17     A     Okay.  Right.

18           In terms of welding characteristics, we

19 didn't, we didn't have industrial hygiene data to

20 actually determine the level of exposure to the

21 individuals in the study.  But as I mentioned

22 previously, we did have kind of a proxy to that with

23 the duration of work.

24     Q     Well, is that what you mean by the number of

25 Parkinson's disease or Parkinsonism was too small to

Page 239

1    ascertain the different types of welding in fact?   Or

2    did I misunderstand what you said about that?

3        A    No.   It's when you start categorizing the

4    individuals into different categories, you start

5    ending up with so many categories that you have only

6    one person or two people in a category and it's

7    difficult to draw any conclusions based on just one

8    case or two cases.

9        Q    Does that get back to power?

10       A    It gets back to study size.

11       Q    I mean, a population of ten thousand people

12   with a thousand people with a disease would be more

13   significant, would it not, than a study of ten people

14   and one person with a disease?

15           MR. SCHACHTMAN:   Objection; foundation.

16       Q    Generally speaking?

17       A    It depends on what your disease is, yeah.

18   But I feel we had pretty good power.   We were able to

19   exclude risk greater than fifty percent, so that's,

20   that's pretty good.   And our point estimate actually

21   showed a, no association at all.   Actually, a slight

22   negative association, nonstatistically significant

23   negative association with welding.

24       Q    Have you told me all the weaknesses?

25       A    All that I. . .

Page 240

1    Q    What would be the result of the weakness or

2    limitation of not having the welding level information

3    after 1986, what would that be?

4    A    I'm not sure because I don't have the

5    information.

6    Q    Do you know if it biases toward the null?

7    A    I don't know which way it would bias it.

8    Q    Using hospitalization, which prevents or

9    limits seeing mild Parkinson's disease or

10   Parkinsonism, what, if anything, will that have on the

11   study and the conclusions?

12   A    The only concern that it would have on the

13   study is if hospitalization rates are ascertained

14   differently in the welders and in the general

15   population, and that wasn't done.  Their

16   hospitalizations were ascertained the same way for all

17   groups.

18   Q    So then, if I'm understanding your

19   hypothesis, your hypothesis is that all people,

20   welders or not, will be suffering from mild or early

21   onset Parkinson's disease or movement disorders at the

22   same time and at the same rate?

23   A    No, no.  I'm just saying that we couldn't

24   pick those up.

25   Q    All right.  So if there is in fact an

Page 241

1    increase incidence of Parkinsonism or movement

2    disorders in welders at a younger age, at an early age

3    of onset, let's say, at a mild level that does not

4    cause hospitalization, then it won't get picked up,

5    will it?

6        A    Right, our study would not be able to pick

7    that up.  The problem is trying to figure out what the

8    comparison or background population rates would be in

9    that type of study.

10       Q    But they wouldn't be in the hospital

11   records --

12       A    Right.

13       Q    -- because they're not going?

14       A    Right.

15       Q    But what you've got there is if there is an

16   increased incidence of early onset or even middle-age

17   onset of Parkinsonism or movement disorder symptoms

18   that doesn't trigger hospitalization in welders, it

19   won't be picked up by this study?

20       A    Right, that was not, not the goal of this

21   study.

22       Q    Right.  The goal of this study, and -- well,

23   you tell me what was the goal of the study.

24       A    To look at the rate of hospitalizations and

25   other neurodegenerative diseases in welders.

Page 242

1    Q    Okay.  So this is getting to full-blown

2    Parkinsonism and fully ascertainable neurodegenerative

3    diseases?

4    A    Yes.

5         MR. SCHACHTMAN:  Objection to form and

6    foundation.

7    Q    You make the statement on Page 5 at the

8    bottom:  Information on all employees with respect to

9    name — this is the last sentence — name, unique

10   personal identification number, PIN, company tax

11   number, and date of start and end of each employment

12   is computerized and retained even after a person

13   retires or died.

14   A    Umh-humh.

15   Q    And the data in this registry, being the

16   National Supplementary Pension Fund Registry, is

17   regarded as complete.

18   A    Yep.

19   Q    By complete do you mean accurate and

20   reflective of occupation, or do you mean just they

21   finished the work?

22   A    No.  We mean that any information —— any of

23   this type of information is recorded in this registry.

24   Q    Okay.  So it would be reliable and give you

25   good data?

Page 243

1       A       Absolutely.

2       Q       Did Doctor Hansen use that same system?

3       A       Yes.  Yeah.

4       Q       Is that the, sometimes called the ATP

5    registry or company records?  Well, ATP registry, do

6    you know?

7       A       Where are you looking?  I'm sorry.

8       Q       I'm looking at the Hansen paper.

9       A       Okay.

10      Q       On Page 377, at the bottom.

11      A       It appears that's, that's one of the

12   systems, yeah, one of the registries.

13      Q       And they refer to the records from the

14   Public Supplementary Pension Fund as the ATP?

15      A       Yes.

16      Q       And that's the one you say is complete?

17      A       Yes.

18      Q       And does he say after that sentence,

19   beginning at the last part of 377:  As many as forty-

20   three percent of the workers employed in the involved

21   companies during the years '64 to '84 were identified

22   from the ATP records only?

23      A       Umh-humh.

24      Q       A drawback to the ATP registration is

25   imprecision of job title?

Page 244

```
1      A    Umh-humh.

2      Q    Is that inconsistent with what you were

3   saying?

4      A    No.  That's why they sent out the

5   questionnaires, to, to confirm that they were welders.

6      Q    But I understood that you said that that was

7   a complete, as in reliable, data --

8          MR. SCHACHTMAN:  Objection.

9      Q    -- from the registry.

10         MR. SCHACHTMAN:  Objection to form.

11     A    Yeah, I'm sorry.  I'm confused by your

12   question.

13     Q    A few questions back I asked you if when it

14   says that the data from that registry is complete

15   meant that it was finished or if it was reliable.

16     A    Umh-humh.

17     Q    And I understood you to say that it was

18   reliable.

19     A    Umh-humh.  It's complete, yeah.

20     Q    Didn't you say it was reliable?

21     A    It was -- the registry was used, the ATP --

22   he's calling it the ATP registry, was used, used to

23   identify areas in which people were welding.  They

24   further supplemented that with a questionnaire to, to

25   capture the people who actually were welding in those
```

Page 245

1    areas.

2        Q    Would you agree with his statement that

3    reliance on the ATP register or to the company records

4    seems to result in incorrect cohort ascertainment?

5        A    My confusion there is I've never looked at

6    this registry, so I'm relying on what Doctor Hansen

7    did.

8        Q    Right.

9        A    So I've never gone in and looked at job

10   titles or anything in the registry.

11       Q    So you're not really in a position under

12   oath to comment with respect to the reliability of the

13   welder classification for the people in the study?

14           MR. SCHACHTMAN:   Objection.

15       A    That's not true, no.

16       Q    Okay.  On what would you base it, then?

17       A    The questionnaire data.

18       Q    But you've not seen that, either, have you?

19       A    I have not -- I have seen the summary data

20   from the Danes.

21       Q    Did you have concerns about the long-term

22   exposed group and what that data may yield in terms of

23   person years --

24       A    I'm not --

25       Q    -- and exposure?

Page 246

1      A      I'm not sure what you're referring to.

2      Q      In your number of person years in the long-

3  term exposed group, is it small, in your population?

4      A      I'll have to look.

5              (Witness reviewing document.)

6      A      For people who worked more than ten years we

7  had about seventy-three thousand person years.

8      Q      Right.  In the general, big picture of

9  things, is that big, or small?

10     A      It depends on what it's relative to.  It's

11  almost -- it's more than the number of person years

12  for people who worked less than ten years.

13     Q      Okay.  Now, Doctor Hansen in his original

14  paper, as I understood it, did a follow-up to randomly

15  sample the classification of welders, not only by

16  questionnaire, but by interview.  Are you familiar

17  with that?

18     A      No.

19     Q      I'll be quick on this.

20            I think I asked you, the primary diagnosis

21  is the only one you all used, right?

22     A      Yes.

23     Q      And you don't know if that was on admission

24  or discharge?

25     A      I don't know, right.

Page 247

1      Q    Okay.  And you all only used first-time

2  hospitalization?

3      A    Right.

4      Q    Okay.  So if somebody's first time to go to

5  the hospital was a car wreck and their second time was

6  to go because of Parkinson's disease, you all would

7  have the car wreck for that welder?

8      A    No, no.  The first time that the

9  hospitalization was due to Parkinson's disease, that

10  was it.

11      Q    Now, what about for those who didn't have

12  Parkinson's disease?

13          MR. SCHACHTMAN:  Objection to form.

14      A    I'm not sure what you're asking about those.

15      Q    Did you compare the population of people

16  without Parkinson's disease as to what their first

17  hospitalization was?

18      A    That wasn't a goal of the study.

19      Q    I understand it might not have been a goal.

20  I'm just asking if you did it.

21      A    No.

22      Q    Did you do any analysis as to the hospital

23  records of nonwelders?

24      A    Yes.

25      Q    And what was that analysis?

Page 248

1        A    We looked at the first hospitalization for

2   Parkinson's disease and the other diseases of interest

3   in our paper for people who were not welders as well.

4        Q    So if you were -- if you were a nonwelder

5   and your first hospitalization was a car wreck, that's

6   what you would record?

7        A    No.

8        Q    You wouldn't record anything?

9        A    We were only interested if their -- the

10  hospital discharge said Parkinson's disease or one of

11  the other diseases.

12            THE VIDEOGRAPHER:  We're going off the video

13  record.  The time is 4:06 p.m.

14            (A short recess was taken.)

15            THE VIDEOGRAPHER:  We are back on the video

16  record.  The time is 4:21 p.m.

17  BY MR. CROSBY:

18       Q    Briefly, Doctor, I think you were here when

19  we had a discussion off the record and counsel

20  explained that you were going to be basically called

21  to testify about this study which is not yet published

22  and may not be published at a point when there may be

23  a hearing or a trial, and that is the limit to which

24  you're going to be called.  Is that your

25  understanding, too?

