# EXHIBIT N

Page 1

1            UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF NEW JERSEY

3                  MDL No. 2875

4    _____

5    IN RE: VALSARTAN, PRODUCTS            )

     LIABILITY LITIGATION                  )

6                                          )

                                           )

7                                          )

                                           )

8    TESTIMONY OF:                         )

                                           )

9    Stephen Hecht, Ph.D.                  )

                                           )

10                                         )

     - - - - - - - - - - - - - - - - - -

11

                        August 17, 2021

12                        9:00 a.m.

13

14        TRANSCRIPT of the stenographic notes of the video

15   recorded proceedings in the above-entitled matter, as

16   taken by and before Sara K. Killian, a Registered

17   Professional Reporter, Certified Court Reporter and Notary

18   Public, remotely via Zoom videoconferencing.

19

20

21

22

23

24

25

Page 2

1 A P P E A R A N C E S :
2
3 MAZIE SLATER KATZ & FREEMAN, LLC
4 Attorneys for Plaintiffs
5 103 Eisenhower Parkway, Second Floor
6 Roseland, New Jersey 07068
7 BY: ADAM SLATER, ESQ.
8    CHRISTOPHER GEDDIS, ESQ.
9    JULIA SLATER, ESQ.
10
11
12
13 MARTIN HARDING & MAZZOTTI, LLP
14 Attorneys for Plaintiffs
15 100 Park Avenue Center, 16th Floor
16 New York, New York 10017
17 BY: ROSEMARIE RIDDELL BOGDAN, ESQ.
18
19
20 GOLOMB & HONIK, PC
21 Attorneys for Plaintiffs
22 1835 Market Street, #2900
23 Philadelphia, Pennsylvania 19103
24 BY: RUBEN HONIK, ESQ.
25

Page 4

1 A P P E A R A N C E S : (cont'd)
2
3 GREENBERG TRAURIG, LLP
4 Attorneys for Teva Pharmaceuticals USA
5 333 SE 2nd Avenue, Suite 4400
6 Miami, Florida 33131
7 BY: STEPHEN FOWLER, ESQ.
8    VICTORIA LOCKARD, ESQ.
9
10
11
12 WALSH PIZZI O'REILLY FALANGA
13 Attorneys for Teva Pharmaceuticals USA
14 One Riverfront Plaza
15 1037 Raymond Boulevard, Suite 600
16 Newark, New Jersey 07102
17 BY: CHRISTINE GANNON, ESQ.
18
19
20 CIPRIANI & WERNER, PC
21 Attorneys for Aurobindo Pharma USA, Inc.
22 450 Sentry Parkway, Suite 200
23 Blue Bell, Pennsylvania 19422
24 BY: JILL FERTEL, ESQ.
25

Page 3

1 A P P E A R A N C E S : (cont'd)
2
3 PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI, LLP
4 Attorneys for Mylan Pharmaceuticals Inc., Mylan
5    Laboratories Ltd., Mylan Inc., and Mylan N.V.
6 One Oxford Centre
7 301 Grant Street
8 Pittsburgh, Pennsylvania 15219
9 BY: CLEM TRISCHLER, ESQ.
10    FRANK STOY, ESQ.
11    TIFFANY GRIMES, Paralegal
12
13
14
15 BARNES & THORNBURG, LLP
16 Attorneys for CVS and Rite Aid
17 11 South Meridian Street
18 Indianapolis, Indiana 46204
19 BY: KARA KAPKE, ESQ.
20
21
22
23
24
25

Page 5

1 A P P E A R A N C E S : (cont'd)
2
3 DUANE MORRIS, LLP
4 Attorneys for Prinston Pharmaceutical Inc., Zhejiang
5    Huahai Pharmaceutical Co., Ltd., Solco Healthcare
6    US, LLC, Huahai US, Inc., Walmart Stores, Inc.,
7    and Walgreen Co.
8 1875 NW Corporate Boulevard, Suite 300
9 Boca Raton, Florida 33431
10 BY: PATRICK C. GALLAGHER, ESQ.
11
12
13
14
15 HINSHAW & CULBERTSON, LLP
16 Attorneys for HJ Harkins and Scigen
17 53 State Street, 27th Floor
18 Boston, Massachusetts 02109
19 BY: KATHLEEN E. KELLY, ESQ.
20
21
22
23
24
25

2 (Pages 2 - 5)

Page 6

1  A P P E A R A N C E S:  (cont'd)

2

3  FALKENBERG IVES, LLP

4  Attorneys for Humana Pharmacy

5  230 W. Monroe, Suite 2220

6  Chicago, Illinois  60606

7  BY: KIRSTEN IVES, ESQ.

8

9

10

11  HILL WALLACK, LLP

12  Attorneys for Hetero Drugs Ltd. and Hetero Labs Ltd.

13  21 Roszel Road

14  Princeton, New Jersey  08543

15  BY: NAKUL Y. SHAH, ESQ.

16     CARLOS S. DeHART, ESQ.

17

18

19

20  BUCHANAN INGERSOLL & ROONEY, PC

21  Attorneys for Albertson's LLC

22  227 West Trade Street, Suite 600

23  Charlotte, North Carolina  28202

24  BY: CHRISTOPHER B. HENRY, ESQ.

25

Page 7

1  A P P E A R A N C E S:  (cont'd)

2

3  HUSCH BLACKWELL, LLP

4  Attorneys for Express Script, Inc.

5  190 Carondelet Plaza, Suite 600

6  St. Louis, Missouri  63105

7  BY: JAMES SPRUNG, ESQ.

8

9

10

11

12

13

14  ALSO PRESENT:

15     WILLIAM MILLER, Veritext Videographer

16

17

18

19

20

21

22

23

24

25

Page 8

1              I N D E X

2

3  WITNESS     EXAMINATION BY      PAGE

4  Dr. Hecht   Mr. Trischler       12

5              Mr. Fowler          309

6              Ms. Kapke           390

7

8          E X H I B I T S

9  EXHIBITS     DESCRIPTION           PAGE

10 Exhibit 1    Expert Report of Stephen    18
              Hecht, Ph.D., 7/6/21

11

   Exhibit 2    Curriculum vitae of        33
12              Stephen Hecht, Ph.D.

13 Exhibit 3    "Plaintiffs' Disclosure    36
              of Cancer Types"

14

   Exhibit 4    "Comparative               67
15              Tumorigenicity and DNA
              Methylation in F344 Rats
16              by
              4-(Methylnitrosamino)-1-(
17              3-pyridyl)-1-butanone and
              N-nitrosodimethylamine"
18              by Stephen Hecht, et al

19 Exhibit 5    Invoices                   102

20 Exhibit 6    "Pharmacokinetics of       113
              N-nitrosodimethylamine in
21              beagles" by C.T. Gombar,
              et al

22
23
24
25

Page 9

1          E X H I B I T S

2  EXHIBITS     DESCRIPTION          PAGE

3  Exhibit 7    "The Production of     118
              Malignant Primary Hepatic

4              Tumours in the Rat by
              Feeding

5              Dimethylnitrosamine" by
              P.N. Magee and J.M.

6              Barnes

7  Exhibit 8    "Effects on 4080 Rats of   123
              Chronic Ingestion of

8              N-Nitrosodiethylamine or
              N-Nitrosodimethylamine:

9              A Detailed Dose-Response
              Study" by Richard Peto,

10             et al

11 Exhibit 9    "Pharmacokinetics of       125
              N-nitrosodimethylamine in

12             swine" by C.T. Gombar, et
              al

13

   Exhibit 10   Agents Classified by the   142
14             IARC Monographs, Volumes
              1-123

15

   Exhibit 11   "Information about          159
16             Nitrosamine Impurities in
              Medications"

17

   Exhibit 12   "Critical Review of Major  174
18             Sources of Human Exposure
              to N-nitrosamines" by

19             Adam J. Gushgari and Rolf
              U. Halden

20

   Exhibit 13   "Nitrosamines as           199
21             Impurities in Drugs,
              Health Risk Assessment

22             and Mitigation Public
              Workshop"

23

   Exhibit 14   "Permitted Daily Exposure  207
24             Limits for Noteworthy
              N-nitrosamines" by George

25             E. Johnson, et al

Page 10

E X H I B I T S
EXHIBITS    DESCRIPTION         PAGE
Exhibit 15    "High-Fat Foods and the    219
    Risk of Lung Cancer" by
    Marc T. Goodman, et al
Exhibit 16    "Risk of Colorectal and    224
    Other Gastro-Intestinal
    Cancers After Exposure to
    Nitrate, Nitrite and
    N-Nitroso Compounds:  A
    Follow-Up Study" by Paul
    Knekt, et al
Exhibit 17    "N-nitroso Compounds and    234
    Cancer Incidence:  The
    European Prospective
    Investigation into Cancer
    and Nutrition" by Yet Hua
    Loh, et al
Exhibit 18    "Dietary Nitrates,    243
    Nitrites, and
    Nitrosamines Intake and
    the Risk of Gastric
    Cancer: A Meta-Analysis"
    by Peng Song, et al
Exhibit 19    Exhibit 2:  Documents    261
    Reviewed
Exhibit 20    Table of Contents    264
Exhibit 21    "Use of    273
    N-nitrosodimethylamine
    (NDMA) contaminated
    valsartan products and
    risk of cancer:  Danish
    nationwide cohort study"
    by Anton Pottegård, et al
Exhibit 22    "N-nitrosodimethylamine-C    282
    ontaminated Valsartan and
    the Risk of Cancer" by
    Willy Gomm, et al

Page 11

E X H I B I T S
EXHIBITS    DESCRIPTION         PAGE
Exhibit 23    Defendants' Notice of    309
    Videotaped Deposition of
    Stephen Hecht, Ph.D.
Exhibit 24    "Interspecies Scaling of    325
    the Pharmacokinetics of
    N-nitrosodimethylamine"
    by Charles Gombar, et al

Exhibit 25    FDA Transcript, March 29,    383
    2021
Exhibit 26    FDA Transcript, March 30,    383
    2021

R E Q U E S T S:
Production requested    Page 347

Page 12

THE VIDEOGRAPHER:  Good morning.  We are going on the record at 9:13 a.m. on August 17, 2021.  This is media unit one of the video recorded deposition of Steven Hecht, PhD in the matter of the valsartan, losartan case.

My name is William Miller from the firm Veritext Legal Solutions.  I'm the videographer.  The court reporter is Sara Killian from the firm Veritext Legal Solutions.

All counsel is noted on the stenographic record.

Will the court reporter please swear in the witness and we can begin?

S T E P H E N   H E C H T, P h D, after having first been duly sworn, was examined and testified as follows:

MR. TRISCHLER:  Dr. Hecht, good morning.

THE WITNESS:  Good morning.

MR. TRISCHLER:  Before we begin, I just want to confirm on the record an agreement that Mr. Slater and I reached before the beginning of this deposition.

Page 13

This is the time and place set for the deposition of Dr. Steven Hecht.  Dr. Hecht issued a report dated July 6th, 2021 and we're here today to take his deposition on issues relating to causation opinions that Dr. Hecht has or may have or wishes to testify about in connection with the valsartan multi-district litigation.

The report of July 6, 2021 includes opinions and potential areas of testimony that go beyond the issue of causation and get into what I would consider to be other liability issues.

I believe the agreement of the parties is that any inquiry of Dr. Hecht on those issues unrelated to causation will be deferred until a later period of time in connection with this multi-district litigation.  My deposition of Dr. Hecht and the defendant's deposition of Dr. Hecht today will be limited to causation opinions.

Is that fair, Mr. Slater?

MR. SLATER:  Yes.  This deposition will not address liability, but will address general causation.

4 (Pages 10 - 13)

S. Hecht, Ph.D.

Page 14

1          MR. TRISCHLER: Understood and
2    agreed.
3          Thank you.
4    EXAMINATION BY
5    MR. TRISCHLER:
6    Q.    Dr. Hecht, as I mentioned just a
7    moment ago, my name is Clem Trischler. I'm an
8    attorney. I represent the Mylan defendants and
9    the Defendants' Executive Committee in the
10   valsartan multi-district litigation that's pending
11   in the United States District Court for the
12   District of New Jersey.
13         You have been identified and
14   disclosed as an expert witness on behalf of the
15   plaintiffs in this litigation.
16         Are you aware of that?
17   A.    Yes.
18   Q.    Obviously, we're gathered to take
19   your deposition on causation issues relevant to
20   this litigation. I take it that you've given
21   deposition testimony before?
22   A.    Yes.
23   Q.    Given that fact, I'll refrain from
24   going into a detailed discussion of what the
25   deposition process is, but suffice it to say

Page 15

1    myself and perhaps some other lawyers are going to
2    be asking you questions today and the answers that
3    you are providing are answers under oath and under
4    penalty of perjury.
5          Do you understand that?
6    A.    Yes.
7    Q.    I presume then that the answers that
8    you provide to my questions today will be honest
9    and truthful and to the best of your ability?
10   A.    Yes.
11   Q.    Tell us your full name, sir.
12   A.    Stephen Samuel Hecht.
13   Q.    What's your professional address,
14   Dr. Hecht?
15   A.    Masonic Cancer Center, University of
16   Minnesota, Minneapolis, 55455.
17   Q.    Where are you physically located
18   today as you give your deposition?
19   A.    I'm in the Cancer and Cardiovascular
20   Research Building on the university campus.
21   Q.    And the university campus being the
22   campus of the University of Minnesota?
23   A.    Yes.
24   Q.    Is anyone in the room with you as you
25   give your deposition testimony today?

Page 16

1    A.    No.
2    Q.    Are you using a laptop or a desktop
3    computer to participate in this deposition?
4    A.    It's a laptop.
5    Q.    Do you have any other electronic
6    devices with you in the room as you give this
7    deposition other than the laptop on which you're
8    using to communicate with me?
9    A.    Yes. I have my desktop and my phone.
10   Q.    Would it be possible for you to turn
11   your desktop and phone off during the deposition?
12   A.    I can. I was going to use the
13   desktop to view any of the papers that we're going
14   to discuss under sender say. I was given a link
15   to Novac Trial Services that would have the -- a
16   lot of the documents, so I thought that would be
17   convenient to look at, but I can turn it off.
18   Q.    Well, that's -- that's all right.
19         What I want to make sure is that
20   you're not receiving communications from any
21   source on other electronic devices during the time
22   of the deposition.
23   A.    No.
24   Q.    All right.
25         What's your occupation?

Page 17

1    A.    I'm a professor. Walin Professor of
2    Cancer Prevention, University of Minnesota.
3    Q.    You indicated in response to one of
4    my earlier questions that you were, in fact,
5    retained by the plaintiffs in the valsartan
6    litigation.
7          True?
8    A.    Yes.
9    Q.    When were you initially retained to
10   work for the plaintiffs in this litigation?
11   A.    I don't have the exact date. It's
12   about two years ago.
13   Q.    I was provided with some of your
14   invoices within the last couple of days and I'll
15   represent to you that the earliest entry that I
16   saw on your invoices was September 4, 2019.
17   A.    Yes, that sounds about right.
18   Q.    So would that entry refresh your
19   recollection as to the approximate period of time
20   when you were initially retained in this
21   litigation?
22   A.    About two years.
23   Q.    So about two years ago would be
24   September 2019; true?
25   A.    Yes.

5 (Pages 14 - 17)

S. Hecht, Ph.D.

Page 18

1   Q.   Who initially retained you?

2   A.   Mr. Slater.

3   Q.   When you were retained by Mr. Slater,

4  were you asked to analyze data and provide an

5  opinion on whether levels of NDMA and NDEA

6  observed in valsartan-containing medication was

7  capable of causing cancer in humans?

8   A.   Yes.

9   Q.   Did you attempt to answer that

10 question in the July 6, 2021 report that's been

11 filed in this case?

12   A.   Yes.

13       MR. TRISCHLER:  I'm going to mark as

14 Exhibit 1 to the deposition a copy of your

15 July 6th, 2021 report.

16       (Whereupon, Exhibit 1 was marked for

17 identification.)

18   Q.   Do you have that with you, Dr. Hecht.

19   A.   Yes, I do.

20       THE VIDEOGRAPHER:  Counsel, would you

21 like me to pull that up on the screen?

22       MR. TRISCHLER:  If need be.  It

23 might -- let's --

24       MR. SLATER:  He has it in hard copy,

25 I think.

Page 19

1       MR. TRISCHLER:  That's why I'm asking

2  if he has it.  I'd rather just work with the

3  doctor if he has it.

4   Q.   You have the report that we marked as

5  Exhibit 1, sir?

6   A.   Yes.

7   Q.   All right.

8       Is that your signature that appears

9  on the first page of that report?

10   A.   Yes.

11   Q.   Did you prepare this report?

12   A.   Yes.

13   Q.   Is it the product of your work?

14   A.   Yes.

15   Q.   Did anyone assist you in the

16 preparation of this report?

17       MR. SLATER:  Clem, objection.

18       Are you trying to get into areas that

19 are obviously covered by work product

20 privilege?  I mean, the preparation of the

21 report is work product.  Drafts are the not

22 discoverable, so I'm not sure where we're

23 going with this.

24       MR. TRISCHLER:  I didn't ask about

25 drafts.  I asked if anyone helped him with

Page 20

1  the report.  It could have been his wife, it

2  could have been an associate professor.  It

3  could have been anyone, Adam.

4       MR. SLATER:  So anyone other than a

5  lawyer?

6       I'll allow him to answer.

7   Q.   Did anyone assist you in the

8  preparation of this report, sir?

9   A.   Yes.  I was assisted by Mr. Slater.

10   Q.   I'm not interested in what assistance

11 Mr. Slater may have provided, so other than

12 Mr. Slater, did anyone assist you in the

13 preparation of this report?

14   A.   No.

15   Q.   Did anyone write any sections of this

16 report for you?

17   A.   No.

18   Q.   In the conclusion to your report that

19 appears on page 27, you write "These nitrosamines

20 in valsartan-containing medication posed an

21 unacceptable risks of causing or substantially

22 contributing to the causation of cancer for those

23 ingesting the valsartan."

24       Did I read that correctly?

25   A.   Presumably.

Page 21

1   Q.   Is there a difference in your mind

2  between an exposure that creates an unacceptable

3  risk of contributing to cancer causation and an

4  exposure that definitely causes cancer?

5       MR. SLATER:  Objection to the form of

6  the question.

7       You can answer.

8   A.   Repeat the question.

9   Q.   Sure.

10       Is there a difference in your mind

11 between an exposure that creates an unacceptable

12 risk of contributing to cancer causation and an

13 exposure that definitely causes cancer?

14       MR. SLATER:  Same objection.

15       You can answer.

16   A.   Yes.

17   Q.   What's the difference in your mind?

18       MR. SLATER:  Same objection.

19       You can answer.

20   A.   We are using the available data to

21 determine whether it's probable or even likely

22 that certain exposure could cause cancer versus

23 another situation where we know perhaps a person

24 has been treated with a chemotherapeutic drug that

25 has carcinogenic side effects where you know on an

6 (Pages 18 - 21)

S. Hecht, Ph.D.

Page 22

1 individual basis that you know the
2 chemotherapeutic drug caused perhaps a second
3 cancer, a different cancer than the one person
4 was being treated for.
5          I don't know. Does that answer your
6 question?
7    Q.    I'm not sure.
8    A.    So in this particular case, we don't
9 know about the individual exposure and outcome.
10 All we know about is that the valsartan drug
11 contained a carcinogen. Whereas in the other case
12 that you mentioned, I believe what you were saying
13 is we know if we administer a certain cancer
14 causing agent to a given person and that person
15 gets cancer, then we know cause and effect in that
16 individual.
17          Is that your question?
18    Q.    I'm not sure that was my question,
19 but I think what I heard you say is that in some
20 instances, we can tell cause and effect with
21 reasonable certainty and some instances, we
22 cannot?
23          MR. SLATER: Objection.
24          You can answer.
25    A.    I don't know what you mean by

Page 23

1 reasonable certainty.
2    Q.    Well, expert opinions -- strike that.
3          Expert witnesses in civil litigation
4 of this nature are supposed to provide scientific
5 testimony to a reasonable degree of scientific
6 certainty.
7          Is that your intention today?
8    A.    Yes.
9    Q.    So to a reasonable degree of
10 scientific certainty, what I'm asking you is are
11 there instances where we can definitively
12 determine the cause of cancer and instances where
13 we could not?
14          MR. SLATER: Objection.
15          You can answer.
16    A.    Yes, there are instances where we can
17 definitively determine the cause of cancer.
18    Q.    So what I'm trying to understand,
19 sir, is the opinion that you intend to offer in
20 this case.
21          Did NDMA and NDEA in
22 valsartan-containing medications increase the risk
23 of cancer or do you intend to offer the opinion
24 that small amounts of nitrosamines observed in the
25 valsartan-containing medications definitively

Page 24

1 caused cancer?
2          MR. SLATER: Objection.
3          Multiple reasons.
4          You can answer, Dr. Hecht.
5    A.    They increased the risk of cancer.
6    Q.    Now, there are lots of risk factors
7 for cancer; true?
8    A.    Yes.
9    Q.    Old age is a risk factor, correct?
10    A.    Yes.
11    Q.    People over the age of 50 are at an
12 increased risk of cancer; true?
13    A.    Correct.
14    Q.    People over the age of 50 are at an
15 increased risk of cancer regardless whether they
16 take valsartan; true?
17    A.    Yes.
18    Q.    People over the age of 50 are at an
19 increased risk of cancer regardless of whether
20 they took valsartan containing small amounts of
21 nitrosamines; true?
22          MR. SLATER: Objection.
23          You can answer.
24    A.    Yes.
25          MR. SLATER: Dr. Hecht, one second.

Page 25

1          Just give a pause because he's going pretty
2 quick and I need to have a little time to
3 place my form objections to the questions and
4 then I would expect I'll go ahead and say you
5 could answer every time or virtually every
6 time, but just give a little pause so I don't
7 step on your answer.
8          Okay?
9          THE WITNESS: Okay.
10    Q.    That's fair, Dr. Hecht. I probably
11 should have told you at the beginning, that
12 especially taking these depositions remotely, we
13 have to be careful not all to speak at the same
14 time because if you and I or Adam and I are
15 speaking at the same time, the audio tends to go
16 out and the court reporter can't take everything
17 down. If you could try to pause before -- after I
18 finish my question, give Adam a chance to
19 interject if he needs to, that will make things go
20 a lot more smoothly. My fault for not covering.
21          Okay?
22    A.    Okay.
23    Q.    So is a family history of cancer also
24 a risk factor for cancer?
25    A.    Yes.

7 (Pages 22 - 25)

Page 26

1    Q.    Is tobacco use a risk factor for
2  cancer?
3    A.    Yes.
4    Q.    Is alcohol use a risk factor for
5  cancer?
6    A.    Yes.
7    Q.    Is obesity a risk factor for cancer?
8    A.    Yes.
9    Q.    What you are saying here today or
10 what your opinion that you intend to offer in this
11 case is that increased nitrosamine intake is
12 also a risk factor for cancer, you believe?
13   A.    Yes.
14   Q.    I assume we could also agree right
15 off the bat, Dr. Hecht, that just because
16 something is a risk factor doesn't mean that it
17 caused cancer?
18   A.    Correct.
19   Q.    You can be 400 pounds, but that
20 doesn't mean that's the reason why you develop
21 lung cancer; true?
22   A.    Correct.
23   Q.    Do you also understand and can we
24 agree that the question of whether a substance is
25 capable of causing cancer is dependent on dose and

Page 27

1  duration of exposure?
2    A.    Yes.
3    Q.    And --
4          MR. SLATER:  Belated objection.
5          It went a little quick, but you could
6  continue.
7    Q.    The reason I thought we could agree
8  on that is you seemed to acknowledge that fact in
9  the conclusion of your report on page 27 when you
10 write that any increased risk would be
11 commensurate with the impurity level, the dose and
12 the period of use.
13         Is that right?
14   A.    Yes.
15   Q.    Are you familiar with the old adage
16 that "The dose makes the poison"?
17   A.    Yes.
18   Q.    Do you agree with that statement?
19   A.    Yes.
20   Q.    All substances -- strike that.
21 Virtually all substances known to man
22 have a capacity to be toxic at some level; true?
23         MR. SLATER:  Objection.
24         You can answer.
25   A.    All substances known to man?  I don't

Page 28

1  know about that.
2    Q.    Well, let me give you a for instance.
3          Water is a life-sustaining substance,
4  correct?
5    A.    Yes.
6    Q.    However, water can be deadly when
7  it's consumed to excess; true?
8    A.    Yes.
9    Q.    So there are -- you didn't want to
10 agree with virtually all, but there are many
11 substances that have the capacity to be harmful at
12 some level; true?
13   A.    Yes.
14   Q.    And since there are many substances
15 that have the capacity to be harmful at some
16 level, looking at exposure levels, dose and
17 duration would be a reasonable and necessary
18 approach when evaluating cancer causation; agreed?
19   A.    Yes.
20   Q.    The question in this litigation to be
21 answered is not whether nitrosamines can cause
22 harm at any level.
23         Do you understand the question that
24 we're interested in getting at is whether there's
25 credible scientific evidence that the small

Page 29

1  amounts of NDMA that was contained in
2  valsartan-containing medications can cause cancer
3  in humans.
4          Can we agree on that?
5          MR. SLATER:  Objection to the form of
6  the question.
7          You can answer.
8    A.    Yes.
9    Q.    I guess a second question to be
10 answered is whether small tiny amounts of NDEA
11 found in valsartan-containing medications can
12 cause cancer in humans, right?
13         MR. SLATER:  Objection to the form of
14 the question.
15         You can answer.
16   A.    Yes.
17   Q.    Since we can agree on the questions
18 to be answered, I take it that what the reason
19 that you're here is that you were retained by
20 Mr. Slater and the lawyers and the plaintiff group
21 to help analyze and provide answers to those two
22 questions.
23         Is that accurate?
24         MR. SLATER:  Objection.
25         You can answer.

8 (Pages 26 - 29)

S. Hecht, Ph.D.

Page 30

1    A.    Yes.
2    Q.    So in broad strokes, Dr. Hecht, tell
3  me generally what work you did to answer those two
4  questions.
5         MR. SLATER:  Objection.
6         You can answer.
7    A.    Well, I looked to the literature and
8  all of the data regarding the contamination of
9  valsartan with dimethylnitrosamine,
10  dimethylnitrosamine. My conclusion was that it
11  posed -- that it should not have been there, first
12  of all, and it posed an unacceptable risk to
13  people using these medications.
14    Q.    Let me stop you.  It sounds like you
15  were finished anyway, Dr. Hecht.  If my question
16  was unclear, I apologize.  I wasn't really
17  interested in getting at all of your opinions
18  right now.
19         My question was if you could just
20  tell me in a general fashion what work you did to
21  answer the questions or to form your opinions.
22         You told me that so far you looked up
23  literature, correct?
24    A.    Yes.
25    Q.    You told me that you looked at some

Page 31

1  data on nitrosamine levels in valsartan products
2  from some manufacturers, correct?
3         MR. SLATER:  Objection.
4         Mischaracterization of the testimony.
5         You can answer.
6    A.    Yes.  I looked at what's in the
7  literature and what's in the documents that I was
8  given.
9    Q.    Okay.
10         So again, I'm just looking for broad
11  strokes in terms of what work you did to sit down
12  and write this report that we marked as Exhibit 1.
13         You've told me looking at literature
14  and looking at documents and I assume we're
15  talking about company documents that were provided
16  to you by Mr. Slater and his team, right?
17    A.    Yes, in part.  And also published
18  literature like the EMA report.
19    Q.    Okay.
20    A.    Other publications in the open
21  literature that have discussed this.
22    Q.    Okay.
23         My apologies for interrupting you
24  there briefly.
25         Other than looking at the literature

Page 32

1  and documents that were provided to you by
2  Mr. Slater and his team, is there anything else
3  you did to sit down and write the report that we
4  marked as Exhibit 1?
5         MR. SLATER:  Objection.
6         You can answer.
7    A.    Anything else that I did?  I, you
8  know, depended on my experience and knowledge of
9  the literature about nitrosamine carcinogenesis.
10  So I depended on that knowledge, I drew on it to
11  write the report.
12    Q.    Sure.
13         Now, I understand -- and I'm going to
14  get into your background in a little bit -- but I
15  understand you drew upon and relied upon your
16  background in reaching conclusions based on your
17  review of the literature and review of the
18  documents provided to you by Mr. Slater.
19         That's what you're telling me,
20  correct?
21    A.    Yes.
22    Q.    Was there any other work that you
23  actively did to prepare the report other than what
24  we've described?
25    A.    I'm not sure exactly what you mean by

Page 33

1  other -- I wrote the report based on the sources
2  that I had.
3         (Whereupon, Exhibit 2 was marked for
4         identification.)
5    Q.    So let's -- let me ask you some
6  questions about your background then.
7         I have attached as Exhibit 2 a copy
8  of your CV, which contains a rather large
9  bibliography.
10         Do you happen to have a copy of your
11  CV with you, Dr. Hecht?
12    A.    It's on my computer.  I don't have --
13         MR. SLATER:  It's also attached to
14  the report, Doctor.  Or it should be.
15    Q.    Well, if you need to refer to it to
16  answer my questions, feel free.
17         Okay?
18    A.    Okay.
19    Q.    But does the -- can you tell me
20  whether the CV that we've marked as Exhibit 2 and
21  which is attached to your report contains an
22  accurate list of your professional qualifications?
23    A.    Yes.
24    Q.    Is it complete and up to date as far
25  as you know?

9 (Pages 30 - 33)

S. Hecht, Ph.D.

Page 34

1    A.    Yes.
2    Q.    Is there anything that you'd like to
3 add or remove from the CV?
4    A.    No.
5    Q.    Based on my review of your CV, it
6 appears your formal education is in the field of
7 chemistry; is that true?
8    A.    Yes.
9    Q.    You have a bachelor's degree in
10 chemistry from Duke University; true?
11    A.    Correct.
12    Q.    And a PhD in organic chemistry that
13 you obtained in 1968, correct?
14    A.    Right.
15    Q.    Did you have to write a thesis to
16 obtain that PhD?
17    A.    Yes.
18    Q.    What was the subject matter of your
19 thesis?
20    A.    The thesis was divided into two
21 parts. The first part had to do with transannular
22 carbene reactions. I'm not sure if you want me to
23 go into detail about that.
24    Q.    That's all right.
25    A.    The second part dealt with the

Page 35

1 photolysis of phenoxy compounds.
2    Q.    Sounds rivetting.
3    A.    Yes.
4    Q.    That was a poor attempt at humor.
5    A.    Yes, I know.
6    Q.    Did your thesis touch on
7 nitrosamines?
8    A.    No.
9    Q.    May I ask your age, sir?
10    A.    Seventy-eight.
11    Q.    You mentioned earlier when I asked
12 you your occupation, you indicated you're a
13 professor, so currently you're in academia, right?
14    A.    Correct.
15    Q.    Are you an employee of the University
16 of Minnesota?
17    A.    Yes.
18    Q.    And so you draw a salary from the
19 university; is that right?
20    A.    Yes.
21    Q.    According to the CV, you're a
22 professor in the Department of Laboratory Medicine
23 and Pathology.
24    A.    Correct.
25    Q.    To be clear, though, you were not a

Page 36

1 pathologist; agreed?
2    A.    Yes.
3    Q.    Are you a medical doctor?
4    A.    No.
5    Q.    Since you're not a medical doctor, I
6 take it you do not diagnose cancer in patients,
7 correct?
8    A.    Correct.
9    Q.    Have you ever diagnosed a patient
10 with esophageal cancer?
11    A.    No.
12    Q.    Have you ever diagnosed a patient
13 with colorectal cancer?
14    A.    No.
15         MR. TRISCHLER: I'm going to mark as
16 Exhibit 3 a document that's entitled
17 "Plaintiffs' Disclosure of Cancer Types."
18         To our technician, this is one you
19 can put up on the screen for me.
20         (Whereupon, Exhibit 3 was marked for
21 identification.)
22    Q.    Are you able to see that document,
23 Dr. Hecht?
24    A.    Maybe you could make it a little
25 larger.

Page 37

1    Q.    I can't, but there's --
2         THE VIDEOGRAPHER: Is there a
3 specific section you'd like me to blow up?
4         MR. TRISCHLER: Just the text in the
5 middle.
6         THE WITNESS: Okay.
7    Q.    Have you ever seen this document
8 before, sir?
9    A.    Let me just read it first.
10 Okay?
11    Q.    Sure.
12         (Witness reviews document)
13    A.    No, I've not.
14    Q.    I'll represent to you that this is a
15 disclosure that was filed by the plaintiffs in
16 this litigation. It's a list of cancer types that
17 have been placed at issue in this litigation.
18 Okay?
19    A.    Okay.
20    Q.    Take a look.
21         Do you see there are 13 cancer types
22 listed? Do you see that?
23    A.    Yes.
24    Q.    Have you ever diagnosed any of these
25 cancer types in any patient?

10 (Pages 34 - 37)

S. Hecht, Ph.D.

Page 38

1    A.    No.
2    Q.    Have you ever treated a cancer
3 patient?
4    A.    No.
5    Q.    Going back to your role at the
6 University of Minnesota, are you actively teaching
7 at the moment?
8    A.    No.
9    Q.    Are you going to be teaching any
10 courses in the 2021/2022 academic year?
11    A.    No.
12    Q.    When was the last time you taught a
13 graduate level course?
14    A.    That's about ten years ago.
15    Q.    What was the course you taught some
16 ten years ago?
17    A.    Chemical carcinogenesis.
18    Q.    Did you use a textbook for that
19 course?
20    A.    No.  We used the current literature.
21    Q.    Who were you teaching that graduate
22 level course to?  Was it medical students at the
23 medical school or was it in some other
24 environment?
25    A.    It was a mixture that -- there

Page 39

1 weren't medical students.
2    Q.    Was it a graduate level course in
3 some --
4    A.    In carcinogenesis.  The students came
5 from different programs in the university, but
6 there weren't medical students.  There were
7 graduate students in medicinal chemistry or from
8 the St. Paul campus on nutrition.
9    Q.    Thank you.
10        I'm trying to get an understanding
11 was it a class that was offered by the Department
12 of Chemistry, the Department of Biology.  Help me
13 understand that, if you can.
14    A.    No, it was a graduate course in --
15 actually, I've forgotten exactly which division it
16 was listed in.  I don't recall whether it was
17 medicinal chemistry or whether it was in the C
18 fans, the food and nutrition.  I'm sorry.  I don't
19 remember.
20    Q.    That's okay.  It's been ten years --
21 I understand it's been ten years since you offered
22 the course, correct, or taught the course?
23    A.    Yes.
24    Q.    Has it been ten years since you've
25 been in the classroom at Minnesota?

Page 40

1    A.    Yes.
2    Q.    Have you ever taught an undergraduate
3 course at the University of Minnesota?
4    A.    No.
5    Q.    Are you a full-time employee at this
6 point or have you slowed down?
7    A.    No, I'm a full-time employee.
8        MR. TRISCHLER:  You can remove that
9    exhibit, sir.
10        Thank you.
11    Q.    Are you actively involved in any
12 research projects at the moment?
13    A.    Yes, I am.
14    Q.    I think in your report that's marked
15 as Exhibit 1 to this deposition you indicate at
16 the bottom of page two that you are the principal
17 investigator on three R01 grants --
18    A.    RO1.
19    Q.    Correct?
20    A.    Yes.
21    Q.    By the way, the Masonic Cancer Center
22 is designated as a comprehensive cancer center,
23 correct?
24    A.    Correct.
25    Q.    I think that's a designation given by

Page 41

1 the National Cancer Institute?
2    A.    Correct.
3    Q.    And Masonic would be one of over 50
4 hospital systems over the country that have been
5 so designated, right?
6    A.    About 50, yeah.
7    Q.    The National Cancer Institute has
8 also designated seven laboratory centers across
9 the country that do cutting edge cancer-related
10 research, correct?
11    A.    Right.  Those are laboratory centers.
12 Comprehensive center includes not only laboratory
13 research, but also treatment.
14    Q.    But Masonic is not one of the seven
15 laboratory cancer centers designated --
16    A.    It's a comprehensive center, which
17 includes laboratory work.
18    Q.    Going back then to the RO1 grants,
19 these are projects that are funded by federal
20 grants; is that right?
21    A.    Yes.
22    Q.    To whom were the three RO1 grants
23 that you reference in your report issued?
24    A.    Well, I'm the principal investigator,
25 but the grants are actually issued to the

11 (Pages 38 - 41)

S. Hecht, Ph.D.

Page 42

1 University of Minnesota.
2    Q.    Can you describe the subject of those
3 three current grants?
4    A.    Yes.  One of them involves the
5 mechanisms and prevention of tobacco-induced
6 cancer caused by a group of carcinogens in tobacco
7 products that we discovered and have worked on for
8 many years called tobacco specific nitrosamines.
9        The second grant --
10   Q.    I'm sorry.
11       Would those be NNN and NNK?
12   A.    Correct.  Do you want me to go on or
13 do you want me to --
14   Q.    Yes, please.
15   A.    The second grant has to do with the
16 carcinogens and toxicants that are possibly
17 omitted from e-cigarettes that are present in
18 e-cigarette paper and could be taken up by people
19 who use these products.
20       The third one is a clinical trial of
21 watercress for -- to enhance the detoxification of
22 environmental toxicants and carcinogens.
23       Those are the three RO1 grants.  I'm
24 also the PI of a program project grant on the
25 ethnic differences in cancer risk due to cigarette

Page 43

1 smoking.
2    Q.    Okay.
3        Thank you for the descriptions.
4        The third one -- the third RO1 grant
5 you mentioned, I'm not sure if I didn't hear you
6 or didn't understand you.  You said it was a
7 clinical trial involving what?
8    A.    Watercress.
9    Q.    Forgive my ignorance.
10       What's watercress?
11   A.    It's a plant.
12   Q.    Okay.
13   A.    It's a common food that people use in
14 salads.  Watercress.
15   Q.    Is it carcinogenic?
16   A.    No.  Not at all.
17   Q.    What does the clinical trial involve?
18   A.    So we found over the years in other
19 studies that we've done that a compound that's
20 present in watercress called PEITC -- or phenethyl
21 isothiocyanate -- can prevent lung cancer in rats
22 and mice treated with tobacco carcinogens.  Based
23 on that work, we performed a clinical trial with
24 our colleagues here at the University of Minnesota
25 to determine whether PEITC would have a similar

Page 44

1 effect in cigarette smokers as it did in
2 laboratory animals, whether it could therefore be
3 used as a chemo-preventative agent in people who
4 couldn't stop smoking because they're addicted to
5 nicotine.  This compound was able to prevent
6 cancer in animals treated with tobacco specific
7 nitrosamines, as I mentioned.
8        So in this clinical trial, we found
9 that PEITC did, in fact, decrease the metabolic
10 activation of NNK in smokers, which was the
11 hypothesized result.  But the decrease was, while
12 significant, was quite small.
13       However, in the same trial, we found
14 that certain people who took the PEITC had a great
15 increase in their ability to detoxify
16 environmental toxicants like benzene.  This formed
17 the basis for the watercress study because
18 watercress is a great source of PEITC.  Just a
19 salad-sized portion of watercress will, when you
20 eat it, when you chew it, will release 20 to
21 30 milligrams of PEITC, which was similar to the
22 dose of the pure compound we had used in the study
23 that I described.
24       So that's what gave rise to the
25 watercress trial.

Page 45

1    Q.    All right.  I understand what you're
2 doing now in that study.  I appreciate the
3 details.
4        So you've now told me about your
5 current RO1 grants and your --
6    A.    Grant project.
7    Q.    -- correct.
8    A.    Yes.
9    Q.    Do any of your current RO1 grants or
10 the program project grant deal specifically with
11 NDMA or NDEA?
12   A.    The one on tobacco specific
13 nitrosamines, while the specific names aren't
14 dealing specifically with NDMA, it's closely
15 related to NNK in terms of its mechanistic
16 properties.
17       So the answer -- the short answer to
18 your question is no, but the longer answer is that
19 yes, it's closely related.
20   Q.    Well, I understand that NDMA and NNN
21 or NNK might be chemically related, but my
22 question was are these grants dealing specifically
23 with NDMA or NDEA grant research?
24   A.    Not specifically.  Not in the
25 specific names.

12 (Pages 42 - 45)

S. Hecht, Ph.D.

Page 46

1    Q.    Have you ever been involved in any
2 federally-funded research products dealing
3 directly with the carcinogenicity of NDMA?
4    A.    Yes.
5    Q.    Can you tell me about those, please?
6    A.    Well, when I was still at the
7 American Health Foundation, we did studies that
8 compared the carcinogenicity and metabolism of
9 NDMA and NNK. We did this because NNK was a
10 relatively -- a relatively new carcinogen that
11 hadn't been explored with a regard to its
12 carcinogenic properties and mechanisms of action,
13 whereas NDMA has been known as a carcinogen since
14 1956.
15         So since NDMA was such a
16 well-established carcinogen, we thought it would
17 be important to compare some of the properties of
18 NNK and NDMA, so we did do those studies.
19    Q.    I think that was back in the 1980s,
20 you said?
21    A.    Yes.
22    Q.    It was a comparative analysis of the
23 potency of NDMA to NNK?
24    A.    Yes.
25    Q.    You published the results of those --

Page 47

1 of that study, correct?
2    A.    Yes.
3    Q.    And I think it was an animal study
4 involving rats; is that right?
5    A.    Yes.
6    Q.    Have you ever been involved in your
7 career in any federally-funded research projects
8 involving the carcinogenicity of NDEA?
9    A.    Not specifically.
10    Q.    Have you ever been involved in any
11 research projects that focused on the human body's
12 metabolism of NDEA?
13    A.    Human NDMA? No, not directly.
14    Q.    Have you ever been involved in any
15 research projects that focused on the human body's
16 metabolism of NDEA?
17    A.    Not directly, no.
18    Q.    Have you ever been involved in any
19 research projects devoted to analyzing the
20 mechanisms of action of cancer induction from
21 NDMA?
22    A.    Yes.
23    Q.    Would that be the same study that you
24 told me about before, the rat comparison to NNK?
25    A.    That was one, yes.

Page 48

1    Q.    Have you ever been involved in any
2 research projects devoted to analyzing the
3 mechanism of action of cancer induction from NDEA?
4    A.    Not directly.
5    Q.    Since you don't have a medical
6 degree, I take it you're not Board Certified in
7 oncology, radiology or any other medical
8 discipline, right?
9    A.    Correct.
10    Q.    Are you an expert in the field of
11 epidemiology?
12    A.    I have worked with epidemiologists
13 throughout my career, yes.
14    Q.    I have, too. Does that make me an
15 expert in epidemiology?
16         MR. SLATER: Objection to the form.
17         You can answer.
18    A.    I don't know. I don't know if you're
19 an expert in epidemiology.
20    Q.    Do you hold yourself out as an expert
21 in the field of epidemiology?
22    A.    That depends on your definition of
23 the word "expert."
24    Q.    Do you agree that epidemiology is the
25 study of the distribution and determinants of a

Page 49

1 disease in a population?
2    A.    Yes.
3    Q.    Do you have a degree in epidemiology?
4    A.    No.
5    Q.    Are you Board Certified in the field
6 of epidemiology?
7    A.    No.
8    Q.    Are you a pharmacoepidemiologist?
9    A.    Pardon me?
10    Q.    Are you a pharmacoepidemiologist?
11    A.    No.
12    Q.    Do you have a degree in pharmacology?
13    A.    No.
14    Q.    Do you agree that pharmacology is the
15 study of effects of drugs on a population?
16    A.    Yes.
17    Q.    Have you ever been trained or
18 employed as a clinical pharmacologist?
19    A.    No.
20    Q.    Are you a molecular biologist?
21    A.    No.
22    Q.    On your CV and also in response to
23 one of my earlier questions, you mentioned you
24 were affiliated for a time with the American
25 Health Foundation.

13 (Pages 46 - 49)

S. Hecht, Ph.D.

Page 50

1        Is that right?
2    A.    I worked there for 23 years.
3    Q.    That was before you moved to the
4 University of Minnesota, right?
5    A.    Correct.
6    Q.    Why did you leave the American Health
7 Foundation?
8    A.    I was concerned about the future of
9 the foundation and also I had a very nice offer
10 from the University of Minnesota.
11    Q.    Nice offer from who?
12    A.    The University of Minnesota.
13    Q.    I'm sorry.  Sometimes I don't hear
14 great and sometimes with the computer your voice
15 trails off a little bit, Doctor.  If I ask you to
16 repeat yourself, it's just because I couldn't hear
17 the answer.
18        Okay?
19    A.    Okay.  Sure.
20        The offer was from the University of
21 Minnesota.  The cancer center in particular.
22    Q.    Understood.
23        When you were at the American Health
24 Foundation, according to your CV, you held the
25 title of Director of Research for over nine years;

Page 51

1 is that right?
2    A.    Yes.
3    Q.    Were you in charge of all the
4 foundation's research activities during that
5 nine-year period?
6    A.    That depends what you mean by "in
7 charge of."  I was responsible for overseeing and
8 coordinating the research.  It was up to the
9 individual investigators to get the research
10 funded.  My role was to bring people together to
11 look for opportunities for interdisciplinary
12 collaboration and also to write the cancer center
13 grant application from the foundation to the
14 National Cancer Institute.
15    Q.    The vast majority of the funding of
16 the American Health Foundation came from federal
17 grants and contracts awarded through NCI, correct?
18    A.    Correct.
19    Q.    So you would have to write the grant
20 applications to outline the scientific basis for
21 the research that you wanted to conduct so that
22 you could get those federal funds into the
23 facility to do that work?
24    A.    Yes.  That's true, but each
25 individual principal investigator was responsible

Page 52

1 for -- also responsible for funding their own
2 research through grants and contracts mostly from
3 the National Cancer Institute.
4    Q.    To whom did you report in your role
5 as Director of Research when you were at the
6 American Health Foundation?
7    A.    To Ernst Wynder, president and
8 founder of the foundation.
9    Q.    At some point in time, the American
10 Health Foundation changed its name to the
11 Institute for Cancer Prevention, right?
12    A.    That was just The Institute.  So the
13 foundation included two branches.  There was a
14 branch in New York City, which focused on
15 epidemiology.  That was Dr. Wynder's specialty.
16 You may be aware that he was the first to -- in
17 this country -- to establish the relationship
18 between smoking and lung cancer.
19        Then there was The Institute, which
20 was in Westchester County, which was the basic
21 research, the laboratory research part of the
22 foundation.  My role was Director of Research of
23 the laboratory part of the foundation.
24    Q.    I understand.
25        The foundation, though, changed its

Page 53

1 name to the Institute for Cancer Prevention,
2 right?
3    A.    No.  The foundation never changed its
4 name.  It's the Naylor Dana Institute, which is
5 the basic research institute.  It changed its name
6 to Institute for Cancer Prevention.  That was
7 after I left.
8    Q.    Where is the health foundation today?
9    A.    It went out of business in the late
10 90s.
11    Q.    It's out of business just as the IFC
12 is out of business, right?
13    A.    Yes.
14    Q.    They filed for bankruptcy, right?
15    A.    I believe.  Something like that.  I
16 don't really know the details.
17    Q.    Several of the leaders of that
18 organization were indicted on federal charges,
19 right?
20    A.    There were some problems, yes.  This
21 was all after I left.  Well after I left.
22    Q.    The leaders of the American Health
23 Foundation and IFCP were indicted on charges of
24 improperly diverting and misusing federal funds
25 for cancer research, right?

14 (Pages 50 - 53)

S. Hecht, Ph.D.

Page 54

1    A.    Something like that, yes.
2    Q.    Several of the members of the
3 management group, including the CFO, pled guilty
4 to those charges, right?
5    A.    I guess so.
6    Q.    Were any charges ever brought against
7 you?
8    A.    No.
9    Q.    Were you ever interviewed or
10 investigated by the FBI in connection with AHF and
11 IFCP's misuse of federal funds?
12    A.    No.
13    Q.    In addition to the criminal matters,
14 there were also a lot of civil charges that were
15 brought by the United States Department of Justice
16 against your old employer and its employees,
17 right?
18    A.    I really don't know anything about
19 that.
20    Q.    Were any charges -- civil charges --
21 brought against you from your work at --
22    A.    No.
23    Q.    -- AHF?
24    A.    No.
25    Q.    Isn't it true that many of the

Page 55

1 allegations that were brought by the federal
2 government involving misuse of funds at IFCP and
3 AHF predate your departure from the organization?
4    A.    I really don't know.
5    Q.    You don't remember hearing anything
6 about any of that while you were there?
7    A.    No.
8    Q.    You said earlier that you were
9 concerned about the future of the organization,
10 which is one of the reasons why you left.
11    A.    Yes.
12    Q.    Did your concern have something to do
13 with the federal charges and federal
14 investigations that were going on?
15    A.    Not at all.
16    Q.    Why were you concerned about the
17 future of the organization when you were there?
18    A.    Ernst Wynder's management style
19 about, you know, the allocation of resources
20 within the institute. It had nothing to do with
21 any of the things you're talking about.
22    Q.    The things I'm talking about actually
23 happened.
24        You know that, right?
25        MR. SLATER: Objection.

Page 56

1        Is this an argument now that you'd
2 like to start with Dr. Hecht or do you have
3 another question?
4        MR. TRISCHLER: I thought I did ask a
5 question, Adam.
6        MR. SLATER: I took it as
7 argumentative and I object to it.
8        You can answer, but I'm sure he's
9 going to -- Mr. Trischler will start asking
10 direct questions instead of what just
11 happened.
12    A.    What was the question again?
13    Q.    There were federal investigations,
14 federal indictments and federal charges of fraud
15 against AHF, IFCP and its employees for misuse of
16 federal funds.
17        You are aware of that; true?
18    A.    I heard about it.
19    Q.    And at the time that you were
20 Director of Research, isn't it true that AHF
21 settled a federal lawsuit by paying the government
22 millions of dollars to replace and reimburse the
23 government for misuse of federal grant monies?
24    A.    I don't know. I don't think that
25 happened when I was there. It may have. I don't

Page 57

1 know. I honestly don't know.
2    Q.    Were you ever deposed in connection
3 with any of those lawsuits?
4    A.    No.
5    Q.    Did you ever given sworn testimony in
6 connection with any of those lawsuits?
7    A.    No.
8    Q.    Was the scrutiny from the federal
9 authorities and investigators anything that led to
10 your departure from that company and your decision
11 to head to the University of Minnesota?
12    A.    No, not at all.
13    Q.    In your report that I have marked as
14 Exhibit 1, you indicated that you've been involved
15 in the -- in research relating to nitrosamine
16 since 1973.
17    A.    Correct.
18    Q.    That's true?
19    A.    Yes.
20    Q.    How many different nitrosamines have
21 been identified by the scientific community?
22    A.    How many have been identified?
23    Q.    Yes, sir.
24    A.    Do you mean in connection with cancer
25 or --

15 (Pages 54 - 57)

S. Hecht, Ph.D.

Page 58

1   Q.   No.
2   A.   -- just in general? I mean, you
3   know, there's an infinite number of possible
4   nitrosamines that can be synthesized and
5   identified. The actual number that have actually
6   been identified by chemists, it's probably in the
7   hundreds. I don't really know that number.
8   Q.   Okay.
9   A.   They're not all -- wouldn't all be
10  with respect to cancer research. I mean
11  nitrosamines have been known as a class --
12  chemical class long before they were known to be
13  carcinogenic.
14  Q.   I appreciate all that information and
15  I understand that there may be nitrosamines that
16  can be synthesized that have yet to be identified.
17  I was just asking if you know generally from your
18  involvement in this field how many have been
19  identified both as carcinogenic and
20  noncarcinogenic.
21       What you told me is that the number
22  is in the hundreds, right?
23  A.   Yeah. As carcinogenic?
24  Q.   No. That wasn't my question.
25  A.   Okay. What's your question?

Page 59

1   Q.   Total number of nitrosamines that
2   have been identified.
3   A.   Independent of any biological
4   activity?
5   Q.   Yes.
6   A.   In all the chemical literature?
7   Q.   Yes.
8   A.   I'm guessing between 100 and 200.
9   Q.   I've seen research suggesting there's
10  been as many as 300 nitrosamines identified.
11       Would you dispute that?
12  A.   That's possible, sure. Nitrosamines
13  or nitroso compounds?
14  Q.   Nitrosamines.
15  A.   You're sure of that?
16  Q.   So if we just use the number 300,
17  while the scientific community has identified
18  around 300 different nitrosamines, is it true that
19  most of your research has focused on nitrosamines
20  found in tobacco products?
21  A.   Yes.
22  Q.   For instance, you've told us here
23  today that you continue to work on and do
24  important research on tobacco-related nitrosamines
25  like NNK and NNN?

Page 60

1   A.   Yes.
2   Q.   Your research was fundamentally
3   important in identifying those nitrosamines as
4   carcinogenic, correct?
5   A.   Yes.
6   Q.   Is NNK listed as a Class 1
7   carcinogen?
8   A.   NNK and NNN are together considered
9   Class 1 by IARC. They're listed together because
10  they always occur together.
11  Q.   While most of your work and research
12  is focused on nitrosamines contained in tobacco
13  products, is it fair to say that you've not
14  researched all the 300 plus nitrosamines
15  recognized by the scientific community?
16  A.   Not all of them, no.
17  Q.   Prior to your retention in this case,
18  had you ever published any research dealing
19  specifically with the carcinogenicity of NDEA in
20  humans?
21  A.   I think you asked me that before.
22       No.
23  Q.   I asked you before whether you'd done
24  any research. This question is whether you
25  published --

Page 61

1   A.   No, not NDEA.
2   Q.   Your work, your published research
3   with respect to NDEA related to a comparative
4   evaluation of the toxicity of NDEA to NNK,
5   correct?
6   A.   Correct.
7        That was NDMA.
8   Q.   If I misspoke, I apologize. Yes.
9        In that comparative analysis --
10  A.   Right.
11  Q.   -- toxicity was an animal study done
12  in rats, right?
13  A.   Correct.
14  Q.   Have you ever in the course of your
15  career prior to your retention in this case
16  published any research dealing with the
17  carcinogenicity of NDMA in humans?
18  A.   No.
19  Q.   Prior to your retention in this case,
20  had you ever published any research on human DNA
21  repair capacity when exposed to NDMA or NDEA?
22  A.   No.
23  Q.   Prior to your retention in this case,
24  have you ever published any peer-reviewed research
25  dealing directly with the level of the reactivity

16 (Pages 58 - 61)

S. Hecht, Ph.D.

Page 62

1 stability and DNA binding of NDMA or NDEA when
2 exposed to -- as a result of human exposure to
3 those chemicals?
4    A.    No.
5    Q.    Prior to this case, have you ever
6 studied and published on the efficiency of human
7 metabolic enzymes in metabolizing and eliminating
8 NDMA or NDEA?
9        MR. SLATER:  Objection.
10        You can answer.
11    A.    No.
12    Q.    Did you answer, sir?  If you did, I
13 didn't hear.
14    A.    The answer is no.
15    Q.    Are you a pharmacokineticist?
16    A.    No.
17    Q.    Do you recognize pharmacokinetics as
18 the discipline that's involved in studying the
19 absorption, delivery, metabolism and elimination
20 of substances from the body?
21    A.    Yes.
22    Q.    You've never been trained in that
23 discipline, correct?
24        MR. SLATER:  Objection.
25    A.    Correct.

Page 63

1    Q.    You've never published any research
2 on the pharmacokinetics of NDMA or NDEA; is that
3 true?
4    A.    Yes.
5    Q.    The CV that you provided to us which
6 we marked as Exhibit 2 lists some major
7 contributions to science that begin on page six.
8 It's actually under the title "Selected
9 Contributions to Science."
10        Are you familiar with that --
11    A.    Yes.
12    Q.    -- in your CV?
13    A.    Yes.
14    Q.    The first one that you list there is
15 basically the study of tobacco-specific
16 nitrosamines and the identification of NNN and
17 NNK, which we talked about, correct?
18    A.    Yes.
19    Q.    Then you then list the -- number two
20 as being the application of tobacco carcinogen and
21 toxic and biomarkers in clinical and
22 epidemiological studies, correct?
23    A.    Correct.
24    Q.    The third thing you list under your
25 significant contributions to science is metabolism

Page 64

1 and DNA adducts -- adducts, A-D-D-U-C-T-S, for the
2 court reporter -- of PAH and aldehydes.
3        Did I pronounce that correctly?
4    A.    Yes.
5    Q.    What is PAH and aldehydes?  What are
6 they?
7    A.    Polycyclic aromatic hydrocarbons.
8 Those are carcinogens present in the environment
9 and in tobacco smoke that form as a result of
10 incomplete combustion of organic matter.  The best
11 known of which is benzoapyrene.
12        Aldehydes are a class of chemical
13 compounds.  The best known are formaldehyde and
14 acid aldehyde and acrolein that are formed in
15 human metabolism of alcohol and they're also
16 humans are exposed through the general environment
17 and tobacco smoke, as well as endogenous roots.
18    Q.    Okay.
19        Then the fourth of five things that
20 you list under your contributions to science is
21 chemo prevention of cancer and that's -- that
22 involves studying things that can help prevent the
23 carcinogenic effect of exposures, correct?
24    A.    Yes.
25    Q.    Like the RO1 study involving the

Page 65

1 salad we talked about?
2    A.    Watercress, yes.
3    Q.    Learn something new every day.  I
4 never knew what watercress was.
5    A.    Now you know.
6    Q.    Number five is expertise in tobacco
7 carcinogenesis, correct?
8    A.    Yes.
9    Q.    In going through your CV and listing,
10 you know, what your major scientific contributions
11 have been during your long career, you don't
12 mention anything specifically related to NDEA,
13 true?
14    A.    Correct.
15    Q.    You don't mention anything
16 specifically related to NDMA, correct?
17    A.    Correct.
18    Q.    Do you hold yourself out as an expert
19 in toxicology?
20    A.    No.  I'm not a toxicologist.
21    Q.    Are you a member of the Society of
22 Toxicology?
23    A.    No.  I don't think I paid my dues.  I
24 was a member, but I'm not now.
25        MR. TRISCHLER:  I'm not sure what

17 (Pages 62 - 65)

S. Hecht, Ph.D.

Page 66

1  that noise is.
2        Can everyone mute their line, please?
3        MR. SLATER:  Someone is certainty off
4  mute.
5        THE VIDEOGRAPHER:  I just muted them
6  for you guys.
7        MR. TRISCHLER:  Sorry about that,
8  Doctor.
9    Q.   Prior to your retention in this case,
10 did you ever conduct a toxicological evaluation of
11 human health risks from exposure to NDMA?
12   A.   No.
13   Q.   Prior to your retention in this case,
14 had you ever conducted a toxicological evaluation
15 of human health risk from exposure to NDEA?
16   A.   No, but I'm not sure exactly what you
17 mean by toxicological evaluation.  I mean, I've
18 served on committees -- I do serve on a committee
19 presently looking at nitrosamines and food and
20 I've been on an FDA panel which talked about
21 nitrosamine contamination of the drugs, so I'm not
22 sure exactly what you mean by the question.
23   Q.   Let me see if I could clear it up
24 then.
25        Have you ever published in the

Page 67

1  peer-reviewed scientific literature any data that
2  would provide a toxicological assessment of human
3  health risk from exposure to NDMA?
4    A.   Well, we published work that could
5  contribute to that.  As far as an overall
6  toxicological evaluation, no.
7    Q.   Have you ever published an overall
8  toxicological evaluation of NDEA?
9    A.   No.
10   Q.   You list in your bibliography about
11 618 entries that you have been responsible for.
12        Do you recall that?
13   A.   Yes.
14   Q.   I know that one dealt specifically
15 with NDMA because we've already talked a little
16 bit about it.  That would be the comparative study
17 between NDMA and NNK, right?
18   A.   Yes.
19        MR. TRISCHLER:  Why don't we just go
20 ahead and have that -- since we've been
21 referring to it -- that paper marked.  I
22 think we'll mark it Exhibit 4 we're up to.
23        (Whereupon, Exhibit 4 was marked for
24 identification.)
25   Q.   It's entitled, for the record,

Page 68

1  "Comparative Tumorigenicity of DNA Methylation in
2  F344 Rats by Methylnitrosamino Butanone and
3  Nitrosodimethylamine."
4        How did I do in the pronunciations?
5    A.   Pretty bad.
6    Q.   Surprising.
7        Do you have that paper in front of
8  you or do you need it?  If not, I could have it
9  put up on the screen?
10   A.   I don't have it in front of me.
11       MR. TRISCHLER:  Bill, can you put it
12 up?
13       THE VIDEOGRAPHER:  Sure.
14       What is the name of the file?  I
15 don't see one that started with what you had
16 announced.
17       MR. TRISCHLER:  I think the file
18 would be Comparative Tumorigenicity --
19       THE VIDEOGRAPHER:  I'm not seeing --
20 I'm going to scroll through.  I'm going to
21 see if it's maybe labeled something else.
22       Yes, got it.  One moment.
23   Q.   So I put up as Exhibit 4 at least the
24 first page of your paper that we've been talking
25 about, Dr. Hecht.

Page 69

1        To go through this efficiently, I'll
2  just ask questions and if you need to review or
3  consult any part of your paper to answer them,
4  please let me know that and we can take as much
5  time as you need to read the document or to review
6  a section of it.
7        Okay?
8    A.   Okay.
9    Q.   In this paper, as we've already
10 talked about, the purpose of it was to compare the
11 toxicity and potency of NNK to NDMA, right?
12   A.   The carcinogenicity, yes.  Not
13 necessarily the toxicity.
14   Q.   Okay.  Understood.
15       As I understand it, a group of 30
16 rats was given IV doses of NNK for 20 weeks; is
17 that right?
18   A.   IV?
19   Q.   Yes, that's what I said.
20   A.   Sub Q I thought it was.
21   Q.   Okay.  There's a section marked
22 "Bioassay" on the first page there.  Can you blow
23 that up for the doctor?  Maybe I misread it,
24 but --
25   A.   SC.  Subq.  Subcutaneous injection,

18 (Pages 66 - 69)

S. Hecht, Ph.D.

Page 70

1 not IV.
2   Q.   Okay.
3        So we had a group of 30 rats that
4 were given subcutaneous injection doses of NNK for
5 20 weeks, right?
6   A.   Yes.
7   Q.   Another group of 30 that were given
8 NNK for the same period of time?
9   A.   Correct.
10   Q.   By the way, 20 weeks is about 20% of
11 the life expectancy of a rat, right?
12   A.   Twenty weeks, something like that.
13        MR. SLATER:  Before we continue, can
14 you please put that document in the folder so
15 it would be accessible to everybody?
16        MR. TRISCHLER:  Sure.
17        THE VIDEOGRAPHER:  It should be in
18 there.  Are you not seeing it?  I would just
19 suggest --
20        MR. SLATER:  Not there.
21        MR. TRISCHLER:  All the exhibits
22 should be placed in the chat or in a folder
23 for everyone's --
24        THE VIDEOGRAPHER:  Just try to
25 refresh the page.

Page 71

1        MR. SLATER:  It's in there now.
2        THE VIDEOGRAPHER:  Great.
3        MR. SLATER:  Sorry about that.
4        MR. TRISCHLER:  That's all right.
5 BY MR. TRISCHLER:
6   Q.   So dosing a rat for about 20 weeks or
7 20% of its life expectancy would be the equivalent
8 of dosing a human for about 15 years, correct?
9   A.   Yeah.
10   Q.   And you understand that when we talk
11 about this case for just a moment, you understand
12 that there's no plaintiff in this litigation who
13 ingested valsartan-containing medications
14 containing nitrosamines for 15 years, right?
15   A.   Correct.
16   Q.   And the total dose that was given to
17 these rats in your study was listed as 0.33
18 mmol/kilogram.
19        Is that right?
20   A.   Yes.
21   Q.   Can you equate that to a human dose
22 for a 150-pound individual?
23   A.   You want me to do that now?
24   Q.   Are you able to?
25   A.   I'm able to, yeah, but I don't know

Page 72

1 if I could do it in my head.  So 0.3 millimoles
2 per kilogram, so a 150-pound person is about
3 70 kilograms.  0.3 millimoles per 70 kilograms
4 would be -- I don't know.  I can't do it in my
5 head.  I'm sorry.
6   Q.   That's fair.  I couldn't do it
7 either.
8        I'll represent to you I did run
9 this --
10   A.   It's significantly higher than the
11 human dose, if that's what you're getting to.  We
12 don't have to waste time going through -- I mean,
13 the purpose of this experiment was to compare NNK
14 and DMN -- NDMA.
15   Q.   Understood.
16   A.   The dose -- the dose is far higher
17 than a human dose.  If you want to get to human
18 dose, you have to look at the Peto study.
19   Q.   We'll get there.
20        What we can agree upon is that in
21 this particular study that the dose administered
22 to rats was on order of magnitude greater than the
23 nitrosamine levels seen in valsartan-containing
24 medications, correct?
25   A.   Yes, absolutely.

Page 73

1   Q.   And there is a formula for converting
2 these doses to a human equivalent dose, correct?
3   A.   Yes.
4   Q.   I think we can agree that formula is
5 not easy to do in one's head, but I've done the
6 math and I'll represent to you that the human
7 equivalent dose in this study would equate to
8 about 336 million nanograms.
9        Does that sound about right?
10   A.   I'll take your word for it.  But I
11 mean this study was not designed to look at human
12 doses at all.
13   Q.   It wasn't designed to look --
14   A.   It was designed to compare NNK and
15 NDMA carcinogenicity and metabolism using the
16 doses of NNK that we knew induced a certain
17 percentage of lung tumors.
18   Q.   This study that we marked as Exhibit
19 4 was not designed to look at issues of human
20 carcinogenicity of NDMA, correct?
21   A.   That's a very broad statement.  It
22 wasn't designed to replicate the human dose of
23 NDMA.  Not at all.
24   Q.   Okay.
25        The point is that the animals in your

19 (Pages 70 - 73)

S. Hecht, Ph.D.

Page 74

1 study were administered nitrosamines in far
2 greater quantities and over a greater period of
3 their life span than any plaintiff in this
4 litigation.
5          Can we agree on that?
6    A.    That's the point you're making, yes.
7    Q.    And is the point I'm making accurate?
8    A.    Yes.
9    Q.    After a long period of exposure at
10 doses far higher than what's contained in any of
11 the valsartan-containing medications, what your
12 study showed was a development of tumors in six of
13 the 30 rats that were administered these high,
14 high doses of NDMA, right?
15    A.    Yes.
16          MR. SLATER:  Objection.
17          Lack of foundation and multiple other
18 objections.
19          You can answer.
20    A.    Yes.
21    Q.    In the conclusion of your study was
22 that NNK is more potent than NDMA?
23    A.    That was the conclusion.
24    Q.    And we know today that NNK and NNN
25 are Class 1 known carcinogens, right?

Page 75

1    A.    Yes.
2    Q.    NDMA is not?
3    A.    Correct.  It's 2A.
4          THE VIDEOGRAPHER:  Counsel, I just
5 want to let you know I have about ten minutes
6 left on this media before I need to do a
7 quick break to change.
8          MR. SLATER:  Why is that?  Aren't you
9 just recording with the Zoom?
10          THE VIDEOGRAPHER:  We run an hour and
11 a half.  It's a Veritext standard.
12          MR. SLATER:  Well, is it
13 technological issue or is it just a Veritext
14 standard?
15          THE VIDEOGRAPHER:  Well, you know, it
16 necessitates the issue that if we go two
17 hours and it crashes, we lose two hours as
18 opposed --
19          MR. SLATER:  Okay.  I got it.  It's a
20 Veritext issue.  Thank you.
21          You can continue.
22          MR. TRISCHLER:  Adam, would you want
23 to stop now or go --
24          MR. SLATER:  I've never heard of any
25 such thing.  I've been in 100 depositions in

Page 76

1 the last year and I haven't heard anyone say
2 we need to stop because of the media cut off.
3 There's a first for everything.  We want to
4 use as much time as we can and keep going.
5          MR. TRISCHLER:  Bill, you could take
6 down Exhibit 4.
7 BY MR. TRISCHLER:
8    Q.    So before we started talking
9 specifically about your paper that we marked as
10 Exhibit 4, Dr. Hecht, I was asking about your
11 bibliography.
12          Those 618 entries that are on it, do
13 any of them deal specifically with the
14 carcinogenicity of NDEA?
15    A.    No.
16    Q.    Other than the comparative paper that
17 we marked as Exhibit 4, do any of those 618 papers
18 that you list on your bibliography deal with the
19 carcinogenicity of NDMA in any way?
20    A.    No.
21    Q.    You also list on your -- as part of
22 your CV that we marked as Exhibit 2 some 280
23 chapters, articles and what's called other papers.
24          Are you familiar with that section of
25 your CV, sir?

Page 77

1    A.    Yes.
2    Q.    Do any of those 280 chapters,
3 articles or other papers deal specifically with
4 the carcinogenicity of NDMA?
5    A.    Yes.
6    Q.    Can you tell me which ones?
7    A.    No.  I've written a number of
8 chapters for books dealing with the metabolic
9 activation or metabolism usually of nitrosamines
10 and NDMA metabolism is kind of the classic
11 example.  So in a number of those chapters, NDMA
12 will have been used as an example of the metabolic
13 activation process by which nitrosamines are
14 metabolized and bind to DNA leading to miscoding
15 and activation of ANCA genes and cancer.
16    Q.    You've told me --
17    A.    That's covered in a number of those
18 book chapters.
19    Q.    You told me that you have your report
20 in front of you in a hard copy form and I know the
21 bibliography is part of the report.
22          What I'd ask you to do is go to the
23 section marked "Chapters, Invited Articles, Books
24 and Other Papers" and look at it and identify for
25 me a few of the places that I can go to read what

20 (Pages 74 - 77)

S. Hecht, Ph.D.

Page 78

1  you've written about NDMA.
2      A.    Okay.  Well, I don't have the hard
3  copy of the bibliography in front of me, so I'll
4  have to pull it up on my computer.  Then I can go
5  through and then I can tell you.  That'll take a
6  few minutes.
7          MR. TRISCHLER:  All right.  We need
8  to take a break for the videographer, so
9  let's take a break.  If you don't mind
10  looking at that --
11         MR. SLATER:  No, Clem.  We're not
12  going to do that during the break.  I don't
13  want to him doing work that should be on the
14  record during a break.
15         MR. TRISCHLER:  Well, we could do
16  it when we come back then, Adam --
17         MR. SLATER:  Yeah, I just want him to
18  be able to take a break, stretch his legs and
19  all.
20         MR. TRISCHLER:  That's fine.
21  Whatever you want to do.  Let's take a break,
22  we'll get the medium up and running and when
23  you're ready to come back, we will pick up
24  with this.
25         MR. SLATER:  Let's take no more than

Page 79

1  ten minutes and come back.
2          THE VIDEOGRAPHER:  The time is 10:37.
3  We're going off the video record.
4  This ends media one.
5          (Recess taken)
6          THE VIDEOGRAPHER:  The time is now
7  10:49.
8          This begins media two.
9          You may proceed.
10  Q.    Welcome back, Dr. Hecht.
11         Before we took a break, we were
12  talking about the section of your bibliography
13  that's part of Exhibit 2 entitled "Chapters,
14  Invited Articles, Books and Other Papers."
15         Do you remember that?
16  A.    Yes.
17  Q.    Have you been able to find that
18  section of your bibliography on your desktop
19  there?
20  A.    Yes.
21  Q.    I had asked if you would be kind
22  enough to peruse that section and just identify
23  for me a couple of the publications that you were
24  a part of that discuss NDMA.
25  A.    Right.  I couldn't quite do that, so

Page 80

1  I have to -- that'll take some more time.
2      Q.    You could do it now.
3      A.    Okay.
4          (Witness reviews document)
5      Q.    Dr. Hecht, may I make a suggestion
6  while you're doing this?
7      A.    Yes.
8      Q.    If you have located three or four
9  that are responsive, that's all I need.  I'm not
10  looking for you to tell me every single one.  Just
11  a few.
12      A.    Okay.  So the question is whether
13  they specifically have dimethylnitrosamine as
14  opposed to nitrosamines in general, correct?
15      Q.    Correct.
16      A.    That's the problem I'm having because
17  I don't remember whether I specifically talked
18  about dimethylnitrosamine, but -- so there's one
19  paper in Environmental and Occupational Medicine,
20  Third Edition, 1998.  It's a chapter on
21  N-nitrosamines.
22      Q.    What number on the bibliography, sir?
23      A.    It's 149 under the "Chapters"
24  section.  One forty-nine.  That would be an
25  example.

Page 81

1      Q.    I'll accept that.  You don't need to
2  look at any further.
3      A.    All right.
4      Q.    So let me ask sort of the same
5  question, but this time related to NDEA.
6          Do any of the chapters, invited
7  articles, books or other papers listed in your CV
8  that we've marked as Exhibit 2 specifically deal
9  with or discuss the carcinogenicity after NDEA?
10      A.    No, I don't believe so.
11      Q.    Are you familiar with the term
12  "threshold dose" as used in the field of
13  toxicology?
14      A.    Yes.
15      Q.    What do you understand that term to
16  mean, sir?
17      A.    A dose below which there would be no
18  effect.
19      Q.    By no effect, you mean no toxicity or
20  harm is --
21      A.    Right.  Whatever the end point is.
22      Q.    In your career, have you ever done
23  any original research to evaluate or establish a
24  threshold dose for NDMA in humans?
25      A.    No.

21 (Pages 78 - 81)

S. Hecht, Ph.D.

Page 82

1    Q.    Have you ever done any research to
2  evaluate a threshold dose for NDEA in humans?
3    A.    No.
4    Q.    Let me ask a little bit about
5  valsartan if I can.
6         Do you understand that valsartan
7  falls into a class of drugs known as angiotensin
8  receptor blockers or ARBs?
9    A.    Yes.
10   Q.    Do you understand that ARBs are used
11 in the treatment and management of hypertension?
12   A.    Yes.
13   Q.    Hypertension and heart disease are
14 the number one cause of death of adults in
15 America; true?
16   A.    Yes.
17   Q.    Do you agree that
18 valsartan-containing medications have proven to be
19 effective in the treatment and management of this
20 deadly condition?
21   A.    Yes.
22   Q.    Do you agree that
23 valsartan-containing medications are an important
24 tool for clinicians to manage and treat this
25 deadly disease?

Page 83

1         MR. SLATER:  Objection.
2         You can answer.
3    A.    Yes.
4    Q.    Do you intend to offer any opinions
5  asserting that valsartan is not effective in
6  treating hypertension?
7    A.    No.
8    Q.    Do you intend to offer any opinion
9  that the small amounts of nitrosamine impurities
10 found in certain valsartan-containing medications
11 compromised, limited or reduced the medication's
12 effectiveness in controlling blood pressure?
13        MR. SLATER:  Objection to the form.
14   A.    No.
15   Q.    You personally do not treat heart
16 disease, correct?
17   A.    Correct.
18   Q.    You're not an expert in the
19 diagnosis, treatment, management of this
20 condition; fair to say?
21   A.    Correct.
22   Q.    Have you ever been prescribed
23 valsartan-containing medications?
24        MR. SLATER:  Objection.
25        Don't answer the question.

Page 84

1         I don't think it's appropriate to ask
2  an expert, whatever the question is about,
3  about their own personal health history.
4         MR. TRISCHLER:  Only reason I ask,
5  Adam, is if he could be a potential
6  plaintiff, it goes to bias.  If he's used
7  these medications, it's certainly relevant.
8         MR. SLATER:  That's why you're asking
9  the question?  To find out if there's a bias
10 issue?
11        MR. TRISCHLER:  To find out if he's
12 used the medications that he's claiming --
13        MR. SLATER:  I'll let Dr. Hecht --
14        MR. TRISCHLER:  If he has a potential
15 claim, I think it's relevant.
16        MR. SLATER:  All right.
17        I'll allow Dr. Hecht to answer one
18 question of whether he's used valsartan.
19   A.    No, I haven't.
20   Q.    Can we agree that hypertension is a
21 major health problem?
22   A.    Yes.
23   Q.    Are you aware that the CDC is
24 estimating that 45% of adult Americans suffer from
25 hypertension?

Page 85

1         MR. SLATER:  Objection to all these
2  statistical proffers.
3         You can answer.
4    A.    I didn't know that number offhand,
5  but, you know, I'll take your word for it.
6    Q.    Does hypertension cause cancer?
7    A.    No.
8    Q.    Is hypertension is risk factor for
9  cancer?
10   A.    No.
11   Q.    As someone who is --
12   A.    It's not a known risk factor.
13   Q.    Are you aware of whether or not there
14 are peer reviewed -- strike that.
15        Are you aware as to whether or not
16 there is peer-reviewed literature that's been
17 published in the medical community noting a
18 statistically significant association between
19 hypertension and cancer?
20   A.    I'm not aware of it.  I may have seen
21 it.  I can't think of it right now.
22   Q.    As part of your work in this case,
23 did you do a literature search to determine
24 whether or not there was peer-reviewed literature
25 discussing, noting or observing a statistically

22 (Pages 82 - 85)

S. Hecht, Ph.D.

Page 86

1 significant observation between hypertension and
2 cancer?
3    A.    No, I did not.
4    Q.    Have you ever done such a literature
5 search?
6    A.    Not recently.
7    Q.    Can we agree that cancer causation is
8 multifactorial?
9    A.    Yes.
10    Q.    I think in going through your CV one
11 of the things I observed in connection with your
12 work as a professor or research that you've done,
13 much of it is focused on cancer prevention,
14 correct?
15    A.    Correct.
16    Q.    As someone who is focused on cancer
17 prevention, one of the things that we've been
18 taught is that good health and good diet can go a
19 long way to reducing an individual's risk factor
20 for developing cancer, correct?
21    A.    Yes.
22    Q.    While we know, based on the research
23 that's been done in the past few decades, there
24 are things we could do to reduce our risk factor
25 to cancer, we still don't know what causes cancer.

Page 87

1    Would you agree?
2    A.    Yes.
3    Q.    While there's certainly no
4 guarantees, what we believe is that a good diet,
5 exercise and good health can go a long way in
6 reducing an individual's risk; true?
7    A.    There's plenty of evidence, yes.
8    Q.    Based on that, would you agree that
9 hypertension can and does lead to cancer?
10    MR. SLATER:  Objection.
11    You can answer.
12    A.    So you can construct a connection, I
13 suppose, because, you know, good health, exercise
14 will be good in preventing hypertension and also
15 preventing cancer, so ...
16    In that respect, there could be a
17 connection, sure.
18    Q.    Is it fair to say that every
19 plaintiff in this litigation was at an increased
20 risk of developing cancer before they ever took a
21 single valsartan pill?
22    MR. SLATER:  Objection.
23    A.    I have no idea.
24    Q.    Are you aware of any peer-reviewed
25 research published in the medical journals finding

Page 88

1 a statistically significant increased risk of
2 kidney, colorectal, breast and other cancers in
3 patients with hypertension?
4    MR. SLATER:  Objection.
5    There's a massive lack of foundation
6 and relevance, but you can answer the
7 question.  Plus -- I said foundation.
8    You can answer.
9    A.    Not offhand.
10    Are you still there?
11    Q.    Yes, I'm just thinking what I want to
12 ask you next.
13    You told me that research and work
14 that's been done over the years will tell us that
15 cancer can be caused by many different things, one
16 of them being smoking and tobacco use, right?
17    A.    Yes.
18    Q.    You identified obesity as a risk
19 factor that can lead to cancer, right?
20    A.    Yes.
21    Q.    Alcohol use can lead to cancer,
22 correct?
23    A.    Yes.
24    Q.    Radiation can lead to cancer?
25    A.    Yes.

Page 89

1    Q.    Genetics can play a role?
2    A.    Yes.
3    Q.    Viruses in some circumstances can
4 cause cancer?
5    A.    Yes.
6    Q.    Environmental -- we believe that some
7 environmental exposures can cause cancer, correct?
8    A.    Yes.  Yes.
9    Q.    Are there other groups of causes that
10 are risk factors that we haven't talked about?
11    A.    I don't know.  I think you covered
12 the main ones.  Sunlight, UV exposure I don't
13 think you mentioned.
14    Q.    Okay.
15    Given all these potential causes of
16 cancer, are you able to look at a mutation at a
17 cellular level and say that that mutation was
18 caused by a specific exposure or condition?
19    A.    That would be very difficult.
20    Q.    So I'm only asking about you, whether
21 you had that ability or capability.
22    Do you have the expertise to look at
23 a given mutation and say this was caused by
24 increased nitrosamine intake as opposed to
25 genetics, as opposed to alcohol use, as opposed to

23 (Pages 86 - 89)

S. Hecht, Ph.D.

Page 90

1 any other factor known to cause cancer?
2         MR. SLATER: Objection.
3         You can answer.
4     A.    I didn't quite hear your question.
5         Did you say patient or mutation?
6     Q.    Mutation I said.
7     A.    Well, some mutations are quite
8 specific. For example, those caused by UV light,
9 you get thymidine cross links in DNA. I'm not
10 aware if those are caused by any other agent, so
11 there are cases of certain mutations that are
12 quite specific.
13    Q.    Are you aware of any unique
14 biomarkers caused by NDMA?
15    A.    No.
16    Q.    Are you aware --
17    A.    Wait. That depends what you mean by
18 biomarkers.
19    Q.    Are you able to look at a mutation
20 and say this mutation was caused by NDMA exposure?
21    A.    No, not a mutation.
22    Q.    Are you able to look at a mutation
23 and say this mutation was caused by NDEA exposure?
24    A.    No.
25    Q.    So if there are no unique biomarkers

Page 91

1 for NDMA or NDEA in human tissue and given that
2 there are multiple risk factors for cancer, are
3 you able to state to a reasonable degree of
4 scientific certainty that cancer causation in any
5 of these plaintiffs in this litigation was caused
6 by nitrosamines?
7         MR. SLATER: Objection.
8         You can answer.
9     A.    I wouldn't say there's no biomarker.
10 You mentioned certain mutations. But if I find --
11 if I'm able to obtain a DNA sample from one of the
12 patients, for example, from their oral cells after
13 they took a contaminated pill and analyzed the DNA
14 in that sample and I find O6-methylguanine in that
15 DNA, I can be reasonably sure that came from
16 dimethylnitrosamine. So that's a biomarker.
17    Q.    Have you obtained DNA samples from
18 any of the plaintiffs in this case?
19    A.    No.
20    Q.    Have you looked for signs of
21 O6-methylformane in any of the DNA samples
22 or tissue samples from any of the plaintiffs in
23 this case?
24    A.    O6-methylguanine.
25    Q.    Guanine.

Page 92

1     A.    Guanine. G-U-A-N-I-N-E.
2         No, I haven't. But that would be a
3 possible approach, a research approach.
4     Q.    The presence of O6-methylguanine in a
5 DNA sample is not the equivalent of a -- does not
6 mean there's a carcinogenic tumor, correct?
7     A.    Correct. But it's one step in a
8 well-established pathway.
9     Q.    Is the presence of O6-methylguanine
10 specific and limited to NDMA and NDEA exposure?
11    A.    No.
12    Q.    Going back to my question, you told
13 me that you cannot look at a biopsied tissue and
14 make the determination that that mutation was
15 caused by NDMA, correct?
16        MR. SLATER: Objection.
17        You can answer.
18    A.    In the absence of other data, but if
19 I had DNA from that tissue and I analyzed it for
20 O6-methylguanine and I find O6-methylguanine and
21 the mutation is a mutation in a raised gene and I
22 have tissue from subjects who did not use
23 valsartan and I don't find the mutation, that
24 would be pretty good evidence.
25    Q.    None of that work has been done in

Page 93

1 this case; is that right?
2     A.    As far as I know.
3     Q.    You've not done it?
4     A.    No.
5     Q.    What causes the presence of
6 O6-methylguanine in a DNA sample?
7     A.    From the metabolism of a substance
8 such as NDMA that leads to the formation of methyl
9 diazohydroxide, which reacts with guanine in DNA
10 to form O6-methylguanine.
11    Q.    My question was other than NDMA what
12 other substances are you aware of that lead to the
13 formation of O6-methylguanine?
14    A.    Other methylating carcinogens, NNK,
15 methyl methane sulfonate. I don't think there's
16 much human exposure to that. So, you know, any
17 methyl nitroso compound.
18    Q.    I'm sorry. I didn't mean to
19 interrupt you. Go ahead.
20    A.    I'm done.
21    Q.    Can the presence of O6-methylguanine
22 be attributed in a DNA sample be attributed to
23 anything other than exposure to nitrosamines?
24        MR. SLATER: Objection.
25        You can answer.

24 (Pages 90 - 93)

S. Hecht, Ph.D.

Page 94

1    A.    Yes, it could be another methylating
2 agent.  Wouldn't necessarily have to be
3 nitrosamine.  Methyl methane sulfonate is one of
4 the more common ones, but it's not really found in
5 the environment.
6    Q.    I'm going to go into this more a
7 little later, but all of us are exposed to
8 nitrosamines every single day, correct?
9         MR. SLATER:  Objection.
10        You can answer.
11   A.    Many people are, yes.
12   Q.    And all of us process and develop
13 nitrosamines endogenously.
14        Our body creates them, right?
15   A.    Yes, to a certain extent.
16   Q.    Every single day?
17        MR. SLATER:  Objection.
18   A.    I don't know about every single day.
19 The measurement of endogenous formation is fraught
20 with difficulties, but there is certainly the
21 evidence for endogenous formation of nitrosamines.
22   Q.    By all of us?
23   A.    I don't know about all of us.
24   Q.    Are you aware of any research that
25 suggests there are some individuals that have the

Page 95

1 unique ability not to endogenously create
2 nitrosamines?
3         MR. SLATER:  Objection.
4         You can answer.
5    A.    Not offhand.
6    Q.    Right.  So here's what I don't
7 understand:  If all of us or virtually all of us
8 endogenously create nitrosamines, then every DNA
9 sample that you are look at is going to have
10 O6-methylguanine.
11   A.    No, that's not true.
12   Q.    You just said that nitrosamine
13 exposure -- strike that.
14   A.    Just because you're exposed to a
15 nitrosamine doesn't mean that you'll be able to
16 necessarily metabolize it efficiently enough to
17 alkylate DNA.  So you might have cases where the
18 exposure is too low or the metabolism is not that
19 efficient.  It doesn't -- you can't say all.
20   Q.    O6-methylguanine observed in a DNA
21 sample is caused by the metabolism of nitrosamines
22 among other things.
23        That's what you've told me, right?
24   A.    Yes.
25   Q.    When you find O6-methylguanine in a

Page 96

1 DNA sample, if you were to ever do this work, you
2 would not be able to tell us whether that
3 O6-methylguanine was from nitrosamines ingested
4 exogenously or developed endogenously, would you?
5         MR. SLATER:  Objection.
6         You can answer.
7    A.    I could do a study that could
8 indicate that.
9    Q.    You've not done such a study?
10   A.    No.
11   Q.    No one in the world has done such a
12 study at this point?
13   A.    I don't know.
14   Q.    Are you aware of any?
15   A.    No.  I could compare subjects who
16 took contaminated valsartan and who did not and
17 get DNA samples from those individuals and analyze
18 them for O6-methylguanine and see if there's a
19 difference.
20   Q.    Okay.  You could do that --
21   A.    That would be a good start.
22   Q.    Great.
23        But my question was you haven't done
24 that scientific investigation, correct?
25   A.    No, but I think it would be a good

Page 97

1 project.  You gave me an idea.
2    Q.    At least I served some purpose here
3 today then.
4         I want to go back and sort of touch
5 on one of the things that I asked you at the
6 outset and that relates to the work that you have
7 done in this case.
8         I think you told me that when you
9 wrote your report that you acknowledged that
10 valsartan -- whether or not nitrosamines in
11 valsartan-containing medications were capable of
12 causing cancer is dependent on the exposure, the
13 dose and the duration.
14        Do you remember telling me that?
15   A.    Mm-hmm.
16        MR. SLATER:  Objection.
17        You can answer.
18   Q.    You have to say "yes" or "no" for the
19 record.
20   A.    Yes.
21   Q.    You gave me a general overview of
22 some of the things that you did to try and answer
23 the question of whether or not the exposure to
24 nitrosamines in valsartan-containing medications
25 was capable of increasing the risk of cancer and

25 (Pages 94 - 97)

S. Hecht, Ph.D.

Page 98

1 you said that one of the things you did was
2 consult literature.
3          Correct?
4     A.    Yes.
5     Q.    How did you go about deciding upon
6 the literature that you were going to review and
7 cite and rely upon in your report?
8     A.    From my experience and from staying
9 up to date on the literature. It's one of the
10 things that we do in research, follow the
11 literature and attempt to read it all and use it
12 our research and let it inform us as to our
13 projects and conclusions. So, you know, it's
14 important to follow the literature. It's
15 something that all researchers do.
16    Q.    Understood.
17          When you were retained by Mr. Slater
18 back in September of 2019, did you do any or
19 attempt to any sort of comprehensive search of the
20 literature or did you just rely on your knowledge
21 and efforts to stay abreast of the literature as
22 you described it?
23    A.    Well, I looked into the valsartan
24 literature, but mainly I relied on my knowledge of
25 the literature.

Page 99

1     Q.    So if I were to --
2     A.    But I'm not an encyclopedia, you
3 know. I could have forgotten things here and
4 there.
5     Q.    Well, that's what -- I'm not
6 suggesting you should be an encyclopedia.
7          Would you agree with me that
8 formulating a meaningful and reliable opinion on a
9 causality of exposure to a disease requires an
10 evaluation of the totality of the evidence?
11          MR. SLATER: Objection.
12    A.    Yes.
13    Q.    So what I'm trying to get a feel for
14 and what I'd like you to explain for me is how did
15 you set out to make sure that your encyclopedic
16 knowledge of the literature was adequate --
17          MR. SLATER: Objection.
18          You can answer.
19    Q.    -- before whether it needed to be
20 supplemented by a literature review?
21          MR. SLATER: Objection.
22          You can answer again.
23    A.    Sure. I needed to review the
24 available literature on valsartan, you know, the
25 contamination with nitrosamines. I also needed to

Page 100

1 refresh my memory regarding dimethylnitrosamine
2 exposures and cancer in the literature.
3     Q.    So how do you go about refreshing
4 your memory in that matter?
5     A.    I go to PubMed and put in the right
6 terms.
7     Q.    What search terms did you use to run
8 that query?
9     A.    Oh, I don't remember.
10    Q.    Do you have a list you created?
11    A.    No, I don't have a list. I know
12 dimethylnitrosamine and cancer. You know, it
13 would come up with probably a thousand references
14 and then you go from there.
15    Q.    Were those the search terms you
16 actually used or --
17    A.    No. No. I mean, it's a mix. So I
18 relied on my knowledge that's been gained over 45
19 years of work in this area. I've looked into the
20 literature specifically regarding valsartan and I
21 updated my -- refreshed my memory regarding papers
22 looking at dimethylnitrosamine occurrence in the
23 environment, in food, in water, etc. So I tried,
24 you know, to cover as much as I could.
25    Q.    I'll be honest with you, Dr. Hecht.

Page 101

1 I'm trying to fact check how you did your work.
2 You said -- you told me that you would have
3 updated your knowledge by a literature search.
4          Are you able to show me the actual
5 search terms you would have used?
6     A.    No.
7     Q.    Are you able to show me the -- have
8 you retained the print out of the results from
9 your initial PubMed searches as far as what hits
10 you received and so forth?
11    A.    No.
12          MR. SLATER: Objection.
13          You can answer.
14    Q.    Do you know how many publications you
15 pulled in on your initial search?
16    A.    No.
17    Q.    One of the things that I asked you to
18 bring with you or to the deposition with a notice
19 and one of the things that your counsel was kind
20 enough to provide to me before we began were your
21 invoices that you've generated in connection with
22 your work in this project.
23          Are you aware of that?
24    A.    Yes.
25    Q.    Did you provide those invoice

26 (Pages 98 - 101)

S. Hecht, Ph.D.

Page 102

1  documents to counsel so that he could provide them
2  to me?
3      A.   Yes.  Yes.
4          MR. TRISCHLER:  Can we mark those as
5  Exhibit 4?
6          THE VIDEOGRAPHER:  Exhibit 4 was the
7  comparative --
8          MR. TRISCHLER:  Exhibit 5.  Exhibit
9  5.
10          THE VIDEOGRAPHER:  What was the name
11  of the document again that you wanted --
12          MR. TRISCHLER:  Invoices.
13          THE VIDEOGRAPHER:  Okay.  Great.
14  Would you like that up on the screen?
15          MR. TRISCHLER:  Yes.
16          (Whereupon, Exhibit 5 was marked for
17  identification.)
18      Q.   The documents related to your
19  invoices that we marked as Exhibit 5 consist of
20  four pages.  What we're looking at here is the
21  first of those four pages that I have.
22      A.   Yes.
23      Q.   This appears to me, Dr. Hecht, to be
24  a summary of the work that you did from at least
25  September of 2019 through June of 2020, right?

Page 103

1      A.   Yes.
2      Q.   You would have billed for your work
3  in connection with this case based on this
4  summary, right?
5      A.   Yes.
6      Q.   What I'm curious about is when I read
7  this document and look at this document marked as
8  Exhibit 5, I don't see any reference to a
9  literature search being done until -- well,
10  actually in -- I stand corrected -- 12/9/19.  It
11  says "Further review and literature search on
12  NDMA, one hour."
13      A.   Yes.
14      Q.   Is that when you would have done your
15  literature search then?
16      A.   That's what it says.
17          MR. SLATER:  Objection.
18          You can answer.
19      Q.   And your search of the literature
20  would have taken you an hour to do?
21      A.   On that particular day, yes.
22      Q.   Is there any reference to any
23  literature search on any other day in your
24  records?
25      A.   I don't know.

Page 104

1          MR. SLATER:  You can go to the next
2  page, sir.
3          Can you highlight that for the
4  doctor?
5      Q.   Is there any reference to your
6  literature search on this page of the billing
7  records?
8      A.   Well, the updated report adding new
9  text and references, so, you know, that could have
10  involved some literature.  I really don't
11  remember.
12      Q.   How about the next page?
13      A.   Right.  There's no reference to
14  literature search there.
15      Q.   How about the last page?
16      A.   That's it.
17      Q.   So if we look at all the invoice
18  documents that I've been provided with, what it
19  suggests is that there's only one reference to a
20  literature search and that was for an hour on
21  December of 2019.
22          Is that the extent of the literature
23  search that you --
24          MR. SLATER:  Objection.
25          Lack of foundation.

Page 105

1          You can answer, Doctor.
2      A.   I do literature work all the time on
3  nitrosamine.  It's my part of my work.
4      Q.   All right.
5          I'm talking about -- you said you
6  keep abreast of the literature.  You're looking at
7  it all the time.
8      A.   Yes.
9      Q.   You're not an encyclopedia and so you
10  did a literature search to supplement your
11  knowledge.
12          Is that supplement the one hour we
13  see in December of 2019?
14          MR. SLATER:  Objection.
15          Foundation.
16          Argumentative.
17          You can answer.
18      A.   That's what it says.
19      Q.   You didn't -- according to your
20  billing records, you didn't spend any other time
21  on the literature search, right?
22          MR. SLATER:  Objection.
23          You can answer.
24      A.   I didn't bill for it.
25      Q.   Do you remember doing it?

27 (Pages 102 - 105)

S. Hecht, Ph.D.

Page 106

1    A.    As I said, I look at the literature
2 almost every day in one form or another, so I
3 don't necessarily bill for it. It's part of my
4 work. It's part of what I do.
5    Q.    In your report that you provided to
6 us, you have footnotes, footnote references at the
7 conclusion of the report, a grand total of about
8 146, correct?
9    A.    Yes.
10    Q.    It looked to me like the last -- you
11 have that report in front of you, sir.
12        The last footnote, 146, is a true
13 footnote, whereas the other 145 are citations to
14 literature, company documents or depositions,
15 right?
16    A.    Yes. Right.
17    Q.    As it relates to the -- I'm trying to
18 distinguish for my question the scientific
19 literature from the company documents and
20 depositions.
21        Okay?
22        With respect to scientific
23 literature, what was your criteria for inclusion
24 or exclusion of literature in your report?
25    A.    Well, the report starts with a

Page 107

1 general consideration of nitrosamine
2 carcinogenesis. For that, I used literature that
3 I refer to frequently, certain reviews and certain
4 specific publications.
5        For the literature that refers more
6 specifically to valsartan, I referred to the -- a
7 couple of publications on valsartan as well as the
8 EMA report and maybe a couple of others. I don't
9 really remember.
10    Q.    I think it's probably fair to say
11 that your report and the references that you cite
12 at the conclusion of the report was not intended
13 to include citation to every publication on the
14 subject of NDMA and NDEA ever written.
15        Fair to say?
16    A.    Yes.
17    Q.    So what I'm just wondering is was
18 there some method in your mind that you started
19 with as to what references you were going to rely
20 upon and cite and which ones you were going to
21 exclude? Did you have any methodology in that
22 regard?
23    A.    Yes. I focused on the studies that
24 are relevant to cancer induction by
25 dimethylnitrosamine in humans. Basically, I'm

Page 108

1 looking at the known, very well established
2 pathways by which the dimethylnitrosamines
3 metabolized can damage DNA, showing that that also
4 occurs in humans, that human metabolism with
5 dimethylnitrosamines are very well characterized.
6        Then looking at aspects of the
7 exposure, putting the dose response studies that
8 were carried out in rats, then looking at the more
9 specific aspects of the valsartan contamination
10 and the resulting exposure to dimethylnitrosamine
11 and blending these together to make a logic and
12 readable product.
13    Q.    Were there things that you came
14 across --
15    A.    In order to do that, I don't need to
16 review every publication that's ever been written
17 on nitrosamines.
18    Q.    Were there studies that you came
19 across in your research and work that found the
20 carcinogenicity of NDMA or NDEA in humans to be
21 inconclusive or unknown that you omitted from your
22 report?
23        MR. SLATER: Objection.
24        You can answer.
25    A.    There are many studies that conclude

Page 109

1 with, you know, statements like, you know, we
2 don't necessarily know whether this particular
3 exposure to products or environments containing
4 NDMA or other carcinogens for that matter actually
5 cause cancer. So I mean, they're all -- you know,
6 all studies have limitations and those limitations
7 are usually described. So I mean, I would say
8 that, you know, virtually every study that I
9 quoted would have some kind of limitation. That's
10 part of science.
11    Q.    Right. It sounds like you would
12 agree with me then that there are studies that are
13 not included in your report that found NDMA or
14 NDEA carcinogenicity in humans to be unknown or
15 inconclusive that you didn't discuss or didn't
16 cite.
17    A.    Sure, that's possible.
18    Q.    The studies -- many of the studies
19 that you ultimately cite are animal studies,
20 correct?
21        MR. SLATER: Objection.
22        You can answer.
23    A.    Yes.
24    Q.    I think beginning on page seven of
25 your report you have a section titled

28 (Pages 106 - 109)

S. Hecht, Ph.D.

1 "Carcinogenicity of Nitrosamines and NDMA and
2 Cancer."
3         Is that right?
4    A.    Yes.
5    Q.    In this section of the report, you
6 seem to cite and rely upon a series of animal
7 studies to demonstrate the carcinogenicity of
8 NDMA?
9    A.    Yes.
10    Q.    Is it true that the -- I think we
11 talked about this a little bit in connection with
12 your comparative paper that we mentioned earlier,
13 but is it true that toxicity tests are often
14 performed on animals to gain an understanding of
15 cellular and tissue response to toxins?
16    A.    Yes.
17    Q.    In an animal study, do you agree that
18 there are many factors that affect the outcome of
19 the test or create uncertainty about its
20 extrapolation into a heterogenous human
21 population?
22         MR. SLATER:  Objection.
23         You can answer.
24    A.    Sure, there are uncertainties.  For
25 sure.

1    Q.    Genomic instability differs from
2 species to species; true?
3         MR. SLATER:  Objection.
4         You can answer.
5    A.    Yes.
6    Q.    DNA repair capacity differs from
7 species to species; true?
8         MR. SLATER:  Objection.
9    A.    It's a very general statement.
10    Q.    Is it true?
11    A.    I don't know.  Probably.
12    Q.    Metabolic factors differ from species
13 to species; true?
14         MR. SLATER:  Objection.
15         You can answer.
16    A.    Sure.  There can be differences.
17    Q.    For instance, the level of metabolic
18 enzymes are not identical from one species to
19 another, correct?
20         MR. SLATER:  Objection.
21         You can answer.
22    A.    In general, that's probably true.
23    Q.    In fact, the level of enzymes are not
24 even homogeneous across the human population?
25    A.    Yes, that's true.

1    Q.    Metabolic rates also differ between
2 humans and animals, right?
3    A.    It can.
4    Q.    The binding efficiency of a foreign
5 substance like NDMA to DNA can also differ across
6 species?
7         MR. SLATER:  Objection.
8         You can answer.
9    A.    It can.
10    Q.    For these and other reasons, most
11 competent scientists recognize that attempts to
12 extrapolate data from animal studies to humans is
13 fraught with peril?
14         MR. SLATER:  Objection.
15    A.    Fraught with peril?
16    Q.    Yes, sir.
17         MR. SLATER:  Someone wrote a good
18 question there.
19    A.    Strong words.  Strong words.
20         MR. SLATER:  Objection to the
21 question.
22         You can answer.
23    Q.    The question is --
24    A.    There are uncertainties.  Sure, there
25 are uncertainties.  I wouldn't say it's fraught

1 with peril.
2    Q.    Would you say it's fraught with
3 difficulty?
4         MR. SLATER:  Objection.
5         You can answer.
6    A.    No, I wouldn't say it's fraught with
7 difficulty.
8    Q.    Well, let me show you --
9    A.    I would say that -- you like the word
10 "fraught."  There are uncertainties I would say.
11    Q.    Sure.
12    A.    Those are well recognized.
13         (Whereupon, Exhibit 6 was marked for
14    identification.)
15    Q.    Let me show you what I'll mark as --
16 I think we're up to Exhibit 6.  It's a paper by
17 Gombar -- G-O-M-B-A-R -- is the lead author.  The
18 paper is entitled "Pharmacokinetics of
19 Nitrosodimethylamine in Beagles."
20         Are you familiar with that paper?
21    A.    Yes.
22    Q.    I think you cited it in your report,
23 correct?
24    A.    Correct.
25    Q.    You relied upon it, correct?

29 (Pages 110 - 113)

S. Hecht, Ph.D.

1   A.    Relied upon it?  Sure, I cited it.
2  Yes.
3           MR. TRISCHLER:  Can you put up the
4  Exhibit 6 please, the first page of it?
5           THE VIDEOGRAPHER:  Looking for it
6  now.  One moment.
7           You said in beagles?
8           MR. TRISCHLER:  Yes.
9           THE VIDEOGRAPHER:  I'm actually not
10  seeing this in the list I was given, one
11  related to beagles.
12           THE WITNESS:  Go to PubMed and enter
13  Gombar --
14           MR. TRISCHLER:  I'll send it now.
15           THE VIDEOGRAPHER:  Thank you.
16           MR. TRISCHLER:  You should have it.
17           THE VIDEOGRAPHER:  One moment while
18  it's downloading.  That was not one that was
19  uploaded before.  Maybe it failed in the
20  upload.
21           MR. TRISCHLER:  Must have been the
22  one that broke the computer.
23           THE VIDEOGRAPHER:  Maybe.
24           MR. TRISCHLER:  Okay.
25  BY MR. TRISCHLER:

1   Q.    So now, Dr. Hecht, we're looking at
2  the first page of Gombar's study that you cite in
3  your report.  There's a section on the left-hand
4  side of the first page marked "Introduction," if
5  you could highlight that section for the doctor.
6           Certainly, Doctor, when I show you a
7  document like this, you're free to read as much of
8  the study as you want, but I wanted to direct your
9  attention to the introduction in the second
10  paragraph where Gombar and his colleagues note
11  that extrapolation of carcinogenicity data from
12  animals to humans is fraught with difficulty.
13           Do you see that?
14   A.    Yes, those are the words he used.
15   Q.    Right.
16           Do you agree with Gombar's
17  statements?
18   A.    Not necessarily.  I think "fraught
19  with difficulty" is a little too strong.  You
20  know, that's his opinion, so it's okay.
21   Q.    But you're the one that cited to this
22  report, not me, correct?
23           MR. SLATER:  Objection.
24           Argumentative.
25   A.    I cited it, yeah, that's true.  It

1  deals with the topic.
2   Q.    And you agree with me that the
3  attempt to -- that there are problems and
4  limitations associated with the extrapolation of
5  carcinogenicity data from animals to humans; true?
6           MR. SLATER:  Objection.
7   A.    There are limitations.  Sure, there
8  are limitations.
9   Q.    Gombar and his colleagues go on to
10  tell us what some of those limitations are,
11  correct?
12   A.    Yes.
13   Q.    Some of those limitations include the
14  inherited susceptiblity of tissues to the
15  carcinogenic action of NDMA, the efficiency and
16  fidelity of repair processes, quantitative and
17  qualitative metabolic aspects and the
18  pharmacokinetics of the compound may be very
19  different in humans, right?
20   A.    Yes.  It's all true.  That's why we
21  do research.
22   Q.    Sure.
23           Do you consider yourself a scientist,
24  Dr. Hecht?
25   A.    Yes.

1   Q.    As a scientist, do you agree that
2  it's improper to draw conclusions and inferences
3  from a study that the authors themselves did not
4  support?
5           MR. SLATER:  Objection.
6   A.    I'm not -- could you repeat that?
7   Q.    Sure.
8           Do you agree that it would be
9  improper to draw conclusions or inferences from a
10  study that the authors themselves did not support?
11           MR. SLATER:  Hold on, Dr. Hecht.
12           Objection and counsel might want to
13  read Law 360 and the Eighth Circuit's
14  decision from yesterday.
15           You can answer, Dr. Hecht.
16   A.    So we draw conclusions from our data.
17  All the data has limitations and we think about
18  and analyze the limitations of the data and that
19  influences our conclusions.
20   Q.    Do you ever draw conclusions from a
21  study that the authors of that study themselves
22  reject?
23           MR. SLATER:  Objection.
24           You can answer.
25   A.    Not in general.  Not in general, no.

30 (Pages 114 - 117)

S. Hecht, Ph.D.

Page 118

1    Q.    In general, you'd agree that would --
2    A.    Well, no, actually -- so, you know,
3 that depends on the data that's being presented.
4 I mean, I might find errors in their data and then
5 I wouldn't come to the same conclusions.
6    Q.    In general, would you --
7    A.    I might find flaws in their
8 experimental approach and then I would reject
9 their conclusions.  Just because it's published
10 doesn't mean that it's necessarily correct.
11   Q.    One of the papers that you also cited
12 was a paper by Magee and Barnes entitled -- you
13 can take that one down -- entitled "The Production
14 of Malignant Primary Hepatic Tumors in the Rat by
15 Feeding Dimethylnitrosamine."
16       Do you recall that paper?
17   A.    Yes, very well.
18       MR. TRISCHLER:  I'll mark that as our
19    next numbered exhibit.  I think we're up to
20    7.
21       (Whereupon, Exhibit 7 was marked for
22    identification.)
23   Q.    In this paper, I believe that the
24 rats were administered NDMA on the order of
25 25 milligrams per kilogram of body weight.

Page 119

1       Is that right?
2    A.    Yes.
3    Q.    Do you know how many nanograms are in
4 a milligram?
5    A.    Sure.  There's a thousand nanograms
6 in a microgram and there's 1,000 micrograms in a
7 milligram, so there are a million nanograms in
8 a milligram.
9    Q.    So the dose that was administered to
10 the rats in the Magee and Barnes study was --
11   A.    Yes, that's correct.
12   Q.    Do you know the equivalent dose of
13 25 million nanograms per kilogram in a human being
14 that weighs 150 pounds?
15   A.    Not offhand, no.  I would have to do
16 the calculation.  I can't do it sitting here,
17 talking to you.
18   Q.    Would you agree that that dose is on
19 order of magnitude far greater than any dose that
20 would have been given to any plaintiff who took
21 valsartan-containing medications containing some
22 nitrosamines?
23   A.    Absolutely.
24   Q.    Do you agree that there's no
25 correlation between the dose administered in the

Page 120

1 Barnes study and what any plaintiff in this case
2 may have received?
3       MR. SLATER:  Objection.
4       You can answer.
5    A.    I don't know what you mean by "no
6 correlation."  This was, as you know, as you're
7 well aware, the first study showing that
8 dimethylnitrosamine causes liver tumors in rats.
9 So naturally, they started with a high dose.
10 That's -- if you don't start with a high dose,
11 then you get a negative result and you still
12 haven't answered the question.
13       If you start with a high dose and you
14 get a negative result, you can be pretty sure that
15 the compound is not a strong carcinogen.  Years
16 later, as you know, after literally many, many
17 studies have extended and confirmed this initial
18 study showing that dimethylnitrosamine causes
19 liver cancer in rats, there was the study -- the
20 dose response study by Peto, Grasso and others --
21 showing going down to extremely low doses.
22       So I don't really see what you're
23 driving at here, sir.
24       MR. TRISCHLER:  Object and move to
25    strike as non-responsive.

Page 121

1    Q.    All I was asking you about was the
2 Magee and Barnes study, Doctor.
3       My question was the doses that Magee
4 and Barnes administered to the rats in this study
5 were far and away greater than the levels of
6 nitrosamines that were observed in any
7 valsartan-containing medications.
8       Would you agree?
9    A.    Absolutely.
10   Q.    And in this same study that we marked
11 as Exhibit 7, did -- I think the authors also
12 tried to duplicate their work on other mammals,
13 namely rabbits, right?
14       MR. SLATER:  Objection.
15       You can answer.
16   A.    Yes.
17   Q.    And there was NDMA that was
18 administered to rabbits in this Magee and Barnes
19 study, correct?
20   A.    Yes.
21   Q.    How much NDMA was delivered to these
22 rabbits?
23   A.    I don't remember.
24   Q.    Was it --
25   A.    It was a high dose.  I think they

31 (Pages 118 - 121)

S. Hecht, Ph.D.

Page 122

1 also had some toxicity.
2    Q.    Was it the same 25 milligrams per
3 kilogram of body weight dose that the --
4    A.    I don't know.  Look in the paper.  I
5 don't remember.
6    Q.    Do you remember that in connection
7 with the rabbits no tumors were observed in this
8 study?
9        MR. SLATER:  Objection.
10        You can answer.
11    A.    I forgot about the rabbits.
12        MR. TRISCHLER:  If you could
13    highlight the second paragraph for me,
14    please.
15    Q.    Take a look at it, Doctor.
16        Were any tumors observed in the
17 rabbits in this study?
18    A.    No.
19        MR. TRISCHLER:  You mentioned the
20    Peto paper, so let me ask you about that.
21        There's a paper by a gentleman named
22    Peto that you just mentioned, P-E-T-O.  We
23    can mark that as Exhibit 8.
24        (Whereupon, Exhibit 8 was marked for
25    identification.)

Page 123

1    Q.    While the gentleman is taking care of
2 that for us, Doctor, you not only mentioned the
3 Peto paper a little earlier, you cited to it in
4 your report, correct?
5    A.    Yes.
6    Q.    In Peto, we have another animal study
7 where NDMA and NDEA were administered to rats,
8 correct?
9    A.    Yes.
10    Q.    In his work, Peto was careful to note
11 that no extrapolation of this data to humans
12 should be done.
13        Do you agree?
14    A.    Yes.
15    Q.    In fact, if you can go to page 6445
16 of that paper, the second paragraph of the
17 chart -- there we go -- what Peto wrote is that
18 "It would be a serious distortion of these
19 experimental results to extrapolate this data to
20 humans."
21        Correct?
22    A.    That's what he wrote.
23    Q.    And so what we know from the Peto
24 study is it provided us with some valuable
25 information on dose response relationship to NDMA

Page 124

1 that was administered to rats, but it did not
2 provide any reliable information on the effects of
3 nitrosamines on humans, correct?
4        MR. SLATER:  Objection.
5        You can answer.
6    A.    Correct.
7    Q.    I didn't hear your answer, sir.
8    A.    Yes, correct.
9        Actually, I wouldn't say any reliable
10 information.  I hate to get into a semantic
11 argument.  I wouldn't say it doesn't provide any
12 reliable information.  It does provide reliable
13 information, well, definitely with respect to
14 rats.  You know, whether this information is
15 directly applicable to humans, we don't know, but
16 it does give a strong indication of the strength
17 of the carcinogen and a widely accepted animal
18 model.
19    Q.    What Peto said and what he wrote in
20 the peer-reviewed literature was that this data
21 does not provide reliable information as to the
22 effects of a part per billion nitrosamine
23 concentration on humans.
24        Isn't that --
25    A.    That's what he says.

Page 125

1    Q.    And he says it would be a distortion
2 of these experimental results to suggest something
3 different?
4    A.    Yes, that's what he said.
5    Q.    My question was not asking you about
6 whether Peto's study provides us dose effect --
7 provides us with relevant and reliable dose effect
8 data on NDMA in rats.
9        I'm talking about humans.  When we
10 talk about humans, Peto's study does not provide
11 us with any reliable information.  He even said
12 so, right?
13        MR. SLATER:  Objection.
14    A.    That's what he says.  It says it
15 right there.
16        MR. TRISCHLER:  I'm going to ask you
17    about another animal study that you cited in
18    your report.  I think we'll mark this
19    one Exhibit 9 and it's another paper by
20    Gombar, G-O-M-B-A-R, entitled
21    "Pharmacokinetics of N-nitrosodimethylamine
22    in Swine."
23        (Whereupon, Exhibit 9 was marked for
24    identification.)
25    Q.    Do you see that?

32 (Pages 122 - 125)

S. Hecht, Ph.D.

Page 126

1    A.    Yes.
2    Q.    In this paper, is it also true, if
3  you recall, that the authors once again cautioned
4  against extrapolating carcinogenicity data from
5  animals to humans?
6          MR. SLATER:  Objection.
7          You can answer.
8    A.    I don't recall, but I presume that
9  they did.
10   Q.    If you go to page 1353, under the
11 "Discussion" section of the paper, first paragraph
12 there, Gombar says once again that extrapolation
13 of carcinogenicity data from laboratory animals to
14 humans is a difficult task because chemical
15 carcinogenesis is a multistep process involving
16 many factors, right?
17   A.    True.
18   Q.    Do you agree with all that?
19   A.    Pardon?
20   Q.    Do you agree with all that, sir?
21   A.    Yes, I do.
22   Q.    While there are many factors that
23 make extrapolation of data from animal studies to
24 humans difficult, one of the things that Gombar
25 and his colleagues note here particularly is the

Page 127

1  differing pharmacokinetics from species to
2  species, correct?
3    A.    Right.
4    Q.    Can we agree that the authors of the
5  animal studies that you cite in your report have
6  repeatedly and consistently cautioned against
7  using this animal data to extrapolate to
8  carcinogenicity in humans?
9    A.    They do, yeah.
10   Q.    And there's one other statement in
11 this Exhibit 9 that I wanted to ask you about.
12 It's -- I think it's on the first page of the
13 paper under the introduction section if you -- and
14 in this study that you cite in your own report,
15 what Gombar said and what he observes is that it's
16 not yet proven that nitrosamines cause any human
17 cancer.
18         Do you see that?
19   A.    Yes.
20   Q.    Do you agree with that statement?
21         MR. SLATER:  Objection.
22   A.    Yes.
23         Sorry, I just had a cramp.
24   Q.    Are you okay?
25   A.    Yes, I'm okay.

Page 128

1          Yes.  I mean, that was written about
2  20 years ago, I think.
3    Q.    It was written in 1988, I think.
4    A.    Okay.  So, you know, 33 years ago.
5    Q.    Was it correct when written in 1988
6  that --
7    A.    Yeah.
8          MR. SLATER:  Let him finish the
9  question so I can place an objection.
10         MR. TRISCHLER:  Sorry.  We have to go
11 back to pausing there, Doctor.  Sometimes --
12 and I know it can be difficult with the, you
13 know, trying to do this remotely, but let me
14 finish my question.
15   Q.    My question was was it true, was
16 Gombar's statement when he wrote it in 1988 that
17 it's not yet been proven that nitrosamines cause
18 any human cancer, was that a true and correct
19 statement when written in 1988?
20         MR. SLATER:  Objection.
21   A.    Yes.
22   Q.    And in the second -- this is the
23 second paper that we looked at from Gombar that
24 you cited in your report and much like the first
25 one, can we agree that the doses that were

Page 129

1  administered to these animals were far greater
2  than any human equivalent dose?
3    A.    They were greater, yes.
4    Q.    Far greater?
5    A.    But not as greater as the Magee and
6  Barnes paper.  The Magee and Barnes paper, they
7  were looking at possible carcinogenicity of a
8  compound.  They didn't know whether it was
9  carcinogenic or not, so they started with a high
10 dose.
11         In these papers by Gombar, I don't
12 really remember the dose, but I'm pretty sure it
13 was less than what Magee and Barnes used because
14 this was a pharmacokinetic study.  They would have
15 used multiple doses, probably ones that were less
16 than used by Magee and Barnes.
17   Q.    Well, if you look at the summary of
18 the paper there in the top left-hand column, the
19 doses are covered.
20         The doses were -- there were doses of
21 NDMA administered both intravenously and orally,
22 correct?
23   A.    Yes.
24   Q.    And the doses were on the magnitude
25 intravenously that totaled 1.6 milligrams per

33 (Pages 126 - 129)

S. Hecht, Ph.D.

Page 130

1 kilogram, right?
2    A.    0.1, 0.5 and 1.0.  Those were
3 separate.  I don't know why you're adding them
4 together.
5    Q.    I was adding them together as a total
6 IV dose.
7    A.    Well, that's wrong.  I mean, I think
8 they had different animals, different specific
9 animals that were each treated with these three
10 different doses.  In other words, the lowest dose
11 would have been 0.1 milligrams per kilogram, not
12 1.6.
13    Q.    All right.
14        Then the oral doses were 1.0
15 milligram per kilogram and 5 milligrams per
16 kilogram?
17    A.    Yes.
18    Q.    There are a million nanograms in a --
19    A.    Yes, they're higher than the human
20 dose.  We don't have to go through it again.
21    Q.    Please let me finish my question.
22    A.    Okay.
23    Q.    There are orders of the doses are
24 orders of magnitude higher than what any human
25 would see from valsartan-containing medications,

Page 131

1 right?
2        MR. SLATER:  Objection.
3    A.    Correct.  Yes, that's correct.
4        MR. TRISCHLER:  You can take that
5 document down, I believe, sir.
6        Thank you.
7    Q.    So what we just learned from the
8 Gombar paper was that -- and what we agreed on was
9 that in 1988 there was no evidence demonstrating
10 that nitrosamines caused any human cancer, right?
11    A.    I wouldn't say no evidence.  I
12 wouldn't say that.
13    Q.    All right.  Let me rephrase the
14 question.
15    A.    We had evidence from -- at that time,
16 we had evidence from tobacco-specific nitrosamines
17 of cancer in humans.
18    Q.    Let me ask my question specific to
19 NDMA then.
20        In 1988, we can agree that it had not
21 been proven that NDMA caused any human cancer,
22 right?
23        MR. SLATER:  Objection.
24        You can answer.
25    A.    Yes, correct.

Page 132

1    Q.    To this day, do you agree that
2 there's no scientific evidence conclusively
3 establishing NDMA as a cause of human cancer?
4        MR. SLATER:  Objection.
5        You can answer.
6    A.    Well, let me answer it this way.
7 I'll read from the IARC report in 1978.
8        "Although no epidemiologic data was
9 available N-nitrosodimethylamine should be
10 regarded for practical purposes as if it were
11 carcinogenic to humans," IARC, 1978, World Health
12 Organization.
13    Q.    Do you agree that there's no
14 scientific evidence conclusively establishing NDEA
15 as a known cause of human cancer?
16        MR. SLATER:  Objection.
17        You can answer.
18    A.    Yes.
19    Q.    Can you cite me to any peer-reviewed
20 publication available in the scientific literature
21 identifying NDMA as a known cause of human
22 cancers?
23        MR. SLATER:  Objection.
24        You can answer.
25    A.    No.

Page 133

1    Q.    Can you cite me to any peer-reviewed
2 publication available in the scientific literature
3 identifying NDEA as a known cause of human
4 cancers?
5    A.    No.
6    Q.    Are you aware of any epidemiological
7 study that's found NDMA to be a known cause of
8 cancer in humans?
9    A.    Not by itself, but there are a number
10 of epidemiology studies that looked at dietary
11 exposure to NDMA and cancer.
12    Q.    Have those -- are you aware of any of
13 those studies that have concluded that NDMA is a
14 known cause of cancer in humans?
15        MR. SLATER:  Objection.
16        You can answer.
17    A.    Not specifically as you stated it,
18 no.
19    Q.    Right.
20        There are studies that suggest there
21 might be an association between NDMA intake and
22 some cancers.
23        My question was are you aware of any
24 epidemiological study that has found NDMA to be a
25 known cause of cancer in humans?

34 (Pages 130 - 133)

S. Hecht, Ph.D.

Page 134

1    MR. SLATER:  Objection.
2    You can answer.
3    A.    No.
4    Q.    Are you aware of any epidemiological
5 study that has found NDEA to be a known cause of
6 cancer in humans?
7    A.    No.
8    Q.    Have you ever seen an article or a
9 case study published anywhere in the literature
10 that concludes that a patient's cancer was caused
11 by NDMA?
12    MR. SLATER:  Objection.
13    You can answer.
14    A.    No.
15    Q.    Have you seen any article or case
16 study published anywhere in the literature that
17 has concluded that a patient's cancer was caused
18 by NDEA?
19    MR. SLATER:  Objection.
20    You can answer.
21    A.    No.
22    Q.    You mentioned the IARC report a
23 little bit earlier.
24    Do you remember that?
25    A.    Yes.

Page 135

1    Q.    IARC is the International Agency for
2 Research on Cancer, correct?
3    A.    Yes.
4    Q.    You mentioned the World Health
5 Organization.  I think IARC is an arm of the World
6 Health Organization, right?
7    A.    Yes.
8    Q.    IARC has working groups that review
9 available scientific data, prepare monographs and
10 those monographs are then used to classify
11 compounds as carcinogenic or noncarcinogenic,
12 correct?
13    A.    Right.
14    Q.    IARC has published a monograph
15 for NDMA you pointed out for us on the video a
16 little bit ago, right?
17    A.    That was an early one.  It also did
18 an update some years later.
19    Q.    Okay.  Sorry.  I didn't realize you
20 were not finished.
21    Were you part of the working group
22 for the NDMA monograph?
23    A.    No.
24    Q.    In the monograph, the IARC working
25 group noted that there was no case reports or

Page 136

1 epidemiological studies to assess carcinogenicity
2 in humans; true?
3    A.    Yes.
4    Q.    IARC has also published a monograph
5 for NDEA, right?
6    A.    Yes.  Yes.
7    Q.    Were you part of the working group
8 for the NDEA monograph?
9    A.    No.
10    Q.    In the NDEA monograph, the working
11 group of scientists who studied this agent
12 observed that there was no case reports available
13 to assess carcinogenicity in humans, correct?
14    A.    Correct.
15    Q.    The working group also went on to
16 note there were no available epidemiological
17 studies to assess carcinogenicity of NDEA in
18 humans; true?
19    A.    Yes.
20    Q.    So based on these monographs, IARC
21 classified both NDMA and NDEA as Class 2A probable
22 carcinogens.
23    A.    Probable human carcinogens.  Probable
24 human carcinogens.
25    Q.    Class 2A?

Page 137

1    A.    Yes.  Probable human carcinogens, not
2 probable carcinogens.
3    Q.    But they were assigned to Class 2A --
4    A.    Probably carcinogenic to humans.
5 That's what they said.
6    Q.    Did you hear my last question?
7    A.    2A.  Yeah, 2A.
8    Q.    When did IARC develop this
9 classification system?
10    A.    I believe it was around 1970.
11    Q.    There's a big, long list of compounds
12 that were -- that IARC has classified since 1970,
13 correct?
14    A.    Yes.
15    MR. TRISCHLER:  I don't know if we
16 have that list or not.
17    On the next break, I'll have that
18 list marked as an exhibit because I don't
19 know if I sent it to the video folks --
20    THE VIDEOGRAPHER:  Counsel, on that
21 note, I have about five minutes left on this
22 media, just to let you know.
23    Q.    In any event, when was the Class 2A
24 designation assigned -- first assigned to NDMA?
25    A.    That would be 1978.

35 (Pages 134 - 137)

S. Hecht, Ph.D.

Page 138

1 Q. You said it was updated after 1978?
2 A. Yes.
3 Q. I think that was in 1987?
4 A. Sounds about right.
5 Q. Was the classification changed in --
6 A. No. Still 2A.
7 Q. When was NDEA first classified as 2A?
8 A. Same.
9 Q. 1970?
10 A. 1978.
11 Q. Seventy-eight. Okay.
12    Was it updated in 1987?
13 A. I believe so.
14 Q. When it was updated in 1987 was the
15 classification of NDEA as a 2A class carcinogen,
16 was it changed?
17 A. No. They're both 2A.
18 Q. To this day, has the classification
19 of NDEA or NDMA ever changed?
20 A. No. Both 2A.
21 Q. From your perspective, the Class 1
22 designation is reserved for known human
23 carcinogens, correct?
24 A. Yes.
25 Q. The known carcinogens that are

Page 139

1 included in Class 1 include tobacco, correct?
2 A. Yes.
3 Q. Is alcohol a Class 1 carcinogen?
4 A. Yes.
5 Q. Asbestos, is that a Class 1
6 carcinogen?
7 A. Yes.
8 Q. Coal?
9 A. Coal tar.
10 Q. Is listed as a Class 1 carcinogen?
11 A. Coal tar. Not coal itself.
12 Q. Okay.
13    The fact is IARC has identified over
14 100 known carcinogens, right?
15 A. You mean Class 1?
16 Q. Yes, sir.
17 A. I believe that's right.
18 Q. To this day, neither NDMA nor NDEA
19 have ever been listed by IARC as known human
20 carcinogens, right?
21 A. Not Class 1, no.
22    MR. TRISCHLER: We need to take a
23 break to change tapes or do whatever the
24 video person needs to do.
25    Adam, what did you want to do about a

Page 140

1 lunch schedule?
2    MR. SLATER: I want to do whatever
3 Dr. Hecht wants to do.
4    MR. TRISCHLER: Okay.
5    Do you want to -- I'm just asking did
6 you want to --
7    MR. SLATER: We'll talk during the
8 break how much longer he wants to go before
9 we eat.
10    Is that all right?
11    MR. TRISCHLER: It's okay with me.
12    THE WITNESS: I'm good until about
13 one o'clock your time.
14    MR. TRISCHLER: Okay.
15    Why don't we take a five-minute break
16 to do whatever the technical people need to
17 do and we can go until one o'clock my time,
18 if that's okay with the witness and if it's
19 okay with Adam.
20    MR. SLATER: It's fine.
21    THE WITNESS: How long are we going
22 to break for lunch?
23    MR. TRISCHLER: As long as you want.
24    THE WITNESS: Okay.
25    MR. TRISCHLER: Or as short as you

Page 141

1 want.
2    THE WITNESS: Okay. I need to go out
3 and get something.
4    MR. TRISCHLER: Okay. Sure, we
5 can -- you're in charge of that aspect, so --
6    THE WITNESS: Okay.
7    THE VIDEOGRAPHER: The time is 12:17.
8 This ends media two.
9    (Recess taken)
10    THE VIDEOGRAPHER: The time is now
11 12:27.
12    This begins media three.
13    You may proceed.
14 Q. Doctor, before our last break, we
15 were talking a little bit about the IARC
16 classification of agents.
17    Do you recall that?
18 A. Yes.
19 Q. I asked you if there was a published
20 list where IARC identifies all of the agents that
21 have been studied by their grouping or
22 classification.
23    Do you recall that?
24 A. Yes.
25    MR. TRISCHLER: So I've gone ahead

36 (Pages 138 - 141)

S. Hecht, Ph.D.

Page 142

1 and sent to our technical folks that list and
2 I'll have that marked as the next numbered
3 exhibit. I think it might be 10.
4        THE VIDEOGRAPHER: Ten is correct,
5 sir.
6        (Whereupon, Exhibit 10 was marked for
7 identification.)
8    Q.    I think what you're now looking at is
9 the first page of that exhibit. It's 37 pages
10 long -- and I think if you could just blow up,
11 Bill, some part of it for the witness's benefit --
12 this is the list that I was showing you or
13 mentioning before, Doctor, and it tells us that
14 IARC has prepared monographs for each of these
15 agents and classified them by their carcinogenic
16 properties, correct?
17   A.    Yes.
18   Q.    As we mentioned, included in this
19 37-page compendium is NDMA and NDEA, both of which
20 are Class 2A, right?
21   A.    Yes.
22   Q.    Is it true that the classification of
23 an agent as Class 2A is a classification that's
24 reserved for agents where there's limited evidence
25 of carcinogenicity in humans and sufficient

Page 143

1 carcinogenicity in experimental animals?
2    A.    I think that's how they describe it.
3    Q.    Do you agree with IARC's
4 classification of NDMA and NDEA as Class 2A?
5    A.    Yes, I agree. But I also agree with
6 the statement that they should be regarded for
7 practical purposes as if it were carcinogenic in
8 humans. That was for NDMA.
9    Q.    Do you agree --
10   A.    But yes, I agree that 2A is proper
11 because 2A is probably carcinogenic to humans.
12 Group one is carcinogenic to humans, so you would
13 need an instance where there's been exposure to
14 NDMA or NDEA in the absence of other possible
15 causes and, you know, this could be the example,
16 valsartan.
17   Q.    Do you agree that there is limited
18 evidence of carcinogenicity in humans for NDMA and
19 NDEA?
20        MR. SLATER: Objection.
21        You can answer.
22   A.    You know, I'm not sure about limited.
23 So, I mean, I know that they do go through each
24 sub category in their final evaluation. I don't
25 really think it's -- I don't think it's limited at

Page 144

1 all. I don't agree. No, I don't agree.
2    Q.    What --
3    A.    I don't agree that it's limited.
4    Q.    Okay.
5        Is there a process within IARC to
6 petition a working group to change a
7 classification?
8    A.    I have no idea.
9    Q.    At any point in your career have you
10 ever submitted any petition, evidence or writings
11 to IARC advocating a change in a classification
12 for an agent?
13   A.    No.
14   Q.    To this point in time, have you
15 submitted any petition, evidence or writings to
16 IARC advocating a change in the classification for
17 NDMA or NDEA?
18   A.    No, I haven't.
19   Q.    Outside the context of this
20 litigation, have you ever submitted anything to
21 any world health authority advocating or
22 suggesting that the scientific evidence justified
23 reclassifying NDMA and NDEA to known human
24 carcinogenic status?
25   A.    No, I haven't.

Page 145

1    Q.    When we talk about Class 1 known
2 human carcinogens, we mention that among the
3 37-page compendium there are hundreds that have
4 been named as Class 1, right?
5    A.    How many? I don't know.
6    Q.    Over 100, I said.
7    A.    If that's what you say.
8    Q.    Okay.
9    A.    You've got the list there.
10   Q.    Would you agree that many of the
11 Class 1 carcinogens are things that all of us are
12 consuming and are exposed to on a daily basis?
13   A.    All of them or many of them? What's
14 your question?
15   Q.    Would you agree that many of the
16 Class 1 carcinogens are things that all of us
17 consume or are exposed to on a daily basis?
18   A.    No.
19   Q.    Is sunlight a Class 1 carcinogen?
20   A.    Yes.
21   Q.    Most of us are exposed to sunlight
22 every day, right?
23        MR. SLATER: Objection.
24   A.    Unless you have xeroderma pigmentosa,
25 yes.

37 (Pages 142 - 145)

S. Hecht, Ph.D.

Page 146

1    Q.    Most of us don't?
2    A.    Correct.
3    Q.    But most of us are exposed to
4  sunlight, a known human carcinogen, on a daily
5  basis, right?
6    A.    Yes.
7    Q.    Processed meat, I think, is a Class 1
8  known carcinogen, right?
9    A.    I don't know whether it's 1 or 2A.
10    Q.    You're not sure about that one?
11    A.    No.  You can look on your list.
12    Q.    Let me take a look.
13        Can you go to page 30, sir?
14  Highlight the top third of that page for the
15  witness.  I think we can --
16        According to Exhibit 10 from the IARC
17  monograph, processed meat is a group one --
18    A.    Group one.
19    Q.    -- carcinogen, right?
20    A.    Group one.  Yes.
21    Q.    So the bacon that I enjoy for
22  breakfast is a known carcinogen?
23    A.    That would be a processed meet, yes.
24    Q.    The deli meat that I have for lunch
25  is a known carcinogen, according to IARC?

Page 147

1    A.    It is, but you have to think about --
2  you have to read the preamble and, you know, dose
3  is part of the picture, so you have to take that
4  into account.  When they say something is group
5  one, they're not talking -- they're not talking
6  about dose specifically.  They're not talking
7  about other dose that you might get when you have
8  bacon.  They're saying that, you know, processed
9  meat, consumption of processed meat can cause
10  cancer in humans.
11    Q.    Sure.
12        It's known to cause cancer in humans
13  according to IARC?
14    A.    Yes, but they're not talking about
15  the amount of processed meat.  They don't do that.
16    Q.    Everything is dose dependent?
17        MR. SLATER:  Objection.
18        You can answer.
19    A.    Most are.  But, you know, the way you
20  just stated this thing, it sounded like you
21  weren't talking dose into account.  The statement
22  that, you know, that you made a couple minutes ago
23  when you first brought up processed meat that --
24  you said something like "The bacon that I enjoy
25  for breakfast is a group one carcinogen."  Yeah,

Page 148

1  that's true.  But everything depends on dose.
2    Q.    I couldn't agree with you more.
3  There are a lot of other foods and beverages that
4  we consume every day that are Class 1 and Class 2A
5  carcinogens according to IARC, correct?
6    A.    Yes.
7    Q.    The hot coffee or hot tea that we
8  enjoy in the morning is a carcinogen according to
9  IARC, right?
10        MR. SLATER:  Objection.
11        You can answer.
12    A.    I don't think so.
13    Q.    Well, if we go to --
14    A.    Coffee?  Coffee?
15    Q.    Yes, that's what I said.  Hot tea or
16  hot coffee.
17    A.    They're talking about super heated.
18  There are certain areas in the world where very
19  hot beverages are consumed.  It has nothing to do
20  with what you do.  Those very hot beverages can
21  lead to cancer.
22    Q.    Sure.  Very hot --
23    A.    Has nothing to do with your cup of
24  coffee.
25    Q.    Very hot beverages --

Page 149

1    A.    Not at all.
2    Q.    Very hot beverages above 65 degrees
3  Celsius?
4    A.    I don't remember the temperature
5  involved.
6    Q.    How does 65 --
7    A.    I think it's higher than that.
8    Q.    How does 65 degrees Celsius convert
9  to Fahrenheit?
10    A.    Nine fifth C plus 32.  You do the
11  math.
12    Q.    I will.
13        Are fried foods a known carcinogen
14  according to IARC?
15    A.    Look on the list.
16    Q.    I'm asking you if you know.  I will.
17        But do you know?
18    A.    I haven't memorized the list.  I told
19  you that.
20        MR. TRISCHLER:  Go to page -- I'll
21  come back to it because I can't find it right
22  now.
23    Q.    Is it fair to say that according to
24  IARC most of us are exposed to known and probably
25  carcinogens on a daily basis?

38 (Pages 146 - 149)

S. Hecht, Ph.D.

Page 150

1    A.    I don't think IARC ever said that.
2  I'm not aware that IARC ever made a statement like
3  that.
4    Q.    Let me rephrase the question.
5         Based on the IARC classifications of
6  agents, would you agree that most of us are
7  exposed to known and probable carcinogens on a
8  daily basis?
9    A.    Well, we don't need IARC for that. I
10 mean, you know, sunlight -- again, it's all in the
11 dose. Everything is dependent on dose.
12   Q.    In our lifetime, all of us are going
13 to be exposed to dozens of carcinogens; true?
14   A.    I wouldn't say necessarily dozens,
15 but yes, we're all exposed to carcinogens, yes. I
16 don't know about dozens. I don't know. I'm not
17 sure what that means.
18   Q.    How about multiple? Would you agree
19 that all of us during our lifetime are exposed to
20 multiple carcinogens?
21   A.    Yes, multiple means more than one.
22   Q.    So when an individual has a lifetime
23 exposure to multiple carcinogens, do you have the
24 basis or ability to determine the cause of cancer
25 in any individual case?

Page 151

1         MR. SLATER: Objection.
2    A.    It's challenging. Definitely
3  challenging, but there are examples. I think I
4  mentioned one earlier where sunlight can cause a
5  cross linking of thymidines in DNA in individuals
6  who cannot repair that damage. It's a specific
7  disease called xeroderma pigmentosa. Those
8  individuals are exposed at all to sunlight, they
9  get skin tumors. So yes.
10   Q.    Are you suggesting that -- it sounds
11 like what you're suggesting is that sunlight can
12 cause unique mutations?
13   A.    Yes.
14   Q.    Absent that example, when we talk
15 about environmental exposures, do you have the
16 ability to look at a given case and sort out
17 multiple carcinogenic exposures and identify one
18 as the cause of cancer in any given case?
19        MR. SLATER: Objection.
20        You can answer.
21   A.    Sure. An example would be smokeless
22 tobacco. I can identify exposure to an oral
23 cavity, oral mucosa carcinogen in smokeless
24 tobacco.
25   Q.    Is there any such thing as a

Page 152

1  signature genetic lesion associated with NDMA?
2    A.    There is a signature genetic lesion,
3  whether that would be associated with NDMA, but
4  there might also be other causes. So
5  O6-methylguanine is a signature genetic lesion, a
6  mutation in the KRAS gene, G28 transition in the
7  second base of codon 12. That's a signature that
8  comes from O6-methylguanine. So yes, that's a
9  signature mutation. Doesn't necessarily come from
10 dimethylnitrosamine as opposed to perhaps another
11 DNA methylating agent. We don't know. But that
12 would be a signature mutation.
13        Another example is in the P53 tumor
14 suppressor gene where it's been shown that
15 benzoapyrene and some other polycyclic aromatic
16 hydrocarbons as well as acrolein can cause
17 mutations at certain specific codons of the P53
18 tumor suppressor gene.
19        Those would qualify as signature
20 mutations. So yes, there are other examples other
21 than the thymidine cross links that I mentioned
22 earlier. So there are examples.
23   Q.    Maybe my question wasn't 100% clear.
24        When I was using the term "signature
25 genetic lesions," what I was referring to were

Page 153

1  lesions that would be unique to NDMA as opposed to
2  other potential sources and it sounds like when
3  you mentioned the P53 tumor, the O6-methylguanine
4  and the KRAS gene, those lesions may be the
5  result -- may be consistent with NDMA, but they
6  might also be consistent with other causes?
7    A.    That's possible.
8    Q.    Right. So my question --
9    A.    But you know, everything has to be
10 taken in context. So, you know, I think valsartan
11 would be a good example of a study that could be
12 done to identify such a genetic mutation that was
13 caused by an NDMA.
14   Q.    But until that study is done, we
15 can't say that the lesion is specifically caused
16 by or related to DNA absent that scientific study?
17        MR. SLATER: Objection.
18   A.    Related to what?
19   Q.    I misspoke. I'm sorry.
20        Absent that study and until such a
21 study is done, we don't have the scientific
22 ability to look at a particular lesion and say it
23 was definitively caused by NDMA exposure?
24        MR. SLATER: Objection.
25        You can answer.

39 (Pages 150 - 153)

S. Hecht, Ph.D.

Page 154

1    A.    No, not right now.  We don't have the
2 data.  The study should be done.
3    Q.    I asked before about NDMA.
4    Are you aware of whether there's any
5 such thing as a signature genetic lesion
6 associated with NDEA?
7    A.    NDEA would produce the same kind of
8 lesion in DNA O6-methylguanine, which could lead
9 to G2A transitions in codon 12.
10    Q.    What is that --
11    A.    But I think there's less data for an
12 ethylating agent, but you would certainly expect
13 the same, the same thing.
14    Q.    What is that opinion based on?
15    A.    My knowledge of the scientific
16 literature.
17    Q.    Is there scientific literature that
18 specifically describes the type of DNA changes
19 that one sees in humans from NDEA?
20    A.    Not in humans.
21    Q.    Following the discovery of
22 nitrosamines in some medications, you've been
23 involved in working with the FDA, correct?
24    A.    Yes.
25    Q.    One of the things you mentioned in

Page 155

1 your report, and I think you alluded to it a
2 little bit earlier, is that you served as a
3 panelist in an FDA workshop in 2021, right?
4    A.    Correct.
5    Q.    I think that workshop was in March of
6 this year; true?
7    A.    Yes.
8    Q.    And at the time you attended that and
9 participated in that FDA workshop, you were an
10 active consultant for the plaintiffs in this
11 litigation; true?
12    A.    Yes.
13    Q.    You'd already been hired by
14 Mr. Slater over a year and a half ago?
15    A.    Right.
16    Q.    How did your involvement in this FDA
17 workshop come to be?
18    A.    They contacted me and asked me
19 whether because of my extensive experience and
20 knowledge of nitrosamine carcinogenicity whether I
21 would like to participate.
22    Q.    When you say they contacted you, are
23 you referring to someone at the FDA?
24    A.    Yes.
25    Q.    Who might that have been?

Page 156

1    A.    I really don't remember.  I could dig
2 out the email if you really want to find out, if
3 you want me to.  I don't remember the person's
4 name, but definitely they had contacted me.
5    They said there's going to be a
6 workshop on whatever the dates were and we're
7 planning the workshop and we'd like you to
8 participate as a panelist or discussant.  I can
9 provide the email if you want.
10    Q.    When you were approached by the FDA
11 to serve on this panel, did you disclose to them
12 your potential bias given your involvement in this
13 litigation?
14    MR. SLATER:  Objection.
15    You can answer.
16    A.    No, I don't believe I have a bias.  I
17 don't have a bias.  Definitely not.  There's no
18 bias here.  It's all based on science.
19    Q.    All right.
20    A.    I don't know why you bring up bias.
21    Q.    Because I'm asking --
22    A.    Why would you do that?
23    Q.    Because I'm asking questions, sir.
24    A.    Okay.
25    Q.    Did you disclose --

Page 157

1    A.    Okay.  I'm saying I don't have any
2 bias.
3    Q.    You said that six times, so let me
4 ask my next question.
5    A.    So I want to make sure you understand
6 it.
7    Q.    Did you disclose to the FDA that you
8 were working on behalf of the plaintiffs pursuing
9 claims against drug companies?
10    MR. SLATER:  Objection.
11    You can answer.
12    A.    I honestly don't remember.  I may
13 have.  I really don't remember.
14    Q.    Do you have email correspondence
15 where you told them that?
16    A.    I have email correspondence.  Whether
17 I told them that or not, I really don't know.
18    Q.    I think you were one of, like, 16 --
19    A.    I wouldn't consider it a conflict of
20 interest at all.
21    Q.    I think you were one of, like, 16
22 members of this panel, right?
23    A.    Yeah, that's right.
24    Q.    Was it a group of esteemed experts in
25 their field?

40 (Pages 154 - 157)

S. Hecht, Ph.D.

Page 158

1    A.    Yes.
2    Q.    A group of well-respected scientists
3 whose opinions you value and trust?
4    A.    Yes.
5    Q.    In addition to this workshop that you
6 participated in with the FDA, were you also aware
7 that the FDA has issued a number of public
8 statements concerning the nitrosamine impurities
9 found in drug products?
10    A.    Yes.
11    Q.    You've mentioned one of the things
12 you did in your work in this case was to look into
13 the public data and public information that was
14 available on that, right?
15    A.    Yes.
16    Q.    So you were certainly aware that the
17 FDA has made lots of public statements about the
18 nitrosamine impurities and the significance of
19 those impurities, correct?
20    A.    As well they should.
21    Q.    In those public statements, is it
22 true that FDA has consistently observed and
23 reported to the public that the theoretical risk
24 of harm from nitrosamines in medications is
25 extremely low?

Page 159

1    A.    Yes.
2        MR. TRISCHLER:  For instance -- why
3 don't we mark as Exhibit 11 this document
4 entitled "Information about Nitrosamine
5 Impurities in Medications" that comes from
6 the FDA website?
7        Can you mark that, Bill?
8        THE VIDEOGRAPHER:  Sure thing.  Just
9 looking for it now.
10        (Whereupon, Exhibit 11 was marked for
11 identification.)
12    Q.    What you're looking at now is an
13 eight-page document from the FDA website.
14        Is this one of the things you read --
15 do you know if this was one of the things you read
16 in connection with your work in this case?
17    A.    I don't recall this.
18    Q.    Can you go to page four of the
19 exhibit, sir?  The last section has a number of
20 bullet points.  Thank you.
21        I don't know that this is page four
22 that you have.  At least it's not page four of
23 mine.
24        THE VIDEOGRAPHER:  What are you
25 looking for on the page?  This is page four

Page 160

1 for me?
2        MR. TRISCHLER:  Top of the page says
3 "What you should know about nitrosamine
4 impurities."  It's the middle box.  I'm
5 sorry.  There we go.  Yes.  Okay.  Sorry.
6 Different printing.
7    Q.    You can see in the middle of the
8 page -- I think it's the fourth bullet point that
9 we've expanded -- that reads "Nitrosamine
10 impurities may increase the risk of cancer if
11 people are exposed to them above acceptable levels
12 and over long periods of time, but a person taking
13 a dose that contains nitrosamines at or below
14 acceptable daily intake limits every day for 70
15 years is not expected to have an increased risk of
16 cancer."
17        Do you see that statement?
18    A.    Yes.
19    Q.    Do you agree with it, sir?
20    A.    Well, I thought that they had come
21 out with a risk estimate.  I've forgotten the
22 exact number.  So I'm a little confused by this
23 particular statement.  I'm not quite sure what
24 they mean, "not expected to have an increased risk
25 of cancer."  It's a little confusing.

Page 161

1    Q.    It seems to me what they're saying is
2 at low levels, they would not expect nitrosamines
3 in valsartan medications to cause an increased
4 risk of cancer.
5        Do you agree or disagree?
6        MR. SLATER:  Objection.
7        You can answer.
8    A.    Well, I'm pretty sure they -- I don't
9 know whether it was after this or -- I'm pretty
10 sure they came out actually with a risk estimate
11 of something like a one in 7,000 or something like
12 that.  So I don't know how that relates to this
13 exactly, but I know that they -- their position
14 was that the risk was low.  So I'm aware of that.
15    Q.    Let's start with that.
16        You said you're aware that the FDA's
17 position that the risk of nitrosamines in
18 valsartan-containing medications containing was
19 low.
20        Do you agree with that statement?
21        MR. SLATER:  Objection.
22        You can answer.
23    A.    It was low compared to the benefit of
24 the medication.  So they recognize the fact that
25 the medications are effective and that they are

41 (Pages 158 - 161)

S. Hecht, Ph.D.

Page 162

1 useful drugs and as I understand it, their
2 position was that, you know, even though this
3 horrible contamination has happened and, you know,
4 it never should have happened, never would have
5 been approved in any way whatsoever, but these
6 drugs have been approved by FDA, if they had been
7 known to contain dimethyl and dimethylnitrosamine,
8 there's no way they would ever be approved, but
9 the fact that it did happen and the drugs are out
10 there now in the market, they were trying to tell
11 people that don't stop taking your drug right now
12 because, you know, that could have worse
13 consequences than the nitrosamines. That's how I
14 understand it.
15        MR. TRISCHLER: Object and move to
16    strike as non-responsive.
17    Q.    Let's look at the sentence that's up
18 on the screen.
19        Do you agree with the statement that
20 a person taking a drug that contains nitrosamines
21 at or below the acceptable daily intake limits
22 every day for 70 years is not expected to have an
23 increased risk of cancer?
24    A.    No.
25    Q.    Do you realize that this statement

Page 163

1 was prepared after the FDA had done a risk
2 assessment on the relative risk presented by
3 nitrosamine impurities?
4    A.    Yeah, I'm not sure exactly about this
5 statement -- okay? -- because I thought -- maybe
6 I'm wrong here, but as I recall, FDA actually came
7 out with a number based on a risk assessment
8 exercise that was something like, you know, one in
9 9,000 or something like that. So I'm a little
10 confused by this statement. I did not expect it.
11 I'm not sure what it means, not expected to have
12 an increased risk of cancer.
13    Q.    Well, if the words --
14    A.    What does that mean exactly, "not
15 expected to"? I don't understand that.
16    Q.    If the words "not expected" are
17 troubling to you, I'll withdraw the question. Let
18 me ask you something different.
19        Have you conducted an independent
20 risk assessment related to nitrosamine exposure
21 from valsartan-containing medications?
22    A.    No, I have not.
23    Q.    Do you understand that regulatory
24 limits for acceptable daily intake have been
25 established by FDA?

Page 164

1    A.    I'm not sure how to answer that. I
2 thought that they came up with a 96 nanograms per
3 day. That's what they came up with, that
4 96 nanograms per day would be acceptable. Above
5 that would not be.
6    Q.    Right. That was my question.
7        Based on its risk assessment, the FDA
8 established that an acceptable daily intake of
9 NDMA was 96 nanograms per day.
10        You're familiar with that, right?
11    A.    Yes, that's what I said.
12    Q.    Based on FDA's risk assessment, it
13 was -- they determined an acceptable daily intake
14 of 26.5 nanograms per day was acceptable for NDEA,
15 right?
16    A.    Yes.
17    Q.    You understood that those acceptable
18 daily intake numbers were based on a lifetime
19 exposure of 70 years, correct?
20    A.    Yes, that's how they did the
21 calculation.
22    Q.    So if you do the math for NDMA, 96
23 times 365 times 70 leaves a lifetime acceptable
24 exposure limit, according to FDA, of
25 2.5 million nanograms, right, plus change?

Page 165

1    A.    You did it, not me.
2    Q.    A lifetime acceptable limit of NDEA
3 according to FDA's risk assessment would be 26.5
4 times 365 times 70, right?
5    A.    Yes.
6    Q.    And you understand, I assume, that no
7 plaintiff in this case was taking nitrosamines
8 containing -- nitrosamine-containing medications
9 for 70 years or anything close to that, right?
10    A.    Probably not.
11    Q.    And what FDA said in its risk
12 assessment was that exposure to roughly two and a
13 half million nanograms of NDMA was reasonably safe
14 for human consumption, right?
15    A.    Yes.
16    Q.    That's what a risk assessment is?
17    A.    Yes.
18    Q.    Do you agree with that risk
19 assessment?
20    A.    Yes, I agree with it. I mean, it's
21 not really my area. I don't present myself as an
22 expert in risk assessment or the calculation of
23 risk. I don't do that. But I think it's
24 reasonable what they did, what they came up with.
25 It sounds reasonable to me.

42 (Pages 162 - 165)

S. Hecht, Ph.D.

Page 166

1    Q.    But you do suggest, at least through
2  your report, that you believe that nitrosamines in
3  valsartan-containing medication increase the risk
4  of causing cancer, right?
5    A.    Yes, absolutely.
6    Q.    And you told me that everything is
7  dose and duration dependent, right?
8    A.    Yes.
9          MR. SLATER:  Objection.
10    Q.    So you need to know if you're going
11  to have an opinion that an exposure increased the
12  risk of causing cancer, you need to know what a
13  reasonably safe level for human consumption is,
14  right?
15          MR. SLATER:  Objection.
16          You can answer.
17    A.    The safe level is zero.  That's what
18  it should be.
19    Q.    That's not what -- not according to
20  the FDA.
21    A.    Well, that's okay.  There's no way
22  there should be NDMA or NDEA in these drugs.  It
23  should be zero.  Absolutely.
24          MR. TRISCHLER:  Object and move to
25    strike because those are issues for another

Page 167

1    day, sir.
2          We're talking about causation here.
3          MR. SLATER:  Objection.
4          Argumentative.
5    Q.    Excuse me.
6          What the FDA said is that two and a
7  half million nanograms of NDMA are reasonably safe
8  for human consumption based on its risk assessment
9  and you've not done any other assessment to say
10  otherwise; true?
11          MR. SLATER:  Objection.
12          Lack of foundation.
13          You can answer.
14    A.    It's not what I do.  That's true.  I
15  haven't done -- I haven't made any calculations.
16  That's up to FDA, EMA and the risk assessors.
17  That's not what I do.
18    Q.    What the FDA has said is that
19  677,075 nanograms of NDEA is reasonably safe for
20  human consumption and you've not done any
21  alternative risk assessment to suggest otherwise?
22    A.    Correct.
23    Q.    When you sat in on the FDA
24  nitrosamine workshop in March of this year, did
25  you publically express any disagreement with FDA's

Page 168

1  risk calculation?
2    A.    No.
3          MR. SLATER:  Objection.
4          Lack of foundation.
5    Q.    That conference was over the course
6  of two days, correct?
7    A.    Yes.
8    Q.    So if you had disagreement with FDA's
9  risk calculation, you certainly had plenty of time
10  to offer it, right?
11          MR. SLATER:  Objection.
12    A.    Sure, but as I recall -- I don't
13  really remember.  I don't think the -- this
14  particular -- I don't remember whether, you know,
15  the risk calculation was actually discussed at the
16  workshop.  I really don't remember.
17    Q.    Well, certainly --
18    A.    The workshop wasn't specifically --
19  it was more general -- about nitrosamine exposure
20  and carcinogenicity.  Obviously, it related to
21  drugs because that's what they do, but I don't
22  really remember whether the risk calculation was
23  actually discussed at that workshop.  I don't
24  think it was.
25    Q.    Well, you've already told me that you

Page 169

1  are aware that the FDA, as the agency responsible
2  for drug safety in America, has repeatedly made
3  public statements that the health risk from
4  nitrosamine impurities was very low.
5          Do you remember telling me that?
6    A.    Yes.
7    Q.    And the workshop that you attended in
8  March, there was actually a transcript prepared of
9  the whole thing.
10          Were you aware of that?
11    A.    Yes, I'm aware.
12    Q.    Do you have a copy of the transcript?
13    A.    No.  Well, it might be on my
14  computer.  I don't have a hard copy.  Not here
15  with me, no.
16    Q.    Have you ever reviewed a transcript
17  of the FDA workshop when you came back after it
18  was completed in March?
19    A.    I did review it, yes.
20    Q.    And it was certainly discussed during
21  the workshop, on multiple occasions, the fact that
22  the risk from exposure to nitrosamine in
23  valsartan-containing medications was de minimis.
24          That was clearly discussed, correct?
25          MR. SLATER:  Objection.

43 (Pages 166 - 169)

S. Hecht, Ph.D.

Page 170

1      You can answer.
2   A.   Yes.
3   Q.   When you were sitting there for two
4   days, did you ever express to anyone on that panel
5   your disagreement with that belief?
6   A.   No.
7   Q.   Did you tell anyone that FDA during
8   this two-day panel that they were wrong, that the
9   risk of developing cancer from these small amounts
10  of nitrosamines was actually much larger than that
11  they believed?
12       MR. SLATER:  Objection.
13       You can answer.
14  A.   No, I told you that's not what I do.
15  I don't do risk assessment calculations, so I
16  would have no grounds to do that, to say that and
17  I'm not disagreeing with the risk assessment
18  calculations that are out there.
19  Q.   Okay.
20  A.   That's not what I do, so why would I
21  say something like that?
22  Q.   My point is that you had an
23  opportunity in March to tell the FDA that their
24  assessment of the risk of nitrosamine impurities
25  in drugs being anything but de minimis was wrong

Page 171

1   and you did nothing about it.
2        Agreed?
3        MR. SLATER:  Objection.
4        Lack of foundation.
5        Complete mischaracterization of what
6   went on.
7        You can answer.
8   A.   I think I already told you, I don't
9   do risk assessment, so, you know, I wouldn't argue
10  with the FDA's risk calculation.  I already told
11  you that, so why do you keep asking?
12  Q.   I'm trying to get an answer to my
13  question.
14       Did you tell anyone at FDA --
15       MR. SLATER:  Counsel, one second.
16       Counsel, he's answered the question
17  multiple times.  You're beyond the point of
18  arguing with him.
19       Is there some other area you want to
20  ask him questions about --
21  Q.   Did you tell anybody --
22       MR. SLATER:  -- or do you want to
23  pull the transcript out or show us the
24  question or do you want to pull the
25  transcript out and try to find a question

Page 172

1   that actually asks that question?
2        I'll be happy to wait for you to look
3   for that in the transcript.
4   Q.   Did you tell anyone at FDA their risk
5   assessment was wrong?  Yes or no?
6   A.   No.
7   Q.   Although you don't -- although you
8   say risk assessments are not your business, are
9   you aware of the fact that risk assessments, when
10  they're performed by regulatory agencies, are
11  intended to be extremely conservative so as to
12  decide a patient's safety?
13  A.   Yes.
14  Q.   Would you agree that the
15  establishment of a conservative, acceptable intake
16  limit does not imply that an exposure at a higher
17  level can cause harm?
18       MR. SLATER:  Objection.
19  A.   I'm not sure I understand your
20  question.
21  Q.   Based on what you know about risk
22  assessments, would you agree that it is generally
23  known and understood that those -- the
24  establishment of those conservative estimates does
25  not mean that an exposure at levels above what's

Page 173

1   determined to be an acceptable level will
2   necessarily cause harm?
3        MR. SLATER:  Objection.
4        You can answer.
5   A.   Correct.  It's based on the
6   probability.
7   Q.   And in fact --
8   A.   It's all based on probability
9   calculations.
10  Q.   In fact, in some of the research that
11  you cited in your report that you prepared in this
12  case, you identified evidence and provided us with
13  information suggesting that virtually all of us
14  are exposed to NDMA and NDEA on a daily basis at
15  concentrations far greater than the acceptable
16  intakes established by FDA, right?
17  A.   I don't know about "far greater."  We
18  are all exposed through the diet for sure.
19  Q.   Okay.
20  A.   I don't know about "far greater."
21  That depends on your diet, that depends on
22  concentrations of NDMA and NDEA and the various
23  foods that you eat and drinking water, etc.  So I
24  don't know about "far greater."
25       (Whereupon, Exhibit 12 was marked for

44 (Pages 170 - 173)

S. Hecht, Ph.D.

Page 174

1    identification.)

2    Q.    Let's take a look at the paper that
3    you cited in your report from Gushgari,
4    G-U-S-H-G-A-R-I.  I think it's entitled "Critical
5    Review of Major Sources of Human Exposure to
6    Nitrosamines."

7         Do you recall this paper, Dr. Hecht?

8    A.    Yes.

9    Q.    Was my representation correct, that
10   this was indeed a paper that you cited in your
11   report that you prepared in this case?

12   A.    It is, yes.

13   Q.    And in Gushgari, the authors
14   concluded that some Americans ingest as much as
15   25,000 to 30,000 nanograms of nitrosamines every
16   single day, correct?

17   A.    That's with respect to tobacco use, I
18   believe.

19   Q.    Right.

20        So smokers, according to Gushgari,
21   consume on the order of 25,000 to 30,000 nanograms
22   of nitrosamines every day?

23   A.    I'm not sure whether he means smokers
24   or smokeless tobacco users.  I'd have to look at
25   that.

Page 175

1    Q.    Okay.

2    A.    Then you know there's the question of
3    whether it's nitrosamines in general or
4    specifically tobacco specific nitrosamines
5    or dimethylnitrosamine.  I'd have to go back and
6    look at that.  So I'm not sure about that number
7    you just gave me.

8    Q.    Well, let's go --

9    A.    Because the levels of
10   dimethylnitrosamine in a cigarette are actually
11   quite low.

12   Q.    Well, you can certainly --

13   A.    He was talking about nitrosamines in
14   general, so that would include tobacco specific
15   nitrosamines, which are present in higher
16   concentrations.  So I think that's where he got
17   the tobacco part in his pie chart or whatever it
18   was.

19   Q.    Let's go to page 1130 of this Exhibit
20   number 12, please.  It's the last paragraph on the
21   right-hand side.

22        One of the things Dr. Gushgari did
23   was to estimate nitrosamine intake and nitrosamine
24   exposure for all of us, correct?

25   A.    Yes.

Page 176

1    Q.    And what he said was that if you --
2    if tobacco use -- if you're a smoker, the rate of
3    your nitrosamine intake is on the order of 21,800
4    plus or minus 4,350 nanograms per day, right?

5    A.    I don't think it also includes
6    smokers.  I think it's smokeless tobacco users.

7    Q.    Understood.

8         But what he discusses in this paper
9    is that in addition to tobacco, our diet is also a
10   source of nitrosamines, correct?

11   A.    Correct.

12   Q.    According to Gushgari, depending on
13   what you eat, you'll consume between 1,800 to
14   1,900 nanograms of nitrosamine from your food,
15   right?

16   A.    That's what he came up with, right.

17   Q.    Beer was another -- if you go to page
18   1131, I think beer was also a source of -- or
19   potential source -- of nitrosamines according to
20   Gushgari on the order of 1,000 nanograms per day,
21   right?

22   A.    Mm-hmm.  Yeah.

23   Q.    He also noted that water was a source
24   of nitrosamines on the order of about
25   120 nanograms per day?

Page 177

1    A.    Yeah, I don't know if that's -- I'm
2    not sure about that number.  Water is very low.

3    Q.    It says -- it was highlighted.

4         Can you highlight it again, please?

5         According to the paper here, the
6    nitrosamine exposure from water is about
7    120 nanograms per day, right?

8    A.    Yeah, but I'm not sure -- there's
9    some problems with -- there's some measurement
10   problems with the order story having to do with
11   artifact formation of NDMA during analysis.  So
12   I'm not sure.  I don't recall whether his water
13   calculation I think was -- may have been carried
14   out before some of those analytical chemistry
15   problems came to light.  So I'm not sure about the
16   water.  I have to look at that more carefully.

17   Q.    This study was done in 2018, right?

18   A.    The review was published in 2018.

19   Q.    Correct.

20   A.    I don't know whether all of the water
21   literature that he considered was before the
22   finding that some of the water measurements were
23   wrong.  I don't know offhand.

24   Q.    So what you're suggesting to me --
25   what you're suggesting to me --

45 (Pages 174 - 177)

S. Hecht, Ph.D.

Page 178

1    A.    I'm suggesting that the water might
2    be wrong.  Everything else probably right.
3    Q.    Might be lower than 120 nanograms?
4    A.    Right.  Yeah.
5    Q.    I guess it would depend on the
6    quality of the water you drink, where you get it,
7    what the source is, right?
8    A.    In part, but, I mean, the calculation
9    would have to be redone based on the actual data.
10   That's not -- that doesn't have artifacts in it.
11   Q.    Well, so let's take water out of the
12   equation because you said the other numbers from
13   Gushgari are probably right.
14         So what his paper suggests to us is
15   that individuals who are exposed to tobacco will
16   consume around 25,000 nanograms of nitrosamines
17   every single day of their life, right?
18   A.    No, not exposed to tobacco.  Use
19   tobacco.  There's a difference.
20   Q.    Individuals who use tobacco will be
21   exposed to 25,000 nanograms of nitrosamine every
22   day, right?
23   A.    That's what he came up with, yes.
24   Q.    For those non-smokers and
25   non-drinkers who lead a good, healthy life,

Page 179

1    according to Gushgari, those individuals are going
2    to be exposed to daily levels of nitrosamines on
3    the order of 2,000 nanograms per day, right?
4    A.    From food.  Food and water, I guess,
5    and beer.  I don't know.  The 2,000 is just from
6    food or is it 2,000 from food plus beer plus
7    water?
8    Q.    Beer is separate.  That's why I left
9    it out.
10   A.    Yeah.  So what is it just from food?
11   Q.    It says -- right in the first line
12   that you're looking at here on the exhibit, 1,800
13   plus or minus 350 for a vegetarian diet, 1,900
14   plus or minus 380 for a Western diet.
15   A.    Okay.
16   Q.    So I was using 2,000 as a round
17   number.
18   A.    Okay.
19   Q.    In your report, you suggest that you
20   received information about nitrosamine levels
21   observed in the valsartan-containing products of
22   some of the defendants to this litigation,
23   correct?
24   A.    Yes.
25   Q.    One of the defendants is Mylan, who I

Page 180

1    identified for you before as a company that I'm
2    representing.  You heard of that name before and
3    you reviewed some of their data, correct?
4    A.    Yes.
5    Q.    If I could just direct your attention
6    just for a second to -- I think it's page 24 and
7    25 of your report.
8          One of the things you indicate on
9    pages 24 and 25 of your report is you had the
10   opportunity to review information relating to
11   nitrosamine levels that were observed in Mylan
12   product, right?
13   A.    Yes.
14   Q.    On page 25, the first full paragraph,
15   you write that Mylan's API testing confirmed NDEA
16   levels in API batches ranging from 0.1 parts per
17   million to 1.57 parts per million.
18         Did I read that accurately from your
19   report?
20   A.    Yes.
21   Q.    As part of your work in this case,
22   sir, did you take that data and attempt to
23   calculate a mean NDEA concentration for Mylan's
24   valsartan?
25   A.    No, I did not.

Page 181

1    Q.    I'll represent to you that the mean
2    is 0.47 parts per million for all batches tested
3    and I'll ask you to accept that number for
4    purposes of my next question.
5          Okay?
6    A.    Okay.
7          MR. SLATER:  Objection.
8          You can answer.
9    Q.    If you know the parts per million of
10   a nitrosamine, you can convert that to nanograms
11   by multiplying it by the dose, right?
12   A.    Yes.
13   Q.    In fact, you've done -- you did that
14   calculation in various parts of your report?
15   A.    Yes.
16   Q.    So if we assume an NDEA concentration
17   at the mean of 0.47 parts per million and multiply
18   it by the highest possible dose, 300 micrograms of
19   valsartan, we get a nanogram of about
20   150 nanograms per day, correct?
21   A.    Okay.
22   Q.    0.47 times 320?
23   A.    Okay.
24   Q.    Do you agree that that math comes out
25   to about 150?

46 (Pages 178 - 181)

S. Hecht, Ph.D.

Page 182

1    A.    Sounds right, yeah.
2    Q.    So taking the mean from my data of
3  about 0.47, what it tells us is that
4  hypothetically, a user of Mylan's valsartan may
5  have consumed an additional 150 nanograms per day
6  during the period he or she used the drug, right?
7    A.    Right.  Yes.
8    Q.    So if we go back then to Gushgari's
9  numbers, we know that tobacco users have a daily
10  nitrosamine intake on the order of
11  25,000 nanograms, correct?
12    A.    Is that his number?
13    Q.    For tobacco users.
14    A.    Yes.
15    Q.    If we assume an intake now of
16  150 nanograms a day for Mylan's valsartan, that
17  individual has increased their daily nitrosamine
18  intake by a scant 0.6%, right?
19    A.    Correct.
20    Q.    If we take a non-smoker and a
21  non-drinker who is living right, Gushgari tells us
22  they will have exogenously consumed about 2,000
23  nanograms a day.
24        Do you see that highlighted?
25    A.    Yes.

Page 183

1    Q.    If we assume an intake of 150
2  nanograms per day for Mylan's valsartan, that
3  clean-living individual has increased his or her
4  nitrosamine intake by about 7.5%, right?
5    A.    Correct.
6    Q.    So what I'd like to know, Dr. Hecht,
7  is what peer-reviewed scientific literature has
8  ever been published to suggest that a modest one
9  to seven percent increase in nitrosamine
10  concentrations over a limited period of time would
11  cause cancer in humans?
12    A.    I'm not aware of any.
13    Q.    In your report, you certainly don't
14  cite any research or studies that establish a one
15  to seven percent increase in baseline nitrosamine
16  consumption will lead to cancer in humans.
17        Do you?
18        MR. SLATER:  Objection.
19    A.    No.
20    Q.    And you don't cite any because no
21  such data exists, right?
22    A.    I didn't cite any.  So if it existed,
23  I would have cited it.
24    Q.    Right.
25        And the fact is that science hasn't

Page 184

1  even advanced enough that the worldwide agencies
2  classify NDEA or NDMA as known human carcinogens,
3  right?  They've never done that?
4    A.    Well, I wouldn't say that exactly
5  because -- go back to my book here.  It says that
6  it should be regarded for practical purposes as if
7  it were carcinogenic to humans, 1978.  1978, but
8  you're right.
9    Q.    Right about what?
10    A.    No one has said that 7.5% increase in
11  nitrosamine exposure would lead to cancers in
12  humans --
13    Q.    I think it's one o'clock --
14    A.    -- in the setting that you just
described.
15    Q.    I think it's one o'clock.  I'm
16  willing to keep going, but you had indicated you
17  wanted to take a break at one o'clock, Doctor.
18        Do you want to --
19    A.    My watch says 12:30.
20    Q.    Okay.  Let's keep going.
21    A.    It's 12:30 here.
22    Q.    Sorry.  Let's keep going then.
23        So what we've been talking about so
24  far is that exogenous nitrosamine consumption,

Page 185

1  correct?
2    A.    Yes.
3    Q.    And when we talk about exogenous
4  consumption, we mean nitrosamines formed outside
5  the organism, right?
6    A.    Yes.
7    Q.    In this case, though, with respect to
8  nitrosamines like NDMA and NDEA, we know that
9  they're also formed endogenously, right?
10    A.    No, we don't really know that.  We
11  don't know that NDMA and NDEA are formed
12  endogenously.  We don't know that.
13    Q.    Huh.  Well, have you seen research
14  suggesting that endogenous formation of NDEA and
15  NDMA and other nitrosamines are significant?
16    A.    Yes, I have seen such research and I
17  believe it's wrong.
18    Q.    Well, tell me what research you've
19  seen to suggest that NDMA and NDEA are not formed
20  endogenously.
21    A.    I don't think that it's -- let's put
22  it this way:  It's hard to prove a negative.  I
23  can't cite any research that proves that they're
24  not formed endogenously.  We do know that there's
25  very solid research that some nitroso compounds

47 (Pages 182 - 185)

S. Hecht, Ph.D.

Page 186

1 are formed endogenously. These are nitrosamines
2 such as nitrosoproline that are not metabolized,
3 so we can actually track their formation in humans
4 by measuring them in urine because they're not
5 metabolized.
6         But NDMA and NDEA present a different
7 problem because they are metabolized, so it's very
8 difficult to track their formation in humans.
9         So the endogenous formation of NDMA
10 and NDEA is very challenging. It's very
11 challenging to establish and I don't believe that
12 it's been established.
13     Q.    Well, I agree with you that it's
14 challenging. I may agree with you that it's not
15 been firmly established, but I think the statement
16 you made earlier that's causing me some
17 consternation is I believe you said that you do
18 not believe and you are of the opinion that there
19 is no endogenous formation of NDMA.
20         Is that an opinion you intend to
21 offer in this case?
22         MR. SLATER: Objection.
23         You can answer.
24     A.    No, I don't think I said that or if I
25 did say that, it's wrong. What I did say is that

Page 187

1 in my opinion, there's no solid evidence for
2 endogenous formation of NDMA and NDEA in humans.
3 There are studies out there, but I believe that
4 they're flawed.
5     Q.    You are not aware of any study
6 suggesting or concluding that NDMA does not form
7 endogenously; true?
8     A.    I'm not aware of any study that it
9 doesn't form endogenously? Is that what you're
10 asking? It's a double negative. Can you clarify?
11     Q.    I'll rephrase it.
12         Are there any studies to your
13 knowledge that conclude that there is no such
14 thing has endogenous formation of NDMA?
15     A.    No.
16     Q.    Are you aware of any studies
17 suggesting there's no such thing as endogenous
18 formation of NDEA?
19     A.    No.
20     Q.    You're not going to offer the opinion
21 in a courtroom in America suggesting that
22 endogenous formation of NDMA or NDEA does not
23 occur?
24     A.    That's correct. I didn't say that.
25 I never said that. In fact, what I did say was

Page 188

1 that there are studies out there that claim
2 endogenous formation of NDMA and NDEA does occur.
3 I think it's NDMA mainly. But I believe some of
4 the methods in those studies are flawed. That's
5 what I said.
6     Q.    Is it true that the FDA has
7 publically stated that the amount of endogenous
8 formation of carcinogenic nitrosamines such as
9 NDMA and NDEA is unknown?
10     A.    I believe that's true. I think that
11 was one of the conclusions of the workshop.
12     Q.    Sure. And one of the conclusions of
13 the workshop was that no scientist could say
14 whether the amount of endogenous formation was
15 equal to, less than or greater than our exogenous
16 intake of those nitrosamines?
17     A.    Yes, that's right. We don't know.
18     Q.    So for all we know, if Gushgari's
19 estimates of endogenous intake of a non --
20     A.    Exogenous. Exogenous.
21     Q.    Let me start over.
22     A.    Gushgari estimated exogenous intake.
23     Q.    Okay. I'm going to try again.
24         For all we know, if we use Gushgari's
25 estimate of exogenous intake of 2,000 nanograms

Page 189

1 per day for a non-tobacco user, endogenous NDMA
2 formation could be 2,000 nanograms, could be
3 1,000, could be 3,000 nanograms per day, right?
4     A.    Right. We don't know.
5     Q.    We don't know.
6     A.    Right.
7     Q.    Let's just assume that it's -- that
8 endogenous formation and exogenous formation are
9 equal to one another.
10     A.    Why would you assume that?
11     Q.    I'm going to ask you hypothetically
12 to assume.
13         What that would suggest to us is that
14 any nitrosamine intake for an individual who was
15 taking valsartan-containing medications subject to
16 a recall would be at an even lower percentage than
17 if you had considered simply exogenous intake?
18         MR. SLATER: Objection.
19     A.    Yes. Sure. If there's also
20 endogenous formation, then the amount from the
21 drug on a percentage basis obviously would be
22 less.
23     Q.    Right.
24         So we used Gushgari's estimates for
25 the mean Mylan exposure and determined it to be

48 (Pages 186 - 189)

S. Hecht, Ph.D.

Page 190

1 0.6% to 7.5%. If we assume endogenous formation,
2 those percentages go down.
3    A.    Correct.
4    Q.    How much they go down is unknown
5 because, according to you, the scientific
6 community doesn't know how much endogenous
7 formation of nitrosamines takes place?
8    A.    I don't think it's just according to
9 me, but yes, that's true.
10   Q.    Well, I say that because you're the
11 only person I'm asking today.
12   A.    Okay.
13   Q.    You've indicated that the level of
14 endogenous formation of nitrosamines is unknown,
15 that there are scientists who have published peer
16 reviewed papers suggesting that endogenous
17 formation is quite high and far exceeds our intake
18 exogenously?
19   A.    Yes.
20   Q.    One of those people was Gushgari, the
21 guy you cited in your report, right?
22   A.    Yes.
23         MR. TRISCHLER: Can you put up page
24   1133 of this paper? Right where you have the
25   cursor, that paragraph right there happens to

Page 191

1 be the one I wanted to talk to the Doctor
2 about.
3    Q.    About halfway through that -- when's
4 the last time you read this article, sir?
5    A.    When was the last time I read it?
6    Q.    Yes, sir.
7    A.    Probably couple months ago.
8    Q.    Fair to say you've read it a couple
9 times since you wrote your report?
10   A.    I don't really know.
11   Q.    But you certainly would have read it
12 before you wrote your report?
13   A.    Yes, I did.
14   Q.    While you cited to Gushgari in your
15 report, you did not cite to any problems or
16 limitations or disagreements that you had with his
17 conclusions or analysis, right?
18   A.    Oh, yeah. That's true.
19   Q.    What Gushgari says here, about
20 halfway through that paragraph that we've
21 highlighted, he says "Recent literature suggests
22 endogenous formation of nitrosamines governs human
23 exposure to these compounds that may account for
24 97% of the total nitrosamine load."
25         Do you see that?

Page 192

1    A.    Yes, I see it.
2    Q.    So if Gushgari is right, that
3 clean-living individual we've been talking about
4 who takes in 2,000 nanograms per day of
5 nitrosamines endogenously -- or exogenously is
6 getting the other 197,000 endogenously, right?
7         MR. SLATER: Objection.
8         You can answer.
9    A.    This is all wrong. I mean, this is
10 crazy because he's talking nitrosamines as a
11 class. So I mean what he's basing this on is
12 nitrosoproline, which is a noncarcinogenic,
13 non-metabolized nitrosamine that's been used as a
14 monitor for endogenous formation. I'm sure that's
15 what that calculation comes from. It had nothing
16 to do with dimethylnitrosamine because
17 nitrosoproline and the other nitros amino acids
18 he's talking about are noncarcinogenic.
19   Q.    Where does it say here that he's
20 talking about noncarcinogenic --
21   A.    I don't think it does. I'm sure
22 that's what he's talking about.
23   Q.    Did you ask him?
24   A.    No, I didn't ask him.
25   Q.    How are you sure that's what he's

Page 193

1 talking about then --
2    A.    Because I know the literature.
3    Q.    You have to let me finish the
4 question, sir.
5    A.    You asked me how I knew. I said
6 because I know the literature.
7    Q.    So where did Gushgari ever state that
8 his determination that endogenous formation of
9 nitrosamines applies only to those noncarcinogenic
10 nitrosamines and not nitrosamines thought to be
11 carcinogenic?
12   A.    Thought to be carcinogenic? I don't
13 know. I can't speak for Gushgari.
14   Q.    We talked before about the fact that
15 there were 300 plus nitrosamines that have been
16 identified in the scientific community.
17         How many are carcinogenic?
18   A.    Most of them. The great majority.
19 It's not 300 nitrosamines. It's 300 nitroso
20 compounds. Not all nitroso compounds are
21 nitrosamines. I think the number for nitrosamines
22 is probably closer to 150 to 200.
23         Anyhow, that's besides the point.
24         What was your question? How many are
25 carcinogenic?

49 (Pages 190 - 193)

Veritext Legal Solutions

800-227-8440                                              973-410-4040

S. Hecht, Ph.D.

Page 194

1    The great majority, but not -- not
2 the ones that we have data on for endogenous
3 formation. Those are noncarcinogenic.
4 Nitrosoproline and some related nitros amino
5 acids, that's where all the reliable endogenous
6 formation data comes from and those compounds are
7 noncarcinogenic because they're not metabolized.
8 They're excreted unchanged because they're polar.
9    Q.    Did you finish your answer?
10    A.    Yes.
11    Q.    Endogenous formation of nitrosamines
12 can occur with both nitrosamines that are
13 carcinogenic and those that are thought to be
14 noncarcinogenic, correct?
15    A.    Yes.
16    Q.    Have you don't any independent
17 scientific research to quantity the levels of
18 nitrosamines --
19    Strike that.
20    Have you done any independent
21 scientific research to quantify the levels of NDMA
22 that are formed endogenously?
23    A.    No. We have not done that.
24    Q.    Have you done any independent
25 scientific research to quantify the levels of NDEA

Page 195

1 that are formed endogenously?
2    A.    No.
3    Q.    Would you agree that evaluating --
4 would you agree that in evaluating the issue of
5 whether NDMA or NDEA actually caused cancer in
6 humans, we need to consider that nitrosamines form
7 both endogenously and exogenously?
8    A.    Yes.
9    Q.    And any intake of NDMA or NDEA from
10 valsartan-containing medication would be just a
11 fraction of an individual's nitrosamine load,
12 correct?
13    MR. SLATER: Objection.
14    A.    That's a very poorly phrased
15 question, Counselor, I have to say because, again,
16 you're mixing carcinogenic nitrosamines --
17 highly-carcinogenic nitrosamines, like NDMA and
18 NDEA, with noncarcinogenic nitrosamines like
19 nitrosoproline.
20    So you need to restate the question.
21    Q.    Well, the question was any intake of
22 NDMA or NDEA from valsartan-containing medications
23 just a fraction of an individual's daily intake of
24 those substances from exogenous and endogenous
25 formation?

Page 196

1    MR. SLATER: Objection.
2    A.    Of total nitrosamines, including the
3 noncarcinogenic ones --
4    Q.    Just those two is my question.
5    A.    So you're saying -- you start the
6 question or sentence -- whatever it was -- with
7 NDMA and NDEA and you end the thought -- it's very
8 confusing the way you said it. I mean, you have
9 to be more specific.
10    Q.    I was --
11    A.    What we're talking about here is NDMA
12 and NDEA.
13    Q.    I agree.
14    In fairness, you didn't --
15    A.    The exposure to those is only a
16 fraction of the total nitrosamine formation, which
17 includes the noncarcinogenic nitrosamines. We
18 don't know whether there's NDMA and NDEA formed
19 endogenously.
20    Q.    Well, we do know there --
21    A.    That's a research question.
22    Q.    We do know there's NDMA in food?
23    A.    Yes.
24    Q.    We do know there's NDMA in beer?
25    A.    Yes.

Page 197

1    Q.    We do know there's NDMA in air?
2    A.    I don't know about that. I don't
3 think that that's a -- that's a blanket statement.
4 It sounds much worse than it is. There's NDMA in
5 food, there's NDMA in beer and there's NDMA in
6 valsartan. We know that. There's no NDMA --
7 extremely small amount -- in water.
8    Q.    Do you agree that the NDMA observed
9 in the valsartan-containing medications is but a
10 fraction of the NDMA to which we are exposed to
11 exogenously and which we form endogenously?
12    MR. SLATER: Objection.
13    You can answer.
14    A.    No, I don't. I agree about the
15 exogenous exposure. We already went through that,
16 the Gushgari. But I maintain that we don't know
17 how much NDMA and NDEAs form endogenously. It
18 could very well be zero. So we don't know. We
19 don't know the answer to that.
20    Q.    In the FDA workshop, was this issue
21 of relative level of exposure from nitrosamines in
22 valsartan-containing medications compared to our
23 exposures exogenously and endogenously something
24 that was discussed?
25    A.    Yes, there was quite a bit of

50 (Pages 194 - 197)

S. Hecht, Ph.D.

Page 198

1 discussion about endogenous nitrosamine formation.
2    Q.    And isn't it true in the FDA workshop
3 the conclusion that was reached among this panel
4 of experts was that the levels of nitrosamines as
5 impurities in drugs are likely minuscule in
6 comparison to exogenous exposure from foods and
7 even more so to endogenous levels?
8        MR. SLATER: Objection.
9    A.    Nitrosamines includes -- first of
10 all, I don't think they use the word "minuscule."
11 I'm not sure about that. I'd have to check the
12 transcript.
13        Again, you're mixing apples and
14 oranges because, as I said several times already,
15 I think, just about everything we know about
16 endogenous formation involves noncarcinogenic
17 nitrosamines such as nitrosoproline. We don't
18 have good data on the endogenous formation of the
19 compounds found in valsartan, dimethylnitrosamine.
20        MR. TRISCHLER: What's your next
21 numbered exhibit?
22        THE VIDEOGRAPHER: Our next exhibit
23 number will be 13 and Counsel, just to let
24 you know, I have about five minutes left on
25 the media.

Page 199

1        MR. TRISCHLER: Please mark as
2 Exhibit 14 --
3        THE VIDEOGRAPHER: Thirteen.
4        MR. TRISCHLER: Thirteen.
5        -- the document entitled
6 "Nitrosamines as Impurities in Drugs, Health
7 Risk Assessment and Mitigation Public
8 Workshop," please.
9        THE VIDEOGRAPHER: Sure thing.
10        (Whereupon, Exhibit 13 was marked for
11 identification.)
12        MR. SLATER: You're putting up part
13 of the transcript here, Clem?
14        MR. TRISCHLER: I'm putting up a
15 publication from the FDA titled "Nitrosamines
16 as Impurities in Drugs, Health Risk
17 Assessment and Mitigation Public Workshop."
18    Q.    Do you see the first page of the
19 Exhibit 13, sir?
20    A.    Yes.
21    Q.    This was a document that the FDA has
22 published from the March 29 and March 30 public
23 workshop that you participated in?
24    A.    Yes.
25    Q.    Have you read this document before?

Page 200

1    A.    Yes.
2    Q.    Do you agree with its content?
3    A.    Yes.
4        MR. SLATER: Objection.
5        You can answer.
6    Q.    Please go to page 14, last paragraph
7 of the page.
8        About halfway through the page, it is
9 written "The levels of nitrosamines as impurities
10 in drug are likely minuscule in comparison to
11 exogenous exposures from foods and even more so to
12 endogenous levels."
13        Did I read that correctly?
14    A.    Yes, you did. But, you know, it's a
15 poorly written sentence, but yeah, you read it
16 correctly. You're right, it's in the report.
17 You're right. I read the report. I wouldn't have
18 written it this way.
19    Q.    It's a poorly written statement that
20 you told me you agreed with, right?
21    A.    Well, first of all, minuscule, I mean
22 you said a few minutes ago, I think, from foods it
23 was up to 7%. I think you said that. I don't
24 know whether that's minuscule. And then even more
25 so to endogenous levels.

Page 201

1        Again, this is really misleading
2 because we don't know about the -- the
3 nitrosamine -- the endogenous data comes almost
4 exclusively from a noncarcinogenic nitrosoproline
5 and related nitrosothyoproline and these compounds
6 that's that are excreted unchanged and they're
7 noncarcinogenic.
8        So, I mean, this sentence actually is
9 a little misleading. I know it was written by the
10 great FDA, but ...
11    Q.    You were --
12    A.    I was part of it. Yeah, I reviewed
13 it. That's right. You know.
14    Q.    You were part of the great FDA panel
15 when this was --
16    A.    I was, yeah. I was. Absolutely.
17    Q.    You have to let me ask a question.
18    A.    Okay.
19    Q.    When this was written, did you
20 express disagreement with it?
21    A.    No, I did not.
22    Q.    Did you tell anyone at FDA that this
23 statement was incorrect?
24    A.    No, I did not.
25    Q.    So even if we assume for the sake of

51 (Pages 198 - 201)

S. Hecht, Ph.D.

Page 202

1 argument that nitrosamines like NDMA and NDEA can
2 cause cancer in humans, what we know is that those
3 nitrosamines can be formed both endogenously and
4 exogenously, correct?
5        MR. SLATER:  Objection.
6        You can answer.
7    A.    I don't think there's good evidence
8 for endogenous formation of NDMA and NDEA.
9    Q.    I thought you told me before you were
10 not going to express the opinion that endogenous
11 formation does not occur.
12        MR. SLATER:  Objection.
13        Argumentative.
14    A.    Double negative.
15        MR. SLATER:  Is there a question?
16    A.    Double negative again.  I don't know.
17        Can you rephrase your question?
18    Q.    Does endogenous formation of NDEA
19 occur?
20    A.    I don't know.
21    Q.    Does endogenous formation of NDMA
22 occur?
23    A.    I don't know.
24    Q.    You can't rule out the possibility
25 that endogenous formation of NDEA and NDMA occur?

Page 203

1    A.    That is correct.
2    Q.    In your work in this case -- strike
3 that.
4        When we talk about exogenous intake
5 of NDEA and NDMA, we know that can come from
6 multiple sources, correct?
7    A.    Yes.
8    Q.    In your work in this case, have you
9 interviewed any of the individual plaintiffs?
10    A.    No.
11    Q.    Have you reviewed any medical records
12 from any of the individual plaintiffs?
13    A.    No.
14    Q.    Have you reviewed any questionnaires
15 completed by any of the individual plaintiffs?
16    A.    No.
17    Q.    Have you prepared questionnaires to
18 be submitted to any of the individual plaintiffs?
19    A.    No.
20    Q.    Have you obtained any information
21 from any of the individual plaintiffs regarding
22 their dietary habits, smoking history, medical
23 history, anything like that?
24    A.    No.
25    Q.    Have you reviewed any of the

Page 204

1 depositions of any of the individual plaintiffs?
2    A.    No.
3    Q.    Is there any scientific means to
4 measure the quantity of NDEA in the human body?
5    A.    No.  Not accurately.
6    Q.    I think I asked you about NDEA.  For
7 completeness, let me ask you about NDMA.
8        Is there any scientific means to
9 measure the quantity of NDMA in the human body?
10    A.    Not in my opinion.  Not right now,
11 no.
12    Q.    So I take it then that no such
13 attempts have been made by you with respect to any
14 plaintiff in this case?
15    A.    No.
16    Q.    So there's no way to do a blood test,
17 a tissue sample or anything like that of an
18 individual, look at it and say how much NDMA he or
19 she might have in their body at any point in time?
20    A.    I wouldn't say that.  There are ways,
21 but I haven't done it.  As far as I know, it has
22 not been done.
23    Q.    Maybe I'm confusing myself.
24        I thought I had asked you if there
25 was any scientific way to measure or quantify NDMA

Page 205

1 or NDEA in the body.
2    A.    There's no established method that's
3 accepted as far as I know, but that doesn't mean
4 it can't be done.
5    Q.    How would you hypothetically do it if
6 there's no established method for doing it?
7    A.    I would use mass spectrometry and I
8 would use an internal standard that labeled
9 internal standard of dimethylamine that would tell
10 me whether any artifact formation or any other
11 interference was occurring in the method.  It can
12 be done, but it hasn't been done as far as I know.
13    Q.    So without some baseline, you don't
14 have any data to establish sort of a baseline
15 nitrosamine level for any particular plaintiff
16 based on their exogenous and endogenous exposures
17 to these particular nitrosamines, right?
18    A.    No.  You know, only -- well, what we
19 already discussed, I mean, from levels in food and
20 that kind of thing.  No, not actual measurements.
21    Q.    So without a baseline --
22    A.    Like a before and after they took the
23 pill or something like that, we don't have that.
24    Q.    Right.
25        So without a per person, individual

52 (Pages 202 - 205)

S. Hecht, Ph.D.

Page 206

1 baseline, there's no -- you don't have any basis
2 to opine whether NDMA intake or NDEA intake from
3 valsartan-containing medications for any plaintiff
4 in this case represented a 1%, 2%, 5% increase in
5 their daily exposure to these nitrosamines,
6 correct?
7     A.    No, we don't have that data.
8     Q.    We don't have that data for either
9 NDMA or NDEA?
10    A.    Correct.
11    Q.    Are you familiar with --
12    A.    It would be based on estimates of
13 exposure that we know -- we know the amounts in
14 food and beer and the things that we discuss, but
15 actual measurements we don't have.
16    Q.    Are you familiar with the Johnson
17 paper on permitted daily exposure limits for
18 nitrosamines?
19    A.    Show me the paper.
20          MR. TRISCHLER:  Sure.  I guess it's
21 14 I think is what we're up to.
22          THE VIDEOGRAPHER:  Counsel, just
23 we're about seven minutes over.
24          Do you mind if we change the media?
25          MR. SLATER:  Why don't we break for

Page 207

1 lunch now?  We're way past --
2          MR. TRISCHLER:  Oh, okay.  Sorry
3 about that.  I lost -- for some reason, my
4 clock on my computer is off.
5          THE VIDEOGRAPHER:  The time is
6 2:04 p.m.
7 This ends media three.
8          (Recess taken)
9          THE VIDEOGRAPHER:  The time is now
10 2:57.
11          This begins media four.
12          You may proceed.
13          (Whereupon, Exhibit 14 was marked for
14 identification.)
15    Q.    Dr. Hecht, are you familiar -- I'm
16 not sure if I asked you this question before the
17 break.  I thought I was ready to introduce a paper
18 by Mr. Johnson entitled "Permitted Daily Exposure
19 Limits for Noteworthy Nitrosamines."  I think that
20 would be Exhibit 14.
21          Have you seen this paper before?
22          Let me know if you need it
23 highlighted or blown up.
24    A.    I don't recognize it.
25          MR. TRISCHLER:  If you could, just

Page 208

1 highlight, Bill, the top portion.
2    Q.    You'll note that the article was
3 received in March of this year and accepted for
4 publication in May.
5          I'm just wondering if you had a
6 chance to review this paper or you recall
7 reviewing this paper before you wrote your report
8 in July of this year?
9    A.    I haven't seen this.
10    Q.    In this report, Johnson and his
11 colleagues calculate a permitted daily exposure
12 level for NDMA and NDEA.
13          Have you ever calculated a permitted
14 daily exposure limit for any compound?
15    A.    No.
16    Q.    Are you familiar with the concept of
17 a permitted daily exposure limit?
18          MR. SLATER:  Objection.
19          You can answer.
20    A.    Yes, in general.  But I'm not sure
21 about the language.
22    Q.    Well, it's my understanding that in
23 the field of toxicology, a permitted daily
24 exposure limit generally refers to a dose that is
25 unlikely to cause an adverse effect in an

Page 209

1 individual is exposed at or below this dose every
2 day of a lifetime.
3          Okay?
4          So accepting that definition, are
5 you -- have you ever attempted to calculate a PDE
6 for any nitrosamine?
7    A.    No.
8    Q.    If you look at -- I think it's the
9 page 302 of this paper.  There's a chart or a
10 table at the top and you'll see that in the last
11 row or last column, Johnson and his colleagues
12 calculated a PDE for NDMA of 6.2 micrograms and a
13 PDE for NDEA of 2.2 micrograms.
14          Do you see that?
15    A.    Mm-hmm.  Yeah.
16    Q.    We talked about the conversions
17 before, but that equates to roughly
18 6,200 nanograms and 2,200 nanograms, right?
19    A.    Right.
20    Q.    And if you go back to the test data
21 from Mylan that you mentioned in your report, that
22 test data shows an NDEA range for API batches of
23 0.1 parts per million to 1.57 parts per million
24 and I represented to you that the mean
25 concentration was calculated at 0.47.

53 (Pages 206 - 209)

S. Hecht, Ph.D.

Page 210

1    Do you recall that?
2    A.    What was the range again?
3    Q.    0.1 parts per million to 1.57 parts
4 per million. That's what you wrote in your
5 report.
6    A.    Okay.
7    Q.    And I had represented to you that
8 that range resulted in a mean of 0.47.
9        MR. SLATER: Did you say NDMA or NDEA
10 for that range you just gave?
11        MR. TRISCHLER: NDEA, sir.
12        MR. SLATER: Gotcha.
13    A.    Okay.
14    Q.    Converting that parts per million to
15 a nanogram level based on the 320 milligram dose
16 results in a nanogram concentration of about
17 150 nanograms.
18        Do you recall that math that we did
19 before?
20    A.    Yes.
21    Q.    So if we use that calculation of
22 150 nanograms of NDEA in a tablet of Mylan's
23 valsartan-containing medication, it's well under
24 the PDE established by Johnson in his
25 peer-reviewed study, correct?

Page 211

1    A.    Yes.
2    Q.    In fact, the mean nanogram
3 concentration would be about 5% of that daily PDE.
4        Correct?
5    A.    Right. Yes.
6    Q.    Do you have any evidence to suggest
7 to this jury that a plaintiff in this litigation
8 who consumed valsartan-containing medication that
9 came from Mylan ever received a pill that
10 contained nitrosamines above the PDE established
11 by Johnson and his colleagues?
12    A.    No, I don't.
13    Q.    Earlier in the deposition --
14    A.    No, it's still maintained that none
15 of that should be there. It should be zero.
16    Q.    Earlier in the deposition, I had
17 asked you a few questions about how you went about
18 doing your work in this case and you told me that
19 there were, you know, three components of it:
20 One, reviewing publically-available information
21 about the valsartan medications; two, looking at
22 the scientific literature; and three, reviewing
23 documents that came to you from plaintiffs'
24 counsel that related to documents from the
25 manufacturer's defendants.

Page 212

1    Do you generally recall that
2 discussion?
3    A.    Mm-hmm. Yes.
4    Q.    And you -- we talked about some of
5 the literature that you reviewed earlier,
6 specifically some of the animal studies, correct?
7    A.    Yes.
8    Q.    In addition to the animal studies, I
9 note in your report, though, that you also discuss
10 a number of dietary studies. I think those are
11 primarily cited at pages 14 and 15 of your report.
12        Is that right?
13    A.    Yes.
14    Q.    Similar to what we talked about
15 before, was there a particular method that you
16 used to decide what dietary studies you were going
17 to include in this report?
18    A.    Well, I looked into literature on
19 epidemiology studies that take into account
20 nitrosamine exposure.
21    Q.    Would we be able to go back at this
22 point in time and recreate what literature you
23 would have looked at by means of a -- the results
24 of a literature search or notes or anything that
25 you maintain to tell us what kind of search you

Page 213

1 did for the literature?
2    A.    I didn't keep records of the -- of my
3 literature search.
4    Q.    I assume that you would agree with me
5 that following a scientific approach to causation
6 requires a review of all the relevant literature?
7    A.    Yes.
8    Q.    Were there any dietary intake studies
9 that you -- addressing the potential
10 carcinogenicity of NDMA or NDEA in foods that you
11 reviewed beyond the ones that you listed in your
12 report?
13    A.    No, I don't believe so. I think
14 they're all listed in the report. It's possible
15 that, you know, I may have missed something, but I
16 think they're all in the report.
17    Q.    My apologies. I thought you had
18 finished.
19        Would you agree with me that there
20 have been many observational studies reported in
21 the literature where scientists observe no
22 statistically significant association between
23 nitrosamine intake and food and the cause of
24 various cancers?
25    A.    No. Repeat the question.

54 (Pages 210 - 213)

S. Hecht, Ph.D.

Page 214

1    Q.    Sure.
2    A.    What did you say?
3    Q.    I said have there been observational
4    studies reported in the literature where
5    scientists observed no statistically significant
6    association between nitrosamine intake and food
7    and the cause of various cancers?
8    A.    What do you mean by observational?
9    Q.    Well, all of these dietary intake
10   studies are observational.
11   A.    Well, sure, broadly speaking, but I'm
12   not sure what you mean by observational.
13   Q.    Let me see if I could ask another
14   question.
15   A.    It's a very broad term.
16   Q.    I was trying to --
17   A.    I'm not sure what that means.
18   Q.    I was just trying to be sort of all
19   encompassing with the question. Let me ask it a
20   different way then.
21         There have been studies that have
22   been reported in the literature where scientists
23   attempted to evaluate NDMA and NDEA content in
24   food and they reported no statistically
25   significant association between that intake and

Page 215

1    cancer.
2         Agreed?
3    A.    Sure. But, I mean, there are also
4    other studies that do report an association, so I
5    think your question should be rephrased.
6    Q.    That was sort of my point, is that
7    there are studies that go both ways. There are
8    studies that have been published that report a
9    statistically significant association between NDMA
10   intake and some foods and the development of
11   cancer and there are other studies that have
12   reached a contrary result. That's the question I
13   was asking.
14   A.    Mm-hmm. There are both types of
15   results -- that's true -- out there.
16   Q.    In your report --
17   A.    It's a very challenging study to do.
18   Q.    Sure.
19         In your report, did you attempt to
20   list or collect or identify all of those studies
21   where no association was found between NDMA in
22   food and the onset or development of cancer?
23   A.    No, I did not.
24   Q.    What it appears to me that you did --
25   and please correct me if I'm wrong -- again, I'm

Page 216

1    looking at pages 14 and 15 of your report -- what
2    it appears to me that you did was to discuss the
3    studies that you believe reported some association
4    between dietary intake of nitrosamines and some
5    cancers while ignoring any studies that reached a
6    contrary result.
7         Is that accurate?
8    A.    I focused on the ones that showed a
9    relationship, yes.
10   Q.    And you did not discuss the ones that
11   don't?
12         MR. SLATER: Objection.
13         Lack of foundation.
14         You can answer.
15   A.    I don't know. I mean, I may not have
16   discussed every study in the literature.
17   Q.    But what you did do -- and it's on
18   page 15, if you want to take a look -- was you
19   sort of covered the omission of non-favorable
20   studies with one paragraph in which you said
21   "Studies do not find a significant association or
22   raise questions. This can be explained by smaller
23   relatively small sample size, inadequate follow-up
24   period to capture all cancers, bias/inadequate
25   dose quantification, potentially mitigating

Page 217

1    dietary factors such as vitamin C intake and
2    others."
3         Right?
4    A.    Right.
5    Q.    So what it sounds to me like what
6    you're suggesting is that you're acknowledging
7    that the dietary intake studies evaluating the
8    role of nitrosamines in diet and the onset of
9    cancer have gone both ways, right?
10   A.    Yes.
11   Q.    And what it sounds like what you did
12   in your report is simply to say that in the
13   studies that find no association, you discredit
14   those by saying that they're subject to either
15   poor study design or confounding factors?
16         MR. SLATER: Objection.
17         You can answer.
18   A.    Well, you know, just about all of
19   these studies can be criticized for one reason for
20   another. I mean, these types of studies are
21   extremely difficult to do, so they can be
22   criticized, but yeah, I didn't cover all of the --
23   I didn't attempt to cover all of the studies of
24   diet and nitrosamine content in foods and cancer.
25   I did not attempt to do that.

55 (Pages 214 - 217)

S. Hecht, Ph.D.

Page 218

1    Q.    And I understand --
2    A.    But I did give examples of where
3  nitrosamine contamination in food has been linked
4  to cancer and there are a number of them.
5    Q.    Right. I understand that there are
6  difficulties in doing these studies and that they
7  all have their limits, but when I read your
8  report, what it suggests is that the only studies
9  that you criticized as being limited by
10 confounding factors are the ones that found no
11 association between cancer and NDMA intake?
12   A.    That's not necessarily true.
13   Q.    Isn't that what that paragraph in
14 page 15 means when we read it?
15   A.    I don't know. You know, I mean, this
16 criticism can also apply to some of the positive
17 sides. It's a general criticism.
18   Q.    Well, let's take a look at some of
19 the studies that you do cite to, if we can.
20       Okay?
21   A.    Okay.
22       MR. TRISCHLER:  You cite to a study
23 by Goodman, G-O-O-D-M-A-N, entitled "High Fat
24 Foods and the Risk of Lung Cancer."
25       Can we mark that as Exhibit 15?

Page 219

1        (Whereupon, Exhibit 15 was marked for
2    identification.)
3    Q.    Are you familiar with this work, sir?
4    A.    Yes, I am.
5    Q.    What the authors of this study found
6  was that there was an association between lung
7  cancer and a diet that was rich in fats, correct?
8    A.    Yes.
9    Q.    They never excluded and they could
10 not exclude was any association was due to dairy
11 products, desserts or other fatty foods, correct?
12   A.    I don't know about dairy products.
13 I'd have to look at it more closely.
14   Q.    You could look at the --
15   A.    I'd have to read it.
16   Q.    I can have our technician --
17   A.    I mean do they -- I think they
18 describe the questionnaire in there, so I have to
19 look at that more carefully.
20       MR. TRISCHLER:  Bill, can you
21 highlight the top portion, please?
22       THE WITNESS:  Yes.
23   Q.    So what the paper says in that last
24 sentence that was highlighted there is that what
25 the data from the Goodman study indicates is that

Page 220

1  smokers with a high intake of foods rich in fat
2  and animal protein and who have a preference for
3  cured meats are at increased risk of lung cancer.
4    A.    That's what they concluded.
5    Q.    That's not really a surprising or
6  controversial finding, is it?
7    A.    No. A study like this would be very
8  difficult to do in smokers. I could be critical
9  of this study for that reason, but this is what
10 they found and it's a good group. It's a very
11 highly respected group.
12   Q.    When we talk about confounding, any
13 attempt to link these results to NDMA consumption
14 would be limited by confounding factors relating
15 to dietary intake of other fatty foods such as
16 dairy products and desserts, right? That would be
17 one confounding factor?
18   A.    The main confounding factor would be
19 smoking. That would blow away other confounding
20 factors. But they found a risk in addition to
21 smoking from cured meats and foods rich in fat and
22 animal protein. It's a very difficult study to
23 do. Very challenging because of the overwhelming
24 effect of smoking.
25   Q.    While smoking might be the primary

Page 221

1  confounding factor, there are others, correct?
2    A.    Yes.
3    Q.    By the way, the control group in this
4  Goodman study was, I think, 326 subjects.
5        Was that a significant and adequate
6  test sample size in your judgment?
7    A.    That's relatively small by current
8  standards. This was published in 1992, I believe.
9  That's a relatively small sample size.
10   Q.    Sorry.
11       Do you agree that a good scientist
12 would not draw conclusions or inferences from a
13 study that even the authors of that study would
14 not support?
15       MR. SLATER:  Objection.
16       We went through this earlier.
17   A.    I'm not sure that question even
18 means. Why wouldn't the authors support their own
19 study? I don't understand that.
20   Q.    I said they would not support.
21       Can you as a scientist reach
22 conclusions that the authors themselves do not
23 draw?
24       MR. SLATER:  Objection.
25       You went over this earlier, Counsel.

56 (Pages 218 - 221)

Page 222

1    I thought we're not going to
2 duplicate areas of questioning in light of
3 the time issue.
4    A.    For this study or any study?
5    Q.    For any study.
6    MR. SLATER:  I object.
7    Counsel, you do realize you went over
8 this entire line of questioning earlier in
9 the deposition, right?  You're just going to
10 ignore me, I guess?  Okay.  Well, I don't
11 appreciate that you're going to go through a
12 line of questioning you already did hours ago
13 or are you representing you didn't ask this
14 question already and go down this line
15 already?
16    MR. TRISCHLER:  I've got a question
17 pending.  I'm just waiting on an answer,
18 Adam.
19    MR. SLATER:  You're ignoring me?
20    Thank you.
21    A.    What was the question again?
22    Q.    Is it good practice for a scientist
23 to draw conclusions from a paper that the authors
24 of that paper do not support?
25    MR. SLATER:  Again, I object to this

Page 223

1 and I'll refer Counsel to the Eighth Circuit
2 decision that came out yesterday that
3 addressed this exact question and he knows
4 it, I'm sure, and asked these questions
5 earlier in the deposition.  I don't
6 appreciate that.
7    We'll take it into account if and
8 when defense counsel asks for more than seven
9 hours on the record with this witness.
10    You can answer.
11    A.    There may be different
12 interpretations of data.  It for sure can happen.
13    Q.    Do you agree that --
14    A.    The authors of a paper may interpret
15 their data in a certain way and, you know, then
16 it's reviewed and the reviewers may agree with it,
17 the editors of the journal may agree with it, but
18 other scientists may not agree with the
19 interpretation.
20    Q.    Do you agree that a scientist should
21 not cherrypick data from a study that might
22 support his or her hypothesis while ignoring other
23 parts of the study that call the conclusion into
24 question?
25    A.    Yes.

Page 224

1    Q.    You also cite to a paper that was
2 written by a gentleman named Paul Knekt,
3 K-N-E-K-T.  I'm sure I'm mispronouncing that.
4    But are you familiar with the paper?
5    A.    Yes.
6    MR. TRISCHLER:  We'll mark that as
7 Exhibit 16, I think.
8    (Whereupon, Exhibit 16 was marked for
9    identification.)
10    Q.    You cited to the Knekt paper in your
11 report in this case, correct?
12    A.    Yes.
13    Q.    Do you recall reading this study
14 and --
15    A.    Yes, I read it.  Absolutely.  I did
16 absolutely read it.
17    Q.    One of the first things that I note
18 right off the bat when I read this study is in the
19 very first sentence at the top, the authors note
20 that the relationship of dietary nitrosamines to
21 human cancer is uncertain.
22    Do you see that?
23    A.    Yes.
24    Q.    We talked about how some studies are
25 difficult, some are flawed, some are well

Page 225

1 designed, some are not.
2    Was this Knekt study one that you
3 considered to be a good, well-designed study?
4    A.    Show me the -- show me the -- you
5 have to show me more.
6    Q.    Which part --
7    A.    I want to make sure -- hold on a
8 second.
9    Q.    Sure.
10    A.    Let me just look at my own notes.
11 Yes.  Okay.  Yes, go ahead.  What was your
12 question.
13    Q.    I think I asked you whether in your
14 judgment this was a good, well-designed study.
15    A.    Yes, it was.
16    Q.    Can we rely on its conclusions then?
17    A.    Yes.
18    MR. SLATER:  Objection.
19    Q.    In this study by Knekt, the authors
20 observed that there was no increased risk of
21 cancer from NDMA for any cancers of the GI tract.
22    Correct?
23    A.    They found an increased risk of
24 colorectal cancer among individuals with a high
25 intake of NDMA.  That's what it says.

57 (Pages 222 - 225)

S. Hecht, Ph.D.

Page 226

1    Q.    Right. I didn't ask you about that,
2 though. My question was --
3    A.    What did you ask me then?
4    Q.    My question was --
5    A.    The GI tract --
6    Q.    -- the authors observed there was no
7 increased risk of NDMA for any cancers of the GI
8 tract.
9         Is that true or not?
10   A.    You know --
11   Q.    I guess I should say any other
12 cancers of the GI tract.
13   A.    Yes, that's true. They observed for
14 colorectal. Colorectal.
15   Q.    They observed no increase --
16   A.    In the first sentence of the
17 discussion --
18   Q.    They did --
19   A.    -- "We found an increased risk of
20 colorectal cancer among individuals with a high
21 intake of NDMA and of colorectal" -- it's part of
22 the GI tract, I think.
23   Q.    Thank you.
24        They observed no increased risk of
25 stomach cancer, correct?

Page 227

1    A.    Correct.
2    Q.    They observed no increased risk of
3 esophageal cancer, correct?
4    A.    Correct.
5    Q.    While as you point out in this Knekt
6 study the authors did find an association between
7 NDMA and colorectal cancer, even those authors
8 observed that this observation might be due to
9 confounding, correct?
10   A.    It's possible.
11   Q.    It's not possible. It's what they
12 said.
13   A.    Yes, I'm agreeing with you. It's
14 possible that it could be due to confounding.
15 That's always an issue in epidemiology studies.
16   Q.    When we talk about dietary studies
17 like this and others that you cited and reviewed,
18 they're all based on self-reported dietary
19 behavior, correct?
20   A.    No. Yes. Yes, they are. Yes and
21 no. Okay? So I mean in some of these studies --
22 so they, you know, the subjects fill out
23 questionnaires about diet. That's self-reporting.
24 But the investigators used data -- very extensive
25 data -- on dimethyl and dimethylnitrosamine in

Page 228

1 food in order to make the calculations. So it's
2 not like somebody self-reports, you know, I don't
3 think I was exposed to much dimethylnitrosamine
4 yesterday or anything like that. It's the
5 self-reporting for the kinds of foods that they --
6 which is pretty reliable.
7         So they ask the subjects -- you know,
8 they could give them a big table of different
9 types of food and methods of preparation,
10 everything, and the subjects fill out these
11 questionnaires so that the investigators know
12 basically what the person's diet consisted of.
13        Then they use that information and
14 tables which are developed by the government
15 agencies in that country -- for example, in
16 Europe, by the EU -- tables that give the
17 nitrosamine content of many different types of
18 food in great accuracy and they combine this
19 information with the personal dietary information.
20 It's not like they're asking people "Did you
21 consume any nitrosamines today?" The people
22 answering the questions have no idea. They're
23 just -- they're just explaining what their
24 customary diet is, which people can do with great
25 accuracy. This is particularly true in cohort

Page 229

1 studies where you're interviewing healthy people
2 and then following them for years.
3    Q.    Have you finished your answer?
4    A.    Yes.
5    Q.    Have you seen any of the
6 questionnaires that were used in the Knekt study
7 that were talked about right now?
8    A.    No, I didn't see the actual
9 questionnaires.
10   Q.    Have you seen any of the --
11   A.    I did not.
12   Q.    Have you seen any of the
13 questionnaires in any of the studies that you cite
14 in your paper?
15   A.    No, I haven't seen the actual
16 questionnaires, but I'm familiar with -- I'm
17 familiar with epidemiologists, I'm familiar with
18 the general topic of diet and cancer from my
19 previous experience in cancer research and from
20 having served on study sections and having been
21 involved in evaluations of areas -- lifestyle
22 habits and cancer, etc., etc.
23        So I've been in a lot of -- I've been
24 on many different committees that have evaluated
25 this kind of work. I've worked with

58 (Pages 226 - 229)

S. Hecht, Ph.D.

Page 230

1 epidemiologists, so I'm familiar with diet and
2 cancer studies and the approaches that are used,
3 but I didn't see the -- I didn't see the
4 particular diet questionnaire that was used for
5 this study or for any of the other studies for
6 that matter.
7        MR. TRISCHLER:  Object and move to
8     strike as non-responsive.
9     Q.    Did you see any of the tables that
10 were used to estimate NDMA exposures in the Knekt
11 study?
12    A.    I didn't see the tables themselves,
13 but I'm familiar with this kind of table.
14    Q.    I didn't ask if you were familiar --
15    A.    All right.
16    Q.    I said did you --
17    A.    You asked me the question.  Okay?
18    Q.    Right --
19    A.    So I'm telling you I'm familiar with
20 the studies that are done, the kind of tables.
21 All right?
22    Q.    I appreciate that, but I'm entitled
23 to answers to the questions I ask.
24        Did you see the tables that were
25 used --

Page 231

1    A.    No.
2    Q.    Did you see the tables used in any of
3 the studies that you cite to calculate nitrosamine
4 or to estimate nitrosamine exposures?
5    A.    I did not see the actual raw data
6 tables, no.  I depended on the published studies.
7 The published information.
8    Q.    In all of these --
9    A.    But I'm familiar with the kinds of
10 tables that they're using.  I am a consultant for
11 the FSA.  That's the European Food Safety
12 Authority.  I'm familiar with the kinds of data
13 they have and that's the kind of data that was
14 used in these studies.
15    Q.    Are you finished?
16        In any of the studies that you cite,
17 is the actual NDMA content in the foods consumed
18 by the subjects ever measured?
19    A.    Not in the specific foods, but in the
20 categories of foods, yes.  Definitely.
21    Q.    Measured by whom?
22    A.    I can't give you an answer to that
23 question, but going back to what I said before,
24 FSA and others have consulting laboratories that
25 make these measurements using well-established and

Page 232

1 well-developed methods.
2    Q.    You said you worked with FSA and are
3 working with them right now, correct?
4    A.    Yes, that's right.
5    Q.    Have you seen FSA publications
6 estimating NDMA content in various foods?
7    A.    We're working on it.
8    Q.    You're working on it?  Have you
9 seen --
10    A.    I've seen the data.  Yes, I've seen
11 the data.
12    Q.    Have they ever published any of it?
13    A.    Not yet, no.
14    Q.    Okay.
15        So if FSA hasn't published any of its
16 data, none of the authors of any of these papers
17 would have ever used it, correct?
18    A.    No, no, no.  They published data
19 before.  I'm talking about this particular report.
20 There's plenty of published data on nitrosamine
21 levels in food and plenty of unpublished data also
22 by government regulatory authorities.
23    Q.    I'm asking you about FSA because you
24 brought them up.
25    A.    Yeah.  I'm telling you what they're

Page 233

1 doing now.
2    Q.    Try to let me ask the question,
3 please.
4    A.    I'm not sure exactly what they were
5 doing at the time of some of these other studies,
6 but there's plenty of -- there's plenty of data
7 out there, reliable data on nitrosamine content in
8 various foods.
9        MR. TRISCHLER:  Object and move to
10     strike as non-responsive.
11    Q.    Sir, has FSA ever published any data
12 on nitrosamine -- on nitrosamine levels in foods?
13    A.    I believe they have.
14    Q.    Have you ever seen it?
15    A.    Maybe.
16    Q.    Do you have it?
17    A.    I don't have it in my hands.  I'd
18 have to look -- FSA has the so-called FSA Journal
19 where they publish a very detailed compendium and
20 it's very likely that there's something in there
21 on nitrosamines in food, but I can't cite it
22 offhand.
23    Q.    One of the things that --
24    A.    You know, you can look.  Look in the
25 FSA Journal.

59 (Pages 230 - 233)

S. Hecht, Ph.D.

Page 234

1    Q.    One of the things that you and I
2  talked about a few minutes ago was that the
3  dietary studies have been inconsistent in terms of
4  knowing an association between dietary intake of
5  nitrosamines and cancer, correct?
6    A.    Yes.
7    Q.    And just by way of one example, you
8  cited to a paper that was published by an author
9  named Loh, L-O-H.
10        Do you recall that paper?
11    A.    Yes.
12        MR. TRISCHLER:  One thing I wanted to
13  ask you about is if you -- we'll mark that as
14  Exhibit 16, I think, and 17 maybe.
15        THE VIDEOGRAPHER:  We're on 17.
16        (Whereupon, Exhibit 17 was marked for
17  identification.)
18        MR. TRISCHLER:  If you go to 1057 of
19  that document, please, the first paragraph of
20  text below the table, can you highlight that
21  for the benefit of the witness?
22    Q.    Are you able to see what is on the
23  screen, sir?
24    A.    Yes.
25    Q.    I see that you referred earlier to

Page 235

1  some notes and you pulled out, I'm guessing, some
2  notes.  It appears you're looking at something.
3  What are you looking at now?
4    A.    I'm looking at the Loh paper.
5    Q.    Before you mentioned that you had
6  some notes when I think I was asking you about the
7  Knekt paper we had out before.
8        Do you have notes that you took from
9  your review of these studies?
10    A.    What do you mean, notes?  I read the
11  papers and, you know, I underlined and circled
12  certain passages.
13    Q.    Did you write any notes based on --
14    A.    No, I didn't write any notes.  No.
15    Q.    So what you have in front of you then
16  is just a binder of studies?
17    A.    Yes.
18    Q.    Are there any studies -- thank you.
19        Are there any studies in the binder
20  that are not cited in your report?
21    A.    No.  All of these come from my
22  report.
23    Q.    And the only markings that you made
24  in your review then are highlighting and circling
25  or underlining those types of things?

Page 236

1        MR. SLATER:  Objection.
2        That wasn't the testimony.
3        You can answer.
4    A.    What's your question?
5    Q.    I'm trying to understand when you
6  made reference before that you wanted to "pull
7  your notes," I'm trying to understand what you
8  meant by notes.
9    A.    Yes.  The binder.  I read the papers
10  in the binder and as I read them, I circled or
11  underlined certain statements that I thought might
12  be relevant.
13    Q.    Did you write any text --
14    A.    No.
15    Q.    -- in those notes?
16    A.    No, I did not.
17    Q.    So if we -- what we're looking at now
18  on Exhibit 17 is a part of the Loh paper.  It
19  looks like you have the actual paper in your
20  notebook, correct, or binder?
21    A.    This is American Journal of Clinical
22  Nutrition.
23        Is that the one you're talking about?
24    Q.    Yes, sir.
25    A.    2011?

Page 237

1    Q.    Yes.
2    A.    Yes.
3    Q.    What we were talking about before,
4  again, is how the studies have been inconsistent
5  and that's one of the things that Dr. Loh observes
6  in this paper, correct?
7    A.    Yes.
8    Q.    Basically, as we look at -- as we're
9  looking at right here, what Loh observed was that
10  there'd been published studies with respect to
11  gastric cancer that go both ways.  Some report a
12  positive association with gastric cancer, while
13  others do not, right?
14    A.    Insufficient evidence for esophageal
15  cancer, but a positive association between
16  nitrosamine intake and gastric cancer.  So I think
17  you said -- I don't think that's what you said.
18        You said a positive association
19  between nitrite and nitrosamine intake and gastric
20  cancer.  That's what Loh is saying.  Not what you
21  said.  Insufficient evidence for esophageal
22  cancer.  I think you said --
23    Q.    I'm looking at --
24    A.    -- both positive and negative --
25    Q.    I'm looking at the sentence that says

60 (Pages 234 - 237)

S. Hecht, Ph.D.

Page 238

1 in his review -- "In this review, cohort studies
2 reported no association for nitrite and NDMA
3 intakes with gastric cancer risk."
4     Do you see that?
5     A.    Cohort studies. Right. Cohort
6 studies.
7     Q.    Right. That's what I'm saying.
8     The studies on gastric cancer and
9 NDMA have gone both ways. Some have said there's
10 an association, others have found to the contrary.
11    A.    Correct. Correct. You're right.
12    Q.    Loh is simply reporting that,
13 correct?
14    A.    Yes.
15    Q.    In Loh's own study, it goes on to
16 note that they did not find a statistically
17 significant association between NDMA and colon
18 cancer, right?
19    A.    I think they found association with
20 rectal cancer, but not colon cancer.
21    Q.    Correct.
22    They found no association with
23 gastric cancer?
24    A.    Correct.
25    MR. SLATER: Objection.

Page 239

1     You went a little quick again. Just
2 give me a second to object.
3     I object to the foundation of that
4 question.
5     Q.    And Loh's work did not support and
6 cannot be cited for support for a statistical
7 association between NDMA and esophageal cancer,
8 correct?
9     A.    Correct.
10    Q.    Not only are the dietary study
11 results conflicting, but the authors of those
12 studies have even acknowledged that they're not
13 reliable in attempting to establish causation of
14 cancer, correct?
15    A.    Where is that?
16    Q.    I'm asking. I'm not saying it's in
17 this paper. I'm just asking --
18    A.    I haven't seen that they said it's
19 not reliable. Maybe you know where that is, but I
20 haven't seen it. Where the authors of the study
21 said their study was not reliable? I haven't seen
22 that. If they didn't think it was reliable, they
23 wouldn't try to publish it.
24    Q.    The question that I was asking was a
25 little bit broader than that. I was simply asking

Page 240

1 you if you would agree with me that given the
2 inconsistencies that have been observed in the
3 findings in these dietary studies that one cannot
4 rely on those studies to suggest a causal
5 connection between NDMA intake and cancer.
6     A.    No, I do not agree whatsoever.
7     Q.    Are you familiar with --
8     A.    There's plenty of evidence from these
9 studies. It's not totally consistent in the sense
10 that different tissues are implicated in different
11 studies, but there's -- overall there are a number
12 of -- particularly, the cohort studies,
13 particularly those that have information on
14 exposure that do indicate a connection between
15 dietary nitrosamines and cancer. I don't agree
16 with you.
17    Q.    Okay.
18    Here, we're looking at an analysis of
19 cohort studies by an author of a paper that you
20 cited that says there's no association with NDMA
21 and gastric cancer.
22    A.    Gastric cancer.
23    Q.    And you agree with that?
24    A.    What I said was that there are cohort
25 studies that show an association between NDMA and

Page 241

1 cancer, GI cancer. Not necessarily gastric
2 cancer. GI tract, colon, rectum --
3     Q.    Are you familiar with the --
4     A.    -- and others.
5     Q.    -- song, S-O-N-G, paper?
6     A.    Yes.
7     Q.    It's entitled "Dietary Nitrates,
8 Nitrites and Nitrosamine Intake and the Risk of
9 Gastric Cancer, a Meta Analysis"?
10    A.    Yes.
11    Q.    What's a meta analysis?
12    A.    Meta analysis, they combine data from
13 multiple different studies and combine them into
14 one statistical package that they use to do the
15 analysis. So it enables you to have a much larger
16 number of subjects than you would in a single
17 study.
18    Q.    So Song pulled data from a lot of
19 different studies?
20    A.    Yes.
21    Q.    Isn't it true --
22    A.    Eleven studies.
23    Q.    Okay.
24    Isn't it true that they -- that the
25 authors of the Song paper concluded that they

61 (Pages 238 - 241)

S. Hecht, Ph.D.

Page 242

1 could not confirm the reliability of any
2 conclusions with respect to an association between
3 NDMA and cancer?
4    A.    I have to look at it. I have to look
5 at it.
6    Q.    It's up on the screen. We could go
7 to page 9893, if you'd like.
8        MR. SLATER: Hang on, Counsel.
9        Of course if Dr. Hecht wants to look
10   through the study before you continue, he's
11   allowed to, right?
12        MR. TRISCHLER: Of course. I was
13   just --
14        MR. SLATER: I think that's what he
15   was doing.
16        MR. TRISCHLER: He could look if he
17   wants. He could read the whole thing if he'd
18   like.
19        MR. SLATER: Okay.
20        THE VIDEOGRAPHER: Counsel, sorry to
21   cut in. You didn't announce you were going
22   to mark this. Would you like this marked as
23   the next one?
24        MR. TRISCHLER: Sure.
25        (Whereupon, Exhibit 18 was marked for

Page 243

1    identification.)
2        THE VIDEOGRAPHER: This is Exhibit
3    18.
4        Do you want me to jump to 9893?
5        MR. TRISCHLER: He seems to be
6    reading it. If he wants you to, you can.
7    We'll let him read it --
8    A.    It's right in the abstract. The
9    summary relative risk of stomach cancer was 1.34
10   for NDMA. It's in the abstract.
11   Q.    So you read the abstract?
12   A.    I read the whole paper.
13   Q.    I'm sorry?
14   A.    Huh?
15   Q.    I said you read the abstract,
16   correct?
17   A.    I read the whole paper.
18   Q.    All right.
19        Did you read the conclusion that
20   appears on page 9893?
21   A.    Dietary nitrates intake was
22   associated with a reduced risk of gastric cancer
23   and high consumption of nitrites and NDMA could
24   increase the risk. They go on to say that they
25   could not absolutely confirm the reliability of

Page 244

1    the findings, which of course is applicable to
2    many epidemiologists, particularly diet and
3    cancer.
4    Q.    Can we agree even though those
5    instances where a study notes or observes an
6    association that that association does not
7    establish causation?
8        MR. SLATER: Objection.
9        You can answer.
10   A.    That depends on the study. I think
11   if we look at things like smoking and cancer and
12   UV and cancer where, you know, the relative risks
13   are extremely high, then you say yes, causation.
14   And, you know, you have to take into account all
15   of the data. So if we have a situation where
16   there's exposure to a carcinogen, which has
17   well-known carcinogenic effects on very low doses,
18   such as NDMA, and can be considered, it should be
19   regarded for practical purposes as if it were a
20   carcinogen to humans, then yes, that equals
21   causation.
22   Q.    Let me be more specific.
23        Have you seen any paper published in
24   the literature that suggests that the -- that
25   there's a causal connection between exogenous NDMA

Page 245

1    intake and the -- and the cause of cancer in
2    humans?
3    A.    Yes. We just discussed -- what we've
4    been talking about the last hour.
5    Q.    Show me where it says that these
6    exogenous NDMA intake in diet cause cancer. Where
7    does it say that, sir?
8    A.    Causes cancer?
9    Q.    Yes, that was the question.
10   A.    No. The language is much more
11   cautious, of course. It has to be.
12   Q.    I'm asking you has there ever been a
13   paper published where it's been concluded that
14   NDMA -- exogenous NDMA intake in food caused
15   cancer?
16   A.    I would say collectively the papers
17   that we reviewed indicate that NDMA in food does
18   cause cancer. Otherwise, they wouldn't have seen
19   these elevated relative risks in all of these
20   different studies, some of which were very large.
21   Q.    Show me a -- find me a statement in
22   any of the papers in your notebook where that
23   conclusion was made by an author of a published
24   study?
25   A.    There isn't. That cause cancer?

62 (Pages 242 - 245)

S. Hecht, Ph.D.

Page 246

1  Q.   Right.  It's not --
2  A.   It did not say that.
3  Q.   It's never been written in the
4  scientific literature that dietary intake of NDMA
5  has caused cancer; true?
6  A.   In humans.
7  Q.   In humans.  Correct.
8  A.   Caused cancer, correct.
9  Q.   Never been --
10  A.   You can't --
11  Q.   Never been written --
12  A.   There's still not enough data to say
13  absolutely cause cancer.
14  Q.   You've got to let me ask a question,
15  sir.
16       It's never been written anywhere in
17  the scientific literature that dietary exposure to
18  NDEA has caused cancer in humans, has it?
19  A.   Now you're on NDEA?
20  Q.   Yes.
21  A.   Okay.  I thought you were talking
22  about NDMA.
23       I do not believe that there is such a
24  study, yes, where it says NDEA caused cancer in
25  humans.  I don't think there is such a study in

Page 247

1  the literature.
2  Q.   Did you suggest to me and to this
3  jury a little bit ago that the mere association
4  between NDMA and cancer is enough to establish
5  causation?  Is that what you want us to believe?
6  A.   I'm saying that there are a number of
7  strong studies where we have good solid dose
8  information and we have good solid information on
9  cancers that occurred and the study design is
10  strong, such that collectively they present a
11  conclusion that NDMA can cause cancer.  Whether it
12  does cause cancer, I would say it still needs
13  research.
14  Q.   By the --
15  A.   I go back to this again.
16  Q.   By the same token --
17       MR. SLATER:  For the record, that was
18  referring to the 1978 IARC publication?
19       THE WITNESS:  Yes.
20  Q.   By the same token, those same studies
21  in the literature include many studies where there
22  have been no association observed between NDMA and
23  cancer, correct?
24  A.   I don't know about many.  There are
25  some.

Page 248

1  Q.   We've looked at a few, right?
2  A.   No.  We looked at a number of
3  different studies.  You know, there are both
4  positive and negative results depending on the
5  tissue or organs being looked at and depending on
6  the study.  It's a mixed bag.
7  Q.   So since the dietary literature is a
8  mixed bag, as you called it, what methodology did
9  you employ to make the leap from an association
10  between NDMA and cancer in some studies and
11  causation?
12       MR. SLATER:  Objection.
13       Foundation.
14       You can answer.
15  A.   I take into consideration the high
16  carcinogenicity of NDMA in animal models able to
17  induce tumors and I think something like 28
18  different animal species, even at very low doses
19  as shown in rats.  I combine that with the study
20  design of the prospective studies and the very
21  reliable dietary information on NDMA in food and I
22  conclude that this is collectively a very strong
23  link.
24  Q.   Are you familiar with the Bradford
25  Hill criteria?

Page 249

1  A.   Yes.
2  Q.   Do you recognize that the Bradford
3  Hill criteria is a recognized methodology that's
4  used to evaluate whether an observed association
5  rises to the level of causation?
6  A.   Yes.
7  Q.   Are you familiar with the actual
8  Bradford Hill criteria?
9  A.   Yes.
10  Q.   Can you cite any of them for me?
11  A.   I don't have them memorized, but we
12  could pull it up if necessary.
13  Q.   It's not a memory test.  I was just
14  asking if you know any --
15  A.   Thank you.
16  Q.   -- offhand.
17  A.   Consistency is one of them.
18  Q.   There's nine of them total, right?
19  A.   I thought you said it wasn't a memory
20  test.
21  Q.   It's not.  I'm just asking if you
22  know the number of them.
23  A.   So why don't you just pull it up then
24  if you want to talk about it?
25  Q.   Did you employ the Bradford Hill

63 (Pages 246 - 249)

Page 250

1 criteria in this case or utilize the Bradford Hill
2 criteria to determine whether the strength of
3 association in some of these studies merited
4 making the leap to causation?
5    A.    No, I did not.
6    Q.    Did you use any methodology that's
7 described in the scientific literature to assist
8 you in making your causation determination or was
9 it simply your own methodology?
10    A.    I'm familiar with the methodology for
11 the analysis of nitrosamine in foods and I know
12 that there are very good, very thorough databases
13 on nitrosamines in food.
14        I'm familiar with the methodology
15 used in epidemiology prospective so-called cohort
16 studies. I'm familiar with those things and I'm
17 also familiar with the animal data on nitrosamines
18 and the dose response data for dimethyl and
19 several other nitrosamines from animal studies.
20 So I'm very familiar with all of this literature.
21        It doesn't -- it's not something that
22 I just started reading about, you know, to prepare
23 for this deposition. This is something I have
24 been involved with for more than 45 years, so I'm
25 quite familiar with the field. I watched the

Page 251

1 field evolve. I'm familiar with the evolution of
2 all of the animal data and the evolution of all of
3 the analytical chemistry data which in the early
4 days was plagued by artifacts and other problems,
5 but now is known to be extremely reliable.
6        So when I put all of this data
7 together and looking at it in comparison, looking
8 at it in context of the firm highly reliable data
9 that we have, put that together with the use of an
10 epidemiologic study design, with the cohort study,
11 I'm quite confident in the results of these
12 studies and after having reviewed them all, my
13 conclusion is that yes, there is definitely
14 causation. That's my conclusion.
15    Q.    And your conclusion was based on the
16 fact that you're familiar with the literature and
17 you're familiar with nitrosamines, right?
18    A.    More than familiar. I would say that
19 I have lived nitrosamines for more than half my
20 life.
21    Q.    So you drew conclusions from the
22 literature based on your -- given that you're
23 familiar with it and experienced in the subject?
24    A.    Yes.
25    Q.    But you did not follow any recognized

Page 252

1 methodology for making the leap from association
2 to causation?
3    A.    It was not a formal --
4        MR. SLATER:  Objection.
5        One second, Doctor. Doctor, one
6 second.
7        Objection. That's a gross
8 mischaracterization and it's argumentative at
9 this point.
10        Do you want him to walk through his
11 methodology again for you, Counsel --
12        MR. TRISCHLER:  Sara, did you get the
13 answer?
14        MR. SLATER:  Let me finish, please.
15        -- or do you want to keep saying
16 things regardless of what you heard?
17        MR. TRISCHLER:  Sara, did you get the
18 answer?
19        (Whereupon, the record was read back
20 by the reporter.)
21    Q.    Did you want to finish that answer,
22 Doctor?
23    A.    It was not a formal evaluation.
24    Q.    In your view of this case and based
25 on your knowledge of all the relevant literature

Page 253

1 which you've told us that you have, did you find a
2 single epidemiological study that concluded that
3 exogenous intake of NDMA was the cause of bladder
4 cancer in humans?
5        MR. SLATER:  Objection.
6    A.    Bladder cancer? I don't think I saw
7 bladder cancer.
8    Q.    In your review --
9    A.    I don't think that's been reported.
10    Q.    In your review of all the literature,
11 did you find a single peer review study that
12 concluded that exogenous intake of NDMA was the
13 cause of blood cancer in humans?
14    A.    No.
15    Q.    In your review of all the literature,
16 did you find a single peer-reviewed study that
17 concluded that exogenous intake of NDMA was the
18 cause of breast cancer in humans?
19    A.    No.
20    Q.    In your review of all the literature,
21 did you find a single peer-reviewed study that
22 concluded that exogenous intake of NDMA was the
23 cause of colorectal cancer in humans?
24    A.    Yes.
25    Q.    My question was cause, not

64 (Pages 250 - 253)

S. Hecht, Ph.D.

Page 254

1 association.
2        Did you find any papers that
3 suggested that exogenous intake of NDMA was the
4 cause of colorectal cancer in humans?
5    A.    We just reviewed -- we just did this.
6 I mean, I don't know.  I don't know what you're
7 getting at here.
8    Q.    I'm distinguishing between --
9    A.    We just did this and we just
10 discussed all of this, so I don't know what you're
11 trying to get at.
12    Q.    Well, let me try and help you out, if
13 I can. I'm distinguishing between a study that
14 notes an association and a published study that
15 makes a determination or statement regarding
16 cause.
17        So my question is are you aware of
18 any peer-reviewed study that concluded that
19 exogenous intake of NDMA was the cause of
20 colorectal cancer in humans?
21    A.    No.
22    Q.    Are you aware of any published study
23 that concluded that exogenous intake of NDMA was
24 the cause of esophageal cancer in humans?
25    A.    No.

Page 255

1    Q.    Are you aware of any peer-reviewed
2 published study that concluded that exogenous
3 intake of NDMA was the cause of gastric cancer in
4 humans?
5    A.    Cause? No.
6    Q.    Are you aware of any peer-reviewed
7 study that concluded that exogenous intake of NDMA
8 was the cause of kidney cancer in humans?
9    A.    No.
10    Q.    Are you aware of any peer-reviewed
11 study that concluded that exogenous intake of NDMA
12 was the cause of liver cancer in humans?
13    A.    No.
14    Q.    Are you aware of any peer-reviewed
15 studies that concluded that exogenous intake of
16 NDMA was the cause of lung cancer in humans?
17    A.    No. Not cause, no.
18    Q.    Are you aware of any peer-reviewed
19 study that concluded that exogenous intake of NDMA
20 was the cause of pancreatic cancer in humans?
21    A.    No.
22    Q.    Are you aware of any peer-reviewed
23 study that concluded that the exogenous intake of
24 NDMA was the cause of pharyngeal cancer in humans?
25    A.    No.

Page 256

1    Q.    Are you aware of any peer-reviewed
2 study that concluded that exogenous intake was the
3 cause of -- exogenous intake of NDMA was the cause
4 of prostate cancer in humans?
5    A.    No.
6    Q.    Are you aware of any peer-reviewed
7 study that concluded that the exogenous intake of
8 NDMA was the cause of uterine cancer in humans?
9    A.    No.
10    Q.    I'm going to ask you a questions now
11 about NDEA as opposed to NDMA.
12    A.    It's all the same answers.  You don't
13 have to go through it.
14    Q.    If we listed all 13 of the cancers
15 that are at issue, are you aware of any
16 peer-reviewed study that concluded that exogenous
17 intake of NDEA was the cause of any of those
18 cancers?
19    A.    No.
20    Q.    Do you agree or disagree with this
21 statement, Doctor: DNA adduct formation alone is
22 inadequate to confirm mutation or cancer?
23    A.    Agree.
24        MR. SLATER:  Objection.
25        You went a little quick again.

Page 257

1        Are we going back over this again?  I
2 thought we --
3        MR. TRISCHLER:  You cut out, Adam.  I
4 couldn't hear you.
5        MR. SLATER:  Can you hear me now?
6        MR. TRISCHLER:  Yes.
7        MR. SLATER:  I said objection.
8        I thought we covered this hours ago.
9    Q.    Are you familiar with MGMT?
10    A.    Yes.
11    Q.    Is MGMT a DNA repair enzyme?
12    A.    Yes.
13    Q.    Is it one of those things in our body
14 that allows us to fight off mutagens?
15    A.    No, it doesn't act on mutagens.  It
16 acts on DNA adducts, specifically
17 O6-methylguanine.  So O6-methylguanine DNA methyl
18 transfers.  Therefore the name MGMT.
19    Q.    Do you agree or disagree with this
20 statement: Risks from nitrosamines in drugs is
21 likely to be very low because depletion of MGMT is
22 not expected?
23    A.    I don't necessarily agree with that,
24 no.
25    Q.    What would be your --

65 (Pages 254 - 257)

S. Hecht, Ph.D.

Page 258

1    A.    I don't agree with that.
2    Q.    What would be your basis for
3 disagreeing?
4    A.    Well, MGMT activity might be low for
5 a number of reasons.  It may have been MGMT
6 activity may have been used up by other exposures,
7 so, you know, if there is O6-alkylguanine form
8 from various different exposures, some of which we
9 may not be aware of, MGMT can be used up tending
10 to those exposures.
11    Q.    Do you --
12    A.    So I don't think we know -- we don't
13 really know, you know, how much MGMT activity a
14 person has in reserve to address nitrosamine
15 exposure.  We don't have that information.
16    Q.    So long as there's no MGMT depletion,
17 one would not expect that a low-level nitrosamine
18 exposure would lead to the development of
19 mutagens, correct?
20        MR. SLATER:  Objection.
21        You can answer.
22    A.    No, I don't think that's correct.  I
23 mean, nitrosamines do a lot of things to DNA.
24 It's not just O6-methylguanine.
25 Dimethylnitrosamine forms multiple different

Page 259

1 adducts in DNA.  O6-methylguanine has been studied
2 most extensively because we know that it has
3 miscoding properties.  We know that it can lead to
4 mutations.  We know about MGMT, we know that it's
5 -- well, it's not the major DNA damage caused by
6 nitrosamines by any means.  It's actually one of
7 the minor ones.  So there's a lot of other damaged
8 DNA that can lead to mutations and cancer.  It
9 wouldn't be addressed by MGMT.
10    Q.    Have you ever studied MGMT depletion
11 in humans?
12    A.    No, I honestly have not studied it.
13 My group has not studied it.  There's a fair
14 amount of literature on it.  There's a large
15 amount of literature on it, particularly in the
16 chemotherapy literature because MGMT can act on
17 chemotherapeutic drugs, decreasing their efficacy,
18 so people looked for inhibitors of MGMT to be used
19 as co-factors in chemotherapy.
20    Q.    I want to go back and do a little
21 housekeeping, just to make sure that I have an
22 understanding of everything that you reviewed and
23 relied upon to put together your report and come
24 to your conclusions.
25        Okay?

Page 260

1    A.    Okay.
2    Q.    You -- we talked about how you were
3 retained by --
4        MR. SLATER:  Counsel, excuse me, I
5 don't mean to interrupt, but are you now
6 going to rehash the testimony from six hours
7 ago?  I don't understand what we're doing.
8        MR. TRISCHLER:  You probably couldn't
9 understand what I'm doing since I haven't
10 asked a question yet.
11        MR. SLATER:  Well, no, but you
12 started to ask about, you know, you're back
13 to the beginning.  I don't think it's a
14 reasonable predicate to say "Well, I just
15 want to make sure I understand ..." and then
16 go over testimony you took in great detail in
17 the questioning.  I ask you not to duplicate
18 that questioning, please.
19        MR. TRISCHLER:  Well, since I haven't
20 asked a question yet, I don't know how it
21 could be duplicative, but if you think it is,
22 I'm sure you could object to it on that
23 basis.
24        MR. SLATER:  Well, it's your
25 obligation not to do so, so don't put it on

Page 261

1 me, please.
2    Q.    You told us that you reviewed
3 documents that were provided to you by counsel.
4        Do you recall that?
5    A.    Yes.
6        MR. TRISCHLER:  I'm going to mark as
7 an exhibit the next number that we're up to,
8 a document that I think was attached to your
9 report.  It's called "Documents Reviewed" and
10 it's Exhibit 2 to your report.  I'm going to
11 mark it as a separate exhibit here.
12        Can you put that up, Bill, please?
13        THE VIDEOGRAPHER:  Just looking for a
14 document that matches that description.
15        Just give me one moment.
16        THE WITNESS:  It's B.  It's addendum
17 B.
18        THE VIDEOGRAPHER:  I'm seeing a
19 document that was uploaded.  The name of the
20 document is reviewed -- got it.  Sorry about
21 that.  That will be Exhibit 19.
22        (Whereupon, Exhibit 19 was marked for
23 identification.)
24    Q.    This is a document that you prepared
25 and provided in connection with your report,

66 (Pages 258 - 261)

S. Hecht, Ph.D.

1 correct, sir?

2   A.   Yes.

3   Q.   All I'm trying to confirm is is this
4 a list of documents that were provided to you by
5 counsel in connection with your review and your
6 work in this case?

7   A.   Yes.

8   Q.   I think that -- and to be fair, when
9 we get to the last -- the second-to-last page,
10 there's a section marked "Regulatory Documents"
11 and you had indicated before that, you know, in
12 addition to looking at company documents and the
13 public literature, you also looked at public
14 materials about the valsartan medications,
15 correct?

16   A.   Yes.

17   Q.   Would this be a list of those public
18 documents that you reviewed?

19   A.   Yes.

20   Q.   Is there -- other than what's on this
21 six-page list -- and please feel free to go
22 through it if you need -- but are there any other
23 documents that you reviewed or received in
24 connection with your work in this case prior to
25 the time you sat down and wrote the report that we

1 marked as Exhibit 1?

2   A.   No. The list is complete.

3   Q.   I was told that you also -- it was
4 delivered to me yesterday, six binders of
5 materials that was delivered to me electronically
6 and there was a table of contents with those
7 binders.

8   Have you ever seen those tables of
9 contents?

10   A.   I think I know what you're referring
11 to. I mean, in the binders, the binders have a
12 table of contents.

13   MR. TRISCHLER: I don't know if we
14   have these in the chat or available, but I
15   was going to mark the table of contents in
16   the binder as the next number of exhibit,
17   just so we have a record of what his file
18   materials consist of. Okay?

19   MR. SLATER: Yeah, I mean all those
20   materials you have already and have had.
21   Those were just provided to him for his
22   convenience, in case he wanted to look at
23   them. You can mark them --

24   MR. TRISCHLER: Right. I understand
25   that. I understand, but it's a nice handy

1 reference of what the contents of his file
2 were, so I was going to mark them as a
3 numbered exhibit, if that's okay.

4   MR. SLATER: Well, yeah, I'm not
5 going to tell you that's all the materials in
6 his file, though, because I don't know that
7 it is. I don't think it is. I don't think
8 we printed everything. So I don't think
9 that's going to -- his file is -- I mean, you
10 have everything. I just can't tell you those
11 table of contents is everything because I
12 don't think we sent him everything.

13   MR. TRISCHLER: Fair enough.

14   (Whereupon, Exhibit 20 was marked for
15   identification.)

16 BY MR. TRISCHLER:

17   Q.   Dr. Hecht, I'm just trying to -- what
18 I'm obviously interested in is in knowing everything
19 you may have read, reviewed and relied upon.

20   Do you have the tables of contents
21 for the binders in front of you?

22   A.   Yes.

23   Q.   Can you take a look at those and tell
24 me whether those tables of contents contain the
25 documents and literature that you relied upon?

1   MR. SLATER: I'm sorry, Clem. You're
2 asking him to do it? He's going to have to
3 sit there and walk through it, compare it to
4 the "Materials Reviewed" list and his whole
5 report? Is that what you're asking him to
6 do?

7   MR. TRISCHLER: I don't really want
8 him to do that, Adam --

9   MR. SLATER: But, I mean, you have it
10 attached to the report, you have the
11 references in the report, so you can mark the
12 tables of contents, you can do whatever you
13 want, I'm just not really sure what we're
14 getting at. You have the tables of contents.
15 Is there something on those tables of
16 contents that you think wasn't in the report?
17 You can tell us and ask him the question, but
18 I don't think so.

19   MR. TRISCHLER: I guess that's the
20 question. Let me ask that question.

21   Q.   Do you know if there's anything
22 listed on the tables of contents in these binders
23 that were not cited in your report?

24   MR. SLATER: You want him -- you want
25 him to go through and compare everything? I

S. Hecht, Ph.D.

Page 266

1  mean, I'm told by Chris that he thinks that
2  the tables of contents are pretty
3  comprehensive, if not everything. But I just
4  can't swear to it right now. Short of him
5  comparing everything, how else is he going to
6  be sure?
7        MR. TRISCHLER: I didn't get the
8  binders until yesterday. I didn't get a
9  chance to look at them. I'm just trying --
10       MR. SLATER: Clem, we gave those
11  binders as a courtesy because they're not new
12  materials. They're all things you already
13  had.
14       MR. TRISCHLER: And I'm not
15  complaining, Adam. I'm trying to figure out
16  whether there's anything on here that I
17  haven't seen or hasn't been identified
18  before. I don't think that's an improper
19  question.
20       MR. SLATER: No, but I'm saying
21  wouldn't it be easier to have someone in your
22  office go down the list and compare to the
23  report and see if there's anything new?
24       MR. TRISCHLER: Well, perhaps, but I
25  wasn't smart enough to do that.

Page 267

1        MR. SLATER: That's not -- I'm not
2  being nasty, so I don't need that comment.
3        MR. TRISCHLER: I didn't suggest you
4  were being nasty.
5        MR. SLATER: Look, you use the time
6  any way you want.
7        Do you know yet if anyone else plans
8  to follow up after you because we are
9  probably at seven hours now?
10       MR. TRISCHLER: I don't how long
11  we're into it and I don't know the answer to
12  that question, but let's just see if we could
13  get this done and then we'll move on to
14  something else.
15       THE VIDEOGRAPHER: Counsel, sorry to
16  cut it. Just to let you know, I don't have
17  a document, the table of contents --
18       MR. TRISCHLER: I know you don't. I
19  already said that you don't have it.
20       THE VIDEOGRAPHER: I'm saying if you
21  want to send it to me later on, I can mark
22  that as the next exhibit.
23       MR. TRISCHLER: Right.
24       THE VIDEOGRAPHER: And we have about
25  seven minutes on this media, just so you

Page 268

1  know.
2        Thank you.
3  BY MR. TRISCHLER:
4    Q.    Do you know offhand, Doctor -- and I
5  don't know how much time you spent with the
6  binder -- do you know offhand whether there's
7  anything in the binders that is not identified
8  in the documents reviewed that we marked as the last
9  exhibit and the references that are mentioned in
10  the report?
11   A.    No. I mean, offhand, you know, the
12  binders contain what's in the report.
13   Q.    Is there any work that you've done
14  since preparing your report in this case?
15   A.    What do you mean by work?
16   Q.    Well, I mean --
17   A.    I had to review all of the material.
18  I mean, that's work.
19   Q.    Sure. Fair enough.
20        Other than reviewing the material, is
21  there any new work that you did, any new studies
22  that you looked at, any additional research that
23  you've done since you wrote this report in July?
24   A.    No. Not relevant to this case.
25   Q.    As part of your work in this case,

Page 269

1  have you reviewed the reports of other experts
2  that were retained by the plaintiffs in this
3  litigation?
4    A.    No, not the reports. I did see some
5  transcripts of, you know, parts of testimony, but
6  not -- I didn't review the report, I haven't
7  reviewed any of the reports.
8    Q.    I'll represent to you that the
9  depositions of the experts for the plaintiff are
10  only taking place recently, so that's including
11  your deposition obviously.
12        I'm looking at the list of deposition
13  testimony that you reviewed that's part of our
14  last numbered exhibit and --
15   A.    No, I didn't review those. I don't
16  know why that's there. I haven't seen them. I
17  haven't seen those.
18       MR. SLATER: Dr. Hecht, can you wait
19  until he asks you a question, please? He
20  hasn't asked you yet. He's moved off the
21  expert reports. He's onto something new now.
22   Q.    You've not reviewed any expert
23  reports from any other expert in the case; true?
24   A.    No. True.
25   Q.    You've not seen any of the deposition

68 (Pages 266 - 269)

S. Hecht, Ph.D.

Page 270

1 transcripts from any of the experts in the case?
2    A.    Correct.
3    Q.    You've not spoken to any of the other
4 experts retained by plaintiff?
5    A.    Correct.
6    Q.    And I take it that you're not relying
7 upon any other expert retained by plaintiff to
8 support any of your opinions in this case?
9    A.    Correct.
10    Q.    I asked you before about medical
11 records and you told me you haven't reviewed any
12 patient medical records.
13        Have you reviewed any pathology
14 slides or tissue samples for any plaintiff?
15    A.    No.
16    Q.    Have you reviewed any of the reports
17 of any of the defense experts in this case?
18    A.    No.
19    Q.    Do you know who any of the defense
20 experts are?
21    A.    No, I do not.
22    Q.    When's the last time you gave a
23 deposition or sworn testimony under oath?
24    A.    Repeat the question, please. I
25 didn't hear the whole thing.

Page 271

1    Q.    Sure.
2        When's the last time you gave a
3 deposition or other sworn testimony under oath?
4    A.    I don't remember the exact date, but
5 I believe it was about ten years ago in a case
6 involving smokeless tobacco and cancer. I'm not
7 sure of the exact date.
8    Q.    Were you working as an expert witness
9 in this case ten years ago?
10    A.    Yes.
11    Q.    In connection with your expert work
12 where you've been asked to give depositions or
13 give deposition testimony, has all of it been in
14 cases involving tobacco?
15    A.    Yes.
16    Q.    I guess another way of asking the
17 same question, just to make sure I understand and
18 get the complete answer, have you ever been
19 involved in a litigation matter as an expert
20 witness that did not involve tobacco?
21    A.    No.
22    Q.    Have you ever testified at trial as
23 an expert witness?
24    A.    No. No.
25        MR. TRISCHLER: This would be a good

Page 272

1 time for me to go into another area and I'm
2 getting near completion.
3        Can we take a five-minute break,
4 Adam, and if you want, I can roundtable with
5 my colleagues and see who we have as
6 questioning and how much?
7        MR. SLATER: Okay. Obviously with
8 the caution that there shouldn't be any
9 duplicative questioning obviously.
10        That's not for your benefit --
11        MR. TRISCHLER: I don't think any
12 that's the intent of anybody, but I
13 understand your position.
14        Why don't we take ten minutes? It'll
15 give me a chance to look at the rest of what
16 I want to do and then I can get some -- at
17 least some electronic feedback from our side
18 as to what else people think.
19        Okay?
20        MR. SLATER: Sounds good.
21        THE VIDEOGRAPHER: The time is 4:27.
22 This concludes media four.
23        (Recess taken)
24        THE VIDEOGRAPHER: The time is now
25 4:38.

Page 273

1        This begins media five.
2        You may proceed.
3    Q.    Dr. Hecht, are you familiar with the
4 Pottegård study?
5    A.    Pottegård?
6        MR. SLATER: Which study did you say,
7 Clem? I missed that.
8        MR. TRISCHLER: Pottegård.
9    A.    I am.
10    Q.    I'll give you a second to grab
11 whatever you're looking for. Are you pulling up a
12 copy of the study?
13    A.    Yeah, I am.
14        Okay. That's the Danish --
15        (Whereupon, Exhibit 21 was marked for
16 identification.)
17    Q.    Right. Yes, sir. We'll mark the
18 Pottegård study as the next numbered exhibit. You
19 don't have to show it. The witness has it in
20 front of him.
21        In this Pottegård paper, the authors
22 followed about 5,150 Danish patients who used
23 valsartan, correct?
24    A.    Yes.
25    Q.    And I think what the paper tells us

69 (Pages 270 - 273)

S. Hecht, Ph.D.

Page 274

1 is that the scientists who did this study followed
2 these individuals for a median of 4.6 years and
3 examined cancer rates in valsartan users as
4 compared to a cohort of non-valsartan users,
5 right?
6     A.    Yes.
7     Q.    Based on your review of this study,
8 was it a good, well-designed study?
9     A.    Well, you know, the follow up -- the
10 sample size was pretty small and the follow up is
11 also pretty small.  So I mean as an initial pass
12 at the problem, and, you know, the effects of the
13 NDMA in tablets, I guess it was okay.  But, I
14 mean, it's a relatively small study and the follow
15 up is not very long, so it's not too surprising
16 that it didn't find anything.  So, you know, a
17 negative study doesn't really prove anything.
18     Q.    So as with all studies, there were
19 some limitations to it?
20     A.    I wouldn't say all studies.  That's a
21 very broad statement.
22     Q.    I thought you said that all studies
23 have limitations?
24     A.    Maybe I said that, but not all
25 studies.  Well, all studies have some limitations.

Page 275

1 I guess that's true.  It's a very broad statement.
2         We do experimental studies here that
3 I don't really think have any limitations.  When
4 you're talking about studies of populations, then
5 the limitations become more -- there can be more
6 limitations.
7     Q.    In any event, what Pottegård reported
8 was that there was no evidence of a markedly
9 increased short term overall risk of cancer from
10 the valsartan containing NDMA, correct?
11     A.    Yes.
12     Q.    You cite Pottegård in your report
13 that you prepared for this case, right?
14     A.    Yes.
15     Q.    And when you prepared this report
16 back in July, did you understand that it was going
17 to be filed with the Federal MDL Court?
18     A.    Federal MDL Court is what?
19     Q.    That's the court --
20     A.    I don't think so.  I'm not sure I
21 know what you're talking about.
22     Q.    I'm trying to tell you, explain it to
23 you.
24         It's the court where this litigation
25 is based.  Did you understand that this report was

Page 276

1 going to be filed with the court?
2     A.    Yes.
3     Q.    And did you put together the report
4 as a summary of the scientific basis for the
5 opinions that you were offering?
6     A.    Yes.
7     Q.    Do you agree that a report of this
8 nature should not misstate or misrepresent the
9 state of clients as reflected in the literature?
10     A.    Yes.
11     Q.    I assume you'd agree with me that
12 scientists are not supposed to take liberties in
13 preparing reports of this nature, correct?
14     A.    I don't know what you mean by "take
15 liberties."
16     Q.    Well, stretching the truth or
17 distorting findings is not what a scientist is
18 supposed to do.
19         Can we agree on that?
20     A.    We never stretch the truth or distort
21 findings.
22     Q.    And so when you cite to Pottegård in
23 your report -- strike that.
24         When you put this report together,
25 you already told me that one of the questions that

Page 277

1 was at the heart of this was whether or not NDMA
2 can cause cancer in humans, correct?
3     A.    Yes.
4     Q.    So when you cite to -- here, we have
5 a study like Pottegård that aims to answer that
6 very question, right?
7     A.    Yes.
8     Q.    When you cite to Pottegård in your
9 report, you make no mention at all of the authors'
10 conclusion that NDMA in valsartan was not found to
11 increase the short term overall risk of cancer?
12     A.    No.
13     Q.    Right?  Never mention that?
14         MR. SLATER:  Objection.
15         You can answer.
16     A.    That's what you say.
17     Q.    Well, it's what I say, but it's
18 truthful, right?  You never mention it in your
19 report --
20     A.    Okay.
21     Q.    -- what Pottegård included?
22     A.    All right.  That's an oversight.  I
23 should have mentioned it.
24     Q.    Because that's an important
25 observation obviously, right?

70 (Pages 274 - 277)

S. Hecht, Ph.D.

Page 278

1        MR. SLATER:  Objection.
2     A.    It's a preliminary observation.  I
3 don't know if it's really an important
4 observation.
5     Q.    It's something an objective scientist
6 would want to disclose, don't you think?
7        MR. SLATER:  Objection.
8        Wait.  Time out, Dr. Hecht.
9        Objection.
10        Argumentative.
11        Do you have a question, rather than
12     just making statements at the witness?
13        MR. TRISCHLER:  I just asked it and
14     he just answered it.
15        MR. SLATER:  Yeah, but you didn't
16     ask.  You're just throwing statements at him
17     instead of asking the question.
18        Do you have a question about
19     Pottegård?  Do you have a question about
20     something?
21        MR. TRISCHLER:  I have another one
22     that I'll ask as soon as you're done.
23 BY MR. TRISCHLER:
24     Q.    Why did you omit Pottegård's
25 conclusion that there was no short term overall

Page 279

1 risk of cancer associated with the use of
2 valsartan with NDMA from your report?
3        MR. SLATER:  Objection to the
4     terminology and foundation.
5        You can answer.
6     A.    I guess I have to find the page where
7 the --
8     Q.    Sure.  I can help you --
9     A.    -- Pottegård is discussed, so I see
10 exactly what I said here.  What page is it?
11     Q.    Page 16 is where I see it, both in
12 the first full paragraph and the last.
13     A.    Yeah, I summarize the EMA comments.
14 EMA statement cites and discusses a study
15 performed in Denmark.  That's the Pottegård study.
16        I'm a little confused here.  Yeah.
17 So what's your question?  What is your question?
18     Q.    Why did you make no mention of
19 Pottegård's conclusion that NDMA in valsartan did
20 not lead to an increased short term overall risk
21 of cancer?
22     A.    Well, I guess I took the NDMA
23 valuation of the 4.6 year follow-up interval was
24 likely too short, so I didn't discuss it further
25 than that.  I might have -- might have discussed

Page 280

1 it more.
2     Q.    Well, what you did cite to with
3 respect to Pottegård was you make a suggestion at
4 page 16 that the study found an increased risk for
5 colorectal cancer and uterine cancer.
6        Do you see that at page 16?
7     A.    Yes, I see that.
8        MR. SLATER:  That's the only
9     question, Doctor.  Did you --
10     A.    I'm a little puzzled by that.
11     Q.    Is that an accurate statement?  Is
12 that what Pottegård actually found?
13     A.    In the analysis of single cancer
14 outcomes, increased risks were seen for colorectal
15 cancer and for uterine cancer, although neither
16 these, nor other single cancer outcomes reached
17 statistical significance.
18        So yeah, that was the outcome.  It
19 wasn't -- so it's -- it's not exactly right,
20 what's written here.  It's a little unclear.  It's
21 not that clear.
22     Q.    "Not exactly right" --
23     A.    I should have -- I should have -- I
24 should have been more clear in the way I wrote
25 this.

Page 281

1     Q.    "Not exactly right" is a kind way of
2 saying what you wrote is incorrect?
3        MR. SLATER:  Objection.
4     Q.    If you look at the results on the
5 first page of the study, what Pottegård wrote was
6 that the confidence intervals for the single
7 outcome cancers were so wide as to include the
8 null, so no conclusions could be drawn, right?
9     A.    Yes.
10     Q.    Looking at it now, what we can say is
11 that Pottegård never found a statistically
12 significant increased risk of colorectal cancer,
13 did he?
14     A.    No.
15     Q.    He never found a statistically
16 significant increased risk of uterine cancer, did
17 he?
18     A.    That's correct.
19     Q.    Those are obviously important
20 observations that were never mentioned in your
21 report either, correct?
22        MR. SLATER:  Objection.
23        You can answer.
24     A.    It's an oversight that should have
25 been mentioned.

71 (Pages 278 - 281)

S. Hecht, Ph.D.

Page 282

1    Q.    You also cite to the Gomm study in
2  your report on page 16, right?
3    A.    Yes.
4    Q.    Do you have that with you, sir, and
5  available to you?
6    A.    I do.
7        MR. TRISCHLER:  We'll mark the Gomm
8  study the next numbered exhibit.
9        Bill, you do not have to display it
10  since the witness has it in front of him.
11       (Whereupon, Exhibit 22 was marked for
12  identification.)
13   Q.    Doctor, Gomm was a study where they
14  used the German registry database to look at over
15  750,000 individuals who filled valsartan scripts,
16  right?
17   A.    Yes.
18   Q.    And the incidence of cancer was
19  compared to non-valsartan users, right?
20   A.    Yes.
21   Q.    And we talked about how most every
22  study has limits and I assume Gomm is no
23  exception, right?
24   A.    Sure.
25   Q.    But not withstanding those limits,

Page 283

1  did you find Gomm to be a good study?
2    A.    I found out to be remarkable in the
3  sense that they sought excessive liver cancer.
4    Q.    Did you find the conclusions in this
5  study reliable?
6    A.    Yes, but it needs confirmation.
7    Q.    Gomm reached the same conclusion as
8  Pottegård.  In a national study, there was no
9  evidence of an increase in the overall risk of
10  cancer amongst valsartan users, correct?
11   A.    Overall, yeah.  But they did find a
12  risk -- an increased risk of liver cancer.
13   Q.    We'll talk about that in a minute.
14   In terms of the overall risk of
15  cancer, Gomm found no evidence of such an
16  increased risk; true?
17   A.    Correct.
18   Q.    The conclusion is Pottegård, correct?
19   A.    Yes.
20   Q.    So we have two national studies done
21  by two different groups of scientists, both
22  concluding that NDMA in valsartan did not lead to
23  an increased overall risk of cancer; true?
24   A.    Well, I think the follow up would
25  have to be much longer.  You know, these are

Page 284

1  both -- really, they're both preliminary studies.
2  The follow up would have to be longer and we would
3  need to know more about who actually took which
4  pills, which is not addressed here.
5        So, you know, these are -- I think
6  these are okay as preliminary studies, but I think
7  they're both preliminary.  We need -- we would
8  need a -- more of a follow up, for example, you
9  wouldn't really necessarily expect to see an
10  increase in liver cancer within three years.
11       And the same goes for the other
12  study.  I think the follow-up time is too short
13  and there are many -- there's many questions about
14  both of these studies.
15   Q.    All right.
16       Limitations aside, you would agree
17  with me we do have two nationwide studies which
18  both reported no increase in the overall risk of
19  cancer.
20       Agreed?
21   A.    Yes, but I wouldn't put the
22  limitations aside.  Limitations are there.  It's
23  obvious what they are.
24   Q.    In your report --
25   A.    I don't think you would expect an

Page 285

1  increased incidence of liver cancer within three
2  years.
3    Q.    In your report to this court where
4  you tried to honestly and objectively answer the
5  causation question, you never mentioned the
6  findings of either one of these studies, right?
7        MR. SLATER:  Objection.
8    A.    No, they're both in the report.
9    Q.    No, they're not.  We went through it.
10       You don't mention --
11       MR. SLATER:  Counselor, lower your
12  voice towards the witness and look at the
13  page because he just told you it's in the
14  report.  You obviously haven't read page 16.
15       You're not going to attack him
16  aggressively like this.  You're not going to
17  do it.  You're just not going to do it.
18   Q.    Sir, do you ever mention in your
19  report that Pottegård found no overall increased
20  risk of cancer?  Yes or no?
21       MR. SLATER:  Objection.
22       We went through this already.
23       You can answer again.
24   A.    Pottegård?  We already went through
25  this.  Pottegård did not find a significant

Page 286

1 increase.
2    Q.    Correct.
3        Am I correct --
4    A.    Did not find -- did not find a
5 significant increase.
6    Q.    Correct.
7        My question is did you ever mention
8 that in your report?
9        MR. SLATER:  Didn't we go through
10 that already --
11    A.    We already did that.  I already told
12 you that was an oversight.  It's unclear the way
13 it's written.  I already told you that.  I already
14 told you that.
15    Q.    Gomm found no --
16    A.    You know, none of us are perfect.
17 Sometimes we make mistakes.
18    Q.    I understand.
19    A.    Maybe even you do.
20        MR. SLATER:  Doctor, it's okay.
21    Q.    Gomm found no overall increased risk
22 of cancer.
23        Did you ever mention that fact in
24 your report?
25    A.    No.

Page 287

1        MR. SLATER:  Take your time, please.
2    A.    The Gomm paper found an increased
3 risk for liver cancer was identified, but no
4 association was identified for the overall risk of
5 cancer.  So yeah, it's in there.  It's in there.
6    Q.    All right.
7        You've talked about what Gomm
8 observed with respect to liver cancer.
9        Do you understand that valsartan is a
10 long-term-use medication?
11    A.    Yes.
12    Q.    Patients that are taking ARBs to
13 control hypertension don't use these medications
14 acutely, right?
15    A.    Right.
16    Q.    When they take valsartan or any ARB,
17 the patients tend to be on them for years,
18 correct?
19    A.    Yes.
20    Q.    In Gomm, when the authors adjusted
21 for long-term use, isn't it true that the data
22 could no longer find an association for liver
23 cancer?
24        MR. SLATER:  Objection.
25        You can answer.

Page 288

1    A.    I don't know.  I'd have to -- I have
2 to look at it again.  I'm sorry.
3    Q.    Sure.
4        If you have to study in front of you,
5 you might want to take a look at page 358.
6    A.    Yes.  No dose-dependent effect on the
7 risk of liver cancer was found for higher
8 exposure, bearing lag times of six month to two
9 years, also did not alter the effect.  Valuation
10 three year long-term use resulted in decreased
11 sample size and showed no significant association
12 with liver cancer.  So that was 1.22, but it was
13 not significant.
14        So yeah, that's what they found.  But
15 I mean I really think both of these studies are
16 somewhat flawed.  That's my opinion.  Because with
17 a low-dose dimethylnitrosamine in animals, it
18 takes time for the tumors to appear.  You wouldn't
19 get them in the same kind of time scale they're
20 talking about here.  Humans are far more
21 susceptible to liver cancer based on exposure to
22 dimethylnitrosamine than animals --
23    Q.    What's the --
24    A.    -- or the -- you know, the timeframe
25 I simply think is not long enough.  Even in

Page 289

1 tobacco and cancer, where you have a much stronger
2 carcinogen, the timeframe is minimum of 20 years.
3    Q.    And that's a minimum of 20 years from
4 exposure to the carcinogen to the development of
5 the tumor?
6    A.    Right.
7    Q.    So, you know, anyone suggesting that
8 they got a tumor from valsartan-containing
9 medication that developed in a year or 18 months,
10 that would be highly unlikely because the time
11 period is just too short?
12        MR. SLATER:  Objection.
13        You can answer.
14    A.    I don't know about anyone -- okay? --
15 because, you know, there could be predisposing
16 conditions.  It could be that the person had other
17 exposures.  So I wouldn't say anyone.  But in
18 general, you would expect that the timeframe would
19 be longer than three years.
20    Q.    You expect the timeframe to be more
21 along the lines of ten to 15 years at least,
22 right?
23    A.    That's what you would expect, but you
24 know, it could be that there's something about
25 NDMA that we don't really know about.

73 (Pages 286 - 289)

S. Hecht, Ph.D.

Page 290

1    Q.    It sounds like there's a lot we don't
2  know about NDMA.
3           MR. SLATER:  Objection.
4    A.    No, I wouldn't say that.  I wouldn't
5  say that at all.  We know a lot about NDMA.  We
6  know a lot about it.
7    Q.    Well, it sounds like you didn't hear
8  my question, so let me ask --
9           MR. SLATER:  It wasn't a question --
10   A.    There might be a co-factor involved
11 in these patients.  Maybe high blood pressure or
12 hypertension previously unrecognized that shortens
13 the waiting period.
14   Q.    Have you ever seen --
15   A.    No, we don't know.
16   Q.    Have you ever seen a study suggesting
17 that hypertension shortens the latency period for
18 tumor development?
19   A.    No, I haven't seen it.
20   Q.    So we were talking about Gomm and I
21 was on page 61 and Gomm provides a table regarding
22 the authors' evaluation of single cancer outcomes.
23        Do you see that?
24   A.    Yes.
25   Q.    And Gomm found no statistically

Page 291

1  significant association between bladder cancer and
2  NDMA in valsartan, right?
3    A.    No.  I don't see bladder cancer.
4  You're looking at table two?
5    Q.    No.  Table three on page --
6    A.    All right.  Sorry.  Yeah, right.
7  Right.  They didn't --
8    Q.    Let me ask the question, please.
9        Gomm found no statistically
10 significant association between bladder cancer and
11 NDMA in valsartan, correct?
12   A.    Yes, correct.
13   Q.    No statistically significant
14 association between breast cancer and NDMA in
15 valsartan, correct?
16   A.    Correct.
17   Q.    No statistically significant
18 association between colorectal cancer and NDMA in
19 valsartan, correct?
20   A.    Correct.
21   Q.    No statistically significant
22 association between kidney cancer and NDMA in
23 valsartan, correct?
24   A.    Correct.
25   Q.    No statistically significant

Page 292

1  association between lung cancer and NDMA in
2  valsartan, correct?
3    A.    That's correct.  But I wonder if
4  these were all nonsmokers.  I don't know if that's
5  the case.
6    Q.    No statistically significant
7  association between pancreatic cancer and NDMA in
8  valsartan, correct?
9    A.    Correct.  Well, malignant melanoma.
10   Q.    No statistically significant
11 association between prostate cancer and NDMA in
12 valsartan, correct?
13   A.    Correct.
14   Q.    No statistically significant
15 association between uterine cancer and NDMA in
16 valsartan?
17   A.    Right.
18   Q.    Do you agree that the metabolism of
19 NDMA and NDEA is the only mechanism by which these
20 substances could possibly cause a mutation?
21   A.    Yes.
22   Q.    So NDMA and NDEA could circulate in
23 the body and unless and until they become
24 metabolized, they'll just be excreted without
25 causing harm, right?

Page 293

1    A.    Say that again, please.
2    Q.    Absent -- what I was saying was until
3  NDMA and NDEA become metabolized, they would
4  simply be excreted from the body without causing
5  harm?
6    A.    That's true, but, in fact, you see
7  very little excretion of unchanged NDMA in the
8  urine.  When it's taken orally, it's metabolized
9  very effectively by the liver and other tissues.
10   Q.    Does most of the metabolism of the
11 NDMA occur in the liver?
12   A.    As far as we know, yes.
13   Q.    And at this point in time, would you
14 say that the scientific community has good data on
15 the metabolism of NDMA and NDEA in the human body?
16   A.    Yes.
17   Q.    Do you agree then that the primary
18 metabolism of NDMA and NDEA takes place through
19 the cytochrome P450 enzyme?
20   A.    Yes.
21   Q.    And that's in the liver.  That's
22 where that enzyme is primarily located, right?
23   A.    No.  They're in other tissues also.
24   Q.    It's not in every organ system of the
25 body, is it?

74 (Pages 290 - 293)

S. Hecht, Ph.D.

Page 294

1    A.    Just about.

2    Q.    Just the enzyme?

3    A.    Yes.  There are different forms in
4 different tissues.  Not just in the liver.  The
5 lung, kidney, small intestine, esophagus, oral
6 cavity.  They all have P450 enzymes.  The liver,
7 of course, is the main metabolizing organ in the
8 body and has a higher P450 content than other
9 tissues, but all tissues have P450s.  Different
10 ones.  There are whole books written on it.

11    Q.    Okay.  I'll take your word for it.

12        Does the scientific community at this
13 point in time have a great deal of valid reliable
14 data about the type of DNA damage caused by NDMA
15 and NDEA?

16    A.    Yes.

17    Q.    Have you ever stated that there are
18 ways to look at a DNA adduct formation and how
19 much damage comes from nitrosamine exposure but
20 right now, in 2021, we don't have that type of
21 data?

22    A.    I'm not sure I understand your
23 question.

24    Q.    My question is simply have you ever
25 made the statement that "We do not have the data

Page 295

1 in 2021 to evaluate the type of DNA damage caused
2 by nitrosamines"?

3    A.    I don't think I ever made that
4 statement, no.  We have a lot of data.  We have a
5 huge amount of data.

6    Q.    Who is Joseph Guttenplan,
7 G-U-T-T-E-N-P-L-A-N?

8    A.    Guttenplan.

9    Q.    Sorry for the mispronunciation.

10        Who is Joseph Guttenplan?

11    A.    He's a scientist at New York
12 University.

13    Q.    Is he an expert in the field of
14 chemical drug and genetic drug toxicology?

15    A.    Yes.

16    Q.    Was Dr. Guttenplan part of the FDA
17 workshop that took place in March?

18    A.    Yes, he was there.

19    Q.    During that workshop was one of the
20 issues that was discussed the body's DNA repair
21 mechanisms?

22    A.    Yes.

23    Q.    In that workshop, was it discussed
24 among the experts and agreed that the small
25 amounts of nitrosamines in medication were sub

Page 296

1 threshold with respect to the body's DNA repair
2 abilities?

3    A.    May have been discussed, but I don't
4 recall that that conclusion was made.

5    Q.    Did Dr. Guttenplan observe that the
6 nitrosamine levels in medicines were so low that
7 they were not approaching threshold for enzyme
8 saturation?  Do you remember that comment or
9 observation being made?

10    A.    For which enzyme?  Repair enzymes,
11 you mean?

12    Q.    Yes, sir.

13    A.    I don't follow what you mean.

14    Q.    My question was did Dr. Guttenplan
15 state at the FDA workshop that the levels of
16 nitrosamines in medicines were so low that they
17 were not approaching thresholds for enzyme
18 saturation in the body?

19    A.    You're still not clear.  First, you
20 were talking about DNA repair enzymes and then
21 you're talking about nitrosamine metabolizing
22 enzymes, so I'm not sure which ones you're
23 actually referring to.

24    Q.    When Dr. Guttenplan used the term
25 "sub threshold," what did you understand that to

Page 297

1 mean?

2    A.    I believe -- I believe he's talking
3 about with respect to the nitrosamine-metabolizing
4 enzyme, like 452E1 and others that are in the
5 body, that those enzymes are not saturated by the
6 kind of exposure that you would get from
7 valsartan.

8    Q.    When those enzymes are not saturated,
9 what that means is that our body has the ability
10 to deal with those small levels of carcinogens,
11 correct?

12    A.    Deal with them, yes.  In dealing with
13 them, it creates a DNA damaging agent.  That
14 metabolism is absolutely required for NDMA to
15 cause liver cancer.

16    Q.    Who is Dr. Richard Adamson?

17    A.    He's a consultant now.  He's a former
18 director of the Division of Cancer Etiology at the
19 National Cancer Institute, which is the US -- main
20 US governing body that does research on cancer.

21    Q.    Was Dr. Adamson also at the workshop
22 in March?

23    A.    Yes.

24    Q.    Do you recall Dr. Adamson also
25 discussing the issue of the body's DNA repair

75 (Pages 294 - 297)

S. Hecht, Ph.D.

Page 298

1 mechanisms and whether low levels of NDMA or NDEA
2 in drug products was expected to present a
3 significant risk of harm to the patient
4 population?
5     A.    I don't recall his exact comments,
6 but he's certainly an expert.  He has done studies
7 exposing primates to NDEA.
8     Q.    Isn't it true that Dr. Adamson stated
9 that the low levels of nitrosamines in the drugs
10 were so low that he would not expect any long-term
11 risk of patient health since there was no
12 saturation or competition for activation of the
13 body's repair enzymes at those levels?
14     A.    Are you quoting?
15     Q.    I'm asking if that's what you heard
16 him say.
17     A.    I don't remember if that's what I
18 heard him say.  I'm asking you whether you're
19 quoting from the transcript.  In that case, it's
20 true.
21     Q.    So is that statement correct, that
22 low levels of exposure to nitrosamines would not
23 be expected to cause long-term harm to the patient
24 population because those levels would not be
25 expected to saturate or compete for activation of

Page 299

1 the body's repair enzymes?
2         MR. SLATER:  Objection.
3         Lack of foundation.  Multiple --
4     A.    It's totally confusing, what you're
5 saying.  Okay?  The low levels would be very
6 effectively metabolized by the P450s in the liver
7 and other tissues of the body, leading to the
8 formation of highly reactive DNA damaging
9 intermediates that cause mutations in DNA.  Some
10 of those may be repaired by a repair enzyme such
11 as MGMT and I think what you're saying is that the
12 MGMT activity would not be saturated.  I think
13 that's what you're referring to, but the way
14 you're saying is it very confusing.  Really
15 muddies the water.
16         The bottom line is that your body
17 definitely has the ability to convert the NDMA in
18 valsartan to a DNA methylating agent that's going
19 to form O6-methylguanine.  I can tell you with
20 100% certainty that a person who takes a tablet of
21 valsartan that's contaminated with
22 dimethylnitrosamine will form a finite amount of
23 O6-methylguanine in their DNA.  Some of that may
24 be repaired.  Some of it may lead to mutations.
25     Q.    My question was at the FDA workshop

Page 300

1 in March, was it the conclusion of the scholars
2 that were impaneled by FDA that the levels in this
3 case were so low that there was not expected to be
4 a significant risk to public health because the
5 body's repair mechanisms would allow for or
6 prevent the development of mutations?
7     A.    Yes, that was the conclusion.
8     Q.    I guess --
9         MR. SLATER:  Objection.
10     A.    What?
11     Q.    I guess then what I'd like to ask you
12 is this --
13     A.    Are you quoting?  I mean, were you
14 quoting from the report?
15         MR. SLATER:  Doctor, if you want to
16     see the transcripts, you could ask him to
17     show it to you.
18     Q.    I'm just asking you a question.
19     A.    I'm just asking you whether you're
20 quoting from the report or not.
21     Q.    I asked you if that was a conclusion
22 of the panelists.
23     A.    I don't remember.  I mean, you have
24 the report right in front of you, so why don't you
25 tell me?

Page 301

1     Q.    We know that you've done research on
2 NNN and NNK in your career and we know that both
3 of those are known Class 1 carcinogens in tobacco,
4 right?
5     A.    Correct.
6     Q.    We know that tobacco also is laced
7 with other carcinogens, not just those two tobacco
8 nitrosamines, right?
9     A.    Tobacco smoked, yes.  Unburnt tobacco
10 is another story.
11     Q.    I've been led to believe -- and I
12 don't know whether it's true or not -- is that
13 tobacco contained over 70 carcinogens.
14         Is that the case?
15     A.    Tobacco smoke, yes.
16     Q.    I think that you have written that
17 cigarette smoking causes up to 90% of all the lung
18 cancers in the world and is the largest cause of
19 cancer death in the world, yet only ten to 20% of
20 lifetime smokers will get lung cancer?
21     A.    Correct.  It's no longer the largest
22 cause of cancer in women in the world.  That's
23 breast cancer.  But everything else you said is
24 correct.
25     Q.    All right.

76 (Pages 298 - 301)

S. Hecht, Ph.D.

Page 302

1    We talked earlier about the Gushgari
2 paper that told us that the estimate is that
3 smoking leads to the injection of 25,000 nanograms
4 of nitrosamines per day.
5    Do you remember that?
6 A.    Yes.
7 Q.    And I assume that doesn't need --
8 that's not even taking into account then the other
9 carcinogens contained in tobacco smoke, right?
10 A.    Correct.
11 Q.    So if only ten to 20% of individuals
12 exposed to 25,000 nanograms a day of nitrosamines
13 plus other carcinogens acquire lung cancer after a
14 lifetime of smoking, do you have any estimate or
15 are you capable of providing an estimate as to the
16 percentage of valsartan users that you would
17 expect to develop cancer from a less-than-lifetime
18 exposure to nitrosamines?
19 A.    I'm not capable of making that
20 calculation, but presumably the risk would be less
21 than from smoking.
22 Q.    Do you know what the --
23 A.    I cannot make that calculation.
24 Q.    Okay.  Fair enough.
25    Do you know what the background rate

Page 303

1 of cancer in the US population is?
2 A.    What do you mean by background rate?
3 Q.    How many people will get cancer in
4 one form or another in their lifetime?
5 A.    Yes.  I know that number, but I'm
6 afraid I can't quote it off the top of my head.
7 But that number is certainly available.
8 Q.    Okay.
9    Do you know what the background rate
10 of cancer among Americans over the age of 50 who
11 suffer from hypertension might be?
12 A.    Not offhand.
13 Q.    Are you able --
14 A.    I don't know what you mean by
15 background.
16 Q.    Maybe --
17 A.    What does background mean?
18 Q.    Maybe it's just my poor language.
19    I'm just trying to tell, you know,
20 how many -- what percentage of Americans over the
21 age of 50 who have hypertension will develop
22 cancer?
23 A.    I can't answer that offhand.  It's
24 definitely available.
25 Q.    I'm only asking --

Page 304

1 A.    Definitely available.
2 Q.    I understand.  I'm only asking --
3 A.    I can't keep all those figures in my
4 brain.
5 Q.    I'm just asking what you know.  If
6 you don't know, just tell me you don't know.
7    Do you intend to present this court
8 with any statistical or epidemiological evidence
9 to say that there will be a statistically
10 significant increased rate of cancer above the
11 background rate simply because of a
12 less-than-lifetime increase in the intake of NDMA
13 when all of the individual plaintiffs have already
14 been exposed to nitrosamines exogenously every day
15 of their life?
16    MR. SLATER:  Objection.
17    You can answer.
18 A.    First of all, your question doesn't
19 make a lot of sense the way --
20 Q.    Well, which part doesn't --
21 A.    The way that all the people have been
22 exposed to nitrosamines every day of their life.
23 That's incredibly nonquantitative.  I mean, I
24 could never agree with a statement like that.
25    In any case, I'm not intending to

Page 305

1 make any numerical estimates because that's not
2 what I do.  That's for the risk assessors to do.
3 Q.    That's fine.  This is what I'm just
4 trying to find out.  Let's just assume
5 hypothetically that those readily-available
6 statistics you talk about tell us that 30% of
7 people over the age of 50 who have hypertension
8 will develop cancer in one form or another.
9    Okay?
10 A.    Okay.
11 Q.    And you just accept that number --
12 A.    Okay.
13 Q.    -- for the purpose of my question.
14 A.    Right.
15 Q.    What I'm trying to figure out is are
16 you going to offer an opinion that that population
17 subgroup is at statistical increased risk of
18 cancer just because they received a
19 less-than-lifetime increase in the intake of NDEA
20 or NDMA for some period of time?
21 A.    Yes.  I would be comfortable with
22 offering an opinion, but not necessarily making a
23 calculation.
24 Q.    Well, that was my question.
25    What is the -- what is that increased

77 (Pages 302 - 305)

S. Hecht, Ph.D.

Page 306

1 risk? Can you calculate it or estimate it?
2    A.    No, I can't.  I can't do that.
3 That's not what I do.
4    Q.    That would be the same thing for -- I
5 think I --
6    A.    For both.
7    Q.    That would be the case for both
8 NDMA and NDEA --
9    A.    That's for the risk assessor to do.
10 Like EMA and any others.
11        MR. TRISCHLER:  I think I'm ready to
12 pass the witness.
13        I think the information that I
14 received, Adam, is that there are others who
15 have -- a few others that have questions,
16 maybe one or two on the side, but I'll let
17 them speak for themselves and I don't know if
18 that's been updated since I finished.  So --
19 but I think --
20        MR. SLATER:  Whoever it is needs to
21 identify themselves and I'm going to object
22 to and expect that there will not be any
23 questioning that's going to go into the areas
24 that Mr. Trischler covered.
25        It's hard for me to imagine there is

Page 307

1 anything new to ask, but please don't come in
2 and make me start objecting and have a back
3 and forth.  I would appreciate that because
4 it's been a long day and I have some
5 questions to follow up on from Mr.
6 Trischler's lengthy questioning.
7        MR. FOWLER:  Good afternoon,
8 Dr. Hecht.  It's Steven Fowler with Greenberg
9 Traurig.
10        I believe the remaining defendants
11 have an hour and a half or so of questions.
12 I've got quite a bit of questions.  I assure
13 you it's not my intent to ask any questions
14 that Dr. Hecht has answered, but I do have
15 questions and I'm just -- in fairness, I
16 think it's about an hour and a half or so --
17        MR. SLATER:  Go ahead.  Start your
18 questioning.  I've heard that before.
19        Let's get going and we'll go question
20 by question and see if it's new questions
21 because it's impossible for me to imagine --
22 unless you guys are just going to walk the
23 dog and come up with things to ask about that
24 are hyper specific to a specific manufacturer
25 just to ask questions, I feel like this has

Page 308

1 been a thorough deposition and we should be
2 able to turn it over to me soon.
3        So go ahead.  Start asking your
4 questions, please.
5        MR. FOWLER:  I will and I'll
6 appreciate if you simply just object to
7 form and --
8        MR. SLATER:  I don't need a
9 coaching --
10        MR. FOWLER:  -- launching into the
11 diatribes I've been hearing all day, so just
12 object to form and I'll ask my questions.
13        MR. SLATER:  Okay.  Now that you
14 you're done talking I'll respond.
15        Please don't coach me.  Please don't
16 tell me what to do --
17        MR. FOWLER:  Same here.
18        MR. SLATER:  -- but please realize
19 that duplicative questions, you'll need to
20 move from question to question.
21        You may proceed.
22        MR. FOWLER:  What I'd like to do
23 first -- good afternoon, Dr. Hecht.  My name
24 is Steve Fowler on behalf of the Teva
25 defendants.

Page 309

1        What I'd like to do first is actually
2 mark as the next exhibit your Notice of
3 Deposition today.  I don't think that that's
4 been marked.
5        Can we get that marked --
6        MR. SLATER:  You're going to need to
7 do that yourself, sir.  You're going to
8 have to have someone put it up.
9        MR. FOWLER:  Adam, I'm not talking to
10 you.
11        Steve, are you able to share the
12 screen?  We have three Steves on the line.
13        THE VIDEOGRAPHER:  Do you have
14 somebody else who is going to be displaying?
15        MR. FOWLER:  The exhibit was just
16 introduced and it can be displayed by the
17 concierge as I understand.
18        THE VIDEOGRAPHER:  As far as the
19 record, it will be Exhibit 23.
20        (Whereupon, Exhibit 23 was marked for
21 identification.)
22        MR. FOWLER:  Is it going to be
23 displayed or am I going to --
24        MR. SLATER:  It's on the screen.
25

78 (Pages 306 - 309)

S. Hecht, Ph.D.

Page 310

1 EXAMINATION BY
2 MR. FOWLER:
3    Q.    Doctor, have you seen this document
4 before?
5    A.    No.
6    Q.    I would submit this is the notice for
7 you today and if we can go to page three of the
8 notice, you'll see that we've asked for certain
9 items to be brought with you and that would
10 include any sort of files or records that you have
11 with regard to this subject matter.
12        And Dr. Hecht, I heard today you've
13 spent much of your career on nitrosamines and my
14 question to you is do you have a file that you've
15 maintained on nitrosamines and the risk of
16 carcinogenicity?
17    A.    A file on risk of carcinogenicity in
18 humans?  In animals?
19    Q.    Let me break it down.
20        Do you have a file on nitrosamines,
21 Doctor?
22    A.    A file?  Everything is summarized in
23 my publications.  I mean, I do not have all of the
24 original records from the research that we've
25 done.  I have files and --

Page 311

1    Q.    Do you maintain any -- setting aside
2 this litigation, Doctor, do you maintain a file on
3 nitrosamine as being an area of your research
4 we've heard about today?
5    A.    Yes, I do.  Yes.
6    Q.    And do you maintain that with paper
7 copies of journal articles you may have printed
8 over the years?
9    A.    Yes.  I have several file cabinets,
10 but, you know, in the last, I don't know, eight
11 years or so, everything is online.
12    Q.    Is your file on nitrosamines
13 organized at all by particular nitrosamines such
14 as NDMA or NDEA?
15    A.    No.
16    Q.    When you were asked to participate in
17 the FDA panel, did you undertake any preparation
18 for that panel?  Did you undertake any research
19 before you appeared?
20    A.    No.
21    Q.    With you today, Doctor, do you have
22 any -- let me ask you this:  I've seen you pick up
23 the red book a couple times.
24        What else do you have in your space
25 there at your office?  Can you hold it up?  Do you

Page 312

1 have binders?  What do you have, sir?
2    A.    In my office?
3        MR. SLATER:  Dr. Hecht, one second.
4        This was covered extensively earlier.
5        MR. FOWLER:  It wasn't.  I've seen
6    him picking up things and looking at things.
7    I just want to know what else he's got.
8        THE WITNESS:  You want me to answer
9    him?
10        MR. SLATER:  Yeah, go ahead, answer
11    him.
12        We're moving quickly towards
13    concluding his questioning if this is --
14    A.    I have binders that have the
15 publications and the other data that was mentioned
16 in the written document and I have some of my
17 books that I refer to, including, you know, the
18 IARC 1978 valuation.  I have all of the IARC
19 monographs up until about year 2000 or maybe a
20 little later.  They're not all here in my office
21 anyhow.
22    Q.    Thank you, sir.
23    A.    Does that answer your question?
24    Q.    I believe so, sir.  Thank you.
25        Doctor, when evaluating the issue

Page 313

1 before you, which I think we've acknowledged is
2 whether the level of NDMA and NDEA found in the
3 valsartan products increases the risk of
4 carcinogenicity, did you apply a specific level
5 of -- let's start with NDMA -- in your analysis as
6 it pertains to the valsartan products?
7        MR. SLATER:  Objection.
8        You can answer.
9    A.    No.  I mean, I did not do a risk
10 assessment.
11    Q.    Am I correct you were --
12    A.    That was done by others.
13    Q.    You were attempting to evaluate
14 whether or not the levels of NDMA and NDEA in the
15 valsartan tablets poses an increased risk.  Wasn't
16 that what the question you were answering?  I
17 thought we heard that earlier.
18        MR. SLATER:  Objection.
19        Asked and answered.
20        You can answer.
21    A.    I don't know what you mean by
22 increased risk.  Sure, there's an increase in
23 risk.  No doubt about it.  It shouldn't be there.
24 The amount should be zero, but I didn't -- I did
25 not do the formal risk assessment.  Those were

79 (Pages 310 - 313)

S. Hecht, Ph.D.

1 done by FDA and EMA, among others.

2    Q.    What level --

3    A.    And I don't do it.  That's not what I

4 do.

5    Q.    I understand, Doctor.

6          What level of NDMA are you operating

7 from when evaluating the valsartan?

8    A.    Zero.

9    Q.    Doctor, you understand FDA has

10 found --

11   A.    It should be zero.

12   Q.    Doctor, that's a liability --

13   A.    It should be zero.

14   Q.    This can take a while.

15   A.    The amounts that have been found in

16 the API from ZHP ranged from about ten to 120

17 parts per million, I believe.

18   Q.    Do you believe that the levels in the

19 API is the same as the levels of NDMA in finished

20 dose valsartan products?

21   A.    No.  No.  It would be -- it would be

22 higher than the API for finished products.

23   Q.    Right.

24          So we're only here today about the

25 finished dose products that plaintiffs allegedly

1 consumed and my question is simply this --

2          MR. SLATER:  You know what, counsel?

3 Before you ask a question, we're taking a

4 break.

5          MR. FOWLER:  Don't talk over me.

6          MR. SLATER:  We're taking a break.

7 We've been going over an hour again.  It's

8 5:30 on the east coast, it's 4:30 -- the

9 doctor has been going for now

10 eight-and-a-half hours, so we're going to

11 take a break.

12          MR. FOWLER:  I was in the middle of a

13 question --

14          MR. SLATER:  I stopped you before you

15 asked it, you talked over me.  We're going to

16 take a break for ten minutes.

17          MR. FOWLER:  Okay.

18          Thank you, Doctor.  We will take a

19 break.

20          THE VIDEOGRAPHER:  Time is 5:34.

21 This concludes media five.

22          (Recess taken)

23          THE VIDEOGRAPHER:  The time is now

24 5:49.

25          This begins media six.

1          You may proceed.

2    Q.    Doctor, what I was trying to get at

3 earlier is simply this question:  Do you think and

4 agree that it's reasonable for those scientists

5 who are evaluating the risk, if any, from the

6 levels of NDMA and NDEA in the valsartan to use

7 the geometric mean value of all of the levels FDA

8 measured in a particular dose of valsartan?

9          MR. SLATER:  Objection.

10          I don't understand.

11          THE WITNESS:  Do you want me to

12 answer that now?

13          MR. SLATER:  If you can --

14   A.    Were you going to reply to his

15 objection first?

16   Q.    I have no reason to.

17          Go ahead, Doctor, if you do

18 understand the question.

19   A.    Could you repeat it again please?

20   Q.    Yes, sir.

21          Do you agree it makes sense to take

22 an average number, a geometric mean of all of the

23 various manufacturers levels of NDMA measured by

24 FDA in, let's say, the 320 milligram dose of

25 valsartan when evaluating what, if any, risk

1 exists from that level of NDMA?

2          Do you understand that?

3    A.    Yeah.  You want to take the geometric

4 mean from all of the manufacturers.  I'm not sure

5 that really makes sense because the different

6 manufacturers may have different amounts.

7    Q.    For example, you would not expect any

8 single patient to have taken the highest level of

9 NDMA detected in the 320 milligram valsartan for

10 the period at issue, would you?

11          MR. SLATER:  Objection.

12   A.    I wouldn't know.  I have no idea.

13   Q.    So do you think it's unreasonable to

14 take an average number of all of the manufacturers

15 of the affected valsartan when evaluating the

16 risk?

17          MR. SLATER:  Objection.

18          You can answer again.

19   A.    I really don't know.  I mean, an

20 average would be the place to start, I suppose.

21   Q.    Okay.

22   A.    You know, one would have to be

23 mindful also of the high doses because the high

24 doses are where you more likely see an effect.  So

25 it might make sense to evaluate the high doses

S. Hecht, Ph.D.

Page 318

1 first, you know, above, let's say, the 80th
2 percentile, something like that. And you know, if
3 you didn't find an effect there, then you could
4 probably safely conclude that there would be no
5 effect to the lower doses.
6        So I'm not sure that the geometric
7 mean is necessarily the way to go about this. As
8 I mentioned, I'm not the risk assessor, so you
9 really -- you're bringing me into an area that's
10 not my area of expertise.
11   Q.   Yes, sir, thank you.
12        And it follows from that that you
13 made no attempt to evaluate the specific level of
14 NDMA from any of the manufacturers' valsartan
15 tablets that FDA measured. You didn't use
16 any of those specific levels in forming the
17 opinions we see in your report; is that correct?
18        MR. SLATER: Objection.
19   A.   I didn't do calculations, no.
20   Q.   You didn't rely on any of the
21 specific numbers that FDA measured in any of the
22 valsartan in forming the opinions contained in
23 your report, correct?
24        MR. SLATER: Objection.
25        Lack of foundation.

Page 319

1        You can answer.
2   A.   Come back to it again. I mean, I
3 didn't do a formal risk assessment. That's not
4 what I do. So --
5   Q.   I understand, Doctor.
6   A.   -- I don't really know what you're
7 driving at with this question. I already told you
8 I don't do these calculations. EMA did
9 calculations, FDA did calculations. Their results
10 are, I think, all documented.
11   Q.   In your research --
12   A.   I don't really see what you're
13 asking -- why you're asking me. I mean, ask the
14 person at EMA who did the calculations.
15   Q.   Thank you, Doctor.
16        When you've done your research on
17 other nitrosamines and in tobacco, like the NNN
18 and NNK, do you ever evaluate the level of NNN or
19 NNK in writing your papers or forming your
20 conclusions on those studies?
21   A.   Yes, we do.
22   Q.   The levels are important, correct?
23   A.   Yes, they are.
24   Q.   I think we started the day with dose
25 and duration are a key to any evaluation.

Page 320

1        Do you agree with that?
2   A.   Yes.
3   Q.   Doctor, forgive me, I'm going to --
4 in an effort to be efficient, I'm going to jump
5 around a little bit, so forgive me if they're
6 disjointed and if you don't follow me, please let
7 me know.
8        Exhibit 1 is your report. If you
9 could please -- I'll direct your attention to page
10 eight.
11   A.   Okay.
12   Q.   The last full paragraph that begins
13 "The pharmacokinetics ..." -- are you with me,
14 sir?
15   A.   Yes.
16   Q.   You state in the third line
17 "Consistently, these studies have demonstrated
18 high systemic clearance and high oral
19 bioavailability of NDMA."
20        Do you see that?
21   A.   Yes.
22   Q.   The support for that statement is
23 contained in part of that Dr. Gombar beagle study
24 that we looked at; is that correct?
25   A.   Yeah.

Page 321

1   Q.   And if we could please look again at
2 Exhibit -- at Exhibit 8, the beagle study --
3        THE VIDEOGRAPHER: Would you like
4 that up on the screen, Counsel?
5        MR. FOWLER: Just pause on that.
6        I may be able to move quicker.
7   Q.   Doctor, let me ask you do you have
8 any understanding of the -- any differences
9 between the metabolism of the capacity of a beagle
10 to metabolize NDMA with the CYP2E1 enzyme compared
11 to humans? Do you have any understanding of that?
12   A.   I don't know if 2E1 has actually been
13 identified in beagles. I'm not sure of that.
14   Q.   If beagles --
15   A.   I think Gombar's conclusions were
16 actually a little bit different. I think, if I
17 remember correctly, the beagle studies came to a
18 slightly different conclusion regarding the
19 clearance of NDMA by the liver than the other
20 studies.
21   Q.   Doctor, if a beagle only has a
22 quarter of the metabolic capacity for NDMA as
23 compared to a human, would you agree that dogs
24 would have less capacity to clear any oral dose of
25 NDMA?

81 (Pages 318 - 321)

S. Hecht, Ph.D.

Page 322

1    A.    Sure.  I mean, if they have less --
2 if they have -- if they have less of the P450
3 metabolizing enzymes in their liver and other
4 tissue than humans, then they would have less
5 capacity to clear the dose of the metabolism.
6    Q.    Do you recall the manner of exposure
7 in that beagle study?  Do you recall whether it
8 was by IV?
9    A.    I think it was IV.
10    Q.    And you agree, Doctor, with regard to
11 metabolism, the route of exposure is essential to
12 understanding the route of metabolism, correct?
13    A.    Right.
14    Q.    And the route of exposure makes a
15 difference in the route of metabolism; true?
16    A.    It can effect it, sure.
17    Q.    So the metabolism that you would
18 expect from an IV or an IP administration of a
19 compound like NDMA, you would expect that to show
20 different results than through an ingestion of an
21 oral tablet containing some level of NDMA,
22 correct?
23    A.    Possibly.
24    Q.    That's a medical fact, isn't it,
25 Doctor, that if it's injected IP, it's not going

Page 323

1 to enter the liver through the mesentery vessels,
2 is it?
3    A.    Well, the distribution will be
4 different, but ultimately, it'll be metabolized.
5    Q.    Would it be metabolized -- it would
6 reach organs that orally ingested via a tablet
7 would never reach, correct, Doctor?
8    A.    I don't know about never, but ...
9    Q.    Okay.
10        Are you intending to offer an opinion
11 as kind of set forth on Exhibit 8 that in humans
12 that NDMA has a high systemic clearance and high
13 oral bioavailability?
14    A.    That's what the literature indicates.
15    Q.    Is there any literature other than
16 the Gombar articles on pharmacokinetics that
17 you're relying on, sir?
18    A.    It's been done in multiple different
19 species pharmacokinetic studies.  There's a lot of
20 them.  There's a lot of data --
21    Q.    Yes, sir.
22    A.    -- as stated in the report.
23    Q.    There was a third article in the
24 Gombar series of pharmacokinetic testing that you
25 had in your materials.

Page 324

1        Correct, Dr. Hecht?
2    A.    Say it again.
3    Q.    There's a third article in Dr.
4 Gombar's series, if you will, on the
5 pharmacokinetics of N-nitrosodimethylamine.
6        Right?
7    A.    Okay.
8        MR. FOWLER:  I'd like to mark the
9 next exhibit.
10        This is the Gombar article, 1990,
11 "Interspecies scaling of pharmacokinetics of
12 then nitrosodimethylamine."
13        Bear with me, Doctor.
14        That should pop up.
15        THE VIDEOGRAPHER:  I'm looking for
16 it.  You didn't upload it by any chance, did
17 you?
18        MR. FOWLER:  I just uploaded it as
19 Exhibit 24.
20        THE VIDEOGRAPHER:  Excellent.  Give
21 me one moment to download it.  I'm not seeing
22 it on our Novak share file.
23        Did you put it on the Veritext
24 Exhibit Share by any chance?
25        MR. FOWLER:  Yes.

Page 325

1        (Whereupon, Exhibit 24 was marked for
2    identification.)
3    Q.    Doctor, do you happen to have a hard
4 copy of this in your materials?
5    A.    No.
6    Q.    We'll do it on the screen.  That's
7 fine, sir.  Okay.  Thank you.
8        If we can please turn to the third
9 page where it begins the discussion -- it's
10 article page 4368.  There you go.
11        The very first sentence of that
12 discussion, sir, states "The role that the
13 pharmacokinetics of a carcinogen plays its impact,
14 both qualitatively, i.e. target organ, and
15 quantitively, i.e. risk assessment, has not been
16 adequately determined for most compounds assumed
17 or suspected to be human carcinogens."
18        Did I read that correctly there,
19 Doctor?
20    A.    Yes.
21    Q.    Do you agree that for NDMA and NDEA
22 there has been sufficient study done to adequately
23 understand the metabolism of those two
24 nitrosamines?
25    A.    There's pretty extensive data, yes.

82 (Pages 322 - 325)

S. Hecht, Ph.D.

Page 326

1    Q.    Yes, sir.
2    A.    I agree that it's pretty well
3 understood.
4    Q.    Okay.
5    A.    There's always questions remaining.
6    Q.    You'll see at the bottom of that that
7 it says "The root of administration can alter the
8 organospecificity as can" -- and it flips to the
9 next page -- "as can manipulation of the clearance
10 with inducers or inhibitors of metabolism."
11       Do you see that, sir?
12    A.    Yes.
13    Q.    So do you agree with that, that the
14 route of administration can affect the
15 organospecificity of where perhaps NDMA may land?
16    A.    I agree with it, but if I'm not
17 mistaken, most studies of NDMA in animals
18 carcinogenicity studies independent of the root of
19 administration show mainly liver cancer.
20    Q.    Doctor, did you evaluate the animal
21 studies with an eye towards the route of
22 administration to assess those which best can be
23 analogized to the oral administration through a
24 tablet? Did you make that --
25    A.    No, not specifically, but I know

Page 327

1 generally in the literature that the main target
2 tissue of NDMA in animals -- laboratory animals --
3 is the liver and it's not all by oral
4 administration.
5    Q.    Doctor, if I use the term "downstream
6 organs" --
7    A.    But there are exceptions.
8    Q.    Thank you. I'm sorry. I didn't mean
9 to step on your response.
10       If I use the term "downstream organs
11 to deliver," do you understand what I mean?
12    A.    Yes.
13    Q.    Okay.
14       Are you aware of any study that was
15 performed on animals using oral ingestion via a
16 tablet -- not drinking water -- via oral ingestion
17 that demonstrated any cancers outside the liver in
18 any oral ingestion studies?
19    A.    Of a tablet?
20    Q.    Or they have -- and I can't remember
21 the name of the tool where they just put it right
22 down the gullet, but not drinking water is my
23 point, Doctor.
24    A.    Yes. Oral intubation.
25    Q.    Thank you, sir.

Page 328

1       Are you aware of any study that
2 demonstrates at low doses that NDMA has caused any
3 downstream cancer from the liver?
4       MR. SLATER: Objection.
5       You can answer.
6    A.    Sure. It causes kidney cancer when
7 the doses exceed a certain level that aren't
8 metabolized by the liver when it's given orally,
9 the doses are too high -- or not too high -- but
10 higher doses will get kidney cancer.
11    Q.    Yes, Doctor.
12       Do you agree that NDMA and NDEA are
13 subject to first pass metabolism?
14    A.    Yes.
15    Q.    Have you made any attempt to
16 determine what the saturation level is for the
17 liver's capacity to handle first pass metabolism
18 NDMA?
19       Do you understand that question?
20    A.    In what species?
21    Q.    Human, sir.
22    A.    Have I made any attempt? No.
23    Q.    Have you made any attempt using any
24 of the animal data to understand at what level the
25 liver's ability to fully metabolize and excrete

Page 329

1 the NDMA is exceeded?
2    A.    That data is in the literature.
3 There's plenty of data on that --
4    Q.    Did you make any --
5    A.    -- from the pharmacokinetic studies
6 and even from the early studies of Magee and Swan
7 that when the metabolic capacity of the liver is
8 exceeded in an oral dose, then kidney tumors start
9 to appear and there's plenty of data on that. Not
10 only tumors, but DNA adduct studies and metabolism
11 studies. There's a lot of data regarding the
12 first pass clearance of NDMA given orally, a lot
13 of data. We understand that really very well.
14    Q.    So it follows, Doctor, that you would
15 understand and agree with the point that NDMA will
16 not escape the liver unless the level is at such a
17 point that it exceeds the liver's capacity to
18 metabolize it, correct?
19    A.    That's what the -- that's what all
20 the data indicates. That's correct.
21    Q.    I'm also correct that sitting here
22 today, you are offering no opinion as to what that
23 level of NDMA is, correct?
24    A.    In humans?
25    Q.    Sir, yes.

83 (Pages 326 - 329)

S. Hecht, Ph.D.

Page 330

1    A.    I'm not.
2    Q.    In particular, in this case, you're
3 not offering an opinion that the levels of NDMA
4 and NDEA that were detected in the valsartan at
5 issue were such that they would exceed the
6 metabolic capacity of the liver, correct, sir?
7    A.    I doubt that they would.  I believe
8 that they would be metabolized in the liver.
9 That's why it was interesting to see that the
10 study from Germany, the insurance study, showed
11 liver cancer.  But we already discussed that.
12    Q.    And I didn't ask that part of the
13 question, sir.
14    A.    No, you did not.
15    Q.    Thank you.
16        Doctor, do you agree that once NDMA
17 is metabolized by the -- the PY450E1 enzyme that
18 that metabolite is very reactive?
19        Do you agree with that statement?
20    A.    One of them is, the methane
21 diazohydroxide that everybody concentrates on
22 because that's what damages DNA, but there's
23 another metabolite that's formed and it's
24 formaldehyde, which is also a carcinogen --
25    Q.    Yes, sir, and --

Page 331

1    A.    -- and paid much less attention to.
2    Q.    I'm sorry.
3    A.    Much less attention has been paid to
4 the formaldehyde which cannot only damage DNA, but
5 can cross link DNA.
6    Q.    Yes, sir.
7        You are aware, of course, that
8 formaldehyde is endogenously produced, correct?
9    A.    Yes.
10    Q.    It would be impossible for you or any
11 other scientist to distinguish between
12 endogenously-induced formaldehyde DNA damage from
13 formaldehyde DNA damage as a result of NDMA
14 metabolism, correct?
15    A.    No.  Incorrect.
16    Q.    You can spot the difference between
17 an endogenous formaldehyde and an NDMA
18 formaldehyde, sir?
19    A.    Yes.
20    Q.    And how do you do that?
21    A.    Well, I would have to have a label in
22 the NDMA that people took into their bodies and
23 then the formaldehyde that's released would be
24 labeled and I could determine how much came from
25 NDMA.

Page 332

1    Q.    To your knowledge, has that study
2 been done?
3    A.    No.
4    Q.    Based on --
5    A.    In humans, it has not.
6    Q.    Has it been done anywhere that you
7 can point to, Doctor?
8    A.    I don't think it's been done in
9 animals either, but, I mean, it could be done in
10 animals.  We have looked at DNA damage from the
11 formaldehyde produced in NDMA metabolism.  We did
12 that study.  But of course in rats, you can just
13 give NDMA and we compare to treat it with a
14 control.  The other way to do is it label NDMA.
15    Q.    Okay.
16        Well, thank you for that.
17        But to be clear, the state of the
18 science today, you nor anyone else can distinguish
19 between endogenously formed formaldehyde DNA
20 adduct and an adduct formed as a result of
21 formaldehyde from the metabolism of NDMA; isn't
22 that correct?
23    A.    It hasn't been done, but it can be
24 done.  We're going to do it.
25    Q.    A lot of projects coming out of this

Page 333

1 deposition, I see.
2        Doctor, you would agree that the NDMA
3 once metabolized -- and you've agreed it's
4 reactive -- it's going to attach, if you will,
5 invade the first cell that it can get into that's
6 close by, correct?
7    A.    The metabolite or the parent NDMA?
8    Q.    The metabolite.  We're talking about
9 the mutation that results.  It's the --
10    A.    The metabolite, other than
11 formaldehyde, methane diazohydroxide is very short
12 lived, so that's going to hit almost where it's
13 formed.
14    Q.    Doctor, you would agree that
15 approximately 95% of our DNA is "junk DNA," isn't
16 it, sir?
17        MR. SLATER:  Objection.
18        You can answer.
19    A.    I don't know.
20    Q.    Let me ask it this way:  You agree
21 that it is approximately only 5% of DNA is coding
22 DNA.
23        Are you familiar with that term?
24    A.    Yes.
25    Q.    And you agree that only if coding DNA

84 (Pages 330 - 333)

S. Hecht, Ph.D.

Page 334

1 is mutated that goes on checked, that's the only
2 DNA that could result in a malignant
3 transformation; agreed?
4     A.    That's the theory, yes.
5     Q.    If the mutated NMDA -- let me strike
6 that.
7           If the metabolized NMDA [sic] reacts
8 quickly to a cell nearby and it's junk DNA, it's
9 not going to have any ill health effects
10 regardless.
11          Correct, sir?
12          MR. SLATER:  Objection.
13          You can answer.
14     A.    I don't know.
15     Q.    Okay.
16          Because you're not a genotoxic
17 impurities expert, correct?
18     A.    Well, I'm not a microbiologist, if
19 that's what you're asking.
20     Q.    You are not a genetic --
21     A.    I don't know whether an effect on
22 so-called junk DNA is necessarily innocuous.
23     Q.    Yes, sir.
24          Can we agree you're not a DNA repair
25 expert?

Page 335

1     A.    Yes.
2          MR. SLATER:  Objection.
3          MR. FOWLER:  I wasn't quite done with
4 that Gombar article.  If we could put up what
5 was 24, I want to look further at 4369.  I'll
6 let you know when to take that down.  I've
7 got a few questions, please.
8          THE VIDEOGRAPHER:  What do you mean
9 by 2369?  Sorry.
10          MR. FOWLER:  4369 is the page.
11          THE VIDEOGRAPHER:  I'm sorry.
12          I thought you said 20.
13          MR. FOWLER:  I probably did.
14 BY MR. FOWLER:
15     Q.    Okay.
16          You see the first full paragraph
17 begins "We have attempted ..."?
18     A.    Yeah, barely.
19     Q.    Yes, sir.  There it goes.
20          MR. SLATER:  Can we blow that up,
21 please?
22          MR. FOWLER:  I think it's blown up.
23     Q.    Doctor, it states "It is well
24 established that NDMA must be metabolized to the
25 ultimate methylating species to exert its toxic

Page 336

1 effect."
2          Correct?
3     A.    Probably to assert its carcinogen.
4     Q.    And you're --
5     A.    I don't know whether the toxicity of
6 NDMA is necessarily related to the methylating
7 species as opposed to formaldehyde.  I don't think
8 that's known.
9     Q.    Doctor, what percentage of the NDMA
10 metabolizes to formaldehyde as opposed to the
11 methylating species?
12     A.    One hundred percent.
13     Q.    So 100% is formaldehyde and 100% is
14 this methylating species?
15     A.    Yes.
16     Q.    Two halves equal three?  Doctor, how
17 can two things both be 100%?
18     A.    For each?  Okay.  Maybe I wasn't too
19 clear, but for each molecule -- let's put it this
20 way:  The first thing that happens is that the
21 methyl -- hold on a second, please.
22          MR. FOWLER:  Yes, sir.
23          (Discussion off the stenographic
24 record)
25          THE WITNESS:  I'm back.

Page 337

1     A.    So the first thing that happens is
2 that the P450 catalyzes the hydroxylation of the
3 methyl group to give it alpha hydroxymethyl
4 dimethylnitrosamine.  That intermediate has a
5 lifetime of a few seconds and it decomposes
6 spontaneously to formaldehyde and methane
7 diazohydroxide.  Methane diazohydroxide is the
8 methylating agent in its DNA and the formaldehyde
9 is formaldehyde.
10          So for every molecule of NDMA that is
11 metabolized, you get one molecule of formaldehyde
12 and one molecule of methane diazohydroxide,
13 methylating agent.
14          THE WITNESS:  Hold on a second.
15          MR. FOWLER:  Yes, sir.
16          THE WITNESS:  Okay.
17     Q.    Does the formaldehyde form the
18 O6-methylguanine mutation, sir?
19     A.    No.  That comes from the methylating
20 agent.
21     Q.    Yes, sir.
22          In any of the literature that you've
23 relied upon in your report or that you've reviewed
24 and is not part of your report, has any literature
25 about NDMA -- let's talk about the dietary

85 (Pages 334 - 337)

S. Hecht, Ph.D.

Page 338

1 studies.
2         Has any literature ever blamed the
3 formaldehyde as being a carcinogenic factor to --
4 let me leave it at that -- as being a carcinogenic
5 factor in those studies?
6     A.    No. In general it's not, no. That's
7 true.
8     Q.    Okay.
9     A.    No literature. It doesn't mean that
10 it doesn't play a role. Nobody has thought of it.
11    Q.    Okay.
12    A.    Maybe they thought about it, but if
13 they thought about it, they didn't do anything
14 about it.
15    Q.    Fair enough, sir.
16        Let's scroll down that page just a
17 little bit further. Right above the formula, the
18 paragraph starts "In spite of ..."
19        Doctor, you see this statement, "In
20 general, the smaller species" -- and we're talking
21 about the Dr. Gombar's pharmacokinetic studies on
22 things like beagles, hamsters and monkeys even --
23 it states "In general, the smaller species tended
24 to show lower bioavailability than larger
25 species."

Page 339

1         Any dispute there, sir?
2     A.    No.
3     Q.    And Doctor, you see if it's assumed
4 that NDMA is cleared solely by hepatic metabolism,
5 the bioavailability will depend upon the clearance
6 and the hepatic blood flow.
7         You agree with that as well, right?
8     A.    Sure.
9     Q.    And is the blood flow in primates --
10 in particular, the hepatic blood flow in
11 primates -- the same, greater, lesser than humans,
12 sir?
13    A.    I don't know.
14    Q.    Wouldn't it be important to
15 understanding anything you want to extrapolate
16 from these pharmacokinetic studies to understand
17 what the hepatic blood flow is in --
18    A.    Probably. Probably would be.
19        So what's your point?
20    Q.    That you didn't -- while you're
21 relying on these for the statement that in humans
22 there's high systemic clearance and high oral
23 bioavailability, you didn't make any effort to
24 determine whether that data can be fairly
25 extrapolated from the Gombar studies, did you?

Page 340

1     A.    No, I didn't.
2     Q.    If you look -- the last paragraph on
3 this page -- I'm sorry. In that column, sir --
4 you see wide interspecies -- there you go, that
5 last one in the first column. Perfect.
6         It states "The wide interspecies
7 difference in bioavailability in NDMA is difficult
8 to explain."
9         Do you see that, Doctor?
10    A.    Yes.
11    Q.    You would agree that there's
12 interspecies differences with humans compared to
13 any of the animals Dr. Gombar studied with his PK
14 analysis.
15        Correct, sir?
16    A.    Sure.
17    Q.    Doctor, do you believe that the lung
18 plays any role in the clearance of NDMA?
19    A.    Administered orally?
20    Q.    Yes, sir.
21    A.    It seems unlikely, but it could.
22    Q.    If we could look to the last
23 paragraph in the second column, do you agree with
24 the statement, Doctor, that it is an
25 oversimplification to focus solely on

Page 341

1 pharmacokinetics when you're trying to do a risk
2 assessment, if you will, of NDMA's
3 bioavailability?
4     A.    Sure. It's complicated.
5     Q.    But it says to base risk on dose
6 alone is also an oversimplification.
7         Do you agree with that, sir?
8     A.    Well, sure, but I mean, you know,
9 dose response is very important in carcinogenesis.
10 You know, this Gombar study was published before
11 the Peto study, if I'm not mistaken.
12        So, I mean, we do know a lot about
13 the dose response characteristics of NDMA in
14 laboratory animals, particularly rats. Also mice
15 and hamsters. So we know a lot about that, so I
16 mean, you know, this very general statement here
17 was probably made in response to a reviewer, so,
18 you know, just because something is written like
19 in the discussion session of a paper doesn't mean
20 that it's necessarily engraved in stone. So sure,
21 it's an oversimplification to focus solely on
22 pharmacokinetics.
23        MR. FOWLER: We can take that exhibit
24 down.
25    Q.    Doctor, returning to your statement

86 (Pages 338 - 341)

S. Hecht, Ph.D.

Page 342

1 on page eight of your report where you were
2 attempting to opine that NDMA has a high systemic
3 clearance and high oral bioavailability in humans,
4 the only studies that you're pointing to, if we
5 look at sites 21, 22, 23, 24, 25, it's Gombar,
6 Gombar, Gombar, then a Dr. Anderson article.
7        Is that the -- is there anything
8 else, sir, to support an opinion that there's high
9 systemic clearance and high oral bioavailability
10 of NDMA?
11     A.    There are other articles, yeah.  I
12 don't think I got them all here.  There's quite a
13 bit of literature on pharmacokinetics and NDMA.
14 You know, I was a little selective here.  This is
15 not a comprehensive review.  But, you know,
16 systemic clearance by the liver is kind of a
17 common observation.
18     Q.    You would agree, Doctor, that the
19 systemic clearance in oral bioavailability depends
20 on the dose, correct?
21     A.    Yes.
22     Q.    And you can point to no study that
23 evaluates a low dose of NDMA and NDEA and arrives
24 at any conclusion about its bioavailability or
25 systemic clearance.

Page 343

1        Fair statement?
2        MR. SLATER:  Objection.
3        You can answer.
4     A.    No, that's wrong.  You're just
5 talking about all kinds of low-dose studies.
6     Q.    Do those studies speak to
7 bioavailability, sir?
8     A.    Sure they did, yeah.
9     Q.    Bioavailability is --
10     A.    When, you know, you have a low dose
11 given to a rat and it's orally and it's
12 metabolized significantly in the liver, then the
13 bioavailability of the test compound to other
14 tissues is very low.
15     Q.    Any such data would have to be
16 extrapolated to humans based upon the hepatic
17 blood flow, correct, sir?
18     A.    Well, sure.
19     Q.    Any dose given to a mouse or any
20 rodent or other species would have to be adjusted
21 to evaluate a low dose in humans, correct?
22        MR. SLATER:  Objection.
23        Lack of foundation.
24        You can answer.
25        MR. FOWLER:  Let me withdraw the

Page 344

1 question, sir.  I think you've answered --
2        MR. SLATER:  Counsel, I'm not looking
3 to argue with you or anything.  I just want
4 to establish something so I understand.
5        I asked the videographer how long
6 we're at at this point and how long
7 Mr. Fowler has been going.  I think it's
8 probably 45 minutes approximately.
9        MR. FOWLER:  We don't have to guess.
10 What's the number?  How long have we been on
11 the record?
12        THE VIDEOGRAPHER:  If you guys
13 wouldn't mind, I could go off the record so I
14 could give you an exact number.
15        MR. FOWLER:  Apparently, that's
16 important right now, so let's do that.
17        THE VIDEOGRAPHER:  The time is 6:27.
18 We're going off the video record.
19        (Recess taken)
20        THE VIDEOGRAPHER:  The time is 6:33.
21 This begins media seven.
22 You may proceed.
23     Q.    Doctor, switching gears again, sir,
24 with regard to the FDA workshop that you
25 participated in, did FDA provide you with any

Page 345

1 written materials in advance or even the questions
2 in advance, sir?
3     A.    Yes, the questions.
4     Q.    Did you share those questions with
5 anyone?
6     A.    No.
7     Q.    What has been marked as Exhibit 12,
8 the FDA's summary on that workshop, sir, did you
9 get -- did you get an advance copy to review and
10 comment upon?
11        MR. SLATER:  Wasn't he questioned on
12    this document already, sir?  So now you're
13    going back into the FDA document?  Okay.
14        You can answer the question.
15        I'm writing to the court.
16     A.    Yes.  I'm not sure what you mean by
17 advance copy.
18     Q.    Did you get a draft to review and
19 comment before FDA published it to the --
20     A.    Yes.  Yes.
21     Q.    And did you take the opportunity to
22 review it?
23     A.    Yes.
24     Q.    Did you have any comments or changes?
25     A.    Nothing -- nothing substantial.  I

87 (Pages 342 - 345)

S. Hecht, Ph.D.

Page 346

1 may have had some minor changes, but in general,
2 it was a good summary.
3    Q.    How did you communicate those changes
4 to FDA?
5    A.    Email with the -- I forgot her name
6 right now.
7    Q.    That's fine, sir.
8         Did you send a red line document or
9 did you type some summary in an email?
10   A.    Summary in an email.
11        MR. SLATER: Just for the record, I
12   object to this entire line of questioning.
13   This document was thoroughly addressed by
14   Mr. Trischler, so this is clearly
15   duplicative.
16        The fact that you may be finding a
17   different question that's not identical to
18   Mr. Trischler's doesn't mean that this
19   shouldn't be left alone, as Mr. Trischler
20   covered this subject.
21        You could continue.
22   Q.    Do you still have that email, Doctor?
23   A.    I don't know.
24   Q.    I will just make a request on the
25   record -- and I'll follow up with counsel -- that

Page 347

1 we'd like a copy of the email with your edits to
2 the draft summary statement.
3    A.    I don't think they were specific, but
4 anyhow, I'd have to go back and look.
5    Q.    Fair enough --
6    A.    It wasn't, like, line 35, change this
7 to that. In general --
8    Q.    Okay. That's helpful. Yes, sir.
9    A.    -- I agreed with her summary. Very
10 comprehensive.
11   Q.    Right, but you indicated you did have
12 changes and you did communicate back to FDA with
13 regard to your response to the draft, correct?
14   A.    I believe so.
15   Q.    I'll make that request offline, sir.
16        At the time that you reviewed the FDA
17 summary, did you have the transcripts available to
18 you?
19   A.    I didn't review the transcripts.
20        MR. FOWLER: Now, let's put up
21   Exhibit 12, the FDA summary. Just a couple
22   things I wanted to clarify from your prior
23   testimony.
24        THE VIDEOGRAPHER: Counsel, I have as
25   Exhibit 12 the "Critical Review of Major

Page 348

1 Sources of Human Exposure." I believe it may
2 be 13. Do you mind if I put 13 up to
3 confirm?
4    MR. FOWLER: Yes, pleaseI.
5    THE VIDEOGRAPHER: This is Exhibit
6 13.
7    MR. FOWLER: Okay. Thank you.
8    Q.    I'll direct your attention to page
9 four, last paragraph.
10        Doctor, you recall the discussion
11 about endogenous and exogenous sources of NDMA?
12 Do you recall that, sir?
13   A.    Yes.
14   Q.    Do you recall the FDA's statement "To
15 calculate the risk, it's imperative to determine
16 endogenous formation and understand the
17 pharmacokinetics of nitrosamine formation and
18 distribution"?
19   A.    Yes.
20   Q.    We were just speaking to the
21 pharmacokinetic --
22        MR. SLATER: Counsel, why are you
23   rehashing? This document and this subject
24   was already addressed by Mr. Trischler.
25        Again, this is duplicative.

Page 349

1    Q.    Do you agree that it's important to
2 understand the endogenous formation and the level
3 of endogenous formation? Correct?
4    A.    Yes.
5    Q.    And you -- during the panel, when the
6 question is presented to the group, each of you
7 has an opportunity to respond to the question at
8 hand, correct?
9         MR. SLATER: Objection.
10   A.    Actually, it was very directed, so I
11 mean certain people -- it was all outlined
12 beforehand who was supposed to respond to which
13 questions and when. It was very scripted. Not
14 scripted, but -- I don't know. I can't think of
15 the word. But basically, you were told when to
16 speak.
17   Q.    Doctor, you would agree that the body
18 sees an NDMA molecule as is and doesn't
19 distinguish its origin, whether it be from food,
20 endogenous or from pharmaceuticals, correct?
21        MR. SLATER: Objection.
22        You can answer.
23   A.    Yes.
24   Q.    And the cumulative exposure that
25 contributes to the response is the essential part

88 (Pages 346 - 349)

S. Hecht, Ph.D.

Page 350

1 of the valuation.
2        Would you agree with that?
3        MR. SLATER: Objection.
4    A.    Yes.
5        MR. SLATER: Cumulative exposure was
6    discussed earlier as well, counsel.
7    Q.    Doctor, you believe that the --
8 strike that.
9        During the testimony, you were given
10 an opportunity to respond on the question of
11 endogenous formation.
12        Do you recall what you testified you
13 believe the level was?
14        MR. SLATER: Again, objection.
15 This has been covered. Mr. Trischler
16 went through that presentation.
17        You can answer.
18        I'm continuing to type my email to
19    the court. I regret it that this is
20    necessary.
21    Q.    Doctor, do you recall what you
22 testified to the levels of endogenous formation
23 being?
24    A.    I don't recall the exact thing, but,
25 you know, the literature indicates that there is

Page 351

1 considerable endogenous formation of nitrosamines
2 that are not metabolized. So my -- excuse me.
3    Q.    Yes, sir.
4    A.    My thinking was that we should really
5 learn more about the endogenous formation of
6 nitrosamines such as NDMA that are metabolized and
7 that was the point I was trying to make at the FDA
8 meeting.
9        MR. FOWLER: Thank you. Let's take
10 down this exhibit. Please put up the day one
11    transcript.
12    Q.    Doctor, when you were testifying at
13 the FDA panel, you understood that your words were
14 being transcribed just as they are today, correct,
15 sir?
16    A.    Yes.
17    Q.    And while you weren't under oath, it
18 was your -- you were certainly doing your best to
19 speak the scientific truth, correct?
20    A.    Yes.
21    Q.    And you said earlier -- several
22 times, I think -- that you had no bias coming into
23 that panel, notwithstanding your retention by
24 Mr. Slater.
25        Do you recall that?

Page 352

1    A.    Correct.
2    Q.    So you answered your questions --
3        MR. SLATER: Counsel, can we stop for
4 a second? I apologize --
5        MR. FOWLER: No, we can't stop today.
6 We can't stop right now. I'm in the middle
7 of a question.
8        MR. SLATER: I object, Counsel.
9 You're not -- this isn't -- I'm really just
10 telling you -- I need to tell you you have on
11 the transcript -- or on the screen the same
12 transcript and you're asking about bias,
13 which he was questioned about already.
14        So that's the third area where you're
15 now in the same question. Therefore, we're
16 going to stop the deposition. This email is
17 going to go to Judge Vanaskie and I'm asking
18 to terminate the deposition because of this
19 conduct --
20        MR. FOWLER: I'm reclaiming my time.
21    Q.    Directing your attention to page --
22        MR. SLATER: We're done.
23        MR. FOWLER: No, we're not.
24        MR. SLATER: Go off the record.
25        I'm stopping the deposition and we're

Page 353

1 going to wait for Judge Vanaskie --
2        MR. FOWLER: I'm in the middle of a
3 question with this witness.
4    Q.    Page 159, please --
5        MR. SLATER: No, you're not. You're
6 done.
7        Dr. Hecht, don't answer the question.
8        This is harassing and in violation of
9 Judge Vanaskie's order.
10        I'm going to email him. Hopefully
11 he'll be available and then we'll go from
12 there.
13        MR. FOWLER: I'm going to make a
14 proffer on the record that I'm attempting to
15 show that the doctor's testimony at this FDA
16 hearing is completely inconsistent with his
17 testimony today.
18        I'm entitled to show him this
19 transcript and ask him why he testified
20 differently at the FDA.
21        MR. SLATER: I'm directing him not to
22 answer.
23        MR. FOWLER: If you want to call the
24 Judge on that, we can.
25        MR. SLATER: Please stop the record.

89 (Pages 350 - 353)

S. Hecht, Ph.D.

Page 354

1    I'm writing to Judge Vanaskie.
2        MR. FOWLER: I would further proffer
3    I have additional questions based on the
4    doctor's testimony at the FDA hearing, I have
5    questions based upon the doctor's testimony
6    with regard to the Peto study, among others,
7    and moreover, I have questions about
8    Dr. Hecht's testimony with regard to
9    Dr. Johnson's PDE and the threshold.
10       I have areas to cover that have not
11   been fully explored.
12       I'm asking you to reconsider letting
13   us finish this deposition --
14       MR. SLATER: I'm writing to the
15   judge.
16       MR. FOWLER: I don't -- you can keep
17   telling me that, Adam. I'm asking you to
18   reconsider and let us finish this deposition.
19   I don't think we're wasting anyone's time
20   other than right now.
21       MR. SLATER: You can't commit to a
22   stop time. You want to be able to go on
23   forever --
24       MR. FOWLER: How can I commit to a
25   stop time, Adam? I've never heard you commit

Page 355

1    to a stop time --
2        MR. SLATER: Sorry. You're so angry.
3    Don't be so angry. I'm just trying to --
4        MR. FOWLER: You've been screaming
5    since I started questioning this witness.
6        MR. SLATER: You know, I feel bad for
7    the court reporter.
8        I don't know what to tell you. If
9    you want me to talk, I will. If you want to
10   talk, you can. But I'm trying to type and
11   email on my iPhone.
12       I think that the ruling has been
13   violated. I think I have good grounds for a
14   protective order. I'm asking for one.
15       THE VIDEOGRAPHER: Would both sides
16   like me to go off the video record?
17       MR. SLATER: Do you have my proffer,
18   Madam Court Reporter?
19       THE COURT REPORTER: I have what you
20   guys have been saying.
21       MR. FOWLER: Fair enough. Thank you.
22       MS. KAPKE: This is Kara Kapke. I
23   also have a few follow-up questions, but they
24   should not last more than ten to 15 minutes.
25       MR. SLATER: Ten to fifteen minutes?

Page 356

1        Okay.
2        MS. KAPKE: Five to ten probably.
3    Maybe not even that long.
4        MR. SLATER: I'm just changing my
5    email. Thank you.
6        THE VIDEOGRAPHER: Counsel, would
7    everyone like me to go off the video?
8        MS. LOCKARD: Yes. Off the record.
9    And can you give us a count of how long we've
10   been going?
11       This is Victoria Lockard speaking.
12       THE VIDEOGRAPHER: The time is 6:45.
13   We're going off the video record.
14       (Recess taken)
15       THE VIDEOGRAPHER: The time is now
16   657.
17       This begins media eight.
18       You may proceed.
19       MR. FOWLER: Can I please get that
20   exhibit back? Day one transcript, FDA panel.
21       Please turn to page 159.
22   Q.  When we stopped, Doctor, I was asking
23   you if you recalled what you said at the time of
24   the panel about the endogenous production.
25       Let me direct you to lines 16 to 20.

Page 357

1        You state "So I think with regard to
2    the question of endogenous formation, which is
3    critical here because there are really high levels
4    in endogenous formation, maybe we do not have to
5    be that concerned about the low levels present in
6    drugs."
7        Have I read your testimony correctly,
8    Dr. Hecht?
9    A.  Yes.
10       MR. SLATER: Before you answer,
11   Doctor, objection.
12       I'm asking you to put the full page
13   up there so Dr. Hecht can see the full
14   context, not just this little snippet. Let's
15   give him the whole page, let's let him see
16   the context and --
17       MR. FOWLER: Absolutely.
18   Q.  So Doctor, the lead-up question for,
19   as you recall, had to do with the endogenous
20   formation of NMDA [sic] and speaking about the
21   biomarkers and the adducts.
22       The question before you responded was
23   "Can we have more discussion of what you think of
24   all the biomarkers that you have discussed today
25   that could be more appropriate for nitrosamines?"

90 (Pages 354 - 357)

S. Hecht, Ph.D.

Page 358

1      As your counsel said, you start your
2  answer "I think DNA adducts would be good to look
3  at. You think we have the technology to reliably
4  quantify DNA adducts with high-res mass
5  spectrometry and we also have the knowledge based
6  on years of study about artifact formation."
7          Then you state what you said about
8  the endogenous formation.
9          Does this refresh your recollection
10 of how you characterized the endogenous formation
11 of NDMA at the FDA panel, sir?
12    A.    Yes.
13          MR. SLATER: Objection.
14          Before you answer, Doctor, please let
15 me object.
16          Objection. Okay? Objection. Lack
17 of foundation. It's a very misleading
18 question, but we'll come back to it later,
19 Mr. Fowler. You and I both know that.
20          You can answer, Dr. Hecht.
21    Q.    Doctor, do you recall this discussion
22 at the FDA panel?
23    A.    Yes.
24    Q.    And do you recall the issue of what
25 levels of endogenous formation NDMA there is?

Page 359

1    A.    Not NDMA in particular. So what I
2  was referring to in that panel discussion was that
3  there's significant of data for the endogenous
4  formation of nitrosoproline and other nitrosamines
5  that are not metabolized. We could determine this
6  by simply measuring other levels in urine after
7  giving people the precursors and sodium nitrite,
8  as an example.
9          For dimethylnitrosamine and other
10 dialkyl nitrosamines, which are extensively
11 metabolized, we don't know how much endogenous
12 formation there is and what I was trying to say in
13 the FDA meeting was that what a real need that we
14 have is to develop the technology by which we
15 would be able to accurately determine how much
16 endogenous formation there was of compounds like
17 dimethylnitrosamine.
18          So, you know, I was speculating. I
19 speculated that the amount that's formed
20 endogenously might be greater than the exogenous
21 amounts, but we don't know and that was my point.
22 We need research. That was my point. Nothing
23 else.
24    Q.    Have you completed --
25    A.    I didn't say that there was -- I

Page 360

1  didn't say that there was higher endogenous
2  formation or that there was lower endogenous
3  formation. I didn't say any of these things.
4          What I said was that we need to
5  develop the technology, the research to assess
6  endogenous formation. That way, we would be able
7  to know whether the endogenous formation of
8  compounds like dimethylnitrosamine really was.
9          Right now, we don't know what it is.
10 So that was my -- that was a message I was trying
11 to deliver.
12    Q.    Have you completed your response,
13 Doctor?
14    A.    Yes.
15          MR. FOWLER: Can I have that sentence
16    that begins with "So ..." blown up, now that
17    we've seen the whole page?
18          MR. SLATER: I'd like to keep the
19    whole page on the screen, frankly, because
20    now we can't see the full context.
21    Q.    Doctor, can you read if we don't blow
22 that up okay?
23    A.    Yes.
24    Q.    Okay.
25          You see the sentence "So I think with

Page 361

1  regard to the question of endogenous formation
2  ..." that we were looking at?
3    A.    Yes.
4    Q.    Okay.
5          You state "which is critical here."
6          Are you talking about here being the
7  issue with NDMA and valsartan?
8          MR. SLATER: Objection.
9          Lack of foundation.
10   A.    No. I was talking about generally.
11 Okay? Not necessarily about valsartan. I was
12 talking about generally for nitrosamines.
13         Okay?
14   Q.    Okay, sir.
15   A.    We know --
16   Q.    You've answered the question --
17         MR. SLATER: Stop.
18         Please continue to answer, Doctor.
19   A.    Let me finish?
20   Q.    Certainly, Doctor.
21   A.    We know from a significant amount of
22 data that there is endogenous formation,
23 nitrosoproline and other nitrosamines that are not
24 metabolized. We can determine this readily. It
25 has been done. There's a lot of solid data out

91 (Pages 358 - 361)

S. Hecht, Ph.D.

Page 362

1 there. We don't have this data for the dialkyl
2 nitrosamines that are sensibly metabolized such as
3 dimethylnitrosamine. We don't have the data.
4        So we don't know whether endogenous
5 formation of dimethylnitrosamine is zero or
6 whether it's the same as the exogenous exposure or
7 more. We don't know.
8        That was my point. So how it's
9 written, how you interpret what's written, I don't
10 know. But that was my point.
11    Q.    Thank you, Doctor.
12        Help me understand the last part of
13 that sentence, please. "Maybe we do not have to
14 be that concerned about the low levels that are
15 present in drugs."
16        Did I read that correctly?
17    A.    Yes.
18    Q.    And we're talking about the NDMA
19 levels in the valsartan that you're there at the
20 panel for, correct?
21    A.    That's right.
22        MR. SLATER: Lack of foundation.
23    Q.    Thank you. Did we get that answer --
24    A.    As I tried to explain, sir, we don't
25 know. Okay? What I was trying to say in that

Page 363

1 panel discussion was that we need to develop the
2 technology and do the experiments so we can find
3 out the extent of formation of -- of endogenous
4 formation -- of dimethylnitrosamine and other
5 dialkyl nitrosamines that are rapidly metabolized.
6 That's what I was trying to say.
7    Q.    Yes, I've gotten that, Doctor. I'm
8 focused now on how you concluded the sentence,
9 that "Maybe we don't have to be concerned about
10 the low levels present in the drugs."
11        Can you explain that, please?
12    A.    You're not listening because I have
13 explained it. Okay? Listen to what I'm saying.
14 Okay?
15        If the amount of endogenous formation
16 of dimethylnitrosamine turn out to be very high,
17 then we wouldn't have to be concerned. But we
18 don't know.
19    Q.    Thank you, Doctor.
20    A.    We don't know. We have zero data.
21    Q.    Well, respectfully, you disagree with
22 the data that your colleague presented at the FDA
23 panel as to the level of 400 micrograms in the --
24 produced endogenously.
25        You just disagreed with that.

Page 364

1    A.    Four hundred micrograms of what and
2 which colleague?
3    Q.    Doctor -- well, I'll not pronounce
4 his name right. It starts with a K. Doctor --
5 can you help me, sir?
6    A.    Kokkinakis.
7    Q.    Yes, sir.
8        Do you recall the slides that he put
9 up at the FDA panel on endogenous formation?
10    A.    Yes, I don't agree with those at all.
11 I think they're flawed.
12    Q.    Right.
13        To your point, Doctor, if the level
14 is high -- and would you agree a level greater
15 than 100 micrograms a day would be considered high
16 in the context that you and I are speaking of now?
17    A.    Yes.
18    Q.    The point is if it's that high and we
19 add 10, 15, 20 micrograms to that endogenous
20 supply of NDMA, you would not consider that to be
21 an increased risk of cancer compared to the
22 endogenous source, correct?
23        MR. SLATER: Objection.
24    A.    I don't know what you're talking
25 about, risk of cancer. I don't know. I mean, the

Page 365

1 point is -- the point that I'm making -- and this
2 is what I believe. Okay?
3        In this deposition, we don't have
4 reliable data on endogenous formation of
5 dimethylnitrosamine and until we have that data,
6 we cannot say that the exogenous formation such as
7 through valsartan is unimportant. We can't say
8 that because we don't have the data. The data
9 that Kokkinakis quoted, I do not believe it's
10 correct.
11    Q.    Doctor, do you agree that the panel
12 and FDA was concerned that it would make no sense
13 to the public, including the scientific informed
14 public like yourself, that if FDA set a limit of
15 NDMA at, like, 96 nanograms and the body is
16 producing 400 micrograms a day, that it could
17 erode the confidence in FDA's risk assessments
18 because that would make no sense to the public?
19 Do you recall that discussion?
20        MR. SLATER: Objection.
21    A.    Well, sure it would, but we don't
22 have the data.
23    Q.    Right.
24    A.    If we had -- if we had reliable
25 accepted data on, you know, that NDMA was formed

92 (Pages 362 - 365)

S. Hecht, Ph.D.

Page 366

1 to the extent of 400 micrograms per day in humans,
2 then FDA would not have put out the thing about
3 96 nanograms.
4    Q.    Did FDA impanel this workshop so that
5 they might understand and get scientific input
6 from leaders in the different areas about what
7 these levels are?  Isn't that why it was one of
8 the questions posed?
9    A.    Yes.
10        MR. FOWLER:  Let me have day two
11 transcript, please.
12    Q.    Directing your attention to page 15,
13 we're going to look at line nine through 18.  It
14 states here, Doctor -- I hope you can see it
15 because I don't want to blow it up, I want to
16 leave the whole page there.
17        It states that the balance of
18 evidence seems to be that the amount consumed by
19 the drugs -- consumed in drugs is minuscule or at
20 least very much smaller than one expects from
21 intake in water and especially in foods and I
22 think it would send a confusing message to
23 consumers, citizens in general, to tell them that
24 the body somehow knows whether a given molecule,
25 any given nitrosamine comes from a drug taken by

Page 367

1 necessity or food voluntarily.
2        Do you see that, Doctor?
3    A.    Yes.
4        MR. SLATER:  Objection.
5        Lack of foundation.
6        Inaccurately read.
7    Q.    You don't disagree with that, Doctor,
8 right?  That's what you and I have been speaking
9 about?
10        MR. SLATER:  Objection.
11    A.    We need the data.  You know, we need
12 the data.  Intake from water is very unclear and
13 endogenous formation is very unclear.
14        The only place where we really have
15 reliable data, you know, other than valsartan and
16 the other drugs obviously is food.
17    Q.    Yes, sir.
18        But my question was actually do you
19 agree that the issue here was that it could send a
20 confusing message if FDA is setting an acceptable
21 intake limit that is far below what our body
22 creates naturally?
23        That's my question, sir.
24    A.    Sure, but we don't have the data and
25 they know that.  They know that --

Page 368

1        MR. SLATER:  Counsel, stop.
2    A.    That's why they made the
3 96 nanograms.
4        MR. SLATER:  Counsel, we're going to
5 stop the deposition.
6    A.    I mean, really, honestly, we have
7 been -- we have been through this before.
8        MR. FOWLER:  I honestly couldn't hear
9 either one of you.
10        THE WITNESS:  I'm starting to agree
11 with Adam.
12        MR. FOWLER:  I couldn't hear Adam or
13 you, sir.
14        MR. SLATER:  Judge Vanaskie has just
15 asked to call -- Mr. Fowler, we're
16 breaking -- let's go off the record.
17        Judge Vanaskie has asked us to
18 include him in a phone conference and he gave
19 the number.  We need to call him.  I don't
20 have a call in number that I can give to
21 anyone, so I don't know what to do.  We got
22 to get him on the phone.  He wants to speak
23 right now.
24        THE VIDEOGRAPHER:  Would you like to
25 go off the video first?

Page 369

1        MR. SLATER:  That's fine.
2        THE VIDEOGRAPHER:  The time is 7:12.
3 We're going off the video record.
4        (Recess taken)
5        THE VIDEOGRAPHER:  The time is now
6 727.
7        This begins media nine.
8        You may proceed.
9    Q.    Dr. Hecht, do you have an opinion
10 whether or not NDMA is a threshold compound?
11        Do you understand the question?
12    A.    Threshold compound?  You mean whether
13 there's a threshold for carcinogenicity?
14    Q.    Yes, sir.
15        MR. SLATER:  Objection.
16        Asked and answered.
17        You can answer.
18    A.    I don't know of any evidence that
19 there is.
20    Q.    Do you have an opinion one way or the
21 other, sir?
22    A.    I believe there is no threshold based
23 on the studies of Peto, Grasso and others.
24        MR. FOWLER:  Well, let's mark --
25    A.    The large rat dose response study.

93 (Pages 366 - 369)

Page 370

1 They concluded that there was no indication of a
2 threshold.
3          MR. FOWLER: Let's mark Peto 1991 B.
4     Q.    Doctor, while that's being called up
5 here, I think we're -- as far as our nomenclature
6 goes, I think we're in agreement that a threshold
7 level is one below which there's no evidence of
8 carcinogenicity. Just so we're on the same page,
9 sir.
10    A.    Yes.
11          THE VIDEOGRAPHER: Counsel, just
12 wanted to check. The document, I just want
13 to check.
14          The document you're looking for, does
15 it have at the top of the page "Cancer
16 Research"?
17          MR. FOWLER: It does. It's called
18 "Dose and Time Relationships for Tumor
19 Induction in the Liver and Esophagus," etc.
20          THE VIDEOGRAPHER: Let me know if
21 this is the right one here.
22          MR. FOWLER: No.
23          THE VIDEOGRAPHER: Okay.
24          MR. FOWLER: It's 1991 A.
25    Q.    Doctor, while this is coming up, do

Page 371

1 you agree that the concept, if you will, of
2 permissible daily exposure of PDE, the PDE itself
3 is a level below which -- let me start that again.
4          The PDE would be considered a
5 threshold level in that nomenclature, sir?
6          MR. SLATER: Objection.
7          This topic was asked and answered and
8 covered earlier.
9          You can answer.
10    A.    Repeat the question.
11    Q.    Is a PDE another term for a threshold
12 level?
13    A.    Essentially, yes.
14    Q.    I understand you did not read
15 Dr. Johnson's article, so is it fair to say that
16 you don't know whether that article establishes
17 any sort of threshold, sir?
18    A.    Which article was that?
19    Q.    Dr. Johnson's 2021 --
20    A.    I hadn't read that, no.
21    Q.    Yes, sir.
22          So you're not here to say whether or
23 not that data demonstrates a threshold at low
24 doses?
25    A.    I'm not, no.

Page 372

1     Q.    And would you defer to a genetic
2 toxicologist to interpret such data when
3 calculating a PDE?
4          MR. SLATER: Objection.
5          You can answer.
6     A.    A genetic toxicologist?
7     Q.    Yes, sir.
8     A.    Would I defer to a genetic
9 toxicologist? I'm not sure.
10    Q.    You've never done a benchmark dose
11 evaluation, have you, sir?
12    A.    I think I mentioned this repeatedly
13 today.
14          MR. FOWLER: Just waiting on Peto,
15 sir. I'm just trying not to --
16          THE VIDEOGRAPHER: Counsel, I only
17 have one document, the one that I pulled up,
18 that was labeled with P-E-T-O for Peto.
19          MR. FOWLER: Okay, sir. I'll forge
20 ahead without it.
21    Q.    Doctor, do you recall that in the
22 Peto study, there was a level of -- let me start
23 that again.
24          The Peto study was a large cancer
25 bioassay, correct?

Page 373

1     A.    Yes.
2     Q.    It administered a variety of doses,
3 some of which until that animal died, correct?
4     A.    Yes.
5     Q.    And it had a control group, yes?
6     A.    Yes.
7     Q.    And at low doses, if the number of
8 subject animals produced fewer tumors than the
9 background rate of the control group, would you
10 say that there's evidence of a -- that that
11 supports evidence of a threshold?
12          Do you understand my question, sir?
13    A.    No.
14    Q.    It was a bad question. I'll try
15 again.
16          If the dose levels from let's say
17 0.001 through 0.087, as reflected in table seven
18 of Peto, produced tumors fewer than the control
19 group expressed, do you agree that you cannot
20 attribute the tumors produced at those low doses
21 to anything other than background?
22          MR. SLATER: Objection.
23          I object for multiple reasons,
24 including you're quoting a table that nobody
25 can see and I object to the multiple parts of

94 (Pages 370 - 373)

Page 374

1 the question.
2         You can answer if you can.
3     A.    I really can't answer that without
4 looking at the data. But I do recall very
5 specifically that Peto said either in the abstract
6 or in the discussion that there was no evidence of
7 a threshold, quote, unquote.
8         Peto is a statistician who was very
9 well respected, so I take his word.
10    Q.    Yes, sir.
11        Doctor, if in an animal study the
12 doses produce fewer tumors than the control group,
13 can you conclude anything about the causation of
14 those low doses, sir?
15    A.    I would have to look at the data. I
16 don't know what data you're talking about.
17    Q.    Is there any conceivable study that
18 you can imagine where the dose group revealed
19 fewer tumors than the control group and a
20 causation determination can be made? Can you
21 envision anything like that, sir?
22        MR. SLATER: Objection.
23        Multiple reasons.
24        You can answer.
25    A.    I don't know.

Page 375

1     Q.    Why are control groups used in animal
2 studies, sir?
3     A.    Because it gives you a reference
4 point to compare to your treated group.
5     Q.    And why is that important?
6     A.    Because, you know, there might be
7 some tumors that form in the untreated animals for
8 reasons other than the material that you're
9 administering due to other factors, endogenous
10 factors and whatever.
11        So you have to have a control group
12 because, you know, tumors will develop in various
13 organs of animals with old age, laboratory animals
14 with old age, so you need the control group as a
15 comparison.
16    Q.    Thank you, sir.
17        Let me direct your attention --
18 shifting gears back to your report, please -- I'm
19 going to direct your attention to page 11.
20        Let me know when you're there, sir.
21    A.    I'm there.
22    Q.    The middle paragraph -- and this is
23 Exhibit 1 -- in the middle paragraph, at the
24 bottom, you state "Given sufficient exposure to
25 NDMA and NDEA, as with the levels found in the

Page 376

1 contaminated valsartan (see below) the formation
2 of these DNA adducts would be sufficient to cause
3 mutations in cancer in exposed humans."
4         Have I read that correctly, sir?
5     A.    Yes.
6     Q.    You would agree, sir, that the number
7 of adducts is dispositive for a cell to undergo a
8 malignant transformation; isn't that correct?
9     A.    Is dispositive? What was your -- I
10 didn't hear --
11    Q.    I'll rephrase, sir.
12    A.    The number of adducts is what?
13    Q.    There is a minimum number of adducts
14 that must be -- that exist in a cell before it
15 undergoes a malignant transformation, correct?
16    A.    A minimum number? Sure. I mean,
17 there is a number. We don't necessarily know what
18 it is.
19    Q.    Yes, sir. And one O6-methylguanine
20 mutation can be the result of one metabolized NDMA
21 molecule, right?
22    A.    Correct.
23    Q.    Do you have any reason to dispute
24 that there are roughly 600 adducts of
25 O6-methylguanine at any given time in a cell

Page 377

1 absent exogenous NDMA?
2     A.    Where did you get that from?
3     Q.    My question is do you have any reason
4 to dispute that, sir?
5     A.    Yes.
6     Q.    What is your basis?
7     A.    I don't know where you got that
8 number from. Just made it up or what? Where did
9 you get the number 600 from?
10    Q.    You agree there's a baseline number
11 of O6-methylguanine adducts in a cell at any given
12 time, sir, right?
13    A.    Baseline number? What is that?
14        THE WITNESS: Hold on, sir.
15        (Discussion off the stenographic
16 record)
17    Q.    I'll move on, Doctor.
18    A.    Sorry.
19    Q.    Referring to page 11, I'm just
20 interested in what the number of DNA adducts you
21 are referring to in that sentence.
22        You don't give any level, sir, and
23 that's what I'm asking --
24    A.    Which sentence now?
25    Q.    The one we read in page 11 of your

95 (Pages 374 - 377)

S. Hecht, Ph.D.

Page 378

1 report, "Given sufficient exposure to NDMA and
2 NDEA, as with the levels found in the valsartan,
3 the formation of these DNA adducts would be
4 sufficient to cause mutations."
5        My question is how many adducts, sir?
6     A.    I don't know.  One.  One adduct in
7 theory.
8     Q.    I'm sorry.  You broke up.
9        One more time?
10    A.    One adduct in theory is enough.
11    Q.    You would agree that one adduct is
12 subject to DNA repair, correct?
13    A.    Yes.
14    Q.    And if repaired, no risk of
15 carcinogenicity, correct?
16    A.    Not from that particular pathway,
17 correct.
18    Q.    Do you disagree that DNA repair can
19 and does create a threshold level when exposed to
20 low doses of NDMA?
21        MR. SLATER:  Objection.
22        You can answer.
23    A.    It's a very general question.  I
24 mean, there's no doubt that DNA repair is
25 important.  You know, when you say does it affect

Page 379

1 the low doses, you know, what's a low dose, what
2 are the conditions.  There are many factors, but
3 we know that DNA repair is important.
4        You know, there's a lot of hand
5 waving in your statement.
6     Q.    Thank you, sir.
7        I've now found where the 600 came
8 from -- I apologize -- earlier.
9        Were you familiar with an article by
10 Dr. Krause and McKeene, et al, from 2019 entitled
11 "Immunological and Mass Spectrometry Approaches to
12 Determine Thresholds of Mutagenic DNA Adduct
13 O6-methylguanine and VBo"?
14        Are you familiar with that article,
15 sir?
16    A.    Doesn't strike a bell offhand.
17    Q.    Okay.
18        Thank you, sir.
19        Doctor, do you agree that potency,
20 the existence of a threshold and dose response are
21 toxicology issues, sir?
22    A.    Yes.
23    Q.    And because you are not a
24 toxicologist, you're not qualified to render
25 opinions on potency existence of a threshold or

Page 380

1 dose response; isn't that correct, sir?
2        MR. SLATER:  Objection.
3        You can answer.
4     A.    That depends what you mean by
5 qualifications.  I'm not a toxicologist.  That's
6 true.  I don't know that that necessarily excludes
7 me from having opinions.
8     Q.    Yes, sir.
9        Would you defer to a toxicologist as
10 to the existence of a threshold for NDMA and NDEA?
11        MR. SLATER:  Objection.
12        You can answer.
13    A.    That would depend who the
14 toxicologist was.
15    Q.    Fair point, sir.  Thank you.
16        Doctor, do you agree that or disagree
17 that the DNA adducts that we're speaking about,
18 this O6-methylguanine, those adduct measurements
19 do not define the location of the adduct in the
20 genome.
21        Is that a true statement?
22    A.    Yes.
23    Q.    Given that cells have evolved
24 efficient measures to keep gene coding sequences
25 damage free, it's not possible to currently say if

Page 381

1 DNA adducts accrue in a linear fashion in the
2 coding sequences.
3        Do you agree with that?
4     A.    Yeah, yes.
5     Q.    And for the jury -- I'm sorry.
6     A.    Yeah.
7     Q.    For the jury's purpose, by saying it
8 does not accrue in a linear fashion, that means if
9 you're adding two more NDMA molecules that it will
10 not -- let me start that again.
11        If you double the NDMA molecules, it
12 doesn't result in a linear uptick of the
13 mutations, correct, sir?
14        MR. SLATER:  Objection.
15        You can answer.
16    A.    You know, that's a complicated
17 question because we know that the dose response
18 for NDMA -- and NNK, for that matter -- in mice is
19 a hockey stick --
20    Q.    Yes, sir.
21    A.    -- kind of picture because when the
22 O6-methylguanine DNA methyl transfer is
23 succeeded -- in the activity that is succeeded --
24 then the cancerous mutations will increase more
25 rapidly, so it's not linear.  It's more like this.

96 (Pages 378 - 381)

S. Hecht, Ph.D.

Page 382

1    Q.    And a hockey stick, I've got a couple
2  behind me, they're long and flat and then the
3  blade goes up at the end, correct, sir?  It's a
4  line with an uptick at the end where the hockey
5  blade would be?  That's how it gets its name?
6    A.    Yes.  You have a slowly increasing
7  amount which would be similar to the blade and
8  then when you reach a certain point, the increase
9  is greater, so that's where the hockey stick comes
10  from.
11    Q.    Yes, sir.  Thank you.
12          Shifting gears a little bit, Doctor,
13  just to keep moving, do you agree that if more
14  than one nitrosamine are present -- let's do it
15  this way.
16          If NDEA and NDMA are both present in
17  the body at the same time, do you agree that their
18  actions, if you will, will be additive and not
19  synergistic?
20          Do you understand the question, sir?
21    A.    Yes, probably.  But to tell the
22  truth, I don't think we have good data on that.
23          MR. FOWLER:  Can I have the FDA
24  transcript, day one please?
25          (Whereupon, Exhibit 25 was marked for

Page 383

1  identification.)
2          (Whereupon, Exhibit 26 was marked for
3  identification.)
4    Q.    Do you recall this issue coming up in
5  the FDA panel, sir?
6    A.    Not right now, I don't, but sure, I
7  probably do.
8    Q.    I'll try to refresh your
9  recollection.  Look at day one and I'll direct
10  your attention, please, to page 143 and in
11  particular, directing you to line 15 through 19.
12          Do you see your name there?
13    A.    Yes.
14    Q.    I could have it blown up so you could
15  take your time to look at it.
16          So you say "I agree.  Considering the
17  low levels that we are going to be observing,
18  additivity is definitely the default assumption of
19  the molar amounts that are present, so I agree
20  with everything that has been said about
21  additivity.
22          Do you see that, sir?
23    A.    Yes.
24    Q.    And are you familiar -- I'm sorry?
25    A.    That's what I said.

Page 384

1    Q.    You're not -- you have no -- you're
2  not disagreeing with yourself here today, are you,
3  sir?
4    A.    No.
5          MR. FOWLER:  Doctor, let me again
6  switch gears.  You could take that down,
7  please.
8    Q.    With regard to your research on
9  tobacco and cigarette smoking, the -- you would
10  agree that there are -- there have been identified
11  specific cancers which are attributed to cigarette
12  smoking, correct, sir?
13    A.    Yes.
14    Q.    And I think you testified earlier
15  there's some 70 carcinogens in tobacco, which
16  include certain nitrosamines, yes?
17          MR. SLATER:  Objection.
18    A.    In tobacco smoke.
19          MR. SLATER:  Objection.
20          We're now duplicating questioning
21  exactly.  I don't appreciate it.
22          MR. FOWLER:  It's just a foundation,
23  Counsel.  Trying to orient the doctor as I
24  jump around here.
25    Q.    So Doctor, the carcinogens from

Page 385

1  cigarette smoke, you would agree, are quickly --
2  quickly enter the bloodstream upon exposure.
3          Do you agree with that?
4    A.    Yes.
5    Q.    And as a result of --
6    A.    For the most part.
7    Q.    Fair enough.
8          As a result, they travel throughout
9  the body's tissues, the arterial system, back,
10  venous system.
11          It's everywhere, correct, sir?
12    A.    It's a very general statement.  You
13  know, each carcinogen behaves differently.  For
14  example, some may be retained in the lung
15  particles.  There may be other factors that affect
16  the absorption into the bloodstream.
17    Q.    Based upon your research, Doctor, you
18  agree that NDMA, as one of those nitrosamines,
19  likewise enters the blood and is transported to
20  various tissue systems in the blood, correct?
21    A.    Yes.
22    Q.    And throughout your research of
23  cigarette smoke and tobacco, none of your studies
24  or any studies that you have seen has identified
25  cigarette smoke-induced tumors as being caused by

97 (Pages 382 - 385)

S. Hecht, Ph.D.

Page 386

1 NDMA.
2       Isn't that true?
3    A.    Correct.
4    Q.    In fact, it's been your publication
5 that the nitrosamines NNN, NNK and there may be a
6 couple more, are the responsible nitrosamines for
7 the cancers that cigarette smoking causes.
8       Is that a fair statement?
9    A.    No. I've never excluded other
10 nitrosamines.
11    Q.    Okay.
12    A.    I presented data that supports the
13 concept that NNN and NNK cause DNA damage and
14 cancer in smokers and also smokeless tobacco
15 users, but I've never excluded other nitrosamines
16 whatsoever.
17    Q.    Thank you for that clarification,
18 sir.
19       Can you explain why it is if NDMA is
20 transported through the blood from the cigarette
21 smoke why there's not any evidence that NDMA
22 causes cancer in these various tissues that it
23 reaches through the cigarette smoke as a result of
24 the cigarette smoke, sir?
25       MR. SLATER:  Objection.

Page 387

1       You can answer.
2    A.    We don't know the answer to that.
3    Q.    You agree that the nitrosamines in
4 tobacco smoke or smokeless tobacco have different
5 carcinogenic presentations when administered
6 differently, correct?
7    A.    Yes and no. It's not really correct.
8 It depends -- you can't generalize. Okay? I know
9 too much about this. Some of them -- NNK for
10 example, will affect the lung almost independent
11 of the root of administration, seemingly given by
12 insulation into the bladder and affects mainly the
13 lung. NNN, on the other hand, will affect the
14 oral cavity and esophagus when given in drinking
15 water.
16    Q.    I'm sorry.
17    A.    It's hard to generalize.
18    Q.    For each cancer that you would agree
19 is caused by cigarette smoke, do you agree that
20 that determination was based upon actual data and
21 testing and an evaluation of human tissue and
22 tumors to make that causation connection?
23    A.    Epidemiology, yes.
24    Q.    Well, I'm speaking of actual lab
25 science, Doctor.

Page 388

1    A.    Well, you were talking about
2 causation.
3    Q.    Yes, sir.
4    A.    So, you know, the first thing in
5 causation is usually epidemiology.
6    Q.    For cancers that are known to be
7 caused by cigarette smoke, sir, have the
8 determinations as to the specific types of cancer,
9 to your knowledge, been evaluated in a -- by
10 pathologists in the laboratory to reach any
11 conclusions at all, sir?
12    A.    Repeat your question.
13    Q.    Well, outside of epidemiology
14 evidence, I'm trying to understand whether the
15 causal link between cigarette smoke and these
16 cancers that you've identified has been identified
17 through toxicology studies of human tissue in in
18 vivo, in vitro, but using human tissue to make
19 that determination?
20    A.    Yes, absolutely.
21    Q.    Okay. And -- I'll just leave it at
22 that.
23       No, I won't.
24       There's no such similar study with
25 regard to any determination of NDMA and any

Page 389

1 cancers that it could allegedly cause in humans,
2 correct?
3    A.    Oh, there are multiple studies of
4 NDMA metabolism by human tissues, organ culture
5 studies. Also, sub cellular fractions. Yes,
6 multiple studies published many years ago.
7    Q.    Notwithstanding the agreement today,
8 Doctor, you said several times that the level of
9 NDMA in the pharmaceuticals should be zero?
10    A.    Yes.
11    Q.    Doctor, you don't hold yourself out
12 as any sort of regulatory expert, do you, sir?
13    A.    No.
14    Q.    Do you know what a drug master file
15 is?
16    A.    Not exactly.
17    Q.    Do you know what criteria FDA uses
18 whether or not to approve a drug?
19    A.    That's not my area.
20    Q.    So you have no basis for saying
21 whether or not these drugs have been approved or
22 not or if that number should be zero, do you?
23       MR. SLATER:  Objection.
24    A.    I have a basis for saying it should
25 be zero. I absolutely have a -- I absolutely have

98 (Pages 386 - 389)

S. Hecht, Ph.D.

Page 390

1 a basis for saying it should be zero because I've
2 looked at the method of synthesis and I've looked
3 at all the data from CHP and the others and
4 absolutely this never should have happened. We
5 shouldn't be here. It should have been zero.
6        MR. FOWLER: Thank you, Doctor.
7        I don't have further questions. I'll
8 pass the witness to the next questioner.
9 Thank you so much for your time and patience.
10       MR. SLATER: You know, if you told me
11 you had a hockey stick, we would have been
12 more easy going. I don't want to get hit by
13 a hockey stick.
14       MS. KAPKE: Good evening, Dr. Hecht.
15 I'll be very brief. I have a couple of
16 questions.
17 EXAMINATION BY
18 MS. KAPKE:
19    Q.     You agreed in response to
20 Mr. Trischler's questions earlier today that
21 valsartan is typically a long-term drug taken
22 chronically.
23       Do you remember that?
24    A.   Yes.
25       MR. SLATER: Objection.

Page 391

1        Duplicative.
2    Q.   Understanding that valsartan is
3 typically taken chronically, do you have an
4 opinion about whether acute usage of valsartan
5 containing an NDMA or NDEA impurity could cause a
6 person to develop cancer?
7        MR. SLATER: Objection.
8        You can answer.
9    A.   Well, it would be more likely from
10 continuous use because, you know, the cumulative
11 dose would be greater.
12    Q.   Did you evaluate the animal studies
13 with an eye towards duration of use to make an
14 assessment of how long a person would need to take
15 valsartan containing NDMA or NDEA before that NDMA
16 or NDEA exposure could have caused the person to
17 develop cancer?
18    A.   Which animal studies?
19    Q.   Any of them.
20    A.   No, I didn't attempt to make that
21 evaluation. There are many -- there are many
22 animal studies of NDMA. I guess the one that's
23 most compelling is the Peto study. So we know
24 that very low doses of NDMA given over a long
25 period of time to rats can cause a significant

Page 392

1 incidence of tumors.
2    Q.    Let's just use that study. I'll just
3 follow up on that.
4        How long of a duration of exposure
5 did the rats have in the Peto study?
6    A.   Over two years, I believe it was.
7    Q.    Are there any studies that you are
8 relying on that are acute animal studies?
9    A.    There are single dose studies of
10 NDMA. Sure.
11    Q.    And are -- could you give me -- are
12 they cited in your report?
13    A.    No. My report doesn't go into detail
14 and all of the literature on NDMA, which is very
15 extensive, the carcinogenicity literature --
16    Q.    Okay. Let me just back up --
17    A.    -- they're out there. I mean,
18 there's a huge number of studies on NDMA
19 carcinogenicity and laboratory animals.
20    Q.    Okay.
21        Let me just back up and ask it this
22 way: You've agreed here multiple times that dose
23 and duration are important.
24        Is there a minimum number of days a
25 person would need to take valsartan that contain

Page 393

1 NDMA or NDEA in any amount that's relevant to this
2 case before that exposure would cause a person to
3 develop cancer?
4    A.    We don't know. In theory, one
5 exposure is sufficient. We don't know a minimum
6 number of days. We don't know that.
7    Q.    Are there any studies that you are
8 relying on specifically to allow you to
9 extrapolate to duration of use for only a single
10 day as being appropriate to cause cancer in a
11 human?
12    A.    No. I don't believe there is any
13 study like that in a human.
14    Q.    Are there any --
15    A.    There are single dose studies in
16 animals --
17    Q.    And --
18    A.    -- of NDMA.
19    Q.    Are any of those studies sufficient
20 for you to extrapolate to a person who took one
21 pill of valsartan containing NDMA or NDEA and NDMA
22 or NDEA impurity? Can you cite me any such study
23 that is appropriate to extrapolate?
24    A.    No, there's not.
25    Q.    What about the same question for a

99 (Pages 390 - 393)

S. Hecht, Ph.D.

Page 394

1 single prescription fill for 30 days?

2     A.     I don't have that kind of data. That

3 would be -- that would be speculation.

4     Q.     And --

5     A.     It's all dose response, so obviously

6 the more frequently the pill contaminated with

7 dimethylnitrosamine was taken, the higher the

8 risk.

9     Q.     Would it be fair to say that a person

10 needed to take valsartan containing an NDMA or

11 NDEA impurity for at least a year before that NDMA

12 or NDEA exposure could have caused that person to

13 develop cancer? Would that be a fair statement?

14     A.     I don't think we know the timeframe.

15 I mean, the study that we talked about before from

16 Germany covered three years, I believe, and they

17 saw an increased risk of liver cancer, but I don't

18 think we know the timeframe. I mean, in theory,

19 everything lines up wrong. You know, one dose

20 should be enough in theory.

21     Q.     Well, in --

22     A.     If everything is wrong, I mean, you

23 know, if your DNA repair is not working right, if

24 you happen to hit the right part of the DNA in the

25 right gene, the right mutation, in theory, it only

Page 395

1 takes one.

2     Q.     Well, what I want to get at is what

3 is your opinion to a reasonable degree of medical

4 and scientific certainty as to the duration of

5 exposure that can cause a person to develop cancer

6 following an exposure to valsartan containing an

7 NDMA or NDEA impurity.

8     I'm trying to see if you can put a

9 duration limit on that for me to a reasonable

10 degree of medical and scientific certainty.

11     A.     It's very hard to do but, you know,

12 if you force me to give a timeframe, I guess as a

13 minimum I would be, you know, comfortable with one

14 year, but it's very -- very difficult question to

15 answer.

16     MS. KAPKE: Okay. I have no further

17 questions. Thank you.

18     MR. SLATER: Let's go off the record.

19     THE VIDEOGRAPHER: The time is 8:05.

20     We're going off the video record.

21     (Time noted: 8:05 p.m.)

22     (Deposition concluded for the

23 evening.)

24

25

Page 396

1     A C K N O W L E D G M E N T

2

3     I, STEPHEN HECHT, Ph.D., hereby certify that I

4 have read the transcript of my testimony taken under oath

5 in my examination of August 17, 2021; that the transcript

6 is a true, complete and correct record of what was asked,

7 answered and said during this deposition, and that the

8 answers on the record as given by me are true and

9 correct.

10 _____

11     STEPHEN HECHT, Ph.D.

12

13 Signed and subscribed to

14 before me, this     day of

15     2021.

16 _____

17     Notary Public

18

19

20

21

22

23

24

25

Page 397

1     CERTIFICATION

2     I, SARA K. KILLIAN, RPR, CCR, do

3 hereby certify that STEPHEN HECHT, Ph.D.

4 the witness whose examination under oath

5 is hereinbefore set forth, was duly sworn,

6 and that such deposition is a true record

7 of the testimony given by such witness.

8     I FURTHER CERTIFY that I am not

9 related to any of the parties to this

10 action by blood or marriage, and that

11 I am in no way interested in the

12 outcome of this matter.

13     IN WITNESS WHEREOF, I have hereunto

14 set my hand this 23rd day of August, 2021.

15

16

17

18     SARA K. KILLIAN, RPR, CCR

19

20

21

22

23

24

25

100 (Pages 394 - 397)

Page 399

1

2    UNITED STATES DISTRICT COURT

3    FOR THE DISTRICT OF NEW JERSEY

4    MDL No. 2875

5    -----------------------------------x

6

     IN RE:

7

       VALSARTAN PRODUCTS

8      LIABILITY LITIGATION

9

10   -----------------------------------x

                   August 18, 2021

11                 9:08 a.m.

12

13

14        Continued Videotaped Deposition of

15   STEPHEN HECHT, Ph.D., taken by Defendants,

16   pursuant to Notice, held via Zoom

17   videoconference, before Todd DeSimone, a

18   Registered Professional Reporter and Notary

19   Public of the States of New York and New

20   Jersey.

21

22

23

24

25

Page 400

```
 1
 2   A P P E A R A N C E S :
 3   MAZIE SLATER KATZ & FREEMAN, LLC
       103 Eisenhower Parkway
 4   Roseland, New Jersey 07068
       Attorneys for Plaintiffs
 5   BY:   ADAM SLATER, ESQ.
       CHRISTOPHER GEDDIS, ESQ.
 6     JULIA SLATER, ESQ.
       CHERYLL A. CALDERON, ESQ.
 7
 8
 9   MARTIN, HARDING & MAZZOTTI, LLP
       100 Park Avenue
10   New York, New York 10017
       Attorneys for Plaintiffs
11   BY:   ROSEMARIE RIDDELL BOGDAN, ESQ.
12
13
       LEVIN, PAPANTONIO, THOMAS, MITCHELL,
14   RAFFERTY & PROCTOR, P.A.
       316 South Baylen Street
15   Suite 600
       Pensacola, Florida 32502
16     Attorneys for Plaintiffs
       BY:   DANIEL A. NIGH, ESQ.
17
18
19   FARR, FARR, EMERICH, HACKETT, CARR &
       HOLMES, P.A
20   99 Nesbit Street
       Punta Gorda, Florida 33950
21     Attorneys for Plaintiffs
       BY:   GEORGE T. WILLIAMSON, ESQ.
22
23
24
25
```

Page 401

```
 1
 2   A P P E A R A N C E S : (Continued)
 3   PIETRAGALLO GORDON ALFANO BOSICK
       & RASPANTI, LLP
 4   One Oxford Centre
       301 Grant Street
 5   Pittsburgh, Pennsylvania 15219
       Attorneys for Mylan Pharmaceuticals
 6       Inc., Mylan Laboratories Ltd., Mylan
       Inc. and Mylan N.V.
 7   BY:   FRANK H. STOY, ESQ.
 8
 9   DUANE MORRIS LLP
       100 High Street, Suite 2400
10   Boston, Massachusetts 02110-1724
       Attorneys for Zhejiang Huahai
11     Pharmaceutical Co., Ltd., Solco
       Healthcare LLC, Prinston
12     Pharmaceutical Inc., and Huahai U.S.
       Inc.
13   BY:   FREDERICK R. BALL, ESQ.
14     - and -
15   DUANE MORRIS LLP
       30 South 17th Street
16   Philadelphia, Pennsylvania 19103-4196
       BY:   RAYMOND VANDERHYDEN, ESQ.
17
18
19   HILL WALLACK LLP
       21 Roszel Road
20   Princeton, New Jersey 08540
       Attorneys for Hetero Labs Ltd.
21   BY:   ERIC I. ABRAHAM, ESQ.
       NAKUL Y. SHAH, ESQ.
22
23
24
25
```

Page 402

```
 1
 2   A P P E A R A N C E S : (Continued)
 3   BARNES & THORNBURG, LLP
       11 South Meridian Street
 4   Indianapolis, Indiana 46204
       Attorneys for CVS and Rite Aid
 5   BY:   KARA KAPKE, ESQ.
 6
 7
       HINSHAW & CULBERTSON LLP
 8   53 State Street
       27th Floor
 9   Boston, Massachusetts 02109
       Attorneys for HJ Harkins Co., Inc.
10   BY:   KATHLEEN E. KELLY, ESQ.
11
12
       GREENBERG TRAURIG, LLP
13   2101 L Street, N.W.
       Suite 1000
14   Washington, DC 20037
       Attorneys for Teva Pharmaceuticals
15       USA, Inc., Teva Pharmaceutical
       Industries Ltd., Actavis Pharma,
16     Inc., and Actavis LLC
       BY:   STEPHEN FOWLER, ESQ.
17
18   - and -
19   GREENBERG TRAURIG, LLP
       3333 Piedmont Road NE
20   Suite 2500
       Atlanta, Georgia 30305
21   BY:   STEVEN M. HARKINS, ESQ.
       VICTORIA LOCKARD, ESQ.
22
23
24
25
```

Page 403

```
 1
 2   A P P E A R A N C E S : (Continued)
 3   CIPRIANI & WERNER, PC
       450 Sentry Parkway
 4   Suite 200
       Blue Bell, Pennsylvania 19422
 5       Attorneys for Aurobindo Pharma
       USA, Inc.
 6   BY:   JILL FERTEL, ESQ.
 7
 8
       FALKENBERG IVES LLP
 9   230 West Monroe
       Suite 2220
10   Chicago, Illinois 60606
       Attorneys for Humana Pharmacy Inc.
11   BY:   KIRSTIN B. IVES, ESQ.
12
13   HUSCH BLACKWELL LLP
       190 Carondelet Plaza, Suite 600
14   St. Louis, Missouri 63105
       Attorneys for Cigna Corporation,
15     Express Scripts Holding Company,
       Express Scripts, Inc.
16   BY:   A. JAMES SPUNG, ESQ.
17
18   BUCHANAN INGERSOLL AND ROONEY PC
       227 West Trade St.
19   Suite 600
       Charlotte, NC 28202
20     Attorneys for Albertsons Companies
       LLC
21   BY:   CHRIS HENRY, ESQ.
22
       ALSO PRESENT:
23   BRADLEY MATTA, Viatris
24   WILLIAM MILLER, Videographer
25
```

2 (Pages 400 - 403)

Page 404

S. HECHT

1
2    THE VIDEOGRAPHER: Good morning.
3    We are going on the record at 9:08 a.m. on
4    August 18th, 2021.
5        This begins day two of the
6    deposition of Stephen Hecht Ph.D. in the
7    matter of the Valsartan/Losartan
8    Litigation.  My name is William Miller from
9    the firm Veritext Legal Solutions and I am
10   the videographer.  The court reporter today
11   is Todd DeSimone from the firm Veritext
12   Legal Solutions.  All counsel is noted on
13   the stenographic record.
14       Would the court reporter swear
15   in the witness or remind him that he is
16   still under oath.
17       *  *  *
18   S T E P H E N   H E C H T, Ph.D.,
19   having been previously duly sworn,
20   testified further as follows:
21       MR. SLATER:  Steve, I think you
22   wanted to put something on the record
23   before we started?
24       MR. FOWLER:  Yes, thanks,
25   Counsel.

Page 405

S. HECHT

1
2        When we concluded yesterday
3    before passing the witness to plaintiff, I
4    just want to confirm on the record that the
5    run time in total at that point on the
6    record was eight hours and 41 minutes as
7    was provided to us yesterday.  Is that your
8    recollection as well, Counsel?
9        MR. SLATER:  That is my
10   grudging recollection.
11       MR. FOWLER:  Yes, sir, okay.
12       MR. SLATER:  You see the smile
13   on my face, I'm saying grudging, because we
14   talked about before that I don't know where
15   all the time went.
16       MR. FOWLER:  Perfect.  Thank
17   you.
18   EXAMINATION BY MR. SLATER:
19   Q.    Okay.  Is it okay if I begin
20   now?  Ready to go, Doctor?
21   A.    Yes.
22       MR. SLATER:  Chris, can you put
23   up the FDA document that had those four
24   bullet points that was used yesterday,
25   please, multiple bullet points I should

Page 406

S. HECHT

1
2    say.  Okay, let me start.
3    Q.    Here is a document that you
4    were shown yesterday, Dr. Hecht, regarding,
5    it is actually the FDA's statement about
6    nitrosamine impurities, and what I would
7    like to do is focus where the defense
8    attorney focused yesterday, on the fourth
9    bullet point, if we could, please.  Let me
10   get this out of the way.
11       Do you see that, the fourth
12   bullet point down?
13   A.    Yes.
14   Q.    Okay.  For the record, it says
15   "Nitrosamine impurities may increase the
16   risk of cancer if people are exposed to
17   them above acceptable levels and over long
18   periods of time, but a person taking a drug
19   that contains nitrosamines at or below the
20   acceptable daily intake limits every day
21   for 70 years is not expected to have an
22   increased risk of cancer."
23       Do you see what I just read?
24   A.    Yes.
25   Q.    First of all, I want to focus

Page 407

S. HECHT

1
2    on the second half where the FDA says that
3    a person taking these drugs at or below the
4    acceptable daily intake limits is not
5    expected to have an increased risk of
6    cancer.
7        Am I correct that when the FDA
8    says not expected, they are not saying they
9    will not have an increased risk of cancer?
10       MR. FOWLER:  Objection, form.
11   A.    Yes, that's what it seems to
12   say.
13   Q.    And if I understand correctly,
14   the FDA said that there may be an increased
15   risk of cancer for people who take the
16   pills with contamination above the
17   acceptable levels for what they term long
18   periods of time, correct?
19       MR. FOWLER:  Objection, form,
20   speculation.
21   Q.    That's what the document says,
22   right?
23   A.    That's what it says, yeah.
24   Q.    Am I correct that above the
25   acceptable levels would encompass virtually

3 (Pages 404 - 407)

Page 408

S. HECHT

1
2  all of the contaminated valsartan at issue
3  and as described in your report where you
4  went through the levels disclosed by the
5  manufacturers in our depositions?
6          MR. FOWLER: Objection, form,
7  facts not in evidence.
8      A.   I mean, as I understand it,
9  they said the acceptable limit was 96
10  nanograms per day.
11      Q.   For the NDMA, correct?
12      A.   Right.
13      Q.   And 26.5 nanograms for the
14  NDEA, correct?
15      A.   Right.
16      Q.   And all or virtually all --
17  rephrase.
18          Virtually all of the pills --
19  rephrase.
20          The manufacturers disclosed
21  their levels and we have them in your
22  report, those levels in virtually all cases
23  exceed those levels, correct?
24      A.   Yes.
25      Q.   So based on this FDA statement,

Page 409

S. HECHT

1
2  those valsartan pills sold by these
3  manufacturers that were above the
4  acceptable levels are deemed by the FDA to
5  potentially increase the risk of cancer,
6  that's what this statement says, right?
7          MR. FOWLER: Objection to form,
8  mischaracterizing.
9      A.   Yes.
10      Q.   And I will give an example.
11  Why don't we go, just so we have some
12  context, Doctor, do you have your report
13  handy, please?  If you have your report,
14  can you turn to page 22.  Actually, it
15  starts at the bottom of page 21, for
16  context, where there is a heading ZHP, NDMA
17  and NDEA Levels.
18      A.   Yeah.
19      Q.   And if I understand correctly,
20  these levels are referenced as coming from
21  documents and testimony provided to you by
22  my law firm based on what we learned in
23  discovery in this case, correct?
24      A.   Right.
25      Q.   And let's just look at some of

Page 410

S. HECHT

1
2  the levels.  If you look at page 22, in the
3  first full paragraph, about four lines
4  down, there was a chart of testing results
5  of 783 batches from ZHP manufactured
6  between 2011 and 2018 with NDMA levels as
7  high as 188.1 parts per million.
8      A.   Right.
9          MR. FOWLER: Objection, form,
10  leading.
11      Q.   Let me know if I have --
12  rephrase.
13          And my calculation is that
14  188.1 parts per million in a 320 milligram
15  pill, you would multiply the parts per
16  million by the 320 and we would come up
17  with 60,192 nanograms.  Does my math sound
18  correct?
19      A.   Yes.
20          MR. FOWLER: Objection to form,
21  leading.
22      Q.   And even if we were to look at
23  levels in the next paragraph where it says
24  in the middle of the paragraph "There are a
25  small number of batches with results in the

Page 411

S. HECHT

1
2  single digits with the lowest at 3.4 parts
3  per million per a separate spreadsheet,"
4  let's look at 3.4 parts per million, in a
5  320 milligram pill, my calculation is that
6  would be 1,088 nanograms.  Does my math
7  sound correct?
8      A.   Yes.
9          MR. FOWLER: Objection, form.
10      Q.   Those levels I just gave as
11  examples would far exceed the levels the
12  FDA found to be acceptable, correct?
13          MR. FOWLER: Objection,
14  leading.
15      A.   96 nanograms, right.
16      Q.   And let's look at page 25,
17  which is the carry-over from page 24,
18  regarding Mylan, talking about NDEA with
19  levels between 0.1 parts per million to
20  1.57 parts per million.  And my calculation
21  is that at 0.1 parts per million in a 320
22  milligram pill, you multiply the 320 by the
23  0.1, you come up to 32 nanograms.  Does
24  that math sound correct?
25      A.   Yes.

4 (Pages 408 - 411)

Page 412

S. HECHT

1            S. HECHT
2            MR. FOWLER:  Objection to form.
3 You are talking about API, Counsel.
4 Mischaracterizing.
5      Q.   Does that math sound correct?
6            MR. FOWLER:  Same.
7      A.   Yes.
8      Q.   And looking at the upper bound
9 of that range, 1.57 parts per million, for
10 a 320 milligram pill, that would be 502.4
11 nanograms.  Does that math sound correct?
12            MR. FOWLER:  Same objection.
13 You are talking about API numbers.  Form.
14      Q.   Does that math sound correct?
15      A.   Yes.
16      Q.   And just to be fair to Mylan's
17 counsel, who was here yesterday, he gave
18 you what he calculated as a mean of 0.47
19 parts per million, and just assuming that
20 for a moment, for a 320 milligram pill,
21 that would come to 150.4 nanograms.  Does
22 that math sound correct?
23            MR. FOWLER:  Objection to form,
24 incomplete, mischaracterizes.
25      A.   Yes.

Page 413

1            S. HECHT
2      Q.   Those NDEA levels for Mylan, do
3 they all exceed the limits the FDA set?
4            MR. FOWLER:  Same objection.
5      A.   Yes.
6      Q.   You can put that document aside
7 for a moment, or for now.
8            Let's go now to the Control of
9 Nitrosamines -- of Nitrosamine Impurities
10 in Human Drugs, Guidance For Industry.  We
11 are now at Appendix B, at the end of that
12 document.
13            MR. SLATER:  And do we have
14 this marked as an exhibit previously in the
15 deposition?  I can't recall.
16            MR. GEDDIS:  No.
17            MR. SLATER:  Let's mark it as
18 whatever the next exhibit is, please.
19            THE VIDEOGRAPHER:  The next
20 exhibit number is 27.
21            MR. SLATER:  Thank you.
22            (Hecht Exhibit 27 marked for
23 identification.)
24      Q.   Looking now at the last page of
25 Exhibit 27, I just want to look at the top

Page 414

1            S. HECHT
2 part where the FDA provides their
3 information as to how they calculated the
4 acceptable intake limits.  Do you see that?
5      A.   Yeah.
6      Q.   And I just want to focus on the
7 beginning where it says that "The FDA
8 followed the procedures recommended in the
9 ICH Guidance For Industry," and it gives
10 the title of that document, and then says
11 "a compound-specific acceptable intake can
12 be calculated based on rodent
13 carcinogenicity potency data such as TD50
14 values."
15            Do you see that?
16      A.   Yeah.
17      Q.   And ultimately that is what was
18 applied based on rat data, correct?
19      A.   Yes.
20      Q.   So the FDA chose to use animal
21 study data to establish the acceptable
22 intake limits for human beings, correct?
23      A.   Yes.
24            MR. FOWLER:  Objection, form.
25            MR. SLATER:  I think now might

Page 415

1            S. HECHT
2 be a good time, let's take that down, and
3 if you could, Chris, let's put up the
4 Johnson study that Dr. Hecht was asked
5 about.  I would like to spend a couple of
6 minutes on that, two minutes or so.  You
7 can blow up the abstract or at least let us
8 be able to see the abstract.  Perfect.
9      Q.   First, Doctor, what I would
10 like to do is read the first sentence or
11 two of the abstract and then ask you a
12 question.  It says "A genotoxic
13 carcinogen" -- and I'm going to stop there.
14 What is a genotoxic carcinogen?  What does
15 that mean?
16      A.   That is a carcinogen that
17 damages DNA, forms adducts with DNA or
18 otherwise damages DNA.
19            MR. FOWLER:  Objection, form.
20      Q.   "A genotoxic carcinogen,
21 N-nitrosodimethylamine (NDMA), was detected
22 as synthesis impurity in some valsartan
23 drugs in 2018, and other nitrosamines, such
24 as N-nitrosodiethylamine (NDEA), were later
25 detected in other sartan products.

5 (Pages 412 - 415)

Page 416

S. HECHT

1  N-nitrosamines are promutagens that can
2  react with DNA following metabolism to
3  produce DNA adducts, such as
4  O6-alkylguanine. The adducts can result in
5  DNA replication miscoding errors leading to
6  GC greater than AT mutations and increased
7  risk of genomic instability and
8  carcinogenesis."
9      What I would like to ask you,
10 Doctor, without getting too deep into it,
11 but as much as you would like to explain,
12 what is this telling us, what I just read,
13 about being promutagens and these
14 mechanisms being described, what is that
15 and what is the significance of it?
16     MR. FOWLER: Objection to form,
17 multiple reasons. Go ahead.
18 A.    Well, it is telling you that
19 all of the data that is out there is very
20 consistent about this particular process,
21 that upon metabolism NDMA and NDEA form
22 reactive intermediates that react with DNA,
23 causing alkylation at the various
24 nucleophilic sites in DNA, one of which is

Page 417

S. HECHT

1  the O6 position of guanine.
2      So it is well established that
3  in animal systems, in all animal systems,
4  if you treat the animal with NDMA or NDEA
5  there will be O6-alkylguanine in the DNA,
6  and that particular DNA adduct is known to
7  cause miscoding, which means that normally
8  where you had a GC, a base pair in the DNA,
9  that will be converted to AT.
10     This will change the sequence
11 in your DNA and if that sequence change
12 occurs in a so-called oncogene enough to
13 activate the oncogene, such as rats, and
14 cause it to enter into a molecular pathway,
15 that results in uncontrolled growth and
16 cancer.
17 Q.    What you just described, is
18 that controversial in any way in the
19 scientific community?
20 A.    No.
21     MR. FOWLER: Objection, form.
22 A.    Absolutely not.
23 Q.    Is that an accepted scientific
24 consensus?

Page 418

S. HECHT

1  A.    Yes. It is rock solid.
2  Q.    I want to ask one other
3  question. If you have explained it as part
4  of your description, you can just confirm
5  that, but I want to make sure for the
6  transcript, you mentioned alkylation, what
7  does that specifically mean?
8  A.    That is the process by which
9  either the methyl group from
10 dimethylnitrosamine or the ethyl group from
11 diethylnitrosamine becomes attached to the
12 guanine that is in DNA, specifically to the
13 O6 position, actually, to multiple
14 positions on the guanine, but the O6 is the
15 one that leads to miscoding. It leads to
16 the GC to AT mutation.
17     We know this from experiments
18 that have specifically put the methyl group
19 on the O6 position, a single guanine in a
20 chain of nucleotides, and then examined
21 what the consequences were.
22 Q.    What you just described, is
23 that or is that not well established in the
24 peer-reviewed literature and in the

Page 419

S. HECHT

1  scientific consensus in the scientific
2  community?
3      MR. FOWLER: Objection, form.
4  A.    It is absolutely well
5  established.
6  Q.    Looking further down, about
7  five lines up, where the authors of this
8  study, Dr. Johnson and others, say "We
9  calculated permissible daily exposures
10 (PDE) for NDMA and NDEA using published
11 rodent cancer bioassay and in vivo
12 mutagenicity data to determine benchmark
13 dose values and define points of departure
14 and adjusted with appropriate uncertainty
15 factors (UFs)."
16     Do you see where I just read?
17 A.    Yes.
18 Q.    So when the authors refer to
19 using published rodent cancer bioassay and
20 in vivo mutagenicity data, what does that
21 mean?
22 A.    The rodent bioassay data would
23 be the large study that was discussed
24 yesterday by Peto, Grasso, and others, on

6 (Pages 416 - 419)

Page 420

1    S. HECHT
2 thousands of rats, a dose-response study.
3 That wasn't the first study of
4 dimethylnitrosamine carcinogenicity. The
5 first study was back in 1956 by Magee and
6 Barnes but that only used one dose. But
7 there have been many subsequent studies,
8 the largest of which was the one we
9 discussed yesterday, which took the
10 dose-response down to extremely low doses,
11 and that's what they used in this
12 calculation.
13    Q.    So based on what this --
14 rephrase.
15        So based on what I just read
16 and what you just discussed, am I correct
17 that this study utilized rodent data to
18 establish its proposed permissible daily
19 exposures and the FDA also used rodent data
20 to utilize its model to establish the
21 acceptable intake levels that actually
22 apply in the United States, do I understand
23 that correctly?
24        MR. FOWLER: Objection to form,
25 leading, mischaracterizes.

Page 421

1    S. HECHT
2    A.    Yes.
3    Q.    And at the very bottom of this
4 page it says PDEs, permissible daily
5 exposures, for NDMA were 6.2 and 0.6 UG per
6 person per day for cancer and mutation.
7 What I will focus on is the
8 higher level, the 6.2 micrograms would
9 convert to nanograms by just multiplying by
10 1,000, that would take us to 6,200
11 nanograms, correct?
12    A.    Yes.
13    Q.    And without going back to your
14 report which documents the levels that you
15 relied on based on what we learned in
16 discovery, did you note that the ZHP levels
17 certainly exceed and in many cases far
18 exceed that level of NDMA?
19        MR. FOWLER: Objection, form,
20 leading, facts not in evidence,
21 mischaracterizes the facts. Go ahead.
22    A.    Yes.
23        MR. SLATER: Chris, could you
24 scroll down now so we can just get the
25 carry-over of the abstract. Perfect.

Page 422

1    S. HECHT
2    Q.    This also provides the levels
3 for NDEA, and those are stated as 2.2 and
4 0.04, correct?
5    A.    Yes.
6    Q.    Now, these levels are higher
7 than the acceptable intake levels that the
8 FDA has established in the United States,
9 correct?
10        MR. FOWLER: Objection, form,
11 leading.
12    A.    Well, the 96 nanograms I
13 believe was for NDMA.
14    Q.    And the 26.5 for NDEA?
15    A.    Okay, the 26.5, all right, yes,
16 there are.
17    Q.    And I will ask it again, just
18 clean.
19        Are these proposed permissible
20 exposure levels in excess of what the FDA
21 set? And you can see the FDA levels are
22 right there in the next sentence.
23        MR. FOWLER: Objection to form.
24    A.    Yes.
25        MR. FOWLER: Leading. You have

Page 423

1    S. HECHT
2 to pause.
3    Q.    I will ask it differently.
4    A.    Yeah, it says right here they
5 are higher.
6    Q.    It says "Both PDEs are higher
7 than the acceptable daily intake values (96
8 nanograms for NDMA and 26.5 nanograms for
9 NDEA) calculated by regulatory authorities
10 using simple linear extrapolation from
11 carcinogenicity data."
12        That's what the authors
13 disclose here, correct?
14    A.    Yes.
15        MR. FOWLER: Objection to form,
16 leading.
17    Q.    And I understand you said
18 yesterday your opinion is that no level
19 should be acceptable for NDMA and NDEA
20 because it is feasible to keep it out of
21 the pills, but if you had to choose between
22 the FDA level and the levels proposed here,
23 which level would you in your opinion
24 believe is more reasonable?
25        MR. FOWLER: Objection, form,

7 (Pages 420 - 423)

Page 424

1        S. HECHT
2  leading, mischaracterizing, incomplete
3  hypothetical.  Go ahead.
4      A.    I don't think -- I wouldn't
5  want to take a pill with any NDMA or NDEA
6  in it.  I think it is a failure of
7  chemistry and manufacturing.  The level
8  should be zero.  That's my opinion.
9      Q.    If you were forced to choose
10 between the FDA levels and the proposed
11 levels here, which would you select if that
12 was your only two choices?
13        MR. FOWLER:  Objection, form,
14 improper.  Are you asking him what medicine
15 he would take, Counsel?  Is that your
16 question?
17        MR. SLATER:  No, I'm sorry,
18 don't be angry.
19        MR. FOWLER:  I just can't
20 fathom what you are asking.
21        MR. SLATER:  Sure, I will ask
22 it more clearly, because it was a long
23 night last night, but I will ask it again.
24      Q.    Doctor, if you -- rephrase.
25        In your opinion, if the only

Page 425

1        S. HECHT
2  choice for the acceptable levels for NDMA
3  and NDEA in drugs in the United States, if
4  one choice was the level set by the FDA, 96
5  nanograms for NDMA and 26.5 nanograms for
6  NDEA, if that was one choice and if on the
7  other hand is the levels that
8  Dr. Johnson suggests of 6,200 nanograms per
9  day of NDMA and 2,200 nanograms per day of
10 NDEA, which would you choose, if those were
11 your only choices in that hypothetical?
12        MR. FOWLER:  Same objection.
13      A.    I would go with the FDA.
14      Q.    Let's go now --
15        MR. SLATER:  You can take that
16 down, Chris, please.
17      Q.    Dr. Hecht, would you please
18 turn to page 25 of your report.
19      A.    Okay.
20      Q.    I'm looking in the center of
21 your report -- rephrase.
22        I'm looking at the center of
23 page 25, heading 5 says Nitrosamines in the
24 Finished Dose Formulations.  I'm going to
25 read something and then I'm going to ask

Page 426

1        S. HECHT
2  you a question, okay?
3        This says "The NDMA and NDEA
4  levels would be expected to be the same or
5  nearly so in the finished dose formulations
6  incorporating the contaminated valsartan
7  API.  This was addressed and confirmed in
8  the deposition of Hai Wang, the president
9  of Solco, ZHP's wholly-owned distributor in
10 the United States.  Hai Wang confirmed that
11 this was determined by ZHP and that data
12 was provided to the FDA."
13        Do you see what I just read?
14      A.    Yeah.
15        MR. FOWLER:  Objection, form,
16 leading.
17      Q.    And did you rely on that
18 testimony by Hai Wang, the president of
19 Solco, in forming your opinions in this
20 case?
21      A.    Yes.
22      Q.    Let's go now to the next page,
23 which is the carry-over from Section 6
24 which is titled Nitrosamines in the Teva
25 Finished Dose Formulation.  At the top of

Page 427

1        S. HECHT
2  page 26, the carry-over paragraph, there is
3  a sentence that states "Daniel Barreto,
4  Teva's former Senior Vice President Global
5  Quality Compliance, testified that the
6  finished dose product would have the same
7  levels of NDMA as tested in the API and
8  Teva extrapolated the nitrosamine test
9  results of the API to the valsartan
10 finished dose."
11        Did you rely on that testimony
12 as well in forming your opinions?
13      A.    Yes.
14        MR. FOWLER:  Objection, form,
15 mischaracterizing, leading.
16        MR. SLATER:  Chris, could you
17 please put up the summary of the FDA public
18 workshop that Dr. Hecht was asked about
19 yesterday, please.  Just for the record, do
20 we know what exhibit this was marked as
21 yesterday?
22        MR. FOWLER:  I believe it was
23 13, Counsel.
24        MR. SLATER:  Great, thank you.
25      Q.    This is titled Nitrosamines as

8 (Pages 424 - 427)

Page 428

S. HECHT

1    S. HECHT
2  Impurities in Drugs, Health Risk Assessment
3  and Mitigation Public Workshop, March 29 to
4  30, 2021, and it was offered by the Office
5  of New Drugs, Food and Drug Administration,
6  and that was the workshop that you
7  participated in and were questioned about
8  yesterday, correct, Dr. Hecht?
9    A.    Yes.
10       MR. SLATER: Chris, please go
11  to page 1, the very beginning. Perfect.
12    Q.    This states at the very
13  beginning "Purpose and goals of the
14  workshop. The Office of New Drugs in the
15  Center for Drug Evaluation and Research
16  (CDER) of the Food and Drug Administration
17  (FDA) organized this public workshop.
18  International and national experts on
19  nitrosamines were invited to discuss the
20  chemistry and toxicology of nitrosamines in
21  the environment and those recently
22  identified as contaminants in
23  pharmaceuticals."
24       I want to stop there. Doctor,
25  were you one of those experts that was

Page 429

1    S. HECHT
2  invited by the FDA to participate in this
3  workshop?
4    A.    Yes.
5       MR. FOWLER: Objection to form.
6    A.    Yes, I was.
7       MR. SLATER: Chris, please go
8  to page 4, if you could. Actually, let me
9  see if I can find something. One second.
10  Just bear with me for one second. I'm
11  trying to figure out how to minimize my
12  Zoom screen. Here it is. And it is not
13  letting me do it. That's not good.
14       THE VIDEOGRAPHER: Counsel, if
15  I could help you out, if you just double
16  click on the screen it should minimize it I
17  think for you.
18       MR. SLATER: Beautiful, thank
19  you very much. I appreciate it.
20       THE VIDEOGRAPHER: Yeah, no
21  worries.
22       MR. SLATER: Okay, let's go
23  now, Chris, to page 4, and focus on the
24  very bottom of the page, the last
25  paragraph, or last section.

Page 430

1    S. HECHT
2    Q.    Doctor, you were asked a bunch
3  of questions yesterday about what you said
4  and what this group concluded regarding
5  endogenous NDMA formation and the levels
6  thereof. Do you recall you were asked
7  about that a bit yesterday?
8    A.    Yes.
9    Q.    I'm going to go through this
10  document a bit and walk through some of the
11  language. At the bottom of page 4, it says
12  "In addition to their abundance in the
13  environment, nitrosamines are formed
14  endogenously. To calculate risk, it is
15  imperative to determine endogenous
16  formation and understand the
17  pharmacokinetics of nitrosamine formation
18  and distribution. At this time there is a
19  considerable gap in knowledge on the
20  endogenous formation of nitrosamines in
21  general, and NDMA in particular. It is
22  unknown whether endogenous formation of
23  carcinogenic nitrosamines exceeds, is equal
24  to, or is less than, the levels detected in
25  pharmaceuticals."

Page 431

1    S. HECHT
2       Do you see what I just read?
3    A.    Yes.
4    Q.    Do you agree with that
5  statement?
6    A.    Absolutely.
7    Q.    Let's go now to page 5, and
8  let's go to the third full paragraph. The
9  third full paragraph on page 5 says
10  "However, reliable data on many reactive
11  carcinogenic nitrosamines, for example,
12  NDMA and NDEA, are sparse because they are
13  rapidly metabolized and the distribution
14  and excretion of their metabolites are
15  unclear."
16       I want to stop there, Doctor.
17  Can you explain what that means, what I
18  just read, that sentence, please?
19       MR. FOWLER: Objection,
20  leading, mischaracterizing.
21    A.    It means exactly what it says,
22  the NDMA and NDEA are rapidly metabolized
23  by cytochrome P450 in the liver and other
24  tissues, and the metabolites are very
25  short-lived, and, you know, the

9 (Pages 428 - 431)

Page 432

1          S. HECHT
2  distribution and excretion of the
3  metabolites is unclear.  I mean, I don't
4  know how else to say it.
5     Q.    In the beginning it refers to
6  reactive carcinogenic nitrosamines and
7  gives examples of NDMA and NDEA.  What is a
8  reactive carcinogenic nitrosamine?
9     A.    So what they are saying here is
10  that NDMA and NDEA, when metabolized,
11  become extremely unstable and give rise to
12  reactive intermediates.  That's what
13  they -- that's what they are trying to say.
14          NDMA and NDEA themselves are
15  actually stable compounds.  They are not
16  terribly reactive, but when they interact
17  with P450s in the body, which happens
18  mainly in the liver, but also in other
19  tissues, they are converted to extremely
20  reactive intermediates, formaldehyde and
21  methyldiazohydroxyl.
22     Q.    Continuing to read this
23  paragraph --
24     A.    So there is no --
25     Q.    I'm sorry, go ahead.

Page 433

1          S. HECHT
2     A.    There is no characteristic NDMA
3  metabolite that is excreted in the urine
4  that you can really use to monitor its dose
5  even.
6     Q.    If I continue to read now, the
7  second sentence of this paragraph says "It
8  is assumed however, that NDMA and NDEA are
9  formed endogenously as their dietary
10  precursors (dimethylamine and diethylamine,
11  respectively), which, together with
12  nitrites and nitrates, are present in
13  foods.  However, no quantitative assessment
14  of NDMA or NDEA is available because of
15  their rapid metabolism."
16          Focusing on that last sentence
17  along with the first sentence we went
18  through, is that consistent with your
19  opinion?
20          MR. FOWLER:  Objection,
21  leading.
22     A.    No, it is absolutely right.  I
23  mean, we just don't know about endogenous
24  formation of NDMA and NDEA.  I mean, you
25  can contrast it to nitrosoproline which is

Page 434

1          S. HECHT
2  unmetabolized, excreted 100 percent
3  unchanged, because of its high polarity.
4          So nitrosoproline is a great
5  monitor for endogenous formation.  You can
6  give proline to people and measure the
7  nitrosoproline, the increase in
8  nitrosoproline, that is excreted in urine,
9  in people who were exposed, for example, to
10  nitrite.  It is a great monitor of
11  endogenous formation, but you can't do that
12  with NDMA and NDEA because they are rapidly
13  metabolized and their metabolites cannot
14  easily be quantified.  So we don't know.
15          MR. SLATER:  Chris, please
16  scroll down to page 14, please, the last
17  paragraph.
18     Q.    Looking now at page 14, at the
19  bottom, the last paragraph is a paragraph
20  you were specifically asked about
21  yesterday, and I want to walk through the
22  whole paragraph though, rather than just
23  the one sentence that was focused on.
24          Looking now, new question,
25  looking now at page 14, the last paragraph,

Page 435

1          S. HECHT
2  this states "The need for up-to-date
3  information on exogenous and endogenous
4  formation of nitrosamines was reiterated by
5  the expert panelists.  Such information is
6  essential for risk assessment and accurate
7  calculation of acceptable intake.  However,
8  most available data are 20 to 50 years old
9  and much has changed since, including
10  dietary habits, exposures, and analytical
11  methods."
12          The next sentence says "The
13  levels of nitrosamines as impurities in
14  drugs are likely minuscule in comparison to
15  exogenous exposure from foods and even more
16  so to endogenous levels."
17          Do you recall you were asked
18  about that sentence and the suggestion that
19  the levels are minuscule?
20          MR. FOWLER:  Objection to form.
21     Q.    In drugs as compared to
22  exogenous and then, more so, endogenous
23  levels, do you remember you were asked
24  about that yesterday?
25     A.    Yes, I do remember.

10 (Pages 432 - 435)

Page 436

S. HECHT

1
2      MR. FOWLER:  Objection to form.
3      Q.    Let's look at the next sentence
4  which we were not asked about yesterday.
5  The next sentence, after what you were
6  asked, says "However, this estimate is
7  based on old data and is thus likely to be
8  inaccurate."
9      I want to stop there.  Do you
10  agree with that statement?
11      MR. FOWLER:  Objection.
12  A.    That's what I said yesterday.
13  We don't know, and the data that's out
14  there is questionable.  I said that
15  yesterday.
16  Q.    Continuing, the paragraph says
17  "By contrast, data on nitrosamines in food
18  are more up-to-date and the food industry
19  has made much improvement over the past few
20  decades.
21  A.    Absolutely.
22  Q.    When this talks about the food
23  industry making improvement, what is that
24  referring to?
25  A.    Well, they made process changes

Page 437

S. HECHT

1
2  having to do with the composition of foods
3  and the storage of foods.  It is also -- it
4  is also true for beer, in the whole
5  manufacturing process to minimize the
6  chance of nitrosamine formation by removing
7  the precursors or by using inhibitors of
8  the reaction, for example, ascorbic acid is
9  known to inhibit nitrosation, and lowering
10  the nitrite content, for example, in cured
11  meats.
12      I mean, so there are a lot of
13  process changes that have occurred over,
14  well, since the '70s, over the last 50
15  years.  So really the levels of
16  nitrosamines in food now are quite low.
17  They typically don't exceed 10 parts per
18  billion, or even lower.
19  Q.    Thank you.
20      MR. SLATER:  Chris, you can
21  take that down.  Let's go now to the
22  transcript of the workshop, day one, page
23  61, please.  If you can blow that up a
24  little bit just so that it is easier to
25  read for everybody.  Terrific.

Page 438

S. HECHT

1
2  Q.    Starting from the top, and when
3  I get to the point where you need to
4  scroll, you can just scroll with me.
5  Dr. Hecht, this is the transcript of a
6  portion of that workshop, and you can see
7  at the top of page 61 there is something
8  that you stated, because we can see
9  "Dr. Hecht," so this is you speaking,
10  correct?
11  A.    Yes.
12  Q.    And I'm going to read what you
13  said and then ask you a question about it.
14      You said "Yes, so, we know
15  quite a bit about endogenous formation
16  based on studies that have been carried out
17  with nitrosoproline where subjects have
18  been dosed with proline plus nitrite or
19  even proline plus nitrate, and then
20  nitrosoproline can be quantified in the
21  urine because nitrosoproline is not
22  metabolized.  It is also not carcinogenic.
23  So, many studies on nitrosoproline
24  formation have been carried out, which
25  demonstrate the endogenous formation of

Page 439

S. HECHT

1
2  nitrosamine.  So, the overall yield is
3  actually quite low based on the amounts of
4  proline and nitrate that are given.  But we
5  do not have reliable data for compounds
6  such as dimethylnitrosamine because
7  dimethylnitrosamine is rapidly metabolized
8  in the liver, and we do not have good data
9  on the quantitative formation and excretion
10  of its metabolites."
11      So I want to stop there.  Is
12  that consistent with what your opinion has
13  been throughout, and does this now show
14  this is what you actually stated during the
15  FDA workshop?
16  A.    Yes.
17      MR. FOWLER:  Objection,
18  leading.
19  A.    That is what I said, that is
20  what I believe, and, you know, that's the
21  truth.  So I don't know what some of these
22  other statements yesterday were all about.
23  This is what I said and this is what I
24  believe.
25  Q.    Is that -- rephrase.

11 (Pages 436 - 439)

Page 440

1          S. HECHT
2          The statements that you made
3    that we just read and the parts of the FDA
4    workshop report or summary report that we
5    went through before regarding the data on
6    endogenous formation of nitrosamines, do
7    you believe that that is scientifically
8    accepted among those people who study these
9    issues?
10          MR. FOWLER:  Objection,
11   leading.
12     A.    Do I believe that --
13     Q.    That those concepts --
14     A.    -- what I said here is
15   accepted?
16     Q.    Yes.
17     A.    Yes, absolutely.
18          MR. SLATER:  Okay, we can take
19   that transcript down.  And the next thing I
20   would like to look to is the Knekt article
21   that Dr. Hecht was asked about yesterday,
22   spend a moment on that.  If you can blow up
23   the abstract, Chris, that would be great,
24   because I think we can just work off that
25   for ease of reference and to be a little

Page 441

1          S. HECHT
2    more efficient.  I think that's good.
3      Q.    In the middle of the abstract,
4    this study says "A significant positive
5    association was observed between intake of
6    NDMA and subsequent occurrence of
7    colorectal cancer with a relative risk (RR)
8    between the highest and lowest quartiles of
9    intake of 2.12 (95 percent confidence
10   interval (CI) 1.04 to 4.33)."
11          Do you see what I just read,
12   Doctor?
13          MR. FOWLER:  Objection,
14   leading.
15     A.    Yes.
16     Q.    What does that mean, what does
17   that statement that I just read mean?
18     A.    It means the relative risk for
19   colorectal cancer is 2.12, so if the CI, 95
20   percent confidence interval, if it is
21   greater than 1, then it is statistically
22   significant, so, you know, the 1.04 to 4.33
23   indicates that this 2.12 is statistically
24   significant, so it means a higher relative
25   risk, for the highest versus the lowest

Page 442

1          S. HECHT
2    intake of NDMA and occurrence of colorectal
3    cancer.  It is a significant one.
4      Q.    And in order to give a little
5    bit of a snapshot of your methodology and
6    your thinking on this, was that significant
7    to you in your overall analysis of the
8    weight of the evidence in this matter?
9      A.    Yes.
10          MR. FOWLER:  Objection,
11   leading.
12     Q.    And can you explain how it is
13   that you incorporated that information into
14   your overall analysis?  How did it fit?
15          MR. FOWLER:  Objection,
16   leading, mischaracterizes, facts not in
17   evidence.
18     A.    Well, it is part of the -- it
19   is one of the studies of NDMA exposure
20   through foods and cancer that gave a
21   positive result, and, you know, this study
22   was strong because it was a cohort study,
23   nearly 10,000 adults, and in a cohort study
24   it is a strong design because you follow
25   the cohort for years and you have -- and

Page 443

1          S. HECHT
2    you obtain information on their diet and
3    from this dietary information tables that
4    are available for analysis of various
5    compounds, including nitrosamines, in the
6    diet, you can calculate the intake and then
7    you can follow the people for years.  So
8    there is no chance of recall bias that is a
9    problem in case control studies.
10          So you follow them for years
11   and then you compare the incidence of
12   cancer to the dietary data.  That's what
13   they did here.  So it is a strong study
14   design, it is a large study, and they have
15   good, solid data.
16     Q.    And to be fair, further down,
17   it says "No significant associations were
18   observed between NDMA intake and cancers of
19   the head and neck combined or of the
20   stomach or between nitrate or nitrite
21   intake and risk of cancers of the
22   gastrointestinal tract."
23          Do you see that?
24     A.    Yup.
25     Q.    Is that something you also

12 (Pages 440 - 443)

Page 444

1          S. HECHT
2 considered as part of your analysis of the
3 weight of the evidence here?
4     A.    Yes.
5          MR. FOWLER:  Objection,
6 leading.
7     A.    Yes.
8     Q.    And can you explain how that
9 fit into your analysis as well, how you
10 took that into account, these negative
11 findings?
12          MR. FOWLER:  Objection,
13 leading, lack of foundation.
14     A.    It is logical because we know
15 from animal studies that nitrate and
16 nitrite don't cause cancer, but NDMA does,
17 so it is logical.
18     Q.    And the part where --
19     A.    It is consistent with the
20 animal studies.
21     Q.    And where this says that "No
22 significant associations were observed
23 between NDMA intake and cancers of the head
24 and neck combined or of the stomach," I
25 will stop there, just talking about the

Page 445

1          S. HECHT
2 NDMA, how did you take that negative
3 finding into account as part of your
4 analysis of the weight of evidence?
5          MR. FOWLER:  Objection,
6 leading, lack of foundation.
7     A.    Well, they just didn't -- they
8 just did not see a positive association for
9 these other two tumor types, and this is
10 really not that surprising because, I mean,
11 there is no animal data that indicates that
12 NDMA causes stomach cancer, and in general
13 it doesn't cause head and neck cancer
14 either.
15     Q.    If someone were to suggest that
16 in the absence of fully consistent data in
17 all of these studies showing significant
18 positive associations between NDMA and
19 cancer that you shouldn't be able to give
20 the opinion you have given about the risk,
21 the increased risk of cancer from NDMA
22 intake, what would be your response to
23 that, someone saying you have to have
24 uniform findings of significant association
25 across all studies, what would be your

Page 446

1          S. HECHT
2 response to that?
3          MR. FOWLER:  Objection,
4 leading, incomplete hypothetical,
5 foundation, speculation, probably more.  Go
6 ahead.
7     A.    Could you repeat the question?
8     Q.    Hopefully not, because it
9 sounded like there are a lot of objections
10 to it, so it probably wasn't a good
11 question.
12          Is uniform results of a
13 statistically significant positive
14 association to cancer necessary in order
15 for you to form your opinion, and can you
16 explain your answer?
17          MR. FOWLER:  Objection.
18     Q.    Across all studies.
19     A.    You know, these studies are
20 challenging to do.  There are a lot of
21 design aspects, you know, you are following
22 people for years, and so, you know, there
23 is a lot of potential variability.  They
24 are really -- they are really very
25 challenging studies to do.  So, you know,

Page 447

1          S. HECHT
2 when you have these cohort studies that are
3 showing a positive result and that positive
4 result is consistent with what we know from
5 experimental studies in animals, it is very
6 compelling.
7     Q.    So to be clear, did you include
8 in your analysis of the weight of the
9 evidence the findings in the studies of
10 positive associations, those that were
11 strong, those that were weak, and those
12 where no association was found, did you
13 take all of that into account across the
14 board?
15          MR. FOWLER:  Objection,
16 leading.
17     A.    Yes.
18     Q.    And we are going to get to this
19 a little more later, but I want to ask one
20 question.
21          Did you also look at this study
22 and other studies that you looked at in the
23 context of the animal studies and the
24 mechanistic evidence as well so that you
25 were looking at things together as part of

13 (Pages 444 - 447)

Page 448

S. HECHT

1 your weight of evidence analysis?
2
3    A.    Yes.
4         MR. FOWLER: Objection,
5 leading, foundation. Doctor, you have to
6 give me a second, we are stepping on each
7 other, please.
8         MR. SLATER: And let's turn
9 now, if we could, to page 854, please,
10 Chris, the Discussion paragraph, lower
11 left. Perfect. If you could blow up that
12 paragraph. Thank you very much.
13    Q.    In the Discussion, the first
14 sentence says, looking now at page 854, the
15 Discussion section of the article, it says
16 "In the present cohort study, we found an
17 increased risk of colorectal cancer among
18 individuals with a high intake of NDMA."
19         That is ultimately their
20 ultimate conclusion, correct?
21         MR. FOWLER: Objection,
22 leading.
23    Q.    With regard to colorectal
24 cancer.
25         MR. FOWLER: Same objection.

Page 449

S. HECHT

1
2    A.    Yes.
3    Q.    If we go down a little further,
4 I want to read something and ask you a
5 question about it.
6         It says "Nitrosamines are
7 potent carcinogens and NDMA has been shown
8 to induce formation of DNA adducts in human
9 colonocytes which may behave as an
10 initiator of carcinogenesis."
11         What does that statement mean?
12         MR. FOWLER: Objection,
13 leading.
14    A.    They did organ culture studies,
15 in vitro studies with human colonocytes,
16 Autrup did that in the '70s by incubating
17 the colonocytes with NDMA, and then they
18 isolated DNA from the colonocytes and
19 analyzed for O6-methylguanine and other
20 DNA, I guess 7-methylguanine, and, you
21 know, they got a positive result.
22         So that was compared to a
23 control, you know, where you have NDMA with
24 colonocytes that have been killed so that
25 there is no metabolism or simply the

Page 450

S. HECHT

1
2 colonocytes without the NDMA.
3    Q.    Is that --
4    A.    Very convincing data. I mean,
5 by current-day standards, the techniques
6 were a little different, but the result is
7 the same.
8    Q.    Is that significant to you in
9 your reaching your opinions here in this
10 matter?
11         MR. FOWLER: Objection.
12    A.    I mean, the human metabolism of
13 nitrosamines study by Autrup and Harris and
14 others in the late 1970s was very
15 significant because it showed that human
16 tissues could metabolize nitrosamines. I
17 mean, that wasn't known before then,
18 because all the studies had been done in
19 rats, so as we discussed repeatedly during
20 these sessions, metabolism is absolutely
21 required for the carcinogenicity of
22 dimethylnitrosamine. These studies
23 demonstrated that clearly back in the '70s,
24 and everything that has been done since
25 then is consistent with that.

Page 451

S. HECHT

1
2    Q.    And why is that important to
3 you -- rephrase.
4         Why is that significant to you
5 in forming your opinion that NDMA and NDEA
6 are human carcinogens?
7         MR. FOWLER: Objection,
8 leading, lack of foundation.
9    A.    Because here they used human
10 tissues to show that human tissues were
11 capable of metabolizing NDMA and NDEA. As
12 we said before, metabolism is required for
13 the carcinogenicity of NDMA, and so, you
14 know, at that time questions still existed
15 whether human tissues could metabolize
16 NDMA, and these studies by Autrup, Harris,
17 and others showed that they could.
18         Even colonocytes, that's
19 significant with respect to this particular
20 study by Knekt, because that's where they
21 found the higher risk for cancer in the
22 colon, colorectal.
23    Q.    Thank you.
24         MR. SLATER: We can take that
25 down. Chris, the next one we will go to is

14 (Pages 448 - 451)

Page 452

S. HECHT

1    a study authored by Wang, et al.
2    Q.    Doctor, we have put up on the
3    screen -- I guess we will have to mark this
4    as a deposition exhibit.
5        MR. SLATER:  Are we up to 28,
6    did I guess that right?
7        THE VIDEOGRAPHER:  You are
8    correct, 28.
9        MR. SLATER:  Thank you.
10        (Hecht Exhibit 28 marked for
11    identification.)
12    Q.    Doctor, can you please read for
13    us the title of this article?  Because I'm
14    not going to try to read all those words.
15    A.    "Development of liquid
16    chromatography electrospray ionization
17    tandem mass spectrometry methods for
18    analysis of DNA adducts of formaldehyde and
19    their application to rats treated with
20    N-nitrosodimethylamine or
21    4-(methylnitrosamino)-1-(3-pyridyl)-1-
22    butanone."
23        I wrote that title.  It is a
24    little too long, but anyhow --

Page 453

S. HECHT

1    Q.    And I see the author --
2    A.    -- it is what it is.
3    Q.    Looking at the authors, going
4    by last names, Wang, Cheng, Villalta and
5    Hecht.  Is that you?
6    A.    Yup.
7    Q.    Before we get into a couple of
8    specifics of this study, what generally was
9    this study -- what was this study and why
10    was it done?
11    A.    So we were interested in NNK
12    for many years, that's the last compound
13    here, 4-(methylnitrosamino)-1-(3-pyridyl)-
14    1-butanone, we call it NNK for short, and
15    we had done many studies on DNA damage by
16    this compound, also its metabolism and
17    carcinogenicity.
18        In this study we wanted to
19    evaluate formaldehyde release.  As I
20    mentioned yesterday, N-nitrosomethyl
21    compounds in their metabolism in the first
22    step will release formaldehyde, and there
23    has been a lot of work on the methyl and
24    other DNA damage from nitrosamines.  There

Page 454

S. HECHT

1    really wasn't much work on the fate of the
2    formaldehyde that is formed.  So that's
3    what we are looking at in this study.
4    Q.    Looking now -- if you could
5    scroll to the bottom of the page, Chris,
6    please -- at the very bottom right, and we
7    are just going to go over to the next side,
8    the article states "The methods were
9    applied" -- rephrase, I'm going to start
10    over.
11        Looking at the bottom right, it
12    says -- rephrase.
13        Looking at the bottom right of
14    the first page of the study, it says "The
15    methods were applied for the analysis of
16    adducts 1 and 2 in rats treated with the
17    carcinogenic nitrosamines,
18    N-nitrosodimethylamine (NDMA) and NNK," I'm
19    going to go with the abbreviation, "NDMA
20    and NNK are representative N-nitrosomethyl
21    carcinogens."
22        I want to stop there.  Is this
23    a peer-reviewed article?
24    A.    Yes.

Page 455

S. HECHT

1        MR. FOWLER:  Objection.  You
2    are leading the doctor through his own
3    article.
4    Q.    And in this peer-reviewed
5    article, you referred to NDMA as a
6    carcinogenic nitrosamine, correct?
7    A.    Yes.
8        MR. FOWLER:  Objection,
9    leading.
10    Q.    I'm going to continue.  You
11    state in this article "Beginning with the
12    landmark studies of Magee, Dutton, Heath
13    and Druckrey nearly 50 years ago,
14    well-established pathways of metabolic
15    activation of nitrosamines involving
16    cytochrome P450-mediated a-methyl
17    hydroxylation have been described in the
18    literature."
19        I'm going to stop there.  Is
20    that what we have been talking about
21    already today a little bit, how these
22    substances are metabolized?
23    A.    Yes.
24        MR. FOWLER:  Objection,

15 (Pages 452 - 455)

Page 456

S. HECHT

1    S. HECHT
2  leading, foundation.
3    Q.   I'm going to go down a little
4  further, and at my peril I'm going to try
5  to read -- actually, let's do it cleaner.
6  If you go down to -- rephrase.
7        If you skip the next sentence
8  after what I just read there is a sentence
9  that starts out "These diazohydroxides," do
10  you see that?
11   A.   I'm having a little trouble
12  seeing.  Can you blow it up a little?  I'm
13  not sure exactly where you are.
14       MR. SLATER:  Yeah, blow up that
15  top paragraph, Chris, please.
16   A.   Yeah, I can see it now.
17       MR. SLATER:  A little more.  We
18  are only talking about that one, so if you
19  can make that bigger, Chris, that would be
20  great.  Perfect.
21   Q.   Is that good, Doctor?
22   A.   Yeah.
23   Q.   So about halfway down after the
24  bold number 10, there is a sentence that
25  starts "These diazohydroxides."  Would you

Page 457

S. HECHT

1    S. HECHT
2  be so kind as to read that sentence and the
3  next one, please, just because I'm
4  virtually certain I will mispronounce a few
5  of those terms.
6    A.   "These diazohydroxides or the
7  corresponding diazonium ions react with
8  DNA, producing adducts such as
9  O6-methylguanine, or dGuo, from NDMA and
10  O6-pyridyloxobutyl dGuo (O6-POB-dGuo) from
11  NNK.  The roles in carcinogenesis of these
12  and related methyl and pyridyoxobutyl and
13  DNA adducts of NDMA, NNK, and other
14  N-nitroso compounds have been extensively
15  studied."
16   Q.   I want to stop there.  What is
17  it that you are describing in those two
18  sentences?
19   A.   DNA damage by
20  dimethylnitrosamine and NNK.
21   Q.   Bear with me one second.  I'm
22  just going to switch to my hotspot because
23  I'm losing my signal again.  Can everyone
24  hear me?
25   A.   Yes.

Page 458

S. HECHT

1    S. HECHT
2    Q.   Thank you.  Thank you, Doctor.
3        At the bottom of that paragraph
4  you state in this paper, "We present the
5  first evidence that formaldehyde DNA
6  adducts are formed in the lung and liver of
7  rats treated with NDMA and NNK."
8        Why was that significant and
9  why did you publish on that?
10       MR. FOWLER:  Objection, form,
11  foundation, leading.
12   A.   It is important because all of
13  the studies up until that time with NDMA
14  and NNK, compounds like it, have focused on
15  the methyl DNA damage that we have
16  discussed extensively before, but, you
17  know, the first step in the metabolism of
18  dimethylnitrosamine that forms the
19  methylating agent also forms formaldehyde,
20  and the formaldehyde part of the overall
21  picture had not been studied.  So that's
22  what we did here.
23   Q.   And is this study and what you
24  learned from it something you take into
25  account in forming the opinion you have

Page 459

S. HECHT

1    S. HECHT
2  offered in this case?
3        MR. FOWLER:  Objection,
4  leading, foundation.
5    A.   Yes.
6    Q.   And why is that?
7        MR. FOWLER:  Same.
8    A.   Because the carcinogenicity of
9  dimethylnitrosamine I believe goes beyond
10  just O6-methylguanine, that is very
11  important, there is no doubt about it, but
12  there are other parts of the DNA damage
13  picture that haven't been fully evaluated.
14  That's what we tried to do here.  That's
15  what we started to do.
16       MR. SLATER:  Okay.  We can take
17  that down and go to the Herron article,
18  please.  Chris, can you put up the Herron
19  and Shank article, please.
20   Q.   Can you hear me?
21   A.   Yes.
22   Q.   Great, okay.  Chris is so fast
23  usually that when it doesn't happen
24  instantaneously I wonder if he has dropped
25  off.  I guess this is Exhibit 29 now.

16 (Pages 456 - 459)

Page 460

1           S. HECHT
2           (Hecht Exhibit 29 marked for
3    identification.)
4      Q.    Looking at this study, it is
5    titled "Methylated Purines in Human Liver
6    DNA after Probable Dimethylnitrosamine
7    Poisoning." It was published in the
8    Journal of Cancer Research in 1980 and the
9    authors are Herron and Shank.
10          Is this an article that you
11   have taken into consideration in forming
12   your opinions in this case?
13     A.    Yes.
14     Q.    And let's just set the stage,
15   if you will.
16          MR. SLATER: Let's look at the
17   abstract, please, Chris. We will just work
18   with that in the interest of time.
19     Q.    This says "DNA, isolated from
20   two samples of human liver obtained from a
21   suspected dimethylnitrosamine poisoning,
22   contained 1,363 to 1,373 umol of
23   7-methylguanine per mol of guanine and 273
24   to 317 umol of 06-methylguanine per mol of
25   guanine."

Page 461

1           S. HECHT
2           If we go down a little further,
3    it states "From the DNA methylation levels,
4    it is estimated that the
5    dimethylnitrosamine poisoning victim had
6    been exposed to a dose of 20 milligrams or
7    more of dimethylnitrosamine per kilogram of
8    body weight. The results indicate the
9    first time that humans, like rodents,
10   appear to activate dimethylnitrosamine
11   metabolically to a strong methylating
12   agent, resulting in methylation of liver
13   DNA at both the 7- and O6 positions of
14   guanine."
15          Is what I just read significant
16   to you in forming your opinions, Doctor?
17     A.    Yes.
18          MR. FOWLER: Objection,
19   leading, foundation.
20     Q.    Can you please tell us why?
21          MR. FOWLER: Same objection.
22     A.    Yes, absolutely it is
23   significant because it shows that in a
24   human you are getting the same types of DNA
25   damage from dimethylnitrosamine that you

Page 462

1           S. HECHT
2    get in a rat. It is very significant.
3           MR. SLATER: Okay, let's take
4    that down.
5      A.    This was a human that was dosed
6    with dimethylnitrosamine which you can't do
7    because of its carcinogenicity, so you
8    can't do that experiment, but this was a
9    murder case.
10          MR. FOWLER: Objection, move to
11   strike. That was a response to no
12   question. There was no question pending.
13   Move to strike his statement.
14     A.    It was murder, so
15   dimethylnitrosamine is poisonous at this
16   dose.
17          MR. FOWLER: There is no
18   question on the table.
19     Q.    I'm sorry, thank you, Doctor,
20   for continuing to answer, I didn't mean to
21   interrupt you in the middle of your answer,
22          MR. SLATER: Let's take that
23   down, and let's go to the Gomm study, and
24   go to page 360, please. If you go to page
25   360, the bottom Biological Background

Page 463

1           S. HECHT
2    section, please, and I'm focused on the
3    first couple of sentences. I think we've
4    got to get bigger and bigger. Perfect,
5    thank you. And what was this marked as, as
6    an exhibit yesterday, if someone could help
7    me out? I just want to make sure the
8    record is clean.
9           THE VIDEOGRAPHER: One moment,
10   let me find it here. That was Exhibit 22.
11          MR. SLATER: Okay, thank you
12   very much.
13     Q.    Looking at the study by Gomm,
14   et al., which is Exhibit 22 from yesterday,
15   looking at page 360, Biological Background
16   section, it starts "Outside NDMA is
17   classified by the IARC as probably
18   carcinogenic (group 2A)."
19          I'm going to stop there. This
20   is a peer-reviewed article, correct?
21          MR. FOWLER: Objection,
22   leading.
23     A.    Yes.
24     Q.    And it is citing to the IARC
25   finding that NDMA is probably carcinogenic,

17 (Pages 460 - 463)

Page 464

S. HECHT

1          S. HECHT
2  do I read that correctly?
3          MR. FOWLER:  Leading.
4     A.    Yes.
5     Q.    Looking at the second sentence
6  under Biological Background, it states "It
7  is carcinogenic in the tissues of
8  experimental animal species with metabolism
9  similar to that of human tissues."
10         I know we have been over this a
11  bit, but can you just explain to us why, if
12  at all, that is significant and how it fits
13  your analysis here?
14         MR. FOWLER:  Objection,
15  leading, foundation.
16    A.    NDMA requires metabolism in
17  order to be carcinogenic.  Without
18  metabolism, there would be no effect,
19  because metabolism produces the
20  intermediates that damage DNA.  So in the
21  previous paper that we discussed, Herron
22  and Shank showed that humans metabolize
23  NDMA to these DNA adducts the same way rats
24  do.
25         MR. SLATER:  Chris, could you

Page 465

1          S. HECHT
2  go up to the top right carry-over
3  paragraph, please, and we are going to go
4  to the bottom part of that.  Perfect.
5     Q.    Looking at the carry-over
6  paragraph from where we were just reading,
7  the bottom of that carry-over paragraph in
8  the top right says "The effect of NDMA
9  exposure on liver cancer is a statistical
10  result.  However, molecular mechanisms
11  known for NDMA in the pathogenesis of liver
12  cancer in experimental animals support an
13  association with NDMA exposure in humans."
14         What is that telling us?
15         MR. FOWLER:  Objection,
16  leading, foundation, speculation.
17    A.    He is saying basically that the
18  similarities between metabolism and DNA
19  damage, in other words, the mechanism of
20  NDMA carcinogenesis that's been so well
21  delineated in laboratory animals and by
22  molecular biology techniques is consistent
23  with everything we see in humans, for
24  example, the Herron and Shank study, and
25  there are other studies as well, Autrup and

Page 466

1          S. HECHT
2  all the others we have been talking about.
3  So he is saying that the human mechanistic
4  data is completely consistent with the
5  animal data.
6          MR. SLATER:  Could you scroll
7  down a little bit, Chris, to the next
8  section in the middle of the page right
9  there.  Perfect.
10    Q.    There is a heading Regulatory
11  and Public Health Implications on the
12  right-hand side of page 360, and I want to
13  read a sentence and ask you a question.  It
14  says, halfway down, "The immediate recall
15  of all potentially NDMA-contaminated
16  valsartan drug products by regulatory
17  authorities worldwide was necessary in
18  order to protect public health."
19         I want to stop there.  Is that
20  decision that was made worldwide as stated,
21  how does that relate, if at all, to your
22  opinion as to the human carcinogenicity of
23  NDMA and NDEA?
24         MR. FOWLER:  Objection,
25  leading, lack of foundation,

Page 467

1          S. HECHT
2  mischaracterizes.
3     A.    It was absolutely necessary to
4  protect human health, as I've said many
5  times.  I mean, there is no -- there is no
6  way that these valsartan tablets should
7  have been contaminated with
8  dimethylnitrosamine.  That's a horrible
9  outcome.  It never should have happened.
10  All of that should have been taken off the
11  market.
12    Q.    When they refer --
13         MR. FOWLER:  Move to strike,
14  beyond the scope of the proffer agreed to
15  by counsel not to get into liability
16  issues, which is exactly what you're doing,
17  Counsel.
18    Q.    With regard to the phrase of
19  protecting the public health, tell me if I
20  understand this, protecting the public
21  health is because these substances, NDMA
22  and NDEA, were considered to be so
23  dangerous to humans, especially at the
24  levels from the regulatory perspective,
25  especially at the levels that they

18 (Pages 464 - 467)

Page 468

S. HECHT

1    S. HECHT
2  contained -- let me rephrase.  I'm going to
3  withdraw the question.
4           With regard to the need to
5  protect public health as stated in this
6  article, was that due to the fact that it
7  was understood that it was too dangerous to
8  humans to have those substances in those
9  pills and have them ingested by humans, is
10 that consistent or not consistent with your
11 understanding?
12          MR. FOWLER:  Objection,
13 foundation, calls for speculation,
14 mischaracterizing.  Go ahead, Doctor.
15     A.    That's what he is talking
16 about.
17     Q.    Let's go down a little bit
18 further into the Conclusion at the bottom
19 of the page.  Perfect.  About a little past
20 halfway down the Conclusion, there is a
21 sentence that says "Long-term effects of
22 regular use of potentially
23 NDMA-contaminated valsartan for more than 3
24 years could not be evaluated because of the
25 currently still relatively short follow-up

Page 469

S. HECHT

1    S. HECHT
2  time."
3           And with regard to that, what
4  from your perspective is the significance
5  of the fact that this was not able to
6  evaluate long-term effects just because
7  only a few years had passed since this was
8  discovered by people in the world?
9           MR. FOWLER:  Objection.
10     Q.    Let me rephrase it.  I have to
11 rephrase the question actually, sorry,
12 Doctor.  That was not artful, so I'm going
13 to ask it again.
14          In the conclusion at the bottom
15 right of page 360 it states "Long-term
16 effects of regular use of potentially
17 NDMA-contaminated valsartan for more than 3
18 years could not be evaluated because of the
19 currently still relatively short follow-up
20 time."
21          Is that significant to you in
22 your evaluation of this study and the data?
23          MR. FOWLER:  Objection,
24 leading, foundation.
25     A.    Yes.

Page 470

S. HECHT

1    S. HECHT
2     Q.    Why?
3           MR. FOWLER:  Same objection.
4     A.    Well, they haven't been exposed
5  for a very long period of time to the
6  contaminated valsartan.  I mean, you would
7  expect that the effect would increase with
8  time, with longer exposure.  I mean, that's
9  just simple dose-response.
10     Q.    When they refer to the
11 relatively short follow-up time, what are
12 they referring to?
13          MR. FOWLER:  Objection,
14 leading, speculation, foundation.
15     A.    The three years.  You know,
16 they are referring to the relatively short
17 time that these contaminated pills have
18 been out there.
19     Q.    Are they also referring to the
20 fact that from the time of discovery in
21 2018 to the time of publication of this
22 study there was a relatively short
23 follow-up time to see what the long-term
24 effect is so they can't study the long-term
25 effects yet?

Page 471

S. HECHT

1    S. HECHT
2           MR. FOWLER:  Objection,
3  leading, asked and answered.
4     A.    Yes.
5           MR. FOWLER:  Leading.
6     A.    Yes.
7           THE VIDEOGRAPHER:  Counsel,
8  sorry to cut in, I just want to let you
9  know, I have about ten minutes on this
10 media before I will need a quick break.
11          MR. SLATER:  Fine.
12     Q.    Ultimately, with regard to what
13 is referred to as the short follow-up time,
14 from your perspective, would it be prudent
15 to continue to follow people going forward
16 to get longer-term data on the impact of
17 this exposure?
18     A.    Yes.
19          MR. FOWLER:  Objection,
20 leading, beyond the scope.
21     A.    Absolutely.
22     Q.    Why is that?
23          MR. FOWLER:  Same.
24     A.    Pardon?
25     Q.    Why is that?

19 (Pages 468 - 471)

Page 472

1           S. HECHT
2           MR. FOWLER:  Calls for
3  speculation.
4       A.    Well, you would expect, you
5  know, if this effect that they are seeing
6  is real, after only three years of
7  follow-up, you would expect an increase
8  with, you know, longer use of the
9  contaminated pills and as well as the
10  longer period for liver cancer to develop,
11  if that's what's going on.  So definitely,
12  you know, there should be longer follow-up.
13           MR. SLATER:  Can you go back to
14  page 359, please, Chris, the top left of
15  the page.  Perfect.
16       Q.    The top left of page 359, it
17  says "Comparison with other studies on
18  valsartan exposure."  It says "Only one
19  cohort study on this topic has been
20  published to date; the Danish registry
21  study by Pottegard, et al., has only a
22  small sample size, comprising 5,150 persons
23  with prescription of valsartan.  Our study
24  contains around 150 times more persons with
25  valsartan prescription."

Page 473

1           S. HECHT
2           I would like to stop there.  Is
3  that significant to you in evaluating this
4  study and the Pottegard study?
5           MR. FOWLER:  Objection,
6  leading, lack of foundation.
7       A.    Yes, sure.
8       Q.    Why is that?
9       A.    Well, you need the big numbers
10  to detect what might be, you know, a
11  relatively small percentage of people who
12  are going to be affected.  So you need big
13  numbers for a study like this.
14           MR. SLATER:  And let's go to
15  the -- let's take this down and go to the
16  Pottegard study, please.  Actually, before
17  we start that, do you want to just flip
18  your tape?  This should only take a second,
19  right?
20           THE VIDEOGRAPHER:  Yeah, only
21  about 30 seconds.
22           MR. SLATER:  Okay, let's do
23  that.
24           THE VIDEOGRAPHER:  The time is
25  10:31.  This concludes media one.

Page 474

1           S. HECHT
2           (Recess taken.)
3           THE VIDEOGRAPHER:  The time is
4  now 10:32.  This begins media two.
5  BY MR. SLATER:
6       Q.    Doctor, we have up on the
7  screen the Pottegard study.
8           MR. SLATER:  And I'm just, for
9  the record, again, could somebody tell me,
10  please, what exhibit number this is, just
11  so we have that?  I think it is 10.
12           THE VIDEOGRAPHER:  This is
13  Exhibit 21.
14           MR. SLATER:  Got that wrong,
15  okay.
16       Q.    Looking at Exhibit 21, the
17  Pottegard study, let's go, if we could, to
18  page 2, and I want to look at the section
19  titled Study Cohort, please.  Perfect.
20  This says "The study cohort comprised all
21  Danish patients filling a valsartan
22  prescription during the study period of 1
23  January 2012 to 30 June 2018.  Prevalent
24  users of valsartan at the start of the
25  study period - defined as individuals

Page 475

1           S. HECHT
2  having filled a valsartan prescription in
3  September to the end of December 2011,
4  entered the study cohort at 1 January 2012,
5  whereas incident users entered the study
6  cohort at the day of filling their first
7  valsartan prescription during the study
8  period."
9           So this is helping to define
10  who are the people being studied, do I
11  understand that correctly?
12           MR. FOWLER:  Objection,
13  leading.
14       A.    Yes.
15       Q.    Let's go to the bottom of the
16  page, please, where there is a heading that
17  says Ascertainment of NDMA Exposure.  It
18  says "Within the study cohort we mapped out
19  each participant's exposure to NDMA
20  contamination using the unique drug ID
21  (Nordic article number) as recorded in the
22  National Prescription Registry to identify
23  the single valsartan product and its
24  manufacturer."
25           Going a little -- rephrase.

20 (Pages 472 - 475)

Page 476

1        S. HECHT
2        It continues, "From the 128
3  unique valsartan drug products used during
4  2012 to 2018 within our study population,
5  we identified 18 drug products (which
6  constituted 18 percent of all prescriptions
7  filled) that were manufactured using an
8  active pharmaceutical ingredient from ZHP,
9  Zhejiang Huahai Pharmaceuticals.  These
10  drug products were classified as probably
11  contaminated with NDMA.  An additional 36
12  drug products (26 percent of all
13  prescriptions) were classified as possibly
14  contaminated with NDMA" -- you can go up to
15  the top of the next column, please -- "as
16  they contained an active pharmaceutical
17  ingredient both from Zhejiang Huahai
18  Pharmaceuticals and from other companies.
19  74 drug products (55 percent of all
20  prescriptions) were classified as unlikely
21  to be contaminated with NDMA as they did
22  not contain an active pharmaceutical
23  ingredient from ZHP."
24        I will stop there.  So if I
25  understand correctly, the cohorts are

Page 477

1        S. HECHT
2  people who were exposed to ZHP valsartan
3  API and those that were not, do I
4  understand that correctly?
5        MR. FOWLER:  Objection, form,
6  leading, lack of foundation, beyond the
7  general causation purpose of this
8  deposition.
9     A.   Yes.
10    Q.   And just tell me if I'm wrong
11  or right -- well, rephrase.
12        As we know from the case, other
13  manufacturers besides ZHP also manufactured
14  valsartan contaminated with NDMA and NDEA,
15  we know that, correct?
16    A.   Yes.
17        MR. FOWLER:  Objection,
18  leading, facts not in evidence, foundation.
19    Q.   What, if any, significance do
20  you attribute to the fact that the control
21  group that was supposed to have not been
22  exposed to contaminated NDMA included
23  people who took pills potentially from
24  other manufacturers other than ZHP that
25  also manufactured contaminated valsartan,

Page 478

1  is that significant to you?
2        MR. FOWLER:  Objection,
3  leading, speculation, lack of foundation,
4  probably others.
5     A.   Well, then it wouldn't be a
6  control group.
7     Q.   Why is that?
8     A.   Well, if they were exposed to
9  pills that contained NDMA, then you are not
10  comparing exposed to nonexposed, so that
11  wouldn't be a proper control group.
12    Q.   In terms of study design, what,
13  if any, significance do you attribute to
14  the fact that people in the so-called
15  control group may have taken contaminated
16  ZHP -- rephrase.
17        What, if any, significance do
18  you attribute to the fact that the
19  so-called control group included people who
20  may have taken contaminated valsartan and
21  that wasn't factored in, is that
22  significant or not and why?
23        MR. FOWLER:  Objection,
24  leading, lack of foundation.

Page 479

1        S. HECHT
2     A.   It could be very significant.
3     Q.   Why is that?
4        MR. FOWLER:  Same objection.
5     A.   Well, if the control group was
6  taking contaminated tablets, then you are
7  comparing -- your comparison is invalid.
8     Q.   And the fact that this
9  article --
10    A.   Because both groups would be
11  exposed.
12    Q.   And the fact this article
13  doesn't provide any certainty at all as to
14  whether or not the control group contained
15  people who took contaminated valsartan or
16  how many or to what extent, how does that
17  impact your evaluation of the data?
18        MR. FOWLER:  Objection,
19  leading, lack of foundation.
20    A.   Well, if the control group was
21  taking contaminated pills, then, you know,
22  that invalidates the study, because you are
23  not comparing exposed versus nonexposed.
24    Q.   And the fact that we have no
25  way of knowing to what extent that

21 (Pages 476 - 479)

Page 480

S. HECHT

1
2 occurred, is that significant to you in
3 evaluating the data and what weight you
4 give to the data?
5     A.    Yes.
6         MR. FOWLER:  Objection,
7 leading, speculation, foundation.
8     Q.    And why is that?
9         MR. FOWLER:  Same.
10    A.    Well, if we don't know whether
11 the control group was exposed or not, it is
12 hard to evaluate the study.  If the control
13 group is exposed, possibly to the same
14 extent as the treated group or the group
15 that took the contaminated pills, then it's
16 not a good comparison.
17        MR. SLATER:  Okay, we can take
18 that down.
19    A.    It is not a valid comparison.
20        MR. SLATER:  You can take the
21 article down now, Chris.  Thank you.
22    Q.    Doctor, you were asked some
23 questions yesterday about your invoices and
24 which entries said literature search and
25 which didn't.  Do you remember you were

Page 481

S. HECHT

1
2 asked a little about that?
3     A.    Uh-huh.
4     Q.    When you sent me invoices to be
5 paid for the time you were spending in this
6 case, were you seeking to be all
7 encompassing as to every single thing you
8 did during each time block that you
9 recorded on those invoices?
10        MR. FOWLER:  Objection,
11 leading.
12    A.    What do you mean by all
13 encompassing?
14        MR. FOWLER:  Thank you.
15    Q.    I will ask it a little
16 differently.
17    A.    I gave you my best estimate of
18 the time that I spent working on the case.
19    Q.    Right.  If you did a literature
20 search, did you make sure that you wrote it
21 down every single time or did you just
22 generally summarize the work you did?
23        MR. FOWLER:  Objection,
24 leading.
25    A.    I did not keep that kind of

Page 482

S. HECHT

1
2 record.
3     Q.    Is there any doubt that you
4 performed an extensive literature search as
5 you described yesterday?
6         MR. FOWLER:  Objection,
7 leading.
8     A.    No, there is no doubt.
9     Q.    You were asked yesterday
10 something, and I want to just make sure we
11 clarify some language, you were asked a
12 question along the lines of whether or not
13 it has been proven that NDMA and NDEA cause
14 cancer in humans.  Do you remember some
15 questions along those lines?
16    A.    I don't remember.
17    Q.    Okay.  In order to prove 100
18 percent or close to it, would you have to
19 set up a study where you deliberately give
20 these substances to humans and then have an
21 unexposed control group and compare the
22 effects, right?
23        MR. FOWLER:  Objection,
24 leading, incomplete hypothetical,
25 speculation.

Page 483

S. HECHT

1
2     A.    Yes, that would be the ideal
3 design.
4     Q.    Why aren't people performing
5 studies right now where they are giving
6 NDMA and NDEA to human beings at the levels
7 seen in the valsartan pills at issue in
8 this case and letting those people be
9 compared to people who don't get exposed,
10 why aren't those studies being done?
11        MR. FOWLER:  Objection,
12 speculation.
13    A.    That would never pass through
14 an institutional review board.  You can't
15 give known carcinogens to subjects in a
16 study.  It would never be approved.
17    Q.    Based on your understanding of
18 the scientific consensus on this issue, can
19 you envision any institution in the United
20 States that would sponsor or permit such a
21 study?
22        MR. FOWLER:  Objection,
23 leading, foundation, speculation.
24    A.    It is absolutely impossible.
25 It would never happen in this country,

22 (Pages 480 - 483)

Page 484

1        S. HECHT
2   probably anywhere in the world.
3     Q.    And in that context, I would
4   like to talk about the time when these
5   pills were being sold, before it had been
6   disclosed that there was NDMA and NDEA
7   contaminating the substances.  I want to
8   look back at that time period, okay?
9     A.    Uh-huh.
10    Q.    Based on your knowledge of
11  everything that you have read and your
12  familiarity with this subject matter, can
13  you envision any circumstance where the
14  levels of NDMA and NDEA that have been
15  found in these pills would have been
16  approved for sale to humans?
17        MR. FOWLER:  Objection, form,
18  speculation, well beyond the scope of this
19  general causation deposition, and contrary
20  to counsel's agreement not to get into
21  this.
22    Q.    You can answer.
23    A.    No.
24    Q.    And is that because of what you
25  have described, the risk that people that

Page 485

1        S. HECHT
2   would take this would get cancer as a
3   result?
4        MR. FOWLER:  Objection,
5   leading, foundation, speculation.
6     Q.    Let me ask it differently.  Let
7   me ask the question differently.
8        Why is that?
9        MR. FOWLER:  Same objection.
10    A.    They are contaminated with a
11  carcinogen.
12    Q.    And these pills are
13  hypertension medications.  Were they
14  intended for short or long-term use in
15  general?
16    A.    Long-term use.
17        MR. SLATER:  Let's go, if we
18  could, Chris, to the World Health
19  Organization publication from 2002.  And
20  let's go, if we could, to page -- well,
21  actually let's start here on the cover,
22  let's go on the cover, I'm sorry.  And this
23  will be Exhibit 29, I believe, right?
24        THE VIDEOGRAPHER:  This will be
25  30.

Page 486

1        S. HECHT
2        MR. SLATER:  I was on a run
3   too.  Okay.
4        (Hecht Exhibit 30 marked for
5   identification.)
6     Q.    Looking at Exhibit 30, this is
7   a document from the World Health
8   Organization published in 2002 titled
9   Concise International Chemical Assessment
10  Document 38, N-nitrosodimethylamine.
11        Doctor, what is the World
12  Health Organization?
13    A.    The World Health Organization
14  is a branch of the United Nations that
15  evaluates and recommends policies having to
16  do with health in the world.
17    Q.    And this is a peer-reviewed
18  publication, correct?
19    A.    Yes.
20    Q.    Let's go now, if we could, to
21  page 23, in the interest of time.  If we
22  could, let's look at the left-hand side,
23  and let's go to the first full paragraph
24  that starts "With the exception of."  If
25  you could blow up that part, that would be

Page 487

1        S. HECHT
2   great.  Great, thank you.
3        Looking now at a portion of
4   this publication, and we are not going to
5   have to turn back to it, but this is the
6   section titled Effects Evaluation, which is
7   Section 11, Evaluation of Health Effects is
8   11.1, and this is the Hazard Identification
9   section.
10        Here we see, on the first full
11  paragraph on the left, the second sentence,
12  it says "The weight of evidence of the
13  carcinogenicity of NDMA in mammalian
14  species is consistent and convincing.
15  Moreover, the pattern of tumor development
16  is characteristic of that for a mode of
17  action of carcinogenesis involving direct
18  interaction with genetic material."
19        What I just read, is that
20  something you agree with?
21    A.    Yes.
22        MR. FOWLER:  Objection,
23  leading.
24    A.    Yes, it's true.
25    Q.    And in terms of the pattern of

23 (Pages 484 - 487)

Page 488

1         S. HECHT
2 tumor development, in simple terms, what
3 does that mean, just so we can orient
4 ourselves?
5    A.    I'm sorry, but I lost --
6    Q.    You lost the place?
7    A.    Yeah.
8    Q.    It is about --
9    A.    Where are you?
10    Q.    It is about seven lines down.
11 I will start over. Seven lines down is a
12 sentence that says "Moreover, the pattern
13 of tumor development is characteristic of
14 that for a mode of action of carcinogenesis
15 involving direct interaction with genetic
16 material."
17         What is that telling you?
18    MR. FOWLER: Objection,
19 foundation, calls for speculation, leading.
20    A.    It is the basic mechanism
21 that's common to well-established
22 carcinogens, that they are metabolically
23 activated in tissues having the requisite
24 enzymes and reactive intermediates are
25 formed which then damage DNA, leading to

Page 489

1         S. HECHT
2 mutations, everything we have been talking
3 about for the last two days.
4         MR. SLATER: Let's go down to
5 the next paragraph, Chris, please.
6    Q.    The second to last full
7 paragraph in the left column starts out
8 "NDMA has been consistently mutagenic and
9 clastogenic in human and rodent cells
10 exposed in vitro."
11         What does that mean?
12    MR. FOWLER: Objection,
13 leading, speculation, foundation.
14    A.    Damages DNA, damages the
15 genetic material.
16    Q.    And I think we have probably
17 touched on this quite a bit, but I want to
18 make sure for the record it is clear.
19         Is there significance to the
20 reference to human and rodent cells exposed
21 in vitro?
22    A.    Yes.
23    Q.    Why?
24    MR. FOWLER: Objection,
25 leading.

Page 490

1         S. HECHT
2    A.    Well, you need to show that
3 what you are finding in animal systems,
4 which are experimental systems, also apply
5 to humans. You see the same -- we have
6 been over this -- you see the same
7 metabolism, the same DNA damage, the same
8 interactions in human cells and animal
9 cells, which supports the risk to humans is
10 similar to what it would be to animals,
11 because you have the same mechanism.
12    Q.    This is -- rephrase.
13         I want to ask you one question
14 that's not found -- rephrase.
15         I have a little bit of
16 follow-up to that. The animal studies and
17 the mechanistic analysis you have been
18 talking about is obviously important to
19 your evaluation and your evaluation of the
20 weight of evidence, correct?
21         MR. FOWLER: Objection,
22 leading, foundation.
23    A.    Yes.
24    Q.    Have you seen epidemiologic
25 data that strongly proves that the animal

Page 491

1         S. HECHT
2 data should be disregarded, have you ever
3 seen anything like that that would
4 overwhelm the animal data with negative
5 findings from epidemiologic studies?
6         MR. FOWLER: Objection,
7 leading.
8    A.    No.
9    Q.    Are you aware of any study that
10 concludes that NDMA and NDEA are not human
11 carcinogens, have you seen that in the
12 peer-reviewed literature where that has
13 been the conclusion that it is not a human
14 carcinogen?
15    A.    No, there is no study like
16 that.
17         MR. FOWLER: Objection, form,
18 leading.
19    A.    There is not even speculation.
20    Q.    Looking now at the bottom left
21 paragraph on this page 23 of this article,
22 it says "DNA adducts (in particular
23 O6-methylguanine) formed by the
24 methyldiazonium ion generated during
25 metabolism likely play a critical role in

24 (Pages 488 - 491)

Page 492

1          S. HECHT
2 NDMA carcinogenicity.  Observed variations
3 in carcinogenicity among species and
4 strains correlate well with variations in
5 activity of O6-methylguanine DNA-methyl
6 transferase.  Putative pathways for the
7 metabolism of NDMA are similar in rodents
8 and humans, and indeed the formation of
9 O6-methylguanine has been detected in human
10 tissues exposed to NDMA."
11          Is that significant to you?
12          MR. FOWLER:  Objection,
13 leading.
14     A.     Yes.
15          MR. FOWLER:  Lack of
16 foundation.
17     Q.     Is that consistent or
18 inconsistent with your own opinion?
19          MR. FOWLER:  Objection, lack of
20 foundation, leading.
21     A.     Completely consistent.
22     Q.     Is that what we were talking
23 about this morning?
24     A.     Yes.
25     Q.     Let's go up now to the top of

Page 493

1          S. HECHT
2 the right-hand column.  It states
3 "Therefore, owing to the considerable
4 evidence of carcinogenicity of NDMA in
5 laboratory species, evidence of direct
6 interaction with DNA consistent with tumor
7 formation, and the apparent lack of
8 qualitative species-specific differences in
9 the metabolism of this substance, NDMA is
10 highly likely to be carcinogenic to
11 humans."
12          Do you agree or disagree with
13 that conclusion?
14          MR. FOWLER:  Objection,
15 leading, foundation.
16     A.     I 100 percent agree.
17     Q.     And I'm not going to go through
18 this whole study, but this study also --
19 rephrase.
20          I'm not going to go through the
21 whole publication, but this publication
22 also discussed human dietary studies as
23 well and took that into account as well,
24 correct?
25     A.     Yes.

Page 494

1          S. HECHT
2          MR. FOWLER:  Objection,
3 leading.
4     Q.     In terms of your evaluation of
5 the weight of evidence, is it similar or
6 dissimilar to what the World Health
7 Organization panel did in this
8 peer-reviewed publication in 2002?
9          MR. FOWLER:  Objection,
10 leading, lack of foundation.
11     A.     Very similar.
12     Q.     And this is a peer-reviewed
13 publication published by the World Health
14 Organization in 2002, correct?
15     A.     Yes.
16          MR. FOWLER:  Objection,
17 leading.
18          MR. SLATER:  Thank you, Doctor.
19 Those are all my questions for now.
20          THE WITNESS:  Thank you.
21          MR. FOWLER:  Counsel, we have
22 been going a little while.  I would like a
23 five to ten minute comfort bio break.  I
24 think everyone would appreciate that.
25          MR. SLATER:  Sure.  We will see

Page 495

1          S. HECHT
2 you in ten.
3          MR. FOWLER:  Thank you.
4          THE VIDEOGRAPHER:  The time is
5 10:55.  This ends media two.
6          (Recess taken.)
7          THE VIDEOGRAPHER:  The time is
8 now 11:07.  This begins media three.  You
9 may proceed.
10 EXAMINATION BY MR. FOWLER:
11     Q.     Doctor, I have some follow-up
12 questions related to what you were asked
13 about today.  And I just want to note out
14 of the box here that on behalf of the
15 defendants we specifically reserve our time
16 to question you at a later time on all
17 liability opinions per the agreement with
18 counsel.  We intend to abide by that
19 agreement, so I'm not going to get into
20 that.  So we reserve all rights to question
21 you on that and your qualifications for
22 giving such opinions.  I just want to make
23 that clear.
24          Now, Doctor, the WHO 2002
25 document that we were last looking at, do

25 (Pages 492 - 495)

Page 496

S. HECHT

1  S. HECHT
2  you recall the statement that counsel
3  showed you that WHO asserted that because
4  there were similarities in the metabolism
5  of NDMA in the animals, that's why they
6  were extrapolating to humans, do you recall
7  that portion of the document you were
8  shown?
9      A.   No, I have to look at it.
10     Q.   Well, let me just, in the
11 interest of time, Doctor, do you recall --
12     A.   Let me just find it.
13          MR. FOWLER:  Then we will need
14 that exhibit put up, if the doctor wants to
15 look at it, let's put that same page up
16 that counsel showed last, please.
17          MR. SLATER:  He wants to have
18 access to the full article also depending
19 on your questions.
20          MR. FOWLER:  Certainly.
21          THE VIDEOGRAPHER:  Counsel, do
22 you know what page that was?
23          MR. FOWLER:  The page number
24 was obscured, so no, I don't.
25          MR. SLATER:  Did you want to

Page 497

1  S. HECHT
2  know the page number, is that what you are
3  asking, Steve?
4          MR. FOWLER:  Yes, just that
5  page you were showing him.  I have
6  follow-up on that.
7          MR. SLATER:  It was page 23.
8          MR. FOWLER:  Thank you.  If you
9  can zoom in on that so we can see.
10          THE VIDEOGRAPHER:  On which
11 portion, Counsel?
12          MR. FOWLER:  Just the whole
13 document if you can zoom up on.  I'm
14 interested that first column in those
15 paragraphs that begin "With the exception."
16 Thank you.
17     Q.   Doctor, it's at the bottom of
18 this column, you see the statement that
19 "The putative pathways for the metabolism
20 of NDMA are similar in rodents and humans,"
21 do you see that, Doctor?
22     A.   No, I can't read it.  Can you
23 make it larger?
24     Q.   Okay.  Now are you with me,
25 Dr. Hecht?

Page 498

1  S. HECHT
2      A.   Yes.
3      Q.   Do you recall our discussion
4  yesterday of the Gombar article, sir?
5      A.   Gombar?
6      Q.   He is the pharmacokinetics --
7      A.   That was one of the
8  pharmacokinetics.  There are actually
9  several Gombar articles.
10     Q.   That's right.
11     A.   So I don't know -- I don't know
12 which one you are referring to.
13     Q.   Well, the one that I showed
14 you, Doctor, do you recall the statement
15 that the hepatic, and you agreed with this
16 I believe, that hepatic blood flow is
17 dissimilar between humans and the animals
18 studied and that you cannot compare the
19 metabolisms -- let me -- let me strike that
20 and rephrase.
21          Doctor, the article I showed
22 you yesterday with Gombar if you recall
23 said that the hepatic blood flow comparison
24 between humans and animals is dissimilar,
25 and you agreed with that, correct?

Page 499

1  S. HECHT
2      A.   No, I don't remember.  You
3  would have to show it to me again.
4      Q.   Is it your testimony, Doctor,
5  that the hepatic blood flow is the same
6  with humans as it is with the rodents that
7  are studied?
8      A.   I don't remember.
9          MR. SLATER:  Counsel, do you
10 think you could put the article up?
11          MR. FOWLER:  I'm just asking
12 his understanding of a comparison right
13 now.
14     A.   I thought you were talking
15 about the Gombar article.
16     Q.   Okay, we will do that.  Let's
17 have that, the Gombar exhibit from
18 yesterday.
19          THE VIDEOGRAPHER:  Do you have
20 the exhibit number by any chance?
21          MR. FOWLER:  I don't have the
22 exhibit number.  It was the only Gombar
23 article that I introduced.
24          THE WITNESS:  There were
25 several Gombar articles.

26 (Pages 496 - 499)

Page 500

1        S. HECHT
2        MR. FOWLER: The one that I
3 introduced.
4        THE VIDEOGRAPHER: I got it. I
5 just had to figure out which one he was
6 talking about. One second.
7        MR. FOWLER: That's the one.
8    Q.    Now, I will just direct your
9 attention again to the fourth page of the
10 article. It is article page 4369.
11        MR. SLATER: I can't read it.
12 It is a little small. Can it be blown up?
13    A.    I can't read that.
14    Q.    So at the bottom of the first
15 complete paragraph --
16        THE VIDEOGRAPHER: Sorry,
17 Counsel, you cut out a little bit. Can you
18 say that again. The bottom of what?
19        MR. FOWLER: Of the first
20 paragraph that starts at the top, it is
21 just the bottom that I'm looking for.
22    Q.    Doctor, the last sentence, you
23 see "The use of carcinogenicity data
24 obtained in small species (rodents) to
25 estimate risk in larger species (humans),

Page 501

1        S. HECHT
2 which do not take these differences into
3 account, may introduce an error."
4        Do you see that, Doctor?
5    A.    Yes, I see that.
6    Q.    And the differences being
7 addressed by Dr. Gombar are the differences
8 in metabolism of NDMA between species,
9 correct, sir?
10    A.    So you want to discredit like
11 the national toxicology program. I mean,
12 how, you know, how are we going to evaluate
13 the toxicity and carcinogenicity of
14 substances in the environment and in our
15 food, for example, without animal studies.
16 You want to -- you want to discredit that
17 by just saying that oh, yeah, there is some
18 differences.
19        Yeah, there are some
20 differences, but NDMA carcinogenicity has
21 been shown in multiple different animal
22 species. So yeah, there are some
23 differences, and Gombar points this out,
24 because probably the reviewers told him to.
25 Sure, there are differences between the

Page 502

1        S. HECHT
2 rats and humans, sure.
3    Q.    Thank you, Doctor. And --
4    A.    I don't see your point. What's
5 your point?
6    Q.    Okay, thanks. The point is
7 while -- you can take that down -- while
8 there may be qualitative similarities
9 between humans and species, you agree
10 quantitatively, Doctor, quantitatively
11 there is -- they are dissimilar with regard
12 to both the ability to metabolize, the
13 amount of DNA repaired capacity, these are
14 different between a rodent that lives two
15 years and a human that lives 30 times that,
16 correct?
17        MR. SLATER: Objection to form
18 of the question.
19    A.    No, I do not -- I absolutely do
20 not agree.
21        MR. SLATER: Just let me
22 object. I object, it is compound and
23 overbroad question. You can answer,
24 Doctor.
25    A.    I absolutely don't agree.

Page 503

1        S. HECHT
2    Q.    You don't agree that
3 qualitatively the human metabolism of NDMA
4 and the compounds like the MGMT that are
5 involved in DNA repair, you believe
6 qualitatively that is the same in rodents?
7    A.    Qualitatively, they are
8 similar, but, you know, the rodents that
9 were used for these studies are inbred.
10 Humans have a huge variation.
11    Q.    So quantitatively, you --
12    A.    So which -- which human are you
13 talking about?
14    Q.    I'm talking about the
15 plaintiffs in this case, Doctor, and --
16    A.    Which human? Which plaintiff?
17    Q.    Doctor, well --
18    A.    They're not all the same, you
19 know.
20    Q.    Doctor, the simple question is
21 quantitatively, humans and rodents are
22 different in the manner and ability to
23 metabolize NDMA, that's a simple question,
24 do you know?
25    A.    Which human?

27 (Pages 500 - 503)

Page 504

S. HECHT

1    S. HECHT
2    Q.    Doctor, the human species, from
3    a qualitative -- strike that -- from a
4    quantitative standpoint, the human beings'
5    capacity to metabolize NDMA and to repair
6    mutations resulting from NDMA are
7    quantitatively different than rodents, do
8    we agree on that, sir?
9    A.    No, we do not agree.
10   Q.    Okay.  Doctor, do you --
11   A.    Which human?  I go back to you,
12   know, you can't treat all humans the same.
13   Q.    Doctor, if you don't know what
14   the --
15   A.    Not all humans are going to
16   respond to NDMA, as an example, in the same
17   way.
18   Q.    Move to strike.  I don't know
19   what that was in response to, Doctor.
20   Let's move on.
21   A.    It was in response to your
22   question.  You said, you know, rats -- you
23   want me to say that rats are different from
24   humans quantitatively, and I'm asking you
25   which human.

Page 505

1    S. HECHT
2    Q.    And I'm asking you whether you
3    can simply agree that they are different,
4    Doctor.  The human species, mammalian
5    species of humans, have a different
6    quantitative ability to fight toxins that
7    have evolved since the time of the caveman
8    grilling their meat and creating NDMA,
9    right, it has evolved; isn't that true,
10   Doctor?
11   A.    Say it again.  I didn't really
12   follow.
13   Q.    You agree that the human liver
14   to support a human that is going to live
15   maybe 70, 80 years, has a greater capacity
16   to handle toxins like NDMA than a rodent
17   who is going to live two years, can we
18   agree on that basic question?
19   A.    Which human?
20   Q.    Really, Doctor?
21   A.    One with a liver problem?  You
22   know, which human?  How about the effects
23   of age?  How about the effects of genetics?
24   Q.    Are we a little outside your
25   expertise as an organic chemist, Doctor, to

Page 506

1    S. HECHT
2    start talking about risk factors and things
3    like that?
4    A.    Well, that's what we are
5    talking about in this case, aren't we?
6    Q.    Doctor, the WHO document that
7    you looked at, you understood that as a
8    hazard evaluation, correct, not a risk
9    assessment?
10   A.    Yes.
11   Q.    Do you know the difference?
12   A.    Risk assessment is a
13   quantitative exercise.  Hazard evaluation
14   is identifying a hazard, you know, in this
15   case dimethylnitrosamine.
16   Q.    Yes, Doctor.  And the WHO,
17   nowhere in that document did it say at what
18   dose does NDMA become carcinogenic in
19   humans, did it?
20   A.    No, I don't think -- I don't
21   think -- well, let me look through it.  Let
22   me just look.
23        MR. SLATER:  While you do that,
24   Doctor, can I just ask the court reporter
25   to read the question back to me, please,

Page 507

1    S. HECHT
2    because I lost it.  I just want to make
3    sure I hear.
4         (The record was read.)
5    A.    So they have a section on
6    dose-response analysis on page 23, and they
7    say that "Scaling for variations in the
8    ratios of surface area to body weight
9    between rodent species and humans was not
10   considered appropriate for the measures of
11   exposure response developed on the basis of
12   experimental data in animals, since it is
13   highly probable that the carcinogenicity of
14   NDMA is mediated primarily through the
15   generation of an active metabolite."
16        That's how they address that.
17   I mean, is that your question?
18   Q.    Doctor --
19   A.    And then they go on to
20   quantitation of exposure response for
21   cancer involved calculation of tumorigenic
22   dose, TD50 --
23   Q.    They make no calculation --
24   A.    -- in rats.
25   Q.    Doctor, let me --

28 (Pages 504 - 507)

Page 508

1          S. HECHT
2          MR. SLATER:  Sorry, you are
3  interrupting his answer, sir.  Let him
4  answer, please.  Don't interrupt him,
5  please.
6      A.    I'm not sure exactly what your
7  question was.
8      Q.    Okay.  Well, then I will move
9  on, Doctor.  Then I will move on, okay.
10  Notwithstanding --
11      A.    I mean, they do have a section
12  on sample risk characterization.
13      Q.    It is a large book, I
14  understand.  Let me ask you a fresh
15  question, sir.
16          Notwithstanding all of the
17  questions that counsel asked you about the
18  WHO hazard analysis and notwithstanding all
19  of the information they have about NDMA,
20  they nevertheless classified NDMA and NDEA
21  as a Class 2A carcinogen, correct?
22      A.    Yes.
23      Q.    And they did not conclude that
24  it is a human carcinogen, correct?
25      A.    Let me go back to --

Page 509

1          S. HECHT
2      Q.    2A, Doctor, is a probable, but
3  not established human carcinogen, correct?
4      A.    Yes.  Let me go back -- let me
5  go back to 1978.
6      Q.    No, actually, Doctor --
7          MR. SLATER:  You can't
8  interrupt.  Everybody needs to stop for a
9  second.
10      A.    WHO, the work as part of WHO,
11  let me read here what they said on page 152
12  of the monograph number 17 on some
13  N-nitroso compounds.  "Although no
14  epidemiological data were available,
15  N-nitrosodimethylamine should be regarded
16  for practical purposes as if it were
17  carcinogenic to humans."
18      Q.    Doctor, Class 2A is a --
19      A.    That's what they said.
20      Q.    Class 2A is a probable human
21  carcinogen, correct?
22      A.    Yes.
23      Q.    And it remains so to this day
24  from 1978, or whatever document you want to
25  pick up, to 2021, it remains only a

Page 510

1          S. HECHT
2  probable human carcinogen, we can agree on
3  that?
4      A.    Only?  Only?
5      Q.    Doctor --
6      A.    What do you mean, only?  It is
7  a probable human carcinogen.  I don't want
8  that in my pill.
9          MR. FOWLER:  Move to strike.
10      Q.    Doctor, with regard to the
11  Pottegard study, you don't know, do you,
12  what the exposure, the relevant exposure
13  period of the affected valsartan tablets
14  is, do you?
15      A.    Let me get the Pottegard study.
16      Q.    Let me rephrase and -- let me
17  rephrase, Doctor.
18          Do you know what the relevant
19  exposure period is for the affected
20  valsartan tablets?
21      A.    The relevant exposure period,
22  as far as I know -- from the studies you
23  mean?
24      Q.    I mean -- you can set aside
25  Pottegard.  I'm not going to ask you

Page 511

1          S. HECHT
2  specifically about that, Doctor.
3      A.    You keep changing on me.  By
4  the time I find the thing, you are on to
5  something else.  Why are you in such a
6  rush?
7      Q.    Do you understand how long the
8  relevant exposure period is for the
9  affected valsartan products?  How long were
10  they on the market in the United States?
11          MR. SLATER:  Objection, lack of
12  foundation.  You can answer.
13      A.    So I think the issue began in
14  2012, that's when they started using the
15  flawed manufacturing process, but I guess
16  these didn't reach the market until later.
17  I'm not exactly sure when it hit the market
18  in the U.S., somewhere between three and
19  nine years ago I guess.  I don't know, I'm
20  not sure.  I'm sure you know.
21      Q.    So notwithstanding having
22  written a report and been working on this
23  case since 2019, Doctor, your opinions are
24  not based on any understanding of how long
25  those pills were actually available to

29 (Pages 508 - 511)

Page 512

S. HECHT

1
2 patients in the United States, correct?
3         MR. SLATER: Objection. You
4 can answer.
5     A.    Sure they are.  Sure.  They are
6 based on everything that is written in the
7 report there.
8     Q.    So notwithstanding your
9 agreement that dose and duration matter,
10 you haven't considered the duration of time
11 that those pills were available to patients
12 in the U.S., correct?
13         MR. SLATER: Objection. You
14 can answer.
15     A.    You are telling me what I've
16 considered?
17     Q.    Well, you can correct me if I'm
18 wrong, Doctor.
19     A.    I don't know, what is -- what
20 is your question?
21     Q.    The question is, am I correct
22 that you do not know and therefore have not
23 considered the actual time period that the
24 pills at issue in this case were available,
25 the products at issue were available in the

Page 513

S. HECHT

1
2 U.S.?
3         MR. SLATER: Objection. You
4 can answer.
5     A.    I don't remember right now the
6 exact date that they became available.
7     Q.    Doctor, this morning you spent
8 some time talking about Exhibit 29, the
9 Herron and Shank article, and then you
10 referred to it a couple of other times
11 after that this morning in response to
12 counsel's question.  Do you recall that?
13         MR. SLATER: Objection, lack of
14 foundation.
15     A.    No.  Let me find it.  What's
16 the Herron and Shank article?
17     Q.    It was Exhibit 29 introduced
18 today, Doctor.  Do you recall referencing
19 that in the discussion today?
20     A.    Can we look at it?
21     Q.    Let's throw it up just to
22 refresh the Doctor.  This is the article
23 I'm asking about, Doctor.
24     A.    Oh, yeah, Herron and Shank.
25     Q.    And you expressed that this was

Page 514

S. HECHT

1
2 important to you in forming your opinions,
3 is that what I understood from you today?
4     A.    Yes.
5     Q.    And if you can pick up your
6 report, Doctor, and tell me what page that
7 you referenced this article, please.  You
8 can -- you can take it down now.  I want to
9 wait for an answer on that.
10     A.    I'm sure I mentioned it.
11         MR. SLATER: Counsel, I know
12 you are concerned about time.  Do you want
13 me to help?
14         MR. FOWLER: I don't.
15         MR. SLATER: Okay, that's fine.
16     A.    I don't know, I can't find it
17 right now.  But I'm sure --
18     Q.    If you want --
19     A.    If I didn't mention it, it is
20 an oversight because, you know, it is an
21 important study.
22     Q.    And can we agree --
23     A.    I know I mentioned -- I don't
24 know.  I don't see it right now.
25     Q.    Sure.  And if you look to the

Page 515

S. HECHT

1
2 end of your report, you will see you have
3 got your references from all those
4 footnotes, right, sir?
5     A.    Yes.
6     Q.    Why don't you look there and
7 tell me if this article appears in any of
8 your footnotes.  Maybe that will help.
9     A.    All right, let me look through
10 it.
11         (Witness perusing document.)
12     A.    Yeah, I don't see it.  You
13 know, that's an oversight.
14     Q.    Okay.
15     A.    It should have been -- it
16 should have been quoted.  It is an
17 important study.
18     Q.    Right.  Let's move on.
19         You were asked today about
20 Exhibit 28, the Wang/Hecht article by the
21 esteemed Dr. Hecht.  Do you recall that
22 discussion today?  And that's in your
23 reference list, yes, sir?
24     A.    Yeah, I'm familiar with it.
25     Q.    Yes, sir.  And my question is

30 (Pages 512 - 515)

Page 516

1           S. HECHT
2  that study dealt with a discussion of the
3  formaldehyde adducts, correct?
4       A.   Yes.
5       Q.   And we're in agreement that
6  formaldehyde is also formed endogenously?
7       A.   Yes.
8       Q.   And you also stand by your
9  testimony yesterday that there is no study
10 with regard to the formaldehyde byproduct,
11 if you will, of NDMA that has established a
12 causation -- let me start that terrible
13 question again.
14           Doctor, you stand by your
15 testimony yesterday that there is no study
16 that finds that the formaldehyde adduct
17 from NDMA caused any cancer, correct?
18      A.   I don't think I really said it
19 that way, but that's -- the role of
20 formaldehyde as a byproduct of nitrosamine
21 metabolism, it is actually the main product
22 other than obviously the DNA methylating
23 agent, has not been thoroughly evaluated,
24 investigated.  That's what I was trying to
25 say.

Page 517

1           S. HECHT
2       Q.   I see.  Can we agree that every
3  article that you've cited, and you can't
4  point to any others, referred to the
5  carcinogenicity mechanism of NDMA is the
6  formation of the O6-methylguanine mutation;
7  isn't that true, Doctor?
8       A.   That is an established
9  mechanism, yes.  That doesn't mean it's --
10 that doesn't mean it's the only mechanism.
11      Q.   It is the only established
12 mechanism, though, can we agree on that?
13      A.   Yes.
14      Q.   And can we agree that the level
15 of oxidative stress that it would take to
16 cause a malignant transformation is
17 magnitudes higher than you would expect to
18 see from the formation of a formaldehyde
19 molecule from NDMA?
20      A.   What do you mean, oxidative
21 stress?  What do you mean?
22      Q.   Are you -- are you familiar
23 with the concept of oxidative stress being
24 related to malignant transformation of
25 cells?

Page 518

1           S. HECHT
2       A.   Yes, I'm familiar with it.
3       Q.   And do you know at what
4  level -- what level it would take to
5  achieve that?
6       A.   I need a -- I need a better
7  explanation of what you mean by oxidative
8  stress.
9       Q.   Let me -- I'll withdraw that
10 and move on, Doctor.
11          None of your discussion in the
12 Wang article with regard to the
13 formaldehyde adducts suggests that that is
14 a cause of carcinogenicity when the animals
15 you studied were exposed to NDMA, correct?
16      A.   I don't know about none.  I
17 mean, I don't know about none.  I mean,
18 formaldehyde can be carcinogenic and, you
19 know, so this is -- this is a plausible
20 additional contributing mechanism to NDMA's
21 carcinogenic effect.  So I don't -- I don't
22 know that you can say none.
23      Q.   Doctor, I'm asking about your
24 study.  You actually have personal
25 knowledge of this, right?

Page 519

1           S. HECHT
2       A.   Yes, I do.
3       Q.   And nowhere in the study data
4  that you have published did you conclude
5  that the formaldehyde adducts resulted in
6  carcinogenicity in any of those animals;
7  isn't that accurate?  I mean, maybe I
8  missed it in the study.
9       A.   No, we -- we couldn't conclude
10 that.  That wasn't really the purpose of
11 the study.
12      Q.   You weren't concerned about it?
13      A.   You know, DNA cross-links are
14 considered genotoxic, and we identified
15 cross-links in the study, so that, you
16 know, this was a possible contributing
17 mechanism that hasn't been evaluated
18 before.
19      Q.   Or since, correct, Doctor?
20      A.   Correct, for
21 dimethylnitrosamine.
22      Q.   Doctor, you testified earlier
23 this morning that human metabolism is
24 important, is essential to transforming
25 NDMA into a mutagenic substance, correct,

31 (Pages 516 - 519)

Page 520

S. HECHT

2 Doctor?
3    A.   Yes.
4    Q.   And you would agree that that
5 specific cytochrome P450 E1 enzyme must be
6 present in a tissue with NDMA in order to
7 metabolize it, right?
8    A.   No.
9    Q.   It doesn't need that cytochrome
10 P450 E1 enzyme?
11    A.   2E1.
12    Q.   2E1, sorry.
13    A.   2E1 is the most efficient P450
14 enzyme to metabolize dimethylnitrosamine,
15 but other P450 enzymes also metabolize
16 dimethylnitrosamine, just not as
17 effectively, for example, 2A6. So it's not
18 the only -- it's not the only enzyme that
19 metabolizes DMN, it is just the one that
20 does it most efficiently.
21    Q.   Doctor, do any of the studies
22 that you have cited refer to any enzyme
23 other than the CY452 E1, do any of them
24 refer to that, any of the studies you have
25 cited, refer to any other enzyme?

Page 521

S. HECHT

2    A.   No. The studies I cited focus
3 on 2E1 because that's the accepted, most
4 effective of the 27 different P450s to
5 metabolize DMN. 2E1 has an affinity for a
6 smaller molecules, but other enzymes, other
7 P450 enzymes, can metabolize
8 dimethylnitrosamine, absolutely, but not as
9 effectively as 2E1.
10    Q.   And you can point to nothing,
11 no scientific article that says that, can
12 you, Doctor?
13    A.   I can, yeah. I can definitely
14 point to scientific articles that will say
15 that, absolutely. Here, read the book by
16 Ortiz de Montellano on P450. You will find
17 it in there, okay? Just read it.
18    Q.   Thank you.
19         MR. SLATER: One second,
20 Doctor. That is a book called Cytochrome
21 P450?
22         THE WITNESS: Cytochrome P450:
23 Structure, Mechanism and Biochemistry.
24    Q.   Can you please --
25         THE WITNESS: Fourth Edition.

Page 522

S. HECHT

2    Q.   Can you please open up the book
3 to where you have that bookmark and tell me
4 what page that's on, sir?
5    A.   The bookmark has nothing to do
6 with this case.
7    Q.   Nevertheless, Doctor, just tell
8 me the page, please.
9    A.   540.
10    Q.   Thank you.
11         Doctor, do you know who
12 Dr. Andrew Teasdale is? Have you heard of
13 him?
14    A.   Who?
15    Q.   Dr. Andrew Teasdale.
16    A.   Spell it.
17    Q.   T-e-a-s-d-a-l-e, an analytical
18 chemist. Are you familiar with him or his
19 writing?
20    A.   Not offhand, no.
21    Q.   And if he is published in that
22 book you are holding, you would -- well,
23 strike that.
24         Do you find that book to be an
25 authoritative book on the CY450 enzyme,

Page 523

S. HECHT

2 Doctor?
3    A.   Yes.
4    Q.   You would rely on that in your
5 regular practice outside of litigation?
6    A.   Yes.
7    Q.   And did you in fact use that as
8 a resource at all in forming your opinions
9 in this case?
10    A.   I didn't quote it, if that's
11 what you mean. Sure, it is a resource,
12 because it is in my brain.
13    Q.   Yes, sir. And can we just
14 agree at a high level, sir, that a
15 metabolic enzyme needs to be present in the
16 tissue with NDMA in order to metabolize it?
17    A.   Yes.
18    Q.   Okay. And absent --
19    A.   Metabolism is required for the
20 carcinogenicity of NDMA, definitely.
21    Q.   And can we also agree, Doctor,
22 that not every tissue or organ system in
23 the human body produces a metabolite that
24 is capable of metabolizing NDMA?
25    A.   I don't -- I don't know if we

32 (Pages 520 - 523)

Page 524

S. HECHT

1
2  have that data. Every -- every organ
3  system in the human body, I don't think we
4  have that data.
5      Q.   Doctor, do you recall earlier
6  looking at --
7      A.   I mean, you know, in science we
8  depend on data.
9      Q.   Thank you.
10         Doctor, do you recall earlier
11 looking at the article that was about
12 colorectal cancer, it was that large cohort
13 study, sir?
14     A.   Yes.
15     Q.   And you recall that in that
16 abstract that we looked at, it stated there
17 was no association found with the stomach
18 cancer, do you recall that?
19     A.   Yes.
20     Q.   And you agreed -- you agreed
21 with that, that there was no evidence, I
22 think was your testimony, there is no
23 evidence that the NDMA causes stomach
24 cancer, correct, that was your testimony?
25     A.   In laboratory animals, correct.

Page 525

S. HECHT

1
2      Q.   Okay. So then you wouldn't be
3  sure if it does in humans, is that what you
4  are saying?
5      A.   Well, that study did not show
6  an effect in stomach cancer. I think -- I
7  believe what I said was that that's
8  consistent with all of the animal studies,
9  which as far as I know have never shown
10 stomach cancer.
11     Q.   And, Doctor, do you agree that
12 in order for there to be colorectal cancer
13 caused -- allegedly caused by NDMA, the
14 NDMA would have to get to the colorectal
15 space, correct?
16     A.   No. It is possible that a
17 metabolite NDMA could be transported to the
18 colon. We don't know. So even though the
19 alphahydroxy metabolite NDMA that we have
20 been talking about for the last couple of
21 days, even though that's unstable, it is
22 still possible that some of it may get
23 conjugated to form an
24 alpha-acetoxy-dimethylnitrosamine which
25 would be stable and could be transported to

Page 526

S. HECHT

1
2  other tissues.
3         That hypothesis has been out
4  there, not thoroughly tested, but it's
5  possible that the alphahydroxy metabolite
6  could actually get conjugated and then the
7  conjugate could be transported to another
8  tissue and then deconjugated. That's how
9  you could get -- that's one way you could
10 induce tumors in the colon.
11     Q.   And you are hypothesizing,
12 correct, Doctor?
13         MR. SLATER:  Objection.
14     A.   I'm hypothesizing, but this is
15 not something I just thought of. I mean,
16 this is -- this pathway has been speculated
17 before in the literature.
18     Q.   As you said a minute ago, the
19 hypothesis has been out there for a while,
20 right?
21     A.   Yes.
22     Q.   And to date no study has been
23 done that demonstrates in an animal or a
24 human that there is that conjugation of
25 this highly reactive metabolite?

Page 527

S. HECHT

1
2      A.   As far as I know, that's
3  correct.
4      Q.   Okay.
5      A.   That doesn't mean it doesn't
6  happen.
7      Q.   Thank you.
8         Now, Doctor, moving on to the
9  discussion counsel had with you this
10 morning with regard to the FDA panel,
11 Doctor, do you agree that the FDA convened
12 that workshop because FDA is uncertain that
13 the acceptable intake of 96 nanograms is
14 appropriate, that's why they convened a
15 workshop; is that a fair statement?
16     A.   I don't know why they convened
17 a workshop.
18     Q.   Well, you do know that they --
19     A.   I think they became aware of
20 this horrible problem and they didn't
21 really know what to do about it and they
22 didn't really -- I think they were probably
23 a little bit blindsided, and all of a
24 sudden they found out, my God, you know,
25 there is dimethylnitrosamine in valsartan,

33 (Pages 524 - 527)

Page 528

S. HECHT

1  what are we going to do?
2      And so, you know, they probably
3  had some focus groups and discussions and
4  they decided well, why don't we get some
5  experts together on nitrosamine
6  carcinogenesis and see what they say, maybe
7  they can -- maybe some good advice will
8  come out of this. That's why I think they
9  convened the workshop.
10  Q.   So do you know approximately --
11  strike that.
12      FDA declared the 96 nanogram
13  acceptable intake somewhere in the 2019
14  time frame, correct?
15  A.   I don't know. I have that
16  here. Let me see. Let me see here. The
17  96 nanograms per day, the recommendation
18  was published September 1st, 2020.
19  Q.   Okay.
20  A.   That's not -- that's not in the
21  2019 time frame.
22  Q.   Thank you for the
23  clarification.
24  A.   September of 2020 is not in the

Page 529

S. HECHT

1  2019 time frame.
2  Q.   Thank you. I would like to
3  mark what you are holding as Exhibit 31.
4  Please make a copy and send it.
5  A.   That is from C&E News published
6  September 7th, 2020.
7  Q.   Thank you. We are going to
8  mark that, Doctor.
9      (Hecht Exhibit 31 deemed marked
10  for identification.)
11  Q.   Behind you, you have got manila
12  folders, Doctor. What are in those
13  folders?
14  A.   Those are some manuscripts I'm
15  working on.
16  Q.   Anything to do with this case?
17  A.   Why do you ask?
18  Q.   Well, because I'm entitled to
19  know what you have with you at the
20  deposition, sir. That's all.
21  A.   I see.
22      MR. SLATER: The question is
23  whether it relates to this case.
24  A.   I'm sitting in my office, and,

Page 530

S. HECHT

1  you know, the stuff on my desk are things
2  I'm working on.
3  Q.   Yes, sir, no problem.
4      Doctor, so they came up with
5  that in September 2020, and in March 2021,
6  Doctor, one of the questions the FDA panel
7  posed was question 4, whether or not the
8  exogenous and endogenous levels should be
9  considered with their acceptable intake
10  assessment, correct?
11  A.   Sure.
12  Q.   And, Doctor, you --
13  A.   We have been through this.
14  Q.   Yes, sir. And you agree,
15  Doctor, that -- let me start that again.
16      Doctor, have you ever testified
17  that NDMA is in fact produced endogenously?
18  A.   I don't believe so. Testified?
19  Q.   Yes, sir.
20  A.   No.
21  Q.   Bear with me.
22      Do you recall the -- do you
23  recall the case of Tuttle versus Lorillard?
24  This is one of your tobacco litigation

Page 531

S. HECHT

1  cases, Doctor.
2  A.   Yeah, that was like more than
3  ten years ago.
4  Q.   Okay.
5  A.   When was it? Refresh my
6  memory.
7  Q.   Yeah, on August 29th, 2002.
8  Let's put the transcript up.
9  A.   2002?
10      THE VIDEOGRAPHER: Counsel,
11  just give me one moment. I'm looking
12  through your documents to try and find it.
13      What is the case name again?
14  I'm sorry.
15      MR. FOWLER: It is T-u-t-t-l-e
16  versus L-o-r-i-l-l-a-r-d. We labeled them
17  with a date, 8-29-02, that's how I think
18  we submitted it.
19      THE VIDEOGRAPHER: Gotcha. I
20  think you guys must have added that
21  yesterday. I didn't have it in my
22  documents.
23      MR. FOWLER: Yes, sir. No, we
24  added it this morning probably.

34 (Pages 528 - 531)

Page 532

1          S. HECHT
2          THE VIDEOGRAPHER:  This
3  morning, that's what I meant.  Just give me
4  one extra second here.
5          Would you like to mark this as
6  the next exhibit?
7          MR. FOWLER:  Yes, please.
8          THE VIDEOGRAPHER:  So that will
9  be 32.
10          (Hecht Exhibit 32 marked for
11  identification.)
12          MR. FOWLER:  The article that
13  the doctor held was 32 and this will be 33?
14          THE VIDEOGRAPHER:  The article
15  the doctor has is 31.
16          MR. FOWLER:  Thank you.  Then
17  this is 32.
18     Q.    Doctor, do you see this is a
19  transcript from United States District
20  Court, District of Minnesota, that's in
21  your backyard, correct, sir?
22     A.    Yes.
23     Q.    Seeing this caption, does this
24  refresh your recollection of being involved
25  in this case?

Page 533

1          S. HECHT
2     A.    Yes, it does.
3     Q.    Directing your attention to
4  page 208.
5          THE VIDEOGRAPHER:  One moment,
6  let me find that page.
7     Q.    Doctor, line 8, "Question:
8  Among the indigenously formed nitrosamines
9  you would agree NDMA is one of them?"
10          Your answer:  "NDMA, the
11  evidence of indigenous, yes, there is
12  evidence for indigenous formation of NDMA.
13  I would agree."
14          Do you see that, Doctor?
15          MR. SLATER:  Do you want to
16  read the rest of the answer?
17     A.    Yeah, "But it is not one of the
18  ones where the evidence is so very strong.
19  But yes, there is evidence for indigenous
20  formation of NDMA".
21          So, I mean, this is exactly
22  what I was saying yesterday, okay?  I mean,
23  you can find it in the literature, and at
24  that time, you know, this was 19 years ago,
25  but those methods have been totally

Page 534

1          S. HECHT
2  discredited.
3     Q.    Doctor --
4     A.    This was -- this was -- this
5  was a true statement in 2002, but it is not
6  correct.
7     Q.    There has been evidence since
8  that time that discredits this statement,
9  Doctor, is that what your testimony is
10  right now?
11     A.    Yes.
12     Q.    And what evidence is it that
13  discredits what you believed under oath in
14  2002?
15     A.    You know, the methods that they
16  used in those studies were not valid.
17  There is cross-reactivity.  There is other
18  problems.  I don't -- I don't remember all
19  the details right now, but the methods
20  aren't valid.
21     Q.    Doctor, you would agree that
22  the technology, if anything, has improved
23  since 2002, correct?
24          MR. SLATER:  Objection.  You
25  can answer.

Page 535

1          S. HECHT
2     A.    What technology?
3     Q.    The technology to detect things
4  like NDMA, for example.
5          MR. SLATER:  Objection.  You
6  can answer.
7     Q.    In the body.
8     A.    Yes.
9     Q.    And the ability to isolate the
10  adducts caused by NDMA, that technology has
11  dramatically improved since 2002, correct?
12     A.    Absolutely.
13     Q.    And, Doctor, it is not your
14  opinion that NDMA is not endogenously
15  formed, is it?
16     A.    Double negative.
17     Q.    Yes, I know.
18     A.    I'm saying we don't have the
19  data, okay?  Why is that complicated?  I
20  have said this over and over.  I think I
21  said it 100 times in the last two days.  We
22  don't have the data, okay?  Why is that
23  complicated?  Why do you guys keep harping
24  on that?
25     Q.    Doctor --

35 (Pages 532 - 535)

Page 536

1          S. HECHT
2          MR. SLATER:  Take it easy.  We
3 are almost done.
4    A.    There is no good data out
5 there.
6          MR. FOWLER:  Can you take that
7 down.
8    A.    So why don't you just believe
9 me?
10    Q.    Doctor, the data that you are
11 referring to has to do with the measurement
12 of the level of endogenously produced NDMA,
13 not whether or not it is endogenously
14 produced, correct?
15    A.    I don't see the difference.  If
16 it's not endogenously produced, then there
17 is -- there wouldn't be a level above and
18 beyond the exogenous exposure.
19    Q.    Maybe my question wasn't
20 phrased right.
21          The scientific question,
22 Doctor, is not whether or not NDMA is
23 endogenously produced, it is how much,
24 correct?
25    A.    No, it is both.  It is whether

Page 537

1          S. HECHT
2 it is endogenously produced, and if it is
3 endogenously produced, how much.  It is
4 both.  It is relevant.
5    Q.    And are you --
6    A.    If there is a lot of endogenous
7 production, then that obviously has an
8 impact on the exogenous exposure.  So, you
9 know, the extent to which it is
10 endogenously produced is highly relevant.
11          MR. FOWLER:  Let's put up that
12 Exhibit 13, please.  I just want to follow
13 up on a question that was asked this
14 morning, page 16.  Thank you.
15    Q.    Doctor, question 5 is "Should
16 the regulatory" -- you don't have to blow
17 it up, we can read it --
18          MR. SLATER:  I can't.
19          MR. FOWLER:  Okay, thank you,
20 then blow it up from there to the bottom of
21 the page.
22          MR. SLATER:  Thanks.  My eyes
23 are starting to --
24    Q.    The question FDA posed to the
25 workshop, Doctor, "Should the regulatory

Page 538

1          S. HECHT
2 limits for nitrosamines listed for food and
3 water, or amount formed endogenously, be
4 considered in determining AI of
5 nitrosamines?"
6          That was one of the questions
7 FDA posed to this panel of the variety of
8 experts before it, correct?
9    A.    Yes, yes.
10    Q.    And if we look to the last
11 paragraph, the "Also, determination," do
12 you see that?
13    A.    Yeah, I see it.
14    Q.    The next sentence states "The
15 argument for a no answer was that if
16 exposure from all sources other than drug
17 contamination is large, then the health
18 risk from the small amount present in drugs
19 becomes insignificant."
20          Do you agree with that
21 conclusion from this FDA panel, Doctor?
22          MR. SLATER:  Objection.
23    A.    I don't know why we keep going
24 over this, okay?  I think I've stated my
25 opinion multiple times already.  The issue

Page 539

1          S. HECHT
2 is we don't have the data, okay?  If in
3 fact there is an amount of endogenous
4 dimethylnitrosamine formation that's far
5 larger than the exogenous exposure from
6 these contaminated pills, then the
7 exogenous exposure would not be such a
8 concern.
9    Q.    Thank you, Doctor.  I will move
10 on.
11    A.    But we don't have the data, as
12 I have said repeatedly, and I don't know
13 why you guys keep trying to twist what I
14 said in the FDA meeting.  That's what I was
15 saying in the FDA meeting, but you guys
16 want to take every word and somehow twist
17 it around to have a different meaning.
18    Q.    Doctor --
19    A.    So, I mean, I'm a little tired
20 of that.
21    Q.    Doctor, respectfully --
22          MR. SLATER:  Dr. Hecht, don't
23 worry, we are almost done.
24    Q.    Doctor, respectfully, you
25 disagree with the data, it is not that

36 (Pages 536 - 539)

Page 540

1          S. HECHT
2 there is no data, correct?
3          MR. SLATER: Objection.
4 Counsel, let's not argue anymore. If you
5 have a question --
6     A.    The data is --
7          MR. SLATER: Dr. Hecht,
8 Dr. Hecht, there is no question. All he
9 did was make a statement at you. Counsel
10 is not going to be argumentative. He
11 didn't ask a question. There is nothing to
12 respond to. Let's take it down a lot of
13 notches. We are almost done. Let's just
14 slow down. We are almost there.
15          MR. FOWLER: Thank you,
16 Counsel. You can take that exhibit down.
17     Q.    Doctor, isn't your position
18 that you disagree with the data that was
19 presented at FDA's workshop by another one
20 of your fellow experts on the level of
21 endogenous formation, you disagree with
22 that data?
23     A.    Yes, that's true.
24     Q.    It's not that there is no data,
25 you disagree with it?

Page 541

1          S. HECHT
2     A.    That's true.
3     Q.    Okay, thank you.
4          Now, let's move on. You were
5 shown today the FDA Guidance for Industry.
6          MR. FOWLER: Can we have that
7 exhibit up. This was something new.
8          THE VIDEOGRAPHER: Are you
9 aware of the exhibit number by any chance?
10          MR. FOWLER: No, I don't. It
11 was the third one introduced today, so I'm
12 going to go with 27.
13          THE VIDEOGRAPHER: 27 was the
14 first document introduced today, or second,
15 but the first new one. Let me see, I will
16 pull up 27 and you let me know if this is
17 right.
18          MR. FOWLER: It is the FDA
19 guidance. I just didn't note the exhibit
20 number. Oh, well done, okay. I hit that
21 one.
22     Q.    Doctor, first of all, do you
23 recall the questions counsel asked you with
24 regard to FDA's methodology, if you will,
25 that they applied in reaching their

Page 542

1          S. HECHT
2 acceptable intake?
3     A.    Was this yesterday?
4     Q.    No, this morning, this is what
5 you and counsel talked about.
6     A.    Yeah, I guess.
7     Q.    Let me direct your attention to
8 page 10 of this document. And you've seen
9 this document before today, is that a fair
10 statement, Doctor?
11     A.    Uh-huh.
12     Q.    And, Doctor, do you -- are you
13 familiar with the ICH M7(R1) regulatory
14 document as well?
15     A.    Not offhand. I'm not sure what
16 that is offhand.
17     Q.    Fair enough.
18     A.    What is ICH?
19     Q.    If we can blow up that
20 paragraph second from the bottom, "If
21 nitrosamines."
22          "If nitrosamines without
23 published AI limits are found in drug
24 products, manufacturers should use the
25 approach outlined in ICH M7 (R1) to

Page 543

1          S. HECHT
2 determine the risk associated with the
3 nitrosamine and contact the Agency about
4 the acceptability of any proposed limit."
5          Doctor -- you can take that
6 down -- Doctor, are you familiar with the
7 alternative method of calculating the risk
8 that is accepted by FDA in ICH M7 called
9 the BLDM approach?
10     A.    Am I familiar with it? I have
11 heard of it. I know what it is, okay? The
12 benchmark lowest dose, but I don't -- I
13 don't -- this is not -- it's not what I do.
14     Q.    Okay. Well, I will just
15 have --
16     A.    But I'm familiar with it, like,
17 you know, you're familiar with the
18 mechanism of hydroxylation.
19     Q.    Oh, thank you.
20     A.    You're welcome.
21     Q.    Let's look at the ICH M7 very
22 quickly. I have a very simple question for
23 you on this. I will direct your attention
24 to note 4 once it's up.
25          THE VIDEOGRAPHER: This is a

37 (Pages 540 - 543)

Page 544

S. HECHT

1  S. HECHT
2 new document, correct, Counsel?
3        MR. FOWLER: Yes, it is the ICH
4 M7 2017 edition.
5        THE VIDEOGRAPHER: This will be
6 Exhibit 33.
7        (Hecht Exhibit 33 marked for
8 identification.)
9    Q.   If we can go to Section 7.2.2,
10 I think it is on page 8 perhaps. Okay, if
11 we can highlight that.
12        Doctor, do you agree that there
13 is sufficient carcinogenic data with NDMA
14 that has established the existence of
15 mechanism with regard to the dose-response?
16    A.   Yes, there is good
17 dose-response data.
18    Q.   And do you have an opinion
19 whether there is sufficient dose-response
20 data to use the alternative approach to the
21 AI and use that data to calculate the PDE,
22 do you believe there is sufficient data for
23 that or do you not have an opinion?
24        MR. SLATER: Objection. You
25 can answer.

Page 545

S. HECHT

1  S. HECHT
2    A.   I don't have an opinion right
3 now. I mean --
4    Q.   Okay.
5    A.   You are throwing this stuff at
6 me. I would have to think about it.
7    Q.   Okay. You can take that down.
8        Doctor, the Johnson -- the
9 Dr. George Johnson study that counsel
10 reintroduced today, I'm correct that you
11 didn't read or rely on that in forming your
12 opinions, right?
13    A.   Correct.
14    Q.   And do you agree -- let's put
15 that exhibit up, please. I can't remember
16 the number, but it was up today.
17        THE VIDEOGRAPHER: Counsel,
18 what was the document?
19        MR. FOWLER: The George Johnson
20 permitted daily exposure limits.
21        MR. SLATER: Hey, while you are
22 looking for that, I just want to make sure,
23 would the court reporter, please, Todd,
24 that we have the appearances of everybody
25 who is attending this deposition, including

Page 546

S. HECHT

1  S. HECHT
2 anybody who is watching it or watching the
3 realtime. I assume, counsel for the
4 defense and everybody else has disclosed
5 themselves for the record as to everybody
6 that is participating. I just want to make
7 sure that we have that.
8        Has everybody been giving their
9 appearances? And if anyone else is
10 watching, like a defense expert or anyone
11 else, that should be documented in the
12 transcript. I'm making sure we have all
13 that.
14        THE COURT REPORTER: I've
15 looked at the participant list and tried to
16 jot everyone down.
17        MR. SLATER: All right, I just
18 want to state for the record that we
19 certainly obviously expect that everybody
20 enters their appearance, and that includes
21 anybody that is watching this deposition,
22 like if counsel has an expert sitting in
23 their office, I assume they will be
24 disclosed.
25        MS. LOCKARD: I can represent

Page 547

S. HECHT

1  S. HECHT
2 -- this is Victoria Lockard for the
3 record -- we do not have any experts
4 sitting in on this deposition. Daniel Nigh
5 at the Madigan deposition made it clear
6 that plaintiffs take the position that
7 would be inappropriate, so I want to make
8 sure that plaintiffs agree and will not
9 have experts in their taking of our
10 depositions, and we could take it up off
11 the record, but to answer your question, we
12 don't have an expert sitting in, and if
13 plaintiffs intend to do that we need to
14 have a discussion off the record about it.
15        MR. BALL: Hey, Adam, I can
16 state for Duane Morris that we do not have
17 any experts.
18        MR. SLATER: No problem. I
19 wasn't accusing anybody. I just wanted to
20 make sure that we had, you know, but we can
21 talk about it another time. Obviously I
22 can't speak for everybody right now. I
23 hadn't even thought about the issue. It
24 just crossed my mind.
25        MR. FOWLER: Dr. Johnson is off

38 (Pages 544 - 547)

Page 548

S. HECHT

1           S. HECHT
2 camping, I'm not in touch with him.
3    Q.    Looking at this exhibit --
4           THE VIDEOGRAPHER: Mr. Fowler,
5 you went on a tangent before I could get
6 the answer, was it an exhibit that was
7 marked today or was it a previously marked
8 exhibit?
9           MR. FOWLER: It was previously
10 marked. Let me get you that number, 16 I
11 believe, I may be off by one, but I think
12 it was 16.
13           THE VIDEOGRAPHER: The document
14 title was the --
15           MR. FOWLER: Was Permissible
16 Daily Exposure Limits.
17           THE VIDEOGRAPHER: So it is not
18 16, it might be 17.
19           MR. FOWLER: Yeah, I think I'm
20 off by one somehow.
21           THE VIDEOGRAPHER: I don't
22 think it is 17.
23           MR. FOWLER: It could be 15.
24 There is a note, 15 is missing from the
25 exhibit site, but I have Johnson as 16. I

Page 549

1           S. HECHT
2 don't know. It was just up this morning.
3 Super, thank you so much.
4    Q.    Doctor, do you have an opinion
5 whether or not -- let me start that again.
6           After we mentioned this article
7 yesterday, Dr. Hecht, did you read this
8 during the break?
9    A.    No.
10    Q.    Overnight or whatever? No?
11    A.    No.
12    Q.    This article was referenced at
13 the FDA workshop panel as well. Do you
14 recall that?
15    A.    No.
16    Q.    Do you have any
17 understanding -- let me start that again.
18           Dr. Johnson, according to this
19 article, established a point of departure,
20 a POD, are you familiar with that
21 terminology?
22    A.    I have heard of it, yeah.
23    Q.    Are you in a position, do you
24 feel qualified to agree or disagree with
25 Dr. Johnson's point of departure for his

Page 550

1           S. HECHT
2 NDMA analysis in this study?
3    A.    Not really. I think I've said
4 repeatedly that this is not what I do.
5    Q.    Okay. Let's look at the
6 introduction. I just --
7    A.    I don't do -- I don't do risk
8 assessment. I don't do risk calculations.
9    Q.    Yes, sir. Well, that helps.
10           In the paragraph, just scroll
11 down a bit, we are going to use that
12 starting "With nitrosamines" paragraph, but
13 I need further down. You see about halfway
14 down, it starts "MGMT's ability," Doctor,
15 do you see where I am?
16    A.    No.
17    Q.    Scroll a little bit down.
18 There you go. "MGMT's ability to remove
19 base alkylations and restore the normal
20 wild-type DNA sequence represents an
21 error-free damage response that can
22 mechanistically account for the
23 manifestation of a dose-response
24 threshold."
25           First, Doctor, do you

Page 551

1           S. HECHT
2 understand that sentence?
3    A.    I'm not sure.
4           MR. SLATER: Take your time,
5 Doctor.
6    A.    I'm not sure exactly what he is
7 trying to say here.
8    Q.    Okay. Okay, that's fine.
9    A.    Sure, I mean, MGMT does restore
10 the damaged DNA to its original form.
11    Q.    Okay.
12    A.    It is an error-free DNA damage
13 response. Whether that can mechanistically
14 account for the manifestation of a
15 dose-response threshold, I'm not sure about
16 that.
17    Q.    That's fine. You can take that
18 down.
19    A.    I think it is an
20 oversimplification.
21    Q.    Fair enough. You can take that
22 down.
23           MR. SLATER: What page was that
24 again, was that 296?
25           MR. FOWLER: Oh, gosh, I think

39 (Pages 548 - 551)

Page 552

1          S. HECHT
2 so.
3          THE VIDEOGRAPHER:  294 was the
4 page.
5          MR. SLATER:  Thank you very
6 much.
7          THE VIDEOGRAPHER:  Counsel, for
8 the record, just so you know, that was
9 Exhibit 14 to the deposition.
10         MR. FOWLER:  Oh, super, thank
11 you.
12    Q.    Now, Doctor, earlier today you
13 were asked questions about your report,
14 pages 24 to 26, about the levels of NDMA
15 measured in finished dose products and the
16 API.  Do you recall those questions?
17    A.    Yes.
18    Q.    And in your report you cite to
19 witness testimony from different
20 manufacturers, correct?
21    A.    Right, yeah.
22    Q.    Is that the sole basis for your
23 statements in your report was the
24 defendants' witness statements, in those
25 paragraphs on page 24 to 26, where you are

Page 553

1          S. HECHT
2 talking about the levels?
3    A.    Yes.
4          MR. SLATER:  I'm sorry, what
5 was the question?  Wait one second, Doctor.
6 What was the question?  It got missed.  Can
7 you just clarify the question?
8          MR. FOWLER:  Sure.
9    Q.    My question is simply is the
10 sole basis for the statements in the
11 paragraphs about each of the manufacturers
12 the statements made by the defendants'
13 witnesses that you cite to there?
14    A.    This is based on the
15 information that was available to me.
16    Q.    Okay.  And am I correct you
17 didn't endeavor to evaluate independently
18 any of the statements made by those
19 witnesses?  And by that you didn't evaluate
20 independently any of the company documents
21 that may or may not have confirmed those
22 statements?
23         MR. SLATER:  Objection, lack of
24 foundation.
25    A.    No, I looked at the company's

Page 554

1          S. HECHT
2 documents.  I mean, I looked at very
3 extensive lists of different batches of
4 valsartan API and their levels of
5 contamination.  I looked at that.
6    Q.    Okay.  Well, for example --
7    A.    I saw that, so I know what the
8 part per million levels of NDMA were in
9 literally hundreds of batches, I've looked
10 at that data.
11    Q.    And, Doctor, do I recall
12 correctly your testimony yesterday, and
13 this is kind of in your wheelhouse as an
14 organic chemist, that the levels of NDMA in
15 the API, the active pharmaceutical
16 ingredient, would not be the same as in the
17 finished dose, I think we established that
18 would be lower in the finished dose, yes?
19    A.    That depends how much inactive
20 material is added to the API to make the
21 finished dose.  That's what it depends on.
22    Q.    Right.  But you would expect,
23 Doctor, that the finished dose levels would
24 be lower than the API levels, correct?
25         MR. SLATER:  Objection.

Page 555

1          S. HECHT
2    A.    I don't know how much excipient
3 was added.
4    Q.    Okay, fair enough.  And you
5 made no effort to try to determine the
6 proportion, if you will, of API to finished
7 dose, you made no effort to extrapolate the
8 levels from API to finished dose levels,
9 did you, sir?
10    A.    No, I didn't.
11    Q.    And you took at face value, if
12 you will, any witness statement that may
13 have incorrectly alluded to the API levels
14 and the finished dose levels being the
15 same?
16         MR. SLATER:  Objection.
17    A.    I don't know if --
18    Q.    That was a bad question.  Let
19 me withdraw that.
20         MR. SLATER:  Counsel, are you
21 saying that your 30(b)(6) witness on behalf
22 of your client, Teva, didn't tell the truth
23 and wasn't accurate when he spoke for the
24 company in his deposition?
25         MR. FOWLER:  I said nothing

40 (Pages 552 - 555)

Page 556

S. HECHT

1
2 like that, and I withdrew the question
3 because I was afraid somebody might
4 misunderstand it.
5        MR. SLATER:  Sorry, I was that
6 guy.
7        MR. FOWLER:  Maybe.
8    Q.    Bear with me, Doctor.  I just
9 want to check a couple of notes.
10        Doctor, after last night did
11 you review any of your materials or do any
12 additional research during the break,
13 during the overnight, sir?
14    A.    No, I went home and watched the
15 Twins game.
16    Q.    How did they do?
17    A.    Had a glass of wine.  They
18 lost.
19    Q.    It wasn't the end of the day
20 you were hoping for then, right?
21    A.    We're used to it.
22    Q.    Did you -- did you discuss your
23 testimony with Mr. Slater or any other
24 counsel between last night's session and
25 today, sir?

Page 557

S. HECHT

1
2        MR. SLATER:  Objection.  Don't
3 answer that question.  That's not --
4        MR. FOWLER:  I'm not asking
5 what, I'm asking if.
6        MR. SLATER:  Doctor, wait.  It
7 is not a reasonable question.  You are not
8 allowed to ask what happens in between
9 breaks, and I assume everybody agrees.  Do
10 you want us asking your experts what you
11 talked to them about during the breaks or
12 overnight?
13        MR. FOWLER:  Counsel, I didn't
14 ask anything like that.
15        MR. SLATER:  You did.
16        MR. FOWLER:  I asked if there
17 was a conversation.  That's where I stopped
18 the question.
19        MR. SLATER:  Oh, without
20 subject matter, you are just saying did we
21 communicate?
22        MR. FOWLER:  Yes, sir, that's
23 all I asked.
24        MR. SLATER:  Okay.  That
25 question you can answer, Doctor, with a yes

Page 558

S. HECHT

1
2 or no.
3    A.    Yes.
4    Q.    And do you recall for how long?
5    A.    No.
6    Q.    Doctor, do you feel -- oh, I
7 know what I was going to ask you.  Doctor,
8 anywhere in your report do you refer to the
9 RAS oncogene?  Do you refer to that
10 anywhere in your report?
11    A.    I believe so.
12    Q.    Can you point to any study,
13 statement in your report where you are
14 attempting to express an opinion of the RAS
15 with regard to the RAS oncogene mutation
16 and NDMA?  You mentioned it again today, so
17 that's why I'm following up.
18    A.    Well, I mention
19 O6-methylguanine in DNA causes G to A
20 mutations.  I don't think I actually
21 mentioned RAS here.
22    Q.    Did you research or review --
23 wait, I'm sorry.
24        MR. SLATER:  Counsel, he is
25 still talking.

Page 559

S. HECHT

1
2        MR. FOWLER:  I'm sorry.
3        MR. SLATER:  He is still
4 talking.  Do you want to finish, Dr. Hecht?
5        THE WITNESS:  I'm finished.
6    Q.    Doctor, did you do any research
7 specifically with regard to the RAS
8 oncogene in forming your opinions in this
9 case?
10    A.    Did I carry out research or did
11 I review the research?  I don't understand
12 your question.
13    Q.    Let me try again.
14        Can you point to any materials
15 in your materials reviewed list that you
16 relied upon for any opinions with regard to
17 the RAS oncogene specifically and any NDMA
18 mutation, sir?
19    A.    Sure.  I mean, we talk about it
20 in reference 43.  We talk about it in
21 reference 37.  We talk about it in
22 reference 19.  They talk about it in
23 reference 25.
24    Q.    Doctor, are those references
25 that you are listing off --

41 (Pages 556 - 559)

Page 560

S. HECHT

1
2     A.    They talk about it in reference
3  10.  You know, all of these references talk
4  about RAS, about mutations in RAS.
5     Q.    Okay.  That's what I was trying
6  to make sure you were answering.
7            Even though those references in
8  your report where you had those footnotes,
9  you don't speak of RAS, it's your opinion
10 that those articles you have just listed
11 off are what you were relying on for any
12 opinion on RAS oncogene mutation?
13           MR. SLATER:  Objection.  You
14 can answer.
15    A.    They are referenced in those
16 other articles -- it is referenced in those
17 other articles.
18    Q.    And you agree, of course,
19 Doctor, that RAS oncogenes are also subject
20 to DNA repair?
21    A.    Yes.
22    Q.    And do you know -- and in order
23 for a RAS oncogene to be affected by NDMA,
24 you would agree it would have to be the AG
25 mutation, right?

Page 561

S. HECHT

1
2            MR. SLATER:  Objection.  You
3  can answer.
4     Q.    The guanine --
5     A.    It is G to A.
6     Q.    G to A mutation right?
7     A.    That's what's normally seen
8  with dimethylnitrosamine, G to A.
9     Q.    And if it is a G to T mutation
10 that is seen on a RAS oncogene, you would
11 agree that's not caused by NDMA, right?
12    A.    That's what the evidence
13 indicates, yes.
14    Q.    And if there is an A to T
15 mutation, that would also not be caused by
16 the NDMA, correct?
17    A.    I'm not sure about that.
18    Q.    Okay.
19    A.    I mean, I have to say, again,
20 there might be other pathways involved in
21 NDMA mechanisms.  You know, everybody talks
22 about O6 methyl G and RAS and G to A
23 because, I mean, there is great evidence
24 for that, and, you know, it all flows, it
25 all fits together, but there are multiple

Page 562

S. HECHT

1
2  possible -- there are multiple -- not
3  possible; known -- DNA damaging pathways of
4  NDMA, okay?  06-methyl G is the only --
5  it's not the only adduct that is formed.
6  You have 7-methyl G is a major one.  You
7  have adducts on phosphate.  You have
8  adducts on thymine.  You have adducts on
9  adenine.  You have adducts on cytidine.
10           So you have a whole -- a
11 collection of DNA adducts.  The focus has
12 been on O6-methyl G, and G to A, and RAS,
13 because we know that that is the sequence.
14 So that's what everybody focuses on.  But
15 that doesn't mean there aren't other
16 mutations also that might be important.
17    Q.    And that's a hypothesis, right,
18 Doctor?
19    A.    I think it is more than a
20 hypothesis.  We know that NDMA doesn't only
21 form O6-methylguanine, this is established,
22 NDMA hits every base in DNA and it hits
23 every nucleophilic site in guanine, so we
24 know this.  This is -- this is established
25 science, and the consequences of those

Page 563

S. HECHT

1
2  other adducts have not been fully
3  investigated, so it could be that there are
4  other mutations caused by NDMA that, you
5  know, we're not discussing because we don't
6  have -- we don't have as much data.
7     Q.    And it would be --
8     A.    So you need to keep that in
9  mind.
10    Q.    Yes, sir.
11    A.    You know, it's not -- it's not
12 so simple, okay?  So, for example, the
13 7-methylguanine adduct, which is a major
14 one, causes a depurination leading to
15 apurinic sites, and the apurinic sites
16 themselves in DNA have an effect, miscoding
17 effect.
18    Q.    Thank you, Doctor.  And fair to
19 say that you can --
20           MR. SLATER:  Counsel, I'm
21 sorry, I think we are at ten hours.
22    Q.    Thank you for that response,
23 Doctor, and your time and patience in your
24 deposition.
25    A.    You're welcome.

42 (Pages 560 - 563)

Page 564

```
 1          S. HECHT
 2     Q.   Do you feel you have had a
 3 chance to express all your opinions today
 4 and yesterday, sir?
 5     A.   Yes.
 6          MR. SLATER:  Objection.  And I
 7 have a few follow-up questions, so I'm
 8 going to actually jump in and finish up
 9 now.  It will take about five minutes,
10 maybe, okay?  Thank you.
11 EXAMINATION BY MR. SLATER:
12     Q.   Doctor, if you could, let's
13 knock a couple of things off real quick.
14 Can you look at your report, please, page
15 22.  Thank you.
16          You were asked some questions
17 by counsel about whether you had any
18 information about the time periods at issue
19 when the contaminated valsartan was on the
20 market, and I'm just going to point to you
21 a couple of things.
22          The top paragraph on page 22,
23 the first full paragraph, do you see about
24 four or five lines down it shows that you
25 had reviewed a chart of results of 783
```

Page 565

```
 1          S. HECHT
 2 batches being tested that were manufactured
 3 between 2011 and 2018 with NDMA levels as
 4 high as 188.1 parts per million from ZHP?
 5          MR. FOWLER:  Objection,
 6 leading.
 7     A.   I reviewed that data.
 8     Q.   And you mentioned earlier I
 9 think, that in the interest of time I will
10 try to move through this, new question, you
11 mentioned earlier it was your understanding
12 that it took some time from the time the
13 process was completed until the time the
14 pills started to be sold, you understood
15 that from the things you have read, right?
16     A.   Yes.
17          MR. FOWLER:  Objection,
18 leading.
19     Q.   I will give you another
20 example.
21          If you go to page 25, if you
22 could, there is a discussion at the bottom
23 of the page in Section 6 about the
24 nitrosamines in the Teva finished dose
25 formulation, and at the end of the first
```

Page 566

```
 1          S. HECHT
 2 paragraph it says that "The valsartan
 3 finished dose labeled as Actavis and sold
 4 in the United States initially was
 5 manufactured using ZHP TEA process with
 6 sodium nitrite quenching valsartan API, and
 7 then ZHP zinc chloride valsartan API
 8 beginning in late 2014."
 9          So that was information you had
10 as well?
11          MR. FOWLER:  Objection,
12 leading, foundation.
13     A.   Yes.
14     Q.   And it was your understanding,
15 I'm not going to get into more detail, but
16 you had an understanding that these pills
17 had been on the market for at least several
18 years in varying lengths of time --
19     A.   There is something wrong with
20 your sound, Adam.
21          MR. FOWLER:  I liked it so much
22 better.
23          (Technical interruption.)
24     Q.   Was it your understanding that
25 the contaminated valsartan was sold in the
```

Page 567

```
 1          S. HECHT
 2 United States for several years, I've shown
 3 you a few of the dates, and it varies
 4 depending on the manufacturer?
 5          MR. FOWLER:  Objection,
 6 leading, foundation, facts not in evidence.
 7     A.   Yes.
 8     Q.   Looking at your report, let's
 9 put another thing to bed.  If you could
10 look towards the end at Exhibit 3, the list
11 of literature references.
12          MR. FOWLER:  Objection to the
13 colloquy.
14     Q.   Do you see at the bottom of
15 that page, literature reference 13?
16     A.   Yes.
17     Q.   Is that the Herron and Shank
18 article that counsel asked you to locate in
19 your report in your reference list?
20     A.   No, I think I misheard you.
21 Which reference did you say it was?
22     Q.   Are you on the page that says
23 Exhibit 3, Literature References?
24     A.   No, I don't have the --
25     Q.   Oh, it's not -- all right,
```

43 (Pages 564 - 567)

Page 568

S. HECHT

well, take my word for it. I'm going to do something, take my word for it.

A. Okay.

Q. On Exhibit 3 to your report, the list of literature references, number 13 says Herron and Shank, and has the title of the article that we went through.

A. Yeah, right, right.

Q. Is that consistent with your recollection that it was something that you reviewed and that we listed here as something you referenced?

MR. FOWLER: Objection, leading, foundation.

A. Yes, I mean, I have said this, you know, it is an important study.

Q. Okay.

MR. SLATER: Chris, why don't you put up the Gombar study and let's look at the first page, and I think we highlighted one section. There is another one that you -- I think -- let me see the other one. Hang on. It just went away, all right. Can you put that back up,

Page 569

S. HECHT

please, Chris? That's not the document. All right, let's see which article this is first so we can orient. I want to get done here.

Q. This is the Gombar article that we talked about earlier.

A. Yup.

MR. SLATER: Now can you blow up the highlighted part on page 1, please.

Q. Looking at the bottom of the first highlighted paragraph, the author says "The potential for extrapolation to the human was evident when data from a sufficient number of species varying widely in body weight were available."

Do you see that?

A. Yeah.

MR. FOWLER: Objection, leading.

Q. Is that consistent with the testimony you provided earlier about the study?

MR. FOWLER: Objection, leading, mischaracterizes.

Page 570

S. HECHT

A. Yes.

MR. SLATER: Okay. You can take that down. Chris, can you bring up the Wang article, please, Dr. Hecht's article. Can you go to page 1146, please, the section Discussion on page 1146, bottom left.

Q. And this starts off the discussion, stating "The results of this study provide the first evidence for the presence of formaldehyde DNA adducts in laboratory animals." Then a little further down, you say "The method was applied to rats treated with the carcinogenic nitrosamines NDMA and NNK, and the results demonstrate for the first time that formaldehyde DNA adducts are produced from these carcinogens, in addition to the well-characterized adducts, which result from diazohydroxides formed in nitrosamine metabolism."

A. Yup.

MR. FOWLER: Objection to form, leading. I'm not sure there was a

Page 571

S. HECHT

question.

MR. SLATER: I didn't get -- I didn't get a chance to ask another question. I asked if Dr. Hecht saw that. He did.

Q. And is that -- is that responsive to the question from counsel earlier about this study?

MR. FOWLER: Objection, form, mischaracterizing my questions.

A. I don't follow you, Adam.

Q. Well, tell us -- let's take a minute and do it. What does this mean, what I just read?

A. It means that formaldehyde DNA adducts are produced in addition to O6-methylguanine and 7-methylguanine that we have been talking about for a couple of days now. Formaldehyde DNA adducts are also produced in rats treated with NDMA.

MR. SLATER: All right, you can take that down. Can you put up the FDA workshop report, please, Chris, and go to page 17.

Page 572

S. HECHT

1
2    Q.    Doctor, you were asked, and
3  let's look at the top of the page, the
4  carry-over paragraph, you were asked some
5  questions by counsel again about discussion
6  of endogenous formation, and I just want to
7  read to you starting with the first full
8  sentence on page 17.
9        "Nevertheless, traditional and
10 M7 cancer risk is based on 1 in 100,000,
11 which is an incremental risk over that of
12 cancer in the general population, i.e., the
13 background incidence is ignored.  In
14 principle this is the more accurate and
15 correct approach, i.e., to consider
16 nitrosamine exposure as a result of its
17 presence only in drugs.  This is also based
18 on the uncertainty of endogenous formation.
19 If endogenous exposure is overestimated
20 (i.e., it is not greater than 100
21 micrograms per day), then incremental
22 exposure from drug contamination becomes
23 more significant conceptually.  Therefore,
24 exposure from other sources should not be
25 considered in risk assessment or acceptable

Page 573

S. HECHT

1
2  intake calculations for nitrosamines in
3  drugs.  It was acknowledged that
4  investigation of endogenous formation is a
5  relatively long-term goal and a practical
6  approach is urgently needed, therefore,
7  flexibility should be exercised."
8        Is that consistent with your
9  understanding?
10    A.    Yes.
11        MR. FOWLER:  Objection,
12 leading, foundation.
13    Q.    I didn't get the answer.
14    A.    Yes.
15    Q.    Thank you.
16        MR. SLATER:  You can take that
17 down.
18    Q.    Finally, Doctor -- let's take
19 the document down -- you read to counsel
20 from the IARC 1978 monograph which
21 indicated that NDMA should be treated as
22 cancerous to humans for practical purposes.
23 Would practical purposes include
24 determining whether it is safe to have that
25 substance, NDMA, or even NDEA,

Page 574

S. HECHT

1
2  contaminating valsartan pills as occurred
3  here?
4        MR. FOWLER:  Objection,
5  leading.
6    A.    Yes, absolutely.  Absolutely,
7  it would.
8        MR. SLATER:  Thank you very
9  much, Doctor.  I have no other questions,
10 and since counsel has no more time, we're
11 done.
12        THE WITNESS:  Thank you.  It
13 has been nice talking to you.
14        MR. SLATER:  That magazine
15 paper, we will take care of getting, if you
16 could just maybe have a copy sent over to
17 Chris at some point, we will send it over
18 to the defense, that is no problem, that
19 little two-sided piece of paper from the
20 magazine.
21        THE WITNESS:  From Chemical &
22 Engineering News?
23        MR. SLATER:  Exactly.
24        MR. FOWLER:  Thank you, Doctor.
25 It was nice meeting you virtually here.

Page 575

S. HECHT

1
2        MR. SLATER:  Thank you
3  everybody.
4        THE VIDEOGRAPHER:  The time is
5  12:39.  This concludes the deposition.
6
7        [TIME NOTED:  12:39 p.m.]
8
   _____
9     STEPHEN HECHT, Ph.D.
10
   _____
11 Subscribed and sworn to
   before me this _____
12 day of _____, 2021.
13 _____
      Notary Public
14
15
16
17
18
19
20
21
22
23
24
25

45 (Pages 572 - 575)

Page 576

1
2          I N D E X
3
   WITNESS    EXAMINATION BY    PAGE
4
   HECHT    SLATER        405, 564
5      FOWLER        495
6
   E X H I B I T S
7
   HECHT    DESCRIPTION    PAGE
8  Exhibit 27 Control of Nitrosamine   413
            Impurities in Human
9           Drugs, Guidance for
            Industry
10 Exhibit 28 Article by Wang    452
   Exhibit 29 Article by Herron and   460
11          Shank
   Exhibit 30 Concise International   486
12          Chemical Assessment
            Document 38
13 Exhibit 31 Article from Chemical &   529
            Engineering News
14 Exhibit 32 Hecht transcript from   532
            Tuttle v. Lorillard case
15 Exhibit 33 ICH M7 2017 edition    544
16
17
18 DIRECTIONS NOT TO ANSWER
   Page    Line
19    (NONE)
20
21
   REQUESTS
22
   Page    Line
23    (NONE)
24
25

Page 578

ERRATA SHEET
VERITEXT/NEW YORK REPORTING, LLC

CASE NAME: IN RE VALSARTAN
DATE OF DEPOSITION: 8/18/21
WITNESS' NAME: STEPHEN HECHT, Ph.D.

PAGE/LINE(S)/    CHANGE    REASON

    _____/_____/_____/_____
    _____/_____/_____/_____
    _____/_____/_____/_____
    _____/_____/_____/_____
    _____/_____/_____/_____
    _____/_____/_____/_____
    _____/_____/_____/_____
    _____/_____/_____/_____
    _____/_____/_____/_____
    _____/_____/_____/_____
    _____/_____/_____/_____
    _____/_____/_____/_____
    _____/_____/_____/_____
    _____/_____/_____/_____

    _____
        STEPHEN HECHT, Ph.D.
SUBSCRIBED AND SWORN TO
BEFORE ME THIS_____DAY
OF_____, 2021.
    _____
        NOTARY PUBLIC
MY COMMISSION EXPIRES_____

Page 577

1
2          CERTIFICATION
3
4    I, TODD DeSIMONE, a Notary Public for
5  and within the State of New York, do hereby
6  certify:
7    That the witness whose testimony as
8  herein set forth, was duly sworn by me; and
9  that the within transcript is a true record
10 of the testimony given by said witness.
11   I further certify that I am not related
12 to any of the parties to this action by
13 blood or marriage, and that I am in no way
14 interested in the outcome of this matter.
15   IN WITNESS WHEREOF, I have hereunto set
16 my hand this 25th day of August, 2021.
17
18
        _Todd DeSimone_
19     TODD DESIMONE
20
21     *    *    *
22
23
24
25