# EXHIBIT C

Page 1

1              UNITED STATES DISTRICT COURT

2                 DISTRICT OF NEW JERSEY

3                   CAMDEN VICINAGE

4

5      - - - - - - - - - - - - - - - - x

6      IN RE:

7      VALSARTAN, LOSARTAN,              MDL No. 2875

8      and IRBESARTAN PRODUCTS

9      LIABILITY LITIGATION

10     - - - - - - - - - - - - - - - - x

11

12          PARTICIPANTS APPEARING VIA ZOOM

13

14      VIDEO DEPOSITION of DAVID MADIGAN, PhD

15        Thursday, August 5, 2021 - 9:32 a.m.

16

17

18

19     Reporter:  Jill K. Ruggieri, RPR, RMR, FCRR, CRR

20

21

22

23

24

25

Page 2

1      APPEARANCES:

2

3      Levin Papantonio Rafferty

4          Daniel Nigh, Esq.

5          Madeline Pendley, Esq.

6          316 South Baylen Street

7          Pensacola, Florida 32502

8          850.435.7013

9          dnigh@levinlaw.com

10         mpendley@levinlaw.com

11     -and-

12     Mazie Slater Katz & Freeman LLC

13         Adam M. Slater, Esq.

14         Christopher J. Geddis, Esq.

15         Cheryll A. Calderon, Esq.

16         103 Eisenhower Parkway 2nd Floor

17         Roseland, New Jersey 07068

18         973.228.9898

19         aslater@mazieslater.com

20         cgeddis@mazieslater.com

21         ccalderon@mazieslater.com

22     -and-

23

24

25

Page 3

1    Kanner & Whiteley LLC

2        Layne Hilton, Esq.

3        701 Camp Street

4        New Orleans, Louisiana 70130

5        504.524.5777

6    -and-

7    Martin, Harding & Mazzotti LLP

8        Rosemarie Riddell Bogdan, Esq.

9        1 Wall Street

10       Albany, New York 12205

11       rosemarie.bogdan@1800law1010.com

12       800.529.1010

13   -and-

14   Farr Law Firm

15       George T. Williamson, Esq.

16       99 Nesbit Street

17       Punta Gorda, Florida 33950

18       941.639.1158

19       gwilliamson@farr.com

20       Counsel for plaintiffs

21

22

23

24

25

Page 4

1      Greenberg Traurig LLP

2          Victoria Davis Lockard, Esq.

3          Steven M. Harkins, Esq.

4          Lori Cohen, Esq.

5          Terminus 200

6          3333 Piedmont Road, N.E., Suite 2500

7          Atlanta, Georgia 30305

8          678.553.2385

9          lockardv@gtlaw.com

10         harkinss@gtlaw.com

11         cohenl@gtlaw.com

12      -and-

13      Walsh Pizzi O'Reilly Falanga LLP

14         Liza M. Walsh, Esq.

15         Three Gateway Center

16         100 Mulberry Street, 15th Floor

17         Newark, New Jersey 07102

18         973.757.1100

19         lwalsh@walsh.law

20         Counsel for Teva Pharmaceuticals USA, Inc.,

21         Teva Pharmaceutical Industries Ltd.,

22         Actavis Pharma, Inc., and Actavis LLC

23

24

25

Page 5

1      Pietragallo Gordon Alfano Bosick & Raspanti, LLP

2          Clem Trischler, Esq.

3          Jason M. Reefer, Esq.

4          38th Floor, One Oxford Centre

5          Pittsburgh, Pennsylvania 15219

6          412.263.1816

7          cct@pietragallo.com

8          jmr@pietragallo.com

9          Counsel for Mylan Pharmaceuticals and Mylan

10         Laboratories, Ltd.

11

12     Barnes & Thornberg

13         Kara Kapke, Esq.

14         2029 Century Park East, Suite 300

15         Los Angeles, California 90067-2904

16         310.284.3880

17         kara.kapke@btlaw.com

18         Counsel for CVS Pharmacy, Inc., and

19         Rite Aid Corporation

20

21

22

23

24

25

Page 6

 1      Cipriani & Werner, P.C.

 2          Jessica Margaret Heinz, Esq.

 3          450 Sentry Parkway

 4          Blue Bell, Pennsylvania 19422

 5          610.567.0700

 6          jheinz@c-wlaw.com

 7          Counsel for CVS Health Co., Aurobindo

 8          Pharma USA, Inc., Aurolife Pharma, LLC,

 9          Aurobindo Pharma, Ltd.

10

11      Hill Wallack LLP

12          Nakul Y. Shah, Esq.

13          21 Roszel Road

14          Princeton, New Jersey 08540

15          609.924.0808

16          nshah@hillwallack.com

17          Counsel for Hetero Labs/Hetero Drugs

18

19

20

21

22

23

24

25

Page 7

1    Husch Blackwell LLP

2        Matthew D. Knepper, Esq.

3        190 Carondelet Plaza, Suite 600

4        St. Louis, Missouri 63105

5        314.480.1500

6        matt.knepper@huschblackwell.com

7        Counsel for Cigna Corporation, Express Scripts

8        Holding Company, Express Scripts, Inc.

9

10    Duane Morris LLP

11        Coleen Hill, Esq.

12        Ray Vanderhyden, Esq.

13        30 South 17th Street

14        Philadelphia, Pennsylvania 19103-4196

15        215.979.1164

16        cwhill@duanemorris.com

17        ravanderhyden@duanemorris.com

18        Counsel for Zhejiang Huahai Pharmaceutical Co.,

19        Ltd., Solco Healthcare LLC, Prinston

20        Pharmaceutical Inc., and Huahai U.S. Inc.

21

22

23

24

25

```
                                                          Page 8

 1       Falkenberg Ives LLP

 2            Kirstin B. Ives, Esq.

 3            230 W. Monroe, Suite 2220

 4            Chicago, Illinois 60606

 5            312.566.4801

 6            kbi@falkenbergives.com

 7            Counsel for Humana

 8

 9       Hinshaw & Culbertson LLP

10            Geoffrey M. Coan, Esq.

11            53 State Street, 27th Floor

12            Boston, Massachusetts   02109

13            617.213.7000

14            gcoan@hinshawlaw.com

15            Counsel for HJ Harkins Co., Inc.

16

17

18       Also present:  Lauren Massey

19

20       Videographer:  Bob Giannini

21       Concierge:  Ben Pelta-Heller

22

23

24

25
```

Page 9

1                          I N D E X

2

3        WITNESS:

4

5        DAVID MADIGAN

6              Examination by Ms. Lockhard      14

7              Examination by Mr. Trischler    251

8              Examination by Ms. Kapke        284

9

10                        E X H I B I T S

11       Exhibit 1    Madigan list of testimony         29

12       Exhibit 2    Madigan invoice, 3/1/2020         47

13       Exhibit 3    Madigan invoice, 7/26/2020        57

14       Exhibit 4    Madigan invoice, 4/17/2020        60

15       Exhibit 5    Madigan invoice, 7/18/2021        65

16       Exhibit 6    Madigan expert report             77

17       Exhibit 7    Defendants' Notice of             91

18                    Videotaped Deposition of

19                    David Madigan, PhD

20       Exhibit 8    Plaintiffs' Objections and        92

21                    Responses to Defendants'

22                    Notice of Videotaped

23                    Deposition of David Madigan,

24                    PhD

25       Exhibit 9    Madigan's file of materials       93

Page 10

1      Exhibit 10   Madigan CV                          97

2      Exhibit 11   Johnson abstract:  Permitted        120

3                   daily exposure limits for

4                   noteworthy N-nitrosamines

5      Exhibit 12   "Laboratory analysis of             125

6                   valsartan products" from FDA

7                   website

8      Exhibit 13   Snodin article:  Short              129

9                   commentary on NDMA

10                  (N-nitrosodimethylamine)

11                  contamination ofvalsartan

12                  products

13     Exhibit 14   Excel spreadsheet                   133

14     Exhibit 15   Torrent Pharmaceutical              136

15                  Limited, Valsartan - Impact

16                  assessment of NEDEA

17     Exhibit 16   Document                            138

18     Exhibit 17   Madigan paper: Evaluating the       150

19                  impact of database

20                  heterogeneity on

21                  observational study results

22     Exhibit 18   Madigan paper:  A Systematic        159

23                  Statistical Approach to

24                  Evaluating Evidence from

25                  Observational Studies

Page 11

| 1 | Exhibit 19A | Use of N-nitrosodimethylamine | 174 |
| 2 | | (NDMA) contaminated valsartan | |
| 3 | | products and risk of cancer: | |
| 4 | | Danish nationwide cohort | |
| 5 | | study | |
| 6 | Exhibit 19B | Use of N-nitrosodimethylamine | 177 |
| 7 | | (NDMA) contaminated valsartan | |
| 8 | | products and risk of cancer: | |
| 9 | | Danish nationwide cohort | |
| 10 | | study | |
| 11 | Exhibit 19C | Use of N-nitrosodimethylamine | 178 |
| 12 | | (NDMA) contaminated valsartan | |
| 13 | | products and risk of cancer: | |
| 14 | | Danish nationwide cohort | |
| 15 | | study | |
| 16 | Exhibit 19D | Use of N-nitrosodimethylamine | 178 |
| 17 | | (NDMA) contaminated valsartan | |
| 18 | | products and risk of cancer: | |
| 19 | | Danish nationwide cohort | |
| 20 | | study | |
| 21 | Exhibit 19E | September 2018 letter, | 180 |
| 22 | | Pottegard to Loder | |
| 23 | Exhibit 19F | September 6, 2018 letter, | 180 |
| 24 | | Loder to Pottegard | |
| 25 | Exhibit 20 | Dietary N-nitroso compounds | 195 |

Page 12

```
 1                   and risk of pancreatic
 2                   cancer: results from a large
 3                   case-control study
 4       Exhibit 21  Relationship between            200
 5                   N-nitrosodimethylamine and
 6                   risk of digestive tract
 7                   cancers: a meta analysis
 8                   based on cohort studis
 9       Exhibit 26  Scientific and Practical        205
10                   Considerations for the
11                   Development of Occupational
12                   Exposure Limits (OELs) for
13                   Chemical Substances
14       Exhibit 22  Acknowledgment and Agreement    222
15                   to be Bound by Protective
16                   Order
17       Exhibit 23  American Statistical            234
18                   Association Releases
19                   Statement on Statistical
20                   Significance and P-Values
21       Exhibit 24  The ASA Statement on            234
22                   P-Values: Context,
23                   Process,and Purpose
24       Exhibit 25  Amended Order                   244
25
```

Page 13

1                    P R O C E E D I N G S

2

3                    THE VIDEOGRAPHER:  Good

4    morning.  We are on the record.  This is the

5    videographer speaking, Bob Giannini, with

6    court reporter Jill Ruggieri, with Veritext

7    Legal Solutions.

8                    Today's date is August 5, 2021,

9    and the time is 9:32 a.m.  We are here to take

10   the remote video deposition of Dr. David Madigan

11   in the matter of In Re: valsartan, Losartan, et

12   al.

13                   Will counsel please introduce

14   themselves for the record.

15                   MR. NIGH:  This is Daniel Nigh

16   for the plaintiffs.

17                   MS. LOCKARD:  Victoria Lockard

18   is here for Teva defendants as well as for

19   the joint defense.

20                   THE VIDEOGRAPHER:  Okay.

21   Thank you.

22                   Will the court reporter please

23   swear in the witness.

24

25                   DAVID MADIGAN, PhD, a witness

Page 14

1    having been duly sworn, on oath deposes and

2    says as follows:

3

4                      EXAMINATION

5    BY MS. LOCKARD:

6         Q    Good morning, Dr. Madigan.

7         A    Good morning, Ms. Lockard.

8         Q    We just met a few minutes ago.

9         A    Yes.

10        Q    I represent the Teva defendants in

11   the valsartan litigation in which you've

12   given an expert report.

13                 I'll be asking you some

14   questions today.  We are off with a bang.  It

15   might be fizzled, so I apologize for the

16   short delay here.

17                 Do you have everything you

18   need to get started?

19        A    I believe so, yes.

20        Q    What's your name, sir?

21        A    David Madigan.

22        Q    Where do you live?

23        A    Brookline, Massachusetts.

24        Q    What do you do for a living?

25        A    I'm the provost at Northeastern

Page 15

1     University.

2          Q     What's your work address?

3          A     I don't know.

4          Q     Do you maintain an address at the

5     university as well as a separate address for

6     consulting purposes?

7          A     I don't have an address for

8     consulting purposes per se.

9          Q     Where do you receive your

10    correspondence and invoices for expert

11    witness services?

12         A     My home.

13         Q     And what profession do you consider

14    yourself a member of?

15         A     I'm a statistician.

16         Q     What's the difference between

17    biostatistician and statistician?

18         A     So biostatistician is a type of

19    statistician who is primarily focused on

20    issues related to, broadly speaking,

21    healthcare.

22         Q     Are there any degrees or

23    certifications that entitled you to call

24    yourself a biostatistician?

25         A     There's certainly PhD programs and

Page 16

```
 1      master's degrees as well in biostatistics.

 2      That -- sure.  Have I answered the question?

 3           Q    Sure, I think so.

 4                     Do you have any of those

 5      master's degrees or advanced degrees in

 6      biostatistics?

 7           A    I do not.

 8           Q    All right.

 9                     You and I have never met

10      before today, correct?

11           A    Correct.

12           Q    All right.

13                     And you understand you're

14      testifying under oath here, sworn to give

15      truthful and accurate testimony, correct?

16           A    Yes.

17           Q    All right.

18                     And do you agree to tell the

19      truth today?

20           A    I do.

21           Q    Okay.

22                     To that end, is there anything

23      that's preventing you today from providing

24      complete and accurate testimony?

25           A    No.
```

Page 17

1          Q    Are you taking any medications or

2     drugs that could affect your memory,

3     comprehension or ability to accurately

4     testify today?

5          A    No.

6          Q    Do you have any personal

7     limitations on your time today?

8          A    I have a dinner reservation at

9     6:45.

10         Q    I will -- I will do what I can to

11     keep you on track, but I can't make any

12     promises.  All right.

13                   Would -- I can't profess to

14     have any sort of degree in statistics, so

15     there's the likelihood that I may ask some

16     questions that are not understandable.

17                   If I ask a question that you

18     don't understand, I want you not to answer

19     it.

20                   Will you agree to that?

21         A    Sure.

22         Q    All right.

23                   And if you don't understand,

24     would you ask me to rephrase it?

25         A    Sure.

Page 18

 1          Q    And if you don't ask me to rephrase
 2     or reask the question, I'm going to assume
 3     you understood it fully.
 4          A    Fine.
 5          Q    All right.
 6                    What were you hired to do in
 7     this case?
 8          A    So I was hired to perform a
 9     statistical analysis to evaluate the strength
10     association, dose response and increased risk
11     of certain cancers related to exposure to
12     NDMA and/or NDEA.
13          Q    And I understand your opinion is
14     limited to the area of statistics, correct?
15                    MR. NIGH:   Form objection.
16          A    Statistics and/or epidemiology.
17     It's kind of fuzzy where one begins and the
18     other ends.
19          Q    All right.
20                    So you intend to give
21     epidemiology opinions in the case.
22          A    That not what I said.  So I have
23     opinions.  They're clearly stated in my
24     report.  Some of these are -- they're all
25     statistical in nature but some of them

Page 19

1    pertain to what people would generally call

2    epidemiology studies.

3        Q    You feel that you're qualified to

4    give an opinion in this case as to whether or

5    not nitrosamine impurities in the valsartan

6    at issue caused or has the potential to cause

7    cancer in humans?

8                    MR. NIGH:  Form objection.

9        A    I don't offer such opinions.  Am I

10    qualified to do so?  Probably not.  I don't

11    understand enough about the mechanisms and so

12    on.  The non-statistical issues.

13        Q    Okay.

14                    And just -- so to be clear,

15    then, you're not here to offer testimony as

16    to whether or not the nitrosamine impurities

17    in the valsartan medications at issue cause

18    or have the potential to cause cancer in

19    humans?

20        A    Correct, I'm not offering a

21    causation opinion.

22        Q    Okay.

23                    And you will not be offering a

24    causation opinion at trial or at any Daubert

25    hearing in this case, correct?

Page 20

1          A     I don't expect to do so, no.

2          Q     And you don't intend to offer any

3     testimonial evidence as to how the

4     nitrosamines formed in medications, I assume?

5          A     No.

6          Q     And I would refer to that generally

7     as root cause testimony, but you're not

8     giving any root cause testimony as to how the

9     nitrosamines were detected or formed; is that

10    fair?

11                MR. NIGH:  Form objection.

12         A     I don't think so.  Root cause, I'm

13    not entirely sure what you mean by that, but

14    I'm not offering opinions pertaining to the

15    matters you just described.

16         Q     All right.

17                You've been deposed a number

18    of times, right?

19         A     Right.

20         Q     And in each of those times, was

21    your testimony truthful and accurate at the

22    time you testified?

23         A     Yes.

24         Q     Are you aware as you sit here today

25    of any testimony in prior depositions that is

Page 21

```
 1    no longer accurate?

 2                  MR. NIGH:  Form objection.

 3       A    I am not.

 4       Q    Okay.

 5                  How long have you been in the

 6    practice of expert witnessing?

 7       A    About 15 or 16 years.

 8       Q    How did you first get involved in

 9    legal consulting?

10       A    So I was asked to help with the

11    Vioxx case.

12       Q    Okay.

13                  So was Vioxx your first

14    litigation?

15       A    Yes.

16       Q    How many times have you been

17    deposed in total?

18       A    I don't know.

19       Q    You don't keep a running list

20    beyond four years?

21       A    I don't.

22       Q    And out of the total depositions

23    you've given, how many of those were as a

24    paid expert?  All of them?

25       A    Probably.  I don't recall, but
```

Page 22

1     probably.
2          Q    So you've never testified as a
3     defendant yourself, correct, been sued?
4          A    Oh, no.
5          Q    Okay.
6                    Have you ever -- have you ever
7     given a deposition testimony in another
8     context, divorce, you know, personal contract
9     dispute, anything outside of your expert
10    witness testimony?
11         A    I don't think so.
12         Q    And in each of the cases where you
13    have provided expert witness testimony in a
14    deposition, is it fair to assume that in each
15    of those cases, you have testified as a
16    statistician?
17         A    As a statistician and/or
18    epidemiologist.
19         Q    But you don't maintain yourself as
20    an epidemiologist, correct?
21         A    No, I do.
22         Q    Okay.  You do?  You do believe that
23    you're qualified to speak on epidemiology?
24         A    On certain aspects of epidemiology.
25    I'm not qualified to testify about, you know,

Page 23

1      outbreaks of Listeria or something like that,

2      but in terms of statistical matters

3      pertaining to epidemiology, I am qualified.

4          Q    Other than statistics or

5      epidemiology, have you ever given any expert

6      testimony on areas outside of those two?

7          A    I don't think so.

8          Q    And of all the depositions you've

9      given, do you have a percentage as to which

10     ones were for the plaintiff versus the

11     defendants?

12         A    They're mostly for plaintiffs.

13     There were one or two for defense.

14         Q    So the vast majority of your expert

15     witness work is for plaintiffs, correct?

16         A    That is correct.

17         Q    Have you ever been a party to a

18     lawsuit?

19         A    I don't think so, no.

20         Q    Okay.

21              How many times have you

22     testified at trial total?

23         A    I don't know.

24         Q    Don't keep a list of trial

25     testimony?

Page 24

```
 1        A    No.
 2        Q    Do you keep your transcripts from
 3   prior depositions/trials?
 4        A    Not systematically.  I -- sometimes
 5   I'm sent them.  Sometimes I'm not.
 6        Q    So at -- your work that you do for
 7   expert witnessing, do you do that on a home
 8   computer or --
 9        A    Yeah.
10        Q    Okay.
11              Do you do any of your expert
12   witnessing work, review or research at
13   university on their computers?
14        A    No.
15        Q    Did you use a laptop or a home
16   computer?
17        A    A laptop.
18        Q    And so on your laptop, do you
19   have -- do you keep files regarding each of
20   your cases?
21        A    Not necessarily.  And so certainly
22   for valsartan right now, I have copies of the
23   papers that I reviewed as well as a copy of
24   my report, but once cases -- as I've worked
25   on a matter that is over, that is finished, I
```

Page 25

1     don't keep materials.

2         Q     After the case is concluded, do you

3     delete your prior materials?

4         A     Generally.  Sometimes I'm

5     instructed to do so, but generally, I do.

6         Q     What about your -- all of your

7     expert reports?  Do you maintain all of

8     those, a copy of those, prior expert reports?

9         A     Not systematically.  You know, I'm

10    sure I have some of them, but I don't

11    systematically have a place where I keep them

12    all.

13        Q     What about unsystematically, do

14    you --

15        A     I'm sure I have some of them.  Do I

16    have all of them?  I doubt it.

17        Q     Do you have a hard copy filing

18    cabinet where you keep things like deposition

19    testimony or expert reports?

20        A     No.

21        Q     Do you have anybody who helps you

22    with your -- the management of your

23    consulting business, like an assistant or

24    manager, family member?

25        A     No.

Page 26

```
 1        Q    So it's all you in terms of getting

 2    the retentions, getting the letters, if you

 3    get any letters, correspondence from counsel,

 4    invoices out, all that kind of paperwork you

 5    do yourself personally?

 6        A    Insofar as there's paperwork, I do

 7    it myself.

 8        Q    And I know that was a terrible

 9    question, but...

10        A    How was my answer?

11             (Laughter.)

12        Q    I just -- I think we understand

13    each other.  Okay.

14             Do you have any scheduled

15    trial testimony presently?

16        A    I do.

17        Q    What case is that?

18        A    I'm supposed to testify in a

19    Taxotere case.  I think it's in November or

20    something like that.

21        Q    Okay.

22             Which -- do you recall which

23    case?  The plaintiff's name?

24        A    No.

25        Q    Where is that pending?
```

Page 27

1          A     New Orleans.

2          Q     And you've been deposed I think

3    four times in the Taxotere litigation?  Does

4    that sound about right?

5          A     Sure.

6          Q     Have you ever testified at trial

7    for defense?

8          A     I don't think so.  There have been

9    a couple of depositions, but I don't think

10   I've given trial testimony on behalf of

11   defendants.

12         Q     In the couple of depositions you've

13   given, who was the defendant you testified

14   for?

15         A     I'd need to look at my list of

16   testimony.  The two in particular were patent

17   cases.

18         Q     So you do patent work -- or -- let

19   me strike that.

20               So you do testify as an expert

21   in patent cases?

22         A     I have done so.

23         Q     So do you testify at Markman

24   hearings before the court?

25         A     What was the word?

Page 28

1          Q    A Markman hearing?

2          A    That doesn't mean --

3          Q    A claim construction hearing for

4     patent cases.

5          A    Given that I don't know what that

6     is, I guess the answer is no.

7          Q    Have you given live testimony at a

8     Daubert hearing in litigation?

9          A    In litigation in general, yes, I

10    have.

11         Q    Okay.

12              How many times have you given

13    live testimony in a Daubert hearing?

14         A    I don't know.  Not many.  Maybe

15    three or four, something like that.

16         Q    Do you keep a list of your Daubert

17    testimony -- strike that.

18              Do you record all of your

19    Daubert testimony in the last four years on

20    your testimonial list?

21         A    Yes.

22         Q    I only saw one on here, I believe,

23    in the last four years, and that was in the

24    Abilify litigation.

25         A    Yeah.

Page 29

```
 1        Q    So was that -- you believe that's
 2    accurate -- let's just make this an exhibit.
 3                 MS. LOCKARD:  This is
 4    Exhibit 1 to David Madigan's deposition, this
 5    will be the deposition and trial testimony,
 6    last four years, and this was Appendix 2 to
 7    the expert's report.
 8                      (Exhibit 1 marked for
 9    identification.)
10    BY MS. LOCKARD:
11        Q    I'm sorry -- extreme closeup to
12    everybody on the Zoom.
13                 All right.  So, I mean, you're
14    welcome to look over it, but the only one I
15    saw on -- for Daubert testimony was the first
16    one, which was Abilify.
17                 MR. PELTA-HELLER:  I'm sorry,
18    what was the name of that file?
19                 MS. LOCKARD:  Abilify,
20    A-B-I-L-I-F-Y.
21                 And for the record, the
22    concierge is with the court reporter -- court
23    reporter's office.  Not my personal
24    concierge.
25        A    Sorry.  So the question was is the
```

Page 30

```
 1     Abilify litigation the only one where I

 2     appear to have testified in a Daubert

 3     hearing?

 4          Q    In the last four years.

 5          A    In the last four years, that

 6     appears to be the case, yes.

 7          Q    And I understand some of your

 8     testimony was limited in that litigation; is

 9     that right?

10                    MR. NIGH:  Form objection.

11          A    I don't recall.  I don't recall

12     exactly.  Certainly the bulk of my opinions

13     were allowed.

14          Q    Okay.  So we'll -- we'll come back

15     to some of this.

16                    Have you been asked to testify

17     in any Daubert hearing in this case?

18          A    No.

19          Q    If asked, would you be available to

20     do so?

21          A    Yes.

22          Q    All right.

23                    So the Exhibit 1 that we

24     marked, is this a true and accurate list of

25     testimony that is required under the federal
```

```
                                            Page 31

 1    rules, for the last four years?

 2         A    Yes, that's my intention.

 3         Q    And the last one on this list

 4    appears to be June 15, is the last deposition

 5    given?

 6         A    Oh, there's a June 29 on the bottom

 7    of page 3.

 8         Q    Ah, okay.  And that's in the Hurley

 9    case.

10         A    Yes.

11         Q    And that's a talc case?

12         A    Yes.

13         Q    All right.

14              So any other testimony you've

15    given since you prepared this report that

16    needs to be added to bring it up to date?

17         A    No.

18         Q    On this list, I counted six trials

19    in the last four years.

20              Is that accurate?

21         A    If you say so, I didn't read --

22         Q    If the paper says six trials, then

23    you stand by that, right?

24         A    I do, yes.

25              MR. NIGH:  Form objection.
```

Page 32

1          Q    And I counted 55 depositions in
2      four years.
3          A    Yes, of which the vast majority are
4      talc, yes.
5                    MR. NIGH:  Form objection.
6          Q    Okay.
7                    And so in the last for years,
8      it appears that you are averaging about one
9      deposition per month?
10         A    Sure.
11         Q    How many expert reports would you
12     say you prepare in an average year?
13         A    Two or three.
14         Q    And are there cases you review but
15     in which you don't give a report or
16     testimony?
17         A    Has that ever happened?  Maybe.  I
18     can think of one case.  But in general, no,
19     I'm -- I'm asked to write a report.
20         Q    And can you recall any occasions
21     where you were approached to give an opinion
22     and you turned down the case for whatever
23     reason?
24         A    Oh, yeah.  If I'm not -- if it's
25     outside the scope of my expertise, obviously

Page 33

1    I won't do it.

2        Q    But you -- can you think of any

3    case in which you were asked to give any

4    opinions within the areas of statistics or

5    epidemiology that you turned down?

6                MR. NIGH:  Form objection.

7        A    Not that I can recall.  I'm asked

8    in each case to do certain analysis, and if

9    it's within my capability to do those

10   analyses, I do them, I write a report.

11       Q    Why do you think it is that your --

12   most of your work is on behalf of plaintiffs?

13               MR. NIGH:  Form objection.

14       A    I don't know.  I'm not asked to

15   be -- I don't have any -- it's not a bias on

16   my behalf.  I'm just never asked.  That's the

17   correct answer to your question.  I'm not

18   asked.

19       Q    What percentage of your

20   professional time is spent consulting on

21   legal matters?

22       A    It has ebbed and flowed over the

23   years.  Currently, it's modest.  It's 10

24   or -- 10 percent, 15 percent, something like

25   that.

Page 34

```
 1          Q    And that's 10 percent of your
 2     professional time is spent on litigation
 3     consulting; is that right?
 4          A    Yes.
 5          Q    Okay.
 6                   What's the other 90 percent
 7     spent on?
 8          A    I have a day job.
 9          Q    Okay.
10                   You're professor at a
11     university?  Is that the other 90 percent?
12          A    Well, and I'm provost, yes.
13          Q    And provost.
14                   How does that -- the other 90
15     percent split between provost and professor?
16          A    There's no daylight between those
17     two things.  The role is -- I am --
18     primarily, I work -- my work pertains to
19     being a provost.  I'm not in the classroom
20     much at the moment, for instance.
21                   Actually, just to give you a
22     complete answer, I also do other types of
23     consulting outside of litigation.
24          Q    All right.
25                   So we've got 10 percent that's
```

Page 35

1    litigation consulting.  Okay.  Out of the

2    remaining 90 percent, how much of that is

3    non-litigation consulting?

4         A    Maybe 5 percent.

5         Q    And what kind of things are those?

6         A    There's a list in my CV.  I've

7    consulted for many pharmaceutical companies

8    over the years.

9         Q    Clinical trial work, grants, things

10   of that nature?

11        A    No.

12        Q    No grants?

13        A    No, grants would be at the

14   university.  I've also consulted for Boeing

15   for 10 years, I was a consultant to Boeing,

16   involved in all kinds of different things.

17              There's a list in my CV.  It's

18   a long list.

19        Q    And we'll pull that up and make it

20   an exhibit in a few minutes.

21              Okay.

22              So that's 15 percent accounted

23   for.  So is the other 85 percent associated

24   with your duties at the university?

25        A    Yes.

Page 36

1          Q    Any other professional activities

2     that you're engaged in other than what we've

3     already talked about, currently?

4          A    No, nothing that's not related to

5     my job at the university.

6          Q    Do you have any plans to retire

7     anytime soon?

8          A    No.

9          Q    Any plans to change jobs, change

10    universities, move?

11         A    No.

12         Q    In the cases that -- where you

13    mentioned that you had served as an expert

14    witness for defendants, do you recall if

15    those were in pharmaceutical cases?

16         A    We could look at the list.  I think

17    one of them -- as I said, they're

18    intellectual property matters.  They were

19    pertaining to drugs.

20         Q    Were they in the last four years?

21         A    No, probably not.

22         Q    So they're not on your Exhibit 1?

23         A    Good point.  Yeah, they're probably

24    not.  They're not, I'm sure.  I don't think.

25    I have to check.  Let me see.

Page 37

1              (The deponent read the

2      document.)

3                   Right.  They're more than four

4      years ago.

5           Q    Okay.

6                   Do you recall if those cases

7      were for pharmaceutical companies?

8           A    Yes, they were.

9           Q    Do you recall which companies?

10          A    No.

11          Q    Are you aware of who the defendants

12     are, the named manufacturer defendants, in

13     this litigation?

14          A    In this litigation?

15          Q    Yes.

16          A    No.  I understand Teva is one of

17     them.  I don't know about the other ones.

18          Q    All right.

19                   So you haven't reviewed any

20     Teva documents, though, as I understand.

21                   Is that correct?

22          A    I don't know.  So my hesitation is

23     I cite to a couple of documents, footnote 6

24     and footnote 7.  I don't think they're Teva

25     documents.  I think Torrent is another

Page 38

1     defendant.  And I'm not sure about footnote

2     6.

3          Q    We'll talk more about the materials

4     in a little bit.

5                    Okay.  What percentage of your

6     income is from expert witnessing versus the

7     other 90 percent?

8                    MR. NIGH:  Form objection.

9          A    I don't know exactly, but it's

10    probably around 20 percent.

11         Q    Do you report all of your expert

12    witnessing income to the IRS?

13         A    I do.

14         Q    Have you ever been audited by the

15    IRS?

16         A    No.

17         Q    Do you have to give any portion of

18    your income from expert witnessing to the

19    university?

20         A    No.

21         Q    Do you make it a practice to donate

22    or give any certain portion of your expert

23    witnessing funds to any charities?

24         A    No, not since -- I have done but I

25    don't do it systematically.

Page 39

```
 1          Q    Do you know how many matters --
 2     litigation matters you have right now that
 3     are open matters that you're consulting on?
 4                MR. NIGH:   Form objection.
 5          A    Four, maybe.
 6          Q    And are those talc, Taxotere,
 7     valsartan, and what's the other one?
 8          A    I wasn't actually counting
 9     valsartan, but Zostavax and Combat Arms
10     Earplug.
11          Q    3M?
12          A    3M.
13          Q    To your knowledge, have you ever
14     been retained by Teva in any consulting
15     capacity?
16          A    Not to my knowledge.
17          Q    Have you ever been retained by
18     Mylan in any consulting capacity?
19          A    No.
20          Q    Ever retained by Hetero in any
21     consulting capacity?
22          A    I don't think so.
23          Q    Ever retained by Torrent in any
24     consulting capacity?
25          A    I don't think so.
```

Page 40

```
 1          Q    Ever retained by Aurobindo in any

 2     consulting capacity?

 3          A    No, I don't think so.

 4          Q    Ever retained by ZHP, Zhejiang

 5     Huahai?

 6          A    No.

 7          Q    Ever retained by Solco or Prinston?

 8          A    No.

 9          Q    Are you -- strike that.

10               Have you ever paid to be

11     listed in any expert witness database or

12     service?

13          A    No.

14          Q    Do you know if you're listed on any

15     publicly available expert witnessing

16     databases, paid or not?

17          A    I don't think so.

18          Q    Have you ever testified in any

19     litigation pending outside of the United

20     States?

21          A    I have.

22          Q    Where was that?

23          A    I testified in Canada.  I testified

24     in Australia.

25          Q    Were those --
```

Page 41

```
 1          A    I think that's it.

 2          Q    Were those in product liability

 3     cases, like most of what's on your report?

 4          A    Yes.

 5          Q    Have you ever spoken to or given a

 6     presentation to a group of lawyers, like the

 7     ABA or a trial lawyers association?

 8          A    No, I don't think so, although I am

 9     scheduled to do so this fall in a continuing

10     legal education context.

11          Q    What -- who's the sponsor of that

12     seminar?

13          A    I have no idea.

14          Q    When is it taking place?

15          A    Sometime this fall.

16          Q    Can you be more specific?

17     September, October, November?

18          A    Don't know.  I think it's --

19     actually, it's being scheduled.  I know

20     there's to-ing and fro-ing right now about

21     the scheduling.

22          Q    Is it an in-person seminar?

23          A    Don't know.

24          Q    Who asked you to participate?

25          A    I'm giving it, so I'm doing it with
```

Page 42

```
 1      myself and a lawyer are preparing a session

 2      on -- on biostatistics.

 3           Q     Who's the lawyer?

 4           A     His name is Abe Alexander.

 5           Q     And is it focused on any particular

 6      litigation?

 7           A     No.

 8           Q     Do you know who the audience is?

 9           A     No.

10           Q     Do you know where it's supposed to

11      take place?

12           A     No.

13           Q     How much money did you make last

14      year from serving as an expert witness in

15      litigation?

16           A     I don't know.

17                 MR. NIGH:   Form objection.

18           Q     Do you have tax records that would

19      show that?

20           A     Yes.

21           Q     Have you ever had to produce your

22      tax records in any expert capacity in

23      litigation?

24           A     No.

25           Q     Do you know how much money you've
```

Page 43

```
 1      made this year, in 2021, from serving as an
 2      expert witness?
 3           A    No.
 4           Q    How do you --
 5                MR. NIGH:  Form objection.
 6           Q    How do you bill for your time spent
 7      expert witnessing?
 8           A    I just keep track of my hours and
 9      just periodically bill.
10           Q    Is it -- do you do monthly invoices
11      or just as-needed?
12           A    It's when I think of it.
13           Q    Do you keep time sheets?
14           A    I keep a running -- you know, I
15      keep track on an invoice.  I start to open an
16      invoice, and as I spend time on a matter, I
17      add it to the invoice.
18           Q    On an electronic document?
19           A    Yes.
20           Q    All right.
21                What's the billing arrangement
22      that you require when you're retained on a
23      case?  Is there a retainer?
24           A    No, I don't do retainers.
25           Q    All right.
```

Page 44

1              Do you have any special

2    riders/requirements?

3         A    No.  I don't think so.  Like, I'm

4    not sure what that would be.

5         Q    Like, you know, special provisions

6    if you have to stay in certain hotels or a

7    per diem if you're testifying out of -- you

8    know, out of your home state?

9         A    No.

10        Q    So the deal is, you just bill

11   monthly for your time?

12        A    I didn't say monthly.  I keep track

13   of my hours.

14        Q    Okay.

15        A    And from time to time I tally it up

16   and send it to the attorney.

17        Q    You're correct.  I completely

18   misspoke on that.  I meant to say you just

19   bill hourly for your time?

20        A    Yes.

21        Q    Do you charge $800 per hour for

22   your work in this case; is that right?

23        A    Yes.

24        Q    And is that what you'll charge if

25   you testify at trial?

Page 45

1           A     Sure.

2           Q     And that's whether it's all day,

3     two days, three days, it's 800 an hour?

4           A     It's for time worked, so it would

5     be hours I spend on the stand.

6           Q     You don't charge getting to trial

7     or returning travel?

8           A     I do not.

9           Q     Do you bill expenses back to the

10    firm?

11          A     If there are any, I would, yeah,

12    direct expenses.

13          Q     Do you have any retention letter or

14    consulting agreement that you use typically?

15          A     No.

16          Q     Is there any retention letter in

17    this case?

18          A     I don't think so.

19          Q     Any consulting agreement entered in

20    this case?

21          A     No.

22          Q     Do you also charge $800 an hour for

23    Daubert hearing time?

24          A     For time spent actually testifying,

25    yes.

Page 46

1          Q    Do you know how much you've billed

2     in total on this case?

3          A    I don't, but you have the invoices.

4          Q    Okay.

5                    Let's take a look at those.

6                    These were invoices produced

7     as part of your file yesterday, so I don't

8     know if everyone on the Zoom received these.

9                    MS. LOCKARD:  Let me ask you,

10    Mr. Nigh, do you know if those were sent out

11    broadly to the defendants or were they

12    just --

13                    (Unidentified voice.)

14                    (Reporter clarification.)

15                    MR. BOGDAN:  It's Rosemarie.

16                    THE VIDEOGRAPHER:  Do you want

17    to go off the record?

18                    MS. LOCKARD:  You can keep the

19    camera rolling.

20                    (Discussion off the record.)

21                    MS. LOCKARD:  We can go back

22    on the record, please.

23    BY MS. LOCKARD:

24         Q    All right, Dr. Madigan.

25                    So I have in my hands the

Page 47

1      invoices that were produced by counsel for

2      plaintiffs yesterday.  I received four of

3      them.

4                      Do you know if you've sent out

5      more than four invoices in the valsartan

6      litigation?

7           A    I have not.

8           Q    Okay.

9                      Now, I'm going to just go

10      through these one at a time.

11                     The first one -- this will be

12      Exhibit 2.  The first one is dated March 1,

13      2020.

14                     (Exhibit 2 marked for

15      identification.)

16      BY MS. LOCKARD:

17           Q    And is that a true and accurate

18      copy of your invoice in the valsartan

19      litigation?

20           A    Yes.

21           Q    It looks like it was addressed to

22      Ned McWilliams.

23                     Do you know who Ned McWilliams

24      is?

25           A    He's an attorney.

Page 48

1          Q    Is he with Mr. Nigh's firm?

2          A    I don't know.  I think he is.

3          Q    Has he been your primary contact on

4     the case so far?

5          A    No.

6          Q    Who has been?

7          A    Mr. Nigh, and Ms. Bogdan.

8          Q    All right.

9               So if we look at this invoice,

10    this is a March 1, 2020 invoice.  This

11    appears to be your first invoice sent out in

12    the case.

13               Is that correct?

14         A    Yes.

15         Q    And it looks like you billed for

16    eight and a half hours at $800 an hour for a

17    total of $6,800, correct?

18         A    Yes.

19         Q    Has this invoice been paid?

20         A    Yes.

21         Q    All right.

22               So it looks like you had an

23    initial literature review on December 1,

24    2019, was your first work on the case, right?

25         A    Yes.

Page 49

1          Q    What did you review in the initial

2     literature review?

3          A    I have no idea.

4          Q    Do you recall if it was materials

5     sent to you by plaintiffs' counsel or if

6     that's your own literature research review?

7          A    Don't recall.

8          Q    Did you do independent research in

9     the case during the course of your review?

10         A    As against?  I don't understand the

11    question.

12         Q    Okay.

13              If I reference independent

14    research, I mean you, Dr. Madigan, actually

15    doing a PubMed search or some sort of search

16    in a literature database yourself as opposed

17    to being provided documents by counsel.

18              Do you follow?

19         A    Yeah, I do.

20         Q    Okay.

21              So assuming that to be the

22    case, did you do any independent research in

23    the case during the course of your review?

24              MR. NIGH:  Form objection.

25         A    I have done some what you're

Page 50

1    calling independent research, yes, I've done

2    some work along those lines.

3        Q    What databases did you use to

4    perform that research?

5        A    So what's coming to mind is, in

6    particular, I looked at -- the Song

7    meta-analysis was done in 2015, so I ran -- I

8    did do a search to see was there anything

9    since then that fit the criteria described in

10   Song.

11              I used the same databases that

12   Song describes, the same search.

13       Q    Did your search generate any new

14   material or studies?

15       A    It generated -- the search produced

16   a bunch of studies, I don't know, 50 or

17   something, but none of them -- again, I went

18   through them.  None of them were -- were

19   appropriate to include, or relevant.

20       Q    Why were they not appropriate or

21   relevant to include?

22       A    Because they didn't satisfy the

23   criteria --

24       Q    What --

25       A    -- in Song.

Page 51

1        Q    What was the criteria you were

2    looking for?

3        A    You'd need to put Song in front of

4    me.  I don't remember.

5        Q    Okay.  Let's come back to that,

6    then.

7                    All right.  So -- all right.

8                    Any -- other than the search

9    to see if there were any updated results from

10   the Song study, did you do any other

11   independent research in the case?

12       A    If you're equating -- if you're

13   equating independent research with searches,

14   then I -- that's the only search I recall

15   doing at this point.

16                    MR. NIGH:  Form objection.

17       Q    All right.

18                    So in the initial invoice, it

19   looks like you had a total of four hours,

20   initial literature review.  Then you had a

21   phone call, and then you had another four

22   hours of literature review.

23                    Is that correct?

24       A    Yeah.

25       Q    Who did you have the phone call

Page 52

1      with on December 4?

2          A    I don't know.

3          Q    Do you know what the purpose of

4      that call was?

5          A    I do not.

6          Q    Did you take any notes during that

7      call?

8          A    No.

9          Q    At this point, when you sent this

10     invoice, had you received any letters or

11     correspondence from plaintiffs' counsel?

12         A    Letters or correspondence?

13         Q    Written letters or written

14     correspondence.  Not email.

15         A    Oh.  No.

16         Q    Like old-fashioned US Mail.

17         A    I don't know what else I was

18     thinking.

19              Can I ask a question?

20         Q    Yes.

21         A    There's a question mark on this.

22     That's not mine.  I just -- for the record, I

23     just want to --

24         Q    I don't know why that's there.

25         A    Okay.

Page 53

1          Q    Let's just mark that out.  It won't
2     be on the official exhibit.
3          A    Okay.
4          Q    But thank you.  If you see any
5     other stray marks, let me know.
6          A    Okay.
7          Q    So -- so in the course of this
8     litigation, you don't think you've received
9     any letters through the mail, written
10    correspondence from plaintiffs' counsel; is
11    that right?
12         A    I know for a fact I have not.
13         Q    Has your communication been through
14    email primarily?
15         A    Yes.
16         Q    All right.
17              And has your communication
18    with plaintiffs' counsel been through the
19    Levin Papantonio firm, Mr. Nigh's firm?
20         A    I guess so.
21         Q    Do you recall speaking with any
22    other lawyers on plaintiffs' side in the case
23    outside of Mr. Nigh's firm?
24         A    Is Ms. Bogdan with a different
25    firm?  I'm not sure.

Page 54

1                    MR. NIGH:  Yes, she is.

2                    MS. LOCKARD:  What firm are

3     you with?  I'm sorry.

4                    MS. BOGDAN:  My office is

5     Martin Harding & Mazzotti.

6                    MS. LOCKARD:  Martin

7     Harding & Mazzotti.

8        Q    So other than Martin

9     Harding & Mazzotti and Levin Papantonio, you

10    don't recall any specific communications with

11    other law firms discussing valsartan.

12                    Is that right?

13       A    Correct.

14       Q    Had you worked with Martin

15    Harding & Mazzotti before this litigation?

16       A    I don't think so.

17       Q    Okay.

18                    So is this the first case

19    you've been involved in with that firm to

20    your knowledge?

21       A    As far as I know.

22       Q    And have you worked with Mr. Nigh's

23    firm previously on matters?

24       A    I think I did work with that firm

25    in the Pradaxa litigation, I think.

Page 55

```
 1            Q    Are you familiar with plaintiffs'
 2     attorney Adam Slater, who is involved in the
 3     litigation?
 4            A    No.
 5            Q    To your knowledge, have you ever
 6     worked with Adam Slater or the firm Mazie
 7     Slater?
 8            A    Not to my knowledge.
 9            Q    Have you -- are you familiar with
10     David Stanoch?
11            A    No.
12            Q    Ever worked with David Stanoch or
13     his firm, to your knowledge?
14            A    Not to my knowledge.
15            Q    Are you familiar with an attorney
16     by the name of Ruben Honik?
17            A    No.
18            Q    Ever worked with Ruben Honik or his
19     firm?
20            A    No.
21            Q    Familiar with a Conlee Whiteley?
22            A    No.
23            Q    Ever worked with her firm?
24            A    No.
25            Q    I'm missing somebody.  I don't mean
```

Page 56

```
 1    to leave them out.

 2                   All right.  Let's get back to

 3    the invoice.

 4                   Okay.  So you don't have any

 5    knowledge of what you reviewed in December of

 6    2019.

 7        A    I do not.

 8        Q    Okay.

 9                   And you don't have any record

10    of what you were sent in your original

11    package from plaintiffs' counsel; is that

12    right?

13                   MR. NIGH:  Form objection.

14        A    I never said there was an initial

15    package.  I just don't recall.

16        Q    Okay.

17                   Was there an initial package

18    that came from plaintiffs when you were

19    retained?

20        A    Not in the mail.  Did they send me

21    some papers at the outset?  I don't remember.

22        Q    So typically when you're retained,

23    are there certain things you ask for, like

24    complaint or depositions or things of that

25    nature, or do you leave it to the attorneys
```

Page 57

1    to decide what's sent to you?

2              MR. NIGH:  Form objection.

3        A    So it all depends.  If -- in this

4    particular case, I was asked to do an

5    analysis of a particular set of studies, and

6    that's what I did.

7        Q    And so when you were asked to do

8    the analysis of that particular set of

9    studies, did plaintiffs' counsel provide

10   those studies to you?

11             MR. NIGH:  Form objection.

12       A    I don't recall the exact sequence

13   of events.

14       Q    All right.

15             So I will mark as Exhibit 3

16   the next invoice in the case.  And this is an

17   invoice dated July 26, 2020.

18             (Exhibit 3 marked for

19   identification.)

20   BY MS. LOCKARD:

21       Q    Does that appear to be a true and

22   correct copy of your invoice?

23       A    Yes.

24             MR. NIGH:  Can I see it?

25             (Counsel read document.)

Page 58

1              MS. LOCKARD:  And for the

2       record, for the court reporter, he probably

3       needs to have his Social Security/tax number

4       redacted.

5              MR. NIGH:  Absolutely.

6       BY MS. LOCKARD:

7           Q     Okay.

8                  So this invoice appears to

9       have the total hours of 19 hours.  And were

10      you charging $800 at the time?

11          A     Yes.

12          Q     All right.

13                 So the total invoice amount is

14      $15,200, correct?

15          A     Yes.

16          Q     Has that been paid?

17          A     Yes.

18          Q     All right.

19                 So it looks like again during

20      the period March 2020 to May 2020, you were

21      doing some additional literature review, you

22      had one call, and then you did an NDEA

23      review, correct?

24          A     Yes.

25          Q     What is meant by NDEA review?

Page 59

1           A    I don't recall.

2           Q    When you were first retained in the

3    case, what were you told about what

4    nitrosamines were or what they were -- or

5    which ones were at issue?

6                    MR. NIGH:  I'm actually going

7    to instruct him not to answer.  Seeking

8    attorney-client privilege.

9           Q    Let me ask it this way:  When you

10   were first retained, were you asked to give

11   any opinions regarding NDEA studies?

12          A    I was certainly asked to give

13   opinions about NDMA and NDEA, but

14   specifically the way you asked it there was

15   at the outset.  I don't recall whether I was

16   asked that right at the outset or if that was

17   added later, I don't remember.

18          Q    Yeah, I mean, it -- the conclusion

19   that I drew from reviewing Exhibit 3 is that

20   in May of 2020, it appeared that the NDEA

21   issue was raised or called to your attention.

22                    Does that seem like a fair

23   conclusion from the documentation?

24                    MR. NIGH:  Form objection.

25          A    It's a speculation.  I just don't

Page 60

```
 1    know.
 2         Q    All right.
 3              And you don't recall what
 4    literature review you did or whether it was
 5    provided to you by counsel?
 6         A    I don't remember.
 7         Q    And when you keep notes of your
 8    time, you don't keep any more detailed notes
 9    other than just this two-word entry,
10    "literature review"?
11         A    Correct, I do not.
12         Q    Do you know who the call was with
13    on March 20th?
14         A    I don't.
15         Q    Do you recall what was the purpose
16    of the call?
17         A    I do not.
18         Q    Let's take a look at the next
19    invoice, which we'll mark as Exhibit 4.  And
20    it's dated April 17, 2020.
21                   (Exhibit 4 marked for
22    identification.)
23    BY MS. LOCKARD:
24         Q    Does this look like a true and
25    correct copy of your invoice in this case?
```

Page 61

```
 1        A    Yes.

 2                 MR. NIGH:  Can I see a copy.

 3                 (Counsel read document.)

 4        Q    And this invoice is for 20.5 hours

 5   at $800, and you billed 16,400.

 6        A    Correct.

 7        Q    And was this invoice paid?

 8        A    Yes.

 9        Q    Is your payment coming from the

10   Levin Papantonio firm?

11        A    I don't know.

12        Q    You don't know who the check is

13   from?

14        A    Sitting here this minute, I don't

15   know, yeah.

16        Q    So in terms of the work that was

17   done during this period -- let me ask you

18   this:  So you look at the date of this

19   invoice is April 17, 2020.  However, the

20   first --

21        A    That should be 2021.  That's an

22   error.

23        Q    Okay.

24        A    Yeah.

25        Q    So invoice which is Exhibit 4
```

Page 62

1      should actually -- it has an error on the

2      date, correct?

3            A    Yeah, yeah.

4            Q    All right.

5                       So we can assume this is

6      actually sent on April 17, 2021, correct?

7            A    Yes.

8            Q    So if you look at the work that was

9      done there, there's a call, and then there's

10     the word "analysis."

11                      What do you mean by "analysis"

12     in your billing records?

13           A    I don't know.  I was in -- it just

14     means I was doing work.  I was doing an

15     analysis, whether it means I was reading

16     papers, doing any kind of statistical

17     calculation, it's nonspecific.

18           Q    Okay.

19                      So is it going to be

20     interchangeable with review of materials or

21     does it indicate you're actually doing some

22     sort of calculations?

23           A    It's ambiguous.

24           Q    All right.

25                      So the word "analysis" on here

Page 63

1    is ambiguous?  You can't provide us any more

2    information about that?

3         A    I can't.

4         Q    Okay.

5              It looks like from this

6    document that your report was actually

7    started on April 4.

8              Is that right?

9         A    So it seems, yeah.

10        Q    Okay.

11             So when you start your report,

12   is that when you actually -- you open up the

13   document and start drafting the text of the

14   report?

15        A    It might have been.  I can't be

16   certain I didn't do that earlier.

17        Q    We don't see anything on your

18   invoice related to a report before April 4,

19   2021.

20        A    We do not, but that doesn't mean

21   that I wasn't doing it.

22        Q    Okay.

23             So it looks like at this point

24   in time, on April 4, it looks like you -- if

25   you look at the three invoices, you had spent

Page 64

```
 1      four hours reviewing documents, less than ten

 2      hours on analysis, and 15 hours on literature

 3      review.

 4            A    Okay.  If you say so.

 5            Q    And one hour on NDEA.

 6                      Is that accurate?

 7            A    Three.  Three.

 8            Q    So it's not accurate?

 9            A    You said one.  It's three.  Right?

10            Q    All right.

11                      So you had -- at that point in

12      time, you had spent -- let me get it.

13                      When you started the report,

14      you had some phone calls, you had spent three

15      hours on NDEA review, you had spent four

16      hours on reviewing literature, less than ten

17      hours on analysis, and another 15 hours on

18      literature review.

19                      Is that correct?

20            A    I mean, I --

21                      MR. NIGH:  Form objection?

22            A    -- if you want me to do the

23      arithmetic -- I don't doubt you're doing it

24      right, but...

25            Q    But any work you'd done up until
```

Page 65

1    that point on April 4, 2021 is reflected in

2    your invoices?

3         A    April 14, 2021, yes, it is.

4         Q    But any work that you've done on

5    the case up until April 4, 2021, is reflected

6    on these invoices?

7         A    Why are you saying 4th?  14th.

8         Q    Your invoice says April 4th is when

9    you started your report.

10        A    Oh, sorry, I'm not following what

11    you're talking about.

12                    No, I'm not sure that's the

13    date I started my report.

14        Q    Okay.

15                    But any work that you did

16    prior to April 4 is going to be documented on

17    your invoices, right?

18                    MR. NIGH:  Form objection.

19        A    Sure.

20        Q    Okay.

21                    Let's look at the fourth and

22    final invoice.  This will be Exhibit 5.

23                    (Exhibit 5 marked for

24    identification.)

25    BY MS. LOCKARD:

Page 66

1          Q    Okay.

2                     And this was dated July 18,

3     2021.  And is this a true and correct copy of

4     your fourth invoice?

5          A    Yes.

6          Q    And you billed for 50 hours at $800

7     an hour for a total of $40,000, correct?

8          A    Yes.

9          Q    And if you add up the prior

10    invoices plus this one, and you can do the

11    arithmetic on this, I would ask you to if you

12    need to, it looks to me like the total

13    bill --

14                     (Technical difficulties.)

15                     (Reporter clarification.)

16          Q    Adding the total of these four

17    invoices, Dr. Madigan, it appears that you

18    have billed and been paid a total of $78,400

19    in the case so far?

20          A    Yes.

21          Q    Is that accurate?

22          A    Yes.

23          Q    And is there any additional work

24    that you've done prior to today that has not

25    been billed?

Page 67

1          A    There are a few hours spent

2    preparing for today.

3          Q    How many hours did you spend

4    preparing for today?

5          A    I don't recall.

6          Q    Did you meet with counsel before

7    today?

8          A    Yes.

9          Q    Did you meet with counsel

10   yesterday?

11         A    Yes.

12         Q    How many hours did you spend

13   yesterday?

14         A    Couple of hours, something like

15   that.

16         Q    Do you have any intention to do

17   additional work on the case prior to any

18   trial or Daubert testimony?

19              MR. NIGH:  Form objection.

20         A    Not unless I'm asked.  Right now, I

21   don't.

22         Q    Is there -- are there any materials

23   that you're awaiting to review?

24              MR. NIGH:  Form objection.

25         A    No.

Page 68

1          Q     When you met with counsel

2     yesterday, was it with both counsel who are

3     present today defending the deposition?

4          A     Yes.

5          Q     Was anybody else in the meeting

6     with you?

7          A     No.

8                 (Pause.)

9          Q     Do you have any other cases with

10     the Levin Papantonio firm other than the

11     valsartan litigation currently?

12          A     Not that I'm aware of.

13          Q     Prior to being contacted by the law

14     firm in this case, were you aware of the

15     issue involving nitrosamines in valsartan?

16          A     I don't know.  I might have read

17     about it.  There's a certain amount of

18     publicity.

19          Q     But as you sit here today, you

20     don't remember one way or the other if you

21     had seen any publicity on the recall or the

22     issues?

23          A     I do not.

24          Q     Is it fair to assume you were --

25     you did not take valsartan?  You're not a

Page 69

1    patient who took valsartan?

2         A    No, I'm not.

3         Q    Okay.

4              Do you do any monitoring of

5    newly filed litigation --

6         A    No.

7         Q    -- in your office?

8         A    No.

9         Q    So when you were contacted by

10   plaintiffs' firm in this case you knew you

11   were being contacted on behalf of plaintiffs'

12   counsel.

13             Is that correct?

14        A    Yes, probably.

15        Q    So you knew you were being asked to

16   review studies that supported the plaintiffs'

17   case from your first interaction.

18             Is that fair?

19             MR. NIGH:  Form objection.

20        A    No.  The way you phrased it was

21   just awkward:  I was asked to review studies

22   that were in favor of.  No, I was asked to

23   review studies.

24        Q    Did you understand that these were

25   studies that plaintiffs had selected for you

Page 70

1    to review?

2                    MR. NIGH:  Form objection.

3         A    So the set of studies that I

4    included in my analysis are studies that are

5    pursuant to a search that Dr. Etminan did.

6         Q    And had you worked on cases

7    involving Dr. Etminan as an expert before?

8         A    Not that I can recall.  I've never

9    met him.

10         Q    So you don't know Dr. Etminan?

11         A    I do not.

12         Q    And you don't recall ever reviewing

13    any studies that Dr. Etminan had relied on in

14    other litigation?

15         A    Reviewing studies that Dr. Etminan

16    had relied on in another litigation.  Not

17    that I can recall.  I recall using or

18    incorporating one of his studies in a

19    previous litigation, in a report I did in a

20    previous litigation.

21         Q    Maybe --

22         A    That's not the question you're

23    asking, though.  Right?  So you're asking a

24    different question.

25         Q    Right.

Page 71

```
 1                    The studies that you reviewed
 2      in generating your opinions in this case, who
 3      selected those studies --
 4                    MR. NIGH:  Form objection.
 5           Q    -- for review?
 6           A    So I was asked to review the
 7      studies that Dr. Etminan -- that came out of
 8      Dr. Etminan's search.  They're the ones I
 9      reviewed.
10                    Now, as we discussed, I did
11      some of my own searching as well.  I searched
12      to see was there anything -- any update for
13      Song.  I also looked -- as I read through the
14      papers, I looked to see were there references
15      to other studies that were missed.  There
16      weren't.
17           Q    But every study that is cited in
18      your report is also cited in Dr. Etminan's
19      report.
20                    Isn't that right?
21           A    That's the way it turned out.
22                    MR. NIGH:  Form objection.
23           Q    Have you reviewed Dr. Etminan's
24      report?
25           A    No, I have -- I have the list of
```

Page 72

```
 1    studies -- I have the reference list from his

 2    report.

 3          Q    Who provided that to you?

 4          A    The attorneys.

 5          Q    Have you ever had any direct

 6    discussions with Dr. Etminan?

 7          A    No.

 8          Q    Any emails with Dr. Etminan?

 9          A    No.

10          Q    Any in-person contact with

11    Dr. Etminan?

12          A    No.

13          Q    And even as you sit here today, you

14    still haven't reviewed his report?

15          A    I've not seen it.

16               (Pause.)

17          Q    In preparing your report or

18    opinions in this case, did you ask for any

19    materials from plaintiffs that were not

20    provided?

21          A    No.

22          Q    Did you attempt to locate any

23    materials on your own for use in your

24    opinions in your report that you could not

25    locate?
```

Page 73

1          A     No.

2          Q     So have you reviewed any other

3     expert report issued in this case, other than

4     your own?

5          A     No.

6          Q     Have you in any other litigation

7     ever been provided a collection of literature

8     relied on by another expert and asked to

9     assess that set of literature?

10                    MR. NIGH:   Form objection.

11         A     Not -- I'm not certain.  That might

12    have happened in -- I did work on Actos

13    litigation, Actos, years ago.  Might have

14    happened in that context.  I don't remember.

15         Q     So you think you might have been

16    asked in the Actos litigation to -- to review

17    another expert's collection of literature

18    that he or she had relied on?

19         A     Yeah, I'm not certain, but I think

20    I might have done that in Actos.

21         Q     Do you recall who the expert was?

22         A     No.  It was a long time ago.

23         Q     So other than the Actos, you don't

24    ever recall performing the function that you

25    were asked to perform in this case, which is

Page 74

1      take a look at these articles that are relied

2      upon by another expert and give us your

3      statistical assessment?

4                    MR. NIGH:  Form objection.

5           A     Are you framing that in litigation?

6           Q     Yes.

7           A     Okay.  Because I've done it in

8      other contexts.

9                    In litigation, as I say, I

10     think that's what happened in Actos.  There

11     may have been others that I don't recall.

12          Q     But you can't recall any other

13     cases as you sit here today, right?

14          A     No.

15          Q     In what other context have you been

16     asked to do such an exercise?

17          A     It's actually something I've done

18     routinely in consulting.

19          Q     Consulting for whom?

20          A     Pharma companies.

21          Q     And that involves they give -- the

22     pharma company gives you a discrete set of

23     literature and says assess the --

24          A     Yeah.

25          Q     -- statistical significance of

Page 75

1        these articles?

2            A    No.  That's putting words in my

3        mouth.  It's they hand -- they've said here's

4        a set of studies that are germane to a

5        question we're interested in.  Please take a

6        look, and -- and do an analysis with respect

7        to question A, B, and C, whatever the topic

8        might be.

9            Q    And in those -- how many times has

10       that happened in a consulting scenario?

11           A    I don't know.

12           Q    A couple?

13           A    Like half a dozen, maybe ten times.

14           Q    And in those scenarios, you didn't

15       do any additional research on your own to

16       identify additional articles or literature to

17       review?

18                      MR. NIGH:  Form objection.

19           A    I don't recall specifically, but I

20       can tell you that I fairly routinely have

21       been asked, you know, here's a collection of

22       studies, we're interested in the following

23       question or questions, please analyze them.

24           Q    And that's essentially what you

25       were asked to do in this case.

Page 76

1           MR. NIGH:  Form objection.

2       Q    Is that right?

3       A    Pretty much, yeah.

4       Q    Okay.

5           And -- all right.  So what was

6  the following question or questions that you

7  were asked to analyze in this case?

8       A    I answered that question already.

9  So I was asked -- do you want me to read it

10  again?

11       Q    Yes.  If that's your answer.

12       A    It's the answer.  "I was asked to

13  perform a statistical analysis to evaluate

14  the strength of association, dose-response

15  and increased risk of the cancers reported in

16  certain dietary and occupational studies

17  which specifically examined exposure to NDMA

18  or NDEA.  Specifically, I considered the

19  studies considered by Dr. Etminan that

20  estimated NDMA or NDEA effect sizes."

21       Q    Let's get a copy of your report

22  marked as Exhibit 6.

23       A    I do have a correction.

24       Q    Yes, let's do that now.

25           I'm going to mark this as

Page 77

1      Exhibit 6 now.  This is a report dated

2      July 7, 2021.

3                      (Exhibit 6 marked for

4      identification.)

5      BY MS. LOCKARD:

6          Q    Does this look like the --

7          A    Yes.

8          Q    -- report that was produced in this

9      case?

10         A    Yes.

11         Q    Okay.

12                  Now, I understand from our

13     discussion off the record that you do have

14     some changes you would like to make to your

15     report, correct?

16         A    Yes.

17         Q    All right.

18                  Can you just -- before you

19     make the changes, can you just describe them

20     for the record?

21         A    Sure.

22                  So one of the studies, it's

23     the Goodman study, gave a -- a milligrams

24     per -- what I thought was milligrams per day,

25     but in actual fact -- which is what's usually

Page 78

1      provided in these studies, but in fact it was

2      milligrams per week.  And I missed that.

3                    So the accumulative exposure

4      is therefore seven times too large and needs

5      to be divided by seven.

6           Q     Is that the only change or are

7      there others?

8           A     No, that's it.  It -- it is --

9      impacts a number in three different places in

10     the report.  It's the same issue.  The one

11     change is in three places.

12          Q     Did someone point that error out to

13     you or did you discover it on your own?

14          A     All on my own.

15          Q     I assume before your testimony,

16     it's your practice to re-review your report,

17     correct?

18          A     Yes.

19          Q     And as part of that re-review, do

20     you do a careful review to make sure there

21     are no errors or misstatements?

22          A     Precisely.

23          Q     Okay.

24                    And is that what led you to

25     discover this error today?

Page 79

```
 1        A     Yes.

 2        Q     All right.

 3                    So are you prepared to make

 4     the correction in your report?

 5        A     Sure.  So if you go to page 7,

 6     Table 1, go down to Goodman, two entries, so

 7     both of those numbers, the 16,363, both of

 8     those numbers should be 2,338.

 9        Q     Okay.

10                    How -- what was the cause of

11     this error?  Did you misread something in the

12     article or your calculation was erroneous?

13        A     So as I just told you, in the

14     paper, what was quoted was milligrams per

15     week, and I mistook that for milligrams per

16     day.  Milligrams per week is unusual.  I

17     hadn't seen that anywhere else.

18        Q     All right.

19                    So did you correct the number

20     on that -- here, can you just highlight it

21     with the orange so I can not miss it?

22        A     Actually, this is going to make a

23     mess, because it's pink, but anyway.

24                    (Deponent complies.)

25        Q     Good enough.  All right.
```

Page 80

```
 1          A    And then the two other places that

 2     I --

 3          Q    Yes.

 4          A    So as a consequence, if you go to

 5     paragraph 24 -- I'll highlight it first.

 6     Paragraph 24, the number there that is 4,303

 7     in paragraph 24 should be 2,338.

 8          Q    Mm-hmm.

 9          A    And similarly, the exact same thing

10     in paragraph 33, there's a number there that

11     is 4,303.  Same thing.  That should be 2,338.

12          Q    All right.

13               So can you just make that

14     notation on both of those pages and highlight

15     them?

16               You did.  All right.

17               Okay.  So with these revisions

18     in mind, does this change your ultimate

19     opinion?

20          A    No.

21          Q    Okay.

22               And that modification was in

23     paragraph 33 which is part of your conclusion

24     section, correct?

25          A    Yeah.  I probably answered that
```

Page 81

1    other question too quickly.  I mean, it

2    doesn't qualitatively change my opinion.  It

3    quantitatively changes because the number

4    changed.

5         Q    And so the Goodman case, as I

6    recall, it was a lung cancer -- excuse me.

7    The Goodman article was a lung cancer

8    article, right?

9         A    That's correct.

10        Q    So despite the change that you've

11   just described, you continue to hold the

12   opinion that there is a statistically

13   significant increased risk demonstrated by

14   the Goodman article?

15        A    Yes.

16        Q    If you look at paragraph 32 of your

17   report --

18        A    Okay.

19        Q    -- there's a reference discussing

20   the Hidajat study, and the statement is

21   "Exposure in the Hidajat, et al., study is

22   via inhalation rather than ingestion, but

23   Dr. Panigrahy has told me that NDMA and NDEA

24   are similarly carcinogenic via either route

25   (except that my calculations are conservative

Page 82

1    because Dr. Panigrahy explained that some

2    amount of inhaled NDMA is exhaled)."

3                    Did I read that correctly?

4        A    You did.

5        Q    Did you have any direct

6    conversations with Dr. Panigrahy?

7        A    I did.

8        Q    When did that occur?

9        A    I don't know.  Sometime in the last

10    few months.

11        Q    Was it as you were preparing your

12    report?

13        A    Sure.

14        Q    Do you know Dr. Panigrahy?

15        A    I've never met him face to face.  I

16    may have interacted with him once before.

17        Q    Do you recall in what context that

18    was?

19        A    Zostavax.  I'm not entirely certain

20    either.  I think I did.

21        Q    And in Zostavax, were you both

22    serving as experts for the plaintiff, to your

23    recollection?

24        A    Yes, to my recollection.

25        Q    How many discussions did you have

Page 83

1    with Dr. Panigrahy regarding valsartan?

2         A    Just one.

3         Q    It was by telephone?

4         A    Yes.

5         Q    How long was the call?

6         A    I don't know.

7         Q    Have you reviewed his report?

8         A    No.

9         Q    Did you call him or did he call

10   you, or something else?

11        A    Something else.  Something else.  I

12   can't remember.  I think the attorneys --

13        Q    That was my next question.

14             To your recollection, the

15   attorneys were also on that call?

16        A    Yes.

17        Q    What was the purpose of that call?

18        A    To address this question.

19        Q    And was that your question as to

20   whether or not inhalation and ingestion were

21   similarly carcinogenic?

22        A    Yes.

23        Q    And so you had a question regarding

24   whether you could draw conclusions about

25   ingestion of nitrosamines from a study that

Page 84

1    focused on inhalation.

2                    Is that fair?

3        A    Yeah, that's -- that's basically

4    what I was asked about.

5        Q    Why did you want to talk to

6    Dr. Panigrahy about that?

7        A    Because it's outside my area of

8    expertise.

9        Q    Did you do any independent research

10   on that question?

11       A    No.

12       Q    And by that, did you do any

13   literature research on that issue?

14       A    Not that I can recall.

15       Q    Do you remember Dr. Panigrahy's

16   response to that question?

17       A    It's what's reflected in the

18   paragraph, in paragraph 32.

19       Q    Did he say anything more than that?

20       A    Not that I can recall.

21       Q    Okay.

22                    So then you took his response

23   at face value and used it as an assumption in

24   your report.

25                    Is that fair?

Page 85

1          A    Yeah, that's fair enough.

2          Q    Okay.

3               Do you want to take a break?

4    We've been going for a little while now.

5    Let's do that, give everybody and the court

6    reporter a break.  Why don't we just come

7    back in about ten minutes.  Sound good?

8          A    Okay.

9               THE VIDEOGRAPHER:  Okay.  The

10   time is 10:49.  We're off the record.

11              (Recess.)

12              THE VIDEOGRAPHER:  The time is

13   11:06.  We're back on the record.

14   BY MS. LOCKARD:

15         Q    Okay.

16              Dr. Madigan, so if you'll take

17   a look at page 7 of your report, just a

18   couple of more questions about your change

19   with respect to the Goodman study.

20              And so if I direct you back to

21   the table.  Given that you've adjusted the

22   16,363 down to 2,338, wouldn't that then

23   impact the P for trend column as well?

24         A    No, it's nothing to do with that.

25         Q    So it doesn't impact the last

Page 86

1    column?

2         A    No, that comes directly from the

3    Goodman paper.

4         Q    And the effect size stays the same?

5         A    Right.  I calculated this lifetime

6    cumulative exposure, and that's not from the

7    paper.  That's my calculation.  But I did it

8    using information that was in the paper where

9    I thought something was per day but in actual

10   fact it was per week.

11        Q    So let me just ask you in terms of

12   all of these columns, is the only one that

13   you actually calculated is the LCE column?

14              MR. NIGH:  Form objection.

15        A    That's a complicated question.

16   Let's go column by column -- not every

17   column, but there's a column called base high

18   dose.

19        Q    Mm-hmm.

20        A    So generally, I simply took that

21   from the paper, but in a few cases, I

22   estimated it.

23        Q    Why did you do that?

24        A    Because I had to.

25        Q    Okay.

Page 87

1              Because there wasn't an

2      express number in the paper?

3          A    Right.

4              The next column, approximate

5      average age, in some of the papers it gives

6      you the average age.  In others I had to

7      estimate it from information in the paper,

8      which I'm happy to talk about.

9              And then the LCE column indeed

10     is, you know, calculated using information in

11     the paper about milligrams per day.

12             The effect size comes directly

13     from the paper.  Whether it's statistically

14     significant comes directly from the paper.

15     And the P value for trend comes directly from

16     the paper.

17         Q    So as you -- as you're looking at

18     this, can you tell us specifically out of the

19     base high dose column which of those you

20     estimated versus took directly from the

21     paper?

22         A    So the -- do you see -- let's look

23     at -- let's look at the last one, Zhu.

24     Right?  So I have 1.24, and then I have that

25     symbol.  So that refers to a footnote at the

Page 88

```
1    bottom of the table.  So it's -- for any
2    study where I have that symbol, so it's Zhu,
3    it's Keszei and it's Pobel.
4                    So in those cases, I estimated
5    the -- the dose at the bottom of the highest
6    quartile.
7                    And the method I used for that
8    is in Appendix A.  I provide the R code in
9    Appendix A.  Anyone can run this, see exactly
10   what I did.
11        Q    What about the approximate average
12   age, which of the studies did you estimate
13   the age?
14        A    We'd have to go through it one by
15   one.  I can't tell you sitting here.
16        Q    You'd have to look at the paper
17   again?
18        A    Yeah.
19        Q    Did you speak with any other
20   persons other than Dr. Panigrahy and
21   plaintiffs' counsel in preparing your report?
22        A    No.
23        Q    Am I pronouncing his name
24   correctly, Dr. Panigrahy?  Do you know?
25        A    I don't actually know.
```

Page 89

```
 1                    MR. NIGH:  So is the question
 2      to him or is it --
 3                    MS. LOCKARD:  I don't know --
 4                    MR. NIGH:  -- plaintiffs'
 5      counsel?
 6                    MS. LOCKARD:  -- I thought you
 7      were looking at each other, so I thought
 8      there was a comment.
 9           Q    All right.
10                    You don't know how to
11      pronounce Dr. Panigrahy's name, though, do
12      you?
13           A    I'm embarrassed to say I do not.
14           Q    All right.
15                    Was there any information
16      provided to you by plaintiffs' attorney from
17      other experts that you relied upon in forming
18      your opinions in this case, other than what
19      we've already talked about?
20           A    No.
21           Q    And you did not speak with any
22      colleagues at the university about your
23      opinions in this case, did you?
24           A    I did not.
25           Q    Do you typically speak with any of
```

Page 90

1    your colleagues or run ideas by them,

2    brainstorm, anything like that, about your

3    expert witness work?

4        A    Typically, no.

5        Q    And you didn't -- did not in this

6    case, right?

7        A    Correct.

8        Q    Okay.

9             Other than what's stated in

10   your report, did you make any other

11   assumptions about any facts or figures in

12   rendering your opinions in the case?

13       A    No.

14            MR. NIGH:  Form.

15       Q    Did plaintiffs' counsel provide you

16   with any hypotheticals to be incorporated and

17   relied upon in generating your opinions in

18   the case?

19            MR. NIGH:  Form objection.

20       A    No.

21       Q    Have you reviewed any additional

22   papers, studies or materials related to

23   valsartan since you completed your report?

24       A    Not that I can recall.

25       Q    Doctor, let me show you a document

Page 91

1    that's been marked as Exhibit 7 to your

2    deposition.  And this is the notice of

3    deposition in the case.

4                    (Exhibit 7 marked for

5    identification.)

6    BY MS. LOCKARD:

7         Q    Have you seen this previously?

8         A    Yes.

9         Q    Okay.

10                    And did you -- let me -- let

11    me rephrase that.

12                    That's actually -- Exhibit 7,

13    that's plaintiffs' objections and responses

14    to defendants' notice of deposition.

15         A    Oh, all right.

16         Q    So let me mark as Exhibit 8 --

17                    (Counsel conferred.)

18                    MS. LOCKARD:  Let's strike the

19    exhibit numbering.

20                    (Counsel conferred.)

21                    MS. LOCKARD:  So we're going

22    to reenter defendants' notice of videotaped

23    deposition as Defendants' 7, or Madigan 7.

24    BY MS. LOCKARD:

25         Q    And so I'll ask you, Dr. Madigan,

Page 92

1        have you seen this document before?

2               A    I have, yes.

3               Q    All right.

4                    (Exhibit 8 marked for

5        identification.)

6        BY MS. LOCKARD:

7               Q    And I'll give you now Exhibit 8,

8        which is Plaintiffs' Objections and Responses

9        to Defendants' Notice of Video Deposition of

10       David Madigan, PhD.

11                   Have you seen that document

12       before?

13              A    I do not believe so.

14              Q    Were you engaged in responding to

15       our notice of videotaped deposition and the

16       request for documents that were attached to

17       it?

18              A    Not that I recall.

19                   MR. NIGH:  Form objection.

20              Q    Have you -- in connection with your

21       review of the notice, did you look at the

22       requests that are attached on page 6?

23              A    Yes.

24              Q    Did you make any effort to identify

25       the items that are requested?

Page 93

1          A    I went through this with the
2     attorneys, and it is my understanding that
3     anything that's responsive to this is
4     provided.  [Unintelligible] I guess,
5     objections.  I don't know.
6          Q    All right.
7                    And so we were provided a
8     stack of materials yesterday from plaintiffs'
9     counsel, and this is a printout of the stack
10    of materials that was produced as your file,
11    so I'm going to mark this as Exhibit 9.
12                    (Exhibit 9 marked for
13    identification.)
14                    MS. LOCKARD:  Only have one
15    copy of this.  And for the record, we do not
16    have an electronic copy of this, but we will
17    get it to the court reporter.
18    BY MS. LOCKARD:
19         Q    What I'd like for you to do -- and
20    keep these materials in front of you, sir, if
21    you would, and just take a look at this, and
22    tell me, is this, to the best of your
23    knowledge, your complete file in this case?
24         A    Can I write on this?  Would that be
25    a problem?

Page 94

1          Q    Let me give you --

2          A    Never mind.  I have my own copy.

3                    Maybe we can short-circuit

4     this.  I'm assuming that everything that is

5     referenced in my report is here.  I've --

6     certainly the studies that are in Table 1,

7     etc., I'm assuming they're all in here, but

8     if you want me to check one by one, it's

9     going to take me a little while.

10         Q    I don't need you to check

11    everything that's in your actual report, and

12    we've confirmed that those items were in the

13    production, but there were a number of other

14    items that are in there that were not cited

15    in your report.

16         A    I see.  Okay.

17         Q    Okay.

18         A    So now I'm lost.  So what's the

19    question?

20         Q    The question is, is this -- what

21    was produced to us yesterday and is in front

22    of you as Exhibit 9, do you identify this as

23    your file in the case?

24                    MR. NIGH:  Form objection.

25         A    Give me a minute.

Page 95

1                    MR. NIGH:  And for the record,

2       this is Daniel Nigh, I'll represent that

3       these materials were produced electronically

4       from plaintiffs to defendants.

5                    The way I see that statement,

6       Victoria, it sounded as if you said you don't

7       have an electronic copy, but we did send this

8       electronically.  I think you meant that you

9       don't have electronic copies sitting here in the

10      room today.

11                   MS. LOCKARD:  Correct.

12                   Right.

13                   And just for clarification, my

14      point is, I don't have an electronic version of

15      that complete file, if that's what it is, put

16      into the exhibit folder on the Zoom, but we have

17      been produced a copy of Exhibit 9 electronically

18      from plaintiffs' counsel.  So we're in

19      agreement.

20           A    Okay.

21                   So I certainly recognize

22      everything that's here.  I believe this is

23      the totality of what you're calling my file,

24      yeah.

25           Q    So as you sit here today, does

Page 96

```
 1     anything else come to mind that seems to be
 2     missing?
 3          A    No, with the proviso I didn't
 4     actually -- I didn't check if every single
 5     study in Table 1 is here.  It seems like they
 6     were all here.  But nothing else.
 7          Q    All right.
 8               If you will turn to the
 9     Exhibit 7 which is in evidence --
10          A    Put this one aside?
11          Q    Yes.  Put this to one side for now.
12               All right.  So the first
13     request was a copy of your current and
14     up-to-date CV.  I know you produced a copy of
15     your CV with your report.
16               Do you have anything that's
17     more current and up-to-date?
18          A    No.
19               MS. LOCKARD:  All right.
20               So we'll mark as Exhibit 10 a
21     copy of the CV that was produced with your
22     report.
23          A    It's already here.
24               MS. LOCKARD:  Exhibit 10 is
25     your standalone CV.
```

Page 97

1        A     Okay.

2                  (Exhibit 10 marked for

3     identification.)

4     BY MS. LOCKARD:

5        Q     It's dated June 1, 2021, correct?

6        A     Yes.

7        Q     The second -- and we'll come back

8     to this a little bit later today, but the

9     second request in the notice of deposition

10    was to produce a list of all articles,

11    abstracts, studies, reports, seminar

12    materials, presentations, publications and so

13    on, from -- authored by you from 2011 to the

14    present.

15                  Are all such materials listed

16    on your CV?

17        A     Yes.

18        Q     The third request -- well, let me

19    ask you this.

20                  On your CV, are there any

21    papers, books or articles or presentations

22    that relate to nitrosamines?

23        A     I don't believe so.

24        Q     Have you written or presented on

25    the nitrosamines or valsartan issues since

Page 98

1    you were retained in the case?

2         A    Written -- other than what is here,

3    no.

4         Q    Other than your report, have you

5    written anything for publication?

6         A    No.

7         Q    Do you intend to turn any of your

8    work in this case into a publication,

9    peer-reviewed or otherwise?

10        A    That's not something I've thought

11   about.

12        Q    Right.

13                  Request No. 3 were documents,

14   presentations, speeches, papers that relate

15   to these issues in the case.

16                  Assuming that you have not

17   spoken on these issues in the case, you

18   wouldn't have anything to produce.

19                  Is that correct?

20        A    I believe that's correct.  The --

21   one of the caveats here was drug safety and

22   cancer risk, and I did search.  I don't think

23   I have anything in that area.

24                  I have a lot of publications

25   related to drug safety, but I don't think

Page 99

1    anything specifically, you know, focused on a

2    drug safety issue which is -- that is cancer.

3         Q    So just to clarify for the record,

4    you don't believe you have written or spoken

5    on drug safety with respect to cancer?

6                   MR. NIGH:  Form objection.

7         A    Specifically.  So, like, I have

8    many papers where they're methods papers

9    where I apply methods in lots of different

10   contexts.  Is it possible that one of those

11   was cancer somewhere along the way?  Yes,

12   it's possible, but I couldn't identify any.

13        Q    But you don't have any papers,

14   publications or materials listed on your CV

15   that attempt to identify or assess the risk

16   of cancer.

17                   Is that right?

18        A    As a drug safety issue.

19        Q    As a drug safety issue.

20        A    Right, I do not.  I don't believe I

21   do.

22        Q    All right.

23                   The list of cases which is

24   requested as No. 5, you provided that.

25                   No. 6, we requested your

Page 100

1      complete and entire file.  You've now

2      identified that as what was produced

3      yesterday in Exhibit 9, correct?

4          A     Yes.

5          Q     I assume you didn't have any

6      communications with FDA, EPA or other federal

7      regulatory bodies about this case.

8                     Is that right?

9          A     That's correct.

10          Q     And you have not reviewed any

11      deposition transcripts.

12          A     No.

13          Q     Have you asked for any deposition

14      transcripts?

15          A     No.

16          Q     And you have not made any notes or

17      calculations or memos yourself other than

18      what may be found within your report.

19                     Is that correct?

20          A     That's correct.

21          Q     And you had discussed earlier that

22      you did do a search with respect to the Song

23      paper in looking for additional articles.

24                     Are those -- were those

25      articles downloaded, saved by you and

Page 101

1      included in your file?

2          A    So the articles weren't, but the

3      search results I stored in an EndNote file

4      which should have been part of -- produced.

5          Q    Can you confirm for us that it is

6      in fact in this file?

7          A    I didn't see it.

8          Q    You did not see it?

9          A    Yeah.  But I don't know how you

10     would you print it, though.  It's proprietary

11     file for the -- you need the EndNote software

12     to open it.

13         Q    All right.

14              But it's not in the file that

15     you produced yesterday?

16         A    Can I look a little bit more?

17         Q    Yes.

18              (The deponent read the

19     document.)

20              MS. LOCKARD:  Do you know if

21     it's in there?

22              (Pause.)

23         A    Yeah, it's not in this set of

24     printouts, in these hard copies.

25         Q    All right.

Page 102

1                    If you wanted to produce the

2       information in the EndNote file, how would

3       you go about doing that?

4           A    My laptop.

5           Q    Is it -- so it's not something you

6       can convert into a document that can be

7       printed?

8           A    I can print it.  You know, I -- you

9       open it up in EndNote, you can print it.

10          Q    Okay.

11                   So you did not produce that to

12      your counsel, then?

13          A    I did.

14                   MS. LOCKARD:  So we'll request

15      that that be produced and provided.

16          Q    All right.

17                   You haven't had any interviews

18      with anyone or taken any statements in

19      connection with this case, have you?

20          A    I have not.

21          Q    Have you had any other

22      communications with anyone else other than

23      Dr. Panigrahy and plaintiffs' counsel with

24      respect to valsartan?

25          A    I have not.

Page 103

1          Q     Okay.

2                     And Request No. 8 is for -- to

3     the extent you rely on for your opinions in

4     the case on specific patient experience,

5     produce all records pertaining to such.

6                     Now, Mr. Nigh's response and

7     objection stated that you are not relying on

8     any specific patient experience.

9                     Is that correct?

10         A     Yes.

11         Q     And we've asked for all invoice,

12    billing, billing records, time records.  And

13    you've testified that you've provided us your

14    complete set of billing records and invoices

15    for this case, correct?

16         A     Yes.

17         Q     You've testified there are no

18    consulting contracts or retention letters,

19    correct?

20         A     Correct.

21         Q     And then No. 11, any other

22    information, documents, studies, texts,

23    treatises, objects or anything else that you

24    will use at trial.

25                     Aside from what you produced

Page 104

1    in your file, do you have any plans to use

2    any additional information, models, diagrams,

3    anything of that sort as you sit here today?

4         A    Not as I sit here today, but I

5    would assume that if I was -- you know, I

6    might want to use slides if I was testifying.

7         Q    And those have not been created

8    yet?

9         A    Correct.

10        Q    Okay.

11                  And No. 11 is all other

12   documents reviewed by you in preparation for

13   the deposition other than communications with

14   counsel.

15                  So in the past -- yesterday or

16   the weeks leading up to your deposition, did

17   you look at any additional documents outside

18   of what's in your file?

19        A    I don't believe so.

20        Q    All right.

21                  You haven't reviewed anything

22   on the FDA website related to nitrosamines

23   other than what's cited in your report,

24   correct?

25        A    Not that I can recall.

Page 105

1          Q    Did anybody assist you in drafting

2     your report?

3          A    No.

4          Q    Was it prepared by you and signed

5     by you?

6          A    Yes.

7          Q    Is that your signature on the front

8     page?

9          A    Yes.

10          Q    All right.

11               So let's take a look at the

12     report.  If you want to turn to page 1.

13               And you understand when

14     preparing an expert report under the federal

15     rules for litigation like this, its purpose

16     is to identify all the opinions which you

17     intend to offer in the case and any bases

18     therefore, correct?

19               MR. NIGH:  Form objection.

20          A    I'm not familiar with the federal

21     rules, but yes, that is my understanding of

22     what's -- what the intent is here.

23          Q    Okay.

24               And all of your opinions you

25     intend to offer in the case are contained

Page 106

1      within that -- the four corners of that

2      report, correct?

3                      MR. NIGH:  Form objection.

4          A    I believe that's the case.  Yes,

5      that's the intention.

6          Q    And all of the bases for each of

7      these opinions are contained within that

8      report.

9                      Is that also correct?

10                     MR. NIGH:  Form objection.

11         A    That's the intention.

12         Q    Did you proofread your report

13     before you submitted it?

14         A    Sure, yes.

15         Q    Did you check your report to make

16     sure all citations were accurate before

17     submitting it?

18         A    I did.

19         Q    And did you check your report to

20     make sure that the proposition for which you

21     provided a citation is actually what is

22     stated in the reference material?

23         A    Sorry, try that again?  The

24     proposition?

25                     What I was asked to do is in

Page 107

1    the report.  Is that what you mean?

2         Q    Did you check to make sure all the

3    citations listed in your report, in your

4    footnotes, support the proposition for which

5    you've offered it?

6         A    Yes, sure.

7         Q    And you know it would be important

8    to proofread and check your citations before

9    submitting a report such as this in

10   litigation in federal court, right?  That

11   would be important to do, don't you agree?

12        A    Sure.

13        Q    And as part of that, it's important

14   for the litigants, but it's also because your

15   professional reputation is on the line and

16   you want to make sure that your opinion is

17   reliable and accurate.

18              Is that true?

19              MR. NIGH:  Form objection.

20        A    There's a lot of vagueness in

21   there.  My professional reputation is on the

22   line.  I'm not entirely sure what you mean by

23   that, but sure, I intend this to be correct.

24   I want this to be correct.

25        Q    All right.

Page 108

1              You said in your report and in

2     the deposition that you were asked to perform

3     a statistical analysis to evaluate the

4     strength of association, dose response and

5     increased risk of the cancers reported in

6     certain dietary and occupational studies

7     which specifically examined exposure to NDMA

8     and/or NDEA, correct?

9         A    Yes.

10        Q    What do you mean by -- when you

11    describe a statistical analysis, what do you

12    mean by that for purposes of the jury's

13    understanding?

14        A    So in this case, I mean statistical

15    interpretation of these studies.  So I looked

16    at the information in the study about

17    strength of association, and about dose

18    response, and I report that in my -- extract

19    that from these studies and computed the

20    exposure and report that here.

21        Q    What is the definition, if there is

22    one, of strength of association?

23        A    So it refers to the association

24    between an exposure and an outcome.  So to

25    what extent does -- you know, is being

Page 109

1    exposed to something -- to what extent is it

2    associated with a particular outcome.  Does

3    it increase the risk of the outcome or

4    decrease the risk of the outcome.

5         Q    So would you agree it's the degree

6    of relationship between two or more

7    variables?

8         A    Yeah, that's a broader definition.

9    I was being more specific to exposures and

10   outcomes.

11                But, yeah, sure, yours is --

12   yours is good, too.

13        Q    Okay.

14                And the exposure and outcome

15   that you were assessing in this case would be

16   the exposure to nitrosamines and the outcome

17   of cancer, correct?

18                MR. NIGH:  Form objection.

19        A    Yeah, that's the nature of what I

20   was -- I was doing here.

21        Q    Are there any other variables that

22   you considered in your analysis other than

23   what's documented in the literature you

24   reviewed?

25                MR. NIGH:  Form objection.

Page 110

1      A    Other than what's in the literature

2  that I reviewed.  No, I don't think so.  I

3  don't really understand the question,

4  actually.

5      Q    What -- can you define what you

6  meant by dose response for the jury's

7  benefit?

8      A    So that's an examination of whether

9  the association strengthens or weakens as you

10  increase the dose.

11      Q    In analyzing the dose response in

12  this case, did you presume a linear dose

13  response relationship between nitrosamines

14  and cancer?

15      A    I didn't presume any association.

16  I looked at the papers to see what they

17  reported, the studies.

18      Q    You looked at the papers to see

19  what was reported.

20      A    Yeah.

21      Q    So in the papers that you reviewed,

22  you did not undertake any independent

23  analysis to verify the dose response that was

24  reported?

25      A    Independent analysis.  If you mean

Page 111

1    did I conduct my own analysis of their data,

2    no, I did not, because I don't have the data.

3    For these -- each of these studies, I don't

4    have access to the data that the study

5    authors have access to.

6         Q    The data that is available for each

7    of the studies would not be publicly

8    available, correct?

9                   MR. NIGH:  Objection.

10        A    Generally not.  You wouldn't expect

11   it to be.

12        Q    In order to get the data, you would

13   have to approach each of the authors

14   individually and have them send it to you,

15   correct?

16        A    In order to get the data, yes, you

17   probably -- you might or might not have any

18   success, but that's how you would go about

19   it.

20        Q    Did you make any effort to reach

21   out to any of the authors of the papers you

22   reviewed to ask for the data they relied

23   upon?

24        A    I did not.

25        Q    In each of the papers you reviewed,

Page 112

1    did you make any assessment to verify if the

2    dose response described in the paper was in

3    fact linear?

4         A    So we'd have to go -- sorry, can

5    you ask the question again?

6         Q    So my question is, did you look at

7    each of the papers and do an assessment to

8    determine if the dose response was in fact

9    linear?

10        A    So I don't have access to the data,

11   the raw data, so I'm relying on the analysis

12   that the authors did.  That's what I'm

13   looking at.

14                  So in, you know, in most

15   cases, they tested for a linear trend, and

16   that's what I report here in the table.  We'd

17   have to go through it one by one.  It wasn't

18   necessarily linear in every case.

19        Q    Okay.

20                  So you'll be able to tell us,

21   though, of those which are reported -- which

22   reported a linear trend and which didn't?  Is

23   that -- is that -- you're saying from the

24   table?  What do you need to look at in order

25   to tell us whether or not each report -- the

Page 113

1      paper itself?

2            A     The paper itself.

3            Q     Okay.

4                        That's not noted in your

5      report, in other words, correct?

6                        MR. NIGH:   Object to form.

7            A     What's not noted?   I'm not with

8      you.

9            Q     Whether or not the authors reported

10     a linear dose response relationship in their

11     paper.

12                        In other words, you didn't

13     notate in your report whether or not each of

14     those authors noted a linear dose response?

15           A     I reported the p-value for the

16     trend, and we'd need to look at the

17     individual papers to see whether -- I think

18     they're actually linear in every case, but

19     we'd have to look at the individual papers to

20     check that.

21           Q     Can you recall -- without looking

22     at the individual papers, can you recall any

23     of them that does not report a linear trend?

24           A     I'm not -- I can't answer that

25     question.   I need to look at the papers.   I

Page 114

1    know the Song meta-analysis specifically

2    reports on nonlinear -- they did a test for

3    nonlinear trend.

4                The individual papers, I don't

5    think so, but we'd have to go through them

6    one by one.

7        Q    All right.

8                Did your conclusions in your

9    report -- well, strike that.  We'll pull up

10   some of the papers in a few minutes.

11               All right.

12               Define what you mean by

13   "increased risk of cancer."

14       A    An association -- a measure of

15   association that -- whether it's a relative

16   risk or an odds ratio or a hazard ratio

17   that's bigger than one.  In this context

18   that's what I mean.

19       Q    Okay.

20               What do you understand to be

21   meant by hazard ratio?

22       A    So it's a measure of effect size

23   that's related to time to event.

24       Q    So in evaluating a hazard ratio, it

25   takes into account the variable of time.

Page 115

1                    Is that fair?

2        A    Yes.  That's not a unique

3    characteristic of the hazard ratio, but that

4    is -- the way you asked is fine.  That is a

5    characteristic of a hazard ratio.

6        Q    So if we start on page 1 of your

7    report, it looks like there's a background

8    section.

9                    The first page and a half

10    actually appears to be background section,

11    correct?

12        A    That is correct.

13        Q    Is this a template that you start

14    with, background, introduction, and so forth

15    for each of your reports you do in

16    litigation?

17        A    I wouldn't call it a template.  I

18    copy it from another report.  I don't write

19    it from scratch each time.

20        Q    So is the -- you used essentially

21    the same background, first page and a half,

22    in every report?

23        A    Pretty much.  I might make tweaks.

24    I don't -- generally, yes.

25        Q    And the first page and a half is

Page 116

1    your background.  It doesn't offer any

2    opinions about the valsartan case, right?

3         A    That is correct.

4         Q    All right.

5                   So if we look at the

6    Introduction section, there are two

7    paragraphs, 6 and 7.

8                   Paragraph 6 appears to be

9    factual assertions that provide context to

10   your report.

11                  Is that a fair characteristic?

12        A    Sure.

13        Q    There are no opinions in

14   paragraph 6 that I can see.

15                  Is that right?

16        A    There are no opinions that are

17   unique, that are my original opinions.  I'm

18   citing facts.

19        Q    Okay.

20                  So paragraph 6 contains none

21   of your original opinions.

22                  Is that fair?

23        A    Yeah, I think that's reasonable.

24        Q    Okay.

25                  And so each of the factual

Page 117

1    assertions in paragraph 6 is then footnoted,

2    and so you're relying on the accuracy of

3    what's reported in the footnote.

4              Is that correct?

5        A    I'm relying on the accuracy of

6    what's in the footnote.  I mean, I'm

7    extracting things from those sources.

8              MR. NIGH:  Form objection.

9        Q    Okay.

10             And you're assuming the data

11   that you've cited here and supported by the

12   footnote to be correct, or else you wouldn't

13   have cited it, right?

14       A    Sure.

15             MR. NIGH:  Form objection.

16       Q    And so, for example, where it says

17   in paragraph 6, US Department of Health and

18   Human Services -- let me read it correctly.

19             "According to the US

20   Department of Health and Human Services,

21   N-nitrosodimethylamine (NDMA) is reasonably

22   anticipated to be a human carcinogen."

23             You're not offering an opinion

24   about whether NDMA is a human carcinogen or

25   reasonably expected to be so, correct?

Page 118

1                    MR. NIGH:   Form objection.

2          A     I suppose I am not.   Why I'm

3      hesitating here is I -- you know, the

4      analysis I did in the report here is germane

5      to that question.   But other than that, I

6      have no -- you know, I don't have an

7      independent opinion.   Am I --

8          Q     Well -- and then there's a quote

9      from IARC essentially saying that NDMA is

10     probably carcinogenic to humans.   And you're

11     just quoting that from the IARC?

12         A     Correct.

13         Q     Okay.

14                    There's the statement the

15     USFDA has indicated that levels of NDMA up to

16     0.096 micrograms per day and levels of NDEA

17     up to 0.0265 micrograms per day are safe.

18                    Again, not your opinion.

19     You're relying on the information provided by

20     the FDA, correct?

21         A     I'm just reporting as a fact that

22     that's what the FDA indicates.

23         Q     And then you note:   "More recently

24     Johnson, et al., have suggested that NDMA

25     levels as high as 6.2 micrograms per day and

Page 119

1    NDEA levels as high as 2.2 micrograms per day

2    could be safe levels of NDMA" --

3         A    That's the wrong one.

4         Q    I'm sorry.  It was.  Let me restate

5    that question.

6              You go on to state:  "More

7    recently Johnson, et al., have suggested that

8    NDMA levels as high as 6.2 micrograms per day

9    and NDEA levels as high as 2.2 micrograms per

10   day could be safe."

11             Correct?

12        A    Correct.  I've lost track of the

13   question.

14             So the -- you know, I'm just

15   reporting that's what these people said.

16        Q    Do you know Dr. Johnson?

17        A    No.

18        Q    Did you read his papers that you

19   cited?

20        A    Yes, I believe so, I did.

21        Q    Okay.

22             And did you understand it's

23   one of the first peer-reviewed papers to be

24   published on nitrosamine exposure limits?

25             MR. NIGH:  Form objection.

Page 120

1          A    Do I understand it?  No, I didn't.

2     I don't know anything about that.

3          Q    And in pharmaceuticals.

4               MR. NIGH:  Form objection.

5          A    Sorry, what's the question?

6          Q    It's not a question.  I just wanted

7     to correct my statement.

8          A    Okay.

9          Q    And I'll restate it for clarity.

10              But when you reviewed the

11    Johnson paper, did you understand that it was

12    one of the first papers -- peer-reviewed

13    papers to be published on nitrosamine

14    exposure limits in pharmaceuticals?

15              MR. NIGH:  Form objection.

16         A    So the question is did I understand

17    that?  No.

18         Q    Do you know anything about

19    Dr. Johnson or his professional reputation?

20         A    No.

21         Q    All right.  So I'll just for the

22    record mark the Johnson paper that you cited

23    to in your report as Exhibit 11.

24              (Exhibit 11 marked for

25    identification.)

Page 121

1    BY MS. LOCKARD:

2        Q    Did you read this paper in its

3    entirety or did you, you know, more or less

4    skim it?

5        A    I think I read it.  I don't recall

6    exactly.

7        Q    As you sit here today, I assume you

8    don't have any basis to quarrel with his

9    conclusions?

10                MR. NIGH:  Form objection.

11        A    It's outside my area of expertise.

12        Q    So you would not -- you would not

13    endeavor to criticize Dr. Johnson's

14    conclusions or his paper because it's outside

15    of your expertise, correct?

16                MR. NIGH:  Form objection.

17        A    I don't think so.  I mean, I'd have

18    to look, refresh my memory here to see are

19    there statistical or epidemiological issues

20    that I could opine on.  But, you know, in

21    general, this -- the topic here is outside

22    the scope of my expertise.

23        Q    And you -- I presume you found it

24    to be a reliable and authoritative paper or

25    you wouldn't have cited it in your report.

Page 122

1          Is that correct?

2                MR. NIGH:  Objection.

3      A    I wouldn't go so far.  I was just

4    noting that, you know, the FDA has said

5    certain levels are safe.  I was just noting

6    that in the literature there are some people

7    saying there are safe levels that are higher.

8    That's all.

9      Q    And his conclusion was based on a

10    permissible daily exposure analysis, and his

11    conclusion was that the PDE provides a more

12    robust assessment of exposure limits as

13    compared with the simple linear

14    extrapolations that underlie the acceptable

15    daily limits reported by FDA?

16                MR. NIGH:  Objection to form.

17      A    I don't recall.  If you want to

18    point me to something in the paper, I can

19    refresh my memory, but I don't recall.

20                MR. NIGH:  Do I get a copy of

21    this?

22                MS. LOCKARD:  Yes, sir, I do

23    have a copy for you.  Thank you.

24      Q    So, if you will, Dr. Madigan, if

25    you will turn to page 3 of the report.

Page 123

1           A     No page numbers.

2           Q     Well, count to the fourth page,

3     there's an abstract.

4                       Are you with me?

5           A     This is a preprint, by the way, not

6     the published version.  It probably doesn't

7     matter, but I'm just noting.

8           Q     Well, the last sentence of the

9     abstract says:  "These PDE calculations using

10    a benchmark approach provide a more robust

11    assessment of exposure limits compared with

12    simple linear extrapolations and can better

13    inform risk to patients exposed to the

14    contaminated sartans."

15                      So did I read that correctly?

16          A     You did.

17                      MR. NIGH:  Object to form.

18          Q     So you don't intend to offer any

19    opinions or criticisms about that conclusion

20    by Dr. Johnson, correct?

21          A     I do not.

22                      MR. NIGH:  Object to form.

23          Q     Did you find this paper yourself or

24    did counsel send it to you?

25          A     I don't recall.

Page 124

1          Q     You're not a genetic toxicologist,

2     I presume?

3          A     I am not.

4          Q     Is toxicology outside of your area

5     of expertise?

6                     MR. NIGH:  Object to form.

7          A     Generally, yes.

8          Q     All right.  You can put that aside.

9                     Okay.  So moving along in your

10    report, if you will, the next sentence in

11    your introduction says:  "Levels of NDMA in

12    contaminated valsartan tablets range from

13    below the limit of detection to

14    20.19 micrograms, while levels of NDEA in

15    contaminated valsartan tablets range from

16    below the limit of detection to

17    1.31 micrograms."

18                     Did I read that correctly?

19         A     Yeah, you did.

20         Q     All right.

21                     So you then cited the Snodin

22    article entitled "Short commentary on NDMA

23    contamination of valsartan products," and you

24    cited the FDA website, correct?

25         A     Right.

Page 125

1          Q    All right.

2               Let's mark as an exhibit to

3     your deposition the FDA website.  What is

4     this?  Exhibit 12.

5               (Exhibit 12 marked for

6     identification.)

7     BY MS. LOCKARD:

8          Q    So I'm showing you what's entitled

9     the "Laboratory analysis of valsartan

10    products."  And if you turn to the second

11    page, there's a table there.

12              Is this what you intended to

13    cite to in your report?

14         A    Yes.

15         Q    All right.

16              Now, I presume you haven't

17    taken any efforts to independently verify the

18    data that's listed in terms of the levels

19    found in this chart, correct?

20         A    Correct.

21         Q    Now, do you have an understanding

22    as to whether the levels noted are for

23    finished dose versus API product?

24         A    It's my understanding based on

25    this -- at face value, and they're referring

Page 126

1     to the amount of NDMA in tablets.

2          Q     So then it's your understanding of

3     this chart that all of these numbers are

4     finished-dose testing levels?

5          A     The phrase "finished-dose testing

6     levels," I don't know what you mean by that.

7                    It's my understanding that

8     they tested tablets and measured the amount

9     of NDMA in tablets.

10         Q     Are you aware of any testing that

11    was done on API that was used to manufacture

12    the tablets?

13         A     I am.

14         Q     Have you seen any test results for

15    the API?

16         A     There's two references in my report

17    that contain testing results for -- at least

18    one of them does, testing results for APIs.

19    I think both do.

20         Q     Are you referring to the company

21    documents?

22         A     Right.

23         Q     All right.

24                    And so just for clarity,

25    you're referring to what's listed under

Page 127

1    footnote 6 and footnote 7 in your report?

2        A    Right.

3        Q    And so it's your position that

4    footnote 6 and footnote 7 included testing of

5    API.

6                    Is that right?

7        A    That's my memory, yeah.  We

8    should -- we can look at it.

9        Q    Right.

10                    Now, so, you understand the

11   difference between API and finished-dose

12   tablets, correct?

13       A    The finished -- you're using the

14   phrase "finished-dose tablets."  I'm not

15   familiar -- I could guess what you mean by

16   that, but it's not a term that's familiar to

17   me.

18       Q    Okay.

19                    So "finished dose," that

20   phrase is not familiar to you?

21       A    That's what I just said.

22       Q    Okay.  All right.

23                    So if we refer to what the

24   patient actually ingested, can we agree to

25   call it tablets?

Page 128

```
 1        A    Sure.

 2        Q    Okay.

 3             All right.  So for clarity,

 4   the FDA chart, your understanding is that's

 5   testing of all tablets.  What's noted in 6

 6   and 7, footnotes, are testing of API?

 7        A    No, no.  That's not what you asked

 8   me.

 9             So you asked me was there

10   testing of APIs in these documents.  Answer,

11   yes.

12             Are there other things in

13   these documents?  Yes, there are.

14        Q    Okay.  That's fair.  That's fair.

15   All right.

16             So, now, I see the numbers

17   that you had listed, the 20.19, is that

18   you're taking from the FDA chart where

19   there's Prinston Pharmaceutical and the

20   highest number in the column is 20.19?

21        A    Yes.

22        Q    And likewise, the highest number

23   that you provide in your report is the 1.31,

24   which you found --

25        A    The last one.
```

Page 129

1          Q    -- in the last one on the next page

2     for Torrent, correct?

3          A    Yes.

4          Q    Now, you also cited the Snodin

5     article.  We'll mark that as Exhibit 13.

6                    (Exhibit 13 marked for

7     identification.)

8     BY MS. LOCKARD:

9          Q    Was the Snodin article provided to

10    you by counsel or did you locate that

11    yourself?

12         A    Don't recall.

13                  MS. LOCKARD:  Do you want a

14    copy of this, Daniel?

15                  MR. NIGH:  Yes.

16         Q    And again, you haven't done any

17    assessment as to the reliability of the

18    Snodin paper itself.

19                  Is that fair?

20         A    An assessment of the reliability of

21    the paper.  So I only -- I cited to it as

22    another source for the -- the NDMA levels,

23    but they're directly taking that from the

24    same website that we were just looking at.

25         Q    Okay.

Page 130

1        And you're citing this paper

2   for both the NDMA and NDEA levels?

3        A    Oh, that I don't remember.

4        Q    Okay.

5        A    I just don't recall.

6        Q    I'll represent to you that I could

7   not find in the Snodin paper the NDEA level

8   of 1.31 for which you listed Snodin as a

9   reference.

10            MR. NIGH:  Object to form.

11       A    That's overstating it.  I listed

12  Snodin as a reference to a compound sentence

13  that had two different things in it, so I did

14  not -- that, to me, does not imply that the

15  citation pertains to every last thing in the

16  sentence.

17       Q    So what are you attributing to the

18  Snodin article in that sentence?

19       A    I don't recall exactly.  The -- the

20  20.19 is rounded to 20 in the -- in a table

21  in this paper.  I just don't recall.  If you

22  want, we can take the time and I can read it.

23  I just don't recall if the -- you're

24  representing it's not there.  Maybe you're

25  right.  I'd have to read it again to remember

Page 131

1    whether the 1.31 is in there or not.

2         Q    Okay.

3              Do you remember whether the

4    20.19 is in the Snodin paper?

5         A    Couldn't tell you.  I'd have to

6    read it.  I see the 20, a rounded -- they're

7    not using -- they're rounding these to the

8    nearest integer in Table 1, but I'd need to

9    read the paper to recall whether 20.19 is in

10   there.

11        Q    Did you look up any of the articles

12   that were cited in the Snodin paper yourself?

13        A    I don't -- I looked at the FDA

14   article, the website.  I don't recall.

15   Beyond that, I -- no memory.

16        Q    Other than what's printed in the

17   Snodin article and the FDA website, along

18   with the footnote 6 and 7 for the ZHP and

19   Torrent documents, you have no knowledge or

20   information about the testing that was done

21   on any manufacturer's products, do you?

22              MR. NIGH:  Form objection.

23        A    I am not aware of any other

24   documents that -- I don't believe I've seen

25   any other documents that list NDMA levels

Page 132

1    detected in -- in these products.  I'm not

2    aware.  I don't think there's anything else,

3    other than what you just talked about.

4         Q    Okay.

5              And you don't have any

6    independent knowledge regarding the actual

7    test results of defendants' products, do you?

8              MR. NIGH:  Form objection.

9         A    Independent knowledge.  Are you

10   asking the same question?  Do I know

11   anything -- do I have any information outside

12   of what's cited here?  Is that the same

13   question?

14        Q    You haven't seen the raw testing

15   data, right?

16        A    Raw testing data.  I don't know

17   what that is.

18             MR. NIGH:  Objection, form.

19        A    The footnote 6 and 7 are pretty

20   darn raw, so I don't know what you mean.

21        Q    So you haven't seen any other

22   testing data other than what you've cited in

23   your footnote 5, 6 and 7?

24             MR. NIGH:  Object to form.

25        A    That's what I said a few minutes

Page 133

1    ago.  Yeah, I believe that's right.

2         Q    All right.

3              So let's take a look at the

4    document that you've cited as No. 6 on the

5    footnote.  And this is -- I believe it's

6    marked as restricted confidential, so we'll

7    need to follow the protocol in the protective

8    order for this.

9              (Counsel conferred.)

10             MS. LOCKARD:  Okay.

11             So I know counsel for ZHP is on.

12   If you have any objection to me introducing

13   this, let me know.  We can have it redacted at

14   the end.

15             MS. HILL:  I think we're fine

16   with just following the protocol and we can

17   redact it later.

18             (Exhibit 14 marked for

19   identification.)

20   BY MS. LOCKARD:

21        Q    So handing you what's been marked

22   as Exhibit 14, Dr. Madigan.  So if you could

23   take a look at that, does it appear to be the

24   same document that you reviewed --

25             MR. NIGH:  Can I have a copy

Page 134

1      of this one?

2                      MS. LOCKARD:  It's -- it's

3      right here.  My arms are too short.

4      BY MS. LOCKARD:

5          Q    Does it appear to be the document

6      you reviewed and cited as Exhibit 6?

7                      MR. NIGH:  Form objection.

8          A    No.

9                      MR. NIGH:  Just state for the

10     record, it appears that the columns are

11     broken up into -- that is, you can't match

12     the columns on the document handed to me

13     to -- you can't see the complete columns on

14     this document.  They're broken up.

15                     MS. LOCKARD:  I agree it is

16     difficult to read.

17                     THE DEPONENT:  There's a more

18     fundamental problem, I think, which is that

19     spreadsheet has two tabs.  I think this is

20     only one of the tabs.  This is a printout of

21     essentially half the -- half the document, I

22     think.

23     BY MS. LOCKARD:

24         Q    Okay.

25                     So I -- it was pulled by our

Page 135

1    staff.  It has -- in your -- in your

2    footnote, just for the record, it has

3    SOLCO00028261, and in -- on the front cover

4    of the document I just handed you, it has the

5    same Bates number.

6              But I understand what you're

7    saying is that you looked at a separate tab.

8        A    Two tabs in the spreadsheet.

9        Q    And what you're looking at here

10   is -- appears to be Tab 1?

11       A    I don't know.  I don't know.  I --

12   it definitely appears to be -- I can't

13   remember what's in the stack, right?  There

14   was a printout of -- related to this in the

15   stack.

16       Q    I didn't see it in the stack, which

17   is why I started to ask you -- actually --

18       A    It should be there.  I think

19   that's --

20       Q    Is this it?

21       A    I don't know if it's any better.

22   Might have the same problem.

23       Q    Okay.

24              Let's try this one.  We'll

25   mark this as Exhibit 15.  This is the table

Page 136

1    that was contained within your file

2    materials, and it's set up in a landscape

3    version.

4                    (Exhibit 15 marked for

5    identification.)

6                    MR. NIGH:  You don't have a

7    copy of this one for me?

8                    MS. LOCKARD:  I don't.

9                    MR. NIGH:  Okay.

10                    (The deponent read the

11    document.)

12        A    This appears to be complete.

13        Q    Okay.

14        A    I can't be certain, but it

15    appears -- I'm looking for the value that --

16    from which I derived the 60.2 that's in my

17    report, and it's here.  I see it.

18        Q    Okay.

19                    If you'll take a -- take a

20    highlighter and just circle the number -- the

21    position where you derived that 60.2 number

22    for NDMA.

23                    MR. NIGH:  I need to take a

24    look at this one, see if this is --

25                    THE DEPONENT:  I'm not sure if

Page 137

1    it's complete, but it has -- it does have the

2    one entry that I had used.

3                    (Counsel read document.)

4                    MR. NIGH:  Yeah.  And just for

5    the record, you can't tell by looking at this

6    printout if it's got every tab printed out

7    for this Socol number, but it refers to

8    the --

9                    This is an Excel spreadsheet, so

10   that's my point behind this.

11                   MS. LOCKARD:  Okay.

12                   And it's an Excel spreadsheet

13   that plaintiffs' counsel produced to defendants

14   from Dr. Madigan's file, so if it's not

15   complete, we received it in an incomplete

16   fashion.

17                   MR. NIGH:  No, I don't agree

18   with that representation.  You -- I don't

19   know how your staff printed this.  They would

20   have to go through each tab and print the

21   potential -- so it's hard to tell by looking

22   at this document versus comparing it to

23   native format whether or not it contains the

24   entire document and all the tabs.

25   BY MS. LOCKARD:

Page 138

1          Q    Well, you've identified for us,

2    Dr. Madigan, on this line here the row that

3    you believe supports the assertion that the

4    levels were as high as 60.2?

5          A    Yes.

6          Q    How did you reach the conclusion of

7    60.2 from the data that's here?

8          A    So you multiply the parts per

9    million by, in this case it's .32, which is

10   the -- for a 320-milligram tablet, the

11   conversion is you multiply that by .32, and

12   that gives you the milligrams in a tablet.

13         Q    And that's how you reached your

14   conclusion of the 60.2 high level?

15         A    Yes.

16         Q    All right.

17                   So I'll mark as Exhibit 16

18   TORRENT-MDL2875-00133890 [sic] and ask you if

19   you can identify this as the document cited

20   in your paper as footnote 7.

21                   (Exhibit 16 marked for

22   identification.)

23                   MS. LOCKARD:  This is also

24   noted as confidential, so if counsel for

25   Torrent is on the line, if you have any

Page 139

1    objection to us introducing this or following

2    the protocol, please let me know.

3    BY MS. LOCKARD:

4        Q    All right.  So you can do the same

5    thing.

6                    If you could take a look at

7    this and identify where in that document you

8    found evidence for the 5.4 NDEA.

9        A    Can I highlight?

10       Q    Yes.

11       A    Let me just do a quick calculation

12   to make sure I've identified the right --

13   yes, that's correct.

14       Q    Okay.

15                   And for the record, you've

16   highlighted row 16 and 17 in the chart on

17   page 5 of 6, and the results of NDEA are

18   listed as 16.93.

19                   Can you explain how you

20   derived the numbers in your report of

21   5.4 micrograms from that chart?

22       A    So same thing, multiply it by .32.

23       Q    Did you -- did you receive these

24   documents from counsel?

25       A    Yes, yes.

Page 140

1           Q    These two?

2                     It's not something you found

3      on your own, right?

4           A    Right.

5           Q    Did you ask counsel to provide you

6      with certain testing results?

7           A    I don't recall exactly, but I said

8      I'd be interested to see anything that would

9      show the amount of NDMA in the -- in the

10     products.

11          Q    And I think you said those were the

12     two company documents that you were provided

13     that had any testing results on them,

14     correct?

15          A    Yes, that's correct.

16          Q    All right.

17                    Turning back to your report,

18     paragraph 7, and we discussed that the

19     studies referenced in paragraph 7, which you

20     refer to as certain dietary and occupational

21     studies, were studies that were relied on by

22     Dr. Etminan that you were asked to consult

23     on.

24                    Is that correct?

25          A    Yes.

Page 141

1          Q    Did you request dietary and

2     occupational studies or were they just

3     provided to you?

4                    MR. NIGH:  Form objection.

5          A    I was asked to consider the studies

6     that, you know, emerged from Dr. Etminan's

7     search.  They are dietary and occupational in

8     nature.

9          Q    Did you at any time review any

10    pharmaceutical studies or published papers

11    regarding nitrosamine exposure?

12                    MR. NIGH:  Form objection.

13         A    Pharmaceutical -- I don't

14    understand what you mean.

15         Q    Any papers that looked at the issue

16    of cancer risk from exposure via

17    pharmaceutical ingestion.  Did you look at

18    any such papers?

19                    MR. NIGH:  Form objection.

20         A    So yeah, I have seen the Pottegard

21    paper.

22         Q    And that was in the materials

23    provided, correct?

24         A    Right.

25         Q    Did you find the Pottegard paper

Page 142

1    yourself?

2         A    I don't recall it.  Maybe I did it

3    early on.  I don't remember.

4         Q    Why did you look at the Pottegard

5    paper?

6         A    Because it pertained broad strokes

7    to the topic I was studying here.

8         Q    Were you asked to look at the

9    Pottegard paper by anyone?

10        A    I don't recall.  I don't think so.

11        Q    Did you perform a statistical

12   analysis to evaluate the strength of the

13   association, dose response, and increased

14   risk of the cancer addressed in the Pottegard

15   paper?

16        A    I -- not directly.  There isn't --

17   it's not germane to those questions in

18   particular.

19             What I did do was -- you know,

20   it's an observational study.  I reviewed --

21   which I have a lot of expertise in.  I

22   reviewed it as a study, and I have opinions

23   about it.  They weren't germane to the

24   questions I was being asked here.

25        Q    What are your opinions about the

Page 143

1    Pottegard study?

2         A    So it compares -- it -- it

3    considers valsartan users and follows them

4    for some period of time, a relatively short

5    period of time in terms of a cancer study.

6                   It divides people who are

7    exposed into contaminated valsartan and

8    uncontaminated valsartan.  There are real

9    questions about -- about the -- the accuracy

10   of that -- of that discrimination.  But leave

11   that aside for a second.

12                   And then they looked forward

13   in terms -- so you've got two groups of

14   people, basically, you know, valsartan

15   uncontaminated and valsartan contaminated.

16   And then they looked to see, you know, how

17   many cancers occurred in these two groups.

18                   There's a fundamental problem

19   with the paper, though, which is it considers

20   all users of valsartan, regardless of whether

21   they were new users at the time this -- the

22   study -- the study was begun, regardless of

23   whether they were new users or existing users

24   of valsartan.

25                   And the state of the art in

Page 144

1    epidemiology in recent years has moved very

2    much towards new user studies.  So you

3    identify new users of Drug A and new users of

4    Drug B and study -- you know, study those

5    people.

6                I myself have published a

7    bunch of new-user studies in the last years.

8    And the -- the reason is, if you include in

9    the study people who are continuing users of

10   valsartan in addition to new users, the

11   people who are continuing users are

12   different.  They're people for whom the drug

13   is tolerated.  They're people for whom the

14   drug in this case probably works, is

15   effective with regard to their hypertension.

16                So it introduces all kinds of

17   potential confounding factors when you take

18   all comers.

19                So this was discussed,

20   actually, by -- I also have the reviews, the

21   peer reviews of the Pottegard paper.  So what

22   I just said was part of one of the -- one of

23   the reviewers pointed this out.

24                In actual fact, in the paper

25   itself, it did do a sub-group analysis

Page 145

```
 1       confined to new users, and then for those
 2       folks is the more -- is the cleaner kind of
 3       higher-quality analysis.
 4                   When you restrict it to new
 5       users of valsartan and compare contaminated
 6       with uncontaminated, and the effect size, my
 7       memory is it's 1.6, approximately, so 60
 8       percent increased risk of cancer.
 9                   And the confidence interval
10       just misses statistical significance, it
11       begins at 0.99 is my memory.  I don't know
12       what it goes up to.  Something above .6.
13                   So -- so that study, to me, is
14       actually -- says -- is very problematic with
15       regards to the risk associated with
16       contaminated valsartan.
17          Q    Because of the failure to
18       distinguish the new users?
19          A    Right.  That's a -- if -- sort of
20       fundamental flaw in that paper.  It's
21       particularly problematic here because the new
22       users were about twice as prevalent in the
23       contaminated group as in the uncontaminated
24       group.  So it's not like the new users were
25       spread evenly between the two groups.
```

Page 146

1              So they -- the authors

2      responded to the reviewers with a response

3      that frankly was nonsensical.  It didn't

4      actually address the issue.

5                  And the -- you know, I think

6      the editor of the paper just, you know, let

7      it through.  In my opinion, he or she

8      shouldn't have done that.

9          Q    Well, that was included in your

10     file, and the letter response itself, was

11     that provided to you by plaintiffs' counsel

12     or did you locate that yourself?

13         A    That was provided by counsel.  I

14     wouldn't have access to that.

15                  It's in the stack.

16                  MS. LOCKARD:  I think I have

17     copies in here.  We may have to take -- let's

18     just take a break so I can get organized.

19     It's also 12:20, so I don't know if you

20     intend to take any sort of lunch break.

21     We're going to need to take a break, I think,

22     for everybody on the call, the court

23     reporter.

24                  Daniel, do you have any

25     preference in terms of timing?

                                                  Page 147

1                       THE DEPONENT:  Short.

2                       MR. NIGH:  Short.

3                       THE VIDEOGRAPHER:  Okay, do

4       you want me to go off the record?

5                       MS. LOCKARD:  Yes, let's go

6       off the record.

7                       THE VIDEOGRAPHER:  Okay.  The

8       time is 12:22.  We're off the record.

9                       (Lunch recess.)

10                      THE VIDEOGRAPHER:  The time is

11      1:14.  We're back on the record.

12                      MR. NIGH:  Okay.  I just want

13      to put on the record that Dr. Madigan has a

14      hard stop at 6:15 Eastern today.  We started

15      this deposition at -- 9:00 was the notice of

16      deposition.  We weren't able to start until

17      about 9:35.

18                      Hopefully this doesn't become an

19      issue and we can take some quicker breaks, but

20      we did stress to try to get back in here at

21      12:50.  Looks like we're going to start at about

22      1:15.  Plaintiffs' counsel was ready at

23      with the witness.

24                      Hopefully we won't have an issue

25      but at this point I think we only have about a

Page 148

1    little over two and a half hours of record time,

2    and he's going to have to leave, he's got a hard

3    stop at 6:15.

4                    THE DEPONENT:  I have to be in

5    Brookline at 6:45, or I will be murdered.

6                    MS. LOCKARD:  Okay.

7                    Well, we don't want that to

8    happen.  I mean, we're going to take our

9    deposition time, and, you know, I don't think

10   we've been unreasonable on breaks.  So I take

11   issue with the sense that we've been taking

12   extra-long breaks.  I don't think that's

13   appropriate.  But I think we should get back on

14   the record and see where we are.  And we'll see

15   if it's an issue.

16   BY MS. LOCKARD:

17        Q    All right, Dr. Madigan.

18                    So we were going through your

19   report previously.  Do you have that in front

20   of you?

21        A    Yes.

22        Q    All right.

23        A    Sorry, I have the --

24        Q    That's okay.

25                    So on paragraph 7, so the last

Page 149

1    statement that you have there:  "These are

2    all observational studies and I have

3    discussed the strengths and limitations of

4    observational studies in several

5    publications."

6                    Did I read that correctly?

7         A    Yes.

8         Q    And then you cite to one of your

9    own publications, which is cited at

10   footnote 8, A systemic [sic] statistical

11   approach to evaluating evidence from

12   observational studies.

13                   And why did you pick that

14   article to site for that proposition?

15        A    It expresses many of my opinions

16   about observational studies.  I have many

17   papers that I could have cited to.  But that

18   one is a fairly complete review at that time.

19        Q    And throughout some of your papers

20   and even your testimony, you have offered a

21   number of criticisms and limitations of

22   observational studies, correct?

23        A    Yes.

24        Q    All right.

25                   And one of the papers that you

Page 150

1    have written in addition to the one that

2    you've cited is one called "Evaluating the

3    impact of database heterogeneity on

4    observational study results," accepted for

5    publication January 17, 2013.  Correct?

6         A    Yes.

7                   (Exhibit 17 marked for

8    identification.)

9    BY MS. LOCKARD:

10        Q    And this is --

11                   MS. LOCKARD:  Sorry, Daniel.

12        Q    So this is one of your papers where

13   you include criticisms and limitations of

14   observational studies.

15        A    Sure.  Number?

16        Q    Exhibit No. 16.

17        A    No, 17.

18        Q    17, Exhibit 17.

19                   All right.  And in this paper,

20   you stated --

21                   (Discussion off the record.)

22                   MR. NIGH:  The spreadsheet was

23   marked as two exhibits?

24                   THE DEPONENT:  The spreadsheet

25   was 15.  Torrent is 16.

Page 151

```
 1              MS. LOCKARD:  All right.
 2     Let's go with 17.  We'll figure it out.
 3     BY MS. LOCKARD:
 4         Q    All right.
 5                   So in this study, Dr. Madigan,
 6     I'm going to read in the executive summary at
 7     the beginning.  There's a statement, third
 8     sentence, and it reads:  "Studies of the same
 9     issue in different databases, however, can
10     and do generate different results, sometimes
11     with strikingly different clinical
12     implications."
13                   And then, "In this paper,
14     we're systemically studying heterogeneity
15     among databases," correct?
16         A    The impact of database
17     heterogeneity, yeah.
18         Q    Okay.
19                   And your conclusion was that
20     clinical studies that use observational
21     databases can be sensitive to the choice of
22     database, and more attention is needed to
23     consider how the choice of data source may be
24     affecting results, correct?
25         A    You read that correct.
```

Page 152

1          Q    Okay.

2                    Now, moving into the actual

3     portion of the article, the first paragraph,

4     midway down, you state:  "Many potential

5     biases and sources of variability threaten

6     the validity of such studies, and a

7     substantial literature documents these

8     concerns."

9                    Correct?

10         A    Yes.

11         Q    All right.

12                   And is that still your opinion

13    today?

14         A    Sure.

15         Q    And then at the bottom of that

16    column, you say:  "Recent meta-analyses of

17    observational studies have shown that

18    individual studies of the same drug effect

19    yielded conflicting results ranging from

20    statistically significant decreased risk to

21    statistically significant increased risk."

22                   Correct?

23         A    You read that correctly.

24         Q    Okay.

25                   And so from a layperson's

Page 153

```
 1    perspective, is what you're saying that

 2    essentially when you're looking at

 3    meta-analyses of observational studies,

 4    you -- if you don't control for

 5    heterogeneity, you will end up with different

 6    results from different studies?

 7         A    No.

 8                   MR. NIGH:  Object to form.

 9         A    That is absolutely not what it

10    says.

11                   So it says that when you're

12    doing -- there are meta-analyses out there

13    where some of the component studies of that

14    meta-analysis can be statistically

15    significant in one direction, and within the

16    context of the same meta-analysis, you can

17    have something that's statistically

18    significant in the other direction.

19                   It didn't happen here, I would

20    point out.  But can that happen?  Yes, that

21    can happen.

22         Q    That's a risk of using

23    observational studies to draw conclusions,

24    correct?

25         A    No, no, it's not a risk.  It's just
```

Page 154

1    a fact.  It can happen.  And it's one of the

2    reasons -- it's one of the motivations for

3    doing meta-analysis, is to arrive at kind of

4    an omnibus picture of what's going on.

5         Q    Well, it's one of the concerns that

6    you raise in your paper about observational

7    studies, correct?

8         A    This paper is not about

9    meta-analysis, and this paper is about

10   database -- first of all, it's about database

11   studies.  We don't have database studies in

12   this context here, in the context of

13   valsartan.  We're not talking about database

14   studies.

15              This is a paper about database

16   studies, claims databases and electronic

17   health records databases, and it's making the

18   point that the database itself can be a

19   source of heterogeneity.  That's the point of

20   the thing.

21        Q    Okay.

22              And if you look at page 647,

23   in your Discussion section, you do talk about

24   database studies, and you say:  "Our findings

25   suggest that 20 percent to 40 percent of

Page 155

1    observational database studies can swing from

2    statistically significant in one direction to

3    statistically significant in the opposite

4    direction depending on the choice of

5    database, despite holding study design

6    constant."

7              Correct?

8         A    You read it correctly.

9         Q    Now, when you turn to page -- the

10   very last page of the article, the next to

11   the last -- actually, the last paragraph

12   before the acknowledgments you state:  "We

13   believe our findings have two immediate

14   implications.  First, when interpreting

15   results from a single observational data

16   source, more attention is needed to consider

17   how the choice of data source may be

18   affecting results."

19              Did I read that correctly?

20        A    You did.

21        Q    "Second, where possible, studies

22   should examine multiple sources to confirm

23   that significant findings are consistently

24   identified, or that results are at least

25   consistent across databases."

Page 156

1          A     I see that.

2          Q     "When interpreting results across

3     multiple sources, it is important to

4     characterize the observed heterogeneity and

5     limit the use of composite estimates that

6     could otherwise hide the uncertainty in

7     effect estimates that is not driven by

8     sampling variability."

9          A     You read that correctly.

10         Q     I read that correctly?

11               And you agree with these

12    statements, although your position is they

13    don't apply to the papers that you reviewed

14    for valsartan.

15               Is that my understanding?

16         A     Not directly.  Because these are --

17    this is about database studies, claims

18    databases, EHR databases, where you have many

19    options that you might consider.

20               These are studies that were

21    designed to address a particular question.

22    They're dietary studies involving

23    questionnaires and so on.  They're of a

24    completely different nature.

25                    MR. NIGH:  Object to the form

Page 157

1    of that last question.

2         Q    Those -- they are of a completely

3    different nature but the issue or the concern

4    with regard to heterogeneity is still at play

5    in those types of studies, even if it's not a

6    large database or a pharmacovigilance

7    database.  Wouldn't you agree with that?

8                   MR. NIGH:  Object to form.

9         A    As a general matter, in particular

10   when you're doing meta-analysis, one of the

11   things you consider is heterogeneity, and

12   that's exactly what I did here in the comment

13   in the report about it, about the context of

14   the Song meta-analysis.

15                   So sure, yeah, heterogeneity

16   is something that one thinks about.

17        Q    Right.

18                   And in the -- your comment on

19   the Song meta-analysis on page 3 of your

20   report, you say -- and this is with respect

21   to gastric cancer:  "Song included 11 studies

22   concerning NDMA and gastric cancer and

23   yielded a relative risk estimate of 1.34 and

24   an associated 95 percent confidence

25   interval."

Page 158

1           You then -- end of that

2    paragraph, you say:  "There was, however,

3    considerable between-study heterogeneity,"

4    correct?

5        A    Yes.

6        Q    Okay.

7             And what is the concern or the

8    reason for the comment that there was

9    considerable between-study heterogeneity in

10   that meta-analysis?

11       A    So the I², which is a measure of

12   heterogeneity, if my memory is right, is

13   around .7.  That's moderately high, so the --

14   there's a certain amount of heterogeneity

15   here.  It's certainly not extreme.

16             It's not extreme in the sense

17   that you've got studies in there that are

18   statistically significant in one direction

19   and others that are statistically significant

20   in the other direction.  But nonetheless, as

21   you look at this and interpret it, there's a

22   fair amount of heterogeneity amongst these

23   studies.

24       Q    And, in fact, it was considerable

25   enough that you felt obligated to mention it

Page 159

1    in your report, correct?

2                    MR. NIGH:   Object to form.

3         A    Evidently so.

4         Q    So the paper that you actually

5    cited in your report on footnote 8, let's get

6    that marked as well.

7                    So we are up to 18, I believe.

8                    (Exhibit 18 marked for

9    identification.)

10   BY MS. LOCKARD:

11        Q    For the record, this is "A Systemic

12   Statistical Approach to Evaluating" --

13        A    Systematic.

14        Q    It says a system -- oh, "Systematic

15   Statistical Approach to Evaluating Evidence

16   from Observational Studies."  Okay.

17                    And this is the paper authored

18   by you that you cited in your report,

19   correct?

20        A    Coauthored by me, yes.

21        Q    Okay.

22                    If you turn to the abstract

23   section on the first page, if you'll follow

24   along with me, it says:  "Threats to the

25   validity of observational studies on the

Page 160

1    effects of interventions raise questions

2    about the appropriate role of such studies in

3    decision-making."

4              Is that what it says there?

5        A    Yes.

6        Q    And then you go on at the end of

7    the abstract to explain:  "Here, we review

8    some of the challenges encountered in

9    observational studies and review an

10   alternative, data-driven approach to

11   observational study design, execution, and

12   analysis."

13             Correct?

14       A    Yes.

15       Q    What -- just in sort of basic

16   terms, what was the alternative, data-driven

17   approach that you were recommending in this

18   paper?

19       A    So if you turn to -- if you turn to

20   Section 5, we describe -- in this paper, we

21   describe an alternative -- an alternative

22   approach.

23       Q    Which is what?

24       A    Give me an hour and I'll tell you.

25   I mean, it's not so simple.

Page 161

1           (Laughter.)

2      A    I'm not giving you an hour.

3           (Laughter.)

4      A    I mean, it involves -- okay.

5  Loosely, it involves the use of negative

6  controls.  As I said, there are many pieces

7  to it, but one piece of it is -- involves the

8  use of negative controls.

9           So the idea is you want to

10  study the association between A and B and you

11  find things that are known to not -- known

12  causally to not be associated with A and are

13  not associated with B.  They are called

14  negative controls.

15           And the basic idea is you

16  build a so-called empirical null distribution

17  from those negative controls and use that to

18  compute calibrated p-values and confidence

19  intervals.

20           So it's a proposed approach

21  that we, myself and my colleagues, have now

22  used and published many such studies in the

23  literature.

24           To state the obvious, you need

25  the data to do this.  You cannot do that kind

Page 162

1      of analysis in the context we're discussing

2      here.

3           Q    Right.

4                     Because the data in the

5      context of valsartan in pharmaceuticals

6      doesn't exist to allow you to apply your

7      alternative methodology, correct?

8                     MR. NIGH:  Object to form.

9           A    I don't know about doesn't exist,

10     but I don't have it.

11          Q    So in Section 5, you also say:

12     "The consumer of the resulting analysis must

13     rely on the professional experience and

14     reputation of the analyst to assess the

15     weight of evidence to attach to the study."

16                     Do you see that?

17          A    Sure.

18          Q    Is that in reference to your

19     alternative approach?

20          A    No.

21          Q    That's with respect to

22     observational settings, correct?

23          A    Well, let's look at the context.

24                     So, "Current strategies" --

25     I'm reading from the paper.

Page 163

1              "Current strategies for the

2      design of observational studies rely heavily

3      on the expertise of analysts.  Process of

4      expert consideration, introspection, anecdote

5      and discussion leads to a particular design.

6      The consumer of the resulting analysis must

7      rely on the professional experience and

8      reputation of the analyst to assess the

9      weight of evidence to attach to the study."

10              That describes the kind of

11     current state of play, including in -- in the

12     context we're discussing here today.

13          Q    And then it goes on to say:

14     "Because little empirical evidence exists to

15     support this process, subjective assessment

16     of new results along with prior release about

17     the reliability of observational studies

18     dominates the interpretation of observational

19     findings and current practice," correct?

20          A    You read that correctly.

21          Q    And you would still agree with that

22     today, correct?

23          A    Yeah, I mean, I -- in this

24     particular context, I am analyzing a set of

25     observational studies, and I am using my

Page 164

1    expertise and my -- my judgment to draw

2    conclusions.

3         Q    And then a couple of sentences

4    later, you say:  "Future work can lead to

5    improvements in methods that may have better

6    performance, but our findings suggest that

7    empirical evidence will be required to

8    justify interpreting observational analyses

9    properly."

10        A    Yeah.  You read that correctly.

11        Q    Okay.

12             In this case, with respect to

13   valsartan, you don't have empirical evidence

14   corroborating the observational studies that

15   you've relied on, correct?

16        A    Not of the type that's envisioned

17   in this paper, nor is it conceivable in this

18   context.

19        Q    Right.

20             So the type of empirical

21   evidence that you are recommending in this

22   paper you do not have for valsartan, right?

23        A    So, conceivably, if this -- this

24   is -- you know, not a practical proposition.

25             If one had access to the raw

Page 165

1        data in every one of these studies, it's

2        conceivable you could do some of the things

3        that are described in this -- in this recipe,

4        but I don't, and I don't think it's feasible.

5                      I will say this:  What we're

6        proposing in this paper is, you know, we are

7        proposing this to the world and hoping that

8        the world, you know, adopts it.  This is

9        not -- this is not standard.

10           Q    Right.

11                      This is what you're proposing

12       as the alternative?  It's not an accepted

13       methodology as of yet, correct?

14                      MR. NIGH:  Object to form.

15           A    Not in widespread use, is how I'd

16       put it.

17           Q    But, I mean, there are other quotes

18       in here, and I can read from them, you know,

19       about challenges and observational analyses

20       and, you know, mainly mentioning insufficient

21       sample size, lack of applicability to

22       reliably estimate the risk of many potential

23       safety concerns for the target population.

24                      "And even if one leverages

25       meta-analytic tools, rare side effects,

Page 166

1    long-term outcomes, both positive and

2    negative, and effects in patients with

3    comorbidities may still be unknown when a

4    product is approved because of the relatively

5    small size and short break in clinical

6    trials."

7         A    The common -- the question I was

8    just asked pertains to clinical trials.

9         Q    Clinical trials.

10        A    Completely different context.

11        Q    Right.

12             The comment I just read

13   doesn't apply to occupational studies at this

14   point, right?

15        A    I believe so.  I don't even know

16   where it is, but I don't -- I don't believe

17   it does.

18        Q    I think I misread the wrong

19   section.  I apologize.

20             I'm on page 15 now.  And at

21   the top of the first full paragraph, it says:

22   "The principal concern for all observational

23   studies, which is of particular relevance in

24   observational database evaluation, is the

25   potential for bias."

Page 167

1              That does apply to

2    occupational studies, correct?

3        A    Sure, yes.  The overarching concern

4    is one of bias, particularly in this case,

5    for example, if there's real possibility of

6    bias to the null, that's a type of bias I was

7    concerned about.

8        Q    Likewise -- and I know you've given

9    testimony on this issue before with respect

10   to challenges of observational studies.

11              Do you recall testifying about

12   that --

13       A    You need to --

14       Q    -- in the -- let me direct you to

15   Thibodeau deposition in Taxotere.

16       A    Okay.

17       Q    You recall that being a line of

18   questioning in your deposition, November 14,

19   2019?

20       A    I'm not that good.  I do not

21   recall.

22       Q    Do you remember giving a deposition

23   in Thibodeau, a Taxotere case, in November of

24   2018?

25       A    I don't remember the name of the

Page 168

1    plaintiff, but we could look up and see if

2    that's one of the -- that's on the list that

3    I did.  I'm sure it is.  I don't doubt it.

4         Q    Let me ask you this:

5                   So do you agree that

6    observational studies can be challenging

7    because of different biases that may distort

8    the true effect, i.e., systematic error,

9    recall bias, selection bias, response bias,

10   therapy bias and confounding?

11        A    That's -- that's --

12                  MR. NIGH:  Object to form.

13        A    -- kind of a sweeping generality.

14   Sure, yeah.  I mean, observational studies

15   differ from a randomized trial, so there are

16   concerns that arise in observational studies.

17   That -- that statement lists a few of them.

18        Q    Where does an observational study

19   fall on the hierarchy of evidence?

20        A    So you asked that question as if

21   there's a single hierarchy of evidence that

22   the whole world agrees on.  There isn't.

23   But -- but I think in just about anyone's

24   hierarchy, below randomized trials.

25        Q    Okay.

Page 169

1            All of the studies that you

2    looked at that were referenced in your report

3    were observational studies; were they not?

4        A    Yeah.  It doesn't seem likely that

5    we're going to have randomized trials in this

6    area anytime soon.

7        Q    Right.

8            That's a challenge, because

9    you don't have the availability to do that,

10   and there would be concerns with patients if

11   you tried to set up such trial, correct?

12       A    Absolutely, yes.  Giving --

13   randomizing people to a carcinogen is not

14   going to happen, thankfully.

15           There's nothing unusual about

16   this.  There are many, many questions in

17   healthcare where the only evidence we have is

18   observational in nature.

19           It's not like this is a

20   bizarre outlier.  This is, in fact, more the

21   norm.

22       Q    And so, you know, in your paper,

23   you recognize that there are limitations --

24   strike that.

25           In your expert report, you

Page 170

1    recognize that there are limitations of

2    observational studies, yet you go on to rely

3    on observational studies.

4         A    And I publish them.  I do them

5    myself, many of them.

6                   MR. NIGH:   Object to form.

7         A    The healthcare system needs

8    evidence, right?  It's the raw -- the fuel

9    that kind of drives the healthcare system.

10   Much of that evidence by necessity derives

11   from observational studies.

12                   Now, my work -- my research

13   work is trying to find always ever-better

14   ways of doing that.  But be that as it may,

15   we rely on observational studies.

16                   I publish them.  The world

17   relies on them.

18        Q    So likewise, though, you took a

19   look at the Pottegard study, which was the

20   only study in your file that actually relates

21   to nitrosamine exposure in pharmaceuticals,

22   and you described for us earlier the

23   limitation of that study, correct?

24        A    Sure, yeah.

25        Q    But you didn't include that study

Page 171

1    with or without its limitations in your

2    report even though you reviewed it?

3         A    It wasn't germane to the question I

4    was being asked.

5         Q    Is it not germane to the question

6    at issue in this litigation regarding whether

7    or not nitrosamines at the levels found in

8    valsartan cause cancer?

9                   MR. NIGH:   Objection.

10        A    That's not the question I was asked

11   to address.  So the question I was asked to

12   address was to look at studies that

13   quantified the effect numerically of certain

14   amounts of NDMA.

15                   That's not -- that's not

16   what's happening in Pottegard.

17        Q    Well, if it wasn't germane to the

18   question you were asked, why do you have the

19   paper, the response and many other documents

20   in your file all related to Pottegard?

21        A    I was interested, and I looked at

22   it and studied it and formed opinions that I

23   shared with you.  But it's not germane to the

24   particular question I was asked here, hence

25   it's not featured in my report.

Page 172

1        Q    Well, it's not featured in your

2    report because it's not consistent with your

3    conclusion in your report.

4                    Isn't that the truth?

5                    MR. NIGH:   Object to form.

6        A    That's -- as I just explained to

7    you this morning, it is in very many ways

8    very problematic.  I consider it the

9    opposite, actually.

10                    You know, it's very

11    problematic with regard to the effect of --

12    the association between contaminated

13    valsartan and cancer.

14                    So no, I -- what you said is

15    false.  And the reason I didn't include it

16    was it wasn't germane to the question I was

17    asked to study, and therefore I didn't

18    include it.

19                    But as you saw this morning, I

20    am more than happy to share my opinions.

21        Q    Well, and I understand that you

22    believe there are some limitations, and you

23    explained this very clearly.

24                    But there is some disconnect

25    that I'm trying to understand where you also

Page 173

```
1    have spent a career explaining the

2    limitations of observational studies, yet you

3    find them reliable and germane enough to

4    include in your report.

5                   MR. NIGH:  Object to form.

6        A    Not in full generality.  There are

7    some observational studies that I will

8    happily rely on, subject to limitations.

9    There are others that I feel are fatally

10   flawed, and that --

11                  The good news with Pottegard

12   is I think their overall analysis is highly

13   problematic, but they did do a new user --

14   happily, they did do a new-user analysis,

15   which I do think is a reliable piece of

16   evidence.

17       Q    But the new-user analysis, I

18   believe you testified, was not statistically

19   significant, right?

20       A    So -- so what?  Like, really?

21                  The confidence interval begins

22   at .99 --

23                  You're going to say the

24   confidence interval because it begins at .99

25   as against 1.01, we're good to go?  There
```

Page 174

1     isn't a problem?

2                     You've got to be kidding me.

3         Q    So let's -- I just want to identify

4     within your file that we were produced

5     yesterday --

6                     MS. LOCKARD:  We'll mark these

7     as Exhibit -- what are we up to?

8                     MR. NIGH:  19, I think.

9                     MS. LOCKARD:  19.  You're

10    better at this than we are.

11                    (Exhibit 19 marked for

12    identification.)

13    BY MS. LOCKARD:

14        Q    Okay.

15                    So this is the collection of

16    materials that were included within a file

17    folder labeled "Pottegard."

18                    So I'll just ask you -- we'll

19    make all of this Exhibit 19, and then we'll

20    just go through these one by one, and you can

21    explain to me what they are.

22                    Let's start with the paper,

23    which I believe is this.  You can correct me

24    if I'm wrong, but is that the Pottegard

25    paper?

Page 175

1          A    You actually gave me two papers.

2      Let me give that back.

3          Q    Yes.

4          A    So this is the paper, yes.

5          Q    Okay.

6               So you read that paper.  It

7      was in your file, right?

8          A    Right.

9          Q    That's the paper you've been saying

10     is flawed?

11         A    I said something more nuanced than

12     that.  I said their main analysis is very

13     problematic, but there's an analysis in here

14     that is much -- I think is much more apropos.

15         Q    Okay.

16              But even their new analysis is

17     not germane to the question you were asked.

18     That's why it's not in your report, right?

19              MR. NIGH:  Object to form.

20         A    Right.  Because it didn't quantify

21     the amount of NDMA.

22         Q    Okay.

23              So what I want to do is to

24     hand you -- so there are an additional five

25     documents that pertain to Pottegard.

Page 176

1          Can you just explain to us for

2     the record what these five documents are?

3          A    Sure.  I can try.

4               So one of them is

5     supplementary material to the published

6     paper.

7          Q    Published by Pottegard, right?

8          A    Right.

9               Another one appears to be --

10    another one appears to be letters -- excuse

11    me, letters published in that journal about

12    this paper.  I have no recollection of

13    looking at that.

14         Q    Okay.

15         A    Actually, two of them appear to

16    be -- are they the same?  No, they're not.

17               These appear to be letters

18    of -- I don't know if they were published or

19    not, but letters about this paper, is what

20    they appear to be.  I have no memory of

21    looking at these.

22               And then the other two are

23    correspondence between -- they're the reviews

24    of the paper.  Actually, one of them is the

25    reviews of the paper with the author's

Page 177

1    response interspersed.

2         Q    Did you look at that?

3         A    Yeah.

4         Q    And you've reviewed the supplement

5    material by Pottegard?

6         A    I don't recall.

7                    (The deponent read the

8    document.)

9         A    Yeah.  So this is correspondence,

10   you know, between the authors and the

11   journal.  Both of these are correspondence

12   between the author and the journal.  I

13   believe I've looked at both of these.

14        Q    If you will, can I have the

15   Pottegard article and the supplement?  I

16   just -- I've got to make the record clear.

17                    So we've made these

18   collectively Exhibit 19, but we'll make --

19   we'll make the actual article you spoke about

20   first 19A; the supplement, 19B; the two

21   letters that you said you did not review --

22        A    No, I didn't.  I said -- I don't

23   know.  They just don't look familiar to me

24   this minute.

25                    (Exhibit 19B marked for

Page 178

1    identification.)

2    BY MS. LOCKARD:

3         Q    Okay.

4                   So --

5         A    And they're not two letters.  I

6    think there's more than -- they're several

7    letters in there.

8         Q    Okay.

9                   One was a letter -- this is

10   one letter to the editor, and you don't know

11   if you reviewed this?

12        A    Yeah, I haven't looked at these for

13   whatever it is, two or three months.  I --

14   that doesn't instantly look familiar to me,

15   so I don't know if I did read.

16        Q    I'm going to make that 19C.  You

17   don't know if you read that.

18                   (Exhibit 19C marked for

19   identification.)

20                   (Exhibit 19D marked for

21   identification.)

22   BY MS. LOCKARD:

23        Q    The 19D is --

24        A    "Letters," plural, right.

25        Q    "Letters," plural.  And you don't

Page 179

1      know if you read these, correct?

2          A    Not sure.  If I read them and

3      talked about them now, I might recall

4      something or I might not.  I don't know.

5          Q    Okay.

6                And one of the letters in 19D

7      was -- there's a letter and a response, and

8      that's between the author and Dr. Etminan,

9      correct?

10         A    I have no idea.

11         Q    Do you recall that?

12         A    No.

13               I mean, I'm sure you're

14     telling the truth, but I don't recall that.

15         Q    Well, it says, "Dear Drs. Etminan

16     and Mansournia."

17         A    Okay.

18         Q    So before me just saying that, you

19     didn't know that these letters were with --

20     at least one of them was with Dr. Etminan?

21         A    I -- I have no recollection of

22     that.  Maybe I knew that.  Maybe I didn't.  I

23     don't know.

24         Q    Did you get these materials from

25     Dr. Etminan?

Page 180

```
 1          A     No.

 2          Q     Did you get them from plaintiffs'

 3     counsel?

 4          A     Yes.

 5                     (Exhibit 19E marked for

 6     identification.)

 7                     (Exhibit 19F marked for

 8     identification.)

 9     BY MS. LOCKARD:

10          Q     Okay.

11                     And these two, which we'll

12     make 19E and 19F --

13          A     Yeah.

14          Q     -- you said you did review these?

15          A     Yeah.

16          Q     Did anybody tell you not to include

17     the Pottegard paper in your report?

18          A     No.

19          Q     Okay.  So let's turn back to your

20     actual report.

21                     All right.  The last sentence

22     of paragraph 8, you say:  "For each study I

23     compute the mean 'lifetime cumulative

24     exposure' (the LCE) as the average number of

25     days from birth to study end multiplied by
```

Page 181

1    the lower bound of the NDMA (or NDEA) daily

2    level in the highest group.  In studies

3    presenting multiple analyses I focused on the

4    maximally adjusted analyses."

5              Did I read that correctly?

6        A    Yes.

7        Q    Can you explain what the maximally

8    adjusted analyses is?

9        A    Sure.

10             So in some papers, not all,

11   but in some of the studies, they present

12   analyses that are unadjusted; and then

13   sometimes analyses that are adjusted for,

14   let's say, age and sex; and then sometimes

15   they present an analysis in addition

16   adjusting for age, sex, and several other

17   things.

18             So I -- as a matter of my

19   approach to this in such matters is to use

20   the maximally adjusted one, the one that has

21   the most variables adjusted.

22       Q    Did you -- did you consider making

23   any adjustments for any confounding factors

24   in any of these reports?

25       A    So I don't get -- I don't have the

Page 182

1    data, so I don't get to do these analyses.

2    I'm relying on the author's analysis.

3                     But, in general, their

4    attempts -- their adjustments are attempts to

5    control for confounding.

6         Q    Did you reach any conclusions about

7    whether the authors adequately control for

8    confounding factors in any of the dietary

9    studies?

10        A    It all seemed reasonable to me.  I

11   looked at each one of them.  Without access

12   to the data, there's only so much you can do.

13                    It seemed reasonable to me,

14   what they did.

15        Q    So if you look at the next section,

16   the gastric cancer section, you talk about

17   the meta-analysis by Song, including 11

18   studies concerning NDMA and gastric cancer

19   yielded a relative risk estimate of 1.34.

20                    And then the next paragraph,

21   you say:  "I note that Loh reports stomach

22   cancer hazard ratio of 1.13."

23                    Correct?

24        A    You read that correctly.

25        Q    And then you say:  "Adding Loh to

Page 183

1    the Song meta-analysis yields an estimate of

2    1.32 and a slightly lower" --

3         A    $I^2$.

4         Q    Okay.

5                   So essentially what you're

6    saying is you're combining summary measures

7    of the relative risk estimate in the cancer

8    hazard ratio.

9                   Is that right?

10        A    I --

11        Q    You're combining those --

12        A    Why did you put the word "cancer"

13   in there?  I'm confused.

14        Q    Because you say:  "I note" -- this

15   is paragraph 10.

16                   "I note that Loh reported a

17   stomach cancer hazard ratio of 1.13."

18        A    Can I try and simplify this, if I

19   might?

20        Q    Sure.

21        A    So in these studies, generally

22   speaking, there are effect estimates.  That's

23   why I'm focusing on them.  And the effect

24   estimates are generally of one of three

25   types:  Relative risks, odds ratios, hazard

Page 184

1    ratios.

2                        Actually, I don't know that

3    they're relative risks.  I'm not even sure

4    all three are represented, but there are

5    certainly odds ratios and hazard ratios.

6                        So in the Song meta-analysis,

7    they are already doing a meta-analysis across

8    odds ratios and hazard ratios, treating them

9    as effect sizes.

10                       They have slightly different

11   meanings, but it's quite common, as Song did,

12   to do meta-analysis across hazard ratios and

13   odds ratios and relative risks.

14        Q    Okay.

15        A    So that's what they did.  I just

16   added one more to the mix.

17        Q    But odds ratios are basically black

18   and white.  You got cancer or you didn't.

19                       Correct?

20                       MR. NIGH:  Object to form.

21        A    They're -- well, they're odds

22   ratios.  They refer to the odds of getting

23   cancer as a function of whether you can treat

24   it or not.

25                       It's a ratio of odds ratios,

Page 185

1   and it comes out of a logistic regression.

2   And hazard ratios are derived differently,

3   but they're effect sizes.  They amount to an

4   estimate of the increased risk.

5                   Song combines them.  Some of

6   the studies have odds ratios.  Some of the

7   studies have hazard ratios.  It's routine to

8   do meta-analysis across those different

9   measures.

10      Q    And hazard ratios take into account

11  the time factor as well, right?

12      A    So can logistic regression, meaning

13  it can account for time.  It's not a unique

14  characteristic of Cox regression, but the --

15  I think the more --

16                  I think the point that you're

17  circling around is putting them together.

18  And my point was yes, I put them together.

19  And Song had already done that, and it's

20  relatively -- you see that all the time in

21  the literature.

22      Q    And so you say that's an accepted

23  method to combine those two summary measures?

24      A    Yeah, it's routine.

25      Q    And then similarly, paragraph --

Page 186

1      well, is it Cui and Rogers?

2           A    Yeah.

3           Q    So in the esophageal section,

4      again, you say:  Cui has a meta-analysis

5      which found an increased risk of esophageal

6      cancer associated with NDMA, and there's a

7      hazard ratio of 1.18.

8                     And then in the next

9      paragraph, you say:  "Cui appear not to have

10     included Rogers."

11          A    Okay.

12                    MR. NIGH:  Object to form.

13          Q    I mean, is that right?  That's

14     right, right?

15          A    You read it correctly.

16          Q    Cui didn't include Rogers.

17                    But so then you've combined

18     Rogers with Cui to come up with your

19     conclusion in paragraph 12?

20          A    The same -- same answer.  It's --

21     there's nothing unusual about that.  I am --

22     yeah, one of them has -- there's -- one of

23     them is a hazard ratio.  There are, I think,

24     four studies in Cui, and they report a hazard

25     ratio, and then I'm combining that with an

Page 187

1    odds ratio.

2                    It's the same answer as the --

3    the discussion we just had about Song.

4        Q    Right.

5                    And I'm just pointing out,

6    this is another instance where you combine

7    the summary measures, but you -- but your

8    position is that that's totally acceptable,

9    correct?

10       A    Yeah, it's -- it's done, you know.

11       Q    All right.

12                   And Song itself -- so that was

13   a gastric cancer which relied on

14   self-reported dietary information from

15   questionnaires, right?

16       A    I think that's true for all of the

17   component studies, yes.

18       Q    And so obviously the information

19   that's relied on in Song or the other studies

20   is only as useful as the information that's

21   provided through the questionnaires?

22                   MR. NIGH:  Object to form.

23       A    I have no idea.

24       Q    Is that fair?

25       A    I have no idea what you mean by "as

Page 188

1    useful as."

2         Q    Well, have you ever seen any

3    reports or studies about the lack of

4    reliability questionnaire reporting in

5    studies?

6                   MR. NIGH:  Object to form.

7         A    Sure, including, you know, when I

8    cited -- at least concern with bias towards

9    the null because of the nature of the way the

10   data are gathered.

11        Q    So my point is that if the

12   information is gathered from a questionnaire

13   which is known to have bias built in, then it

14   is going to potentially impact the

15   reliability of the study results, correct?

16                  MR. NIGH:  Object to form.

17        A    I mean, that -- you said -- I think

18   you used the phrase "known biases," and I

19   don't think we know the nature of any bias in

20   any one of these studies in particular or

21   specifically.

22                  You know, as a general matter,

23   one worries about bias in observational

24   studies, as we've talked about.  And, yeah,

25   you know, when you're gathering data via

Page 189

1    questionnaire, there are recall biases that

2    you worry about.

3                    You know, arguably, these are

4    generally biases towards the null, but -- but

5    certainly, you know, these are things one

6    worries about.

7        Q    Okay.

8                    And so just simply put,

9    that -- biases such as recall biases from

10   questionnaires that are used in these types

11   of dietary studies that you relied on here is

12   one potential concern with relying on these

13   studies?

14                   MR. NIGH:  Object to form.

15       A    Sure.  Insofar as there are

16   concerns about recall bias.  And recall --

17   actually, forget bias for a second.  Just

18   concerns about how well people can recall

19   these things, that's a concern, sure.

20       Q    So the gastric study -- the only

21   two gastric studies you looked at were Song

22   and Loh.

23                   Is that correct?

24       A    No.  So I looked at the component

25   studies of Song.

Page 190

1          Q    Okay.

2                    So you looked at the actual

3     component studies of Song.  You said that

4     earlier, correct?

5          A    Yes.

6          Q    Are those part of what was

7     contained within your file?

8          A    Should be, yes.

9                    MR. NIGH:  Object to form.

10         A    Actually, let me be more

11    definitive.  "Yes," rather than "should be."

12    They are in there.

13         Q    They are in there.

14                    (Pause.)

15         A    And actually, they are -- and they

16    are in Table 1.

17         Q    Okay.

18                    Table 1 on page 7?

19         A    Yeah.

20         Q    Right.

21                    On Table 1, did you consider

22    making an adjustment for the multiple

23    comparison problem?

24                    MR. NIGH:  Object to form.

25         A    Multiple comparison problem.  I

Page 191

1      mean, I did not adjust -- there's no

2      adjustment for multiplicity here, nor would

3      I -- would I think it's even remotely

4      appropriate.

5          Q    Why not?

6          A    This is a safety issue, so there's

7      kind of a fundamental tension between, you

8      know, multiplicity correction and safety.

9                So multiplicity corrections,

10     you know, there are various kinds out there.

11     You know, what they do is they focus on

12     so-called type one error, so they -- they put

13     an extreme cap on the chance of making a type

14     one error, which is a false signal.

15                So what they do is they

16     literally destroy statistical power.  That's

17     what they do.  They reduce the statistical

18     power of the analysis in order that you keep

19     a tight lid on the type one error rate.

20                That's the opposite of what

21     you want to do with safety.  With safety, you

22     want to know about a safety problem if

23     there's one there.  And in general, for

24     example, in clinical trials, multiplicity

25     adjustment for safety endpoints is -- is --

Page 192

```
 1    is not -- is very unusual.  It's not -- it's
 2    not what the normal practice is.
 3                    So, you know, for any one of
 4    these -- I'm pointing to Table 1.
 5                    For any one of these studies,
 6    if the p-value is less than .05, that study
 7    is statistically significant.  Period.  Full
 8    stop.
 9                    And the fact that there are
10    other studies on the table doesn't in any way
11    take -- diminish that fact.  I can go on and
12    on.  I won't.
13        Q    If -- if you -- if you had made an
14    adjustment for the multiple comparison
15    problem, would the p-value have the -- the
16    question -- well, strike that.
17                    If you had applied a .0003
18    rather than a .05, would that have resulted
19    in a change in the SS column, for statistical
20    significance?
21        A    Sure.  I mean, that's a tautology.
22    You're saying if you did something
23    inappropriate, I consider inappropriate, if
24    you did that, would it reduce the number of
25    things that were statistically significant.
```

Page 193

1       Of course.

2                   As a matter of fact, you could

3       set the threshold to zero and nothing would

4       be statistically significant.

5           Q    Correct.

6           A    Knock yourself out, but it doesn't

7       make any sense.

8           Q    Right.

9                   But if you -- if you did apply

10      a .0003 rather than .05, then virtually none

11      of these studies would have shown statistical

12      significance, right?

13          A    Again, the premise seems absurd to

14      me, but we actually don't know that, because

15      for a bunch of them, it's just less than --

16      I'm looking at the P for trend.

17          Q    Yeah, so we wouldn't know for

18      DeStefani --

19          A    For trend in particular.

20          Q    -- or Zheng -- no, actually, Zheng

21      would be -- well, I guess -- let me -- I'm

22      sort of talking out of turn.

23                   The ones that have less than

24      you're saying you wouldn't necessarily know.

25          A    Strictly speaking, yeah, we don't

Page 194

1    know.  We don't know what the p-value

2    actually is.

3         Q    So even using the .05, the SS

4    column for statistical significance, for each

5    and every one of the cancers that was covered

6    in these studies in the table, there's at

7    least one study that was not statistically

8    significant, right?

9         A    True.

10        Q    And for bladder, there's only one

11   study, and it wasn't statistically

12   significant, right?

13        A    Sure.

14        Q    And then for prostate, there are

15   two studies, and neither of them is

16   statistically significant, right?

17        A    Sure.

18        Q    And then for esophagus, there are

19   four studies, and three out of four are not

20   statistically significant?

21        A    Sure.  I'm wanting to say "so

22   what," but I'm not allowed to do that, so I

23   won't.

24        Q    So the Zheng study that you looked

25   at, that was the only study in your report

Page 195

1    that involved NDEA, correct?

2         A    That is correct.

3                   So that was the only study

4    that I had that quantified an NDEA of that

5    size.

6         Q    Did you look for any additional

7    NDEA dietary studies outside of what you were

8    provided by counsel?

9         A    Well, that goes back to a

10   conversation we had earlier.

11                  I started with the -- you

12   know, the studies that came out of

13   Dr. Etminan's search, and I did look at

14   references in those papers to see if there

15   was anything that was not included in that

16   set, and that would have included NDEA.

17        Q    Just so we can get -- take a look

18   at that.

19                  MS. LOCKARD:  So we'll mark

20   this as 20.

21                  (Exhibit 20 marked for

22   identification.)

23   BY MS. LOCKARD:

24        Q    So this, I believe, is the Zheng

25   paper, which is the NDEA paper?

Page 196

1          A    It has both.

2          Q    And it has both.

3                      But it's the only paper that

4      addresses NDEA in your file, correct?

5          A    Is that a true statement?  It might

6      be.  It's the only one that quantified --

7      quantifies NDEA and the effect of it.

8          Q    Well, it's the only paper

9      addressing NDEA that you relied on in your

10     expert report, right?

11                      MR. NIGH:  Object to form.

12         A    I think that's a true statement.

13     It's the only one in Table 1 for sure.

14         Q    So there are a number of references

15     in Zheng at the last two pages, that are

16     additional papers that do address NDEA, I

17     believe.

18         A    So I looked at these.  I don't

19     think any of them quantified the amount of

20     NDEA in their analysis.

21         Q    So did you look at all of the --

22     this is just -- just trying to clarify.

23                      Did you actually look at all

24     of the papers that are listed in the

25     references 1 through 43?

Page 197

1          A    Yes.

2          Q    And there was nothing that you saw,

3     whether it quantified or not, NDEA that you

4     felt that was germane to include it in your

5     report?

6          A    No, hang on.  It wouldn't have been

7     germane if it didn't quantify the amount of

8     NDEA.

9               So I didn't find anything in

10    any of these references -- any of these

11    papers, I didn't find anything in the

12    references that rose to the level, so to

13    speak, that it should be included.

14               Am I being clear?

15         Q    I think so.  I get your point.  I

16    take your point.

17               And Zheng was also the only

18    study you looked at that addressed pancreatic

19    cancer.

20               Is that right?

21         A    Yes.

22         Q    So I notice that in your report,

23    you don't address any studies involving lung

24    cancer.

25               Why is that?

Page 198

1          A     Yes, I do.

2                    MR. NIGH:  Object to form.

3          Q     Excuse me.  Let me strike that.

4     You're right.  I'm not trying to pull a fast

5     one.

6                    You didn't refer to any

7     studies involving breast cancer.  That's

8     correct, right?

9          A     I don't recall there being breast

10    cancer in any of the studies that were --

11    remember, my starting point is Dr. Etminan's,

12    you know, search.  I don't believe there were

13    any breast cancer studies in there that

14    quantified the amount of NDMA or NDEA.

15         Q     There -- the plaintiffs in this

16    case submitted a disclosure of cancers at

17    issue in the litigation.

18                    Have you ever seen that

19    document?

20         A     No.

21         Q     So as you sit here in the

22    deposition, you're not aware of what specific

23    cancers plaintiffs had disclosed as being at

24    issue in the MDL?

25         A     I am not.  I am not familiar with

Page 199

1    that.

2                    MR. NIGH:   Object to form.

3         Q    So the list of cancers that you

4    have in your paper -- gastric esophageal,

5    pancreatic, lung, colorectal, prostate,

6    bladder -- is that a list that was provided

7    to you by counsel when you were asked to look

8    at the case?

9         A    No.  So this is a function of the

10   studies.  Do you know what I mean?

11        Q    I know what you mean, okay.

12                    So plaintiff asked you to look

13   at the studies.  These are the cancers that

14   were addressed in the study?

15        A    Yeah.  And Hidajat has other ones.

16        Q    Okay.  We'll get there.

17                    I guess since your report

18   doesn't address breast cancer, you don't have

19   any opinions about breast cancer or

20   statistical opinions about breast cancer?

21        A    As it relates to contaminant

22   valsartan, no, I do not.

23                    (Pause.)

24        Q    So the Cui paper we were talking

25   about, the Cui paper --

Page 200

1         A     Mm-hmm.

2                    (Pause.)

3         Q     All right.  Let's get that marked,

4    Exhibit 20 [sic].

5                    (Exhibit 21 marked for

6    identification.)

7    BY MS. LOCKARD:

8         Q     All right.  So can you identify 20,

9    Exhibit 20?  Is that the --

10                   MR. NIGH:  21.

11                   MS. LOCKARD:  Got to keep it

12   straight, Steve.

13   BY MS. LOCKARD:

14        Q     So 21, is that the Cui paper?

15        A     Yes.

16        Q     All right.

17                   And this is the version that

18   was in your file, I believe, correct?

19        A     Looks like it.

20        Q     It's in Chinese.

21                   Do you speak or read Chinese?

22        A     No.

23        Q     Okay.

24                   Were you able to get this

25   translated to English?

Page 201

1    A    No, but the abstract is in English.

2    Q    Okay.

3             So in terms of the Cui paper,

4    you only reviewed the abstract?

5    A    No.  The -- there's a table on

6    page 728 that lists the studies that were in

7    the -- in the Cui meta-analysis in English,

8    so to speak.  Names and numbers.

9    Q    Okay.

10            So out of the Cui article, you

11   relied on the abstract and the table --

12   A    Sure.

13   Q    -- on 728?

14   A    Yeah.

15   Q    And that's all you relied on,

16   because the rest of it is in Chinese, so you

17   can't read it, right?

18   A    Correct.

19   Q    Okay.

20            You mentioned that the hazard

21   ratio in Cui was 1.18?

22   A    Right.

23   Q    Where is that on this table, if you

24   can mark it?

25            (Deponent complies.)

Page 202

1          A    Right there.  And --

2                    (Deponent complies.)

3          Q    Okay.

4                    And the statement that you

5     have highlighted states:  "The relationship

6     between NDMA and esophageal cancer was not

7     significant."

8                    Correct?

9          A    Not statistically significant?  Is

10    that what it says?  Okay, not statistically

11    significant is what he means, he/she.

12         Q    You read what it says.  I want to

13    make sure we get it right.

14         A    "The relationship between NDMA and

15    esophageal cancer was not significant

16    (RR=1.18, 95 percent confidence interval .98

17    to 1.41)."

18         Q    Just jumping around a couple of

19    things on your --

20         A    We're done with this?

21         Q    Yeah, we're done with that.  Thank

22    you.

23                    (Pause.)

24         Q    Okay.

25                    On paragraph 25 of your

Page 203

1    report --

2        A    Okay.

3        Q    -- it states:  "The Zhu, et al.,

4    study has the second highest top quintile

5    level of NDMA LCE amongst these studies."

6                    Did you mean to say

7    "quartile"?

8                    (The deponent read the

9    document.)

10       A    That's a reasonable question.  It's

11   a little -- I should have used some other

12   terminology.  It is quintile, because there

13   are quintiles in the Zhu paper.  It's divided

14   into five, you know, to an extent, blocks.

15                   Some of the other ones are

16   quartiles and some of them are tertiles.

17                   So the more correct -- a more

18   accurate phrasing here would be -- "has the

19   second highest top bracket of NDMA LCE

20   amongst all the studies" would have been a

21   more accurate, a -- more correct, arguably.

22   It is a quintile.

23       Q    Do you want to revise it, the same

24   page where you had the earlier revision?

25                   MR. NIGH:  Object to form.

Page 204

1          Q    If it's more accurate.

2          A    Sure.  Quintile with bracket.  I

3     hope that's not an [unintelligible].

4          Q    I think your testimony explained

5     it.

6               On -- I'm going to -- I want

7     to -- let's talk about the occupational study

8     that -- page 8 of your report, evidence from

9     occupational study.

10              Hidajat was the only

11    occupational study that you considered in

12    your review.

13         A    Correct.

14         Q    Okay.

15              And so, again, the Hidajat was

16    one that was in Dr. Etminan's set, right?

17         A    Sure.

18         Q    Okay.

19              And you didn't do any

20    additional occupational study/research to

21    identify any other articles?

22         A    Other than as we talked about,

23    looking at references in these papers.

24         Q    Did you look at the references in

25    Hidajat?

Page 205

1          A    Yes.

2          Q    But you didn't rely on any of those

3    references in forming your opinion in this

4    expert report?

5          A    No, because none of them quantified

6    the amount of NDMA.

7                    (Exhibit 26 marked for

8    identification.)

9    BY MS. LOCKARD:

10         Q    And so based on the Galer paper,

11   which was Exhibit 26, you assumed a standard

12   measure that the average worker breathed a

13   certain amount per day.

14                    Is that correct?

15         A    Sure.

16         Q    And then it looks like you also

17   assumed the air contained a certain amount of

18   the impurity?

19                    MR. NIGH:  Object to form.

20         A    I didn't assume that.  That comes

21   from Hidajat.

22         Q    And in rendering your opinion,

23   though, you assumed that the exposure type

24   between inhalation and ingestion were

25   similar?

Page 206

1          A    Well, specifically, I assumed,

2    because Dr. Panigrahy told me that they

3    have -- they are similarly carcinogenic via

4    either route.

5          Q    You have no basis for offering that

6    opinion that they are actually similar via

7    either route, right?

8               MR. NIGH:  Object to form.

9          A    I have a basis.  My basis is what

10   Dr. Panigrahy told me, but it's outside the

11   area of my scope and my expertise.

12         Q    I assume you don't know how NDMA or

13   NDEA are metabolized in the body.

14               Is that also outside of your

15   expertise?

16         A    That is outside my expertise.

17         Q    And in terms of any opinions about

18   how NDMA or NDEA affect different organ

19   systems, is that also outside of your

20   expertise?

21               MR. NIGH:  Object to form.

22         A    Yes, that's outside my area of

23   expertise.

24         Q    In paragraph 34 --

25         A    Okay.

Page 207

1        Q    -- so you state, "Per Hidajat, et

2    al., cumulative exposure to greater than

3    7,514 micrograms NDMA statistically

4    significantly increases one's risk of

5    developing the following cancers:  Bladder,

6    lung, stomach, multiple myeloma, esophageal,

7    prostate and prostate."

8                    So is there -- is that an

9    error?  Should that not be "prostate" twice?

10       A    Oh, my goodness.  Ha, ha, indeed.

11       Q    Okay.

12       A    Yes.

13       Q    What should be substituted there?

14                    (The deponent read the

15   document.)

16       A    Pancreas.  Good catch.  You can

17   read it off -- the previous page you can see

18   and read it off the table.

19       Q    Will you highlight that too for me,

20   sir?

21                    (Deponent complies.)

22       Q    Exhibit -- I'll need to get that

23   one back from you, because that will be an

24   original.

25                    Your report in paragraph 35

Page 208

1    states that:  "Based on valsartan dosing, the

2    levels of the NDMA reported in contaminated

3    valsartan and the time frame over which the

4    contamination occurred, it is scientifically

5    plausible that users of contaminated

6    valsartan could develop cancer."

7              My question is, what do you

8    mean by scientifically plausible?

9        A     I mean -- you know, I studied

10   across a variety of dietary studies, and

11   significant occupational study, and the

12   association between certain amounts of

13   cumulative exposure to NDMA and cancer

14   outcomes, and, you know, in many cases, there

15   are statistically significant associations,

16   you know, between them.

17              And so, you know, if indeed

18   these levels of NDMA -- in these studies if

19   indeed they cause cancer, this is exactly

20   what you'd expect to see.  These kinds of

21   associations are exactly what you'd expect to

22   see.

23              And based on this analysis, it

24   seems entirely plausible to me that user --

25   based on what I know about the contamination

Page 209

1      levels in valsartan, it's entirely plausible

2      to me that the contaminated valsartan --

3      those folks could have developed -- the folks

4      that took contaminated valsartan could have

5      developed cancer.

6          Q    But you cannot offer to any

7      reasonable degree of scientific certainty

8      that people who took that valsartan with the

9      nitrosamine impurity over the time frame you

10     assume developed cancer as a result of taking

11     valsartan?

12                  MR. NIGH:  Object to form.

13         A    My opinion is not -- is not a

14     causal opinion.  I'm not offering an opinion

15     the contaminated valsartan caused the cancer.

16                  I'm -- statistical analysis is

17     entirely consistent with that proposition.

18         Q    So the takeaway is that your

19     statistical analysis of the studies relied on

20     by Etminan are -- is consistent with

21     Etminan's opinion that valsartan impurity

22     caused cancer.

23                  Is that right?

24                  MR. NIGH:  Object to form.

25         A    Certainly.  Yeah.  It is consistent

Page 210

1    with that opinion.  My analysis is consistent

2    with that opinion.

3         Q    And your opinion hinders on the

4    opinion of Dr. Etminan both in terms of

5    general causation and the selection of his

6    papers?

7         A    No.

8                   MR. NIGH:  Object to form.

9         A    So my -- nothing in here depends on

10   his causal -- his opinion about causation.

11   Nothing in here depends on that.

12        Q    Well, it depends on the papers that

13   he told you to review, though, doesn't it?

14                  MR. NIGH:  Object to form.

15        A    So he did a search.  I took that as

16   my starting point.  I took that list of

17   studies as my -- as my starting point.  I

18   might have expanded it.

19                  As it turned out, I didn't

20   find anything beyond that.  So, yeah, in that

21   sense I'm relying on his list of studies.  It

22   wasn't my starting point.

23        Q    Is "scientifically plausible" a

24   term that you use or that is generally

25   accepted in your practice as a statistician?

Page 211

1          A    Sure.  Yeah.

2          Q    Do you use that in your papers?

3          A    Oh, I would guess so.  Now you're

4    going to ask me to point to a paper where I

5    used it, and I'm not able to do that sitting

6    here, but I imagine I have used that.

7          Q    And you -- in this case, you did

8    not do a Bradford Hill analysis?

9          A    No.

10         Q    You weren't asked to do that?

11         A    Did you know "Bradford" was his

12   middle name?

13         Q    I did not know that.

14         A    So strictly speaking, it should be

15   a Hill analysis, or Austin Bradford Hill

16   analysis.

17         Q    That's less flashy.

18              THE DEPONENT:  Did you know

19   that?

20              MR. NIGH:  I've heard the name

21   referenced.

22   BY MS. LOCKARD:

23         Q    So the time frame that you're

24   assuming here in paragraph 35 is -- is what?

25              You're saying based on the

Page 212

1      time frame over which the contamination

2      occurred.

3                      What's the time frame that

4      you're assuming in paragraph 35?

5                      MR. NIGH:  Object to form.

6          A    I don't know.  I don't have any

7      data on this topic.  But as I understand it,

8      in some cases people were consuming these

9      tablets for years, these contaminated tablets

10     for years.

11                     That's my understanding.

12         Q    But you don't know how many

13     years --

14         A    I don't.  But years -- small number

15     of years is enough to get to the levels in

16     some of these studies.  That is my -- I don't

17     know the exact number of years.  But in my

18     report, I am offering an opinion about the --

19     it's a small -- small number of years at,

20     say, 20 milligrams, 20 micrograms a day and

21     will get you to the levels that are

22     problematic in -- in the dietary studies or

23     in Hidajat.

24         Q    What would 20 micrograms of NDMA

25     daily for a year be in terms of the lifetime

Page 213

1    cumulative exposure?

2                    MR. NIGH:  Object to form.

3        A    That doesn't make any sense.  You

4    said take what -- taking that much per day

5    for a year, you mean for --

6        Q    The 20-microgram daily dose for a

7    year, one year, what would that be in terms

8    of the lifetime cumulative exposure?

9                Can you calculate that?

10       A    Depends on the lifetime.  So it's

11   20 micrograms times 365 days, times the

12   numbers of years in the lifetime, but you'll

13   have to tell me what you want to assume.

14               (Pause.)

15       Q    So we talked a lot about

16   statistical significance, but what is the

17   definition of "statistically significant"?

18       A    So a statistical test is --

19   produces a statistically significant result

20   from the p-values less than .05.

21       Q    And do you understand the concept

22   of "relative risk" in epidemiology?

23       A    I do.

24       Q    If the relative risk was below 2.0,

25   would you consider that to be statistically

Page 214

1      significant?

2           A    You didn't give me a p-value, so

3      you --

4           Q    If the paper doesn't reach a

5      95 percent confidence interval, would you

6      consider it to be statistically significant?

7           A    Try again.

8                     MR. NIGH:  Object to form.

9           A    Try again.

10                    If the -- give -- can you be

11     more specific?  A paper reports a relative --

12     an estimated relative risk of 2.0?

13          Q    Mm-hmm.

14          A    What's the confidence interval?

15          Q    95 percent.

16          A    From what to what?

17          Q    I don't have that factor.

18          A    Well, then I can't answer the

19     question.

20                    (Discussion off the record.)

21                    THE VIDEOGRAPHER:  The time is

22     2:35.  We're off the record.

23                    (Recess.)

24                    THE VIDEOGRAPHER:  The time is

25     2:50.  We're back on the record.

Page 215

1                      MR. NIGH:  As we're back on

2       the record, I have a couple of things.  First

3       off, Dr. Madigan said something off the

4       record I think was important for him to say

5       on the record.

6                      THE DEPONENT:  Right.

7                      So we talked about -- and I think

8       we're about to talk again, about my,

9       quote/unquote, file, and that's everything I had

10      stored that was in -- you know, on my laptop.

11                     But just in case there's any

12      ambiguity, there are many other things I

13      looked at, some of which we've already

14      touched on.

15                     I looked at things when I sought

16      to update the Song meta-analysis.  I looked at

17      the table of the references in Dr. Etminan's

18      report.  I looked at all of those.  I looked at

19      the references in the studies to see were there

20      any other things that were relevant.

21                     So I -- just so we're on the same

22      page, these are thing I kept, but it is

23      absolutely not the totality of what I looked at.

24                     MR. NIGH:  And then the second

25      thing is, I just wanted to make sure -- clear

Page 216

1    that there isn't any undisclosed party that's

2    reviewing either the realtime or watching the

3    Zoom conference call.

4                        If anybody is not a party, I

5    think that's -- I think that's improper given

6    our deposition protocol to be viewing the

7    realtime transcript and/or be watching the Zoom

8    conference call, you know, without being

9    disclosed.

10                       MS. LOCKARD:  Do we have

11   reason to think someone is doing either of

12   those?

13                       MR. NIGH:  I do.  But as of

14   right now, I'm going to just put on if

15   anybody is not a party, I think that's

16   improper given our deposition protocol to be

17   viewing realtime transcripts or be watching

18   the Zoom conference call without being

19   disclosed.

20                       MS. LOCKARD:  Let's go off the

21   record for a second.  Off the record, please.

22                       THE VIDEOGRAPHER:  The time is

23   2:52.  We're off the record.

24                       (Recess.)

25                       THE VIDEOGRAPHER:  The time is

Page 217

1    2:55.  We're back on the record.

2    BY MS. LOCKARD:

3        Q    Okay.  All right.

4                Dr. Madigan, so right before

5    we had talked about some of your materials

6    that were in your pile, and I understand your

7    testimony that you may have looked at things

8    or considered them that did not make it into

9    the file, but just for clarity's sake, if it

10   is something that you relied upon in

11   rendering your opinions, it needs to be

12   disclosed.

13               And my -- is it fair to assume

14   you have disclosed either in your report or

15   in your file anything that you relied upon?

16       A    Yes, that's the intention.  It's

17   just it's not everything I looked at.

18       Q    Okay.

19               There are a few things in

20   there I wanted to ask you about.  There's a

21   Haller, et al., Applying new competing risks

22   regression models: an overview.

23       A    That's a statistical paper that is

24   referenced in Hidajat.  They reference that

25   as a source for their method, so I pulled

Page 218

1    that paper and looked at it.

2         Q    And many of these made these

3    references in the papers you reviewed.

4                   Helmut, Relevance of

5    nitrosamines to human cancer.

6         A    No simple way to do this.

7                   (Pause.)

8         A    I don't -- I see it here.  I don't

9    recall.  I don't think I referenced it.  If I

10   didn't reference it in the report, I'm not

11   relying on it.

12        Q    The Straif paper, Exposure to high

13   concentrations of nitrosamines and cancer

14   mortality among a cohort of rubber workers.

15        A    So that's an occupational study

16   that I at one point thought might be

17   relevant, but it doesn't actually quantify

18   amounts of NDMA and NDEA.

19        Q    Did you talk to Dr. Etminan about

20   this paper?

21        A    I didn't talk to Dr. Etminan about

22   anything.  I've never spoken to him.

23        Q    Okay.

24                   Did you talk with

25   Dr. Panigrahy about this paper?

Page 219

1          A    No.

2          Q    What about -- there were some

3     supplementary materials and responses on the

4     Hidajat paper, including response by Sorahan.

5                    Have you reviewed those?

6          A    I did look at this.  It's familiar,

7     but I don't -- I'm certainly not relying on

8     it.

9          Q    Was there anything there germane to

10    your review that you recall?

11         A    Not that I recall.

12         Q    The Mitacek Geographic distribution

13    of liver and stomach cancers in Thailand in

14    relation to estimated dietary intake of

15    nitrate, nitrite and nitrosodimethylamine.

16         A    So same answer as for Straif.  It's

17    a study that I thought might be germane, but

18    in fact it isn't.  Doesn't quantify the

19    amount of NDMA or NDEA.

20         Q    What about the Prieto, Effects on

21    4,080 rats of chronic ingestion of

22    N-nitrosodimethylamine and

23    N-nitrosodiethylamine, a detailed

24    dose-response study?

25         A    So that's a famous animal study to

Page 220

1    do with the effects of NDEA and NDMA on

2    cancer, so that's -- that's a paper -- excuse

3    me -- I just -- I remember reading, you know,

4    as -- by way of background early on in my

5    work in this case.

6         Q    Not one of the papers you were

7    asked to review by counsel?

8         A    Not that I -- not that I recall.

9         Q    And nothing in there you found

10    germane to include in your report?

11         A    That's correct.

12         Q    Do you recall the conclusion of

13    that paper?

14         A    I don't have it right in front of

15    me.  You know, they -- they found a striking

16    relationship between the dose of these -- of

17    NDEA and NDMA and the occurrence of cancer in

18    rats.

19         Q    Do you have any opinions about the

20    extrapolating animal study data to humans?

21                   MR. NIGH:  Object to form.

22         Q    I mean that you intend to offer in

23    this case.

24         A    There we go.  No, I do not.  I do

25    have opinions, but I do not intend to offer

Page 221

1    opinions in this particular case on that

2    topic.

3         Q    And then there's -- I think Straif

4    is in here twice.

5                   What about -- there's a Dich,

6    et al., Dietary intakes of nitrite --

7    nitrate, nitrite and NDMA in the Finnish

8    Mobile Clinic Health Examination Survey.

9                   Do you recall that paper?

10        A    So this is -- my memory is -- I

11   believe this is correct -- that this is a

12   paper describing the same cohort as the Knekt

13   paper, which is one of the ones I do include.

14                  So I think I was looking to

15   this paper for information about average age,

16   so it's the same cohort.

17                  That's my memory.

18        Q    Do you know if you applied any

19   average-age information that's in the Dich

20   paper?

21        A    I don't think I did.  I don't

22   believe I did.  So I'm not relying on it.

23        Q    And Tricker, et al., Carcinogenic

24   N-nitrosamines in the diet: occurrence,

25   formation, mechanisms and carcinogenic --

Page 222

1          A    So I think --

2          Q    -- potential.

3          A    Sorry.  I think -- I'm not relying

4     on it.  I think it's another one of these

5     papers that I looked at early on, but -- you

6     know, by way of background.

7          Q    One additional item that was in

8     your file was a signature page from a

9     protective order that was entered in the

10    case.

11         A    Right.

12         Q    Do you recall seeing this?

13         A    Yes.

14         Q    We'll get that marked as an

15    exhibit.

16              MS. LOCKARD:  Okay.  We'll

17    mark the Acknowledgment and Agreement to be

18    Bound by Protective Order that was in your

19    file as Exhibit 22.

20         A    Okay.

21              (Exhibit 22 marked for

22    identification.)

23    BY MS. LOCKARD:

24         Q    Did you see anything else in the

25    stack that we haven't talked about today?  I

Page 223

1      know that's a terrible question.

2           A    I think everything here is either

3      cited in my report or we have just talked

4      about it.

5           Q    Okay.

6           A    Did you have a question about the

7      Exhibit 22?

8           Q    Yes.  Okay.  I just want to let you

9      finish what you're doing if you --

10          A    I was looking for that in here,

11     actually.

12          Q    Oh.

13                    So do you know what this is?

14          A    Yes.

15          Q    What is it?

16          A    It's a -- it binds me -- I signed

17     it.  It binds me to hold any information that

18     I received in confidence.

19          Q    Okay.

20                    So you're familiar with these

21     types of protective orders from your

22     litigation work, I presume?

23          A    Yes.

24          Q    Okay.

25                    So -- but the version that was

Page 224

1    in your file is not signed.  Do you know if

2    you ever signed this?

3           A    I did, yeah.

4           Q    Okay.

5           A    This is the one that was just sent

6    to me.  I presume I signed it, scanned it and

7    sent it back.

8           Q    Okay.

9                   In any event, you've reviewed

10   it, and you agree to be bound by the terms of

11   the protective order, right?

12          A    Yes.

13          Q    So what are the most -- what are

14   some of the respected professional societies

15   or professional organizations in your field?

16          A    American Statistical Association,

17   Institute of Mathematical Statistics.

18   They're the two primary ones in statistics.

19   Then -- and there are more specialized

20   societies.

21                   There's a society related to

22   Bayesian analysis.  There's a biometrics

23   society related more to biostatistics kinds

24   of things.

25                   Have I told you enough?

Page 225

1          Q    Are you a member of the American

2    Statistical Association?

3          A    Probably.

4          Q    Are you a member -- well, let me

5    ask it this way -- and we can take a look at

6    your CV as well.

7          A    That wouldn't be on my CV.

8          Q    You don't have your --

9          A    Membership.

10         Q    -- memberships --

11              Why not?

12         A    I don't -- just doesn't seem very

13   interesting to put on my CV.  I have

14   fellowships.  I'm a fellow of a number of

15   organizations.  That's an honorary thing.

16         Q    But in terms of, you know,

17   membership of some professional organizations

18   like the American Statistical Association,

19   that's not something you would put on your

20   CV?

21         A    No.

22         Q    Okay.

23              Did you review any of the

24   defendants' expert reports?

25         A    No.

Page 226

```
 1          Q    So do you know who the defendants'
 2      experts are?
 3          A    No.
 4          Q    Do you intend to review any of
 5      their expert reports?
 6                    MR. NIGH:  Object to form.
 7          A    I will if I'm asked to.
 8          Q    Do you have a copy of your CV?
 9          A    Yes, I do.
10          Q    Okay.
11                    So I noticed you were trained
12      at Trinity College in Dublin, correct?
13          A    Right.
14          Q    That's a nice place.  I've been
15      there to see the Book of Kells.
16          A    Good.
17          Q    Were you -- were you born and
18      raised in Ireland?
19          A    Yes.
20          Q    When did you move to the US?
21          A    1990.
22          Q    Are you a citizen of Ireland?
23          A    Yes, and the US.
24          Q    Dual citizenship?
25          A    Yes.
```

Page 227

```
 1        Q    Have you ever been terminated or
 2   asked to leave a position?
 3        A    No, never.
 4        Q    You mentioned that you're not doing
 5   any classroom teaching currently.
 6              Is that right?
 7        A    I didn't in the last academic year.
 8   I may -- I'm not going to teach a full course
 9   this year.  I may do some guest lectures.
10        Q    What -- in the past five years or
11   so, what courses have you taught?
12        A    It's on my CV.
13        Q    Okay.
14              Maybe just if you could direct
15   me to --
16        A    Page 36.
17        Q    I see.
18              So under "Teaching" on page 36
19   at Columbia, Rutgers and University of
20   Washington --
21        A    Right.
22        Q    -- those were all the courses you
23   taught?
24        A    Full courses, you know, where I was
25   instructor of record.
```

Page 228

1              Are you with me?  As against,

2     you know, doing a week of lectures for

3     some -- in a class.  I wouldn't put that

4     here.

5          Q    Understood.

6               Why are you no longer doing

7     classroom teaching?

8          A    Because I'm the provost.

9          Q    Just time commitment?

10         A    Yeah.

11         Q    So I can't help but notice, none of

12    these courses have "epidemiology" in the

13    title.

14              Is that correct?

15         A    That appears to be correct, but

16    there's epidemiology in the content of many

17    of these.

18         Q    Is there an epidemiology department

19    at your institution?

20         A    No.  Just to be clear, not at my

21    current institution.  There is one at

22    Columbia.

23         Q    So not at Northeastern?

24         A    Correct.  It's the statistics

25    department at Northeastern.

Page 229

1          Q    And your current title, one of

2     them, is provost at Northeastern, and the

3     other title is professor of statistics?

4          A    Right.

5          Q    You're not a professor of

6     epidemiology, correct?

7          A    I am not.

8          Q    Are you a member of any

9     professional organizations in the

10    epidemiology realm?

11         A    I don't think so.  I don't know

12    what I'm a member of.  I don't really keep

13    track of it.

14         Q    Are you -- do you have any degrees

15    in epidemiology?

16         A    I do not.

17         Q    Any certifications in epidemiology?

18         A    I'm not entirely sure what that is,

19    but I don't -- I don't think I do.

20         Q    Have you ever had any of your

21    epidemiology opinions excluded by any court?

22         A    I had opinions excluded in a case

23    related to Accutane some years ago that might

24    be called epidemiology.

25         Q    I think you would agree you're not

Page 230

1    qualified to offer any clinical or medical

2    opinions, correct?

3                    MR. NIGH:  Object to form.

4        A    "Clinical" is an awfully broad

5    term.  I'm not a medical expert.  You know,

6    does my work have clinical ramifications and

7    clinical consequences from time to time?

8    Yes.

9        Q    But you don't intend to offer any

10   clinical opinions in this case --

11                   MR. NIGH:  Object to form.

12       Q    -- outside of what's in the report?

13       A    I do not.  Outside of what's in my

14   report, I do not.

15       Q    So you cannot -- you don't diagnose

16   or treat cancer, right?

17       A    Correct.

18       Q    You don't have any and won't have

19   any specific causation opinions in terms of

20   whether nitrosamines in valsartan caused any

21   particular patient's cancer?

22       A    Correct.

23       Q    I assume you don't have any intent

24   to offer opinions about any individual

25   plaintiffs' damages in this case?

Page 231

1          A    I do not.

2          Q    And you're not a pathologist,

3     oncologist or hematologist, right?

4          A    Correct.

5          Q    And you're not a cell biology

6     expert?

7          A    I am not.

8          Q    You're not a toxicologist?

9          A    I am not.

10         Q    And you are not intending to give

11    toxicology opinions in this case, correct?

12         A    Correct.

13                   MR. NIGH:  Object to form.

14         Q    And you're not a pharmacologist or

15    a pharmacokinetics expert, correct?

16         A    Correct.

17         Q    And you're not qualified to offer

18    opinions about how nitrosamines are absorbed

19    in the human body?  Is that true?

20         A    That's true.

21         Q    Now, you -- on your CV, you had

22    some involvement in FDA advisory -- in an FDA

23    advisory committee.

24         A    Yes.

25         Q    What was the role that you served

Page 232

1    on the FDA advisory committee?

2         A    I was a voting member.

3         Q    Was it an advisory committee on a

4    particular issue?

5         A    So it's a -- I served a term on the

6    Drug Safety and Risk Management Advisory

7    Committee.  During that three-year term, you

8    know, I was involved in many, many different,

9    you know, cases that came before that

10   committee.

11        Q    None of your involvement with the

12   FDA on any committee has involved

13   nitrosamines.

14             Is that right?

15        A    Probably not.  Not that I can

16   recall, and probably not.

17        Q    In connection with your roles with

18   FDA, none of those involved valsartan either.

19             Is that right?

20        A    Probably not.  It's a matter of

21   public record what came before that

22   committee.  I don't remember anything to do

23   with valsartan.

24        Q    You've never been employed at the

25   FDA, have you?

Page 233

1          A     Not really.  Strictly speaking, I

2     was something called an SGE, a special

3     government employee.  So when you're on one

4     of these committees, you're actually

5     technically an employee, but not -- not in

6     any normal sense of the word.

7          Q     Okay.

8                So I assume you're not

9     planning to offer any opinion about CGMPs or

10    quality systems?

11         A     I am not.

12         Q     And no opinions about the labeling

13    of the valsartan?  Adequacy of the labeling,

14    for example?

15         A     I do not intend to offer such

16    opinions.

17         Q     And you haven't reviewed any

18    labeling for valsartan, have you?

19         A     I have not.

20         Q     And you're not offering any

21    opinions about regulatory compliance or FDA

22    rules and regulations, correct?

23         A     In this case, no, I'm not.

24                (Pause.)

25         Q     And just to be sure, you don't

Page 234

1    intend to offer any opinions about liability

2    in this case in terms of what the

3    manufacturers or other defendants did or

4    should have done?

5                    MR. NIGH:  Object to form.

6         A    I don't believe so.

7         Q    You won't come testify about

8    standard of care applicable to manufacturers,

9    right?

10                   MR. NIGH:  Object to form.

11        A    I don't think so.

12        Q    Let me show you what I've marked as

13   Exhibit 23 and 24.  I'll get you a copy here.

14                   (Exhibit 23 marked for

15   identification.)

16                   (Exhibit 24 marked for

17   identification.)

18   BY MS. LOCKARD:

19        Q    Do you recognize either of these

20   documents?

21        A    Sure.

22        Q    What are they?

23        A    One is a paper that was published

24   in The American Statistician, which is a

25   publication of the American Statistical

Page 235

1    Association, and the other looks like a press

2    release related to the same thing.

3        Q    Do you get any publications or

4    guidelines from the ASA, email or in the

5    mail?

6        A    No.

7        Q    Do you know if you would have

8    received the press release?

9        A    I really don't know.

10       Q    Okay.

11            So 23 is the ASA news, and

12   it's entitled "American Statistical

13   Association Releases Statement on Statistical

14   Significance of p-values."

15            And Exhibit 24 is, "The ASA

16   Statement on p-Values:  Context, Process and

17   Purpose."

18            And you -- have you read the

19   statement in its entirety?

20       A    Yes.  Not recently.  It's not fresh

21   in my mind, but...

22       Q    Do you know Dr. Wasserstein and

23   Dr. Lazar?

24       A    Lazar, I do.

25       Q    Were you invited to comment on this

Page 236

1      article or this guideline, rather?

2           A    I don't know.  I don't remember.  I

3      didn't -- you asked was I invited.  It's

4      possible.  I don't remember.

5           Q    So --

6                     (Pause.)

7           Q    So if you turn to, I guess,

8      page 131 at the top?

9           A    Yes.

10          Q    And it says: "ASA Statement on

11     Statistical Significance and P-values," and

12     there's the introduction.

13                     Are you with me?

14          A    Yes.

15          Q    Do you agree with what's in this

16     guideline?

17          A    I can't -- I -- I haven't looked at

18     this in probably five years.  I can't go

19     there unless you give me -- I can read it,

20     but...

21          Q    Let me just -- so I'll pull out a

22     few things.

23                     In the introduction on the

24     second paragraph --

25          A    Okay.

Page 237

1          Q    -- the second line, it says:

2     "While the p-value can be a useful

3     statistical measure, it is commonly misused

4     and misinterpreted."

5                    Do you agree with that

6     statement?

7          A    Yeah, that's not unreasonable.  I

8     don't misuse it or misinterpret it, I should

9     add, but is it, you know, is it misused and

10    misinterpreted sometimes?  Yeah.

11         Q    And it says:  "What is a p-Value?"

12    on point 2.  And this paper says:

13    "Informally, a p-value is the probability

14    under a specified statistical model that a

15    statistical summary of the data (for example,

16    the sample mean difference between two

17    compared groups) would be equal to or more

18    extreme than its observed value."

19                    So is that a reasonable

20    definition of the p-value?

21         A    Yeah, it is informal.  It's not

22    mathematically precise, but it's not

23    unreasonable.

24         Q    Okay.

25                    And under Principles, it says,

Page 238

1    the first one:  "P-values can indicate how

2    incompatible the data are with a specified

3    statistical model."

4                    Do you agree with that?

5        A    Yeah.

6        Q    No. 2, the second principle is:

7    "P-values do not measure the probability that

8    the studied hypothesis is true or the

9    probability that the data were produced by

10   random chance alone."

11                   Do you agree with that?

12       A    That's very ambiguous.  P-values do

13   not measure the probability that the studied

14   hypothesis is true.  I don't -- "studied

15   hypothesis" is kind of an ambiguous term

16   there.

17                   If you mean -- if by that they

18   mean a null hypothesis -- actually, I think

19   they do.  If you interpret that to mean the

20   null hypothesis, then I certainly agree.

21                   The probability that the data

22   were produced by random chance alone, I don't

23   exactly know what that means, but that's not

24   what a p-value is.

25       Q    Principle No. 3 says:  "Scientific

Page 239

1        conclusions in business or policy decisions

2        should not be based only on whether a p-value

3        passes a specific threshold."

4                        Do you agree with that?

5            A    I do.

6            Q    No. 4 principle states:  "Proper

7        inference requires full reporting and

8        transparency."

9                        Do you agree with that?

10           A    Who could disagree with it?  But I

11       don't know what it means exactly.

12           Q    Seems vague, I guess.

13                        All right.  No. 4 --

14           A    5.

15           Q    Excuse me.  Start over.

16                        Principle No. 5:  "A p-value

17       or statistical significance does not measure

18       the size of an effect or the importance of a

19       result."

20                        Do you agree with that?

21           A    I do.

22           Q    No. 6:  "By itself, a P-value does

23       not provide a good measure of evidence

24       regarding a model or a hypothesis."

25                        Do you agree with that?

Page 240

1          A    What I'm stumbling over there is

2     "good."  What does that mean?  It is what it

3     is.  It measures -- it's a measure of the

4     strength of the evidence against the null

5     hypothesis in a particular sense, so it's

6     a -- it's kind of too vague for me to just

7     give you a blanket "yes, I agree," or "no, I

8     don't."

9          Q    Okay.

10                    And then the final statement

11     in the conclusion:  "No single index should

12     substitute for scientific reasoning."

13          A    It's motherhood and apple pie,

14     sure.

15          Q    Everybody would agree with that,

16     right?

17          A    You couldn't disagree with it.  I

18     don't know what it means exactly.

19          Q    But the point is, nobody would

20     disagree that no single index should

21     substitute for scientific reasoning, right?

22          A    Sure.  I don't know what an index

23     is, but yeah.

24          Q    Does -- does your university know

25     that you're serving as an expert witness in

Page 241

1       this case?

2           A    Yes.

3           Q    Do you have to report that at

4       Northeastern?

5           A    I'm supposed to disclose outside

6       activities, which I do all the time.

7           Q    Do they provide any input into what

8       you can review or not?

9           A    No, absolutely not.

10          Q    Do they do any peer review of your

11      expert reports?

12          A    No.

13          Q    Has anybody at the university ever

14      asked to approve any of your opinions in an

15      expert report?

16          A    No.  They published an article

17      about my work.  Just saying.

18          Q    The university did?

19          A    Yes.

20          Q    Based on an expert report?

21          A    No, no, no, no, no, just in

22      general, in the kind of university magazine.

23          Q    I think you -- when I asked you

24      about any exclusions of your testimony, you

25      said you recalled a court order excluding

Page 242

1    some testimony in the Accutane litigation?

2        A    You asked a narrower question, but

3    yes.

4        Q    And the Accutane litigation was --

5    that was a judge in New Jersey state court?

6        A    I can't remember what court it was.

7    It was in -- physically in New Jersey, that

8    is true.

9        Q    So at least one judge in New Jersey

10   excluded your opinions on general causation.

11              Is that right?

12       A    No, no.  He excluded specific

13   opinions related to analysis I had done.  I

14   don't -- my memory is it was nothing to do

15   with general causation.

16       Q    Did you read the judge's opinion?

17       A    Sure did.

18       Q    Did you agree with it?

19       A    No.  But I did agree wholeheartedly

20   with the appellate court who overturned the

21   judge's ruling and who said things like --

22   that my opinions weren't consistent and --

23   I'd be happy to read you --

24       Q    That's okay.  We have a full file.

25   Got a lot of paper.

Page 243

1                      And did you have some of your
2        testimony excluded in the Vioxx litigation?
3            A    Not that I can recall.  Maybe I --
4                      MR. NIGH:  Object to form.
5            A    Maybe -- in some litigation, maybe
6        twice or three times, medical opinions were
7        excluded, which I contend I was not offering
8        in the first place.
9                      Maybe that's what happened in
10       Vioxx, but I don't remember.
11           Q    All right.
12                     And do you recall having your
13       opinion excluded in the Abilify litigation?
14                     MR. NIGH:  Object to form.
15           A    No.  So it was limited.  So again,
16       again, it was -- my memory of that one was
17       that it was to do with the judge felt that
18       I -- something I said was a medical opinion.
19                     I was told I cannot offer
20       medical opinions.
21           Q    The judge said you cannot offer
22       medical or scientific causation opinions in
23       Abilify.
24                     Isn't that right?
25                     MR. NIGH:  Object to form.

Page 244

1          A    I don't remember that.  Maybe

2     you've got it in front of you, but that's

3     fine.

4          Q    This is the order I have.  We can

5     get it marked as Exhibit No. 2- -- 24 [sic].

6                    (Exhibit 25 marked for

7     identification.)

8     BY MS. LOCKARD:

9          Q    And I'll just give you a moment to

10    look at that.

11                    MR. NIGH:  You don't have an

12    extra copy of this one either?

13                    MS. LOCKARD:  I don't think

14    this is the same.  It's not.  I don't have an

15    extra copy.

16                    Do you have access to the -- he's

17    going to load it up on the -- on the Zoom if you

18    have access to the exhibits that way.  Abilify.

19         A    I can't look at a document this

20    large in realtime.  What do you want to do

21    here?  And it's 150 pages.  I don't remember.

22         Q    Okay.  I'll take it back.

23         A    Okay.

24         Q    I'll just ask questions about it.

25                    (Pause.)

Page 245

1          Q    Okay.

2                    MS. LOCKARD:  Correction, the

3     exhibit is No. 25.

4                    (Pause.)

5     BY MS. LOCKARD:

6          Q    Do you recall your testimony being

7     excluded earlier this year in the Incretin

8     litigation?

9          A    I do.

10         Q    What was --

11         A    This year or last year?

12         Q    I have an order looking like

13    March 9, 2021.

14         A    Okay.

15         Q    Does that sound right?

16         A    No, but maybe.  I could be wrong

17    about that.

18         Q    Do you recall the basis for

19    excluding your testimony in that litigation?

20         A    I do.

21         Q    What was it?

22         A    Two things:  One, the lawyers that

23    I had worked with filed a report that I wrote

24    in 2015 unbeknownst to me, and the judge

25    excluded it because there are new data.

Page 246

1    Indeed, there are.

2                    And then the second one was I

3    did a more recent report that was much

4    narrower, and the claim was I used a

5    different methodology that I had used in

6    2015, which is correct, but for -- for very

7    good, solid, scientific reasons, the judge

8    didn't read or didn't understand.

9         Q    So you disagree with that

10   exclusion, I assume?

11        A    Yes.

12                    MR. NIGH:  Object to form.

13        A    Well, yes and no, actually.  The

14   exclusion of the 2015 report I don't

15   necessarily disagree with.

16                    MR. NIGH:  Object to form.

17                    (Counsel conferred.)

18   BY MS. LOCKARD:

19        Q    So Exhibit 25 on page 150, that's

20   Judge Casey Rodgers' order.

21        A    Are you going to give it back to

22   me?

23        Q    Yes, I'm going to --

24        A    Okay, okay.

25        Q    All right.

Page 247

1            The order that I'm reading

2      from, to refresh your recollection,

3      Dr. Madigan, is the court's summary

4      conclusion on the motion to exclude the

5      general causation opinion of David Madigan is

6      that it was due to be granted in part and

7      denied in part.

8            The court went on to say:

9      "Dr. Madigan may not offer an expert opinion

10     on medical causation and also may not testify

11     about the five statistically insignificant

12     p-values he calculated from the clinical

13     trial data."  And then, "In all other

14     respects, his opinion is admissible as to

15     statistics."

16            MR. NIGH:  Objection.

17      A     Okay.

18      Q     So does that refresh your

19     recollection as to the exclusion by the court

20     in that litigation?

21      A     Yes.  So she excluded me from

22     offering medical opinions, and then there

23     were five specific p-values that for some

24     reason she knew more about than I did and

25     decided it shouldn't -- shouldn't be allowed.

Page 248

1          Q    Okay.

2                     So there have been, I believe,

3     two Abilify orders, the Accutane order, the

4     Incretin order.  So that's four that we've

5     discussed that involved the limiting or

6     excluding some or all of your deposition

7     testimony?

8                     MR. NIGH:  Object to form.

9          Q    Is that right?  At least four?

10         A    You just -- yeah, sure.  You

11    mentioned four particular cases where I -- in

12    two cases my opinion was excluded; in two

13    cases my opinion was -- was narrowed.

14    Although I would -- in the Abilify context,

15    it's in a completely insignificant way.

16                     What was the fourth one,

17    actually?  Vioxx?

18         Q    There were two Abilify orders.

19         A    Oh, sorry, two Abilify orders.

20         Q    And are you -- do you recall any

21    other orders from any other judge either

22    excluding or limiting your opinions?

23         A    There are no others where my

24    opinions are excluded.  Limited, I can't be

25    sure.  As I say, I have this memory from time

Page 249

1    to time of being told I can't offer medical

2    opinions, and I don't.

3                    MR. NIGH:  Objection.

4        A    I agree.  I shouldn't offer medical

5    opinions, and I don't.

6        Q    Okay.

7                    Have you ever been convicted

8    of a crime?

9        A    Is this Alice's Restaurant?

10                   No.

11       Q    Surely you've been asked that

12   before in a deposition.  I can't be the

13   first.

14                   (Laughter.)

15       Q    Have you ever filed for bankruptcy?

16       A    No.

17       Q    Do you -- have you told me all the

18   opinions you hold today as they relate to

19   this case?

20                   MR. NIGH:  Object to form.

21       A    No, I have not.  We've -- they're

22   contained in the -- in the report that I

23   have, but I -- we haven't talked about every

24   last little thing in there, I don't think.

25       Q    Okay.  Understood.

Page 250

1            But in terms of what's in your

2      report, is there anything in addition that

3      you need to add, supplement or change in

4      order to complete your opinions in this case?

5          A    Not that I'm aware of.  Actually, I

6      suppose other than the correction that we

7      went over this morning.

8          Q    Okay.

9                Other than the corrected

10     version as it stands today after today's

11     testimony, is there anything else you need to

12     do to change or supplement your report to

13     make it complete?

14         A    I don't believe so.

15                MR. NIGH:  Object to form.

16                (Pause.)

17     BY MS. LOCKARD:

18         Q    My computer keeps freezing on me.

19     I think it's telling me it's time to stop.

20                I'm going to stop here and

21     turn the questioning over to Mr. Trischler or

22     anybody else who has questions.  I may have

23     some additional wrap-up questions once I can

24     get my computer fixed.

25                MR. TRISCHLER:  Okay.  We'll

Page 251

1    go off the record.

2                    THE VIDEOGRAPHER:  The time is

3    3:43.  We're off the record.

4                    (Recess.)

5                    THE VIDEOGRAPHER:  The time is

6    3:48.  We're back on the record.

7

8                    EXAMINATION

9    BY MR. TRISCHLER:

10        Q    Dr. Madigan, good afternoon.

11        A    Hello.

12        Q    I introduced myself to you at the

13   beginning of our session today.  My name is

14   Clem Trischler.  I'm one of the lawyers

15   representing some of the defendants in the

16   valsartan litigation, particularly Mylan

17   Pharmaceuticals.

18                    Okay?

19        A    Okay.

20        Q    I'm going to ask you a few

21   questions.  I'm going to try not to be

22   repetitive.  Ms. Lockard was very -- very

23   thorough in her examination, so there's just

24   a few areas that I'd really like to cover

25   with you.

Page 252

```
 1                     And I guess I'll start when
 2        you were retained in this case.  I understand
 3        from looking at some of your invoices that
 4        were previously marked as exhibits that you
 5        were retained sometime around March of 2020
 6        to provide consulting litigation services for
 7        the plaintiffs in the valsartan litigation,
 8        correct?
 9             A     Yes.
10             Q     And you were contacted by Mr. Nigh
11        or members of his firm, I believe you told
12        us?
13             A     Right.  Yes.
14             Q     And I guess my question was, you
15        were contacted by the plaintiffs' lawyers to
16        work in this case.  You did not seek them
17        out.
18                     Fair to say?
19             A     Correct.
20             Q     And prior to the time you were
21        contacted by the plaintiffs' lawyers in this
22        case, have you ever participated in any
23        epidemiological studies regarding the
24        carcinogenic effects of NDMA?
25             A     No.
```

Page 253

1          Q    Prior to the time you were

2     contacted by the plaintiffs' lawyers in this

3     case, did you ever participate in any

4     epidemiological studies regarding

5     carcinogenic effects of NDEA in humans?

6          A    No.

7          Q    Had you ever -- before you were

8     contacted to serve as an expert witness in

9     this case, had you ever published any papers

10    relating to NDMA or NDEA?

11         A    No.

12         Q    So before Mr. Nigh knocked on your

13    door, had you ever done a statistical

14    analysis to evaluate the strength of

15    association, dose response or increased risk

16    of cancer from exposure to NDEA?

17         A    No, I had not.

18         Q    Before you were contacted to do

19    this work in a litigation context, had you

20    ever done a statistical analysis to evaluate

21    the strength of association, dose response or

22    increased risk of cancer from exposure to

23    NDEA?

24         A    No.

25         Q    You were kind enough to provide us

Page 254

1    with your CV, and I think, if I recall

2    correctly, your CV suggests that you

3    published at least 180 technical papers

4    during the course of your career on issues

5    relating to biostatistics and epidemiology.

6                    Is that fair to say?

7                    MR. NIGH:  Object to form.

8         A    Sure.

9         Q    How many of those 180 papers relate

10   to NDEA?

11        A    Zero, as far as I know.

12        Q    How many --

13        A    Is that the same question I

14   answered a minute ago or am I missing

15   something?

16        Q    Might be.  It's certainly similar.

17   I don't know if it's the same.

18                    How many of those 180 papers

19   relate to NDMA?

20        A    Zero.

21        Q    One of the things that we talked

22   about earlier today was in your report you

23   make reference to the Johnson study.

24                    Do you recall talking about

25   that?

Page 255

1          A    I do.

2          Q    I think it's on page 2 of your

3    report where that reference appears under the

4    Introduction section.

5                    Is that right?

6          A    Right.

7          Q    And I think that Johnson paper is

8    entitled "Permitted Daily Exposure Limits for

9    Nitrosamines."

10                   Do I have that right?

11         A    Yes.

12         Q    And you -- in your report, you do

13   not offer any criticisms of the Johnson

14   paper, correct?

15         A    I mean, not -- not directly, but my

16   table has, you know, statistically

17   significant increased risks at much lower

18   doses than in Johnson, so implicitly there's

19   a criticism of Johnson.

20         Q    Do you state any criticisms of

21   Johnson's report in -- of Johnson's paper in

22   your report?

23         A    No, I do not.

24                   MR. NIGH:  Objection.

25         Q    Do you take any issue with his

Page 256

1      methodology anywhere in your report?

2          A    It's outside of scope of my

3      expertise.  So let me answer your question.

4      No, I do not.  It's outside the scope of my

5      expertise.  I wouldn't.

6          Q    And do you take -- do you -- in

7      your report that you wrote in this case, did

8      you dispute any of the conclusions that

9      Johnson and his colleagues reached in their

10     paper?

11                 MR. NIGH:  Object to form.

12         A    No.  Nor would I.  It's outside the

13     scope of my expertise.

14         Q    In fact, in the report all you did

15     was to cite to the conclusions that Johnson

16     and his colleagues reached regarding safe

17     exposure levels to both NDEA and NDMA,

18     correct?

19                 MR. NIGH:  Object to form.

20         A    I think I'm agreeing with you.  I

21     just noted I had seen that.  I just noted it

22     here.  I don't agree with it in the sense

23     that I told you.

24                 There are statistically

25     significant increased risks at much lower

Page 257

1    doses in what I looked at.

2         Q    Based on your review of other

3    papers that were provided to you by one of

4    the plaintiffs' experts --

5                   MR. NIGH:   Object to form.

6         Q    -- right?

7         A    No.   So Dr. Etminan didn't provide

8    me with the papers.   I started with a list of

9    papers that were pursuant to a search that he

10   did.

11                  So I'm just taking issue

12   with -- the way you phrased it was he

13   provide -- he didn't provide me the papers.

14        Q    He provided you with the list of

15   papers to --

16        A    Yes, that I started with.

17        Q    Started with.   Understood.   Thank

18   you.

19                  But what you actually write in

20   your report as it relates to the Johnson

21   study is that that study suggests that NDMA

22   levels as high as 6.2 micrograms per day

23   could be safe, correct?

24                  MR. NIGH:   Objection.

25        A    No.   I said more recently they have

Page 258

1    suggested -- somebody else has suggested

2    that.  I'm not -- I'm -- you know, I -- I

3    am --

4                   It's outside my expertise

5    to -- to provide a critique, you know, of

6    that paper.  What I can do is contrast with

7    the analysis I did.

8         Q    Well, I'm just trying to -- do

9    these words appear in your report:  Johnson,

10   et al. -- "Johnson, et al., have suggested

11   that NDMA levels as high as 6.2 micrograms

12   per day could be safe."

13                  Indeed, that was just -- it's

14   a direct quote from their paper.  And if

15   we --

16        A    It's not a direct quote, but

17   it's -- you know, it's implicit -- it's a

18   fact that's lifted from their paper.

19        Q    Okay.

20                  And 6.2 micrograms per day is

21   roughly 6,200 nanograms per day, correct?

22        A    Precisely, yeah.

23        Q    And you also note in your report

24   that Johnson has suggested that NDEA levels

25   as high as 2.2 micrograms per day could be

Page 259

1    safe, correct?

2         A    That's what he -- that's what's in

3    that paper, yes.

4         Q    Which translates to 2,200 nanograms

5    per day?

6         A    Right.

7         Q    And based on -- although you had

8    never done any research of NDEA or NDMA prior

9    to coming to this case, have you learned

10   since that time that nitrosamines are

11   ubiquitous?

12              MR. NIGH:  Object to form.

13        A    No.

14        Q    Do you know -- do you agree based

15   on the research that you've done and the

16   papers that you've read that we're all

17   exposed to nitrosamines on a daily basis?

18        A    Not something I looked at.

19        Q    That's news to you?

20              MR. NIGH:  Object to form.

21        A    I looked at NDMA and NDEA, and I

22   learned that there are certain levels of

23   those substances in foods, so that's what I

24   learned.

25        Q    Okay.

Page 260

1          So you looked at -- you looked

2     at papers from a list given to you by one of

3     the plaintiffs' experts that suggested that

4     there was NDEA and NDMA in certain dietary

5     substances, correct?

6               MR. NIGH:  Object to form.

7          A    Sure.  You're phrasing it in a

8     very, you know -- he did a search.  He

9     searched databases, and I'm -- with certain

10    search criteria and produced a list of

11    papers.

12               I used that as my starting

13    point.

14         Q    Well you said -- in fairness, I

15    think you said you never spoke to Etminan,

16    right?

17         A    Right.

18         Q    So you don't know what he did to

19    generate the list --

20         A    No, I was told he did a search.

21         Q    By whom?

22         A    Counsel.  So counsel told me what

23    the search was that he did.

24         Q    From reviewing the papers that

25    discussed NDEA and NDMA levels in dietary

Page 261

1      substances, have you come to learn that we

2      are all exposed to those two nitrosamines on

3      a daily basis?

4          A    No, I don't know.  I've learnt that

5      there's NDMA and NDEA in certain foods.  So

6      therefore, if you consume those foods, I

7      guess you will ingest some NDEA.

8                    I have no idea how ubiquitous

9      that is.  I don't know.

10         Q    From the literature that you've

11     read, do you have an opinion as to whether

12     there are certain exposure levels of -- to

13     NDMA that presents a de minimis risk of harm

14     to human beings?

15                   MR. NIGH:  Object to form.

16         A    That's not something I know

17     anything about.

18         Q    From the research that you've done

19     in this case, do you have an opinion as to

20     whether there are certain exposure levels of

21     NDEA that are so low as to prevent a

22     de minimis risk of harm to humans?

23                   MR. NIGH:  Object to form.

24         A    So I don't know.  It's not

25     something I've looked at.  I quoted what the

Page 262

1      FDA said.  I quoted Johnson.  I don't know.

2      That's not something I studied myself.

3          Q    Fair enough.

4                    One of the papers that you did

5      talk about in your report that I wanted to

6      ask you a little bit about was the Zheng

7      paper, which is spelled Z-H-E-N-G for the

8      benefit of our court reporter.  Okay?

9                    And I think that paper might

10     be marked as Exhibit 20 to the deposition for

11     purposes of our record.

12         A    Okay.

13         Q    You want to grab that and have it

14     in front of you.

15         A    I'm there.

16         Q    And this would have -- Zheng would

17     have been one of the papers that would have

18     been on the list provided to you from

19     Etminan, correct?

20         A    Correct.

21         Q    And since it's on your list and

22     discussed in your report, you obviously would

23     have read it, correct?

24         A    Yes.

25         Q    And if we go to page 255 of the --

Page 263

```
 1          A    Yup.
 2          Q    -- paper, which is the second page
 3    of our exhibit, Zheng and his colleagues
 4    acknowledge that there are epidemiological
 5    studies investigating the association of
 6    dietary nitroso compounds with pancreatic
 7    cancer that are inconsistent, correct?
 8          A    Where are you?
 9          Q    Oh, I'm sorry, go -- if I can
10    point?  This paragraph, okay?
11               Paragraph on left-hand column
12    starting with "Although the carcinogenicity
13    of processed meat is under significant
14    attention."
15               Are you with me?
16          A    Yes.
17          Q    Isn't it true that what Zheng and
18    his colleagues write there is that
19    epidemiological studies investigating the
20    association of dietary nitroso compounds with
21    pancreatic cancer are inconsistent?
22               MR. NIGH:  Object to form.
23          A    It's more specific than that.
24    So -- actually, what was the question?  Did
25    you read it correctly?  Can I have a
```

Page 264

1      question?

2           Q    Yes.

3           A    Yeah, you did.

4           Q    Okay.

5                     And, in fact, they go on --

6      Zheng goes on to state that there have been

7      studies suggesting that they found no

8      association between dietary intake of

9      nitrosamines and pancreatic cancer, correct?

10          A    I don't see -- that's actually kind

11     of --

12          Q    Sure.  Let me see if I can find it

13     for you.

14                    About halfway through that

15     paragraph, Zheng writes:  "Among three case

16     control studies, two reported inverse

17     associations for nitrate, one reported a

18     positive association for nitrate" --

19          A    'trite.

20          Q    Nitrite, thank you.

21                    -- "and one reported null

22     associations for nitrate and nitrite."

23                    Correct?

24          A    You read that correctly.

25          Q    And then in the same paper, Zheng

Page 265

1    and his colleague go on to reference four

2    cohort studies that found no statistically

3    significant associations for the intake of

4    nitrates, nitrites and pancreatic cancer

5    risk, true?

6          A    You read it correctly.

7          Q    And I think you said that in

8    addition to just reading the Zheng paper, you

9    would have gone on and read the references to

10   this paper, correct?

11         A    To see if they were -- if they

12   quantified NDMA -- not nitrates or nitrites,

13   but NDMA and/or NDEA, whether they quantified

14   it and quantified the effect sizes.

15         Q    So your testimony under oath is you

16   would have read the Risch, R-I-S-C-H, paper

17   cited by Zheng?

18         A    Yes, I would have looked at it for

19   sure.

20         Q    You would have read the Baghurst,

21   B-A-G-H-U-R-S-T, study cited by Zheng,

22   footnote 10?

23         A    Yeah, I looked at all these papers.

24         Q    You would have read the papers that

25   are cited at footnotes 14 and 17 of the Zheng

Page 266

1    paper?

2         A    Yes.

3         Q    And if we go to the conclusion,

4    what Zheng and his colleagues wrote, and I

5    think we find that conclusion beginning on

6    page 260, going on to page 261, what they

7    concluded was that there is a biologically

8    plausible association between NDEA and NDMA

9    with pancreatic cancer, correct?

10        A    No, you didn't read it completely.

11   But, in summary, in this large hospital-based

12   matched case control study, we found a

13   biologically plausible cause and association

14   of two potent dietary carcinogens, NDEA and

15   NDMA, with pancreatic cancer.

16        Q    And this was the only paper that

17   you cite in your entire report that dealt

18   with NDEA, true?

19        A    It was the only one I found.

20        Q    And the only paper that you cite

21   relating to NDEA that Zheng went on to

22   observe was that a possibility of an

23   association between NDEA and pancreatic

24   cancer needed to be confirmed in a readily

25   large -- available large prospective cohort

Page 267

1     study, correct?

2                    MR. NIGH:  Object to form.

3          A    Can you point me?

4          Q    Yes, page 261.

5                    (The deponent read the

6     document.)

7          A    Sure, yeah.

8          Q    So basically -- and the only study

9     that you cite that relates to NDEA, what the

10    authors of that study indicated was that the

11    potential association between NDEA and

12    pancreatic cancer is something that needed

13    further research, correct?

14         A    Their opinion is these findings

15    need to be confirmed, but the rest of it is

16    kind of weird.  And readily available.  What

17    the heck's that got to do with anything?

18                    Large prospective cohort

19    studies with consideration of sufficient

20    time -- I don't fully understand the rest of

21    it, but I -- they're saying it would be nice

22    if -- to get this confirmed, yeah.

23         Q    My question was, the authors of the

24    Zheng paper concluded that any conclusion

25    about the association between NDEA and

Page 268

1    pancreatic cancer required further research,

2    correct?

3              MR. NIGH:  Object to form.

4       A    Sure.  You know, it's an

5    observational study with all the limitations

6    that go with that, and they're saying we'd

7    like more of them.  Sure.

8       Q    And they suggested that there would

9    be -- that further research, including a

10   large cohort study, before any confirmation

11   could be made, correct?

12      A    That's not quite the way they

13   worded it, but it's not far off.  So

14   they're -- these findings need to be

15   confirmed, sure.

16      Q    And they also acknowledge that

17   there was contradictory research regarding

18   the association between NDEA and pancreatic

19   cancer, right?

20      A    No, they didn't.

21              MR. NIGH:  Objection.

22      A    That part that you read earlier was

23   about nitrites and nitrates.  Nitrites and

24   nitrates.  Not NDEA specifically.

25      Q    The Zheng paper does not address an

Page 269

1    association between NDEA and any other form

2    of cancer, correct?

3         A    That is true, right.  It's -- the

4    paper is about pancreatic cancer.

5         Q    And when we talk about NDEA, you

6    don't cite any observational study anywhere

7    in your report linking NDEA exposure to any

8    form of cancer other than pancreatic cancer,

9    correct?

10        A    That's correct.  I'm not aware of

11   such studies.

12        Q    In your work in this case, did you

13   read any studies finding a statistically

14   significant increased risk of bladder cancer

15   and NDEA?

16        A    And NDEA, no, I did not.

17        Q    In connection with your work in

18   this case, did you read any studies finding a

19   statistically significant increased risk of

20   blood cancer and NDEA?

21        A    I did not.

22        Q    In connection with your work in

23   this case, did you find any studies that

24   suggest that -- a statically significant

25   increased risk of breast cancer and NDEA?

Page 270

1          A    I did not.

2          Q    In connection with your work in

3     this case, did you find any studies that

4     suggest a statistically significant increased

5     risk of colorectal or intestinal cancer and

6     NDEA?

7          A    I did not.

8          Q    In connection with your work in

9     this case, did you read any studies or find

10    any studies suggesting a statistically

11    significant increased risk of gastric cancer

12    and NDEA?

13         A    I did not.

14         Q    In connection with your work in

15    this case, did you find any studies

16    suggesting a statistically significant

17    increased risk of kidney cancer and NDEA?

18         A    I did not.

19         Q    In connection with your work in

20    this case, did you find any study suggesting

21    a statistically significant increased risk of

22    liver cancer and NDEA?

23         A    I did not.

24         Q    In connection with your work in

25    this case, did you find any studies

Page 271

1      suggesting a statistically significant risk

2      of lung cancer and NDEA?

3          A    I did not.

4          Q    In connection with your work in

5      this case, did you find any studies

6      suggesting a statistically significant risk

7      of -- I'm going to butcher the

8      pronunciation -- pharyngeal cancer and NDEA?

9          A    I did not.

10         Q    In connection with your work in

11     this case, did you find any studies

12     suggesting a statistically significant risk

13     of prostate cancer and NDEA?

14         A    I did not.

15         Q    In connection with your work in

16     this case, did you find any study suggesting

17     a statistically significant increased risk of

18     uterine cancer and NDEA?

19         A    I did not.

20         Q    Based on the absence of any

21     observation studies relating to NDEA and any

22     form of cancer other than pancreatic, I take

23     it that you are not able to testify to any

24     reasonable degree of scientific certainty

25     that exposure to NDA creates statistically

Page 272

1    significant risk of developing any form of

2    cancer other than pancreatic?

3        A    NDEA.  I think you said "NDA."

4    That's right.  I don't have -- I don't have

5    studies that are germane to that question so

6    I can't answer the question.

7        Q    And just NDEA is what I was asking

8    about.

9        A    You said NDA.

10        Q    Not NDA, so thank you for

11    clarifying that.

12                On page 6 of your report,

13    there it is, it's numbered paragraph 26.

14        A    Right.

15        Q    You sort of wrote in summary

16    fashion on the subject that you and I have

17    just been talking about.

18                Your paragraph 26 reads:

19    "Concerning NDEA, Zheng, et al., shows a

20    statistically significant increased risk and

21    an LCE of 2,520 micrograms," correct?

22        A    Correct.

23        Q    And "LCE" is an abbreviation for

24    "lifetime cumulative exposure."

25                Is that right?

Page 273

1          A     Right.

2          Q     And so what you write in your

3     report that you filed with the court in this

4     case -- which has been filed with the court

5     in this case is that there is a -- in your

6     opinion, a statistically significant

7     increased risk of pancreatic cancer where the

8     lifetime cumulative exposure of the NDEA is

9     greater than 2,520 micrograms?

10         A     Right.

11         Q     In doing the math, that would be

12    2,250,000 nanograms?

13         A     Two and a half million nanograms,

14    yes.

15         Q     Yes, 2,520,000 nanograms.

16               I told you at the outset I

17    represent Mylan.  I don't think you've

18    reviewed any Mylan company documents in

19    connection with your work in this case.

20               Is that true?

21         A     I believe that's true.

22         Q     In your report, I didn't see any

23    reference to any Mylan company documents.

24               Can we agree on that?

25         A     I believe that's correct.  I

Page 274

1    believe the only company documents are the

2    few that I referenced on page 2, and they

3    don't -- they're not from Mylan.

4        Q    Right.

5                And Ms. Lockard walked you

6    through those ones you reference on page 2, I

7    think some from ZHP and some from Torrent,

8    correct?

9        A    That's my memory.

10        Q    And so my question to you, sir, is

11    this:  Do you have any information to suggest

12    that the levels of nitrosamines in Mylan's

13    Valsartan-containing medication over the

14    period of potential exposure exceeded the LCE

15    you calculated from the Zheng paper?

16                MR. NIGH:  Object to form.

17        A    I have no idea.  I have no such

18    opinion.

19        Q    Do you have any idea or any opinion

20    that any defendants' Valsartan-containing

21    medication exceeded the LCE that you've

22    calculated for NDEA in paragraph 26 of your

23    report?

24                MR. NIGH:  Objection.  Form.

25        A    From NDEA?

Page 275

1          Q    Yes, sir.

2          A    I didn't -- one could do such

3    calculations.  I didn't do such calculations.

4    I did them for NDMA.

5          Q    And can you -- look for a moment

6    with me at your -- what you wrote in your

7    numbered paragraph 35 of your report, sir.

8          A    Okay.

9          Q    And essentially, the way I read

10   paragraph 35 of your report is that you

11   conclude that it's scientifically plausible

12   that certain users could have developed

13   certain cancers based on the NDMA levels in

14   the Valsartan-containing medications of some

15   of the defendants.

16               Is that essentially the

17   conclusion that you drew there?

18         A    Sure, sure.

19         Q    There's nothing in paragraph 35 of

20   your report that states anything with respect

21   to NDEA, agreed?

22         A    There's not.

23         Q    And you've already told me that

24   you've not looked at any data relating to

25   Mylan's NDEA levels in any of Mylan's

Page 276

1    products, correct?

2         A    You know, firstly, the reference in

3    my report to the FDA website, I do not know

4    if there's Mylan drug -- there's, you know, a

5    list.  We looked at it this morning.  It's an

6    exhibit.

7         Q    Right.

8         A    I don't know if Mylan is on that.

9    It's not something I focused on.

10        Q    And that's fair.  And I don't think

11   that is inconsistent with your prior

12   testimony, because I think before I had asked

13   you if you saw the Mylan company documents.

14              And so I think what you're

15   talking about now is there was information

16   about nitrosamine levels observed -- that

17   were reported by the FDA and publicly

18   available materials?

19        A    Yes, yes.

20        Q    And I think there may be some

21   information about Mylan levels in there.

22        A    In which case it would be -- it

23   would be trivial to take those numbers and do

24   the kinds of calculations I did in my report.

25        Q    Okay.

Page 277

1          But you've not done the

2     calculations thus far?

3          A    I have not.

4          Q    And you do not intend to offer the

5     opinion that Mylan's -- that levels of NDEA

6     in Mylan's Valsartan-containing medication

7     over the period of potential exposure

8     exceeded the LCE of 2,520,000 nanograms, do

9     you?

10               MR. NIGH:   Object to form.

11          A    That's sort of a tricky question

12     because, like, you know, anybody can

13     calculate that.

14               If somebody asks me that

15     question, I can do the calculation.  I go on

16     an FDA website.  I would see the NDEA content

17     of what they report for Mylan.  I could then

18     take that number and, you know, say over one

19     year what the cumulative exposure would be,

20     over two years, over three years, just as I

21     did with NDMA.

22               It's a trivial thing to do.  I

23     didn't do it, but I could do it.

24          Q    That was my first question.

25               (Simultaneous speech.)

Page 278

1            (Reporter interrupted.)

2        A    Sorry.

3        Q    I asked him.  I can't even

4    remember.

5                I think what I asked you is do

6    you intend to offer that opinion, and there

7    was an objection to form, and then the

8    witness was about to give an answer.

9        A    And the answer was I don't intend

10   to, but if I was asked to, I would -- I could

11   do that.

12       Q    Do you remember what exhibit that

13   was that you looked at earlier this morning

14   with the FDA numbers?

15       A    I think the first few exhibits, you

16   took them back.  Was it an early exhibit or

17   was it later?

18       Q    It was early.

19       A    I have it.  Let me check.  Let me

20   check I'm giving you the right thing.  No,

21   sorry, it's not the FDA one.  It's the

22   Torrent.

23       Q    Well, do you want to go off the

24   record for a minute while we try to find the

25   exhibit?

Page 279

1        I only have about ten more

2    minutes of questions, I think.

3            (Counsel conferred.)

4            THE VIDEOGRAPHER:  Are we

5    going off the record?

6            MS. LOCKARD:  No, we have it.

7    BY MR. TRISCHLER:

8        Q    So Ms. Lockhard has been kind

9    enough to provide us with a chart that we've

10    been referencing, and you can see on page 2

11    of that chart, there is some data that was

12    provided with respect to Mylan.

13            Do you see that?

14        A    I do.

15        Q    So if you wanted to do the

16    calculation, let's take, for instance, the

17    highest level for Mylan reported on that

18    chart I think is .38 parts per million,

19    correct?

20        A    In micrograms per tablet.

21        Q    Okay.

22            And --

23        A    And the level that you were asking

24    me about is -- the number in paragraph 35,

25    2520.

Page 280

1          Q    Correct.

2          A    Okay.  So it would take -- at that

3     level, it would take 6600 days to get to --

4     if you're consuming .38 micrograms a day of

5     Mylan -- of NDEA, it would take you 6,631

6     days to get to 2500 -- an exposure --

7     cumulative exposure of 2520, ignoring --

8     ignoring NDEA from diet and other sources,

9     just purely from that source.

10         Q    And that's -- and that

11    2,520 micrograms is the LCE that you've

12    calculated for there to be a statistically

13    significant increase of pancreatic cancer?

14         A    That's --

15         Q    NDEA.

16         A    As the Zheng study would suggest,

17    yes.

18         Q    Okay.  Thank you for that.

19              The -- and I guess just to

20    sort of wrap it up from my perspective,

21    Dr. Madigan, what I understood your testimony

22    to be is that you are not going to offer any

23    general causation opinions, correct?

24         A    Correct.

25         Q    What you are able to do and what --

Page 281

1    the work that you did in this case was to

2    perform a statistical analysis on the

3    literature that was provided to you by

4    Dr. Etminan, correct?

5        A    No.

6              MR. NIGH:   Objection.

7        A    So the -- this -- I was provided

8    with a list by Dr. Etminan which was a seed

9    list, if you will, so I consider lots of

10   other potential materials.

11             As it turns out, none of them,

12   you know, the set of studies that are

13   ultimately in Table 1 are the ones in

14   Etminan, as it happens.

15       Q    So while you may have looked beyond

16   what was originally given to you in the list

17   created by Dr. Etminan, the studies that you

18   have -- that you ultimately utilize for your

19   statistical analysis are the same ones that

20   he provided to you?

21       A    They were on his -- they're studies

22   that are on the list of references in his

23   report, as it happens.

24       Q    And just to make sure my feeble

25   mind is able to understand it, what you're

Page 282

1    testifying is -- is that you -- strike that.

2                    You are not going to testify

3    that there's a statistically significant

4    increased risk of cancer from the

5    Valsartan-containing medications that were

6    provided by the defendants, correct?

7                    MR. NIGH:  Object to form.

8        A    No.  I mean, my analysis is -- is

9    about the association between NDMA and

10   various cancers as studied in dietary studies

11   and an occupational study.

12       Q    Right.

13                   So what you're going to say is

14   that you found statistically significant

15   increased risk of certain cancer types in the

16   literature that was initially provided to you

17   and then independently reviewed by you?

18                   MR. NIGH:  Object to form.

19       A    I think that's basically correct,

20   yes.

21       Q    And you -- you were asked about the

22   Pottegard study, and you gave us your

23   rationale for why it's not mentioned in the

24   report.

25                   Did you ever review the Gomm

Page 283

1    study?

2         A    Not in English.  So there was a

3    German version of it.  I don't speak German.

4    So as I understand it, there's an English

5    version of it on the way, that's what I...

6         Q    So it's fair to say you never read

7    the Gomm study?

8         A    As I said, I don't read German, so

9    I didn't read it.

10        Q    Just asking.

11        A    I'm aware of the existence of it,

12   is what I'm trying to tell you, but, you

13   know...

14        Q    I gathered.

15        A    Yeah.

16        Q    All right.

17             I think that might be all the

18   questions that I have.  Thank you for your

19   time.

20        A    Okay.

21             MS. LOCKARD:  Are there

22   others?

23             MS. KAPKE:  I have some, but I

24   can wait until after the manufacturers go.

25   This is Kara Kapke for CVS and Rite Aid.

Page 284

```
 1                    MS. LOCKARD:  Any of the other
 2      manufacturers have questions?
 3
 4                         EXAMINATION
 5      BY MS. KAPKE:
 6           Q    Well, I -- this is Kara Kapke.  I
 7      represent CVS and Rite Aid.  I just have a
 8      couple of quick follow-up questions.
 9                    One of the things you
10      mentioned earlier in response to
11      Ms. Lockard's questioning was that you
12      believe that questionnaires are biased to the
13      null, and I just wanted to confirm that you
14      did not reference that in your report as an
15      opinion you're holding in this case.
16                         Is that correct?
17                    MR. NIGH:  Object to form.
18           A    No, that is not -- that is not
19      correct.  Give me a second.
20                    It's in paragraph 23, and
21      there's a reference in that paragraph.
22           Q    Okay.  That's -- that's fair.
23                    And then I want to follow up
24      with a couple of questions based on
25      paragraph 35 where your report states that:
```

Page 285

1    "Based on valsartan dosing, the levels of

2    NDMA reported in contaminated valsartan and

3    the time frame over which the contamination

4    occurred, it is scientifically plausible that

5    users of contaminated valsartan could develop

6    cancer."

7                    I just want to confirm that

8    it's your opinion that you would agree that

9    not all, quote/unquote, users of contaminated

10   valsartan, as you put it, could develop

11   cancer.

12                    Is that correct?

13       A    Do I think that they're all going

14   to get cancer?  No, but could any of them

15   get -- develop cancer?  Yes.

16       Q    Well, anybody who -- anybody could

17   develop cancer, true, whether they've taken

18   Valsartan-containing NDMA or not, correct?

19       A    Sure.  I -- I mean that, you know,

20   I do believe that everyone who takes

21   contaminated valsartan is at increased risk

22   based on -- based on what I have found in

23   these studies.

24       Q    Okay.  So that was the analysis

25   that I wanted to go to.

Page 286

1           So is there a lifetime

2    cumulative exposure at which you believe NDMA

3    from valsartan will increase a person's risk

4    of cancer?

5               MR. NIGH:  Object to form.

6       A    So I don't know if I can be that

7    precise.  I do have an opinion based on these

8    studies about, you know, LCEs from diet that

9    would seem to lead -- that are associated

10   with statistically significant increased

11   risk.

12              Also LCEs associated with

13   occupation exposure.  I -- you know, I'm

14   assuming that ingesting NDMA or NDEA from

15   valsartan is no different.

16      Q    Okay.

17              And that's why in paragraph 35

18   your preceding phrase to the sentence

19   discussing it's scientifically plausible that

20   users of contaminated valsartan references

21   valsartan dosing, NDMA levels and the time

22   frame, and why the next sentence references

23   daily use of valsartan containing

24   20 micrograms of NDMA for one year, correct?

25      A    I'm sorry, I lost the drift of the

Page 287

1    question there.  Can you try again?

2         Q    Sure.

3                   So you -- in paragraph 35 when

4    you say it is scientifically plausible that

5    users of contaminated valsartan could develop

6    cancer, are you limiting that opinion, that

7    increased risk of developing cancer, to the

8    fact that you are basing that opinion based

9    on valsartan dosing, the levels of NDMA

10   reported in contaminated valsartan and the

11   time frame over which the contamination

12   occurred?

13                  That's why you have those

14   qualifiers there.

15        A    That's a for example.  It's not a

16   qualifier.  It's a for example.

17        Q    Okay.

18        A    So I didn't do that for other

19   contamination levels.  I just --

20        Q    Okay.

21                  So --

22        A    I just did for example.

23        Q    So in your opinion, if a person

24   took a single pill of valsartan that contains

25   NDMA, would they be at an increased risk of

Page 288

1    cancer?

2         A    I don't have any such opinion one

3    way or another.

4         Q    Okay.

5              So I will -- I'll ask that

6    your report -- the next sentence, for

7    example, you reference the NDMA from

8    valsartan would be less than 700 -- or 7300

9    micrograms?

10        A    I'm not --

11        Q    Do you see that, where you're

12   talking about the Hidajat study?

13        A    7514 -- you're not -- sorry, you're

14   in paragraph 34 now?

15        Q    Yeah.

16              And that's basically

17   20 micrograms of NDMA daily for one year,

18   correct?

19              MR. NIGH:  Object to form.

20        A    No.  I'm sorry, I'm not -- I'm not

21   following your logic here.

22              So Hidajat was exposure via

23   inhalation.

24        Q    Okay.

25              So I'm going to ask, what

Page 289

1    would 20 micrograms of NDMA daily for one

2    year be in terms of a lifetime cumulative

3    exposure?

4                    MR. NIGH:  I'm going -- at

5    this point, I'm going to put on the record

6    that I believe that the questioning is

7    becoming cumulative.

8                    I believe we're getting into

9    areas that have been addressed, and, you

10   know, I'll let this go on for a few more

11   questions, but I would put a strict, harsh

12   warning that at this point it's cumulative.

13                   We have a report that is ten

14   pages long.  We have spent hours and hours

15   and hours, and now we have a third questioner

16   that -- where I think the questions are

17   becoming more and more cumulative as we go

18   on.

19                   Go ahead.

20       A    Does paragraph 29 answer your

21   question?

22   BY MS. KAPKE:

23       Q    I don't know, but I am asking you

24   to answer my question.

25                   What would 20 micrograms of

Page 290

1    NDMA daily be in terms of a lifetime

2    cumulative exposure?

3                    You would derive that by

4    multiplying 20 micrograms by 365 days,

5    correct?

6         A    To get the exposure in that one

7    year, right.

8         Q    Right.

9                    If you -- if you only took

10   valsartan for one year that contained NDMA

11   and the NDMA, using your assumption,

12   contained 20 micrograms a tablet, you would

13   have an LCE of 7300 micrograms, correct?

14        A    Sure.

15        Q    Okay.

16                    Seventy --

17        A    Let me be more careful there.

18                    You -- from that source in

19   that one year, your cumulative exposure would

20   be 7300.

21        Q    Okay.

22                    And that is what you say is --

23   you say that both Hidajat and several dietary

24   studies show statistically significantly

25   elevated risks of several cancers in the next

Page 291

1    sentence in paragraph 35 of your report,

2    correct?

3                  I'm trying to draw a link

4    between those two statements.

5        A    I see.  So 20 -- 20 micrograms a

6    day for a year is -- yeah, gets you to 7300.

7    7300 is larger than many of the lifetime

8    exposures in Table 1 for which there is

9    statistical significance.  It's just shy of

10   the same number in Hidajat.

11                 Am I answering your question?

12       Q    Yes.

13                 And what I'm trying to get you

14   to explain here is I think using your

15   analysis, you -- in the language of your

16   report, you have a person needing to take

17   valsartan that contained NDMA of an average

18   of 20 micrograms for at least one year in

19   order to have an increased risk of cancer.

20                 Is that fair?

21       A    No, that's not what I said.

22       Q    Okay.

23                 And what I'm trying to figure

24   out -- and I don't think this has been asked

25   and I don't think you've explained that -- is

Page 292

 1    where in your report you explain that that's

 2    not the case, that it doesn't have to be at

 3    least one year of taking a tablet containing

 4    20 milligrams -- 20 micrograms of NDMA for at

 5    least a year?

 6         A    So look at Table 1.  So Table 1

 7    shows the lifetime cumulative exposure, you

 8    know, in those studies.  And for several of

 9    them, it's statically significant at well

10    under 7300.

11         Q    Okay.

12              So what's the lowest that

13    you're willing to go?

14         A    2338 in --

15              MR. NIGH:  Object to form.

16         A    2,338 -- an LCE of 2,338 micrograms

17    in Goodman yields a statistically significant

18    increased risk of lung cancer.

19              In -- there you go.  That, I

20    think, is the -- no.  It's also, I believe,

21    statistically significant in Keszei for

22    squamous cell esophageal cancer in women at a

23    lower -- at a lower LCE.  I think that's --

24         Q    Okay.  Okay.

25              So is it fair to say, then, if

Page 293

1    you're relying on an assumption that each

2    tablet of valsartan contains 20 micrograms of

3    NDMA, that you need at least 100 pills of

4    valsartan containing NDMA before you have an

5    increased risk of cancer?

6         A    Absolutely not.

7              MR. NIGH:  Object to form.

8         A    But what -- what is true is, you

9    know, per these studies, the smallest

10   lifetime cumulative exposure that yields a

11   statistically significant increased risk --

12              (The deponent read the

13   document.)

14        A    I misspoke.  It's actually 1962,

15   actually.  It's the lowest -- and it happens,

16   that's the lowest one for which there's a

17   statistically significantly increased risk.

18        Q    Okay.

19              So -- so tell me the basis

20   that you have to suggest that there's an

21   increased risk of cancer for a person with a

22   lifetime cumulative exposure to NDMA that is

23   less than 1962 micrograms.

24        A    I never said any such thing.  I'm

25   not following -- I don't follow the question.

Page 294

1          Q    Okay.

2                    Then -- okay.  So will you

3     agree that there is no increased risk of

4     cancer for a person with a lifetime

5     cumulative exposure of NDMA that is less than

6     1962 micrograms?

7                    MR. NIGH:  Object to form.

8          A    No, no.  Absolutely not.  I would

9     not agree with that statement.

10         Q    Okay.

11                   Then what basis do you have to

12    not agree with that statement?

13         A    There are increased risks at

14    various levels that this -- the level that

15    yields statistical significance -- the lowest

16    level that yields statistical significance in

17    these studies is 1962, but that absolutely

18    doesn't mean there isn't an increased risk at

19    much lower -- at potentially much lower

20    levels.

21         Q    Okay.

22                   So what is a scientifically

23    valid opinion that there is an increased risk

24    that is not based on chance when you have an

25    LCE to NDMA less than 1962?

Page 295

1           A      We read the FDA's statement on

2    p-values a few minutes ago, and it's not the

3    same as due to chance.  It's a completely

4    different concept.  So the way you're

5    phrasing it there is kind of inappropriate.

6                    Like I said, based on these

7    studies, there is statistical significance,

8    for what that's worth -- because that's what

9    you were asking about earlier.

10                   There's a statistical

11   significance with an LCE as low as 1962.

12   Statistical significance.

13                   You know, is there increased

14   risk at levels lower than that, I would have

15   to go back and look at the studies one by one

16   to see if they are -- if there is.

17                   But it wouldn't be -- it

18   wouldn't be statistically significant.  That

19   doesn't mean there isn't an increased risk.

20         Q      Okay.

21                   Do you have any basis to

22   suggest that there is a statistically

23   significant increase in risk of cancer for a

24   person with a lifetime cumulative exposure to

25   NDMA that's less than 1962 micrograms?

Page 296

1          A     In the studies I looked at, the

2     lowest lifetime cumulative exposure that

3     yielded a statistically significant increase

4     was 1962, I believe, although that might

5     be --

6                    I'd have to go back and look

7     at Keszei for esophageal squamous cell

8     cancer, which for women there is a lower

9     lifetime cumulative exposure there.

10                   So I'd need to go back and

11    look at that more closely.

12         Q     Okay.

13                   So 1962 micrograms of NDMA, to

14    get that type of exposure from valsartan that

15    contained NDMA using your assumption of

16    20 micrograms per tablet, would you have to

17    take 98 pills, correct?  At least 98 pills?

18         A     I don't know.  Let me do the math.

19                   As a matter of fact, to get to

20    1962 micrograms from valsartan alone at

21    20 micrograms a pill, yes, it would take 98.1

22    days.  Call that 99 days.

23         Q     Okay.

24         A     To get to that level.  That's a

25    fact, yes.

Page 297

1              Q    Okay.

2                        On what basis do you have to

3       assert that there is an increased risk of

4       cancer from taking pills containing --

5       valsartan pills containing NDMA for fewer

6       than 99 days?

7                        MR. NIGH:  Object to form.

8              A    Well, first of all, you're equating

9       statistical significance with the existence

10      of risk.  That's inappropriate.  So I can

11      tell you that statistical significance -- if

12      that's what you're interested in, statistical

13      significance occurs at an LCE of 1962.

14                        If you're -- if you're -- from

15      valsartan alone, if it's 20 micrograms in the

16      pill, yes, it's 99 days.  But as we looked at

17      earlier, for all I know, it could -- even --

18      there's a document suggesting that it can be

19      a lot more than that that we looked at this

20      morning.

21                        So I -- you know, I don't

22      know.  It all depends on how much NDMA is in

23      the pills.  I do not know how much NDMA is in

24      the pills.

25              Q    Okay.  Those are all the questions

Page 298

1    I have.

2         A    Thank you.

3              MS. LOCKARD:  Anyone else?  I

4    don't have any more questions for you.

5              THE DEPONENT:  Okay.  Are we

6    done?

7              MR. NIGH:  I don't have any

8    questions.  I think we're done.  We'll read.

9              THE DEPONENT:  Very good.

10   Thank you pleasure to meet you.

11             MS. LOCKARD:  Nice to meet

12   you, too.  Enjoy your dinner.

13             (Discussion off the record.)

14             THE VIDEOGRAPHER:  Hold on.

15   Let me go off the record.

16             The time is 4:40.  That

17   concludes the deposition.  We're off the

18   record.

19             (Whereupon, the proceedings

20   adjourned.)

21

22

23

24

25

Page 299

1              C E R T I F I C A T E

2         I, Jill K. Ruggieri, Registered Merit

3     Reporter and Certified Realtime Reporter, do certify

4     that the deposition of DAVID MADIGAN, PhD, in

5     the above-captioned matter, on August 5, 2021, was

6     stenographically recorded by me; that the witness

7     provided satisfactory evidence of identification, as

8     prescribed by Executive Order 455 (03-13) issued by

9     the Governor of the Commonwealth of Massachusetts,

10    before being sworn by me, a Notary Public in and for

11    the Commonwealth of Massachusetts; that the

12    transcript produced by me is a true record and

13    accurate record of the proceedings to the best of my

14    ability; that I am neither counsel for, related to,

15    nor employed by any of the parties to the above

16    action; and further that I am not a relative or

17    employee of any attorney or counsel employed by the

18    parties thereto, nor financially or otherwise

19    interested in the outcome of the action.

20

21

22         Jill K. Ruggieri, RPR, RMR, FCRR, CRR

23

24    Transcript review was requested of the reporter.

25

```
                                         Page 300

 1    Daniel Nigh, Esq.

 2    dnigh@levinlaw.com

 3                      August 11, 2021

 4    RE:    In Re: Valsartan, Losartan, Et Al  v.

 5        8/5/2021, David Madigan , PhD (#4748772)

 6        The above-referenced transcript is available for

 7    review.

 8        Within the applicable timeframe, the witness should

 9    read the testimony to verify its accuracy. If there are

10    any changes, the witness should note those with the

11    reason, on the attached Errata Sheet.

12        The witness should sign the Acknowledgment of

13    Deponent and Errata and return to the deposing attorney.

14    Copies should be sent to all counsel, and to Veritext at

15    erratas-cs@veritext.com

16

17     Return completed errata within 30 days from

18    receipt of testimony.

19      If the witness fails to do so within the time

20    allotted, the transcript may be used as if signed.

21

22              Yours,

23              Veritext Legal Solutions

24

25
```

```
                                                  Page 301
```

1    In Re: Valsartan, Losartan, Et Al  v.

2    David Madigan , PhD (#4748772)

3              E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____   _____

24   David Madigan , PhD                              Date

25

Page 302

1    In Re: Valsartan, Losartan, Et Al  v.

2    David Madigan , PhD (#4748772)

3                ACKNOWLEDGEMENT OF DEPONENT

4        I, David Madigan , PhD, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11    _____    _____

12    David Madigan , PhD                          Date

13    *If notary is required

14                       SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                       _____ DAY OF _____, 20___.

16

17

18                       _____

19                       NOTARY PUBLIC

20

21

22

23

24

25

[& - 2018]                                                          Page 1

**&**

**&**   2:12 3:1,7 5:1
  5:12 6:1 8:9 54:5
  54:7,9,15

**0**

**0.0265**   118:17
**0.096**   118:16
**0.99**   145:11
**0003**   192:17
  193:10
**02109**   8:12
**03-13**   299:8
**05**   192:6,18 193:10
  194:3 213:20
**07068**   2:17
**07102**   4:17
**08540**   6:14

**1**

**1**   3:9 9:11 29:4,8
  30:23 36:22 47:12
  48:10,23 79:6
  94:6 96:5 97:5
  105:12 115:6
  131:8 135:10
  190:16,18,21
  192:4 196:13,25
  281:13 291:8
  292:6,6
**1.01**   173:25
**1.13.**   182:22
  183:17
**1.18**   201:21 202:16
**1.18.**   186:7
**1.24**   87:24
**1.31**   124:17 128:23
  130:8 131:1
**1.32**   183:2
**1.34**   157:23
**1.34.**   182:19

**1.41**   202:17
**1.6**   145:7
**10**   10:1 33:23,24
  34:1,25 35:15
  96:20,24 97:2
  183:15 265:22
**100**   4:16 293:3
**103**   2:16
**10:49**   85:10
**11**   10:2 103:21
  104:11 120:23,24
  157:21 182:17
  300:3
**11:06**   85:13
**12**   10:5 125:4,5
  186:19
**120**   10:2
**12205**   3:10
**125**   10:5
**129**   10:8
**12:20**   146:19
**12:22**   147:8
**12:50**   147:21
**13**   10:8 129:5,6
**131**   236:8
**133**   10:13
**136**   10:14
**138**   10:17
**14**   9:6 10:13 65:3
  133:18,22 167:18
  265:25
**14726**   299:21
**14th**   65:7
**15**   10:14 21:7 31:4
  33:24 35:22 64:2
  64:17 135:25
  136:4 150:25
  166:20
**15,200**   58:14
**150**   10:18 244:21
  246:19

**15219**   5:5
**159**   10:22
**15th**   4:16
**16**   10:17 21:7
  138:17,21 139:16
  150:16,25
**16,363**   79:7 85:22
**16,400**   61:5
**16.93.**   139:18
**17**   10:18 60:20
  61:19 62:6 139:16
  150:5,7,17,18,18
  151:2 265:25
**174**   11:1
**177**   11:6
**178**   11:11,16
**17th**   7:13
**18**   10:22 66:2
  159:7,8
**180**   11:21,23 254:3
  254:9,18
**1800law1010.com**
  3:11
**19**   58:9 174:8,9,11
  174:19 177:18
**190**   7:3
**19103-4196**   7:14
**19422**   6:4
**195**   11:25
**1962**   293:14,23
  294:6,17,25
  295:11,25 296:4
  296:13,20 297:13
**1990**   226:21
**19a**   11:1 177:20
**19b**   11:6 177:20
  177:25
**19c**   11:11 178:16
  178:18
**19d**   11:16 178:20
  178:23 179:6

**19e**   11:21 180:5,12
**19f**   11:23 180:7,12
**1:14**   147:11
**1:15**   147:22

**2**

**2**   9:12 29:6 47:12
  47:14 237:12
  238:6 244:5 255:2
  274:2,6 279:10
**2,200**   259:4
**2,250,000**   273:12
**2,338**   79:8 80:7,11
  85:22 292:16,16
**2,520**   272:21 273:9
  280:11
**2,520,000**   273:15
  277:8
**2.0**   213:24 214:12
**2.2**   119:1,9 258:25
**20**   11:25 38:10
  130:20 131:6
  154:25 195:20,21
  200:4,8,9 212:20
  212:20,24 213:6
  213:11 262:10
  286:24 288:17
  289:1,25 290:4,12
  291:5,5,18 292:4,4
  293:2 296:16,21
  297:15 302:15
**20.19**   124:14
  128:17,20 130:20
  131:4,9
**20.5**   61:4
**200**   4:5 12:4
**2011**   97:13
**2013**   150:5
**2015**   50:7 245:24
  246:6,14
**2018**   11:21,23
  167:24

**[2019 - 7]**                                                    Page 2

**2019**  48:24 56:6 167:19
**2020**  47:13 48:10 57:17 58:20,20 59:20 60:20 61:19 252:5
**2021**  1:15 13:8 43:1 61:21 62:6 63:19 65:1,3,5 66:3 77:2 97:5 245:13 299:5 300:3
**2029**  5:14
**205**  12:9
**20th**  60:13
**21**  6:13 12:4 200:5 200:10,14
**215.979.1164**  7:15
**22**  12:14 222:19,21 223:7
**222**  12:14
**2220**  8:3
**23**  12:17 234:13,14 235:11 284:20
**230**  8:3
**2338**  292:14
**234**  12:17,21
**24**  12:21 80:5,6,7 234:13,16 235:15 244:5
**244**  12:24
**25**  12:24 202:25 244:6 245:3 246:19
**2500**  4:6 280:6
**251**  9:7
**2520**  279:25 280:7
**255**  262:25
**26**  12:9 57:17 205:7,11 272:13 272:18 274:22

**260**  266:6
**261**  266:6 267:4
**27th**  8:11
**284**  9:8
**2875**  1:7
**29**  9:11 31:6 289:20
**2:35**  214:22
**2:50**  214:25
**2:52**  216:23
**2:55**  217:1
**2nd**  2:16

**3**

**3**  9:13 31:7 57:15 57:18 59:19 98:13 122:25 157:19 238:25
**3/1/2020**  9:12
**30**  7:13 300:17
**300**  5:14
**30305**  4:7
**310.284.3880**  5:16
**312.566.4801**  8:5
**314.480.1500**  7:5
**316**  2:6
**32**  81:16 84:18 138:9,11 139:22
**320**  138:10
**32502**  2:7
**33**  80:10,23
**3333**  4:6
**33950**  3:17
**34**  206:24 288:14
**35**  207:25 211:24 212:4 275:7,10,19 279:24 284:25 286:17 287:3 291:1
**36**  227:16,18
**365**  213:11 290:4

**38**  279:18 280:4
**38th**  5:4
**3:43**  251:3
**3:48**  251:6
**3m**  39:11,12

**4**

**4**  9:14 52:1 60:19 60:21 61:25 63:7 63:18,24 65:1,5,16 239:6,13
**4,080**  219:21
**4,303**  80:6,11
**4/17/2020**  9:14
**40**  154:25
**40,000**  66:7
**412.263.1816**  5:6
**43**  196:25
**450**  6:3
**455**  299:8
**47**  9:12
**4748772**  300:5 301:2 302:2
**4:40**  298:16
**4th**  65:7,8

**5**

**5**  1:15 9:15 13:8 35:4 65:22,23 99:24 132:23 139:17 160:20 162:11 239:14,16 299:5
**5.4**  139:8,21
**50**  50:16 66:6
**504.524.5777**  3:5
**53**  8:11
**55**  32:1
**57**  9:13

**6**

**6**  9:16 11:23 37:23 38:2 76:22 77:1,3 92:22 99:25 116:7 116:8,14,20 117:1 117:17 127:1,4 128:5 131:18 132:19,23 133:4 134:6 139:17 145:12 239:22 272:12
**6,200**  258:21
**6,631**  280:5
**6,800**  48:17
**6.2**  118:25 119:8 257:22 258:11,20
**60**  9:14 145:7
**60.2**  136:16,21 138:4,7,14
**600**  7:3
**60606**  8:4
**609.924.0808**  6:15
**610.567.0700**  6:5
**617.213.7000**  8:13
**63105**  7:4
**647**  154:22
**65**  9:15
**6600**  280:3
**678.553.2385**  4:8
**6:15**  147:14 148:3
**6:45**  17:9 148:5

**7**

**7**  9:17 37:24 77:2 79:5 85:17 91:1,4 91:12,23,23 96:9 116:7 127:1,4 128:6 131:18 132:19,23 138:20 140:18,19 148:25 158:13 190:18

**7,514**  207:3
**7/18/2021**  9:15
**7/26/2020**  9:13
**700**  288:8
**701**  3:3
**70130**  3:4
**728**  201:6,13
**7300**  288:8 290:13
  290:20 291:6,7
  292:10
**7514**  288:13
**77**  9:16
**78,400**  66:18

**8**

**8**  9:20 91:16 92:4
  92:7 103:2 149:10
  159:5 180:22
  204:8
**8/5/2021**  300:5
**800**  44:21 45:3,22
  48:16 58:10 61:5
  66:6
**800.529.1010**  3:12
**85**  35:23
**850.435.7013**  2:8

**9**

**9**  9:25 93:11,12
  94:22 95:17 100:3
  245:13
**90**  34:6,11,14 35:2
  38:7
**90067-2904**  5:15
**91**  9:17
**92**  9:20
**93**  9:25
**941.639.1158**  3:18
**95**  157:24 202:16
  214:5,15
**97**  10:1

**973.228.9898**  2:18
**973.757.1100**  4:18
**98**  202:16 296:17
  296:17
**98.1**  296:21
**99**  3:16 173:22,24
  296:22 297:6,16
**9:00**  147:15
**9:32**  1:15 13:9
**9:35**  147:17

**a**

**a.m.**  1:15 13:9
**aba**  41:7
**abbreviation**
  272:23
**abe**  42:4
**abilify**  28:24 29:16
  29:19 30:1 243:13
  243:23 244:18
  248:3,14,18,19
**ability**  17:3 299:14
**able**  112:20
  147:16 200:24
  211:5 271:23
  280:25 281:25
**absence**  271:20
**absolutely**  58:5
  153:9 169:12
  215:23 241:9
  293:6 294:8,17
**absorbed**  231:18
**abstract**  10:2
  123:3,9 159:22
  160:7 201:1,4,11
**abstracts**  97:11
**absurd**  193:13
**academic**  227:7
**acceptable**  122:14
  187:8
**accepted**  150:4
  165:12 185:22

210:25
**access**  111:4,5
  112:10 146:14
  164:25 182:11
  244:16,18
**account**  114:25
  185:10,13
**accounted**  35:22
**accumulative**  78:3
**accuracy**  117:2,5
  143:9 300:9
**accurate**  16:15,24
  20:21 21:1 29:2
  30:24 31:20 47:17
  64:6,8 66:21
  106:16 107:17
  203:18,21 204:1
  299:13
**accurately**  17:3
**accutane**  229:23
  242:1,4 248:3
**acknowledge**
  263:4 268:16
**acknowledgement**
  302:3
**acknowledgment**
  12:14 222:17
  300:12
**acknowledgments**
  155:12
**actavis**  4:22,22
**action**  299:16,19
**activities**  36:1
  241:6
**actos**  73:12,13,16
  73:20,23 74:10
**actual**  77:25 86:9
  94:11 132:6
  144:24 152:2
  177:19 180:20
  190:2

**adam**  2:13 55:2,6
**add**  43:17 66:9
  237:9 250:3
**added**  31:16 59:17
  184:16
**adding**  66:16
  182:25
**addition**  144:10
  150:1 181:15
  250:2 265:8
**additional**  58:21
  66:23 67:17 75:15
  75:16 90:21
  100:23 104:2,17
  175:24 195:6
  196:16 204:20
  222:7 250:23
**additions**  302:6
**address**  15:2,4,5,7
  83:18 146:4
  156:21 171:11,12
  196:16 197:23
  199:18 268:25
**addressed**  47:21
  142:14 197:18
  199:14 289:9
**addresses**  196:4
**addressing**  196:9
**adequacy**  233:13
**adequately**  182:7
**adjourned**  298:20
**adjust**  191:1
**adjusted**  85:21
  181:4,8,13,20,21
**adjusting**  181:16
**adjustment**
  190:22 191:2,25
  192:14
**adjustments**
  181:23 182:4

[admissible - appendix]

**admissible** 247:14
**adopts** 165:8
**advanced** 16:5
**advisory** 231:22
  231:23 232:1,3,6
**affect** 17:2 206:18
**afternoon** 251:10
**age** 87:5,6 88:12
  88:13 181:14,16
  221:15,19
**ago** 14:8 37:4
  73:13,22 133:1
  229:23 254:14
  295:2
**agree** 16:18 17:20
  107:11 109:5
  127:24 134:15
  137:17 156:11
  157:7 163:21
  168:5 224:10
  229:25 236:15
  237:5 238:4,11,20
  239:4,9,20,25
  240:7,15 242:18
  242:19 249:4
  256:22 259:14
  273:24 285:8
  294:3,9,12
**agreed** 275:21
**agreeing** 256:20
**agreement** 12:14
  45:14,19 95:19
  222:17
**agrees** 168:22
**ah** 31:8
**ahead** 289:19
**aid** 5:19 283:25
  284:7
**air** 205:17
**al** 13:12 81:21
  118:24 119:7

203:3 207:2
217:21 221:6,23
258:10,10 272:19
300:4 301:1 302:1
**albany** 3:10
**alexander** 42:4
**alfano** 5:1
**alice's** 249:9
**allotted** 300:20
**allow** 162:6
**allowed** 30:13
  194:22 247:25
**alternative** 160:10
  160:16,21,21
  162:7,19 165:12
**ambiguity** 215:12
**ambiguous** 62:23
  63:1 238:12,15
**amended** 12:24
**american** 12:17
  224:16 225:1,18
  234:24,25 235:12
**amount** 58:13
  68:17 82:2 126:1
  126:8 140:9
  158:14,22 175:21
  185:3 196:19
  197:7 198:14
  205:6,13,17
  219:19
**amounts** 171:14
  208:12 218:18
**analyses** 33:10
  152:16 153:3,12
  164:8 165:19
  181:3,4,8,12,13
  182:1
**analysis** 10:5 12:7
  18:9 33:8 50:7
  57:5,8 62:10,11,15
  62:25 64:2,17

70:4 75:6 76:13
108:3,11 109:22
110:23,25 111:1
112:11 114:1
118:4 122:10
125:9 142:12
144:25 145:3
153:14,16 154:3,9
157:10,14,19
158:10 160:12
162:1,12 163:6
173:12,14,17
175:12,13,16
181:15 182:2,17
183:1 184:6,7,12
185:8 186:4
191:18 196:20
201:7 208:23
209:16,19 210:1
211:8,15,16
215:16 224:22
242:13 253:14,20
258:7 281:2,19
282:8 285:24
291:15
**analyst** 162:14
  163:8
**analysts** 163:3
**analytic** 165:25
**analyze** 75:23 76:7
**analyzing** 110:11
  163:24
**anecdote** 163:4
**angeles** 5:15
**animal** 219:25
  220:20
**answer** 17:18
  26:10 28:6 33:17
  34:22 59:7 76:11
  76:12 113:24
  128:10 186:20

187:2 214:18
219:16 256:3
272:6 278:8,9
289:20,24
**answered** 16:2
  76:8 80:25 254:14
**answering** 291:11
**anticipated** 117:22
**anybody** 25:21
  68:5 105:1 180:16
  216:4,15 241:13
  250:22 277:12
  285:16,16
**anyone's** 168:23
**anytime** 36:7
  169:6
**anyway** 79:23
**api** 125:23 126:11
  126:15 127:5,11
  128:6
**apis** 126:18 128:10
**apologize** 14:15
  166:19
**appear** 30:2 57:21
  133:23 134:5
  176:15,17,20
  186:9 258:9
**appearances** 2:1
**appeared** 59:20
**appearing** 1:12
**appears** 30:6 31:4
  32:8 48:11 58:8
  66:17 115:10
  116:8 134:10
  135:10,12 136:12
  136:15 176:9,10
  228:15 255:3
**appellate** 242:20
**appended** 302:7
**appendix** 29:6
  88:8,9

[apple - attributing]

apple   240:13
applicability
  165:21
applicable   234:8
  300:8
applied   192:17
  221:18
apply   99:9 156:13
  162:6 166:13
  167:1 193:9
applying   217:21
approach   10:23
  111:13 123:10
  149:11 159:12,15
  160:10,17,22
  161:20 162:19
  181:19
approached   32:21
appropriate   50:19
  50:20 148:13
  160:2 191:4
approve   241:14
approved   166:4
approximate   87:4
  88:11
approximately
  145:7
april   60:20 61:19
  62:6 63:7,18,24
  65:1,3,5,8,16
apropos   175:14
area   18:14 84:7
  98:23 121:11
  124:4 169:6
  206:11,22
areas   23:6 33:4
  251:24 289:9
arguably   189:3
  203:21
arithmetic   64:23
  66:11

arms   39:9 134:3
arrangement
  43:21
arrive   154:3
art   143:25
article   10:8 79:12
  81:7,8,14 124:22
  129:5,9 130:18
  131:14,17 149:14
  152:3 155:10
  177:15,19 201:10
  236:1 241:16
articles   74:1 75:1
  75:16 97:10,21
  100:23,25 101:2
  131:11 204:21
asa   12:21 235:4,11
  235:15 236:10
aside   96:10 103:25
  124:8 143:11
asked   21:10 30:16
  30:19 32:19 33:3
  33:7,14,16,18
  41:24 57:4,7
  59:10,12,14,16
  67:20 69:15,21,22
  71:6 73:8,16,25
  74:16 75:21,25
  76:7,9,12 84:4
  100:13 103:11
  106:25 108:2
  115:4 128:7,9
  140:22 141:5
  142:8,24 166:8
  168:20 171:4,10
  171:11,18,24
  172:17 175:17
  199:7,12 211:10
  220:7 226:7 227:2
  236:3 241:14,23
  242:2 249:11

276:12 278:3,5,10
  282:21 291:24
asking   14:13
  70:23,23 132:10
  272:7 279:23
  283:10 289:23
  295:9
asks   277:14
aslater   2:19
aspects   22:24
assert   297:3
assertion   138:3
assertions   116:9
  117:1
assess   73:9 74:23
  99:15 162:14
  163:8
assessing   109:15
assessment   10:16
  74:3 112:1,7
  122:12 123:11
  129:17,20 163:15
assist   105:1
assistant   25:23
associated   35:23
  109:2 145:15
  157:24 161:12,13
  186:6 286:9,12
association   12:18
  18:10 41:7 76:14
  108:4,17,22,23
  110:9,15 114:14
  114:15 142:13
  161:10 172:12
  208:12 224:16
  225:2,18 235:1,13
  253:15,21 263:5
  263:20 264:8,18
  266:8,13,23
  267:11,25 268:18
  269:1 282:9

associations
  208:15,21 264:17
  264:22 265:3
assume   18:2 20:4
  22:14 62:5 68:24
  78:15 100:5 104:5
  121:7 205:20
  206:12 209:15
  213:13 217:13
  230:23 233:8
  246:10
assumed   205:11
  205:17,23 206:1
assuming   49:21
  94:4,7 98:16
  117:10 211:24
  212:4 286:14
assumption   84:23
  290:11 293:1
  296:15
assumptions   90:11
atlanta   4:7
attach   162:15
  163:9
attached   92:16,22
  300:11
attempt   72:22
  99:15
attempts   182:4,4
attention   59:21
  151:22 155:16
  263:14
attorney   44:16
  47:25 55:2,15
  59:8 89:16 299:17
  300:13
attorneys   56:25
  72:4 83:12,15
  93:2
attributing   130:17

audience  42:8
audited  38:14
august  1:15 13:8
  299:5 300:3
aurobindo  6:7,9
  40:1
aurolife  6:8
austin  211:15
australia  40:24
author  177:12
  179:8
author's  176:25
  182:2
authored  97:13
  159:17
authoritative
  121:24
authors  111:5,13
  111:21 112:12
  113:9,14 146:1
  177:10 182:7
  267:10,23
availability  169:9
available  30:19
  40:15 111:6,8
  266:25 267:16
  276:18 300:6
average  32:12
  87:5,6 88:11
  180:24 205:12
  221:15,19 291:17
averaging  32:8
awaiting  67:23
aware  20:24 37:11
  68:12,14 126:10
  131:23 132:2
  198:22 250:5
  269:10 283:11
awfully  230:4
awkward  69:21

**b**

**b**  8:2 9:10 29:20
  75:7 144:4 161:10
  161:13 265:21
**back**  30:14 45:9
  46:21 51:5 56:2
  85:7,13,20 97:7
  140:17 147:11,20
  148:13 175:2
  180:19 195:9
  207:23 214:25
  215:1 217:1 224:7
  244:22 246:21
  251:6 278:16
  295:15 296:6,10
**background**  115:7
  115:10,14,21
  116:1 220:4 222:6
**baghurst**  265:20
**bang**  14:14
**bankruptcy**
  249:15
**barnes**  5:12
**base**  86:17 87:19
**based**  12:8 122:9
  125:24 205:10
  208:1,23,25
  211:25 239:2
  241:20 257:2
  259:7,14 266:11
  271:20 275:13
  284:24 285:1,22
  285:22 286:7
  287:8 294:24
  295:6
**bases**  105:17
  106:6
**basic**  160:15
  161:15
**basically**  84:3
  143:14 184:17

267:8 282:19
  288:16
**basing**  287:8
**basis**  121:8 206:5
  206:9,9 245:18
  259:17 261:3
  293:19 294:11
  295:21 297:2
**bates**  135:5
**bayesian**  224:22
**baylen**  2:6
**becoming**  289:7
  289:17
**beginning**  151:7
  251:13 266:5
**begins**  18:17
  145:11 173:21,24
**begun**  143:22
**behalf**  27:10 33:12
  33:16 69:11
**beings**  261:14
**believe**  14:19
  22:22 28:22 29:1
  92:13 95:22 97:23
  98:20 99:4,20
  104:19 106:4
  119:20 131:24
  133:1,5 138:3
  155:13 159:7
  166:15,16 172:22
  173:18 174:23
  177:13 195:24
  196:17 198:12
  200:18 221:11,22
  234:6 248:2
  250:14 252:11
  273:21,25 274:1
  284:12 285:20
  286:2 289:6,8
  292:20 296:4

**bell**  6:4
**ben**  8:21
**benchmark**
  123:10
**benefit**  110:7
  262:8
**best**  93:22 299:13
**better**  123:12
  135:21 164:5
  170:13 174:10
**beyond**  21:20
  131:15 210:20
  281:15
**bias**  33:15 166:25
  167:4,6,6 168:9,9
  168:9,10 188:8,13
  188:19,23 189:16
  189:17
**biased**  284:12
**biases**  152:5 168:7
  188:18 189:1,4,9,9
**bigger**  114:17
**bill**  43:6,9 44:10
  44:19 45:9 66:13
**billed**  46:1 48:15
  61:5 66:6,18,25
**billing**  43:21 62:12
  103:12,14,14
**binds**  223:16,17
**biologically**  266:7
  266:13
**biology**  231:5
**biometrics**  224:22
**biostatistician**
  15:17,18,24
**biostatistics**  16:1,6
  42:2 224:23 254:5
**birth**  180:25
**bit**  38:4 97:8
  101:16 262:6

bizarre 169:20
black 184:17
blackwell 7:1
bladder 194:10
  199:6 207:5
  269:14
blanket 240:7
blocks 203:14
blood 269:20
blue 6:4
bob 8:20 13:5
bodies 100:7
body 206:13
  231:19
boeing 35:14,15
bogdan 3:8 46:15
  48:7 53:24 54:4
book 226:15
books 97:21
born 226:17
bosick 5:1
boston 8:12
bottom 31:6 88:1
  88:5 152:15
bound 12:15 181:1
  222:18 224:10
bracket 203:19
  204:2
bradford 211:8,11
  211:15
brainstorm 90:2
break 85:3,6
  146:18,20,21
  166:5
breaks 147:19
  148:10,12
breast 198:7,9,13
  199:18,19,20
  269:25
breathed 205:12

bring 31:16
broad 142:6 230:4
broader 109:8
broadly 15:20
  46:11
broken 134:11,14
brookline 14:23
  148:5
btlaw.com 5:17
build 161:16
built 188:13
bulk 30:12
bunch 50:16 144:7
  193:15
business 25:23
  239:1
butcher 271:7

                c

c 6:6 13:1 75:7
  265:16 299:1,1
cabinet 25:18
calculate 213:9
  277:13
calculated 86:5,13
  87:10 247:12
  274:15,22 280:12
calculation 62:17
  79:12 86:7 139:11
  277:15 279:16
calculations 62:22
  81:25 100:17
  123:9 275:3,3
  276:24 277:2
calderon 2:15
calibrated 161:18
california 5:15
call 15:23 19:1
  51:21,25 52:4,7
  58:22 60:12,16
  62:9 83:5,9,9,15
  83:17 115:17

127:25 146:22
  216:3,8,18 296:22
called 59:21 86:17
  150:2 161:13,16
  191:12 229:24
  233:2
calling 50:1 95:23
calls 64:14
camden 1:3
camera 46:19
camp 3:3
canada 40:23
cancer 11:3,8,13
  11:18 12:2 19:7
  19:18 81:6,7
  98:22 99:2,5,11,16
  109:17 110:14
  114:13 141:16
  142:14 143:5
  145:8 157:21,22
  171:8 172:13
  182:16,18,22
  183:7,12,17
  184:18,23 186:6
  187:13 197:19,24
  198:7,10,13
  199:18,19,20
  202:6,15 208:6,13
  208:19 209:5,10
  209:15,22 218:5
  218:13 220:2,17
  230:16,21 253:16
  253:22 263:7,21
  264:9 265:4 266:9
  266:15,24 267:12
  268:1,19 269:2,4,8
  269:8,14,20,25
  270:5,11,17,22
  271:2,8,13,18,22
  272:2 273:7
  280:13 282:4,15

285:6,11,14,15,17
  286:4 287:6,7
  288:1 291:19
  292:18,22 293:5
  293:21 294:4
  295:23 296:8
  297:4
cancers 12:7 18:11
  76:15 108:5
  143:17 194:5
  198:16,23 199:3
  199:13 207:5
  219:13 275:13
  282:10 290:25
cap 191:13
capability 33:9
capacity 39:15,18
  39:21,24 40:2
  42:22
captioned 299:5
carcinogen 117:22
  117:24 169:13
carcinogenic
  81:24 83:21
  118:10 206:3
  221:23,25 252:24
  253:5
carcinogenicity
  263:12
carcinogens
  266:14
care 234:8
career 173:1 254:4
careful 78:20
  290:17
carondelet 7:3
case 12:3 18:7,21
  19:4,25 21:11
  25:2 26:17,19,23
  30:6,17 31:9,11
  32:18,22 33:3,8

[case - cited]

43:23 44:22 45:17
45:20 46:2 48:4
48:12,24 49:9,22
49:23 51:11 53:22
54:18 57:4,16
59:3 60:25 65:5
66:19 67:17 68:14
69:10,17 71:2
72:18 73:3,25
75:25 76:7 77:9
81:5 89:18,23
90:6,12,18 91:3
93:23 94:23 98:1
98:8,15,17 100:7
102:19 103:4,15
105:17,25 106:4
108:14 109:15
110:12 112:18
113:18 116:2
138:9 144:14
164:12 167:4,23
198:16 199:8
211:7 215:11
220:5,23 221:1
222:10 229:22
230:10,25 231:11
233:23 234:2
241:1 249:19
250:4 252:2,16,22
253:3,9 256:7
259:9 261:19
264:15 266:12
269:12,18,23
270:3,9,15,20,25
271:5,11,16 273:4
273:5,19 276:22
281:1 284:15
292:2
**cases** 22:12,15
24:20,24 27:17,21
28:4 32:14 36:12

36:15 37:6 41:3
68:9 70:6 74:13
86:21 88:4 99:23
112:15 208:14
212:8 232:9
248:11,12,13
**casey** 246:20
**catch** 207:16
**causal** 209:14
210:10
**causally** 161:12
**causation** 19:21
19:24 210:5,10
230:19 242:10,15
243:22 247:5,10
280:23
**cause** 19:6,17,18
20:7,8,12 79:10
171:8 208:19
266:13
**caused** 19:6
209:15,22 230:20
**caveats** 98:21
**ccalderon** 2:21
**cct** 5:7
**cell** 231:5 292:22
296:7
**center** 4:15
**centre** 5:4
**century** 5:14
**certain** 18:11
22:24 33:8 38:22
44:6 56:23 63:16
68:17 73:11,19
76:16 82:19 108:6
122:5 136:14
140:6,20 158:14
171:13 205:13,17
208:12 259:22
260:4,9 261:5,12
261:20 275:12,13

282:15
**certainly** 15:25
24:21 30:12 59:12
94:6 95:21 158:15
184:5 189:5
209:25 219:7
238:20 254:16
**certainty** 209:7
271:24
**certifications**
15:23 229:17
**certified** 299:3
**certify** 299:3
**cgeddis** 2:20
**cgmps** 233:9
**challenge** 169:8
**challenges** 160:8
165:19 167:10
**challenging** 168:6
**chance** 191:13
238:10,22 294:24
295:3
**change** 36:9,9 78:6
78:11 80:18 81:2
81:10 85:18
192:19 250:3,12
301:4,7,10,13,16
301:19
**changed** 81:4
**changes** 77:14,19
81:3 300:10 302:6
**characteristic**
115:3,5 116:11
185:14
**characterize** 156:4
**charge** 44:21,24
45:6,22
**charging** 58:10
**charities** 38:23
**chart** 125:19
126:3 128:4,18

139:16,21 279:9
279:11,18
**check** 36:25 61:12
94:8,10 96:4
106:15,19 107:2,8
113:20 278:19,20
**chemical** 12:13
**cheryll** 2:15
**chicago** 8:4
**chinese** 200:20,21
201:16
**choice** 151:21,23
155:4,17
**christopher** 2:14
**chronic** 219:21
**cigna** 7:7
**cipriani** 6:1
**circle** 136:20
**circling** 185:17
**circuit** 94:3
**citation** 106:21
130:15
**citations** 106:16
107:3,8
**cite** 37:23 125:13
149:8 256:15
266:17,20 267:9
269:6
**cited** 71:17,18
94:14 104:23
117:11,13 119:19
120:22 121:25
124:21,24 129:4
129:21 131:12
132:12,22 133:4
134:6 138:19
149:9,17 150:2
159:5,18 188:8
223:3 265:17,21
265:25

**citing**  116:18
130:1
**citizen**  226:22
**citizenship**  226:24
**claim**  28:3 246:4
**claims**  154:16
156:17
**clarification**  46:14
66:15 95:13
**clarify**  99:3
196:22
**clarifying**  272:11
**clarity**  120:9
126:24 128:3
**clarity's**  217:9
**class**  228:3
**classroom**  34:19
227:5 228:7
**cleaner**  145:2
**clear**  19:14 177:16
197:14 215:25
228:20
**clearly**  18:23
172:23
**clem**  5:2 251:14
**client**  59:8
**clinic**  221:8
**clinical**  35:9
151:11,20 166:5,8
166:9 191:24
230:1,4,6,7,10
247:12
**closely**  296:11
**closeup**  29:11
**coan**  8:10
**coauthored**
159:20
**code**  88:8
**cohen**  4:4
**cohenl**  4:11

**cohort**  11:4,9,14
11:19 12:8 218:14
221:12,16 265:2
266:25 267:18
268:10
**coleen**  7:11
**colleague**  265:1
**colleagues**  89:22
90:1 161:21 256:9
256:16 263:3,18
266:4
**collection**  73:7,17
75:21 174:15
**collectively**  177:18
**college**  226:12
**colorectal**  199:5
270:5
**columbia**  227:19
228:22
**column**  85:23 86:1
86:13,16,16,17,17
87:4,9,19 128:20
152:16 192:19
194:4 263:11
**columns**  86:12
134:10,12,13
**combat**  39:9
**combine**  185:23
187:6
**combined**  186:17
**combines**  185:5
**combining**  183:6
183:11 186:25
**come**  30:14 51:5
85:6 96:1 97:7
186:18 234:7
261:1
**comers**  144:18
**comes**  86:2 87:12
87:14,15 185:1
205:20

**coming**  50:5 61:9
259:9
**comment**  89:8
157:12,18 158:8
166:12 235:25
**commentary**  10:9
124:22
**commitment**
228:9
**committee**  231:23
232:1,3,7,10,12,22
**committees**  233:4
**common**  166:7
184:11
**commonly**  237:3
**commonwealth**
299:9,11
**communication**
53:13,17
**communications**
54:10 100:6
102:22 104:13
**comorbidities**
166:3
**companies**  35:7
37:7,9 74:20
**company**  7:8
74:22 126:20
140:12 273:18,23
274:1 276:13
**compare**  145:5
**compared**  122:13
123:11 237:17
**compares**  143:2
**comparing**  137:22
**comparison**
190:23,25 192:14
**competing**  217:21
**complaint**  56:24
**complete**  16:24
34:22 93:23 95:15

100:1 103:14
134:13 136:12
137:1,15 149:18
250:4,13 302:8
**completed**  90:23
300:17
**completely**  44:17
156:24 157:2
166:10 248:15
266:10 295:3
**compliance**
233:21
**complicated**  86:15
**complies**  79:24
201:25 202:2
207:21
**component**  153:13
187:17 189:24
190:3
**composite**  156:5
**compound**  130:12
**compounds**  11:25
263:6,20
**comprehension**
17:3
**compute**  161:18
180:23
**computed**  108:19
**computer**  24:8,16
250:18,24
**computers**  24:13
**conceivable**
164:17 165:2
**conceivably**
164:23
**concentrations**
218:13
**concept**  213:21
295:4
**concern**  157:3
158:7 166:22

[concern - control]                                                                Page 10

167:3 188:8
189:12,19
**concerned** 167:7
**concerning** 157:22
182:18 272:19
**concerns** 152:8
154:5 165:23
168:16 169:10
189:16,18
**concierge** 8:21
29:22,24
**conclude** 275:11
**concluded** 25:2
266:7 267:24
**concludes** 298:17
**conclusion** 59:18
59:23 80:23 122:9
122:11 123:19
138:6,14 151:19
172:3 186:19
220:12 240:11
247:4 266:3,5
267:24 275:17
**conclusions** 83:24
114:8 121:9,14
153:23 164:2
182:6 239:1 256:8
256:15
**conduct** 111:1
**conference** 216:3
216:8,18
**conferred** 91:17
91:20 133:9
246:17 279:3
**confidence** 145:9
157:24 161:18
173:21,24 202:16
214:5,14 223:18
**confidential** 133:6
138:24

**confined** 145:1
**confirm** 101:5
155:22 284:13
285:7
**confirmation**
268:10
**confirmed** 94:12
266:24 267:15,22
268:15
**conflicting** 152:19
**confounding**
144:17 168:10
181:23 182:5,8
**confused** 183:13
**conlee** 55:21
**connection** 92:20
102:19 232:17
269:17,22 270:2,8
270:14,19,24
271:4,10,15
273:19
**consequence** 80:4
**consequences**
230:7
**conservative**
81:25
**consider** 15:13
141:5 151:23
155:16 156:19
157:11 172:8
181:22 190:21
192:23 213:25
214:6 281:9
**considerable**
158:3,9,24
**consideration**
163:4 267:19
**considerations**
12:10
**considered** 76:18
76:19 109:22

204:11 217:8
**considers** 143:3,19
**consistent** 155:25
172:2 209:17,20
209:25 210:1
242:22
**consistently**
155:23
**constant** 155:6
**construction** 28:3
**consult** 140:22
**consultant** 35:15
**consulted** 35:7,14
**consulting** 15:6,8
21:9 25:23 33:20
34:3,23 35:1,3
39:3,14,18,21,24
40:2 45:14,19
74:18,19 75:10
103:18 252:6
**consume** 261:6
**consumer** 162:12
163:6
**consuming** 212:8
280:4
**contact** 48:3 72:10
**contacted** 68:13
69:9,11 252:10,15
252:21 253:2,8,18
**contain** 126:17
**contained** 105:25
106:7 136:1 190:7
205:17 249:22
290:10,12 291:17
296:15
**containing** 274:13
274:20 275:14
277:6 282:5
285:18 286:23
292:3 293:4 297:4
297:5

**contains** 116:20
137:23 287:24
293:2
**contaminant**
199:21
**contaminated**
11:2,7,12,17
123:14 124:12,15
143:7,15 145:5,16
145:23 172:12
208:2,5 209:2,4,15
212:9 285:2,5,9,21
286:20 287:5,10
**contamination**
10:11 124:23
208:4,25 212:1
285:3 287:11,19
**contend** 243:7
**content** 228:16
277:16
**context** 12:22 22:8
41:10 73:14 74:15
82:17 114:17
116:9 153:16
154:12,12 157:13
162:1,5,23 163:12
163:24 164:18
166:10 235:16
248:14 253:19
**contexts** 74:8
99:10
**continue** 81:11
**continuing** 41:9
144:9,11
**contract** 22:8
**contracts** 103:18
**contradictory**
268:17
**contrast** 258:6
**control** 12:3 153:4
182:5,7 264:16

[control - cover]    Page 11

266:12
**controls**   161:6,8
   161:14,17
**conversation**
   195:10
**conversations**
   82:6
**conversion**   138:11
**convert**   102:6
**convicted**   249:7
**copies**   24:22 95:9
   101:24 146:17
   300:14
**copy**   24:23 25:8
   25:17 47:18 57:22
   60:25 61:2 66:3
   76:21 93:15,16
   94:2 95:7,17
   96:13,14,21
   115:18 122:20,23
   129:14 133:25
   136:7 226:8
   234:13 244:12,15
**corners**   106:1
**corporation**   5:19
   7:7
**correct**   16:10,11
   16:15 18:14 19:20
   19:25 22:3,20
   23:15,16 33:17
   37:21 44:17 48:13
   48:17 51:23 54:13
   57:22 58:14,23
   60:11,25 61:6
   62:2,6 64:19 66:3
   66:7 69:13 77:15
   78:17 79:19 80:24
   81:9 90:7 95:11
   97:5 98:19,20
   100:3,9,19,20
   103:9,15,19,20

104:9,24 105:18
106:2,9 107:23,24
108:8 109:17
111:8,15 113:5
115:11,12 116:3
117:4,12,25
118:12,20 119:11
119:12 120:7
121:15 122:1
123:20 124:24
125:19,20 127:12
129:2 139:13
140:14,15,24
141:23 149:22
150:5 151:15,24
151:25 152:9,22
153:24 154:7
155:7 158:4 159:1
159:19 160:13
162:7,22 163:19
163:22 164:15
165:13 167:2
169:11 170:23
174:23 179:1,9
182:23 184:19
187:9 188:15
189:23 190:4
193:5 195:1,2
196:4 198:8
200:18 201:18
202:8 203:17,21
204:13 205:14
220:11 221:11
226:12 228:14,15
228:24 229:6
230:2,17,22 231:4
231:11,12,15,16
233:22 246:6
252:8,19 255:14
256:18 257:23
258:21 259:1

260:5 262:19,20
262:23 263:7
264:9,23 265:10
266:9 267:1,13
268:2,11 269:2,9
269:10 272:21,22
273:25 274:8
276:1 279:19
280:1,23,24 281:4
282:6,19 284:16
284:19 285:12,18
286:24 288:18
290:5,13 291:2
296:17 302:8
**corrected**   250:9
**correction**   76:23
   79:4 191:8 245:2
   250:6
**corrections**   191:9
   302:6
**correctly**   82:3
   88:24 117:18
   123:15 124:18
   149:6 152:23
   155:8,19 156:9,10
   163:20 164:10
   181:5 182:24
   186:15 254:2
   263:25 264:24
   265:6
**correspondence**
   15:10 26:3 52:11
   52:12,14 53:10
   176:23 177:9,11
**corroborating**
   164:14
**counsel**   3:20 4:20
   5:9,18 6:7,17 7:7
   7:18 8:7,15 13:13
   26:3 47:1 49:5,17
   52:11 53:10,18

56:11 57:9,25
60:5 61:3 67:6,9
68:1,2 69:12
88:21 89:5 90:15
91:17,20 93:9
95:18 102:12,23
104:14 123:24
129:10 133:9,11
137:3,13 138:24
139:24 140:5
146:11,13 147:22
180:3 195:8 199:7
220:7 246:17
260:22,22 279:3
299:14,17 300:14
**count**   123:2
**counted**   31:18
   32:1
**counting**   39:8
**couple**   27:9,12
   37:23 67:14 75:12
   85:18 164:3
   202:18 215:2
   284:8,24
**course**   49:9,23
   53:7 193:1 227:8
   254:4
**courses**   227:11,22
   227:24 228:12
**court**   1:1 13:6,22
   27:24 29:22,22
   58:2 85:5 93:17
   107:10 146:22
   229:21 241:25
   242:5,6,20 247:8
   247:19 262:8
   273:3,4
**court's**   247:3
**cover**   135:3
   251:24

**covered** 194:5
**cox** 185:14
**created** 104:7
    281:17
**creates** 271:25
**crime** 249:8
**criteria** 50:9,23
    51:1 260:10
**criticism** 255:19
**criticisms** 123:19
    149:21 150:13
    255:13,20
**criticize** 121:13
**critique** 258:5
**crr** 1:19 299:22
**cs** 300:15
**cui** 186:1,4,9,16,18
    186:24 199:24,25
    200:14 201:3,7,10
    201:21
**culbertson** 8:9
**cumulative** 86:6
    180:23 207:2
    208:13 213:1,8
    272:24 273:8
    277:19 280:7
    286:2 289:2,7,12
    289:17 290:2,19
    292:7 293:10,22
    294:5 295:24
    296:2,9
**current** 96:13,17
    162:24 163:1,11
    163:19 228:21
    229:1
**currently** 33:23
    36:3 68:11 227:5
**cv** 10:1 35:6,17
    96:14,15,21,25
    97:16,20 99:14
    225:6,7,13,20

226:8 227:12
    231:21 254:1,2
**cvs** 5:18 6:7
    283:25 284:7
**cwhill** 7:16

**d**

**d** 7:2 9:1 13:1
**daily** 10:3 122:10
    122:15 181:1
    212:25 213:6
    255:8 259:17
    261:3 286:23
    288:17 289:1
    290:1
**damages** 230:25
**daniel** 2:4 13:15
    95:2 129:14
    146:24 150:11
    300:1
**danish** 11:4,9,14
    11:19
**darn** 132:20
**data** 111:1,2,4,6
    111:12,16,22
    112:10,11 117:10
    125:18 132:15,16
    132:22 138:7
    151:23 155:15,17
    160:10,16 161:25
    162:4 165:1 182:1
    182:12 188:10,25
    212:7 220:20
    237:15 238:2,9,21
    245:25 247:13
    275:24 279:11
**database** 10:19
    40:11 49:16 150:3
    151:16,22 154:10
    154:10,11,13,15
    154:18,24 155:1,5
    156:17 157:6,7

166:24
**databases** 40:16
    50:3,11 151:9,15
    151:21 154:16,17
    155:25 156:18,18
    260:9
**date** 13:8 31:16
    61:18 62:2 65:13
    96:14,17 301:24
    302:12
**dated** 47:12 57:17
    60:20 66:2 77:1
    97:5
**daubert** 19:24
    28:8,13,16,19
    29:15 30:2,17
    45:23 67:18
**david** 1:14 9:5,19
    9:23 13:10,25
    14:21 29:4 55:10
    55:12 92:10 247:5
    299:4 300:5 301:2
    301:24 302:2,4,12
**davis** 4:2
**day** 34:8 45:2
    77:24 79:16 86:9
    87:11 118:16,17
    118:25 119:1,8,10
    205:13 212:20
    213:4 257:22
    258:12,20,21,25
    259:5 280:4 291:6
    302:15
**daylight** 34:16
**days** 45:3,3 180:25
    213:11 280:3,6
    290:4 296:22,22
    297:6,16 300:17
**de** 261:13,22
**deal** 44:10

**dealt** 266:17
**dear** 179:15
**december** 48:23
    52:1 56:5
**decide** 57:1
**decided** 247:25
**decision** 160:3
**decisions** 239:1
**declare** 302:4
**decrease** 109:4
**decreased** 152:20
**deemed** 302:6
**defendant** 22:3
    27:13 38:1
**defendants** 9:17
    9:21 13:18 14:10
    23:11 27:11 36:14
    37:11,12 46:11
    91:14,22,23 92:9
    95:4 132:7 137:13
    225:24 226:1
    234:3 251:15
    274:20 275:15
    282:6
**defending** 68:3
**defense** 13:19
    23:13 27:7
**define** 110:5
    114:12
**definitely** 135:12
**definition** 108:21
    109:8 213:17
    237:20
**definitive** 190:11
**degree** 17:14
    109:5 209:7
    271:24
**degrees** 15:22 16:1
    16:5,5 229:14
**delay** 14:16

[delete - distribution]                                                                Page 13

**delete** 25:3
**demonstrated**
  81:13
**denied** 247:7
**department**
  117:17,20 228:18
  228:25
**depending** 155:4
**depends** 57:3
  210:9,11,12
  213:10 297:22
**deponent** 37:1
  79:24 101:18
  134:17 136:10,25
  147:1 148:4
  150:24 177:7
  201:25 202:2
  203:8 207:14,21
  211:18 215:6
  267:5 293:12
  298:5,9 300:13
  302:3
**deposed** 20:17
  21:17 27:2
**deposes** 14:1
**deposing** 300:13
**deposition** 1:14
  9:18,23 13:10
  22:7,14 25:18
  29:4,5 31:4 32:9
  68:3 91:2,3,14,23
  92:9,15 97:9
  100:11,13 104:13
  104:16 108:2
  125:3 147:15,16
  148:9 167:15,18
  167:22 198:22
  216:6,16 248:6
  249:12 262:10
  298:17 299:4

**depositions** 20:25
  21:22 23:8 24:3
  27:9,12 32:1
  56:24
**derive** 290:3
**derived** 136:16,21
  139:20 185:2
**derives** 170:10
**describe** 77:19
  108:11 160:20,21
**described** 20:15
  50:9 81:11 112:2
  165:3 170:22
**describes** 50:12
  163:10
**describing** 221:12
**design** 155:5
  160:11 163:2,5
**designed** 156:21
**despite** 81:10
  155:5
**destefani** 193:18
**destroy** 191:16
**detailed** 60:8
  219:23
**detected** 20:9
  132:1
**detection** 124:13
  124:16
**determine** 112:8
**develop** 208:6
  285:5,10,15,17
  287:5
**developed** 209:3,5
  209:10 275:12
**developing** 207:5
  272:1 287:7
**development**
  12:11
**diagnose** 230:15

**diagrams** 104:2
**dich** 221:5,19
**diem** 44:7
**diet** 221:24 280:8
  286:8
**dietary** 11:25
  76:16 108:6
  140:20 141:1,7
  156:22 182:8
  187:14 189:11
  195:7 208:10
  212:22 219:14
  221:6 260:4,25
  263:6,20 264:8
  266:14 282:10
  290:23
**differ** 168:15
**difference** 15:16
  127:11 237:16
**different** 35:16
  53:24 70:24 78:9
  99:9 130:13
  144:12 151:9,10
  151:11 153:5,6
  156:24 157:3
  166:10 168:7
  184:10 185:8
  206:18 232:8
  246:5 286:15
  295:4
**differently** 185:2
**difficult** 134:16
**difficulties** 66:14
**digestive** 12:6
**diminish** 192:11
**dinner** 17:8
  298:12
**direct** 45:12 72:5
  82:5 85:20 167:14
  227:14 258:14,16

**direction** 153:15
  153:18 155:2,4
  158:18,20
**directly** 86:2
  87:12,14,15,20
  129:23 142:16
  156:16 255:15
**disagree** 239:10
  240:17,20 246:9
  246:15
**disclose** 241:5
**disclosed** 198:23
  216:9,19 217:12
  217:14
**disclosure** 198:16
**disconnect** 172:24
**discover** 78:13,25
**discrete** 74:22
**discrimination**
  143:10
**discussed** 71:10
  100:21 140:18
  144:19 149:3
  248:5 260:25
  262:22
**discussing** 54:11
  81:19 162:1
  163:12 286:19
**discussion** 46:20
  77:13 150:21
  154:23 163:5
  187:3 214:20
  298:13
**discussions** 72:6
  82:25
**dispute** 22:9 256:8
**distinguish** 145:18
**distort** 168:7
**distribution**
  161:16 219:12

**district** 1:1,2
**divided** 78:5
   203:13
**divides** 143:6
**divorce** 22:8
**dnigh** 2:9 300:2
**doctor** 90:25
**document** 10:17
   37:2 43:18 57:25
   61:3 63:6,13
   90:25 92:1,11
   101:19 102:6
   133:4,24 134:5,12
   134:14,21 135:4
   136:11 137:3,22
   137:24 138:19
   139:7 177:8
   198:19 203:9
   207:15 244:19
   267:6 293:13
   297:18
**documentation**
   59:23
**documented** 65:16
   109:23
**documents** 37:20
   37:23,25 49:17
   64:1 92:16 98:13
   103:22 104:12,17
   126:21 128:10,13
   131:19,24,25
   139:24 140:12
   152:7 171:19
   175:25 176:2
   234:20 273:18,23
   274:1 276:13
**doing** 41:25 49:15
   51:15 58:21 62:14
   62:14,16,21 63:21
   64:23 102:3
   109:20 153:12

154:3 157:10
   170:14 184:7
   216:11 223:9
   227:4 228:2,6
   273:11
**dominates** 163:18
**donate** 38:21
**door** 253:13
**dose** 18:10 76:14
   86:18 87:19 88:5
   108:4,17 110:6,10
   110:11,12,23
   112:2,8 113:10,14
   125:23 126:4,5
   127:11,14,19
   142:13 213:6
   219:24 220:16
   253:15,21
**doses** 255:18
   257:1
**dosing** 208:1
   285:1 286:21
   287:9
**doubt** 25:16 64:23
   168:3
**downloaded**
   100:25
**dozen** 75:13
**dr** 13:10 14:6
   46:24 49:14 66:17
   70:5,7,10,13,15
   71:7,8,18,23 72:6
   72:8,11 76:19
   81:23 82:1,6,14
   83:1 84:6,15
   85:16 88:20,24
   89:11 91:25
   102:23 119:16
   120:19 121:13
   122:24 123:20
   133:22 137:14

138:2 140:22
   141:6 147:13
   148:17 151:5
   179:8,20,25
   195:13 198:11
   204:16 206:2,10
   210:4 215:3,17
   217:4 218:19,21
   218:25 235:22,23
   247:3,9 251:10
   257:7 280:21
   281:4,8,17
**drafting** 63:13
   105:1
**draw** 83:24 153:23
   164:1 291:3
**drew** 59:19 275:17
**drift** 286:25
**driven** 156:7
   160:10,16
**drives** 170:9
**drs** 179:15
**drug** 98:21,25
   99:2,5,18,19 144:3
   144:4,12,14
   152:18 232:6
   276:4
**drugs** 6:17 17:2
   36:19
**dual** 226:24
**duane** 7:10
**duanemorris.com**
   7:16,17
**dublin** 226:12
**due** 247:6 295:3
**duly** 14:1
**duties** 35:24

**e**

**e** 9:1,10 13:1,1
   262:7 299:1,1
   301:3,3,3

**earlier** 63:16
   100:21 170:22
   190:4 195:10
   203:24 245:7
   254:22 268:22
   278:13 284:10
   295:9 297:17
**early** 142:3 220:4
   222:5 278:16,18
**earplug** 39:10
**east** 5:14
**eastern** 147:14
**ebbed** 33:22
**editor** 146:6
   178:10
**education** 41:10
**effect** 76:20 86:4
   87:12 114:22
   145:6 152:18
   156:7 168:8
   171:13 172:11
   183:22,23 184:9
   185:3 196:7
   239:18 265:14
**effective** 144:15
**effects** 160:1
   165:25 166:2
   219:20 220:1
   252:24 253:5
**effort** 92:24
   111:20
**efforts** 125:17
**ehr** 156:18
**eight** 48:16
**eisenhower** 2:16
**either** 81:24 82:20
   206:4,7 216:2,11
   217:14 223:2
   232:18 234:19
   244:12 248:21

electronic  43:18
93:16 95:7,9,14
154:16
electronically  95:3
95:8,17
elevated  290:25
email  52:14 53:14
235:4
emails  72:8
embarrassed
89:13
emerged  141:6
empirical  161:16
163:14 164:7,13
164:20
employed  232:24
299:15,17
employee  233:3,5
299:17
encountered  160:8
endeavor  121:13
endnote  101:3,11
102:2,9
endpoints  191:25
ends  18:18
engaged  36:2
92:14
english  200:25
201:1,7 283:2,4
enjoy  298:12
entered  45:19
222:9
entire  100:1
137:24 266:17
entirely  20:13
82:19 107:22
208:24 209:1,17
229:18
entirety  121:3
235:19

entitled  15:23
124:22 125:8
235:12 255:8
entries  79:6
entry  60:9 137:2
envisioned  164:16
epa  100:6
epidemiological
121:19 252:23
253:4 263:4,19
epidemiologist
22:18,20
epidemiology
18:16,21 19:2
22:23,24 23:3,5
33:5 144:1 213:22
228:12,16,18
229:6,10,15,17,21
229:24 254:5
equal  237:17
equating  51:12,13
297:8
errata  300:11,13
300:17
erratas  300:15
erroneous  79:12
error  61:22 62:1
78:12,25 79:11
168:8 191:12,14
191:19 207:9
errors  78:21
esophageal  186:3
186:5 199:4 202:6
202:15 207:6
292:22 296:7
esophagus  194:18
esq  2:4,5,13,14,15
3:2,8,15 4:2,3,4,14
5:2,3,13 6:2,12
7:2,11,12 8:2,10
300:1

essentially  75:24
115:20 118:9
134:21 153:2
183:5 275:9,16
estimate  87:7
88:12 157:23
165:22 182:19
183:1,7 185:4
estimated  76:20
86:22 87:20 88:4
214:12 219:14
estimates  156:5,7
183:22,24
et  13:11 81:21
118:24 119:7
203:3 207:1
217:21 221:6,23
258:10,10 272:19
300:4 301:1 302:1
etminan  70:5,7,10
70:13,15 71:7
72:6,8,11 76:19
140:22 179:8,15
179:20,25 209:20
210:4 218:19,21
257:7 260:15
262:19 281:4,8,14
281:17
etminan's  71:8,18
71:23 141:6
195:13 198:11
204:16 209:21
215:17
evaluate  18:9
76:13 108:3
142:12 253:14,20
evaluating  10:18
10:24 114:24
149:11 150:2
159:12,15

evaluation  166:24
evenly  145:25
event  114:23
224:9
events  57:13
everybody  29:12
85:5 146:22
240:15
evidence  10:24
20:3 96:9 139:8
149:11 159:15
162:15 163:9,14
164:7,13,21
168:19,21 169:17
170:8,10 173:16
204:8 239:23
240:4 299:7
evidently  159:3
exact  57:12 80:9
212:17
exactly  30:12 38:9
88:9 121:6 130:19
140:7 157:12
208:19,21 238:23
239:11 240:18
examination  9:6,7
9:8 14:4 110:8
221:8 251:8,23
284:4
examine  155:22
examined  76:17
108:7
example  117:16
167:5 191:24
233:14 237:15
287:15,16,22
288:7
exceeded  274:14
274:21 277:8
excel  10:13 137:9
137:12

**exclude** 247:4
**excluded** 229:21
  229:22 242:10,12
  243:2,7,13 245:7
  245:25 247:21
  248:12,24
**excluding** 241:25
  245:19 248:6,22
**exclusion** 246:10
  246:14 247:19
**exclusions** 241:24
**excuse** 81:6
  176:10 198:3
  220:2 239:15
**execution** 160:11
**executive** 151:6
  299:8
**exercise** 74:16
**exhaled** 82:2
**exhibit** 9:11,12,13
  9:14,15,16,17,20
  9:25 10:1,2,5,8,13
  10:14,17,18,22
  11:1,6,11,16,21,23
  11:25 12:4,9,14,17
  12:21,24 29:2,4,8
  30:23 35:20 36:22
  47:12,14 53:2
  57:15,18 59:19
  60:19,21 61:25
  65:22,23 76:22
  77:1,3 91:1,4,12
  91:16,19 92:4,7
  93:11,12 94:22
  95:16,17 96:9,20
  96:24 97:2 100:3
  120:23,24 125:2,4
  125:5 129:5,6
  133:18,22 134:6
  135:25 136:4
  138:17,21 150:7

150:16,18 159:8
174:7,11,19
177:18,25 178:18
178:20 180:5,7
195:21 200:4,5,9
205:7,11 207:22
222:15,19,21
223:7 234:13,14
234:16 235:15
244:5,6 245:3
246:19 262:10
263:3 276:6
278:12,16,25
**exhibits** 150:23
  244:18 252:4
  278:15
**exist** 162:6,9
**existence** 283:11
  297:9
**existing** 143:23
**exists** 163:14
**expanded** 210:18
**expect** 20:1 111:10
  208:20,21
**expected** 117:25
**expenses** 45:9,12
**experience** 103:4
  103:8 162:13
  163:7
**expert** 9:16 14:12
  15:10 21:6,24
  22:9,13 23:5,14
  24:7,11 25:7,8,19
  27:20 32:11 36:13
  38:6,11,18,22
  40:11,15 42:14,22
  43:2,7 70:7 73:3,8
  73:21 74:2 90:3
  105:14 163:4
  169:25 196:10
  205:4 225:24

226:5 230:5 231:6
231:15 240:25
241:11,15,20
247:9 253:8
**expert's** 29:7
  73:17
**expertise** 32:25
  84:8 121:11,15,22
  124:5 142:21
  163:3 164:1
  206:11,15,16,20
  206:23 256:3,5,13
  258:4
**experts** 82:22
  89:17 226:2 257:4
  260:3
**explain** 139:19
  160:7 174:21
  176:1 181:7
  291:14 292:1
**explained** 82:1
  172:6,23 204:4
  291:25
**explaining** 173:1
**exposed** 109:1
  123:13 143:7
  259:17 261:2
**exposure** 10:3
  12:12 18:11 76:17
  78:3 81:21 86:6
  108:7,20,24
  109:14,16 119:24
  120:14 122:10,12
  123:11 141:11,16
  170:21 180:24
  205:23 207:2
  208:13 213:1,8
  218:12 253:16,22
  255:8 256:17
  261:12,20 269:7
  271:25 272:24

273:8 274:14
277:7,19 280:6,7
286:2,13 288:22
289:3 290:2,6,19
292:7 293:10,22
294:5 295:24
296:2,9,14
**exposures** 109:9
  291:8
**express** 7:7,8 87:2
**expresses** 149:15
**extent** 103:3
  108:25 109:1
  203:14
**extra** 148:12
  244:12,15
**extract** 108:18
**extracting** 117:7
**extrapolating**
  220:20
**extrapolations**
  122:14 123:12
**extreme** 29:11
  158:15,16 191:13
  237:18

|           f           |
|-----------------------|

**f** 29:20 299:1
**face** 82:15,15
  84:23 125:25
**fact** 53:12 77:25
  78:1 86:10 101:6
  112:3,8 118:21
  144:24 154:1
  158:24 169:20
  192:9,11 193:2
  219:18 256:14
  258:18 264:5
  287:8 296:19,25
**factor** 185:11
  214:17

**factors** 144:17
181:23 182:8
**facts** 90:11 116:18
**factual** 116:9,25
**fails** 300:19
**failure** 145:17
**fair** 20:10 22:14
59:22 68:24 69:18
84:2,25 85:1
115:1 116:11,22
128:14,14 129:19
158:22 187:24
217:13 252:18
254:6 262:3
276:10 283:6
284:22 291:20
292:25
**fairly** 75:20
149:18
**fairness** 260:14
**falanga** 4:13
**falkenberg** 8:1
**falkenbergives.c...**
8:6
**fall** 41:9,15 168:19
**false** 172:15
191:14
**familiar** 55:1,9,15
55:21 105:20
127:15,16,20
177:23 178:14
198:25 219:6
223:20
**family** 25:24
**famous** 219:25
**far** 48:4 54:21
66:19 122:3
254:11 268:13
277:2
**farr** 3:14

**farr.com** 3:19
**fashion** 137:16
272:16
**fashioned** 52:16
**fast** 198:4
**fatally** 173:9
**favor** 69:22
**fcrr** 1:19 299:22
**fda** 10:6 100:6
104:22 118:20,22
122:4,15 124:24
125:3 128:4,18
131:13,17 231:22
231:22 232:1,12
232:18,25 233:21
262:1 276:3,17
277:16 278:14,21
**fda's** 295:1
**feasible** 165:4
**featured** 171:25
172:1
**federal** 30:25
100:6 105:14,20
107:10
**feeble** 281:24
**feel** 19:3 173:9
**fellow** 225:14
**fellowships** 225:14
**felt** 158:25 197:4
243:17
**fewer** 297:5
**field** 224:15
**figure** 151:2
291:23
**figures** 90:11
**file** 9:25 29:18
46:7 93:10,23
94:23 95:15,23
100:1 101:1,3,6,11
101:14 102:2
104:1,18 136:1

137:14 146:10
170:20 171:20
174:4,16 175:7
190:7 196:4
200:18 215:9
217:9,15 222:8,19
224:1 242:24
**filed** 69:5 245:23
249:15 273:3,4
**files** 24:19
**filing** 25:17
**final** 65:22 240:10
**financially** 299:18
**find** 123:23 130:7
141:25 161:11
170:13 173:3
197:9,11 210:20
264:12 266:5
269:23 270:3,9,15
270:20,25 271:5
271:11,16 278:24
**finding** 269:13,18
**findings** 154:24
155:13,23 163:19
164:6 267:14
268:14
**fine** 18:4 115:4
133:15 244:3
**finish** 223:9
**finished** 24:25
125:23 126:4,5
127:11,13,14,19
**finnish** 221:7
**firm** 3:14 45:10
48:1 53:19,19,23
53:25 54:2,19,23
54:24 55:6,13,19
55:23 61:10 68:10
68:14 69:10
252:11

**firms** 54:11
**first** 21:8,13 29:15
47:11,12 48:11,24
54:18 59:2,10
61:20 69:17 80:5
96:12 115:9,21,25
119:23 120:12
152:3 154:10
155:14 159:23
166:21 177:20
215:2 238:1 243:8
249:13 277:24
278:15 297:8
**firstly** 276:2
**fit** 50:9
**five** 175:24 176:2
203:14 227:10
236:18 247:11,23
**fixed** 250:24
**fizzled** 14:15
**flashy** 211:17
**flaw** 145:20
**flawed** 173:10
175:10
**floor** 2:16 4:16 5:4
8:11
**florida** 2:7 3:17
**flowed** 33:22
**focus** 191:11
**focused** 15:19 42:5
84:1 99:1 181:3
276:9
**focusing** 183:23
**folder** 95:16
174:17
**folks** 145:2 209:3
209:3
**follow** 49:18 133:7
159:23 284:8,23
293:25

**following** 65:10
75:22 76:6 133:16
139:1 207:5
288:21 293:25
**follows** 14:2 143:3
**foods** 259:23
261:5,6
**footnote** 37:23,24
38:1 87:25 117:3
117:6,12 127:1,1,4
127:4 131:18
132:19,23 133:5
135:2 138:20
149:10 159:5
265:22
**footnoted** 117:1
**footnotes** 107:4
128:6 265:25
**foregoing** 302:5
**forget** 189:17
**form** 18:15 19:8
20:11 21:2 30:10
31:25 32:5 33:6
33:13 38:8 39:4
42:17 43:5 49:24
51:16 56:13 57:2
57:11 59:24 64:21
65:18 67:19,24
69:19 70:2 71:4
71:22 73:10 74:4
75:18 76:1 86:14
90:14,19 92:19
94:24 99:6 105:19
106:3,10 107:19
109:18,25 113:6
117:8,15 118:1
119:25 120:4,15
121:10,16 122:16
123:17,22 124:6
130:10 131:22
132:8,18,24 134:7

141:4,12,19 153:8
156:25 157:8
159:2 162:8
165:14 168:12
170:6 172:5 173:5
175:19 184:20
186:12 187:22
188:6,16 189:14
190:9,24 196:11
198:2 199:2
203:25 205:19
206:8,21 209:12
209:24 210:8,14
212:5 213:2 214:8
220:21 226:6
230:3,11 231:13
234:5,10 243:4,14
243:25 246:12,16
248:8 249:20
250:15 254:7
256:11,19 257:5
259:12,20 260:6
261:15,23 263:22
267:2 268:3 269:1
269:8 271:22
272:1 274:16,24
277:10 278:7
282:7,18 284:17
286:5 288:19
292:15 293:7
294:7 297:7
**format** 137:23
**formation** 221:25
**formed** 20:4,9
171:22
**forming** 89:17
205:3
**forth** 115:14
**forward** 143:12
**found** 100:18
121:23 125:19

128:24 139:8
140:2 171:7 186:5
220:9,15 264:7
265:2 266:12,19
282:14 285:22
**four** 21:20 27:3
28:15,19,23 29:6
30:4,5 31:1,19
32:2 36:20 37:3
39:5 47:2,5 51:19
51:21 64:1,15
66:16 106:1
186:24 194:19,19
248:4,9,11 265:1
**fourth** 65:21 66:4
123:2 248:16
**frame** 208:3 209:9
211:23 212:1,3
285:3 286:22
287:11
**framing** 74:5
**frankly** 146:3
**freeman** 2:12
**freezing** 250:18
**fresh** 235:20
**fro** 41:20
**front** 51:3 93:20
94:21 105:7 135:3
148:19 220:14
244:2 262:14
**fuel** 170:8
**full** 166:21 173:6
192:7 227:8,24
239:7 242:24
**fully** 18:3 267:20
**function** 73:24
184:23 199:9
**fundamental**
134:18 143:18
145:20 191:7

**funds** 38:23
**further** 267:13
268:1,9 299:16
**future** 164:4
**fuzzy** 18:17

**g**

**g** 13:1 262:7
265:21
**galer** 205:10
**gastric** 157:21,22
182:16,18 187:13
189:20,21 199:4
270:11
**gateway** 4:15
**gathered** 188:10
188:12 283:14
**gathering** 188:25
**gcoan** 8:14
**geddis** 2:14
**general** 28:9 32:18
121:21 157:9
182:3 188:22
191:23 210:5
241:22 242:10,15
247:5 280:23
**generality** 168:13
173:6
**generally** 19:1
20:6 25:4,5 86:20
111:10 115:24
124:7 183:21,24
189:4 210:24
**generate** 50:13
151:10 260:19
**generated** 50:15
**generating** 71:2
90:17
**genetic** 124:1
**geoffrey** 8:10
**geographic** 219:12

**george** 3:15
**georgia** 4:7
**german** 283:3,3,8
**germane** 75:4
   118:4 142:17,23
   171:3,5,17,23
   172:16 173:3
   175:17 197:4,7
   219:9,17 220:10
   272:5
**getting** 26:1,2 45:6
   184:22 289:8
**giannini** 8:20 13:5
**give** 16:14 18:20
   19:4 32:15,21
   33:3 34:21 38:17
   38:22 59:10,12
   74:2,21 85:5 92:7
   94:1,25 160:24
   175:2 214:2,10
   231:10 236:19
   240:7 244:9
   246:21 278:8
   284:19
**given** 14:12 21:23
   22:7 23:5,9 27:10
   27:13 28:5,7,12
   31:5,15 41:5
   85:21 167:8 216:5
   216:16 260:2
   281:16 302:9
**gives** 74:22 87:5
   138:12
**giving** 20:8 41:25
   161:2 167:22
   169:12 278:20
**go** 46:17,21 47:9
   79:5,6 80:4 86:16
   88:14 102:3
   111:18 112:4,17
   114:5 119:6 122:3

137:20 147:4,5
151:2 160:6 170:2
173:25 174:20
192:11 216:20
220:24 236:18
251:1 262:25
263:9 264:5 265:1
266:3 268:6
277:15 278:23
283:24 285:25
289:10,17,19
292:13,19 295:15
296:6,10 298:15
**goes** 145:12
   163:13 195:9
   264:6
**going** 18:2 47:9
   59:6 62:19 65:16
   76:25 79:22 85:4
   91:21 93:11 94:9
   146:21 147:21
   148:2,8,18 151:6
   154:4 169:5,14
   173:23 178:16
   188:14 204:6
   211:4 216:14
   227:8 244:17
   246:21,23 250:20
   251:20,21 266:6
   271:7 279:5
   280:22 282:2,13
   285:13 288:25
   289:4,5
**gomm** 282:25
   283:7
**good** 13:3 14:6,7
   36:23 79:25 85:7
   109:12 167:20
   173:11,25 207:16
   226:16 239:23
   240:2 246:7

251:10 298:9
**goodman** 77:23
   79:6 81:5,7,14
   85:19 86:3 292:17
**goodness** 207:10
**gorda** 3:17
**gordon** 5:1
**government** 233:3
**governor** 299:9
**grab** 262:13
**granted** 247:6
**grants** 35:9,12,13
**greater** 207:2
   273:9
**greenberg** 4:1
**group** 41:6 144:25
   145:23,24 181:2
**groups** 143:13,17
   145:25 237:17
**gtlaw.com** 4:9,10
   4:11
**guess** 28:6 53:20
   93:4 127:15
   193:21 199:17
   211:3 236:7
   239:12 252:1,14
   261:7 280:19
**guest** 227:9
**guideline** 236:1,16
**guidelines** 235:4
**gwilliamson** 3:19

**h**

**h** 9:10 262:7
   265:16,21 301:3
**ha** 207:10,10
**half** 48:16 75:13
   115:9,21,25
   134:21,21 148:1
   273:13
**halfway** 264:14

**haller** 217:21
**hand** 75:3 175:24
   263:11
**handed** 134:12
   135:4
**handing** 133:21
**hands** 46:25
**hang** 197:6
**happen** 148:8
   153:19,20,21
   154:1 169:14
**happened** 32:17
   73:12,14 74:10
   75:10 243:9
**happening** 171:16
**happens** 281:14
   281:23 293:15
**happily** 173:8,14
**happy** 87:8 172:20
   242:23
**hard** 25:17 101:24
   137:21 147:14
   148:2
**harding** 3:7 54:5,7
   54:9,15
**harkins** 4:3 8:15
**harkinss** 4:10
**harm** 261:13,22
**harsh** 289:11
**hazard** 114:16,21
   114:24 115:3,5
   182:22 183:8,17
   183:25 184:5,8,12
   185:2,7,10 186:7
   186:23,24 201:20
**health** 6:7 117:17
   117:20 154:17
   221:8
**healthcare** 7:19
   15:21 169:17
   170:7,9

**heard** 211:20
**hearing** 19:25
  28:1,3,8,13 30:3
  30:17 45:23
**hearings** 27:24
**heavily** 163:2
**heck's** 267:17
**heinz** 6:2
**heller** 8:21 29:17
**hello** 251:11
**helmut** 218:4
**help** 21:10 228:11
**helps** 25:21
**hematologist**
  231:3
**hereto** 302:7
**hesitating** 118:3
**hesitation** 37:22
**hetero** 6:17,17
  39:20
**heterogeneity**
  10:20 150:3
  151:14,17 153:5
  154:19 156:4
  157:4,11,15 158:3
  158:9,12,14,22
**hidajat** 81:20,21
  199:15 204:10,15
  204:25 205:21
  207:1 212:23
  217:24 219:4
  288:12,22 290:23
  291:10
**hide** 156:6
**hierarchy** 168:19
  168:21,24
**high** 86:17 87:19
  118:25 119:1,8,9
  138:4,14 158:13
  218:12 257:22
  258:11,25

**higher** 122:7
  145:3
**highest** 88:5
  128:20,22 181:2
  203:4,19 279:17
**highlight** 79:20
  80:5,14 139:9
  207:19
**highlighted**
  139:16 202:5
**highlighter** 136:20
**highly** 173:12
**hill** 6:11 7:11
  133:15 211:8,15
  211:15
**hillwallack.com**
  6:16
**hilton** 3:2
**hinders** 210:3
**hinshaw** 8:9
**hinshawlaw.com**
  8:14
**hired** 18:6,8
**hj** 8:15
**hmm** 80:8 86:19
  200:1 214:13
**hold** 81:11 223:17
  249:18 298:14
**holding** 7:8 155:5
  284:15
**home** 15:12 24:7
  24:15 44:8
**honik** 55:16,18
**honorary** 225:15
**hope** 204:3
**hopefully** 147:18
  147:24
**hoping** 165:7
**hospital** 266:11
**hotels** 44:6

**hour** 44:21 45:3
  45:22 48:16 64:5
  66:7 160:24 161:2
**hourly** 44:19
**hours** 43:8 44:13
  45:5 48:16 51:19
  51:22 58:9,9 61:4
  64:1,2,2,15,16,17
  64:17 66:6 67:1,3
  67:12,14 148:1
  289:14,14,15
**huahai** 7:18,20
  40:5
**human** 117:18,20
  117:22,24 218:5
  231:19 261:14
**humana** 8:7
**humans** 19:7,19
  118:10 220:20
  253:5 261:22
**hurley** 31:8
**husch** 7:1
**huschblackwell....**
  7:6
**hypertension**
  144:15
**hypothesis** 238:8
  238:14,15,18,20
  239:24 240:5
**hypotheticals**
  90:16

| i |
|---|

**i.e.** 168:8
**iarc** 118:9,11
**idea** 41:13 49:3
  161:9,15 179:10
  187:23,25 261:8
  274:17,19
**ideas** 90:1
**identification** 29:9
  47:15 57:19 60:22

65:24 77:4 91:5
  92:5 93:13 97:3
  120:25 125:6
  129:7 133:19
  136:5 138:22
  150:8 159:9
  174:12 178:1,19
  178:21 180:6,8
  195:22 200:6
  205:8 222:22
  234:15,17 244:7
  299:7
**identified** 100:2
  138:1 139:12
  155:24
**identify** 75:16
  92:24 94:22 99:12
  99:15 105:16
  138:19 139:7
  144:3 174:3 200:8
  204:21
**ignoring** 280:7,8
**illinois** 8:4
**imagine** 211:6
**immediate** 155:13
**impact** 10:15,19
  85:23,25 150:3
  151:16 188:14
**impacts** 78:9
**implications**
  151:12 155:14
**implicit** 258:17
**implicitly** 255:18
**imply** 130:14
**importance**
  239:18
**important** 107:7
  107:11,13 156:3
  215:4
**improper** 216:5
  216:16

**improvements**
164:5
**impurities** 19:5,16
**impurity** 205:18
209:9,21
**inappropriate**
192:23,23 295:5
297:10
**include** 50:19,21
144:8 150:13
170:25 172:15,18
173:4 180:16
186:16 197:4
220:10 221:13
**included** 70:4
101:1 127:4 146:9
157:21 174:16
186:10 195:15,16
197:13
**including** 163:11
182:17 188:7
219:4 268:9
**income** 38:6,12,18
**incompatible**
238:2
**incomplete** 137:15
**inconsistent** 263:7
263:21 276:11
**incorporated**
90:16
**incorporating**
70:18
**increase** 109:3
110:10 280:13
286:3 295:23
296:3
**increased** 18:10
76:15 81:13 108:5
114:13 142:13
145:8 152:21
185:4 186:5

253:15,22 255:17
256:25 269:14,19
269:25 270:4,11
270:17,21 271:17
272:20 273:7
282:4,15 285:21
286:10 287:7,25
291:19 292:18
293:5,11,17,21
294:3,13,18,23
295:13,19 297:3
**increases** 207:4
**incretin** 245:7
248:4
**independent** 49:8
49:13,22 50:1
51:11,13 84:9
110:22,25 118:7
132:6,9
**independently**
125:17 282:17
**index** 240:11,20
240:22
**indicate** 62:21
238:1
**indicated** 118:15
267:10
**indicates** 118:22
**individual** 113:17
113:19,22 114:4
152:18 230:24
**individually**
111:14
**industries** 4:21
**inference** 239:7
**inform** 123:13
**informal** 237:21
**informally** 237:13
**information** 63:2
86:8 87:7,10
89:15 102:2

103:22 104:2
108:16 118:19
131:20 132:11
187:14,18,20
188:12 221:15,19
223:17 274:11
276:15,21
**ing** 41:20,20
**ingest** 261:7
**ingested** 127:24
**ingesting** 286:14
**ingestion** 81:22
83:20,25 141:17
205:24 219:21
**inhalation** 81:22
83:20 84:1 205:24
288:23
**inhaled** 82:2
**initial** 48:23 49:1
51:18,20 56:14,17
**initially** 282:16
**input** 241:7
**insignificant**
247:11 248:15
**insofar** 26:6
189:15
**instance** 34:20
187:6 279:16
**instantly** 178:14
**institute** 224:17
**institution** 228:19
228:21
**instruct** 59:7
**instructed** 25:5
**instructor** 227:25
**insufficient** 165:20
**intake** 219:14
264:8 265:3
**intakes** 221:6
**integer** 131:8

**intellectual** 36:18
**intend** 18:20 20:2
98:7 105:17,25
107:23 123:18
146:20 220:22,25
226:4 230:9
233:15 234:1
277:4 278:6,9
**intended** 125:12
**intending** 231:10
**intent** 105:22
230:23
**intention** 31:2
67:16 106:5,11
217:16
**interacted** 82:16
**interaction** 69:17
**interchangeable**
62:20
**interested** 75:5,22
140:8 171:21
297:12 299:19
**interesting** 225:13
**interpret** 158:21
238:19
**interpretation**
108:15 163:18
**interpreting**
155:14 156:2
164:8
**interrupted** 278:1
**interspersed** 177:1
**interval** 145:9
157:25 173:21,24
202:16 214:5,14
**intervals** 161:19
**interventions**
160:1
**interviews** 102:17
**intestinal** 270:5

**introduce** 13:13
**introduced** 251:12
**introduces** 144:16
**introducing**
    133:12 139:1
**introduction**
    115:14 116:6
    124:11 236:12,23
    255:4
**introspection**
    163:4
**inverse** 264:16
**investigating**
    263:5,19
**invited** 235:25
    236:3
**invoice** 9:12,13,14
    9:15 43:15,16,17
    47:18 48:9,10,11
    48:19 51:18 52:10
    56:3 57:16,17,22
    58:8,13 60:19,25
    61:4,7,19,25 63:18
    65:8,22 66:4
    103:11
**invoices** 15:10
    26:4 43:10 46:3,6
    47:1,5 63:25 65:2
    65:6,17 66:10,17
    103:14 252:3
**involved** 21:8
    35:16 54:19 55:2
    195:1 232:8,12,18
    248:5
**involvement**
    231:22 232:11
**involves** 74:21
    161:4,5,7
**involving** 68:15
    70:7 156:22
    197:23 198:7

**irbesartan** 1:8
**ireland** 226:18,22
**irs** 38:12,15
**issue** 19:6,17 59:5
    59:21 68:15 78:10
    84:13 99:2,18,19
    141:15 146:4
    147:19,24 148:11
    148:15 151:9
    157:3 167:9 171:6
    191:6 198:17,24
    232:4 255:25
    257:11
**issued** 73:3 299:8
**issues** 15:20 19:12
    68:22 97:25 98:15
    98:17 121:19
    254:4
**item** 222:7
**items** 92:25 94:12
    94:14
**ives** 8:1,2
**i²** 158:11 183:3

### j

**j** 2:14
**january** 150:5
**jason** 5:3
**jersey** 1:2 2:17
    4:17 6:14 242:5,7
    242:9
**jessica** 6:2
**jheinz** 6:6
**jill** 1:19 13:6 299:2
    299:22
**jmr** 5:8
**job** 34:8 36:5
**jobs** 36:9
**johnson** 10:2
    118:24 119:7,16
    120:11,19,22
    123:20 254:23

255:7,13,18,19
    256:9,15 257:20
    258:9,10,24 262:1
**johnson's** 121:13
    255:21,21
**joint** 13:19
**journal** 176:11
    177:11,12
**judge** 242:5,9
    243:17,21 245:24
    246:7,20 248:21
**judge's** 242:16,21
**judgment** 164:1
**july** 57:17 66:2
    77:2
**jumping** 202:18
**june** 31:4,6 97:5
**jury's** 108:12
    110:6
**justify** 164:8

### k

**k** 1:19 299:2,22
**kanner** 3:1
**kapke** 5:13 9:8
    283:23,25 284:5,6
    289:22
**kara** 5:13 283:25
    284:6
**kara.kapke** 5:17
**katz** 2:12
**kbi** 8:6
**keep** 17:11 21:19
    23:24 24:2,19
    25:1,11,18 28:16
    43:8,13,14,15
    44:12 46:18 60:7
    60:8 93:20 191:18
    200:11 229:12
**keeps** 250:18
**kells** 226:15

**kept** 215:22
**keszei** 88:3 292:21
    296:7
**kidding** 174:2
**kidney** 270:17
**kind** 18:17 26:4
    35:5 62:16 145:2
    154:3 161:25
    163:10 168:13
    170:9 191:7
    238:15 240:6
    241:22 253:25
    264:10 267:16
    279:8 295:5
**kinds** 35:16
    144:16 191:10
    208:20 224:23
    276:24
**kirstin** 8:2
**knekt** 221:12
**knepper** 7:2
**knew** 69:10,15
    179:22 247:24
**knock** 193:6
**knocked** 253:12
**know** 15:3 21:18
    22:8,25 23:23
    25:9 26:8 28:5,14
    33:14 37:17,22
    38:9 39:1 40:14
    41:18,19,23 42:8
    42:10,16,25 43:14
    44:5,8 46:1,8,10
    47:4,23 48:2
    50:16 52:2,3,17,24
    53:5,12 54:21
    60:1,12 61:11,12
    61:15 62:13 68:16
    70:10 75:11,21
    82:9,14 83:6
    87:10 88:24,25

89:3,10 93:5
96:14 99:1 101:9
101:20 102:8
104:5 107:7
108:25 112:14
114:1 118:3,6
119:14,16 120:2
120:18 121:3,20
122:4 126:6
132:10,16,20
133:11,13 135:11
135:11,21 137:19
139:2 141:6
142:19 143:14,16
144:4 145:11
146:5,6,19 148:9
162:9 164:24
165:6,8,18,20
166:15 167:8
169:22 172:10
176:18 177:10,23
178:10,15,17
179:1,4,19,23
184:2 187:10
188:7,19,22,25
189:3,5 191:8,10
191:11,22 192:3
193:14,17,24
194:1,1 195:12
198:12 199:10,11
203:14 206:12
208:9,14,16,17,25
211:11,13,18
212:6,12,17
215:10 216:8
220:3,15 221:18
222:6 223:1,13
224:1 225:16
226:1 227:24
228:2 229:11
230:5 232:8,9

235:7,9,22 236:2
237:9 238:23
239:11 240:18,22
240:24 254:11,17
255:16 258:2,5,17
259:14 260:8,18
261:4,9,16,24
262:1 268:4 276:2
276:3,4,8 277:12
277:18 281:12
283:13 285:19
286:6,8,13 289:10
289:23 292:8
293:9 295:13
296:18 297:17,21
297:22,23
**knowledge** 39:13
39:16 54:20 55:5
55:8,13,14 56:5
93:23 131:19
132:6,9
**known** 161:11,11
188:13,18

**l**

**l** 29:20
**labeled** 174:17
**labeling** 233:12,13
233:18
**laboratories** 5:10
**laboratory** 10:5
125:9
**labs** 6:17
**lack** 165:21 188:3
**landscape** 136:2
**language** 291:15
**laptop** 24:15,17,18
102:4 215:10
**large** 12:2 78:4
157:6 244:20
266:11,25,25
267:18 268:10

**larger** 291:7
**laughter** 26:11
161:1,3 249:14
**lauren** 8:18
**law** 3:14 54:11
68:13
**lawsuit** 23:18
**lawyer** 42:1,3
**lawyers** 41:6,7
53:22 245:22
251:14 252:15,21
253:2
**layne** 3:2
**layperson's**
152:25
**lazar** 235:23,24
**lce** 86:13 87:9
180:24 203:5,19
272:21,23 274:14
274:21 277:8
280:11 290:13
292:16,23 294:25
295:11 297:13
**lces** 286:8,12
**lead** 164:4 286:9
**leading** 104:16
**leads** 163:5
**learn** 261:1
**learned** 259:9,22
259:24
**learnt** 261:4
**leave** 56:1,25
143:10 148:2
227:2
**lectures** 227:9
228:2
**led** 78:24
**left** 263:11
**legal** 13:7 21:9
33:21 41:10
300:23

**letter** 11:21,23
45:13,16 146:10
178:9,10 179:7
**letters** 26:2,3
52:10,12,13 53:9
103:18 176:10,11
176:17,19 177:21
178:5,7,24,25
179:6,19
**level** 130:7 138:14
181:2 197:12
203:5 279:17,23
280:3 294:14,16
296:24
**levels** 118:15,16
118:25 119:1,2,8,9
122:5,7 124:11,14
125:18,22 126:4,6
129:22 130:2
131:25 138:4
171:7 208:2,18
209:1 212:15,21
256:17 257:22
258:11,24 259:22
260:25 261:12,20
274:12 275:13,25
276:16,21 277:5
285:1 286:21
287:9,19 294:14
294:20 295:14
**leverages** 165:24
**levin** 2:3 53:19
54:9 61:10 68:10
**levinlaw.com** 2:9
2:10 300:2
**liability** 1:9 41:2
234:1
**lid** 191:19
**lifetime** 86:5
180:23 212:25
213:8,10,12

272:24 273:8
286:1 289:2 290:1
291:7 292:7
293:10,22 294:4
295:24 296:2,9
**lifted** 258:18
**likelihood** 17:15
**likewise** 128:22
167:8 170:18
**limit** 124:13,16
156:5
**limitation** 170:23
**limitations** 17:7
149:3,21 150:13
169:23 170:1
171:1 172:22
173:2,8 268:5
**limited** 10:15
18:14 30:8 243:15
248:24
**limiting** 248:5,22
287:6
**limits** 10:3 12:12
119:24 120:14
122:12,15 123:11
255:8
**line** 107:15,22
138:2,25 167:17
237:1 301:4,7,10
301:13,16,19
**linear** 110:12
112:3,9,15,18,22
113:10,14,18,23
122:13 123:12
**lines** 50:2
**link** 291:3
**linking** 269:7
**list** 9:11 21:19
23:24 27:15 28:16
28:20 30:24 31:3
31:18 35:6,17,18

36:16 71:25 72:1
97:10 99:23
131:25 168:2
199:3,6 210:16,21
257:8,14 260:2,10
260:19 262:18,21
276:5 281:8,9,16
281:22
**listed** 40:11,14
97:15 99:14 107:3
125:18 126:25
128:17 130:8,11
139:18 196:24
**listeria** 23:1
**lists** 168:17 201:6
**literally** 191:16
**literature** 48:23
49:2,6,16 51:20,22
58:21 60:4,10
64:2,16,18 73:7,9
73:17 74:23 75:16
84:13 109:23
110:1 122:6 152:7
161:23 185:21
261:10 281:3
282:16
**litigants** 107:14
**litigation** 1:9
14:11 21:14 27:3
28:8,9,24 30:1,8
34:2,23 35:1,3
37:13,14 39:2
40:19 42:6,15,23
47:6,19 53:8
54:15,25 55:3
68:11 69:5 70:14
70:16,19,20 73:6
73:13,16 74:5,9
105:15 107:10
115:16 171:6
198:17 223:22

242:1,4 243:2,5,13
245:8,19 247:20
251:16 252:6,7
253:19
**little** 38:4 85:4
94:9 97:8 101:16
148:1 163:14
203:11 249:24
262:6
**live** 14:22 28:7,13
**liver** 219:13
270:22
**living** 14:24
**liza** 4:14
**llc** 2:12 3:1 4:22
6:8 7:19
**llp** 3:7 4:1,13 5:1
6:11 7:1,10 8:1,9
**load** 244:17
**locate** 72:22,25
129:10 146:12
**lockard** 4:2 13:17
13:17 14:5,7 29:3
29:10,19 46:9,18
46:21,23 47:16
54:2,6 57:20 58:1
58:6 60:23 65:25
77:5 85:14 89:3,6
91:6,18,21,24 92:6
93:14,18 95:11
96:19,24 97:4
101:20 102:14
121:1 122:22
125:7 129:8,13
133:10,20 134:2,4
134:15,23 136:8
137:11,25 138:23
139:3 146:16
147:5 148:6,16
150:9,11 151:1,3
159:10 174:6,9,13

178:2,22 180:9
195:19,23 200:7
200:11,13 205:9
211:22 216:10,20
217:2 222:16,23
234:18 244:8,13
245:2,5 246:18
250:17 251:22
274:5 279:6
283:21 284:1
298:3,11
**lockard's** 284:11
**lockardv** 4:9
**lockhard** 9:6
279:8
**loder** 11:22,24
**logic** 288:21
**logistic** 185:1,12
**loh** 182:21,25
183:16 189:22
**long** 21:5 35:18
73:22 83:5 148:12
166:1 289:14
**longer** 21:1 228:6
**look** 27:15 29:14
36:16 46:5 48:9
60:18,24 61:18
62:8 63:25 65:21
74:1 75:6 77:6
81:16 85:17 87:22
87:23 88:16 92:21
93:21 101:16
104:17 105:11
112:6,24 113:16
113:19,25 116:5
121:18 127:8
131:11 133:3,23
136:24 139:6
141:17 142:4,8
154:22 158:21
162:23 168:1

170:19 171:12
177:2,23 178:14
182:15 195:6,13
195:17 196:21,23
199:7,12 204:24
219:6 225:5
244:10,19 275:5
292:6 295:15
296:6,11
**looked** 50:6 71:13
71:14 108:15
110:16,18 131:13
135:7 141:15
143:12,16 169:2
171:21 177:13
178:12 182:11
189:21,24 190:2
194:24 196:18
197:18 215:13,15
215:16,18,18,23
217:7,17 218:1
222:5 236:17
257:1 259:18,21
260:1,1 261:25
265:18,23 275:24
276:5 278:13
281:15 296:1
297:16,19
**looking** 51:2 87:17
89:7 100:23
112:13 113:21
129:24 135:9
136:15 137:5,21
153:2 176:13,21
193:16 204:23
221:14 223:10
245:12 252:3
**looks** 47:21 48:15
48:22 51:19 58:19
63:5,23,24 66:12
115:7 147:21

200:19 205:16
235:1
**loosely** 161:5
**lori** 4:4
**los** 5:15
**losartan** 1:7 13:11
300:4 301:1 302:1
**lost** 94:18 119:12
286:25
**lot** 98:24 107:20
142:21 213:15
242:25 297:19
**lots** 99:9 281:9
**louis** 7:4
**louisiana** 3:4
**low** 261:21 295:11
**lower** 181:1 183:2
255:17 256:25
292:23,23 294:19
294:19 295:14
296:8
**lowest** 292:12
293:15,16 294:15
296:2
**lunch** 146:20
147:9
**lung** 81:6,7 197:23
199:5 207:6 271:2
292:18
**lwalsh** 4:19

**m**

**m** 2:13 4:3,14 5:3
8:10
**madeline** 2:5
**madigan** 1:14 9:5
9:11,12,13,14,15
9:16,19,23 10:1,18
10:22 13:10,25
14:6,21 46:24
49:14 66:17 85:16
91:23,25 92:10

122:24 133:22
138:2 147:13
148:17 151:5
215:3 217:4 247:3
247:5,9 251:10
280:21 299:4
300:5 301:2,24
302:2,4,12
**madigan's** 9:25
29:4 137:14
**magazine** 241:22
**mail** 52:16 53:9
56:20 235:5
**main** 175:12
**maintain** 15:4
22:19 25:7
**majority** 23:14
32:3
**making** 154:17
160:3 181:22
190:22 191:13
**management**
25:22 232:6
**manager** 25:24
**mansournia**
179:16
**manufacture**
126:11
**manufacturer**
37:12
**manufacturer's**
131:21
**manufacturers**
234:3,8 283:24
284:2
**march** 47:12
48:10 58:20 60:13
245:13 252:5
**margaret** 6:2
**mark** 52:21 53:1
57:15 60:19 76:25

91:16 93:11 96:20
120:22 125:2
129:5 135:25
138:17 174:6
195:19 201:24
222:17
**marked** 29:8
30:24 47:14 57:18
60:21 65:23 76:22
77:3 91:1,4 92:4
93:12 97:2 120:24
125:5 129:6 133:6
133:18,21 136:4
138:21 150:7,23
159:6,8 174:11
177:25 178:18,20
180:5,7 195:21
200:3,5 205:7
222:14,21 234:12
234:14,16 244:5,6
252:4 262:10
**markman** 27:23
28:1
**marks** 53:5
**martin** 3:7 54:5,6
54:8,14
**massachusetts**
8:12 14:23 299:9
299:11
**massey** 8:18
**master's** 16:1,5
**match** 134:11
**matched** 266:12
**material** 50:14
106:22 176:5
177:5
**materials** 9:25
25:1,3 38:3 49:4
62:20 67:22 72:19
72:23 90:22 93:8
93:10,20 95:3

[materials - mind]                                                    Page 26

97:12,15 99:14
136:2 141:22
174:16 179:24
217:5 219:3
276:18 281:10
**math** 273:11
296:18
**mathematical**
224:17
**mathematically**
237:22
**matt.knepper** 7:6
**matter** 13:11
24:25 43:16 123:7
157:9 181:18
188:22 193:2
232:20 296:19
299:5
**matters** 20:15
23:2 33:21 36:18
39:1,2,3 54:23
181:19
**matthew** 7:2
**maximally** 181:4,7
181:20
**mazie** 2:12 55:6
**mazieslater.com**
2:19,20,21
**mazzotti** 3:7 54:5
54:7,9,15
**mcwilliams** 47:22
47:23
**mdl** 1:7 198:24
**mdl2875-00133...**
138:18
**mean** 20:13 28:2
29:13 49:14 55:25
59:18 62:11 63:20
64:20 81:1 107:1
107:22 108:10,12
108:14 110:25

114:12,18 117:6
121:17 126:6
127:15 132:20
141:14 148:8
160:25 161:4
163:23 165:17
168:14 179:13
180:23 186:13
187:25 188:17
191:1 192:21
199:10,11 203:6
208:8,9 213:5
220:22 237:16
238:17,18,19
240:2 255:15
282:8 285:19
294:18 295:19
**meaning** 185:12
**meanings** 184:11
**means** 62:14,15
202:11 238:23
239:11 240:18
**meant** 44:18 58:25
95:8 110:6 114:21
**measure** 114:14
114:22 158:11
205:12 237:3
238:7,13 239:17
239:23 240:3
**measured** 126:8
**measures** 183:6
185:9,23 187:7
240:3
**meat** 263:13
**mechanisms** 19:11
221:25
**medical** 230:1,5
243:6,18,20,22
247:10,22 249:1,4
**medication** 274:13
274:21 277:6

**medications** 17:1
19:17 20:4 275:14
282:5
**meet** 67:6,9
298:10,11
**meeting** 68:5
**member** 15:14
25:24 225:1,4
229:8,12 232:2
**members** 252:11
**membership**
225:9,17
**memberships**
225:10
**memory** 17:2
121:18 122:19
127:7 131:15
145:7,11 158:12
176:20 221:10,17
242:14 243:16
248:25 274:9
**memos** 100:17
**mention** 158:25
**mentioned** 36:13
201:20 227:4
248:11 282:23
284:10
**mentioning**
165:20
**merit** 299:2
**mess** 79:23
**met** 14:8 16:9 68:1
70:9 82:15
**meta** 12:7 50:7
114:1 152:16
153:3,12,14,16
154:3,9 157:10,14
157:19 158:10
165:25 182:17
183:1 184:6,7,12
185:8 186:4 201:7

215:16
**metabolized**
206:13
**method** 88:7
185:23 217:25
**methodology**
162:7 165:13
246:5 256:1
**methods** 99:8,9
164:5
**microgram** 213:6
**micrograms**
118:16,17,25
119:1,8,9 124:14
124:17 139:21
207:3 212:20,24
213:11 257:22
258:11,20,25
272:21 273:9
279:20 280:4,11
286:24 288:9,17
289:1,25 290:4,12
290:13 291:5,18
292:4,16 293:2,23
294:6 295:25
296:13,16,20,21
297:15
**middle** 211:12
**midway** 152:4
**milligram** 138:10
**milligrams** 77:23
77:24 78:2 79:14
79:15,16 87:11
138:12 212:20
292:4
**million** 138:9
273:13 279:18
**mind** 50:5 80:18
94:2 96:1 235:21
281:25

**mine** 52:22

**minimis** 261:13,22

**minute** 61:14
94:25 177:24
254:14 278:24

**minutes** 14:8
35:20 85:7 114:10
132:25 279:2
295:2

**misinterpret**
237:8

**misinterpreted**
237:4,10

**misread** 79:11
166:18

**missed** 71:15 78:2

**misses** 145:10

**missing** 55:25 96:2
254:14

**missouri** 7:4

**misspoke** 44:18
293:14

**misstatements**
78:21

**mistook** 79:15

**misuse** 237:8

**misused** 237:3,9

**mitacek** 219:12

**mix** 184:16

**mm** 80:8 86:19
200:1 214:13

**mobile** 221:8

**model** 237:14
238:3 239:24

**models** 104:2
217:22

**moderately**
158:13

**modest** 33:23

**modification**
80:22

**moment** 34:20
244:9 275:5

**money** 42:13,25

**monitoring** 69:4

**monroe** 8:3

**month** 32:9

**monthly** 43:10
44:11,12

**months** 82:10
178:13

**morning** 13:4 14:6
14:7 172:7,19
250:7 276:5
278:13 297:20

**morris** 7:10

**mortality** 218:14

**motherhood**
240:13

**motion** 247:4

**motivations** 154:2

**mouth** 75:3

**move** 36:10
226:20

**moved** 144:1

**moving** 124:9
152:2

**mpendley** 2:10

**mulberry** 4:16

**multiple** 155:22
156:3 181:3
190:22,25 192:14
207:6

**multiplicity** 191:2
191:8,9,24

**multiplied** 180:25

**multiply** 138:8,11
139:22

**multiplying** 290:4

**murdered** 148:5

**myeloma** 207:6

**mylan** 5:9,9 39:18
251:16 273:17,18
273:23 274:3
276:4,8,13,21
277:17 279:12,17
280:5

**mylan's** 274:12
275:25,25 277:5,6

**n**

**n** 9:1 10:4,10 11:1
11:6,11,16,25 12:5
13:1 117:21
219:22,23 221:24
262:7

**n.e.** 4:6

**nakul** 6:12

**name** 14:20 26:23
29:18 42:4 55:16
88:23 89:11
167:25 211:12,20
251:13

**named** 37:12

**names** 201:8

**nanograms** 258:21
259:4 273:12,13
273:15 277:8

**narrowed** 248:13

**narrower** 242:2
246:4

**nationwide** 11:4,9
11:14,19

**native** 137:23

**nature** 18:25
35:10 56:25
109:19 141:8
156:24 157:3
169:18 188:9,19

**nda** 271:25 272:3
272:9,10

**ndea** 18:12 58:22
58:25 59:11,13,20

**64**:5,15 76:18,20
81:23 108:8
118:16 119:1,9
124:14 130:2,7
139:8,17 181:1
195:1,4,7,16,25
196:4,7,9,16,20
197:3,8 198:14
206:13,18 218:18
219:19 220:1,17
253:5,10,16,23
254:10 256:17
258:24 259:8,21
260:4,25 261:5,7
261:21 265:13
266:8,14,18,21,23
267:9,11,25
268:18,24 269:1,5
269:7,15,16,20,25
270:6,12,17,22
271:2,8,13,18,21
272:3,7,19 273:8
274:22,25 275:21
275:25 277:5,16
280:5,8,15 286:14

**ndma** 10:9 11:2,7
11:12,17 18:12
59:13 76:17,20
81:23 82:2 108:7
117:21,24 118:9
118:15,24 119:2,8
124:11,22 126:1,9
129:22 130:2
131:25 136:22
140:9 157:22
171:14 175:21
181:1 182:18
186:6 198:14
202:6,14 203:5,19
205:6 206:12,18
207:3 208:2,13,18

212:24 218:18
219:19 220:1,17
221:7 252:24
253:10 254:19
256:17 257:21
258:11 259:8,21
260:4,25 261:5,13
265:12,13 266:8
266:15 275:4,13
277:21 282:9
285:2,18 286:2,14
286:21,24 287:9
287:25 288:7,17
289:1 290:1,10,11
291:17 292:4
293:3,4,22 294:5
294:25 295:25
296:13,15 297:5
297:22,23
**nearest** 131:8
**necessarily** 24:21
112:18 193:24
246:15
**necessary** 302:6
**necessity** 170:10
**ned** 47:22,23
**nedea** 10:16
**need** 14:18 27:15
51:3 66:12 94:10
101:11 112:24
113:16,25 131:8
133:7 136:23
146:21 161:24
167:13 207:22
250:3,11 267:15
268:14 293:3
296:10
**needed** 43:11
151:22 155:16
266:24 267:12

**needing** 291:16
**needs** 31:16 58:3
78:4 170:7 217:11
**negative** 161:5,8
161:14,17 166:2
**neither** 194:15
299:14
**nesbit** 3:16
**never** 16:9 22:2
33:16 56:14 70:8
82:15 94:2 218:22
227:3 232:24
259:8 260:15
283:6 293:24
**new** 1:2 2:17 3:4
3:10 4:17 6:14
27:1 50:13 143:21
143:23 144:2,3,7
144:10 145:1,4,18
145:21,24 163:16
173:13,14,17
175:16 217:21
242:5,7,9 245:25
**newark** 4:17
**newly** 69:5
**news** 173:11
235:11 259:19
**nice** 226:14 267:21
298:11
**nigh** 2:4 13:15,15
18:15 19:8 20:11
21:2 30:10 31:25
32:5 33:6,13 38:8
39:4 42:17 43:5
46:10 48:7 49:24
51:16 54:1 56:13
57:2,11,24 58:5
59:6,24 61:2
64:21 65:18 67:19
67:24 69:19 70:2
71:4,22 73:10

74:4 75:18 76:1
86:14 89:1,4
90:14,19 92:19
94:24 95:1,2 99:6
105:19 106:3,10
107:19 109:18,25
111:9 113:6 117:8
117:15 118:1
119:25 120:4,15
121:10,16 122:2
122:16,20 123:17
123:22 124:6
129:15 130:10
131:22 132:8,18
132:24 133:25
134:7,9 136:6,9,23
137:4,17 141:4,12
141:19 147:2,12
150:22 153:8
156:25 157:8
159:2 162:8
165:14 168:12
170:6 171:9 172:5
173:5 174:8
175:19 184:20
186:12 187:22
188:6,16 189:14
190:9,24 196:11
198:2 199:2
200:10 203:25
205:19 206:8,21
209:12,24 210:8
210:14 211:20
212:5 213:2 214:8
215:1,24 216:13
220:21 226:6
230:3,11 231:13
234:5,10 243:4,14
243:25 244:11
246:12,16 247:16
248:8 249:3,20

250:15 252:10
253:12 254:7
255:24 256:11,19
257:5,24 259:12
259:20 260:6
261:15,23 263:22
267:2 268:3,21
274:16,24 277:10
281:6 282:7,18
284:17 286:5
288:19 289:4
292:15 293:7
294:7 297:7 298:7
300:1
**nigh's** 48:1 53:19
53:23 54:22 103:6
**nitrate** 219:15
221:7 264:17,18
264:22
**nitrates** 265:4,12
268:23,24
**nitrite** 219:15
221:6,7 264:20,22
**nitrites** 265:4,12
268:23,23
**nitrosamine** 19:5
19:16 119:24
120:13 141:11
170:21 209:9
276:16
**nitrosamines** 10:4
20:4,9 59:4 68:15
83:25 97:22,25
104:22 109:16
110:13 171:7
218:5,13 221:24
230:20 231:18
232:13 255:9
259:10,17 261:2
264:9 274:12

**nitroso** 11:25
263:6,20
**nitrosodiethyla...**
219:23
**nitrosodimethyl...**
10:10 11:1,6,11,16
12:5 117:21
219:15,22
**non** 19:12 35:3
**nonlinear** 114:2,3
**nonsensical** 146:3
**nonspecific** 62:17
**norm** 169:21
**normal** 192:2
233:6
**northeastern**
14:25 228:23,25
229:2 241:4
**notary** 299:10
302:13,19
**notate** 113:13
**notation** 80:14
**note** 118:23
182:21 183:14,16
258:23 300:10
**noted** 113:4,7,14
125:22 128:5
138:24 256:21,21
302:7
**notes** 52:6 60:7,8
100:16
**noteworthy** 10:4
**notice** 9:17,22
91:2,14,22 92:9,15
92:21 97:9 147:15
197:22 228:11
**noticed** 226:11
**noting** 122:4,5
123:7
**november** 26:19
41:17 167:18,23

**nshah** 6:16
**nuanced** 175:11
**null** 161:16 167:6
188:9 189:4
238:18,20 240:4
264:21 284:13
**number** 20:17
58:3 78:9 79:19
80:6,10 81:3 87:2
94:13 128:20,22
135:5 136:20,21
137:7 149:21
150:15 180:24
192:24 196:14
212:14,17,19
225:14 277:18
279:24 291:10
**numbered** 272:13
275:7
**numbering** 91:19
**numbers** 79:7,8
123:1 126:3
128:16 139:20
201:8 213:12
276:23 278:14
**numerically**
171:13

**o**

**o** 13:1
**o'reilly** 4:13
**oath** 14:1 16:14
265:15
**object** 113:6
123:17,22 124:6
130:10 132:24
153:8 156:25
157:8 159:2 162:8
165:14 168:12
170:6 172:5 173:5
175:19 184:20
186:12 187:22

188:6,16 189:14
190:9,24 196:11
198:2 199:2
203:25 205:19
206:8,21 209:12
209:24 210:8,14
212:5 213:2 214:8
220:21 226:6
230:3,11 231:13
234:5,10 243:4,14
243:25 246:12,16
248:8 249:20
250:15 254:7
256:11,19 257:5
259:12,20 260:6
261:15,23 263:22
267:2 268:3
274:16 277:10
282:7,18 284:17
286:5 288:19
292:15 293:7
294:7 297:7
**objection** 18:15
19:8 20:11 21:2
30:10 31:25 32:5
33:6,13 38:8 39:4
42:17 43:5 49:24
51:16 56:13 57:2
57:11 59:24 64:21
65:18 67:19,24
69:19 70:2 71:4
71:22 73:10 74:4
75:18 76:1 86:14
90:19 92:19 94:24
99:6 103:7 105:19
106:3,10 107:19
109:18,25 111:9
117:8,15 118:1
119:25 120:4,15
121:10,16 122:2
122:16 131:22

132:8,18 133:12
134:7 139:1 141:4
141:12,19 171:9
247:16 249:3
255:24 257:24
268:21 274:24
278:7 281:6
**objections** 9:20
91:13 92:8 93:5
**objects** 103:23
**obligated** 158:25
**observation**
271:21
**observational**
10:21,25 142:20
149:2,4,12,16,22
150:4,14 151:20
152:17 153:3,23
154:6 155:1,15
159:16,25 160:9
160:11 162:22
163:2,17,18,25
164:8,14 165:19
166:22,24 167:10
168:6,14,16,18
169:3,18 170:2,3
170:11,15 173:2,7
188:23 268:5
269:6
**observe** 266:22
**observed** 156:4
237:18 276:16
**obvious** 161:24
**obviously** 32:25
187:18 262:22
**occasions** 32:20
**occupation** 286:13
**occupational**
12:11 76:16 108:6
140:20 141:2,7
166:13 167:2

[occupational - opinions]                                                    Page 30

204:7,9,11,20
208:11 218:15
282:11
**occur** 82:8
**occurred** 143:17
208:4 212:2 285:4
287:12
**occurrence** 220:17
221:24
**occurs** 297:13
**october** 41:17
**odds** 114:16
183:25 184:5,8,13
184:17,21,22,25
185:6 187:1
**oels** 12:12
**offer** 19:9,15 20:2
105:17,25 116:1
123:18 209:6
220:22,25 230:1,9
230:24 231:17
233:9,15 234:1
243:19,21 247:9
249:1,4 255:13
277:4 278:6
280:22
**offered** 107:5
149:20
**offering** 19:20,23
20:14 117:23
206:5 209:14
212:18 233:20
243:7 247:22
**office** 29:23 54:4
69:7
**official** 53:2
**ofvalsartan** 10:11
**oh** 22:4 31:6 32:24
52:15 65:10 91:15
130:3 159:14
207:10 211:3

223:12 248:19
263:9
**okay** 13:20 16:21
19:13,22 21:4,12
22:5,22 23:20
24:10 26:13,21
28:11 30:14 31:8
32:6 34:5,9 35:1
35:21 37:5 38:5
44:14 46:4 47:8
49:12,20 51:5
52:25 53:3,6
54:17 56:4,8,16
58:7 61:23 62:18
63:4,10,22 64:4
65:14,20 66:1
69:3 74:7 76:4
77:11 78:23 79:9
80:17,21 81:18
84:21 85:2,8,9,15
86:25 90:8 91:9
94:16,17 95:20
97:1 102:10 103:1
104:10 105:23
109:13 112:19
113:3 114:19
116:19,24 117:9
118:13 119:21
120:8 124:9
127:18,22 128:2
128:14 129:25
130:4 131:2 132:4
133:10 134:24
135:23 136:9,13
136:18 137:11
139:14 147:3,7,12
148:6,24 151:18
152:1,24 154:21
158:6 159:16,21
161:4 164:11
167:16 168:25

174:14 175:5,15
175:22 176:14
178:3,8 179:5,17
180:10,19 183:4
184:14 186:11
189:7 190:1,17
199:11,16 200:23
201:2,9,19 202:3
202:10,24 203:2
204:14,18 206:25
207:11 217:3,18
218:23 222:16,20
223:5,8,19,24
224:4,8 225:22
226:10 227:13
233:7 235:10
236:25 237:24
240:9 242:24
244:22,23 245:1
245:14 246:24,24
247:17 248:1
249:6,25 250:8,25
251:18,19 258:19
259:25 262:8,12
263:10 264:4
275:8 276:25
279:21 280:2,18
283:20 284:22
285:24 286:16
287:17,20 288:4
288:24 290:15,21
291:22 292:11,24
292:24 293:18
294:1,2,10,21
295:20 296:12,23
297:1,25 298:5
**old** 52:16
**omnibus** 154:4
**once** 24:24 82:16
250:23

**oncologist** 231:3
**one's** 207:4
**ones** 23:10 37:17
59:5 71:8 193:23
199:15 203:15
221:13 224:18
274:6 281:13,19
**open** 39:3 43:15
63:12 101:12
102:9
**opine** 121:20
**opinion** 18:13 19:4
19:21,24 32:21
80:19 81:2,12
107:16 117:23
118:7,18 146:7
152:12 205:3,22
206:6 209:13,14
209:14,21 210:1,2
210:3,4,10 212:18
233:9 242:16
243:13,18 247:5,9
247:14 248:12,13
261:11,19 267:14
273:6 274:18,19
277:5 278:6
284:15 285:8
286:7 287:6,8,23
288:2 294:23
**opinions** 18:21,23
19:9 20:14 30:12
33:4 59:11,13
71:2 72:18,24
89:18,23 90:12,17
103:3 105:16,24
106:7 116:2,13,16
116:17,21 123:19
142:22,25 149:15
171:22 172:20
199:19,20 206:17
217:11 220:19,25

[opinions - papers]                                                    Page 31

221:1 229:21,22
230:2,10,19,24
231:11,18 233:12
233:16,21 234:1
241:14 242:10,13
242:22 243:6,20
243:22 247:22
248:22,24 249:2,5
249:18 250:4
280:23
**opposed**  49:16
**opposite**  155:3
172:9 191:20
**options**  156:19
**orange**  79:21
**order**  12:16,24
111:12,16 112:24
133:8 191:18
222:9,18 224:11
241:25 244:4
245:12 246:20
247:1 248:3,4
250:4 291:19
299:8
**orders**  223:21
248:3,18,19,21
**organ**  206:18
**organizations**
224:15 225:15,17
229:9
**organized**  146:18
**original**  56:10
116:17,21 207:24
**originally**  281:16
**orleans**  3:4 27:1
**outbreaks**  23:1
**outcome**  108:24
109:2,3,4,14,16
299:19
**outcomes**  109:10
166:1 208:14

**outlier**  169:20
**outset**  56:21 59:15
59:16 273:16
**outside**  22:9 23:6
32:25 34:23 40:19
53:23 84:7 104:17
121:11,14,21
124:4 132:11
195:7 206:10,14
206:16,19,22
230:12,13 241:5
256:2,4,12 258:4
**overall**  173:12
**overarching**  167:3
**overstating**  130:11
**overturned**  242:20
**overview**  217:22
**oxford**  5:4

**p**

**p**  12:20,22 13:1
85:23 87:15
113:15 161:18
192:6,15 193:16
194:1 213:20
214:2 235:14,16
236:11 237:2,11
237:13,20 238:1,7
238:12,24 239:2
239:16,22 247:12
247:23 295:2
**p.c.**  6:1
**package**  56:11,15
56:17
**page**  31:7 79:5
85:17 92:22 105:8
105:12 115:6,9,21
115:25 122:25
123:1,2 125:11
129:1 139:17
154:22 155:9,10
157:19 159:23

166:20 190:18
201:6 203:24
204:8 207:17
215:22 222:8
227:16,18 236:8
246:19 255:2
262:25 263:2
266:6,6 267:4
272:12 274:2,6
279:10 301:4,7,10
301:13,16,19
**pages**  80:14
196:15 244:21
289:14
**paid**  21:24 40:10
40:16 48:19 58:16
61:7 66:18
**pancreas**  207:16
**pancreatic**  12:1
197:18 199:5
263:6,21 264:9
265:4 266:9,15,23
267:12 268:1,18
269:4,8 271:22
272:2 273:7
280:13
**panigrahy**  81:23
82:1,6,14 83:1
84:6 88:20,24
102:23 206:2,10
218:25
**panigrahy's**  84:15
89:11
**papantonio**  2:3
53:19 54:9 61:10
68:10
**paper**  10:18,22
31:22 79:14 86:3
86:7,8,21 87:2,7
87:11,13,14,16,21
88:16 100:23

112:2 113:1,2,11
120:11,22 121:2
121:14,24 122:18
123:23 129:18,21
130:1,7,21 131:4,9
131:12 138:20
141:21,25 142:5,9
142:15 143:19
144:21,24 145:20
146:6 150:19
151:13 154:6,8,9
154:15 159:4,17
160:18,20 162:25
164:17,22 165:6
169:22 171:19
174:22,25 175:4,6
175:9 176:6,12,19
176:24,25 180:17
195:25,25 196:3,8
199:4,24,25
200:14 201:3
203:13 205:10
211:4 214:4,11
217:23 218:1,12
218:20,25 219:4
220:2,13 221:9,12
221:13,15,20
234:23 237:12
242:25 255:7,14
255:21 256:10
258:6,14,18 259:3
262:7,9 263:2
264:25 265:8,10
265:16 266:1,16
266:20 267:24
268:25 269:4
274:15
**papers**  24:23
56:21 62:16 71:14
87:5 90:22 97:21
98:14 99:8,8,13

[papers - pharmacy]                                                                 Page 32

110:16,18,21
111:21,25 112:7
113:17,19,22,25
114:4,10 119:18
119:23 120:12,13
141:10,15,18
149:17,19,25
150:12 156:13
175:1 181:10
195:14 196:16,24
197:11 204:23
210:6,12 211:2
218:3 220:6 222:5
253:9 254:3,9,18
257:3,8,9,13,15
259:16 260:2,11
260:24 262:4,17
265:23,24
**paperwork** 26:4,6
**paragraph** 80:5,6
80:7,10,23 81:16
84:18,18 116:8,14
116:20 117:1,17
140:18,19 148:25
152:3 155:11
158:2 166:21
180:22 182:20
183:15 185:25
186:9,19 202:25
206:24 207:25
211:24 212:4
236:24 263:10,11
264:15 272:13,18
274:22 275:7,10
275:19 279:24
284:20,21,25
286:17 287:3
288:14 289:20
291:1
**paragraphs** 116:7

**park** 5:14
**parkway** 2:16 6:3
**part** 46:7 78:19
80:23 101:4
107:13 144:22
190:6 247:6,7
268:22
**participants** 1:12
**participate** 41:24
253:3
**participated**
252:22
**particular** 27:16
42:5 50:6 57:4,5,8
109:2 142:18
156:21 157:9
163:5,24 166:23
171:24 188:20
193:19 221:1
230:21 232:4
240:5 248:11
**particularly**
145:21 167:4
251:16
**parties** 299:15,18
**parts** 138:8 279:18
**party** 23:17 216:1
216:4,15
**passes** 239:3
**patent** 27:16,18,21
28:4
**pathologist** 231:2
**patient** 69:1 103:4
103:8 127:24
**patient's** 230:21
**patients** 123:13
166:2 169:10
**pause** 68:8 72:16
101:22 190:14
199:23 200:2
202:23 213:14

218:7 233:24
236:6 244:25
245:4 250:16
**payment** 61:9
**pde** 122:11 123:9
**peer** 98:9 119:23
120:12 144:21
241:10
**pelta** 8:21 29:17
**pending** 26:25
40:19
**pendley** 2:5
**pennsylvania** 5:5
6:4 7:14
**pensacola** 2:7
**people** 19:1
119:15 122:6
143:6,14 144:5,9
144:11,12,13
169:13 189:18
209:8 212:8
**percent** 33:24,24
34:1,6,11,15,25
35:2,4,22,23 38:7
38:10 145:8
154:25,25 157:24
202:16 214:5,15
**percentage** 23:9
33:19 38:5
**perform** 18:8 50:4
73:25 76:13 108:2
142:11 281:2
**performance**
164:6
**performing** 73:24
**period** 58:20
61:17 143:4,5
192:7 274:14
277:7
**periodically** 43:9

**permissible**
122:10
**permitted** 10:2
255:8
**person** 41:22
72:10 287:23
291:16 293:21
294:4 295:24
**person's** 286:3
**personal** 17:6 22:8
29:23
**personally** 26:5
**persons** 88:20
**perspective** 153:1
280:20
**pertain** 19:1
175:25
**pertained** 142:6
**pertaining** 20:14
23:3 36:19 103:5
**pertains** 34:18
130:15 166:8
**pharma** 4:22 6:8,8
6:9 74:20,22
**pharmaceutical**
4:21 7:18,20
10:14 35:7 36:15
37:7 128:19
141:10,13,17
**pharmaceuticals**
4:20 5:9 120:3,14
162:5 170:21
251:17
**pharmacokinetics**
231:15
**pharmacologist**
231:14
**pharmacovigila...**
157:6
**pharmacy** 5:18

pharyngeal 271:8
phd 1:14 9:19,24
13:25 15:25 92:10
299:4 300:5 301:2
301:24 302:2,4,12
philadelphia 7:14
phone 51:21,25
64:14
phrase 126:5
127:14,20 188:18
286:18
phrased 69:20
257:12
phrasing 203:18
260:7 295:5
physically 242:7
pick 149:13
picture 154:4
pie 240:13
piece 161:7 173:15
pieces 161:6
piedmont 4:6
pietragallo 5:1
pietragallo.com
5:7,8
pile 217:6
pill 287:24 296:21
297:16
pills 293:3 296:17
296:17 297:4,5,23
297:24
pink 79:23
pittsburgh 5:5
pizzi 4:13
place 25:11 41:14
42:11 226:14
243:8
places 78:9,11
80:1
plaintiff 23:10
82:22 168:1

199:12
plaintiff's 26:23
plaintiffs 3:20
9:20 13:16 23:12
23:15 33:12 47:2
49:5 52:11 53:10
53:18,22 55:1
56:11,18 57:9
69:10,11,16,25
72:19 88:21 89:4
89:16 90:15 91:13
92:8 93:8 95:4,18
102:23 137:13
146:11 147:22
180:2 198:15,23
230:25 252:7,15
252:21 253:2
257:4 260:3
planning 233:9
plans 36:6,9 104:1
plausible 208:5,8
208:24 209:1
210:23 266:8,13
275:11 285:4
286:19 287:4
play 157:4 163:11
plaza 7:3
please 13:13,22
46:22 75:5,23
139:2 216:21
pleasure 298:10
plural 178:24,25
plus 66:10
pobel 88:3
point 36:23 51:15
52:9 63:23 64:11
65:1 78:12 95:14
122:18 137:10
147:25 153:20
154:18,19 166:14
185:16,18 188:11

197:15,16 198:11
210:16,17,22
211:4 218:16
237:12 240:19
260:13 263:10
267:3 289:5,12
pointed 144:23
pointing 187:5
192:4
policy 239:1
population 165:23
portion 38:17,22
152:3
position 127:3
136:21 156:12
187:8 227:2
positive 166:1
264:18
possibility 167:5
266:22
possible 99:10,12
155:21 236:4
potent 266:14
potential 19:6,18
137:21 144:17
152:4 165:22
166:25 189:12
222:2 267:11
274:14 277:7
281:10
potentially 188:14
294:19
pottegard 11:22
11:24 141:20,25
142:4,9,14 143:1
144:21 170:19
171:16,20 173:11
174:17,24 175:25
176:7 177:5,15
180:17 282:22

power 191:16,18
practical 12:9
164:24
practice 21:6
38:21 78:16
163:19 192:2
210:25
pradaxa 54:25
preceding 286:18
precise 237:22
286:7
precisely 78:22
258:22
preference 146:25
premise 193:13
preparation
104:12
prepare 32:12
prepared 31:15
79:3 105:4
preparing 42:1
67:2,4 72:17
82:11 88:21
105:14
preprint 123:5
prescribed 299:8
present 8:18 68:3
97:14 181:11,15
presentation 41:6
presentations
97:12,21 98:14
presented 97:24
presenting 181:3
presently 26:15
presents 261:13
press 235:1,8
presume 110:12
110:15 121:23
124:2 125:16
223:22 224:6

[pretty - published]                                                                    Page 34

**pretty** 76:3 115:23
  132:19
**prevalent** 145:22
**prevent** 261:21
**preventing** 16:23
**previous** 70:19,20
  207:17
**previously** 54:23
  91:7 148:19 252:4
**prieto** 219:20
**primarily** 15:19
  34:18 53:14
**primary** 48:3
  224:17
**princeton** 6:14
**principal** 166:22
**principle** 238:6,25
  239:6,16
**principles** 237:25
**prinston** 7:19 40:7
  128:19
**print** 101:10 102:8
  102:9 137:20
**printed** 102:7
  131:16 137:6,19
**printout** 93:9
  134:20 135:14
  137:6
**printouts** 101:24
**prior** 20:25 24:3
  25:3,8 65:16 66:9
  66:24 67:17 68:13
  163:16 252:20
  253:1 259:8
  276:11
**privilege** 59:8
**probability**
  237:13 238:7,9,13
  238:21
**probably** 19:10
  21:25 22:1 36:21

36:23 38:10 58:2
  69:14 80:25
  111:17 118:10
  123:6 144:14
  225:3 232:15,16
  232:20 236:18
**problem** 93:25
  134:18 135:22
  143:18 174:1
  190:23,25 191:22
  192:15
**problematic**
  145:14,21 172:8
  172:11 173:13
  175:13 212:22
**proceedings**
  298:19 299:13
**process** 12:23
  163:3,15 235:16
**processed** 263:13
**produce** 42:21
  97:10 98:18 102:1
  102:11 103:5
**produced** 46:6
  47:1 50:15 77:8
  93:10 94:21 95:3
  95:17 96:14,21
  100:2 101:4,15
  102:15 103:25
  137:13 174:4
  238:9,22 260:10
  299:12
**produces** 213:19
**product** 41:2
  125:23 166:4
**production** 94:13
**products** 1:8 10:6
  10:12 11:3,8,13,18
  124:23 125:10
  131:21 132:1,7
  140:10 276:1

**profess** 17:13
**profession** 15:13
**professional** 33:20
  34:2 36:1 107:15
  107:21 120:19
  162:13 163:7
  224:14,15 225:17
  229:9
**professor** 34:10,15
  229:3,5
**programs** 15:25
**promises** 17:12
**pronounce** 89:11
**pronouncing**
  88:23
**pronunciation**
  271:8
**proofread** 106:12
  107:8
**proper** 239:6
**properly** 164:9
**property** 36:18
**proposed** 161:20
**proposing** 165:6,7
  165:11
**proposition**
  106:20,24 107:4
  149:14 164:24
  209:17
**proprietary**
  101:10
**prospective**
  266:25 267:18
**prostate** 194:14
  199:5 207:7,7,9
  271:13
**protective** 12:15
  133:7 222:9,18
  223:21 224:11
**protocol** 133:7,16
  139:2 216:6,16

**provide** 57:9 63:1
  88:8 90:15 116:9
  123:10 128:23
  140:5 239:23
  241:7 252:6
  253:25 257:7,13
  257:13 258:5
  279:9
**provided** 22:13
  49:17 60:5 72:3
  72:20 73:7 78:1
  89:16 93:4,7
  99:24 102:15
  103:13 106:21
  118:19 129:9
  140:12 141:3,23
  146:11,13 187:21
  195:8 199:6 257:3
  257:14 262:18
  279:12 281:3,7,20
  282:6,16 299:7
**provides** 122:11
**providing** 16:23
**provisions** 44:5
**proviso** 96:3
**provost** 14:25
  34:12,13,15,19
  228:8 229:2
**public** 232:21
  299:10 302:19
**publication** 98:5,8
  150:5 234:25
**publications** 97:12
  98:24 99:14 149:5
  149:9 235:3
**publicity** 68:18,21
**publicly** 40:15
  111:7 276:17
**publish** 170:4,16
**published** 119:24
  120:13 123:6

[published - read]                                                          Page 35

141:10 144:6
161:22 176:5,7,11
176:18 234:23
241:16 253:9
254:3
pubmed  49:15
pull  35:19 114:9
198:4 236:21
pulled  134:25
217:25
punta  3:17
purely  280:9
purpose  12:23
52:3 60:15 83:17
105:15 235:17
purposes  15:6,8
108:12 262:11
pursuant  70:5
257:9
put  51:3 95:15
96:10,11 124:8
147:13 165:16
183:12 185:18
189:8 191:12
216:14 225:13,19
228:3 285:10
289:5,11
putting  75:2
185:17

**q**

qualified  19:3,10
22:23,25 23:3
230:1 231:17
qualifier  287:16
qualifiers  287:14
qualitatively  81:2
quality  145:3
233:10
quantified  171:13
195:4 196:6,19
197:3 198:14

205:5 265:12,13
265:14
quantifies  196:7
quantify  175:20
197:7 218:17
219:18
quantitatively
81:3
quarrel  121:8
quartile  88:6
203:7
quartiles  203:16
question  16:2
17:17 18:2 26:9
29:25 33:17 49:11
52:19,21 70:22,24
75:5,7,23 76:6,8
81:1 83:13,18,19
83:23 84:10,16
86:15 89:1 94:19
94:20 110:3 112:5
112:6 113:25
118:5 119:5,13
120:5,6,16 132:10
132:13 156:21
157:1 166:7
168:20 171:3,5,10
171:11,18,24
172:16 175:17
192:16 203:10
208:7 214:19
223:1,6 242:2
252:14 254:13
256:3 263:24
264:1 267:23
272:5,6 274:10
277:11,15,24
287:1 289:21,24
291:11 293:25
questioner  289:15

questioning
167:18 250:21
284:11 289:6
questionnaire
188:4,12 189:1
questionnaires
156:23 187:15,21
189:10 284:12
questions  14:14
17:16 75:23 76:6
85:18 142:17,24
143:9 160:1
169:16 244:24
250:22,23 251:21
279:2 283:18
284:2,8,24 289:11
289:16 297:25
298:4,8
quick  139:11
284:8
quicker  147:19
quickly  81:1
quintile  203:4,12
203:22 204:2
quintiles  203:13
quite  184:11
268:12
quote  118:8 215:9
258:14,16 285:9
quoted  79:14
261:25 262:1
quotes  165:17
quoting  118:11

**r**

r  13:1 88:8 265:16
265:21 299:1
301:3,3
rafferty  2:3
raise  154:6 160:1
raised  59:21
226:18

ramifications
230:6
ran  50:7
random  238:10,22
randomized
168:15,24 169:5
randomizing
169:13
range  124:12,15
ranging  152:19
rare  165:25
raspanti  5:1
rate  191:19
ratio  114:16,16,21
114:24 115:3,5
182:22 183:8,17
184:25 186:7,23
186:25 187:1
201:21
rationale  282:23
ratios  183:25
184:1,5,5,8,8,12
184:13,17,22,25
185:2,6,7,10
rats  219:21 220:18
ravanderhyden
7:17
raw  112:11 132:14
132:16,20 164:25
170:8
ray  7:12
reach  111:20
138:6 182:6 214:4
reached  138:13
256:9,16
read  31:21 37:1
57:25 61:3 68:16
71:13 76:9 82:3
101:18 117:18
119:18 121:2,5
123:15 124:18

130:22,25 131:6,9
134:16 136:10
137:3 149:6 151:6
151:25 152:23
155:8,19 156:9,10
163:20 164:10
165:18 166:12
175:6 177:7
178:15,17 179:1,2
181:5 182:24
186:15 200:21
201:17 202:12
203:8 207:14,17
207:18 235:18
236:19 242:16,23
246:8 259:16
261:11 262:23
263:25 264:24
265:6,9,16,20,24
266:10 267:5
268:22 269:13,18
270:9 275:9 283:6
283:8,9 293:12
295:1 298:8 300:9
302:5
**readily** 266:24
267:16
**reading** 62:15
162:25 220:3
247:1 265:8
**reads** 151:8
272:18
**ready** 147:22
**real** 143:8 167:5
**really** 110:3
173:20 229:12
233:1 235:9
251:24
**realm** 229:10
**realtime** 216:2,7
216:17 244:20

299:3
**reask** 18:2
**reason** 32:23
144:8 158:8
172:15 216:11
247:24 300:11
301:6,9,12,15,18
301:21
**reasonable** 116:23
182:10,13 203:10
209:7 237:19
271:24
**reasonably** 117:21
117:25
**reasoning** 240:12
240:21
**reasons** 154:2
246:7
**recall** 21:25 26:22
30:11,11 32:20
33:7 36:14 37:6,9
49:4,7 51:14
53:21 54:10 56:15
57:12 59:1,15
60:3,15 67:5
68:21 70:8,12,17
70:17 73:21,24
74:11,12 75:19
81:6 82:17 84:14
84:20 90:24 92:18
104:25 113:21,22
121:5 122:17,19
123:25 129:12
130:5,19,21,23
131:9,14 140:7
142:2,10 167:11
167:17,21 168:9
177:6 179:3,11,14
189:1,9,16,16,18
198:9 218:9
219:10,11 220:8

220:12 221:9
222:12 232:16
243:3,12 245:6,18
248:20 254:1,24
**recalled** 241:25
**receipt** 300:18
**receive** 15:9
139:23
**received** 46:8 47:2
52:10 53:8 137:15
223:18 235:8
**recess** 85:11 147:9
214:23 216:24
251:4
**recipe** 165:3
**recognize** 95:21
169:23 170:1
234:19
**recollection** 82:23
82:24 83:14
176:12 179:21
247:2,19
**recommending**
160:17 164:21
**record** 13:4,14
28:18 29:21 46:17
46:20,22 52:22
56:9 58:2 77:13
77:20 85:10,13
93:15 95:1 99:3
120:22 134:10
135:2 137:5
139:15 147:4,6,8
147:11,13 148:1
148:14 150:21
159:11 176:2
177:16 214:20,22
214:25 215:2,4,5
216:21,21,23
217:1 227:25
232:21 251:1,3,6

262:11 278:24
279:5 289:5
298:13,15,18
299:12,13
**recorded** 299:6
**records** 42:18,22
62:12 103:5,12,12
103:14 154:17
**redact** 133:17
**redacted** 58:4
133:13
**reduce** 191:17
192:24
**reefer** 5:3
**reenter** 91:22
**refer** 20:6 127:23
140:20 184:22
198:6
**reference** 49:13
72:1 81:19 106:22
130:9,12 162:18
217:24 218:10
254:23 255:3
265:1 273:23
274:6 276:2
284:14,21 288:7
**referenced** 94:5
140:19 169:2
211:21 217:24
218:9 274:2 300:6
**references** 71:14
126:16 195:14
196:14,25 197:10
197:12 204:23,24
205:3 215:17,19
218:3 265:9
281:22 286:20,22
**referencing**
279:10
**referring** 125:25
126:20,25

**refers** 87:25
108:23 137:7
**reflected** 65:1,5
84:17
**refresh** 121:18
122:19 247:2,18
**regard** 144:15
157:4 172:11
**regarding** 24:19
59:11 83:1,23
132:6 141:11
171:6 239:24
252:23 253:4
256:16 268:17
**regardless** 143:20
143:22
**regards** 145:15
**registered** 299:2
**regression** 185:1
185:12,14 217:22
**regulations** 233:22
**regulatory** 100:7
233:21
**relate** 97:22 98:14
249:18 254:9,19
**related** 15:20
18:11 36:4 63:18
90:22 98:25
104:22 114:23
135:14 171:20
224:21,23 229:23
235:2 242:13
299:14
**relates** 170:20
199:21 257:20
267:9
**relating** 253:10
254:5 266:21
271:21 275:24
**relation** 219:14

**relationship** 12:4
109:6 110:13
113:10 202:5,14
220:16
**relative** 114:15
157:23 182:19
183:7,25 184:3,13
213:22,24 214:11
214:12 299:16
**relatively** 143:4
166:4 185:20
**release** 163:16
235:2,8
**releases** 12:18
235:13
**relevance** 166:23
218:4
**relevant** 50:19,21
215:20 218:17
**reliability** 129:17
129:20 163:17
188:4,15
**reliable** 107:17
121:24 173:3,15
**reliably** 165:22
**relied** 70:13,16
73:8,18 74:1
89:17 90:17
111:22 140:21
164:15 187:13,19
189:11 196:9
201:11,15 209:19
217:10,15
**relies** 170:17
**rely** 103:3 162:13
163:2,7 170:2,15
173:8 205:2
**relying** 103:7
112:11 117:2,5
118:19 182:2
189:12 210:21

218:11 219:7
221:22 222:3
293:1
**remaining** 35:2
**remember** 51:4
56:21 59:17 60:6
68:20 73:14 83:12
84:15 130:3,25
131:3 135:13
142:3 167:22,25
198:11 220:3
232:22 236:2,4
242:6 243:10
244:1,21 278:4,12
**remote** 13:10
**remotely** 191:3
**rendering** 90:12
205:22 217:11
**repetitive** 251:22
**rephrase** 17:24
18:1 91:11
**report** 9:16 14:12
18:24 24:24 29:7
31:15 32:15,19
33:10 38:11 41:3
63:6,11,14,18
64:13 65:9,13
70:19 71:18,19,24
72:2,14,17,24 73:3
76:21 77:1,8,15
78:10,16 79:4
81:17 82:12 83:7
84:24 85:17 88:21
90:10,23 94:5,11
94:15 96:15,22
98:4 100:18
104:23 105:2,12
105:14 106:2,8,12
106:15,19 107:1,3
107:9 108:1,18,20
112:16,25 113:5

113:13,23 114:9
115:7,18,22
116:10 118:4
120:23 121:25
122:25 124:10
125:13 126:16
127:1 128:23
136:17 139:20
140:17 148:19
157:13,20 159:1,5
159:18 169:2,25
171:2,25 172:2,3
173:4 175:18
180:17,20 186:24
194:25 196:10
197:5,22 199:17
203:1 204:8 205:4
207:25 212:18
215:18 217:14
218:10 220:10
223:3 230:12,14
241:3,15,20
245:23 246:3,14
249:22 250:2,12
254:22 255:3,12
255:21,22 256:1,7
256:14 257:20
258:9,23 262:5,22
266:17 269:7
272:12 273:3,22
274:23 275:7,10
275:20 276:3,24
277:17 281:23
282:24 284:14,25
288:6 289:13
291:1,16 292:1
**reported** 76:15
108:5 110:17,19
110:24 112:21,22
113:9,15 117:3
122:15 183:16

187:14 208:2
264:16,17,21
276:17 279:17
285:2 287:10
**reporter** 1:19 13:6
13:22 29:22 46:14
58:2 66:15 85:6
93:17 146:23
262:8 278:1 299:3
299:3,24
**reporter's** 29:23
**reporting** 118:21
119:15 188:4
239:7
**reports** 25:7,8,19
32:11 97:11 114:2
115:15 181:24
182:21 188:3
214:11 225:24
226:5 241:11
**represent** 14:10
95:2 130:6 273:17
284:7
**representation**
137:18
**represented** 184:4
**representing**
130:24 251:15
**reputation** 107:15
107:21 120:19
162:14 163:8
**request** 92:16
96:13 97:9,18
98:13 102:14
103:2 141:1
**requested** 92:25
99:24,25 299:24
**requests** 92:22
**require** 43:22
**required** 30:25
164:7 268:1

302:13
**requirements** 44:2
**requires** 239:7
**research** 24:12
49:6,8,14,22 50:1
50:4 51:11,13
75:15 84:9,13
170:12 204:20
259:8,15 261:18
267:13 268:1,9,17
**reservation** 17:8
**respect** 75:6 85:19
99:5 100:22
102:24 157:20
162:21 164:12
167:9 275:20
279:12
**respected** 224:14
**respects** 247:14
**responded** 146:2
**responding** 92:14
**response** 18:10
76:14 84:16,22
103:6 108:4,18
110:6,11,13,23
112:2,8 113:10,14
142:13 146:2,10
168:9 171:19
177:1 179:7 219:4
219:24 253:15,21
284:10
**responses** 9:21
91:13 92:8 219:3
**responsive** 93:3
**rest** 201:16 267:15
267:20
**restate** 119:4
120:9
**restaurant** 249:9
**restrict** 145:4

**restricted** 133:6
**result** 209:10
213:19 239:19
**resulted** 192:18
**resulting** 162:12
163:6
**results** 10:21 12:2
51:9 101:3 126:14
126:17,18 132:7
139:17 140:6,13
150:4 151:10,24
152:19 153:6
155:15,18,24
156:2 163:16
188:15
**retained** 39:14,17
39:20,23 40:1,4,7
43:22 56:19,22
59:2,10 98:1
252:2,5
**retainer** 43:23
**retainers** 43:24
**retention** 45:13,16
103:18
**retentions** 26:2
**retire** 36:6
**return** 300:13,17
**returning** 45:7
**review** 24:12
32:14 48:23 49:1
49:2,6,9,23 51:20
51:22 58:21,23,25
60:4,10 62:20
64:3,15,18 67:23
69:16,21,23 70:1
71:5,6 73:16
75:17 78:16,19,20
92:21 141:9
149:18 160:7,9
177:21 180:14
204:12 210:13

219:10 220:7
225:23 226:4
241:8,10 257:2
282:25 299:24
300:7
**reviewed** 24:23
37:19 56:5 71:1,9
71:23 72:14 73:2
83:7 90:21 98:9
100:10 104:12,21
109:24 110:2,21
111:22,25 119:23
120:10,12 133:24
134:6 142:20,22
156:13 171:2
177:4 178:11
201:4 218:3 219:5
224:9 233:17
273:18 282:17
**reviewers** 144:23
146:2
**reviewing** 59:19
64:1,16 70:12,15
216:2 260:24
**reviews** 144:20,21
176:23,25
**revise** 203:23
**revision** 203:24
**revisions** 80:17
**riddell** 3:8
**riders** 44:2
**right** 16:8,12,17
17:12,22 18:5,19
20:16,18,19 24:22
27:4 29:13 30:9
30:22 31:13,23
34:3,24 37:3,18
39:2 41:20 43:20
43:25 44:22 46:24
48:8,21,24 51:7,7
51:17 53:11,16

[right - saved]                                                                 Page 39

54:12 56:2,12
57:14 58:12,18
59:16 60:2 62:4
62:24 63:8 64:9
64:10,24 65:17
67:20 70:23,25
71:20 74:13 76:2
76:5 77:17 79:2
79:18,25 80:12,16
81:8 86:5 87:3,24
89:9,14 90:6
91:15 92:3 93:6
95:12 96:7,12,19
98:12 99:17,20,22
100:8 101:13,25
102:16 104:20
105:10 107:10,25
114:7,11 116:2,4
116:15 117:13
120:21 124:8,20
124:25 125:1,15
126:22,23 127:2,6
127:9,22 128:3,15
130:25 132:15
133:1,2 134:3
135:13 138:16
139:4,12 140:3,4
140:16 141:24
145:19 148:17,22
149:24 150:19
151:1,4 152:11
157:17 158:12
162:3 164:19,22
165:10 166:11,14
169:7 170:8
173:19 175:7,8,18
175:20 176:7,8
178:24 180:21
183:9 185:11
186:13,14,14
187:4,11,15

190:20 193:8,12
194:8,12,16
196:10 197:20
198:4,8 200:3,8,16
201:17,22 202:1
202:13 204:16
206:7 209:23
215:6 216:14
217:3,4 220:14
222:11 224:11
226:13 227:6,21
229:4 230:16
231:3 232:14,19
234:9 239:13
240:16,21 242:11
243:11,24 245:15
246:25 248:9
252:13 255:5,6,10
257:6 259:6
260:16,17 268:19
269:3 272:4,14,25
273:1,10 274:4
276:7 278:20
282:12 283:16
290:7,8
**risch** 265:16
**risk** 11:3,8,13,18
12:1,6 18:10
76:15 81:13 98:22
99:15 108:5 109:3
109:4 114:13,16
123:13 141:16
142:14 145:8,15
152:20,21 153:22
153:25 157:23
165:22 182:19
183:7 185:4 186:5
207:4 213:22,24
214:12 232:6
253:15,22 261:13
261:22 265:5

269:14,19,25
270:5,11,17,21
271:1,6,12,17
272:1,20 273:7
282:4,15 285:21
286:3,11 287:7,25
291:19 292:18
293:5,11,17,21
294:3,18,23
295:14,19,23
297:3,10
**risks** 183:25 184:3
184:13 217:21
255:17 256:25
290:25 294:13
**rite** 5:19 283:25
284:7
**rmr** 1:19 299:22
**road** 4:6 6:13
**robust** 122:12
123:10
**rodgers** 246:20
**rogers** 186:1,10,16
186:18
**role** 34:17 160:2
231:25
**roles** 232:17
**rolling** 46:19
**room** 95:10
**root** 20:7,8,12
**rose** 197:12
**roseland** 2:17
**rosemarie** 3:8
46:15
**rosemarie.bogdan**
3:11
**roszel** 6:13
**roughly** 258:21
**rounded** 130:20
131:6

**rounding** 131:7
**route** 81:24 206:4
206:7
**routine** 185:7,24
**routinely** 74:18
75:20
**row** 138:2 139:16
**rpr** 1:19 299:22
**rr** 202:16
**rubber** 218:14
**ruben** 55:16,18
**ruggieri** 1:19 13:6
299:2,22
**rules** 31:1 105:15
105:21 233:22
**ruling** 242:21
**run** 88:9 90:1
**running** 21:19
43:14
**rutgers** 227:19

**s**

**s** 9:10 13:1 265:16
265:21 301:3
**safe** 118:17 119:2
119:10 122:5,7
256:16 257:23
258:12 259:1
**safety** 98:21,25
99:2,5,18,19
165:23 191:6,8,21
191:21,22,25
232:6
**sake** 217:9
**sample** 165:21
237:16
**sampling** 156:8
**sartans** 123:14
**satisfactory** 299:7
**satisfy** 50:22
**saved** 100:25

**saw** 28:22 29:15
  172:19 197:2
  276:13
**saying** 65:7 112:23
  118:9 122:7 135:7
  153:1 175:9
  179:18 183:6
  192:22 193:24
  211:25 241:17
  267:21 268:6
**says** 14:2 31:22
  65:8 74:23 117:16
  123:9 124:11
  145:14 153:10,11
  159:14,24 160:4
  166:21 179:15
  202:10,12 236:10
  237:1,11,12,25
  238:25
**scanned** 224:6
**scenario** 75:10
**scenarios** 75:14
**scheduled** 26:14
  41:9,19
**scheduling** 41:21
**scientific** 12:9
  209:7 238:25
  240:12,21 243:22
  246:7 271:24
**scientifically**
  208:4,8 210:23
  275:11 285:4
  286:19 287:4
  294:22
**scope** 32:25
  121:22 206:11
  256:2,4,13
**scratch** 115:19
**scripts** 7:7,8
**se** 15:8

**search** 49:15,15
  50:8,12,13,15 51:8
  51:14 70:5 71:8
  98:22 100:22
  101:3 141:7
  195:13 198:12
  210:15 257:9
  260:8,10,20,23
**searched** 71:11
  260:9
**searches** 51:13
**searching** 71:11
**second** 97:7,9
  125:10 143:11
  155:21 189:17
  203:4,19 215:24
  216:21 236:24
  237:1 238:6 246:2
  263:2 284:19
**section** 80:24
  115:8,10 116:6
  154:23 159:23
  160:20 162:11
  166:19 182:15,16
  186:3 255:4
**security** 58:3
**see** 36:25 50:8
  51:9 53:4 57:24
  61:2 63:17 71:12
  71:14 87:22 88:9
  94:16 95:5 101:7
  101:8 110:16,18
  113:17 116:14
  121:18 128:16
  131:6 134:13
  135:16 136:17,24
  140:8 143:16
  148:14,14 156:1
  162:16 168:1
  185:20 195:14
  207:17 208:20,22

  215:19 218:8
  222:24 226:15
  227:17 264:10,12
  265:11 273:22
  277:16 279:10,13
  288:11 291:5
  295:16
**seed** 281:8
**seeing** 222:12
**seek** 252:16
**seeking** 59:7
**seen** 68:21 72:15
  79:17 91:7 92:1
  92:11 126:14
  131:24 132:14,21
  141:20 188:2
  198:18 256:21
**selected** 69:25
  71:3
**selection** 168:9
  210:5
**self** 187:14
**seminar** 41:12,22
  97:11
**send** 44:16 56:20
  95:7 111:14
  123:24
**sense** 148:11
  158:16 193:7
  210:21 213:3
  233:6 240:5
  256:22
**sensitive** 151:21
**sent** 24:5 46:10
  47:4 48:11 49:5
  52:9 56:10 57:1
  62:6 224:5,7
  300:14
**sentence** 123:8
  124:10 130:12,16
  130:18 151:8

  180:21 286:18,22
  288:6 291:1
**sentences** 164:3
**sentry** 6:3
**separate** 15:5
  135:7
**september** 11:21
  11:23 41:17
**sequence** 57:12
**serve** 253:8
**served** 36:13
  231:25 232:5
**service** 40:12
**services** 15:11
  117:18,20 252:6
**serving** 42:14 43:1
  82:22 240:25
**session** 42:1
  251:13
**set** 57:5,8 70:3
  73:9 74:22 75:4
  101:23 103:14
  136:2 163:24
  169:11 193:3
  195:16 204:16
  281:12
**settings** 162:22
**seven** 78:4,5
**seventy** 290:16
**sex** 181:14,16
**sge** 233:2
**shah** 6:12
**share** 172:20
**shared** 171:23
**sheet** 300:11
**sheets** 43:13
**short** 10:8 14:16
  94:3 124:22 134:3
  143:4 147:1,2
  166:5

[show - specific]

Page 41

**show** 42:19 90:25
140:9 234:12
290:24
**showing** 125:8
**shown** 152:17
193:11
**shows** 272:19
292:7
**shy** 291:9
**sic** 138:18 149:10
200:4 244:5
**side** 53:22 96:11
165:25
**sign** 300:12
**signal** 191:14
**signature** 105:7
222:8 299:21
**signed** 105:4
223:16 224:1,2,6
300:20
**significance** 12:20
74:25 145:10
192:20 193:12
194:4 213:16
235:14 236:11
239:17 291:9
294:15,16 295:7
295:11,12 297:9
297:11,13
**significant** 81:13
87:14 152:20,21
153:15,18 155:2,3
155:23 158:18,19
173:19 192:7,25
193:4 194:8,12,16
194:20 202:7,9,11
202:15 208:11,15
213:17,19 214:1,6
255:17 256:25
263:13 265:3
269:14,19,24

270:4,11,16,21
271:1,6,12,17
272:1,20 273:6
280:13 282:3,14
286:10 292:9,17
292:21 293:11
295:18,23 296:3
**significantly** 207:4
290:24 293:17
**similar** 205:25
206:6 254:16
**similarly** 80:9
81:24 83:21
185:25 206:3
**simple** 122:13
123:12 160:25
218:6
**simplify** 183:18
**simply** 86:20
189:8
**simultaneous**
277:25
**single** 96:4 155:15
168:21 240:11,20
287:24
**sir** 14:20 93:20
122:22 207:20
274:10 275:1,7
**sit** 20:24 68:19
72:13 74:13 95:25
104:3,4 121:7
198:21
**site** 149:14
**sitting** 61:14 88:15
95:9 211:5
**six** 31:18,22
**size** 86:4 87:12
114:22 145:6
165:21 166:5
195:5 239:18

**sizes** 76:20 184:9
185:3 265:14
**skim** 121:4
**slater** 2:12,13 55:2
55:6,7
**slides** 104:6
**slightly** 183:2
184:10
**small** 166:5
212:14,19,19
**smallest** 293:9
**snodin** 10:8
124:21 129:4,9,18
130:7,8,12,18
131:4,12,17
**social** 58:3
**societies** 224:14,20
**society** 224:21,23
**socol** 137:7
**software** 101:11
**solco** 7:19 40:7
**solco00028261**
135:3
**solid** 246:7
**solutions** 13:7
300:23
**somebody** 55:25
258:1 277:14
**song** 50:6,10,12,25
51:3,10 71:13
100:22 114:1
157:14,19,21
182:17 183:1
184:6,11 185:5,19
187:3,12,19
189:21,25 190:3
215:16
**soon** 36:7 169:6
**sorahan** 219:4
**sorry** 29:11,17,25
54:3 65:10 106:23

112:4 119:4 120:5
148:23 150:11
222:3 248:19
263:9 278:2,21
286:25 288:13,20
**sort** 17:14 49:15
62:22 104:3
145:19 146:20
160:15 193:22
272:15 277:11
280:20
**sought** 215:15
**sound** 27:4 85:7
245:15
**sounded** 95:6
**source** 129:22
151:23 154:19
155:16,17 217:25
280:9 290:18
**sources** 117:7
152:5 155:22
156:3 280:8
**south** 2:6 7:13
**speak** 22:23 88:19
89:21,25 197:13
200:21 201:8
283:3
**speaking** 13:5
15:20 53:21
183:22 193:25
211:14 233:1
**special** 44:1,5
233:2
**specialized** 224:19
**specific** 41:16
54:10 103:4,8
109:9 198:22
214:11 230:19
239:3 242:12
247:23 263:23

**specifically** 59:14
75:19 76:17,18
87:18 99:1,7
108:7 114:1
188:21 206:1
268:24
**specified** 237:14
238:2
**speculation** 59:25
**speech** 277:25
**speeches** 98:14
**spelled** 262:7
**spend** 43:16 45:5
67:3,12
**spent** 33:20 34:2,7
43:6 45:24 63:25
64:12,14,15 67:1
173:1 289:14
**split** 34:15
**spoke** 177:19
260:15
**spoken** 41:5 98:17
99:4 218:22
**sponsor** 41:11
**spread** 145:25
**spreadsheet** 10:13
134:19 135:8
137:9,12 150:22
150:24
**squamous** 292:22
296:7
**ss** 192:19 194:3
**st** 7:4
**stack** 93:8,9
135:13,15,16
146:15 222:25
**staff** 135:1 137:19
**stand** 31:23 45:5
**standalone** 96:25
**standard** 165:9
205:11 234:8

**stands** 250:10
**stanoch** 55:10,12
**start** 43:15 63:11
63:13 115:6,13
147:16,21 174:22
239:15 252:1
**started** 14:18 63:7
64:13 65:9,13
135:17 147:14
195:11 257:8,16
257:17
**starting** 198:11
210:16,17,22
260:12 263:12
**state** 8:11 44:8
119:6 134:9
143:25 152:4
155:12 161:24
163:11 207:1
242:5 255:20
264:6
**stated** 18:23 90:9
103:7 106:22
150:20
**statement** 12:19
12:21 81:20 95:5
118:14 120:7
149:1 151:7
168:17 196:5,12
202:4 235:13,16
235:19 236:10
237:6 240:10
294:9,12 295:1
**statements** 102:18
156:12 291:4
**states** 1:1 40:20
202:5 203:3 208:1
239:6 275:20
284:25
**statically** 269:24
292:9

**statistical** 10:23
12:17,19 18:9,25
19:12 23:2 62:16
74:3,25 76:13
108:3,11,14
121:19 142:11
145:10 149:10
159:12,15 191:16
191:17 192:19
193:11 194:4
199:20 209:16,19
213:16,18 217:23
224:16 225:2,18
234:25 235:12,13
236:11 237:3,14
237:15 238:3
239:17 253:13,20
281:2,19 291:9
294:15,16 295:7
295:10,12 297:9
297:11,12
**statistically** 81:12
87:13 152:20,21
153:14,17 155:2,3
158:18,19 173:18
192:7,25 193:4
194:7,11,16,20
202:9,10 207:3
208:15 213:17,19
213:25 214:6
247:11 255:16
256:24 265:2
269:13,19 270:4
270:10,16,21
271:1,6,12,17,25
272:20 273:6
280:12 282:3,14
286:10 290:24
292:17,21 293:11
293:17 295:18,22
296:3

**statistician** 15:15
15:17,19 22:16,17
210:25 234:24
**statistics** 17:14
18:14,16 23:4
33:4 224:17,18
228:24 229:3
247:15
**stay** 44:6
**stays** 86:4
**stenographically**
299:6
**steve** 200:12
**steven** 4:3
**stomach** 182:21
183:17 207:6
219:13
**stop** 147:14 148:3
192:8 250:19,20
**stored** 101:3
215:10
**straif** 218:12
219:16 221:3
**straight** 200:12
**strategies** 162:24
163:1
**stray** 53:5
**street** 2:6 3:3,9,16
4:16 7:13 8:11
**strength** 18:9
76:14 108:4,17,22
142:12 240:4
253:14,21
**strengthens** 110:9
**strengths** 149:3
**stress** 147:20
**strict** 289:11
**strictly** 193:25
211:14 233:1
**strike** 27:19 28:17
40:9 91:18 114:9

169:24 192:16
198:3 282:1
**striking** 220:15
**strikingly** 151:11
**strokes** 142:6
**studied** 171:22
208:9 238:8,13,14
262:2 282:10
**studies** 10:25 19:2
50:14,16 57:5,9,10
59:11 69:16,21,23
69:25 70:3,4,13,15
70:18 71:1,3,7,15
72:1 75:4,22
76:16,19 77:22
78:1 88:12 90:22
94:6 97:11 103:22
108:6,15,19
110:17 111:3,7
140:19,21,21
141:2,5,10 144:2,7
149:2,4,12,16,22
150:14 151:8,20
152:6,17,18 153:3
153:6,13,23 154:7
154:11,11,14,16
154:24 155:1,21
156:17,20,22
157:5,21 158:17
158:23 159:16,25
160:2,9 161:22
163:2,17,25
164:14 165:1
166:13,23 167:2
167:10 168:6,14
168:16 169:1,3
170:2,3,11,15
171:12 173:2,7
181:2,11 182:9,18
183:21 185:6,7
186:24 187:17,19

188:3,5,20,24
189:11,13,21,25
190:3 192:5,10
193:11 194:6,15
194:19 195:7,12
197:23 198:7,10
198:13 199:10,13
201:6 203:5,20
208:10,18 209:19
210:17,21 212:16
212:22 215:19
252:23 253:4
263:5,19 264:7,16
265:2 267:19
269:11,13,18,23
270:3,9,10,15,25
271:5,11,21 272:5
281:12,17,21
282:10 285:23
286:8 290:24
292:8 293:9
294:17 295:7,15
296:1
**studis** 12:8
**study** 10:21 11:5
11:10,15,20 12:3
51:10 71:17 77:23
81:20,21 83:25
85:19 88:2 96:5
108:16 111:4
142:20,22 143:1,5
143:22,22 144:4,4
144:9 145:13
150:4 151:5 155:5
158:3,9 160:11
161:10 162:15
163:9 168:18
170:19,20,23,25
172:17 180:22,25
188:15 189:20
192:6 194:7,11,24

194:25 195:3
197:18 199:14
203:4 204:7,9,11
204:20 208:11
218:15 219:17,24
219:25 220:20
254:23 257:21,21
265:21 266:12
267:1,8,10 268:5
268:10 269:6
270:20 271:16
280:16 282:11,22
283:1,7 288:12
**studying** 142:7
151:14
**stumbling** 240:1
**sub** 144:25
**subject** 173:8
272:16
**subjective** 163:15
**submitted** 106:13
198:16
**submitting** 106:17
107:9
**subscribed** 302:14
**substances** 12:13
259:23 260:5
261:1
**substantial** 152:7
**substitute** 240:12
240:21
**substituted** 207:13
**success** 111:18
**sued** 22:3
**sufficient** 267:19
**suggest** 154:25
164:6 269:24
270:4 274:11
280:16 293:20
295:22

**suggested** 118:24
119:7 258:1,1,10
258:24 260:3
268:8
**suggesting** 264:7
270:10,16,20
271:1,6,12,16
297:18
**suggests** 254:2
257:21
**suite** 4:6 5:14 7:3
8:3
**summary** 151:6
183:6 185:23
187:7 237:15
247:3 266:11
272:15
**supplement** 177:4
177:15,20 250:3
250:12
**supplementary**
176:5 219:3
**support** 107:4
163:15
**supported** 69:16
117:11
**supports** 138:3
**suppose** 118:2
250:6
**supposed** 26:18
42:10 241:5
**sure** 16:2,3 17:21
17:25 20:13 25:10
25:15 27:5 32:10
36:24 38:1 44:4
45:1 53:25 65:12
65:19 77:21 78:20
79:5 82:13 106:14
106:16,20 107:2,6
107:12,16,22,23
109:11 116:12

117:14 128:1
136:25 139:12
150:15 152:14
157:15 162:17
167:3 168:3,14
170:24 176:3
179:2,13 181:9
183:20 184:3
188:7 189:15,19
192:21 194:13,17
194:21 196:13
201:12 202:13
204:2,17 205:15
211:1 215:25
229:18 233:25
234:21 240:14,22
242:17 248:10,25
254:8 260:7
264:12 265:19
267:7 268:4,7,15
275:18,18 281:24
285:19 287:2
290:14
**surely** 249:11
**survey** 221:8
**swear** 13:23
**sweeping** 168:13
**swing** 155:1
**sworn** 14:1 16:14
299:10 302:14
**symbol** 87:25 88:2
**system** 159:14
170:7,9
**systematic** 10:22
159:13,14 168:8
**systematically**
24:4 25:9,11
38:25
**systemic** 149:10
159:11

**systemically**
151:14
**systems** 206:19
233:10

**t**

**t** 3:15 9:10 265:21
299:1,1 301:3,3
**tab** 135:7,10 137:6
137:20
**table** 79:6 85:21
88:1 94:6 96:5
112:16,24 125:11
130:20 131:8
135:25 190:16,18
190:21 192:4,10
194:6 196:13
201:5,11,23
207:18 215:17
255:16 281:13
291:8 292:6,6
**tablet** 138:10,12
279:20 290:12
292:3 293:2
296:16
**tablets** 124:12,15
126:1,8,9,12
127:12,14,25
128:5 212:9,9
**tabs** 134:19,20
135:8 137:24
**take** 13:9 42:11
46:5 52:6 60:18
68:25 74:1 75:5
85:3,16 93:21
94:9 105:11
130:22 133:3,23
136:19,19,23
139:6 144:17
146:17,18,20,21
147:19 148:8,10
185:10 192:11

195:17 197:16
213:4 225:5
244:22 255:25
256:6 271:22
276:23 277:18
279:16 280:2,3,5
291:16 296:17,21
**takeaway** 209:18
**taken** 102:18
125:17 285:17
**takes** 114:25
285:20
**talc** 31:11 32:4
39:6
**talk** 38:3 84:5 87:8
154:23 182:16
204:7 215:8
218:19,21,24
262:5 269:5
**talked** 36:3 89:19
132:3 179:3
188:24 204:22
213:15 215:7
217:5 222:25
223:3 249:23
254:21
**talking** 65:11
154:13 193:22
199:24 254:24
272:17 276:15
288:12
**tally** 44:15
**target** 165:23
**taught** 227:11,23
**tautology** 192:21
**tax** 42:18,22 58:3
**taxotere** 26:19
27:3 39:6 167:15
167:23
**teach** 227:8

**teaching** 227:5,18
228:7
**technical** 66:14
254:3
**technically** 233:5
**telephone** 83:3
**tell** 16:18 75:20
87:18 88:15 93:22
112:20,25 131:5
137:5,21 160:24
180:16 213:13
283:12 293:19
297:11
**telling** 179:14
250:19
**template** 115:13
115:17
**ten** 64:1,16 75:13
85:7 279:1 289:13
**tension** 191:7
**term** 127:16 166:1
210:24 230:5
232:5,7 238:15
**terminated** 227:1
**terminology**
203:12
**terminus** 4:5
**terms** 23:2 26:1
61:16 86:11
125:18 143:5,13
146:25 160:16
201:3 206:17
210:4 212:25
213:7 224:10
225:16 230:19
234:2 250:1 289:2
290:1
**terrible** 26:8 223:1
**tertiles** 203:16
**test** 114:2 126:14
132:7 213:18

[tested - time]                                                                    Page 45

**tested**  112:15
 126:8
**testified**  20:22
 22:2,15 23:22
 27:6,13 30:2
 40:18,23,23
 103:13,17 173:18
**testify**  17:4 22:25
 26:18 27:20,23
 30:16 44:25 234:7
 247:10 271:23
 282:2
**testifying**  16:14
 44:7 45:24 104:6
 167:11 282:1
**testimonial**  20:3
 28:20
**testimony**  9:11
 16:15,24 19:15
 20:7,8,21,25 22:7
 22:10,13 23:6,25
 25:19 26:15 27:10
 27:16 28:7,13,17
 28:19 29:5,15
 30:8,25 31:14
 32:16 67:18 78:15
 149:20 167:9
 204:4 217:7
 241:24 242:1
 243:2 245:6,19
 248:7 250:11
 265:15 276:12
 280:21 300:9,18
 302:8
**testing**  126:4,5,10
 126:17,18 127:4
 128:5,6,10 131:20
 132:14,16,22
 140:6,13
**teva**  4:20,21 13:18
 14:10 37:16,20,24

39:14
**text**  63:13
**texts**  103:22
**thailand**  219:13
**thank**  13:21 53:4
 122:23 202:21
 257:17 264:20
 272:10 280:18
 283:18 298:2,10
**thankfully**  169:14
**therapy**  168:10
**thereto**  299:18
**thibodeau**  167:15
 167:23
**thing**  80:9,11
 130:15 139:5,22
 154:20 215:22,25
 225:15 235:2
 249:24 277:22
 278:20 293:24
**things**  25:18 34:17
 35:5,9,16 56:23,24
 117:7 128:12
 130:13 157:11
 161:11 165:2
 181:17 189:5,19
 192:25 202:19
 215:2,12,15,20
 217:7,19 224:24
 236:22 242:21
 245:22 254:21
 284:9
**think**  16:3 20:12
 22:11 23:7,19
 26:12,19 27:2,8,9
 32:18 33:2,11
 36:16,24 37:24,25
 39:22,25 40:3,17
 41:1,8,18 43:12
 44:3 45:18 48:2
 53:8 54:16,24,25

73:15,19 74:10
 82:20 83:12 95:8
 98:22,25 110:2
 113:17 114:5
 116:23 121:5,17
 126:19 132:2
 133:15 134:18,19
 134:22 135:18
 140:11 142:10
 146:5,16,21
 147:25 148:9,12
 148:13 165:4
 166:18 168:23
 173:12,15 174:8
 175:14 178:6
 185:15,16 186:23
 187:16 188:17,19
 191:3 196:12,19
 197:15 204:4
 215:4,7 216:5,5,11
 216:15 218:9
 221:3,14,21 222:1
 222:3,4 223:2
 229:11,19,25
 234:11 238:18
 241:23 244:13
 249:24 250:19
 254:1 255:2,7
 256:20 260:15
 262:9 265:7 266:5
 272:3 273:17
 274:7 276:10,12
 276:14,20 278:5
 278:15 279:2,18
 282:19 283:17
 285:13 289:16
 291:14,24,25
 292:20,23 298:8
**thinking**  52:18
**thinks**  157:16

**third**  97:18 151:7
 289:15
**thornberg**  5:12
**thorough**  251:23
**thought**  77:24
 86:9 89:6,7 98:10
 218:16 219:17
**threaten**  152:5
**threats**  159:24
**three**  4:15 28:15
 32:13 45:3 63:25
 64:7,7,9,14 78:9
 78:11 178:13
 183:24 184:4
 194:19 232:7
 243:6 264:15
 277:20
**threshold**  193:3
 239:3
**thursday**  1:15
**tight**  191:19
**time**  13:9 17:7
 20:22 33:20 34:2
 43:6,13,16 44:11
 44:15,15,19 45:4
 45:23,24 47:10
 58:10 60:8 63:24
 64:12 73:22 85:10
 85:12 103:12
 114:23,25 115:19
 130:22 141:9
 143:4,5,21 147:8
 147:10 148:1,9
 149:18 185:11,13
 185:20 208:3
 209:9 211:23
 212:1,3 214:21,24
 216:22,25 228:9
 230:7,7 241:6
 248:25 249:1
 250:19 251:2,5

**[time - type]**                                                    Page 46

252:20 253:1
259:10 267:20
283:19 285:3
286:21 287:11
298:16 300:19
**timeframe** 300:8
**times** 20:18,20
21:16 23:21 27:3
28:12 75:9,13
78:4 213:11,11
243:6
**timing** 146:25
**title** 228:13 229:1
229:3
**today** 14:14 16:10
16:19,23 17:4,7
20:24 66:24 67:2
67:4,7 68:3,19
72:13 74:13 78:25
95:10,25 97:8
104:3,4 121:7
147:14 152:13
163:12,22 222:25
249:18 250:10
251:13 254:22
**today's** 13:8
250:10
**told** 59:3 79:13
81:23 206:2,10
210:13 224:25
243:19 249:1,17
252:11 256:23
260:20,22 273:16
275:23
**tolerated** 144:13
**tools** 165:25
**top** 166:21 203:4
203:19 236:8
**topic** 75:7 121:21
142:7 212:7 221:2

**torrent** 10:14
37:25 39:23 129:2
131:19 138:18,25
150:25 274:7
278:22
**total** 21:17,22
23:22 46:2 48:17
51:19 58:9,13
66:7,12,16,18
**totality** 95:23
215:23
**totally** 187:8
**touched** 215:14
**toxicologist** 124:1
231:8
**toxicology** 124:4
231:11
**track** 17:11 43:8
43:15 44:12
119:12 229:13
**tract** 12:6
**trained** 226:11
**transcript** 216:7
299:12,24 300:6
300:20 302:5,8
**transcripts** 24:2
100:11,14 216:17
**translated** 200:25
**translates** 259:4
**transparency**
239:8
**traurig** 4:1
**travel** 45:7
**treat** 184:23
230:16
**treating** 184:8
**treatises** 103:23
**trend** 85:23 87:15
112:15,22 113:16
113:23 114:3
193:16,19

**trial** 19:24 23:22
23:24 26:15 27:6
27:10 29:5 35:9
41:7 44:25 45:6
67:18 103:24
168:15 169:11
247:13
**trials** 24:3 31:18
31:22 166:6,8,9
168:24 169:5
191:24
**tricker** 221:23
**tricky** 277:11
**tried** 169:11
**trinity** 226:12
**trischler** 5:2 9:7
250:21,25 251:9
251:14 279:7
**trite** 264:19
**trivial** 276:23
277:22
**true** 30:24 47:17
57:21 60:24 66:3
107:18 168:8
187:16 194:9
196:5,12 231:19
231:20 238:8,14
242:8 263:17
265:5 266:18
269:3 273:20,21
285:17 293:8
299:12 302:8
**truth** 16:19 172:4
179:14
**truthful** 16:15
20:21
**try** 106:23 135:24
147:20 176:3
183:18 214:7,9
251:21 278:24
287:1

**trying** 170:13
172:25 196:22
198:4 258:8
283:12 291:3,13
291:23
**turn** 96:8 98:7
105:12 122:25
125:10 155:9
159:22 160:19,19
180:19 193:22
236:7 250:21
**turned** 32:22 33:5
71:21 210:19
**turning** 140:17
**turns** 281:11
**tweaks** 115:23
**twice** 145:22 207:9
221:4 243:6
**two** 23:6,13 27:16
32:13 34:17 45:3
60:9 79:6 80:1
109:6 116:6
126:16 130:13
134:19 135:8
140:1,12 143:13
143:17 145:25
148:1 150:23
155:13 175:1
176:15,22 177:20
178:5,13 180:11
185:23 189:21
194:15 196:15
224:18 237:16
245:22 248:3,12
248:12,18,19
261:2 264:16
266:14 273:13
277:20 291:4
**type** 15:18 164:16
164:20 167:6
191:12,13,19

[type - verify]                                                                     Page 47

205:23 296:14
**types** 34:22 157:5
  183:25 189:10
  223:21 282:15
**typically** 45:14
  56:22 89:25 90:4

**u**

**u** 265:21
**u.s.** 7:20
**ubiquitous** 259:11
  261:8
**ultimate** 80:18
**ultimately** 281:13
  281:18
**unadjusted** 181:12
**unbeknownst**
  245:24
**uncertainty** 156:6
**uncontaminated**
  143:8,15 145:6,23
**underlie** 122:14
**understand** 16:13
  17:18,23 18:13
  19:11 26:12 30:7
  37:16,20 49:10
  69:24 77:12
  105:13 110:3
  114:20 119:22
  120:1,11,16
  127:10 135:6
  141:14 172:21,25
  212:7 213:21
  217:6 246:8 252:2
  267:20 281:25
  283:4
**understandable**
  17:16
**understanding**
  93:2 105:21
  108:13 125:21,24
  126:2,7 128:4

156:15 212:11
**understood** 18:3
  228:5 249:25
  257:17 280:21
**undertake** 110:22
**undisclosed** 216:1
**unidentified** 46:13
**unintelligible** 93:4
  204:3
**unique** 115:2
  116:17 185:13
**united** 1:1 40:19
**universities** 36:10
**university** 15:1,5
  24:13 34:11 35:14
  35:24 36:5 38:19
  89:22 227:19
  240:24 241:13,18
  241:22
**unknown** 166:3
**unquote** 215:9
  285:9
**unreasonable**
  148:10 237:7,23
**unsystematically**
  25:13
**unusual** 79:16
  169:15 186:21
  192:1
**update** 71:12
  215:16
**updated** 51:9
**usa** 4:20 6:8
**use** 11:1,6,11,16
  24:15 45:14 50:3
  72:23 103:24
  104:1,6 151:20
  156:5 161:5,8,17
  165:15 181:19
  210:24 211:2
  286:23

**useful** 187:20
  188:1 237:2
**user** 144:2,7
  173:13,14,17
  208:24
**users** 143:3,20,21
  143:23,23 144:3,3
  144:9,10,11 145:1
  145:5,18,22,24
  208:5 275:12
  285:5,9 286:20
  287:5
**usfda** 118:15
**usually** 77:25
**uterine** 271:18
**utilize** 281:18

**v**

**v** 300:4 301:1
  302:1
**vague** 239:12
  240:6
**vagueness** 107:20
**valid** 294:23
**validity** 152:6
  159:25
**valsartan** 1:7 10:6
  10:15 11:2,7,12,17
  13:11 14:11 19:5
  19:17 24:22 39:7
  39:9 47:5,18
  54:11 68:11,15,25
  69:1 83:1 90:23
  97:25 102:24
  116:2 124:12,15
  124:23 125:9
  143:3,7,8,14,15,20
  143:24 144:10
  145:5,16 154:13
  156:14 162:5
  164:13,22 171:8
  172:13 199:22

208:1,3,6 209:1,2
  209:4,8,11,15,21
  230:20 232:18,23
  233:13,18 251:16
  252:7 274:13,20
  275:14 277:6
  282:5 285:1,2,5,10
  285:18,21 286:3
  286:15,20,21,23
  287:5,9,10,24
  288:8 290:10
  291:17 293:2,4
  296:14,20 297:5
  297:15 300:4
  301:1 302:1
**value** 84:23 87:15
  113:15 125:25
  136:15 192:6,15
  194:1 214:2 237:2
  237:11,13,18,20
  238:24 239:2,16
  239:22
**values** 12:20,22
  161:18 213:20
  235:14,16 236:11
  238:1,7,12 247:12
  247:23 295:2
**vanderhyden** 7:12
**variability** 152:5
  156:8
**variable** 114:25
**variables** 109:7,21
  181:21
**variety** 208:10
**various** 191:10
  282:10 294:14
**vast** 23:14 32:3
**verify** 110:23
  112:1 125:17
  300:9

**veritext** 13:6
300:14,23
**veritext.com**
300:15
**version** 95:14
123:6 136:3
200:17 223:25
250:10 283:3,5
**versus** 23:10 38:6
87:20 125:23
137:22
**vicinage** 1:3
**victoria** 4:2 13:17
95:6
**video** 1:14 13:10
92:9
**videographer** 8:20
13:3,5,20 46:16
85:9,12 147:3,7,10
214:21,24 216:22
216:25 251:2,5
279:4 298:14
**videotaped** 9:18
9:22 91:22 92:15
**viewing** 216:6,17
**vioxx** 21:11,13
243:2,10 248:17
**virtually** 193:10
**voice** 46:13
**voting** 232:2

**w**

**w** 8:3
**wait** 283:24
**walked** 274:5
**wall** 3:9
**wallack** 6:11
**walsh** 4:13,14
**walsh.law** 4:19
**want** 17:18 46:16
52:23 64:22 76:9
84:5 85:3 94:8

104:6 105:12
107:16,24 122:17
129:13 130:22
147:4,12 148:7
161:9 174:3
175:23 191:21,22
202:12 203:23
204:6 213:13
223:8 244:20
262:13 278:23
284:23 285:7
**wanted** 102:1
120:6 215:25
217:20 262:5
279:15 284:13
285:25
**wanting** 194:21
**warning** 289:12
**washington**
227:20
**wasserstein**
235:22
**watching** 216:2,7
216:17
**way** 59:9,14 68:20
69:20 71:21 95:5
99:11 115:4 123:5
188:9 192:10
218:6 220:4 222:6
225:5 244:18
248:15 257:12
268:12 275:9
283:5 288:3 295:4
**ways** 170:14 172:7
**we've** 34:25 36:2
85:4 89:19 94:12
103:11 148:10,11
177:17 188:24
215:13 248:4
249:21 279:9

**weakens** 110:9
**website** 10:7
104:22 124:24
125:3 129:24
131:14,17 276:3
277:16
**week** 78:2 79:15
79:16 86:10 228:2
**weeks** 104:16
**weight** 162:15
163:9
**weird** 267:16
**welcome** 29:14
**went** 50:17 93:1
247:8 250:7
266:21
**werner** 6:1
**white** 184:18
**whiteley** 3:1 55:21
**wholeheartedly**
242:19
**widespread**
165:15
**williamson** 3:15
**willing** 292:13
**witness** 9:3 13:23
13:25 15:11 22:10
22:13 23:15 36:14
40:11 42:14 43:2
90:3 147:23
240:25 253:8
278:8 299:6 300:8
300:10,12,19
**witnessing** 21:6
24:7,12 38:6,12,18
38:23 40:15 43:7
**wlaw.com** 6:6
**women** 292:22
296:8
**word** 27:25 60:9
62:10,25 183:12

233:6
**worded** 268:13
**words** 75:2 113:5
113:12 258:9
**work** 15:2 23:15
24:6,12 27:18
33:12 34:18,18
35:9 44:22 48:24
50:2 54:24 61:16
62:8,14 64:25
65:4,15 66:23
67:17 73:12 90:3
98:8 164:4 170:12
170:13 220:5
223:22 230:6
241:17 252:16
253:19 269:12,17
269:22 270:2,8,14
270:19,24 271:4
271:10,15 273:19
281:1
**worked** 24:24 45:4
54:14,22 55:6,12
55:18,23 70:6
245:23
**worker** 205:12
**workers** 218:14
**works** 144:14
**world** 165:7,8
168:22 170:16
**worries** 188:23
189:6
**worry** 189:2
**worth** 295:8
**wrap** 250:23
280:20
**write** 32:19 33:10
93:24 115:18
257:19 263:18
273:2

**writes** 264:15
**written** 52:13,13
  53:9 97:24 98:2,5
  99:4 150:1
**wrong** 119:3
  166:18 174:24
  245:16
**wrote** 245:23
  256:7 266:4
  272:15 275:6

---
**x**
---

**x** 1:5,10 9:1,10

---
**y**
---

**y** 6:12 29:20
**yeah** 24:9 28:25
  32:24 36:23 45:11
  49:19 51:24 59:18
  61:15,24 62:3,3
  63:9 73:19 74:24
  76:3 80:25 84:3
  85:1 88:18 95:24
  101:9,23 109:8,11
  109:19 110:20
  116:23 124:19
  127:7 133:1 137:4
  141:20 151:17
  157:15 163:23
  164:10 168:14
  169:4 170:24
  177:3,9 178:12
  180:13,15 185:24
  186:2,22 187:10
  188:24 190:19
  193:17,25 199:15
  201:14 202:21
  209:25 210:20
  211:1 224:3
  228:10 237:7,10
  237:21 238:5
  240:23 248:10

  258:22 264:3
  265:23 267:7,22
  283:15 288:15
  291:6
**year** 32:12 42:14
  43:1 212:25 213:5
  213:7,7 227:7,9
  232:7 245:7,11,11
  277:19 286:24
  288:17 289:2
  290:7,10,19 291:6
  291:18 292:3,5
**years** 21:7,20
  28:19,23 29:6
  30:4,5 31:1,19
  32:2,7 33:23 35:8
  35:15 36:20 37:4
  73:13 144:1,7
  212:9,10,13,14,15
  212:17,19 213:12
  227:10 229:23
  236:18 277:20,20
**yesterday** 46:7
  47:2 67:10,13
  68:2 93:8 94:21
  100:3 101:15
  104:15 174:5
**yielded** 152:19
  157:23 182:19
  296:3
**yields** 183:1
  292:17 293:10
  294:15,16
**york** 3:10
**yup** 263:1

---
**z**
---

**z** 262:7
**zero** 193:3 254:11
  254:20
**zhejiang** 7:18 40:4

**zheng** 193:20,20
  194:24 195:24
  196:15 197:17
  262:6,16 263:3,17
  264:6,15,25 265:8
  265:17,21,25
  266:4,21 267:24
  268:25 272:19
  274:15 280:16
**zhp** 40:4 131:18
  133:11 274:7
**zhu** 87:23 88:2
  203:3,13
**zoom** 1:12 29:12
  46:8 95:16 216:3
  216:7,18 244:17
**zostavax** 39:9
  82:19,21

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.