Case 1:19-md-02875-RMB-SAK    Document 1713-8    Filed 11/01/21    Page 250 of 322
PageID: 39934
Case 1:03-cv-17000-KMO    Document 1862-4    Filed 08/07/2006    Page 249 of 321

Page 249

```
1        A     Yes.

2        Q     And you're not going to comment on studies

3   of others, even the study by Doctor Russett?

4        A     Correct.

5        Q     Okay.  Do you plan on commenting about

6   statements contained in either Doctor Wells' or Doctor

7   Louis' declaration?

8        A     If, if they're specific to my study, yes.

9        Q     Okay.  Has anybody talked to you about what

10  testimony Doctor Garabrant or Doctor Goldwin or others

11  have given in this litigation with respect to your

12  study?

13       A     I read Doctor Garabrant's deposition about

14  my study.  Other than that, I haven't.  I don't know

15  anything else.

16       Q     I guess since what you're going to do is

17  come in and testify about your study and explain it,

18  I'd like to go ahead and hear it now.  So feel free.

19       A     The details on how we conducted the study?

20       Q     And what the results are and --

21       A     Okay.

22       Q     -- what you believe it shows and what you

23  would tell a court or a jury --

24       A     Umh-humh.

25       Q     -- if the lawyer said tell us about your
```

Page 250

1    study and what you did and what it shows.

2        A    Okay.  In our study we looked at people who

3    worked in the welding industry.  We ascertained

4    information on about twenty-seven thousand people.

5    From those people we were able to identify people who

6    worked in welding departments, and the people who

7    worked in welding departments we administered a

8    questionnaire, and from the questionnaire we

9    identified between six and seven thousand people.

10       Q    Let me interrupt you just a second.

11       A    Umh-humh.

12       Q    You're saying that we administered a

13   questionnaire.  You all didn't administer a

14   questionnaire.

15       A    I did not personally, right.  I'm talking

16   about myself and I'm talking about my collaborators.

17       Q    But none of the collaborators on your study

18   administered a questionnaire either, did they?

19       A    Yeah, yeah.  They did.

20       Q    Which questionnaire did they administer?

21       A    The original questionnaire in '86.

22       Q    Who was on your study that's on the '86

23   study?

24       A    Axle Sytes, Skytes (phonetic).

25       Q    And was he involved in the questionnaire

Page 251

```
1    aspect?

2         A    I'm not sure exactly what his role was, and

3    I'm not sure if it was a him or a her.

4         Q    Okay.  So I take it you haven't met that

5    doctor?

6              MR. SCHACHTMAN:  Axle.  We just call him

7    Axle.

8         Q    Skytthe, however it's said.

9         A    No, I have not met him.

10        Q    But he did that, or she did that, or the

11   doctor who is a Ph.D. doctor did that back in '86?

12        A    Yes.

13        Q    Okay.  So what I want to try to do is keep

14   it clear as to what you all in your group did for your

15   particular undertaking.

16        A    Okay.

17        Q    Okay?

18        A    Okay.

19        Q    So go ahead, though, please.  I'm sorry.

20        A    All right.  So after we assembled the

21   cohort, then, of about twenty-seven thousand people

22   who worked in the welding industry, we linked them --

23   we didn't link them, though, the National Board of

24   Health and Welfare linked them to the hospitalization

25   registry, the mortality registry, the immigration
```

Case 1:19-md-02875-RMB-SAK    Document 1713-8    Filed 11/01/21    Page 253 of 322
PageID: 39937
Case 1:03-cv-17000-KMO    Document 1862-4    Filed 08/07/2006    Page 252 of 321

Page 252

```
 1    registry, to ascertain hospitalizations due to

 2    Parkinson's disease.  The National Board of Health and

 3    Welfare also determined the rates of hospitalizations

 4    for Parkinson's disease among the general population.

 5              Then using standardized methods we

 6    calculated SHRs, which is standardized hospitalization

 7    rates, to see if welders were hospitalized more

 8    frequently for Parkinson's disease than people in the

 9    general population.  And our study found that in fact

10    there was no statistically significant increase risk

11    in hospitalizations for Parkinson's disease for

12    welders.

13        Q    Okay.  Now, is that what you would basically

14    say --

15        A    Basically, yes.

16        Q    -- if you had an opportunity?

17              And let me ask you, you have twenty-seven,

18    in round numbers, twenty-seven thousand welders,

19    correct?

20        A    No.  It was about six thousand.  There were

21    about twenty-seven thousand that were in the industry.

22        Q    Right.  Twenty-seven thousand in that

23    industry overall in some twenty-odd facilities?

24        A    Whoever was in the retrospective, whoever

25    was in the Hansen cohort.
```

Page 253

1    Q    But is your twenty-seven thousand people the

2    same twenty-seven thousand people that are in Doctor

3    Hansen's other than the loss to follow up by either

4    immigration or death?

5    A    Umh-humh.

6    Q    Or does your twenty-seven thousand pick up

7    people that were not in Doctor Hansen's twenty-seven

8    thousand so that, let's say, for instance, five

9    hundred people that were in his have died or left the

10   country, was it filled back up with five hundred new

11   people that entered the trade?

12   A    Umh-humh.  No, no.  We only used his cohort.

13   Q    And so your six thousand or so welders would

14   be the same six thousand or so welders that he saw

15   except for those that have left Denmark or died?

16   A    Yeah.  Six thousand, one hundred and sixty-

17   three.

18   Q    Do you remember how many he -- how many

19   welders he had?

20   A    No.  But I can look in the paper.

21   Q    That's all right.

22   A    Okay.

23   Q    Did you notice any trends in your study?

24   A    Trends in?

25   Q    In incidence of Parkinson's disease or

EX 5-253

Page 254

1    Parkinsonism or the diseases that you studied.

2        A    Umh-humh.  We did not notice any

3    statistically significant trends in our study.

4        Q    Did you notice any trends that in your

5    opinion were not statistically significant?

6        A    We noticed -- let me look at the data.

7            (Witness reviewing document.)

8        A    I, I guess you could make a judgment about

9    increasing or decreasing point estimates.  But none of

10   the trends that we looked at in Table 3 were

11   statistically significant.

12       Q    Tell us what you mean by point estimates,

13   please.

14       A    The SHRs.

15       Q    And how do you mean that you see -- perhaps

16   seen a trend but is not statistically significant with

17   respect to SHRs?

18       A    Yeah.  You can look at the SHRs over the

19   different categories of the, of the variables, and

20   just look to see if they go up or down.

21       Q    And what do you observe?

22       A    For calendar time period, it appears that

23   the SHR goes up slightly.

24       Q    Which table are you looking at?

25       A    Table 3.  I'm sorry.

Page 255

1      Q      Okay.

2      A      It goes -- from zero-point-eight-zero to

3   zero-point-eight-eight.  But the confidence intervals

4   overlap indicating that there's, there's really no

5   trend or increase in, in SHRs over time.  You can look

6   at attained age and see that the point estimate goes

7   for less than sixty-five is one-point-one-three and at

8   sixty-five years or older is zero-point-seven-one.

9   But, again, none of these trends are statistically

10  significant.

11     Q      Insignificant, or significant?

12     A      They're, they're -- none of them are

13  statistically significant.

14     Q      What would it have to have in it for it to

15  be statistically significant in your opinion?

16     A      We calculate a trend test, and if the P

17  value for that was less than zero-point-zero-five,

18  then it would be significant.

19     Q      So you would do a P value there?

20     A      That's the only way you can do a trend test.

21     Q      Was that done?

22     A      Yes.

23     Q      And what was the P value?

24     A      It's reported for smoking, it's zero-point-

25  zero-seven.

Page 256

1     Q     Was there one done for any of the other

2   aspects of Table 3?

3     A     Not formally because when you look at them,

4   just eyeball them, it doesn't really appear to be a

5   trend in any of the categories.

6     Q     So let's look at the tables.  Looking at

7   Table 1.

8     A     Umh-humh.

9     Q     Tell me, please, what you wanted to

10  demonstrate by including Table 1 in this paper.

11    A     This just shows the characteristics of the

12  study cohort.

13    Q     And what do you mean by the characteristics

14  of the study cohort?

15    A     How many years they were followed up; the

16  number of people in each cohort; the mean years that

17  they were followed up; what their vital status was at

18  the end of our follow-up period; their year of birth;

19  and then their smoking status.  Oh, I'm sorry.  Also

20  at the bottom we have the age when Parkinson's disease

21  was onset.

22    Q     And the smoking status portion?

23    A     Umh-humh.

24    Q     There are no data under employees in welding

25  companies and workers in welding department, it's all

1    under total and then broken out into the sum under

2    welders?

3        A    Right.  The questionnaire was only

4    administered to people who they suspected were

5    welders, worked in welding departments.

6        Q    And what is -- with respect to age at

7    Parkinson's disease onset have a ninety-five percent

8    confidence interval?

9        A    No, I'm -- yeah.  That's actually kind of --

10    that's a range, I think.

11        Q    Okay.  Could you then tell me what those,

12    each of those numbers in each of those columns is

13    there to show?

14        A    For?  I'm sorry.

15        Q    Age at Parkinson's disease onset, paren,

16    ninety-five percent, CI, closed paren.

17        A    Right.  That -- for employees in the welding

18    companies, that's the average age of onset for those

19    who had Parkinson's disease.

20        Q    That's seventy people?

21        A    No.  Seventy years.

22        Q    I'm sorry.  Seventy years of age?

23        A    Yeah.  And they're between sixty-eight and

24    seventy-two.

25        Q    All right, sir.

Case 1:19-md-02875-RMB-SAK    Document 1713-8    Filed 11/01/21    Page 259 of 322
PageID: 39943
Case 1:03-cv-17000-KMO    Document 1862-4    Filed 08/07/2006    Page 258 of 321

Page 258

```
 1        A     And then for welding department it was

 2   sixty-eight, between sixty-four and seventy-two.  And

 3   sixty-nine for people who responded to the

 4   questionnaire.  And then sixty-seven for welders.

 5        Q     Is it a mean age, then, or is that just --

 6        A     Yeah, it's -- I think in the paper -- let me

 7   look in the paper.  I think we reported it as a mean

 8   age.  Right.  It's the mean age.

 9        Q     So am I to gather from this - and please

10   help me if I'm incorrect --

11        A     Umh-humh.

12        Q     -- that the mean age -- or, excuse me, the

13   range using the CI --

14        A     Umh-humh.

15        Q     -- for employees in the welding companies,

16   someone could be as young as sixty-eight or as old as

17   seventy-two?

18        A     Well, this is --

19              MR. SCHACHTMAN:  Objection to form.

20        A     Well, yeah, this is, this is really kind of

21   a confidence interval, so it's the, it's the deviation

22   around, around the age.

23        Q     What does that mean?

24        A     That for welding departments specifically,

25   if someone -- we said that the mean age in the welding
```

Case 1:19-md-02875-RMB-SAK    Document 1713-8    Filed 11/01/21    Page 260 of 322
PageID: 39944
Case 1:03-cv-17000-KMO    Document 1862-4    Filed 08/07/2006    Page 259 of 321

Page 259

```
 1    department was seventy years old.  So ninety-five

 2    percent of the time if you resampled them, the age

 3    would be between sixty-eight and seventy-two.

 4        Q    Yeah, but that's in welding companies, you

 5    mean?

 6        A    Yes.  I'm sorry, in -- at what age did --

 7        Q    I thought you said employees in welding

 8    departments, but seventy is --

 9        A    Let me look at the table.

10             I'm sorry.  Welding companies, yeah.

11        Q    Is the text at variance to the table?

12        A    No, I don't, I don't believe so.

13        Q    All right.  So I'm just trying to help you

14    before it's published if it is.

15        A    Yeah, absolutely.  I appreciate that.

16        Q    So, then, that means that ninety-five

17    percent of the time under the confidence interval they

18    will be that age, but there could be five percent of

19    the time some of them would be younger than that or

20    older than that?

21        A    Right.  But the mean age is seventy.

22        Q    Okay.  And is that the way it was done for

23    all those ages in those categories?

24        A    Right.

25        Q    Person years, how did you calculate the
```

Page 260

1    person years?

2        A    Person years, for each individual was when

3    they entered the cohort, and we followed them until

4    either they immigrated, died, or developed Parkinson's

5    disease.  So we discounted the number of years for

6    each person and added them up.

7        Q    And then how does it -- let's go to, I

8    guess -- this table - tell me if I'm wrong - does it

9    address any incidence of Parkinson's disease other

10   than telling us the age?

11       A    No, this -- no.  It doesn't.

12       Q    Okay.  What table do we need to go to for

13   that?

14       A    Table 2.

15       Q    And help me with what Table 2 shows.

16       A    Table 2 gives us the different disease

17   categories that we looked at; the number of

18   observations for the different disease categories,

19   Parkinson's disease, secondary Parkinsonism; and then

20   the standardized hospital rates; and the ninety-five

21   percent confidence intervals.

22       Q    And what was that table presented for, what

23   would you want to show with that?

24       A    To see if there was an excess of any of the

25   diseases we looked at among welders, a statistically

Page 261

1    significant excess.

2         Q    When you provided the first submission to

3    the journal --

4         A    Umh-humh.

5         Q    -- it didn't have any confidence intervals?

6         A    No, it did.

7         Q    Were there places where it did not?

8         A    No.

9         Q    Well, in the questions or the comments by

10   the viewers, where it says in the text:  I would also

11   be interested to see the exact P value rather than P

12   is greater than zero-point-one-zero.

13        A    Umh-humh.

14        Q    In your response you state:  We have also

15   provided the confidence interval.

16        A    Right.

17        Q    Which leads me to believe that there was no

18   confidence interval.

19        A    There was confidence intervals in the paper

20   before.

21        Q    So is it your interpretation that this

22   reviewer simply ignored the confidence intervals?

23        A    No.  He was talking --

24             MR. SCHACHTMAN:  Objection to form.

25        A    He was talking about the confidence

Page 262

1   intervals around age.  But all the other measurements

2   had confidence intervals.

3        Q    So did you all add them as to age?

4        A    I'm sorry?

5        Q    Did you all have to add them as to the age

6   aspect?

7        A    Add?

8        Q    Confidence intervals.

9        A    We did add confidence intervals for age,

10  yes.

11       Q    Now, in looking at No. 2, Table 2.

12       A    Umh-humh.

13       Q    Looking at Parkinson's disease, there were

14  sixty-nine observed under employees and welding

15  companies with an SHR of zero-point-nine and a ninety-

16  five percent confidence interval of zero-point-seven

17  to one-point-two, correct?

18       A    Correct, yes.

19       Q    For all welding exposed workers, there's

20  twenty-five observed with an SHR of one-point-zero, a

21  confidence interval of zero-point-seven to one-point-

22  five, correct?

23       A    Right.

24       Q    And then you have another category of

25  questionnaire, response status of welders, metal

Page 263

1    workers and nonresponders.  Is that a breakout of the

2    all welding group?

3        A    That's a breakout of people who were

4    submitted the questionnaire.

5        Q    Were all of the people under all welding

6    exposed, second column, Table 2, submitted the

7    questionnaire?

8        A    I believe so.  I think the numbers add up.

9    Let me. . .

10            (Witness reviewing document.)

11        A    I believe so.

12        Q    Okay.  So these are subsets of Column 2?

13        A    Yeah.

14        Q    And as I understand the ninety-five percent

15    confidence interval with respect to the numbers that

16    are parenthetical --

17        A    Umh-humh.

18        Q    -- does that mean that if you were to look

19    at this population or a similar population, for

20    example, under metal workers where there were eight

21    observed and an SHR of zero-point-nine, that there

22    was -- there is a five percent chance that it could be

23    less than zero-point-four or greater than one-point-

24    eight?

25        A    I would agree.

Page 264

1    Q    And there's a ninety-five percent likelihood

2  that it would hit somewhere in between those two?

3    A    Right.  But your best estimate is that it's

4  zero-point-nine.

5    Q    But -- now, does that number get arrived at

6  by like averaging or a mean number?  How do you all

7  come up with a number like where to put that zero-

8  point-nine?  Did you do that yourself?

9    A    No.  It's a computer package that estimates

10  that number for us.

11    Q    Okay.  And whose computer did the estimating

12  for this study?

13    A    All the analyses were done in Denmark.

14    Q    And is that that SAS program you're talking

15  about?

16    A    Absolutely, yeah.

17    Q    How often do they update and change their

18  program?

19    A    SAS, or --

20    Q    Yes.

21    A    I don't know.

22    Q    Would it have been -- was there a SAS around

23  back in 1997?

24    A    Yes.

25    Q    '96?

EX 5 / 264                    EX 5-264

Page 265

1        A      Yeah.

2        Q      When Doctor Hansen did his first study?

3        A      I'm not sure.

4        Q      Do you know if he used the same program that

5    you all used?

6        A      I, I have no knowledge if he did or not.

7        Q      Would it make a difference?

8        A      No.

9        Q      Why is that, that you seem confident that it

10   would not?

11       A      Because they used the same statistical

12   formulas.

13       Q      What did you physically do that contributed

14   to this study?

15       A      I wrote the paper and designed the analysis.

16       Q      Okay.  And how did you go about designing

17   the analysis?

18       A      I looked at the type of information on the

19   questionnaire and the type of information we were

20   ascertaining, and I created the tables.

21       Q      Okay.  And did you create the tables, or did

22   you have to write any programs, did you have to design

23   any formulas to do any of the work that you did?

24       A      I had our statistician do the computations

25   for me.

Page 266

1    Q    Okay.  But did you have to tell him or her

2    what computations to do?

3    A    I gave him an outline of the table that I,

4    that I was interested in looking at, and -- I'm sorry,

5    she, and she was able to, to complete those for me.

6    Q    So you didn't deal with any of the details

7    with respect to how the numbers were actually

8    generated?

9    A    I did not do any of the programming.

10    Q    And looking at Table 3 -- well, let me go

11    back to Table 2 for just a minute, I'm sorry.  Table

12    2.  If something was in your study that caused it to

13    bias toward the null by something like zero-point-five

14    to zero-point-eight, and you increased your range in

15    your ninety-five percent CIs by those numbers, would

16    it give you an approximation of your CIs?

17            MR. SCHACHTMAN:  Objection to form.

18    Q    Or would you have to recalculate the CIs

19    altogether?

20            MR. SCHACHTMAN:  Objection to form.

21    A    I'm sorry.  I'm not sure what you're asking.

22    Q    If there was something about your study that

23    created a bias toward the null to somewhere around

24    zero-point-five to zero-point-eight --

25    A    Umh-humh.

Case 1:19-md-02875-RMB-SAK    Document 1713-8    Filed 11/01/21    Page 268 of 322
PageID: 39952
Case 1:03-cv-17000-KMO    Document 1862-4    Filed 08/07/2006    Page 267 of 321

Page 267

1      Q    -- would you increase the range in your

2   confidence interval by those numbers?

3      A    My understanding of bias is bias is an issue

4   of study design, it's not an issue of analysis.

5      Q    Okay.  So if Doctor Hansen was of the view

6   that there was an underestimation of relative risk

7   with respect to some aspect of this cohort, would that

8   have any impact in your view?

9      A    I have no idea how that would impact the

10  study.

11     Q    Okay.  Would you look at Page 379, please,

12  sir, of the Hansen paper.

13     A    Okay (complying).

14     Q    And I guess it's somewhat like your group's

15  random sampling of hospital records.  Do you recall

16  that Doctor Hansen did a random sampling of a hundred

17  and eighteen cohort members with respect to

18  occupation?

19     A    I, I had no knowledge of that.

20     Q    Okay.  If you would look at Page 379.

21     A    Okay (complying).

22     Q    In the left column.  And we will, the first

23  part is, expose your assessment in a historical cohort

24  study has an inherent possibility of introducing bias

25  because of the use of different sources of exposure

1    data for living and deceased subjects.

2         A    Okay.

3         Q    Do you agree with that?

4         A    Yes.

5         Q    Did you have that issue to deal with in your

6    study?

7         A    If it was in the Hansen study, it was also

8    here.

9         Q    Okay.  In this study all living cohort

10   members were asked to answer a detailed questionnaire

11   on lifetime exposures, and spouse and colleagues of

12   deceased subjects were interviewed using the same

13   questions.  Is that the Danish questionnaire that we

14   have as Exhibit 1, or 3?  I can't remember.

15            MR. SCHACHTMAN:  I think it's 1.

16        A    Yes.

17            MR. SCHACHTMAN:  Or 3.

18        Q    Then it says:  An attempt has been made to

19   assess the magnitude of this bias.  Two years after

20   the primary data collection a hundred and eighteen

21   cohort members who answered the questionnaire had

22   died.

23        A    Umh-humh.

24        Q    Spouses and colleagues were then interviewed

25   using the same questions to validate the accuracy of

Page 269

1    exposure information obtained from surrogate

2    responses.

3        A    Umh-humh.

4        Q    Comparison of answers showed a fairly high

5    level of concordance on smoking habits, spouses, and

6    the basic questions on occupational exposures.  The

7    nonwelders were classified correctly, but the

8    sensitivity of correct, quote, welder, closed quote,

9    classification was rather low.  This misclassification

10   might result in an underestimation of the relative

11   risk by a factor of at least zero-point-five to zero-

12   point-eight in the exposed group in the present study,

13   the present study being Hansen 1996.

14       A    Umh-humh.

15       Q    What, if anything, does that indicate to

16   you?

17       A    You know, actually, this is not surprising

18   at all.  I did a study of occupational exposures and

19   looked at surrogate responses and people who had died

20   to see how reliable they were to what the actual

21   people reported, and they're not reliable at all.  So

22   his finding is consistent with what's in the

23   literature, that the best information you can get

24   about occupations is from the individuals themselves,

25   surrogates just don't know.

Page 270

1      Q     Okay.  And what, if any, impact did it have

2  on his study or your study?

3      A     Given that, I don't think it had any impact.

4      Q     Okay.  And with respect to this study by

5  Hansen, which would be your study, was there missing

6  data in surrogate interviews utilized?

7      A     There were surrogate interviews utilized.

8      Q     Do you agree with his statement here at the

9  bottom of the left-hand column:  Due to the higher

10  proportion of missing data in the surrogate

11  interviews, the case referent analysis is expected to

12  result in estimates biased toward the null?

13         MR. SCHACHTMAN:  Objection to form.

14      A     I'm not -- I'm reading this out of context,

15  but I think he's referring to a different study, the

16  Lordson and Hansen study, it's a nested case reference

17  analysis.

18         MR. SCHACHTMAN:  You have to read the

19  sentence above it to see what he's referring to.

20         MR. CROSBY:  Let me show you what we'll

21  marked as Exhibit 10.

22         (Deposition Exhibit No. 10 was marked for

23  identification and was attached to the transcript.)

24  BY MR. CROSBY:

25      Q     And where was the nested cohort taken from?

1    A    Within the -- within this cohort.

2    Q    Have you seen Exhibit 10 before, Lung Cancer

3    Mortality in Stainless Steel and Mild Steel Workers:

4    A Nested Case slash -- or dash, Reference Study?

5    A    Yeah, I've not read this before.

6    Q    So you don't -- or do you have an opinion or

7    view as to whether or not it would yield any

8    information with respect to any bias towards the null

9    in Hansen's cohort, which is also your cohort?

10    A    Yeah, I have no idea how it would affect the

11    results.

12    Q    If it affected it by point-five to point-

13    eight in a relative risk, would we, for example, take

14    Column 2, Parkinson's disease, observed twenty-five on

15    Table 2, and the SHR from one-point-zero with a

16    confidence interval, and if we add point-five would it

17    change the rate or the range from zero-point-seven to

18    one-point-two and from one-point-five to two-oh?

19    MR. SCHACHTMAN:  Objection; form and

20    foundation.

21    A    His, his statement was about lung cancer,

22    and this is Parkinson's disease.  I'm not aware of any

23    incidence where you'd try to look at two different

24    diseases in that aspect.

25    Q    Yeah.  But his is also dealing with the fact

Page 272

1    that the information is not that reliable.

2              MR. SCHACHTMAN:  Objection to form.

3    Q    And it's from the same cohort, right?

4              MR. SCHACHTMAN:  Objection; form.

5    A    I disagree.

6    Q    Why do you disagree?

7    A    I believe the information is reliable.

8    Q    Because?

9    A    Given all the information we have from the

10   Danes, it's, it's -- we were able to identify who were

11   welders and who were not.

12   Q    But isn't the person who was involved in

13   doing the first identification process expressing his

14   concern and doubts about that very aspect?

15             MR. SCHACHTMAN:  Objection; form and

16   foundation.

17   A    He's expressing doubts in one unique

18   situation.

19   Q    But it says that it biases toward the null,

20   nevertheless, correct?

21             MR. SCHACHTMAN:  Objection; form and

22   foundation.

23   A    His statement says that it biases toward the

24   null, for lung cancer.

25   Q    Well, lung cancer was diagnosed -- didn't

Page 273

1    they use the same system you all did?

2        A    No.

3        Q    What did they do?

4        A    They have a cancer registry that started in

5    1945.

6        Q    Oh.  So they have a system that just

7    identifies that specific disease?

8        A    Absolutely.

9        Q    They don't have that for Parkinsonism, do

10    they?

11        A    They don't.

12        Q    And lung cancer, unlike a movement disorder,

13    that one, when you get diagnosed with it, that's going

14    to usually get primary diagnosis, top billing on it,

15    won't it?

16        A    I don't know.

17        Q    If you went to a doctor and you had a

18    cancer, would you think that if you were hospitalized,

19    that it would be the primary diagnosis?

20        A    You know, I'm not a nosologist, so I'm not

21    sure how they would put it.

22        Q    What is a nosologist?

23        A    Someone who classifies diseases.

24        Q    And, generally speaking, is a nosologist

25    someone like, who has an undergraduate degree?

Page 274

1      A     I have no idea.

2      Q     So you don't know about nosologists?

3      A     I know they're important.

4      Q     Is there anything in your study that in your
5   view indicates that you have any biases toward the
6   null as a result of the cohort you selected?

7      A     I have no indications of that.

8      Q     Is there anything in your calculations that
9   indicate that there is a bias toward the null in your
10  study?

11     A     Not to my knowledge.

12     Q     Or in the calculations?

13     A     Not to my knowledge.

14     Q     Is there anything in your study that in your
15  opinion indicates that any of your data are incorrect
16  or unreliable in any respect?

17     A     No.

18     Q     So in your opinion – and tell me if I'm
19  wrong, I'm sure you will – your study does a good job
20  of saying –– or determining exactly what you say it
21  determines, and that is that there is not an increased
22  incidence of hospitalizations of Parkinson's disease
23  by stainless steel and mild steel welders in Denmark?

24     A     Yes.

25     Q     And do you agree with the last sentence

Page 275

1    before the conclusions?  I take it you wrote it.

2           MR. SCHACHTMAN:  Objection to form.

3       A    Okay.

4       Q    Well, let's -- since there was an objection,

5    let me back up.

6           At the top of Page 15 --

7       A    Umh-humh.

8       Q    -- exposure levels in the Danish industry

9    may have been higher in the 1950s and 1960s.  That

10   follows a statement that says that you didn't know any

11   of the welding exposure levels for these workers,

12   correct?

13      A    Right.

14      Q    We don't know if they welded all day long or

15   if they welded just every now and then?

16      A    Right.

17      Q    And we don't know what the conditions were

18   when they welded?

19      A    Correct.

20      Q    Then the next is:  The welders in our cohort

21   may have been less exposed because exposure levels are

22   lower in stainless steel welding and high level

23   exposure environments like shipyards were left out of

24   the cohort.

25      A    That's what the statement says.

1    Q    Okay.  Did you write that?

2    A    No.

3    Q    Who wrote that?

4    A    Doctor Bonde.

5    Q    And then the next statement is:  Therefore,

6  rates for PD found for welders in the present study

7  may not necessarily be representative for welders

8  exposed to higher levels of welding fumes and during

9  occupational conditions different from those in

10  Denmark.  Did you write that?

11    A    No.

12    Q    Doctor Blot did?

13    A    No.  Doctor, I'm sorry, Bonde, B-O-N-D-E.

14    Q    Oh, Bonde.  So the portion dealing with --

15  where does Doctor Bonde's portion start?

16    A    Again, I'm assuming that he's the one that

17  wrote it.  As I stated before, the Danish colleagues

18  submitted all their comments together.  And I think

19  it's the bottom of Page 14, that paragraph there.

20    Q    How many people have died from the time that

21  Doctor Hansen's study was published until you all did

22  yours?

23    A    I have no idea.

24    Q    What effort, if any, did you all undertake

25  to look at cause of death in those that died?

Page 277

1        A     That, that wasn't out an outcome that we

2    were interested in in our study.

3        Q     Did you all undertake any effort to do a

4    follow-up to see whether any of those people who had

5    died had had a hospitalization for any of the diseases

6    that you were studying?

7        A     No.

8            MR. CROSBY:  Your Declaration in this, which

9    I will mark as 11.

10           (Deposition Exhibit No. 11 was marked for

11    identification and was attached to the transcript.)

12           MR. SCHACHTMAN:  Do you have an extra copy

13    of the Lauritsen paper that you marked?  If you don't,

14    I'll make a copy.

15           (Mr. Crosby handing.)

16           MR. SCHACHTMAN:  Thanks.

17           MR. CROSBY:  My friend just reminded me of

18    something.  Do you have the proposal?  I can't

19    remember what its number was.

20           MR. SCHACHTMAN:  5.  The Danish proposal,

21    or --

22           MR. CROSBY:  The Danish proposal.

23           (Witness handing.)

24    BY MR. CROSBY:

25        Q     This Declaration that you prepared that

1    we've marked now as Exhibit 11?

2        A    Umh-humh.

3        Q    In Paragraph 3 --

4        A    Okay.

5        Q    -- it says:  This large study of welders

6    with long-term follow-up provides evidence that there

7    is no moderate or strong association between welding

8    and measures of morbidity for Parkinson's disease,

9    Parkinsonism, and other neurological conditions.

10            Would you explain to me what that means in

11    just plain terms?

12        A    Yeah.  We looked at the hospitalizations,

13    the standardized hospitalization rates among welders

14    for Parkinson's disease, Parkinsonism, and other

15    neurological conditions, and none of them --

16            MR. SCHACHTMAN:  Hello.  On the phone there,

17    if you could turn down your music, that would be

18    great.

19        A    -- and none of them were statistically

20    significantly increased.

21        Q    In your opinion, does your study conclude

22    that welding fume exposure does not cause

23    Parkinsonism?

24        A    Our study concludes that people who worked

25    as welders are not at an increased risk for being

Page 279

1    hospitalized for Parkinson's disease.

2        Q    So your study's limited to exactly what it

3    says in that portion we discussed at the very end?

4        A    Yes.

5        Q    Would it be fair to take it beyond that?

6        A    Beyond the conclusions that we wrote, no.

7        Q    Yeah.

8            Is there a pharmacological registry in

9    Denmark?

10       A    Yes.

11       Q    Is there one in Sweden?

12       A    Yes.

13       Q    So if you got these people's secret code

14   number and you want to, can you find out all the

15   prescriptions that they've had?

16       A    Yes.

17       Q    If someone had been diagnosed with a

18   movement disorder for which there is a medication

19   available and it's prescribed, would the Danish system

20   pick it up?

21       A    It would, but only to a small extent.  The

22   prescription database in Denmark is only in one

23   county, Aarhus County, which is one small section of

24   the country, it's not a nationwide registry, so we

25   wouldn't get all the information about all the welders

Page 280

1   in our study.  And our registry only started in '89, I

2   believe.

3        Q    Okay.  And if you had that data, would it

4   help with doing an analysis of how many people, if

5   any, may have been missed by the hospital or a clinic

6   process?

7        A    We can look to see who was prescribed

8   specific information -- or specific prescriptions.

9        Q    And what about the Swedish pharmaceutical or

10  pharmacy registry?

11       A    I believe that began either last year or is

12  beginning this year.

13       Q    Are neuropsychological conditions codable

14  under the ICD?

15       A    The ones that we've classified in the paper

16  are.  We present the ICD codes with them.

17       Q    Are any of those neuropsychological?

18            MR. SCHACHTMAN:  Are you asking about

19  neuropsychological diseases, or --

20            MR. CROSBY:  Conditions.

21            MR. SCHACHTMAN:  Conditions.

22       A    Yeah.

23       Q    Which ones?

24       A    I'm sorry.  These are -- these are the

25  diseases we were able to look for in the registry.

Page 281

1    Q    Okay.  Are any of those conditions, in your

2    opinion, consistent with the neuropsychological

3    diagnosis of ICD?

4    A    I don't know.

5    Q    Are there other neurological conditions or

6    diseases that can be caused by occupational exposure

7    that are not on your ICD list in the proposal?

8    A    I have no idea.

9         (Mr. Gonzalez-Magaz left the deposition.)

10   Q    Who came up with that list?

11   A    Doctor Blot.

12   Q    With respect to your Declaration --

13   A    Umh-humh.

14   Q    -- when is the last time you reviewed it?

15   A    Probably December.

16   Q    Did you have any suggestions or changes at

17   that time?

18   A    No.

19   Q    Do you have any at this time?

20        (Witness reviewing document.)

21   A    No.

22        THE VIDEOGRAPHER:  I think now would be a

23   good time to change the tapes.

24        MR. CROSBY:  Okay.

25        THE VIDEOGRAPHER:  Here ends Tape No. 3 in

Page 282

1    the deposition of John P. Fryzek, Ph.D.  We are going

2    off the record.  The time is 5:09 p.m.

3              (A short recess was taken.)

4              (Mr. Kelly left the deposition.)

5              THE VIDEOGRAPHER:  Here begins Tape No. 4 in

6    the deposition of John P. Fryzek, Ph.D.  We are back

7    on the record.  The time is 5:17 p.m.

8    BY MR. CROSBY:

9        Q    Doctor, your study that you've got in press,

10   does it exclude a relative risk of two for the

11   incidence of Parkinson's disease or Parkinsonism in a

12   population of welders exposed to welding fumes?

13              MR. SCHACHTMAN:  Objection; compound.

14       A    Our study excludes a relative risk of two

15   for the instance of hospitalization due to Parkinson's

16   disease in welders.

17       Q    In Denmark?

18       A    In Denmark.

19       Q    Does it exclude a relative risk of two for

20   the instance of Parkinson's disease occurring in a

21   population of welders in the United States?

22       A    No, it does not.

23       Q    Does it exclude -- does the study exclude a

24   relative risk of two or greater for Parkinsonism of

25   welders in the United States?

Page 283

1    A    No.

2         (Mr. Thompson left the deposition.)

3    Q    Welders anywhere?

4    A    For?

5    Q    Parkinson's disease, Parkinsonism.

6    A    It excludes a risk of two or greater for

7    Parkinson's -- hospitalizations due to Parkinson's

8    disease in Denmark.

9    Q    And that's it?

10   A    Yes.

11   Q    So as to relative risk for the incidence of

12   Parkinson's disease or Parkinsonism of welders in the

13   United States, it remains unaddressed in this study?

14   A    I'm not sure what the exposure levels of

15   welders are in the U. S. compared to Denmark, but if

16   they're similar exposure, then it could exclude a risk

17   of two or greater in the U. S. as well.

18   Q    But that would be limited to

19   hospitalizations, wouldn't it?

20   A    Exactly.

21   Q    Your study, even if exposures in the U. S.

22   are the same as exposures in Denmark, does not exclude

23   a relative risk of two or greater for the incidence of

24   Parkinson's disease or the incidence of Parkinsonism

25   in welders exposed to welding fumes; is that correct?

Page 284

1      A      It excludes the risk for hospitalization,

2   correct.

3      Q      I'm not asking about hospitalization.

4      A      Umh-humh.

5      Q      So that word's not in my question.

6      A      Okay.

7      Q      So my question to you is does your study

8   exclude a relative risk of two or greater for the

9   incidence of Parkinsonism in a population of welders

10  exposed to welding fumes in the United States?

11     A      No.

12     Q      Does your study exclude a relative risk of

13  two or greater for any neurological condition in

14  welders exposed to welding fumes in the United States,

15  the incidence of that disease or condition?

16     A      It looks at the incidence of

17  hospitalizations for those diseases.

18     Q      Right.  And I'm not asking about

19  hospitalizations.

20     A      Right.

21     Q      I'm asking about the incidence or the

22  occurrence of the disease.

23     A      The study was not designed to look at that.

24     Q      Is the Swedish study designed to do that?

25     A      The Swedish study is still undergoing

Page 285

1    approval, so I'm not sure of the final design of that

2    study.

3         Q    So if I asked a lot of questions about the

4    Swedish study, would that mean that it might all be

5    changed?

6         A    Yeah.

7         Q    Right after we leave the room, couldn't it?

8         A    I, I have no idea yes or no.

9              MR. SCHACHTMAN:  You could have a creative

10   input.

11             MR. CROSBY:  I'm trying.

12   BY MR. CROSBY:

13        Q    Could we look at Doctor Louis' Declaration,

14   please?  Actually, I think you were going to also

15   comment on Doctor Wells'; am I right?

16        A    If you want me to.

17        Q    I don't know that I want you to, but if you

18   might while we're in hearing, then I want to learn

19   about it.  That's one of the purposes of this process.

20        A    Okay.

21        Q    Do you have Doctor Wells' report?

22        A    No.

23        Q    Do you recall what it was that he had to say

24   about your paper with which you take issue?

25        A    I don't recall specifics.

Page 286

1    Q    Well, while I'm looking for that, while you

2  haven't done a calculation with respect to power in

3  this 2004 Danish study for the industry, that is

4  something that you do customarily and from time to

5  time in other papers that you publish; am I correct?

6         MR. SCHACHTMAN:  Objection; foundation.

7    A    I have never published a power calculation

8  in any of the papers that I've written.

9    Q    Do you recall whether or not Breslow & Day

10 address power calculations?

11   A    I don't recall what they say.

12   Q    Is that an authoritative work, the arc

13 monograph?

14   A    What specific one are you asking about?

15   Q    The one that you've cited in your paper.  I

16 can't remember, is it your paper, or your Declaration?

17 I think it's your Declaration.  The first one

18 (handing).

19   A    Okay.  Yes.  This, this describes

20 epidemiological research analysis, yes.

21   Q    And that's one of the things that you rely

22 on in performing epidemiological --

23   A    It describes --

24   Q    -- research and analysis?

25   A    Yeah, it describes standardized techniques.

1      Q     And is it reliable and authoritative in your

2  opinion?

3      A     In my opinion, yes.

4      Q     Are all of the works that you have listed as

5  attached to your Declaration reliable and

6  authoritative in your opinion?  And I can't remember

7  them all.  You might look.  I'm not trying to --

8      A     Yeah.  Yes, I agree they're all reliable and

9  authoritative.

10         MR. CROSBY:  Do you happen to have a copy of

11  Wells?

12         MR. SCHACHTMAN:  No.  I actually never gave

13  him a copy of Wells.

14         MR. CROSBY:  Oh.

15         MR. SCHACHTMAN:  I mean we talked about what

16  Wells said, but I never showed him Wells.

17  BY MR. CROSBY:

18      Q     So is it your understanding, then, that your

19  concerns about -- do you have concerns about what

20  Doctor Wells was reported to have said about your

21  study?

22      A     I can't recall specifically what he said.

23  If you give me specifics I'll tell you if I agree or

24  not.

25      Q     Well, if I can find the file folder where I

Page 288

1    put it in.

2        MR. SCHACHTMAN:  I've got it on my laptop,

3    if that helps.

4        MR. CROSBY:  Which one is it?

5        MR. SCHACHTMAN:  He, too, has two

6    Declarations, and I think we discussed the December

7    2004 Declaration.

8        MR. CROSBY:  I only have one copy of that.

9    BY MR. CROSBY:

10       Q    But this is a statement that is -- and see

11   if this rings a bell.  And Fryzek -- am I saying your

12   name right?

13       A    You're saying it perfect.

14       Q    Thank you.  In Fryzek et al., 2004, the

15   power to detect rate of occurrence of the number of

16   welders with PD under the alternative hypothesis, that

17   is, fifty percent, and a hundred percent larger than

18   the occurrence of the number of welders with PD

19   yielding five observed cases of PD are zero-point-two-

20   two-six and zero-point-five-two-six respectively, the

21   power in Fryzek, et al. is quite low relative to the

22   large magnitude of the difference one is trying to

23   detect.

24            I'll give it to you, but, first, while it

25   was long, do you have it enough in your mind to know

Page 289

1    whether or not you agree with it or disagree with it?

2         A    I need to read it.

3         Q    Sure.  I'll give it to you.  But let me ask

4    you this.

5              The alternative hypothesis, what does that

6    mean?

7         A    I need to see it in context to see what he's

8    saying.

9         Q    Okay (handing).

10             (Witness reviewing document.)

11        A    Okay.  What is your specific question?

12        Q    My question is have you now read that?

13        A    Yes.

14        Q    Do you agree or disagree with it, or do you

15   know whether or not the information contained therein

16   is accurate with which you could agree or disagree?

17        A    I'm not clear how he did his power

18   calculation.

19        Q    If he correctly performed his power

20   calculation and his numbers are correct, what does

21   that mean to you?

22        A    Doing a power calculation after you have the

23   point estimate and the confidence interval around a

24   measure doesn't really mean much to me.

25        Q    But what would it mean if you didn't have a

1    confidence interval and what you saw was what is there

2    as to the power calculation, what would it mean to you

3    as to what your study would reveal if those were the

4    results of such a calculation?

5        A    If, if I, I did a study I would, I would

6    never only present the power calculation.  I'd present

7    the ninety-five percent confidence interval and the

8    point estimate.

9        Q    Okay.  But assume that you don't.  Assume

10    you didn't do it, assume some other body, some other

11    human being did it and that's what they presented.

12        A    Umh-humh.

13        Q    If you saw that as the power calculation,

14    what would it mean to you as to the strength of their

15    results?

16            MR. SCHACHTMAN:  Objection to form.

17        A    Without the, the point estimate and the

18    ninety-five percent confidence interval, it wouldn't

19    mean much to me at all.

20        Q    Assuming that we have your point estimate

21    and your ninety-five percent confidence interval and

22    you have that power calculation, what does it tell you

23    about your study?

24        A    With my study, with the point estimate and

25    ninety-five percent confidence interval, it actually

Page 291

1    tells you the magnitude of risk that you can detect in

2    the study, and that our study can actually exclude

3    risks greater than one-point-five, and that our best

4    estimate of what the risk is given the point estimate

5    is zero-point-nine.

6         Q    And does that power calculation in any way

7    impact the weight to which one would give your

8    numbers?

9         A    Not at all.

10        Q    So what would the power calculation

11   accomplish?

12        A    In my opinion, nothing.

13        Q    Why would anybody do it?

14        A    I don't know.

15        Q    It doesn't assist in assessing the strength

16   of the study?

17             MR. SCHACHTMAN:  Objection; form.

18        A    The confidence interval is a much better

19   measure of the strength association.

20        Q    I understand.  But just like this gentleman

21   has a videotape and a digital machine, does it give

22   some kind of confirmation or clue that there is

23   something else going on or that the study is strong as

24   new rope or that the study is weak?

25        A    If, if I saw a power calculation along with

Page 292

1    the ninety-five percent confidence interval and the

2    point estimate, the power calculation would not offer

3    me any new information.

4         Q    Okay.  What if you had the point information

5    but no ninety-five percent confidence interval?

6         A    I can't imagine a case where that would be.

7         Q    What if you had a P factor as opposed to

8    ninety-five percent confidence interval and the P

9    factor was zero-point -- greater than zero-point-one-

10   zero?

11              MR. SCHACHTMAN:  P value?

12        Q    P value.  I keep saying factor, I'm sorry.

13   Would that tell you anything?

14        A    Can you say it again?  I got focused on

15   factor.

16        Q    If there was a P value --

17        A    Umh-humh.

18        Q    -- of greater than zero-point-one-zero --

19        A    Umh-humh.

20        Q    -- and those power calculations and your

21   SHRs, what, if anything, would it reveal to you?

22        A    Well, that P value would be more powerful

23   because it was actually based on the data.  These

24   power calculations are based on some assumptions and

25   other calculations that I have no knowledge how those

Page 293

1    were created.

2        Q    What assumptions would someone have to make?

3        A    The estimate of the rate of the disease and

4    the population that you're studying and then the

5    background population.

6        Q    And is that information --

7        A    And other --

8        Q    -- unavailable?

9        A    Prior to a study it is.  Prior to our study

10    of Parkinson's disease it was unavailable.

11        Q    Okay.  If he used your numbers from your

12    study, what would it tell you?

13        A    You know --

14            MR. SCHACHTMAN:  Objection; foundation.

15        A    Again, I'm just -- I have no idea how he's

16    done the calculations without telling me the formulas

17    he's used and the assumptions he's made.

18        Q    Okay.  Could I have that back?

19        A    Umh-humh (handing).

20        Q    That was from the --

21            MR. SCHACHTMAN:  December 2004.

22        Q    December 2004, the last two sentences of the

23    paragraph numbered 17.

24            I think we both have copies of the

25    Declaration of Doctor Louis.

Page 294

1      A      Yeah.  I don't have a copy with me, but I've

2   seen it.

3              MR. SCHACHTMAN:  We made some copies

4   (handing).

5      Q      Did you read all of Doctor Louis'

6   Declaration?

7      A      No.  Only the parts that pertained to me.

8      Q      Do you recall any parts that pertained to

9   you other than what's contained in Paragraph 33 on

10  Pages 23 and 24 --

11     A      No --

12     Q      -- and Page -- and Paragraph 35, did you

13  look at Paragraph 35 on Page 25?

14     A      Yeah.

15     Q      Let's look at that one first, because it's

16  sort of the Paragraph 35.

17     A      Paragraph 35, okay.

18     Q      One study, paren, Fryzek, unpublished, paren

19  closed, uses a cohort design which is its major

20  strength, but the study also has several serious

21  weaknesses.  As enumerated above, these increase the

22  likelihood that the study makes a type one error.

23  What is a type one error?

24     A      The type one error is that if you find --

25  the likelihood that the positive results you found is,

Page 295

1    is actually not positive, a false positive.

2        Q    Do you agree with that statement?

3        A    No.

4        Q    Why do you disagree?

5        A    Because we didn't find a positive

6    association.

7        Q    And with respect to Paragraph 33.

8        A    Okay.

9        Q    Do you have a general observation about the

10   comments made in Paragraph 33?

11       A    I don't have a general observation.

12       Q    Okay.  And starting with that, it says:  In

13   a recent study by Fryzek, paren, unpublished, closed

14   paren, of a cohort of Danish welders, some of whom

15   developed PD, the author studied the risk of

16   hospitalization for PD among welders compared to the

17   risk of hospitalization for PD in the Danish

18   population.  The major strength of this study is its

19   cohort design.  The authors conclude that the rates

20   for hospitalization for PD were not elevated among

21   welders.  The study is problematic for the following

22   reasons.  No. 1:  First they studied rates of

23   hospitalizations for PD rather than rates of

24   occurrence for PD.

25            Do you agree with that, that that's a

Page 296

1    problem?

2        A    I don't agree it's a problem, but I agree

3    that's what we did.

4        Q    Okay.  Would the study be better if it could

5    be designed to detect occurrences of PD as opposed to

6    hospitalizations?

7        A    I'm not sure.

8        Q    Okay.  Well, you were using

9    hospitalizations, I guess, as an effort for some form

10   of a surrogate for occurrence, right?

11       A    Right.

12       Q    The problem with hospitalizations with the

13   surrogate is that it doesn't pick up the early cases,

14   right?

15       A    Umh-humh.

16            MR. SCHACHTMAN:  You have to say yes or no.

17       A    I'm sorry.  Yes.  I'm sorry.

18       Q    It's getting late, we're all forgetting it.

19   I'm sorry.

20       A    I apologize.

21       Q    Are you too tired to go ahead and --

22       A    No, I'm okay.

23       Q    All right.  Do you agree that this -- then

24   the study would probably only assess severe cases of

25   PD?

Page 297

1    A    It would only assess hospitalizations of PD.

2    Q    Okay.  Do you agree with his rationale to

3  support his view that the incidence of PD among

4  individuals sixty-five and older supports his position

5  that it was assessing only severe cases?

6    A    I, I have no knowledge what he's basing his

7  statement on.

8    Q    Well, do you agree that what he provides

9  there is confirmation for his view that it's assessing

10  severe cases is a valid and rational confirmation

11  methodology?

12    A    I don't see that he has any estimates of

13  Parkinson's disease in Denmark.  So I don't know.

14    Q    Well, isn't he using your figures, in the

15  first portion?

16    A    Right.  But he's comparing it to populations

17  in New York and Spain.

18    Q    And so is that not cricket?

19    A    Pardon?

20    Q    Is that not cricket, that's not legitimate

21  or fair?

22    A    Diseases vary across populations.

23    Q    From one country to another?

24    A    From one geographic location to the next.

25    Q    Second, they excluded shipyard workers, a

1    group of individuals who have potential heavy exposure

2    to manganese through welding, creating a second

3    systematic bias.  Do you agree with that?

4        A    No.

5        Q    You don't agree that it creates a systemic

6    bias?

7        A    No.

8        Q    Did it create any kind of issues,

9    limitations, or weakness?

10        A    It limited what we could say about

11    hospitalization of Parkinson's disease for shipyard

12    workers.

13        Q    And, third, is they showed that smoking was

14    an important protective factor for PD.  Did you all

15    include smoking as a co-variant in the statistical

16    model?

17        A    We looked at the effect modification of

18    smoking and we did a stratified analysis.

19        Q    Did you include smoking as a co-variant in

20    your statistical model?

21        A    By doing a stratified analysis we have

22    controlled for it.

23        Q    So then he is wrong when he says that you

24    did not include smoking as a co-variant in your

25    statistical model?

Page 299

1      A    I am not sure what statistical models he's

2   talking about.

3      Q    So are you saying he's wrong, or are you

4   saying you're not sure what he's saying?

5      A    I'm not sure what he's saying.

6      Q    Now, he acknowledges that you stratified it,

7   correct?

8      A    Right.

9      Q    Do you agree with his assessment that the

10  risk of PD is nearly two times higher in welders than

11  in nonwelders, although the numbers are small in the

12  smoking population?

13     A    No, I, I don't agree with that.

14     Q    What did Table 3 show concerning that?

15     A    That they're not statistically different.

16     Q    On Table 3, nonsmokers, am I understanding

17  this correctly?

18     A    I got it.  Sorry.

19     Q    Plaintiff's 8?  It's the very last page.

20     A    Okay.

21     Q    It shows smoking, nonsmokers, your SIR is

22  one-point-nine-oh with a ninety-five percent CI of

23  zero-point-three-eight to five-point-five-four?

24     A    Right.

25     Q    That indicates that you're well beyond two,

Page 300

1   doesn't it?

2       A    No, no.  What that's showing is that --

3       Q    It can be, I'm sorry.

4       A    No -- well, it can be.

5       Q    Okay.

6       A    But what it's showing is that across the

7   categories of smoking the point estimates aren't

8   statistically different.  You can see that by the

9   confidence intervals.  The confidence intervals

10  overlap, and the numbers contain all the point

11  estimates.  And also the trend is not significant.

12      Q    Is the trend increasing with age?

13      A    I'm sorry.  The trend is for smoking, from

14  nonsmokers to former smokers to heavy smokers.

15      Q    I understand.

16      A    So when you look across those groups you

17  don't see a decrease in Parkinson's disease, a

18  statistically significant decrease.

19      Q    But is there a trend in age in the tables

20  that provide age?

21      A    No.

22      Q    Is there an indication of a trend with

23  respect to age?

24      A    For, for age it appears that the rate of

25  hospitalizations for Parkinson's disease goes down for

EX 5-300

Page 301

1    those aged sixty-five years or older.

2         Q    And do you know the age of the people who

3    had died?

4         A    We know the ages, yes.

5         Q    Did you include that in the table, in any of

6    the tables?

7         A    They're included in all the tables.

8         Q    Okay.  But do we know how many of -- what

9    percentage of those people who died had Parkinson's

10   disease?

11        A    No.

12        Q    With a ninety-five percent confidence

13   interval that gives a range that is less than one but

14   greater than two -- or, excuse me, anywhere from less

15   than one to greater than two, such as the point-three-

16   eight to five-point-five-four --

17        A    Umh-humh.

18        Q    -- does that indicate that the risk could be

19   as high as five times?

20        A    Yes, but it could also be as low as point-

21   three-eight.

22        Q    Right.  And with respect to the duration of

23   time spent welding table --

24        A    Umh-humh.

25        Q    -- less than ten years, is your confidence

EX 5-301

1    interval point-two-four up to two-point-two-eight?

2        A    Yeah.

3        Q    So it could be as low as point-two-four and

4    it could be more than doubled?

5        A    Right.

6        Q    And with respect to ten to twenty years, it

7    could be as low as point twenty-two or it could be

8    more than tripled?

9        A    Yes.

10       Q    More than twenty years it could be as low as

11   point-twenty-one and almost doubled?

12       A    Right.

13       Q    And for attained age less than sixty-five it

14   could be as low as point-three-six and as high as two-

15   point-six-three?

16       A    Umh-humh.

17       Q    And under your calendar time, seventy-seven

18   to ninety-two, as low as point-twenty-one and as high

19   as doubled?

20       A    Yes.

21       Q    So these -- this doesn't rule out a relative

22   risk of two overall, does it?

23           MR. SCHACHTMAN:  Objection; form and

24   foundation.

25       A    This looks at various categories of disease.

1    Q    And, generally speaking, would most of them

2    capture a two or greater --

3        MR. SCHACHTMAN:  Objection; form.

4    Q    -- in their confidence interval?

5        MR. SCHACHTMAN:  Objection; form.  Actually

6    and foundation.

7        MR. CROSBY:  Fine.

8    A    Some do and some do not.

9    Q    Did you agree that, in summary, this study

10   that I'm looking now at, Doctor Louis --

11   A    Okay.

12   Q    -- this study has an important strength as a

13   cohort study, but also several important limitations,

14   failure to assess occurrence rather -- excuse me,

15   failure to assess occurrence of rather than

16   hospitalizations?  It's sort of a repeat of what we've

17   talked about before.  Has your opinion changed?

18   A    No.

19   Q    Doctor, since you're under oath, I'll ask

20   you a question that I would probably ask you even if

21   you were not under oath, but this way I know I'm going

22   to get it straight.

23   A    Okay.

24   Q    Your study on the Danish welders --

25   A    Umh-humh.

Page 304

1    Q    -- what's the part that you just are most

2    uncomfortable about insofar as its design or its

3    presentation or its results?

4    A    There's no part.  It's a very well designed

5    study.  It follows standardized epidemiological

6    methods.  The results are, are published in an

7    understandable manner.  I think it's clearly written.

8    I have no concerns about it.

9    Q    Okay.  And you don't find anything about it

10    that makes you uncomfortable with any kind of flaws or

11    not intended biases, just biases that occur

12    confounding factors, anything like that?

13    A    No.

14    Q    So have you got your dream study here?

15    A    I don't think I defined my dream study.

16    Q    Well, I know, but you've got one here, as I

17    understand --

18    A    My dream study was a randomized controlled

19    trial, and I don't have that.

20    Q    Well, I know.  Unfortunately, while some of

21    the folks you work with, not your co-employees, but

22    that you consult for may engage in that activity.  You

23    don't, do you?

24    A    What activity?  I'm sorry.

25    Q    Exposing people to something without knowing

Page 305

1   what it's going to do to them.

2       A    I --

3       MR. SCHACHTMAN:  Objection; foundation,

4   form.

5       A    I have never done that, no.

6       Q    Okay.  And that's not a good thing to do, is

7   it?

8       MR. SCHACHTMAN:  Objection; form.

9       A    It depends on the circumstances.

10      Q    Well, if you're going to put a product out

11  on the marketplace, wouldn't you want to know before

12  you put it out whether or not it would cause problems?

13      A    That's why clinic -- randomized clinical

14  trials are done.

15      Q    Could you do something like that with

16  respect to welding rods?

17      A    I have no knowledge of that.

18      Q    Could you have done something with respect

19  to welding rods or welding fumes to find out whether

20  or not it was going to pose a hazard to the health of

21  human beings before you put them out in the general

22  marketplace?

23      A    I have no knowledge of that at all.

24      Q    Are you familiar with animal studies?

25      A    Limited.

Page 306

1    Q    Are you familiar with the chemical
2  components of welding fumes?
3    A    I can't name them for you, but I realize
4  there are some.
5    Q    And are you familiar that some of those
6  components of those fumes pose a potential health risk
7  in human beings?
8    A    I don't know what those components are.
9    Q    If manganese, or manganese oxide is one of
10  those components, is manganese capable of causing
11  disease in human beings?
12        MR. SCHACHTMAN:  Objection; form and
13  foundation.
14    A    It's my understanding it depends on the
15  circumstance of exposure.
16    Q    That's pretty much true of everything, isn't
17  it?
18    A    Absolutely.
19    Q    It's kind of life.
20    A    I don't know.
21        MR. CROSBY:  Can we stop a second so I can
22  look at what I've got and see if we can stop?
23        THE VIDEOGRAPHER:  We are going off the
24  video record.  The time is 5:48 p.m.
25        (Discussion off the record.)

Page 307

1          THE VIDEOGRAPHER:  We are back on the video

2   record.  The time is 5:57 p.m.

3   BY MR. CROSBY:

4          Q    I can't remember, and I do apologize for

5   that, but it gets worse.  So I'm tipping you off to

6   that part.  Had you read Hansen's 1996 paper before?

7          A    Which one was that?  I'm sorry.  Was that

8   the nest --

9          Q    Exhibit 9.

10         A    Was that the nested case control study?

11         Q    Exhibit 9.

12         A    Let me see.  There was one I read and one I

13   hadn't read.

14         MR. SCHACHTMAN:  And, Doctor Fryzek, can you

15   identify it by exhibit number?

16         MR. CROSBY:  It's Exhibit 9.

17         THE WITNESS:  Yes.

18         A    I believe this is the one that I looked at.

19   BY MR. CROSBY:

20         Q    Okay.

21         A    Yeah.

22         Q    Do you recall any other limitations Doctor

23   Hansen pointed out in his study with respect to his

24   cohort?

25         A    I -- to be frank, I haven't read that

Page 308

1   article for six months, so I don't know.  I don't

2   recall.

3       Q    Okay.  Do you know if anybody had read this

4   article prior to the selection of that cohort for

5   purposes of the study that you undertook?

6       A    I have no idea.

7       Q    Looking at the Swedish study, I think you've

8   got a copy.

9       A    Okay.

10      Q    And I'm not going to be long, but I just

11  have a couple questions.

12      A    Do you remember what number?

13           MR. SCHACHTMAN:  4.

14      Q    4.

15      A    Okay.  I have it.

16      Q    Do you have an understanding as to the

17  purpose behind that study?

18      A    Yes, I understand the purpose about the

19  study.

20      Q    And what is the purpose?

21      A    Is to look at the incidence of Parkinson's

22  disease and other neurodegenerative disorders in

23  Sweden, among Swedish welders.

24      Q    Is there a reason to expedite this study, or

25  was there a reason to expedite the Danish study?

1      A      Not to my knowledge.

2      Q      Was there a reason to use the Danish cohort

3   in order to get the study done more quickly than if

4   you formulated your own cohort, or do you know?

5      A      My understanding of the purpose of using the

6   Danish cohort, which I think is a good one, is that

7   they had gone through all the heavy work of

8   administering the questionnaires, identifying the

9   welding industries, and, and so we were able to build

10  off of that to examine Parkinson's disease.

11     Q      And was another of the reasons that it would

12  allow the study to be performed quickly?

13     A      I, I had no knowledge of how quickly the

14  study needed to be done or not.

15     Q      Do you know whether or not there is a sense

16  of urgency with respect to the Swedish study?

17     A      I don't know what the sense of urgency is on

18  the Swedish study.

19     Q      You don't know one way or the other?

20     A      No.

21     Q      With respect to the documents that I've

22  shown you today that were either received or generated

23  by IEI or you, are those true and correct copies of

24  the documents that you either received or generated or

25  that IEI received or generated?

Page 310

```
 1      A    You're talking specifically about the

 2  exhibits?

 3      Q    Yes, sir.

 4      A    I believe so.

 5          MR. CROSBY:  Okay.  It's a question of

 6  authenticity, is all I'm trying to cover.

 7          MR. SCHACHTMAN:  I hope not, since I sent

 8  you the documents.

 9          MR. CROSBY:  Well, okay.

10  BY MR. CROSBY:

11      Q    Now, the Swedish study, you're going to

12  include -- what's the difference in the Swedish study

13  and the Danish study?

14      A    One of the largest differences is there's

15  more welders in Sweden.  It's a larger country.

16      Q    Is there any particular subgroup or group

17  within the cohort that will be included that was not

18  included in the Danish study?

19      A    Sure.  People who worked in shipyards,

20  people -- welders who worked in shipyards.

21      Q    Did you have anything to do with the design

22  of the study?

23      A    No.

24      Q    Do you know why shipyards are included in

25  this one?
```

Page 311

1      A      I don't know why.

2      Q      Do you think -- or do you have any opinion

3  or view one way or the other as to what, if anything,

4  it may do to have that in the study?

5      A      I have no knowledge of how that will affect

6  the study results.

7      Q      Any other differences besides increased

8  population and shipyard welders?

9      A      It's a different population.

10      Q      So it may well be that the results from

11  Swedish welders will vary from the results of Danish

12  welders?

13      A      Yes.

14      Q      Do you have any rationale for why that could

15  occur?

16      A      I, I don't.

17      Q      So just some human -- the human beings in

18  Sweden may be different than the human beings in

19  Denmark?

20      A      I, I have no idea what the study results

21  will be before I do the study.

22      Q      Okay.  But, I mean, I guess you'd have to do

23  it because you think that there is a chance or

24  likelihood that it will be different?

25      A      That's not, not the reason for doing it.

Page 312

1    Q    Okay.  What's the reason for doing it?

2    A    In epidemiology one way to look at -- or one

3  method to examine disease associations is to look at

4  different populations and see if you find similar

5  results or not.

6    Q    And will these data yield results that will

7  be limited to population of welders in Sweden?

8    A    Yes.

9    Q    Will it be hospitalization?

10    A    I'm not sure at this point how exactly

11  they're going to ascertain the outcome.

12    Q    In this study the price has gone up, is

13  expected to be two hundred and ninety-seven thousand,

14  four hundred dollars, if it's like this is?

15    A    I assume so, yes.

16    Q    And what's the projected length of time for

17  this study?

18    A    The proposal says six to seven months.

19    Q    And are you all starting this from scratch?

20    A    Yes.

21    Q    So you're going to start one from scratch

22  and be able to do it quicker than the one that you --

23  where you already had a cohort of convenience?

24    A    No, it would be quicker.

25    Q    How long was the project in Denmark?

Page 313

1      A      I'm not sure of the exact length of the

2  project.

3      Q      Okay.

4      A      And I don't know how long this one will

5  take, either.  We haven't, haven't started.

6      Q      Have you read Hansen's 1982 publication

7  dealing with --

8      A      I don't know what you --

9      Q      No, okay.

10             If one has a confidence interval in a paper,

11  does it make the number of cases and the number of

12  control irrelevant?  Or does the confidence interval

13  that you calculate take that into consideration?

14      A      The confidence interval does take into

15  consideration the population size.

16      Q      How does it do that?

17      A      A larger population will give a more precise

18  confidence interval.

19      Q      Tighten the range?

20      A      Yes.

21      Q      Will it tell you how much more accurate it

22  is that it's within that range, or will it still be a

23  ninety-five percent confidence interval?

24      A      It will still be a ninety-five percent

25  confidence interval.

Page 314

1    Q    Do the Danes consider sheet metal workers to

2    be welders, do you know?

3    A    I'm not -- I'm not sure.

4    Q    Are you familiar with the, any other causes

5    of Parkinson's disease or Parkinsonism from chemical

6    exposure?

7    A    I am not familiar that there are any

8    established risk factors for Parkinson's disease other

9    than protective effect smoking.

10   Q    In your opinion, do all epidemiological

11   studies require a control group?

12   A    All epidemiological studies have a

13   comparison group.

14   Q    Can it -- is it just so one is -- the

15   numerator comes from the denominator?

16   A    I'm sorry?

17   Q    Is it that the numerator should come from

18   the denominator?

19   A    Yes.

20   Q    And must the --

21   A    No.  I'm sorry, that's -- no, that's not

22   correct.

23   Q    Okay.  Correct me, then, please.

24   A    I'm not -- I'm not sure what you're asking.

25   Q    Do the people under study have to be part of

Page 315

1    a larger group that's your denominator?

2        A    It depends on your study design.

3        Q    Can census data be a surrogate for control

4    group?

5        MR. SCHACHTMAN:   Objection; form, overbroad.

6        A    It depends what that data consists of.

7        Q    Is there anything about your paper or your

8    opinions with respect to your paper that you have not

9    expressed?

10       A    I think we've covered everything that I

11   wanted to express.

12       Q    Do you have any opinions about what your

13   paper demonstrates or shows other than what is

14   expressed in the conclusions contained in the paper?

15       A    No.

16       Q    Have you been in the military?

17       A    No.

18       Q    You had service in the Peace Corps, I think?

19       A    Yes.

20       Q    Any other employment or affiliation with the

21   United States Government or any state government or

22   institution other than that?

23       A    The State of Nebraska.

24       Q    And what was your --

25       A    I was assistant professor at the University

Page 316

1    of Nebraska Medical School.

2        Q    We talked about that.

3        A    Yeah.  Also, I received employment through

4    the National Cancer Institute; I had a grant as a

5    graduate student.  And I received funding from the

6    University of Michigan, which is part of the State of

7    Michigan, in graduate school.

8        Q    Have you ever had any employment within

9    industry?

10       A    No.

11       Q    So has your employment been limited to --

12   just give me a brief overview of your employment.

13       A    Starting with what year?

14       Q    College.

15       A    In college I worked as a research assistant

16   for an endocrinologist who was studying osteoporosis

17   disease.  Then I joined the Peace Corps and worked as

18   a teacher.  And after that I went to graduate school,

19   and since then I have worked as an epidemiologist.

20       Q    And who have been your various employers?

21   Is that reflected on your CV.

22       A    It is.

23       Q    Yeah.

24       A    Would you like me to state them again?

25       Q    No, that's quite all right.

1          Have you ever been terminated from any

2     employment?

3          A    No.

4          Q    Have you ever resigned under duress?

5          A    No.

6          Q    And are you still refusing to provide the

7     information with respect to your income from IEI

8     and/or Vanderbilt?

9          A    Yes.

10              MR. CROSBY:  That's all that I have.  Thank

11     you.

12              MR. SCHACHTMAN:  Thank you, Doctor.

13              THE VIDEOGRAPHER:  Here ends the videotape

14     deposition of John P. Fryzek, Ph.D.  The number of

15     tapes used today was four.  We are going off the

16     record.  The time is 6:12 p.m.

17              (Signature having not been waived, the

18     deposition of Jon Peter Fryzek was concluded at 6:12

19     p.m.)

20                         ------------

21

22

23

24              ACKNOWLEDGMENT OF DEPONENT

25         I, Jon Peter Fryzek, do hereby acknowledge

Page 318

1    that I have read and examined the foregoing testimony,

2    and the same is a true, correct and complete

3    transcription of the testimony given by me and any

4    corrections appear on the attached Errata sheet signed

5    by me.

6

7    _____          _____

8            (DATE)                            (SIGNATURE)

9                              _____

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 319

1    CERTIFICATE OF SHORTHAND REPORTER – NOTARY PUBLIC

2    I, Beatriz D. Fefel, Registered Professional

3    Reporter, the officer before whom the foregoing

4    proceedings were taken, do hereby certify that the

5    foregoing transcript is a true and correct record of

6    the proceedings; that said proceedings were taken by

7    me stenographically and thereafter reduced to

8    typewriting under my supervision; and that I am

9    neither counsel for, related to, nor employed by any

10   of the parties to this case and have no interest,

11   financial or otherwise, in its outcome.

12   IN WITNESS WHEREOF, I have hereunto set my

13   hand and affixed my notarial seal this 9th day of

14   February 2005.

15   My commission expires:

16   August 1, 2008

17

18   _____

19   NOTARY PUBLIC IN AND FOR THE

20   STATE OF MARYLAND

21                      _____

22

23

24

25

Page 320

1                            E R R A T A   S H E E T

2        IN RE:   In Re:  MDL Docket No. 1535

3    RETURN BY:

4    PAGE        LINE                    CORRECTION AND REASON

5    _____       _____        _____

6    _____       _____        _____

7    _____       _____        _____

8    _____       _____        _____

9    _____       _____        _____

10   _____       _____        _____

11   _____       _____        _____

12   _____       _____        _____

13   _____       _____        _____

14   _____       _____        _____

15   _____       _____        _____

16   _____       _____        _____

17   _____       _____        _____

18   _____       _____        _____

19   _____       _____        _____

20   _____       _____        _____

21   _____       _____        _____

22   _____       _____        _____

23   _____       _____        _____

24   _____                    _____

25        (DATE)                        (SIGNATURE)

Page 321

1        E R R A T A   S H E E T (C O N T I N U E D)

2        IN RE:  In Re:  MDL Docket No. 1535

3    RETURN BY:

4    PAGE        LINE                CORRECTION AND REASON

5    _____     _____     _____

6    _____     _____     _____

7    _____     _____     _____

8    _____     _____     _____

9    _____     _____     _____

10   _____     _____     _____

11   _____     _____     _____

12   _____     _____     _____

13   _____     _____     _____

14   _____     _____     _____

15   _____     _____     _____

16   _____     _____     _____

17   _____     _____     _____

18   _____     _____     _____

19   _____     _____     _____

20   _____     _____     _____

21   _____     _____     _____

22   _____     _____     _____

23   _____     _____     _____

24   _____     _____     _____

25     (DATE)                    (SIGNATURE)

